Rich Curtner
Federal Defender
FEDERAL PUBLIC DEFENDER
FOR THE DISTRICT OF ALASKA
601 West Fifth Avenue, Suite 800
Anchorage, Alaska  99501
(907) 646-3400

Peter Offenbecher
Skellenger Bender, P.S.
1301 Fifth Avenue, Suite 3401
Seattle, WA 98101
(206) 623-6501
WA State Bar No. 11920

Attorneys for Defendant James Wells

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>JAMES MICHAEL WELLS,<br><br>Defendant. | NO. 3:13-cr-00008-RRB-JDR<br><br>**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO SUPPRESS STATEMENTS**<br>**(Fourth and Fifth Amendments)** |

I.     INTRODUCTION

James Wells seeks to suppress his statements to an FBI special agent and Coast Guard Investigative Service (USCGIS) special agent on April 12 and 13, 2012. The government obtained the statements through an illegal seizure. The statements were not voluntary. The government obtained the statements in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966).

Mr. Wells is a 62-year-old with multiple health problems. Among his ailments, he suffers from diabetes and complications related to diabetes. Shortly after graduating high school, Mr. Wells served in the United States Navy from 1969-1977. After his honorable discharge from the Navy, Mr. Wells enlisted with the United States Coast Guard (USCG) from 1978-1990. The USCG discharged Mr. Wells due to a medical condition in 1990. Mr. Wells assumed a civilian position with the USCG twenty-three years ago. Mr. Wells has devoted most of his adult working life to military service.

On April 12, 2012, Mr. Wells' coworkers, USCG Electronic Technician First Class James Hopkins and retired Chief Boatswain's Mate Richard Belisle, were shot and killed shortly after they arrived at work at T2, a USCG communications station in Kodiak, Alaska. (The T2 building is also called the rigger shop.) T2 is a small building where an enlisted USCG member (Hopkins) oversaw two civilian USCG employees (Wells and Belisle), a USCG petty officer, and four recently enlisted USCG non-rates. "Non-rates" are Coast Guard members who have not yet chosen their specialization. The workers at T2 performed antenna repair work for towers around the state. The T2 building comprised a small office area and a work shop. The T2 building is situated off the road leading up to the T1 building, which is where the local command sits.

A.  USCG Officials Ordered Mr. Wells to Participate in Interrogations.

The command at T1 are commissioned USCG officers of relatively high rank who oversee those working at T2. The T1 building is located above T2 with cameras that record entry and egress into T1 and T2. A tall chain-link fence encloses the T1 building

and a small parking area.[1] T1 has an electronically operated gate that remained closed from approximately 9:00 a.m. on April 12, 2012, through April 13, 2012, based on the available video feed.

After USCG command learned of the homicides, USCG command ordered those working at T2, including Mr. Wells, to report to the T1 building. USCG officials brought meals to T1 so that nobody would leave the area. The only time Mr. Wells left the T1 area was when the FBI escorted him to his truck so that they could examine it. Additionally, USCG command at T1 ordered Mr. Wells and undisclosed individuals to participate in the interrogations with FBI and USCGIS officials. Mr. Wells was confined under USCG commands at T1 on April 12, 2012, from 8:20 a.m., until at least 9:30 p.m. Mr. Wells made statements in Sessions 1-4, from 7:21-9:30 p.m. on that date. USCG command ordered him to return on April 13, 2012, at 9:00 a.m. Mr. Wells made statements in Sessions 5-6, from 11:25 a.m.-1:47 p.m while he was confined at T1.

B. Mr. Wells Did Not Have Crucial Access to Diabetes Medication.

At the time of the interrogation, Mr. Wells was recovering from surgery for a hernia and removal of his gall bladder, which occurred on February 9, 2012. He also held prescriptions for the following medications and shots: insulin, glipizide, hydrochlorizide tablets, metformin, pantoprazole, pioglitazone, rosuvaftatin, and pain medication. Typically, Mr. Wells ingested his medications as detailed below. In the mornings, Mr. Wells took two tablets of glipizide, one tablet of hydrochlorizide, one tablet of metformin, one tablet of

---

[1] Many people who work at T1 park their cars outside the T1 area before they enter T1.

pantoprazole, and one tablet of pioglitazone. In the afternoon, Mr. Wells occasionally took one tablet of metformin. In the evening, Mr. Wells took two tablets of glipizide, one tablet of metformin, one tablet of rosuvaftatin, and injected insulin.

Although there is some flexibility when timing the ingestion of these medications, big gaps in ingestion of insulin and diabetes-related medications may be fatal. Mr. Wells did tell his interrogators on April 12, 2012, Session 1, that he was diabetic and needed to take his evening medication. The FBI and USCGIS proceeded to continue interrogating Mr. Wells and secured his consent to search his truck and all electronic devices[2] during Session 2. In Session 3, Mr. Wells' interrogators acknowledged the precariousness of his medical condition and seemingly allowed him to go home to retrieve his medication with an FBI escort. However, his interrogators continued to detain him at the T1 building for a gun shot residue test after telling him he could leave. This occurs in Session 4. At some point after submitting to the gun shot residue test, Mr. Wells was permitted to leave T1. However, USCG command ordered Mr. Wells to return to T1 the following morning.

On April 13, 2012, USCG command again ordered Mr. Wells to remain at T1 and participate in his interrogations. During Session 5, Mr. Wells' interrogators advised him of his *Miranda* rights. Mr. Wells continued to speak with his interrogators briefly. When FBI Special Agent Kirk Oberlander informed Mr. Wells that he was accusing Mr. Wells of committing the homicides, Mr. Wells invoked his right to silence and his right to counsel.

---

[2] Specifically, the FBI and USCGIS interrogators obtained consent to search all electronics and or optical storage and retrieval systems or medium or any related computer peripherals, and Mr. Wells' phone.

## II. STANDARD FOR FOURTH AMENDMENT SEIZURE

A person is seized within the meaning of the Fourth Amendment, "only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 545 (1980); *United States v. Al Nasser*, 555 F.3d 722, 728 (9th Cir. 2009). A court determines whether a person is seized by evaluating the totality of the circumstances that might affect how a reasonable person would perceive his freedom to leave, *i.e.*, whether there was a formal arrest or restraint on freedom of movement to the degree associated with formal arrest. *Stanley v. Schriro*, 598 F.3d 612, 618 (9th Cir. 2010). The reasonable person test is an objective test considering the readily apparent personal characteristics of the accused. *California v. Hodari D.*, 499 U.S. 621, 628 (1991); *United States v. Moreno*, 742 F.2d 532, 536 (9th Cir. 1984). To evaluate if a person is seized, some pertinent factors a court may consider include: (1) the language used to summon the individual; (2) the extent to which the accused is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual. *United States v. Kim*, 292 F.3d 969, 973-74 (9th Cir. 2002).

At a hearing, the totality of the circumstances may establish that Mr. Wells was seized on April 12-13, 2012. Mr. Wells participated in questioning after being detained for over ten hours on April 12, 2012, and for over two hours on April 13, 2012. He was under the COMMSTA Command to remain at T1 and participate in the interrogation sessions. Additionally, USCG and FBI interrogators may have subjected Mr. Wells to

undue pressure by detaining him until late at night without his medication or appropriate food.

## III. STANDARD FOR VOLUNTARY STATEMENTS

A statement obtained through coercive conduct which undermines a suspect's ability to exercise his free will is involuntary. *See Colorado v. Connelly*, 479 U.S. 157, 167 (1986). Coercive conduct includes application of psychological pressure to elicit a statement. *Mincey v. Arizona*, 437 U.S. 385 (1978).

> The test for voluntariness is well-established: is the confession the product of an essentially free and unconstrained choice by its maker? . . . The line of distinction is that at which governing self-direction is lost *and compulsion, of whatever nature or however infused*, propels or helps to propel the confession.

*Henry v. Kernan*, 197 F.3d 1021, 1026-27 (9th Cir. 1999) (citations and internal quotation marks omitted, emphasis in original). The government bears the burden to demonstrate voluntariness by a preponderance of the evidence, with the court considering the totality of all circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 224 (1973).

At a hearing, the totality of the circumstances may establish that the statements from April 12-13, 2012, were not voluntary. Mr. Wells gave statements while under the COMMSTA Command to do so. Additionally, USCG and FBI interrogators may have subjected Mr. Wells to coercive conduct by detaining him until late at night without his medication or appropriate food.

## IV. STANDARD FOR VALID *MIRANDA* ADMONITION AND WAIVER

Police must inform a suspect of his right to remain silent and his right to counsel before any questioning because of the inherent coercive nature of in-custody interrogations. *Miranda v. Arizona*, 384 U.S. 436 (1966). Police must administer *Miranda* warnings when an individual is in custody and police are the interrogators. *Id.*

A person is in custody when in light of the objective circumstances of the interrogation, a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave. *Howes v. Fields*, 132 S. Ct. 1181, 1189 (2012) (citations and internal quotation marks omitted). The court examines the totality of the circumstances to determine whether a person is in custody, looking in particular at the relevant environment to determine coercive pressures. *Id.* at 1190. A person is subject to interrogation when police questioning includes any words or actions that are reasonably likely to elicit an incriminating response from a suspect. *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980).

The burden is on the government to prove a waiver of *Miranda* rights by a preponderance of the evidence. *Colorado v. Connelly*, 479 U.S. 157, 168 (1986); *United States v. Cazares*, 121 F.3d 1241, 1244 (9th Cir. 1997). A waiver of *Miranda* must be voluntary, knowing, and intelligent. *United States v. Garibay*, 143 F.3d 534, 536 (9th Cir. 1998). The relinquishment of *Miranda* rights must be voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. *Benson v. Terhune*, 304 F.3d 874, 882 (9th Cir. 2002) (*citing Moran v. Burbine*, 475 U.S.

412, 421 (1986). Under *Edwards'* [3] prophylactic protection of the *Miranda* right, once a defendant invokes the right to counsel, interrogation must stop and, per *Minnick*,[4] cannot take place until counsel is present. *Montejo v. Louisiana*, 556 U.S. 778, 794 (2009). *Edwards'* prophylactic rule protects a suspect's voluntary choice not to speak outside his lawyer's presence. *Id.* at 787.

At a hearing, the government will not be able to show that its agents administered *Miranda* warnings to Mr. Wells for Sessions 1-4. On April 13, 2012, USCGIS and FBI official advised Mr. Wells of his *Miranda* rights in Session 5. Mr. Wells continued speaking after they read him his rights until the agents accused him of committing the two homicides of his coworkers. At this point, he invoked his right to silence twice and then invoked his right to counsel, Session 6. Also, the government may be unable to prove that any *Miranda* waiver in Session 5 was knowing, voluntary, and intelligent. Mr. Wells gave statements while under COMMSTA Command to do so, which undermines any claim that the statements were voluntary. Statements obtained from Mr. Wells after he invoked his right to a lawyer should not be admissible.

## V.  FRUIT OF THE POISONOUS TREE

When evidence is discovered through illegal police action and the evidence would not otherwise have been discovered by sufficiently distinguishable means, the evidence is inadmissible. *Wong Sun v. United States*, 371 U.S. 471, 488 (1963). The

---

[3] *Edwards v. Arizona,* 451 U.S. 477 (1981).

[4] *Minnick v. Mississippi*, 498 U.S. 146 (1990).

Ninth Circuit test for suppression of fruits of the poisonous tree is whether the illegal government activity tends to significantly direct the investigation to the evidence in question. *United States v. Chamberlin*, 644 F.2d 1262, 1269 (9th Cir. 1980); *see also United States v. Davis*, 332 F.3d 1163, 1171 (9th Cir. 2003).

When evidence is obtained subsequent to a Fourth Amendment violation, unless the evidence is purged of the primary taint, it is inadmissible under the fruits of the poisonous tree doctrine. *United States v. Washington*, 490 F.3d 765, 774 (9th Cir. 2007). When coercion produces an involuntary statement in violation of the Fifth Amendment right against self incrimination, "the fruits of that unconstitutional coercion may not be used to prosecute the individual involved for crime." *Williams v. United States*, 401 U.S. 646 (1971) (citations omitted).

A hearing may demonstrate that Mr. Wells' consent to search his truck and electronic materials, etc., during Session 2, was the product of an illegal seizure and/or impermissible coercion inducing involuntary statements. As a direct result, Mr. Wells' consent to these searches and the test while under the COMMSTA Command to participate and assist in the interrogation was invalid and may be suppressed as the fruit of the poisonous tree.

## VI. CONCLUSION

The court should hold a hearing at which the government bears the burden, by a preponderance of the evidence, to demonstrate that Mr. Wells was not illegally seized, that his statements were voluntary, and that any *Miranda* waiver was knowing, intelligent,

and voluntary. If the court should find a violation of Mr. Wells' Fourth or Fifth Amendment rights on the previously-stated grounds, Mr. Wells moves the court to suppress the fruits of these illegalities.

DATED this 30th day of August 2013.

Respectfully submitted,

/s/Rich Curtner
Federal Defender
601 West Fifth Avenue, Suite 800
Anchorage, AK 99501
Phone:     907-646-3400
Fax:        907-646-3480
E-Mail:    rich_curtner@fd.org


/s/ Peter Offenbecher
Skellenger Bender, P.S.
1301 Fifth Avenue, Suite 3401
Seattle, WA 98101
Phone:     206-623-6501
Fax:        206-447-1973
E-Mail:    poffenbecher@skellengerbender.com
WA State Bar No. 11920

Certification:
I certify that on August 30, 2013,
a copy of the **Memorandum of Law in Support of Motion to Suppress Statements (Fourth and Fifth Amendments)** was served electronically on:

Bryan D. Schroder
Assistant U.S. Attorney
222 West 7th Avenue, #9
Anchorage, AK 99513
Email: bryan.schroder@usdoj.gov

Karen L. Loeffler
U.S. Attorney
222 West 7th Avenue, #9
Anchorage, AK 99513
Email: karen.loeffler@usdoj.gov

Kathleen A. Duignan
Special Assistant U.S. Attorney
222 West 7th Avenue, #9
Anchorage, AK 99513
Email: kathlee.duignan@usdoj.gov

/s/Rich Curtner