KAREN L. LOEFFLER
United States Attorney

BRYAN SCHRODER
Assistant U.S. Attorney

KATHLEEN A. DUIGNAN
Special Assistant U.S. Attorney
Federal Building & U.S. Courthouse
222 West Seventh Avenue, #9, Room 253
Anchorage, Alaska 99513-7567
Tel: (907) 271-5071
Fax: (907) 271-1500
E-mail: karen.loeffler@usdoj.gov
E-mail: bryan.schroder@usdoj.gov
E-mail: kathleen.duignan@usdoj.gov

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) ) ) | No. 3:13-cr-00008-RRB-JDR |
| Plaintiff, | ) ) | **GOVERNMENT'S OPPOSITION TO** |
| v. | ) ) ) | **DEFENDANT'S MOTION TO SUPPRESS WELLS'** |
| JAMES MICHAEL WELLS, | ) ) | **STATEMENTS TO LAW ENFORCEMENT** |
| Defendant. | ) | |

COMES NOW the United States, by and through undersigned counsel, and hereby opposes defendant's motion, filed at docket 120, to suppress the statements Wells made to law enforcement agents.

## INTRODUCTION

Defendant has moved to suppress the four statements given on April 12, 2012 and the two statements given after *Miranda* warnings on April 13, 2012. Although not completely clear, he appears to challenge the April 12th interviews on the grounds that he was illegally seized by **his employers**, the Coast Guard command, on April 12th and, although again, he does not articulate the connection, the government assumes he is claiming that this alleged "seizure" necessitated the giving of *Miranda* warnings before taking the four statements he gave on April 12th. Without any further factual predicate, he argues that, "[a]t a hearing the totality of the circumstances **may** establish that the statements from April 12-13th were not voluntary." Docket 121 at p. 6. Similarly, with regard to the statements that Mr. Wells gave on April 13th that were taken after *Miranda* warnings, defendant articulates no factual basis for suppressing such statements, stating only that: "Also

Case 3:13-cr-00008-SLG   Document 138   Filed 09/24/13   Page 2 of 31

the government **may** be unable to prove that any Miranda waiver in Session 5 was knowing, voluntary and intelligent." Docket 121 at p. 8 (emphasis added). His motion is unaccompanied by any affidavits, documents, or evidence, or even any citations to the statements given, which were all recorded and transcripts of which were provided to the defense on March 1, 2013, more than six months ago. Thus, although defendant asks for a hearing, for the reasons set forth below, his motion fails to identify any facts necessary to a resolution that justify a hearing. Moreover, because the Defendant was never in custody, but was mirandized anyway, his statements were completely voluntary and therefore admissible.

## SUMMARY OF WELLS' STATEMENTS

The United States Coast Guard Communications Station (COMMSTA) Kodiak suffered a monstrous incident of workplace violence on the morning of April 12, 2012, just as most of the crew was arriving to work. ET1 (Electronics Technician First Class Petty Officer) James Hopkins and Mr. Richard Belisle (a retired Boatswain's Mate Chief Petty Officer) were brutally shot to death at their place of work

the COMMSTA Rigger Shop (T2 building, hereinafter known as "T2").

Upon learning of the murders, first responders closed off the building as

a crime scene and Coast Guard command called for all the T2 workers

to gather in the T1 building (hereinafter "T1") up the hill from T2. The

Anchorage office of the FBI was informed of the murders and arrived at

COMMSTA Kodiak from Anchorage to begin their investigation at

approximately 2:30 p.m. that afternoon.

Upon arriving at work, until the evening, the defendant was

seated with his co-workers, waited with his co-workers, and was

interviewed along with his co-workers. He was never in custody, and

any reasonable person observing that the entire crew was being treated

the same way, would not have thought he or she was in custody. The

next day, the defendant returned to work and was again questioned by

agents. Even though the defendant again was not in custody, nor would

a reasonable person think anyone from the T2 crew was in custody, the

officers started to believe Wells was a suspect. At that point, even

though they were not required to read the defendant his *Miranda*

rights, out of an abundance of caution, they did so. Because the

Case 3:13-cr-00008-SLG   Document 138   Filed 09/24/13   Page 4 of 31

defendant was properly Mirandized and waived his rights to silence and consult with counsel, his statements of that day were completely voluntary and therefore admissible.

The defendant was interviewed six times on April 12th and 13th — four of those interviews lasted 11 minutes or less. All of the interviews were recorded.

The statements Wells made were taken in the following order:

| Interview Date | Interview Time | Duration of Interview | Transcript |
|---|---|---|---|
| 4/12/2012 | 7:21 pm | 31 minutes, 25 seconds | Exhibit 1 |
| 4/12/2012 | 8:04 pm | 10 minutes, 53 seconds | Exhibit 2 |
| 4/12/2012 | 9:05 pm | 3 minutes, 44 seconds | Exhibit 3 |
| 4/12/2012 | 9:22 pm | 7 minutes, 28 seconds | Exhibit 4 |
| 4/13/2012 *(Miranda warnings given)* | 11:25 am | 1 hour, 23 minutes, 51 seconds | Exhibit 5 |
| 4/13/2012 | 1:43 pm | 4 minutes, 39 seconds | Exhibit 6 |

The last two statements Wells made were given on the second day of the investigation, after he had been advised of his rights under

*Miranda*, and affirmatively waived his rights to silence and counsel as demonstrated by his signature on the waiver form. *Miranda* waiver, Exhibit 7.

## FACTS

On April 12, 2012, two Coast Guard employees, ET1 (Electronics Technician First Class Petty Officer) James Hopkins and Mr. (retired Boatswain's Mate Chief Petty Officer) Richard Belisle, were shot and murdered shortly after arriving for work at 7:00 a.m. at the Coast Guard COMMSTA Rigger Shop in Kodiak, Alaska, located in building T2. Those assigned to the Rigger Shop were primarily responsible for the maintenance of Coast Guard antennas for their area of responsibility, which included all of Alaska and a few areas beyond, all of which were remote and harsh locations. The defendant, James Wells, was a retired Coast Guard Chief Petty Officer working as a civilian in this facility, and had been employed at COMMSTA Kodiak as an antenna technician since his retirement from active-duty service in the Coast Guard in 1990. Mr. Wells was medically retired from the Coast Guard for anaphylactic episodes of unknown origin, otherwise known as

Case 3:13-cr-00008-SLG   Document 138   Filed 09/24/13   Page 6 of 31

extreme allergic reactions to unspecified allergens.  Mr. Wells received

a Coast Guard medical board that decided to medically retire him for

this condition after 20 years of active-duty service.  The medical

retirement documents did not mention Mr. Wells' diabetes and did not

seem to limit him from the very strenuous physical activity of climbing

high antenna towers for repair.  This was the civilian job that the Coast

Guard hired him to do in 1990 and that he continued performing until

April 12, 2012.

Most of the crew who worked at COMMSTA Kodiak worked at the

main building up the hill, known as T1.  The Rigger Shop (T2) was a

smaller outpost apart from the main command.  The entire Rigger Shop

at T2 was comprised of only eight people.  The personnel allowance list

for the entire command of COMMSTA Kodiak, inclusive of the Rigger

Shop, consisted of 51 total positions.  But the Rigger Shop at T2 was

physically removed from the majority of the command, which was

located at T1.  The Rigger Shop was led by a Petty Officer First Class

(James Hopkins), who supervised two civilian workers (James Wells

and Richard Belisle), a Petty Officer Third Class, and four seamen.

Case 3:13-cr-00008-SLG   Document 138   Filed 09/24/13   Page 7 of 31

The one other employee who was supposed to already be working at T2 on the morning of April 12, 2012 at the time of the murders was the defendant, James Wells. Once the first co-workers from T2 arrived and saw the murder scene, they reported the emergency to the watch officers at T1. First responders, and eventually the Alaska State Troopers, arrived that morning to secure the scene. All of these events unfolded quickly and in rapid succession, creating an anxiety-ridden atmosphere. As those who worked at T2 arrived that morning, they were sent up to T1 to wait, because their workplace had been transformed into a crime scene.

That morning, those who began to show up for work at the Rigger Shop, and then later the command staff, were specifically looking for James Wells. This was an obvious and natural reaction in light of the fact that James Wells' two co-workers had just been murdered, he was supposed to have been in the Rigger Shop alongside them working at the time of the murders, and James Wells' whereabouts were as of yet unknown. It was unclear to the Coast Guard and investigators at this point whether Wells was also dead, wounded, or just missing.

Once competent law enforcement authorities were on scene and had secured the crime scene, the command gathered everyone in a common area of T1 known as the "ET space" for several reasons: (1) to account for everyone assigned to the command; (2) to ensure everyone's safety; (3) to allow law enforcement to begin processing the crime scene; and (4) to gather as much useful and fresh information as early as possible from those assigned to COMMSTA Kodiak. Once Mr. Wells eventually arrived to work later that morning at some time after 8:00 a.m., he was told to go up to T1 and wait – just like everyone else.

The defendant states that the area around building T1 was enclosed by a fence, with an "electronically operated gate that remained closed from approximately 9:00 a.m. on April 12, 2012, through April 13, 2012, based on the available video feed." Docket 121, p. 3. There are actually two gates, a vehicle gate and smaller pedestrian gate. The defendant's implication that he was confined in some way by the fence and gate is inaccurate. T1 is a secure facility, as was T2, having a mechanized gate around the parking area, security cameras mounted on the approaches to the building, and locked doors providing restricted

access to unauthorized visitors. That protection was even more important on April 12, 2012 when two crewmembers had just been murdered, and the killer was on the loose. The fence and gate do little to hold anyone in.

The apparent security protections around these buildings were known to all who worked there. Anyone working at COMMSTA Kodiak knew how to open the gate to T1 – both to get in and to get out. Anyone inside the gate could leave through the pedestrian gate simply by pressing a button to exit. Moreover, Wells' truck was not parked within the gated fence. It was parked outside of the fence in the crew's parking lot.

Agents from the FBI arrived in Kodiak to assume the investigative lead at approximately 2:30 pm. A group of T2 workers remained at the T1 building later into the evening to be interviewed, as the investigators split their tasks. Most of the T2 shop stayed at T1 until 9:30 p.m. that evening. None were detained at T1 or any place else that day. All had reported to T1 that morning as part of their duties that day, stayed to assist in the investigation, and for moral

Case 3:13-cr-00008-SLG   Document 138   Filed 09/24/13   Page 10 of 31

support.  They were free to come and go for water, food, and restroom breaks.  In fact, the command specifically brought in both lunch and dinner to ease logistical difficulties.  COMMSTA Kodiak has a vending machine, but no messing or cafeteria facilities.  The command tried to make the situation as comfortable as possible at the time for all affected, including Mr. Wells.

When Mr. Wells was interviewed, agents treated him like everyone else.  He was interviewed in an office that they used to interview many others.  Mr. Wells was seated closest to the door, with the agents facing him furthest from the door.  The agents were dressed in plain clothing and wore jackets that concealed their weapons.  The door was closed for all interviews for privacy, because the hallway outside of the office was heavily trafficked and the interview contents would have been known to all had the door remained open.  In fact, interviews of all the T2 crew members were conducted with the door closed.  The door was unlocked throughout.

Moreover, the transcripts of Mr. Wells' interviews show that he was offered any needed breaks, including offers of any needed

medication or food to ensure his diabetes was addressed. The agents asked questions to ensure his personal and medical needs were being met. As one example, the first 30-minute interview of the defendant concluded as follows:

**Agent 1:** [. . .] Ah hum, what's your clock for your, your medicine? What are we looking at here?

**Wells:** Hum.

**Agent 1:** Because if for some reason, we're not done, but you still need your medicine.

**Wells:** We'll [sic], I'm going to need to eat something. And the box lunches, don't, aren't, don't do anything for me.

**Agent 2:** What type of food would you need?

**Wells:** Oh, I don't, I don't know. Right now, I haven't. I don't have. I don't have an appetite.

**Agent 2:** Okay.

**Wells:** You know, it's just.

**Agent 1:** Are you okay? I mean.

**Wells:** Yeah. Yeah. I, I'm just had chips today, so. A couple of fruit cups and that's it.

**Agent 2:** Are you on any other medications other than insulin? Or.

*United States. v. Wells*
3:13-cr-00008-RRB-JDR                    Page 12 of 31

**Wells:** Well, yeah.

**Agent 2:** Okay.

**Agent 1:** Anything we need to be concerned about?

**Wells:** No.

Exhibit 1 at pp. 34-35.

Later interviews of Mr. Wells that day display the same level of concern for his health and welfare. Exhibit 3, pp. 1-2. The last interview of Wells that day concluded at 9:30 p.m. and only lasted seven minutes. Exhibit 4. It was a very quick interview to determine whether he had fired a gun recently and gauge his reaction to taking gun residue samples. He was free to leave at any time and expressed no concerns about his health. In fact, he left immediately following that interview.

The last two interviews of Mr. Wells (exhibits 5 and 6) did not occur until after 9:00 am the next morning. Along with the rest of the crew, the defendant was allowed to go home the evening of April 12, 2012, had the opportunity to take any needed medication, eat anything

Case 3:13-cr-00008-SLG   Document 138   Filed 09/24/13   Page 13 of 31

necessary for his well-being, and get a good night's sleep.  He was allowed to come to work the next day at 9:00 am, two hours after the beginning of his normal start time.

At the beginning of the fifth interview, the first one on April 13th, the defendant was read his *Miranda* rights.  Exhibit 5.  He agreed to speak to the officers and signed a *Miranda* waiver form.  Exhibit 7.  He spoke to the officers for more than an hour.  At the sixth interview, he invoked his right to counsel, and the interview was immediately terminated.  Exhibit 6.

## ARGUMENT

### I.  THE DEFENDANT HAS NOT MADE A SUFFICIENT SHOWING TO WARRANT AN EVIDENTIARY HEARING.

Completely absent from the defendant's motion is any affidavit or declaration from Wells– or anyone else – swearing that he was the victim of a coerced or otherwise illegal police action.  Similarly missing is any quotation from or citation to the actual recorded statements given.  While this is understandable, since no illegal conduct occurred, it is insufficient to warrant an evidentiary hearing.  An evidentiary

Case 3:13-cr-00008-SLG   Document 138   Filed 09/24/13   Page 14 of 31

hearing on a motion to suppress need be held only when the moving papers allege facts with sufficient definiteness, clarity, and specificity to enable the trial court to conclude that contested issues of fact exist. *See United States v. Harris*, 914 F.2d 927, 933 (7th Cir.1990); *United States v. Irwin*, 612 F.2d 1182, 1187 n. 14 (9th Cir.1980); *United States v. Carrion*, 463 F.2d 704, 706 (9th Cir.1972).

In *United States v. Howell*, 231 F.3d 615 (9th Cir. 2000), the defendant identified no facts which, if proved, would allow the court to suppress the confession. To justify his request for an evidentiary hearing, Howell submitted a boilerplate motion from his attorney that relied wholly on the fact that the government has the burden of proof to establish adequate *Miranda* warnings. Based on Howell's conclusory motion, the Court found that the magistrate judge did not abuse his discretion in refusing to hold an evidentiary hearing. *Id.* at 620-21.

Similarly, counsel here alleges only that an evidentiary hearing may show that defendant was coerced and/or may show that his waiver of *Miranda* warnings was invalid. As in *Howell*, the defendant cites no facts and provides no evidence to support his allegation, but simply

Case 3:13-cr-00008-SLG   Document 138   Filed 09/24/13   Page 15 of 31

notes that the burden is on the government to prove a waiver of

*Miranda* rights. Docket 121 at p. 7. This is not entirely accurate.[1]

Rather, generally "the burden of production and persuasion rests on the

person seeking to suppress evidence." *United States v. Sciolino*, 2009

W: 2914570, *3 (quoting *United States v. Smith,* 783 F.2d 648, 650 (6th

Cir. 1986) and *United States v. Arboleda*, 633 F.2d 985, 989 (2nd Cir.

1980)). At the very least, to be entitled to an evidentiary hearing the

defendant must "allege facts with sufficient definiteness, clarity, and

specificity to enable the trial court to conclude that contested issues of

facts exist." *Howell*, 231 F.3d at 620. The defendant has not done so

here.

 Instead, the defendant merely asserts that the United States has

the burden of proving that the defendant's statement is voluntarily

given and that he waived *Miranda* and asks for a hearing to see if he

can "go fishing" for some basis for seeking suppression.

---

[1] In any event, the government has met this burden, as discussed in Section IV, below.

Case 3:13-cr-00008-SLG   Document 138   Filed 09/24/13   Page 16 of 31

As for his custody argument, the defendant makes vague assertions about coercion, relying solely on unsupported and misleading representations about his medical condition[2] and somewhat absurd conclusory statements about actions by **his employer** – and not the investigating agents – that applied to all employees who came to work the day of the murders, completely unsupported by anything resembling

---

[2] The defendant makes a number of statements early in his Memorandum of Law (docket 121) that are stated as facts, but when examined more closely, they are strung together out of context. On page 2 of docket 121, the defendant states that "Among his ailments, he suffers from diabetes and complications related to diabetes." He then goes on to state that "the USCG discharged Mr. Wells due to a medical condition in 1990." Based on this statement, the Court might be left to believe that the defendant was discharged for a reason related to diabetes. In fact, the defendant was medically retired from the Coast Guard for anaphylactic episodes of unknown origin, otherwise known as extreme allergic reactions to unspecified allergens. There is no indication his retirement was related to diabetes, or that he was unduly limited by either malady. Shortly after his medical retirement, the defendant was hired as a Coast Guard civilian antenna mechanic, an assignment that required climbing tall antenna towers, which is an extremely rigorous activity. He held that job for more than twenty years – until one year after the murders.

In addition, the defendant also provides a long list of medications that he took on a daily basis, again attempting to suggest that his medical condition was precarious. However, nothing in the record suggests these medications adversely affected his cognitive abilities or that he was denied medication at any time. The government can submit relevant portions of the defendant's medical record under seal, if it would assist the Court in making its findings.

Case 3:13-cr-00008-SLG   Document 138   Filed 09/24/13   Page 17 of 31

sworn facts. Indeed, Wells, in essence, concedes that he has no facts to support his claims that his statements were coerced or that his waiver of *Miranda* was involuntary when he simply asks the court to hold a hearing to let him see if he can discover any facts that "may" support such a claim. This is the perfect example of the type of deficient motion that should properly be denied without a hearing. *United States v. Carrion*, 463 F.2d 704, 706 (9th Cir.1972); *Howell*, 231 F.3d at 620-621.

Defendant's attempt to allege facts to support his argument that he was "seized" pursuant to the Fourth Amendment, are similarly unavailing. First, for the reasons stated below (section II, *infra*), the Fourth Amendment law is simply irrelevant to his request to suppress statements governed by Fifth Amendment jurisprudence. Second, he fails to allege any improper police action.

Wells' factual basis for his claim that he was illegally "seized" boils down to the conclusory statements contained on page 3 of his memorandum at docket 121 where he repeatedly equates an obligation to be present on a work day as "orders" from his employer. Thus, he claims that the U.S. Coast Guard COMMSTA command "ordered" those

Case 3:13-cr-00008-SLG   Document 138   Filed 09/24/13   Page 18 of 31

working at T2 to report to the T1 building; "ordered" him and others to participate in interrogations; and "ordered" him to return to work the next day at 9:00 a.m. – a time that was two hours later than his normal reporting time. What is marked in this recitation is any reference to legally relevant facts. Most glaring, Wells makes **no reference whatsoever** to anything done by the law enforcement agents who conducted the interviews. In fact, the federal agents that conducted the interviews did not even arrive at the COMMSTA until approximately 2:30 p.m.

Thus, Wells' claim that he was "detained" for some 10 hours on April 12th is disingenuous at best. To the extent that defendant is attempting to allege facts sufficient to raise a claim that he was in custody for purposes of the applicable analysis – Fifth Amendment law — the government admits to being stymied in finding any cases to address defendant's attempt to stretch Fifth Amendment jurisprudence to actions by an individual's employer asking employees to gather in a building away from the crime scene, stay together until law enforcement has an opportunity to make sure they are safe, and

interview them about what happened.  Although it is blue book law that the Constitution applies to governmental action, in this case the COMMSTA command, of which defendant complains, was acting in the capacity as defendant's employer, not the police.  *See United States v. Bassignani,* 575 F.3d 879 (9th Cir. 2009).

To the extent that defendant is attempting to allege that he was "in custody" during the four interviews that took place on April 12th, his motion is markedly missing any reference to relevant facts surrounding the actual interviews that took place.  For example, relevant facts include that he was questioned at his place of work; that between interviews he was seated with all of his co-workers together in the T1 building as an alternate place of work; that he was interviewed by agents wearing plain clothes; that none of the agents were actively displaying their weapons; that the defendant was seated closest to the door; that the door was closed for privacy reasons; and that the interviews were conducted in similar, if not identical settings to the interviews of all of his co-workers.

The lack of factual pleadings gives the court proper discretion to deny defendant's motion without a hearing. If the court does decide to hold a hearing, it should be limited to the relevant facts necessary to make a determination of custody under the Fifth Amendment analysis.

## II. THE FOURTH AMENDMENT IS NOT APPLICABLE TO MOTIONS TO SUPPRESS STATEMENTS

In the heading of his motion to suppress (docket 120), and in section II of his memorandum in support of the motion (docket 121), the defendant claims that his statements were somehow taken in violation of the Fourth Amendment to the U.S. Constitution. However, he provides no precedent to support that proposition that somehow the statements of the defendant were the result of a search and seizure violation.

The cases cited by the defendant that relate to the Fourth Amendment all concern seizure of physical evidence from a defendant, not a statement. The cases cited by the defendant related to defendant statements all rely on the Fifth Amendment as the basis for their holdings. Thus, this Court should disregard any Fourth Amendment-

based cases or arguments, and focus on the precedent that is applicable to this issue, precedent based on the Fifth Amendment. *United States v. Kim,* 292 F.3d 969, 976 (9th Cir. 2002).

## III.  FIFTH AMENDMENT ANALYSIS -- THE DEFENDANT WAS NOT IN CUSTODY

The Fifth Amendment directs that no person "shall be compelled in any criminal case to be a witness against himself…."  In *Miranda v. Arizona*, the Supreme Court reasoned that interrogation of suspects while they are in custody "contains inherently compelling pressures" which can lead to statements that must be deemed compelled."  384 U.S. 444, 467 (1966).  However, the defendant may waive his right to remain silent if the "waiver is made voluntarily, knowingly, and intelligently."  *Id*. at 444.   Thus, the proper inquiry by this Court is to first examine whether the defendant was in custody, requiring a Miranda waiver, and if so, was the waiver signed and agreed to by the defendant intelligent, knowing, and voluntary.  The United States submits that the defendant was never in custody, thus no *Miranda* waiver was required for any of the defendant's six statements, and if a

Case 3:13-cr-00008-SLG   Document 138   Filed 09/24/13   Page 22 of 31

waiver was required at some point, the defendant's agreement and signature on exhibit 7 meet all the Constitution requirements for the waiver.

It is well settled that "police officers are not required to administer *Miranda* warnings to everyone whom they question." *Oregon v. Mathiason*, 429 U.S. 492, 97 S.Ct. 711, 714 (1977). An officer has a duty to administer *Miranda* warnings "only where there has been such a restriction on a person's freedom as to render him 'in custody.'" *Stansbury v. California*, 511 U.S. 318, 322, 114 S.Ct. 1526, 1529 (1994) (*per curiam*) (quoting *Mathiason*, 97 S.Ct. at 714 (1977).

An individual is "in custody" at the point that a reasonable person would feel that he or she was not free to terminate the interrogation. *Thompson v. Keohane,* 516 U.S. 99, 116 S.Ct. 457 (1995). "In determining whether an individual was in custody, a court must examine all of the circumstances surrounding the interrogation, but 'the ultimate inquiry is whether there [was] a 'formal arrest' or restraint on freedom of movement of the degree associated with a formal arrest. *Id*.

Case 3:13-cr-00008-SLG   Document 138   Filed 09/24/13   Page 23 of 31

(quoting *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520 (1983) (*per curium*)).

The court must "employ an objective standard, asking whether a reasonable person in the interviewee's position would consider himself or herself free to leave." *Kim,* 292 F.3d at 973; *People of the Territory of Guam v. Palomo*, 35 F.3d 368, 375 (9th Cir. 1994). Threats of arrest often suggest custody. *United States v. Zahrey*, 963 F.Supp. 1273, 1279 (E.D.N.Y. 1997), as can coercive words or acts. *United States v. Wyatt*, 179 F.3d 532, 537.

The court has fashioned a five-prong test for determining whether a person is "in custody" thus triggering the need for *Miranda* rights. *See Kim, supra*. The five *Kim* factors are: (1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual. *Kim,* 292 F.3d at 974.

The Court examines these five factors under the "totality of the circumstances." Under the totality of the circumstances, a defendant

Case 3:13-cr-00008-SLG   Document 138   Filed 09/24/13   Page 24 of 31

who was questioned in a conference room at his place of employment for over two and a half hours was not in custody for *Miranda* purposes. *United States v. Bassignani,* 575 F.3d 879 (9th Cir. 2009) (applying the five *Kim* factors to the facts of the case, concluding that the conversation was open, friendly, and consensual, not triggering need for *Miranda* warnings).

Here, the Court should apply the five *Kim* factors to assess whether Wells was objectively in "custody" at the time he made statements prior to the reading of *Miranda* warnings. *See id.* at 884-87.

First, one looks at the language that was used to summon the defendant. Here, Wells was asked to remain in the common area with everyone else, and then asked to come into a private office to speak with the investigators, just like everyone else working at T2 at COMMSTA Kodiak that day. Wells was not subject to any special command that "ordered" him to wait in a manner different from his co-workers. No special language was used different from that used to speak with anyone else. Moreover, as discussed above, any instructions came from

Case 3:13-cr-00008-SLG   Document 138   Filed 09/24/13   Page 25 of 31

his employers, not the FBI.  This factor objectively weighs against

custody.

Second, the court looks at the extent to which the defendant is

confronted with evidence of guilt.  Here, the agents didn't openly

confront Wells with any evidence of guilt until the fifth interview on

April 13th, after they had already read him his *Miranda* rights.  Any

questions asked before this time were asked to ascertain the

circumstances surrounding the morning of April 12th, but were not

accusations of guilt.  Those questions came only after Wells waived his

*Miranda* rights.  This factor weighs against custody.

Third, the court looks at the physical surroundings of the

interrogation.  An interrogation conducted in familiar surroundings

weight against a finding that the defendant was in custody.  *Id.* at 885,

citing *United States v. Eide,* 875 F.2d 1429, 1437 (9th Cir. 1989).  Here,

the defendant was questioned in an office located off of the open

common area that everyone else in the command had been questioned

in.  The defendant was familiar with the work surroundings, having

waited in a room full of co-workers that he had known for many years.

Case 3:13-cr-00008-SLG   Document 138   Filed 09/24/13   Page 26 of 31

There was no surprise associated with the meetings, because everyone else at the command had been through the same questioning and had waited in the same locations, having seen the office door open and close with the start and end of each interview. The door was closed for privacy for each and every interview, including the ones for Wells. And all saw the door open and close. Wells sat closest to the door in his interview and was easily able to leave, if he had so chosen. This factor clearly weighs against a finding of custody.

Fourth, the court looks at the duration of the questioning. In *Bassignani*, the court found that the questioning of defendant for 2.5 hours was at the high-end of the spectrum, but was not so excessive as to support a finding of custody. *Bassignani*, 575 F.3d at 886. Here, on April 12th, the defendant was only questioned for short periods of time, ranging from a time period of about 30 minutes, down to a period of less than four minutes. This factor clearly weighs against a finding of custody. It wasn't until after he was Mirandized, on the second day, that he participated in the longer interview.

Case 3:13-cr-00008-SLG   Document 138   Filed 09/24/13   Page 27 of 31

Fifth, and finally, the court looks at the degree of pressure used to detain the defendant. Here, the only indication of resistance to speak with the agents came just before the very last interview, in which Wells asked whether the agents could ask him their remaining questions before he was going to leave and drive home to get his diabetes medication. Exhibit 4, pp. 1-2. The agents instead insisted that Wells go home and take his diabetes medication first, before any continued questioning occurs. *Id.* But Wells chose to stay instead for a few more minutes on the evening of April 12th to finish answering questions and then headed home shortly thereafter. The defendant was never placed under arrest, threatened with arrest, or coerced by the officers in any way. This factor weighs heavily against a finding of custody.

The analysis of the *Kim* factors shows that there was no restraint even approaching the degree associated with formal arrest. *Beheler*, 463 U.S. at 1125. If there is no custody, there is no need for *Miranda* warnings. Here, *Miranda* warnings were given during the fifth interview. Exhibit 5. Once the warnings were given, and the defendant freely waived them (see exhibit 7), any statements given are deemed

voluntary. All statements were made prior to the invocation of the right to counsel, which the defendant did not call for until the sixth and final interview. Exhibit 6. After the defendant invoked his right to counsel, questioning ceased.

## IV. THE DEFENDANT'S *MIRANDA* WAIVER WAS INFORMED AND VOLUNTARY

A *Miranda* waiver must be both intelligent and voluntary.

*Miranda v. Arizona*, 384 U.S. 439, 471-72 (1966).

> The decision to waive one's Fifth Amendment rights must be the product of "a deliberate choice to relinquish the protection those rights afford." *Berghuis v. Thompkins*, [130 S.Ct. 2250, 2262] (2010). A court will inquire first, whether "the relinquishment of the right [was] voluntary in the sense that it was the product of a free and deliberate choice," and second, whether the waiver was made "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."
> *Moran v. Burbine*, [475 U.S. 412, 421] (1986).

Whether a statement is made knowingly, intelligently, and voluntarily determined by the court using a totality of the circumstances review.

*United States v. Binder*, 769 F.2d 595, 598 (9th Cir. 1985).

An express statement that a person is willing to make a statement, and does not want an attorney present, closely followed by a

Case 3:13-cr-00008-SLG   Document 138   Filed 09/24/13   Page 29 of 31

statement, will serve as a valid waiver. *Miranda,* 384 U.S. at 475.
That is precisely the circumstances in this matter. The defendant was
advised of his rights using an FBI form FD-395. He was advised of his
right to remain silent and right to counsel, and the form clearly asked if
the person understands his or her rights. In the transcript, the agents
read each of the rights to Wells and asked if he understood. The
consent section of the form, signed by the defendant states, "I have read
this statement of my rights and I understand what my rights are." By
answering the oral questions in the affirmative, and signing the form,
the defendant demonstrates that he understood his rights. His waiver
was knowing and intelligent. See exhibit 7.

In addition, the "Consent" section of the form signed by the
defendant states "At this time I am willing to answer questions without
a lawyer present." Thus, his signature on the form also demonstrates
that he made any subsequent statements voluntarily. Exhibit 7.

Because the defendant waived his right to remain silent and his
right to counsel knowingly, intelligently and voluntarily, even if the

Case 3:13-cr-00008-SLG   Document 138   Filed 09/24/13   Page 30 of 31

Court were to find that he was in custody, the statements made on

April 13, 2012 are admissible.

## CONCLUSION

Therefore, the government requests that the defense's motion to

suppress defendant's statements be denied in its entirety.

RESPECTFULLY SUBMITTED on September 13, 2013, in

Anchorage, Alaska.

s/ Karen L. Loeffler
KAREN L. LOEFFLER
United States Attorney

s/ Bryan Schroder
BRYAN SCHRODER
Assistant U.S. Attorney
United States of America

s/ Kathleen A. Duignan
KATHLEEN A. DUIGNAN
Special Assistant U.S. Attorney
United States of America

**CERTIFICATE OF SERVICE**

I hereby certify that on September 13, 2013,
a copy of the foregoing was served via the
CM/ECF system on all counsel of record.

s/ Bryan Schroder
Office of the U.S. Attorney

*United States. v. Wells*
3:13-cr-00008-RRB-JDR        Page 31 of 31