Rich Curtner
Federal Defender
FEDERAL PUBLIC DEFENDER
FOR THE DISTRICT OF ALASKA
601 West Fifth Avenue, Suite 800
Anchorage, Alaska  99501
(907) 646-3400

Attorney for Defendant James Wells

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>JAMES MICHAEL WELLS,<br><br>Defendant. | NO. 3:13-cr-00008-RRB-JDR<br><br>**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO SUPPRESS PHYSICAL EVIDENCE** |

I.      **INTRODUCTION**

         James Wells seeks to suppress the physical evidence obtained from the

twenty-six search warrants executed from April 12, 2012 to September 24, 2013, because

the government obtained the physical evidence in violation of his Fourth Amendment right

to be free of unreasonable searches and seizures.  For the court's convenience, defense

counsel is attaching a table listing all the search warrants and their returns as Exhibit A.

         Mr. Wells moves to exclude the physical evidence obtained from the search

warrants on the following bases:

         •      the search warrants lack probable cause;

- the affidavits in support of the searches appear to be based on material misstatements and omissions;[1]

- the search warrants are the product of prior illegality;

- a number of the search warrants are stale;

- a number of the search warrants are overbroad; and

- a number of the seizures exceed the scope of the warrants.


## CHRONOLOGY

Dates of Government Execution of Search Warrants

The homicides at issue in this case occurred on April 12, 2012. The government executed fourteen search warrants in April 2012. The government conducted multiple searches of Mr. Wells' home, person and clothing, vehicle, and iPhone for evidence related to the homicide weapon and/or the victims' blood and/or tissue.

Over one month after the crimes (May 2012), the government searched Mr. Wells' work desk and locker. It appears that the FBI and USCG investigators searched these areas before the issuance of a search warrant.

Four months after the crimes (August 2012), the government again searched Mr. Wells' home and iPhone for all electronically stored information relating to the

---

[1]    The government has not disclosed the complete statements of the individuals who are quoted and/or whose statements and observations are referenced in the search warrant affidavits. Mr. Wells reserves his right to complete briefing on this issue when he is able to review those statements. Also, the government has not disclosed full discovery related to the forensic investigation of the video footage of the blue car that was potentially involved in the homicides. Mr. Wells reserves his right to complete briefing on the issue when he is able to view those documents.

homicides. The date of the search coincides with a government informant's conversation with Mr. Wells.

Seven months after the crimes (November 2012), the government searched Mr. Wells' home for automatic and pneumatic nailers and nails configured for use in such machines. The government also searched Mr. Wells' and his wife's person for hairs.

Ten months after the crimes (in February 2013), the government again searched Mr. Wells' home for firearms and a tool capable of driving nail parts.

Thirteen months after the crimes (May 2013), the government searched Mr. Wells' home for a rifle scope and photographs of miscellaneous swords.

Seventeen months after the crimes (September 2013), the government searched the lots by Mr. Wells' home for bullets possibly shot by Mr. Wells and other people in the past.

Locations the Government Searched in Execution of Warrants

The court issued search warrants for:

- Mr. Wells' person on: April 18, 2012 (SW167), August 17, 2012 (SW252), and November 13, 2012 (SW348).

- Mrs. Wells' person on November 13, 2012 (SW349).

- Mr. Wells' three iPhones on: April 13, 2012 (SW158,159[2]), April 15, 2012 (Redacted, SW161), August 17, 2012 (SW252, 253).

- The Wells' Blue Honda CR-V pursuant to search warrants on: April 13, 2012 (SW155) and April 16, 2012 (SW12:163).

- Mr. Wells' White Dodge Pickup on: April 13, 2012 (SW156), April 16, 2012 (SW164), and April 18, 2012 (SW168).

---

[2] It appears this search warrant was issued on April 13, 2012 but that is not clear.

- Mr. Wells' residence ten times on: April 13, 2012 (SW157), April 15, 2012 (SW160), April 18, 2012 (SW 166), April 21, 2012 (SW172), August 17, 2012 (SW251), November 13, 2012 (SW347), February 21, 2013 (SW39), May 23, 2013 (SW144), May 25, 2013 (SW13:163), and September 20, 2013 (SW 285).

- Mr. Wells' office desk pursuant to a search warrant on May 23, 2012. (SW182).

Search Warrant Affidavits

In order to secure the twenty-six search warrants in this case, the government used a few affidavits to which they added and subtracted information. There are eighteen versions of the affidavits. Those listed below are Exhibits B-S. Some search warrants are not included in the scope of this motion because it appears that no items were seized from the search warrants connected to those affidavits. Mr. Wells is not challenging the following search warrants: SW-Redacted,159, 166, 172, 253, and 144.

The differences between the versions are as follows:

Exhibit B-     3:12-mj-Redacted-DMS – original search warrant affidavit.

Exhibit C-     3:12-mj-00155, 00156, 00157, 00159-DMS – lack content of paragraphs 40-42 present in Exhibit B regarding GPS technology and data extraction tools.

Exhibit D-     3:12-mj-00160-DMS – adds paragraph 43 to Exhibit B, which specifies that during the initial search of the Wells' residence, officers observed fingernail clippings with a reddish material under them and black hairs similar to those found at the crime scene.

Exhibit E-     3:12-mj-00163, 00164-DMS – adds paragraphs 44 and 45 to Exhibit D. Those paragraphs assert that blood and bone fragments may have been transferred onto the shoes and clothing of the assailant and his/her vehicle and that casting of tire prints have been made from the crime scene.

Exhibit F-     3:12-mj-00166, 00167, 00168-DMS – adds paragraphs 46-53 to Exhibit E. Those paragraphs include: Mr. Wells' statements from the FBI and USCGIS interrogations on April 13th and 14th [sic]; initial searches of Mr. Wells' truck for tires; updates to paragraph 27,

specifying that both victims were shot 3 times by a .44 magnum; updates to paragraph 31 including information about the recovery of a bloody towel and fingernail clipping with a reddish substance from the Wells' residence and their hypothetical involvement in the homicides; information regarding the work on the septic tank system at the Wells' residence; the results of preliminary forensic examination demonstrating that the markings on a bullet recovered from Belisle were not consistent with any of the firearms recovered from the Wells' residence; Mr. Wells was observed to be looking at the area around his septic tank.

Exhibit G-    3:12-mj-00172-DMS – adds section titled "New Information." Omits paragraph 53 of Exhibit F and adds paragraphs 54-61 to Exhibit F. Those paragraphs include: updates on surveillance of Mr. Wells and information about the characteristics of the murder weapon, *i.e.* that it is .44 caliber handgun with a 5 right twist consistent with Smith and Wesson Model 29/629 or a Taurus.

Exhibit H-    3:12-mj-00182-DMS – creates a new search warrant affidavit.

Exhibit I-    3:12-mj-00251-DMS – creates a new search warrant affidavit.

Exhibit J-    3:12-mj-00252-DMS – adds a new paragraph 54 to Exhibit I, including information about the data usage on Mr. Wells' iPhone on April 12, 2012. Removes paragraph 61 from Exhibit I and adds paragraphs 62-65, seeking financial information and referring to Mr. Wells' iPhone and the missing murder weapon.

Exhibit K-    3:12-mj-00253-DMS – omits the last sentence of paragraph 47 from Exhibit J, paragraphs 63-66 of Exhibit J, paragraph 69(e) of Exhibit J, and paragraph 73(h) of Exhibit J. Specifies only Mr. Wells' premises under Forensic Image retention in paragraph 74 of Exhibit J.

Exhibit L-    3:12-mj-00347-JDR – omits paragraphs 46-52 of Exhibit K, lines at the end of paragraph 53 (from "All of this adds up...") in Exhibit K, paragraphs 54 and 55 of Exhibit K, and paragraphs 58-69 of Exhibit K. Adds paragraphs 48-52, which refer to forensic tire and nail analysis.

Exhibit M -    3:12-mj-00348-JDR – omits paragraphs 50-52 of Exhibit L. Adds paragraphs 50-56, which refer to searches of Mrs. Wells' vehicle and seek samples of Mrs. Wells' hair for DNA testing.

Exhibit N -    3:12-mj-00349 – identical to Exhibit M except that it seeks samples of Mr. Wells' hair for DNA testing.

| Exhibit O- | 3:13-mj-00028-JDR – adds paragraph 38 to Exhibit N, which refers to an interview with Amanda Sanford. Adds three sentences at the end of 42(c) in Exhibit N. Omits paragraph 45 from Exhibit N and paragraphs 50-56 from Exhibit N. Adds paragraphs 50-54, which relate to ballistics investigations. |
|---|---|
| Exhibit P- | 3:13-mj-00039-JDR – omits the three inserted sentences at the end of 43(c) in Exhibit O. Adds paragraph 45 of Exhibit O. Omits paragraphs 51-54 of Exhibit O. Adds paragraphs 51-54, describing automatic and pneumatic nail guns. |
| Exhibit Q- | 3:13-mj-00144-JDR – omits paragraphs 47-54 of Exhibit P. Adds paragraphs 52-57, describing Mr. Wells' acquaintance with John Stein and possible possession of a gun scope. |
| Exhibit R- | 3:13-mj-00163-DMS – adds paragraphs 57-61 to Exhibit Q about ceremonial swords owned by John Stein. |
| Exhibit S- | 3:13-mj-00285-DMS- creates a new search warrant affidavit. |

Search Warrants Exceeding Scope of the Warrant

The scope of each warrant is detailed in the columns of Exhibit A – Search Warrant Log.

## II.     LEGAL STANDARD REGARDING SEARCH WARRANT VALIDITY

The Fourth Amendment states that:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated; and no Warrants shall issue but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized. United States Constitution, Amendment IV.

The physical evidence obtained from a warrant should be suppressed when a warrant is based on an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Brown v. Illinois*, 422 U.S. 590, 611 (1975) (Powell, J., concurring). Officers could not in good faith rely on a search warrant to investigate a

homicide, which occurred nine months earlier, where the affidavit provided insufficient evidence to link the defendant to the murder. *United States v. Grant*, 682 F.3d 827, 832-38 (9th Cir. 2012). A mere resemblance to a general description of a murder suspect is not enough to establish probable cause for inferring a suspect was involved in a homicide. *United States v. Lopez*, 482 F.3d 1067, 1073-74 (9th Cir. 2007) (internal quotations and citations omitted).

      *Franks v. Delaware*, 438 U.S. 154, 171 (1978), requires an evidentiary hearing when the defense makes a preliminary showing that false statements were made in support of a search warrant. If the affidavit, cleansed of the challenged statements, does not establish probable cause, the accused is entitled to suppression of the derivative evidence. *Id.* at 171-72. Material omissions as well as false statements are subject to challenge. *United States v. Stanert*, 762 F.2d 775, 781 (9th Cir. 1985), *amended by* 769 F.2d 1410 (9th Cir. 1985). The fact that probable cause existed and could have been established in a truthful affidavit will not cure a *Franks* error. *Baldwin v. Placer County*, 418 F.3d 966, 971 (9th Cir. 2005). In order to obtain a *Franks* hearing, the accused must make a substantial showing that misrepresentations were deliberate or reckless. *United States v. Gonzales, Inc.*, 412 F.3d 1102, 1111 (9th Cir. 2005). The due process principles of *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny concerning the production of exculpatory or potentially exculpatory evidence are applicable to suppression hearings involving a challenge to the truthfulness of allegations in the affidavit for a later search warrant. *United States v. Barton*, 995 F.2d 931, 934-36 (9th Cir. 1993).

      The government cannot insulate an illegal warrantless search by including the product of that search in a warrant affidavit. *United States v. Grandstaff*, 813 F.2d

1353, 1355 (9th Cir. 1987); *see also Allen v. City of Portland*, 73 F.3d 232, 236 (9th Cir. 1996) (facts learned or evidence obtained as a result of an illegal stop or arrest cannot be used to justify probable cause for that arrest).

Information offered to support a search warrant application becomes stale when there is not a "sufficient basis to believe... that the items to be seized are still on the premises." *United States v. Lacy*, 119 F.3d 742, 746 (9th Cir. 1997) (internal citations and quotations omitted). A "mere lapse of substantial amounts of time," does not undermine a warrant only if "a continuing pattern or other good reasons suggest that the evidence sought remains in the location to be searched." *Id.*

Where the warrant is facially overbroad, an officer cannot reasonably rely on its validity. *United States v. Spilotro*, 800 F.2d 959, 964, 968 (9th Cir. 1986). A court determines whether a warrant's description of the items to be seized is sufficiently specific, by evaluating the following factors: "(1) whether probable cause exists to seize all items of a particular type described in the warrant; (2) whether the warrant sets out objective standards by which executing officers can differentiate items subject to seizure from those which are not; and (3) whether the government was able to describe the items more particularly in light of the information available to it at the time the warrant was issued." *Id.* at 963.

## III.   THE PHYSICAL EVIDENCE OBTAINED FROM THE SEARCH WARRANTS SHOULD BE SUPPRESSED BECAUSE THEY LACK PROBABLE CAUSE.

In this case, there was no description of the suspect in the homicides. Investigators have not located the murder weapon. Investigators have not identified with any degree of certainty the vehicles connected to the homicides. The affidavits from the

search warrants infer that Mr. Wells is a suspect in the case because his whereabouts at the time of the homicides were unknown. As law enforcement continued investigating this case they did not uncover any physical evidence linking Mr. Wells, his vehicles, or any property from his home to the homicides. The search warrants merely build inference upon inference without disclosing that previous investigative inquiries have been unfruitful.

Mr. Wells' Person and iPhone

The government searched Mr. Wells' person pursuant to search warrants on: April 18, 2012 (SW167), August 17, 2012 (SW252), and November 13, 2012 (SW348). The search warrant receipts list the items seized from those warrants as: (1) a buccal swab from Mr. Wells and his finger prints, (2) Mr. Wells' iPhone, and (3) Mr. Wells' hairs.

The government searched and seized Mr. Wells' iPhones pursuant to search warrants on: April 13, 2012 (SW158), April 15, 2012 (Redacted, SW159, 161), and August 17, 2012 (SW252, 253). There was no GPS data on the iPhone, which the government seized around April 13, 2012. The government seized Mr. Wells' iPhones twice more and subjected the cell phones to numerous data extraction tests during October 2012. (See Exhibit A.)

There was no affirmative evidence linking Mr. Wells to the homicides, *i.e.* no witnesses, no confessions, no video footage, etc. In *Lopez*, a mere resemblance to a general description of a murder suspect was insufficient to establish probable cause for inferring a suspect was involved in a homicide. Similarly, the absence of a person's presence is insufficient to establish probable cause for inferring a suspect was involved in a homicide. Especially as more information surfaced that no forensic evidence connected Mr. Wells to the homicides, the likelihood of establishing probable cause erodes.

With respect to Mr. Wells' iPhones, it is unlikely that a suspect of two homicides whose phones were repeatedly seized and subjected to tests by the government would maintain information related to the homicides on his iPhones weeks or months after the event. There was no information in the search warrant affidavits indicating why the officers thought there would still be electronic information stored about the homicides on Mr. Well's iPhone in August 2012. The government had extracted no useful data when examining Mr. Wells' iPhones while interrogating him during April 2012 or in a subsequent iPhone seizure. There was no probable cause to believe that new searches of Mr. Wells' new iPhone would yield better results when previous attempts to attain the information from a nearly identical source were unsuccessful.

The Wells' Blue Honda CR-V

There is a blurry image of a blue car that resembles the Wells' vehicle near the crime scene. The report from the government indicates that their experts could not positively match or eliminate the Wells' blue Honda with the image of the vehicle potentially involved in the homicides according to the video.[3] The government searched the Wells' Blue Honda CR-V pursuant to search warrants on April 13, 2012 (SW155) and April 16, 2012 (SW12:163). The government found no physical evidence related to the homicides in the Wells' vehicle.

There was not enough information to establish probable cause that the blue Honda was involved in the homicides nor that the vehicle in the video image belonged to

---

[3] It is unclear when the government learned this information. Mr. Wells requests that the government disclose the entire record of communication and documents related to video imaging of the vehicle, which may bear on a *Franks* hearing regarding critical omissions and misstatements regarding this vehicle.

the Wells family. As in *Lopez*, if a mere resemblance to a general description of a murder suspect is insufficient to establish probable cause for inferring a suspect was involved in a homicide, a car's resemblance to a blurry image of a vehicle involved in a murder, is insufficient to establish probable cause for inferring a vehicle was connected to a homicide. The physical evidence seized pursuant to these search warrants should be suppressed for lack of probable cause.

Mr. Wells' White Dodge Pickup

Mr. Wells' truck was not present at the crime scene. The government surmises that Mr. Wells switched his truck with the Honda CR-V at the Kodiak airport in order to commit the homicides. There is no evidence to support this assertion. The government searched Mr. Wells' white Dodge Pickup pursuant to search warrants on: April 13, 2012 (SW156), April 16, 2012 (SW164), and April 18, 2012 (SW168). The government found no evidence linking Mr. Wells to the homicides in his truck.

In *Lopez*, a mere resemblance to a general description of a murder suspect was insufficient to establish probable cause for inferring a person was involved in a homicide. A mere resemblance is too attenuated from articulable facts to establish probable cause. In this case, there was no direct connection between Mr. Wells' truck and the homicides and no physical evidence connecting the truck to the homicides. The degree of attenuation between Mr. Wells' truck and the crimes as described in the search warrants are insufficient to establish probable cause for inferring the truck was connected to a homicide.

The Wells' Residence

        The FBI searched the Wells' residence on ten occasions pursuant to search warrants, *i.e.* April 13, 2012 (SW157), April 15, 2012 (SW160), April 18, 2012 (SW 166), April 21, 2012 (SW172), August 17, 2012 (SW251), November 13, 2012 (SW347), February 21, 2013 (SW39), May 23, 2013 (SW144), May 25, 2013 (SW13:163), and September 20, 2013 (SW285).

        As noted above there are insufficient facts to establish probable cause that Mr. Wells should be a suspect of the homicides. Thus, the warrants executed in April 2012 of the Wells' residence should be suppressed for lack of probable cause.

        After April 2012, Mr. Wells knew he was a murder suspect. Each date thereafter, the probable cause of the warrants diminishes. As in *Grant*, the government could not in good faith rely on a search warrant to investigate a homicide, which occurred months earlier, where the affidavit provided insufficient evidence to link the defendant to the murder. The government completed four searches of Mr. Wells' residence during April 2012 and did not find any weapons or items connected to the homicides. The government should have noted this fact in subsequent search warrant affidavits because it diminishes the strength of any finding of probable cause in later searches of Mr. Wells' residence. Additionally, the later warrants involved in the searches of Wells' residence lack probable cause because it is unlikely that a murder suspect would maintain evidence of a murder when he knows he was subject to regular searches. The government did not aver in its probable cause statements why Mr. Wells would maintain evidence of a homicide in his home or the land surrounding his home months after the incident while the government constantly surveilled him.

Additionally, there was no probable cause establishing that the swords belonging to Mr. John Stein are evidence of any crime alleged in this case. The swords should be suppressed because they are merely illustrative of the friendship between Mr. Wells and Mr. Stein as opposed to having a connection to the murders.

Finally, the government did not proffer in its probable cause statement in SW285 why they expected to find evidence relating to the crimes since no person had ever seen Mr. Wells shooting a .44 caliber weapon on his property. The evidence seized pursuant to this search warrant should be suppressed because it is not clear how the bullets are connected to the murders.

Mr. Wells' Office Desk

Before obtaining a warrant to search Mr. Wells' work space, FBI agent Angela Strause searched Mr. Wells' desk drawers while processing the crime scene. She seized a Letter of Caution to Mr. Wells. Then a USCGIS agent searched Mr. Wells' desk without a warrant on April 27, 2012. The affidavit for search warrant 3:12-mj-182-DMS asserts that the USCGIS agent was unaware that he needed a warrant to search the desk. The affidavit does not mention FBI agent Strause's earlier search. The FBI searched Mr. Wells' work space for evidence of homicide planning pursuant to a search warrant in May 2012.

The warrants executed in April 2012 do not refer to FBI agent Strause' search of Mr. Wells' desk at the crime scene, for which there was no warrant and no justification. Because there was not enough information to establish that Mr. Wells was involved in the homicides, there was not enough information to search his work space for evidence of planning the homicides in May 2012. The May search occurred more than a month after

the homicides. The probable cause determination in May 2012 would have diminished if the affidavit had also included the dearth of evidence connecting Mr. Wells to the homicides at that point in time.

## IV.    THE PHYSICAL EVIDENCE OBTAINED FROM THE SEARCH WARRANTS SHOULD BE SUPPRESSED BECAUSE THEY ARE BASED ON MATERIAL MISSTATEMENTS AND OMISSIONS.

No blood or tissue related to the homicides was found pursuant to the earliest search warrants in either Mrs. Wells' vehicle or Mr. Wells' vehicle or in their residence.[4] This information was not disclosed to the magistrates issuing the search warrants. These are material omissions because they would tend to exculpate Mr. Wells based on the government's theory of multiple vehicle use. Pursuant to *Barton*, the production of such information is applicable to suppression hearings involving a challenge to the truthfulness of allegations in the affidavit for a search warrant.

In this case, the defense has not yet received the full statements of individuals quoted in the search warrants or the reports of experts relied upon to support the statements in the search warrants. The affidavits all contain statements from Mr. Wells that were not *Mirandized* in what the government characterizes as non-custodial interviews. The government may have obtained those statements illegally from custodial interrogations of Mr. Wells that were not voluntary nor *Mirandized*.

Also, Mr. Rudat's statement in the affidavits indicates that "he heard what he claimed to be a loud metal hitting metal sound come from the direction of Building T2 at

---

[4]  It is unclear when the government learned that the Wells' blue Honda was not clearly a match for the vehicle in the USCG video from the crime scene.

approximately 0710 hours as he was walking from the area." (*See* Exhibit B, p. 4, ¶ 20.) In the defense interview with Mr. Rudat, he stated that he was unconcerned about the sound he heard despite having military training. Critically, he disclosed that he was listening to loud music on his ear buds at the time of the alleged noise. Mr. Rudat's attention to loud music may have affected his perception of any sound emanating from another direction. Significantly, the government did not disclose Mr. Rudat's lack of concern and attention to the magistrate reviewing the affidavits in support of the search warrants.

Since the majority of contentions in the affidavits are inferences, such omissions and mis-characterizations are particularly problematic because they improperly shade the magistrate's ability to perceive the strength of the government assertions. The court should conduct a *Franks* hearing because in addition to the material omissions noted above, the search warrants mis-characterize Mr. Wells and Mr. Rudat's statements.

## V.   THE PHYSICAL EVIDENCE OBTAINED FROM THE SEARCH WARRANTS SHOULD BE SUPPRESSED BECAUSE THEY ARE THE PRODUCT OF PRIOR ILLEGALITY.

All the search warrants may have been obtained as a result of prior illegality.

The search warrants contain statements from Mr. Wells that may be the result of custodial interrogation. Those statements may be involuntary and were non-*Mirandized*. Consent obtained through those interrogations may not be voluntary. The physical evidence obtained from search warrants containing these statements should be suppressed as physical evidence obtained from those illegalities singly or together if there is no probable cause once those portions are excised. *See Allen v. City of Portland*, 73

F.3d 232, 236 (9th Cir. 1996) (facts learned or evidence obtained as a result of an illegal stop or arrest cannot be used to justify probable cause for that arrest).

Also, all the search warrants contain information obtained from an illegal search. Before obtaining a warrant to search Mr. Wells' work space, FBI agent Angela Strause searched Mr. Wells' desk drawers while processing the crime scene. She seized a Letter of Caution to Mr. Wells. Ms. Strause was advised that this type of search was beyond the scope of processing the crime scene and ceased her search. Despite this legal obstacle, the government agents reference this Letter of Caution in every search warrant affidavit in this case.

A USCGIS agent then searched Mr. Wells' desk without a warrant on April 27, 2012. The affidavit for search warrant 3:12-mj-182-DMS asserts that the USCGIS agent was unaware that he needed a warrant to search the desk. He discovered information that he thought was relevant to the homicide investigation, though, and contacted his supervisors about it. His supervisor told him not to mention what he saw. The FBI later searched the desk pursuant to a warrant. Under *Grandstaff*, the government cannot insulate an illegal warrantless search by including the product of that search in a warrant affidavit. Results from the USCGIS pre-warrant search may also be listed in all of the search warrants the government used from May 2012. The proceeds of the warrants using either of these sources of information should be suppressed.

Certain items were illegally seized beyond the scope of earlier warrants, knowledge of which may have led to application and authorization of later search warrants. Search warrant 160 may contain illegal information because it appears to have been

executed after the actual search of Mr. Wells' residence occurred.[5]  Items from the search seem to have been logged into evidence prior to the issuance of the warrant (April 14-16, 2012 – evidence log date and April 15, 2012 issuance date).  The fruits from this search may have been obtained without a warrant and the USCG property that was seized was beyond the scope of the warrant.  These items should be suppressed.

Finally, the search warrants lack probable cause and so any derivative search warrants are the product of the illegality of the earlier search warrants.

## VI.  THE PHYSICAL EVIDENCE OBTAINED FROM THE SEARCH WARRANTS SHOULD BE SUPPRESSED BECAUSE THEY ARE STALE.

The government executed a number of the warrants in this case several months after the homicides.  There is no evidence that there was a continuing pattern or other good reason to suspect that the evidence sought remained in the locations searched after the weeks following the homicide.  A homicide is not a continuing crime.  Further there is no good reason to suggest that any of the evidence the government sought would remain in the locations to be searched once the government told Mr. Wells that he was the suspect of the homicides and commenced surveilling him.  Per *Lacy*, information offered to support a search warrant application becomes stale when there is not a "sufficient basis to believe... that the items to be seized are still on the premises."  *Id.* at 746.

Four months after the homicides, the government conducted a search of Mr. Wells' home and his iPhone for electronically stored information relating to finances, email

---

[5]  There is a similar problem with search warrants 156 and 164, which share an evidence log, and search warrants 155 and 163, which share an evidence log.  The government should clarify which items it seized during particular searches.  Mr. Wells reserves his right to contest the legality of those searches.

accounts, and weapons purchases. This information is stale and should be suppressed. Mr. Wells knew he was a suspect. The government had searched his house and iPhone repeatedly by the time they sought these records. Mr. Wells is not alleged to have brought new records or equipment home. The affidavits do not demonstrate why the government believed Mr. Wells would keep records tying him to the homicides at his home several months after the homicides.

Seven and ten months after the incident, November 13, 2012 and February 22, 2013, the government conducted more searches of Wells' home for pneumatic and automatic nailers and nails configured for use in those devices as well as "small caliber firearm type casings and material to which they are attached manufactured for use in any type of tool capable of driving nail parts...". (See Exhibit A - SW 347, 39.) The government knew about the nail in Mr. Wells' tire since April 13, 2012. The information in this warrant is stale because by the time the government conducted the searches Mr. Wells knew he was a suspect and would not have an incentive to keep such information in his home. Similarly, the search for bullets on Mr. Wells' property seventeen months after the incidents is stale. The government had already searched the Wells' house repeatedly. Pursuant to *Lacy*, items seized pursuant to these warrants should be suppressed because there is no reason Mr. Wells would have kept inculpatory items months after the incidents for which he was a suspect.

## VII. THE PHYSICAL EVIDENCE OBTAINED FROM A NUMBER OF THE SEARCH WARRANTS SHOULD BE SUPPRESSED BECAUSE THE SEARCH WARRANTS ARE OVERBROAD.

The searches of Mr. Wells' home and person for electronically stored information (search warrants 251 and 252) relating to finances, travel, weapons purchases,

etc... were overbroad because there was no financial motive to the homicides, no travel involved for which there would be a record, and the government knew which type of weapon was used in the homicide.

Where the warrant is facially overbroad, an officer cannot reasonably rely on its validity. *United States v. Spilotro*, 800 F.2d 959, 964, 968 (9th Cir. 1986). A court determines whether a warrant's description of the items to be seized is sufficiently specific, by evaluating the following factors: "(1) whether probable cause exists to seize all items of a particular type described in the warrant; (2) whether the warrant sets out objective standards by which executing officers can differentiate items subject to seizure from those which are not; and (3) whether the government was able to describe the items more particularly in light of the information available to it at the time the warrant was issued." *Id.* at 963.

The search warrant affidavits do not establish probable cause to seize all of the particular types of items listed in the search warrants. The affidavits in support of these searches do not enumerate the facts supporting a financial motive. Rather the affidavits appear to be searching for a motive that Mr. Wells committed the homicides. The physical evidence sought should support the existing facts supporting probable cause.

There were no standards by which the officers could differentiate items subject to seizure because the categories of information are so broad. It is unclear why the government would need to know Mr. Wells' entire history of travel or his financial history and personal correspondence. The vast data sweep of financial records and weapons purchases are beyond the scope and unsupported by the facts in the government's possession at the time they sought this warrant. For example, the

government knew what type of weapon was used in the homicides but it sought records for all weapons purchases, failing to account for particular facts in its possession that would have limited the search. Since the government was not sufficiently particular in the scope of these warrants, the physical evidence obtained through their execution should be suppressed.

## VIII. THE PHYSICAL EVIDENCE OBTAINED FROM SOME OF THE SEARCH WARRANTS SHOULD BE SUPPRESSED BECAUSE THEY EXCEED THE SCOPE OF THE WARRANTS.

During the initial searches of the Wells' residence, FBI seized items that are beyond the scope of the warrants. The following items should be suppressed because they were outside the scope of search warrants 157 and 160: a USCG magnifying lamp, a USCG LCD projector, USCG Mustang suits, USCG opened bag of zip ties, USCG fluorescent light bulbs, a USCG COMMSTA drill, and a USCG laptop computer.

The items extracted from Mr. Wells' iPhone exceed the scope of search warrant 252 because they include the phone numbers of people who are not sellers of firearms and unrelated to COMMSTA workers. The government seized all phone records. The government did not execute a limited search. Those items beyond the scope of the search warrant should be suppressed.

Pursuant to search warrant 285, the government searched Mr. Wells' residence for bullets and bullet fragments. The government also seized logs and a film canister when executing the warrant. These items exceed the scope of the search warrant and should be suppressed.

## IX.    CONCLUSION

The court should determine whether the government violated Mr. Wells' Fourth Amendment right to be free of unreasonable searches and seizures.  If the court should find a violation of Mr. Wells' Fourth Amendment rights on the previously stated grounds, Mr. Wells moves the court to suppress the physical evidence obtained from these illegalities.

As requested before, the defense moves for an evidentiary hearing, pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), to be held after defense counsel receives and reviews the full statements from individuals whose remarks were included in the search warrant affidavits as well as additional materials defense counsel has requested that are material to the litigation of these motions.


DATED this 4th day of October 2013.

Respectfully submitted,

/s/Rich Curtner
Federal Defender
601 West Fifth Avenue, Suite 800
Anchorage, AK 99501
Phone:       907-646-3400
Fax:           907-646-3480
E-Mail:       rich_curtner@fd.org

Certification:
I certify that on October 4, 2013,
a copy of the *Memorandum of Law in
Support of Motion to Suppress Physical
Evidence* was served electronically on:

Bryan D. Schroder
Assistant U.S. Attorney
222 West 7th Avenue, #9
Anchorage, AK 99513
Email: bryan.schroder@usdoj.gov

Karen L. Loeffler
U.S. Attorney
222 West 7th Avenue, #9
Anchorage, AK 99513
Email: karen.loeffler@usdoj.gov

Kathleen A. Duignan
Special Assistant U.S. Attorney
222 West 7th Avenue, #9
Anchorage, AK 99513
Email: kathlee.duignan@usdoj.gov

/s/Rich Curtner