# Affidavit in Support of Search Warrant

I, Dan Gaston, Special Agent with the Federal Bureau of Investigation (FBI), being duly sworn, hereby deposes and state the following:

## AFFIANT

I am a Special Agent (SA) of the United States Department of Justice, Federal Bureau of Investigation (FBI). I have been so employed for approximately twenty one years. I am currently assigned to the FBI Violent Crimes Squad, Anchorage Field Division, and have been so assigned for the past 20 months. As a part of my official duties, I investigate violent crimes committed in areas under the special maritime and territorial jurisdiction of the United States.

## PURPOSE OF THE AFFIDAVIT

1. This affidavit is made in support of search warrants for the person, residence, and vehicles of:

Name:                       James Michael Wells
Date of Birth:              6/24/1951

Residence Address:          365 Pavloff Circle Kodiak, AK 99615
Residence Description:      Blue 2 story dwelling/reddish colored roof

| Property ID | R9003010031 |
|---|---|
| Last Name | WELLS |
| First Name | JAMES |
| Legal Description | BELLS FLATS BK 1 LT 3B & 3C |
| Street Address | 365 PAVLOFF CIR |
| Tax Code Area | 9 |
| School District | KISD |
| Exempt Code | N/A |
| Zoning Type | RR1 |
| Property Use | SFR |
| Mailing Address | P.O. BOX 1814 KODIAK, AK 99615 |
| Land Value | 66000 |
| Misc Value | 0 |
| Building Value | 137000 |

Vehicle:

1

2001 Blue Honda CR-V, AK Plate EJR582, VIN: JHLRD18491C042288, Registered to James or Nancy Wells of 365 Pavloff Circle, Kodiak, AK.

Vehicle:

2002, extended cab, two door, white, Dodge Ram 2500 Pickup truck, AK Plate VCG 520, VIN: 3B7KF23622m307642, with white camper top over the bed, registered to James or Nancy Wells of 365 Pavloff Circle, Kodiak, AK. The camper top has a horizontally slanted race track shaped window extending about ¾ the length with two smaller vertically oriented racetrack shaped windows toward the rear. The back window of the camper top is not present and the roof line slopes upward toward the rear of the vehicle.

A review of property records in Kodiak Borough and in information maintained by the Alaska Public Safety Information Network (APSIN) disclosed that James Michael Wells and Nancy Jean Wells are the owners of the residence and two vehicles described above. Employment records maintained by the United States Coast Guard disclose that James Michael Wells resides at 365 Pavloff Circle, Kodiak, AK 99615.

2. The evidence, set forth more fully below, provides probable cause to believe that evidence regarding the murders of United States Coast Guard Electronics Technician First Class (ET1) James A. Hopkins and United States Coast Guard Civilian Employee Richard W. Belisle on April 12, 2012, at Building T2 (Rigger Shop) United States Coast Guard Communications Station Kodiak, AK (approximately mile two (2) of Antoine Larsen Road Kodiak, AK) in violation of Title 18, United States Code, Section 1111(a) (Murder) and 1114 (Murder of a Federal Officer or Employee) may be found at the locations described above. The items to be seized are set forth in Attachment A incorporated by this reference.

3. The facts set forth in this affidavit are based on my personal knowledge; knowledge obtained from other individuals, including other law enforcement officers; interviews of persons with knowledge; my review of documents, interview reports and computer records related to this investigation; communications with others who have personal knowledge of the events and circumstances described herein; and information gained through my training and experience. This affidavit contains information necessary to support probable cause for this application and does not contain every material fact that I have learned during the course of this investigation; however, no information known to me that would tend to negate probable cause has been withheld from this affidavit.

## PROBABLE CAUSE

4. James M. Wells is employed by the United States Coast Guard as an Antenna Maintenance Specialist (Wage Grade 10) at Building T2 (Rigger Shop) United States Coast Guard (USCG) Communications Station (COMMSTA) Kodiak, AK (approximately mile two (2) of Antoine Larsen Road Kodiak, AK). He has been employed there since approximately 1990.

5. On April 12, 2012 at 0747 hours, Alaska State Troopers (AST) responded to a 911 emergency call from USCG COMMSTA Kodiak, AK two male victims on the floor bleeding. On arrival, AST found Coast Guard Police Department (CGPD) and Coast Guard Fire Department (CGFD) on scene responding to the emergency call. On AST's entrance into the Rigger shop, AST found two adult males on the floor of the Rigger Shop with several medical personnel present. Both victims appeared to be moved from their original positioning by medical personnel.

7. The first victim observed by AST was ET1 James Hopkins who was lying on his back with one gunshot wound to his right torso and wounds to his mouth and nose area. He also had what appeared to be wounds to his right arm and lost a large amount of blood that had started to coagulate on the floor.

8. The second victim observed by AST was found in a separate office from the first victim, AST found USCG Civilian employee Richard W. Belisle lying on the floor with at least one gunshot wound to the torso, a small amount of blood on the floor, and Belisle's face had a dark discoloration.

9. Coast Guard medical personnel attempted to resuscitate the victims with no success.

10. The remains of Hopkins and Belisle have been transported to the State of Alaska Medical Examiner's Office for examination. At this time, it is not know what type or caliber of gunshot was inflicted upon them.

11. Building T2 (Rigger Shop) United States Coast Guard (USCG) Communications Station (COMMSTA) Kodiak, AK (approximately mile two (2) of Antoine Larsen Road Kodiak, AK) is on property owned by the United States Coast Guard, an agency of the Department of Homeland Security. USCG District 17 Legal Counsel has informed me that this building is within the Special Maritime and Territorial Jurisdiction of the United States as set forth in 18 U.S.C. sec. 7(3) because it has been reserved or acquired for the use of the United States.

12. ET1 Hopkins was an active duty member of the United States Coast Guard, and was an employee of the United States. He was present at the Rigger Shop for the performance of his official duties which began at 0700 on April 12, 2012.

13. Mr. Belisle had been a civilian employee of the United States Coast Guard since November 13, 2005. He was present at the Rigger Shop for the performance of his official duties which began at 0700 on April 12, 2012.

14. Geographic References

a. The Coast Guard's main base in Kodiak, officially known as Base Support Unit (BSU) Kodiak, is located immediately south of the Kodiak State Airport. This allows Coast Guard fixed-wing aircraft to use the runways at Kodiak State Airport.
   b. COMMSTA Kodiak is not located on the main facility of BSU Kodiak. It is located approximately 3 miles north-northwest of BSU Kodiak on Mile 2 of Anton Larsen Bay Road. The turn off for Anton Larson Bay Road is immediately north of the Kodiak State Airport.
   c. The Wells' residence on Pavloff Circle is located in the Bells Flats area, South of BSU Kodiak. Moreover, there is one primary road, Rezanof Drive/Chiniak Hwy, that runs from Bells Flats, past BSU Kodiak, to the Kodiak State Airport.

15. At approximately 0648 hours on 12 April 2012 closed circuit television cameras (CCTC) located at the front gate at BSU Kodiak show a white dodge truck with camper shell (two slanted rear windows) passing the base heading to the north. This would be the route from the Wells' residence to either Kodiak State Airport or COMMSTA Kodiak. The times of sightings cited in this paragraph and the next have been confirmed to be accurate.

16. According to available closed circuit television cameras at BSU Kodiak a white dodge truck with camper shell with two slanted rear windows was observed travelling on Rezanof Drive West/Chiniak Hwy towards Bells Flats, southbound from the Kodiak State Airport area at approximately 0722 hours.

17. The driving time from James Wells's residence to COMMSTA is approximately 10 minutes at posted speed limits.

18. According to electronic access records for Building T2 Rigger Shop, Richard Belisle's Access card was swiped at approximately 0700 hours which is consistent with the arrival of his vehicle at COMMSTA Building T2 Rigger Shop as viewed on CCTC.

19. According to CCTC at COMMSTA Building T2 Rigger Shop [reviewed by Alaska Wildlife Troopers (AWT)], ET1 James Hopkins vehicle arrived at Building T2 at approximately 0708 hours.

20. According to joint witness interview of Aviation Electronic Technician First Class (AET1) Don Rudat, an active duty Coast Guard member who was walking/running in the area, Rudat stated he heard what he claimed to be a loud metal hitting metal sound come from the direction of Building T2 at approximately 0710 hours as he was walking away from the area. Building T2 is located within 200 feet of Anton Larson Bay Road, and is a concrete block structure. In my experience, the sound of a gunshot in such a structure could be perceived to be a loud metal sound.

21. According to CCTC at COMMSTA Building T2 Rigger Shop [reviewed by Alaska Wildlife Troopers (AWT)], a small blue SUV was observed within camera view at

4

approximately 0711 hours heading away from the COMMSTA on Anton Larson Bay Road towards Rezanof Drive/Chiniak Highway, the same direction as the Kodiak State Airport. It is known by your affiant that James Wells has a blue Honda SUV registered in his name and that the vehicle is currently parked in the airport 2-hour parking lot at the Kodiak State Airport.

22. The wife of James Wells was interviewed in Anchorage during the evening of April 12, 2012. She confirmed that she flew out of Kodiak to Anchorage on Tuesday, April 10, 2012, leaving her blue Honda SUV in the 2-hour parking lot at the Kodiak Airport. According to the interview, James Wells told her he got flat tire on the morning of the murders. In addition, Mrs. Wells indicated there was a spare tire in a carrier under James Wells white Dodge pickup. This is inconsistent with the story that he gave investigators that once he noticed that he had a low tire, he returned to his home to get a spare tire and a jack.

23. According to USCG civilian employee Charlene Puddish, she witnessed James Wells turning from Rezanof Drive/Chiniak Highway onto Sergeant Creek Road (Bells Flats area). Charlene Puddish said she knew it was James Wells because she recognized him driving his white dodge pickup with a white camper shell. Charlene Puddish stated she saw James Wells just minutes after she left her residence at approximately 0722 hours.

24. According to USCG civilian employee Annette Ecret, she witnessed James Wells in his white dodge truck turning at the intersection of Bells Flats Road and Sergeant Creek Road minutes after 0720 when she left home. Annette Ecret stated she waved at James Wells and he waved in return as they passed each other. Annette Ecret stated she was leaving Bells Flats in route to USCG BSU Kodiak.

25. According to Chief Information Technician (ITC) Scott Reckner, USCG COMMSTA Kodiak, he received a voicemail from James Wells at approximately 0731 hours. James Wells informed ITC Reckner he had a flat tire on his way into work and would be late to work. ITC Scott Reckner found this call to be extremely odd as James Wells typically would not call if he was late until at least a couple hours had elapsed. Reckner opined it is not common for James Wells to be proactive with respect to keeping supervisors apprised of his whereabouts and activities.

26. At approximately 0730 hours on 12 April 2012, ET3 Cody Beauford of USCG COMMSTA Kodiak arrived at work and entered Building T2, smelled gun powder in the air, and found ET1 James Hopkins on the floor in a pool of blood. ET3 Cody Beauford tried to make verbal contact with ET1 James Hopkins several times with no success. ET3 Beauford then went to the main office and found Richard Belisle on the floor, unresponsive. ET3 Beauford walked back to ET1 Hopkins and tried to gather his thoughts. ET3 Beauford then walked back towards the main entrance door and encountered Seaman (SN) Aaron S. Coggins arriving for work. ET3 Beauford alerted his chain of command of the scene and asked them to get help.

27. The scene of the homicides has been processed for evidence. No firearms or cutting instruments or weapons such as knives were found at the scene. No ammunition casings were found at the scene. One distorted, possibly fired, bullet was found on top of a microwave oven in the room where Hopkins was discovered. An initial rough estimate is that the size of the round is in the range of a .40 caliber. Investigators believe both deaths were caused by gunshots, but have not had time to establish the likely caliber or type of the firearm used. Investigators believe that at least one round hit ET1 Hopkins and approximately 2-3 rounds hit Mr. Belisle. Investigators observed such quantities of blood at the scene to form a belief that blood splashes and transfers may be present on the clothing and persons of the person or persons who caused these two deaths.

28. Further interview of ITC Scott Reckner revealed the following information:

   a. ITC Scott Reckner had dealt with a series of disciplinary issues regarding James Wells, both this year and last year, to include accusations of misappropriation of a government fuel card. This disciplinary action resulted in the issuance of a letter of caution to James Wells in approximately January 2012. According to ITC Scott Reckner, ET1 James Hopkins informed Reckner of a missing fuel card and Hopkins' suspicions that James Wells may have been involved. When James Wells was presented with the caution letter, he seemed to show no care or emotion.

   b. More recently, James Wells was upset with the removal of a significant amount of items (government or unknown personal) stored at a warehouse controlled COMMSTA Kodiak. The initiative to clean out the warehouse was lead by Richard Belisle.

   c. Reckner reported that during a conversation between Richard Belisle and ITC Scott Reckner, Richard Belisle expressed his disapproval for the recent conduct by James Wells (referring to the caution letter). Since Richard Belisle and James Wells were the only two civilians attached to the COMMSTA, it was common for the other members to associate "Jim and Rich" as a pair. Richard Belisle clarified to ITC Scott Reckner that it was to be "Jim or Rich," and Richard Belisle did not want to be associated with James Wells. Interviews indicate there was some level of animosity between Wells and Belisle.

   d. When the wife of victim Richard Belisle was notified of his death, she confirmed that Mr. Belisle left for work that morning at 6:45 am. Also, she made the unsolicited comment to the affect that she "hoped Jim wouldn't do something like this."

   e. ITC Scott Reckner stated that ET1 James Hopkins was a good leader, but sometimes could appear to be very brash when issuing orders. ITC Scott Reckner didn't believe he was harsh or unfair towards James Wells or the other workers. However, Hopkins and Wells did not get along well.

f. ITC Scott Reckner received the initial telephone call regarding the incident from the COMMSTA at approximately 0800. After concluding the phone call, ITC Reckner verbally expressed in the presence of his wife that he hoped James Wells didn't do something crazy, or words to that effect.

g. When ITC Scott Reckner arrived at the COMMSTA, he clearly noticed that James Wells' truck was not present at Building T2. ITC Scott Reckner asked about the presence James Wells and stated to the CGPD that James Wells needed to be located, or words to that effect.

h. James Wells arrived at the COMMSTA between 0820 hours and 0830 hours. ITC Scott Reckner told James Wells about the deaths of Wells' coworkers. In reply, James Wells did not react to the murder of his co-workers, the first words stated by James Wells were that he had a flat tire.

29. Further interview of SN Para Upchurch, who is a subordinate of ET1 James Hopkins in the rigger shop, revealed the following information:

   a. SN Para Upchurch stated she believed ET1 James Hopkins was a bitter worker because he had to keep correcting James Wells' work, which led to ET1 James Hopkins and James Wells not getting along in the shop.

30. Further non-custodial, non-mirandized, interview of James Wells revealed the following information:

   a. James Wells had worked in the Rigger Shop since approximately 1990. Prior to 1990, he was a USCG active duty member. His normal assigned work hours are from 0700 hours to 1530 hours.

   b. James Wells stated he left his home at approximately 0650 hours in order to head to work. During the drive, and approximately at the airport, he observed his right front tire low. At that time, James Wells made the decision to turn around and head back to his home. Upon arrival at his home, he stated he changed the tire and called ITC Scott Reckner, however he didn't remember in which order that happened. James Wells also stated he contacted ET1 James Hopkins and Richard Belisle prior to calling ITC Scott Reckner.

   c. When asked about firearms, James Wells stated he owned a 7mm magnum and a .45 ACP handgun. During questioning, James Wells appeared to be evasive in his answers, in that he did not indicate any number of guns when asked, or the caliber. When FBI agents interviewed the wife of James Wells in Anchorage on the early morning of April 13, 2012, her comments indicated he had additional firearms.

7

Exhibit F - Page 7 of 13

Case 3:13-cr-00008-SLG   Document 143-6   Filed 10/04/13   Page 7 of 13

000216

d. When asked about what he felt was appropriate actions in the event a person is arrested for the crimes, he took a prolonged pause and stated there were two ways to answer the questions. The first way he did not want to reveal on the grounds that the interviewing agents were law enforcement. The second way was through the justice process.

e. When asked about his telephone usage, James Wells presented an iPhone, telephone number 907-942-4844, and consented investigators to perform a cursory examination of the iPhone. The examination did not disclose any evidence sought by this warrant. No technical means were immediately available to forensically image or otherwise analyze stored or deleted data. COMMSTA members reported that while gathered waiting for the arrival of law enforcement officers for interviews, James Wells was seen texting on his iPhone. Moreover, throughout the evening, agents observed Wells holding his phone in both hands in a consistent manner as if texting with his thumbs. Wells' wife, in her interview during the morning of April 13, 2012, indicated that she had received several texts from him the morning prior. At the time the investigators viewed his iPhone, there were no text messages on the phone, indicating the possibility that all test messages had been erased.

f. When asked, James Wells consented for investigators to perform a quick search of his Dodge Ram 2500 pickup. Agents searched for blood stains and firearms. Agent found none. Interview agents did find at least two edged weapons. Wells has since had custody of his vehicle and may have placed items previously and currently sought into the vehicle. Wells was also in possession of a knife on his person. Wells also received a pat-down search prior to his interview, and had the knife on his person at that time.

31. Based upon my training and experience, I know that given the amount of blood described by the first responders and AST at the scene, as well as other reports of the scene, it is possible if not likely that blood was transferred from the victims to the clothing of and the persons or persons who shot and cut them at the scene during the commission of these offenses.

32. Based upon my training and experience, I know that when the weapons or devices are not located at the scene, that the person or persons who committed the offenses have carried them away. Based upon my training and experience, I know that such weapons and devices are sometimes hidden in the vehicles and homes of the persons who committed the offenses.

33. Based upon my training and experience, and the training and experience of investigators familiar with the operation, capabilities and forensic examination of the devices known as "iPhones" that such devices are equipped with a GPS capability. Based upon my knowledge and experience, I know that persons often carry such devices such as iPhones on their person.

8

34. GPS: GPS equipped devices, including some cellular telephones, use the Global Positioning System to identify their current location. These devices also often contain historical GPS records identifying where the devices have been and associated time. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS equipped device on Earth can receive those signals. When a GPS equipped device receives signals identifying the current time from at least four satellites, the device can mathematically calculate the device's latitude, longitude, and sometimes altitude with a high level of precision.

35. The Apple iPhone includes global positioning system ("GPS") technology for determining the location of the device and electronic data storage capacity to store GPS related information, including historical GPS location information. The default setting of an iPhone is to obtain, use, and store GPS information for various purposes, such as location aware services (e.g., maps). Forensic software can locate and recover from the device's electronic data storage historical GPS information.

36. Recovering historical GPS information from Wells' iPhone will identify where iPhone was physically located and its movements, but is unlikely to identify the exact location of the iPhone for all time periods. The GPS information on iPhone may, however, include where the phone was located and when in relation to the murders of Hopkins and Belisle.

37. Upon review of the above, there is probable cause to believe that James Wells drove his White Dodge Ram 2500 pickup from his residence to the Kodiak State Airport where he changed vehicles into the blue Honda SUV normally driven by his wife, and which a blue SUV was seen on closed circuit television leaving the area of the homicides. There is probable cause to believe that he drove the blue Honda SUV back to the Airport parking lot where it remains, and retrieved his White Dodge 2500 pickup in which he returned to his residence. Nancy Wells indicated to agents that her SUV is only one of two like it on the island.

38. On April 12, 2012, after the deaths of Hopkins and Belisle, James Wells arrived at COMMSTA Kodiak between 8:20 – 8:30 am. He remained at the COMMSTA until 9:50 pm on April 12, 2012. He left COMMSTA Kodiak, and his white Dodge pickup was seen in his driveway at 365 Pavloff Circle at approximately 10:30 pm. Wells had one known vehicle visiting at the residence at approximately 11:30 pm. Agents conducted surveillance on the residence from a distance until approximately 1:30 am on April 13, 2012. His white Dodge pickup was gone from his driveway at 365 Pavloff Circle by 8:30 – 8:40 am on April 13, 2012. He arrived at COMMSTA Kodiak again at approximately

9

Exhibit F - Page 9 of 13

Case 3:13-cr-00008-SLG   Document 143-6   Filed 10/04/13   Page 9 of 13

000218

9:00 am. From that time, until approximately 2:30 pm, Wells was at the COMMSTA. He departed the COMMSTA, and was given a ride to the residence at 365 Pavloff Circle. At that point, agents had secured the house pending application for a search warrant. Wells was last seen in the driveway of 365 Pavloff Circle at approximately 6:00 pm. Wells blue Honda SUV has been under surveillance at Kodiak State Airport since approximately 9:30 pm on April 12, 2012. Wells' white Dodge pickup is currently at COMMSTA Kodiak, and has been under the surveillance of law enforcement officers since 9:00 am on April 13, 2012.

39. Wells was seen talking on his iPhone immediately before leaving COMMSTA Kodiak at 2:30 pm on April 13, 2012. During the last 2 days of observing Wells, he has had the phone on his person at all times, except when allowing the agents to examine it briefly on April 12, 2012. He has not been in his vehicles or house since that time. The phone is most likely on his person in his driveway at 365 Pavloff Circle.

40. As previously described in paragraph 35 above, the iPhone includes GPS technology that collects location information of the device. Search Warrant 3:12-mj-158-DMS authorized searching the device for location information of the device in a specific time period from 6:30 a.m. through 8:30 a.m. on April 12, 2012. Upon further discussions with forensic examiners from the Kodiak Island Police Department, two software tools are available to search this device: Cellarbrite, a device used to extract data from many types of devices, and Lantern, a software tool specific to iPhones.

41. Lantern and Cellarbrite tools work to extract all data on the device. They cannot discriminate among the data bits. To retrieve the specific data authorized in the warrant, all data must first be extracted by these tools to a spreadsheet or data base. An investigator must then use either automated tools or must personally go through the data line by line to identify the specific information authorized to be seized by the original warrant. Because an investigator cannot tell in advance how the information is stored, the investigator must use either or both methods as the search itself requires.

42. Lantern cannot isolate the GPS information automatically. Therefore this application is to authorize a qualified forensic examiner from the Kodiak Police Department to use Cellarbrite and Lantern to extract all the data from the iPhone, and to examine that data to isolate and seize the GPS information described in Attachment A to Search Warrant 3:12-mj-158 DMS. That investigator will in turn provide only the seized information to the case investigators, and will keep the remainder of the information secure and unavailable to the case investigators. The data and information will remain sealed pending further orders of this court.

43. During the initial search of the residence on April 15, 2012, officers observed fingernail clippings in the sink of the master bathroom, which is adjacent to the master bedroom. One fingernail clipping appears to have a reddish material under it. Also in the sink were long black hairs similar to those found at the crime scene. One of the victims, Richard Belisle, had long black hair. The defendant and his wife both have graying hair.

10

44. During the search of the crime scene on April 13-14, 2012, investigators discovered significant quantities of blood and some human tissue and bone fragments, as cited in paragraph 27 above, leading them to believe that blood and other trace evidence such as hair and fibers, may have been spattered or otherwise transferred onto the shoes or clothing of the assailant. That blood and other trace evidence could then be tracked, rubbed, or otherwise transferred onto the interior of any vehicle entered by the assailant.

45. Also, outside of the crime scene, investigators found tire prints from a vehicle leading from an area behind the building in which the homicides occurred. That area is not visible to any of the surveillance video cameras providing security of the area. The tire tracks lead on to the hard-surfaced roadway, and there are tire scuff marks on the roadway consistent with an accelerating vehicle. The observable tire tracks are also consistent with a smaller and lighter vehicle such as the 2001 Blue Honda CR-V, AK Plate EJR582. Casts have been made of those tire prints, requiring casts to be made of vehicles for comparison. This application seeks authority to seize impressions, tracings, photographs and any other means of replicating or copying the treads of the tires on the 2001 Blue Honda CR-V, AK Plate EJR582.

46. In interviews conducted on April 13th and 14th, Wells stated that on the morning of the murders, he was on his way to work when he noticed he had a low tire on the white Dodge pickup. He claimed that he pulled off the road near the Kodiak State Airport, looked at the tire, then returned to his home to change the tire because the spare tire and jack were at his residence. Wells was then confronted with the information contained in paragraphs 15 & 16 above, that he passed the main gate of the Coast Guard Base Kodiak at going North toward the COMMSTA at 6:48 am, and did not return past the main gate camera going South toward his residence until 7:22 am. When asked to reconcile the 34-minute gap shown by the camera and his story about checking the tire, which would only take 6-8 minutes, he said he had no explanation.

47. When investigators originally searched the white Dodge pickup, they found an additional tire in the bed of the pickup. When they removed tire from the bed as part of their inspection, it bounced high off the ground, exhibiting no signs of low pressure. The investigators, believing the search warrants for the white Dodge pickup allowed them to further inspect the tires, obtained tire pressures from the extra tires, as well as all tires on the vehicle.

48. Updating paragraph 27: based on initial analysis by the Alaska medical examiner and the Alaska Crime Laboratory, both victims were shot 3 times each, for a total of six shots. One of the rounds, recovered from the body of Petty Officer Hopkins, has been identified as a .44 magnum.

49. Updating paragraph 31: further analysis of the crime scene indicates that the assailant discharged the firearm in close proximity to the victims. Coupled with the information

that at least one fingernail clipping with reddish substance and a bloody towel were recovered from Wells' residence, there is probable cause to believe there may have been a struggle between the assailant and at least one of the homicide victims. From my experience, if there was such a struggle between the victim and the assailant, the assailant may have received injuries or that DNA from the skin, hair or blood would have transferred from the victim to the assailant.

50. At a search of the residence located at 365 Pavloff Circle, Kodiak, AK pursuant to warrant 3:12–mj-00157-DMS, which is attached to this application and incorporated herein by this reference, searchers noted that someone had been working on the septic system located on the property, and about 15-20 feet from the principal residence. There is a cover to the septic tank itself, and an open trench which appears to lead to/from the septic tank, in which a pipe can be observed. Based on its location, it appears that the trench, pipe and tank are all part of the septic system attached to and serving the residence. This is consistent with statements made by James Wells to interviewing agents that he was working on the septic system at his home, and that the toilets and wastewater systems in his residence were inoperable because he was working on the septic system.

51. At the autopsy of Richard Belisle, the Medical Examiner removed a projectile from the cervical spine of Mr. Belisle. The projectile was intact, and was removed without further marking the item. That item has been submitted to preliminary forensic examination at the Alaska Scientific Crime Detection Laboratory. Preliminary findings are that the projectile is a 44 caliber bullet bearing markings of a 5 right twist. Such markings are not consistent with any of the firearms recovered in the search of the residence. Thus, law enforcement does not have possession of the murder weapon at this time.

52. When the search authorized under warrant 3:12–mj-00157-DMS above was completed, the property was released by agents. Wells was observed by agents as he arrived at his residence, accompanied by his wife. Wells' wife was observed to promptly enter the residence. Wells, however, did not enter the residence, but went to the area of the septic tank and trench, where agents observed him looking at the cover to the septic tank and the area of the trench with the pipe at the bottom.

53. This application seeks authority to search the area of the septic tank, the septic tank itself, the contents of the septic tank, and the trench that appears to be connected to the septic tank for any firearms.

54. Upon review of the above, there is probable cause to believe that evidence of the crimes of Murder in the First Degree in violation of 18 U.S.C. sec 1111(a) and Murder of a Federal Officer or Employee in violation of 18 U.S.C, 1114 may be found at the locations described in Attachment A.

## CONCLUSION

Based upon the foregoing, your affiant respectfully submits that there is probable cause to believe that evidence of the crimes of Murder in the First Degree, a violation of 18 U.S.C. sec. 1111(a) and Murder of a Federal Officer or Employee, a violation of 18 U.S.C. sec. 1114 may be found at the location to be searched as described above and on the face of the warrant.

/s/ Signature Redacted

Daniel A. Gasino
FBI

Sworn and subscribed before me
This 18 day of April, 2012

/s/Michael A. Thompson, USMJ
Signature Redacted

United States Magistrate Judge

13