# Affidavit in Support of Search Warrant

I, Dan Gaston, Special Agent with the Federal Bureau of Investigation (FBI), being duly sworn, hereby depose and state the following:

## AFFIANT

1. I am a Special Agent (SA) of the United States Department of Justice, Federal Bureau of Investigation (FBI). I have been so employed for approximately 21 years. I am currently assigned to the FBI Violent Crimes Squad, Anchorage Field Division, and have been so assigned for the past 22 months. As part of my official duties, I investigate violent crimes committed in areas under the special maritime and territorial jurisdiction of the United States.

## PURPOSE OF THE AFFIDAVIT

2. This affidavit is made in support of a warrant to search the desk and locker of James WELLS in Building T2 (Rigger Shop), United States Coast Guard Communications Station Kodiak, AK (approximately mile two (2) of Anton Larson Bay Road Kodiak, AK). A photograph of the desk to be searched is included as part of Attachment A. A photograph of the locker to be searched is also included as part of Attachment A. The items to be seized are identified in Attachment B as:

    a. Evidence of travel during the past 10 years, including notes, travel claims, itineraries, reservation documents, receipts, and photos.
    b. Evidence of motive in the form of notes, letters, memoranda or other written records regarding job performance, job evaluations, statements of dislike or animosity towards the victims or command personnel at COMMSTA Kodiak.
    c. Evidence related to planning the homicides or purchasing items needed or used in the homicide, such as firearms, ammunition, boots or shoes, gloves, coveralls, catalogs of equipment or firearms that could be used in a homicide.
    d. Photographs or any indicia of ownership by any person of silver or metallic colored handguns, or any .44 magnum handguns.
    e. All telephone numbers to determine if they are of vendors of firearms or ammunition.

3. The evidence, set forth more fully below, provides probable cause to believe that evidence of the murders of United States Coast Guard Electronics Technician First Class (ET1) James A. Hopkins and United States Coast Guard Civilian Employee Richard W. Belisle on April 12, 2012, at Building T2 (Rigger Shop) United States Coast Guard Communications Station Kodiak, AK (approximately mile two (2) of Anton Larson Bay Road Kodiak, AK) may be found in or on the desk of James WELLS located in that building in the office shared by WELLS and the two victims, and the locker used by James WELLS in a common area.

MAY 23 2012

1

4. The facts set forth in this affidavit are based on my personal knowledge; knowledge obtained from other individuals, including other law enforcement officers; interviews of persons with knowledge; my review of documents, interview reports and computer records related to this investigation; communications with others who have personal knowledge of the events and circumstances described herein; and information gained through my training and experience. This affidavit contains information necessary to support probable cause for the search warrant requested and does not contain every material fact that I have learned during the course of this investigation; however, no information known to me that would tend to negate probable cause has been withheld from this affidavit.

5. The following search warrants have been previously issued as part of this investigation:

| Warrant # | Date | Location to be Searched | Items to be Seized | Judicial Officer |
|---|---|---|---|---|
| 3:12-mj-00155 | 4/13/12 | Blue Honda CR-V | Guns, gun accessories, blood stained items | Roberts |
| 3:12-mj-00156 | 4/13/12 | White Dodge Pickup | Guns, gun accessories, blood stained items | Roberts |
| 3:12-mj-00157 | 4/13/12 | Wells Residence | Guns, gun accessories, blood stained items | Roberts |
| 3:12-mj-00158 | 4/13/12 | Wells' iPhone | GPS Location Data | Roberts |
| 3:12-mj-00160 | 4/15/12 | Wells Residence | Fingernail clippings, hair, drain trap | Burgess |
| 3:12-mj-00161 | 4/15/12 | Wells' iPhone | GPS Location Data | Burgess |
| 3:12-mj-00163 | 4/16/12 | Blue Honda CR-V | Trace evidence Tire impressions Photo/video | Thompson |
| 3:12-mj-00164 | 4/16/12 | White Dodge Pickup | Trace evidence | Thompson |

| 3:12-mj-00166 | 4/18/12 | Wells Residence – Septic System | | Guns, gun accessories, blood stained items | Thompson |
| 3:12-mj-00167 | 4/18/12 | Person of James Wells | | Photographs, DNA samples, fingerprints, fingernail scrapings | Thompson |
| 3:12-mj-00168 | 4/18/12 | White Dodge Pickup | | Spare Tire | Thompson |
| 3:12-mj-00172 | 4/21/12 | Wells Residence | | Guns, gun accessories | Burgess |

## PROBABLE CAUSE

### Jurisdictional Matters

6. JAMES M. WELLS is employed by the United States Coast Guard as an Antenna Maintenance Specialist (Wage Grade 10). His workplace is Building T2, United States Coast Guard (USCG) Communications Station (COMMSTA) Kodiak, AK. Building T2 is also known as the "Rigger Shop." COMMSTA Kodiak is located approximately mile two (2) of Anton Larson Bay Road, Kodiak, AK. He has been employed there since approximately 1990.

7. On April 12, 2012 at 7:47 am, Alaska State Troopers (AST) responded to a 911 emergency call from USCG COMMSTA Kodiak. On arrival, AST found Coast Guard Police Department (CGPD) and Coast Guard Fire Department (CGFD) on scene responding to the emergency call. On AST's entrance into the Rigger Shop, Troopers found two adult males on the floor of the Rigger Shop with several medical personnel present. Both victims appeared to be moved from their original positioning by medical personnel. Both men were later determined to be dead.

8. The first victim observed by AST was ET1 James Hopkins, who was lying on his back with one gunshot wound to his right torso and wounds to his mouth and nose area. He also had what appeared to be wounds to his right arm and lost a large amount of blood that had started to coagulate on the floor. Hopkins was found in a common area of Building T2, near a locker used by James WELLS.

9. The second victim observed by AST was USCG Civilian employee Richard W. Belisle. Belisle was found in a separate office from the first victim, lying on the floor with at least one gunshot wound to the torso and a small amount of blood on the floor. The office in which Mr. Belisle was found contains four desks, one each for Chief Reckner,

3

MAY 23 2012

ET1 Hopkins, Mr. Belisle, and James WELLS. Mr. Belisle was found on the floor in front of and partially under James WELLS' desk.

10. COMMSTA Kodiak, including Building T2, is on property owned by the United States Coast Guard, an agency of the Department of Homeland Security. USCG District 17 Legal Counsel has informed me that this building is within the Special Maritime and Territorial Jurisdiction of the United States as set forth in 18 U.S.C. sec. 7(3) because it has been reserved or acquired for the use of the United States.

11. ET1 (Petty Officer First Class – Electronics Technician) Hopkins was an active duty member of the United States Coast Guard, and was an employee of the United States. He was present at the Rigger Shop for the performance of his official duties which began at 7:00 am on April 12, 2012.

12. Mr. Belisle had been a civilian employee of the United States Coast Guard since November 13, 2005. He was present at the Rigger Shop for the performance of his official duties as an employee of the United States which began at 7:00 am on April 12, 2012.

**Geographic References**

13. The Coast Guard's main base in Kodiak, officially known as Base Support Unit (BSU) Kodiak, is located immediately south of the Kodiak State Airport. This allows Coast Guard fixed-wing aircraft to use the runways at Kodiak State Airport.

14. COMMSTA Kodiak is not located on the main facility of BSU Kodiak. It is located approximately 3 miles north-northwest of BSU Kodiak on Mile 2 of Anton Larsen Bay Road. The turn off for Anton Larson Bay Road is immediately north of the Kodiak State Airport.

15. The Wells' residence, 365 Pavloff Circle, Kodiak, Alaska, is located in the Bells Flats area, South of BSU Kodiak. Moreover, there is one primary road, Rezanof Drive/Chiniak Hwy, which runs from Bells Flats, past BSU Kodiak and the Kodiak State Airport, to the City of Kodiak. Thus, to get from the Wells' residence to COMMSTA Kodiak, a vehicle must pass the entrance to BSU Kodiak and the entrance road for Kodiak State Airport.
16.

**Timeline**

17. Based on the timeline discussed in detail below, JAMES WELLS had the opportunity to commit the murders of Hopkins and Belisle, as detailed in the following sequence of events. There is probably cause to believe WELLS drove from his home in Bells Flats, past the main gate camera at BSU Kodiak, then pulled into the parking lot at Kodiak State Airport. WELLS then switched to his wife's small blue Honda CR-V and drove

4

MAY 23 2012

to COMMSTA Kodiak. After the murders, he then returned to Kodiak State Airport, switched back to his white Dodge pickup. He drove back toward his residence, again passing the main gate of BSU Kodiak. This all occurred between 6:48 a.m. and 7:22 a.m. on April 12, 2012.

18. At approximately 6:48 a.m. on April 12, 2012 closed circuit television cameras (CCTC) located at the front gate of BSU Kodiak captured video of a white Dodge truck with a camper shell with two slanted rear windows passing the base heading to the north. WELLS is the registered owner of a truck fitting this description. A person traveling from Bells Flat on Rezanof Drive to either Kodiak State Airport or COMMSTA Kodiak must pass this gate and video camera. The times of sightings cited in this paragraph and paragraph 23 have been adjusted to actual time.

19. Electronic access records for Building T2 show Richard Belisle's access card was swiped at approximately 7:00 a.m. which is consistent with the arrival of his vehicle at COMMSTA Building T2 Rigger Shop as viewed on CCTC.

20. CCTC at COMMSTA Building T2 show ET1 James Hopkins' vehicle arrived at Building T2 at approximately 7:08 a.m.

21. CCTV from a tower near COMMSTA Kodiak Building T1 captured video of a small blue Sport Utility Vehicle (SUV) arriving at Building T2 at 7:09 a.m. The blue SUV appears to have a black nose, black wheels, and a tire mounted on the rear.

22. According to a witness interview of a person who was walking/running on Anton Larson Bay Road near Building T2, he heard a loud metal hitting metal sound come from the direction of Building T2 at approximately 7:10 a.m. as he was walking away from the area. Building T2 is a concrete block structure located within 200 feet of Anton Larson Bay Road. In my experience, the sound of a gunshot in such a structure could be perceived to be a loud metal hitting metal sound.

23. Video captured by the CCTC near COMMSTA Building T1 shows a small blue SUV with what appears to be a black nose, black wheels, and a profile that appears to be consistent with a Honda CR-V emerging from behind Building T2 heading towards Anton Larson Bay Road at approximately 7:14 a.m. A blue Honda CR-V owned by James and Nancy Wells was later found parked in the 2-hour parking lot at the Kodiak State Airport. The vehicle is currently equipped with black steel wheels, a black vinyl or fabric covering on the front (commonly called a "car bra"), and has a tire affixed to the rear door on a carrier.

24. According to available CCTV at the BSU Kodiak main gate, a white Dodge truck with camper shell with two slanted rear windows was observed travelling on Rezanof Drive West/Chiniak Hwy towards Bells Flats, southbound from the Kodiak State Airport area at approximately 7:22 a.m.

25. Two USCG civilian employees who know WELLS stated they witnessed JAMES WELLS in his white dodge truck in the area of Bells Flats after 7:22 a.m.

26. According to Chief Information Technician (ITC) Scott Reckner, USCG COMMSTA Kodiak, he received a voicemail from JAMES WELLS at approximately 7:31 am. WELLS informed ITC Reckner he had a flat tire on his way into work and would be late to work. ITC Scott Reckner found this call to be extremely odd as JAMES WELLS typically would not call until after 8:00 am if he was going to be late and sometimes did not call at all. Reckner opined it is not common for JAMES WELLS to be proactive with respect to keeping supervisors apprised of his whereabouts and activities. On the previous day WELLS disappeared for approximately three hours between 9:00 am and 12:00 pm. WELLS had informed Reckner that he would be working in building T1 of the COMMSTA, a short distance away. Attempts to locate Wells in building T1 during that time were unsuccessful.

27. A review of Hopkins' voicemail revealed that WELLS had called Hopkins at approximately 7:30 am to tell Hopkins that he had a flat tire and would be in when he had changed it. A review of ITC Reckner's voicemail revealed that WELLS had called Reckner at approximately 7:31 am to tell Reckner that he had a flat tire and would be in when he had changed it. He also mentioned to Reckner that he was having a problem with the lug nuts on the tire.

28. At approximately 11:00 a.m., an individual employed by a civilian contractor spoke to WELLS on a work related matter. WELLS said nothing of the murder and stated only that "Rich" (Belisle) was "not available" and that they had "no immediate plans to climb the tower."

## Interviews

29. Nancy Jean Wells, the wife of JAMES WELLS, was interviewed in Anchorage during the evening of April 12, 2012. She confirmed that she flew out of Kodiak to Anchorage on Tuesday, April 10, 2012, leaving her blue Honda SUV in the 2-hour parking lot at the Kodiak Airport. According to the interview, JAMES WELLS told her in a telephone conversation that he got a flat tire on the morning of the murders. In addition, Mrs. Wells indicated there was a spare tire in a carrier under JAMES WELLS white Dodge pickup.

30. An interview of ITC Reckner revealed the following information:

    a. Reckner took over supervision of the COMMSTA Rigger Shop in July of 2010. At that time, WELLS and Belisle were the only two civilian employees at the shop. It became apparent to Reckner shortly after he took over that the "civilians" were running the shop. Reckner made it clear to Hopkins that Hopkins was in charge and counseled him regarding his leadership skills.

6

MAY 23 2012

Hopkins' assumption of a leadership role in the Rigger Shop caused tension between Hopkins and WELLS, who was used to acting with impunity.

b. Reckner assessed WELLS as being the most knowledgeable antenna mechanic on Kodiak Island and possibly the entire Coast Guard. Belisle's title was rigger, but there was not much difference between the job descriptions for rigger and antenna mechanic. Belisle's skill in electronics was weak, but he was a fast learner. WELLS and Belisle were both relied upon by the Coast Guard nationwide for their expertise.

c. In July of 2011 Reckner, WELLS, Hopkins, Belisle and other Rigger Shop personnel were erecting new towers on a remote Coast Guard facility. WELLS had decided that they were not going to install devices required by the Environmental Protection Agency on the towers. Reckner later decided that the devices must be installed as required by law. WELLS argued with Reckner over the decision and yelled at anyone who would listen that Reckner wasn't letting him do his job

d. WELLS became ill in August of 2011 and was rarely in the office until January of 2012. WELLS eventually had his gall bladder removed and had surgery for a hernia.

e. In September of 2011 a fuel card that was kept in WELLS' desk was reported missing by ET1 Hopkins. The fuel card was subsequently used at the Coast Guard BSU gas station and later found back in WELLS' desk. An investigation concluded that WELLS had used the card to fuel his personal vehicle. WELLS denied taking and using the fuel card. COMMSTA Commanding Officer, Commander (CDR) Peter Van Ness; Executive Officer, Lieutenant (LT) David Pizzuro; and ITC Reckner had a meeting with WELLS in February of 2012 in Van Ness' office and presented him with a Letter of Caution regarding the incident. Van Ness informed WELLS that he no longer trusted WELLS. WELLS repeatedly denied the accusation and repeated the phrase "It just doesn't sit right." WELLS was asked to sign the Letter of Caution, which he refused to do. All the participants of the meeting except for WELLS left the table. WELLS remained at the table alone and eventually signed the letter.

f. On November 2, 2011, ITC Reckner called WELLS to his office to have WELLS sign a Memorandum for Record advising that trees on COMMSTA property were not to be cut and removed for personal use and that all tree removals must be approved by Reckner. The same memo was also issued to Belisle. It had come to Reckner's attention that trees were being collared, a procedure that allows a tree to die slowly, and removed in areas in which the trees would not have been a hazard to the towers or any other COMMSTA resource. Much of this wood was taken by WELLS and Belisle for firewood. (Interviews with friends of WELLS indicate that he heats his home using a wood burning fireplace). During the discussion, WELLS asked Reckner

7

MAY 23 2012

about his (WELLS') role at the COMMSTA. Reckner informed WELLS that things were not looking good for him because of the tree collaring issue and the fuel card incident and that it was "time to get in line." Reckner and WELLS had a heated discussion which was loud enough to be overheard by individuals outside Reckner's office. During the argument, Reckner informed WELLS that the only reason he wasn't getting fired was because there were no cameras at the BSU gas station. WELLS thanked Reckner for his honesty.

g. Around the time that the aforementioned Memorandum of Record was issued, Belisle approached Reckner and attempted to disassociate himself with WELLS. WELLS and Belisle were often referred to as "Jim and Rich" since they were the only two civilian employees in the rigger's shop. Richard Belisle clarified to ITC Reckner that it was to be "Jim or Rich," and Richard Belisle did not want to be associated with WELLS.

h. In December of 2012 Reckner had grown weary of hearing from other Rigger Shop employees that tasks were not being completed because WELLS wasn't ready or didn't want to do them. Reckner spoke to LT Pizzurro, who agreed that the rigger's shop staff should not wait for WELLS and should attempt to accomplish required tasks with or without WELLS' assistance. Reckner informed WELLS that they would no longer wait on him and that everyone that worked in the Rigger Shop, with the exception of one person, had told him that things didn't get done around the shop unless WELLS wanted to do them. Reckner told WELLS that he needed to "come in and be a part of the process or fucking retire. I don't care which, but we're not doing this anymore." WELLS and Reckner had a heated argument which was heard by others outside of Reckner's office.

i. On or about January 17, 2012 Reckner told Wells that he would not be going to the annual National Association of Tower Erectors (NATE) conference which WELLS regularly attended. Reckner told WELLS that he would not be going due to the aforementioned disciplinary problems and WELLS' excessive absences in the preceding months. Reckner stated that WELLS enjoyed the conference where he would "strut around" and "talk a big game." Reckner further informed WELLS that he, ET1 Hopkins, and Belisle would be attending the conference this year. WELLS questioned Reckner as to why ET1 Hopkins and Belisle were going. WELLS pointed at Belisle's chair and stated "he's not an antenna mechanic. He's just a rigger. I'm the mechanic and I should be going." Reckner and WELLS had a heated argument regarding Reckner's decision to not have WELLS attend the conference. After they had finished arguing, WELLS sat and stared at Reckner. Reckner stated that he was "sick" of WELLS' attitude and stared back for what seemed like a long time, but was probably two or three minutes. Eventually both WELLS and Reckner broke eye contact with no further discussion.

j. On April 11, 2012, the day prior to the murder of Belisle and Hopkins, WELLS, Belisle, Hopkins, Reckner, and other rigger's shop staff were

8



discussing the best way to run an antenna cable. WELLS and Belisle suggested different ways of running the cable. Reckner stated that he preferred Belisle's method and engaged Belisle in conversation regarding the technical aspects of completing the task.

k. Reckner stated that due to WELLS' disciplinary problems and extended absences, WELLS' status with the command structure had deteriorated. Reckner's assessment of WELLS was that WELLS thought he (WELLS) needed to be the "top dog." Belisle's ability and initiative were also being noticed by Reckner. Reckner stated that WELLS' "star was fading" while Belisle's was "starting to shine."

29. SN Para Upchurch, a subordinate of ET1 James Hopkins in the Rigger Shop, was interviewed and stated she believed ET1 James Hopkins was bitter because he had to keep correcting James WELLS' work, which led to ET1 James Hopkins and James WELLS not getting along in the shop.

30. An interview with a co-worker of Nancy Wells revealed that one week prior to the murder of Hopkins and Belisle, Nancy Wells was upset while at work. Nancy confided in her co-worker that she was upset over a situation at WELLS' job in which he was having problems with "the idiots that he works with." Nancy provided no further details to her co-worker regarding the situation.

31. Lyle Phillips, a former ETC at the COMSTA rigger's shop, was interviewed and stated that he was the supervisor of the Rigger Shop from 2002 to 2007. WELLS worked for Phillips during this entire period. Belisle was hired during Phillips' tenure at the Rigger Shop. Phillips stated that WELLS had a bad temper and difficulty controlling himself. Phillips provided the following additional information:

    a. On one occasion in late 2002, WELLS' wallet fell out of his pocket and between the seats of a government vehicle. WELLS screamed at the younger seamen in the shop and accused them of stealing it when he could not find it. He demanded that Phillips punish the seamen, which Phillips refused to do. WELLS became angry, got in his truck, and accelerated out of the parking lot so quickly that he lost control and hit a government vehicle. WELLS wallet was later found between the seats of the government vehicle he had been driving.

    b. Phillips stated he was involved in two official disciplinary actions against WELLS. Phillips stated that WELLS was officially sanctioned in 2001 or 2002 for removing wood from COMMSTA property. Phillips also stated WELLS wanted to fly a communications hut from the island of Attu to COMMSTA Kodiak for repairs in 2004. Phillips ordered WELLS to leave the hut in Attu and request the parts needed for repairs be sent to Attu. The next day WELLS showed up in Kodiak with the hut.

9



000314

c. WELLS disappeared often during work hours without letting anyone know where he was going. Phillips believed that WELLS was often working on the base assisting others, which was helpful when the COMMSTA needed help or assistance. WELLS was present and ready when important tasks needed to be completed. After Belisle was hired Phillips wasn't as concerned with WELLS disappearing since he had another employee to assist him.

32. A non-custodial, non-mirandized, interview of JAMES WELLS revealed the following information:

    a. JAMES WELLS has worked in the Rigger Shop since approximately 1990. Prior to 1990, he was a USCG active duty member. His normal assigned work hours are from 7:00 am to 3:30 pm.

    b. JAMES WELLS stated he left his home at approximately 6:50 am on April 12, 2012, in order to head to work. During the drive he stopped to check his tires and found the right front tire to be low. When asked where he turned around, WELLS stated "probably" at the Comfort Inn. The Comfort Inn is located at the entrance road to Kodiak State Airport. At that time, WELLS made the decision to turn around and head back to his home. Upon arrival at his home, he stated he changed the tire and called ITC Scott Reckner, however he didn't remember in which order that happened. James Wells also stated he attempted to contact ET1 James Hopkins and Richard Belisle prior to calling ITC Scott Reckner.

    c. When asked, James WELLS consented for investigators to perform a quick search of his Dodge Ram 2500 pickup. Agents searched for blood stains and firearms. Agent found none.

    d. In additional interviews conducted on April 13th and 14th, WELLS stated that on the morning of the murders, he was on his way to work when he noticed he had a low tire on the white Dodge pickup. He stated that he pulled off the road near the Kodiak State Airport, looked at the tire, then returned to his home to change the tire because the spare tire and jack were at his residence. Wells was then confronted with the information contained in paragraphs 17 & 23 above, that he passed the main gate of the Coast Guard Base Kodiak going north toward the COMMSTA at 6:48 am, and did not return past the main gate camera going south toward his residence until 7:22 am. When asked to reconcile the 34-minute gap shown by the camera and his story about checking the tire, which would only take 6-8 minutes, he stated he had no explanation.

33. According to Collette Francisco, a civilian Coast Guard employee, she was riding with a friend to the Kodiak State Airport on the morning of April 12, 2012, at approximately 6:45 am. Mrs. Francisco stated that she was talking to the driver of the

10

000315

vehicle when she noticed a vehicle go by in the other direction that she believes was Nancy Wells' small blue SUV. The location was near the "Self Help." The "Self Help" is a Coast Guard owned warehouse at the corner of Rezanof Drive/Chiniak Highway and Anton Larson Bay Road. Agents reviewed CCTV of the Alaska Airlines check in counter which revealed that Mrs. Francisco arrived at the counter at 6:46 a.m. Mrs. Francisco knows Nancy Wells and regularly sees her car on the road. She can usually identify Nancy Wells as the driver. On this particular day Mrs. Francisco did not see the driver. When Mrs. Francisco was asked to provide details on why she believed the car was Mrs. Wells' vehicle, she could not provide details, but stated something to the effect that she just knew it was Nancy Wells' car. In a subsequent interview, Mrs. Francisco stated that she believed the small blue SUV had a Coast Guard sticker. She did not name the black car bra as a distinguishing characteristic of the vehicle.

34. In an interview with Joseph Francisco, the husband of Colette Francisco, he related his conversation with his wife regarding her reported sighting of the Blue Honda CRV on April 12, 2012 to the interviewing agents. His recollection of the conversation was that his wife was not sure if the car she saw was Nancy Wells' car.

**Other investigation and information.**

35. Nancy Wells stated to agents that her SUV is only one of two like it on the island. However, agents have identified six 1998 to 2003 blue Honda CR-V's on Kodiak Island, and have personally seen them. None of these CR-V's have a black "car bra."

36. Based on initial analysis by the Alaska medical examiner and the Alaska Crime Laboratory, both victims were shot 3 times each, for a total of six shots. At the autopsy of Richard Belisle, the Medical Examiner removed a projectile from the cervical spine of Mr. Belisle. The projectile was intact, and was removed without further marking the item. That item was submitted to preliminary forensic examination at the Alaska Scientific Crime Detection Laboratory. Preliminary findings are that the projectile is a .44 caliber bullet bearing markings of a 5 right twist, consistent with a Smith & Wesson Model 29/629 revolver or a Taurus revolver. In searches conducted to date, investigators have not located such a weapon. Thus, law enforcement does not have possession of the murder weapon at this time.

37. Investigators have been seeking to determine whether WELLS has ever purchased a firearm that is the same type as the murder weapon. Investigators have been reviewing records of firearms purchased on Kodiak Island, including purchases at the Coast Guard Exchange, Walmart, and local sports shops. Only the review of Coast Guard records is complete, but they show no purchases by WELLS. A number of firearms were voluntarily turned over to investigators by WELLS prior to the search of his residence under search warrant 3:12-mj-00157. At least two of those firearms were purchased in Anchorage. Investigators are aware that WELLS has made at least

11

MAY 23 2012

Case 3:13-cr-00008-SLG   Document 143-8   Filed 10/04/13   Page 11 of 13
Exhibit H - Page 11 of 13
000316

two trips to Anchorage in the past year and are seeking additional information on those trips, as well as any others in the past 10 years.

38. On April 13, 2012, FBI Special Agent (SA) Angela Strauss, a member of the FBI Evidence Response Team (ERT) processing the crime scene, started to go through the desk drawers. She found a copy of the Letter of Caution discussed in paragraph 29.e., which was photographed and seized. She was then advised that the ERT was not searching for documentary evidence, and ceased searching the desk. She has prepared a report on the matter, which is attached in a sealed envelope to this application to be dealt with by the court as explained in paragraph 43 below. On April 27, 2012, Coast Guard Investigative Service Guard Special Agent Jason Weimer started a search of the desk of James Wells in the Rigger Building. The entire homicide scene at the Rigger Building, including the desk of James Wells, had been previously released to the Coast Guard. USCG members and contractors have been cleaning and repainting the interior of the building, including cleaning the office where WELLS's desk is located. However, USCG personnel were instructed not to touch WELL's desk or locker. SA Weimer was not aware that a warrant was required. SA Weimer saw something which he thought might be relevant to the investigation of the homicides, and called a supervisor. At that time he was told not to say what he had found, to stop searching, and that a warrant would be required to search further. SA Weimer has prepared a report of his actions and what he has found. That report is in a sealed envelope also attached to this application. None of the information seen by SA Straus or SA Weimer, with the exception of the Letter of Caution, was used in preparing this affidavit, or is known to the affiant. The Letter of Caution information used in this affidavit was provided independently by Chief Reckner.

39. A photograph of WELLS' desk as observed on the date of the processing of the crime scene (April 12 through 14, 2012) is attached as part of Attachment A. That desk has been identified by ITC Reckner as belonging to WELLS. The photograph and plain view observations of the desk establish that WELLS keeps many documents on his desk, including a telephone rolodex and handwritten notes. WELLS does not maintain a neat and orderly filing system, and so it is very difficult to determine from observing his desk whether there are photographs in or on his desk.

40. WELLS also had a locker that he used to store material. A photograph of WELLS' locker is included as part of Attachment A. That locker has been identified by ITC Reckner as belonging to WELLS. The locker is not secured with a lock, thus the contents are visible. However, as is visible in Attachment A, the locker contains a significant amount of material, with apparently little organization. Material will have to be moved to determine which items may be material to the investigation.

41. Based on my training and experience, and the experience of others with whom I have consulted, I believe that persons who plan homicides often make notes and checklists of things they need to execute their plan, including acquiring the weapon and, if

12

MAY 23 2012

needed in the plan, the ammunition. They often make notes of telephone numbers of vendors of such items as well. They also may look at catalogs of weapons and ammunition, and make notes or marks in the catalog. As stated above, this investigation believes at this time that the murder weapon is a .44 caliber magnum revolver with associated ammunition. However, this weapon may have been selected after other avenues of acquisition were foreclosed for whatever reason. Thus, in the planning process, any type of weapon may have been considered.

42. The revolvers recovered from WELLS home in the execution of search warrant 3:12-mj-00157 were all blued. However, an interview with a witness established that WELLS carried a silver colored hand gun while hunting with the witness several years ago. Thus we seek authority to search for photographs of WELLS with any silver or metal covered handgun, or any .44 magnum handgun.

43. This application asks the court to find probable cause to issue the warrant to search the desk of James WELLS based on the foregoing, without knowledge of the contents of the sealed envelopes containing SA Weimer's and SA Straus' reports. If the court finds probable cause and issues the warrant, I also request that the court read the contents of the sealed envelope and make a notation on the warrant whether the information contained therein would affect the earlier finding of probable cause. This request is made to take into consideration the ruling of the Alaska Court of Appeals in *Cruise v. Alaska*, 584 P.2d 1141, 1145-47 (Alaska Ct. App. 1978) and to assure that the fruits of the search, if any, would be admissible in an Alaska State court in the event this investigation and prosecution is referred to the State of Alaska for resolution. *The Court made its probable cause determination based upon the information in this application, & then reviewed an affidavit of Angela Strause 5/18/2012 and Memo by SA Jason Winn re 4/25/2012. This later revealed information does not change my earlier probable cause determination*

## CONCLUSION

Based upon the foregoing, your affiant respectfully submits that there is probable cause to believe that evidence of the crimes of Murder in the First Degree, a violation of 18 U.S.C. sec. 1111(a) and Murder of a Federal Officer or Employee, a violation of 18 U.S.C. sec. 1114, may be found in or on the desk of James Michael WELLS located in Building T2 (Rigger Shop), United States Coast Guard Communications Station Kodiak, AK (approximately mile two (2) of Anton Larson Bay Road Kodiak, AK).

*Judge Deborah Smith*
*Deborah Smith*
*5/23/12*

SIGNATURE REDACTED

Daniel A. Gasn
FBI

Sworn and subscribed before me
This 23 day of May, 2012

*[signature]*
United States Magistrate Judge

13

MAY 23 2012