IN THE UNITED STATES DISTRICT COURT
FOR DISTRICT OF ALASKA

IN THE MATTER OF THE SEARCH OF:
365 Pavloff Circle Kodiak, AK 99615

Case No. 3:12-mj-00348-JDR

**AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH FOR AND SEIZE HAIRS FROM THE PERSON OF JAMES MICHAEL WELLS**

I, **KIRSTEN R. WISE**, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the person of JAMES MICHAEL WELLS, further described in Attachment A, for the things described in Attachment B, generally hairs.

2. I am a Special Agent (SA) of the United States Department of Justice, Federal Bureau of Investigation (FBI). I have been so employed for approximately 21 months. I am currently assigned to the FBI Violent Crimes Squad, Anchorage Field Division, and have been so assigned for the past 12 months. As a part of my official duties, I investigate violent crimes committed in areas under the special maritime and territorial jurisdiction of the United States.

**PROBABLE CAUSE**

3. The evidence set forth in this affidavit provides probable cause to believe that evidence regarding the murders of United States Coast Guard Electronics Technician First Class (ET1) James A. Hopkins and United States Coast Guard Civilian Employee Richard W. Belisle on April 12, 2012, at Building T2 (Rigger Shop) United States Coast Guard Communications Station Kodiak, AK (approximately mile two (2) of Anton Larson Bay Road Kodiak, AK) in violation of Title 18, United States Code, Section 1111(a) (Murder) and 1114 (Murder of a Federal Officer or Employee) may be found at the locations described in Attachment A.

4. The facts set forth in this affidavit are based on my personal knowledge; knowledge obtained from other individuals, including other law enforcement officers; interviews of persons with knowledge; my review of documents, interview reports and computer records related to this

000468

investigation; communications with others who have personal knowledge of the events and circumstances described herein; and information gained through my training and experience. This affidavit contains information necessary to support probable cause for this application and does not contain every material fact that I have learned during the course of this investigation; however, no information known to me that would tend to negate probable cause has been withheld from this affidavit.

5. The following search warrants have been previously issued as part of this investigation:

| Warrant # | Date | Location to be Searched | Items to be Seized | Judicial Officer |
|---|---|---|---|---|
| 3:12-mj-00155 | 4/13/12 | Blue Honda CR-V | Guns, gun accessories, blood stained items | Roberts |
| 3:12-mj-00156 | 4/13/12 | White Dodge Pickup | Guns, gun accessories, blood stained items | Roberts |
| 3:12-mj-00157 | 4/13/12 | Wells Residence | Guns, gun accessories, blood stained items | Roberts |
| 3:12-mj-00158 | 4/13/12 | Wells' iPhone | GPS Location Data | Roberts |
| 3:12-mj-00160 | 4/15/12 | Wells Residence | Fingernail clippings, hair, drain trap | Burgess |
| 3:12-mj-00161 | 4/15/12 | Wells' iPhone | GPS Location Data | Burgess |
| 3:12-mj-00163 | 4/16/12 | Blue Honda CR-V | Trace evidence Tire impressions Photo/video | Thompson |
| 3:12-mj-00164 | 4/16/12 | White Dodge Pickup | Trace evidence | Thompson |

2

| | | | | |
|---|---|---|---|---|
| 3:12-mj-00166 | 4/18/12 | Wells Residence – Septic System | Guns, gun accessories, blood stained items | Thompson |
| 3:12-mj-00167 | 4/18/12 | Person of James Wells | Photographs, DNA samples, fingerprints, fingernail scrapings | Thompson |
| 3:12-mj-00168 | 4/18/12 | White Dodge Pickup | Spare Tire | Thompson |
| 3:12-mj-00172 | 4/21/12 | Wells Residence | Guns, gun accessories | Burgess |
| 3:12-mj-00182 | 5/23/12 | Wells' Office Desk | Evidence of motive, purchases, travel, photographs, and telephone numbers | Smith |
| 3:12-mj-00251 | 8/17/12 | Wells Residence | Electronically stored information | Oravec |
| 3:12-mj-00252 | 8/17/12 | Person of James Wells | Electronically stored information | Oravec |
| 3:12-mj-00253 | | Apple iPhone | Electronically stored information | Oravec |

6. Suspect Name:    James Michael Wells
   Date of Birth:    6/24/1951

7. Residence Address:    365 Pavloff Circle Kodiak, AK 99615
   Residence Description:    Blue 2 story dwelling/reddish colored roof

3

Exhibit M - Page 3 of 17
Case 3:13-cr-00008-SLG   Document 143-13   Filed 10/04/13   Page 3 of 17
000470

| Property ID | R9003010031 |
|---|---|
| Last Name | WELLS |
| First Name | JAMES |
| Legal Description | BELLS FLATS BK 1 LT 3B & 3C |
| Street Address | 365 PAVLOFF CIR |
| Tax Code Area | 9 |
| School District | KISD |
| Exempt Code | N/A |
| Zoning Type | RR1 |
| Property Use | SFR |
| Mailing Address | P.O. BOX 1814<br><br>KODIAK, AK 99615 |
| Land Value | 66000 |
| Misc Value | 0 |
| Building Value | 137000 |

8. Vehicle 1:

    2002, extended cab, two door, white, Dodge Ram 2500 Pickup truck, AK Plate VCG 520, VIN: 3B7KF23622m307642, with white camper top over the bed, registered to James or Nancy Wells of 365 Pavloff Circle, Kodiak, AK. The camper top has a horizontally slanted race track shaped window extending about ¾ the length with two smaller vertically oriented racetrack shaped windows toward the rear. The back window of the camper top is not present and the roof line slopes upward toward the rear of the vehicle.

9. Vehicle 2:

    2001 Blue Honda CR-V, AK Plate EJR582, VIN: JHLRD18491C042288, Registered to James or Nancy Wells of 365 Pavloff Circle, Kodiak, AK.

4

10. A review of property records in Kodiak Borough and in information maintained by the Alaska Public Safety Information Network (APSIN) disclosed that James Michael WELLS and Nancy Jean WELLS are the owners of the residence and two vehicles described above. Employment records maintained by the United States Coast Guard disclose that James Michael WELLS resides at 365 Pavloff Circle, Kodiak, AK 99615.

**Jurisdictional Matters**

11. James M. WELLS is employed by the United States Coast Guard as an Antenna Maintenance Specialist (Wage Grade 10) at United States Coast Guard (USCG) Communications Station (COMMSTA) Kodiak, AK. He has been employed there since approximately 1990.

12. On April 12, 2012 at 0747 hours, Alaska State Troopers (AST) responded to a 911 emergency call from USCG COMMSTA Kodiak. On arrival, AST found Coast Guard Police Department (CGPD) and Coast Guard Fire Department (CGFD) on scene responding to the emergency call. On AST's entrance into the Rigger shop, Troopers found two adult males on the floor of the Rigger Shop with several medical personnel present. Both victims appeared to be moved from their original positioning by medical personnel.

13. The first victim observed by AST was ET1 James Hopkins, who was lying on his back with one gunshot wound to his right torso and wounds to his mouth and nose area. He also had what appeared to be wounds to his right arm and lost a large amount of blood that had started to coagulate on the floor.

14. The second victim observed by AST was USCG Civilian employee Richard W. Belisle. Belisle was found in a separate office from the first victim, lying on the floor with at least one gunshot wound to the torso, a small amount of blood on the floor, and Belisle's face had a dark discoloration.

15. Physically, COMMSTA Kodiak is comprised of two primary buildings, T1 and T2. Building T1 is the main facility, housing the command staff, operations personnel, and most of the maintenance personnel.

16. Building T2, also known as the Rigger Shop, is the workplace of the antenna maintenance staff. Building T2 is on the same grounds as T1, located approximately 100 yards away.

17. The COMMSTA, including Building T2, is on property owned by the United States Coast Guard, an agency of the Department of Homeland Security. USCG District 17 Legal Counsel has informed me that this building is within the Special Maritime and Territorial Jurisdiction of the United States as set forth in 18 U.S.C. sec. 7(3) because it has been reserved or acquired for the use of the United States.

18. ET1 (Petty Officer First Class – Electronics Technician) Hopkins was an active duty member of the United States Coast Guard, and was an employee of the United States. He was present

5

at the Rigger Shop for the performance of his official duties which began at 0800 on April 12, 2012.

19. Mr. Belisle had been a civilian employee of the United States Coast Guard since November 13, 2005. He was present at the Rigger Shop for the performance of his official duties which began at 0700 on April 12, 2012.

### Geographic References

20. The Coast Guard's main base in Kodiak, officially known as Base Support Unit (BSU) Kodiak, is located immediately south of the Kodiak State Airport. This allows Coast Guard fixed-wing aircraft to use the runways at Kodiak State Airport.

21. COMMSTA Kodiak is not located on the main facility of BSU Kodiak. It is located approximately 3 miles north-northwest of BSU Kodiak on Mile 2 of Anton Larsen Bay Road. The turn off for Anton Larson Bay Road is immediately north of the Kodiak State Airport.

22. The WELLS' residence on Pavloff Circle is located in the Bells Flats area, South of BSU Kodiak. Moreover, there is one primary road, Rezanof Drive/Chiniak Hwy, that runs from Bells Flats, past BSU Kodiak and the Kodiak State Airport, to the City of Kodiak.

23. To get from the WELLS' residence in the Bells Flats area to COMMSTA Kodiak, a vehicle must pass the Main Gate of BSU Kodiak and the entrance road to Kodiak State Airport.

### Timeline

24. Based on the timeline discussed in detail below, JAMES WELLS had the opportunity to commit the murders of Hopkins and Belisle, as detailed in the following sequence of events. There is probable cause to believe WELLS drove from his home in Bells Flats, past the main gate camera at BSU Kodiak, then pulled into the parking lot at Kodiak State Airport. WELLS then switched to his wife's small blue Honda CR-V and drove to COMMSTA Kodiak. After the murders, he then returned to Kodiak State Airport, switched back to his white Dodge pickup. He drove back toward his residence, again passing the main gate of BSU Kodiak. This all occurred between 6:48 a.m. and 7:22 a.m. on April 12, 2012.

25. At approximately 6:48 a.m. on April 12, 2012 closed circuit television cameras (CCTC) located at the front gate of BSU Kodiak captured video of a white Dodge truck with a camper shell with two slanted rear windows passing the base heading to the north. WELLS is the registered owner of a truck fitting this description. A person traveling from Bells Flat on Rezanof Drive to either Kodiak State Airport or COMMSTA Kodiak must pass this gate and video camera. The times of sightings cited in this paragraph and the following paragraphs have been adjusted to actual time.

6

Exhibit M - Page 6 of 17
Case 3:13-cr-00008-SLG   Document 143-13   Filed 10/04/13   Page 6 of 17

000473

26. Electronic access records for Building T2 show Richard Belisle's Access card was swiped at approximately 0700 hours which is consistent with the arrival of his vehicle at COMMSTA Building T2 Rigger Shop as viewed on CCTC.

27. CCTV at COMMSTA Building T2 show ET1 James Hopkins' vehicle arrived at Building T2 at approximately 7:08 a.m.

28. CCTV from a tower near COMMSTA Kodiak Building T1 show a small blue Sport Utility Vehicle (SUV) driving on Anton Larson Bay Road arriving at and disappearing from view behind Building T2 at 7:09 a.m. The blue SUV appears to have the profile of a 2001 Honda CRV, a black nose, black wheels, and a tire mounted on the rear. This vehicle did not enter the T2 parking lot via the primary entrance, and thus was not captured on the T2 video camera.

29. According to a witness interview of Aviation Electronic Technician First Class (AET1) Don Rudat, an active duty Coast Guard member who was walking/running on Anton Larson Bay Road near Building T2, Rudat stated he heard a loud metal hitting metal sound come from the direction of Building T2 at approximately 0710 hours as he was walking away from the area. Building T2 is a concrete block structure located within 200 feet of Anton Larson Bay Road. As related to me by those agents with experience in such matters, the sound of a gunshot in such a structure could be perceived to be a loud metal sound. CCTV from near COMMSTA Building T1 shows Rudat walking down Anton Larson Bay Road past T2 at approximately 7:12 a.m.

30. According to CCTC near COMMSTA Building T1, a small blue SUV with a black nose, black wheels, and a profile that appears to be a 2001 Honda CR-V was driving on Anton Larson Bay Road and came into view from behind Building T2 at 7:14 a.m. Again, this vehicle did not depart the T2 parking lot via the primary entrance, and thus was not captured on the T2 video camera.

31. The blue Honda CR-V owned by James WELLS was later found parked in the 2-hour parking lot at the Kodiak State Airport. The vehicle is currently equipped with black steel wheels, a black vinyl or fabric covering on the front (commonly called a "car bra"), and has a tire affixed to the rear door on a carrier. When found in the parking lot, the SUV was unlocked and the keys were in/on the center console.

32. According to available closed circuit television cameras at BSU Kodiak, a white dodge truck with camper shell with two slanted rear windows was observed travelling on Rezanof Drive West/Chiniak Hwy towards Bells Flats, southbound from the Kodiak State Airport area at approximately 0722 hours.

33. Two USCG civilian employees who know WELLS, Charlene Puddish and Annette Ecret, stated they witnessed James WELLS in his white dodge truck in the area of Bells Flats after 0722.

34. According to Chief Information Technician (ITC) Scott Reckner, USCG COMMSTA Kodiak, he received a voicemail from James WELLS at approximately 7:31 am. WELLS informed ITC Reckner he had a flat tire on his way into work and would be late to work. ITC Scott Reckner found this call to be extremely odd as James WELLS typically would not call until after 8:00 am if he was going to be late and sometimes did not call at all. Reckner opined it is not common for James WELLS to be proactive with respect to keeping supervisors apprised of his whereabouts and activities. On the previous day WELLS disappeared for approximately three hours between 9:00 am and 12:00 pm. WELLS had informed Reckner that he would be working in building T1 of the COMMSTA, a short distance away. Attempts to locate WELLS in building T1 during that time were unsuccessful.

35. A review of Hopkins' work voicemail revealed that WELLS had called Hopkins at approximately 7:30 am to tell Hopkins that he had a flat tire and would be in when he had changed it. A review of ITC Reckner's voicemail revealed that WELLS had called Reckner at approximately 7:31 am to tell Reckner that he had a flat tire and would be in when he had changed it. He also mentioned to Reckner that he was having a problem with the lug nuts on the tire.

36. At approximately 11:00 a.m., an individual employed by a civilian contractor spoke to WELLS on a work related matter. WELLS said nothing of the murder and stated only that "Rich" (Belisle) was "not available" and that they had "no immediate plans to climb the tower."

## Interviews

37. Nancy Wells was interviewed in Anchorage during the evening of April 12, 2012. She confirmed that she flew out of Kodiak to Anchorage on Tuesday, April 10, 2012, leaving her blue Honda SUV in the 2-hour parking lot at the Kodiak Airport. According to the interview, James WELLS told her he got a flat tire on the morning of the murders. In addition, Mrs. Wells indicated there was a spare tire in a carrier under James WELLS white Dodge pickup.

38. An interview of ITC (Chief Petty Officer – Information Technology) Scott Reckner revealed the following information:

    a. Reckner took over supervision of the COMMSTA Rigger Shop in July of 2010. At that time, WELLS and Belisle were the only two civilian employees at the shop. It became apparent to Reckner shortly after he took over that the "civilians" were running the shop. Reckner made it clear to Hopkins that Hopkins was in charge and counseled him regarding his leadership skills. Hopkins' assumption of a leadership role in the Rigger Shop caused tension between Hopkins and WELLS, who was used to acting with impunity.

8

b. Reckner assessed WELLS as being the most knowledgeable antenna mechanic on Kodiak Island and possibly the entire Coast Guard. Belisle's title was rigger, but there was not much difference between the job descriptions for rigger and antenna mechanic. Belisle's skill in electronics was weak, but he was a fast learner. WELLS and Belisle were both relied upon by the Coast Guard nationwide for their expertise.

c. In July of 2011 Reckner, WELLS, Hopkins, Belisle and other Rigger Shop personnel were erecting new towers on a remote Coast Guard facility. WELLS had decided that they were not going to install devices required by the Environmental Protection Agency on the towers. Reckner later decided that the devices must be installed as required by law. WELLS argued with Reckner over the decision and yelled at anyone who would listen that Reckner wasn't letting him do his job.

d. WELLS became ill in August of 2011 and was rarely in the office until January of 2012. WELLS eventually had his gall bladder removed and had surgery for a hernia.

e. During that period, members of the staff recall that Belisle, Hopkins and Reckner increased their knowledge and expertise. In addition, other staff members learned to rely on existing maintenance manuals, and realized that they could operate the Rigger Shop without Wells.

f. In September of 2011 a fuel card that was kept in WELLS' desk was reported missing by ET1 Hopkins. The fuel card was subsequently used at the Coast Guard BSU gas station and later found back in WELLS' desk. An investigation concluded that WELLS had used the card to fuel his personal vehicle. WELLS denied taking and using the fuel card. COMMSTA Commanding Officer, Commander (CDR) Peter Van Ness; Executive Officer, Lieutenant (LT) David Pizzuro; and ITC Reckner had a meeting with WELLS in February of 2012 in Van Ness' office and presented him with a Letter of Caution regarding the incident. Van Ness informed WELLS that he no longer trusted WELLS. WELLS repeatedly denied the accusation and repeated the phrase "It just doesn't sit right." WELLS was asked to sign the Letter of Caution, which he refused to do. All the participants of the meeting except for WELLS left the table. WELLS remained at the table alone and eventually signed the letter.

g. On November 2, 2011, ITC Reckner called WELLS to his office to have WELLS sign a Memorandum for Record advising that trees on COMMSTA property were not to be cut and removed for personal use and that all tree removals must be approved by Reckner. The same memo was also issued to Belisle. It had come to Reckner's attention that trees were being collared, a procedure that allows a tree to die slowly, and removed in areas in which the trees would not have been a hazard to the towers or any other COMMSTA resource. Much of this wood was taken by WELLS and Belisle for firewood. (Interviews with friends of WELLS indicate that he heats his home using a wood burning fireplace). During the discussion, WELLS asked Reckner about his (WELLS') role at the COMMSTA. Reckner informed WELLS that things were not looking good for him because of the tree collaring issue and the

9

fuel card incident and that it was "time to get in line." Reckner and WELLS had a heated discussion which was loud enough to be overheard by individuals outside Reckner's office. During the argument, Reckner informed WELLS that the only reason he wasn't getting fired was because there were no cameras at the BSU gas station. WELLS thanked Reckner for his honesty.

h. Around the time that the aforementioned Memorandum of Record was issued, Belisle approached Reckner and attempted to disassociate himself with WELLS. WELLS and Belisle were often referred to as "Jim and Rich" since they were the only two civilian employees in the rigger's shop. Richard Belisle clarified to ITC Reckner that it was to be "Jim or Rich," and Richard Belisle did not want to be associated with WELLS.

i. In December of 2011 Reckner had grown weary of hearing from other Rigger Shop employees that tasks were not being completed because WELLS wasn't ready or didn't want to do them. Reckner spoke to LT Pizzarro, who agreed that the rigger's shop staff should not wait for WELLS and should attempt to accomplish required tasks with or without WELLS' assistance. Reckner informed WELLS that they would no longer wait on him and that everyone that worked in the Rigger Shop, with the exception of one person, had told him that things didn't get done around the shop unless WELLS wanted to do them. Reckner told WELLS that he needed to "come in and be a part of the process or fucking retire. I don't care which, but we're not doing this anymore." WELLS and Reckner had a heated argument which was heard by others outside of Reckner's office.

j. On or about January 17, 2012 Reckner told WELLS that he would not be going to the annual National Association of Tower Erectors (NATE) conference which WELLS regularly attended. Reckner told WELLS that he would not be going due to the aforementioned disciplinary problems and WELLS' excessive absences in the preceding months. Reckner stated that WELLS enjoyed the conference where he would "strut around" and "talk a big game." Reckner further informed WELLS that Reckner, ET1 Hopkins, and Belisle would be attending the conference this year. WELLS questioned Reckner as to why ET1 Hopkins and Belisle were going. WELLS pointed at Belisle's chair and stated "he's not an antenna mechanic. He's just a rigger. I'm the mechanic and I should be going." Reckner and WELLS had a heated argument regarding Reckner's decision to not have WELLS attend the conference. After they had finished arguing, WELLS sat and stared at Reckner. Reckner stated that he was "sick" of WELLS' attitude and stared back for what seemed like a long time, but was probably two or three minutes. Eventually both WELLS and Reckner broke eye contact with no further discussion.

k. On April 11, 2012, the day prior to the murder of Belisle and Hopkins, WELLS, Belisle, Hopkins, Reckner, and other rigger's shop staff were discussing the best way to run an antenna cable. WELLS and Belisle suggested different ways of running the

10

cable. Reckner stated that he preferred Belisle's method and engaged Belisle in conversation regarding the technical aspects of completing the task.

    l. Reckner stated that due to WELLS' disciplinary problems and extended absences, WELLS' status with the command structure had deteriorated. Reckner's assessment of WELLS was that WELLS thought he (WELLS) needed to be the "top dog." Belisle's ability and initiative were also being noticed by Reckner. Reckner stated that WELLS' "star was fading" while Belisle's was "starting to shine."

    m. Reckner had also heard WELLS discuss financial issues, including investment losses that may have had an effect on his ability to retire.

39. SN Para Upchurch, a subordinate of ET1 James Hopkins in the Rigger Shop, was interviewed and stated she believed ET1 James Hopkins was bitter because he had to keep correcting James WELLS' work, which led to ET1 James Hopkins and James WELLS not getting along in the shop.

40. An interview with a co-worker of Nancy Wells revealed that one week prior to the murder of Hopkins and Belisle, Nancy Wells was upset while at work. Nancy confided in her co-worker that she was upset over a situation at WELLS' job in which he was having problems with "the idiots that he works with." Nancy provided no further details to her co-worker regarding the situation.

41. Lyle Phillips, a former ETC at the COMSTA rigger's shop, was interviewed and stated that he was the supervisor of the Rigger Shop from 2002 to 2007. WELLS worked for Phillips during this entire period. Belisle was hired during Phillips' tenure at the Rigger Shop. Phillips stated that WELLS had a bad temper and difficulty controlling himself. Phillips provided the following additional information:

    a. On one occasion in late 2002, WELLS' wallet fell out of his pocket and between the seats of a government vehicle. WELLS screamed at the younger seamen in the shop and accused them of stealing it when he could not find it. He demanded that Phillips punish the seamen, which Phillips refused to do. WELLS became angry, got in his truck, and accelerated out of the parking lot so quickly that he lost control and hit a government vehicle. WELLS wallet was later found between the seats of the government vehicle he had been driving.

    b. Phillips stated he was involved in two official disciplinary actions against WELLS. Phillips stated that WELLS was officially sanctioned in 2001 or 2002 for removing wood from COMMSTA property. Phillips also stated WELLS wanted to fly a communications hut from the island of Attu to COMMSTA Kodiak for repairs in 2004. Phillips ordered WELLS to leave the hut in Attu and request the parts needed for repairs be sent to Attu. The next day WELLS showed up in Kodiak with the hut.

11

    c. WELLS disappeared often during work hours without letting anyone know where he was going. Phillips believed that WELLS was often working on the base assisting others, which was helpful when the COMMSTA needed help or assistance. WELLS was present and ready when important tasks needed to be completed. After Belisle was hired Phillips wasn't as concerned with WELLS disappearing since he had another employee to assist him.

42. A non-custodial, non-mirandized, interview of James WELLS revealed the following information:

    a. JAMES WELLS has worked in the Rigger Shop since approximately 1990. Prior to 1990, he was a USCG active duty member. His normal assigned work hours are from 7:00 am to 3:30 pm.

    b. JAMES WELLS stated he left his home at approximately 6:50 am on April 12, 2012, in order to head to work. During the drive he stopped to check his tires and found the right front tire to be low. When asked where he turned around, WELLS stated "probably" at the Comfort Inn. The Comfort Inn is located at the entrance road to Kodiak State Airport. At that time, WELLS made the decision to turn around and head back to his home. Upon arrival at his home, he stated he changed the tire and called ITC Scott Reckner, however he didn't remember in which order that happened. James WELLS also stated he attempted to contact ET1 James Hopkins and Richard Belisle prior to calling ITC Scott Reckner.

    c. When asked about firearms, James WELLS stated he owned a 7mm magnum rifle and a .45 ACP handgun. During questioning, James WELLS appeared to be evasive in his answers, regarding the number of guns owned and the caliber. When FBI agents interviewed the wife of James WELLS in Anchorage on the early morning of April 13, 2012, her comments indicated he had additional firearms. In a search of the PREMISES conducted pursuant to warrant 3:12-mj-00157, WELLS was found to possess 2 handguns: a Ruger .44 magnum revolver and a Ruger .45 ACP pistol. He was also in possession of three shotguns and seven rifles.

    d. When asked, James WELLS consented for investigators to perform a quick search of his Dodge Ram 2500 pickup. Agents searched for blood stains and firearms. Agents found none.

    e. In interviews conducted on April 13th and 14th, WELLS stated that on the morning of the murders, he was on his way to work when he noticed he had a low tire on the white Dodge pickup. He claimed that he pulled off the road near the Kodiak State Airport, looked at the tire, then returned to his home to change the tire because the spare tire and jack were at his residence. WELLS was asked how a person could evade detection by the CCTC located on building T2. WELLS told the investigators

12

a person could park behind or beside the building and walk under the cameras. WELLS was then confronted with the information contained in paragraphs 28 and 30 above, that he passed the main gate of the Coast Guard Base Kodiak at going North toward the COMMSTA at 6:48 am, and did not return past the main gate camera going South toward his residence until 7:22 am. When asked to reconcile the 34-minute gap shown by the camera and his story about checking the tire, which would only take 6-8 minutes, he said he had no explanation for the missing 22 minutes.

43. According to Collette Francisco, a civilian Coast Guard employee, she was riding with a friend to the Kodiak State Airport on the morning of April 12, 2012, at approximately 6:45 am. Mrs. Francisco stated that she was talking to the driver of the vehicle when she noticed a vehicle go by in the other direction that she believes was Nancy Wells' small blue SUV. The location was near the "Self Help." The "Self Help" is a Coast Guard owned warehouse at the corner of Rezanof Drive/Chiniak Highway and Anton Larson Bay Road. Agents reviewed CCTV of the Alaska Airlines check in counter which revealed that Mrs. Francisco arrived at the counter at 6:46 a.m. Mrs. Francisco knows Nancy Wells and regularly sees her car on the road. She can usually identify Nancy Wells as the driver. On this particular day Mrs. Francisco did not see the driver. When Mrs. Francisco was asked to provide details on why she believed the car was Mrs. Wells' vehicle, she could not provide details, but stated something to the effect that she just knew it was Nancy Wells' car. In a subsequent interview, Mrs. Francisco stated that she believed the small blue SUV had a Coast Guard sticker. She did not name the black car bra as a distinguishing characteristic of the vehicle.

44. In an interview with Joseph Francisco, the husband of Colette Francisco, he related his conversation with his wife regarding her reported sighting of the Blue Honda CRV on April 12, 2012, to the interviewing agents. His recollection of the conversation was that his wife was not sure if the car she saw was Nancy Wells' car.

**Other investigation and information**

45. Based on initial analysis by the Alaska medical examiner and the Alaska Crime Laboratory, both victims were shot 3 times each, for a total of six shots. At the autopsy of Richard Belisle, the Medical Examiner removed a projectile from the cervical spine of Mr. Belisle. The projectile was intact, and was removed without further marking the item. That item has been submitted to preliminary forensic examination at the Alaska Scientific Crime Detection Laboratory. Preliminary findings are that the projectile is a .44 caliber bullet bearing markings of a 5 right twist, consistent with a Smith & Wesson Model 29/629 revolver, a Taurus revolver, or a Llama revolver. In searches conducted to date, investigators have not located such a weapon. Thus, law enforcement does not have possession of the murder weapon at this time.

46. A number of factors related to the homicide of Hopkins and Belisle indicate a level of advanced planning. The person who committed the murder chose a time when only a limited number of the staff was required to be on duty at T2, or had normally arrived at T2, and well

13

before the remainder of the staff arrived at 7:45 – 8:00 am. Moreover, the person chose a route into building T2 that prevented the camera on that building to capture an image of the vehicle. Finally, the murder weapon has not been located, indicating that it was disposed of or hidden with some thought, and the murderer left a limited forensic trail in building T2, indicated planned steps to prevent leaving trace evidence. All of this adds up to a significant level of advanced planning.

47. Nancy Wells indicated to agents that her 2001 Honda SUV is only one of two like it on the island. However, agents have identified six 1998 to 2003 model year Honda CR-V's registered with addresses on Kodiak Island, including the CRV registered to James and Nancy Wells. Investigation disclosed that two of the CRVs were not on the Island on April 12, 2012. The investigators located the remaining three CRVs, and have personally seen them. None of these CR-V's have a black "car bra." All three had silver colored wheels.

48. Pursuant to search warrant 168 issued on April 18, 2012 in the District of Alaska a studded truck tire, described as LT265/75R16 BF Goodrich Commercial Traction T/A, was seized from the bed of WELLS' white Dodge pickup truck. A 3 ½ to 4 inch long nail was embedded in a groove of the tire between two of the treads.

49. Forensic analysis of the tire concluded that the 3 ½ to 4 inch long nail was inserted into the tire manually and was not picked up nor present during normal operation of the vehicle. This conclusion is based on the following factors:

    a. There was no evidence of pavement or debris abrasion on the nail head which would necessarily be present had the nail been picked up during normal vehicle operation.
    b. The nail was located in the groove between the tread and had penetrated to the extent that the nail head was below the height of the tread. The nail head would not have penetrated below the height of the tread had it been picked up during normal operation.
    c. The nail shank was not bent and the nail penetrated the tire at an angle nearly perpendicular to the tire surface. A nail of this length could only penetrate the tire at an oblique angle during normal operation or the shank would be bent as the tire rolled over it.

50. On April 13, 2012, during an interview with investigating agents, Nancy Wells, one of the registered owners of the 2001 Blue Honda CRV (vehicle 2 described in detail in paragraph 9 above), signed a written consent for the search of the car. In her written consent, Nancy Wells made the following statement: "I authorize these agents to take any items which they determine may be related to their investigation." Agents took custody of the vehicle pending searches, although the vehicle remained at the Kodiak Island Airport under surveillance of law enforcement personnel.

51. Search warrant 3:12-mj-00155 was issued on April 13, 2012, to search the 2001 Blue Honda CRV (vehicle 2 described in detail in paragraph 9 above) for the items described in Attachment B to the warrant:

   > Guns, gun parts, ammunition, expended shell casings, accessories (if needed for weapon to function, such as a magazine), knives, edged weapons, blood stained articles, to include but not limited to: gloves, shoes, boots, towels, or clothing.

   The vehicle was moved to an indoor garage at the Kodiak Police department for execution of the warrant. The warrant was executed at 7:50 p.m. on April 15, 2012, before the date and time (April 15, 2012 at 10:00 p.m.) on that warrant expired. In the execution of that warrant, and consistent with the prior consent of one of the registered owners, Nancy Wells, the following items were also seized and secured for safekeeping pending an application for a warrant for these items on the following day:

   a. Vacuum sweepings from front driver's side and console;
   b. Vacuum sweepings from front driver's side and console;
   c. Vacuum sweepings from front passenger's side;
   d. Vacuum sweepings from rear driver's side;
   e. Vacuum sweepings from rear passengers side;
   f. Vacuum sweepings from rear area;
   g. Vacuum sweepings from rear area;
   h. Small piece of rock with red substance;
   i. Swabbing of possible blood from front driver's interior doo;
   j. Swabbing of possible blood from steering wheel; and
   k. five known tire impressions.

   These items were secured, and no further investigation occurred regarding these items until after a further warrant (described below) was sought and approved.

52. Search warrant 3:12-mj-00163 was issued on April 16, 2012, to search the 2001 Blue Honda CRV (vehicle 2 described in detail in paragraph 9 above) registered to James or Nancy Wells. Evidence authorized by that warrant to be seized was set forth in Attachment B to that warrant, and included:

   Guns, gun parts, ammunition, expended shell casings, accessories (if needed for weapon to function, such as a magazine), knives, edged weapons, blood stained articles, to include but not limited to: gloves, shoes, boots, towels, or clothing.

   Fibers, hairs, liquids, dried liquids, stones, soil, gunshot residue, dust, and other trace material for comparison.

15

Exhibit M - Page 15 of 17
Case 3:13-cr-00008-SLG   Document 143-13   Filed 10/04/13   Page 15 of 17

000482

Impressions, tracings, photographs and any other means of replicating or copying the treads of the tires on the vehicle.

Move the vehicle to the location of the vehicle sighted on videotape near the crime scene on the morning of April 12, 2012 (affidavit paragraph 21). Take photographs and video tape of the vehicle at that location.

53. On April 16, 2012, the items described in paragraphs 51(a) – (g) and (k) were seized for further processing.

54. On November 9, 2012, lab technicians from the FBI lab in Quantico, Virginia, notified the Anchorage Field Office that they had discover head hairs consistent with those of victim Richard Belisle in the vacuum sweepings recovered from the front driver's and front passenger's area of the Blue Honda CRV. The lab technician also stated that other hairs were present, and requested that a warrant be sought to seize head hairs of James and Nancy Wells, the registered owners of the vehicle, for comparison purposes. Such evidence, if authorized by the court, may allow the laboratory to identify the owners of the unknown hairs.

55. This warrant seeks to obtain the following hairs from JAMES WELLS in the indicated manner:

   a. Human head hairs, 5 hairs to be combed, and 5 hairs each from the top, front, back, and both sides to be plucked, for a total of 25 hairs to be plucked.

## CONCLUSION

56. I submit that this affidavit supports probable cause for a warrant to search the person of James Michael Wells, as described in Attachment A and seize hairs as described in paragraph 53 above and fully set forth in Attachment B, as evidence relating to violations of Title 18, United States Code, Section 1111(a) (Murder) and 1114 (Murder of a Federal Officer or Employee) those violations involving James M. WELLS

## REQUEST FOR SEALING

57. It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant. I believe that sealing this document is necessary because the items and

16

information to be seized are relevant to an ongoing investigation into the criminal organizations as not all of the targets of this investigation will be searched at this time. Based upon my training and experience, I have learned that online criminals actively search for criminal affidavits and search warrants via the Internet, and disseminate them to other online criminals as they deem appropriate, i.e., post them publicly online through the carding forums. Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

Respectfully submitted,

/s/ Signature Redacted

KIRSTEN R. WISE
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on November 13, 2012:

/s/John D. Roberts, USMJ
Signature Redacted

JOHN D. ROBERTS
U.S. MAGISTRATE JUDGE

17