KAREN L. LOEFFLER
United States Attorney

BRYAN SCHRODER
Assistant U.S. Attorney

KATHLEEN A. DUIGNAN
Special Assistant U.S. Attorney
Federal Building & U.S. Courthouse
222 West Seventh Avenue, #9, Room 253
Anchorage, Alaska 99513-7567
Tel: (907) 271-5071
Fax: (907) 271-1500
E-mail: karen.loeffler@usdoj.gov
E-mail: bryan.schroder@usdoj.gov
E-mail: kathleen.duignan@usdoj.gov

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>JAMES MICHAEL WELLS, )<br>)<br>Defendant. )<br>_____ ) | No. 3:13-cr-00008-RRB-JDR<br><br>**GOVERNMENT'S RESPONSE<br>IN OPPOSITION TO DEFENSE<br>MOTION TO SUPPRESS<br>PHYSICAL EVIDENCE** |

I.    INTRODUCTION

To date, the investigation of James Wells has included the

issuance of 24 search warrants.[1]  The 24 search warrants were reviewed and approved by five different federal judicial officers of the District of Alaska.  Defendant now seeks to suppress all evidence obtained through any and all search warrants, claiming broadly, and with little particularity, that all warrants lacked probable cause – in essence, that all five federal judicial officers erred.

Defendant's motion, however, is striking for what it fails to address.  First, despite the fact that five different judicial officers found probable cause, defendant does not even mention the government agents' well established right to rely in good faith on the 24 determinations of five judges.  Secondly, defendant's memorandum is most notable for its almost total lack of discussion about the

---

[1] Defendant lists 26 search warrants in his initial Attachment A.  The accurate total is 24 warrants.  Defendant's first listing is "3:12-mj-Redacted-DMS".  This is the same as 3:12-mj-00160-DMS.  Defendant just received a version with the search warrant number redacted along with the version that had the search warrant number listed.  Search warrant 3:12-mj-00159-DMS was never submitted to the court.  A similar search warrant application for the person of the defendant was submitted and issued five days later under search warrant number 3:12-mj-00167.  The confusion stems from a typographical error on search warrant 3:12-mj-00158.  The search warrant itself (AO 93) was issued by Magistrate Judge Roberts under 3:12-mj-00158.  However, the search warrant application form (AO106) had "3:12 mj-00159" incorrectly listed as the case number.  It was simply a typographical error.  The search warrant was properly issued as 3:12-mj-00158.  Thus the 26 items listed in defense Attachment A resulted in only 24 warrants.

*United States. v. Wells*
3:13-cr-00008-RRB-JDR          Page 2 of 49

information contained within the four corners of the affidavits.

When confronted with a request from law enforcement officers to conduct a search, "all data necessary to show probable cause for the issuance of a search warrant must be contained within the four corners of a written affidavit given under oath." *United States v. Gourde*, 440 F.3d 1065, 1067 (9th Cir. 2006). Instead, the defendant spends pages discussing what is not in the affidavit, trying to draw the Court's attention away from the four corners of the documents themselves – the only relevant analysis.

As detailed below, and found repeatedly by officers of the court, the affidavits in support of the search warrants fully established probable cause to search the places listed for the items identified. Moreover, even if there were some issue with the warrants, the agents were fully entitled to rely in good faith on the warrants' validity. Defendant's other claims of staleness, overbreadth, misstatement, etc. are equally deficient and are further addressed, *infra*.

Case 3:13-cr-00008-SLG   Document 151-2   Filed 10/18/13   Page 3 of 49

## II.   LEGAL ANALYSIS

### A.   THE AGENTS WERE ENTITLED TO RELY IN GOOD FAITH ON THE WARRANTS ISSUED BY ALL FIVE JUDICIAL OFFICERS AS ESTABLISHED BY *UNITED STATES V. LEON,* 468 U.S. 897 (1984).

Even if a court determines that there was insufficient probable cause to support a search warrant, the evidence should not be suppressed if the law enforcement officer relies in good faith on the warrant's validity.  *United States v. Leon*, 468 U.S. 897, 920-921 (1984). Indeed, the Ninth Circuit has noted that the district court need not even address the defendant's arguments about the basic sufficiency of probable cause.  The Court can move directly to applying the standards of the good faith exception: "Before embarking on the exercise of determining whether the affidavit supported probable cause, we may proceed directly on the issue of whether there was good faith reliance." *United States v. Crews*, 502 F.3d 1130, 1136 (9th Cir. 2007).

Here, defendant does not even address this well-established principle of good faith, and that failure dooms his entire motion.  There is simply no legal rationale supporting suppression or exclusion of any of the evidence recovered from execution of the 24 separate warrants.

*United States. v. Wells*
3:13-cr-00008-RRB-JDR          Page 4 of 49

To the extent that proponents of exclusion rely on its
behavioral effects on judges and magistrates in these areas,
their reliance is misplaced. First, the exclusionary rule is
designed to deter police misconduct rather than to punish
the errors of judges and magistrates. Second, there exists no
evidence suggesting that judges and magistrates are inclined
to ignore or subvert the Fourth Amendment or that
lawlessness among these actors requires application of the
extreme sanction of exclusion.

*Leon* at 468 U.S. 897, 104 S.Ct. 3405, 3417.

The good faith exception is a high wall for the defendant to scale.

He cannot do so in this case, nor has he tried. To overcome the

exception, the defendant must show that the "affidavit upon which the

warrant is based is so lacking in indicia of probable cause that no

reasonable officer could rely on it in good faith. *United States v. Crews*,

502 F.3d 1130, 1136 (9th Cir. 2007). For the good faith exception to

apply, all the affidavit must do is present a "colorable argument for

probable cause." *Id*. As detailed below, the judicial officers correctly

found ample probable cause in all 24 warrants – all of which were valid

even without the good faith reliance that precludes suppression here.

Case 3:13-cr-00008-SLG   Document 151-2   Filed 10/18/13   Page 5 of 49

### B. ALL FIVE JUDICIAL OFFICERS HAD A SUBSTANTIAL BASIS FOR FINDING PROBABLE CAUSE TO ISSUE A SEARCH WARRANT

#### 1. The Warrants

The search warrants in this case started with searches for obvious items in obvious locations. Then, as new information came to light that filled out the government's theory of the crime, and provided probable cause for additional searches, agents applied for additional search warrants. The government used a "running affidavit," taking the affidavit for the previous search warrant, then adding new information that supported probable cause, and occasionally removing old information that was determined to have limited relevance. As such, each search warrant affidavit was similar to the previous version, but tailored to provide the probable cause for the new search.

#### 2. Standard of Review

The courts apply a narrow standard of review for a magistrate judge's determination of probable cause for a search warrant: "[t]he duty of a reviewing court is simply to ensure that a magistrate had a 'substantial basis' for . . . concluding that probable cause existed." *United States v. Stanert*, 762 F.2d 775, 779 (9th Cir. 1985) (quoting

*United States. v. Wells*
3:13-cr-00008-RRB-JDR          Page 6 of 49

*Illinois v. Gates*, 462 U.S. 213, 238 (1983)).  The court may not reverse the magistrate's decision unless it determines it to be "clearly erroneous."  *Stanert* at 779.  *See also*, *United States v. Estrada*, 733 F.2d 683, 684 (9th Cir. 1984).

         3.     Probable Cause

The Supreme Court in *Gates*, adopted a "totality of the circumstances" test:  "In dealing with probable cause . . . as the very name implies, we deal with probabilities.  These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians act."  *Gates* at 231, (quoting *Brinegar v. United States*, 338 U.S. 160 (1949)).

In his motion, defendant focuses almost wholly on alleged information missing from supporting affidavits or what evidence was not found as a result of the searches.  This is simply the wrong approach.  Probable cause is determined by looking within the "four corners of the affidavit."  *Gourde* at 1067.

In the initial days after the murders, the defendant became a key suspect.  This suspicion was based on a few simple facts.  There were supposed to be three men in building T2 at the time of the murder.  Two

*United States. v. Wells*
3:13-cr-00008-RRB-JDR      Page 7 of 49

of the men were dead; the third was James Wells. Wells had an alibi that he developed a low or flat tire as he drove to work, so he decided to go home and change the tire before coming to work. However, that alibi immediately came under suspicion. A video camera at the main Coast Guard Base showed Wells' white pickup going past the front gate on the way from his residence to work at 6:48 am.[2] The same camera showed Wells returning toward his residence at 7:22 am. The amount of time between the two sightings was 34 minutes. Yet, Wells' alibi, that he drove toward the Kodiak Airport only one mile farther down the road, looked at his tire, then returned home, only accounted for approximately 6-10 minutes. Twenty-two minutes remained unaccounted for. In that 22 minutes, a camera at COMMSTA Kodiak showed a small blue SUV going into Building T2 at 7:08 am, then leaving at 7:14 am. Wells' wife was in Anchorage, but had left her small blue Honda CR-V at the Kodiak Airport, the same place Wells claimed he stopped to examine his tire, a location only 1.5 miles from

---

[2] COMMSTA Kodiak is located apart from the main Coast Guard Base by a distance of 3.7 miles. For Wells to get from his residence to his workplace at COMMSTA Kodiak, he must pass both the front gate of the main Coast Guard Base and the Kodiak Airport.

*United States. v. Wells*
3:13-cr-00008-RRB-JDR          Page 8 of 49

COMMSTA. The timeline was consistent with Wells driving his white truck to the airport, switching to the blue CR-V, driving to the T2 building at COMMSTA Kodiak to commit the murders, returning to the airport to switch cars again, and then driving home.

The first set of search warrants was for the Wellses' residence, his white truck, and the blue Honda CR-V, searching for guns and blood stained items. Also, Wells' iPhone was checked for GPS location data for the morning of the murders. Then as additional information was uncovered, the government sought additional warrants, slightly expanded as supported by additional probable cause. Tires were examined, and DNA, fingerprint, and fingernail scrapings were taken to see if any tissue matched the victims. The Wellses' septic system, which was dug up for repair or replacement, was searched as a possible hiding place for the gun or blood stained clothing. Then over the coming months, search warrants were obtained for the Wellses' residence for defendant's papers or electronic media that could provide evidence of motive or purchases, such as a gun consistent with the murder weapon.

As more information developed, such as an expert analysis that

*United States. v. Wells*
3:13-cr-00008-RRB-JDR        Page 9 of 49

the supposed flat tire had a nail that was inserted on purpose, possibly by a nail gun, later search warrants were obtained for the Wellses' residence searching for nail guns and related items. Most recently, government investigators uncovered a former associate of Wells who left a gun safe at the Wellses' residence when leaving Kodiak, and returned a few months later to find one handgun missing, a handgun consistent with the murder weapon. Based on that information, the government then sought search warrants related to the missing gun and other items stolen from the associate. The final search warrant was for bullets fired into the hillside that may be consistent with the murder weapon. This search warrant was obtained based on information obtained from the former associate, as well as Wells' children and friends.

Defendant's claim for suppression is generally not to attack what is in the affidavits or even how that leads to probable cause, but instead he just lists evidence that does not exist. The problem with this approach is that it is both legally misguided – controlling precedents direct the court to look at what is in the affidavits – and factually irrelevant. No investigation uncovers every possible fact or every

Case 3:13-cr-00008-SLG   Document 151-2   Filed 10/18/13   Page 10 of 49

possible piece of evidence. That is why the standard for conviction is beyond a reasonable (not all) doubt. The standard for seeking evidence via search warrant is much lower since, by definition, the search is designed to seek potential evidence; there is no need to search if every piece of evidence has been found. Identifying a list of items that are *not* part of the government's proof, in any case, is simplistic and has no relevance to the issue before the court. The fact that the defendant did not confess or that the government has not found the murder weapon, for example, does not in any way affect what the investigation had found at the time of each affidavit and whether such facts establish sufficient probable cause.

Although, defendant's arguments may be dismissed in total by their failure to address or even reference the substance of the affidavits, for completeness the government will address each of the five specific items/places discussed by defendant.

### a)    Defendant's Person and iPhone

Defendant challenges searches of his person for forensic evidence such as DNA, fingerprints, and hair. He claims there was no probable cause which is a conclusion without reference to the affidavit at all:

*United States. v. Wells*
3:13-cr-00008-RRB-JDR        Page 11 of 49

"there was no affirmative evidence linking Mr. Wells to the homicides, i.e. no witnesses, no confessions, no video footage." Mem. at 9. In fact, contrary to his claims, the investigation is built on the statements of many witnesses. There are just no eye witnesses; Wells killed them. Ironically, defendant faults the attempt to investigate forensic leads through warrants for things like fingerprints and DNA, arguing that the result of those searches did not lead to further evidence. It is unclear how his claim undermines the right and relevance of the warrant to collect evidence to determine if there are such connections. Indeed, that is what warrants are for – to collect potential evidence in furtherance of an investigation. Moreover, the only case he cites has no factual bearing on his argument whatsoever.

Throughout his motion, defendant almost exclusively relies on one case, *United States v. Lopez*, 482 F.3d 1067 (9th Cir. 2007), to support its arguments that evidence should be suppressed from various search warrants. The defense cites this case for the proposition that mere resemblance to a general description of a suspect is not enough to establish probable cause for arrest. The facts of *Lopez* are highly distinguishable from any of the facts in this case, and thus its relevance

*United States. v. Wells*
3:13-cr-00008-RRB-JDR          Page 12 of 49

to the points for which it is cited throughout the defense motion at docket 143 is greatly diminished. Moreover, *Lopez* did not even address a search warrant issue; it involved probable cause to detain an individual.

In *Lopez*, two police officers witnessed a shooting and saw the shooter flee the scene of the crime. The police officers described the shooter as "an adult, male Hispanic in his 20s, thin build, taller, wearing a white sweater and armed with a firearm." *Lopez* at 1069. The officers also provided a description of the shooter's getaway car, including make, model, and license plate number. *Lopez* at 1070. The car was a green Ford Focus. One-half hour after the shooting, the car was found in a nearby parking lot of a Fred Meyer store. *Id*. Law enforcement ran the plate information through the Department of Motor Vehicles and got the name of the vehicle's registered owner, Roberto Lopez Gomez, and his physical description, which included his height and weight. *Id*. The police then staked out the area surrounding the parking lot of the Fred Meyer store where the getaway car had been left. *Id*. After about eight hours, officers saw a white, 1990s Ford Taurus approach the Ford Focus, and saw a Hispanic male who was in

*United States. v. Wells*
3:13-cr-00008-RRB-JDR        Page 13 of 49

his 20s drop off a woman who drove the getaway car out of the parking lot. The police followed the man and the woman, pulled both over using police techniques, and arrested both. It was later determined that the male Hispanic man was Hosvaldo Lopez, not the registered owner of the car, Roberto Lopez Gomez. Hosvaldo Lopez contested the probable cause to arrest him, because he only generally resembled the description given of the original suspect, who turned out to be Roberto Lopez Gomez. Hosvaldo Lopez was a Hispanic male in his 20s, but he was relatively short at 5' 6", wore prescription eyeglasses, was not armed, and was not wearing a white sweater. The Court held that there was insufficient probable cause to hold Lopez as the principal shooter, but they ultimately concluded that there was probable cause to arrest Lopez as an aider and abettor to the principal offense. "Under the law of the [9th] Circuit, mere resemblance to a general description is not enough to establish probable cause." *Lopez* at 1073-74, citing *Grant v. City of Long Beach*, 315 F.3d 1081, 1088 (9th Cir. 2002) (other citations omitted). What factual relevance this case has to the issues before this court simply eludes the government. There are no physical descriptions of the shooter in the affidavits, no misidentification or any

Case 3:13-cr-00008-SLG   Document 151-2   Filed 10/18/13   Page 14 of 49

other factual similarity that would suggest *Lopez* could provide any relevant guidance on the probable cause finding here.

But in this case, probable cause was based on other factors. Probable cause was not based upon a description of the assailant. There were no living eyewitnesses to the crime and thus no corresponding descriptions of the murderer. Therefore, the *Lopez* case is inapposite for the points cited by the defense.

Probable cause was well-established in the affidavit supporting searches of the defendant, Wells, and his iPhone. It was also well established in the affidavit that the iPhone could have contained valuable GPS information to establish his location at the time of the murders. The fact that the defendant had shut off the GPS locating function of his iPhone accounts for the reason why no such information was recovered. However, it does not undermine probable cause to search for such data which would clearly have been useful if it had not been shut off.

The initial search warrants for the iPhone sought GPS data only. The later search in August 2012 was part of the expanded search for electronically stored information that included Wells' residence and his

Case 3:13-cr-00008-SLG   Document 151-2   Filed 10/18/13   Page 15 of 49

person. The affidavit provides probable cause for searching for evidence of motive, possible electronic purchases (including for firearms), and related web searches. The defendant's claim that the iPhone would not have contained incriminating information months after the murders misrepresents the facts. The iPhone was seized by investigators on April 13, 2012, the day after the murder, before the defendant might have had the opportunity to delete items, and before he would have broader knowledge of what the government would be seeking during the search. The August 2012 search warrant allowed the government to take the iPhone that was already seized and search for additional evidence, all of which was fully supported by the affidavit.

b) Wellses' Blue Honda CR-V

The search warrant affidavits demonstrate that defendant Wells drove his white truck toward the COMMSTA at 6:48 a.m. and back toward home at 7:22 a.m. past the security cameras at the main Coast Guard Base on April 12, 2012. In between that camera and COMMSTA Kodiak is the Kodiak Airport. Nancy Wells' car was parked at the airport just past the base entrance. A small, blue SUV, similar in shape, color, and size to Nancy Wells' SUV was seen on a COMMSTA

*United States. v. Wells*
3:13-cr-00008-RRB-JDR        Page 16 of 49

video going to and from the road in front of the COMMSTA, which was consistent with arriving and leaving during the time of the murders. The connection between that car, the murders, and Nancy Wells' vehicle is spelled out in the affidavits and clearly shows probable cause for any search of that vehicle.

### c)    Defendant's White Dodge pickup

The defendant gave investigators an alibi for the murders that directly referenced his white Dodge pickup truck.  Wells claimed that a flat tire on the Dodge pickup was the reason he was not at work at the time of the murders.  The fact that the truck was not located at the scene of the murder at the time of the murders is inconsequential to a finding of probable cause, especially since the government's theory is that defendant Wells used Nancy Wells' SUV in order to conceal his presence.

### d)    The Wellses' residence

The defense alleges in their motion (Dkt. 143 at p. 12) that the government did not disclose previous searches in their search warrant affidavits.  This is simply untrue.  The defense acknowledges this fact earlier in their brief (Dkt. 143 at pp. 4-6).  In fact, just about every

*United States. v. Wells*
3:13-cr-00008-RRB-JDR        Page 17 of 49

affidavit later in the case built upon one before it. Each successive affidavit includes a listing of the previous warrants. Thus, the information necessarily important to a finding of probable cause was included in each one. Moreover, the defense concedes that the defendant knew he was a murder suspect shortly after the murders. But the defense then jumps to a conclusion that probable cause diminishes each day going forward from the day the defendant was first suspected on April 13, 2012. This conclusion is unsupported. It is true that nothing of evidentiary value was found in several of the earlier searches. But as time progressed, the investigation honed in on leads that needed further investigation, and these leads generated further support establishing a basis for probable cause. Thus, in reality, as time progressed in the investigation, the support for probable cause in several instances intensified. As with his previous claims, Wells challenges probable cause with only broad and conclusory claims, i.e., there was no eyewitness evidence linking Wells to the crime and any murderer would get rid of all evidence (except, of course, if the murderer does not know what the government has found and what they are looking for).

*United States. v. Wells*
3:13-cr-00008-RRB-JDR      Page 18 of 49

e) Wells' Office Desk – Independent Source

Defendant challenges the warrant to search Wells' desk on two grounds. First, defendant claims that an agent found a letter of reprimand through an impermissible warrantless search of Wells' desk drawer. Then he claims (falsely) that this search was not detailed in the warrant application. Second, he appears to allege the search in May 2012 was stale because it occurred a month after the homicides. However, the defense makes this allegation without mentioning the rather key fact that Wells had no access to his desk or the COMMSTA in the intervening month.

All of these claims fail on the facts. First, despite claiming, indeed twice, that the agent's search of the desk drawer was concealed in the affidavit, the truth is it was described clearly and directly in the warrant. See full discussion in section III. Second, the disputed document came from Wells' personnel file and was provided to the government by his supervisor – a clear independent source. Finally, the search was not stale because whatever evidence was on Wells' desk at the time of the murders would still have been there in May since Wells was barred from access after April 12, and government investigators

*United States. v. Wells*
3:13-cr-00008-RRB-JDR        Page 19 of 49

had control of the building.

C.  THE INFORMATION IN THE SEARCH WARRANT
AFFIDAVITS WAS NOT STALE, NOR WERE THE ITEMS
TO BE SEIZED STALE, BECAUSE THOSE PORTIONS OF
THE SEARCH WARRANTS SOUGHT ITEMS LIKELY TO
EXIST EVEN AFTER THE PASSAGE OF TIME.

In challenging warrants issued after the homicides, the defendant

conflates two concepts of staleness, first, that the underlying

information in the affidavit is too old to be reliable, and second, that the

information does not provide sufficient probable cause that the evidence

sought is still at the place to be searched.  Attempting to discern his

argument, it appears that he is only claiming that the evidence sought

by the government would not have been at the defendant's residence at

the time of the search because he would have disposed of evidence

incriminating him.  This is not really an issue of staleness, but one

questioning the sufficiency of probable cause: was there sufficient

probable cause to believe that the items sought in the search warrant

were in the place to be searched?  There was sufficient probable cause

because the defendant would not have disposed of the items sought,

which were not obvious, primary items of evidence.  They were related

to associated matters – motive and the fabrication of false evidence.

*United States. v. Wells*
3:13-cr-00008-RRB-JDR        Page 20 of 49

"The mere lapse of substantial amounts of time is not controlling in a question of staleness." *United States v. Dozier*, 844 F.2d 701, 707 (9th Cir. 1988). In *Dozier*, the magistrate authorized a search warrant for items related to a marijuana-growing operation, but included "written records, financial statements, address books, United States currency, telephone books, and bills…." *Id.* at 704. The Ninth Circuit Court of Appeals found that "[t]he documentary records sought are the type of records typically found to be maintained over long periods of time." *Id.* at 707. Thus, the issue is not just has time passed, but is the evidence of the type that would likely be in the place to be searched.

Even the case cited by the defendant, when examined more closely, supports the government's position. In *United States v. Lacy*, U.S. Customs officials obtained a search warrant to search computers in the defendant's apartment for child pornography. 119 F.3d 742, 745 (9th Cir. 1997). Some of the information was 10 months old. *Id.* The Court stated that "[w]e evaluate staleness in light of the particular facts of the case and the nature of the criminal activity and property sought." *Id.*, quoting *United States v. Pitts*, 6 F.3d 1366, 1369 (9th Cir. 1993). Based on the nature of the crime, the court was willing to accept that viewers

*United States. v. Wells*
3:13-cr-00008-RRB-JDR          Page 21 of 49

of child pornography were willing to retain images for 10 months.

The quote from *Lacy* offered by the defendant at the bottom of p. 17 (docket 143) is truncated and misleading. The full quote is "[t]he information offered in support of the application for a search warrant is <u>not</u> stale if 'there is a sufficient basis to believe, based on a continuing pattern or <u>other good reasons</u>, that the items to be seized are still on the premises.'" *Id.* at 746, quoting *U.S. v. Gann*, 732 F.2d 714, 722 (9th Cir. 1984) (emphasis added). As discussed below, there were sufficient "good reasons" for the magistrate judges to find probable cause that the evidence sought in this case was on the premises.

The defendant claims that the when the government executed search warrants related to three particular types of items, there was insufficient probable cause to believe that those items would be at the Wellses' residence because he knew he was a suspect, and would not have retained evidence against him. Those items were:

- "Information relating to finances, email accounts, and weapons purchases,"
- "Pneumatic and automatic nailers and nails,"
- Bullets on the Wellses' property.

While the defendant's contention that he would dispose of

*United States. v. Wells*
3:13-cr-00008-RRB-JDR        Page 22 of 49

evidence of the crime is generally logical, it is a bit too simple. A
defendant does not necessarily know what items may become relevant
evidence as the government's theory of the case develops. Countering
the defense argument, there are two important reasons why a
perpetrator would not have destroyed certain valuable evidence. First,
the perpetrator did not recognize the items as evidence. Second, the
perpetrator made a mistake.

None of the items mentioned by the defendant were "primary"
items of evidence, like a gun or bloody clothing. The items sought were
evidence of motive, or corroboration that the defendant falsified
evidence, or proof that although the murder weapon has not been found,
that the defendant once had possession of a .44 magnum revolver that
matched the basic ballistics of the murder weapon.

The first search warrant challenged by the defendant, the one
seeking "information relating to finances, email accounts, and weapons
purchases," was SW 3:12-MJ-00251, signed by Magistrate Judge
Oravic. The affidavit clearly spells out the government's belief that
there may have been a financial motive for the murders, and why the
defendant's finances were an issue. Docket 143-10, ¶¶ 51-52.

*United States. v. Wells*
3:13-cr-00008-RRB-JDR        Page 23 of 49

Moreover, it is common for people to retain financial records for a reasonable period of time. Thus, there was probable cause for the magistrate judge to believe that these items were still available at the Wellses' residence, and to understand how they fit into the government's theory of the case.

The second warrant challenged by the defendant, although not specifically identified in the defendant's motion, is SW 3:12-MJ-00347. In that affidavit, signed by Magistrate Judge Roberts, the government sought pneumatic or automatic nailers, associated parts, and nails. Again, within the four corners of the affidavit the government explained that Wells' alibi was that while he was driving to COMMSTA on the morning of April 12, 2012, he had a low or flat tire that caused him to return to his residence. The tire he identified as the low tire was seized, examined, and it was determined that the nail in the tire was not acquired while driving, but rather, affirmatively inserted, most likely by some sort of nail gun. While a murderer might dispose of obvious evidence related to the crime, it is much less likely that he or she would dispose of a valuable power tool like a nail gun, just because it might have been used to cover up the crime. Moreover, nail guns were seen at

*United States. v. Wells*
3:13-cr-00008-RRB-JDR          Page 24 of 49

the Wellses' residence during previous searches. Docket 143-12, ¶¶48-51. This was spelled out clearly for the magistrate judge, who logically found probable cause.

Finally, the defendant claims that the government's most recent search, conducted last month, was for evidence unlikely to still be there, in this case bullets. The purpose of that search, done under SW 3:13-MJ-00285, issued by Magistrate Judge Smith, was to find bullets which matched the murder weapon. The murder weapon has not been recovered in this case. However, a former associate of Wells has indicated he left a Smith and Wesson model 629, .44 magnum revolver in Wells' possession in 1997, which Wells later claimed was "lost." Docket 143-19, ¶ 20. The Smith & Wesson model 629 has a 5-right twist generally consistent with the bullet removed from the body of Rich Belisle. Moreover, the government provided information that Wells, along with family and friends, had occasionally shot firearms into a hillside behind his residence. *Id*., ¶¶22-26. If the murder weapon was the Model 629 left in Wells' care, and a bullet was found in the hillside that matched the ballistics of the murder weapon, it would be a significant piece of evidence in the case. This type of evidence would

Case 3:13-cr-00008-SLG   Document 151-2   Filed 10/18/13   Page 25 of 49

not have dissipated in the past few years, and it would be extremely unlikely that Wells would remember there could be incriminating bullets in his hillside and try to remove them.  It is even less likely that Wells would have been successful if he tried to remove these bullets.  The affidavit provides more than sufficient probable cause for the search, and the magistrate judge properly concluded that evidence was likely to be at the place to be searched.

As with all of the defendant's previous allegations of judicial error, the government was entitled to rely on each warrant in good faith reliance.

### D.   DEFENDANT'S ALLEGATIONS DO NOT MEET THE REQUIREMENTS FOR A *FRANKS* HEARING

#### 1.   Standards

In addition to challenging the sufficiency of probable cause in the government's search warrants, the defendant also alleges that the government omitted information from the search warrant affidavit.  Based on these allegations, the defendant asks the Court to hold a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978).  The defendant fails to mention the significant requirements necessary to trigger a

*Franks* hearing, presumably because he does meet those requirements. In fact, he fails to make any showing on key required factors. Based on this failing, the request for a *Franks* hearing should be denied.

*Franks* requires a substantial preliminary showing to trigger an evidentiary hearing on the validity of the affidavit or testimony underlying a search warrant. To fulfill that requirement, the defendant must: (1) allege specifically which portions of the warrant affidavit are claimed to be false; (2) contend that the false statements or omissions were deliberately or recklessly made; (3) make a detailed offer of proof, including affidavits, to accompany the allegations; (4) challenge only the veracity of the affiant; and (5) show that the challenged statements must be necessary to find probable cause. *United States v. DeCesare*, 765 F.2d 890, 894-95 (9th Cir. 1985). The principles of *Franks* have also been applied to deliberate or reckless omissions that mislead the judicial officer, as well as false statements. *United States v. Stanert*, 762 F.2d 775, 780-781 (9th Cir. 1985).

The requirement of a substantial preliminary showing is not lightly met. A mere allegation standing alone, without an offer of proof in the form of a sworn affidavit or a witness or some other reliable

*United States. v. Wells*
3:13-cr-00008-RRB-JDR          Page 27 of 49

corroboration, is insufficient to make the difficult preliminary showing. *United States v. Mathison*, 157 F.3d 541, 548 (8th Cir. 1998). (internal citations omitted).

The defendant bears the burden of proving a *Franks* violation by a preponderance of the evidence. *United States v. Dozier*, 844 F.2d 701, 705 (9th Cir. 1988). The defendant must further demonstrate that the agent intentionally or recklessly made the false statement or omission. Mere negligence or inadvertence does not constitute a *Franks* violation. *Id.*; *see also*, *United States v. Collins*, 61 F.3d 1379, 1384 (9th Cir. 1995) (holding that agents knowledge of a fact (a specific date) and his failure to include it in an affidavit constituted negligence or innocent mistake and did not justify a hearing); *United States v. Hole*, 564 F.2d 298, 302 (9th Cir. 1977) (holding that innocent misstatements that are not intentional or reckless, even if material, will not vitiate an otherwise sufficient affidavit); *United States v. Botero*, 589 F.2d 430, 433 (9th Cir. 1978) (holding that misstatements or omissions in the affidavit are fatal only if reckless and if made with intent to deceive the court).

Even if the defendant were able to show there were omissions or misstatements *and* that they were intentionally made, that is still not

*United States. v. Wells*
3:13-cr-00008-RRB-JDR          Page 28 of 49

enough to warrant a *Franks* hearing. The defendant also has to show that the deceptions were material – that is, he or she has to show that the issuing magistrate judge could not have found probable cause absent the omissions or false statements. *Franks*, 438 U.S. at 171-72. Courts have also denied a *Franks* hearing where the allegation is a failure to investigate, not a deliberate omission or falsity. *See United States v. Ranney*, 298 F.3d 74, 78 (1st Cir. 2002) (Denying hearing in mail fraud case where allegation of omission in search warrant affidavit depended on claim agent should have probed facts further); *United States v. Miller*, 753 F.2d 1475, 1478 (9th Cir. 1985) ("It might have been prudent for the federal agents to check on [an informant's] background and criminal record, but their failure to do so is not reckless disregard.").

    2.    Allegations

The Defendant makes no allegations that government affiants made false statements to the court, only that they made certain omissions. The defendant alleges that the affiants failed to notify the court (1) that no blood or tissue (presumably of the victims) was found in the Wellses' vehicles or their residence, and (2) that Mr. Rudat, the

*United States. v. Wells*
3:13-cr-00008-RRB-JDR      Page 29 of 49

jogger/walker that was on Anton Larson Bay Road near COMMSTA at the time of the murders "was unconcerned" about the sound he heard, a "loud metal hitting metal sound," and that Mr. Rudat was listening to music at the time he heard the noise.

        a)      Alleged Omissions Unsupported by Evidence of Intent to Deceive the Court

Of the five *DeCesare* factors identified above as requirements for a *Franks* hearing, the Ninth Circuit has identified two as threshold requirements: "A *Franks* hearing is appropriate where the defendant makes a substantial preliminary showing that a false statement was (1) deliberately or recklessly included in an affidavit submitted in support of a wiretap, and (2) material to the district court's finding of necessity. *United States v. Shryock*, 342 F.3d 948, 977 (9th Cir. 2004). The defendant's request for a *Franks* hearing fails in both regards.

Most importantly, there is no specific contention that any government affiant deliberately or recklessly omitted the information cited by the defendant. There are no supporting documents, including affidavits, for such a contention. The defendant appears to believe that a bald assertion about the omission of facts by itself triggers a *Franks*

*United States. v. Wells*
3:13-cr-00008-RRB-JDR      Page 30 of 49

hearing.  As cited above, mere allegations of omissions are not sufficient to cause a *Franks* hearing.  *Mathison*, 157 F.3d at 548.  Requesting a hearing without supported allegations of intent to deceive the court or reckless disregard for the truth is using *Franks* as a fishing expedition.

If anything, the government took significant steps to assure that it provided the information that the court needed.  The affiants worked with the U.S. Attorney's Office, which reviewed each affidavit.  Moreover, the affiants – who were in Anchorage – worked with case agents on scene in Kodiak to assure that the appropriate information was provided to the Court.  Due to the defendant's failure to show, or even allege, deliberate deception or recklessness, the court should deny the defendants request for a *Franks* hearing on all allegations.

b)      Alleged Omissions not Material to the
        Magistrates' Decisions

The defendant's request for a *Franks* hearing should also be denied because even if the information in the defendant's allegations were provided to the magistrate, a reasonable person would still find probable cause to issue the search warrant.  *United States v. DeLeon*, 979 F.2d 761, 764 (9th Cir. 1992).

*United States. v. Wells*
3:13-cr-00008-RRB-JDR        Page 31 of 49

The defendant again tries to steer the Court's focus away from the significant amount of evidence contained in the four corners of the search warrant affidavit, and only look at other evidence. The search warrant affidavits in this case, many attached as exhibits to the defendant's motion to suppress, are comprehensive. From the earliest search warrant requests, the affidavits started at 10 or more pages, with 40 or more separate paragraphs, explaining important facts related to the crime scene, the medical and lab findings about the death of the victims, the evidence of the defendant being in the area of the murders, and his possible motives. If the defendant's two alleged omissions were added to any of the affidavits, they would not have reduced the amount of probable cause in any significant way. There would have been more than enough probable cause to issue the warrants. Thus, any alleged omissions are not material.

### 1)    Blood and Tissue Information

The defendant carefully phrases his motion to focus on areas away from the crime scene, where blood and tissue evidence are logically less likely to be found. This murder was completed with a high-powered handgun, a .44 magnum. There was no reason for the killer to be close

enough to his victims to receive any significant amount of blood or tissue spray.  Moreover, examining this crime from the totality of the circumstances, this was a well-planned homicide.  It happened at the time when there was minimal chance for the killer to be interrupted or identified.  He used a large-caliber revolver, which was effective and did not leave casings behind, and he disposed of the gun.  It is also likely that he took steps to assure he did not collect blood or tissue, and that he cleaned or disposed of clothes to try and minimize his chance of being caught.  Thus, it is not especially significant that no blood or tissue of the victims was found in his vehicles or home.  Therefore, the lab information proffered by the defendant would not have had a significant effect on the probable cause determination.

Moreover, the lab results related to blood and tissue were not completed by the Alaska Scientific Crime Detection Laboratory until May 9, 2012 (blood) and May 14, 2012 (DNA).  Most of the search warrants in this case were issued prior to that date.   Thus, even if the Court were to find the lab information to be material, it would not change the status of the majority of the search warrants in this case.

*United States. v. Wells*
3:13-cr-00008-RRB-JDR        Page 33 of 49

The key information provided by Mr. Rudat was accurately reported in the affidavit.  He stated that he heard a loud metal-hitting-metal sound.  The defendant claims that Mr. Rudat's military background should have been provided to the Court in the affidavit.  The implication is that Mr. Rudat has some level of expertise with firearms that would allow him to identify gunshots.

However, Mr. Rudat is a civilian employee of the Coast Guard, and his active-duty experience was in the Navy.  Based on that alone, there is no common sense expectation that Mr. Rudat has significant experience with small arms, and the defendant has not provided evidence that Mr. Rudat has such experience.  In fact, his position in the Coast Guard relates to avionics, and his role in the Navy was also related to aviation electronics.

Thus, there is no reason that his military experience would give him any insight into the sound of small-arms fire.  In fact, in his first interview, Mr. Rudat specifically says, "I haven't been around guns or anything at that point, you know, for a long time now."  Exhibit 1, p. 5. Given that his military experience was not related to small arms, and

*United States. v. Wells*
3:13-cr-00008-RRB-JDR         Page 34 of 49

he admits he does not have experience – at least recent experience –
with small arms, revealing his military background to the judicial
officer reviewing the warrant would have had little or no value.  Thus, it
is not material.

The other piece of information related to Mr. Rudat that the
defendant alleges was not provided was that he was wearing earbuds
and listening to music at the time he heard the noise in Building T2.
The implication is that the accuracy of Mr. Rudat's hearing should be in
question.  However, because Mr. Rudat did not claim to have
specifically heard a gunshot, the accuracy of his interpretation is not a
significant issue.  The main point is that he heard a loud noise.  On that
issue he is certainly clear.  If anything, the fact that Mr. Rudat was
wearing earbuds and listening to music, adds to the fact that it was a
loud noise.  If Mr. Rudat could hear the noise over his music, it
corroborates that the noise was loud.  Thus, had the affidavit included
the fact that Mr. Rudat was wearing earbuds and listening to music, it
would have strengthened the probable cause determination, not
lessened it.  Neither allegation related to Mr. Rudat's observations
would have changed the probable cause determinations by the judicial

*United States. v. Wells*
3:13-cr-00008-RRB-JDR          Page 35 of 49

officers, thus, the information was not material for *Franks* purposes.

The defendant's motion for a *Franks* hearing should be denied.

### III.  NO INFORMATION USED IN THE SEARCH WARRANT AFFIDAVITS WAS OBTAINED ILLEGALLY OR IMPROPERLY.

The defendant alleges that the government used information in the search warrant affidavits that was obtained illegally in two instances.  This is incorrect.  No information used in the affidavit was obtained even improperly, much less illegally.

First, the defendant alleges that the information used in the search warrant affidavits was illegally obtained from the defendant in interviews that "may be" the result of custodial interrogations.  Docket 143, p. 15.  The government strongly contests this characterization.

This issue is the subject of defendant's motion to dismiss statements at dockets 122 and 123.  The government has opposed that motion because no *Miranda* warnings were required during the first four (of six) statements because the defendant was not in custody. Those statements occurred on the day of the murder, when the defendant was interviewed as part of the crew that worked at the murder scene.  He was treated like all other members of the crew, none

of which were in custody.  The fourth and fifth statements, taken the next morning, were Mirandized.  Thus, there were no illegally obtained statements.

However, the defendant's statements were only a small part of the evidence providing probable cause for the search warrants.  Even if the information from the defendant's statements was not considered as part of the search warrant affidavit, there was still more than sufficient probable cause.  Inclusion of tainted evidence in an affidavit does not taint the entire affidavit.  *United States v. Heckencamp*, 482, F.3d 1142, 1149 (9th Cir. 2007).  To determine whether evidence seized under a search warrant containing information that might have been illegally obtained, the court must "excise the tainted evidence and determine whether the remaining untainted evidence would provide a neutral magistrate with probable cause to issue a warrant." *Id*., quoting *United States v. Vasey*, 834 F.2d 782, 788 (9th Cir. 1987).  *See also*, *United States v. Bishop*, 264 F.3d 919, 924 (9th Cir. 2001) (search warrant upheld after statements made during improper traffic stop and detention were excised from the affidavit).

In this case, the defendant's statements used in the affidavit were

*United States. v. Wells*
3:13-cr-00008-RRB-JDR          Page 37 of 49

limited.  That information included:

- An explanation of his normal schedule and arrival time, information that was also provided by his supervisors and co-workers.
- His alibi for the morning of April 12th – that he drove towards the COMMSTA, but had a tire problem and returned home.
- The guns he owned, which was incomplete.  He stated that he owned a hunting rifle and .45 semi-automatic pistol. When officers eventually searched his residence they also found six other rifles, three shotguns, and a .44 magnum revolver, although not the murder weapon.
- That the defendant gave consent for agents to search his pickup for blood or firearms, and they found none.
- That when confronted with a timeline that when compared to his alibi showed 22 minutes that he had not explained, the defendant stated he had no "reasonable" explanation.

The information related to the defendant's schedule was also provided by his supervisors or co-workers, so that information was independently provided.  The information on his alibi was information that he wanted to provide.  He left the same information on a voicemail to his supervisors earlier that morning, so it was to his benefit to include it in the affidavit.  The firearms information added little to the overall determination of probable cause because many Alaskans have firearms in their homes.  The information related to the consent search was more likely to lessen the level of probable cause, not bolster it, so it

*United States. v. Wells*
3:13-cr-00008-RRB-JDR          Page 38 of 49

was to his benefit that it was included. Finally, the defendant's inability to explain the timeline was certainly significant, but when compared against the remainder of the extensive evidence included in the affidavit, it was not necessary for the finding of probable cause. The determination of probable cause in this case was not a close call.

The defendant's other accusation of illegality was that agents improperly searched Wells' desk at the COMMSTA, finding a letter of caution, which was discussed in the affidavit. This complaint must fail for two reasons. First, the only references to the letter of caution made in the search warrant affidavits are from statements made by Chief Petty Officer (Chief) Scott Reckner, Wells' supervisor. This starts with the first search warrant, 3:12-MJ-00155-DMS, paragraph 28. Docket 143-3. The fact that the information was acquired through an independent source[3], which is clear from a reading of the affidavits, is ignored by the defendant in his attempt to accuse the government of illegal conduct.

---

[3] "Under the independent source exception, 'information which is received through an illegal source is considered to be cleanly obtained when it arrives through an independent source.'" *Heckencamp* at 1149, quoting *Murray v. United States*, 487 U.S. 533, 538-39 (1986).

Case 3:13-cr-00008-SLG   Document 151-2   Filed 10/18/13   Page 39 of 49

The misleading nature of this accusation could be shrugged off if the defendant did not also accuse the government of purposefully misleading the Court on this same matter. In the motion to suppress, the defendant refers to the affidavit in support of the search warrant to later search the desk, 3:12-MJ-00182-DMS, and states that "[t]he affidavit does not mention FBI agent Strause's earlier search." Docket 143, p. 13. This is absolutely false. Paragraph 38 of the affidavit starts with the sentence "On April 13, 2012, FBI Special Agent (SA) Angela Strauss, a member of the FBI Evidence Response Team (ERT) processing the crime scene, started to go through the desk drawers." The paragraph goes on to explain the searches by both SA Strause and CGIS SA Weimer. The government was completely up front about the previous searches, specifically asking the magistrate judge to review affidavits of the agents, and evaluate her finding of probable cause, which she annotated after paragraph 43 of docket 143-8.

It is disconcerting that the defendant wrongly accuses the government of improperly using illegal evidence, and even worse, hiding the illegality from the Court. Nothing could be further from the truth. The full story of the letter of caution is clearly stated in the appropriate

*United States. v. Wells*
3:13-cr-00008-RRB-JDR        Page 40 of 49

affidavits.  Either the defendant has failed to fully read the affidavits, or is choosing to ignore the facts in a purposeful attempt to sully the reputation of the government's trial team.  We hope it is the former.

## IV.   OVERBROAD ARGUMENT

The defense claims that all of the warrants issued in this case, presumably all 24, are overbroad.  The defense provides no additional specificity or support for this claim, with the exception of stating that "the searches of Mr. Wells' home and person for electronically stored information (search warrants 251 and 252) relating to finances, travel, weapons purchases, etc. . . were overbroad because there was no financial motive to the homicides, no travel involved for which there would be a record, and the government knew which type of weapon was used in the homicide."   Docket 143, at pp. 18-19.

The defense cites to *United States v. Spilotro*, 800 F.2d 959 (9th Cir. 1986), in support of their argument.  In *Spilotro*, the Court held that four warrants issued in that case seeking stolen items were insufficiently particular to be valid under the Fourth Amendment. *Spilotro*, 800 F.2d at 966-67.  In *Spilotro*, the warrant being challenged as overbroad allowed for the search of a jewelry store and permitted

*United States. v. Wells*
3:13-cr-00008-RRB-JDR          Page 41 of 49

seizure of numerous classes of documents and jewelry as evidence of violations of 13 different statutes identified by section number, without further description. *Id*.

But this case is factually distinguishable from *Spilotro* in several respects. First, the court in *Spilotro* relied upon the fact that the detailed affidavit, upon which the warrant was based, was not incorporated by reference into the warrant itself and only a few pages were made available to the officers executing the warrant. *Spilotro* at 967. That is not the case here. The detailed affidavit in this case was incorporated by reference and completely available to the law enforcement officer conducting the searches.

Second, the Court in *Spilotro* noted that "[t]he specificity required in a warrant varies depending on the circumstances of the case and the type of items involved. Warrants which describe generic categories of items are not necessarily invalid if a more precise description of the items subject to seizure is not possible." *Spilotro* at 963, citing *United States v. Cardwell*, 680 F.2d 75, 78 (9th Cir. 1982). The Court can look at one or more of the following categories to determine whether a description is sufficiently precise: (1) whether probable cause exists to

Case 3:13-cr-00008-SLG   Document 151-2   Filed 10/18/13   Page 42 of 49

seize all items of a particular type described in the warrant; (2) whether the warrant sets out objective standards by which executing officers can differentiate items subject to seizure from those which are not; and (3) whether the government was able to describe the items more particularly in light of the information available to it at the time the warrant was issued. *Spilotro* at 964-65 (internal citations omitted).  In *Spilotro*, the Court determined that had they attempted to do so, the warrant could have spelled out more completely how the documents to be seized related to the charged crimes.

Our case is easily distinguishable, especially because it involves one defendant alleged to have committed two murders, rather than the complex scheme of fraud and multiple co-conspirators involved in *Spilotro.  See, e.g., United States v. Kissler*, 937 F.Supp. 884, 887-89 (D.Alaska 1996) (distinguishing *Spilotro* and *United States v. Cardwell*, 680 F.2d 75 (9th Cir. 1982) from Kissler's case based upon notice of specific criminal acts, factual distinctions between the case, and application of the good faith exception).

In this case, the warrants were specifically tailored to the probable cause seeking evidence related to the defendant's planning

Case 3:13-cr-00008-SLG   Document 151-2   Filed 10/18/13   Page 43 of 49

and execution of the murders at COMMSTA Kodiak.  It was clear from the warrant what criminal acts the government alleged the defendant had committed.  The warrants provided specificity as to the types of information sought, the location where those items may be located, and the particularity of their relation to the crime.  The search warrants were so specific that in many instances agents had to get additional warrants to search the same places for new items.

The warrants complained of, search warrants 251 and 252, dockets 143-9 and 143-10, were issued to search defendant's computers, home records, and cellular phones.  The warrants were tailored and targeted to investigation of the murders in this case, and were detailed and specific.  Attachment B to search warrant 251 is two pages long and Attachment B to search warrant 252 is three pages long.  Each attachment provides specificity for the areas to be searched and authorization for the items to be seized, detailing particulars and specifics directly related to these crimes.  A review of the warrants and their attachments demonstrates that they were sufficiently particular and properly tailored to the purpose at hand.

Moreover, the defense cannot argue that probable cause was

*United States. v. Wells*
3:13-cr-00008-RRB-JDR        Page 44 of 49

lacking because several items the government is seeking have not yet been located, or were later located through alternative investigation outside of the challenged search warrants. For instance, the defense first complains that the government knows what type of weapon was used in the murders, but had not recovered the murder weapon. The defense then criticizes the government for seeking records to support defendant's possession of the murder weapon, after the government's investigation revealed the type of weapon and the fact that the defendant owned various types of weapons. Seeking such records was a task clearly supported by probable cause and spelled out with specificity in the warrant, and these records, if found in defendant's home, would be directly connected to the murders. Search warrants 251 and 252 were issued with sufficient specificity to allow those executing it to distinguish those items that could be lawfully seized pursuant to the warrants.

Thus, when the law of *Spilotro* is applied to the facts at hand, the Court should conclude that that the warrants in this case are more than sufficiently particularized to fulfill Fourth Amendment requirements. It was clear what defendant was accused of doing and what items were

*United States. v. Wells*
3:13-cr-00008-RRB-JDR        Page 45 of 49

being sought in support of the charged acts. And even if this Court decided that any portion of the warrant was overbroad, the evidence seized pursuant to the warrant should remain admissible. Law enforcement officers here conducted their search and seizures in objectively reasonable good faith reliance on the warrants. See discussion of "good faith exception" infra.

## V. CONTRABAND SEIZED DURING A LAWFUL SEARCH IS ADMISSIBLE EVIDENCE

The defense argues that certain items should be suppressed as outside the scope of the warrants. The defense seeks to suppress admission of various items of stolen U.S. Coast Guard property, information extracted from defendant's iPhone, and bullets, bullet fragments, logs, and a film canister.

First, the defense argues that the stolen Coast Guard property seized while executing warrants 157 and 160, namely a USCG magnifying lamp, a USCG LCD computer projector, USCG cold water immersion suits, an opened USCG bag of zip ties, 6 cartons of USCG fluorescent light bulbs, a USCG COMMSTA drill, and a USCG laptop computer should be suppressed. The government disagrees. These

*United States. v. Wells*
3:13-cr-00008-RRB-JDR        Page 46 of 49

items were clearly contraband seized during execution of a lawful warrant where law enforcement officials had a legal right to be present and the items were in plain view of the officers. The defendant makes no claim that he legally possessed any of these items. Defendant's possession of the items was clearly illegal, and the items were subject to lawful seizure. *See Ponce v. Craven*, 409 F.2d 621 (9th Cir. 1969), citing *Warden v. Hayden*, 387 U.S. 294, 307, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967) ("Items of contraband by their very nature relate to criminal behavior, so are therefore subject to seizure in the course of lawful search.").

The defense objection to items seized from the defendant's iPhone is not specific. The defense claims that telephone numbers seized under warrant 252 should be suppressed because they did not belong to sellers of firearms. However, at the time of the seizure, there was probable cause to seize all numbers because there was no information as to whom they belonged. The seizure of the numbers was clearly within the purview of the lawful warrant.

Finally, the defense argues that items seized pursuant to warrant 285 should be suppressed as outside of the warrant. The bullets and

*United States. v. Wells*
3:13-cr-00008-RRB-JDR          Page 47 of 49

bullet fragments are exactly what was being sought by the warrant, and are therefore admissible. The logs seized contained bullets as identified by a metal detector. Again, these items are directly covered by the warrant. The government concedes that the film canister is outside the scope of the warrant, and it has been returned to Mrs. Wells, the defendant's wife, through counsel.

## VI. CONCLUSION

The government requests that this court deny the defendant's motion to suppress evidence in its entirety.

RESPECTFULLY SUBMITTED October 18, 2013, in Anchorage, Alaska.

s/ Karen L. Loeffler
United States Attorney
United States of America

s/ Bryan Schroder
Assistant U.S. Attorney
United States of America

s/ Kathleen Duignan
Special Assistant U.S. Attorney
United States of America

Case 3:13-cr-00008-SLG   Document 151-2   Filed 10/18/13   Page 48 of 49

**CERTIFICATE OF SERVICE**

I hereby certify that on October 18, 2013,
a copy of the foregoing was served via the
CM/ECF system, on all counsel of record.

s/ Bryan Schroder
Office of the U.S. Attorney