Rich Curtner
Federal Defender
FEDERAL PUBLIC DEFENDER
FOR THE DISTRICT OF ALASKA
601 West Fifth Avenue, Suite 800
Anchorage, Alaska  99501
(907) 646-3400

Attorney for Defendant James Wells

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>JAMES MICHAEL WELLS,<br><br>Defendant. | NO. 3:13-cr-00008-RRB-JDR<br><br>**REPLY TO GOVERNMENT OPPOSITION TO MOTION TO SUPPRESS PHYSICAL EVIDENCE** |

JAMES MICHAEL WELLS replies to the government's opposition (Docket No. 153) to his motion to suppress the physical evidence obtained from search warrants executed by law enforcement personnel from April 12, 2012 to the present (Docket No. 142).

Mr. Wells relies on his motion, which asserts that the physical evidence obtained from the search warrants should be excluded because:

- the search warrants lack probable cause;

- the affidavits in support of the searches are based on material misstatements and omissions;

- the search warrants are the product of prior illegality;

- some of the search warrants are overbroad;

- a number of the search warrants are stale; and

- a number of the seizures exceed the scope of the warrants.

He responds to the government's arguments in turn.


## I.      THE WARRANT AFFIDAVITS LACK PROBABLE CAUSE

Mr. Wells urges the court to look within the four corners of the affidavits in this case because insufficient probable cause existed to issue the search warrants. The court will note that there is no affirmative evidence in the affidavits linking Mr. Wells to the homicides. The government's conjecture, to explain how the homicides occurred, is that Mr. Wells switched his white truck at the Kodiak airport with his wife's blue Honda CR-V, drove his wife's car to the rigger shop, killed his coworkers then drove home on April 12, 2012.

The linchpin of the government's allegations to establish probable cause that Mr. Wells committed the homicides is that he drove his wife's blue Honda CR-V to commit the murders. There was no witness who saw Mr. Wells driving his wife's car on the day of the homicides. There was no physical evidence of the homicides in the Wells' blue Honda CR-V or white truck. There was no physical evidence of the homicides at the Wells residence. The government repeatedly searched the Wells' vehicles and home and found no physical evidence linking Mr. Wells to the homicide. The affiants never noted in their probable cause statements that despite their repeated attempts to find physical evidence of the crime within the Wells' property, they found none.

Significantly, the government attempted to find support for its theory that Mr. Wells drove the blue Honda CR-V by analyzing USCG video footage of T2 at the time of the homicides. FBI case agents sent USCG video footage of the blue car to the FBI crime lab in Quantico, Virginia to test whether Mrs. Wells' car was a match with a blue car seen in USCG video.

The correspondence between the FBI lab in Quantico and FBI agents in Anchorage from April 20, 2012, makes it clear that experts examining the USCG video of the blue car were not able to identify the make or model of the car. (Exhibit T, Bates Stamp 19101-02.) This discovery was provided to Mr. Wells after he filed the motion to suppress physical evidence. In fact, in a letter provided to Mr. Wells only last week, FBI Agent Iber from the Quantico lab wrote Anchorage FBI Agent Allison that the "low resolution, poor image quality, low frame rate, and blurring caused by motion through the frame," of the video "not only make a conclusion that the car in the video is the same as the suspect's car impossible it also makes a conclusion about the class characteristics of the vehicle's make and model not viable." (Exhibit U, Bates Stamp 19219-220.) The date of this email is August 10, 2012.

The affiants at no time disclosed this information to the magistrates issuing the search warrants. This is a critical omission because the affiants aver that Mr. Wells drove his wife's car, as seen (or similar to the one seen) in the USCG video, to commit the homicides. The affiants rely on this video evidence to support the probable cause determination that Mr. Wells used that vehicle to commit the crimes in question. There is no evidence that Mr. Wells actually drove his wife's car to T2 on the morning of the homicides. There was clear information that there was no way to support this conjecture

through the video images on which the government relied in its affidavits. Consequently, not only is there no evidence within the four corners of the affidavits that corroborates the government's conjecture about how this crime took place, there is expert opinion evidence that such conjecture cannot be supported by the video. The lack of evidence tying Mr. Wells to the homicides and the lack of information supporting the government's conjectures about how the homicides occurred undermine any determination of probable cause.

The government provides a chronology for their searches that attempts to explain why they proceeded to search for certain items after initial searches of the Wells' residence, vehicles, and Mr. Wells' iPhone were not fruitful. As with the affidavits in this case, they do not mention that the government discovered no information linking Mr. Wells to the homicides in each of these searches. Mr. Wells does not dispute that the government disclosed that they previously searched locations multiple times. (*See* Docket No. 153, p. 17.) Mr. Wells takes issue with the fact that the affiants failed to mention that those searches uncovered no information of evidentiary value to the magistrate and failed to note when there was expert information that disclosed a lack of support for the government's theory.

Mr. Wells is attacking both the lack of affirmative information in the affidavits linking him to the homicides, as well as the government's failure to make clear to the court that they were not finding any information linking Mr. Wells to the homicides when they returned to obtain more warrants. The court had no way to appropriately make a probable cause determination when the affiants were not disclosing that they were not finding any actual evidence tying Mr. Wells to the homicides, and that their tests did not support their theories.

Mr. Wells has, indeed, relied on the case *United States v. Lopez*, 482 F.3d 1067 (9th Cir. 2007) but not for the proposition the government cites. Mr. Wells cites this case for the proposition that a mere resemblance to a general description of a murder suspect is not enough to establish probable cause for inferring a suspect was involved in a homicide. The government incorrectly states that Mr. Wells cites it for the proposition that mere resemblance to a general description of a suspect is not enough to establish probable cause for arrest.

The government states that the importance of *Lopez* to the issues in this case eludes the government. *Lopez* is cited by the Ninth Circuit in *United States v. Grant*, 682 F.3d 827 (9th Cir. 2012), which is a recent published opinion where the Ninth Circuit determined that there was insufficient information to establish probable cause in a search warrant affidavit to link a defendant to a murder. In *Grant*, an officer obtained a warrant to search Grant's home to recover a firearm used in a homicide that occurred nine months before. *Grant*, 682 F.3d at 828. Grant was not a suspect in the homicide but police suspected his sons were involved in some way in the homicide. *Id.*

The *Grant* affidavit stated that a man was found with multiple gun shot wounds in Culver City, California. *Id. a*t 829. A witness who heard the shots saw a thin, black male with a dark complexion, flee the scene. *Id.* at 829. Forensic tests on bullets recovered from the crime scene indicated that they had been fired from a .38 Special or .357 Magnum cartridge. *Id.* at 829. The government executed a warrant at Grant's home and discovered an empty box for a cell phone with an identity number which the police tracked to a phone number that was associated with members of two gangs. *Id.* at 829. One of Grant's sons, Davonte, was associated with one of those gangs. *Id.* at 829.

Davonte had been arrested for a different assault with a deadly weapon and the weapon was not recovered. *Id.* at 829. The officer obtained a warrant to search Davonte's cell phone and found pictures of him with a gun that was possible a .357 caliber. *Id.* at 829.

The officer also tracked Grant's other son, James, who was also affiliated with a gang. *Id.* at 829. The officer saw James discard a .45 in a park where James was shot. *Id.* at 829. The officer obtained a warrant to search for DNA to compare to DNA recovered at the homicide and there was no match. *Id.* at 829-830.

The officer then interviewed Davonte in jail and surveilled Davonte's conversations with a woman who was associated with Grant. *Id.* at 830-831. In those conversations Davonte referenced "taking someone down" with his daddy. *Id.* at 831. From those conversations, the officer surmised that Grant and Davonte had been looking for James and that it was possible James gave the woman associated with Grant the cell phone stolen from the homicide victim. *Id.* at 831. Based on those inferences and facts, a judge granted the officer a warrant to search the woman's residence for guns and ammunition used in the homicide. *Id.* at 831.

When executing that warrant, police found no evidence related to the homicide but found two firearms and ammunition belonging to Grant. *Id.* at 828. The district court found that there was insufficient probable cause to support the warrant but held that the good faith exception applied. *Id.* at 832. The Ninth Circuit upheld the decision that there was insufficient information to establish probable cause but held that the good faith exception did not apply. *Grant* at 828. The Ninth Circuit reasoned that the totality of connections from the homicide suspects, Davonte and James, to the defendant were too weak to amount to probable cause to search his residence. *Id.* at 832.

Case 3:13-cr-00008-SLG   Document 161-2   Filed 11/01/13   Page 6 of 21

Specifically in reference to James, the court found that there was no reasonable basis for inferring that he was involved in the homicide because his resemblance to a general description was not enough to establish probable cause. *Id.* at 833 citing *United States v. Lopez*, 482 F.3d 1067 (9th Cir. 2007).

This type of probable cause determination of a person or item associated with a homicide within a search warrant is precisely the type of analysis in which the Ninth Circuit engages in making a probable cause determination for a search warrant in *Grant*. In this case a purported resemblance between the Wells' blue Honda CR-V to a blurry image is not enough to establish probable cause. This is borne out by the FBI laboratory's analysis, which was not revealed to the magistrates issuing the search warrants and was only recently disclosed to Mr. Wells.

## II.  AGENTS WERE NOT ENTITLED TO RELY ON THE WARRANTS BECAUSE THEY LACKED PROBABLE CAUSE.

"Probable cause for a search requires a fair probability that contraband or evidence of a crime will be found in a particular place, based on the totality of the circumstances." *Dawson v. City of Seattle*, 435 F.3d 1054, 1062 (9th Cir. 2006) (internal citations and quotations omitted). In *United States v. Leon*, 468 U.S. 897 (1984), the Supreme Court held that a search conducted in good faith reliance on an objectively reasonable search warrant was not subject to the exclusionary rule if there was at least a colorable argument for probable cause. *United States v. Luong*, 470 F.3d 898, 903 (9th Cir. 2006).

The good faith exception does not apply:  (1)  where an affiant misleads the issuing magistrate or judge by making a false statement or recklessly disregarding the truth

in making a statement; (2) where the magistrate or judge wholly abandons her judicial role in approving the warrant, acting only as a "rubber stamp" to the warrant application rather than as a neutral and detached official; (3) where the warrant is facially deficient in detail as to the place to be searched or the things to be found that the officers could not presume to be valid; or (4) where the affidavit upon which the warrant is based is so lacking in indicia of probable cause that no reasonable officer could rely upon it in good faith. *United States v. Leon*, 468 U.S. at 923-26.

As detailed above, there is no affirmative evidence in the affidavits linking Mr. Wells to the homicides. The failure to establish a nexus between Mr. Wells and the homicides precludes the determination that there was probable cause to issue the search warrants in this case so the good faith exception does not apply. This case is akin to *Grant*. The officer in *Grant* was not entitled to rely on the warrant in good faith because of the degree of attenuation between the location to be searched and the lack of facts uncovered in the investigation connecting the defendant to the homicide. *Grant* at 832-38. Similarly here, the officers were not entitled to rely on the warrants in good faith because there is no nexus between Mr. Wells and any evidence connected to the homicides.

There was no physical evidence from the homicides in either of the Wells' vehicles. There was no GPS data placing Mr. Wells at the scene of the crime. There was no physical or electronic evidence from Mr. Wells' home or possessions connecting him to the homicides. Mr. Wells was not seen in the blue Honda CR-V that the government believes was connected to the homicides. There was no proof that the blue Honda CR-V was actually connected to the homicides. Most importantly, the government's own investigation, which was not disclosed to the magistrates, specifically states that there was

insufficient detail in video images of the questioned vehicle to make a conclusion about the make or model of the car involved in the homicides. The affiants state in the search warrants that Mr. Wells drove his wife's car to T2 to commit the crimes in question when there is no actual support that the vehicle on video was similar to the Wells' vehicle.

The government states that probable cause was based on other factors. Crucially, the government makes reference to no other factors within the four corners of the affidavits to support its position. Also, the government claims that their investigation honed in on leads generating further support for establishing probable cause and probable cause intensified. (*See* Docket No. 153, p. 18.) The government does not provide a single example of where this occurred nor a single item of relevant evidence obtained when probable cause allegedly intensified.

The government also claims that Mr. Wells phrases his motion to focus on areas away from the crime scene, where blood and tissue evidence are logically less likely to be found. There is no dispute about what was found at the area of the crime scene at this time. The government's other argument that blood and tissue are logically less likely to be found away from the crime scene is baffling since the affiants specifically swore out search warrants looking for blood and tissue evidence on Mr. Wells' property. (*See* Exhibit C, ¶ 31.) If the government did not believe such information would be located on Mr. Wells' property, it is unclear why they sought a search warrant specifically alleging they expected to find that type of information on his property.

### III. THE OMISSIONS IN THE WARRANTS WERE DELIBERATELY OR RECKLESSLY MADE SO WELLS IS ENTITLED TO A FRANKS HEARING.

In requesting a *Franks* hearing, Mr. Wells includes specific allegations relating to the Wells' blue Honda CR-V for the first time in this reply because the government did not disclose the information necessary to support these allegations until after Mr. Wells filed his underlying Motion to Suppress Physical Evidence (Docket No. 142).[1]

As the government notes in its opposition, a defendant must make the following showing in order to obtain a *Franks* hearing: (1) allege specifically which portions of the warrant affidavit are claimed to be false; (2) contend that the false statements or omissions were deliberately or recklessly made; (3) make a detailed offer of proof, including affidavits, to accompany the allegations; (4) challenge only the veracity of the affiant; and (5) show that the challenged statements must be necessary to find probable cause. *United States v. DeCesare*, 765 F.2d 890, 894-95 (9th Cir. 1985). *Franks* applies to deliberate or reckless omissions that mislead the judicial officer. *United States v. Stanert*, 762 F.2d 775, 780-81 (9th Cir. 1985). Neither the First nor the Eighth Circuit case

---

[1] Mr. Wells continues to reserve his right to contest omissions and misstatements related to the statements of the individuals whose quotes the affiants included in the search warrant affidavits. The statements made by Mr. Rudat and his military background were only disclosed in the government's opposition. Mr. Wells would like to address all the statements at one time. When the government provides the statements of those quoted he will address these allegation. Under the current scheme, Mr. Wells is forced to argue his position piecemeal, which provides the government an unfair advantage. By isolating each individual statement, Mr. Wells is not able to analyze and show individual omissions and patterns of omissions. The government should deliver all of this information at one time in order for Mr. Wells to prepare his argument once for the court to make an accurate and efficient assessment of a possible *Franks* violation.

law cited by the government is the law of this circuit so it does not apply to this court's analysis.

The specific portions of the warrant affidavit which are claimed to be false are:

- Exhibit B, ¶¶ 21, 37
- Exhibit C, ¶¶ 21, 37
- Exhibit D, ¶¶ 21, 37
- Exhibit E, ¶¶ 21, 37
- Exhibit F, ¶¶ 21, 37, 45
- Exhibit G, ¶¶ 21, 37
- Exhibit H, ¶¶ 17, 21, 23
- Exhibit I, ¶¶ 24, 28, 30
- Exhibit J, ¶¶ 24, 28, 30
- Exhibit K, ¶¶ 24, 28, 30
- Exhibit L, ¶¶ 24, 28, 30
- Exhibit M, ¶¶ 24, 28, 30, 54
- Exhibit N, ¶¶ 24, 28, 30, 54
- Exhibit O, ¶¶ 24, 28, 30
- Exhibit P, ¶¶ 24, 28, 30
- Exhibit Q, ¶¶ 24, 28, 30
- Exhibit R, ¶¶ 24, 28, 30

Mr. Wells contends that these statements were recklessly or deliberately made by the affiants. Affidavits B-E were recklessly made because the FBI agents did not have any support for their belief that the video images of the blue vehicle were a match for the Wells' car and the images were of such poor quality that it was not possible to make this determination. Affidavits F-R were deliberately made because the FBI agents had the assessments of forensic imaging tests which did not support their theory of how Mr. Wells supposedly committed the homicides and failed to disclose this to the reviewing magistrates.

The omission of the results from the FBI lab in Quantico demonstrate that there was no support for the government's conjecture connecting the Wells' blue Honda

CR-V and the homicides, and that the FBI knew that when swearing out these affidavits. The first report that alerted the affiants to the lack of evidence supporting the hypothesis that the Wells' blue Honda CR-V came into the FBI's possession by April 20, 2012 (Exhibit T). The second came into its possession on August 10, 2012 (Exhibit U).

The affiants were not being truthful in the affidavits in Exhibits B-R when they claimed that the USCG closed-caption television cameras at T1 and T2 show what appears to be a blue Honda CR-V near T2 at the time of the homicides. The attached declaration of Noa Oren, in conjunction with Exhibits T and U support, Mr. Wells' allegations. Without the video footage allegedly placing Mr. Wells at the scene of the crime in his blue Honda CR-V, there is no evidence that he was present at the rigger shop at the time of the homicides. There is no probable cause to believe that Mr. Wells committed these homicides because there is no evidence that he was there at the time of the homicides. The information related to the crime scene and medical findings notwithstanding, there is nothing linking Mr. Wells to the crime scene.

## IV.    A NUMBER OF THE SEARCH WARRANTS WERE STALE BECAUSE THE ITEMS TO BE SEIZED WOULD NOT AND DID NOT EXIST AFTER THE PASSAGE OF TIME.

Mr. Wells posits that items sought months after the homicides, after he was aware he was a suspect, are stale. As outlined in the underlying motion[2] and the government opposition[3], the court's inquiry on staleness focuses on whether there was a

---

[2] Memorandum in Support of Motion to Suppress Physical evidence, Docket No. 143, p. 8.

[3] Docket No. 153-2, p. 22.

sufficient basis to believe that there was a continuing pattern or other good reason to believe the evidence sought remained in the location delineated in the search warrant after a lapse of time. The court evaluates "the particular facts of the case and the nature of the criminal activity and property sought." *United States v. Lacy*, 119 F.3d 742, 745 (9th Cir. 1997) (internal citations and quotations omitted).

There were no good reasons for Mr. Wells to maintain information relating to his finances, email accounts, and weapons purchases if they related to the homicides. First, it is unclear why Mr. Wells would keep financial records and emails relating to the homicides if this was a carefully planned endeavor and he knew he was a suspect. Second, weapons purchases could potentially relate to the weapon involved in the homicides, but no pertinent information on this issue was obtained through the search warrants. It defies logic that Mr. Wells would retain such records months after the homicides, if he actually was involved, since the FBI had searched his property on multiple occasions prior to the issuance of this warrant. The government claims, with respect to Mr. Wells' iPhone, that it merely seized one phone.[4] However, it is our understanding that the government seized and searched three of Mr. Wells' iPhones.

There was even less reason for Mr. Wells to retain a pneumatic nail gun or nails related to the flat tire which he had the morning of the homicide if the nail was related to the homicide. The government argues that it is less likely that a person would dispose of a valuable power tool like a nail gun. However, the government's position is flawed because perpetrators of crimes routinely dispose of or hide valuable tools, such as

---

[4] Docket No. 151-2, p. 16.

firearms, if they believe they are suspected of crimes involving such tools. The government explicitly states this in its affidavits supporting the search for the firearm involved in the homicide. (*See* Exhibit C, ¶ 32.) These searches occurred seven and ten months after the alleged incident and after the government had seized the tire with the nail for forensic evaluation. Under these circumstances, it makes no sense that a suspect would keep this type of equipment in his home, which has been searched repeatedly, if it was related to a homicide.

Finally, the government contends that the most recent search for bullets on the Wells' property was not stale. This search occurred seventeen months after the homicides and there was no person who ever claimed they saw Mr. Wells shoot a Model 629 .44 magnum revolver. Thus, this search is also not supported by probable cause.

The government cites two cases to support its position that there was a sufficient basis to believe that search warrants were not stale with regard to: information relating to finances, email accounts, and weapons purchases; pneumatic and automatic nailers and nails; and bullets on the Wells' property. The first case is *United States v. Dozier*, 844 F.2d 701 (9th Cir. 1988). The case concerns a marijuana grow operation, which is a business enterprise that by its nature is an ongoing endeavor, unlike a homicide, and which requires record-keeping to document financial transactions, unlike a homicide.

The second case is *United States v. Lacy*, 119 F.3d 742 (9th Cir. 1997). The case concerns possession of child pornography. Owners of pornography typically keep such items for repeated viewing of the materials for sexual gratification. This is quite different from a homicide which does not typically include maintenance of records or

materials for a long period of time, especially when the person knows they are a suspect. In fact a homicide suspect would typically discard evidence related to the crime.

## V.  ILLEGALLY OBTAINED INFORMATION WAS INCLUDED IN THE WARRANT SO THOSE PORTIONS OF THE WARRANT SHOULD BE EXCISED.

Mr. Wells has alleged that a few items of illegally obtained information were included in the search warrants.  The government contends that the interrogations of Mr. Wells on April 12, 2012, were not custodial and did not require *Miranda* warnings.  The government does not address the fact that Mr. Wells' statements were not voluntary.  The court will need to make a determination about the admissibility of Mr. Wells' statements, based on the failure to give *Miranda* warnings and voluntariness, before the issue is addressed in the context of the search warrants.  Mr. Wells is in agreement as to the remedy the court would adopt, *i.e.* excising illegally obtained evidence from an affidavit, when the court makes this determination.

Mr. Wells renews his request for the full statements of people quoted in the affidavits, with regard to Agent Strause's search of Mr. Wells' desk on April 12, 2012, and Chief Petty Officer Reckner's access to a letter of caution relating to Mr. Wells.  The government assumes that Mr. Wells should know that Chief Reckner divulged this information independently.  In reality, since the government has not turned over any of the statements of individuals quoted in the affidavits, Mr. Wells has no way to evaluate the government's assertion.  It is not known whether Agent Strause found the letter first which triggered questioning of Chief Reckner or vice versa.  The reference to Agent Strause's search of Mr. Wells' desk on April 12, 2012, in Exhibit H is the first time Mr. Wells learned of her illegal search, so it is unclear whether this search led to seeking additional

information from Chief Reckner about Mr. Wells' relationship with his supervisors and co-workers.

## VI. SOME OF THE WARRANTS ARE OVERBROAD. ITEMS SEIZED PURSUANT TO THOSE WARRANTS SHOULD BE SUPPRESSED.

The government contends that the searches for electronic stored information from Mr. Wells' iPhone and computers were carefully tailored to include only relevant and specific items. A search authorizing seizure of papers is inherently more dangerous to Fourth Amendment rights than a search for tangible objects. In *Andresen v. Maryland*, 427 U.S. 463, 482, n. 11 (1976), the Supreme Court stated:

> We recognize that there are grave dangers inherent in executing a warrant authorizing a search and seizure of a person's papers that are not necessarily present in executing a warrant to search for physical objects whose relevance is more easily ascertainable. In searches for papers, it is certain that some innocuous documents will be examined, at least cursorily, in order to determine whether they are, in fact, among those papers authorized to be seized.

*United States v. Spilotro*, 800 F.2d 959 (9th Cir. 1986) is on point and supports Mr. Wells' position that the government search in this case was overbroad. As the underlying motion and the government opposition notes, the court conducts three inquiries which help determine whether the particularity requirement is met:

> (1) whether probable cause exists to seize all items of a particular type described in the warrant; (2) whether the warrant sets out objective standards by which executing officers can differentiate items subject to seizure from those which are not; and (3) whether the government was able to describe the items more particularly in light of the information available to it at the time the warrant was issued.

*Spilotro*, 800 F.2d at 963 (citations omitted).

Mr. Wells avers, as mentioned above, that there was no probable cause to search his property in light of the information presented in the search warrants. The chief problem in the government's search for electronically stored information relating to this case is that there is no objective standard by which an executing officer could differentiate items subject to seizure from those that are not. The government was able to review every piece of electronic information in conducting its search not limited to the categories of information sought. For example, the request to search for photographs of Mr. Wells with a .44 magnum revolver once granted permitted the government to search all photographs. The request to search for evidence and documents related to researching or acquiring firearms once granted permitted the government to search all documents on every drive and Mr. Wells' entire internet search history. The request to search through Mr. Wells' email accounts once granted allowed the government to review all of Mr. Wells' email correspondence. The same is true of Mr. Wells' financial and travel records.

Thus, the actual application of the warrant was neither specifically tailored as applied nor limited in any real sense. For example, at Mr. Wells' bail review the government brought to the court's attention Mr. Wells' activity on web sites and phone records that are wholly unrelated to the homicides, such as a person named Sage. The government uncovered this information because the execution of the search for specific electronic information was not tailored but, in fact, was a fishing expedition. There were no objective standards that actually limited law enforcement's search of the hard drives that they seized.

The Ninth Circuit district courts are quite cognizant of the dangers of allowing unfettered access to search electronic and digital devices, which violates the Fourth

Amendment by becoming a general warrant in effect. In *United States v. Comprehensive Drug Testing, Inc.* ("CDT III"), 621 F.3d 1162, 1177 (9th Cir. 2010) (*en banc*) (*per curiam*), the Ninth Circuit stated:

> We recognize the reality that over-seizing is an inherent part of the electronic search process and proceed on the assumption that, when it comes to the seizure of electronic records, this will be far more common than in the days of paper records. This calls for greater vigilance on the part of judicial officers in striking the right balance between the government's interest in law enforcement and the right of individuals to be free from unreasonable searches and seizures. The process of segregating electronic data that is seizable from that which is not must not become a vehicle for the government to gain access to data which it has no probable cause to collect.

A recent application of the heightened vigilance magistrates must apply when reviewing a warrant to seize electronically stored data is *In re United States' Application for a Search Warrant to Seize and Search Electronic Devices from Edward Cunnius*, 770 F.Supp.2d. 1138 (W. D. Wash. 2011). In that case, the court denied a search warrant application where the government refused to conduct a search of digital devices using a filter team and foreswearing reliance on the plain view doctrine. In that search warrant application, the government sought any computers or digital devices for all electronically stored information relating to crimes of copyright infringement or trafficking in counterfeit goods.

The information the government obtained and used against Mr. Wells while limited on the face of the warrant, in reality became a search of all electronically stored information, thereby exceeding the scope of Attachment B to search warrants 251, 252 and 253. The information obtained through search warrants 251, 252 and 253 should be

suppressed because the search warrant is overbroad as applied to the scope of the seizure.

## VII.   ITEMS SEIZED BEYOND THE SCOPE OF THE WARRANTS SHOULD BE SUPPRESSED.

The government does not dispute that the objected to items[5] from warrants 157 and 160 exceed the scope of the warrants.  The government claims that those items were clearly contraband in plain view.  To justify a warrantless seizure based on plain view, however, three conditions must be satisfied.  First, the seizing officer must not have violated the Fourth Amendment "in arriving at the place from which the evidence could be plainly viewed." *Horton v. California*, 496 U.S. 128, 136 (1990).  Second, the item must not only be in plain sight, but "its incriminating character must also be immediately apparent." *Id.* (quotation omitted).  Finally, "not only must the officer be lawfully located in a place from which the object can be plainly seen, but he or she must also have a lawful right of access to the object itself."  *Id.* at 137.

Mr. Wells reiterates that the government had no probable cause to search his home pursuant search warrants 157 and 160.  Critically, these USCG items were not clearly incriminating on April 15-16, 2012.  Chief Reckner and Cody Beauford had to identify the items that were, in fact, unaccounted for by USCG records.  (Exhibit V, Bates Stamps 17663-17664**.)** These identifications occurred on November 7, 2012.  Thus, it was not immediately apparent that these items were contraband at the time they were seized.

_____

[5] A USCG magnifying lamp, a USCG LCD projector, USCG Mustang suits, USCG opened bag of zip ties, USCG fluorescent light bulbs, a USCG COMMSTA drill, and a USCG laptop computer.

The government cites *Ponce v. Craven*, 409 F.2d 621 (9th Cir. 1969) to support its position. However, it is not on point because it relates to heroin and narcotics paraphernalia, which are plainly illegal items that the officer recognized when he saw them.

With respect to the items seized from Mr. Wells' iPhone pursuant to warrant 252, the government claims that there was probable cause to seize all numbers because there was no information as to whom the numbers belonged. Mr. Wells renews his request to suppress these items on the previously mentioned grounds. *See In re United States' Application for a Search Warrant to Seize and Search Electronic Devices from Edward Cunnius*, 770 F. Supp. 2d. 1138 (W. D. Wash. 2011).

## VIII.    CONCLUSION

The court should find that the government violated Mr. Wells' Fourth Amendment right to be free of unreasonable searches and seizures. The court should suppress the physical evidence obtained from these illegalities.

As requested before, the defense moves for an evidentiary hearing, pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), to be held after defense counsel receives and reviews the full statements from individuals whose remarks were included in the search warrant affidavits.

DATED this 1st day of November 2013.

Respectfully submitted,

/s/Rich Curtner
Federal Defender
601 West Fifth Avenue, Suite 800
Anchorage, AK 99501
Phone:        907-646-3400
Fax:           907-646-3480
E-Mail:        rich_curtner@fd.org

Certification:
I certify that on November 1, 2013,
a copy of the **Reply to Government
Opposition to Motion to Suppress
Physical Evidence** was served
electronically on:

Bryan D. Schroder
Assistant U.S. Attorney
222 West 7th Avenue, #9
Anchorage, AK 99513
Email: bryan.schroder@usdoj.gov

Karen L. Loeffler
U.S. Attorney
222 West 7th Avenue, #9
Anchorage, AK 99513
Email: karen.loeffler@usdoj.gov

Kathleen A. Duignan
Special Assistant U.S. Attorney
222 West 7th Avenue, #9
Anchorage, AK 99513
Email: kathlee.duignan@usdoj.gov

/s/Rich Curtner