1          UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF ALASKA

3  UNITED STATES OF AMERICA,    )   Case 3:13-cr-00008-RRB-JDR
                                )
4            Plaintiff,         )   Anchorage, Alaska
                                )   Monday, November 18, 2013
5       vs.                     )   9:30 o'clock a.m.
                                )
6  JAMES MICHAEL WELLS,         )
                                )
7            Defendant.         )
   _____)

8

9  **EVIDENTIARY HEARING ON OBJECTIONS TO MAGISTRATE JUDGE ORDER**
   **(DOCKET 140)/MOTIONS TO SUPPRESS (DOCKETS 120, 122)**

10              **TRANSCRIPT OF PROCEEDINGS**

11        BEFORE THE HONORABLE JOHN D. ROBERTS
             UNITED STATES MAGISTRATE JUDGE

12  APPEARANCES:

13
   For the Plaintiff:       KAREN L. LOEFFLER
14                          U.S. Attorney
                            BRYAN SCHRODER
15                          KATHLEEN ANN DUIGNAN
                            Assistant U.S. Attorneys
16                          Office of the U.S. Attorney
                            222 West 7th Avenue, #9, Room 253
17                          Anchorage, Alaska  99513-7567
                            (907) 271-5071
18
   For the Defendant:       F. RICHARD CURTNER
19                          Federal Defender
                            Office of the Federal Public Defender
20                          601 West 5th Avenue, Suite 800
                            Anchorage, Alaska  99501
21                          (907) 646-3400

22  Court Recorder:          NANCY LEALAISALANOA
                            U.S. District Court
23                          222 West 7th Avenue, #4, Room 229
                            Anchorage, Alaska  99513-7564
24                          (907) 677-6111

25

```
1   APPEARANCES (Continued):

2   Transcription Service:     A & T Transcripts
                               6299 West 111th Avenue
3                              Westminster, Colorado  80020
                               (720) 384-8078
4

5   Proceedings recorded by electronic sound recording; transcript
    produced by transcription service.
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

<u>**ANCHORAGE, ALASKA – MONDAY, NOVEMBER 18, 2013**</u>

3        (Call to Order of the Court at 9:30 a.m.)

4        (Defendant present)

5        THE CLERK:  All rise.  His Honor the Court, the United

6    States District Court for the District of Alaska is now in

7    session, with the Honorable John D. Roberts presiding.  Please

8    be seated.

9        THE COURT:  This is the time set for a hearing, *U.S.*

10   *versus James Wells*.  Defendant and counsel are present.  The

11   matter set is a suppression hearing on the motion to suppress

12   statements, Docket 120 only.

13       One housekeeping matter that we might take up first.

14   The government has filed an opposed request for a one-week

15   extension of time to provide the 404(b) notice.  I assume that

16   it is unopposed?

17       MR. CURTNER:  That's correct, Your Honor.

18       THE COURT:  I'll go ahead and grant that request.  And

19   that is Docket Number 176.  Before we begin the testimony, is

20   the witness rule going to be invoked by either side?

21       MR. CURTNER:  Yes, Your Honor.

22       THE COURT:  I'll leave it to counsel then to instruct

23   your respective witnesses to abide by that rule.

24       MS. LOEFFLER:  Your Honor, we assume the exception for

25   the case agent is allowable.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 187   Filed 11/26/13   Page 3 of 130
(720) 384-8078  attrans@sbcglobal.net

**VAN NESS - DIRECT**

1    THE COURT:  That's correct.  All right.  Well, I'm

2  ready to begin if counsel are.

3    MR. SCHRODER:  We are, Your Honor.  The government

4  calls Commander Peter Van Ness.

5    (Side conversation)

6    MR. SCHRODER:  Commander Van Ness, come up to the

7  witness stand, please.  Oh, this one.

8    THE CLERK:  Sir, if you can please remain standing.

9  Raise your right hand.

10   **PETER RUSSELL VAN NESS, PLAINTIFF'S WITNESS, SWORN**

11   THE CLERK:  Thank you.  Please have a seat.  And for

12  the record, please state and spell your full name.

13   THE WITNESS:  Peter Russell Van Ness.  P-e-t-e-r, R-u-

14  s-s-e-l-l, V-a-n, space, capital N-e-s-s.

15   THE CLERK:  Thank you.

16   **DIRECT EXAMINATION**

17  BY MR. SCHRODER:

18  Q    Commander Van Ness, what do you do?

19  A    I am a commander in the Coast Guard.

20  Q    And how long have you been in the Coast Guard?

21  A    I've been in the Coast Guard about 18-1/2 years.

22  Q    And how did you get into the Coast Guard?

23  A    Through the Coast Guard Academy.

24  Q    And what is your current assignment?

25  A    I am currently assigned at Coast Guard Headquarters, the

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1  Office of Strategic Planning and Management.

2  Q    And what do you do there?  What's that mean?

3  A    Well, my -- my official position is business intelligence

4  program manager, so I'm in charge of our Enterprise data

5  management system.  But I'm also doing a strategic planning

6  project for the Coast Guard, writing a long-term strategic

7  plan.

8  Q    And do you have some kind of expertise or specialty in

9  data -- kind of, data, electronics area?

10 A    I'm a considered a C4IT officer, computers,

11 communications, command and control, information technology.

12 Q    All right.

13 A    That's my specialty.

14 Q    And what did you do before you reported to Coast Guard

15 Headquarters?

16 A    Before headquarters, I was the commanding officer of

17 COMMSTA Kodiak, Communications Station Kodiak.

18 Q    And how long were you -- what dates were you the

19 commanding officer at COMMSTA Kodiak?

20 A    Let's see, I took command in July of 2009, and I departed

21 at the end of June 2012.

22 Q    And I note, looking at your uniform, that was -- that's

23 not -- was probably not your first command, it appears.

24 A    It was not.

25 Q    You had other commands?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

**VAN NESS - DIRECT**

1  A    I've had command of two other patrol boats, ships.

2  Q    All right.  Now, what does Communications Station Kodiak

3  do?  What's the mission of COMMSTA Kodiak?

4  A    COMMSTA Kodiak is a -- it's a commun -- a Coast Guard

5  communications station.  We provided communication services for

6  Coast Guard, aircraft, and ships, and we also provided

7  communication services for the mariners in the North Pacific

8  and Bering Sea.

9  Q    Now, does that include search-and-rescue operations?

10  A    It does.  We have a search-and-rescue guard, a watch

11  stander who sits and listens to the radio for search-and-rescue

12  calls, as well as automated systems.

13  Q    All right.  So COMMSTA Kodiak on some days, it does handle

14  life-and-death matters?

15  A    Yes.

16  Q    Now -- and you were the commanding officer on April

17  12th -- or April 12th of 2012, the day of the homicides at

18  COMMSTA Kodiak.  Correct?

19  A    I was.

20  Q    And let's talk a little bit about the morning there.

21  Your -- what was your condition when you woke up that morning?

22  A    I was -- I was fighting a -- like, a stomach flu.

23  Q    Okay.

24  A    My wife had been sick and I had picked up whatever she had

25  that previous weekend.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 187   Filed 11/26/13   Page 6 of 130
(720) 384-8078  attrans@sbcglobal.net

**VAN NESS - DIRECT**

1  Q    And what was your intention about going to work that day

2  when you first got up?

3  A    I had actually -- and I don't -- I don't remember whether

4  it was a phone call or email, but I'd reached out to my

5  executive officer, just to let him know that I was going to

6  head over to the clinic instead of being into work first thing

7  in the morning.

8  Q    And when did you first get an indication or notice that

9  something was wrong at COMMSTA?

10 A    I got a -- a voicemail.  I had gotten up -- I believe I

11 was in the bathroom or I was out of the room.  And the -- and

12 the phone rang, I heard it ring.  I came back in and checked my

13 voicemail.  And it was a call from the watch center at the

14 communication station.

15 Q    Okay.  Now, when you say the watch, what do you mean, the

16 watch center or the watch, when you use that term?

17 A    The communication station is responsible for search-and-

18 rescue guard.  We listen -- listen to the radios 24 hours a

19 day, 7 days a week.  So we have a watch made up of several

20 individuals who stay and listen to the radios and -- and manage

21 that -- that job.  So they're there 24 hours a day.

22 Q    And what was that initial report to you?

23 A    The -- the initial report was a little confusing, a little

24 vague, but it had to do with someone had been injured down in

25 the rigger shop, and that there was a lot of blood.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 187   Filed 11/26/13   Page 7 of 130
(720) 384-8078  attrans@sbcglobal.net

**VAN NESS - DIRECT**

1  Q    Okay.  What did you do when you got that information?

2  A    I immediately called the -- called back the watch deck,

3  which would normally be the watch officer that I would speak

4  to.  However, the watch officer was -- because of the --

5  everything going on at the communication station, wasn't there.

6  I spoke to one of the junior folks, who didn't have any

7  significant information, wasn't able to elaborate.  And so I

8  just said, "I'll -- I'll be in in just a minute."  And I only

9  lived about three miles from the -- the communication station,

10 so I just decided to go out and get in the car and go.

11 Q    All right.  Now, on the way in, did you get any initial

12 information and other contacts on the way in?

13 A    I did.  About -- about halfway in, I was driving past the

14 airport in Kodiak and my phone rang.  I looked down at it, my

15 cell phone, and it was my executive officer.  So I pulled over

16 and -- and answered it.  He told me two people had been shot,

17 and I just -- at that point I said, "I'm about two minutes

18 away.  We'll talk when I get there.  Let me just -- let me get

19 in and we'll talk about this."

20 Q    Okay.  What -- and you used that term a couple times, so

21 let's talk about the term "executive officer" or "XO."  Is that

22 the same thing?

23 A    It is.

24 Q    And what is that person -- what is their role or

25 responsibility at a Coast Guard command?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 187   Filed 11/26/13   Page 8 of 130
(720) 384-8078  attrans@sbcglobal.net

1  A    Very simply, the executive officer is the second in

2  command, the -- the second officer.  The executive officer is

3  normally in charge of pretty much all the daily functions of

4  what goes on, running daily business administratively, and then

5  overseas the operations officer and the engineering officer.

6  Q    So as this day proceeded along, did you end up relying

7  pretty heavily on your XO?

8  A    I did.

9  Q    All right.  Now let's take another minute, and what I want

10 to do to maybe assist the Court just briefly is talk about the

11 geography of the area.  If somebody was to refer to you

12 generally, refer generally to the Coast Guard base on Kodiak,

13 what are they referring to?

14 A    Usually -- most people when they refer to the Coast Guard

15 base, whether they were civilians in town or they were Coast

16 Guard personnel, they would be referring to the main base,

17 which is where the air station and the ships moored, and it was

18 the -- the large Coast Guard facility.

19 Q    Now, is COMMSTA located on that facility?

20 A    It -- it is not.

21 Q    And where, and again generally, is COMMSTA located in

22 comparison to that?

23 A    Just a few minutes away to three miles from the main base,

24 kind of out in the hills.

25 Q    And why is COMMSTA not located on that facility?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 187   Filed 11/26/13   Page 9 of 130
(720) 384-8078  attrans@sbcglobal.net

1  A   It's a combination of the -- the functionality of setting

2  up large antennas and needing the space, and the fact we took

3  over a old naval communication station, and that was where it

4  was located.

5  Q   All right.  And let's talk about the actual layout of

6  COMMSTA for a minute.  And I'm going to show what -- we'll

7  mention a couple things, then I'll show you a picture and have

8  you show the Court -- point out some things to the Court.  How

9  many buildings are there at COMMSTA that are work spaces for

10 people?

11 A   There's two main buildings that are work spaces.

12 Q   And what are those called?

13 A   We refer to them as T1 and T2.

14 Q   All right.  And I just learned something the other day.

15 What's the "T" for in T1 and T2?

16 A   Transmitter.

17 Q   And --

18 A   It's the transmission site for the radios.

19 Q   Okay.  Now, is there a separate area that you had

20 responsibility for that was receive antennas?

21 A   Yes.

22 Q   Okay.  And that's not located at the same place?

23 A   It's not.

24 Q   So what happens at T1?

25 A   T1 is the main building for the command, the

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 187  Filed 11/26/13  Page 10 of 130
(720) 384-8078  attrans@sbcglobal.net

1  administrate -- the administrative spaces.  It's the workshop

2  for the electronics technicians that take care of the

3  transmitters.  And it is the operations deck where those watch

4  standers we talked about earlier sit and stand radio guard.

5  Q    And where do you work?

6  A    I -- I worked in T1.

7  Q    And what about building T2?  What goes on there?

8  A    T2 is the -- we referring to it as the rigger shop.  It

9  was the -- the workshop for the -- the team that maintained the

10  antenna fields and grounds.

11  Q    Okay.  And who works there?

12  A    The -- which individuals?

13  Q    Yeah, right.  What -- more from a functionality

14  standpoint.  Who works at T2?

15  A    There were two civilians, electronics technicians, and a

16  few seamen --

17  Q    Okay.

18  A    -- there were --

19  Q    And where did Mr. Wells work?

20  A    He worked in T2.

21  Q    Now I'm going to ask you a couple questions about

22  security, because that issue came up a little bit in the

23  motions.  Are there different levels of security for the two

24  buildings of COMMSTA?

25  A    Yes.

1 Q    And why is that?

2 A    Primarily, the focus on security was T1, and that's

3 because of the operations deck, the communications center

4 there, and they handle classified material.  And therefore

5 there was additional security -- significant additional

6 security in -- around T1.

7 Q    Okay.  And what types of additional security were there?

8 A    There's an -- there's an outer fence.  There is lighting

9 that covers the entire exterior of the building.  There's

10 camera covers around the exterior of the building.  You're

11 required to have the -- a card to access the building.  It's

12 locked with a card-reading system.  And then you also had to

13 have access to the operations deck inside the building,

14 separate type -- separate access requirements.

15 Q    Okay.  Are any of those systems, those security systems,

16 designed to keep people in?

17 A    No.

18 Q    And in your opinion, having worked there, been the

19 commanding officer, would those systems have been effective at

20 keeping people in?

21 A    No.  I mean, you can leave that building just as easily as

22 you could leave the courtroom here.

23 Q    Let's talk about -- specifically about the fence around.

24 And what -- how did -- that fence, how do you get in and out

25 through the fence?

1  A    To get in, you could drive up.  There was a card reader

2  that you could use out the window of your car.  You'd put your

3  card up, it would open the gate, you could drive in.  Or you

4  could walk up to a pedestrian gate, same thing.  Put your card

5  up, it would release a magnetic lock on the gate.

6  Q    Now, if you wanted leave those gates, the car gate or the

7  pedestrian gate, do you need a card -- you would need a card to

8  get out?

9  A    You could just use the -- the -- the -- if you're driving,

10  there was a -- like, the pressure sensitive, it would just open

11  the gate.  And there was just a button to release the magnetic

12  lock on the pedestrian gate.

13  Q    All right.  Now, would that be common knowledge of the

14  crew -- the entire crew at COMMSTA that that's how you get out

15  of that area?

16  A    Yes.

17  Q    Okay.  Now let's just -- one more question before I show

18  you the picture.  About how many people work at COMMSTA, and

19  then specifically in each building?

20  A    The crew was roughly 60.  And most people worked in T1.

21  The rigger shop had a crew of about seven or eight.

22  Q    Okay.  I'm going to hand you what's been marked as

23  Government Exhibit Number 1.  Now, are you familiar with this

24  photograph?

25  A    I am.

1  Q    And what does it depict?

2  A    It's a overhead photo of the communications station.

3  Q    All right.  And did you take this photo?

4  A    No.

5  Q    But are you familiar with the scene?

6  A    Yes.

7  Q    And is it a fair and accurate representation of COMMSTA

8  Kodiak when you were commanding officer?

9  A    It accurate -- it -- it represents the buildings that are

10  where people work.

11  Q    Okay.

12       MR. SCHRODER:  Your Honor, we'd move for admission of

13  Government's Exhibit 1.

14       MR. CURTNER:  No objection.

15       THE COURT:  Admitted.

16    (Plaintiff's Exhibit 1 admitted)

17  BY MR. SCHRODER:

18  Q    Now I'm just going to ask you to point out a couple things

19  again for the -- to help the Court understand the layout.  And

20  you may want to hold -- kind of hold it up; that may help,

21  since we don't have any electronic means of doing that in this

22  courtroom.  Where is the main building, T1?

23  A    It's this white-and-gray building up here.

24  Q    And where is T2?

25  A    T2 is down here at the base of the hill, with the red

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 187   Filed 11/26/13   Page 14 of 130
(720) 384-8078   attrans@sbcglobal.net

1  roof.

2  Q    And what road do you drive in on?  How do you drive into

3  the base or to COMMSTA?

4  A    Access is down Anton Larsen Road, which is this road

5  across the bottom of the picture.

6  Q    And which way do you get to Kodiak Proper?  Which way on

7  that road?

8  A    You'd go --

9  Q    What is in essence --

10 A    I don't know if that's east but --

11 Q    -- to the right on --

12 A    -- but you'd go to the right on the picture.

13 Q    On the picture.  All right.  And what is the area --

14 that's good.  I think we'll stop there.  So -- now let's get

15 back to April 12th.  When you were driving -- you just pointed

16 to Anton Larsen Bay Road, the road you drove in on.  When you

17 were driving in, did -- were you following anybody that you

18 recognized the vehicle?

19 A    Yes, I recognized Jim Wells's vehicle on the way in.

20 Q    Okay.  And about what time was that?

21 A    It was after -- after 7:30, maybe around 8 o'clock --

22 Q    Okay.

23 A    -- about 8 o'clock.

24 Q    And are you familiar with the kind of vehicle Mr. Wells

25 drives?

1    A    Yes, it's a --

2    Q    And what kind?

3    A    -- white pickup truck.

4    Q    Have you ever seen him drive anything else?

5    A    No, I don't remember driving a --

6    Q    Now, what happened when you got to COMMSTA?  Where did you

7 stop first?

8    A    I -- I stopped at the -- the Y here, because there was a

9 law enforcement vehicle blocking the access road to the

10 buildings.

11    Q    Okay.  And what did you do there?

12    A    I pulled off to the side of the road and got out and

13 showed my identification to the -- the officer who was standing

14 there.

15    Q    And what did you do after that?

16    A    I walked up.  There were several crewmembers standing on

17 the side of the road, and I believe Scott Reckner, one of the

18 crewmembers, was standing there.  He had -- he was bent over

19 with his hands on his -- on his knees, sobbing.  And he -- he

20 said someone shot Jim and Rich.

21    Q    Okay.  Did you speak to any of the law enforcement

22 officers while you were down at the bottom of the hill?

23    A    I did.  There was a uniform -- I believe he was state

24 police officer.

25    Q    Okay.  And did you speak to any other crewmembers besides

1  Chief Reckner?

2  A    I'm sure I did, but I don't remember.

3  Q    Was Mr. Wells there?

4  A    He was.

5  Q    Did you say anything to him?

6  A    I didn't say anything to him, no.

7  Q    Now, after you left T2, where did you go?

8  A    I eventually made my way up to T1, to the main building.

9  Q    All right.  And what did you do first when the -- or at

10  least maybe not first, but what kind of activity were you doing

11  when you got to T1?

12  A    Well, I -- I had a couple things I was concerned about.

13  First and foremost, I wanted to find the executive officer,

14  because I'd spoken to him on the phone and wanted to find him.

15  I also went in and -- and -- and I honestly don't remember the

16  order of this a year ago, but I -- I went in and talked to the

17  watch deck, to make sure that we were actually functioning as a

18  communication center, wanted to make sure that they were able

19  to do their job and focused on what they needed to do, or

20  whether we needed to think about giving someone else that radio

21  guard.

22  Q    So along with, kind of, this mission thought, what other

23  things were you focused on there when you first got up to T2 --

24  A    I -- I also --

25  Q    -- to T1?

**VAN NESS - DIRECT**

1   A    -- I attempted to reach out to my senior command, which is

2   the area master station in California, and tried to call my

3   boss down there.  I wasn't able to reach him.  I ended up

4   talking to his executive officer.

5   Q    Okay.  What -- anything else you were thinking about that

6   morning?

7   A    Eventually, in -- in walking through there, my -- my

8   thought was, we need to make sure that -- that Debbie and

9   Nicola knew what had happened.

10  Q    And who are Debbie and Nicola?

11  A    The spouses of the two individuals who were shot.

12  Q    At some point did you become aware of the location of the

13  remainder of the T2 crew?

14  A    At some point I did.  It -- it may have been after I went

15  out and did notifications.  But eventually the entire crew was

16  in T1.

17  Q    Okay.  At any point during that morning had you given any

18  orders about the T2 crew to do anything or be anywhere?

19  A    No.

20  Q    Okay.  Now let's talk about what was going to go on with

21  the crew that day.  Did you have a discussion with your

22  executive officer or even others in the command staff about

23  what you needed to do in anticipation of the investigation as

24  it was developing?

25  A    A discussion with the XO that folks need to be available

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 187   Filed 11/26/13   Page 18 of 130
(720) 384-8078   attrans@sbcglobal.net

**VAN NESS - DIRECT**

1  if the investigators were looking to talk to someone.  So we --

2  we just -- I -- and I -- I don't remember whether the XO came

3  to me or I -- I had initiated the conversation with the XO at

4  that point.  But we just discussed keeping the crew together at

5  T1, so they were accessible and could be found if someone

6  needed to talk to them.

7  Q   And, I mean, at the -- the fact that it was a workday, did

8  that enter into your thought process at all?

9  A   Only in a sense that it didn't seem unusual just to ask

10  folks to be somewhere, if it was in the middle of the workday.

11  Q   Now, these instructions between -- that you and the XO

12  discussed, were that -- was that for any individuals or groups,

13  or was it for the crew as a whole?

14  A   It was generally the -- the crew as a whole.

15  Q   And did you give any specific instructions that were to

16  apply to Jim Wells individually?

17  A   Only in the sense that it -- it was the whole crew.

18  Nothing specifically (indiscernible).

19  Q   Now continuing with chronology that we're going to use to

20  kind of move through this day, you mentioned that you realized

21  that you needed to provide notification to the spouses of the

22  men involved.  Did you make those notifications?

23  A   Yes.

24  Q   And about what time did you do that?

25  A   It was -- it was midmorning.  It was probably sometime

**VAN NESS - DIRECT**

1  between 9:30 and 10:30 in the morning.

2  Q    Okay.  And did you leave COMMSTA to do that or did -- did

3  that happen at COMMSTA?

4  A    Yes.  I did it in person.

5  Q    Okay.  And while you were away from COMMSTA for that time,

6  did you go anywhere else?

7  A    After -- after talking to both spouses, I went over to the

8  base.  The base commander was with me when I went to see the

9  spouses.  So we went back over to his main conference room

10  because there was a scheduled conference call with the -- the

11  Pacific Area Command, the Alaska Command, as you know, and

12  the -- and the National Command Center in Washington, D.C.

13  Q    All right.  Now, as part of those meetings, was there any

14  kind of discussion of crisis response procedures?

15  A    Following the conference call, I spoke with John Eaton,

16  who was a civilian on the base who provided counseling and

17  support for military and civilian members of the Coast Guard.

18  And he was a crisis response expert or trained in that -- that

19  type of thing.  So he recommended that I get the crew together

20  when I get back and just kind of give them an update on what's

21  going on.

22  Q    Okay.  And did you do that?

23  A    I did.

24  Q    All right.  Was that soon after you arrived back at

25  COMMSTA?

Case 3:13-cr-00008-SLG   Document 187   Filed 11/26/13   Page 20 of 130

1 A    Fairly soon.  Again, it's been a while.  I know I had a

2 conversation with the XO, asked him to set up a time to get

3 everybody together.  It would have been within probably the

4 first hour or two I was back at the COMMSTA.

5 Q   Is there a place you can do that, get everybody into one

6 spot?

7 A    The -- the basement of the communication station pretty

8 much runs underneath this entire building, so it's a big open

9 space.  We can get everybody together.  So we got everybody

10 down there, with the exception of a few people who were in the

11 radio booths.

12 Q   And that -- when you say the communication station, are

13 you referring to T1 or T2?

14 A    T1.

15 Q   All right.  And what was the demeanor of the crew?

16 A   It was a combination of -- of shock, anguish, sorrow.  I

17 mean, some -- some people were just sobbing, some were blank-

18 faced.

19 Q   So after that meeting, did you then go -- did you then

20 have the opportunity to kind of check on people more -- you

21 know, more directly than in the group meeting?

22 A    Just over the course of the -- the rest of that day, I

23 mean, I -- I just would walk around the -- the main building,

24 the T1 there, and yes, I mean, I was checking on the watch,

25 make sure things were going all right in there.  I walked

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

**VAN NESS - DIRECT**

1  around the electronics deck, which is where the technicians

2  were, just to check on them.  And then -- and through the

3  conference room, where a lot of the rigger shops -- the folks

4  who work down there were sitting because they weren't able to

5  be down in T2.

6  Q    And -- I mean, and it seems logical, but why -- common

7  sense.  But why were they not in T2 or down by T2?

8  A    The law enforcement had set it up as a crime scene.

9  Q    All right.  And what was the weather like?

10  A    It was April in Kodiak.  We had had a pretty harsh winter.

11  I think there was -- I honestly don't remember.  I think there

12  was still snow on the ground, but I don't remember exactly.

13  But it was -- the weather was not terribly comfortable to be

14  outside.

15  Q    Was Jim Wells in the room when you went in there?

16  A    He was in the conference room.

17  Q    Did you speak to him individually?

18  A    No, not individually.

19  Q    Now, as part of this process of kind of care of the crew,

20  did that involve them getting fed at some point during that

21  day?

22  A    Yes.

23  Q    Now, is there a true kind of dining facility at COMMSTA,

24  to feed people?

25  A    There -- there is, like, a kitchenette that's set up to

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 187   Filed 11/26/13   Page 22 of 130
(720) 384-8078  attrans@sbcglobal.net

**VAN NESS - DIRECT**

1  allow people to prepare their food, to watch to use it when

2  they're there for 12 hours.  Has a oven, a sink, a microwave,

3  but that's -- that's it.  And there's some vending machines.

4  Q    Okay.  So was that going to be sufficient for that day?

5  A    For folks who didn't bring food, no, that wouldn't be

6  sufficient.

7  Q    Yeah.  And what do a lot of folks norm -- did some folks

8  leave the facility for lunch on a normal day?

9  A    Yes.

10  Q    Yeah.  So what happened that day?

11  A    The base sent over some -- some boxed lunches, some

12  sandwiches and fruit, drinks, in a box.

13  Q    Now, at what point do you remember that the FBI started

14  arriving?

15  A    Started arriving?  They -- they arrived late in the day.

16  Q    Okay.  And who in the crew was still at COMMSTA at that

17  point?

18  A    Pretty much everyone was there.  I have a vague

19  recollection of a few people who had gone with law enforcement

20  to -- over to base, but the grand majority of the crew was in

21  T1.

22  Q    Okay.  And at that point did the law enforcement

23  investigators -- did they start to exercise some control of

24  what was going -- what was happening at T1?

25  A    Yes, in the sense that they were -- they were starting

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 187   Filed 11/26/13   Page 23 of 130
(720) 384-8078   attrans@sbcglobal.net

1    their investigation and they asked for spaces to work in to

2    do -- to talk to people, to use the phones.  We don't have very

3    good cell phone service out there, so they were using our

4    phones.  And just spaces to work, (indiscernible).

5    Q    And how would you describe how you were working with them

6    at that point?

7    A    For the most part it was -- it was my executive officer

8    who was working directly with them, though I -- I mean, I saw

9    and heard some of it going on.  But they were -- they asked for

10   offices.  We provided some spaces for them to sit down and --

11   and conduct interviews.

12   Q    And at that point did they start to interview crewmembers?

13   A    They did.

14   Q    Yeah.  And did any of the crew express any concern to you

15   about being interviewed?

16   A    No.

17   Q    And did Mr. Wells express any concern to you or express

18   any concern through anyone that got to you about being

19   interviewed?

20   A    Not to me, or that got to me.

21   Q    And did you order anybody to submit to an interview?

22   A    No.

23   Q    Now moving more toward the -- you know, the end of the

24   day.  As the evening progressed, what were you involved in?

25   What were you doing?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 187   Filed 11/26/13   Page 24 of 130
(720) 384-8078   attrans@sbcglobal.net

1   A    It was a -- a combination of just keeping track of -- of

2   what the XO and -- was doing administratively to help the

3   investigation, keeping an eye on the watch, the -- the

4   operations center, to make sure that they were, again, still

5   focused on standing radio guard and doing their job.  And --

6   and I know there were a few other conference calls that

7   afternoon with the Senior Coast Guard Command.

8   Q    And did you or your command staff continue to consult with

9   the law enforcement, the investigators that were there?

10  A    Yes.

11  Q    And did people at some point start to depart?

12  A    Yes.

13  Q    And what were the circumstances of that that you remember?

14  A    Pretty much when -- if the investigators said they were --

15  the -- the -- they were done with that person for the day, they

16  just checked out with their supervisor.  And we -- we

17  eventually -- we had a discussion sometime in the late

18  evening -- or early evening, the XO and I, about bringing the

19  crew in a little later.  So that was -- I'm sure that was

20  passed to the crew through their supervisors.

21  Q    Okay.  And did you do that in consultation with the

22  investigators?

23  A    Yes.

24  Q    And what time were you telling people to come back in?

25  A    It was midmorning.  I -- I think it was about 10 a.m., but

1  I don't remember the exact time, so about.

2  Q    All right.  What was the normal -- what was your norm --

3  their normal work hours?

4  A    Most of the crew was in at 7:30, 8 o'clock.

5  Q    Okay.  Now, was that time schedule set for the crew as a

6  whole or for individuals, that you remember?

7  A    The -- the next morning?

8  Q    Yeah.

9  A    For -- for the crew.

10 Q    Okay.  Do you remember ever giving any specific orders or

11 instructions to Jim Wells on April 12th, 2012?

12 A    No.

13 Q    And did you from your observations see that he was ever

14 treated any differently than the rest of the crew that was in

15 T1 that day?  Or let's say from your perspective --

16 A    (Indiscernible).

17 Q    -- as the commander, were you -- did you treat him any

18 differently than anybody else that day?

19 A    No.

20 Q    I want to read you something, just to get your input.  In

21 the defendant's motion to suppress that leads us to be here

22 today, which is Docket 121, there's a couple statements.  I

23 want to see what your reaction to those statements are.  One --

24 on page 3, toward the top, it says:  "The USCG Command ordered

25 those working at T2, including Mr. Wells, to report to the T1

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 187   Filed 11/26/13   Page 26 of 130
(720) 384-8078   attrans@sbcglobal.net

1  building."  From your perspective, is that accurate?

2  A    I did not give an order to tell everyone to report to T1.

3  Q    Says:  "Additionally, the USCG Command at T1 ordered Mr.

4  Wells and undisclosed individuals to participate in

5  interrogations with the FBI and USCGIS officials."

6  A    No.

7  Q    And then finally it said:  "However, the USCG Command

8  ordered Mr. Wells to return to T1 the following morning."

9  A    There -- there was a guidance to the crew when to return

10  to work the next day.  In other words, instead of being there

11  at the normal time, they had a few extra hours to sleep in.

12       MR. SCHRODER:  I have no further questions on direct,

13  Your Honor.

14       THE COURT:  Mr. Curtner.

15                    **CROSS-EXAMINATION**

16  BY MR. CURTNER:

17  Q    Good morning, Commander.

18  A    Good morning.

19  Q    I wonder if you could tell me a little bit about what it

20  means to be a commanding officer at a location such as COMMSTA.

21  You indicated that there were 60 people under your command?

22  A    Correct.

23  Q    And those are civilian and military?  Is that correct?

24  A    It -- there were two civilian, and the remainder were --

25  were military.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 187   Filed 11/26/13   Page 27 of 130
(720) 384-8078   attrans@sbcglobal.net

1   Q   Okay. And where did the civilian employees work?

2   A   They worked down in T2.

3   Q   Okay. Now, while you're the commander of that facility,

4 you consider all the crewmembers under your command?

5   A   Absolutely.

6   Q   And they consider you to be their commander?

7   A   That's true.

8   Q   And if they were -- and they would be expected to follow

9 your directions. Is that correct?

10   A   That's correct.

11   Q   And any orders that you would give?

12   A   Orders apply to the military. Direction would apply to

13 civilians.

14   Q   Okay. And do you make a distinction when you might

15 provide a direction or an order to your crew?

16   A   I'm sorry, I don't understand the question.

17   Q   When you give a -- tell somebody that they should do

18 something or when you deliver a command, do you distinguish

19 between whether it's a direction or an order?

20   A   Generally, no. Guide -- guidance -- I mean, instructions,

21 guidance requests, if either someone was not -- not following

22 directions, you might explicitly make it an order. And then

23 there were -- I had standing orders that were written orders to

24 my watch and crew.

25   Q   And that would apply to the civilian crew as well?

1  A    Yes.

2  Q    And who was the -- your XO at that time?

3  A    David Pizaro (ph).

4  Q    All right.  And he -- it would be the same for him.  He

5  would be second in command, so his orders would be followed by

6  everybody who worked at COMMSTA?

7  A    Yes, they should be.

8  Q    Okay.  And you knew Mr. Wells?

9  A    Yes.

10 Q    And you knew his background?

11 A    Yes.

12 Q    You knew he had 43 years in the military, Navy and Coast

13 Guard, altogether?

14 A    Active duty, so yes.

15 Q    Uh-huh (affirmative).  And so you would have -- expect him

16 to follow any orders from you or your executive officer?

17 A    Yes.

18 Q    Now let's talk about April 12th a little bit.  You were on

19 your way to COMMSTA that morning and you saw Mr. Wells's

20 vehicle?

21 A    Yes.

22 Q    And where did you first see his vehicle?

23 A    I don't know if it was before I turned on Anton Larsen

24 Road or while we were driving down Anton Larsen Road.

25 Q    And so sometime probably from the beginning of Anton

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 187  Filed 11/26/13  Page 29 of 130
(720) 384-8078  attrans@sbcglobal.net

1  Larsen Road where it connects with Rezanof Drive?

2  A    Correct.

3  Q    That's where you would have first seen the vehicle?

4  A    I -- I don't remember exactly if I saw him before we

5  turned or after we turned, but yes, it was on -- I'll say on

6  Anton Larsen Road.

7  Q    And it would have been at that intersection basically,

8  just before, just after?

9  A    We were -- we were both driving down Anton Larsen Road,

10  towards the communication station.

11  Q    Was there anything unusual about his driving at that time?

12  A    No.

13  Q    He was driving the normal speed and didn't pull over or

14  stop or anything?

15  A    No.

16  Q    Now, when you pulled into COMMSTA area in front of T2,

17  describe for me again what that scene was like.

18  A    There were law enforcement vehicles, there were a lot of

19  people standing around.  There was a uniformed officer there

20  with a clipboard who was -- everybody who showed up, he was

21  going up and talking to them, looking at identification.

22  Q    And so how many law enforcement officers were there at

23  that time you got there?

24  A    I -- I couldn't tell you a number at this point.  Several.

25  Q    Were there Alaska State Troopers?

1    A    Yes.

2    Q    Were there Coast Guard Police Department employees --

3    A    Yes.

4    Q    -- staff?  Was there CG -- CGIS, or C-G-I-S?  That's the

5    Coast Guard Investigative Services?

6    A    I -- I don't know if they were there at that point.

7    Q    Okay.  Could you estimate how many law enforcement were

8    there altogether when you got there?

9    A    No.  I don't remember the exact number.

10   Q    Could you estimate?  Five, ten?

11   A    There -- there could have been somebody I couldn't see.

12   I -- I don't know the exact number.  It could have been five,

13   it could have been fifteen, and I just didn't see them all.

14   I -- there was probably -- there were probably about five in

15   the general area when I pulled up.

16   Q    Now, you were interviewed at that time with a Alaska State

17   Trooper?  Is that right?

18   A    Shortly after I arrived, yes.

19   Q    Uh-huh (affirmative).  And do you remember that was

20   Trooper Dupras?  Is that how you pronounce his name?

21   A    I believe it's Dupree [sic].

22   Q    Dupree?

23   A    I -- I -- I believe --

24   Q    Okay.

25   A    -- that's what -- all -- yeah.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 187   Filed 11/26/13   Page 31 of 130
(720) 384-8078   attrans@sbcglobal.net

1  Q   All right.  And you were able to review your interviews

2  with him?

3  A   Yes.

4  Q   Now, I think you indicated that you signed in with law

5  enforcement when you first got there.  Tell me what that was

6  like.

7  A   I don't know -- I -- I don't think I signed in.  I think

8  they wrote my name down.  They looked at my identification and

9  recorded who I was.

10  Q   Okay.  And then that -- is that -- so when you first got

11  there, was it Trooper Dupree that did that?

12  A   No, I believe it -- I believe it was a military police

13  member, but I don't remember specifically.

14  Q   And they did that for everybody who was showing up there?

15  A   Yes.

16  Q   Including Mr. Wells?

17  A   I didn't observe it, but I would assume so.  I mean, they

18  were checking everyone who came in.

19  Q   They were checking everybody's identification?

20  A   Yes.

21  Q   Okay.  And Chief Reckner was there at the time?

22  A   He was.

23  Q   Were you in a discussion -- in sort of a group discussion

24  with Mr. Reckner -- with Chief Reckner or Mr. Wells?  Who was

25  all standing there together when you were there?

1   A    There was one or two law enforcement officers.  There

2   was -- I walked up, Chief Reckner -- Scott Reckner had his

3   hands, like, on his knees.  And he -- he said something along

4   the lines of, "Someone shot Jim and Rich."  And -- and Jim

5   Wells was in -- in the general area and he made a comment

6   about -- like, "Oh, God," or "Oh, man," or something like that,

7   "I -- I had a flat tire," I think something like that.  And

8   then there were a few other crewmembers there, I believe

9   from -- from the T2 building.  And that's -- I -- I got into

10  the conversation with Officer Dupras.

11  Q    Okay.  And did all those crewmembers and you go up to T1

12  at that time?

13  A    I -- I don't think we all went up together.  I don't

14  remember all walking up together.

15  Q    Did you walk up from that spot or did you drive?

16  A    I don't remember whether I drove up initially or I walked

17  up and came back down and got my vehicle.  I don't remember.

18  Q    So when you were in that area around T2 at first, did you

19  hear Chief Reckner say anything about Mr. Wells?

20  A    Not that I remember, not at that time.  No.

21  Q    Did you remember anybody at all saying anything about --

22  that might be accusatory about Mr. Wells being involved in this

23  homicide?

24  A    No.

25  Q    You didn't remember that from anybody?

1  A    I -- not when I walked in, no.

2  Q    Do you remember saying when you were interviewed anything

3  of that nature?

4  A    I remember -- I don't know if it was in that interview,

5  but I do remember having a -- a gut feeling driving down the

6  road, knowing the XO had just told me two people had been shot.

7  I saw Jim Wells' truck, and my initial gut reaction was, oh,

8  man, Jim, what did you do.  And then, you know, second-guessed

9  myself, well, what -- you know, that's -- that's not a rational

10 thing for the commanding officer to think, and -- and I -- I

11 believe I had a conversation like -- with Officer Dupras

12 about -- Dupras about that.  But --

13 Q    And would that conversation have been soon after you got

14 there?

15 A    It -- it would have been before I went up to T1.

16 Q    Okay.  So when you first got to the scene, you may have

17 made -- you may have described that gut reaction about Mr.

18 Wells to law enforcement immediately -- almost immediately when

19 you got there?

20 A    I'll -- I'll be honest with you.  I don't remember exactly

21 when it was, but it -- I -- it would make sense that it was

22 during that conversation.

23 Q    And do you know if anybody else had that kind of gut

24 feeling or reaction that was mentioned at that time?

25 A    I -- I don't -- not at that time, no.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 187   Filed 11/26/13   Page 34 of 130
(720) 384-8078  attrans@sbcglobal.net

1  Q   When did it become -- when did you hear something like

2  that?

3  A   I know somewhere during that morning, Scott Reckner made a

4  similar comment.  When I went to see Nicola and had to tell her

5  that her husband had been shot, I believe she said something

6  along the same lines.

7  Q   Okay.  So -- now, that was midmorning, you say, when

8  you --

9  A   Yes.

10 Q   -- left COMMSTA?  So by midmorning that morning of April

11 12th, a number of people had identified Mr. Wells as a

12 potential suspect?  Is that correct?

13 A   I don't know if you'd call it potential suspect, but

14 people had concerns, yes.

15 Q   That he might be involved in the homicide?

16 A   Yes.

17 Q   You wouldn't consider that a suspect in the homicide?

18 A   Well, we were investigating a homicide at that point.  It

19 wasn't a military investigation.

20 Q   So do you remember when you're standing out there by T2

21 who told Mr. Wells to go up to T1?

22 A   I don't -- I don't know if anyone did.  I don't know.

23 Q   Well, he worked at T2.  Is that correct?

24 A   That's correct.

25 Q   He didn't have an office in T1?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 187  Filed 11/26/13  Page 35 of 130

1  A    No, his office was in T2.

2  Q    Okay.  Did he have -- did he ever go up to T1 to work?

3  A    Oh, he'd -- he'd come up for meetings and discussions with

4  the folks who worked up there.

5  Q    So if he were called to T1 for a discussion or a meeting,

6  that's when he would go to T1?

7  A    Correct.

8  Q    Not in the normal course of his duties?

9  A    That's correct.

10  Q    And so he was called to a meeting this day, apparently?

11  A    Well, as we discussed earlier, the weather wasn't the

12  best.  And because the folks who worked in T2 weren't able to

13  go into T2 -- I don't know whether it was a suggestion by law

14  enforcement, by a member of the crew, or someone on their own,

15  but everybody migrated to T1 as the place to be inside.

16  Q    Now, you talked about the weather.  Weren't the staff and

17  the crew at T2 -- weren't they planning to go climbing that

18  day?

19  A    No, I -- I couldn't tell you.  I don't remember.

20  Q    Okay.

21  A    I don't know.

22  Q    So was it a -- well, describe the weather exactly.  What

23  was it like?

24  A    It was April in Kodiak.  We had had a -- a rough winter.

25  I don't -- I don't remember whether there was still snow on the

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 187   Filed 11/26/13   Page 36 of 130
(720) 384-8078   attrans@sbcglobal.net

1  ground, but it would be more comfortable to be inside.

2  Q    All right.  But it wasn't storming that day?

3  A    I don't remember it raining, yeah.

4  Q    Do you have storms on Kodiak?

5  A    We do.

6  Q    And could be a snowstorm or rainstorm?

7  A    Snow.

8  Q    Snowstorms that day, though, is that correct?

9  A    Correct.

10 Q    And Mr. Wells couldn't have done any work up in T1.  Is

11 that correct?

12 A    That's correct.

13 Q    Now I'd like to show you something that we've -- I want to

14 identify as Defendant's Exhibit A, if I could, and see if you

15 recognize this.

16 A    Okay.

17      MR. CURTNER:  And, Judge, if I could provide the Court

18 copies?

19      THE COURT:  Yes.

20 BY MR. CURTNER:

21 Q    Do you recognize what that might be?

22 A    It's a log from the radio watch.

23 Q    Now, you mentioned the watch officer.  Who was that watch

24 officer that day?

25 A    It was OS1 Hazelton.

1   Q   Okay.  And so if you look at the top of this -- and I
2   am -- it's going to take some interpretation, I think, from
3   you, but you can interpret everything in here.  Is that
4   correct?
5   A   I believe so.
6   Q   So this is a watch log by Hazelton.  Is that correct?
7   A   Correct.
8   Q   And I'm looking at the time.  It says 1525Z.  Is that
9   reference to Alaska Time or is that considered what --
10  A   That's universal time, Greenwich Mean Time.  It's a --
11  it's a general time, so regardless of where you are in the
12  world, it's -- it's the same reference time.
13  Q   Okay.  So what would that translate to as far as Alaska
14  Time on that morning?
15  A   All right, you're going to test my memory here.  Think it
16  would have been eight hours' difference.  That would have been
17  7:25.
18  Q   Okay.  So this log starts at 7:25 the morning on April
19  12th.  Is that how you read this?
20  A   Yes.
21  Q   Okay.  And then at -- if you go down to -- what does OD
22  refer to?  You see on the far left there's OD --
23  A   Officer of the Day.
24  Q   All right.  And what does that reference, then?
25  A   The -- the senior watch officer serves dual roles, one as

1   the communications watch officer, CWO, and the other as the

2   officer of the day, which is just generally their -- the XO

3   would publish a plan of the day, things that needed to happen

4   that day, what the expectations were for work hours.  And that

5   officer of the day was just kind of responsible for running the

6   routine of the -- the unit, overseeing what was going on.

7   Q    Okay.  So that one reference -- the first one after the

8   top, was -- it says -- and this would be at 15:41:0, 7:41 a.m.

9   It says:  "Received call from FM ET3 Beauford, reporting ET1

10  Hopkins and Mr. Belisle unconscious and in a pool of blood at

11  T2."  So that would have been a call that was received by

12  Beauford from T2 at 7:41?  Is that correct?

13  A    No.

14  Q    Pardon me?

15  A    It's a -- no, it -- it's a call that was received by the

16  watch, so it was probably OS1 Hazelton who received the call

17  from Day Officer Beauford.

18  Q    Oh, okay.  And --

19  A    Day Officer Beauford was calling from -- reporting.

20  Q    And then the next reference, then, would that have been

21  from Hazelton, "Watch supervisor called 911 to report injury"?

22  And then --

23  A    Right.  So whoever was -- was Hazelton's assistant at that

24  time -- I'll have to go back and look who was on watch.  But

25  whoever his assistant was called 911.  And Petty Officer

1  Hazelton went down to T2, is what I interpret from that.

2  Q   Okay.  And those times would have been at 7:41 a.m., 7:46

3  a.m., 7:47 a.m.?  Is that the times that are referenced there?

4  A   So super -- the -- the watch entry says that the

5  supervisor called 911 at -- at 7:46 in the morning.

6  Q   Okay.  Then the next reference is?

7  A   And then they called the Coast Guard Police Department at

8  a minute later, 7:47.

9  Q   And this is before you arrived there?

10  A   Yes.

11  Q   If you go down about halfway down, there's a OP note.

12  What does that reference?

13  A   Operational note.

14  Q   Okay.  And it says:  "Alaska State Troopers arrived at

15  T1."

16  A   Okay, I see that.

17  Q   And what would be the time of that reference?  Would that

18  be reference to 1659 Zulu, 8:59 in the morning?

19  A   Yes.

20  Q   Now, if you go below that, then, the next OOD.  Could you

21  read and interpret that notation in the watch logs?

22  A   Directly underneath that?

23  Q   It starts off with "Gate secured to T1."

24  A   Says:  "Gate secured to T1.  Duty ET tasked with escorting

25  any non-COMMSTA personnel throughout the building."  Let's see.

1  Okay.

2  Q    And then --

3  A    "All -- all hands briefed that no one allowed to enter or

4  depart T1 without prior knowledge of the CWO, CSO, due to

5  active crime scene at T2."

6  Q    Okay.  So what does that mean, "Gate secured to T1"?

7  A    There's a vehicle gate --

8  Q    Uh-huh.

9  A    -- and a lot of times the watch would open it when

10 everybody was arriving, and then in this case they -- they

11 closed the gates.  And that's -- that's direction not to use

12 that gate.

13 Q    Okay.  So that's a direction not to use the gate, the

14 large gate that goes up to T1?

15 A    Correct.

16 Q    Now if you could -- let's just stop a minute.  If you

17 could describe the fencing around T1.  This T2 does not have

18 any fencing around it?

19 A    That's correct.

20 Q    And T1 is a more secure facility?

21 A    That's correct.

22 Q    And they have fencing all around it?

23 A    Correct.

24 Q    Including the gate for vehicle traffic?

25 A    Correct.

1 Q    And is there also -- how tall is that fencing?

2 A    It's about an eight-foot fence.

3 Q    And is there construction fencing wiring on top of the

4 fence?

5 A    Barbed wire?

6 Q    Barbed wire.

7 A    Yes.  Yes.

8 Q    And that's on top of the fence?

9 A    I -- yes.  I -- I think it has to be a total of eight

10 feet, but generally, yes.

11 Q    And it's -- that's all around T1?

12 A    Correct.

13 Q    And it's not around T2 at all?

14 A    Correct.

15 Q    And at that time -- and when is the reference time for

16 that?  Is 1710 Zulu, is that 9:10 in the morning?

17 A    Yes, that's correct.

18 Q    Okay, so the gate was secured and closed at T1 at 9:10,

19 after the troopers arrived and after the Coast Guard Police had

20 been notified.  Is that correct?

21 A    Yes.

22 Q    Okay.  And then moving down to "All hands briefed that no

23 one allowed to enter or depart T1 without prior knowledge of

24 CWO, CSO."  Who's the CWO?

25 A    That would be -- well, I think at this point at 8:45, it

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net

1  says that Chief Garazanof (ph) had briefed the CO.  I'm just --

2  there was -- okay, up at 1618 --

3  Q    Uh-huh (affirmative).

4  A    -- 8:18 --

5  Q    Uh-huh (affirmative).

6  A    -- it says:  "Op note.  Chief Anderson assumed the watch

7  from Garazanof."  So there -- there had been a pass of

8  responsibility for the watch over the course of several minutes

9  here as a result of the -- everything going on at COMMSTA.

10 So -- I'm sorry, what was your question?

11 Q    Well, what does that mean, "All hands briefed"?

12 A    That just means that it -- it was -- it was passed to all

13 members of the communication station.

14 Q    And every -- all the crew at T1?

15 A    Yes.

16 Q    Everybody that worked under your command?

17 A    Correct.

18 Q    They were briefed that no one was allowed to enter, depart

19 T1 without prior knowledge?

20 A    Correct.

21 Q    Would that have been an order from you or the XO, or who

22 would have given that order in order for everyone to be briefed

23 on it?

24 A    I don't remember exactly.  I don't even know if -- this is

25 at 9:03.  I'm not sure where I was at that point.  But the CWO

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 187   Filed 11/26/13   Page 43 of 130
(720) 384-8078  attrans@sbcglobal.net

1  is the chief watch officer.  CSO is the chief security officer.

2  That was my operations officer, Phil Jordianelli.  So someone

3  passed all hands -- I couldn't tell you exactly who it was --

4  which would have gone through department heads and supervisors,

5  that everyone was -- that no one's allowed to enter or depart

6  T1 without notifying the watch officer or the command security

7  officer.

8  Q    Okay.  So by that time, the crew at T2 was up at T1, 9:10

9  in the morning.  Is that correct?

10  A    I -- I don't know.

11  Q    Well, what time did you go up there?

12  A    Shortly after I arrived, so probably sometime between 8:15

13  and 8:30.

14  Q    And Mr. Wells went up about the same time, approximately?

15  A    I -- I honestly do not remember.

16  Q    Okay.  And do you remember when you saw other crew from T2

17  up at T1?  Was it a -- was it before 9:10 in the morning?

18  A    I -- I couldn't tell you.  I don't know.

19  Q    But that would have been the order to everybody that

20  nobody was to enter or leave T1 without the knowledge of your

21  CSO or your CWO?

22  A    That's correct.

23  Q    Now if you go to the second page of that exhibit.  Toward

24  the end, maybe the last third of it, it references ZFH2.  What

25  does that mean?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 187  Filed 11/26/13  Page 44 of 130

1  A    I'm sorry, where are you?

2  Q    There's -- the last time that's referenced up on the top

3  of the page is 2359 Zulu.  That would have been about 4 in the

4  afternoon?

5  A    Yes.

6  Q    And then the bottom references 2400 Zulu.  That's 4 in the

7  afternoon.

8  A    Is that right -- yes, that's correct.

9  Q    And is this sort of a summary of the activity for that day

10 on the logs?

11 A    You -- you're talking about where it says "End of radio

12 day"?

13 Q    And it starts off with "Number 1 keys."

14 A    Number 1 keys.

15 Q    Says:  "ZFH2," colon, "number 1 keys" --

16 A    That's just -- it's a status of the communication station.

17 Basically it's recording the end of the day for the next watch.

18 Q    Okay.  So at the end of the day he's reporting to the next

19 watch about the keys and about assignments.  Is that correct?

20 A    Right.  So keys, those are just actual keys for gates at

21 Holiday Beach and Bear Valley.  Those are -- gates, physical

22 keys, just accountability.

23 Q    And then number 2 then is "Nav techs and Gotham

24 assignments."  What's that reference?

25 A    That has to do with how radio transmitters are designed

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net

1  for different missions or completing communications missions.

2  Q   Okay.  And this is information from that day on watch to

3  the next person coming on watch?  Is that correct?

4  A   Correct.  It's -- well, it's information about the status.

5  They'll do a verbal discussion between the watch officers.

6  This is more for just recording for the record in the

7  communication station.

8  Q   Okay.  And then if you work down then to number 5, "T2

9  currently at crime scene being investigated by CGI and federal

10  law enforcement due to earlier shooting incident described

11  earlier in this log."  By "federal law enforcement," they're

12  referencing the FBI?  Is that how you would interpret your

13  logs?

14  A   "Crime scene being investigated" -- well, it -- yes.

15  Because they also state CGI, Coast Guard Investigator Service,

16  which could --

17  Q   Okay.

18  A   -- be federal law enforcement.

19  Q   And so obviously -- was the FBI there by 4 o'clock, then?

20  A   I -- I don't remember exactly when they arrived.  I don't

21  know if they were there by 4 o'clock.

22  Q   And then, number 6, "All personnel currently at T1 have

23  been ordered not to leave the building."  Do you see that?

24  A   I do.

25  Q   Okay.  And "Gates remain secured."  So that would have

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 187  Filed 11/26/13  Page 46 of 130
(720) 384-8078  attrans@sbcglobal.net

1  been the status at 4 o'clock --

2  A    Correct.

3  Q    -- that afternoon of April the 12th?

4  A    Yes.

5  Q    That any -- all personnel that were at T1 were ordered not

6  to leave the building?

7  A    That's correct, it says that.

8  Q    And the gate remained secured.  Is that how I interpret

9  it?

10  A    Yes.  And secured generally means closed in a log.  I

11  mean, when we say something's secured, it's either off or

12  closed.

13        THE COURT:  Mr. Curtner, did you want to offer this as

14  an exhibit?

15        MR. CURTNER:  Yes, Your Honor, I would like to offer

16  this as an exhibit to the Court.

17        THE COURT:  Any objection?

18        MR. SCHRODER:  No objection.

19        THE COURT:  A is admitted.

20     (Defendant's Exhibit A admitted)

21        MR. CURTNER:  Thank you, Your Honor.

22  BY MR. CURTNER:

23  Q    Commander Van Ness, did you have any chance to see any --

24  you have video surveillance cameras at T1 and T2 at COMMSTA, is

25  that correct?

1  A    That's correct.

2  Q    And did you have a chance to review the video footage from

3  that day, April 12th?

4  A    No, I did not see the video footage from that day.

5  Q    But you've not seen any video footage from that day?

6  A    I have not.

7  Q    All right.  Now -- so I think you described T1 as having

8  an eight-foot fence around it, and then the one gate that was

9  secured.  And now, what is the interior of the command station

10  T1 like?  Does it also require access?

11  A    Yes.  There's a card reader, yes.  Have a -- a card that's

12  issued to the people who work at the communication station.

13  Q    Okay.  So only those who have been issued access cards

14  have access to the interior and to the building?

15  A    That's correct.

16  Q    Now -- and you've indicated that -- I think when you were

17  talking about access in and out, you said that people could

18  leave voluntarily.  Is that correct?

19  A    Could -- I'm sorry, ask that question again?

20  Q    Was not designed to keep people in.  I think that's what

21  your quote was.

22  A    That -- that's correct.

23  Q    Okay.  Given that, do you think military personnel, if

24  they were ordered to remain at T1, would feel free to leave?

25  A    Mil -- no, military personnel would feel they need to

1  stay.

2  Q    Okay.  Anybody in your command would feel like they were

3  not free to leave?

4  A    Correct.

5  Q    Okay.  You said it was like this courtroom, but you could

6  go through those doors.  Is that correct?

7  A    That's correct.

8  Q    They're not locked?

9  A    That's correct.

10 Q    Would you feel free to leave while you're being questioned

11 here, today?

12 A    No, I would not be comfortable doing that.

13 Q    So can you guess what hours you may have been at T1 that

14 day?  I know you got there shortly after you arrived, then you

15 left by midmorning.  And, I'm sorry, do you know what time you

16 came back?

17 A    Shortly after lunch, maybe 1, 1:30 --

18 Q    Okay.

19 A    -- 2 o'clock, sometime (indiscernible).

20 Q    Early afternoon.

21 A    Yes.

22 Q    And you were there the rest of the time?  Or how late were

23 you there that day?

24 A    Again, I don't -- I don't remember exactly when I got

25 home.  It was well after dinner.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 187   Filed 11/26/13   Page 49 of 130
(720) 384-8078   attrans@sbcglobal.net

1 Q   Aft -- well --

2 A   Well, sometime between maybe 7 and 10.  I -- I don't

3 remember exactly.  But it was -- it was later in the evening.

4 Q   Okay.  And do you remember then all the crew from T2 being

5 up there?

6 A   Yes, they were up there.

7 Q   Including Mr. Wells?

8 A   He was.

9 Q   Do you recall -- at that time in the afternoon when you

10 received -- when you came back, who was in charge of the

11 investigation, in your mind?

12 A   The Coast Guard Investigative Service.

13 Q   They were in charge of the investigation?

14 A   There -- there was discussion of who ultimately was going

15 to have jurisdiction, but at that time the Coast Guard

16 Investigative Service was in charge, yes.

17 Q   And what was that discussion about?

18 A   I -- I believe one of the agents had told me that they had

19 called the FBI and that the FBI may either -- was -- was going

20 to be involved.  And their involvement was still under

21 discussion.

22 Q   Okay.  How many law enforcement officers were in T1 while

23 you were there in the afternoon?

24 A   They were in and out.  I don't remember exactly.

25 Q   How many offices did they use to question your crew from

1  T2?

2  A    Several.  Three, four.

3  Q    Three or four of -- and you remember then everybody from

4  T2 being questioned?

5  A    I -- I can't say I remember everyone being questioned.  I

6  remember them cycling through the crewmembers and talking to --

7  I remember where I had to replace people on the watch so that

8  there were folks that -- there was a general -- I -- I don't

9  know that they talked to every single person, but they were

10  talking to the majority of the group.

11  Q    Do you know if all the crew from T2 were released at the

12  same time that day?

13  A    I -- I don't believe they were.  I believe they were

14  released sporadically as law enforcement said --

15  Q    That they could go?

16  A    -- they're free.

17  Q    So when law enforcement said, "You don't have to stay

18  anymore, you can go," then some people left?

19  A    Yes.

20  Q    And do you remember the earliest that might have been?

21  A    I don't -- I don't remember.

22  Q    Was it -- had some people already left by the time you got

23  there in the afternoon?

24  A    No.  In general, the -- the crew was there.

25  Q    And do you remember the -- during the afternoon, some

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 187   Filed 11/26/13   Page 51 of 130
(720) 384-8078   attrans@sbcglobal.net

1 left?

2 A    During the afternoon, some were -- went to -- went with

3 some of the law enforcement officers over to the base.

4 Q    Okay.

5 A    But people just didn't go home.

6 Q    All right.  Do you remember when Mr. Wells left?

7 A    I -- I don't.

8 Q    Do you -- now, you mentioned bringing food in.  Now,

9 normally if somebody under your command was -- it was

10 lunchtime, normally they could leave and go home or to a

11 restaurant to eat for lunch?

12 A    Yes.

13 Q    But not this day?

14 A    That's correct.

15 Q    They had to stay?  And you brought food in?

16 A    Are you asking about lunch or the -- were -- I'm sorry,

17 were you asking --

18 Q    Well, you brought in boxed lunches because they were not

19 free to go out and --

20 A    I didn't bring in the box lunches.  I -- I believe the

21 base sent them over, in -- in an effort to support our command,

22 knowing that we didn't have a galley facility.

23 Q    Now, were you familiar at all with Mr. Wells's medical

24 situation at that time?

25 A    I -- I was aware that he had some med -- he had

1  significant medical issues, yes.

2  Q    Okay.  And you -- do you -- did you know that he was --

3  had a medical discharge originally from the Coast Guard?

4  A    Yes.

5  Q    And do you know why that was?

6  A    I want to say it was his knee, but I don't remember

7  exactly.

8  Q    Okay.  Do you remember him having medications that he

9  normally would have access to?  Was that ever an issue?

10  A    Not something ever discussed.

11  Q    And how about -- do you know if he had diabetes or had

12  dietary issues?

13  A    No, the -- honestly, the -- no.  I -- I wasn't aware of

14  that.

15  Q    Now -- so I think at one point did you come up to Mr.

16  Wells and put your hand on his shoulder or have any contact

17  with him at all while he was in T1, maybe?

18  A    Very -- very possible.

19  Q    Okay.

20  A    I was walking around, talking to the crew all afternoon,

21  so --

22  Q    But all the afternoon, Mr. Wells would have been sitting

23  in a common area?  Where would he --

24  A    I remember seeing Mr. Wells in the conference room and I

25  remember seeing -- I -- I believe I saw him on the electronics

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 187  Filed 11/26/13  Page 53 of 130
(720) 384-8078  attrans@sbcglobal.net

1  deck, where the other technicians were.  But I wasn't -- I

2  wasn't keeping track of any particular crewmembers, so I --

3  Q    And so you don't actually remember when he was released

4  that evening?

5  A    I don't.

6  Q    Do you -- okay, now, you said that all your crew was

7  supposed to come back the next day?

8  A    Yes.  Generally what -- the workday would have started at

9  7:30, 8 o'clock.  We said, you know, we're going to -- we've

10  been here late, we're going to push that off.  We gave -- the

11  XO and I discussed it.  I believe we talked to the

12  investigators and made sure that they were comfortable with

13  starting a little later, whatever they needed to do, it wasn't

14  going to interfere with their investigation.  And we -- we made

15  arrangements for the crew to come in late the next morning.

16  Q    Okay.  And do you know what time that would have been?  9,

17  10, 11?

18  A    It -- it was, like, 10 o'clock, but I -- again, I don't

19  recall the exact time.  But I believe it was -- we gave them,

20  like, two additional hours.

21  Q    So the crew at T1, they couldn't go back to work at T -- I

22  mean, at T2?  They couldn't go back to work at T2.  Is that

23  right?

24  A    That -- that's correct.  They had to secure it as a crime

25  scene.

1  Q   So they were all ordered to come to T1 the next morning?

2  A   No.  I mean, the expectation was that they would come to

3  work.  Since they couldn't go to T2, yes, there was a general

4  expectation that they would show up at T1, and they're not

5  going to stand in the parking lot at T2.

6  Q   But they're not -- there's no work they can do in T1.  Is

7  that correct?

8  A   There -- there -- I -- I honestly at that point was not

9  too concerned about what work was being done on the antenna

10 fields.  That wasn't on the top of my list.

11 Q   But Mr. Wells was not returning to work at T2 that next

12 day.  He was returning to come to T1?

13 A   He was returning to the communications station and he

14 couldn't go to his office.  So yes, he came to T1.

15      MR. CURTNER:  Just a minute, Your Honor.  No further

16 questions for this witness, Your Honor.

17      THE COURT:  Redirect.

18      MR. SCHRODER:  Just a couple things, Your Honor.

19                    **REDIRECT EXAMINATION**

20 BY MR. SCHRODER:

21 Q   Let's talk about this little issue -- or this issue of,

22 kind of, the difference between how you give somebody

23 directions in different scenarios.  Is every directive you give

24 to somebody who works for you -- do you consider that an order?

25 A   No.  General -- generally, I don't walk around just

1  issuing orders.

2  Q    Right.  I mean, how do you get work done with your crew on

3  a day-to-day basis?

4  A    My general practice was -- be a discussion with the

5  executive officer and the department heads, the operations

6  officer, engineering officer.  We take a look at what -- what

7  work needed to be done, what some of the priorities were,

8  what's going on operationally, and kind of come up with a plan.

9  And, you know, they'd look to me as the commanding officer to

10 say, you know, that -- that sounds good.  But I -- I would not

11 walk in with a -- a sheet of orders and say, "You are ordered

12 to do this today."  That's not -- not generally how we

13 function.

14 Q    And on the 12th of April, in this decision of what's --

15 what the crew were going to do during that day while you're

16 anticipating the investigation ramping up, was that the same

17 kind of process?

18 A    I'm sorry, could you ask me the question again?

19 Q    Or on that day, did you issue an order?

20 A    I -- I did not -- I personally did not specifically issue

21 an order to every member of the crew to report to T1 and not to

22 leave.  There was a understood request in -- through

23 conversation with the police and investigators, the -- my

24 executive officer, my security officer, command security

25 officer, let's -- everybody needs to stay here until we figure

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 187  Filed 11/26/13  Page 56 of 130
(720) 384-8078  attrans@sbcglobal.net

1  out where we're going with the investigation and what the
2  investigators need.
3  Q    Let me ask you another question about giving orders and
4  directives.  Is there a difference between what you can do as
5  far as issuing orders to a military person versus to a civilian
6  person?
7  A    Yes.  If -- if we were to get technical, military members
8  are subject to the Uniform Code of Military Justice.  The
9  civilians are not.  If they -- if I -- if -- if I gave
10  direction to a -- a military member and said, you know, "Could
11  you take out that trash for me" and they didn't do it, I might
12  issue an order:  "Take out that trash.  Can you take that out?"
13  I could do the same thing with civilian.  The difference is the
14  repercussions if they don't respond or don't do what I'm asking
15  or -- or telling them to do.  Again, the military members being
16  subject to the UCMJ; I could take them to captain's mess and
17  add additional punishment, or I could actually send them to
18  court martial for disobeying an order.
19      The civilian process is much different.  In the civilian
20  management, we would have to follow the Coast Guard's civilian
21  management processes.  There would be written documentation,
22  counseling.  The first time would be a informal local file
23  documentation.  It wouldn't even go in the permanent file.  If
24  it happened again, then we could pursue more aggressive
25  documentation.  There just isn't the same level of -- of

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 187   Filed 11/26/13   Page 57 of 130

1  mandatory compliance from a civilian as there is from a -- a

2  military where expectation of -- or orders -- I mean, I -- you

3  could -- I could issue orders to the crew and the general

4  expectation is the crew follows them.

5  Q    And in your experience interacting with Mr. Wells, did he

6  understand the difference between an order to a military person

7  and a directive or some kind of directive to a civilian

8  employee?

9  A    We mentioned his 43 years of service, both active duty and

10 civilian, so I -- I think he understood the difference between

11 military and civilians.

12 Q    Now let me clarify one other point.  And I think you made

13 this, but let's make it very clear.  The term -- how did you

14 describe what the term "secured" means when used in the

15 military?

16 A    Generally when something's secured in the military,

17 particularly in a log, that means it's turned off or it's

18 closed.  So a door being secured means that you have closed

19 it --

20 Q    Are you aware --

21 A    -- it --

22 Q    -- at any point during that day of April 12th, was either

23 the automobile gate to the fence or the person gate to the

24 fence locked so that no one could get out?

25 A    The -- the only way to really do that at the COMMSTA would

Case 3:13-cr-00008-SLG   Document 187   Filed 11/26/13   Page 58 of 130

1  be to go out and put a chain around it and lock it.  So no,

2  that was not done.

3      MR. SCHRODER:  No further questions, Your Honor.

4      THE COURT:  Recross, if any.

5      MR. CURTNER:  Just briefly, Your Honor.

6                **RECROSS EXAMINATION**

7  BY MR. CURTNER:

8  Q    So, Commander, according to the logs, would you agree

9  somebody ordered all personnel not to leave -- not to be able

10 to leave T1 by 4 o'clock in the afternoon?  Would you agree

11 with that?  If it wasn't your order, it was somebody's order?

12 A    Yes.  There was direction given to the crew not to leave.

13 Just one other point of clarification.  The log is -- it's a

14 very formal document.  And so putting the word "ordered" in

15 there, I mean, the -- it -- that could mean a lot of things and

16 it could have been delivered in a lot of different ways.  And

17 it's just -- the militar -- like "secured," "ordered" is

18 someone is told to do something.

19 Q    And when there's an order, you have different processes

20 for civilian and military who do not follow the order.  Is that

21 correct?

22 A    That's correct.

23 Q    But there is a disciplinary process for civilians who

24 don't follow orders?

25 A    That's correct.

1  Q   Now, do you know Mr. Wells's work schedule at T2?  Does he

2  normally --

3  A   I would -- I believe it was generally 8 to 4, was

4  assuming.

5  Q   So if he were at T1 until 9:30 at night, that would have

6  been --

7  A   That would have been overtime.

8  Q   -- beyond his work schedule?

9  A   Yes.

10 Q   So if he would not -- and if he had left -- he was there

11 till 9:30 in the evening; that's because he wasn't released by

12 law enforcement that evening?  He wasn't working?  Is that

13 correct?

14 A   That's true.

15 Q   Thank you.

16         MR. CURTNER:  That's all we have, Your Honor.

17         MR. SCHRODER:  No additional questions.

18         THE COURT:  May this witness be excused?

19         MR. SCHRODER:  Yes, Your Honor.

20         THE COURT:  Commander Van Ness, you may step down, and

21 you're free to leave.

22         THE WITNESS:  Yes, sir.

23         THE COURT:  I'll offer the parties an opportunity for a

24 brief recess, if you like.

25         MR. SCHRODER:  Yes, Your Honor.  Thank you.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 187   Filed 11/26/13   Page 60 of 130
(720) 384-8078  attrans@sbcglobal.net

1        THE COURT:  Ten minutes enough?

2        MR. CURTNER:  That would be fine.

3        MR. SCHRODER:  Yes.

4        THE COURT:  All right.  We'll be in recess.

5        THE CLERK:  All rise.  This matter stands in a 10-

6   minute recess.

7      (Court recessed at 10:45 a.m., until 11:03 a.m.)

8        THE CLERK:  All rise.  His Honor the Court, the United

9   States District Court is again in session.  Please be seated.

10        THE COURT:  Continue with the hearing.  Next witness.

11        MS. DUIGNAN:  Your Honor, the government is going to

12   call Special Agent Kirk Oberlander to the stand.

13        THE COURT:  All right.

14        THE CLERK:  Please raise your right hand.

15        **KIRK OBERLANDER, PLAINTIFF'S WITNESS, SWORN**

16        THE CLERK:  Thank you.  Please have a seat.  And for

17   the record, please state and spell your full name.

18        THE WITNESS:  Kirk Oberlander.  K-i-r-k, O-b-e-r-l-a-n-

19   d-e-r.

20        THE CLERK:  Thank you.

21                    **DIRECT EXAMINATION**

22   BY MS. DUIGNAN:

23   Q    Special Agent Oberlander, by whom are you employed?

24   A    The Federal Bureau of Investigation.

25   Q    And where are you based out of?

1    A    Anchorage, Alaska.

2    Q    And how long have you been employed by the FBI?

3    A    Five years.

4    Q    And what -- what's your background and training in the

5    FBI?

6    A    I had -- just like every special agent, I graduated from

7    Quantico, the FBI Academy there.  I -- my first year and a

8    half, I worked gangs and drugs and violent crime.  From there,

9    spent two-and-a-half years doing cyber crime and cyber national

10   security investigations.  And currently assigned to a white-

11   collar squad.  Prior to the bureau, I had training at the

12   Maritime Law Enforcement Academy in Yorktown, Virginia as a

13   Coast Guard officer, law enforcement officer.

14   Q    And prior to being employed by the FBI, you were indeed in

15   the Coast Guard.  Correct?

16   A    Yes.

17   Q    And how long was that?

18   A    Eight years active duty.

19   Q    And how did you come into the Coast Guard?

20   A    Through the Coast Guard Academy.

21   Q    Thank you.  How did you come to be involved in this case?

22   A    The morning of April 12th, I received a call from my

23   supervisor that said, "Pack your bags.  You're going to

24   Kodiak."

25   Q    And do you recall about what time that morning you

1  received the telephone call?

2  A    It was about 9:30, I believe.

3  Q    And about how long from the time you received the call did

4  it take to get to the airport?

5  A    We were told, I believe, that the plane would be taking

6  off at noon, and we need to be there by 11:30.

7  Q    At approximately what time did you arrive in Kodiak?

8  A    I believe it was about 1 o'clock, between 1 and 1:30.

9  Q    And about how many agents were you traveling with?

10  A    I think there were eight agents on the plane, and we met a

11  couple agents there.  Those are approximate numbers.  I don't

12  know.

13  Q    And about what time did you arrive at the Coast Guard base

14  in Kodiak?

15  A    I guess the Coast Guard ba -- we landed on the Coast Guard

16  base at about 1 -- between 1 and 1:30.  And then we went from

17  there to the police -- the Coast Guard -- or the Coast Guard

18  Police Department for a briefing at about 2.

19  Q    And about how long did the briefing last?

20  A    Maybe 30 minutes.

21  Q    And from there, what assignments did you receive?

22  A    After the briefing from the state trooper that was one of

23  the initial responders, we kind of had some different

24  investigative leads, and we divvied them up amongst the agents

25  that were there.  And I took some of the leads and other agents

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 187  Filed 11/26/13  Page 63 of 130
(720) 384-8078  attrans@sbcglobal.net

1  took some of the other leads.

2  Q    And what was the first lead that you followed up on after

3  arriving?

4  A    I believe the first lead I followed up on was a lead

5  regarding a dispute over a dog.  There was some conjecture that

6  the homicides were over a -- a -- a dog dispute.

7  Q    And about how long did it take you to finish up with that

8  lead?

9  A    Maybe a half-hour.  We -- we -- I think I contacted two

10  people regarding that lead.

11  Q    And were there any other interviews that you had prior to

12  going to the communication station in Kodiak?

13  A    I don't recall.

14  Q    Do you recall what time that you arrived at the

15  communication station on Kodiak?

16  A    I think it was about 3 -- I don't know -- would have been

17  about -- between 3 and 4 p.m.  I can't recall exactly, though.

18  Q    And what other agents, if any, were you working on as far

19  as your leads on this case?

20  A    I'm sorry, ask that question again?

21  Q    Were you working with any other agents or were you working

22  alone?

23  A    No.  All the interviews I did were with another person.

24  Q    And --

25  A    And it -- I don't think each of them were the same agent.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 187   Filed 11/26/13   Page 64 of 130
(720) 384-8078   attrans@sbcglobal.net

**OBERLANDER - DIRECT**

1    I -- I know some were with Sean Bottary, a CGIS agent.  And I

2    don't recall if I did interviews with others or -- or not.

3    Q    Did there come a time where you and Special Agent Bottary

4    had the ability or occasion to interview Mr. Jim Wells?

5    A    Yes.

6    Q    And about what time was that, if you can recall?

7    A    I think it was about 1920, so 7:20 p.m.

8    Q    And when you arrived at the communication station, was

9    there anybody that you talked to at the command first, or did

10   you just go in and start interviewing people?

11   A    No, there were multiple interviews prior to interviewing

12   Mr. Wells.

13   Q    And when you arrived at the communication station, how did

14   you wind up going into the building?  Did you take a car or did

15   somebody drop you off?

16   A    We drove over.  I don't know if I drove or if I rode in a

17   vehicle.  But there was a -- from the Coast Guard police

18   station, we kind of caravanned over to the communication

19   station, which was a few miles away.

20   Q    And arriving at the communication station, how was it that

21   you went about trying to find work space?

22   A    We were told that they would make a conference room

23   available for us for kind of a command post.  And then we were

24   told that there were multiple officers there that we could use

25   for private interviews.

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 187   Filed 11/26/13   Page 65 of 130

1  Q   Do you recall drawing a diagram in this case of what the
2  building at T1 looked like?
3  A   Yes.
4      MS. DUIGNAN:  Your Honor, I have what is marked
5  Government Exhibit 2.  And I've already provided a copy to
6  defense counsel.  I'd like to hand you a copy and show one to
7  the witness, please.
8      THE COURT:  Yes.
9  BY MS. DUIGNAN:
10 Q   Looking at Government Exhibit 2, can you please describe
11 what that picture depicts?
12 A   It's a very rough sketch of T1.  It has the front door at
13 the bottom center of the picture.  The -- and the command suite
14 off to the right of that main hallway that goes down the
15 middle, where -- where the YN's desk was and the CO and XO's
16 office.  Going up the page in -- I guess in landscape form
17 here, it's -- to the right is the master chief's office, and
18 it -- the hallway T's and goes right and left.  To the left is
19 the comm suite at the end of the hallway, and there was a door
20 going into a large open ET space, where most of the crew was
21 mustered.  And then there was a office kind of in the back left
22 corner there that was SK1's office.  Turning left around the
23 corner near the comm suite, there was a galley and a -- the
24 conference room that we used as our command post.
25 Q   And who prepared this picture?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 187   Filed 11/26/13   Page 66 of 130
(720) 384-8078   attrans@sbcglobal.net

1  A    I did.

2  Q    Would it help you explain how you used the office space

3  that day, the use of this diagram?

4  A    Yes.

5        MS. DUIGNAN:  Your Honor, I'd like to offer Government

6  Exhibit 2.

7        MR. CURTNER:  No objection.

8        THE COURT:  Exhibit 2 is admitted.

9     (Plaintiff's Exhibit 2 admitted)

10  BY MS. DUIGNAN:

11  Q    Looking at Government Exhibit 2, what office spaces were

12  you offered to use that day in order to be able to do your

13  investigation?

14  A    Again, the conference room we were using as our command

15  post, so that's where all the agents kind of gathered and

16  collaborated and gathered information.  The comm suite was not

17  used.  The SK1's office was the room I primarily used for

18  interviews.  There are also offices off the ET space that are

19  not depicted.  Bless you.

20  Q    Thank you.

21  A    So on the first day that -- the 12th, SK1's office was the

22  office I primarily used for interviews.

23  Q    And when you arrived at building T1, were there people

24  waiting in different areas of the building?

25  A    Primarily, from my recollection, they were mustered in

1  what I have labeled as the ET space.

2  Q    And when you arrived, approximately how many people did

3  you see there?

4  A    Maybe 20, 20 to 30.

5  Q    And were you told anything about who was waiting there or

6  why they were there?

7  A    We were told that they were waiting and available for

8  interviews.

9  Q    When you arrived, you said you were offered the use of

10 primarily the SK1's office.  Is that correct?

11 A    We were offered multiple offices, but I -- it -- it just

12 turned out that I primarily used SK1's office.  It wasn't

13 necessarily the only office that was offered.  It was just one

14 of many that was offered and just kind of how it panned out

15 that I used that one.

16 Q    Sometime that day, you stated that you interviewed Mr.

17 Wells, correct?

18 A    Yes.

19 Q    Do you recall approximately what time that was?

20 A    It was about 1920, 7:20 p.m.

21 Q    And do you recall which office you used in order to be

22 able to interview him?

23 A    It was SK1's office.

24        MS. DUIGNAN:  Your Honor, I have a second, Government

25 Exhibit Number 3, I'd like to hand to the witness and the

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 187   Filed 11/26/13   Page 68 of 130

1  Court.

2          THE COURT:  You may.

3          THE WITNESS:  Thank you.

4  BY MS. DUIGNAN:

5  Q    Looking at Government Exhibit 3, do you recognize that?

6  A    I do.

7  Q    And what is it?

8  A    It is a copy of a drawing that I made depicting a little

9  bit more detail of SK1's office.  Again, it's a rough sketch.

10 Q    And would this assist you in giving your testimony today?

11 A    Yes.

12         MS. DUIGNAN:  Your Honor, I'd like to admit Government

13 Exhibit 3.

14         MR. CURTNER:  No objection.

15         THE COURT:  Admitted for purposes of this hearing.

16     (Plaintiff's Exhibit 3 admitted)

17 BY MS. DUIGNAN:

18 Q    Special Agent Oberlander, looking at Government Exhibit 3,

19 can you describe what it was that you drew and what the

20 locations are on the diagram?

21 A    Yes.  I -- I drew a picture -- again, a rough picture --

22 of a square, large square with three small squares.  The large

23 square is the boundaries of -- of the room.  The three chairs

24 are labeled with my name, "Kirk," "Sean," and "Wells."  That is

25 depicting where we sat in the room.  There was a desk also that

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 187   Filed 11/26/13   Page 69 of 130
(720) 384-8078   attrans@sbcglobal.net

1  I labeled.  I was sitting behind the desk.  Mr. -- or Sean

2  Bottary was sitting in front of the desk.  Mr. Wells was

3  sitting nearest the door.  I -- I -- I'd drawn a -- a square

4  depicting a -- a chair right behind the door, but I believe the

5  chair actually was far enough away from the door that it -- it

6  could be opened.  So I redrew a square, labeling it a little

7  bit farther away.

8  Q    And when you first interviewed Mr. Wells, as you said, at

9  approximately 7:20 on April 12th, and you invited him into the

10 room, how were you dressed?

11 A    I was dressed in khaki cargo pants, button-up shirt.  I

12 believe I was wearing a jacket or a vest.  Had my service

13 weapon on my hip and handcuffs and a extra magazine on my left

14 hip.

15 Q    Do you recall whether your weapon was visible or not?

16 A    I -- I don't think it was.  Typically when we do

17 interviews, we try to have it covered so that it is, you know,

18 less intimidating of a -- of a posture.  Some people are

19 intimidated by a shown weapon.

20 Q    Do you recall how Special Agent Bottary was dressed?

21 A    Similarly.

22 Q    And when you invited Mr. Wells into the room, was the door

23 left open or was it closed?

24 A    It was closed for privacy.

25 Q    And when you had conducted other interviews that day, how

1 did you conduct those interviews?

2 A    Closed door for privacy.

3 Q    Do you recall how long that first interview was?

4 A    It was approximately 30 minutes.

5 Q    And do you recall the general nature of what the interview

6 was about?

7 A    Yes.  It was to gather, kind of, Mr. Wells' take on what

8 might have happened, what his general duties were, any theories

9 that he might have regarding what may have happened down at T2.

10 Q    And was the interview recorded or did you take notes, or

11 how was the interview documented?

12 A    It was recorded and notes were taken.

13 Q    And was the interview eventually transcribed?

14 A    Yes.

15 Q    And you had the opportunity to review that, correct?

16 A    Yes.

17 Q    Was there a time later that day where you had the

18 opportunity to interview Mr. Wells again?

19 A    Yes.

20 Q    And what were the circumstances that led to that

21 interview?

22 A    The first interview -- it -- it was kind of -- all the --

23 I guess, the semantics of it, it was kind of a continued

24 interview, but multiple recordings.  It -- the first recording

25 was about 30 minutes long, and we told him, you know, we'd like

1 to go out and discuss and gather other information from the

2 case agent, and we'd like to ask him some more questions when

3 we came back in a little bit later.  So we -- the second

4 interview just was a -- a follow-on the first, with questions

5 that we hadn't asked him yet.

6 Q   Do you recall approximately how long that interview was?

7 A   I think it was about 10 minutes.

8 Q   Did there come a time during the day that you became aware

9 of anything regarding Mr. Wells' medical condition?

10 A   Yes.

11 Q   And what did you find out?

12 A   He told us he was a diabetic.

13 Q   And approximately when did you find that out?

14 A   I think it was -- it was during the first 30-minute

15 interview.  I believe he kind of coughed, and I asked him if he

16 needed a bottle of water.  He said no, but something about his

17 diet -- he was diabetic.  And --

18 Q   And what, if any, actions did you take because of that?

19 A   We asked him if he needed a snack or any food.  And he

20 said no.  And he said it -- I believe, if I -- memory serves,

21 he said something to the effect that he would need his

22 medication at -- at some point.

23 Q   And did there come a time later in the day where you

24 talked to him again, where that conversation turned towards his

25 medical condition?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 187   Filed 11/26/13   Page 72 of 130
(720) 384-8078   attrans@sbcglobal.net

1   A    Yes.

2   Q    And when was that, approximately?

3   A    I -- I don't -- I -- it was within -- it was before 9 but

4   after 7:30.  I don't know exactly.

5   Q    And was there a third interview that day?

6   A    Yes.

7   Q    And what was the primary topic of that interview?

8   A    I believe -- there were a third and a fourth, and I don't

9   remember which one came first.  But they were very short and

10  close together.

11  Q    Was there a time where you recorded an entry where you

12  asked him about his medical condition?

13  A    Yes.

14  Q    So you would say that was probably the third or fourth

15  interview?

16  A    Yes.

17  Q    And how long was that?  How long was the third interview,

18  approximately?

19  A    Maybe three minutes.

20  Q    And there was --

21  A    Three to four.

22  Q    -- a time that day where you interviewed him one last

23  time, a fourth interview.  Correct?

24  A    Correct.

25  Q    And approximately how long was that?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 187  Filed 11/26/13  Page 73 of 130
(720) 384-8078  attrans@sbcglobal.net

1  A    Again, it was less than 10 minutes.  It was short.  I

2  can't remember.  The transcript would -- should indicate.

3  Q    And during the time that you were interviewing Mr. Wells,

4  were there other interviews occurring that evening, to your

5  knowledge, or were there other people around?

6  A    There were other people around.  And I believe there were

7  other interviews taking place.

8  Q    At the time that the interviews concluded for the evening,

9  were there any -- was there any direction given to anybody

10 about, you know, reporting back the next day or what they could

11 do?

12 A    I believe we told Mr. Wells to check with his chain of

13 command.  But as far as we were concerned, the FBI would talk

14 to him at some point the next day, but that we would coordinate

15 that with his command.

16 Q    And to your knowledge, was there anything scheduled for

17 the next morning?

18 A    Believe the CSM training, the Critical and -- man --

19 Stress Management Training, for the whole crew.  I'm not -- it

20 started in the morning.  I'm not sure what time.

21 Q    And was that something that you as federal law enforcement

22 were trying to work around with the command?

23 A    Yes.

24 Q    Was there any time where you talked with Mr. Wells about a

25 delayed reporting time or do you have any knowledge of that?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 187  Filed 11/26/13  Page 74 of 130

1  A    I remember having a conversation similar to that.  I'd

2  already described that, you know, it -- it wasn't up to us when

3  he reported, it was -- had him check with his chain of command

4  on when to report, but we would like to talk with him again.

5  But, you know, we said we would coordinate through his chain of

6  command on that.

7           MS. DUIGNAN:  Your Honor, I have no further questions

8  at this time.

9           THE COURT:  Mr. Curtner.

10          MR. CURTNER:  Thank you, Your Honor.

11                      **CROSS-EXAMINATION**

12  BY MR. CURTNER:

13  Q    Good morning, Agent.

14  A    Good morning.

15  Q    Going to assume that you didn't take a commercial flight

16  to Kodiak.  Was it a military flight you took over to -- from

17  Anchorage to Kodiak?

18  A    Yes.

19  Q    And what type of flight was that?  Was it a -- what kind

20  of plane did the agents go in on?

21  A    It was a C130.

22  Q    And there were eight agents altogether on that flight?

23  A    I don't recall how many.  I -- I know we were limited by

24  weight, because we were taking a vehicle as well.  And I

25  believe it was eight agents.

1  Q    Okay.  Now, when you first then got to Kodiak, you went to

2  the Coast Guard base.  Is that correct?

3  A    We --

4  Q    Or that's where you landed?

5  A    We landed at the Coast Guard air station and from there

6  went to the police department, Coast Guard Police Department.

7  Q    And then you were briefed on the situation.  Is that

8  right?

9  A    Yes.

10  Q    And who did the briefing?

11  A    Trooper Dupras.

12  Q    Okay.  And so what do you mean by a briefing?  Did he

13  describe the crime scene?

14  A    He did describe the crime scene and some of the

15  investigative leads that he had followed and had not followed

16  as of yet.

17  Q    Okay.  So how many leads do you think he had followed at

18  that time during the debriefing?

19  A    Very few.  I -- I don't know for sure.

20  Q    Do you remember what they were, though?

21  A    No.

22  Q    And so you -- then there were -- and how many leads do you

23  think that there were that had to be investigated at that

24  point?

25  A    Dozens.

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 187   Filed 11/26/13   Page 76 of 130

1 Q   Okay.  And you said you were -- you -- then the leads were

2 divvied up between the FBI agents?

3 A   FBI and CGIS.

4 Q   Okay.  And yours was the first -- you said you had several

5 leads you were going to -- that were in your -- that were

6 assigned to you?

7 A   I don't know if any were particularly assigned.  It was

8 just -- we kind of said, okay, I'll take this one, you take

9 that one.  It -- it wasn't at that point, like I said,

10 assigned.  It was -- we had an idea of what needed to be done

11 and we started doing it.

12 Q   Okay.  So the first lead that you took was about this dog

13 dispute?

14 A   I believe that I was the first one, yes.

15 Q   And then that was -- did it have to do with the

16 (indiscernible) crewmembers from T2?

17 A   I don't believe so.  I -- I -- I don't recall.

18 Q   Do you know how it could have been related to this

19 investigation?

20 A   I think it had to do with a -- a dispute within housing.

21 And there was some concern that it -- again, it was as

22 investigative lead that we followed up on and it proved not to

23 be related.

24 Q   Well, then what other leads did you -- were you involved

25 in that day?

1  A    There was -- I -- I don't recall.  I remember there being

2  one about infidelity.  And I don't remember if I talked to

3  somebody about that or if it was -- somebody had told me about

4  them -- another agent telling me their followup on it.  But

5  again, it -- it didn't seem to pan out.  But --

6  Q    And that's -- infidelity.  Could you describe what that --

7  what you're describing?

8  A    There were some rumors of infidelity between some of the

9  members of T2 that may have led to the homicides there.  Again,

10  I -- I don't recall much more detail than that.

11  Q    Did it not involve Mr. Wells?

12  A    I don't recall.

13  Q    Now, was Mr. Wells identified in the debriefing as a

14  possible lead?

15  A    Yes.

16  Q    And was he describe -- tell me about that.  Descr -- tell

17  us about how he was described as a possible lead.

18  A    It was described that there was a -- a crewmember at T2

19  that was supposed to be there at the time of the homicides that

20  had not reported.  And that name was given as Jim Wells.  I

21  believe there was mention of a flat tire.  He was late because

22  of a flat tire.  There was some indications that there had been

23  some disciplinary action and some health issues with Mr. Wells.

24  And I believe that said something about his prior military

25  service.

1  Q   All right.  So was that a lead that you were supposed to

2  follow up with?

3  A   Again, it wasn't assign -- it was just on a -- a list of

4  things that we needed to get to.  But I wasn't necessarily

5  assigned that lead specifically.

6  Q   Do you recall if there was any information provided from

7  any of the crewmembers or staff at COMMSTA identifying Mr.

8  Wells as a potential suspect?

9  A   I believe there was.  The question was asked if anybody

10  could have done this, who -- who could have done it.  And I --

11  there were a -- a couple that said -- you know, Jim Wells' name

12  did come up.  I don't remember when that came, if it was at the

13  briefing or shortly thereafter.

14  Q   Okay.  And would that have been from -- would one of those

15  statements come from Commander Van Ness?

16  A   I don't think so.

17  Q   How about Chief Reckner?  Do you know Chief Reckner, Scott

18  Reckner?

19  A   I -- I do know Chief Reckner.  I spoke with him.

20  Q   And did you have information from him that led you to

21  believe that Mr. Wells could be a potential suspect?

22  A   At that point, I -- I don't know.  I don't recall when I

23  spoke with Chief Reckner.  But at -- at some point Chief

24  Reckner did say that it's a potential that Mr. Wells would be

25  a -- a suspect.

1   Q    And during this debriefing with Trooper Dupras or Dupree,

2   he indicated to you that Mr. Wells could be a potential

3   suspect?

4   A    Yes.

5   Q    So this was before you got to COMMSTA, between 3 and 4?

6   A    Yes.

7   Q    And this is the information you had when you got to

8   COMMSTA by 4 o'clock?

9   A    Yes.

10  Q    Now -- so the first interview with Mr. Wells was at 7:21

11  p.m. that evening.  And were you at COMMSTA then from 3 or 4 in

12  the afternoon until 7:21, when you interviewed Mr. Wells?

13  A    Yes.

14  Q    And what else did you do during that time?

15  A    We were following investigative leads.  I made -- I had

16  several interviews before Mr. Wells.

17  Q    And who else did you interview?

18  A    I believe it was Mr. Beauford or -- I -- I can't remember

19  the names.  He was a -- a member that -- I think it was one of

20  the members that found the bodies down at -- at T2.

21  Q    Okay.  That was one interview you remember doing before

22  Mr. Wells?

23  A    Yes.

24  Q    Do you remember anybody else?

25  A    I remember that there were others, but I -- I don't

1  remember who they were.

2  Q    And do you remember -- could you recall how many

3  interviews you did before Mr. Wells?

4  A    Maybe four or five.

5  Q    Was Mr. Wells the last person you interviewed?

6  A    That day, yes.

7  Q    Okay.

8  A    Actually, we were up -- well, into the -- the next

9  morning, so I -- I -- I don't recall.  He was the last one --

10 the last crewmember at T1 that I interviewed that night.

11 Q    From T2?

12 A    Well, at -- at T1 --

13 Q    At T1.

14 A    -- from T2.  But he was the last crewmember that I

15 remember interviewing that night.

16 Q    All right.  And so who did you do these interviews with

17 with Mr. Wells?

18 A    Special Agent Bottary.

19 Q    And so you and he worked together --

20 A    Yes.

21 Q    -- on those interviews with Mr. Wells?

22 A    Yes.

23 Q    Now, when you interviewed Mr. Beauford, was that with

24 Agent Bottary as well?

25 A    I believe so.  I -- I can't -- I don't know for sure.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 187   Filed 11/26/13   Page 81 of 130
(720) 384-8078   attrans@sbcglobal.net

1  Q    Do you remember where you interviewed him?  Was it the

2  same office?

3  A    I believe so.

4  Q    Okay.  Did you have a chance to, with Agent Bottary,

5  discuss how you were going to do the interviews with Mr. Wells?

6  A    Briefly.

7  Q    Do you remember -- did you use a -- any kind of a standard

8  questioning matrix when you were questioning Mr. Wells or other

9  people that night?

10  A    I know we did at one point.  I -- I don't remember or

11  recall when that matrix was made or that -- I use your word,

12  "matrix," but it was a -- a prescripted question sheet, I

13  guess.

14  Q    Let me show you what's been identified as Defendant's

15  Exhibit B and see if you recognize that.  Do you recognize

16  what's been identified as Defense Exhibit B?

17  A    Yes.

18  Q    And so this is -- at the top it says a "Standard Question

19  and Matrix."  Is that something that is an FBI form or is that

20  a Coast Guard Investigative Services form?  Or do you know?

21  A    This is something that is not a standard.  It -- it was

22  just -- we were interviewing so many people, it was decided

23  that this would be a good tool to use to try to standardize and

24  get similar -- I guess speed up the process of interviewing

25  some of these people and -- and make sure we're hitting some of

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 187   Filed 11/26/13   Page 82 of 130
(720) 384-8078   attrans@sbcglobal.net

1    the questions that the case agent wanted to be hit.

2    Q    Okay, so when was that created?  When was that drafted as

3    far as helping you in your investigations?

4    A    I don't know.  I'm pretty sure it was not the first day,

5    though.

6    Q    Was that the -- on -- when you interviewed Mr. Wells on

7    the 12th?

8    A    I -- I don't believe so.

9    Q    Okay.  So did you have any kind of matrix or questioning

10   that you used with people you did on April 12th?

11   A    No.

12   Q    Just kind of winged it?

13   A    Yes.

14   Q    Now, was this used then for questioning on April 13th?

15   A    I -- again, I don't know when this was created.  I -- I --

16   my best guess would be yes.  I -- I don't recall exactly when

17   it was created or when it started being used.

18   Q    All right.  Do you see the targeted interview questions at

19   the bottom of the page 1?

20   A    Yes.

21   Q    Okay.  At the time this was created, was Mr. Wells a

22   suspect?

23   A    I would say yes, because as we've already discussed, he

24   was a -- not necessarily a primary suspect, but a suspect, as

25   of our arrival.

1  Q    Well, one of the target interview questions which is

2  labeled number 1 -- this is a question that you would have used

3  in all your interviews or --

4  A    Not all my interviews.

5  Q    -- after it was -- after you had this form, I suppose?

6  A    Again, these are question -- these are suggested questions

7  that -- the general questions would have been asked and then

8  the targeted questions would have been used if they seemed

9  logical for the investigator.  So I can't say that every

10 question was asked in every interview, but these are as they

11 would come up logically in the interview.  It was a reminder to

12 the agents that these are -- this type of information, it would

13 be helpful.

14 Q    Okay.  And then one of the questions there at the bottom

15 is that you're specifically looking for information concerning

16 a blue SUV minivan or a white truck.  Is that right?  That's

17 one of the targeted questions you would have had during

18 interviews after you had this form?

19 A    Can you ask that again?  I'm sorry.

20 Q    You were specifically targeted in your interview

21 questions, information concerning a blue SUV minivan or a white

22 truck.  Do you remember asking people about the blue minivan or

23 the white truck, the blue SUV minivan or the white truck?

24 A    Throughout the investigation, yes.  I -- I don't know

25 specifically on -- on the 12th when I spoke with Mr. Wells if

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 187   Filed 11/26/13   Page 84 of 130
(720) 384-8078   attrans@sbcglobal.net

1  we -- we had that information yet or not.

2  Q    Well, do you see under that there's a paren?  It says:

3  "Subject vehicles are a blue 2001 Honda CRV and a 2002 white

4  Dodge truck with camper shell."  Do you see that?  Do you --

5  A    I do.

6  Q    Do you recognize that?

7  A    I do.

8  Q    Do you recognize who those subject vehicles belong to?

9  A    Yes.

10  Q    Who do they belong to?

11  A    Mr. Wells.

12  Q    And this is information you had when you were doing

13  interviews?

14  A    Yes.

15  Q    And you had this information because he was a suspect at

16  that time?

17  A    What time are we talking about?

18  Q    I don't know.  When did you first see this?

19  A    I -- I -- I don't believe it was on the 12th.  It may have

20  been on the 13th.  I -- I don't know for sure.

21  Q    So your first interview with Mr. Wells on April the 12th

22  started at 7:21.  Is that correct?

23  A    That sounds about right, yes.

24  Q    And it went about 31 minutes, little over?  Okay.

25  A    That sounds about right.

1  Q    Now, by that time, do you know how long Mr. Wells had

2  already been at T1?

3  A    I believe he told us he arrived at 8:30, so -- and I don't

4  believe he had left.

5  Q    So it had been almost 11 hours that he had been there

6  before this interview started.  Is that correct?

7  A    Yes.

8  Q    Okay.  And to your knowledge, he hadn't left before this

9  interview started?

10  A    Correct.

11  Q    He was in -- was he that whole time in -- where were these

12  people mustered?  In the ET section?

13  A    That's where it -- it appeared most of the crew had been

14  mustered.

15  Q    What do you mean by "mustered"?  I'm not familiar with

16  that term.

17  A    Gathered.

18  Q    Okay.  And what kind of room is that where the crew is

19  mustered?

20  A    It was a large open -- large open room with a lot of

21  computers, electronic equipment.  It was a raised floor for

22  electrical wires to be ran under it.  There were offices on the

23  perimeter of that room.  I know there were stacks of box

24  lunches, desks.  There was a door that led off to another open

25  area.  That -- I guess that's my best description.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 187   Filed 11/26/13   Page 86 of 130
(720) 384-8078   attrans@sbcglobal.net

1  Q    And so this is on the interior of the building T1?

2  A    Yes.

3  Q    Okay.  There's no windows or access -- doors accessed

4  outside to -- outside of the building?  I mean --

5  A    I can't say for sure.  I don't believe there were windows,

6  but I -- I don't -- I'm not sure about doors.

7  Q    And so in that interview -- that was that first interview

8  when you talked about Mr. Wells's medical conditions.  Is that

9  correct?

10  A    It -- it did come up in the first interview, yes.

11  Q    You were somewhat concerned, because he had been there

12  over 11 hours by that time?

13  A    Yes.

14  Q    And didn't have access to leave to get any type of food or

15  medications?

16  A    No medication.  He -- there was plenty of food available.

17  Q    Well, if he needed a special diet or something, it was

18  just whatever was in the box lunches.  Is that correct?

19  A    We had offered him -- we had asked him if he needed

20  anything, but --

21  Q    Did he mention what he had to eat while he was waiting

22  there that -- that day?

23  A    I think he did.  I don't recall what that was.

24  Q    Chips or something?  That's all he had?

25  A    I -- I don't -- again, don't recall.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 187   Filed 11/26/13   Page 87 of 130
(720) 384-8078   attrans@sbcglobal.net

1 Q   This will be in the transcript, though, that's been

2 provided to the --

3 A   Correct.

4 Q   -- Court, right?  Okay.  And, now, as you said, there were

5 four different recorded sessions of these interviews.  But did

6 Mr. Wells leave that office between 7:21 and 9:30 that evening?

7 A   I believe when you -- you -- I guess for clarification,

8 SK1's office?  Is that what you're specif --

9 Q   Yes, uh-huh (affirmative).

10 A   I believe between the first and second interview there was

11 a little bit of a -- a larger time gap there.  I believe he

12 went back into the ET area during that time.

13 Q   Now, so the second interview would have started at 8:04.

14 Is that correct?

15 A   That sounds correct.

16 Q   So the first interview is about 35 minutes, and this just

17 ended about 7:52, the first interview you had with him?

18 A   Okay.

19 Q   And then there was about -- the next interview started at

20 8:04.  So there's some time gap there.  Did he leave the office

21 there that small time or would the -- he stay in there while

22 you left?  And I think you said you went to talk to your case

23 agent.  Who was the case agent at that time?

24 A   It was Special Agent Darrel Allison.

25 Q   Okay.  So after -- was it after the first interview or the

1  second interview that you left him in the room and talked to

2  the case agent and then went back?

3  A    I believe each time we finished a recording session, an

4  interview, we would go back and talk with the case agent.  And

5  I don't -- I -- I know at one point, whichever the longest

6  break was in the interviews, I believe that's when Mr. Wells

7  went back to the ET space.

8  Q    So when you went to the case agent, you would discuss

9  followup questions or a thing you wanted to question Mr. Wells

10  about?

11  A    Correct.  And to see what other information may have been

12  gathered while we were in the interview.

13  Q    Now, during that second interview, did you ask to search

14  his truck or to go to his truck or to look into his truck?

15  A    I believe it was the second interview where we did ask for

16  consent to search his phone and his truck.

17  Q    Okay.  So search his phone, what do you mean by that?

18  A    We did not have forensic capability there with us at the

19  time, so we -- at that point we just wanted to look through his

20  phone to see, you know, what pictures, what phone numbers would

21  have been called.  We wrote down some of the numbers that

22  had -- incoming and outgoing calls around the time in question,

23  I believe.

24  Q    So was this a smartphone, a cell phone that he had on him?

25  A    Yes.

1 Q    Do you remember what kind of phone?

2 A    Believe it was a iPhone.

3 Q    So he had an iPhone with him and you asked to go through

4 it and see what was in there?

5 A    Yes.

6 Q    And you looked for phone calls, phone messages, text

7 messages?

8 A    Yes.

9 Q    Photographs?

10 A    Yes.

11 Q    And you examined that and he allowed you to do that?

12 A    Yes.

13 Q    Okay.  And that was to see if you could be -- if there

14 might be any leads that might help you in your investigation?

15 A    Correct.

16 Q    And then why did you ask to look at his truck?

17 A    It was seen as a logical next step in the investigation.

18 Q    And so why was it the next logical step?  What were you

19 looking for?

20 A    Any blood, any weapons, clothing that might have blood on

21 it.

22 Q    Did he go with you?

23 A    Yes.

24 Q    And so you went through his truck, then, when he was

25 there?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 187   Filed 11/26/13   Page 90 of 130
(720) 384-8078   attrans@sbcglobal.net

1  A    Yes.

2  Q    And you were looking for these kind of items?

3  A    Yes.

4  Q    And you didn't find anything.  Correct?

5  A    No.

6  Q    Okay.  The third interview was then at -- started at 9:05,

7  and it was about -- just a three-minute interview.  Was there

8  some more discussion about his -- he needed his medications?

9  A    I don't recall.

10  Q    Was there a discussion in there about him going home

11  possibly and getting medications for his diabetes?

12  A    Again, I don't remember which interview -- we did have

13  that discussion at -- at one point.  I don't recall which

14  specific --

15  Q    What --

16  A    -- interview it was.

17  Q    Was it -- was he allowed to leave, to go home -- to his

18  home and get his medications, or was it discussed about he

19  would have to be escorted to do that?

20  A    We didn't say he -- he would have to be escorted, from --

21  from what I recall, but that it -- we would like to go with him

22  if he went home.

23  Q    Okay.  So if he were to go home and get medications, you

24  would have accompanied him or gone with him?

25  A    Again, we would have liked to go with -- gone with him,

1  yes.

2  Q    And this is --

3  A    It wasn't -- so -- go ahead.

4  Q    By this time it was 9 o'clock at night.  Isn't that

5  correct?

6  A    Yes.

7  Q    Okay.  And then -- so I assume the fourth interview then

8  started at 9:22.  Do you recall that interview?  There was a --

9  there was somebody else in the interview at that time.  Is that

10  correct?

11  A    Yes.

12  Q    And who was the other person?

13  A    The -- that one -- that one -- I don't believe we asked

14  him any questions specifically.  It was -- we had Special Agent

15  Sedrauss with us, and we had -- the only thing we did during

16  that, I believe, was ask him to -- take some swabs of his

17  hands.

18  Q    And why was that?

19  A    To get a reaction, to see what reaction he would have to

20  the question.

21  Q    Okay.  So Agent Sedrauss was there to administer this

22  swab?

23  A    Yes.

24  Q    And how was it described to him?

25  A    As a gunpowder residue test.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 187   Filed 11/26/13   Page 92 of 130
(720) 384-8078   attrans@sbcglobal.net

1  Q    And was it a gunpowder residue test?

2  A    No.  It was a ruse.

3  Q    It was a ruse just to see if you could get a reaction from

4  him?

5  A    Yes.

6  Q    And so clearly at that time, when you were talking to him,

7  searching his truck, going through his phone, and seeing if he

8  would react to a gunpowder residue test, he was a suspect in

9  your investigation?

10 A    Yes.

11 Q    Now -- so he left that night.  He was there till about

12 9:30 at night?

13 A    Yes.

14 Q    And then he left on his own?

15 A    Yes.

16 Q    Do you know where he went after that?

17 A    No.

18 Q    Was there any surveillance on him when he left?

19 A    I don't believe so.

20 Q    You interviewed him the next day, didn't you?

21 A    Yes.

22 Q    When he came back, he came back to T1?

23 A    Yes.

24 Q    And you interviewed him a sec -- a fifth and sixth time?

25 A    Yes.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 187   Filed 11/26/13   Page 93 of 130
(720) 384-8078   attrans@sbcglobal.net

1  Q    Didn't you discuss -- didn't he ask you if the FBI or

2  somebody from the FBI had interviewed his wife --

3  A    Yes.

4  Q    -- during the interim?  Okay.  And did he also ask if

5  somebody had come out to his place in the driveway?

6  A    Yes.

7  Q    And did he ask you if he had been in survei -- under

8  surveillance, either driving home or while he was at home?

9  A    He did ask that, yes.

10 Q    And was he under surveillance during that time?

11 A    Not that I know of, as far as -- I don't know if somebody

12 drove into his driveway.  I know there was some discussion when

13 he left that we wanted him under surveillance, but I don't

14 think he was immediately under surveillance.  I think

15 surveillance may have been set up later that evening, but I --

16 I don't know for sure.  I didn't -- I didn't order any

17 surveillance on him.

18 Q    You didn't order, but to your knowledge, he was under

19 surveillance between the first four interviews that you did and

20 the next two the next day?

21 A    Again, I -- I don't recall specifically, no.

22 Q    Okay.  Now, the next day -- first of all, on April 12,

23 2012, you never gave him any *Miranda* warnings.  Is that

24 correct?

25 A    Can you ask that again?  I'm sorry.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 187   Filed 11/26/13   Page 94 of 130
(720) 384-8078   attrans@sbcglobal.net

1  Q    On April 12th, during that four conversations, the

2  interviews you had with him, you did not give him any *Miranda*

3  warnings at any time on April the 12th.  Is that correct?

4  A    Correct.

5  Q    And during the time he was there from 8:30 in the morning

6  till 9:30 at night, to your knowledge, he had no -- he had not

7  been given any *Miranda* warnings by any law enforcement.  Is

8  that correct?

9  A    Correct.

10 Q    Okay.  So the next morning he came in, and your interview

11 number 5 started at 11:25 a.m.?

12 A    That sounds about right.

13 Q    And, oh, what -- how did that interview start?  Did you

14 start ques -- did you give *Miranda* at the beginning or did you

15 start asking questions from when you first came in --

16 A    The transcript would indicate, but I believe there was --

17 we gave him *Miranda* pretty much right away.

18 Q    Okay.  Well, if the transcript said that the waiver was at

19 11:40 -- did you see the written waiver form?

20 A    I mean, I remember having him sign it, but I -- I don't --

21 I have not seen that since.

22 Q    If you look at your -- do you have the transcripts with

23 you?

24 A    I do not.

25 Q    Let me give you what has been filed with the Court, Your

1  Honor, as an Exhibit Number 5 to the government's opposition.

2  Just a minute.  You -- now, you -- you've reviewed the

3  transcripts of your interviews?

4  A    Yes.

5  Q    And is that a accurate transcript of your interview with

6  Mr. Wells on April 13th?

7  A    Yes.

8  Q    Okay.  You see at the beginning that the start time is

9  11:25 on Friday, April 13th.  You go to page 1.

10  A    I'm sorry, what was the question?

11  Q    So you see this is the first page of the transcript of

12  that interview.  Is that correct?

13  A    Yes.

14  Q    And you were with, again, Sean Bottary?

15  A    Yes.

16  Q    And this starts at approximately 11:25 a.m. on April 13th?

17  A    Yes.

18  Q    Okay.  And then you see at the very beginning he asked why

19  his wife wasn't being interviewed?

20  A    Yes.

21  Q    And then if you go to page 2 of this exhibit, two-thirds

22  of the way down he says, "Did you guys drive to my house last

23  night?"  Do you see that?  Do you remember him asking you that?

24  A    I do.

25  Q    And he was describing somebody being in the driveway at

1 his home?  You recall that?

2 A    I do.

3 Q    Okay.  And let's go to page 4 of that.  Now, you see at

4 the bottom of page 4 there's a long paragraph.  That's "K.O."

5 That's your -- reference to your part of the interview?

6 A    Okay.

7 Q    And basically you're talking about, if you read through

8 that, the nature of that is you're talking about his expertise

9 about T2 and how that might help in your investigation.  So at

10 that time, even with all the information you have, you didn't

11 want to be blatantly accusatory at that time.  Is that correct?

12 A    Correct.

13 Q    You wanted to present this interview as being about

14 information he might have about T2 and what goes on at T2?

15 A    Correct.

16 Q    But then you switched gears.  If you go to page 9 of that

17 transcript, you see at the very top, "K.O."  Is that you again?

18 A    Yes.

19 Q    So now you're talking about this formality of having a

20 waiver.  Do you see that paragraph?

21 A    Yes.

22 Q    It's like the same things you hear on TV, blah-blah-blah.

23 So is that when you're first suggesting during your course of

24 interviews that he has certain *Miranda* rights?

25 A    Yes.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 187   Filed 11/26/13   Page 97 of 130
(720) 384-8078   attrans@sbcglobal.net

1 Q   Okay.  And now, when you -- later on down toward the

2 bottom you said, "We can show you that again.  I should have

3 filled that out before I put it in front of you."  Did you feel

4 that you should have given *Miranda* warnings before this time?

5 A   Our intention, I believe, was to read them when he first

6 came in that morning, but he hit us with questions and we

7 answered his questions before we ended up going -- so my

8 intention was to read them that morning when we first -- when

9 we first started the interview.  But a -- again, he hit us with

10 questions first and then we got off our game plan, I guess, if

11 you will.

12 Q   Okay.  So the game plan was to read him his *Miranda* rights

13 because he was a suspect in this investigation?  Isn't that why

14 you read *Miranda* rights to somebody?

15 A   We read the *Miranda* rights because we wanted to inform him

16 of his rights.  I -- as a agent, I don't specifically have to

17 read a subject his rights.  It's only if that subject is in

18 custody.  And we didn't want there to be a hearing such as

19 this, where custody was, you know, being questioned.  We didn't

20 feel that he was in custody at that point, but to -- to better

21 be safe than sorry, we wanted to advise him of his rights.  But

22 again, he was free to go at that point.

23 Q   In your mind?

24 A   Correct.

25 Q   So you should have given him *Miranda* rights the day

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 187   Filed 11/26/13   Page 98 of 130
(720) 384-8078   attrans@sbcglobal.net

1  before?

2  A    I disagree.

3  Q    Okay.  Now, at the time you did give him this *Miranda*

4  rights, that was 11:40.  You see at the bottom your reference

5  to time?  Or I guess Mr. Bottary mentions 11:40.

6  Q    Okay.

7  A    So that's 15 minutes into this interview, then?  Can we

8  agree on that?

9  A    Yes.

10 Q    And then after that, though, you continue to ask questions

11 about T2, "Has anybody camped there," "What do you know about

12 what happens down there?"  Is that correct?

13 A    Yes.

14 Q    And that was by design?

15 A    Yes.

16 Q    Okay.  It was --

17 A    I --

18 Q    -- not to be too confrontational at the beginning?

19 A    Correct.

20 Q    So he will talk to you, continue to talk to you?

21 A    Yes, we would like to continue to talk to Mr. Wells.

22 Q    And then at some point you switch gears, and that was by

23 game plan, to talk about his timeline?

24 A    It was kind of a natural progression of -- of questions,

25 yes.

1  Q   So did you and your -- and the agent in charge and Sean

2  Bottary talk about having a game plan of not being

3  confrontational during the interview, asking him questions

4  about T2 before you got into more confrontational questions

5  about his timeline?  Was that the plan?

6  A   Interview by definition, in my mind, is

7  nonconfrontational.

8  Q   So at what point did you start talking about "This is your

9  chance to tell us what happened"?  Do you remember that?

10 A   Can you ask that question again?  I'm sorry.

11 Q   At what point during this interview did you come right out

12 and say, "This is your time to tell us -- this is your chance

13 to tell us what happened"?

14 A   I believe it was about an hour, maybe hour and 10 minutes,

15 into this interview.

16 Q   Okay.  And so this full interview took about an hour and

17 23 minutes.  It's a long transcript.  Is that correct?

18 A   Correct.

19 Q   Okay.  And so toward the end of that interview, that's

20 when he -- you told him, "This is your chance to tell us what

21 happened."  And what was his reaction to that?

22 A   Do you have a specific line that you could point me to?  I

23 mean, I -- it's a long transcript and I want to give you the

24 most accurate answer possible.

25 Q   Well, I'm looking at page -- that's -- the very last page,

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 187   Filed 11/26/13   Page 100 of 130

1  72 of -- I guess it says 73 -- page 72 of that transcript.  If

2  you look at the paragraph that's "S.B."  That's Sean Bottary?

3  A    Yes.

4  Q    And this is where, at the end of that paragraph it says,

5  "This is a chance to let us know if you know something that

6  happened that we should know about."  And you add, "I know,

7  because you said, you know, sometimes things aren't planned,

8  they're just, you know, random -- random acts."  And so what is

9  his reaction to that line of questioning?

10  A    Mr. Wells says, "Uh, I think we -- we better terminate

11  this thing."

12  Q    Okay.  So basically he --

13  A    Invoked his right to silence.

14  Q    All right.  And then what did you do then?

15        MS. DUIGNAN:  Objection, Your Honor.  At this point,

16  this is well after the *Miranda* rights were given and waived.

17        MR. CURTNER:  I still think it's pertinent to all the

18  issues before the Court, Your Honor.

19        THE COURT:  Well, I'm following the transcript.  If you

20  would bring it out.  I assume there's no objection to

21  transcripts being part of the hearing.  I'll permit it at this

22  point.

23        MR. CURTNER:  Thank you, Your Honor.

24  BY MR. CURTNER:

25  Q    So the -- was that conversation temporarily terminated at

1 that time?

2 A   I see I said, "Okay, okay, we -- mean, let's -- we can

3 step out and talk some things through, or talk -- some things.

4 We'll -- we'll come back for you, okay?"

5 Q   Okay, and so that was at 12:51?

6 A   It appears, yes.

7 Q   And then the next interview, the last interview that day

8 after that, began at 1:43 p.m.?  Do you recall that?

9 A   That sounds about right.

10 Q   So that's, you know, 50 minutes or thereabouts afterwards.

11 What happened during those 50 minutes?

12 A   Mr. Wells went into the ET space.  He was very agitated

13 and wanted some time to himself, so he went and read his book

14 in a -- a space that was off the ET space.

15 Q   And then after 50 minutes or so, you called him back into

16 the same office?

17 A   Yes.

18 Q   Okay.  And then that was a four-minute interview.  What

19 happened during that four-minute interview?  By that time it --

20 A   I don't have the transcript, I'm sorry.

21 Q   Let me give it to you.

22 A   Thank you.

23 Q   Do you recall at the beginning, you begin the recording as

24 Friday, 13th of April, 13:43.  That'd be 1:43 in the afternoon?

25 A   Yes.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 187   Filed 11/26/13   Page 102 of 130
(720) 384-8078   attrans@sbcglobal.net

1  Q   And then there's -- you say, "Go ahead, Sean."  And then

2  Agent Bottary talks about "what we went over 45 minutes ago,"

3  reference to *Miranda* warnings.  Do you recall that?

4  A   I -- I don't believe -- maybe I'm missing it, but I don't

5  believe he was referencing *Miranda* warnings.

6  Q   All right.  I think the gist of this conversation is "We'd

7  really love to hear what happened."  Is that correct?

8  A   Yes.

9  Q   Then on the next page, this is where you pick up -- can

10  you see at the time, "Because it's either -- you know, it

11  either happened in the heat of the moment or it was planned,

12  Jim.  And, you know, it's either in the heat of the moment or

13  it was planned, and, like, we think you know you're" -- and he

14  interrupts, "Are you accusing me?"  And your answer at that

15  point is, "At this point, yes, Jim."  Is that correct?

16  A   Yes.

17  Q   Okay.  And then you go on a little bit -- now, what's his

18  reaction after this, after that paragraph?

19  A   He is --

20  Q   Can you read his response?

21  A   -- defiant -- oh, I'm sorry.

22  Q   "We ought to terminate this conversation."  Right?

23  A   "We ought to terminate this conversation."  Yes.

24  Q   Okay.  And your reaction, what do you say to that?

25  A   "Okay, so -- so you're saying it was -- it was in the heat

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 187   Filed 11/26/13   Page 103 of 130
(720) 384-8078   attrans@sbcglobal.net

1  of the moment?  It" --

2  Q    And his response?

3  A    "I'm not saying anything."

4  Q    And then what did you say?

5  A    "Okay, so it is a -- was it a conspiracy?  Were you acting

6  alone, or were other people involved?"

7  Q    And what did he say?

8  A    "I'm not saying anything."

9  Q    And then what did you respond -- how did you respond to

10  that?

11  A    "Are you trying to protect other people or are you trying

12  to protect yourself?"

13  Q    And his response?

14  A    "I guess it's -- it's time for me to request a lawyer,

15  then."  End of interview.

16  Q    And is that when you interviewed -- you ended these series

17  of interviews?

18  A    Yes.

19  Q    Okay.

20        MR. CURTNER:  That's all I have, Your Honor.  Thank

21  you.

22        MS. DUIGNAN:  Your Honor, just a few followup

23  questions.

24        THE COURT:  Go ahead.

25                    REDIRECT EXAMINATION

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 187  Filed 11/26/13  Page 104 of 130

1  BY MS. DUIGNAN:

2  Q    Special Agent Oberlander, when Mr. Curtner was asking you

3  about the point of the evening where Mr. Wells and you

4  discussed his medications, I think he cut you off on that point

5  there.  But part of what you were saying, you said that you

6  didn't -- you weren't requiring you and Special Agent Bottary

7  to go home with Mr. Wells.  Is that correct?

8  A    Correct.

9  Q    You said you would have liked to?

10 A    Yes.

11 Q    So would you interpret that -- it wasn't required, it was

12 something that you wanted to accompany him if he would have had

13 you go with him --

14 A    Yes.

15 Q    -- to get medications?  In fact, that evening, instead,

16 you wound up terminating the interview instead of going home

17 for medications and allowing him to go home.  Correct?

18 A    Yes.

19 Q    And also, the last part of all the transcripts that Mr.

20 Curtner was reading you through, those were after *Miranda*

21 warnings had been given and a form had been signed waiving

22 those warnings --

23 A    Correct.

24 Q    -- waiving those rights, correct?

25 A    Correct.

1  Q    I have no further questions.

2          THE COURT:  Recross.

3          MR. CURTNER:  Nothing further.

4          THE COURT:  You may step down.  I am mindful of the

5  hour.  It's just after noon.  If you want to take a lunch

6  break, medicine break, whatever, if needed, we can certainly do

7  that now.  We have the rest of the day.

8      (Witness excused)

9          MR. CURTNER:  Your Honor, I don't think that there are

10 going to be any other witnesses.  It's just a mat -- it's up to

11 you, I think.

12         THE COURT:  Well, let's first talk about the

13 transcripts that are part of Docket 120 -- let's see, is it

14 120 -- Docket 138, I guess it is.  So if -- the parties agree

15 that that's an accurate transcript or at least for purpose of

16 the motions to suppress?

17         MR. CURTNER:  Yes, Your Honor.

18         THE COURT:  All right.

19         MS. DUIGNAN:  Yes, Your Honor.

20         THE COURT:  So those are considered in.  Any further

21 evidence to be offered at this hearing by the government?

22         MS. DUIGNAN:  Not from the government, Your Honor.

23         THE COURT:  Any by the defendants?

24         MR. CURTNER:  No, Your Honor.

25         THE COURT:  All right.  Did you want to just do your

1 oral argument?  It's been briefed, but you may have some

2 summary based on the facts that have been elicited today.  I

3 mean, I'm willing to just go ahead and do it that way, and then

4 you have no further briefing on the motion.

5        MS. LOEFFLER:  We're ready to argue, if you would like

6 it.

7        MR. CURTNER:  Yes.

8        THE COURT:  All right, we'll do that.  So defense gets

9 to go first.  It's their motion.

10        MR. CURTNER:  Well, Your Honor, I think the simplest

11 issue in this case is whether Mr. Wells when he was questioned

12 by law enforcement was in custody for purposes of *Miranda* under

13 Fifth Amendment.  And I think clearly the way to -- what that

14 boils down to is would a reasonable person in his position have

15 felt he was not at liberty to terminate the interrogation and

16 leave.  Well, I think that's what we've established between the

17 witnesses today, that anybody in the military under a

18 commanding officer and with law enforcement there, under these

19 circumstances would not feel -- a reasonable person would not

20 feel they have a position at liberty to leave in the

21 interrogation, any more than a witness would feel that they

22 have the liberty to just say, "I don't" -- you know, "I don't

23 want to answer any more questions," and leave.  So --

24        THE COURT:  But you realize it's not just a matter of

25 leaving.  I mean, he's at work.  You can have a -- you can be a

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 187   Filed 11/26/13   Page 107 of 130
(720) 384-8078   attrans@sbcglobal.net

1   prisoner in prison and be interviewed about different facts,

2   but you're not necessarily in custody for *Miranda* purposes, but

3   because you're in prison, you can't leave.

4        MR. CURTNER:  I understand.  But I think that under

5   these circumstances he was in custody and not able to leave,

6   under the standards of the Supreme Court law.  And we basically

7   were citing to *U.S.* *versus Kim*, which is 9 -- 292 F.3d 969.  It

8   looks at the factors that are used in order to make this

9   determination by the Court.  One is the -- and you have to look

10  at all the circumstances of the interrogations.  But looking at

11  the language, first of all, that -- in which an individual is

12  summoned to participate in the -- into the interviews and being

13  questioned by law enforcement -- well, in this particular case,

14  I think it's clear from the logs that Mr. Wells and all parties

15  were ordered to be in T1 and not leave.  And so I think that's

16  the language we'd have to focus on.

17       Second, I think the second factor to look at is was he

18  confronted during this time as a witness.  Well, I think that's

19  clear from the exhibit we had as far as the targeted questions,

20  that they were looking at vehicles that belonged to Mr. Wells,

21  and that although they were trying to be cagy and coy in

22  getting to the confrontational questions, that was the plan of

23  the whole questioning.

24       Another factor is looking at the physical surroundings

25  of the interrogation.  And this is why I think the description

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 187   Filed 11/26/13   Page 108 of 130
(720) 384-8078   attrans@sbcglobal.net

1   of T1 being a secure facility, having the gates secured, being

2   inside of a facility with a -- fencing around it, eight-foot

3   fencing around it, being inside an office with two armed law

4   enforcement officers, I think that meets the factor under *Kim*

5   as far as the physical surroundings of interrogation.

6         One of the big issues or factors to look at is the

7   duration of the detention. Mr. Wells was ordered with

8   everybody else to go up to T1 at approximately 8:30 in the

9   morning. He didn't leave till approximately 9:30 that night,

10   and that's clear I think from the transcript and from the

11   evidence today. That's 11 hours in this one facility. And I

12   think that's a major factor for the Court to look at as far as

13   the question of custody.

14         And then the degree of pressure that was used is the

15   fifth fact under *Kim*. And I think that, you know, just the

16   whole process of checking his phone, searching his vehicle -- I

17   think those factors together speak to a finding by this Court

18   that he was in custody at the time he was in care --

19   interrogated all the way through April 12th.

20         What -- what's interesting, then, is I guess a second

21   factor to come before Court, is that if he was in custody and

22   not Mirandized, in the series of four interviews on April the

23   12th, during that 11-hour period, can any statements he made

24   the next day after *Miranda* warnings be admissible. Well, I

25   think *Missouri versus Seibert*, 542 U.S. 600, U.S. Supreme Court

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG Document 187 Filed 11/26/13 Page 109 of 130
(720) 384-8078 attrans@sbcglobal.net

1 decision, talks about how the admissions of second statements

2 after *Miranda* that were basically the by-product or the fruits

3 of the first interviews without *Miranda* warnings should not be

4 admissible.  And so I think that's maybe another issue that

5 hasn't been clearly briefed before the Court, but I think that

6 it depends on the Court's finding that he was in custody and

7 that the first statements he made on April 12th should be

8 suppressed.  So I think, in a nutshell, that's where we are,

9 and I think that's what the evidence has demonstrated.

10          THE COURT:  Is your argument that he's in custody for

11 all of the interviews, all six of them?

12          MR. CURTNER:  Yes.

13          THE COURT:  What about other people who were present

14 and were interviewed during some of that time?  Were they in

15 custody as well?

16          MR. CURTNER:  I don't know.  I don't know if they were

17 suspects.  I can't really --

18          THE COURT:  No, I didn't ask whether he was a suspect

19 then --

20          MR. CURTNER:  Uh-huh (affirmative).

21          THE COURT:  -- but whether these other people were in

22 custody.

23          MR. CURTNER:  I would say a reasonable person -- any of

24 those people would not have felt free to leave.  That's why

25 they didn't leave.  That's why they didn't go out to lunch.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 187   Filed 11/26/13   Page 110 of 130

1  That's why they brought box lunches in for everybody, because

2  under those circumstances, when there was an order from the

3  commanding officer or the XO that you were not to leave T1 and

4  all hands were briefed on that, nobody was -- felt free to go

5  under the circumstances.

6        THE COURT:  Well, if they were all in custody, then

7  there are other factors that precipitate the need for *Miranda*.

8  Just being in custody is not enough.  You agree with that?

9        MR. CURTNER:  Yes.  Well, yeah.  I mean, there has to

10  be -- and it has to be -- I think what difference --

11  different -- Mr. Wells is from other people who were in custody

12  at that time was he was identified early on, from the

13  beginning, as a potential suspect.  And I think that was clear

14  from the debriefing that the FBI had when they first got to the

15  island.  So that's I think the other factor that requires a

16  *Miranda* warning.

17        THE COURT:  Would it make a difference whether he was

18  told he was a suspect, or just an officer doing the interview

19  thought he might be a suspect?

20        MR. CURTNER:  Just the officer.  For him, it's his

21  state of mind as far as custody.  For the purposes of *Miranda*,

22  it's the officers looking at him as a suspect.

23        THE COURT:  I'll hear from the government.

24        MS. LOEFFLER:  Your Honor, I want to try to make a

25  point of a couple of red herrings, and then our agreement,

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 187  Filed 11/26/13  Page 111 of 130

1  which is that the *Kim* factors and the standard law applies.

2  First of all, there's a couple of red herrings here.  And

3  for -- and that is the conflation of the Coast Guard command

4  with law enforcement.  For purposes of whether somebody is

5  detained, it's detained by law enforcement.  So there'd been a

6  lot of discussion about, oh, he was detained for 11 hours; but,

7  in fact, he showed up to work.  It was his workday.  So the

8  fact that he came to work is not detention by law enforcement,

9  nor is it even the action of the law enforcement officers.  And

10  the actions of the Coast Guard command is just his boss.

11        And I guess my best analogy to that, Your Honor, is

12  I'm going to go to something recent.  We had no power on

13  Tuesday.  I don't know if you ordered your people to stay, but,

14  you know, I'm the boss; I ordered my people to stay in the

15  building until I told them they could leave.  I hope they

16  weren't all in custody.  It was a workday.  You know, I have

17  the right to decide when I was going to let people go.

18        So the reason I'm discussing that is, of course, I

19  think you go to an absurd level to say because you came to work

20  on a workday you were in custody.  And it's the same thing

21  about -- I think there's a red herring about saying because

22  they went to T1 and not their normal space.  And again, I just

23  use common reality.

24        I recall -- to be honest -- I hate to bring it up, but

25  I think your office was flooded out some time, because you

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 187   Filed 11/26/13   Page 112 of 130

1  worked in a different office, because --

2         THE COURT:  More than once.

3         MS. LOEFFLER:  Yeah.  Doesn't make you in custody, nor

4  did the people that couldn't be in their offices on Tuesday

5  because the lights were dark and they couldn't sit in there,

6  and they went to a different part.  I mean, that -- that's a

7  red herring.  It has nothing to do with anything.

8         What we do is we look at *Bass* -- and -- at *Kim*.  And I

9  think the best case analysis is *Basenyani* (ph), which we cited,

10 so I'm not going to go through.  But the language used to

11 summon the individual -- well, Mr. Wells was being interviewed

12 like everybody else.  And it's also a red herring about whether

13 an officer thought he was a suspect or not.  The cases made

14 clear it's an objective factor, not what the officer thought.

15 Everybody on the base was a suspect, because it was clearly an

16 inside job.  They interviewed lots of people.  It's irrelevant

17 whether they thought he was a suspect or when.

18        So the language used to summon the individual -- he's

19 in his workplace, everybody's going into spaces.  There's

20 nothing strong about the language.  The extent to which the

21 defendant's confronted with evidence of guilt, that didn't

22 happen until after they Mirandized him.  So they did exactly

23 the right thing, being careful.  Whether he was in custody or

24 not, when they decided to confront him, they Mirandized him

25 first.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 187  Filed 11/26/13  Page 113 of 130

1    The physical surroundings of the interrogation:  a
2 conference room in T1.  He's sitting next to the door.  The
3 duration of the detention, yes, there's -- from 7:30 to about 9
4 they're talking to him.  Although he went back out to ET, to
5 the main area at times, nobody told him you -- there's no
6 evidence anybody said, "You can't leave the room."  They were
7 treating him like everyone else.  And the degree of pressure
8 applied -- there was no pressure applied.  And other people
9 were there late, as the commander said.  People stayed late
10 after hours.  That doesn't turn somebody into custody.  Again,
11 we just go to common sense.  If I tell my people, "I can't meet
12 you after work," or you tell your secretary, "I need you to
13 stay," are they suddenly in custody?  No, and there's no case
14 law to support that.

15    And finally, the one other law thing is in -- I'm
16 sorry, not the law thing, the controlling law.  I went through
17 the factors in *Kim*.  But the court's also stated -- and this is
18 in the Supreme Court case of *Keohane* that we cited.  It's on
19 page 23 of our brief.  The ultimate inquiry is whether there
20 was a formal arrest or restraint on freedom of moment of the
21 degree associated with formal arrest.

22    So we -- you know, as the Court's aware, we use the
23 language of "Do you feel free to go," but there's lots of
24 instances where you don't feel free to go, but the courts don't
25 determine our custody.  They look -- it's more like formal

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 187  Filed 11/26/13  Page 114 of 130

1   arrest.  Just as Commander Van Ness said, he didn't feel free

2   to go while he's on the stand, nor do any of us feel free to go

3   when you're talking to us.  Of course we wouldn't do that.  But

4   it doesn't make it custody.  It's not the type of indicia of a

5   formal arrest.

6          THE COURT:  Does it make any difference that Coast

7   Guard investigators may have given the command or the request

8   to stay versus just an employee or a supervisor?

9          MS. LOEFFLER:  If the CGIS -- they are investigative

10  agents, absolutely.  If they told somebody, "You may not leave

11  until I'm done with you," you could have a custody situation.

12  What we had here originally is, as far as we know -- I mean,

13  first of all, when he showed up at work, he showed up at work.

14  And when he showed up at work the next day, it was a delay.

15         Somebody suggested that they, you know, pull everybody

16  together until law enforcement got there.  I don't know who,

17  whether it was the Coast Guard command doing it or somebody

18  asked them to do.  But none of that turned into custody.  They

19  had two people murdered.  People were at the workday.  And, you

20  know, at the -- it's natural to say, well, let's wait here and

21  sort out the chaos of what's going down.  It doesn't become

22  custody because they were working and said let's wait here

23  until law enforcement comes and see what they want.

24         THE COURT:  At what point did this become an

25  investigation by law enforcement?

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 187   Filed 11/26/13   Page 115 of 130

         1          MS. LOEFFLER:  Well, it was an investigation by law

         2  enforcement, I -- as soon as the murder happened and law

         3  enforcement was -- because, of course, if a murder happens, law

         4  enforcement's going to investigate.  And that's why, you know,

         5  they're going to talk to everybody.  So I -- I'm not trying to

         6  suggest in any way that there was no investigation.

         7          THE COURT:  Well, there's cooperation between FBI and

         8  troopers --

         9          MS. LOEFFLER:  Right.

        10          THE COURT:  -- Coast Guard investigators.

        11          MS. LOEFFLER:  I mean, the fir -- yeah, the first

        12  people that showed up would have been the troopers and local

        13  police.  And then Coast Guard investigators, and then the FBI,

        14  as we heard, didn't get there till 3, because they're not

        15  physically located in Kodiak.  But --

        16          THE COURT:  Have you researched *Miranda* applying to a

        17  crime scene situation where the crime is fresh and the area is

        18  closed down, and they want to talk to people who were there

        19  about what they saw or did or when they got there, whatever,

        20  just basic questions?

        21          MS. LOEFFLER:  I don't think that's a -- yeah, that's

        22  not a custodial interview.  When I -- and the best case -- the

        23  closest one, which is a case that it be much -- where the

        24  coercion was much stronger than this one -- is the *Basenyani*

        25  case.  And that's the only case we found -- and the defense

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 187   Filed 11/26/13   Page 116 of 130

1  didn't cite any -- in which it was an employer situation.

2  That's the individual who -- they already had -- in the case in

3  *Basenyani*, they already had a search warrant for him.  They

4  already had probable cause that this guy had stuff on his

5  computer.  And they told him to step away from the computer and

6  walked him into a room with law enforcement present.  And the

7  Ninth Circuit reversed the district court finding of

8  suppression.  That's much stronger factors than exist here.

9  The court mainly relied on the fact that the statements were

10 not confrontational, and I would simply direct the Court to

11 there, because that's a much more custodial circumstance than

12 what we have here.

13         THE COURT:  Is there some statements in the interview

14 that you're not going to use?  I mean, is there -- you have

15 six.  Are we needing to decide as to all six of those, or is

16 the government in a position to say, well, the first X number,

17 we're not going to use any statements?

18         MS. LOEFFLER:  Well, no, I'm not going to commit to

19 using any, other than when he invoked his rights on the sixth

20 statement.  No -- there really isn't any statements after that.

21 All he says is "I'm not going to say anything further."  And

22 certainly we would try to introduce that.

23         But there is -- to me, -- I mean, the defense sort of

24 didn't differentiate on anything when they're first talking to

25 him and they're trying to gather information.  And then the --

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 187   Filed 11/26/13   Page 117 of 130

1   when the defendant was Mirandized on day 2, I don't think there
2   was anything to suggest he was in custody at the time.  But the
3   questioning, the one *Kim* factor which became -- where it became
4   accusatory, it was a proper conservative thing to do, saying,
5   "Now that I'm going to make this confused, or we're going to
6   Mirandize you first."  So I don't think he was in custody even
7   then.

8         THE COURT:  So you're saying *Miranda* was not required?

9         MS. LOEFFLER:  I'm not saying I don't think it was
10  required, but I think it was a much closer call and the right
11  thing to do, of course, if somebody would be -- let's
12  Mirandize, let's be safe.  But before that, not only was
13  custody not at issue, but the questions -- you know, the *Kim*
14  factor -- they weren't accusatory, there's never a voice raised
15  in any of it.  And that was actually -- in *Basenyani*, that was
16  one of the biggest things that the court reversed the district
17  court on.

18        THE COURT:  Thank you.

19        MS. LOEFFLER:  Thank you, Your Honor.

20        THE COURT:  Mr. Curtner, anything else?

21        MR. CURTNER:  Just one point, Your Honor, just to
22  remember that this was -- that law enforcement and the Coast
23  Guard were hand in glove in all this.  And so I don't think you
24  can separate -- forget the circumstances.  When you're looking
25  at the circumstances of the custodial situation, I think you --

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 187   Filed 11/26/13   Page 118 of 130
(720) 384-8078  attrans@sbcglobal.net

1  you know, it has to be understood that law enforcement and

2  Coast Guard command are hand in glove in whatever orders were

3  given that everybody should remain in T1 and -- especially

4  with -- to Mr. Wells.  And that's the only thing I would add.

5  Thank you.

6      THE COURT:  I've not heard argued specifically that his

7  statements were not voluntary.  Is that still an issue?

8      MR. CURTNER:  No, Your Honor.

9      THE COURT:  All right.  I'll take that one off the

10 board.  The matter is taken under advisement.  It will be the

11 practice as a -- once the transcript is prepared, then it --

12 it's actually under advisement by the Court.  And I don't think

13 we need anything further for that matter to go forward.  So the

14 clerk can collect the exhibits, make sure they're all

15 available.  I don't know that the standard matrix was offered.

16     MR. CURTNER:  Oh, I'm sorry, Your Honor.  I would offer

17 that as an exhibit.  I thought I had said that, but that would

18 be Ex --

19     MS. LOEFFLER:  We have no objection, Your Honor.

20     THE COURT:  And that would be what?  B?

21     THE CLERK:  Uh-huh (affirmative).

22     THE COURT:  Exhibit B, all right.  We'll admit that.

23 All right, that con --

24     (Defendant's Exhibit B admitted)

25     MS. LOEFFLER:  I think the Court has them.  The Court

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 187  Filed 11/26/13  Page 119 of 130

1  has them.

2        THE COURT:  I have --

3        MS. LOEFFLER:  Those were the witness's copies.

4        THE COURT:  All right, so you have 3, 2, B, A, 1.

5  Believe I have them all.  All right, I don't think there are

6  any other evidentiary hearings scheduled in this case at the

7  present time.  The *Franks* hearing request has not been decided,

8  so that was not part of the hearing today.  Anything else for

9  the record?

10        MS. LOEFFLER:  No, Your Honor.

11        MR. CURTNER:  No, Your Honor.  Thank you.

12        THE COURT:  We'll be in recess.

13        THE CLERK:  All rise.  This matter stands adjourned.

14  Court stands, subject to call.

15     (Proceedings concluded at 12:27 p.m.)

16

17

18

19

20

21

22

23

24

25

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 187  Filed 11/26/13  Page 120 of 130

1

CERTIFICATE

2  I certify that the foregoing is a correct transcript from the
   electronic sound recording of the proceedings in the above-
3  entitled matter.

4
   _____s/Teresa K. Combs_____        _____11/24/13_____
5
   Teresa K. Combs, Transcriber          Date
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 187   Filed 11/26/13   Page 121 of 130
(720) 384-8078  attrans@sbcglobal.net

1                                    **INDEX**

2                                                              FURTHER
                            <u>DIRECT</u>   <u>CROSS</u>   <u>REDIRECT</u>   <u>RECROSS</u>   <u>REDIRECT</u>
3
<u>PLAINTIFF'S WITNESSES</u>
4
Peter Russell Van Ness     4       27        55        59
5   Kirk Oberlander           61       75       105

6   <u>PLAINTIFF'S EXHIBITS</u>                                        <u>ADMITTED</u>

7   1        Photograph - communication station                  14

8   2        Sketch - T1 office space                            67

9   3        Sketch - interview office diagram                   69

10  <u>DEFENDANT'S EXHIBITS</u>

11  A        Watch log                                           47

12  B        Question matrix                                    119

13

14

15

16

17

18

19

20

21

22

23

24

25

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 187   Filed 11/26/13   Page 122 of 130

1 ... 4, 13, 14, 45, 49, 63, 83, 84, 96, 102, 120, 122
1:30 ... 49, 63
1:43 ... 102
10 ... 20, 25, 42, 44, 50, 54, 61, 72, 74, 100
10:30 ... 20
10:45 ... 61
105 ... 122
11 ... 54, 61, 63, 86, 87, 95, 96, 99, 109, 112, 121
11:03 ... 61
11:25 ... 95, 96
11:30 ... 63
11:40 ... 95, 99
119 ... 122
12 ... 23, 94, 102, 120
12:27 ... 120
12:51 ... 102
120 ... 3, 106
121 ... 26
12th ... 6, 15, 26, 29, 35, 38, 47, 48, 56, 58, 62, 67, 70, 83-85, 95, 109, 110
13 ... 102, 121
13:43 ... 102
138 ... 106
13th ... 83, 85, 96, 102
14 ... 122
15 ... 39, 44, 99
15:41:0 ... 39
1525Z ... 38
1618 ... 43
1659 ... 40
1710 ... 42
176 ... 3
18 ... 3, 4, 43
1920 ... 65, 68
2 ... 4, 45, 49, 63, 66, 67, 96, 118, 120, 122
20 ... 65, 68, 70
2001 ... 85
2002 ... 85
2009 ... 5
2012 ... 5, 6, 26, 94
2013 ... 3
23 ... 100, 114
2359 ... 45
24 ... 7, 121

2400 ... 45
27 ... 120, 122
292 ... 108
3 ... 26, 64, 68, 69, 80, 116, 120, 122
30 ... 3, 15, 20, 26, 44, 49, 54, 60, 63, 68, 71-73, 86, 88, 93, 95, 109, 114
31 ... 85
35 ... 88
4 ... 45-47, 59, 60, 64, 80, 97, 122
404 ... 3
43 ... 29, 58, 102
45 ... 42, 61, 103
47 ... 40, 122
5 ... 46, 95, 96
50 ... 102
542 ... 109
55 ... 122
59 ... 40, 122
6 ... 46
60 ... 13, 27
600 ... 109
61 ... 122
67 ... 122
69 ... 122
7 ... 7, 15, 26, 38-40, 50, 54, 65, 68, 70, 73, 80, 85, 88, 114
7:20 ... 65, 68, 70
7:21 ... 80, 85, 88
7:25 ... 38
7:30 ... 15, 26, 54, 73, 114
7:41 ... 39, 40
7:46 ... 40
7:47 ... 40
7:52 ... 88
72 ... 101
73 ... 101
75 ... 122
8 ... 15, 26, 40, 42-44, 54, 60, 86, 88, 95, 109
8:04 ... 88
8:15 ... 44
8:18 ... 43
8:30 ... 44, 86, 95, 109
8:45 ... 42
8:59 ... 40

9 ... 3, 20, 42-44, 54, 60, 63, 73, 88, 91-93, 95, 97, 108, 109, 114
9:03 ... 43
9:05 ... 91
9:10 ... 42, 44
9:22 ... 92
9:30 ... 3, 20, 60, 63, 88, 93, 95, 109
911 ... 39, 40
969 ... 108

**A**
a.m. ... 3, 25, 39, 40, 61, 95, 96
abide ... 3
ability ... 65
able ... 8, 17, 18, 22, 32, 36, 59, 67, 68, 108
above ... 121
absurd ... 112
Academy ... 4, 62
access ... 12, 15, 16, 48, 53, 87
accessed ... 87
accessible ... 19
accompanied ... 91
accompany ... 105
according ... 59
accountability ... 45
accurate ... 14, 27, 96, 100, 106
accusatory ... 33, 97, 118
accusing ... 103
across ... 15
acting ... 104
action ... 78, 112
actions ... 72, 112
active ... 29, 41, 58, 62
activity ... 17, 45
acts ... 101
actual ... 10, 45
add ... 57, 101, 119
adjourned ... 120
administer ... 92
administrate ... 11
administrative ... 11
administratively ... 9, 25
admissible ... 109, 110
admission ... 14
admissions ... 110

admit ... 69, 119
admitted ... 14, 47, 67, 69, 119, 122
advise ... 98
advisement ... 119
Aft ... 50
afternoon ... 25, 45, 47, 49-53, 59, 80, 102
agent ... 3, 61, 62, 64, 65, 69, 70, 72, 75, 78, 81-83, 88, 89, 92, 98, 100, 103, 105
agents ... 50, 63, 64, 67, 75, 77, 84, 115
aggressive ... 57
agitated ... 102
agree ... 59, 99, 106, 111
agreement ... 111
ahead ... 3, 92, 103, 104, 107
air ... 9, 76
aircraft ... 6
airport ... 8, 63
Alaska ... 3, 20, 30, 31, 38, 40, 62
Allison ... 88
allow ... 23
allowable ... 3
allowed ... 41-44, 90, 91
allowing ... 105
alone ... 64, 104
altogether ... 29, 31, 75
Amendment ... 107
amongst ... 63
analogy ... 112
analysis ... 113
ANCHORAGE ... 3, 62, 75
Anderson ... 43
anguish ... 21
antenna ... 11, 55
antennas ... 10
anticipating ... 56
anticipation ... 18
Anton ... 15, 29, 30
anymore ... 51
anywhere ... 18, 20
apparently ... 36
appeared ... 86
appears ... 5, 102
applied ... 114
applies ... 112

apply ... 19, 28
applying ... 116
approximate ... 63
approximately ... 44, 63, 68, 70-73, 96, 109
April ... 6, 15, 22, 26, 29, 35, 36, 38, 47, 48, 56, 58, 62, 70, 83, 85, 94-96, 102, 109, 110
Area ... 5, 9, 10, 13, 15, 18, 20, 30, 31, 33, 53, 86, 88, 114, 116
areas ... 67
argue ... 107
argued ... 119
argument ... 107, 110
armed ... 109
arrangements ... 54
arrest ... 114, 115
arrival ... 83
arrive ... 63
arrived ... 20, 23, 31, 40, 42, 44, 46, 49, 64, 65, 67, 68, 86
arriving ... 23, 41, 64, 65
assign ... 79
assigned ... 4, 62, 77, 79
assignment ... 4
assignments ... 45, 63
assist ... 9, 69
assistant ... 39
associated ... 114
attempted ... 18
automated ... 6
automobile ... 58
available ... 18, 65, 68, 87, 114
aware ... 18, 52, 53, 58, 72, 114
**B**
ba ... 63
back ... 7, 8, 15, 20, 21, 25, 33, 39, 49, 50, 54, 66, 72, 74, 88, 89, 93, 102, 114
background ... 29, 62
bags ... 62
Barbed ... 42
base ... 9, 14, 15, 20, 23, 52, 63, 76, 113

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 187   Filed 11/26/13   Page 123 of 130
(720) 384-8078   attrans@sbcglobal.net

based ... 61, 107
basement ... 21
Basenyani ... 113, 116-118
basic ... 116
basis ... 56
Bass ... 113
bathroom ... 7
Bay ... 15
Beach ... 45
Bear ... 45
Beauford ... 39, 80, 81
became ... 72, 118
become ... 18, 35, 115
began ... 102
behind ... 70
Belisle ... 39
belong ... 85
belonged ... 108
below ... 40
bent ... 16
Bering ... 6
big ... 21, 109
biggest ... 118
bit ... 6, 11, 27, 29, 69, 70, 72, 88, 103
blah ... 97
blank ... 21
blatantly ... 97
Bless ... 67
blocking ... 16
blood ... 7, 39, 90
blue ... 84, 85
board ... 119
boats ... 6
bodies ... 80
boils ... 107
book ... 102
booths ... 21
boss ... 18, 112
both ... 20, 30, 58
Bottary ... 65, 70, 81, 82, 96, 99-101, 103, 105
bottle ... 72
bottom ... 15, 16, 45, 66, 83, 84, 97-99
boundaries ... 69
box ... 23, 52, 86, 87, 111
boxed ... 23, 52
break ... 89, 106
brief ... 60, 114

briefed ... 41-43, 76, 107, 110, 111
briefing ... 63, 76, 79, 107
brought ... 52, 111
building ... 10-14, 17, 21, 27, 33, 40, 46-48, 65-67, 87, 112
buildings ... 10, 11, 14, 16
Bureau ... 61, 62
business ... 5, 9
button ... 13, 70

**C**

C130 ... 75
C4IT ... 5
cagy ... 108
California ... 18
call ... 3, 7, 18, 20, 35, 39, 61-63, 118, 120
called ... 8, 10, 36, 39, 40, 50, 89, 102
calling ... 39
calls ... 4, 6, 25, 89, 90
camera ... 12
cameras ... 47
camped ... 99
camper ... 85
Can ... 4, 12, 21, 38, 49, 51, 55, 57, 65, 66, 69, 84, 94, 98-100, 102, 103, 106, 107, 109, 118, 119
capability ... 89
capital ... 4
car ... 8, 13, 65
caravanned ... 65
card ... 12, 13, 48
cards ... 48
care ... 11, 22, 109
careful ... 113
cargo ... 70
case ... 3, 41, 62, 64, 66, 72, 83, 88, 89, 107, 108, 113, 114, 116, 117, 120
cases ... 113
cause ... 117
cell ... 8, 24, 89
center ... 7, 12, 17, 20, 25, 66
certain ... 97

certainly ... 106, 117
CERTIFICATE ... 121
certify ... 121
CG ... 31
CGI ... 46
CGIS ... 31, 65, 77, 115
chain ... 59, 74, 75
chair ... 70
chairs ... 69
chance ... 47, 48, 82, 100, 101
chaos ... 115
charge ... 5, 9, 50, 100
check ... 21, 22, 74, 75
checked ... 7, 25
checking ... 21, 32, 109
Chief ... 17, 32, 33, 43, 44, 79
Chips ... 87
chronology ... 19
Circuit ... 117
circumstance ... 117
circumstances ... 25, 71, 107, 108, 111, 118
cite ... 117
cited ... 113, 114
citing ... 108
civilian ... 20, 27, 28, 57-59
civilians ... 9, 11, 28, 57-59
clarification ... 59, 88
clarify ... 58
classified ... 12
clerk ... 3, 4, 61, 119, 120
climbing ... 36
clinic ... 7
clipboard ... 30
close ... 73
closed ... 41, 42, 47, 58, 70, 71, 116
closer ... 118
closest ... 116
clothing ... 90
CO ... 43, 66
Coast ... 4-6, 8, 9, 20, 25, 29, 31, 40, 42, 46, 50, 53, 57, 62, 63, 65, 76, 82, 112, 115, 116, 118, 119
... Code 57
coercion ... 116

collaborated ... 67
collar ... 62
collect ... 119
colon ... 45
combination ... 10, 21, 25
Combs ... 121
come ... 4, 25, 36, 53-56, 62, 65, 72, 79, 84, 87, 94, 100, 102, 109
comes ... 115
comfortable ... 22, 37, 49, 54
coming ... 46
comm ... 66, 67
command ... 5, 6, 8-10, 18, 20, 25-29, 43, 44, 48, 49, 52, 56, 65-67, 74, 75, 112, 115, 119
commander ... 4, 20, 26-28, 47, 59, 60, 79, 114, 115
commanding ... 5, 6, 12, 14, 27, 34, 56, 107, 111
commands ... 5
comment ... 33, 35
commercial ... 75
commit ... 117
common ... 13, 22, 53, 112, 114
COMMSTA ... 5-7, 9-11, 13-16, 20-23, 27, 29, 30, 35, 40, 43, 47, 58, 79, 80
commun ... 6
communication ... 6-8, 10, 17, 21, 30, 43, 45, 46, 48, 64, 65, 122
Communications ... 5, 6, 12, 14, 39, 46, 55
comparison ... 9
completing ... 46
compliance ... 58
computer ... 117
computers ... 5, 86
con ... 119
concern ... 24, 77
concerned ... 17, 55, 74, 87
concerning ... 84
concerns ... 35
concluded ... 74, 120
condition ... 6, 72, 73

conditions ... 87
conduct ... 24, 71
conducted ... 70
conference ... 20, 22, 25, 53, 65-67, 114
conflation ... 112
confront ... 113
confrontational ... 99, 100, 108, 117
confronted ... 108, 113
confused ... 118
confusing ... 7
conjecture ... 64
connects ... 30
consent ... 89
conservative ... 118
consider ... 28, 35, 55
considered ... 5, 38, 106
conspiracy ... 104
construction ... 42
consult ... 25
consultation ... 25
contact ... 53
contacted ... 64
contacts ... 8
continue ... 25, 61, 99
continued ... 71
continuing ... 19
control ... 5, 23
controlling ... 114
conversation ... 4, 19, 21, 33, 34, 56, 72, 75, 101, 103
conversations ... 95
cooperation ... 116
coordinate ... 74, 75
copies ... 37, 120
copy ... 66, 69
corner ... 66
coughed ... 72
counsel ... 3, 4, 66
counseling ... 20, 57
couple ... 8, 10, 11, 14, 17, 26, 55, 63, 79, 111, 112
course ... 21, 36, 43, 97, 112, 115, 116, 118
court ... 3, 4, 9, 10, 14, 27, 37, 47, 55, 57, 59-61, 66, 67, 69, 75, 88, 95,

101, 104, 106-111, 113-120
... courtroom 12, 14, 49
courts ... 114
covered ... 70
covers ... 12
coy ... 108
created ... 83
crew ... 13, 18-28, 36, 43, 44, 50, 51, 53, 54, 56, 58, 59, 66, 74, 86
crewmember ... 78, 81
crewmembers ... 16, 24, 28, 33, 51, 54, 77, 79
crime ... 22, 41, 46, 54, 62, 76, 116
crisis ... 20
Critical ... 74
CROSS ... 27, 75, 122
CRV ... 85
CSM ... 74
CSO ... 41, 42, 44
current ... 4
currently ... 4, 46, 62
CURTNER ... 3, 14, 27, 37, 47, 55, 59-61, 67, 69, 75, 101, 104-108, 110, 111, 118-120
custodial ... 116-118
custody ... 98, 107-115, 118
cut ... 105
CWO ... 39, 41-44
cyber ... 62
cycling ... 51

**D**

D.C. ... 20
daily ... 9
dark ... 113
Darrel ... 88
data ... 5
Date ... 121
dates ... 5
David ... 29
day ... 6, 7, 9, 10, 18, 19, 21-27, 36-39, 45, 46, 48, 49, 51, 52, 54-56, 58, 67, 68, 70-74, 77, 81, 83, ... 87, 93, 94, 98, 102, 106, 109, 115, 118

days ... 6, 7
death ... 6
Debbie ... 18
debriefing ... 76, 78, 80, 111
decide ... 112, 117
decided ... 8, 82, 113, 120
decision ... 56, 110
deck ... 8, 11, 12, 17, 22, 54
defendant ... 3, 118
defendants ... 106
defense ... 66, 82, 107, 116, 117
defiant ... 103
definition ... 100
degree ... 109, 114
delay ... 115
delayed ... 74
deliver ... 28
delivered ... 59
demeanor ... 21
demonstrated ... 110
depart ... 25, 41-44
departed ... 5
Department ... 31, 40, 44, 56, 63, 76
depict ... 14
depicted ... 67
depicting ... 69, 70
depicts ... 66
Descr ... 78
describe ... 24, 30, 36, 41, 58, 66, 69, 76, 78
described ... 34, 46, 48, 75, 78, 92
describing ... 78, 96
description ... 86, 108
design ... 99
designed ... 12, 45, 48
desk ... 66, 69, 70
desks ... 86
detained ... 112
detention ... 109, 112, 114
determination ... 108
determine ... 114
developing ... 18
diabetes ... 53, 91
diabetic ... 72
diagram ... 66, 67, 69, 122
diet ... 72, 87

dietary ... 53
difference ... 38, 55, 57, 58, 111, 115
different ... 11, 46, 55, 57, 59, 63, 67, 88, 108, 111, 113
differentiate ... 117
differently ... 26
dining ... 22
dinner ... 49
direction ... 28, 41, 57, 59, 74
directions ... 28, 55
directive ... 55, 58
directives ... 57
directly ... 21, 24, 40
disagree ... 99
discharge ... 53
disciplinary ... 59, 78
discussing ... 112
discussions ... 36
disobeying ... 57
dispute ... 64, 77
distinction ... 28
distinguish ... 28
District ... 3, 61, 117, 118
divvied ... 63, 77
Docket ... 3, 26, 106
document ... 59
documentation ... 57
documented ... 71
Dodge ... 85
dog ... 64, 77
door ... 58, 66, 70, 71, 86, 114
doors ... 49, 87
Dozens ... 76
drafted ... 83
drawing ... 66, 69
drawn ... 70
dressed ... 70
drew ... 69
drinks ... 23
drive ... 13, 15, 16, 30, 33, 96
drives ... 15
driveway ... 94, 96
driving ... 8, 13, 15, 16, 29, 30, 34, 94
drop ... 65

drove ... 15, 33, 65, 94
drugs ... 62
dual ... 38
due ... 41, 46
DUIGNAN ... 61, 66-69, 75, 101, 104-106
Dupras ... 31, 33, 34, 76, 80
Dupree ... 31, 32, 80
duration ... 109, 114
duties ... 36, 71
duty ... 29, 40, 58, 62

**E**

each ... 13, 64, 89
earlier ... 11, 36, 46
earliest ... 51
Early ... 25, 49, 111
easily ... 12
east ... 15
eat ... 52, 87
Eaton ... 20
effect ... 72
effective ... 12
effort ... 52
eight ... 13, 38, 42, 48, 62, 63, 75, 109
elaborate ... 8
electrical ... 86
electronic ... 14, 86, 121
electronics ... 5, 11, 22, 53
elicited ... 107
email ... 7
employed ... 61, 62
employee ... 58, 115
employees ... 28, 31
employer ... 117
enforcement ... 16, 22, 23, 25, 30-34, 36, 46, 50-52, 60, 62, 74, 95, 107-109, 112, 115-119
engineering ... 9, 56
enter ... 19, 41-44
Enterprise ... 5
entire ... 12, 13, 18, 21
entitled ... 121
entry ... 40, 73
equipment ... 86
escorted ... 91
escorting ... 40
essence ... 15
established ... 107

estimate ... 31
ET ... 40, 66-68, 86, 88, 89, 102, 114
ET1 ... 39
ET3 ... 39
evening ... 24, 25, 50, 54, 60, 74, 80, 88, 94, 105
eventually ... 17, 18, 25, 71
Everybody ... 21, 29, 30, 32, 36, 41, 43, 44, 51, 56, 109, 111, 113, 115, 116, 119
everyone ... 23, 27, 32, 43, 44, 51, 114
everything ... 8, 38, 43
evidence ... 106, 109, 110, 113, 114
evidentiary ... 120
Ex ... 119
EXAMINATION ... 4, 27, 55, 59, 61, 75, 104
examined ... 90
exception ... 3, 21
excused ... 60, 106
executive ... 7-9, 17, 18, 24, 29, 56
exercise ... 23
Exhibit ... 13, 14, 37, 44, 47, 66-69, 82, 96, 108, 119
exhibits ... 119, 122
expect ... 29
expectation ... 55, 58
expectations ... 39
expected ... 28
experience ... 58
expert ... 20
expertise ... 5, 97
explain ... 67
explicitly ... 28
express ... 24
extension ... 3
exterior ... 12
extra ... 27, 70
eye ... 25

**F**

F.3d ... 108
faced ... 21
facility ... 9, 22, 23, 28, 41, 52, 109
factors ... 108, 109, 111,

112, 114, 117
fair ... 14
Fairly ... 21
far ... 38, 57, 64, 70, 74, 83, 94, 108, 109, 111, 115
farther ... 70
FBI ... 23, 27, 46, 50, 62, 74, 77, 82, 94, 111, 116
fed ... 22
federal ... 46, 61, 74
feed ... 22
feel ... 48, 49, 98, 107, 114, 115
feeling ... 34
feet ... 42
felt ... 107, 110, 111
fence ... 12, 42, 48, 58
fencing ... 41, 42, 109
fields ... 11, 55
fifteen ... 31
fifth ... 93, 107, 109
fighting ... 6
figure ... 56
file ... 57
filed ... 3, 95
filled ... 98
find ... 17, 65, 72, 91
finding ... 109, 110, 117
fine ... 61
fir ... 116
first ... 3, 5, 7, 16, 17, 21, 29, 30, 32-34, 39, 57, 62, 64, 65, 67, 70-73, 76, 77, 80, 83, 85, 87, 88, 94-98, ... 106-108, 110-113, 115-118
Five ... 31, 62, 81
flat ... 33, 78
flight ... 75
flooded ... 112
floor ... 86
flu ... 6
FM ... 39
focus ... 12, 108
focused ... 17, 25
folks ... 8, 18, 19, 22, 23, 36, 119
follow ... 28, 29, 57, 59, 72, 79
followed ... 29, 64, 76, 77

following ... 15, 20, 27, 28, 80, 101
follows ... 58
followup ... 78, 89, 104
food ... 23, 52, 72, 87
foot ... 42, 48, 109
footage ... 48
foregoing ... 121
foremost ... 17
forensic ... 89
forget ... 118
form ... 66, 82, 84, 95, 105
formal ... 59, 114, 115
formality ... 97
forward ... 119
found ... 19, 80, 116
four ... 51, 73, 81, 88, 94, 95, 102, 109
fourth ... 73, 92
Franks ... 120
free ... 48, 49, 51, 52, 60, 98, 110, 111, 114, 115
freedom ... 114
fresh ... 116
Friday ... 96, 102
front ... 30, 66, 70, 98
fruit ... 23
fruits ... 110
full ... 4, 61, 100
function ... 56
functionality ... 10, 11
functioning ... 17
functions ... 9
further ... 27, 55, 59, 75, 106, 107, 117, 119, 122

**G**

galley ... 52, 66
game ... 98-100
gangs ... 62
gap ... 88
Garazanof ... 43
gate ... 13, 40-42, 47, 48, 58
gates ... 13, 41, 45, 46, 109
gathered ... 67, 86, 89
gave ... 54, 57, 94, 95
gears ... 97, 99
general ... 31, 33, 38, 51,

55, 56, 58, 71, 84
generally ... 9, 19, 28, 39, 42, 47, 54-56, 58, 60
geography ... 9
get ... 4, 7, 8, 12, 13, 15, 20, 21, 26, 56-58, 63, 79, 82, 87, 91-93, 105, 116
gets ... 107
gist ... 103
give ... 19, 20, 27, 28, 55, 95, 99, 100, 102
given ... 18, 43, 48, 59, 74, 78, 95, 98, 101, 105, 115, 119
glove ... 118, 119
go ... 3, 8, 15, 17, 18, 20, 21, 33, 35, 36, 38-40, 44, 49, 51, 52, 54, 55, 57, 59, 65, 72, 75, 89-92, 96-98, ... 103-105, 107, 109-115, 119
Going ... 3, 7, 8, 10, 11, 13, 14, 18-21, 23, 24, 30, 38, 39, 43, 50, 54-57, 61, 62, 64-66, 75, 77, 82, 91, ... 93, 98, 105, 106, 112, 113, 115-118
gone ... 23, 44, 91
good ... 15, 24, 27, 56, 75, 82
Gotham ... 45
Government ... 3, 4, 13, 61, 66-69, 106, 111, 117
graduated ... 62
grand ... 23
grant ... 3
gray ... 14
Greenwich ... 38
ground ... 22, 37
grounds ... 11
group ... 21, 32, 51
groups ... 19
Guard ... 4-9, 11, 17, 20, 25, 29, 31, 40, 42, 46, 50, 53, 62, 63, 65, 76, 82, 112, 115, 116, 118, 119
... guess 49, 63, 66, 71, 82, 83, 86, 88, 98, 99, 101, 104, 106, 109, 112

guessed ... 34
guidance ... 27, 28
Guide ... 28
guilt ... 113
gunpowder ... 92, 93
gut ... 34
guys ... 96

**H**

half ... 62, 64
halfway ... 8, 40
hallway ... 66
hand ... 4, 13, 53, 61, 66, 68, 118, 119
handcuffs ... 70
handle ... 6, 12
hands ... 16, 33, 41-44, 92, 118
happening ... 23
harsh ... 22
hate ... 112
Hazelton ... 37-40
head ... 7
Headquarters ... 4, 5
health ... 78
hear ... 33, 35, 97, 103, 111
heard ... 7, 24, 116, 119
hearing ... 3, 61, 69, 98, 101, 106, 120
hearings ... 120
heat ... 103
heavily ... 9
help ... 14, 25, 67, 90, 97
helpful ... 84
helping ... 83
herring ... 112, 113
herrings ... 111, 112
hill ... 14, 16
hills ... 9
hip ... 70
hit ... 83, 98
hitting ... 82
hold ... 14
Holiday ... 45
home ... 49, 52, 91, 94, 97, 105
homicide ... 33, 35
homicides ... 6, 64, 78
Honda ... 85
honest ... 34, 112
honestly ... 17, 22, 44, 53, 55

Honor ... 3, 4, 14, 27, 47, 55, 59-61, 66-69, 75, 96, 101, 104, 106, 107, 111, 112, 118-120
Honorable ... 3
hope ... 112
Hopkins ... 39
hour ... 21, 64, 100, 106, 109
hours ... 7, 23, 26, 27, 39, 49, 54, 86, 87, 109, 112, 114
house ... 96
housekeeping ... 3
housing ... 77
husband ... 35

**I**

identification ... 16, 30, 32
identified ... 35, 78, 82, 111
identifying ... 79
immediately ... 8, 34, 94
incoming ... 89
indeed ... 62
INDEX ... 122
indicated ... 27, 32, 48, 80
indication ... 7
indications ... 78
indicia ... 115
indiscernible ... 19, 24, 26, 49, 77
individually ... 19, 22
infidelity ... 78
informal ... 57
initial ... 7, 8, 34, 63
initially ... 33
initiated ... 19
injured ... 7
injury ... 39
input ... 26
inquiry ... 114
inside ... 12, 36, 37, 109, 113
instruct ... 3
instructions ... 19, 26, 28
intelligence ... 5
intention ... 7, 98
interacting ... 58
interesting ... 109
interfere ... 54
interim ... 94
interior ... 48, 87

interpret ... 38, 40, 46, 47, 105
interpretation ... 38
interrogated ... 109
interrogation ... 107-109, 114
interrogations ... 27, 108
interrupts ... 103
intersection ... 30
interview ... 24, 34, 65, 68, 71-73, 80, 83-89, 91, 92, 95-100, 102, 104, 105, 111, 116, 117, 122
interviewed ... 24, 31, 34, 68, 70, 73, 80-83, 93, 94, 96, 104, 108, 110, 113
interviewing ... 65, 74, 81, 82
interviews ... 24, 32, 64, 65, 67, 68, 70, 71, 74, 80-82, 84, 85, 88, 89, 94-97, 104, 108-110
intimidated ... 70
intimidating ... 70
introduce ... 117
investigate ... 116
investigated ... 46, 76
investigating ... 35
investigation ... 18, 24, 25, 35, 50, 54, 56, 57, 61, 67, 77, 84, 90, 93, 97, 98, 115, 116
investigations ... 62, 83
Investigative ... 31, 50, 63, 76, 77, 80, 82, 115
investigator ... 46, 84
investigators ... 19, 23, 25, 54, 56, 57, 115, 116
invited ... 70
invoked ... 3, 101, 117
involve ... 22, 78
involvement ... 50
iPhone ... 90
irrelevant ... 113
island ... 111
issue ... 11, 53, 55-58, 107, 110, 118, 119
issued ... 48

issues ... 53, 78, 101, 109
issuing ... 56, 57
items ... 91

**J**

jacket ... 70
James ... 3
Jim ... 15, 16, 19, 22, 26, 33, 34, 65, 78, 79, 103
job ... 7, 17, 25, 113
John ... 3, 20
Jordanelli ... 44
Judge ... 37
July ... 5
June ... 5
junior ... 8
jurisdiction ... 50
Justice ... 57

**K**

K.O. ... 97
Keohane ... 114
keys ... 45
khaki ... 70
Kim ... 108, 109, 112-114, 118
Kirk ... 61, 69, 122
kitchenette ... 22
knee ... 53
knees ... 16, 33
knowing ... 34, 52
knowledge ... 13, 41-44, 74, 86, 94, 95
Kodiak ... 5, 6, 8, 9, 14, 15, 22, 36, 37, 62-64, 75, 76, 116

**L**

labeled ... 68-70, 84
labeling ... 70
landed ... 63, 76
landscape ... 66
language ... 108, 113, 114
large ... 9, 10, 41, 66, 69, 86
larger ... 88
Larsen ... 15, 29, 30
late ... 23, 25, 49, 54, 78, 114
later ... 25, 40, 50, 54, 71, 72, 94, 98
lawyer ... 104

layout ... 10, 14
lead ... 64, 77-79
leads ... 26, 63, 64, 76, 77, 80, 90
learned ... 10
leave ... 3, 12, 13, 20, 23, 44, 46-49, 52, 56, 59, 60, 87, 88, 91, 107-112, 114, 115
leaving ... 107
led ... 71, 78, 79, 86
left ... 17, 35, 38, 49, 51, 52, 60, 66, 70, 86, 88, 89, 93, 94
level ... 57, 112
levels ... 11
liberty ... 107
lighting ... 12
lights ... 113
liked ... 91, 105
limited ... 75
line ... 100, 101
lines ... 33, 35
list ... 55, 79
listens ... 6
lived ... 8
local ... 57, 116
located ... 9, 10, 116
location ... 18, 27
locations ... 69
lock ... 13, 59
locked ... 12, 49, 58
LOEFFLER ... 3, 107, 111, 113, 115-120
log ... 37, 38, 46, 47, 58, 59, 122
logical ... 22, 84, 90
logically ... 84
logs ... 40, 45, 46, 59, 108
long ... 4, 5, 62-64, 71-73, 86, 97, 100
longest ... 89
look ... 38, 39, 56, 89, 90, 95, 101, 108, 109, 113, 114
looked ... 8, 32, 66, 90
looking ... 5, 19, 30, 38, 66, 67, 69, 84, 90, 91, 100, 108, 111, 118
lot ... 7, 22, 23, 30, 41, 55,

59, 86, 112
lots ... 113, 114
love ... 103
lunch ... 23, 49, 52, 106, 110
lunches ... 23, 52, 86, 87, 111
lunchtime ... 52

**M**

machines ... 23
magazine ... 70
magnetic ... 13
main ... 9, 10, 14, 17, 20, 21, 66, 114
mainly ... 117
maintained ... 11
major ... 109
majority ... 23, 51
make ... 17-19, 21, 25, 28, 34, 58, 65, 82, 108, 111, 113, 115, 118, 119
man ... 33, 34, 74
manage ... 7
management ... 5, 57, 74
manager ... 5
mandatory ... 58
many ... 10, 13, 30, 31, 50, 63, 68, 75, 76, 81, 82
mariners ... 6
Maritime ... 62
marked ... 13, 66
martial ... 57
master ... 18, 66
mat ... 106
material ... 12
matrix ... 82, 83, 119, 122
matters ... 6
means ... 14, 27, 43, 47, 58
med ... 52
medical ... 52, 53, 72, 73, 87
medication ... 72, 87
medications ... 53, 87, 91, 105
medicine ... 106
meet ... 114
meeting ... 21, 36
meetings ... 20, 36
meets ... 109
member ... 32, 36, 56, 57, 80
members ... 20, 43, 57, 78,

80
memory ... 38, 72
men ... 19
mentions ... 99
mess ... 57
messages ... 90
met ... 63
microwave ... 23
midmorning ... 19, 25, 35, 49
migrated ... 36
Mil ... 48
miles ... 8, 9, 65
militar ... 59
military ... 20, 27-29, 32, 35, 48, 57-59, 75, 78, 107
mindful ... 106
minivan ... 84
Miranda ... 94, 95, 97-99, 101, 103, 105, 107-111, 116, 118
Mirandize ... 118
Mirandized ... 109, 113, 118
missing ... 103
mission ... 6, 17
missions ... 46
Missouri ... 109
MONDAY ... 3
moored ... 9
morning ... 6, 7, 18, 20, 26, 27, 29, 35, 38, 40, 42, 44, 54, 55, 62, 74, 75, 81, 95, 98, 109
motion ... 3, 26, 107
motions ... 11, 106
move ... 14, 19
moving ... 24, 42
much ... 9, 21, 23, 25, 57, 78, 95, 116-118
multiple ... 65, 68, 71
murder ... 116
murdered ... 115
mustered ... 66, 67, 86

**N**

names ... 80
National ... 20, 62
natural ... 99, 115
Nav ... 45
naval ... 10
Navy ... 29

near ... 66
nearest ... 70
needed ... 17-19, 39, 54, 56, 72, 77, 79, 87, 91, 106
needing ... 10, 117
Ness ... 4, 47, 60, 79, 115, 122
Nicola ... 18, 35
night ... 60, 81, 82, 92, 93, 95, 96, 109
Ninth ... 117
nobody ... 44, 111, 114
non ... 40
nonconfrontational ... 100
noon ... 63, 106
nor ... 112, 113, 115
norm ... 23, 26
normal ... 23, 26, 27, 30, 36, 112
normally ... 8, 9, 52, 53, 60
North ... 6
notation ... 40
note ... 5, 40, 43
notes ... 71
notice ... 3, 7
notification ... 19
notifications ... 18, 19
notified ... 42
notifying ... 44
NOVEMBER ... 3
numbers ... 63, 89
nutshell ... 110

**O**

Oberlander ... 61, 69, 105, 122
objection ... 14, 47, 67, 69, 101, 119
objective ... 113
observations ... 26
observe ... 32
occasion ... 65
occurring ... 74
OD ... 38
offer ... 47, 60, 67, 119
offered ... 67, 68, 87, 106, 119
office ... 5, 35, 36, 55, 66-69, 82, 88, 102, 109, 112, 113, 122
officer ... 5-9, 12, 14, 16-18,

24, 27, 29, 30, 33, 34, 37-39, 44, 56, 62, 107, 111, 113
officers ... 16, 30, 33, 46, 50, 52, 65, 109, 111, 112
offices ... 24, 50, 67, 68, 86, 113
official ... 5
officials ... 27
old ... 10
one ... 3, 4, 8, 13, 16, 21, 26, 33, 38, 39, 41-43, 48, 50, 53, 58, 59, 63, 66, 68, 73, 77-82, 84, 89, 91, ... 92, 108, 109, 114, 116, 118, 119
OOD ... 40
OP ... 40, 43
open ... 13, 21, 41, 66, 70, 86
opened ... 70
Operational ... 40
operationally ... 56
operations ... 6, 9, 11, 12, 25, 44, 56
opinion ... 12
opposed ... 3
opposition ... 96
oral ... 107
order ... 3, 17, 24, 27, 28, 43, 44, 55-59, 67, 68, 94, 108, 111
ordered ... 26, 27, 46-48, 55, 56, 59, 108, 109, 112
orders ... 18, 26, 28, 29, 56-59, 119
originally ... 53, 115
OS1 ... 37, 39
outer ... 12
outgoing ... 89
oven ... 23
overhead ... 14
overseas ... 9
overseeing ... 39
overtime ... 60
own ... 36, 93

**P**

p.m. ... 64, 65, 68, 80, 102, 120
Pacific ... 6, 20
Pack ... 62
pan ... 78
panned ... 68
pants ... 70
paren ... 85
parking ... 55
participate ... 27, 108
particularly ... 58, 77
parties ... 60, 106, 108
pass ... 43
passed ... 25, 43, 44
past ... 8
patrol ... 6
pedestrian ... 13
people ... 8-10, 12-14, 21-25, 27, 30, 34, 35, 48, 51, 52, 64, 65, 67, 68, 70, 74, 82-84, 86, 104, 110-116
... perimeter 86
period ... 109
permanent ... 57
permit ... 101
person ... 8, 20, 25, 46, 51, 57, 58, 64, 81, 92, 107, 110
personally ... 56
personnel ... 9, 40, 46-48, 59
perspective ... 26, 27
PETER ... 4, 122
Petty ... 39
ph ... 29, 43, 113
Phil ... 44
phone ... 7, 8, 17, 24, 89, 90, 93, 109
phones ... 24
photo ... 14
photograph ... 13, 122
Photographs ... 90
physical ... 45, 108, 109, 114
physically ... 116
pick ... 103
picked ... 6
pickup ... 16
picture ... 10, 13, 15, 66, 69
pictures ... 89
Pizaro ... 29

place ... 10, 21, 36, 74, 94
plan ... 5, 39, 56, 98-100, 108
plane ... 63, 75
planned ... 101, 103
Planning ... 5, 36
plenty ... 87
pointed ... 15
police ... 16, 31, 32, 40, 42, 56, 63, 65, 76, 116
pool ... 39
position ... 5, 107, 117
post ... 65-67
posture ... 70
potential ... 35, 79, 80, 111
power ... 112
practice ... 56, 119
precipitate ... 111
prepare ... 23
prepared ... 66, 119
prescripted ... 82
present ... 3, 97, 110, 117, 120
presiding ... 3
pressure ... 13, 109, 114
previous ... 6
prior ... 41-43, 62, 64, 65, 78
priorities ... 56
prison ... 108
prisoner ... 108
privacy ... 70, 71
private ... 65
probable ... 117
procedures ... 20
proceeded ... 9
proceedings ... 120, 121
processes ... 57, 59
product ... 110
program ... 5
progressed ... 24
progression ... 99
project ... 5
pronounce ... 31
proper ... 15, 118
protect ... 104
proved ... 77
provide ... 3, 19, 28, 37
provided ... 6, 20, 24, 66, 79, 88
publish ... 39

pull ... 30, 115
pulled ... 8, 16, 30, 31
punishment ... 57
pursue ... 57
push ... 54
putting ... 59

**Q**

Quantico ... 62
ques ... 95
questioned ... 49, 51, 98, 107, 108
questioning ... 82, 83, 101, 108, 118
quote ... 48

**R**

radio ... 6, 11, 17, 21, 25, 37, 45
radios ... 7, 10
raining ... 37
rainstorm ... 37
raise ... 4, 61
raised ... 86, 118
ramping ... 56
ran ... 86
random ... 101
rang ... 7, 8
rational ... 34
reach ... 18
reached ... 7
react ... 93
reaction ... 26, 34, 92, 93, 100, 101, 103
reader ... 13, 48
ready ... 4, 107
reality ... 112
realize ... 107
realized ... 19
reason ... 112
reasonable ... 107, 110
receive ... 10, 63
received ... 39, 50, 62, 63
recent ... 112
recessed ... 61
Reckner ... 16, 17, 32, 33, 35, 79
recognize ... 37, 69, 82, 85
recognized ... 15
recommended ... 20
recorded ... 32, 71, 73, 88
recording ... 45, 46, 71, 89,

102, 121
recordings ... 71
RECROSS ... 59, 106, 122
red ... 14, 111-113
REDIRECT ... 55, 104, 122
redrew ... 70
referenced ... 40, 45
references ... 44, 45
referencing ... 46, 103
release ... 13
released ... 51, 54, 60
relied ... 117
relying ... 9
remain ... 4, 46, 48, 119
remainder ... 18, 27
remained ... 47
reminder ... 84
repercussions ... 57
replace ... 51
report ... 7, 26, 27, 39, 56, 75
reported ... 5, 75, 78
reporting ... 39, 45, 74
representation ... 14
request ... 3, 56, 104, 115, 120
requests ... 28
require ... 48
required ... 12, 105, 118
requirements ... 12
requires ... 111
requiring ... 105
rescue ... 6, 7
researched ... 116
residue ... 92, 93
respective ... 3
respond ... 57, 104
responders ... 63
response ... 20, 103, 104
responsibility ... 8, 10, 43
responsible ... 7, 39
restaurant ... 52
restraint ... 114
result ... 43
return ... 27
returning ... 55
reversed ... 117, 118
reviewed ... 96
Rezanof ... 30
Rich ... 16, 33
rigger ... 7, 11, 13, 22

rights ... 97-99, 101, 105, 117
ring ... 7
rise ... 3, 61, 120
road ... 15, 16, 29, 30, 34
Roberts ... 3
rode ... 65
role ... 8
roles ... 38
roof ... 15
room ... 7, 20, 22, 53, 65-67, 69, 70, 86, 89, 114, 117
rough ... 36, 66, 69
routine ... 39
rule ... 3
rumors ... 78
running ... 9, 39
runs ... 21
ruse ... 93
Russell ... 4, 122

**S**
S.B. ... 101
safe ... 98, 118
sandwiches ... 23
sat ... 69
saw ... 24, 29, 30, 34, 44, 53, 116
scenarios ... 55
scene ... 14, 22, 30, 34, 41, 46, 54, 76, 116
schedule ... 26, 60
scheduled ... 20, 74, 120
SCHRODER ... 4, 14, 27, 47, 55, 59-61
Scott ... 16, 33, 35, 79
Sea ... 6
seamen ... 11
Sean ... 65, 69, 70, 96, 100, 101, 103
search ... 6, 7, 89, 117
searching ... 93, 109
seat ... 4, 61
seated ... 3, 61
sec ... 93
second ... 9, 29, 34, 44, 68, 72, 88, 89, 108-110
secretary ... 114
secure ... 41, 54, 109
secured ... 40-42, 46-48,

58, 59, 109
security ... 11, 12, 44, 56, 62
Sedrauss ... 92
see ... 5, 20, 26, 29, 31, 35, 37, 38, 40, 46-48, 68, 82, 83, 85, 89, 90, 92, 93, 95-97, 99, 102, 103, 106, ... 115
seeing ... 53, 93
seen ... 16, 30, 48, 90, 95
Seibert ... 109
semantics ... 71
Senior ... 18, 25, 38
sensitive ... 13
sent ... 23, 52
separate ... 10, 12, 118
series ... 104, 109
serves ... 38, 72
Service ... 24, 46, 50, 58, 70, 78
services ... 6, 31, 82
session ... 3, 61, 89
sessions ... 88
set ... 3, 21, 22, 26, 94
setting ... 10
seven ... 13
several ... 7, 16, 30, 43, 51, 77, 80
sheet ... 56, 82
shell ... 85
ships ... 6, 9
shirt ... 70
shock ... 21
shooting ... 46
shop ... 7, 11, 13
shops ... 22
Shortly ... 31, 44, 49, 79
shot ... 8, 16, 18, 33-35
shoulder ... 53
show ... 10, 13, 37, 55, 66, 82, 98
showed ... 16, 30, 112, 115, 116
showing ... 32
shown ... 70
sick ... 6
side ... 3, 4, 16
sign ... 95
signed ... 32, 105
significant ... 8, 12, 53

silence ... 101
similar ... 35, 75, 82
Similarly ... 70
simplest ... 107
simply ... 9, 117
single ... 51
sink ... 23
sit ... 11, 24, 113
site ... 10
sits ... 6
sitting ... 22, 53, 70, 114
situation ... 52, 76, 115-118
six ... 110, 117
sixth ... 93, 117
sketch ... 66, 69, 122
sleep ... 27
small ... 69, 88
smartphone ... 89
snack ... 72
snow ... 22, 36, 37
snowstorm ... 37
Snowstorms ... 37
sobbing ... 16, 21
somewhat ... 87
sorrow ... 21
sound ... 121
sounds ... 56, 85, 88, 95, 102
space ... 4, 10, 21, 65-68, 89, 102, 112, 122
spaces ... 10, 11, 24, 67, 113
special ... 61, 62, 65, 69, 70, 81, 87, 88, 92, 105
specialty ... 5
specif ... 88
specific ... 19, 26, 91, 100
speed ... 30, 82
spell ... 4, 61
spent ... 62
spoken ... 17
sporadically ... 51
spot ... 21, 33
spouses ... 18-20
squad ... 62
square ... 69, 70
squares ... 69
stacks ... 86
staff ... 18, 25, 31, 36, 79
stand ... 4, 11, 55, 61, 115
Standard ... 82, 112, 119
standardize ... 82

standards ... 108
stander ... 6
standers ... 11
standing ... 4, 16, 25, 28, 30, 32, 35
standpoint ... 11
stands ... 61, 120
start ... 23-25, 65, 95, 96, 100
started ... 23, 54, 74, 77, 83, 85, 86, 88, 91, 92, 95, 98
starting ... 23, 54
starts ... 38, 40, 45, 96
state ... 4, 16, 30, 31, 40, 46, 61, 63, 111
statement ... 117
statements ... 3, 26, 79, 109, 110, 117, 119
station ... 5-10, 14, 18, 21, 30, 43, 45, 46, 48, 55, 64, 65, 76, 122
status ... 45-47
stay ... 7, 49, 51, 52, 56, 88, 112, 114, 115
stayed ... 11
step ... 60, 90, 102, 106, 117
stomach ... 6
stop ... 15, 16, 30, 41
stopped ... 16
storming ... 37
storms ... 37
strategic ... 5
Stress ... 74
strong ... 113
stronger ... 116, 117
suddenly ... 114
sufficient ... 23
suggested ... 84, 115
suggestion ... 36
suite ... 66, 67
summary ... 45, 107
summon ... 113
summoned ... 108
super ... 40
supervisor ... 25, 39, 40, 62, 115
supervisors ... 25, 44
support ... 20, 52, 114
suppose ... 84

supposed ... 54, 78, 79
suppress ... 3, 26, 106
suppressed ... 110
suppression ... 3, 117
Supreme ... 108, 109, 114
surroundings ... 108, 109, 114
survei ... 94
surveillance ... 47, 93, 94
suspect ... 35, 79, 80, 83, 85, 93, 98, 110, 111, 113
suspects ... 110
SUV ... 84
swab ... 92
swabs ... 92
switch ... 99
switched ... 97
SWORN ... 4, 61
system ... 5, 12
systems ... 6, 12

**T**

T1 ... 10-14, 17-19, 21, 23, 26, 27, 33-37, 40-44, 46-50, 53-56, 59, 60, 66, 67, 81, 86, 87, 93, 108, ... 109, 111, 112, 114, 119, 122
T2 ... 10, 11, 14, 17, 18, 21, 22, 26, 28, 30, 33, 35, 36, 39-42, 44, 46, 47, 50, 51, 54, 55, 60, 71, 77, ... 78, 80, 81, 97, 99, 100
taking ... 63, 74, 75
tall ... 42
target ... 84
targeted ... 83, 84, 108
tasked ... 40
team ... 11
technical ... 57
technicians ... 11, 22, 54
technology ... 5
techs ... 45
telephone ... 63
telling ... 25, 57, 78
temporarily ... 101
Ten ... 31, 61
Teresa ... 121
term ... 5, 7, 8, 58, 86
terminate ... 101, 103, 107

terminated ... 101
terminating ... 105
terribly ... 22
test ... 38, 92, 93
testimony ... 3, 69
text ... 90
theories ... 71
thereabouts ... 102
therefore ... 12
these ... 19, 81, 82, 84, 86, 88, 91, 104, 107, 108, 110
third ... 44, 73, 91
thirds ... 96
three ... 8, 9, 51, 69, 73, 91
time ... 3, 15, 19-21, 25-27, 29-34, 38-40, 42, 44, 45, 49-52, 54, 57, 62-65, 68, 71-76, 78, 80, 83, 85-89, ... 92-100, 102-104, 108-112, 118, 120
timeline ... 99, 100
times ... 8, 40, 41, 114
tire ... 33, 78
today ... 26, 49, 56, 69, 107, 109, 120
took ... 5, 10, 63, 64, 75, 77, 100
tool ... 82
top ... 26, 38, 39, 42, 45, 55, 82, 97
topic ... 73
total ... 42
toward ... 24, 26, 44, 98, 100
towards ... 30, 72
town ... 9
track ... 25, 54
traffic ... 41
trained ... 20
training ... 62, 74
transcribed ... 71
Transcriber ... 121
transcript ... 74, 88, 95-97, 100-102, 106, 109, 119, 121
transcripts ... 95, 96, 101, 105, 106
translate ... 38

transmission ... 10
Transmitter ... 10
transmitters ... 11, 45
trash ... 57
traveling ... 63
treat ... 26
treated ... 26
treating ... 114
Trooper ... 31, 32, 63, 76, 80
troopers ... 30, 40, 42, 116
truck ... 16, 34, 84, 85, 89, 90, 93
Tuesday ... 112, 113
turn ... 114
turned ... 29, 30, 58, 68, 72, 115
Turning ... 66
TV ... 97
two ... 6, 8, 10, 11, 18, 21, 27, 33, 34, 54, 62, 64, 94, 96, 109, 115
types ... 12
Typically ... 70

**U**

U.S. ... 3, 108, 109
UCMJ ... 57
ultimate ... 114
unconscious ... 39
underneath ... 21, 40
understood ... 56, 58, 119
undisclosed ... 27
Uniform ... 5, 16, 57
uniformed ... 30
unit ... 39
United ... 3, 61
universal ... 38
unopposed ... 3
unusual ... 19, 30
update ... 20
USCG ... 26, 27
USCGIS ... 27
using ... 24, 67, 117

**V**

vague ... 7, 23
Valley ... 45
Van ... 4, 47, 60, 79, 115, 122
vehicle ... 15, 16, 29, 30, 33, 41, 65, 75, 109
vehicles ... 30, 85, 108

vending ... 23
verbal ... 46
versus ... 3, 57, 108, 109, 115
vest ... 70
video ... 47, 48
violent ... 62
Virginia ... 62
visible ... 70
voice ... 118
voicemail ... 7
voluntarily ... 48
voluntary ... 119

**W**

wait ... 115
waiting ... 67, 68, 87
waiver ... 95, 97
waiving ... 105
walk ... 13, 21, 33, 55, 56
walked ... 16, 21, 33, 34, 117
walking ... 18, 33, 53
warning ... 111
warnings ... 94, 95, 98, 103, 105, 109, 110
warrant ... 117
Washington ... 20
watch ... 6-8, 11, 17, 21, 23, 25, 28, 37-41, 43-46, 51, 122
water ... 72
ways ... 59
weapon ... 70
weapons ... 90
wearing ... 70
weather ... 22, 36
week ... 3, 7
weekend ... 6
weight ... 75
Wells ... 3, 11, 15, 17, 19, 22, 24, 26, 27, 29, 32-35, 37, 44, 50, 52, 53, 55, 58, 65, 68-71, 74, 78-86, ... 88, 89, 96, 99, 101, 102, 105, 107-109, 111, 113, 114
whichever ... 89
white ... 14, 16, 62, 84, 85
whole ... 19, 26, 74, 86, 108, 109
wife ... 6, 94, 96

will ... 88, 98, 99, 119
willing ... 107
wind ... 65
window ... 13
windows ... 87
winged ... 83
winter ... 22, 36
wire ... 42
wires ... 86
wiring ... 42
WITNESS ... 3, 4, 55, 60, 61, 66, 68, 69, 106-108
witnesses ... 3, 106, 107, 122
woke ... 6
word ... 59, 82
words ... 27
work ... 7, 10, 11, 13, 14, 22, 24, 26-28, 36, 37, 39, 46, 48, 54-56, 60, 65, 74, 107, 112, 114, 115
workday ... 19, 54, 112, 115
worked ... 11-13, 28, 29, 35, 36, 43, 62, 81, 113
working ... 24, 26, 60, 64, 115
workplace ... 113
works ... 11, 55
workshop ... 11
world ... 38
wound ... 105
writing ... 5
written ... 28, 57, 95
wrote ... 32, 89

**X**

XO ... 8, 9, 18, 19, 21, 25, 29, 34, 39, 43, 54, 111

**Y**

year ... 17, 62
years ... 4, 29, 58, 62
Yorktown ... 62
yours ... 77

**Z**

ZFH2 ... 44, 45
Zulu ... 40, 42, 45