# J. Reid Meloy, Ph.D., A.B.P.P.
FORENSIC PSYCHOLOGY

P.O. Box 90699
San Diego, CA 92169

Tel: 858.551.8092
Fax: 858.551.8096
email: jrmeloy@san.rr.com

Diplomate, Forensic Psychology  
American Board of Professional Psychology

Fellow, American Academy of  
Forensic Sciences

Nov. 22, 2013

United States Attorney Karen Loeffler  
Assistant U.S. Attorney Bryan Schroder  
Special Assistant U.S. Attorney Kathleen Duignan  
District of Alaska  
222 West 7th Ave., Number 9, Room 253  
Anchorage, AK 99513

**United States v. James Wells**

Dear Ms. Loeffler, Mr. Schroder, and Cpt. Duignan,

    Pursuant to your request, I am submitting a report concerning my opinions in U.S. v. James Wells. These opinions focus upon four areas supported by my training, education, experience as a consultant, and research conducted by me and others: targeted and intended violence, workplace violence, multiple murder, and the personality and psychological characteristics of individuals who commit such acts. None of these opinions, however, will be applied by me to the known facts of the case of U.S. v. James Wells, and I will not testify to their relevance in the case. I have no opinion concerning Mr. Wells' guilt or innocence, which will be determined by the trier of fact. I also have not clinically evaluated Mr. Wells,

1

so I have no opinion as to his specific personality traits, presence or absence of a psychiatric disorder, or psychological functioning. As you know, I have been provided with some of the evidence to review in this case, and have done so; this evidence is outlined in a letter from U.S. Attorney Loeffler dated April 19, 2013 (attached).

**Targeted and Intended Violence**

There are two modes of violence which are, in many ways, psychobiologically distinctive: affective violence, otherwise known as emotional or reactive violence; and predatory violence, otherwise known as instrumental, targeted or intended violence (Barratt & Feltous, 2003; Calhoun & Weston, 2003; McEllistrem, 2004; Meloy, 2006; Meloy & Hoffmann, 2014; Siever, 2008; Siegel & Victoroff, 2009). Affective violence is the most common mode of violence among people, and is a reaction to an imminent threat, accompanied by anger and/or fear, and preceded by a heightened state of emotional arousal (Meloy, 1997). It is defensive (Siegel & Victoroff, 2009), and its sole purpose is to make a perceived threat go away. The latter mode of predatory or instrumental violence among people is less common but more dangerous. Predatory or instrumental violence is planned, purposeful, and emotionless. It involves research and preparation, and is often the end point of a pathway to violence (Calhoun & Weston, 2003; Fein, Vossekuil & Holden, 1995). It is offensive. It usually begins with a grievance, and continues along a pathway to the point of a decision to intend to be violent as the only alternative to address a particular problem (Meloy, 2000). Planning and preparation may take days, weeks, or months. Implementation is not impulsive, but opportunistic: taking advantage of an opportunity when it arises, rather than a loss or impairment of control.

Research has demonstrated that those who engage in affective *homicide*, as opposed to predatory *homicide*, have functional impairments in their pre-frontal cortex when measured by positron emission tomography (Raine et al., 1998;

2

Raine, 2013); and also show impairments in intelligence, memory, attention, and executive functioning (Hanlon et al., 2013). Few such impairments have been found in those who commit predatory or instrumental homicide. There are reliable and valid measurement instruments—both observational and self report-- which distinguish the two modes of violence (Meloy, 2006; Hanlon et al., 2013). These distinctive modes of violence have been identified in children, adolescents, and adults (Dodge & Coie, 1987; Pulkkinen, 1998).

Predatory (targeted or intended) violence is carried out with a specific target or targets in mind. It is carried out in a tactical manner meant to heighten the probability of success: for example, in most cases of targeted or intended violence (with the exception of prior sexually intimate victims), there is no direct threat expressed to the victim(s) beforehand (Fein & Vossekuil, 1999; Meloy, Sheridan & Hoffmann, 2008; Meloy & Hoffmann, 2014). Stealth is a key element of targeted or intended violence since surprise of the victim(s) also heightens the probability of success. Contrary to what most people think, acts of targeted or intended violence are not accompanied by a high state of emotional arousal in the perpetrator (Cornell et al., 1996). From an evolutionary perspective, however, this makes sense. The evolutionary origin of targeted or intended or predatory violence was hunting for food. If the hunter was highly autonomically aroused, or fearful and/or angry, there was greater likelihood that he would signal his approach to the target, and also miss the target when he utilized his weapon. In sport hunting, this is referred to as "buck fever." Hence, no food would be secured, and therefore survival was not insured among our ancestors. Those individuals throughout the evolution of mankind whose brains dampened or muted their emotional response when hunting were destined to be the most successful, and therefore were able to pass their genes into the next generation. Likewise, those individuals who could display the greatest amount of emotion and arousal when threatened also survived to live another day, and had a better chance of passing their genes into the next generation. None of us would be here unless are ancestors did both affective and predatory violence well. Fortunately, most of us do not need to be affectively or predatorily violent most of the time

3

unless we choose to do so. In the case of predatory (intended and targeted) violence, humans engage this capacity for legal (military, law enforcement, marital arts, sport hunting, etc.) or illegal (homicide with many motives) means in contemporary societies. It is my opinion that we all have the biological capacity to be either affective or predatorily violent.[1]

**Workplace Violence**

Although most workplace violence is minor, it is one of the leading causes of workplace injury; serious acts of nonfatal violence in the workplace include rape, sexual assault, robbery, and simple assault. In 2009 there were approximately 579,000 nonfatal violent crimes in the US perpetrated toward individuals in their workplace. The highest risk workers are law enforcement officers, mental health professionals, security guards, bartenders, and sales employees. Most workplace assaults are affective or reactive, but some of them are predatory (intended or targeted)(Bureau of Labor Statistics, 2010, 2011).

Most workplace *homicides* are committed in the course of a robbery. The second most common workplace homicide occurs between work associates. This has been a consistent finding between 1997 and 2010 (Bureau of Labor Statistics, 2010, 2011). Although most workplace homicides are affective (reactive, impulsive, emotional), about one third are predatory or instrumental (targeted and intended). Although homicide in the workplace is very rare, it can occur anywhere. There are now approximately 500 homicides in the US workplace each year, but these numbers have *steadily decreased* since 1997. In 2010, there were 177 victims of targeted or intended homicide in the US workplace (White, 2014).

---

[1] There is animal research that has identified the suppressor neurotransmitter (GABA) in the hypothalamus that facilitates the expression of emotion in affective violence and its suppression in predatory violence (Siegel & Victoroff, 2009). There is no human research that has directly measured this biological mechanism, but this animal finding is consistent with perpetrators' descriptions of the absence of emotion when they have committed predatory violence (Meloy, 1988). Studying different modes of violence at the behavioral genetic level, however, is in its infancy (Viding & Frith, 2006).

4

Among those who commit targeted homicide in the workplace, they do not "snap." This is a common public misperception, although often the term appears in media headlines when such acts occur. Instead they proceed along a pathway to violence which usually includes the following steps: grievance, ideation (formulation of violent intent), research, planning and preparation, implementation, and attack. Some perpetrators are motivated by an accumulation of losses or humiliations, which may be inaccurately perceived or quite real—or a combination of both—and the decision is made to commit a violent act against those whom are blamed for the humiliation or loss (Calhoun & Weston, 2003; White, 2014). Most workplace homicides involve one perpetrator and one victim (Bureau of Labor Statistics, 2010, 2011).

**Multiple (Mass) Murder of Civilians**

Definitions of mass murder vary, but typically involve the killing of three or more individuals by a single perpetrator at the same time and same location—or in close temporal and physical proximity (Holmes & Holmes, 2001; Kelleher, 1997; Lane & Gregg, 1994; Levin & Fox, 1985). They are virtually always committed by males, especially if extrafamilial (outside the family). The few women who commit mass murder are usually psychotic and do so within their family.

Over the past fifteen years my colleagues and I have conducted a series of studies of adolescent and adult mass murderers in North America and elsewhere (Meloy, 1997; Hempel, Meloy & Richards, 1999; Hempel, Levine, Meloy & Westermeyer, 2000; Meloy, Hempel, Mohandie, Shiva & Gray, 2001; Meloy, Hempel, Gray, Mohandie, Shiva & Richards, 2004; Katsavdakis, Meloy & White, 2011). A large proportion of these mass murderers intentionally killed others in their workplace. I have also consulted on such cases throughout my career as a forensic

5

psychologist, and have forensically interviewed a few mass murderers who survived their own massacre (the majority of adult mass murderers—but not adolescent mass murderers--either commit suicide or are killed by the police at the time of the crime). These research and consultations have yielded some important findings.

Virtually all mass murders are predatory (instrumental, intended, and targeted). This is in stark contrast to the public belief that multiple killings require an individual to "snap." This is not the case. We arrived at this finding through the investigation of three avenues: 1) observed perpetrator behavior at the time of the killings by video and victims who survived; 2) descriptions by the perpetrators of their absence of emotion at the time of the killings; 3) self-report and evidence that indicate the perpetrators had planned and prepared their mass murder for days, weeks, or months.

Despite this high level of organization, the majority (approximately two thirds) of our sample of adult mass murderers were psychotic at the time of the killings. In other words, they actively exhibited what are referred to as positive signs of psychosis, such as hallucinations and/or delusions. They typically targeted strangers and not people whom they knew. The psychology is that these subjects, most of whom are clearly paranoid, identify a group of individuals in their mind that are conspiring against them—what has been referred to as a "paranoid pseudocommunity" (Cameron, 1959)—and set out to maximize their casualty rate, which is typically higher than the nonpsychotic mass murderer. Paradoxically they are more lethal because of their psychosis and their indiscriminate killing. The specific time and place of the event is often determined following a major loss in love or in work, but the killings are the result of an accumulation of insults that have often occurred over the course of years, magnified in the paranoid mind of the perpetrator with little anchoring in consensual reality.

6

The nonpsychotic mass murder typically has fewer casualties—either injuries or deaths—because he is specifically targeting certain individuals who have angered and/or humiliated him. These insults are not a product of his delusional thinking, but are instead often based in reality. Such individuals, however, often have a narcissistic sensitivity to such events, and their reactive feelings are typically more intense than the normal individual. We refer to them as "rejection sensitive." However, they share with the psychotic mass murderer a precipitating event: a humiliating loss in love or in work that often finalizes the decision to carry out the violent act.

Most adult mass murderers are in their fourth decade of life, significantly older than the majority of males who commit a violent act (late adolescence to early adulthood). They typically also have a psychiatric history which includes both a clinical diagnosis as well as a personality disorder diagnosis. In our first study (Hempel et al., 1999), we wrote, "extreme anger appears to be the central emotion fueling these events, and it is often caused by the perception that others are persecuting or treating one unfairly. Often paranoid ideation and/or depressed mood complicate and intensify the chronic brooding anger of the perpetrators, while their antisocial and narcissistic traits provide a sense of callousness and entitlement that allows them to act it out" (p. 222).

Such individuals are typically single or divorced, and alcohol plays little or no role in their mass murder. This is in striking contrast to the prominence of alcohol in many other single murders which are typically affective rather than predatory. Our explanation for this difference is that mass murder is virtually always predatory (instrumental, intended, targeted), and alcohol could impede the tactical success of the perpetrator in killing whom he wants. He therefore chooses to not be intoxicated at the time and have a clear mind.

7

Case 3:13-cr-00008-SLG   Document 228-9   Filed 12/19/13   Page 7 of 18
Exhibit 7 - Page 7

The annual frequency of mass murders in the United States has been stable since the 1970s; but there appears to be an increase in the past year. Again, this contrasts with the steady decline of single homicides in the United States over the past 30 years.

**Personality and other Psychological Characteristics**

These above areas of research have allowed for reasonable inferences concerning the personality and psychological characteristics of those who carry out targeted workplace homicides of more than one victim. These inferences may or may not apply to a particular individual.

Workplace homicide is usually motivated by a profound sense of rejection, a felt injustice, and a determination to seek revenge—to have the last word. It usually begins with a grievance that is deeply felt, which in turn, may be openly expressed or held within.

The grievance is both a thinking pattern which involves blaming others for one's predicament and not taking any personal responsibility for contributing to the predicament, and an emotional state which typically contains both feelings of shame and anger. The grievance is thought about frequently. The grievance may have been stimulated by one humiliating event, or cumulative events over time. These events typically involve a loss of status or some other perceived rejection. Such events may be completely delusional (false), real, or magnified by the personality of the subject. Humiliating events, by definition, stimulate shame, a sense of public exposure of the self as deficient or bad. Shame is not guilt, which is remorse for having committed a bad act. These emotions are very different.

8

Such a state of grievance will typically be accompanied by vengeful thoughts, which may develop into violent fantasies toward the humiliating objects. Most individuals will go no further. But a very few will move to the next step along a pathway: the entertainment that such violence may solve the problem, and eventually a decision of intent to act. As de Becker (1997) has noted, this decision is typically supported by four beliefs: 1) the act is justified; 2) there is no alternative; 3) the consequences are accepted; 4) the capacity is present to do the act of violence.

The decision to act is followed by a series of stages: research, planning, and preparation, which then culminate in implementation of the violent act itself. Research is typically general data gathering: weapons to be considered, targets to be considered, time to be considered, and approach behavior to be considered. Planning and preparation will follow for some subjects after research is completed, and may involve the selection of a weapon(s), target selection, location selection, and time selection. Intelligence gathering and surveillance of the targets likely follow to determine behavioral patterns as well as physical location which may impair or enhance the probability of success. Practice in the use of the chosen weapon may be important to advance skill after capacity to do the act has been determined. Such activity almost always involves secrecy—which oftentimes leads to an emotional state of clandestine excitement—and then culminates in surprise of the targets. This activity has a twofold purpose: it tactically prepares for success and it emotionally lifts the mood of the subject. Secrecy can also be enhanced if the subject has skill at deception.

These emotional states (shame and anger) are often magnified because of the presence of narcissistic personality traits in the subject. Such traits are evident in an inflated sense of self (grandiosity), which is the disparity between how important one believes one is when compared to the facts of one's situation; entitlement, which is a belief that one is special and should be treated as such; reduced empathy, which is a lowered sense of being able to see another's

9

perspective and understand their feelings with a sense of compassion; and the treatment of others in a dismissive manner. Shame is endemic in such personalities since their inflated sense of self is easily deflated with the slightest pinprick of criticism. This deflation leads to the feeling of shame, which is quickly converted into anger, especially in males. Shame is also most likely to be stimulated when criticism is done in front of other witnesses—the public exposure of the self as deficient or bad.

In our work for universities, corporations, and the government in threat assessment, we have developed an instrument called the WAVR-21 (Workplace Assessment of Violence Risk-21; White & Meloy, 2007). This is not a psychological test, but an observational measure which helps organize data to risk manage difficult and/or threatening situations in the workplace.

The WAVR-21 has five "red flag" indicators for imminent risk of targeted violence in the workplace: 1) a motive for violence; 2) homicidal ideas and preoccupation; 3) violent intentions and expressed threats; 4) weapons skill and access; and 5) pre-attack planning and preparation.

More distal indicators of risk for targeted violence include stalking or menacing behavior; current job problems; extreme job attachment; loss, personal stressors and negative coping; lack of conscience and irresponsibility; anger problems; depression and suicidality; paranoia and other psychotic symptoms; substance abuse; increasing isolation; history of violence, criminality, and conflict; domestic/intimate partner violence; and situational/organizational contributors to violence. Again, the WAVR-21 is not a predictive instrument, but helps organize observations and thinking to help with risk management.

10

The actual timing of targeted homicide in the workplace is usually triggered by an event that was experienced by the subject as a humiliation in the hours or days before the killing(s). This was found in 90% of our adult mass murderer sample. We wrote,

"Adult triggers included termination from a job or envy over another's promotion, bankruptcy, confrontation by an employer, actual or perceived abandonment by a sexual intimate, jealousy, erotomanic beliefs, child support issues, or property damage or trespass. Most precipitants occurred within hours or days of the mass murder, although direct causality could not be established" (Meloy et al., 2004, p. 298).

There was no directly communicated threat beforehand to the targets in 80% of our adult mass murder sample. However, 60% did leak their intent to third parties. Leakage is defined as the communication to a third party of intent to do harm to a target (Meloy & O'Toole, 2011). Leakage contrasts, of course, with the emotional state of clandestine excitement, and poses the risk of discovery of the plan by others. The reasons for leakage are many, but may include anxiety, ambivalence, pride, or paradoxically, excitement over anticipation of the act which cannot be contained.

Thank you for this referral.

J. Reid Meloy, Ph.D., ABPP
Clinical Professor of Psychiatry
University of California, San Diego, School of Medicine

11

Faculty, San Diego Psychoanalytic Institute

Fellow, American Academy of Forensic Sciences

# References

Barratt E, Feltous A (2003). Impulsive versus premeditated aggression: implications for mens rea decisions. *Behavioral Sciences and the Law 21*, 619-630

Bureau of Labor Statistics (2010). *National Census of Fatal Occupational Injuries in 2010.* Washington, DC: US Dept. of Labor.

Bureau of Labor Statistics (2011). *National Census of Fatal Occupational Injuries in 2011.* Washington, DC: US Dept. of Labor.

Calhoun T, Weston S (2003). *Contemporary Threat Management*. San Diego: Specialized Training Services.

Cameron N (1959). The paranoid pseudo-community revisited. *Am J Sociology 65*, 52-58

Cornell D, Warren J, Hawk G, Stafford E, Oram G, Pine D (1996). Psychopathy of instrumental and reactive violent offenders. *J Consulting Clinical Psychology 64*, 783-790

De Becker G. (1997). *The Gift of Fear*. New York: Random House.

Dodge K, Coie J (1987). Social information processing factors in reactive and proactive aggression in children's peer groups. *J Personality Social Psychology* 53, 1146-1158

Fein R, Vossekuil B, Holden G (1995). *Threat Assessment: An Approach to Prevent Targeted Violence* (publication NCJ 155000). Washington, DC: US Dept. of Justice, Office of Justice Programs, National Institute of Justice.

Fein R, Vossekuil B (1999). Assassination in the United States: An operational study of recent assassins, attackers, and near-lethal approachers. *J Forensic Sciences 44*, 321-333

Hanlon R, Brook M, Stratton J, Jensen M, Rubin L (2013). Neuropsychological and intellectual differences between types of murderers: affective/impulsive vs predatory/instrumental (premeditated) homicide. *Criminal Justice and Behavior* http://cjb.sagepub.com/content/early/2013/04/25/0093854813479779

Hempel A, Levine R, Meloy JR, Westermeyer (2000). A cross-cultural review of sudden mass assault by a single individual in the Oriental and Occidental cultures. *J Forensic Sciences 45*, 582-588

Hempel A, Meloy JR, Richards T (1999). Offender and offense characteristics of a nonrandom sample of mass murderers. *J Am Acad Psychiatry Law* 27, 213-225

Holmes R, Holmes S (2001). *Mass Murder in the United States*. Upper Saddle River, NJ: Prentice-Hall.

Katsavdakis K, Meloy JR, White S (2011). A female mass murderer. *J Forensic Sciences 56*, 813-818

Kelleher M (1997). *Flashpoint: The American Mass Murderer*. Westport, CT: Praeger.

Lane B, Gregg W (1994). *The Encyclopedia of Mass Murder*. United Kingdom: Brockhampton Press.

Levin J, Fox J (1985). *Mass Murder*. New York: Plenum Press.

McEllistrem J (2004). Affective and predatory violence: A bimodal classification system of human aggression and violence. *Aggression and Violent Behavior 10*, 1-30

Meloy JR (1988). *The Psychopathic Mind*. Northvale, NJ: Aronson.

Meloy JR (1997). Predatory violence and mass murder. *J Forensic Sciences 42*, 326-329

Meloy JR (2000). *Violence Risk and Threat Assessment*. San Diego: Specialized Training Services.

Meloy JR (2006). Empirical basis and forensic application of affective and predatory violence. *Australian and New Zealand J Psychiatry 40,* 539-547.

Meloy JR, Hempel A, Mohandie K, Shiva A, Gray T (2001). Offender and offense characteristics of a nonrandom sample of adolescent mass murderers. *J Am Acad Child Adolescent Psychiatry 40*, 719-728

Meloy JR, Hempel A, Gray T, Mohandie K, Shiva A, Richards T (2004). A comparative analysis of North American adolescent and adult mass murderers. *Behavioral Sciences and the Law 22*, 291-309

Meloy JR, O'Toole ME (2011). The concept of leakage in threat assessment. *Behavioral Sciences and the Law 29*, 513-527

Meloy JR, Hoffmann J, eds (2014). *International Handbook of Threat Assessment.* New York: Oxford Univ. Press.

Meloy JR, Sheridan L, Hoffmann J, eds (2008). *Stalking, Threatening, and Attacking Public Figures: A Psychological and Behavioral Analysis.* New York: Oxford Univ. Press.

Pulkkinen L (1998). Proactive and reactive aggression in early adolescence as precursors to anti- and prosocial behavior in young adults. *Aggressive Behavior 22*, 241-257

Raine A (2013). *The Anatomy of Violence*. New York: Pantheon Books.

Raine A, Meloy JR, Bihrie S, Stoddard J, LaCasse L, Buchsbaum M (1998). Reduced prefrontal and increased subcortical brain functioning assessed using positron emission tomography in affective and predatory murderers. *Behavioral Sciences and the Law 16*, 319-332.

Siegel A, Victoroff (2009). Understanding human aggression: new insights from neuroscience. *Int J Law Psychiatry 32*, 209-215

Siever L (2008). Neurobiology of aggression and violence. *Am J Psychiatry 165*, 429-442

Viding E, Frith U (2006). Genes for susceptibility to violence lurk in the brain. *Proceedings of the National Academy of Sciences, 103*, 6085-6086

White S (2014). Workplace targeted violence. In JR Meloy, J Hoffmann, eds, *International Handbook of Threat Assessment*. New York: Oxford Univ. Press, pp. 83-106.

White S, Meloy JR (2007*). The Workplace Assessment of Violence Risk-21 Manual*. San Diego: Specialized Training Services.



# U.S. Department of Justice

United States Attorney
District of Alaska

Federal Building & U.S. Courthouse
222 West 7th Avenue, #9, Room 253
Anchorage, Alaska 99513-7567

Commercial (907) 271-5071
Fax Number (907) 271-3224

April 19, 2013

Reid Meloy
334 Westbourne St.
La Jolla, CA 92037

Re: USA v. James Wells, 3:13-cr-00008

Mr. Meloy,

Bryan Schroder asked that I forward you the enclosed case materials to review:

- Criminal Complaint;
- PowerPoint presentation created by AUSAs Schroder and Cooper;
- Autopsy reports and photos for both victims; — their photos
- Photos of the crime scene (T2 building) and the area around the COMMSTA;
- Photos of the initial search of James Wells' Residence;
- First responder reports;
- Grand Jury testimony;
- James Wells' USCG service record, personnel records and VA medical records;
- Photos from the search of Wells' residence and vehicle and forensic exam of his iPhone;
- Audio recordings and transcripts of interviews with USCG chain of command, T2 staff, T1 staff, victim family and friends, Wells' ex-coworkers, friends and acquaintances; transcripts only of other witnesses and the emergency calls on 4/12/12;
- Audio recordings and transcripts of interviews with James Wells and statements voice mail messages on 4/12/12; and
- Video of the arrival and departure of the blue SUV at T2 and of the main gate.

If you have questions, please call Mr. Schroder at (907) 271-5071.

Sincerely,

KAREN L. LOEFFLER
United States Attorney

Misty Elwood
Misty Elwood
Paralegal to Bryan Schroder, AUSA