UNITED STATES DISTRICT COURT

DISTRICT OF ALASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 3:13-cr-00008-RRB-JDR |
| | ) | |
| Plaintiff, | ) | Anchorage, Alaska |
| | ) | Monday, December 16, 2013 |
| vs. | ) | 9:31 o'clock a.m. |
| | ) | |
| JAMES MICHAEL WELLS, | ) | **EVIDENTIARY HEARING ON MOTIONS** |
| | ) | **TO SUPPRESS (DKTS 122 AND 142)** |
| Defendant. | ) | |
| _____ | ) | |

**TRANSCRIPT OF PROCEEDINGS**

BEFORE THE HONORABLE JOHN D. ROBERTS
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:                 KATHLEEN ANN DUIGNAN, ESQ.
                                   KAREN LOEFFLER, ESQ.
                                   BRYAN D. SCHRODER, ESQ.
                                   U.S. Attorney's Office
                                   222 West 7th Avenue, #9
                                   Anchorage, Alaska   99513-7567
                                   (907) 271-5071

For the Defendant:                 F. RICHARD CURTNER, ESQ.
                                   Federal Public Defender Agency
                                   601 West 5th Avenue, Suite 800
                                   Anchorage, Alaska   99501
                                   (907) 646-3400

Court Recorder:                    SUZANNETTE DAVID-WATERS
                                   U.S. District Court
                                   222 West 7th Avenue, #4
                                   Anchorage, Alaska   99513
                                   (907) 677-6102

Transcription Service:          NODAK ROSE TRANSCRIPTS
                                721 North 19th Street
                                Bismarck, North Dakota  58501
                                (701) 255-1054

Proceedings recorded by electronic sound recording.
Transcript produced by transcription service.

1    ANCHORAGE, ALASKA - MONDAY, DECEMBER 16, 2013

2        (Call to Order of the Court at 9:31 a.m.)

3        (All parties present; defendant present)

4        THE CLERK:  All rise.  His Honor the Court, the

5    United States District Court for the District of Alaska is

6    now in session, with the Honorable John D. Roberts presiding.

7    Please be seated.

8    **HEARING ON MOTION TO SUPPRESS AT DOCKET 122**

9        THE COURT:  We've convened court in Case Number

10   3:13-cr-08, U.S. v. Wells.  Defendant and counsel are

11   present.  I'd like to take up first the matter of the motion

12   at 122, and since the Government has agreed that Mr. Wells

13   had an attorney and has an attorney-client relationship and

14   they acknowledge that the informant was used by them, other

15   than perhaps a transcript, if there is one, of the

16   conversations, where we need -- and we'll have an evidentiary

17   hearing.

18       MR. CURTNER:  Your Honor, we plan to call two

19   witnesses, and they'll both be brief.  Para Upchurch -- Petty

20   Officer Para Upchurch is the one who was recording these

21   conversations on behalf of the Government, and I wanted to

22   call Sue Ellen Tatter who was at that time -- had the

23   attorney-client relationship, briefly just to describe the

24   nature -- that I know it's not really an issue, but I think

25   when we come to a discussion of not just a Sixth Amendment

1   violation, but also a Fifth Amendment due process violation.

2   I think the nature of that relationship and her contact with

3   the Government might be important.  She would be a second

4   brief witness we'd call.

5          THE COURT:  With respect to Para Upchurch, what --

6   what are you probing other than the existence of the

7   attorney-client relationship?

8          MR. CURTNER:  The -- well, the circumstances of her

9   participating on behalf of the Government and circumstances

10  surrounding that.  She wasn't necessarily a volunteer in our

11  opinion, and there was some, I think -- it's not simply a

12  matter of she volunteering to be an informant, there was some

13  pressure, I would say, to have her do this, and she had a

14  close relationship with Mr. Wells.  I think the Court should

15  hear a little bit of those circumstances.

16         THE COURT:  Government have any comments?

17         MS. LOEFFLER:  Yes, Your Honor.  Pardon me.  I'm --

18  Captain Duignan, just so you know, is going to do all the

19  questioning and I'm doing the legal part of it.  So, that's

20  what -- how the division is.

21         My point just relates to the law.  I don't think

22  that it's relevant actually for Ms. Upchurch -- I'm not sure

23  how it relates to any Fifth Amendment claim of outrageous

24  government conduct.  You know, the circumstances in which she

25  decided to do it -- I mean, they're -- they're alleging she

1   was, you know, brutalized, forced, whatever.  There's no

2   affidavit or fact put in their motion bringing that in, and

3   I'm not sure how that relate -- in fact, I don't think it

4   would relate to any legal finding he made.

5           That being said, of course, you know, we'll go

6   forward with anything the Court does.  There's no dispute

7   that -- that the Sixth Amendment -- well, there's no dispute

8   that -- that -- that there was an attorney-client

9   relationship, so I'm not sure why they're putting on Ms.

10  Tatter.  I'm not sure how it relates to anything, and there's

11  no allegation that I've seen in any of the motions about

12  misconduct by the Government.  I don't even know what the

13  factual claim is that the Government did so egregiously wrong

14  that would even raise it.  But that's where we are and the

15  Court -- we'll do whatever the Court, of course, asks us to

16  do.

17          THE COURT:  Mr. Curtner, with respect to not being

18  a volunteer, what prima facie showing do you have that that's

19  the case here?

20          MR. CURTNER:  Your Honor, I think Petty Officer

21  Upchurch would indicate that she was asked several times to

22  participate as an agent for the government, that she at first

23  agreed to and then changed her mind and told her she didn't

24  want to, and then she was contacted again by FBI agents and

25  at that time, agreed to participate as an agent for the

6

Government, and so those are the facts we would submit.

And I think it's important -- and this is sort of a strange area of the law, I think, dealing with the intersection of the Fifth Amendment right to remain silent, the Sixth Amendment right to counsel, and also how those intersect in -- in due process with the intersection of those two amendments. That's -- that's the purpose we bring this motion because it's not -- there's not a clear-cut case that indicates that a Sixth Amendment right would be applied prior to -- to an indictment, but I think in this particular case, it kind of -- it goes around those circumstances.

The fact that Mr. Wells was not only being investigated, but also being prepared for prosecution, and there was that dialogue between his defense counsel and the Government agents and prosecutors, and the fact that even with that knowledge that the Government asked a close friend and associate of Mr. Wells to participate as an agent for the Government while knowing that they were going to charge Mr. Wells and that he had counsel, I think that's that facts the Court has to consider as far as this motion is concerned.

THE COURT: I'll consider your statements a proffer then in order to save time. The examination of Ms. Upchurch will be limited then to the arrangements for her willingness to serve in that capacity as an informant and any pressure that the Government might have put on her. So, we'll go

6

6

1    forward with the evidentiary hearing on that motion.  Mr.

2    Curtner?

3          MR. CURTNER:  Yes, Your Honor.  We'd call Petty

4    Officer Upchurch, please.

5          THE CLERK:  Please walk around the table and stand

6    before me so I can swear you in.  Please raise your right

7    hand.

8          **PARA UPCHURCH, DEFENDANT'S WITNESS, SWORN**

9          THE CLERK:  Thank you.  Please have a seat in the

10   witness box.  Speak into the microphone at all times.  Would

11   you please state and spell your full name?

12         THE WITNESS:  Para Danielle Upchurch.  P-A-R-A

13   D-A-N-I-E-L-L-E  U-P-C-H-U-R-C-H.

14         THE CLERK:  Thank you.

15                    **DIRECT EXAMINATION**

16   BY MR. CURTNER:

17   Q    Petty Officer Upchurch, could you tell the Court a

18   little bit about where you're employed and living now?

19   A    Well, right -- right now, I live in Alameda, California,

20   and I work for Sector San Francisco.

21   Q    And you're in the Coast Guard?

22   A    Yes, I am.

23   Q    How long have you been in the Coast Guard?

24   A    A little more than four years.

25   Q    And what is your rank?

1    A    I'm a Third Class Petty Officer.

2    Q    Now, at one point, were you stationed in Kodiak, Alaska?

3    A    Yes.

4    Q    Do you -- can you remember the dates you were stationed

5    at Kodiak?  Approximately.

6    A    December 2009 until August or September 2013.

7    Q    What type of job responsibilities -- what did you do

8    while you were on Kodiak?

9    A    Oh, I worked -- I was a (indiscernible), so I worked in

10   the rigger shop and I did what I was told to do.  It depended

11   on the season.  I plowed snow and shoveled snow in the

12   wintertime.

13   Q    Let me get -- explain to the Court.  What do you mean by

14   the rigger shop, exactly where were you assigned, and what

15   were your -- some of the responsibilities you had there?

16   A    The rigger shop was attached to the communication

17   station in Kodiak, and so we were responsible for the

18   maintenance on the -- the acreage that (indiscernible - voice

19   too low).

20   Q    The communication station, is that normally known as

21   COMMSTA?

22   A    Yes.

23   Q    And the rigger shop is normally known as T2 to COMMSTA?

24   A    T -- T2 or the rigger shop.

25   Q    And that's where you were working at the time?

1  A    In the rigger shop, that's where I worked.

2  Q    And at that time, did you happen to know James Wells?

3  A    I did.

4  Q    And how long did you know Mr. Wells?

5  A    The whole time.

6  Q    The whole time you were there?

7  A    (No audible reply.)

8  Q    Did you have a -- what kind of relationship did you have

9  with Mr. Wells?

10  A    Well, he taught me my job, everything that I needed to

11  know to work in the rigger shop, and he answered all my

12  questions, and so I felt comfortable asking him questions.

13  So, we worked together.

14  Q    Okay.  And did you have a good working relationship?

15  A    Yes.

16  Q    Did you have any social interactions with Mr. Wells?

17  A    Yes.

18  Q    Okay.  And what -- could you describe what your social

19  relationship was?

20  A    Well, I like Jim and I like his wife Nancy, and it's

21  fairest to say if I had a Kodiak family, they were my family

22  in Kodiak.

23  Q    Did you do social things with them?

24  A    Well, yes.  I'd go to their house from time to time and

25  -- I always offered to help do chores for food, like they

1   know I like to eat at people's houses and so most of the time

2   I would just eat over there and hang out.

3   Q    So, you spent a lot of time over at their home?

4   A    Well, some time.  I mean, it wasn't all the time, it was

5   maybe once a week or less, maybe once every few weeks or -- I

6   mean it wasn't all the time, but I mean I definitely was

7   hoping that -- I mean, could go over there and have a

8   barbecue or something like that.

9   Q    Okay.  Now, do you recall April of 2012 when there was a

10  crime scene and some homicides at your -- where you were

11  working?

12  A    (No audible reply.)

13  Q    And at that time, were you questioned by Coast Guard

14  investigators?

15  A    During the day of the murders, we were -- we were

16  interviewed -- yeah, we were interviewed that day by -- by

17  CGIS and then later that day we were interviewed again I

18  think after the -- the FBI arrived.

19  Q    At what point did either the Coast Guard investigators

20  or the FBI agents ask you to work on their behalf and have

21  contact with Mr. Wells?

22  A    I'm sorry, what's the question?

23  Q    After the murders took place and you had your first

24  contact with the Coast Guard investigators and FBI agents --

25  after that, at some point did they ask you to actually be an

1    agent for them -- to do something for them?

2    A    They did, yeah.

3    Q    Can you describe what -- what that was?

4    A    Well, I -- I can't remember exactly how long after it

5    was that they asked me, but they -- they just asked me if I

6    wanted to help with the investigation, and I said that I

7    would, I did want to help.

8    Q    Did they ask you how they wanted you to help?

9    A    Um --

10   Q    I'm sorry.  Did they tell you what they wanted -- they

11   wanted you to do?

12   A    They did.  I can't remember it all word for word --

13   Q    Mm-hmm (affirmative).

14   A    -- but I know they wanted to record conversations that I

15   would may -- maybe have with Jim.

16   Q    Okay.  So, they wanted you to record conversations just

17   between you and Mr. Wells?

18   A    Yes.

19   Q    When he wouldn't know these were being recorded, is that

20   correct?

21   A    Yes.

22   Q    And did they tell you what type of conversation they

23   wanted you to have with Mr. Wells?

24   A    I don't -- I don't remember exactly what they -- what

25   they said.

1   Q    Was it to ask him questions about the homicide?

2   A    There -- there were a few things -- yeah, they wanted me

3   to ask him parti -- questions sort of around certain topics

4   and -- I remember.

5   Q    So, they gave you a list of topics?

6   A    I remember one in particular.

7   Q    That is?

8   A    Whether Jim used the restroom at the -- the airport.

9   Q    Okay.  And can you recall any other topics, not

10  specifically but in general, that you might have asked him

11  about?

12  A    No, I really don't remember all of them.

13  Q    And so you agreed to help?

14  A    I did, I agreed.

15  Q    And what happened after that?  Did you change your mind?

16  A    I did.

17  Q    Explain that -- how that happened.

18  A    Well, I think a week went by and I had some time to

19  think about it, and I was nervous, but then also I didn't

20  want to regret, I didn't want to feel bad for doing that, so

21  I changed my mind.

22  Q    Why would you have felt bad?  What were you thinking?

23  A    Well, Jim was my friend, and so I just -- I didn't want

24  to do that to my friend, but --

25  Q    Explain.  Do what?

1    A    Oh, record conversations without him knowing.

2    Q    And you felt that was sort of a violation of your own

3    morals or ethics?

4    A    I did.  I just -- I just wanted to sleep good at night

5    for the rest of my life.

6    Q    Okay.  So, you changed your mind.  What happened then?

7    Who did you inform?

8    A    Oh, I went to Coast Guard Investigative Service

9    office --

10   Q    Mm-hmm (affirmative).

11   A    -- and I spoke with Aaron Woods.  I told him that I

12   changed my mind.

13   Q    What was his response to that?

14   A    He said that was okay, that -- you know, that I had that

15   choice to change my mind, but he wanted me to -- he called

16   Anchorage and he wanted me to tell them in person that I

17   changed my mind.

18   Q    And who do you -- who -- who did you tell in person?

19   Did you talk to somebody on the phone?

20   A    I did.  I -- I'm pretty sure it was Darrel -- and I'm

21   sorry, I don't remember his last name.

22   Q    The FBI agent in charge of the investigation there?

23   A    Yes.

24   Q    Okay.  So, you told him you didn't want to do this.

25   A    That's right.

1   Q    And then what -- what was that conversation?  How did

2   that end?

3   A    He said that was fine and it was my choice and he told

4   me to think about it and if I changed my mind, just to let

5   them know.

6   Q    Okay.  So, you changed your mind again to do this?

7   A    Well, I -- I did eventually.

8   Q    Describe how that happened.

9   A    Well, some time went by.  I don't know exactly how much

10  time, quite a bit, and -- well, they -- I just -- it was time

11  for me to leave Kodiak, so I had some furniture that Jim and

12  Nancy had loaned Leah (ph) Henry and myself, and I wanted to

13  return the furniture and I wanted to see Jim again before I

14  left, and we were instructed not to have contact with Jim and

15  Nancy, or if we did have any -- I'd see Nancy from time to

16  time at the commissary, and I would always let them know that

17  I saw Nancy and what we talked about.

18  Q    Now, when you changed your mind, did you inform the

19  investigators that you changed your mind or did they come to

20  see you?

21  A    The day that I -- I left Kodiak -- you know, honestly, I

22  don't remember how that whole day went.  I wish I did, but I

23  don't.

24  Q    Do you remember when you -- you did go visit with Jim?

25  You made a phone call first and that was recorded.  Do you

1  remember that?

2  A    I did -- yeah, I did.  I was at -- from -- I made the

3  phone call from the Coast Guard Investigative Service office.

4  Q    Okay.  And that was to -- to set up that you could visit

5  with Jim?

6  A    (Indiscernible -- voice too low.)

7  Q    And do you remember what date that was?

8  A    I don't remember the date, but I do know that it was my

9  last day in Kodiak.

10 Q    And you don't -- so that was the -- you left that day?

11 A    I left that evening.

12 Q    That evening?  Okay.  So, did you inform the agents that

13 you were willing to do this like that day or was it a few

14 days earlier or --

15 A    It's really hard for me to remember all of the details

16 of -- of how it all happened.

17 Q    Do you recall some of the agents coming to you when you

18 were working at the rigger shop?

19 A    Yes.

20 Q    Okay.  Tell us what happened then.

21 A    You mean after they asked me and I had changed my

22 mind --

23 Q    Mm-hmm (affirmative).

24 A    -- right?  Okay.  So, after I changed my mind, some time

25 went by, and they came -- some -- the FBI, they came to the

1  rigger shop -- or to the COMMSTA and they asked to meet with

2  me in the conference room, and they spoke with me and they

3  shared some things with me, I think just to kind of let me

4  know they weren't just charging Jim, they had sort of

5  reasons; they shared some information with me.

6  Q    And do you remember when that was in relation to when

7  you were leaving Kodiak?

8  A    I don't remember exactly how -- how much time it was

9  before I left Kodiak, but it was -- I don't remember how much

10 time it was.

11 Q    Was it like the day before or a week before?

12 A    I really don't remember that.

13 Q    Okay.  But they were asking you if you would change your

14 mind again?  Is that what -- the nature of their talking to

15 you?

16 A    They shared the information with me -- I can't remember

17 our conversation, I just remember hearing what I -- you know,

18 what I heard, and I think they -- I don't remember exactly

19 what they said, I'm sorry.

20 Q    Okay.  But at the time that they called you in to talk

21 to you at COMMSTA, there was -- that was at T1, right?

22 A    Right.

23 Q    Had you -- you hadn't changed your mind at that point,

24 right?

25 A    No, I didn't change my mind.

1   Q     So, at that point, you were not going to do this, is

2   that correct, before you talked to them?

3   A     That's right.

4   Q     And then they called you up to COMMSTA, T1, to talk to

5   you again --

6   A     Mm-hmm (affirmative).

7   Q     -- and they told you -- they -- they shared some of

8   their reasons why they thought that Jim was a suspect?

9   A     That's right.

10  Q     And that convinced you to go ahead and change your mind

11  again and -- and do these recordings?

12  A     I'm pretty sure that was just a -- it was just think

13  about it -- just for me to think about it more.

14  Q     Well, did you tell them at that meeting that you would

15  do it?

16  A     I don't remember if it was that meeting that I said I

17  would.  I'm -- I really don't remember.

18  Q     The meeting with them -- how many agents were there?

19  A     Total in the room?

20  Q     Yes.

21  A     At least two.

22  Q     Okay.

23  A     I don't remember how many.

24  Q     So, there were two agents or more and -- meeting with

25  you, and that's when you changed your mind again and decided

1    to do this.

2    A    Well, like I said, I don't know if I changed my mind at

3    that meeting.  So -- so much time has gone by, it's hard for

4    me to remember all of this, so --

5    Q    I understand.

6    A    -- but I know that I did change my mind --

7    Q    After that meeting.

8    A    -- after -- after that --

9    Q    After talking to them.

10   A    -- meeting.

11   Q    And that's when you decided to go ahead and --

12   A    To go ahead and (indiscernible - voice too low).

13   Q    And then who was it that actually gave you directions on

14   how to do this?

15   A    It was Aaron Woods.

16   Q    And did he tell you -- give you directions on -- to call

17   Jim and see if you could go over to his home?

18   A    Yes.

19   Q    And he gave -- and he's the one that gave you the topics

20   that he wanted you to discuss with Jim?

21   A    Yes.

22   Q    And did he go ahead and wire you up with a recording

23   device?

24   A    Yes.

25   Q    Okay.  And then you returned that to him after the

1  conversation?

2  A    That's right.

3  Q    And then they asked you to make a few phone calls, I

4  think, after you had left Kodiak, is that correct?

5  A    Aaron Woods didn't ask me to make phone calls after I

6  left Kodiak --

7  Q    Who did?

8  A    -- but they -- but I was asked to do that.

9  Q    By FBI agents or --

10  A    That's right.

11        MR. CURTNER:  Okay.  That's all the questions I

12  have, Your Honor.  Thank you.

13        THE COURT:  Government may inquire.

14                    **CROSS-EXAMINATION**

15  BY MS. DUIGNAN:

16  Q    Good morning, Petty Officer Upchurch.  How are you?

17  A    I'm good.

18  Q    You had mentioned earlier that you had received some

19  instructions about contact with Jim and Nancy Wells.  Who was

20  it who gave you instructions?

21  A    Well, the -- the command instructed all of us not to

22  have any contact with Jim, and then the investigators who

23  were coming from time to time and -- to ask those questions.

24  We were all interviewed from time to time, just random --

25  randomly inter -- with all these different people who were

1   asking us questions.  They also encouraged us if we had any

2   contact -- phone calls or if we, you know, ran -- just ran

3   into them, you know, out in town or anything, to let them

4   know what was said.

5   Q    And you had said in response to questioning by Mr.

6   Curtner that you -- you eventually did agree to wear the wire

7   and -- and do the recorded phone calls, correct?

8   A    That's right.

9   Q    Is part of the reason you did that is because you wanted

10  to see Jim Wells again?

11  A    That's the big reason.  It was my last day in Kodiak

12  and --

13  Q    And the decision to actually wear the wire and do the

14  phone calls was totally yours, correct?

15  A    That's right.

16  Q    You -- you had been offered earlier opportunities to not

17  make the phone calls and -- and you could have done that if

18  you had so chosen.

19  A    I know I could have said, no, I absolutely don't want to

20  do it.

21  Q    Did anybody pay you to make the phone calls?

22  A    No.

23  Q    Were you forced by anyone to make the phone calls?

24  A    No.

25  Q    Did anybody threaten you if you didn't make the phone

1    calls?

2    A    No.

3    Q    And were you ordered to make the phone calls by anybody

4    in your chain of command?

5    A    No.

6           MS. DUIGNAN:  Thank you.  I don't have any further

7    questions.

8           THE COURT:  Redirect (indiscernible)?

9           MR. CURTNER:  Nothing further, Your Honor.

10          THE COURT:  May the witness be excused?

11          MR. CURTNER:  Yes.

12          THE COURT:  All right.  You're free to leave.  You

13   may step down.

14                        (Pause)

15          THE CLERK:  Please remain standing and raise your

16   right hand.  Please stand.

17        **SUE ELLEN TATTER, DEFENDANT'S WITNESS, SWORN**

18          THE CLERK:  Thank you.  Please have a seat.  Speak

19   into the microphone at all times.  Please state and spell

20   your full name.

21          THE WITNESS:  My name is Sue, S-U-E, Ellen,

22   E-L-L-E-N, Tatter, T as in Thomas, A-T-T-E-R.

23          THE CLERK:  Thank you.

24                 **DIRECT EXAMINATION**

25   BY MR. CURTNER:

1    Q    Ms. Tatter, are you currently employed?

2    A    I'm retired from the Federal Defender.

3    Q    How long did you work at the Federal Public Defender

4    Office?

5    A    I worked there for two years in the nineties and for

6    thirteen years in -- in this century.

7    Q    And when did you retire?

8    A    September 30th, 2013.

9    Q    During that time, you were -- what was your position in

10   the office?

11   A    I was an Assistant Federal Defender.

12   Q    And what did that entail?

13   A    It meant representing clients in federal court here and

14   in Juneau.

15   Q    Okay.  Did you -- during that -- while you were employed

16   in that capacity, did you get to -- were you representing Jim

17   Wells?

18   A    Yes.

19   Q    Could you tell us when you first got involved with

20   representing Mr. Wells?

21   A    The first I was aware of the case coming in was April

22   14th, I believe, because my office made sort of -- my

23   colleagues Kevin McCoy and yourself were planning a trip to

24   Kodiak to go see him at the request of the Government.

25   Q    Now, the homicides that he was being investigated for,

1   that was on April 12th, 2012.

2   A    Yes.

3   Q    So, you're talking about a few days after that.

4   A    Yes.

5   Q    And when did you first meet Mr. Wells?

6   A    I met him on April 23rd.

7   Q    And could you describe how that happened?

8   A    My office asked me to go to Kodiak to see him because

9   there were several pieces of work we had to do.  So, Barb

10  Brink and I flew on the morning of April 23rd to Kodiak, then

11  we met with Mr. Wells and also the prosecutor, Dan Cooper.

12  Q    Okay.  So, you and -- and your investigator, Barb Brink,

13  went on April 23rd -- you flew to Kodiak.

14  A    Yes.

15  Q    And that's the first time you met with Mr. Wells?

16  A    Yes.

17  Q    And you -- you also met with the -- Dan Cooper, who was

18  an Assistant U.S. Attorney at that time?

19  A    Yes.

20  Q    Was he in charge of this investigation at that time?

21  A    As far as I knew, yes.

22  Q    Okay.  And what kind of discussions did you have with

23  Mr. Cooper?

24  A    Well, the first discussion we had was that when I -- I

25  was meeting with Mr. Wells in the office of Steve Gray, who's

1  a lawyer there who loaned his office to us, and Mr. Wells and

2  his wife came in to talk to Barb and me.  And while I was

3  there, I got a phone call from Dan Cooper who told me that my

4  investigator, Barb Brink, should stop taking pictures of the

5  car that FBI agents were in, which had been following us, and

6  she went downstairs -- and Dan Cooper told us that that would

7  be very bad for our client when it came to mitigation if we

8  engaged in countersurveillance.

9  Q     And what do you mean by mitigation?  What -- what --

10 what kind of conversation did you have Ms. -- Ms. --

11 A     He had talked about whether this would be a death

12 penalty case or not with me, and so I think he was referring

13 to the fact that this would be bad for -- for the sentencing

14 of a homicide for our client if Barb Brink continued to take

15 pictures of the FBI car.

16 Q     Okay.  So, how long were you in Kodiak on that time?

17 A     Two days.

18 Q     And how many times did you have contact with Mr. Cooper?

19 A     There was that phone call, there was a lengthy meeting

20 with him in the afternoon involving a view of the scene at

21 the Coast Guard, there was also a conversation of about an

22 hour in his car with Barb Brink and myself.  Because it was

23 raining, we -- we -- we couldn't stand outside, so we got in

24 his rented car and talked about the case.

25 Q     And what kind of information did you talk about then?

1    A    He talked about what information he thought was

2    inculpatory, and he was asking us to tell our client to

3    cooperate.

4    Q    Now at that time, was it your knowledge that Mr. Wells

5    did not want to be interviewed by the Government?

6    A    Yes.

7    Q    And you told that to Mr. Cooper?

8    A    I believe so -- oh, I know so.

9    Q    And Mr. Cooper was in contact with you as Mr. Wells'

10   attorney?

11   A    Yes.

12   Q    Was there any question about that was your relationship

13   with Mr. Wells when you talked to Mr. Cooper?

14   A    No.

15   Q    And so how long -- what other conversations did you have

16   with Mr. Cooper?  What else happened while you were there

17   that trip?

18   A    I got a call from Mr. Cooper the next -- later that

19   afternoon, and he wanted us -- he wanted us to be with Mr.

20   Wells the next day, which would have been April 24th, because

21   he had a search warrant for a swab for DNA and I believe some

22   kind of hair samples.  And he -- Mr. Cooper told me to bring

23   Mr. Wells to the Kodiak Police Department office and they

24   would do the samples.  So, Barb Brink and I agreed and

25   arranged to stay an extra day.

1   Q    Okay.  So, this was in the context of executing a search

2   warrant with Mr. Wells.

3   A    Yes.  And --

4   Q    And -- and -- I'm sorry.  Did Mr. -- go ahead.

5   A    And Mr. Cooper showed us the search warrant.

6   Q    And so he actually went through you in order to ask Mr.

7   Wells to participate in a search warrant --

8   A    Right.

9   Q    -- execution.

10  A    Right.

11  Q    Okay.  And did -- what happened after that?  Did you

12  have any other conversation with Mr. Cooper?

13  A    Yes.  We talked about getting one of the Wells vehicles

14  back to the family.

15  Q    What do you mean back by the -- to the --

16  A    I believe that the Government had seized a white truck

17  and a blue SUV, and we -- Mr. Cooper and I talked about how

18  they could get one of those vehicles back.  I think it was

19  the blue car, but I'm not exactly sure whether it was the car

20  or the truck.  And so, Mr. Cooper and I were trying to

21  arrange the Wells family picking up the car that was going to

22  be returned.

23  Q    And again, you were negotiating for that on behalf of

24  Mr. Wells as his attorney?

25  A    Right.

1   Q    And that was clear with Mr. Cooper.

2   A    Yeah, as -- well, I don't know what he thinks, but he

3   treated me like I was an attorney.

4   Q    Did he talk to -- refer to Mr. Wells as your client?

5   A    Often.

6   Q    Okay.  And then -- so, did anything else happen that

7   trip?

8            MS. LOEFFLER:  Your Honor, at this point, I'm going

9   to object to relevance.  The Government has already conceded

10  that there was an attorney-client relationship, so how many

11  questions were you asked -- you know, we'll concede lots of

12  times -- we would always have referred to them, and Mr.

13  Cooper would have, as your client.

14           MR. CURTNER:  Yeah, I just have a few more

15  questions, Your Honor, just to establish the basis and the

16  nature of this relationship.

17           THE COURT:  Does it relate to the use of the

18  informant?

19           MR. CURTNER:  Yes.  Because I think what's clear is

20  that Ms. Tatter represented Mr. Wells from April of 2012 up

21  through and past the time that the informant actually

22  conducted this conversation with Mr. Wells on behalf of the

23  Government and that on numerous times, it was made known to

24  Mr. Cooper and the Government that Mr. Wells did not want to

25  be interviewed without a lawyer.

 1          MS. LOEFFLER:  We would concede that.

 2          THE COURT:  Well, I'll allow you to establish your

 3    record.  You may pursue that line.

 4    BY MR. CURTNER:

 5    Q    Well, just brief -- anything else happen on that

 6    particular trip?

 7    A    Not that I recall it now.

 8    Q    Okay.  Did -- after that, did you still keep in contact

 9    with Mr. Cooper about Mr. Wells, his travel, anything of that

10    nature?

11    A    Yes.  He -- Mr. Cooper wanted us to inform the

12    government when Mr. Wells would travel outside of Kodiak,

13    even though he wasn't under arrest, and we decided that just

14    in the nature of cooperation and to avoid any kind of

15    problems, we would inform Mr. Cooper, and he would ask me to

16    e-mail Mr. Wells' travel arrangements, and I did that.  And

17    he also asked us to make arrangements for Mr. Wells to turn

18    over firearms to the State Troopers.  And he also would

19    inform me if there was going to be a search warrant so that

20    the Wells would either leave the home or be aware that

21    something was coming.

22    Q    Okay.  And so that -- so you had a continuing

23    relationship on behalf of Mr. Wells in negotiating different

24    things with the Government, letting him know when Mr. Wells

25    was going to travel, is that correct?

1    A    That's correct.

2    Q    And the whole time that -- through April 2012 -- at

3    least through August 2012 and beyond that?

4    A    Yes.

5    Q    And was it always clear during the time you represented

6    Mr. Wells that he did not want to be interviewed by

7    government agents without a lawyer present?

8    A    Yes.

9            MR. CURTNER:  Okay.  That's all I have, Your Honor.

10            THE COURT:  Cross-examination.

11                    **CROSS-EXAMINATION**

12   BY MS. LOEFFLER:

13   Q    Ms. Tatter, how many years have you been a criminal

14   defense attorney?

15   A    About thirty-five.

16   Q    Okay.  And during the thirty-five years, I take it

17   you've represented lots of people who have -- before they've

18   been charged -- were targets of an investigation before

19   they're charged.

20   A    Yes.

21   Q    Okay.  And in many of those circumstances -- I take it

22   as a criminal defense attorney, you're fully aware that

23   there's a risk that anybody they talk to might talk to law

24   enforcement, right?

25   A    Anybody the client talks to?

1  Q    Yep.  Could talk to law enforcement.

2  A    I imagine that's true.

3  Q    Well, let me go beyond imagining.  How many -- well, let

4  me ask you.  Have you ever instructed a client you should

5  beware of who you talk to because conversations that you

6  state may then be told to law enforcement?

7  A    Yes.

8  Q    Okay.  That's a pretty common risk, isn't it, of a

9  criminal -- a target of an investigation?

10 A    I'd say not common, but -- but about fifty percent I

11 would -- or less.

12 Q    But it's a risk you address as a --

13 A    It certainly is.

14 Q    -- criminal defense attorney, right?

15 A    Yes.

16 Q    Okay.  So, did you tell Mr. Wells watch out who you talk

17 to because they may talk to law enforcement?

18 A    I don't have present memory of that conversation.  That

19 was often my practice, but I have no present memory of that

20 conversation.

21 Q    So, you're telling us you could have or it's possible

22 you didn't, but it is a common thing that you do.

23 A    Yes.

24 Q    Okay.  And the reason is because the individual that

25 they're talking to may make any statements to law enforcement

1   -- may tell them whatever your client said to law

2   enforcement.

3   A     Yes.

4   Q     Okay.  Now, in this case, as -- as -- all the questions

5   that Mr. Curtner asked you, those are all conversations you

6   had with Mr. Cooper before Mr. Wells was charged, right?

7   A     Yes.

8   Q     And he was charged in February 2013, right?

9   A     Right.

10  Q     Okay.  So, the conversations with Ms. Upchurch that are

11  at issue here were well before he was charged, right?

12  A     They were before he was charged.  I don't know exactly

13  how many months.

14        MS. LOEFFLER:  Okay.  If I can have just a minute.

15  I have no -- I'm sorry -- I have no other questions, Your

16  Honor.

17        THE COURT:  Mr. Curtner, anything else?

18                    **REDIRECT EXAMINATION**

19  BY MR. CURTNER:

20  Q     Ms. Tat -- Ms. Tatter, during the time that you

21  represented Mr. Wells and had discussions with Mr. Cooper,

22  was it your impression that there was no question that Mr.

23  Wells would be charged?

24        MS. LOEFFLER:  Your Honor, I don't know the

25  relevance of her impression.  If she has a direct statement,

1    I'm happy to hear it.

2              THE COURT:  Rephrase your question.

3    BY MR. CURTNER:

4    Q    Did Mr. Cooper ever indicate to you in your

5    conversations that Mr. Wells will be charged in this case?

6    A    He suggested that many times.  He didn't -- he didn't --

7    he -- he didn't use specifics, but he -- he'd say things like

8    when your client is charged, it will be better if he does

9    this or -- so -- so there were quite a few indirect

10   references to him being charged as almost inevitable.

11             MR. CURTNER:  Thank you.  That's all I have, Your

12   Honor.

13             MS. LOEFFLER:  I could follow up.  I'm sorry, Your

14   Honor.

15             THE COURT:  Yes.

16                      **RECROSS-EXAMINATION**

17   BY MS. LOEFFLER:

18   Q    So, basically, you knew Mr. Wells was the target of the

19   investigation, right?

20   A    Yes.

21   Q    And you've represented lots of people who were targets,

22   which is a -- that's the -- let me rephrase this question.

23   So, the target of the investigation is somebody that law

24   enforcement is looking at as somebody they will potentially

25   charge if the investigation comes to fruition, correct?

1  A    Yes.

2          MS. LOEFFLER:  Okay.  Thank you.

3          THE COURT:  You may step down.  Mr. Curtner, do you

4  have any other evidence --

5          MR. CURTNER:  No, Your Honor.  Thank you.

6          THE COURT:  -- on this particular motion?  Does the

7  Government choose to put on evidence on this motion?

8          MS. DUIGNAN:  Your Honor, at -- at this point, I'd

9  like to first introduce what's been marked as Prosecution

10  Exhibit 1.  Defense already has a copy.  They're the

11  recordings of the conversations.

12          THE COURT:  All right.  Any objection to Exhibit 1?

13          MR. CURTNER:  No, Your Honor.

14          THE COURT:  It'll be received as part of this

15  evidentiary hearing.

16      (Government's Exhibit 1 admitted)

17          MS. DUIGNAN:  May I approach, Your Honor?

18          THE COURT:  Yes.  Any other evidence by the

19  Government?

20          MS. DUIGNAN:  In a second, Your Honor, we'd like to

21  call Special Agent Aaron Woods to the stand.

22                          (Pause)

23          THE CLERK:  Walk around the counsel table and stand

24  before me so I can swear you in.  Raise your right hand.

25          **AARON WOODS, GOVERNMENT'S WITNESS, SWORN**

1    THE CLERK:  Thank you.  Please have a seat in the

2    witness box.  Speak into the microphone at all times.  Will

3    you please state and spell your full name?

4    THE WITNESS:  Aaron W. Woods.  A-A-R-O-N

5    W-O-O-D-S.

6    THE CLERK:  Thank you.

7                    **DIRECT EXAMINATION**

8    BY MS. DUIGNAN:

9    Q    Special Agent Woods, where are you currently employed?

10   A    I'm employed at Coast Guard Investigative Service,

11   Resident Agent Office, in Kodiak.

12   Q    And how long have you been assigned there?

13   A    Since 2011.

14   Q    And how long have you been a special agent with the

15   Coast Guard?

16   A    Just approximately eight years.

17   Q    And what involvement have you had in this case?  Have

18   you worked on this case?

19   A    Yes, ma'am.

20   Q    Is one of the things you did on this case was talking

21   with Petty Officer Upchurch?

22   A    Yes, ma'am.

23   Q    And at some point, did you have a conversation with her

24   regarding potentially recording conversations with the

25   defendant?

1    A    I did.

2    Q    Can you explain to the Court how that conversation --

3    how that approach came about?

4    A    Ms. Upchurch approached me sometime in late May and said

5    that the defendant's spouse had contacted her at her

6    residence and implicated that there may be a alternative

7    alibi to Mr. Wells' whereabouts the morning of the homicides.

8    Q    And would that have been late May of 2012?

9    A    Yes, it was.

10   Q    Okay.  So, it was about approximately a month or so

11   after the murders.

12   A    Yes, ma'am.

13   Q    And after you heard that information, what did you

14   discuss with her?

15   A    I didn't discuss anything with her other than just took

16   her general information.  It was several days later that I

17   had contacted her seeking if she would be interested in

18   wearing a recording device and having a monitored

19   conversation with Mr. Wells.

20   Q    And what was her reaction to that at that point?

21   A    At that point, she expressed some reluctance because of

22   the close relationship that they had, but she agreed.

23   Q    Was there a point at which she had changed her mind?

24   A    She did contact me sometime later, I do not know exactly

25   how many -- how many days, it was awhile, and said that she

1   had changed her mind.

2   Q    And was there a point at which she changed her mind back

3   and agreed to do the recording?

4   A    Yeah.  That -- at that conversation that she had with

5   me, I had a general talk with her and told her, you know, to

6   think about it and do what she felt was right, and sometime

7   later she came back and chose to do the recording.

8   Q    And approximately when did you talk with her and prepare

9   her for doing the recording?

10  A    It was August and -- I believe it was the 17th of August

11  that we did the recording.

12  Q    Of what year?

13  A    2012.

14  Q    And were you the agent who prepared her with the

15  recording device to do the recording?

16  A    Yes, ma'am.

17  Q    And were there any instructions that you gave to her at

18  that time?

19  A    Just -- I told her to let -- let a conversation flow,

20  just have a general conversation.  I did -- to my

21  recollection, I -- I told her that not to discuss any -- any

22  information about any legal advice that he had received, and

23  if that came up, to just redirect the conversation another

24  way.

25  Q    Were there any problems -- reported problems with the

1    recordings after they were made?

2    A    No.

3    Q    And did you indeed test the recording devices before she

4    went to make the recordings?

5    A    Yes, I did.

6    Q    Did you listen to the recordings after they were done?

7    A    Yes, ma'am.

8    Q    After they were -- so you can -- everything on the

9    recordings is audible.

10   A    Yes.

11   Q    Was there a point at which you would have been contacted

12   if things had gone wrong with the recordings by Petty Officer

13   Upchurch?

14   A    Uh --

15   Q    Did she have a way to contact you?

16   A    Yes, ma'am.  She had her -- her cell phone with her and

17   I had a visual of the residence when she was inside.

18   Q    Did you receive any telephone calls from her at any

19   point during the recordings indicating there was a problem?

20   A    No, ma'am.

21   Q    And is everything that occurred during the conversations

22   audible on the recordings to your knowledge?

23   A    Yes.  Her conversation and everything within her

24   conversation is audible.

25   Q    Did you promise her anything for her participation?

1    A    No, ma'am.

2    Q    Did you pay her anything?

3    A    No.

4    Q    Did you force her in any way to make the recordings?

5    A    No, ma'am.

6    Q    Did you threaten her in any way?

7    A    No.

8    Q    Did anybody from the command order her to make the

9    conversations to your knowledge?

10   A    Not to my knowledge, no.

11            MS. DUIGNAN:  Thank you very much.

12            THE WITNESS:  Yes, ma'am.

13            THE COURT:  Mr. Curtner?

14                    **CROSS-EXAMINATION**

15   BY MR. CURTNER:

16   Q    Good morning, Agent Woods.

17   A    Morning, sir.

18   Q    So, the homicides were April 12th, 2012?

19   A    Yes, sir.

20   Q    And then the first conversation I think you described

21   with having with Para Upchurch was the end of May?

22   A    I -- I have had other conversations with her, but that

23   -- that one in particular was the one where she came and said

24   that she had had a visit from Mrs. Wells.

25   Q    Okay.  So, she told you about the visit with Mrs. Wells.

1    A    Yes, sir.

2    Q    And then was that the same time that you had this

3    conversation about her acting as an agent and -- and

4    recording conversations with Mr. Wells?

5    A    No, sir.

6    Q    When was that then?

7    A    It was day -- it was days later, and to my recollection,

8    I met her at -- at the Walmart in -- in Kodiak.  She was

9    shopping and I had approached her regarding --

10   Q    Okay.  So, you approached her after the conversation you

11   had in May some -- a few days later?

12   A    Yeah.  It -- I can't -- I don't know exactly how many

13   days, sir, but it was -- it -- I would say a week, two weeks

14   at the most.

15   Q    And then that's when you approached her about recording

16   conversations with Mr. Wells.

17   A    Yes, sir.

18   Q    Now, in between those times, had you discussed the

19   prospect of her wearing a wire with the FBI agents?

20   A    Yes, we spoke about it.  Yes, sir.

21   Q    Okay.  And then so after she came in to see you and told

22   you about the discussion she'd had with Mrs. Wells, then you

23   had -- you had relayed that information to the FBI --

24   A    Yes, sir.

25   Q    -- and there was a joint discussion about her possibly

1    wearing this wire.

2    A     Yes, sir.

3    Q     Okay.  And then -- so then when you -- then you

4    approached her again after that or is that the -- is that

5    when you discussed that with her, in the Walmart?

6    A     The Walmart parking lot meeting was when I discussed

7    whether she would be interested in doing a recording.

8    Q     And so she was reluctant at that time.

9    A     She -- she didn't -- yeah, she expressed some -- some

10   reluctance.  She had a close personal relationship with the

11   Wells' and she seemed conflicted with that.

12   Q     Was there any plan to do it right away then or what

13   happened after that?

14   A     No, sir.  It was -- you know, we did not make any

15   immediate plans.

16   Q     Okay.  So, do you think that's -- are we now into June

17   -- early June or still late May, do you think when you --

18   A     It would have been June time frame approximately.

19   Q     Okay.  And when after that -- after you had that

20   conversation in the Walmart parking lot, when did you -- when

21   did she contact you again?

22   A     Again, I'm not specific on the day, but it was -- it was

23   several days, weeks after that meeting that I had with her in

24   Walmart, to my recollection.

25   Q     Probably still in June?

1    A    I would -- I would guess it to be late -- late June,

2    maybe even July potentially.

3    Q    Now, did you have -- did you record or summarize,

4    memorialize any of the con -- any of these conversations with

5    her?

6    A    No, sir.  They were very short in nature.

7    Q    Didn't write any notes on it or anything?

8    A    No, sir.

9    Q    But you did share the information, again, with the FBI?

10   A    Yes, sir.  I did.

11   Q    And you told them that she had declined -- she had

12   changed her mind and declined to do this.

13   A    Yes, sir.

14   Q    Now, where was that discussion -- what happened after

15   that?

16   A    To my -- to my recollection, we -- there was some

17   discussion with her, like I said, about, you know, think

18   about it.  I believe she was offered to review some evidence.

19   I wasn't privy to what -- what she was advised, and at some

20   point later, she -- she chose to do the recording.

21   Q    So, did the FBI tell you they were going to go ahead and

22   see her again, talk to her, and maybe share some evidence

23   with her to see if she would change her mind again?

24   A    I believe it was a telephone call.  I'm not -- not

25   exactly sure what -- what transpired.

1  Q    But that was your contact with the FBI?  Did they give

2  you that information that they were going to contact her?

3  A    No.  We -- the day that she came into my office and said

4  that she did not wish to make the -- the recording, we had a

5  -- I believe it was a conference call --

6  Q    Mm-hmm (affirmative).

7  A    -- with her on there, and there was some discussion.

8  Q    About seeing if she would change her mind again.

9  A    I believe -- well, for her to think about it and if

10  there was anything that would, you know, make her reconsider,

11  it's your choice, think about it, and do what you feel is

12  right was my --

13  Q    They --

14  A    -- was my -- was my recollection of the conversation.

15  Q    They never shared any information to you about a plan to

16  meet with her and share evidence with her?

17  A    I -- I do not recall having a meeting about that, sir,

18  no.

19  Q    You said you told her not to discuss any legal advice.

20  Why is that?

21  A    Because that's what I was instructed to tell her.

22  Q    By who?

23  A    That would have been Mr. Cooper.

24  Q    Okay.  Mr. Cooper told you do not have her discuss any

25  legal advice.

1    A    I was -- I was instructed that if there was conversation

2    about -- to make sure she steered clear of any conversation

3    regarding attorney-client privilege.

4    Q    Okay.  So, Mr. Cooper gave you the directions to give to

5    Petty Officer Upchurch.

6    A    I believe it was Mr. Cooper, yes.

7    Q    Okay.

8    A    It came through him.

9    Q    And he gave you different topics to ask her to talk

10   about?

11   A    No, that was the -- that was the only thing.  The -- the

12   general topic and the reason for the recording was to talk

13   about the alibi that morning, to see if that came up in the

14   conversation.

15   Q    Okay.  So, she was advised that that would be a topic

16   that she should bring up in the conversation.

17   A    That was what I wanted her to talk about.  Yes, sir.

18              MR. CURTNER:  That's all I have, Your Honor.  Thank

19   you.

20              MS. DUIGNAN:  We have nothing further, Your Honor.

21              THE COURT:  You may step down.  Any other evidence

22   by the Government?

23              MS. DUIGNAN:  No, Your Honor.  Ms. Loeffler is

24   going to be doing the argument.  (Indiscernible) switch

25   seats.

1    THE COURT:  All right.  Parties ready to proceed

2  with that aspect of it?

3    MR. CURTNER:  Yes, Your Honor.

4    THE COURT:  You may do it.

5                  **DEFENDANT'S ARGUMENT**

6    MR. CURTNER:  Well, Your Honor, I think this is the

7  evidence.  Mr. Wells was clearly represented by counsel, Mr.

8  Wells clearly through counsel advised the Government that he

9  did not want to be interviewed by the Government or any

10  agents of the Government, that Ms. Upchurch was a reluctant

11  at best participant and she was an associated and a friend of

12  Mr. Wells, and in spite of the fact obviously the Government

13  knew that Mr. Wells was represented, they circumvented that

14  by having a friend, a confidante of Mr. Wells act on their

15  behalf even though they knew he didn't want to discuss the

16  case with the Government or any of their agents, even though

17  he was advised by counsel not to do that, even though he had

18  an attorney.  They circumvented that by getting Para Upchurch

19  to work as their agent.

20    And so I think that, you know, it's a -- all these

21  circumstances go to violating Mr. Wells' right to counsel,

22  violating his right to remain silent, and that was clearly

23  what he had invoked, and -- and the juxtaposition of those

24  rights circumventing those is really a due process violation

25  as well.

1      So, I think you have to look at those circumstances

2  collectively and -- and that -- see that this is a violation

3  of Mr. Wells' constitutional right -- to circumvent under

4  these circumstances his -- his invoke -- invocation of his

5  right to remain silent, have an attorney present, made clear

6  very many times to the Government.  It was just circumvented

7  in this case, and that's why we brought this motion.  Thank

8  you.

9      THE COURT:  I'm not clear on understanding your

10 statement violation of right to counsel.  I understand the

11 advice of not to talk and Ms. Tatter was not clear whether

12 she had actually told him not to talk to anybody, and

13 understand that Miranda gives you the right to remain silent

14 and the right to have your attorney present.  That situation

15 is where you're talking to a government agent because of the

16 inferred or assumed pressure that law enforcement puts on a

17 person.  Now, I'm not sure the right to counsel -- may be a

18 violation of advice to counsel, but I don't -- I don't see it

19 as a right to counsel.  Can you explain that?

20     MR. CURTNER:  Well, Your Honor, it's -- because

21 when Mr. Wells continuously -- even if he was a target of

22 investigation, when he clearly indicates to the Government

23 that I do not want to interact with the Government except

24 through counsel, that's his right, and he informed them of

25 that and they knew about that.  And so that's where, you

1   know, it -- it becomes that interaction with an agent

2   circumventing and it becomes, I think, a violation --

3   constitutional violation.

4           So, it's why it's -- it's not a -- you know, it

5   would have been a more clear violation if he had been

6   charged, but obviously he was going to be charged, that was

7   inevitable.  And -- but I think the fact that he made it so

8   clear that he did not want to have any interaction with the

9   Government without the advice of counsel being available,

10  that was always clearly made to the Government.  That's --

11  you know, that's what makes this a -- you know, violating his

12  invocation of those rights.

13          THE COURT:  When you talk about Mr. Wells making it

14  clear, you're referring to the -- the April interview -- one

15  of the sessions where he invoked his right?

16          MR. CURTNER:  He invoked his right as early as

17  April 13th, 2012, and we -- that's in the record from prior

18  hearings, and since that time, he had been -- as -- as of

19  April 14th, he had been in contact with the Government

20  through counsel as a -- as soon as -- as early as April 23rd

21  is when Ms. Tatter was meeting with him in person and having

22  these conversations with Mr. Cooper, and there was always --

23  as she indicated, Mr. Cooper many times said that he could

24  cooperate and that would make it easy, especially at

25  sentencing.

1    And so -- and it was always clear that the -- Mr.

2   Wells did not want to interact with the Government unless

3   through counsel.  And I think that's what makes this

4   different than other types of cases of this nature.

5        THE COURT:  So, you're relying upon what Ms. Tatter

6   may have told Mr. Cooper about the defendant not wanting

7   interaction.

8        MR. CURTNER:  Yes.  I think it was always clear to

9   the Government as they -- as they -- in their opposition,

10  they recognize that there was an attorney-client

11  relationship.  And there was never any question during all

12  the discussions with Mr. Cooper that Mr. Wells did not want

13  to interact with the Government except through counsel.

14       THE COURT:  Have you found any cases that indicate

15  that the Government should not rely upon someone to tell them

16  what the defendant said after he's once invoked his rights

17  under <u>Miranda</u>?

18       MR. CURTNER:  No, I haven't any -- this is a unique

19  case, I think, Your Honor.  I don't think I've found any

20  circumstances that clearly fit these facts on all fours.

21       THE COURT:  Thank you.  Government?

22                 **GOVERNMENT'S ARGUMENT**

23       MS. LOEFFLER:  Your Honor, actually, I want to

24  relate sort of like one fact to each one of the amendments

25  that the defendant's raised.

1    First of all, this case isn't unique at all.  It's

2    very common that aft -- when somebody's being investigated,

3    whether they have an attorney or said, you know, I'm not

4    talking to you, that the Government goes around and tries to

5    interview anybody that they've spoken to or puts a wire on

6    them.  I mean, that's common police tactics acknowledged in

7    lots of cases.

8    Now, let me turn to the two things.  The defendant

9    has alleged a violation of the Fifth Amendment and the Sixth

10   Amendment.  There are two different standards, and both

11   standards are easily put aside in this case.

12   Let me turn to the Sixth Amendment.  Right in their

13   brief on page four, it states:

14   "The Sixth Amendment becomes applicable only when

15   the government's role shifts from investigation to

16   accusation."

17   And the Government noted the Sixth Amendment only -- only

18   applies when he's charged.  So, there is no Sixth Amendment

19   violation here.

20   Now, the defendant did cite Irwin and claimed that

21   it stood for the proposition that the Sixth Amendment applies

22   prior to charging.  That's not the case, that's not what

23   Irwin says, and on page 1185 where they cite it, let me quote

24   you the first sentence of the section:

25   "Irwin first contends Wisdom's post-arrest

1          approaches constituted a gross subversion of his

2          Sixth Amendment rights."

3   That was a post-charging case.  The court in <u>Irwin</u> never said

4   that the Sixth Amendment applies prior to charging.  And in

5   that case, agents went and tried to convince him against his

6   attorney's advice to continue to cooperate with them without

7   the attorneys present, had conversations with him without his

8   attorney, which everybody acknowledged was -- was wrong, and

9   then the court found that there was no prejudice, and so they

10  dismissed it.

11          But here, in fact what you heard is that any

12  conversation with him from the Government, you know, when

13  they -- nobody ever tried to undermine the relationship, and

14  Mr. Cooper, when they wanted to try to convince him to

15  cooperate, went through his attorney.

16          Anyway, so the Sixth Amendment has nothing to do

17  with the motion the defendant filed.  So, let's turn to the

18  Fifth Amendment.

19          And the Government acknowledged in our response you

20  could have such an interference with attorney-client

21  relationship that you could possibly have a Fifth Amendment

22  violation.  Now, the defendant cited no case where the court

23  found that, but it is a possibility.  But that's an

24  outrageous government conduct claim, and that requires proof

25  of gross misconduct that's virtually never granted, and only

1   the most intolerable conduct fits that, and that's from our

2   brief on page eight.  And not only has the defendant not

3   alleged any misconduct in this case, every action by the

4   Government in this case was completely proper and

5   professional.

6          They went to somebody, they didn't say that you had

7   to -- I don't even know if they had tried to convince her,

8   Ms. Upchurch, that it would have violated the defendant's

9   rights at all, but this was, you know, completely proper

10  investigative work and doesn't meet each of the legal

11  standards which are fairly clear the law; it is not a murky

12  area.  Thank you.

13          THE COURT:  Any reply?

14                  **DEFENDANT'S REBUTTAL ARGUMENT**

15          MR. CURTNER:  I just want to emphasize, Your Honor,

16  it's the intersection of the Fifth and Sixth Amendment.  And

17  what makes this case different is that when -- some other

18  cases where a Sixth Amendment violation has been alleged,

19  that's when a person waives his Fifth Amendment privilege,

20  can invoke his Fifth Amendment privilege if he talks to law

21  enforcement, even though he has an attorney.

22          This is a unique case where the defendant clearly

23  invoked his Fifth Amendment privilege, clearly the Government

24  knew that, and -- and still managed to question him about his

25  alibi through their agents and circumventing their attorney.

1  I think it's that intersection of the Fifth and Sixth

2  Amendment rights that makes this a violation.

3       THE COURT:  I will order a transcript of the

4  proceedings for the benefit of the District Court and any

5  appeal that might be taken.  Once that's received, then the

6  motion will be deemed submitted.  So, I'm ready to move on to

7  the next motion which is at 142.  Do you want any recess

8  before we proceed with that?  That's oral argument.

9       MS. LOEFFLER:  We're switching teams again, Your

10  Honor, and so you'll have Mr. Schroder for that.

11                          (Pause)

12       **HEARING ON MOTION TO SUPPRESS AT DOCKET 142**

13       THE COURT:  The text order indicates oral argument

14  on 142 to suppress physical evidence.  The parties should be

15  prepared to discuss whether Search Warrant 251 and 252 are

16  overly broad, whether the agents exceeded the scope of the

17  search warrants as to what items or information were seized,

18  and whether the good faith exception applies to these search

19  warrants.  Mr. Curtner, I'll give you a chance to go first.

20  It's your motion.

21                  **DEFENDANT'S ARGUMENT**

22       MR. CURTNER:  Thank you, Your Honor.  And

23  specifically addressing your questions, Your Honor.  Of

24  course, I think Search Warrants 251 and 252 are really

25  covered by U.S. v. Comprehensive Drug Testing, and -- and I

1  think that this is sort of the nature of our Fourth Amendment

2  jurisprudence now is when the Government looks -- gets search

3  warrants for electronic data, that there has to be some

4  restrictions on that, and that's what the <u>Comprehensive Drug</u>

5  <u>Testing</u> case teaches us.  And what's wrong in this particular

6  case is that the warrant is not tailored to include only

7  specific items and relevant items, and so I think that

8  addresses both the being overly broad and also having

9  exceeded the scope.

10       Now, I think the proof of that and the real problem

11  of those search warrants is that they were speci -- they were

12  drafted to look at evidence of the crime, and that they were

13  looking for photographs of a firearm that could have been the

14  murder weapon, they were looking for information about

15  purchase of a firearm that could have been the murder weapon,

16  but obviously they went beyond that and they went through all

17  the data in all the electronic devices, including the cell

18  phones.

19       And the proof of that is that in their 404(b)

20  notice, they indicate information that might be used if Mr.

21  Wells testifies that was gathered pursuant to the search

22  warrant from his electronic data that was not part of -- not

23  anything to do with the homicide investigation itself, this

24  -- this speaks now to his character under 404(b).

25       The proof of this is that through their search

warrant and all through this electronic data, they never did

get any information that was -- that they were looking for

under -- pursuant to the affidavit; that is, evidence of the

homicide.  And they have now used -- because it is overbroad

and it's not tailored to specific relevant information, it

can be used and has been used to get character evidence

against Mr. Wells, and potential character evidence.

        And that's, I think, an example of why those two

search warrants are in violation of Comprehensive Drug

Testing, despite the -- the court in -- in that case and then

we cited another case recently from the Western District of

Washington where discovery -- or evidence was suppressed

under those types of warrants, and under -- under Leon and

the good faith exception.

        The Washington case cites that and says that, you

know, it's -- it -- the good faith exception does not apply

in this kind of circumstance where a search warrant is

overbroad and -- and allows basically free access to all

electronic data.  That's about -- that -- the Leon case does

not say that there's no exception to the Fourth Amendment.

        So, those are the cases we're relying on in that

context, and I don't know if the Court wanted us to address

the -- I think everything else has been briefed pretty

thoroughly.  If the Court had any other questions as far as,

you know, the other issues we raised -- this is a unique

1    case, I think, in -- all the search warrants that were issued

2    over a long period of time, so it raises some unique issues

3    about staleness, about probable cause.

4        But I did want to focus the Court on one thing, and

5    one of the problems we're having to deal with in this kind of

6    investigation, these many search warrants and not having all

7    the discovery that I think the Court ordered in order to

8    completely go through these different types of motions.

9        In -- in our reply to this particular motion, we

10   include some exhibits, and I'll just address that briefly.

11   The linchpin of the search warrants and the investigation

12   that were outlined in the search warrants is this blue

13   vehicle that was identified as Mr. Wells' family car.  And

14   there's no other evidence that puts him at the crime scene.

15   There's no physical evidence, there's no eyewitnesses, the

16   only thing that could put -- possibly put him at the crime

17   scene is the -- and it's set forth in the search warrants --

18   is that his vehicle was seen there -- or allegedly seen

19   there.

20       After the Court -- and the Magistrate gets those --

21   that information in search warrants, we find out late in

22   discovery that there are at least FBI agents and experts

23   analysis say that you can't identify that vehicle.  Those are

24   the exhibits we had attached in our reply.  I think it just

25   demonstrates --

1    THE COURT:  Well, they didn't say exactly that.

2  They said they couldn't identify it.

3    MR. CURTNER:  Well, they couldn't -- in fact, they

4  said it was impossible.  I think if you look --

5    THE COURT:  No, they didn't say that either.

6    MR. CURTNER:  That -- in fact that the Quantico lab

7  said in a letter that was just recently discovered, not only

8  -- the -- the video not only could make a conclusion that the

9  car in the video is the same as the suspect's car impossible,

10  it also makes the conclusion that the class characteristics

11  of the vehicle's make and model not viable.  That's at

12  Exhibit U.  And it uses the word -- the Government's report

13  uses the word impossible, even as to class characteristics

14  much -- much less the specific vehicle.

15    So, that kind of information that we're getting now

16  that the Magistrate didn't have is I think -- illustrates

17  some of the problems when the Court reviews the four corners

18  of the search warrants with this new information and why we

19  need I think any information -- any discovery that relates to

20  the foundation and the basis of these search warrants.

21    THE COURT:  Let me ask you about the good faith

22  exception.  Does it apply when the allegation is that the

23  officers exceeded the scope of the search warrant?

24    MR. CURTNER:  Yes.  Yes.  And I think that's what

25  Comprehensive Drug Testing and the other case we cite, the

1  recent District Court case out of the Western District of

2  Washington address, and I think they specifically address

3  that.  In those circumstances, a search warrant is facially

4  invalid and it's not protected by Leon.

5         And as far as the good faith exception to, for

6  example, the blue vehicle, I think that that falls under the

7  other limitation of Leon that says that when -- if the

8  Government is reckless in their application, that that

9  doesn't save a good faith exception.  In this case, for the

10  Government to allege that this is the blue vehicle that

11  belongs to Mr. Wells in their investigation to the Magistrate

12  Judge, that is -- and then they have information that you

13  can't say that -- it's impossible to say that -- that that's,

14  I think, reckless in the sense that as part of the other

15  search warrants that we've attached.

16         THE COURT:  I'll hear from the Government.  Mr.

17  Schroder?

18                   **GOVERNMENT'S ARGUMENT**

19         MR. SCHRODER:  Your Honor, may it please the Court.

20  Let me start with a couple of things that Mr. Curtner said.

21  One, about the blue SUV note e-mail, I believe he's talking

22  about that goes along with a -- goes along with a report from

23  the FBI lab.  I think the Court's memory of that is accurate,

24  that -- indeed, I think the -- the -- the reviewer or the

25  person writing the report used the word impossible, but I

1    think what he said is it's impossible for him to do it based

2    on the quality of the video -- video, and then he follows up

3    by saying but if you take this to somebody who is a car

4    expert, they may be able to do something with that.  So, I

5    think the Court's memory of that is accurate.

6          Let me correct one other thing or just clear up one

7    other thing.  The investigation of the defendant's cell phone

8    did not only happen based on the search warrant.  That was

9    the second look at the cell phone.  The first look at the

10   cell phone happened with the consent of the defendant right

11   about the time -- 13th or 14th of -- of April, and it was in

12   that review based upon the consent of the defendant that

13   there were -- there were issues in there related to the

14   prostitution matter that we discussed at the bail hearing,

15   Your Honor, and that's what we're talking about in the 404(b)

16   notice.

17         So, the 404(b) notice doesn't have anything to do,

18   at least in my memory from what's cited by Mr. Curtner, with

19   anything that was uncovered based upon Search Warrant 252.

20         So -- now let me go back to -- now back to the

21   start here.

22         Your Honor, I understand what Mr. Curtner talks

23   about with CDT, and I'll talk about that in a minute, but it

24   seems to me your initial question, which was -- was the

25   warrants -- were the warrants overly broad, is not a CDT

1  technical issue.  That's an issue of how the document was

2  drafted.  Was there sufficient -- if you go back and look at

3  the Spilotro case that was cited by the defendant, cited by

4  us, and there's some subsequent cases which basically ask was

5  there P.C. to support the specific request and were the

6  requests specific enough for the person searching to

7  differentiate between the types of documents?  And I would

8  argue to the Court that this search -- those search warrants

9  meet that criteria.

10       And I'm prepared, Your Honor -- I -- I've got lists

11  of which -- which paragraphs support the probable cause of

12  each -- you know, of each of those things that are requested,

13  but instead of going through that, what I would point out to

14  the Court, if you go to starting about paragraph forty-five

15  of both of those search warrants -- affidavits, all the

16  paragraphs that come after that are specifically designed to

17  support what is requested -- the items requested to be seized

18  in the -- in the search warrants.  So, I think it's well

19  supported by probable cause.

20       And then if you go and look at whether they were

21  adequately described so that somebody doing the search could

22  separate out the documents, again, I would argue that they

23  were, and I think this is very significantly different from

24  Spilotro where basically what the -- the defendant -- or the

25  government in that case asked for kind of all documents

related to thirteen different violations of statute, and the court said that's too general. That is not what we have here.

Specifically what was asked for in those -- and -- and -- and I'd ask the Court to focus on the entire document; specifically, the Attachment B's to those search warrants, not -- not just the -- the affidavit, which is what the defendant provided. If you look at the Attachment B's, what we asked for was firearms related, and very specific, photos of a forty-four magnum, researching -- info on researching and acquiring firearms or sellers of firearms. Very specific. Finance records related to banks, credit unions, S and L's, credit cards. It didn't ask for any pay information, we didn't ask for any utility information, very specific towards what was supported by probable cause in the affidavit, specific e-mail accounts and specific travel just on and off Kodiak.

So, my argument -- I -- I -- I think what we provided in that affidavit and in the specificity of the search warrant is significantly different from what was done in Spilotro and was well differentiated allowing for that search.

I would recommend the Court maybe go back and look at something I think is more akin to a later case of U.S. v. Adjani, A-D-J-A-N-I, 452 F.3d 1140, and specifically pages

1    1148 and 49.  That's a Ninth Circuit case from 2002.  I think

2    you'd find that's much closer to what we have here where they

3    identified the specific crime, they provided the identity and

4    the nature of the items to be seized, with an extensive

5    statement of probable cause, and I -- I think that's what we

6    have here.

7            Just one other point.  I mean, the defendant in

8    their -- their -- their discussion kind of downplays the idea

9    of fine -- the issue of finance as a motive.  And I think

10   when you go back and you look through the -- look through the

11   -- those paragraphs we've cited in the -- in the affidavit,

12   you'll see that motive was a significant poten -- financial

13   -- a financial motive was potentially significant in this

14   case, and again, was well supported.

15           Now, Your Honor, going back to the -- to Mr.

16   Curtner's discussion of CDT, and as we know, CDT has a long

17   history, the last of which was where the Court kind of pared

18   back on some of the original requirements of CDT.  So, citing

19   CDT, I don't think, really gets us where we -- we need to be

20   there.

21           The search warrant affidavit put a process in place

22   for handling the computer and storage data, and that process

23   was to seize the electronic media and access it off-line, and

24   that was supported and that's required by Ninth Circuit law

25   under the Hill case, that we support that in the affidavit,

1  and we did and retained a forensic image and then returned

2  the hardware, which we did.

3       The process was explained to the Court, and the

4  Court signed off on that.  So, I would make the point that

5  you really can't exceed the scope of -- scope of the -- of

6  the warrant if it's specifically described how the process is

7  going to be in the Court at the time the judicial officer

8  signs off on that and the agents followed it, and I don't

9  think there's been any allegation that the agents did not

10  follow the process as it was laid out in the affidavit, a

11  process which has been approved in previous cases in the

12  Ninth Circuit, and I go back to U.S. v. Hay, for example, and

13  U.S. v. Hill.  Hay is 231 F.3d 630, 637 is the specific page,

14  and -- and Hill, 459 F.3d 966, and 976 is the specific page.

15       I think after -- after we look at CDT and we see

16  how it was pared back in the final iteration of CDT, this

17  kind of process is still good law in the Ninth Circuit.

18  That's what was put into the affidavit, and that was what was

19  followed.

20       Now, getting to the Court's question about good --

21  the good faith exception.  Certainly, we feel the good faith

22  exception applies.  If you go back to the Spilotro case cited

23  by both parties, as part of the sillo -- sillo -- Spilotro

24  case, that court cites a case of U.S. v. Acardo (ph), 749

25  F.2d 1477, and the specific pages are 1480 and 81, that's an

1    Eleventh Circuit case, Your Honor, but it was again

2    specifically cited by the Spilotro court, that talks about

3    applying good faith exception in a case -- it wasn't a

4    computer case, it was a large document case, and what the --

5    you know, I think what we're -- what we get from that is

6    whether the agents acted in good faith is not driven by a

7    final determination by the Court of whether a document was

8    overbroad, but it's driven by the conduct of the agents, and

9    that's what needs to be examined.

10    And in a part of it, they said the agents didn't

11    proceed dishonestly or -- or recklessly, they worked with

12    prosecutors on a fairly complex case to put together a

13    warrant, which was approved by a magistrate, and the agents

14    -- the term they used -- took every step that they could

15    reasonably be expected of them, and I -- I would argue that

16    that's exactly what happened in this case.  The agents took

17    every step that was reasonably expected of them.  So, I think

18    the good faith exception would apply.

19    Now, back to your case you specifically mentioned

20    to Mr. Curtner, could the good faith exception potentially

21    apply to an -- not an overbroad, but a case where they

22    exceeded -- the agents exceeded the scope of the search, I

23    think it probably could.  I mean, I think if you had a

24    situation where agents went in with a limited search warrant

25    and grabbed everything they could, I think you probably would

1  have an argument that the good faith exception would not

2  apply in that case, but that's not our case.

3       The facts of this case are that the agents applied

4  the process that was listed in the affidavit, and they --

5  there's been no argument that they have not applied that

6  process and because of that, the good faith exception should

7  apply.  Thank you.

8       THE COURT:  Does the good faith exception apply

9  when (indiscernible) alleged by the defense occurred during

10 the execution of the warrant?  Is that what you're saying it

11 does?

12      MR. SCHRODER:  I'm sorry.  I -- Your Honor, that --

13 that specific question is not something I researched, but it

14 seems to me it would apply if the agents, you know,

15 overstepped the bounds.  But in this case, they didn't, so I

16 -- I -- I'm not sure that the legal question -- the facts

17 don't lead us to that legal question.  I mean, I'd be happy

18 to look it -- look at it more for you, Your Honor, but I'm

19 speaking without benefit of research on that.

20      THE COURT:  Let me ask you about Search Warrant

21 252, the authority to search the iPhone.  The warrant is for

22 the person of Wells.

23      MR. SCHRODER:  Yes, sir.

24      THE COURT:  Attachment A include property to be

25 searched, it lists the person, clothing, and luggage of

1  Wells.  Could you -- could the Court say that as a result of

2  the way the search warrant was drafted, the Government could

3  seize the iPhone, but they also should need an additional

4  search warrant to actually search it?

5      MR. SCHRODER:  Well, I would -- I'm trying to find

6  that full copy, Your Honor; 252.  Here we go.  Let me go back

7  and look at the Attachment A and Attachment B.  I mean,

8  certainly, the -- the -- the -- I mean, I -- I guess I would

9  argue the person to be searched was Wells in fact, Your

10 Honor, but I think it's fairly clear when you read the

11 Attachment B of what was going to be done -- and it wasn't

12 just -- it wasn't just an iPhone, Your Honor.  I mean, I

13 think that's another point.  An iPhone search happened based

14 on that, but there were -- there were numerous other items

15 that Mr. Wells had on him at the time that were electronic

16 storage media, and all of those were searched according to

17 the protocol put into the affidavit under the -- under the --

18 the limited description that you find in Attachment B.

19     THE COURT:  Well, where -- where the phone was

20 actually searched, what procedure was put in place to protect

21 the Fourth Amendment rights of the defendant?  The actual

22 search of the phone.  Was there any protocol set forth in the

23 search warrant?

24     MR. SCHRODER:  Well, Your Honor, there was not a

25 specific search protocol or description of how the electronic

1   search would take place, but it -- again, it's my

2   understanding that that -- that is not required to protect

3   the Fourth Amendment rights of the defendant.  I think if you

4   go and you look at the Hay case I cited -- I believe it's

5   Hill.  Now, Hill talks about how that is not a requirement

6   that there be a specific search protocol.

7           Now, that changed with the original CDT, but again,

8   my understanding is as CDT has been pared back, that a

9   specific search protocol -- computer search protocol is not

10  required, and I think that takes us back to the precedent of

11  Hill.

12          THE COURT:  Assuming arguendo that the scope of the

13  search was exceeded, that would mean, wouldn't it, that the

14  items outside the scope of the warrant should have been

15  pursued by another search warrant?  If you exceed the scope

16  of the search warrant basically to get at items that you

17  should have sought with a different search warrant.

18          MR. SCHRODER:  I mean, as a general proposition, I

19  would agree with that, Your Honor, but I just -- I'm not

20  seeing any place in here where the search warrant was

21  exceeded.  I mean, the agents -- the -- the protocol was that

22  the agents would take the -- take the hardware and it would

23  get reviewed, and that's -- that's exactly what they did.

24          THE COURT:  Reviewed pursuant to the search warrant

25  or pursuant to some other protocol?

1          MR. SCHRODER:  No, pursuant to the search warrant.

2          THE COURT:  Search Warrant 251 and 252 uses similar

3   language in Attachment B for the property to be seized under

4   -- number one, it requests to seize all electronically stored

5   information including the bullet points that are listed from

6   A to H.  Does this mean that there's no limit to what the

7   items can be seized?  In other words, the word including is

8   not exclusive.  It doesn't say only those items, but it says

9   all electronically stored information including the A to H.

10  So, how would that guide an executing officer in determining

11  what the limits are in searching?

12         MR. SCHRODER:  Well, I think it gives -- I'd make a

13  couple of points, Your Honor.  Giving the examples guides the

14  person who's doing the search warrant to -- to -- to

15  understand what they can seize and not seize, and the -- the

16  affidavit, which is available also, describes to the person

17  searching what the -- you know, what the -- the events were,

18  what the crime was, so they understand what's -- how they

19  need to limit the search.

20         Also, I think if you look through -- again, this is

21  not a specific issue that I have prepared for the Court, but

22  I think if you look at Adjani and -- to my memory and maybe

23  those -- some of those other cases I've cited, you'll see

24  that the courts approved a similar type -- similar type of

25  language, which is kind of a -- kind of a example-based

1  language.  I don't think what you'll find in any of those

2  that the courts are saying the differentiation has to be

3  specific, that they have -- you have to tell the -- the

4  person doing the search you can only seize this document.

5  It's just got to be limited.  It can't be -- it can't be too

6  general, but it doesn't have to be perfectly specific either.

7          THE COURT:  All right.  Anything else before I hear

8  from Mr. Curtner?

9          MR. SCHRODER:  Not from the Government, Your Honor.

10  Thank you.

11          THE COURT:  Reply?

12              **DEFENDANT'S REBUTTAL ARGUMENT**

13          MR. CURTNER:  Just very briefly, Your Honor.  I

14  think you focused on the issues in Search Warrants 251 and

15  252, and the fact that there was no protocol and the fact

16  that it was overbroad and that the Government exceeded the

17  scope of that.  And so I think that -- I just want to refer

18  the Court to -- in our reply brief, pages sixteen and

19  seventeen, addressing these issues.

20          I think Spilotro supports our position, as well as

21  CDT and -- the the other case we cited from the Seattle

22  court.  So, I think it's -- it's before the Court.

23          THE COURT:  All right.  I'll ask that a transcript

24  of the arguments be prepared for the benefit of the Court,

25  and then once that's received, then this motion will be

1    deemed submitted.

2            MR. SCHRODER:  Thank you, Your Honor.

3            THE COURT:  When is our next status hearing set?

4            MR. CURTNER:  We have a hearing in front of Judge

5    Beistline today, but with this Court, I don't think we have

6    one, so --

7            MR. SCHRODER:  Yep.

8            THE CLERK:  No, there's not one set (indiscernible

9    - away from microphone).

10           THE COURT:  All right.  I'll give further direction

11   to the matters that are pending if we need argument or

12   anything else to be filed, further briefing.  It is my intent

13   to try to wrap up the motions to preserve the trial date, so

14   you should work toward preparing for that trial date -- the

15   date it's set.  And counsel are aware of the hearing before

16   Judge Beistline.  If there's anyone participating then on the

17   telephone, you'll need to call in again, what, just prior to

18   that hearing?  They call the same number --

19           THE CLERK:  Yes, Your Honor.

20           THE COURT:  -- so that you can hear that

21   proceeding.

22           MR. CURTNER:  Judge, I just want to bring up one

23   more thing.  We have -- I think today is the date for motions

24   in limine, and we have -- we -- I guess that would make it

25   more our motion; it's not been opposed by the Government --

1   that we have until Thursday to file the motions in limine,

2   and if we could have the Court's approval of that, we'll have

3   those filed Thursday of this week.

4           THE COURT:  Government have a position on that?

5           MR. SCHRODER:  Your Honor, I would just request

6   that we -- we would not oppose it, we'd just set the -- back

7   the -- the motion in limine deadline for Thursday.  The

8   Government and the defense will both provide our motions on

9   that day.

10          THE COURT:  You're just simply saying preserve your

11  time frame --

12          MR. SCHRODER:  Yes.

13          THE COURT:  -- to respond.

14          MR. SCHRODER:  Right.  No, I'm just saying we

15  should all -- if we're -- we're going to set back the date to

16  provide motions in limine until Thursday --

17          THE COURT:  It should apply to you, too.

18          MR. SCHRODER:  -- it should be for both parties.

19          THE COURT:  I understand.

20          MR. SCHRODER:  Right.  Yes.

21          THE COURT:  All right.  We'll -- I'll agree to

22  that.

23          MR. CURTNER:  And one -- I guess one other thing.

24  We had filed a motion to -- to extend our time for notice of

25  experts, and I don't think that's been ruled on.  And so

1   we're -- we're prepared to file our notice of experts once

2   the Court approves our motion for late filing on that.  I

3   think that was -- not those two.

4            THE COURT:  I'll look for that.  I've not read

5   that.

6            MR. CURTNER:  Thank you.

7            THE COURT:  Thank you for your participation today.

8   We'll be in recess.

9            MR. SCHRODER:  Thank you, Your Honor.

10            THE CLERK:  All rise.  Your Honor is now adjourned

11   -- Court now stands adjourned subject to call.

12        (Proceedings concluded at 10:59 a.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                              INDEX

 2                                                    Further
                      Direct    Cross    Redirect    Recross  Redirect
 3
   WITNESSES FOR THE
 4  DEFENDANT:

 5  Para Upchurch          7       19

 6  Sue Ellen Tatter      21       29        31         32

 7  WITNESSES FOR THE
     GOVERNMENT:
 8
 9  Aaron Woods           34       38

10
   EXHIBITS:                                       Marked    Received
11
   GOVERNMENT:
12
13  1   CD of recorded conversations                          33

13                                                          Page
14
   Motion to Suppress at Docket 122:
15
16  DEFENDANT'S ARGUMENT:  Mr. Curtner                          44

17  GOVERNMENT'S ARGUMENT:  Ms. Loeffler                        47

17  DEFENDANT'S REBUTTAL ARGUMENT:  Mr. Curtner                 50
18
19  Motion to Suppress at Docket 142:

20  DEFENDANT'S ARGUMENT:  Mr. Curtner                          51

21  GOVERNMENT'S ARGUMENT:  Mr. Schroder                        56

22  DEFENDANT'S REBUTTAL ARGUMENT:  Mr. Curtner                 67

23

24

25
```

1                          **CERTIFICATE**

2      I certify that the foregoing is a correct transcript from the
       electronic sound recording of the proceedings in the above-
3      entitled matter.

4

5      ___/s/ D. Kathleen Stegmiller_____        ____12/20/2013___
       D. Kathleen Stegmiller, Transcriber               Date
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25