1  ALEJANDRO N. MAYORKAS
   United States Attorney
2  JOHN S. GORDON
   Assistant United States Attorney
3  Chief, Criminal Division
   PAUL G. STERN (No. 162734)
4  RANEE A. KATZENSTEIN (No. 187111)
   Assistant United States Attorneys
5  Major Frauds Section
        1100 United States Courthouse
6       312 North Spring Street
        Los Angeles, California 90012
7       Telephone: (213) 894-0715/2432

8  Attorney for Plaintiff
   United States of America
9

10

11              UNITED STATES DISTRICT COURT

12        FOR THE CENTRAL DISTRICT OF CALIFORNIA

                                  SA CR 01 56 AHS
13 UNITED STATES OF AMERICA   )   No. CR 00-485(A)-JSL
                              )
14          Plaintiff,        )   GOVERNMENT'S MOTION IN
                              )   LIMINE TO EXCLUDE TESTIMONY
15          v.                )   OF DEFENDANTS' EXPERTS, DRS.
                              )   MARK MILLS AND J. REID
16 JOHN BUSSELL and           )   MELOY, REGARDING MENTAL
   LETANTIA BUSSELL,          )   CONDITION
17                            )
            Defendants.       )
18                            )   Hearing Date: 3/19/01
                              )   Hearing Time: 11:00 a.m.
19                            )
                              )
20

21      Pursuant to Federal Rules of Evidence 402, 403, 608(b), 702,

22 and 704(b) and Federal Rules of Criminal Procedure 16(b),

23 plaintiff United States of America, through its attorney of

24 record, hereby moves _in limine_ for an Order by the Court to

25 exclude the testimony of two experts, namely, Dr. Mark Mills,

26 designated by defendant John Bussell, and Dr. J. Reid Meloy,

27 designated by defendant Letantia Bussell.  This Motion is made on

28

1 | the following grounds: (1) as to expert J. Reid Meloy, defendant
2 | Letantia Bussell has failed to provide reciprocal discovery as
3 | required by Fed. R. Crim. P. 16(b); (2) the proffered testimony
4 | of Drs. Mills and Meloy is neither sufficiently reliable nor
5 | helpful to the trier of fact to warrant admission under Federal
6 | Rule of Evidence 702; (3) the proffered testimony of Dr. Mills
7 | improperly pertains to the ultimate issue of defendant's mental
8 | state; (4) the proffered testimony of Drs. Meloy and Mills will
9 | serve only to confuse and mislead the jury; and (5) the proffered
10 | testimony of Dr. Meloy will serve improperly to attack the
11 | credibility of witnesses by means of extrinsic evidence.

12 | This Motion is based on the attached memorandum of points
13 | and authorities, the attached exhibits, the files and records in
14 | this case, and such further argument or evidence as may be
15 | presented at or before the hearing on this motion.

16 | DATED: March 1, 2001.

Respectfully submitted,

ALEJANDRO N. MAYORKAS
United States Attorney

JOHN S. GORDON
Assistant United States Attorney
Chief, Criminal Division

PAUL G. STERN
Assistant United States Attorney

Attorneys for Plaintiff
United States of America

2

**TABLE OF CONTENTS**

| Description | Page(s) |
|---|---|

Table of Authorities . . . . . . . . . . . . . . . . . . . . iii

MEMORANDUM OF POINTS AND AUTHORITIES . . . . . . . . . . 3

I    INTRODUCTION . . . . . . . . . . . . . . . . . 3

II   FACTUAL BACKGROUND . . . . . . . . . . . . . . . 6

    A.   Defendants' Contemplated Advice
       of Counsel Defense . . . . . . . . . . . . . 6

    B.   Dr. Mills' Report . . . . . . . . . . . . . . 8

    C.   Proffer As To The Testimony of
       Dr. J. Reid Meloy . . . . . . . . . . . . . . 13

III  ARGUMENT . . . . . . . . . . . . . . . . . . . 13

    A.   Relevant Legal Standards . . . . . . . . . 13

        1.   Admissibility of Expert Testimony . . . . . . 13

        2.   Admissibility of Mental
           Condition Evidence . . . . . . . . . . . 15

    B.   The Proffered Testimony of Dr. Mills and Dr.
       Meloy Does Not Meet The *Daubert* Threshold of
       Reliability . . . . . . . . . . . . . . . . 17

        1.   Dr. Mills' testimony is unreliable because
           it rests on a faulty premise and a flawed
           application of this premise to the facts
           of this case . . . . . . . . . . . . . . . 17

        2.   Defendant Letantia Bussell has failed to
           provide the specific opinion or bases of
           Dr. Meloy's proffered testimony, there by
           precluding any reliability
           determination . . . . . . . . . . . . . . 19

    C.   Dr. Mills' Proffered Testimony Is Inadmissible
       Under Rule 704(b) Because It Reflects An Opinion
       As To Whether Defendant Had The Requisite Mental
       State To Commit The Offenses Charged . . . . . . . 20

-i-

D.   Dr. Mills' and Dr. Meloy's Proffered Testimony
Should Be Excluded Under Rule 403 . . . . . . . . . . .  21

E.   Dr. Meloy's Testimony Is Inadmissible Under
Rule 608(b) . . . . . . . . . . . . . . . . . . . . . .  22

IV

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . .  24

-ii-

# TABLE OF AUTHORITIES

**CASES**                                                              **PAGE(S)**

United States v. Bussey,
    942 F.2d 1241, (8th Cir. 1991),
    cert. denied, 504 U.S. 908 (1992) . . . . . . . . . 5, 23

United States v. Frisbee,
    623 F. Supp. 1217, (N.D. Cal. 1985) . . . . . . . . 17, 21

United States v. Juvenile Male,
    864 F.2d 641, (9th Cir. 1988) . . . . . . . . . . . 16, 20

United States v. Kessi,
    868 F.2d 1097, (9th Cir. 1989) . . . . . . . . . . . 4, 21

United States v. Morales,
    108 F.3d 1031, (9th Cir. 1997) . . . . . . . . 16, 21, 22

United States v. Rahm,
    993 F.2d 1405, (9th Cir. 1993) . . . . . . . . . . . . 17

United States v. Scholl,
    166 F.3d 964, (9th Cir.)
    cert. denied, 528 U.S. 973 (1999) . . . . . . . . . . 15

United States v. Sinigaglio,
    942 F.2d 581, (9th Cir. 1991) . . . . . . . . . . . . 15

United States v. Twine,
    853 F.2d 676, (9th Cir. 1988) . . . . . . . . . . . . 15

Daubert v. Merrell Dow Pharmaceuticals.
    509 U.S. 579, (1993) . . . . . . . . . . . . . . Passim

Daubert v. Merrell Dow Pharmaceuticals,
    43 F.3d 1311, (9th Cir. 1995) . . . . . . . . . . . . 17

Kumho Tire Co., Ltd. v. Carmichael,
    526 U.S. 137, (1999) . . . . . . . . . . . . . . . 4, 19

Provident Life and Accident Insurance Co.
v. John A. Bussell, MD,
    203 F.3d 832 (9th Cir. 1999) . . . . . . . . . . . . 11

Exhibit B - Part 1
Page 5 of 50

Case 3:13-cr-00008-SLG   Document 247-2   Filed 01/07/14   Page 5 of 50

**AUTHORITIES (CON'T)**

**CASES**                                                        **PAGE(S)**

FEDERAL STATUTES

18 U.S.C. §§ 371, 152, 1956 and 26 . . . . . . . . . . . . . . 6

Fed. R. Evid. 104(a) . . . . . . . . . . . . . . . . . . . 22

Fed. R. Evid. 403 . . . . . . . . . . . . . . . . . 5, 15, 21

Fed. R. Evid. 608(b) . . . . . . . . . . . . . . . . . 5, 23

Fed. R. Evid. 702 . . . . . . . . . . . . . . . . . . . . Passim

Fed. R. Evid. 704 . . . . . . . . . . . . . . . . . . . . 15

Fed. R. Evid. 704(b) . . . . . . . . . . . . . . . . . 4, 20

Federal Rules of Evidence

402, 403, 608(b), 702, and 704(b) . . . . . . . . . . . . . . 2

U.S.C. §§ 7201 and 7206(2) . . . . . . . . . . . . . . . . . 6

-iv-

## MEMORANDUM OF POINTS AND AUTHORITIES

### I

### INTRODUCTION

Defendants John and Letantia Bussell have each provided notice that they intend to call an expert psychologist, Drs. Mark Mills and J. Reid Meloy respectively, to testify on two different issues of mental condition in their cases-in-chief. Defendant John Bussell has proffered that he will call Dr. Mills to testify that, because John Bussell was suffering from depression and cognitive impairment between 1993-1997, he was "more apt to accept the advice of experts" during this time period and "much more likely to have acceded to the formulations and plan of any outside authority figure," such as that proposed by "Messrs. Sherman and Beaudry." (Report of Dr. Mills at 6, attached hereto as Exhibit A). Defendant Letantia Bussell has proffered that she will call Dr. Meloy to testify that co-conspirators Jeffrey Sherman and Robert Beaudry exhibited "traits and behaviors" characteristic of "the psychopathic personality." (February 20, 2001 Letter from Nathan Hochman, Esq., at 4, attached hereto as Exhibit B).

By this motion, the government seeks to exclude the proffered testimony of Drs. Mills and Meloy on several grounds. As to Dr. Mills' contemplated testimony, a review of his report indicates, first, that he has constructed a conclusory psychological explanation, without considering substantial contrary evidence, to underwrite John Bussell's principal defense

3

to the charges in this case, namely, that he "passively" followed "the directions of Messrs. Sherman and Beaudry" in concealing his assets and causing false tax returns to be filed and thereby lacked the required fraudulent intent necessary to establish his guilt for the offenses charged. The application of the central premise of Dr. Mills' forensic analysis -- namely, that individuals with depression and cognitive impairment "are more apt to accept the advice of experts" (Exh. A at 6) -- to the specific facts of this case lacks the requisite indicia of evidentiary reliability necessary to warrant the admission of this testimony under Fed. R. Evid. 702. <u>See</u> <u>Kumho Tire Co., Ltd.</u> <u>v. Carmichael</u>, 526 U.S. 137, 149 (1999) (Rule 702 "establishes a standard of evidentiary reliability" and trial judge must exercise "gatekeeping" function to ensure that testimony has "a reliable basis in the knowledge and experience of [the relevant] discipline.")(quoting <u>Daubert v. Merrell Dow Pharmaceuticals</u>. 509 U.S. 579, 592 (1993)).

Second, Dr. Mills' proffered testimony should be excluded because it effectively constitutes an opinion "as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged," thereby violating Fed. R. Evid. 704(b)'s prohibition of "opinion or inference" on the ultimate issue of mental state. Fed. R. Evid. 704(b); <u>United</u> <u>States v. Kessi</u>, 868 F.2d 1097, 1108 (9th Cir. 1989) (expert testimony as to defendant's ability to form the requisite intent to commit the crimes charged inadmissible under Fed. R. Evid.

4

704(b)). Further, Dr. Mills' testimony should be excluded under
Fed. R. Evid. 403 because it presents a substantial risk that the
jury will allow the judgment of Dr. Mills to substitute for its
own on the question of defendant John Bussell's mental state at
the time he committed the charged crimes, thereby needlessly
confusing the jury in its deliberations on that issue.

As to the testimony of Dr. Meloy, while defendant Letantia
Bussell has cursorily indicated that Dr. Meloy will testify as to
the traits of the "psychopathic personality" and their relation
to the actions of co-conspirators Sherman and Beaudry, she has
neither produced a report identifying Dr. Meloy's specific
opinions as to this issue nor enumerated in any detail the facts
or data upon which Dr. Meloy will base his opinion. Given that
defendant Letantia Bussell has failed to comply with her
reciprocal discovery obligations under Rule 16(b), Dr. Meloy's
testimony should be excluded on this basis alone. In view of the
absence of any specific proffer as to the content or bases of Dr.
Meloy's opinion, defendant Letantia Bussell has also not met her
burden of showing that Dr. Meloy's expected testimony is either
sufficiently relevant or reliable under Fed. R. Evid. 702 to
qualify as admissible. Daubert, 509 U.S. at 589. Finally, to
the extent that defendant Letantia Bussell intends to use Dr.
Meloy's expert testimony to attack the credibility of Messrs.
Sherman and Beaudry as witnesses, use of such extrinsic expert
testimony to attack the credibility of a witness is barred under
Fed. R. Evid. 608(b). United States v. Bussey, 942 F.2d 1241,

5

1253 (8th Cir. 1991) cert. denied, 504 U.S. 908 (1992).

For all these reasons, and for the reasons stated below, this Court should exclude the proffered expert testimony of Dr. Mills and Dr. Meloy.

## II

### FACTUAL BACKGROUND

A.  Defendants' Contemplated Advice of Counsel Defense

Defendants John and Letantia Bussell are charged in a seventeen-count First Superseding Indictment ("the Indictment") with one count of conspiracy to conceal assets and make false statements in bankruptcy, ten substantive counts of bankruptcy fraud, one count of money laundering, and five counts of tax evasion and causing false tax returns to be filed, in violation of 18 U.S.C. §§ 371, 152, 1956 and 26 U.S.C. §§ 7201 and 7206(2), respectively.  Trial in this matter is currently set for March 27, 2001.

In essence, the First Superseding Indictment alleges that the Bussells entered into a conspiracy with their attorneys, defendant Sherman and unindicted co-conspirator Robert Beaudry ("Beaudry"), to defraud the bankruptcy court by diverting their assets into a number of corporations using nominee shareholders and officers, which enabled the Bussells to conceal their ownership interest in these assets from the bankruptcy trustee. By utilizing this structure of nominee corporations set up by their attorneys from January 1993 through March 1995, the Bussells were able to present themselves to the bankruptcy court

6

in March 1995 as having no disposable assets and thereby
succeeded in fraudulently discharging a debt to the Internal
Revenue Service in excess of $1 million, as well as liabilities
in excess of $3 million to other creditors, at the conclusion of
their bankruptcy case in August 1995, while continuing to retain
control over the profits of defendant Letantia Bussell's
dermatology practice as well their equity in a 4-unit condominium
located at the Stein Eriksen Lodge in Park City, Utah.

In addition to the bankruptcy fraud scheme identified above,
the Indictment also alleges that defendant John Bussell caused
false corporate tax returns to be filed for the years 1993
through 1995, substantially understating the gross receipts
flowing to one of the nominee corporations, BBL Medical ("BBL"),
which was utilized by the Bussells in connection with their
bankruptcy fraud scheme. The Indictment further alleges that the
Bussells' attorneys, defendant Jeffrey Sherman and unindicted co-
conspirator Beaudry, advised and assisted defendant John Bussell
in causing these false corporate tax returns for BBL for the
years 1993-95 to be filed in November and December 1997.

On January 22, 2001, unindicted co-conspirator Beaudry
entered a plea of guilty to a four-count Information, charging
him with aiding and abetting the Bussells in evading the payment
of taxes listed on their March 1995 bankruptcy filing and in
causing false corporate tax returns for BBL for the tax years
1993-95 to be filed. On February 1, 2001, co-defendant Sherman
entered a plea of guilty to counts one and twelve of the

7

Exhibit B - Part 1
Page 11 of 50

Indictment, namely, conspiracy to commit bankruptcy fraud and aiding and abetting the Bussells in evading the payment of taxes listed on their March 1995 bankruptcy filing.

It is anticipated that one of the key factual issues at trial will be whether defendants John and Letantia Bussell can establish that they relied in good faith on the advice of their attorneys and charged co-conspirators, Jeffrey Sherman and Robert Beaudry, in engaging in the course of conduct described in the Indictment. In order to convict the Bussells of the charged offenses of bankruptcy fraud and tax fraud, the government must introduce evidence of the Bussells' specific intent fraudulently to conceal assets in bankruptcy and deliberately to make false and fraudulent statements on their individual and corporate tax returns. If the Bussells can establish that they acted in good faith reliance on the advice of  counsel in this connection, they may thereby succeed in showing that the government failed to meet its burden of proof with respect to the required <u>mens</u> <u>rea</u> element of intent to defraud or willfulness.

B.    Dr. Mills' Report

On February 1, 2001, defendant John Bussell notified the government of his intention to call Dr. Mark Mills to testify as an expert regarding his mental condition during the time period of his offense conduct. On February 16, 2001, defendant provided the government with a forensic report summarizing Dr. Mill's "psychiatric impressions" after meeting with defendant Bussell for five hours. Following a detailed recitation of John

8

1  Bussell's personal history from 1988 through 1997 (described by
2  Dr. Mills as "star-crossed"), which appears to derive almost
3  exclusively from defendant Bussell's own narrative (Exh. A at 3-
4  5), Dr. Mills summarizes the main portion of his findings in the
5  following paragraph of his report:

> First, you asked me to consider the potential
> relationship between Dr. Bussell's depression and his
> apparent passivity in following the directions of
> Messrs. Sherman and Beaudry. In this regard, it
> probably makes sense to consider this question
> concurrently with the second question you posed about
> the relationship between his cognitive impairment and
> his apparent passivity. As discussed above, John's
> depression, diagnosed independently and long before the
> present litigation was contemplated, dates back at
> least from 1993 and perhaps earlier ([Letantia Bussell]
> believes that his symptoms began in 1988 when the baby
> died in the operating room fire) when he sustained his
> back injury, became disabled and had to stop working. .
> . . [Medical reports and records] all strongly
> support the notion that John has had both major
> depression and secondarily cognitive problems dating
> from at least 1992 and 1993. While there are no
> universal rules in psychiatry, it is <u>almost</u> <u>always</u> true
> that individuals with depression and individuals who
> are suffering from cognitive impairment are more apt <u>to</u>
> <u>accept</u> <u>the</u> <u>advice</u> <u>of</u> <u>experts</u> than they would if all
> their critical faculties were available to them. Thus,
> John's psychiatric condition during the relevant
> periods of this case (roughly 1993-97) would have made
> it much more difficult for him to exercise independent
> judgment and would have made it much more likely to
> have acceded to the formulations and plans of any
> outside authority figure.

21  (Exh. A at 6) (emphasis added).

22      Aside from the above-stated psychiatric conclusion, Dr.
23  Mills also provided the following subsidiary opinions in his
24  report: (1) owing to their highly specialized training,
25  physicians typically adopt an attitude of "professional deference
26  to others' expertise;" accordingly, as "the tax advice of Mr.

28                                    9

Sherman and the estate planning advice of Mr. Beaudry would have
been completely outside John's [Bussell's] area of expertise [ ],
he would, as is common with any medical subspecialty, have
deferred to them, recognizing their expertise" (Exh. A at 6-7);
(2) John Bussell's training as an anesthesiologist, subjecting
him to the ultimate authority of the lead surgeon, would have
further "made him unusually deferent to outside professional
advice" (Exh. A at 7); and (3) John Bussell's psychological test
results on the MMPI and MMPI-2 indicate that he does not have
"any propensity toward psychopathic deviance (Pd.), the scale
that measures antisocial traits such as conspiring to defraud
creditors and/or the government" (Exh. A at 8).

In reaching his "psychiatric" conclusions, Dr. Mills ignored
a number of relevant considerations. First, while Dr. Mills
simply assumes in his report that John Bussell's alleged
depression dates back to "when he sustained his back injury,
became disabled and had to stop working" (Exh. A at 6), it is
highly doubtful whether John Bussell was ever genuinely disabled
either by a back injury or (as he alleged) by his subsequent
depression. This is evidenced both by his stockpiling of
multiple disability insurance policies, which enabled him to
collect in excess of $50,000 a month in tax-free disability
benefits between 1993-95, and by a civil jury's finding after a
lengthy trial (involving the testimony of several experts) in
November 1997 in Provident Life and Accident Ins. Co. and John
Hancock Mutual Life v. John Bussell, MD, Nos. CV 94-1756 and 94-

10

5987-RAP, that he was not totally disabled.[1]

Second, Dr. Mills failed to address substantial evidence, which arose in the presentation of defendant's disability claims, that John Bussell is a malinger, who is inclined to exaggerate both his physical and mental difficulties. Consider, for example, Dr. Raymond Friedman's February 1994 psychiatric evaluation of John Bussell, following two meetings with defendant lasting over 6 hours:

> Dr. Bussell is a 47-year-old anesthesiologist [who] is not suffering from a serious mental condition at the present time. He has no difficulties with concentration, memory or attention, although he wishes us to believe so and is exaggerating his responses on testing in order to appear as if he has difficulty in these areas. The injury of September 2, 1992 did not cause psychiatric sequelae, nor result in a need for psychiatric treatment. Dr. Bussell's reports of diminished mental functioning indicate significant exaggeration, and I have discussed some of the possible hypotheses which might explain this exaggeration. In short, I view him as attempting to convince us that he is not capable of performing his usual and customary work as an anesthesiologist due to these mental problems. The findings from examination do not corroborate these allegations, and instead reveal that he concentrates, attends and remembers very well and that he is capable of performing his usual work.

(Dr. Friedman's Psychiatric Evaluation of Dr. Bussell, dated February 11, 1994, attached hereto as Exhibit D). See also Provident Life and Accident Insurance Co. v. John A. Bussell, MD, 203 F.3d 832 (9th Cir. 1999) ("substantial evidence supports the jury verdict the Bussell was not disabled as defined by the policies" in that "[s]everal doctors testified that Bussell's

---

[1]A copy of the Ninth Circuit's Memorandum Disposition in this matter, which summarizes the outcome of the trial proceedings, is attached hereto as Exhibit C.

11

claim was subjective, and a reasonable jury could have concluded
he was not telling the truth.") (unpublished Mem. Dispo.,
attached as Exh. C).

    Finally, notwithstanding being provided with a copy of the
government's Motion For a Finding of the Applicability of the
Crime-Fraud Exception for his review, Dr. Mills simply elected to
ignore the substantial evidence included therein that defendant
John Bussell was not "relatively passive," but played an active
role in implementing the bankruptcy and tax fraud schemes set
forth in the First Superseding Indictment (Exh. A at 1-2, 6).
The evidence of John Bussell's active involvement in the
fraudulent scheme was clearly spelled out in the government's
Motion and included the following conduct, unaddressed by Dr.
Mills: (1) recruiting nominees and then lying to them about the
purpose of the corporate reorganization of their dermatology
practice (Gov. Mot. at 11-12); (2) secreting the profits from the
dermatology practice into a concealed, non-interest bearing bank
account (the Sanwa account) in nominees' names (Gov. Mot. at 11);
(3) causing nominees' signatures to be forged on tax returns,
checks and signature cards of corporations which they effectively
owned and controlled (Gov. Mot. at 12); (4) taking possession of
over $1 million in profits (which they subsequently moved
offshore) from the concealed Sanwa account in January 1996
through depositing of a forged check, after discharging $4
million in debt in bankruptcy in August 1995 (Gov. Mot. at 13);
(5) depositing rental checks from the Stein Eriksen condo

                            12

directly in UHL's account, their supposed lender (Gov. Mot. at 15); (6) making numerous false statements on their bankruptcy petition and in subsequent bankruptcy proceedings (Gov. Mot. at 18-22); and (7) causing false 1993-95 tax returns to be filed for their nominee corporation, BBL, which understated its gross receipts and were executed under the forged signature of Andre Boutboul, whom the Bussells knew was not the responsible corporate officer for BBL (Gov. Mot. at 23-25).

C.    Proffer As To The Testimony of Dr. J. Reid Meloy

On February 20, 2001, counsel for defendant Letantia Bussell notified the government that she intends to call forensic psychologist Dr. J. Reid Meloy, whose testimony will include (but not necessarily be limited to) the following:

> Explaining psychopathy and the expected traits and behaviors of the psychopathic personality; and relating such expected traits and behaviors to the actions of Jeffrey Sherman and Robert Beaudry. The defense has not received nor does it expect to receive a report from Dr. Meloy. The bases for his testimony, at this time, include his training and experience, as documented in his resume, and his review of the First Superseding Indictment and the Government interviews of Jeffrey Sherman and Robert Beaudry.

(Exh. B at 4).

### III

### ARGUMENT

A.    Relevant Legal Standards

1.    Admissibility of Expert Testimony

The admissibility of expert testimony is governed by Fed. R. Evid. 702.  That Rule provides as follows:

> If scientific, technical, or other specialized

13

knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Fed. R. Evid. 702.

In <u>Daubert</u>, the Supreme Court held that the Federal Rule of Evidence 702 imposes a special obligation upon a trial judge to "ensure that any and all scientific testimony . . . is not only relevant, but reliable." <u>Daubert</u>, 509 U.S. at 589. <u>Daubert's</u> assignment of a "gatekeeping" function to trial judges with respect to the reliability of expert testimony rests on the premise that expert witnesses are granted testimonial latitude unavailable to other witnesses, a latitude justified only on the "assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline." <u>Id.</u> at 592.

In setting out the "gatekeeping" function of the trial judge with respect to expert testimony, <u>Daubert</u> further identified a non-exclusive list of specific factors which may properly bear upon the court's determination of relevance and reliability. These factors include: (1) whether a theory or technique can be, or has been, tested; (2) whether it has been subjected to peer review and publication; (3) whether, with respect to a particular technique, there is a known or potential rate of error; (4) whether there are standards controlling the technique's operation; and (5) whether the theory enjoys general acceptance within a relevant scientific community. <u>Id.</u> at 592-94. Finally, even if the proffered testimony satisfies the relevance and

14

reliability requirements of Rule 702, it must also satisfy the balancing test of Fed. R. Evid. 403. _Id._ at 595; _United States v. Scholl_, 166 F.3d 964, 971 (9th Cir.) _cert._ _denied_, 528 U.S. 873 (1999). A district court's decision to exclude expert testimony is reviewed for an abuse of discretion. _Scholl_, 166 F.3d at 972.

2. Admissibility of Mental Condition Evidence

Mental condition evidence is admissible not as an affirmative defense to excuse the defendant from responsibility for his acts, but to negate specific intent when that is an element of the charged act itself. _United States v. Twine_, 853 F.2d 676, 679 (9th Cir. 1988). However, district courts have wide latitude to exclude mental condition expert testimony, _United States v. Sinigaglio_, 942 F.2d 581, 584 (9th Cir. 1991), and Rule 704 of the Federal Rules of Evidence strictly limits the admissibility of such expert testimony. Rule 704 provides:

> (a) Except as provided in subdivision (b), testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact.
>
> (b) No expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto. Such ultimate issues are matters for the trier of fact alone.

Fed. R. Evid. 704.[2]

_____

[2]According to the legislative history, the purpose of Rule 704(b) "is to eliminate the confusing spectacle of competing expert witnesses testifying to directly contradictory conclusions as to the ultimate legal issue to be found by the trier of fact.

15

Rule 704(b) prohibits expert testimony as to whether the defendant possessed the requisite intent to commit a specific crime. <u>United States v. Juvenile Male</u>, 864 F.2d 641, 648 (9th Cir. 1988). "A prohibited 'opinion or inference' under Rule 704(b) is testimony from which it necessarily follows, if the testimony is credited, that the defendant did or did not possess the requisite mens rea." <u>United States v. Morales</u>, 108 F.3d 1031, 1037 (9th Cir. 1997). Such expert testimony is admissible only if it merely "support[s] an inference or conclusion that the defendant did or did not have the requisite mens rea, so long as the expert does not draw the ultimate inference or conclusion for the jury and the ultimate inference or conclusion does not necessarily follow from the testimony." <u>Id.</u> at 1038 (allowing expert testimony that a defendant charged with willfully making false entries in a union ledger had a weak grasp of bookkeeping principles, because to hold otherwise "would exclude an expert's opinion on any matter from which the factfinder might infer a defendant's mental state"). Specifically, such testimony is admissible if limited to the experts' "diagnoses, the facts upon which those diagnoses are based, and the characteristics of any mental diseases or defects the experts believe the defendant possessed during the relevant time period," staying clear of

Under this proposal, expert psychiatric testimony would be limited to presenting and explaining their diagnoses, such as whether the defendant had a severe mental disease or defect and what the characteristics of such a disease or defect, if any, may have been." <u>United States v. Morales</u>, 108 F.3d 1031, 1035 (9th Cir. 1997) (quoting S. Rep. No. 225, 98th Cong., 2d Sess. 230 (1984), reprinted in 1984 U.S.C.C.A.N. 3182, 3412).

16

"directly or indirectly opining on the [ultimate] issue of specific intent." United States v. Frisbee, 623 F. Supp. 1217, 1223 (N.D. Cal. 1985). Expert testimony should not invade the province of the jury or "address matters within the understanding of the average juror." United States v. Rahm, 993 F.2d 1405, 1412 (9th Cir. 1993).

B.  The Proffered Testimony of Dr. Mills and Dr. Meloy Does Not Meet The *Daubert* Threshold of Reliability

    1.  Dr. Mills' testimony is unreliable because it rests on a faulty premise and a flawed application of this premise to the facts of this case

A review of the report submitted by Dr. Mills makes clear that his expert opinion does not satisfy the Daubert standard requiring that it reflect a "reliable basis in the knowledge and experience of his discipline," thereby qualifying as "scientific knowledge." Daubert, 509 U.S. at 592; see also Daubert v. Merrell Dow Pharmaceuticals, 43 F.3d 1311, 1315 (9th Cir. 1995) (opinion on remand). Rather, the report rests on an entirely unsupported, general premise, presented as little more than a commonplace of "folk-psychology," that "it is almost always true that individuals with depression and individuals who are suffering from cognitive impairment are more apt to accept the advice of experts than they would if all their critical faculties were available to them." (Exh. A at 6).

The report contains no reference to relevant psychiatric or psychological literature in support of this general premise, that is, "appropriate validation, i.e., 'good grounds,' based on what is known." Daubert, 509 U.S. at 590. Dr. Mills does not

17

Exhibit B - Part 1
Page 21 of 50

identify any peer studies or publications corroborating this alleged "universal truth," nor is there any indication that Dr. Mills' hypothesis as to the connection between depression/cognitive impairment and reliance on experts has ever been subject to empirical testing. Indeed, Dr. Mills does not even distinguish between different types of depression or cognitive impairment in his diagnosis of defendant Bussell, preferring to rely on the more general "notion that John has had both major depression and secondarily cognitive problems dating from at least 1992 or 1993." (Exh. A at 6). Even a cursory familiarity with some of the behavioral traits associated with particular forms of depression -- including, for example, social withdrawal, agitation, irritability, a tendency to respond to events with angry outbursts of blaming others, or an exaggerated sense of frustration over minor matters, see Diagnostic and Statistical Manual of Mental Disorders, 4th ed. (1994) (describing symptoms of a major depressive episode) at 320-24 -- suggests that Dr. Mills' convenient association of depression/cognitive impairment with reliance on experts or "outside authority figure[s]" (id.) is far from universally accepted in the psychiatric community.

Dr. Mills' evaluation is fatally unreliable not only with respect to the faulty general premise on which it relies, but also in its application of this premise to the facts of the instant case. Conspicuously absent from Dr. Mills' analysis is any consideration of the evidence that is inconsistent with his presumption of a connection between defendant John Bussell's

depression/cognitive impairment and his allegedly uncritical reliance on experts. In particular, Dr. Mills appears to afford no weight to the following salient facts: (1) that a civil jury already rejected John Bussell's claim of total disability (premised in part upon his depression), following a lengthy trial, in which the issue whether he was faking his disability was centrally in dispute; (2) that there is substantial evidence that John Bussell is a malinger, disposed to exaggerate his physical and mental problems for expedient purposes; and (3) that there is also substantial evidence that John Bussell did not passively accede to the plans and formulations of outside "authority figures" in this case, but actively implemented a comprehensive scheme to conceal assets and commit tax fraud. Dr. Mills' failure even to attempt to address this body of contrary evidence makes clear that his method of analysis does not provide a reliable guide which "will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. See Kumho, 526 U.S. at 156-57 (affirming exclusion of expert testimony of engineer based upon district court's scrutiny of whether the principles and methods employed by the engineer "have been properly applied to the facts of the case").

    2.   <u>Defendant Letantia Bussell has failed to provide the specific opinion or bases of Dr. Meloy's proffered testimony, thereby precluding any reliability determination</u>

As to Dr. Meloy, defendant Letantia Bussell's proffer regarding this expert testimony fails to satisfy the reciprocal discovery requirements of Fed. R. Crim. P. 16(b) in that it

19

identifies only the subject-matter of Dr. Meloy's testimony,
namely, the traits and behavior of the "psychopathic personality"
and their relation to the actions of Messrs. Sherman and Beaudry,
but it fails to identify either the specific opinions or bases of
Dr. Meloy's testimony with respect to this subject-matter.
Accordingly, Dr. Meloy's testimony should be precluded on this
basis alone.  See Fed. R. Crim. P. 16(d)(2).  Given defendant's
failure to specify either the specific opinion or bases of Dr.
Meloy's expert testimony, she has also thereby failed to make the
required showing that this testimony is either relevant or
reliable under Fed. R. Evid. 702.  The proffered testimony should
be excluded on this ground as well.

C.   Dr. Mills' Proffered Testimony Is Inadmissible Under Rule
     704(b) Because It Reflects An Opinion As To Whether
     Defendant Had The Requisite Mental State To Commit The
     Offenses Charged

     Dr. Mills' proffered testimony is also inadmissible under

Fed. R. Evid. 704(b) in that it effectively constitutes an

opinion that defendant John Bussell did not possess the requisite

mental state to commit the charged bankruptcy and tax fraud

offenses, because he passively acceded to the bankruptcy and tax

advice provided by Messrs. Sherman and Beaudry, his "outside

authority figure[s]," (Exh. A at 6), and did not act with intent

to "defraud creditors and/or the government." (Exh. A at 8).

     As set forth above, Rule 704(b) prohibits expert testimony

as to whether the defendant possessed the requisite intent to

commit a specific crime.  United States v. Juvenile Male, 864

F.2d 641, 648 (9th Cir. 1988).  "A prohibited 'opinion or

20

inference' under Rule 704(b) is testimony from which it
necessarily follows, if the testimony is credited, that the
defendant did or did not possess the requisite mens rea." United
States v. Morales, 108 F.3d 1031, 1037 (9th Cir. 1997). See also
United States v. Kessi, 868 F.2d 1097, 1108 (9th Cir. 1989)
(expert's testimony that defendant, who was aider and abetter,
"couldn't say no" to principal in a scheme to defraud because he
suffered from post-traumatic stress disorder was inadmissible,
because it constituted an opinion as to whether defendant had
requisite intent to commit the crime).

Testimony of the type offered by Dr. Mills is admissible
only if it is limited to the experts' "diagnoses, the facts upon
which those diagnoses are based, and the characteristics of any
mental diseases or defects the experts believe the defendant
possessed during the relevant time period," staying clear of
"directly or indirectly opining on the [ultimate] issue of
specific intent." United States v. Frisbee, 623 F. Supp. 1217,
1223 (N.D. Cal. 1985). Because Dr. Mills' analysis does not
provide a specific clinical diagnosis of defendant John Bussell's
mental condition during the relevant time period but seeks
instead to provide an opinion on the ultimate issue of
defendant's specific intent, it is inadmissible.

D.   Dr. Mills' and Dr. Meloy's Proffered Testimony Should Be
     Excluded Under Rule 403

Assuming arguendo that the proffered testimony of Drs. Mills
and Meloy is relevant and reliable, which the government does not
concede, their testimony should in any event be excluded pursuant

21

to Fed. R. Evid. 403 in that it poses the likelihood of
substantial jury confusion on the question of defendants'
specific intent to commit the offenses charged.  Instead of
deciding the question whether defendants acted with intent to
defraud or willfully based on direct evidence concerning
defendants' own actions and the advice they actually received
from counsel, the jury will be forced to consider expert
testimony on the traits of the "psychopathic" or "depressed"
personality and whether such traits are consistent with
defendants' having specific intent to commit the crimes charged.
Given the limited probative value of the expert testimony at
issue and the potentially significant prejudicial effect that
such testimony will likely have on the jury's independent
assessment of defendants' specific intent, exclusion of this
proffered expert testimony under the balancing test of Rule 403
is amply warranted.  Indeed, admission of this testimony invites
the prospect of a "confusing spectacle of competing expert
witnesses testifying to directly contradictory conclusions as to
the ultimate legal issue to be found by the trier of fact."
Morales, 108 F.3d at 1036 (quoting S. Rep. No. 225, 98th Cong.,
2d Sess. 230 (1984)).

E.   Dr. Meloy's Testimony Is Inadmissible Under Rule 608(b)

As stated above, defendant Letantia Bussell has failed to
make the necessary showing under Fed. R. Evid. 104(a) that the
proffered testimony of Dr. Meloy is either sufficiently relevant
or reliable under Fed. R. Evid. 702 to warrant its admission.  It

22

appears, however, that the real purpose of Dr. Meloy's testimony as to the traits of the "psychopathic personality" will be to attack the credibility of Jeffrey Sherman and Robert Beaudry, who are cooperating with the government and are likely to testify against the Bussells. To the extent that defendant Letantia Bussell intends to use Dr. Meloy's expert testimony to attack the credibility of Sherman and Beaudry as witnesses, use of such extrinsic expert testimony to attack the credibility of a witness is barred under Fed. R. Evid. 608(b). See United States v. Bussey, 942 F.2d 1241, 1253 (8th Cir. 1991) (it was proper to exclude accounting expert's proffered testimony, offered to attack the credibility of a tax preparer testifying that he discussed certain matters with defendant, because use of extrinsic evidence for such purposes is barred under Fed. R. Evid. 608(b)). Accordingly, Dr. Meloy's testimony should be excluded on this basis as well.

/ /
/ /
/ /
/ /
/ /
/ /
/ /
/ /
/ /
/ /

23

## IV

### CONCLUSION

For the foregoing reasons, the government respectfully submits that the court should exclude the proffered testimony of Drs. Mills and Meloy at trial in the above-entitled matter.

DATED: March 1, 2001.

                          Respectfully submitted,

                          ALEJANDRO N. MAYORKAS
                          United States Attorney

                          JOHN S. GORDON
                          Assistant United States Attorney
                          Chief, Criminal Division

                          _____
                          PAUL G. STERN
                          Assistant United States Attorney

                              Attorneys for Plaintiff
                              United States of America

24

**FORENSIC SCIENCES MEDICAL GROUP, P.C.**

**3301 New Mexico Avenue, N.W., Suite 252**
**Washington, District of Columbia 20016**
**Phone (202) 298-8600 Fax (202) 298-8603**
**office@forensicsciences.com**

Mark J. Mills, J.D., M.D.                                                                  Robert B. Shearin, M.D.
Susan E. Mills, R.N., M.H.P.                                                          Deborah L. Gutterman, Ph.D.

C O N F I D E N T I A L

February 16, 2001

**Via Facsimile**

Peter Morris, Esquire
Altman & Morris
1880 Century Park East, Suite 613
Los Angeles, California 90067

Re:  *U.S. v. Bussell*

Dear Mr. Morris:

As you requested, this letter summarizes my psychiatric impressions of John A. Bussell,
M.D. Both before and after the evaluation, I reviewed those documents that I received
from your office concerning his case. They include the following, numbered in the order
in which they were received (in some cases, the same document has been received more
than once; in that case, it receives a separate and additional number): 1) Psychiatric Ex-
amination of John A. Bussell by Tracy L. Cogbill, M.D.; 2) MMPI-2 results from the
Caldwell Report; 3) Medical expenses and prescription records; 4) Government's Under
Seal Filing in Support of its Motion for a Finding of Applicability of the Crime-Fraud
Exception; Declaration of Norma Ballard and Paul G. Stern; Exhibits; 5) First Supersed-
ing Indictment; 6) Medical records of John Bussell; 7) Rockwood, K, Dobbs, A., Rule,
B., Howlett, S. and Black, W. The Impact of Pacemaker Implantation on Cognitive
Functioning in Elderly Patients. JAGS 40:142-6, 1992.; 8) Lagergren, K. Effect of ex-
ogenous changes in heart rate upon mental performance in patients treated with artificial
pacemakers for complete heart block. British Heart Journal 36:1126-32, 1974.; 9) Depo-
sition Summary of John A. Bussell, Vol I taken on January 16, 1996. Bussell v. Paul Re-
vere; 10) Deposition Summary of John A. Bussell, Vol II taken on January 23, 1996,
Bussell v. Paul Revere; 11) Deposition Summary of John A. Bussell, Vol III taken on
January 24, 1996, Bussell adv. Provident Life; 12) Deposition Summary of John A. Bus-
sell, Vol IV taken on March 11, 1996, Bussell adv. Provident Life; 13) Deposition of
John A. Bussell, M.D., Volume I, January 16, 1996; 14) Deposition of John A. Bussell,
M.D., Volume II, January 23, 1996; 15) Deposition of John A. Bussell, M.D., Volume
III, January 24, 1996; 16) Deposition of John A. Bussell, M.D., Volume IV, March 11,
1996 and exhibits; 17) Deposition of James R. High, M.D., April 4, 1996; 18) Exhibits to

Deposition of Judith G. Armstrong, Ph.D., April 2, 1996; 19) Deposition of Tracy I.
Coxbill, M.D., March 3, 1994; 20) Deposition of J. Stuart Meisner, Ph.D., March 13,
1996 and exhibits; 21) Deposition of Judith G. Armstrong, Ph.D., April 2, 1996; 22)
Deposition of Brooke M. Barton, M.D., January 21, 1997 and exhibits; 23) Deposition of
Robert L. Swezey, M.D., Volume I, February 1, 1994 and exhibits; 24) Deposition of
Robert L. Swezey, M.D., Volume II, May 25, 1994 and exhibits; 25) Deposition of Rich-
ard P. Brightman, Ph.D., Volume I, March 22, 1994; 26) Deposition of Richard P.
Brightman, Ph.D., Volume II, April 26, 1994; 27) Deposition of Robert L. Swezey, M.D.,
February 21, 1996; 28) Trial Witness List; 29) Deposition Summary of Letantia Bussell,
2/5/96; 30) Deposition of Letantia Bussell, M.D., February 5, 1996; 31) Deposition
Summary of Nicholas Franke, March 20, 1996; 32) Deposition of Nicholas Franke,
March 20, 1996; 33) Deposition of John I. Hochman, M.D., March 7, 1996; 34) Exhibits
to Deposition of James R. High, M.D., April 4, 1996; 35) Deposition of Raymond J.
Friedman, M.D., Ph.D., March 26, 1996 and exhibits; 36) Deposition of Brooke M. Bar-
ton, M.D., Volume II, February 11, 1997 and exhibits; 37) Transcript of Proceedings,
Morning Session, October 9, 1997; 38) Transcript of Proceedings, Afternoon Session,
October 9, 1997; 39) Transcript of Proceedings, Morning Session, October 10, 1997; 40)
Transcript of Proceedings, Morning Session, October 14, 1997; 41) Transcript of Pro-
ceedings, Morning Session, October 23, 1997; 42) Transcript of Proceedings, Afternoon
Session, October 23, 1997; 43) Transcript of Proceedings, Morning Session, October 24,
1997; 44) Deposition of John Hochman, M.D., March 1, 1994; 45) Reaudry Payments on
Behalf of Bussells; 46) Wire Transfers from Sterling Foundation to Holmes Enterprises
Account and Beaudry Law Office Client Trust Account; 47) Asset Dermatology Business
and 48) Record from Los Angeles Ear, Nose and Throat Associates, 1/13/98.

You may recall that I evaluated Dr. John Bussell (because both of the Doctors Bussell use
that name, I refer during the rest of the report by their Christian names: John and Tannie)
on February 7, 2001 for about five and a half hours in the conference room of your of-
fices. John, accompanied by his wife, arrived punctually for his evaluation. He appeared
neatly and informally attired, made good eye contact although he was frequently down-
cast during much of his evaluation, spoke slowly and softly, appeared sad and occasion-
ally seemed on the verge of tears and was cooperative throughout his evaluation. Be-
cause his history and evaluation suggested the need for consultation with other colleagues
(both a neuropsychologist and a psychopharmacologist), I deferred formal psychometric
testing to the neuropsychologist, Robert F. Asarnow, Ph.D. who will evaluate John's
cognitive difficulties associated with his depression and associated with his heart block.

As I understand it, you wish that I address the following topics: First, is there a relation-
ship between John's apparent depression and his relative passivity in following the in-
structions of Messrs. Sherman and Beaudry and if so, what is that relationship? Second,
is there a relationship between his cognitive slowing and his apparent willingness to fol-
low the directions of Messrs. Sherman and Beaudry and if so, what is that relationship?
Third, is there a relationship between the way in which physicians such as John are edu-
cated and trained that might explain his professional deference to other professionals such
as Messrs. Sherman and Beaudry? Fourth, is there a relationship between John's chosen

profession as an anesthiologist and his professional deference to Messrs. Sherman and Beaudry? Finally, are there any other psychiatric observations that might help one understand how and/or why John engaged and/or relied upon the advice of Messrs. Sherman and Beaudry?

At the risk of unbecoming grandiloquence, John's life since 1988 would appear to have been star-crossed. Most tragically, during that year, a baby for whom he was providing anesthesia, burned to death in the operating room. Although John was not responsible for what occurred, he felt very bad for the baby and the baby's parents. Later, when the baby's parents sued the hospital, Cedar-Sinai, and the physicians involved, he was named as a co-defendant, although he was not responsible for the unusually high oxygen tension in the operating room, the fact that the operating room was not authorized for that use or the fact that the electrocautery machine had been recently modified. Irrespective of blame, the baby's death was his first completely unexpected loss and the horror of the baby's demise haunted him for years. Later (1992), after the government had apprised John and his wife of their enormous tax liability, John was defending himself in the lawsuit.

In 1990, John's wife, Tannie, developed type 1, insulin-dependent diabetes mellitus. Her blood sugar swung dramatically from more than 600 into the severely hypoglycemic range and John perceived correctly that his wife had a chronic disease that would both curtail her longevity and probably lead to infirmity. He appreciated, unlike most members of the lay public, that even well controlled diabetics often develop neuropathies (sensory deficits that make certain kinds of functioning difficult), retinopathies (difficulty seeing) and renal (kidney) problems. While each of these conditions, as they develop, would lead to a lessened quality of life, the former two will ultimately limit Tannie's dermatology practice. As an aside, John told me that last year for the first time, Tannie had had her first episode of ketoacidotic coma secondary to her greatly elevated blood sugar. This was a portentous event because it presages increased difficulties in managing Tannie's blood sugar that could directly affect her ability to practice medicine and her ability to drive.

Roughly in 1991, Tannie's substantial business loan with the Bank of Beverly Hills that had been used to underwrite her dermatologically-safe skin care line of products was called (contrary to a written agreement that they had with the Bank) and in the process of evaluating where their finances were, the Bussells discovered that their accountant was not degreed and that he had been embezzling from them. While the accountant subsequently made restitution, they realized that their finances were more precarious than they had previously believed. At about that same time, the Internal Revenue Service contacted the Bussells and indicated that they owed about a million dollars in back taxes, interest and penalties resulting from a disallowal of certain tax shelters that had been recommended by their accountant. For them, this was a staggering amount; it was completely unexpected. Somewhat later, Tannie and the Bank of Beverly Hills sued one another, each alleging breach of contract. Irrespective of the merits of the cases, this added

Exhibit B - Part 1
Page 32 of 50

additional stress to John's and Tannie's lives and when the court determined that Tannie owed the entire sum to the bank, this added financial strain, as well.

In 1992, John was shopping at a local store, was tripped (by a lump of duct tape designed to fill in for a missing tile), fell and injured his back. Subsequent radiographic evaluation revealed that he had vertebral compression of the thoracic bodies T7 through T10 and that he was suffering from Scheuermann's disease. Whether as a result of his traumatic injury, his underlying disease or both, John was unable to resume working as an anesthesiologist and has not worked since. As a result of his injury, John filed to receive benefits under the various disability policies that he held. Not surprisingly, for someone who had devoted himself to his profession since adolescence, John found himself increasingly depressed, although that condition was not formally diagnosed until the following year. Initially, the insurance policies provided benefits under the terms of the policies although that income was conditioned by a reservation-of-rights clause. Later however, several of the insurance companies owned by Provident Insurance litigated to recover the benefits that they had provided, the benefits were stopped and John was ultimately required to reimburse the insurance carriers.

By 1993, John had become so overwhelmed and depressed that an independent medical evaluation for his back injury suggested that he be evaluated by a psychiatrist, and that psychiatrist, Tracy I. Coghill, M.D. from UCLA, indicated that John was suffering from a major depression. Major depression is different from the condition that most individuals think of when they say that they are "depressed." People suffering from a major depression typically experience psychomotor slowing, significant neurovegetative changes, suicidal ideation and/or rumination and are unable to cope with the quotidian aspects of life. Despite his reservations about psychiatry and psychology, John was referred to Richard Brightman, Ph.D. by his rehabilitative medicine (rheumatologist) physician, Robert L. Swezey, M.D. and has been seeing Dr. Brightman ever since, typically at a frequency of once a week. Rather unusually (because most major depressions remit spontaneously within six to twenty-four months), John's symptoms have never fully abated despite vigorous treatment with medication and psychotherapy. Certainly one of the reasons that his symptoms continued was the ongoing stress of the Bussell's conflict with the IRS and with the disability carriers.

Also in 1993, John recalls that for the first time, he and his wife learned of the proposal that Mr. Sherman had of putting them into bankruptcy, rather than fighting their IRS debt with litigation in tax court. Both he and Tannie found this a distressing and frightening prospect, although John indicated he was relieved that some of his debt could be discharged, reducing one of his sources of ongoing stress. According to John's recollection at the time the bankruptcy proposal was mentioned, he and Tannie had been in discussion with Mr. Sherman for about a year and a half. Still, these discussions added an additional burden to those pressures that John was already feeling because of the resolution of the fire case, his ongoing back pain and inability to work, his major depression and Tannie's increased reliance upon him because of the progression of her diabetes. In 1994, John's principal disability carrier, Provident, brought their lawsuit.

## FORENSIC SCIENCES MEDICAL GROUP, P.C.

Peter Morris, Esquire
Re: *U.S. v. Bussell*
February 16, 2001
Page 5 of 8

By 1995, according to John's recollection and at the specific direction of Mr. Sherman, the Bussell's bankruptcy was filed. Roughly coincident with that filing, in April, Dr. Brightman finally persuaded John to seek medication for his ongoing depressive symptoms. Because Dr. Brightman is a psychologist, he referred John to a psychiatrist/psychopharmacologist, Brooke M. Barton, M.D. Dr. Barton initially treated John with Prozac®, but later also treated him with Cylert®, Desyrel®, Dexedrene®, Effexor®, Elavil®, Klonopin®, Ritalin®, Tenuate®, Valium® and Zoloft® (he was also treated with Percocet® and Tylenol® with codeine #3 for his ongoing backpain). The point in prescribing the anti-depressant medications (most of those listed above fall into that class) was to provide symptomatic relief for John. Specifically, Dr. Brightman hoped to diminish John's lack of energy, sadness and his ongoing difficulties with concentration and memory. While John believes that his depressive symptoms improved slightly, Tannie believes that the medication caused John to become increasingly passive and accepting of events around him. This passivity was so pronounced that according to Tannie, a perception that John confirmed, that he would sit around the house for days doing essentially nothing. Eventually, his passivity and the fact that on several occasions he became intoxicated (this appears to have been a combined effect due to his medications and his alcohol consumption), led Tannie, in consultation with Dr. Barton, to stop his medications (and drinking) in hopes that his passivity would diminish, even if his depression worsened. John recalls that this is exactly what happened. However, he describes the end of 1997 as a very bad time because that was when the Provident trial occurred.

Whether because of the additional stress, the effects of the medications that were still in place, the combination of the two or something else, it was during this period that he began to be aware that he was having difficulties with his memory. According to Tannie, these difficulties became so pronounced that on some occasions John would have to go upstairs twice in order to retrieve the two items that Tannie had asked him to find. John confirms that this happened with such frequency that he began to worry about his memory problems. Accordingly, in 1998 John began a dementia evaluation at UCLA that ultimately concluded on the basis of a Positron Emission Tomography (PET) scan that he had diffuse hypometabolism consistent with either early Alzheimer's disease or depression. Since, if anything, John's memory problems appear to have attenuated in the intervening two years, Alzheimer's would appear to be an unlikely diagnosis (ordinarily in Alzheimer's disease there is a gradual, but marked progression of the symptoms every year, with a typical period of seven years between diagnosis and death). Nonetheless, the PET scan confirms that John had significant neurocognitive difficulties associated with his depression. While these difficulties have waxed and waned in the eight years since his major depression was diagnosed, they appear to have been remarkably pronounced at various times. Overall, the degree of John's symptoms of confusion and memory impairment is not only significant (and well documented going back to 1993) but undoubtedly added to his passivity from the onset of his depression through the present (as his depression continues, largely unimproved).

## FORENSIC SCIENCES MEDICAL GROUP, P.C.

Peter Morris, Esquire
Re: *U.S. v. Bussell*
February 16, 2001
Page 6 of 8

With this history in mind, it is now possible to address those issues that you posed. First, you asked me to consider the potential relationship between Dr. Bussell's depression and his apparent passivity in following the directions of Messrs. Sherman and Beaudry. In this regard, it probably makes sense to consider this question concurrently with the second question you posed about the relationship between his cognitive impairment and his apparent passivity. As discussed above, John's depression, diagnosed independently and long before the present litigation was contemplated, dates back at least from 1993 and perhaps earlier (Tannie believes that his symptoms began in 1988 when the baby died in the operating room fire) when he sustained his back injury, became disabled and had to stop working. Worthy of note is Dr. Coghill's description of the extremely long time it took John to complete the Minnesota Multiphasic Personality Inventory (MMPI). Most individuals of good intelligence and John certainly is, complete the MMPI in less than two hours. Instead, John apparently took about six hours. Such difficulty completing a test of all "True/False" items is very rare and reflects significant depression, significant cognitive problems and/or major problems with obsessive ruminations. Dr. Coghill describes that John appeared very slowed down and that information plus the information from Dr. Brightman's records (and his telephonic conversation with me of February 12, 2001) all strongly support the notion that John has had both major depression and secondarily cognitive problems dating from at least 1992 or 1993. While there are no universal rules in psychiatry, it is almost always true that individuals with depression and individuals who are suffering from cognitive impairment are more apt to accept the advice of experts than they would if all their critical faculties were available to them. Thus, John's psychiatric condition during the relevant periods of this case (roughly 1993-1997) would have made it much more difficult for him to exercise independent judgment and would have made it much more likely to have acceded to the formulations and plans of any outside authority figure. Further, the concurrence of depression and cognitive slowing probably had a multiplicative rather than an additive effect insofar as his critical faculties were concerned.

You asked if there were a relationship between the way in which physicians are trained and the professional deference to Messrs. Sherman and Beaudry by John. In my experience, the answer is a clear yes. As part of their training, physicians are indoctrinated with the perspective that their work and effort can save lives, but that inadvertent or erroneous interventions can cost lives. It is therefore common, from the earliest days of medical school, for student physicians to ask one another for information they deem relevant for dealing with a particular condition. If you will, as part and parcel of their training, they learn from the first years of medical school the importance of consulting with a more knowledgeable colleague about a particular problem. This trait is greatly amplified during residency when physicians choose their career path. As medical knowledge has accumulated, it is impossible for any individual to know all the relevant facts. Thus, ophthalmologists consult cardiologists and they each consult psychiatrists and none of these physicians would think about practicing in the other's area. This perspective permeates advanced medical training and allows individuals to regularly accord colleagues deference on issues outside their own specialty. Analogously, the tax advice of Mr. Sherman and the estate planning advice of Mr. Beaudry would have been completely outside



**FORENSIC SCIENCES MEDICAL GROUP, P.C.**

Peter Morris, Esquire
Re: *U.S. v. Bussell*
February 16, 2001
Page 7 of 8

John's area of expertise and he would, as is common with any medical subspecialty, have deferred to them, recognizing their expertise. Because medical training is the most protracted of all the professions, I am aware of no professional arena where this trait of professional deference to others' expertise is as profound as it is in medicine.

You also asked more specifically about John's specific work as an anesthesiologist. While the work of an anesthesiologist is vitally important in allowing a surgical procedure to be performed, the anesthesiologist is virtually never the "captain" of the operating room; that task falls to the lead surgeon. By way of an analogy, the anesthesiologist might he considered equivalent to the propulsion officer aboard a nuclear submarine. Without that individual, the boat can go nowhere and its missions are rendered ineffective. With appropriate propulsion, the submarine can accomplish its mission, but the captain of the ship still has to determine what weapons, if any, should be used and by what authority, how should the submarine's manpower be deployed, what emergency measures should be considered, if any, and when to abort an assigned mission. Thus, the propulsion officer, although vital to the mission, is always in the role of deferring to the captain. Similarly, even a highly skilled anesthesiologist regularly defers to the chief surgeon. In this context, then, it would be expected that John would have deferred to those experts outside of his own arena of expertise who had particular knowledge about his and Tannie's IRS liens, their estate planning and the appropriateness of filing for bankruptcy. Even had he had no depression and no cognitive impairment, his years of training in the operating room after his years of training as a medical student, intern and resident would have made him unusually deferent to outside professional advice. Of course, John had no particular knowledge, training, interest or experience in tax and estate-planning matters.

Finally, you asked if there are any other psychiatric observations that might be helpful as you endeavor to understand John's role during the 1993-1997 timeframe. Although I have skimmed all the documents that you have provided me, I have not yet had the opportunity to analyze them thoroughly and they may provide additional perspectives. If that occurs, I will immediately let you know and will write an addenda to this report if you wish. In the meantime, however, three other observations come to mind. First, the combination of medications used to treat John's depression suggests, as do the clinical records, that his major depression was (and remains) treatment refractory. Still, the medications used to treat depression can cause confusion. While the medications that John received are not the most notorious in this regard, they can, in and of themselves, cause some of the symptoms of confusion of which John complained. As you know, I have recently asked that John obtain another psychopharmacologic consult with David L. Fogelsen, M.D. in order to address his depression and I am hopeful that if his depression can be successfully treated that his ongoing symptoms of cognitive impairment will be treated as well. Second, in dealing with John, I have been struck by how compliant he is. Again, as you know, I have arranged for him to he evaluated by Dr. Asarnow. Both in speaking with John about his appointments with these individuals and in asking him for permission to speak with Dr. Brightman, I have experienced directly his degree of deference and compliance. Even beyond the fact that I am cast in the role of helping him, his willingness to follow directions is remarkable. Finally, I am aware that John has been

## FORENSIC SCIENCES MEDICAL GROUP, P.C.

Peter Morris, Esquire
Re: *U.S. v. Bussell*
February 16, 2001
Page 8 of 8

repeatedly tested with multiple psychological instruments including the MMPI and its successor, the MMPI-2. These instruments contain a variety of scales that allow one to assess whether or not the test taker (the evaluee) is being defensive, duplicitous, exaggerating or antisocial. The recurrent answer to all of these questions is that John is none of these things. The symptoms that he reports, he reports accurately. He is not dissembling, evading or exaggerating. Finally, on none of these instruments does he appear to have any propensity toward psychopathic deviance (Pd.), the scale that measures antisocial traits such as conspiring to defraud creditors and/or the government. In fact, in speaking with Dr. Brightman, he told me that of all of his patients, he would have expected John to be the *least* likely to have such difficulties! While his commentary may be colored by his long term relationship with John, the test results are so robust as to be incontrovertible: John does not have antisocial tendencies. This is important information that corroborates his repeated statements that he was following the directions of Messrs. Sherman and Beaudry.

If you have any questions about this report, please let me know.

Sincerely,

Mark J. Mills, J.D., M.D.
Principal

MJM/srs

AVERY®   Avery® LEGAL INDEX™ EXHIBIT DIVIDER

**Exhibit B**

LAW OFFICES

## HOCHMAN, SALKIN, RETTIG, TOSCHER & PEREZ
A PROFESSIONAL CORPORATION
9150 WILSHIRE BOULEVARD
SUITE 300
BEVERLY HILLS, CALIFORNIA 90212-3414

NATHAN J.HOCHMAN
DIRECT LINE
(310) 281-3290

TELEPHONE
(310) 281-3200
(310) 273-1181
FACSIMILE
(310) 859-1430
EMAIL
Hochman@Taxlitigator.com

February 20, 2001

**BY HAND DELIVERY**

Paul Stern, Esq.
Ranee Katzenstein, Esq.
Assistant United States Attorney
312 North Spring Street
Los Angeles, CA 90012

**RE:  United States v. Letantia Bussell, et al.**
**– Discovery re Rule 16(b)(1)(C)**

Dear Mr. Stern and Ms. Katzenstein:

As we stated to you before, it is our full expectation that we will not have to present a defense because we will be able to show the Court that the Government has not satisfied its burden of proof at the end of the Government's case.  We also anticipate obtaining much, if not all, of the points we intend to make through the cross-examination of the Government's witnesses, thus, potentially obviating the need to call any or all of the defense experts in our case-in-chief.  Since we do not know which points our experts will need to cover because we do not presently know which defense points the Government's witnesses will supply to the jury, we are only in the position to provide general summaries of the testimony our experts may provide under Fed.R.Crim.Proc. 16(b)(1)(C) and Fed.R.Evid 702, 703, and 705.  Once the Government has presented its case, we reserve the right to update the summaries of expert testimony herein provided to account for points that our experts will cover in response to the testimony of the Government's witnesses.

In addition to the other experts we have previously disclosed, we intend to call the following additional experts: Dr. Gamini Hethumuni and J. Reid Meloy. Each of these experts' resumes listing their qualifications is attached herein.

With respect to Dr. Hethumuni, Letantia Bussell is not asserting a Rule 12.2 defense based on her Type 1 insulin dependent diabetic condition but currently intends to introduce this testimony to explain the context, circumstances and motivation in which certain relevant events in this case occurred. Dr. Hethumuni's testimony will include but not necessarily be limited to the following:

1.    Since approximately 1990, Letantia Bussell has been a Type 1 insulin dependent diabetic. He bases that opinion on a review of the medical information, including blood tests, for Letantia Bussell that has been provided to him that indicated levels of blood glucose, c-peptide and insulin consistent with a Type 1 insulin dependent diabetic. A copy of the information that has been provided to Dr. Hethumuni to render this opinion is included herein.

2.    Type 1 insulin dependent diabetes can have an acute onset and occurs when the pancreas no longer produces any significant amount of insulin.

3.    When this type of diabetes occurs, it dramatically changes the diabetic's life. The diabetic becomes totally dependent on having insulin injections and has to maintain a regimented dietary schedule as well as a regimented activity schedule. The diabetic has to balance diet, activity, and insulin throughout the day. On a daily basis, the diabetic suffers periodically from severe fatigue and the inability to concentrate or function.

4.    Once this type of diabetes, which is a more serious form than Type 2 diabetes which can be treated with pills, occurs, the diabetic will eventually experience the following complications (notwithstanding a properly balanced regime of diet, activity and insulin). These



complications, which can occur unexpectedly and rapidly, include:

a.   Retinopathy – bleeding in the retina which if not treated promptly can lead to blindness.

b.   Neuropathy – which affects the sensory system leading to numbness in the feet and hands and pain in feet at night – these complications are very difficult to treat and also affect muscles, the stomach and the heart.

c.   Kidney failure – this disease causes the kidneys to leak protein and eventually to fail — at that point, the diabetic must go on dialysis to survive.

5.   Once a person, particularly a doctor, is diagnosed with this type of diabetes, the person's life expectancy and quality of life become more immediate issues. If the diabetic does not take a sufficient amount of insulin or properly balance her diet and activity, she can go into a diabetic coma which may lead to death. The diabetic will also experience periodic hypoglycemic episodes (low blood sugar) which will impair the body's ability to function and, if not treated properly, can lead to death. This type of diabetes will significantly and deleteriously alter a person's estimate of their ability to remain productive on a professional and personal level.

The bases for nos. 2-5 above are Dr. Hethumuni's training and experience as documented in his resume and his review of pertinent literature in the field.

Dr. Hethumuni has not and does not intend to physically examine Letantia Bussell in order to be able to testify about his above opinions nor will he be generating a report containing his opinions and the bases for them.

Presently, the defense intends to call J. Reid Meloy, Ph.d, whose testimony will include but not necessarily be limited to the following: Explaining psychopathy and the expected traits and behaviors of the psychopathic personality; and relating such expected traits and behaviors to the actions of Jeffrey Sherman and Robert Beaudry. The defense has not received nor does it expect to receive a report from Dr. Meloy. The bases for his testimony, at this time, include his training and experience, as documented in his resume, and his review of the First Superseding Indictment and the Government interviews of Jeffrey Sherman and Robert Beaudry.

The defense reserves the right, as stated above, to amend this expert disclosure, depending on the evidence adduced in the Government's case-in-chief. The defense also reserves the right to amend this expert disclosure should it determine any additional experts are necessary to present the defense case.

Cordially,

HOCHMAN, SALKIN, RETTIG, TOSCHER
& PEREZ

NATHAN J. HOCHMAN
Counsel for Letantia Bussell

ALTMAN & MORRIS

BRYAN C. ALTMAN
PETER MORRIS
Counsel for John Bussell

**(Cite as: 203 F.3d 832, 1999 WL 1072390 (9th Cir.(Cal.)))**

NOTICE: THIS IS AN UNPUBLISHED OPINION.

(The Court's decision is referenced in a "Table of
Decisions Without Reported Opinions" appearing in
the Federal Reporter. Use FI CTA9 Rule 36-3 for rules
regarding the citation of unpublished opinions.)

United States Court of Appeals, Ninth Circuit.

**PROVIDENT LIFE & ACCIDENT INSURANCE
CO., a corp.; John Hancock Mutual Life
Insurance Co., a corp., Plaintiffs-C ounter-
Defendants-Appellees,**
v.
**John A. BUSSELL, M.D., Defendant-Counter-
Claim ant-Plaintiff-Appellant,**
v.
**THE PAUL REVERE LIFE INSURANCE
COMPANY, a corp., Defendant-Appellee.**

No. 98-55546.
DC No. CV 94-1756 RAP.

Argued and Submitted Nov. 3, 1999.
Decided Nov. 23, 1999.

Appeal from the United States District Court for the
Central District of California Richard A. Paez, District
Judge, Presiding.

Before BROWNING and TASHIMA, Circuit Judges,
and KING, District Judge. [FN**]

FN** Honorable Samuel P. King, Senior United States
District Judge for the District of Hawaii, sitting by
designation.

MEMORANDUM [FN*]

FN* This disposition is not appropriate for publication
and may not be cited to or by the courts of this circuit
except as provided by Ninth Cir. R. 36-3.

**\*1** John Bussell appeals the district court's denial of
his motion for a new trial on the issue of whether he
was "disabled" under the terms of his disability
insurance policies. He also appeals the district court's
grant of summary adjudication in favor of Provident
and John Hancock (together "Provident") on the issues
of breach of the covenant of good faith and fair dealing
and punitive damages. We affirm both rulings. [FN1]

FN1. We decline to address the issue of whether the
restitution claim should have been decided by the
district court. Bussell is barred from raising this
argument here because his conduct in the district court
was utterly inconsistent with his current position. *See
Marx v. Loral Corp.,* 87 F.3d 1049, 1056 (9th
Cir.1996) (court of appeals deemed equitable estoppel
argument waived where party's conduct in the district
court was inconsistent with its position on appeal).

A. Motion for a New Trial

We review the district court's denial of a new trial for
abuse of discretion. *See Knapp v. Ernst & Whinney,* 90
F.3d 1431, 1439 (9th Cir.1996). Here, substantial
evidence supports the jury verdict that Bussell was not
disabled as defined by the policies. Several doctors
testified that Bussell's claim was subjective, and a
reasonable jury could have concluded that he was not
telling the truth. There was no abuse of discretion.

1. *Evidentiary Rulings*

Evidence of Bussell's stockpiling of insurance was not
barred by law of the case. That doctrine only applies to
issues actually decided by the first court. *See United
States v. Cote,* 51 F.3d 178, 181 (9th Cir.1995). Judge
Kenyon ruled only that the policies were not void on a
theory of overinsurance; he did not consider whether
evidence of stockpiling insurance was relevant to
Bussell's disability claim.

Furthermore, under Federal Rule of Evidence 401,
evidence regarding the amount of insurance Bussell
was carrying at the time of his disability--in addition to
evidence regarding his pre-disability income,
bankruptcy, investment losses and tax obligations--was
highly relevant. The insurers' entire theory rested on the
premise that Bussell was faking his injury; thus, this
evidence was relevant to show that he had a motive to
fake a disability in order to meet his financial
obligations. [FN2]

FN2. Even assuming that the evidence regarding the
$1.2 million tax lien was erroneously admitted, the error
was harmless. Over the course of a two week trial, the
error would not "more probably than not" have tainted
the judgment. *Brown v. Sierra Nev. Mem'l Miners
Hosp.,* 849 F.2d 1186, 1190 (9th Cir.1988) (internal
quotation marks and citation omitted).

Federal Rule of Evidence 404(b) also did not prohibit
the district court from admitting the evidence of

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

Exhibit B EXHIBIT C
Page 43 of 50




Bussell's finances. Because the evidence was relevant for a reason other than to show that Bussell was predisposed to committing insurance fraud, the district court did not abuse its discretion by admitting the evidence. *See United States v. Hadley,* 918 F.2d 848, 850 (9th Cir.1990).

The district court did not abuse its discretion in allowing Provident to cross-examine Bussell about alleged misrepresentations on his bankruptcy petition pursuant to Federal Rule of Evidence 608. Evidence that a witness lied on a bankruptcy petition is probative of his character for truthfulness, and Rule 608(b) specifically contemplates inquiries into prior behavior in order to challenge a witness' credibility. *See United States v. Gay,* 967 F.2d 322, 328 (9th Cir.1992).

The introduction of the surveillance tapes pursuant to Federal Rule of Evidence 1003 also was not an abuse of discretion. Apparently, the trial court credited Mutch's testimony that the copy was a true and correct copy of what was depicted on the original and that the original could not be shown in its current format.

\*\*2 Finally, the district court was not required to exclude the contested evidence under Federal Rule of Evidence 403. The court adequately balanced the probative value against the prejudicial effect of the evidence. There was no abuse of discretion. *See Thurman Indus., Inc. v. Pay 'n Pak Stores, Inc.,* 875 F.2d 1369, 1380 (9th Cir.1989).

### 2. *Attorney Misconduct*

The district court did not abuse its discretion in deciding that a new trial was not warranted by attorney misconduct. The improper remarks occurred only during closing argument and the judge admonished the jury that counsel's arguments were not to be considered as evidence. Thus, the misconduct did not permeate the trial so that the jury was necessarily prejudiced or influenced by passion in reaching its verdict. *See Kehr v. Smith Barney, Harris Upham & Co., Inc.,* 736 F.2d 1283, 1286 (9th Cir.1984).

### B. Summary Adjudication

We review a grant of summary judgment *de novo, see City of Vernon v. Southern Cal. Edison Co.,* 955 F.2d 1361, 1365 (9th Cir.1992), and we affirm the district court's grant of summary adjudication on the issue of

bad faith. In California, "proper cause" to seek declaratory relief exists as a matter of law if, under an objective standard, "on the basis of the facts known to the [insurer], the institution of the ... action was legally tenable from the viewpoint of a reasonable attorney." *Dalrymple v. United Servs. Auto. Ass'n,* 46 Cal.Rptr.2d 845, 857 (Ct.App.1995).

In the present case, no genuine issue of material fact exists as to whether Provident had "proper cause" to file its claim for declaratory judgment. Contrary to Bussell's arguments, the relevant inquiry is not whether there was a dispute that Bussell was disabled, but rather, whether there was a factual dispute that the insurance company properly brought its suit for declaratory relief. Because of the various doctors' reports that questioned the validity of Bussell's disability, Provident's counsel had sufficient evidence, from the standpoint of a reasonable attorney, to believe that it had a legally tenable claim.

Even assuming that Bussell is correct that Provident was required reasonably to believe in the validity of each theory it set forth in its declaratory relief action, he still would not prevail. Although Judge Kenyon ultimately ruled against Provident on its alternative theories, it had proper cause to sue under both. Provident presented evidence that it had prior success on both the "lack of insurable interest" and "reformation" theories in other courts, and neither of these theories was foreclosed by appellate law until after Provident filed its declaratory relief claim. Because a "genuine issue as to the insurer's liability" may be created by uncertainties in controlling case law, Provident had an objectively reasonably belief that its alternative causes of action were legally tenable. *Filippo Indus., Inc. v. Sun Ins. Co.,* 88 Cal.Rptr.2d 881, 887 (Ct.App.1999). It is not bad faith for an insurer to decline a claim based upon an untested legal theory provided that "intelligent disagreement" on the legal issue was possible. *Clemco Indus. v. Commercial Union Ins. Co.,* 665 F.Supp. 816, 830 (N.D.Cal.1987).

\*\*3 For the same reasons that Bussell's bad faith claims were properly dismissed, punitive damages are not recoverable. *See Continental Ins. Co. v. Superior Court,* 43 Cal.Rptr.2d 374, 384 (Ct.App.1995).

AFFIRMED.

END OF DOCUMENT

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

Aigner® LEGAL INDEX™ EXHIBIT DIVID

AVERY®

**EXHIBIT D**



**BARRINGTON PSYCHIATRIC CENTER**
A MEDICAL GROUP

RAYMOND J. FRIEDMAN, M.D., Ph.D
MOSY B. FRANKL, Ph.D

DAVID N. GLASER, M D
RONALD F. HONTZ, M D
KENNETH TODD, M.S.

STEFANIE D. PETERI, Ph.D
ROBERT W. OODWIN, Ph.D
JAMES L. DECK, Ph.D
DALE I. LENEFELD, Ph.D
MICHAEL R. OSWANEZ, Ph.D
DAVID APPLETON, Ph.D
MYRNA BEAUFAES, Ph.D
LORETTA FOX, Ph.D
SHARON GOLDSTEIN, Ph.D
GARD HANSON, Ph.D
JUDITH MARSHALL, Ph.D
WILLIAM BODNER, Ph.D
SANDRA GOSSMAN-LEESH, Ph.D
CARIO BASSANEGUSE, Ph.D
STEVEN L. DOKSENBAUM, Ph.D
JULIANNE P. OHARA, Psy.D

GARY COLTER, EXECUTIVE DIRECTOR
IAN FRIEDMAN, SPEC. ADMINISTRATOR
A. CHRISTENSEN, CONTROLLER

**PROGRAM DIRECTORS**

COST CONTAINMENT STRATEGIES
MOSY B. FRANKL, Ph.D

WORKERS COMPENSATION
MATTHEW H. RYAN, Ph.D

INDUSTRIAL INTERVENTION
CAMILLA CANNON, Ph.D

CIVIL LITIGATION
FRANCINE S. ELLICE, Ph.D

COMMUNITY SERVICE
ROBERTA L. PALEY, Ph.D

PSYCHOTHERAPY
DAVID P. ZAKEK, Ph.D

1990 SOUTH BUNDY DRIVE
SUITE 220
LOS ANGELES, CALIFORNIA 90025
TELEPHONE: (310) 826-3235
FAX: (310) 447-0840

1717 SOUTH STATE COLLEGE BL
SUITE 180
ANAHEIM, CALIFORNIA 92806
TELEPHONE: (714) 434-4003
FAX: (714) 935-0149

February 11, 1994

Dana Alden Fox
Lindberg & Watkins
International Tower Plaza
888 S. Figueroa St.
16th Floor
Los Angeles, CA 90017-2516

Re:   John Albert Bussell vs. Collins & Aikman Group, Inc. (Builders Emporium) et al

### PSYCHIATRIC EVALUATION

Dear Mr. Fox:

On Wednesday, January 5, 1994, I met for five hours with Dr. Bussell in order to evaluate his mental state and review the history of his life. I planned on meeting with Dr. Bussell again on January 6, but this plan was interrupted by Dr. Bussell's scheduling conflicts. We were able to meet for 1¼ hours on January 7. I asked Dr. Bussell to return for the final 1½ hours, which I had budgeted for my examination. As you are aware, there remains a dispute over whether I am entitled to this time in order to complete the examination. I am assuming that this issue may not resolved expeditiously, and I am therefore preparing this report with the information I do have. I will attempt to indicate where further information is needed and when I discuss my findings, I will indicate where, if any, the lack of information creates difficulty in opinion formation.

Dr. Bussell was also evaluated by my associate, Stuart Meisner, Ph.D. on January 5. Dr. Meisner administered psychological tests and prepared a report which served as an addendum to this report.

I plan to organize this report to you as follows. First I will present as brief an outline as possible of Dr. Bussell's current condition, the history of his illness and his past history. I will also describe his mental state and the nature of the interaction between us that developed during

EXHIBIT 227
R. NEWLANDER, CSR
Exhibit B - Part 1
Page 46 of 50
EXHIBIT D

the interview process. The main thrust of this report will be to develop conclusions about Dr. Bussell's mental state both past and present, and his relationship to the injury of September 2, 1992. In the process of presenting my conclusions, I will present and explain the findings from the psychological testing administered by Dr. Meisner.

## I.    MENTAL STATUS EXAMINATION

Dr. Bussell arrived on time for his appointments. He is a neatly, casually dressed middle aged man who appears mildly obese, generally relaxed and in no acute physical or emotional distress. His movements are easy and unguarded. He walks without limp or noticeable deformity. The kyphosis described by the orthopedic surgeons is not visible to me through Dr. Bussell's clothing. His posture may seem somewhat slouched at the shoulders but there is no growth deformity consistent with some descriptions of kyphosis in the severe range. After sitting for several hours Dr. Bussell shifted in his chair, indicating discomfort and breaks were taken appropriately. Prior to the beginning of one session of interviews, Dr. Bussell was standing with his back against the wall in the waiting room and remarked that this position helped relax his back muscles.

I believe that Dr. Bussell is mildly depressed. When I began the examination with him he seemed moderately depressed at first glance. I believe there are a number of factors which lead to an over estimation of his level of clinical depression in an examination setting. As I came to know this gentleman more personally during our lengthy examination, it became apparent to me that he is a soft spoken, shy and retiring individual who has a constricted range of emotional display. This is life long characterological issue. He is thoughtful, driven and when speaking of issues which are not presently contentious to him, he displays a keen sense of humor and an ability to smile and laugh about current and past events. His laughter however is not bellicose. Instead it is muted and more in the form of a wry smile which certainly transmits a note of laughter through his eyes, which do not appear at all sad at those moments.

The sadness I perceive in Dr. Bussell seems of longstanding duration and part and parcel of his personality. In regard to his assertions of physical limitation, he seems to express frustration but I do not detect that the sadness relates to his comments about physical limitations. Rather, the sadness seems deep-seated and I can only wonder if it stems from past disappointments in others and in himself. His ability to relate to other individuals appears impaired by anxiety in close interpersonal situations. He tends to talk at or past me much of the time that we are together and this is especially true when relations with his wife and children are at issue. There were other times where he more spontaneously offered vignettes about friends, which indicated a greater comfort in discussing interpersonal relationships. There was considerable vagueness and avoidance of discussion and amplification of answers to questions about his wife and their relationship.

Dr. Bussell alleges that because of sleep deprivation he has difficulty concentrating and is prone to cognitive errors because of diminished concentration and attention to details. I did not observe manifestations of this alleged impairment during my examination. Instead Dr. Bussell evidenced satisfactory concentration and attention to the details of the issues we spoke about. He was able to retain the original subject when we took tangents away from it. His memory for both recent events, including questions and answers within our examination itself was excellent and his recall of past events also seems unimpaired. Therefore I saw no indication of the type of concentration and attention problems he is describing and which I will present in the next section of this report.

Dr. Bussell did not appear to be anxious or agitated. However, it should be noted that characterologically he is emotionally constricted and would not be expected to display evidence of anxiety overtly in the form of gross nervousness, restlessness or expressions of fear. Nevertheless, he appeared to me to be very relaxed and only became flustered when asked questions which seemed uncomfortable to him and the answers to which he seemed to want to avoid exploring. For example, when asked about Dr. Brightman's comments that he was depressed in the spring of 1993, Dr. Bussell tried to minimize the statements and became so vague in his expression of why he saw Dr. Brightman in the first place that his answer was almost incomprehensible. He became even more detached and vague when asked about Dr. Brightman's comments that he was dreaming about fires in the spring of 1993. He virtually claimed that he was not, although he never directly stated that he had not made this complaint to Dr. Brightman. Instead he attempted to minimize the after effects of the 10 week malpractice trial he underwent in the fall of 1992. For example, on the first day of interview Dr. Bussell described the trial and implied that having an attorney hold up the picture of a burned baby and implying that someone was a "murderer," was stressful for him. When I came back this imagery and the climate of anxiety that it creates, on the second day of interviews Dr. Bussell downplayed the stressful impact on him saying that the case was a pain but that it was not personally that stressful to him. He then went on to describe the attorney as grandstanding to make his point, implying that Dr. Bussell did not take it personally, etc.

Dr. Bussell's thinking is clear, logical and coherent and there is no evidence of any disturbance of thinking suggesting a psychotic disorder. One idea logically follows another and there is no evidence of hallucinations or delusions.

## II.  CURRENT CONDITION

At this time, Dr. Bussell lives with his wife who is his age and who works full time as a dermatologist in private practice. Dr. Bussell notes admiringly that his wife has a very large and busy practice which she has built up by dint of her personality over the years. He asserts

that she has been working approximately 25%-30% more since his accident in order to make up for lost income. The couple have three children, a boy, 15 and girls, 13 and 10, who all attend private schools in Los Angeles.

Dr. Bussell is reluctant to describe himself as suffering from mental symptoms. He does acknowledge some feelings of depression at the present time, but does not view himself predominantly as depressed. Certainly he does not see himself as suffering from any type of anxiety disorder. He contends that he suffers from two main sets of symptoms, which he repeatedly asserts to me over the course of our interviews, cause him to be totally disabled. The first set of symptoms relate to back pain and the second set relate to mental errors caused by, in his opinion, sleep disturbance secondary to back pain. In Dr. Bussell's opinion, the cause of all his suffering at the present time is the presence of a thoracic spine condition which causes pain and disability.

The/patient reports that he attempts to go to sleep by 10:00 p.m. every night, but often the family is not able to settle down before 11:00 p.m. He generally falls asleep without much trouble, but at least 2-3 nights per week he reports that he wakes up early in the morning and is unable to fall asleep thereafter. He may awaken as early as 12:15 or 1:00 a.m. or an hour or two later, but on those 2-3 nights he receives only 2-3 or at the most 4 hours of sleep. On the remaining nights of the week he is able to sleep until approximately 5:30 a.m., but he receives at least 6 hours of sleep. He does indicate that he would hope to be able to sleep longer so that he could have 7 hours of sleep which he implies would allow him to feel rested and functional. Dr. Bussell reports that when he awakens it is because he is experiencing back pain, and not because he is experiencing either depression or anxiety which awaken him from sleep.

The "mental errors" which he believes stem from the sleep disturbance impair Dr. Bussell and he asserts that one of the main reasons for not going back to work is because of his fear that secondary to the tiredness, he will have mental lapses which could be dangerous to patients, since he functions as an anesthesiologist. I asked Dr. Bussell for examples of these mental errors and he reported several, which I will note to you. He notes that recently his wife asked him to empty out the suitcase and to divide their sweatclothes on both sides of the bed. Instead Dr. Bussell put all their sweatclothes together on his side of the bed. In the spring of 1993 he "lost concentration" while waiting at a stop sign to make a right hand turn. This incident has been described elsewhere and I will not repeat it here. The long and short of it is that he gently hit a girl walking her bicycle through a crosswalk because he was looking the other way and did not see her when he began to make his turn. Dr. Bussell knows that he often forgets the time of day, and as an example of this notes that he was a half hour late to pick up his daughter the other day at school. He describes himself as "absent minded," implying that he forgets tasks he is supposed to be doing. He could not think of an example of this at the time of our meetings. As an example of distractibility during periods when he should be concentrating, he noted that he was placing regular gas into his car which takes only diesel. He claims this is a

major error, since regular gas can ruin a diesel car. He also notes that he recently "screwed up" a deposit at the bank for his wife. In short, he implies that numerous small tasks like this often end up mismanaged or forgotten.

The second set of symptoms which Dr. Bussell reports, and which he believes accounts for the first set, i.e. the mental errors, is that of chronic mid-back pain. He claims that there is always a low grade background level of pain present, that the pain becomes noticeable and significant when he attempts physical activities which he claims are beyond his range. For example, he notes that when he attempts to lift anything heavy or when he puts himself into twisted and unusual positions, he will have an aggravation in the back. He gave me one example which appears repeatedly in the history he has given to other doctors sometime in early 1993 I believe. He claims that his daughter wanted him to fix a backpack for her and she either handed or threw it to him and he automatically caught it. In any event, he experienced an exacerbation of back pain which lasted for many months, and left him at a plateau from which he has never recovered.

Let me review Dr. Bussell's daily routine as he presents it to me. He is usually out of bed by 6:15 a.m. and interacts with the family as the children are getting ready for school. He takes either all three or at least two to school. His son requires the longest drive to his high school, whereas his daughters attend school closer to home. He then returns home and engages in some physical therapy exercises. He stretches, uses a Swiss ball which he finds helpful, and has some other exercises of an active nature which have been prescribed through his physical therapy training. He reserves the evening time for aerobics which does not do in the morning. Instead he prefers the "quiet time" in the morning to work on several research projects he is involved in. One revolves around the development of a new type of topical anesthesia, and the other relates to a new telemetry system for monitoring patients under anesthesia. Dr. Bussell is not developing products at the present time, but says he is doing literature searches and a considerable amount of reading on these subjects. He is not yet into developing machinery, biochemical products or computer software, all of which will have to be developed once these inventions come to fruition. Dr. Bussell notes that anesthesiologists are known to be inventors and he states that he is no exception, and these activities represent part of a longstanding habit of "fiddling around and inventing."

Dr. Bussell is also engaged in medical-legal work, the extent of which was described in his deposition. I did not have time to review this activity with him in detail, but hope to do so in a future interview. Finally, he indicates that he keeps up with the anesthesiology literature since he is contemplating taking an academic position in the future and would have to be up on the academic literature in order to do so. Part of my remaining time with Dr. Bussell would be dedicated to understanding his desires in this direction.