When I specifically asked Dr. Bussell if he was able to concentrate on what he read, he indicated that at times he has to re-read sections of literature and that when he is reading about important matters, he has to diagram outlines for himself so that he can concentrate. He remarked, "I'm slow - so damn slow." Then went on to say that it often takes him 2-3 hours to pay bills, indicating that he should be able to do so in a much shorter period of time. He added, "I think I'm just tired."

Dr. Bussell states that there has been no major change in his appetite or weight since his injury, but he does note that there has been a fluctuation in a very narrow range. He implies that eating is not one of the great pleasures of life for him, and that this state of affairs pre-existed his injury. He also gives the impression that he has not been sexually involved significantly with his wife over the years, but he does claim that their sexual relations have diminished since the injury. The impression he gives is that his sexual desire is perhaps half or even less than what it used to be, although he states this in terms of frequency of sexual relations between he and his wife. He also notes that part of the reason for their diminished sexual relationship stems from the fact that his wife is working 30% harder than she used to, gets tired and is less available to him sexually.

The latter part of the day is spent by Dr. Bussell tending to more errands such as picking the children up from school and helping them with their homework in the evening. He is able to concentrate on their work and visit with his wife in this short time that he implies they have together in the evening because of her long work schedule. Also at the end of the day, he performs aerobics, which he does on a regular basis at least 3-4 times a week. He states that he walks on a treadmill for approximately 20 minutes at 3-3.1 miles per hour. He claims that he cannot seem to build up stamina to exceed this speed and alleges that this is due to his chronic back condition. He also notes that he will take a short walk around the block with his family, but hardly counts this as exercise. Occasionally he rides a bike around the neighborhood with his children, but also states that this would not count as aerobic exercise since it is non-strenuous. During the summer months Dr. Bussell swam on a regular basis and claims that he enjoyed this and that it was not deleterious. He swam at least 20 minutes several times per week (I do not have accurate information about the frequency). He stopped swimming ostensibly because the pool was no longer heated, or at least heated to the temperature he enjoyed.

Dr. Bussell gave me the clear impression that his social revolved around his wife and children. He and his wife did not make a practice going out either alone or with friends in order to find time away from the children. More often that not when they do go out, they take the children with them either to dine or to a movie. He claims that he was raised in a family in which the children and the parents integrated in such a fashion, and he finds no motive to separate from his children. (I am not implying that he should). Social activities with his wife are relatively infrequent although I get a mixed message from Dr. Bussell in this regard. On the one hand he gives me the impression that they attend black tie functions once every several months, but on

Case 3:13-cr-00008-SLG   Document 247-3   Filed 01/07/14   Page 1 of 50

the other hand he states that his wife has a practice containing celebrities, dignitaries, etc. and that they are invited to special functions frequently. He implies that they are obligated to go and that they are even honored to be invited. This reporting of this type of activity implies a busier social life than I initially pictured, and I remain somewhat confused as to the exact tempo of Dr. Bussell's social activities at the present time.

## III.  HISTORY OF THE PRESENT ILLNESS (ACCORDING TO INFORMATION PROVIDED BY THE PATIENT)

Time limits imposed on me by Dr. Bussell's refusal to return for a final session of history taking affects this section of the report more than others. I had hoped to review with Dr. Bussell the accident itself and his course of treatment with Dr. Swezey. I also wanted to talk directly with him about the opinions of other doctors whose records I have reviewed. While this review would be very helpful to me in terms of rounding out my own impressions of the course of his symptoms following the accident, I am able to gain the necessary information from the medical records and I will be basing some of my discussion concerning the course of his illness on those records.

For example, the deposition of Dr. Bussell contains a detailed description of the incident itself as do the notes by the various doctors. I doubt that my reiterating that here or going over it again with Dr. Bussell would add much to the picture, although one never knows. In any event, let me note that the injury occurred on September 2, 1992 when Dr. Bussell fell at the Builders Emporium store in Tarzana. He experienced immediate buttock pain and his wife, who is a physician, insisted that he have X-rays taken. They decided to go to Tarzana Hospital where he was seen in the emergency room. At Tarzana Hospital X-rays showed no acute fracture. According to Dr. Bussell, the emergency room doctor thought that everything was generally OK an and he was sent home. Later that afternoon the pain which at that time was in his buttocks, low back and mid-back, intensified.

The next day Dr. Bussell sought consultation and treatment with Dr. Swezey in Santa Monica who diagnosed the presence of an old compression fracture in-the thoracic spine. The next day CAT scan was performed, he was placed on Motrin and muscle relaxers. Over the next several months the pain in the lower back and buttocks gradually diminished. However, he states that he has had chronic mid-back pain since that time and that the pain in the mid-back region has been aggravated by most twisting and bending movements of the back.

Dr. Bussell described his work as an anesthesiologist to me in some detail, noting the type of procedures he performs and the physical limitations he now believes he experiences which would interfere with those activities. The general point that he makes is that his work requires regular lifting of people and equipment and prolonged hours of sitting, often in a slightly forward bent position. Dr. Bussell claims that prior to the September 2, 1992 injury, he worked full time as

an anesthesiologist at Cedars-Sinai Medical Center.  His specialty was cardiac anesthesiology which I believe he practiced exclusively.  He states that he had excellent relations with the cardiovascular surgeons on staff, noting that he did not experience the often demeaning types of relationships that do exist between surgeons and anesthesiologists, with the demeaning behavior generally coming from the surgeon directed at the anesthesiologist.  Instead he notes that he regarded himself as part of the surgical team and that he felt that his work was valued and that he was integrated into a meaningful organization.  In other words, he is claiming that he did not feel disenchanted or isolated in his work.  On the contrary, his assertion is that he loved his work and that he was excellent at it and that he had earned a good reputation for himself.  In contrast he is afraid now that he will return to work with both his physical limitations and the cognitive impairment that he experiences secondary to his sleep loss, which he relates to back pain, he will make mistakes and that these might ruin his reputation and/or harm people.

There was not sufficient time for me to completely review the malpractice trial which began on September 8, 1992.  Clearly, this major event occurred 6 days after the physical injury in question in this case.  Part of the problem arises from Dr. Bussell's markedly differing accounts of the trial.  On the first day that we met, he expressed with great emotion the overall impression that the trial was an ordeal.  He spent 8 weeks in court everyday.  When we first talked about it he implied that this was an aggravating experience to say the least, noting, "When a burned baby is held up and you're accused of being a murderer, how is it supposed to feel?"  He was also upset that it was implied that he should have been the one responsible for making sure the operating suite was adequate to perform the surgery in question; whereas he adamantly claims that this was neither his responsibility, nor did it have anything to do with his training.  Finally, when we first talked about the trial he claimed that there was considerable mention made of the oxygen line coming into the operating suite and that the implication was that he was somehow responsible for oxygen leaking excessively onto the operative field.  The excess oxygen in turn added to the combustion and the fire.  The clear implication here is that the was a major cause of the extent of the fire and the death of a child which resulted from it.  Finally, on the first day that we discussed the matter, he noted that he guessed that if he ever had a law suit, the Board of Medical Quality Assurance would probably send an investigator to examine his behavior as a physician.  In short, indirectly he implied that this was a trying matter.

On the second day that we met I attempted to go back over the trial and its effect on him.  Dr. Bussell took a different position, stating that he was not seriously emotionally affected by the trial.  Perhaps part of his defensiveness was due to my questions relating to Dr. Brightman's comments that when he first met Dr. Bussell he was complaining of dreaming of fires.  In any event, Dr. Bussell downplayed the effect of the trial, stating that he was not made the scapegoat and it was not implied that he was the cause of the baby's death.  He claims that all the doctors involved were so accused and that he was strongly supported by his attorney and did not feel that he was being scapegoated.  When one of his former residents personally attacked him by

claiming that he should have known better than to allow the surgery to proceed in such a room, he was pained. He claimed on the second day that he did not in essence lose a lot of sleep over this matter and that surgeons who testified did not implicate him as the cause of the fire, and that although the hospital tried to blame it on him, he did not feel that this was being done personally, but rather that they were acting self-defensively. During the first day that we discussed the fire, I thought I understood him to imply that one of the attorney's was claiming that he was responsible for the oxygen leak, that pictures had been altered to make it appear as if he might be responsible. On the second day he did clarify that some of these pictures were both altered and just taken at different times by different people. However, there was in my opinion, the tendency to downplay the earlier statements that he was being set up as the scapegoat at the time of trial. He also claimed that he did not dream of the fire during the time of the trial, and when I asked him about the dreams that Dr. Brightman reported, Dr. Bussell became very vague and changed the subject repeatedly to the point where I could not get him to re-focus on it. I assumed that I would go into this matter with him in detail when we met again, but I was then informed that we would not meet again and, unfortunately, this bit of history has illuded me, at least in so far as my opportunity to hear it directly from Dr. Bussell. The medical records tell a different story, and I will turn to them momentarily.

In a similar fashion I had hoped to clarify the nature of the referral by Dr. Swezey to Dr. Brightman, whereas Dr. Bussell had made it sound as if the referral occurred because Dr. Brightman had some specialty in people suffering from chronic pain. Dr. Brightman's notes on the other hand indicate that the trial and its aftermath may have been playing a part in the formation of Dr. Bussell's mental state. Dr. Bussell indicates that at the time he saw Dr. Brightman in February or March, he was depressed and "not too pleased with things." I did not obtain a clear picture of the nature of the therapy, which Dr. Bussell describes as "cognitive" in its organization. This also implies that Dr. Brightman helped him with physical matters, but once again I did not have the time available to me to explore what that statement meant.

I did have time to review the course of physical therapy the patient received and the effects of low doses of Elavil (approximately 30 mg at night time) upon his sleep. He did indicate to me that other anti-depressants or higher doses of Elavil were not agreeable to him, but I did not have time to explore what experiences he encountered in this regard or what he meant by such statements.

## IV. PAST HISTORY

Dr. Bussell reports that he grew up in a "happy" two parent family in Los Angeles, California. He lived near Sunset Blvd. and Doheny Dr. and attended Hollywood High School which he fondly recalls being able to walk to in those days. His father worked for 45 years at Metro-Goldwyn-Mayer Studios and retired as the assistant manager of film processing. Mr. Bussell fondly recalls his dad, noting that throughout his upbringing he worked alongside his father in

dad's machine shop at home. He notes that his father enjoyed fixing things and making small objects.

Mother is described as a supportive woman who worked as a school teacher and who had earned a Master's Degree in English. There is a 3 year old sister whom he claims to have got along well with.

The family owned a ranch in Julien, near San Diego where they spent most weekends and vacations. Dr. Bussell spent a good deal of time with his father, mostly in the shop but also on vacations.

Throughout school Dr. Bussell describes himself as a B+ student. He reports that he enjoyed grammar school, junior high and high school and that he attended public schools until beginning USC after high school. As noted, he was a B+ student throughout his education which includes college and medical school.

In grammar school and junior high school he was on the one hand not highly academic but still studious, while on the other hand he was not highly social but had a small group of friends. Some of his friends remain present in his life to date. "I was not big time social," and notes that throughout high school he did not date. He also denies a strong sexual interest during high school.

Dr. Bussell was involved in the chess club in high school and also ran the 100 and 220 in track meets, played football and ran cross country. Despite his interest in sports, he does not give the impression that he was involved socially with an athletic crowd. It is difficult to obtain a clear picture of his social functioning during these high school years, and one tends to gain the overall impression of someone who existed on the fringes of social groups and clubs.

He had a "platonic" girlfriend in high school whose father was a doctor and who he credits for serving as a powerful role model for him, which helped him decide on medicine as a career. His mother was also helpful academically.

When Dr. Bussell entered USC he was strongly influenced by one of his professors, Dr. Paul Salzman, a biochemist. Dr. Bussell majored in biochemistry and claims that he studied hard during college. During his free hours he would swim laps in the school pool. He notes that he lived at home and spent a good deal of time with his family during his college years.

He attended USC Medical School and interned at LA County Medical Center. I believe his residency was at Harbor General Hospital, but I am not certain of this.

Dr. Bussell has been married for 22 year to his wife who is a dermatologist. They met during his internship when his wife was still in medical school.

Dr. Bussell notes that after he left his residency he got in his car and drove to Cedars-Sinai Medical Center, where he began working in 1975. He implies that he parked his car on the lot and has never left. He describes his work there as highly satisfactory and notes that he and his wife enjoyed a happy life. Prior to moving to Beverly Hills in 1987 or 1988 they lived near Mulholland and Coldwater Canyon in a home they owned since 1975. He describes life as "good," noting that he and his wife took frequent vacations with their children and that they had tended to have an insular but happy life together.

In 1979 Dr. Bussell's father died of a cardiovascular accident at age 80. He had lingered in ill health after the CVA for 6 months. The other major event he remembers of a traumatic nature is that his youngest daughter had to be resuscitated when she fell from an upper floor window during the early years of her life. He was there and resuscitated her and remembers how frightening an incident that was.

In 1988 the fire in the operating room, which became the basis of the law suit occurred. A baby died in that fire and there was an immediate law suit filed against all parties concerned. He was charged with negligently administering oxygen. He claims that the suit dragged on and on and that nobody believed it would ever come to trial until the day before it did. Thus Dr. Bussell asserts that in the summer of 1992 he fully expected the case to settle before coming to trial. He notes that a number of trial dates had been set and broken, and he had no reason that the trial would actually go forward in September, 1992. Thus he claims that up to the day of the trial he neither expected it to happen nor did he expect the absorbing type of trial he encountered. At one point while describing the trial, he noted that the entire family was caught up in it, even the children. Of course the next time we talked about the trial, he downplayed how much it consumed his life.

Dr. Bussell claims that his past health has been excellent and there is no history of prior litigation.

## V.    REVIEW OF MEDICAL RECORDS

Psychological Testing: Performed at my request by Stuart Meisner, Ph.D. whose report to me is attached to the end of this report as an addendum.

Medical records of Robert Swezey, M.D.

I carefully reviewed the physical therapist's notes, which in September indicate that on some days when the patient was in court he was very tense and on other days, perhaps when he was

not in court, he was more relaxed. For example, on a September 23, 1992 entry, a note is made "I was able to rest before coming here today." The therapist indicates that the patient is improving with decreased pain today, partially because "less stress regarding law suit."

On September 25, 1992 he was worse, stating that he had woken up in the morning with pain. I assume this means he was awakened from sleep with pain.

The pain was clearly waking him at night, and in an October 2, he said, "I'm not sleeping well at night. The pain wakes me up." He goes on to state that he can eventually get back to sleep but then he wakes ups. The statement was made, "The stress of the lawsuit is wearing on me too."

In an October 19 note the therapist states that he is not very motivated to re-start his exercise program at home because he is fatigued secondary to lack of sleep.

On October 7, he again attributes his insomnia to back spasms.

In a note dated October 26, he states, "Its been nearly two months since I've had a good night's sleep - getting old."

In a note dated November 2, the patient is quoted as saying, "I have more pain. I'm not sure if its due to stress with being in court (the handwriting is barely legible here), knew - the word seems something like strain or stress and the next word is worker, or Ex". The therapist remarks that the patient is "exhausted" emotionally and physically with (the next word is illegible) pain.

The next entry dated November 6, 1992 states, "I'm so tense and exhausted." (The next word is difficult to read, but it may be "I'm") "done in court." There are then some words I cannot read and the next words are "do my Ex on Wednesday." The therapist states that the "patient is very fatigued, stressed and exhausted."

On November 9, 1992, he states, "I have the flu and ache all over and still not sleeping well at night."

On November 11 and 30 he complains primarily of not sleeping well. On November 30 he says, "Now I'm forgetting things, starting to nap during the day." There is then a comment to the effect that something that his father did before he died - I assume sleeping during the day and forgetting things.

Case 3:13-cr-00008-SLG   Document 247-3   Filed 01/07/14   Page 7 of 50



On December 9, he stated that he thought the Elavil might be working. "My back feels a little better." The therapist noted that "Patient in a better mood today." There is some reference to his moving around and then a statement is made that "appeared less pensive."

On December 12 it states that the Elavil is affecting him negatively and on December 16 there is a statement "Still having problem with sleeping, pain now varies with position."

There is a note dated January 4, 1993 noting that he is able to continue his exercise on vacation and since then has had difficulty sleeping and still has problems with fatigue and lack of concentration.

A January 6, 1993 note reports in the patient's words, "My back is sore due to some family problem last night."

In mid to late January he reported some improvement and noted he was using the treadmill and the Swiss ball.

There is a February 10 note which has the patient stating, "My back is really sore today. I started yoga and I really like this man who is my instructor. He is knowledgeable."

On February 12 the patient stated, "I've had a bad week with stresses and problems." On this day he indicated that he felt more relaxed and the therapist notes that he benefitted from the therapy. The therapist makes a statement, "His main problem is tension which adds to his pain in mid-back" (underlining by Dr. Friedman).

There is a note, the date of which is illegible, but I believe it is mid-March. It is definitely in March and may be either 3/10 or 3/12. He states, "I re-injured my back this morning when trying to (next word is illegible) pack my daughter's backpack light weight, 15-20 lbs. When I picked it up and moved it forward, my mid back hurt."

In a note dated March 31, the patient states, "I've been having more intermittent spasm to my back and haven't slept well. I'm not sure what I'm doing to cause these spasms - (the rest of the note is illegible).

In early April he continued to complain of insomnia.

The last note seems to be dated April 19, 1993.

I reviewed Dr. Swezey's initial consultation of September 4, 1992. He diagnosed a contusion of the buttocks and a strain of the dorsal and lumbar spine and noted that there were some old fractures at T-9 and T-10, and wanted to rule out any recent fractures.

Exhibit B - Part 2
Page 58 of 100



In a September 22, 1992, Dr. Swezey says, "The patient continues to have major discomfort. He has been in court for the last few weeks and this will continue for a few more weeks in what is a very complex legal matter. He has gotten considerable relief with the TENS unit. His low back discomfort has improved. The major discomfort remains in the dorsal area, but he is getting some relief with corseting. He clearly is functioning at a great disadvantage, in that prolonged sitting, even in a court room, is a source of great discomfort for him, and he is obviously disabled from his customary activities as an anesthesiologist, subsequent to his fall on September 2, 1992."

In a note dated October 14, 1992, Dr. Swezey states, "The patient is still under tremendous stress and is still involved in courtroom proceedings. He is awakening about every other night with pain, somewhere between 2:00 and 5:00 a.m. He has difficulty then finding a comfortable position and getting back to sleep. He responds well but temporarily to the therapy and this seems to be able to keep him able to function, however marginally and make appearances, (emphasis, Dr. Friedman), which is basically in his lifestyle function at this time, having no other choice.

In a note dated November 10, 1992 Dr. Swezey notes, "The patient's trial finally settled about 3 days ago. He is still not sleeping nights and is still having pain. He will be started on Elavil, 10-30 mg at night."

The note dated December 9, 1992 states the patient is overall improved. He is still not sleeping well but is better on 10 mg Elavil, as 20 mg seems to make him quite groggy and he has difficulty concentrating. He has less pain overall."

The January 12, 1993 note states, "The patient is making slow progress on his recondition. His sleep is erratic but he definitely is improved by taking Elavil up to 30 mg at bedtime."

In a note dated February 19, 1993 Dr. Swezey states that the patient is making slow improvement. He has not yet had psychological counseling although he has been strongly advised to do this because of his chronic pain problem."

Since the last note is dated December 12, 1993, I can only assume that he was urged to seek counseling at that time, if not sooner. Dr. Swezey goes on to state, "Nonetheless, he seems to be recognizing that he is going to have to make some adjustments. He has been doing some clinical paperwork research and is thinking of the possibility of working in some less stressful aspects of his profession, but this is exploratory at this time. He continues to sleep poorly, although he is taking Elavil, 30 mg at bedtime." In the same note Dr. Swezey states, "Overall, he seems to be responding to the program, is making progress and is aware that it is in his best interest to begin to find a way to resume his professional activities in a less demanding work environment than cardiac anesthesia, at least in the short term." (This would imply that Dr.

Case 3:13-cr-00008-SLG   Document 247-3   Filed 01/07/14   Page 9 of 50



Swezey views a large part of his problems as emotional in nature, urging to seek a less demanding work environment, unless Dr. Swezey means less demanding physically, although the implication is that he means less demanding emotionally.

In his March 17, 1993 note, Dr. Swezey notes that the patient has gone to two sessions of psychological counseling, which have gone well.

In his April 23, 1993 note, Dr. Swezey notes the presence of continued chronic pain, but also notes that he is benefitting from his counseling with Dr. Brightman. He does not say how he is benefitting.

In a May 19, 1993 note little change is noted. The statement is made, "His sleep is interrupted by back pain and he finds it difficult to concentrate for more than an hour or so." Dr. Swezey then goes on to note that the patient complains of pain with bending, twisting and lifting, and then the patient goes on to explain that as an anesthesiologist, he cannot do all this bending and twisting, noting in some detail the process of intubation, then the process of inhalation. Dr. Swezey states, "Further, he points out that a typical cardiac surgery is a 6 hour procedure which he has to perform without interruption except for urination, which is minimized by avoiding coffee and fluids." (It would seem that the patient is either consciously or unconsciously lobbying Dr. Swezey to understand and believe that he either cannot or should not return to his work).

In this note, Dr. Swezey seems to respond to this appeal by the patient by prescribing more and vigorous exercise. He states, "He is advised to continue with his home program, to stretch first, do his weight work and then his aerobics. He has only been walking about a block outside the house, and I have advised him to increase his walking tolerance on a steady progression, increasing this on alternate days. I have also advised him to take up swimming."

In a June 16, 1993 note Dr. Swezey discusses Dr. Duncan's diagnosis of Scheuermann's disease. He thought this might be a "reasonable assumption" and says, "This may be contributing to his discomfort, although status post strain and stress are major players. The real question is whether or not the T9-10 30% wedging was due to a fracture for which there is no history of trauma, or due to Scheuermann's epiphysitis. The latter becomes more tenable given the lack of recalled trauma. In any event, the combination of stress and skeletal deformities are the important factors in his functioning level. He has progressed with psychological counseling, and he seems more ready to accept the fact that whereas he has pain, he will be able to function, if indeed in a somewhat limited capacity." Dr. Swezey goes on to state that he could do more work, including anesthesiology, although cardiac anesthesiology should not be done in the immediate foreseeable future. Dr. Swezey concludes by stating, "He will be re-checked in 6 weeks, noting no change in his examination at this time except for an obviously improved psychological status, vis-a-vis the totality of his psychological and stress problems." (Could Dr. Swezey be

Case 3:13-cr-00008-SLG   Document 247-3   Filed 01/07/14   Page 10 of 50

registering the response to therapy and the beginning of the resolution of the traumatic emotional state which seems to have been begun at the time of the trial, and which coincides with the back injury chronologically?).

There is a May 27, 1993 letter from Edgar G. Dawson, an orthopedist, addressed to Dr. Swezey. He supports a diagnosis of Scheuermann's Disease, and recommends a trial of facet blocks to "see if we can't identify the pain generator. Once the pain generators are identified, a consideration of perhaps surgical treatment could be entertained."

Notes of Richard Brightman, Ph.D. - Psychologist

There are just some scattered notes from a March 15, 1993 exam. There are several references to the malpractice case but these are literally one word references with no elaboration. There is a statement, "Finances have not been affected."

The next note is dated April 1, 1993 and gives a time line of the law suit. At the very end of the note it says, "September 2, 1992" (and then there is the mark of an arrow) "John falls in mall. He was taking son to Notre Dame. Trial begins next week." (There is an arrow drawn from the date September 2, 1992 to the sentence "Trial begins next week.").

An April 20, 1993 note contains a little past history, report of increased back pain, a note that his wife is great to him, a statement that, "Speech is slow, deliberate," and a statement that his sleep continues to be difficult. There is a note dated June 13, 1993 stating, "Continues to be quite depressed regarding numerous pain related issues: ability to continue career, professional alternatives, role in the family, role in the professional community and the like. Discussed the possibility of anti-depressant medication."

There is a note dated May 26, 1993, there is also one dated June 10, 1993, they're just out of order. There is one dated June 17, 1993 noting continued improvement for the last two sessions.

In the May 15, 1993 note a statement is made by Dr. Brightman that the patient's "first concern is not doing work properly. Second concern is - sued for malpractice."

The May 23, 1993 note reports, "Thinking about the fire a lot lately. (Waco fires with children)."

Records of Stanford M. Noel, M.D.

Dr. Noel's report is dated January 28, 1993 and is addressed to the Connecticut Life Insurance Company. The date of the examination is not listed.

Dr. Noel noted that "His demeanor and behavior during the examination and interview were unusual. He appears to be withdrawn, concerned, speaks in a low, quiet voice without evidence of emotion. He primarily stands during the interview, leaning against a wall and does so with support as he undresses in my presence to remove his socks or shoes. (He states that is easier than sitting when asked). Dr. Noel made two diagnoses: 1. Old scoliosis, thoracolumbar with old compression fracture lower thoracic spine; 2. Clinical depression. Dr. Noel did not believe that he was disabled, based on the musculoskeletal disorder, though he notes, "He does have some residual discomfort and decreased flexibility. Considered alone, I do not believe the musculoskeletal complaints would disable him from his usual work."

Dr. Noel continues by stating, "This man is clinically depressed. He has significant alteration of his sleep pattern with early morning awakening in spite of the use of Elavil at night. He describes difficulty with attention span and is quite concerned that he recently bumped a young girl on a bicycle when he was turning a corner while driving his car. He appears withdrawn to me at the time of this evaluation with a flat affect. He does not describe visual or auditory hallucinations. Considering all the factors noted above, it is my opinion that Dr. Bussell must be considered disabled for his usual work as a cardiac anesthesiologist, an occupation which requires attention to detail and entails a high degree of responsibility. It is my suggestion that he seek at least support of psychotherapy for further evaluation and probable treatment of the matters outlined above, and I discussed this briefly with him at the time of the evaluation. While detailed psychiatric evaluation is obviously not within my area of expertise, I do believe he has sufficient historical features and evidence on examination to make the above diagnoses.

Later Dr. Noel states that he could do administrative work but then concludes, "I would consider him disabled for work requiring repeated heavy lifting, but that does not appear to be part of his usual job." Dr. Noel believed that he would remain disabled until at least April, 1993 and probably somewhat longer.

Medical Records of Albert Meyer, M.D.

Dr. Meyer is an orthopedic surgeon who, in a report dated January 25, 1993 reported on his examination of January 23, 1993 to the Paul Revere Insurance Company.

Dr. Meyer, after presenting the same history as everybody else, reports a relatively normal examination, except for some kyphosis, which everybody else finds. He concludes by stating that after the fall "he probably sustained a contusion and sprain of the dorsal lumbar spine regions. He has evidence on his X-rays of possibly an old compression fracture of the 9th dorsal vertebra. The patient has arthritic changes in his dorsal spine at this level. The patient has not worked since the accident. At the present time, his subjective complaints are out of proportion to his objective physical findings and his X-ray findings. A patient with a strain of the dorsal lumbar spine would probably be unable to work as an anesthesiologist for 3-4 weeks

Case 3:13-cr-00008-SLG   Document 247-3   Filed 01/07/14   Page 12 of 50

after the injury. He does not appear to be disabled at this time. He needs no further diagnostic studies and/or treatment. It is interesting that this man was involved in a long malpractice trial that started shortly after he was injured and continued for about 10 weeks."

## Medical Records of Mark Stern, M.D.

Dr. Stern examined Dr. Bussell in May, 1993. I find some handwritten notes and the history and examination part of a report but I do not find any conclusions in these records. There is an orthopedic examination requested by John Hancock Insurance Company.

## Records of Graham Purcell, M.D.

The records indicate that Dr. Bussell self-referred to Dr. Purcell for an opinion regarding his condition. Dr. Purcell evaluated him on May 28, 1993 and dictated a 2 page report addressed to Dr. Bussell. The history of the present illness deals only with back symptoms. There is no mention of the trial that took place shortly after the injury. Dr. Purcell's impression was Scheuermann's kyphosis and also chronic musculoligamentous thoracic strain secondary to a fall in September, 1992. Dr. Purcell stated, "I have recommended that he continue conservative treatment for his ongoing symptoms. I have recommended that he start swimming laps on a regular basis, ½ mile, 3 times per week, and to continue his exercise program at home. I believe his current symptoms are such that he is disabled from his profession for the foreseeable future. He may require surgical intervention at some point in the future to alleviate his symptoms."

## Records of Jan Duncan, M.D.

Dr. Duncan reviewed many of the same records I have just reviewed. For example, he noted that he read Dr. Meyer's report. He also re-stated Dr. Noel's opinions. His review fills in a gap in my own since he states in regard to Dr. Stern's review: "He states that he felt he was not disabled and could return to his occupation as an anesthesiologist."

I reviewed Dr. Duncan's report dated May 19, 1993 addressed to Dr. Bussell. In his history of the present illness there is no mention made of the malpractice trial, nor is there any recognition of the fact that the patient was undergoing psychological treatment. His impressions were 1. Old Scheuermann's Disease of the thoracic spine. 2. Thoracolumbar strain as a result of the accident on September 2, 1992. In his discussion he believed there were significant objective findings on both the physical examination and the X-rays. He notes that the degree of kyphosis "is approaching 90° in this particular individual." He states, "In this particular case the ideology of the marked deformity is not an issue, however, in my opinion, this results from a development deformity of the thoracic spine, that has reached a point where it has become significantly symptomatic and was aggravated by an injury, as described above. The prognosis

for this is that the degeneration will increase and become more symptomatic. The patient is a surgical candidate in that the majority of the severe degeneration of the thoracic spine become symptomatic to the point that it is surgically treated by a combined anterior and posterior spine fusion."

Dr. Duncan went on to state, "This patient is disabled from work which requires repetitive bending and should be restricted from any lifting over 25 lbs. In addition to this, the patient will be symptomatic if he is any one position for a significant period of time, and will be symptomatic on repetitive bending. Specifically, in my opinion, this patient is disabled for his work as an anesthesiologist. This work requires lifting over 50 lbs. and participation in lifting the patients that may be well over 200 lbs. He also has to do significant bending in this work, as described above under the job description."

END OF SECTION V.
PROCEED TO NEXT PAGE FOR DISCUSSION SECTION.

## VI.   DISCUSSION

### A.   INTRODUCTION

Dr. Bussell, according to my understanding, is claiming that he suffers from a mid-back condition, the symptoms of which restrict and limit his movements, and the pain of which causes insomnia, which in turn results in forgetfulness, diminished concentration and poor attention. His chief claim is that because of the physical back condition and the mental difficulties that he asserts result from the insomnia and back condition, he is disabled from performing his usual occupation as a cardiac anesthesiologist. I am assuming that a corollary claim is that he is unable to function as a general anesthesiologist. The injury of September 2, 1992 is alleged to have aggravated a chronic degenerative arthritic mid-back condition, causing all the asserted disabilities.

My primary finding is that Dr. Bussell is not suffering from a significant mental disorder caused by the injury of September 2, 1992. Contrary to Dr. Bussell's beliefs, my finding is that his memory, concentration and attention are intact. There are no mental impairments which disable him from the performance of his usual occupation. There is no need for treatment of a psychiatric or psychological nature stemming from the September 2, 1992 injury.

### B.   DIAGNOSIS

From a diagnostic standpoint, the evaluation of Dr. Bussell presents certain complications which I will attempt to point out so that some of the apparent contradictions that exist in this case can be understood. One contradiction is the frequent observation by examining physicians and psychologist that Dr. Bussell is depressed. On the one hand this is true, but on the other it is not the type of depression which is serious. I will explain why Dr. Bussell may appear more depressed than he actually is momentarily, but first let me describe the nature of the depression that he evidences at the present time.

According to the criteria of DSM-III-R, Dr. Bussell suffers from a Depressive Disorder Not Otherwise Specified (DSM-III-R, 311.00). This type of depression, according to DSM-III-R, can be a "recurrent mild depressive disturbance that does not meet the criteria for Dysthymia." This depression is longstanding and can be considered part and parcel of Dr. Bussell's personality and character formation. It may be slightly worse at the present time for reasons I will describe below, but on the whole it is representative of the way Dr. Bussell has been for a number of years (probably during all his adulthood). This is a firm clinical opinion based on observation and history. It is also supported by psychological testing results.

The second psychiatric diagnosis is that of an Axis II condition. According to DSM-III-R, Axis II is used to describe aspects of the personality which are problematic and of longstanding

Case 3:13-cr-00008-SLG   Document 247-3   Filed 01/09/14   Page 15 of 50

duration. In the case of Dr. Bussell I find that he suffers from a Mixed Personality Disorder. According to DSM-III-R (301.90) this type of Personality Disorder is officially called "Personality Disorder Not Otherwise Specified." The degree of Personality Disorder is so mild that one could simply make the diagnosis of a cluster of personality traits without resorting to the more official and somewhat pejorative sounding title of "Disorder" which DSM-III-R dictates.

The characteristics of this longstanding problem have been social withdrawal, avoidance of intense personal involvement, and a generally subdued and flat emotional expressiveness. These types of characteristics are called, according to DSM-III-R "schizoid features." There are also passive dependent features present in Dr. Bussell's personality organization and I note the presence of narcissistic features as well. For example, on psychological testing, there was a tendency toward self-aggrandizement which is well concealed from both the patient and others, but which did emerge in objective testing. This narcissistic trend is also evidenced by the patient's strong need to look good, which leads to considerable defensiveness on standard psychological tests, such as the MMPI and during the clinical interview where Dr. Bussell wishes to see himself as not suffering from any mental symptoms at all. In fact, he wishes to appear super normal in that he has difficulty seeing himself as suffering from even the usual stresses and strains associated with stressful life events. Finally, the personality difficulty is evidenced by a feeling of immaturity which Dr. Bussell puts forth during the examination, and which comes through on the psychological testing, as described by Dr. Meisner.

I want to return to the issue of the patient's appearance of depression which has been commented on by Drs. Swezey, Noel and Brightman and by the physical therapist in Dr. Swezey's office. When I first met Dr. Bussell, I thought he was considerably more depressed than I later came to understand him to be. This is due to the fact that the "schizoid" aspects of his personality cause a sense of emotional detachment and a flatness of feeling which, when combined with a mild state of depression, tend to give one the feeling of a much stronger level of depressive affect. Actually, as I got to know Dr. Bussell, I found that he was not that depressed at all. He was able to laugh freely, although in a subdued manner, and at times was able to show a far less sober side of himself. As I mentioned before, there is some complication in this case concerning apparent diagnoses, and the psychological testing is helpful in understanding why. On the one hand, Dr. Bussell wants to look good in a general psychological sense. In other words, he does not want to appear as if he is suffering from any mental symptoms at all. Plus he tends to deny any depressed feelings. The testing reveals that he actually has a tendency to translate depressed feelings into somatic ones, so that when he is under stress he is most likely to experience that stress as physical in nature. In other words, people who suffer from this type of lack of expression of depressive or anxious feelings often complain of physical pain of a musculoskeletal nature, or of headaches, or of various hypochondriacal concerns related to their heart or gastrointestinal symptom. Often they have psychosomatic problems such as irritable bowel syndrome or eczema.



While on the one hand the psychological testing reveals that Dr. Bussell does not wish to see himself as depressed, on the other hand the testing shows that he responds to questions about depression with a mild elevation in this area. So on the on the one hand he wants to look good, but on the other hand he does acknowledge some depressed feelings. Now a logical question develops as to whether or not he may be concealing to himself and others, a more serious depression than is evident either on examination by me or through the psychological testing performed by Dr. Meisner. My answer clinically is no. There are no clinical correlates to a state of significant depression. For example, his appetite is satisfactory, his sexual desire while decreased is not so seriously decreased that it is indicative of a serious state of depression. His ability to concentrate and focus is not impaired. His sense of humor is intact. His daily activities are not consistent with a serious state of depression and there is no sense of sadness or hopelessness of a significant degree present on examination. The psychological testing confirms that the depression is an old problem, but also tells us that there is very little if any increase in his level of mental distress now when compared to his level of mental distress during most of his adulthood years. Psychological testing also reveals that Dr. Bussell possesses above average coping skills and that there has been little or no deterioration in his coping skills or mental state in recent years, even given the fact that the malpractice trial he went through in the fall of 1992 was stressful at the time. The psychological testing indicates that in all probability there have been no longlasting psychological damaging effects from that stress.

Clinical examination reveals that Dr. Bussell has excellent concentration, memory, and attention. He was able to engage in a lengthy interview process, exhibited clear recall for all events with no drop off in concentration or attention during our long time together. Psychological testing is a more precise instrument for measuring the type of cognitive impairment which Dr. Bussell is alleging. Psychological testing corroborates and supports my observation which is that Dr. Bussell wants us to believe that he is dysfunctional secondary to poor concentration, poor attention and forgetfulness. However, in this regard, the psychological testing reveals that Dr. Bussell exaggerates weakness in the area of concentration and that he attempted to appear so impaired on tasks of incidental learning that he would be classified as an early Alzheimer's patient if he were actually performing at that level of impairment. Psychological testing reveals no evidence of weakness in the areas of attention or concentration, but the testing does show that he is attempting to "look bad" on these tasks. For example, his speed task completion of psychological testing varies widely, suggesting that he wants to look poor when it is obvious that he is being timed. On the other hand, when he is unaware of being timed, he does not evidence the same level of impairment that he does when he thinks he is being tested on this parameter.

## C.   DISABILITY CONSIDERATIONS

The clinical interview and psychological testing in summary reveal a mildly depressed man suffering minimal emotional distress who has a long past history of mild depression, which may be no different than the depression we are seeing now. The testing reveals that he is markedly

defensive, wishes on the one hand to appear to be super normal from a mental standpoint, while on the other wishing to appear more impaired than he is from a cognitive standpoint. Finally, both the clinical examination and the testing reveal that he suffers from significant personality difficulties of a longstanding nature.

What are we to conclude then as a result of these diagnostic considerations? First, we can conclude that Dr. Bussell is a mildly depressed man, and I will turn momentarily to discussion for some possible reasons for this mild state of depression. A second conclusion that we are drawn to, is that in large part, Dr. Bussell is consciously trying to look bad and to appear cognitively disabled. I cannot discern how much of the exaggeration Dr. Bussell is consciously aware of and how much is unconscious, i.e. outside of his awareness. There is a mixture of both, but there is no question that he, to some significant extent, is aware of his tendency to exaggerate. Unfortunately, exaggeration casts some doubt on his self-reports of insomnia, and even on the degree of back pain and limitation of motion he is reporting. As I noted above, his allegations of impaired concentration, memory and attention are not present and I believe these claims are consciously and unconsciously fabricated, or certainly highly exaggerated by the patient.

The motive for the exaggeration in this case is far from clear. In other words, why does Dr. Bussell want us to believe that he is not capable of working as an anesthesiologist? There are a number of possibilities which occur to me, which I will list for you. As I do so, I will try and describe what information we might be able to gather which would support some of these hypotheses.

1.  We know that Dr. Bussell is chronically depressed and that he suffers from a personality organization which renders him an aloof and withdrawn individual. These characteristics can be enabling for a doctor who works as an anesthesiologist. The work itself allows a relative lack of interaction with other people and satisfies a certain need for withdrawal. I do not have sufficient past history regarding Dr. Bussell (and I do not believe I could obtain such history under medical-legal circumstances that we are operating under) to know if he has been dissatisfied with his work to the point where he wishes to withdraw from it. He may also be suffering from symptoms of withdrawal and aloofness to the point where they become maladaptive for his work and perhaps he wishes to escape, even from the interactions that he has to engage in as an anesthesiologist. In other words, a combination of dissatisfaction with his work as an anesthesiologist and, with his personality characteristics, may have caused Dr. Bussell to look for an avenue of exits from his former occupation. His professed "love" for cardiac anesthesiology may, under these conditions, serve as a type of "reaction formation," i.e. as an expression of too much positive regard to cover over his negative feelings. In order to gain information regarding this hypothesis, it would

be helpful to know from other individuals who are familiar with Dr. Bussell whether he did indeed evidence dissatisfaction with his lot in life prior to his injury in 1992. Cannot tell whether his desire to enter academic medicine at the present time is an expression of a wish to leave active practice or is based on his belief that he has no alternative. Perhaps other individuals such as colleagues, or his therapist, Dr. Brightman, have information which would shed light on these questions.

2.   The possibility exists that following the malpractice trial, Dr. Bussell developed phobia about returning to work as an anesthesiologist. At the time of my examination he evidences a phobic response about returning to work. A phobia is an irrational fear. Dr. Bussell believes himself to be suffering from concentration, attention and memory problems, which is an irrational belief, since we have demonstrated that such problems do not exist. This belief leads to a second belief, namely that he would make mistakes performing his work as an anesthesiologist and that he could endanger people and perhaps be sued again. He certainly is afraid that if he is sued again he will be investigated by the Board of Medical Quality Assurance, and hints that he fears he might lose his license to practice medicine. In other words, he might be afraid to "get back on the horse" due to the traumatic effects of a prolonged and vicious malpractice trial. As I noted in the body of this report, Dr. Bussell was of two minds concerning the effects of this trial. On the first day we met he presented the trial as quite engrossing and traumatic, noting that even his children were caught up in it and it dominated his life. He implied that he was accused of murdering a child as her attorneys held up pictures of a burned baby for all in court to see. When we discussed these types of thoughts during our second meeting, Dr. Bussell backed away from them and made it sound as if the trial was less emotionally stressful, almost to the point where he implied that he took it in stride. This assertion is at odds with the notes of Dr. Swezey and the physical therapist who treated him. Their comments are replete with references to the emotional stress he was undergoing during the trial. Dr. Noel also noted in January, 1993 that the patient appeared depressed (although I have commented that Dr. Noel may have over estimated his depression because he was not aware of personality characteristics which make him look more depressed than he is), and that he had just gone through a long, trying malpractice law suit.

3.   There is considerable "secondary gain" accruing to Dr. Bussell as the result of his alleged injuries. My understanding is that he is earning disability monies (or could possibly in the future), which might equal his salary. Also, his wife is working more in order to compensate for lost income. Thus the normal pressure in life to make a living has been eased for Dr. Bussell, and this will make it



easier to exit from what he may perceive as a very demanding, dislikable and, in light of the malpractice trial, frightening type of work.

4. I am not sure what to make of the patient's back condition. There appears to be some serious disagreement among the orthopedic surgeons concerning Dr. Bussell's orthopedic condition. I gather from Dr. Swezey's notes that in general, he believes Dr. Bussell is capable of considerable physical activity since he recommends it. I would interpret this recommendation for that level of activity as practically stating between the lines that Dr. Bussell could perform his work as an anesthesiologist.

Dr. Noel is very clear about the matter. He believes that the back condition is not impairing Dr. Bussell at all, but he does believe that he is depressed. Dr. Meyers similarly believes there is no disability present and points to the fact that the subjective complaints do not match the objective findings. Usually in medicine, this is indicative of psychological-emotional problems entering into the picture, or a doctor may be implying that he believes the patient is consciously exaggerating his symptoms for clear cut gain.

Dr. Stern also believes Dr. Bussell is not disabled, and it appears that Dr. Duncan is the only voice who loudly and strongly states that the patient is significantly disabled. To a much lesser extent, Dr. Purcell notes disability, but on the other hand he recommends a vigorous swimming program which Dr. Bussell pursued successfully. I would think this would contra-indicate any surgical intervention and would imply that the patient who tolerated this vigorous swimming program was capable of physical activity in the workplace. Only Dr. Duncan then seems to strongly recommend surgery in the near future with a high degree of probability. I am somewhat confused by his report which seems hyperbolic. For example, he states that there is a kyphosis of 90°. My understanding of kyphosis would lead me to believe that if there was one of 90°, the patient would be bent over at a right angle, i.e. he would be looking at the floor. If my understanding is incorrect, please advise me and I can similarly revise my integration of Dr. Duncan's conclusions.

From a psychiatric standpoint I can add two bits of information to the orthopedic debate which I hope they can find helpful. First, psychological testing reveals that Dr. Bussell is the type of individual who, when under stress, tends to express it somatically, since he has difficulty expressing it directly through emotional channels. It is therefore very possible that the back injury became the focus of expressing the distress generated by the malpractice trial. When one reads the physical therapy notes, one certainly gains the impression that they viewed him as a

man who was going through considerable emotional distress secondary to the trial, and that they viewed the back symptoms as related to emotional factors.

My own review of the physical therapy notes also gives the impression of a man under considerable emotional distress secondary to the trial who possibly was expressing that distress through somatic channels, i.e. exaggerated back pain. The distress may have even caused considerable muscle spasm in the back. When the trial ended the back condition was reported as gradually improving. Perhaps at that time other factors took over. In other words, the secondary gain of financial remuneration for being off work, and the chance to avoid a frightening, and perhaps disliked professional career, took over once the stress of the trial took over. Finally, I want to mention the possibility that if the back is as serious as Dr. Duncan asserts, then some of Dr. Bussell's fear that he could make mistakes because of the limitations imposed by the back condition might become more plausible. I am not referring to his allegations of insomnia which I do not attribute to the back condition, but rather to physical mistakes because of an inability to lift or perform certain tasks in the operating room. I defer to the orthopedic surgeons though to make a decision about his physical limitations. We note that to the extent that they regard his back condition as seriously as Dr. Duncan does, then there is a possibility that the back condition may add to his wish to withdraw from work as an anesthesiologist.

D.    **FINAL OPINION & SUMMARY**

Dr. Bussell is a 47-year-old anesthesiologist is not suffering from a serious mental condition at the present time. He has no difficulties with concentration, memory or attention, although he wishes us to believe so and is exaggerating his responses on testing in order to appear as if he has difficulty in these areas. The injury of September 2, 1992 did not cause psychiatric sequelae, nor result in a need for psychiatric treatment. Dr. Bussell's reports of diminished mental functioning indicate significant exaggeration, and I have discussed some of the possible hypotheses which might explain this exaggeration. In short, I view him as attempting to convince us that he is not capable of performing his usual and customary work as an anesthesiologist due to these mental problems. The findings from examination do not corroborate these allegations, and instead reveal that he concentrates, attends and remembers very well and that he is capable of performing his usual work. He does have lifelong mild emotional problems of two types. There is a chronic low grade depression and a chronic mild Personality Disorder which have been with him a long time, and certainly they both pre-existed the injury of September 2, 1992. Finally, I have discussed at length the possibility that the malpractice trial which occurred almost simultaneously with the back injury, may have been a mental stressor and I have attempted to rate its role in the clinical picture.

February 11, 1994
RE: John Albert Bussell
Page 27

I hope these comments are helpful in understanding Dr. Bussell's current clinical condition.

Sincerely yours,

Raymond J. Friedman, M.D., Ph.D.
Diplomate, American Board of
Psychiatry and Neurology

RJF/owp/337



# CERTIFICATE OF SERVICE

I, **CHRISTINE SALAZAR,** declare:

That I am a citizen of the United States and resident or employed in Los Angeles County, California; that my business address is the Office of United States Attorney, United States Courthouse, 312 North Spring Street, Los Angeles, California 90012; that I am over the age of eighteen years, and am not a party to the above-entitled action;

That I am employed by the United States Attorney for the Central District of California who is a member of the Bar of the United States District Court for the Central District of California, at whose direction I served a copy of:

**GOVERNMENT'S MOTION IN LIMINE TO EXCLUDE TESTIMONY OF DEFENDANTS' EXPERT, DRS. MARK MILLS AND J. REID MELOY, REGARDING MENTAL CONDITION**

**service was:**

[ ] Placed in a closed envelope, for collection and interoffice delivery addressed as follows:

[X] Placed in a sealed envelope for collection and mailing via United States Mail, addressed as follows:

[ ] By hand delivery addressed as follows:

[ ] By facsimile as follows:

[ ] By messenger as follows:  [ ] By federal express as follows:

**addressed to: PLEASE SEE ATTACHMENT**

This Certificate is executed on **March 1, 2001,** at Los Angeles, California.

I certify under penalty of perjury that the foregoing is true and correct.

_____
CHRISTINE SALAZAR

## ATTACHMENT

**Counsel for John Bussell:**    (BY MAIL)
Peter Morris, Esq.
Bryan C. Altman, Esq.
1880 Century Park East
Suite 613
Los Angeles, CA 90067
FAX: (310) 227-8483


**Counsel for Letantia Bussell**:    (BY MAIL)
Nathan J. Hochman, Esq.
9150 Wilshire Blvd.,
Suite 300
Beverly Hills, CA 90212
FAX: (310) 859-1430

1  NATHAN J. HOCHMAN, ESQ., State Bar No. 139137
   HOCHMAN, SALKIN, RETTIG, TOSCHER and PEREZ,
2  A Professional Corporation
   9150 Wilshire Boulevard
3  Suite 300
   Beverly Hills, California 90212
4  Telephone: (310) 281-3200



5

6  Attorneys for Defendant
   LETANTIA BUSSELL
7

8
                    UNITED STATES DISTRICT COURT
9
           FOR THE CENTRAL DISTRICT OF CALIFORNIA
10
                       SOUTHERN DIVISION
11

12 UNITED STATES OF AMERICA,          CASE NO. SA CR 01-56(A)-AHS

13         Plaintiff,                  DEFENDANT LETANTIA BUSSELL'S
                                       OPPOSITION TO GOVERNMENT'S
14    v.                               MOTION IN LIMINE TO EXCLUDE
                                       THE TESTIMONY OF DR. J. REID
15 LETANTIA BUSSELL, JOHN BUSSELL,     MELOY
   AND JEFFREY SHERMAN,
16                                     Date: April 30, 2001
                                       Time: 2:30 p.m.
17         Defendants.

18

19

20      Defendant Letantia Bussell, by and through her counsel of

21 record, hereby opposes the Government's motion in limine to exclude

22 the testimony of defense expert Dr. J. Reid Meloy regarding the

23 psychopathic behavior of the Government's main witnesses: Robert

24 Beaudry and Jeffrey Sherman.

25 / / /

26

27 / / /

28



1    This opposition is based on the files and records of the case,

2    the attached Memorandum of Points and Authorities, and any such

3    argument as may be heard by the Court.

5    Dated: April 11, 2001              Respectfully Submitted,

7                                       HOCHMAN, SALKIN, RETTIG, TOSCHER & PEREZ

8                                       By _____

9                                          NATHAN J. HOCHMAN,
                                           Attorney for Defendant,
10                                         LETANTIA BUSSELL

2

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . ii

I   BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . 3

II  ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . 6

    A.  Dr. Meloy's Testimony is Scientifically
        Reliable . . . . . . . . . . . . . . . . . . . . . . . 6

    B.  Dr. Mills Testimony Is Highly Relevant . . . . . . . . 9

    C.  Dr. Meloy's Testimony Should Not Be Barred by
        Fed. R. Evid. 608(b) . . . . . . . . . . . . . . . . 10

    D.  The Probative Value of Dr. Meloy's Testimony
        Will Not Be Substantially Outweighed by the
        Prejudicial Effect of Such Testimony under Fed.
        R. Evid. 403 . . . . . . . . . . . . . . . . . . . . 11

III CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . 12

i

# TABLE OF AUTHORITIES

Page

CASES

Daubert v. Merrell Dow Pharmaceuticals, Inc.,
509 U.S. 579 (1993) . . . . . . . . . . . . . . . . 5, 6, 7, 9

United States v. Bussey,
942 F.2d 1241 (8th Cir. 1991) . . . . . . . . . . . . . . . 11

United States v. Campos,
217 F.3d 707 (9th Cir. 2000) . . . . . . . . . . . . . . . . 9

United States v. Hiss,
88 F. Supp. 559 (S.D.N.Y. 1950) . . . . . . . . . . . . . . 12

United States v. Morales,
108 F.3d 1031 (9th Cir. 1997) . . . . . . . . . . . . . . . 10

United States v. Rahm,
993 F.2d 1405 (9th Cir. 1993) . . . . . . . . . . . . . . . 10

United States v. Vallejo,
237 F.3d 1008 (9th Cir. 2001) . . . . . . . . . . 7, 8, 9, 10

Exhibit B - Part 2
Page 78 of 100

# MEMORANDUM OF POINTS AND AUTHORITIES

## I

## BACKGROUND

It should be undisputed that Robert Beaudry and Jeffrey Sherman evidence psychopathic traits and behaviors: deceitfulness, manipulativeness, projection of blame onto others, and irresponsible behavior that causes hardship for others. These lawyers/convicted felons have admitted to lying, cheating, and stealing over a number of years involving numerous individuals and a sundry of fraudulent schemes. These types of traits and behaviors do not show a one-time occurrence of criminality but a pattern of psychopathic behavior that occurs in different places, at different times, with different victims.

The term "psychopathy" is not a euphemism but a medical term that describes a constellation of behaviors and traits wherein there is a callous disregard for the rights and feelings of others and a pattern of chronic anti-social behavior. Psychopaths can be either violent or non-violent; non-violent psychopaths are commonly referred to as "con men," "imposters," or "swindlers." Because of their absence of any personal loyalties or values, they are often the first people who will cut a deal with the Government to save themselves at the expense of others.

The field of psychopathy has been developing consistently over the past 30 years, and articles about psychopathy regularly appear in both psychiatric and psychological journals. This field is considered an accepted science as its theories have been rigorously tested and have been found to show both concurrent and predictive validity.

3

1     Dr. Letantia Bussell's designated expert to testify on the

2 psychopathic traits of Beaudry and Sherman is Dr. J. Reid Meloy.

3 The Government does not question Dr. J. Reid Meloy's expertise in

4 the field of psychopathy.  Dr. Meloy is a nationally recognized

5 authority in psychopathy, is the author of several books on

6 psychopathy, teaches throughout the United States and Europe on

7 psychopathy, and is regularly retained by both prosecution and

8 defense to testify as an expert in psychopathy.

9     Dr. Meloy's proffered testimony would include testifying to

10 the psychopathic traits applicable to Beaudry and Sherman that will

11 show how they exhibited psychopathic behavior.  These traits have

12 been encapsulated in the Psychopathy Checklists.[1]  Much of the

13 foundation for this testimony is anticipated to be derived through

14 the cross-examination of Beaudry and Sherman.

15     The Government contends that Dr. Meloy's testimony should be

16 precluded based on the failure to properly summarize it under Fed.

17 R. Crim. Proc. 16(b)(1)(C), because it is not sufficiently reliable

18 or relevant under Fed. R. Evid. 702, because it is improper

19 extrinsic evidence under Fed. R. Evid. 608(b) and because the

20 probative value will be substantially outweighed by the possibility

21 of jury confusion.

22     The Government's arguments are without merit.  First, the

23

---

24    [1] These traits include: glibness/superficial charm, grandiose
sense of self-worth, pathological lying, conning/manipulative, lack

25 of remorse or guilt, shallow affect, callous/lack of empathy, failure
to accept responsibility for own actions, promiscuous sexual behavior,

26 many short-term marital relations, criminal versatility, need for
stimulation/proneness to boredom, parasitic lifestyle, poor behavioral

27 controls, early behavioral problems, lack of realistic long-term
goals, irresponsibility, juvenile delinquency, and revocation of

28 conditional release. See Dr. J. Reid Meloy, "Psychopathy," Violence
Risk and Threat Assessment (2000), attached herein as Exhibit 2.

4

proffer[2] summarized Dr. Meloy's testimony, his qualifications, and the reasons and bases of his testimony that were available to counsel at the time.[3] See Exhibit 1 (letter to Gov't re proffer of Dr. Meloy and resume). Second, the science of psychopathy is reliable under the standards outlined in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993) and Ninth Circuit law. Third, Dr. Meloy's testimony will be highly relevant to show the psychopathic tendencies of Beaudry and Sherman that led them to deceive and manipulate the Bussells. It cannot be overemphasized that the central debate at trial will be between the Bussells' contention that they were victims of deceitful, manipulative, psychopathic lawyers and the Government's theory that the Bussells were co-conspirators in the lawyers' fraudulent schemes.

Fourth, this testimony does not constitute improper extrinsic evidence barred by Rule 608(b) because this testimony will not be addressing "specific instances of the conduct of a witness for the purpose of attacking or supporting the witness' credibility" but

---

[2] The proffer was as follows: "Presently, the defense intends to call J. Reid Meloy, Ph.d, whose testimony will include but not necessarily be limited to the following: Explaining psychopathy and the expected traits and behaviors of the psychopathic personality; and relating such expected traits and behaviors to the actions of Jeffrey Sherman and Robert Beaudry . The defense has not received nor does it expect to receive a report from Dr. Meloy. The bases for his testimony, at this time, include his training and experience, as documented in his resume, and his review of the First Superseding Indictment and the Government interviews of Jeffrey Sherman and Robert Beaudry." See Exhibit 1.

[3] To the extent that the proffer outlined Dr. Meloy's testimony in general terms, such proffered testimony is supplemented herein in this opposition pleading in sufficient detail to satisfy Rule 16(b)(1)(C). All references herein to psychopathy, psychopathic traits and behaviors, the scientific foundation for psychopathy, and Dr. Meloy's preliminary conclusions constitute part of Dr. Meloy's proffer.

5

1  will instead be helpful to the jury in understanding how the
2  Bussells were victimized by the lawyers/con men.

3      Fifth, given the importance of the testimony of Beaudry and
4  Sherman, two of the chief Government witnesses, and the factual
5  dispute over whether the Bussells were victims or co-conspirators,
6  the probative value of Dr. Meloy's testimony will not be
7  substantially outweighed by its prejudicial effect under Rule 403.

8      Accordingly, the Government's motion in limine to exclude Dr.
9  Meloy's testimony should be denied.

10                              II

11                           ARGUMENT

12  A.   Dr. Meloy's Testimony is Scientifically Reliable

13      The Government claims that Dr. Meloy's testimony should be
14  excluded under Federal Rule of Evidence 702 because Dr. Meloy's
15  testimony is not scientifically reliable.  As elaborated below, the
16  Government's argument is meritless.

17      Federal Rule of Evidence 702 provides:

18      If scientific, technical, or other specialized knowledge
        will assist the trier of fact to understand the evidence
19      or to determine a fact in issue, a witness qualified as
        an expert by knowledge, skill, experience, training, or
20      education may testify thereto in the form of opinion or
        otherwise.
21

22  In Daubert, 509 U.S. at 588, the U.S. Supreme Court recognized "the
    'liberal thrust' of the Federal Rules [of Evidence] and their
23  'general approach of relaxing the traditional barriers to 'opinion'
24  testimony.'"  With respect to Rule 702, the Daubert court held that
25  scientific testimony must be reliable and the Court set out the
26  test for reliability as follows:
27
28      [W]hether the expert is proposing to testify to (1)
        scientific knowledge that (2) will assist the trier of

                              6

fact to understand or determine a fact in issue. This
entails a preliminary assessment of whether the reasoning
or methodology underlying the testimony is scientifically
valid and of whether that reasoning or methodology
properly can be applied to the facts in issue.

Id. at 592.

In <u>United States v. Vallejo</u>, 237 F.3d 1008 (9th Cir. 2001), the
Ninth Circuit addressed the test for reliability under Rule 702.
In that case, Vallejo was charged with importation and possession
with intent to distribute marijuana. During trial, Vallejo
proffered the expert testimony of his high school's psychologist
and director of special education. The expert was prepared to
testify about Vallejo's long-standing, severe language disorder,
documented by more than ten years of school and special education
records, and the difficulties he experienced understanding and
expressing English. The testimony was offered to explain the
discrepancies between Vallejo's and government agents' recollection
of the communications which occurred during an interrogation of
Vallejo. The district court excluded the expert testimony under
Rule 702, and Vallejo was convicted. Id. at 1018-1019.

On appeal, the Ninth Circuit reversed the conviction on the
ground that the district court improperly excluded the expert
testimony under 702. The Ninth Circuit held:

To be admissible, expert testimony must (1) address an
issue beyond the common knowledge of the average layman,
(2) be presented by a witness having sufficient
expertise, and (3) assert a reasonable opinion given the
state of the pertinent art or scientific knowledge.

Id. at 1019. The Ninth Circuit found that the expert's testimony
satisfied each of these three elements. Consequently, the Ninth
Circuit concluded "that the expert testimony was necessary to
assist the jury in determining whether the inconsistencies resulted

7

from Vallejo's recognized language difficulties." _Id_. at 1020.

_Vallejo_ is directly on point regarding the admissibility of Dr. Meloy's testimony under Rule 702. Like the expert's testimony in _Vallejo_, Dr. Meloy's testimony is admissible under Rule 702 because his testimony satisfies the three elements set out in _Vallejo_. With respect to the first element, Dr. Meloy's testimony will address the science of the psychopathic personality, an area beyond the common knowledge of the average layperson.

With respect to the second element, as evidenced by his resume attached herein in Exhibit 1, Dr. Meloy is one of the nation's leading experts in psychopathy, has published extensively and taught all over the world in the area, and has been admitted as an expert in a number of federal and state courts on the subject.

With respect to the third element, Dr. Meloy will be able to state a reasonable opinion given the state of the scientific knowledge, concerning the psychopathic traits and behaviors of Beaudry and Sherman. Dr. Meloy's opinion will be grounded in the science of psychopathy that has been rigorously tested over the past 30 years. _See_ Exhibit 2 attached herein (Dr. Meloy's chapter on "Psychopathy" in his book _Violence Risk and Threat Assessment_ (2000) with related authorities cited therein). In addition, prior to testifying, he will have reviewed all relevant discovery and will have the opportunity of witnessing Beaudry and Sherman on the witness stand in order to gauge their responses to questions dealing with traits of the psychopathic personality.

Based on his preliminary review of the discovery thus far, Dr. Meloy is able to conclude that Beaudry and Sherman exhibit telltale signs of the psychopathic personality, including engaging in

8

patterns of deceit and manipulation with different victims at
different times using different types of lies and falsities,
demonstrating irresponsible behavior and a lack of acceptance of
responsibility by trying to blame others for their actions, and
showing a pattern of adult anti-social behavior by disregarding the
rules and regulations of society over a number of years.  For
example, Dr. Meloy has observed that Sherman's pattern of deceitful
and manipulative conduct started as early as when he was with IRS
District Counsel in 1989 where credible evidence obtained by the
IRS Inspector William Shaffer showed Sherman engaged in a variety
of conflicts of interest and using the Government facilities for
his own personal ends.  See Exhibit 3 (IRS Inspector's 1989-91
investigation of Sherman's improprieties while at IRS District
Counsel).

    Since Dr. Meloy's testimony meets the three Vallejo elements
for reliability under Rule 702, this Court should exercise its
discretion to permit such testimony.

B.    Dr. Mills Testimony Is Highly Relevant

    Under Daubert, an expert's testimony must not only be reliable
but relevant, that is, it needs to be able to assist the jury in
understanding a fact in dispute.  Here, one of the principal facts
that will be in dispute is whether the Bussells were victims of
deceitful, manipulative, psychopathic lawyers or co-conspirators
with them.  Dr. Meloy's testimony will assist the jury in
understanding how Beaudry and Sherman were able to manipulate and
deceive the Bussells, victimizing them in the process, in the same
manner in which they victimized other unsuspecting clients.  The
testimony will present the predicate from which the Bussells'

9

1 victimization can be argued; the testimony does not compel this
2 finding, however, and the jury will be free to accept or reject it.
3 See United States v. Campos, 217 F.3d 707, 711 (9th Cir. 2000)
4 (expert testimony that establishes the predicate from which the
5 jury draws its own inferences or conclusions is proper so long as
6 the ultimate inference does not necessarily follow from the
7 testimony); United States v. Morales, 108 F.3d 1031, 1034 (9th Cir.
8 1997) (en banc) (permits expert testimony concerning the predicate
9 of defendant's level of knowledge and understanding of bookkeeping
10 principles that would allow the defendant to argue that she had no
11 intention of causing false entries in union records); United States
12 v. Rahm, 993 F.2d 1405, 1408-12 (9th Cir. 1993) (permits expert
13 testimony concerning the predicate of defendant's poor visual
14 perception that would allow the defendant to argue that he did not
15 knowingly pass counterfeit currency); Vallejo, 237 F.3d at 1018-19
16 (permits expert testimony concerning the predicate of defendant's
17 language disorder and difficulties in understanding and expressing
18 English that would allow the defendant to argue that he did not
19 confess to the crime).

20     Accordingly, Dr. Meloy's testimony is highly relevant and
21 should be admitted.

22 C.    Dr. Meloy's Testimony Should Not Be Barred by Fed. R. Evid.
       608(b)
23
24     The Government contends that Fed. R. Evid. 608(b) should bar
25 the admission of Dr. Meloy's testimony. Since Dr. Meloy will not
26 be testifying as to specific instances of conduct for the purpose
27 of attacking a witness' credibility, this rule does not prevent the
28 admission of such testimony.

10

1    Rule 608(b) provides as follows: "Specific instances of the
2 conduct of a witness, for the purpose of attacking or supporting
3 the witness' credibility . . . may not be proved with extrinsic
4 evidence."

5    Here, Dr. Meloy's testimony will not be proving specific
6 instances of any conduct of Beaudry or Sherman; such conduct will
7 already be in evidence at trial prior to Dr. Meloy taking the
8 stand.  Thus, Dr. Meloy's testimony will not run afoul of this
9 rule.

10    The Government's reliance on <u>United States v. Bussey</u>, 942 F.2d
11 1241, 1253 (8th Cir. 1991) is misplaced.  In that tax fraud case,
12 the defendant tried to have an accounting expert testify that the
13 defendant's accountant (a government witness) did not tell the
14 truth with respect to the preparation of a tax return at issue.
15 The court affirmed the district court's exclusion of such testimony
16 as violating Rule 608(b)'s prohibition against using extrinsic
17 evidence to prove a specific act of conduct attacking a witness'
18 credibility.  Here, in contrast, Dr. Meloy will not be testifying
19 to any specific instance of conduct of either Beaudry or Sherman
20 but to their psychopathic personalities that led them to deceive
21 and manipulate the Bussells.

22    Hence, Rule 608(b) does not bar the admission of Dr. Meloy's
23 testimony.

24 D.  <u>The Probative Value of Dr. Meloy's Testimony Will Not Be
     Substantially Outweighed by the Prejudicial Effect of Such
25   Testimony under Fed. R. Evid. 403</u>

26    Under Fed. R. Evid. 403, relevant testimony may still be
27 excluded if its "probative value is substantially outweighed by the
28 danger of unfair prejudice, confusion of the issues, or misleading

                                11

the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

Here, in conducting the Rule 403 balancing test, on the one hand, the probative value of Dr. Meloy's testimony is very high since it will provide a scientific basis from which to understand the deceitful and manipulative actions of Beaudry and Sherman. This probative value is not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, because it will provide a predicate from which to argue the Bussells' victimization at the hands of their lawyers that the jury is free to accept or reject. Jury instructions concerning the role of experts can prevent any confusion that may arise. Moreover, Dr. Meloy's testimony will be relatively brief and will not be duplicative of any other witness' testimony.

Accordingly, the Rule 403 balancing test tips strongly in favor of admitting Dr. Meloy's testimony. See United States v. Hiss, 88 F. Supp. 559, 560 (S.D.N.Y. 1950) (court admitted the defense's psychiatric expert to discredit and impeach the credibility of the Government's main witness).

### III

### CONCLUSION

For the foregoing reasons, Dr. Letantia Bussell respectfully requests that the Court deny the Government's motion in limine seeking to exclude Dr. Meloy's testimony since such testimony is scientifically reliable, highly relevant, and not barred by Rules 608(b) and 403.

12

Exhibit B - Part 2
Page 88 of 100



Exhibit 1

LAW OFFICES

# HOCHMAN, SALKIN, RETTIG, TOSCHER & PEREZ

A PROFESSIONAL CORPORATION
9150 WILSHIRE BOULEVARD
SUITE 300
BEVERLY HILLS, CALIFORNIA 90212-3414

NATHAN J. HOCHMAN
DIRECT LINE
(310) 281-3290

TELEPHONE
(310) 281-3200
(310) 273-1181
FACSIMILE
(310) 859-1430
EMAIL
Hochman@Taxlitigator.com

February 20, 2001

**BY HAND DELIVERY**

Paul Stern, Esq.
Ranee Katzenstein, Esq.
Assistant United States Attorney
312 North Spring Street
Los Angeles, CA 90012

**RE:  United States v. Letantia Bussell, et al.**
**– Discovery re Rule 16(b)(1)(C)**

Dear Mr. Stern and Ms. Katzenstein:

As we stated to you before, it is our full expectation that we will not have to present a defense because we will be able to show the Court that the Government has not satisfied its burden of proof at the end of the Government's case. We also anticipate obtaining much, if not all, of the points we intend to make through the cross-examination of the Government's witnesses, thus, potentially obviating the need to call any or all of the defense experts in our case-in-chief. Since we do not know which points our experts will need to cover because we do not presently know which defense points the Government's witnesses will supply to the jury, we are only in the position to provide general summaries of the testimony our experts may provide under Fed.R.Crim.Proc. 16(b)(1)(C) and Fed.R.Evid 702, 703, and 705. Once the Government has presented its case, we reserve the right to update the summaries of expert testimony herein provided to account for points that our experts will cover in response to the testimony of the Government's witnesses.

In addition to the other experts we have previously disclosed, we intend to call the following additional experts: Dr. Gamini Hethumuni and J. Reid Meloy. Each of these experts' resumes listing their qualifications is attached herein.

With respect to Dr. Hethumuni, Letantia Bussell is not asserting a Rule 12.2 defense based on her Type 1 insulin dependent diabetic condition but currently intends to introduce this testimony to explain the context, circumstances and motivation in which certain relevant events in this case occurred. Dr. Hethumuni's testimony will include but not necessarily be limited to the following:

1.  Since approximately 1990, Letantia Bussell has been a Type 1 insulin dependent diabetic. He bases that opinion on a review of the medical information, including blood tests, for Letantia Bussell that has been provided to him that indicated levels of blood glucose, c-peptide and insulin consistent with a Type 1 insulin dependent diabetic. A copy of the information that has been provided to Dr. Hethumuni to render this opinion is included herein.

2.  Type 1 insulin dependent diabetes can have an acute onset and occurs when the pancreas no longer produces any significant amount of insulin.

3.  When this type of diabetes occurs, it dramatically changes the diabetic's life. The diabetic becomes totally dependent on having insulin injections and has to maintain a regimented dietary schedule as well as a regimented activity schedule. The diabetic has to balance diet, activity, and insulin throughout the day. On a daily basis, the diabetic suffers periodically from severe fatigue and the inability to concentrate or function.

4.  Once this type of diabetes, which is a more serious form than Type 2 diabetes which can be treated with pills, occurs, the diabetic will eventually experience the following complications (notwithstanding a properly balanced regime of diet, activity and insulin). These

complications, which can occur unexpectedly and rapidly, include:

a. Retinopathy – bleeding in the retina which if not treated promptly can lead to blindness.

b. Neuropathy – which affects the sensory system leading to numbness in the feet and hands and pain in feet at night – these complications are very difficult to treat and also affect muscles, the stomach and the heart.

c. Kidney failure – this disease causes the kidneys to leak protein and eventually to fail — at that point, the diabetic must go on dialysis to survive.

5. Once a person, particularly a doctor, is diagnosed with this type of diabetes, the person's life expectancy and quality of life become more immediate issues. If the diabetic does not take a sufficient amount of insulin or properly balance her diet and activity, she can go into a diabetic coma which may lead to death. The diabetic will also experience periodic hypoglycemic episodes (low blood sugar) which will impair the body's ability to function and, if not treated properly, can lead to death. This type of diabetes will significantly and deleteriously alter a person's estimate of their ability to remain productive on a professional and personal level.

The bases for nos. 2-5 above are Dr. Hethumuni's training and experience as documented in his resume and his review of pertinent literature in the field.

Dr. Hethumuni has not and does not intend to physically examine Letantia Bussell in order to be able to testify about his above opinions nor will he be generating a report containing his opinions and the bases for them.

Presently, the defense intends to call J. Reid Meloy, Ph.d, whose testimony will include but not necessarily be limited to the following: Explaining psychopathy and the expected traits and behaviors of the psychopathic personality; and relating such expected traits and behaviors to the actions of Jeffrey Sherman and Robert Beaudry . The defense has not received nor does it expect to receive a report from Dr. Meloy. The bases for his testimony, at this time, include his training and experience, as documented in his resume, and his review of the First Superseding Indictment and the Government interviews of Jeffrey Sherman and Robert Beaudry.

The defense reserves the right, as stated above, to amend this expert disclosure, depending on the evidence adduced in the Government's case-in-chief. The defense also reserves the right to amend this expert disclosure should it determine any additional experts are necessary to present the defense case.

Cordially,

HOCHMAN, SALKIN, RETTIG, TOSCHER & PEREZ

NATHAN J. HOCHMAN
Counsel for Letantia Bussell

ALTMAN & MORRIS

BRYAN C. ALTMAN by NJH
PETER MORRIS
Counsel for John Bussell

## J. REID MELOY, Ph.D.
### 964 Fifth Avenue, Suite 409
### San Diego, CA 92101

(619) 544-1424
FAX 544-1418
e mail: jrmeloy @ cts.com

Born: May 7, 1949

Social Security:      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

## Education

| | | |
|---|---|---|
| Ph.D. | Clinical Psychology, United States International University, 1981 |
| M. Div. | Theology, McCormick Theological Seminary, 1975 |
| M.S.W. | Clinical Social Work, University of Illinois, 1974 |
| B.A. | History, College of Wooster, 1971 |

## Training and Experience

| | |
|---|---|
| 1982 to present | Private Practice, Forensic and Clinical Psychology |
| 1986 - 1997 | Chief, Forensic Mental Health Division, San Diego County Department of Health Services (Court Services only beginning April 15, 1992 on a part time basis) |
| 1982 - 1986 | Director, Psychiatric Security Unit, San Diego County Central Detention Facility |
| 1978 - 1981 | L.C.S.W. Private practice, psychotherapy and psychodiagnostic evaluations |
| 1979 - 1982 | Senior Psychiatric Social Worker, San Diego County Mental Health Department |
| 1975 - 1977 | Program Coordinator, Adult Day Treatment, Oak Park Family Service and Mental Health Center |
| 1974 - 1975 | Clinical Social Worker, Adult Day Treatment, Oak Park Family Service and Mental Health Center |

2

| 1973 | Internship, Oak Park Family Service and Mental Health Center |
| 1972 | Internship, Bernard Horwich Jewish Community Center |
| 1972 | Internship, Industrial Areas Foundation |
| 1971 | Clinical Practicums, Illinois Masonic Medical Center and Michael Reese Hospital |

## Licenses and Certifications

Licensed Psychologist, State of California, PSY 7510
Licensed Clinical Social Worker, State of California, 6558
Diplomate in Forensic Psychology, American Board of Professional Psychology, 1991

## Elections, Appointments, and Awards

Associate Clinical Professor, Department of Psychiatry, University of California, San Diego, School of Medicine (1994)
Assistant Clinical Professor, Department of Psychiatry, University of California, San Diego, School of Medicine (1991)
Clinical Associate Professor, California School of Professional Psychology, San Diego (1996)
Adjunct Professor, University of San Diego School of Law (1986 - present)
Visiting Professor, The Menninger Clinic (October, 1995)
Adjunct Faculty, Mesa Vista Hospital Internship Program
Member, California Psychological Association Continuing Education Committee (1985 - 1988)
Member, California Jail Mental Health Standards Committee (1985)
Vice-President, San Diego Psychology-Law Society (1985 - 1987)
President, San Diego Psychology-Law Society (1987 - 1989)
Presidential Nominee, San Diego Academy of Psychologists (1985)
Program Chairman, California Psychological Association Annual Convention, 1987
Liaison Psychologist, San Diego County Mental Health (1983 - 1986)
Member, Forensic Committee, San Diego Academy of Psychologists (1987 - 1989)
Instructor, San Diego County Sheriff's Academy, Southwestern College
Psychologist of the Year, San Diego County Department of Health Services, Mental Health Division, 1989
Dissertation Awards Committee, Psychology-Law Division (41), American Psychological Association (1989 - 1990)
Onsite co-chairperson, Society for Personality Assessment Annual Meeting, San Diego, 1990
Fellow, Society for Personality Assessment (1989)

Fellow, San Diego Academy of Psychologists (1991)
Fellow, American Academy of Forensic Psychology (1991)
Distinguished Contribution to the Profession of Psychology Award, California
Psychological Association (1992)
Secretary, American Academy of Forensic Psychology (1992 - 1994)
Vice President, American Academy of Forensic Psychology (1994-1996)
Member, Criminal Justice Committee, Addictions Treatment Center, UCSD
President, American Academy of Forensic Psychology (1996-1998)
Member, Advisory Board, Forensic Psychology Program, Behavioral Sciences Unit,
        Federal Bureau of Investigation
President and Chairman of the Board, Forensis, Inc.
National Achievement Award (1998), Association of Threat Assessment Professionals
William T. Rossiter Award (1999), Forensic Mental Health Assoc. of California
Fellow, American Academy of Forensic Sciences
Honorable Mention, Manfred Guttmacher Award, American Psychiatric Association,
        (2000) for edited book, The Psychology of Stalking: Clinical and Forensic
        Perspectives (Academic Press, 1998).

## Memberships

American Psychological Association
        Division 39, Psychoanalysis
        Division 41, Psychology and Law
San Diego Psychological Association
San Diego Psychology-Law Society
Society for Personality Assessment
American Association for Correctional Psychology
American Academy of Forensic Sciences
American Academy of Forensic Psychology
Association of Threat Assessment Professionals

## Peer Reviewed and Published Scientific Papers, Abstracts and Chapters

1.    Working with the judge. Voices: Journal of the American Academy of Psychotherapists.
      14, 49-50, 1978.

2.    The effect of assertiveness training on the personality construct extraversion. Personality
      and Individual Differences. 1, 176-77, 1980.

3.    Thought organization and primary process in the parents of schizophrenics. British Journal
      of Medical Psychology. 57, 279-281, 1984.

4

4.  The psychiatric security unit. Newsletter of the San Diego Academy of Psychologists. September, 1984.

5.  Concept and percept formation in object relations theory. Psychoanalytic Psychology, 2, 35-45, 1985.

6.  Book review: J. Zeigenfuss, Law, Medicine, and Health Care: A Bibliography, in Bulletin of the American Academy of Psychiatry and Law, 13, 107, 1985.

7.  Book review: R. Roesch, C. Webster, D. Eaves, The Fitness Interview Test, in Bulletin of the American Academy of Psychiatry and Law, 13, 419-420, 1985.

8.  With Burkman, K. The black mirror: Joseph Conrad's the nigger of the narcissus and Flannery O'Connor's "the artificial nigger," The Midwest Quarterly, 28, 230-47, 1987.

9.  Rapid classification of the functionally psychotic individual in custody, Criminal Justice and Behavior, 13, 185-195, 1986.

10. Narcissistic psychopathology and the clergy. Pastoral Psychology, 35, 50-55, 1986.

11. A countertransference sonnet. Newsletter of the San Diego Academy of Psychologists, June, 1985.

12. On the relationship between primary process and thought disorder. Journal of the American Academy of Psychoanalysis. 14, 47-56, 1986.

13. The schizophrenic suspect. Journal of California Law Enforcement. 19, 3, 1985.

14. Inpatient psychiatric treatment in a county jail. Journal of Psychiatry and Law, 14, 377-396, 1985.

15. Prediction of violence in outpatient psychotherapy. American Journal of Psychotherapy, 16, 38-45, 1987.

16. Book review: R. Rogers, Rogers Criminal Responsibility Assessment Scales, in Bulletin of the American Academy of Psychiatry and Law, 14, 99, 1986.

17. Assessing violence risk during psychotherapy. In: Innovations in Clinical Practice, Vol. 7, ed., P. Keller. Sarasota, Florida: Professional Resource Exchange, Inc., 1988.

18. Abstract: the prediction of violence in outpatient psychotherapy. Psychiatry Digest, 8, 18-20, 1987.

19. Book review: D. Doren, Understanding and Treating the Psychopath, in Journal of Psychiatry and Law, 303-310, 1988.

20. Raw psychological data protected. The California Psychologist, 22, 7, 1987.

21. Book review: D. Cameron and E. Frazer, The Lust to Kill: A Feminist Investigation of Sexual Murder, in Journal of Psychiatry and Law, 477-485, 1988.

22. Book review: L. Roth, ed., Clinical Treatment of the Violent Person, in American Journal of Psychotherapy, 42:647-48, 1988.

23. The mass murderer: a clinical profile. Newsletter of the Academy of San Diego Psychologists, February, 1988.

24. The mass murderer: a clinical profile. The California Psychologist, Vol. 23, January - February, 1988.

25. Violent and homicidal behavior in primitive mental states. Journal of the American Academy of Psychoanalysis, 16:381-94, 1988.

26. Unrequited love and the wish to kill. Newsletter of the Academy of San Diego Psychologists, March, 1988.

27. The forensic interview. In: Clinical and Diagnostic Interviewing, R. Craig, ed., Jason Aronson, Inc., 1989.

28. Unrequited love and the wish to kill. California Psychologist, March - April, 1988.

29. With K. DiFrancesca. A comparative clinical investigation of the MMPI "Charlie" and "How" subtypes. Journal of Personality Assessment, 53:396-403, 1989.

30. With C. Gacono. Cognitive style and defensive process in psychopathy. Criminal Justice and Behavior, 15:472-83, 1988.

31. With J. Walus-Wigle. Battered woman syndrome as criminal defense. Journal of Psychiatry and Law, 16:389-404, 1988.

32. The exclusion of attorneys during court-ordered evaluations. The California Psychologist, July, 1988.

33. A California commitment primer. San Diego Psychiatry, July, 1988.

34. Serial murder: a four book review. Journal of Psychiatry and Law, 17:85-108, 1989.

6

35.     A California commitment primer.  California Psychologist, September, 1988.

36.     Voluntary intoxication and the insanity defense.  Newsletter of the American Academy of
        Psychiatry and the Law, December, 1988.

37.     The forensic interview, Part I.  California Psychologist, October, 1988.

38.     The forensic interview, Part II.  California Psychologist, December, 1988.

39.     Book review: S. Hymer, Confessions in Psychotherapy, American Journal of
        Psychotherapy, 44:147-48, 1990.

40.     Unrequited love and the wish to kill: diagnosis and treatment of borderline erotomania.
        Bulletin of the Menninger Clinic, 53, 477-92, 1989.

41.     Book review: C. Fitzmaurice and K. Pease, The Psychology of Judicial Sentencing,
        Journal of Psychiatry and Law, 17:641-46, 1989.

42.     The forensic interview, Part III.  California Psychologist, February, 1989.

43.     The forensic interview, Part IV.  California Psychologist, May, 1989.

44.     With J. Adams and S. Moritz.  Violence and neuropsychological deficits in incarcerated
        schizophrenics.  Journal of Nervous and Mental Disease, 179:253-256, 1990.

45.     The forensic interview, Part V.  California Psychologist, July, 1989.

46.     The forensic interview, Part VI.  California Psychologist, November, 1989.

47.     Letter to the editor.  Journal of Psychiatry and Law, 531-535, 1988.

48.     With C. Gacono and T. Heaven.  A Rorschach investigation of narcissism and hysteria in
        antisocial personality.  Journal of Personality Assessment, 55, 270-279, 1990.

49.     Book review: E. Benedek and D. Cornell, eds., Juvenile Homicide, Journal of Psychiatry
        and Law, 18:221-24, 1990.

50.     With J. Singer.  A Psychoanalytic View of the Comprehensive System "Special Scores".
        Journal of Personality Assessment, 56, 202-217, 1991.

51.     Nondelusional or borderline erotomania (letter to the editor).  American Journal of
        Psychiatry, 147:820, 1990.

52.   Book review: R. Holmes, Profiling Violent Crimes: An Investigative Tool, Journal of Forensic Sciences, 35:1247-48, 1990.

53.   With C. Gacono. A Rorschach investigation of attachment and anxiety in antisocial personality disorder. Journal of Nervous and Mental Disease, 179:546-552, 1991.

54.   With C. Weber and C. Gacono. A Rorschach study of attachment and anxiety in inpatient conduct disordered and dysthymic adolescents. Journal of Personality Assessment, 58:16-26, 1992.

55.   The construction of case studies: publish and perish? The California Psychologist, January, 1991.

56.   With C. Gacono. The aggression response and the Rorschach. Journal of Clinical Psychology, 48:104-114, 1992.

57.   With C. Gacono and J. Berg. Object relations, defensive operations, and affective states in borderline, narcissistic, and antisocial personality disorder. Journal of Personality Assessment, 59:32-49, 1992.

58.   The psychologist, the patient, his weapons, and our data. The California Psychologist, March, 1991.

59.   The psychopath and the death penalty. Newsletter of the American Academy of Psychiatry and Law, 15:77-78, 1990.

60.   Revisiting the Rorschach of Sirhan Sirhan. Journal of Personality Assessment, 58:548-570, 1992.

61.   The decision to criminally prosecute the psychiatric patient. American Journal of Forensic Psychiatry, 12:69-80, 1991.

62.   With C. Gacono. A psychotic (sexual) psychopath: "I just had a violent thought..." Journal of Personality Assessment, 58:480-493, 1992.

63.   With C. Gacono. The Rorschach and DSM-IIIR antisocial personality: a tribute to Robert Lindner. Journal of Clinical Psychology, 48:393-406, 1992.

64.   The "blurring" of ego boundary in projective identification (letter to the editor). American Journal of Psychiatry, 148:1761-2, 1991.

65.   Discussion of "dangerous mentally disordered criminals: unresolvable societal fear?" (letter to the editor). Journal of Forensic Sciences, 36:1279-80, 1991.