66.     Psychological test data protected...again. The California Psychologist, November, 1991, p. 21.

67.     Rorschach testimony. Journal of Psychiatry and Law, 19:221-235, 1992.

68.     Discussion of "On the predictability of violent behavior: considerations and guidelines" (letter to the editor). Journal of Forensic Sciences, 37:949-950, 1992.

69.     Discussion of "Alleged brain damage, diminished capacity, mens rea, and misuse of medical concepts" (letter to the editor). Journal of Forensic Sciences, 37:370-371, 1992.

70.     With P. Werner.  Decision-making about dangerousness in releasing patients from long term hospitalization. Journal of Psychiatry and Law, 20:35-47, 1992.

71.     With J. Schmuecker and D. Williams.  Disulfiram toxicity and catatonia in a forensic outpatient (letter to the editor). American Journal of Psychiatry, 149:1275-76, 1992.

72.     Psychopathy and the Rorschach. The Correctional Psychologist, 24:1-3, 1992.

73.     With C. Gacono.  Some thoughts on Rorschach findings and psychophysiology in the psychopath. British Journal of Projective Psychology, in press.

74.     With C. Gacono.  A borderline psychopath: "I was basically maladjusted..." Journal of Personality Assessment, 61:358-373, 1993.

75.     Voluntary intoxication and the insanity defense. Journal of Psychiatry and Law, 20:439-57, 1992.

76.     With C. Gacono and L. Kenney.  A Rorschach investigation of sexual homicide. Journal of Personality Assessment, 62:58-67, 1994.

77.     With C. Gacono.  Assessing the psychopathic personality. In J. Butcher, ed., Clinical Foundations in Personality Assessment, Oxford University Press, 1994.

78.     Treatment of antisocial personality disorder.  In: G. Gabbard, ed., Treatments of Psychiatric Disorders, Second Edition. American Psychiatric Press, 1995.

79.     With G. Morris.  Out of Mind? Out of Sight: The uncivil commitment of the permanently incompetent criminal defendant. University of California Davis Law Review, 27:1-96,1993.

80.     With C. Gacono.  A neurotic criminal: "I've learned my lesson...". Journal of Personality Assessment, 63:27-38, 1994.

9

81.   With W. Reid and J. Lion. Psychopathy and antisocial syndromes (audiotape). American College of Psychiatrists-Psychiatric Update, 14:1, 1994.

82.   Assessing violence risk (videotape). Menninger Video Productions. Topeka, Kansas: Menninger Clinic, 1994.

83.   With G. Morris. Dispositional issues involving mentally incompetent criminal defendants: A fifty state analysis. Criminal Practice Law Report, 2:130-136, 1994.

84.   Orestes in Southern California: A forensic case of matricide. J Psychiatry and Law, 14:77-102, 1996.

85.   Book review: M. Kantor, Diagnosis and Treatment of the Personality Disorders, American Journal of Psychotherapy, 48:471-472, 1994.

86.   With S. Gothard. A demographic and clinical comparison of obsessional followers and mentally disordered offenders. American Journal of Psychiatry, 152:258-63, 1995.

87.   With J. Meyers. A discussion of "A comparative study of erotomanic and obsessional subjects in a forensic sample" (letter to the editor). Journal of Forensic Sciences, 39:905-907, 1994.

88.   A clinical investigation of the obsessional follower: "She loves me, she loves me not..." In L. Schlesinger, Editor. Explorations in Criminal Psychopathology. Springfield, IL: Charles C. Thomas, 1996, pp. 9-32.

89.   With S. Gothard, D. Viglione and M. Sherman. Detection of malingering in competency to stand trial evaluations. Law and Human Behavior, 19:493-506, 1995.

90.   With C. Gacono, K. Sheppard, E. Speth, A. Roske. A clinical investigation of malingering and psychopathy in hospitalized insanity acquittees. Bulletin of the American Academy of Psychiatry and the Law, 23:1-11, 1995.

91.   Stalking (obsessional following): A review of some preliminary studies. Aggression and Violent Behavior, 1:147-162, 1996.

92.   A case study of stalking: "all I wanted was to love you..." In: R. Meloy, M. Acklin, C. Gacono, J. Murray, C. Peterson (eds.) Contemporary Rorschach Interpretation, Lawrence Erlbaum Associates, 1997, pp. 177-190.

93.   Pseudonecrophilia following spousal homicide. J. Forensic Sciences, 41:706-8, 1996.

94.   The dangerous psychopath. (audiotape). Psychiatry, 25:1, 1996. Audio-Digest

10

Foundation.

95. With C. Gacono. Rorschach research and the psychodiagnosis of antisocial and psychopathic personalities. Rorschachiana, 22:130-148, 1997.

96. The psychology of wickedness: psychopathy and sadism. Psychiatric Annals, 27:630-33, 1997.

97. With C. Gacono. The inner world of the psychopath. In T. Millon, ed., Psychopathy: Antisocial, Violent and Criminal Behaviors, 1998.

98. The nature and dynamics of sexual homicide: An integrative review. Aggression and Violent Behavior, 5:1-22, 2000.

99. Predatory violence during mass murder. J. Forensic Sciences, 42:326-329, 1997.

100. The sexual life of the psychopath. In R. Meyer, ed., Psychopathy, in press.

101. Author's response. J Forensic Sciences, 41:1092-1093, 1996.

102. with T. Hansen, I. Weiner. The authority of the Rorschach: legal citations during the past fifty years. J Personality Assessment, 69:53-62, 1997.

103. The clinical risk management of stalking: "Someone is watching over me..." American Journal of Psychotherapy, 51:174-184, 1997.

104. Do restraining orders restrain? Finally some data. Proceedings of the American Academy of Forensic Sciences, 3:173, 1997.

105. with J. McEllistrem. A study of bombing and its relationship to psychopathy. Proceedings of the American Academy of Forensic Sciences, 3:171, 1997.

106. with K. Kienlen, D. Birmingham, K. Solberg, J. O'Regan. A comparative study of psychotic and non-psychotic stalking. Journal of the American Academy of Psychiatry and the Law, 25:317-334, 1997.

107. with C. Gacono, E. Speth, A. Roske. Above the law: Escapes from a maximum security psychiatric hospital and psychopathy. Journal of the American Academy of Psychiatry and the Law, 25:547-550, 1997.

108. Commentary on Geberth, VJ, Turco, RN. Antisocial personality disorder, sexual sadism, malignant narcissism, and serial murder. J Forensic Sciences, 42:757, 1997

109. with J. McEllistrem. Bombing and psychopathy: an integrative review. Journal of Forensic Sciences, 43:556-562, 1998.

110. The psychology of stalking. In J. R. Meloy, ed., The Psychology of Stalking: Clinical and Forensic Perspectives, 1998.

111. with P. Cowett, S. Parker, B. Hofland, A. Friedland. Domestic protection orders and the prediction of subsequent criminality and violence toward protectees. Psychotherapy, 34:447-458, 1997.

112. Stalking: an old behavior, a new crime. Psychiatric Clinics of North America, 22:85-99, 1999.

113. Threats, stalking, and criminal harassment. In: Georges-Franck Pinard, M.D., F.R.C.P., and Linda Pagani, Ph.D. (Eds.) Clinical Assessment of Dangerousness: Empirical Contributions, Cambridge University Press, 2001.

114. with L. Walker. Stalking and domestic violence. In R. Meloy, ed., The Psychology of Stalking: Clinical and Forensic Perspectives. San Diego: Academic Press, 1998.

115. with A. Raine, S. Bihrie, J. Stoddard, L. LaCasse and M. Buchsbaum. Reduced prefrontal and increased subcortical brain functioning assessed using positron emission tomography in affective and predatory murderers. Behavioral Sciences and the Law, 16:319-332, 1998.

116. Erotomania, triangulation, and homicide. J Forensic Sciences, 44:421-424, 1999.

117. with C. Gacono. Attachment deficits in antisocial and psychopathic personalities. British Journal of Projective Psychology, 42:47-55, 1997.

118. with S. Holt and S. Strack. Sadism and psychopathy in violent and sexually violent offenders. Journal of the American Academy of Psychiatry and the Law, 27:23-32, 1999.

119. with A. Hempel and T. Richards. Offender and offense characteristics of a nonrandom sample of mass murderers. Journal of the American Academy of Psychiatry and the Law, 27:213-225, 1999.

120. With C. Gacono. Psychopathy assessment and report writing. In C. Gacono (ed.) The Clinical and Forensic Assessment of Psychopathy. Lawrence Erlbaum Assoc., 2000.

121. With S. Doyne, J. Bowermaster, D. Dutton, P. Jaffe, J. Bowermaster, S. Temko, P. Mones. Custody disputes involving domestic violence: making childrens' needs a priority. Juvenile and Family Court Journal, 50: 1-12, 1999.

12

122. On violence (letter to the editor). International Journal of Psychoanalysis, 80:626-7, 1999.

123. With G. Leach. Serial murder of six victims by an African-American male. Journal of Forensic Sciences, 44;1073-78, 1999.

124. With L. Rivers, L. Siegel, S. Gothard, D. Naimark, R. Nicolini. A replication study of obsessional followers and offenders with mental disorders. J Forensic Sciences, 45:147-152, 2000.

125. With C. Gacono, M. Bridges. A Rorschach comparison of psychopaths, sexual homicide perpetrators, and nonviolent pedophiles. Journal of Clinical Psychology, 56:757-777, 2000.

126. With K. Mohandie. Clinical and forensic indicators of "suicide by cop". J Forensic Sciences, 45:384-389, 2000.

127. Book review: C.F. Alford, What Evil Means To Us. J American Psychoanalytic Association, in press.

128. With A. Hempel, R. Levine, J. Westermeyer. A cross-cultural review of sudden mass assault by a single individual in the Oriental and Occidental cultures. J Forensic Sciences, 45:582-588, 2000.

129. With A. Bukhanovsky, A. Hempel, W. Ahmed, A. Brantley, D. Cuneo, R. Gleyser. Assaultive eye injury and enucleation. J Am Academy Psychiatry and the Law, 27:590-602, 1999.

130. Antisocial personality disorder. In G. Gabbard, ed., Treatments of Psychiatric Disorders, 3rd edition, American Psychiatric Press, in press.

131. With B. Davis, J. Lovette. Risk factors for violence among stalkers. J Threat Assessment, in press.

132. Book review: D. Dutton, The Abusive Personality. Bulletin of the Menninger Clinic, in press.

133. With C. Gacono. Assessing psychopathic and antisocial personalities. In J. Butcher, ed., Clinical Personality Assessment, 2nd edition. New York: Oxford Univ. Press, in press.

134. With K. Mohandie. Investigating the role of screen violence in specific homicide cases. J Forensic Sciences, in press.

135. Book review: Stalkers and Their Victims, by P. Mullen, M. Pathe, R. Purcell. Journal of

13

Forensic Psychiatry, in press.

136. Stalking and violence.  In: J. Boon and L. Sheridan, eds., Stalking and Psychosexual Obsession, London: Wiley, in press.

137. Communicated threats and violence toward public and private targets: discerning differences among those who stalk and attack.  J Forensic Sciences, in press.

138. With A. Hempel, K. Mohandie, A. Shiva, T. Gray.  Offender and offense characteristics of a nonrandom sample of adolescent mass murderers.  J Am Acad Child Adolescent Psychiatry, in press.

## Books and Monographs

1. The Psychopathic Mind: Origins, Dynamics, and Treatment, Jason Aronson, Inc., 1988. (French translation, Les Psychopathes.  Paris: Frison Roche, 2000).

2. With A. Haroun and E. Schiller, Clinical Guidelines for Involuntary Outpatient Treatment, Professional Resource Exchange, Inc., 1990.

3. Violent Attachments, Jason Aronson, Inc., 1992.

4. With C. Gacono, Rorschach Assessment of Aggressive and Psychopathic Personalities, Lawrence Erlbaum Associates, Inc., 1994. (translations into Spanish and Japanese, in press)

5. (Senior editor) Contemporary Rorschach Interpretation.  Lawrence Erlbaum Associates, Inc., 1997.

6. (Editor)  The Psychology of Stalking: Clinical and Forensic Perspectives, Academic Press, Inc., 1998.

7. Violence Risk and Threat Assessment: A Practical Guide for Mental Health and Criminal Justice Professionals.  Specialized Training Services, 2000.

8. (Editor)  The Mark of Cain: Psychoanalytic Insight and the Psychopath.  The Analytic Press, in press.

## Select Presentations by Invitation

Southern California Kaiser Permanente (1989)

14

The Menninger Clinic (1989-1991)
Simon Fraser University (1992)
Letterman Army Hospital, San Francisco (1992)
Langley Porter Neuropsychiatric Institute, UCSF (Psychiatry Grand Rounds) (1992)
Massachusetts General Hospital (Psychiatry Grand Rounds) (1992)
Atascadero State Hospital (1991-1993)
Patton State Hospital (1989-1991)
Oregon State Hospital (1991)
Balboa Naval Hospital (1990)
Mesa Vista Hospital (1990- 1992)
Napa State Hospital (1989)
Arkansas Psychological Association (1992)
California Psychological Association (1989-1991)
Ohio Psychological Association (1989)
Colorado Psychological Association (1991)
University of Florida (Classics Department) (1991)
Illinois Psychological Association (1991)
Pasadena Area Psychological Association (November 19, 1993)
Orange County Psychological Association (November 5, 1993)
University of California, San Diego, School of Medicine (1989-present)
CPC Westwood Hospital (January, 1993)
California School of Professional Psychology-San Diego and Berkeley campuses
National Association of Women Judges (October, 1992)
Rush-Presbyterian St. Luke's Hospital (Grand Rounds, June, 1993)
International Rorschach Congress (Portugal, July, 1993)
Boston College (October 28, 1993)
Harvard Medical School (CE Conference, October 29, 1993)
University of Texas School of Medicine, San Antonio (invited lecture, March 9, 1994)
CPC Rancho Lindo Hospital (July 14, 1994)
Central Intelligence Agency (September 22-23, 1994)
Wisconsin Resource Center (December 14-15, 1994)
Alta Bates Hospital, Berkeley, California (Grand Rounds, January 9, 1995)
Redwood Psychological Association, Sonoma (February 20, 1995)
California School of Professional Psychology, Alameda (February 21, 1995)
Harvard University Medical School (CE Conference, March 10, 1995)
New Mexico Psychological Association (March 24, 1995)
Miramar Naval Air Station, Consolidated Brig (March 28-29, 1995)
Division 39 (psychoanalysis), American Psychol Association (April 28, 1995)
The Cutting Edge, UCSD Dept. of Psychiatry Conference (April 30, 1995)
Kirby Forensic Psychiatric Center, New York (grand rounds, May 17, 1995)
Enright Inn at Court (June 1, 1995)
Vernon State Hospital, Vernon, Texas (July 31-Aug. 1, 1995)
Los Angeles Police Department Threat Management Conference (August 24, 1995)

Arizona State Hospital (Sept. 14, 1995)
American Correctional Health Services Association (Sept. 28, 1995)
Menninger Clinic (October 13, 1995)
American Public Health Association (Oct. 31, 1995)
Minnesota Rorschach Society (Dec. 1-2, 1995)
Naval Medical Center, San Diego (psychiatry grand rounds, Feb. 2, 1996)
Children's Hospital, San Diego (psychiatry grand rounds, Feb. 16, 1996)
San Diego Psych-Law Society (Feb. 23, 1996)
American Academy of Forensic Psychology (CE workshop, Feb. 24, 1996)
Society for Personality Assessment, Denver (conference, Mar. 9, 1996)
California Psychological Association (master lecture, March 22, 1996)
Sixth Annual National Symposium: Mental Health and the Law (University of
    Miami School of Law, April 13-14, 1996)
California Sexual Assault Investigators' Association, San Diego (April 17, 1996)
Mental Health in Corrections Consortium, Kansas City (May 29, 1996)
Tavistock Clinic (location only), London (July 2-3, 1996)
Mesa Police Department, Mesa, Arizona (May 31, 1996)
International Rorschach Congress, Boston (July 7, 1996)
National District Attorneys Association Summer Conference, Nashville (July 22, 1996)
Los Angeles Police Department (July 26, 1996)
Summer Clinical Institute, National Addictions Training Center (Aug. 6, 1996)
"Violence and Criminality: A Gathering of Leading Experts", San Diego (August 29,
1996)
Sixth Annual Threat Management Conference, Los Angeles (Aug. 28-30, 1996)
Shadow Mountain Hospital, Tulsa, Oklahoma (Sept. 20, 1996)
Conference: Domestic Violence in the Workplace, Long Beach (Sept. 27, 1996)
American Prosecutors Research Institute, Chicago (Oct. 12, 1996)
Rochester Academy of Medicine, Rochester, N.Y. (Oct. 25, 1996)
Wisconsin Resource Center, Oshkosh, Wisconsin (Oct. 30, 1996)
American Academy of Forensic Sciences, New York (Feb, 21, 1997)
American Academy of Forensic Psychology, San Francisco (April 5, 1997)
California School of Professional Psychology, Alameda (April 8, 1997)
Naval Medical Center, San Diego (Psychiatry Grand Rounds, May 2, 1997)
Texas Forensic Mental Health Conference, Vernon, Texas (May 21-23, 1997)
Dr. Henri van der Hoeven Kliniek, Utrecht, the Netherlands (July 4, 1997)
Miramar Naval Air Station, Consolidated Brig (July 30, 1997)
"Sexual Offenders: A Gathering of Leading Experts", San Diego (Aug. 21, 1997)
Seventh Annual Threat Management Conference, Los Angeles (Aug. 28, 1997)
Mesa Vista Hospital, Grand Rounds (Sept. 26, 1997)
American Academy of Forensic Psychology, Santa Fe (Nov. 6, 1997)
International Countermeasures Conference, NSA (Dec. 1, 1997)
American Academy of Forensic Sciences, San Francisco (Feb. 10,1998)
American Academy of Forensic Psychology, San Diego (Feb. 20, 1998)

16

Massachusetts Mental Health Center/Harvard Conference (March 13-14, 1998)
Criminal Investigative Conference, Glendale, Ariz. (March 26, 1998)
30th Annual Southwestern School of Behavioral Health, Tucson (June 16, 1998)
Central Intelligence Agency (June 24, 1998)
Dr. Henri van der Hoeven Kliniek, Utrecht, Netherlands (June 29-30, 1998)
American Psychological Association, AAFP Symposium (August 16, 1998)
Eighth Annual Threat Management Conference, Los Angeles (August 26, 1998)
Investigation for Identification Educational Conference, Pensacola (Oct. 2, 1998)
Northwestern University, Chicago (psychiatry grand rounds, Nov. 11, 1998)
Rethinking Mental Disability Law, Univ. of San Diego (Feb. 20, 1999)
Keynote Address, California Forensic Mental Health Association (March 10, 1999)
Master Lecturer, California Psychological Association (March 26, 1999)
Ohio Forensic Psychiatric Centers Directors Conference (June 25, 1999)
Ninth Annual Threat Management Conference (July 15, 1999)
Stalking the Stalker Annual Conference, Keynote Speaker (Sept. 23, 1999)
Governor's Summit on Domestic Violence, Phoenix (Sept. 27, 1999)
ABA/APA Criminal Justice Conference, Washington (Oct. 15, 1999)
The Menninger Clinic, Grand Rounds (Dec. 10, 1999)
APA Continuing Education Conference, San Diego (Feb. 11, 2000)
American Academy of Forensic Sciences, Reno (Feb. 22 & 24, 2000)
Behavioral Analysis Program, National Intelligence Division, FBI (March 2, 2000)
American Academy of Forensic Psychology, New Orleans (March 10, 2000)
L'Ecole Nationale de la Magistrature, Paris, France (April 20, 2000)
New Mexico Psychological Association, Albuquerque (April 28, 2000)
Massachusetts Mental Health Center/Harvard University (June 2-3, 2000)
Assessing and Treating Personality Disorders, Irvine, CA (July 20, 2000)
Tenth Annual Threat Management Conference, Anaheim, CA (Aug. 31, 2000)
Stalking the Stalker Statewide Conference, Boise, Idaho (Sept. 12, 2000)
The Commonwealth Club, San Francisco (Sept. 22, 2000)
National Conference on Science and the Law, National Institute of Justice (Oct. 13, 2000)
Youth and Violence, San Diego Psychoanalytic Institute (Oct. 28, 2000)
National Center for the Analysis of Violent Crime, FBI, Quantico (Jan. 9, 2001)

**Peer Reviewer of Manuscripts for:**

Criminal Justice and Behavior
Journal of Nervous and Mental Disease
Law and Human Behavior
The Western Journal of Medicine
Journal of Personality Assessment
Applied and Preventive Psychology
Journal of Adolescence
Journal of Forensic Sciences

Journal of Criminal Justice
Behavioral Sciences and the Law
Psychological Assessment
Psychosomatic Medicine
Journal of the American Academy of Psychiatry and the Law
Journal of Family Violence
Journal of Interpersonal Violence

## Book Reviewer for:

Bulletin of the American Academy of Psychiatry and the Law
American Journal of Psychotherapy
Journal of Psychiatry and Law
Journal of Forensic Sciences
Cambridge University Press
Lawrence Erlbaum Associates
Jason Aronson Inc.
American Psychological Association
Oxford University Press
Academic Press

## Editorial Board Member:

Journal of Psychiatry and Law
Criminal Justice and Behavior
Behavioral Sciences and the Law
Aggression and Violent Behavior
Journal of Forensic Psychology Practice
Journal of Threat Assessment
L'evolution Psychiatrique

## Expert Witness Experience

Retained as an expert in civil or criminal matters in the following states and provinces since 1982: California, Wisconsin, Washington, Illinois, Tennessee, Arizona, Massachusetts, Missouri, Kansas, Oregon, South Carolina, New Mexico, Hawaii, Colorado, Michigan, Ohio, Florida, District of Columbia, Newfoundland and seven federal jurisdictions (to date).

Ratio of Civil to Criminal practice: 30/60.

Ratio of plaintiff/prosecution to defense: 40/60.

18

Trial testimony to date: 100

Depositions to date: 30

Formal, written forensic evaluations: 300

Clinical evaluations in criminal settings: 2,000+

**Areas of Particular Expertise** (publications, clinical experience, teaching, and testimony):

> Sexual homicide (single and serial) and sexual aggression
> Homicide (Complex, Stranger, familial, domestic)
> Criminal pairing; coercive persuasion; conspiracy
> False rape allegations
> Psychological malpractice - personal injury
> Criminality and mental disorder
> Personality disorder
> Psychopathic and antisocial personality disorder
> Insanity - criminal responsibility issues, disposition issues
> Stalking and obsessional following
> Erotomania
> Rorschach testing
> Voluntary intoxication and insanity
> Violence risk and threat assessment
> Litigation and cross examination strategies

**Recent Cases with Annotations**

Harris v. Pulley (1991). Submitted an affidavit at the request of the defense attorneys in the case of Robert Alton Harris to the Ninth Circuit Court of Appeals. The affidavit concerned the ways in which psychopathic individuals respond to experiments in learning. Harris was the first person executed in the state of California since the death penalty was, once again, declared constitutional.

People v. Susan Smith (1995). Retained by the defense to analyze and interpret the psychological test data of the defendant.

People v. Richard Allen Davis (1995-6). Retained by the defense as the psychiatric and psychological litigation consultant in the death of Polly Klaas, the victim.

People v. Robert Hoskins (1995). Retained by the prosecution as the psychological consultant on the stalking of Madonna Ciconne, the victim.

State of Colorado vs. Albert Petrosky, Jr. (1996). Retained by the prosecution as a rebuttal expert at trial for the defense psychiatric and psychological evidence. This case was a well known regional case involving mass murder after spousal estrangement: the defendant killed his wife, her lover, and a police officer. The defendant subsequently committed suicide, which was noted in the New York Times on May 11, 1996.

People v. Danny Palm (1996). Retained by the defense and testified as an expert witness on "predatory" vs. "affective" violence. This case was covered live on Court TV and focused on the murder of an antisocial victim who had frightened and intimidated a community for three years, and was subsequently shot to death by a retired Navy officer on behalf of his family and neighbors.

In Re: B.T. (1996). Consulted with the psychiatrist leading the team evaluating a six year old charged with attempted murder in the beating of an infant in Richmond, California. My specific role, as requested by the psychiatrist, was to review the final draft of the report submitted to the court, review the psychological and neuropsychological test findings, and offer treatment recommendations. Subsequent to this consult the report prompted the district attorney to drop the attempted murder charges and proceed on prosecution/disposition concerning lesser charges.

The United States v. Timothy James McVeigh (1996). Retained by the prosecution as their forensic psychologist and mitigation rebuttal expert.

The United States v. Terry Lynn Nichols (1997). Retained by the prosecution as their forensic psychologist and mitigation rebuttal expert.

The United States v. John Hinckley, Jr. (1998). Retained by the prosecution as a forensic psychological consultant.

People v. Gerald Atkins (1998). Retained by the defense as a forensic psychologist to render opinions concerning the diagnosis and mental state at the time of the crime of the defendant. Testified at trial on April 13, 1998. Focus of testimony was erotomanic delusional disorder and triangulation as an explanation for his assault on a Ford plant outside Detroit which resulted in the homicide of a manager and the wounding of two police officers. The defendant was found guilty of all crimes charged and sane at the time of the crime.

Nevada State Athletic Commission (Sept., 1998). Consulted with the commission to help them define the nature and extent of psychological testing and evaluation that should be conducted concerning the boxing relicensure of Michael Tyson.

Orenthal J. Simpson v. Louis Brown et al. (1998). Filed an amicus curiae brief with S. Doyne, D. Dutton, P. Jaffe, J. Bowermaster, and S. Temko concerning the special needs of children exposed to spousal violence. The brief was accepted by the Fourth Appellate District Court (Division Three) and sealed. On Nov. 10, 1998 the appeals court overturned the ruling that

allowed Mr. Simpson to retain custody of his children and remanded the case back to the original commissioner for retrial. They opined that evidence from the killing of Nicole Brown Simpson would have to be considered. The California Supreme Court subsequently upheld the finding in February, 1999.

**People v. Timothy Masters.** (1997-1999). Retained by law enforcement agency and the prosecution in the investigation and subsequent trial of a defendant in a ten year old sexual homicide case. The arrest and prosecution was based upon the extensive pre-offense productions of the defendant since there was no direct evidence linking him to the crime. Testimony involved both an evidentiary hearing and jury trial. Defendant was convicted of first degree murder.

**People v. Lucas Salmon.** (1997-1999). Retained by the defense in a capital trial involving a defendant who conspired with his friend and committed the abduction, rape, and killing of a 22 year old stranger female. My testimony at the guilt and penalty phases involved mitigating evidence that this defendant was a dependent personality disorder who became a compliant accomplice of a psychopath and sexual sadist to carry out the latter's sexually homicidal fantasies. Defendant was found guilty and sentenced to life in prison.

**Turner v. Duncan.** (1999). A federal habeas hearing following a finding by the ninth circuit court of appeals that defendant, in prison for murder, had incompetent representation at the time of his trial in 1981 (158 F.3d 449). I testified on behalf of the defendant that the jury was prejudiced at the time since they did not hear any expert testimony concerning the known facts and scientific expertise on serial sexual rapists (the victim) and rape trauma syndrome. My testimony was limited by the federal judge to extant research at the time of the original trial. The judge found prejudice and granted the writ. The Los Angeles County District Attorney's subsequently charged the defendant with manslaughter, he accepted a guilty verdict, and was released with time served.

**Maria D. v. Westec et al.** (1999). A civil trial in which the plaintiff sued the defendant following an alleged rape "under color of authority" by an employee of the defendant in 1997. There was no criminal prosecution. I evaluated the plaintiff and determined that she did have PTSD. I was not called to testify at trial. The jury found for the defendant.

**People v. Derwin Anderson** (1999). A "third strike" case in which I was retained by the prosecution to determine whether or not the defendant was legally insane at the time of the crime. I testified that he was not insane at the time of the crime. The jury deadlocked, the defendant withdrew his insanity defense, and a plea bargain for 18 years in prison was accepted.

**People v. Marquell Smith** (1999). Testified for the defense concerning the propensity of the state's prosecution witness to chronically lie in a death penalty trial of the two perpetrators of the "tri-cities robberies", a local San Diego case.

**People v. Steve Larsen** (1999). Testified for the defense in a restoration of sanity case involving a paranoid schizophrenic man who murdered his physician in 1986. Testimony focused upon

research concerning schizophrenia, violence, and medication compliance. Patient was restored to sanity.

National Crime Faculty (1999-2000). Forensic psychological consultant on the Jill Dando case, a British news anchorwoman murdered in April, 1999 at her home in London.

State v. Russell Dean (2000). Testified for the defense in a homicide case in which the common law husband of a stalking victim ambushed and killed the stalker in Baker City, Oregon. Testimony focused upon a psychological autopsy of the victim and stalking research. The jury convicted the defendant of voluntary manslaughter.

People v. Danielle Barcheers (2000). Testified for the defense in a homicide case in which the defendant was the youngest female (age 15) ever tried as an adult for murder in California. Testimony focused upon her sadomasochistic relationship with a dominant male which replicated her severe physical and sexual abuse as a child, age 2, culminating in the killing of the male's step grandmother. The jury convicted her of first degree murder.

Colon v. Henderson (2000). Retained by the U.S. Attorney in Florida as an expert witness in a civil case involving allegations of sexual harassment against the U.S. Post Office and certain employees.

People v. Jason Ritchie (2000). Retained by the defense in a homicide case involving the killing of a violent and mentally ill man by a younger man. The case was charged as first degree murder, but settled with a plea of voluntary manslaughter.

State v. David Ray (2000). Retained by the defense in a New Mexico case involving a man charged with various counts of abduction and sexual assault. The FBI believed the man was also a serial killer and a sexual sadist whose criminal career spanned four decades. Trial resulted in a hung jury and a declared mistrial.

People v. Dante Suiu (2000). Retained by the prosecution as their expert witness in a California case involving a man who stalked the actress Gwyneth Paltrow over the course of a year. The man entered a plea of guilty, and not guilty by reason of insanity. I opined that he was insane at the time of the crime, and agreed with the other experts. Both prosecution and defense stipulated to the NGRI finding.

Exhibit 2

# J. Reid Meloy, Ph.D.

Violence
Risk
and Threat
Assessment

A PRACTICAL GUIDE FOR MENTAL HEALTH AND CRIMINAL JUSTICE PROFESSIONALS

# *Psychopathy*

I mentioned psychopathy in chapter 4 as one factor in the individual/psychological domain for assessing violence risk, and recommended the use of the PCL-R to measure it. I now return to this topic for several reasons: first, the measurement of psychopathy during the past decade has been shown to account for the largest proportion of explainable variance in violence risk research concerning offenders (in other words, it accounts for most of the predictive success of the study); and second, it is a complex term that mental health and criminal justice professionals often misunderstand and confuse with other words, such as psychotic, sociopath, and antisocial personality.

If you think that a psychopath is just a figment of movie makers' imaginations, just follow your local newspaper for a period of time. You can always count on psychopaths making the news, usually self-destructing after a period of callous manipulation and exploitation of other people for a number of years. I can think of lots of examples. President Bill Clinton evidenced some psychopathic traits in his lying to the American public about his affair with Monica Lewinsky, and then his subsequent use of his friends to protect him, as he knew full well they were lying on his behalf. He was impeached, but escaped removal from office. I don't think Clinton is a full blown, primary psychopath; but like some other politicians he is psychopathic and narcissistic enough–in his case, mixed with a certain amount of dependency–to succeed in that profession.[23] William Safire, a columnist for the New York Times, was befuddled by Clinton's persistent lying over time and wrote about it in one of his pieces; he obviously did not understand the importance of contemptuous delight in the psychopath's emotional life, which I will get to later.

If there is a current poster boy for psychopaths who ascend to positions of power and authority, and then wreak havoc upon their countrymen, it is Saddam Hussein. Other psychopathic national

Exhibit B - Part
Page 117 of 14
Case 3:13-cr-00008-SLG   Document 247-4   Filed 01/07/14   Page 17 of 40

leaders have preceded him, like Stalin and Hitler, but Hussein is truly a piece of work. Here is a man who has had family members who betray him murdered, and has had a member of his own executive cabinet killed and dismembered when he disagreed with him (one story related by the psychiatrist Jerrold Post indicates that when this cabinet member's wife pleaded for the return of her husband, Hussein obliged: he sent her husband's dismembered parts back to his wife in plastic bags). The typical outcome of a psychopath assuming national leadership is that he targets a portion of his country's population for persecution, and subsequently kills them en masse: Hitler's holocaust, Stalin's persecutions, Pol Pot's killing of Cambodians, and Hussein's targeting of the Kurds are a few examples.

Other psychopaths take different journeys, but they all accomplish the same thing: they leave behind a trail of damaged and destroyed human beings. Whether it is a con man who is bilking people and institutions out of money, such as Ivan Boesky, or a serial murderer who sexually assaults, kills, and mutilates, like Ted Bundy, the psychopath dominates his objects at all costs to them.

### Some Historical Comments

There are actually two traditions for understanding chronic antisocial behavior. The first one is rather young, what I call the social deviancy tradition, and is identified primarily through the DSM series of diagnostic manuals, most recently DSM-IV. The diagnostic term used to describe this tradition is antisocial personality disorder (ASPD), and whenever you hear this term used, the speaker or writer is focusing on the degree to which the person's behavior deviates from acceptable, normal social behavior. The seven criteria in DSM-IV for ASPD are mostly behavioral, except for the last one: lacks remorse. A clinician needs three, any three, to make the diagnosis. The other six criteria focus upon illegal, aggressive, and irresponsible acts over time.

The reason these criteria are so behavioral is that they were developed by a sociologist named Lee Robins, who is at Washington University in St. Louis. Dr. Robins has led the research, and the charge, for this tradition in American psychiatry. The major criticism of this research tradition, which dates back to her monumental study, *Deviant Children Grown Up*, published in 1966, is that it doesn't describe what these people are like inside, their personalities, their makeup. It only focuses on what they do. Another more technical

Case 3:13-cr-00008-SLG   Document 247-4   Filed 01/07/14   Page 18 of 40

problem is that if you are poor, uneducated, and have a lower than average IQ, you are more likely to be diagnosed with antisocial personality disorder than if you are not poor, educated, and above average in IQ.

In the United States about 5% of adult males and 1% of adult females are at risk for this diagnosis sometime in their lives. These figures have increased slightly over the past twenty years, and the female figure is actually growing a little faster than the male figure. Although I think there are genuine biological differences between the sexes that will always make for more antisocial males than females—primarily testosterone related—the gap is closing a bit, probably due to more permissiveness in the culture for women to be antisocial and aggressive.

Antisocial personality disorder also varies among cultures, and appears to be highest in cultures that are individualistic and lowest in cultures that are collectivistic. For instance, rates of ASPD in Taiwan are 0.10-0.22%, about ten to twenty times less than in the U.S. Typically, the more the society rewards autonomous striving and individual responsibility at the expense of the group, the higher the rates of ASPD[24].

In order to be diagnosed with ASPD in adulthood, the person must have met criteria for conduct disorder in childhood or adolescence. This means the clinician must look back in time and see if criteria are met. Sometimes there is just not enough information, which can often be a problem; when this happens, the adult diagnosis of ASPD cannot be made. I have also seen cases where a conduct disordered child has avoided the diagnosis whenever he became too disruptive by being hospitalized by his well-to-do parents in a private setting. Again, without family resources, the disruptive child is much more likely to end up in juvenile hall and be seen by a public sector employed psychiatrist who will not hesitate to diagnose conduct disorder. The good news, however, is that only 25-50% of conduct disordered children grow up to be antisocial personality disordered adults. If you work with delinquent kids, stay optimistic!!!

The second tradition is a much older one, and dates back to late 19th century Germany. If you lived in Frankfurt and were an aggressive, lying, manipulative, arrogant, and sensation- seeking young man, your neighbors might drag you down to your local shrink and you would subsequently be diagnosed as a "constitutional psychopathic inferior." This was one of several favorite diagnostic

Exhibit B - Part 3
Page 119 of 140
Case 3:13-cr-00008-SLG Document 247-4 Filed 01/07/14 Page 19 of 40

terms a hundred years ago. Notice what it implies. The word "constitutional" suggests something inherited, a "bad seed"; a common belief at the time. Ironically, a century later there is a substantial body of good research that suggests that habitual criminality is partially caused by certain biological predispositions. The word "psychopathic" at that time generally meant any kind of psychopathology, or disease of the mind; and the word "inferior" strongly pointed toward a bias that still haunts this area of research. Why study these people? They are mutations of the species. Let's just eliminate them from the gene pool! You've probably heard this kind of devaluation if you've ever worked in a correctional or law enforcement setting. We end up doing to them what they habitually do to us.

Allow me to preach for a moment. We all have a right to be judgmental. Good judgment is what keeps our social fabric together and our communities stable. To visit moral judgment on a psychopath who is on trial for something he has done is the basis of our criminal law, and we should never shirk from our duty as citizens to carry out such roles. On the other hand, we have a right to scientifically investigate phenomenon that we don't understand, such as psychopathy, or we risk fostering an anti-intellectual, doctrinaire approach to knowledge based not in facts, but only prejudice and irrational beliefs. We have a duty to not confuse the two. Explanation is not an excuse. Moral judgment is not science. Both are very important. It is very important to keep them separate.

The term psychopathy found its way into the twentieth century, was almost knocked off course by the introduction of the term sociopathy in Germany during World War I, and wound up being adopted by psychoanalysts and written about in a number of influential American and European papers through the first half of this century. I'm assembling the best of these papers in a book called *The Mark of Cain* which will be published by The Analytic Press sometime in 2001. But the major booster of the term was a psychiatrist named Hervey Cleckley who wrote a book, still in print, called *The Mask of Sanity* in 1941. One of the most important things he did was to develop a list of 16 criteria for describing the psychopath, and here they are:

1. Superficial charm and *good intelligence*
2. Absence of delusions and other *irrational thinking*
3. Absence of nervousness or psychoneurotic manifestations

4. Unreliability
5. Untruthfulness
6. Lack of remorse or shame
7. *Inadequately motivated* antisocial behavior.
8. Poor judgment and *failure to learn from experience.*
9. Pathological egocentricity and incapacity for love.
10. General poverty in major affective reactions.
11. Specific loss of insight.
12. Unresponsiveness in general interpersonal relations.
13. *Fantastic and uninviting behavior* with or without drink
14. Suicide rarely carried out.
15. Sex life impersonal, trivial, and poorly integrated.
16. Failure to follow any life plan.

Dr. Cleckley, I think, was right on target most of the time. I have italicized the criteria, or portions of criteria, where I think he was off base. See what you think and if you agree with me. The remarkable aspect of this list is that it was derived only from his experience, yet 13 of these criteria have found their way into the most valid and reliable measure of psychopathy, the Psychopathy Checklist-Revised, and have survived rigorous empirical testing.

Following Cleckley's book, American psychiatry incorporated many of his descriptors in DSM-I in 1952, about a decade later, but then took a major shift in the behavioral direction with DSM-III in 1980, more than a decade after Robins' study was published. The social deviancy tradition was born of this older tradition, which I call the personality tradition.

They have remained separate ever since. Dr. Hare and Dr. Robins both did separate field trials for DSM-IV, but the social deviancy model won–not scientifically, but politically. The personality model is more closely allied with psychology, and the social deviancy model has been more closely allied with psychiatry, and thus medicine. The strong shall survive. One of the interesting sequelae (literally, what follows) is that the American Psychiatric Association asked me to write the treatment chapter for antisocial personality disorder in their companion treatment volumes for DSM-IV. I did, and I think they knew full well that I would incorporate both traditions in my chapter. It will soon be available in its latest incarnation in *Treatments of Psychiatric Disorders, 3rd edition*, to be published by American Psychiatric Press in 2002 and edited by Glen Gabbard of the

Menninger Clinic.

This brings us to the Psychopathy Checklist-Revised, which I mentioned and listed criteria for in the earlier chapter on individual/psychological correlates of violence. I won't repeat that information here, but I will do something that I think will be clinically helpful. At each workshop I read each of the criterion scoring to the audience, and then discuss my thoughts about the criterion. I can't write the descriptors of each criterion in this book because the information is copyrighted and only available in the scoring manual*. But I can mention each criteria, and then discuss my perspective on each one, in the hope that it will improve your general scoring of the instrument. Again, if you want the complete administration manual, you need to purchase it, and you cannot rely on my comments to score the PCL-R. The descriptive criteria for each item in the manual are very precise, and my comments are meant to serve as an adjunct to those criteria, not a replacement.

Let's begin with just the Factor I criteria. As you'll recall from Chapter 4, I have labeled this factor "aggressive narcissism", and believe that this phrase conveys the general meaning of the items that load on it.

**1. Glibness/Superficial charm.** I think this item probably correlates with intelligence, since the brighter the psychopath, the more charming and socially skilled he is likely to be. Intelligence, however, does not correlate with psychopathy, and has been shown to be independent of it in at least a dozen studies. In other words, most psychopaths have average IQs, with a few in the very superior range, probably 2%, and the same percentage at the other end, in the mentally retarded range. This research finding is important because it flies in the face of a general public perception that all psychopaths are brilliant, Machiavellian, Hannibal Lecterian monsters, which they are not.

What do you think Ted Bundy's IQ measured? If you guessed below 120, you are right. You probably overestimated it, however, because of his glibness and superficial charm. Bundy was a primary psychopath, scoring about 36 on the PCL-R, yet not as bright as he appeared (he was doing very poorly during his first year of law school at the University of Washington, but was able to enroll for his

*Copyright ©1990, 1991 by Robert D. Hare, Ph.D., under exclusive license to Multi-Health Systems Inc. 1990, 1991. All rights reserved. In the USA, 908 Niagara Falls Blvd., North Tonawanda, NY 14120-2060, 1-800-456-3003. In Canada, 3770 Victoria Park Ave., Toronto, ON M2H 3M6, 1-800-268-6011. Internationally, +1-416-492-2627. Fax, +1-416-492-3343. Reproduced by permission.*

Exhibit B - Part 3
Page 122 of 140

Case 3:13-cr-00008-SLG   Document 247-4   Filed 01/07/14   Page 22 of 40

first year again at the University of Utah when he relocated because the bodies were accumulating too quickly outside Seattle). He fooled us into believing his IQ was higher than it was (he typically scored in the bright normal range, 110-119) because of this first item from the PCL-R.

Psychopaths know a little about a lot. They are chameleons, imposters. They sense what you want them to know, and then charm you into thinking you were right. They evidence "poverty of content of thought" but it is hard to identify. A useful clinical tool to uncover this is to take the psychopath into an area during the interview where you know a lot, and ask him some questions. If you know how to build car engines, talk to him about this topic; if your expertise is baking apple pies, discuss recipes. You will see how thin his depth of knowledge actually is. Remember the old sexist saying, "he'll charm your pants off"? When it comes to the bright psychopath, this applies to both men and women.

**2. Grandiose sense of self worth.** Psychopaths are a legend in their own mind, to borrow a line from a Clint Eastwood movie. Their grandiosity, or inflated sense of self, is one aspect of their aggressive narcissism. It may be defensive–in other words, it is compensating for low self esteem–or it may be adaptive. Incidentally, our Rorchach research with a total sample now exceeding 700 antisocial individuals, finds no evidence of low self esteem among psychopaths. Be careful to not assume low self esteem unless you have evidence to support your opinion. Your perception of his low self esteem may be just your wishful projection that he has low self esteem so there is something with which to therapeutically work. He'll be glad to convince you of this, too.

I once had a psychopathic patient whose wife was divorcing him, his children were angry at him, he had just been fired from his job, and his house was being foreclosed. He said to me, "I don't aspire to greatness, I claim it." That's grandiosity.

Here's another example I like to read in my workshops. It's from a legal newspaper in California:

> Serial killer Randy Kraft's $60 million libel lawsuit was dismissed by a judge who agreed the death row inmate's reputation could not be damaged further by a book about his violent crime spree.
>
> Los Angeles Superior Court Judge Richard Montes

Exhibit B - Part
Page 123 of 140

Case 3:13-cr-00008-SLG   Document 247-4   Filed 01/07/14   Page 23 of 40



> granted the dismissal Friday without comment from the bench. In a brief written ruling, Montes sided with attorneys representing the book by finding that Kraft is "libel-proof."
>
> He is awaiting execution for the sexual torture murders of sixteen men.
>
> *Los Angeles Daily Journal*

That's also grandiosity. Kraft was executed in California several years later, and after his death the authorities found out that his mother had been collecting his disability checks while he was on death row and depositing them into her account. Like son, like mother.

Grandiosity is maintained in the psychopath by devaluing others in real life. He aggressively injures people–economically, emotionally, or physically–and thereby proves to himself once again that he is superior. This maintains his heightened status above others. The psychopath does not appear to be able to do this just in fantasy, as other narcissistic personalities do, but instead must do it in real life. That's why the psychopath leaves so many damaged people in his wake.

**4. Pathological lying.** Noticed I skipped item 3. That's because it loads on Factor II, which we will get to eventually. The psychopath is a chronic liar, but he doesn't lie for the obvious reasons most of us lie: to reduce or manage anxiety in the face of angering or disappointing someone we care about. Instead, the psychopath lies to dominate and control his objects. Lying keeps him in a position of power over others.

Unfortunately, lying is difficult to detect, and I am no expert. But I'm not alone. Most people can't detect liars. Paul Ekman, one of the few serious researchers on the subject, did a fine study about a decade ago. He had various groups of people whom we would think could detect lying–judges, psychiatrists, police officers, etc.–attempt to detect lying in a laboratory experiment. None of them did better than chance, except for the U.S. Secret Service agents, and they didn't know how they did it! Dr. Ekman continues to research lying and deception, and has actually developed an intricate scheme of reading facial muscles that seems to work. But until we all learn his methods, what do we know?

There are a couple of good books on the subject. First, check

Exhibit B - Part 3
Page 124 of 140

Case 3:13-cr-00008-SLG   Document 247-4   Filed 01/07/14   Page 24 of 40

out Ekman's paperback, *Telling Lies*. Second, if you are a mental health clinician, purchase Richard Rogers' second edition of *Clinical Assessment of Malingering and Deception* (Guilford Press). Lying in the mental health field is called malingering, and the best tests to detect it are the validity scales of the MMPI-2 and the Structured Interview of Reported Symptoms (SIRS), the latter developed by Dick Rogers.

But what if you aren't a psychologist or a mental health professional? The first thing to do is recognize that you will most likely be misled by *the special skill you think you have* to detect lying. If you learned long ago that facial gestures, eye movements, nervousness, and body posturing all worked to detect lying, forget it. The research is not there. Nonverbal methods of detection are fraught with problems and too ambiguous to depend upon.

So what do you do? God dwells in the details. Pay very close attention to contradictions in the details of the case. You can best do this by comparing across data sources: compare depositions by the same person at different times, compare physical evidence to the confession, compare the defendant's police interrogation with later interviews by others, ask the subject the same questions twice during your interviews and write down exactly what he says, and look for contradictions in various eye witness accounts across time. Memory fallibility may play a role here, but if the time sequence is short enough between data sets, that should not be a problem in most cases.

One of the methods by which Dan Petrocelli got a plaintiff win in the O.J. Simpson civil case was to put photos of Nicole Brown's battered face on a screen right next to Mr. Simpson when he was testifying, and then asking him about her battered appearance. Simpson's lying and deception were quite apparent to the jurors. The same went for the shoes—dozens of photos of him wearing the Bruno Magli's, yet he still denied wearing them. Unconscious denial or conscious deception? I cover this in detail in chapter five of *The Psychopathic Mind*.

The devil dwells in the details, too. Take careful notes (remembering that they will all end up as evidence or work product) and compare your notes. Good forensic work is dependent upon detail, and without it the work is invariably sloppy. One of the techniques I outlined in my second book is to draw a 3x3 box, labeling the top "thoughts, feelings, actions" and the side "before,

Exhibit B - Part 3
Page 125 of 140

during, after the crime". I then try to fill in all the boxes when I interview the defendant. This search for details is very useful, because then you can compare what he tells you with physical evidence and other sources of data. Another technique I use when someone reports amnesia for a crime (which occurs in 40-70% of homicide cases) is to establish an "amnesic window": the exact time he lost memory and the exact moment it began again. I then carefully and repeatedly question him around these times, and note any shifts or changes. It is much harder to lie than to tell the truth because lies are not grounded in memories of experience, but memories of fantasy or confabulation.

**5. Conning/Manipulative.** This is a more behavioral version of item number 4 above. It has to do with various methods of using other people to promote certain criminal or at least grossly exploitive schemes. About thirty years ago, a psychoanalyst named Ben Bursten wrote a book, *The Manipulator* (Yale University Press, 1972, and it's still available), which is enormously useful in understanding the behavioral and psychodynamic aspects of this item. Dr. Bursten showed that what he called "the manipulative cycle" typically has four stages to it:

    A. A goal conflict
    B. The intent to deceive
    C. The deceptive act is successfuly carried out
    D. Feelings of contemptuous delight

Here's an example: a psychopath you are seeing in psychotherapy recognizes that the court wants to see substantial improvement in his attitude and behavior to release him from probation. He has a history of abusing women with whom he gets involved. He is smart, and quickly recognizes that by imitating your feeling states and attitudes, he can put something over on you, because you will begin to believe that he is actually changing. He does this, you write a glowing letter to the judge, and probation is terminated. Now he can return to what he likes to do without any court impediments: abusing women.

Take a look at these four stages. Notice that only one is a behavior (C), while the first two are conscious thoughts or wishes, and the last one, D, is a feeling state. If you are a behavioral psychologist, what does stage D predict?

It predicts repetition of the manipulative cycle because it is an intermittent positive reinforcer for the psychopath. He likes that feeling of contemptuous delight, and will repeat the cycle to get there

Exhibit B - Part 3
Page 126 of 140

in. How do we feel if we run someone through this cycle, as we
bably all have done at one time or another? We will likely feel
ty and remorseful, and will never get to a fully developed feeling
contemptuous delight, because we have a conscience. The
ative, aversive feelings will then predict that we won't do this
in, because they function as punishment. Without a conscience,
psychopath experiences no punishments for his behavior, only
ards.

Let's think about this cycle from a psychodynamic perspective.
at is its meaning? For starters, it devalues other people, and
efore enhances the psychopath's grandiose feelings about himself,
ay to maintain his aggressive narcissism. "See, I told you I was
rter (brighter, quicker, more clever, slicker, etc.) than that doctor
vchotherapist, probation officer, parole agent, police officer,
ver, judge, etc.)." The professional is put down; the psychopath
vates himself. How did he do this? Through the chronic
aluation and derogation of others by manipulating them.

When are we most vulnerable to the manipulative cycle? When
don't understand our own narcissistic vulnerabilities. If you don't
k you have any, answer this next question:

*vhat way am I perfect, or nearly so?*

If you'll answer this honestly, you are on your way to identifying
r vulnerabilities in working with psychopathic individuals.

Let me tell you a story: about two decades ago I was treating a
ng psychopath who had been found not guilty by reason of
nity for robbing his credit union. He also had bipolar disorder.
was in a full blown manic state when he did the robbery. He had
rned to the local court to petition for release, having spent a
iber of years in a forensic psychiatric hospital.

I liked Bob. He was bright, verbal, and a refreshing
imunicative breeze in an inpatient unit where the average IQ was
bably 90. One day he and I were having a lively debate on the
chopharmacological restoration of sanity—not exactly a hot topic.
of sudden he said to me with a sly smile, "surely, Dr. Meloy, you
w the case of People v. De Anza?" I paused for a moment, and
said, "Yes, of course." He then went on to quote from the case
use it to defend his side of the argument, thoroughly and
pletely. Our conversation was finished, and he walked back into

Exhibit B - Part 3
Page 127 of 140

the patient sleeping area.

I felt horrible. I began to ponder my internal emotional state at that moment, and began to put together what had just happened. I had lied to Bob. I never heard of that case. I lied because he put me between a rock and a hard place (or, as a schizophrenic patient of mine used to say, between a hard place and a rock). The "rock" was my narcissistic investment (felt as pride) in my knowledge concerning insanity law and clinical issues. We always want to maintain our pride (narcissistic) investments, but they are subject to sudden deflation, like a balloon, if they are punctured, because the underbelly of feelings of pride are feelings of shame. Since I did not know the case, if I had admitted it, I would have felt, for the moment, ashamed. I didn't want to feel that! So what did I do? I chose the "hard place", and I lied, thus leaving myself vulnerable to his manipulation of me.

I may have narcissistic vulnerabilities, but I'm not stupid. Later that evening I went across the street to the law library, looked up the case, and the judicial opinion was the exact opposite of what Bob had said it was. He turned it on its head, recognizing that I had lied to him, and used it very effectively against me.

What are the typical narcissistic vulnerabilities of professionals that are likely to encounter psychopaths? Mental health professionals often invest in the belief that they have the power to heal other people. The psychopathic patient will be happy to maintain this narcissistic illusion by holding up a mirror every time he comes in for a psychotherapy session so that the mental health professional can admire him/herself for the wonderful healing that is being done. But the admiration will come at a hugh price. Wait and see.

Criminal justice professionals often invest in the belief that they can't be fooled, or they are stronger, tougher, and more savvy than the psychopathic subject. He will demonstrate to them that he is the dominant one, and the police officer, probation officer, or judge will end up feeling angry, humiliated, and often bent on retaliation.

**6. Lack of remorse or guilt.** If there is a benchmark for the psychopath, it is his lack of conscience. This is the item that gets closest to the psychopath's inability to feel badly for what he has done. The emotions of remorse and guilt, feelings that we are quite familiar with, are learned by us as we developmentally mature, typically around the age of 4-7. These are socialized emotions: feelings that we can only experience if we see other people as whole, real, and meaningful individuals, separate from us, with their own

Exhibit B - Part 3
Page 128 of 140

lives, wishes, fears, desires, and values. We probably take such emotions for granted, but to understand the psychopath you must recognize that he or she doesn't have a clue as to what these emotions feel like. One psychopath, asked time and again what it was like for him to feel remorse, finally said, "it's like you want to kick off your shoes, put your feet up on the couch, and light up a cigarette." He had no idea what such feelings were like.

Many psychopaths, however, have learned to imitate such feeling, either with words or facial gestures, and they can fool even the most sophisticated interviewer. Here is a useful technique to determine whether or not the stated feeling is real:

After the person has articulated a particular feeling to you, such as "guilt" or "remorse", ask him, "Tell me what it's like for you to feel _____?" Use the exact word he used. A person who genuinely feels a certain way will be able to describe to you the physical sensation of the feeling, like this:

"Well, doc, when I'm guilty I want to hide from people, I feel really heavy, sort of a sick feeling in my stomach, and I don't want to talk about it...I can sometimes hear my momma yelling at me..."

The psychopath, when he is asked to give you specifics about his feeling, will usually do one of three things: he will evade the question, he will get irritated, or he will give an absurd answer. Write down whatever he says, and put the verbal exchange in your report for the court. This is much better than the often vague statements I have seen in many reports through the years: "it is this (probation officer's, psychiatrist's, social worker's, etc.) belief that Mr. _____ did not genuinely feel guilty for his crimes." Your opinion may be valid, but it won't fly in court without more specific evidence.

Carl Gacono and I have found in our Rorschach research that psychopaths, and other antisocial individuals, typically have a very young emotional makeup. They live in a presocialized emotional world where feelings such as boredom, rage, excitement, envy, restlessness, fatigue, and hungers of various sorts predominate. Emotions for the psychopath are very narcissistic, that is, self focused, and do not necessarily involve other people's desires—only what he wants from them.

In order for us to internalize values, and eventually form a conscience, we have to be able to form attachments. As I have mentioned before in this book, psychopaths are chronically emotionally detached, and without an ability to bond, they have no

Exhibit B - Part 3
Page 129 of 140



biological avenue to usher in various values that will guide their behavior throughout life. It's like attachment is the highway, and values come in many different cars and trucks down the highway, first driven by mom and dad, and then by peers, school teachers, other mentors, and the society at large. Without the highway, values don't arrive. The destination remains elusive and isolated from others.

**7. Shallow affect.** I actually don't like the label for this item, because I think that psychopaths sometimes do feel quite deeply–it is just that the feeling is very self-focused, often passes quickly, and leaves us out of the emotional exchange. From our perspective, it may look shallow, however, and the psychopath will often express emotion suddenly, very coarsely, and then it will dissipate rapidly. He goes from zero to sixty in four seconds flat. He also may act as if nothing has just occurred, while other people quake as if the ground has shuddered.

About eight years ago I testified on a sexual homicide case–it was every parents' worse nightmare. A man picked up a nine year old girl from in front of her school, and within the hour had sexually assaulted and killed her in a nearby motel. He was eventually captured and returned for his death penalty trial.

This man was a psychopath. He scored 36 on the PCL-R. He had an IQ of 85. He also was very impulsive, which we were able to measure in a variety of ways, from neuropsychological testing to neural imaging of his frontal lobes, which were almost non- existent. I happened to be testifying on the stand one day, and he was sitting on the left side of the courtroom between his two attorneys. The prosecutor was cross examining me, and I had just talked at length about his lack of emotional modulation and impulsivity.

Suddenly we heard a third voice: "I'm going to fuck you up, punk." The prosecutor and I both looked at the defense table at the same moment, the defendant was sitting up like a ramrod, and then he suddenly bolted across the courtroom, heading straight for the prosecutor, who was back pedaling into the jury box.

I have never seen a jury box empty so quickly. Half of them ran back into the judge's chambers, half into the hallway, and just as the defendant was two feet from the prosecutor with his fists flying, the bailiff tackled him from behind.

In a moment of masterful understatement, the judge said, "I think it's time for lunch."

Unmodulated emotion. Impulsivity. This was such a perfect

Exhibit B - Part 3
Page 130 of 140
Case 3:13-cr-00008-SLG   Document 247-4   Filed 01/07/14   Page 30 of 40

example, we were afraid the jury would think we orchestrated it. We didn't. Again, we have found through our research that psychopaths modulate emotion about as well as a 5-7 year old child. Intense excitement one moment, intense anger the next. Emotional maturity means that feelings tend to come on more slowly, are more smoothly expressed, and don't have the rawness of a child's feelings.

**8. Callous/Lack of empathy.** This one item is actually the term that Bob Hare has used to describe all of the Factor I criteria. My term is "aggressive narcissism". It also is the label for an item which describes someone who remains emotionally detached from others, has no affectional feelings for others, and shows no ability to empathize with another's plight, even if that person is overtly suffering.

The most interesting component of this item, which is mentioned in the definition in the administration manual, is sadism. Sadism is the experience of pleasure through the dominance and suffering of another. Sexual sadism is the experience of sexual arousal through the dominance and suffering of another. They are often closely related: unfortunately, there is only one diagnosis in DSM-IV that mentions sadism, which is sexual sadism, one of the paraphilias (actually a rare one: even among sex offenders, only 1.5% are sexual sadists). DSM-IIIR used to have sadistic personality disorder, and it is still measured by the MCMI-III's aggressive/sadistic subscale, but the personality disorder itself was eliminated in DSM-IV. As my friend Michael Stone is fond of saying: "sadistic personality disorder, not in the DSM but still in the USA."

There is a compelling and small body of research that shows a significant and positive correlation between how psychopathic someone is and how sadistic someone is. As psychopathy increases, evidence of sadism increases. The first study was done by Park Dietz, Roy Hazelwood, and Janet Warren in 1990.[25] Although they did not explicitly measure psychopathy in their sample of 30 sexually sadistic criminals, the behaviors they document strongly suggest it. Other toilers in this little corner of criminal psychopathology are Steve Hart and his group, who showed a strong relationship between the Millon subscale I mentioned above and measures of psychopathy[26] and work I have done with several colleagues. First, Carl Gacono and I showed a relationship between a measure of sadomasochism on the Rorschach and whether or not an inmate was a psychopath[27]. Second, Sue Holt, a doctoral student of mine, Steve Strack, one of the

Exhibit B - Part 3
Page 101 of 140

country's experts on the Millon instruments, and I showed a positive, significant, and strong relationship between various measures of sadism and psychopathy in samples of inmates who were violent or sexually violent[28]. It was Sue's fine doctoral dissertation. So there you have it. A little bit of compelling research that proves something many of us have suspected for a number of years.

Several final comments on sadism. Remember, it can come in many forms, ranging from the socially acceptable form of sadism we see regularly and call teasing, to sexually sadistic murder. Most people deny it as an impulse that could possibly exist in them, even when they obviously express it. Another point: most serial murderers are both sexual sadists and psychopaths. And another: most sexual sadists prefer anal intercourse. If you work sex crimes, please pay close attention to evidence of anal intercourse, and at least consider sexual sadism as a possibility, especially if the victim is abducted, symmetrically bound, kept in captivity, repeatedly raped, and the crime scene is quite organized. And finally: there is no psychiatric or psychological treatment for sexual sadism, and it doesn't go away by itself. I've had several experiences when I would travel to forensic hospitals in California to evaluate patients where "sexual sadism" would be diagnosed on admission (usually based on a criminal history), and then disappear as a diagnosis from the patient's chart within a year. I'd ask the attending doctor, and this is what I would hear: "Well, he hasn't shown any sexually sadistic behavior here at the hospital, so we dropped the diagnosis." This is not only ludicrous, but quite dangerous. Just because your most favorite sex acts are not available to you doesn't mean the urge (and the fantasies) to do them go away. When you were an adolescent, and it was not convenient to masturbate and think about your favorite high school sweetheart, did you decide to never masturbate again? Of course not. Sexual behaviors (both preferred activity and object) are deeply conditioned, stable patterns that are quite immune to change: one of the reasons sex offender treatment results have been pretty abysmal over the past thirty years.

**16. Failure to accept responsibility for own actions.** This is the last item on Factor I, and it has to do with a defense mechanism we call "projection": the attribution of responsibility for one's behavior to other people and other things. "She made me do it...the criminal system is unfair...my boss was too mean...my kids provoke me...the little girl tried to seduce me..." It is everyone else's fault but mine.

This defense is a stable epidemic among psychopaths, and they use it early and often in their criminal careers. It is easy to recognize when the externalization is obvious, but it gets tricky when the mental health professional subtly plays a role in it. Here's how:

A psychologist thinks his psychopathic patient is depressed, so he decides to measure his depression with the Beck Depression Inventory. Not being easily fooled, the psychopath recognizes what the instrument is measuring, answers the questions in the direction of depression, and VOILA! The psychologist confirms his diagnosis.

Some psychological measures have high face validity. This simply means that it is easy to recognize what they are measuring. Avoid using them in forensic settings unless you suspect malingering and want to see if it is actually occurring. Malingerers typically overreact to obvious measures of their faked disorder and produce elevations way beyond what even a truly disordered person would produce. He doth protest too much.

Even neuropsychological measures have motivational components in them that can be used to produce invalid results. For instance, a smart psychopath can usually produce a lower IQ than he actually has, but will not be able to produce a higher IQ than he actually has. All he has to do is just mess up on the more difficult questions at the end of each subtest.

I typically only use measures that have sensitive distortion scales built into them, like the MMPI-2, or are sufficiently ambiguous to leave the psychopathic subject at a loss for what to do next, like the Rorschach.

There are three items on the Psychopathy Checklist-Revised which don't load on either factor, and I want to address them next.

**11. Promiscuous sexual behavior.** This item is closely related to item 17, and refers to the "polymorphous" sexuality of the psychopath. This is an old term that literally means "many shapes", and the psychopath is known for the variety of his consensual and coerced sexual encounters, from the mundane to the criminal.

His sex life is typically devoid of emotion, and mostly based upon sensation seeking. His sexual partners are there to gratify him, and the idea of having a long term, whole relationship with another person that includes sexual intimacy is beyond his grasp. He is also more likely to engage in paraphilic activity, referring to sexual

Exhibit B - Part
Page 133 of 140

Case 3:13-cr-00008-SLG   Document 247-4   Filed 01/07/14   Page 33 of 40



behavior that is outside the norm. Such behaviors may range from pedophilia (sexual interest in children) to sexual sadism.

When I consulted with the defense on the Richard Allen Davis murder trial, the paroled felon who sexually assaulted and killed Polly Klaas, Park Dietz testified for the prosecution at trial on May 21, 1996. He offered useful categorizations for understanding the various ways paraphilic desires are manifested:

1. They may remain in fantasy, and are never acted out with another.
2. A consensual sexual partner, such as a spouse, is told of the fantasy and persuaded to act it out with him.
3. Sexual partners are hired, usually prostitutes, to act out the fantasies.
4. A person is abducted, and criminally sexually assaulted, to act out the fantasies.

Notice that each of this categories stands alone, and one person may never progress past category 1. On the other hand, some individuals may move from stage 1 to stage 4 in a progressive fashion. In all cases, recent research has pointed toward a positive and significant relationship between psychopathy and the inclination to sexually offend, whatever the actual crime that is committed. In fact, one research group, led by Marne Rice, Grant Harris, and Vernon Quinsey, have found this relationship to be so strong that they have authored a number of papers that have followed this research trail, culminating most recently in their book, *Violent Offenders: Appraising and Managing Risk* (American Psychological Association, 1998).

I have had a steady interest in the sexuality of the psychopath which has grown from my experience with different psychopathic individuals, and their willingness to talk to me about their sexual history. Regardless of the veracity of what they tell me, the polymorphous nature of their sexuality seems to be right on the mark. I think this occurs for a number of reasons:

    *a. Grandiosity.* Psychopaths see themselves as unique, special, and larger than life, deserving of whatever sexual gifts are available to them.

    *b. Sensation-seekers.* Psychopaths are drawn to exciting stimuli. Sexual pursuit can be very exciting, novel, and at times, dangerous, combining an adrenalin and orgasmic rush. In fact,

Exhibit B - Part 3
Page 134 of 140

Case 3:13-cr-00008-SLG   Document 247-4   Filed 01/07/14   Page 34 of 40

most of us are drawn to sexual novelty, we just inhibit our impulses (unless we're lucky enough to have a creative partner).

c. *Entitlement.* Psychopaths believe they are entitled to have what they want, when they want it; hence, the opportunism of their sexuality, and the disregard for the feelings and desires of the victim.

d. *Lack of bonding.* Without any attachments, when the novelty of sex with a new partner is gone, he's gone. What would be the point of staying in a boring bed?

e. *Sex object/part object devaluation.* Psychopaths use other people to meet certain desires. The woman he is with is just "a piece". That's all. Affectional relating to her as a separate, whole person is beyond his psychological grasp.

f. *Diminished capacity for love.* One of my favorite psychoanalytic writers, Robert Stoller, who died in a tragic car accident in LA a few years ago, believed that unbonded sexuality diminishes the capacity for love.

g. *Search polygyny.* This term refers to a mating strategy whereby certain males travel around a lot and impregnate as many different women as possible. Here's my theory: because psychopaths don't form bonds, they typically have very weak or non-existent family networks. Families, moreover, help the next generation to survive. Without a family network, the risk of the psychopath's children to not grow up and reproduce is higher than normal. Therefore, the psychopaths that do search polygyny the best are the ones that successfully reproduce the most children to carry their genes into the next generation. They stay in the gene pool. (This is an evolutionary theory, and is not a conscious decision on the part of the psychopath; although you should be able to see how the other elements would work with this quite well: the more grandiose, sensation-seeking, and entitled the psychopath is, the more women he will have, and the greater likelihood of multiple impregnations.)

h. *Sex partners leave.* Anyone with half a brain who begins to date a psychopath will leave, unless he's holding a gun to her head or is somehow forcing compliance with his wishes. Therefore, by necessity he is going to seek out and have multiple sex partners.

**117**

**17. Many short-term marital relationships.** In the PCL-R Manual there are specific scoring criteria for this item. It is basically measuring the instability of intimate commitments in the psychopath's life. You can see how this item is also related to the 8 reasons I have cited above for his sexual wanderlust.

**20. Criminal versatility.** This is the last item in the PCL-R, and the third item in this grouping that doesn't load very strongly on either factor (for those of you into statistics, the loading on these three items was less than .40). Bob Hare and his colleagues grouped criminal behaviors into 15 categories, and the psychopathic subject earns a certain number of points (0, 1, or 2) for having been arrested or convicted of a certain number of crimes.

Now we move to Factor II. This has been variously described, the most common term for it being "chronic antisocial behavior." All of the nine items on this factor have something to do with overt criminality, but also have some important tie-ins to biology and personality (If you did a factor analysis of the DSM-IV criteria for antisocial personality disorder, you'd only have one factor, and this is it).

**3. Need for stimulation/proneness to boredom.** Of all the twenty items on the PCL-R, this is probably the most biologically based. The experimental work on this particular item was done by a number of individuals working independently of one another–Herbert Quay, Hans Eysenck, Frank Farley, Marvin Zuckerman, and Robert Hare, to name most of them–who all came to the conclusion that many habitual criminals were sensation-seeking extroverts. They yearned for the wild life, took unreasonable chances, lived in the fast lane, and appeared rather fearless, especially when confronted by lethal authority (remember the last frame of the movie "Butch Cassidy and the Sundance Kid"? Or "Thelma and Louise"? Hollywood has a marvelous way of freezing people in the thrall of adrenalin-pumping excitement just before they are killed by "the authorities" because of their own deeds).

All these researchers found remarkable convergence, an indication of validity or the scientific truthfulness of the finding, in their work. Robert Hare, for instance, was the first to study the "autonomic hyporeactivity" of psychopaths. In other words, he found that psychopaths did not automatically react to things like punishment, or the threat of punishment, as you or I would. They didn't seem to get anxious or uptight. Marvin Zuckerman, on the

**118**

Exhibit B - Part 3
Page 136 of 140

other hand, found that certain people seemed to be "wired" to seek sensation, and published his Sensation-Seeking Scale in 1964.

As the years have gone by, there has developed a general agreement in the field of criminal psychopathology that certain criminals are "chronically cortically underaroused," a phrase first used by Adrian Raine, which I like a lot. In other words, he has shown in his contemporary biosocial research that cortical underarousal (this has nothing to do with IQ) will predict criminality a decade later, and the absence of cortical underarousal seems to innoculate people who live in environments that produce a lot of criminals from becoming criminals themselves.[29]

This marvelous research is both compelling and controversial, because it stands on its head the old social work notion that all criminals are made, not born. A substantial body of biological research, as I noted earlier, now indicates that certain biologically based characteristics will predispose a person to behave criminally. In fact, it is likely the most hard core, habitually repetitive, and violent felons have the most things biologically wrong with them. I think even Dorothy Lewis would agree with me here, although she would attribute the biological problems to acquired rather than given traits.

Another interesting line of research that fits nicely with what I am saying: we know that conduct disorder is a necessary prelude for the development of antisocial personality disorder, at least if you are using DSM-IV. We also know that there is a big overlap between conduct disorder and attention deficit disorder (ADD or ADHD). We also know that ADD is a product of cortical underarousal, and the medical treatment of choice is a class of drugs known as stimulants, such as the product Ritalin (methylphenidate). What we need, and no one has done yet, is a good study of carefully diagnosed adult psychopaths to see how many also have residual ADD. My guess is the figure is quite high. It actually would make a great doctoral dissertation, since you could compare a group of psychopathic and nonpsychopathic prisoners, matched on other demographic variables, on various measures of ADD or ADHD. If anyone reading this book grabs this idea, please let me know. You are more than welcome to it.

So where does this lead us? Back to item #3, and the observation that most psychopaths are easily bored and constantly seeking stimulation. Remember, this is a biological problem, and is not going to change with psychotherapy. They need more to be going on outside because they have less going on inside: *there is less there*

*than meets the eye.* That's why they stir it up. I know of cases where psychopaths in prison have shanked (stabbed) another inmate just to relieve the boredom of prison life! I had one psychopath tell me that his most exciting moments were having sex with two different women at the same time he was intravenously shooting speed: "doc, I thought my heart was going to explode–it was great!" That's sensation-seeking.

These biological differences also have certain social ramifications: first, psychopaths will abuse drugs left and right, just to alter their consciousness. They particularly like alcohol and stimulants (even though the former is a depressant); second, because they don't learn from punishment, prison will not work as a form of rehabilitation. Prison for psychopaths is graduate school, at taxpayers' expense; and third, this low level of arousal is one of the biological traits that makes them good predators (the predatory vs. affective violence model). They don't get anxious, they stay cool, they orient quickly to a threat, appear to be fearless, and even decrease their heart rate when they are batterers and verbally conflict with their spouses.[30]

**9. Parasitic lifestyle.** This item is a measure of economic exploitation. It basically refers to the psychopath living off the resources of others. The manual will give you specifics on scoring.

This behavioral pattern is psychologically driven by the psychopath's sense of entitlement, another aspect of his narcissism. He has a right to take whatever he wants from you by whatever means. Life is a smorgasbord (if he's Swedish) upon which is placed various delicious foods that are his for the taking (Tom Harris does a nice job of describing the festive, expansive, and cannibalistic appetites of his favorite psychopath, Hannibal Lecter, in his book of the same name). The psychopath has no concept of "reciprocal altruism", anthropologists' phrase for the pleasurable give-and-take of social networks. He relates to others, as I have said, on the basis of dominance and submission—a power gradient—and you will likely be the submissive one.

**10. Poor behavioral controls.** This item is the one most specifically related to violent behavior in the psychopath. It refers to his rapid escalation, violence when provoked, and generally poor motor control over angry feelings. I have previously talked about the lack of affect modulation which we have found in psychopaths, and this item fits nicely with the coarseness of his emotional expression.

Exhibit B - Part 3
Page 138 of 140
Case 3:13-cr-00008-SLG   Document 247-4   Filed 01/07/14   Page 38 of 40

The violence of the psychopath, even when compared to other criminals, is over-the-top. I will be talking about it more specifically when I get to the validation research below. Suffice it to say here that the psychopath is likely to be more predatorily violent than others, and also affectively violent when provoked or threatened.

**12. Early behavioral problems**. This item is very similar to the criteria that go into a diagnosis of conduct disorder in children, but the PCL-R specifies the years of age 12 or below. In the manual are listed the various behaviors that you will need to identify to score this item.

I have wondered about psychopathy in childhood for a number of years, and fortunately there are now some people doing serious research on the problem: how do you identify among the many children who have conduct disorder the ones at greatest risk for becoming psychopaths in adulthood? The proportion at risk are actually quite small, and here's how I extrapolate it:

As I mentioned earlier, no more than 25-50% of CD children will become ASPD adults. We also know that only one in three ASPD adults (in a maximum security prison) are also severe psychopaths. One third of 25-50% is 8-16%. Therefore, we can roughly estimate that only 8-16% of CD children will grow up to be psychopaths. That's about one out of ten, if you average the percentage.

I have no more precise way of determining this figure, and it should be treated for what it is, a rough estimate; but my point should be clear. Looking for the psychopathic child among all the acting out, disruptive children, is not looking for a needle in a haystack, just a certain bale of hay among many. Here's how he looks, poignantly expressed by a mother of a 10 year old:

It is, of course, my fervent hope that my son is not a psychopath. But all the signs seem to indicate that he is. He's 10 years old, and he is adopted. From the time we got him (at 3 days of age) he showed an aversion to touch and holding. He seemed incapable of forming emotional attachments, even at that age.

At 18 months, it was as if a switch had gone off in him. He started showing tremendous rage, complete lack of remorse and an almost complete lack of empathy. His first reaction, when he would see an animal, would be to kill it. He became extremely hateful and vicious, especially towards me. It's kind of ironic that, when he was 2 years old, I said to his pediatrician, "I'm really afraid for William

Exhibit 3 - Part 3
Page 139 of 140
Case 3:13-cr-00008-SLG   Document 247-4   Filed 01/07/14   Page 39 of 40

because he's showing signs of becoming a sociopath." The pediatrician said, "I think you're overreacting."

This mother went on to describe his affective and predatory behavior toward her, including starting fires in the house, threatening her with a knife, and sticking straight pins out of the carpeting in front of her dresser, out of her pillow, and into her clothes so they would scratch her when she put them on.

Most conduct disordered children do not evidence such behavior. As her child has grown older, sadistic behavior is more evident. Once he hanged a cat in the backyard and waited for his mother to come home to watch her reaction. She remembers seeing his pleasure at her horror, and then imitating her horror back to her.

The two researchers who have done the most to understand childhood psychopathy are Don Lynam and Paul Frick. Working independently of one another, they have published a series of fine papers which they believe identify the "fledgling psychopath"[31]. Frick has most closely followed the research path of Robert Hare, and has found a two factor model for kids: the first factor, callous/unemotional is very similar to the adult first factor; and the second factor, impulsivity/conduct problems, is also very similar to the adult second factor[32]. Lynam has emphasized what he refers to as:

$$HIA + CP$$

Hyperactivity, impulsivity, and attentional disorder, coupled with conduct problems, appear to capture a particularly high risk subgroup of conduct disordered children.

I have not done any predictive work in this area, but clinically emphasize two characteristics that may identify the psychopathic child-at-risk:

1. No attachments and no depression
2. Cruelty to animals

The first criterion addresses the lack of a capacity to form an emotional bond with another living person, and the absence of distress or yearning to do so. The second criterion addresses the developing sadism (pleasure through the suffering of another) of the psychopathic child, to be clearly distinguished from just an angry