child who may displace his fury toward his parents onto a pet. Alan Felthous found in a study over a decade ago that cruelty to animals did correlate with a wide variety of adult violent behaviors, and also emphasized in his work that multiple acts against various domesticated animals should concern us the most.[33]

**13. Lack of realistic long-term goals.** A person could have long term goals, but they could be patently unrealistic. Psychopaths have great difficulty projecting into the future, that is, foreseeing the long term consequences of their actions in life; and also reflecting meaningfully on the past, what we call "insight." They are prisoners of the present.

There was a young psychopath in San Diego who was doing some "speed" with his girlfriend in his apartment. He had his loaded .357 magnum next to him on the bed, since one never knows when self-defense will be necessary. In a moment of paranoid rage he shot his girl in the chest. He then hid her body under the bed, jumped in his car, and decided to flee the country. He started driving north to Canada.

This young man, whom we'll call Dave, was picked up in Oceanside, a community about 30 miles north of San Diego. He was interviewed by a doctor a few days after his arrest:

"Now, Dave, I understand you were driving to Canada to flee the country."

"Yea, so what?"

"Well, Canada is 1500 miles north, and Mexico is only a 10 minute drive south. Why didn't you go to Mexico?"

"Doc, I don't speak spanish."

As Henry Lee, the great criminalist in the O.J. Simpson case said, "something wrong." What is it about this exchange? It appears that Dave, in a way, has focused on a legitimate concern, but one that we probably wouldn't consider central to our decision-making to get out of the country. The language issue is, in fact, somewhat secondary to freedom and escape. But it wasn't for Dave. Why not?

Another example, and a real one. Two guys just robbed a 7-11 store. As they run out and jump in their car, one of them tosses the car keys to the other and says, "You drive."

"Why?" asks the other.

"Because my driver's license was suspended last week."

Exhibit B - Part 4
Page 141 of 200
Case 3:13-cr-00008-SLG   Document 247-5   Filed 01/07/24   Page 1 of 60

Again, a humorous and off-the-mark response, but a real concern for the robber.

My last example:

Richard, an angry psychopath who was fired from his job at Taco Bell and that afternoon abducted, raped, and killed a little girl, flees in his car from California to Texas. He arrives several days later, but doesn't have any money.

Pondering his predicament, he decides to apply for a job. He picks a Taco Bell in San Antonio. During the interview he gives as a reference the Taco Bell he left behind in California. Several phone calls later, and the Texas store manager is told that Richard is a fugitive wanted for rape and murder in California. Another day goes by, Richard is called in for his second interview, and is arrested by two FBI agents posing as Taco Bell employers.

Richard was subsequently tried and convicted for the rape and murder, and is now on death row in San Quentin. His escape failed because he didn't foresee the long term consequences of his actions. His tactical manipulations were good; his strategic skills were horrible. The psychopath thinks it's a light at the end of a tunnel, when in fact it's a train.

This aspect of psychopathy focuses on his thinking, and the past decade has yielded an array of findings concerning the thought, or cognition of the psychopath. Simply put, their perceptions and thoughts are much more disordered than we ever expected them to be.

We found in our Rorschach research that psychopaths show moderate and pervasive amounts of "formal thought disorder", a technical term that refers to the disorganization of thinking. Psychopaths are often tangential or circumstantial (they wander around the barn, or they miss the barn completely), and usually it serves their need to self-aggrandize, or pump themselves up. They do OK on mental status exams, except for proverb interpretation: being unable to explain the meaning of proverbs to the interviewer, such as "one swallow doesn't make a summer."

Other cognitive findings indicate that psychopaths don't understand the emotional or connotative meaning of words. They can hear the lyrics, but they don't hear the song. It's as if that portion of the brain, the limbic system, is disconnected. Hervey Cleckley labeled this "semantic aphasia" over half a century ago, a term he borrowed from Henry Head's 1926 book, and we're just beginning to measure it.

**124**

They don't process words the way we do, and this may also interfere with their thinking ability, especially the interpretation of emotions.

Much of the research action concerning the psychopath is focusing on the executive portion of the brain (the pre-frontal cortex) and the emotional portion of the brain (the limbic system). Although there are no definitive findings, one of the most exciting areas of work concerns neuroimaging and psychopathy. Both Adriane Raine and Robert Hare have been involved in such studies, and these measures are particularly important since they are immune to the manipulation of the psychopath.

The social consequence of item 13 is that the psychopath is very adept at short-term manipulation of others (tactics), but he will not be able to develop an effective, long term plan (strategy). This is why most psychopaths, in my opinion, will eventually self destruct.

**14. Impulsivity.** This item looks simple, but it isn't. There is a voluminous and fragmented research base on impulsivity, and no one can agree on what it means. I had a doctoral student a few years back, Lynette Rivers, who did a nice unpublished dissertation on impulsivity in offenders. She found in her review of all the research that there are three kinds of impulsivity not necessarily related to one another: motor impulsivity, emotional impulsivity, and cognitive impulsivity. The best textbook on the topic is *Impulsivity*, edited by Chris Webster and Margaret Jackson (Guilford, 1997). They include a nice chapter on impulsivity in the psychopath by Steve Hart and Rebecca Dempster.

The problem seems to be one of definition. The PCL-R item is defined in the manual in a way that captures motor or behavioral impulsivity. Studies of psychopaths, most recently the work of Dewey Cornell and his colleagues[34], however, have shown that there is a strong, positive relationship between psychopathy and instrumental violence: in my terminology, predatory violence. which is planned, purposeful, and emotionless. This doesn't sound like impulsivity to me. Furthermore, in our Rorschach research we have found that psychopaths by and large score zero (normal) on the indices D and Adjusted D, the two Rorschach measures that come closest to impulsivity (although I think we are measuring a combination of cognitive and emotional impulsivity with the Rorschach). Impulsivity measures abound, most prominently the fine work of Ernie Barratt. who has devoted his career to the study of impulsivity at the University of Texas.

Impulsive is often wrongly equated with opportunistic or spontaneous offending, or with reactive violence. Again, in the model I use, affective violence can be impulsive, but it is not its defining characteristic. Furthermore, a predatorily violent individual can strike while the iron is hot; a serial rapist, for instance, can act very quickly and stealthily when a victim crosses his path, taking great advantage of the criminal moment, but this does not mean he is impulsive.[35] He can also choose not to rape if there is no victim available during his hunting.

I don't have a good answer to these problems, other than to urge you to be very careful the next time you begin to write, "the patient (or probationer) is impulsive." Think about the basis for your opinion: do you have a clear definition in your own mind, and what is the evidence that supports your opinion that the patient is impulsive? I think we often see impulsivity in patients, particularly forensic patients, when there is none. Impulsivity becomes a wish that we project onto the patient to give him a problem that is potentially treatable.

**15. Irresponsibility.** This is very different from item 16, failure to accept responsibility, which we already addressed on factor I. This item has to do with behaviors that tell you this person cannot be trusted to keep his word. The manual will give you details for scoring.

In my workshops, I like to stress the absence of internalized values that are implicit in this item. I wrote about such matters in *The Psychopathic Mind*, and speculated that without attachments, we have no method by which to internalize the values of others. Psychopaths are valueless individuals, and therefore have no emotional commitments to anything, even though they may say they do. Here's a question:

Are all terrorists psychopaths? No, they are not. Why? Because many terrorists are deeply committed to certain ideas or causes, and are willing to die for them.

Are there terrorists who are psychopaths? Of course. They are likely to be the leaders of the terrorist cadre or the ones carrying out the riskiest, most sensation-seeking, violent, and cruel acts. Why? Because they are generally hypoaroused emotionally and also sadistic.

Think about yourself. Do you hold values deeply enough that you would die for them? Is there anyone or anything in your life that you value beyond your own life? When your principles are violated,

Exhibit B - Part 4
Page 144 of 200
Case 3:13-cr-00008-SLG   Document 247-5   Filed 01/07/24   Page 4 of 60

do you have sudden and deeply felt emotion? Unless you are a psychopath, you probably had lots of internal responses to these questions. That's because you have deeply internalized values.

Would you want your commando squadron to be made up of psychopaths? Absolutely not! You could be their first victim, especially if the so-called "enemy" made them a better offer.

But wait a second. Wouldn't their low levels of autonomic arousal, lack of anxiety, and fearlessness make them excellent predators? Yes, of course. The problem is staying in control of their behavior.

A very well known psychologist told me about his work with the army during the Korean War. They found that the individuals that scored highest on scale 4 (the psychopathic deviate scale) of the MMPI made the best flamethrowers. The problem was how to control what they set on fire. The answer was to provide each flamethrower with a "buddy" (read "superego") who was not a psychopath who would select the target! It worked.

This item is also an opportunity to make some political comments. Psychopaths will assume national leadership positions at various times in various countries. The key ingredients are:

A masculine, charismatic psychopath
+
An emotionally and economically depressed populace

The outcome is usually tragedy. The psychopath will mobilize most of the country by showing them how to blame others for their problems, and these others usually include both foreign countries and certain minority groups that live in the country. This paranoid mobilization then moves to extreme aggression, either in the form of war or extermination of the minority group. The psychopathic leader is eventually killed, commits suicide, or flees the country and lives in wealthy exile.

I've mentioned a number of examples at the beginning of this chapter; suffice it to say that we have never had a President who is a primary, or severe psychopath. Typically, democratically run societies have enough mechanisms to prevent such a calamity from occurring. Authoritarian or autocratic governments do not.

**18. Juvenile delinquency.** This is simply a measure of antisocial behavior between the ages of 13 and 17 (a five year period). The



manual, once again, defines the charges and convictions that should be considered when determining a correct score for the individual.

**19. Revocation of conditional release.** This is the final item of factor II. It is calculated in the manual to measure both escapes and losses of freedom which often appear in the history of the psychopath.

## Psychopathy and the DSM-IV

Now that I have introduced you to the measurement of psychopathy, or have broadened and deepened your understanding of it, the question remains: what do we do with this information? First of all, if you use the DSM-IV as a clinician, I recommend that you make a statement about psychopathy on Axis II, and put it in parentheses, like this:

### *Axis II: Antisocial Personality Disorder (severe psychopathy)*

Then in the paragraph below your DSM diagnosis, explain what you mean by "severe psychopathy" and its impact on the case. For example:

"This patient scored 38 on the Psychopathy Checklist-Revised, the most reliable and valid measure of psychopathy. This confirms what the other evidence in this case suggests and research supports: the patient has committed 8 serial murders and has also been diagnosed with sexual sadism. He now is petitioning the court for release, stating that he is an ordained minister of the Church of Christ the Crusader and is now being persecuted for his religious beliefs by being detained.

Notwithstanding his religious protestations, he will remain a psychopath, continue to fantasize about sexual torture and killing of young women, now perhaps utilizing a crucifixion motif, and will likely kill again if the parole board releases him back to San Diego County."

Such paragraphs help integrate the psychopathy research into the DSM tradition, and allow for further understanding of the patient. Notice that if we just diagnosed this individual with antisocial personality disorder, it would not do his psychopathology—and his extreme dangerousness—justice.

**128**

Another important aspect of the psychopathic-antisocial nexus is the proportion of individuals who are antisocial and also psychopathic. If we took a field trip to a maximum security prison in the US and selected 100 inmates at random, regardless of skin color, we would find that about 60-75% would meet criteria for antisocial personality disorder. If we then assessed for the degree of psychopathy in these inmates, we would find that about one out of three, or one third of the antisocial personality disordered men, would also score at least 30 points on the PCL-R. In other words, the good news is that two out of three antisocial PDs, even in prison, are not psychopaths. The bad news is that one out of three is a primary, or severe psychopath.

You're probably wondering about those 25-40% that are neither. They're hiding in their cells, trying not to be victimized by anyone until they've served their time.

## Some additional statistics

This information is for the statistical wonks reading this book. The average score in a maximum security prison for PCL-R ratings is about 23 with a standard deviation of 8. The average score in a forensic psychiatric hospital for males is about 20 with a standard deviation of 8. Surprisingly, men and women score about the same in a maximum security prison. Juvenile delinquents, with appropriate adjustments in scoring, will usually end up in the 15-25 range. College age males will usually score 5-8 points on the PCL-R; college age females will likely score no more than 2 points, if at all.

Test-retest reliability is good, and ranges around .60-.80, even after two years with independent raters. Interrater reliability is very good, and often exceeds .88 (various types of correlation coefficients can be used for this, such as ICCs, kappas, or weighted kappas), especially if the raters are competently trained. When Carl Gacono and I independently score a subject, our scoring is invariably within one or two points. The best way to achieve accurate scoring is to do a number of practice cases, at least 10, with another person who is also interested in this area of work. Then run some reliability coefficients on your two scores. DO NOT USE the PCL-R for any forensic case until your interjudge reliability is in the excellent range, typically at least .75.[36]

As psychopaths grow older, it appears that factor II–chronic antisocial behavior–scores decrease. Factor I scores–aggressive

Exhibit B - Part 4
Page 147 of 200
Case 3:13-cr-00008-SLG   Document 247-5   Filed 01/07/24   Page 7 of 60

narcissism–do not. This is particularly disturbing since this first factor may be more directly related to violence than factor II. I'll say more about this when I talk about "validity" below.

The PCL-R is most confidently used with male inmates in prison. This is where all the original research was done. There are enough published studies, and several in the pipeline, to warrant its use with female inmates, too. The juvenile delinquency research is also growing, so it can be used with caution to arrive at a psychopathy rating for juvenile delinquents. There are also three studies published by Dave Kosson on its use with African-American males in prison. Be careful here, because they scored significantly higher than Caucasian inmates, and the factor structure wasn't as clear. To my knowledge there are no published studies on its use with hispanic men or women in prison, which is unfortunate, particularly in southern California.

The cross-cultural measurement of psychopathy is in its infancy, but there are some intriguing findings. David Cooke in Scotland has been the leader in this area of research, and he has found significantly lower rates of severe psychopaths in Scottish prisons. This doesn't seem to be a product of methodology or research design, or other "within test" problems, and as a Scotsman myself, I am particularly proud of his finding. Nevertheless, Cooke's theory is predominantly a theory of migration. The psychopaths leave, or flee under duress, to greener, more urban, more anonymous pastures to prey (with an "e"). He may be on to something, since the high rates in the US may be partially do to the fact that our country was founded by Christian fundamentalists and criminals—neither group I find very psychologically stable.

I also have a theory that is pure speculation at this point. I think that psychopathy is actually a *genotype*: an inherited clustering of stable traits that are passed on from generation to generation and express themselves phenotypically in various ways, depending on how much the culture supports the various traits of psychopathy. A doctoral student of mine, James Reavis, did a nice dissertation where he showed a high degree of relationship between how individualistic vs. collectivistic a society is, and frequencies of predatory criminality in that society. The most individualistic societies, like the US, had the highest rates of predatory crimes. Unfortunately, there is just not enough research in various countries on psychopathy to begin to support or refute my theory. Time will tell.

Exhibit B - Part 4
Page 148 of 200

## Validity: Is psychopathy just more useless psychobabble?

Maybe psychopathy is just another useless term that is winding its way through the popular culture, but has no scientific meaning, like "co-dependency" or "addictive personality." This is a question of validity, or the usefulness of the term. Does it tell us any more than we already knew? Does it expand our understanding of human behavior? Does it contribute to prediction of human behavior? Is it possible that such research might someday locate a cure, or at least a treatment, for psychopathy?

The answer to all these questions, except the final one, is an unqualified YES. The construct of psychopathy, especially during the past twenty years, has been shown to have quite powerful validity, or usefulness, in a number of studies. Let's take a look at Table 9-1 (the + and - signs are correlation directions, that is, to what degree do each of these measures parallel increases or decreases in psychopathy):

## TABLE 9-1

| Factor I | Factor II |
|---|---|
| +Narcissistic Personality Disorder | +Antisocial Personality Disorder |
| +Histrionic Personality Disorder | +Substance Abuse |
| -Avoidant Personality Disorder | |
| -Dependent Personality Disorder | |
| +Narcissism self-report | +Pd, Ma (MMPI-2) |
| +Machiavellianism measures | +MCMI-III Antisocial |
| +MCMI-III Aggressive/Sadistic | -Socialization (CPI) |
| -Empathy measures | +Impulsivity |
| -Anxiety measures | +Sensation-seeking |
| +Violent recidivism | +General recidivism |
| | -Age at onset |
| | +Criminal frequency/versatility |
| -Affect intensity | -Social class, age |
| -Cerebral asymmetry | -IQ, education |

This table is a good place to begin a discussion of validity. Notice that the personality disorder diagnoses, and their correlation with each factor, are about what one would expect: narcissism and hysteria load on factor I, and antisocial stuff, like DSM-IV, load on factor II. Moving downward, you can see how the various objective

tests stack up, and I'll say more about them in a bit. Look at "violent recidivism." It only correlates with factor I, aggressive narcissism, and not factor II, chronic antisocial behavior. This was a finding by Ralph Serin in Canada, and he was the first to provide a reasonable explanation for the fact that violence does not seem to decrease with age among psychopaths, although nonviolent criminality does: it is more closely related to the aggressively narcissistic personality traits of the psychopath, which also do not decrease with age, than to the chronic antisociality of the psychopath, which does generally decrease with age.

Moving downward on the left side, we see two important biological findings that correlate with only factor I: a decrease in affect intensity as aggressive narcissism increases ("he's such a cool, detached individual") and a decrease in cerebral asymmetry as aggressive narcissism increases (this is a fancy way of saying that the psychopath uses both hemispheres of his brain to process language, and maybe other things, rather than just the left side).

On the bottom right of this table are some very important relationships that shouldn't be neglected. If you are not very bright, have no money, and are uneducated, you are more likely to be diagnosed with antisocial personality disorder (DSM-IV) than if you are bright, educated, and have a reasonable income in the US. This is a fact–and a problem–for the DSM diagnosis, as I mentioned earlier. Notice, however, that in psychopathy only factor II correlates with social class, IQ, and education, and factor I does not. This supports the importance of aggressive narcissism as a very robust and measurable component of psychopathy that is unaffected by such social, economic, and class distinctions. Likewise, most neglectful and abusive parenting experiences as a child are only related to factor II, and not to factor I.

My emphasis on factor I and factor II differences is to stress the growing importance of these two factors, or components of psychopathy. It is also likely that factor I will help us measure the successful psychopath in society, something that has yet to be done. Virtually all research has focused on the *failed psychopath* who is somewhere in a criminal justice system when he is asked to participate in research. That's sort of like studying the most mediocre athletes to understand players in the NBA. But that's all we have for now.

**132**

## Recidivism

Studies have consistently shown over the past decade that psychopaths, when compared to nonpsychopathic offenders (not Boy Scouts), have higher frequencies of general recidivism and violent recidivism. This research has been done by several independent groups in both the U.S. and Canada, and the typical rates for psychopathic reoffending are 70-80% over the course of 7-10 years. The nonpsychopaths, over the same period of time, are likely to reoffend at a rate of 20-30%. The most interesting fact that emerges from this research is the public ignorance of it. Most commentators, when discussing "failure rates on parole" cite the figure of 50-60%. Not very good. However, if you average the rates I gave you; in other words, if you combine the psychopaths' rates and the nonpsychopaths' rates, and divide by two, you get about 50%. The public doesn't understand that all offenders are not the same. In fact, if the public was willing, and the funding was available, every state and federal prison could determine who was and was not psychopathic in their prison, and then estimate, quite reliably, whether or not that person would reoffend.

Recidivism has also been measured and predicted by the PCL-R in male forensic psychiatric patients, female offenders, and juvenile offenders. Sex offenders, especially rapists, are good candidates for predicting recidivism when their psychopathy levels are combined with their sexual arousal to deviant stimuli (usually rape scenes with adult females).

There are some warnings in order: not all psychopaths will reoffend, just as some nonpsychopaths can be very dangerous. This is one of the major problems with the use of large group studies to make predictions concerning one individual. In fact, some people argue that large group studies are irrelevant when it comes to the individual case. I take a middle road, and advise you to use this information as background data for estimating risk (or at least knowing generally where the risk is). I once heard one of the founding fathers of forensic psychiatry, Emanuel Tanay[37], say:

"It is better to be accurate than precise."

I think he was absolutely correct: strive first of all to be in the ball park–not to hit a home run every time–because you may strike out.

**133**

The recidivism research also teaches us one other thing: the failure rate among psychopaths is faster than the failure rate among other nonpsychopathic criminals. Most of the action is in the first three years of release from custody. Psychopaths reoffend more quickly and more frequently than other criminals. As Robert Lindner wrote in his great book, *Rebel Without a Cause*, more than half a century ago,

"Psychopaths sparkle with the glitter of personal freedom, the checks and reins of the community are absent, and there are no limits either in a physical or a psychological sense. (p. 13)."

**Violence**

Another important area of validation is violence. I have carefully studied all the violence research on psychopaths, and it is now quite substantial and revealing. Here are most of the findings:

- Psychopaths are more violent than nonpsychopathic criminals
- Psychopaths commit more crimes
- Psychopaths are more likely to use a weapon, especially if their IQ is greater than average
- Psychopaths are more aggressive in prison
- Psychopaths escape more often from forensic hospitals
- Violence does not decrease with age for half of psychopaths
- Psychopaths are likely to target strangers, rather than family members or acquaintances
- They target male rather than female victims, unless they are serial sexual aggressors where the primary victim pool is female
- It appears that psychopaths who are domestically violent will autonomically slow down, and become calmer, as they enter into conflict
- Psychopaths often display sadistic personality traits
- Most sexual sadists are psychopaths
- Violence and aggression are quite stable across a large portion of the psychopath's life
- Violence is usually predatory and affective
- The construct of psychopathy usually accounts for the largest proportion of explainable variance in most studies of violent offenders (this one is for the statistic wonks, but don't forget to explain it to the jury)

**134**

These fourteen findings are quite impressive when one considers that research in this particular area did not begin until the early 1980s. Are all psychopaths violent? Of course not, and it is important to recognize that some individuals can be quite psychopathic and never be physically violent, although their destruction of others can be just as virulent and intense. Take, for instance, the psychopath who seduces vulnerable women, moves in with them, and economically exploits them; or the psychopathic swindler who convinces elderly people to invest all their life savings in a fraudulent scheme; or the psychopathic leader who ascends to power and uses his authority to magnify prejudice and hatred against certain minority groups. I could go on, but you get the picture.

## Treatment

There is no known psychological or psychiatric treatment for the psychopath. Virtually all studies have shown no treatment effects, regardless of the method of treatment. One study, done by Marne Rice and her colleagues in eastern Canada, showed a negative treatment effect.[38] In other words, those psychopaths who received treatment had significantly higher violent reoffense rates 10 years after release when compared to psychopaths who received no treatment. This study, however, focused on the effects of an idiosyncratic therapeutic community where most of the counseling was done by peers, many of the subjects also had a mental illness, and it should not be generalized to other methods of treatment until other studies are done. Their study also has not been replicated, or repeated by an independent research group on a different sample of subjects.

In contrast to the treatment of psychopaths, mental health treatment in correctional populations in general, especially with juvenile delinquents, suggests positive effects (although the impact of treatment on this population is about half what it is on the general population).

But let me defer to the researchers whom I think are the most rigorous concerning treatment of adult offenders: Marne Rice and Grant Harris. Here is a paragraph from their chapter in the excellent textbook, *Handbook of Antisocial Behavior* (Wiley, 1997):

"Available evidence, when closely examined, does not yet permit a firm conclusion that we have developed effective treatments for

**135**

adult offenders. Meta-analyses based on juvenile offenders provide strong evidence of positive treatment effects. Treatments with the most promise are skills based and behavioral provided to high risk offenders in the community...The literature on effective treatments for adult offenders is exceedingly sparse, and almost all existing studies reporting positive results for adult offenders have significant problems (p. 432)."

So there you have it. Things are pretty bleak at present, except for juvenile offenders, but that fact does not preclude the possibility that somebody somewhere will come up with something that works.

### Psychological Testing

Let's turn to something a little more upbeat: how should a psychologist test for psychopathy to see if it exists? This could be a very important question in some criminal and civil trials regardless of the impact of treatment.

First of all, it's important to recognize that the only instrument (not a psychological test) which has been specifically developed to render a quantitative index for psychopathy is the PCL-R. But again, it is not a psychological test, and can be used by other licensed mental health professionals trained in its use. Second, many psychologists unfamiliar with forensics will use tests that have high face validity. This means that you can look at the test and quickly tell what it is trying to measure, like the Beck Depression Inventory. This brief test is great for a highly motivated patient who is clinically depressed and wants help from his HMO shrink, but you can see how useless it would be in attempting to measure depression in a psychopath. If he wants to be depressed, he'll deliver that to you with a high depression score. The only reason to use face valid tests with psychopaths, as I wrote under item 16 of the PCL-R, is to test for malingering, since psychopaths are likely to mark all the pathological items.

In my assessment of psychopaths for both clinical-forensic and research purposes I use tests that have accurate measures of distortion or tests that are very ambiguous. Here are three that I commonly use:

*The Rorschach*. This measure of personality is very effective with psychopathic subjects because it is very difficult to malinger or distort the findings, especially if the Comprehensive System is used to score the protocol. For the psychologists reading this book who use the Rorschach, here's what a typical Rorschach structural summary looks

Exhibit B - Part 4
Page 154 of 200
Case 3:13-cr-00008-SLG   Document 247-5   Filed 01/07/14   Page 14 of 60

like. This table has been published in several places, first appearing in Jim Butcher's book, *Clinical Personality Assessment* (Oxford, 1995), in a chapter Carl Gacono and I wrote, and also in Carl's new book, *The Clinical and Forensic Assessment of Psychopathy* (Lawrence Erlbaum, 2000).

**TABLE 9-2**

**Rorschach Findings in the Protocol of a Typical Psychopath**

| Responses | 21 | Interpersonal | |
|---|---|---|---|
| Core characteristics | | Pure H | 2 |
| Lambda | >.99 | (H)+Hd+(Hd) | 2.5 |
| D | 0 | COP | 0 |
| Adjusted D | 0 | Ag | 0 |
| Affects | | Sx | 1 |
| FC:CF+C | 1:4 | Self-perceptual | |
| Afr | <.50 | Rf | 1 |
| Pure C | >0 | PER | >2 |
| T | 0 | W:M | >3:1 |
| Y | <1 | Cognitive | |
| Space | >2 | X+% | 54 |
| | | F+% | 56 |
| | | X-% | 22 |
| | | M minus | 1 |
| | | WSum6Spec | 17 |

I'm not going to explain the meaning of these indices since this is not a Rorschach textbook, and our papers and books on this test are widely available. But if you use the test, this should be helpful. I must also mention that in a very exciting recent study, three colleagues, Myla Young, Jerald Justice, and Phil Erdberg, were able to predict histories of highly violent behavior in mentally disordered inmates in part by using the Rorschach CDI (negative), Personal responses (elevated), and Raw Sum Special Scores (elevated). Their strongest predictor, moreover, was a positive finding on the PCL-R (score greater than or equal to 30 points).[19]

*The MMPI-2*. If you are not familiar with this test, it is the workhorse of the psychology profession and the most widely used

test in the world. It contains 567 true-false questions, takes about 1.5-2 hours to complete, and is usually computer scored. The test has ten clinical scales, and scale 4, also called the psychopathic deviate scale, is the one most commonly associated with antisocial and psychopathic individuals. In fact, most prisoners elevate on this scale (meaning they show abnormality on this scale–you don't do better if you score higher).

Unfortunately this scale is not measuring psychopathy. In fact, correlations with the PCL-R are typically modest and statistically insignificant (about .21). The reason for this surprising finding, even to many psychologists, is that scale 4 is measuring a history of antisocial behavior, and doesn't get into the personality traits I call "aggressive narcissism": the hallmark of the psychopath.

The most promising scale on the MMPI-2 for measuring psychopathy appears to be the new content scale, antisocial practices (ASP), but more research is needed. Psychopaths will still elevate on scale 4, but do not label someone a psychopath solely on the basis of this elevation. A chunk of that scale is measuring family conflict, among other things.

*The MCMI-III.* This is one of Ted Millon's tests, in its third edition. It is shorter than the MMPI-2, and I typically use it to get some direction on the personality traits and disorders that may be apparent in a patient or subject. When psychologists ask me for one objective self-report test that they can use when time is of the essence and they can't do the Rorschach, the MMPI-2, or the PCL-R, this is the one I recommend. It gets closest of all the self-report measures to psychopathy, especially the Antisocial and the Aggressive/Sadistic scales. The Narcissistic Scale will typically also elevate. In fact, correlations between the PCL-R and the first two scales are often greater than .40.

*Other tests.* Psychologists can pick and choose among other tests when assessing psychopathy, and often both intelligence tests and neuropsychological tests are useful sources of other data. But if you are a psychologist, remember that all these tests are based upon performance, and if you're testing a bright psychopath, he can readily discern what you're measuring and then lower his scores to appear less intelligent, or more brain impaired, than he is. I visited one man on death row at San Quentin to test him for his appeal, and all the records reflected at the time of trial a mentally retarded defendant. I prepared myself to evaluate someone with MR, but when I arrived I

**138**

was greeted by a bright, charming, articulate, and verbal man who had been there for about 10 years. I tested his reading level, and then asked him what he liked to read. He said, "Oh, Whitehead, Kirkegaard, whatever I can get my hands on."

Taken aback, I told him that I had expected him to be retarded and he obviously wasn't. He then said, "Doc, I wanted to appear stupid at my trial. I figured the jury would give me a break if they thought I was a moron." You can't raise the ceiling when you are tested for IQ, but you can certainly drop your floor.

The one kind of testing that psychopaths cannot distort is neuroimaging. It now comes in many shapes and forms, including functional magnetic resonance imaging, which can non-invasively measure brain activity by using a powerful magnet to momentarily rearrange the hydrogen molecules in the brain. Other techniques used for both clinical and research purposes include CT Scans and PET Scans. There is a small but growing body of research which indicates that psychopaths show differences in certain portions of their brains when such neural imaging is used to compare them to normals. Much of the action in this work is focusing upon the "orbito-frontal" portion of the pre-frontal cortex. This is the portion of your brain that sits at the front of your head, toward the middle, and above your eyes and the bridge of your nose. It is involved in the ability to organize and execute behaviors in a purposeful manner, and just recently Antonio Damasio, a neurologist, has shown that injury to this portion of the brain in early childhood can produce adolescent and adult behavior that is strikingly similar to the psychopathy I have been describing. Other researchers, such as Adrian Raine and Robert Hare, have also shown a hypofrontality (underactivity) in portions of the brain closely allied with the areas I have described. It's an exciting area of work that is just beginning.

### Childhood Psychopathy

A question that I have pondered for about twenty years is the nature of psychopathy in childhood, if there is such a thing. What I have taught at my workshops for the past decade is the evident clinical findings of animal abuse and emotional detachment that are often present in the child who is heading for psychopathy as an adult. Of course these two characteristics suggest the budding of sadism and the absence of any capacity to form a bond, respectively, which I think are the first noticeable problems in the psychopathic

**139**

child–problems that make him stick out like a sore thumb, even when he is with a bunch of other delinquents. In fact, if you work in a juvenile detention facility, and want to know who the psychopathic delinquents are, ask around. The psychopathic kids are usually the ones that scare the hell out of the other delinquents; they don't seem to "connect" with anybody, and they enjoy hurting others a little too much.

My guidelines are good, as far as they go. But they fall a bit short of science. Fortunately, and just in the past few years, several research groups have begun to study child psychopathy, and the results are quite intriguing. But first I want to review some of the fictions associated with that larger category the DSM calls "conduct disorder." Here they are (remember, these statements are not true):

- All conduct disordered children grow up to be antisocial personalities
- Conduct disorder criteria never change
- Conduct disorder is a rare condition
- Conduct disorder is a homogeneous diagnosis
- Adolescent delinquency is abnormal
- Conduct disorder is only caused by the environment
- Conduct disorder and child psychopathy are the same thing
- There are no effective treatments for conduct disorder

If you believed any of these statements to be true, please correct your misunderstanding. No use carrying around outdated or inaccurate "facts" in your head. There's too many new ones to learn.

Two researchers that I mentioned earlier have done most of the work in child psychopathy. Paul Frick, who is at the Univ. of New Orleans, has developed the Psychopathy Screening Device for children. He has designed it to closely parallel the PCL-R, and has found two factors that are strikingly similar when he analyzed his results.

The other researcher I want to mention again is Donald Lynam at the Univ. of Kentucky. His work is somewhat different from Frick's, and he has shown both theoretically and clinically that hyperactivity, impulsivity, inattention, and conduct problems appear to lay the groundwork for the development of child psychopathy. Both of these psychologists have active research programs that I think will move the science forward as we struggle to identify both the nature and source

**140**

of psychopathy in childhood.

Carl Gacono and I have contributed a little bit of understanding to this area in our Rorschach research. We have found that solitary-aggressive conduct disordered children (about age 9) are quite different internally from other kids their age. The CD children show minimal signs of anxiety, are emotionally detached, devalue themselves, and have measurable amounts of formal thought disorder and impaired reality testing. Their conscious fantasies ("internal representations") are also populated with aggressive and malevolent objects. Not a pretty picture, and quite a sad one at best. The children are not pathologically narcissistic at that age, since most 9 year olds are normally quite narcissistic (self-focused). But as they grow older they do not become less self-centered, as other kids do, and their narcissism is used to inflate the self and ward off those lousy feelings of low self esteem.

Although there is no identified treatment for childhood psychopathy, there are some useful treatments for antisocial children in general. They fall into four categories:

1) Teaching parents how to more effectively raise their child.

2) Using various models of family treatment, such as Alexander's Functional Family Therapy.

3) Teaching interpersonal skills through cognitive-behavioral training.

4) Fostering other kinds of community based treatment that surround the child with positive role models, provide objects with whom he can bond, and structure his time in ways that are productive and build a sense of mastery of certain prosocial skills.

This all sounds easy, but it isn't. The most common failure of these kinds of programs is the high dropout rate for the most difficult kids and their families. But if you work with conduct disordered children or adolescents, please remember three things: a stable, secure, and long term attachment is critical to treatment success (as it is to a healthy emotional life); the social system that surrounds the child is the key (family, school, community); and most antisocial children do not grow up to be psychopaths, or even antisocial personality disorders.

## Countertransference Reactions

This is a fancy psychoanalytic phrase for describing the typical feelings that are felt by individuals when they work with psychopaths.

Exhibit B - Part 4
Case 3:13-cr-00008-SLG   Document 247-5   Filed 01/07/14   Page 159 of 200   Page 19 of 60

My wife and I have analyzed data from a large survey of mental health and criminal justice professionals concerning how they physically and emotionally react to psychopaths. Before I give you my list, think for a moment how you typically feel when interviewing a psychopath–you should have a good idea by now as to whether you have encountered one. What are the typical emotional reactions you have had, and did he trigger any particular physical reaction? Take a moment, and write your response below or on a separate sheet of paper:

_____

_____

_____

_____

_____

_____ .

Here is my list of typical reactions, with abbreviated definitions of each:

**1. Therapeutic nihilism.** I borrowed this term from the work of John Lion. It is the mistaken belief that nothing will work therapeutically: an all encompassing cynicism whenever one encounters any individual with even the slightest antisocial history.

**2. Illusory treatment alliance.** This is the opposite of the first one. It is the mistaken belief that a positive emotional bond exists between you and the psychopathic patient, and you are both invested in the progress of therapy.

**3. Fear of assault or harm.** This is a tricky one, because a real threat of danger can exist with the psychopath. The countertransference reaction is usually experienced as a visceral (physical) sensation of goose bumps, hair standing up on the back of the neck, skin crawling, having the "creeps" or the "willies," or a sense of hotness or coldness, when first encountering a psychopathic individual. These are all signs of a very old, biologically rooted activating system within our brains that is warning us of danger. The old fear of being prey to the predator. We have found in our survey research that this is a very common reaction among professionals when they first have contact with a psychopath, somewhere in the neighborhood of 25-30%.

Exhibit B - Part 4
Page 160 of 200
Case 3:13-cr-00008-SLG   Document 247-5   Filed 01/07/14   Page 20 of 60

The trick is distinguishing this spontaneous reaction from a reality-based fear response, which it may be. The best way to do it is to do a careful violence risk and threat assessment of the psychopath based upon as much objective data as possible. Use your visceral reaction as an "early warning system" to investigate further and determine if there is a real risk. Trust your intuition, but don't stop there.

**4. Denial and deception.** Denial is most often seen when there is a counterphobic response to real danger. This is the feeling that there is nothing to fear; when, in fact, the patient is very dangerous. Deception of the patient is common, especially if the professional is frightened of him, and fears that any limit setting or frankness will cause an angry or violent reaction. It is very important to be fiercely honest with the psychopathic individual. This doesn't mean self-disclosure, which I never advise. It does mean a direct answer to his questions and desires, even if the answer is an adamant, "No".

**5. Helplessness and guilt.** Attempting to treat the psychopath typically results in a feeling of helplessness and guilt that one has failed at the task. Larry Strasburger has written about this before, and has emphasized the anger that the professional can passively express by withdrawing from the individual. Guilt is most often apparent in those young clinicians who believe that they have the capacity to heal others, and are heavily invested in their Midas' touch, a nice phrase used by Annie Reich, a psychoanalyst who was writing about fifty years ago. When the psychopath shows no change, they feel burdened with the responsibility for his resistance.

**6. Devaluation and the loss of professional identity.** As Don Viglione once said to me, psychopaths tarnish their object world. They chip away at our self esteem. This is due to their need to constantly devalue others to enhance their own sense of specialness and grandiosity. If you work with them over time, you will become aware of the ways in which they get you to question your own self worth. Tom Harris captured this nicely in the dialogue he structured between Agent Starling and Hannibal Lecter in his masterpiece, *Silence of the Lambs.* Unfortunately, he had them living together by the end of his disappointing sequel, *Hannibal.*

Sometimes this devaluation is then laid at the feet of the psychopath–look at the way some correctional officers will deal with their own depression and boredom by condemning all prisoners to a status much inferior to them. We do to them what they do to us.

**143**

Exhibit B - Part 4
Page 161 of 200



**7. Hatred and the wish to destroy.** Psychopaths often bring us face to face with our own destructive impulses, aggression, and hatred. We can see in them our tendency to manage envy through possessiveness and rage through cruelty. It is very important to recognize that the psychopath has no corner on evil, he just incarnates it more clearly than you or me. The best way to manage this reaction is to recognize our own capacity for destruction, and therefore understand it, rather than act it out.

**8. The assumption of psychological complexity.** This is the most subtle of all reactions to the psychopath, especially if he is bright. We assume that he has within him the more mature and developed emotions that we want to see, and through our work with him they will be discovered. We also assume a conscience that only needs nurturing. Although I haven't talked at all about the primitive psychology of the psychopath, please recognize that his personality is less complex and more dangerous than he appears, especially if he has a brighter than average IQ. Remember, there is less there than meets the eye.

## Summary

I have attempted in this chapter to elucidate the difference between the two research traditions for understanding antisocial behavior—social deviance and personality—and then spent a fair amount of time on my clinical understanding of the various items of the Psychopathy Checklist-Revised. The chapter carried on with a look at validation: recidivism, violence, treatment, psychological testing, and our own emotional reactions to the psychopath. It is absolutely imperative, given the state of the research, that psychopathy be measured in most violence risk assessments, especially in offender populations. It is also critical that measurement of psychopathy be done by competent and trained professionals.

Exhibit B - Part 4
Page 162 of 200
Case 3:13-cr-00008-SLG   Document 247-5   Filed 01/07/14   Page 22 of 60

## Internal Security Report of Legal Action

| | | | |
|---|---|---|---|
| SHERMAN, Jeffrey A. | **Address** *(city, state, zip)*<br>Los Angeles, Ca. | | **Case Number**<br>7-0689-0081 |
| **Occupation**<br>Attorney | **IRS District Where Violation Occurred**<br>Los Angeles | | |
| **SSN/EIN** 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 | **Judicial District**<br>Central District of California | | |
| **DOB** *(mo., day, yr.)*<br>9 / 8 / 61 | **Race**<br>W | **Sex** ☒ Male<br>☐ Female | **Asst. U.S. Attorney Assigned Case**<br>Rick Rathman |
| **Employee** ☒ | **Non-Employee** ☐ | **Jurisdiction:** ☒ Federal | ☐ State/Local |

**Brief Narrative of Violation & Other Remarks:** *(Use reverse side as continuation sheet)*

SHERMAN was alleged to have operated a law practice while working for the IRS and to have represented taxpayers before the IRS while employed with the IRS. After resigning from the IRS, SHERMAN received payments from a taxpayer and represented the taxpayer before the IRS. SHERMAN worked a related case against the taxpayer while employed with the IRS.

### Case Activity Chronology

| 1) Prosecution Action | Date | Charge<br>*(USC Title & Section)* | ISMIS Code |
|---|---|---|---|
| ☒ Prosecution Declined | 7/1/91 | 18 USC 205, 18 USC 207 | 662 |
| ☐ Information ☐ Indictment ☐ No True Bill | | | |
| ☐ Arrest ☐ Summoned ☐ Other | | | |
| ☐ Arraignment Information      Cost<br>☐ Plead Guilty ☐ No      of Bond<br>☐ Plead Not Guilty   Plea   $ | | | |
| 3) Disposition | | | |
| ☐ Plead Guilty to original charge | | | |
| ☐ Found Guilty | | | |
| ☐ Found Not Guilty | | | |
| ☐ Plead Nolo Contendere | | | |
| ☐ Plead Guilty to charge other than original *(plea bargaining)*. Enter Title/Section of USC and ISMIS code | | | |
| ☐ Pretrial Diversion Program | | | |
| ☐ Case Dismissed | | | |
| 4) Sentencing Information<br>Enter Date of Sentencing ⟶ | | | |

Results of Sentence:

| | Months | | Fines | | | |
|---|---|---|---|---|---|---|
| | Prison<br>*(mos. to serve)* | Suspended | Probation | To Pay<br>$ | Suspended<br>$ | ☐ Other *(Describe in Remarks)* |
| Charge 1: | | | | | | |
| Charge 2: | | | | | | |

# Inspection Referral Memorandum

*Please prepare in quadruplicate.*
*See reverse for instructions.*

| | |
|---|---|
| 1. Address of appointing or receiving official | 2. Case Number |
| | 7-0689-0081 |
| Chief Inspector    I<br>Attn: I:IS:0A | 3. Date forwarded |
| | AUG - 9 1991 |

| | |
|---|---|
| 4. Name of subject | 5. Date of birth |
| SHERMAN, Jeffrey A. | September 8, 1961 |

| | |
|---|---|
| 6. Position | 9. Action on criminal features |
| Attorney | Prosecution declined<br>Discontinued Investigation |
| 7. Office | |
| District Counsel,  POD Los Angeles | |

8. Status    A. ☐ Applicant - Commitment date _____

B. ☐ Employee - EOD date _____

10. Result of investigation - Inspection report attached

A. ☐ Character or Security     B. ☐ Background     C. ☒ Conduct

   1. ☐ Final       1. ☐ NACI       1. ☐ Preliminary
                                                                       (See instructions)

   2. ☐ Preliminary     2. ☐ Preappointment     2. ☒ Final
      (see instructions)

   3. ☐ Supplemental     3. ☐ Police Check Only     D. ☐ Other

   4. ☐ Information       4. ☐ Per Diem Employee       1. ☐

                                        5. ☐ Preliminary
                                           (see instructions)

                                           6. ☐ Information

11. Remarks

Employee resigned effective: August 4, 1989

| | |
|---|---|
| 12. Signature and title of Inspection official | |
| Richard J. Perez | Branch Chief, Internal Security<br>Western Region |
| 13. Address of Inspection office | 14. Date returned |
| REGIONAL INSPECTOR<br>INTERNAL REVENUE SERVICE<br>333 MARKET, SUITE 380-S<br>SAN FRANCISCO, CALIFORNIA 94105 | |

15. Nature of action taken and effective date

16. Signature and title of returning official

Exhibit B - Part 4
Page 165 of 200
Case 3:13-cr-00008-SLG   Document 247-5   Filed 01/07/14   Page 25 of 60
00002

# REPORT OF INVESTIGATION

*(Assistant Commissioner (Inspection) - Washington, D.C. 20224)*

| Office of Origin<br>Regional Inspector, Western Region | | | Date of Report<br>8/8/91 | |
|---|---|---|---|---|
| Title *(Name and address)*<br>SHERMAN, JEFFREY A.<br>10920 Wilshire Blvd. Ste. 1000<br>Los Angeles, Ca. 90024 | | Type of Investigation<br><br>Conduct<br>(Discontinued) | Type of Report<br>☐ Preliminary<br>☒ Final<br>☐ Supplemental | |
| | Inspector Schafer | | | |
| Social Security Number<br>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 | Cross indexing: Required | ☒ Employee | ☐ Applicant | ☐ Nonemployee |
| Date of Birth<br>September 8, 1961 | Place of Birth   Not Required ____ | Position and Grade<br>Attorney - GS-12 | | |
| Headquarters *(City)*<br>Los Angeles | Completed _X_ | Date Entered on Duty<br>December 8, 1986 | | |
| Post of Duty<br>Los Angeles | Control Clerk | Period of Investigation<br>June 28, 1989 - July 1, 1991 | | |

### BASIS FOR INVESTIGATION

A confidential informant, T-1, reported that IRSE JEFFREY A. SHERMAN was representing taxpayers in Tax Court and may be practicing law "on the side". T-1 'd that SHERMAN was maintaining his private client list at his IRS work desk.

### ALLEGATIONS

Title 18, United States Code § 205 - Activities of Employees in Claims Against and Other Matters Affecting the Government.

### ALLEGATIONS DEVELOPED DURING INVESTIGATION

Title 18, United States Code § 207 - Disqualification of Former Employees.

### RESULTS OF INVESTIGATION

SHERMAN admitted preparing tax returns while employed with the IRS, but denied receiving compensation. SHERMAN denied representing taxpayers in Tax Court or IRS Appeals while employed with the IRS. SHERMAN refused to answer questions regarding the identity of taxpayers for whom he prepared tax returns and he resigned during the investigation. After resigning, SHERMAN received payments from a taxpayer whose case had been previously settled by SHERMAN, while he was working for the IRS. Documents in a related Tax Court case of the taxpayer showed that SHERMAN was involved in the representation of the taxpayer in the subsequent case.

(Continued)

| Distribution | No. | Case Number | Signature of Investigator Making Report | |
|---|---|---|---|---|
| AC (Inspection) | 2 | | | |
| Regional Inspector | 1 | 7-0689-0081 | William Schafer | |
| Inspector General | | Signature of Person Examining and Forwarding Report | | Date Examined and Forwarded |
| Asst. U.S. Attorney | | J. Rabatin | | |

Exhibit B-7, Part 4/9 /<br>Page 166 of 200<br>Case 3:13-cr-00008-SLG   Document 247-5   Filed 01/07/14   Page 26 of 60<br>00003

T-1 received information that SHERMAN had been representing taxpayers in     1
Tax Court and may be practicing law "on the side". T-1 said that SHERMAN
may also be maintaining private client files at his IRS work desk.

SHERMAN told IRS District Counsel Attorney MICHAEL NOBLE that he was very    2
busy preparing tax returns and, with the two jobs, he made as much money
as an outside attorney.    NOBLE stated that he had overheard some of
SHERMAN's telephone conversations wherein it appeared that SHERMAN was
giving more than the normal advice that an IRS employee would give to a
taxpayer. NOBLE also overheard SHERMAN ask the other person if they had
received SHERMAN's bill. NOBLE stated that he has observed SHERMAN use
government typewriters and copy machines for non-government business.

SHERMAN told IRS District Counsel Attorney JACK KLINGHOFFER that he could    3
not make it on his government salary and that he was doing private legal
work from his IRS office. KLINGHOFFER observed SHERMAN conducting the
private legal work while on Government time. On one occasion, SHERMAN
asked KLINGHOFFER for some advice on a criminal matter.    KLINGHOFFER
stated that it appeared that SHERMAN was representing someone in the
criminal matter.

'HERMAN told NOBLE that he was resigning from the IRS and that he was        4
sending notices to everyone on his "Roledex" to advise them of his new
business.

Sherman admitted that he prepared tax returns for friends while he was      5
employed with the IRS. He denied receiving compensation for preparing the
returns. SHERMAN admitted that he preformed private legal services for
compensation while employed with the IRS. SHERMAN stated that the private
legal matters did not involve the Government. Sherman denied representing
taxpayers before the Tax Court, IRS Appeals or in IRS audits.    SHERMAN
refused to give the names of persons for whom he prepared tax returns or
did private legal work. SHERMAN refused to answer additional questions,    5,6
terminated the interview and resigned.

A review of the Preparer Inventory Listing (PIL) files did not show any      8
tax returns prepared by SHERMAN.

A review of the Central Authorization File (CAF) did not show that SHERMAN   9
was representing any taxpayers whom he had worked cases on while he was
employed with the IRS.

KLINGHOFFER reported that he was assigned a Tax Court case (TC-#2)          16
involving taxpayer JENNIFER BALBIER. A related case (TC-#1) involving
BALBIER was worked by SHERMAN when SHERMAN was employed with the IRS.
KLINGHOFFER stated that he was contacted by an attorney named CHUCK
''GNUSON who said that he was representing BALBIER. KLINGHOFFER knew that
.JNUSON and SHERMAN were working together.    He believed that SHERMAN
-olicited BALBIER to represent her in the Tax Court case.

                                                      (Continued)
SHERMAN, Jeffrey A.                                   Exhibit B - Part 4
_____                                               Page 167 of 290

Documents revealed that, after SHERMAN resigned from the IRS, SHERMAN received payments from BALBIER.

18

A review of the TC-#2 case file revealed that documents relating to TC-#1 were sent to KLINGHOFFER via a fax transmittal from SHERMAN'S law office. The documents showed stipulations, settlements and computations that were made by SHERMAN in TC-#1.

19

Prosecution was declined.

20

SHERMAN, Jeffrey A.
Conduct
7-0689-0081

Exhibit B - Part 4
Page 168 of 200
Case 3:13-cr-00008-SLG   Document 247-5   Filed 01/07/14   Page 28 of 60

## EXHIBIT LIST SHEET

| Number | Description | Page |
|--------|-------------|------|
| 1 | Memorandum of Interview of T-1, Dated June 28, 1989. | 1 |
| 2 | Memorandum of Interview of MICHAEL NOBLE, Dated July 28, 1989. | 2 |
| 3 | Memorandum of Interview of JACK KLINGHOFFER, Dated July 31, 1989. | 4 |
| 4 | Memorandum of Interview of MICHAEL NOBLE, Dated August 2, 1989. | 5 |
| 5 | Memorandum of Interview of JEFFREY SHERMAN, Dated August 3, 1989. | 6 |
| 6 | IRS Memorandum from J.O. GREAVES. | 7 |
| 7 | IRS Memorandum from ARTHUR OSHIRO. | 10 |
| 8 | Memorandum of Activity, Review of Preparer Inventory Listing, Dated September 12, 1989. | 11 |
| 9 | Memorandum of Activity, Review of Central Authorization File, Dated October 25, 1989. | 12 |
| 10 | Memorandum of Interview of JOE GREAVES, Dated October 26, 1989. | 13 |
| 11 | Memorandum of Interview of JACK KLINGHOFFER, Dated November 7, 1989. | 14 |
| 12 | Memorandum of Interview of LINDA TAYLOR, Dated November 21, 1989. | 15 |
| 13 | Memorandum of Interview of PHOEBE TANG, Dated November 21, 1989. | 16 |
| 14 | Memorandum of Interview of MARLENE KRISTOVICH, Dated November 21, 1989. | 17 |
| 15 | Memorandum of Interview of ED ROBBINS, Dated November 22, 1989. | 18 |
| 16 | Memorandum of Interview of JACK KLINGHOFFER, Dated February 13, 1990. | 20 |

SHERMAN, Jeffrey A.

17          Memorandum of Interview of JEAN LAWSON, Dated          21
            February 14, 1990.

18          Memorandum of Activity, Review of Documents,          22
            Dated February 25, 1991.

19          Memorandum of Activity, Review of District           23
            Counsel Case File #21790-89.

20          Memorandum of Interview of RICK RATHMAN, Dated        35
            February 1, 1991.

SHERMAN, Jeffrey A.
CONDUCT (Discontinued)
7-0689-0081

| Type of Activity: | Inspection Service | Date and Time |
|---|---|---|
| ☐ Personal Interview<br>☐ phone Interview<br>☐ cords Review<br>☐ other | Memorandum of Interview<br>or Activity | June 28, 1989 |

| Activity or Interview of: *(Include all necessary data)*<br><br>T-1 | Conducted by:<br>Inspector WILLIAM SCHAFER |
|---|---|
| | Location Of Interview/Activity:<br>Office of Regional Inspector<br>Los Angeles, CA |

### Subject Matter/Remarks

T-1 reported the following information:

    T-1 has been working with several Assistant United States Attorneys (AUSA) who have told T-1 that IRS District Counsel Attorney JEFFREY SHERMAN has been representing taxpayers in Tax Court. T-1 was also told that SHERMAN may be practicing law "on the side" and is maintaining his client files at his IRS work desk.

    T-1 stated that the AUSA's do not want to identify themselves as they are also working with SHERMAN and they do not want to jeopardize their cases.

    T-1 requested confidentiality.

| Activity or Interview of: (Include all necessary data) | Conducted by: |
| --- | --- |
| MICHAEL NOBLE<br>Attorney<br>District Counsel<br>Los Angeles POD | Inspector WILLIAM SCHAFER |
| | Location Of Interview/Activity:<br>Office of Regional Inspector<br>Los Angeles, CA |

### Subject Matter/Remarks

NOBLE reported the following information regarding IRSE JEFFREY SHERMAN:

He and SHERMAN work in the same group. They are assigned to the tax litigation group. Their duties include preparing for trials and negotiating settlements. His office is across from SHERMAN's office. He has had conversations with SHERMAN and has overheard some of SHERMAN's telephone conversations wherein SHERMAN has indicated that he is representing taxpayers and preparing tax returns for money.

Earlier this year, he had a conversation with SHERMAN wherein SHERMAN told him that he was very busy preparing tax returns. SHERMAN told him that it was difficult "making ends meet" on a Government salary, but with his two jobs he made as much as an outside attorney.

He has overheard some of SHERMAN'S telephone calls where it appeared that SHERMAN was speaking to taxpayers who were involved in an IRS audit or appeal. It appeared that SHERMAN was giving the taxpayers more than the "normal" advice that an IRS employee would give a taxpayer. During some of the telephone conversations he heard SHERMAN ask the person "Did you receive my bill?".

He has seen a form that SHERMAN sends to his clients. SHERMAN said that he calls the form a "Client Organizer" and that it helps him prepare clients tax returns.

He has also overheard several conversations that SHERMAN had with a woman who appeared to be purchasing a shopping center. It appeared that SHERMAN was representing the woman in the transaction. He heard SHERMAN make the statement that he would not use a certain real estate broker unless SHERMAN received half of the commission.

He has also seen SHERMAN meet people, who appear to be clients, in SHERMAN's IRS office. It appears that SHERMAN is conducting non-government business from his IRS office. He has seen SHERMAN use the Government telephone to call home to retrieve telephone messages. He has seen SHERMAN using the Government typewriters and copy machines to conduct non-government business.

(Continued)

He does not know the names of any of SHERMAN'S clients or the people for whom SHERMAN prepared tax returns.

He has been told that SHERMAN will be resigning on August 11. SHERMAN has told him that he is opening his own law practice and has obtained an office near his home in Brentwood. He has seen SHERMAN removing various books and items from the office. He had no information of what exactly SHERMAN has taken or where he has taken it.

SHERMAN, Jeffrey A.
CONDUCT
7-0689-0081

| Type of Activity: | Inspection Service | Date and Time |
|---|---|---|
| ☒ Personal Interview<br>☐ Telephone Interview<br>☐ Records Review<br>☐ Other | Memorandum of Interview<br>or Activity | July 31, 1989 |

| Activity or Interview of: *(Include all necessary data)* | Conducted by: |
|---|---|
| JACK KLINGHOFFER<br>Attorney<br>District Counsel<br>Los Angeles POD | Inspector WILLIAM SCHAFER |
| | Location Of Interview/Activity:<br>Office of Regional Inspector<br>Los Angeles, CA |

### Subject Matter/Remarks

KLINGHOFFER was interviewed regarding allegations of misconduct of IRSE JEFFREY SHERMAN. He provided the following information:

He has worked in the same group as SHERMAN since August 1988. SHERMAN has told him that he was doing private legal work. SHERMAN said that he could not "make it" on his Government salary and private work helped to supplement his salary. SHERMAN said that he was doing some of the private work from his IRS office. He also noticed that SHERMAN was doing the private legal work while on Government time.

On one occasion, SHERMAN asked him for advice relating to a criminal matter. It appeared that SHERMAN was representing a defendant in the criminal matter. He did not know the name of the defendant.

From time to time, he overheard SHERMAN talking on the telephone. From the telephone conversations, it appeared that SHERMAN was also doing tax work "behind the scenes". He heard SHERMAN giving tax advice and he could tell that SHERMAN was preparing tax returns. During one telephone conversation, SHERMAN told a taxpayer to file a petition in Tax Court. The taxpayer had received a collection notice. SHERMAN told the taxpayer that they should file a petition stating that they did not receive the statutory notice of the assessment. SHERMAN told the taxpayer that the petition would cause the IRS to respond to the petition and a District Counsel attorney would have to file motions and produce a copy of the notice. He did not know if SHERMAN was paid for the advice and he did not know the name of the taxpayer. He did not know if SHERMAN assisted in the preparation of the petition. During another telephone conversation, he heard SHERMAN make the statement "You have to get your W-2's to me so I can file a return".

He believes that SHERMAN keeps the names of his clients on a Rolodex card file which is kept on SHERMAN's desk.

| Type of Activity: | Inspection Service | Date and Time |
|---|---|---|
| ☐ Personal Interview<br>☑ Telephone Interview<br>☐ Records Review<br>☐ Other | **Memorandum of Interview<br>or Activity** | August 2, 1989 |

| Activity or Interview of: *(Include all necessary data)* | Conducted by: |
|---|---|
| MICHAEL NOBLE<br>Attorney<br>District Counsel<br>Los Angeles POD | Inspector WILLIAM SCHAFER |
| | Location Of Interview/Activity:<br>Telephone Call |

### Subject Matter/Remarks

NOBLE called to provide the following additional information regarding IRSE JEFFREY SHERMAN:

Yesterday, he had lunch with SHERMAN. SHERMAN told him that he had gone to a printer and ordered business cards and invitations to announce the opening of SHERMAN's new business. SHERMAN said that he gave the printer the names and addresses of all the people he had listed on his Rolodex card file. SHERMAN said that the printer would address the envelopes to be sent. SHERMAN seemed anxious to get his new law practice business going and felt that the announcements would help.

He believed that there may be taxpayer names on SHERMAN's Rolodex file and that the taxpayers may receive announcements.

| Type of Activity:<br>☒ Personal Interview<br>☐ Telephone Interview<br>☐ Records Review<br>☐ Other | Inspection Service<br>**Memorandum of Interview<br>or Activity** | Date and Time<br>August 3, 1989 |
|---|---|---|

| Activity or Interview of: *(Include all necessary data)*<br>JEFFREY SHERMAN<br>Attorney<br>District Counsel<br>Los Angeles POD | Conducted by:<br>Inspector WILLIAM SCHAFER<br>Inspector DAVE RICHARDSON |
|---|---|
| | Location Of Interview/Activity:<br>Office of Regional Inspector<br>Los Angeles, CA |

### Subject Matter/Remarks

SHERMAN was interviewed regarding allegations of misconduct relating to the preparation of tax returns for compensation, representing taxpayers in Tax Court and IRS audits, and conducting a private legal practice while being employed with the IRS.

SHERMAN was issued Notice 417, Privacy Act Notice and was placed under oath. He provided the following:

> While he was employed with the IRS, he has helped some friends with some civil legal matters. He did receive some compensation for some of the matters. None of the matters involved the Government. He found it difficult to live on the Government salary and he needed the money to meet his expenses.

> He never represented anyone before the Tax Court, IRS Appeals or IRS audits.

He did not want to answer questions regarding the preparation of tax returns. SHERMAN was advised of Rules of Conduct sections pertaining to answering questions of official interest. He provided the following:

> For a period of time before he came to work for the IRS, he worked for an accounting firm. His job included preparing returns for clients. After he joined the IRS, he was contacted by some of his former clients who asked him to prepare their returns. Most of the people were his friends and he did not receive compensation for preparing the returns. He did not know if any of the returns he prepared had been audited. He did not keep a copy of the returns he prepared and he did not sign any of the returns as preparer.

SHERMAN refused to answer questions regarding the identities of persons for whom he prepared tax returns. He was again advised of Rules of Conduct sections. SHERMAN continued his refusal to answer questions and he terminated the interview.

Inspector Note: District Counsel Chief JOSEPH GREAVES advised that SHERMAN refused to answer additional questions and resigned effective close of business 8/4/89.

# Internal Revenue Service
# memorandum

date: August 4, 1989

to: William Shaffer
Internal Audit

from: J. O. Greaves
District Counsel, Los Angeles

subject: Jeffrey Sherman

    Enclosed are memos to the file setting forth some of the
steps taken in the above matter. Also not he has now resigned
from this office effective c.o.b. August 4, 1989.

    Please let me know if you have any questions or need
anything further.


cc:    Al Larson
       With enclosures

August 1, 1989
.5:15 P.M.

### MEMO TO THE FILE

At about 2:00 P.M. Monday, July 31, Steve Simpson advised me that Mike Melone had reported to Inspection his suspicion that Jeff Sherman was conducting private law practice from his office. Steve also raised the question of whether Jeff should remain on the S Calendar which begins August 5. I said let me check with Debby Jones of Inspection because if we remove him from the calendar he will undoubtedly ask why he is being removed at this point since we had previously asked him to delay his resignation until **after** he handled the cases. At about 3:00 p.m. August 1 I conveyed this information to her and expressed my strong belief he should be removed from the calendar in view of the seriousness and nature of the allegations and even though they had not been proven at this time. (I had previously called Debra Jones twice on July 31 but she was tied up and could not return my call until today.) Ms. Jones asked that we not speak to Jeff Sherman for a day or two because that might cause him to clean out his office and place evidence beyond reach which is now in his office. I agreed, but pointed out that the calendar is next Monday and I could not wait too long. She informed me she would have Bill Schaffer, the investigating agent, contact me tomorrow, August 2, before close of business.

J. O. GREAVES
District Counsel

\* \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

·August 2, 1989
4:30 P.M.

Just spoke to Bill Schaffer, Inspection. He advised that U.S. Attorney's Office did NOT believe there was sufficient evidence of crime to search Jeff·· Sherman's office, so Schaffer· planned to question Sherman tomorrow and ask if he would consent to a search.

J. O. GREAVES

**MEMO TO THE FILE**
August 3, 1989

I spoke with Inspector Bill Shaffer and later to his Acting Supervisor, Jack Mason and the substance of the talks was as follows:

> Jeff Sherman had spoken with Shaffer and admitted he had prepared returns for friends. When asked for the names Sherman refused. The next step in this situation is for a supervisor to instruct the employee to answer in accordance with Rule 214.1 Rules of Conduct. I assured both of them I had no objection to so informing Sherman but it would seem to be a useless gesture since Sherman had already submitted his resignation. In any event, I advised them I would check with Al Larson, head of our GLS Division, and I would inform them of his views and recommendation.

> At 4:00 P.M. I spoke to Al Larson and then conveyed to Jack Mason the substance of the conversation which was:

>> We can and should speak to Sherman and remind him of his obligation under Rule 214.1. If he resigns at a date earlier than 8/11/89 there is no recourse. However, if no we can consider the possibility of a letter of discipline to him, and his resignation would then be under threat of discipline.

At 11:00 A.M. Friday, August 4, I spoke to Jeff Sherman. Steve Simpson was also present. I gave him a copy of Rule 214.1 and told him of his obligation to answer the questions of Inspection. He stated he had refused to answer the questions because he did not want to give out the names of friends and associates, because they might be subjected to undue questioning. He stated he had made some mistakes but he felt the entire matter had been blown out of all proportions. He also stated he wished to move his resignation date up to c.o.b. today instead of 8/11/89.

J. O. GREAVES
District Counsel

**Internal Revenue Service**
**m e m o r a n d u m**

date: August 14, 1989

to: Internal Security (Inspection)
Los Angeles     Room 7643
Attn: William Shaffer

from: District Counsel, Los Angeles
Arthur A. Oshiro, Assistant District Counsel
(213/894-3027; FTS/798-3027)

subject: <u>Jeffery Sherman--Former District Counsel Attorney</u>

      This memorandum is a follow-up to our telephone discussion on August 14, 1989 regarding the Jeff Sherman, a former District Counsel attorney. I was informed by Assistant U.S. Attorney Edward M. Robbins, Jr. that Mr. Sherman had advised the plaintiff, George Brnilovich (USDC CD CA, CV No. 89-3147-KN(GHKx)), that he should continue to pursue his civil suit for damages under I.R.C. §§ 7432 and 7433 because his case was very strong. We have an informal settlement proposed with Brnilovich's attorney of record, Mary C. Alexander, which calls for Brnilovich to dismiss his action with prejudice since the Service is already taking the action requested by Brnilovich. If Brnilovich does not authorize Ms. Alexander to withdraw his complaint, then she will withdraw as his attorney.

      District Counsel Joseph Greaves has informed me that Mr. Sherman's last official day in the office was Friday, August 4, 1989. Mr. Robbins informed me that he personally observed Mr. Sherman in our suite on Sunday, August 6, 1989. Mr. Greaves tells me that he is aware of the fact that Mr. Sherman was in the office during that time period in order to clean up his office.

      If you have any need to discuss this matter any further, please call me at ex. 3027. Mr. Robbins can be reached at ex. 2729.

| Type of Activity: | Inspection Service | Date and Time |
|---|---|---|
| ☐ Personal Interview<br>☐ phone Interview<br>☐ cords Review<br>☐ Other | Memorandum of Interview<br>or Activity | September 12, 1989 |

| Activity or Interview of: *(Include all necessary data)* | Conducted by: |
|---|---|
| Review of Preparer Inventory<br>Listing (PIL) for JEFFREY SHERMAN | Inspector WILLIAM SCHAFER |
|  | **Location Of Interview/Activity:**<br>Office of Regional Inspector<br>Los Angeles, CA |

**Subject Matter/Remarks**

A review of the PIL for JEFFREY SHERMAN revealed the following:

There were no returns listed as being prepared by SHERMAN.

Case 3:13-cr-00008-SLG   Document 247-5   Filed 01/07/14   Page 41 of 60

| Type of Activity: | Inspection Service | Date and Time |
|---|---|---|
| ☐ Personal Interview<br>☐ Telephone Interview<br>☐ Records Review<br>☐ Other | Memorandum of Interview<br>or Activity | October 25, 1989 |

| Activity or Interview of: (Include all necessary data) | Conducted by: |
|---|---|
| Review of Central Authorization<br>File (CAF) for JEFFREY SHERMAN | Inspector WILLIAM SCHAFER |
| | **Location Of Interview/Activity:**<br>Office of Regional Inspector<br>Los Angeles, CA |

### Subject Matter/Remarks

A review of the CAF for JEFFREY SHERMAN revealed the following:

There were two taxpayers who issued a Power of Attorney to SHERMAN. The taxpayers were listed as:

MIGUEL & GUADALUPE ROMERO, SSN: 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

ARPAD & ROSALIE SPEISER, SSN: 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

Inspector Note: Neither of the taxpayers were listed as having cases in which SHERMAN was involved with while SHERMAN was employed with the IRS.

| Type of Activity:<br>☐ Personal Interview<br>☒ :phone Interview<br>☐ .cords Review<br>☐ Other | Inspection Service<br>**Memorandum of Interview<br>or Activity** | Date and Time<br><br>October 26, 1989 |
|---|---|---|

| Activity or Interview of: *(Include all necessary data)*<br><br>JOE GREAVES<br>Chief, District Counsel<br>Los Angeles POD | Conducted by:<br>Inspector WILLIAM SCHAFER |
|---|---|
| | Location Of Interview/Activity:<br>Telephone Call |

**Subject Matter/Remarks**

GREAVES was called regarding the location of a District Counsel case file on taxpayer ARPAD & ROSALEE SPEISER in connection with allegations against former District Counsel Attorney JEFFREY SHERMAN. He provided the following information:

The case file is currently located in Manhattan District and is assigned to CRAIG CANNELL.

The case was initially assigned in Los Angeles District in order to answer the petition. The statutory notice of taxes due was also originated from Los Angeles District.

The issues involve approximately $59,000.00 of tax due and approximately $17,300.00 of penalties for 1985 taxes.

An answer to the petition was prepared by IRS Paralegal MARTHA JEFFERS. He asked her if she remembered the case and she told him that she did not remember it. JEFFERS prepared and filed the answer on May 18, 1989. The case was then transferred

SHERMAN is now indicated as the attorney of record for the taxpayer. SHERMAN's address is listed as 10920 Wilshire Blvd.

He does not know why the case was transferred to Manhattan District because the taxpayer's address is listed as San Marino, CA, which is handled by Los Angeles District. However, if the case involves a tax shelter, it is common for the case to be handled in the District where the shelter is located.

He will contact the District Counsel Chief in Manhattan District and have him send a copy of the file.

Type of Activity:
☐ Personal Interview
☒ ˙ephone Interview
☐ .cords Review
☐ Jther

**Inspection Service**
**Memorandum of Interview**
**or Activity**

Date and Time

November 7, 1989

Activity or Interview of: *(Include all necessary data)*

JACK KLINGHOFFER
District Counsel Attorney
Los Angeles POD

Conducted by:

Inspector WILLIAM SCHAFER

Location Of Interview/Activity:

Telephone Call

---

### Subject Matter/Remarks

KLINGHOFFER reported additional information regarding former District Counsel Attorney JEFFREY SHERMAN.  He provided the following:

District Counsel Attorney LYNDA TAYLOR is working a docketed case that was previously worked by SHERMAN.  Recently, a court appearance was made by CHUCK MAGNUSON on behalf of the taxpayer.  MAGNUSON was formerly the head of the tax division for the U.S. Attorney's office.  MAGNUSON is also sharing an office with SHERMAN.  TAYLOR has expressed suspicions of how MAGNUSON came to represent the taxpayer due to his associations with SHERMAN.

When SHERMAN was assigned the District Counsel case, there were three prior years involved which were dropped because some statutes of limitation had expired.  He did not fully know the details of who was responsible for the statute expirations.

He does not know the name of the involved taxpayer but he will speak with TAYLOR and have her contact Internal Security

| Activity or Interview of: (Include all necessary data) | Conducted by: |
| --- | --- |
| LINDA TAYLOR<br>Attorney, District Counsel<br>Los Angeles POD | Inspector WILLIAM SCHAFER |
| | Location Of Interview/Activity:<br>Los Angeles, CA |

### Subject Matter/Remarks

TAYLOR was interviewed regarding allegations of a conflict of interest concerning former IRSE JEFFREY SHERMAN. She provided the following information:

She is assigned a tax court case involving taxpayer RICHARD R. & EMILY LEVIN, SSN: 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, 660 Foxbrook Glendora, CA 91740, Docket No. 4315-88.

The case was formerly worked by SHERMAN. On April 27, 1988, SHERMAN answered the tax court petition.

The tax court petition was filed by the taxpayer in pro se.

On August 22, 1989, she sent the taxpayer a letter requesting a conference and making a discovery notice to produce documents.

Sometime in early October, she received a telephone call from CHUCK MAGNUSON. MAGNUSON advised her that he was representing the taxpayer. On October 12, 1989, MAGNUSON met with her and provided some of the requested documents. She advised MAGNUSON that she could not speak with him further until he made an official entry of appearance to the court.

On October 24, 1989, MAGNUSON made an official entry of appearance to the tax court to represent the LEVINs.

The case is scheduled for trial on December 4, 1989. It appears that the case will go to trial due to the reluctance of the taxpayer to settle the case. The case involves issues of Universal Life Church deduction schemes that have previously been decided in favor of the IRS.

She did notice that MAGNUSON's letterheads contain the same office address that she knows to be SHERMAN's office address. In addition, she has heard that SHERMAN and MAGNUSON have filed some tax court petitions showing both names on the petitions as attorneys for the petitioners. Group Manager PHOEBE TANG may have information regarding the recent petitions.

15

## Inspection Service
## Memorandum of Interview
## or Activity

Date and Time

November 21, 1989

Activity or Interview of: (Include all necessary data)

PHOEBE TANG
Group Manager
District Counsel
Los Angeles POD

Conducted by:

Inspector WILLIAM SCHAFER

Location Of Interview/Activity:

Los Angeles, CA

### Subject Matter/Remarks

TANG was interviewed regarding allegations of conflict of interest of former IRSE JEFFREY SHERMAN. She provided the following information:

One of her employees, MARLENE KRISTOVICH, is assigned a case where she believes that SHERMAN and CHUCK MAGNUSON have made appearances for the taxpayer. The case is scheduled for the January 8, 1990 tax court calendar.

She also heard that District Counsel Attorney ALISON LEHR, San Jose POD, FTS 466-7415, has a case where the taxpayer may have made a complaint about SHERMAN.

16

| Type of Activity: | Inspection Service | Date and Time |
|---|---|---|
| ☒ Personal Interview<br>☐ Telephone Interview<br>☐ Records Review<br>☐ Other | Memorandum of Interview<br>or Activity | November 21, 1989 |

| Activity or Interview of: (Include all necessary data) | Conducted by: |
|---|---|
| MARLENE KRISTOVICH<br>Attorney, District Counsel<br>Los Angeles POD | Inspector WILLIAM SCHAFER |
| | Location Of Interview/Activity:<br>Los Angeles, CA |

### Subject Matter/Remarks

KRISTOVICH was interviewed regarding allegations of conflict of interest of former IRSE JEFFREY SHERMAN. She provided the following information:

The only case she has at this time involving SHERMAN is on taxpayer HYMES, Docket No. 2096-89. The case is also related to a court of claims case in which the taxpayer is being represented by CARLOS SEDILLO.

ED ROBBINS with the U. S. Attorneys office may have some information about cases being represented by both SHERMAN and MAGNUSON.

17

| Type of Activity: | Inspection Service | Date and Time |
| :-- | :--: | :-- |
| ☒ Personal Interview | Memorandum of Interview | |
| ☐ Telephone Interview | or Activity | November 22, 1989 |
| ☐ Records Review | | |
| ☐ Other | | |

| Activity or Interview of: (Include all necessary data) | Conducted by: |
| :-- | :-- |
| ED ROBBINS<br>Assistant United States Attorney | Inspector WILLIAM SCHAFER |
| | Location Of Interview/Activity:<br>Los Angeles, CA |

### Subject Matter/Remarks

ROBBINS was interviewed regarding allegations of conflict of interest of former District Counsel Attorney JEFFREY SHERMAN. He provided the following information:

He has been working on a case involving taxpayer GEORGE BRNILOVICH, SSN: 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, 301 Foxridge.Dr., Thousand Oaks, CA 91361.

BRNILOVICH was represented by an attorney, MARY ALEXANDER.

BRNILOVICH did not file of tax returns for several years and the IRS filed substitute returns and assessed taxes, penalties and interest. The IRS then filed liens and began distraint action. ALEXANDER tried to get information about the assessments and could not determine that a deficiency notice was sent to BRNILOVICH. Meanwhile, ALEXANDER got BRNILOVICH to go to a CPA. The CPA prepared all non-filed returns. The returns prepared by the CPA were substantially less than those assessed by the IRS. BRNILOVICH then filed and paid the returns prepared by the CPA.

ALEXANDER then filed a Tax Court petition claiming that no deficiency notice was sent. District Counsel responded to the Tax Court petition by admitting that no deficiency notice had been sent to BRNILOVICH and requested the Tax Court to dismiss the case for lack of jurisdiction. District Counsel's motion to dismiss was made by ALISON LEHR. The case was dismissed on April 5, 1989 for lack of jurisdiction and the court order stated that the grounds for dismissal was the admission of District Counsel.

Even though District Counsel stated that no deficiency notice was sent, he has since located BRNILOVICH'S file and found that a deficiency notice was sent.

On May 5, 1989, ALEXANDER filed a civil complaint in U. S. District Court for damages authorized under IRC 7432 & 7433.

IRC 7432 & 7433 are new code sections which were enacted as part of the new taxpayer bill of rights bill. This is a highly sensitive case as it is the first such case to be filed in the country.

During June and July he was working with ALEXANDER to settle the case. He had worked out a settlement with ALEXANDER that she would dismiss the case and he would have the returns prepared by the CPA looked at by IRS EXHIBIT No. 15

Exam Division. The settlement included an abatement of the IRS assessment
if there were no problems with the returns prepared by the CPA. In July,
he was almost to the point of an official settlement when ALEXANDER told
him that BRNILOVICH was not willing to settle. ALEXANDER told him that
BRNILOVICH was getting advice from another attorney and that the other
attorney told BRNILOVICH that he had a very good case against the
Government. The other attorney also advised BRNILOVICH not to drop his
case. ALEXANDER told him that the other attorney was JEFFREY SHERMAN.
He questioned ALEXANDER about her statements because he knew SHERMAN to
be employed by IRS District Counsel. BRNILOVICH told ALEXANDER that
SHERMAN was going to leave the IRS. She told BRNILOVICH that if BRNILOVICH
would not take the settlement offer she would substitute out of the case.
ALEXANDER also told him that BRNILOVICH and SHERMAN may have known each
other for several years.

On September 27, 1989, ALEXANDER officially substituted SHERMAN and CHARLES
MAGNUSON as attorneys for BRNILOVICH.

MAGNUSON is a former Assistant U. S. Attorney who headed the Tax Division.
MAGNUSON now works in the same office as SHERMAN.

The case was recently dismissed by the Court, without prejudice. The case
was dismissed on his motion that the original complaint did not properly
plead the statutes. He does not know if the complaint will be refiled,
but, he believes that it will be refiled.

He heard that MAGNUSON had taken the case on a contingency fee and was not
paid for his work so far.

He feels that if it were not for SHERMAN'S interference, the case would
have been settled and closed. In addition, he feels that SHERMAN has
caused added expense to the Government to defend the action.

SHERMAN, Jeffrey A.
CONDUCT
7-0689-0081

| Type of Activity: | Inspection Service | Date and Time |
|---|---|---|
| ☐ Personal Interview<br>☒ Telephone Interview<br>☐ Records Review<br>☐ Other | Memorandum of Interview<br>or Activity | February 13, 1990 |

| Activity or Interview of: (Include all necessary data) | Conducted by: |
|---|---|
| JACK KLINGHOFFER<br>Attorney, District Counsel<br>Los Angeles POD | Inspector WILLIAM SCHAFER |
| | Location Of Interview/Activity:<br>Telephone Call |

## Subject Matter/Remarks

KLINGHOFFER called to report additional information regarding former IRSE JEFFREY SHERMAN. He provided the following information:

He is assigned a Tax Court case involving Taxpayer JENNIFER BALBIER, SSN: 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. The Docket number of the case is 21790-89. The issues involve a tax shelter that BALBIER participated in. A previous case involving BALBIER was worked by SHERMAN. The Docket number for that case was 23288-85. SHERMAN settled the case.

Recently, he was contacted by Attorney CHUCK MAGNUSON regarding his case. MAGNUSON said that he was representing BALBIER and wanted to have a settlement conference.

He knows that SHERMAN and MAGNUSON are working together and he believes that SHERMAN solicited BALBIER.

He is also aware of a complaint regarding a conflict of interest of SHERMAN that was made by JEAN LAWSON, (213) 553-5050. LAWSON is an attorney who represents JOANN PFLUG. SHERMAN was assigned a Tax Court case involving PFLUG. LAWSON complained that SHERMAN solicited PFLUG'S accountant for a job while SHERMAN was settling the case. SHERMAN settled the case, but, the case was transferred to him, when SHERMAN resigned, in order to make final tax computations.

| Type of Activity: | Inspection Service | Date and Time |
|---|---|---|
| ☐ Personal Interview<br>☑ Telephone Interview<br>☐ Records Review<br>☐ Other | Memorandum of Interview<br>or Activity | February 14, 1990 |

| Activity or Interview of: *(Include all necessary data)* | Conducted by: |
|---|---|
| JEAN LAWSON<br>(213) 553-5050 | Inspector WILLIAM SCHAFER |
| | Location Of Interview/Activity:<br>Telephone Interview |

### Subject Matter/Remarks

LAWSON was interviewed regarding her complaint against former IRSE JEFFREY SHERMAN. She provided the following information:

She is an attorney and represents actress JOANN PFLUG. PFLUG was formerly married to television personality CHUCK WOOLERY. PFLUG and WOOLERY worked out of a personal service corporation that was managed by an accountant named BRUCE WEBBER.

For many years PFLUG and WOOLERY's income was paid from the personal service corporation. They were issued W-2's at the end of the year. The personal service corporation had a fiscal year which ended in August. When PFLUG and WOOLERY separated, the personal service corporation was dissolved. However, PFLUG continued to receive some income from the corporation. The income was reported to PFLUG on a Form 1099, which caused additional taxes to be assessed. This became one of the issues in the Tax Court petition.

SHERMAN was assigned to represent the Government in the Tax Court case.

During April or May 1988, she met with SHERMAN and WEBBER to discuss the case. The meeting was held at WEBBER's office. When she showed up at the meeting, she was kept waiting for approximately 30 minutes while SHERMAN met privately with WEBBER. She was very upset and felt that it was unethical for SHERMAN to interview her client's accountant outside her presence.

At the end of the meeting between SHERMAN, WEBBER and herself, SHERMAN said to WEBBER "Are you sure that you wouldn't want to lease some of your office space?". WEBBER replied that he did not wish to lease any space. SHERMAN also said to WEBBER that he could do estate planning for WEBBER's clients. She asked SHERMAN what he knew about estate planning and SHERMAN replied that he had experience in that area of the law. SHERMAN also made the statement "You know that you can't make ends meet on a Government salary alone".

She made a complaint to SHERMAN's supervisor, however, the supervisor seemed to stand behind SHERMAN and disregard her complaint. She believed that the supervisor was named "BILL" or "PHIL".

| Type of Activity: | Inspection Service | Date and Time |
|---|---|---|
| ☐ Personal Interview<br>☐ Telephone Interview<br>☐ Records Review<br>☐ Other | Memorandum of Interview<br>or Activity | May 17, 1991 |

| Activity or Interview of: (Include all necessary data) | Conducted by: |
|---|---|
| Review of District Counsel<br>Case File #21790-89 | Inspector WILLIAM SCHAFER |
| | Location Of Interview/Activity:<br>Office of Regional Inspector<br>Los Angeles, CA |

### Subject Matter/Remarks

A review of District Counsel case file #21790-89, Tax Court petition of JENNIFER BALBIER revealed the following:

A Tax Court petition was filed on September 8, 1989. The attorney for BALBIER was ALEX CHANG. The petition was based upon an IRS notice of deficiency which was dated June 8, 1989.

The IRS attorney assigned to the case was JACK KLINGHOFFER.

On January 29, 1990, a motion was made by CHANG to withdraw as BALBIER'S attorney and a substitution was made for CHARLES MAGNUSON to be BALBIER'S attorney.

The file contained a fax transmittal of documents. The transmittal cover sheet indicated that the documents were sent from SHERMAN & KAHN, Attorneys at Law, and CHARLES MAGNUSON, 10920 Wilshire Blvd., Los Angeles, CA. The documents contained stipulations, settlements and computations involving a previous related Tax Court case in which BALBIER was the petitioner. The documents indicated that they were all prepared by JEFFREY SHERMAN, while he was employed with the IRS.

The attached are copies of the fax documents.

474·9939

## SHERMAN & KAHN
ATTORNEYS AT LAW
10920 WILSHIRE BOULEVARD
SUITE 1000
LOS ANGELES, CALIFORNIA 90024

MICHAEL A. KAHN
JEFFREY A. SHERMAN
BONNIE H. YAEGER

OF COUNSEL
CHARLES H. MAGNUSON

AREA CODE (213)
TELEPHONE 824-7944
FACSIMILE 208-4801

3/F
027₀

## TELECOPIER COVER LETTER

FILE NO.

WE ARE TRANSMITTING A TOTAL OF 11 PAGES INCLUDING THIS COVER PAGE.

PLEASE DELIVER THE FOLLOWING PAGES TO:

NAME:   Jack Klinghoffer          FAX NO:   (213) 894-6548

DATE:   September 13, 1990        FROM:     Charles Magnuson

COMMENTS:

S&K FILE NAME:

S&K FILE NO:

ORIGINAL TRANSMITTED BY:

FEDERAL EXPRESS:     _____
U.S. MAIL:           _____
NOT SENT:               X
OTHER:               _____

IF YOU DO NOT RECEIVE ALL OF THE PAGES, PLEASE CALL OUR OFFICES AS
SOON AS POSSIBLE, AT (213) 824-7944, AND ASK FOR Wendy.

OPERATOR: Wendy

TIME:     10:45 A.M.


ORIGINAL

UNITED STATES TAX COURT

JENNIFER BALBIER,        )
                              )
           Petitioner,      )
                              )
      v.                    )      Docket No. 23288-85
                              )
COMMISSIONER OF INTERNAL REVENUE,   )
                              )
           Respondent.      )

DECISION

      Pursuant to agreement of the parties in this case, it is

      ORDERED and DECIDED: That there is a deficiency in income tax due from the petitioner for the taxable year 1981 in the amount of $9,025.00.

      That there is an addition to the tax due from the petitioner for the taxable year 1981, under the provision of I.R.C. $6659 in the amount of $1,805.00.

      That there is no additions to the tax due from the petitoner for the taxable year 1981, under the provisions of I.R.C. $6653(a)(1) and (2).

                                            Judge

Entered:

      *        *        *       *        *

      It is hereby stipulated that the Court may enter the foregoing decision in this case.

It is further stipulated that, effective upon entry of this decision by the Court, petitioner(s) waive(s) the restrictions contained in Section 6213(a) of the Internal Revenue Code of 1954 prohibiting assessment and collection of any deficiencies in income taxes and/or additions to tax shown above in this decision, plus statutory interest, until the decision of the Tax Court has become final.

WILLIAM F. NELSON
Chief Counsel
Internal Revenue Service

By: _____

JENNIFER BALBIER
Petitioner
260 West 52nd Street
Suite 14K
New York, New York 10019

JEFFREY A. SHERMAN
Attorney for Respondent
Internal Revenue Service
300 N. Los Angeles Street
P.O. Box 2031, Main P.O.
Los Angeles, CA 90053
Tel. No. (213) 894-4656
        (FTS) 798-4656

Date: _____

Date: _____

**Regional Counsel**

Internal Revenue Service

WESTERN REGION
Main Post Office
P.O. Box 2031
Los Angeles, California 90053

Jennifer Balbier
260 West 52nd Street
Suite 14K
New York, New York  10019

                    In re:  Jennifer Balbier v. Commissioner
                            of Internal Revenue
                            Docket No. 23288-85

Dear Ms. Balbier

        Enclosed herein please find three copies of the decision
document which is to be filed with the Tax Court so that this
case may be closed.  Please sign two copies and return them
to me as soon as possible.  The remaining copy is for your
records.  Additionally, please sign two copies of the Closing
Agreement, retain one copy for your records, and return them
to me along with the decision documents.

        Also enclosed is a copy of the Statment of Income Tax
Changes (which reflects the various adjustments per our
settlement) which properly reflects the amount as stated on
the decision document.

        If I can be of any further assistance,  please call.


                                Very truly yours,



                                Jeffrey A. Sherman
                                Attorney for Respondent
                                Tel. No. (213) 894-4656


Enclosures:
  As stated.

Form **906**
(Rev. September 1980)

Department of the Treasury—Internal Revenue Service

# Closing Agreement On Final Determination
# Covering Specific Matters

Under section 7121 of the Internal Revenue Code  Jennifer Balbier

260 West 52nd Street, Suite 14K, New York, New York   10019

(Taxpayer's name, address, and identifying number)

SSN: 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

and the Commissioner of Internal Revenue make the following closing agreement:

WHEREAS, the taxpayer entered into a contract with Soundwave Records,
Inc. in __1981__ for the lease of a master recording ("Lease
Transaction"), and

WHEREAS, the taxpayer has claimed deductions and investment credit
with respect to the Lease Transaction, and

WHEREAS, the parties wish to resolve with finality the income tax
consequences of the Lease Transaction.

NOW IT IS HEREBY DETERMINED AND AGREED FOR FEDERAL INCOME TAX
PURPOSES THAT:

(1)   The taxpayer is entitled to a Section 165(a) ordinary loss
      deduction from adjusted gross income in the taxable year
      ended December 31, 1981, in an amount equal to one-half the
      sum of all cash payments made in connection with the Lease
      Transaction.

(2)   Taxpayer is entitled to deductions for adjusted gross income
      in taxable years subsequent to December 31, 1981, in an
      amount equal to any additional cash payments made in each year
      subsequent to 1981 in connection with the Lease Transaction
      not to exceed the amount of income reported from the Lease
      Transaction in that year.

(3)   Taxpayer is not entitled to any investment tax credit with
      respect to the Lease Transaction.

(4)   Except as provided in paragraphs (1) and (2) above, taxpayer
      is not entitled to any other deductions in connection with
      the Lease Transactions or distribution of the master
      recording.

I have examined the specific matters involved and recommend the acceptance of the proposed agreement.

..........................................................................................
(Receiving Officer)                          (Date)

..........................................................................................
(Title)

I have reviewed the specific matters involved and recommend approval of the proposed agreement.

..........................................................................................
(District Reviewing Officer)                  (Date)

..........................................................................................
(Title)

Exhibit B – Part 4
Page 198 of 200

(5) In the event the taxpayer receives any payment from exploitation of the master recording or any reimbursements for payments made in connection with the Lease Transaction or distribution of the master recording, such payment(s) shall constitute ordinary income in the taxable year of receipt.

(6) The taxpayer is not subject to a penalty under Section 6653(a) of the Internal Revenue Code in connection with the Lease Transaction.

(7) The applicable percentage to be used in computing the addition to tax for valuation overstatements pursuant to section 6659(a) of the Internal Revenue code shall be twenty percent.

This agreement is final and conclusive except:

(1) the matter it relates to may be reopened in the event of fraud, malfeasance, or misrepresentation of material fact;

(2) it is subject to the Internal Revenue Code sections that expressly provide that effect be given to their provisions notwithstanding any other law or rule of law except Code section 7122; and

(3) if it relates to a taxable period ending after the date of this agreement, it is subject to any law, enacted after the agreement date, that applies to that taxable period.

By signing, the above parties certify that they have read and agreed to the terms of this document.

Your signature .............................................................. Date Signed ..............................

Spouse's signature (if a joint return was filed) .......................... Date Signed ..............................

Taxpayer's representative ................................................. Date Signed ..............................

Taxpayer (other than individual)...........................................................................................

By ...................................................................... Date Signed ..............................

Title ....................................................................

Commissioner of Internal Revenue

By ...................................................................... Date Signed ..............................

Title ....................................................................

c70—263-213-1

# Instructions

This agreement must be signed and filed in triplicate. (All copies must have original signatures.)

The original and copies of the agreement must be identical.

The name of the taxpayer must be stated accurately.

The agreement may relate to one or more years.

If an attorney or agent signs the agreement for the taxpayer, the power of attorney (or a copy) authorizing that person to sign must be attached to the agreement. If the agreement is made for a year a joint income tax return was filed by a husband and wife, it should be signed by or for both spouses. One spouse may sign as agent for the other if the document (or a copy) specifically authorizing that spouse to sign is attached to the agreement.

If the fiduciary signs the agreement for a decedent or an estate, an attested copy of the letters testamentary or the court order authorizing the fiduciary to sign, and a certificate of recent date that the authority remains in full force and effect must be attached to the agreement. If a trustee signs, a certified copy of the trust instrument or a certified copy of extracts from that instrument must be attached showing:

    (1) the date of the instrument;

    (2) that it is or is not of record in any court;

    (3) the names of the beneficiaries;

    (4) the appointment of the trustee, the authority granted, and other information necessary to show that the authority extends to Federal tax matters; and

    (5) that the trust has not been terminated, and that the trustee appointed is still acting. If a fiduciary is a party, Form 56, Notice Concerning Fiduciary Relationship is ordinarily required.

If the taxpayer is a corporation, the agreement must be dated and signed with the name of the corporation, the signature and title of an authorized officer, or officers, or the signature of an authorized attorney or agent. It is not necessary that a copy of an enabling corporate resolution be attached. See 26 C.F.R. 601.504(b)(2)(ii) as to dissolved corporations.

Use additional pages if necessary, and identify them as part of this agreement.

Please see Revenue Procedure 68-16, C.B. 1968-1, page 770 for a detailed description of practices and procedures applicable to most closing agreements.