**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ALASKA**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>               Plaintiff,<br>vs.<br><br>JAMES MICHAEL WELLS,<br><br>               Defendants. | 3:13-cr-00008-RRB-JDR<br><br>**RECOMMENDATION**<br>**REGARDING**<br>**MOTION TO SUPPRESS**<br>**STATEMENTS**<br>**(Fourth and Fifth Amendments)**<br><br>**Docket 120** |

Defendant **James Michael Wells** moves this court for an order suppressing statements made by him to law enforcement personnel on April 12 and 13, 2012.  In his motion Wells alleges the following:

(1) He was immediately seized and/or held in custody.

(2) His statements elicited during the first four sessions were obtained in violation of Miranda v. Arizona, 384 U.S. 436 (1966).  He states he was held in custody for over 10 hours and interrogated without Miranda advisements on April 12, 2012.

(3) His statements elicited on April 13, 2012 during session five, were not the product of a knowing, intelligent and voluntary waiver of <u>Miranda</u> rights.

(4) He was denied access to his diabetic medications and appropriate food on April 12, 2012.  Docket 120.

The government filed an opposition at Docket 138,  Wells submitted a reply at Docket 141 and a Supplemental Brief with declaration in support of evidentiary hearing at Docket 158.  The government filed a Supplemental response to defendant's Supplemental Brief at Docket 165.   An evidentiary hearing was conducted on November 18, 2014, before the magistrate judge. Testifying were Peter Russell Van Ness and Kirk Oberlander.   Transcript Evidentiary Hearing, Docket 187.

Upon due consideration of the evidence adduced and arguments of counsel the magistrate judge recommends that the Motion to Suppress be  DENIED.

### Statement of Facts

Coast Guard workers James Hopkins and Richard Belisle were discovered dead or dying on the morning of April 12, 2012 at the rigger shop known as Building T2[1] at COMMSTA, U.S. Coast Guard Base, Kodiak, Alaska.   Building T2 was a small outpost separate from the main command.  The building had a small office area and a workshop.   The entire personnel for the COMMSTA Kodiak consisted of 51 people. There were only eight people assigned to T2.  Petty Officer

---

[1] T stands for transmission site.

First Class James Hopkins supervised two civilian workers, James Wells and Richard Belisle, a Petty Officer Third Class, and four seaman. The workers at Building T2 performed antenna repair work for towers around the state. The T2 building is situated off the road leading up to the T1 building.

The building at T1 is the situs for the local command which handles classified material. The T1 building is located above T2 with cameras that record entry and egress into T1 and T2. An 8 foot tall chain-link fence encloses the T1 building and a small parking lot. T1 has an electronically operated gate that remained closed from about 9 :00 AM on April 12, 2012 through April 13, 2012.

The Alaska State Troopers arrived at T1 about 8:59 AM. the gate was secured and closed at T1 at 9:00 AM. All hands were briefed that no one would be allowed to enter or depart T1 without prior knowledge of the CWO (Chief Watch Officer). Initially the Coast Guard Investigative Service was in charge of the investigation before the FBI became involved.

As the workers at the T2 arrived on the morning of April 12 they were sent to T1 to wait because the workplace had become a crime scene. Wells was supposed to have been in the rigger shop at the time the two workers were shot. Initially Wells' whereabouts was unknown.

The Command gathered everyone in a conference room area of T1 to account for those persons assigned to the Command, to ensure their safety, to allow law enforcement to begin processing the crime scene, and to gather as much useful

and fresh information as early as possible from those assigned to COMMSTA Kodiak. Sometime after 8:00 AM Wells arrived at work and was told to go to T1 and wait.

The log from the radio watch reports that at 7:41 AM a call was received from Day Officer Bearford reporting that Hopkins and Belisle were found unconscious and in a pool of blood. At 7:46 a supervisor called 911 to report the incident and then called the Coast Guard Police Department.

The Watch Commander, Peter Van Ness was the commanding officer at COMMSTA Kodiak in April 2012. On the morning of April 12, he received a voice mail at home that someone had been injured at the rigger shop and that there was a lot of blood.

Commander Van Ness arrived at the COMMSTA about 8:00 AM and recognized Wells' vehicle on the way in. There was a law enforcement vehicle at the access road to the buildings. One of the crew members, Scott Reckner, was standing nearby. The Commander heard him say that someone had shot Jim and Rich. The commander did not speak to Wells. His first concerns were whether the communication center was functioning and making sure the spouses of the victims knew what had happened.

On April 12 Commander Van Ness gave no orders about the T2 crew doing anything or being anywhere. He had a discussion with the XO (David Pizaro) that the crew needed to be available if the investigators wanted to talk to them. No

specific instructions were given to Jim Wells individually. The crew was assembled so the Commander could give them an update on what was going on. The demeanor of the crew was one of shock, anguish and sorrow.

The Coast Guard command directed Mr. Wells and other individuals to be available to participate in the interrogations with FBI and investigative services officers of the Coast Guard. None of the crew expressed any concern about being interviewed.

Mr. Wells was under the Coast Guard command at T1 on April 12, 2012 from 8:20 AM until 9:30 PM. During that time the interrogators conducted four sessions of interviews with Wells. On Thursday, April 12, Wells was interviewed at Building T1beginning at the following times and durations:

      (1) 7:21 PM about 32 minutes;

      (2) 8:04 PM for about 11 minutes;

      (3) 9:05 PM for about 4 minutes: and

      (4) 9:22 PM for a little over 7 minutes.

The total interview time that evening was less than one hour. All of the interviews were recorded.

The Coast Guard command directed Wells to return on April 13, 2012 at 10:00 AM. There is no evidence whether other employees were also asked to return for interviews. Mr. Wells made statements in sessions five and six from 11:25 AM to 1:47 PM, with about a one hour break.

James Wells was a retired Chief Coast Guard Chief Petty Officer working as a civilian. He had been employed at COMMSTA Kodiak as an antenna technician since his retirement from active duty service in the Coast Guard in 1990. He was medically retired from the Coast Guard for Anaphylactic Episodes of unknown origins for allergic reactions to unspecific allergens.

Security cameras are mounted on the approaches to the buildings and locked doors provided restricted access to unauthorized visitors. Workers at COMMSTA Kodiak knew how to open the gate to T1 to get in or out. Normally anyone inside the gate could leave through the pedestrian gates simply by pressing a button to exit. The Command brought in lunch and dinner for the workers so that no one needed to leave the area. There was a vending machine nearby but no cafeteria or mess facilities.

Kodiak is an island 252 air miles from Anchorage where the FBI office in Anchorage is headquartered. Eight FBI agents arrived late in Kodiak between 1 and 1:30 PM via special flights that landed at the Coast Guard base. They went to the Coast Guard Police Department for a briefing at about 2:00 PM. The FBI assumed the investigative lead at about 2:30 PM on April 12. They divided up the investigative leads. When the agents began interviewing the crew members no one complained.

COMMSTRA Command did not order the crew to submit to questioning. As the investigators concluded their interviews with a particular crew member that person was allowed to leave.

FBI Agent Kirk Oberlander followed several leads and interviewed about four other persons before commencing his interview of Wells together with Special Agent Sean Bottary, Coast Guard Investigative Services. He considered Wells a suspect, but not necessarily a primary suspect. Other investigative leads included rumors of infidelity between some of the members of T2 and a dispute about a dog. According to Police Chief Reckner, Jim Wells was a potential suspect.

During his questioning Wells was seated closest to the door with one agent facing him and another agent on the other side. The agents wore plain clothing and jackets that concealed their weapons. The interviews of all the workers were conducted with the door closed which provided privacy for those interviewed. The door to the room remained unlocked. Wells never was advised during the interrogations that he was or was not under arrest. There were other interviews taking place.

Agent Oberlander characterized the interview as an attempt to learn about Wells' take on what might have happened and to learn about his duties. Each time the agents finished a recording session, the agents would talk to the case agent, Special Agent Darrell Allison. On April 12 at the end of the day, the agents

told Wells to check with his chain of command and that it was up to the command to decide if and when he could be made available for further questioning.

## Summary of Interviews

### (1) Session One  (31 minutes, 25 seconds)

Initially the officers asked Wells for preliminary information such as his home address, a contact phone number and whether he had any weapons on his person.  Wells volunteered an explanation of why he was not at work at 7:00 AM which he attributed to having had a flat tire "in (sic) his truck."  This precipitated followup questions about  his running late.  The officers then began questioning to establish a time line to account for Wells' whereabouts the morning of the homicides.

The officers asked Wells if he knew of "any issues" the two victims had had at work.  They asked Wells if he knew of anybody that might have had a grudge against the victims.  They asked Wells if he knew of anybody at the job sites that might have been belligerent or had words with the victims.

Wells was asked if anybody in his crew carried a weapon for bear protection.  There was a discussion about the presence of weapons inside the shop or whether anyone had ever discharged a firearm inside the shop.  Questions were asked if anyone had talked about shooting someone else.

### (2) Session Two (an elapsed time of 10 minutes and 53 seconds)

The second session began 12 minutes after session one ended with the agents indicating that they had received some new leads.  Agent Bottary told Wells

they were starting to receive a lot of leads. They stated it was not "if" they got the perpetrator but "when." Agent Oberlander asked Wells what he thought should happen to the person who committed the crimes. Essentially, Wells indicated " let the law take it in their hands." Wells stated that his answer had two parts and he was not sure if he could say one of them in front of the law enforcement officers. This led Agent Oberlander to ask Wells if he was saying he might incriminate himself. Wells responded: "No, I'm saying that I'd probably be very angry." He explained he was referring to the person taking matters into their own hands rather than letting somebody else take care of it. The agents responded that they "got that." Wells then asked if they were recording the conversation. Agent Bottary stated that they were recording but told Wells they were not trying to put words in his mouth.

Agents then asked Wells if the tire that went flat was in the back of his truck and if they could get a consent to search the truck. Docket 138-3, pp. 4-5. Wells consented. Agents asked Wells if they could look at his iPhone. Wells consented. Wells was offered a fruit cup or juice shortly after the officers asked to take a look at Wells' iPhone.

> (3) Session Three (an elapsed time of 3 minutes, 44 seconds)

In recorded session 3 the agents explained that they could not "cut Wells' loose because they had follow-up questions. The agents expressed a concern for Wells' health and his diabetes and stated they would like to take him

home and get his medicine and he could grab something to eat and then return to the base for further questioning. After Wells stated "alright," the recording stopped. The agents did not tell Wells that he would have to be escorted but neither did they say he could go home on his own and return that evening. Wells suggested that they just ask the additional questions then.

### (4) Session Four (7 minutes, 28 seconds)

Session 4 began with a question about whether Wells had shot any guns that day. During this session the agents asked Wells if they could take swabs of his hands for a gun powder residue test. Agent Oberlander testified at the evidentiary hearing that this was a ruse; they really just wanted to see what Wells' reaction would be to the request. While the test was being administered, Wells was asked when he last fired a weapon, and whether he did any reloading of ammunition.

### (5) Session Five - April 13 (one hours, 25 minutes, 51 seconds)

In Session 5 Agent Oberlander brought up the topic of "procedures" and the Advise of Rights form containing the <u>Miranda</u> advisement. Wells was then mirandized and voluntarily waived his <u>Miranda</u> rights. Wells was asked if he had any questions of the agents and he said "Nope." The interview continued until the topic of the video recording of a vehicle attributed to Wells occurred. Wells was asked if he had a theory to explain the window of time to account for his whereabouts just

prior to the discovery of the homicides.  Wells invoked his right to remain silent and the interview ended shortly thereafter.

In Session 5 Wells expressed concern about why his wife had been interviewed by the FBI and inquired whether the agents had driven to his house the previous night.  The agents decided to advise Wells of his <u>Miranda</u> rights.  When the agents began talking about the Advice of Rights form and asked Wells if he would like to continue to talk with them he stated that he was a little concerned.[2]  After completing the advisement of rights, Agent Oberlander asked Wells if there were any other questions that they could answer for him.  Wells, responded: "Nope."

Agent Oberlander then asked if Wells knew of anyone having spent the night in the shop.  Wells indicated not in the shop, but people had done so out in the antenna fields.  After an additional question or so Wells modified his answer that there might have been someone spending the night in the shop.  He speculated that someone might have been in the "doghouse."  The discussion continued about the layout of the rigger shop and whether it had an alarm system.  At one point Agent Oberlander asked Wells if he needed any water, juice or a sandwich.  Wells indicated that he did not.

Discussion continued about access to the shop.  Agents then asked questions about the purpose of the outside camera covering the parking lot.  There was discussion about the exact physical location where the victims were discovered

_____

[2] An Advice of Rights form dated April 13, 2012 at 11:40 hours, signed James Wells and witnessed by the two agents is filed at Docket 138-9, p.1.

and what their usual schedules were when they arrived at work.  They discussed the delegation of work assignments and the leadership provided by those who had oversight at the shop. Wells was asked if he had any disciplinary issues with the Command.  Wells declined to answer that question.  They asked Wells if he like his job and if he could retire now if he wanted to.  Wells was asked if he held any animosity against his supervisor.  A discussion was had about personal property items that the Coast Guard was getting rid of.  During Session 5. .

In a lighter tone the agents asked Wells how long he had had his beard and Wells told him that in May 2000 he retired, never to shave again and never to wear a necktie.  Agents then told Wells that they were trying to figure out the motive. They asked Wells if he thought they should rule out ET-3 Beauford and whether he had had a beef with ET-1.  Wells stated that he did not think so.

There was a discussion about whether people liked working in Building T2 or preferred to work at the Command site.  They talked about employees Coggins and Upchurch,

They asked Wells if someone were to go to the shop to steal something what would they look for.  Wells mentioned a suicide that had occurred there in previous years.  Agent Oberlander reasoned out loud whether the intended target could have been one of the victims and the other just happened to be there.

Agents asked Wells to provide his time line again and walked him through it.  The agents indicated that they had attempted to match up these events

with frames recorded on the camera. Agent Oberlander said they had done eleven interviews yesterday.

Agent Bottary asked Wells if he owned any other vehicles than the Dodge pickup. Wells mentioned his wife's Honda CR-V. The discussion disclosed that the vehicle had been left at the airport while his wife was out of town.

In response to questions, Wells indicated he had driven to the airport that morning. Wells indicated where he had gotten out to look at his tire. Wells acknowledge that he realized that he did not have a new tire to change to, or the equipment to handle the tire change. He then opted to go back home. The agents discussed Wells' time line again in detail. Eventfully, Agent Bottary told Wells that they had seen his truck passing on the camera and that it had passed the guard shack northbound to the airport at approximately 6:48 AM [on April 12].

The agents indicated that they had a period of time that they were trying to account for and asked Wells if he had a reasonable explanation for it. Wells responded that he did not have a theory at that moment. Docket 138-7, p.31.

Agent Bottary said now is a chance to let us know that if something did happen that we should know about. Agent Oberlander stated that sometimes things aren't planned and random acts occur. Agent Oberlander added: "You never know what's going to happen." Wells responded: "We better terminate this thing." The agents offered to step out and give Wells a chance to have a restroom break but he declined. That ended Session 5.

//

<u>(6) Session Six, April 13 (4 minutes, 39 seconds)</u>

Session 6 began with an explanation by Agent Bottary that they had laid out the facts time line and Wells' stories weren't lining up with it with no explanation provided. Agent Bottary explained that he wanted to find out what had happened and he'd really like to hear Wells talk about it. Wells responded: "Talk about what?" Agent Oberlander added that ". . . it either happened in the heat of the moment or it was planned . . . ." Docket 138-8, p.2. Wells then asked he they were accusing him. Agent Oberlander said at that point they were. Agent Oberlander asked if it was in the heat of the moment or whether it was a conspiracy and was Wells trying to protect other people? Wells then requested a lawyer and the interview ended.

Approximately 12 minutes lapsed between the end of Wells' first interview and the beginning of the second session on April 12. There was one hour delay before beginning the third interview and 13 minutes lapsed between the end of the third interview and the beginning of the fourth interview. Wells went back to the conference area during this time. The total time of recorded interviews that evening lasted less than an hour (53 ½ minutes). The interviews on April 12 concluded by 9:30 PM.

During the 50 minutes between the fifth and sixth (last) session Wells went to the conference room. He was very agitated and wanted some time to

himself. All the crew including Wells was allowed to go home on the evening of April 12.

## Access to Medications

During the first interview Wells told the agents he had received a medical retirement was going to need something to eat but that he was not then hungry. Docket 138,-1, p.4.

Throughout the interviews on April 12, the agents expressed sufficient concern for Wells' health and welfare. During the breaks in the interview session(s) Wells had an opportunity to take care of his bodily needs. He was not denied access to his medications, food, or water during the interviews. He declined an offer for water, but told them he was diabetic and getting low on sugar. The agents offered Wells a snack or something to eat, but he told them he had just "had something." Docket 138-2, p.9. He added it was time for medicine, "pretty quick." *Id.* Wells said his medicine was at home. *Id.*

Shortly thereafter, Agent Sean Bottary asked Wells what his time clock was for his medicine. Wells did not answer that question, but said that he was going to need something to eat. He added: "the box lunches . . . don't do anything for me." Docket 138-2, p.14. Agent Oberlander asked Wells what type of food he would need. Wells responded that he did not have an appetite, that he had just had chips and a couple of fruit cups. Docket 138-2, p.15. Agent Oberlander asked about any

medications Wells was taking other than insulin. Wells indicated it was nothing they needed to be concerned about. *Id.*

In Session two, the agents offered Wells a fruit cup or juice. The transcript is unclear whether Wells accepted. Docket 138-3, p.8.

In Session three, the agents offered to take Wells home to get his medicine and something to eat because they wanted to continue the interview. Docket 138-4, p.1-2. In session five, Wells was asked if he needed water or juice or anything else such as a sandwich. Wells said "no." Docket 138-6, pp. 16-17.

## Application of Law

### I. Fourth Amendment Seizure

Wells argues that he was seized under the Fourth Amendment because considering all the circumstances surrounding the incident a reasonable person would have believed that he was not free to leave. Docket 121, p.5 "Detention" for purposes of the Fourth Amendment does not necessarily amount to "custody" within the meaning of the Fifth Amendment. United States v. Striefel, 781 F.2d 953 (1st Cir. 1986). The court explained that the Fourth Amendment is implicated when a reasonable person would not feel free to leave.

The Fifth Amendment as interpreted in Miranda, is not as easily triggered. Miranda's warnings are not required until the person's freedom is curtailed to a degree associated with a formal arrest. *See* also Blake v. State of Alaska, 763 P.2d 511 (Alaska App. 1988), discussing the separate analysis of when

a person is in custody for purposes of <u>Miranda</u> warnings, and when a person is seized for purposes of the Fourth Amendment.

## II. <u>Application of Miranda</u>

Wells claims that the government obtained his statements in violation of <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966). He has moved to suppress all statements given by him on April 12 and 13, 2012. The parties disagree about whether Wells was in custody for purposes of <u>Miranda</u> during the six interviews. The defense claims that Wells was in custody the entire time he was interrogated while the government argues that the custody requirement was not met before the advisement of <u>Miranda</u> rights. Before applying the law to the facts of this case, the court set forth a general over view of relevant law.

<u>Miranda</u> holds that the Fifth Amendment privilege against being compelled to be a witness against one's self is fully applicable during a period of custodial interrogation. 384 U.S. at 460-463. The court found that compulsion is inherent in police interrogation in custodial surroundings. To dispel the inherent coercion of custodial interrogations, the police must inform a suspect of certain rights and warn him of the consequences of relinquishing those rights. The <u>Miranda</u> warnings need not be given unless a person is both being "interrogated" and is "in custody." General on the scene questioning as to facts surrounding a crime need not be preceded by the warnings. 384 U.S. 436, 477. The officers' obligation to give a suspect <u>Miranda</u> warnings before interrogation extends only to those instances

where the individual is "in custody." United States v. Kim, 292 F.3d 969, 973 (9th Cir. 2002).

Conduct may be considered interrogation if it is intended to elicit incriminating remarks from the suspect. *See* for example, United States v. Barnes, 432 F.2d 89 (5th Cir. 1970); Combs v. Wingo, 465 F.2d 96 (6th Cir. 1972). The Supreme Court has recognized that any interview of one suspected of a crime by a law enforcement officer may have coercive aspects without rising to the level of custody. California v. Beheler, 463 U.S. 1121 (1983) at 1125, citing Oreton v. Mathiason, 429 U.S. at 495 (1977). Miranda warnings need not always be given prior to questioning of one whose freedom of action is inhibited to some degree during an investigatory detention. *See* United States v. Woods, 720 F.2d 1022-1029 (9th Cir. 1983) (Brief questioning of suspects in a cocktail lounge was not custodial under Miranda simply because they were under investigation for narcotics violations and not free to leave).

Although Miranda indicates that a person was in custody when he was "deprived of his freedom of action in any significant way," courts do not take this language literally. Inquiry rather is whether there was a formal arrest or "restraint on freedom of movement of the degree associated with a formal arrest." California v. Beheler, 463 U.S. 1121, 1125 (1983). "For a person to be in custody when he has not been arrested, something must be said or done by the authorities, either in their manner of approach or in any tone or extent of their questioning, which indicates that

they would not have heeded a request to depart or to allow the suspect to do so." United States v. Willaman, 437 F.3d 354, 359 (3rd Cir. 2006), cert, denied 126 S. Ct. 2902. *See* also United States v. James, 113 F.3d 721, 727 (7th Cir. 1997).

The term "custody" is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion. Howes v. Fields, 132 S. Ct. 1181, 1189-1190 (2012). The Supreme Court instructed: "In determining whether a person is in custody in this sense, the initial step is to ascertain whether, in light of "the objective circumstances of the interrogation," a "reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." In order to determine how a suspect would have "gauge[d]" his "freedom of movement," courts must examine "all of the circumstances surrounding the interrogation." *Id.* For example, a road side traffic stop is not custody for purposes of Miranda. Nor does a routine Terry stop trigger the Miranda rule.

A person appearing before a probation officer is not in custody for Miranda purposes even though his appearance may be mandatory. Minnesota v. Murphy, 465 U.S. 420 (1984). Testimony before a grand jury may not be "custodial interrogation" requiring the Miranda warnings. Chief Justice Burger would have so held in United States v. Mandujano, 425 U.S. 564 (1976).

Howes, teaches that not all restraints on freedom of movement amount to custody for the purposes of Miranda. The Supreme Court stated: "We have 'decline[d] to accord talismanic power' to the freedom-of-movement inquiry, and

have instead asked the additional question whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in Miranda." Id.

"To determine whether an individual was in custody, a court must, after examining all the circumstances surrounding interrogation, decide whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Id.*

In Howes v. Fields, petitioner Fields sought habeas corpus relief arguing that he was subjected to custodial interview without being given Miranda warnings while serving a jail sentence for an unrelated offense. The Supreme Court held that there was no categorical rule (that established that a prisoner is always in custody) when the prisoner is removed from the general prison population and questioned about events that occurred outside the prison. In other words, service of a term of imprisonment was not enough to constitute Miranda custody. Taking a prisoner aside for questioning does not necessarily convert a non-custodial situation to one in which Miranda applies. *Id.*

In United States v. Martin, 781 F.2d 671 (9th Cir. 1985), the questioning of Martin had taken place in a hospital where he was being treated for injuries sustained in an explosion. Martin contended that because law enforcement personnel failed to advise him of his constitutional rights pursuant to Miranda any statements he made should have been suppressed. He argued that he was "in

custody" because he was not free to leave the hospital and that his presence there was the functional equivalent of being in custody and that he was deprived of his freedom of action to a significant degree. In deciding the case against Martin, the Ninth Circuit noted that procedural safeguards provided by Miranda are designed to protect individuals from police "custodial interrogation."

Miranda was concerned about the incommunicado interrogation of individuals in a police-dominated atmosphere which elicits self-incriminating information without informing the suspect of his constitutional rights. The Miranda court stated "[a]n individual swept from familiar surroundings into police custody, surrounded by antagonistic forces, and subjected to . . . techniques of persuasion . . . cannot be otherwise than under compulsion to speak." 384 U.S. at 461. In Martin, supra, the court found no facts to indicate that law enforcement officials were in anyway involved with Martin's hospitalization or did anything to extend his stay and treatment. Thus, Miranda warnings were not required before a law enforcement person spoke with Martin at the hospital.

> "A defendant is in custody if a 'reasonable innocent person
>
> in such circumstances would conclude that after brief
>
> questioning he or she would not be free to leave.' United
>
> States v. Booth, 669 F,2d 1231, 1235 (9th Cir. 1981). The
>
> custody determination is objective and is not based upon

'the subjective views of the officers or the individual being questioned.' Kim, 292 F.3d at 973."

United States v. Bassignani, 575 F.3d 879, 883 (9th Cir. 2009).

The court must apply an objective test to resolve the ultimate inquiry, namely whether there was a formal arrest or restraint on freedom of movement of the degree associated with formal arrest. J.D.B v. North Carolina, 131 S. Ct. 2394, 2402 (2011). In Kim the Ninth Circuit Court of Appeals identified five factors relevant to the custody determination, namely (1) the language used to summons the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual. 292 F.3d at 974. Bassignani states that these considerations are not exhaustive and that other factors maybe pertinent or even dispositive of the ultimate determination whether a reasonable person would have believed he could freely walk away from the interrogators. 575 F.3d at 884. The five Kim factors are discussed below.

## A.    Language Used to Summons Defendant

In Howes, the inmate was led to a separate room in the prison where he was questioned without Miranda warnings for five to seven hours about a crime that had occurred outside the prison before the inmate was incarcerated. Reversing the Court of Appeals, the Supreme Court ruled that questioning an inmate who was isolated from the general prison population was not itself enough to constitute

interrogation. The court found significant the fact that inmates are familiar with the prison setting and less likely to be coerced by it, and were less likely to feel pressured into speaking in hopes of promptly gaining their freedom. On the facts of that case the court found that the inmate was not in custody and thus the <u>Miranda</u> warnings were not required.

Where the defendant has agreed to accompany officers to the police station or to an interrogation room the Ninth Circuit has found an interrogation to be non custodial. *See* <u>United States v. Crawford</u>, 372 F.3d 1048, 1059 (9th Cir. 2004) (en banc). *See* also <u>United States v. Norris</u>, 428 F.3d 907, 912 (9th Cir. 2005).

In <u>United States v. Mendenhall</u>, 446 U.S. 544 (1980) the Supreme Court held that the evidence supported the finding that the defendant voluntarily accompanied agents from the airport concourse to the Drug Enforcement Administration office. Non uniformed agents had approached Mendenhall and after identifying themselves as federal agents requested but did not demand to see her identification and airline ticket in a public concourse at an airport. She was not expressly told by the agents that she was free to decline to cooperate with their inquiry. The fact that she might have felt threatened by the officers, though relevant, was not a decisive factor in determining whether she voluntarily accompanied the officers in the airport concourse to the DEA office.

Directing Wells to report to a building other than that designated as the crime scene itself added no further restraint on his freedom to depart. In <u>United</u>

States v. Edwards, 442 F.2d 122 (9th Cir. 1971) an officer investigating a stolen vehicle asked the defendant to follow him to the police station where the discrepancies of the license plates on the various documents provided by the defendant could be resolved. The court denied the defendant's motion to suppress finding that the record established that the statements sought to be suppressed were obtained during investigatory, on-the-scene questioning and that Miranda warnings therefore were not required. This court concludes that Wells was not in custody within the meaning of Miranda merely because he was led to a room for questioning during an on-the-scene investigation.

On April 12, 2012 the T1 Building was a crime scene and the USCG Command directed all workers at T2, including Mr. Wells to report to the T1 building. In Bassignani the district court found that the detectives after approaching Bassignani from behind and "asking him to remove himself from the computer," "instructed" Bassignani to go to the conference room. The Ninth Circuit court recognized that "an instruction" is short of an "order," but that it was plain under the facts of that case that Bassignani did not voluntarily agree to accompany officers to the conference room. In the present case, Wells voluntary accompanied the two agents to the interview room. From the totality of the circumstances in this case the magistrate judge surmises that Wells welcomed the opportunity to plant his alibi with the agents. He knew he was a suspect because he worked in the rigger shop.

In United States v. Fernandez-Ventura, 132 F.3d 844 (1st Cir. 1998) defendants who were questioned by customs officials at an airport were not in custody for Miranda purposes even though one defendant was taken directly to a secondary inspection and the defendants were not free simply to walk away from the officials who were armed. The defendants were detained for over an hour. The court reasoned that in the context of customs inspections the assessment whether the interrogation was custodial must take into account the strong governmental interests in controlling its borders. Similarly, the Coast Guard had a strong governmental interest in controlling its installation, and law enforcement had a strong interest in controlling the crime scene.

In United States v. Dockery, 736 F.2d 1232 (8th Cir. 1984), the U.S. Court of Appeals for the Eighth Circuit sitting en banc, overturned the ruling of an earlier panel majority and held that the defendant who was questioned about embezzlement by FBI agents was not in custody for purposes of Miranda warning. There, a bank employee suspected of embezzlement had at the request of the employer submitted to questioning by the FBI agents in a small room in the back. The court held that although the defendant was directed by the employer to submit to questioning, this was not significantly different from when a defendant is interviewed at her home. Dockery's freedom of movement was restricted but not by the actions of the government officials but by her voluntary obligation to her employer. In the instant case it is unlikely that Wells felt free to leave the installation

on Building T1 because of his employer's request, but he was not compelled by the law enforcement agents to accompany them to the interrogation room.

Wells was "a suspect" when he was led to the interview room. He was not told he was free to leave the building, but he was not physically restrained, handcuffed or subjected to anything other than inconvenience or delay. Wells did not possess unrestrained freedom of movement during the questioning although he was offered food, water and a chance to receive medication throughout the interviews. According to the agents the questioning on April 12 was essentially one continuous interview with intermittent breaks while the officers compared notes with other agents. The interview was essentially amicable and the agents and Wells occasionally laughed. The language used to summons Wells to the interview room did not place him in custody.

## B.    Confronting Suspect With Evidence of Guilt

The second factor to consider in determining whether the accused is in custody is the extent to which he is confronted with evidence of guilt. The court has considered the language used by the agents during their questioning of Wells. The topics of each session are summarized below. According to Agent Oberlander, in their interview the agents tried not to be blatantly accusatory.

Courts have found a defendant to be in custody when the interrogator adopts an aggressive, coercive, and deceptive tone. *See* United States v. Beraun-Panez, 812 F.2d 578, 579 (9th Cir. 1987) (Officers told defendant that witnesses had

placed him at the scene).  In <u>United States v. Wauneka</u>, 770 F.2d 1434, 1439 (9th Cir. 1985),  Wauneka was told that he supplied information that only a perpetrator would know and that he matched the description of the rapist, thus he had better tell the truth.   Police questioning constitutes interrogation  when there is either expressed questioning or the functional equivalent, which the police should realize is "reasonably likely to elicit an incriminating response from the suspect." <u>Rhode Island v. Innis</u>, 446 U.S. 291, 300-01 (1980).

Wells was isolated from others when he was questioned and this in a sense arguably adds an element of psychological coercion. In the instant case there was no formal arrest of Wells on April 12 or 13, 2012 nor was he restrained as to his freedom of movement to the degree associated with a formal arrest.  There is no evidence that any of the employees who were questioned on April 12, 2012 at Building T1 were arrested or treated as if they were under arrest.

Investigative detention such as an investigatory stop is not custodial interrogation triggering the protections afforded by <u>Miranda</u>.   <u>United States v. Woods</u>, 720 F.2d 1022 (9th Cir. 1983). The fact that an interrogation is not random and focuses on a particular defendant does not automatically render it custodial. <u>United States v. Galloway</u>, 316 F.3d 624 (6th Cir. 2003).  "Custody" is not to be equated with "coercive environment." <u>Oregon v. Mathiason</u>, 429 U.S. 492 (1977). The Supreme Court has not determined a need for <u>Miranda</u> warnings based on the coerciveness of the environment in which the suspect is interrogated.  Rather, the

Supreme Court has made clear that custody must be interpreted in a formal sense. *Id.* Custody under Miranda involves a restraint on a suspect's freedom of movement "to the degree associated with formal arrest." Minnesota v. Murphy, 465 U.S. 420, 430 (1984).

In Stansbury v. California, 511 U.S. 318 (1994), a man who was considered a witness rather than a suspect accompanied police to their station house for questioning. During the course of that questioning, police began to suspect him of having committed a crime. They ceased the interview and read him the Miranda warnings. At trial he moved to suppress his pre-warning statements. The trial court denied the motion and Stansbury was convicted of murder, rape, kidnaping and lewd act on a child under the age of 14. The California Supreme Court affirmed. Before determining whether Stansbury was in custody for purposes of Miranda, the court set out what it believed was the applicable legal standard in deciding the custody issue. The California Supreme Court reasoned that the interrogation became custodial when suspicion focused on the defendant. 511 U.S. at 321-22. The U.S. Supreme Court remanded the case for reconsideration and explicitly stated that the officer's subjective and undisclosed beliefs about whether the interviewee was a suspect was irrelevant to the Miranda determination. *Id.* at 323-26.

Berkermer v. McCarty, 468 U.S. 420 (1984), involved a traffic stop during which the officer elicited incriminating statements from the suspect. The court

held that the traffic stop, though a seizure, failed to implicate the coercive aspects of a station-house interrogation and failed to constitute Miranda custody. The court rejected the argument that the officers "unarticulated plan" to arrest the suspect had any bearing on the determination of custody. 468 U.S. at 442. *See* also United States v. Willoughby, 860 F.2d 15, 23 (holding that incarceration does not necessarily constitute Miranda "custody").

Stansbury and Berkermer establish that a person interviewed is not entitled to Miranda warnings merely because he may have been the focus of an investigation. It is the compulsive aspect of custodial interrogation, "and not the strength or contact of the government's suspicion at the time the questioning was conducted" which impose the Miranda requirements. *See* Stansbury, 511 U.S. at 323. The overreaching "custody" question depends on whether a reasonable person in the suspect's position would have understood himself or herself to be "subjected to restraints comparable to those associated with a formal arrest." Berkermer, 468 U.S. at 441.

During the first four sessions of the Wells interrogation, the physical surroundings of the interrogation were that of a crime scene where Wells was questioned without pressure to confess. The officers were engaged in a fact finding inquiry regarding the ongoing nature of the homicides and security of the Coast Guard facility. Wells was not confronted with evidence of his guilt during this questioning. There is nothing about Wells' age, intellect or experience that rendered

this initial interrogation unusual or more coercive. When the agents conducted the "gun shot residue test" in the fourth session with Wells' consent, the focus of this test arguably was on Wells as a suspect. This observation does not change the magistrate judge's assessment that Wells was not in custody for purposes of Miranda. It is just as likely that the agents were trying to rule Wells out as a suspect. *See* Agents' statements at Docket 138-5, p.1.

When agents decided to continue the questioning to another day, Agent Oberlander told Wells that because he had been working in the shop for a long time he might be able to answer questions while agents were still investigating the shop (crime scene). Wells responded: "alright." Prior to Miranda rights being administered to Wells, the agents gathered information from Wells for their investigation, but in a non accusatory manner.

## C.    Physical Surroundings of Interrogation

The interrogations took place in Building T2, the Command situs for the Coast Guard station at Kodiak. The two officers and Wells sat around a table in a relatively small room. The agents wore civilian clothes and Agent Oberlander surmised that the pistols they were carrying would not have been visible to Wells. At no time was a weapon shown or pulled out of its holster, nor was any threat made against Wells to coerce him to talk with the agents.

The Ninth Circuit Court of Appeals has found a defendant not in custody when the officers did not attempt to challenge the defendant's statement with other

'known facts' suggesting his guilt, and merely ask him about the allegations.  United States v. Norris, 428 F.3d 907, 913 (9th Cir. 2005).    The questioning of Wells in the first five sessions was not confrontational.  When Wells was finally confronted with evidence of his guilt he invoked his right to remain silent. The defense argues that the degree of pressure imposed upon Wells when the agents searched his property and checked his phone means that he was in custody for Miranda.  The agents did not search Wells' vehicle and phone without his consent to do so.

The Ninth Circuit has said that the issue is properly articulated as "taking into account the totality of the circumstance," to decide "whether a reasonable person [in defendant's] position would have felt deprived of his freedom of action in any significant way, such that he would not have felt free to terminate the interrogation.  United States v. Craighead, 539 F.3d 1073, 1083 (9th Cir. 2008). Several factors identified by the Ninth Circuit in Craighead are relevant to the inquiry of whether the questioning took place in a police dominated atmosphere:

> "(1) the number of law enforcement personnel and whether they were armed; (2) whether the suspect was at any point restrained, either by physical force, or by threats; (3) whether the suspect was isolated from others; and (4) whether the suspect was informed that he was free to leave or terminate the interview, and the context in which any of such statements were made.

In Craighead, under the facts of that case, the court found the defendant was physically detained in his home and thus, the failure to administer Miranda warnings made his statements inadmissible. In this case Wells was not restrained or threatened, but he was not informed that he could terminate the questioning. There were only two law officers present and they did not display or draw attention to the their weapons. Other employees were being interviewed nearby. Wells was located at the site of his employment, not a police building. The physical surroundings themselves do not render Wells in custody. He was not questioned in a police atmosphere confronting him with evidence of guilt.

In Behler, supra, the Supreme Court held that in determining whether a police interview is custodial the fact that the individual is in a "coercive environment" is not controlling since every police interview has coercive aspects. The "ultimate question is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *Id.* at 1124-25.

Prior to receiving the Miranda warning, Wells was asked questions without being confronted with evidence of guilt or challenged as to his truthfulness. The agents probed Wells' alibi concerning the flat tire, but the agents did not challenge his responses to their questions. The agents did not accuse Wells of having a motive to commit the crimes.

### D.    Duration of Detention

One of the factors to consider in determining custody is the duration of the detention. The separate interview sessions were neither long nor did they deprive Wells of the opportunity to use the bathroom facilities or get a drink of water. Wells alleges he was detained for over 13 hours at T1 on April 12, 2012 and about 5 hours on April 13, 2012. Because these were work days and Wells' immediate work station was a crime scene, he was directed to report to T2 and be available for investigators. Wells was interrogated on April 12 after other potential suspects had been questioned. He was allowed to mingle with other workers in the ET (conference) space when he was not being questioned. His total interrogation time on April 12 was less than an hour.

### E. Degree to Pressure by Agents

In <u>United States v. Beraun-Panez</u>, 812 F2d 578 (9th Cir. 1987) the appellate court upheld the ruling that the defendant although not physically bound was subjected to psychological restraints and thus in custody during interrogation. The agent had repeatedly accused the defendant of lying, confronting him with false or misleading statements, employing good guy/bad guy tactics, taking advantage of a defendant's insecurities about his ailing status, and keeping him separated from his co-workers in a remote rural location insisting on the "truth" until he told them what they sought. *Id.* at 580. In this setting the court ruled that a person would believe that he was not free to leave.

The court cited Judge Friendly's decision in United States v. Hall, 421 F.2d 540, 545 (2nd Cir. 1969), cert. denied 397 U.S. 990 (1990) for a suspect to be in custody "in absence of actual arrest something must be said or done by the authorities, either in a manner of approach or in the tone or extent of their questioning, which indicates that they would not have heeded a request to depart or to allow the suspect to do so." In the instant case, no such statements or actions were done by the agents that could be construed as constructively placing Wells in custody for purposes of Miranda.

## F. Whether Interrogation was Custodial Under Totality of Circumstances

In United States v. Allen, 699 F.2d 453 (9th Cir. 1982) the court upheld the district court's determination that the defendant was not in custody when it denied Allen's motion to suppress statements he made with his first meeting with ATF agents concerning ownership of a gun and its location which were relied upon to establish probable cause for a search warrant. The Ninth Circuit stated that whether a person is in custody for purposes of Miranda is answered by reviewing the "totality of facts involved at the time of the alleged restraint." Id. at 458.

Not every statement of a suspect held in custody implicates the Miranda procedures. The concept of interrogation "must reflect a measure of compulsion above and beyond that inherent in custody." Rhode Island v. Innis, 446 at 300-01. In United States v. Hall, 421 F.2d 540, 545 (2nd Cir. 1969), cert. denied 397 U.S. 990 (1970), Judge Friendly stated that for a suspect to be in custody, in the absence of

an actual arrest, something must be said or done by the authorities either in their manner of approach or in the tone or extent of their questioning, which indicates they would not have heeded a request to depart or to allow the suspect to do so.

To summarize the Kim factors relevant to the custody determination, the manner and language used to summons Wells to Building T1 and then to the office where the questioning took place did not place Wells into custody for purposes of Miranda. This does not mean that he was never in custody for that purpose. The office where Wells was questioned was typical for an interrogation room both in size and configuration. There were two agents seated at the table with Wells and the door was closed for privacy. No threats were made to encourage Wells to participate in the questioning and he was not told what might happen to him if he declined the interviews. He was not given an opportunity to decline to participate in the interviews. That is to be expected under the circumstances. Wells was one of the few people who worked In the building where the homicides took place. He worked for and with the victims and knew the working climate. Therefore, he would be a suspect or a possible victim in the loss of his fellow workers.

Law officers wanted to talk to him about some of the surrounding circumstances. The duration of Wells' detention was nothing unusual given the extent of the investigation at this stage with other people to interview and the need of interrogating officers to corroborate with other officers in sharing information.

### III.    Voluntariness of Statements

Wells alleges that his statements to the agents during his interviews on April 12 and 13, at COMMSTRA were not made voluntarily. His claim that he provided statements only because he was under the COMMSTRA command to do so is not factually correct. Command never ordered him to give statements. His claim that his statements were coercive because he was denied medication or appropriate food is factually incorrect.

Wells also claims that the Coast Guard and FBI interrogators subjected him to coercive conduct by detaining him until late at night. Wells was interviewed several times on April 12, as the agents gathered information from on-the-scene investigation and interviews with other Coast Guard workers. Although April 12 was long day for Mr. Wells the questioning was not of such duration that it was coercive. The colloquy between Wells and the agents does not indicate that he was being worn down by the interrogators talking to him after normal work hours on a piece meal approach.

A statement obtained through coercive conduct which undermines a suspect's ability to exercise his free is involuntary. Colorado v. Connelly, 479 U.S. 157, 167 (1986). Coercive conduct may include the application of psychological pressure to elicit a statement. Mincey v. Arizona, 437 U.S. 385 (1978). The government bears the burden of demonstrating voluntariness by preponderance of the evidence based upon an assessment of the totality of the circumstances. Lego

v. Twomey, 404 U.S. 477, 489 (1972); Schneckloth v. Bustamonte, 412 U.S. 218, 224 (1973).

Any interview by law enforcement officers of an individual suspected of committing a crime has "coercive aspects to it." Oregon v. Mathiason, 429 U.S. 492, 495 (1977). In Dickerson v. United States, 530 U.S. 428, 435 (2000) the Supreme Court held that only those interrogations that occur while a suspect is in police custody "heighte[n] the risk" that statements obtained are not the product of the suspect's free choice.

Based upon such an assessment of the totality of the circumstances, the court concludes under a preponderance of the evidence that Wells' statements are the product of an essentially free and unconstrained choice and not that of any compulsion of whatever nature.

### IV.    Miranda Waiver

A waiver of Miranda rights must be voluntary, knowing, and intelligent. United States v. Garibay, 143 F.3d 534, 536 (9th Cir. 1998). The government bears the burden of proving a waiver of Miranda rights by a preponderance of the evidence. United States v. Cazares, 121 F.3d 1241, 1244 (9th Cir. 1997). The relinquishment of Miranda rights must be voluntary in the sense that it was a product of a free and deliberate choice rather than intimidation, coercion, or deception. Moran v. Burbine, 475 U.S. 412, 421 (1986).

Wells was advised of his <u>Miranda</u> rights in a somewhat piece meal fashion. Agent Oberlander explained in his testimony that Wells kept asking questions that prolonged the completion of the advisement of rights. This does not mean that the waiver of <u>Miranda</u> rights was not valid. <u>Miranda</u> requires that prior to any questioning the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has the right to the presence of an attorney either retained or appointed. 384 U.S. at 344-345. Failure to provide these warnings requires suppression of any statements taken from the accused in a custodial context.

In Session 5, the discussion of the <u>Miranda</u> warnings in the colloquy first came up at Docket 138-6, p.7. Wells stated that he was a little concerned. Wells was told that he did not have to talk to the agents and he indicated that he understood. He was told that anything that he said could be used against him in court. When asked if he understood, Wells responded: "Uh, huh." Agent Oberlander added that he had the right to talk to a lawyer for advice before they asked him any questions and Wells indicated that he understood. There was a discussion about completing the waiver form and Agent Oberlander asked Wells if there were any other questions he had that they could answer for him; Wells replied "Nope." Agent Oberlander told Wells that if he agreed, just sign [the waiver form] indicating that you

have read the statement of your rights and understand what those rights are, and you are willing to answer questions without an lawyer present.[3]

After some light talk Kirk Oberlander stated you understand you don't have to talk to us. Wells acknowledged that statement and the agent then advised Wells that anything that he said could be used against him in court and asked him if understood that. Wells' response again was "Uh, huh." The agent advised him that he had a right to talk to a lawyer before they asked him any questions and Wells acknowledged understanding that. Agents then advised him that if he could not afford a lawyer one would be appointed for him before any questioning if desires. The agent added that if he decided to answer questions now without a lawyer present he could still have the right to stop the questioning at any time.

Wells was invited to sign the form if he chose, to acknowledge that he had read the statement of his rights and understood the rights and was willing to answer questions. The waiver form was signed and witnessed and dated April 13, 2012. That occurred at about 11:40 AM.

The agents then asked Wells if he had questions for them. The agents proceeded to ask Wells several more questions and Wells freely answered their questions until they told him he was being accused of committing the murders.

In North Carolina v. Butler, 441 U.S. 369 (1979) the court held that an explicit statement of waiver is not invariably necessary to support a finding that the

---

[3] Wells signed the Advice of Rights and consent form dated April 13, 2012. See Docket 138-9 filed on September 24, 2013.

defendant waived his right to remain silent or the right to counsel guaranteed by Miranda. The question of waiver is determined on "the particular facts and circumstances surrounding that case including the background, experience and conduct of the accused." *Id.* at 374-375, citing Johnson v. Zerbst, 304 U.S. 458, 464 (1938).

An understanding of rights is different from an intention to waive them. Professor LaFave notes: "[W]hen it is clear the defendant does understand his rights it is some what easier to make some judgments about the significance of his subsequent conduct in terms of whether or not those rights are being invoked." *See* 2 Wayne R. LaFave, Criminal Procedure, § 6.9(d) at 831-32 (3rd Ed. 2007). Professor LaFave adds that a finding of waiver is likely when the defendant is engaged in certain conduct following short of an expressed waiver, such as a cooperative attitude.

In Berghuis v. Thompkins, 560 U.S. 370, 130 S.Ct. 2250, 2264 (2010) the Supreme Court held that a suspect who receives and understands the Miranda warnings and does not invoke his Miranda rights waives those rights if he makes an uncoerced statement to the police. Under current federal law Wells' conduct was sufficient to show an implicit waiver of his Miranda rights. Accordingly, the court concludes that Wells knowingly, and intelligently waived his Miranda rights based upon his actions and words during the interview.

The invocation of the right to remain silent may occur when the suspect refuses to answer questions or ask that an ongoing interrogation be terminated. Under these circumstances his request must be "scrupulously honored." Michigan v. Mosely, 423 U.S. 96, 103-04 (1975); Miranda, 384 U.S. at 479. The context of the colloquy that followed the Miranda advisement to Wells and his acknowledgment that he understood the rights shows that he freely and voluntarily agreed to continue to answer questions until he stated that the interview should be terminated.

After considering the evidence adduced, the magistrate judge concludes that Wells not only acknowledged that he understood his rights but effectively waived those rights by freely answering questions posed to him. His conduct was sufficient to show an implicit waiver of his Miranda rights. *See* Berghuis v. Thompkins, 560 U.S. 370, 130 S.Ct. 2250, 2264 (2010) (suspect who receives and understands Miranda warnings and does not invoke his Miranda rights waives those rights if he makes an uncoerced statement to the police.) Wells' statements were made freely, knowingly and voluntarily after he implicitly waived his Miranda rights.

## Summary

The initial questioning of Wells even though constituting a seizure for Fourth Amendment purposes was not custodial for Miranda purposes. A reasonable person would expect to be questioned by officers at a fresh crime scene. Wells had voluntarily reported to work on the morning of April 12, albeit later than his usual time

of arrival. Because he worked with or was supervised by the deceased a reasonable person in Wells' shoes would expect to be asked questions at the scene.

Wells was not able to go to the rigger shop because the building was closed as a crime scene. Wells was not given a choice to go to Building T2. Rather he was directed to do so along with the other Coast Guard employees at that facility. Wells was merely directed to report to a different duty station by his employer and thus he was not in custody for purposes of Miranda by reporting to Building T2.

The evidence shows that prior to the employees being directed to Building T2 a joint investigation had commenced involving the Coast Guard investigators and the Alaska State Troopers and probably local police as well. It was reasonable for the Command to gather every one in a common area to insure their safety, to account for everyone assigned to the Command and to allow law enforcement to begin processing the crime scene. He waited with his co-workers for his turn to be interviewed. During this time he was not in custody within the meaning of Miranda.

Wells was not taken into custody when the officers initiated their questioning. There is no evidence that he was treated any differently than other workers when he was led into a smaller room and interviewed behind the closed door for privacy. Wells voluntarily accompanied the two agents to the interrogation room. No one ordered him to do this. No threats were made against him to encourage him to answer questions.

In the context of a crime scene, a reasonable person would expect some compulsory questioning inherent to the situation. A reasonable COMSTRA employee would expect some constraints as well as questions and followup about his relationship to the deceased and the crime location itself. The fact that other employees were questioned at the same time reduces the likelihood that reasonable persons in that situation would consider themselves to be under arrest.

Although the interrogation took place in a closed room out of public view the agents explained that this was done for the privacy benefits of the person being interviewed. Although Wells was not informed that he was free to go, the officers never drew their weapons; no physical restraints were used; and most importantly a reasonable person would recognize the questions put to Wells as relevant to a routine crime scene investigation.

Applying the above precedent the court has reviewed the transcript of the Wells interviews to determine if the questioning became custodial. Wells was not confronted with any evidence of his guilt. The pre-Miranda questions were designed to determine what had happened, whether a crime was continuing, and what immediate actions were needed to be taken if any, and whether Wells should be considered a prime suspect. As the Supreme Court recognized in Quarles, supra the Fifth Amendment itself does not prohibit all incriminating admissions. "[A]bsent some officially coerced self-accusation, the Fifth Amendment privilege is not violated

by even the most damning admissions." *Id.* at 654, citing <u>United States v. Washington</u>, 431 U.S. 181, 187 (1977).

The Supreme Court in <u>Miranda</u> abandoned the "focus of investigation" as a test to determine when rights attach in confession issues. 384 U.S. at 444, n.4. The test is whether or not the person has been taken into custody or otherwise deprived of his freedom of action in any significant way. *Id.* at 444.

The U.S. Supreme Court has indicated that "custody" in the <u>Miranda</u> context does not necessarily arise merely because questioning takes place in an "inherently coercive" environment such as a station house. Generally a person questioned by officers in familiar surroundings is less likely to feel pressured. In the instant case Wells was not being questioned in a public area but he was in a familiar location at his work site. The officers' manner of interviewing Wells did not render him in custody for purposes of <u>Miranda</u> before the <u>Miranda</u> warnings were given. The statements made by Wells to the law officers were made voluntarily and in compliance with <u>Miranda</u>. His waiver of <u>Miranda</u> rights was the product of a knowing, intelligent and voluntary waiver.

*The Motion to Suppress at Docket 120 should be DENIED. IT IS SO RECOMMENDED.*

DATED this 16th day of January, 2014, at Anchorage, Alaska.

_/s/ John D. Roberts_
JOHN D. ROBERTS
United States Magistrate Judge


Pursuant to D.Ak.L.M.R. 6(a), a party seeking to object to this proposed finding and recommendation shall file written objections no later than **CLOSE OF BUSINESS, January 27, 2014**.

Failure to object to a magistrate judge's findings of fact may be treated as a procedural default and waiver of the right to contest those findings on appeal. The Ninth Circuit concludes that a district court is not required to consider evidence introduced for the first time in a party's objection to a magistrate judge's recommendation.

Objections and responses shall not exceed five (5) pages in length, and shall not merely reargue positions presented in motion papers. Rather, objections and responses shall specifically designate the findings or recommendations objected to, the basis of the objection, and the points and authorities in support.

Response(s) to the objections shall be filed on or before **CLOSE OF BUSINESS, February 3, 2014**. The parties shall otherwise comply with provisions of D.Ak.L.M.R. 6(a).