**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ALASKA**

| | |
|---|---|
| UNITED STATES OF AMERICA | 3:13-cr-00008-RRB-JDR |
| Plaintiff, | |
| vs. | **RECOMMENDATION** |
| | **REGARDING** |
| JAMES MICHAEL WELLS, | **MOTION TO SUPPRESS** |
| Defendants. | (Docket 122) |

Defendant **James Wells** moves to suppress his statements made to

Para Upchurch, a confidential informant working with law enforcement on

August 17, 2012 and September 14, 2012. Wells alleges that these statements

were obtained in violation of his Fifth Amendment right to due process and his Sixth

Amendment right to counsel. Docket 122. The government filed an opposition

acknowledging that the government was aware that the Federal Public Defender had entered into an attorney client relationship with Mr. Wells. It is the government's position that because these statements were taken before Wells had been formally charged with a crime, the Sixth Amendment right to counsel did not apply. The government denies that it engaged in any investigative misconduct, any improper collection of defense information, or conduct that had any effect on Wells' attorney client relationship and thus did not violate due process. Docket 134.

Wells filed a reply at Docket 144 arguing that the government is not permitted to use a non government actor to contact a criminal suspect, and the law prohibits the government from using an informant to contact the suspect. Wells alleges that the government "attempted to subvert his right to counsel and right against self incrimination."

An evidentiary hearing was conducted before the magistrate judge on November 16, 2013. Para Upchurch and Sue Ellen Tatter testified for the defense. Special Agent Aaron Woods Coast Guard Investigative Service, testified for the government. Upon due consideration, the court concludes that neither defendant's Fifth or Sixth Amendment rights were violated by the government's informant.

### Findings of Fact

On April 12, 2012, two Coast Guard employees, Electronic Specialist First Class James A. Hopkins and retired Chief Boatswain's Mate Richard W. Belisle were shot and murdered shortly after they arrived at the rigger shop at Coast Guard

COMMSTA Kodiak at about 7:00 AM. James Wells a fellow coworker of the victims was scheduled to be at work at the time of the murders but was absent until sometime after 8:00 AM due to an alleged flat tire.

A confidential witness, Para Upchurch, agreed to wear a body recording device during discussions she had with James Wells. Recordings of their discussions were made in an August 17, 2012 phone call and in a face-to-face conversation on September 14, 2012.

Sometime in Late May, Ms. Upchurch contacted Coast Guard Investigative Service Agent Aaron Woods and told him that Wells' spouse (Nancy) had contacted her at her residence and implied that there may be an alibi to Jim Wells' whereabouts the morning of the homicides. Tr. 35.[1] Several days later Agent Woods contacted Upchurch to see if she would be interested in wearing a recording device and having a monitored conversation with Mr. Wells. She expressed some reluctance because of the close relationship they had, but she eventually agreed. Tr. 35.

The defense argues that Upchurch was "not necessarily a volunteer." Transcript of Proceedings, Docket 233, p.4. Although Ms. Upchurch did initially agree to help with the investigation, then declined, she changed her mind again and voluntarily agreed to participate with a recording device. Tr. 20. Upchurch had

---

[1] Transcript of Testimony, hearing held November 18, 2013, Docket No. 187.

worked with Wells in the rigger shop and had established a good working relationship with him as well as having had social interaction with him. The government agents told Upchurch it was her choice to let them know if she decided to assist them. They shared with Ms. Upchurch some of the reasons why they considered Jim Wells a suspect and asked her to think about it.

No one threatened Upchurch or forced her to make the phone calls or contact Wells nor was she paid for her participation. She was not ordered to participate by her chain of command. Agent Woods told Upchurch to let the conversation flow and just have a general conversation. Agent Woods told her some topics he hoped she might discuss with Wells. He told her not to discuss anything about legal advice that Wells had received. He told her if that topic came up, to redirect the conversation. She was told to record any conversation about the alibi if the subject came up.

Assistant Public Defender Sue Ellen Tatter first met Wells on April 23, 2012 in Kodiak. She also met with Assistant U.S. Attorney Dan Cooper in Kodiak that day. Ms. Tatter told Mr. Cooper that Wells did not want to be interviewed by the government without a lawyer present. Ms. Tatter continued to represent Wells past the time Ms. Upchurch recorded her conversations with Wells. Ms. Tatter has no present memory about whether she advised Wells to be careful who he talked to because that person may talk to law enforcement. Tr. 30.

At the time of the conversations, Wells was unaware that the

government's witness was recording them on behalf of government investigators. Wells was not indicted for these homicides until February 2013.

## Discussion

### A.     Sixth Amendment Claim

The Sixth Amendment right to counsel attaches at the first formal proceeding against an accused. McNeil v. Wisconsin, 501 U.S. 171 (1991); Moran v. Burbine, 475 U.S. 412, 430 (1986). A formal charge is the point at which the adverse positions of government and defendant have solidified and the government has committed itself to prosecute. Kirby v. Illinois, 406 U.S. 682, 689 (1972). The Sixth Amendment defines the scope of the constitutional right to counsel regarding when the right may be asserted as "in all criminal prosecutions."

In Kirby a plurality of the court held that the prosecution's evidence of a robbery victim's one-on-one station house identification of an un-counseled suspect shortly after the suspect's arrest was admissible because the adversary judicial proceedings had not yet been initiated. Id. at 226-227. The Supreme Court has also rejected the idea that the right to counsel entitles a defendant to a pre-indictment private investigator. United States v. Gouveia, 467 U.S. 180, 191 (1984).

In Rothgery v. Gillespie County, Tex., 554 U.S. 191 (2008), the court held that the assistance of counsel is guaranteed at "critical stages" of the prosecution including pretrial interrogation to provide a fair trial. The phrase "pretrial" is not the equivalent of "pre-accusation." The court held that the criminal defendant's

initial appearance before the Magistrate marked the initiation of adversary proceedings that trigger attachment of the Sixth Amendment right to counsel.

The Supreme Court has never held that the right to counsel attaches at the time of arrest. <u>Gouveia</u>, 467 U.S. at 190. The mere possibility of prejudice to a suspect resulting from surreptitious recording of his statements is not itself sufficient reason to apply the Sixth Amendment apart from its proper context.

Under the Sixth Amendment a prosecutor and law enforcement officers have an affirmative obligation not to act in a manner that circumvents and thus dilutes the protection afforded an accused by the right to counsel. <u>Maine v. Moulton</u>, 474 U.S. 159 (1985). There, the Court held that the State violated the Sixth Amendment rights of a defendant (Moulton), who had already been charged with committing crimes, when it arranged to record conversations between the defendant and a cooperating co-defendant at a meeting of the two to plan defense strategy for the upcoming trial. The government's obligation to refrain from acting in a manner that circumvents or dilutes the protection afforded by the right to counsel applies once the right to counsel has attached and been asserted.

<u>Moulton</u> is distinguishable on its facts because it relates to events that occurred after the Sixth Amendment right to counsel has attached. The holding did not relate to statements which were recorded at a time when adversary proceedings had not yet commenced. Under the circumstances in <u>Moulton</u>, the court found that the cooperating co-defendant's participation in the conversation was the functional

equivalent of interrogation. The police knew that since Moulton and Colson were meeting for the purpose of discussing the pending charges and planning a defense, Moulton would make statements that he had a constitutional right not to make to law enforcement prior to consulting with counsel. By concealing the fact that Colson was an agent of the State, the court ruled, the police denied Moulton the opportunity to consult with counsel guaranteed by the Sixth Amendment.

The Sixth amendment becomes applicable only when the government's role shifts from investigatory to accusation through the initiation of adversary judicial proceedings. Moran v. Burbine, 475 U.S. 412 (1986). Wells cites Moran v. Burbine, for his contention that the Sixth Amendment applies "When the government's role shifts from investigation to accusation." Docket 123, p.4. That "shift" occurs when formal accusation occurs, not when the government's focus of investigation is upon the suspect, or even when the government agents have enough probable cause information to bring a formal charge against the suspect.

In Burbine, the Supreme Court held that the failure of police to inform the defendant of the efforts of an attorney who had been retained by defendant's sister without his knowledge, to reach him did not deprive the defendant of his right to counsel. Burbine had not been formally charged.

In Burbine the defendant argued that the right of no interference with an attorney's dealings as a criminal suspect arises the moment that the relationship is found. The Supreme Court rejected that argument. 475 U.S. at 429. The

statements recorded by Para Upchurch were not taken in violation of the defendant's Sixth Amendment right to counsel.

### B.    Fifth Amendment Claims

The Fifth Amendment states that no person "shall be compelled in any criminal case to be a witness against himself . . . ."  Thus, a defendant may not be compelled or coerced into saying anything before trial.  Whether as a matter of self-incrimination or of due process, the proscription is against compulsion – coerced incrimination.  Massiah v. United States, 377 U.S. 201, 210 (1964).[2]  Here, there was no coerced or compelled self-incrimination.  A defendant's remedy for prosecutorial misconduct in the pre-indictment stage is provided in the due process protections of the Fifth Amendment.  United States v. Marion, 404 U.S. 307, 315 (1971); United States v. Simmons, 536 F.2d 827, 830 n.9 (9th Cir. 1970).

To constitute a Fifth Amendment violation for outrageous government conduct the conduct at issue must be fundamentally unfair and "shocking to the universal sense of justice, mandated by the Due Process Clause of the Fifth Amendment."  United States v. Russell, 411 U.S. 423, 432 (1973).  The issue here is whether prior to formal accusation the government's use of an informer to record the defendant's self-incriminating statements reaches such a demonstrable level of

---

[2] In Massiah, the petitioner relied on the Fourth, Fifth and Sixth Amendments to suppress his incriminating statements.  The Supreme Court decided the case only under the Sixth Amendment since petitioner Massiah had been indicted when the federal agents elicited his incriminating statements to his co-defendant.  The instant case is distinguishable because Wells' constitutional right to counsel under the Sixth Amendment had not yet attached.

outrageousness to constitute a due process violation.

With regard to the outrageous conduct allegation, the offensive conduct is limited to extreme cases in which the defendant can demonstrate that the government's conduct violates fundamental fairness and is so grossly shocking and so outrageous as to violate the universal sense of justice. In United States v. Black, 733 F.3d 294, 302 (9th Cir. 2013) a reverse sting operation employed by government agents did not constitute outrageous government conduct.

Neither party has cited to the court case law based on facts similar to those found here. There is no bright line dictating when law enforcement conduct crosses the line between acceptable and outrageous conduct; every case must be resolved on its own particular facts. *Id.* Outrageous government conduct is a highly fact-sensitive legal issue. It is not outrageous for the government to "use artifice and stratagem to ferret out criminal activity." *Id.* citing United States v. Bogart, 783 F.2d 1428, 1438 (9th Cir. 1986), vacated in part on other grounds, sub nom United States v. Wingender, 790 F.2d 802 (9th Cir. 1986) (Order); Sorrells v. United States, 287 U.S. 435, 441 (1932).

In United States v. Voigt, 89 F.3d 1050 (3rd Cir. 1996) the court held that the district court should have conducted an evidentiary hearing on whether the government had engaged in outrageous conduct by using an attorney as an informant when she was allegedly representing the defendant. The court acknowledged that the Supreme Court has recognized that outrageous misconduct

by a law enforcement officer in detecting and obtaining incriminating evidence can rise to a level of a due process violation, citing Rochin v. California, 342 U.S. 165 (1952) (Vacating conviction and dismissing indictment where police had pumped stomach of suspected drug pusher to obtain incriminating evidence).

Essentially the conduct of law enforcement agents must be so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction. The conduct must violate that "fundamental fairness, shocking to the universal sense of justice" mandated by the Due Process Clause of the Fifth Amendment. The court in Voigt, noted that the judiciary is extremely hesitant to find law enforcement conduct so offensive that it violates the Due Process Clause. Under the court's review of case law in Voigt, a claim of outrageous conduct premised upon deliberate intrusion into the attorney client relationship will be cognizable where the defendant can point to actual and substantial prejudice in his attorney relationship. *Id.* at 1066.

In United States v. Ofshe, 817 F.2d 1508 (11th Cir.), cert. denied 484 U.S. 963 (1987), the government used a defense attorney as an informant against the defendant in a matter unrelated to the subject of the attorney's representation (a drug prosecution). With the attorney's permission, the government placed a body bug on him, to record conversations with the defendant. The Eleventh Circuit concluded that the government's misconduct was not so outrageous as to violate the Fifth Amendment. *Id.* at 1516.

A Fifth Amendment violation may occur when the government interferes with the defendant's attorney-client relationship resulting in ineffective assistance of counsel. No facts have been alleged that support any government interference with Wells' relationship with his attorney(s). Ms. Upchurch did not provide legal advice to Wells, or obstruct his relationship with his attorney as in Moulton, supra. *See* also United States v. Owen, 580 F.2d 365 (9th Cir. 1978) (upholding denial of dismissal of indictment for alleged interference by government agent with right to counsel by pressing defendant to supply incriminating information against counsel).

One decision that ordered a dismissal of an indictment due to pre-indictment intrusion into the attorney-client relationship found the intrusion to be so pervasive and prejudicial as to be considered "outrageous." United States v. Marshank, 777 F. Supp. 1507 (N.D. CA 1991). In Marshank, an attorney for two cooperating defendants, provided information to the government leading to the indictment of another one of his clients. Attorney Minikin then encouraged the client to cooperate with the government in order to secure an indictment against Marshank with whom Minikin also had an ongoing attorney client relationship. The court found the government's active encouragement of impropriety egregious and not just passive tolerance.

The recorded conversations of Wells by Upchurch took place before the admonitions given in adversary judicial proceedings. The conduct challenged here falls short of the kind of "misbehavior" that . . . shocks the sensibilities of civilized

society" as to warrant judicial relief. *Id.* The conduct of the law officers wiring a worker associate of Wells to record their conversation was not so offensive as to deprive Wells of the fundamental fairness guaranteed by the Due Process Clause of the fifth Amendment.

Wells cites <u>United States v. Irwin</u>, 612 F.2d 1182, 1185 (9th Cir. 1980) for its statement that the Sixth Amendment applies pre-indictment where government interference with a defendant's relationship with his attorney renders counsel's assistance ineffective. He argues that the Fifth Amendment right to due process and protection from self-incrimination as well as the Sixth Amendment right to counsel are violated when government intrusion "substantially prejudices" the defendant. He states that this prejudice may occur when the government undertakes actions that give the prosecution an unfair advantage at trial. He maintains that such prejudice will occur in this prosecution if the government is allowed to use statements made by him to the government's informant while he was represented by counsel prior to indictment.

The factual background in <u>Irwin</u> indicates that he was arrested by the Denver police department for possession of cocaine. In exchange for dismissal of the criminal charge against him he agreed to become an informant for the police department. Subsequently he met a DEA agent (Darrell Wisdom) who was posing as a large scale drug dealer. Irwin did not know that Wisdom was an undercover agent although Wisdom was working as a confidential informant for the Denver

police. Based upon Irwin's negotiations with Wisdom, DEA agents later informed the Denver police that they thought Irwin was double dealing, that he was acting as an informant and selling drugs on the side. At trial, the government's theory was that although Irwin was working as a informant for the Denver police, he was also trafficking in drugs. The district court denied Irwin's motion to dismiss, without an evidentiary hearing, and stated that any exculpatory statements made by Irwin to government agents subsequent to his arrest and appointment of counsel would be suppressed.

On appeal, Irwin argued that the indictment should have been dismissed because the government's gross intrusion into the attorney-client relationship deprived him of his Fifth and Sixth Amendment rights. Irwin argued that DEA Agent Wisdom caused him to ignore the advice of his attorney that he not talk to or actively work with police or a government agent and also urged him to resume his activities as a government informant. The Ninth Circuit Court of Appeals stated that not all police action which arguably could be called an interference with the attorney-client relationship is violative of the Fifth or Sixth Amendments.

Citing Weatherford v. Bursey, 429 U.S. 545 (1977) the Irwin court recognized that the Sixth Amendment does not establish any per se rule. Weatherford held that when conversations with counsel have been overheard, the constitutionality of a conviction depends on whether the overheard conversations have proved directly or indirectly any of the evidence offered at trial.

Irwin also cited United States v. Glover, 596 F.2d 857 (9th cir. 1979) wherein the court stated that "[n]ot all police action that arguably could be called an interference with the attorney-client relationship is violative of the Sixth Amendment right to counsel." In Glover the court stated "the principle that the existence or non existence of prejudicial evidence derived from an alleged interference with the attorney-client relationship is relevant in determining if the defendant has been denied the right to counsel." *Id.* at 863-64. In Glover the court found that the defendant had not been prejudiced and found no Sixth Amendment violation.

From these cases, the court in Irwin stated: ". . . it is apparent that mere government intrusion into the attorney-client relationship, although not condoned by the court, is not of itself violative of the Sixth Amendment right to counsel. Rather, the right is only violated when the intrusion substantially prejudices the defendant." 612 F.2d at 1187. The court gave examples of how prejudice can manifest itself. One is by use of confidential information pertaining to the defense plan and strategy or the use of confidential information which destroys the defendant's confidence in his attorney. There is no evidence of that use in the present case. The court stated that prejudice could also result from evidence gained through the interference if it is used against the defendant at trial. This discussion occurred in the context of the alleged violation of the Sixth Amendment right to counsel. Under the facts of the instant case the attorney-client relationship was not impacted by the use of the government's investigative tactic with Ms. Upchurch.

Wells seeks to combine the Fifth and Sixth Amendment protection by arguing that the evidence gained through the use of the informant Upchurch would prejudice him at trial and thus violate his due process rights under the Fifth Amendment. The missing link in this argument is that there is no direct intrusion into Wells' attorney-client relationship.

In Illinois v. Perkins, 496 U.S. 292 (1990), an undercover law officer posing as a fellow inmate was not required to give Miranda warnings to an incarcerated suspect before asking him questions that may elicit an incriminating response because the suspect was never in a coercive atmosphere. The police placed an undercover officer in an inmate's cell block after receiving a tip that the prison inmate had committed an unsolved murder. The false sense of security did not rise to the level of compulsion. The court held that Miranda does not forbid mere strategic deception by taking advantage of a suspect's misplaced trust.

In Perkins, the state court of appeals concluded that Miranda "prohibits all undercover contacts with incarcerated suspects that are reasonably likely to elicit an incriminating response. 496 U.S. at 295. The Supreme Court disagreed and reversed observing that "[c]onversations between suspects and undercover agents do not implicate the concerns underlying Miranda." Perkins, 496 U.S. at 296. The court continued: "The essential ingredients of a police-dominated atmosphere and compulsion are not present when an incarcerated person speaks freely to someone whom he believes to be a fellow inmate." Id. (citations and internal quotation marks

omitted). The Fifth Amendment privilege against self-incrimination, the court recalled, is triggered by custodial interrogation, but the "custody in a technical sense" to which prisoners are routinely subjected. *Id.* at 297, is not the coercive custody contemplated by Miranda. *See* also Howes v. Fields, ___ U.S. ___, 132 S.Ct. 1181, 1189 (2012) (explaining that "custody, in the Miranda context, "is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion"); Montejo v. Louisiana, 556 U.S. 778, 795 (2009) (emphasizing that "[i]f the defendant is not in custody then" Miranda and Edwards "do not apply").

It was irrelevant in Perkins that the incriminating statements were made in prison. The same result would have been obtained had the suspect's dialogues with the undercover officer taken place in the suspect's home or business. It is clear that the police were not operating under the incumbrance of a preexisting invocation of the suspect's Fifth Amendment rights. *See* Justice Brennan's concurring opinion in Perkins, 496 U.S. at 300.

In the instant case the magistrate judge has listened to the taped conversation(s) between Upchurch and Wells. This questioning did not take place in a police dominated atmosphere nor was Wells interrogated by Upchurch. Wells was not in custody nor questioned in an atmosphere of official coercion. There were no officers present. He was not forbidden access to anyone including his attorney. No promises, benefits or threats were made to Upchurch to obtain her cooperation. Upchurch was under no order by law enforcement or her employer to become an

informer. The agents did not direct the informer to ask particular incriminating questions. Nor did Upchurch resort to physical or psychological persuasion to elicit the statements. There was no attempted intrusion into Wells' attorney-client relationship, for example, to gain access to confidential defense strategy such as in United States v. Levy, 577 F.2d at 200 (Sixth Amendment claim). An unindicted suspect runs the risk that when he talks to a friend that friend may decide to disclose information about the suspect's criminal activities.

It is clear that if the police engage in objective behavior constituting impermissible trickery, deceit or coercion, that behavior may undermine a suspect's essential knowledge of his rights and the effect of abandoning those rights. Moran v. Burbine, 475 U.S. at 423. The focus is whether such tricks or deceit led the suspect to conclude that he could speak without consequences. No such impermissible deceit was used by Upchurch to cause Wells to talk freely with her.

Under the totality of circumstances, Wells' statements to Upchurch were voluntary within the meaning of the Due Process Clause. In reaching this conclusion the court has considered the police conduct and the manner in which Upchurch was solicited and instructed, the characteristics of the accused, the conditions of the colloquy, the absence of psychological coercion, threats and material misrepresentations or affirmative acts of trickery or deceit, the characteristics of the accused including his experience, background, age, education, intelligence and physical and mental state. The court has also considered the place of the colloquy

(Wells' home), its duration and conditions, and the absence of counsel.

No single factor controls the analysis. Here, there was no police induced coercive environment. No facts suggest physical or psychological deprivation. Wells was sufficiently possessed of his faculties and engaged in rational conversation. The agents instructed upchurch to essentially serve as a sounding board and report any relevant statements by Wells. Wells was in his own home using his own telephone when his statements were recorded; there is nothing inherently coercive about such physical environment.

During the time frame between the murders on April 12, 2012 and August 17, 2012, when Wells' statements to Upchurch were recorded, Wells was represented by the Federal Public Defender's office. Sue Ellen Tatter, Assistant Public Defender testified at the suppression hearing that she could not recall whether she had cautioned Wells about discussing the facts of the case with anyone other than his attorney or informed him that under some circumstances his statement can be used by the government against him at trial. If she had given such advice, then Wells proceeded on his own to ignore that advice by talking to Para Upchurch. If Ms. Tatter did not give such advise then Wells' cannot argue that the use of the informant to record his statements was in conflict with his attorney's advice.

The defendant's argument that the government cannot do indirectly something that it is prohibited from doing directly makes sense as a general

proposition. Had the government attempted to interfere with Wells' attorney-client relationship the government's conduct would not be sanctioned. At the other end of the spectrum the law permits a person in contact with a suspect to voluntarily report any incriminating statements made by the suspect to law enforcement officers. The circumstances in the instant case appear more like the latter than the former. The agents carefully instructed Ms. Upchurch to avoid discussing legal advice. Ms. Upchurch did not direct Wells to talk about an alibi.

Upchurch was requested but not pressured to relay to the officers any statement she heard Wells make about the homicides. As an investigative technique she agreed to wear a wire so that the officers could hear the conversations directly and record them for accuracy. It is clear from the evidence that Upchurch still considered Wells to be a friend. She did not challenge anything Wells told her. Because Upchurch and Wells had worked together and Upchurch was leaving Kodiak Island shortly for a reassignment of duty stations it was only natural that she informed Wells that she hoped he was not guilty of any crime. Wells was interested in learning how Upchurch and other employees of the Coast Guard were being treated by the law officers after he had ceased going to work at the rigger shop. This court is unable to conclude that Wells was denied his constitutional right to due process or right to counsel as a result of the recordings of his colloquy with Para Upchurch in August and September of 2012.

//

**SUMMARY**

The Constitution does not require law enforcement to supply a suspect with information to help him decide if it is in his self-interest to speak or not with a friend or fellow worker. No unfair deception was used to elicit Wells' statements to Upchurch. Wells did not request to confer with his attorney nor did he tell Upchurch anything his attorney may have told him in an attorney-client relationship. The Motion to Suppress Statements at Docket 122 should be DENIED. IT IS SO RECOMMENDED.

DATED this 16th day of January, 2014, at Anchorage, Alaska.


_/s/ John D. Roberts_
JOHN D. ROBERTS
United States Magistrate Judge


Pursuant to D.Ak.L.M.R. 6(a), a party seeking to object to this proposed finding and recommendation shall file written objections no later than **CLOSE OF BUSINESS, 1/27/2014**.

Failure to object to a magistrate judge's findings of fact may be treated as a procedural default and waiver of the right to contest those findings on appeal. The Ninth Circuit concludes that a district court is not required to consider evidence introduced for the first time in a party's objection to a magistrate judge's recommendation.

Objections and responses shall not exceed five (5) pages in length, and shall not merely reargue positions presented in motion papers. Rather, objections and responses shall specifically designate the findings or recommendations objected to, the basis of the objection, and the points and authorities in support.

Response(s) to the objections shall be filed on or before **CLOSE OF BUSINESS, 2/3/2014**. The parties shall otherwise comply with provisions of D.Ak.L.M.R. 6(a).