# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

UNITED STATES OF AMERICA

          Plaintiff,

   vs.

JAMES MICHAEL WELLS,

          Defendants.

3:13-cr-008-RRB-JDR

## <u>ORDER</u>
## <u>DENYING  REQUEST</u>
## <u>FOR  FRANKS  HEARING</u>

## <u>DOCKET  142</u>

Wells argues that the affiant in some of the search warrant affidavits intentionally included false statements and/or omitted exculpatory ones. A defendant is entitled to a hearing to determine the veracity of search warrant affidavits if he can make a substantial preliminary showing that a false statement was included in the affidavit or that relevant information was omitted from it intentionally or recklessly, and that the allegedly false statement was necessary to a finding of probable cause or that the alleged omission would have made it impossible to find a probable cause.  <u>Franks v. Delaware</u>, 438 U.S. 154, 155-56

(1978).  Wells argues that the affiant and some of the search warrants intentionally included false statements and/or admitted exculpatory ones.  He has failed to make the preliminary showing necessary to require a _Franks_ hearing.

To obtain a _Franks_ hearing, the defendant must make the following showing: (1) allege specifically which portions of the warrant affidavit are claimed to be false; (2) contend that the false statements or omissions were deliberately or recklessly made; (3) make a detailed offer of proof, including affidavits to accompany the allegations; (4) challenge only the veracity of the affiant; and (5) show that the challenged statements must be necessary to find probable cause.  _United States v. DiCesare_, 765 F.2d 890, 894 (9th Cir. 1985).

The requirement of a substantial preliminary showing "is not lightly met." _United States v. Mathison_, 157 F.3d 541, 548 (8th Cir. 1998), rehearing and suggestion for rehearing en banc denied; _United States v. DiCesare_, 765 F.2d 890, 894-95 (9th Cir. 1985).  _See_ also _United States v. Stanert_, 762 F.2d 775, 780-81 (9th Cir. 1985) (Applying principles of _Franks_ to a deliberate or reckless omissions that mislead a judicial officer, as well as false statements).

Wells requests the court to hold a hearing under _Franks_.  In the allegation of false statements where omissions without an offer of proof in the form of a sworn affidavit or some other reliable corroboration is not sufficient to make the necessary preliminary showing.  _Mathison_, _supra_ at 548.

The defendant must demonstrate that the affiant intentionally or recklessly made a false statement or omission. Mere negligence or inadvertence does not constitute a Franks violation. United States v. Dozier, 844 F.2d 701, 705 (9th Cir. 1988); United States v. Collins, 61 F.3d 1379, 1384 (9th Cir. 1995). Collins holds that an agent's knowledge of a fact of a specific date and his failure to include it in an affidavit constituted negligence or an innocent mistake and did not justify a Franks hearing. See also United States v. Hole, 564 F.2d 298, 302 (9th Cir. 1977) holding that innocent misstatements that are not intentional or reckless, even if material, will not vitiate an otherwise sufficient affidavit. Misstatements or omissions in an affidavit are fatal only if they are reckless and made with intent to deceive the court. United States v. Botero, 589 F.2d 430, 433 (9th Cir. 1978). The defendant must also show that the issuing judicial officer can not identify probable cause absent the omissions or false statements. Franks, 438 U.S. at 171-72.

Wells alleges that the government should have noted in the search warrant affidavits which were presented after April 2012 that they did not find any weapons or items connected to the homicides in the four searches of the residence. He alleges that the affidavits should also have disclosed the failure to find any blood or tissue regarding the homicides in either of the Wellses vehicles or his residence. He claims that these omissions would tend to exculpate him. He also cites the failure to disclose Rudat's lack of concern about a loud metal hitting metal sound coming from the direction of Building T2 at about 7:10 AM.

A search warrant is not an accusatory document. There is no need to address in the affidavit whether the agents have enough evidence to arrest the suspect. The focus of an application for a search warrant is whether there is probable cause to believe that "the object of the search is located in a particular place." Steagald v. United States, 451 U.S. 204, 213 (1981). Whether certain evidence not sought by the warrant has been discovered or even exists does not negate a showing of probable cause for particular items sought in the respective warrants. "[T]he level of detail necessary in a warrant is related to the particular circumstances and the nature of the evidence sought." United States v. Adjani, 452 F.3d 1140, 1147 (9th Cir. 2006).

The statements of Mr. Wells referenced in the warrant affidavits obtained through the consensual use of an informant need not have been preceded with the Miranda warnings. Wells was not in custody nor was he interrogated by a law enforcement officer when those statements were made. The affidavits do not contain statements illegally obtained from "custodial interrogations of Mr. Wells" as alleged in Docket 143. Mr. Wells' statements taken by the agents on April 12 and 13, 2012 that are referenced in the warrant affidavits were all made voluntarily by Mr. Wells and not taken in violation of Miranda. See Recommendations regarding the defendant's motion(s) to suppress statements.

The warrant affidavits reference Mr. Rudat's statement that "he heard what he claimed to be a loud metal hitting metal sound coming from the direction of

Building T2 at approximately 0710 hours as he was walking from the area." Wells faults the affiant for not adding to the affidavit that Rudat was unconcerned about the sound he heard and that he was listening to loud music on his ear buds at the time of the reported noise. The affidavits do not mischaracterize Rudat's statement about the sound he heard because the affidavit deals with probabilities not certainties with respect to the time the homicides allegedly occurred.

Whether or not the sound Rudat attributed to metal hitting metal was part of the music he heard on his ear buds or actually came from the direction away from Building T2 was not determinative of the issuance of the search warrants. Mr. Rudat reported what he heard and that is sufficient for the agent to include it in his affidavit. Failure to detail the circumstances surrounding Rudat's hearing the noise at about 7:10AM are not material omissions to the issuance of the particular search warrants. The omission does not suggest that Rudat's statements were false, rather they merely go to the certainty of the truth as to what he thought he heard. I reject Wells' claim that the affidavits mischaracterize his or Rudat's statements.

Nor would disclosure of Mr. Rudat's military background have been necessary information to the affidavit. The fact that Mr. Rudat was wearing ear buds and listening to music would likely have enhanced the probable cause showing not lessened it because this observation adds to the fact that it was a loud noise.

Paragraph 20 in Exhibit B references Don Rudat. This paragraph reads as follows:

"According to joint witness interview of Aviation Electronic Technician First Class (AETI) Don Rudat, an active duty Coast Guard member who was walking/rum1ing in the area, Rudat stated he heard what he claimed to be a loud metal hitting metal sound come from the direction of Building T2 at approximately 0710 hours as he was walking away from the area. Building T2 is located within 200 feet of Anton Larson Bay Road, and is a concrete block structure. In my experience, the sound of a gunshot in such a structure could be perceived to be a loud metal sound."

Wells faults the affiant for not addressing Rudat's lack of concern about the sound he heard or that he was listening to loud music at the time which might have affected his ability to discern what he was hearing. Neither of those statements detract from the statement attributed to Rudat that he heard a loud metal hitting metal sound coming from the location stated in the affidavit. The affidavit does not state that Rudat heard a gun shot. Rather, the reference to a gun shot is that of the affiant relating his experience that the sound of the gun shot could be perceived as a loud metal sound. The omission of this information does not render the statements false or recklessly negligent. The record does not support Wells' contention that the

officers knowingly omitted material information from the affidavit or deliberately falsified allegations to demonstrate probable cause.

In his reply at Docket 163, Wells claims that government did not provide the issuing court with information relating to the FBI analysis of the quality of video showing the automobile approaching the location of Building T2. He states that the government failed to provide the issuing court with information about the inconclusiveness of the results from the lab tests.

The affidavits did not misrepresent the evidence about the blue SUV captured on the video. The FBI's initial report by the lab technician who reviewed the surveillance video concluded that there was insufficient detail to identify the make or model of the vehicle depicted. The technician did not reject the image as that of a "blue sports utility vehicle," he simply concluded that he did not have enough detail to determine the make and model. This report signed April 20, 2012 occurred after eleven of the search warrants in this case had already been served.

In his attack on the truthfulness as to the claim that USCG closed-caption television cameras at T1 and T2 show what appears to be a blue Honda SR-V near T2 at the time of the homicides, Wells offers a declaration of Noa Oren, a staff attorney at the Federal Defenders office. Oren avers that correspondence between the FBI lab and Quantico and FBI agents in Anchorage from April 20, 2012 and August 10, 2012 makes it clear that FBI experts examining the USCG video of the blue car were not able to identify the make or model of the car. This

correspondence did not conclude that the video was not that of a blue car consistent with the Welles blue Honda; the correspondence indicated that the lab was not able to identify the make or model of the car. The statements in the challenged search warrant affidavits allege that Wells owned a blue Honda CR-V. That statement is correct. The affidavits aver that Wells' blue Honda CR-V appears to be that shown in the USCG video footage at T2. The affiant uses the word "appears" advisedly. There has been no showing that the video footage is not that of the Wells vehicle and the statement in the affidavit is not untruthful.

The language in the affidavit would not have misled a reasonable judicial officer in believing that the affiant was claiming that the video unequivocally depicted a specific vehicle, a Honda CR-V. There was no deception by the affiant in his description of the vehicle. The lab technician added in his report that a person with knowledge of automobiles, such as a car dealer or a mechanic, might be able to recognize the make and model. The lab technician did not find the image "impossible" to identify.[1]

Paragraphs 21 and 37 of the search warrant affidavits identified in Exhibits B, C, D, E, F and G of the defendant's reply at Docket 163, p.11 contain the same language. Paragraph 21 reads as follows:

---

[1] The lab report was not sent to the FBI case agent until August 2012 after 13 search warrants in this case had already been served. *See* Government's Response, Docket 174, p.7, ftn 2.

"21.    According to CCTC at COMMSTA Building T2 Rigger Shop [reviewed by Alaska Wildlife Troopers AWT] a small blue SUV was observed within camera view at approximately 0711 hours heading away from the COMMSTA on Anton Larson Bay Road towards Rezanof Drive/Chiniak Highway the same direction as the Kodiak State Airport. It is known by your affiant that James Wells has a blue Honda SUV registered in his name and that the vehicle is currently parked in the airport 2-hour parking lot at the Kodiak State Airport."

Paragraph 37 reads:

"Upon review of the above, there is probable cause to believe that James Wells drove his White Dodge Ram 2500 pickup from his residence to the Kodiak State Airport where he changed vehicles into the blue Honda SUV normally driven by his wife, and which a blue SUV was seen on closed circuit television leaving the area of the homicides. There is probable cause to believe that he drove the blue Honda SUV back to the Airport parking lot where it remains, and retrieved his White Dodge 2500 pickup in which he returned to his residence. Nancy Wells

indicated to agents that her SUV is only one of two like it

on the island."

This paragraph explains the theory of the affiant connecting Wells to the crime scene.  It is an allegation of probable cause to believe that Wells drove his White Dodge Ram Pickup from his residence to the Kodiak State Airport, changed vehicles, drove the Blue Honda to the area of the homicides and then returned it to the airport where he retrieved his Dodge Pickup and returned to his residence.  The issuing judicial officer would not have been misled by this statement of the government's theory being pursued throughout the search warrants.

Wells has also claimed paragraph 45 of Exhibit F to be false.  That paragraph reads:

> "45.    Also, outside of the crime scene, investigators found tire prints from a vehicle leading from an area behind the building in which the homicides occurred. That area is not visible to any of the surveillance video cameras providing security of the area. The tire tracks lead on to the hard-surfaced roadway, and there are tire scuff marks on the roadway consistent with an accelerating vehicle. The observable tire tracks are also consistent with a smaller and lighter vehicle such as the 2001 Blue Honda CR-V, AK Plate EJR582. Casts have been made of those tire

prints, requiring casts to be made of vehicles for
comparison. This application seeks authority to seize
impressions, tracings, photographs and any other means
of replicating or copying the treads of the tires on the 2001
Blue Honda CR-V, AK Plate EJR582."

The Motion for <u>Franks</u> Hearing does not identify any false information
contained in that paragraph.   The statement that observable tire tracks are
consistent with a vehicle such as the Blue Honda CR-V has not been shown to be
false.  The paragraph explains that the warrant applications seeks authority to seize
impressions, tracings, photographs and other means of replicating or copying the
treads of the tires on Wells' Blue Honda so that the laboratory can make
comparisons.

Wells cites paragraph 24, 28 and 30 of Exhibits I through Exhibits R as
portions of the affidavit claimed to be false.  These paragraphs state the following:

"24.   Based on the timeline discussed in detail below,
JAMES WELLS had the opportunity to commit the
murders of Hopkins and Belisle, as detailed in the
following sequence of events. There is probable cause to
believe WELLS drove from his home in Bells Flats, past
the main gate camera at BSU Kodiak, then pulled into the
parking lot at Kodiak State Airport. WELLS then switched

to his wife's small blue Honda CR-V and drove to COMMSTA Kodiak. After the murders, he then returned to Kodiak State Airport, switched back to his white Dodge pickup. He drove back toward his residence, again passing the main gate of BSU Kodiak. This all occurred between 6:48 a.m. and 7:22 a.m. on April 12, 2012.

. . .

28.    CCTV from a tower near COMMSTA Kodiak Building Tl show a small blue Sport Utility Vehicle (SUV) driving on Anton Larson Bay Road arriving at and disappearing from view behind Building T2 at 7:09 a.m. The blue SUV appears to have the profile of a 2001 Honda CRV, a black nose, black wheels, and a tire mounted on the rear. This vehicle did not enter the T2 parking lot via the primary entrance, and thus was not captured on the T2 video camera.

. . .

30.    According to CCTC near COMMSTA Building Tl, a small blue SUV with a black nose, black wheels, and a profile that appears to be a 2001 Honda CR-V was driving on Anton Larson Bay Road and came into view from

behind Building T2 at 7: 14 a.m. Again, this · vehicle did

not depart the T2 parking lot via the primary entrance, and

thus was not captured on the T2 video camera."

Paragraph 24 connects Wells to the homicides by setting forth a proposed timeline concluding that he had the opportunity to commit the murders of Hopkins and Belisle through the switching of vehicles between 6:48AM and 7:22 AM on April 12, 2012. The scenario is presented as the agents' assessment of the events, not facts written in stone. Although one may disagree with that assessment, the defendant has not shown that it is a false statement or statement made recklessly or deliberately in disregard of the facts. Paragraph 28 states that the vehicle observed from the tower near neat COMMSTA Kodiak Building T1 "appears to have the profile" of a 2001 Honda CR-V with a black nose, black wheels and a tire mounted on the rear. This statement explains why the vehicle was not recorded on the T2 video camera, namely because it appears that the vehicle did not enter the T2 parking lot via the primary entrance. Paragraph 30 states that the vehicle on the video recorder appears to be a 2001 Honda CR-V that was driven on Anton Larson Bay Road and came into view from Building T2 at 7:14 AM. By using the word "appears," the affiant has not overstated the conclusion that the vehicles observed on the two occasions is the same vehicle.

Wells challenges Paragraph 54 in Exhibit M and N. That paragraph reads as follows:

"54.   On November 9, 2012, lab technicians from the FBI lab in Quantico, Virginia, notified the Anchorage Field Office that they had discover head hairs consistent with those of victim Richard Belisle in the vacuum sweepings recovered from the front driver's and front passenger's area of the Blue Honda CRV. The lab technician also stated that other hairs were present, and requested that a warrant be sought to seize head hairs of James and Nancy Wells, the registered owners of the vehicle, for comparison purposes. Such evidence, if authorized by the court, may allow the laboratory to identify the owners of the unknown hairs."

This paragraph explains why a warrant was sought to seize head hairs from James and Nancy Wells, the registered owners of the Blue Honda for comparison purposes to identify the owners of unknown hairs recovered in the vacuum sweepings recovered from the front driver's and front passenger's area of the Blue Honda.  Wells fails to make an adequate showing that this paragraph contains any false statements.

Wells challenges paragraph 17, 21 and 23 of Exhibit H.

Paragraph 17 is similar to Paragraph 24 discussed above.  It sets forth the affiant's theory as to how Wells had the opportunity to commit the murders of

Hopkins and Belisle. Paragraph 21 describes the video depiction of the vehicle observed from a tower near COMMSTA Kodiak Building T1 as that of a small blue sports utility vehicle that appears to have a black nose, black wheels and a tire mounted on the rear. There is insufficient showing that this statement is false. In paragraph 23, in addition to describing a Blue Honda CR-V owned by the Welles, later found parked at the airport, the paragraph references the video captured near Building T1 showing a small Blue SUV which appears to be consistent with that leaving Building T2 and heading toward Anton Larson Bay Road at about 7:14AM. No prima facie showing of falsity as to these statements has been made.

In response to the allegation that the affidavits are defective for failing to disclose that no blood or tissue regarding the homicides was found in the execution of search warrants for either of the vehicles or the defendant's residence, the government retorts that the murders were accomplished with a high powered hand gun namely, a 44 magnum. There would be no reason for the shooter to be close enough to his victims to receive any significant amount of blood or tissue spray that could have been transferred to the vehicles or any of the defendant in his residence. No casings were left behind and the gun has not been found. The omission of this information would not have had a significant effect on the probable cause determination. Moreover, most of the search warrants were issued prior to the date that the lab results relating to the blood and tissue were completed by the

Alaska Scientific Crime Detection Laboratory.  (May 9, 2012 as to the blood; May 14, 2012 as to DNA).

Wells complains of the omission that the affidavit in support of the search warrant to search his desk, 3:12-mj-00182-DMS does not mention FBI Agent Strause's earlier search of the desk.  Paragraph 38 of the affidavit states: "On April 13, 2012, FBI Special Agent (SA) Angela Straus, a member of the FBI evidence response team (ERT) processing the crime scene, started to go through the desk drawers.  As the paragraph explains, searches were conducted  by both Agent Strause and CGIS Agent Weimer.  Agent Strause found a letter of caution in Wells' desk during her warrantless search.  The only references to this letter in the affidavits are from the statements made by Chief Petty Officer (Chief Scott Reckner), Wells' supervisor. *See* Paragraph 28 of the affidavit for search warrant 3:12-mj-00155-DMS.  The affidavit discloses that the information was acquired through an independent source which renders it legally obtained.  *See* United States v. Heckenkamp, 482 F.3d 1142, 1149 (9th Cir. 2007) citing Murray v. United States, 487 U.S. 533, 538-39 (1986).

Wherefore, the Motion for a Franks Hearing is DENIED.

DATED this 16th day of January, 2014, at Anchorage, Alaska.


*/s/ John D. Roberts*
JOHN D. ROBERTS
United States Magistrate Judge