# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>            Plaintiff,<br>   vs.<br><br>JAMES MICHAEL WELLS,<br><br>            Defendant. | 3:13-cr-008-RRB-JDR<br><br>**RECOMMENDATION<br>REGARDING<br>MOTION TO SUPPRESS<br>PHYSICAL EVIDENCE**<br><br>(Docket No. 142) |

## I. Introduction

On October 4, 2013, Defendant **James Michael Wells** (Wells) filed a *Motion to Suppress Physical Evidence* at Docket 142. The government filed its opposition at Docket 153. Wells filed his reply at Docket 163, and the government filed a response to the newly raised claims in Wells' reply at Docket 174. For the reasons stated below, the Magistrate Judge recommends that the *Motion to Suppress Physical Evidence* be GRANTED IN PART AND DENIED IN PART. The USCG property seized during the execution of SW 157 and SW 160 should be suppressed because the government failed to demonstrate how it was immediately apparent that the USCG items were contraband.

## II. Issues Presented

Wells argues that the physical evidence obtained from the various search warrants must be excluded for the following reasons: (1) The search warrants used to obtain the physical evidence lack probable cause; (2) the affidavits in support of the search warrants are based on material misstatements and omissions; (3) the search warrants are the product of prior illegality; (4) some of the search warrants are stale; (5) some of the search warrants are overbroad; and (6) some of the search warrants exceed the scope of the warrants.[1]

The government counters that, regardless of whether probable cause exists, the agents were entitled to rely in good faith on the validity of all search warrants as established in *United States v. Leon*, 468 U.S. 897 (1984). Additionally, the affidavits in support of the search warrants fully establish probable cause to search the places listed for the items identified. The information contained in the search warrant affidavits and the items to be seized are not stale because those portions of the search warrants sought items likely to exist even after the passage of time. The government denies that any information used in the search warrant affidavits was obtained illegally or improperly, and that the search warrants are

_____

[1] The issues of whether to hold a *Franks* hearing, *Franks v. Delaware*, 438 U.S. 154 (1978), and whether the statements obtained from Wells are the product prior illegality will be considered under separate cover.

overboard. Finally, the government argues that the contraband seized during a lawful search should not be suppressed. The government, therefore, requests that this court deny the Defendant's motion to suppress physical evidence in its entirety.

### III. Relevant Facts

On April 12, 2012 at 0747 hours, AST responded to a 911 emergency call from USCG COMMSTA Kodiak, Alaska. The call indicated that there were two male victims on the floor bleeding in Building T2. Building T2 is also referred to as the Rigger Shop. When AST arrived on scene, they discovered the first victim, James Hopkins, and the second victim, Richard Belisle, shoot to death inside the Rigger Shop. Both men were active duty members of the USCG and were employees of the United States. The victims were present for work at the Rigger Shop on the morning in question. James Wells is also employed by USCG as an Antenna Maintenance Specialist in the Rigger Shop.

Wells indicated that he left his home for work at 0650 hours. However, during the drive, and approximately at the airport, Wells states that he noticed that his right front tire was low. Wells then decided to return home to change his tire. As a result, he arrived at the Rigger Shop between 8:20 am and 8:30 am. As the initial search warrants indicate and the subsequent investigation reveals, Wells became the prime suspect in the case.

## IV. The Search Warrants at Issue

The homicides took place in the early morning hours of April 12, 2012. Twenty-four search warrants were issued between April 13, 2012 and September 20, 2013 as a result.[2]

Four search warrants were issued on April 13, 2012.[3] Search Warrant 155 (SW 155) was issued for a 2001 blue Honda CR-V, which was registered to James or Nancy Wells. The affiant was SA Dan Gaston. The search warrant was issued by Magistrate Judge John D. Roberts, and the return was made by SA Russell A. Doran on May 2, 2012. The government seized vacuum sweepings, swabbings from the interior of the vehicle, tire impressions and a small piece of rock upon execution of the search warrant.

Search Warrant 156 (SW 156) was issued for a white 2002 Dodge Ram 2500 Pickup Truck registered to James or Nancy Wells. The affiant was SA Gaston. Magistrate Judge John D. Roberts issued the search warrant. The return was executed on May 5, 2012 by SA Doran. The government seized a right leather glove,

---

[2] The defense lists twenty-six search warrants in Attachment A. That number is incorrect. Search warrant 3:12-mj-00159-DMS does not exist. It appears that the agent mistakenly wrote "3:12-mj-00159" on Attachments A and B, which are associated with search warrant 3:12-mj-158. Thus, 3:12-mj-159 does not exist. Search warrant 3:12-mj-Redacted-DMS is the same as search warrant 3:12-my-00160-DMS. The defense likely received the redacted version in error.

[3] Search warrants 3:12-mj-00155-DMS, 3:12-mj-00156-DMS, 3:12-mj-00157 and 3:12-mj-00158-DMS.

a left leather glove, one empty 7mm Remington ammo box, a blue latex glove, shoe lace, empty shell casings, swabbings from the interior of the vehicle, tape lifts, vacuum sweepings, and camouflage pants upon execution the search warrant.

Search Warrant 157 (SW 157) was issued for the Wellses' residence, 365 Pavloff Circle, Kodiak, AK 99615. The affiant was SA Gaston. The search warrant was issued by Magistrate Judge John D. Roberts. SA Doran executed the return on April 14, 2012. The agents seized a great number of items including but not limited to guns, ammunition, gun accessories, various swabbings, finger nail clippings, hair, a laptop computer and a sink trap.

Search Warrant 158 (SW 158) was issued for an Apple iPhone, phone number 907-942-4844. SA Gaston was the affiant. Magistrate John D. Roberts issued the search warrant, and SA Doran executed the return on April 16, 2012. The search warrant was issued for all the historical GPS information on April 12, 2012. The GPS function was turned off during that period of time. No information was seized.

Investigators then used what is commonly referred to as a "running affidavit" to obtain the twenty additional search warrants. A running affidavit takes the affidavit for a previous search warrant and adds new information to support a showing of probable cause. Old information is sometimes removed if it is determined to have limited relevance. A running affidavit allows investigators to efficiently apply

for additional search warrants as new information becomes available during investigations in criminal cases. Thus, all search warrant affidavits are similar to the previous version, but are tailored to provide the probable cause necessary for the issuance of the new search warrant.

*A. Search warrants concerning Defendant's person and iPhone*

The government executed three search warrants on the defendant's person,[4] and three search warrants on the defendant's iPhone.[5]

Search Warrant 167 (SW 167) sought photographs of James Wells' body markings and fingernails, a DNA sample, fingerprints, and finger nail scrapings. Investigators seized a Buccal Swab and fingerprints as a result. Search Warrant 252 (SW 252) sought electronically stored information that may be found on Wells' person. Investigators seized iPhone serial number 87014TB13NR upon execution of the warrant. Search Warrant 348 (SW 348) sought human hair from Wells. Investigators subsequently seized twenty-five hairs from the defendant.

---

[4] 3:12-mj-167-DMS issued April18, 2012; 3:12-mj-252-DMS issued August 17, 2012; and 3:12-mj-348-JDR issued November 13, 2012.

[5] 3:12-mj-158-DMS (discussed above); 3:12-mj-161-DMS issued April 15, 2012; and 3:12-mj- 252 issued August 17, 2012 (3:12-mj-253-DMS was issued for an additional search of the iPhone seized under search warrant 3:12-mj-158-DMS).

SW 158, which was for the defendant's iPhone, was limited to GPS data only. The subsequent search warrants concerning the defendant's iPhone were expanded to search for electronically stored information.

*B. The Wellses' Blue Honda CR-V*

The Wellses' blue Honda CR-V was searched on two separate occasions. It was first searched on April 13, 2012[6] (SW 155) and again on April 16, 2012 (SW 12-mj-163).[7] SW 12-mj-163 allowed for an expanded search of the vehicle, including tire impressions. SW 12-mj-163, Attachment B. The search warrant also allowed investigators to move the vehicle to the location of the vehicle sighted on videotape near the crime scene so that they could take photographs and video tape of the blue Honda at that location. *Id.* Investigators seized a number of vacuum sweepings as well as swabbings for blood, a small piece of rock and tire impressions after executing the search warrant. FBI Receipt for Property, April 15, 2012, associated with SW 12-mj-163.

*C. The Wellses' White Dodge Ram 2500 Pickup Truck*

Three separate search warrants were issued for the defendant's pickup truck. The first search warrant was issued on April 13, 2012 (SW 156).[8] The

---

[6] 3:12-mj-155-DMS (discussed above)

[7] 3:12-mj-163-DMS

[8] 3:12-mj-156-DMS (discussed above).

13-cr-008-RRB-JDR WELLS @142 RR Re Motion to Suppress_mtd.wpd

7

additional search warrants were issued on April 16, 2012 (SW 164) [9] and April 18, 2012 (SW 168).[10]

SW 164 sough information/evidence similar to what was sought in SW 156. However, SW 164 expanded upon the information sought in SW 156. For example, SW 164 sought additional vacuum sweepings and swabbings from the interior of the pickup. SW 168 focused on the pickups tires. It sought information regarding the extra tire located in the bed of the pickup and the tire pressure from all tires in or on the vehicle.

### D. The Wellses' Residence

The FBI searched the Wellses' residence on ten separate occasions.[11] SW 160 sought guns, gun parts, ammunition, expended shell casings, gun accessories, knives, edged weapons, and blood stained articles. Many items were

---

[9] 3:12-mj-164-DMS

[10] 3:12-mj-168-DMS

[11] 3:12-mj-157-DMS (SW 157) (discussed above); 3:12-mj-160-DMS (SW 160) issued April 15, 2012; 3:12-mj-166-DMS (SW 166) issued April 18, 2012 (not challenged by the defense); 3:12-mj-172-DMS (SW 172) issued April 21, 2012 (not challenged by the defense); 3:12-mj-251-DMS (SW 251) issued August 17, 2012; 3:12-mj-347-DMS (SW 347) issued November 13, 2012; 3:13-mj-039-DMS (SW 139) issued February 21, 2013; 3:13-mj-144-JDR (SW 144) issued May 23, 2013 (not challenged by the defense); 3:13-mj-163-DMS (SW 163) issued May 25, 2013; and 3:13-mj-258-DMS (SW 258) issued September 20, 2013.

seized upon execution of the search warrant.[12] In addition to the items listed in the search warrant, investigators seized a number of items that belonged to the United States Coast Guard (USCG). The items include a magnifying lamp, LCD projector, open bag of zip ties, four mustang suits, six boxes of fluorescent light bulbs and a USCG COMMSTA drill. FBI Receipt of Property, File # 70A-AN-15667, attached to SW 160.

SW 251 sought electronically stored information relating to the murders that occurred from January 1, 2000, through the date of the execution of the warrant. Such records included photographs of Wells in possession .44 magnum revolver, records relating to the sellers of firearms, financial records, information related to two specific email accounts, records related to the travel of Wells, and information relating to the command or co-workers at COMMSTA Kodiak. SW 251 also sought information specifically related to any computers found in the residence. Thirty-seven items were subsequently seized. *See* Inventory Sheet attached to SW 251.

SW 347 was issued on November 13, 2012. The search warrant itself is much more limited in terms of the items sought when compared to the prior search warrants for the residence. SW 347 sought automatic and pneumatic nailers and associated nails. Upon execution of the search warrant, investigators seized a

---

[12] An accurate description of the items seized can be found at Docket 143-1, at 3 (Exhibit A).

Hitiachi nail gun, Hitiachi Brad Nailer, various rows of framing nails, rows of round head plastic nails and miscellaneous nails.

SW 39 was issued on February 21, 2013. It sought "[s]mall caliber firearm type casings and materials to which they are attached, manufactured for use in any type of tool capable of driving a nail, parts for reconfiguring such a tool to drive a larger or smaller nail, as well as nails that appear to have been operated on by this type of tool, or nails that appear to be capable of use in this type of tool." SW 39, at Attachment B. The items sought appear to be in furtherance of government's investigation into the nail guns seized pursuant to SW 347. Investigators seized a Hilti booster strip and thirty-six miscellaneous nails. FBI Receipt for Property, 70A-AN-15667, associated with SW 39.

SW 163 was issued on May 25, 2013. It sought three swords that investigators believed were located at the residence based on an interview with John Stein. Investigators found three swords during the search. FBI Receipt for Property, 70A-AN-15667, associated with SW 163. The first sword was a USCG Ceremonial sword with the name "John A. Stein" engraved on it, along with a case bearing the initials "J.A.S". *Id.* The second sword was a Japanese sword approximately forty to fifty inches in length. *Id.* The third sword was also a Japanese sword approximately thirty inches in length with a scabbard. *Id.*

SW 285 was issued on September 20, 2013. The government sought to search the Wellses' residence for expended bullets and bullet fragments. SW 285, at Attachment B. The agents hoped to seize expended .44 magnum rounds by using metal detectors. Agent's seized forty-two items after executing the search warrant. Receipt For Property, 70A-AN-15667, associated with SW 285.

No items were seized as a result of SW 166, SW 172 and SW 144. The defense does not challenge the validity of these search warrants. No further analysis of these search warrants is necessary.

*E. Search Warrant for the Defendant's Desk and Locker*

SW 182 was issued for the search of the desk and locker used by Wells, located at Coast Guard Communications Station Kodiak, AK, building T2. 3:12-mj-182-DMS. The warrant sought evidence of travel, evidence of motive, evidence related to the planning of the homicides, photographs or any indicia of ownership of .44 magnum handguns and phone numbers to determine if the numbers belonged to vendors of firearms or ammunition. *Id.* at Attachment B. The evidence recovery log indicates that 14 items were seized, including a letter of memorandum dated April 29, 2011, and a performance plan and evaluation.

*F. Search Warrant for the Person of Nancy Wells*

SW 349 sought to search the person of Nancy Wells, the Defendant's wife. 3:12-mj-349-JDR, at Attachment A. The agents seized twenty-five head hairs from Mrs. Wells. *Id.* at Attachment B.

*G. Search Warrant for Defendant's Winchester Marlin .44 Caliber Rifle*

SW 28 was issued on February 21, 2013 for the Defendant's .44 caliber rifle. 3:13-cr-00028-JDR. The rifle was already in the possession of the Alaska State Troopers as a result of SW 157. *Id.* at Attachment A.

## V. Legal Analysis

### A. The Agents Should Be Entitled to Rely in Good Faith
### on the Search Warrants

The defense claims that the agents cannot rely on the good faith exception to an otherwise objectively reasonable search warrant because the search warrants at issue are so lacking in probable cause that they cannot stand. Docket 163 at 7. Such an argument is unpersuasive.

The Supreme Court established a good faith exception to the probable cause requirement in *United States v. Leon*, 468 U.S. 897 (1984). For the good faith exception to apply, all the affiant must do is present a "colorable argument for probable cause." *United States v. Crews*, 502 F.3d 1130, 1136 (9th Cir. 2007). "An officer does not manifest objective good faith in relying on a warrant based on an affidavit that is so lacking in indicia of probable cause that official belief in its

existence is entirely unreasonable." *United States v. Fowlie*, 24 F.3d 1059, 1067 (9th Cir. 2004) (*citing Leon*, 468 U.S. at 923). The relevant inquiry is whether the affidavit was "sufficient to create disagreement among thoughtful and competent judges as to the existence of probable cause." *Leon*, 468 U.S. at 926. If yes, the good faith exception applies and the search warrant must stand.

The good faith exception does not apply in the following situations: (1) where the issuing judge abandons his or her judicial role in approving the search warrant; (2) where the affiant misleads the issuing judge by making a false statement of recklessly disregarding the truth in making a statement; (3) where the warrant is so deficient in detail as to the place to be searched or the items to be seized that the agent could not presume it to be valid; or (4) the affidavit is so lacking probable cause that no reasonable agent could rely upon it. *Leon*, 468 U.S. at 923-26.

The defense claims that the government's failure to establish a nexus between Wells and the homicides precludes the determination that there was sufficient probable cause to issue the search warrants. The defense points out that there is no physical evidence from the homicides in either of the Wellses' vehicles. There is no GPS data placing Wells at the crime scene. There is no proof that the Wellses' blue Honda CR-V was actually connected to the homicide as evidenced by the government's investigation into the video images in question. Also, the defense argues that the agents are not entitled to rely on the warrants in good faith because

Case 3:13-cr-00008-SLG   Document 270   Filed 01/16/14   Page 13 of 60

of the high degree of attenuation between the location to be searched and the lack of facts uncovered in the investigation connecting Wells to the homicides. *See United States v. Grant*, 682 F.3d 827 (9th Cir. 2012) (An officer is not entitled to rely on the good faith exception when there is a high "degree of attenuation between the location searched and the lack of facts uncovered in the investigation connecting [a] defendant to [a] homicide.").[13]

      *Grant* is easily distinguishable from the present case. The correct analysis is to determine whether the affidavits are so lacking in indicia of probable cause that official belief in its existence is unreasonable. Here, the affidavits present at the very least a colorable argument for probable cause. In fact, there likely exists sufficient probable cause. That inquiry, however, is unnecessary since a colorable argument for probable cause can be made. The agents are allowed to rely on the good faith exception in this case. The court will move directly to applying the standards of the good faith exception without embarking on the exercise of applying the totality-of-circumstances test to all twenty search warrants challenged by the defense. *Crews*, 502 F.3d at 1136.

---

[13] *Grant* is discussed in detail below on page 18.

### i. The agents acted in good faith reliance on the first four search warrants

The agents used the same affidavit in support of the search warrants for the person, residence and vehicles of the defendant.[14]  A careful reading of the search warrants reveals a colorable argument for probable cause.

The affidavits in support of the search warrants demonstrate that Wells likely had the opportunity to commit the murders. The warrants suggest that Wells drove his white Dodge pickup truck north from his home in Bells Flats and past the main gate camera at BSU Kodiak at 0648 on April 12, 2012. Affidavit in Support of SW 158, at ¶ 15. The same camera showed the same truck heading south back towards the defendant's residence at 0722 . *Id.* at ¶ 16. Charlene Puddish stated that she saw James Wells turning from Rexanof Drive/Chiniak Highway onto Sergent Creek Road at approximately 0722 hours. *Id.* at ¶ 23.  Annette Ecret confirmed that she saw James Wells driving his white Dodge pickup at the intersection of Bell Flats Road and Sergeant Creek road minutes after 0720 hours when she left home. *Id.* at ¶ 24.

The victims arrived at COMMSTA 0700 and 0708 respectively. SW 158 at ¶ 18-19. Ron Rudat, an active duty Coast Guard member who was

---

[14] SW 158 (the person of Wells); SW 157 (the residence of Wells); SW 155 (the blue Honda CR-V belonging to James or Nancy Wells); and SW (the white Dodge Ram 2500 belonging to James or Nancy Wells).

walking/running in the area, stated that he heard what he claimed to be loud metal-hitting-metal sound come from the direction of the Rigger Shop at 0710 hours. *Id.* at ¶ 20. In Agent Gaston's experience, the sound of a gunshot in such a structure could be perceived as a loud metal-hitting-metal sound.

According to a closed circuit television camera at the Rigger Shop, "a small blue SUV" was observed within camera view at approximately 0711 hours heading away from COMMSTA toward the Kodiak Airport. *Id.* at ¶ 21.

Nancy Wells, the wife of the defendant, drives a blue Honda CR-V. She stated that she flew from Kodiak to Anchorage on Tuesday, April 10, 2012, and that she left her vehicle in the 2-hour parking lot at Kodiak Airport. *Id.* at ¶ 22.

Wells told investigators that he left for work at 0650 hours. Affidavit in Support of SW 158, at ¶ 30(b). On his way to work, he observed that his right front tire was low, at which point he turned around and headed home to change his tire. *Id.* He was approximately at the airport when he observed that his tire was low. *Id.* Either before or after he changed his tire, Wells contacted both victims and ITC Scott Reckner to inform them of the flat tire. *Id.* Reckner opined that it is not common for Wells to be proactive with respect to keeping supervisors apprised of his whereabouts and activities. *Id.* ¶ at 25. When asked about firearms, Wells stated that he owned a 7mm magnum and a .45 ACP hand gun. *Id.* at 30(c). The interviewing agent indicated that Wells appeared evasive in his answers. *Id.*

An earlier interview with Mrs. Wells contradicted Wells' statement about his gun ownership. During the interview of Mrs. Wells on April 13, 2012, she told investigators that her husband possessed additional firearms. *Id.* She also contradicted Wells' statement that he returned home to get a spare tire and jack. *Id.* at ¶ 22. Mrs. Wells told investigators that Wells carried a spare tire in a container under his white Dodge pickup. *Id.*

The time line established above indicates that Wells had the opportunity to commit the murders because it is possible that Wells drove from his home to the airport where he switched vehicles. He then drove his wife's blue Honda to the Rigger Shop where the murders took place. Wells then drove back to the airport, got back into his white Dodge pickup and returned home. It was at this point that Wells may have put his alibi into effect by calling the victims and his supervisor about the flat tire.

The search warrants go on to describe Wells' rocky relationship with the deceased and ITC Reckner. ITC Reckner brought a disciplinary action against Wells in January, 2012, for the misappropriation of a government fuel card. *Id.* at ¶ 28. The search warrants go on to state that Wells may have been upset with Belisle because he expressed his disapproval of Wells' conduct to Reckner. *Id.*

Unsolicited statements made by Belisle's wife and ITC Reckner suggest that Wells may have been capable of committing such a crime. Affidavit in Support

of SW 158, at ¶ 28(d). Upon notifications of her husband's death, Mrs. Belisle made an unsolicited comment to the affect that she "hoped Jim wouldn't do something like this." *Id.* Reckner made a similar comment shortly after receiving the initial telephone call regarding the incident from COMMSTA. Reckner "verbally expressed in the presence of his wife that he hoped James Wells didn't do something crazy, or words to that effect." *Id.* at ¶ 28(f).

Throughout the early investigation, Wells was seen on his iPhone sending text messages. *Id.* at ¶ 30(e). Based on the iPhone's GPS capabilities, the investigators believed that the iPhone may contain historical GPS records that could pin points the defendant's movements on the day in question. *Id.* ¶ at 33.

The search warrants make clear that no firearms or knives were found at the scene. *Id.* ¶ at 27. No ammunition casings were found either even though it appeared that the victims were shot multiple times. *Id.* Based on the quantities of blood observed at the scene, investigators believed that blood splashes and transfers may be present on the individual or individuals that committed the murders. *Id.*

The facts above suggest a rift between Belisle and Wells based on Belisle's disapproval of Wells' conduct, which serves as a possible motive as to why Wells may have committed the murders. Additionally, Wells had the opportunity to commit the murders as evidenced by the locations of the flat tire in comparison to

the blue Honda CR-V, and the time when Rudat heard the loud metal-hitting-metal sound coming from the direction of the Rigger Shop. The contradictory statements made by Nancy Wells to the investigators and the evasive statements given by Wells himself also increase the likely hood that Wells was involved in the murders. The unsolicited comments made by Belisle's wife and Reckner show Wells may have been capable of committing such a crime. Therefore, the agents acted in good faith when the executed the search warrants on the white Dodge pickup truck, the blue Honda CR-V, the person of Wells and the Wellses' residence based on the information contained in the affidavits.

The defense cites *Grant* as authority for holding that the agents in this case should not be allowed to rely on the good faith exception. *Grant*, 682 F.3d at 827. *Grant* is easily distinguishable from the present case before the court.

The search warrant at issue in *Grant* sought evidence related to the defendant's son, not the defendant himself. *Id.* at 828. The search warrant was for a murder weapon that the authorities believed one of the defendant's sons had given the defendant well before the search. *Id.* at 832. The murder weapon was never located. *Id.* at 831. The police found two firearms and ammunition belonging to Grant. He was later charged with being a felon in possession of firearms and ammunition based on a prior felony conviction. *Id.* The Nine Circuit held that, based on the level of attenuation between Grant and the murder, there could be no good

faith reliance because the objects seized were different from those stated in the warrant and related to completely different crimes. *Id.* at 832. Such is not the case in the present situation.

The defense makes much of the fact that there is no affirmative evidence linking Wells to the crime. Thus, the officers are not entitled to rely on the warrants in good faith. That argument is unpersuasive because the affidavits make clear that there is limited physical evidence at the crime scene connecting Wells or anyone else to the murders. Affidavit in Support of SW 155, at ¶ 27. That fact in and of itself does not prevent the agents from relying on the warrants in good faith. Based on the information available at the time the first four search warrants were issued, a colorable argument for probable cause can be made. The issue then becomes whether the agents were entitled to rely in good faith on the subsequent search warrants.

The court thoroughly reviewed the remaining sixteen search warrants. Because the subsequent search warrants are all based off same underlying probable cause determination discussed above, the agents are entitled to rely on the good faith exception as long as each individual search warrant provides a colorable argument that additional probable cause exists to justify what it is that the agents sought to obtain. In other words, as long as each additional search warrant provides

additional information concerning the places to be searched and items to be seized, the agents should be allowed to rely on the good faith exception.

### ii. Investigators can rely on the good faith exception for the additional search warrants

SW 160 is for the Wellses' residence but sought additional material from the master bathroom. Attachments B specifically requests to search for "fingernail clippings in the sink, long dark hairs in the sink and on the counter similar to those found at the crime scene, and material from the drain trap beneath the sink." SW 160, at Attachment B. The additional probable cause for the search warrant can be found in the affidavit in support of SW 160. It states that during the initial search of the residence on April 15, 2012, the officers observed long black hairs in the sink located in the master bathroom. Affidavit in Support of SW 160, at ¶ 43. The long black hairs were similar to those found at the crime scene. Belisle had long black hair. The Wellses' both have graying hair. Based on this new information, a colorable argument can be made that the requisite probable cause exists for the agents to rely on the good faith exception concerning SW 160.

SW 161 sought all historical GPS information for the period from 6:30 a.m. through 8:30 a.m on the day of the murder. SW 161 expands on the search conducted on the defendant's iPhone pursuant to SW 158. In support of probable cause, the affidavit adds paragraphs' 40-41. After consulting with forensic examiners from the Kodiak Island police department, investigators discovered two software

tools available to search the device for the requested GPS information. Based on this new understanding, SW 161 authorized a qualified forensic examiner from the Kodiak Police Department to use the software programs to extract the GPS data from the iPhone. Thus, the agents executing SW 161 are entitled to rely on the good faith exception.

SW 12-mj-163 sought an additional search of the blue Honda CR-V. The agents requested permission to move the car to the location of CCTC camera located at the Rigger Shop in order to take pictures of the vehicle at that location. SW 163 also sought additional information relating to the Honda's tires. The affidavit states that the agents found tire prints leading from an area behind the building in which the homicides occurred. Affidavit in Support of 12-mj-163, at ¶ 45. The area is not visible by the surveillance video cameras. The observable tire tracks were consistent with smaller and lighter vehicles. This information provides the additional probable cause necessary for the agents to rely on the good faith exception.

SW 164 is for the second search of the defendant's white dodge pickup. It sought fibers, hairs, liquids, dried liquids, stones, soil, gunshot residue and dust, and other trace materials for comparison. SW 164, at Attachment B. The affiant added paragraph 44 in support of the additional probable cause necessary to issue the warrant. Paragraph 44 indicates that based on the search of the crime scene on April 13 and 14, investigators believed that blood and other trace evidence such as

hair and fibers may be splattered or otherwise transferred onto the assailant. The search warrant would allow investigators to search for the trace materials. Paragraph 44 provides the sufficient additional probable cause to allow the agents to rely on the good faith exception.

SW 167 sought photographs of the defendant's body markings and fingernails, a DNA sample, fingerprints and finger nail scraping. SW 167, at Attachment B. The affidavit provides more information connecting Wells to the murders. During interviews conducted with Wells on April 13 and 14, Wells once again stated that he noticed he had a low tire and pulled off the road near the airport. Affidavit in Support of SW 167, at ¶ 46. Wells claimed that he got out of his truck to investigate the tire, and then he decided to return home to change the tire because the spare and the jack were at his residence. *Id.* The camera located at the main gate showed that he past at 6:48 a.m., but did not show him returning home until 7:22 a.m. *Id.* The distance between the camera and the airport where Wells claimed to have turned around is approximately one mile. The investigators estimated that it would have only taken six to ten minutes for Wells to drive to the airport, check his tire and return home. *Id.* That leaves approximately twenty-two minutes unaccounted for. *Id.* Wells had no explanation when asked to explain why it took 34 minutes for him to pass back through the main gate. *Id.* Thus, a colorable argument for probable cause can be made.

SW 168 is for the third search of the white Dodge pickup. It sought information relating to the tire located in the bed of the vehicle. The tire was on the vehicle the morning of the murders and was changed by Wells. The affidavit explains that when investigators originally searched the vehicle, they believed that the warrant allowed them to inspect the tire found in the bed. Affidavit in Support of SW 168, at ¶ 47. The agents removed the tire and bounced it off the ground. *Id.* The tire exhibited no signs of low pressure. *Id.* The requisite additional probable cause was present in SW168 to allow for the agents to rely on the good faith exception.

SW 182 is for the search of the desk and locker used by Wells in the Rigger Shop. The affidavit itself differs greatly in terms of structure from SW 172. However, the affidavit provides additional information relating to the interview of ITC Scott Reckner. Paragraph 30 discusses in detail Reckner's relationship with Wells, his illness in 2011 and how it affected his relationship among his co-workers, the incident involving Wells' improper use of the government issued fuel card, the memorandum of record concerning the removal of trees on COMMSTA property, and Wells' work performance leading up to the murders. Affidavit in Support of SW 182, at ¶ 30.

The affidavit also contains a new section entitled "Other investigation and information," which adds paragraphs 35-43. Paragraphs 35-37 and 41-42 reveal the following: (1) there are six blue Honda CR-V's on Kodiak Island, but only

the Wellses' vehicle has a black "car bra"; (2) the autopsy of Belisle reveals that he was shot with "a .44 caliber bullet bearing markings of a 5 right twist, consistent with a Smith & Wesson Model 29/629 revolver or Taurus revolver," which is has not be located; (3) Wells may have purchased the murder weapon while traveling to Anchorage within the past year since he has purchased firearms from Anchorage in the past on two separate occasions; and (4) the revolvers recovered from the Wellses' residence were all blued, but a interview with a witness established that Wells carried a silver colored hand gun while hunting with the witness several years ago. These paragraphs show a connection between Wells and what investigators believe is the probable murder weapon, a .44 magnum revolver. This information, along with paragraph 30, provides the added probable cause necessary for the agents to rely on the good faith exception.

SW 251 is for the Wellses' residence and represents a shift in the investigation towards electronically stored information that is likely to still be in the possession of the defendant. The affidavit adds paragraphs 38(m), 42(d) and 46-71. The additional probable cause is based off items witnessed to be in the residence as a result of the search pursuant to SW 157. The investigation leading up to this point focused on where Wells may have purchased firearms. Financial records stored electronically were thought to still exist in residence.

Additionally, paragraph 51 and 52 discuss a possible financial motive for carrying out the crimes, and paragraph 53 adds information relating to the level of advanced planning required to commit the murders. Information that Wells is believed to possess. These paragraphs contribute significantly to a showing of probable cause. Therefore, the agents were entitled to rely on the good faith exception.

SW 252 sought electronically stored information that may be found on the person of Wells. SW 252, at Attachment B. In support of their application, investigators added paragraphs 53 and 63-65 to the affidavit. Investigators observed Wells acquiring another cellular telephone. It was thought that Wells may have acquired another cellular telephone with GPS abilities that would allow investigators to trace his movements when Wells traveled out of state. The additional information provides enough probable cause to allow the agents to rely on the good faith exception.

SW 347 was issued for the search of the Wellses' residence. It sought evidence related to automatic and pneumatic nailers (nail guns) and nails configured for use in nail guns. SW 347, at Attachment B. The affiant provided the additional probable cause necessary to issue the warrant. Paragraph 50 states that the forensic analysis of the markings on the nail head found in the defendant's tire indicate that the nail had been driven in using an automatic or pneumatic nailer.

Affidavit in Support of SW 347, at ¶ 50. Photographs taken of the defendant's garage during the execution of SW 157 revealed a partially obscured automatic or pneumatic tool that had attributes consistent with a pneumatic nailer. *Id.* at ¶ 51.

SW 348 sought 25 hairs from the defendant. Like the pervious search warrants, the affidavit includes the added probable cause necessary to allow the agents to rely on the good faith exception. Paragraphs 50 through 55 were added to the affidavit in support of the search warrant. Paragraph 54 indicates that lab technicians from the FBI lab in Quantico, VA, discovered head hairs consistent with those of the victim, Belisle, in vacuum sweepings recovered from the front driver's seat and front passenger area of the blue Honda CR-V. Affidavit in Support of SW 348, at ¶ 54. The lab technician also stated that other hairs were present and requested that a search warrant be issued in order to seize head hairs from James and Nancy Wells for comparison purposes. *Id.* Based on this newly discovered evidence, ample probable cause exits to allow for the agents to rely on the good faith exception.

SW 349 sought 25 head hairs from Nancy Wells. The affidavit was based on the same affidavit from SW 248 and both were issued on the same day. For the reasons discussed above, the agents can rely on the good faith exception.

SW 28 is for a Winchester Marlin .44 caliber rifle that belonged to Wells but was in possession of AST in Kodiak. The affiant, in support of the application,

added paragraphs 51 through 53. The victims were both shot with .44 caliber bullets. Winchester .44 magnum 240 grain jacketed soft points were found during the execution of SW 157. SW 156 revealed two expanded .44 magnum casings manufactured by Winchester. Forensic examination showed that the casings were not fired by the .44 magnum revolver found at the Wellses' residence. The only other .44 caliber firearm found in the defendant's residence that is capable of firing .44 caliber ammunition is the Winchester model 94AE that Wells turned over to AST. Based on this new information and the information contained in the previous warrants, there exists sufficient probable cause to allow for the agents to rely on the good faith exception.

SW 39 is for the Wellses' residence and relates to government's investigation into the nail gun. The warrant sought "small caliber firearm type casings and materials to which they are attached, manufactured for use in any type of tool capable of driving a nail, parts for reconfiguring such a tool to drive a larger or smaller nail, as well as nails that appear to have been operated on by this type of tool." SW 39, at Attachment B. The affidavit adds paragraphs 52-54. Forensic analysis of the nail guns seized pursuant to SW 347 found that, of the two, one fired nails the same size as was found in Wells' front right tire. However, further analysis determined that it was not the nail gun used to fire the nail into the tire. During the execution of SW 347, an agent observed a plastic strip labeled with the brand name

"Hilti." The plastic strip and attached casings are referred to as "boosters." The boosters are manufactured to be used with Hilti power nailers. A Hilti model DX 451 power nailer is listed in the tool inventory at the Rigger Shop. That nailer was shipped to an examiner at the FBI. It was later determined that the DX 451 shoots a nail smaller than the one found in the tire, but it can be reconfigured to shot a nail similar to the one found in the tire. When this new information is considered in connection with the information found in the previous search warrants, sufficient probable cause exists to justify the investigators good faith reliance on the search warrant.

SW 13-mj-163 is also for the Wellses' residence. It sought three swords thought to be in the possession of the defendant. SW 13-mj-163, at Attachment B-1, B-2. The affidavit in support of the application adds paragraphs 52 through 60. The additional probable cause comes from two interviews of John Stein, a former supervisor and friend of Wells. Stein told investigators that he lived with Wells for a short time in approximately 1996. *Id.* at ¶ 52. He brought his gun safe with him to the Wellses' residence. *Id.* Stein stated that he left the state for six months, leaving behind his gun safe. *Id.* He told investigators that when he returned to Kodiak he noticed that a .44 magnum caliber Smith and Wesson model 629 stainless steel revolver was missing from his gun safe. *Id.* Wells told Stein he did not know what happened to the revolver. *Id.* In a letter signed by Stein to AST regarding the missing

revolver, dated August 21, 1997, he indicated that he decided to leave his gun safe and guns with a friend, and that the friend was provided the combination to the safe. *Id.* at ¶ 53. The letter also states that he is missing a Leupold M8-12X twelve power rifle scope. *Id.*

A photograph taken of the Wellses' gun safe during the execution of SW 157 revealed a gray box that reads "LEUPOL." *Id.* at ¶ 55. The same gun safe was photographed during the execution of SW 347. *Id.* at ¶ 57. The gray box is not present in the safe. *Id.* This information was provided in SW 144, which is not challenged by the defense, but is included in SW 163. However, during the execution of SW 144, investigators saw a U.S. Coast Guard ceremonial sword inside the gun safe. *Id.* at ¶ 57. The sword's case bears the initials "JAS," which are the initials of James Stein. *Id.*

Stein was subsequently interviewed via telephone. *Id.* at ¶ 58. He stated that he did not give or sell the sword to James or Nancy Wells. *Id.* Stein also stated that Mr. and Mrs. Wells cleaned up his house and prepared it for sale when he was not present. *Id.* Stein volunteered that he is missing two other samurai type swords that he purchased in Okinawa. *Id.* at ¶ 59.

Mrs. Wells, who was present during the search, stated that Stein gave the sword to Wells as a gift. *Id.* at ¶ 60. She also stated that she heard Stein

suffered from dementia, a mental condition that the agents who interviewed Stein did not notice. *Id.*

The new information provides more than enough probable cause to justify the agents' reliance on the good faith exception since it demonstrates a possible connection between Wells and a gun similar to the one believed to be the murder weapon.

Finally, SW 285, which was issued after the indictment, sought expended bullets and fragments likely present on the Wellses' property. SW 285, at Attachment B. In support of probable cause, paragraphs 22 through 29 were added to the affidavit. The paragraphs reveal that the Wellses shot guns into the hill beside the residence. Affidavit in Support of Support of SW 285, at ¶ 22. Two individuals indicated to investigators that they had been invited over to the residence to shoot guns off the back porch, though neither individual actually did so. *Id.* at ¶ 23-24. Stein did shoot guns off the Wellses' back porch, but it does not appear that he actually did so with the defendant. *Id.* at ¶ 25. Given this new information, the agents were entitled to rely on the good faith exception.

A thorough review of all the search warrants at issue reveals that the affiants' provided the additional probable cause necessary to support their issuance. As such, the agents are entitled to rely on the good faith exception in each individual case. The Magistrate Judge recommends that no physical evidence should be

suppressed based on the defendant's claim that the warrants lacked probable cause.

### B. The Information Contained in the Search Warrant Affidavits is Not Stale

The defense claims that SW 251, SW 252, SW 347, SW 39 and SW 285 are stale.

The information offered in support of the application for a search warrant is not stale if "there is sufficient basis to believe, based on a continuing pattern or other good reasons, that the items to be seized are still on the premises." *United States v. Lacy*, 119 F.3d 742, 745-46 (9th Cir. 1997) (*quoting United States v. Gann*, 732 F.2d 714, 722 (9th Cir. 1984)). "The mere lapse of substantial amounts of time is not the controlling question of staleness." *Id.* at 745 (*quoting United States v. Dozier*, 844 F.2d 701, 707 (9th Cir. 1988)). Rather, courts "evaluate staleness in the light of the particular facts of the case and the nature of the criminal activity and property sought." *Id.* (*quoting United States v. Pitts*, 6 F.3d 1366, 1369 (9th Cir. 1993)).

The defense challenges SW 251 and SW 252 relating to electronically stored information at the Wellses' residence as well as the defendant's cell phone. Wells argues that there is no reason to believe that the evidence sought remained at the locations searched because Wells knew that he was a suspect since his residence and cell phone had already been searched.

The defense also claims that the search warrants issued pursuant to the government's investigation into the automatic and pneumatic nailers are also stale.[15] Again, the defense claims that Wells knew that he was as suspect. Thus, he had no incentive to keep such material in his home.

Finally, the defense claims that SW 285 is stale. The defense states that homicide is not a continuing crime, and that SW 285 was issued seventeen months after the murders.

SW 251 and SW 252 are not stale. The search warrants sought information relating to finances, email accounts and weapons purchases. Up until that point, the investigation had been focused on the search for physical evidence connecting Wells to the murders. The affidavit clearly states that investigation revealed that the murders indicate a high level of planning. Affidavit in Support of SW 251, at ¶ 53. As a result, the murderer left limited forensic evidence. Based on the affiant's training and experience, it is likely that the murderer used computers to gather information helpful to planning the crime. *Id.* This may include information relating to finances, email accounts and weapons purchases. *Id.*

The initial search of the Wellses' residence pursuant to SW 157 revealed several computers in the dining area along with numerous media storage devices, two routers and a wireless router. The Wellses' financial records indicate

---

[15] SW 347 and SW 39.

that they used the internet to purchase items from Costco and Amazon. Finally, the affidavit clearly spells out the government's belief that there may have been a financial motive for the murders and why the defendant's finances were an issue. *Id.* at ¶ 51-52.

This information indicates that there was reason to believe that the evidence sought would be found at the Wellses' residence. The investigators saw the items sought in plain view when the executed SW 157. Moreover, it is common for people to retain financial records for a reasonable period time.

There is little merit in the argument that Wells would have destroyed the electronically stored information simply because he is a suspect. The evidence sought was not the primary evidence in the case. Thus, Wells may not have recognized the electronically stored information as evidence. It is also entirely possible that he simply made a mistake or forgot to destroy the information. As discussed in section A, there is at the very least a colorable argument for probable cause to suggest that he electronically stored information would still be at the residence. The defendant's fixation on the passage of time is misplaced.

Likewise, SW 347 and SW 39 are not stale. Wells' alibi along has been that while he was driving to work on April 12, 2012, he noticed his tire was low, which caused him to return to his residence to change the tire. Forensic analysis subsequently determined that the nail found in the defendant's right front tire could

not have been picked up off the road. Affidavit in Support of SW 347, at ¶ 49. Paragraph 50 states that an automatic or pneumatic nailer was used to manually insert the nail into the tire. Pursuant to the execution of SW 157, investigators viewed automatic or pneumatic tool in the Wellses' garage. *Id.* at ¶ 51. Given that the investigators already saw the nailer in the garage and based on the nail guns value, it is reasonable to infer that the nail gun and materials associated with the use of the nail guns would continue to be at the Wellses' residence.

SW 285 is not stale. The defense places significant importance on the fact that the search warrant was issued 17 months after the murders and that homicide is not a continuing crime. The argument again places too much emphasis on the passage of time. The mere lapse of substantial amounts of time is not the controlling question in the staleness analysis. The relevant inquiry is based on the particular facts of the case, the nature of the crime and the property sought.

The property sought in SW 285 is for bullets fired on the defendant's property that may match the murder weapon. It is highly unlikely that a perpetrator would undergo the laborious task digging into the hillside to remove bullets that had been previously fired by a gun which was subsequently used to commit a crime. This is based on the obvious fact that the perpetrator forgot where or when he or she fired the weapon. Even if a perpetrator did remember, it is even more unlikely that he or

she would have been successful in removing the evidence without the necessary equipment.

In the present situation, the evidence obtained about where Wells fired firearms on his property came from interviews conducted in June, July and August of 2013. Furthermore, the metals present in bullets, although subject to corrosion, may persist indefinitely in some condition. Based on the particular facts before the court and the type of property sought, SW 285 is not stale.

The Magistrate Judge recommends that no evidence be suppressed based on the staleness argument.

*C. The Search Warrants Are Not Overbroad*

When determining whether a search warrant provides sufficient specificity concerning the places to be searched and the items to be seized, courts "have concentrated on one or more of the following: (1) whether probable cause exists to seize all items of a particular type described in the warrant; (2) whether the warrant sets out objective standards by which executing officers can differentiate items subject to seizure from those which are not; and (3) whether the government was able to describe the items more particularly in light of the information available to it at the time the warrant was issued." *United States v. Spilotro*, 800 F.2d 959, 963 (9th Cir. 1986).

Searches for electronic records pose a unique challenge for law enforcement in that the over-seizing of information is an inherent part of the electronic search process. *See United States v. Schesso*, 730 F.3d 1040 (9th Cir. 2013) (upholding the search of the defendants computer for child pornography). The problem was succinctly stated in *United States v. Comprehensive Drug Testing, Inc.*:

> There is no way to be sure exactly what an electronic file contains without somehow examining its contents—either by opening it and looking, using specialized forensic software, keyword searching or some other such technique. But electronic files are generally found on media that also contains thousands or millions of other files among which the sought-after data may be stored or concealed. By necessity, government efforts to locate particular files will require examining a great many other files to exclude the possibility that the sought-after data are concealed there.

621 F.3d 1162, 1176 (9th Cir. 2010). In striking the right balance between the government's interest in law enforcement and the right of individuals to be free from unreasonable searches and seizures, the government must limit its search in some way to ensure that information beyond the scope of the search warrant does not fall

into the hands of investigators. *See Schesso*, 730 F.3d at 1042 (discussing the "reality" that judicial officers exercise "greater vigilance" in protecting against the danger that the process of identifying seizable electronic evidence could become a vehicle for the government to gain access to a larger pool of data that it has no probable cause to collect). As such, courts look favorably upon the inclusion of search protocols in the actual search warrant, but failure to include a search protocol in the actual search warrant is not fatal. *United States v. Hill*, 459 F.3d 966, 978 (9th Cir. 2006); *Schesso*, 730 F.3d at 1047.

The defense argues that the search warrants relating to electronically stored information, SW 251 and SW 252, are overbroad because there was no financial motive to homicides, no travel was involved for which there would be a record, and the government knew which type of weapon was used to commit the murders. The defense claims that the affidavits in support of those warrants appear to be searching for motive rather than enumerated by specific facts contained in the affidavits. Thus, the searches amounted to nothing more than a vast data sweep of financial records and weapons purchases beyond the scope of the warrant.

In support of its motion, the defense cites *In re United States' Application for a Search Warrant to Seize and Search Electronic Devices from Edward Cunnis*, 770 F. Supp. 2d 1138 (W.D. Wash. 2011). The search warrant in that case sought to seize the following:

[A]ny computers or digital devices (collectively "digital devices") that may be located at the premises, and to search all electronically stored information ("ESI") contained in any digital devices seized from Mr. Cunnius' residence for evidence relating to the crimes of copyright infringement or trafficking in counterfeit goods. Specifically, in addition to the search of the residence and the seizure of digital devices, the application requests the authority for investigative officers to: (1) search all ESI contained in Mr. Cunnius' digital devices and related to the use of the devices; (2) conduct the search without segregation by a filter team; (3) conduct the search without foreswearing the plain view doctrine; and (4) permit investigative agents to obtain a second warrant if, during the search of the ESI, the investigating and searching agents find evidence of crime outside the scope of the instant warrant.

770 F. Supp. 2d at 1139. The search warrants at issue in this case do not suffer from the same deficiencies as those stated in *Cunnius*.

Here, the warrants were tailored to evidence related to the defendant's planning and execution of the murders. SW 251 Attachment B, when read in connection with the government's application, provides the necessary specificity as to the information sought, the locations where the items may be found, and the particularity of their relation to the murders.

During the first search of the Wellses' residence, investigator noticed several computers, media storage devices and at least two routers. Affidavit in Support of SW 251, at ¶ 46. The investigation revealed that Wells was known to use email address Jameswells69@hotmail.com. *Id.* at ¶ 47. Review of the Wellses' financial records available to investigators before the issuance of the search warrant demonstrate that he used costco.com and amazon.com to purchase items. *Id.* at ¶ 51.

The affidavit also spells out the Government's belief that Wells' motive may have been financial. The investigation showed that the Wellses had a significant amount of debt, and that Wells was having difficulties at work that may have caused him to be concerned that he might be fired or forced to retire. *Id.* at ¶ 52. In the affiant's training and experience, "when the job difficulties are considered in light of Wells' financial challenges, they form a possible motive for the homicide of Rigger Shop supervisor, Hopkins, and the man some of the staff at COMMSTA Kodiak thought was showing the ability to replace Wells, Richard Belisle." *Id.*

Furthermore, Attachment B describes with particularity the items to be seized. For example, it authorized investigator to look for any photographs of Wells while possession of any handgun that is silver or matalic, or any .44 magnum, documents relating to the purchase of firearms or ammunition, phone numbers and email addresses of possible sellers of firearms, financial records including bank records and two email accounts used by Wells.

Attachment B also set out objective standards by which executing officers can differentiate items subject to seizure from those which are not. For example, as a result of SW 157, investigator knew where in the house the items were likely to be found and what information to look for when they searched the devices. Therefore, SW 251 and SW 252 are not overbroad. The government's application strikes the correct balance between the government's interest in law enforcement and the right of individuals to be free from unreasonable searches and seizures.

Regardless of whether any portions of SW 251 and SW 252 may be overbroad, suppression of the evidence seized is inappropriate in this case for two reasons. First, "[t]he exclusionary rule does not require suppression of evidence within the scope of a warrant simply because other items outside the scope of the warrant were unlawfully taken as well." *United States v. Tamura*, 694 F.2d 591, 597 (9th Cir. 1982). Second, the good faith exception prevents the suppression of

evidence when agents act in objectively reasonable reliance on a search warrant issued by a detached and neutral magistrate judge that is later determined to be invalid. *Massachusetts v. Sheppard*, 468 U.S. 981, 987-88 (1984).

In *Hill*, the Ninth Circuit Court of Appeals held that the warrant at issue was overbroad in authorizing a blanket seizure of all electronically stored information when there is no affidavit giving a reasonable explanation as to why a wholesale seizure is necessary. *Hill*, 459 F.3d at 976. However, the Court or Appeals concluded that suppression of the evidence was not the proper remedy since the officers failed to justify the wholesale seizure to the magistrate judge, not because they acted unreasonably or improperly in executing the warrant. *Id.* at 977. The court stated that "[b]ecause the officers were motivated by consideration of practicality rather than by a desire to engaged in indiscriminate 'fishing,' we cannot say . . . that the officers so abused the warrant's authority that the otherwise valid warrant was transformed into a general one, thereby requiring all fruits to be suppressed." *Id.* (*quoting United States v. Tamura*, 694 F.2d 591, 597 (9th Cir. 1982)).

Here, the issuing magistrate judge was well aware that the search warrant authorized the seizure of all electronically stored information. Attachment B in SW 251 and SW 252 specifically allows for the seizure of "all electronically stored information." The justification for seizing all electronically stored information is found at the beginning on page 17 of the Application in Support of SW 251 and on page

18 of the Application in Support of SW 252. Each application details the probable

cause supporting its request,[16] the need for seizing all forensic evidence,[17] and the

nature of the examination of the evidence once seized.[18] Both search warrant

applications contain the following language:

> *Necessity of seizing or copying entire computers or*
> *storage medium.* In most cases, a thorough search of a
> premises for information that might be stored on a storage
> media often requires the seizure of the physical storage
> media and later off-site review consistent with the warrant.
> In lieu of removing storage media from the premises, it is
> sometimes possible to make an image copy of the storage
> media. Generally speaking, imaging is the taking of a
> complete electronic picture of the computer's data,
> including all hidden sectors and deleted files. Either
> seizure or imaging is often necessary to ensure the
> accuracy and completeness of data recorded on the

---

[16] Affidavit in Support of SW 251, at ¶ 65; Affidavit in Support of SW 252, at ¶ 69.

[17] SW 251, ¶ 67; SW 252, ¶ 71.

[18] SW 251, ¶ 68; SW 252, ¶ 72.

storage media, and to prevent the loss of the data either

from accidental or intentional destruction . . . .

Affidavit in Support of SW 251, at ¶ 67; Affidavit in Support of SW 252, at ¶ 71.

The above language shows that the affiants brought the issue to the attention of the issuing magistrate and presented him with a valid justification for why the wholesale seizure is necessary. Such was not the case in *Hill*. In that case, the officers failed to justify the wholesale seizure of evidence to the issuing magistrate judge.

Even if the search warrants were overbroad, the good faith exception prevents the suppression of the evidence in this case. In *Leon*, the district court suppressed a quantity of drugs found in execution of a facially valid search warrant on the ground that the affidavit to the warrant failed to establish the existence of probable cause. *United States v. Leon*, 468 U.S. 897, 904 (1984). The Court of Appeals for the Ninth Circuit affirmed, and in doing so refused to recognized a good-faith exception to the exclusionary rule. *Id.* at 905. The issue presented before the Supreme Court was "whether Fourth Amendment exclusionary rule should be modified so as not to bar the use in the prosecution's case-in-chief of evidence obtained by officers acting in reasonable reliance on a search warrant issued by a detached and neutral magistrate but ultimately found to be unsupported by probable cause." *Id.* at 900. The Court concluded that "the officers' reliance on the

magistrate's determination of probable cause was objectively reasonable, and application of the extreme sanction of exclusion is inappropriate." *Id.* at 926.

In a companion case, *Massachusetts v. Sheppard*, 468 U.S. 981 (1984), the *Leon* rule was used more broadly. The Court held that "[t]he exclusionary rule should not be applied when the officer conducting the search acted in an objectively reasonable reliance on a warrant issued by a detached and neutral magistrate that subsequently was determined to be invalid." *Id.* at 987-88. In that case, the warrant was defective because it misstated the items that could be seized. *Id.* at 985-87. The affiant had, however, properly set out those items in his affidavit, and the officer reasonably relied upon the magistrate's representations that the warrant authorized him to conduct the search he had requested. *Id.* at 986.

The basis for *Leon* is that the exclusionary rule is not implicated where there is no police misconduct to deter. In other words, the law enforcement authorities should not be allowed to rely on an error of their own making. The goal of the good faith exception is to limit the exclusionary rule to situations where the illegal behavior of officers might be deterred. *Leon*, 468 U.S. at 918. *Leon* has never been extended to the improper execution of a search warrant.

In *United States v. Gantt*, 194 F.3d 987 (9th Cir. 1999), the court discussed the application of the exclusionary rule where the violation is the fault of the officers. The court stated:

> If there is no error on the part of the judiciary, the good-
> faith exception is inapplicable. Stated differently, the good
> faith exception is not relevant where the violation lies in
> the *execution* of the warrant, not the validity of the warrant.
> Under such circumstances, suppression will presumably
> deter future violations and the exclusionary rule serves its
> purpose.

*Id.* at 1006.

In the present situation, the officer executed the search warrants properly. SW 251 covers all electronically stored information discovered at the Wellses' residence. As discussed above, the affidavit in support of SW 251 details the necessity for seizing all the data. The officers seized only those devices that contained electronically stored information. Once the information was seized, the search warrants make clear that they were only allowed to look for evidence "occurring from January 1, 2000 through the date of the execution of the warrant . . . ." SW 251, at Attachment B; SW 252, at Attachment B. The investigating officers did not choose that date at random.

The affidavits in support of the search warrants state that the investigators discovered that Wells had in his possession a silver colored hand gun when he hunted with a witness ten years ago. Affidavit in Support of SW 251, at ¶

60. The revolvers discovered in the Wellses' residence during the execution of SW 157 were all blued. *Id.* Thus, the officers had reason to believe that electronically stored information pertaining Wells' ownership of a silver colored hand gun may exist at least as far back as the year 2000, which is when Wells was last seen in possession of a silver colored hand gun. It appears that the searches were not a vast data sweep of financial records and weapons purchases beyond the scope of the warrant, and, even if the search warrants are deemed to be overbroad, suppression of the evidence is not the inappropriate remedy in this case because there exists no illegal behavior on the part of the officers to deter.

### D. The Information Contained in the Search Warrant Affidavit was Not Obtained Illegally or Improperly.

Wells claims that information used in all search warrant affidavits was illegally obtained from the defendant because his statements were obtained from interviews that are the result of custodial interrogations. The issue is the subject of defendant's *Motion to Dismiss Statements* at Docket 122. Analysis concerning those statements can be found in the recommendation regarding Docket 122. The Magistrate Judge recommends that since the initial interviews did not amount to custodial interrogations, the statements made by Wells were legally obtained.

Wells next claims that the investigators illegally searched Wells' desk at COMMSTA on two separate occasions, which requires the "proceeds of [all] search warrants using either of these sources of information" be suppressed. Docket

143. The first illegal search revealed a Letter of Caution that was issued to Wells. Affidavit in Support of SW 182, at ¶ 38. Although investigators improperly searched Wells' desk without a proper search warrant on two separate occasions, the information was acquired through an independent source. The illegal searches were properly disclosed in the Affidavit in Support of SW 182 to the issuing magistrate judge.

The independent source exception to the exclusionary rule allows information that is received through an illegal source to be considered cleanly obtained when it arrives through an independent source. *United States v. Heckencamp*, 482 F.3d 1142, 1149 (9th Cir. 2007) (*citing Murray v. United States*, 487 U.S. 533, 538-39 (1988)). When determining whether evidence obtained through a tainted warrant is admissible, "a reviewing court should excise the tainted evidence and determine whether the remaining untainted evidence would provide a neutral magistrate with probable cause to issue a warrant." *Id.* (*quoting United States v. Reed*, 15 F.3d 928, 933 (9th Cir. 1994)).

Wells claims that all affidavits in support of the search warrants fail to mention the illegal searches and are thus tainted. That accusation is misleading. The affidavit in support of SW 182 was issued on May 23, 2012. The affidavit informs the issuing magistrate judge of the improper searches and clearly demonstrates how the

affiant obtained the information concerning the Letter of Caution from an independent source. The affidavit in support of SW 182 reads as follows:

On April 13, 2012, FBI Special Agent (SA) Angela Strauss, a member of the FBI Evidence Response Team (ERT) processing the crime scene, started to go through the desk drawers. She found a copy of the Letter of Caution discussed in paragraph 29.e.,[19] which was photographed and seized. She was then advised that the ERT was not searching for documentary evidence, and ceased searching the desk. She has prepared a report on the matter, which is attached in a sealed envelope to the application to be dealt with by the court as explained in paragraph 43 below. On April 27, 2012, Coast Guard Investigative Service Guard Special Agent Jason Weimer started a search of the desk of James Wells in the Rigger Building. The entire homicide scene at the Rigger Building, including the desk of James Wells, had been previously released to the Coast Guard. USCG members and contractors have been cleaning and repainting the interior

---

[19] The actual reference is found in paragraph 30(e).

of the building, including cleaning the office where Wells's

[sic] desk is located. However, USCG personnel were

instructed not to touch Wells's [sic] desk or locker. SA

Weimer was not aware that a warrant was required. SA

Weimer saw something which he thought might be

relevant to the investigation of the homicides, and called

a supervisor. At that time he was told not to say what he

had found, to stop searching, and that a warrant would be

required to search further. SW Weimer has prepared a

report of his actions and what he has found. That report is

in a sealed envelope also attached to this application.

None of the information seen by SA Strause or SA

Weimer, with the exception of the Letter of Caution, was

used in preparing this affidavit, or is known to the affiant.

The Letter of Caution information used in the affidavit was

provided independently by Chief Reckner.

Affidavit in Support of SW 182, at ¶ 38. Paragraph 43 goes on to state that the

issuing magistrate judge reviewed the submissions of both SA Strause and SA

Weimer after making the probable cause determination. Paragraph 30(e) discusses

in detail the incident surrounding the letter, and confirms that ITC Reckner was present when Wells was issued the Letter of Caution.

SW 182 and all other search warrants issued after it are not tainted. The government was up front about the previous searches, as evidenced by paragraph 43, which requests that the issuing magistrate judge review the sealed envelopes before making a probable cause determination.

Furthermore, all search warrants leading up to SW 182 are not tainted even though they fail to mention the illegal searches of the defendant's desk because they show that the information concerning the existence and contents of the Letter of Caution was acquired independently from ITC Reckner.

The affidavit in support of SW 155 discusses the Letter of Caution. It states:

> ITC Scott Reckner had dealt with a series of disciplinary issues regarding James Wells, both this year and last year, to include accusations of misappropriation of a government fuel card. This disciplinary action resulted in the issuance of a letter of caution to James Wells in approximately January 2012. According to ITC Scott Reckner, ET1 James Hopkins informed Reckner of a missing fuel card and Hopkins' suspicion that James Wells

> may have been involved. When James Wells was
> presented with the caution letter, he seemed to show no
> care or emotion.

Affidavit in Support of SW 155, at ¶ 28(a). SW 155 was issued on April 13, 2012, at 6:33 p.m. The alleged misconduct of SA Strause and SA Weimer occurred at some point on April 13 and April 17 respectively. It is not clear from the record if the misconduct occurred before SW 155 was issued. Given that the letter was only referenced in connection with interviews of ITC Reckner, not from a letter of caution in the possession of the government, the information contained in SW 155 and all subsequent search warrants leading up to SW 182 are not tainted.

For arguments sake, if this court were to find that SW 155, which forms the basis for the subsequent search warrants leading up to SW 182, is tainted than the court should strike the tainted evidence and determine whether the remaining untainted evidence would provide a neutral magistrate with probable cause. *Heckencamp*, 482 F.3d at 1149.

Probable cause for a search warrant exists if there is a fair probability that evidence of a crime will be found at a particular place, based on the totality of circumstances. *Dawson v. City of Seattle*, 435 F.3d 1054, 1062 (9th Cir. 2006). The totality-of-circumstances test is based on the factual and practical consideration of

everyday life on which reasonable and prudent people act. *Illinois v. Gates*, 462 U.S. 213, 231 (1983).

Pages 15-21, *supra*, analyze the first four search warrants, including SW 155, to determine whether there exists a colorable argument for probable cause. This was done to determine whether the agents are entitled to rely in good faith on first four search warrants issued. Those same facts establish the probable cause necessary to support the issuance of the first four search warrants.

The last full paragraph on page 17, *supra*, discusses the contents of the letter of caution without specifically referencing it. If that paragraph is removed, it does not change the probable cause determination. The analysis discussed on pages 15-21, *supra*, minus the last full paragraph on page 17, *supra*, provides the probable cause necessary for the issuance of SW 155. The inclusion of the alleged tainted information does not require suppression of said evidence.

### E. The Search Warrants are Not Based on Material Misstatements and Omissions

Wells claims that all search warrants issued after SW 158 should be suppressed because they omit the fact that no blood or tissue was found as a result of SW 155, SW 156, SW 157 and SW 158. Wells contends that's "[t]hese are material omissions because they tend to exculpate Mr. Wells based on the government's theory of multiple use vehicles." Docket 143, at 14. Wells also challenges the statements made by Mr. Rudat about the loud metal-hitting-metal

sound he heard on the morning in question because the affidavit omits the fact that he was unconcerned about the sound he heard and that he was listening to loud music with his ear buds in at that time. Wells also claims that the government did not provide the issuing court with information relating to the FBI analysis of the quality of the video showing the automobile approaching the location of Building T2. Docket 163, at 10. He argues that the government failed to provide the issuing court with information concerning the inconclusiveness of the results from the lab tests.

These arguments are addressed in this court's order regarding the request for a *Franks* hearing. In that order, this court denied the defendant's motion at Docket 142. Therefore, no evidence should be suppressed based on the alleged misstatements and omissions argued by the defendant.

### F. The USCG Property Seized Exceeded the Scope of SW 157 and SW 160

The defense argues that the USCG property seized during the execution of SW 157 and SW 160 should be suppressed because the government has no probable cause to search the home and it is not readily apparent that the USCG property was unlawfully in the defendant's possession. The defense also claims that the phone numbers seized during the execution of SW 252 must be suppressed because they include numbers of people who are not sellers of firearms and are unrelated to COMMSTA workers. Finally, the defense argues that the logs

and film canister seized pursuant to SW 285 must be suppressed because they exceed the scope of the warrant.

The Magistrate Judge agrees that it was not immediately apparent that the USCG property was unlawfully in the possession of Wells, a USCG employee. Therefore, the USCG property should be suppressed. The phone numbers and the log, however, were properly within the scope of SW 285.

### i. The USCG Property

In *Horton v. California*, the petitioner was convicted of armed robbery of the treasurer of the San Jose Coin Club. *Horton v. California*, 496 U.S. 128, 130 (1990). The treasurer was accosted by two masked men, one armed with a machine gun and the other with a stun gun. *Id.*

Based on the victim's ability to recognize one of the assailants voice, which was partially corroborated by a witness who saw the robbers leaving the scene, a warrant was issued to search the petitioner's home for the proceeds of the robbery, not for the weapons used by the robbers. *Id.* at 130-31. During the execution of the search warrant, investigators found no proceeds of the robbery. *Id.* at 131. They did find "in plain view an Uzi machine, a .38 caliber revolver, two stun guns, a handcuff key, a San Jose Coin Club advertising brochure, and a few items of clothing identified by the victim." *Id.* at 131.

The trial court refused to suppress the evidence, and the petitioner was later found guilty and sentenced to prison after a jury trial. *Id.* The California Court of Appeal affirmed. The California Supreme Court subsequently denied the petitioner's request for review. The United States Supreme Court granted certiorari because the California courts' interpretation of the plain view doctrine conflicted with the view of other courts. *Id.* at 132.

The United States Supreme Court held that he plain view doctrine applies to situations "in which the police have a warrant to search a given area for specified objects, and in the course of the search come across some other article of incriminating character." *Id.* at 135. The Court reasoned that the plain view doctrine applies in these situations because the police officers executing the search warrant had a prior justification for the intrusion where they inadvertently came across a piece of incriminating evidence. However, the Court specifically limited the application of the plain view doctrine to situations where it is immediately apparent to the police that they have incriminating evidence before them. *Id.* The plain view doctrine cannot "be used to extend a general exploratory search from one object to another until something incriminating at last emerges." *Id.*

The Court went on to adopt a three-part test to determine when the seizure of contraband discovered in plain view during the execution of an otherwise valid search warrant is admissible. *Horton*, 496 U.S. at 136. First, the officers must

not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed. *Id.* Second, "not only must the item be in plain view; its incriminating character must also be immediately apparent." *Id.* Third, "not only must the officer be lawfully located in the place from which the object can be plainly seen, but he or she must also have a lawful right of access to the object itself. *Id.* at 137.

In the present situation, the government has failed to show how it was immediately apparent to the investigators conducting the search that the USCG items were contraband. The government accurately points out that the law enforcement officials had a legal right to be on the property and that the items were in plain view of the officers. The government also points out that the defendant makes no claim that he legally possessed any of the items. However, whether the defendant claims that he legally possessed the items is irrelevant in this case because the plain view doctrine requires the items illegal nature to be immediately apparent to the officer. The plain view doctrine cannot be used to justify seizing an item until something incriminating eventually emerges.

The record shows that SW 157 and SW 160 occurred April 15 and 16 respectively. Assistance from ITC Scott Reckner and ET3 Cody Beauford of the USCG was required to identify whether the USCG items were unaccounted for by USCG records. Docket 163-3. These identifications occurred on November 7, 2012, well after the search warrants were executed. *Id.* Given that digital photographs of

the items in question had to be presented to USCG personal in order to determine whether they were accounted for, it appears that it was not immediately apparent to investigators at the time they were seized whether the USCG items were, in fact, contraband.

Therefore, the Magistrate Judge recommends that the USCG property be suppressed.

### ii. The phone numbers

SW 252 sought all electronically stored information, including cellular phones, on the person of Wells. The seizure of the unidentified phone numbers contained in the cell phone did not exceed the scope of the warrant.

Attachment B specifically requests records and information relating to the possible sellers of firearms. It is possible that one of the unidentified phone numbers contained in Wells' cell phone belonged to a seller of firearms. As such, the unidentified phone numbers are possible records relating to a possible seller of firearms, which are within the scope of the warrant. The only way to know what numbers are relevant to the investigation is for the government to seize all the numbers so that they could identify to whom the numbers belonged.

### iii. The log and film canister

SW 285 sought expanded bullets and bullet fragments on the Wellses' property. Investigators seized a log upon the execution of the search warrant

because a metal detector indicated the presence of metal inside the log. The seizure of the log was directly covered by the warrant.

The government concedes that the film canister seized pursuant to SW 285 is outside the scope of the warrant, and has since been returned to Mrs. Wells through counsel. Thus, no further analysis concerning the film canister is necessary.

Since the government has failed to demonstrate how it was immediately apparent that the USCG items were contraband, all USCG items should be suppressed. The phone numbers seized pursuant to SW 252 and the log seized pursuant to SW 258 should not be suppressed because the items are within the scope of the search warrants.

## VI. Conclusion

The Magistrate Judge recommends that the *Motion to Suppress Physical Evidence* at Docket 142 be GRANTED IN PART AND DENIED IN PART. The government failed to demonstrate how it was immediately apparent that the USCG items were contraband. Therefore, the USCG magnifying lamp, USCG LCD projector, USCG Mustang suits, USCG opened bag of zip ties, USCG fluorescent

//

//

//

//

light bulbs, USCG COMMSTA drill, and USCG laptop computer should all be suppressed. All other evidence seized pursuant to the search warrants should otherwise be admitted.

DATED this ____16th____ day of January, 2014, at Anchorage, Alaska.

   /s/ John D. Roberts   
JOHN D. ROBERTS
United States Magistrate Judge


Pursuant to D.Ak.L.M.R. 6(a), a party seeking to object to this proposed finding and recommendation shall file written objections no later than **CLOSE OF BUSINESS, 1/27/2014.**

Failure to object to a magistrate judge's findings of fact may be treated as a procedural default and waiver of the right to contest those findings on appeal. The Ninth Circuit concludes that a district court is not required to consider evidence introduced for the first time in a party's objection to a magistrate judge's recommendation.

Objections and responses shall not exceed five (5) pages in length, and shall not merely reargue positions presented in motion papers. Rather, objections and responses shall specifically designate the findings or recommendations objected to, the basis of the objection, and the points and authorities in support.

Response(s) to the objections shall be filed on or before **CLOSE OF BUSINESS, 2/3/2014.** The parties shall otherwise comply with provisions of D.Ak.L.M.R. 6(a).