```
 1              UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF ALASKA

 3  UNITED STATES OF AMERICA,     )   Case 3:13-cr-00008-RRB-JDR
                                  )
 4                 Plaintiff,     )   Anchorage, Alaska
                                  )   Tuesday, January 14, 2014
 5       vs.                      )   10:01 o'clock a.m.
                                  )
 6  JAMES MICHAEL WELLS,          )   HEARING ON MOTION FOR DAUBERT
                                  )   AND RELATED IN LIMINE MOTIONS
 7                 Defendant.     )   RE DOCKETS 192, 194, 196,
                                  )   198, 200, 211, 213, 216, 219,
 8  _____)   222, AND 225

 9
                    TRANSCRIPT OF PROCEEDINGS
10
            BEFORE THE HONORABLE JOHN D. ROBERTS
11               UNITED STATES MAGISTRATE JUDGE

12  APPEARANCES:

13  For the Plaintiff:       KAREN LOEFFLER
                             BRYAN D. SCHRODER
14                           KATHLEEN A. DUIGNAN
                             U.S. Attorney's Office
15                           222 West 7th Avenue, #9
                             Anchorage, Alaska  99513
16                           907-271-5071

17
    For the Defendant:       F. RICHARD CURTNER
18                           Federal Public Defender's Agency
                             601 West 5th Avenue, Suite 800
19                           Anchorage, Alaska  99501
                             907-646-3400
20

21  Court Recorder:          SUZANNETTE DAVID-WATERS
                             U.S. District Court
22                           222 West 7th Avenue, Box 4
                             Anchorage, Alaska  99513-7564
23                           907-677-6102

24

25
```

1  APPEARANCES (CONTINUED):

2  Transcription Service:    GAYLENE'S WORD SERVICES
                             M. Gaylene Larrecou
3                            7330 Madelynne Drive
                             Anchorage, Alaska  99504-4659
4                            907-338-3936

5  Proceedings recorded by electronic sound recording; transcript
   produced by transcription service.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**ANCHORAGE, ALASKA - TUESDAY, JANUARY 14, 2014**

1

2    (Courtroom 6)

3         (On record at 10:01:39 a.m.)

4         THE CLERK:  All rise.  His Honor the Court, the

5    United States District Court for the District of Alaska is now

6    in session, with the Honorable John D. Roberts presiding.

7    Please be seated.

8         THE COURT:  'Morning.  We're here on the case of

9    *U.S. versus James Wells*, 3:13-cr-08.  Hearing is pursuant to

10   an order put out addressing defendant's *Daubert* and related

11   in limine motions.  My order was at Docket 242, and there was

12   a following order at Docket 251 that clarified what this

13   hearing is not about.

14        Before we talk about the respective witnesses, a

15   couple of points.  First I'll caution counsel to keep up with

16   what should be under seal or not under seal because some of

17   these items relating to the topics today were placed under

18   seal, and I don't know if that's still of concern to the

19   parties.

20        Let me address the matter of participation by

21   telephone.  Do we have somebody at all -- do we have one or

22   more persons on the telephone?

23        THE CLERK:  Your Honor, only one has made their

24   selves known.

25        THE COURT:  All right.  So we do have a person on

1    the telephone, so counsel should keep that in mind, speak in

2    front of a microphone so that the individual on the telephone

3    can hear.

4           I think related to the topic this morning, there are

5    a couple of matters that need to be addressed.  The government

6    has a motion to strike defense pleadings at Dockets 213

7    through 237.  That's at Docket 243, the government's motion to

8    strike, and I believe that one is ripe because the defense has

9    submitted an opposition at Docket 257.  I'm prepared to rule

10   on that.  If there's anything new to add, I'll hear from you.

11   Otherwise, I'll just go ahead and put the ruling on the record

12   on that matter.  Anything else?

13          MS. LOEFFLER:  We're comfortable with the Court

14   going ahead.

15          MR. CURTNER:  We're fine, yes.

16          THE COURT:  All right.  The motion to strike defense

17   pleadings was based on insufficient points and authorities.

18   The defense has filed related motions in limine and motions

19   for *Daubert* hearing, citing that *Daubert*, or *Daubert* (ph), if

20   you want the French, and *Kumho Tire*.

21          The gatekeeping function is actually a duty of the

22   Court regardless of the request from the parties to bring it

23   to the court's attention.  So the Court already has that

24   obligation, and I think the lack of any other case law, if

25   that's the situation, goes to the strength of the motion

1 itself, or motions, so I'll deny the motion to strike.  I
2 think it's proper for the Court to address those motions.  So
3 Docket 243 is denied.

4          The government has a motion to strike defense
5 pleading at Docket 240, and that was a supplement that the
6 defense filed without leave of court.  The Court did strike
7 that, and then I put out the order for this hearing, which
8 allowed matters to be filed in advance so the Court has an
9 opportunity to review what you're going to rely upon here
10 today, and that document was refiled under that order.  So I
11 think it's properly before the Court.

12          I understand the criticism of it, the shortcomings
13 based on what is not in that presentation.  If you're going to
14 rely upon a prior court ruling, the Court needs to know the
15 context of it, something about the pleadings and the issue to
16 see the significance of it.  In other words, you can't just
17 simply say in a similar case, the court ruled against the
18 defendant or against the government.  That bottom line doesn't
19 provide enough information.  But perhaps during the arguments
20 here today, we'll have enough information to get the position
21 of the parties.

22          So anyway, I'm going to deny Docket 254, the motion
23 to strike defense pleadings at Docket 240, as moot because I
24 did allow the item to get filed.

25          I don't know if there are any other matters that you

1  think need to be addressed before we hear the arguments on

2  respective expert witnesses.

3        MS. LOEFFLER:  Not from the government, Your Honor.

4        MR. CURTNER:  No, Your Honor.  Thank you.

5        THE COURT:  All right.  I'm going to start with the

6  government because it's their witnesses, and you can take them

7  in any order.  And I think to help follow what we're doing

8  here that we'll just take one witnesses at a time and follow

9  through with the argument, opposition, response, whatever it

10  is.  So we're interested really in the admissibility of the

11  testimony, not the conclusion reached, that's not being

12  addressed here, that's for the fact finder, but whether the

13  government should be allowed to put on that expert.  And it

14  may be that some of the expert conclusions are not

15  appropriate, but the witness should otherwise be allowed to

16  testify to some other conclusions.  So I think there may be a

17  distinction.  It's not an all-or-nothing proposition.

18        So the government can begin with whichever witness

19  you want to start with.

20        MS. LOEFFLER:  Your Honor, if I may, there is one

21  thing that I would like, with the permission of the Court.  I

22  believe there is one -- there's a set of standards that

23  applies to every expert, and if I can briefly, in less than

24  five minutes, summarize that with your permission.  What it

25  is, is that, first of all, I appreciate the Court's had this

1   hearing, and I'm relying -- a lot of what I'm going to rely on

2   legally relating on the advisory committee notes to Rule 702,

3   which pretty much cover everything, describe everything.  And

4   in the advisory committee notes, there are three principles I

5   just want to point out.

6         One is the amendment is not intended to provide an

7   excuse for an automatic challenge to the testimony of every

8   expert, and I think the Court already understood that.  The

9   second one is that *Daubert* is not a rule of exclusion, and the

10   advisory committee notes it is -- notes that exclusion is the

11   exception and not the rule.

12         And the other thing I did do before this hearing,

13   and I have a copy for everybody, is come up with the latest

14   Ninth Circuit 2013 case on *Daubert*, and I have it -- I

15   actually have a copy highlighted for everybody, and I

16   wanted --

17         THE COURT:  That's the *Quinn* case?

18         MS. LOEFFLER:  No, it is the *Alaska Rent-A-Car* case.

19   And I am going to hand the defense a copy, and I'm -- with a

20   page that I'm highlighting, and I'll give the Court one.  I've

21   highlighted for both of you.

22         THE COURT:  Thank you.

23         MS. LOEFFLER:  And if I get to the microphone, this

24   is *Alaska Rent-A-Car versus Avis-Budget*, and it is March 2013.

25   And the page I'm referring to, which I have highlighted in all

1   of your copies, page 883, says basically the judge is supposed

2   to screen the jury from unreliable, nonsense opinions but not

3   exclude opinions merely because they are impeachable, which I

4   think the Court was referring to a minute ago.

5        So it's a -- I mean, it's an important gatekeeping

6   function that every court has to do, but the reality is, as

7   this brings out, it's a pretty low hurdle for reliability.

8   You have to have a methodology that, in the area of expertise

9   that the person is talking about, is a methodology that's

10  valid, that's not guesswork or speculation, which is one of

11  the things that we pointed out from another case.  And the

12  advisory committee notes I will refer to as we talk to each

13  expert, because they point out that experience alone is enough

14  sometimes, experience and education, and I will refer to where

15  the advisory committees notes, which I think everybody will

16  admit is a -- you know, a good example of what the law is,

17  applies to each expert.

18       So if I may now turn, let's see who I have in what

19  order.  I think what I have first is the crime scene experts.

20  Do you want Mr. Gifford and Mr. Morton taken separately or

21  would you like them together?  They're both crime scene

22  experts, so the methodology is in essence the same.  It's up

23  to you, Your Honor, of course.

24       THE COURT:  The Court will rule separately --

25       MS. LOEFFLER:  Okay.

1        THE COURT: -- so you can take them as a group if

2 you want, the two of those.

3        MS. LOEFFLER: Oh, okay. Thank you. I thought that

4 might be the most efficient way. Now, for Mr. Gifford and

5 Mr. Morton, what they are is crime scene experts, and I

6 don't -- I haven't noticed any challenge to their --

7 obviously, to their qualifications. Mr. Gifford has 41 years

8 in law enforcement; Mr. Morton has 30 years in law

9 enforcement. Both of them, as is, you know, set forth in the

10 reports that we attached, what they did is they relied on

11 experience, training, and observation, and focused on the

12 crime scene evidence, which has been provided to the defense.

13        And what they did -- in Mr. Gifford, he explains his

14 reconstructive analysis and what pieces of evidence support it

15 right in his report. He has 41 years in law enforcement; has

16 taught many courses on forensics, death investigation,

17 bloodstain; he's got publications; and he's a teacher. The

18 Rule 702 specifically says that people can be qualified by

19 knowledge, skill, experience, training, and education; and it

20 also, under the advisory committee notes, note that Rule 702

21 expressly contemplates that the method can be experience

22 alone, and it may be the predominate method in some fields.

23        Now, what both of these individuals did is they took

24 the evidence of crime scene--the photographs, the reports, the

25 facts as set out, and they said which facts were relevant

1  right in their reports--and they applied their experience,

2  education, and training, and said here's the conclusions I can

3  draw from that.  If you look at the advisory committee notes,

4  not only is that explicitly nodded as a method to use, I can't

5  imagine any other method one would use on a crime scene other

6  than saying, you know, I've got 40 years of experience.  And

7  we cited some cases where, you know, somebody has 13 years of

8  experience and the court says okay, and in the advisory

9  committee notes they talk about law enforcement officers

10 talking about the jargon for drug dealers, you know, using

11 their experience and saying I know this from experience.

12 Well, these people, beyond that, they have training.  And I'm

13 not aware of any attack on the methodology of applying

14 observation and experience and training to the facts of the

15 case that you see from the crime scene.

16      And the bases of the opinion are laid out, you know,

17 right in the report, saying, you know, this is what I looked

18 at, this is where my conclusion comes from.  That's --

19 Rule 16(g) covers what, you know, you're supposed to put in

20 the report.  The reports are there.  And I'm not aware -- and,

21 in fact, in all of the myriad of defense pleadings, I don't

22 see anything that suggests that observation and application to

23 that -- there's no other way to do that.

24      And the second thing I want to point out a little

25 bit, the only thing that we see here is some complaint that,

1  you know, we want more, we want more.  And I think there's a

2  fundamental criminal process principle that applies here, and

3  that is that if you look at the cases and you look at the

4  criminal rules, the way you do experts is, Rule 16(g) says

5  turn over the reports; the advisory committee notes say the

6  general way to attack an expert is in court, vigorous cross-

7  examination, et cetera, here's what you have to put in the

8  report, and at trial somebody testifies and you cross-examine.

9  As long as the methodology meets the low hurdle, it's

10  something that people would do in this field, then any attack

11  is subject -- happens in the court.

12          And I think the sort of constant, well, we just want

13  more information and more information fundamentally

14  miscomprehends criminal process in which we don't do discovery

15  depositions of experts in the criminal process.  You know,

16  there's a rule, the rule is actually more limited than the

17  civil rule, and says, okay, as long as there is a methodology

18  that, as I said, is [sic] sort of nonsensical and isn't

19  guesswork or speculation and people would rely on.  There is

20  an obvious commonsense approach of what these -- both of these

21  people did.  Neither one of the experts are -- you know, they

22  don't work in the same organization, but they did exactly the

23  same thing.  They came up with similar conclusions and

24  slightly different ones, which the advisory committee notes is

25  there's nothing wrong with that.  They applied their

1  experience and training to the facts and to the basic crime

2  scene evidence, and that's, you know, valid and nothing

3  unusual about that or unique in any way.

4          And that's all I have.  Thank you.

5          THE COURT:  Well, a question or so.

6          MS. LOEFFLER:  Sure.

7          THE COURT:  Morton concludes that the noise

8  Rudat (ph) heard could have come from a damaged silencer.

9          MS. LOEFFLER:  I believe that's Mr. Gifford, sir.

10          THE COURT:  All right.  What is the methodology used

11  to come to that conclusion?  I mean, how does that -- there's

12  no evidence so far, because we haven't started the trial, but

13  there's no silencer recovered that I'm aware of.

14          MS. LOEFFLER:  There's no -- there was no gun

15  recovered at all.  What Mr. Gifford says is that the pieces of

16  fiber -- he says there are this paperous (ph) fiber that he

17  sees -- and this is in his report -- that he sees on the

18  clothing and that there is nothing that -- nothing where a

19  bullet would've ricocheted off of that would've created that,

20  and, therefore, his view is that the explosion of the bullet

21  spread these pieces of paper that you can see on the

22  photographs, and that that -- the most likely scenario is some

23  sort of silencer which he would say are often made out of

24  paper put around something, and that's what he has.  The

25  methodology is simply his experience and the fact that when

1   the -- that these paper items and his observation would be

2   that it didn't come from any other area, it had to have come

3   from the explosion of the gun, and that's what he says.

4           THE COURT:  Well, I guess my concern is not the

5   observations but the conclusions that -- can the expert in

6   these criminal cases, a forensic expert, give a speculation

7   guess as to what might've been a cause or --

8           MS. LOEFFLER:  Well, it's not speculation, Your

9   Honor.  I mean, what he says is he -- speculation would be I

10  guess somebody would use a silencer because nobody heard it,

11  or something like that.  He connects it to the evidence in the

12  case.  He says explicitly that the -- there is no other

13  explanation.  In other words, he does -- you know, he

14  eliminates everything else and say there -- this isn't -- it

15  couldn't have gotten on the clothes is what he says based on

16  the -- you know, nothing that where the bullet trajectories,

17  they don't show anything else that does that, and these are

18  fibers that around the wounds on the clothes in the

19  photographs.  And based on his experience, that's what he

20  believes it is, and he's certainly subject to cross-

21  examination about how strong he believes that, but the

22  methodology that he used to do it is observation which is

23  backed up by exactly what he says he relied on.

24          THE COURT:  All right.  I think I'll stop my

25  question at this point because I don't want to be an advocate

1   in this.  We'll see what issues are raised by the defense.

2            MS. LOEFFLER:  Thank you, Your Honor.

3            THE COURT:  And I may have more questions for you.

4            Mr. Curtner?

5            MR. CURTNER:  Thank you, Your Honor.  I think you

6   are focused, Your Honor, on the fact that there may be some

7   conclusions that are inadmissible in -- with these two experts

8   in not necessarily all their testimony.  And we agree that

9   they have expertise in crime scenes, but what we object to and

10  we think is inadmissible is when they go beyond their

11  expertise and they talk about certain conclusions that they

12  don't have -- we don't have any methodology as far as how they

13  came to those conclusions.

14           I would -- with Mr. Morton's report, one thing he

15  talks about in his report is the victimology and the fact that

16  the two people -- the two victims that were shot had nothing

17  in their lives that would explain this violence, and he goes

18  on to a conclusion that this is workplace violence.  And the

19  problem is that -- with that conclusion is that it is

20  subjective, it is guesswork in our opinion, and it's based --

21  and it creates a profile of the person who committed these

22  crimes that would only fit Mr. Wells.  There's no evidence or

23  indication that anybody else in this small workplace would be

24  involved in workplace violence.

25           Now, we think that there are other explanations that

1  are -- that -- for this violence that go beyond workplace

2  violence, and it could be from -- based on the things in the

3  lives of these two victims.  There are other explanations, but

4  for them to conclude that this is workplace violence, that is,

5  Mr. Wells did this, that's basically a conclusion for the

6  jury, and they go beyond the scope of their expertise.

7            With Mr. Gifford, you have pointed out that his

8  testimony -- or his report about a silencer, that contradicts

9  from what I read as Mr. Morton's in -- report.  And also I

10  think that -- and to my mind, the followup investigation on

11  the fibers contradict that, and so I think that, you know,

12  that's just evidence of his subjective conclusion that's not

13  based on the evidence, and that -- about these fibers, and it

14  contradicts Mr. Morton's report.

15            And the fact that they disagree, these two crime

16  experts, on the sequence of the shooting, I don't know if

17  that's critical.  They can have different opinions on that,

18  but the -- as this points out, I think that, you know, the

19  reliability of each -- in order to -- are they reliable in

20  their 702 as far as making the other opinions and conclusions

21  that we have.

22            And with Mr. Gifford's report, he again, at page 1,

23  talks about workplace violence.  And so that's our main

24  objection to their report, and we think their testimony about

25  workplace violence and it couldn't be anything but somebody

1   who worked there, is a conclusion for the jury and beyond the

2   scope of their expertise.

3          THE COURT:  Would you allow the witnesses to testify

4   as to their observations but preclude their conclusions?

5          MR. CURTNER:  Yes.

6          THE COURT:  Do you have any case authority that

7   helps the Court in this area?  Because we don't have many

8   experts in criminal cases in this court, and so looking for

9   how the court approaches this type of situation.

10         MR. CURTNER:  And, you know, this is a very unique

11  case of that, Your Honor.  This is not DNA, this is not

12  fingerprint evidence, you know, the strictly scientific.  And

13  I think that there's sort of a theme in this case when there's

14  a lack of evidence as far as motive or as far as -- and we'll

15  get to that later as far as identification of Mr. Wells being

16  at the scene.  When there's no evidence, then we're getting

17  into opinions, not evidence, on that.

18         And so I think that it's -- the theme here is that,

19  based on a lack of evidence, the government has been able to

20  retain experts that fill in gaps with opinion, and that's

21  what I think.  And I -- you know, this is a unique case, these

22  are novel issues.  I think all we can do is apply the basic

23  principles of *Daubert* and *Kumho Tire* and also Rule 702.  And,

24  you know, I know you understand the standards, and I think

25  that with -- in this particular case, with the crime scene,

1   there are conclusions that go beyond what the gatekeeper

2   should allow to go to the jury is -- we -- I think we've

3   illustrated that.

4           THE COURT: All right. Reply?

5           MS. LOEFFLER: Yes, Your Honor. First of all, I

6   would say that opinions are all experts do, so to say that you

7   can't give an opinion based on the facts I think

8   misunderstands it. And I would go directly to the advisory

9   committee notes, which says, "When a trial court applying this

10  amendment rules an expert testimony is reliable, that does not

11  mean that contradictory expert testimony is unreliable." In

12  other words, people don't always draw the same conclusions.

13  The question is is the method reliable.

14          On the issue, it also, in the advisory committee

15  notes on page 350, it says, "It also is important in some

16  cases for an expert to educate the fact finder about general

17  principles without ever attempting to apply these principals

18  to the specific facts.

19          Now, both Mr. Gifford and Mr. Morton, I mean, with

20  30 and 40 years of law enforcement experience going to a crime

21  scene, they observed it; the facts are going to be put in by

22  the jury, but the observation that they make, and, in fact, we

23  have three different experts who, as far as we know, don't

24  even know each other, which came up with the same conclusion,

25  which is the facts lead to a view that this was an insider and

1 workplace violence.  Well, that opinion, the question is the
2 methodology of relying on the facts and observing that, is
3 that valid?  Yes, it's exactly what experts do, and talk about
4 characteristics.

5      And if the Court wants a supplemental pleading, I
6 can put in case law.  I mean, there's no case law from the
7 defense challenging this at all.  We put in some cases about
8 talking about characteristics of the crime.  But that's
9 exactly what -- if you look at Mr. Morton's CV, he's a
10 behavioral analysis unit, he examines crime scenes and talks
11 about what you can glean from them.  The basis for what they
12 glean, which is about there doesn't appear to be anything in
13 the background of these individuals--that will come in from
14 other witnesses--you know, the relevance of the facts that
15 their relying on will be put in by other witnesses, and they
16 will apply their expert principles to that, are exactly
17 what -- and exactly what they do every day: What do you glean
18 from the crime scene?

19      And they've set forth their bases, which are
20 actually pretty obvious in this case and which is, you know,
21 bypassing the camera, knowing when these two people were
22 there, that this looked like targeted violence, there's not a
23 robbery, you know, all of the criteria make that conclusion
24 something that's not only reliable, it's not nonsensical, it's
25 based on it.  And as the advisory committee notes, the way you

1  challenge that conclusion is vigorous cross-examination.  The

2  defense in this case has not put in a single case suggesting

3  that that type of crime scene analysis is -- you know, if they

4  dispute it -- what they're saying is it's unfair the

5  government is filling a gap with expert opinion.  But that's

6  what it's for, and that's what you do.  These are -- you know,

7  these aren't people that are just making up something.  The

8  facts will be put in by the jury, they'll draw the

9  conclusions, and the defense can cross-examine them on the

10  basis for that.

11        THE COURT:  Do you anticipate these experts sitting

12  in and listening to the evidence that's presented?

13        MS. LOEFFLER:  I think to some extent, yes.  I'm not

14  right now sure whether we would ask that they sit in through

15  sort of everything, because I think that the facts they're

16  going to rely on to the extent that they are not introduced in

17  court, the experts certainly couldn't testify to that, and

18  that would be appropriate objection.

19        But we haven't -- some of the facts I don't think

20  will be, you know, in dispute, and I'm -- you know -- it's our

21  risk, in essence, if I don't have them sit in and they

22  testify -- they can't testify to a fact that isn't put in in

23  front of the jury, but these are facts that we think are not

24  really going to be assailable in the case.

25        So I just have to determine money-wise whether we're

1  going to pay to have them -- how much we're going to have them

2  sit through, but that's a risk that we take.

3         THE COURT:  One of these two experts talks about a

4  motive being discerned through actions of the offender and the

5  lifestyles and occupations of the victims.

6         MS. LOEFFLER:  Right.

7         THE COURT:  And in order to come up with an opinion

8  about the motive, it seems like you'd have to have a certain

9  amount of factual basis about the offender and the victims.

10         MS. LOEFFLER:  Which we intend to put in evidence.

11         THE COURT:  So my question, then, is that if they

12  don't sit in, then you'd have to make a hypothetical question

13  that assumed such and such.  I mean, in other words, they have

14  to have those facts to make -- to give an opinion about the

15  motive.

16         MS. LOEFFLER:  Yeah.  I mean, what they're going to

17  talk about -- they're not going to -- neither one of them are

18  testifying about the offender's specific motive.  What they're

19  testifying about is that this appears to be a targeted insider

20  job.  They're not going to get up there and say let me talk

21  about Mr. Wells and why he did it.  That's not what these two

22  are going to talk about.  What they're saying is if you look

23  at the facts of the case, you can -- it appears to have been

24  done by an insider and it appears to be workplace because it

25  is targeted on these two, there was no robbery, there doesn't

1 appear to be any other motive.

2       And I believe, again, that's subject to cross-

3 examination in the courtroom, the method of analyzing these

4 facts and coming up with this conclusion is a reliable method.

5 And if the Court has some -- it's -- with all due respect,

6 it's not up to the trial judge to say, well, the method's okay

7 but I disagree with the conclusions. That's exactly what the

8 advisory committee notes in some cases we cited. They say

9 that's up to the jury. And if you look at the -- and it says

10 it explicitly in the *Avis* case I just said, look, it's not up

11 to the court to decide whether the expert is right or wrong.

12 What you decide is -- you know, is this type of thing,

13 analyzing the facts of the case and seeing what it -- you

14 know, applying your experience, 40 years in case, or 30, and

15 saying here's the conclusions I can draw a valid method? Of

16 course it is. That's exactly what these people.

17       And then, you know, if the defense objects to it,

18 they cross-examine them, and that's what the advisory

19 committees do. It -- sort of skepticism of it (indiscernible)

20 if they reached the right conclusion is something for the jury

21 to decide.

22       THE COURT: I'm not concerned about the judge

23 reaching an opinion or the pretrial motion judge reaching an

24 opinion. My concern is to what extent does it encroach on the

25 jury's ability to make these decisions. Basically, you're

1 doing some of the thinking for the jury through the opinion of

2 the expert, and I don't know if this is a valid statement, but

3 I think the defense was making this claim that you can't fill

4 in facts with the opinion of an expert. I mean, you have to

5 have some -- the facts, and then the expert can give an

6 opinion, and the jury can agree or disagree with it.

7 But do you have any case law, or can you -- do you

8 think you might be able to find some that would talk about

9 this issue in terms of the extent of conclusions that the

10 expert can give? Because we're not talking about, you know,

11 science where you have --

12 MS. LOEFFLER: No.

13 THE COURT: -- a mathematical answer. This is a

14 sociological issue, and so the question is how far can the

15 expert go in --

16 MS. LOEFFLER: Well, in --

17 THE COURT: -- giving his opinion?

18 MS. LOEFFLER: In fact, I can give two things. One,

19 in fact, in the advisory committee notes, they specifically

20 talk about sociology and say that's an, you know, appropriate

21 thing to come in and it doesn't have to do with scientific

22 conclusions.

23 But the other thing I can do, and if you would like

24 to, I'll file the supplemental cases about when experts talk

25 about they've had -- in child sexual abuse cases, they've had

1  victims who get up there, and, you know, the jury doesn't

2  necessarily understand what an eight-year-old does or doesn't

3  know, and then they said it's perfectly appropriate to put in

4  an expert in to say, you know, this is the behavior, this is

5  the -- you know, this is my conclusion from my study of child

6  sexual abuse victims about how they behave, which is an

7  explanation as to the credibility of the child.  And I can

8  cite to you Ninth Circuit authority supporting that.

9        I mean, that's exactly what experts do.  I think it

10  is sort of -- you know, to say you can't fill in gaps of

11  explanations with an expert, that's exactly why.  Otherwise,

12  the expert opinion wouldn't be relevant if you weren't filling

13  in a gap, and especially in nonscientific experts.  It says,

14  you know, it might be important in some cases for an expert to

15  educate the fact finder about general principles.  But in this

16  case the conclusion, that's why you use a crime scene expert,

17  to say my conclusion looking at this is that it was a

18  targeted, you know, killing, intentional killing in the

19  workplace.  And as long as this isn't sort of nonsensible

20  guesswork, it's a valid opinion that is subject solely to

21  cross-examination.

22        But if you want supplemental cases on, like the

23  child sexual abuse line of expert opinions, I mean, I think

24  it's analogous because it talks about here's the

25  characteristics of this type of person, and the expert talks

1  about them.

2          THE COURT:  We'll just leave it this way, then.

3  Make a note to provide any authority that you have along our

4  discussion, and Mr. Curtner will have a chance to respond to

5  that, so we'll just move on to the next expert.

6          MS. LOEFFLER:  Okay.  Let's see where -- let me grab

7  my pile.

8          The next one I guess I would refer to as

9  Mr. Schmidt, who is a 30-year -- I think I have 30 years is

10  the right -- he's an expert in Hondas.  I know he's a

11  Honda CRV engineer, and he's testifying as to his observation

12  of and says he's like 70-percent sure this appears --

13  70-percent sure this appears to be a Honda, an early model

14  Honda CRV, and he sets forth here's -- you know, here's why,

15  in color and shape and this and that.  And I think that's --

16  it's one of the things that again the advisory committee

17  notes, you know, at the top of page 351, "702 expressly

18  contemplates an expert may be qualified on the basis of

19  experience."  And I think we cited (indiscernible) case in

20  which we point out that there's nothing wrong with somebody

21  using their specialized knowledge of, in fact, what an early

22  Honda CRV is, to say I can look at this, and here's the

23  characteristics give me a 70-percent conclusion.

24          And in terms of the issue of, you know, it's not a

25  100-percent conclusion, but, again, that's very common in the

1   area of expert opinions.  I guess my -- one of my best

2   analogies is before we had DNA, we often had in the court,

3   people would put in blood types and say, you know, the

4   perpetrator in this case was AB; you know, that's 20 percent

5   of the population, there's a one-in-20-percent characteristic.

6   I mean, there's lots of forensic evidence that is --

7           THE COURT:  That's scientific.

8           MS. LOEFFLER:  Yes, of course.  But there's lots of,

9   you know, in cases in which you make the possibility more

10  likely than not.  We have a ballistics expert that's not

11  challenged that says here, it's one of three guns.  What this

12  person did, I mean, in terms of -- I mean, the advisory

13  committee notes expressly acknowledge this type of expertise.

14  You know, he has specialized knowledge of Honda Civics, looked

15  at the thing and said here's why I think it's most likely.

16  And he can be cross-examined on, you know, where the 30

17  percent comes from, and that's, you know, I mean, that's a

18  common usage of experts.

19          THE COURT:  Does his report indicate where the

20  percentage comes from, percentage of accuracy?

21          MS. LOEFFLER:  Well, what it says is is that he says

22  he is -- that he's about 70 percent, and he explains what

23  characteristics he's relying on.  So it's not a -- you know,

24  the mathematical is his own view of about I'm 70 percent, and

25  he explains in his 302 that -- and his testimony it's based on

this shape and this color and exactly what the basis of his
opinion is. The mathematical certainty is -- it's not a
mathematical certainty, and obviously he's not using a -- you
know, a scientific test to get there. He's applying his
expertise and saying this is what it -- you know, this is what
I view it and this is why. It's just sort of a commonsense
approach, and the courts recognize that that type of
specialized knowledge is fully appropriate for experts.

THE COURT: It's one thing to conclude that, in his
opinion, the car is the same as in the video, and it's another
to put a percentage.

MS. LOEFFLER: He doesn't conclude it's the same as
the video. He says the video -- he's 70-percent belief that
it's a Honda CRV, early model. He doesn't say this car in the
video is this car.

THE COURT: Right. I'll accept your correction.

MS. LOEFFLER: Yeah. I just wanted to be clear.

THE COURT: But in terms of putting a percentage, I
don't remember reading anything about any other comparison for
percentage. I mean, just why not 55 percent, why not 80
percent?

MS. LOEFFLER: Well, I think that's cross-
examination. I think it's an appropriate question to say how
sure are you. It's just a way of phrasing an answer. And I'm
not sure of any cases that say when you say, you know, are you

1  more than 50-percent sure, yes, I'm more than 50-percent sure.
2  How would -- you know, if I ask you what would be, you know,
3  your percentage of belief, (indiscernible) said I'd be about
4  70-percent sure.  I think it's a fully appropriate way to
5  phrase the question, and it's --

6           THE COURT:  All right.  I just didn't understand --
7           MS. LOEFFLER:  I mean, I think I put how sure I am
8  of it and what it leads you to.  I mean, he's not going to get
9  up there and say I'm 100-percent sure this is whatever, and
10 then you just -- it's just -- that's just normal in-court
11 cross-examination, you know.  The defense can challenge the
12 bases, but in terms of what we have here is does he have
13 qualifications?  Of course.  Is this reliable?  Well, the
14 advisory committee notes say of course it is, it's somebody
15 who's to lots of expertise who looks at it and says let me
16 tell you why I think it's a Honda CRV and let me tell you, you
17 know, on cross-examination or even in direct why I can't be
18 absolutely 100-percent positive.

19          THE COURT:  All right.  Mr. Curtner, we're talking
20 about Mr. Schmidt.

21          MR. CURTNER:  Yes, Your Honor.  First of all,
22 though, let me follow up, and I appreciate the Court giving us
23 a chance to reply if the government files supplemental
24 briefing.  But I want to indicate to the Court that what we
25 have been trying to get testimony and *Jencks* material and

1 interviews that were the basis of these opinions for a long

2 time, and we have received since January 3rd over hundreds of

3 audio interviews.  I think we have over a hundred hours of

4 interviews to listen to now.  And just, for an example, we'll

5 talk about Dr. Meloy, but in his case --

6                THE COURT:  No, we're talking about Schmidt.

7                MR. CURTNER:  Well, okay.  So I just want to give

8 you the idea of how many -- these experts depended on a whole

9 lot of information that we haven't been able to listen to yet

10 and read.  So -- but with Mr. Schmidt, I think the second

11 thing that the Court as gatekeeper needs to look at is the

12 identification putting Mr. Wells at the crime scene, and

13 through the vehicle is the only way.  There's no forensic

14 evidence that he was at the crime scene, there's no witnesses

15 that put him at the crime scene.

16                And so when we look at Mr. Schmidt's testimony,

17 first of all, the Court should be aware, and we -- there have

18 been three other FBI experts that have looked at the quality

19 of the video and have declared you can't really identify this

20 vehicle based on the poor quality of the video.  So I think

21 the problem I have with Mr. Schmidt's testimony and his

22 conclusions is that I think it's such a suggestive process.

23 In my mind, the analogy I make is that this was a bank

24 robbery, and in the old days bank robbery surveillance photos

25 were very, very poor.  And if experts came in and said, you

1 know, you can't identify who that person is, and then they go

2 to somebody else and they show them a picture of the suspect

3 that they're looking at and say do you think that's the person

4 in that picture, and whatever their expertise might be, and

5 they say yes, I think that's going to be suggestive. That's

6 going to be identification that's suggestive.

7 And in this case, Mr. Schmidt, who's I don't think

8 has ever been qualified as an expert before, I don't think he

9 has the credentials as an expert, but -- and I think the Court

10 pointed out it is guesswork. Seventy percent, I mean, you're

11 right, that is his guess. But once they -- he looked at the

12 videos of Mr. Wells's car -- they took videos of Mr. Wells's

13 car driving past on April 19th and April 20th. Once he had a

14 picture and once he -- it was known to him that the -- what

15 they were looking for is if that vehicle in the poor quality

16 video frame is a Honda CRV, that's why they contacted him,

17 he's a Honda -- he's got experience with Hondas and going way

18 back, and I think that given that there's such a poor quality

19 of the video, and then they asked -- they find somebody who

20 can identify, 70 percent at least, that that's the Honda CRV,

21 is the same as the suggestive lineup at a bank robbery.

22 And so I think that this is where clearly as

23 gatekeeper, this type of conclusion should not come in before

24 the jury, because that is basically a jury determination that

25 needs to be made.

1        THE COURT:  Is it not more like identifying in your

2   bank robbery analogy perhaps ethnicity or some characteristic

3   of who is depicted, male or female, whatever characteristic

4   you want to take, not saying it's one and the same person as

5   the defendant, but it sort of narrows down the field?  The

6   government has the burden of proof in this case, and it's a

7   high one, beyond a reasonable doubt, and so giving the fact

8   finder as much evidence and opinion as they can to assist them

9   in making that determination.  All evidence is, in a sense,

10  suggestive to be relevant.  I mean, the idea of trying to

11  identify that car as belonging to the Wells family.  I mean,

12  that's the relevance of it.

13       MR. CURTNER:  Well, I just think this whole process

14  was so suggestive that, you know, given this poor quality

15  video that you can't even tell what type of car, and then say,

16  you know, you're an expert on Hondas, do you think this is a

17  Honda CRV is, I think -- that's taking it from the province of

18  the jury.  And so I think this has gone beyond his expertise

19  as far as, under the circumstances, of his identification,

20  so --

21       THE COURT:  All right.  Thank you.

22       Reply?

23       MS. LOEFFLER:  If I can respond, I have one factual

24  and one legal.  One, the factual, the defendant's counsel's

25  statements as to what government video people said is simply

1  false.  The FBI experts did not say that nobody can identify

2  what this is from the video.  They said they couldn't enhance

3  it, and they also said, in the things that we have turned

4  over, a car expert might be, you know, able to look at it,

5  which is why we went to a car expert, and that's what we did.

6          Secondly, I did not see, despite about eight

7  pleadings from the defense, a single case cited suggesting

8  that alleged bias of a government witness should be a basis to

9  exclude under *Daubert*.  That's what your cross-examine on.

10 And I'm not going to go into these.  I don't think it's

11 relevant to the Court what was said to the, you know, expert,

12 whether somebody said, oh, it's a Honda Civic, can you verify

13 that, which is obviously not what happened.  But bias is

14 something that you cross-examine experts on all the time.

15 It's not a *Daubert* issue.

16          And basically this is something that -- I mean, as

17 the Court pointed out, lots of times people give descriptions,

18 and we admit the descriptions even when the person can't be a

19 hundred-percent sure.  I mean, I don't think it's relevant.  I

20 mean, I had a bank robbery case where, you know, we identified

21 somebody as a female by the rear end in the picture.  I mean,

22 we talked about it, the jury looked at it, somebody said,

23 yeah, that's a female's rear end, and the jury decides it.

24          Anyway, as a matter of law, there's not a single

25 case cited by the defense in any way that suggests their new

1  theory that we believe the expert is biased by his personal

2  knowledge.  That's not a matter of law under *Daubert*.

3           I'm sorry.  I think I'm up next on the --

4           THE COURT:  You are, so choose your next one.

5           MS. LOEFFLER:  My next one is Meloy, and then the

6  last two experts are going to be Mr. Schroder, so that's why

7  we're taking it in this order.

8           Mr. Meloy is -- again, I don't think there's any

9  confusion as to his qualifications.  Obviously he's -- he --

10  and he -- you know, he's a forensic psychologist.  He has

11  testified as an expert in lots of different places.  He's done

12  some 2,000 interviews in crimes, if you look at his resume.

13  And in his report, in Rule 16 we originally met the deadline

14  by putting in the -- you know, a summary of his statement, and

15  then I asked him to write a report.  And in his report, if you

16  want to turn to his methodology, he actually annotated his

17  report with the studies that were the basis of his opinions.

18           Now, the attack seems to be that you can't testify

19  as to general characteristics, which the defense said in their

20  motion, but they cited no cases to support it.  And, in fact,

21  the advisory committee notes specifically and explicitly talk

22  about this type of situation.  They point out that it is

23  common as an expert -- sorry, I was grabbing Mr. Schroder's

24  instead of mine.  "It is in fact common as an expert, yet it

25  might be important in some cases for an expert to educate the

1 fact finder about general principles without ever attempting
2 to apply these principles to the specific facts of the case."
3 That's in the advisory committee notes on page 350. And they
4 talk about this situation.

5 In fact, he's not going to say, because he didn't
6 examine Mr. Wells, but what he is is a forensic psychologist,
7 and he's going to talk about the characteristics of workplace
8 violence. Now, that is very -- again, since the Court has
9 already invited me to do that, I will supply cases that talk
10 about characteristics of child sexual abuse victims in which
11 the court admitted them and said, yeah, that's perfect for
12 expert opinion because it allows something that the public
13 wouldn't necessarily know.

14 The attack on this appears to be, you know, you
15 don't have -- you're filling in the motive. Well, that's
16 exactly right. It's something that this person has studied
17 for years and years and years, which is what is the
18 characteristics of the type of people that commit a workplace
19 violence.

20 Now, again, we will put in the facts that show that
21 to be the case, and then we will put in Mr. Meloy. Because he
22 could not testify first, we have to do the normal process.
23 We'll put in the facts that -- and the jury will apply the
24 facts to his principles. And that's exactly what's
25 contemplated right in the advisory committee notes about him

1   testifying these are the characteristics, and then the jury

2   will decide whether the facts apply.  That's exactly what the

3   advisory committee notes say to do.

4           And there's -- the relevance, I think, has been

5   conceded because the defense is trying to keep him out because

6   he talks about something the jury wouldn't know,

7   characteristics such as there's generally not a warning, and

8   that type of thing.  And, of course, the admissibility will

9   come in by the trial judge when he decides, yes, you put in

10  the facts that he states are the basis, those facts will be

11  admitted through the evidence of other people.  And that's how

12  we're going to do it, and I think it's the type of testimony

13  that's been admitted.  But, as I said, my best analogy is the

14  child sexual abuse cases.

15          THE COURT:  At Docket 228-9, which is this expert's

16  presentation, I guess I'll call it.

17          MS. LOEFFLER:  Uh-huh (affirmative).

18          THE COURT:  There's a list on page 13 to 17 with a

19  lot of items.  And my question is are these publications that

20  he's read.  Maybe that's what you were referring to when you

21  said initially that he's indicated what studies he's --

22          MS. LOEFFLER:  Well, what --

23          THE COURT:  -- looked at to prepare this opinion.

24          MS. LOEFFLER:  No, what I did is I -- let me go

25  through.  What we did is took his resumé -- I'm thinking --

1  I'm hoping I'm looking at exactly the same presentation that

2  we filed.  There are -- on pages 4 to, I think, I don't know,

3  whatever, he talks about peer reviewed and published

4  scientific papers and abstracts that he has done, that he has

5  been involved in.  He also -- one of the things, again, in the

6  advisory committee notes when they talk about it's appropriate

7  to testify based on education, research, training, and

8  practical experience, in his actual report when he gives a

9  sentence, he cites one of the papers that he relies on.  I'm

10  trying to turn to the same page you are.

11      He has peer reviewed and published scientific papers

12  that he has been involved in.  And now, again, because there's

13  pages and pages and pages of them -- and then he's done

14  presentations and he's done training.

15      And I do want to actually -- since the Court has

16  admitted the pile of stuff that the defense submitted with

17  regard to Mr. Meloy -- and I want to briefly address that

18  because as far as I can tell, the only relevance that has is

19  to the government's motion to compel the defense to produce

20  expert reports, because in that case the opinion of the court

21  doesn't do anything.  The opinion of the court simply says

22  we're excluding the testimony.  It doesn't say -- give any

23  reasons why.  What the defense attached was the plaintiff's

24  brief, which was the government in that case, and the first

25  part of the plaintiff's brief noticed that the defense had not

1 complied with Rule 16, I think it's (b)(1)(C) on the defense

2 side, because the defense hadn't provided any expert reports

3 and hadn't properly summarized the testimony.  There's nothing

4 in the court's ruling that suggests -- has anything to do with

5 this case, and obviously Dr. Meloy has testified as it lays

6 out in his extensive (indiscernible) in all sorts of cases, 40

7 percent for the government, 60 percent for the defense in

8 criminal cases.  And he's an acknowledged expert in this field

9 of forensic pathology and of, you know, homicide

10 investigations and the bases and characteristics of people

11 that commit these crimes, and what he's doing is being

12 expressly -- oh, yeah.

13          And what he did, Mr. Schroder pointed out to me, is

14 he gave short citations in the middle of his report of some of

15 the research and then linked it to the full citations, you

16 know, in the back.  And what he was doing was, and some of

17 this was at our request, was saying, look, you know, here's

18 the research and studies that I've done that support my

19 conclusions.

20          And the procedure at trial will be the procedure it

21 is for many experts.  First you put in the evidence, and then

22 you put in the expert to testify about it.  I mean, I've done

23 that in many, many, many, many trials.  And often the cross-

24 examination has to go with whether, you know, if you change

25 the facts, does your opinion change, based on what's in the

1 court.

2           THE COURT:  Thank you.

3           Mr. Curtner?

4           MR. CURTNER:  Your Honor, again, this is in the

5 realm of creating a profile, and that could, I think, arguably

6 only be applied to Mr. Wells if this is workplace violence.

7           And so I think that that's the -- the problem I had

8 with Mister -- Dr. Meloy's report is it's so vague and it has

9 generalizations, and it's not supported by underlying facts as

10 far as looking at his report.  It's just generalizations that

11 the government wants to apply in this particular case.

12           In the other case in which his testimony was

13 excluded, I think that one of the arguments there was -- is

14 that there was a lack of underlying facts.  And that's, you

15 know, -- that was, I think, arguably one of the bases for

16 excluding his testimony in that prior case.  It's hard to tell

17 from the opinion of the court.

18           But I think that in this case there's no indication

19 of the underlying facts on which he bases these generalized

20 findings of his.  So I think that, you know, this is a classic

21 example of vague generalizations that are too broad to be

22 admitted in this particular case under these circumstances.

23           THE COURT:  Thank you.

24           Any reply?

25           MS. LOEFFLER:  Again, I want to go with the law.  I

1   have not seen a single case supplied by the defense suggesting

2   that vague -- the sort of analysis of vague generalizations,

3   and the facts are -- will be established at trial.  The

4   connection to what Mr. Meloy says will be based on, you know,

5   the facts that are established at trial, but the facts of

6   whether it appears the basis for the opinion that this appears

7   to be targeted, intentional murder are laid out in the

8   opinion, and they're actually laid out in Mr. Gifford's and

9   Mr. Morton's also.  They rely on the same facts.  All three

10  experts come up with some of the same conclusions, although

11  they come at it -- Mr. Meloy comes at it with a different

12  background in a different way.

13          And obviously the district -- I'm not in any way

14  trying to be disrespectful to this process, but if the court

15  decides at trial that it's not relevant because the facts that

16  form the basis have not been introduced, that's really a trial

17  issue.  The issue before the Court here, as you pointed out in

18  your order, was is the methodology that he's using a reliable

19  methodology.  When we propose them in trial, the court's going

20  to rule regardless if the -- you know, any expert that this

21  Court decides has an appropriate methodology, the district

22  court is still going to rule on relevance in the courtroom no

23  matter which side purports somebody.

24          So, anyway, the -- again, we keep having these

25  attacks that have not a single case supporting them in

1  methodologies that are well established in the field.

2          THE COURT:  Thank you.

3          MS. LOEFFLER:  Thank you.

4          MR. SCHRODER:  If it please the Court.

5          THE COURT:  Yes, go ahead.

6          MR. SCHRODER:  Your Honor, I'm here to talk about

7  Mr. Bolden, the tire expert, and Mr. Toglia, whose background

8  is in accident reconstruction and has provided some help to us

9  on the issue of videos.

10          They're similar in one way, in that they -- the work

11  they do is not per se scientific in that they're, you know,

12  like a DNA expert or somebody who's using, you know, clearly

13  scientific principles and testing those principles.  Now,

14  certainly they use -- there's some underpinnings of science in

15  what they do, but I would argue that for the most part, that's

16  in the tools that they use, not in the -- really in the

17  practices that they're involved in.  And that's one of the

18  reasons why we provided the *Quinn* case last night -- or

19  noticed that.

20          I don't know, did you have a copy -- did you get a

21  copy?

22          MR. CURTNER:  Uh-huh (affirmative).

23          MR. SCHRODER:  Does the Court have a copy?

24          THE COURT:  I have it.

25          MR. SCHRODER:  All right.  For a couple reasons, and

1 even though it's more directly to Mr. Toglia in the area of

2 photogrammetry, one of the things the Court said and I thought

3 is applicable to both was that what they're testifying to is

4 an area that doesn't involve any new or questionable

5 scientific techniques, and I think that's true of both.

6 So let me talk about Mr. Bolden first. You know,

7 one of the issues is I went back and -- the Court asked us to

8 talk about the *Daubert* factors. And when I went back and read

9 the *Daubert* factors, you know, I see what they're talking

10 about in there, that the court keeps referring to a scientific

11 theory or technique, a scientific theory or technique. The

12 defense hasn't identified, certainly for either of these two

13 witnesses, any scientific theory or technique that is to be

14 challenged.

15 Mr. Bolden, for the most part, it's not a

16 methodology that lends itself to *Daubert* because, frankly,

17 it's a pretty commonsense technique. I mean, what he did was

18 examine the tire. He looked at the tire from the outside, he

19 dismounted it off the rim, and he looked at it from the

20 inside. He examined the nail that was embedded in the tire,

21 and he used -- they took an x-ray so he could look at x-rays

22 of the tire. But I don't anybody is indicating that wants the

23 Court to go into the scientific background of x-rays.

24 And then the remainder of the methodology involved

25 basically testing for a leak. They did it as a static test,

1   inflated the tire and let it sit and checked it, and they did
2   it as a dynamic test, what they called it, where they put the
3   tire on a machine and they spun it with some pressure on it to
4   indicate weight.  And -- but again all we're talking about
5   there is tools.  It's an observation of the tools, and I'd
6   dare to say that the Court, like most of the rest of us, has
7   used a tire gauge.  And that's really what we're talking about
8   here, probably a more advanced industrial set of tire gauges
9   in the equipment, but it's really just checking the pressure,
10  and there's no scientific theory for the Court -- or technique
11  for the Court really to evaluate there.

12          So in our opinion, the *Daubert* do not apply.  And,
13  you know, there's no -- again, we see no scientific theory or
14  technique to test.  Use of a tire gauge or an x-ray is not a
15  specialized kind of scientific technique that would warrant
16  any peer review, so there's no real peer review out there.
17  There's not any data-driven analysis in this case, so there's
18  really no error rate to be applied to the data.  And the
19  community of tire experts is really not a scientific community
20  to look at whether, you know, the techniques were common, and,
21  again, I think the techniques were so commonsense that that's
22  really unnecessary.

23          Now, the defendant had a couple of complaints that
24  they filed, and if it's okay with the Court, I'll go ahead and
25  address those now.

1        THE COURT:  Yes.

2        MR. SCHRODER:  That the dynamic testing was not

3  properly done because it was warmer at the testing site, which

4  was in Ohio, than in Kodiak.  The defendant makes no offer of

5  how that would affect the test and what difference that would

6  make on the leak of air over a period of time.  And, again,

7  that's an issue we go -- and we keep going back to this point,

8  that that's an issue that could be handled on cross-

9  examination.  Mr. Bolden can be cross-examined about how that

10  affected it.

11        Also, the defense expert, there was a -- although we

12  don't have any report of the defense expert, there's now at

13  least an affidavit of the defense expert where he says that he

14  could not recreate or monitor the dynamic test, which is what

15  he would be expected to do in a civil case.  That may well be

16  true in a civil case, but the simple answer is there's not

17  a -- this is not a civil case.  It's a criminal case.

18        There were three people scheduled to be in that

19  building, Building T2, at the COMMSTA the morning of the

20  murder.  Two were killed, and one wasn't there, and he had an

21  alibi, and that alibi had to be checked, and the alibi was the

22  tire.  So it was a perfectly acceptable and a thing that

23  almost was absolutely required for the government to do, which

24  was to check that alibi by having the tire tested.

25        It was appropriately documented, so any expert the

1 defense might hire down the road could review that, and I

2 think commonsense will tell the Court that it was properly

3 done.  The defense's seeming argument that --

4        THE COURT:  Well, let me ask you a question on that

5 properly done

6        MR. SCHRODER:  Sure.

7        THE COURT:  Why was the defense not invited to

8 observe the testing so they could see the nail before it was

9 pulled out?

10        MR. SCHRODER:  Because there was no one charged at

11 the time, Your Honor.  That was all done months before the

12 defendant was charged.  And I think it gets into my next

13 point, which is, you know, the suggestion of the defense

14 would -- if followed through to its, you know, kind of

15 illogical extent, would handcuff a criminal investigation.  If

16 all evidence had to be maintained for the defense to get an

17 equal access to it, you couldn't process a crime scene, you

18 couldn't take fingerprints, you couldn't do blood and hair

19 analysis, you couldn't even autopsy a body and get it back to

20 the family.

21        Basically, what the defendant is suggesting, that

22 all testing would be -- all testing -- to preclude all testing

23 to determine the perpetrator was identified, which is

24 obviously a Catch-22 that's unworkable.  So our argument is

25 that was -- the testing was properly done, Your Honor, and the

1  defense has all the material that they need to be able to

2  analyze that.

3        And again no case by the defense indicating that

4  that kind of technique and that kind of approach by the

5  government was improper.

6        THE COURT:  Have you done any research on the issue

7  of spoilation, which is what the defense raises to -- just as

8  a general matter, where the defense claims, well, I can't

9  duplicate this, I can't even effectively cross-examine because

10 I don't have the original material to look at?  I understand

11 your argument, but --

12       MR. SCHRODER:  Yes, sir.

13       THE COURT:  -- any case law on that issue?

14       MR. SCHRODER:  Well, Ms. Loeffler actually has

15 looked at that particular issue.  I'll let her address that.

16       MS. LOEFFLER:  Sorry I'm jumping in because I

17 looked --

18       THE COURT:  That's fine.  I'd rather have the answer

19 than --

20       MR. SCHRODER:  Okay.

21       THE COURT:  -- keep repeating it.

22       MS. LOEFFLER:  I looked last night, and I can

23 supplement because what I -- spoilation is not the right term.

24 It was a term they raised.  Spoilation, if you try to research

25 that, you end up in civil cases about something else.  But

there are destruction of evidence cases.

        But the destruction of evidence cases -- and I
haven't done, you know, going -- what I came across was
*Loud Hawk*, which was en banc opinion, but they were the cases
in which the evidence was completely destroyed.  In *Loud Hawk*,
I think it was a -- it's an en banc Ninth Circuit opinion, and
it was a -- some local police had gotten rid of explosives
that were relevant to the case.  I didn't -- and I won't claim
that I'm an expert in that area of legal matter because I
simply just looked at it last night.  But those were cases
where the evidence was destroyed, you know, completely, and
the court said you had to weigh whether it was intentional,
whether, you know, it was real, whether it was bad faith, and
there's a whole list of rules about it.

        But none of that has to do with the natural testing,
for example, like, you know, a situation -- I couldn't find
anything that had to do with, let's say, an example, let's say
when you do a DNA test but you don't have enough material for
the defense to test it also, that type of thing.  I have not
found -- I didn't find any cases on that.  What I found is
cases where the evidence was actually not kept and what
standards the court uses.  And you can look at the *Loud Hawk*
case, which is an en banc Ninth Circuit.  I don't think it's
directly on point because I think it has to do with cases
where the evidence isn't maintained at all.  And that's sort

1 of as far as I got. I didn't find anything at all, but I

2 didn't do much more than about 40 minutes of looking last

3 night, Your Honor.

4 THE COURT: I'll ask you to add that to the list,

5 then, for both sides to see if you can come up with anything

6 that's more helpful than your discussion here.

7 MS. LOEFFLER: Do you want it simultaneously, or in

8 this case, this is something -- and I guess I would ask.

9 Since the defense just used the word "spoilation," would you

10 like me to come up with it, would you like them to come up --

11 or should I just do one supplemental pleading and they can

12 respond, whichever method the Court wants.

13 THE COURT: Well, I'm more interested in getting

14 this done --

15 MS. LOEFFLER: Okay.

16 THE COURT: -- as quickly as we can --

17 MS. LOEFFLER: I can file something.

18 THE COURT: -- and giving you a fair opportunity, so

19 why don't you go ahead first?

20 MS. LOEFFLER: Okay.

21 THE COURT: Mr. Curtner, you're up.

22 MR. CURTNER: Thank you, Your Honor. I know

23 Mr. Bolden has been an expert as far as examining tires, an

24 expert on tires, an expert in civil cases where there has been

25 defective tires. I don't know that he's actually an expert in

1 nails in tires, and -- but for his testimony and his opinion

2 to be admissible, it should be reliable and it should be able

3 to be replicated, and that's the problem we have here.

4    The nail has been removed, our expert can't

5 duplicate the examination that Mr. Bolden based his opinion on

6 as far as the tire is concerned. And that's one reason it

7 should not be admissible.

8    The other part of his report about the air retention

9 study that he did, I think that it goes without saying that it

10 could be completely different in a 95-degree garage as

11 compared to outdoors on -- with the road conditions in Kodiak,

12 and so --

13    THE COURT: Why wouldn't that be an issue for cross-

14 examination on the weight to give to the evidence?

15    MR. CURTNER: Well, it could be. I mean, it will

16 be, but it also, I think, goes to reliability as far as

17 whether this -- that testimony should even be admitted at all.

18    So -- but I think the main problem we have, though,

19 is the fact that we can't replicate his opinion about the nail

20 in the tire and it being manually placed there, and we

21 can't --

22    THE COURT: I understand that argument, and I've

23 invited briefing by both sides on it.

24    MR. CURTNER: Yes, we will. Thank you.

25    THE COURT: Any reply?

1          MR. SCHRODER:  Your Honor, just quickly.  I mean,

2    I'm not sure what the defense is thinking they're going to

3    duplicate.  There was very high definition photos taken of the

4    nail in the tire, there was an x-ray taken of the nail in the

5    tire.  The factors that Mr. Bolden relied on are all very well

6    laid out in his report.  And there's nothing to replicate.

7    All the issues that Mr. Bolden pointed out, the tire itself

8    has already been sent to the defense's expert.  They've been

9    able to examine the tire, they've been able to examine the

10   name.  There's no kind of case that can be replicated here, so

11   I don't think there's any issue to that, Your Honor.  Thank

12   you.

13          THE COURT:  All right.  Go ahead with your --

14          MR. SCHRODER:  And I'll continue with Mr. Toglia.

15   Your Honor, the government's concern is that what the defense,

16   I think, seems to be trying to imply is that whatever

17   Mr. Toglia has done is so complex or mystical that somehow it

18   must require a *Daubert* hearing, when, in fact, what Mr. Toglia

19   does is geometry, it's math.

20          And that's one of the reasons I think the *Quinn* case

21   is so important, is that the -- that's where the court

22   found -- and I'd read the last part of it, but now I'll read

23   the full quote, that what Mister -- the man in that case, the

24   agent did, was photogrammetry, using photos to compare size --

25   varying sizes in photos, is nothing more than a series of

1 computer-aided calculations that did not involve any novel or

2 questionable scientific technique.

3 Now, Mr. Toglia is doing a little bit more than just

4 the basic photogrammetry by creating a 3D model, but again

5 that's nothing especially complicated when it's broken down by

6 its parts. I mean, in essence, the courts have been -- we've

7 used models in courts for years, models of -- you know,

8 physical models of things, of a crime scene. We -- that --

9 those have been accepted and used for years, and the key to

10 that has always been the accuracy of the model; how important

11 it is depends on the accuracy.

12 And that's what Mr. Toglia does. That's what he

13 first did in this case, he built a model, but he built it

14 after he personally went to Kodiak and did his own surveying

15 measurements of all the things the camera. And I don't think

16 we're here to talk about whether, you know, the concept of

17 surveying, that's been around for at least since I think

18 George Washington was a surveyor, if I remember correctly.

19 And it's a little more modern now, but they

20 surveyed, got accurate measurements, and the defense hasn't

21 challenged those measurements, and they have them. We've

22 given them all of those. We've given them the full set of

23 measurements that Mr. Toglia has taken for them to use.

24 So the difference becomes, instead of making a

25 physical model, Mr. Toglia makes the model in a computer, and

1  which makes it much more useful by doing that.  Once he has

2  the model, they can train -- within the computer 3D model,

3  they can put the viewpoint in the position of the camera, the

4  camera that took the video.  And then by using the programs

5  and techniques, they can overlay the video, again, accurately

6  because the things in the video--buildings, fences, lines in

7  the parking lot--have all been accurately measured, and they

8  can match those up so that the video accurately overlays the

9  3D model.  They use a lot of computers, but it's a common --

10  it's really a commonsense thing.

11          Then what they can do, and that's what we're ask --

12  we've asked him to do in this case, is they can get

13  precisely -- engineered is not [sic] the wrong words, but

14  prepared electronic copies of the cars.  They can place them

15  in the 3D model in the right place to compare to things in the

16  3D model, and then that allows the jury then to compare what's

17  in the 3D model, compare those things--size, shape, all of

18  those things--with the cars in the video.  That's what it is.

19  I mean, it's not especially complicated.  It just uses

20  computers to crunch the numbers.

21          In discovery we provided all the photos, we provided

22  the -- all the measurements Mr. Toglia took, we provided the

23  names of all the computer programs that were used, we provided

24  the places where they could go buy the small, appropriately

25  rendered, accurately rendered models of the cars.  We've given

1  them all to that -- all that to the defense, and we haven't

2  heard anything back on why that methodology doesn't work,

3  what's wrong with that methodology, because there is nothing

4  wrong with that methodology, Your Honor.  It's not -- there's

5  nothing mystical or magic or especially complicated about it.

6          Now, going back to -- and it really ends up not

7  being specifically scientific, but if you look at the *Daubert*,

8  what you see is, you know, going to the first one, is

9  there a -- is it test -- well, there's really no scientific

10 theory.  Certainly the defense has not identified a scientific

11 theory to test.

12          But when you go to the next step, it maybe is

13 useful:  The process has been subject to peer review.  And,

14 you know, for example, we'd be happy to supply some of these

15 to the Court, but just my own look at the American -- the

16 Society of Automotive Engineers and running some of the terms

17 through their website for publications, you see things like

18 determining crash test data using camera matching photogrammic

19 techniques; video projection mapping photogrammetry through

20 video tracking.  And I talked to Mr. Toglia, and he indicated

21 some of those very articles are ones they have on file at

22 their offices.

23          So the kind of practices we're talking about here

24 are subject to peer review, and, again, not necessarily

25 subject to error rates, but I think one of the important

1 things about this is, you know, error is a factor of accuracy.

2 And throughout this process, one of the things that Mr. Toglia

3 has done is done everything to make sure that it's accurate,

4 starting with personally surveying the site to make sure that

5 they had accurate data, which, again, we've turned over to the

6 defense.

7          And then, finally, I don't -- I think I got the

8 wrong -- and, finally, I think the last of the *Daubert* factors

9 is whether it's -- the technique is accepted in the relevant

10 scientific community.  And I think by looking at those peer

11 review articles, you see that there is a community of folks

12 who are, again, more engineers than they are scientists, but

13 those kind of techniques are accepted.  And, again, we've

14 provided the Court with precedent, with case law, that

15 indicates that these types of both accident reconstruction

16 evidence has been admissible in court, accident reconstruction

17 evidence using computer modeling has been admissible in court,

18 and video depictions have been admissible in court, and those

19 are just the techniques that Mr. Toglia is using.

20          THE COURT:  What's been the practice of producing as

21 discovery items that an expert might use? If he's going to

22 show a video as part of his presentation, has that been

23 provided in advance as discovery?

24          MR. SCHRODER:  Yes.  We've provided the -- and I --

25 Your Honor, what he's producing in some ways are demonstrative

1  exhibits, and we may have other demonstrative exhibits,

2  versions of what he's done that we will use that we will

3  present to the defense before trial.  But the essence of what

4  he's done is in the report, if you look at the report.  I

5  mean, the bottom line at the end of the day, he's produced a

6  video of the computer model, which is what the defense has

7  talked about filing with the Court.  But at the end of the

8  day, it all comes down to comparison of images, and those

9  images are in his report.  So at the end of -- and all of this

10 work, what you see in his report, are some of those comparison

11 images, still images, of the car, the car heading to

12 Building T2, and other types of cars overlaid to see if

13 they're consistent with that type of car or not.  And we have

14 produced those.

15        THE COURT:  Is this the witness that Mr. Curtner

16 criticizes about the video in progress where there might be an

17 updated video?

18        Mr. Curtner, maybe you can fill in.  Is this the one

19 you're talking about?

20        MR. CURTNER:  Yes.

21        THE COURT:  All right.  So I assume that there's --

22 at some point there has to be a cutoff date where, if you're

23 going to produce something in discovery, you don't come in the

24 day of trial with something new.

25        MR. SCHRODER:  No, we don't intend to do that, Your

1  Honor.  I mean, I looked at that animation again this morning.

2  I think if anything it will be -- I don't think it's going to

3  change much if at all.  It may be broken up into parts to make

4  it easier for Mr. Toglia to explain.

5          The problem with Mr. Curtner introducing it to you,

6  I think, is that it was not -- it was never designed as a

7  standalone piece of evidence that somebody is not going to get

8  testimony to understand how it works.

9          THE COURT:  Right.  First of all, I haven't seen it.

10         MR. SCHRODER:  No, I understand.  I understand.

11         THE COURT:  And I don't know if I need to see it.

12         MR. SCHRODER:  I don't think it helps you unless you

13  have somebody explaining it to you, Your Honor.  I mean,

14  that's the point.

15         THE COURT:  Well, this is an admissibility issue.

16  It's not a critique of the work.

17         MR. SCHRODER:  Sure.

18         THE COURT:  But at some point his expert needs to

19  have fair opportunity to -- you know, to see that.  So you

20  understand the problem.

21         MR. SCHRODER:  I -- yeah, I don't see it changing.

22  I mean, it says on it "in progress," Your Honor, and we'll

23  take the "in progress" off, but I really don't see it

24  changing.  And we're going to produce anything totally

25  different.  That's not what's going to happen.  I mean, we

1  gave them this product well ahead of time because we wanted to

2  allow them, if they wanted to get their own expert, if they

3  wanted to look at this and challenge it, they will have to do

4  that.

5          THE COURT:  Thank you.

6          MR. SCHRODER:  Yes.

7          THE COURT:  Mr. Curtner?

8          MR. CURTNER:  Well, Your Honor, one reason we

9  haven't gotten back to the government, as Mr. Schroder

10 indicated, was because we just got the stuff last night.  We

11 have asked over and over and over again for everything our

12 expert needs to be able to review and make sure that these --

13 this process was accurately done by their expert.  And so we

14 finally got the raw data last night, and we're sending off to

15 our expert, but our expert has told us specifically what he

16 needs in order to be able to give us an opinion as to the

17 accuracy and the application of the methods that were used in

18 this video.

19          I wanted to -- I think the Court needs to look at

20 that video, because the result of that, if it were to be

21 admissible, this is a perfect example of an opinion going to

22 the point of going right to what the jury is supposed to

23 decide.  Because if you look at this video, and it's short, it

24 basically puts Mr. Wells's car right there at the scene, and

25 not just in a blurred image but in this animation it is a

1 perfect, you know, replication of Mr. Wells's car.  That's

2 like at the robbery, not only having somebody identify the

3 robber from a picture that's not -- that's very poor quality,

4 but then doing an animation with the suspect in the bank.

5 And, I mean, that's going to have a very prejudicial impact on

6 the jury.

7 And I think that, you know, it's not only as --

8 first of all, we have to have all the information to -- for

9 our expert to review Toglia's work product and report, and

10 we're still trying to get that, and we're going to have our

11 expert let us know within the next couple of days if

12 everything we sent him last night is going to be sufficient

13 for him to do his report.  And as soon as he does the report,

14 we'll supply it to the government.

15 We -- I think that specifically that video goes

16 beyond the admissibility standards for that opinion, and

17 that's where we are as far as Mr. Toglia's report and his

18 evidence.

19 THE COURT:  How would you suggest that it should've

20 been done to take the overly suggestiveness out of it?

21 MR. CURTNER:  You know, I don't think that the video

22 should come in at all.  I mean, I think the animation should

23 not come in.  I think he can report on what -- you know, he

24 can give a report as any other expert if he -- if we -- and we

25 can cross-examine him once our expert has a chance to review

1   it.  But I think the animation goes beyond that, and the

2   animation is just a primary thing that we think is

3   inadmissible, you know, with his testimony.

4           THE COURT:  Thank you.

5           Reply?

6           MR. SCHRODER:  Your Honor, I'd make a couple of

7   points.  First off, the government has gone -- what's required

8   by Rule 16 for us to provide are the report of the expert,

9   which we've done.  We provided some of the underlying basis of

10   things that he relied on.  We have gone well beyond that.

11           And I don't think there's any requirement, certainly

12   the defendant has not cited a case, the defendant has not

13   filed a motion to compel discovery that we provide everything

14   all our experts do and all their work product throughout a

15   process so that a defense expert can create step by step

16   what's done by our expert.  There's no requirement for that.

17   We've gone well beyond what we are required to do by providing

18   some of the baseline data, providing the names of the computer

19   programs, and doing all that, because we wanted -- we think it

20   was the right thing to do, so we did that.  So I want to make

21   that point first.

22           Again, part of the problem with the video, without

23   having somebody to explain it, is the section they're talking

24   about there's an overlay of the car with a Honda CRV, and it's

25   a demonstration of the accuracy of the program.  That's the

1  part Mr. Curtner is talking about, because they overlay the

2  video, the little piece of the car onto the image -- the video

3  image.  Then it moves back to the 3D model and pans around to

4  show that the car when overlaid on the video image accurately

5  ends up on the road in the right lane in the right place.

6  It's an accuracy check, and indeed that's what the video

7  shows.

8          So it's not there to try to depict any particular

9  car.  It's there to show that the accuracy of the model goes

10  in.  And, really, at the end of the day, what's going to be

11  the most important things for the jury to look at are going to

12  be the comparisons of that image with the different outlines

13  of types of vehicles, and there's going to be more than one so

14  the jury for themselves are going to be able to conclude

15  whether they're seeing is consistent with one type of vehicle.

16          THE COURT:  I'm not sure this is an accurate

17  question, but could the presentation be made without saying

18  this is the defendant's vehicle but just simply it's an

19  accuracy check taking a known vehicle and using the overlay

20  and seeing to show how accurately it's depicted?

21          MR. SCHRODER:  I think it probably could be, Your

22  Honor.  But, I mean, Mr. Toglia is not going to reach the

23  conclusion of that being the defendant's vehicle.  He's not

24  going to do that.

25          THE COURT:  So you may not have to mention that it's

1 his vehicle.

2          MR. SCHRODER:  Right.  We wouldn't.

3          THE COURT:  Thank you.  All right.  I think we've

4 been through the list here of the experts that were subject to

5 the motions in limine.

6          And I'd like to address one matter, and I'm not sure

7 whether it's ripe or not, but it might be helpful to talk

8 about it here, and that is the defendant's presentation of

9 reciprocal discovery, and Mr. Curtner basically objects

10 because he hasn't received some discovery -- or enough

11 discovery.  And I'll just tell you my thinking on it is I

12 think that the Rule 16 provides that you give the report.  It

13 also uses the word "summary."  I don't think you can get

14 around it by simply having your expert come in without any

15 kind of written report.

16          The government's entitled to a summary.  It's

17 entitled to something to know what the expert's going to say.

18 And I think because they provided their opinions reports, that

19 you need to provide that summary or report from your expert,

20 if you have one.  And I would hope that you're not getting

21 around it by getting an oral report rather than a written one

22 and think that you don't have to produce it.  I wouldn't

23 suggest that you do that.

24          So that's my thinking on it, and I don't know if

25 that motion in that area is ripe or not, but I'm likely to

1 require the production of a summary on your behalf.

2        I'm not aware of any discovery motions that are

3 pending, and I understand you're going back and forth on

4 requests for discovery, and the government says we've given

5 more discovery than you're entitled to. I think where the

6 government has promised discovery, the Court would be inclined

7 to enforce that. You know, if they say they're going to

8 produce something, then they should produce it, and I don't

9 know if there's any outstanding discovery in that regard.

10        But that's kind of where I'm at on the discovery

11 issue and on reciprocal discovery, so if that's helpful to

12 counsel.

13        Anything else we might take up topic-wise? And I'll

14 just give you some --

15        MR. SCHRODER: No, Your Honor. Thank you.

16        THE COURT: -- thoughts on one other matter. The

17 government has a notice of intent to introduce 404(b)

18 evidence. There's a motion to exclude that. My thinking is

19 to refer that to the trial judge because I think to make a

20 decision on that requires some knowledge of the evidence, and

21 I don't feel comfortable at this point, pretrial, really in

22 making that decision. I think that should be preserved for

23 trial, and unless someone disagrees, that's probably what I'm

24 going to do there.

25        MR. CURTNER: Understood.

1          MR. SCHRODER:  We're good with that, Your Honor.

2          THE COURT:  All right.  Anything else for the record

3   before we recess?

4          MR. SCHRODER:  No, Your Honor.

5          MR. CURTNER:  No, Your Honor.  Thank you.

6          MS. LOEFFLER:  No, Your Honor.

7          THE COURT:  All right.  Let's talk about the timing

8   of your briefing so we have some expectation there.  Would the

9   government suggest when it might be?

10         MS. LOEFFLER:  Today is Tuesday.  If I -- I

11  think what we'd like to do is ask for Friday.  If we can get

12  it in before, we will, but I don't see any reason why we

13  couldn't get it in by Friday if that's okay with you.

14         THE COURT:  That's all right with me. So then the

15  response would be a like period of time so we're talking about

16  three business days after Friday, so the middle of next week.

17         MS. LOEFFLER:  Okay.

18         MR. CURTNER:  That'll be fine.

19         THE COURT:  Thank you very much.

20         (Proceedings concluded at 11:26:47 a.m.)

21                            **CERTIFICATE**
    I certify that the foregoing is a correct transcript from the
22  electronic sound recording of the proceedings in the above-
    entitled matter.
23
    _____          January 15, 2014
24       S/M. Gaylene Larrecou
    M. Gaylene Larrecou, Transcriber          Date
    United States Court Approved
25  AAERT Certified #00285