**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ALASKA**

| | |
|---|---|
| UNITED STATES OF AMERICA | 3:13-cr-00008-RRB-JDR |
| Plaintiff, | |
| vs. | **ORDER**<br>**REGARDING**<br>**DAUBERT MOTIONS**<br>(Dockets 192 - 200)<br>**and**<br>**MOTIONS IN LIMINE**<br>(Dockets 213 - 225) |
| JAMES MICHAEL WELLS, | |
| Defendants. | |

Defendant **James Michael Wells** filed several motions for a hearing

pursuant to <u>Daubert v. Merrell Dow Pharmaceticals, Inc.</u>, 509 U.S. 579 (1993)

(<u>Daubert</u> hearing), seeking to exclude the opinion testimony of certain government

expert witnesses. The defendant also filed motions in limine to exclude testimony

and companion motions for <u>Daubert</u> hearings regarding the following experts:

William Gifford and Robert Morton - Docket 213 and Docket 192; Dr. J. Reid Meloy - Docket 216, Docket 196, Supplemental Briefing at Docket 247; Gary Bolden - Docket 219 and 194; Neil Schmidt - Docket 222, Docket 198; and Angelo Toglia - Docket 225, Docket 200. The government filed a consolidated memorandum in opposition to defendant's motions for Daubert hearings (and request for a determination by the District Court), Docket 238.[1] A Daubert hearing was conducted by the magistrate judge on January 14, 2014 (Docket 265), regarding the motions for a Daubert Hearing at Docket Nos. 192, 194, 196, 198 and 200. The government filed a Supplemental Briefing, Docket 273; Defendant filed a reply to Government's Supplemental Briefing, Docket 274. After due consideration of the parties' memoranda and arguments, the Motions in Limine at Docket Nos. 213, 216, 219, 222 and 225 are GRANTED and DENIED as stated below. After discussing the general state of the law in this area, this Order will address the admissibility of the opinion testimony of each of the named expert witnesses separately.

## GENERAL LAW

Under Daubert, a trial judge is charged with a "gatekeeping" role to ensure that all scientific testimony or evidence submitted is both reliable and relevant. The Federal Rules of Evidence also impose a "gatekeeping" duty on the district court for expert opinion testimony. The admissibility of testimony by expert

---

[1] The parties' exhibits to their pleadings are referenced herein as relevant to the discussion.

witnesses is addressed in Federal Rule of Evidence 702.  That Rule provides that a witness who is qualified as an expert by "knowledge, skill, experience, training, or education" may testify in the form of an opinion or otherwise if:

"(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case."

Rule 702 requires that "[e]xpert testimony . . . be both relevant and reliable." United States v. Vallejo, 237 F.3d 1008 (9th Cir. 2001).  Relevancy requires that the evidence "logically advance a material expert of the party's case."  Cooper v. Brown, 510 F.3d 870, 942 (9th Cir. 2007).

In interpreting F.R.E. 702, the U.S. Supreme Court related that in order to qualify as "scientific knowledge," an inference or assertion must be derived by the scientific method and proposed testimony must be support by appropriate validation. In order to determine whether scientific reasoning is valid under Daubert, the trial court should consider factors such as whether the reasoning: (1) can be and has been tested; (2) has been subject to peer review; (3) has a known or potential rate

of error; and (4) generally has been accepted by the scientific community. 509 U.S. at 593-94.

The conditions stated in Daubert are not a required check list. *See* 509 U.S. at 593. Daubert does not teach that a trial judge should automatically exclude relevant evidence if one of the listed conditions is not fully satisfied. The inquiry under both Rule 702 and Daubert is a flexible one. *See* Cabrera v. Cordis Corp, 134 F.3d 1418, 1420 (9th Cir. 1998). The trial court is to strike the appropriate balance between admitting reliable, helpful expert testimony and excluding misleading or confusing testimony to achieve a flexible approach outlined in Daubert. United States v. Cordoba, 104 F.3d 225, 228 (9th Cir. 1997) (citing United States v. Rincon, 28 F.3d 921, 926 (9th Cir. 1994)).

Daubert enunciated a two prong test for the court to use when accessing admissibility of expert testimony. First, the court determines whether the proffered expert testimony is based on a methodology that is "scientific" and therefore reliable. 509 U.S. at 589. Second, the court must determine whether that methodology can properly be applied to the facts of the case. Id. at 592-93

In Kumho Tire Co. LTD. v. Carmichael, 526 U.S. 137 (1999), the Supreme Court ruled the gatekeeping obligation under Daubert applies not only to scientific testimony but also to testimony based on "technical" and "other specialized knowledge." The word "knowledge" means more than subjective belief or

unsupported speculation. Thus, a party cannot escape any fundamental reliability by characterizing the expert testimony as "non-scientific" evidence.

The proponent bears the burden of showing that the expert's findings are based on sound science. This requires some objective, independent validation of the expert's methodology. *See* Smelser v. Norfolk Southern Ry Co, 105 F.3d 299, 303 (6th Cir.), cert. denied 522 U.S. 817 (1997). The test of reliability is flexible and Daubert's list of specific factors do not necessarily or exclusively apply to all experts in every case. Kumho Tire, 526 U.S. at 142. An "expert" is viewed as a person qualified by "knowledge, skill, experience, training, or education," not in any narrow sense.

Under Daubert, the purpose of a hearing is to determine the scientific validity and thus the evidentiary relevance and reliability of the principles that underlie a proposed submission. 509 U.S. at 594-95. The Ninth Circuit Court of Appeals recognizes that although it may be appropriate in some instances to have a Daubert hearing outside the presence of a jury to assess the preliminary questions of relevance reliability relating to experts, the trial court is not compelled to conduct a pretrial hearing in order to discharge its gatekeeping function under Daubert. United States v. Alatorre, 222 F.3d 1098 (9th Cir. 2000). The Ninth Circuit has summarized the gatekeeping function in Alatorre as follows:

> "[T]he trial judge must determine at the outset, pursuant to
> Rule 104(a), whether the expert is proposing to testifying

to (1) scientific knowledge that (2) will assist the trier of
fact to understand or determine a fact in issue. This
entails a preliminary assessment of whether the reasoning
or methodology underlying the testimony is scientifically
valid and of whether that reasoning or methodology
properly can be applied to the facts in issue . . . . Many
factors will bear on the inquiry, and we do not presume to
set out a definitive check list or test."

*Id.* at 592-93, 113 S. Ct. 2786. The Supreme Court held in Kumho Tire that the trial
court "may consider one or more of the specific factors that Daubert mentioned when
doing so will help determine the testimony's reliability." 526 U.S. at 141. The
gatekeeping inquiry, therefore is tied to the facts of the particular case.

### **Testimony from Gary Bolden - Tire Expert**

The government expects Mr. Bolden to testify as to his examination of
the tire and embedded nail seized from the defendant's truck. The defendant's
motion in limine complains that the government fails to provide enough information
for the defense to test Bolden's assertions or explain why the information is relevant
in the case. The government responds that it provided the defendant with copies of
Bolden's report, his bench notes, photographs, x-rays of the tire, and re-outs from
his static air retention studies. The government has sufficiently complied with Rule
16, F,R.Cr.P.

Wells claims that Bolden's testimony is irrelevant and lacks a foundation for its admissibility. The documents recently provided to the defense should sufficiently explain how Bolden's formed his opinions and conducted his tests. The defendant's claim that the methods used by Mr. Bolden and his tests cannot be replicated. However, the defendant's concern that Mr. Bolden's tests may not accurately capture the condition of Mr. Wells' tire on April 12, 2012 (the date of the homicides) goes to the weight of the evidence, not its admissibility.

Gary Bolden is the Director of Forensics at Standards Testing and Laboratories, Inc. in Massillon, Ohio. He holds a B.S. in Civil Engineering from University of Akron, a degree representing completion of a five year, full time curriculum combining academic and on-the-job training in related fields. He was formerly the director of forensics at the laboratory since October 2009.

As Director of Forensics he coordinates the department projects, examination and failure analysis of tires, rims, vehicles, related products and testing involved in litigation as well as research in failure mechanics and modes. Prior to that, he served as a principal engineer for the company in related fields.

He previously worked as a quality assurance contract engineer and then principal engineer for the Goodyear Tire and Rubber Company analyzing tires and related components involving property damage or personal injury. He also provided expert testimony regarding these examinations and technical assistance to legal

counsel. At Goodyear his primary accounts included Honda (Auto and ATV), Audi/VW, and BMW.

He also served as a manager for product services for the Kelly-Springfield Tire Company in Cumberland, Maryland, as a Product Analysis Engineer; the Kelly-Springfield Tire Company, Development Division where he was a senior field engineer in 1978-79. Prior to that, he was a quality assurance engineer and quality control engineer for Kelly-Springfield Tire Company, the Goodyear Tire and Rubber Company and B.F. Aerospace Division in Akron, Ohio.

Mr. Bolden is a member of the American Society for Quality Control (ASQC), Tire Society, Akron Rubber Group, Society of Automotive Engineers (SAE) and American Society for Testing and Materials (ASTM). He has published papers on topics including (1) Drag and Steering Effects from Tire Tread Belt Separation and Loss; (2) Effects of Over-Deflection on the Tire/Rim Interface; (3) Simulation of Road Hazard Impacts and Their Effect on the Tire/Wheel System in an Indoor Laboratory Setting; (4) Component Interfacial Tearing Appearances; (5) Impact Simulations; and (6) Structural Impact Damage under Varying Laboratory Conditions.

In a report contained at Docket 219, he explains in detail his tire analysis in the instant case. The report states that the analysis of the tire was visual and the tire was not altered. His opinions are based upon his observation and professional analysis as well as a static air retention study followed by a dynamic

study to reach a few stated conclusions regarding whether the tire was in service while the nail was present and why he concludes that the nail in the tire was inserted manually.

The testimony is relevant to whether Wells needed to change the tire in his truck at the time of the homicides. This is relevant to the time line concerning whether the defendant was at the crime scene when the homicides occurred.

Mr. Bolden's conclusion that the nail was not picked up during the operation of the motor vehicle is based upon his own observations and knowledge and experience of how a nail of that size would appear in a tire if it were picked up while the vehicle was being operated. For example, he examined the tire to determine whether the nail had been "working" while the tire was in service, the orientation of the nail to the tread surface, any indication of pavement contact or coercion on exposed portion of the nail, and evidence of component damage around the nail shank. He observed that there was no chafing or fracturing of the belt cables adjacent to the nail.

He performed a static air retention study and a dynamic study to determine the rate of air loss occurring as a result of the puncture. The subject matter of his testimony relates to the field of specialized knowledge of an engineer with occupational experience in the analysis of tires and related property damage. He is qualified to testify as to his opinion regarding whether the nail in the tire was inserted manually. His method of testing demonstrates the use of standards for

controlling his technique and subjecting the tire and nail to objective testing. Upon considering the methodology and principles underlying his proposed testimony as an expert, the court finds that Mr. Bolden should be allowed to testify as an expert as proffered.

The defense argues that even though Mr. Bolden may be an expert on tires he is not necessarily an expert on nails and tires. The court determines that this is a distinction without merit. Mr. Bolden has years of experience as an engineer with the Goodyear Tire and Rubber Company examining and analyzing the failure of tires. He is published on the topic of structural impact damage to tires. Mr. Bolden's expert testimony has a reliable basis in the knowledge and experience of the relevant disciplines as required by <u>Kimho Tire Co., Ltd.</u>, 526 U.S. at 149.

The main argument the defense has here is that because Mr. Bolden removed the nail, his expert cannot duplicate the examination. The government responds by arguing that the destruction of evidence to the extent necessary to run this test was appropriate and done in good faith. The test was done months before the defendant was criminally charged. Because Wells worked in the office where the two victims were killed it was appropriate to check out Wells' alibi at an early stage of investigation. This testing helped to identify the alleged perpetrator for formal accusation.

Mr. Bolden examined the tire, dismounted it off the rim and looked at it from the inside. He examined the nail that was imbedded in the tire and took x-rays

of the area. Mr. Bolden performed a static test on the tire for its rate of leaking air. He inflated the tire and performed a dynamic test by putting the tire in a machine and spinning it with pressure to indicate weight.

The defense argues that the dynamic testing was not done properly because it was tested at a warmer test sight. The court rules that this is a matter for cross-examination, not admissibility. Evidentiary reliability is concerned "not [with] the correctness of the expert's conclusions but the soundness of his methodology." Primiano v. Cook, 598 F.3d 558, 564 (9th Cir. 2010).

Wells cites United States v. Loud Hawk, 628 F.2d 1139 (9th Cir. 1979), cert. denied 100 S.Ct. 1279 (1980), for its guidance when criminal evidence is lost or destroyed. The defendants were charged with three counts relating to possession of an unregistered and unnumbered destructive device. A federal agent present at the destruction site photographed the explosions. *Id.* at 1142. State officials also preserved wrappers from the dynamite casings.

The circuit court held that where state officials seized from defendant a substance identified as dynamite, and state officials destroyed the dynamite based on lack of a storage facility, defendants were prejudiced as a result of the destruction only to the extent that their inability to observe the destruction and to analyze the samples deprived them of the opportunity to contest the government's conclusion that the substance destroyed was indeed explosive. The court held that the government's secondary evidence that the substance was dynamite was probative

and reliable, and the government was entitled to introduce the secondary evidence indicating that the substance seized from defendant was dynamite.

The federal officials did not participate in the destruction of the dynamite. The court held that, under these circumstances, the trial court should strike a proper balance between the quality of the government's conduct and the degree of prejudice to the accused. *Id.* at 1152. The court stated that the government bears the burden of justifying its conduct, and the defendant bears the burden of demonstrating prejudice.

In weighing the conduct of the government the <u>Loud Hawk</u> court stated:

The court should inquire whether evidence was lost or destroyed while in government's custody, whether government acted in disregard for the interests of accused, whether it was negligent in failing to adhere to established and reasonable standards of care for police and prosecutorial functions, and, if acts were deliberate, whether they were taken in good faith or with reasonable justification.

*Id.* With regard to the degree of prejudice to the defendant the court stated:

In analyzing prejudice, the court must consider a wide number of factors including, without limitation, the centrality of the evidence to the case and its importance in

establishing the elements of the crime or the motive or intent of the defendant; the probative value and reliability of the secondary or substitute evidence; the nature and probable weight of factual inferences or other demonstrations and kinds of proof allegedly lost to the accused; the probable effect on the jury from absence of the evidence, including dangers of unfounded speculation and bias that might result to the defendant if adequate presentation of the case requires explanation about the missing evidence.

*Id.* at 1152.

The Ninth Circuit stated that the test is not of constitutional dimensions, citing United States v. Augenblick, 393 U.S. 348 (1969), wherein the Supreme Court stated that destruction of evidence becomes a problem of constitutional dimensions only in the most extreme case. The Ninth Circuit described the approach as a flexible one and a judicially created rule designed to prevent police misconduct and provide as fair a trial as possible. 628 F.2d at 1154. The court in Loud Hawk referenced the balancing test used by that court in United States v. Higginbotham, 539 F.2d 17 (9th Cir. 1976), wherein the court stated that the following factors should be considered: (1) the degree of negligence or bad faith involved; (2) the importance of the lost evidence, and (3) the sufficiency of the other evidence adduced at the trial

to sustain a conviction. 628 F.2d at 1152. In a footnote, the <u>Loud Hawk</u> court suggested that "prejudice" in this context means serious impairment of the accused's ability to present his defense. 628 F.2d at 1153, n.3.

Applying this balancing test to the facts of this case, the court first examines the reasonableness of the government's conduct. Prior to formal accusation, the government sought to test Wells' alibi that he had a flat tire that prevented him from getting to work on time when the homicides occurred. No one suggests that the government had probable cause evidence at the time to formally charge Wells, although he was a prime suspect at this time. It bears mentioning that the government's expert did not destroy the tire or the nail, but rather possibly altered the tire when the nail was removed for further testing. By this process, the defendant did lose the opportunity after being indicted to have his own expert observe the condition of the tire with the nail in it before the nail was removed.

There is no reason to conclude that the test was run to place the defendant at a disadvantage in presenting a defense. Rather, the government was proceeding cautiously in its evaluation of the potential alibi of Wells. The court concludes that the FBI did not act in bad faith in the altering of the evidence by its expert. Some flexibility should be accorded to investigators proceeding in a reasonable manner to narrow their focus on a particular suspect.

The defense can only speculate whether its own expert would have reached any different conclusion as to the condition, location, angle, etc., of the nail

while still in the tire. The government documented the nail in the tire as previously referenced, and the tire and nail itself have been made available to the defense to conduct its own tests.

The government argues that the instant facts scenario is similar to one in which a knife or bullet is removed from a victim as a crime scene is processed. It is impractical, the government argues, to require it to preserve a homicide victim or crime scene until the case can be solved. The court is mindful that the government bears the high burden of proving the defendant guilty beyond a reasonable doubt in the face of any defense raised by the defendant. Wells' ability to present evidence at trial through the eyes and observations of his own expert has not been completely removed because the tire and nail are available for examination and testing, and Mr. Bolden's analysis can be challenged at trial. Because the video and x-rays taken by the government's expert have been available to the defense, Wells' own expert can study the secondary evidence as to the location and angle of the nail as well as view the existing condition of the nail itself.

The testing of the tire and nail address only the defendant's alibi, not the condition of the homicide scene itself. There has been no showing that the government failed to follow accepted standards of police conduct by their testing of the tire when they did so rather than delaying the removal of the nail until post-indictment. The court is aware that the prosecutors knew that Mr. Wells was represented by the Federal Public Defender who could have been notified

prospectively about the tire testing. This would have necessitated Wells hiring an expert witness which would have unnecessarily postponed the testing.

In evaluating the degree of prejudice to Wells consideration is given to the reliability or trustworthiness of the testing of the government's expert's conclusion that the nail was intentionally placed in the tire and not picked up by running over it while driving. The condition of the tire and nail separately have not been substantially altered, although Wells is free to argue that the tire puncture was altered before his expert examined it. The photographs taken with the nail in the tire preserves some evidence of its location and angle for purposes of analysis.

There is no question that Wells was driving his truck on the morning of April 12 or that a tire with a nail in it was in the trunk of his car when he arrived at work. Whether that particular tire was on the truck at the time he was driving remains an open factual issue. Wells still has the opportunity at trial through cross-examination of the government's expert and by presenting his own expert, on the issue, to argue the plausibility of the tire having picked up the nail accidently.

Wells' ability to test the tire with the nail imbedded has been removed, but he can still challenge Mr. Bolden's opinions and tests as to the issue of how fast the tire with the nail would have leaked air. For example, the defendant attacks the reliability of the government's test by suggesting that the temperature of the environment in which the air pressure test was conducted would make a difference.

Loud Hawk is distinguishable to the extent that the material destroyed in that case was the very substance the government charged was the "destructive device" and none of the material was saved to permit independent testing of the substance. In the instant case, the defense can still conduct independent testing on the tire and nail but cannot make the same observation as the government's expert did when the nail was still in the tire.

This court concludes that there has been no "serious impairment" to the accused's ability to present his defensive alibi. There has been no bad faith or connivance on the part of the government. Any prejudice to the defendant by the loss or alteration of the evidence is not sufficient to deny him a fair trial or impugn the integrity of the judicial process. Mr. Bolden's testimony is both relevant and reliable.

### **Testimony of William Gifford and Robert Morton**

The government intends to elicit testimony from William Gifford and Robert Morton regarding their analysis of the crime scene.

### William Gifford - (Crime Scene Expert)

William Gifford is a former detective who served in law enforcement for forty years. He served for three years in the Alaska State Troopers Cold Case Unit and served as a consultant for the nine years prior to that. His experience includes serving as Captain of the Shasta College Campus Police in Redding, California in early 1970s, and then six years as a police officer for the Redding Police

Department. In 1978 to 2002 he joined the Anchorage Police Department rising to the level of captain in the detective division.

His education and training includes attending the FBI National Academy, the Anchorage Police Department Training Academy, and State of California Police Academy. He holds an Associate Degree in police science from Shasta College. He received additional training in fields including a study in blood stain pattern analysis, a masters course in death investigation at the St. Louis School of Medicine, numerous forensic science conferences, FBI National Academy training and various homicide investigation seminars. He holds basic and intermediate certifications from the states of California and Alaska, and an advanced certificate from the State of Alaska in his field of expertise.

His publications include such topics as "Bloodstain Survival in Water" (1999), "Development of a Crime Scene Response Vehicle" (1994), and "Limiting Angles" relative to blood pattern analysis (1993). He is or has been a member of a number of professional associations including past chair of the Anchorage Task Force on Sexual Assault, Board of Directors for Alaska CARES, past Board of Directors for the FBI National Academy Associates, and International Association of Homicide Investigators.

He also served in consultation with several named police departments in Alaska, the State of Alaska Crime Detection Laboratory, Dr. Henry Lee, and others. He was an instructor in courses including advanced crime scene

investigation, uniformed investigations, shooting scene reconstruction photography, and blood spatter interpretation. He has been consulted on evidence preservation, crime scene investigations including homicides and evidence awareness by various police organizations. He also gave presentations on "Opposing View Points in Blood Stain Pattern Analysis," Shooting Scene Forensics and "Developing a Homicide Response Team." Mr. Griffin testified numerous times before superior court judges in Alaska.

Mr. Gifford traveled to the crime scene, took measurements, reviewed the case file and photographs, and relied on his experience and training before writing a report detailing his theory of how the crime unfolded. His qualifications and proposed testimony are the type commonly and repeatedly used and recognized by the courts in his field of expertise.

He proposes to testify as to his reconstructive analysis including the shooting sequence entry and exit of the perpetrator, and muzzle to target issues including a bullet striking an intervening object, and possible sequence of events. He concludes that this is a case of workplace violence.

The methodology used by Mr. Gifford is reliable for crime scene investigation. Mr. Gifford has set forth a synopsis of his analysis and opinions in a document filed at Docket 215-1 (Sealed). He opines that the shooter used an intervening object while shooting. He claims that the perpetrator shot Hopkins in the face and then shot Belisle three times. His expressed opinions include the impact

of the blood stain pattern, the number of fibers, and shrapnel injuries to Hopkins' shirt and skin. His synopsis includes a "possible order of events."

Mr. Gifford relies on his forensic analysis to explain how he arrives at the shooting sequence. He uses the evidence from the crime scene to conclude that an intervening object was used between the muzzle of the weapon and some of the gun shot wounds. The evidence he used in this regard is outlined in his report. He explains why he concludes that Belisle's two torso shots and Hopkins' torso shot were fired with the suspect standing over them. He explains why he believes that the intervening object was constructed of something hard, like metal or plastic and contained some type of fiber material. He opines that a homemade silencer could explain some of the evidence. This testimony is relevant and reliable and will assist the fact finder in determining the likely scenario and timing of events. Mr. Gifford's synopsis of a possible order of events is based upon his reconstructive analysis of the shootings, examination of evidence of the crime scene and location of white fibers found on the victims' clothing.

Mr. Gifford opines that the noise Mr. Rudat heard while passing by the building on the morning of the homicides could have come from a damaged silencer. His own crime scene analysis provides the foundation in the evidence to suggest that a silencer or other intervening object was used. Since no such item was found at the crime scene, Mr. Gifford opines that the suspect may have taken it with him.

<u>Testimony of Robert J. Morton - (Crime Scene Expert)</u>

**Robert J. Morton** is currently employed as a Supervisory Special Agent (SSA) for the Federal Bureau of Investigation. He is assigned to one of the Behavioral Analysis Units for the National Center for the Analysis of Violent Crime at the FBI Academy in Quantico, Virginia. The Behavioral Analysis Unit is part of the critical incident response group for the FBI. This center serves as a national and international resource center for law enforcement agencies, providing assistance in "unusual, bizarre, and repetitive violent crimes."

He has been assigned to the Center since 1997 and has consulted in hundreds of cases both domestically and internationally. His experience in analyzing homicide cases and violent crimes includes serial murders and sexual homicides. He previously provided crime scene assessment and analysis, investigative strategies, case linkage analysis in serial cases, and on topics including the development of unknown offender characteristics, the development of interview designs for suspects, and major management issues as well as providing assistance with strategies for prosecution. His previous experience includes investigative assignments with violent crime, gang investigations, terrorism and weapons of mass destruction. He has supervised the processing of crime scenes in major FBI cases that required forensic examination and participated in processing a number of high priority national crime scenes including the Oklahoma City Bombing, the 1996 Atlanta Olympic Park bombing and the September 11, 2001 attack on the Pentagon.

Agent Morton testified in the federal criminal trials of Timothy McVeigh and Terry Nichols as well as the Oklahoma State trial of Nichols for the bombing of the Murrah Federal Building. Agent Morton has over thirty years of law enforcement experience working with the FBI and the Virginia State Police. His curriculum vitae includes a long list of specialized training and research experience as well as a list of abstracts and publications which he authored.

His research experience focuses on the characteristics of serial murders, the search methodologies for abducted children, and characteristics of sexually motivated murder. He previously testified as an expert in areas concerning crime scene analysis in several courts. He has received significant awards, participated in symposiums, and has teaching experience in over 150 training classes and workshops to law enforcement personnel, prosecutors, forensic scientists, medical examiners and coroners, and other criminal justice practitioners.

In its notice, the government proposes that Agent Morton will testify that the perpetrator of the homicides shot Belisle first before shooting Hopkins. He does not mention the use of an intervening object while shooting. His proposed testimony includes a narrative as to how the shootings occurred based on the locations of the bodies, the wounds and fired bullets, as well as the layout of the rigger shop. He also opines as to the motive behind the homicides. Agent Morton considered the autopsies of the two victims in accessing the cause of death, namely a gun shot wound to the head of James Hopkins and gunshot wounds to the neck and trunk to

Richard Belisle. Under his analysis of the crime scene, Richard Belisle was shot first and then shot again after the offender shot Hopkins. It appears that this crime analysis is supported by accepted forensic analysis by a qualified expert.

Agent Morton states that the motive in this case "can be discerned through the actions of the offender, as well as the lifestyles and occupations of the victims." On the present record, the court is of the opinion that the testimony of Agent Morton with respect to the motive is either based on observations the jury can make or is pure speculation. The evidence presented at trial before Mr. Morton testifies may or may not provide a sufficient basis for his opinion as to probable motive. Mr. Morton acknowledges that complete information about the victim(s) is an important part of the crime analysis process. His report contains very little information known to him about the victims and Wells.

Agent Morton's opinion that the circumstances and activities indicate a kind of offender who was familiar with the shop location, had knowledge of the victims' time schedule, and knew that no one else would be at the shop at that time is supported by his methodology although it does not exclude other people who may have worked at or be familiar with that particular shop or necessarily reflect a singular purpose to kill both victims.

Agent Morton drew his opinions from his experience, background and training to reach his analysis. He reviewed photographs, statements, diagrams and

investigative reports.  This methodology is commonly used by experts in homicide cases.

### Assessment of Crime Scene Investigators

The defense argues that the forensic experts have gone beyond their expertise by providing conclusions without any methodology.  The defendant objects to the conclusion that this was workplace violence based upon an expert's observation that the two victims had nothing in their lives that would explain the violence.  The defendant argues that their opinions are mere guess work and are offered as a profile that would fit only Mr. Wells because there is no evidence indicating anybody else in the small workplace could have been involved in workplace violence.  The defense points out that the two forensic experts disagree on the sequence of the shooting which he considers an indication that their opinions are unreliable.  The defendant argues that the expert should not be allowed to fill in evidentiary gaps with their opinions.

The government responds that experts do not always draw the same conclusions.   Ruling that an expert's testimony is reliable for purposes of admissibility does not mean that contradictory expert testimony is unreliable.  If that were the case, then the defendant would not be able to offer contradictory expert testimony through his own experts because it would be deemed unreliable.

The government argues that the facts in this investigation lead to a view that this was an insider and workplace violence.  They point to facts such as the

perpetrator bypassing the camera and entering the building where the homicides occurred, the apparent knowledge of the perpetrator that the two victims were inside the building, and the lack of any other apparent motive such as robbery. The government argues that its experts who are trained in behavioral and crime scene analysis should be allowed to testify as to what they gleaned from the facts.

The defense does not challenge the qualifications of the forensic experts. Both crime scene experts have explained their reconstructive analysis and identified evidence in their reports to support their conclusions. Federal Criminal Rule 702 specifically allows an expert witness to be qualified by knowledge, skill, experience, training, and education. Pursuant to Rule 702, these qualifications can qualify an expert to consider the evidence of the crime scene and testify about his conclusions based upon his qualifications.

The usual way to test the validity of an expert's conclusions is through his cross-examination in court as well as any contradictory evidence presented. For example, Mr. Gifford's concludes that the noise Rudat heard on or about the time of the murders could have come from a damaged silencer. This opinion is based upon an assessment of the scene including pieces of paper fiber as well as evidence of the explosion of the bullet(s) observed on the photographs of the crime scene.

### Testimony of Dr. J. Reid Meloy, Pd.D. - (Forensic Psychologist)

The government provided notice of its intent to elicit testimony from Dr. J. Reid Meloy, a forensic psychologist regarding targeted and intended violence,

workplace violence, multiple murders and the personality and other characteristics of those who commit these types of crimes. The notice states that Dr. Meloy will not be asked to give an opinion about how these characteristics apply to the known facts concerning James Wells.

Dr. Meloy's report outlines the traits of a person who carries out targeted workplace homicides of more than one victim. The defense alleges that his testimony is unverifiable and lacks methodology. The defense argues that his proffered testimony is not supported by any scientific data, is irrelevant, and lacks foundation. The defense surmises that the jury could interpret this general unsupported proffered testimony by Dr. Meloy as vouching for the actions and general character attributed to Wells.

Dr. Meloy is a clinical professor of psychiatry at the University of California, San Diego School of Medicine. He is a member of the American Board of Professional Psychology, a Diplomate in forensic Psychology (American Board of Professional Psychiatry, and a Fellow with the American Academy of Forensic Sciences. References he relies upon include publications by Meloy, Jr.: "The psychopathic Mind" (1988), Predatory Violence and Mass Murder" (1997), "Violence Risk and Threat Assessment" (2000), "International Handbook of Threat Assessment" (2014), "Stalking, Threatening, and Attacking Public Figures: The Psychological Behavioral Analysis" (2008), among others. He also served as a peer reviewer for manuscripts including "Criminal Justice and Behavior," "Journal of

Nervous and Mental Disease", "Law and Human Behavior", "The Western Journal of Medicine", and "Journal of Criminal Behavior". He is or has been an editorial board member of over a dozen publications, and published numerous scientific papers. He has expert witness experience in forensic and clinical evaluations in criminal settings.

Dr. Meloy reviewed autopsy reports and photos for both victims, photos of the crime scene (Building T2) and the area around the COMMSTA, photos of the initial search of James Wells' residence, first responder reports, grand jury testimony, James Wells' USCG service record, personal records and VA Medical Records, photos from the search of Wells' residence and vehicles and forensic exam of his iPhone; audio recordings and transcripts of interviews with USCG chain of command, T2 staff and T1 Staff, victim family and friends, Wells' ex-coworkers, friends and acquaintances; transcripts of other witnesses; the emergency calls on April 12, 2012; audio recordings and transcripts of interviews of James Wells and statements, voice mail messages on April 12, 2012; and video of the arrival and departure of the blue SUV at T2 and of the main gate. His education and experience together with his reference to other research and studies is sufficient to constitute a reliable methodology for commenting on whether certain characteristics are indicative of workplace violence.

Based upon his training, education, experience as a consultant, and research conducted by him and others, his opinions focus upon four areas: targeted

and intended violence, workplace violence, multiple murder, and the personality and psychological characteristics of individuals who commit such acts. He does not propose to apply his opinions to the known facts of this case nor testify as to their relevance in the case. He acknowledges that he did not clinically evaluated Mr. Wells, so he has no opinion as to the specific personality traits, presence or absence of a psychiatric disorder, or psychological functioning of the defendant.

With regard to targeted and intended violence, he offers two modes of violence which are distinctive, mainly affective violence and predatory violence. He opines that those who engage in affective homicide have functional impairments in their pre-frontal cortex when measured by a positron emission tomography and show impairments in intelligence, memory, attention and executive functioning.

Predatory violence, in his opinion, is carried out with a specific target(s) in mind. It is carried out in a tactical manner without direct threats expressed to the victims beforehand. He states that stealth is a key element of targeted or intended violence since surprise of the victim heightens the probability of success. This type of violence is not accompanied by a high state of emotional arousal in the perpetrator. He opines that all of us have biological capacity to be either affective or predatorily violent. He further states that none of us would be here "unless our ancestors did both affective and predatory violence well."

His report describes workplace violence and opines that those who commit targeted homicide in the workplace do not "snap." He states that some

perpetrators are motivated by an accumulation of losses or humiliations whether inaccurately perceived or real.

With regard to mass murder of civilians he states that eventually this type of murder almost always is committed by males, especially if outside the family. He states that virtually all mass murders are predatory. A study conducted by him and his colleagues revealed that two thirds of the sample of adult mass murderers were psychotic at the time of the killings. They typically targeted strangers and not people whom the knew. He states that most of the murders in this category are clearly paranoid and they are more lethal because of their psychosis and their indiscriminate killing. He states that the non psychotic mass murderer typically has fewer casualties because he specifically targets certain individuals who have angered and/or humiliated him. He states that the precipitating event for mass murderers is a humiliating lose in love or in work that often finalizes the decision to carry out the violent act.

His report discusses that workplace homicide is usually motivated by a profound sense of rejection. The emotional state of such person is typically containing feelings of shame and anger. He recites the four beliefs of a mass murderer as stated in de Becker (1997) and the stages experienced by one who participates in such crime. He discusses the inflated sense of self, one's belief in entitlement to different treatment, the reduced empathy and other feelings that a

mass murder is likely to experience. He provides indicators of risk for targeted violence in the workplace.

The defense claims that there is no indication of the underlying facts on which Melroy bases his generalized findings which are thus vague and unsupported. The government points out that Dr. Melroy is a forensic psychologist who will testify as to the general characteristics of workplace violence. The Advisory Committee Notes to FRE 703 acknowledges that it might be important in some cases for an expert to educate the fact finder about general principles without attempting to apply those principles to the specific facts of the case.

The defense complains that Melroy is creating a profile that can only be applied to the defendant if the crime was workplace violence. That observation is not a sufficient reason to preclude the government from calling an expert witness to testify about workplace violence.

Dr. Melroy has not examined the defendant. He annotated his report with studies that he refers to in forming the bases of his opinions. It is appropriate in this case for the government to offer the opinion of a forensic psychologist as to whether certain characteristics present in this case suggest workplace violence. For example, no warning given to victims and other facts indicating the likelihood of the perpetrator having knowledge and detail of the workplace. The government acknowledges that the predicate facts must be presented in the evidence before Dr. Melroy's testimony becomes relevant.

According to the OSHA fact sheet on workplace violence (U.S. Dept. of Labor, Occupational Safety and Health Administration (2002)), "Workplace violence is violence or threat of violence against workers. It can occur at or outside the workplace and can range from threats and verbal abuse to physical assaults and homicide, one of the leading causes of job-related deaths."

The court has carefully considered Dr. Meloy's letter addressed to the United States Attorney dated November 22, 2013. The magistrate judge concludes that the subject matter of his proposed testimony may but not necessarily will assist the trier of fact depending on the evidence presented at trial. The probative value of Dr. Meloy's proposed testimony may or may not outweigh the danger of unfair prejudice, confusion of the issues, or misleading evidence that would be placed before the jury. At this stage of the proceedings Dr. Meloy's analysis and theories, based upon his experience and training, are not sufficiently relevant to the case at hand to be ruled admissible at trial.

### Neil Schmidt - (Tech Specialist for Honda North America)

The government intends to elicit testimony from Neil Schmidt regarding his expertise to identify a blue vehicle in the United States Coast Guard video footage of COMMSTA taken at the approximate time of the homicides as a Honda similar to that owned by the Wellses. Mr. Schmidt is a mechanical engineer who worked with the Honda North America Corporation since 1997. During this employment, Honda was manufacturing the Honda CRV Sport Utility Vehicle.

Schmidt is familiar with its body style and its exterior paint colors.  Defendant James Wells and his wife owned a blue 2001 Honda CRV at the time of the homicides.  The government contends that Wells used the CRV to drive to the rigger shop where the murders were committed.

As a technical specialist for Honda North America, Schmidt conducted product and scene inspections; provided technical assistance to in-house and out-side counsel, experts and other parties; performed interpretations of SRS download data; and served as a corporate representative during trials for product liability matters relating to Hondas.  In 2007 he completed a course in traffic accident reconstruction at Northwestern University.  As a senior coordinator/engineer for Honda he worked in the development process of Honda, investigated vehicle quality concerns for multiple factories at Honda and Acura products, and developed diagnostic repair and service procedures for distribution to dealerships.  As model engineer and senior coordinator/engineer, he has conducted quality products of production vehicles at port and factory facilities, and participated in vehicle disassembly for documentation validation.

Mr. Schmidt holds a BS degree in mechanical engineering from the University of California, Irvine.  From 1980 to 1985, he was an engineering assistance with Electro-Optical Industries, and from 1986 to 1994 was an engineer/scientist specialist for Douglas Aircraft Company where he supervised

teams of engineers, scheduled work packages, and prepared and presented change proposals to a review board.

Mr. Schmidt viewed video footage that captured the movements of a vehicle on April 12, 2012 and was asked if he could identify the vehicle. Although he states that he cannot be one hundred percent certain, he concluded that the vehicle is the correct size and proportion as that of a Honda CRV first generation vehicle. These vehicles were made in the United States between 1997 and 2001. He adds that the vehicle head lights and position of the vehicle tail lights and the off-center, rear mounted spare tire are consistent with the first generation Honda CRVs. According to Schmidt, the Honda has a relatively unique tail light location. The tail lights run up to the roof line from about the mid-line of the CRV. The tail lights are also on the rear corners of the CRVs. Schmidt is familiar with similar vehicles such as the Toyota RAV4 and the Volvo XC-90. The tail lights for those vehicles are similar to the CRVs.

He determined that the vehicle in the video was a 2001 Honda CRV S LX 4WD. The paint code for this vehicle (Electron Blue Pearl) was only available on the Honda Prelude and CRV in 2001. Based on his knowledge and experience, he is able to talk about the video depiction of the vehicle and state why he believes other so called similar vehicles are different in appearance or shape. He concludes that the vehicle depicted in the video is more likely than not a Honda CRV and

consistent in size, shape, proportion and tail light position to the Wellses' Honda CRV.

To testify as an expert under <u>Daubert</u> and <u>Kumho Tire</u>, the expert may not always perform scientific tests. He may draw from part of his education, training and experience to reach his conclusions. *See* <u>Precision Seed Cleaners v. County Mut. Ins.</u>, 2013 WL 943571, *15 (D.Or. 2013) (expert who had worked in seed equipment business for 27 years competent to opine on equipment values). The Advisory Committee notes (2002) to Federal Rule of Civil Procedure 702 states that the expert need only explain "how that experience leads to the conclusion reached, why that experience is a sufficient bases for the opinion, and how that experience is reliability applied to the facts." Mr. Schmidt's testimony is admissible regarding the unique shape of the CRV body panels, the CRV's unique roof line, the unique placement of tail lights on the CRV, the unique location of CRV's spare tire, and methods for excluding other makes and models similar to the Honda CRV. That the video of the vehicle shown to Mr. Schmidt is "quite blurry" is a matter going to the weight of the evidence and illustrates the need for an expert to assist the fact-finder in assessing the photograph. *See* <u>Kennedy v. Collagen Corp</u>, 161 F3d 1226, 1231 (9th Cir. 1998).

The defense argues that because FBI experts could not identify the vehicle in the video as belonging to the Wellses, because of the video's poor quality, this means Mr. Schmidt went beyond his expertise in identifying the type of car. To

the contrary, Mr. Schmidt is an expert on Hondas, and, even though he has not testified as an expert previously, he does have the experience and knowledge to assist the jury in deciding whether the car depicted in the video is a Honda CRV.

The defense suggest that once Mr. Schmidt was advised that the investigators thought that the video depicted a Honda, Schmidt's testimony would necessarily be based on an unduly suggestive process. The government disputes that Schmidt was given any such bias and that issue can be probed during cross-examination.

The defense questions whether Schmidt should be allowed to testify as to the percentage of how sure he is that the video vehicle is a Honda. When an expert testifies in an unscientific area a logical and appropriate question for the witness is how sure he is of his testimony. That the expert witness may choose to testify as to a percentage of his assurance goes to the manner and means of expressing his opinion not to whether his testimony and opinion are admissible.

Testimony and expert opinion attempting to identify the vehicle is pertinent to the government's case in placing the defendant at the crime scene. Thus, the testimony is relevant. The court is satisfied that Ms. Schmidt's testimony is sufficiently reliable to be admitted under <u>Daubert</u> and that his testimony is relevant and more probative than prejudicial.

//

## Angelo Togolia - (Research and Consulting Engineer)

Angelo Togolia has worked as an engineer in the automotive testing and analysis field for 20 years. He is currently employed by Collision Research and Analysis, Inc., where he has been a consulting engineer for 12 years. Mr. Togolia created a model of the rigger shop area on the morning of the homicides using a wire frame model that he generated using a 3-D modeling, animation and software program. Using this program he created a model of the incident area and then imported an image of the blue Honda CRV onto the image of the blue vehicle present in the Coast Guard video.

Mr. Toglia specializes in engineering analysis, reconstruction and computer simulations of automobile collisions and industrial accidents. These duties include forensic video and photographic analysis. Prior to working for Collision Research, Mr. Toglia was employed as a consulting/test engineer at Exponent Failure Analysis Associates for eight years. He owns a bachelors and masters degree in mechanical engineering and is a registered professional mechanical engineer in Alabama, Arizona, Mississippi, and Washington. He is a member of both the American Society of Mechanical Engineers and the Society of Automotive Engineers. He has presented papers before both professional organizations, including papers on the use of photography, modeling accident and reconstruction.

The government provided the defense with a copy of Mr. Toglia's extensive report in October 2013. The court concludes that Mr. Toglia's 3-D

modeling and video analysis constitutes "technical or other specialized knowledge" within the meaning of Federal Rule of Evidence 702.

With respect to his methodology, he visited the incident site and performed a detailed site inspection at COMMSTA Kodiak. Mr. Toglia visited the scene himself and took his own measurements. He used computers and surveyors measurements to analyze actual photos and video. He also used modern surveying techniques to accurately measure physical features visible from the camera located at building T1. This is the same camera that recorded the blue SUV approaching Building T2 on the morning of April 12, 2012.

Mr. Toglia used commercial available software and surveyor measurements to create a 3D virtual model of the scene and surrounding area. He posted a camera in the modeling scene and adjusted the camera setting so that his view closely matched the view of the subject camera. He then overlaid the video images of the T1 camera from the morning of April 12, 2012 including the frames of the small blue SUV arriving at the time of the homicides. Using the 3D model video overlay he had created, he added different sized models of vehicles to compare to the image of the small blue SUV. This resulting comparison of the different vehicles showed him that the vehicle in the video was consistent with the Wells Honda CRV.

Mr. Toglia explains that his process of "camera matching" the scene within the three dimensional model with the captured video view from the camera was subjected to and validated by peer review. He also checked the

photogrammetry process for accuracy. By taking the accurate survey and measurements he collected on site, and building the wire frame and 3D model, he then compared that model to the actual photographs and screen captures from the T1 camera to see whether the objects aligned. During his visit to Kodiak he captured images of known vehicles on the same road in the approximate same place as the small SUV on the morning of April 12, 2012. He then overlaid accurate computer models of those vehicles over the captured images using the view of the video camera at T1. After aligning the images, he could move the view point and 3D model to see where the computer image of the car aligned with the road. He was able to get the computer images of the vehicles to line up exactly on the road to confirm the accuracy.

Mr. Toglia has stated a sufficient basis for his opinion to avoid it being characterized as speculation or guess work. The use of a computer crash simulation production with software called "PC Crash" was accepted by a prior court. *See e.g.*, North v. Ford Motor Company, 505 F. Supp 2d 1113-1118 (D. Utah. 2007). Courts have admitted video simulation as being "substantially similar" to the alleged events. *See* United States v. Norris, 217 F.3d 262, 269-270 (5th Cir. 2000); Desrosiers v. Flight Intern. of Florida Inc., 156 F.3d 952, 959-961 (9th Cir. 1998) (aircraft accident reconstruction).

The defense objects to Mr. Toglia showing his video arguing that it unfairly places Mr. Wells' vehicle at the scene not just in a blurred image but in an

animation form.  The government responds that the video uses the Wellses' vehicle as an example to show the accuracy of using it as a known vehicle to show the vehicle image accurately on the road in the right place.  The government agrees that the presentation can be made without saying that the known vehicle is the defendant's vehicle.  This should satisfy the defendant's prejudicial argument under Federal Rule of Evidence 403.  Mr. Toglia should be allowed to use the Honda CR-V in his overlay model without identifying it as the defendant's vehicle.

Mr. Toglia built the model after he did his own surveying of measurements in Kodiak.  He uses photographs to show varying sizes and applies computer aided calculations in preparation for his 3D model to assist the jury in its assessment of the blurred image of the vehicle taken at the gate on the morning of April 12.   As for peer review, the government states that Mr. Toglia's approach is similar to what has been done in publications by the Society of Automotive Engineers for crash test data, projection mapping, and accident reconstruction.

The government cites United States v. Quinn, 18 F.3d 1461 (9th Cir. 1994), to support the admissibility of expert testimony regarding the use of photogrammetry to render an opinion regarding the identity of an object depicted in surveillance photograph.  In United States v. Quinn, 18 F.3d 1461 (9th Cir. 1994), the court held that the expert's testimony regarding his use of photogrammetry to render an opinion as to the height of an individual in a surveillance photograph taken in a bank robbery was admissible as expert scientific testimony.  The district court had

concluded that the process is nothing more than a theory of the computer assisted calculations that did not involve a knowledgeable, questionable or scientific technique in the absence of anything in the record calling reliability of the process into question.

In Quinn, the expert referred to objects of known dimension in a photograph and by using vanishing points the expert was able to measure the rate of the change in the size of the objects as they moved away from a camera. Four of the bank tellers described the robber as being 5 foot 6 inches to 5 foot 8 inches tall and weighing 140 to 165 pounds. By analyzing photographs, an FBI agent concluded and testified that the robber was between 5 foot 3 inches tall and 5 foot 6 inches tall. Quinn was 5 foot 5 inches tall.

The agent used a process in which a formula is derived by measuring a change in dimensions of the objects in a photograph as they move away from the camera. After testing the formula against objects of known dimensions in the photograph, the agent was able to make an estimate of the robber's height. The appellate court sustained the district court's finding that the process was scientifically valid and sufficiently reliable to meet the standard for determining admissibility of expert scientific testimony under Federal Rule of Evidence 702 and Daubert. Similarly, in the instant case the court determines that the methodology used by Mr. Toglia is sufficiently sound and reliable to be admissible at trial regarding the

identification of the vehicle depicted in the Coast Guard video as consistent with that Honda CRV.

This court has reviewed Mr. Toglia's report, his methodology contained therein and his qualifications to offer such testimony. The court concludes that the proposed expert testimony is reliable, and likely helpful to the fact finder without misleading or confusing them in identifying the vehicle that the government contends was used by Mr. Wells in the commission of the homicides.

## CONCLUSION

The proffered testimony of the government's expert witnesses Gary Bolden, Neil Schmidt and Angelo Togolia, is admissible under Federal Rule of Evidence 702 and <u>Daubert</u> and its progeny. Defendant's Motions in Limine, Docket 219 to Exclude Testimony by Gary Bolden; Docket 222 to Exclude Testimony on Alleged Expertise Re: Characteristics of Honda Cars, and Docket 225 to Exclude Expert Testimony By Video Analyst and Accident Reconstruction Expert Toglia, are hereby DENIED.

The government states that the opinions of its crime scene experts, William Gifford and Robert Morton will be connected to the evidence admitted at trial. Each crime scene expert has relevant and reliable testimony to provide at trial. The magistrate judge concludes that it is premature to determine the extent of the conclusions these experts may offer in their testimony at trial. This is better assessed by the trial judge prior to their testimony. Defendant's Motion in Limine to

Exclude Testimony by Crime Scene "Experts"[Gifford and Morton], Docket 213 is DENIED with the understanding that the trial court will provide the parameters of respective expert's testimony when the matter is addressed at trial.

Work place violence is a material theory of the prosecution. Dr. J. Reid Meloy has the knowledge and experience in the relevant field of forensic psychology to testify about the nature of workplace violence. The remaining issue is whether his proposed testimony passes the balancing test of Federal Rules of Evidence 403. The government should be given the opportunity at trial to support the issue of admissibility of Dr. Meloy's testimony before it is presented to the jury. Ruling on the Defendant's Motion in Limine to Exclude Testimony on Issues of Violence and Psychological Characteristics of Perpetrators of Violent Crimes, *Docket 216 is held in abeyance pending further consideration at trial*.

DATED this 5th day of February, 2014, at Anchorage, Alaska.

*/s/ John D. Roberts*
JOHN D. ROBERTS
United States Magistrate Judge