

# REED COLLEGE

7 February 2014

Richard Curtner, Attorney at Law
Federal Public Defender for the District of Alaska
601 West Fifth Avenue, Suite 800
Anchorage, Alaska 99501

Re: U.S. v. James Michael Wells

Dear Mr. Curtner:

As you requested, I am writing with my assessment of the materials you sent me in Mr. Wells' case, with a focus on two issues: first, the possible role of confirmation bias in the forensic analysis of this case (specifically: of the T1 video and of the tire of Mr. Wells' truck) and, second, a possible concern about 'top-down' effects that might compromise a jury's capacity to view the evidence objectively.

For this purpose, you provided me with the following materials:

- FBI Digital Evidence Lab report, dated April 20, 2012; marked 017925-017926
- FBI Import Form, dated July 16, 2012; marked 017938-017940
- FBI Import Form, dated February 20, 2013; marked 018029-018032
- Three pages of "Standard Questioning Matrix" for this case; marked 018333-018335
- Neil Schmidt's curriculum vitae, and reports on conversations with him by the FBI; marked 019292-019299
- Angelo Toglia's curriculum vitae and his report; marked 019300-019307
- FBI electronic communication, dated August 3, 2013; marked 021392-021394
- FBI electronic communication, dated October 12, 2012; marked 021501-021503
- FBI electronic communication, dated November 9, 2012; marked 02156-021517
- FBI electronic communication, dated December 12, 2012; marked 021524-021525
- FBI report, dated, January 2, 2013; marked 021559
- FBI Import Form, dated February 1, 2013; marked 021577-021578
- Transcript of Scott Reckner's testimony before the grand jury on December 13, 2012; marked 22587
- FBI Electronic communication, dated July 18, 2012; marked 22671
- Affidavit in support of a criminal complaint, from Elizabeth Oberlander, FBI SA
- First Search warrant, dated April 15, 2012


100

- Search warrant dated for execution on Oct 4, 2013, and affidavit offered in support of this search warrant.
- A computer disk (DVD) containing videos from the T1 and T2 cameras, originally recorded on 4/12/12, also containing files labeled "April 19 reenactment clip" and "April 20 reenactment clip," a file labeled "Fly-In (h264)" and a file labeled "T1-T2 700-730.mp4"
- Kodiak Daily Mirror Newspaper Articles dated 4/13/2012, 4/18/2012, 4/19/2012, 4/23/2012.

My background. Before turning to these materials, let me start by introducing myself. I am a research psychologist with a Ph.D. in Experimental Psychology (from the University of Pennsylvania in 1980). I am currently employed at Reed College, in Portland OR, where I am the Patricia and Clifford Lunneborg Professor of Psychology, and also Chair of the College's Psychology Department. For more than two decades, my scholarly work has focused on the completeness and accuracy of human memory; my work includes both laboratory experiments and field studies, and also extensive writing about memory, which has of course forced me to maintain current and complete knowledge of other researchers' work. I have also written extensively on several related topics – including visual perception, and also the psychological processes involved whenever someone is making a judgment about evidence. I also teach courses that cover this material, and so, for multiple reasons, make certain that I keep myself informed about a broad range of research pertinent to these topics.

In addition to my activities in the academic world, I have consulted extensively with attorneys and law enforcement. I have provided seminars (CLE's) for several groups, including the Oregon State Bar, the Oregon Criminal Defense Lawyers Association, the Multnomah County (OR) D.A.'s office, and the King County (WA) Prosecutor's Office. I have provided training sessions for the Detective Division of the Portland Police Bureau and for the Oregon Paralegal Association. I have testified on issues of witness memory in federal court and in state courts in Oregon, California, Idaho and Washington; I have also consulted on specific cases in New York and Pennsylvania.

I should also mention that I am not an expert in Honda CR-V model shapes (although I do own a CR-V). I am also not an expert in accident reconstruction. However, in this report, I will be able to draw on several aspects of my expertise – my knowledge of perception (and the related knowledge of optics that is necessary for any psychologist doing professional work in perception), and also my knowledge of identification procedures, and – most centrally – my knowledge of how beliefs and expectations can color perception.

The present case. With that base, let me turn to the specifics of the case you sent me. It is my understanding in this case that the base facts are as follows. I make no comment here about the veracity of these facts; instead, this is simply my understanding of the facts as stated in the materials you provided me.

1. On April 12, 2012, James Hopkins and Richard Belisle were murdered; their bodies were found in building T2, where they worked, at the Coast Guard Communications Station in Kodiak. It is my understanding that law enforcement believes these two men were killed at that location, and were killed shortly after arriving for work that morning.

2. The materials you have sent me indicate that the murder occurred sometime after 7:07 a.m. that morning (when Hopkins arrived at work) and before 7:40 a.m. that morning (when the bodies were discovered).

3. Your client, James Wells, is a civilian employee of the Coast Guard, and also worked at the same building. He usually arrived at work at approximately 7:00 a.m. On the day of the murder, however, Wells reported that he had a flat tire in his car, and so was late for work.

4. The Station's security camera, attached to Building T1, shows a white pickup truck, then a dark-colored SUV passing by within the time frame in which the murder took place, then a dark-colored SUV (allegedly the *same* SUV) going back in the other direction five minutes later, and, finally, a white pickup truck again. FBI correspondence indicates an interest in this SUV soon after the crime. Correspondence from April 20 (8 days after the murder) is requesting enhanced video that might allow identification of the make and model of this SUV.

5. It is also my understanding, first, that the murder weapon itself has never been located, and, second, that there is at least one gun that was allegedly in your client's possession at some point in the past, but which has not been located.

6. On April 13, 2012, the day after the shootings, the Coast Guard Investigative Service named James M. Wells as a "logical suspect."

7. By April 15, 2012, an FBI affidavit in support of a search warrant makes it clear that James Wells is a central suspect (and, as far I can see, their only suspect). Specifically, the affidavit alleges that there is probable cause to believe that James Wells drove his white pickup from his residence to the

Page 3 of 15

Kodiak State Airport, where he left the truck and drove away in the blue Honda CR-V normally driven by his wife, and that Wells later returned to the airport, left the Honda, and retrieved his truck.

8. The same point is echoed in reports from the FBI in August and in October. In October, for example, the FBI wrote that their "investigation to date indicates" that Wells had driven to the airport in his truck, collected his wife's CR-V (which was parked at the airport), drove to the T2 building, murdered the two victims, drove back to the airport, collected his truck, and drove home.

9. According to the FBI, Wells claims that, on the day of the murder, he drove his truck, saw that his tire was flat, and then returned home. The FBI has linked this drive-then-return to the video, and claims that the timing of the video does not fit with Wells' account – that there is an unexplained gap of roughly a half-hour between when the camera shows the truck going one way and then going the other way. I believe this fact (the gap in time) remains unexplained. There is some suggestion, however, that your client may have suffered from a bout of diarrhea that morning, and perhaps this point is the source of the delay. Any further comment about this issue, however, is outside of my expertise.

10. The FBI has collected a report from the Standards Testing Lab that indicates that the nail in Wells' truck was "manually inserted," and not the result of driving over a nail on the road. The FBI also asserts that the lab tests indicate the nail was not driven on after it was inserted.

11. The FBI spent considerable energy in seeking to identify the dark-colored SUV on the surveillance video. On April 16, 2012, the Forensic Audio Video and Image Analysis Unit of the FBI was asked to enhance the video and provide make and model of the questioned SUV. The conclusion of the FBI expert (Iber) was that "Due to the insufficient detail of the questioned vehicle depicted in the Q1 images, no conclusion of the make or model could be reached". Similarly, in August, 2012, Iber again opined that low resolution, poor image quality, low frame rate and blurring "not only make a conclusion that the car in the video is the same as the suspect's car impossible it also makes a conclusion about the class characteristics of the vehicle's make and model not viable."

12. Similar notes of caution arise when the Anchorage FBI (and, specifically, Daryl Allison) request a comparison between the image and Nancy Wells' 2001 CR-V. The resulting report does say that the known and questioned

vehicles "share limited characteristics," but that it is "not possible to identify or eliminate" the 2001 CR-V as being (or not being) the vehicle in the video. As an example of the uncertainty in this report, the report is only able to say that the known and questioned vehicles have "comparable" overall lengths, with a substantial degree of uncertainty (plus-or-minus 10 inches) in their estimates of those lengths.

13. In January 2013, Gerald Richards, another expert, provides a report for the FBI that again emphasizes the poor quality of the image; Richards is not certain even about the color of the vehicle (he identifies it as "dark grey or blue"). He is likewise uncertain about the brake lights: They appear high "but with the snow in the background it was hard to tell for sure." Richards could also not see a "car bra" or spare tire on the car, both of which are features of your client's wife's car.

14. As part of their continuing efforts to identify the SUV, the FBI also spoke with Neil Schmidt, a Technical Specialist at Honda, at least twice in November 2012, once in December, and again in January 2013. Each time, Schmidt was advised of the "purpose of the interview," but we have little information about what exactly this entailed. In their initial contact with Schmidt, he told them he "could not be 100% certain" that the SUV was a CR-V. In a subsequent interview, Schmidt seems to have identified part of the image by a process of elimination: The "light colored area high on the rear of the SUV is too concentrated to be anything other than part of the tail light assembly or a reflector." By January, however, he seems to have backed off from this position, and is now uncertain about the tail light position because "it could be the angle of the sun or light." Nonetheless, he indicates the he is "70%" certain that the vehicle is a CR-V of the same model type as your client's. Finally, in March, Schmidt is interviewed again, and now he seems able to narrow things down so that the video either shows a CR-V or a particular model of Volvo.

15. Your client was indicted for these murders on February 19, 2013.

16. In October 2013, the FBI received a report from Angelo Toglia, from Collision Research and Analysis, Inc. Toglia claims that, from the video, he can identify various structures such as "headlights, wheels, windows, and overall vehicle geometry." Here I note only that this is an impressive claim, in light of the more cautious assessments that several others have offered of the video. Nonetheless, Toglia is not able to tell us that the video shows a CR-V. He

indicates only that the video depicts a vehicle "*consistent with* the overall size and geometry" of a CR-V (emphasis added). (This is, of course, distinct from saying that the video *shows* a CR-V, much less your client's CR-V.)

Confirmation bias defined and explained. So-called "forensic science" has been the subject of severe criticism in recent years, with some of the criticism coming from the National Academy of Sciences (e.g., in the National Research Council's 2009 report), and some from specific authors (e.g., Fisher, 2008; Harris, 2012; Kassin et al. 2013; Simon, 2012). Part of this criticism has focused on the absence of consistent and specific standards – either for evaluating forensic labs, or for evaluating the evidence itself. On these grounds, there is room for debate about whether "forensic science" is "science" at all – with well-established protocols, carefully designed steps to diminish or eliminate any role of subjectivity, procedures for guarding against bias, a means of testing (and possibly falsifying) hypotheses, and so on. In addition, part of the criticism has focused on errors that have been well-documented even in high-profile cases for which investigators were doing all they could to be careful (e.g., the botched analysis of Brandon Mayfield's fingerprints in the Madrid bombing case). And part of the criticism has focused on the potential for *confirmation bias* in forensic investigation.

The term "confirmation bias" refers to a family of effects through which every one of us seeks to protect our current beliefs. A wealth of scientific research indicates that people tend to *notice* facts that support their beliefs, but to overlook facts that might challenge their beliefs; people tend to *seek* information that will support beliefs, rather than seeking contrary evidence; people give greater *weight* to information that supports their beliefs; they are more likely to *accept* at face value information supporting their beliefs, while they might greet contrary information with skepticism; they are better able to *remember* confirming information, and either forget disconfirming information or remember it in some distorted form that robs the disconfirmation of its force. And so on.

Confirmation bias is not the result of people being lazy or irresponsible; instead, this pattern is the automatic, unconscious result of well-engrained cognitive processes. (In fact, in ways I can explain later if need be, these processes serve us well in most settings, and so, for many aspects of day to day life, confirmation bias does not produce problems for us.) Likewise, confirmation

bias is not just what happens when someone is thinking about long-held, deeply important beliefs, beliefs for which the person might feel a strong sense of commitment. Instead, confirmation bias can easily be demonstrated even for recently-acquired, weakly-supported beliefs, for which the person might have little sense of commitment.

The potential for confirmation bias in your case. Confirmation bias has been documented in many settings and in many groups of people, making it unsurprising that this form of bias can also be detected in forensic settings. At the same time, let me emphasize that confirmation bias is not an overwhelming, guaranteed-to-prevail force; it is instead correctly named as a *bias* – an inclination or prejudice that can compromise the quality and accuracy of someone's judgment. On this basis, it is important that the experts who looked at the video in your case have offered diverse opinions – with Richards emphasizing that it is "hard to tell for sure" what the video shows; with the report to Daryl Allison only able to say the video shows something "comparable" to a CR-V, and that it is "not possible" to make a determination from the video; but with Schmidt eventually convinced that the video probably does show a CR-V, and Toglia apparently inclined toward the same view, but cautiously saying only that the video is "consistent with" the notion that the SUV is a CR-V.

The key question, however, is whether Schmidt and Toglia – the two viewers most likely to say the video shows a CR-V – were compromised to some extent by confirmation bias. We do know that Schmidt was interviewed over and over, and we know that he was told the "purpose of the interview," but have no details about what exactly he was told. Given that his position is at Honda (as a Technical Specialist), he surely knew that the FBI suspected that the SUV might be a Honda (why else would they be approaching him?), and the FBI's multiple returns to him (I count at least four interviews) must have made it clear to Schmidt that the FBI thought it reasonably likely that this notion (that the SUV was a Honda) was a promising option within their investigation. Likewise, Toglia's report makes it clear that he understood the FBI to be especially interested in the possibility that the unknown car was a Honda. In other words, his report makes it clear that the FBI did not approach him asking, in a neutral, open-ended way: "Can you figure out what car this might be?" Instead, they apparently put a possibility in front of him from the start: "Is the car a CR-V?"

Evidence for confirmation bias in forensic settings. To the best of my knowledge, there is no scientific research examining the exact issue in play here – whether (or to what extent) car identification from low-quality video is influenced by confirmation bias. Any assessment of Schmidt and Toglia, therefore, must rest on an extrapolation from other studies. However, there are many studies to build on, in exploring this extrapolation. In what follows, I offer a brief (and partial) catalogue.

Dror and Charlton, in a 2006, paper, evaluated the judgments of fingerprint experts who had been asked to compare a latent and known print (just as they would in an actual investigation). Initially, these well-trained experts were only shown the prints. Later, these experts were told that the suspect had in fact confessed, and now the experts were invited to re-view the prints. The data showed a clear effect of confirmation bias: Once the experts knew what they were "supposed to" (or "expected to") see in the patterns, they shifted their view, and now asserted that the prints could be deemed a "match" rather than "ambiguous."

A similar pattern was observed with eyewitness identifications. In a 2009 paper by Hasel and Kassin, participants viewed a theft and then tried to make a selection from a lineup. A few days later, the participants were told that another suspect – not the person they had selected from the lineup – had confessed. Having heard this new information, many witnesses seemed to gain "new memories" for the perpetrator's appearance. Indeed, almost two-thirds of the witnesses who had initially made a selection from the lineup now changed their minds about their decision, and offered a new response that brought their I.D. into alignment with the confession – and thus (just like the fingerprint experts) shifted their view to bring it into tune with what they were "supposed to" or "expected to" see.

Yet another example comes from actual criminal investigations. Kassin, Bogart & Kerner (2012) explored this issue by scrutinizing the records from DNA exoneration cases. As a first step, they sorted these cases into those that did contain a confession (roughly 25% of the cases) and those that did not. (Note that, since these are exoneration cases, we know that these confessions are false.) The analysis next asked: What other evidence was there in the case that had favored the wrongful conviction? It turns out that the confession cases included more "incriminating evidence," in addition to the confession, than the non-

confession cases did. (And, once more, "incriminating" is in quotations here because we know these defendants to be innocent.)

What happened in these cases? One possible account is that, once the (false) confession was in view, investigators sought – and found – other evidence that would corroborate the confession. But, of course, since the confession was later learned to be false, the other evidence "confirming" the suspects' guilt would also have been misleading. Or, to put this more bluntly, the concern is that the presence of the false confession somehow corrupted subsequent steps of the investigation, leading the investigators to find other evidence that we now know to be bad evidence.

This account assumes a temporal sequence: If the bad evidence was available *before* the confession was obtained, then the confession could not possibly be the source of, or have led to, the discovery of the bad evidence. But this concern is easily set aside: Kassin et al.'s (2012) scrutiny of these exoneration cases suggests that the confessions were obtained before the other "corroborating" evidence was collected. This bolsters the troubling suggestion that the confession did play a causal role in guiding the interpretation of this other evidence – evidence we now know to be unreliable and misleading.

In a recent (2013) pair of papers, Kassin, Dror and Kukucka assemble other evidence for just how widespread this pattern is. They cite evidence that polygraphers are likely to obtain results in line with their expectations, with those expectations governed by information provided to the polygraphers by other professionals investigating the case. They mention similar studies showing bias, guided by prior expectations, in handwriting analysis, fire investigations, firearm evaluation, and more. They document similar problems in DNA analysis (especially in complex cases when the DNA sample contains contributions from multiple individuals). This last point is especially ironic inasmuch as DNA analysis is commonly considered the 'gold standard' of objective, sophisticated forensic science – but here, too, confirmation bias can be detected, with investigators appreciably more likely to detect a certain pattern if they have been led to believe that pattern will be in place.

Given this spectrum of results, it seems reasonable to me that the video analysis at stake in your case would be susceptible to the same sorts of bias. Both Schmidt and Toglia, I believe, knew what the FBI suspected, and perhaps (more strongly) what the FBI hoped to confirm. In other words, Schmidt and Toglia both knew what they were looking for, and what they were expected to see, in a

Case 3:13-cr-00008-SLG Document 312-1 Filed 02/11/14 Page 9 of 15 Exhibit A - Page 9

very low-quality video. In this setting, the risk that their perception was to some extent shaped by these expectations – and, indeed, biased by and perhaps compromised by these expectations – must be taken seriously.

Let me emphasize that I am not saying that Schmidt and Toglia are mistaken. I have no basis for asserting this – or denying this. My evaluation here is simply that there is a substantial risk that their evaluations have been compromised by confirmation bias, and this point, I believe, demands caution in interpreting their evidence, and plausibly suggests that the finders of fact should eventually give less weight to their evidence. However, these latter points are obviously up to the court; here I can only comment on the risk of bias.

Can confirmation bias be avoided? I should also mention that, while confirmation bias is an automatic and powerful tendency for all us, there are various investigative procedures that can diminish or avoid this bias. For example, testing of new medicines is usually done in a "double-blind" fashion, so that neither the patient nor the person administering the medicine knows whether genuine medicine is being delivered, or some placebo. In this fashion, we ensure that neither the patient nor the administrator has relevant expectations, and so their expectations can not possibly bias the result.

Similar safeguards are, with increasing frequency, being used by law enforcement in conducting I.D. procedures. In some jurisdictions, an officer not involved with the case collects the I.D. In other jurisdictions, the officer uses the so-called "folder method." Individual pictures for a photolineup are put into unmarked folders. Before collecting the I.D., the officer shuffles the folders and hands the now-shuffled stack to the witness. Then the officer takes a large step backwards, so that the officer has no way of knowing what photo the witness is examining at each point in time. When the witness eventually says, "It's this one," and hands the folder to the officer, this is the first moment at which the officer knows what photo has been viewed and selected. Again, this procedure ensures that the officer's expectations cannot bias the result.

Scientific researchers have their own safeguards. For example, we often collect our data in a double-blind fashion. We routinely take steps to hide the experimenters' expectations from the study participants. We have many provisions to ensure that the data collection, recording, and analysis do not rely on subjective assessments. And, perhaps most important, we cross-check data collected by a researcher with one type of expectation against data collected by

researchers with a different type of expectations, so that we have balanced (and so rendered irrelevant) any contribution from confirmation bias.

I leave it to others to decide whether some sort of precautions should have been taken in the present investigation to remove confirmation bias. My point here, though, is that there is no reason to regard this form of bias as a "necessary evil," and careful and responsible investigators do have various means at their disposal for making sure their evidence is not compromised by confirmation bias.

"Top-down" effects in the courtroom. Let me at this point shift perspective, and focus, not on the experts in this case, but on the likely finders of fact – that is, the jury if this case goes to trial. I assume a judge will make an assessment of the video evidence pretrial, to decide if the evidence is reliable enough to be admitted. I assume a judge may also be called on to evaluate the procedure through which Toglia "enhanced" the video, with this evaluation presumably guided by a Daubert / Kumho criterion. I will offer no comment on these issues, since they involve legal questions for which I lack expertise.

For purposes of this report, however, let me assume that the judge will allow both the video and the expert testimony into the trial. How should this information be presented to a jury? One possibility is that the Government will start by presenting the enhanced version of the video – i.e., the version created by Toglia. The Government will surely acknowledge, though, that the jury must decide for itself what the original video shows, and so they will next show the jury the original video – perhaps with some declaration that 'We have shown you what *we* think the video depicts; you must now decide for yourself.'

The science of visual perception tells us that the sequence just described (or any of a number of variants on it) would be highly problematic. What is at issue here is the perceptual analogue to confirmation bias – and, specifically, effects that are often referred to as 'top-down' or 'expectation-driven' effects in vision. The idea, in brief, is that our vision is heavily influenced by our knowing what we are 'supposed to' see, and, once we have perceived a pattern in one fashion, it is extremely difficult to "un-see" that pattern and to go back to being an objective viewer.

For clarity, we should be clear here that we are not talking about something like the Rorschach test (or related tests) for which (supposedly) people

"project" their unconscious wishes and desires onto the perceptual input. Instead, top-down processing refers to the ordinary mechanisms through which every one of us draws on knowledge and expectations to supplement the visual input, and to interpret that input. Not surprisingly, top-down effects are strongest when the input is of low-quality (for example: a fast and blurry video, precisely the case in the present investigation), because this is a situation in which the need for supplementing and interpreting is greatest. Let's also be clear that top-down processing is not a deliberate, conscious process separate from ordinary perception. (It is thus not the case that one first sees a pattern and then interprets it as a separate step.) Instead, top-down processes permeate and literally shape what one sees.

I hope you will indulge me in an informal example here. Many people, when they view the figures shown below, initially see only a pattern of random blotches. Eventually, though, the pattern seems to "click into place," and the viewer discovers the Dalmatian in the first figure, and the cow in the second. The key, though, is that once you see these 'hidden' forms, you can not go back to *not* seeing them. The patterns will forever be "in view," even if you set the figures to the side and encounter them again only months later. Once perception is guided by some bit of knowledge, the guidance remains in place.



*Page 12 of 15*

Case 3:13-cr-00008-SLG   Document 312-1   Filed 02/11/14   Page 12 of 15  Exhibit A Page 12



While these informal demonstrations are helpful, systematic data collection is obviously preferable (and, for purposes of science, necessary). In fact, researchers have provided numerous formal demonstrations of these points. One instructive example comes from a study conducted many years ago by Jerome Bruner and Mary Potter. Research participants were shown out-of-focus pictures that were gradually brought *into* focus. Participants tried to identify the common objects shown in these pictures, and the question of interest was how quickly this identification could happen. Put differently, as the picture became clearer and clearer, at what point was it clear enough to allow identification? Bruner and Potter showed that identification was appreciably slower if the *initial* blur was quite high. In other words, the more out-of-focus the picture was at the start, the greater the level of clarity eventually needed for identification. Researchers have offered several explanations for this effect, but most explanations center on top-down processing: When the pictures were very much out-of-focus, viewers were likely to settle on initial hypotheses that were wholly mistaken. Then, once this initial hypothesis was in place, viewers had great difficulty in setting aside this initial mis-step, with the result that they had a harder time seeing what the pictures really did depict.

For present purposes, let me highlight two points about the (so-called) Bruner-Potter Interference Effect. First, once a perceptual perspective or framework or interpretation is in place, it is very difficult to set that interpretation aside. Second, if the initial perspective is mistaken, this makes it measurably more difficult to see what the image actually does represent.

Another often-quoted study is also relevant here: In 2004, Harley, Carlsen and Loftus published a paper on (what they called) the "saw-it-all-along" effect. In their procedure, participants were shown out-of-focus pictures of celebrity faces, and then, as the participants watched, the faces were gradually brought into focus. Participants were then asked (in some procedures) to recall the level of blur at which they had been able to identify the faces or (in other procedures) were asked to predict the level of blur at which naïve observers would be able to identify the faces. Participants consistently *over*-estimated performance (even when they were explicitly instructed to avoid this sort of bias). Thus, the participants recalled being able to discern the face at levels of blur that, in fact, had *not* allowed this identification. Likewise, the participants predicted that naïve viewers would be able to discern the face at levels of blur that, again, would in truth not allow identification. In these ways, it seems that participants were unable to separate their current perception of the images (having now seem them with little-or-no blur) from their perception of the images in blurred form – and so they now perceived the blurred versions as being clearer than they actually were. From this base, it was inevitable that the participants would (falsely) recall that they had been able to identify the forms in the blurred version, and would (falsely) predict that others could identify the forms in the blurred version.

I might mention in addition that these examples are all concerned with *visual* inputs. The same pattern can also be documented in *auditory* inputs, confirming that top-down processing is a central aspect of all human perception. Perhaps the best-known example from the auditory domain comes from the stories that sometimes circulate about messages "hidden" in popular music – messages that are revealed when the music is played *backwards*. As far as I know, there are no messages hidden in this fashion, but the widespread belief in these messages provides testimony for the power of top-down processing. The key idea here is that someone tells you, "*This* is what you should hear in this audio clip" – a message perhaps referring to Satan, or some sexual suggestion. This knowledge then guides and shapes what you hear, so that you end up

organizing the (chaotic, unpatterned) input in a fashion guided by the knowledge. The result, of course, is that you "hear" what you expect to hear.[1]

I assume the application of these findings to your trial is straightforward: Once a juror has seen an enhanced version of the video relevant to Mr. Wells' case, a juror will be guided by this knowledge and so will see the 'raw' video in the same way – even if the enhanced version is misleading. Jurors will not be able to set aside the ideas gained from the enhanced video, and, if these ideas are misleading, this will undermine the juror's ability to see what is actually in the raw video. Moreover, jurors are likely to recall that they saw "all along" in the raw video what they now have been guided to see by the enhanced video.

In fact, let me respectfully carry this one step forward, by considering how the videos will appear in your *judge's* eyes. Plausibly, the judge's decisions about the video evidence will be shaped by the judge's own assessment of how clear the raw video is, and I hope you can see that the science described here suggests that the judge will *over*-estimate the clarity if the judge has already seen the enhanced version. As a closely related point, it seems plausible that the judge's decision about the video evidence will be guided by the judge's estimation of what the jury will be able discern in the raw video, and, again, this estimation will be compromised if the judge has already seen the enhanced version.

I hope this provides the information you need. Please let me know if I can help with any further points.

Sincerely,

Daniel Reisberg, Ph.D.

---

[1] Examples of this phenomenon can be found at this website: < http://jeffmilner.com/backmasking/index.html >. On this site, you can play the audio clip itself (you will see a button labeled "Play in Reverse"). Then, once you are certain that there really is nothing 'hidden' in the audio (and nothing is), click on the button "Show/Hide Reverse Lyrics" to see what you are 'supposed to' hear in the clip, then listen to the clip again guided by this knowledge. Of course, the phenomenon depends on there being *some match* between the expectations guided by your knowledge, and the audio itself. It is inevitable, therefore, that some examples are more compelling than others. From this website, my students and I find these examples especially striking: "...Baby One More Time," "Revolution 9," and "Paparazzi." People disagree, though, on which of the supposed-messages are clearest. One way or another, these examples provide an illustration of how expectations and knowledge can guide your perception – and can, in particular, lead you to perceive patterns that are not there at all.