KAREN L. LOEFFLER
United States Attorney

BRYAN SCHRODER
Assistant U.S. Attorney

KATHLEEN A. DUIGNAN
Special Assistant U.S. Attorney
Federal Building & U.S. Courthouse
222 West Seventh Avenue, #9, Room 253
Anchorage, Alaska 99513-7567
Phone: (907) 271-5071
Fax: (907) 271-1500
Email: karen.loeffler@usdoj.gov
       bryan.schroder@usdoj.gov
       kathleen.duignan@usdoj.gov


Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. 3:13-cr-00008-RRB-JDR |
| | ) | |
| Plaintiff, | ) | **GOVERNMENT'S TRIAL BRIEF** |
| | ) | |
| vs. | ) | |
| | ) | |
| JAMES MICHAEL WELLS, | ) | |
| | ) | |
| Defendant. | ) | |

COMES NOW the UNITED STATES OF AMERICA and files its

Trial Brief as follows:

## I. STATEMENT OF THE CASE

### A. Summary of Charges

The defendant has been indicted and charged with violations of 18 U.S.C. § 7(3) and 1111(a)&(b), Murder in the First Degree (Counts I & II); 18 U.S.C. § 1114 and 1111, Murder of an Officer or Employee of the United States (Counts III & IV); and 18 U.S.C. § 924(c)&(j), Possession and Use of a Firearm in Relation to a Crime of Violence (Counts V & VI). All charges arise out of the shooting murders of United States Coast Guard (USCG) Petty Officer First Class James Hopkins and USCG civilian employee Richard Belisle, a retired Coast Guard Chief Boatswain's Mate. Both men were killed at their place of work, Communications Station (COMMSTA) Kodiak, on April 12, 2012.

### B. Factual Summary

The defendant is employed by the Coast Guard as an Antenna Maintenance Specialist (Wage Grade 10) at COMMSTA Kodiak. He has been employed there since approximately 1990. The physical location of his place of work is known as Building T2.

Physically, COMMSTA Kodiak is comprised of two primary

*UNITED STATES v. WELLS*
3:13-cr-00008-RRB-JDR

Case 3:13-cr-00008-SLG   Document 362   Filed 03/17/14   Page 2 of 61

buildings, T1 and T2. Building T1 is the main facility, housing the command staff, operations personnel, and most of the maintenance personnel.

Building T2, also known as the Rigger Shop, is the workplace of the antenna maintenance staff. Building T2 is on the same grounds as T1, located approximately 100 yards away.

The COMMSTA, including Building T2, is on property owned by the USCG, an agency of the Department of Homeland Security. The property is within the Special Maritime and Territorial Jurisdiction of the United States as set forth in 18 U.S.C. § 7(3) because it has been reserved or acquired for the use of the United States.

On April 12, 2012 at 7:47 a.m., Alaska State Troopers (AST) responded to a 911 emergency call from USCG COMMSTA Kodiak regarding an incident at Building T2. After entering the building, AST found two adult males on the floor with several medical personnel present.

The first victim observed by AST was ET1 (Electronics Technician Petty Officer First Class) James Hopkins, who was lying on his back. Hopkins had been shot twice – once directly in the face while standing

*UNITED STATES v. WELLS*
3:13-cr-00008-RRB-JDR

and facing his shooter, and once through his torso while he was already on the ground dead or dying. Hopkins was an active-duty member of the USCG, and was an employee of the United States. He was present in Building T2 to start his normal work day.

The second victim was USCG civilian employee Richard W. Belisle. Belisle was found lying on the floor in the office he shared with Hopkins, their supervisor, Chief Scott Reckner, and the defendant. Belisle was dead with three gunshot wounds. Like Petty Officer Hopkins, the murderer shot Belisle after he was incapacitated on the ground and lay dead or dying. Belisle had been a civilian employee of the USCG since November 13, 2005. He was present at Building T2 for the start of his normal work day.

There are six strands of evidence essential to understanding the case against the defendant.

    1. Premeditation and Planning with Insider Knowledge – The murders were committed in a premeditated brutal attack by someone who was familiar with the layout of T2, the schedule of those who worked there, and the location of security cameras.

    2. Timeline – A timeline of Wells's movements on the morning of April 12, 2012 shows he was in the vicinity of the COMMSTA in that he was in a 3-4 area for a period of 34

*UNITED STATES v. WELLS*
3:13-cr-00008-RRB-JDR

4

minutes during the exact time of the murders.

3. Wells's False Alibi – In recorded statements, Wells claims he was driving into work, noticed a low tire on his pickup, stopped momentarily at the Kodiak Airport to check the tire, then drove home to change it. This alibi suffers from <u>at least three</u> significant problems. First, video cameras capture Wells approaching the vicinity of the airport, and then leaving 34 minutes later. His alibi of briefly stopping to check the tire, only logically accounts for 6-10 minutes of that time. Second, many witnesses will testify that it would have made no sense for Wells to go home to deal with a faulty tire, as tools and opportunity make the COMMSTA a more logical choice to change the tire. Third, a government expert with over 30 years in the tire industry will testify that the nail found in Wells's tire was manually inserted.

4. Wells's Motive - The motive for the crime was the threats to Wells's perceived position as the unofficial head of the Rigger Shop. Wells's co-workers and chain of command indicate the murders were the culmination of a year full of conflict and disciplinary actions, including discussion of replacing Wells.

5. Blue SUV – The murderer arrived at Building T2 in a small blue SUV. Wells's wife drives a blue Honda CR-V, but she was in Anchorage at the time of the murders, and had left the car at the airport. Because the airport is in between the Wells' residence and COMMSTA Kodiak, the car was perfectly positioned for Wells to switch vehicles, assuring that the pickup truck he commonly drives would not be seen near the Building T2. In addition witness statements show that Mrs. Wells's car was moved between the time she left Kodiak on April 10 and the time the car was found on April 12, after the murders.

6. No Other Person with Motive, Opportunity, and Means - Despite an intense effort and hundreds of interviews,

investigators have uncovered no one else with a motive or reason to murder these two men.

## C. <u>Geographic References Relevant to the Time-Gap Opportunity</u>

The USCG's main base in Kodiak, officially known as Base Support Unit (BSU) Kodiak, is located immediately south of the Kodiak State Airport. COMMSTA Kodiak is not located on the main facility of BSU Kodiak. It is located approximately 3 miles north-northwest of BSU Kodiak on Mile 2 of Anton Larsen Bay Road. The turn off for Anton Larson Bay Road is immediately north of the Kodiak State Airport.



The defendant's residence is located on Pavloff Circle in the Bells

Flats area, south of BSU Kodiak. There is one primary road, Rezanof

Drive/Chiniak Highway, which runs from Bells Flats, past BSU Kodiak

and the Kodiak State Airport, to the City of Kodiak. For the defendant

to get from the his residence in the Bells Flats area to COMMSTA

Kodiak and Building T2, he must pass the Main Gate of BSU Kodiak

and the entrance road to Kodiak State Airport. The Main Gate area is

fitted with closed circuit television cameras (CCTV) which are designed

to provide images of vehicles entering the base, but, can also capture images of vehicles driving down Rezanof Drive within its view.

<u>Timeline April 12, 2012</u>

At approximately 6:48 a.m. on April 12, 2012 the BSU Main Gate CCTV captured video of Jim Wells's truck passing the base heading north on Rezanof Drive toward the airport and his work place at COMMSTA.  The video shows a white Dodge truck with a camper shell with two slanted rear windows.  The defendant is the registered owner of a truck fitting this description, and admitted in later statements that he was driving the road during a time frame consistent with this evidence.

COMMSTA Building T2 is secured at the close of the work day. On the evening of April 11, 2012, at approximately 7:00 p.m., the building was checked by a watch-stander from Building T1.  The building was secured, with all doors locked. Based on the electronic key logs and video surveillance, no one entered the building on April 12, 2012 until Belisle arrived at 7:00 a.m.  Electronic access records for Building T2 show Belisle's access card was swiped at approximately 7:00 a.m., and CCTV at Building T2 shows the arrival of his vehicle at

*UNITED STATES v. WELLS*
3:13-cr-00008-RRB-JDR

Building T2 shortly before the access card was swiped.

CCTV at Building T2 show Hopkins's vehicle arriving at Building T2 at approximately 7:08 a.m.

CCTV from a tower near COMMSTA Kodiak Building T1 shows a small blue Sport Utility Vehicle (SUV) driving on Anton Larson Bay Road arriving at and disappearing from view behind Building T2 at 7:09 a.m. The government consulted Honda engineer, Neil Schmidt, who stated that the vehicle in the video appears to have the profile of an early-model Honda CR-V. Mr. Schmidt states that he cannot identify the make and model with absolute certainty, but would say that he is 70% certain in his identification. Other evidence described below will also show that the vehicle in the video is consistent with an early-model CR-V. The vehicle also appears to have a black nose and black wheels. This vehicle did not enter the Building T2 parking lot via the primary entrance, and, thus, was not captured on the Building T2 video camera.

At approximately 7:11 – 7:12 a.m., Don Rudat, a jogger/walker on Anton Larson Bay Road, heard a loud "metal hitting metal" sound come from the direction of Building T2 as he was walking away from the area. CCTV confirmed the presence of Rudat on the road at

approximately 7:12 a.m.  Corroborating evidence will prove that he heard one of the shots, and probably the last shot.

At 7:14 a.m., CCTV near Building T1 shows the small blue SUV, reappearing and heading in the other direction from behind Building T2 – driving onto Anton Larson Bay Road towards the airport.  This vehicle did not depart the Building T2 parking lot via the primary entrance, and thus avoided being captured on the Building T2 video camera.  Analysis of video evidence shows that the small blue SUV drove inbound towards COMMSTA at about half the speed that it drove when heading outbound.

At approximately 7:22 a.m., CCTV at the BSU Kodiak gate showed Jim Wells's white pick-up truck passing southbound on Rezanof Drive towards Bells Flats.  Two USCG civilian employees, who know the defendant, witnessed him driving in his white Dodge truck in the area of Bells Flats after 7:22 a.m.

Jim Wells left two voice mail messages for his supervisors, Jim Hopkins (who was already dead at this time) and Scott Reckner, respectively at 7:29 and 7:31 a.m.  The messages stated that Wells had a flat tire, had had trouble with his lug nuts, and would be in when he

got the tire changed.

At approximately 7:40 a.m., a U.S. Coast Guard member assigned to duties at Building T2 discovered the bodies of Jim Hopkins and Rich Belisle dead at their workplaces. He reported the situation to Building T1, who alerted police and medical units. USCG military police conducted a security sweep and established that only one door in Building T2 was unlocked – the other doors remained secure. There were no logged entries through the electronic lock, other than as noted above.

A blue 2001 Honda CR-V owned and driven by Nancy Wells, Jim Wells's wife, was found later that day by a wildlife trooper looking for vehicles that might match the video evidence parked in the two-hour parking lot at the Kodiak State Airport. When found in the parking lot, the SUV was unlocked and the keys were in or on the center console. Nancy Wells, the defendant's wife, told investigators that she flew out of Kodiak to Anchorage on Tuesday, April 10, 2012, leaving her blue Honda SUV parked at the Kodiak Airport. A witness who drove with Nancy Wells to the airport stated that she recalls that they parked in an area where they could walk straight into the Alaska Airlines

*UNITED STATES v. WELLS*
3:13-cr-00008-RRB-JDR

Case 3:13-cr-00008-SLG   Document 362   Filed 03/17/14   Page 11 of 61

terminal – a location consistent with where passengers would park on departing flights.  When discovered, Mrs. Wells's vehicle was at the very end of the parking lot, diagonally distant from this location, and therefore appeared to have been moved after Mrs. Wells had parked the car and before the time it was found on the day of the murder.

Work Environment Prior to Murders

COMMSTA Kodiak was staffed by approximately 60 members. Most worked in the T1 building, and approximately 7 people were assigned to building T2.  Wells and Belisle were the only civilian employees at the COMMSTA; all others were active-duty Coast Guard members.

Chief Scott Reckner took over supervision of the Rigger Shop in July of 2010.  James Hopkins was assigned to COMMSTA in approximately 2009, and was the direct supervisor of Wells and Belisle. When Reckner arrived at COMMSTA, he had recently been promoted to the rank of Chief Petty Officer.  In the chain of command, he reported to Senior Chief Reed, the Engineering Officer, and then up the line to the Executive Officer, Lieutenant David Pizzurro, and finally to the Commanding Officer in charge of COMMSTA, Commander Peter Van

*UNITED STATES v. WELLS*
3:13-cr-00008-RRB-JDR

Ness. Soon after the various command changes that put Van Ness, Pizzurro, Reed, and Reckner in charge of the Rigger Shop functions, the command realized that the Rigger Shop, and specifically the civilian who had worked there for over 20 years, Jim Wells, appeared to be acting too much as an independent unit. The command wanted it to be brought back into line as a functioning part of the overall COMMSTA command structure. Reckner was tasked to gain bring the Rigger Shop back into the fold. Reckner told Hopkins to supervise the defendant more closely. Later, Reckner even moved his desk into the Rigger Shop office shared by Hopkins, Wells, and Belisle, so that he could have more day-to-day contact with what was going on in T2.

Jim Wells's role at COMMSTA was as an antenna mechanic. He was extremely knowledgeable about antenna maintenance and very competent at his job. He was also very proud of that knowledge. However, he attempted to hoard that knowledge and it was difficult for others to extract the knowledge from him. Wells liked to be the "go-to" person for all questions involving antenna maintenance. Wells had a history of operating independently of Coast Guard management and was resistant to any suggestions or orders that countered what he

wanted to do.  In addition, if he did not agree with a command decision, he would just not participate in the work to implement it.  A few examples of this behavior are:

In 2003, the Rigger Shop personnel were on Attu Island in the Aleutian chain to deal with a Coast Guard hut that had become unusable due to the Navy's closure of the base where the Loran station was located.  Wells wanted to bring the hut back to Kodiak for repairs.  Despite a direct order not to ship the hut, Wells had it placed on a Coast Guard C-130, in direct contravention of orders, and shipped it back to Kodiak.

In July of 2011, Reckner, Hopkins, Belisle, other Rigger Shop personnel, and the defendant were erecting new towers at a remote Coast Guard facility.  The defendant had decided not to install devices required by the Environmental Protection Agency on the towers.  Reckner ordered the devices to be installed.  The defendant argued with Reckner over the decision and yelled at anyone who would listen to him that Reckner wasn't letting Wells do his job.

<u>Wells's Other Disciplinary Issues</u>

In April 2011, the Engineering Officer (EO), Senior Chief Reed,

issued Wells a memorandum of "EO Expectations/Clarifications." Wells was instructed to notify the command when he was taking time off from work, and to receive command approval for official travel. Wells's supervisors were often not aware when he was gone, or where he was. Wells would travel to other parts of the country to assist other units, and if the other units provided the funding, Wells would sometimes not bother to inform his bosses. Wells was also warned about improperly taking trees from Coast Guard property. Wells was known to heat his house with wood.

In September 2011, all members of the Rigger Shop, except Wells, were off island for various tasks. Most were on Shemya to work on an antenna issue. Wells was on Kodiak because he had a medical appointment scheduled in Anchorage. While Wells was gone, ET1 Hopkins discovered that the COMMSTA fuel card that was kept in Wells's desk was missing. The card was authorized for government fuel purchases, allowing Rigger Shop personnel to purchase fuel at the main Coast Guard base for official vehicles and equipment.

Commander Van Ness ordered an investigation, and Chief Cartier was assigned to conduct the investigation. Chief Cartier's investigation

revealed that during the time that the card was missing, it had been used to purchase approximately $250 of diesel fuel at the base. The investigation indicated that Wells had driven onto the base at the time the card was used. The investigation concluded that Wells had used the card to fuel up his personal vehicle. The proof was not overwhelming, but Commander Van Ness felt the facts were sufficient to order civilian disciplinary action, and he wrote a letter of caution to Wells for taking the fuel. However, because of Wells's ensuing illness, and the Commander's schedule, it was late February before the command could meet with Wells to address the issue.

In August of 2011, the defendant became ill and was in and out of the office through most of the fall of 2011 and winter of 2012, only returning to full-time duty in February 2012. Wells eventually had his gall bladder removed and had surgery for a hernia. While the defendant was out, the Rigger Shop staff assumed many of the defendant's duties. They discovered that they could research issues and find solutions for many of the problems that previously Wells had handled. As one Coast Guard member noted, they realized that Wells was no longer relevant. The two members of the Rigger Shop staff that

stepped up most significantly to keep operations going in Wells' absence were Jim Hopkins and Rich Belisle.

In November 2011, Reckner called the defendant to his office to sign a Memorandum for Record advising that trees on COMMSTA property were not to be cut and removed for personal use.  It had come to Reckner's attention that the defendant was "collaring" trees to have them die prematurely.  The defendant was then harvesting the trees for firewood.  Reckner told the defendant that it was "time to get in line." The two had a heated discussion that was loud enough to be overheard by individuals outside Reckner's office.  During the argument, Reckner brought up the gas card incident and informed the defendant that the only reason he wasn't getting fired was because there were no cameras at the BSU gas station.

In December of 2011, Reckner told the defendant that he was abusing his sick leave and needed to report back to work or retire.  The defendant and Reckner had a heated argument which was heard by others outside of Reckner's office.

In January 2012, Reckner told the defendant that, because of his disciplinary problems and excessive absences, the defendant could not

attend the annual National Association of Tower Erectors (NATE) conference. The defendant had attended the conference for many years, but Reckner decided that only he, Hopkins, and Belisle would attend the 2012 conference. Reckner and the defendant had another heated argument regarding the decision. After they had finished arguing, the defendant simply sat and stared at Reckner. Reckner stated that he was "sick" of the defendant's attitude and stared back for what seemed like a long time.

In February 2012, the COMMSTA Commanding Officer, Executive Officer, and Reckner met and presented the defendant with a Letter of Caution regarding misuse of the fuel card (fully discussed above). The Commanding Officer informed the defendant that he no longer trusted the defendant. The defendant denied the accusation and repeated the phrase, "It just doesn't sit right." The defendant initially refused to sign the Letter of Caution, but did so after everyone left the table.

### D. The False Alibi

During interviews the day of and the day following the murders, the defendant stated that on the morning of the murders, he was on his

way to work when he noticed he had a low tire on his pickup. He claimed that he pulled off the road near the Kodiak State Airport, looked at the tire, and returned to his home to change the tire, because the spare tire and jack were at his residence. The next day he further explained that he believed he went into the house and went to the bathroom and looked for his equipment before calling his supervisors.

When asked how a person could evade detection by the CCTV located on Building T2, the defendant gave a detailed answer and drew a diagram for the investigators showing them the location, angles, and coverage of the camera.

Prior to being told about the CCTV videos obtained from the BSU main gate camera, the defendant was questioned on how long it took him to drive from the Main Gate at BSU to the Kodiak airport, check his tire, and drive back to his residence. Investigators told the defendant their estimate was about 6-10 minutes. After hearing the analysis and estimate, the defendant did not commit to a specific time, nor did he correct the investigators when given the opportunity to do so.

At the end of the interview on April 13, the day after the murder, the investigators told Wells that the BSU gate camera showed him

passing the main gate going north toward the COMMSTA at 6:48 a.m., and not returning going south toward his residence until 7:22 a.m. – a gap of 34 minutes that was clearly inconsistent with his stated explanation. When asked to reconcile the 34-minute gap shown by the camera and the estimate of 6-10 minutes, he stated: "I can't think of why there would be the time discrepancy." Agents gave him an additional opportunity to explain the time discrepancy, asking him to help them account for the missing time. The defendant stated: "I don't have a reasonable explanation for it." He then added, "I don't have a theory at the moment." When asked again if he had anything to add to that, he responded, "Nope". He then terminated the interview.

Just following the interview, on April 13, 2012, Wells went to the airport and entered the building at Island Air – a charter airline service located directly across the airport parking lot from the Alaska Airlines Building. Wells stood and stared at the internal cameras located in the building for a long enough time that one of the managers approached him and asked what he was doing. He mumbled something about the café next door being closed and walked away. As the manager noted, she remembered the incident, because Wells, "creeped her out."

*UNITED STATES v. WELLS*
3:13-cr-00008-RRB-JDR

Defendant's low or flat tire story made no sense to anyone familiar with him or the COMMSTA, nor does it fit the established time line for a number of reasons.  First, the COMMSTA is less than 2 miles from the airport and the drive home is almost 4 times that long.  Second, the COMMSTA has all of the equipment necessary to change or fix a low tire and, as Commander Van Ness notes, six shipmates to help.  It was common and allowable for Coast Guard members to work on cars and use equipment at the Rigger Shop for minor car repairs such as this.  Third, the tools at the Rigger Shop were organized and easily accessible, unlike Wells's home.  Wells was a hoarder, his driveway was very steep, his garage inaccessible, and his tools dumped in a hoarders' nightmare in various places around his house and property.  Moreover, based on the time that he was caught on video passing the BSU gate, and the time he called with his excuse for being late to work, he could not possibly have had time to get out tools and check the lug nuts on his tire before claiming his excuse in the calls to both Hopkins and Reckner.  Expert testimony corroborates this fact – that the alibi was false.

Pursuant to a search warrant, a studded tire was seized from the bed of the defendant's white Dodge pickup truck.  A 3 ½ to 4 inch long

*UNITED STATES v. WELLS*
3:13-cr-00008-RRB-JDR

nail was embedded in a groove of the tire between two of the treads. Forensic analysis of the tire was conducted by Gary Bolden, from an independent tire testing laboratory. Bolden has 32 years' experience in the tire industry, including 22 years in forensic tire testing. Bolden concluded that the 3 ½ to 4 inch long nail was inserted into the tire manually, and had not been picked up nor present during normal operation of the vehicle. This conclusion is based on the following factors:

- There was no evidence of pavement or debris abrasion on the nail head which would necessarily be present had the nail been picked up during normal vehicle operation.

- The nail was located in the groove between the tread and had penetrated to the extent that the nail head was below the height of the tread. The nail head would not have penetrated below the height of the tread had it been picked up during normal operation.

- The nail shank was slightly bent and the nail penetrated the tire at an angle nearly perpendicular to the tire surface. A nail of this length could only penetrate the tire at an oblique angle during normal operation or the shank would be bent as the tire rolled over it.

- A toolmarks analysis conducted by the FBI Laboratory, also concluded that markings on the nail head indicated that it has been driven using an automatic or pneumatic nail gun.

*UNITED STATES v. WELLS*
3:13-cr-00008-RRB-JDR

### E.  Other False Statements

During his interviews, Wells was also asked about any interpersonal problems between him and his co-workers.  He stated that there were none.  However, after the murders when talking to his sister and brother-in-law, he became incensed when their daughter asked about how the families of Hopkins and Belisle were coping. Wells, visibly angry, went on a tirade about how both were incompetent, unable to perform their jobs and said that Belisle was a drunk.  In fact, all of the supervisors of both men will have nothing but complementary things to say about both of the men, their competence, work ethic, and dedication to the job.  Indeed, Hopkins was named COMMSTA Enlisted Person of the Year for 2011.

### F. Weapon Used in Murders

Both victims were shot multiple times.  At the autopsy of Belisle, the Medical Examiner removed a projectile from Belisle's cervical spine. The projectile was intact, and was removed without further marking the item.  That item was submitted to forensic examination at the Alaska Scientific Crime Detection Laboratory.  The lab determined that the projectile is a .44 caliber bullet bearing markings of a 5 right twist,

*UNITED STATES v. WELLS*
3:13-cr-00008-RRB-JDR

consistent with a Smith & Wesson Model 29/629 revolver, a Taurus revolver, or a Llama revolver. Despite extensive searches, the murder weapon has never been found. However, in approximately 1996, a friend of Wells's left his gun safe with numerous firearms with Wells when he left Kodiak. Included in the inventory was a Smith and Wesson Model 629 .44 Magnum silver revolver of the type that is consistent with the possible murder weapon. The friend, John Stein, returned one year later to arrange for the gun safe to be sent to his brother. When he went to Wells' house he found the safe open and the Smith & Wesson Model 629 .44 Magnum missing. He asked Wells what happened to it and Wells gave a noncommittal answer that it must have gotten lost or something.

Bob Pletnikoff was a friend of the defendant's and had on at least one occasion hunted with the defendant. Pletnikoff stated that on at least one occasion, the defendant was armed with a silver-colored revolver of unknown caliber, but which Pletnikoff believed was "a bear gun." In the searches of the defendant's residence and vehicles, only one revolver was recovered, the .44 caliber Ruger. The Ruger was blued steel. No silver-colored revolver has been found in any location

associated with the defendant.

The Alaska State Crime Lab criminologist reported that the bullets recovered from the bodies and crime scene were .44 Magnum caliber jacketed soft points. In the execution of a search warrant at the defendant's residence, investigators recovered and seized .44 caliber jacketed soft point ammunition. The jacketed soft point ammunition was analyzed at the FBI laboratory and found to be consistent with the bullets recovered from the crime scene.

### G. The Murders Were Personal, Intentional, Internal to the Coast Guard, and Well-Planned

A number of factors indicate a level of advanced planning and knowledge of the routines of Building T2:

The person who committed the murder chose a time when only a limited number of the staff would normally be on duty at Building T2. Belisle and Wells normally arrived to work around 7:00 am. Hopkins was usually in between 7:10 and 7:20 a.m. The video evidence shows that the murderer in the blue SUV followed Hopkins as he arrived at the Rigger Shop, and thus, was fully aware that Hopkins was in that day by 7:09 a.m. As part of the normal routine, no one else was likely to

be at T2 before 7:30 a.m. or later. Thus, by arriving almost precisely at 7:10 a.m., the murderer likely had approximately 20 minutes to murder two unarmed individuals and escape.

Any person approaching Building T2 at 7:09 a.m. on April 12, 2012, would have seen four trucks parked in front of the building: two government trucks, and the personal trucks of Belisle and Hopkins. A person not familiar with the daily routines and operations at Building T2 would be faced with the possibility of confronting four or more persons in the building. In addition, there are no windows in the front of the T2 building and a "stranger" murderer would not have any idea where anyone was located within the large building. A person familiar with T2 would have known only Belisle and Hopkins were inside.

The murderer chose a route into Building T2 that prevented the camera on that building from capturing an image of the vehicle. The murderer also walked under the camera located on the T2 building, so that the camera would not capture his entrance into the building.

The normal routine for the workers at T2 was that the first one into the building, generally Belisle or Wells, would swipe through the card reader door to get in and then unlock the door on the east side of

the building.  The murderer apparently was aware that there would be an open door as the murdered did not card swipe in.

The murderer left no forensic footprint.  There were no bloody footprints, no bloody fingerprints, indeed, no blood evidence at all beyond the two rooms where Hopkins and Belisle were murdered. Although investigators, following standard practice, collected what crime scene evidence they could find, nothing in those collections pointed to the likelihood that the evidence would point to a murderer and, in fact, nothing did.  (Obviously evidence that Wells, or any other COMMSTA member,  had been present at the crime scene, which of course did exist, would not be of evidentiary value since he worked in those locations.)

The murder was personal and targeted these victims.

Crime scene experts and common sense demonstrates that the murderer targeted Hopkins and Belisle and intended to kill them.

Despite the fact that the Rigger Shop is a tool shop, and was full of tools, radios, and related gear, there was no evidence that anyone had broken in or taken anything.

Both Hopkins and Belisle had money on them that was not taken.

There was no evidence of a motive of burglary or robbery.

Each victim was shot multiple times and both were shot while lying on the ground dead or dying.

Both victims were shot in adjoining rooms, where they were likely to be found as was their morning routine.

Belisle and Hopkins, although they worked together, were not social acquaintances, and had no connection to each other except work.

Expert Testimony

The first trooper on the scene was Alaska State Trooper Denis Dupras – a 14year veteran of Alaska law enforcement with years of experience responding to crime scenes and murder sites. Trooper Dupras, after making sure the scene was secure viewed the scene and victims. His opinion based on experience was that the scene showed a personal, targeted murder by someone familiar with the building and individuals. Crime scene expert William Gifford, former Anchorage Police Officer with 30 years of law enforcement experience and murder investigations, will echo that assessment. Gifford, like Dupras, will testify that this was an intentional and well planned murder by someone familiar with the set up and routine of COMMSTA. FBI

UNITED STATES v. WELLS
3:13-cr-00008-RRB-JDR

Supervisor of the Behavioral Analysis Unit, Robert Morton also independently reviewed the evidence and reached similar conclusions. (Gifford and Morton have different theories as to who was shot first and the order of shooting, however both acknowledge that there is no way to know exactly what order the shooting took place based on the forensic evidence and both agree on the essential fact that this was a planned, intentional murder by an individual familiar with the locations, as well as the schedules of the victims and any possible witnesses.

Dr. Meloy

The government also engaged forensic physchologist Reid Meloy, to review the general facts and provide insight into the murder. In considering the defendant's *Daubert* motion, this Court found Dr. Meloy's "education and experience together with his reference to other research and studies is sufficient to constitute a reliable methodology for commenting on whether certain characteristics are indicative of workplace violence." Doc. 303, p. 27.

Dr. Meloy, will not testify specifically as to Mr. Wells, as he advises that giving such an opinion would not be appropriate under professional ethics where he has not examined Mr. Wells. He, however,

has years of study and research analyzing targeted, personal and workplace homicides involving multiple victims. His research defuses a number of commonly misplaced beliefs (often formed by the unfortunate reliance on TV plots) as to the characteristics of those who commit these crimes. For example, many, if not most people, believe that work place violence is committed after the perpetrator "snaps" based on some obvious incident. Dr. Meloy's reseach and study shows that this is not necessarily the case and such crimes are often committed by someone, who prior to the incident, is more likely to become withdrawn and isolated, and that these actions are often thought out and planned well in advance. He also talks about a heightened sense of ego based on one's job and heightened sense of insult based on setbacks at work. Dr. Meloy's studies will show some characteristics that appear to fit Mr. Wells closely and list some characteristics that are not consistent with his biography. The facts and applicability will be for the jury to decide along with other evidence. In considering the defendant's *Daubert* motion, this Court found Dr. Meloy's "education and experience together with his reference to other research and studies is sufficient to constitute a reliable methodology

for commenting on whether certain characteristics are indicative of workplace violence." Docket 303, p. 27.

The case against Jim Wells is made up of the intersecting strands of evidence showing that the murders of James Hopkins and Richard Belisle were committed, by someone who intentionally planned and targeted these two innocent men, who was familiar with the layout and daily schedule of the COMMSTA and especially the rigger shop; by someone who had access to a small blue SUV that was consistent with the one left at the airport by Nancy Wells. The evidence further shows that Jim Wells was within 1.5 miles of the COMMSTA during the time of the murders with plenty of time to access his wife's vehicle, commit the murders, change vehicles and go home; that he was not prepared for the 34 minute gap in time that was caught on the BSU gate camera and had prepared a false alibi that does not account for the time. That Wells and Wells alone was the only individual having work issues at the Rigger Shop; that he was a very competent and knowledgeable antenna mechanic, but that he also had a grandiose and overblown view of his importance to the job.

## II. POTENTIAL LEGAL/EVIDENTIARY ISSUES

### A. Defendant's False Alibi

#### *Generally*

Federal Rule of Criminal Procedure 12.1 sets forth the procedures governing an alibi defense. Under the Rule, the defense must, within 14 days of a request by the government, provide: 1) each specific place where the defendant claims to have been at the time of the commission of the offense; and 2) the name, address and telephone of number of each witness the defense intends to call in support. FRCrP 12.1(a). The rule allows a defendant "unfettered discretion" both to elect to present an alibi defense and to withdraw the defense without penalty. FRCrP 12.1(f); *Williams v. Florida*, 399 U.S. 78, 84 (1970) (interpreting similar Florida rule). Defendant provided such a Notice. Dockets 106, 118. However, he did not list any witnesses that he claims could provide testimony as to where he was during the missing 34 minutes when the murder was committed.

#### *Inconsistent Alibis*

Although the defendant initially provided the "flat tire" alibi to investigators, it has come to the Government's attention that the

*UNITED STATES v. WELLS*
3:13-cr-00008-RRB-JDR

defendant may offer a different alibi at trial – bowel troubles required him to make an urgent visit to a restroom near the airport on the morning of the murders.

FRCrP 12.1 does not permit a defendant to "defer until the moment of his testifying the election between alternative and inconsistent alibis." *Id.* at 85, n. 15, *citing with approval State ex rel Simon v. Burke*, 163 N.W. 2d 177, 181 (Wisc. 1968). A defendant cannot use the alibi procedures as a means of hampering the court's search for truth. *Id.* In order to ensure that the truth is not obfuscated, "[w]here there is even a pretrial change of alibi, this court has permitted cross-examination and introduction of the initial alibi notice as bearing upon an issue raised by the choice and change of mind of the defendant." *Burke*, 163 N.W. 2d at 181.

### Representations of Attorney Binding on Defendant

Any representations to the Court made by defense counsel regarding the defendant's alibi may also be introduced by the Government. As late as January 23, 2014, in a pleading to the court, counsel for Mr. Wells stated, "Mr. Wells's alibi is that his tire had low pressure at the time of the homicides and that he returned to his home

to change the tire.  Docket 274, pp. 8-9.  Under Federal Rule of
Evidence 801(d)(2)(D), courts routinely allow statements by a
defendant's attorney to be introduced as admissions by a party
opponent.  *United States v. Benson*, 947 F.2d 1353, 1356 (9th Cir. 1991)
(counsel's admission in closing that defendant filed no tax return barred
litigating lack of government's evidence on issue); *Magallanes-Damian
v. INS*, 783 F.2d 931, 934 (9th Cir. 1986) (absent egregious
circumstances, parties are generally bound by admission of attorney);
*see also Oscanyan v. Arms Co.*, 103 U.S. 261, 263 (1880) ("any fact,
bearing upon the issues involved, admitted by counsel, may be the
ground of the court's procedure equally as if established by the clearest
proof").

 In *United States v. Butler*, 496 Fed.Appx. 158 (3rd Cir. 2012),
defendant's attorney, both in conversations with police and during a
pretrial hearing, stated that the defendant had fired the gun, but had
not intended to fire it at the police.  496 Fed.Appx. at 159.  At trial, the
court ruled that, should the defendant put on a defense inconsistent
with those statements, the prosecution would be allowed to introduce
the attorney's statements as rebuttal.  *Id.*  The Third Circuit held that

"statements by counsel, which had been made on the record in the course of pretrial proceedings in the present case, were admissible under § 801(d)(2)(D)."  *Id.* at 160-61; *see also, United States v. Joseph*, 483 Fed.Appx. 146, 149-50 (6th Cir. 2012) (admitting defense attorney statements made to IRS during tax fraud investigation); *United States v. Amato*, 356 F.3d 216, 218-19 (2nd Cir. 2004) (pre-trial letter written by defense counsel introduced to rebut witness' inconsistent testimony).

Here, although the defendant may withdraw his alibi at any time without penalty, he should not be allowed to straddle the fence with two inconsistent alibis, waiting until the last possible minute to decide which side to take.  If the defense takes a position which is inconsistent with previous representations to the court, the government should be allowed to introduce the prior representations to impeach the testimony.

### *Prior Consistent Statements*

As part of his alibi, the defendant may seek to introduce prior statements which are consistent with the alibi.  FRE Rule 801(d)(1)(B) permits the introduction of prior consistent statements, but "only when those statements were made before the charged recent fabrication or

improper influence or motive." *Tome v. United States*, 513 U.S. 150, 167 (1995). Statements made by defendant after he became aware of the government's investigation are inadmissible. *United States v. James*, 344 Fed.Appx. 382, 384 (9th Cir. 2009) (statement made after federal agents searched defendant's home); *United States v. Bao*, 189 F.3d 860, 864 (9th Cir. 1999) (statement made after search of defendant's home, but before defendant was told he was a suspect).

## **B.** Defendant's Exculpatory Statements/Admissions

At trial, the government may introduce prior statements of the defendant as substantive evidence. FRE 801(d)(2)(A); *United States v. Swenson*, 2014 WL 349559, *1 (D. Idaho 2014). Any exculpatory statements made by a defendant are, however, hearsay, and are not admissible through other witnesses. *See United States v. Ortega*, 203 F.3d 675, 682 (9th Cir. 2000). In addition, FRE 106, the rule of completeness, does not compel admission of otherwise inadmissible hearsay evidence. *Ortega*, 203 F.3d at 682; *United States v. Caldicott*, 92 F.3d 973, 983 (9th Cir. 1996).

## **C.** Expert Issues

### *Motions Filed*

*UNITED STATES v. WELLS*
3:13-cr-00008-RRB-JDR

The government has filed a notice of its intent to introduce the testimony of a number of expert witnesses under Rules 702, 703, and 705 of the Federal Rules of Evidence. (Docket 160). The defense filed motions *in limine* for six of the named experts: William Gifford and Robert Morton, both crime scene experts (Docket 193, 213); Gary Bolden, a transportation technology and tire expert (Docket 195, 219); Dr. J. Reid Meloy, a forensic psychologist (Docket 196, 216); Neil Schmidt, an engineer with Honda North America (Docket 199, 222); and Angelo Toglia, a mechanical engineer, forensic photo and video analyst, and accident reconstruction expert (Docket 201, 225). The government filed responses (Docket 230, 238, 273).

Following a hearing, the Court ruled that the testimony of Bolden, Schmidt and Toglia is admissible. (Docket 303). The Court further found that the crime scene experts, Gifford and Morton, had "relevant and reliable testimony to provide at trial," but deferred a ruling on the extent of their opinions until trial. *Id.* The government respectfully disagrees that the district court's gatekeeper role includes analyzing the evidence introduced to determine whether the expert opinion is properly supported: "The factual basis of an expert opinion goes to the credibility

of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross examination." *Hangarter*, 373 F.3d at 1017 n.14, citing *Children's Broadcasting*, 357 F.3d 860, 865 (8th Cir. 2004); *United States v. Boyajian*, 2013 WL 4189649 (C.D. Cal.) *15. The trial court is "a gatekeeper, not a fact finder." *United States v. Sandoval–Menxoza*, 472 F.3d 645, 654 (9th Cir. 2006) (reasonable medical opinion should have been admitted even though it did not conclusively prove lack of predisposition). Likewise, the admissibility or the strength of the evidence relied upon by the expert is not a determining factor in a pretrial *Daubert* analysis. *United States v. Gonzales*, 307 F.3d 906, 910 (9th Cir. 2002) (expert could properly rely on inadmissible hearsay to form opinion); *Micro Chemical, Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1392 (Fed. Cir. 2003) (in *Daubert* challenge "it is not the role of the trial court to evaluate the correctness of facts underlying one expert's testimony").

The Court also held that the workplace violence expert, Dr. Meloy, had knowledge and experience in his field, but withheld ruling on the motion until a balancing test under Fed. R. Evid. 403 was performed during trial. Similar evidence has been admitted by the courts in

numerous situations.

Dr. Meloy's testimony will provide qualified and educated information concerning an area of human behavior that he has long studied that is not within the common understanding of jurors. *See, e.g., United States v. Lukashov, Jr.* 694 F.3d 1107, 1116-7 (9th Cir. 2012) (Expert testimony concerning assessment of child sex abuse victim's story admissible as helpful to the jury to understand the evidence); *United States v. Hitt*, 473 F.3d 146, 158 (5th Cir. 2006) (Admitting expert testimony concerning the methods by which sexual abusers of children commonly operate); *United States v. Hayward*, 359 F.3d 631, 635-6 (3rd Cir.. 2004 ( testimony about characteristics of acquaintance child molesters admitted); *United States v. Hadley*, 918 F.2d 848, 853 (9th Cir. 1990) (Admitting expert testimony on general behavioral characteristics of abused children based on experience prior to *Daubert*). As with the cases cited, the government will not ask Dr. Meloy to give an opinion concerning Mr. Wells. He will only testify concerning characteristics of those who commit targeted, violent acts in workplace settings. Again, contrary to defendant's previous legal claims, it is both common and useful for experts to testify about general

principles and characteristics without "ever attempting to apply them to the facts of the case". Advisory Committee Notes to Fed. R. Evid. 702 (2000 Amendments).

The government filed a motion *in limine* regarding defense expert Daniel Reisberg, arguing that the testimony is inadmissible under Fed. R. Evid. 703. Docket 312. This Court denied the motion, subject to certain limitations. Docket 354. The government disputes this ruling but, in aid of efficiency, would simply ask to voir dire the witness at trial so that the court can determine whether Dr. Reisberg, has the qualifications or any reliable methodology to give the opinions proposed by the defense. *See* Gov't Motion in Limine at dockets 312 and 327.

### *General Law*

Federal Rule of Evidence 702 permits qualified experts to opine on specialized knowledge that will assist the trier of fact in determining a fact in issue. Ultimately, however, that specialized knowledge must also be reliable and relevant. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 591 (1993); *Daubert v. Merrell Dow Pharmaceuticals, Inc.* ( *"Daubert II"* ), 43 F.3d 1311, 1315 (9th Cir. 1995). A witness must be "qualified as an expert by knowledge, skill, experience, training, or

education" and may testify "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702; *see also Kumho Tire v. Carmichael*, 526 U.S. 137, 141, 148-49 (1999).

The Court is directed to the above-cited pleadings for detailed arguments regarding the admissibility of the expert testimony in this case. Additional issues involving the experts that may arise at trial are briefed below.

### Reliance on Evidence Not Admitted

Expert opinions may be based on facts or data not admissible into evidence, if the facts are of a type reasonably relied upon by experts in the field. Fed. R. Evid. 703. The inadmissible facts may be disclosed to a jury "if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect." *Id.* The facts relied upon by the expert need not be introduced into evidence in order for the expert to refer to those facts while testifying. *United States v. Castellon*, 135 Fed.Appx 122, 124 (9th Cir. 2005) (experts'references to "line sheets" of monitored phone calls). In such cases, the court should

instruct the jury "to consider the evidence only for the limited purpose of showing the information upon which the [ ] expert based her opinion ... [and] not to be considered ... as evidence of the truth of the facts disclosed by those statements." *Jackson v. Harrington*, 2011 WL 3875710, \*14 (E.D. Calif. 2010) (any prejudice caused by expert testifying of prior uncharged acts mitigated by instruction). Otherwise inadmissible evidence may not be introduced through an expert if the evidence was not used as a basis for the expert's opinions. *Carson Harbor Village, Ltd. v. Unocal Corp.*, 270 F3d 863, 873-74 (9th Cir. 2001) (evidence "admissible because it was part of the basis for [ ] expert opinion"); *Castaic Lake Water Agcy. v. Whittaker Corp.*, 272 F.Supp.2d 1053, 1062 (C.D. Calif. 2003).

### *Data Commonly Relied Upon*

In forming their opinions regarding the size and shape of various vehicles, government experts have relied in part upon data generated and maintained by third parties, such as Edmunds Automotive Network (Edmunds, Inc.) and Honda Motor Company. "Experts commonly rely on material prepared by others to develop their findings and ultimate conclusions." *Abarca v. Franklin County Water Dist.*, 761

F.Supp.2d 1007, 1032, n. 31 (E.D. Calif. 2011) (input data used by expert to create fugitive air emissions model). Fed. R. Evid. 703 "permits the expert to base opinions or inferences on facts or data not admissible in evidence if they are of a type reasonably relied upon by experts in the field." *Bieghler v. Kleppe*, 633 F.2d 531, 533 (9th Cir. 1980); *Hopkins v. Dow Corning Corp.*, 33 F.3d 1116, 1124 (9th Cir. 1994) (approving experts who "based their opinions on the types of scientific data and utilized the types of scientific techniques relied upon" by other experts in the field); *see also Campbell v. Fawber*, __ F.Supp.2d __, 2013 WL 1330153, *11 (M.D. Pa. 2013) (approving expert evaluation of designs of Chevrolet Blazer, Volvo XC–90, Honda CR–V, Volkswagen Jetta, and Toyota Camry). An expert may also rely upon his own work in the industry. *Buck v. Ford Motor Co.*, 810 F.Supp.2d 815, 852 (N.D. Ohio 2011) (expert's prior work at Ford). Rule 703 further permits the data to be admitted into evidence, even if otherwise inadmissible. *Wielgus v. Ryobi Technologies, Inc.*, 2012 WL 3614642, *5 (N.D. Ill. 20102) (admitting safety data under both Fed. R. Evid. 703 and 803).

When an expert relies upon business records to form his opinion,

those records may be admitted without violating the Confrontation Clause. *McNeiece v. Lattimore*, 2009 WL 1464368, *10 (C.D. Calif. 2009) (autopsy report) *citing United States v. Hagege,* 437 F.3d 943, 957-58 (9th Cir. 2006) (business records are non-testimonial and therefore "not subject to the *Crawford* requirement of confrontation[ ]"); *United States v. Thornton*, 642 F.2d 599, 607 (7th Cir. 2011) (reliance on written materials provided by manufacturer); *United States v. Ware*, 914 F.2d 997, 1003 (7th Cir. 1990) (expert relied upon various publications and trade books).

Automotive guides such as Edmunds and other data generated by third parties are often used by experts in developing their opinions. *See In re Scott*, 437 B.R. 168, 171 (Bkrtcy. D. N.J. 2010) (car appraisal); *United States v. Whitlow*, 979 F.2d 1008, 1012 (5th Cir. 1992) (use of National Automobile Dealers Association guide); *Trull v. Volkswagen of America*, 187 F.3d 88, 97 (1st Cir. 1999) (auto crash data).

### *Demonstrative Evidence*

The government intends to use charts and PowerPoint presentations to summarize relevant evidence in the case, both with fact and expert witnesses. The use of summaries is governed by Fed. R.

Evid. 611(a) (demonstrative summaries), and Fed. R. Evid. 1006 (summaries of evidence).

"When considering the admissibility of summary exhibits, it is critical to distinguish between charts or summaries as *evidence* and charts or summaries as *pedagogical devices*." *United States v. Wood*, 943 F.3d 1048, 1053 (9th Cir. 1991) (emphasis in original). Charts and summaries "as evidence" are governed by Fed. R. Evid. 1006, which permits their introduction if composed "of voluminous writings, recordings, or photographs which cannot conveniently be examined in court[.]" *Id.* To be admissible, "[t]he proponent of a summary must establish a foundation that: (1) the underlying materials upon which the summary is based are admissible in evidence; and (2) the underlying documents were made available to the opposing party for inspection." *Paddack v. Dave Christensen, Inc.*, 745 F.2d 1254, 1259 (9th Cir. 1984). These materials must be admissible, but need not themselves be admitted into evidence. *United States v. Meyers*, 847 F.2d 1408, 1412 (9th Cir. 1988).

In contrast, charts or summaries of testimony or documents already entered into evidence are merely pedagogical devices, and are

governed by FRE 611(a). Summaries are admissible under FRE 611(a) when they contribute "to the clarity of the presentation to the jury, avoid[ ] needless consumption of time and [are] a reasonable method of presenting the evidence." *United States v. Gardner*, 611 F.2d 770, 776 (9th Cir. 1980). These summaries may be more "one-sided" in their presentation of the evidence. *United States v. White*, 737 F.3d 1121, 1135 (7th Cir. 2013); *United States v. Nolberto Pena*, 213 F.3d 634, *3 (4th Cir. 2000) (display of photographs admissible despite defense complaints that arrangement made certain defendants look more culpable).

The government must lay a foundation for the summary evidence outside of the presence of the jury, the defendants must be provided an opportunity to review the summaries prior to their admission, and the court should give limiting instructions informing the jury that the summary is not admissible as substantive evidence. *United States v. Olano*, 62 F.3d 1180, 1204 (9th Cir. 1995).

"As jurors have become more visually oriented, counsel in modern trials seek to persuade them with an ever-expanding array of objects, maps, charts, displays, summaries, video reconstructions, computer

simulations, and so on." *Baugh ex rel. Baugh v. Cuprum S.A. de C.V,* 730 F.3d 701, 706 (7th Cir. 2013); *see also United States v. Salerno,* 108 F.3d 730, 744-45 (7th Cir. 1997) (allowing jury to walk up to scale model for better viewing). The use of PowerPoint and similar computer presentations during a criminal trial does not violate a defendant's right to a fair trial. *Smith v. Hawaii,* 2007 WL 1853982, *8 (D. Hawaii 2007) (PowerPoint presentation during opening statements and closing arguments); *see also Ammons v. Lewis,* 2012 WL 6645034, *14-15 (C.D. Calif. 2012) (finding only *one slide* of presentation should not have been used because it appeared to quantify "reasonable doubt").

In *Verizon Directories Corp. v. Yellow Book USA, Inc.*, 331 F.Supp.2d 136 (E.D. N.Y. 2004), the court undertook an extensive analysis of the admissibility of computer generated pedagogical devices and concluded that such devices should be admitted, subject to Fed. R. Evid. 402 and 403, including simulations, models and enhanced images. 331 F.Supp.2d at 137-44. In *Livingston v. Isuzu Motors, Ltd.,* 910 F.Supp.1473 (D. Mont. 1995), the court admitted a computer accident simulation developed by the expert after "studying a wide variety of experimental vehicles, in various situations, equipped with sensors and

data recorders [and then] putting various data, such as physics equations, vehicle dimensions, road conditions, and vehicle movements, into computers to reach a simulation of the events involved in the subject accident." *Id.* at 1495; *see also United States v. Wright*, 412 Fed.Appx. 993, 994 (9th Cir. 2011) (demonstrative aid for fingerprint expert); *United States v. Soulard*, 730 F.2d 1292, 1300 (9th Cir. 1984) (allowing charts to be used as visual aid for testimony and closing, but not admitted into evidence).

### D. Spousal Privilege

It may be possible that the defendant's spouse, Nancy Wells, will be called by the defense or that, if the defendant chooses to take the stand, he will testify concerning communications he had with Mrs. Wells.

#### *Generally*

Fed. R. Evid. 501 provides that "the privilege of a witness [or] person ... shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience." Courts recognize two privileges in a marital relationship: 1) the "anti-marital facts" privilege, which allows a

witness to refuse to testify against his or her spouse. *See Trammel v. United States*, 445 U.S. 40, 53 (1980); *United States v. White*, 974 F.2d 1135, 1138 (9th Cir. 1992); *United States v. Montgomery*, 384 F.3d 1050, 1056 (9th Cir. 2004) (witness spouse alone holds privilege and may waive it); and 2) the "marital communications" privilege, which provides that "[c]ommunications between the spouses, privately made, are generally assumed to have been intended to be confidential, and hence they are privileged . . . ." *Wolfle v. United States*, 291 U.S. 7, 14 (1934). This privilege (1) extends to words and acts intended to be a communication; (2) requires a valid marriage; and (3) applies only to confidential communications, i.e., those not made in the presence of, or likely to be overheard by, third parties. *United States v. Marashi*, 913 F.2d 724, 729-30 (9th Cir. 1990). This privilege may be invoked by either spouse. *United States v. Carlson*, 946 F.3d 1115, 1125 (9th Cir. 2013).

These marital privileges "obstruct[ ] the truth-seeking process," and have been construed narrowly "because of society's strong interest in the administration of justice." *Marashi*, 913 F.2d at 730; *Harris v. New York*, 401 U.S. 222, 225-26 (1971) (privileges "cannot be perverted

into a license to use perjury by way of defense, free from the risk of confrontation with prior inconsistent utterances.")

### Mrs. Wells's Testimony

If Mrs. Wells chooses to testify, she has waived the privilege and cannot refuse to answers questions from the government, except that she is not required to disclose actual communications between herself and the defendant. *United States v. Brock*, 724 F.2d 817, 823 (7th Cir. 2013); *see also United States v. Artates*, 2013 WL 321574, *2 (D. Hawaii 2013) (in severed trials, defendant could not testify against wife in his own trial, then claim privilege in wife's trial). Privileges may not be used as both a sword and a shield. *See United States v. Kerr*, 2013 WL 4430917, *3 (D. Ariz. 2013) (in case where attorney-client privilege was asserted, defense could not assert "reliance on counsel" defense in opening, then prevent government from calling tax attorney), *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1162 (9th Cir. 1992) ("Chevron argues that Pennzoil waived the [attorney-client] privilege by using advice of counsel both as a sword to defeat Chevron's tax arguments, and as a shield to protect against disclosure of the basis for Pennzoil's affirmative defense. This argument has merit.")

*UNITED STATES v. WELLS*
3:13-cr-00008-RRB-JDR

Case 3:13-cr-00008-SLG   Document 362   Filed 03/17/14   Page 50 of 61

*Defendant's Testimony*

Should the defendant choose to take the stand, he waives the marital communications privilege in so far as it covers Mrs. Wells's ability to affirm or contradict his testimony. *United States v. Renzi*, 2010 WL 582100, *10 n. 2 (D. Ariz. 2010) (defendant may waive privilege by testifying as to privileged conversations); *United States v. Nichols*, 594 F.Supp.2d 1116, 1124-25 (C.D. Calif. 2008) ("The marital communications privilege does not preclude the introduction of privileged communications for impeachment insofar as the defendant's testimony constitutes waiver of the privilege."); *United States v. Benford,* 457 F.Supp. 589, 598 (E.D. Mich. 1978) (testifying defendant waives marital privilege "surrounding the substance of his testimony").

*Statement Used to Question Witnesses*

The defendant waives the privilege if he should use any of his wife's statements during cross-examination of government witnesses. *United States v. Burkhart*, 501 F.2d 993, 995 (6th Cir. 1974).

*Statements to Investigators*

Any spousal communications which were related to investigators by either the defendant or Ms. Wells operate as a limited waiver of the

privilege. *United States v. Mendelsohn*, 896 F.2d 1183, 1188 (9th Cir. 1990) (defendant made limited waiver of attorney-client privilege by telling investigators the advice he received from his attorney.

### **E.** Character Witnesses

The defendant may present character witnesses to testify concerning their opinion of the defendant's character for truthfulness and honesty or his reputation for the same in the community. Such testimony opens the door for cross examination concerning whether the witness is aware of certain things or has heard of certain things. *See, e.g., United States v. Bush*, 58 F.3d 482, 488-89 (9th Cir. 1995) (witness who has endorsed the character of the defendant may be cross-examined about whether he has heard about prior bad acts of the defendant); *United States v. Gillespie*, 852 F.2d 475, 479-80 (9th Cir. 1988).

Of course, the government must have a good faith factual basis for the questions asked and the incidents raised during cross-examination of the witness. *United States v. Davenport*, 753 F.2d 1460, 1463-64 (9th Cir. 1985) (good faith belief in conduct of defendant which is to be subject of question must be established to satisfaction of the court

outside presence of jury before asked).

Assuming that the defendant elicits opinion or reputation testimony from government witnesses on cross-examination, or presents the same sort of evidence through the testimony of his own witnesses on direct examination, the government should be entitled to ask questions that are relevant to such witnesses' opinions. These include inquiring if they are aware of certain specific instances, including, but not limited to, the defendant's prior bad acts. *See, e.g., United States v. Warren*, 561 F.2d 763, 772 (9th Cir. 1977); *United States v. Moore*, 27 F.3d 969, 974 (4th Cir. 1994) (in prosecution for bank fraud, once defendant introduced evidence of his trustworthiness and dependability in business matters, he "opened the door" to rebuttal by the government by inquiring on cross-examination into relevant instances of conduct); *United States v. Jordan*, 722 F.2d 353, 359 (7th Cir. 1983).

### F. Other Acts Evidence

The government has given written notice to the defendant of its intention to introduce evidence in its case-in-chief relating to a number of events or incidents that occurred within the time frame of the charged crime. Docket 181. It is the government's contention that

these acts committed by the defendant should be admitted into evidence as intrinsic to motive, a central issue to the crimes charged, and are not subject to Fed. R. Evid. 404(b). However, in order to give fair notice, the government provided notice of its intention to introduce evidence of the following acts of the defendant:

1) The defendant had been counseled on several occasions by his supervisors for failing to obey orders, ignoring his supervisors, significant ethical contracting violations, diminished work performance, failure to participate as a fully functioning team member, and unexcused absences;

2) The defendant had been confronted about misuse of a U.S. government credit card that had been improperly used to buy gasoline on base;

3) The defendant was counseled for taking U. S. Coast Guard property for his personal use;

4) The defendant had been counseled about removing trees from Coast Guard property to obtain firewood for his personal use, including "collaring" trees to cause their premature death;

5) The defendant's travel orders to a professional conference were

cancelled because of his diminished professional performance, and one of the victims was substituted to attend in his place; and

6) The defendant's professional performance had diminished, and newly reported Coast Guard command members were holding the defendant accountable for his actions.

As the Ninth Circuit has held, Rule 404(b) "is inapplicable . . . where the evidence the government seeks to introduce is directly related to, or inextricably intertwined with, the crime charged in the indictment." *United States v. Lillard*, 350 F.3d 850, 854 (9th Cir. 2003); *see also United States v. Williams*, 989 F.2d 1061, 1070 (9th Cir. 1993) ("Evidence should not be considered 'other crimes' evidence when the evidence concerning the other act and the evidence concerning the crime charged are inextricably intertwined.") (internal quotation marks and citations omitted).

The Ninth Circuit has recognized two categories of evidence that may be considered "inextricably intertwined" with a charged offense, thereby permitting its introduction "without regard to Rule 404(b)." *United States v. DeGeorge*, 380 F.3d 1203, 1220 (9th Cir. 2004). First, evidence of prior acts may be admitted if the evidence "constitutes a

Case 3:13-cr-00008-SLG   Document 362   Filed 03/17/14   Page 55 of 61

part of the transaction that serves as the basis for the criminal charge."
*Id.* at 1220.  Second, prior act evidence may be admitted "when it was
necessary to do so in order to permit the prosecutor to offer a coherent
and comprehensible story regarding the commission of the crime."  *Id.*
(defendant's concealment of prior insurance claims several years prior
to fraud "inextricably intertwined").

    As stated in its Notice, the government believes that the above
acts are intrinsic evidence, "necessary...to permit the prosecutor to offer
a coherent and comprehensible story regarding the commission of the
crime." *United States v. Dorsey*, 677 F.3d 944, 951 (9th Cir. 2012)
(testimony regarding prior gun possession added to the circumstantial
evidence against defendant) (*quotations omitted*).  The jury may hear
"circumstantial evidence explaining the general nature of a defendant's
business activity and providing a context in which the transactions at
issue took place."  *United States v. Anderson*, ___ F.3d ___, 2013 WL
6670793, *9 (9th Cir. 2013) (sales occurring six months after charged
conduct admissible to help explain business operations); *United States
v. Beckman*, 298 F.3d 788, 793 (9th Cir. 2002) (evidence admissible to
explain relationship between defendant and witnesses).

*UNITED STATES v. WELLS*
3:13-cr-00008-RRB-JDR

Should, however, the Court conclude that any of this evidence is not "inextricably intertwined" to the conduct charged in the indictment, the evidence is nonetheless admissible under Rule 404(b).

The Ninth Circuit has set forth a four-part test regarding the admission of other act evidence. Such evidence is admissible if: "1) the evidence tends to prove a material point; 2) the other act is not too remote in time; 3) the evidence is sufficient to support a finding that defendant committed the other act; and 4) (in certain cases) the act is similar to the offense charged." *United States v. Chea*, 231 F.3d 531, 534 (9th Cir. 2000).

The Ninth Circuit has uniformly recognized that Rule 404(b) is one of inclusion and that other acts evidence "is admissible whenever relevant to an issue other than the defendant's criminal propensity." *Chea*, 231 F.3d at 534; *see also United States v. Gibson*, 625 F.2d 887, 888-89 (9th Cir. 1980) (picture of kidnapping not complete unless "all of the relationships of the defendant to the victims" is shown). "Rule 404(b) does not bar evidence that completes the story of the crime or explains the relationship of parties or the circumstances surrounding a particular event." *United States v. Edwards*, 159 F.3d 1117, 1129 (8th

Cir. 1998) (details of defendant's relationships with various women admissible), *quoting United States v. Edwards*, 159 F.3d 1117, 1129 (8th Cir. 1998).

Here, the above evidence is admissible under 404(b) in that it completes the story of the crime, proves motivation, and is not too remote in time.

### G. 911 Calls

The United States plans to introduce audio tapes of telephone calls made from Building T2 to the Communications Watch Officer at Building T1 and the 911 emergency dispatch center immediately following discovery of the bodies at Building T2.

The admission of telephone calls to emergency responders does not violate the Confrontation Clause of the Sixth Amendment or *Crawford v. Washington*, 546 U.S. 975 (2005). *Davis v. Washington*, 547 U.S. 813, 822 (2006) ("A 911 call, on the other hand, and at least the initial interrogation conducted in connection with a 911 call, is ordinarily not designed primarily to "establis[h] or prov[e]" some past fact, but to describe current circumstances requiring police assistance.") As such, the calls are admissible under the "excited utterance" exception in

Federal Rule of Evidence (Fed. R. Evid.) 803(2). *United States v. Gomez*, 472 Fed.Appx. 601, 603 (9th Cir. 2012) (approving admission of statements to dispatcher "made almost immediately after" caller first discovered the victim); *United States v. Zaragoza*, 349 Fed.Appx. 220 (9th Cir. 2009), *citing United States v. Hills, Jr.,* 455 F.2d 504, 505 (9th Cir. 1972) (admission of a police operator's testimony was a "correct application of a well-known exception to the hearsay exclusionary rule"). Emergency calls have also been admitted under the "present sense impression" exception of Fed. R. Evid. 803(1). *United States v. Presley*, 2008 WL 189565, *4 (W.D. Wash. 2008) (admitting wife's statement that husband "was deleting child pornography from his computer and that [he] was 'scaring the crap out of' her").

## **H.** Opinion Testimony by Lay Witnesses

Fed. R. Evid. 701 permits admission of opinions or inferences of a lay witness which are rationally based on the perceptions of the witness and helpful to a clear understanding of the witness's testimony or a fact in issue. Thus, a witness may testify, based on personal observation, about the various roles played by persons involved in illegal conduct. *United States v. Fleishman*, 684 F.2d 1329, 1335-6 (9th Cir. 1982). The

investigators in this case may be called upon to discuss their observations and the steps in their investigation. The investigators may also be called upon to discuss their approach and reaction to the defendant and other witnesses based upon their training and experience.

### I. Transcripts

The United States has provided the defendant with transcripts of the audio recordings it may use at trial. It is generally accepted in the Ninth Circuit and elsewhere that transcripts may be provided to aid the jury while an audio recording is being played. *United States v. Delgado*, 357 F.3d 1061, 1070 (9th Cir. 2004); *United States v. Franco*, 136 F.3d 622, 626 (9th Cir. 1998). The United States requests that a proper instruction be provided to the jury, as outlined in the Ninth Circuit Manual of Model Jury Instructions.

### J. Stipulations

The government and defense may enter into stipulations regarding certain evidence. Those stipulations will be made known to the Court prior to trial.

*UNITED STATES v. WELLS*
3:13-cr-00008-RRB-JDR

RESPECTFULLY SUBMITTED this March 17, 2014, in

Anchorage, Alaska.

<div style="margin-left:40%">

s/ KAREN L. LOEFFLER
KAREN L. LOEFFLER
United States Attorney


s/ BRYAN SCHRODER
BRYAN SCHRODER
Assistant U.S. Attorney
United States of America


s/ KATHLEEN A. DUIGNAN
KATHLEEN A. DUIGNAN
Special Assistant U.S. Attorney

</div>

**CERTIFICATE OF SERVICE**

I hereby certify that on March 17, 2014 a true and correct copy of the foregoing was served electronically via the CM/ECF system, on all counsel of record.

s/ KATHLEEN A. DUIGNAN
Office of the U.S. Attorney