```
 1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF ALASKA
 2
    UNITED STATES OF AMERICA,    )    Case No. 3:13-cr-00008-RRB-JDR
 3                               )
                  Plaintiff,     )    Anchorage, Alaska
 4                               )    Tuesday, April 1, 2014
       vs.                       )    8:51 a.m.
 5                               )
    JAMES MICHAEL WELLS,         )    TRIAL BY JURY - DAY 2
 6                               )
                  Defendant.     )
 7                               )

 8                 PARTIAL TRANSCRIPT OF PROCEEDINGS
                      Pages 1 - 28, inclusive
 9
                 BEFORE THE HONORABLE RALPH R. BEISTLINE
10                  UNITED STATES DISTRICT JUDGE

11  A P P E A R A N C E S :
    For Plaintiff:    KAREN LOEFFLER, ESQ.
12                    BRYAN D. SCHRODER, ESQ.
                      KATHLEEN ANN DUIGNAN, ESQ.
13                    U.S. Attorney's Office
                      222 W. 7th Avenue, #9
14                    Anchorage, Alaska 99513
                      Ph: 907/271-5071
15
    For Defendant:    F. RICHARD CURTNER, ESQ.
16                    Federal Public Defender's Agency
                      601 W. 5th Avenue, Suite 800
17                    Anchorage, Alaska 99501
                      Ph: 907/646-3400
18
                      PETER OFFENBECHER, ESQ.
19                    Skellenger Bender, P.S.
                      1301 5th Avenue, Suite 3401
20                    Seattle, Washington 98101-2605
                      Ph: 206/623-6501
21
    Court Recorder:   NANCY LEALAISALANOA
22                    U.S. District Court
                      222 W. 7th Avenue, Box 4
23                    Anchorage, Alaska 99513
                      Ph: 907/677-6111
24

25
```

1    A P P E A R A N C E S:  (Continued)

2    Transcribed by:    LEONARD J. DIPAOLO, RPR, CRR, CCP
                        Peninsula Reporting
3                       110 Trading Bay Road, Suite 100
                        Kenai, Alaska 99611
4                       Ph: 907/283-4429

5

     Proceedings recorded by digital sound recording, transcript
6    produced by stenographic transcription service.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 3:13-cr-00008-SLG   Document 562   Filed 04/09/14   Page 2 of 28

```
 1                    P R O C E E D I N G S

 2              ANCHORAGE, ALASKA - TUESDAY, APRIL 1, 2014

 3      (Log 8:51:27)

 4         (This portion not requested)

 5      (Log 10:05:41)

 6         (Defendant present and jury present)

 7                    OPENING STATEMENT BY DEFENDANT

 8             MR. CURTNER:  Is that good?

 9             THE CLERK:  Yes.

10             MR. CURTNER:  Good morning.  You heard the

11   government's opening statement.  And I'll tell you right now,

12   Ms. Loeffler said Jim Wells killed the two people he worked

13   with, and that is wrong.  Jim Wells is innocent; he's presumed

14   innocent by law; and the facts that you will hear in this case

15   will not convince you otherwise.  He did not -- he did not do

16   these shootings.

17             What she did say that was correct is that it's a

18   circumstantial case, which means it's built on so many

19   assumptions, that during the course of this trial, you'll see

20   how many of those assumptions that were, stacked up together,

21   are just wrong, just flat wrong, and when you hear all the

22   evidence, you'll realize that.

23             And the other thing you should remember when hearing

24   all this evidence is that this investigation focused on Jim

25   Wells from the very beginning, from that very first morning, and
```

1  it was because of Scott Reckner.  Chief Reckner, for some

2  reason, did not like Jim Wells.  And before he even got there

3  that day, he started thinking, this must have been Jim Wells,

4  and he poisoned everybody else to think that.

5          And the whole investigation of this double homicide

6  was focused on Jim Wells, and it never went anywhere else until

7  maybe much later, they might have tried to look at other

8  options, other theories, but they focused from the very

9  beginning on Jim Wells.

10          Well, let me tell you a little bit about Mr. Wells

11  first.  He's 62 years old.  He's a family man.  He's been in

12  Kodiak for many years.  He's a military man.  He joined the Navy

13  when he was 18.  He was in the Navy for eight years.  He was on

14  a ship that went to Vietnam.

15          After eight years in the Navy, he joined the Coast

16  Guard.  He retired after another 12 years in the Coast Guard.

17  And he had an honorable discharge after 20 years serving our

18  country.  The reason he got out of the Coast Guard -- he loved

19  it -- but he had medical problems.  And I'm not a doctor, but

20  it's idiopathic anaphylaxis, which was something that interfered

21  with his work.

22          But let me show you a slide of Jim Wells.  If we could

23  dim the lights, please, Madam Clerk.

24          So this is Mr. Wells.  He's a family man.  This is

25  when he first was in Kodiak in 1980.  This is Nancy, Nancy

1  Wells, his wife.  She's here in the courtroom.  This is his --
2  let me get my pointer out -- this is the oldest son, that's
3  Cable.  He is a bush pilot in Southeast Alaska.  This is his
4  daughter, Elizabeth.  She's in the courtroom for this trial.
5  And this is his youngest son, Matt.  He's a police officer in
6  Portland.
7          Jim Wells raised his family in Kodiak.  He was very
8  involved with his family.  He didn't get into other social
9  activities as maybe other Coast Guard members did.  Some Coast
10 Guard guys like to go to bars, some guys just like to shoot, but
11 he was a family man.  He spent the time with his children.  He
12 coached and umpired baseball on Kodiak Island.  He was involved
13 with outdoor activities with his children.  He was really
14 focused on his job and his family.  And he had one hobby, it was
15 photography, that was the other thing he did on Kodiak Island.
16         He -- if we can go to slide No. 2.  So after many
17 years on Kodiak Island, this is the family he raised.  Oh, one
18 thing I should tell you about Jim is that when he got out of the
19 Coast Guard, he made two vows: never to wear a tie again and
20 never to shave his beard.  And he's honored that all these
21 years.
22         But this is Cable and his wife.  And this is Nancy,
23 Elizabeth.  This is Matt, who is a police officer, and Casandra,
24 his wife, is also a police officer.  This is Cable's and Lacy's
25 daughter.

1          And No. 3, you'll see that sometimes when you get

2    older and your beard gets white, it comes in handy as Santa

3    Claus.  Mr. Wells was known to play Santa Claus for the

4    children, including his granddaughter for many years, in Kodiak.

5          So now Jim's work history.  After he got out of the

6    Coast Guard, he, in 1990 -- he loved climbing towers.  His

7    training was in electronics.  And so he heard about and got the

8    job at what we call COMMSTA, the communications station in

9    Kodiak in the rigger shop, because he had an electronics

10   background, he loved to climb towers, he climbed in the Navy, he

11   climbed in the Coast Guard, and he loved his job at climbing

12   towers in the rigger shop for COMMSTA.

13         And he was good at it.  He was known nationwide as an

14   expert as an antenna mechanic.  He would get calls everywhere.

15   They would ask him for help and advice.  He was good.  You'll

16   see about his personnel evaluations and performance evaluations.

17   He was good at his job.

18         Now, that didn't mean -- when you're really good at

19   something and you know what you're doing, if you have

20   supervisors, supervisors who come in that come and go, they tell

21   you what to do, but there is some friction along the line with

22   maybe a supervisor who knew much less than him but was in charge

23   of him.  Well, there might have been some friction.  But I think

24   you'll see the real friction in the workplace, the real conflict

25   was with Scott Reckner.  He's the one that, for some reason,

1  didn't like Jim Wells and had a problem with him.

2          So I think the first assumption that you'll see that's

3  just wrong is that there was a lot of conflict at the rigger

4  shop.  Mr. Reckner had problems with Jim Wells you'll hear, but

5  the rest of the workers, they got along.  There was no

6  arguments.  There was no violence.  There was no threats.  There

7  was no fights.  But Jim -- any conflict would have been with

8  Chief Reckner.

9          The other thing I should tell you about Jim Wells at

10  62 years old, he doesn't have any -- he's never been charged

11  with a crime before.  He's never been violent.  There is nobody

12  who can say he ever raised a hand to anybody, ever got in a

13  fight.  62 years of raising a family and no violence, nothing at

14  all.

15          Now, as I said, Jim was medically discharged from the

16  Coast Guard after his 20 years of military service, and then --

17  he's had medical problems over the years.  I think you need to

18  know about some of the medical problems he's had recently,

19  because during -- it will help explain why some of their

20  assumptions are wrong.

21          In the fall of 2011, just before the spring of 2012

22  when this tragedy happened, he was suffering from biliary

23  dyskinesia, if I said that right.  That means that he was having

24  gall bladder problems.  His gall bladder was causing him nausea

25  and vomiting, and it was something -- he was really sick.

1  You'll hear a lot of testimony about how he was really sick

2  during this time frame in late 2011, early 2012, and he wasn't

3  in the shop.

4        Of course, most of the work is in the summertime at

5  the shop, but he was sick, missed a lot of work, took a lot of

6  sick leave, took trips to Anchorage to the VA Hospital.  And

7  when your gall bladder is not working, this is what will cause

8  the nausea and the vomiting and the retching.

9        So he had his gall bladder removed in February of

10  2012, and he also had a hernia operation at that time.  Now,

11  that corrected the vomiting and the retching.  The gall bladder

12  was, as I understand it, backed up, not functioning, and that

13  would cause the nausea.  He had it removed, but there is a

14  second -- now there is a different problem that's not uncommon

15  when you have a gall bladder removed, and that is chronic

16  diarrhea, and it may last for a couple months.  Not everybody

17  gets it, but Jim suffered from that.  For the few months after

18  his operation, he had to deal with chronic diarrhea.

19        Now, that's -- so, let me tell you about after his

20  operation, let me tell you about April 12th.  Well, let's go

21  back actually to April 10th.  And this is one of the

22  assumptions, I think, that the government made that I'll show

23  you it's wrong.

24        If we can go to -- well, let me, first of all,

25  let's -- on April 10th, that's when Nancy Wells parked at the

airport in front of the airport gates at Kodiak.  It's a small
airport.  She and a friend of hers, Amanda Stanford, parked
because they were going to a conference here in Anchorage.  Mr.
Wells was at work.  He went to see them off.  He did come back.
He did go to the airport to see them off.  And I'll show you a
couple videos that demonstrate that.

Now, at the airport there is Alaska Cargo, and they do
have a video surveillance camera at their front desk.  And you
will see on April 10th, you will see coming through the airport
and into that parking spot that we talked about, you'll see
Nancy Wells' car.  Nancy and Amanda are driving to the airport
and they are parking directly in front of where you go into the
airport terminal for Alaska Airlines.

Okay, the next one, this will show you Jim Wells
driving his white truck the same day before they leave to see
them off, to see his wife, Nancy, off with Amanda.  There is
Jim's truck.  He's coming in the same way.  He's parking to see
them off.  Now, Mr. Johnson, if we could look at the map of the
airport, that would be No. 6.

Okay, so you saw some diagrams, but this is Anton
Larsen Bay Road that goes to the communications station.  This
is Rezanof.  This is the main road that goes from Bells Flats
where Mr. Wells lived, and many people that you'll hear from,
that goes into Kodiak.  This is the road to the airport.  This
is the airport.

1          Now, if you could blow up that section a little bit,

2    Mr. Johnson.

3          So what you'll see is this is the main terminal for

4    Alaska Airlines.  This is where people park when they are

5    leaving town.  You can park here.  This is the two-hour spot

6    they were talking about.  This is where Amanda Stanford said

7    this is where they parked that morning.  This is where the cargo

8    office is and where you can see the cars drive through this way,

9    up around here, and right in front of that camera.

10          And so Nancy parks in front.  Jim comes behind, parks

11   about the same area, sees them off.  Now, what you can do in

12   this Kodiak airport, you can park there for a short time, but if

13   you're going to be gone for a couple days, you have to move it

14   down to where the Westmark [sic] terminal used to be.  Westmark

15   is no longer there, but you can -- I'm sorry, MarkAir.  MarkAir

16   is gone, and so you can park down here.  That's what Jim did

17   that day.  When you saw that video, he was seeing his wife off

18   at the airport and moved her car down where these cars are where

19   you can park for a longer time.

20          So that's one assumption that the government made,

21   that that car was moved on April 12th.  It was on April 10th.

22   And what's important about these videos, is that you will not

23   see, if you go through for the next two days, you will not see

24   Jim Wells drive by that camera again.  You won't see on the

25   morning of the 12th, which is their theory, their assumption, in

1  order to switch cars.

2         Okay, so what happened on April 12th?  Well, Nancy was

3  in Anchorage.  Jim normally gets up, and he's a breakfast guy,

4  he'll make breakfast for Nancy.  He made coffee for her every

5  day even though he doesn't drink coffee.  She's out of town.  So

6  he gets up, and he's going to work that day.  He's going to work

7  because they have a plan, they are going to climb a tower and

8  they have a job to do that day.  So that was the plan.  It's not

9  like going to the shop and planning something else later in the

10  year, they are going to climb that day.

11         He's on his way to the airport.  We can show that No.

12  6 again.  As he's going to the airport and he goes by --

13  probably just after you see him go by the main gate at 6:48, he

14  notices that the tire is low, it's not handling just right.  So

15  instead of coming this way to work, he's going to check his

16  tire.  He pulls right in here to the Comfort Inn parking lot.

17         He sees -- he gets out of his car.  He sees that there

18  is -- the tire is low.  But the other thing he is experiencing

19  at that time is this chronic diarrhea, and when it hits, he's

20  got to find a restroom.

21         Well, he's -- up here is Servant Air.  Servant Air is

22  a more local air taxi, takes people out to different communities

23  around Kodiak, on Kodiak.  Jim has been there a number of times

24  mainly because his wife, who works with the Kodiak Area Native

25  Association, would fly out of there many times to different

1  places in her work.  So he knew that.  He knew that at 7 o'clock

2  in the morning it wasn't going to be busy.  He knew there was a

3  restroom there, and he had to use the restroom.

4          And with the diarrhea he had, the effects he had from

5  this gall bladder surgery, he was there maybe 20 or 25 minutes

6  in the restroom, and got back, drove back toward his house.  He

7  saw a couple people, his neighbors on the way back; we don't

8  dispute that.  He went back by the gates at 7:22; we don't

9  dispute that.  He went back to his home.  He backed up the

10 truck, and he was going to take off the tire that was low.

11          Now, he didn't want to park at COMMSTA all day when

12 they are going to climb a tower.  By that time the tire would be

13 flat.  They don't have any spare tires at COMMSTA for him to use

14 on his car.  He's got a spare tire that's under the bed of his

15 truck that he hasn't had off of there in ten years, but in this

16 quarter, which most people in Kodiak have to be, I think, or

17 certainly are, he's got all kinds of tires and tools, and so he

18 drives on them.

19          He's going to change the tire.  He uses the impact

20 wrench to take the tire off, the low tire.  Sometimes the impact

21 wrench isn't enough to get off lug nuts that have been on there

22 all winter, so he was having trouble with that.  The timing is

23 perfect.  He calls into work, he says, "I'm having trouble with

24 these lug nuts, it's going to take a few minutes, I'll be a

25 little bit late."

1    He has to get a lug wrench with an extension that you
2   can put pressure on to break those lugs in order to be able to
3   change the tire.  He changes the tire, puts it in the back of
4   his truck.  He's got his summer tires right there, those are the
5   summer tires -- the other three he'll put on later -- and drives
6   into work.

7        The government is assuming he was at COMMSTA shooting
8   Rich Belisle and Jim Hopkins, and they are wrong.  He was at
9   home changing the tire.

10       Then he gets to work.  And the first thing when he
11  gets to COMMSTA is Chief Reckner tells him what happened.  And
12  you'll hear witnesses say Jim was in shock.  He was generally in
13  shock at that time when he heard that his people he worked with
14  were -- had been killed.

15       They asked him to go up -- he's up in the main
16  communication station for 13 hours while they are questioning
17  everybody.  They questioned Jim four times that day.  He
18  volunteers about the flat tire.  He says, "It's in my truck."
19  He lets them look at the tire.  And he goes home that night
20  after 13 hours.

21       The next day they want him to come back.  He comes
22  back, he talks to them, but it's evident that from that time
23  he's the suspect, and they are questioning him about -- and they
24  suspect that he's the one that was the shooter.

25       Now the other thing that's important to remember, just

1    like you heard, they were watching him change his tires.  They

2    were timing him change his tires.  Jim Wells was under

3    surveillance somehow or another from, like, 8:23 the morning of

4    April 12th for who knows how long.  He was under constant

5    surveillance.  He was always being watched.

6            He was in COMMSTA, the main building, for 13 hours on

7    the 12th, back there for another five hours on the 13th, and

8    they would follow him home that day.  They were watching Nancy's

9    car at the airport.  He was always under surveillance.

10           So then the investigation starts all about Jim Wells.

11   It's all focused on Jim Wells.  The best way I can describe it

12   is if you were put -- if your life was put on a government

13   microscope and they drilled down into everything about your

14   life, well, that's what they did with Mr. Wells.

15           I think there were 24 search warrants on his person,

16   on his home, on both vehicles, on -- they asked for DNA, they

17   took nail clippings from his house, they went into his septic

18   tank, they dug out the hillside looking for other bullets.  They

19   went through and put his whole life under a microscope.

20           And they were looking for the gun.  He didn't have the

21   gun.  Ballistics will tell you this gun could have been a Smith

22   & Wesson 629, it could have been a Taurus, it could have been a

23   Llama.  He had a couple Ruger .44s.  He did not have a gun that

24   could possibly have been used in these homicides.

25           But through all this, days, he couldn't go home for

three days when his wife came back.  They had to stay at the
Comfort Inn when the government was going through his whole
house looking at everything on the 13th on.  He couldn't --
they -- search warrants kept going for weeks, months.  And they
have no forensic evidence that Jim Wells was involved in this
homicide.

That's another assumption, is that he had the murder
weapon.  And they searched everywhere.  He didn't have it.  He
never has had it.

So the next thing they are going to do is they are
going to look for witnesses.  And you would think, as well known
as Jim Wells was, he'd been there for 20, 30 years in Kodiak,
you think of how well his wife was known, you think in the small
community somebody would have seen his car or the white truck,
something consistent with their timeline except for -- you think
somebody would be a witness to seeing that blue car, Nancy's
car, at the rigger shop that day.

Well, in fact, let's go to No. 7.  They even published
in the front page of the Kodiak paper:  Anybody see this blue
car?  Anybody see this white truck?

Everybody knew that Wellses was under investigation
now because they know their vehicles, they know who is being the
suspect.  So you would think that somebody would report having
seen one of those vehicles that's consistent with the
government's theory, their assumption on April 12th.

1          Well, let's go to the next slide.  Okay, this is a

2     map, and this is some of the reports that came in after this

3     picture was in the paper.  Somebody said that they saw the white

4     truck at Dead Man's Curve at 7:50.  That would have been right

5     there headed toward town.  Well, if that person saw a white

6     truck, it could not have been Jim Wells because he was already

7     headed home, we know, at 7:22.

8          Somebody else said they saw -- they were sure, they

9     were positive, a neighbor, saw his -- Jim Wells' white truck

10    parked at Sargent Creek Road at 10:42 on the 12th.  Well, that's

11    impossible because Jim Wells was still being questioned that

12    morning at the communications station, so that was at 10:42 on

13    April 12th.  That is wrong.

14         Somebody -- there was some reports about a blue SUV

15    on -- somebody said that on the 12th at 6:30 a.m. they saw the

16    blue SUV headed into town.  And that can't be wrong -- that's

17    wrong because we know Jim Wells didn't even go in this way until

18    6:48.  So 6:30, there is no way that blue SUV could have been

19    going that way, the Wells' SUV.

20         Somebody said they saw him at -- well, somebody said

21    they saw Jim driving Nancy's car on April 13th, the next day.

22    But we know that the government had that vehicle under

23    surveillance from the 12th.  That's wrong.

24         So you think if there were any witnesses that saw Mrs.

25    Wells' car go down that road that day, down Anton Larsen Bay

1   Road, that somebody, if it were there, would have seen it and

2   would have reported it.  We have reports that are completely

3   wrong, and nobody saw that vehicle.

4          There is one other report that's interesting, because

5   somebody on the 12th around 7:30 saw a blue SUV parked just off

6   the road toward the Buskin River between 7:30 and 7:40 that

7   morning, and that could not have been the Wells' vehicle,

8   because we know that by 7:30 Jim had already come by in his

9   truck past the Coast Guard base at 7:22.

10          Now, I don't know whose blue vehicle, blue SUV that

11   was, but it wasn't Mrs. Wells' vehicle.  So -- but this is

12   important, because I think it shows that nobody -- no witnesses

13   are consistent with this government's assumption that that blue

14   blur, that phantom blur you see, is Mrs. Wells' car, but that's

15   what they are going to assume.  They are going to assume that's

16   the murderer's car and they are going to assume that's Mrs.

17   Wells' car, and they are wrong.

18          So if you don't have any evidence, you can get

19   experts.  So there are a lot of experts in this case.  Now, the

20   first expert that you will hear from -- well, the first expert

21   to look at this evidence was actually an FBI agent, an FBI -- he

22   works at a digital evidence lab, Christopher Iber.  He's going

23   to be our witness.  He's the first one to look at this phantom

24   blurred image that you saw up here.

25          He explained that -- and this is his job, and he works

1   with the FBI -- he explained that it would be impossible to
2   conclude from that blur that that's a CR-V, or any particular
3   CR-V, and he explains why.  And you'll hear all this.  I'm not
4   going to explain it very well, but he explains why there is low
5   resolution; secondly, there is poor image quality; thirdly,
6   there is a low frame rate; and finally there is that motion
7   blurring.
8         Now he'll explain what those terms mean.  But he'll
9   explain to you what your common sense will tell you:  That
10  phantom blur, you can't tell what it is.
11        We'll have -- so to go to a second retired FBI expert,
12  Gerald Richards, he was examiner of questioned photographs.  He
13  looked at that.  And, again, he will be a witness for the
14  defense that again states that the quality of the pixels from
15  1100 yards and that type of camera is not -- you're not able to
16  identify -- do a positive identification from that.
17        So the government hires a guy who works for Honda.
18  They show him the video you saw, the demonstration with Mrs.
19  Wells' CR-V Honda, and ask him to identify it.  Well, he says,
20  "Yeah, 70 percent sure that looks like an early generation
21  Honda."  That's their identification evidence.
22        And you have to ask yourself when you hear this, if
23  they show you the suspect car -- we think this is Mrs. Wells'
24  CR-V.  I'm going to show you this blurred image.  What's the
25  likelihood that he would go ahead and say, yeah, that looks like

1    it?  Well, he's 70 percent sure.

2           And then you'll also see, I think, from the -- Ms.

3    Loeffler talked about Toglia and his evidence about how he can

4    identify this by the parameters.  Well -- and Mr. Vorder

5    Bruegee.  Mr. Vorder Bruegee measured Mrs. Wells' car, and he

6    says that's consistent with the measurements of this blur.  What

7    he didn't say, or what he will, I think, testify to, "Yeah, it's

8    consistent with the range of maybe ten inches in length and

9    within five inches of height."

10           Well, that can be a number of vehicles.  And so if we

11   could go to No. 9.  This is what our defense expert will show

12   you.  This is a Toyota RAV4, you can see where he superimposed

13   the CR-V in front of that; it fits.  The Ford Escape, same size,

14   same dimensions; that fits.  Jeep Grand Cherokee fits.  Nissan

15   Pathfinder fits.  The Chevy S-10 Blazer fits.  The Isuzu Rodeo

16   fits.  The Honda Santa Fe fits all within that parameter, that

17   five inch to ten inch -- the Subaru Forester fits, and the Honda

18   CR-V fits.

19           So we'll have our expert come in, use the same

20   information, same -- that -- the government data that the

21   government had, and that's his -- and he will tell you that,

22   one, any of those vehicles could have been that blue blur,

23   including what somebody saw parked by the river.  And you will

24   also hear evidence about how many blue vehicles of those models

25   are on Kodiak Island.  But they are going to assume the murderer

1  was in Nancy Wells' car.

2          Now, the other assumption that they are making is that

3  Jim Wells put a nail in his tire by a nail gun.  Well, we're

4  going to have experts.  Bruce Currie is a technical forensic

5  consultant, 35 years' experience in the tire business, and his

6  opinion was that that nail was picked up on the road.  Jaco

7  Swanepoel is an expert for us, he's a senior forensic scientist

8  at the Forensic Analytical Sciences office in California, he

9  specializes in firearm and tool mark examination.  And he will

10  explain to you and support Mr. Currie's opinion that it was not

11  inserted by a nail gun, that that nail was picked up on the

12  road.

13          Now, another assumption that's critical to their case

14  is that -- what they want to call workplace violence, and what

15  they really mean is co-worker violence.  Because if you believe

16  this was co-worker violence, well, Rich and Jim Hopkins,

17  obviously it wasn't them.  There is five young people, Coast

18  Guard people, nobody suspected them.  That just leaves Jim

19  Wells.  But that assumption is wrong.

20          There is not any evidence -- which I think is just

21  impossible to believe -- that Jim Wells could have been there,

22  done the homicide, and they search everything that he has,

23  everything he's touched, and don't have any evidence of that.

24          The other things you'll hear is that the -- when they

25  looked at -- I mean, their theory is that it had to be Jim

1  Wells, he was the only one to have access to it.  But the
2  back -- there is evidence you'll here about the back door being
3  not secured, about unidentified fingerprints in there.  There is
4  other mysteries that I -- that you'll see in this investigation.

5          Mr. Rudat, he claims to have seen a black truck parked
6  to the side at the same time he heard that shot.  Jason Bullis,
7  who was on watch that day, drove down after 7:30 when he got off
8  work, and he noted some type of a black vehicle that was parked
9  to the side.

10          Now, I don't see that video going back toward -- down
11 this way, down Anton Larsen Bay Road, back to the main highway
12 or to the airport, but that doesn't mean it wasn't there.  I
13 don't know.  What's interesting, too, is that Jason Bullis, he
14 was on watch that night, got off that morning, he noted in his
15 reports that there was a suspicious white vehicle that came by
16 twice the night before.

17          And let's look at that shot -- so from the
18 surveillance video, this is from the rigger shop itself, there
19 is a -- he notes that there is a suspicious car coming through
20 at 7:36, and then -- and that's what he noted.  Now, this is Mr.
21 Wells' truck.  And you can see -- and Mr. Bullis will tell you
22 that's not Mr. Wells' truck, some other white truck came by the
23 night before.

24          So if we looked at the video from the night before --
25 Mr. Johnson, do you want to do 11.

1        Now, what you notice here is that Anton Larsen Bay

2   Road goes up here toward the airport, but it also goes this way.

3   And this car is coming from the opposite direction.  You can see

4   the headlights coming from the opposite direction, coming around

5   and turning around and going back the other way down Anton

6   Larsen Bay Road.  This is the second video.

7        This is eight minutes later, same night, the night

8   before the homicide.  Same thing, comes from this direction,

9   headlights are shining this way instead of coming in like those

10  other cars you'll see coming this way.  Comes in closer this

11  time, pulls around like it might be casing the rigger shop,

12  okay.  I don't know whose that white truck is.

13       But let's go to No. 13.  Okay, this is not a fancy

14  map, but this is what I want to show you.  This whole

15  investigation, like you see here, goes from -- well, there is

16  the golf course.  And the COMMSTA, the communication station, is

17  right there across from Buskin Lake.  This is the Anton Larsen

18  Bay Road.  This is what you've already seen.  And this whole

19  investigation obviously is centered around that.

20       Now, another assumption that's wrong is that that road

21  only goes a mile-and-a-half to the golf course.  No.  That road

22  goes all the way to the boat lunch at Larsen Bay Road.  One

23  could take a boat back to Kodiak from there.  One could even

24  leave the rigger shop and go anywhere down here.  So that black

25  vehicle could have gone that way.  That white truck could have

1    come in, dropped somebody off, and gone back that way; we don't

2    know.

3            But let me show you the next one.  The reason I know

4    that road is open in the wintertime is because we drove it.  And

5    we took some pictures of houses and buildings back down toward

6    Larsen Bay Road way past the golf course.  That road was open --

7    go ahead, next -- all kind of big buildings, small buildings

8    that anybody could have access to -- go ahead -- where there are

9    trailers -- go ahead -- so you can see the number of places that

10   are down that road that have never been investigated in this

11   investigation because it's all been about Jim Wells.

12           So if it wasn't Jim Wells, their theory, their

13   assumption is nobody else would have had a motive, a means, or

14   an opportunity.

15           Well, the last thing anybody wants to do is

16   investigate the families of two people that were tragically

17   killed.  And their theory, their assumption is that Rich Belisle

18   and Jim Hopkins didn't have anything going on in their life that

19   would possibly make them a target of this type of violence.

20           Well, I think all of us at some point have the burden

21   of family members that affect your life.  Jim Hopkins, it was

22   his wife Deborah.  I think you'll hear evidence about other

23   people with possible motive, means, or opportunity.  They were

24   in substantial financial debt.  Deborah used to come by T2, the

25   rigger shop, quite a bit, she knew it.  She was there when --

even when Jim was not there.  They -- she would -- some say was
emotionally unstable.  Some people would testify she flirted
with some of the younger men at the rigger shop.

    And probably the biggest thing you need to look at is
that Jim -- they had a rocky relationship, and Jim was -- Jim
Hopkins had told people that he was thinking he was going to
file for divorce as soon as their son graduated high school a
few months later.  You need to look at that as there are not --
as other -- as Ms. Loeffler said, the only theory, the only
answer; there are other possibilities.

    Now Rich Belisle, he was one of the best liked people
in Kodiak.  Everybody liked Rich.  But he had three daughters,
and sometimes with your teenage daughters comes the people they
want to hang out with.

    Well, Hannah is the youngest, she was 16, and
unfortunately she had some drug problems.  And she hung out
with, I can only describe them as, the bad boys of Kodiak.  So I
think we need to look at that.

    One of them was Travis Biocic, that was her boyfriend
just before this tragedy happened.  Travis is a drug user, he's
got a record, and he's older than her.  She was 16, he was 22.
They had -- the Belisles had issues with Hannah running away
from home with Travis.

    What's interesting about Travis, first of all, he was
with Hannah the night before the homicides.  Hannah was getting

1  a tattoo, and Travis was at this party or gathering when she was

2  getting a tattoo on April 11th, the night of that, and Travis's

3  family has been known to live -- they have vehicles

4  registered -- the Biocics have a vehicle registered to those

5  places we took pictures of way down Anton Larsen Bay Road,

6  that's where -- he's got connections there.  He knows that area.

7  His family used to live there.

8       Casey Brennick.  Casey Brennick is another bad boy of

9  Kodiak.  He's got a criminal history.  He's got -- a drug user.

10 And what's interesting about Casey, is that he was trying to

11 sell the gun they were looking for, or the same type of gun they

12 were looking for around the same time of these homicides.  He

13 was texting to somebody, "I want to sell a 629 Smith & Wesson

14 stainless revolver."

15      Then there is Dylan Froehlich, he was another

16 boyfriend, ex-boyfriend of Hannah.  And what's interesting

17 about -- you have to look at the Dylan connection, because with

18 Dylan, for sometime during April 2012, there was a guy living

19 with him and his father named Jason Barnum.

20      Now Jason Barnum was the drug dealer connection for

21 these guys in April of 2012.  He was there -- if you could dim

22 the lights -- he was there for a month.  He was staying with

23 Hannah's ex-boyfriend.  He was in Kodiak.  He was known to be

24 selling drugs.  He kind of disappeared right after the

25 homicides, and left the island shortly thereafter.

1     What's interesting about Jason is that the day after
2 the homicides he was at a store out in the Flats where he used
3 to hang out, he used to go there a lot, usually drunk, usually
4 high, and he's in there, and out of the blue he's saying, "I
5 didn't do it.  I didn't do it.  Everybody thinks I did it, but I
6 didn't do it."  Just out of the blue.  And then he points his
7 finger like a gun, like he's shooting somebody.

8     Now that seems suspicious to me.  And Jason comes back
9 to Anchorage, burgles a lot of homes, steals a lot of guns, and
10 ends up in jail for attempted murder of a police officer.  That
11 is the person that was there at the time, too, that was not
12 investigated because the investigation was all about Jim Wells.

13     Well, I can't for certain tell you who shot Rich and
14 Jim Hopkins, Rich Belisle, but it just seems like their whole
15 case, the circumstantial case, is built on assumptions trying to
16 prove it was Jim Wells, and even though I can't tell you who did
17 it, I can tell you it was not Jim Wells, he's innocent, and
18 that's what the evidence will show you, thank you.

19     THE COURT:  All right, we'll stand in recess for
20 roughly 15 minutes.

21   (Log 10:53:14)

22     (This portion not requested)

23   (Log 4:25:49)

24         (Proceedings recessed at 4:25:49 p.m.)

25

CERTIFICATION

1

2

3      I, LEONARD J. DiPAOLO, RPR, CRR, CCP, court-approved

4   transcriber, certify that the foregoing is correct transcript

5   from the official digital electronic sound recording of the

6   proceedings in the above-entitled matter.

7

8

9   _____          __4/9/14___
    Leonard J. DiPaolo, RPR, CRR, CCP               Date
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                         I-N-D-E-X
    OPENING STATEMENT:
2
    By Defendant              3
3
    WITNESSES:                DIRECT   CROSS  REDIRECT  RECROSS
4
    FOR THE PLAINTIFF:
5
    None
6

7   FOR THE DEFENDANT:

8   None

9
    EXHIBITS:                             ADMITTED
10
    FOR THE PLAINTIFF:
11
    None
12
    FOR THE DEFENDANT:
13
    None
14

15

16

17

18

19

20

21

22

23

24

25
```