1      UNITED STATES DISTRICT COURT
       DISTRICT OF ALASKA
2
 UNITED STATES OF AMERICA, )  Case No. 3:13-cr-00008-RRB
3         )
      Plaintiff, )  Anchorage, Alaska
4         )  Tuesday, April 1, 2014
  vs.      )  8:51 a.m.
5         )
 JAMES MICHAEL WELLS,  )  TRIAL BY JURY - DAY 2
6         )
     Defendant. )
7         )

8     PARTIAL TRANSCRIPT OF PROCEEDINGS
      Pages 1 - 31, inclusive
9
    BEFORE THE HONORABLE RALPH R. BEISTLINE
10     UNITED STATES DISTRICT JUDGE

11 A P P E A R A N C E S:
 For Plaintiff:  KAREN LOEFFLER, ESQ.
12      BRYAN D. SCHRODER, ESQ.
      KATHLEEN ANN DUIGNAN, ESQ.
13      U.S. Attorney's Office
      222 W. 7th Avenue, #9
14      Anchorage, Alaska 99513
      Ph: 907/271-5071
15
 For Defendant:  F. RICHARD CURTNER, ESQ.
16      Federal Public Defender's Agency
      601 W. 5th Avenue, Suite 800
17      Anchorage, Alaska 99501
      Ph: 907/646-3400
18
      PETER OFFENBECHER, ESQ.
19      Skellenger Bender, P.S.
      1301 5th Avenue, Suite 3401
20      Seattle, Washington 98101-2605
      Ph: 206/623-6501
21
 Court Recorder:  NANCY LEALAISALANOA
22      U.S. District Court
      222 W. 7th Avenue, Box 4
23      Anchorage, Alaska 99513
      Ph: 907/677-6111
24

25

1    A P P E A R A N C E S:  (Continued)

2    Transcribed by:    LEONARD J. DIPAOLO, RPR, CRR, CCP
                        Peninsula Reporting
3                       110 Trading Bay Road, Suite 100
                        Kenai, Alaska 99611
4                       Ph: 907/283-4429

5

     Proceedings recorded by digital sound recording, transcript
6    produced by stenographic transcription service.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

ANCHORAGE, ALASKA - TUESDAY, APRIL 1, 2014

1    (Log 8:51:27)

2    (This portion not requested)

3    (Log 9:16:14)

4    (Defendant present and jury present)

5              OPENING STATEMENT BY PLAINTIFF

6    THE COURT:  So we'll hear first from the government.
Ms. Loeffler.

7    MS. LOEFFLER:  Thank you, Your Honor.  Your Honor, can
I put these up?

8    THE COURT:  Put those up.  Don't worry about me, I'll
be here.

9    MS. LOEFFLER:  Ladies and gentlemen, next to you I
have put up some pictures.  And the one on the right with the
Ducks Unlimited hat is Rich Belisle; the one on the left in the
Coast Guard uniform is Jim Hopkins.

And on April 12th, 2012, on a Thursday morning, both
men got up at their normal time in Kodiak, Alaska, they left for
work at their normal time, drove to their normal place of work,
which was the communications station in Kodiak, Alaska.

THE COURT:  Okay, at that point, move your microphone
up so we can have a clear record.

MS. LOEFFLER:  Oh, I'm sorry.

THE COURT:  Or put it on.

1              P R O C E E D I N G S

2         ANCHORAGE, ALASKA - TUESDAY, APRIL 1, 2014

3    (Log 8:51:27)

4      (This portion not requested)

5    (Log 9:16:14)

6      (Defendant present and jury present)

7              OPENING STATEMENT BY PLAINTIFF

8         THE COURT:  So we'll hear first from the government.

9    Ms. Loeffler.

10        MS. LOEFFLER:  Thank you, Your Honor.  Your Honor, can

11   I put these up?

12        THE COURT:  Put those up.  Don't worry about me, I'll

13   be here.

14        MS. LOEFFLER:  Ladies and gentlemen, next to you I

15   have put up some pictures.  And the one on the right with the

16   Ducks Unlimited hat is Rich Belisle; the one on the left in the

17   Coast Guard uniform is Jim Hopkins.

18        And on April 12th, 2012, on a Thursday morning, both

19   men got up at their normal time in Kodiak, Alaska, they left for

20   work at their normal time, drove to their normal place of work,

21   which was the communications station in Kodiak, Alaska.

22        THE COURT:  Okay, at that point, move your microphone

23   up so we can have a clear record.

24        MS. LOEFFLER:  Oh, I'm sorry.

25        THE COURT:  Or put it on.

1          MS. LOEFFLER:  Actually, I did not put on a

2    microphone.

3          THE CLERK:  It's by the podium.

4          THE COURT:  That explains that.  You can start over,

5    but I think the jury heard you.

6          MS. LOEFFLER:  Ladies and gentlemen, so they went to

7    work on their normal day at the communications station in

8    Kodiak, Alaska in a building you will hear is called T2, or the

9    rigger shop, and I will explain that.

10          And within minutes they started their normal day, and

11    a few minutes later, both were dead, shot, as we will show you

12    through the evidence as the trial goes on, by this man, James

13    Wells, their colleague and co-worker.

14          Rich Belisle, I want to tell you a little bit about

15    him.  He was a civilian employee of the Coast Guard.  He was a

16    retired Coast Guard member, 20 years.  He was a chief

17    boatswain's mate in the Coast Guard before he retired.  Then he

18    went to work at the communications station in Kodiak as an

19    antenna rigger, someone who helped maintain the antennas that

20    are there, and I will explain a little bit more about the rigger

21    shop.  He had been employed there for seven years helping

22    maintain the antennas and the array that was used to gather

23    communications for the mission of the Coast Guard on Kodiak.

24          He was married to Nicola Belisle for 19 years, and

25    they had three daughters.  You will hear from the witnesses that

1  every person that met Mr. Belisle, I expect you will hear, liked

2  him.  He had a sense of humor, he had a smile for everybody, was

3  a teacher and a helpful person, and was very well liked.

4          Next to him in uniform was Jim Hopkins.  He was a

5  petty officer first class in the Coast Guard.  His rating was as

6  an electronic technician.  He was the supervisor of the rigger

7  shop because he was the uniformed Coast Guard officer in charge

8  of some of the new Coast Guard members that worked below him and

9  the two civilians.  He had been married to Debbie for almost 20

10 years at the time of his death.  And at that time he had just

11 received an award as Enlisted Man of the Year for Communications

12 Station Kodiak.  He was a quieter man, but he was well like and

13 respected for his hard work ethic and his dedication to the

14 mission of the Coast Guard.

15         Now, I want to turn to Thursday, April 12th, 2012.  In

16 order to understand what went on, what you see here is a picture

17 of the building that will be called either T2 or the rigger shop

18 by people.  It was a maintenance building.  It was designed to

19 repair things and to work on things and had tools and equipment.

20         On April 12th, 2012, the two men, Jim Hopkins and Rich

21 Belisle, came to work at their normal time.  Rich Belisle

22 arrived at 7 a.m., which was his normal time of work; and Jim

23 Hopkins got there about eight minutes later.

24         When Mr. Belisle got there, he started his normal day

25 by signing on to his computer and doing some e-mails.

1    Mr. Hopkins started his normal day.  He was a

2  uniformed officer, and at that time of year he had to do a

3  certain blousing of his sleeves on his uniform.  And he went

4  into the break room, which was next to the office, and I will

5  show you on here -- oh, there it is -- I will describe it to you

6  later that there is a break room next to the office, and he went

7  in to put his shirt down on the table where he would fold it up.

8    And less than five minutes later both men were dead.

9  And they were shot, brutally murdered in their workplace by

10  somebody, we will show you, Jim Wells, with a plan and a method

11  and a motive to kill these two individuals, and leave leaving

12  little trace.

13    And we'll show you this, as I go through the outline

14  and you hear the evidence, with direct facts of time and place

15  that you'll hear, and with circumstantial evidence, which the

16  Judge instructed you about, which is using your common sense and

17  inference from the facts that are shown to you.  And this will

18  show you that the person that walked in to Rich Belisle when he

19  was sitting in the office and shot him with a .44 magnum

20  revolver killing him, and then shot Jim Hopkins in the face with

21  a revolver killing him, and went back and shot both men while

22  they lay dead and dying on the ground at their place of work,

23  was Jim Wells.

24    The evidence that we will introduce will show you that

25  this murder was personal and intentional.  You will learn from

1   the evidence and from your common sense that the murderer, Jim

2   Wells, targeted both men, and the evidence -- some of the

3   evidence we expect you to see turns from the layout of the

4   rigger station.

5           There are no windows in the front.  You can't see who

6   was in there if you don't already know that.  The evidence will

7   show you that there was no robbery that occurred because there

8   was money on these men, that nothing was disturbed in the

9   building.

10          You will hear that Mr. Hopkins and Mr. Belisle were

11  connected by work alone.  They weren't -- they knew each other.

12  Kodiak is a small place.  They didn't socialize.  Their

13  connection was work.  They were both well regarded at their

14  jobs.  And that Mr. Wells, the murderer, targeted these

15  individuals.

16          And you will hear that, from people talking about the

17  multiple shots, that both of these men were inside their rooms

18  at their normal routine.  There is nothing that will show that

19  they had a chance to defend themselves, that they were surprised

20  by the murderer, and of course Mr. Wells was their colleague and

21  would have been expected to be at work that day.

22          The evidence will show you that this murder was very

23  well planned and it was premeditated, and some of the things

24  that you will hear is that there are some unique characteristics

25  to this building.

1    For one, you come in, as I said, there are no windows
2    in the front, nothing that you would know who was in there.  The
3    murderer carefully avoided certain cameras, and we'll come back
4    to that.  There was a camera on the rigger shop, but the
5    murderer -- and Jim Wells knew where that camera was and knew
6    how it was placed -- bypassed the camera both in driving up to
7    commit the murder and in leaving the murder.

8    Now, you will also hear, of course, that Mr. Wells
9    knew the schedule of the people that worked there.  There are
10   only three people that would normally be at the rigger shop
11   between 7 and 7:10:  that was Jim Hopkins; Rich Belisle; and the
12   third man is Jim Wells.

13   His normal work time was 7 o'clock.  He was not there
14   at 7 o'clock that morning.  And as I will walk through this, I
15   expect to show you an outline of the evidence that explains why
16   he wasn't there at 7 o'clock, because he was driving up in his
17   wife's car to murder these two individuals.

18   Other things that will tell you this was premeditated
19   and planned.  Mr. Wells used a .44 caliber revolver.  There were
20   no casings on the floor, because a revolver, of course, doesn't
21   eject them.  You will see the connection with Mr. Wells through
22   the timeline of where he was and where he says he was at the
23   time.  But the one individual who was not there at that morning
24   at the comm station and at the rigger shop when he should have
25   been at his normal time was Jim Wells.

1          Now, the evidence that we will introduce will show you

2    that this was a personal, planned, premeditated murder.  That

3    when Mr. Wells left the site after killing these people, he

4    left -- there is very little or no trace evidence of the

5    murderer.  Obviously, Mr. Wells worked at the COMMSTA.  DNA or

6    fingerprints of him would not tie him to it, but there is no

7    other trace evidence that would tie to anyone else.

8          I guess an example is there are no bloody footprints,

9    there is no bloody fingerprints, there was nothing to collect

10   that would say, "This is the murderer for sure," that you can

11   collect forensically, because all of the blood -- and you will

12   see pictures, I'm sorry, we won't show them a lot, but you will

13   see the pictures -- it was all in the two rooms.  There was

14   nothing dragged out.  It was well planned, well thought out, but

15   it was not perfect.

16         And I'm going to take you through an outline of what I

17   expect the evidence to show, some of the key evidence that shows

18   you how the facts and the circumstantial evidence and your

19   common sense and inferences all tells that it was Jim Wells in

20   there that morning shooting his colleagues.

21         The evidence comes from the geography of Kodiak, the

22   layout, and some cameras that I'm going to talk about that

23   caught Mr. Wells' actions that morning.  None of the evidence is

24   going to be an, "A-ha, this is it."  There were no eyewitnesses

25   to this murder.  But you will be able to see how it's put

1  together and how it all links to only one person that committed

2  this murder, and that was James Wells.

3         Now, what I want to do first is lay out by the map,

4  and I'm going to see -- there we go -- that's probably better,

5  thank you -- except -- oh, thank you.  Yeah, this is a better

6  one, thank you.

7         This is a map of Kodiak.  What it is is starting down

8  by the end of the bay, you will see that Mr. Wells' residence

9  and actually Mr. Belisle's residence are right across from each

10 other in a place called Bells Flats.  Then there is one general

11 exit out of Bells Flats -- there is more than one, but everybody

12 uses this road -- and on West Rezanof Drive there is one road

13 that drives toward -- in order to get to the COMMSTA, which is

14 at the very top of the map here, the rigger shop.

15        Along the way is the Kodiak base, the main Coast Guard

16 base, and that base has a camera.  The camera is designed to

17 catch people driving just into the base, but in this case it

18 also caught the road and Mr. Wells going by and coming back, and

19 I will go through that with you.

20        Once they go past the base, next to it is the airport,

21 and West Rezanof Drive goes around the airport, and it is only

22 1.7 miles from the base to the turn into the airport.  This is

23 Kodiak airport.

24        Then from the turnoff, from the Kodiak airport to the

25 COMMSTA, is about two miles.  And this whole travel takes

1  somewhere from 10 to 15 minutes to do.  It's a very small place.

2  And I'll come back to the geography, because I'm going to

3  connect the geography to the timeline of where cameras caught

4  Mr. Wells and where he was that morning when the murder was

5  committed.

6          When I talk to you about the building, and I showed

7  you -- COMMSTA Kodiak is Communication Station Kodiak.  The

8  purpose of the communications station is to gather information,

9  radio signals, and other signals from the antenna fields.  A

10 number of things are done in the mission.  For one thing, the

11 search and rescue mission of the Kodiak -- of Kodiak, I'm sorry,

12 and of the Coast Guard, comes through this array.  And you will

13 find that at COMMSTA there is a 24-hour watch to listen to the

14 radio signals, both to gather it for search and rescue and for

15 other information gathering.  That is done at a building that

16 you'll hear called T1, which is up the hill.  That's the

17 operations center where the watch is done.  The rigger shop is

18 the maintenance building.

19         Now, at the rigger shop -- I have a chart, and it's a

20 long way away, but we will go through this with you.  The office

21 where Mr. Belisle was found, and I'm pointing to where he was

22 found murdered, is right here.  And in that office four people

23 worked:  Jim Hopkins is the supervisor; and there were two

24 civilians, Jim Wells and Rich Belisle; and then the chief, a man

25 named Scott Reckner, who you'll hear from, actually worked there

1    and had a desk there part time.  And he moved his desk down

2    there because of issues with Mr. Wells and trying to get him

3    back in line to the mission that they were doing.

4              The break room is right here.  And you will hear from

5    the witnesses that Mr. Hopkins was murdered standing, facing his

6    murderer and lying right here.  And at the time he was rolling

7    his sleeves up on this table.  And these two rooms are very

8    close together.  That's where they were on their normal start of

9    the day.

10              What I have shown you is -- when I talked to you about

11   the other building, which you will hear is building T1, that's

12   the building up the hill, and that's where the watch is done,

13   and most of the people that work at COMMSTA work up at that

14   building.  Down the hill is the rigger shop.

15              Now, the two buildings you'll also hear had different

16   levels of security.  T1 had a fence around it and also had

17   security, and there are -- there is a camera at T1, and I'm

18   going to go into it.  I will show you where it is and what it

19   shows.

20              On T2, you will hear, the night before the murder, the

21   security person walked around, checked that everything was

22   locked at T2.  It was locked up the night before, but during the

23   day what would happen is the first person in, usually Mr.

24   Belisle or Mr. Wells, would card in and then open a door, and

25   during the day it was fairly open.  And these are things, of

course, that people working there knew, although people that did
not work there would not know that, would not necessarily know
that you could get into this building.

And I put both -- if you can see it a little better,
this is the layout of the building. Again, Mr. Belisle was
murdered in the office, and Mr. Hopkins was just in the break
room a few steps away.

Now, you will also -- some of the geography and the
importance that we will show you is how you get to the rigger
shop when you drive up Anton Larsen Bay Road. What you will see
and hear is there is a normal entrance where people simply drive
up this road. This is actually not a great diagram of it.
There is a road that goes straight up to T2, and there are
entrances. That's where everybody drives up. There is another
entrance. And there is a third way around. The first two would
be seen on the camera at T1. The third one would not. And that
is the way Mr. Wells got there, to avoid the camera.

We have witnesses who will talk to you about the crime
scene, and what they are going to tell you, just gathering the
evidence and what will appear as common sense to you, is that
this was a personal murder by someone who knew this building,
knew the environment very well, because it will not make sense
any other way. No one else would know who was in the building,
no one else would know that the two individuals would be close
together and not spread out through all these very different

1 areas of this building, where the cameras were, or even what was

2 in this building.

3      And you will also hear, as I mentioned, that there is

4 not a -- there is no trace evidence of the murderer at the crime

5 scene.  This was well planned.  As I said, no bloody footprint,

6 no bloody fingerprints, no mud-splattered footprints walking

7 across the floor that you can match to anything.

8      You will hear the agents gathered up what evidence

9 they could, but none of it was anything that would say, "This is

10 the murderer."  And obviously, as I said, fingerprints or DNA of

11 Mr. Wells or anybody else that worked there is not really of

12 evidentiary value because they did work there, and neither DNA

13 or fingerprints can be time dated.  You can't say somebody left

14 it this day.

15      But the evidence that will lead to Mr. Wells as the

16 murderer shows you that this wasn't perfect, that by the

17 timeline that I'm going to show you next, the action of who

18 drove up, what car was used to commit the murder, and what

19 excuse Mr. Wells gave is going to show you that he was the

20 murderer.

21      What I think I'd like to do at this point is turn the

22 lights down, because I'm going to switch to a timeline.  This is

23 Mr. Wells' residence, and it is where we've shown you on the

24 chart in Bells Flats at the end of -- or not at the end, but on

25 West Rezanof Drive.  And then there is the base gate camera, the

1  Kodiak airport, and the COMMSTA.

2         Now, I want to go to the timeline of the movements of

3  Mr. Wells that we captured that morning.  This is the base

4  camera.  At 6:48 in the morning, this is Wells' truck passing

5  that main gate, the front gate.  And you will also hear that

6  everybody knew -- COMMSTA was a small place.  Everybody knew

7  that this is Jim Wells' truck.  Everybody can identify it.  They

8  can identify each other's cars.

9         Now, at 7 in the morning, Rich Belisle badged into the

10  rigger shop.  What I'm showing you on this slide is the camera

11  that is on T2, or the rigger shop.  That camera will catch cars

12  driving up to T1.  It does not catch cars on Anton St. [sic]

13  Larsen Road, but you can see most of the cars driving up on that

14  camera, and you will be able to see Rich Belisle's car driving

15  in.

16         At 7:08, James Hopkins drove to work.  That's his

17  truck driving up.  And the T2 camera caught him coming in.

18         At 7:09, this car, this blurry image of a car, came

19  from the T1 camera.  And you can see what the T1 camera shows.

20  It's hard to see on this picture, but we will explain it to you,

21  that the camera, the way it was that morning, it was way up the

22  hill on T1, could only catch a small part of Anton St. Larsen --

23  Anton Larsen Drive, and there were cars parked in the parking

24  lot.

25         This small blue SUV was caught on that camera going

1   past the COMMSTA, not turning in, but going past at 7:09 in the

2   morning.

3           At 7:12 an individual named Don Rudat happened to be

4   jogging up the road, and somewhere between 7:11 and 7:12 he

5   heard a loud metal on metal noise.  And this is not -- if you

6   look very closely in the slide, it's actually -- he's caught on

7   the T1 camera walking by.  That little movement, and you may not

8   be able to see it, is him.  And it's around 7:12.  He heard that

9   loud noise, which you will find was the shot, and probably the

10  last shot, murdering one of these two individuals.

11          At 7:14, here is that small blue SUV caught on the T1

12  camera heading back the other way.  And what you will hear from

13  the evidence is this road, Anton Larsen Road, it only goes for

14  about a mile-and-a-half farther in the winter.  It goes up to

15  the golf course.  It goes farther, but it's not maintained in

16  the winter, and almost nobody drives that road in the winter

17  that isn't going to the COMMSTA.

18          In fact, the only three cars -- there are only three

19  cars during this morning that drive by the COMMSTA at all.  Two

20  of them -- one is a guy named Mr. Schilback, one is a guy named

21  Mr. Bores (ph), both of those people will testify and identify

22  their cars.  The only unidentified car on the road that morning,

23  the only one that didn't go up to the COMMSTA or wasn't the

24  other two, the one identified [sic] car is this small blue SUV,

25  and I will explain in a few minutes how that ties directly to

1  Mr. Wells.

2           So at 7:22 the base gate camera catches Mr. Wells'

3  truck heading back home the other way.  There is a 6:48 to 7:22,

4  there is a time gap of 34 minutes, and during that time gap his

5  two colleagues were murdered by somebody who knew them and knew

6  the exact layout of cameras in the building.

7           And when Mr. Wells turned back home at about 7:25, two

8  of his neighbors saw him turn in.  They recognized his white

9  truck and they recognized him, because Bells Flats is a small

10  neighborhood and Kodiak is a small place.  So they will place

11  him at about 7:25, you know, a couple of minutes to go by the

12  base gate heading back home.

13           And then -- this is just a picture of Mr. Wells from

14  his driver's license -- at 7:30 and 7:31, Jim Wells called the

15  office, and he left a message with his excuse as to why he

16  wasn't at work, because he would normally come to work at 7

17  o'clock.  I'm sorry, I'm missing -- okay, okay.  I'm sorry.

18  Okay, that's fine.

19           What you will hear -- I'm sorry, I have a technical

20  difficulty, my fault -- what you will hear is that Jim Wells,

21  right after he got home -- remember, they see him turning in at

22  7:25 -- it's okay, I can do it, thanks -- right after he leaves

23  is seen, caught on the base camera at 7:22.

24           7:25 he turns into the neighborhood.  Just a few

25  minutes later, immediately after he gets home, he calls and

1  leaves a message -- he leaves two messages.  One on the phone at
2  work of Scott Reckner, and one on the phone of Jim Hopkins who
3  is already dead.  And what the message says to Mr. Reckner, and
4  you will hear it here, what Jim Wells tells him is, you know, I
5  had a flat tire, having trouble with my lug nuts, so I'll be in
6  when I get it done.
7             Now, I'm going to go through two other pieces of
8  evidence here in some detail.  That is how this blue car ties to
9  Jim Wells, where it was located and how it ties to Jim Wells;
10 and also that that claim that he had a flat tire and that he was
11 having trouble with his lug nuts is not possible, and it was a
12 lie, and that's what we are going to show you.  I'm sorry, Kim,
13 to close --
14             UNIDENTIFIED FEMALE SPEAKER:  Click the play button on
15 the --
16             MS. LOEFFLER:  That's right.
17             UNIDENTIFIED FEMALE SPEAKER:  And close that.  Use
18 your clicker.  Use the advance button.
19             MS. LOEFFLER:  Thank you.
20             The small -- I'm going to turn first to the small blue
21 SUV.  And we've circled it with a little block so you can see
22 it.
23             This is the car that the murderer drove.  And the
24 reason that I believe the evidence will show you that is based
25 on a couple of things:  when Mr. Belisle -- the last e-mail

1　message you'll hear, the last action on his computer is

2　approximately 7:10; from his routine, from Mr. Hopkins, when he

3　first gets there at 7:08 and then he's rolling up his sleeve;

4　and then just after that the blue car comes in; Mr. Rudat hears

5　the loud clang on clang noise; and then immediately after 7:14

6　the blue car goes the other way.  So the murderer came in that

7　car.  It's the only identified car and it's exactly when the

8　murder happened.

9　　　　　Now, what you'll hear is nobody -- CSI doesn't work,

10　you can't hone in and make a distance picture somehow ultra

11　clear.  This is just a zoomed-in picture of the small blue SUV.

12　　　　　Jim Wells had another car in his family, other than

13　the white truck that he drove.  The one that his wife drove was

14　a Honda, early model Honda blue CR-V.  The blue CR-V -- Nancy

15　Wells left for a convention, a meeting in Anchorage, on April

16　10th, two days before the murderer -- the murder.  And when she

17　left, she drove with another person, a friend of hers, and they

18　parked at the airport where you would normally park, in the

19　middle of the parking lot somewhere, and you walk into the front

20　door of Alaska Airlines.  And the friend will testify that she

21　doesn't know exactly where the car was parked, but that's the

22　natural thing, you park in the middle, you walk in the door.

23　　　　　After the murder was -- happened, one of the troopers

24　went down to the airport looking to see if he could find a car

25　that looked like the one in the video.  And what they found was

1  Nancy Wells' blue Honda CR-V in the airport parking lot, but it

2  had been moved.  It wasn't where it was left.  It wasn't in the

3  middle of the parking lot.  It was way at the end in a place

4  where it hadn't been left when Nancy Wells left for Anchorage.

5  The car moved.

6          Now, this is the entrance to the Alaska Airlines

7  terminal, and that's where the friend will tell you, you would

8  walk straight in.  You know, you don't take a long walk when the

9  parking lot has got snow and gravel, but this cone represents

10  where the car was found, and it is not where it was left.

11          I want to turn back to that car.  The video that you

12  saw is not a clear picture.  So what the government did is a

13  couple of steps to try to give the jury and in the investigation

14  the best way to see whether the car in the picture appeared to

15  match Jim Wells' other car, his wife's car, or whether it did

16  not.

17          The car that's labeled 419 is actually Nancy Wells'

18  vehicle.  That's the one that the agents took, and they drove it

19  down the road on the 19th, which is seven days after the

20  murder -- yes, sorry, my math -- and they had -- and they took

21  it with the same camera from T1 to try to sort of put it on the

22  same place.  There are no cars parked in the way, that's why you

23  see a fuller picture.  On the left is the suspect vehicle.

24  That's the vehicle that was used to murder these two

25  individuals.

1          The FBI also contacted a video expert from the FBI

2     lab, and you will hear from him.  And what he did is measured

3     Nancy Wells' car, just from the picture he measured it.  And

4     then he stuck that measurement over the actual picture of the

5     suspect vehicle.  And he's going to describe to you that these

6     measurements are consistent.

7          The government also went to somebody that has years of

8     experience in cars, and is actually a Honda engineer.  And he's

9     going to come up here and testify -- again, the picture is

10    blurry in some ways, it's pixilated -- and he's going to say,

11    based on his very, very familiar knowledge, that he would say

12    with about 70 percent certainty that it looks like an early

13    model Honda CR-V, which is exactly what this car is.

14          Now, the government also went to another video expert

15    to determine whether there was anything else that could rule

16    in -- this car in as a CR-V or rule it out.  And the expert from

17    a place called Collision Research -- and he will explain this,

18    I'm not going to go in detail -- but what he did is he took the

19    actual image and he imposed outlines of other cars.  This is the

20    outline of a CR-V to see whether it matched it.  Some will not

21    match.  A bigger car won't fit.  This is the outline of a CR-V,

22    and placed it over the video, and he will explain that to you.

23          All of these pieces of evidence will lead to show that

24    the video that was taken of the actual suspect car appears to be

25    a small blue Honda CR-V, and you will also know that a small

1    blue Honda CR-V that Jim Wells had access to at that airport

2    moved from before the murder to after the murder.

3            There were also a number -- the rigger shop is a very

4    small place.  The people that work there -- as I told you, there

5    were a number of seamen who were starting out, and in that

6    office worked four people:  Scott Reckner; Jim Hopkins, Rich

7    Belisle, and Jim Wells.  And what you will hear is there is only

8    one of that group that was having workplace conflicts.

9            Mr. Wells was a very knowledgeable mechanic.  He was

10    an antenna mechanic, but he had a history of running things

11    himself.  He liked, and you will hear from people that have

12    supervised him before, that he liked to be in charge and have

13    things done the way he liked them done.  He didn't like change,

14    he liked them done his way.

15            And he had pretty much been able to do that, because

16    the Coast Guard uniformed force would leave -- you know, they

17    rotate out every once in a while, but starting in 2011, about a

18    year before the murders, Wells started having conflicts, and

19    they became more and more because the management of the Coast

20    Guard at that time tried to bring him into the mission of the

21    Coast Guard, to have him follow directions and orders.

22            And during that time -- we will go through this --

23    there were a number of efforts to get him to start to follow

24    orders, and there were some reprimands and counseling that went

25    to Mr. Wells to say, you know, you need to get with the program,

1  you need to start to do what we were doing.

2          And Chief Reckner, who you will hear from, actually
3  moved a desk down into the office so that he could try to work
4  and get Mr. Wells in line with the program.

5          Now, these efforts sort of culminated in the fall of
6  2011 with some allegations that Mr. Wells, when everybody was
7  gone, that he had stolen some fuel, and they went to counsel him
8  on that.  And then Jim Wells got very ill, and he was gone for,
9  off and on between vacation and illness, for five months or so.

10         During that time the people working in the rigger shop
11 figured out that they could do the job without him, that they
12 could -- there were manuals, there were things they could look
13 up, and that they didn't need him.  And you will hear from
14 people, that Jim Wells was knowledgeable, but he had a very high
15 regard for his own knowledge.  He didn't tend to give it up to
16 other people, he did sometimes, but he didn't like letting other
17 people learn that they could do this without him.

18         And some of this culminated, when -- he liked to go
19 every year, he liked to travel to go to a conference on antenna
20 riggers, a national antenna conference.  And when he came back
21 to work after being ill and out, he was told by a supervisor, by
22 Chief Reckner, that he couldn't go because he hadn't been there,
23 and everybody else was going.  And he pointed at Mr. Belisle and
24 said, "Yeah, but he's only the antenna rigger."  And he was not
25 fitting in and having work conflicts and nobody else was.

1          Now, we're also going to bring in a forensic
2    psychologist who is going to talk to you a little bit about
3    workplace violence, he's not going to talk to you about Mr.
4    Wells -- he didn't examine him -- but he's going to talk to you
5    a little bit about and explain to you, based on his research,
6    the difference between violence that happens when somebody just
7    has an emotional response and targeted, personal, planned
8    violence at the workplace.  And he studied that and he will talk
9    to you about it.

10          And I don't want to go into it here, but I think if
11   you will listen and hear from him, that some of the common
12   things that people get on TV are not really borne out but what
13   happens in reality.

14          In other words, when these workplace actions happen,
15   they don't happen from somebody snapping, there is no direct
16   threat; they happen, in some of these instances, from somebody
17   who plans things, acts with stealth and gives no warning.  And
18   you will listen to the evidence and determine whether that fits
19   exactly what happened here.

20          Now the other thing that I told you a minute ago, that
21   there is that 34-minute gap, and Mr. Wells called and said.  "I
22   had a flat tire."  This is what I said, "The only reason I
23   wasn't there is that I had a flat tire in my truck."  This is
24   when he was talking to the agents.  The day of the murder they
25   spoke to everybody at the communications station trying to

1  figure out what had happened.

2          He said, "I started to come to work and noticed my

3  tire was low and turned around and went back home."  He said, "I

4  turned around near the Comfort Inn..." which is at the entrance

5  to the airport right over here, "...and went to the bathroom --

6  went home and went to the bathroom and went to change a tire."

7          And here is the call he made at 7:31.  "Hey, Scott..."

8  that's Scott Reckner, "... Jim.  I haven't been able to get a

9  hold of Rich or Jim.  I got a flat tire in the truck, having

10  trouble getting it off, the lug nut.  So anyway, when I get

11  done, I'll be in."  And here is what the evidence, I believe,

12  will show you about that statement.

13          One, it doesn't explain a 34-minute time gap.  That

14  the timing to drive -- to go by here at 6:48 and come back at

15  7:22, it doesn't take 34 minutes to go one mile and see a low

16  tire and come back.

17          Secondly, you will hear from a number of the people at

18  the station, every tool that you would possibly need to deal

19  with a low tire exists at the rigger shop, which is only two

20  miles away.  And they will tell you the story didn't make sense

21  to them, I believe, at the time.  Why not just go to work and

22  deal with it.  There is a flat, drive surface there as opposed

23  to Wells' steep driveway.

24          Also, remember, Wells says, "Oh, I'm having trouble

25  with the lug nuts."  But because this camera caught him driving

1  back at 7:22, and people saw him turn into the neighborhood at

2  7:25, he couldn't have tried -- the timing doesn't fit trying

3  your lug nuts when he made the call just a minute or two later.

4       Also you will hear that it so happened that agents

5  were watching him after the murder, a few days later, and they

6  saw him change the three other tires in 14 minutes.

7       There is some other facts you will hear.  I expect you

8  will hear from people that it was unusual for Jim Wells to call

9  immediately if he was going to be in late, and that he did own a

10 cell phone, but the call came from his home, not his cell.

11       Then the agents did find the tire.  They did take the

12 tire that Mr. Wells said he had a low tire or a flat tire, they

13 did take the tire.  And you will hear expert opinions that there

14 was a nail in that tire, but it wasn't naturally inserted, it

15 didn't come from running it over in the road.

16       You will hear a tool mark expert tell you that that

17 was not naturally inserted, that was manually put in.  And

18 another tire expert with 34 years in the business will tell you

19 that it appears to him that that nail was shot in by a nail gun,

20 it was not something that was picked up along the road.

21       So when I tell you that this murder will appear very

22 well planned, but not perfect, what we will put before you was

23 that this alibi doesn't work.  The 34-minute time gap makes no

24 sense except for the fact that it is the perfect amount of time

25 to drive toward the airport, there is plenty of time, and we

will go through this in detail, to have gotten Nancy Wells' car,
which was sitting at the airport, driven up to the COMMSTA,
murder these two individuals, and then leave at 7:14, drive
back, drop the car at the airport, and drive home, and that will
fit perfectly with the time that Jim Wells is caught in his
white truck heading back home.

You will hear that the murder weapon has not been
recovered.  It was a .44 magnum revolver.  The ballistics expert
will tell you that there are three types, models that it could
be.  One of them is a Smith & Wesson .44.  And an investigation
will not -- led to no public records showing that Jim Wells has
a Smith & Wesson .44.

But a friend of Mr. Wells in the '90s left a Smith &
Wesson .44 stainless steel revolver with Mr. Wells, and that
same friend came back a year later -- he left it in a gun safe
because he was leaving Kodiak -- and when he came back a year
later to ship the safe to his brother in Michigan, the safe was
opened and the .44 revolver wasn't there.

And he asked Mr. Wells about it and got sort of a
non-committal, "I don't know, it's lost or something."  But
we'll show you pictures of Mr. Wells' garage at his house, and
you will hear from other people that he's a hoarder, that he
didn't get rid of anything, and, in fact, found at his house
were -- the friend was a Coast Guard member -- that the Coast
Guard member ceremonial swords that had been there were still

1  found in Mr. Wells's house.  And you will hear from others that

2  he never gets rid of anything.  But that gun, since it was owned

3  by the other person, would not tie back to Mr. Wells.

4       You will also hear, when we go through the timeline,

5  that between the time that Mr. Wells got back to his home, left

6  the phone message at 7:31 saying, "I had trouble with the lug

7  nuts," and the time that he got back to work, when he had to

8  leave to come back to work that day, because he drove in at

9  8:23, is 40 minutes of time at home.  40 minutes to do whatever

10 with any evidence of the crime.

11      So, now after the agents discovered the 34-minute time

12 gap, the camera that Mr. Wells, I believe you will find, did not

13 know about, and they asked him about it on April 13th, the day

14 after the murder, and what Wells told them is, "I don't have a

15 reasonable explanation for it.  I don't have a theory at the

16 moment..." for where he was when his colleagues were murdered.

17      And I believe at the end of this case -- or we believe

18 that the evidence will show you through facts, through

19 circumstances, through absolute proof beyond a reasonable doubt,

20 that there is one explanation and one theory for what happened

21 that day, and that is that Jim Wells planned and thought and

22 decided to murder his colleagues, and he drove to the airport,

23 got out of his white truck, got the blue car that was not as

24 recognizable to him, he drove up to the building, avoided the

25 cameras that he knew about, went into the building knowing his

1  colleagues would be in these rooms and defenseless, and he
2  murdered them, went back, dropped the car off, took his truck,
3  went home, and called with the alibi that he had planned that
4  didn't work.  And that's the only explanation that fits the
5  facts, thank you.
6           THE COURT:  Thank you.  Mr. Curtner.
7   (Log 10:05:16)
8     (This portion not requested)
9   (Log 4:25:49)
10           (Proceedings recessed at 4:25:49 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1                              CERTIFICATION

2

3       I, LEONARD J. DiPAOLO, RPR, CRR, CCP, court-approved

4    transcriber, certify that the foregoing is correct transcript

5    from the official digital electronic sound recording of the

6    proceedings in the above-entitled matter.

7

8

9    _____          __4/14/14___
     Leonard J. DiPaolo, RPR, CRR, CCP              Date

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                          I-N-D-E-X
    OPENING STATEMENT:
 2
    By Plaintiff             3
 3
    WITNESSES:           DIRECT   CROSS   REDIRECT   RECROSS
 4
    FOR THE PLAINTIFF:
 5
    None
 6

 7  FOR THE DEFENDANT:

 8  None

 9
    EXHIBITS:                          ADMITTED
10
    FOR THE PLAINTIFF:
11
    None
12
    FOR THE DEFENDANT:
13
    None
14

15

16

17

18

19

20

21

22

23

24

25
```