1          UNITED STATES DISTRICT COURT
                DISTRICT OF ALASKA
2
   UNITED STATES OF AMERICA,    )    Case No. 3:13-cr-00008-RRB-JDR
3                               )
              Plaintiff,        )    Anchorage, Alaska
4                               )    Monday, May 20, 2013
     vs.                        )    1:30 p.m.
5                               )
   JAMES MICHAEL WELLS,         )    BAIL REVIEW HEARING
6                               )
              Defendant.        )
7                               )

8              TRANSCRIPT OF PROCEEDINGS
                Pages 1 - 87, inclusive
9
           BEFORE THE HONORABLE JOHN D. ROBERTS
10             UNITED STATES MAGISTRATE JUDGE

11  A P P E A R A N C E S:
   For Plaintiff:    BRYAN D. SCHRODER, ESQ.
12                   U.S. Attorney's Office
                     222 W. 7th Avenue, #9
13                   Anchorage, Alaska 99513
                     Ph: 907/271-5071
14
   For Defendant:    F. RICHARD CURTNER, ESQ.
15                   Federal Public Defender's Agency
                     601 W. 5th Avenue, Suite 800
16                   Anchorage, Alaska 99501
                     Ph: 907/646-3400
17
                     PETER OFFENBECHER, ESQ.
18                   Skellenger Bender, P.S.
                     1301 5th Avenue, Suite 3401
19                   Seattle, Washington 98101-2605
                     Ph: 206/623-6501
20
   For Probation:    ERIC ODEGARD
21                   U.S. Probation Office
                     222 W. 7th Avenue, Room 48
22                   Anchorage, Alaska 99513
                     Ph: 907/271-5494
23

24

25

**Peninsula Reporting**
**110 Trading Bay Dr., Ste. 100, Kenai, AK 99611 907/283-4429**

1    A P P E A R A N C E S:  (Continued)

2    Court Recorder:    NANCY LEALAISALANOA
                        U.S. District Court
3                       222 W. 7th Avenue, Box 4
                        Anchorage, Alaska 99513
4                       Ph: 907/677-6111

5    Transcribed by:    LEONARD J. DIPAOLO, RPR, CRR, CCP
                        Peninsula Reporting
6                       110 Trading Bay Road, Suite 100
                        Kenai, Alaska 99611
7                       Ph: 907/283-4429

8

     Proceedings recorded by digital sound recording, transcript
9    produced by stenographic transcription service.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

ANCHORAGE, ALASKA - MONDAY, MARCH 3, 2014

1
2
3     (Log 1:30:37)
4       (Defendant present)
5             THE CLERK:  All rise.  His Honor the Court, the United
6     States District Court for the District of Alaska is now in
7     session with the Honorable John D. Roberts presiding.  Please be
8     seated.
9             THE COURT:  Good afternoon.
10            MR. CURTNER:  Good afternoon, Your Honor.
11            THE CLERK:  And, Your Honor, we have parties on the
12    phone also.
13            THE COURT:  Thank you.  The court is convened for a
14    hearing in the U.S. versus James Wells case, 3:13-cr-08, bail
15    review hearing.  Both parties are represented by counsel,
16    defendant is present.
17            And I assume those participating by telephone can hear
18    me speak at this time; is that correct?
19            UNIDENTIFIED SPEAKER:  Yes, sir.
20            THE COURT:  Thank you.  For the record, let me
21    indicate that I have read the letters provided by Nicola
22    Belisle, Anthony Pecoraro, Richard Belisle -- I'm not sure I'm
23    pronouncing that right.
24            MR. SCHRODER:  Your Honor, it's Belisle, Your Honor.
25    It's, I believe, from Nicola Belisle, Amy Belisle, and Emily

1  Belisle.

2       THE COURT:  -- those three, and James Hopkins, and

3  Scott Griffin, and a declaration by Sue Ellen Tatter.  So I am

4  familiar with the content of those.

5       I'll ask the government to state its position for

6  purposes of this hearing as a predicate.

7       MR. SCHRODER:  Your Honor, the government moves that

8  the defendant continue to be detained.  We believe -- first we

9  would call the Court's attention, as we have done previously, to

10  the presumption of 18 U.S. Code 3142(e)(3)(D) that applies in

11  this case based upon the charges of 18 U.S.C. 924(c).

12       We believe that given the gravity of the charges in

13  this case, that the defendant is both a flight risk and a

14  considerable danger in the community, and we think that's

15  especially true if he's returned to Kodiak.

16       THE COURT:  Mr. Curtner, are you the spokesperson?

17       MR. CURTNER:  Yes, I am, Your Honor.  And we've put

18  our proposal for our release plan before the Court, and we have

19  three proposed third-party custodians available to testify

20  before the Court.  And we think this is a reasonable release

21  plan.  Would you want to hear from the custodians at this time?

22       THE COURT:  It's my practice to hear the evidence,

23  certainly allow the defense to make the case, and then the

24  government will have a chance to argue with particular

25  objections.  So you may call your witnesses.

 1              MR. CURTNER:  Thank you, Your Honor.  We first call

 2  Henry Pennington.

 3              THE CLERK:  Sir, if you can remain standing.

 4              MR. PENNINGTON:  Excuse me.

 5              THE CLERK:  Raise your right hand.

 6       HENRY McKINLEY PENNINGTON, DEFENDANT'S WITNESS, SWORN

 7              THE CLERK:  Thank you, please have a seat.

 8              And for the record, please state and spell your full

 9  name.

10      A.  Okay, Henry McKinley Pennington.  Do you want me to

11  spell all of them?

12              THE CLERK:  Yes.

13      A.  Okay.  H-e-n-r-y M-c, capital K, i-n-l-e-y, Pennington,

14  P-e-n-n-i-n-g-t-o-n.

15              THE CLERK:  And what city and state do you reside?

16      A.  Kodiak, Alaska.

17              THE CLERK:  Okay.

18                      DIRECT EXAMINATION

19   BY MR. CURTNER:

20      Q.  Mr. Pennington, where exactly are you living right now?

21      A.  Mile 35, Chiniak Highway.

22      Q.  And could you describe for us where you're living and

23  how far that is from basically the downtown of Kodiak?

24      A.  I think it's measured from the Y intersection of town,

25  it's 35-and-a-half miles out, the last five of which are on

1    gravel road.

2        Q.  So in order to drive from Kodiak to your house, could

3    you describe the drive?

4        A.  Winding mountain road.  There is no other access.  It

5    goes only to Pasagshak, a fork in the road, which terminates on

6    a dead end.  And it's a dead end road beyond us.

7        Q.  And how big is your home?

8        A.  Two bedroom, couple thousand square feet.

9        Q.  Who lives there with you?

10       A.  Me and my wife.

11       Q.  Just the two of you at this time?

12       A.  And a cat.

13       Q.  And a cat.  Are you employed now?

14       A.  I'm retired and a part-time writer.

15       Q.  So tell me a little bit about your employment before

16   you retired.

17       A.  22-and-a-half years, I think it was, 23 years with the

18   University of Alaska, as a -- what's called a marine advisory

19   agent.  It's a faculty position advising communities on marine

20   affairs, fisheries, just marine safety.

21       Q.  And what other type of employment or hobbies have you

22   had?

23       A.  We're commercial -- or now retired commercial

24   photographers.  We did that for 20 years over a period of full

25   employment with the --

```
 1        Q.  You're referring to you and your wife?
 2        A.  Yes, excuse me.
 3        Q.  And how long have you been retired?
 4        A.  Since 1997.
 5        Q.  But you continue to live at the same residence in
 6   Kodiak?
 7        A.  Yeah.
 8        Q.  Chiniak?
 9        A.  We've lived there just short of 40 years.
10        Q.  That's how long you've been at that one home?
11        A.  Yeah.
12        Q.  Now, do you know James Wells?
13        A.  Yes.
14        Q.  How do you know Jim?
15        A.  Got acquainted through photography class, as the best I
16   recall, over 20 years ago, and we shared common interests.
17        Q.  Now, he was in one of your classes?
18        A.  I co-taught a -- to the best of my recollection, I
19   co-taught a photography class with another photographer, and he
20   was in that class.
21        Q.  And that's how you met Jim?
22        A.  Yeah, I think so.
23        Q.  And what kind of a relationship do you think you have
24   with him?
25        A.  Very well acquainted with him.  We've seen him through
```

 1    all kinds of activities, from camping together to traveling
 2    together, shared dinners, a lot of photography, a little bit of
 3    hunting, a lot of fishing.
 4        Q.  So you got to know him pretty well over the years?
 5        A.  Yes.
 6        Q.  Now, do you know what a third-party custodian is?
 7        A.  I sure learned recently.
 8        Q.  Well, what have you learned?
 9        A.  We'll be responsible for making sure he complies to the
10    terms.  And if he doesn't, we quickly call probation or the
11    courts or Alaska State Troopers or whoever, if that's a good
12    (indiscernible).
13        Q.  Now, you understand what he's been charged with?
14        A.  Yes.
15        Q.  And you've heard about the charges in the case --
16        A.  Yes.
17        Q.  -- and the indictment against him?
18            If he were to stay with you, do you think you could
19    provide 24-hour coverage as a custodian for him?
20        A.  Yes.
21        Q.  And how would that work?
22        A.  Either my wife or I or the alternate, Victoria, would
23    be there at all times.
24        Q.  And so do you think -- that's something you discussed
25    with your wife?

1      A.  Yes.

2      Q.  That's something you're willing to do?

3      A.  Yeah.  We originally planned to do some traveling this

4  winter, but if we become custodians, we'll forego the travel.

5      Q.  And so you plan to stay in Kodiak up until February of

6  2014 if necessary?

7      A.  If necessary, certainly.

8      Q.  If he's in your custody?

9      A.  Yes.

10     Q.  So describe your responsibilities as a custodian.  What

11  would you have to do?  What is your responsibility?

12     A.  I'm (indiscernible).  Keep an eye on him.  But

13  basically understand what his limitations are in terms of the

14  Court for what he can do and can't do and make sure he doesn't

15  exceed those.

16     Q.  And if he were to violate any of the conditions

17  whatsoever, what do you do then?

18     A.  Call.

19     Q.  Call?

20     A.  The probation office, I think.

21     Q.  Or whoever they instruct you to call?

22     A.  That's right.

23     Q.  Now, part of the plan that is suggested is that there

24  be electronic monitoring at your home.  Do you have a land line?

25     A.  It's a microwave line from town.  But yeah, it's a land

1    line.

2        Q.   And so you've talked to a probation officer about that?

3        A.   Yes.

4        Q.   As something they can set up electronic monitoring at

5    your home?

6        A.   They thought so, yes.  He was going to talk to somebody

7    else, and I haven't heard differently.

8        Q.   And besides that, do you have your own cell phone?

9        A.   Yes.  And my wife has her cell phone as well.

10       Q.   And do you have pretty good connection, connectivity

11   out there where you live on a cell phone?

12       A.   A line of sight to town, five bars.

13       Q.   So you have --

14       A.   It's very good reception.

15       Q.   Do you have any reservations about taking this

16   responsibility?

17       A.   Only being unfamiliar with the process now and wanting

18   to learn as much as I can.  But I think once I understand fully

19   what has to happen, I have no reservations.

20       Q.   And let's say, for example, one of your

21   responsibilities is to report any violations whatsoever.  Would

22   you hesitate at all to --

23       A.   No.

24       Q.   -- call on your friend Mr. Wells if he violated any

25   condition?

 1      A.  None, not for a second, no.

 2      Q.  Even if that meant he would go back to jail, you'd be

 3  willing to do that?

 4      A.  Willing to do it, yeah.  I wouldn't cover for him,

 5  yeah.

 6          MR. CURTNER:  That's all the questions I have for Mr.

 7  Pennington.  Mr. Schroder will have some questions.

 8      A.  Okay.

 9          THE COURT:  Government's cross-examination.

10          MR. SCHRODER:  Thank you, Your Honor.

11                      CROSS-EXAMINATION

12   BY MR SCHRODER:

13      Q.  Mr. Pennington, from your understanding, is there

14  anyplace Mr. Wells is going to be able to go if the Court would

15  approve this proposal?  He's at your house --

16      A.  Oh.

17      Q.  -- anyplace he can go?

18      A.  In the house?

19      Q.  Outside of the house?

20      A.  There is a yard there.

21      Q.  Anytime?  Can he leave your house or leave your

22  property, to your understanding?

23      A.  No, not at all.

24      Q.  Under any condition?

25      A.  Not without a phone call first to the probation office.

1    Q.  So you're willing to live with that, and you have to

2  have -- what's your understanding about somebody having to be

3  with him all the time?

4    A.  He's got to be covered 24/7.

5    Q.  So you and your wife are willing to give up basically

6  any social engagements that you might do together for nine

7  months or more?

8    A.  That's the point of having Victoria to relieve us if we

9  have something we want to do.  And if she's not available, we

10  won't do it.

11    Q.  And you're willing to forego traveling for nine months?

12    A.  Yes.

13    Q.  Do you live year round in Kodiak?

14    A.  We've spent last winter outside as an experiment, six

15  months.

16    Q.  Would that be something you would do again if it wasn't

17  for this?

18    A.  Probably so, yeah.  We've discussed it, but we hadn't

19  made a final decision.

20    Q.  And I know you said you're a hunter?

21    A.  Yeah.

22    Q.  Do you have any hunting trips planned that you would

23  have to forego because of this?

24    A.  No.

25    Q.  You said you're retired.  I know at one point, correct

1  me if I'm wrong, I believe you had -- either you or your wife

2  had a photography studio in town?

3      A.  Yeah.

4      Q.  Do you still have that?

5      A.  Yeah.  She's had it up for sale.  She could give you

6  the details.  But we had a flood there this winter, and we had

7  to fully restore the building and now she's put it up for rent.

8  But we still have the building.  It's either going to be rented

9  or up for sale.  And if she does any photography, it will be

10  outside of that.

11     Q.  Do you ever both work there?

12     A.  At the studio?

13     Q.  At the studio.

14     A.  No.

15     Q.  Now, I want to talk to you for a couple minutes about

16  kind of how this process is going to work, and not as much about

17  what happens when everybody is at your residence, but what is

18  your understanding of how the process would work if Mr. Wells

19  had a hearing?

20     A.  As I understand it, we would make a phone call to make

21  arrangements, and we would take him to town or we would be met

22  by somebody who would fly him to Anchorage.

23     Q.  Do you have any idea who that would be?

24     A.  Something that would emerge.

25     Q.  And could you be the one who escorts him to Anchorage?

1   Is that something you could do?

2       A.  It would be -- it's sort of getting tough to afford the

3   tickets, but I'd certainly be willing to do that if that was

4   what was needed to do.

5       Q.  But nobody has talked to you about that part of the

6   process?

7       A.  Just in vague terms.  It was unsettled at the time.

8       Q.  Now, let's talk for a minute about Chiniak.

9           And I know that you talked to Mr. Curtner about -- you

10  have electrical service?  In addition to phone service, you have

11  electrical service?

12      A.  Yes.

13      Q.  Now, I understand from reading some material from the

14  probation officer, that there have been issues in the past with

15  electrical service?

16      A.  Yeah.

17      Q.  And what are those issues?

18      A.  The power has gone out.  And if I can anticipate your

19  question, the microwave facility from ACS has about a six-hour

20  battery life, and if it's going to extend longer than six hours,

21  for health and safety reasons they put a generator on it.

22          But last winter through a six-day power outage, we

23  didn't lose phone service.

24      Q.  So phone service would continue to work.  What about

25  just pure electrical service into your house?

```
 1        A.  We have generators.

 2        Q.  And any issues with those?

 3        A.  Cost of fuel.

 4        Q.  Now, you and I talked before; correct?

 5        A.  Yes.

 6        Q.  And we talked about this case; is that correct?

 7        A.  Yes.

 8        Q.  And you just mentioned to Mr. Curtner, and I think you

 9   said when we talked, that you know -- seem to know Mr. Wells

10   pretty well, or you think you do?

11        A.  Yes.

12        Q.  Now, I'm going to ask a couple sensitive questions

13   here.

14            Have you ever heard of him being involved with

15   prostitutes?

16        A.  Only this morning.

17        Q.  And how did you find out about that?

18        A.  Nancy told us about it.

19        Q.  And what do you understand about that?

20        A.  It was consensual, and she knew about it.

21        Q.  And how extensive do you understand it to be, or do you

22   understand?

23        A.  I have no idea frequency or anything else at all.  She

24   just told us it had happened.

25        Q.  Does that change your thoughts or your opinions of Mr.
```

1  Wells?

2      A.  It's their business, not ours.

3      Q.  If it was more extensive than just a time or two, would

4  that change your thoughts about it?

5      A.  Again, it's their business, not ours.  It doesn't

6  affect us.

7      Q.  Is that something you condone among your friends?

8      A.  It's their business.

9      Q.  Something you find acceptable?

10     A.  Not for my wife and I.  But again it's the other

11 people's business, it's not ours.

12     Q.  And does it make you question how well you know the

13 man?

14     A.  No.

15     Q.  Does it make you question leaving him alone with

16 anybody who you're close to?

17     A.  No.  He's been alone with my wife a lot.

18     Q.  Now, let's talk for a moment about -- you have a boat;

19 is that correct?

20     A.  Yes.

21     Q.  And when did you acquire that boat?

22     A.  Last spring.  In fact, Jim picked it up for us in

23 Anchorage.

24     Q.  And when was that?  What -- when did he pick it up for

25 you?

1      A.  Mid March.

2      Q.  And where is it now?

3      A.  It's in our driveway.

4      Q.  Where do you access the water with that boat?  How do

5  you put it in the water?

6      A.  It's about a quarter mile from our house down to the

7  beach.  Anytime except low tide or bad weather we launch off the

8  beach.

9      Q.  And after the murders occurred on Kodiak last year,

10 when Mr. Wells was on administrative leave, did you spend some

11 time with him?

12     A.  A lot.

13     Q.  And what did you do during those hours?

14     A.  Fished.  And Jim and I are both fairly quiet, and we

15 talked fishing.

16     Q.  How many times did you say you went fishing?

17     A.  A dozen.

18     Q.  And how often on a, let's just say an average, were you

19 out when you went out?  How many hours?

20     A.  Oh, four to six.  I think it would be -- I don't know

21 that we were ever out there eight hours.

22          MR. SCHRODER:  Your Honor, I have no further

23 questions.

24          THE COURT:  Redirect, if any.

25          MR. CURTNER:  Just a few questions, Your Honor.

1                    DIRECT EXAMINATION

2    BY MR. CURTNER:

3        Q.  So Mr. Pennington, if I can follow up on some of the

4    questions about if Mr. Wells had to leave and travel anyplace.

5        A.  Uh-huh.

6        Q.  Could you explain that a little bit?

7            Is it your understanding that there would have to be

8    prior permission from the probation office or the Court for him

9    to leave your home?

10       A.  Absolutely.

11       Q.  And so you would be making -- you would be willing to

12   make sure that there was those arrangements and permission ahead

13   of time before he left your house at all?

14       A.  Absolutely.  And the only other possibility came up was

15   if there was a medical emergency, we should call first and

16   then --

17       Q.  So you wouldn't let him out of your custody unless

18   there was somebody who was already permitted to take over

19   custody for you?

20       A.  That's right, that's right.

21       Q.  I forgot to ask you -- and I know you submitted a list

22   of the firearms at your residence.

23       A.  Right.

24       Q.  You're willing to remove all those firearms from your

25   residence if Mr. Wells is there?

1          A.  Yeah, whatever it takes to comply, the ammunition, the

2     reloading equipment, whatever.

3          Q.  How would you do that?  Where would you take it?

4          A.  Use a commercial storage facility in town.

5          Q.  So you're willing to take everything in your house that

6     might be firearms or ammunition and put them in storage away

7     from your home?

8          A.  Certainly.

9          Q.  And how far would that be from your home?

10         A.  Thirty-five miles.

11         Q.  Now, as I understand, you've dealt with electrical

12    issues where you live from time to time?

13         A.  Yep.

14         Q.  And you have your own generators still?

15         A.  We have two.

16         Q.  Two generators?

17         A.  We have a large run for running the freezers and we

18    have a small one for household heat and lighting.

19         Q.  So you -- and your cell phones were going to be working

20    regardless of anything with the --

21         A.  Unless there was a loss of power in town, because we're

22    getting signal from town.  And with our household generator, we

23    could recharge them easily.

24         Q.  Now, how big is the boat you have?

25         A.  Twenty feet.

1      Q.  It's a fishing boat?

2      A.  Yeah.  It's a 20-foot boat with a 50 horse motor, and

3  maximum speed of about 25 miles an hour.

4      Q.  So what kind of range would that have just on a tank of

5  gas?

6      A.  At full speed it's supposed to burn, I think, six

7  gallons an hour, and it's got a 24-gallon tank.  So four hours,

8  a hundred miles.

9      Q.  So do you think you could take it to the mainland or

10  anyplace?

11      A.  I don't think so.  Not at full speed.  It's flat

12  bottomed.  You could not sustain full speed.

13      Q.  So it's not made to go anywhere except maybe fishing

14  around where you live?

15      A.  It's sold and a lake and riverboat, but we use it in

16  the ocean.  But the manufacturer characterizes it as a lake and

17  riverboat.

18          MR. CURTNER:  That's all the questions I have, Your

19  Honor.

20          MR. SCHRODER:  Just one more on that last point, Your

21  Honor.

22                    RECROSS-EXAMINATION

23   BY MR. SCHRODER:

24      Q.  Looking at some pictures the other day of your house,

25  and I saw a number of gas fuel tanks over there.

1    A.  Yeah.

2    Q.  Do you own fuel tanks?

3    A.  Yes.

4    Q.  Could those fuel tanks be used to extend the range of

5  the boat?

6    A.  If they had anything in them.

7        MR. SCHRODER:  Thank you, Your Honor.

8        MR. CURTNER:  Nothing further.

9        THE COURT:  You may step down.

10    A.  Thank you.

11  (Witness excused)

12        THE COURT:  Next witness.

13        MR. CURTNER:  Yes, Your Honor.  Mrs. Janet Pennington,

14  please.

15     JANET ROBERTA PENNINGTON, DEFENDANT WITNESS, SWORN

16        THE CLERK:  Thank you, please have a seat.

17        And for the record, please state and spell your full

18  name.

19    A.  My full name is Janet Roberta Pennington.  Janet,

20  J-a-n-e-t, Roberta, R-o-b-e-r-t-a, Pennington,

21  P-e-n-n-i-n-g-t-o-n.

22        THE CLERK:  Okay.  And in what city and state do you

23  reside?

24    A.  Kodiak, Alaska.

25        THE CLERK:  Thank you.

DIRECT EXAMINATION

BY MR. CURTNER:

Q.  Mrs. Pennington, you're the wife to Henry Pennington?

A.  Yes, sir.

Q.  And so you heard his testimony today?

A.  Yes, sir.

Q.  And you live in the same home in Chiniak?

A.  Yes.

Q.  What is your background, Mrs. Pennington?  What type of work have you done since you've been living in Kodiak?

A.  Originally I did work within offices.  I worked at King Crab, I worked at -- which is a cannery; I worked at Sutliff's in their office, which they are a hardware store; I ran a book store; I worked 17 years for the Kodiak Island Borough in their mental health center.  I was more or less the main administrative office there.  I supervised personnel.  I wrote grants.  I did the number crunching.

And then in like 1991 or '92 I started a photography business that I ran on the side.  And then when I retired from the borough in '97, I worked at it full time.

I closed that business last October, and my intent was to dabble a little here and there just because I like taking pictures of people, but I don't have a full-time business at this time.  And as Hank told you, my studio is currently still being put back together.  It's an empty building.  All the

1    things that I had in there, we've either got in our house or

2    I've gotten rid of them.

3        Q.  So how many years total have you lived on the island of

4    Kodiak?

5        A.  Since 1976.  It's 40 plus.

6        Q.  And during that time, were you employed outside of the

7    home most of that time, all the time?

8        A.  All except the last 16, 17 years.

9        Q.  Did you raise children at that home?

10       A.  Yes.

11       Q.  And how many children did you and Mr. Pennington have?

12       A.  Two.

13       Q.  And so you raised them in that home and now they have

14   gone and had their own lives?

15       A.  Yes.  I have one daughter left.  I lost one in a car

16   accident.  We did actually.

17       Q.  So you've been retired since?

18       A.  '97, July '97.

19       Q.  Now, how do you know Jim Wells?

20       A.  Through photography originally.  I mean, that was the

21   original contact, through the classes that Hank and I helped

22   teach.

23           And then we did a lot of outside activity, photo shoots

24   around the island and Denali Park.  We've traveled with them in

25   the Southwest.  We hunt with them.  We have meals with them.

1  He's helped me with projects at the studio.

2      Q.  So you met Mr. Wells first at the class.  Were you

3  teaching that with your husband, or helping with it?

4      A.  I may have actually kind of met him because Hank and he

5  worked together.  I mean, I wasn't really teaching the class at

6  that point in time.  I did at a later point in time, but I'm not

7  sure that I did at that time.

8      Q.  But you met Mr. Wells about the same time as your

9  husband did?

10     A.  Yes.

11     Q.  So you've traveled with Mr. Wells and his wife over the

12  years?

13     A.  Uh-huh.

14     Q.  Got to know the family pretty well?

15     A.  Uh-huh.

16     Q.  Do you know their children?

17     A.  Yes.

18     Q.  Get to know their children?

19     A.  Yes.

20     Q.  So you understand the responsibilities of the

21  third-party custodian?

22     A.  Yes, sir.

23     Q.  You've discussed that with your husband?

24     A.  Yes.

25     Q.  I'm sure this is something you've given a lot of -- did

1    a lot of thinking about and discussion with your husband about

2    assuming these responsibilities?

3        A.  Yes.

4        Q.  And is this something you're willing to do?

5        A.  Yes.

6        Q.  You understand -- do you understand the responsibility

7    to a third-party custodian just as your husband had described?

8        A.  Yes.  24/7, and if there is any violation of the terms,

9    that we immediately get a hold of somebody.

10       Q.  And is there -- and you're willing to do that?

11       A.  Yes, sir.

12       Q.  Do you understand that if there was any violation at

13   all, you'd have to report it, and that means that Mr. Wells

14   would go back to jail?

15       A.  Yes, I know that.

16       Q.  And you wouldn't have any reservation at all to do

17   that?

18       A.  No.  No, I mean, that's the promise we're making to the

19   Court.

20           MR. CURTNER:  I guess that's all the questions.  Mr.

21   Schroder may have some.

22                        CROSS-EXAMINATION

23    BY MR. SCHRODER:

24       Q.  Good afternoon, ma'am.

25       A.  Good afternoon.

1     Q.  And although I have talked to your husband, you and I

2  have never spoken?

3     A.  That's correct.

4     Q.  And I'm going to ask you many of the same kind of

5  questions.

6          What's your understanding of how -- must Mr. Wells --

7  is your understanding, he's restricted to you at home, is

8  that -- understand this proposal?

9     A.  That is correct.

10    Q.  And what are the circumstances that you understand he

11 could leave your home?

12    A.  Only if there is a request from the court or probation

13 officer to take him to a hearing or something, or if there were

14 medical issues, all of which we would need to notify someone of.

15    Q.  And it sounds like you're a very active person?

16    A.  Yeah.

17    Q.  I hear about all these things you were just talking

18 about that you do.

19    A.  Uh-huh.

20    Q.  How is this going to curtail your life?

21    A.  Well, for, you know, six, ten months, unless Veroni can

22 come and be a relief, we will do them independently, my husband

23 and I.

24    Q.  Did you have any plans coming up for the future, the

25 next nine or ten months, that you're going to have to give up?

1    A.  Well, we've discussed them.  I mean, we're kind of in a

2  point in time in our life where we're transitioning.  And we did

3  spend six months Outside this last year, and we had discussed

4  doing that.  And that's probably the biggest piece.  But it's a

5  small price to pay, and we're willing to do that.

6    Q.  Do you have grandchildren?

7    A.  Yes.

8    Q.  And where do they live?

9    A.  Currently D.C.

10    Q.  And would this prevent you from seeing your

11  grandchildren?

12    A.  Yes, sir.

13    Q.  Now, I want to also talk to you about how, again, the

14  process will work.  We went over that with your husband, so I'll

15  be brief.

16        How would you -- what do you understand would happen if

17  Mr. Wells had a hearing?  What would your responsibility be?

18    A.  Well, my understanding is that, in coordination with

19  the court and probably his defense, that arrangements would be

20  made to get -- to drive Jim to town and he will go by plane back

21  to Anchorage.  And it had been discussed that the defending

22  attorney would help with that process of getting him to

23  Anchorage.  But we're available to do that.

24    Q.  And now let me ask you again, and I suspect the answer

25  is going to be the same, but I'll ask you about this sensitive

1    issue.

2          Are you aware that Mr. Wells has been involved with

3    prostitutes?

4        A.  Because it was discussed this morning, yes, sir.

5        Q.  And again, what is your understanding of the scope of

6    that?

7        A.  I don't have an understanding of that.

8        Q.  Is that something that you believe is consistent with

9    the Jim Wells you knew before you heard that information?

10       A.  It's not anything I have experience with, sir.

11       Q.  But I don't think that was exactly the question.

12       A.  That's the only answer I can give you.

13       Q.  So it's not inconsistent with the Jim Wells you thought

14   you knew?

15       A.  I knew nothing about it.

16       Q.  What do you think today now that you have that -- I

17   understand before you learned the information it wasn't part of

18   your scope of knowledge of Mr. Wells, but what about today now

19   that you know it?

20       A.  It doesn't change my opinion of Mr. Wells.

21       Q.  If you were to find out it was a broader scope, would

22   that change your opinion, more to it than just --

23       A.  It has not affected me in the past.  I don't anticipate

24   it will in the future.

25       Q.  In other situations, or this situation?  You said "in

 1  the past."

 2      A.  In this situation.

 3      Q.  Does it concern you that he was involved in what is

 4  potentially illegal activity?

 5      A.  Those were his personal affairs.  I'm not part of that.

 6          MR. SCHRODER:  No further questions, Your Honor.

 7          THE COURT:  Mr. Curtner.

 8          MR. CURTNER:  I don't have anything else for Mrs.

 9  Pennington.

10          THE COURT:  You may step down.

11      A.  Thank you.

12   (Witness excused)

13          MR. CURTNER:  Your Honor, we would next call Victoria

14  Geyer.

15          THE CLERK:  Please raises your right hand.

16        VICTORIA LYNNE GEYER, DEFENDANT'S WITNESS, SWORN

17          THE CLERK:  Thank you, please have a seat.

18          For the record, please state and spell your full name.

19      A.  Victoria Lynne Geyer.  V-i-c-t-o-r-i-a L-y-n-n-e

20  G-e-y-e-r.

21          THE CLERK:  And what city and state do you reside?

22      A.  Kodiak, Alaska.

23                      DIRECT EXAMINATION

24   BY MR. CURTNER:

25      Q.  Ms. Geyer, how long have you lived on Kodiak?

1    A.  Since August of 2011.

2    Q.  And what do you do on that island?

3    A.  I had a teaching position last year, and since then

4  I've been teaching private violin and tutoring English and

5  other --

6    Q.  Where did you live before you came to Kodiak?

7    A.  I was in Kwethluk for three years, and based in

8  Anchorage while I was looking for work.

9    Q.  And before that, where did you --

10   A.  Michigan.

11   Q.  You're from Michigan originally?

12   A.  Yes.

13   Q.  And since you've been on Kodiak Island, have you gotten

14  a chance to know the Wells family?

15   A.  Just Nancy.

16   Q.  Have you ever met Jim Wells?

17   A.  No.  Actually today is the first time I've ever seen

18  him.

19   Q.  And how do you know Nancy Wells?

20   A.  She started coming to my church this past year.

21   Q.  What church is that?

22   A.  Kodiak Christian Fellowship.

23   Q.  So did you get to know her fairly well there?

24   A.  Friendly acquaintance I would say.

25   Q.  Now, where are you living now?

1      A.   I'm currently living in the Wells' house.

2      Q.   Why is that?

3      A.   Nancy asked if I wouldn't mind moving out to give her

4  human contact, keep her company so she's not there all alone.

5  And she mentioned she wanted to travel a little bit this year,

6  see her granddaughter.  She's got another grandchild coming.

7  She wanted to see that baby but not leave the house unattended.

8      Q.   So she asked you to come live with her?

9      A.   Yes.

10      Q.   And that's so that she could do some traveling without

11  leaving the house unattended?

12      A.   Uh-huh, correct.

13      Q.   Did she also feel -- did you also feel like she needed

14  some moral support since she was living there by herself?

15      A.   I do feel that, yes.

16      Q.   Now, it's been discussed that you might be a

17  third-party custodian in this case.

18      A.   Uh-huh.

19      Q.   Is it fair to say you would have a lesser role in that

20  regard than --

21      A.   Correct.

22      Q.   -- than the Penningtons?

23      A.   Correct.

24      Q.   Explain how you see your role as a third-party

25  custodian.

1      A.  I see my role as when the Penningtons have something

2   that they absolutely need to do, that I would step in and take

3   over at that point, but it would be out at their house.

4      Q.  And if you did step in, then what would that be like?

5   Would you be at their house?

6      A.  Correct.

7      Q.  And you would be with Jim all the time that you were

8   with him?

9      A.  Correct.

10     Q.  That you were on -- and would that be something that

11  you would have to make arrangements for ahead of time so it

12  wouldn't be on a -- any kind of a ad hoc basis or --

13     A.  I would have to have some notice, yes.

14     Q.  Now, day-to-day right now in your teaching business, do

15  you go teach out of the Wells' home or do you go to other

16  people's homes to teach?

17     A.  I go to my student's houses.

18     Q.  And how often do you do that?

19     A.  Almost every day of the week.

20     Q.  During the week you go to students' home and you give

21  them music lessons?

22     A.  Yes.

23     Q.  But if the Penningtons asked you to step in for them as

24  a third-party custodian in their home, you'd be willing to do

25  that?

```
 1      A.  Yes.
 2      Q.  And you understand all the responsibilities just as
 3  you'd have the same as the Pennington's would?
 4      A.  Yes.
 5      Q.  Would you be willing to report any violation --
 6      A.  Yes.
 7      Q.  -- if you saw any?
 8      A.  Yes.
 9      Q.  And that would be calling --
10      A.  Calling the correct person.
11      Q.  Even though that meant Mr. Wells going to jail?
12      A.  Yes.
13      Q.  You'd be willing to do that?
14      A.  Yes.
15      Q.  Do you have any reservations about this type of role?
16      A.  No.
17      Q.  Have you ever done this before?
18      A.  No, I have not.
19      Q.  But you're willing to do this in this particular case?
20      A.  Yes.
21          MR. CURTNER:  All right, thank you.  Mr. Schroder will
22  have some questions for you.
23                        CROSS-EXAMINATION
24   BY MR. SCHRODER:
25      Q.  Good afternoon, Ms. Geyer.
```

1    A. Good afternoon.

2    Q. You talked about how you live with Nancy Wells. Do you

3 pay rent to Ms. Wells?

4    A. I do not.

5    Q. Now, the value of music teachers, in my opinion, is

6 very high, but it's not exactly a job where you're going to get

7 rich.

8    A. Correct.

9    Q. So is it helpful, the fact that you have this -- you're

10 able to live with her without paying rent; does that help your

11 budget?

12    A. It does.

13    Q. And how did it happen that you were called to be asked

14 to be a third-party custodian?

15    A. It was just mentioned in passing. And when offered the

16 paperwork, I said okay.

17    Q. And you said you'd never met Mr. Wells?

18    A. No, I have not.

19    Q. Do you understand what he's been charged with?

20    A. I do.

21    Q. And have you spoken to anybody besides Mrs. Wells or

22 friends of Mrs. -- Mr. Wells potentially, about what kind of

23 person he is --

24    A. No.

25    Q. -- before agreeing to do this?

1      A.  No.

2      Q.  Given the gravity of those charges, do you think that

3  probably would have been a wise idea?

4      A.  I saw his picture on the wall, and from the

5  photographs, he does not strike me as somebody -- it was a very

6  apparent perception that I received from the pictures.

7      Q.  So just based on photographs, you'd be willing to put

8  yourself in a position where you're alone with this person who

9  is charged with multiple homicides --

10     A.  Yes.

11     Q.  -- thirty-five miles from law enforcement officers in

12 Kodiak?

13     A.  Yes.

14     Q.  Now, you talked about your role as being the fill-in,

15 basically, when needed by the Penningtons, if so.

16     A.  Yes.

17     Q.  Have you thought about how -- do you think you'd be

18 called upon to do that for a day at a time, multiple days at a

19 time?  What's been the discussion how that might go?

20     A.  There hasn't actually been any discussion about finer

21 details.

22     Q.  And how would that affect your teaching jobs, your

23 teaching lessons, if they needed you to come and spend multiple

24 days at the house?

25     A.  I could make arrangements.

1      Q.  Do you have family -- how about travel, do you travel

2  much?

3      A.  Not since I got to Kodiak.

4      Q.  And do you have family outside of Alaska?

5      A.  In Michigan.

6      Q.  And do you go visit them, or do you have plans to go

7  visit them?

8      A.  I have no plans currently.  I have not since I got to

9  Kodiak.

10     Q.  And you're willing to forego any travel for the next

11 nine months?

12     A.  Yes.

13     Q.  Now, what first brought you to Kodiak?

14     A.  A teaching job.

15     Q.  And you said you had a teaching position.  Where was

16 that?

17     A.  At the Kodiak Middle School.

18     Q.  And why aren't you there anymore?

19     A.  I was told it was because the budget cut backs last

20 spring.  They had to cut seven positions, I was a brand new

21 arrival.  I was one of them.

22     Q.  You said you were told.  Is that what you believe the

23 reason was?

24     A.  That's what I was told.

25     Q.  Is there another reason?

1     A.  I believe there were educational differences.

2     Q.  What do you mean by "educational differences"?

3     A.  I don't think that my superior understood some of the

4  things I was doing in the classroom.

5     Q.  And what kind of things.

6     A.  Using Love and Logic for a classroom discipline

7  program.

8     Q.  What does that require you to do for disciplinary

9  purposes, or what does that guide you to do?

10    A.  You offer the student a choice, both of choices -- both

11 of which choices are acceptable to the teacher, but where the

12 student has a little bit of control and starts to take

13 responsibility for their actions.

14    Q.  Is that program consistent with what the Kodiak school

15 system requires?  Do they accept that program?

16    A.  Yes, they do.

17    Q.  Were you ever told not to do that?

18    A.  No.

19    Q.  How did you understand that maybe that was your

20 superior didn't like you?

21    A.  Because in May he told me he didn't quite understand

22 it, until he took a seminar at the end of April, and then he

23 understood it.  But he had already made his decision before

24 that.

25    Q.  Ah, okay.

1          Now, I'm going to ask you the same sensitive question

2    that I have asked Mr. and Mrs. Pennington.

3          Have you become aware that Mr. Wells was involved with

4    prostitutes?

5      A.   I found out this morning.

6      Q.   And do you have any knowledge of the scope of that?

7      A.   No.

8      Q.   How does that make you -- how does that change your

9    calculus of agreeing to do this and agreeing to spend time alone

10   with the man?

11     A.   That's their personal business.

12     Q.   What if you found out it was more extensive?

13     A.   That's their personal business.

14     Q.   Does it concern you that it's illegal?

15     A.   Again, that's something that I'm not responsible for.

16   That would be --

17     Q.   Do you consider Nancy Wells to be a friend?

18     A.   I do.

19     Q.   And has that friendship grown since you moved in with

20   her?

21     A.   It has.

22     Q.   And you understand -- you've said this to Mr. Curtner,

23   that you understand that your role as a third-party custodian

24   could potentially be to turn in Mr. Wells if he violated one of

25   the conditions of his release?

```
 1        A.  Correct.
 2        Q.  And that -- do you understand that could lead to him
 3   returning to jail?
 4        A.  I do.
 5        Q.  How do you think that would affect your relationship
 6   with Nancy Wells?
 7        A.  I think it would not affect that relationship.  I think
 8   if he actually violated one of the conditions, that she would
 9   see that was very clear and it would stand.
10        Q.  Does it concern you that you might lose your -- the
11   place you live if you were to do something like that?
12        A.  No.
13             MR. SCHRODER:  No further questions, Your Honor.
14             MR. CURTNER:  I don't have any further questions for
15   Ms. Geyer.
16             THE COURT:  You may step down.
17    (Witness excused)
18             MR. CURTNER:  We have no further witnesses to present,
19   Your Honor.
20             THE COURT:  Does the government have any evidence to
21   present?
22             MR. SCHRODER:  We do, Your Honor.  The government
23   calls Special Agent Denise Andersen.
24             DENISE ANDERSEN, PLAINTIFF'S WITNESS, SWORN
25             THE CLERK:  Thank you, please have a seat.
```

1                      DIRECT EXAMINATION

2    BY MR. SCHRODER:

3       Q.  Special Agent Andersen --

4            THE CLERK:  One moment.  For the record, can you

5    please state and spell your full name.

6       A.  My name is Denise Andersen.  D-e-n-i-s-e

7    A-n-d-e-r-s-e-n.

8            THE CLERK:  Thank you.

9    BY MR. SCHRODER:

10      Q.  Special Agent Andersen, who do you work for?

11      A.  I work for the United States Coast Guard Investigative

12   Service.

13      Q.  And where are you -- what do you do for them?

14      A.  I'm a special agent out of our Anchorage office.

15      Q.  And what are you currently assigned -- or have you been

16   assigned as one of your duties to work on the investigation of

17   the Kodiak homicide from April 12th, 2012?

18      A.  Yes, I have.

19      Q.  Now, as part of your investigation, have you looked

20   into Mr. Wells' use of prostitutes?

21      A.  I have.

22      Q.  And what led to that investigation?  What was the

23   genesis of that part of the investigation?

24      A.  Initially it was based on a consensual review of his

25   cell phone, which found a few phone numbers that were identified

1  to belong to escorts, prostitutes, erotic dancers.

2      Q.  And was there any other information you found of a

3  similar vein in other places?

4      A.  Yes, sir, based on subpoenas of the telephone calls.

5      Q.  And how about other documents with phone numbers

6  related from Mr. Wells?

7      A.  We also found approximately nine pages of written names

8  with phone numbers and other notes alongside them on his work

9  desk.

10     Q.  And that was on his desk at COMMSTA?

11     A.  At COMMSTA, yes, sir.

12     Q.  And did you generally try to identify those numbers and

13 what kind of businesses they were attached to?

14     A.  We did.

15     Q.  You and other agents?

16     A.  Yes, sir, utilizing a basic search on the computer.  I

17 used some law enforcement database just to look up a telephone

18 number.

19     Q.  And what kind of -- and I'm going to keep this fairly

20 general.  So what kind of businesses did those numbers come back

21 to?

22     A.  Erotic dancers, companions, people basically selling

23 their time.  And there would be photos of the women sometimes on

24 the web pages.

25     Q.  And you talked about getting phone numbers, records of

1    phone numbers.  Did you cross-check any calls from Mr. Wells to

2    any of those numbers?

3        A.  Yes, sir.

4        Q.  And did you find numbers that he had called?

5        A.  Yes.

6        Q.  Were there any in Alaska?

7        A.  Yes.  Anchorage.

8        Q.  And where?

9        A.  In the local area here in Anchorage.

10       Q.  Did you follow up, you or other agents, follow up with

11   any of those numbers and personally talk to any of the -- I take

12   it they were women?

13       A.  Yes.

14       Q.  Talk to any of them personally?

15       A.  Yes, I did.

16       Q.  And what did the woman that you talked to, what did she

17   say her business was?

18       A.  She said she was a companion, also a dancer.  And she

19   was paid $200 an hour.  And she would meet with Mr. Wells, and

20   she identified him from a photo, and said that she would meet

21   with him in return for money.

22       Q.  And how many times did she say she met with him?

23       A.  She said she had known him for about 12 or 13 months,

24   and that he had been to her apartment over on Spenard, I believe

25   she said three to four times.  And she [sic] had recently come

1  to his -- her new place on Muldoon.

2       Q.  What was the date of your interview?

3       A.  September 17th of 2012.

4       Q.  And did she indicate to you that the trips where she

5  met with Mr. Wells, what he was doing on those trips, why he was

6  in Anchorage?

7       A.  She knew that --

8       Q.  -- in any of the occasions?

9       A.  She did know that he was coming to VA appointments over

10 in Anchorage, and that she had recently -- he had recently come

11 within the past three days to a week of us meeting with her for

12 a VA appointment.

13      Q.  This was on the 17th you said?

14      A.  Yes.

15      Q.  Now, were there any other women specifically

16 interviewed by agents?

17      A.  There were.

18      Q.  And was that by you?

19      A.  That was not by me.

20      Q.  And did they also identify Mr. Wells?

21      A.  She did by -- with a photo.

22      Q.  And how many times did she indicate that she had met

23 with Mr. Wells?

24      A.  I believe three to four times.

25      Q.  Now, I want to talk about a different topic.

 1          As part of the investigation, were search warrants

 2    served on Mr. Wells' property?

 3        A.  Yes.

 4        Q.  And were you personally involved in any of those

 5    searches?

 6        A.  Yes.

 7        Q.  Were you involved in all of them?

 8        A.  No.

 9        Q.  And have you read reports and spoken to the agents that

10    were involved in the other searches?

11        A.  Yes, I have.

12        Q.  Now, in the course of those searches, did it come to

13    light that there was property at Mr. Wells' residence that was

14    not his?

15        A.  Yes.

16        Q.  And whose was it?

17        A.  It belonged to the U.S. Coast Guard, or COMMSTA Kodiak.

18        Q.  Now, was there a significant amount?

19        A.  There was.

20        Q.  And what types of items did the agents find?

21        A.  There were snowblowers, chainsaws, weed eaters, a -- I

22    can't remember the name of it now.

23        Q.  I'm going to hand you some photographs.

24        A.  Miscellaneous tools and saws.

25          MR. SCHRODER:  May I approach, Your Honor?

1              THE COURT:  Yes.

2              MR. SCHRODER:  Marked as government Exhibits 1 and 2.

3    Would the Court like a copy now?

4              THE COURT:  Only if there are extra copies.

5              MR. SCHRODER:  There are extra copies.

6    BY MR. SCHRODER:

7        Q.  I'm going to ask you, are you familiar with this photo?

8        A.  I am.

9        Q.  And how are you familiar with it?

10       A.  I've reviewed the reports and reviewed the photos.

11       Q.  And where were these photos taken?

12       A.  I believe these were taken of the search warrant of the

13   house.  I can't really tell where it's exactly located right

14   now.

15       Q.  And what were the dates of the photographs?  When were

16   they taken?

17       A.  April 14th and 15th, I believe.

18       Q.  So soon after the homicides?

19       A.  Yes.  Yes, sir.

20       Q.  Now, what do these photos --

21             MR. SCHRODER:  Your Honor, I would move for admission

22   of 1 and 2.

23             MR. CURTNER:  No objection.

24             THE COURT:  Admitted.

25                       PLAINTIFF'S EXHIBIT 1 and 2 ADMITTED

1   BY MR. SCHRODER:

2       Q.  What do these photos show?

3       A.  The first one, No. 1 is a black case, and it's labeled

4   USCG COMMSTA.

5           And then the second one is that same case opened, and

6   it appears to be an impact wrench.  That's No. 2.

7       Q.  But on the first picture, photo No. 1, it says "COMMSTA

8   Kodiak"?

9       A.  Yes.

10      Q.  "USCG COMMSTA"?

11      A.  "USCG COMMSTA."

12      Q.  Can you hand those back to Mr. Allison.

13          And I'm going to hand you now what's been marked as

14  government Exhibits 3 and 4.

15          MR. SCHRODER:  Hand a copy to the Court.

16  BY MR. SCHRODER:

17      Q.  Are you familiar with this photograph?

18      A.  I am.

19      Q.  And how are you familiar with it?

20      A.  This is also a photo of a projector that was taken in

21  his house during the search warrant.

22      Q.  Now, I want to direct you especially to photo No. 4.

23      A.  Okay.

24      Q.  In the middle of the photo, in the middle of the

25  projector, is there a label?

1      A.  There is.

2      Q.  And what does the label say?

3      A.  "Property of U.S. Coast Guard Communications Station."

4          MR. SCHRODER:  Your Honor, I move for admission of No.

5   3 and 4.

6          MR. CURTNER:  No objection.

7          THE COURT:  They are admitted for this hearing.

8                      PLAINTIFF'S EXHIBITS 3 and 4 ADMITTED

9          MR. SCHRODER:  I'm going to hand the witness what's

10  been marked as government Exhibit No. 5.

11   BY MR. SCHRODER:

12     Q.  Is this part of the same photo set --

13     A.  Yes.

14     Q.  -- taken during the same search?

15     A.  Yes.

16     Q.  I'm just trying to move things along here a little bit.

17          MR. SCHRODER:  So I move for admission of No. 5, Your

18  Honor.

19          MR. CURTNER:  No objection.

20          THE COURT:  What does 5 show?

21          MR. SCHRODER:  5 shows -- I'll ask, Your Honor.

22   BY MR. SCHRODER:

23     Q.  What does 5 show?

24     A.  5 shows a ladder, an extension ladder.  And then behind

25  that are two stainless steel ladders that were identified as

1    being unique to COMMSTA Kodiak.  They are used in the -- for the

2    towers.

3              THE COURT:  5 is admitted.

4                                    PLAINTIFF'S EXHIBIT 5 ADMITTED

5              MR. SCHRODER:  Your Honor, next I'm going to hand the

6    witness what's been marked as Government Exhibit 5 -- or 6.

7     BY MR. SCHRODER:

8        Q.  And ask you, are you familiar with this photo?

9        A.  Yes, I am.

10       Q.  And how are you familiar with it?

11       A.  These are also photos that were taken on the same date

12   during the same search warrant.

13       Q.  And what does this photo depict?

14       A.  Three U.S. Coast Guard Mustang suits.

15       Q.  What is a Mustang suit?

16       A.  It's a protection suit for the weather where the

17   fishermen will put on if they have to go overboard or -- it's a

18   life-saving measure of sorts.

19       Q.  Do Coast Guard crews wear those as well?

20       A.  They do.

21             MR. SCHRODER:  Your Honor, move for admission of No.

22   6.

23             MR. CURTNER:  No objection.

24             THE COURT:  Admitted.

25                                    PLAINTIFF'S EXHIBIT 6 ADMITTED

1          MR. SCHRODER:  Your Honor, I'm going to -- may I

2   approach the witness?

3          THE COURT:  Yes.

4    BY MR. SCHRODER:

5      Q.  I'm going to hand you what's been marked as

6   government's Exhibit 7 and 8.  Are you familiar with these, this

7   exhibit?

8      A.  Yes, sir.

9      Q.  And what is it?

10     A.  They are photos taken underneath Mr. Wells' residence,

11  storage.

12     Q.  What do those photographs depict?

13     A.  Clearly in Exhibit No. 7 there is four chainsaws.  And

14  then when you look at No. 8, it also has the two, call them weed

15  whackers or weed eaters.

16         MR. SCHRODER:  Move for admission of No. 8.

17         MR. CURTNER:  No objection.

18         THE COURT:  7 and 8 are admitted.

19         MR. SCHRODER:  7 and 8, I'm sorry, sorry.

20                    PLAINTIFF'S EXHIBITS 7 and 8 ADMITTED

21   BY MR. SCHRODER:

22     Q.  And just for clarification, have officials from COMMSTA

23  Kodiak looked at those photos?

24     A.  All of these photos they have looked at.

25     Q.  And what have they said about those items in the

1  photos?

2      A.  That they are consistent with the same items that

3  COMMSTA Kodiak has and some of which are missing.

4          MR. SCHRODER:  Two more sets, Your Honor, and we'll be

5  done with this.

6   BY MR. SCHRODER:

7      Q.  I'm going to hand you what's been marked as government

8  Exhibits 9 and 10.

9          Are you familiar with this exhibit?

10     A.  Yes, I am.

11     Q.  And what is it?

12     A.  These are photos taken, I believe, underneath his

13  residence or in his garage.

14     Q.  And what do they depict?

15     A.  They are boxes of fluorescent tube lighting.

16     Q.  And were they taken as part of that same search

17  warrant?

18     A.  Yes, sir.

19     Q.  And what does -- let's focus on No. 10.  What is

20  picture No. 10, Exhibit No. 10?

21     A.  10 is an upclose picture of one of the boxes with it

22  labeled "USCG Kodiak."

23          MR. SCHRODER:  Move for admission of No. 10, Your

24  Honor, 9 and 10.

25          MR. CURTNER:  No objection.

 1              THE COURT:  9 and 10 are admitted.

 2                          PLAINTIFF'S EXHIBITS 9 and 10 ADMITTED

 3              MR. SCHRODER:  And one last one, Your Honor.

 4       BY MR. SCHRODER:

 5         Q.  What's been marked as government Exhibit No. 11, can I

 6       ask you, are you familiar with that photo?

 7         A.  Yes, I am.

 8         Q.  And how are you familiar with it?

 9         A.  They are photos that were taken on the same day of the

10       search warrant.

11         Q.  And we see what appear to be two orange items in the

12       middle.  What are those?

13         A.  Yes, sir.  Both of them are snowblowers.

14         Q.  And have you examined those snowblowers or other

15       depictions of those snowblowers or talked --

16         A.  Yes, I have.

17         Q.  -- to agents who have seen those snowblowers?

18         A.  Yes, I have.

19         Q.  Is there any indication on those who they belong to?

20         A.  There is an indication on one of them.  It has black

21       marker that says "USCG Port Clarence."  And then the other one

22       that has a U.S. Coast Guard property sticker on it.

23         Q.  And what is -- what was Port Clarence?  What kind of

24       Coast Guard operations?

25         A.  It was an isolated duty station in Port Clarence where

 1  they had antennas up and they would do communications.

 2      Q.  And is that facility still open?

 3      A.  It is not.

 4          MR. SCHRODER:  Move for admission of No. 11, Your

 5  Honor.

 6          MR. CURTNER:  No objection.

 7          THE COURT:  Mr. 11 is admitted.

 8                      PLAINTIFF'S EXHIBIT 11 ADMITTED

 9   BY MR. SCHRODER:

10      Q.  Now again, Special Agent Andersen, kind of shifting

11  gears a bit here.

12          In your experience in the Coast Guard, have you had

13  occasion to review personnel records?

14      A.  I have.

15      Q.  Have you reviewed both civilian and military records?

16      A.  I have.

17      Q.  And have you reviewed parts or -- all of or parts of

18  Mr. Wells' civilian personnel record?

19      A.  Yes, I have.

20      Q.  Now, I'm going to hand you what's been marked as

21  government Exhibit No. 12.

22          Now, did you find any disciplinary documents in Mr.

23  Wells' file?

24      A.  In this record, I did.

25      Q.  And what is Exhibit No. 12?

1      A.  Exhibit No. 12 is a letter of reprimand to Mr. James

2  Wells dated June 8th of 2000.  And it's basically for unethical

3  behavior in that he was both employed by the Coast Guard and a

4  contractor of the Coast Guard to provide services.  So he was

5  basically working for the contractor that was providing services

6  to the Coast Guard which was deemed unethical.  You cannot do

7  that.

8      Q.  And was there kind of an end note to that --

9      A.  There is.

10     Q.  -- technically about how the situation ended?  What was

11  that?

12     A.  The contractor advised the Coast Guard that Mr. Wells

13  stated he would not approve the work for payment until he was

14  paid for his work from that contractor.

15          MR. SCHRODER:  Your Honor, government moves for

16  admission of Exhibit 12.

17          MR. CURTNER:  No objection, Your Honor.

18          THE COURT:  Admitted.

19                          PLAINTIFF'S EXHIBIT 12 ADMITTED

20   BY MR. SCHRODER:

21     Q.  I'm going to hand you what's been marked as government

22  Exhibit 13.

23          Are you familiar with this document?

24     A.  I am.

25     Q.  And how are you familiar with it?

1      A.  I reviewed it.

2      Q.  And what does -- what is it?

3      A.  It's a letter of reprimand to Mr. James Wells dated

4  December 10th of 2003.  And it is reference to -- there was an

5  incident where he had to go to Attu Island, and his senior

6  personnel told him not to bring back the hut, and he disobeyed

7  their order and brought back the hut on the C-130.

8      Q.  So it does appear he was given an order?

9      A.  He was given an order not to bring the hut back and he

10  violated that.

11          MR. SCHRODER:  Your Honor, government moves for

12  admission of Exhibit No. 13.

13          MR. CURTNER:  No objection.

14          THE COURT:  13 is admitted.

15                      PLAINTIFF'S EXHIBIT 13 ADMITTED

16          MR. SCHRODER:  I'm going to hand the witness what's

17  been marked as government Exhibit No. 14.

18  BY MR. SCHRODER:

19      Q.  I'm going to ask you, what is this document?

20      A.  This is a memorandum for record dated November 2nd of

21  2011 given to Mr. James Wells.

22      Q.  And where did it come from?

23      A.  It came from the rigger shop, Chief Reckner.

24      Q.  And what's the title of the memo?

25      A.  "Establishment of Expectations Other Than Performance."

 1          Q.  And what was the gist of this -- the Court will have

 2     the opportunity certainly to read the whole thing, but what is

 3     the gist of this document?

 4          A.  Chief Reckner, or COMMSTA Kodiak, had learned that Mr.

 5     Wells was collaring trees, or cutting around the outer tree

 6     trunk, which would cause the tree to die.  And he was collecting

 7     that wood, and they told him not to do that anymore unless it

 8     was impacting the antennas.

 9          Q.  Now, in your review of the file, did you find any other

10     records on a similar subject?

11          A.  There was a previous memo for this very same thing

12     years prior.

13               MR. SCHRODER:  Your Honor, government moves for

14     admission of No. 14.

15               MR. CURTNER:  Your Honor, I'm going to object at this

16     point.  We're getting piecemeal part of a large personnel file

17     that has much more positive information in it than it does these

18     little -- these exhibits.  And I'd ask the Court, if the Court

19     is going to consider these, to consider Mr. Wells' entire

20     personnel file that, of course, the government can supply to the

21     Court.

22               But I don't think it's fair to pick out a few

23     instances that may negatively reflect on Mr. Wells when there

24     are many, many more examples in his personnel file that are

25     positive.  And I don't think the Court should just consider a

 1    small part of it without considering his whole personnel file.

 2              THE COURT:  Response.

 3              MR. SCHRODER:  Your Honor, the government has provided

 4    that personnel file in discovery.  If the defense would like to

 5    submit it, they can submit it.

 6              THE COURT:  The objection is overruled.  The

 7    government can put on parts of it if it chooses, and you can put

 8    on what parts you believe are appropriate if you choose to do

 9    that.  So 14 was objected to, the objection is overruled.  14 is

10    admitted.

11                            PLAINTIFF'S EXHIBIT 14 ADMITTED

12              MR. SCHRODER:  Your Honor, we have one more along this

13    line.  I'm going to hand the witness what's been marked as

14    government Exhibit No. 15.

15     BY MR. SCHRODER:

16       Q.  Special Agent Andersen, what is this document?

17       A.  This is a letter of caution, misuse of COMMSTA Kodiak's

18    general fuel card, dated January 4th of 2012 from Commander Van

19    Ness to Mr. James Wells.

20       Q.  Who is Commander Van Ness?

21       A.  He was the -- either the XO or the CO of communications

22    station.

23       Q.  And, again, the Court can read the document, I think it

24    stands on its own, but what was the gist of the document?

25       A.  There are allegations made that Mr. Jim Wells took the

 1  fuel card and filled up his personal vehicle with gas from the

 2  government fuel card.

 3          MR. SCHRODER:  Your Honor, move for admission of No.

 4  15.

 5          MR. CURTNER:  Same objection, Your Honor.

 6          THE COURT:  Same ruling.  Admitted.

 7                          PLAINTIFF'S EXHIBIT 15 ADMITTED

 8   BY MR. SCHRODER:

 9      Q.  Now, again, we've got two more areas I want to discuss,

10  Special Agent Andersen.  So I'm going to hand you -- let's see,

11  I'm going to go back to my notes to make sure I'm covering

12  everything.

13          As part of the investigation, did the agents look into

14  Mr. Wells' travel?

15      A.  They did.

16      Q.  And did he travel as part of his job?

17      A.  He did.

18      Q.  Did he travel personally?

19      A.  He did.

20      Q.  And how would you say the scope -- how would you define

21  the scope of that travel?

22      A.  He traveled extensively for work and --

23      Q.  And did the agents determine whether he had accumulated

24  airline miles as part of that?

25      A.  They did.

1      Q.  I'm going to hand you -- and did he have a particular

2  airline he traveled with most often?

3      A.  I believe Alaska Airlines.

4      Q.  And I'm going to hand you what has been marked as

5  government Exhibit No. 16.

6          And are you familiar with this exhibit?

7      A.  I am.

8      Q.  And what is it?

9      A.  It is an e-mail dated February 21st, 2013, Alaska

10  Airlines heading from an Alaska Air representative stating Mr.

11  Wells and Mrs. Wells' airline miles that they currently have.

12      Q.  And what amount of airline miles does Mr. Wells have,

13  according to this?

14      A.  It has 443,302 miles.

15          MR. SCHRODER:  Your Honor, the government moves for

16  admission of 16.

17          MR. CURTNER:  No objection.

18          THE COURT:  Admitted.

19                          PLAINTIFF'S EXHIBIT 16 ADMITTED

20   BY MR. SCHRODER:

21      Q.  And one final area I want to discuss.

22          Have you reviewed in your -- as part of the

23  investigation -- has the government received medical records

24  from the Veterans Administration?

25      A.  Yes, we have.

1      Q.  And have you reviewed some of those records?

2      A.  Yes.

3      Q.  Do those records have documents in them that indicate

4  visits to the Veterans Administration facility here in

5  Anchorage?

6      A.  Yes.

7      Q.  I'm going to hand you --

8          MR. SCHRODER:  Your Honor, we're not going to go into

9  any medical conditions.  This is purely for visits and dates is

10  all we wanted to establish.

11   BY MR. SCHRODER:

12      Q.  So I'm going to hand you what's been marked as

13  government's Exhibit No. 17.

14          And are you familiar with this exhibit?

15      A.  I am.

16      Q.  And what is it?

17      A.  It's an RN note, nursing note, dated 8/30 of 2012,

18  1305.

19      Q.  And was this from the medical records you reviewed of

20  Mr. Wells?

21      A.  It was.

22      Q.  And what does this indicate?  What was the date of this

23  record?

24      A.  Note dated was August 30th of 2012.

25      Q.  And at the top there, right under where it says --

1   fourth line it says "visit."  Right under there, what does it

2   say?

3       A.  "1300, Anchorage PAC (ph) to 06 nurse, and veteran here

4   for an RN appointment in response to a phone request on 8/20."

5             MR. SCHRODER:  Government, Your Honor -- or, Your

6   Honor, government moves for admission of 17.

7             MR. CURTNER:  No objection.

8             THE COURT:  What is the relevance of this?

9             MR. SCHRODER:  Your Honor, we want to show trips made

10  by Mr. Wells to Anchorage for Veterans Administration calls.

11  Ms. Tatter, in her affidavit, said that he made three trips to

12  Anchorage that were reported.  And I think we want to show that

13  there were more than that.

14            THE COURT:  17 is admitted.

15                      PLAINTIFF'S EXHIBIT 17 ADMITTED

16            MR. SCHRODER:  I'm handing the witness what's been

17  marked as government Exhibit No. 18.

18   BY MR. SCHRODER:

19      Q.  And what is this exhibit?

20      A.  This is another visit to the Veterans Health Care

21  Administration.

22      Q.  And what was the date of this?

23      A.  September 10th of 2012.

24      Q.  And what's the title of the document?

25      A.  It says, "Primary Care Note."

1      Q.  Now, right under that top set of headings there is a

2   group -- and I don't want to go into the numbers, but there is a

3   group of readings or data.  And what is that?

4      A.  It's a list of all his vital signs.

5      Q.  And do you have reason to understand what those mean?

6      A.  I do.

7      Q.  And what is that?  What -- what in your background,

8   just to help the Court, helps you understand?

9           MR. CURTNER:  You know, I'm going to object.  This is

10  way beyond the purpose of this hearing to get into medical

11  records from the VA on Mr. Wells.  I'm going to object to this

12  whole line of questioning.

13          MR. SCHRODER:  I'll make the point, Your Honor.

14   BY MR. SCHRODER:

15     Q.  In your experience, does somebody have to be at the

16  facility to have their vital signs?

17     A.  They do, and it's a requirement.

18          MR. SCHRODER:  Government moves to admit No. 18.

19          THE COURT:  I'll admit it.

20                          PLAINTIFF'S EXHIBIT 18 ADMITTED

21   BY MR. SCHRODER:

22     Q.  Now, let me make one more point about that date -- or

23  I'll do that when we're done.  Get these in first.

24          No. 19, are you familiar with this record?

25     A.  I am.

1      Q.  And how are you familiar with it?

2      A.  I've reviewed them.

3      Q.  And what is the title of the document?

4      A.  It is a health care note, again, from the Alaska VA

5  dated 11/6/2012.

6      Q.  And does it indeed have -- and what's the -- if you

7  look down at about the fifth line, what does it say for the date

8  and time?  What is the heading for that?

9      A.  Visit, 11/6/2012, Anchorage.

10     Q.  And are there vital signs on that one as well?

11     A.  Yes, there are also vital signs.

12         MR. SCHRODER:  Government moves for exhibit [sic] of

13 No. 19, Your Honor -- or admission of No. 19.

14         MR. CURTNER:  Same objection, Your Honor.

15         THE COURT:  19 is admitted.  Objection overruled.

16                         PLAINTIFF'S EXHIBIT 19 ADMITTED

17         MR. SCHRODER:  One more, Your Honor, to establish this

18 date.

19  BY MR. SCHRODER:

20     Q.  Government Exhibit No. 20.  And are you familiar with

21 government Exhibit No. 20?

22     A.  I am.

23     Q.  And how are you familiar with it?

24     A.  I've reviewed them.

25     Q.  And what is the date on this?

```
 1        A.   November 28th of 2012, 1109.

 2        Q.   And what kind of note -- what kind of document is it?

 3        A.   It's a primary care note.

 4        Q.   And does it also indicate a visit?

 5        A.   Yes, it also has vital signs listed.

 6             MR. SCHRODER:  Your Honor, the government would move

 7   for admission of No. 20.

 8             MR. CURTNER:  Same objection, Your Honor.

 9             THE COURT:  Same ruling.  20 admitted.

10                            PLAINTIFF'S EXHIBIT 20 ADMITTED

11             MR. SCHRODER:  If you could hand that to Mr. Allison.

12    BY MR. SCHRODER:

13        Q.   One last thing, though.  Let's go back to exhibit --

14             MR. SCHRODER:  If you could hand the witness Exhibit

15   No. 18.

16    BY MR. SCHRODER:

17        Q.   And what was the date on this?

18        A.   This was September 10th of 2012.

19        Q.   And when you -- what was the date you interviewed the

20   woman who Mr. -- identified she'd seen Mr. Wells on three or

21   four occasions?

22        A.   That was September 17th.

23        Q.   And what did she say about her last visit with him?

24        A.   She had said that she had seen him recently from three

25   days to a week prior to our interview.
```

1      Q.  Is that consistent with that document?

2      A.  Yes.

3           MR. SCHRODER:  No further questions, Your Honor.

4           THE COURT:  Mr. Curtner.

5           MR. CURTNER:  A few questions, Your Honor.

6                        CROSS-EXAMINATION

7    BY MR. CURTNER:

8      Q.  Agent, you've looked at Mr. Wells' personnel file; is

9    that correct?

10     A.  Yes, sir.

11     Q.  You've reviewed his entire file?

12     A.  I would not say the entire file, but yes, I have

13   reviewed it.

14     Q.  How large -- if you could estimate how large that file

15   is?  Is it a thick personnel file that you reviewed?

16     A.  The one I reviewed, it was, I'd say, three to six

17   inches.

18     Q.  Three to six inches, all individual papers that you

19   reviewed about --

20     A.  I did not review every individual paper, but yes, I saw

21   the file.

22     Q.  Were there positive personnel evaluations in there?

23     A.  I saw evaluations.  There were some that said "meet

24   expectations," yes.

25     Q.  Were there some that had him overexceeding

1  expectations?

2      A.  I did not see them.

3      Q.  Did you see any type of acknowledgments of some of the

4  work he had done before any kind of awards or any kind of

5  descriptions of -- in a positive nature of his performance?

6      A.  I did not review awards.  I did see where he provided

7  training to some COMMSTA personnel or personnel at other units.

8      Q.  Would it be fair to say that there are a number of

9  recognitions of his positive performance in that file that you

10  reviewed?

11      A.  I've not seen them.

12      Q.  You've not seen any positive in your review of the

13  file?

14      A.  I reviewed stuff that indicated that he provided

15  training to other Coast Guard units and personnel.  And I guess

16  you could say that that was an "atta boy" to him for providing

17  training to other Coast Guard personnel.

18      Q.  So it's your testimony, in reviewing his entire

19  personnel file, that you were able to find out these negative

20  references to Mr. Wells but you didn't see anything that you

21  could consider positive?

22      A.  I did not take note of the positive.  I was going

23  through to look for these types of memos.

24      Q.  So you have been investigating Mr. Wells' travel since

25  this investigation started; is that correct?

1     A.   As part of the investigation, yes.

2     Q.   And so you're aware that he traveled in May of last

3   year outside of Anchorage to Juneau and to Gustavus, Alaska?

4     A.   I do remember when he went to Gustavus, yes.

5     Q.   And to your knowledge, that was with the permission and

6   notice to the government; is that correct?

7     A.   I was not aware of it, but if they asked for permission

8   and they went, then yes.

9     Q.   Now, there wasn't any type of court mandate or

10   conditions that he report that; is that correct?

11     A.   You'd have to ask somebody else that.  I'm not aware of

12   that.

13     Q.   Are you aware of him traveling to Seattle and Santa

14   Barbara in June of last year?

15     A.   I do know that he went on another trip, yes.  I didn't

16   know where.

17     Q.   And again, the government was aware of that before he

18   took the trip; correct?

19     A.   They may have been, yeah.

20     Q.   And there was also travel to Seattle, to Boston, to

21   Portland in August of last year that the government was aware of

22   beforehand?

23     A.   I'm not aware of that.  I don't know.

24     Q.   You didn't research that travel?

25     A.   I was not involved in that one, no.

1      Q.  Travel to Las Vegas, you're not aware of that either?

2      A.  No.

3      Q.  And other travel in November to Portland or Seattle or

4  Santa Barbara, you're not aware of that, to visit family

5  members?

6      A.  I'm not aware of that.

7      Q.  You didn't look at -- you weren't informed at all?

8      A.  No.  I know that his son lives in Portland, but I was

9  not specifically aware of that trip.

10          MR. CURTNER:  Okay, thank you.

11          THE COURT:  Mr. Schroder.

12          MR. SCHRODER:  We have no additional evidence, Your

13  Honor.

14                  VOIR DIRE EXAMINATION

15   BY THE COURT:

16      Q.  Agent Andersen, do you have any evidence or information

17  that Mr. Wells is continuing to have his vitals taken after the

18  date of the last exhibit, which looks like it was November 28th,

19  2012?

20      A.  I'm sorry, Your Honor.

21      Q.  Is he continuing to have those vitals taken by VA?

22      A.  I'm not aware.  I have not looked at anything recently

23  as far as his trips to the VA.

24      Q.  Is there any investigation going on as to the property

25  that was identified in the earlier exhibits from the Kodiak

1  Coast Guard property?  Is there any investigation as to theft of

2  property?

3      A.  We are looking into it, yes, sir.

4      Q.  No charges have been filed though?

5      A.  No, Your Honor.

6          THE COURT:  Any other questions for the witness?

7          MR. SCHRODER:  Not from the government, Your Honor.

8          THE COURT:  You may step down.

9      A.  Thank you.

10  (Witness excused)

11          THE COURT:  Does the government have any additional

12  evidence.

13          MR. SCHRODER:  We do not, Your Honor.

14          THE COURT:  Mr. Curtner, that concludes the evidence.

15          MR. CURTNER:  Yes, Your Honor.

16          THE COURT:  Evidence is closed.  We're at the point of

17  summation then.  Mr. Curtner, why don't you go first.

18          MR. CURTNER:  Thank you, Your Honor.  Of course, you

19  know, the basic issues before the Court are the risk of any harm

20  to the community or a non-appearance of Mr. Wells.  And I think

21  we have presented a very solid plan of third-party custodians

22  and conditions that would assure Mr. Wells' appearance in court

23  and that there would be no risk to the community.

24          As we file this motion, we've pointed out to the Court

25  that Mr. Wells was identified as a suspect, his vehicles were

1    published in the newspaper in Kodiak from the very beginning of

2    this investigation, yet the FBI would tell the community of

3    Kodiak there was not a risk to the community knowing that Mr.

4    Wells was their suspect and that he was living in the community.

5    And now they are saying that there is a risk to the community,

6    even though for ten months during this investigation they

7    claimed publically just the opposite.

8            And as far as a risk of non-appearance, Mr. Wells had

9    no requirements to notify the government of his travels, but

10   he -- since he was identified as their suspect, he was -- he

11   continuously traveled around the country to visit family, and

12   notified the government on his own of his travels, and was able

13   to abide by that itinerary that he submitted to the government.

14           He had many chances to leave if he were going to do

15   that.  And I think that looking at those factors and what went

16   on for ten months, and now looking at the solid third-party

17   custodians we have now that will have Mr. Wells living

18   35-and-a-half miles outside of Kodiak with solid third-party

19   custodians with him 24 hours a day and can assure the Court if

20   you're even to leave the house, there is so much less risk of

21   non-appearance, so much less of a risk to the community than

22   there had been during ten months of this investigation.

23           So I think if the Court were to focus on the factors

24   that the Court could consider for release, and the fact that,

25   you know, of course Mr. Wells is presumed innocent, and the

1   reason we have a bail statute is to make sure that somebody who
2   is innocent doesn't have to be -- spend a year in jail awaiting
3   trial if that person is innocent, I think that's -- that's why
4   we have a bail statute and this is for the Court to consider.  I
5   think we have a solid plan for his release that will meet all
6   the requirements that the Court should consider.

7          The government is presenting these side issues, in my
8   opinion, that don't really affect the Court's judgment on what
9   is to be considered here.  I think we have a solid plan for
10  release.  This will assure Mr. Wells will make his court
11  appearances.

12         The third-party custodians are perfectly willing to
13  work with my office or the probation office or whatever it is to
14  make sure there is no gap in coverage if Mr. Wells has to come
15  to Anchorage for any court hearings.  We can assure the court of
16  that.  It will all be with the oversight of the Pretrial
17  Services anytime he were to leave the home.  So this is a solid
18  plan, and I don't see any reason it should be denied at this
19  point.

20         And we'd -- you know, the -- we all have -- the
21  evidence that the government is presenting about the property,
22  there is no background for that.  We don't know if that was
23  surplus property that was -- that had been in the home of Mr.
24  Wells for years, we don't know the circumstances of that
25  property being there.

1          As far as the allegations of illegal activity that was

2   extensive, according to the government, it involved two people,

3   two women, that from my hearing the evidence never admitted that

4   there was any illegal activity.

5          And so I think under these circumstances, this release

6   is justified, we would ask the Court to consider it, and

7   anything we need to do to make sure that all the conditions the

8   Court would want to impose would be met, and we're prepared to

9   do that.  Thank you.

10          THE COURT:  Thank you, Mr. Schroder.

11          MR. SCHRODER:  Your Honor, Your Honor, the defendant's

12   proposal does not overcome the presumption.

13          The government concurs with the probation officer that

14   this proposal does not provide sufficient safeguards that will

15   assure the defendant does not escape the home of the

16   Penningtons' to either flee or harm witnesses.

17          First, the location is too remote.  He cannot be

18   adequately supervised by the probation office.  Cannot be really

19   effectively monitored with the probation officer here in

20   Anchorage and he being remote in Kodiak.

21          And although Mr. Pennington said they have generators,

22   they have other devices, obviously the utility structure is

23   questionable out in their area, and we're not going to be able

24   to rely on electronic monitoring to indicate whether the

25   defendant has left.

1        And even if probation was notified by electronic

2    monitoring whether he left, Your Honor, the process of them

3    notifying -- getting to the court, getting to an arrest warrant,

4    notifying people to try to intercept him, would allow him to get

5    into town and potentially harm witnesses or potentially flee.

6        It's commendable that the Penningtons and Ms. Geyer

7    are willing to make this kind of commitment, but they are put in

8    an awfully difficult position to have to do that kind of

9    coverage at that remote location for that long.  And Ms. Geyer

10    is even put in a more difficult position in that she's -- you

11    know, she's got -- doesn't have full-time work, she teaches

12    music on the side, doesn't make a whole lot of money, and yet

13    she's relying on Nancy Wells, the wife of the defendant, to take

14    care of her, to allow her to have free rent as a house guest.  I

15    mean, she's helping some when Mrs. Wells goes out of town, but

16    it would have to be on her mind that if she were to turn in Mr.

17    Wells, that Mrs. Wells would be unhappy about that and she would

18    find herself in a very difficult situation.

19        Another aspect of the plan that's a problem is that

20    it's incomplete.  I mean, we still don't know -- we have Mr.

21    Curtner's assurances, and I understand that that they would make

22    calls and make arrangements, but we don't know how he would get

23    to Anchorage for court appearances, and there are going to be a

24    number of them over the next few months.  We don't know whether

25    the plan would be to try to get -- to have the Penningtons go

1   with him, to have somebody else come get him.  Certainly it

2   would be very difficult for defense counsel to come to Kodiak

3   and get him and be monitoring him, you know, in the travel to

4   Anchorage.  That would be very difficult considering their

5   lawyer/client privilege obligations.

6           Another factor along the same lines, is that 18 U.S.

7   Code 3005, the section of the code that allows for two lawyers

8   to be presented -- or to be paid for by the government requires

9   free access to the accused at all reasonable hours.  And I think

10  that's normally directed at the government to make sure the

11  defense attorneys have access, but they are putting their client

12  in a position down in Kodiak where they are not going to have

13  good access to him.  He's going to be in a remote location

14  requiring at least an airline flight and a long drive to get him

15  there.

16          Second, Your Honor, the defense -- I don't think we

17  can trust him to fulfill his conditions.  And that's why we put

18  on all this material, is that in their proposal they said he had

19  no criminal record.  It implies a law-abiding citizen.  What

20  we're showing is that's not accurate.  And the reason -- and

21  we're not going to go into it any more than that, the Court can

22  see what it is for what it is.

23          And we also added the government's material that shows

24  minimally it's only part of a record, but it's a very, very

25  important part of -- any personnel record, disciplinary matters

1   are a key part of that record.

2          And what it shows -- the Court can look at them -- and

3   what it shows is that he's a guy who doesn't follow

4   instructions.  And he would have to be able to follow the

5   Court's instructions for -- to be released.  And the

6   government -- what we're saying, Your Honor, is he won't do

7   that.  He won't follow the Court's instructions.  If it's

8   something he wants to do and he thinks he can get away with it,

9   he'll do it, and that's what those documents show.

10         Now, it's also somewhat of a concern that Mr. and Mrs.

11  Pennington and Ms. Geyer all are willing to look at an illegal

12  act of prostitution as something that's his own business.

13  Because they would have to report any illegal acts, that would

14  be part of their requirement, and it just -- you know, the Court

15  should consider what other things they are going to consider

16  just his business and not be willing to report.

17         Your Honor, the stakes are very high in this case to

18  allow the defendant to be returned to Kodiak.  You've read the

19  statements, you indicated, that you saw that we filed.

20         Now the defendant claims that he would not flee or

21  attempt to harm witnesses, claims that during that time when he

22  knew he was under investigation that he didn't do any of those

23  things.  This is a very different situation now, Your Honor.

24  Whoever -- Your Honor has read the complaint in this case, the

25  original complaints, so you have a working knowledge of the

1  facts.

2        Whoever committed this murder planned not to get

3  caught.  They were very careful about trying not to get caught.

4  That period from the murder until the time he was arrested, if

5  he would have taken any of those negative actions, it would have

6  drawn attention to himself and got him caught.  He had every

7  reason in the world to be careful during that period.  Now is a

8  very different time.  He's got charges over him, he's got

9  charges with -- at least at this point charges with the ultimate

10  sanction of death, and at a minimum life imprisonment.

11        If he's got any inclination to flee or any inclination

12  to harm a witness to try to affect this case, now would be the

13  time.  This would be give him the opportunity to do that.

14        And I would remind the Court, we've shown that he

15  has -- and another factor is, before the charges were levied, he

16  didn't know who the witnesses are.  Now he's gotten discovery,

17  now he's seen the complaint and the other documents, he knows

18  who the witnesses are now.  And he certainly would not have

19  another chance.

20        And we remind the Court that he has 400,000 Alaska

21  Airline miles, which I think would allow you to go just about

22  anywhere you want.

23        Your Honor, the stakes are too high, the crimes was

24  too heinous, and we believe that it is not -- the proposal is

25  not sufficient to show that the witness -- or that the defendant

1  would not be a danger to the community or flee, and we think it

2  certainly does not overcome the presumption of 18 U.S.C. 3142,

3  and we think the defendant's request should be denied.

4           THE COURT:  Mr. Curtner, anything else?  You don't

5  have to be repetitive.

6           MR. CURTNER:  Well, no, Your Honor.  I mean, I don't

7  know how I can even rebut any of these arguments.  He's not

8  going to take the boat to Russia, he's not going to -- if he

9  were to use his miles to fly, it's going to be a red flag

10  immediately known to everybody.  I think that all these cautions

11  about this release plan are ridiculous.

12           He's going to be in a firm place where he's not going

13  to be able to move anywhere without the court knowing about it,

14  and that's about all I can say about that.

15           THE COURT:  In addressing the motion for bail release,

16  I start with the indictment.  The charges are two counts of

17  murder in the first degree; Counts 3 and 4 are repetitive, they

18  simply charge the victim as an employee of the United States;

19  Counts 5 and 6, possession and use of a firearm in relation to a

20  crime of violence under 18 U.S.C. Section 924(c) and (j).

21           The penalties are serious.  The parties have

22  identified from life -- there is no decision yet by the

23  government as to whether they will seek this as a capital

24  punishment.

25           Section 3142 of Title 18 (f) addresses detention

hearing and addresses specific types of offenses which allow for
a rebuttable presumption of detention.  First counts appear to
be a crime of violence to the Court.  Moreover, the government
has also charged under (f)(1)(E), for purposes of a detention
hearing, a felony that involves the possession or use of a
firearm or destructive device.  So there is a presumption of
detention that's created in this case.

        If there is a probable cause to believe the defendant
violated 18 U.S.C. Section 924(c), a presumption arises as to
both dangerousness and flight risk.  So the Counts 5 and 6
create that rebuttable presumption.

        The return of the indictment is sufficient to
establish probable cause as to the offenses alleged.  The
presumption imposes upon the defendant a burden of production,
not a burden of proof.  The presumption continues to carry
weight even if it's overcome.

        Now, the case law is not clear as to when a
presumption is overcome.  It appears that it takes slight
evidence to do that, but I repeat that the presumption continues
to carry weight even after the defendant makes a showing in
opposition to it.  So it's not a bursting bubble.

        The likely sentence can be affect the weight to be
given to the presumption under U.S. v. Moss, and that is a U.S.
First Circuit case, 887 F.2d 333.

        In U.S. versus Salerno, the Supreme Court held that

1  pretrial detention for dangerousness under the act is not an

2  unconstitutional act on its face.

3          The Ninth Circuit case of U.S. v Windsor gives some

4  guidance as to due process limit on the length of pretrial

5  detention.  I've given some consideration to that in this case.

6          The length of confinement and the extent to which the

7  government is responsible for the delay may be important

8  factors.  The government here is seeking to move the case to

9  trial expeditiously.  We've had that issue addressed in the

10  scheduling orders of the court for pretrial motions.

11          The case has not reached a stage where there is any

12  due process violation.

13          The biggest problem with this case, in the Court's

14  view, is the location monitoring.  The home -- the incarceration

15  that would be here on a third-party basis, we haven't talked

16  about home incarceration, but basically third-party, 24-hour

17  supervision, and the location in Kodiak I think raises a problem

18  for court appearances, for conferences, hearings on motions,

19  payment of it.  But the biggest problem is Pretrial Services

20  monitoring the defendant.

21          The flight risk, I'll address that separately.  As far

22  as dangerousness goes, the location is such that the troopers

23  would have to respond, and just a lot of time it's taken.

24  Pretrial Service cannot monitor the defendant from that

25  distance.  They have not made a home visit.  And of course we

1 are in a period where a cost to the government are a factor.

2 You know, just leave that as it is.

3 In the report, Pretrial Service report, the first one

4 for the defendant, according to FBI, the defendant has over

5 $300,000 in a Thrift Saving Plan and is within about four years

6 of paying off his mortgage.  The proposal to put up the property

7 as bond is rejected.  If there were any bond that the Court were

8 setting in the case, it would certainly have to be a cash bond.

9 The defendant does have court-appointed counsel, so he's not

10 paying for attorney's fees.

11 He does have mileage that could be used to travel if

12 he had the freedom to do that.  I recognize that probably those

13 miles could be put on hold or frozen so that they were not

14 readily available to him.  The defendant has a boat, but it

15 appears that it might get him around the island, but probably

16 not to the mainland.  Mr. Pennington said he can't afford to pay

17 for the flights to Anchorage.  The Court is aware that the

18 defense would probably ask for the government to pay for the

19 cost, but the problem of course is the third-party custodian

20 would have to fly with the defendant, so whether that cost would

21 be met is a separate issue.

22 Victoria Geyer does not know the defendant personally,

23 so she doesn't know much about him as far as monitoring him as a

24 third-party custodian, and that's where some of the factors fit

25 in here that the government has put on evidence to show.

1    The prostitution evidence, of course, is unresolved
2  because we don't know what acts took place.  But I think what it
3  tells me is that the defendant has a separate life, if you will,
4  that everything is not on the counter for him.  His friends
5  don't know everything about him.  And then Ms. Geyer certainly
6  doesn't know anything about who he is or what to expect.

7    People who have a career with the same employer may
8  receive reports that are negative.  I'm sure there are some good
9  reports in there as well in terms of giving training to other
10  employees, for example, but the letter of reprimand, Exhibit 12,
11  was for unethical conduct.  The letter of reprimand for December
12  2003, Exhibit 13, was for disobeying an order.  Exhibit 14
13  involved collecting wood from Coast Guard trees.  Exhibit 15, a
14  letter of caution, misuse of fuel card, does raise the question
15  the type of person that Mr. Wells is.

16    The items of government property missing, we don't
17  know what the outcome of that is.  As Mr. Curtner said, it could
18  be items that were surplused or made available for use or
19  whatever.  There may be some explanation there.  Appears that
20  there is an investigation underway, and they are treating it as
21  stolen property.  What it shows me though is some indicia of
22  dishonesty of having that property.  So it just is a red flag
23  that raises a question with the Court.

24    With respect to flight, I think the evidence presented
25  by the government overcomes the presumption of a flight risk.

1  Doesn't mean it totally disappears.

2         But I think the biggest concern here is the danger to
3  the community because of the nature of the offense and the
4  character or unknown character of the defendant, not so much the
5  flight risk which can be minimized by third-party custodians.

6         You know, the State of Alaska treats capital
7  punishment a little differently when it comes to bail.  This is
8  not a state case, it's a federal case.  But under the state
9  Constitution, the accused is to be released on bail except for
10 capital offenses when the proof is evident or the presumption
11 great.  And we're dealing with statutory presumptions here.

12        The right under federal law is a right to reasonable
13 bail; it's not a guarantee.  And I have made a search to see if
14 there are cases of this nature in capital punishment or murder
15 cases where the defendant has been released on bail.  And there
16 must be far and few reported, because I've not found any.  I
17 have checked through the Ninth Circuit where these capital cases
18 are monitored, and they were not aware of a release on bail.

19        The point is that these are serious charges, and it
20 has to be considered a little differently.  I have letters of
21 people who are concerned.  We don't know the mental processes of
22 the defendant.  We have two homicides here.  He may or may not
23 be found guilty; that is not the decision here.  The decision is
24 bail release, danger to the community, and the flight risk.  So
25 even if he is found not guilty, it doesn't mean he was denied

1  his right to bail.

2         Mr. Pennington, according to the records here, is

3  potentially a witness in the case with regard to a defense that

4  the defendant might raise.  Based on the nature of the instant

5  offense and the representations of the government regarding the

6  potential danger to a former co-worker, the defendant is a

7  significant danger to the community.  Based on the potential

8  penalties and age of the defendant involved in this case, there

9  is a significant risk of non-appearance concludes the Pretrial

10 Service office.

11        The fact that Mr. Wells did not flee earlier is to his

12 benefit.  I have notes that indicate that I made the same

13 observation the government has pointed out, that during the

14 early investigation of this case it was not clear the government

15 had enough to target an individual or suspect or make an arrest,

16 and so flight would have tipped them off to focus on him more.

17        The nature of the offense that's committed, whoever

18 did it, shows that they were planned, and there was some cunning

19 involved.  So whoever did it is a person who can make plans and

20 carry it out.

21        It's not clear what the limits are on the motive for

22 the homicides that occurred, and the government argues that

23 others may be in jeopardy, fellow employees, a boss, a relative

24 of a witness, potential witness.

25        On these serious charges, the government doesn't have

1    to wait until something occurs, an action with obstruction of
2    justice or threats, I think, for the Court to find that there is
3    a dangerousness that's not overcome, or if overcome, still
4    carries today.

5              So what I'm saying is I'm not at all convinced that
6    bail is appropriate in this case, but even if it is, release to
7    third parties on Kodiak Island is not appropriate.  I would not
8    approve of that as a location for any bail release if that were
9    to occur.

10             So we're dealing with crimes of violence.  I've
11   considered the factors under 3142(g), the nature and
12   circumstance of the offense as charged, which includes whether
13   it's a crime of violence, history and characteristics of the
14   person, physical and mental condition.  He's on medication.
15   There is quite a number of medicines that he's taking according
16   to the Pretrial Service report, and if he doesn't take those, he
17   could become unstable or -- well, blood pressure is one of the
18   factors, I'm not going to put all of that on the record, but the
19   parties have had access to that.

20             So I've considered he has a family tie, he has no
21   employment at the present time, he does have a length of
22   community -- in the community of Kodiak, but unfortunately it's
23   the place of the offenses and the place where there is the
24   greatest danger of what might happen to other people.

25             So considering all of these factors, the Court denies

1  the bail application.  The defendant should be given a

2  reasonable opportunity for private consultation with counsel.  I

3  assume that's happened or he would have complained about it

4  through his counsel.  So I believe I have addressed the issue

5  that's before me, which is the only one set today and that is

6  the bail issue.

7        I've given it careful consideration before this

8  hearing, and I talked to Pretrial Service.  I've listened

9  carefully to the evidence, I've read all the material that's

10  been filed in this case, and if necessary, then my statements on

11  the record here today can be transcribed as my written findings.

12  This will conclude the proceeding in this case.

13        MR. SCHRODER:  Thank you, Your Honor.

14        THE CLERK:  All rise.  This matters stands adjourned.

15  Court stands adjourned subject to call.  The parties on the

16  phone, I'll disconnect now, thank you.

17        (Proceedings recessed, 3:13:44 p.m.)

18

19

20

21

22

23

24

25

1                          CERTIFICATION

2

3      I, LEONARD J. DiPAOLO, RPR, CRR, CCP, court-approved

4   transcriber, certify that the foregoing is correct transcript

5   from the official digital electronic sound recording of the

6   proceedings in the above-entitled matter.

7

8

9   _____          __9/11/14____

    Leonard J. DiPaolo, RPR, CRR, CCP              Date
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                         I-N-D-E-X

2    WITNESSES:              DIRECT   CROSS  REDIRECT  RECROSS

3    FOR THE PLAINTIFF:

4    Denise Andersen          40       64
          Voir dire           67
5
     FOR THE DEFENDANT:
6
     Henry McKinley
7    Pennington                5       11       18       20

8    Janet Roberta
     Pennington               22       26       -        -
9
     Victoria Lynne
10   Geyer                    29       34       -        -

11   EXHIBITS:                                 ADMITTED

12   FOR THE PLAINTIFF:

13   1:      Photograph                           45

14   2:      Photograph                           45

15   3:      Photograph                           47

16   4:      Photograph                           47

17   5:      Photograph                           48

18   6:      Photograph                           48

19   7:      Photograph                           49

20   8:      Photograph                           49

21   9:      Photograph                           51

22   10:     Photograph                           51

23   11:     Photograph                           52

24   12:     Letter of Reprimand                  53

25   13:     Letter of Reprimand                  54
```

```
 1   EXHIBITS:                               ADMITTED

 2   FOR THE PLAINTIFF:

 3   14:      Memorandum of Record                56

 4   15:      Letter of Caution                   57

 5   16:      Email of Alaska Airlines miles      58

 6   17:      Medical care note 8/30/2012         60

 7   18:      Medical care note 9/10/2012         61

 8   19:      Medical care note 11/16/2012        62

 9   20:      Medical care note 11/28/2012        63

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```