1                    UNITED STATES DISTRICT COURT
                          DISTRICT OF ALASKA
2
   UNITED STATES OF AMERICA,    )    Case No. 3:13-cr-00008-RRB-JDR
3                               )
                  Plaintiff,    )    Anchorage, Alaska
4                               )    Monday March 10, 2014
      vs.                       )    1:59 p.m.
5                               )
   JAMES MICHAEL WELLS,         )    HEARING ON MOTION IN LIMINE TO
6                               )    EXCLUDE EXPERT TESTIMONY OF
                  Defendant.    )    DANIEL REISBERG (DKT 312),
7                               )    MOTION FOR LEAVE TO APPEAR PRO
                                )    HAC VICE (DKT 339)
8

9                      TRANSCRIPT OF PROCEEDINGS
                        Pages 1 - 20, inclusive
10
                  BEFORE THE HONORABLE JOHN D. ROBERTS
11                  UNITED STATES MAGISTRATE JUDGE

12   A P P E A R A N C E S:
     For Plaintiff:    KAREN LOEFFLER, ESQ.
13                     BRYAN D. SCHRODER, ESQ.
                       U.S. Attorney's Office
14                     222 W. 7th Avenue, #9
                       Anchorage, Alaska 99513
15                     Ph: 907/271-5071

16   For Defendant:    F. RICHARD CURTNER, ESQ.
                       Federal Public Defender's Agency
17                     601 W. 5th Avenue, Suite 800
                       Anchorage, Alaska 99501
18                     Ph: 907/646-3400

19   Court Recorder:   ALISON HURST
                       U.S. District Court
20                     222 W. 7th Avenue, Box 4
                       Anchorage, Alaska 99513
21                     Ph: 907/677-6101

22

23

24

25

1   A P P E A R A N C E S:  (Continued)

2   Transcribed by:   LEONARD J. DIPAOLO, RPR, CRR, CCP
                      Peninsula Reporting
3                     110 Trading Bay Road, Suite 100
                      Kenai, Alaska 99611
4                     Ph: 907/283-4429

5

    Proceedings recorded by digital sound recording, transcript
6   produced by stenographic transcription service.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1            P R O C E E D I N G S
 2         ANCHORAGE, ALASKA - MONDAY, MARCH 10, 2014
 3    (Log 1:59:00)
 4       (Defendant present)
 5            THE CLERK:  All rise.  His Honor the Court, the United
 6    States District Court for the District of Alaska is now in
 7    session with the Honorable John D. Roberts presiding.  Please be
 8    seated.
 9            And, Your Honor, Nicola Belisle and Scott Hopkins are
10    on the overhead.
11            THE COURT:  Thank you, good afternoon.  We're here for
12    a case hearing in 13-cr-08 U.S. versus Wells.  Defendant and
13    counsel are present.
14            The first matter that I will take up will be the
15    request to participate pro hac vice, Peter Offenbecher.  Mr.
16    Curtner.
17            MR. CURTNER:  Yes, Your Honor.  You know that Mr.
18    Offenbecher was previously on this case, and he has entered his
19    appearance as associate counsel with me as second chair in this
20    trial, and so he is just, I think, going through the formality
21    of having the Court approve his participating here in Alaska and
22    being involved in the trial.
23            THE COURT:  He's being retained by your office, is
24    that correct?
25            MR. CURTNER:  No.  Well, yes, he's being retained as
```

1  my second counsel, yes.

2          THE COURT:  He's not CJA appointed?

3          MR. CURTNER:  No, he is not.

4          THE COURT:  All right.  Does the government have any

5  position to take?

6          MS. LOEFFLER:  Your Honor, I have certainly no

7  position on Mr. Offenbecher, you know, appearing.  I'm not quite

8  sure what's going on in terms of -- if he's being privately

9  paid, I'm not aware -- I would actually like a minute to look it

10 up.  I'm not sure that the CJA Act allows you to have public

11 counsel and privately paid counsel.  If he's pro bono or

12 something, it's none of our business.

13         THE COURT:  Well, I'm satisfied that if the public

14 defender has taken care of it, that he can participate.  It's

15 not a private retention, it's through the Public Defender's

16 Office, but the monies are coming from that office, not from the

17 CJA.  If it were a CJA appointment, that would be a different

18 story.

19         MS. LOEFFLER:  And I don't have any position if the

20 PDs are paying him, and I just was curious whether he's been

21 privately retained as opposed to paid for by the PDs.  If he's

22 paid for by the PDs, it's none of my business, I think.

23         THE COURT:  Well, I think that's the case.

24         MR. CURTNER:  No, Your Honor, I'm sorry.  He is not on

25 the CJA appointment.  He's not being paid by CJA.  But there

1  have been other arrangements for him to participate.  He has

2  agreed to participate.  It's not coming out of my budget either.

3  So his participation is not a matter of public funds from my

4  office or the CJA panel.

5          THE COURT:  Is it a matter of private funds?

6          MR. CURTNER:  Yes.

7          THE COURT:  Well, all right.  I'll leave it to the

8  government then to look into that matter and see if he continues

9  to qualify for CJA if he's having private counsel as well.

10          MS. LOEFFLER:  Yeah, that's all I meant is I needed an

11  opportunity to look at it.  Obviously I don't want to take any

12  position about how many lawyers they want, I don't care, but I'm

13  not sure that's what --

14          THE COURT:  All right.  Well, you can file an

15  appropriate motion if you find authority to support that.

16          MS. LOEFFLER:  Thank you, Judge.

17          THE COURT:  And I will state, though, that Mr.

18  Offenbecher comes in the case as is where is.  We're not turning

19  the clock back, we're not re-litigating pretrial motions.  We're

20  basically on the eve of trial, and I assume he's coming in to

21  help prepare for a trial of the case.

22          MR. CURTNER:  That's correct, Your Honor.

23          THE COURT:  All right.  With that in mind then the pro

24  hac vice motion is granted.

25          We'll turn our attention next to the motion in limine

1  which is before the Court.  I have read the briefs on the

2  matter.  I wanted to give counsel an opportunity to add anything

3  that you have or to summarize it.  And I'll hear from Mr.

4  Curtner first.  I think it makes more sense to see what the

5  opposition is.

6          MR. CURTNER:  Thank you, Your Honor.  Well, I think by

7  looking at Dr. Reisberg's CV and resume and his publications and

8  the things in his background, he's extremely qualified.  And I

9  would just have to say he is qualified in the general area of

10  cognitive psychology.

11          In fact, he's basically helped writing the textbook on

12  the subject.  He's acknowledged, I think, nationwide as an

13  expert on cognitive psychology and what he studies.  And that is

14  the same type of psychological phenomenon that's involved in

15  experts on eyewitness testimony, which has been accepted for

16  years now.  In fact, that could be considered almost a subset of

17  confirmation bias in the area of suggestiveness.

18          This concept of suggestiveness and influencing the

19  testimony of witnesses has been well accepted, in fact, of the

20  cases that the government cites, United States versus Beck,

21  which was a Ninth Circuit case in 2005; the State of Oregon

22  versus Lawson, which was an Oregon case in 2010; and the most

23  recent case in Idaho, Idaho versus Almaraz in 2013, Dr. Reisberg

24  in particular has been approved as an expert witness.  And in

25  fact in the last Idaho case, the Court found it was error to

1  exclude his testimony, although there was an argument about

2  whether that would be harmless there or not under the

3  circumstances of that case.

4       And I just want to emphasize that his testimony is

5  just akin to eyewitness testimony in eyewitness cases.  It's not

6  attacking necessarily the credibility of the witnesses, it's not

7  saying -- explain -- testifying that a witness is wrong or

8  providing false testimony, it's merely giving the type of

9  information that the jury can use in weighing the evidence of a

10  witness under all the circumstances.

11       And I think it's critical for the defense to be able

12  to present evidence of the type of suggestibility that might be

13  involved in weighing the testimony of these particular

14  witnesses.  That's not usurping the role of the Court.  We're

15  not saying that these witnesses are not -- we're not trying

16  to -- it's not a motion to exclude their testimony, it's merely

17  giving information to the jury in order to evaluate the case.

18       And, you know, Your Honor, as we've gone through a

19  number of Daubert challenges to the government's witnesses, I

20  think the theme has been, with this type of testimony, to allow

21  it to be vetted in the courtroom with confrontation, with

22  challenge in the courtroom.  And given the nature of the

23  government's evidence, I think it's especially critical for Mr.

24  Wells and his Sixth Amendment right to confrontation to have

25  this testimony available for him at trial.

1    So we think it's certainly admissible, and we'd ask

2  the Court to allow him -- to recommend that he be allowed to

3  testify in this trial.

4    THE COURT:  Dr. Reisberg has a long list of

5  publications that were presented.  What can you point out that

6  shows that he has expertise in the analogous field here?

7    MR. CURTNER:  You know, there's a more recent

8  publication, Your Honor, that I can provide to the Court.  It

9  was not in his CV that he admitted to the Court.

10    But he just recently was involved in the publication

11  of an article with a couple other experts in the profession on

12  the Mayfield case out of Oregon that was -- talked about the FBI

13  misidentification of fingerprints.  And I can file that with the

14  Court if the Court would like to look at that.

15    But it basically takes the same themes of cognitive

16  psychology and suggestiveness to the point of how it might even

17  affect forensic scientists.  I can submit that to the Court.

18  But I think it specifically addresses and speaks to confirmation

19  by us on behalf of forensic experts.

20    THE COURT:  I will accept that offer.  It seems to me

21  fingerprint analysis might be more appropriate than eyewitness.

22  Eyewitness testimony, if you're critiquing that, the time for

23  people to observe frequently is limited unless you're -- if it's

24  a lineup.  There are different types of eyewitness.

25    But if it's a scene eyewitness, there are lots of

1   things going on and a person may not pay attention to the
2   clothing and the identification of a person rather than the
3   actions or what's being said and it's a threatening situation,
4   what's going to happen, et cetera.  And so there's -- and it's
5   also a layperson's opinion that's being challenged.

6           Here we have an expert, just like a court is an
7   expert, to rule on matters without bias.  I mean, we have
8   normal -- we have biases and prejudices in our lives, and so we
9   put those aside.  And an expert in conducting a test knows that,
10  you know, if you're going to apply some scientific method to it,
11  you have to build in a system that's not going to be result
12  oriented.  So I think it's a little different criticizing an
13  expert.

14          If it's just general testimony that the doctor's going
15  to give, why doesn't cross-examination and jury instructions
16  help the jury to understand that they have to weigh and consider
17  what a person says in court.  Jurors are told by jury
18  instruction to keep an open mind until the case is given to them
19  to decide.  You've got to start somewhere with piecemeal
20  evidence, and an expert has to start somewhere with analysis.
21  And at the beginning, they may have certain thoughts about
22  what's going to be the outcome, but if they have a good
23  scientific approach, then they keep an open mind and they have
24  means of testing that to make sure that the outcome is as a
25  result of the test and not simply because that's what somebody

1  hoped or expected it to be.

2        So I guess my concern is that he not be allowed to

3  just testify generally in terms of here is what confirmation

4  bias is and be sure and look for it.  Why doesn't jury

5  instructions and cross-examination cover that part?

6        MR. CURTNER:  I'm sorry, Your Honor, what's the

7  question?

8        THE COURT:  Well, if he's going to testify generally

9  about confirmation bias, explain what it is in his opinion and

10  telling the jury that, you know, be sure and weigh all of the

11  experts' opinions and the rest of the testimony with that in

12  mind, why do we need that from an expert rather than just jury

13  instructions and cross-examination to point out any bias?

14        MR. CURTNER:  Well, it's not so much to bias as to

15  psychological phenomenon of how suggestibility can affect even

16  forensic experts, for example.

17        I mean -- and I agree that's -- probably the study I

18  can file with the Court by tomorrow will address that

19  specifically.  And so I think that that's what would be missing

20  from jury instructions or cross-examination, this explanation of

21  the phenomenon of suggestibility in cognitive psychology.

22        And it's been recognized -- I think eyewitness

23  identification is one area, but it's also now, you know, I

24  think, been expanded into forensic experts and a number of

25  examples, and so I'll provide that with the Court.

1           THE COURT:  Is your expert expected to testify about

2    the increased risk of error if a forensic analysis is conducted

3    by someone who knows what the outcome is expected?

4           MR. CURTNER:  Well, yes.  And I think that

5    specifically applies to Mr. Schmidt, who is not a forensic

6    expert.  He is somebody in the automobile industry that works

7    for Honda that was requested by the government to identify a

8    picture of what the government would believe to be a Honda.

9           And I think that that whole process is very akin to

10   eyewitness testimony in the sense of suggestibility, and I think

11   that's one of the things that without -- that I think that the

12   risk of suggestiveness, especially with a witness who says, "I'm

13   70 percent sure under those circumstances," would be helpful to

14   the jury to hear Dr. Reisberg's explanation and expert testimony

15   on that particular issue.

16          THE COURT:  Is your expert expected to testify that a

17   person's perception of low quality visual input can be distorted

18   by that person's expectations or knowledge about what the inputs

19   are supposed to show?

20          MR. CURTNER:  Yes.

21          THE COURT:  What about that Experts Schmidt and Toglia

22   evaluations have been compromised by confirmation bias?

23          MR. CURTNER:  Well, it sort of goes to that too.  It's

24   also hiring an expert to make an identification of a particular

25   vehicle.  And I think one of the things we were most concerned

1    about may be addressed by the government, was that of Mr. Toglia

2    actually did an animation that transfers a very fuzzy picture

3    into an animation of a vehicle that's identical to the suspect

4    vehicle, of Mr. Wells' vehicle.

5           And so the government said that -- and they're not

6    going to show that in opening statement or in their testimony,

7    that the jury will decide to -- the jury will see the raw

8    footage.  And I think Dr. Reisberg was speaking to the fact that

9    if you start off the case with this animation, it informs or it

10   influences the jury's perception of the raw video footage, and

11   that's one of the things we wanted to address too.

12          THE COURT:  Does your expert rely on a body of

13   research which examines bias by experts in the form -- in the

14   favor of their clients?

15          MR. CURTNER:  No.  No, I don't think that's the issue.

16          THE COURT:  Thank you.  Government.

17          MS. LOEFFLER:  Your Honor, I have a number of problems

18   with this, and I'll get to the fact that he -- the description

19   of what Mr. Toglia did isn't even true.  It's not what he did,

20   and there is no animated version of the car.

21          But let me start back by what the law is.  First of

22   all, let me just -- I want to jump on a theme that the Court

23   said, and that's confirmation bias.  That's just bias.  I mean,

24   it's a psychobabble term for something that's been identified

25   from the beginning.  In fact, I will cite my source.

1       I Wikipedia'd confirmation bias, and the explanation
2   they gave was -- it used to be my-side bias, which is just the
3   common -- you know, a tendency in all sorts of areas.  Like, you
4   know, if you follow a sports team and the ref rules in your
5   favor, you think he's right; and if he rules in the other guy's
6   favor, you think he's wrong.  Politicians give a pronouncement
7   then -- you know, or the conservatives may watch Fox News and
8   the liberals may watch MSNBC.  But that's what this bias is.
9       THE COURT:  I use that term, as you know, because the
10  expert uses it.
11      MS. LOEFFLER:  Right.  No, I agree.  But my point is
12  he uses it, but it's no different than the bias courts admit
13  every day.  I mean, you could call it political bias, financial
14  bias, whatever.  And that's why the defense didn't cite a single
15  case where any expert has ever testified as an expert in
16  confirmation bias, nor -- let me point out that we pointed out
17  cases saying it's inappropriate to call an expert to testify
18  about the credibility of another expert.  They can testify about
19  problems with the methodology, and they might be able to say,
20  well, I think the problem with your methodology was you suffered
21  from confirmation bias.
22      But this expert doesn't know anything about cars, and
23  doesn't know anything at all about what Mr. Toglia did.  He just
24  wants to say, in essence, that if you're a government expert and
25  you tended to support this piece of information, you must be

1    biased.  And there's -- and I'll get to that, there's just leaps
2    and gaps on his things.
3            But let me turn to qualifications.  I want to say,
4    because the defense has just referred to him as a psychologist
5    on suggestibility, which by the way, isn't anywhere in his
6    report, but in terms of his qualifications, he says, I quote
7    page 2, "For more than two decades, my scholarly work has
8    focused on the completeness and accuracy of human memory," which
9    is not -- has nothing to do with this case.
10           Mr. Schmidt is not testifying from memory.  This is
11   Mr. -- Dr. Reisberg's own words.  He's analyzing something that
12   he had plenty of time to look at because he -- and he's not --
13   nor is he a forensic expert.  He's saying I'm an -- you know, I
14   know a lot about cars, I know a lot about Hondas, let me see
15   what characteristics I can find.
16           And there's not a single thing by Dr. Reisberg
17   suggesting that there is any study that somebody with a lot of
18   familiarity with an issue might be best able to determine the
19   issue.
20           And again, the example I was thinking about before is,
21   like, okay, I'm a dog owner, I have a golden retriever.  If a
22   dog goes down the street, I might ask -- and I think it might
23   be, I'd ask a golden retriever breeder, does that -- do you
24   think it's a golden retriever?  I mean, that would be the person
25   most likely, too.

1           The reason there are no studies is because to suggest
2    that the person that's most commonly aware of something is
3    somehow more likely to misidentify it, I would think common
4    sense would tell you they're more likely to be able to say
5    whether something is or isn't.  Whatever it is, Dr. Reisberg has
6    no studies of this.

7           In terms of eyewitness identification, if you look at
8    the heading of a bunch of his articles, they talk about the
9    effects on perception of emotional trauma and -- let me see, I
10   wrote down the terms -- but it's the effects on perception of
11   emotions, stress, and trauma, which has nothing to do with an
12   expert with no emotion, not even a government employee, saying
13   what can I do.

14          So the eyewitness identification -- is he an expert in
15   eyewitness identification?  Absolutely.  Has he done studies of
16   this effect?  Absolutely.  But if you read his articles, none of
17   it is akin to saying, "I don't know anything about these
18   experts, and I don't even know about their subject matters, but
19   I can tell you they're biased."  Because if you get to the
20   bottom line, he's basically saying they're biased because they
21   came up with a fact that my client disagrees with.

22          And let me go to the methodology that he used and why,
23   again, that has no bearing.  Okay, he doesn't have any expertise
24   in cars or accident reconstruction, which is not what Mr. Toglia
25   did.  And by the way, there is no animated version of this car.

1          What Mr. Toglia did with photogrammetry is create a

2    virtual computer model through mathematics that was identical in

3    terms of -- through survey points, in terms of the actual layout

4    and put the actual raw footage in it.  It's not an animated

5    version of it.  It is the raw footage put into a computer model

6    where surveys were done and it was mathematics to do that.

7          Okay, so what -- I want to go again to his

8    methodology.  There are no papers written by him, he's not

9    studied this at all.  And what he lists as his examples is he

10   talks about -- and this is why I want to show that there is

11   massive gaps between the data and what he comes up with -- he

12   talks about -- he says that there is a recent massive attack on

13   forensic science.  That's what he says in his -- on page 8.  On

14   page 8 he says, "There is no study supporting my hypothesis in

15   this context."

16         But I'm not aware, by the way, of a massive attack on

17   forensic evidence, which seems to be not only admitted in lots

18   of cases, but the defense isn't even objecting to all of the

19   forensic experts in this case being admitted.

20         Then he refers to the case of the misidentification of

21   the fingerprint on the Madrid bomber, not that he knows anything

22   about why, he just says it must be confirmation bias.  And then

23   he goes into the DNA Innocence Project and says, "DNA, which is

24   forensic evidence, has managed in many instances to show that

25   somebody was wrongly convicted."

1    I don't know what that has to do with saying, so
2  therefore experts are biased.  The forensic expert actually, you
3  know, found that the person was innocent and then he just
4  assumes, well, then if he was wrongly convicted, there must have
5  been confirmation bias, which is just a leap of faith.  So
6  there's no methodology whatsoever that he's applying in this
7  area.

8    Anyway, so the -- you know, nothing in his report --
9  and you have to look at the report -- makes him an expert on the
10 subject he now wants to testify to.  Because if you get to the
11 bottom line, it seems to be they just want to get up there and
12 say, because they talked to the government, they must have been
13 influenced somehow to come up with the answer that the
14 government wanted, but he's got no studies to show that.

15    And as I said, that would apply to every forensic
16 expert that exists in all the defense experts.  And I don't see
17 any court that's done it, and certainly there isn't a single
18 court -- and the defense cited nothing to suggest a court would
19 allow an expert to come in and testify about the lack -- it is
20 lack of credibility.  He's saying, "Oh, well, you guys must have
21 been suggested, so your answer is biased," about fields he knows
22 absolutely nothing about.

23    And I don't -- nobody's precluding the defense from
24 calling experts, and nobody's saying that Dr. Reisberg isn't an
25 expert.  He's just not an expert in what he wants to talk about

1  now, and nor does it have any relevance.  The courts have been

2  instructing juries, and people have been cross-examining people

3  about bias sort of from the beginning of time.

4          Let me just ask whether you want to put any --

5          MR. SCHRODER:  I just want to make sure --

6          MS. LOEFFLER:  Yeah.

7          MR. SCHRODER:  -- for the record.

8          MS. LOEFFLER:  Oh, I just want to make sure on the

9  record.  We've never said we wouldn't show Mr. Toglia's computer

10  model during our opening.  And it's not an animation of -- he

11  didn't reconstruct the accident and animate it.  If the Court

12  saw it, he put the raw footage that's from the actual video into

13  the virtual model that he created, but it's the raw footage from

14  the video, which is not enhanceable.  Despite all the references

15  by Dr. Reisberg about the enhanced video, it's not.

16          And I don't -- I haven't even heard from Mr. Curtner,

17  and I -- so I don't really want to go into it, this theory that

18  he wants to testify about what order the Court should admit

19  evidence.  And I think I'll just leave that aside, because I

20  haven't heard any argument, and it's the defense burden as to

21  why he could testify as to what pieces of evidence should be

22  shown and why.

23          So if I can quickly -- I just want to -- anyway.

24          So I guess my bottom line is to do something this sort

25  of out of the ordinary, I think the defense could at least -- if

1  this is such an obvious area of specific scientific knowledge, I

2  would expect they would have come up with a case where some

3  court had ever allowed anybody to testify, or even allowed an

4  expert to testify as to the bias of an expert in a completely

5  different field in which the expert has no experience

6  whatsoever.

7       THE COURT:  Thank you.  Mr. Curtner, did you have any

8  summation?

9       MR. CURTNER:  No, Your Honor.

10       THE COURT:  All right.  My practice is to take it

11  under advisement because I will do a written response and ruling

12  on it.  I have my thoughts together, and as soon as I can get it

13  dictated and typed, I'll file it.  It shouldn't take too long.

14       MS. LOEFFLER:  Thank you, Your Honor.

15       THE COURT:  Thanks for your appearances here today.

16  We'll be in recess.

17       MR. CURTNER:  Thank you.

18       THE CLERK:  All rise.  This matter is adjourned.  This

19  court stands adjourned subject to call.

20            (Proceedings adjourned, 2:24:40 p.m.)

21

22

23

24

25

CERTIFICATION

    I, LEONARD J. DiPAOLO, RPR, CRR, CCP, court-approved
transcriber, certify that the foregoing is correct transcript
from the official digital electronic sound recording of the
proceedings in the above-entitled matter.


_____          __9/10/14____
Leonard J. DiPaolo, RPR, CRR, CCP              Date