1      UNITED STATES DISTRICT COURT

       DISTRICT OF ALASKA

2

 UNITED STATES OF AMERICA, )  Case No. 3:13-cr-00008-RRB

3         )

     Plaintiff,  )  Anchorage, Alaska

4         )  Tuesday, April 1, 2014

  vs.      )  8:51 a.m.

5         )

 JAMES MICHAEL WELLS,  )  TRIAL BY JURY - DAY 2

6         )

     Defendant.  )

7         )

8      TRANSCRIPT OF PROCEEDINGS

      Pages 219 - 461, inclusive

9

    BEFORE THE HONORABLE RALPH R. BEISTLINE

10     UNITED STATES DISTRICT JUDGE

11 A P P E A R A N C E S:

 For Plaintiff:  KAREN LOEFFLER, ESQ.

12      BRYAN D. SCHRODER, ESQ.

      KATHLEEN ANN DUIGNAN, ESQ.

13      U.S. Attorney's Office

      222 W. 7th Avenue, #9

14      Anchorage, Alaska 99513

      Ph: 907/271-5071

15

 For Defendant:  F. RICHARD CURTNER, ESQ.

16      Federal Public Defender's Agency

      601 W. 5th Avenue, Suite 800

17      Anchorage, Alaska 99501

      Ph: 907/646-3400

18

      PETER OFFENBECHER, ESQ.

19      Skellenger Bender, P.S.

      1301 5th Avenue, Suite 3401

20      Seattle, Washington 98101-2605

      Ph: 206/623-6501

21

 Court Recorder:  NANCY LEALAISALANOA

22      U.S. District Court

      222 W. 7th Avenue, Suite 4

23      Anchorage, Alaska 99513

      Ph: 907/677-6111

24

25

1    A P P E A R A N C E S:  (Continued)

2    Transcribed by:    LEONARD J. DIPAOLO, RPR, CRR, CCP
                        Peninsula Reporting
3                       110 Trading Bay Road, Suite 100
                        Kenai, Alaska 99611
4                       Ph: 907/283-4429

5

     Proceedings recorded by digital sound recording, transcript
6    produced by stenographic transcription service

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                 P R O C E E D I N G S

 2            ANCHORAGE, ALASKA - TUESDAY, APRIL 1, 2014

 3       (Defendant present)

 4                                        (Jury not present)

 5    (Log 8:51:27)

 6            THE CLERK:  All rise.  His Honor the Court, the United

 7   States District Court for the District of Alaska is now in

 8   session with the Honorable Ralph R. Beistline presiding.  Please

 9   be seated.

10            THE COURT:  Okay, good morning.  Are we ready to go?

11            MR. OFFENBECHER:  Not quite yet, Your Honor.  Mr.

12   Curtner is, I think, just in the hallway on his way in.

13            THE COURT:  Okay.  I can't tell who is here and who is

14   not here.  Government ready to go?

15            MS. LOEFFLER:  Yes, we are, Your Honor.  When I -- I

16   asked Nancy to let you know as we were trying to figure out -- I

17   showed Mr. Offenbecher these charts.

18            THE COURT:  Okay.

19            MS. LOEFFLER:  But I was trying to find someplace to

20   put them up --

21            THE COURT:  No problem.

22            MS. LOEFFLER:  -- where the jury can see them, they

23   can see them.  The only problem -- we made an opening for you,

24   and I'm happy to show them to you, but I can't figure out a way

25   for everybody to see them.
```

 1          THE COURT:  Don't worry about it, that's fine.

 2          MS. LOEFFLER:  Okay.  Well, you're the judge.  I've

 3  got to get your okay that we've done.

 4          THE COURT:  Okay.  It looks like you've done the best

 5  you can do under the circumstances.

 6          MS. LOEFFLER:  Thank you.

 7          THE COURT:  I don't see Mr. Curtner here.

 8          MS. LOEFFLER:  Your Honor, when you tell me to go

 9  ahead, because there is security on our computer, my person will

10  just have to help me pull it up.  We've got to dial in security.

11          THE COURT:  I have one matter to deal with before we

12  start, and I'm just waiting for Mr. Curtner.

13          MS. LOEFFLER:  Okay.

14     (Pause)

15          THE COURT:  Actually, I'll deal with my matter later.

16  As soon as Mr. Curtner gets here, we'll get started.

17          MS. LOEFFLER:  Perhaps, Your Honor, while we're

18  waiting, there is one little tiny thing we might take care of

19  easily.  That's just that after the openings, might be a good

20  time to take an early morning break simply because we can get

21  rid of this stuff and wheel in the exhibits.  There is no room

22  in the courtroom to put them in.

23          THE COURT:  That's fine with me.

24          MS. LOEFFLER:  So I just thought I'd -- if that's

25  okay, that would be a good time to just be able to bring it in.

```
 1          MR. OFFENBECHER:  Sure, that makes sense.

 2          THE COURT:  Can you call the jury in?  Are they here

 3  already?

 4     (Pause)

 5          THE COURT:  We're waiting for the jurors.  There is an

 6  issue with the jurors.

 7          MS. LOEFFLER:  Okay.

 8     (Pause)

 9          THE COURT:  Everybody can be at ease, it's going to be

10  a few minutes.  The jurors are gathering still.

11     (Pause)

12          THE COURT:  Okay, we do have an issue with the jurors.

13  We may have to have the jury clerk explain it to us.  We may be

14  going with 14 instead of 15 jurors.

15          THE CLERK:  (States juror name), who was --

16          THE COURT:  You can explain it.  I meant to have the

17  jury clerk.

18          THE CLERK:  Oh.

19          THE COURT:  But if you can explain it, you can explain

20  it.

21          THE CLERK:  I can tell you what they told me.

22          THE COURT:  That's hearsay.

23          MR. CURTNER:  Objection.

24          THE COURT:  So apparently there is a confusion as to

25  one of the jurors.  One of the jurors who was seated had been
```

1  excused.  And the jurors are confused as to whose number was

2  who, is that the issue -- the problem?

3          THE CLERK:  I believe the issue is Number 32.

4          THE COURT:  Number 32.

5          THE CLERK:  (States juror name) believed his Number

6  was 31.

7          THE COURT:  He thought he was 31 despite the fact he

8  had it -- he just looked wrong?

9          THE CLERK:  So when we called 31, (states juror name)

10 came up and took chair number 5.

11         THE COURT:  What did Number 31 do?

12         THE CLERK:  I don't believe he did anything.  He just

13 went back to -- he got excused.

14         MS. LOEFFLER:  I thought the guy on -- if I think who

15 we're talking about, I thought he was wearing 31.  We need to

16 look back at the -- I don't have my jury -- I don't have the

17 jury book in here.

18         THE COURT:  I don't either.  But it sounds like we're

19 going to -- I think the solution is to go with 14 jurors if

20 there is an issue.

21         MR. CURTNER:  Judge, we had, because I counted, and

22 I'm not always right, we had 15 people --

23         THE COURT:  We had 15 up there.  I counted.

24         MR. CURTNER:  -- sworn in.

25         THE COURT:  You're right.  One of them had been

1  excused.  One of them had apparently thought he was 31.

2         MR. CURTNER:  How many do we have now?

3         THE CLERK:  All 15 are here except --

4         THE COURT:  16.  We have 16 here.

5         THE CLERK:  No, (states juror name) has not shown up.

6         THE COURT:  Oh, the other fella didn't come?

7         THE CLERK:  No.

8         THE COURT:  So --

9         MS. LOEFFLER:  The only thing I want to do is -- I

10 thought the person you're talking about, Juror Number 5 -- if

11 it's Juror Number 5 -- I don't have the book in front of me, but

12 I thought he was wearing the 31 button.  Now I'm really confused

13 as to --

14         THE COURT:  Should we bring this juror down or what?

15         MS. LOEFFLER:  I don't have the jury book.

16         MR. CURTNER:  I don't have mine either.

17         MS. LOEFFLER:  Yeah, the list.

18         MR. SCHRODER:  My book -- I think I left it sitting on

19 the conference room table.

20         MS. LOEFFLER:  Judge, I think we can resolve this

21 quickly.  What we'd like to do is go get the book and the list

22 so that we can maybe consult together on it --

23         THE COURT:  Sure.

24         MS. LOEFFLER:  -- and take a look at it and we'll just

25 go get ours.  Because you don't have yours in here either, do

1  you, Mr. Curtner?

2          MR. CURTNER:  No, I don't.

3          MS. LOEFFLER:  Let's go get it, we'll get the list.

4  We can get together and consult and hopefully help the Judge

5  resolve this quickly.

6          THE COURT:  Can you say again what you think the

7  problem -- Number 31 -- Number 31 thought he was 32?

8          THE CLERK:  Did Number 32 have a 31 badge number, or

9  did he think he was?

10         THE COURT:  We have number problems.

11         THE CLERK:  Can we verify with him, did he have number

12  31?

13         MS. LOEFFLER:  We have a copy of the list.

14         THE CLERK:  He was wearing 31.

15         THE COURT:  He was wearing 31.

16         THE CLERK:  Did they switch 31 and 32 when you were

17  back there?  Okay, okay.  He said -- but the whole time he was

18  wearing Number 31.

19         THE COURT:  He was wearing 31, good.

20         THE CLERK:  Okay.  I'll see what the judge wants to

21  do, thank you.  He says the whole time he was wearing 31.  He's

22  Number 31, but his name is (states juror name).  So I asked the

23  jurors if there was a possibility maybe they switched the

24  numbers back there, and she said she doesn't know.  But he says

25  he was wearing Number 31 the whole time.

1          MS. LOEFFLER:  That's what I was saying, is that I saw

2   Juror Number 5 with that maroon shirt was wearing Number 31.

3          THE COURT:  Okay.  So is everybody happy with the jury

4   that was seated?

5          MS. LOEFFLER:  Let me just consult with Mr. Curtner

6   and we can make sure that we're all -- if I can.

7      (Whispered discussion off the record)

8          THE COURT:  So what is counsel asking to do?

9          MS. LOEFFLER:  We're trying to be a consensus on this,

10  Your Honor.

11          THE COURT:  That's what we'd like.  Get it squared

12  away.

13          THE CLERK:  Would you like me to have the Jerri come

14  down.

15          THE COURT:  I'd like to talk to Jerri.

16      (Whispered discussion off the record)

17          THE CLERK:  She said a few moments.  They are taking

18  the other group down and then she's coming in.

19      (Whispered discussion off the record)

20          THE COURT:  If you want, I can bring the jurors in and

21  we can --

22          MS. LOEFFLER:  I think what we need to do is -- the

23  story, if I can ask -- it sounds like we all know Juror 31, what

24  his -- you know, who he was, except that now you're telling us

25  that his name is not (states juror name), it's (states juror

1  name)?

2           THE COURT:  Yes.

3           THE CLERK:  Correct.

4           MS. LOEFFLER:  And I think both sides are a little

5  confused about whether the person -- Mr. -- we have different

6  lists of where they are from.  It's a little bit confusing.

7           THE COURT:  He's from Bethel.

8           MS. LOEFFLER:  Yeah, well, if the information that we

9  got on (states juror name) -- if the information that we got on

10 the juror that sat is correct, I think we're all happy.  We're

11 just not sure whether the information we got on him is the right

12 information because of the confusion with the names.

13          THE COURT:  I think it is.  Do you want to bring them

14 down?

15          MS. LOEFFLER:  Mr. Curtner, what do you want to do?

16          MR. CURTNER:  Yes, let's bring that juror down, one

17 juror.

18          MS. LOEFFLER:  And just figure it out.

19          THE COURT:  He's going to be kind of intimidated here.

20 Well, do you want to just have him stand here?

21          MR. CURTNER:  Just a minute, Your Honor.

22          THE COURT:  How about if we meet with -- we'll meet

23 with him out here in the hall.

24          MS. LOEFFLER:  Your Honor, what I think is --

25          THE COURT:  We're going to meet with him now.

1          MS. LOEFFLER:  I think we all know who he is, in which

2     case we have no problem.  I just think the numbers system

3     created a situation where his name got confused and nobody ever

4     caught it.  And if that's the case, we're fine with him.

5          THE COURT:  But I want counsel to talk with him.

6     He'll be right here.  We'll be right out here so we won't

7     embarrass him.  We'll go outside.

8     (Sidebar begins)

9          THE COURT:  What I think happened is the numbers got

10    switched.

11         MR. CURTNER:  Excuse me.  (Indiscernible).

12         THE COURT:  What?  Pardon?  What?  Yes, but he's not

13    the one that's here.

14         MS. LOEFFLER:  (Indiscernible).

15         MR. CURTNER:  At the end we let him go.

16         THE COURT:  This guy is the guy from Bethel, he works

17    at --

18    (Indiscernible - simultaneous speech)

19         THE CLERK:  He didn't tell anybody out there.

20    (Indiscernible).  Yeah, but I think they switched the numbers.

21    (Indiscernible).  So I think they meant to kick out (states

22    juror name).

23         MR. CURTNER:  (Indiscernible).

24         THE COURT:  Okay, do you remember, what number are

25    you?

1          JUROR NUMBER 32:  31 [sic].

2          THE COURT:  Okay, and you were seated as a juror,

3   right?

4          JUROR NUMBER 32:  No, I was not, (indiscernible) and

5   then there was a little confusion and then they got me back in

6   there (indiscernible).

7          THE COURT:  (Indiscernible).

8          MS. LOEFFLER:  The right person.

9          THE COURT:  This is the right person.  Does everybody

10  agree?

11         MS. LOEFFLER:  This is the right person.

12         MR. CURTNER:  This is the right person.

13         MR. OFFENBECHER:  And his name is?

14         JUROR NUMBER 32:  (Juror states name).

15         THE COURT:  Okay, from Bethel.  We've gotten the

16  numbers down -- somehow -- we've got the right juror.

17         MS. LOEFFLER:  (Indiscernible).  We know the person

18  that we don't have.

19         THE CLERK:  (Indiscernible).

20         JUROR NUMBER 32:  Right.

21         THE COURT:  If you can bring the rest of the jury on

22  down.  Okay, so the record is clear, everybody is happy with the

23  jurors?  There was a confusion with regard to numbers, but not

24  with regard to people.  This person is the person that is sworn

25  in.  Mr. -- what was his name?

          1           MR. CURTNER:  (States juror name).

          2           THE COURT:  (States juror name), okay.  And he's the

          3  juror.  Any objection?

          4           MS. LOEFFLER:  No, we agree.

          5           THE COURT:  Any objection?

          6           MR. CURTNER:  No, Your Honor.

          7       (Sidebar end)

          8           THE COURT:  Okay, problem solved.  And the jurors are

          9  on their way down, and we'll get started in probably three or

         10  four minutes.

         11           While we're waiting, counsel, what I would like to do

         12  scheduling wise is to start trial from now on at 8:30 in the

         13  morning, and we're going to take this Friday off, and we'll

         14  probably take next Friday, excuse the jury, because we have one

         15  juror that's traveling, you all remember?  But we will use that

         16  day from 8:30 to 10 to work on jury instructions and the issues,

         17  and I'll do sentencings, et cetera, the rest of that day.

         18           I want to be able to tell the jury in advance so they

         19  can may plans.  So the plan is we're going to go this week, we

         20  won't go Friday because of other commitments, we'll go next week

         21  Monday through Thursday.  Counsel and the Court will meet Friday

         22  morning, and then we'll just -- and we'll start our trials at

         23  8:30 in the morning.  Any objection?

         24           MS. LOEFFLER:  No, Your Honor.

         25           THE COURT:  I'll advise the jury of that then.

1          Ms. Loeffler, can I ask you to take that picture down

2   until --

3          MS. LOEFFLER:  Absolutely.

4          THE COURT:  -- until I address the jury, so they don't

5   just hear a voice coming from out of nowhere.

6          MS. LOEFFLER:  We tried to find a way to get it out.

7          THE COURT:  I don't mind.

8          MS. LOEFFLER:  Do you want them both down, Your Honor?

9          THE COURT:  I think that's good enough.  I can move

10  over.

11         MS. LOEFFLER:  How about we do this so then you can

12  see them.

13         THE COURT:  All right.  And then you can put them up

14  as soon as you get started.

15         And Nancy, they can come right in as soon as they

16  are --

17         MS. LOEFFLER:  Your Honor, do you want to see what the

18  other two ones are, or the other two -- I can show them to you.

19         THE COURT:  I can see from the back.  There is nothing

20  on the front.

21         MS. LOEFFLER:  Well, they are going to get turned

22  around.

23         THE COURT:  Well, I can see that.

24         MS. LOEFFLER:  Okay.

25      (Pause)

1                                               (Jury present)

2          THE COURT:  Okay, can you remember your seats, that's

3  the -- after a while, you'll come in in the right order and it

4  will be smooth as a bell.

5          All right, thank you.  Good morning, ladies and

6  gentlemen, please be seated.  How are you doing?  Are you

7  holding up?  One day, this is day number two.  There is water

8  right next to you.  That's fine.  We have water.  Remember, I

9  told you yesterday, if you need anything, let us know.

10         The plan from now on is we're going to from 8:30 in

11  the morning until roughly noon, and then from 1 or 1:15 to

12  roughly 4:30 or 5.

13         But we're going to take this Friday off for other

14  commitments.  And next Friday will be not a court day either, so

15  you can plan on that.  We'll be here, the attorneys are here

16  because we have to have time to work on jury instructions, but

17  you can plan, ma'am, next Friday so that the -- this is to

18  accommodate jurors as well as who had other commitments on the

19  11th.  And then we'll just go after that straight through until

20  the trial is over.  Any questions?

21         Okay, let me read one more instruction to you, and

22  then we'll get started.  The next phase of the trial will now

23  begin.  First, each side may make an opening statement.  An

24  opening statement is not evidence, it is simply an outline to

25  help you understand what the party expects the evidence will

1 show. A party is not required to make an opening statement.

2 The government will then present evidence and counsel

3 for the defendant may cross-examine. Then, if defendant chooses

4 to offer evidence, counsel for government may cross-examine.

5 After the evidence has been presented, the attorneys

6 will make closing arguments and I will instruct you on the law

7 that applies to the case. After that you will go to the jury

8 room to deliberate on your verdict. So, we'll hear first from

9 the government. Ms. Loeffler.

10 OPENING STATEMENT BY PLAINTIFF

11 MS. LOEFFLER: Thank you, Your Honor. Your Honor, can

12 I put these up?

13 THE COURT: Put those up. Don't worry about me, I'll

14 be here.

15 MS. LOEFFLER: Ladies and gentlemen, next to you I

16 have put up some pictures. And the one on the right with the

17 Ducks Unlimited hat is Rich Belisle; the one on the left in the

18 Coast Guard uniform is Jim Hopkins.

19 And on April 12th, 2012, on a Thursday morning, both

20 men got up at their normal time in Kodiak, Alaska, they left for

21 work at their normal time, drove to their normal place of work,

22 which was the communications station in Kodiak, Alaska.

23 THE COURT: Okay, at that point, move your microphone

24 up so we can have a clear record.

25 MS. LOEFFLER: Oh, I'm sorry.

1            THE COURT:  Or put it on.

2            MS. LOEFFLER:  Actually, I did not put on a

3    microphone.

4            THE CLERK:  It's by the podium.

5            THE COURT:  That explains that.  You can start over,

6    but I think the jury heard you.

7            MS. LOEFFLER:  Ladies and gentlemen, so they went to

8    work on their normal day at the communications station in

9    Kodiak, Alaska in a building you will hear is called T2, or the

10   rigger shop, and I will explain that.

11           And within minutes they started their normal day, and

12   a few minutes later, both were dead, shot, as we will show you

13   through the evidence as the trial goes on, by this man, James

14   Wells, their colleague and co-worker.

15           Rich Belisle, I want to tell you a little bit about

16   him.  He was a civilian employee of the Coast Guard.  He was a

17   retired Coast Guard member, 20 years.  He was a chief

18   boatswain's mate in the Coast Guard before he retired.  Then he

19   went to work at the communications station in Kodiak as an

20   antenna rigger, someone who helped maintain the antennas that

21   are there, and I will explain a little bit more about the rigger

22   shop.  He had been employed there for seven years helping

23   maintain the antennas and the array that was used to gather

24   communications for the mission of the Coast Guard on Kodiak.

25           He was married to Nicola Belisle for 19 years, and

1  they had three daughters.  You will hear from the witnesses that

2  every person that met Mr. Belisle, I expect you will hear, liked

3  him.  He had a sense of humor, he had a smile for everybody, was

4  a teacher and a helpful person, and was very well liked.

5        Next to him in uniform was Jim Hopkins.  He was a

6  petty officer first class in the Coast Guard.  His rating was as

7  an electronic technician.  He was the supervisor of the rigger

8  shop because he was the uniformed Coast Guard officer in charge

9  of some of the new Coast Guard members that worked below him and

10 the two civilians.  He had been married to Debby for almost 20

11 years at the time of his death.  And at that time he had just

12 received an award as Enlisted Man of the Year for Communications

13 Station Kodiak.  He was a quieter man, but he was well like and

14 respected for his hard work ethic and his dedication to the

15 mission of the Coast Guard.

16       Now, I want to turn to Thursday, April 12th, 2012.  In

17 order to understand what went on, what you see here is a picture

18 of the building that will be called either T2 or the rigger shop

19 by people.  It was a maintenance building.  It was designed to

20 repair things and to work on things and had tools and equipment.

21       On April 12th, 2012, the two men, Jim Hopkins and Rich

22 Belisle, came to work at their normal time.  Rich Belisle

23 arrived at 7 a.m., which was his normal time of work; and Jim

24 Hopkins got there about eight minutes later.

25       When Mr. Belisle got there, he started his normal day

1   by signing on to his computer and doing some e-mails.

2           Mr. Hopkins started his normal day.  He was a

3   uniformed officer, and at that time of year he had to do a

4   certain blousing of his sleeves on his uniform.  And he went

5   into the break room, which was next to the office, and I will

6   show you on here -- oh, there it is -- I will describe it to you

7   later that there is a break room next to the office, and he went

8   in to put his shirt down on the table where he would fold it up.

9           And less than five minutes later both men were dead.

10  And they were shot, brutally murdered in their workplace by

11  somebody, we will show you, Jim Wells, with a plan and a method

12  and a motive to kill these two individuals, and leave leaving

13  little trace.

14          And we'll show you this, as I go through the outline

15  and you hear the evidence, with direct facts of time and place

16  that you'll hear, and with circumstantial evidence, which the

17  Judge instructed you about, which is using your common sense and

18  inference from the facts that are shown to you.  And this will

19  show you that the person that walked in to Rich Belisle when he

20  was sitting in the office and shot him with a .44 magnum

21  revolver killing him, and then shot Jim Hopkins in the face with

22  a revolver killing him, and went back and shot both men while

23  they lay dead and dying on the ground at their place of work,

24  was Jim Wells.

25          The evidence that we will introduce will show you that

1  this murder was personal and intentional.  You will learn from

2  the evidence and from your common sense that the murderer, Jim

3  Wells, targeted both men, and the evidence -- some of the

4  evidence we expect you to see turns from the layout of the

5  rigger station.

6          There are no windows in the front.  You can't see who

7  was in there if you don't already know that.  The evidence will

8  show you that there was no robbery that occurred because there

9  was money on these men, that nothing was disturbed in the

10 building.

11         You will hear that Mr. Hopkins and Mr. Belisle were

12 connected by work alone.  They weren't -- they knew each other.

13 Kodiak is a small place.  They didn't socialize.  Their

14 connection was work.  They were both well regarded at their

15 jobs.  And that Mr. Wells, the murderer, targeted these

16 individuals.

17         And you will hear that, from people talking about the

18 multiple shots, that both of these men were inside their rooms

19 at their normal routine.  There is nothing that will show that

20 they had a chance to defend themselves, that they were surprised

21 by the murderer, and of course Mr. Wells was their colleague and

22 would have been expected to be at work that day.

23         The evidence will show you that this murder was very

24 well planned and it was premeditated, and some of the things

25 that you will hear is that there are some unique characteristics

1  to this building.

2          For one, you come in, as I said, there are no windows
3  in the front, nothing that you would know who was in there.  The
4  murderer carefully avoided certain cameras, and we'll come back
5  to that.  There was a camera on the rigger shop, but the
6  murderer -- and Jim Wells knew where that camera was and knew
7  how it was placed -- bypassed the camera both in driving up to
8  commit the murder and in leaving the murder.

9          Now, you will also hear, of course, that Mr. Wells
10 knew the schedule of the people that worked there.  There are
11 only three people that would normally be at the rigger shop
12 between 7 and 7:10:  that was Jim Hopkins; Rich Belisle; and the
13 third man is Jim Wells.

14         His normal work time was 7 o'clock.  He was not there
15 at 7 o'clock that morning.  And as I will walk through this, I
16 expect to show you an outline of the evidence that explains why
17 he wasn't there at 7 o'clock, because he was driving up in his
18 wife's car to murder these two individuals.

19         Other things that will tell you this was premeditated
20 and planned.  Mr. Wells used a .44 caliber revolver.  There were
21 no casings on the floor, because a revolver, of course, doesn't
22 eject them.  You will see the connection with Mr. Wells through
23 the timeline of where he was and where he says he was at the
24 time.  But the one individual who was not there at that morning
25 at the comm station and at the rigger shop when he should have

1   been at his normal time was Jim Wells.

2          Now, the evidence that we will introduce will show you

3   that this was a personal, planned, premeditated murder.  That

4   when Mr. Wells left the site after killing these people, he

5   left -- there is very little or no trace evidence of the

6   murderer.  Obviously, Mr. Wells worked at the COMMSTA.  DNA or

7   fingerprints of him would not tie him to it, but there is no

8   other trace evidence that would tie to anyone else.

9          I guess an example is there are no bloody footprints,

10  there is no bloody fingerprints, there was nothing to collect

11  that would say, "This is the murderer for sure," that you can

12  collect forensically, because all of the blood -- and you will

13  see pictures, I'm sorry, we won't show them a lot, but you will

14  see the pictures -- it was all in the two rooms.  There was

15  nothing dragged out.  It was well planned, well thought out, but

16  it was not perfect.

17         And I'm going to take you through an outline of what I

18  expect the evidence to show, some of the key evidence that shows

19  you how the facts and the circumstantial evidence and your

20  common sense and inferences all tells that it was Jim Wells in

21  there that morning shooting his colleagues.

22         The evidence comes from the geography of Kodiak, the

23  layout, and some cameras that I'm going to talk about that

24  caught Mr. Wells' actions that morning.  None of the evidence is

25  going to be an, "A-ha, this is it."  There were no eyewitnesses

to this murder.  But you will be able to see how it's put together and how it all links to only one person that committed this murder, and that was James Wells.

Now, what I want to do first is lay out by the map, and I'm going to see -- there we go -- that's probably better, thank you -- except -- oh, thank you.  Yeah, this is a better one, thank you.

This is a map of Kodiak.  What it is is starting down by the end of the bay, you will see that Mr. Wells' residence and actually Mr. Belisle's residence are right across from each other in a place called Bells Flats.  Then there is one general exit out of Bells Flats -- there is more than one, but everybody uses this road -- and on West Rezanof Drive there is one road that drives toward -- in order to get to the COMMSTA, which is at the very top of the map here, the rigger shop.

Along the way is the Kodiak base, the main Coast Guard base, and that base has a camera.  The camera is designed to catch people driving just into the base, but in this case it also caught the road and Mr. Wells going by and coming back, and I will go through that with you.

Once they go past the base, next to it is the airport, and West Rezanof Drive goes around the airport, and it is only 1.7 miles from the base to the turn into the airport.  This is Kodiak airport.

Then from the turnoff, from the Kodiak airport to the

COMMSTA, is about two miles. And this whole travel takes somewhere from 10 to 15 minutes to do. It's a very small place. And I'll come back to the geography, because I'm going to connect the geography to the timeline of where cameras caught Mr. Wells and where he was that morning when the murder was committed.

When I talk to you about the building, and I showed you -- COMMSTA Kodiak is Communication Station Kodiak. The purpose of the communications station is to gather information, radio signals, and other signals from the antenna fields. A number of things are done in the mission. For one thing, the search and rescue mission of the Kodiak -- of Kodiak, I'm sorry, and of the Coast Guard, comes through this array. And you will find that at COMMSTA there is a 24-hour watch to listen to the radio signals, both to gather it for search and rescue and for other information gathering. That is done at a building that you'll hear called T1, which is up the hill. That's the operations center where the watch is done. The rigger shop is the maintenance building.

Now, at the rigger shop -- I have a chart, and it's a long way away, but we will go through this with you. The office where Mr. Belisle was found, and I'm pointing to where he was found murdered, is right here. And in that office four people worked: Jim Hopkins is the supervisor; and there were two civilians, Jim Wells and Rich Belisle; and then the chief, a man

named Scott Reckner, who you'll hear from, actually worked there
and had a desk there part time.  And he moved his desk down
there because of issues with Mr. Wells and trying to get him
back in line to the mission that they were doing.

The break room is right here.  And you will hear from
the witnesses that Mr. Hopkins was murdered standing, facing his
murderer and lying right here.  And at the time he was rolling
his sleeves up on this table.  And these two rooms are very
close together.  That's where they were on their normal start of
the day.

What I have shown you is -- when I talked to you about
the other building, which you will hear is building T1, that's
the building up the hill, and that's where the watch is done,
and most of the people that work at COMMSTA work up at that
building.  Down the hill is the rigger shop.

Now, the two buildings you'll also hear had different
levels of security.  T1 had a fence around it and also had
security, and there are -- there is a camera at T1, and I'm
going to go into it.  I will show you where it is and what it
shows.

On T2, you will hear, the night before the murder, the
security person walked around, checked that everything was
locked at T2.  It was locked up the night before, but during the
day what would happen is the first person in, usually Mr.
Belisle or Mr. Wells, would card in and then open a door, and

during the day it was fairly open.  And these are things, of
course, that people working there knew, although people that did
not work there would not know that, would not necessarily know
that you could get into this building.

And I put both -- if you can see it a little better,
this is the layout of the building.  Again, Mr. Belisle was
murdered in the office, and Mr. Hopkins was just in the break
room a few steps away.

Now, you will also -- some of the geography and the
importance that we will show you is how you get to the rigger
shop when you drive up Anton Larsen Bay Road.  What you will see
and hear is there is a normal entrance where people simply drive
up this road.  This is actually not a great diagram of it.
There is a road that goes straight up to T2, and there are
entrances.  That's where everybody drives up.  There is another
entrance.  And there is a third way around.  The first two would
be seen on the camera at T1.  The third one would not.  And that
is the way Mr. Wells got there, to avoid the camera.

We have witnesses who will talk to you about the crime
scene, and what they are going to tell you, just gathering the
evidence and what will appear as common sense to you, is that
this was a personal murder by someone who knew this building,
knew the environment very well, because it will not make sense
any other way.  No one else would know who was in the building,
no one else would know that the two individuals would be close

1    together and not spread out through all these very different

2    areas of this building, where the cameras were, or even what was

3    in this building.

4            And you will also hear, as I mentioned, that there is

5    not a -- there is no trace evidence of the murderer at the crime

6    scene.  This was well planned.  As I said, no bloody footprint,

7    no bloody fingerprints, no mud-splattered footprints walking

8    across the floor that you can match to anything.

9            You will hear the agents gathered up what evidence

10   they could, but none of it was anything that would say, "This is

11   the murderer."  And obviously, as I said, fingerprints or DNA of

12   Mr. Wells or anybody else that worked there is not really of

13   evidentiary value because they did work there, and neither DNA

14   or fingerprints can be time dated.  You can't say somebody left

15   it this day.

16           But the evidence that will lead to Mr. Wells as the

17   murderer shows you that this wasn't perfect, that by the

18   timeline that I'm going to show you next, the action of who

19   drove up, what car was used to commit the murder, and what

20   excuse Mr. Wells gave is going to show you that he was the

21   murderer.

22           What I think I'd like to do at this point is turn the

23   lights down, because I'm going to switch to a timeline.  This is

24   Mr. Wells' residence, and it is where we've shown you on the

25   chart in Bells Flats at the end of -- or not at the end, but on

West Rezanof Drive.  And then there is the base gate camera, the
Kodiak airport, and the COMMSTA.

Now, I want to go to the timeline of the movements of
Mr. Wells that we captured that morning.  This is the base
camera.  At 6:48 in the morning, this is Wells' truck passing
that main gate, the front gate.  And you will also hear that
everybody knew -- COMMSTA was a small place.  Everybody knew
that this is Jim Wells' truck.  Everybody can identify it.  They
can identify each other's cars.

Now, at 7 in the morning, Rich Belisle badged into the
rigger shop.  What I'm showing you on this slide is the camera
that is on T2, or the rigger shop.  That camera will catch cars
driving up to T1.  It does not catch cars on Anton St. [sic]
Larsen Road, but you can see most of the cars driving up on that
camera, and you will be able to see Rich Belisle's car driving
in.

At 7:08, James Hopkins drove to work.  That's his
truck driving up.  And the T2 camera caught him coming in.

At 7:09, this car, this blurry image of a car, came
from the T1 camera.  And you can see what the T1 camera shows.
It's hard to see on this picture, but we will explain it to you,
that the camera, the way it was that morning, it was way up the
hill on T1, could only catch a small part of Anton St. Larsen --
Anton Larsen Drive, and there were cars parked in the parking
lot.

1    This small blue SUV was caught on that camera going

2  past the COMMSTA, not turning in, but going past at 7:09 in the

3  morning.

4    At 7:12 an individual named Don Rudat happened to be

5  jogging up the road, and somewhere between 7:11 and 7:12 he

6  heard a loud metal on metal noise.  And this is not -- if you

7  look very closely in the slide, it's actually -- he's caught on

8  the T1 camera walking by.  That little movement, and you may not

9  be able to see it, is him.  And it's around 7:12.  He heard that

10  loud noise, which you will find was the shot, and probably the

11  last shot, murdering one of these two individuals.

12    At 7:14, here is that small blue SUV caught on the T1

13  camera heading back the other way.  And what you will hear from

14  the evidence is this road, Anton Larsen Road, it only goes for

15  about a mile-and-a-half farther in the winter.  It goes up to

16  the golf course.  It goes farther, but it's not maintained in

17  the winter, and almost nobody drives that road in the winter

18  that isn't going to the COMMSTA.

19    In fact, the only three cars -- there are only three

20  cars during this morning that drive by the COMMSTA at all.  Two

21  of them -- one is a guy named Mr. Schilback, one is a guy named

22  Mr. Bors, both of those people will testify and identify their

23  cars.  The only unidentified car on the road that morning, the

24  only one that didn't go up to the COMMSTA or wasn't the other

25  two, the one identified [sic] car is this small blue SUV, and I

will explain in a few minutes how that ties directly to Mr. Wells.

So at 7:22 the base gate camera catches Mr. Wells' truck heading back home the other way.  There is a 6:48 to 7:22, there is a time gap of 34 minutes, and during that time gap his two colleagues were murdered by somebody who knew them and knew the exact layout of cameras in the building.

And when Mr. Wells turned back home at about 7:25, two of his neighbors saw him turn in.  They recognized his white truck and they recognized him, because Bells Flats is a small neighborhood and Kodiak is a small place.  So they will place him at about 7:25, you know, a couple of minutes to go by the base gate heading back home.

And then -- this is just a picture of Mr. Wells from his driver's license -- at 7:30 and 7:31, Jim Wells called the office, and he left a message with his excuse as to why he wasn't at work, because he would normally come to work at 7 o'clock.  I'm sorry, I'm missing -- okay, okay.  I'm sorry.  Okay, that's fine.

What you will hear -- I'm sorry, I have a technical difficulty, my fault -- what you will hear is that Jim Wells, right after he got home -- remember, they see him turning in at 7:25 -- it's okay, I can do it, thanks -- right after he leaves is seen, caught on the base camera at 7:22.

7:25 he turns into the neighborhood.  Just a few

1  minutes later, immediately after he gets home, he calls and

2  leaves a message -- he leaves two messages.  One on the phone at

3  work of Scott Reckner, and one on the phone of Jim Hopkins who

4  is already dead.  And what the message says to Mr. Reckner, and

5  you will hear it here, what Jim Wells tells him is, you know, I

6  had a flat tire, having trouble with my lug nuts, so I'll be in

7  when I get it done.

8           Now, I'm going to go through two other pieces of

9  evidence here in some detail.  That is how this blue car ties to

10  Jim Wells, where it was located and how it ties to Jim Wells;

11  and also that that claim that he had a flat tire and that he was

12  having trouble with his lug nuts is not possible, and it was a

13  lie, and that's what we are going to show you.  I'm sorry, Kim,

14  to close --

15           UNIDENTIFIED FEMALE SPEAKER:  Click the play button on

16  the --

17           MS. LOEFFLER:  That's right.

18           UNIDENTIFIED FEMALE SPEAKER:  And close that.  Use

19  your clicker.  Use the advance button.

20           MS. LOEFFLER:  Thank you.

21           The small -- I'm going to turn first to the small blue

22  SUV.  And we've circled it with a little block so you can see

23  it.

24           This is the car that the murderer drove.  And the

25  reason that I believe the evidence will show you that is based

1    on a couple of things:  when Mr. Belisle -- the last e-mail
2    message you'll hear, the last action on his computer is
3    approximately 7:10; from his routine, from Mr. Hopkins, when he
4    first gets there at 7:08 and then he's rolling up his sleeve;
5    and then just after that the blue car comes in; Mr. Rudat hears
6    the loud clang on clang noise; and then immediately after 7:14
7    the blue car goes the other way.  So the murderer came in that
8    car.  It's the only identified car and it's exactly when the
9    murder happened.

10         Now, what you'll hear is nobody -- CSI doesn't work,
11   you can't hone in and make a distance picture somehow ultra
12   clear.  This is just a zoomed-in picture of the small blue SUV.

13         Jim Wells had another car in his family, other than
14   the white truck that he drove.  The one that his wife drove was
15   a Honda, early model Honda blue CR-V.  The blue CR-V -- Nancy
16   Wells left for a convention, a meeting in Anchorage, on April
17   10th, two days before the murderer -- the murder.  And when she
18   left, she drove with another person, a friend of hers, and they
19   parked at the airport where you would normally park, in the
20   middle of the parking lot somewhere, and you walk into the front
21   door of Alaska Airlines.  And the friend will testify that she
22   doesn't know exactly where the car was parked, but that's the
23   natural thing, you park in the middle, you walk in the door.

24         After the murder was -- happened, one of the troopers
25   went down to the airport looking to see if he could find a car

1   that looked like the one in the video.  And what they found was

2   Nancy Wells' blue Honda CR-V in the airport parking lot, but it

3   had been moved.  It wasn't where it was left.  It wasn't in the

4   middle of the parking lot.  It was way at the end in a place

5   where it hadn't been left when Nancy Wells left for Anchorage.

6   The car moved.

7           Now, this is the entrance to the Alaska Airlines

8   terminal, and that's where the friend will tell you, you would

9   walk straight in.  You know, you don't take a long walk when the

10  parking lot has got snow and gravel, but this cone represents

11  where the car was found, and it is not where it was left.

12          I want to turn back to that car.  The video that you

13  saw is not a clear picture.  So what the government did is a

14  couple of steps to try to give the jury and in the investigation

15  the best way to see whether the car in the picture appeared to

16  match Jim Wells' other car, his wife's car, or whether it did

17  not.

18          The car that's labeled 419 is actually Nancy Wells'

19  vehicle.  That's the one that the agents took, and they drove it

20  down the road on the 19th, which is seven days after the

21  murder -- yes, sorry, my math -- and they had -- and they took

22  it with the same camera from T1 to try to sort of put it on the

23  same place.  There are no cars parked in the way, that's why you

24  see a fuller picture.  On the left is the suspect vehicle.

25  That's the vehicle that was used to murder these two

1  individuals.

2          The FBI also contacted a video expert from the FBI

3  lab, and you will hear from him.  And what he did is measured

4  Nancy Wells' car, just from the picture he measured it.  And

5  then he stuck that measurement over the actual picture of the

6  suspect vehicle.  And he's going to describe to you that these

7  measurements are consistent.

8          The government also went to somebody that has years of

9  experience in cars, and is actually a Honda engineer.  And he's

10  going to come up here and testify -- again, the picture is

11  blurry in some ways, it's pixilated -- and he's going to say,

12  based on his very, very familiar knowledge, that he would say

13  with about 70 percent certainty that it looks like an early

14  model Honda CR-V, which is exactly what this car is.

15          Now, the government also went to another video expert

16  to determine whether there was anything else that could rule

17  in -- this car in as a CR-V or rule it out.  And the expert from

18  a place called Collision Research -- and he will explain this,

19  I'm not going to go in detail -- but what he did is he took the

20  actual image and he imposed outlines of other cars.  This is the

21  outline of a CR-V to see whether it matched it.  Some will not

22  match.  A bigger car won't fit.  This is the outline of a CR-V,

23  and placed it over the video, and he will explain that to you.

24          All of these pieces of evidence will lead to show that

25  the video that was taken of the actual suspect car appears to be

1  a small blue Honda CR-V, and you will also know that a small

2  blue Honda CR-V that Jim Wells had access to at that airport

3  moved from before the murder to after the murder.

4        There were also a number -- the rigger shop is a very

5  small place.  The people that work there -- as I told you, there

6  were a number of seamen who were starting out, and in that

7  office worked four people:  Scott Reckner; Jim Hopkins, Rich

8  Belisle, and Jim Wells.  And what you will hear is there is only

9  one of that group that was having workplace conflicts.

10        Mr. Wells was a very knowledgeable mechanic.  He was

11  an antenna mechanic, but he had a history of running things

12  himself.  He liked, and you will hear from people that have

13  supervised him before, that he liked to be in charge and have

14  things done the way he liked them done.  He didn't like change,

15  he liked them done his way.

16        And he had pretty much been able to do that, because

17  the Coast Guard uniformed force would leave -- you know, they

18  rotate out every once in a while, but starting in 2011, about a

19  year before the murders, Wells started having conflicts, and

20  they became more and more because the management of the Coast

21  Guard at that time tried to bring him into the mission of the

22  Coast Guard, to have him follow directions and orders.

23        And during that time -- we will go through this --

24  there were a number of efforts to get him to start to follow

25  orders, and there were some reprimands and counseling that went

1  to Mr. Wells to say, you know, you need to get with the program,

2  you need to start to do what we were doing.

3          And Chief Reckner, who you will hear from, actually

4  moved a desk down into the office so that he could try to work

5  and get Mr. Wells in line with the program.

6          Now, these efforts sort of culminated in the fall of

7  2011 with some allegations that Mr. Wells, when everybody was

8  gone, that he had stolen some fuel, and they went to counsel him

9  on that.  And then Jim Wells got very ill, and he was gone for,

10  off and on between vacation and illness, for five months or so.

11          During that time the people working in the rigger shop

12  figured out that they could do the job without him, that they

13  could -- there were manuals, there were things they could look

14  up, and that they didn't need him.  And you will hear from

15  people, that Jim Wells was knowledgeable, but he had a very high

16  regard for his own knowledge.  He didn't tend to give it up to

17  other people, he did sometimes, but he didn't like letting other

18  people learn that they could do this without him.

19          And some of this culminated, when -- he liked to go

20  every year, he liked to travel to go to a conference on antenna

21  riggers, a national antenna conference.  And when he came back

22  to work after being ill and out, he was told by a supervisor, by

23  Chief Reckner, that he couldn't go because he hadn't been there,

24  and everybody else was going.  And he pointed at Mr. Belisle and

25  said, "Yeah, but he's only the antenna rigger."  And he was not

1    fitting in and having work conflicts and nobody else was.

2           Now, we're also going to bring in a forensic

3    psychologist who is going to talk to you a little bit about

4    workplace violence, he's not going to talk to you about Mr.

5    Wells -- he didn't examine him -- but he's going to talk to you

6    a little bit about and explain to you, based on his research,

7    the difference between violence that happens when somebody just

8    has an emotional response and targeted, personal, planned

9    violence at the workplace.  And he studied that and he will talk

10   to you about it.

11          And I don't want to go into it here, but I think if

12   you will listen and hear from him, that some of the common

13   things that people get on TV are not really borne out but what

14   happens in reality.

15          In other words, when these workplace actions happen,

16   they don't happen from somebody snapping, there is no direct

17   threat; they happen, in some of these instances, from somebody

18   who plans things, acts with stealth and gives no warning.  And

19   you will listen to the evidence and determine whether that fits

20   exactly what happened here.

21          Now the other thing that I told you a minute ago, that

22   there is that 34-minute gap, and Mr. Wells called and said.  "I

23   had a flat tire."  This is what I said, "The only reason I

24   wasn't there is that I had a flat tire in my truck."  This is

25   when he was talking to the agents.  The day of the murder they

1  spoke to everybody at the communications station trying to

2  figure out what had happened.

3          He said, "I started to come to work and noticed my

4  tire was low and turned around and went back home." He said, "I

5  turned around near the Comfort Inn..." which is at the entrance

6  to the airport right over here, "...and went to the bathroom --

7  went home and went to the bathroom and went to change a tire."

8          And here is the call he made at 7:31. "Hey, Scott..."

9  that's Scott Reckner, "... Jim. I haven't been able to get a

10 hold of Rich or Jim. I got a flat tire in the truck, having

11 trouble getting it off, the lug nut. So anyway, when I get

12 done, I'll be in." And here is what the evidence, I believe,

13 will show you about that statement.

14         One, it doesn't explain a 34-minute time gap. That

15 the timing to drive -- to go by here at 6:48 and come back at

16 7:22, it doesn't take 34 minutes to go one mile and see a low

17 tire and come back.

18         Secondly, you will hear from a number of the people at

19 the station, every tool that you would possibly need to deal

20 with a low tire exists at the rigger shop, which is only two

21 miles away. And they will tell you the story didn't make sense

22 to them, I believe, at the time. Why not just go to work and

23 deal with it. There is a flat, drive surface there as opposed

24 to Wells' steep driveway.

25         Also, remember, Wells says, "Oh, I'm having trouble

with the lug nuts." But because this camera caught him driving
back at 7:22, and people saw him turn into the neighborhood at
7:25, he couldn't have tried -- the timing doesn't fit trying
your lug nuts when he made the call just a minute or two later.

Also you will hear that it so happened that agents
were watching him after the murder, a few days later, and they
saw him change the three other tires in 14 minutes.

There is some other facts you will hear. I expect you
will hear from people that it was unusual for Jim Wells to call
immediately if he was going to be in late, and that he did own a
cell phone, but the call came from his home, not his cell.

Then the agents did find the tire. They did take the
tire that Mr. Wells said he had a low tire or a flat tire, they
did take the tire. And you will hear expert opinions that there
was a nail in that tire, but it wasn't naturally inserted, it
didn't come from running it over in the road.

You will hear a tool mark expert tell you that that
was not naturally inserted, that was manually put in. And
another tire expert with 34 years in the business will tell you
that it appears to him that that nail was shot in by a nail gun,
it was not something that was picked up along the road.

So when I tell you that this murder will appear very
well planned, but not perfect, what we will put before you was
that this alibi doesn't work. The 34-minute time gap makes no
sense except for the fact that it is the perfect amount of time

1   to drive toward the airport, there is plenty of time, and we

2   will go through this in detail, to have gotten Nancy Wells' car,

3   which was sitting at the airport, driven up to the COMMSTA,

4   murder these two individuals, and then leave at 7:14, drive

5   back, drop the car at the airport, and drive home, and that will

6   fit perfectly with the time that Jim Wells is caught in his

7   white truck heading back home.

8           You will hear that the murder weapon has not been

9   recovered.  It was a .44 magnum revolver.  The ballistics expert

10  will tell you that there are three types, models that it could

11  be.  One of them is a Smith & Wesson .44.  And an investigation

12  will not -- led to no public records showing that Jim Wells has

13  a Smith & Wesson .44.

14          But a friend of Mr. Wells in the '90s left a Smith &

15  Wesson .44 stainless steel revolver with Mr. Wells, and that

16  same friend came back a year later -- he left it in a gun safe

17  because he was leaving Kodiak -- and when he came back a year

18  later to ship the safe to his brother in Michigan, the safe was

19  opened and the .44 revolver wasn't there.

20          And he asked Mr. Wells about it and got sort of a

21  non-committal, "I don't know, it's lost or something."  But

22  we'll show you pictures of Mr. Wells' garage at his house, and

23  you will hear from other people that he's a hoarder, that he

24  didn't get rid of anything, and, in fact, found at his house

25  were -- the friend was a Coast Guard member -- that the Coast

1    Guard member ceremonial swords that had been there were still

2    found in Mr. Wells's house.  And you will hear from others that

3    he never gets rid of anything.  But that gun, since it was owned

4    by the other person, would not tie back to Mr. Wells.

5         You will also hear, when we go through the timeline,

6    that between the time that Mr. Wells got back to his home, left

7    the phone message at 7:31 saying, "I had trouble with the lug

8    nuts," and the time that he got back to work, when he had to

9    leave to come back to work that day, because he drove in at

10   8:23, is 40 minutes of time at home.  40 minutes to do whatever

11   with any evidence of the crime.

12        So, now after the agents discovered the 34-minute time

13   gap, the camera that Mr. Wells, I believe you will find, did not

14   know about, and they asked him about it on April 13th, the day

15   after the murder, and what Wells told them is, "I don't have a

16   reasonable explanation for it.  I don't have a theory at the

17   moment..." for where he was when his colleagues were murdered.

18        And I believe at the end of this case -- or we believe

19   that the evidence will show you through facts, through

20   circumstances, through absolute proof beyond a reasonable doubt,

21   that there is one explanation and one theory for what happened

22   that day, and that is that Jim Wells planned and thought and

23   decided to murder his colleagues, and he drove to the airport,

24   got out of his white truck, got the blue car that was not as

25   recognizable to him, he drove up to the building, avoided the

1 cameras that he knew about, went into the building knowing his

2 colleagues would be in these rooms and defenseless, and he

3 murdered them, went back, dropped the car off, took his truck,

4 went home, and called with the alibi that he had planned that

5 didn't work.  And that's the only explanation that fits the

6 facts, thank you.

7         THE COURT:  Thank you.  Mr. Curtner.

8         MS. LOEFFLER:  Can you close it?  Mr. Curtner, do you

9 want me to remove the charts?

10         MR. CURTNER:  Push this over.

11         MS. LOEFFLER:  Is that good?

12         THE CLERK:  Yes.

13         OPENING STATEMENT BY DEFENDANT

14         MR. CURTNER:  Good morning.  You heard the

15 government's opening statement.  And I'll tell you right now,

16 Ms. Loeffler said Jim Wells killed the two people he worked

17 with, and that is wrong.  Jim Wells is innocent; he's presumed

18 innocent by law; and the facts that you will hear in this case

19 will not convince you otherwise.  He did not -- he did not do

20 these shootings.

21         What she did say that was correct is that it's a

22 circumstantial case, which means it's built on so many

23 assumptions, that during the course of this trial, you'll see

24 how many of those assumptions that were, stacked up together,

25 are just wrong, just flat wrong, and when you hear all the

1   evidence, you'll realize that.

2          And the other thing you should remember when hearing

3   all this evidence is that this investigation focused on Jim

4   Wells from the very beginning, from that very first morning, and

5   it was because of Scott Reckner.  Chief Reckner, for some

6   reason, did not like Jim Wells.  And before he even got there

7   that day, he started thinking, this must have been Jim Wells,

8   and he poisoned everybody else to think that.

9          And the whole investigation of this double homicide

10   was focused on Jim Wells, and it never went anywhere else until

11   maybe much later, they might have tried to look at other

12   options, other theories, but they focused from the very

13   beginning on Jim Wells.

14          Well, let me tell you a little bit about Mr. Wells

15   first.  He's 62 years old.  He's a family man.  He's been in

16   Kodiak for many years.  He's a military man.  He joined the Navy

17   when he was 18.  He was in the Navy for eight years.  He was on

18   a ship that went to Vietnam.

19          After eight years in the Navy, he joined the Coast

20   Guard.  He retired after another 12 years in the Coast Guard.

21   And he had an honorable discharge after 20 years serving our

22   country.  The reason he got out of the Coast Guard -- he loved

23   it -- but he had medical problems.  And I'm not a doctor, but

24   it's idiopathic anaphylaxis, which was something that interfered

25   with his work.

1        But let me show you a slide of Jim Wells.  If we could
2    dim the lights, please, Madam Clerk.

3        So this is Mr. Wells.  He's a family man.  This is
4    when he first was in Kodiak in 1980.  This is Nancy, Nancy
5    Wells, his wife.  She's here in the courtroom.  This is his --
6    let me get my pointer out -- this is the oldest son, that's
7    Cable.  He is a bush pilot in Southeast Alaska.  This is his
8    daughter, Elizabeth.  She's in the courtroom for this trial.
9    And this is his youngest son, Matt.  He's a police officer in
10   Portland.

11       Jim Wells raised his family in Kodiak.  He was very
12   involved with his family.  He didn't get into other social
13   activities as maybe other Coast Guard members did.  Some Coast
14   Guard guys like to go to bars, some guys just like to shoot, but
15   he was a family man.  He spent the time with his children.  He
16   coached and umpired baseball on Kodiak Island.  He was involved
17   with outdoor activities with his children.  He was really
18   focused on his job and his family.  And he had one hobby, it was
19   photography, that was the other thing he did on Kodiak Island.

20       He -- if we can go to slide No. 2.  So after many
21   years on Kodiak Island, this is the family he raised.  Oh, one
22   thing I should tell you about Jim is that when he got out of the
23   Coast Guard, he made two vows: never to wear a tie again and
24   never to shave his beard.  And he's honored that all these
25   years.

1        But this is Cable and his wife.  And this is Nancy,
2   Elizabeth.  This is Matt, who is a police officer, and Casandra,
3   his wife, is also a police officer.  This is Cable's and Lacy's
4   daughter.
5        And No. 3, you'll see that sometimes when you get
6   older and your beard gets white, it comes in handy as Santa
7   Claus.  Mr. Wells was known to play Santa Claus for the
8   children, including his granddaughter for many years, in Kodiak.
9        So now Jim's work history.  After he got out of the
10  Coast Guard, he, in 1990 -- he loved climbing towers.  His
11  training was in electronics.  And so he heard about and got the
12  job at what we call COMMSTA, the communications station in
13  Kodiak in the rigger shop, because he had an electronics
14  background, he loved to climb towers, he climbed in the Navy, he
15  climbed in the Coast Guard, and he loved his job at climbing
16  towers in the rigger shop for COMMSTA.
17       And he was good at it.  He was known nationwide as an
18  expert as an antenna mechanic.  He would get calls everywhere.
19  They would ask him for help and advice.  He was good.  You'll
20  see about his personnel evaluations and performance evaluations.
21  He was good at his job.
22       Now, that didn't mean -- when you're really good at
23  something and you know what you're doing, if you have
24  supervisors, supervisors who come in that come and go, they tell
25  you what to do, but there is some friction along the line with

maybe a supervisor who knew much less than him but was in charge of him. Well, there might have been some friction. But I think you'll see the real friction in the workplace, the real conflict was with Scott Reckner. He's the one that, for some reason, didn't like Jim Wells and had a problem with him.

So I think the first assumption that you'll see that's just wrong is that there was a lot of conflict at the rigger shop. Mr. Reckner had problems with Jim Wells you'll hear, but the rest of the workers, they got along. There was no arguments. There was no violence. There was no threats. There was no fights. But Jim -- any conflict would have been with Chief Reckner.

The other thing I should tell you about Jim Wells at 62 years old, he doesn't have any -- he's never been charged with a crime before. He's never been violent. There is nobody who can say he ever raised a hand to anybody, ever got in a fight. 62 years of raising a family and no violence, nothing at all.

Now, as I said, Jim was medically discharged from the Coast Guard after his 20 years of military service, and then -- he's had medical problems over the years. I think you need to know about some of the medical problems he's had recently, because during -- it will help explain why some of their assumptions are wrong.

In the fall of 2011, just before the spring of 2012

when this tragedy happened, he was suffering from biliary
dyskinesia, if I said that right.  That means that he was having
gall bladder problems.  His gall bladder was causing him nausea
and vomiting, and it was something -- he was really sick.
You'll hear a lot of testimony about how he was really sick
during this time frame in late 2011, early 2012, and he wasn't
in the shop.

Of course, most of the work is in the summertime at
the shop, but he was sick, missed a lot of work, took a lot of
sick leave, took trips to Anchorage to the VA Hospital.  And
when your gall bladder is not working, this is what will cause
the nausea and the vomiting and the retching.

So he had his gall bladder removed in February of
2012, and he also had a hernia operation at that time.  Now,
that corrected the vomiting and the retching.  The gall bladder
was, as I understand it, backed up, not functioning, and that
would cause the nausea.  He had it removed, but there is a
second -- now there is a different problem that's not uncommon
when you have a gall bladder removed, and that is chronic
diarrhea, and it may last for a couple months.  Not everybody
gets it, but Jim suffered from that.  For the few months after
his operation, he had to deal with chronic diarrhea.

Now, that's -- so, let me tell you about after his
operation, let me tell you about April 12th.  Well, let's go
back actually to April 10th.  And this is one of the

1    assumptions, I think, that the government made that I'll show
2    you it's wrong.
3            If we can go to -- well, let me, first of all,
4    let's -- on April 10th, that's when Nancy Wells parked at the
5    airport in front of the airport gates at Kodiak. It's a small
6    airport. She and a friend of hers, Amanda Stanford, parked
7    because they were going to a conference here in Anchorage. Mr.
8    Wells was at work. He went to see them off. He did come back.
9    He did go to the airport to see them off. And I'll show you a
10   couple videos that demonstrate that.
11           Now, at the airport there is Alaska Cargo, and they do
12   have a video surveillance camera at their front desk. And you
13   will see on April 10th, you will see coming through the airport
14   and into that parking spot that we talked about, you'll see
15   Nancy Wells' car. Nancy and Amanda are driving to the airport
16   and they are parking directly in front of where you go into the
17   airport terminal for Alaska Airlines.
18           Okay, the next one, this will show you Jim Wells
19   driving his white truck the same day before they leave to see
20   them off, to see his wife, Nancy, off with Amanda. There is
21   Jim's truck. He's coming in the same way. He's parking to see
22   them off. Now, Mr. Johnson, if we could look at the map of the
23   airport, that would be No. 6.
24           Okay, so you saw some diagrams, but this is Anton
25   Larsen Bay Road that goes to the communications station. This

1    is Rezanof.  This is the main road that goes from Bells Flats

2    where Mr. Wells lived, and many people that you'll hear from,

3    that goes into Kodiak.  This is the road to the airport.  This

4    is the airport.

5              Now, if you could blow up that section a little bit,

6    Mr. Johnson.

7              So what you'll see is this is the main terminal for

8    Alaska Airlines.  This is where people park when they are

9    leaving town.  You can park here.  This is the two-hour spot

10   they were talking about.  This is where Amanda Stanford said

11   this is where they parked that morning.  This is where the cargo

12   office is and where you can see the cars drive through this way,

13   up around here, and right in front of that camera.

14             And so Nancy parks in front.  Jim comes behind, parks

15   about the same area, sees them off.  Now, what you can do in

16   this Kodiak airport, you can park there for a short time, but if

17   you're going to be gone for a couple days, you have to move it

18   down to where the Westmark [sic] terminal used to be.  Westmark

19   is no longer there, but you can -- I'm sorry, MarkAir.  MarkAir

20   is gone, and so you can park down here.  That's what Jim did

21   that day.  When you saw that video, he was seeing his wife off

22   at the airport and moved her car down where these cars are where

23   you can park for a longer time.

24             So that's one assumption that the government made,

25   that that car was moved on April 12th.  It was on April 10th.

1   And what's important about these videos, is that you will not

2   see, if you go through for the next two days, you will not see

3   Jim Wells drive by that camera again. You won't see on the

4   morning of the 12th, which is their theory, their assumption, in

5   order to switch cars.

6           Okay, so what happened on April 12th? Well, Nancy was

7   in Anchorage. Jim normally gets up, and he's a breakfast guy,

8   he'll make breakfast for Nancy. He made coffee for her every

9   day even though he doesn't drink coffee. She's out of town. So

10  he gets up, and he's going to work that day. He's going to work

11  because they have a plan, they are going to climb a tower and

12  they have a job to do that day. So that was the plan. It's not

13  like going to the shop and planning something else later in the

14  year, they are going to climb that day.

15          He's on his way to the airport. We can show that No.

16  6 again. As he's going to the airport and he goes by --

17  probably just after you see him go by the main gate at 6:48, he

18  notices that the tire is low, it's not handling just right. So

19  instead of coming this way to work, he's going to check his

20  tire. He pulls right in here to the Comfort Inn parking lot.

21          He sees -- he gets out of his car. He sees that there

22  is -- the tire is low. But the other thing he is experiencing

23  at that time is this chronic diarrhea, and when it hits, he's

24  got to find a restroom.

25          Well, he's -- up here is Servant Air. Servant Air is

a more local air taxi, takes people out to different communities
around Kodiak, on Kodiak. Jim has been there a number of times
mainly because his wife, who works with the Kodiak Area Native
Association, would fly out of there many times to different
places in her work. So he knew that. He knew that at 7 o'clock
in the morning it wasn't going to be busy. He knew there was a
restroom there, and he had to use the restroom.

And with the diarrhea he had, the effects he had from
this gall bladder surgery, he was there maybe 20 or 25 minutes
in the restroom, and got back, drove back toward his house. He
saw a couple people, his neighbors on the way back; we don't
dispute that. He went back by the gates at 7:22; we don't
dispute that. He went back to his home. He backed up the
truck, and he was going to take off the tire that was low.

Now, he didn't want to park at COMMSTA all day when
they are going to climb a tower. By that time the tire would be
flat. They don't have any spare tires at COMMSTA for him to use
on his car. He's got a spare tire that's under the bed of his
truck that he hasn't had off of there in ten years, but in this
quarter, which most people in Kodiak have to be, I think, or
certainly are, he's got all kinds of tires and tools, and so he
drives on them.

He's going to change the tire. He uses the impact
wrench to take the tire off, the low tire. Sometimes the impact
wrench isn't enough to get off lug nuts that have been on there

1    all winter, so he was having trouble with that.  The timing is

2    perfect.  He calls into work, he says, "I'm having trouble with

3    these lug nuts, it's going to take a few minutes, I'll be a

4    little bit late."

5            He has to get a lug wrench with an extension that you

6    can put pressure on to break those lugs in order to be able to

7    change the tire.  He changes the tire, puts it in the back of

8    his truck.  He's got his summer tires right there, those are the

9    summer tires -- the other three he'll put on later -- and drives

10    into work.

11            The government is assuming he was at COMMSTA shooting

12    Rich Belisle and Jim Hopkins, and they are wrong.  He was at

13    home changing the tire.

14            Then he gets to work.  And the first thing when he

15    gets to COMMSTA is Chief Reckner tells him what happened.  And

16    you'll hear witnesses say Jim was in shock.  He was generally in

17    shock at that time when he heard that his people he worked with

18    were -- had been killed.

19            They asked him to go up -- he's up in the main

20    communication station for 13 hours while they are questioning

21    everybody.  They questioned Jim four times that day.  He

22    volunteers about the flat tire.  He says, "It's in my truck."

23    He lets them look at the tire.  And he goes home that night

24    after 13 hours.

25            The next day they want him to come back.  He comes

1  back, he talks to them, but it's evident that from that time

2  he's the suspect, and they are questioning him about -- and they

3  suspect that he's the one that was the shooter.

4          Now the other thing that's important to remember, just

5  like you heard, they were watching him change his tires.  They

6  were timing him change his tires.  Jim Wells was under

7  surveillance somehow or another from, like, 8:23 the morning of

8  April 12th for who knows how long.  He was under constant

9  surveillance.  He was always being watched.

10          He was in COMMSTA, the main building, for 13 hours on

11  the 12th, back there for another five hours on the 13th, and

12  they would follow him home that day.  They were watching Nancy's

13  car at the airport.  He was always under surveillance.

14          So then the investigation starts all about Jim Wells.

15  It's all focused on Jim Wells.  The best way I can describe it

16  is if you were put -- if your life was put on a government

17  microscope and they drilled down into everything about your

18  life, well, that's what they did with Mr. Wells.

19          I think there were 24 search warrants on his person,

20  on his home, on both vehicles, on -- they asked for DNA, they

21  took nail clippings from his house, they went into his septic

22  tank, they dug out the hillside looking for other bullets.  They

23  went through and put his whole life under a microscope.

24          And they were looking for the gun.  He didn't have the

25  gun.  Ballistics will tell you this gun could have been a Smith

1  & Wesson 629, it could have been a Taurus, it could have been a

2  Llama.  He had a couple Ruger .44s.  He did not have a gun that

3  could possibly have been used in these homicides.

4          But through all this, days, he couldn't go home for

5  three days when his wife came back.  They had to stay at the

6  Comfort Inn when the government was going through his whole

7  house looking at everything on the 13th on.  He couldn't --

8  they -- search warrants kept going for weeks, months.  And they

9  have no forensic evidence that Jim Wells was involved in this

10 homicide.

11         That's another assumption, is that he had the murder

12 weapon.  And they searched everywhere.  He didn't have it.  He

13 never has had it.

14         So the next thing they are going to do is they are

15 going to look for witnesses.  And you would think, as well known

16 as Jim Wells was, he'd been there for 20, 30 years in Kodiak,

17 you think of how well his wife was known, you think in the small

18 community somebody would have seen his car or the white truck,

19 something consistent with their timeline except for -- you think

20 somebody would be a witness to seeing that blue car, Nancy's

21 car, at the rigger shop that day.

22         Well, in fact, let's go to No. 7.  They even published

23 in the front page of the Kodiak paper:  Anybody see this blue

24 car?  Anybody see this white truck?

25         Everybody knew that Wellses was under investigation

1  now because they know their vehicles, they know who is being the

2  suspect.  So you would think that somebody would report having

3  seen one of those vehicles that's consistent with the

4  government's theory, their assumption on April 12th.

5          Well, let's go to the next slide.  Okay, this is a

6  map, and this is some of the reports that came in after this

7  picture was in the paper.  Somebody said that they saw the white

8  truck at Dead Man's Curve at 7:50.  That would have been right

9  there headed toward town.  Well, if that person saw a white

10 truck, it could not have been Jim Wells because he was already

11 headed home, we know, at 7:22.

12         Somebody else said they saw -- they were sure, they

13 were positive, a neighbor, saw his -- Jim Wells' white truck

14 parked at Sargent Creek Road at 10:42 on the 12th.  Well, that's

15 impossible because Jim Wells was still being questioned that

16 morning at the communications station, so that was at 10:42 on

17 April 12th.  That is wrong.

18         Somebody -- there was some reports about a blue SUV

19 on -- somebody said that on the 12th at 6:30 a.m. they saw the

20 blue SUV headed into town.  And that can't be wrong -- that's

21 wrong because we know Jim Wells didn't even go in this way until

22 6:48.  So 6:30, there is no way that blue SUV could have been

23 going that way, the Wells' SUV.

24         Somebody said they saw him at -- well, somebody said

25 they saw Jim driving Nancy's car on April 13th, the next day.

1  But we know that the government had that vehicle under

2  surveillance from the 12th.  That's wrong.

3          So you think if there were any witnesses that saw Mrs.

4  Wells' car go down that road that day, down Anton Larsen Bay

5  Road, that somebody, if it were there, would have seen it and

6  would have reported it.  We have reports that are completely

7  wrong, and nobody saw that vehicle.

8          There is one other report that's interesting, because

9  somebody on the 12th around 7:30 saw a blue SUV parked just off

10 the road toward the Buskin River between 7:30 and 7:40 that

11 morning, and that could not have been the Wells' vehicle,

12 because we know that by 7:30 Jim had already come by in his

13 truck past the Coast Guard base at 7:22.

14         Now, I don't know whose blue vehicle, blue SUV that

15 was, but it wasn't Mrs. Wells' vehicle.  So -- but this is

16 important, because I think it shows that nobody -- no witnesses

17 are consistent with this government's assumption that that blue

18 blur, that phantom blur you see, is Mrs. Wells' car, but that's

19 what they are going to assume.  They are going to assume that's

20 the murderer's car and they are going to assume that's Mrs.

21 Wells' car, and they are wrong.

22         So if you don't have any evidence, you can get

23 experts.  So there are a lot of experts in this case.  Now, the

24 first expert that you will hear from -- well, the first expert

25 to look at this evidence was actually an FBI agent, an FBI -- he

works at a digital evidence lab, Christopher Iber.  He's going
to be our witness.  He's the first one to look at this phantom
blurred image that you saw up here.

He explained that -- and this is his job, and he works
with the FBI -- he explained that it would be impossible to
conclude from that blur that that's a CR-V, or any particular
CR-V, and he explains why.  And you'll hear all this.  I'm not
going to explain it very well, but he explains why there is low
resolution; secondly, there is poor image quality; thirdly,
there is a low frame rate; and finally there is that motion
blurring.

Now he'll explain what those terms mean.  But he'll
explain to you what your common sense will tell you:  That
phantom blur, you can't tell what it is.

We'll have -- so to go to a second retired FBI expert,
Gerald Richards, he was examiner of questioned photographs.  He
looked at that.  And, again, he will be a witness for the
defense that again states that the quality of the pixels from
1100 yards and that type of camera is not -- you're not able to
identify -- do a positive identification from that.

So the government hires a guy who works for Honda.
They show him the video you saw, the demonstration with Mrs.
Wells' CR-V Honda, and ask him to identify it.  Well, he says,
"Yeah, 70 percent sure that looks like an early generation
Honda."  That's their identification evidence.

1       And you have to ask yourself when you hear this, if
2   they show you the suspect car -- we think this is Mrs. Wells'
3   CR-V.  I'm going to show you this blurred image.  What's the
4   likelihood that he would go ahead and say, yeah, that looks like
5   it?  Well, he's 70 percent sure.

6       And then you'll also see, I think, from the -- Ms.
7   Loeffler talked about Toglia and his evidence about how he can
8   identify this by the parameters.  Well -- and Mr. Vorder
9   Bruegee.  Mr. Vorder Bruegee measured Mrs. Wells' car, and he
10  says that's consistent with the measurements of this blur.  What
11  he didn't say, or what he will, I think, testify to, "Yeah, it's
12  consistent with the range of maybe ten inches in length and
13  within five inches of height."

14      Well, that can be a number of vehicles.  And so if we
15  could go to No. 9.  This is what our defense expert will show
16  you.  This is a Toyota RAV4, you can see where he superimposed
17  the CR-V in front of that; it fits.  The Ford Escape, same size,
18  same dimensions; that fits.  Jeep Grand Cherokee fits.  Nissan
19  Pathfinder fits.  The Chevy S-10 Blazer fits.  The Isuzu Rodeo
20  fits.  The Honda Santa Fe fits all within that parameter, that
21  five inch to ten inch -- the Subaru Forester fits, and the Honda
22  CR-V fits.

23      So we'll have our expert come in, use the same
24  information, same -- that -- the government data that the
25  government had, and that's his -- and he will tell you that,

one, any of those vehicles could have been that blue blur, including what somebody saw parked by the river. And you will also hear evidence about how many blue vehicles of those models are on Kodiak Island. But they are going to assume the murderer was in Nancy Wells' car.

Now, the other assumption that they are making is that Jim Wells put a nail in his tire by a nail gun. Well, we're going to have experts. Bruce Currie is a technical forensic consultant, 35 years' experience in the tire business, and his opinion was that that nail was picked up on the road. Jaco Swanepoel is an expert for us, he's a senior forensic scientist at the Forensic Analytical Sciences office in California, he specializes in firearm and tool mark examination. And he will explain to you and support Mr. Currie's opinion that it was not inserted by a nail gun, that that nail was picked up on the road.

Now, another assumption that's critical to their case is that -- what they want to call workplace violence, and what they really mean is co-worker violence. Because if you believe this was co-worker violence, well, Rich and Jim Hopkins, obviously it wasn't them. There is five young people, Coast Guard people, nobody suspected them. That just leaves Jim Wells. But that assumption is wrong.

There is not any evidence -- which I think is just impossible to believe -- that Jim Wells could have been there,

1    done the homicide, and they search everything that he has,

2    everything he's touched, and don't have any evidence of that.

3           The other things you'll hear is that the -- when they

4    looked at -- I mean, their theory is that it had to be Jim

5    Wells, he was the only one to have access to it.  But the

6    back -- there is evidence you'll here about the back door being

7    not secured, about unidentified fingerprints in there.  There is

8    other mysteries that I -- that you'll see in this investigation.

9           Mr. Rudat, he claims to have seen a black truck parked

10   to the side at the same time he heard that shot.  Jason Bullis,

11   who was on watch that day, drove down after 7:30 when he got off

12   work, and he noted some type of a black vehicle that was parked

13   to the side.

14          Now, I don't see that video going back toward -- down

15   this way, down Anton Larsen Bay Road, back to the main highway

16   or to the airport, but that doesn't mean it wasn't there.  I

17   don't know.  What's interesting, too, is that Jason Bullis, he

18   was on watch that night, got off that morning, he noted in his

19   reports that there was a suspicious white vehicle that came by

20   twice the night before.

21          And let's look at that shot -- so from the

22   surveillance video, this is from the rigger shop itself, there

23   is a -- he notes that there is a suspicious car coming through

24   at 7:36, and then -- and that's what he noted.  Now, this is Mr.

25   Wells' truck.  And you can see -- and Mr. Bullis will tell you

 1   that's not Mr. Wells' truck, some other white truck came by the

 2   night before.

 3           So if we looked at the video from the night before --

 4   Mr. Johnson, do you want to do 11.

 5           Now, what you notice here is that Anton Larsen Bay

 6   Road goes up here toward the airport, but it also goes this way.

 7   And this car is coming from the opposite direction.  You can see

 8   the headlights coming from the opposite direction, coming around

 9   and turning around and going back the other way down Anton

10   Larsen Bay Road.  This is the second video.

11           This is eight minutes later, same night, the night

12   before the homicide.  Same thing, comes from this direction,

13   headlights are shining this way instead of coming in like those

14   other cars you'll see coming this way.  Comes in closer this

15   time, pulls around like it might be casing the rigger shop,

16   okay.  I don't know whose that white truck is.

17           But let's go to No. 13.  Okay, this is not a fancy

18   map, but this is what I want to show you.  This whole

19   investigation, like you see here, goes from -- well, there is

20   the golf course.  And the COMMSTA, the communication station, is

21   right there across from Buskin Lake.  This is the Anton Larsen

22   Bay Road.  This is what you've already seen.  And this whole

23   investigation obviously is centered around that.

24           Now, another assumption that's wrong is that that road

25   only goes a mile-and-a-half to the golf course.  No.  That road

goes all the way to the boat lunch at Larsen Bay Road.  One
could take a boat back to Kodiak from there.  One could even
leave the rigger shop and go anywhere down here.  So that black
vehicle could have gone that way.  That white truck could have
come in, dropped somebody off, and gone back that way; we don't
know.

But let me show you the next one.  The reason I know
that road is open in the wintertime is because we drove it.  And
we took some pictures of houses and buildings back down toward
Larsen Bay Road way past the golf course.  That road was open --
go ahead, next -- all kind of big buildings, small buildings
that anybody could have access to -- go ahead -- where there are
trailers -- go ahead -- so you can see the number of places that
are down that road that have never been investigated in this
investigation because it's all been about Jim Wells.

So if it wasn't Jim Wells, their theory, their
assumption is nobody else would have had a motive, a means, or
an opportunity.

Well, the last thing anybody wants to do is
investigate the families of two people that were tragically
killed.  And their theory, their assumption is that Rich Belisle
and Jim Hopkins didn't have anything going on in their life that
would possibly make them a target of this type of violence.

Well, I think all of us at some point have the burden
of family members that affect your life.  Jim Hopkins, it was

his wife Deborah.  I think you'll hear evidence about other people with possible motive, means, or opportunity.  They were in substantial financial debt.  Deborah used to come by T2, the rigger shop, quite a bit, she knew it.  She was there when -- even when Jim was not there.  They -- she would -- some say was emotionally unstable.  Some people would testify she flirted with some of the younger men at the rigger shop.

And probably the biggest thing you need to look at is that Jim -- they had a rocky relationship, and Jim was -- Jim Hopkins had told people that he was thinking he was going to file for divorce as soon as their son graduated high school a few months later.  You need to look at that as there are not -- as other -- as Ms. Loeffler said, the only theory, the only answer; there are other possibilities.

Now Rich Belisle, he was one of the best liked people in Kodiak.  Everybody liked Rich.  But he had three daughters, and sometimes with your teenage daughters comes the people they want to hang out with.

Well, Hannah is the youngest, she was 16, and unfortunately she had some drug problems.  And she hung out with, I can only describe them as, the bad boys of Kodiak.  So I think we need to look at that.

One of them was Travis Biocic, that was her boyfriend just before this tragedy happened.  Travis is a drug user, he's got a record, and he's older than her.  She was 16, he was 22.

1    They had -- the Belisles had issues with Hannah running away

2    from home with Travis.

3          What's interesting about Travis, first of all, he was

4    with Hannah the night before the homicides.  Hannah was getting

5    a tattoo, and Travis was at this party or gathering when she was

6    getting a tattoo on April 11th, the night of that, and Travis's

7    family has been known to live -- they have vehicles

8    registered -- the Biocics have a vehicle registered to those

9    places we took pictures of way down Anton Larsen Bay Road,

10   that's where -- he's got connections there.  He knows that area.

11   His family used to live there.

12         Casey Brennick.  Casey Brennick is another bad boy of

13   Kodiak.  He's got a criminal history.  He's got -- a drug user.

14   And what's interesting about Casey, is that he was trying to

15   sell the gun they were looking for, or the same type of gun they

16   were looking for around the same time of these homicides.  He

17   was texting to somebody, "I want to sell a 629 Smith & Wesson

18   stainless revolver."

19         Then there is Dylan Froehlich, he was another

20   boyfriend, ex-boyfriend of Hannah.  And what's interesting

21   about -- you have to look at the Dylan connection, because with

22   Dylan, for sometime during April 2012, there was a guy living

23   with him and his father named Jason Barnum.

24         Now Jason Barnum was the drug dealer connection for

25   these guys in April of 2012.  He was there -- if you could dim

1  the lights -- he was there for a month.  He was staying with

2  Hannah's ex-boyfriend.  He was in Kodiak.  He was known to be

3  selling drugs.  He kind of disappeared right after the

4  homicides, and left the island shortly thereafter.

5          What's interesting about Jason is that the day after

6  the homicides he was at a store out in the Flats where he used

7  to hang out, he used to go there a lot, usually drunk, usually

8  high, and he's in there, and out of the blue he's saying, "I

9  didn't do it.  I didn't do it.  Everybody thinks I did it, but I

10 didn't do it." Just out of the blue.  And then he points his

11 finger like a gun, like he's shooting somebody.

12         Now that seems suspicious to me.  And Jason comes back

13 to Anchorage, burgles a lot of homes, steals a lot of guns, and

14 ends up in jail for attempted murder of a police officer.  That

15 is the person that was there at the time, too, that was not

16 investigated because the investigation was all about Jim Wells.

17         Well, I can't for certain tell you who shot Rich and

18 Jim Hopkins, Rich Belisle, but it just seems like their whole

19 case, the circumstantial case, is built on assumptions trying to

20 prove it was Jim Wells, and even though I can't tell you who did

21 it, I can tell you it was not Jim Wells, he's innocent, and

22 that's what the evidence will show you, thank you.

23         THE COURT:  All right, we'll stand in recess for

24 roughly 15 minutes.

25                                    (Jury not present)

1           THE COURT:  You're going to open that door and get you

2   out of there.  Okay, government is going to get rid of -- or

3   move this.

4           MS. LOEFFLER:  Yes.

5           THE COURT:  We'll have a witness ready in roughly 15

6   minutes.

7           MR. SCHRODER:  We will, Your Honor.

8           THE COURT:  Okay.

9           THE CLERK:  15 minute recess.

10      (Proceedings recessed, 10:54:28 a.m. until 11:11:50 a.m.)

11                                      (Jury not present)

12          THE CLERK:  All rise.  His Honor the Court the United

13  States District Court for the District of Alaska is again in

14  session.  Please be seated.

15          THE COURT:  Okay, the government's first witness is.

16          MR. SCHRODER:  Your Honor, the government calls Nicola

17  Belisle.

18          THE COURT:  And do you want her seated before the jury

19  comes in, or do you want to --

20          MR. SCHRODER:  We could probably let the jury come in

21  first.

22          THE COURT:  All right.

23                                      (Jury present)

24          THE COURT:  Okay, the government's first witness.

25          MR. SCHRODER:  Your Honor, the government calls Nicola

1  Belisle.

2             THE COURT:  Okay.

3             MR. SCHRODER:  Just walk right up there --

4             THE COURT:  Just get up fairly near the chair, and

5  just remain standing for a few moments -- or for a few seconds,

6  and my clerk will swear you in.

7             THE CLERK:  Please raise your right hand.

8              NICOLA BELISLE, PLAINTIFF'S WITNESS, SWORN

9             THE CLERK:  Thank you, please have a seat.  And ma'am,

10 for the record, please state and spell your full name.

11     A.  Nicola Anne Belisle.  N-i-c-o-l-a A-n-n-e

12 B-e-l-i-s-l-e.

13            THE CLERK:  Thank you.

14            THE COURT:  All right, Mr. Schroder.

15                     DIRECT EXAMINATION

16  BY MR. SCHRODER:

17     Q.  Mrs. Belisle, where do you live?

18     A.  Kodiak.

19     Q.  And how long -- where in Kodiak do you live?

20     A.  We live in Bells Flats.

21     Q.  And how long have you lived there?

22     A.  Since 2003 in Bells Flats.  Since '97 in Kodiak.

23     Q.  Now, there is no mistaking a little bit of an accent.

24  So are you originally from the United States?

25     A.  No, I'm from England.

1      Q.  Where in England?

2      A.  South Hampton/Beaumont area, southwest.

3      Q.  And what brought you to the United States?

4      A.  Rich, my husband.

5      Q.  And how did that happen?

6      A.  I was working in a hotel, a 5-star hotel in Bahrain,

7  and Rich was stationed there through the Coast Guard as part of

8  the tactical law enforcement team.  And he was my knight in

9  shining armor.  He protected me from a unsavory situation in my

10 place of work.

11     Q.  And how long were you married to Rich?

12     A.  Just over 19 years.

13     Q.  Now, I'm going to ask you to look at a photo on the

14 screen in front of you.  And are you familiar with that

15 photograph?

16     A.  Yeah, that's my husband.

17     Q.  And is it a fair and accurate -- when was that taken?

18     A.  That was taken two days after Thanksgiving in 2011.  We

19 had a family portrait session done.

20     Q.  And is it a fair and accurate representation of your

21 husband?

22     A.  Yeah, it really is.

23          MR. SCHRODER:  Your Honor, move to enter Exhibit No.

24 1.

25          MR. OFFENBECHER:  No objection.

```
 1              THE COURT:  It will be admitted.

 2                              PLAINTIFF'S EXHIBIT 1 ADMITTED

 3   BY MR. SCHRODER:

 4      Q.  And I think if I --

 5              THE COURT:  I'm going to tell the jury right off

 6   because we're just starting off.  You don't see things until

 7   they are admitted, and then when they are admitted, that means

 8   you will get them when you deliberate, and if the parties want,

 9   they might be shown right on the screen.  But it occurs after

10   it's admitted.

11              MR. SCHRODER:  I think what we'd rather do, Your

12   Honor, if you don't mind, is use the poster instead of turning

13   down the lights.

14              THE COURT:  That's fine.  That's another way of doing

15   it.

16              MR. SCHRODER:  Thank you.

17   BY MR. SCHRODER:

18      Q.  Now, did you and Rich have any children?

19      A.  We had three girls.

20      Q.  And what are their names and ages?

21      A.  Emily and Amy are 21, they are twins; and Hannah, our

22   youngest, is 18.

23      Q.  And where was your husband last employed?

24      A.  COMMSTA Kodiak.

25      Q.  And what did he do there?
```

1     A.  He was a rigger.

2     Q.  And to your understanding, what did that mean?

3     A.  He climbed those tall towers and did safety inspections

4  and changed the light bulbs.

5     Q.  And what did he do before he worked at COMMSTA Kodiak?

6     A.  After he retired from the Coast Guard, he had a couple

7  jobs in town.

8     Q.  Let's talk about -- how long was he in the Coast Guard?

9  Let's talk about that.

10    A.  Twenty-three years.

11    Q.  And what did he do in the Coast Guard?

12    A.  He was a chief boatswain mate when he --

13    Q.  Okay.  And I think we heard the term "boatswain mate"

14 in the opening, but can you explain just a little bit about what

15 a boatswain mate does in the Coast Guard?

16    A.  Rich would tell me that a boatswain mate is what made

17 the Coast Guard run because they did everything.  They were

18 the -- the jack-of-all-trades.  He was on ships, he was on

19 lifeboats.

20    Q.  He spent a lot of time at sea, is that fair to say?

21    A.  Yes.  Yeah, he had a permanent cutterman's pin, which

22 meant he spent five years at sea.

23    Q.  Now, did you ever go see him do his work?

24    A.  Yeah.

25    Q.  What did you ever see him do?

1      A.   When we were stationed in Tillamook, Oregon, Rich was a

2    surfman.  So he was the one who was qualified to drive the motor

3    lifeboats during really heavy seas, 30-foot seas.  We would --

4    me and some other wives, we would stand on the bar of the

5    Tillamook River and watch them leave and watch them come back

6    in.

7      Q.   Was that a little nerve-wracking for you?

8      A.   Very.  He bought me a scanner so I could listen to the

9    communications while they were out there so I knew he was safe.

10     Q.   And a surfman, is that a common thing for a boatswain

11   mate in the Coast Guard?

12     A.   No.  It's an elite group of people.

13     Q.   Did he like working at COMMSTA?

14     A.   Yes, he did.  He liked working there a lot.

15     Q.   And what was his favorite part of working at the

16   COMMSTA?

17     A.   Several.  He said that he had the best office in the

18   world because he'd step outside and he had Kodiak there.  He got

19   to climb towers, he got to be outside.  He climbed a lot when he

20   was young.  He climbed mountains, so climbing towers was nothing

21   to him.

22     Q.   Was there any special group he liked the work with?

23     A.   The non-rates.  When Rich retired from the Coast Guard,

24   his biggest thing was -- the thing that he missed the most was

25   teaching the non-rates.

```
 1            THE COURT:  I'm not hearing what that word is.  The
 2    "non-rates"?
 3       A.  The non-rates.
 4            THE COURT:  Non-rates.
 5       A.  Non-rates, yeah, the new people who hadn't yet chosen
 6    their careers.
 7            He loved to take them under his wing and teach them the
 8    ways of the Coast Guard and how to be successful and how to
 9    choose their career path.
10       Q.  Now, how long did he work with Jim Wells?
11       A.  Seven years.
12       Q.  And what was his relationship like, to your
13    understanding, living with a man every day for that period, I
14    mean, initially?
15            MR. OFFENBECHER:  Your Honor, I guess I would object
16    on the grounds that it calls her for to speculate or calls for
17    lack of personal knowledge.  I think hearsay perhaps.
18            THE COURT:  Don't speculate, just what was your
19    impression as to that.  Don't guess.  If you don't know, that's
20    fine.
21       A.  No, I know.
22            THE COURT:  Could you lay a little more foundation
23    then.
24     BY MR. SCHRODER:
25       Q.  Well, you saw him come in every day to your home?
```

1    A.   Uh-huh.

2    Q.   And were you -- at some point -- were you able to judge

3    his moods on a day-to-day basis?

4    A.   Oh, yes.

5    Q.   And could you tell when he'd had a good day or a bad

6    day?

7    A.   Yes, I could.

8    Q.   I mean, did he -- did he need to say words to you to

9    communicate that?

10   A.   No.  No, when Rich was upset, he got very, very quiet.

11   He didn't share for a few days when he was stressed about

12   something, he would keep it to himself.  He wasn't one to gossip

13   and bad-mouth anybody.  When he would come home, I could tell if

14   he had a bad day.

15   Q.   And initially, were there many bad days the first few

16   years at COMMSTA --

17   A.   No.

18   Q.   -- that you could tell?

19   A.   He was -- Rich really enjoyed his job.  He loved

20   learning.  He knew who had the knowledge and sucked in as much

21   as he possibly could.  He was a sponge for new information about

22   anything.

23        I want to say after the first two years things began to

24   change.  He still loved what he did, but it was --

25   Q.   Did you see his stress levels increase?

1       A.  Very much so.

2       Q.  And again, seeing that every day, what was the source

3   of that stress level?

4           MR. OFFENBECHER:  Your Honor, I would object on the

5   lack of personal knowledge or hearsay, because if she's talking

6   about what her husband told her about what happened at work,

7   it's hearsay, and there is a lack of personal knowledge.

8           MR. SCHRODER:  Your Honor, any hearsay -- we're not

9   going to ask her specific things about what her husband said.

10  Any hearsay she might get would not be for the truth of the

11  matter asserted.  I'm asking her if she knows the source of the

12  stress level.

13          MR. OFFENBECHER:  Your Honor, the same objection.

14  It's not relevant to the case unless it is for the truth of the

15  matter asserted, with all due respect.

16          THE COURT:  She can testify with regard to her

17  impressions based on having lived with her husband for a number

18  of years.  And I don't know if she visited the workplace or not,

19  you haven't addressed that -- you haven't made a foundation in

20  that regard.

21   BY MR. SCHRODER:

22      Q.  Did you ever visit his workplace?

23      A.  Only a couple times when he was changing tires on cars.

24      Q.  Okay.

25      A.  And I think once or twice I went into his office just

1   because he wanted to show me.

2           MR. SCHRODER:  It's just a basic question, Your Honor,

3   the source of the stress level.

4           MR. OFFENBECHER:  Same objection.

5           THE COURT:  Can't testify as to hearsay, can testify

6   as to her impression, and the jury can evaluate what weight to

7   give it.

8    BY MR. SCHRODER:

9       Q.  What was your impression of the source of the stress?

10          MR. OFFENBECHER:  Your Honor, that I do object to,

11   because it necessarily invites the witness unfortunately to

12   either speculate about what it was or to relate to the jury what

13   her husband told her about the source of the stress, which is

14   for the truth of the matter asserted and it goes to a central

15   issue in the case.

16          THE COURT:  She can testify simply, and no more, what

17   her impression was as to her husband's relationship with the

18   defendant.

19   BY MR. SCHRODER:

20      Q.  What was your impression of your husband's relationship

21   to Mr. Wells?

22      A.  In the first few years of his -- of Rich working at the

23   COMMSTA, he was really happy.  He loved that he was back working

24   with the Coast Guard, and he felt that he was being taught a

25   lot, a lot of information that was necessary for him to do his

1   job.

2          After a couple of years -- my husband was a very

3   ethical man.  Work ethic and honesty were just part and parcel

4   of who he was, and others weren't so ethical, and it was really

5   hard for Rich to let that go.

6       Q.  So as time increased -- and again, just what you see,

7   him walking in the door -- did he have a increasingly number of

8   bad days?

9       A.  Yes, he did.

10          MR. OFFENBECHER:  Object on the grounds that he's

11   leading the witness now.

12          THE COURT:  Overruled.  Trying to get through it.  I

13   understand.  I'm not permitting leading as a matter of course,

14   but I want to get on to the next subject.

15    BY MR. SCHRODER:

16       Q.  And your answer to that was?

17       A.  Yes.  In the last year before my husband was killed, he

18   would come home and he would -- he really wouldn't say anything

19   and he would just sit in his chair, and he would just sit and he

20   would look out of the window and just not say anything.

21          And when my husband didn't talk, I knew that he was

22   really stressed out.  And after a few days, then he would

23   share -- after he processed it to himself, then he would share

24   that information with me.

25       Q.  Now, let's go a couple brief questions about the

1    morning of the 12th.

2          What time did your husband normally go to work?

3    A.  About a quarter to 7.

4    Q.  And did he leave at the normal time --

5    A.  Yes.

6    Q.  -- on April the 12th?

7    A.  Yes.

8    Q.  And was that the last time you saw him?

9    A.  It was the last time I saw him alive.

10   Q.  What kind of personality was your husband?

11   A.  He was so laid back.  Rich was really laid back.  It

12   took a lot to get him upset, to get him angry.  He -- when I got

13   pent up, he would just say, "Okay, you done?  Just breathe and

14   let's think about this for a bit."  And he would talk some sense

15   into me.

16         He was kind.  He was just a sweet man.  He loved his

17   girls.  They had him wrapped around their little fingers.

18   Family was so important to him.  He loved the Coast Guard.  He

19   had respect for the chain of command and people's positions.  He

20   respected the position, not the man.  He was generous in spirit.

21   He gave.  He loved to teach people stuff.  He loved history and

22   he considered becoming a history teacher.  That was one of the

23   biggest things that he ever missed was teaching the younger

24   members of the Coast Guard.

25   Q.  Let me ask you a few final questions.

1          Are you aware of anybody who had threatened harm

2    against your husband or your family?

3       A.  No, nobody.  Everybody loved Rich.

4       Q.  Was your husband involved in any illegal activities you

5    knew about?

6       A.  No, not at all.

7       Q.  Was he involved with any violent persons --

8       A.  No.

9       Q.  -- that you knew about?

10          Can you think of anyone, anyone -- we're not talking

11   about the case here -- anyone outside of the case here who had

12   threatened -- who had wanted to harm your husband?

13      A.  Absolutely not.

14          MR. SCHRODER:  No further questions, Your Honor.

15          THE COURT:  Cross-examination.

16          MR. OFFENBECHER:  Your Honor, we don't have any

17   questions of this witness.

18          THE COURT:  All right, thank you, ma'am.

19    (Witness excused)

20          THE COURT:  Government's next witness.

21          MS. DUIGNAN:  Our next witness, Your Honor, is Scott

22   Hopkins.

23          THE COURT:  Is Mr. Hopkins on his way.

24          MS. DUIGNAN:  He should be, Your Honor.  He was right

25   outside.

1              THE COURT:  Okay.

2              MS. DUIGNAN:  We were respecting the witness

3  exclusion.

4              THE COURT:  Right, I appreciate that.  I think that

5  door pulls out and the witness -- I think it pulls out.  And if

6  you could remain standing and the clerk will swear you in.

7              THE CLERK:  Sir, please raise your right hand.

8              SCOTT W. HOPKINS, PLAINTIFF'S WITNESS, SWORN

9              THE CLERK:  Thank you, please have a seat.  Sir, for

10  the record, please state and spell your full name.

11      A.  My name is Scott William Hopkins.

12              THE CLERK:  Spell your full name.

13      A.  I'm sorry.  S-c-o-t-t, and the middle initial W, last

14  name H-o-p-k-i-n-s.

15              THE CLERK:  Thank you.

16              THE COURT:  Counsel.

17                      DIRECT EXAMINATION

18   BY MS. DUIGNAN:

19      Q.  Mr. Hopkins, in what city and state do you currently

20   live?

21      A.  I currently live in Medway, Massachusetts.

22      Q.  And how long have you lived there?

23      A.  I've lived there since 1998.

24      Q.  And what is your relationship to the victim in this

25   case, James Hopkins?

1    A.  James Hopkins is my brother.

2    Q.  And where did you grow up?

3    A.  We grew up in a small town in Vermont called Vergennes.

4    Q.  If I can ask you first to look at your screen, I'm

5  going to ask you to look at a photograph.

6        Can you please tell me whether you recognize that

7  photograph?

8    A.  That would be my brother James.

9    Q.  And when is the last time you saw him?

10   A.  The last time I saw him was in June of 2000 -- I think

11  it was 2009 before he made his trip out to Alaska.

12   Q.  And would you say that that photo is a close

13  representation of the way he looked?

14   A.  Yes.

15        MS. DUIGNAN:  Your Honor, I'd like to admit

16  prosecution Exhibit 2.

17        MR. OFFENBECHER:  No objection.

18        THE COURT:  It will be admitted without objection.

19                         PLAINTIFF'S EXHIBIT 2 ADMITTED

20   BY MS. DUIGNAN:

21   Q.  I want to ask you a couple questions about your

22  brother.

23        Did he go by James or Jim?

24   A.  I think in his work life he went by Jim.  I always

25  called him James.  As a kid we called him Jamie.  So as he got

1  older I called him James.  But I know that his colleagues

2  referred to him as Jim.

3       Q.  And since you called him James, I'll call him James.

4            Were you older or younger brother to James?

5       A.  I'm his older brother by two years.

6       Q.  And during the time that you grew up, how would you

7  describe your relationship?

8       A.  It was pretty typical.  You know, we -- sibling

9  brothers, we got along most of the time, we fought once in a

10 while.

11           We entertained ourselves by biking and doing a lot of

12 outdoor activities together when we were younger.  And then as

13 we grew older, we remained pretty good friends because we had

14 brothers that were -- we had friends that were brothers in

15 different classes.  So I was a little closer to him, I think,

16 towards the end of my high school years.

17      Q.  And tell me a little bit about your family.  Did you

18 have any other siblings?

19      A.  No, it was just the two of us.

20      Q.  And what about your parents?

21      A.  My father is still living.  My mother is deceased.

22      Q.  And when did your mother pass away?

23      A.  In 2002.

24      Q.  And during the time that you grew up, did you move

25 around a lot or did you live in the same location?

1       A.  We never moved around a lot.  We always had the same, I
2   guess, childhood home since we were quite young.
3       Q.  And when it came time for you to leave the home, who
4   was it who left first, you or your brother James?
5       A.  That would be me.  I had left and moved on.  I went to
6   college, and he was still two years behind, so still in school.
7       Q.  And when was it that James would have left the family
8   home?
9       A.  Probably -- he was -- two years later.  Although he
10  went to school in Vermont and I went into New York state for a
11  couple years.  So he probably left, you know, the home
12  permanently when he joined the Navy.  He went to two years of
13  college after high school and then joined the Navy.
14      Q.  And what year, if you recall, was that?
15      A.  It would have probably been 1990.
16      Q.  And after you left the home, what did you decide to do?
17      A.  Again, I went to college, and then from there I pursued
18  a career in sales and moved to Massachusetts where my wife's
19  family was from.
20      Q.  And after the time that your brother James joined the
21  Navy, how frequently would you keep in touch or see each other?
22      A.  It was kind of infrequent.  There were a lot of times
23  where we would just send a quick e-mail back and forth over the
24  course of a month.  There might be a phone call or two just to
25  check in and see how each other were doing.  Oftentimes it was

 1  around somebody's upcoming birthday or holiday, what can we get

 2  you, what can we send out, is there anything the kids need,

 3  those kinds of things.

 4      Q.  But during the course of James' career, you kept in

 5  touch over the course of his career?

 6      A.  Yeah, I kept in touch.  And I always knew, you know,

 7  where he was stationed and did have at least monthly contact

 8  with him.

 9      Q.  And around -- can you tell me a little bit about his

10  decision to join the Coast Guard.

11      A.  Well, he had been in the Navy for a number of years and

12  had been on the West Coast.  And at one point my mom was sick

13  and I know he was trying to get back to the East Coast.  So

14  eventually he decided that maybe by switching to the Coast Guard

15  he might get a duty station that was on the East Coast.

16          Unfortunately, that didn't work out for him.  As soon

17  as he joined the Coast Guard, they shipped him right back out to

18  California from Vermont, so...

19      Q.  And did you know anything about what he did in the

20  Coast Guard?

21      A.  Not too much.  I know that when he was out of

22  California he often said he was on -- they did some patrolling

23  for drug enforcement down off the Mexico coast.

24          I had a better sense, I guess, what he did when he was

25  in the Navy just because I had participated in a cruise for

1    family members with the Navy and knew he was a technician there.

2        Q.  And you said you kept in touch enough to know about his

3    duty stations.  Can you tell me a little bit about his transfer

4    to Alaska?

5        A.  He actually had this as one of his choice picks as a

6    place to go knowing that it would be for a limited period of

7    time.

8            He was an avid hunter, fisherman, loved the outdoors,

9    had quads or four-wheelers, and, you know, liked to be outside,

10   like outdoor things.  So he was looking forward to it as an

11   opportunity to get to work in a place that would offer up some

12   of those other things that he liked doing, the hunting and the

13   fishing.

14       Q.  And from the time that -- around the time he

15   transferred to Alaska, when was the last time that you saw him?

16       A.  The last time I saw him was right before he left.  I

17   live in the Boston area, so it's still a four-hour drive to get

18   to my parents' house.  So anytime that I would see him, it would

19   be me having to take a weekend to go up there with either myself

20   or my family.

21           So the last time I did see him was on a weekend right

22   before he decided to drive out here for his new assignment.

23       Q.  And you mentioned your family.  Can you please tell the

24   jury, you know, what your family consists of.

25       A.  Well, personally I have a wife and one son who is 10

1    years old.  And then there is my family that's still remaining.

2    And then we have a pretty good extended family, my mother's

3    sisters and their kids, so our cousins up in Vermont.

4        Q.  And you kept in touch with your brother to know how his

5    family consisted as well, correct?

6        A.  Yes.

7        Q.  And can you please tell the jury about James' family.

8        A.  Sure.  He had his wife Debby, he had two kids, a son

9    Patrick and daughter Angela.  Both of them now are older.

10   Angela, his daughter, works in law enforcement down in North

11   Carolina and has two kids of her own now and married, and his

12   son lives in Connecticut.

13       Q.  And have you had opportunities before James was

14   murdered in order to spend time with his family?

15       A.  Not really, just because of the nature of his work

16   being in the Coast Guard and being in the Navy prior to that.

17   We were always thousands of miles away.  And when he did come

18   back, it was, again, a weekend time because I really couldn't

19   take time off of my work to spend the entire weeks up there.

20   But we would spend weekends together.

21       Q.  And you mentioned what his son and daughter do.  Do you

22   keep in touch with them?

23       A.  I know my wife keeps in touch more closely than I with

24   his daughter.  She's tried to be a mentor, tried to help her

25   out.  And I know his daughter always looked up to my wife.  So

1   she's made a really strong effort to stay in touch and provide

2   guidance to her.

3       Q.  And can you describe what interactions, if any, you've

4   had with his wife Debby?

5       A.  Not so much since my brother's murder.  I've seen her

6   on a couple of occasions up in Vermont.  And, you know,

7   otherwise since then I haven't had too much interaction.

8       Q.  Did you have the opportunity before he was murdered to

9   see them together?

10      A.  Yes.  Again, before he moved was the last time we all

11  spent some time together as a family at my dad's house.

12      Q.  And how would you describe your observations of their

13  relationship?

14      A.  I think they -- it looked like they were all looking

15  forward to coming to Alaska.  They saw it as an adventure, and

16  everybody seemed pleased with that decision to make the move

17  here.

18      Q.  Do you have any opinions, if you do, about whether they

19  were co-equals in their relationship in taking care of the

20  house?

21      A.  I think my brother was probably the more responsible

22  one, and I think he really took care of the kids and took care

23  of Debby.  They were all relatively dependent on him.  And he

24  tried to be that responsible person to take care of everyone.

25      Q.  What type of plans did you know your brother had for

1    the next couple of years?

2        A.  Well, you know, I always convinced him that he just got

3    a couple more years, just stick it out, stay in the Coast Guard,

4    and I think he kind of planned to do that.  But he did look

5    towards maybe a civilian career.  And just talked lightly of it,

6    you know, finding something possibly that might have to do with

7    what his Coast Guard job was, or he would be the person, the

8    kind of person that would even be perfectly happy working for a

9    carpenter, contractor.

10          And I think his ultimate goal was to move himself and

11   his family back to Vermont to be close to the extended family,

12   closer to my dad who is much older.  So that's really, I think,

13   what his goal was.

14       Q.  And if you had to sum up the type of person your

15   brother was, what would you say?

16       A.  He was -- you know, in comparing him to myself, because

17   when we were together I was always the more driven, aggressive

18   one, he was very laid back, very accepting of people.  I think

19   that he was quiet and kept to himself.

20          He was responsible for things and took responsibility

21   and didn't -- you know, he never really told me about problems

22   that he had.  He never did any of that stuff.  I think he just

23   took it on and tried to solve things himself and do the best he

24   could at work.

25          I was always very proud of his service to the country

1   in both the Navy and the Coast Guard, and I know that he did

2   enjoy working there.  As much as he didn't like the fact that he

3   got transferred all over the place, and when he was in the Navy

4   he was often away from his family for long periods of time on

5   deployments, but for the most part, he was the guy that would

6   help out a friend, help out a neighbor.  If you needed something

7   done, he would be there to lend a hand.

8          At the time that he was stationed in Connecticut, he

9   came up on a couple of occasions to help me out with projects,

10  siding projects and some other things.  And he was, you know,

11  just willing to drop what he was doing and come and help

12  somebody out.  He was a good guy.

13         MS. DUIGNAN:  Thank you.  I don't have any further

14  questions.

15         THE COURT:  Cross-examination.

16         MR. OFFENBECHER:  Thank you, Your Honor.

17                        CROSS-EXAMINATION

18  BY MR. OFFENBECHER:

19  Q.  Mr. Hopkins, first of all, let me say that we are very

20  sorry for your loss and for the loss of your family.

21         You indicated in your direct examination that the

22  nature of the relationship with his wife, Debby -- you call her

23  Debby; is that right?

24  A.  Correct.

25  Q.  -- Debby Hopkins was that Jim was really the person who

1  was in charge of most things; is that fair to say?

2      A.  I would say he was the responsible person.  He was the

3  person that worked to support the family, yes.

4      Q.  He was the person who provided for her, and Mrs.

5  Hopkins really didn't contribute financially to the

6  relationship; is that right?

7      A.  I don't know the details of that, whether she worked or

8  not.  To my knowledge, I don't think she did, but she did

9  maintain the household.

10     Q.  Well, do you remember you were interviewed by some

11 federal agents on October 30th of 2002 [sic]; weren't you?

12     A.  Yes, I was.

13     Q.  And do you remember telling the agents then that as far

14 as you knew, their relationship was that he provided for her and

15 she really didn't do a whole lot to contribute to the household

16 financially?

17     A.  Financially I don't believe she did.

18     Q.  Thank you.  And you were aware -- you were aware of all

19 of the details of their financial circumstances, but you were

20 aware that they had some debts.  They had bought trucks and ATVs

21 and such like that; right?

22     A.  I don't know the details of any of that.  I don't know

23 if they -- how they paid for them, so I can't answer that.

24     Q.  You do know that your brother really -- his first

25 choice was to have a duty station on the East Coast though;

1   isn't that right?

2       A.  That is correct, yes.

3       Q.  And that a West Coast or Alaska duty station was not

4   his first choice?

5       A.  It was definitely not -- no, I don't think it was his

6   first choice, but it wasn't one that he had ruled out.  So it

7   wasn't one that he didn't -- he absolutely didn't want to come

8   to.

9       Q.  And you also knew from some contact with him that Mr.

10  Hopkins, Jim Hopkins, did maintain relationships with some of

11  his high school friends, he kept in touch with them anyway by

12  Facebook and e-mail and correspondence and letters and telephone

13  and things such as that; right?

14      A.  Yeah, he had a core group of friends that were pretty

15  close that kept in touch.  Several of them were also in the

16  military as well, so they kind of had a common bond of being

17  stationed in different parts of the world.

18      Q.  But the one thing they had in common was school; right?

19      A.  And school, yes.

20      Q.  Right.  Now, you've indicated that you have had not so

21  much contact with Debby Hopkins since these deaths occurred; is

22  that right?

23      A.  That is correct.

24      Q.  And the person you referred to as Debby Hopkins is

25  actually the woman in the red sitting in the front row of the

1  courtroom right now; is that right?

2     A.  Yes.

3          MR. OFFENBECHER:  I don't have any other questions,

4  Your Honor.

5          THE COURT:  Redirect?  Anything else.

6          MS. DUIGNAN:  No other questions, Your Honor.

7          THE COURT:  All right, thank you, sir.  You're

8  excused.

9   (Witness excused)

10          THE COURT:  Do you have a ten-minute witness or should

11  we break now.

12          MS. DUIGNAN:  I don't have a ten-minute witness.

13          THE COURT:  Ladies and gentlemen, we're going to take

14  our lunch recess a little early, but we'll start right at 1

15  o'clock.  So we'll stand in recess at this time.

16          You're free to go.  You'll go in the little room, they

17  will take you to the big room.  If you can be back about five to

18  1, we'll try to start here right at 1 o'clock.  And that door is

19  going to open in a second.  She's running to open it.

20                                    (Jury not present)

21          THE COURT:  Okay, counsel, anything you want to

22  discuss with me before we break?

23          MS. LOEFFLER:  No.

24          THE COURT:  Counsel.

25          MR. OFFENBECHER:  No.

         THE COURT:  Can you be here ready to start with a
witness at 1 o'clock?

         MS. LOEFFLER:  Yeah.  He's standing outside.  We've
got him lined up.

         THE COURT:  All right.  Stand in recess until 1
o'clock.

         THE CLERK:  Stand in recess until 1 p.m.

         (Lunch recess, 11:50:45 a.m. until 1:03:16 p.m.)

                                    (Jury not present)

         THE CLERK:  All rise.  His Honor the Court the United
States District Court for the District of Alaska is again in
session.  Please be seated.

         THE COURT:  How are we doing?

         MR. OFFENBECHER:  Good.

         MS. DUIGNAN:  Good.

         THE COURT:  This is Ruth, my law clerk.  And I'm going
to have her, unless someone objects, sit over here to help get
the jurors in and out so we can do it quickly.  Any objection
from the government?

         MS. LOEFFLER:  I'm sorry, I was trying to find my
direct --

         THE COURT:  This is Ruth, my law clerk.  I'm going to
use her to help get the jurors in and out a little quicker.  Any
objection?

         MS. LOEFFLER:  Of course not.

```
 1              THE COURT:  She's a career law clerk.  She's been here
 2   longer than I have, which is true.
 3              MS. LOEFFLER:  So have I, Judge.
 4              THE COURT:  That's true.  Okay, what were you going to
 5   say, did you have an issue?
 6              MS. LOEFFLER:  No, I don't have any issue.
 7              THE COURT:  Okay, let's bring the jury in.
 8              MS. LOEFFLER:  Your Honor, the only thing is we're
 9   trying to get our computer to come up so we can display the
10   exhibits.  It's doing computerese, freezing things, so we're
11   working on it.
12              THE COURT:  Well, can we start the jurors in or not?
13              MS. LOEFFLER:  I think we can.  I think we can start,
14   and then we'll just -- absolutely.
15              THE COURT:  Okay, good.  Technical issues.
16                                          (Jury present)
17              THE COURT:  Okay, please be seated.  I hope you had a
18   good lunch, you're ready to go.  And government, are you ready
19   to go with the witness?
20              MS. LOEFFLER:  Yes, Your Honor.
21              THE COURT:  And who is that?
22              MS. LOEFFLER:  We would call Trooper Dennis Dupras to
23   the stand.
24              THE COURT:  Okay, all right, very well.
25              THE CLERK:  In the first one.
```

1          THE COURT:  We have more doors.

2          THE CLERK:  Trooper, if you can please remain standing

3  and raise your right hand.

4          DENNIS VICTOR DUPRAS, PLAINTIFF'S WITNESS, SWORN

5          THE CLERK:  Thank you, please have a seat.  And sir,

6  for the record, please state and spell your full name.

7     A.  My name is Dennis Victor Dupras.  My last name is

8  spelled D-u-p-r-a-s.

9          THE CLERK:  Can you spell your full name, too, please.

10    A.  First name is Dennis, D-e-n-n-i-s.  Middle name Victor,

11  V-i-c-t-o-r.

12         THE CLERK:  Thank you.

13         THE COURT:  All right, counsel.

14                    DIRECT EXAMINATION

15  BY MS. LOEFFLER:

16    Q.  Trooper Dupras, obviously you're in uniform, but what's

17  your present occupation?

18    A.  I'm an Alaska State Trooper, ma'am.

19    Q.  How long have you been an Alaska State Trooper?

20    A.  Fifteen years.

21    Q.  And where are you currently stationed?

22    A.  I'm stationed at the Kodiak post.

23    Q.  I want to go through your background as a trooper, but

24  before that, was there another career that you had a number of

25  years before you became a trooper?

1        A.  I was in the regular Army, ma'am.  I was an infantry

2   officer.

3        Q.  When did you join -- how long were you in the Army?

4        A.  I was enlisted from '88 to '92.  I was infantry in the

5   82nd Airborne Division.  And I was in the National Guard in

6   college, and then I was commissioned in the regular Army and

7   sent up here to Alaska, Ft. Wainwright.

8        Q.  When you were an infantryman, did you actually serve in

9   the Gulf War?

10       A.  Yes, ma'am.

11       Q.  In what capacity?

12       A.  I was assigned to an infantry unit.  I was in an

13  infantry -- airborne infantry platoon, and I carried the radio

14  for the platoon leader.

15       Q.  And then after the Gulf War, did you go to -- did you

16  go to school?

17       A.  Yes, ma'am.  I went to the Virginia Military Institute

18  and was commissioned as a lieutenant in the infantry in the U.S.

19  Army.

20       Q.  And that's how you ended up up here?

21       A.  Yes, ma'am.  I was assigned to Ft. Wainwright, Alaska,

22  and then I eventually became a trooper.  And I was in the Army

23  National Guard for a while, too, as an officer.

24       Q.  And so how long were you in the military?

25       A.  About 14, 15 years, on and off.

1      Q.  And after that, is that when you joined the troopers?

2      A.  Yes, ma'am.

3      Q.  Do you recall what year you joined the troopers?

4      A.  1998.

5      Q.  And after you first joined them, can you briefly go

6   through where you have been stationed until the time you were

7   stationed in Kodiak?

8      A.  I attended the public safety academy in Sitka.  After

9   finishing the academy, I was assigned to the Fairbanks post.

10  Almost all troopers, once they finish the academy, are assigned

11  to one of three different locations, Fairbanks, Palmer, or

12  Soldotna, for field training.

13        I was in Fairbanks for approximately two-and-a-half

14  years, then I was transferred to Glennallen, which is a road

15  post at a road intersection above Valdez where the Glenn Highway

16  and the Parks --

17     Q.  How long were you in Glennallen?

18     A.  About two years, two-and-a-half.

19     Q.  Where did you go from there?

20     A.  And then I was transferred to Kodiak.

21     Q.  How long have you been stationed in Kodiak?

22     A.  About 11 years, ma'am.

23     Q.  And in terms of the scope of duties that you do in

24  Kodiak, can you give sort of a brief summary of what the job of

25  a trooper is in Kodiak?

1      A.  I'm assigned to patrol in Kodiak.  And we are assigned

2   for criminal investigations, enforcing state law, criminal law,

3   traffic law, in charge of search and rescues, and court service.

4      Q.  So you sort of -- do you respond to everything that

5   happens in Kodiak, as a rule of thumb?

6      A.  If it doesn't -- if it occurs outside the city limits,

7   it's our area, we're responsible for it.

8      Q.  In terms of the things that you've covered in Kodiak --

9   well, first of all, let me back up a second and ask you.

10         So I take it with 11 years, you're pretty familiar with

11   the terrain and the -- you know, all around Kodiak Island?

12      A.  Yes, ma'am.

13      Q.  And in terms of the types of crimes that you have

14   investigated, have you been called to scenes involving, I guess

15   I would call it death scenes or scenes involving people that

16   have been killed or are dead?

17      A.  Yes, ma'am.  I've investigated accidental deaths and

18   suicides and natural deaths in Kodiak.

19      Q.  And also crimes?

20      A.  Yes, ma'am.

21      Q.  And burglaries and robberies and the whole gamut of

22   things?

23      A.  Yes, ma'am.

24      Q.  I want to turn to --

25         MS. LOEFFLER:  Do we have exhibits yet.

1              MS. DIXON:  I need to get on the (indiscernible).  I
2   just need to --
3              MS. LOEFFLER:  While you're doing that, I'll try to
4   switch to something else.
5    BY MS. LOEFFLER:
6      Q.  We're having some technical difficulties getting
7   pictures up on the screen.  We have to reboot the computer or
8   something.  Whatever it is, it's whatever this woman says to do,
9   so I'm going to try to turn a little bit out of order.
10             And Kim, go ahead and see if you can work your magic
11  and get it up and going.
12             I think what I'm going to do next, what we're trying to
13  do with the computer is ask you about April 12th, 2012.  I'm
14  going to start with that.  We may come back to it when I can
15  show some pictures of the area.
16             But on April 12th, 2012, were you on duty in the
17  morning?
18     A.  Yes, ma'am.  I started work early because I had to go
19  to grand jury that day.
20     Q.  And did you receive a call to respond to a place that's
21  known as the COMMSTA in Kodiak, Alaska?
22     A.  Yes, ma'am.  I was sitting at my desk.  Fairbanks
23  dispatch called -- we're dispatched out of Fairbanks -- and they
24  reported that they had an incident at the COMMSTA.
25     Q.  Were you familiar with the COMMSTA?

1      A.  I knew -- I know where it's at.  I pass by it several

2  times.  And I've been there a few times.

3      Q.  When you say you've been there, there were actually --

4  how many buildings are there there?

5      A.  There are two main buildings there.

6      Q.  And I'm calling it the COMMSTA.  Is that the

7  Communications Station Kodiak?

8      A.  Yes, ma'am.

9      Q.  And it's not located at the same place as the main

10 base, is it?

11     A.  No, ma'am, it's not.  It's not on the main cantonment

12 area of the Coast Guard base, no.

13          MS. LOEFFLER:  In fact, counsel, if we could use -- we

14 can't pull up anything.  I was going to try to use the chart

15 because we're having computer problems.

16 BY MS. LOEFFLER:

17     Q.  If everybody will stay with me for 20 seconds, we'll

18 see if we can get the photographs up.

19          So what I want to do -- I'm going to go back a little

20 out of order and talk about some of the geography of where the

21 COMMSTA is and go through some photos.

22          So if we can pull up Exhibit 42, and see if this works.

23 You should have a copy right next to you on the screen.

24          And can you recognize that as an aerial photograph of

25 an area that you're familiar with?

1      A.  Yes, ma'am, that's an aerial photo of the Coast Guard
2  base and the airport, state airport.
3              MS. LOEFFLER:  I would move Exhibit 42.
4              MR. OFFENBECHER:  No objection, Your Honor.
5              THE COURT:  It will be received.
6                              PLAINTIFF'S EXHIBIT 42 ADMITTED
7   BY MS. LOEFFLER:
8      Q.  When you said before it's a photo.  In the yellow,
9  what's the yellow line depict?
10     A.  That depicts the roads, ma'am, the main roads.  The
11 yellow one runs here along the runway, that's known as Rezanof
12 Drive or the Chiniak Highway.  And then this other road that
13 runs -- you can see the picture to the -- the top of the picture
14 the other way.
15     Q.  So is this West Rezanof?
16     A.  Yes, ma'am.
17     Q.  And this area is?
18     A.  That's the Coast Guard base.  That's -- below that is
19 the air station, the pads.  That's kind of the main cantonment
20 area, and then aviation.
21     Q.  And this is?
22     A.  That's the airport, ma'am.
23     Q.  And this turn-off right here is what?
24     A.  That's Anton Larsen Road.
25     Q.  Is that the road that goes to the COMMSTA?

1      A.  Yes, ma'am.

2      Q.  I'm going to turn to Exhibit 43 now and ask you if you

3  can recognize that as a photo showing the two buildings you

4  talked about at the COMMSTA.

5      A.  Yes, ma'am, that's an aerial photo of the

6  communications station.

7           MS. LOEFFLER:  And I would move Exhibit 43.

8           MR. OFFENBECHER:  No objection, Your Honor.

9           THE COURT:  It will be received.

10                          PLAINTIFF'S EXHIBIT 43 ADMITTED

11  BY MS. LOEFFLER:

12      Q.  Thank you.  So when you talked about two buildings,

13  this building is -- these are the two buildings that you were

14  describing as the COMMSTA?

15      A.  Yes, ma'am.

16      Q.  Now, you said you were not that familiar with -- or

17  actually, let me ask it another way.

18          How familiar were you with the two buildings prior to

19  April 12th?

20      A.  I was more familiar with the main building.

21      Q.  And by that one, it's the one I'm pointing at now?

22      A.  Yes, ma'am, the one on top of the hill.

23      Q.  How much familiarity did you have with this one?

24      A.  I'd never been there until the 12th.  I'd never gone to

25  that building.

1    Q.  And in terms of the main building, what types of things

2  would have ever called you to the main building?

3    A.  I've served summonses there.  I had to go there to talk

4  to somebody about his dog, some animal issue several years ago.

5  I had to talk to a member about his dog, and somebody

6  complaining about his dog.

7    Q.  But you'd never been to what I will call the rigger

8  shop?

9    A.  Yes, ma'am, I'd never been there.

10    Q.  And in terms of this picture, what road is this?

11    A.  That's the Anton Larsen Road.

12    Q.  And when you would go up to the main building, is this

13  the -- I'm pointing with my pointer -- but would you go up this

14  main road?

15    A.  Yes, ma'am.

16    Q.  Now, I want to turn to Exhibit 44 and ask you if that's

17  just another picture showing the topography around there?

18    A.  Yes, ma'am.

19    Q.  Same area.

20        MS. LOEFFLER:  I move Exhibit 44.

21        MR. OFFENBECHER:  No objection.

22        THE COURT:  It will be received.

23                        PLAINTIFF'S EXHIBIT 44 ADMITTED

24  BY MS. LOEFFLER:

25    Q.  So for Exhibit 44, I take it this is sort of a bigger

1  view back?  A higher view I guess would be a better way?

2      A.  Yes, ma'am.

3      Q.  What is that?

4      A.  That's the Buskin River.

5      Q.  And on April 12th, was that river frozen, do you

6  recall?

7      A.  No, it wasn't.

8      Q.  And in terms of -- it's a little hard to see because

9  obviously it's a photo, not a three-dimensional matter, but can

10  you describe the sort of topography of this area, you know, in

11  terms of --

12      A.  It's -- well, wooded hills.  I mean, it's not solid

13  wood, but back behind the COMMSTA it's mostly woods, woods and

14  steep peaks.

15      Q.  Sort of goes up and down, up and down?

16      A.  Yes, ma'am.

17      Q.  Turn to Exhibit 46.  I'll just -- again, is that

18  another picture just showing a different angle?

19      A.  Yes, ma'am.

20          MS. LOEFFLER:  Move Exhibit 46.

21          MR. OFFENBECHER:  No objection, Your Honor.

22          THE COURT:  Received.

23                          PLAINTIFF'S EXHIBIT 46 ADMITTED

24  BY MS. LOEFFLER:

25      Q.  Now, on Exhibit 46, again, this area -- this is the

1    rigger shop, right, that I'm pointing at with my -- is this

2    the --

3        A.  Yes, ma'am.

4        Q.  And this area, what is this that's right behind there?

5        A.  That's a hill, ma'am.

6        Q.  And if I can -- I'm going to do this for you, but does

7    this hill continue sort of --

8        A.  It continues down edge toward the road.

9        Q.  Okay.

10            MR. OFFENBECHER:  Which one is that?

11            MS. LOEFFLER:  Excuse me?

12            MR. OFFENBECHER:  Excuse me, which one is that, 46?

13            MS. LOEFFLER:  This is Exhibit 46.

14            MR. OFFENBECHER:  Thank you.

15            MS. LOEFFLER:  Actually, I think it's 47.  Did I do

16    this wrong?

17            MS. DIXON:  No, it's 46.

18            MS. LOEFFLER:  Oh, okay.

19     BY MS. LOEFFLER:

20        Q.  Well, let's turn to Exhibit 47 then.  That's just a

21    farther back picture that will show some of the same topography.

22            Is that the same area?

23        A.  Yes, ma'am.

24            MS. LOEFFLER:  I move 47.

25            MR. OFFENBECHER:  No objection.

 1                THE COURT:  Received.

 2                                    PLAINTIFF'S EXHIBIT 47 ADMITTED

 3    BY MS. LOEFFLER:

 4        Q.  So again, so this that I'm pointing at farther up,

 5    that's the upper -- the main building up -- farther up the hill?

 6        A.  Yes, ma'am, it is.

 7        Q.  And I say, "up the hill."  But is there a hill that

 8    goes up there?

 9        A.  There is.  That road that travels up there, it goes

10    uphill.  There is a grade there.

11        Q.  And then it's a darker area, but this would be --

12        A.  That's where the rigger shed is -- the rigger shop.

13        Q.  And the road, the straight road going back here, is

14    that --

15        A.  That's Anton Larsen Road.  That's heading out toward

16    Rezanof.

17        Q.  And Rezanof is what you pointed out before that goes

18    along the water and has the Coast Guard base and the airport?

19        A.  Yes, ma'am.

20        Q.  And then the hill is right here that I'm running my --

21        A.  Yes, ma'am.

22        Q.  I want to turn now to Exhibit 49, and I'll ask you what

23    that is?

24        A.  That's a wider depiction of the Anton Larsen Road and

25    the valley associated with it.  And at the very -- toward --

 1   that blue roof building, that's around where DOT is near the

 2   intersection.

 3            MS. LOEFFLER:  I'd move Exhibit 49.

 4            MR. OFFENBECHER:  No objection.

 5            THE COURT:  Received.

 6                      PLAINTIFF'S EXHIBIT 49 ADMITTED

 7    BY MS. LOEFFLER:

 8      Q.  So, I'm sorry I had to do this without the picture up.

 9   But -- so this bay here, what's the name of this bay?

10      A.  That's Womens Bay.

11      Q.  And the Coast Guard base, do I have it?

12      A.  That's the general area of the Coast Guard base, ma'am,

13   yes.

14      Q.  And then this is the airport?

15      A.  Yes, ma'am.

16      Q.  And then this would be -- this is Anton Larsen Bay Road

17   that you talked about; right?

18      A.  Yes, ma'am.

19      Q.  And the COMMSTA would be up here?

20      A.  Uh-huh.

21      Q.  And then there is a little turn here that I've got.

22           And is that a bridge that goes over the river that you

23   mentioned before?

24      A.  Yes, it does.

25      Q.  So it's hard to see, but this is the Buskin River?

1      A.  Yes, it is.

2      Q.  I'm going to go back.  Now I want to go to April 12th,

3  2012.

4          Again, now that we were able to show the pictures, and

5  you -- I believe when I went back and we got our technical

6  difficulties fixed, I said you were called to the COMMSTA that

7  morning?

8      A.  Yes, I was, ma'am.

9      Q.  And let me take you through some of the -- your first

10  action when you got there.

11          What did you see?  Who else was there?

12      A.  When I arrived at the scene, the Coast Guard fire

13  department and the Coast Guard police department, also known

14  as -- locally as MilPol, they were already there.

15      Q.  And were you the first trooper on the scene?

16      A.  I was, ma'am.

17      Q.  And did you take actions to secure the scene?

18      A.  I did, ma'am.

19      Q.  What did you do?

20      A.  As I exited my vehicle, I was contacted by the Coast

21  Guard fire chief, and he indicated that there were two victims

22  inside and both were deceased.

23          I went inside with the firemen, and the EMTs were still

24  there.  I questioned them really quick.  They said they were

25  both deceased.  And I told them to get out of the building, I

1    wanted to secure the facility and get everybody out.

2        Q.  And I'm going to go through -- did you take some

3    photographs of what you saw at the scene when you got there?

4        A.  I did.  I took some quick photos, ma'am.

5        Q.  Before we go through those, what I want to do is sort

6    of set the scene with a diagram and this model.

7            And in preparation for today, did you compare the

8    diagram to the model, and are you able to say that the model --

9    that this is an accurate depiction of part of the COMMSTA and

10   that it is in general what the building looked like?

11       A.  Yes, ma'am.

12       Q.  And let me go back.

13           MS. LOEFFLER:  If I can move Exhibit 392, which is the

14   chart, counsel, that was used in the opening.

15           MR. OFFENBECHER:  No objection.

16           THE COURT:  It will be received.

17                          PLAINTIFF'S EXHIBIT 392 ADMITTED

18           MS. LOEFFLER:  And I'm also going to move Exhibit 386,

19   which is the model that you've seen.

20           MR. OFFENBECHER:  No objection.

21           THE COURT:  It will be received.

22                          PLAINTIFF'S EXHIBIT 386 ADMITTED

23           MS. LOEFFLER:  If I may, Special Agent Allison, will

24   you turn the one around and then put the model up.  That should

25   be there, we just need to turn it around so the jury can see it.

1    That should be Exhibit 392.  Oh, that's not 392.  You have it

2    back there?  I'm sorry.

3             If not, why don't we put it up on the screen for the

4    moment.  There it is, okay.  Thank you.  We can have it in both

5    places.  It's just whatever is easiest for people to see.  And

6    then if you will set that up.

7             Ladies and gentlemen, sorry about the napkin over the

8    top, but until it's been admitted, I can't show it to you, so

9    that's why we covered it.  If we can put it up so people can see

10   it.

11            Your Honor, if I may, I'm going to show the witness

12   some pictures, but I'm wanting -- I'm going to want to him to

13   point out on this for the jury where the pictures show.  So if I

14   may ask him to where a mic and be examined standing next to it?

15            THE COURT:  That's fine.  Counsel can move as you feel

16   appropriate.

17            MR. OFFENBECHER:  Thank you, Your Honor.

18    BY MS. LOEFFLER:

19       Q.  Trooper Dupras, when you went in, did you take

20   photographs of the -- where you found the two victims of the

21   crime?

22       A.  Yes, ma'am.

23       Q.  And you stated earlier, did you not, that you knew that

24   EMTs had already been there?

25       A.  Yes, they had, ma'am.

1     Q.  So the pictures that you're showing is where you saw

2   them when you first went in?

3     A.  Yes, ma'am.

4          MS LOEFFLER:  And I will tell you, ladies and

5   gentlemen, I won't belabor them, but I'm going to introduce the

6   pictures right now.  I just wanted to give people a heads up.

7    BY MS. LOEFFLER:

8     Q.  Turning to Exhibit 255, and Trooper Dupras, what I

9   think what I'll have you do -- there should be a portable mic,

10  and I would ask you to come down, because I will be asking you

11  where in the model those photos are.

12         MS. LOEFFLER:  Your Honor, if I may examine from in

13  front here, it may be the easiest way to do this.

14         THE COURT:  That's fine.  As long as we can hear where

15  you are and you're not obstructing the view of anybody, that's

16  fine with me.  I don't know whose microphone is causing the

17  feedback, but I think we've solved it.  Is that working?

18         MS. LOEFFLER:  It's not me.  I'm not moving.

19    A.  I'm sorry, I'm trying to -- so I can walk with it and

20  not trip over it.

21         THE COURT:  That fancy machine he's wearing is hitting

22  that right down to his brain.

23    A.  Sorry, sir.

24         UNIDENTIFIED SPEAKER:  You don't want to be out on the

25  water here.

1      A.  Pardon me, sir, didn't mean to do that.

2   BY MS. LOEFFLER:

3      Q.  Exhibit -- you're going to have to turn around a little

4   bit to look at your screen.

5          Exhibit 255, can you describe what that is, and then I

6   will introduce it?

7      A.  It's a photo of one of the victims, Hopkins.

8              MS. LOEFFLER:  I'm going to move Exhibit 255.

9              THE COURT:  Any objection.

10             MR. OFFENBECHER:  Your Honor, can we approach the

11  sidebar for just a moment.

12     (Sidebar conference as follows:)

13             MR. OFFENBECHER:  Your Honor, this is -- as was

14  indicated before, this was a who-done-it case, not a -- very

15  little to do with this, so we're going to object to the photos.

16  I don't know how many more are coming, what they are going to

17  look like, but they are very disgusting and huge pools of blood

18  in these photos.

19             A couple of photos to indicate where the bodies are

20  located is one thing, but I just don't know what's coming.  So I

21  just wanted get this up front with you and what our objections

22  were.

23             MS. LOEFFLER:  Your Honor, I have three photos of

24  Hopkins showing where he was found, two of Belisle.  One is just

25  his feet, the other was where he was found.

```
 1            I believe under the law I am entitled to show where
 2    the bodies were.  I am calling EMTs to show where they were when
 3    they were originally found.  It certainly goes to this person's
 4    opinion that it was a personal murder, and he has to be able to
 5    describe it.  And I've only got five photos.  I didn't do all of
 6    them.
 7            THE COURT:  Any problem with showing where the victims
 8    were at the point where they were discovered by a police officer
 9    (indiscernible).
10            MS. LOEFFLER:  (Indiscernible).
11            THE COURT:  (Indiscernible).
12            MS. LOEFFLER:  I will show them to you.
13            MR. OFFENBECHER:  There is no dispute about where the
14    bodies were located, what the orientation was.
15            THE COURT:  No, but the jury was -- the just is
16    involved in this process and (indiscernible).
17            MR. OFFENBECHER:  These photos are going to be
18    shocking.  I just want to make sure we're objecting to this.  I
19    thought -- I think you're going to have to look at them too.
20            THE COURT:  I don't mind (indiscernible).
21            MR. OFFENBECHER:  I know.  (Indiscernible).
22            MS. LOEFFLER:  Judge, I'm (indiscernible).
23            THE COURT:  (Indiscernible), but if you can make this
24    a better thing (indiscernible), I will.
25            MR. OFFENBECHER:  I think you will be.
```

```
 1              THE COURT:  Do you have them handy?

 2              MS. LOEFFLER:  I can pull them all out on the card.  I

 3    think we have them on a card in here.  (Indiscernible).

 4              THE COURT:  We can see them on the screen before they

 5    go up.

 6              MS. LOEFFLER:  Right.

 7              THE COURT:  Okay, that's good enough for me.  If I

 8    think there is something objectionable, I'll tell you.

 9              MS. LOEFFLER:  Thank you.

10              MR. OFFENBECHER:  That's the only objection.

11              THE COURT:  Yes, absolutely.

12         (End of sidebar)

13     BY MS. LOEFFLER:

14         Q.  So 255, the exhibit that you were looking at, and

15    that's a photo actually that you took?

16         A.  Yes, ma'am.

17         Q.  Is that close to sort of your first view of where you

18    found the first victim?

19         A.  Yes, ma'am.  It's after coming in through the door.

20              MS. LOEFFLER:  I would move Exhibit 255.

21              THE COURT:  It will be admitted.

22                        PLAINTIFF'S EXHIBIT 255 ADMITTED

23     BY MS. LOEFFLER:

24         Q.  Now, what I want to do is I want to place it in

25    context.  So if you'll back up just a second, we have the chart
```

1    of the whole area of COMMSTA.  There is a --

2              MS. LOEFFLER:  If I may approach?  Your Honor, may I?

3              THE COURT:  Yes.

4     BY MS. LOEFFLER:

5         Q.  Without -- okay.  So in terms of the rigger shop --

6         A.  Yes, ma'am.

7         Q.  -- there are two entrances.  Can you point to the jury

8    which entrance you went in?

9         A.  This one here.

10        Q.  And looking at the big model -- this is not the whole

11   building, I take it?

12        A.  No, ma'am, there is not.

13        Q.  There is a whole -- and I'm going to leave a --

14        A.  There is a section that goes this way and then a

15   section that comes down this way.

16        Q.  So this is only -- okay.

17             Looking at Exhibit 255, can you point out actually on

18   the model where that picture shows?

19        A.  That picture shows this area in here.

20             THE COURT:  Okay, now, all the jurors need to see what

21   you're doing.

22        A.  This photo depicts this area right in here, through

23   this -- I'm taking a photo through this doorway.

24             THE COURT:  And it's up to the jurors to tell me if

25   you can't see, and we'll make sure you can see, okay.

1          UNIDENTIFIED JUROR:  We can't see.

2          MS. LOEFFLER:  We can move the chart up.  Actually,

3   that's adjustable.  Let me try that.  Sir, can you do that?  No,

4   I meant lift the bottom.  The easel part will go up.  You can

5   actually raise the part that holds the chart up much higher.

6          THE COURT:  Okay, is that better?  Good.

7    BY MS. LOEFFLER:

8     Q.  So Trooper Dupras, when you pointed out that there are

9   parts that the model doesn't have, I'm pointing my hand down to

10  the ground, and that's -- on the chart, that's referred to as

11  the --

12    A.  The repair shop.

13    Q.  And then there is an area out toward where the Judge is

14  that's referred to --

15    A.  The wood shop and the garage.

16    Q.  So is the chart now oriented the same way that this is?

17    A.  Yes, ma'am.

18    Q.  And when you saw Mr. Hopkins, you demonstrated -- this

19  picture is your first view of him and you showed where it was?

20    A.  Yes, ma'am.  I'm entering through this door here.

21    Q.  And I have two more pictures of Mr. Hopkins that I will

22  move briefly.

23          Turning to 259, and if you can look at your screen, is

24  that a picture of where you found Mr. -- the whole person of Mr.

25  Hopkins?

1      A.  Yes, ma'am.

2           MS. LOEFFLER:  I'd move 259.

3           THE COURT:  It will be admitted.

4                              PLAINTIFF'S EXHIBIT 259 ADMITTED

5   BY MS. LOEFFLER:

6      Q.  And again, you were not the first person there, but

7   that's where you found him?

8      A.  Yes, ma'am.

9      Q.  And I'm going to take it off the screen.

10          But when you first saw him, were you able to tell at

11  least what one of the main wounds was?

12     A.  Yes, ma'am.  There appeared to be a head wound, there

13  was a big chunk missing out of his right arm, and I saw what

14  appeared to be a wound to his mid torso.

15     Q.  And with regard to the arm, I do have a shot of that,

16  Exhibit 261, just ask you whether -- if you'll look at your

17  screen, whether that shows what you just described?

18     A.  Yes, ma'am.

19          MS. LOEFFLER:  I'd move 261.

20          THE COURT:  It will be admitted.

21                              PLAINTIFF'S EXHIBIT 261 ADMITTED

22  BY MS. LOEFFLER:

23     Q.  And that's what you were referring to as the arm wound?

24     A.  Yes, ma'am.

25     Q.  Now, I'm going to move to -- I want to move on to the

1  second victim, and I have a photo, Exhibit 257.  And if you'll

2  take a look at that and describe what that shows.

3      A.  That shows the entryway into the other office, ma'am.

4           MS. LOEFFLER:  I move 257.

5           MR. OFFENBECHER:  No objection.

6           THE COURT:  It will be admitted.

7                          PLAINTIFF'S EXHIBIT 257 ADMITTED

8   BY MS. LOEFFLER:

9      Q.  Now, for 257, I am going to ask to you show on the

10  model -- well, let me stop a second, sorry.

11          Did you find the second victim inside the room that

12  this is the -- you know, that this door enters into?

13      A.  Yes, ma'am.

14      Q.  And if you could, without tripping over it, show on the

15  model where that room is.

16      A.  That's the -- I'm sorry.  It's this room right here.

17  Goes into there.

18      Q.  And again, point to the other one.

19      A.  This is like a hallway.  This goes into, I guess, the

20  repair shop down here.  And this is a picture of that door, that

21  doorway.

22      Q.  And we actually have -- I think it's Scotch taped in --

23  a body in the break room.  And is that approximately where Mr.

24  Hopkins was?

25      A.  Hopkins?

1     Q.  Yeah.

2     A.  This is where Mr. Hopkins was, this is where Mr.

3  Belisle was.

4     Q.  I have two photos of Mr. Belisle, and that's it, and

5  then we will move on.

6         Turning to 258, is that -- you have to look at your

7  screen, I'm sorry, the way we have this lined up.

8     A.  Yes, that's Mr. Belisle's lower body, his legs.

9     Q.  And that's what you saw when you went into the room

10  first?

11     A.  Yes, ma'am.  That's a picture from the entry of the

12  doorway right there.

13         MS. LOEFFLER:  I move 258.

14         THE COURT:  It will be admitted.

15                     PLAINTIFF'S EXHIBIT 258 ADMITTED

16  BY MS. LOEFFLER:

17     Q.  And again, you showed us in the doorway.  And then this

18  is the -- first you could see his feet?

19     A.  Yes, ma'am.

20     Q.  And then were you able to -- did you go in and check

21  the -- his hole torso?

22     A.  Yes, ma'am, I did.

23         MS. LOEFFLER:  And if we could pull up 262, please.

24  BY MS. LOEFFLER:

25     Q.  Is that the condition you found Mr. Belisle when you

1   went in?

2       A.  Yes, ma'am.

3           MS. LOEFFLER:  I move 262.

4           THE COURT:  It will be admitted.

5                           PLAINTIFF'S EXHIBIT 262 ADMITTED

6    BY MS. LOEFFLER:

7       Q.  Now, we can turn those off.  And I'm going to go back

8   to my -- Trooper Dupras, I'll have you go back to your seat now.

9       A.  Yes, ma'am.

10      Q.  Now, when you went into the building at the rigger

11  shop, I think you testified a little bit before when we went

12  into the pictures that you went in to secure the building?

13      A.  Yes, ma'am, I went in to see what was there and to

14  secure and -- get the firemen out and secure the scene.

15      Q.  And was there anything about that building, based on

16  your training -- actually, both in the military and as a police

17  officer -- that would -- or how would that impress you in terms

18  of the danger of going into that building, based on your

19  experience?

20      A.  To clear the building, at least coming from the

21  entrance, the entryway I did, is -- I was -- a tactical

22  challenge.

23          Once you come in, there is multiple areas you have to

24  cover.  There is a double doors, a hallway to the left, the

25  other room straight ahead where Mr. Hopkins was, and then there

1   was an open entry to that same room where Mr. Hopkins was.  When

2   you first come in, I couldn't tell where that went either.  So

3   there is multiple areas you're going to have to try to cover

4   when you go in there.

5        Q.  Did you -- and looking at the front of the building,

6   were there any obvious -- I mean, could you see through into the

7   building from outside?

8        A.  No, ma'am, there was very -- the one section there is

9   no windows at all.

10       Q.  Now, I brought the pictures down, but when you got to

11  the scene and looked at the two individuals, did you see any

12  evidence of contamination of the crime scene?

13           Well, let me ask the question -- I didn't get -- when

14  you got to the individuals where there was -- was there any

15  evidence that you saw of -- left, obviously left by the

16  murderer?

17       A.  No, ma'am.

18       Q.  And when you say no, what are you basing that statement

19  on?

20       A.  Well, I didn't see any footprints in the blood; I

21  didn't see any forced entry into the building, any signs of

22  forced entry; I didn't see any signs of struggle other than the

23  two victims, like there was a fight, like items knocked over or

24  chairs knocked over or papers knocked about, I just found the

25  two -- the two victims.

1      Q.  And in terms of the -- I mean, did you see anything --

2   were there any -- was there any evidence on the floor of the

3   building at all by entry by anyone?  I mean, wet spots, grass

4   spots, anything like that?

5      A.  No, ma'am, there were no tracks, no mud tracks or wet

6   tracks or anything like that.

7           MR. OFFENBECHER:  Excuse me, Ms. Loeffler, if we

8   just -- if we moved it back five inches I could see the witness.

9           MS. LOEFFLER:  That's fine.

10           MR. OFFENBECHER:  Is that okay?  Just back this way.

11           MS. LOEFFLER:  I'm trying to do my best to put things

12   up where the jury can see it and everybody can.

13           MR. OFFENBECHER:  Yeah.  That's perfect, thank you.

14    BY MS. LOEFFLER:

15      Q.  Now, when you got to the scene, again as the first

16   trooper on the scene, basically I'd ask, were you the senior law

17   enforcement guy on the scene when you first got there?

18      A.  Yes, ma'am.

19      Q.  And later the case went over to the FBI.  But when you

20   started out on the scene, were you there also as the

21   investigator?

22      A.  Yes, ma'am.  Normally the -- often the first trooper on

23   the scene is usually the case officer, although that sometimes

24   varies.

25      Q.  Now, when you got to the scene, again as the

1    investigator and your -- how long were you in the building?

2       A.  Not too long, ma'am.  I know once I got in there and

3    talked to the firemen, they said they were both gone, I had them

4    get out.  I asked the Coast Guard police, MilPol contacts

5    through the CGIS agents, and then I called on the radio.

6       Q.  Let me just go back.  CGIS is Coast Guard Investigative

7    Services?

8       A.  Yes, ma'am.

9       Q.  And you also took a bunch of photographs?

10      A.  Yes, ma'am.

11      Q.  Were there any things that were immediately obvious to

12   you about the crime that would be things that, you know, you

13   processed as an investigator in the case?

14      A.  It didn't appear to be --

15          MR. OFFENBECHER:  Your Honor, I would object on the

16   grounds that there has not been a foundation for this witness

17   to, you know, speculate about the crime at this point.  He's

18   describing an event that happened a while ago, and there has

19   been no foundation that this witness is qualified to make it.

20          THE COURT:  I'm not sure I even understand the

21   question.

22    BY MS. LOEFFLER:

23      Q.  How many scenes have you responded to of assaults or

24   crimes or people injured?

25      A.  Ma'am, I don't know how many by now.  A lot.

1      Q.  And as part of your job as a trooper, when you look at
2  the scenes, do you look at it with an eye to determine what the
3  evidence is and to try to be able to see if it gives you any
4  information about the perpetrator?
5      A.  Yes, ma'am.
6      Q.  And are you able -- and based on -- based on what have
7  you gained, knowledge, that would allow you to interpret a crime
8  scene like that?
9      A.  Well, the training we get at the academy.  And then
10  on-the-job training, usually we have experience investigating
11  different scenes, and assault scenes, sexual assault scenes, and
12  thefts.
13      Q.  And scenes involving death?
14      A.  Yes, ma'am.
15      Q.  And I would ask you, based on that experience, were you
16  able to -- are there certain impressions that you were able to
17  gain immediately from what you saw?
18          MR. OFFENBECHER:  Your Honor, may I voir dire the
19  witness on this issue just briefly.
20          THE COURT:  Briefly.
21                      VOIR DIRE EXAMINATION
22   BY MR. OFFENBECHER:
23      Q.  Trooper Dupras, you've indicated some of your
24  experience in sexual abuse, sexual assault, narcotics, felony
25  thefts, burglaries, and then also some death investigations; is

1  that right?

2      A.  Yes, sir.

3      Q.  How many murder investigations have you been the lead

4  counsel on, or lead investigator?

5      A.  Lead investigator?

6      Q.  Yeah.

7      A.  None, sir.

8      Q.  And the other death investigations involved a suicide;

9  is that right?

10     A.  Suicide, accidental death, air crashes, fatalities from

11 vehicles.

12     Q.  Vehicular homicides, stuff like that?

13     A.  Yes, sir.

14     Q.  But no death by gunshot murder investigation; right?

15     A.  Correct, sir.  I've been involved in some, but I wasn't

16 a lead, no, sir.

17     Q.  So this is your first murder investigation; right?

18     A.  No, sir.

19     Q.  Well, the first one where you're in charge of the

20 scene; right?

21     A.  As far as investigation of the scene?

22     Q.  Yes.  You're talking about your observations of the

23 scene of a murder -- a murder scene; right?

24     A.  Yes, sir.

25     Q.  This is the first time you've been in that role as the

1   lead investigator in a murder scene; isn't it?

2       A.  Yes, sir.

3               MR. OFFENBECHER:  Your Honor, based on that, I don't

4   think he's really qualified to speculate about compared to other

5   murder scenes.  It's the first time out.  And I think the

6   question goes beyond this witness' ability to make a conclusion.

7   And so I would object to it on that basis.

8               MS. LOEFFLER:  Your Honor, I think there is some

9   confusion there.  He's responded to dead bodies and other

10  murders.  The question that he was asked on voir dire:  Whether

11  he was the lead investigator.

12              He wasn't the lead investigator in this case either,

13  but he's certainly qualified and has had many examples of

14  looking at it.  And the jury can evaluate -- it goes to weight,

15  not admissibility -- they can evaluate the basis of what he's

16  saying.

17              THE COURT:  Very well.  You asked him what was his

18  impression?

19              MS. LOEFFLER:  Yeah.

20              THE COURT:  He can give his impression based on his

21  experience and his observations.

22                      CONTINUED DIRECT EXAMINATION

23   BY MS. LOEFFLER:

24      Q.  So Trooper Dupras, were you able to make any

25  impressions about the perpetrator from what you saw at the

1    scene?

2       A.  My impression was -- one was that it appeared to me

3    that whoever the shooter was had some knowledge of that

4    building.

5       Q.  Why was that?

6       A.  Because it's an odd-shaped building.  You can't really

7    see who is inside from most of the angles.  And when you walk

8    in, it's kind of -- to me it was initially confusing which way

9    you go, which -- it was a shop.  It wasn't like a normal office

10   building, even a normal garage.

11      Q.  And, in fact, with your 11 years there, had you

12   actually had any experience with this building before?

13      A.  I'd never been in that building, ma'am.

14      Q.  Was there any other impression that you had, based on

15   where the bodies were found, as to -- that you were able to

16   make?

17      A.  Well, they were both found in obviously separate

18   offices or separate rooms.  My impression was this event

19   occurred quickly.

20      Q.  Did you see any evidence -- I know you testified before

21   you responded to lots of burglaries and robberies.  Did you see

22   any evidence of such?

23      A.  I did not, ma'am.

24      Q.  And when you say you didn't see any evidence of that,

25   what would you have expected to find if that were the case?

1      A.  I'd expect to find drawers open, disturbance of other

2    items, like he would have taken tools or valuable items.  I saw

3    none of that.  Nothing appeared disturbed necessarily except for

4    the victims.

5      Q.  And were you able to -- did you see any evidence about

6    whether the -- any evidence of a struggle or defensive action by

7    the victims?

8      A.  No, ma'am.

9      Q.  And was there any blood outside the two areas, you

10   know, in the main areas or toward the --

11     A.  I did not see any.

12     Q.  Now, I want to go back to just a different area of

13   geography.  And I'm going to pull up Exhibit 51.

14          And can you tell the jury what 51 is.

15     A.  That's the Kodiak state airport.  That's the main

16   terminal area.  There is several buildings that are involved in

17   the terminal.  There is the main Alaska Air terminal, there is

18   Island Air, a little piece of Servant Air, and then there is a

19   building Island Air's.

20     Q.  Is that a fair and accurate depiction of actually what

21   it used to look like?  There have been a few changes since then;

22   right?

23     A.  Yes, ma'am.

24          MS. LOEFFLER:  I'd move Exhibit 51.

25          MR. OFFENBECHER:  No objection, Your Honor.

1          THE COURT:  It will be received.

2                              PLAINTIFF'S EXHIBIT 51 ADMITTED

3   BY MS. LOEFFLER:

4      Q.  Okay, turning to Exhibit 51 -- I'm going to use the

5   pointer -- but this road this way in --

6      A.  Yes, ma'am.  That's known as Airport Way.

7      Q.  And that's Airport Way?

8      A.  Yes, ma'am.

9      Q.  And then this is the -- I'm circling the parking lot;

10  right?

11     A.  That's the main parking lot, ma'am.

12     Q.  All right.  Now in order to get into the airport --

13  first of all, do you have to drive past the absolute -- the

14  front of Alaska Airlines?

15     A.  No, ma'am.

16     Q.  Back then?

17     A.  No, ma'am.

18     Q.  What was the parking lot like back -- I'm going to go

19  back to April 12th, 2012.

20         What was the surface of the parking lot like?

21     A.  It was pretty beat up.  It was supposed to be an

22  asphalt parking lot, but it was really torn up.

23     Q.  And since then, have they -- I mean, if somebody shows

24  some pictures later, and I think we do have some, what have they

25  done since then?

1    A.  They have leveled it.  I think they used some hard

2    solid to pack it down, and then they repaved it.  It's a much

3    better surface now.

4    Q.  So --

5    A.  And there is now an access road to -- there is no way I

6    can point to it for the jury -- but there is an access road --

7    Q.  I'm going to give you the laser pointer because that

8    would probably be the best way to do it, and then you can

9    explain your own testimony.

10    A.  They made an access road, a paved road that goes all

11    the way to the parking lot now.

12    Q.  But previously, back in 2012, if you were going in to

13    the airport, you would drive up that?

14    A.  Yes, ma'am.

15    Q.  And then what was the traffic?

16    A.  This was the -- this is the short-term parking.  So

17    normally if people were dropping somebody off, say, at the main

18    terminal here, this is Alaska Airlines and Era, they would go

19    here, pull along there and unload.

20    Q.  But if you want to leave a car at the end of -- we have

21    two of these.

22        If you want to leave a car down here, do you have to

23    drive all the way up and around the front of Alaska Airlines to

24    get there?

25    A.  No, ma'am.

1    Q.   You can actually drive down that road right down here?

2    A.   You can drive out this way and park in there.

3    Q.   And, in fact --

4    A.   Or you could at the time.

5    Q.   You could, I'm sorry, at the time?

6    A.   Yes.

7    Q.   And in terms of the -- and have you, in fact -- as a

8    trooper, do you patrol this parking lot sometimes?

9    A.   Yes, ma'am.

10   Q.   And you said before this is two-hour parking.  Is all

11   of this that I'm circling all the way down to the end two-hour

12   parking?

13   A.   Yes, ma'am.

14   Q.   And is there long-term parking at the airport?

15   A.   Yes, ma'am.

16   Q.   And --

17   A.   This is the long-term parking here.

18   Q.   You have to pay for that; right?

19   A.   Yes, ma'am.

20   Q.   In terms of the airport, when people actually go

21   generally for flights, where do they park when they leave a car,

22   generally?

23   A.   Generally, if they are leaving a car, usually in here.

24   Q.   Oh, because that's long term?

25   A.   That's long term.  People do sometimes -- sometimes

1   people will park in here and have a friend pick up the vehicle.

2   That's quite common in Kodiak.

3      Q.  Is that short-term parking lot ever -- I mean, is this

4   very often full, this whole thing?

5      A.  Not very often, but it can get full.  If the weather

6   backs flights up in Kodiak, there is several delayed or canceled

7   flights, it will get crowded in here.

8      Q.  Do you remember what the weather was on April 12th?

9      A.  It was a very nice day.

10     Q.  In the investigation, were you asked a couple of times

11  to determine whether anybody had ever been ticketed in the

12  last -- you know, from 2012 or 2011?

13     A.  Yes, ma'am.

14     Q.  For parking in short-term parking?

15     A.  Yes, ma'am.

16     Q.  And are there -- any tickets ever been issued?

17     A.  Not that I know about.  I've never written anyone, and

18  I don't know any other trooper who has.

19     Q.  I want to show you what's been marked as Exhibit 104

20  and ask you, on April 12th, 2012 -- how long were you up at the

21  COMMSTA that morning, do you recall?

22     A.  I was up there for quite a considerable time.  I had a

23  break to do grand jury, and I had to do new notifications in

24  town, but then I went back to the COMMSTA.  And I was between

25  the COMMSTA and the main base of the Coast Guard several times.

1      Q.  Were you at some point drawn by somebody else down to a

2  small blue SUV at the airport area?

3      A.  Yes, I was, ma'am.

4      Q.  Is that the car in 104?

5      A.  Yes, ma'am.

6          MS. LOEFFLER:  I move Exhibit 104.

7          MR. OFFENBECHER:  No objection.

8          THE COURT:  It will be received.

9                      PLAINTIFF'S EXHIBIT 104 ADMITTED

10  BY MS. LOEFFLER:

11      Q.  And who drew -- and I don't want to get into hearsay,

12  what they told you, but who drew your attention down there?

13      A.  Lieutenant Ray Ellis of the Alaska Wildlife Troopers.

14      Q.  And in terms of the picture we showed before, where was

15  this car?  Was it -- do you recall?

16      A.  I do.  It was toward the end, toward the Servant Air

17  end of the parking lot.

18      Q.  And would you have had to drive past the very front of

19  Alaska Airlines to get to this car?

20      A.  No, ma'am.

21      Q.  Did you also look to see if there were any stolen

22  vehicle reports around the time of April 12th?

23      A.  Yes, ma'am.

24      Q.  Were there any?

25      A.  No.

1       Q.  I want to go to one last area, and that is -- I have

2   the pictures -- all right, turning your attention to -- is it

3   243 -- 243.

4           At some point were you involved -- or were you with the

5   FBI later in that day and get involved in seizing an item from

6   Mr. Wells' truck?

7       A.  Yes, ma'am.  I don't think it was the same day, though.

8   It was like the 18th, I think.

9       Q.  Oh, okay.  You took an item later?

10      A.  Yes, ma'am.

11      Q.  What was it?

12      A.  A tire.

13      Q.  And are you familiar with this picture?

14      A.  Yes, ma'am.

15      Q.  What was this?

16      A.  This is a -- the truck.  I forget the plate, Victor

17  Golf Bravo, and I forget the last numbers.  It was a Coast Guard

18  veteran plate.  I believe it belongs to Mr. Wells.

19          MS. LOEFFLER:  I'd move Exhibit 243.

20          MR. OFFENBECHER:  Just a quick question, Your Honor.

21  Now, did you actually look in the back of his truck and see

22  this.

23      A.  This?  I took that photo.

24          MR. OFFENBECHER:  Oh.  Okay, I have no objection.

25          THE COURT:  It will be received.

1                              PLAINTIFF'S EXHIBIT 243 ADMITTED

2    BY MS. LOEFFLER:

3       Q.  And this is from the back of Mr. Wells' truck?

4       A.  Yes, ma'am.

5       Q.  And were you also with -- I take it you weren't alone,

6    but were you involved in taking of the tire from the back of the

7    truck?

8       A.  I assisted, yes, ma'am.

9       Q.  And what did you take out of the back of the truck?

10      A.  We took all the tires out of the back of the truck and

11   photographed them.

12      Q.  Turning to Exhibit 244, is that a picture you took of

13   one of the tires that you took?

14      A.  Yes, ma'am.

15          MS. LOEFFLER:  I'd move 244.

16          MR. OFFENBECHER:  No objection.

17          THE COURT:  That would be received.

18                              PLAINTIFF'S EXHIBIT 244 ADMITTED

19   BY MS. LOEFFLER:

20      Q.  And 245, if you could -- I'm sorry.  There is 244, and

21   then I'll turn you to Exhibit 245.

22          Another picture of the same tire?

23      A.  Yes, ma'am.

24      Q.  And you took it?

25      A.  I did.

1            MS. LOEFFLER:  I move 245.

2            MR. OFFENBECHER:  No objection, Your Honor.

3            THE COURT:  It will be received.

4                            PLAINTIFF'S EXHIBIT 245 ADMITTED

5   BY MS. LOEFFLER:

6      Q.  When you looked at this tire, was there anything -- any

7   foreign object in it?

8      A.  Yes, ma'am, there was a nail in it.

9            MS. LOEFFLER:  What I'm about to do, if we can have a

10  minute, Your Honor, I forgot to wheel in the tire itself.

11           THE COURT:  Okay.

12           MS. LOEFFLER:  Let me see if I have anything else,

13  otherwise we're getting it.  Just a second to consult with my

14  colleagues.

15  BY MS. LOEFFLER:

16     Q.  Actually, I did forget to ask -- Trooper Dupras, I did

17  forget to ask you about one other area.

18           Anton Larsen Road, the one that goes by the COMMSTA --

19     A.  Yes, ma'am.

20     Q.  -- where does that road lead?

21     A.  It leads to Anton Larsen Bay.  It goes up over a

22  mountain pass and back down to the other side.  Technically the

23  other side of the island.

24           There is not much over there.  There is a place called

25  Red Cloud Ranch, and the road ends, and at the end some people

1   park their cars -- well, excuse me, there is a boat launch and

2   then there is the end of the road where people park their cars.

3   And those people, there is some homes on Anton Larsen Island,

4   which is out in that bay.

5       Q.  How many people live out there?

6       A.  Probably less than a dozen.

7       Q.  And in the winter, is that road maintained?

8       A.  No, ma'am.

9       Q.  But is it maintained at all past the COMMSTA?

10      A.  It is, it is.  It's paved out to a little bit past the

11  golf course, the Coast Guard golf course, and then it turns into

12  gravel.  DOT tries to plow it and keep it open as long as they

13  can, though.

14      Q.  So is it drivable all -- you know --

15      A.  I would say with a two wheel vehicle it's not drivable

16  all year round.  With a four-wheel drive vehicle, it may be,

17  depending how deep the snow is past the ski chalet.  If it's

18  pretty deep, DOT doesn't plow anymore.

19          MS. LOEFFLER:  We are about to cart in Exhibit 231.

20  And if I can smooth this along, counsel, can I -- I'm going to

21  wheel in what we've marked as Exhibit 231.  And I'm going to --

22   BY MS. LOEFFLER:

23      Q.  We did the photos, but I'm going to ask you whether

24  this is the tire that you seized.  And you can look at it to

25  see -- I'll tell you the nail isn't in it, but whether you can

1   see the hole.

2           Why don't you take it over to Trooper Dupras so he can

3   take a look at it.

4       A.  Yes, ma'am, I see where the hole is.

5           MS. LOEFFLER:  I move Exhibit 231.

6           MR. OFFENBECHER:  No objection, Your Honor.

7           THE COURT:  Okay, it will be received.

8                           PLAINTIFF'S EXHIBIT 231 ADMITTED

9    BY MS. LOEFFLER:

10      Q.  If you -- Trooper Dupras, you said there was a nail in

11  it when you seized it.  When you saw the hole -- the nail isn't

12  in it anymore; right?

13      A.  No, it's not, ma'am.

14      Q.  Okay, we'll have other witnesses for that.

15          MS. LOEFFLER:  Okay, I have nothing further at this

16  time.

17          THE COURT:  Cross-examination?

18          MS. LOEFFLER:  Counsel, do you want the tire or can

19  we --

20          MR. OFFENBECHER:  No.

21          MS. LOEFFLER:  Why don't we -- we've admitted it.  So

22  why don't we try to see -- there is not enough room in this

23  place.  So maybe Special Agent Sturgis, maybe we can just take

24  it out.

25  ///

                            CROSS-EXAMINATION

  BY MR. OFFENBECHER:

      Q.  Trooper Dupras, good afternoon.

      A.  Sir.

      Q.  Now, you've been a trooper since 1998; is that right?

      A.  September, yes, sir.

      Q.  You attended the Alaska Department of Public Safety
Academy in Sitka?

      A.  Yes, sir.

      Q.  And that is the trooper's academy; is that right?

      A.  Yes, sir.

      Q.  And you completed the field training program in
Fairbanks?

      A.  Yes, sir.

      Q.  And you have other training?  Along the way you had
kind of inservice training and documentation and processing of
crime scenes; is that fair to say?

      A.  Yes, sir.

      Q.  Now your job currently in Kodiak, is that a patrol
trooper; is that right?

      A.  That's correct, sir.

      Q.  You're not like a detective in the detective bureau or
anything like that; right?

      A.  No, sir, I'm not in ABI.

      Q.  I'm sorry?

1      A.   I'm not in ABI.

2      Q.   And so there is a part of the troopers that's kind of

3  the investigative or detective section of the Alaska State

4  Troopers; right?

5      A.   Yes, sir.

6      Q.   But that's not a particular vocation that you're

7  involved in; right?

8      A.   I'm reporting there on the 16th of April.

9      Q.   Okay.  But you haven't done that yet --

10      A.   Correct.

11      Q.   -- is what I'm saying?

12           That's not your job right now?

13      A.   No, it's not, sir.

14      Q.   Having been through the public safety academy and

15  completed the field training program, you know that taking notes

16  is an important part of being a police officer; right?

17      A.   Yes, sir.

18      Q.   And you sometimes take notes on a spiral pad or a pad

19  of paper or something like that when you're out at the scene;

20  right?

21      A.   Yes, sir.

22      Q.   And then you -- writing a report later when you get

23  back to the police station is also a very important thing; isn't

24  it?

25      A.   Sometimes, yes, sir.

1      Q.  Well, writing a report is an important part of a police

2  officer's job; isn't it?

3      A.  Yes, sir.

4      Q.  For example, in this case, you know that the -- you

5  directed a number of different police officers who were down at

6  the scene; didn't you?

7      A.  No, sir.

8      Q.  Well, you were the ranking police officer on the scene?

9      A.  I directed some MilPol officers.  I did direct some

10  wildlife troopers, yes, sir.

11      Q.  Well, the MilPol officers were the Coast Guard

12  officers, right -- I mean, the Coast Guard police officers;

13  right?

14      A.  The MPs, yeah.  They are Coast Guard police, yes, sir.

15      Q.  And then there were also some fire department folk out

16  there; weren't there?

17      A.  Yes, sir, there were.

18      Q.  And you, for example, went into the scene, told them to

19  get out to secure the scene; right?

20      A.  Yes, sir.

21      Q.  So in your training at the Alaska Department of Public

22  Safety Academy, they trained you to write a report; don't they?

23      A.  Yes, sir.

24      Q.  And they want you to base your report on your

25  observations at the scene of the crime; right?

1      A.  Yes, sir.

2      Q.  And so one of the reasons that you write a report is so

3  there is a good record later on of what you observed out at the

4  scene of the crime; right?

5      A.  Yes, sir.

6      Q.  And it's important that your report be done close in

7  time to the time that you made your observations at the scene;

8  right?

9      A.  If it's going to be my case, yes, sir.

10     Q.  Well, if you're going to testify in court, for example,

11  and you want to remember what happened back at the scene of the

12  crime, it's important that you write those things down in a

13  timely fashion; right?

14     A.  It could be, sir, yes.

15     Q.  Well, wouldn't you agree that your memory at the time

16  that you observe them, or close in time to the time that you

17  observed something, is better than, say, two years later?

18     A.  Yes, sir.

19     Q.  So the reason -- and that report is put in a file with

20  other police reports; right?

21     A.  It can be, yes, sir.

22     Q.  And that becomes the case file for something, whether

23  it's your report or an FBI report or somebody else's report,

24  that becomes the case file; right?

25     A.  It could be, yes, sir.

1    Q.   And that's so that a supervising police officer, or

2    maybe a prosecutor later on, can look at the statements of all

3    the police officers who worked on the case at one time, figure

4    out what happened, and then make some charging decisions; right?

5    A.   I think that's the district attorney's decision on

6    charging, right?

7    Q.   Exactly, a charging decision.

8         But the police reports get all put together so that

9    they go to the prosecutor, and then the prosecutor makes a

10   charging decision; right?

11   A.   Yes, sir.

12   Q.   So you know that what's in your police report is

13   important because important decisions are made based on your

14   police report; right?

15   A.   Yes, sir.

16   Q.   Now you also do lots of different cases at a time;

17   don't you?

18   A.   Yes, sir.

19   Q.   I mean, you're not just doing one case and then

20   stopping and picking up the next case and --

21   A.   It depends on what's going on.  If it's a big case,

22   you're probably just going to work on that.

23   Q.   Okay.  Well, even if it's a big case, you do that case

24   for a while, and then in the meantime you have other cases;

25   correct?

1        A.  Yes, sir.

2        Q.  I mean, you would say that this was a pretty big case;

3   wasn't it?

4        A.  Yes, sir.

5        Q.  And this happened about two years ago; right?

6        A.  That's correct, sir.

7        Q.  But you've had a lot of cases since then; haven't you?

8        A.  Yes, sir.

9        Q.  You've had probably hundreds of cases since then;

10  haven't you?

11       A.  Yes, sir.

12       Q.  And so you don't just do one case at a time.

13           So you appear at the scene of a crime, do your work,

14  make a report, move on to the next case; right?

15       A.  Yes, sir.

16       Q.  And the reason that you make a report -- well, of

17  course when you sit down and write your report, you want to make

18  sure that your report is as accurate as possible; right?

19       A.  Yes, sir.

20       Q.  And you want to base your report on the observations

21  that you made at the scene of the crime right at that time;

22  right?

23       A.  Yes, sir.

24       Q.  And you do it close in time so that it's accurate?

25           And you've been taught in your field training, and also

1   at the academy, that you should make your report as close in

2   time to the time that you made the observations; right?

3       A.  Yes, sir.

4       Q.  And, in fact, in your field training program, you were

5   judged about how timely you made your reports and how complete

6   and thorough they were; right?

7       A.  Yes.  I don't know about timely.  It depends on the

8   case.

9       Q.  Well, certainly having them done timely was rewarded in

10  the program; wasn't it?

11      A.  Not necessarily, sir.

12          MR. OFFENBECHER:  Can you pull up defense Exhibit No.

13  DE-044, please.  I'm sorry, it would be 6518.

14      (Whispered discussion off the record)

15   BY MR. OFFENBECHER:

16      Q.  Trooper Dupras, could you take a look at D-6518, which

17   is a defense Exhibit DE-044?

18          MS. LOEFFLER:  Can I ask to have a copy of the defense

19  exhibit?  I know I've got a picture, but --

20          MR. OFFENBECHER:  You got a copy.  I can't really read

21  that.

22          MS. LOEFFLER:  And I've never gotten a copy of this.

23          MR. OFFENBECHER:  DE-6518.

24          MS. LOEFFLER:  I can't read it either.

25          MR. OFFENBECHER:  Just a moment, Your Honor.

1    BY MR. OFFENBECHER:

2        Q.  Trooper, you're looking at page D-6518.  Have you

3    looked at that?

4        A.  Yes, sir.  That's a copy of the OPM.

5        Q.  The OPM is what, the operating procedures manual for

6    the state troopers?

7        A.  Yes, sir.

8        Q.  And the page that you're looking at has case

9    responsibilities as 201.010; right?

10       A.  Yes, sir.

11       Q.  And case responsibilities, on A, it says:  Officer is

12   required to make timely submission of reports; is that right?

13       A.  Yes, sir.

14       Q.  Now, the other thing that you do as a police officer is

15   you have to come testify in court; is that right?

16       A.  Yes, sir.

17       Q.  Now, you know that when you make observations at the

18   scene of a crime, that you might have to testify in court weeks

19   from the time that you observe them; right?

20       A.  Yes, sir.

21       Q.  Or it might even be months from the time that you

22   observe it; right?

23       A.  Yes, sir.

24       Q.  Or it might be, as in this case, even years after you

25   make the observations; right?

1      A.  Yes, sir.

2      Q.  And you want to make sure that your testimony in court

3  is as accurate as it can possibly be; right?

4      A.  Yes, sir.

5      Q.  So that's the other reason that you write down a report

6  and you write down notes at the scene, is because you want to

7  make sure that when you testify under oath in an important case

8  like a murder case, that your testimony will be as accurate as

9  possible; right?

10      A.  Yes, sir.

11      Q.  And that all of the observations that you made out at

12  the scene of the crime are going to be as accurate as possible;

13  right?

14      A.  Yes, sir.

15      Q.  And you do that in pretty much every kind of a case as

16  a state trooper; don't you?

17          MS. LOEFFLER:  Your Honor, at this point I'm just

18  going to object, cumulative.  I suspect we all have the point.

19          THE COURT:  Sustained.

20   BY MR. OFFENBECHER:

21      Q.  Well, let me just ask you this.  In this case you

22  didn't write a report; did you?

23      A.  Yes, sir, I didn't.

24      Q.  You did not?

25      A.  I did not.

1     Q.  So in testifying here today, you have not refreshed
2  your memory with your report?
3     A.  I refreshed my memory with the notes and photographs
4  and recordings I made at the scene and took at the
5  investigation.
6     Q.  But you have not written a report?
7     A.  I didn't write a report, sir.
8     Q.  Now, you testified on direct examination about some
9  impressions that you have; is that right?
10    A.  Yes, sir.
11    Q.  And one of your impressions is that it was -- this
12 crime must have been perpetrated by someone who was familiar
13 with the scene; is that right?
14    A.  That was my impression, sir.
15    Q.  And you indicated that the reason for that impression
16 was that because it was an odd-shaped building; is that right?
17    A.  It's an odd shaped building.  It's offset from the
18 road.  It's, in some ways, a rather obscure building.  It's not
19 frequented by the public.
20    Q.  It's off a little bit on the side of the road; is that
21 right?
22    A.  It's at least 50 feet away from the road.
23    Q.  Well, crimes often occur in isolated places; don't
24 they?
25    A.  They can, yes, sir.

1    Q.  So if you were going to guess about a place that would

2  be more likely, for example, to be the subject of a burglary,

3  would you suggest that a house that's in an area with a lot of

4  other houses would be more likely or would it be a house that's

5  in a remote area?

6    A.  A house in a remote area would be more -- like cabins,

7  they are often targets in Alaska for burglaries.

8    Q.  Right.  And that's because people who want to commit

9  crimes don't want to be observed committing a crime; do they?

10    A.  That's correct, sir.

11    Q.  And so they will want to commit a crime in a more

12  remote place so that there are not a lot of other people looking

13  on; right?

14    A.  Yes, sir.

15    Q.  And if it's in an area with a lot of homes, there might

16  be some people watching; right?

17    A.  Yes, sir.

18        MR. OFFENBECHER:  Can you call up 51, please,

19  government's Exhibit 51.

20        MS. LOEFFLER:  You want you to put it on the screen.

21  I thought you were asking us to do it.

22        MR. OFFENBECHER:  Sorry, sorry.  I think we've got it.

23        MS. LOEFFLER:  Okay.

24   BY MR. OFFENBECHER:

25    Q.  I'm showing you what's been marked as government's 51.

1  Do you remember that?

2      A.  Yeah.

3      Q.  That's the airport; isn't it?

4      A.  Yes, sir.

5      Q.  And this is the road coming into the airport right

6  here; isn't it?

7      A.  Yes, sir.

8      Q.  And you indicated that one could go down either way.

9  If you drove in, you could just come in this way?

10     A.  I didn't say that, sir.

11     Q.  So that's not correct; is it?

12     A.  I said -- you can come down this road and you can park

13 over here.

14     Q.  Okay.  Well, you showed us a picture of a blue car

15 there just a moment ago.  I don't have the exhibit number, but

16 do you remember the picture of the blue car?

17     A.  I do.

18     Q.  And you observed that at the airport; didn't you?

19     A.  I did.

20     Q.  And could you indicate with your pointer where on

21 the --

22     A.  It was on this end.

23     Q.  So about your -- you have your -- I'll use my pointer

24 now just to make sure I'm clear.

25     A.  Okay.

1        Q.  But it's right about where this white car is; right?

2        A.  In that vicinity.  I think it's closer to this side,

3   but --

4        Q.  Where the red car is then?

5        A.  I think it's closer to this side, sir.  It's this end

6   of the parking lot.

7        Q.  Okay.  So I'm going to point -- mine is a little more

8   precise on the end there.

9            So the cars that are in this area right here -- thank

10  you -- the cars that are in this line right here are actually

11  all parked facing this direction; right?

12       A.  Yes, sir.

13       Q.  And so this lane of traffic is actually one way when

14  you come in here; right?

15       A.  That is correct, sir.

16       Q.  So if you're coming in the airport from here and you

17  want to end up here, you need to turn right and go down the one

18  way here and then come back around.  And this is another one way

19  on the other side; isn't it?

20       A.  Which way is the other one you're talking about?

21       Q.  This one right here.

22       A.  Yes, sir.

23       Q.  See how all the cars are parked?

24       A.  Yes, sir.

25       Q.  On both sides that way?

1    A.  Yes, sir.

2    Q.  So if a car were going to end up where the white car

3  is, or where this car is a little bit to the left where you're

4  indicating, it would need to come in and come through here and

5  go this way; right?

6    A.  It could.  Or it could come in and turn around fairly

7  short of that depending if there is a lot of cars parked in

8  here.  It could come in there and turn around and park right

9  there.

10    Q.  Excuse me, go ahead.

11    A.  I mean, you could come in -- if there is not a lot of

12  cars parked, you could come in, turn this way, and park in here.

13    Q.  Okay, so you could kind of cut through --

14    A.  Or you could come in and come down and park in there --

15  come down, turn around in here and come and park.

16    Q.  Right.  But if you were going to follow the road signs,

17  the street signs, the one-way signs, which I'm sure as a trooper

18  you would want people to do --

19    A.  Yes.

20    Q.  -- you'd come down through here and go back through

21  there; wouldn't you?

22    A.  Yes, sir.

23    Q.  Now, you indicated also that you didn't have experience

24  with many people getting parking tickets for parking too long in

25  the two-hour zone; right?

1      A.   Correct, sir.

2      Q.   But you wouldn't suggest for a moment that people

3   should ignore the parking signs that say "two-hour zone," would

4   you?

5      A.   Sir, normally DOT handles the parking issue there.

6   That's two-hour parking.  I've never written anybody for it.  In

7   my experience, DOT will call us and we'll run a plate to see if

8   the vehicle is stolen or something is wrong with the owner;

9   otherwise DOT, if it's there too long, will call the local tow

10  company and they will tow it.

11     Q.   Right.  But you're a law enforcement officer?

12     A.   Yes, sir.

13     Q.   If there is a sign that says no parking for more than

14  two hours, you would expect people to follow that; wouldn't you?

15     A.   Yes, sir.

16          MR. OFFENBECHER:  Can I have Exhibit 44, please.  I'm

17  sorry, government Exhibit No. 44.  This one is fine.

18   BY MR. OFFENBECHER:

19     Q.   I'm showing you what's been marked as government's

20  Exhibit No. 44; right?

21     A.   Yes, sir.

22     Q.   Do you recognize that?

23     A.   I do, sir.

24     Q.   And I'm going to -- can you see over that little poster

25  there okay?  Do you want me to take that down?

1      A.  Yeah, I can see it, sir.

2           MS. LOEFFLER:  I can have the poster down.  If you

3  would like it down, Mr. Offenbecher, we'll just take it down.

4           MR. OFFENBECHER:  Yeah, I think it would probably be

5  best.

6           MS. LOEFFLER:  Okay.

7   BY MR. OFFENBECHER:

8      Q.  So Trooper Dupras, I think you indicated earlier that

9  this is Anton Larsen Bay Road right here; isn't it?

10     A.  Yes, sir.

11     Q.  And in this direction, and I'm pointing to the

12  right-hand side of governor Exhibit 44, that's the way to the

13  airport; isn't it?

14     A.  Yes, sir.

15     Q.  And then eventually if you turn left, that's the way to

16  Kodiak if you go left?

17     A.  Toward town, yes, sir.

18     Q.  And if you go right, it's toward the main basin, Bells

19  Flats; right?

20     A.  That is correct, sir.

21     Q.  So if you're coming from the airport, you come up here,

22  you would cross over the Buskin River.  That's this right here;

23  right?

24     A.  Yes, sir.

25     Q.  And then T2 is this area right here; isn't it?

 1      A.  Yes, sir.

 2      Q.  And there are three different kind of ways to get into

 3  T2; right?

 4      A.  There are, sir.

 5      Q.  And one of them is to drive up here and turn straight

 6  in; right?

 7      A.  Yes, sir.

 8      Q.  The other one would be, if you're coming from the

 9  airport, would be to turn right up the front of it and go in

10  there; right?

11      A.  Yes, sir.

12      Q.  Or another way would be to come here and turn right and

13  go in there; right?

14      A.  Yes, sir.

15          MR. OFFENBECHER:  Can you make it bigger then, Mr.

16  Johnson.

17   BY MR. OFFENBECHER:

18      Q.  Now that assumes that one is coming from the airport

19  side; right?

20      A.  Yes, sir.

21      Q.  Now this road right here is the one that you talked

22  about that goes out to actual Anton Larsen Bay; right?

23      A.  That's correct, sir.

24      Q.  And that one goes -- this is about -- where we are here

25  is about Mile 2 of Anton Larsen Bay Road; right?

1      A.  It's about -- yes, sir.  It's about Mile 1.75.

2      Q.  Okay, Mile 1.75.  So the mile markers actually start at

3  Rezanof; right?

4      A.  That's the mile marker for Anton Larsen Road.

5      Q.  Right.

6      A.  They are separate mile markers.

7      Q.  Okay.  But this one -- about here would be about 1.75?

8      A.  Yes, sir.

9      Q.  And then it goes all the way on out to Anton Larsen Bay

10  Road -- Anton Larsen Bay actually; right?

11      A.  Correct, sir.

12      Q.  And how far is it from T2 to Anton Larsen Bay?

13      A.  To the very end of the road?

14      Q.  Right.

15      A.  About seven miles.

16          MR. OFFENBECHER:  And can I see the green

17  (indiscernible).  It's DE-043.  This is the one he used --

18  excuse me, this is the one he used in opening the

19  (indiscernible).

20          MS. LOEFFLER:  I'm sorry, let me look it up if it's

21  something I used.

22          MR. OFFENBECHER:  I can go ahead without the map, Your

23  Honor.  Can we just see the exhibit we just had up.

24          UNIDENTIFIED SPEAKER:  (Indiscernible).

25          MR. OFFENBECHER:  Right.

1          THE CLERK:  I'm sorry, what exhibit are we looking at?

2          MR. OFFENBECHER:  DE-043.  I'm sorry, Your Honor,

3   we're just having a small technical difficulty.  I'm just going

4   to go ahead and ask the witness the questions without the map,

5   and then we'll look at the map in a moment.

6   BY MR. OFFENBECHER:

7      Q.  So this road goes from -- the road goes from -- Trooper

8   Dupras, I don't think they have got anything on there.

9      A.  Okay.

10     Q.  I'll just do this without the map.

11     A.  All right.

12     Q.  So the road goes from T2, we know that it goes from

13  there all the way out to Anton Larsen Bay; right?

14     A.  Yes, sir.

15     Q.  And on the way from T2 -- and that's about eight or so

16  miles you think?

17     A.  I believe there is a final mile marker that's Mile 8 of

18  Anton Larsen Road where people park to get onto the -- to where

19  they skiff out to their houses.

20     Q.  Is it like 8.5 or something like that maybe?

21     A.  Around that.

22     Q.  All right.  And so on the way from T2, if you're

23  driving all the way out the Anton Larsen Bay, there is a couple

24  of things along the way; aren't there?

25     A.  Yes, there are.

1    Q.  And one of them is that there is a golf course out

2  there; isn't there?

3    A.  Yes, sir.

4    Q.  And that golf course is about at Mile 2.5 or 3,

5  something like that; isn't it?

6    A.  Yes, sir.

7    Q.  And then if you keep going, there is a group of

8  buildings that are before you get to Anton Larsen Bay; aren't

9  there?

10    A.  Are you talking about Red Cloud Ranch or --

11    Q.  Could be Red Cloud Ranch.  But tell us about Red Cloud

12  Ranch.

13    A.  It's -- after you cross the pass, it's the first major

14  set of buildings on the other side of the pass.  It used to

15  be -- I don't think anybody is living -- there might be somebody

16  living there now, but at the time I don't think anybody was

17  living there.

18    Q.  Okay.  Trooper, can you take a look at the exhibit

19  that's in front of you now, DE-043.

20       MS. LOEFFLER:  I have no objection as long as I can

21  get a marked copy at the end of the day.

22       MR. OFFENBECHER:  Sure.

23    A.  Yes, sir, I see it.

24       MR. OFFENBECHER:  Can we admit that then, move for

25  admission.

 1            THE COURT:  Hearing no objection, it will be admitted.

 2                                 DEFENDANT'S EXHIBIT DE-043 ADMITTED

 3            MR. OFFENBECHER:  Here you go.

 4            MS. LOEFFLER:  Thank you.

 5            MR. OFFENBECHER:  Can we publish that then?

 6    BY MR. OFFENBECHER:

 7       Q.  So let's just recap for one second.

 8            So this is Anton Larsen Bay Road going out this way;

 9    right?

10       A.  Yes, sir.

11       Q.  Now, take a look at that.  Does that appear to be a

12    reasonably accurate map of the general area, including Anton

13    Larsen Bay Road?

14       A.  Yes, sir.  I think it's the one from the Chamber of

15    Commerce, one of the sector maps or something.

16       Q.  Does that appear to be reasonably accurate?

17       A.  Yes, sir.

18            MR. OFFENBECHER:  I move for the admission of it if I

19    haven't already.

20            MS. LOEFFLER:  I think I already not objected.  I

21    think he already admitted it, Judge.

22            MR. OFFENBECHER:  Okay, thank you, counsel.

23    BY MR. OFFENBECHER:

24       Q.  Now, taking a look at this where it says 11.9 miles out

25    at the end of the road, does that refresh your memory at all

 1   about -- exactly about how long that is?

 2       A.  Sir, I can't -- the red, green, I can't -- the red -- I

 3   can't really read that.

 4       Q.  Take a look now.

 5       A.  Yes, sir.

 6       Q.  Does that refresh your memory about how long the road

 7   is?

 8       A.  Sir, it could be.  I still think it's 8, but it may

 9   be --

10       Q.  All right, let's take it back down.  So it's eight

11   miles.

12           So and this -- where I'm pointing right now is Buskin

13   Lake; is that right?

14       A.  Yes, sir.

15       Q.  And that's pretty close to where T2 is located; isn't

16   it?

17       A.  Yes, sir.

18       Q.  T2 is just kind of right in there; isn't it?

19       A.  Yes, sir.

20       Q.  And then as you continue out Anton Larsen Bay Road,

21   there is the golf course that you talked about; right?

22       A.  Yes, sir.

23       Q.  And that's at about 2.3 miles; right?

24       A.  Roughly, sir, yes.

25       Q.  And then you can continue on this road.  And why don't

1    you indicate with the your pointer there where the pass is.

2        A.  It's hard because there is no elevation depicted in

3    this map.  It's a range -- I would say the pass is right where

4    that curve of the road makes, probably in there, or just below

5    it.

6        Q.  And then point where the ranch is that you're talking

7    about.

8        A.  After you cross the river on the downhill side, the

9    north side of the pass, the ranch is about a half mile to a mile

10   up the road.

11       Q.  And there is also a sledding hill up there; isn't

12   there?

13       A.  At the ski chalet.  That's more or less the pass.

14       Q.  Okay.  So as you go over the pass there is a place

15   called the ski chalet; right?

16       A.  Yes, sir.

17       Q.  And that has like a sledding -- a place where folks go

18   and sled during the winter?

19       A.  Well, people -- people sled there, people back-country

20   ski there, snowboard there.

21       Q.  So it's kind of a winter sports place; right?

22       A.  Originally it was set up that way, I think, for Navy

23   recreation when the Navy ran the base.

24       Q.  So all kind of winter sports like skiing, cross-country

25   skiing, sledding, snowshoeing, things like that; right?

1    A.  Snowshoeing, the few snowmachiners on the island

2  usually put in that area too.

3    Q.  Okay, that's the pass.

4        And then if you go down the pass on the other side, you

5  will find the ranch that you talked about; is that right?

6    A.  Yes, sir.

7    Q.  I'm going to show you defense Exhibit 38 and then

8  defense Exhibit 39 and defense Exhibit 40.

9        THE COURT:  All right, now there is -- these have been

10  admitted as numbers, not -- what's the concern?  The clerk has a

11  concern.

12        THE CLERK:  Plaintiff's exhibits are normally numbers,

13  defendants have letters.  So if I do 38, is it plaintiff Exhibit

14  38 or are these defendant?

15        THE COURT:  These haven't been admitted.

16        MR. OFFENBECHER:  No.

17        THE COURT:  Okay, these have not been admitted.

18        MR. OFFENBECHER:  I'm just going to have him take a

19  look at all of them.

20        THE COURT:  He's just looking.

21        MR. OFFENBECHER:  Yeah, just looking right now.

22   BY MR. OFFENBECHER:

23    Q.  And now defense Exhibit 40, DE-40, sorry.  Do you

24  recognize those at all?

25    A.  I do, sir.

1      Q.  What are they?

2      A.  That's the area known as Red Cloud Ranch.

3      Q.  And that's an area that's located on the Anton Larsen

4   Bay Road that we talked about; right?

5      A.  Yes, sir.

6           MR. OFFENBECHER:  I'd move for the admission of those

7   photographs, Your Honor.

8           MS. LOEFFLER:  My only concern is I don't know when

9   they were taken.  If it's near the time, I don't have any

10  objection, but I have no idea whether it's the same year or

11  anything.  I need some foundation.

12          MR. OFFENBECHER:  Well, he's testified that he

13  recognizes that as the ranch or whatever it is.

14          THE COURT:  Well, so the government objects because

15  foundation as to when they were taken?

16          MR. OFFENBECHER:  The witness has testified that

17  that's the ranch.  It looks like it's the winter.  They can

18  certainly cross-examine him and see if --

19          THE COURT:  So let me ask the clerk.  Are you clear

20  what exhibits he's talking about?

21          THE CLERK:  No.  Are they DE-38?

22          UNIDENTIFIED SPEAKER:  All the defense exhibits will

23  start with DE.

24          THE CLERK:  Okay, DE-38.

25          UNIDENTIFIED SPEAKER:  39 and 40.

1          THE CLERK:  Thank you.

2          THE COURT:  DE-38, -39 and -40 will be admitted.

3          MR. OFFENBECHER:  Thank you, Your Honor.

4          DEFENDANT'S EXHIBITS DE-038, DE-039, DE-040 ADMITTED

5          MR. OFFENBECHER:  Excuse me just a moment, Your Honor.

6  Your Honor, could we publish those, I'm sorry?

7          MS. LOEFFLER:  I object, Your Honor.  I did

8  something -- I don't know what year they were taken.  And if the

9  trooper says that these are what he thought it looked like in

10  2012, you know, within a month or two, I have no problem, but --

11          THE COURT:  Why don't you voir dire the witness then.

12          MS. LOEFFLER:  I'll just ask him that.

13                    VOIR DIRE EXAMINATION

14   BY MS. LOEFFLER:

15     Q.  If I may, Trooper Dupras.

16     A.  Yes, ma'am.

17     Q.  Do you know -- have any -- is this what it looked like,

18  you know, I don't know, April, May or even March of 2012; do you

19  have any idea?

20     A.  It appears to be there is still a lot of snow.  So it's

21  probably closer to December or January than probably May or

22  April.

23     Q.  Do you know whether it was 2012?

24     A.  I have no idea, ma'am.

25     Q.  Do you know whether the -- I'm trying to just -- in

1   2012, to your best knowledge, do you know whether the trailers

2   and cars that are in this picture would have been there about

3   then?

4        A.   A lot of the vehicles that are there have never --

5   haven't left in years.  That area -- some people used to store

6   their boats there and vehicles there, like their trailers with

7   their boats.  I don't think it's been used for that purpose with

8   any regularity in a while.

9            MS. LOEFFLER:  Let me consult with my counsel.  I'm

10  trying to move this along, Your Honor.

11           THE COURT:  That's fine.  I mean, that's fine.

12      (Pause)

13           MS. LOEFFLER:  Your Honor, to move things along, I

14  think I'm just going to non-op on the grounds that it's a photo

15  taken some year, we don't know what year it is, but I don't --

16           THE COURT:  Appears that they are photos taken not by

17  this witness, but by some person at an unidentified time, that

18  are being admitted for the purpose of showing that this is the

19  ranch.

20           MS. LOEFFLER:  Okay, that's fine with me.

21           THE COURT:  That's what he's testified to.

22           MR. OFFENBECHER:  Thank you, Your Honor.

23           THE COURT:  Does the jury understand that?  Okay.

24           MR. OFFENBECHER:  And Your Honor, we'll tie it up with

25  the witness who took the photos later, that's fine.

1                    CONTINUED CROSS-EXAMINATION

2    BY MR. OFFENBECHER:

3        Q.  Trooper, let me ask you this to clarify.

4            Did you travel up the road to the ranch on April 12th

5    to do any investigation?

6        A.  I didn't go up that road, sir, no.

7        Q.  Did you travel up as far as the pass to do any

8    investigation on April 12th, 2012?

9        A.  Not on that day.

10       Q.  Did you go -- and obviously you didn't go all the way

11   to Anton -- to the Anton Larsen Bay to do any investigation on

12   April 12th, 2012; did you?

13       A.  No, sir.

14       Q.  And exactly how far up the road to do investigation did

15   you go from T2 on Anton Larsen Bay to do your investigation that

16   day, on April 12th, if you recall?

17       A.  On April 12th I didn't go up Anton Larsen Road.  I

18   didn't go north of the golf course that day.

19       Q.  Okay, did you go as far as the golf course that day?

20       A.  I don't believe so, sir.

21       Q.  So you didn't -- basically you didn't go in the

22   direction from T2 to Anton Larsen Bay?  You didn't go any

23   further than T2 to do your investigation; did you?

24       A.  I walked around past T2 up along the road a little bit,

25   but I didn't go to the -- I didn't go far up the road, no, sir.

1      Q.  Well, so how many yards up the road, Anton Larsen Bay

2  Road, from T2 did you go?

3      A.  Thirty or 40.

4      Q.  Thirty or 40 yards from there.  And then you turned and

5  went back?

6      A.  Yes, sir.

7      Q.  And so you didn't do any further investigation from 30

8  or 40 yards beyond T2 all the way to Anton Larsen Bay Road; is

9  that right?  Anton Larsen Bay Road --

10     A.  On the 12th?

11     Q.  Right.

12     A.  Yes, sir.

13     Q.  The day that the homicides occurred?

14     A.  Yes, sir.

15     Q.  Now, Trooper Dupras, you were also -- you've been on

16  Kodiak Island for what, about ten years; right?

17     A.  Yes, sir.

18     Q.  And you are also away that the Belisle family had been

19  having trouble with their daughter Hannah; right?

20     A.  Yes, sir.

21     Q.  You had been involved -- you knew that because they had

22  reported her to you as a runaway along the way; right?

23     A.  Yes, sir.

24     Q.  And for how long of a period had that been going on?

25  I'm talking about prior to the homicides.

1     A.  Prior to the homicide?

2     Q.  Yeah.

3     A.  Three to six months.  I don't know the exact date, but

4  it was prior to the homicide.

5     Q.  Sure.  I know you're --

6     A.  I want to say at least three to six months.

7     Q.  And Mrs. Belisle had been contacting you and trying to

8  get your help in kind of reeling her in; right?

9     A.  That's correct, sir.

10    Q.  And the Belisles were concerned that she was only 16

11 years old and she was hanging out with older kind of criminal,

12 low-life drug dealers?

13         MS. LOEFFLER:  I'm going to object, hearsay, Your

14 Honor.

15         MR. OFFENBECHER:  I'm asking about his personal

16 knowledge.

17         MS. LOEFFLER:  But it's his knowledge based on

18 apparently somebody else speaking to him, and he's asking him to

19 confirm hearsay.

20         THE COURT:  He can testify as to his general

21 impression without referring to specific comments.

22  BY MR. OFFENBECHER:

23    Q.  So you're aware that the Belisle family was concerned

24 about this; right?

25    A.  The mother was, Nicola.

1      Q.   And that Nicola was concerned that Hannah was

2  frequenting the Jackson Trailer Park, for example?

3      A.   Yes, sir.

4      Q.   And that's known to you as a law enforcement officer as

5  a place where drug dealers and criminals hang out and live;

6  right?

7      A.   Yes, sir.

8      Q.   Anybody on Kodiak Island knows that; right?

9      A.   I don't know about anybody, but it is fairly common

10  knowledge.

11      Q.   And you knew that Hannah was getting in a lot of

12  trouble during this period of time; right?

13      A.   I know her mother was concerned about her.

14      Q.   And that months before the homicides, that she had

15  called you and tried to get your help; is that right?

16      A.   Yes, she came to the post one time and discussed Hannah

17  with me, yes, sir.

18      Q.   So it hadn't just been a phone call, she actually came

19  down to the post, which is your office; right?

20      A.   Yes, sir.

21      Q.   And told you about the trouble that she was having with

22  Hannah; right?

23      A.   Yes, sir.

24      Q.   And that included hanging out with these drug dealers

25  and criminals at Jackson Trailer Park; right?

1    A.  She mentioned that she was in Jackson's and she didn't

2 want her there.

3    Q.  And did you do what you could to try to help her out?

4    A.  I did.  I think we did have a locate for Hannah for a

5 while in APSIN.

6    Q.  And you knew that Travis Biocic was one of Hannah's

7 guys that she was hanging out with?

8    A.  Travis Biocic.

9    Q.  Travis Biocic, I'm sorry.  You knew that Travis Biocic

10 was one of the guys that Hannah was hanging out with; right?

11    A.  I don't recall that, but I know who Travis is, yes.  I

12 don't recall that name being associated with Hannah.

13    Q.  Okay.  Do you remember conducting an interview of

14 Nicola Belisle on April 16th, 2012?

15    A.  Yes.

16    Q.  And do you recall during that interview that you

17 indicated on the tape recording -- and you were conducting the

18 tape recording of that one, weren't you?

19    A.  Yes, sir.

20    Q.  Do you recall indicating on the tape recording that the

21 name of Travis Biocic had come up as one of the guys that she

22 was hanging out with?

23    A.  Travis Biocic?

24    Q.  Yeah.

25    A.  If I said it, obviously it was so.

1      Q.  And what was your concern about the people and Ms.

2  Belisle's concern about the people at the Jackson Trailer Park?

3      A.  Travis Biocic -- I've known Travis since he's been a

4  teenager, and he's been in trouble quite frequently.

5      Q.  When you say "trouble," you're talking about criminal

6  trouble?

7      A.  Yes, sir.

8      Q.  And so you've had contact with him over an extended

9  period of time?

10     A.  Yes, sir.

11     Q.  Have you had occasion to arrest him before?

12     A.  Yes, sir.

13     Q.  Have you had occasion to testify or be a witness at any

14  trial against Travis Biocic?

15          MS. LOEFFLER:  Your Honor, I'm going to object to

16  relevance about whether he's arrested somebody who may know

17  somebody who may know somebody connected to this case.

18          THE COURT:  Getting kind of tenuous, but I'll allow it

19  so far.

20     A.  I've arrested Travis twice, both on warrants.

21   BY MR. OFFENBECHER:

22     Q.  And are you also family with Travis's father, Gary

23  Biocic?

24     A.  Gary?  Yes, sir.

25     Q.  And is he also a person who you've had -- or the

1   troopers have had significant contact with?

2           MS. LOEFFLER:  Objection, relevance.  Are we going to

3   go through everybody the troopers have ever -- every criminal in

4   Kodiak.

5           MR. OFFENBECHER:  If they were associating with

6   Hannah.

7           THE COURT:  I'll allow this question, but I think

8   that's about it.

9    BY MR. OFFENBECHER:

10      Q.  Are you also familiar with Gary Biocic?

11      A.  Yes, I am, sir.

12      Q.  Is he also a person who has had trouble with the

13   troopers and the criminal justice system during this period of

14   time?

15      A.  Yes, sir.

16          MR. OFFENBECHER:  And then may I ask one more

17   question, Your Honor, on this line.

18          THE COURT:  I'm not even sure you connected Gary with

19   Hannah.  In other words, it's pretty tenuous, and if that's

20   tenuous, you may not.

21          MR. OFFENBECHER:  Well, then I will ask -- the next

22   question concerns a person who was associating with Hannah

23   directly.

24    BY MR. OFFENBECHER:

25      Q.  Are you aware that Casey Brennick was one of the

1  individuals who was hanging out with Hannah?

2      A.  I've heard that name, yes, sir.

3      Q.  And have you heard that name in association with Hannah

4  Belisle?

5      A.  I don't recall.  I've heard that name other times and

6  I've contacted the Brennicks, Casey Brennick for other issues.

7      Q.  Casey Brennick is one of those individuals who was

8  hanging out with --

9          MS. LOEFFLER:  I'm going to object, Your Honor.  If he

10  hasn't connected the --

11          THE COURT:  He said he couldn't recall.  He said he

12  couldn't recall.

13          MR. OFFENBECHER:  Very well.  Can I have just a

14  moment, Your Honor.  Can I have just one minute, Your Honor.  I

15  don't have any other questions, Your Honor.

16          THE COURT:  Redirect.

17          MS. LOEFFLER:  Yes, Your Honor.

18                       REDIRECT EXAMINATION

19  BY MS. LOEFFLER:

20      Q.  Trooper Dupras, when you arrived on April 12th to the

21  scene at COMMSTA, did you have a tape recorder on you?

22      A.  I did.  I had a digital recorder.

23      Q.  A digital.  Did you run it?

24      A.  Yes, I did.

25      Q.  Did you turn the evidence from that, the recordings

1  actually over to the people that were ultimately investigating

2  this case?

3      A.  Yes, sir, I -- yes, ma'am.  Pardon me.

4      Q.  I'm too short to be a sir.  You can use ma'am, okay.

5          You turned it over to -- and let me just ask you this.

6          When this first happened, you're the trooper on the

7  scene; right?

8      A.  Yes, ma'am.

9      Q.  What law enforcement agency took the case over?

10      A.  The FBI.

11      Q.  And they got there that day?

12      A.  They did, ma'am.

13      Q.  So you weren't the lead?

14      A.  No, ma'am.  If it stayed with AST, I would be -- the

15  case management would be up to me, but it wasn't my case.  It

16  became an agency assist.

17      Q.  Right.  So then you turned over your tapes to the

18  investigating agents?

19      A.  Yes, ma'am.

20      Q.  And was that, in part, because of discovery -- in your

21  system or our system -- then they go over to the defense; right?

22      A.  Yes, ma'am.

23      Q.  And you took pictures?

24      A.  Yes, ma'am.

25      Q.  And you turned that all over to the investigating

1    agency; right?

2         A.  Yes, ma'am.

3         Q.  So, you know, after responding to the scene, this

4    wasn't your case?

5         A.  I found out probably, I want to say, within an hour or

6    so after getting on the scene, maybe less, that it was going to

7    be turned over to the FBI.

8         Q.  And of the things you testified to earlier, do you have

9    any problem with your memory of the scene and the impressions

10   that you have?

11        A.  No, ma'am.

12        Q.  And when Mr. Offenbecher asked you about burglaries

13   being in remote areas, are you familiar with burglaries?

14        A.  Yes, ma'am.

15        Q.  Was there any evidence of a burglary that you saw?

16        A.  No, ma'am.

17        Q.  Let me just quickly, if we can pull up Exhibit 51

18   again, or maybe I can do it -- Exhibit 51 is the exhibit of the

19   airport.

20             And when Mr. Offenbecher was pointing that the --

21   following the arrows, traffic pattern would go down the middle.

22             There are two rows of cars, right, at the airport?

23        A.  There is three.

24        Q.  Let's pull up the exhibit.  Let's do this with a

25   picture.

 1        A.   That's probably better.

 2        Q.   Yeah, that's a better idea.  Sometimes I try to whip

 3   through too fast and it doesn't help.

 4             All right, so when he was pointing down this road,

 5   that's one way to get to this area, right?

 6        A.   Yes, ma'am.

 7        Q.   But that's not -- that's not the traffic pattern,

 8   right?  There is another road in front of the terminal; right?

 9        A.   Yes, ma'am.  The normal pattern, as you come in this

10   Airport Way -- I mean, if this wasn't here -- today, I mean, you

11   pull in this way, people come this way, turn right, unload, and

12   then they can come around and park again.

13        Q.   But back then?

14        A.   Back then, you'd come up, make a right, and you could

15   pull in this way and park or you could pull up here, off-load

16   and come around again and park.

17        Q.   So if somebody --

18        A.   Or you could just -- people could turn in here, if

19   nothing is stopping them, and park too.

20        Q.   I mean, are the traffic -- you know, at the Kodiak

21   airport, is there a lot of enforcement of the traffic area if

22   there is nobody there?

23        A.   No.  The only enforcement I ever recall ever hearing

24   about is Sergeant Hill -- I don't know if you get a ticket or

25   warn people about, you know, parking and staying by the

1   terminal, like at a large airport you can't park your vehicle

2   and leave it.  I heard vaguely that he did something there.

3   I've never done it, but he did at some point.

4       Q.  And when -- Mr. Offenbecher asked you about the fact

5   that there is a golf course past T2; right?

6       A.  Yes, ma'am.

7       Q.  Is it open in the winter?

8       A.  No.  Some people use it for cross-country skiing and

9   snowshoeing during the winter, but it's not open to play golf.

10      Q.  And how common is that at 7 o'clock in the morning on a

11  weekday?

12      A.  Playing golf in the snow?

13      Q.  No, I don't know.  Or even -- well, let me go back.

14          On the sledding hill, you said there is is a chalet

15  with some sledding?

16      A.  Yes, ma'am.

17      Q.  Is that real busy at 7 o'clock on a weekday?

18      A.  No, it would be more on the weekend.

19      Q.  Now, the other thing on this is that back in April of

20  2012, looking back at this picture, was there any curbing or

21  anything around here to prevent people from, in some sense,

22  doing whatever they wanted down here?

23      A.  No, ma'am, I don't recall any curbing.  At some point

24  they pulled all the concrete -- it wasn't curbs, but there was

25  little long blocks, I don't know what to call them, that were

1    there, but they were removed.

2        Q.  And then in the photos that the defense put up on

3    Exhibits 38, 39 and 40, there were some trailers and cars?

4        A.  Yes, ma'am.

5        Q.  And do you have any -- I think you had testified

6    earlier that you didn't know whether in 2012 anybody was

7    actually living there?

8        A.  Yes, ma'am, I don't know if anybody was living there.

9    There have been people living there in the past, and somebody --

10   and I forget -- it's been empty for a long time.  And I think

11   right now it's still empty.

12       Q.  But even if there are trailers and cars there?

13       A.  Yes.  The white house with the green trim in the photo,

14   I don't know if the jury didn't see that, that's the main house.

15   That's where people have lived and I have contacted people at

16   that house.

17       Q.  But you don't know whether, with the trailers, that

18   means that anybody was living there or whether they were dumped

19   there or not?

20       A.  Yes, ma'am.

21       Q.  When -- I just have one final area.

22           Mr. Offenbecher was asking you about certain, you know,

23   people that are involved in the criminal milieu in Kodiak.  And

24   I take it with 11 years, you're pretty familiar with people that

25   are?

 1      A.  Yes, ma'am.

 2      Q.  Any of that ever connect to -- or have you ever had any

 3  dealings with Rich Belisle or Jim Hopkins in any way connected

 4  to this criminal milieu?

 5      A.  No, ma'am.

 6              MS. LOEFFLER:  I don't have anything else.

 7              THE COURT:  Recross.

 8              MR. OFFENBECHER:  Just one.  And actually I think it's

 9  beyond the scope of the recross, but since the witness is here,

10  it's a question that I'd just like to ask.

11              MS. LOEFFLER:  Well, let's hear what the question is.

12              MR. OFFENBECHER:  I can bring him back in our case if

13  we want.

14              THE COURT:  She said ask the question and she'll see

15  what she says.

16              MS. LOEFFLER:  I said ask the question.

17              MR. OFFENBECHER:  Government's Exhibit 392, please.

18  Our Exhibit No. DE-062.

19              MS. LOEFFLER:  What's 392?

20              MR. OFFENBECHER:  It's this one here.

21              MS. LOEFFLER:  Oh, of course.  We're pulling it up.

22  Do you want us to use the good one?

23              MR. OFFENBECHER:  Yeah, we can just use that.

24              MS. LOEFFLER:  Why don't we use the big one.  Use the

25  big one.

1            THE COURT:  It's up now.

2            MS. LOEFFLER:  Go ahead.

3                      RECROSS-EXAMINATION

4    BY MR. OFFENBECHER:

5       Q.  I think we've got it up here.  Yeah, that's good, we'll

6    use this here.

7            Trooper Dupras, I'm showing you government's Exhibit

8    392, which you looked at before; do you remember that?

9       A.  Yes, sir.

10      Q.  You testified earlier about some windows or lack of

11   windows.  But let's take a look at this and see if you can help

12   me.  I'm going to use my pointer.

13           This right here in the area of the wood shop, that's a

14   window; isn't it?

15      A.  I believe so.

16      Q.  And I'm pointing down here.  This is another spot in

17   the wall of the wood shop; that's a window, isn't it?

18      A.  At the edge of the garage?

19      Q.  Right here.

20      A.  Yes, sir.

21      Q.  And in the garage right here, that's a window, isn't

22   it?

23      A.  Yes, sir.  That's to the rear of the building.

24      Q.  Right.  And then over here in the wood shop, that's a

25   window; isn't it?

1      A.  Yes, sir, to the rear.

2      Q.  And over here by the wood shop, that's another window;

3  isn't it?

4      A.  Yes, sir.

5      Q.  And then here in the break room where Mr. Hopkins was,

6  that's a window right there; isn't it?

7      A.  Those were those, as I recall, sir, aren't full

8  windows.  They are like skylight windows like at the edge of the

9  wall, like up here.

10     Q.  Okay.  How about right here?  There is a window there

11  as well, isn't there?

12     A.  Same thing, sir.  And I may be wrong, but I recall, I

13  think they were on the upper side, like skylights kind of.  Not

14  full skylights on the ceiling, but up along the edge of the

15  wall.

16     Q.  So you're not sure; is that right?

17     A.  Yes, sir.  As I recall they were skylight on the edge,

18  not full windows.

19     Q.  Did you write down any description at the time of those

20  windows?

21     A.  No, sir.

22     Q.  You did not, all right.

23         This window would have looked right into the break

24  room, is that right, this window here that I'm pointing to?

25     A.  It could, sir, yeah.

1      Q.  Would have looked right into the break room; is that

2   right?

3      A.  Yes, sir.

4      Q.  And Mr. Hopkins was laying right here after he was

5   shot; is that right?

6      A.  That's where I found him, yes, sir.

7      Q.  Right by the cooler?

8          And then there is a window in the bathroom right here;

9   is that right?

10     A.  I would suppose, sir, yes, sir.

11     Q.  And then there is another window here in the boiler

12  room; is that right?

13     A.  As the map indicates, it is, sir.

14     Q.  Well, I'm just asking you your recollection of this.

15     A.  I concentrated on the front, sir.  There is only those

16  two sets of windows in the front, and they are looking at the

17  wood shop and not where the people were.

18     Q.  Well, you've testified about a lack of windows under

19  oath, and I just wanted to see if you remembered those or not.

20         MS. LOEFFLER:  Your Honor, I'm objecting to the

21  explanation.  He just --

22         MR. OFFENBECHER:  All right.

23   BY MR. OFFENBECHER:

24     Q.  That's a window there; right?

25     A.  Yes, sir.

1    Q.  And then this is the office where Mr. Belisle was

2   found; is that right?

3    A.  Yes, sir.

4    Q.  He was found right here by this desk; right?

5    A.  Yes, sir.

6    Q.  And there is a window in the back of that office as

7   well; isn't there?

8    A.  Yes, sir.

9        MR. OFFENBECHER:  I don't have any other questions.

10       THE COURT:  Cross [sic].

11       MS. LOEFFLER:  Your Honor, I'm going to ask just one.

12       THE COURT:  Sure.  I mean, that was direct.  Yours is

13  cross.

14       MS. LOEFFLER:  We'll just leave it up.

15                    REDIRECT EXAMINATION

16  BY MS. LOEFFLER:

17   Q.  Trooper Dupras, when you were talking about sort of the

18  dangerousness of the entry, are there any windows, even looking

19  at the map, that would look in when -- if you're coming from the

20  road and you're looking in the front of the room, that would

21  show you where these guys were or the areas where they were

22  found dead?

23   A.  No, sir -- no, ma'am, no, ma'am, there is no windows at

24  all.  Sorry, ma'am.

25   Q.  And would you mean in any way to say -- I mean, yeah,

1    there are windows all the way around the back if you're

2    wandering in -- around.  But you were talking about the front of

3    the building; right?

4        A.  Yes, ma'am.  Toward the road, that's open to the road.

5            MS. LOEFFLER:  Okay, that's all I have.

6            THE COURT:  All right.

7            MR. OFFENBECHER:  Can I just follow up with one

8    question, Your Honor and this will be just one question.

9                        RECROSS-EXAMINATION

10    BY MR. OFFENBECHER:

11        Q.  So what you're saying is that if you drove up to the

12    front of the building --

13        A.  Yes.

14        Q.  -- and looked in, there weren't any windows that looked

15    in on where the folks were; that's what you're saying?

16        A.  From the front.  Except for these two over here that

17    (indiscernible) as wood shop and by that garage, it's all solid

18    wall.

19        Q.  But if someone came, for example, from Anton Larsen Bay

20    down the road and looked in the back of the building instead of

21    the front --

22        A.  They wouldn't have seen any windows hardly, because

23    that mountain -- that hill comes right in here.  They would have

24    to get up and traverse the ridge line.

25        Q.  Well, how about if they just walked over here and

1  looked in this window where Mr. Belisle was?

2      A.  They have to come around.

3      Q.  They could just walk along the back of the building --

4      A.  Yes, sir.

5      Q.  -- and look right in there, couldn't they?

6          If they walked along the back of the building here --

7      A.  They would have to traverse that hill.

8      Q.  Well, no, they wouldn't have to traverse a hill.  What

9  if you just parked your car right here and walked around the

10 building and looked in this window?

11     A.  Yes, sir.

12     Q.  You could just look in that window.  That's the room

13 that Mr. Belisle was in; isn't it?

14     A.  Yes.

15         MR. OFFENBECHER:  I don't have any other questions.

16         THE COURT:  Recross [sic].

17         MS. LOEFFLER:  No, Your Honor.

18         THE COURT:  All right, thank you, sir.  We'll take a

19 15-minute recess.

20  (Witness excused)

21         THE CLERK:  All rise.

22     (Proceedings recessed, 2:51:04 p.m. until 3:15:19 p.m.)

23                                      (Jury not present)

24         THE CLERK:  All rise.  His Honor the Court, the United

25 States District Court is again in session.

1          THE COURT:  Are we ready for the jury?

2          MS. LOEFFLER:  Yes.

3                                        (Jury present)

4          THE COURT:  Okay, please be seated.  Government's next

5  witness.

6          MS. LOEFFLER:  Yes.  United States calls Aaron Coggins

7  to the stand.  Seaman Coggins, if you'll go up to the witness

8  box, the clerk will swear you in.

9          THE CLERK:  Raise your right hand.

10        AARON SCOTT COGGINS, PLAINTIFF'S WITNESS, SWORN

11         THE CLERK:  Thank you.  Please have a seat.  And sir,

12  for the record, please state and spell your full name.

13     A.  Aaron Scott Coggins.  A-a-r-o-n S-c-o-t-t

14  C-o-g-g-i-n-s.

15         THE CLERK:  Thank you.

16         THE COURT:  Okay, counsel.

17                     DIRECT EXAMINATION

18   BY MS. LOEFFLER:

19     Q.  Seaman Coggins, I know you're in uniform, so I guess

20  it's a little obvious, but where do you work?

21     A.  The United States Coast Guard.

22     Q.  And what is your title in the Coast Guard?

23     A.  A seaman.

24     Q.  And in the ranking of the Coast Guard, where does that

25  fall?

1      A.  I'm the lowest of the low.

2      Q.  And of course that's just because -- when did you join

3  the Coast Guard?

4      A.  About two-and-a-half years ago.  September 20th, 2011.

5      Q.  Was that right after high school?

6      A.  Yes, ma'am.

7      Q.  What was your first posting?

8      A.  COMMSTA Kodiak.

9      Q.  Before you went to the COMMSTA in Kodiak, is there a

10  Coast Guard boot camp type of thing?

11     A.  Yes, ma'am.  It's in Cape May, New Jersey.

12     Q.  How long were you there?

13     A.  Eight weeks.

14     Q.  And then immediately you traveled to COMMSTA Kodiak?

15     A.  Yes, ma'am.

16     Q.  Now, we haven't had a lot of this, but you did say you

17  were the lowest of the low.

18         But as a seaman, what were your duties assigned to

19  COMMSTA?

20     A.  I shovel the sidewalk when it snows, come in and plow

21  with our snowplow trucks if it's too much to snow for anybody to

22  drive in.

23         And then in the summer I cut grass and cut down trees

24  with a chainsaw.

25     Q.  When you went to the COMMSTA, we've had some testimony,

1  so I hope the jury is familiar now that there are two different

2  buildings at the communications station.  What are those two

3  buildings?

4      A.  There is T1, which is the main building that has the

5  ETs and the OSs, do all the main work; and then there is T2

6  which is the rigger shop where I work.

7      Q.  Okay, let me go back to T1.  You said OSs.  What's an

8  OS?

9      A.  An operation specialist.

10     Q.  And then you said but there is also ETs.  And what are

11 they?

12     A.  Electronics technician.

13     Q.  Now, I know you were down being basically the

14 maintenance dog's body in the T2 shop, or maybe that's not the

15 right word.

16         But in the T1 shop, what type of operations go on up

17 there, or went on up there?

18     A.  There is radios and a bunch of communications

19 equipment.  And then there is the admin office where you do all

20 the paperwork.  I don't really work up there that much, so -- I

21 mean, I go up there, but not that often.

22         MS. LOEFFLER:  And down in the rigger shop --

23 actually, if we could pull up Exhibit 43.  Let's just have the

24 pictures of the place up while we're talking to you.  I think

25 I've already admitted that, Your Honor.

1            THE CLERK:  Yes, you have.

2            MS. LOEFFLER:  Thank you.  Let's show this one

3  directly.

4   BY MS. LOEFFLER:

5     Q.  So the area you're talking about, that's T1; right?

6     A.  Yes, ma'am.

7     Q.  And if I'm pointing to here, that's --

8     A.  T2.

9     Q.  You said you didn't go up to T1 that often.  Let me ask

10  you a little bit about T2, or the rigger shop.

11            How many people worked there in -- I'm going to go back

12  to -- well, let me go back to April of 2012, two years ago.

13            How long had you worked at T2 when the murders

14  happened?

15     A.  Approximately four months.

16     Q.  So when you said you were the lowest of the low, were

17  you the new guy?

18     A.  I was the newest member of COMMSTA Kodiak.

19     Q.  How many people -- unfortunately you're the first

20  serving officer from there that's on the stand.  So how many

21  people worked there at the time?

22     A.  At the rigger shop?

23     Q.  Yeah.

24     A.  About six approximately, I think.  I'm not exactly

25  sure.  I think six.

 1     Q.  Turning -- maybe we could put it back up on the stand.

 2            MS. LOEFFLER:  Special Agent Allison, sorry, can

 3   you -- I've got a chart next to you of the -- yeah, thank you.

 4   Sorry, it wasn't clear.

 5    BY MS. LOEFFLER:

 6     Q.  I'm going to go back to a little bit of the -- I'm

 7   going to talk to you a little bit about the routine at the

 8   rigger shop, but first I just want to ask you -- I don't know if

 9   it's changed, but back in 2012, where were you housed?

10     A.  In the barracks.  And I still currently live in the

11   barracks.

12     Q.  And is that located on the base?

13     A.  Yes, ma'am.

14     Q.  And about how long does it take you to get to work from

15   the barracks to get to the --

16     A.  About seven minutes.

17     Q.  Not a very big place?

18     A.  It's a short drive.

19     Q.  And you say your barracks is on the base.  Is the

20   command of the base and the command of COMMSTA under the same

21   Coast Guard chain of command, or is that different?

22     A.  It's different, I think.

23     Q.  Again, you're the first guy up.  So can you explain to

24   the jury a little bit of what you know of the difference?

25     A.  From what I know, there is base Kodiak which has all

1    the boats and whatever is on base, and there is COMMSTA which is

2    part of CAMSPAC area which is Alaska and everything else.  It's

3    different, but we do certain functions with base.  But I think

4    we fall under CAMSPAC, not the base command.

5        Q.  I didn't mean to drill you on that.  Let me go on to a

6    different area.

7            I'm going to turn to April 12th of 2012.  And I think

8    you said a minute ago you worked for about four months at

9    COMMSTA at that time?

10       A.  Yes, ma'am.

11       Q.  Can you describe the command chain in the rigger shop

12   only, who was in charge and sort of the levels of people who

13   worked there?

14       A.  I had a Third Class Petty Officer Beauford, he was my

15   direct supervisor.  And his supervisor was ET1 Hopkins.  And

16   then the overall shop supervisor was Chief Reckner.

17       Q.  And when you say "ET1 Hopkins," if I can help with the

18   Coast Guard, that's electronic technician?

19       A.  First class.

20       Q.  And first class, does that also mean petty officer

21   first class?

22       A.  Yes.

23       Q.  Can you explain the difference between rating and rank?

24       A.  Rating is your specific job that you are specialized

25   in.  And rank is your rank, how high you are up on the scale.

1     Q.   So the petty officer first class would have been?

2     A.   Higher than pretty officer third class.

3     Q.   And petty officer first class would be the rank.  And

4 ET, electronic technician, would be the rating?

5     A.   Yes.

6     Q.   And are you about to hopefully go get your first

7 rating?

8     A.   Yes.

9     Q.   You said that there was Petty Officer Third Class

10 Beauford who was your direct supervisor?

11     A.   Yes, ma'am.

12     Q.   And were there other what you would call non-rates,

13 people that hadn't yet gotten a rating in the Coast Guard?

14     A.   Yes, there were three other non-rates that worked with

15 me.

16     Q.   Now, I want to turn a little bit again to April 2012,

17 that time, and ask you about your normal routine and what you

18 knew of the routine of others.

19          What was -- what time would you normally come to work?

20     A.   Around 7:20, 7:30 because -- we had to do morning

21 colors every morning, because the light bulbs were out at the

22 flag pole.

23     Q.   Let me back up a little bit.  So morning colors is

24 what?

25     A.   We have to take the National flag, the Coast Guard flag

1   and the Prisoner of War Missing in Action flag and run it up the

2   flag pole at 8 o'clock every morning.

3       Q.  And it's at 8 o'clock every morning?

4       A.  Yes, ma'am.

5       Q.  All over the Coast Guard, or you don't know?

6       A.  I know for here it's 8 o'clock.

7       Q.  And what was your official time that, you know -- did

8   you have a set time that said -- even though you came in early,

9   what was your duty hours?

10      A.  Liberty expires at 8 o'clock, so we have to be at work

11  in uniform at 8 o'clock.

12      Q.  Were there people at the rigger shop that would come in

13  earlier than you?

14      A.  Yes.

15      Q.  Who was that?

16      A.  ET1 Hopkins, Mr. Belisle, and Mr. Wells.

17      Q.  And who are the first people generally to get there?

18      A.  Generally those three around the same time.

19      Q.  Was there a -- do you know whether they got there --

20  how long it was between when they would get there and when you

21  would get there?

22      A.  A few minutes usually.  I don't really know what exact

23  time they usually got there.

24      Q.  When you got to the shop -- and I have a chart next to

25  you that's previously been admitted as Exhibit 392 -- was there

1   a door -- was there a secure door at the rigger shop?

2       A.  Yes, there is a door that you have to use a card reader

3   to open it.

4       Q.  Was there another door in the front of the building

5   that you could go in?

6       A.  It's -- it had a dead bolt.  But when the first people

7   showed up at work, they usually unlocked it so you could get in.

8       Q.  Are you aware, when you left at the end -- what was the

9   time -- I'm sorry.

10          What was the time of day that you would usually leave?

11      A.  2 p.m.

12      Q.  Were you aware at the end of the day, was there any

13  effort to secure the rigger shop?

14      A.  There -- we made sure all the doors were locked before

15  we left.

16      Q.  And in terms of all the doors, there is -- next to you

17  at 392 there is a boiler room.  And if I can get the overhead

18  version of this.  I'm going to pull it up, 392.

19          So if I have the boiler room right here -- and in the

20  office -- who worked in the office?

21      A.  Chief Reckner, ET1 Hopkins, and Mr. Wells, and Mr.

22  Belisle.

23      Q.  And Mr. Wells and Mr. Belisle, were they uniformed

24  members of the Coast Guard in April of 2012?

25      A.  No, ma'am.

1      Q.  What was their position?

2      A.  They were civilian hires that worked in the rigger shop

3  as riggers.

4      Q.  So were they in your chain of command?

5      A.  No.

6      Q.  Now, in the office, when you came in, where was Mr.

7  Belisle and Mr. Hopkins generally when you would come to work?

8      A.  They would be in their office.

9      Q.  What about Mr. Wells?

10      A.  He would also be in the office.

11      Q.  In here?

12      A.  Yes, ma'am.

13      Q.  Did you hang out in the office much?

14      A.  No, ma'am.

15      Q.  When you're laughing about "no ma'am," can you explain

16  to the jury why you're saying "no ma'am"?

17      A.  Because two of the highest bosses were in there all the

18  time, and I should not be in there when they are in there.

19      Q.  So if I can have it a little bit, is it fair to say

20  your job is to look busy and be busy?

21      A.  Yes.

22      Q.  And then there is a door to the boiler room that in

23  this chart looks open.  But which way does that door lock?

24      A.  It locks from inside so we can dead bolt it so no one

25  can get in.

1    Q.  So, in other words, if somebody comes in here, they

2    can't get through here because it's dead bolted from the inside?

3    A.  Yes, ma'am.

4    Q.  Now, I'm going to -- when you arrived on April 12th,

5    2012, do you recall when you got to work that day?

6    A.  Approximately 7:25, 7:20.

7    Q.  And did you notice whose cars were there when you got

8    there?

9    A.  ET1 Hopkins' Dodge Ram was there; Mr. Belisle's Ford

10   F-150 was there; and then the two government vehicles.

11   Q.  When you say "two government vehicles," what type of

12   vehicles are they?

13   A.  They are both F-350s, Ford F-350s, white.

14   Q.  Are they something that people take home at night or

15   are they parked there?

16   A.  They are parked there.  They are not for personal use.

17   Q.  Was there another individual that would normally be

18   there, according to duty hours, who were not there that morning?

19   A.  Yes, ma'am.

20   Q.  Who was that?

21   A.  Mr. Wells.

22   Q.  Now, you said you came to work at about 7:25 or

23   thereabouts.  What did you do when you first got there?

24   A.  I pulled in the parking lot, parked my Jeep, and

25   immediately walked up to T1 to get the flags to perform morning

1   colors.

2       Q.  And when you came back down, was there anything unusual

3   that you found that day?

4       A.  When I arrived in the building, I found Petty Officer

5   Beauford standing at the door and he looked shocked.  So I asked

6   him what was wrong.  And he said he found the bodies of ET1

7   Hopkins and Mr. Belisle.

8       Q.  Did you go in?

9       A.  Yes, ma'am.

10      Q.  And when you went in -- I'm not going to show the

11  pictures to you -- but when you went in, did you see both of

12  them?

13      A.  Yes, ma'am.

14      Q.  I'm going to ask you, because you were one of the first

15  on the scene, to describe Mr. Hopkins and what position he was

16  laying in.  Let's pull just the chart up, 392, just so we can

17  describe where.

18          On Exhibit 392, where was Mr. Hopkins?

19      A.  He was laying underneath the water fountain.

20      Q.  And if I point to that, is that here?

21      A.  Yes, ma'am.

22      Q.  Can you describe whether he was face up, face down, or

23  what you saw?

24      A.  From what I remember, he was on his side with his arm

25  up around his head.

1     Q.  Could you tell that he had been shot?

2     A.  Yes, ma'am.

3     Q.  Did you touch him?

4     A.  No, ma'am.

5     Q.  Did you also see Mr. Belisle?

6     A.  Yes, ma'am.

7     Q.  And where was Mr. Belisle?

8     A.  He was in his office laying underneath Mr. Wells' desk.

9     Q.  And is this Mr. Wells' desk here?

10    A.  Yes, ma'am.

11    Q.  And again, did you touch him?

12    A.  No, ma'am.

13    Q.  Did you -- I take it there was blood around?

14    A.  Yes, ma'am.

15    Q.  Did you get any blood on you?

16    A.  No, ma'am.

17    Q.  I know -- when you looked around, or at least walking

18    in, did you notice anything else out of place in the rigger

19    shop?

20    A.  I remember a smell that smelled like gunpowder.  But

21    other than that, I didn't notice anything out of place or out of

22    the norm.

23    Q.  And what types of -- what type of machinery or tools or

24    things are stored in the rigger shop, or what do they have?

25    A.  Pretty much anything you can think of, we have it.  We

1   have table saws and band saws, drills, heavy chains, tape
2   measures, screwdrivers, wrenches.  Pretty much anything you can
3   think of, we probably have it.
4       Q.  I'm going to ask you a little bit about the
5   individuals, the two men that were murdered.
6           Electronic Technician 1 Hopkins who, I guess, was in
7   your direct chain of command.  I know you were there for -- was
8   he there the whole time that you were there?
9       A.  Yes, ma'am.
10      Q.  Can you describe how he was as a boss to you?
11      A.  I didn't really have much interaction with him because,
12  like I said before, I wanted to look busy and not get yelled at.
13  But he was a good boss.  He taught me a lot from the short time
14  I was there with him.  He expected greatness from all his
15  workers, so we tried our best to give it to him.
16      Q.  Did he work hard?
17      A.  Yes.  Yes, ma'am.
18      Q.  When I ask that sort of in a leading way, I put the
19  words, but how would you describe his work ethic?
20      A.  He tried his best to do the job we had to do and do it
21  well.  Anytime we had a broken antenna or had to come in and
22  plow, he would be out there working with us when necessarily the
23  first class didn't have to, and he would be out there shoveling
24  snow or, you know, working with the heavy equipment.  Very hard
25  worker.

1      Q.  I'm going to ask about Mr. Belisle.

2          Did you have -- again, four months, but did you have

3  some interactions with him?

4      A.  Yes, ma'am.

5      Q.  Now, he's not in your chain of command?

6      A.  No, ma'am.

7      Q.  But can you describe your interactions with him and

8  what you saw of him as a person?

9      A.  I enjoyed working with him.  He taught me a lot also.

10  When I first got to COMMSTA, pretty much all I knew is what a

11  wrench and a screwdriver were.  I didn't know nothing about any

12  type of heavy equipment working.  They both taught me a lot of

13  what I needed to do and what my job was pertaining to COMMSTA.

14      Q.  Did you have much interaction with Mr. Wells in your

15  four months before the murders happened?

16      A.  No, ma'am.

17      Q.  Why not?

18      A.  When I first arrived, he was sick.  I don't remember

19  what it was, but he was sick, so I didn't see him much.  And

20  then he was at work for a couple weeks, and then he went on

21  vacation.  And then he returned, and then -- he was at work, but

22  since he's not in my chain of command, I didn't really have much

23  interaction with him.

24      Q.  On the day of the murder, did you see Mr. Wells arrive

25  to work?  Did he come to work that day?

1    A.  Yes, ma'am.

2    Q.  And approximately when was that?

3    A.  I don't remember.  It was way later than everybody

4  else.

5    Q.  With regard to Mr. Belisle, did you ever have any

6  interaction with the family?

7    A.  Yes, I had visited them once or twice.

8    Q.  And what was the occasion?

9    A.  Boxing Day.  We went over the day after Christmas and

10  just ate a bunch of leftovers, had a good time.

11    Q.  Was most of the COMMSTA there?

12    A.  No, just pretty much the rigger shop and then a bunch

13  of their local friends.

14    Q.  Was Mr. Wells there?

15       I'm sorry, the Boxing Day, the only one that you would

16  have been there would have been in 2012 right after Christmas,

17  either Christmas 2011 or right around that time?

18    A.  Yes, ma'am.

19    Q.  Was Mr. Wells there that day?

20    A.  No, ma'am.

21    Q.  Now, after you and Mr. Beauford discovered the murders,

22  was there a step that you took next?

23    A.  We called up to T1 to notify the watch of what we had

24  found.  So then Petty Officer Haselden came down the hill to see

25  if we were okay and wanted to assess the situation himself.  And

1   then he went -- then they called MilPol, the watch did, and then

2   military police showed up.

3       Q.  MilPol is military police?

4       A.  Yes, ma'am, sorry.

5       Q.  Let me turn to Exhibit 390.

6           MS. LOEFFLER:  Yeah, bring it up and display it.

7    BY MS. LOEFFLER:

8       Q.  And this is a chart.  If you'll look next to you,

9   you'll see 390.

10          Mr. Coggins, in preparation for testimony, did you go

11  through this chart kind of in detail with me over the weekend, I

12  guess?

13      A.  Yes, ma'am.

14      Q.  And did you initial on the right-hand column -- if I

15  can describe it.  It's a list of cars that were on videos that

16  you watched; right?

17      A.  Yes, ma'am.

18      Q.  And videos of the cars going up the hill that day?

19      A.  Yes, ma'am.

20      Q.  And did you initial every car that you could identify?

21      A.  Yes, ma'am.

22      Q.  And I'm going to turn to Exhibit 152.

23          MS. LOEFFLER:  Your Honor, I'm not going to move it in

24  until I have every car initialed --

25          THE COURT:  Okay.

1          MS. LOEFFLER:  -- so I'm not going to move it.  It's
2    going to take just a minute.
3     BY MS. LOEFFLER:
4        Q.  And what I'm going to do is show you a bit of the video
5    so that you can describe, you know, some examples of what you
6    did and how the cars were.
7          MS. LOEFFLER:  And I believe Exhibit 152, because we
8    had a stipulation as to authenticity, counsel, do you have any
9    objection if we play it to the jury?
10         MR. OFFENBECHER:  No objection.
11         MS. LOEFFLER:  Okay.  I'm going to move in Exhibit
12   152, Your Honor without objection.
13         THE COURT:  Currently received without objection.
14                        PLAINTIFF'S EXHIBIT 152 ADMITTED
15         MS. LOEFFLER:  It's going to take just a minute.  We
16   have to change computer systems to play this.  Okay.  We can
17   also have it -- so the jury can see it.
18    BY MS. LOEFFLER:
19       Q.  So the building -- this is a camera looking down at --
20   what you're looking down at is the rigger shop, right, the gray
21   building?
22       A.  Yes, ma'am.
23       Q.  And if we can turn to, for example, a little -- just
24   after 7 o'clock, see if we can -- I'll see if you can -- just go
25   through a little bit of what we did before where you identify

1    the cars that drive up the hill.  We need Exhibit 151.

2            Okay, actually, I'm going to take 152 off and I would

3    like to play parts of 151.

4            MS. LOEFFLER:  And I would move 151.  I had the wrong

5    camera up, and move the admission of Exhibit 151.

6            MR. OFFENBECHER:  No objection.

7            THE COURT:  It will be received.

8                        PLAINTIFF'S EXHIBIT 151 ADMITTED

9    BY MS. LOEFFLER:

10       Q.  So, Seaman Coggins, is this the view -- this is a

11   different view.  This is the view off of building T2; do you see

12   that?

13       A.  Yes, ma'am.

14       Q.  Let's just turn to 7:31 on this.  I think we'll wait

15   until 7:31:19.  It's 7:36 -- oh, 7:31, there you go.  For

16   example, Seaman Coggins, who is that?

17       A.  That is me, ma'am.

18       Q.  Now, what are you doing?

19       A.  I'm pulling in the parking lot, and I'm going to park

20   and then walk up the hill to get the flags.

21       Q.  So that would show when you got there that day on April

22   12th?

23       A.  Yes, ma'am.

24       Q.  Did you -- on Exhibit 390, which was that chart, did

25   you go through these videos and just initial every car that you

1   could identify?

2       A.  Yes, ma'am.

3       Q.  Why don't we play 7:32:10 so we can -- and who is that?

4       A.  That is also me.

5       Q.  Is that when you were heading up to get the flags?

6       A.  Yes, ma'am.

7       Q.  Before you discovered the murders?

8       A.  Yes, ma'am.

9       Q.  Now, at the rigger shop, were there tools to fix tires,

10  that type of thing?

11      A.  Yes, ma'am.

12      Q.  And did people work on cars in the rigger shop?

13      A.  If they got prior approval from our chief, they could

14  work on their personal vehicles in the workshop.

15          MS. LOEFFLER:  If I can have just a minute, Your

16  Honor.  I don't have anything further for this witness.

17          THE COURT:  Cross-examination.

18          MR. OFFENBECHER:  Thank you, Your Honor.

19                          CROSS-EXAMINATION

20   BY MR. OFFENBECHER:

21      Q.  Good afternoon, Seaman Coggins.

22      A.  Good afternoon.

23      Q.  Okay, first of all, help me out.  Are non-rates and

24  seaman the same thing?

25      A.  Yes, sir.

 1      Q.  I thought maybe you might have advanced?

 2      A.  No, sir, I'm still the same.

 3      Q.  Okay.  So you were only at the rigger shop for about

 4  four months?

 5      A.  Yes, sir.

 6      Q.  And what was the atmosphere there when you worked

 7  there?

 8      A.  For me it was -- I was just trying to get settled in

 9  and figure out what my job was.  As far as I could tell, it was

10  a well-oiled machine.  Everybody knew what they had to do and

11  they got the job done and there was no complaints from anybody.

12      Q.  So that's how you have described it before when people

13  asked you about it?

14      A.  Yes.  Yes, sir.

15      Q.  You didn't see any conflicts there or anything?

16      A.  No, sir.

17      Q.  And it seemed like everybody got along, it was a pretty

18  good place to work?

19      A.  Yes, sir.

20      Q.  And you enjoyed working there when you were there?

21      A.  Yes.  I still do.

22      Q.  Oh, good.  Oh, you're still at T2, or at the rigger

23  shop?

24      A.  Yes, sir.

25      Q.  But I guess for that time that you were there, that's

1    pretty much -- Jim Wells was out sick most of that time; right?

2       A.  Yes, sir.

3       Q.  And then he also took some vacation?

4       A.  Yes, sir.

5       Q.  You said that he was not there at the boxer day --

6    Boxing Day party at the Belisles'?

7       A.  No, sir, he was not there.

8       Q.  Was that during the time he was on his Christmas

9    vacation at that time?

10      A.  I believe so.

11      Q.  And so do you know, had he attended those parties at

12   the Belisles' before?

13      A.  I'm not sure, sir.  I don't know.

14      Q.  Now, as I understand it from your contact with Mr.

15   Wells, though, he enjoyed working there, too; is that correct?

16      A.  Yes, sir.

17      Q.  And he thought it was -- he agreed with you, it was a

18   good workplace?

19      A.  Yes, sir.

20      Q.  Did he ever make any comment about it being the best

21   rigger shop that he had been involved in?

22           MS. LOEFFLER:  Objection, hearsay.

23           THE COURT:  Sustained.

24    BY MR. OFFENBECHER:

25      Q.  But he enjoyed it as much as you?

1       A.  I believe so, yes.

2       Q.  The work atmosphere?

3       A.  I believe so, yes.

4       Q.  Now, in that line of work there, it seems like

5  wintertime you couldn't do much more than plow the snow or --

6       A.  Yes, sir.  Unless it was an emergency to fix something,

7  pretty much all we did was take care of snow removal.

8       Q.  The summertime is your busy season?

9       A.  Yes, sir.

10       Q.  And in April 12th, would you be getting close to the

11  busy season?

12       A.  Yes, sir, we would be getting ready to start cutting

13  and doing all the repairs.

14       Q.  Now, do you recall on April 11th, 2012, the day before

15  the shootings, were you involved in any kind of work then?

16       A.  I was there.  I was probably doing work, but I wasn't

17  involved in any big decision making that day.

18       Q.  Do you know what was talked about or what was -- what

19  kind of projects you had on the horizon then?

20       A.  I know they were discussing about putting an antenna on

21  top -- on the roof of T1.

22       Q.  But you're non-rate, so they weren't sharing that

23  discussion?

24       A.  I'm just told to get the tools.

25       Q.  Nothing else unusual that day, is that correct, as far

 1  as your experience?

 2      A.  No, sir.

 3      Q.  You talked about -- let me go back a little bit.

 4          So when you were working there, it was ET1 Hopkins?

 5      A.  Yes, sir.

 6      Q.  And Mr. Belisle?

 7      A.  Yes.

 8      Q.  And Mr. Wells?

 9      A.  Yes.

10      Q.  And the other non-rates there, was that Para Upchurch?

11      A.  Yes, sir.

12      Q.  Leah Henry?

13      A.  Yes, sir.

14      Q.  Nate Pacheco.

15      A.  Yes, sir.

16      Q.  And Mr. -- oh, and then there was Cody Beauford?

17      A.  Yes, sir.  He was a petty officer.  He still is.

18      Q.  He was a petty officer.  He was a higher rank?

19      A.  Yes, sir.

20      Q.  Now, Chief Reckner, you said that he had an office down

21  there, too?

22      A.  Yes, sir.

23      Q.  But his main office was up on the hill at T1?

24      A.  Yes, sir.

25      Q.  And was it -- did he always have an office down there

1  or was that something recent since you got there?

2      A.  Ever since I've been there he had an office, so I don't

3  know how recent he had moved down there.

4      Q.  Had you heard anything about him recently moving down

5  there?

6      A.  I did hear he had recently moved down the hill.

7      Q.  And that had been about the period that Mr. Wells was

8  sick, was it about the same time?

9          MS. LOEFFLER:  Objection, Your Honor.  I'm sorry, this

10 witness doesn't know because it's before he got there.

11         MR. OFFENBECHER:  Well, he can answer if he doesn't

12 know.  He can tell me.

13         THE COURT:  Only answer what you know.

14     A.  I do not know how recent he moved down.

15  BY MR. OFFENBECHER:

16     Q.  Okay, all right.  You also talked about locking the

17 doors.  Now whose responsibility is that when you leave, like,

18 at 2 o'clock?

19     A.  The last person to leave the building was to lock the

20 doors.

21     Q.  And do you know who was the last one to leave on April

22 11th, 2012?

23     A.  I do not, sir.

24     Q.  Were you the one, or do you know?

25     A.  No, sir, I was not the last person.

1      Q.  Okay, so you assumed that somebody after you had locked

2  all the doors?

3      A.  Yes, sir.

4      Q.  And what doors would they be?  All the doors in the

5  building?

6      A.  The doors that don't automatically lock at the end of

7  the day and the doors that we had unlocked during the workday.

8           So the front door with the dead bolt usually was one of

9  them, and then the back door with the dead bolt.  Other than

10 that, usually they were all locked.

11     Q.  What do you mean by the dead bolt -- the back door with

12 the dead bolt?  Was that to the boiler room or was that to

13 another --

14     A.  It was to the outside.  It's in the repair shop.  It's

15 the back door in the repair shop, and it goes outside.

16     Q.  So how many doors are in the back of the building?

17     A.  Two.  There is only two in the back of the building,

18 and one is to the boiler room and one is to the inside of the

19 repair shop.

20     Q.  So you're talking about the one inside the repair shop?

21     A.  Yes, sir.

22     Q.  Not the boiler room?

23     A.  No, sir.  That one is a different lock.  You have to

24 have a key to open it.

25     Q.  Now, have you seen this model before that's been marked

1  as government's Exhibit 386?

2      A.  Yes, sir, I've seen the model.

3      Q.  So you've looked it over at the U.S. Attorney's Office?

4      A.  Yes, sir.

5      Q.  Is that an accurate picture of what that looks like?

6      A.  Yes, sir.

7      Q.  Now, can you see it from where you are?

8      A.  Not very well.  I can see it, but the angle is bad.

9          MS. LOEFFLER:  I can take the chart down.

10  BY MR. OFFENBECHER:

11     Q.  Is that better?

12     A.  Yes, sir.

13     Q.  That's a pretty accurate model of what your shop looks

14  like?

15     A.  Yes, sir.

16     Q.  Does that include -- do you see the office space?

17     A.  Yes, sir.

18     Q.  And do you see -- is that a window in the back --

19     A.  Yes, sir.

20     Q.  -- that looks into the office space?

21     A.  Yes, sir.

22     Q.  That's windows there?

23     A.  Yes, sir.

24     Q.  That's what it looks like --

25     A.  Yes, sir.

1      Q.  -- about the same thing.

2          And then you also see the break room?

3      A.  Yes, sir.

4      Q.  And there are windows directly into the break room?

5      A.  Yes, sir.

6      Q.  Two windows there; do you see that?  That's how it

7  looks like today; right?

8      A.  Yes, sir.

9      Q.  Let me --

10         MR. OFFENBECHER:  If we can get up defense Exhibit

11  DE-060.

12  BY MR. OFFENBECHER:

13     Q.  Is that on your screen?

14     A.  Yes, sir.

15     Q.  Do you recognize that?

16     A.  Yes.  That is the side of the rigger shop.

17     Q.  That's where you are working now?

18     A.  Yes, sir.

19         MR. OFFENBECHER:  Move to admit.

20         MS. LOEFFLER:  No objection.

21         THE COURT:  It will be received.

22                            DEFENDANT'S EXHIBIT DE-060 ADMITTED

23         MR. OFFENBECHER:  Could we publish that.

24  BY MR. OFFENBECHER:

25     Q.  Now it's kind of dark, but what's that view?

1      A.  It is from the side of the garage side right in front
2   of the repair shop.
3      Q.  Do you have a pointer up there?
4      A.  I don't think so.
5      Q.  So from this view, these are the doors you're talking
6   about, the entry on that side of the building?
7      A.  Yes.
8      Q.  And that white truck, does that look like one you
9   called the government vehicles?
10      A.  Yes, that is one of the government vehicles.
11      Q.  Can you tell what's in the middle there, what's
12   blocking that view?
13      A.  That is a dumpster.
14      Q.  Okay, so that dumpster was still there?
15      A.  Yes.
16      Q.  It was there April 12th --
17      A.  Yes.
18      Q.  -- 2012?
19      A.  Yes, sir.
20      Q.  And then what's this part?
21      A.  Those are the garage doors that lead into the repair
22   shop.
23      Q.  Let me show you what's been marked as defense DE-061.
24   Can you see that on your screen?
25      A.  Yes, sir.

1      Q.   Is that a little bit better picture of that vantage

2   point?

3      A.   Yes, sir?

4           MR. OFFENBECHER:  Move for admission of that exhibit.

5           MS. LOEFFLER:  No objection.

6           THE COURT:  Be received.

7                          DEFENDANT'S EXHIBIT DE-061 ADMITTED

8           MR. OFFENBECHER:  Can we publish that.

9    BY MR. OFFENBECHER:

10     Q.   Okay, I guess we have a little bit more light here.

11          So is this the dumpster you were talking about?

12     A.   Yes, sir.

13     Q.   And what are these?

14     A.   Those are those same garage doors.

15     Q.   And so -- was this the way it looked on April 12th,

16   2012?

17     A.   Yes, sir.

18     Q.   So this is the side of the building.  Oh, is that where

19   the colors are?

20     A.   Yes, sir.

21     Q.   And you can actually pull around here in a vehicle?

22     A.   Yes.

23     Q.   You can pull into the garage?

24     A.   Yes, sir.

25     Q.   And you also kept other vehicles back here?

1      A.  Yes, sir.  Vehicles that are too big to fit in the

2  garage.

3      Q.  So how many vehicles would be parked back there

4  normally?

5      A.  Two to three usually.

6      Q.  And is it easy enough to walk around that vehicle or

7  past that vehicle?

8      A.  Yes, sir.

9      Q.  And then when you walk around that vehicle, past that

10  vehicle, is that where you go to the back door to the garage?

11      A.  Yes, sir.

12      Q.  And you could also then go to the back door to the

13  boiler room?

14      A.  Yes, sir.

15      Q.  And you would walk right past a window to the office --

16  the offices?

17      A.  Yes, sir.

18      Q.  Thank you.  I think you had been asked some questions

19  about if anybody brought firearms to T2; do you recall that?

20      A.  Yes, sir.

21      Q.  And who do you remember bringing guns into T2, the

22  rigger shop?

23      A.  I remember only one occasion while I was present at the

24  rigger shop, and it was Chief Reckner brought a gun to the

25  rigger shop.

1      Q.  Do you know the purpose why he brought the gun in?

2      A.  He had just purchased it and wanted to show it off.

3      Q.  So he was showing it to other guys there?

4      A.  Yes, sir.

5      Q.  Do you recall ET1 Hopkins, did he ever talk to you

6  about retiring?

7      A.  He never talked to me about that because that wasn't

8  any of my concern.

9      Q.  All right.  I know you've been asked a lot of questions

10  about this before; right?

11     A.  Yes, sir, so many questions.

12     Q.  I won't ask you very many more.  Let me make sure I

13  have the right transcript.

14          Do you remember talking to Special Agent Denise

15  Andersen and Special Agent Jerry Pritchard on August the 6th?

16     A.  I'm sure I did, but -- I talked to so many people, I

17  don't remember specifically.

18     Q.  Have you had a chance to review the transcripts of --

19  what questions people have asked you before and your answers?

20     A.  Yes.  Yes, sir.

21     Q.  So you've seen all the transcripts of your -- of what

22  questions you answered?

23     A.  I believe so, yes.

24     Q.  Just a minute.

25          MS. LOEFFLER:  Your Honor, I'm going to object if he's

1    trying to either refresh or impeach without asking him the

2    question first.  I don't have any problem if he doesn't remember

3    something, but perhaps we could do it that way.

4                THE COURT:  Okay.

5                MR. OFFENBECHER:  Not publish it, just

6    (indiscernible).

7     BY MR. OFFENBECHER:

8        Q.  No, my question is if you ever recall ET1 Hopkins

9    talking about retiring?

10       A.  I do not recall.

11       Q.  Well, I want to show you something just on your screen,

12   and see if you can recall this conversation and see if that

13   might help you recollect what you said on this day.

14               If you look at the --

15               MS. LOEFFLER:  Counsel, so I can read it -- I can get

16   to it -- if you just tell me what date.

17               MR. OFFENBECHER:  August the 6th.  And it's at your

18   discovery 26010.

19               MS. LOEFFLER:  Okay.

20    BY MR. OFFENBECHER:

21       Q.  Maybe if you could just read the second -- well, the

22   first question where it says "DA."  And then "AC," is that you?

23       A.  Yes, sir.

24       Q.  And could you just read to yourself that question, your

25   answer to that -- what you said then.

1      A.  Now I remember.

2      Q.  Okay, just tell me what you remember.

3      A.  I remember that he had talked about when he retired,

4  that he would drive his camper around the Lower 48 and go to the

5  National parks and stuff like that because he was really proud

6  of the camper that he had been fixing up.

7      Q.  Okay.  And did he give you any indication when that

8  might be or just that he wanted to do that?

9      A.  Just that he wanted to do that.  He never gave us dates

10 or --

11     Q.  Okay, just a minute.  Almost done.

12          Okay, April 12th, 2012, you said Mr. Wells got there

13 late?

14     A.  Yes, sir.

15     Q.  And -- to work.

16          You were there when he got there?  He drove up?

17     A.  Yes, sir.

18     Q.  And you were there when he got out of his truck?

19     A.  Yes, sir.

20     Q.  And you were there -- who approached him when you were

21 there?

22     A.  As I can recall, it was Chief Reckner who approached

23 Mr. Wells.

24     Q.  And then did Chief Reckner say anything to Mr. Wells?

25     A.  I didn't really hear.  I was talking to the trooper at

1    that time, the state trooper.

2        Q.  Do you recall or did you have the impression that Chief

3    Reckner was the one to tell Mr. Wells that Rich Belisle and Jim

4    Hopkins were dead?

5        A.  He was the one to tell him, yes.

6        Q.  And what did you see Mr. Wells' reaction to that?

7        A.  He looked shocked just like everybody else.

8            MR. OFFENBECHER:  Thank you.  That's all I have.

9            THE COURT:  Redirect.

10           MS. LOEFFLER:  Very briefly.

11                           REDIRECT EXAMINATION

12    BY MS. LOEFFLER:

13       Q.  Two questions, if I can, Seaman Coggins.

14           When we've done all this stuff with the windows, I just

15    want to make clear.  From the front of the building, if you

16    don't know the building, can you see into the office or the

17    break room?

18       A.  No, ma'am.

19       Q.  But if you want to wander around and go through the

20    cars in the back, you can get back there and peer in the windows

21    if somebody wanted to?

22       A.  The window in the back to the office is high up, so

23    you'd have to climb up something to look through it.

24       Q.  So you couldn't actually see into that from the back

25    unless you were climbing up something?

1        A.  Or you walked up the hill behind the rigger shop with a

2   lot of trees.  It would be a pain to walk -- try and look

3   through that window.

4        Q.  And then the only other one.

5            When you talked about -- when you said that you now

6   remember Mr. Hopkins talking about taking his camper and

7   visiting the National parks, did he mention anything about doing

8   that with his wife?

9        A.  Yes.

10            MS. LOEFFLER:  That's it.

11            THE COURT:  Any cross?  All right, thank you, sir,

12   you're excused.

13    (Witness excused)

14            THE COURT:  Government's next witness.

15            MS. DUIGNAN:  Your Honor, the government will Petty

16   Officer Acosta.

17            THE COURT:  Ms. Loeffler, I just have one quick thing.

18            MS. LOEFFLER:  I'm sorry, okay.

19            THE CLERK:  Sir, you can have a seat.

20            THE COURT:  Just real quick, no big deal.

21    (Sidebar conference as follows:)

22            THE COURT:  If you can somehow subtly, without making

23   a big deal about it, just take that picture and put it sideways.

24            MS. LOEFFLER:  Which one?

25            THE COURT:  The picture that's looking into the

1    jurors -- at the jurors.

2             MS. LOEFFLER:  Oh, you mean the chart?

3             THE COURT:  No, the picture of the --

4             MR. OFFENBECHER:  (Indiscernible).

5             THE COURT:  Yeah.

6             MS. LOEFFLER:  I thought it was turned.

7             MR. OFFENBECHER:  No, it's turned so it's right

8    looking at the jury.

9             MS. LOEFFLER:  Oh, I'm sorry.

10            THE COURT:  Just turned it the wrong way.

11            MR. OFFENBECHER:  I'm assuming the other Coast Guard

12   (indiscernible).

13            MS. LOEFFLER:  (Indiscernible).

14       (End of sidebar)

15            THE COURT:  Okay, sir, if you'll just -- you haven't

16   been sworn in yet, have you?

17            MR. ACOSTA:  Sorry.

18            THE CLERK:  No.

19            THE COURT:  If you'll just stand, she's going to swear

20   you in.

21            THE CLERK:  Please raise your right hand, sir.

22            HERNANDO ACOSTA, PLAINTIFF'S WITNESS, SWORN

23            THE CLERK:  Thank you, please have a seat.  And sir,

24   for the record, please state and spell your full name.

25       A.  My full name is Hernando Acosta, H-e-r-n-a-n-d-o

1   A-c-o-s-t-a.

2           THE COURT:  Very well.  Counsel.  She's going to start

3   asking you questions now.

4                        DIRECT EXAMINATION

5    BY MS. DUIGNAN:

6       Q.  Petty Officer Acosta, what organization do you work

7   for?

8       A.  Coast Guard.

9       Q.  And you're on active duty; correct?

10      A.  Yes.

11      Q.  And how long have you been in the Coast Guard?

12      A.  Eight years.

13      Q.  Eight years?

14      A.  Yes.

15      Q.  And where are you stationed now?

16      A.  I'm stationed on the Coast Guard Cutter SHERMAN down in

17   San Diego.

18      Q.  And how long have you been stationed on the Cutter

19   SHERMAN?

20      A.  Nine months.

21      Q.  And where were you stationed before that?

22      A.  ESD San Diego for a year.  And before that I was

23   stationed at COMMSTA Kodiak.

24      Q.  And where were you stationed on April 12th, 2012?

25      A.  Communications Station Kodiak.

1      Q.  What was your job description at that time?

2      A.  I was an electronics technician.  I fixed transmitters,

3   receivers, not only in Kodiak, but in the remote sites.

4      Q.  And, in fact, what is your rate and rank?

5      A.  Electronics technician second class.

6      Q.  What was the mission of Communications Station Kodiak?

7      A.  Answer distress calls whenever there were boats in

8   danger, personnel in danger.  That's the first people that were

9   called to.

10     Q.  And in what shop at the communications station did you

11  work at?

12     A.  At the main building, T1.

13     Q.  And T1, I think the jury has already seen, is the

14  larger main building up the hill; is that an accurate --

15     A.  Yes.

16     Q.  And who did you work with at T1?

17     A.  I worked with ET1 Stone, ET1 Gross (ph), ET2 Encinas,

18  ET3 Bonde (ph), ET2 Lawrence (ph).

19     Q.  And what shop was that considered?  How would you

20  describe it?

21     A.  Regular ET shop.

22     Q.  So it was a group of ETs that worked at T1?

23     A.  Yeah.

24     Q.  I'd like to pull up Exhibit 393, please.

25          You should be seeing something on your screen shortly.

```
 1   Do you recognize that chart?
 2       A.  Yes.  That's our chain of command chart.
 3       Q.  And is it an accurate representation of what the
 4   command structure looks like?
 5       A.  Yes.
 6               MS. DUIGNAN:  I move to admit Exhibit 393.
 7               MR. CURTNER:  No objection.
 8               THE COURT:  It will be received.
 9                           PLAINTIFF'S EXHIBIT 393 ADMITTED
10               MS. DUIGNAN:  I'd like to publish it.
11               THE COURT:  Very well.
12               MS. DUIGNAN:  Did we leave the pointer up there?
13               MS. LOEFFLER:  There is one right here.
14               THE COURT:  He's got one.
15               MS. LOEFFLER:  Yeah, the witness has one.
16    BY MS. DUIGNAN:
17       Q.  Do you have it?  Can you please point to the exhibit
18    and show the group of people that you worked with.  Yeah, it's
19    barely showing up.  Let's see if I can -- which one is it, this
20    one?  I can see where you're pointing, but just so the jury sees
21    it.
22           You're pointing at this group of people on the far left
23    lower corner; correct?
24       A.  Yes, ma'am.
25       Q.  And so you were one of the ET2s in this particular
```

 1   group of people?

 2       A.  Yes, ma'am.

 3       Q.  Do you recognize what this group of people with the

 4   dotted line represents?

 5       A.  Yes.  That is the rigger shop.

 6       Q.  And those would be the people who worked at T2?

 7       A.  Yes.

 8       Q.  Who were you living with on April 12th, 2012?

 9       A.  I lived with OS2 Schafer and ET3 Beauford.

10       Q.  And how did you get to work that morning?

11       A.  We took my truck.

12       Q.  Who did you drive to work that morning?

13       A.  I drove with ET3 Beauford.

14       Q.  And do you recall approximately what time you left for

15   work?

16       A.  We left around 6:55, 7.  We stopped to get some coffee

17   and we went to COMMSTA.

18       Q.  And where did you stop along the way for coffee?

19       A.  Harbor Sun.

20       Q.  And so what time approximately would you say you pulled

21   up to work at the communications station?

22       A.  I'd say between 6:30 -- I mean 7:30 and 7:35.

23       Q.  Just one minute, I'm going to pull up another exhibit.

24   I'm pulling up what has been marked as Exhibit 165.  I'm going

25   to ask you to watch it.

1          Do you recognize the vehicle in that video?

2     A.  Yes, the white truck.

3     Q.  And that represents the day of April 12th, 2012;

4  correct?

5     A.  Yes.

6          MS. DUIGNAN:  I move for admission of Exhibit 165.

7          MR. CURTNER:  No objection.

8          THE COURT:  It will be received.

9                         PLAINTIFF'S EXHIBIT 165 ADMITTED

10         MS. DUIGNAN:  I'd like to play it again for the jury.

11  BY MS. DUIGNAN:

12    Q.  Is that your truck backing up?

13    A.  Yes, ma'am.

14    Q.  What happened there?

15    A.  I forgot that I had to drop them off there.  I do that

16  all the time.

17    Q.  And so you're pulling a little bit off the camera in

18  this picture; correct?

19    A.  Yes.

20    Q.  And so what's happening right now?

21    A.  I'm dropping them off and then turning around and then

22  going back to T1.

23    Q.  When you say "him," you're referring to Petty Officer

24  Beauford; correct?

25    A.  Yes, ma'am.

1      Q.  Okay, thank you.  At about that time when you were

2  dropping off Petty Officer Beauford to work, did you see anybody

3  else outside working around the communications station?

4      A.  I saw Collins [sic], Seaman Collins [sic].  He was

5  going off to T1.  I'm pretty sure it was because he needs to

6  pick up the flags because colors will be held at 8, 0800.

7      Q.  And what was the procedure for colors?

8      A.  They have to go to T1 to pick up the flag.  And then

9  first call is in five minutes before 8, so they have to stand

10 there, have it ready to go.

11     Q.  And after you dropped off Petty Officer Beauford, did

12 you see where he went?

13     A.  Beauford?  Inside the building.

14     Q.  And where did you go?

15     A.  I went into T1.

16     Q.  And what did you do at that time?

17     A.  Went to change, check my e-mail, just do the usual

18 stuff before.  I usually come early just to do that, you know,

19 check my e-mail, have some coffee, because the workday doesn't

20 officially start until 8.

21     Q.  Let me back up a little bit.  On your way driving to

22 work you said you had stopped for coffee.  Did you see anything

23 else unusual during that time?

24     A.  The only thing I saw was a jogger, you know, but

25 nothing came out of it because I'm pretty sure he was jogging.

1   No big deal.

2       Q.  Did you recognize the person?

3       A.  I seen him around.  He was a contractor, but didn't

4   think anything of it.

5       Q.  Let me fast forward to about, you said, 8 o'clock and

6   you went in to start your workday?

7       A.  Uh-huh.

8       Q.  So what did you do upon arriving to work?

9       A.  Well, I went to -- after changing and all that, I went

10  to the ops deck, that's where all the operational specialists

11  work, and I was talking to them.  And the next thing you know I

12  see a camera -- I mean, the cameras, I see a bunch of ambulances

13  and cop cars.  And they said something happened.  We didn't

14  think anything of it.  You know, it could be somebody might have

15  fainted because we deal with, you know, dangerous substances.

16  But then they told us later that there was blood everywhere and

17  people got shot.

18      Q.  And at approximately what time at what point did you

19  find out what had happened?

20      A.  A couple of hours ago [sic].  I remember the XO pulling

21  us and telling everybody what happened.

22      Q.  After you heard what had happened, you found out who

23  had been murdered; correct?

24      A.  Yes.

25      Q.  Did you know either Petty Officer Hopkins or Mr.

1  Belisle?

2      A.  Yes, ma'am.  I worked with them a couple times.

3      Q.  And how did you know -- I'll start with Petty Officer

4  Hopkins.  How did you know him?

5      A.  I worked with both mainly on Shemya, on a remote site

6  when we were doing some adjustments to the system, because we

7  were running transmission cables.

8      Q.  And how would you describe your interactions with Petty

9  Officer Hopkins?

10     A.  They were okay.  I didn't see anything wrong with -- we

11 talked about random stuff.  Nothing big.

12     Q.  Were you aware of any problems he would have been

13 having at home or at work?

14     A.  He never mentioned any problems about -- at home or at

15 work.

16     Q.  And how did you know Mr. Belisle?

17     A.  Mr. Belisle, same.  We worked on a couple remote sites.

18 And we worked twice in the Shemya remote site.  Because around

19 that time we were installing that site, you know, so we needed

20 to take -- you know, to run cables.  And then I was the one who

21 was going to set up the transmitters.

22     Q.  And how would you describe your interactions with Mr.

23 Belisle?

24     A.  It was good.  He had good advice.  It was good.

25     Q.  And were you aware of any problems he was having either

1   at home or at work?

2       A.  No, no.

3       Q.  And moving back to that day, you said you were told by

4   the XO what had happened.

5       A.  Uh-huh.

6       Q.  So how long were you there that day?

7       A.  We were there for approximately 13 hours, 14 hours.  It

8   was a long day.

9       Q.  And how would you describe the reactions of other

10  people that you saw that day?

11      A.  Everybody was crying, everybody was, you know, nervous.

12  Like a lot of people are freaking out because of the incident,

13  you know, like what's going to happen to us.

14      Q.  Did you have any time where you saw either Seaman

15  Upchurch or Seaman Henry that day?

16      A.  Yes, I saw them at the conference room.  And yeah, they

17  were crying non-stop over there.  It was bad.

18      Q.  Did you have any opportunity to observe Mr. Wells that

19  day?

20      A.  Yes, I saw Mr. Wells.  And he was sleeping around that

21  time that I saw him.  I thought it was the initial -- that I saw

22  the two girls just crying non-stop, and he was just laying back

23  and sleeping like nothing happened.

24          MS. DUIGNAN:  Thank you Petty Officer Acosta, I have

25  no further questions.

1          THE COURT:  Cross-examination.

2                      CROSS-EXAMINATION

3    BY MR. CURTNER:

4       Q.  Good afternoon.

5       A.  Good afternoon.

6       Q.  I was curious about the video.  You viewed that video

7    before of you driving up to the rigger shop?

8       A.  Yes, I saw the video.

9       Q.  Now, is that part of what is on that video, or is that

10   everything you can see on the video?

11      A.  What do you mean?

12      Q.  Well, I noticed that I couldn't even see Cody Beauford

13   get out of your truck.  Can you see that on the video?

14      A.  No, you cannot see it on the video.

15      Q.  I imagine that when you pulled up there were other

16   trucks that were even closer to the building?

17      A.  Yes.

18      Q.  And you couldn't see those?

19      A.  You cannot see the trucks on the video, but there were

20   trucks there.

21      Q.  Yes, there were trucks there.

22          But from that video perspective, you can only see out

23   toward the road, you can't see anything close to the building --

24      A.  Yes.

25      Q.  -- even as long as the trucks; is that correct?

1       A.  Yes.

2       Q.  And that wasn't cropped, that's the whole view that you

3   got from the video?

4       A.  Yes.

5       Q.  And did you look at that video during that morning --

6   during the hour of people coming and going?

7       A.  No.

8       Q.  Just your part?

9       A.  Yeah.

10      Q.  Now, you said you saw the jogger on the road?

11      A.  Uh-huh.

12      Q.  And he was jogging.  Where did you see him at?  Where

13  did you notice him?

14      A.  Right at the beginning of Anton Larsen Road.  He was

15  running back toward the main road, but he was all the way out

16  there.  So it was like a good probably two miles.

17      Q.  I'm sorry, you saw him by Rezanof and Anton Larsen Bay

18  Road?

19      A.  Yes, yes.

20      Q.  Toward the airport?

21      A.  Yes.

22      Q.  Not anywhere close to T2?

23      A.  No, all the way out there.

24      Q.  And did you notice any other vehicle traffic as you

25  were coming in from there after you saw him going out?

1      A.  I saw people that I knew, like Miller.  I saw --

2  Miller, you can see it on the video, I'm pretty sure he was the

3  one on the bike.

4      Q.  He was the one on the motorcycle that went --

5      A.  Yes, yes.

6      Q.  -- just after you?

7      A.  Yes.  I saw just people that I knew because they

8  usually change shifts between that hour.

9      Q.  Now, you didn't spend a lot of time with Mr. Belisle or

10  Mr. Hopkins; is that right?

11      A.  No, I didn't work with them as much, but the times that

12  we worked, we worked pretty much non-stop for, like, two weeks,

13  so...

14      Q.  And they never discussed with you any issues they had

15  with their family, is that right, is that what you're saying?

16      A.  They never did.

17      Q.  If Mr. Hopkins was having issues with his wife, he

18  never shared that with you?

19      A.  Never shared.

20      Q.  If Mr. Belisle was having issues with his daughter and

21  who she was running around with, he never shared that with you;

22  is that correct?

23      A.  No.

24      Q.  That's not untypical that people would kind of keep

25  their private lives separate from their work?

1      A.  They were pretty professional.

2      Q.  Now, when you saw Mr. -- when you were up at T1 after

3  you heard about the homicides, how long were you there?

4      A.  How long was I at T1?  13 to 14 hours.

5      Q.  T1 after the homicides when they brought everybody up

6  to T1 to the conference room -- or where was everybody?

7      A.  They kept moving us.  They kept moving us.  First it

8  started at the basement, and then they switched us to the

9  conference room, then we went back to the basement.  It was, you

10  know -- yeah, they kept moving us.  But we were there for 13

11  hours.

12      Q.  Thirteen hours.  And the that includes you and Leah

13  Henry?

14      A.  Yes.

15      Q.  And Para Upchurch?

16      A.  Yes.

17      Q.  Mr. Wells?

18      A.  Yes.

19      Q.  Everybody was kept there locked down for 13 hours; is

20  that correct?

21      A.  Yes.

22      Q.  And do you know anything about Mr. Wells' -- any kind

23  of physical problems he may have that would make it difficult

24  for him to be there for 13 hours?

25      A.  No.

1      Q.  Not that you're aware of?

2          Had anybody mentioned to you during those 13 hours that

3  maybe Mr. Wells was responsible for this?

4      A.  No.

5      Q.  Nobody said that to you?

6      A.  No.

7      Q.  You never heard that rumor?

8      A.  We didn't.

9          MR. CURTNER:  No further questions.

10         THE COURT:  Redirect.

11         MS. DUIGNAN:  Just a couple follow-up questions.

12                        REDIRECT EXAMINATION

13  BY MS. DUIGNAN:

14     Q.  Mr. Curtner had asked you about the other vehicles that

15  perhaps were off camera when you swung around.

16         Were there any vehicles there that you recognized that

17  were parked out in front of T2?

18     A.  Yes.  ET1's and Mr. Belisle's.  It's been a while

19  though.

20     Q.  But you knew what kind of cars they drove?

21     A.  Yes.  I remember I think ET1 drove a Dodge, if I'm not

22  mistaken.  It's been two years.

23     Q.  Were there any other vehicles parked out front?

24     A.  Jeep for Collins [sic], I think there was a Jeep there.

25  It's been a while.

1      Q.  No, that's okay.  I notice you didn't mention any kind
2   of the white trucks.  But were there government vehicles there?
3      A.  Yeah, there were government vehicles there.
4      Q.  But you don't really think about them as being
5   vehicles --
6      A.  No.
7      Q.  -- because nobody uses them?
8          What are they used for?
9      A.  They are used to haul in equipment when we're going to
10  the receiver antennas and the transmitter antennas, so they use
11  it to -- pretty much landscaping so that way the antennas don't
12  get destroyed by nature.
13     Q.  Would it be fair to say everybody at the command knew
14  that those were government vehicles?
15     A.  Yes.
16              MS. DUIGNAN:  Thank you.
17              THE COURT:  Recross.
18                       RECROSS-EXAMINATION
19   BY MR. CURTNER:
20     Q.  I'm sorry, I couldn't really tell from the video, what
21  color is your truck?
22     A.  It's burgundy.  It's reddish.
23     Q.  I'm sorry?
24     A.  Sides are burgundy.
25     Q.  Burgundy, reddish?

1      A.  Yes.

2              MR. CURTNER:  Thank you.

3              THE COURT:  Okay.  Thank you, sir, you're excused.

4      (Witness excused)

5              THE COURT:  What's the government's situation now?  Do

6      you have a short one?

7              MS. LOEFFLER:  We have another witness sitting here.

8      He's not going to get done today, so maybe -- do you want to

9      just wrap it up today?

10              MS. DUIGNAN:  That might be better.

11              MS. LOEFFLER:  That might be a good thing because --

12      you know, start with him in the morning and then he can get

13      done.

14              THE COURT:  Okay.  We're done for the day.  We're

15      going to start 8:30 tomorrow.  So if you can be in the big room

16      by 8:25 tomorrow, we'll try to start right at 8:30 sharp.

17              Any issues, any problems, any questions?  Remember, no

18      newspaper, no 5 o'clock news, okay.  That's going to take some

19      effort, but I'm trusting that you'll do it, okay.  And for all

20      the reasons that I told you the other day.  Yes, ma'am.

21              UNIDENTIFIED JUROR:  Are we going to be starting at

22      8:30 for the rest of the week?

23              THE COURT:  I think we're going to try for that.  Is

24      that a problem?

25              UNIDENTIFIED JUROR:  No.

1    THE COURT: We're doing that so that we can take those
2 Fridays off, okay. Because we're going to keep working, but
3 we're going to go for 8:30 the rest of the week, try to go
4 between 4:30 and 5. I didn't want to start a brand new witness
5 at the end.
6    Always put your notes right in the chair, and no one
7 looks at them, they are safe, okay.
8    We'll stand in recess, see you tomorrow morning.
9                                    (Jury not present)
10    THE COURT: They are gone. Please be seated.
11 Counsel, what's the government have?
12    MS. LOEFFLER: Oh, nothing. I was just trying to
13 determine whether we could leave the model in here or have to
14 take it out every night?
15    THE COURT: I think you can leave it here. Why
16 couldn't you leave it here? The courtroom is locked, isn't it?
17    MS. LOEFFLER: We will do that if we can, unless we
18 have to show it to people. So thank you.
19    THE COURT: You choose, that's your choice. Anything
20 else?
21    MS. LOEFFLER: We don't have anything else.
22    THE COURT: Mr. Curtner, anything else.
23    MR. CURTNER: No.
24    THE COURT: I just want to take one thing up here with
25 counsel.

1   (Sidebar conference as follows:)

2           THE COURT:  I'm just following up on that Batson issue

3   now that I've been able to look at the jurors.  There are five

4   minorities on this jury, five out of the 15.  I wasn't sure, but

5   now that I look at them, there is one black, one or two Asian

6   and three Natives.  In addition to that, there is a gentleman

7   that works in Bethel for the Native corporations, and the lady

8   on the far end is first generation German.

9           So when I look at the big picture, I think this is an

10  extremely diverse jury, and I'm not concerned at all about the

11  Batson issue that we discussed the other day.  You withdrew the

12  one I was concerned about, and the other one clearly, I think

13  you established just cause for the -- a just explanation for

14  that.

15          But I had a chance to look at -- when I looked at the

16  jury, it's a very diverse jury, more diverse than our population

17  of voters.  Any response?

18          MR. CURTNER:  This is the most diverse jury I've seen

19  in federal court.

20          THE COURT:  Amazing, isn't it?  Okay.

21          MR. CURTNER:  It's a good thing.

22          THE COURT:  It is, it is.  Okay, thank you.

23   (End sidebar)

24          THE COURT:  Okay, counsel, 8:20 tomorrow so we can

25  start right at 8:30 sharp.

1          MS. LOEFFLER:  Yep.

2          THE COURT:  Okay.

3          THE CLERK:  All rise.  This matters stands in recess

4  until tomorrow at 8:30.

5              (Proceedings recessed at 4:25:49 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                      CERTIFICATION

2

3      I, LEONARD J. DiPAOLO, RPR, CRR, CCP, court-approved

4  transcriber, certify that the foregoing is correct transcript

5  from the official digital electronic sound recording of the

6  proceedings in the above-entitled matter.

7

8

9  _____       ___9/3/14_____

    Leonard J. DiPaolo, RPR, CRR, CCP       Date

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                              I-N-D-E-X
PLAINTIFF'S OPENING STATEMENT                           234
DEFENDANT'S OPENING STATEMENT                           260

WITNESSES:              DIRECT   CROSS   REDIRECT   RECROSS
FOR THE PLAINTIFF:

Nicola Belisle          284       -        -         -

Scott Hopkins           297      306       -         -

Dennis Victor Dupras    312/343  356/383  390/400  397/401
   (Voir dire)          381      341

Aaron Scott Coggins     403      422      437        -

Hernando Acosta         440      449      453       454

EXHIBITS:                                 ADMITTED
FOR THE PLAINTIFF:

1:       Photo of Richard Belisle             287

2:       Photo of James Hopkins               298

42:      Photo - aerial map                   318

43:      Photo - aerial map                   319

44:      Photo - aerial map                   320

46:      Photo - aerial map                   321

47:      Photo - aerial map                   323

49:      Photo - aerial map                   324

392:     Photo - T2 building floor plan       326

386:     T2 model (3-D physical model)        326

255:     Photo - view of Hopkins from entryway
         into T2 office                       331

259:     Photo - view of Hopkins lying on office
         floor                                334

261:     Photo - second view of Hopkins and
         wounds                               334
```

```
 1  EXHIBITS:                                ADMITTED
    FOR THE PLAINTIFF:
 2
    257:    Photo - view of office entryway       335
 3
    258:    Photo - view of Belisle from office
 4            doorway                             336

 5  262:    Photo - view of Belisle on office floor 337

 6  51:     Photo - aerial map, airport (closer)  346

 7  104:    Photo - Nancy Wells' blue CR-V airport 350

 8  243:    Photo                                 352

 9  244:    Photo                                 352

10  245:    Photo                                 353

11  231:    Tire - BF Goodrich studded 265/75/R16 355

12  152:    Video from T1 COMMSTA camera 4/12/12
            7:00:18 to 7:34:00                    420
13
    151:    Video from T2 COMMSTA camera 4/12/12
14          7:30 to 8:30                          421

15  393:    COMMSTA organization chart            442

16  165:    Video from T2 camera 4/12/12 7:33:33 to
            7:34:24                               444
17
    FOR THE DEFENDANT:
18
    DE-043: Photo - map OS-103                    376
19
    DE-038: Photo - ranch                         381
20
    DE-039: Photo - ranch                         381
21
    DE-040: Photo - ranch                         381
22
    DE-060: Photo - COMMSTA garage Bates 811      430
23
    DE-061: Photo - COMMSTA garage Bates 809      432
24

25
```