1           UNITED STATES DISTRICT COURT
                DISTRICT OF ALASKA
2
   UNITED STATES OF AMERICA,    )    Case No. 3:13-cr-00008-RRB
3                                )
              Plaintiff,         )    Anchorage, Alaska
4                                )    Wednesday, April 2, 2014
      vs.                        )    8:21 a.m.
5                                )
   JAMES MICHAEL WELLS,          )    TRIAL BY JURY - DAY 3
6                                )
              Defendant.         )
7                                )

8                 TRANSCRIPT OF PROCEEDINGS
                Pages 462 - 709, inclusive
9
           BEFORE THE HONORABLE RALPH R. BEISTLINE
10              UNITED STATES DISTRICT JUDGE

11  A P P E A R A N C E S:
   For Plaintiff:    KAREN LOEFFLER, ESQ.
12                   BRYAN D. SCHRODER, ESQ.
                     KATHLEEN DUIGNAN, ESQ.
13                   U.S. Attorney's Office
                     222 W. 7th Avenue, #9
14                   Anchorage, Alaska 99513
                     Ph: 907/271-5071
15
   For Defendant:    F. RICHARD CURTNER, ESQ.
16                   Federal Public Defender's Agency
                     601 W. 5th Avenue, Suite 800
17                   Anchorage, Alaska 99501
                     Ph: 907/646-3400
18
                     PETER OFFENBECHER, ESQ.
19                   Skellenger Bender, P.S.
                     1301 5th Avenue, Suite 3401
20                   Seattle, Washington 98101-2605
                     Ph: 206/623-6501
21
   Court Recorder:   NANCY LEALAISALANOA
22                   U.S. District Court
                     222 W. 7th Avenue, Suite 4
23                   Anchorage, Alaska 99513
                     Ph: 907/677-6111
24

25

**Peninsula Reporting**
**110 Trading Bay Dr., Ste. 100, Kenai, AK 99611 907/283-4429**

```
 1   A P P E A R A N C E S:   (Continued)

 2   Transcribed by:    LEONARD J. DIPAOLO, RPR, CRR, CCP
                        Peninsula Reporting
 3                      110 Trading Bay Road, Suite 100
                        Kenai, Alaska 99611
 4                      Ph: 907/283-4429

 5
     Proceedings recorded by digital sound recording, transcript
 6   produced by stenographic transcription service

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

P R O C E E D I N G S

ANCHORAGE, ALASKA - WEDNESDAY, APRIL 2, 2014

(Defendant present)

(Jury not present)

(Log 8:21:50)

THE CLERK:  We're on record.

THE COURT:  Okay, back on record, yes, sir.

MR. OFFENBECHER:  Peter Offenbecher for the defendant. Your Honor, Ms. Duignan and I just agreed that there are a number of personnel exhibits that we -- tomorrow, so a list of witnesses that the government has marked as fairly voluminous.

THE COURT:  Okay.

MR. OFFENBECHER:  Rather than us individually mark them all as defense exhibits, we agreed that if they do not introduce some of those exhibits and we wish to do that, they will simply move the admission of government's Exhibit No. XXX and then perhaps renumber it later with a defense exhibit number if that's okay.

THE COURT:  Did you follow that, Nancy?

THE CLERK:  Uh-huh.

THE COURT:  Okay.

MR. OFFENBECHER:  Thank you.

THE COURT:  Wait a second.  Who is running the show here today?

MS. LOEFFLER:  The next witness is Ms. Duignan's.  And

1    we don't have enough seats for three attorneys, so we're just
2    rotating somebody in the back in the bench.
3              THE COURT:  That's fine.  So do you have your witness
4    handy?
5              MS. DUIGNAN:  Yes, Your Honor, he's right outside.
6              THE COURT:  Okay, we'll bring the jury in.
7                                        (Jury present)
8              THE COURT:  Okay.  Everybody is waiting for you people
9    to sit down before they sit down.  We'll be standing all day if
10   somebody didn't move first.
11             Ladies and gentlemen, how are you doing?  Doing okay?
12   Anything you need from me?  Okay, the government's next witness
13   is.
14             MS. DUIGNAN:  Yes, Your Honor.  The government calls
15   Petty Officer Beauford to the stand.
16             THE COURT:  Sir, you can just come right up here to
17   this chair, and then remain standing for a second and my clerk
18   will swear you in.  The door pulls out, yep.  She'll swear you
19   in right over here.
20             THE CLERK:  Please raise your right hand, sir.
21             CODY JAY BEAUFORD, PLAINTIFF'S WITNESS, SWORN
22             THE CLERK:  Thank you.  Please have a seat.  And sir,
23   for the record, please state and spell your full name.
24        A.  Cody J. Beauford.  C-o-d-y J-a-y B-e-a-u-f-o-r-d.
25             THE CLERK:  Thank you.

 1              THE COURT:  All right, counsel.

 2                    DIRECT EXAMINATION

 3   BY MS. DUIGNAN:

 4       Q.  Good morning, Petty Officer Beauford.

 5       A.  Good morning, ma'am.

 6       Q.  What organization do you work for?

 7       A.  United States Coast Guard.

 8       Q.  And when did you join the Coast Guard?

 9       A.  July of 2009.

10       Q.  Where are you from originally?

11       A.  Skowhegan, Maine.

12       Q.  Where are you stationed now?

13       A.  Cape May, New Jersey on the Coast Guard Cutter

14   VIGOROUS.

15       Q.  Where were you stationed on April 12th of 2012?

16       A.  Communication Station Kodiak.

17       Q.  And how long were you stationed at the communication

18   station in Kodiak?

19       A.  Slightly over three years.

20       Q.  What was your job description at that time?

21       A.  ET3.

22       Q.  And could you please describe to the jury what an ET3

23   means?

24       A.  Electronics technician is what the acronym stands for.

25   I maintain and repair navigation communications equipment for

1   the U.S. Coast Guard.

2       Q.  In the rank structure, can you explain what a petty

3   officer third class is?

4       A.  Petty officer third class is your first level of

5   supervision.  I supervise anybody who has not gone to A school

6   and become proficient in a specific trade yet.

7       Q.  And an A school is a specialty school in the Coast

8   Guard?

9       A.  Yes, ma'am.

10      Q.  I'm going to ask you what has been marked as

11  prosecution Exhibit 381.  It's on the screen, I'm sorry.

12          If you can just take a look at that and see if you

13  recognize what that chart shows?

14      A.  Yes.  That's the enlisted rank structure for the U.S.

15  Coast Guard.

16      Q.  And is that a fair and accurate representation of what

17  the rank structure is?

18      A.  Yes, ma'am.

19          MS. DUIGNAN:  I'd like to move exhibit -- is there a

20  second page?

21   BY MS. DUIGNAN:

22      Q.  Okay, look at the second page, please.  If you can look

23  at the second page and tell me what that shows.

24      A.  That's the officer rank structure for the U.S. Coast

25  Guard.

1      Q.  And is that a fair and accurate representation of what
2  the officer structure is in the U.S. Coast Guard?
3      A.  Yes, ma'am.
4          MS. DUIGNAN:  Thank you.  I'd like to move Exhibit 381
5  into evidence.
6          MR. OFFENBECHER:  No objection.
7          THE COURT:  It will be received.
8                          PLAINTIFF'S EXHIBIT 381 ADMITTED
9          MS. DUIGNAN:  I'd like to publish it to the jury.  Can
10  we go back to page 1.
11  BY MS. DUIGNAN:
12      Q.  So looking at the chart, if you -- look at chart.
13          Where do you fall on that chart?
14      A.  Petty officer third class, E-4.
15      Q.  So looking at the left-hand column, that would be the
16  fourth block down?
17      A.  Yes, ma'am.
18      Q.  Thank you very much.
19      A.  You're welcome.
20      Q.  In what shop at the communications station in Kodiak
21  did you work at?
22      A.  The rigger shop, building T2.
23      Q.  And how would you describe the rigger shop in relation
24  to the entire command at Communications Station Kodiak?
25      A.  The rigger shop was in a satellite building from the

1    rest of COMMSTA.  We maintain the intended grounds and did

2    maintenance on our towers.

3            MS. DUIGNAN:  And, Your Honor, may I approach the

4    easel.  I'd like to put up one of the exhibits.  It's already

5    admitted.

6            THE COURT:  Okay.

7            MS. DUIGNAN:  I'm putting up the organization chart.

8            MS. LOEFFLER:  Captain Duignan, you're going to need

9    the portable microphone.

10   BY MS. DUIGNAN:

11     Q.  I've just put up the organization chart already

12   admitted as Exhibit 393.

13          Petty Officer Beauford, can you please take a look at

14   that chart.  Can you see it, first of all?  We can probably pull

15   it up on the computer, that might be easier for you.

16          THE COURT:  It's on your screen as well.

17     A.  Oh, thank you, ma'am.  Yes, I see it.  It's accurate.

18   It's actually -- we have a couple recent advancements.

19   BY MS. DUIGNAN:

20     Q.  Okay.  But the organization itself of the unit remains

21   accurate, even though people thankfully have been promoted?

22     A.  Yes, ma'am.

23     Q.  Looking at that chart, where do you fall in the

24   organization on that chart?

25          And do you have a pointer up there?  If not, we'll get

1  you one.

2      A.  I don't see one, ma'am.

3      Q.  Okay, so looking at that chart, you're pointing at the

4  box that is above all of what we've called the non-rates?

5      A.  Yes, ma'am.

6      Q.  And so what was your role in the rigger shop?

7      A.  I was the direct supervisor of the non-rates.  I

8  received tasking from ET1 Hopkins.

9      Q.  So you worked directly for ET1 Hopkins?

10      A.  Yes, ma'am.

11          MS. DUIGNAN:  And if we could pull up Exhibit 384.

12   BY MS. DUIGNAN:

13      Q.  If you could look on your screen, do you recognize what

14  that chart is?

15      A.  Yes, ma'am.  That's the rigger shop chain of command.

16      Q.  So essentially it's a break-out, a smaller break-out of

17  the larger chart?

18      A.  Yes, ma'am.

19          MS. DUIGNAN:  I move Exhibit 384 into evidence.

20          MR. OFFENBECHER:  No objection.

21          THE COURT:  It's received.

22                      PLAINTIFF'S EXHIBIT 384 ADMITTED

23   BY MS. DUIGNAN:

24      Q.  I'll just leave this up because it might make it a

25  little bit easier to talk about your testimony.

1          So looking at the chart, you already said that you

2    supervised the non-rates.  How did you fit into the larger chain

3    of command, if you can explain what the chain of command was at

4    COMMSTA -- at the T2 rigger shop?

5        A.  The chain of command was -- is we worked in a separate

6    building from the much higher ups.  Chief acted as a go-between

7    between our building and our shop and the higher chain of

8    command, the command staff.

9        Q.  And when you say "chief," who are you referring to?

10       A.  Chief Reckner, ma'am.

11       Q.  And where is he on the chart?

12       A.  Directly above ET1 Hopkins.

13       Q.  And was Chief Reckner in the building at T2 the entire

14   time?

15       A.  No, ma'am, he was there partially.  Like I said, he was

16   our go-between to the command staff up in T1.

17       Q.  And who else is above Chief Reckner in the chain of

18   command?

19       A.  You have Senior Chief Reed, he was the engineering

20   officer; Lieutenant Pizzurro, he was our executive officer; and

21   Commander Van Ness, he was the CO of COMMSTA at the time.

22       Q.  And how would you describe your day-to-day interactions

23   between all of these individuals on the chart?

24       A.  Above Chief Reckner, my interaction day-to-day was very

25   minimal.  Chief Reckner I saw on a regular basis.  He wasn't

1    down at the rigger shop all the time, but he was there for a

2    number of regular interactions.

3          ET1 was always there.  He was my direct supervisor.

4    Q.  And there are also blocks on the right of this that

5    show some WG positions.  Can you explain what those are?

6    A.  Those are the civilian rigger and antenna mechanic

7    positions.  They are there for continuity of knowledge.  It's a

8    unique unit.

9    Q.  But the civilians on the chart, they did not report to

10   you?

11   A.  No, ma'am.

12   Q.  And so who would they have reported to?

13   A.  ET1.

14   Q.  Thank you.  Take the chart off.

15         Do you recall the morning of April 12th, 2012?

16   A.  Yes, ma'am.

17   Q.  Who were you living with at that time?

18   A.  Hernando Acosta and Jacob Schafer.

19   Q.  And they were your roommates?

20   A.  Yes, ma'am.

21   Q.  And how did you get to work on the morning of April

22   12th, 2012?

23   A.  Hernando Acosta gave me a ride.

24   Q.  And why did he do that?

25   A.  My truck was in the shop.

1      Q.  Did you make any stops along the way that morning?

2      A.  Yes, ma'am.  We stopped for coffee on the way.

3      Q.  And do you recall where you stopped?

4      A.  I can't recall the name.  It was down on Shelikof

5   Street in Kodiak.  I can't remember the name, I'm sorry.

6           MR. OFFENBECHER:  Excuse me, Your Honor, could we just

7   move that easel back so we can see the witness.

8           MS. DUIGNAN:  Absolutely.

9           MR. OFFENBECHER:  Thank you.

10          MS. DUIGNAN:  Can everybody see?

11   BY MS. DUIGNAN:

12     Q.  While you were driving to work that morning, did you

13   see anything of note, anything that was a little bit different?

14     A.  There was a jogger on Anton Larsen Road.  That's not

15   completely out of the realm of normal, but it was noteworthy.

16     Q.  And do you recall about what time you arrived at work

17   that morning?

18     A.  Slightly after 7:30.

19     Q.  And just one moment.  Please look at your screen again.

20   I'd like to pull up Exhibit 151.

21          Since it's already been admitted, I'm going to ask to

22   publish it.

23          Do you recognize that truck?

24     A.  Yes, ma'am.  Hernando Acosta.

25     Q.  I'm going to wait and play the entire clip.

1          So what is the truck doing now?

2     A.  Backing up because he forgot to drop me off.

3     Q.  And where is the truck pulling into?

4     A.  It's pulling into the rigger shop parking lot inside

5  kind of in the corner of the L shape of the building.

6     Q.  And I see that part of the truck appears to be off the

7  camera.  Can you describe what was happening at that point?

8     A.  I was getting out of the passenger's side.

9     Q.  And do you have any general awareness of where the

10  cameras are that face from T1 to T2?

11     A.  Yes, ma'am.

12     Q.  Have you been up on the ops deck before to see the

13  cameras?

14     A.  Yes, ma'am.

15     Q.  Would you say that people who worked in the shop might

16  know where the cameras were?

17     A.  Yes, ma'am.

18     Q.  When you pulled up and you got out, what vehicles did

19  you notice parked outside of building T2?

20     A.  ET1 Hopkins; Rich Belisle's; and there was the

21  government vehicles, those were always there.

22     Q.  When we first spoke you didn't mention the government

23  vehicles.  Was there a reason?

24     A.  Yes.  Those are -- they are specifically for work and

25  at the rigger shop.  They are always there.  They are almost

1    like just equipment we use.  They are rigger shop property.

2        Q.  So you almost don't consider them as being kind of

3    vehicles --

4        A.  Correct.

5        Q.  -- parked?

6            Were there any designated parking spots outside of

7    T1 -- I mean T2, rather?

8        A.  Not officially.  The more senior people parked closer

9    to the door.  It was generally accepted.

10       Q.  Did you see anybody outside walking around when you

11   first arrived at T2?

12       A.  Before we pulled into the parking lot where you saw the

13   truck, I saw Seaman Coggins.  He was almost all the way up the

14   hill.

15       Q.  And based on your knowledge of the normal routine, what

16   was he doing?

17       A.  He was going to get the flags for morning colors.

18       Q.  And what time are morning colors?

19       A.  8 a.m.

20       Q.  Going back to the cars that were parked outside of T2,

21   I'd asked you are there any designated parking spots?

22       A.  Not officially.  ET1 and the civilian employees

23   normally parked to the right of the GVs closer to the door and

24   the corner of the yellow-shaped building.

25       Q.  And are most of those vehicles that were parked -- you

1    had mentioned you saw Petty Officer Hopkins' vehicle.  You saw

2    Rich Belisle's vehicle.

3           First I'll start with Petty Officer Hopkins.  What kind

4    of vehicle did he drive?

5       A.  He drives a blue extended cab long bed, newer model,

6    1-ton Dodge.

7       Q.  And what type of vehicle did Mr. Belisle drive?

8       A.  Dark blue regular cab long bed F-150.

9       Q.  How did Seaman Coggins get to work?

10      A.  He drove his -- he had a Jeep Cherokee.  That was

11   parked farther over on the left.

12      Q.  And what kind of vehicle did Mr. Wells drive?

13      A.  A white 1-ton Dodge.

14      Q.  And you didn't see it there that morning?

15      A.  No, ma'am.

16      Q.  Where was Petty Officer Hopkins parked?

17      A.  The very far right parking spot, right -- what would be

18   the corner of the L.

19      Q.  Who would normally park there?

20      A.  Mr. Wells.

21      Q.  What was the protocol for parking at T2?  You said

22   there were no designated parking spots, but what was the normal

23   protocol?

24      A.  The normal protocol was usually the civilians would get

25   the two closest most every day.  One of them was Barry T.

1    Wonderwith (ph).  And then it worked the farther away from the

2    door based on rank structure.  We'd usually end up to the left

3    of the GVs.

4        Q.  When you saw that Petty Officer Hopkins was parked in

5    that closest spot, what did you think?

6        A.  I assumed that Mr. Wells wasn't going to be at work

7    that day.

8        Q.  And why did you assume that?

9        A.  That was a fairly common occurrence.

10       Q.  When you first arrived at work, what did you do?

11       A.  Well, I saw -- getting out of Petty Officer Acosta's

12   truck -- and I went in through the door, which would be on the

13   right side of where I got out of the truck.

14       Q.  Would having a diagram help you with your testimony?

15       A.  Yes, ma'am.

16       Q.  We're pulling up Exhibit 396.  It's already been

17   admitted.

18           THE COURT:  There is water.  Help yourself to the

19   water.

20       A.  Thank you, sir.

21       (Whispered discussion off the record)

22           THE CLERK:  Is that Exhibit 396?

23           MS. DUIGNAN:  392, sorry.

24           THE CLERK:  392, thank you.

25           MS. DUIGNAN:  Yes, please.  And we're going to use the

1  model as well, which has already been admitted.  Model is number

2  396.

3          THE COURT:  Might have to move that model back when

4  counsel proceed.

5          MS. DUIGNAN:  Can everybody at the defense table see?

6          MR. OFFENBECHER:  Thanks.

7          MS. DUIGNAN:  Can everybody in the jury see?

8  Everybody is nodding.

9   BY MS. DUIGNAN:

10     Q.  Can the witness see?

11     A.  Is it okay if I -- it would be easier a little bit in

12  front, ma'am.

13          MS. DUIGNAN:  Your Honor, with your permission, can

14  the witness get out of the box with the microphone?

15          THE COURT:  That's fine.

16   BY MS. DUIGNAN:

17     Q.  So starting with the diagram, if you can -- you said

18  that you came in the door.

19          So if you can use the pointer and point to which door

20  that you used in order to come into the building, for the jury,

21  please.

22          THE COURT:  Make sure you're not standing in front of

23  the jurors.  It's real hard.

24     A.  This door here.

25   BY MS. DUIGNAN:

1    Q.  And when you came into the building, can you explain

2    what the procedure was for when you arrived, whether you had to

3    swipe a card, or whether you went in through a door that was

4    unlocked, or how you got into the building?

5    A.  This door that I came in was dead bolted when everybody

6    left.  This door here was with a key card access.  Whoever got

7    there first would come in through the key card access door and

8    would undead bolt the door everybody else came in, the door I

9    came in.

10   Q.  And in the mornings, what time did you normally arrive?

11   A.  7:30, maybe a little bit before.

12   Q.  And what time did -- were there people there when you

13   first arrived normally?

14   A.  Yes, ma'am.

15   Q.  And who would normally be there on a regular workday?

16   A.  ET1 Hopkins and the civilian employees.

17   Q.  Do you know what time they arrived on a regular basis?

18   You just know they were there before you?

19   A.  Yes, ma'am.

20   Q.  When you first got in on the day of April 12th, 2012

21   and you walked in, where did you walk first?

22   A.  I walked in this door and went to go around through the

23   left doorway to the -- what's labeled the break room where my

24   office and the non-rates was.

25   Q.  Okay.  And what did you see upon walking in?

1     A.  As I went to go through the left-hand doorway, I saw

2  the body of ET1 Hopkins.

3     Q.  And what did you do at that point?

4     A.  At that point the first thing I did was talk to him,

5  tried to get a response.

6     Q.  And what was going through your mind at that point?

7     A.  My first -- my first thought was that somebody was

8  trying to play a practical joke on me.

9     Q.  And why did you think that?

10    A.  I was preparing the next week to transfer back up to T1

11 to work in the regular ET shop.

12    Q.  How would you describe your relationship in that shop

13 that you thought it might have been a joke?

14    A.  We all had a good working relationship.  Jokes and

15 pranks weren't outside what -- weren't outside what we

16 considered appropriate.

17    Q.  So after you saw ET1 Hopkins on the ground, what did

18 you do next?

19    A.  I tried to talk to him.  And after I saw that, I went

20 back through kind of a hallway to the office of ET1, the

21 civilians, and the chief.

22    Q.  And what did you see there?

23    A.  I saw Rich's body.

24    Q.  And what did you do at that point?

25    A.  I tried talking to Rich also.  No response.

1      Q.  And how would you describe the office?  Was there
2  anything out of order?
3      A.  The chairs were slightly skewed from the civilian's
4  desk from where it looked like Rich had gotten up in a hurry and
5  where he fell.
6      Q.  And would you describe, was there any type of odor in
7  the air?
8      A.  Gunpowder, ma'am.
9      Q.  You said that you first walked in and you noticed both
10 ET1 and Mr. Belisle on the ground.  Can I ask you to maybe move
11 to the model, and with the model point out exactly where you saw
12 them.
13     A.  Yes, ma'am.  The model is accurate.  This is ET1.  He
14 would have taken up less space than is portrayed on the model.
15 He had -- his legs were brought slightly up to his chest, so he
16 didn't extend this far into the office.
17     Q.  In what position -- how would you describe you saw him
18 on the ground?  What position was he in?
19     A.  Almost fetal position.  Not quite, but close with his
20 head resting on his hands.
21     Q.  And if you can move to the other office and describe
22 what you saw there using the model.
23     A.  This would be Mr. Belisle.
24          THE COURT:  Half the jurors -- part of the jurors
25 can't see him.

1    A.  I'm sorry.

2  BY MS. DUIGNAN:

3    Q.  I know it's difficult.  If you could just position

4  yourself that way.

5    A.  This would be Mr. Belisle.  He was not -- his legs

6  weren't brought up like ET1's.  He was fallen on an angle

7  slightly under this desk here.

8    Q.  So where you're pointing, you're saying his head was

9  under that desk to the right-hand side of that room?

10    A.  Yes, ma'am.

11    Q.  Whose desk was that?

12    A.  Mr. Wells.

13    Q.  If you could point out, who did the other desks in the

14  office belong to?

15    A.  This is Mr. Belisle's; ET1 Hopkins; Chief Reckner's;

16  and this was (indiscernible), not in the Coast Guard network.

17  It wasn't really a desk, an office, it was a --

18    Q.  Just a computer somebody could use if they came in?

19    A.  Yes, ma'am.

20    Q.  Thank you.  Going back to the chart.

21      So after you saw that, where did you go next?

22    A.  After I saw Rich, I went around through the locker room

23  the long way.  I could see ET1 better, and there was a phone on

24  my desk here.

25    Q.  Did you see anything unusual on the tables or on the

1 floor?

2     A. No, ma'am, nothing out of the ordinary.

3     Q. Did you know Petty Officer Hopkins' routine normally in

4 the morning?

5     A. Yes, ma'am. He got there early. He'd drink coffee.

6 And if it wasn't done already, he'd fold his sleeves on his

7 blouse on the table in the break room.

8     Q. And for the jury members who haven't served in the

9 military, can you explain what you mean about folding sleeves on

10 the blouse?

11     A. In our BDUs, or our operational dark blue uniforms,

12 during the summer, which usually started April 1st, the sleeves,

13 it's like you cuff them all the way up and then fold them back

14 down over.

15        So before he was ready for work for the day, he had to

16 roll his sleeves up and then cuff them back down to like a

17 T-shirt style button-up.

18     Q. And there is a special designated procedure to do that;

19 is that right?

20     A. Yes, ma'am.

21     Q. And it takes a little bit of time?

22     A. Yes, ma'am.

23     Q. In doing that, did you notice his blouse anywhere in

24 the room?

25     A. It was in the break room on the back of the chair or

1    the table, I can't recall exactly right now, ma'am.

2         Q.  That's okay.  While you were walking around the

3    offices, did you touch anything?

4         A.  No, ma'am, not that I recall.  Maybe nothing other than

5    like the railing here by the ramp and things just you would

6    touch when you walk by, something like that.

7         Q.  Did you touch either Petty Officer Hopkins or Mr.

8    Belisle?

9         A.  No, ma'am.

10        Q.  Did you wind up stepping in any blood by accident?

11        A.  No, ma'am.

12        Q.  After you saw them, did anybody come to the door, come

13   into the building after you?

14        A.  Yes, ma'am.  Aaron Coggins did before I called when I

15   was going back over.

16        Q.  Okay, so about -- after you had seen both Petty Officer

17   Hopkins and Mr. Belisle, there was a point at which you saw

18   Seaman Coggins either at the door or on his way into the

19   building?

20        A.  Yes, ma'am.

21        Q.  Did he actually come into the building or did he wait

22   outside?

23        A.  He came in, ma'am.

24        Q.  And so what happened at that point?

25        A.  I asked him if he knew anything about it.  He said no,

1    that was the first time he'd been in the building.  He went

2    right from his Jeep to get the flags for colors.  And he was

3    there when I called the watch officer.

4        Q.  So did you -- what phone did you use to call the watch

5    officer?

6        A.  The phone on my desk right here.

7        Q.  And if you can recall -- you called the watch officer.

8    Did you ask them to do anything specifically?

9        A.  I asked them to call emergency services and have them

10   come to T2.

11       Q.  And at that point what did you do?

12       A.  I waited by the door here.

13       Q.  Where was Seaman Coggins at that time?

14       A.  He was with me.

15       Q.  And did you move from that place until the emergency

16   services arrived?

17       A.  No, ma'am.

18       Q.  I can take off the microphone and ask you to sit back

19   in the box.  If you need help, we can help you.

20           I'm going to move some of the exhibits out of the way

21   sort of and you can see better.  We'll put it back up if we need

22   it.  I think the Judge is the one who can't see, so maybe we can

23   move it down in front of the easel.

24           Can you please describe your relationship with those in

25   the office?  First I'll start with Petty Officer Hopkins.  How

1  would you describe your relationship with him?

2      A.  A good supervisor and subordinate relationship.

3  Also -- I mean, we had a good -- we had other things to talk

4  about other than work.  We had mutual interests in hunting and

5  that kind of thing, ma'am.

6      Q.  Did you ever socialize outside of the office?

7      A.  Morale events, and there was a Boxing Day.  That's the

8  only one I can recall specifically.

9      Q.  So starting with morale events, what do you mean by

10 that?

11     A.  Sometimes the communication station would sponsor --

12 usually on a Friday afternoon we'd go do something as a unit.

13 Everybody would have fun, and a lot of times the families would

14 come.

15     Q.  So these were essentially organized command family

16 events?

17     A.  Yes, ma'am.

18     Q.  And when you talked about Boxing Day, what event is

19 that?

20     A.  It's everybody brings over leftovers after Christmas --

21 Christmas -- and a bunch of people get together and they eat

22 leftovers.

23     Q.  And where would you do this?

24     A.  Mr. Belisle's.

25     Q.  And what kind of holiday is this?

1    A.  English, I believe.

2    Q.  So how would you describe your relationship with Mr.

3  Belisle?

4    A.  Good, good.  Very good work relationship.

5    Q.  So you actually had been to his house before?

6    A.  Yes, ma'am.

7    Q.  Did you have any other kind of interaction with him?

8    A.  At work?  He was also interested in hunting and that

9  kind of stuff.  And he had also been in the Coast Guard for --

10  he retired from the Coast Guard, so he'd been in 20 years at

11  least.  So we had -- there is always the Coast Guard in common.

12    Q.  And obviously you supervised the non-rates.  So can you

13  describe your relationship with them?

14    A.  Good, good.  At that point we'd all been there a while,

15  except Seaman Coggins, he was new.  But the other three had been

16  there a long time.  Everybody had their jobs down pretty good.

17    Q.  And what kind of relationship did you have with Chief

18  Reckner?

19    A.  Good, good.  He was a good chief.  We had done antenna

20  projects together, and he'd been to morale events also.  A good

21  working relationship.

22    Q.  And how long again did you serve at the communications

23  station at Kodiak, from what year to what year?

24    A.  I served from May 2010 to June 2013.

25    Q.  You had had interactions with the defendant, Mr. Wells,

1  before his medical leave; correct?

2      A.  Yes, ma'am.

3      Q.  And you had interactions with him after he returned

4  from medical leave?

5      A.  Yes, ma'am.

6      Q.  How would you describe your interactions with him

7  during that period of time overall, first?

8      A.  Overall, he was more difficult to work with than the

9  others.  There was a wealth of knowledge, but he had a poor

10  attitude.

11      Q.  And did you notice any difference in his behavior and

12  interaction with others after he returned from medical leave?

13      A.  Yes, ma'am.  Quieter, more withdrawn than he was

14  before.

15      Q.  Did he -- did anybody in the office have any kind of

16  tension or issues with one another?

17      A.  There was issues over -- I wasn't directly involved,

18  but even though we were there, disciplinary actions with Mr.

19  Wells.

20          MR. CURTNER:  Objection, Your Honor.  He should just

21  speak to his own personal knowledge.

22          THE COURT:  Very well.

23   BY MS. DUIGNAN:

24      Q.  What kind of interactions did you observe between Mr.

25  Wells and others?

1      A.   Limited.  Work related almost always, but fairly
2   limited, especially towards the end.
3      Q.   Did you ever observe an incident, a discussion about
4   how to install an antenna on April 11th, 2012?
5      A.   Yes, ma'am.
6      Q.   Can you please tell the jury about what you observed?
7      A.   We were going to install a satellite antenna on a roof
8   of the communications station.  It was on a metal frame, very
9   light.  We were going to attach it to the sheet metal vent
10   pieces up on top.  Most of the discussion was how we were going
11   to run the cabling for it.
12      Q.   And what did those -- without going into the substance
13   of the discussion, what was the nature of the type of discussion
14   that was had?
15      A.   We had a -- there was a couple different ideas on how
16   to run the cable.  One would be up through the COMMSTA, T1,
17   through the roof; the other one would have been up the outside
18   of the building, if I remember correctly.
19      Q.   And who proposed each of the two ideas?
20      A.   Mr. Belisle and ET1.  I think Mr. Belisle's original
21   idea was to run it up through T1, up through the attic to the
22   roof.  Mr. Wells was going to run it outside of the building
23   along the peak.
24      Q.   And was there a discussion amongst all of the office
25   members about how to proceed?

1    A.  Yes, ma'am.

2    Q.  And what was ultimately decided?

3    A.  It was decided to run it up through the attic.

4    Q.  And whose idea was that?

5    A.  Mr. Belisle's.

6    Q.  Who made the ultimate decision about how the antenna

7  wire was going to be run?

8    A.  Chief Reckner.

9    Q.  Can you please describe an incident at the command

10  where you were all tasked with cleaning out a warehouse?

11    A.  Yes, ma'am.  It was in March, I believe.  I was tasked

12  by ET1.  I'm not sure where the original tasking came from.  I

13  got mine from ET1.  Most of the work was done by myself and the

14  non-rates and Mr. Belisle.

15    Q.  And what was the tasking to do?

16    A.  We were organizing the warehouse and discarding

17  unnecessary items.

18    Q.  And you mentioned everybody pretty much except Mr.

19  Wells.  Was there a reason for that?

20    A.  Mr. Wells didn't like to get rid of things, and he was

21  sick.  So he was gone for a good part of it.

22    Q.  Was there anything in the warehouse that was found that

23  was not disposed of?

24    A.  We kept serviceable parts, hardware, stuff we were

25  going to use.  And pallets of concrete, those were in there

1   also.

2      Q.  And what were the pallets of concrete for?

3      A.  I was told they were Jim Wells' personal property.

4      Q.  Do you know anything about an antenna book project?

5      A.  Yes, ma'am.

6      Q.  What was the nature of that project?

7      A.  Seaman Henry was tasked with putting together a binder

8   with information on all of our towers, kind of bullet points for

9   everything.  If you were going to work on it, you could get the

10  basic specifications of the tower without digging through

11  manuals and such.

12     Q.  And were you aware of the reason for the project?

13     A.  It made life much easier.  Our records weren't the best

14  organized.  It was good to have it all in one place.

15     Q.  Was there any reason that the project had not been

16  started earlier?

17     A.  I never heard one, ma'am.

18     Q.  Around the time that that project was tasked, who

19  participated in it?

20     A.  Seaman Henry, the civilians, ET1, myself a little bit.

21  A lot of people brought what knowledge they had to the project.

22          THE COURT:  Just -- you refer to ET1 all the time.

23  Occasionally it's good to be more descriptive.

24     A.  I'm sorry, ET1 Hopkins.  Hopkins was --

25   BY MS. DUIGNAN:

1      Q.  I know everybody was used to calling him ET1, but for

2  the Court it would be better to refer to him by his full name,

3  thank you.

4      A.  No problem, ma'am.

5      Q.  I'm sorry, going back -- one last thing.

6          Going back to the antenna incident you discussed, you

7  had said that Chief Reckner chose Mr. Belisle's recommendation.

8  Were you there when that happened?

9      A.  Yes, ma'am.

10     Q.  And did Mr. Wells have any reaction to that?

11     A.  Not that I recall, ma'am.

12     Q.  And looking back to the antenna book, did you have any

13  participation in that, or was it mostly Seaman Henry?

14     A.  Mostly Seaman Henry.

15     Q.  Was there a time when you walked into the boiler room

16  for something and saw something unusual?

17     A.  Yes, ma'am.  About an hour after our workday ends one

18  day, I went back there to change out of my uniform, and Mr.

19  Wells was in there, which was strange.  It isn't really a used

20  room.

21     Q.  When you went in to -- so you said you went in there

22  though to use it for uniform changing.  What do people use the

23  boiler room for, if anything?

24     A.  Storage of extra clothes.  There was cleaning supplies

25  back there, and our boiler and the air compressor were back

1    there.  It wasn't a commonly used space.

2        Q.  When you walked back there and you said you saw Mr.

3    Wells there, what was he doing?

4        A.  He was sitting on a stool towards the back right.  I

5    think he had a book, ma'am, if I remember correctly, it was a

6    book.

7        Q.  Was this during the workday?

8        A.  During -- after my workday, during his workday.

9        Q.  When was this?

10       A.  I don't remember a precise date, ma'am.  March, I

11   believe.  I believe it was in March.

12       Q.  Were you aware of any issues with firewood?

13       A.  Yes, ma'am.

14       Q.  And what happened with that?

15       A.  We take down trees at the COMMSTA regularly, the ones

16   that threaten our towers, could fall on it and damage it in a

17   storm.

18          What the issue was is some of them were collared, which

19   is what you do before you fall them for firewood to dry the wood

20   out, that weren't somewhere that was necessary for them to be

21   cut down.

22       Q.  Did you know who was doing this?

23       A.  Yes.  Mr. Wells.

24       Q.  Were you aware of an incident with the government gas

25   card?

1    A.  Yes, ma'am.

2    Q.  And what was that incident?

3    A.  It went missing for a period of time.  There was

4 charges on it that I don't believe there was ever an official

5 explanation for it.  They weren't used for our equipment.

6    Q.  And where was the card normally kept?

7    A.  Mr. Wells' desk.

8    Q.  You said Mr. Wells was out of work for a period of

9 time.  Do you recall that period of time?

10   A.  Yes, ma'am.  Early spring.  March, I believe.  A good

11 part of March.

12   Q.  And you worked there before he went on medical leave

13 and after he returned from medical leave; is that correct?

14   A.  Yes, ma'am.

15   Q.  Did you notice any change in his demeanor when he came

16 back after being out on medical leave?

17   A.  Yes, ma'am.  More quieter, withdrawn.

18   Q.  And you said you knew both Petty Officer Hopkins and

19 Mr. Belisle.  So I'm going to start with Petty Officer Hopkins.

20       Were you aware of any issues he might have been having

21 outside of work?

22   A.  No, ma'am.

23   Q.  And you said you knew Mr. Belisle as well.  Were you

24 aware of any family problems or issues he may have been having

25 outside of work?

1      A.  No, ma'am.

2           MS. DUIGNAN:  Thank you.  I don't have any further

3  questions, but the defense might.

4      A.  Thank you.

5           THE COURT:  Cross-examination.

6                          CROSS-EXAMINATION

7  BY MR. CURTNER:

8      Q.  Good morning.

9      A.  Good morning, sir.

10     Q.  On April 12th you arrived in Acosta's car; is that

11  correct?

12     A.  Yes, sir.

13     Q.  What color is his vehicle?

14     A.  Maroon, two tone.

15     Q.  What are the two colors?

16     A.  Yes, sir, I think it's a gold color along the rocker

17  panels, if I remember correctly.

18     Q.  And on April 12th you were -- later on that afternoon

19  you were interviewed by some of the investigating agents, do you

20  remember that, about 4 in the afternoon?

21     A.  Yes, sir.

22     Q.  And at that time they asked you what the work

23  atmosphere was in the rigger shop; do you remember?

24     A.  Can you say again, sir?

25     Q.  At the time they asked you how was the work environment

1    at the rigger shop.  They were asking you about that then;

2    right?

3        A.  I don't recall that specifically, but they asked that

4    several times, sir.

5        Q.  And on April 12th you said that it was a small shop and

6    everybody got along pretty good; do you recall that?

7        A.  Yes, sir.

8        Q.  And that's how it was; right?

9        A.  For the most part, yes.

10       Q.  Do you know about Mr. Wells' illness?  Do you know what

11   kind of illness he had?

12       A.  No, sir.

13       Q.  Did you know he had surgery?

14       A.  I know he came to Anchorage.  I didn't know exactly

15   what for.

16       Q.  Do you know he had his gall bladder removed?

17       A.  No, sir.

18       Q.  Do you know he had a hernia operation?

19       A.  No, sir.

20       Q.  You didn't know any of this?

21       A.  No.

22       Q.  Did you know he had been sick for most of that fall?

23       A.  No, sir.

24       Q.  He was gone a lot then; right?

25       A.  I don't remember exactly the times he was gone.  There

1  was a period of time where he was gone very often.

2      Q.  And that would have been about three or four months, do

3  you think?

4      A.  Not continuously three or four months.

5      Q.  No, but he was sick and he would miss work, and maybe

6  he would go to Anchorage for an appointment and then he would

7  come back and he'd maybe still be sick, still having problems,

8  and he might take some more time off; is that how you recall?

9      A.  That sounds accurate, yes, sir.

10     Q.  But you never had any indication of how sick he was?

11     A.  He never shared it with me.

12     Q.  And do you know if he was having problems at work?

13     A.  I knew about the tree collaring situation.

14     Q.  No, I mean physical problems?

15     A.  Physical problems?

16     Q.  Yeah.

17     A.  Can you elaborate on that, sir?  Could he perform his

18  job, is that --

19     Q.  No, I'm not saying that.

20         Did he ever seem to be -- did he use the restroom a

21  lot?

22     A.  Yes, sir.

23     Q.  Would he be there sometimes a long time?

24     A.  Yes, sir.

25     Q.  And that was over a three or four-month period, or was

1  that after his surgery?

2      A.  I don't remember specifically.  I remember it

3  happening.  I can't place it in a timeline.  I remember it

4  happening for quite a while.

5      Q.  So it could have happened the fall, those last

6  November, December of 2011 and into the spring up to April 12th,

7  2012; is that correct?

8      A.  It could have, sir.  Like I said, I don't have dates.

9      Q.  You were talking about the doors that secured the

10  rigger shop; right?

11      A.  Yes, sir.

12      Q.  Now, what is the practice when you leave work as far as

13  locking doors?

14      A.  We lock the doors before we left.

15      Q.  And "we" is who?

16      A.  Me -- I had the non-rates do it, and both me and ET1

17  checked it before we left.

18      Q.  I'm sorry, what's that?

19      A.  Mr. Hopkins, meaning Mr. Hopkins would check it and I

20  would, too, before we left.

21      Q.  Do you recall April 11th, who checked the doors April

22  11th, 2012, the day before?

23      A.  Not specifically, sir.

24      Q.  Did you check the doors to make sure --

25      A.  Most likely.  It was -- I don't remember exactly doing

1   it, but I most likely checked them.  I did every day.

2       Q.  Did anybody ask you that during the investigation?

3       A.  Yes, they asked about the doors.

4       Q.  And what did you say then?

5       A.  They were locked.  We lock them.

6       Q.  Now, you said that there is a door -- how many doors

7   are in the back of the rigger shop?

8       A.  What are you referring to as the back?  The back that

9   faces the hill, sir?

10      Q.  Yes.

11      A.  There is the one off the big room is what we call it,

12  the big room adjacent to the garage, there is a locking door and

13  then a storm door.  And the one in the boiler room faces back

14  that way, too.

15      Q.  Okay, so let's go to the big room first.

16          First of all, there is like a screen door, Arctic

17  entry?

18      A.  Yes, sir.

19      Q.  Outer door?

20      A.  Yes, sir.

21      Q.  And then there is an interior door just beyond that?

22      A.  Yes, sir.

23      Q.  And that is dead bolted?

24      A.  The interior door is, yes.

25      Q.  So if that dead bolt was thrown, it would be impossible

1  for anybody to get in that way?

2      A.  Yes.

3      Q.  And then the other door facing the hill in the back

4  would be the door into the boiler room?

5      A.  Yes, sir.

6      Q.  Has that got a dead bolt on it?

7      A.  I think it's a lock on the knob, if I remember

8  correctly.

9      Q.  Well, describe that to me.  How does that work?

10     A.  It's a twisting on the knob.

11     Q.  There is no dead bolt there?

12     A.  I don't remember there being one, sir, no.

13     Q.  When you came -- when you go into the boiler room, if

14  you were to go into the boiler room, the next door into where

15  the office faces, is there a dead bolt there?

16     A.  Yes, sir.

17     Q.  Now, you normally would check both of those dead bolts

18  before you left?

19     A.  Yes, sir.  Everything is locked.

20     Q.  And if they were locked, then you couldn't get in

21  through those two doors into the main part of the rigger shop?

22     A.  Right.  If the doors were locked, you couldn't get in.

23     Q.  And anybody who worked there would know that; right?

24     A.  Yes, sir.

25     Q.  You would know that?

1    A.  Yes.

2    Q.  And anybody who worked there would know that, that once

3  those dead bolts are thrown, there is no way you're going to get

4  in?

5    A.  Right.

6    Q.  You talked about Chief Reckner moving his desk down to

7  the rigger shop?

8    A.  He didn't move his whole desk.  He made another one

9  down there for when he worked down there.  He still had his desk

10  in T1.

11    Q.  So his office actually was up the hill in the main

12  building of COMMSTA?

13    A.  Yes, his main office was there.

14    Q.  And he had a second desk or something down at the

15  rigger shop?

16    A.  Yes, sir.

17    Q.  And do you recall when he moved down there?

18    A.  Yes, I remember, sir.

19    Q.  When was that?

20    A.  It was right before or after when we did the Shemya

21  project.  He was down there a lot because we were really busy,

22  so he wanted his own desk.

23    Q.  And when was the Shemya project?

24    A.  The summer of 2011.  Summer of 2011.

25    Q.  Because there was a lot of activity out in Shemya?

1      A.  Yes, sir.

2      Q.  And was Mr. Wells on the Shemya trip?

3      A.  He was, sir.

4      Q.  Now, you guys would make fun of things, joke around;

5  right?

6      A.  Yes, sir.

7      Q.  Was there a -- something that happened on that Shemya

8  trip that you were involved with, I think making some type of a

9  box for an antenna or something; do you recall that?

10      A.  We made forms for concrete if that's what you're asking

11  about.  I'm not sure what you're getting -- what you're asking,

12  sir.

13      Q.  Well, I heard the phrase somewhere you were using main

14  math in some of your -- one of your projects, and because you

15  made wrong measurements, they were kidding you about that; do

16  you recall that at all?

17      A.  Yes, sir.

18      Q.  Huh?

19      A.  Yes, sir.

20      Q.  So that was sort of a joke?

21      A.  Yes.

22      Q.  What happened exactly?

23      A.  We were trying to figure out the dimensions for

24  something, and I calculated something wrong.

25      Q.  And Mr. Wells and everybody was just joking about it;

1 right?

2     A.  Yes, sir.

3     Q.  Mr. Wells didn't get angry at you or anything; did he?

4     A.  Not that I remember.

5     Q.  In fact, the whole time he was down there he never

6 threatened anybody?

7     A.  I don't remember, sir.  I don't remember every

8 conversation.  It was a while ago, but I don't recall that

9 specifically, no.

10     Q.  He was not -- there weren't any big arguments in the

11 shop?

12     A.  It was --

13     Q.  They would have discussions?

14     A.  Right.  I don't --

15     Q.  They might differ in opinion?  It wasn't any kind of a

16 hostile environment, though; right?

17     A.  I wouldn't call it hostile, sir.

18     Q.  Right.  Mr. Wells had a lot of knowledge; didn't he?

19     A.  Yes, sir.

20     Q.  He'd been doing this for 40 years; right?

21     A.  Yes, sir.

22     Q.  And sometimes he might not agree with somebody else's

23 opinion; right?

24     A.  Yes, sir.

25     Q.  Or they might not agree with his opinion?

1      A.  Yes, sir.

2      Q.  So, for example, on April 11th, this is the day before

3  the shooting, there were two ideas about how to wire the

4  antenna; is that correct?

5      A.  Yes, sir.

6      Q.  And one was to go through the roof?

7      A.  Yes, sir, up through the roof and into the vent space.

8      Q.  And then Mr. Wells thought it would be better not to go

9  through the roof?

10     A.  Yes, sir.

11     Q.  And do you know why that was -- he thought that was a

12  better idea not to go through the roof?

13     A.  I don't remember the reasoning, sir.

14     Q.  Could it be because you might cause a leak in the roof

15  if you went through the roof; do you recall that conversation at

16  all?

17     A.  No, sir, not specifically.

18     Q.  But there was no argument about it?

19     A.  I don't remember an argument, sir.

20     Q.  Well, I think, in fact, when you were interviewed about

21  that, several times you said that -- May 3rd, after that they

22  asked you about that.  You said Mr. Wells didn't complain; do

23  you recall that?

24     A.  Yes, sir.

25     Q.  So you discussed it.  Chief Reckner took Mr. Belisle's

1  idea to go through the roof rather than what Mr. Wells was
2  suggesting, and he didn't complain about that; right?
3      A.  Not that I remember, sir.
4      Q.  And then they asked you again in January of 2013 about
5  that incident, and you said, yeah, there was no raised voices,
6  it was pretty calm; do you recall that?
7      A.  Not the specific interview, but I recall that opinion,
8  sir.
9      Q.  That's the way it was; right?  It was calm, no
10 argument, not a big issue, two different opinions, and the chief
11 took Mr. Belisle's opinion over Mr. Wells; that's it, right?
12     A.  Yes, sir.
13     Q.  Is it against regulations to bring in firearms into the
14 rigger shop?
15     A.  Yes, sir.
16     Q.  Do you know of anybody who brought in firearms into the
17 rigger shop?
18     A.  Yes, sir.
19     Q.  Who do you know that brought in firearms to the rigger
20 shop?
21     A.  Mr. Hopkins, Seaman Pacheco.  Those were the only two I
22 remember specifically.
23     Q.  Do you remember Mr. Belisle bringing in a weapon at any
24 time?
25     A.  I don't, not specifically, no.

1    Q.  Well, do you recall being interviewed April 23rd when

2    they asked you this question, you thought it was ET1 Hopkins and

3    Mr. Belisle that had done that before?

4    A.  I remember -- I probably remembered better then, sir,

5    than I do now.

6    Q.  He might have brought in a weapon, because that's what

7    you said; right?

8    A.  It's entirely possible, sir.

9    Q.  And Mr. Wells had never brought any weapons into the

10   rigger shop?

11   A.  Not that I remember, sir.

12   Q.  Well, two years ago when they asked you, you said no;

13   do you recall that?

14   A.  Not the interview, but I don't remember him bringing

15   one in.

16   Q.  So you would have said no?

17   A.  Right.

18   Q.  You talked about the warehouse.  This was after -- this

19   was in March 2012, right, and you said that Mr. Wells had been

20   sick at that time.  And you talked about -- you didn't know he

21   had his surgery in February, though, and he was taking time off

22   for that?

23   A.  I didn't know, sir.

24   Q.  But he was sick during that time you guys were supposed

25   to clean out the warehouse?

1      A.  Part of it.  He was there for part of it, but I think
2   he was gone for most of it, if I remember correctly, sir.
3      Q.  Now, did Mr. Belisle store things in the warehouse?
4      A.  Tires, I think.
5      Q.  Okay.
6      A.  Snow tires.
7      Q.  He had a lot of tires in the warehouse that he stored
8   there; right?
9      A.  A set, sir, I think, yes.
10      Q.  A set of tires.  How about his boat?
11      A.  That was in there for a little bit, yes, I remember
12   that.
13      Q.  So he used the warehouse to store his boat for a while,
14   okay.  Was that ever an issue?
15      A.  I don't remember it being one.  It got taken out when
16   we cleaned it.
17      Q.  You talked to -- about cutting trees for firewood?
18      A.  Yes, sir.
19      Q.  Do you know if Mr. Belisle had cut trees on that
20   property for firewood?
21      A.  There is some trees we cut down and we leave for
22   firewood, the ones that needed to be cut down, that are
23   necessary to be cut down.  I believe he did take firewood from
24   the ones that needed to be cut down.
25      Q.  And Mr. Belisle, he warmed his house with firewood?

1      A.  Yes, sir.

2      Q.  Did he have a wood stove?

3      A.  He had a stove.

4      Q.  Huh?

5      A.  I said yes, sir, he had a wood stove.

6      Q.  And so did Mr. Wells?

7      A.  I've never been to his house, sir.

8      Q.  They both took firewood over the course of the time you

9   were there; right?

10     A.  Yes, sir.

11     Q.  Was there kind of issue with Mr. Belisle taking

12  firewood; do you recall that at all?

13     A.  I don't recall that, sir.

14     Q.  Let's talk a little bit about the parking.

15         Normally -- who would be the first two people at the

16  rigger shop in the morning on a typical day?

17     A.  I'm not sure.  There was usually three people there

18  when I arrived.  I don't know who got there first before --

19     Q.  As I understand it, those first two spots might be for

20  either ET1 Hopkins or one of the civilians who got there first;

21  is that correct?

22     A.  Yes, sir.

23     Q.  And so usually Mr. Belisle and Mr. Wells would get

24  there first and they would park in those two spots; is that

25  correct?

1      A.  If they got there first?

2      Q.  Yes.

3      A.  Yes, sir, if they got there first, they would take the

4   spots.

5      Q.  Normally you would see those two vehicles there?  They

6   weren't designated to one or the other?

7      A.  No, sir.

8      Q.  And where did other people park?  How many people -- if

9   you had seven people working in the rigger shop, where did

10  everybody else park?

11     A.  To the left of the GVs by the dumpster.

12     Q.  Would they park up the hill?

13     A.  Chief did if he went up the hill first sometimes.

14     Q.  But all the non-rates would park down in the lower lot?

15     A.  Yes, sir.

16     Q.  That's where you parked every time, every day when you

17  drove?

18     A.  Yes, sir.

19     Q.  Now this boiler room -- I'm sorry, when did that take

20  place, when you saw Mr. Wells in the boiler room?

21     A.  I believe that was in March.  I can't speak to a

22  specific date.  I didn't -- I don't know the exact date, sir.

23     Q.  The boiler room is not typically used?

24     A.  No, sir.

25     Q.  It's probably pretty quiet?

1      A.  If the compressor isn't on, sir.

2      Q.  Pardon me?

3      A.  If the air compressor isn't on.

4      Q.  Okay.  Is there some solitude there?

5      A.  Yes, sir.

6      Q.  Do you think Mr. Wells was in there reading a book?

7      A.  He could have been, sir.

8      Q.  He usually carried a book in his pocket; right?

9      A.  Yes, sir.

10     Q.  So that was not uncommon to see him with a book that he

11  might read at work or after work?

12     A.  It was common to see him reading at work, sir.

13     Q.  Now, if that was in March that Mr. Wells was in the

14  boiler room, I think you said -- did you say summer starts April

15  1st?

16     A.  The sleeves start April 1st.

17     Q.  So as far as regulations or -- it's considered summer

18  uniform?

19     A.  It's just -- they change the uniform of the day when it

20  starts to warm up.  I think it's usually April 1st.  It varies,

21  though, depending -- based on what they do that day.

22     Q.  On Kodiak, by April 1st the days are getting longer,

23  most of the snow is gone?

24     A.  We got a lot of snow that year.  I think there was

25  still some left, sir.

1    Q.  Most of your work you did out of the rigger shop might

2   be, though, after April 1st though, right?

3    A.  I don't understand what you're asking.

4    Q.  Would you go out and climb antennas during the winter?

5    A.  Not usually, sir.

6    Q.  That was sort of tasked for the summertime when you

7   could climb?

8    A.  Yes, sir.

9    Q.  And so March would have been, that part of the year,

10  the season, before you really got actively involved in outdoor

11  projects?

12   A.  Yes.

13   Q.  And so, in fact, April 11th, 2012 when you were --

14  that's when you were doing the antenna up at T1, looking at

15  that?

16   A.  Yes, sir.

17   Q.  And then April 12th, what was the plan then?  Was there

18  a project for that day?

19   A.  We planned a climb and replaced a light.  I don't

20  recall which one.  I think it was on one of the 300 foot towers.

21   Q.  And that would have been right there around the rigger

22  shop?

23   A.  Just down the dirt road, if you've seen the video, you

24  went down that way down there.

25   Q.  That would be Tower 9?

1    A.  I can't remember off the top of my head what the

2  numbers are right now, sir.  The four 300s, I don't --

3    Q.  It's one of the local towers, not on a different island

4  or anyplace?

5    A.  No, sir.

6    Q.  And the project was to climb that tower on April 12th?

7    A.  Yes, sir.

8    Q.  And everybody was going to be involved?

9    A.  Yes, sir.

10    Q.  And who were the climbers typically?

11    A.  The civilians climbed very often.  Seaman Pacheco

12  climbed often.  Most of us were tower qualified.  So I don't

13  remember who was specifically going to climb that day.  It was

14  common for the civilians, they went up on pretty much every

15  climb.

16    Q.  So pretty much that climb, that project -- that's a

17  300-foot tower?

18    A.  Yes, sir.

19    Q.  And that was going to be Mr. Wells and Mr. Belisle for

20  sure climbing that day?

21    A.  At least one of them, sir, probably.

22    Q.  And then maybe Pacheco.

23    A.  Yes.

24    Q.  Do you know Deborah Hopkins?

25    A.  I did, sir.

1      Q.  Was she -- did you know her when you were at the rigger

2   shop?

3      A.  Yes, sir, I knew who she was.  I met her a couple

4   times.

5      Q.  Did she come over to the rigger shop?

6      A.  I think I remember her coming once to drop something

7   off.

8      Q.  And that's the only time you remember being at the

9   rigger shop?

10     A.  That's the only time I remember her being there, sir.

11     Q.  She was only -- you only remember her being at the

12  rigger shop when you were there one time?

13     A.  That's all I can remember is one time she came to drop

14  something off.

15     Q.  Did you ever have any conversations with her at the

16  rigger shop?

17     A.  I met her, but I didn't introduce -- I think that's the

18  first time I met her was -- she came to work.

19     Q.  Did you have a conversation with her?

20     A.  Not like a conversation-conversation.  We met and I was

21  at work.

22     Q.  Did she have any names for you that she referred to you

23  as anything besides Seaman Beauford?

24     A.  Not that I remember, sir.  ET3 Beauford, Cody.  I

25  don't -- nothing stands out in my mind.

1      Q.  She didn't refer to you as one of the boys, her boys;
2   do you remember that at all?
3      A.  I remember her, like, talking about the boys in the
4   rigger shop, that's all of us.  I think it was --
5      Q.  You in particular?
6      A.  Me and Pacheco and --
7      Q.  Hopkins?
8      A.  -- Mr. Hopkins and -- everybody.
9      Q.  Do you recall Mr. Hopkins talking about his retirement?
10     A.  Yes, sir.  He mentioned it.  He bought a camper and he
11  was interested in doing that kind of thing, sir.
12     Q.  Did he sound like he was serious about retiring in the
13  near future?
14     A.  I don't know how near, sir.  I mean, it's normal for
15  people to talk about retirement, especially when they get a lot
16  of time in.  I've only been in five years.  I'm excited to
17  retire sometimes.
18     Q.  Yeah, me, too.  You got longer to go than I do, I hope.
19     A.  I got way too long to go, sir.
20     Q.  Well, let me ask you.  Did he ever talk to you about
21  filling out the retirement paperwork?
22     A.  I think he mentioned it.  He mentioned retirement
23  paperwork.  He was getting close, close to that time.
24     Q.  And so that would have been a pretty serious step, to
25  turn in his paperwork for retirement, wouldn't it?

1     A.  That would have, sir.

2     Q.  Was Mr. Hopkins, was he qualified to climb?

3     A.  I don't think so, sir.  I think he was scheduled for a

4  class that was coming up.

5     Q.  Did Mr. Hopkins ever talk to you about his relationship

6  with Debby Hopkins?

7     A.  No, sir.  I mean, people get pretty good at keeping

8  work and home life separate.

9     Q.  He never talked to you about possibly going through a

10  divorce or leaving his wife when he retired?

11     A.  No, sir.

12     Q.  Never told you that?

13     A.  No, sir.

14     Q.  Did Mr. Belisle ever talk about his daughters at all?

15     A.  Yes, he talked about his daughters.  He was proud of

16  them.

17     Q.  Uh-huh.  Did he ever talk about any issues with Hannah?

18     A.  Not that I can remember, sir.  I mean, other than

19  daughter issues that everybody has, you know, just they don't

20  want to listen today or something.  Nothing that stuck out in my

21  mind, sir, that I can recall right now.

22     Q.  Like running away from home or being gone all night or

23  being with any guys that he didn't approve of?

24          MS. DUIGNAN:  Objection, asked and answered.

25          MR. CURTNER:  I don't think he's answered that

1    question.

2              THE COURT:  Overruled.

3        A.  What was it again, sir?

4     BY MR. CURTNER:

5        Q.  Did he ever talk about Hannah?  Did he ever talk about

6     her running away, being gone all night or being with any older

7     men that he didn't -- that Mr. Belisle didn't approve of?

8        A.  I don't remember, sir.  Not that I can remember.  I

9     can't think of anything off the top of my head right now.

10       Q.  I was asking you about if anybody brought a gun to the

11    rigger shop.

12             Do you know if Mr. Belisle kept a gun in his vehicle?

13       A.  I don't remember.  I never saw one.  I don't remember.

14    I don't know if he did.  I don't remember him saying anything

15    about it.  Not right now.

16             MR. CURTNER:  That's all the questions I have, thank

17    you.

18             THE COURT:  Redirect.

19             MS. DUIGNAN:  Yes, Your Honor.

20                      REDIRECT EXAMINATION

21     BY MS. DUIGNAN:

22       Q.  Petty Officer Beauford --

23       A.  Yes, ma'am.

24       Q.  Going back to the questions that Mr. Curtner asked you

25    about weapons and people bringing weapons into work.

1    If, when that happened -- if or when that happened,

2  what was the purpose?

3    A.  To show us there.  We all had an interest in firearms,

4  so it was always interesting if somebody had one or a new one,

5  we would look at it and -- it was just interesting to us, ma'am.

6    Q.  So it was kind of like a show-and-tell.  It was not

7  like keeping them in the office?

8    A.  Yes, ma'am.

9    Q.  Mr. Curtner also mentioned the fact that Mr. Wells was

10  very knowledgeable.  What was it like trying to get that

11  knowledge from him?

12    A.  It was difficult.  He -- a lot of times he wouldn't

13  give up any more than he had to, ma'am.  Working with him, a lot

14  of times I remember not getting the whole picture.

15    Q.  You had mentioned that he was gone for a period of

16  time.  There was a lot of questions about his medical leave.

17    When Mr. Wells was gone, how did the shop run?

18    A.  It ran well, ma'am, smoothly.

19    Q.  Before he left, what was Mr. Wells' role?

20    A.  He was the antenna mechanic in the shop.  So he was our

21  knowledge base and continuity of knowledge as how the civilian

22  positions were explained to me.

23    Because the rigger shop and that role is outside of

24  most Coast Guard units, so most people who come there don't have

25  enough knowledge to draw on from training and past units to

 1   effectively do the job.

 2      Q.  And would you say that you used him for that purpose in

 3   your role?

 4      A.  Yes, ma'am.

 5      Q.  Before -- when he was gone, how did you guys function?

 6      A.  It was difficult at first.  But we had a good group of

 7   people, so we just got the knowledge on our own and did what we

 8   could with what we had.

 9      Q.  And when he returned, how would you describe his role?

10      A.  Lessened.  All of us were more confident and had a

11   bigger knowledge base at that point.  We didn't need as much

12   assistance as we did before.

13      Q.  And Mr. Curtner had asked you about things in Mr.

14   Belisle's truck.  Did you ever have an occasion to look into Mr.

15   Wells' truck?

16      A.  I've seen in the back part, or the camper shell.

17      Q.  And what did you see there?

18      A.  Just random assortment of tools and spare tires.  And

19   just accumulated stuff.

20            MS. DUIGNAN:  Thank you.

21            MR. CURTNER:  A few questions, Your Honor.

22            THE COURT:  All right.

23                          RECROSS-EXAMINATION

24   BY MR. CURTNER:

25      Q.  Now, as far as the regulations on bringing guns in on

1    base or on Coast Guard property, is there an exception if it's

2    just for show-and-tell, is that an exception in the regulation?

3        A.  No, sir.

4        Q.  And as far as Mr. Wells' knowledge, I assume that in

5    that position you need a lot of information, a lot of knowledge

6    about electronics; right?

7        A.  Yes, sir, different than your average.  The basic

8    troubleshooting is really hard, but when you get into the more

9    technical aspects of antennas, yes.

10       Q.  So you went to electronics school; right?

11       A.  Yes, sir.

12       Q.  And how long was that?

13       A.  Fifty-two weeks.  I think it's 52 weeks.

14       Q.  So it's an extensive training in electronics?

15       A.  Yes, sir.

16       Q.  And Mr. Wells had had that training, and had that

17   probably years ago?

18       A.  Yes, sir.

19       Q.  And he had quite a bit of experience in that.

20           Now, do you know if -- who else in the rigger shop

21   would have had that much training in electronics?  Did Mr. --

22   ET1 Hopkins have that training?

23       A.  Mr. Hopkins had gone -- he was a fire FT in the Navy.

24   He did have a lot of electronics background, but not as strongly

25   in antennas as Mr. Wells.  But yes, he had electronics training.

1      Q.  And did Mr. Belisle, did he go to electronics school at

2  all, do you know?

3      A.  I don't believe so, sir.  I don't believe he'd been to

4  an electronic-specific school.

5      Q.  And the non-rates, they hadn't been through electronics

6  school?

7      A.  No, sir.

8      Q.  I imagine that that type of -- 52 weeks of training,

9  that's something that you just can't really learning on-the-job

10  training with somebody telling you all that; can you?

11      A.  Like I said, it goes back to how indepth you want to

12  get.

13          Basic troubleshooting, you can teach almost anybody in

14  a fairly short amount of time.  The more you dig into it, the

15  more it's better to have the classroom background.

16      Q.  Isn't it -- it's kind of important when you have all

17  the power that goes into an antenna to know the electronics;

18  right?

19          Was there an incident where somebody crossed wires and

20  put down an antenna for a while; do you recall that at all?

21      A.  No, sir.  We had them break.  I don't remember anybody

22  crossing the race.

23      Q.  I'm sorry, you said a break?

24      A.  Antennas, they broke, they broke.  I don't remember

25  anybody crossing a race or anything like that.

1    Q.  You don't remember anybody doing a connection the wrong

2    way and causing a problem by -- the electronic connections that

3    somebody was working on?  That's not you?

4    A.  Are you talking -- I'm trying to understand what you're

5    getting at?

6    Q.  Was there ever an incident where you tied the wrong

7    wire -- somehow did some kind of -- I don't know electronics,

8    but was there some kind of a mistake or something electronically

9    that caused a problem?

10   A.  On the towers, towers, no.  I think I wired a -- it's

11   not the actual antenna part, but the rotating box wrong once.

12   Q.  The box on the antenna?

13   A.  Yes, it was the box.

14   Q.  Tell me about that then, that's what I'm getting at.

15   A.  Okay.

16       MS. DUIGNAN:  Objection, Your Honor, I think this is

17   beyond the scope.

18       THE COURT:  It is beyond the scope.  I think we had

19   kind of an agreement we could do that to avoid recalling.

20       MR. CURTNER:  Just answer this question and then I'm

21   done.

22       THE COURT:  Okay.

23   BY MR. CURTNER:

24   Q.  Tell me what happened.

25   A.  I hooked up the 220 alternating current, like big wall

1    power, I got the leads mixed up.

2        Q.   That's what I was referring to.  You remember that now?

3        A.   I do.  I thought you were talking about the big array

4    parts.  I was like I don't even know how to do that.

5        Q.   Okay, but that could happen.

6             MR. CURTNER:  All right, thank you, that's all I have.

7             THE COURT:  Okay, we'll take a 15-minute recess.

8                                          (Jury not present)

9             THE COURT:  Thank you, sir, you're excused.  And the

10   government will have another witness in 15 minutes, is that

11   right?

12       (Witness excused)

13            MS. DUIGNAN:  Yes, sir.

14            THE CLERK:  All rise.  This matter stands in a

15   15-minute recess.

16       (Proceedings recessed, 9:52:16 a.m. until 10:13:15 a.m.)

17                                          (Jury not present)

18            THE CLERK:  All rise.

19            THE COURT:  Are we ready for the jury?

20            MR. CURTNER:  Yes.

21            THE CLERK:  His Honor the Court, the United States

22   District Court is again in session.  Please be seated.

23            THE COURT:  We're bringing the jury in.

24       (Pause)

25            THE COURT:  See what's going on.

1      (Whispered discussion off the record)

2              THE COURT:  Okay, here are the questions from the

3      jury.  Just clarifications.  I told them, you know, no

4      discussion among themselves.

5              They said:  Can we have conversations like if someone

6      just wanted to be reminded about who was who.

7              When you say, don't read the paper, does that mean we

8      can't have a paper or we just can't read the article in the

9      paper?

10              And what's the -- I think I know the answers to all

11      this, but they shouldn't talk about the case at all, number one.

12              MS. LOEFFLER:  That's correct.

13              MR. CURTNER:  Yes.

14              THE COURT:  And number two, in prior years -- my prior

15      life I used to say, yes, you can read the paper, you just can't

16      read any articles on the case.  What do you say about that?

17              MS. LOEFFLER:  Your Honor, what I've had a judge do,

18      to the extent it's useful, is say, if you have someone else in

19      your household, make sure they look at it first and that they

20      take that article out, if you want to let them do that.  But

21      it's not -- you can't peruse the paper and say, oh, I promise

22      not to read that article, but just ask someone else to take it

23      out.

24              THE COURT:  What do you think?

25              MS. LOEFFLER:  If that's okay, I've had judges do

1   that.

2            MR. CURTNER:  Well, I'd prefer that they not have any

3   newspapers even --

4            THE COURT:  For the next month?

5            MR. CURTNER:  Well, I don't think we'll be here a

6   month, but just because -- you know, also it's important where

7   the article is.  If somebody gives you the newspaper and the

8   whole front page is off, then that could be --

9            THE COURT:  They know that the case is being reported.

10           MS. LOEFFLER:  I mean, like today, Your Honor, I think

11  it was in the second section -- I didn't read it, but I saw that

12  it was there.  But, I mean, if you have a spouse or somebody who

13  can say there is nothing related to it in the first, and

14  somebody could read about the assembly races.  I don't want to

15  tell people who are interested in their assembly members that

16  they can't --

17           THE COURT:  I think that's a reasonable response.

18           This last question is unclear to me.  Somebody

19  mentioned something in opening statement about an object, and

20  the evidence that's been presented appears different than the

21  object, the physical object.

22           MS. LOEFFLER:  They will just have to resolve it

23  through the evidence --

24           THE COURT:  They will just have to resolve that.  I'm

25  not going to resolve those issues.

1          MS. LOEFFLER:  -- at trial.  Right.

2          THE COURT:  Okay, so I'm just going to bring them in

3   and answer the questions, okay.  All right, bring them in.  I'm

4   going to tell them from now on, when you have a question, put it

5   in writing and give it to me.  Well, they don't have a

6   foreperson yet, okay.

7          MR. CURTNER:  They may have.

8          THE COURT:  Who knows.  Is this the whole team?  There

9   we go.

10                                        (Jury present)

11         THE COURT:  Okay, I've got a couple questions, let me

12  answer them for you.

13         No, you can't talk about the case among yourselves at

14  all, one; number two, newspapers, if you have someone around

15  you, a friend, significant other, acquaintance who can go

16  through the paper, pull the article out, then you can have the

17  paper; and you're just going to have to listen to the whole

18  trial and decide what the evidence is.

19         We can't -- I'm not -- all I'm going to do is read

20  instructions, another instruction to you again, and then if you

21  have more questions -- I'm glad you're asking questions.  But in

22  the future, if you have questions, I think there is a piece of

23  paper in there.  Write it down and I'll take the question in

24  writing, okay.

25         I will now say a few words about your conduct as

jurors.  First, keep an open mind throughout the trial and do

not decide what the verdict should be until you and your fellow

jurors have completed your deliberations at the end of the case.

Second, because you must decide this case based only

on the evidence received in the case and on my instructions as

to the law, you must not be exposed to any other information

about the case or to the issues it involves during the course of

your jury duty.  Thus, until the end of the case or unless I

tell you otherwise, do not communicate with anyone in any way,

and do not let anyone else communicate with you in any way about

the merits of the case or anything to do with it.  This includes

discussing the case in person, in writing, by phone, or

electronic means via e-mail, text messaging, or any Internet

chat room, blog, website or other feature.

This applies to communicating with your fellow jurors

until I give you the case for deliberation, and it applies to

communicating with everyone else, including your family members,

your employer, the media or press, and the people involved in

the trial, although you may notify your family or your employer

that you have been seated as a juror in the case, but if you are

asked or approached in any way about your jury service or

anything about the case, you must respond that you have been

ordered not to discuss the matter and to report the contact to

the Court.

Because you will receive all the evidence and legal

1    instruction you properly may consider to return a verdict, do

2    not read, watch, or listen to any news or media accounts or

3    commentary about the case or anything to do with it.  Do not do

4    any research such as consulting dictionaries, searching the

5    Internet, or using other reference materials, and do not make

6    any investigation or in any way try to learn about the case on

7    your own.

8            The law requires these restrictions to ensure the

9    parties have a fair trial based on the same evidence that each

10   party has had an opportunity to address.  A juror who violates

11   these restrictions jeopardizes the fairness of these

12   proceedings.  To any jurors exposed to any outside information,

13   please notify the Court immediately.

14           I know it's not easy, but these are the rules.  You

15   can do it.  I'm on your side, I know you can do it.  Have I

16   answered your questions?  If you have others, let me know, put

17   it in writing and let me know, I'll try to respond.

18           Okay, government's next witness.

19           MR. SCHRODER:  Your Honor, the government calls Petty

20   Officer Jason Bullis.

21           THE COURT:  That door pulls out, that's always tricky.

22   And just remain standing and the clerk will swear you in.

23           THE CLERK:  Please raise your right hand.

24       JASON ANTHONY BULLIS, PLAINTIFF'S WITNESS, SWORN

25           THE CLERK:  Thank you, please have a seat.  And sir,

1    for the record, please state and spell your full name.

2        A.   My name is Jason Anthony Bullis, J-a-s-o-n

3    A-n-t-h-o-n-y B-u-l-l-i-s.

4              THE CLERK:  Thank you.

5              THE COURT:  All right, counsel.

6                        DIRECT EXAMINATION

7    BY MR. SCHRODER:

8        Q.   Petty Officer Bullis, who do you work for?

9        A.   United States Coast Guard.

10       Q.   And what is your -- what's your rank?

11       A.   I'm an E-5, second class petty officer.

12       Q.   Now the jury is getting a little bit of an education on

13   the rank structure, and we're trying to keep that a little --

14   without going too much in depth.

15            So you're a second class petty officer.  How does that

16   compare to the third class petty officer they just had testify,

17   Petty Officer Beauford?

18       A.   I'm senior in rank to Petty Officer Beauford.

19       Q.   And where would you be in comparison to ET1 Jim

20   Hopkins, who is one of the victims in this case?

21       A.   I would be a pay grade below him.

22       Q.   And they have also learned a little bit about the

23   concept of rates, but I think you're the first OS we've seen.

24   So what's an OS?

25       A.   An OS is an operations specialist.  We handle

1    communications and message traffic, stuff like that.  In some

2    cases, even the mail.

3           For my job as an OS, I do message traffic,

4    communications with aircraft, Coast Guard aircraft, and then

5    also communications with the commercial fishing vessels and

6    pleasure crafts, stuff like that that are out in -- surrounding

7    Kodiak and the Bering Sea and other parts of the Alaska.

8    Q.  We'll talk about that in a minute.  Let's get a little

9    more about you just quickly.

10   A.  Okay.

11   Q.  How long have you been in the Coast Guard?

12   A.  I've been in the Coast Guard almost 12 years.

13   Q.  And where are you presently assigned?

14   A.  I'm assigned to COMMSTA Kodiak.

15   Q.  And how long have you been there?

16   A.  This tour I've been there almost three years.

17   Q.  What, just quickly, could you tell the jury what other

18   assignments you had before coming to COMMSTA Kodiak?

19   A.  In 2003 I was assigned to COMMSTA Kodiak for five

20   years, until 2008.  And then in 2008 until 2011 I was assigned

21   to Coast Guard Cutter MONROE.  And then I returned to COMMSTA

22   Kodiak.  So I've been on Kodiak for 11 years.

23   Q.  Where did you patrol when you were on the MONROE?

24   A.  From Hawaii north.

25   Q.  Now, since you're the first operator we've talked to,

1   let's ask a couple questions about COMMSTA.

2       A.  Okay.

3       Q.  And who does -- it's a communications station, but you

4   basically said this a minute ago, who do you communicate with?

5       A.  We do two types of communication.  We do military

6   communication, so we're talking to military aircraft, military

7   vessels, stuff like that, mess traffic, military messages

8   between services and different branches.

9           We also do civilian communications.  So we're talking

10  to mariners on the water, sometimes civilian aircraft, as well

11  as civilians that might be stranded inland or something like

12  that.  But most of our communications are focused toward the

13  mariners in the Bering Sea and surrounding Alaska waters.

14      Q.  So some fisherman keys a mic in the Bering Sea and

15  sends out a distress signal.  Does that end up with you?

16      A.  Hopefully we hear it.

17      Q.  Now, as part of your duties, do you stand watches?

18      A.  Yes, sir.

19      Q.  So is somebody always listening to the radios at

20  COMMSTA Kodiak?

21      A.  Yes.

22      Q.  And you stand watches to do that?

23      A.  Yes.

24      Q.  And how long are your watches?  What's the length of

25  period of the watches?

 1      A.  A watch usually runs -- at least at COMMSTA it

 2 runs from -- our standing orders say 7:30 a.m. to 7:30 p.m., and

 3 then from 7:30 p.m. to 7:30 a.m.

 4      Q.  So a 12-hour watch?

 5      A.  Yes, sir.

 6      Q.  And what particular watch duty were you standing on

 7 April 12th?

 8      A.  I have what we call the mid watch, or the 7:30 p.m. to

 9 7:30 a.m. watch.

10      Q.  And what was your responsibility on the watch?

11      A.  I was the officer of the day and the communications

12 watch officer.

13      Q.  And what does the officer of the day do?

14      A.  Officer of the day is responsible for general upkeep,

15 or general oversight of the unit itself; we do security rounds;

16 we take charge when the CO is not present.

17      Q.  When you say "CO," what do you mean?

18      A.  CO, a commanding officer, the person that actually is

19 in charge at COMMSTA.  We're his direct representative when he's

20 not there.

21      Q.  And does that -- do you have responsibilities for the

22 buildings then at COMMSTA at part of our OOD duties?

23      A.  Correct.  We're responsible for the security and the

24 general well-being of the buildings and the grounds.

25      Q.  And do you actually -- does that include the T2, also

1  known as the rigger shop?

2      A.  Yes, sir.

3      Q.  And do you actually go to the rigger shop as part of

4  your duties?

5      A.  Yes, sir.

6      Q.  And when in that 12-hour watch rotation would you do

7  that?  How many times and what times?

8      A.  It's usually done once a watch, and that's when you're

9  called the oncoming watch.  So around 7 o'clock at night when I

10  was coming on, I would check that round -- or I would do that

11  round and go through T2.

12      Q.  What do you do there?  When you talk about doing a

13  round, what does that mean?  What do you do?

14      A.  Basically when you do a round you are going into the

15  building and you're making sure it's locked and it's secured,

16  that unauthorized people aren't in the building or around the

17  building basically.

18      Q.  Making sure the building is secure?

19      A.  Yes, sir.

20          MR. SCHRODER:  Now I'm going to ask Ms. Dixon to pull

21  up Exhibit 392 which has already been admitted.  Your Honor, may

22  I approach with a pointer for the --

23          THE COURT:  That's fine.  There is one here, isn't

24  there.

25          MR. SCHRODER:  Well, let's try that one.  That one was

1    a little low on juice yesterday.

2              THE COURT:  Yeah, see how it works.

3              MR. SCHRODER:  We'll see how it works.

4              THE COURT:  Does it work?  You've got it turned on?

5    Yep, it's working.

6     BY MR. SCHRODER:

7        Q.  Does that look familiar to you?

8        A.  Yes, sir.

9        Q.  What is it?

10       A.  It's a diagram of T2, or the rigger shop.

11       Q.  So when you come down to do your round, how do you get

12   into the building?

13       A.  All right.  Usually there is a parking lot right here

14   and usually you drive in, you park right here, and you walk in

15   this door.

16       Q.  Why do you use that door?

17       A.  Mostly it's considered the front door.

18       Q.  Right.

19       A.  So you walk in this door, it's got a badge swipe that

20   you swipe your badge and it lets you in.  You come in here and

21   you start your round.

22            So what you're looking for -- this wall right here

23   during the time was pretty much solid.  There was a little door

24   right here.  So you come in, you walk through the door, you

25   check this space right here to make sure that it's just in good

1    order, that the doors are down.  There are two garage doors

2    right here.  You go through here, you check in here real quick.

3    There is some flammable lockers right here, too, that you check.

4          You come out of that door --

5    Q.  When you say that, what's that mean, "flammable

6    lockers"?

7    A.  Usually it's like oils and, like, paints, aerosol cans,

8    stuff like that, stuff that would, if exposed to heat or

9    something like that, would combust.  We keep them all in one

10   spot.  And then like oily rags and stuff like that, too, are

11   right here.

12         You come through, you check this space, and then you

13   come out and you check this door right here.  And there is two

14   doors here.  This door is like a solid metal door, and then you

15   have a screen door right here.  So you go through this door, you

16   check this door just to make sure it's shut, and then you -- and

17   then this space likes to flood with water occasionally, so you

18   also check to make sure there is no water sitting in there.

19         And then you come out and you lock this door.  And this

20   door locks with a dead bolt.

21   Q.  So it's a dead bolt lock?

22   A.  It's a dead bolt lock.  It locks into the door frame

23   itself.

24   Q.  Where do you go next?

25   A.  You come down and you basically -- it's kind of like if

1    you look at it like a horseshoe.

2          So you start here and you circle around.  And then you

3    check over here, and there is some Vidmars right here which hold

4    parts, mechanical parts, stuff like that, some computer stuff,

5    some servers right here.

6          And you come down, and then there is a ramp right here.

7    You go through the ramp.  You stick your head in the offices

8    right here just to make sure that nothing is out of order and

9    that the window that's right here isn't open.

10          You come through this area right here to -- it's kind

11    of like -- it's like a break room/office kind of, or break room

12    and some desks and stuff like that right here.  And you stop.

13    And different people do this round differently.

14          The way I do this round is I stop right here.  I can

15    look into the offices to make sure there is nothing going on in

16    the offices -- or in the break room.  And then I can also look

17    into the head or the restroom and see, make sure that the toilet

18    is okay and it's not flooding or anything like that.

19          Then I proceed to open this door to the boiler room,

20    which is also a dead bolt lock.  I walk in here, and there is a

21    boiler right about here.  And there is also hike a void kind of

22    space right here that has a sump pump down at the bottom of

23    that.  You also check that to make sure that the water isn't

24    overflowing, that the sump pump actually hasn't kicked on.

25          Then you walk back, and there is a back door right

1  here.  This door is like just a key lock door.  So what you do

2  is you make sure that -- you give it a good push on it to make

3  sure that it's seated in the doorjamb and that it's locked.

4          So after that --

5     Q.  You might be able to brace it, brace it on the edge

6  there.

7          THE COURT:  You can rest it on that.  You can use two

8  hands if you want to.

9     A.  After that, what you do is you come out of this room,

10 lock this door again with the dead bolt.  One special thing

11 about this dead bolt right here is it's best described as being

12 special.  It's -- for most people it requires two hands.  If you

13 have a lot of practice with it you can actually do it with one

14 hand, but it's got like a thumb switch that you have to depress

15 and then you have to slide over and can be kind of tricky.

16         So you come in here, and then you go back this way.

17 You check this door, which is another key lock door.  It also

18 has a dead bolt, but at this time the dead bolt wasn't working

19 properly.  You follow down this path right here just checking

20 the locker room.  Lockers on either side, it's not really a big

21 thing.

22         You go through these double doors into the wood shop.

23 And in the wood shop you're, again, checking to make sure

24 everything is clean and in a tidy order.  There is another door

25 right here which is a badge swipe door and a key lock door.

 1    You're checking to make sure that door is secure.

 2            And you go in here.  This is a dead bolt door, or a

 3    dead bolt locked door.  And you go in the garage here and you

 4    check -- this is where they store their Bobcat.  Go in here and

 5    make sure that everything is secure and in proper order.  There

 6    is also a garage door right here.  And then you exit.

 7            Some people will exit out this door.  I usually like to

 8    back -- I backtrack my way back out to the front because I

 9    usually park right here.  So I backtrack my way to where my

10    truck is and then I leave.

11        Q.  All right.  And let's go back for a minute and talk

12    about -- we've heard a little bit of discussion already about

13    this boiler room door, so let's go back and talk about that a

14    minute.

15            I'm going to ask you to take a look at what has been

16    marked as government Exhibit 361.  And can I get to you identify

17    that exhibit?

18        A.  It's the door to the boiler room.  You can see the

19    doorknob --

20        Q.  We'll talk about it in a minute.  Let me ask you a

21    couple preparatory questions here.

22            Are you familiar with this --

23        A.  Yes.

24        Q.  -- this place?

25            And is it a fair and accurate depiction of the boiler

1   room as you remember it about the date of the murders, April

2   12th, 2012?

3       A.  Of the boiler room door?

4       Q.  Of the boiler room door, yes.

5       A.  Yes, it is.

6           MR. SCHRODER:  Your Honor, government moves admission

7   of 361.

8           MR. CURTNER:  No objection.

9           THE COURT:  It will be received.

10                          PLAINTIFF'S EXHIBIT 361 ADMITTED

11   BY MR. SCHRODER:

12      Q.  Now, we're going to blow up a little bit of this.

13   We're going to show it to jury, and we're going to blow up a

14   little section of this just to see it a little better.  Still a

15   little shadow over it, but I just wanted the jury to see at

16   least where it is.

17          Now, where is the lock you're talking about?

18      A.  All right, so the dead bolt -- starting to die.  The

19   dead bolt lock is right there.

20      Q.  And that's on the inside?  Inside is a tricky term, but

21   which side of the door is it on?

22      A.  That is on the break room or the side with the break

23   room and the offices.

24      Q.  And is it a fairly -- how would you describe it?  Is it

25   a sturdy lock?

1      A.  It's a pretty sturdy lock.  It's probably, I'd say, a

2  half inch piece of steel.

3      Q.  And you've set that lock before?

4      A.  Yes, several times.

5      Q.  How many times have you made that round in your three

6  years now at COMMSTA?

7      A.  You figure 15 watches a month, 12 months for three

8  years.  So a couple hundred times.

9      Q.  So you've got some experience with that lock?

10      A.  Yes.

11      Q.  Have you figured out how to do it the one-handed way?

12      A.  Yes.

13      Q.  So now let's go -- we can take that off.

14          So did you have duty on April 11th of 2012?

15      A.  Yes.

16      Q.  And which watch did you have?

17      A.  I had the mid watch for the 7:30 p.m. to 7:30 a.m.

18  watch.

19      Q.  And did you do a round of T2 before assuming the watch?

20      A.  Yes.

21      Q.  And about what time was that?

22      A.  Somewhere in between 7 and 7:10 at night.

23      Q.  Did you do your round basically the same way that

24  you've described it to the jury?

25      A.  With one exception.

1      Q.  What was that?

2      A.  That back boiler room door that goes outside, instead

3   of actually turning the doorknob, I just pushed on the door to

4   make sure it was seated and secure.  I didn't actually check to

5   make sure it was locked.

6      Q.  But was it properly seated?

7      A.  Yes.

8      Q.  And when you came back out of the boiler room door, do

9   you remember setting the dead bolt?

10     A.  Yes.

11     Q.  And how confident are you of how you set it?

12     A.  A hundred percent.

13     Q.  So if somebody were coming into that boiler room, would

14  they be able to get through that door into the other parts of

15  T2?

16     A.  If someone came through the door, the back boiler room

17  door, the farthest they would get would be to the front boiler

18  room door before they realized it was dead bolted.

19     Q.  Who relieved you that day as officer -- or the next

20  morning as officer of the day?

21     A.  OS1 Mike Haselden.

22     Q.  And what time was that?

23     A.  He relieved me --

24     Q.  Or let's say -- I mean, what time was your -- do you do

25  the reliefs on a normal kind of schedule?

1    A.  Yes.

2    Q.  So about what time do you get relieved?

3    A.  Usually the officer of the day comes in around, in the

4  morning, around 7 a.m.

5    Q.  And then you have -- do you go through a process?

6    A.  Yes, there is a process that you -- it's called pass

7  down.  Basically passing to the next guy or telling the next

8  person that's relieving you what happened for the day or during

9  the night.

10   Q.  And did the other watch standers work for you?

11   A.  Yes.

12   Q.  And what time do they get there?

13   A.  They get in -- our standing orders say they are

14  supposed to be there by 7:30.  And they usually get -- a general

15  rule of thumb for a watch stander is whatever time they tell you

16  you have to be there, you try to be there 15 minutes early.  So

17  you try to be there at 7:15.

18       And if you -- there is also an unwritten rule between

19  watch standers that you -- whatever time someone relieves you is

20  what time you relieve them.  So if someone is really nice to you

21  and they relieve you early, at like 7, then the next day you

22  come in and relieve them early at 7.

23   Q.  So as a general practice, are the watch standers there

24  by 7:15?

25   A.  Between 7 and 7:15, yes.

1    Q.  And what time do they -- how long does the watch relief
2    take?
3    A.  It kind of depends on how busy the watch -- previous
4    watch was.  Some watch reliefs can be 15 minutes, some can be an
5    hour, it just kind of depends.  On that night was probably about
6    a 15, 20-minute watch relief.
7    Q.  So what time -- well, let's talk about first.
8        So how about for your watch standers, is it about the
9    same for them?
10   A.  Usually a watch stander, it's a little bit quicker
11   process.  They don't have as much to pass to their relief
12   because they are only in charge of one specific part of what we
13   do at COMMSTA, whereas I was in charge of everything we do at
14   COMMSTA.
15   Q.  So what time does your watch standers normally get out
16   of there?
17   A.  They usually get out of there between -- usually before
18   7:30.
19   Q.  Okay.
20   A.  So somewhere between 7:15 and 7:30.
21   Q.  And what time did you get out of there that day?
22   A.  I actually got out of there a little bit later.  I got
23   out of there about 7:35 -- 7:34, 7:35.
24   Q.  And as you were walking up the hill -- or as you were
25   going out to get in your car, did you see anybody coming up the

1   hill from T2?

2       A.  Yes, Seaman Coggins was walking up the hill to get the

3   flags for morning colors.

4           MR. SCHRODER:  I don't have any further questions,

5   Your Honor.

6           THE COURT:  Cross-examination.

7           MR. CURTNER:  Thank you.

8                       CROSS-EXAMINATION

9    BY MR. CURTNER:

10      Q.  Good morning, Petty Officer Bullis, how are you?

11      A.  Good morning.  Good.

12      Q.  Let's talk a little bit about the rounds you made on

13  April 11th, can we do that?

14      A.  Okay.

15          MR. CURTNER:  And can we have government exhibit back

16  on the screen, Exhibit No. 392, please.  392 government exhibit,

17  please.

18   BY MR. CURTNER:

19      Q.  Okay, so as I understand it from your testimony, you

20  are positive that this door that goes into the repair shop, or

21  the big room it's called, that was dead bolted that night?

22      A.  Yes.

23      Q.  And it's also your testimony that this door from the

24  boiler room into the offices is -- was dead bolted that night?

25      A.  Yes.

1      Q.  And now what do you recall about this door?

2      A.  That door is the door that leads from the boiler room

3   outside.  And as I previously stated -- like wintertime -- but

4   that door, all I did that night was I put my hand on it and

5   pushed against it to make sure it was seated in the doorjamb,

6   make sure it was shut.  I did not actually turn the door to

7   confirm that it was locked.

8          That door specifically to confirm that it's locked, you

9   would actually have to open it, reach around the outside and

10  actually turn the outside knob to make sure it was locked.

11     Q.  And did you find out later that perhaps that door was

12  not locked that night?

13     A.  The next day after everything had happened, it was

14  reported to me that the troopers had found that door open.

15  Sorry, not open --

16          MR. SCHRODER:  Your Honor, objection, hearsay to the

17  answer.  He has no personal knowledge of that.

18          THE COURT:  Sustained.

19   BY MR. CURTNER:

20     Q.  Did you have some concerns about whether you didn't

21  actually lock that door that night yourself?

22     A.  At the time, no.

23     Q.  How about afterwards, did you have some -- did you

24  express quite a bit of regret that you may have not locked that

25  door, or you didn't lock that door?

```
 1         A.  After, yes.

 2         Q.  Let me ask you a few questions about the layout of the

 3    T2 building.

 4              MR. CURTNER:  If we could go to defense Exhibit

 5    DE-069, please.

 6      BY MR. CURTNER:

 7         Q.  Is that on your monitor?

 8         A.  Oh, yes.

 9         Q.  Do you recognize that photograph?

10         A.  Yes.

11         Q.  And so do you see a -- some type of emergency or police

12    vehicle in the far right?

13         A.  Yes.

14         Q.  And does this -- what's in this picture?

15         A.  It's a building of T2, the rigger shop.

16         Q.  Does that look like a photograph?  That's what the

17    rigger shop looks like?

18         A.  Yes.

19         Q.  It would have looked like that on that particular -- on

20    April 12th, 2012?

21         A.  Yes.  The awning that now is on there is not on there.

22    So yeah, that would be.

23              MR. CURTNER:  Move to admit defense Exhibit DE-069.

24              MR. SCHRODER:  No objection.  I'm just trying to

25    figure out -- it's got a government exhibit stamp on it.  Do you
```

 1  know which one it is, Kim?

 2          MS. DIXON:  No, I don't. (Indiscernible).

 3                      DEFENDANT'S EXHIBIT DE-069 ADMITTED

 4          MR. CURTNER:  Could we publish that?

 5          MS. DIXON:  278, maybe.

 6          MR. CURTNER:  271.

 7          MR. SCHRODER:  271 okay.

 8          MR. CURTNER:  Can we publish that.  Thank you.

 9   BY MR. CURTNER:

10      Q.  It's probably better on your screen, but can you see

11  where these vehicles are here that I'm pointing out?

12      A.  Yes.

13      Q.  Can you tell from your screen or from this projection

14  whether -- do you recognize any of those vehicles?

15      A.  One of them is one of the non-rates that worked down

16  the hill for one of the seamen.  Her name now is Henry, and for

17  some reason I can't think of her last name back then.

18      Q.  It was Killingsworth back then.  That's Leah Henry, do

19  you know?

20      A.  Yes, Killingsworth.  The Xterra is hers.  Beyond that,

21  it looks like a government vehicle.  And then the blue truck in

22  the back is either Petty Officer Hopkins or Mr. Belisle's.

23      Q.  All right.  Now, are all those vehicles, where are they

24  parked compared to -- do you see a dumpster in that photograph?

25      A.  Yes.

 1       Q.  And it has somewhat of a fence around it?

 2       A.  Yes.

 3       Q.  And those vehicles are parked between the dumpster and

 4  the building?

 5       A.  Yes.

 6            MR. CURTNER:  If we could go to DE-070.

 7   BY MR. CURTNER:

 8       Q.  Is that on your screen?

 9       A.  No, sir.

10       Q.  It will be.  It's a different view of the --

11       A.  Okay.

12       Q.  Do you see that?

13       A.  Yes.

14       Q.  Now that obviously looks like it's a different day, but

15  is that an accurate picture of the rigger shop?

16       A.  Yes.

17            MR. CURTNER:  Move to admit DE-070.

18            MR. SCHRODER:  No objection.

19            THE COURT:  It will be received.

20                          DEFENDANT'S EXHIBIT DE-070 ADMITTED

21            MR. CURTNER:  If we could publish that.

22   BY MR. CURTNER:

23       Q.  Well, that's even darker.  Can you see it on your

24  screen?

25       A.  I can.

1    (Whispered discussion off the record)

2  BY MR. CURTNER:

3    Q.  Okay, well, let's move on.  Let's try DE-071, let's see

4  if -- how that comes out, if that's on your screen.  Can you see

5  that?

6    A.  Yes.

7    Q.  What's that?

8    A.  That is the backside of T2.

9    Q.  Okay, that's the back part where the screen door is?

10    A.  Yes.  It's also called the alley.

11    Q.  The alley.  Why is it called the alley?

12    A.  Because it's a really narrow road right there that you

13  can drive through.

14    Q.  So you can actually drive through or walk through that

15  road along the back of the --

16    A.  Yes.

17        MR. CURTNER:  If we could admit defense Exhibit

18  DE-071.

19        MR. SCHRODER:  Your Honor, can I ask one voir dire

20  question.

21        THE COURT:  Yes.

22            VOIR DIRE EXAMINATION

23  BY MR. SCHRODER:

24    Q.  Petty Officer Bullis, are you familiar with any of the

25  timing of this photo or at what point any of these objects in

1   the photo were there?

2       A.  I'm familiar with a couple of the objects.  The metal

3   storage container right there has been there for a long time,

4   and I know it was prior to or directly after the incident only

5   because now we have an overhang awning that is back there, and

6   that's where we park all of our large vehicles.

7           MR. SCHRODER:  No objection, Your Honor.

8           THE COURT:  Okay.

9                       DEFENDANT'S EXHIBIT DE-071 ADMITTED

10          MR. CURTNER:  If we could publish that.  Let's see if

11  we can see it.

12                  CONTINUED CROSS-EXAMINATION

13   BY MR. CURTNER:

14      Q.  Okay.  So that's -- basically what you can see here in

15  this is the alley.

16          But on your screen, can you see the screen door and the

17  back doors?

18      A.  I can see -- yes, I can.

19      Q.  Let's move to defense Exhibit 065.  Is that any better

20  on your screen?

21      A.  Much better.

22      Q.  Do you recognize that?

23      A.  Yes.

24      Q.  That's government exhibit --

25          MR. CURTNER:  Do you know what that is?

```
1              MR. SCHRODER:  267.

2              MR. CURTNER:  267.  Move for admission of this

3    photograph.

4              MR. SCHRODER:  No objection, Your Honor.

5              THE COURT:  It will be received.

6                          DEFENDANT'S EXHIBIT DE-065 ADMITTED

7              MR. CURTNER:  Can we publish that?

8    BY MR. CURTNER:

9       Q.  We've got a good picture of T2.

10          What do you see there?

11      A.  It's the same picture except from a different angle of

12   the back of T2.  You have the line truck, or the big line truck

13   and then also --

14      Q.  This is this?

15      A.  Which is that, yes.  And also looks like Sno-Cat.

16      Q.  That's the Sno-Cat?

17      A.  Yes.

18      Q.  Does it look like this is the day of April 12th with

19   all the emergency vehicles there, law enforcement vehicles?

20      A.  Yes.

21      Q.  And so what is -- this is the screen door you were

22   talking about?

23      A.  Yes.

24      Q.  And inside that screen door in that little Arctic entry

25   or something is the door that's dead bolted into the big room?
```

1      A.   Yes.

2      Q.   And then it's kind of hard to see, but is that the

3   other door into the boiler room?

4      A.   Yes.

5      Q.   And let's go back.  And what is that?

6      A.   That's a window.

7      Q.   Okay, and where does that window look into?

8      A.   Into the offices.

9      Q.   All right.  And when you made your rounds that night

10  before, did you check all the windows to see if they were locked

11  and secured?

12     A.   I just made sure that they were shut and secured.

13     Q.   What do you mean by "shut and secured"?

14     A.   That they were shut and --

15     Q.   Did you check if they were locked?  Are they sliding

16  windows or permanent windows or --

17     A.   I don't recall.

18     Q.   So you had to make sure they were closed.  They

19  obviously could have been opened?

20     A.   They were closed.

21     Q.   But during your rounds, you make sure all the doors are

22  locked?  Do you make sure every night that all the windows are

23  locked and secured as well?

24     A.   I make sure that they were closed.  I didn't check to

25  make sure they were locked.

1    Q.  And you don't know what happened -- well, that's the

2  normal course of rounds?

3    A.  Yes.

4    Q.  And then let's go to defense Exhibit DE-068, see if

5  you -- on your screen.  Do you recognize that?

6    A.  Yes.

7    Q.  And what is that?

8    A.  That's the back door to the boiler room.

9         MR. CURTNER:  Move for admission of DE-068.

10         MR. SCHRODER:  One question, Your Honor.

11         THE COURT:  All right.

12                   VOIR DIRE EXAMINATION

13   BY MR. SCHRODER:

14    Q.  Is that overhang there over the door?  Does that date

15  the photo in some way?

16    A.  I'm trying to recall.  I honestly don't recall if there

17  is an overhang there.

18    Q.  Could we go back to the last photo.

19    A.  I don't think there is an overhang over there except

20  for the roof.

21         MR. SCHRODER:  That's my only concern, Your Honor.  I

22  mean, the last photo clearly was the time of the incident, and I

23  don't remember there being an overhang there.  Maybe it's just

24  missing.

25         MR. CURTNER:  Go back to DE-065, it's the government

1  exhibit, I forget the number of that one.

2            MS. DIXON:  267.

3            MR. CURTNER:  265 is the --

4      A.  Okay, it is there.

5            MR. SCHRODER:  I guess there is.  I guess there is.

6  No, we have no objection.

7            THE COURT:  Okay, it will be received.

8                        DEFENDANT'S EXHIBIT DE-068 ADMITTED

9                  CONTINUED CROSS-EXAMINATION

10  BY MR. CURTNER:

11     Q.  So let's go back to DE-065.  Okay, it looks like that's

12  the overhang that we saw in the other picture?

13     A.  Yes.

14            MR. CURTNER:  If we can go ahead then to 068 and

15  publish that.  That's been admitted?

16            THE COURT:  Yes, that's admitted.

17  BY MR. CURTNER:

18     Q.  So that's the outdoor -- the outside door to the boiler

19  room?

20     A.  Yes.

21     Q.  That doesn't have a dead bolt?

22     A.  No.

23     Q.  And that you have to push in the button and make sure

24  it's locked.  And that's the one you didn't see if it was locked

25  that night?

```
1      A.  Yes.

2      Q.  If we can go to defense exhibit DE-064, and it's a

3  government exhibit, too.

4          MR. CURTNER:  What's the number on that, Bruce?

5          UNIDENTIFIED SPEAKER:  266.

6          MR. CURTNER:  Government 266, okay.

7   BY MR. CURTNER:

8      Q.  Do you see that on your screen?

9      A.  Yes.

10     Q.  Okay, let's -- and you recognize that.  What does that

11  show to you?

12     A.  That's the other side of the T2.

13     Q.  And that's the one facing up the hill?

14     A.  It's facing up the hill toward T1, or the main building

15  of COMMSTA.

16         MR. CURTNER:  Move for admission of this photograph.

17         MR. SCHRODER:  No objection.

18         THE COURT:  It will be received.

19                         DEFENDANT'S EXHIBIT DE-064 ADMITTED

20         MR. CURTNER:  If we could publish this.

21  BY MR. CURTNER:

22     Q.  So these -- so this is the back -- what did you call

23  it, the backside of T2?

24     A.  You could call it that, yes.

25     Q.  And then so do you know what that -- is that a window?
```

```
 1        A.   That is a window.

 2        Q.   And what is that window into?

 3        A.   That window goes into the boiler room.

 4        Q.   There is a little -- does that look like a window

 5   there?

 6        A.   That is a window, too.

 7        Q.   And what does that go to?

 8        A.   That window goes into the head or the restroom.

 9        Q.   And then what about that window?

10        A.   That one goes into the office space -- or not the

11   office space, the break room space.

12        Q.   The break room space?

13        A.   Yes.

14        Q.   And how about that window?

15        A.   Break room.

16             MR. CURTNER:  Could we blow up just that window and

17   see the view.

18    BY MR. CURTNER:

19        Q.   Okay, so if you're outside that window, you can

20   actually look into the break room?

21        A.   It would be -- you would see the tops of the lockers,

22   which I think is actually what you're seeing there is the top of

23   the locker.

24        Q.   Can you see over the lockers or if anybody was inside?

25        A.   I guess if they were as tall as the locker you could.
```

1      Q.  Do you know how tall the lockers are?

2      A.  They are taller than I am.

3      Q.  How about these two windows?

4      A.  Let's see, those next two are into the wood hobby shop,

5  or the woodworking space.

6      Q.  That's fine.  So you were on watch from 7 o'clock the

7  night of April 11th through 7 a.m. the next morning, April 12th?

8      A.  I think I was on watch from 7 at night until about

9  7:30 -- or I think I signed off at 7:18 that morning.

10     Q.  Okay, over the night then, part of your job is to pay

11 attention to all the cameras that -- the monitors that are in

12 the main building?

13     A.  Yes.

14     Q.  And so how many cameras are there?  How many monitors

15 of different camera angles?

16     A.  There are a few.  Somewhere around, I believe, 11.

17     Q.  Now, during the evening while you're monitoring the

18 surveillance cameras, did you notice anything unusual?

19     A.  During the evening, yeah, there was a couple of things

20 that I did note.  Initially it was just kind of -- I didn't

21 really think anything of them until when I was asked by the FBI.

22          One of them was noted -- there was a white truck

23 that -- around 10:30 at night, drove up toward COMMSTA and

24 turned around right around the flag pole.  The only reason I

25 took note of it, or thought it was out of the ordinary, was

1  because of the manner in which they turned around.

2  Most people will turn around actually in the T2 parking

3  lot.  We get a lot of people that turn around when they get up

4  to T2, up to the building, just because they have -- a lot of

5  visitors don't know how far or where they are going once they

6  get past that point, so they usually turn around right there.

7  This one was odd because they, instead of turning

8  around in the parking lot, they turned around right out in front

9  of the flag pole.

10  Q.  I'd like to have you watch a short video on your screen

11  before we publish it to the jury.

12  MR. CURTNER:  If we can bring up defense Exhibit 37.

13  UNIDENTIFIED SPEAKER:  36.

14  MR. CURTNER:  36.  DE-36.  Geez, if it was a -- if it

15  wasn't a video, I wouldn't use a computer.

16  THE COURT:  Okay, well, I presume something is

17  happening.

18  (Pause)

19  BY MR. CURTNER:

20  Q.  Do you recognize that video clip?

21  A.  Yes.

22  Q.  Was that the video that you watched that night when you

23  were on watch that you just described?

24  A.  Yes.

25  MR. CURTNER:  Move for admission of defense exhibit

1  DE-36.

2          MR. SCHRODER:  No objection.

3          THE COURT:  It will be received.

4                    DEFENDANT'S EXHIBIT DE-036 ADMITTED

5          MR. CURTNER:  So let's publish that and see if we can

6  watch it together.  Let's stop there a minute, Bruce.

7   BY MR. CURTNER:

8      Q.  So if you could describe -- this is what you saw from

9  your monitor up in the main building?

10     A.  Yes.

11     Q.  And that camera view is from --

12     A.  From T2.

13     Q.  -- from the rigger shop?

14     A.  Yes.

15     Q.  And you took note of it?  You noticed this that night

16  as being unusual; is that correct?

17     A.  Yes.

18     Q.  Now, let me ask you, because you've seen a lot of the

19  video coverage, or the surveillance video from T2 going in this

20  direction toward -- this is the flag pole?

21     A.  Yes.

22     Q.  And what is this back here?

23     A.  It's a water treatment facility for Kodiak.

24     Q.  Is that close to Anton Larsen Bay Road as it goes back

25  toward the airport?

1      A.  You mean as it -- I'm sorry, I don't understand the

2  question.

3      Q.  Okay, so if that -- that vehicle --

4      A.  Yes.

5      Q.  -- doesn't appear to be coming from the airport area

6  into this area; is that correct?  Is that your impression?

7      A.  No, it came across the bridge.

8      Q.  Did you see it across the bridge?

9      A.  No, sir.

10      Q.  Now typically when you watch vehicles come in there,

11  you can see a little bit of their headlights coming down here,

12  is that right, as they come in to -- down to the bridge?

13      A.  Yes.

14      Q.  And on this video, did you see that vehicle come from

15  that direction?

16      A.  Not on this particular video, no.

17      Q.  Now --

18          MR. SCHRODER:  Your Honor, I've got to object to that

19  question.  I don't think there is a foundation for how long it

20  takes a vehicle to get from that water treatment plant area to

21  this.  I mean, if he's asking -- if he wants to -- depending on

22  how many seconds that takes, I think we need to look at more

23  video.

24          THE COURT:  I don't understand -- what's the question?

25  What's the concern?  He said he didn't see it.

```
 1              MR. CURTNER:  The question -- well, okay, that's the
 2    answer to the question then.
 3     BY MR. CURTNER:
 4        Q.  But you -- this was unusual enough that you took note
 5    of it?
 6        A.  Yes.
 7        Q.  And when they questioned you the next day, you made
 8    sure you pointed this out?
 9        A.  Yes.
10        Q.  And let's go then to --
11              MR. SCHRODER:  The concern, Your Honor, is -- I think
12    it's like we're entering a fact in evidence that's not in
13    evidence --
14              THE COURT:  What's that fact?
15              MR. SCHRODER:  -- and that's that it takes a certain
16    period of time to get -- there was certainly an inference there
17    that it takes a certain period of time to get from that road up
18    by the water treatment plant to this area.
19              So let's say it takes 20 seconds, and if you only show
20    ten seconds of video, there is no way that's going to be in
21    there.  And the implication with the witness is that it didn't
22    come from that direction.  I just don't think that --
23              THE COURT:  But he said that it did come from that
24    direction.  He said it came from over the bridge.
25        A.  Correct.
```

1          THE COURT:  All right, good.

2    BY MR. CURTNER:

3      Q.  But that's the truck you saw that night?  Let's finish

4    the video.

5      A.  Yes.

6      Q.  Now, you're familiar with Mr. Wells' truck; right?

7      A.  Yes.

8      Q.  And you've seen the still shots of that white truck?

9      A.  Of the white truck on that video?

10     Q.  Yeah.

11     A.  Yes.

12     Q.  And you know that's not Mr. Wells' truck; right?  Were

13   you able to determine that?

14     A.  The still shots were really blurry, and no, I was not.

15          MR. CURTNER:  Let's bring up defense Exhibit DE-035.

16   BY MR. CURTNER:

17     Q.  If you could look at that.  Okay, so you have two

18   screen shots from a surveillance video on your left-hand side of

19   that; do you see that?

20     A.  Yes.

21     Q.  And is that the same truck that you happened to see and

22   you noted from April 11th around 10:36 p.m.?

23     A.  The only difference is in this video they are actually

24   turning into the T2 parking lot as opposed to turning around at

25   the flag pole.

1    Q.  Does it look like the same vehicle, though, that you

2  saw originally?

3    A.  Without seeing the other one, I'd say yes.

4    Q.  And then on the right is -- do you recognize that

5  vehicle?

6    A.  Yes.  That's Mr. Wells' vehicle.

7    Q.  And you recognize that?

8    A.  Yes.

9    Q.  In fact, you're familiar with the vehicles of everybody

10  who works down at the rigger shop pretty much?

11    A.  For the most part.

12    Q.  Well, let's go to --

13        MR. CURTNER:  Can we do the video from DE-37.

14   BY MR. CURTNER:

15    Q.  Now, while we're getting this up for you to look at,

16  you were interviewed by the FBI and Coast Guard investigators

17  that day.  And did somebody else review all this video with you?

18    A.  Not until after I had already given my statement, yes.

19    Q.  Right.  And did something else come up?  Did somebody

20  discover -- did you discover that the same vehicle came back

21  eight minutes later?

22    A.  No, I already -- I saw the vehicle come back.

23    Q.  You saw it twice that night?

24    A.  Yes.

25    Q.  Let's look at this video, if we can.  Watch this video

1  first.

2    (Pause)

3  BY MR. CURTNER:

4    Q.  Okay, if we can -- is that a video you saw that night?

5    A.  Yes.

6        MR. CURTNER:  If we can -- admissions for DE-37.

7        MR. SCHRODER:  Yes, no objection.

8        THE COURT:  Be received.

9                    DEFENDANT'S EXHIBIT DE-037 ADMITTED

10  BY MR. CURTNER:

11   Q.  So let's play that for the jury then.

12       MR. CURTNER:  Okay, Bruce, if we can stop it there.

13  BY MR. CURTNER:

14   Q.  So, first of all, what's the time -- what does this

15  mean to you?  What is the time of this video?

16   A.  The time is April 11th, 2012 at 10:42 and 16 seconds in

17  the evening.

18   Q.  And then the earlier video, do you remember the time on

19  that?

20   A.  10:36.

21   Q.  10:36.  Okay, so we're talking about six minutes apart.

22  And this is the same vehicle that we just saw from six minutes

23  ago; right?

24   A.  Yes, sir.

25   Q.  And so can you tell, since you know Mr. Wells' truck,

1    can you confirm that that's not his truck?  Doesn't he have a
2    raised cab on the back?
3         A.  Yes, sir.  It's missing that upper portion of the
4    topper.
5         Q.  So at least you can say whatever -- whoever's vehicle
6    this is, it wasn't Mr. Wells?
7         A.  Yes, sir.
8         Q.  Now, this is actually -- that's still a flag pole.
9    This comes in further than the other one; right?
10        A.  Yes.  This time, instead of turning around at the flag
11   pole, it turns around in the T2 parking lot.
12        Q.  And so is that unusual for cars to come by twice within
13   six minutes?
14        A.  It's odd, but not unheard of.  Sometimes people -- or
15   later in the summer, sometimes people are trying to find a good
16   fishing spot.
17        Q.  Or a good party spot?
18        A.  I don't know about that.
19        Q.  So this vehicle turning around might be headed back
20   toward Larsen Bay -- it's Anton Larsen Bay itself?
21        A.  Yes.  If you actually watch the rest of the video
22   beyond this clip, you actually see them continue on.
23        Q.  Which way?
24        A.  They continue on toward Anton Larsen Bay.
25        Q.  Toward -- do you know the ranch, the Red Cloud Ranch

 1  out that way?  Is that where that is?

 2      A.  I've never heard of that.

 3      Q.  Okay, but out Anton Larsen Bay Road toward --

 4      A.  Toward the golf course.

 5      Q.  Okay, good.

 6          All right, if we can just finish that.

 7          MR. CURTNER:  Did we admit DE-035?  Bruce?  Can we

 8  bring that up again for Mr. -- for Petty Officer Bullis.

 9   BY MR. CURTNER:

10      Q.  Can you see that, the photograph side by side now?

11      A.  Yes, sir.  The time stamp is wrong on them, but yes.

12      Q.  You can confirm that's -- on the left-hand side is the

13  vehicle you recognized from the surveillance video?  It's a

14  screen shot, right?

15      A.  Yes, sir.

16      Q.  And that's Mr. Wells' truck on the right?

17      A.  Yes.

18      Q.  And they are different vehicles --

19      A.  Yes.

20      Q.  -- correct?  Okay.

21          I just wonder if we could go back quickly to defense

22  Exhibit 064.  Okay, if we could dim the lights.

23          I think -- do you see a locker in there?  Is that what

24  that is you mentioned?

25      A.  Yes, sir.

1          Q.  How about that window, are there any lockers in front

2     of that window?  Anything obstructing the view from that window?

3          A.  There is probably a desk near it or underneath it.

4          Q.  But that wouldn't be obstructing the view straight in

5     from that window; is that correct --

6          A.  No, sir.

7          Q.  -- into the break room?

8          A.  Not that I recall.

9          Q.  Did you -- during your watch that night, did you notice

10    anything else unusual on the video?

11         A.  Later that evening around 2, 2 a.m., 2:30, somewhere

12    around there in the morning, I was actually outside, and there

13    was another vehicle that drove past coming from the airport

14    direction, as you called it, toward -- past COMMSTA toward Anton

15    Larsen Bay at a relatively good speed.

16              The road right there is, especially across the bridge,

17    is kind of windy and curvy, and you have to actually -- if you

18    don't know the road really well, you don't really want to go

19    fast on it, especially since there was still snow on the ground

20    around then too.

21              So I took notice of that because they were going pretty

22    quick.  And either they knew the area or they were unaware that

23    it could be a hazard.

24         Q.  Were you able to identify what kind of vehicle that

25    was?

1    A.  It was a smaller car, car like Ford Taurus, Dodge Neon,

2  some smaller car.

3    Q.  And you saw that -- you just noted that because it was

4  going fairly fast?

5    A.  Yeah, they were going pretty quick.  And it's also 2:30

6  in the morning, and most people don't come out our way, except

7  for Coast Guard police, at 2:30 in the morning.

8    Q.  And that was a civilian vehicle and it was headed out

9  toward Larsen Bay, Anton Larsen Bay?

10    A.  Well, I don't know if it was a civilian vehicle, but it

11  was someone's personal vehicle.

12    Q.  And it was going fairly fast?

13    A.  Yeah, it was going quick.

14    Q.  Now, when you were off the watch --

15    A.  Yes.

16    Q.  -- and you were leaving COMMSTA, T1 area, did you

17  notice anything else out of the ordinary that you thought you

18  should report?

19    A.  When I was driving away, I remember looking over at T2

20  as I was leaving, and there was an older model, like older model

21  Chevy/Ford truck parked on the other side of the garbage cans --

22  or the dumpster.

23    Q.  So you knew Seaman Coggins' vehicle; right?

24    A.  Yes.  It's a Jeep Cherokee.

25    Q.  And that's not the one you saw?

1      A.  No.

2      Q.  And then -- and you recognized -- you saw the white

3  vehicle, the government vehicles?

4      A.  Yes.

5      Q.  And you knew Mr. Belisle's truck?

6      A.  Yes.

7      Q.  And you know Mr. Hopkins' truck?

8      A.  Yes.

9      Q.  You talk about another vehicle beyond those --

10     A.  Yes.

11     Q.  -- that you noticed?

12         Now, I'd like to draw your attention to defense Exhibit

13 DE-073.  And it will be on your screen.  Tell me if you

14 recognize that.

15     A.  It's a diagram of T2.

16     Q.  This is a diagram you drew?

17     A.  Yes.  It looks like it's had some additions to it, but

18 yes.

19         MR. CURTNER:  Move to move -- defense Exhibit 073.

20         MR. SCHRODER:  I ask for more foundation on what this

21 is, Your Honor.

22         THE COURT:  Well --

23         MR. CURTNER:  I can do that, Your Honor.

24         THE COURT:  Go ahead.

25   BY MR. CURTNER:

1      Q.  Petty Officer Bullis, so did you talk to my

2  investigator, Barbara Brink, about this case?

3      A.  Yes.

4      Q.  And did she ask you about the rounds you made that

5  night?

6      A.  Yes.

7      Q.  And did she ask you about that black vehicle that you

8  didn't recognize that you thought was unusual?

9      A.  Yes.

10      Q.  And then while -- during that conversation, did you

11  draw this small diagram?

12      A.  Yes.

13          MR. CURTNER:  Move it for admission.

14          MR. SCHRODER:  No objection.

15          THE COURT:  It will be received.

16                        DEFENDANT'S EXHIBIT DE-073 ADMITTED

17          MR. CURTNER:  Okay, if we can publish that.

18  BY MR. CURTNER:

19      Q.  So from looking at this, this is a T2 building?

20      A.  Yes.

21      Q.  And does this look like pretty much -- you may have to

22  do some interpretation here, but pretty much the rounds that you

23  described doing that night?

24      A.  Yes.

25      Q.  And then you also explained where you saw the black

1  vehicle?

2       A.  Yes.  You can actually see it, black truck.

3       Q.  This is the black truck.  And this is what you

4  indicated -- this is what you saw that morning when you got off

5  duty?

6       A.  Yes, sir.

7       Q.  And that is actually in front of those two garage

8  doors, or in front of one of the garage doors?

9       A.  Yes, sir, in front of the garage doors, dumpster.

10  Depth perception is kind of hard when you're driving by and

11  it's -- they are all, like, lined up right on -- next to each

12  other.  So it could have been its general area, yes.

13       Q.  Now, the other vehicle -- that dumpster --

14       A.  Is right about there.

15       Q.  And so all the other vehicles were on this side of the

16  dumpster?

17       A.  Yes.

18       Q.  And this vehicle was on this side -- the other side of

19  the dumpster?

20       A.  Yes.

21       Q.  And that was a vehicle that you noted when you were

22  first interviewed two days after that?

23       A.  Yes.

24       Q.  You mentioned that, that it was there?

25       A.  Yes.

1              MR. CURTNER:  Did we admit defense Exhibit 35?  I move

2     for admission of that.

3              THE COURT:  Any objection?

4              MR. SCHRODER:  No.

5              THE COURT:  It will be received.

6                               DEFENDANT'S EXHIBIT DE-035 ADMITTED

7              MR. SCHRODER:  That's the comparison?

8              MR. CURTNER:  Yeah.

9              MR. SCHRODER:  Yeah.  No.

10    BY MR. CURTNER:

11       Q.  Oh, one other question about the door to T2.  That's

12    card swipe, I think you said?

13       A.  Yes.

14       Q.  And who all would have those badges to swipe in; do you

15    know?

16       A.  People that were given access by COMMSTA.  So it would

17    be COMMSTA personnel.

18       Q.  Anybody -- anybody in COMMSTA?

19       A.  Usually -- it would be -- the badge system we use, you

20    can actually designate different areas of access to people.  So

21    it would have been given to the people that work down at the

22    rigger shop.

23       Q.  So everybody at the rigger shop would have had a pass

24    card?

25       A.  Yes.

1      Q.  How about watch people, like --

2      A.  The watch officers, or the OOD, the officer of the day,

3   they would have had badge card access, too.

4      Q.  One other question.  I'm sorry, one last question.

5          When you were going through what might have been

6   unusual at T2 that night of April 11th, did you notice that the

7   wood shop lights were on?

8      A.  They could have been on.  That wouldn't have been

9   abnormal, though.

10          MR. CURTNER:  Okay, that's all the questions I have,

11   thank you.

12          THE COURT:  Redirect.

13          MR. SCHRODER:  Yes, Your Honor, just briefly.  Would

14   you bring up government 260 -- what's the one you pointed -- or

15   267.

16          This has been admitted as a defense exhibit, Your

17   Honor.  I guess I'd move for admission of the same government

18   exhibit just to kind of keep things --

19          THE COURT:  And I didn't catch the number.

20          MR. SCHRODER:  -- so I can use my own number.  267.

21          THE COURT:  Okay, it will be admitted then.

22                              PLAINTIFF'S EXHIBIT 267 ADMITTED

23                         REDIRECT EXAMINATION

24   BY MR. SCHRODER:

25      Q.  So that area you called the alley --

1       A.  Yes.

2       Q.  -- what's usually in that area?

3       A.  Usually it's the heavier equipment:  the large line

4   truck there, the Sno-Cat, you might also see the ditch -- or the

5   trencher that we have.  I'm trying to think.  Usually the

6   heavier equipment.

7       Q.  Is it fairly common for that equipment to be back

8   there?

9       A.  Yes.

10      Q.  As a matter of fact, does that even look like that now?

11      A.  No, it's actually changed.  Now there is actually an

12  overhang over that whole area right there, and they actually

13  park all the heavy equipment underneath it.

14      Q.  You talked about the white truck and the two viewings

15  of it that night.  Would that would have even struck you if the

16  incident hadn't happened the next day?

17      A.  No.

18      Q.  So is there a fairly common decent amount of traffic up

19  and down that road?

20      A.  Yes.  Especially as you head into summer when the fish

21  start running down that river.

22      Q.  Now, did you ever see that truck go into --

23          MR. SCHRODER:  Let's bring up No. 46.  That's

24  admitted?  Okay.

25    BY MR. SCHRODER:

1      Q.  Do you still have your pointer?

2      A.  Yes.

3      Q.  Show us where that white truck -- boy, that's not --

4      A.  It's starting to die.

5      Q.  Yeah, that thing, if you turn it, it focuses, I think.

6          UNIDENTIFIED SPEAKER:  It does if it's got any --

7      A.  Oh, okay.

8    BY MR. SCHRODER:

9      Q.  So what entrance did that white truck come in?

10     A.  The entrance -- the first time it actually turned

11   around right here.  And then the second time it came down this

12   road, turned here, and then turned here -- or went through here

13   and then turned down this way.

14     Q.  How many entrances are there off of Anton Larsen on the

15   right side of the screen in the T2?

16     A.  In the T2, off of Anton Larsen?

17     Q.  Off of Anton Larsen.

18     A.  We've got --

19     Q.  Coming from -- on the other side.  There you go --

20     A.  Over here?

21     Q.  -- on that side.

22     A.  You've got this one right here.

23     Q.  Yes.

24     A.  And then this one.  It's kind of hard to see right

25   here, it's kind of dark, but there is actually a little road

1    that runs right here, too.

2         Q.  And if a vehicle comes in that -- should we call it the

3    second or third entrance?  Point -- that one.

4         A.  Third one?

5         Q.  Let's talk about that as the third entrance.

6         A.  Okay.

7         Q.  A vehicle comes in there, and would it get caught by

8    that camera at T2?

9         A.  By this camera right here?

10        Q.  Yep.

11        A.  No.

12        Q.  Unless it pulled out in front, right?

13        A.  Yeah, unless it swung out, it came around and came out

14   over here.

15        Q.  Now, I don't know if we can see it on this picture or

16   not, but where is the dumpster?

17        A.  The dumpster, you can actually kind of see it right

18   there.  It's this green thing right there.

19        Q.  So you said you had -- you're not sure about the depth

20   perception of you seeing this black vehicle?

21        A.  Correct.  Yeah, it's the dumpster right there.

22             MR. SCHRODER:  That's good, Kim, we can take that off

23   there.

24    BY MR. SCHRODER:

25        Q.  So is it possible, since your depth perception -- you

1   weren't sure about the depth perception, that it could have been

2   parked next to the dumpster?

3       A.  Yes, it could have been probably -- it wasn't as far

4   back in the drawing, but it was probably right around here.

5           MR. SCHRODER:  No further questions, Your Honor.

6           THE COURT:  Recross?

7           MR. CURTNER:  Just briefly.  If we could go back to

8   government Exhibit 46, I'm sorry.

9                       RECROSS-EXAMINATION

10   BY MR. CURTNER:

11      Q.  Tell me if I'm wrong, but when I was looking at that

12   video, it looked like when that white truck came in, the

13   headlights kind of illuminated this area behind the flag pole;

14   is that correct?

15      A.  Correct.

16      Q.  Do you see that?

17          Now, if a vehicle had gone straight this way, would it

18   still have illuminated that, do you think, the same, or do you

19   think it might have come up this way and turned around?

20      A.  I don't know.

21      Q.  Okay, that's fair enough.

22          MR. CURTNER:  Thank you.

23          THE COURT:  Is that it?

24          MR. SCHRODER:  One more, Your Honor.

25          THE COURT:  Yep.

```
 1                    REDIRECT EXAMINATION
 2    BY MR. SCHRODER:
 3       Q.  Do you remember actually seeing Coggins' car that
 4    morning?
 5       A.  I don't remember actually seeing his car, no.
 6            MR. SCHRODER:  That's it, thank you.
 7            THE COURT:  Okay, thank you, sir.
 8    (Witness excused)
 9            THE COURT:  Government's next witness.  We can at
10    least get started before lunch.
11            MR. SCHRODER:  Yes, Your Honor.  Your Honor, the
12    government calls Petty Officer Kevin O'Connor.
13            THE COURT:  All right, sir, if you'll just come right
14    up here and step up and go through the door, that little door,
15    it pulls out.  And then remain standing for a second, my clerk
16    over here is going to swear you in.
17            THE CLERK:  Please raise your right hand, sir.
18         KEVIN RYAN O'CONNOR, PLAINTIFF'S WITNESS, SWORN
19            THE CLERK:  Thank you, please have a seat.
20            And sir, if you can please state and spell your full
21    name.
22       A.  Kevin Ryan O'Connor.  K-e-v-i-n R-y-a-n
23    O-'-C-o-n-n-o-r.
24            THE CLERK:  Thank you.
25            THE COURT:  All right, counsel.
```

1                          DIRECT EXAMINATION

2        BY MR. SCHRODER:

3            Q.  Petty Officer O'Connor, who do you work for?

4            A.  United States Coast Guard.

5            Q.  Wasn't supposed to be a trick question.

6                And what's your rank?

7            A.  I'm E-6.

8            Q.  And what's your rating?

9            A.  Operations specialist.

10           Q.  How long have you been in the Coast Guard?

11           A.  Five-and-a-half years.

12           Q.  And where are you currently assigned?

13           A.  Cutter VIGILANT.

14           Q.  And I suppose it's probably pretty basic, but when you

15       say "cutter," what do you mean?

16           A.  It's our boats.

17           Q.  How big of a -- well, your captain may not be happy if

18       you call it a boat.

19           A.  Oh.  Ship.

20           Q.  How big is the VIGILANT?

21           A.  She's a -- 210.  210 feet.

22           Q.  And based where?

23           A.  In Cape Canaveral, Florida.

24           Q.  And what do you do on the VIGILANT?

25           A.  I'm a watch supervisor in the combat information

1   center.

2       Q.  That's a pretty neat sounding title.  So what's the

3   combat information center?

4       A.  It's basically where we do all radio communications.

5   We monitor message traffic, both secured and unsecured.

6       Q.  And where were you assigned before you were on the

7   VIGILANT?

8       A.  COMMSTA Kodiak.

9       Q.  And how long were you there?

10      A.  Three years.

11      Q.  And what did you do at COMMSTA Kodiak?

12      A.  I was the watch floor supervisor.  And I basically

13  would troubleshoot equipment, monitor message traffic, and make

14  sure that certain weather products went out on time.

15      Q.  And that duty that you had, how does that compare to --

16  we've heard a couple people talking about the CWO/OOD watch.  So

17  how -- what did your watch -- where in the chain of command is

18  that, or the watch standing chain?

19      A.  I was directly under the CWO.

20      Q.  So you worked for that person?

21      A.  Yes.

22      Q.  And we've already heard a little bit about the watches,

23  so I don't think we need to talk about.

24          What are your responsibilities as the watch supervisor?

25      A.  I would oversee three to four watch standers at a time

1   making sure that they are standing at top watch, listening to

2   the radios, and assist in anything that I need.

3       Q.  And what time -- let's talk about -- you run 12-hour

4   watches, is that correct?

5       A.  Yes.

6       Q.  So when you were on the day watch -- and what time was

7   that, what I would consider the day watch at least?

8       A.  It was typically from about 7:30 in the morning until

9   7:30 in the evening.

10      Q.  And what time did you normally arrive for watch?

11      A.  About 7, 7:15.

12      Q.  And how long does it take you to relieve?

13      A.  About 15 minutes.

14      Q.  And then so what time is your relief leaving the area

15  about?

16      A.  I would typically leave around 7:45 just to make sure

17  that all my watch standers were gone and relieved properly.

18      Q.  And did you have watch on the 12th of April 2012?

19      A.  Yes.

20      Q.  What time did you -- did you arrive -- do you remember

21  specifically what time you arrived that day?

22      A.  I think it was just a little after 7.

23      Q.  And did you go through your watch rotation?

24      A.  Yes.

25      Q.  What were you doing when you first got notice of the

1    shooting at T2?

2        A.  I was coordinating with the CWO, make sure that we got

3    the proper pass down together.  Checking up on all my watch

4    standers, making sure the equipment was good --

5        Q.  Okay.

6        A.  -- there were no issues.

7        Q.  All right, now I'm going to ask you to look at a

8    document which has been marked as government Exhibit 352.

9            And are you familiar with this exhibit?  Or you can

10   take a moment and check it.

11       A.  These are our daily radio logs.

12       Q.  And what particular day is this?

13       A.  April 12th, 2012.

14       Q.  Did you have some responsibility for this document?

15       A.  I did.

16       Q.  And have you reviewed this document prior to your

17   testimony today?

18       A.  Yes.

19       Q.  Did you make entries into this log?

20       A.  Yes.

21       Q.  And are the entries made at the time of the action,

22   generally?

23       A.  It was as close to it as we could.

24           MR. SCHRODER:  Your Honor, government moves for

25   admission of Exhibit 352.

1              MR. CURTNER:  No objection.

2              THE COURT:  It will be received.

3                             PLAINTIFF'S EXHIBIT 352 ADMITTED

4              MR. SCHRODER:  Yeah, I don't know -- we'll show it to

5    the jury.  I don't think the folks will actually be able to read

6    it very well, but maybe later in the jury room.  But we'll leave

7    it up there.

8    BY MR. SCHRODER:

9        Q.  Let me ask you a couple questions.

10            What time does your -- or there are certain times on

11   there -- if you look in the far right column, it says "time" at

12   the top, and there is a number and it ends with Zulu.  So what

13   does that mean?

14       A.  Zulu is Greenwich Mean Time.  It goes off the

15   Greenwich, England time.  It's basically a time that we could

16   all use to coordinate with each other to make sure we're all on

17   the same page military wide.

18       Q.  Is that fairly common to use that time, especially in

19   the radio world?

20       A.  Yes.

21       Q.  So now as a practical matter, then how do you convert

22   it to your local time, to Alaska time?

23       A.  Depending on the time zone that you're in, it's -- I

24   believe Alaska is minus eight or nine, depending on the time of

25   year.

 1      Q.  Does that depend on daylight savings time?

 2      A.  Yes.

 3      Q.  So to confirm the Alaska time, you would have to apply

 4  that correction?

 5      A.  Yes.

 6      Q.  So is the -- you're probably going to be able to see

 7  this better on your screen, but does the call you originally

 8  took in this case indicating the shootings, is that on there?

 9      A.  Yes.

10      Q.  And what time is it?

11      A.  What is that?  1547 Zulu.

12          MR. SCHRODER:  Can you blow that up, Kim.  See if it

13  looks a little better if we blow it up.  A little better.

14   BY MR. SCHRODER:

15      Q.  So let's talk about it.

16          So you originally got the call, it indicated 1547 on

17  the document.  And to convert that to -- can you convert that

18  for us to what the actual time of day was in Alaska?

19      A.  7:47 a.m.

20      Q.  And who called you?

21      A.  ET3 Cody Beauford.

22          MR. SCHRODER:  The other thing, Kim, I could put it up

23  on the Elmo if we need to -- I don't think we really need it, so

24  probably good.

25   BY MR. SCHRODER:

1      Q.  Now, we'll talk about -- we'll talk about the actual

2  calls in a moment, but for now, after the initial call I want to

3  kind of go through your tracking.

4         What did you understand the situation to be in T2 once

5  you took that original call?

6      A.  At first I was skeptical.  I thought Cody was joking

7  around, because we had a pretty relaxed working relationship.

8  But once he explained what was going on, my initial action was

9  just to call 911 and CGPD.

10     Q.  Okay.  And did you notify anybody else in your chain of

11  command?

12     A.  I left messages with the COXO, and I spoke with the

13  command master chief and ops.

14     Q.  And how about other watch standers?

15     A.  I tried to keep the watch standers out of it as much as

16  possible, because I wanted to make sure they were still standing

17  there at their watch.

18     Q.  Did you notify -- you were the second there to the OOD?

19     A.  Yes.

20     Q.  Did you notify the OOD?

21     A.  Well, I did notify one watch stander, and it was Jared

22  Andrews, OS3 Jared Andrews.  And he went down and got Mike

23  Haselden.

24     Q.  Was Petty Officer Haselden the officer of the day?

25     A.  Yes.

 1      Q.  And what was he doing at the time?

 2      A.  At the time he was in the basement.

 3          MR. SCHRODER:  Now, let's get -- can we get that back

 4  up, Kim.

 5   BY MR. SCHRODER:

 6      Q.  All right.  And does the log indicate the times that

 7  you -- the entries and times for the calls you made to first

 8  responders?

 9      A.  Yes.

10      Q.  And what times were those, or time or times?

11          MR. SCHRODER:  Can you blow it up, Kim?  Blow up that

12  middle section.

13      A.  That was at --

14          MR. SCHRODER:  You may have to scroll it down a bit.

15      A.  -- 1542.

16          MR. SCHRODER:  I mean toward the top, Kim.  I think

17  the entry is hidden at the top.  There.

18   BY MR. SCHRODER:

19      Q.  Okay, where -- do you have a pointer up there with you?

20  Look and see, I think we left a pointer.  Hopefully we did.  If

21  not, we'll give you one.

22          Can you point at the entry where -- point at the entry

23  where you received the call from Beauford.

24      A.  Sorry.

25      Q.  There we go.  Oh, that was --

1              THE COURT:  It's not working.

2              MR. SCHRODER:  Not working.  Okay.

3    BY MR. SCHRODER:

4       Q.  So give us the times, we'll go from the times.

5           So what was the time of the call from Beauford you

6    said?

7       A.  That was like 1542, 1541.

8       Q.  Okay.  And when was your first outgoing call?

9       A.  That was at 1546.

10      Q.  And who was that to?

11      A.  That was to 911.

12      Q.  And what was your next reporting call?

13      A.  CGPD.

14      Q.  And what time was that?

15      A.  1547.

16      Q.  And again, so 1546 would have been what time local?

17      A.  7:46.

18      Q.  And 1547 would be what time local?

19      A.  7:47.

20      Q.  All right.  And the first call you said you made, you

21   said you made to what, 911?

22      A.  Yes.

23      Q.  And the second call was to who?

24      A.  Coast Guard Police Department.

25      Q.  And where are they located?

1      A.  At base Kodiak.

2      Q.  And why did you call them?

3      A.  They have jurisdiction over our area.

4      Q.  Now, let's go back to the initial call from Petty

5  Officer Beauford.

6          Was that call recorded?

7      A.  Yes.

8      Q.  And is it recorded as -- are your phone calls recorded

9  as part of the operation of COMMSTA?

10     A.  Yes.

11     Q.  How many -- are all the calls to the watch recorded?

12     A.  They are.

13     Q.  And are they stored and maintained by the COMMSTA?

14     A.  They are maintained for 90 days.

15     Q.  And are they recorded as part of the records maintained

16  by the Coast Guard public agency?

17     A.  Yes.

18     Q.  Now, prior to your testimony today, did you review the

19  recording of that phone call?

20     A.  I did.

21     Q.  And did you recognize the call?

22     A.  Yes.

23     Q.  And how did you recognize it?

24     A.  It was my voice.

25          MR. SCHRODER:  Your Honor, government moves admission

1    for Exhibit 321-A.

2              MR. CURTNER:  No objection.

3              THE COURT:  It will be received.

4                             PLAINTIFF'S EXHIBIT 321-A ADMITTED

5              MR. SCHRODER:  If we could play that.

6              SPEAKER:  Just one second.

7              MR. SCHRODER:  Sure.

8         (Audiotape played)

9              MS. DIXON:  Let me start it over.

10        (Audiotape played)

11   BY MR. SCHRODER:

12        Q.  Now, did you also -- were the 911 calls recorded?

13        A.  Yes.

14        Q.  And again, recorded as part of your operation at

15   COMMSTA?

16        A.  Yes.

17        Q.  And have you reviewed those prior to your testimony

18   today?

19        A.  Yes.

20        Q.  And did you recognize those?

21        A.  Yes.

22        Q.  And how did you recognize them?

23        A.  It was my voice.

24              MR. SCHRODER:  Your Honor, the government moves for

25   admission of 321-B.

```
 1              MR. CURTNER:  No objection.

 2              THE COURT:  It will be received.

 3                              PLAINTIFF'S EXHIBIT 321-B ADMITTED

 4      (Audiotape played)

 5   BY MR. SCHRODER:

 6      Q.  Now, did you also, prior to your testimony today,

 7   listen to a third call, a call to the MilPol?

 8      A.  Yes.

 9      Q.  And was that your voice that you heard on the tape?

10      A.  Yes.

11              MR. SCHRODER:  Your Honor, government moves 321-C to

12   be admitted.

13              MR. CURTNER:  No objection.

14              THE COURT:  It will be received.

15                              PLAINTIFF'S EXHIBIT 321-C ADMITTED

16      (Audiotape played)

17   BY MR. SCHRODER:

18      Q.  Petty Officer O'Connor, one last question.

19          How long did you say you were at COMMSTA?

20      A.  Three years.

21      Q.  And are you familiar with what kind of vehicle Mr.

22   Wells drives?

23      A.  It was a white pickup with a white camper.

24              MR. SCHRODER:  No further questions, Your Honor.

25              THE COURT:  Cross-examination?
```

```
 1              MR. CURTNER:  No questions for this witness.
 2              THE COURT:  No questions.  Okay, thank you, sir,
 3  you're excused.
 4   (Witness excused)
 5              THE COURT:  We'll start after lunch, is that the idea?
 6              MR. SCHRODER:  Yes, Your Honor, that's a good idea.
 7              THE COURT:  Okay, ladies and gentlemen, we'll stand in
 8  recess until about 1:10, okay.  So if you could be back in the
 9  big room by 1:05.
10                                      (Jury not present)
11              THE COURT:  All right, government, do you need
12  anything else?
13              MR. SCHRODER:  No, Your Honor.
14              THE COURT:  Mr. Curtner, anything else?
15              MR. CURTNER:  No.
16              THE COURT:  If we can be here at 1:05, we'll try to
17  start right at 1:10 with the government's next witness.
18              THE CLERK:  All rise.  The matter stands in recess
19  until 1:05 -- 1:10, sorry.
20          (Lunch recess, 11:51:34 a.m. until 1:15:08 p.m.)
21                                      (Jury not present)
22              THE CLERK:  All rise.
23              THE COURT:  We're ready for the jury, counsel?
24              MS. LOEFFLER:  We're ready for the jury.
25              THE COURT:  Are we ready?
```

1          MR. CURTNER:  Yes.

2          THE CLERK:  His Honor the Court, the United States

3   District Court for the District of Alaska is again in session.

4          THE COURT:  They are on their way.

5          THE CLERK:  Please be seated.

6                                        (Jury present)

7          THE COURT:  Welcome back.  Government's next witness.

8          MR. SCHRODER:  Your Honor, the government calls Petty

9   Officer Michael Haselden.

10         THE COURT:  Yes, sir.  You can just come on up here.

11  You see there is a door there that pulls out and you step right

12  in here, remain standing, and my clerk right over here will

13  swear you in.

14         THE CLERK:  Raise your right hand.

15      MICHAEL BIRCH HASELDEN, PLAINTIFF'S WITNESS, SWORN

16         THE CLERK:  Thank you, please have a seat.  And sir,

17  for the record, if you could please state and spell your full

18  name.

19     A.  Full name is Michael Birch Haselden.  Michael,

20  M-i-c-h-a-e-l; Birch, B-i-r-c-h; Haselden, H-a-s-e-l-d-e-n.

21         THE CLERK:  Thank you.

22         THE COURT:  All right, counsel.

23                     DIRECT EXAMINATION

24   BY MR. SCHRODER:

25     Q.  Petty Officer Haselden, who do you work for?

1        A.   I work for Communications Station Kodiak.

2        Q.   And what's your -- what service?  Let's start broader

3   than that.

4        A.   Oh, I'm sorry.  I'm with the United States Coast Guard.

5        Q.   And where are you assigned?

6        A.   I'm stationed at Communications Station Kodiak.

7        Q.   And what's your rate and rank?

8        A.   My rate is OS1, operations specialist first class.  I

9   am an E-6 in the Coast Guard.

10        Q.   And how long have you been at COMMSTA?

11        A.   I've been at COMMSTA for almost four years.

12        Q.   How long did you say you've been in the Coast Guard?

13        A.   I've been in the Coast Guard for 14 years.

14        Q.   What other -- just give us just like a quick rundown of

15   the other places you've been.

16        A.   Definitely.  First unit was out of Maine, in Southwest

17   Harbor, Maine at what is called Group.  Next unit was at the

18   Coast Guard Cutter DAUNTLESS, a 210-foot medium endurance cutter

19   out of Galveston, Texas.  The next was at the Air Station

20   Houston, Texas, and then finally in Kodiak, COMMSTA Kodiak.

21        Q.   So you've hit most parts of the country at least?

22        A.   Yeah.

23        Q.   And what are your duties at COMMSTA Kodiak?

24        A.   My duties?  I serve as the communication watch officer

25   and officer of the day.

1    Q.  And what do you do as the communications watch officer?

2    A.  Well, the communications watch officer, I make sure

3    that we do the -- we execute our operations, missions at

4    Communications Station Kodiak, COMMSTA Kodiak if you will.

5          And then as the OOD, or the operation -- or the officer

6    of the day, basically I'm responsible for the commanding

7    officer.

8    Q.  Are you responsible for the facilities at COMMSTA as

9    part of your OOD duties?

10   A.  Yes, sir.

11   Q.  And does that include all the buildings?

12   A.  Yes, sir.

13   Q.  Including the rigger shop?

14   A.  Yes, sir.

15   Q.  And do you actually sometimes go to T2 as part of your

16   duties?

17   A.  Yes, sir, I do.

18   Q.  And how many times -- I think we've heard this before,

19   but just to make it clear, how long are the watches that you

20   stand?

21   A.  Our watches at COMMSTA Kodiak are approximately 12

22   hours.

23   Q.  And they run from when to when?

24   A.  Generally they run from 7 a.m. to 7 p.m., or -- yeah, 7

25   a.m. to 7 p.m.

1      Q.  And when do you go -- how many times a watch do you go

2  to T2?

3      A.  Typically I just do once a watch, or if a situation

4  were to happen over there, I would respond immediately if there

5  was no one else out there.

6      Q.  And do you usually go at the beginning or end of your

7  watch?

8      A.  I usually do it at the beginning of watch.

9      Q.  How does that work?

10     A.  Typically when we drive in, we typically do a -- what

11 we call a security round of the rigger shop, or T2.  And we make

12 sure that we maintain the security and safety of the building,

13 make sure that everything is okay out there.

14     Q.  So if you have the day watch, what time do you normally

15 arrive?

16     A.  Around -- between 7 to 7:15, between that time frame.

17     Q.  Now, did you have that watch on April 12th, 2012?

18     A.  Yes, sir.

19     Q.  And what time did you arrive that day?

20     A.  I believe I arrived between, like I said, around 7,

21 7:10 maybe.

22     Q.  Now, did you stop and check T2 that morning?

23     A.  I did not.

24     Q.  Why not?

25     A.  Well, I saw Petty Officer Hopkins driving.  Looks like

1    he had arrived.  Also had saw Mr. Belisle's truck there as well.

2    So I assumed that if they would have came into that -- I came

3    into the building that morning.  If there would have been any

4    sort of safety or security issues that we had out there, they

5    would have called up to T1 and then we would have responded

6    appropriately.

7        Q.  So you just went on up to T1?

8        A.  Yes, sir.

9        Q.  Did you go ahead and relieve the watch?

10       A.  Yes, sir, I did.

11       Q.  And about what time did you finish that relief process?

12       A.  I believe I -- around 7:15, I would say.

13       Q.  So did you immediately start to work right after that?

14       A.  After that I just did a quick round of T1.  And then

15   right after that went down below to our basement area, we have a

16   basement area.  In the basement area we have gym facilities, and

17   I decided to see if I can't get a quick workout in before the

18   rest of the day came in.

19       Q.  And when were you first notified about a problem at the

20   rigger shop?

21       A.  Around 7 -- 7:30, I believe.

22       Q.  And how did you find out?

23       A.  I was working out, and one of our junior enlisted

24   persons came down, and they told me that there was some sort of

25   issue.

1    Q.  What did you initially understand the issue was?

2    A.  The issue was that the -- that either Petty Officer

3  Hopkins or Mr. Belisle, either one or both of them had -- were

4  unconscious and bleeding.  But it was -- at that time I was kind

5  of unclear about that.

6    Q.  So what did you do?

7    A.  So immediately I got dressed.  Went up to what we call

8  the operations deck where we actually stand our watches at.  And

9  I got a brief from Petty Officer O'Connor.

10    Q.  And did that change your understanding of what was

11  going on at that point?

12    A.  It did.  He said that both of them appeared to have

13  been injured or unconscious and lay in a pool of blood, or

14  bleeding I should say.

15    Q.  Now, did that change your kind of feeling about the

16  situation?

17    A.  Yes, sir.  I thought it was a little bit more urgent

18  than that for sure.

19    Q.  Then what did you do then?

20    A.  Then I went outside and I just -- I ran down the hill.

21    Q.  Now, before you left, did you give any instructions to

22  Petty Officer O'Connor?

23    A.  I did.  I asked him if they could call the emergency

24  services.  He said he had already had done so.  So I went ahead,

25  and like I said, I took on down -- up -- down here to T2.

1       Q.  Now, does COMMSTA have a video camera system?

2       A.  They do, yes.

3       Q.  And are you familiar with that system?

4       A.  Yes, sir.

5       Q.  And how are you familiar?

6       A.  I use it every day just to check around all the --

7   around the other buildings that we have -- that we have the

8   camera systems stationed at for safety and security reasons as

9   well.

10      Q.  Now prior to your testimony today, did you review a

11  short bit of video about the activity at T2 on that morning?

12      A.  Yes, sir, I did.

13      Q.  And did you recognize that activity?

14      A.  Yes, sir, I did.

15      Q.  And how did you recognize it?

16      A.  It was myself.  I recognized myself.

17      Q.  Was that a fair and accurate representation of you

18  responding to the call?

19      A.  Yes, sir, it is.

20          MR. SCHRODER:  Your Honor, the government would

21  propose -- it's exhibit, what is it, Kim -- 169.  We could show

22  it.  I've had him look at it already.

23          MR. CURTNER:  Yeah, if I could see it.

24          MR. SCHRODER:  Yeah.  Can you show it to them, Kim.

25          MR. CURTNER:  No objection.

1          THE COURT:  It will be received.

2                                  PLAINTIFF'S EXHIBIT 169 ADMITTED

3          MR. SCHRODER:  Show that to the jury, please.

4     BY MR. SCHRODER:

5     Q.  Is that you coming into the picture there?

6     A.  Yes, sir, it is.  Yes, sir, it is.

7     Q.  Now, when you arrived at T2, did you see anybody before

8     you went inside?

9     A.  Yes, sir, I did.

10    Q.  And who was that?

11    A.  That was Petty Officer Beauford.

12    Q.  And did he -- you don't need to tell us what he said,

13    but did he brief you on what -- what he'd seen?

14    A.  Yes, sir, he did.

15    Q.  And did you then enter T2?

16    A.  Yes, sir.

17    Q.  Did you go by yourself or did anybody come with you?

18    A.  Petty Officer Beauford came with me.

19    Q.  And how did you enter?

20    A.  I entered through what we call the -- sort of the main

21    area where we scan in at --

22    Q.  Okay.

23    A.  -- right into the rigger shop.

24    Q.  And why did you use that door versus another?

25    A.  Because that's how we typically go in there.  It's

1  just -- that's just how we typically go in.

2      Q.  And are you aware of any other doors that are commonly

3  used during the workday into that space?

4      A.  At that time, yes.

5      Q.  And what was -- you were aware at that time, or now

6  you're aware?

7      A.  No, no.  Yeah, at that time -- I'm sorry.

8          At that time they commonly used an access door on the

9  right-hand side towards there.  But I am aware, yeah.

10     Q.  And we'll actually point that out in a minute.

11     A.  Okay.

12     Q.  All right, so I think we want to have you point out how

13 you came in.  I think we might have you use the model, if

14 that's --

15         MR. SCHRODER:  If I could ask the Court permission to

16 have you enter the well, we'll put the model up.

17         THE COURT:  That's fine.  That's fine.  He's going to

18 have to mic up.

19         MR. SCHRODER:  I instructed him about the microphone.

20 We're going to try something new.  We actually got ourselves a

21 pointer.

22     A.  Okay.

23  BY MR. SCHRODER:

24     Q.  Now, if you could stand -- might be better to stand on

25 this side maybe.  Of course, you've got a cord to deal with, I

1    apologize about that.

2        A.  If I see this.

3        Q.  Might help the jury see it.

4            MS. LOEFFLER:  Mr. Schroder, Mr. Curtner is right

5    here.  So he can see him.

6     BY MR. SCHRODER:

7        Q.  Okay, you can go on the other side, that's fine.

8        A.  That's fine right here?

9        Q.  Just make sure -- you've got jurors all the way down

10   here on the end, so you've got to try not to block their view.

11       A.  Sure.

12       Q.  So which door did you enter?  And I understand the

13   doors -- I guess the door is not on there, but --

14       A.  Right.

15       Q.  But the door is --

16       A.  I entered through this -- wait, let me see.

17           MS. LOEFFLER:  Show him the chart.

18    BY MR. SCHRODER:

19       Q.  You can put up the chart behind you.  There is a chart

20   right behind you.  We put that up on the easel, that's Exhibit

21   392.

22       A.  Okay.

23       Q.  Now, point out which door you entered through.

24       A.  So I went through this door right here.

25           THE COURT:  Any juror that cannot see, raise your

1  hand.  If you can see, good.

2   BY MR. SCHRODER:

3      Q.  Which is the door, the other door you mentioned that

4  you know people commonly use during the day?

5      A.  During the day, I know that -- during the day they used

6  this one right here, this side door next to what we consider the

7  main entrance.

8      Q.  All right, so why don't you put the chart down and

9  let's use the model now.

10     A.  Okay.

11     Q.  So how did you enter into that part of the building

12  then?

13     A.  After I entered into the main part of the building, I

14  came in through this area right here.

15     Q.  And when you entered, did you sense anything?

16     A.  I did.  Immediately when I came in I smelled what I

17  considered gunpowder.

18     Q.  And do you own firearms yourself?

19     A.  Yes, sir, I do.

20     Q.  And do you shoot those firearms?

21     A.  Yes, sir.

22     Q.  So are you familiar with -- are you familiar with the

23  smell of gunpowder?

24     A.  Yes, sir.

25     Q.  And so where did you go first once you got through that

 1 | door?

 2 |     A.  When I went first, I went into this area right here.

 3 |     Q.  All right.  And what did you find when you entered that

 4 | office?

 5 |     A.  I saw Mr. Belisle.  He was face first and right --

 6 | there was a desk, you can see it right here, or right -- he was

 7 | face first.  Looked like some -- a pool of blood.

 8 |     Q.  Were you able to identify any wounds at that point?

 9 |     A.  Yes, sir.  I saw some wounds on his torso area.

10 |     Q.  And did you do anything?

11 |     A.  Yes, sir.  I shook him just to see if I could get any

12 | sort of response from him.  And I yelled his name.

13 |     Q.  And was there any response?

14 |     A.  No, sir.

15 |     Q.  And did you -- you said you saw blood in the area.

16 |         Did you make any conscious effort to try to avoid that?

17 |     A.  Yes, sir, I did.

18 |     Q.  Now, once you had checked Mr. Belisle, what did you do

19 | next?

20 |     A.  Then I went to this -- through here and to this

21 | building right here, right to this door.

22 |     Q.  And what did you find?

23 |     A.  At that time I saw Petty Officer Hopkins.  And again,

24 | he was -- looked like he was laying down almost in a fetal

25 | position in a much bigger pool of blood.

1    Q.  And where was he in kind of relation to the water

2 fountain in that room?

3    A.  I believe his head was right near the -- right at the

4 front of the water fountain.

5    Q.  Did you identify any specific wounds?  You said there

6 was a large pool of blood?

7    A.  Yes, sir.

8    Q.  Did you identify any specific wounds?

9    A.  I believe I saw a wound right near his head area.

10    Q.  And did you do anything in that instance?

11    A.  Again, I shook him just to see if I could get a

12 response and I yelled his name.  No response.

13    Q.  Now, again, did you do anything to try to avoid contact

14 with the blood in that situation?

15    A.  Yes, sir.

16    Q.  And what did you do next?  Once you had established --

17 you made attempts to contact both of the men, what did you do

18 next?

19    A.  Next after that, after establishing that, based off the

20 smell and wounds, I could only assume that it was a gunshot

21 wound.

22        So I made Petty Officer Beauford leave with me, and I

23 tried to secure the area until the first responders came on

24 scene.

25    Q.  And did they eventually show up there, the first

1  responders?

2      A.  Yes, sir.

3      Q.  Any idea, your memory, about how long after that was,

4  once you got out of the building?

5      A.  Maybe 15 minutes.

6      Q.  Okay, all right.

7      A.  Maybe less.

8      Q.  And what happened after the first responders arrived?

9      A.  After the first responders arrive, me and the

10 officer -- there was a CGPD person -- entered the building.  I

11 showed them what was going on.

12     Q.  Did you go back in with them or just --

13     A.  I did go back with them, yes.

14     Q.  All right.  And what did you do after that?

15     A.  After that, after she established the situation, I

16 left.  And by that time the rest of the first responders had

17 came.  So then I went back up to T1.

18     Q.  What did you do there?

19     A.  And I just reported the situation to Chief Gerasimof.

20     Q.  And then after that, did you go back on the watch?

21     A.  After that I went back down the hill and I did some --

22 I answered some more questions from the Coast Guard police

23 department personnel, told them what was going on.

24     Q.  Thank you.  I just have one more question.

25          Do you know what type of vehicle Mr. Wells drives?

1       A.  Mr. Wells, I believe he drove a white pickup truck with

2  a camper on that.

3              MR. SCHRODER:  Thank you.  You can take off the

4  microphone -- or you can go back on -- unless Mr. Curtner wants

5  you to stand down there.

6              MR. CURTNER:  You can sit down.

7                         CROSS-EXAMINATION

8   BY MR. CURTNER:

9       Q.  Good afternoon, Petty Officer Haselden.

10      A.  Good morning, sir.

11      Q.  Now, as I understand it, what time did you arrive at

12  COMMSTA that day?

13      A.  Like I said, I believe it was between 7 or 7:10, but I

14  wasn't quite sure.

15      Q.  And then you saw Mr. Hopkins drive up?

16      A.  Yes, sir, I did.

17      Q.  So did you follow him down Anton Larsen Bay Road?

18      A.  Yes, sir.  I was actually following Petty Officer

19  O'Connor right in front, and right up in front of him was Petty

20  Officer Hopkins.

21      Q.  And so there was no other vehicle between you and

22  O'Connor and Hopkins?

23      A.  Not that I can recall, sir.

24      Q.  Any vehicles that you could tell behind you?

25      A.  Not that I can recall, sir.

1    Q.  And do you remember when you got there and you saw ET1

2    Hopkins pull in, was there any other vehicles that you noticed

3    going by?

4    A.  No, sir, not that I noticed.

5    Q.  And normally it's your normal practice to do your

6    rounds at T2 when you first start in the morning --

7    A.  Yes, sir.

8    Q.  -- if you're on watch?

9         But that day you decided not to because there was

10   already somebody there?

11   A.  Yes, sir, yes, sir.  I saw Petty Officer Hopkins there,

12   and I assumed that he would be able to report anything that were

13   to happen.

14   Q.  Now, is your office -- do you have an office up at T1,

15   the main building?

16   A.  It's more like a -- it's a big -- it's a large common

17   area, what we call the operations desk.  It's basically an area

18   where we have like certain cubicles, if you will, of certain --

19   you know, our communication equipment.  And we have operators

20   that talk on the radios to mariners, aircraft, stuff like that.

21   It's a big common area.

22   Q.  And that's your work site primarily?

23   A.  Yes, sir, it is.

24   Q.  Now, does Chief Reckner, does he have an office close

25   to that?

1    A.  No, sir, he does not.

2    Q.  Okay.  His office is not close to you, to where you are

3  at work?

4    A.  Not even close.

5    Q.  And I think at one point you were asked about the work

6  environment in T2.  Did you say that was a pretty tight shop?

7    A.  To be honest with you, I didn't know much about what

8  was going on at T2.  They were kind of -- they were kind of left

9  to their own devices.  I really don't know what was going on.

10   Q.  From your perspective, from what you knew, there was no

11  problems down there?

12   A.  Not that I know of, no.

13           MR. CURTNER:  That's all right, thank you.

14           THE COURT:  Redirect?

15           MR. SCHRODER:  No questions, Your Honor.

16           THE COURT:  Thank you, sir.

17  (Witness excused)

18           THE COURT:  Government's next witness.

19           MS. DUIGNAN:  The government is calling Petty Officer

20  Kolodzik to the stand.  I have the next three witnesses, so why

21  don't I slide over.

22           MS. LOEFFLER:  Okay.

23           MR. CURTNER:  Do you want that (indiscernible)?

24           MS. DUIGNAN:  Yes, I'm going to be using that.

25           MR. CURTNER:  Counsel, is it okay if I just grab this

```
 1   and move it.
 2           MS. DUIGNAN:  Sure.  I'm going to be using it, though,
 3   so if you could just leave it up.  But I want you to be able to
 4   see obviously.
 5           Petty Officer Kolodzik, if you could just walk down
 6   this aisle way and take the seat right there.  There is a door
 7   that you'll have to pull open.
 8           THE COURT:  Just remain standing for a moment and the
 9   clerk will swear you in.
10           THE CLERK:  Please raise your right hand.
11            KELLY KOLODZIK, PLAINTIFF'S WITNESS, SWORN
12           THE CLERK:  Thank you, please have a seat.  And ma'am,
13   for the record, if you can please state and spell your full
14   name.
15      A.  Kelly Kolodzik.  First name K-e-l-l-y, last name
16   K-o-l-o-d-z-i-k.
17           THE CLERK:  Thank you.
18                      DIRECT EXAMINATION
19    BY MS. DUIGNAN:
20      Q.  Good afternoon, Petty Officer Kolodzik.  What
21   organization do you work for?
22      A.  United States Coast Guard.
23      Q.  And how long have you served in the Coast Guard?
24      A.  Just shy of six years.
25      Q.  What is your current rank and rate?
```

1    A.  I am a second time -- second class maritime enforcement

2  specialist.

3    Q.  And can you please explain to the jury what a maritime

4  enforcement specialist does?

5    A.  Yes.  We are responsible for the enforcement of all

6  applicable federal laws to include counter-drug, migrant

7  interdiction, counter-terrorism, as well as being the primary

8  and only rating that serves at Coast Guard police departments

9  throughout the service.

10    Q.  And what kind of training have you had related to your

11  specialty?

12    A.  I was originally a boatswain mate and lateraled over to

13  the maritime enforcement specialist rating where I was required

14  to take end-of-course test which involved over 70 practical

15  factors.

16        And then I was sent to the Federal Law Enforcement

17  Training Center in Glynco, Georgia and attended a three-month

18  uniformed police training program academy.

19        And since then I've also graduated from boarding

20  officer training, which is a five-week course in Charleston,

21  South Carolina.

22    Q.  And you said prior to that you were a boatswain's mate.

23  How long were you a boatswain's mate?

24    A.  Approximately three months.

25    Q.  Where are you currently assigned?

1      A.   Sector San Francisco in California.

2      Q.   And what are your duties there?

3      A.   I'm a boarding officer for the Sector boarding team.

4      Q.   What does a boarding officer do?

5      A.   I'm in control of a -- usually a six-man team that

6   boards, in our case, deep-draft vessels primarily for the

7   purpose of counter-terrorism.

8      Q.   And how long have you been at the Sector in San

9   Francisco?

10      A.   Just shy of two years.

11      Q.   And prior to that, where were you stationed?

12      A.   In Kodiak, Alaska at the Coast Guard Police Department.

13      Q.   And how long were you stationed at the police

14   department?

15      A.   Three years.

16      Q.   Were you working there on the morning of April 12th,

17   2012?

18      A.   Yes.

19      Q.   And what was your shift on that day?

20      A.   I was just finishing my shift.  We work 12-hour shifts,

21   and at that time I don't recall if we were working 1800 --

22   excuse me, 2100 to 0900, but I believe that was the shift.

23      Q.   And 2100 is 9 p.m., correct?

24      A.   Correct.

25      Q.   So you received a call early on the morning of April

1  12th, 2012; is that correct?

2      A.  Correct.

3      Q.  Approximately what time did the call come in?

4      A.  I believe it was just after 0730.

5      Q.  And what information did you receive?

6      A.  We received a call from -- that there were two men down

7  with a lot of blood.  And it was at the T2 building, which is

8  the rigger shop next to the comm station.

9      Q.  Had you ever been to the T2 building before?

10     A.  Just the exterior.

11     Q.  And when you say "the exterior," what was the purpose

12 of visiting the exterior of T2?

13     A.  We conducted routine patrols of all the Coast Guard

14 property.

15     Q.  How did you get to the scene that morning?

16     A.  I was parked on Dolphin Road.  Came out off of Dolphin

17 Road, right to Rezanof, and made a left on Anton Larsen, turned

18 up the road to the comm station, and made a left into that

19 driveway into the rigger shop parking lot.

20     Q.  If you can look at your monitor, I'm going to ask to

21 bring up government Exhibit 45.

22         MR. OFFENBECHER:  I'm sorry, what's the number?

23         MS. DUIGNAN:  45.

24  BY MS. DUIGNAN:

25     Q.  Looking at that photo, do you recognize what it

 1  depicts?

 2      A.  Yes, that's building T2, rigger shop for the COMMSTA.

 3      Q.  And it's an aerial view; correct?

 4      A.  Correct.

 5      Q.  Would you say that's a fair representation of what it

 6  looked like --

 7      A.  Yes.

 8      Q.  -- around 2012?

 9      A.  Yes.

10          MS. DUIGNAN:  I move for the admission of government

11  Exhibit 45.

12          MR. OFFENBECHER:  No objection, Your Honor.

13          THE COURT:  It will be received.

14                          PLAINTIFF'S EXHIBIT 45 ADMITTED

15          MS. DUIGNAN:  Can you project it, please.

16   BY MS. DUIGNAN:

17      Q.  Looking at -- do you have a pointer up there, Petty

18  Officer Kolodzik?  I think we left one up there.

19      A.  Yes.  Yes.

20      Q.  The question is does it work?

21      A.  Yes.

22      Q.  Using the pointer, can you point the entrance the way

23  you drove in on that morning?

24      A.  Certainly.  I was coming up Anton Larsen this

25  direction, pulled up this road and into the parking lot through

1    this entrance.

2       Q.  And when you do -- you had mentioned that you have done

3    rounds on the exterior of the T2 building before.

4          Can you show me how you would drive around T2 when you

5    were doing rounds on a routine basis?

6       A.  It would be one of two directions.  Either we would

7    come up the same COMMSTA road and then turn in and pull back out

8    through this driveway here, or vice versa.  Rarely if ever did

9    anybody ever use this other entrance.

10      Q.  Thank you.  Looking again at the picture, I know that

11   there are -- it was taken on a different day, I think, so there

12   was a range of vehicles out there.

13         Can you tell me, when you first pulled up, what you saw

14   parked outside?

15      A.  There were several heavy machinery vehicles parked

16   similar to these ones here.  And then as well there were a few,

17   looked like, personal-owned vehicles parked in the front of the

18   building where you can see the two white trucks there.

19      Q.  And you were talking about the two white trucks there.

20   What are they, do you know?

21      A.  They appear to be government vehicles.

22      Q.  Thank you.  When you arrived at T2 and you pulled up

23   and got out of the car -- first of all, were you with anybody?

24      A.  No, I was driving by myself.

25      Q.  And when you got out of the car, was there anybody

1  outside of the building who greeted you at the front door?

2      A.  Yes, there was a female non-rate that was walking in

3  the parking lot close to the very first entrance.

4      Q.  And were you provided any information at that time?

5      A.  Negative.  I questioned her as to where the emergency

6  was, and she seemed confused.  And then immediately after that I

7  was greeted by OS1 Haselden.

8      Q.  And at that point, did he provide you any information

9  that caused you to take action?

10      A.  He quickly ushered me inside the building, and he was

11  gesturing come, come, come quickly.

12      Q.  I'm going to ask you, I think there is a microphone up

13  there.

14          MS. DUIGNAN:  I'm going to ask if the witness can

15  approach the model and the chart, Your Honor.

16          THE COURT:  Very well.

17   BY MS. DUIGNAN:

18      Q.  If you just clip it on your jacket, you can leave that

19  piece -- you can either hold it or leave it on the side?

20      A.  On here?

21      Q.  Yeah.  And then there is also a pointer in the corner

22  there that may be helpful.  Do you see it?  I'm sorry, it's

23  straight to the right of the chart.  Right there.

24          And this is going to be a little bit tricky, so first

25  I'm going to ask to you stand to the right of the chart of T2

 1    and we'll start there.  The jury has to be able to see it.

 2            So can everybody see with where the witness is

 3    standing?  Everybody is nodding yes.

 4            So using the pointer, if you can show which entrance on

 5    that chart that you used in order to enter the building.

 6        A.  I entered through -- sorry.  I entered through this

 7    doorway.

 8        Q.  And was that doorway -- did you have to use a swipe

 9    card or was it opened?

10        A.  No, it was being held open by the two other members

11    that were inside.

12        Q.  And who were the two other members who were inside?

13    You mentioned Petty Officer Haselden.  Who else was there?

14        A.  I later identified them as ET3 Beauford and Seaman

15    Coggins.

16        Q.  Okay.  I know it's been a long time.

17        A.  It has been a long time.

18        Q.  So after you came in through that entrance, did they

19    direct you to go anyplace, or where did you go?

20        A.  As soon as I walked in the door, they immediately

21    pointed to this break room area.  And it was immediately

22    apparent that there was a victim lying on the ground.  It was

23    visible from the front doorway.

24        Q.  And what did you see?

25        A.  That's where I witnessed ET1 Hopkins was lying in a

1    position similar to the recovery position right near this water

2    fountain.

3         Q.  And when you say "the recovery position," what do you

4    mean?

5         A.  That's a position that we use for first responders to

6    help aid the victim with breathing, things like that.  But it

7    would almost -- it would be on his side, pretty much almost

8    in -- not quite the fetal position, but very similar to that.

9         Q.  But similar to the fetal position?

10        A.  Correct.

11        Q.  And you had mentioned that his head was up against the

12   wall.  Can you point to the area where his head would have been

13   leaning up against?

14        A.  Right next to this water fountain.  On this wall where

15   the water fountain is actually mounted.

16        Q.  And what else in the area did you notice?

17        A.  He was -- he had his blouse to his uniform.  He was

18   wearing his ODU pants and a Coast Guard T-shirt.  He had -- his

19   ODU blouse was to the left of him, so that would have been

20   closer to this side of the wall, if that makes sense.

21             There was a sizable amount of blood on the ground

22   surrounding it looked like his chest area, and as well as around

23   his head.

24        Q.  And at that point did you touch or move anything?

25        A.  Negative.

1     Q.  What else, if anything, did you notice around the area?
2  Anything you noticed that you touched or smelled or saw?
3     A.  Definitely smelled the very, very strong odor of
4  gunpowder was readily apparent in the building.
5     Q.  And what experience do you have with firearms, Petty
6  Officer Kolodzik?
7     A.  Aside from a lifetime of firearm training with my
8  father, I've also been, as a maritime enforcement specialist,
9  required to go to the range a minimum of two times a year.  And
10 shot over 2,000 rounds during my training at the Federal Law
11 Enforcement Training Center in Glynco, Georgia.  I'm also a -- I
12 own my own personal firearms and frequent the range.
13    Q.  Thank you.  After you noticed the pool of blood and
14 Petty Officer Hopkins, what action did you take?
15    A.  I asked where the next victim was.
16    Q.  And where did you go?
17    A.  They pointed me in the direction of this office space.
18 Made entry into the office space and observed Mr. Belisle lying
19 on his chest with his head partially underneath the desk and
20 with a chair to his left in this space here kind of over the top
21 of him.
22    Q.  And you're pointing to the desk that's, I guess,
23 closest to the hallway?
24    A.  Correct.
25    Q.  You said he was face down; correct?

1      A.   Correct.

2      Q.   What did you do at that point?

3      A.   At that point I removed my jacket, donned a pair of

4   latex gloves.  I set my jacket on this couch here and returned

5   to the break room area to assess breathing and search for a

6   pulse on ET1 Hopkins.

7      Q.   And what did you find?

8      A.   He had no pulse or breathing.

9      Q.   What did you do next?

10     A.   I returned to the office space and did the same,

11  checked for breathing and a pulse on Mr. Belisle, and was unable

12  to locate either.

13     Q.   And at that point what did you do?

14     A.   At that point I had returned to the break room with ET1

15  Hopkins, and I started to further assess his injuries.  And

16  that's what I moved his blouse to help identify him to see his

17  name tag and his pay grade.

18          At that point I had taken notice to a large laceration

19  on his right arm, which before -- they had been asking me, the

20  people on scene, they were asking me if this was a drill.  And

21  we weren't entirely sure up until I started assessing ET1

22  Hopkins' injuries in more detail, realizing that that laceration

23  couldn't be faked even by the best of our medical staff.  That

24  is when I realized that the burning smell that was in the

25  building was gunpowder.

1    Q.  That's when you essentially made the conclusion between

2    what you smelled and the fact that it was gunpowder?

3    A.  Correct.  Before that I wasn't sure if it had been an

4    electrical accident, given the nature of the work that they do

5    at the rigger shop, and it was confusing why I had two different

6    victims, one was bloody and one wasn't.

7         So it wasn't until I assessed ET1's injuries that I was

8    able to identify that it was gunshots, and the burning smell in

9    the air was, in fact, gunpowder.

10   Q.  Was there a point at which anybody else arrived to T2?

11   A.  Yes.  After I had cleared the break room area at the

12   locker room and office space, and the doors were open to the

13   wood shop and I cleared in this area as well, my partner, Petty

14   Officer Elizondo, arrived on scene next.

15   Q.  So you had pointed to which rooms that you had been in

16   to be able to clear?

17   A.  The office, the break room, the locker room, the wood

18   shop, and the garage.

19   Q.  And at this point, if I can ask you to move over to the

20   model.

21        If you look at the figures as they are placed in the

22   rooms, if you can say, based on your testimony, whether they

23   appeared to be accurately placed or not?

24   A.  Fairly accurate.  I would say that ET1's head was

25   closer to the wall.  It was actually physically touching a

1   90-degree to the wall and the floor underneath the water

2   fountain.

3           And Mr. Belisle was not in that position at all.  He

4   was facing this direction with his head underneath the desk.

5   Q.  Thank you.  Going back to the chart, when Petty Officer

6   Elizondo arrived, what happened next?

7   A.  Petty Officer Elizondo arrived.  I brought him into

8   this locker room space and gave him a very, very quick brief of

9   the situation.  I pointed out both of the victims and notified

10  him that I hadn't had the opportunity to verify that the rest of

11  the building was secure.  And then immediately after that Coast

12  Guard Fire Department arrived on scene.

13  Q.  As the Coast Guard Fire Department was arriving, what

14  did you and Petty Officer Elizondo do?

15  A.  We started to begin our search of the rest of the

16  interior of the buildings -- or the interior rooms of the

17  building.

18  Q.  And at this point you already had your latex gloves on;

19  correct?

20  A.  Correct.

21  Q.  Did you give anything to Petty Officer Elizondo?

22  A.  I attempted to give him a pair of latex gloves, but I'd

23  only had one additional one in my vest, so he couldn't don two

24  pairs of gloves.  Also, they were too small for him so he wasn't

25  able to wear them.

1     Q.  And after you had given him the glove and started --
2   what did you do next?
3     A.  Next we basically staged ourselves at the entrance of
4   this door here to the repair shop.  I took what is called point
5   position in front because I was wearing the latex gloves.  So to
6   maintain crime scene integrity, not get my fingerprints
7   everywhere, I was the one that would open the door for every
8   room that we went in.  Petty Officer Elizondo wound up directly
9   behind me.  We drew our weapons and began our search of the
10  building.
11    Q.  And how did you conduct that search?
12    A.  We first came through -- searched the repair shop in
13  its entirety.  And then we exited out of this building here --
14  or this door here, and that would be where the heavy machinery
15  had been parked next to the hillside.
16        We then searched through the heavy machinery and any
17  other vehicles that were parked out back.  Then came through
18  this back door, which was unsecured.  We were able to make entry
19  into the boiler room.  Searched the boiler room and all the
20  wardrobe site -- basically anyplace that a human could fit.
21    Q.  Okay.
22    A.  We attempted to make entry back through this door, but
23  it was locked from the inside, so we had to come back out and
24  around.
25    Q.  And in searching through the building, did you find

1   anybody else?

2        A.   Negative.

3        Q.   At the point in which you were conducting that search,

4   had the EMT folks arrived?

5        A.   Yes, they were on scene before we had started our

6   search.

7        Q.   And what -- did you provide them any information?

8        A.   They poked their head through the front door as myself

9   and Petty Officer Elizondo were standing in the locker room.

10  They requested to know if the scene was safe.  I could not

11  guarantee that the scene was safe because I hadn't checked the

12  rest of the buildings.  I told them that there was nobody in the

13  immediate area, and they decided to make entry.  Sent two teams

14  both to go -- to work on both the victims.

15       Q.   And so at the time that they were doing that, you were

16  conducting the rest of your security round?

17       A.   Correct.  It happened concurrently.

18       Q.   Did you see anybody else who arrived at the time that

19  you were doing security rounds -- or I should ask, did anybody

20  arrive with Petty Officer Elizondo?

21       A.   Petty Officer Swearingen was closely behind him, but we

22  didn't permit her to enter the building.

23       Q.   Was there a point at which you had given any task

24  direction to Petty Officer Swearingen?

25       A.   Yes, I gave her the keys to my vehicle and requested

1    that she go lock the --

2        Q.  If we pull up Exhibit 45 again, that might help you.

3    I'm sorry, you can take your seat, please.

4            So using the laser pointer, you gave her the keys to

5    your truck.  And what did you say -- or what did you direct her

6    to do, I should say?

7        A.  I directed her to park her vehicle in front of the

8    COMMSTA road entrance to block it off so nobody could enter the

9    crime scene, as well as gave her the keys to my vehicle and had

10   her block off this entrance.

11       Q.  Was there a point that anybody else arrived after the

12   EMT?

13       A.  The next person to arrive on scene was Trooper Dupras.

14       Q.  And what, if anything, did he direct you to do?

15       A.  Trooper Dupras --

16       Q.  Had you worked with -- let me start with this.

17           Had you worked with him before?

18       A.  Several times.

19       Q.  And how did the Coast Guard police work with the

20   troopers?

21       A.  The troopers and Coast Guard Police Department share

22   concurrent jurisdiction within Coast Guard's area of

23   responsibility.  And they typically -- if we come across a case

24   that is -- subjects that person to arrest, we'll call for the

25   Alaska State Troopers to come out and actually make the arrest.

1      Q.  So you've worked with Trooper Dupras before and knew

2   who he was?

3      A.  Several times.

4      Q.  So when he arrived, what happened next?

5      A.  When he arrived, I quickly briefed him on the

6   situation.  I brought him inside.  It was just -- him and myself

7   were the only two to re-enter the building at that point.  Coast

8   Guard Firehouse was still inside working on the victims.

9          I showed him first ET1 Hopkins and then Mr. Belisle.

10  And I asked him if it was -- if there was anything else that I

11  needed to do at that point.

12         And he suggested that we start a log of vehicles that

13  were attempting to make entry to the comm station.

14     Q.  And did he take any other action at that point that you

15  witnessed?

16     A.  Not that I witnessed.

17     Q.  After you left -- what was your reaction when Trooper

18  Dupras arrived?

19     A.  Relieved.

20     Q.  And at that point did you consider him to essentially

21  be -- have relieved you of the situation?

22     A.  Yes.

23         MS. DUIGNAN:  I don't have any further questions for

24  you, thank you.  The defense might.

25         THE COURT:  Okay.

1                      CROSS-EXAMINATION

2    BY MR. OFFENBECHER:

3         Q.   Good afternoon, Ms. Kolodzik.

4         A.   Good afternoon.

5         Q.   After you determined -- at some point you determined

6    inside that, first of all, that it was a crime scene; is that

7    right?

8         A.   Correct.

9         Q.   And that the individuals had passed on; is that right?

10        A.   To the best of my medical knowledge, yes.

11        Q.   And in conducting -- as a trained investigator, you

12   realize that in terms of the crime scene, one of your

13   responsibilities is to make sure that the crime scene is not

14   altered by the investigators such as yourself; right?

15        A.   Correct.

16        Q.   Because you know that there are going to be other

17   trained investigators who come afterwards; is that right?

18        A.   Correct.

19        Q.   And they are going to want to see everything in as

20   original a position as possibly can be achieved; right?

21        A.   Correct.

22        Q.   So when you go about conducting the rest of your

23   security screen, for example, you wanted to leave everything as

24   much in the same condition as it was when you got there; right?

25        A.   As much as possible, yes.

1      Q.  And you did that in this case; is that right?

2      A.  Yes.

3      Q.  At the end of your work at T2, you were instructed by

4  Trooper Dupras to also conduct some additional investigation; is

5  that right?

6      A.  Correct.

7      Q.  And Trooper Dupras instructed you to go to Building

8  N23; isn't that right?

9      A.  Correct.

10     Q.  And N23 is a building that is just across the road.

11 It's kind of -- it's the sewage treatment plant, right?

12     A.  The water treatment plant, yes.

13     Q.  Water treatment plant, excuse me.

14         MR. OFFENBECHER:  Can you call up, please, government

15 Exhibit No. 47, please.  This has previously been admitted, by

16 my reckoning; right?

17         MS. LOEFFLER:  I think I did it.  I'm sure it is.

18  BY MR. OFFENBECHER:

19     Q.  Can you take a look at this and see if you recognize

20 what that is?

21     A.  Yes.  It's an overhead view of the comm station and the

22 rigger shop as well as a portion of Anton Larsen Road.

23         MR. OFFENBECHER:  Can you publish that, please.

24 Sorry.

25  BY MR. OFFENBECHER:

1      Q.  So it's a little bit dark, but just so -- if I can

2   help, and correct me if I'm wrong on this, but this is Anton

3   Larsen Road going towards the airport over here; right?

4      A.  Correct.

5      Q.  And if you continue on going out this way, it goes out

6   to the golf course and the ranch; is that right?

7      A.  Correct.

8      Q.  And Anton Larsen Bay; right?

9      A.  Correct.

10      Q.  And then I'm circling around a dark spot on this

11   photograph that's actually -- that's the T2 rigger shop that

12   we've been talking about; right?

13      A.  Correct.

14      Q.  And then if you go -- come off Anton Larsen Bay up this

15   way, then T1 is the larger building that's a bit up the hill;

16   right?

17      A.  Correct.

18      Q.  And Trooper Dupras -- after you had cleared the T2

19   scene, Trooper Dupras asked you to go to the N23 spot; right?

20      A.  Yes.

21      Q.  And that is across here kind of right in this area

22   right here; is that right?

23      A.  Correct, in that general area.

24          MR. OFFENBECHER:  Can we try government Exhibit 49,

25   please, which has been admitted.

 1    BY MR. OFFENBECHER:

 2      Q.  This is a little bit bigger view.  But you can see here

 3   is T2; right?  Isn't that right?

 4      A.  Correct.

 5      Q.  Here is T1.  And then from T2 you just cross over Anton

 6   Larsen Bay and you cross immediately over to N23; right?

 7      A.  It's not -- that's not Anton Larsen Bay, it's just the

 8   road.

 9      Q.  Right.  Anton Larsen Bay Road is what I meant, sorry.

10      A.  Anton Larsen Road, yes.

11      Q.  Okay, Anton Larsen Road.  This is Anton Larsen Road;

12   right?

13      A.  Yes.

14      Q.  And this is N23; right?

15      A.  Correct.

16      Q.  And its most distinctive feature is that it has kind of

17   a large kind of spherical dome that has something in it, water

18   in it perhaps; right?

19      A.  Correct.

20      Q.  And then it has some pools there as well; right?

21      A.  Yes.

22          MR. OFFENBECHER:  And then if we could see government

23   Exhibit No. 48, please.

24          MR. SCHRODER:  I'd like to look at it.

25    BY MR. OFFENBECHER:

1      Q.   Take a look at that and see if you recognize what that

2  is.

3      A.   Yes, that's much more clear identifying Building N23.

4      Q.   Okay.  So does that appear to be -- what is that?

5      A.   That would be another aerial view showing a larger

6  portion of Anton Larsen Road.  Doesn't have the COMMSTA, just T2

7  and N23.

8      Q.   So this is kind of a tighter shot of what we've just

9  seen; is that right?

10      A.   Correct.

11      Q.   And it shows pretty much just T2 and N23 together; is

12  that right?

13      A.   Correct.

14      Q.   And is that a fair representation of what that looks

15  like, or your recollection of it?

16      A.   Yes.

17           MR. OFFENBECHER:  Your Honor, I would move to admit

18  government Exhibit No. 48 and we can renumber it as a defense

19  exhibit later.

20           MS. DUIGNAN:  No objection.

21           THE COURT:  It will be received.

22                          PLAINTIFF'S EXHIBIT 48 ADMITTED

23           MR. OFFENBECHER:  Can you publish it, please.

24   BY MR. OFFENBECHER:

25      Q.   So those were a little bit far away, but just to get

1   the spatial relationships here, this is T2 that you've talked

2   about before; right?

3        A.  Correct.

4        Q.  And you conducted your perimeter search all around the

5   outside of T2 here; right?

6        A.  Correct.

7        Q.  And then after Trooper Dupras came, you and Officer

8   Elizondo drove down here and over to N23; right?

9        A.  Correct.

10       Q.  And you went to N23 because there were a bunch -- a

11  number of individuals who were working there; is that right?

12       A.  There were four workers there, yes.

13       Q.  And there were a number of vehicles over there as well?

14       A.  Correct.

15       Q.  And so about what time do you think you arrived at N23?

16       A.  Approximately just before 0900.

17       Q.  Okay.  And you did some interviews of individuals who

18  had been working there since earlier in the morning; right?

19       A.  Correct.

20       Q.  Some of them had been working there since 7 o'clock,

21  right?

22       A.  7:05 was the earliest.

23       Q.  And you also identified a number of vehicles that were

24  there as well; is that right?

25       A.  Yes.

1      Q.  And after you completed your work there at N23, was

2  that the end of your contact with this -- with this particular

3  event?

4      A.  Then I returned to Coast Guard Police Department and

5  proceeded to begin writing a statement.

6      Q.  And so -- and you did write a statement, didn't you?

7      A.  Yes.

8      Q.  Because that's part of your job as a police officer, to

9  write a statement about what happened; right?

10     A.  Yes.

11     Q.  And in this case you actually did a rough draft that

12  very same day and wrote it down in your own hand; didn't you?

13     A.  Yes.

14     Q.  And you did that on the same day so that it would be an

15  accurate reflection of what you observed that day; isn't that

16  right?

17     A.  Yes.

18     Q.  And as a police officer, that's part of your training;

19  isn't it?

20     A.  Yes.

21     Q.  And then you converted that handwritten statement to a

22  typed written statement a little bit later; is that right?

23     A.  Yes.

24     Q.  Was that the same day or was it a few days later?

25     A.  That was -- later that evening I was able to go home

1  and write my statement in more detail.

2      Q.  No more detail.  And you did that on a computer or a

3  typewriter or something like that?

4      A.  Computer, yes.

5      Q.  Computer, sorry.  And so you had your handwritten

6  statement that you made when you got back to the police station;

7  right?

8      A.  Yes.

9      Q.  And then you went home and did an actual -- on your

10 computer you did a more full typewritten statement; is that

11 right?

12     A.  It was the beginning of a draft, yes.  I didn't end up

13 finishing the statement until the next day.

14     Q.  So within 24 hours or so you had completed a

15 handwritten draft and an official police report which reported

16 your activity that day; right?

17     A.  Correct.

18     Q.  And your official police report was about -- a little

19 more than two pages of single spaced typewriting; is that right?

20     A.  Yes.

21     Q.  Now, before Trooper Dupras arrived, you were standing

22 by -- outside of T2; weren't you?

23     A.  Yes.

24     Q.  And you began questioning some of the individuals who

25 were there; is that right?

1      A.  Correct.

2      Q.  You and Officer Elizondo were doing this; is that

3  right?

4      A.  Correct.

5      Q.  And you were questioning Mr. Beauford and Mr. Coggins;

6  is that right?

7      A.  Correct.

8      Q.  And while you were there, Officer Swearingen arrived as

9  well; is that right?

10      A.  Yes.

11      Q.  And she was there helping you and Officer Elizondo?

12      A.  To secure the scene, yes.

13      Q.  And while you were interviewing Mr. Beauford and Mr.

14  Coggins, ITC Scott Reckner arrived on the scene; didn't he?

15      A.  Yes.

16      Q.  And by ITC, that's information technician chief,

17  technology chief; is that right?

18      A.  Correct.

19      Q.  And you understood him to be the supervisor of the T2

20  facility; is that right?

21      A.  He was identified by the rest of the employees there

22  that he was the shop chief.

23      Q.  And he pulled his car up, right?  You actually saw him

24  pull his car right up there; right?

25      A.  Correct.

1        Q.  And he tried to actually get into T2; is that right?

2        A.  He -- not to actually enter the building, but he did

3    attempt to step into the parking lot.

4        Q.  And you considered that to be a crime scene that you

5    were protecting?  You were trying to protect the evidence;

6    right?

7        A.  Correct.

8        Q.  And so you Officer Swearingen stopped ITC Mr. Reckner

9    from entering the crime scene; is that right?

10       A.  Correct.

11       Q.  And is it fair to say that as he was trying to enter

12   the crime scene, he was distraught and panicked?

13       A.  Yes.

14       Q.  He wanted to know who the victims were; is that right?

15       A.  That was his first priority, yes.

16       Q.  And he wanted to know the location of the rest of the

17   shop crew?

18       A.  Correct.

19       Q.  You identified Mr. Hopkins as being one of the victims;

20   is that right?

21       A.  Correct.

22       Q.  And then his next response -- by Mr. Reckner --

23   immediately was he wanted to know where Jim Wells was; isn't

24   that right?

25       A.  His first request was to know who the other victim was.

1   And I was able to identify him only by the name Rich based on

2   statements of the other members of the shop.

3        Q.  So you said that it was Mr. Belisle, that is Rich

4   Belisle; is that right?

5        A.  Correct.

6        Q.  And Mr. Reckner's next response was, "Where is Jim

7   Wells?"

8        A.  Correct.

9        Q.  And you told him that he hadn't shown up for work yet;

10  is that right?

11       A.  Correct.

12       Q.  Mr. Reckner then told that you Mr. Wells had been

13  having performance issues --

14            MS. DUIGNAN:  Objection, hearsay.

15            MR. OFFENBECHER:  It's not offered for the truth of

16  the matter asserted.  It's offered for its effect on the here or

17  down the road.  I'm not offering to prove that there were

18  performance problems, simply that this was Mr. Reckner's

19  immediate reaction which began this entire investigation.

20            THE COURT:  Overruled.

21   BY MR. OFFENBECHER:

22       Q.  So Mr. Reckner stated that Mr. Wells had been having

23  performance issues over the period of the last year; is that

24  right?

25       A.  Correct.

1      Q.   And had had conflicts with other members of the shop;

2   right?

3      A.   Correct.

4      Q.   And he immediately speculated right there in the

5   parking lot that Mr. Wells was responsible for the shootings;

6   didn't he?

7      A.   Correct.

8           MR. OFFENBECHER:  I don't have any other questions,

9   Your Honor.

10          THE COURT:  Redirect.

11          MS. DUIGNAN:  Briefly, Your Honor.

12          THE COURT:  Okay.

13                      REDIRECT EXAMINATION

14   BY MS. DUIGNAN:

15     Q.   Petty Officer Kolodzik, what kind of cases does the

16   Coast Guard Police Department normally handle, routinely handle?

17     A.   Routinely primarily traffic stops, responses to noise

18   complaints, conducting rounds to make sure that the base is

19   secure, and preventing unauthorized access.

20     Q.   Would it be safe to say this was your first case

21   involving homicide?

22     A.   It would be very safe to say that.

23          MS. DUIGNAN:  I don't have anything else.  Thank you

24   very much.

25          THE COURT:  Any cross?

 1              MR. OFFENBECHER:  No, Your Honor, thank you.

 2              THE COURT:  Thank you, you're excused.

 3    (Witness excused)

 4              THE COURT:  Government's next witness.

 5              MS. DUIGNAN:  The government's next witness is Petty

 6    Officer Small.

 7              THE COURT:  If you'll just remain standing, the clerk

 8    will swear you in.

 9              THE CLERK:  Please raise your right hand.

10         KRISTIN ALYSSA SMALL, PLAINTIFF'S WITNESS, SWORN

11              THE CLERK:  Thank you, please have a seat.  Ma'am, if

12    you can please state and spell your full name.

13       A.  It's Kristin A. Small -- oh, Kristin Alyssa Small.

14    K-r-i-s-t-i-n A-l-y-s-s-a S-m-a-l-l.  At that time it was -- my

15    last name was Swearingen, S-w-e-a-r-i-n-g-e-n.

16              THE CLERK:  Thank you.

17              THE COURT:  Counsel.

18              MS. DUIGNAN:  Thank you very much.

19                        DIRECT EXAMINATION

20    BY MS. DUIGNAN:

21       Q.  Petty Officer Small, what organization do you work for?

22       A.  United States Coast Guard.

23       Q.  And how long have you been in the Coast Guard?

24       A.  Since 2007.

25       Q.  And what is your current rank and rate?

 1     A.  Maritime enforcement specialist third class.

 2     Q.  And what do maritime enforcement specialists do?

 3     A.  The law enforcement professionals of the Coast Guard.

 4     Q.  What kind of training have you had to do your job?

 5     A.  On-the-job training at Coast Guard Police Department,

 6  Kodiak, Alaska.

 7     Q.  And where are you currently stationed?

 8     A.  MSST, Kings Bay, Georgia.

 9     Q.  What is MSST Kings Bay?

10     A.  Maritime Safety and Security Team.

11     Q.  And what do they do?

12     A.  We provide security for submarine escorts, VIP visits,

13  high interest vessels.

14     Q.  And before that, where were you stationed?

15     A.  At Coast Guard Police Department, Kodiak, Alaska.

16     Q.  And from what year to what year were you there?

17     A.  From 2011 to 2013.

18     Q.  And where were you working on April 12th, 2012?

19     A.  At Coast Guard Police Department.

20     Q.  What was your shift that day, if you recall?

21     A.  We were supposed to do shift change at 9:30 a.m.  So it

22  was 10 p.m. the previous night to 10 a.m.

23     Q.  And so -- so essentially you were working the night

24  shift?

25     A.  Yes, ma'am.

1     Q.  Do you recall receiving a call come into the station

2  early that morning to report to the communications station in

3  Kodiak?

4     A.  Yes, ma'am, I do.

5     Q.  And about what time was that, approximately?

6     A.  Approximately shortly before 8 o'clock.

7     Q.  And how did the call come into the station?

8     A.  02 unconscious personnel with blood in the area.

9     Q.  And who were you working with that morning?

10    A.  ME3 Joshua Honour was the dispatcher.  And ME1, then

11 ME2, Pedro Elizondo.

12    Q.  And upon receiving the call, what did you do?

13    A.  I was in the dispatch window.  Dispatcher passed it

14 verbally to me as we received the tone out.  I turned around and

15 motioned to at the time ME2 Elizondo to -- that we had to leave.

16 And he grabbed his bag and we got into the F-250 GV2235 and

17 headed out to the COMMSTA.

18    Q.  And what happened when you arrived at the scene?

19    A.  We were under the impression that we were responding to

20 a medical emergency.  At this time, as I was pulling in getting

21 ready to set up traffic enforcement so that the EMTs could come

22 in, I dropped off then ME2 Elizondo as he went in with his

23 first-aid kit, his bag, his gear bag.

24        And then, like I said, I pulled around to set up

25 traffic enforcement.  At that time I heard it passed over the

1    radio that there were gunshot wounds.

2          And I stopped setting up traffic enforcement.  At this

3    time I had been getting out of the vehicle.  I went to go back

4    to the vehicle.  Lieutenant Pizzurro pulled up.

5        Q.  Who is Lieutenant Pizzurro?

6        A.  He told me that he was the XO of the COMMSTA.

7        Q.  And what is an XO?

8        A.  The executive officer.  He would have been second in

9    command of the unit.

10        Q.  And so what happened then?

11        A.  He asked me what was going on.  He was the XO, so I

12    gave him the information that I had, that there were unconscious

13    personnel.  And he said that he would go get his uniform and

14    come back.

15          I at that time was proceeding to walk back to the truck

16    to go set up crime scene, and I saw Alaska State Troopers and

17    the EMTs pull in.  And the Alaska State Trooper got out and

18    motioned for me to go ahead and pull the truck to block off the

19    entrance to the parking lot of the COMMSTA, at which time I did.

20        Q.  Had you ever been to the T2 building before?

21        A.  I had passed by it.  I mean, it's part of our area of

22    fam to know where it is and our DARN (ph) routine patrols.

23          MS. DUIGNAN:  I'm going to ask to put up government

24    Exhibit 45, which has already been admitted.

25      BY MS. DUIGNAN:

1      Q.  There should be a pointer up there, Petty Officer

2   Small.  I don't know if you see it.  It's a laser pointer.

3          If you can point to the screen up on the wall, and if

4   you could just show us what entrances you blocked -- what

5   entrance you blocked off.  Is it working okay or is it not?

6   There we go.

7          So right over there is the entrance.  You're pointing

8   to that one on the right?

9      A.  Yes, ma'am.

10     Q.  And when you did the routine security patrols -- hang

11  on, we're getting you some technical assistance.

12         When you did your routine security patrols, what roads

13  would you drive?

14     A.  Usually we had to come all the way down Anton Larsen

15  and follow -- continue to follow the road out to the golf

16  course.  Usually we checked the golf course, the building, the

17  clubhouse located there.  And most of the time we turned around

18  at that point and come back.

19         A lot of times when the road isn't passable, we'd drive

20  through here to turn around because it hasn't been plowed from

21  here back, and sometimes from here back.  So sometimes we do

22  drive through here.  A lot of people go up here and then turn

23  around.  We aren't supposed to make it routine.

24     Q.  Thank you.  We can take the chart down now.

25         And would it be safe to say that except for those

1  routine patrols, that that was the first time you had been

2  called to T2?

3      A.  Yes, ma'am.

4      Q.  On that day, did you ever set a foot inside the

5  building?

6      A.  No, ma'am.

7      Q.  In fact, have you ever set a foot inside the building

8  even today?

9      A.  No, ma'am.

10     Q.  After you had blocked off the road to T2 where you had

11 been instructed by Trooper Dupras, what happened next?  Who

12 arrived, to the best of your knowledge, people that you

13 recognized or that you talked to?

14     A.  ME2 at the time, Elizondo, started taking statements

15 from the petty officer who had originally discovered the

16 personnel.  And ITC Reckner pulled his truck across that street

17 in front of my vehicle, or directly across from my vehicle and

18 began to try to enter the crime scene.

19         At the time ME3 Kolodzik and I instructed him that it

20 was a crime scene and that he couldn't enter the area.

21     Q.  What was his appearance?  How did he look to you?

22     A.  Frantic.  Very upset.  He started inquiring as to

23 who -- he wanted to know who was inside and what had happened,

24 where -- he wanted to know about his people.

25         And we asked him how many people there were supposed to

1    be, trying to calm him down.  And kind of told him that there

2    was -- I just heard a call to muster at the COMMSTA building,

3    and that everybody should be there that's not involved in this

4    incident.  And he started asking me about the whereabouts of a

5    civilian employee.

6        Q.  And who was the employee he was asking about?

7        A.  Jim -- James Wells.

8        Q.  Was there a point at which any information was passed

9    to you about the location of James Wells?

10       A.  Yes, ma'am.

11       Q.  And what information was passed to you?

12       A.  ITC Reckner believed that it was out of the ordinary

13   for him not to be there.  He said that he usually gets there

14   early.  And so they started to locate him because he wasn't

15   already there.

16           And so there was another COMMSTA personnel that I never

17   did get the name of that started trying to locate him on his

18   cell phone.  And ITC Reckner walked away for a few minutes and

19   then he came back and told me that James Wells had been located

20   and that he had a flat tire and this is why he was late.

21           MS. DUIGNAN:  Thank you.  I don't have any further

22   questions.  The defense might.

23           THE COURT:  Cross-examination.

24           MR. OFFENBECHER:  Thank you, Your Honor.

25                           CROSS-EXAMINATION

 1    BY MR. OFFENBECHER:

 2        Q.  Good afternoon, Ms. Small.

 3        A.  Good afternoon, sir.

 4        Q.  So you were not the first Coast Guard military person

 5    on the scene; is that right?

 6        A.  No, sir.

 7        Q.  Ms. Kolodzik had been there first, and you and Mr.

 8    Elizondo came together, as I understand it?

 9        A.  Yes, sir.

10        Q.  And your job was to park your vehicle where you've

11    showed us on the map to kind of contain the crime scene; is that

12    right?

13        A.  After we knew that it was a crime scene, yes, sir.

14        Q.  Sure.  But at some point you did that?  You parked your

15    car there; is that right?

16        A.  Yes, sir.

17        Q.  And then you had contact -- you were talking -- you and

18    Officer Elizondo were talking with Mr. Beauford and Mr. Coggins

19    for a while; is that right?

20        A.  Yes, sir.

21        Q.  And then soon thereafter Mr. Reckner arrived; is that

22    right?

23        A.  Yes, sir.

24        Q.  And that was at about 8:15, wasn't it?

25        A.  Approximately, sir.

1      Q.  And Mr. Reckner actually pulled his truck in front of

2  your rig; is that right?

3      A.  It was directly across the street from mine.

4      Q.  But it was very -- in very close proximity?

5      A.  Yes, sir.

6      Q.  So the point being that you actually saw him park his

7  truck there; right?

8      A.  Yes, sir.

9      Q.  So you saw him arrive on the scene, and it was about

10  8:15?

11      A.  Approximately, sir.

12      Q.  And as far as you know, that's the first time he got to

13  the scene; is that right?

14      A.  Yes, sir.

15      Q.  And he was obviously very upset; is that right?

16      A.  Yes, sir.

17      Q.  As you've said, he was frantic?

18      A.  Yes, sir.

19      Q.  And he wanted to see his people, and he began to ask

20  about how many people -- you know, who was involved in this; is

21  that right?

22      A.  Yes, sir.

23      Q.  And at some point right then he said he could not see

24  the vehicle of Jim Wells in the parking lot; isn't that right?

25      A.  Yes, sir.

1    Q.  And then you talked to him about there being a muster

2    so that you could identify who the folks were who were actually

3    around and involved; right?

4    A.  Yes, sir.

5    Q.  And Mr. Reckner repeatedly asked you in a frantic

6    manner, "Where is Jim Wells?"  Isn't that right?

7    A.  Yes, sir.

8    Q.  And you asked him why he was so concerned, or what the

9    importance of Jim Wells was; wasn't that right?

10   A.  Yes, sir.

11   Q.  And he told you that Jim Wells was a civilian employee

12   who had been having a hard time at work; right?

13   A.  Yes, sir.

14   Q.  And having a hard time at work and creating a bad work

15   environment; isn't that right?

16   A.  Yes, sir.

17   Q.  And that Jim Wells had been a bad employee; isn't that

18   right?

19   A.  Yes, sir.

20   Q.  In recent weeks; right?

21   A.  Yes, sir.

22   Q.  And Mr. Reckner said, regarding what had happened at T2

23   that day, he said, "That's the only way this could happen";

24   right?

25   A.  Yes, sir.

 1      Q.  And he was referring to Jim Wells, wasn't he?

 2      A.  Yes, sir.

 3              MR. OFFENBECHER:  That's all I have, Your Honor.

 4              THE COURT:  Redirect?

 5              MS. DUIGNAN:  No redirect, Your Honor.

 6              THE COURT:  All right, thank you, you're excused.

 7   (Witness excused)

 8              THE COURT:  Government's next witness.

 9              MS. DUIGNAN:  The government calls Petty Officer

10   Elizondo to the stand.

11              THE COURT:  Remain standing, she'll swear you in.

12               PEDRO ELIZONDO, PLAINTIFF'S WITNESS, SWORN

13              THE CLERK:  Thank you, please have a seat.

14      A.  Thank you.

15              THE CLERK:  And, sir, if you can please state and

16   spell your full name.

17      A.  Sure.  My first name is Pedro, P-e-d-r-o, last name

18   Elizondo, E-l-i-z-o-n-d-o.

19              THE CLERK:  Thank you.

20              THE COURT:  All right, counsel.

21                       DIRECT EXAMINATION

22   BY MS. DUIGNAN:

23      Q.  Good afternoon.  Petty Officer Elizondo, how long have

24   you been in the Coast Guard?

25      A.  Been in the Coast Guard for 11 years.

1    Q.   And what is your rank and rate?

2    A.   E-6, maritime enforcement first class.

3    Q.   And what does -- I know the jury has heard this, but

4  I'd like you to tell them, what does a maritime enforcement

5  specialist do.

6    A.   Sure.  So maritime enforcement specialists in the Coast

7  Guard provide security and law enforcement support for the Coast

8  Guard's missions.

9    Q.   And have you had past tours in the maritime enforcement

10  specialty?

11    A.   Yes, I have, yes, ma'am.  Beginning in January of 2010

12  when the rate started up on the Coast Guard Cutter BLOCK ISLAND

13  off of the coast of North Carolina.

14    Q.   And before that, what was your rating?

15    A.   I was a gunner's mate for the Coast Guard.

16    Q.   And can you explain what a gunner's mate does?

17    A.   Yes, ma'am.  So a gunner's mate is responsible for

18  maintenance of firearms, administration regarding ammunition,

19  and also conducts training for its personnel.

20    Q.   And what kind of training have you had to be a maritime

21  enforcement specialist?

22    A.   I've attended the Coast Guard's Boarding Officer

23  Academy in 2007.  Additionally, I've been to the Department of

24  the Army Civilian Police Academy in early 2012, in addition to

25  on-the-job training and our recertifications that we have to go

1    through.

2         Q.   And where were you stationed on April 12th, 2012?

3         A.   I was stationed at the Coast Guard Police Department in

4    Kodiak, Alaska.

5         Q.   And you're still stationed there; correct?

6         A.   Yes, I am.

7         Q.   So how long have you been there?

8         A.   To date, just shy of three years.  June will be three

9    years for me.

10        Q.   And on April 12th, 2012, what was your rank?

11        A.   I was a ME2, maritime enforcement second class.

12        Q.   So you've been promoted since that time?

13        A.   I have, yes, ma'am.

14        Q.   Congratulations.

15        A.   Thank you.

16        Q.   You were on duty that morning of April 12th; correct?

17        A.   I was, yes, ma'am.

18        Q.   And what was your shift?

19        A.   It was -- I was standing the mid watch, which is our

20   night watch.  So shift start time was at 10 o'clock p.m., 2200,

21   and goes until on or about 10 o'clock in the morning.  So it

22   was, you know, late in the shift for us.

23        Q.   And at some point during your shift did you receive a

24   call to go to the communications station in Kodiak?

25        A.   Yes, I did.

1    Q.  Do you recall about what time that call came in?

2    A.  If my memory serves, that was on or about 0745, -46,

3    sometime around that in the morning.

4    Q.  And how did the call come in?

5    A.  Came across over our police radios as two communication

6    station members who were laying on the ground unconscious with

7    blood in the area.

8    Q.  And who were you working with that morning?

9    A.  On shift with me was Petty Officer Honour, Petty

10   Officer Kolodzik, Petty Officer Small, and myself.

11   Q.  And Petty Officer Small has since changed her name.

12   What was her name at the time of the incident?

13   A.  She was Petty Officer Kristin Swearingen at the time.

14   Q.  When you received the call, what did you do?

15   A.  Upon receiving the call, I got into one of our police

16   vehicles with Petty Officer Small, then Petty Officer

17   Swearingen, and proceeded to the communications station

18   building.

19   Q.  And who drove?

20   A.  Petty Officer Small was operating the motor vehicle and

21   I was the passenger in the vehicle.

22   Q.  And at the point that you were responding, based on the

23   information you had, what were you expecting to do?  What was

24   your mind set?

25   A.  I believed at the time that it was a medical assist.

1   What I believed at the time with the information that we

2   received was I was thinking, you know, somebody had received

3   some type of injury and had become unconscious on the ground.

4   It was very limited information what we first got.

5       Q.  And when you arrived to the building at T2, what did

6   you observe?

7       A.  So upon arriving at the building, Petty Officer -- like

8   I said, Petty Officer Small was driving.  She pulled up on Anton

9   Larsen Road directly across from the building.  I exited the

10  vehicle, walked across a small grassy area through a parking

11  lot, and met briefly a Coast Guard Fire Department member who

12  was standing in the gravel parking lot.

13          He asked me had the scene -- was the scene safe.  And I

14  responded that I heard Petty Officer Kolodzik over our police

15  radios just prior to arriving saying that the scene was safe.

16      Q.  Had you had an opportunity shortly after that to speak

17  with Petty Officer Kolodzik?

18      A.  I did, yes, ma'am.

19      Q.  And what information did she pass to you?

20      A.  So immediately after speaking with the Coast Guard Fire

21  Department member, met with her right at the front door.  And to

22  the best of my recollection, she said something to the effect

23  of, "I can't get a pulse, I can't get a pulse."

24      Q.  And at that point, did she provide you any information

25  that led to your next actions?

1      A.  Yes, ma'am, she did.  She told me that there was two

2   men laying inside of the building.  I followed her in.  And once

3   entering the building, caught the real heavy smell of, like,

4   lingering gunpowder in the air.

5          First we went into -- or headed toward the office

6   directly in front of the entrance to the building where she

7   pointed out one of the members, Petty Officer Hopkins.  And then

8   took me over to the office just next to it where she pointed out

9   Mr. Belisle.

10     Q.  Petty Officer Elizondo, I'm going to ask you to put on

11  a microphone that I think is up there, because I think it might

12  be easier for the jury to understand if you can use the model.

13         There is both a diagram up there to your right, to the

14  jury's left.  If you can kind of stand back enough so they can

15  see both the diagram and the model.

16     A.  Okay.

17     Q.  Depending on which makes it easier, I think we should

18  start with the diagram first, because it has the whole building

19  on it.

20     A.  Okay.

21     Q.  So looking at the diagram, if you can use the pointer

22  and point to the entrance that you met Petty Officer Kolodzik at

23  where you entered the building?

24     A.  Okay.  So as I mentioned previously, I walked across a

25  grassy area here, a parking lot area here, and Petty Officer

1  Kolodzik met me at this door, and that's the door that I entered

2  the building from.

3      Q.  When you were there and you met with Petty Officer

4  Kolodzik, was there anybody else inside the building or around

5  the entrance?

6      A.  The only person that I can remember that was near the

7  entrance was the Coast Guard Fire Department member that was

8  standing about in this area right here.

9      Q.  And when you went in the building, if you can use the

10  pointer and show where Petty Officer Kolodzik led you first.

11      A.  Sure.  So first thing, she brought me in here, and

12  through this doorway right here I could see Petty Officer

13  Hopkins.  She then took me through this doorway here where I

14  could see Mr. Belisle laying in this office right here.

15      Q.  Going back to the first where she took you to see Petty

16  Officer Hopkins, did you -- were you able to see what position

17  he was in, do you recall?

18      A.  Unfortunately, I'm unable to recall the exact position

19  that he was in other than he was laying on the ground.  I

20  apologize about --

21      Q.  That's okay.  What do you remember from what you

22  viewed?

23      A.  I remember looking at Petty Officer Hopkins laying in a

24  large pool of blood.  And again, the smell of gunpowder in the

25  air is what I remember, along with that large pool of blood

 1  around Petty Officer Hopkins.

 2      Q.  And when she took you into the room with Mr. Belisle,

 3  what do you recall seeing?

 4      A.  I recall seeing, again, another man laying on his

 5  stomach, was later identified to me as Mr. Belisle, and blood on

 6  his shirt.  Again, laying in a position, and unfortunately I'm

 7  unable to recall the exact position he was laying in.

 8      Q.  After she took you to see both victims, what did you do

 9  next?

10      A.  So after she showed me both of the victims, we came

11  back to about this area for a brief second.  And I asked her

12  what the extent of her security sweep had been.  She mentioned

13  to me that it was a security sweep of the immediate area, and

14  the entire building had not been cleared.

15          So at that point it became our priority to make sure

16  that there was no additional threats in the building and make

17  sure that there was nobody else in the building, so that became

18  our priority.

19      Q.  And at that point did you -- were there any latex

20  gloves involved?

21      A.  Yes, yep.  So -- yeah.  And when I first -- while Kelly

22  and I were having that conversation, she was -- I noticed that

23  she was wearing a pair of black latex gloves.  And I asked her

24  if she had an additional pair of gloves that I could use.  She

25  handed me what she had.  I donned one of the gloves while we

1   were having the conversation about clearing the rest of the

2   building, and wore it for maybe, you know, maybe a few seconds

3   at most before I took it off so that I could draw my weapon and

4   continue with our security sweep of the building.

5       Q.  So going around with her, what was your role in the

6   security sweep?

7       A.  We were working together as a team to clear the

8   building and basically looking for anybody else in the building,

9   any other threats.  So weapons were drawn, we were moving

10  through the building, you know, systemically as best we could.

11  This was my first time being in the building, so just making

12  sure that there were no additional threats in the building.

13      Q.  Where did you start the security sweep?

14      A.  We began the sweep from where we were having the

15  conversation, the very brief conversation that that -- you know,

16  when we decided that that needed to be our priority, that was

17  where we started from.

18          And I recall these -- first coming into this area here.

19  And this was basically backtracking where she had already

20  cleared, from what I understood at the time from what she had

21  told me.  And then beginning our sweep, moving to the right,

22  moving to the right inside of the building, so checking these

23  large lockers right here because they are man-sized spaces,

24  moving into the wood shop, then into the garage, and then double

25  backing through the same doors, over this ramp into the repair

1   shop, and then back out through the same door, which I entered

2   from, was where we finished the inside of the building.

3       Q.  And where did you go next from there when you came

4   outside the building?

5       A.  So after we finished the inside of the building, we

6   moved along this wall right here.  And there were a couple of

7   vehicles parked right here.  One of us went nearest the wall,

8   the other one went the other side visually checking inside of

9   the vehicles for any body in there.  Right around this area

10  there was a dumpster.  Again, we moved past that.

11          And then these two garage doors, past that around that

12  wall, around the backside of the building where there were a

13  couple of tractors, Sno-Cat type of machinery, and same thing

14  with the vehicles as we were passing by looking into the

15  vehicles.

16          Move all the way across the backside of this building

17  and then into the boiler room through this back door right here.

18  Conducted our security sweep of the boiler room, and then walked

19  out across this grassy area around the building.  And then ended

20  up back basically right here in this small parking lot just in

21  front of the door, and that's where our security sweep

22  terminated.

23      Q.  Going back to the boiler room, you said you conducted

24  the security sweep and you were able to enter it from the

25  outside.  Did you get any farther into the building from that

1    point?

2         A.   No, ma'am.  Once coming into the boiler room and

3    verifying that everything in there was clear, this door right

4    here, we attempted to make entry into it, and it was locked --

5    or actually, correction.  If I can backtrack real quick.

6              While we were inside of the building, I recall

7    attempting to make entry into this door.  And it was secure from

8    the other side; we were unable to make entry into it.  So that's

9    when, once we were in here, saw that same green door and

10   realized that that was the door from the inside, that we were

11   unable to open from the inside.

12        Q.   When you got around back to the front after conducting

13   your security sweep -- first, let me ask you.

14             Did you find anybody else along this route?

15        A.   No, ma'am.

16        Q.   When you got back to the front after conducting a

17   security sweep, what happened next?

18        A.   After the security sweep was complete, I noticed that

19   Trooper Dupras was on scene.  I moved over to about this area

20   where I began speaking with three Coast Guard members.  One was

21   Petty Officer Haselden, Seaman Coggins, and I'm unable to recall

22   the name of the third Coast Guard member that I spoke with.  But

23   began asking them basic questions and handing out statements.

24        Q.   Were you handing out forms for them to give statements?

25        A.   Yes, yes, ma'am, handing them forms that they could

1  fill out.

2      Q.  And you said you'd never been inside the building in T2

3  before; is that correct?

4      A.  No, ma'am, that was my first time being inside of this

5  particular building.

6      Q.  Had you conducted security rounds outside the area of

7  T2 before?

8      A.  Yes, ma'am.  The extent of those rounds would have been

9  while on patrol in that area, driving down Anton Larsen Road

10 over to the golf course just a little bit further down the road,

11 and/or coming into this parking lot up to T1 and then coming

12 back out was the extent of my knowledge of the building.

13     Q.  During the time that you were in the building, did you

14 touch or move anything?

15     A.  The only thing that I touched were the latches to these

16 large tan-in-color lockers, for lack of a better word to

17 describe them, and opening up to visually inspect that there was

18 nobody inside of the lockers.

19     Q.  You can take your seat for the rest of the testimony.

20 Thank you, Petty Officer Elizondo.

21     A.  Okay, thank you.

22     Q.  Do you recall a point at which you were contacted to

23 provide some DNA in this case?

24     A.  I do, yes, ma'am.  It was by Special Agent Woods.  And

25 I don't recall the exact date, but he contacted me regarding the

1    black latex glove that I donned briefly while I was on scene.

2        Q.   And were you asked to make a statement about it?

3        A.   I was, yes, ma'am.

4        Q.   And what's your best recollection of what happened with

5    the black latex glove?

6        A.   To the best of my knowledge, after removing the glove

7    from my hand, there is only two things I would have done with

8    it.  One would have been to place it on my gear bag, which was

9    right at the door that I made entry through that was propping

10   the door open.  So it was either to put it right on top of my

11   gear bag or to place it inside of my pants cargo pocket, and

12   those are the two places that, you know, that I could have

13   thought I put it.

14       Q.   When Trooper Dupras arrived on scene, what, if

15   anything, did he give direction to do?

16       A.   Trooper Dupras -- I didn't have -- I didn't really have

17   much interaction with Trooper Dupras because I was so busy with

18   speaking with other Coast Guard members and then beginning a

19   crime scene log.

20            The last interaction that I can remember of myself and

21   Trooper Dupras was as I was walking back to the main entrance to

22   grab my gear bag, he told me to stop, and he grabbed it for me

23   and brought it to me just a few short steps away from the door.

24       Q.   And when you were outside talking to members, were

25   other members arriving at that time?

1      A.  Yes.  So shortly after I spoke with the three Coast

2   Guard members outside, if I'm not mistaken, Petty Officer

3   Kolodzik came up to me and said, "Agent Sturgis would like for

4   you to start a crime scene log."

5          So I broke away from speaking with those three

6   individuals and I began to log vehicles that were coming in, to

7   include their plate numbers, description of the vehicle,

8   occupants inside the vehicle, and as best I could arrival times,

9   departure times, things of that nature.

10     Q.  And eventually how were you relieved from the scene for

11  the day?

12     A.  I was relieved of the crime -- of the crime -- keeping

13  that crime scene log by Petty Officer Rocque.  And he took over,

14  you know, keeping track of the crime scene log.

15         From there, Petty Officer Kolodzik and I headed towards

16  Building November 23, which is our water treatment plant just

17  down the road, and we headed down there to go speak with the

18  on-duty personnel that were there, they were working.

19         And so when we arrived there, Petty Officer Kolodzik

20  spoke with them while I continued another crime scene log, per

21  se, you know, identifying the vehicles that were there, writing

22  down their plate numbers and who they belonged to.

23         MS. DUIGNAN:  Thank you, I have no further questions.

24     A.  Thank you.

25         THE COURT:  Cross-examination.

1                       CROSS-EXAMINATION

2    BY MR. OFFENBECHER:

3        Q.  Good afternoon, Mr. Elizondo.

4        A.  Good afternoon, sir.

5        Q.  You've described your actions with Officer Kolodzik in

6    clearing the scene; is that right?

7        A.  Yes, sir.

8        Q.  And you were conducting a security sweep of the inside

9    and the outside perimeter of T2; weren't you?

10       A.  Yes, sir.

11       Q.  And also the vehicles that were parked around T2;

12   right?

13       A.  Yes, sir.

14       Q.  And the purpose of that was to make sure that the scene

15   was secure; right?

16       A.  Yes, sir.

17       Q.  And by making the scene secure, what you mean is that

18   you wanted to make sure that the person who had committed these

19   murders wasn't hiding someplace inside the building; right?

20       A.  Yes.  If at the point -- yep.  And also to make sure

21   that it was safe for the first responders, medical personnel,

22   and the Coast Guard fire that were there.

23       Q.  Well, because if the person who had committed these

24   murders was hiding someplace in the building, it wouldn't be

25   safe for the other first responders and the Coast Guard fire

1  folks to come into the building; right?

2      A.  Yes, sir.

3      Q.  And so you wanted to make sure that the person who

4  committed these murders wasn't hiding someplace inside the

5  building; right?

6      A.  Yes, sir.

7      Q.  And then you checked all of the cars and other vehicles

8  and trucks and whatever else these other heavy vehicles that

9  were outside, you checked those as well; right?

10     A.  Yes, sir.

11     Q.  Because you wanted to make sure that the person who had

12 committed these murders wasn't hiding in one of those vehicles

13 out there; right?

14     A.  Yes, sir.

15     Q.  And the person -- first of all, you would want to catch

16 the person who did this; right?

17     A.  Sure.

18     Q.  And second of all, you wanted to make sure that the

19 person who committed these murders couldn't harm anyone else,

20 like you or your comrades or anybody else at T2 or the fire

21 department folks; right?

22     A.  Yes, sir.

23     Q.  And in doing this, you wanted to make sure that it was

24 safe for everybody; right?

25     A.  Yes, sir.

1    Q.  And at the same time, as a trained investigator, police

2  officer, you wanted to make sure that you maintained the

3  integrity of the crime scene; is that right?

4    A.  Yes, sir.

5    Q.  So you wanted to be very -- and part of your training

6  is that you want to be very special -- careful when you're

7  clearing an area to not alter the crime scene at all; right?

8    A.  Yes, sir.

9    Q.  Because you know there are going to be investigators

10 who are going to come after you who are going to want to take

11 pictures of the crime scene; right?

12   A.  Yes, sir.

13   Q.  They want to make diagrams of where everything is;

14 right?  Isn't that right?

15   A.  Yes, sir.

16   Q.  And they will want to know where everything was and

17 exactly how it was when you got there; right?

18   A.  Yes, sir.

19   Q.  And so you go -- you're very careful -- although you

20 want to make sure it's safe, you're very careful not to alter

21 anything or change it from the way it was when you first got

22 there; is that right?

23   A.  Yes, sir.

24   Q.  And that's what you did in this case; isn't that right?

25   A.  That was definitely my attempt.

1              MR. OFFENBECHER:  Call up government's Exhibit No.

2    390.

3        (Whispered discussion off record)

4              MR. OFFENBECHER:  Your Honor, can I just come over

5    here and use the pointer with --

6              THE COURT:  As long as your voice can be heard.

7              UNIDENTIFIED SPEAKER:  There is a microphone right

8    there.

9              MR. OFFENBECHER:  I'll speak very loud.  I'm just

10   going to point for a second, is that okay?

11             THE COURT:  Go ahead, and Nancy will tell you if it's

12   not.

13    BY MR. OFFENBECHER:

14       Q.  Officer Elizondo, you were looking -- you pointed out

15   here with a pointer on government's Exhibit 392, which is kind

16   of a diagram of the building; is that right?

17       A.  Yes, sir.

18       Q.  And as I understand your testimony -- I'm going to put

19   the pointer here -- you began your search of the perimeter of

20   the building right here; is that right?

21       A.  No, sir.

22       Q.  Where did you begin it?  Go ahead and use your pointer.

23       A.  Right there at that door.

24       Q.  And then you went all the way around the building,

25   around this way; is that right?

1      A.  After exiting the building, yes.

2      Q.  Right.  By "perimeter," we mean the outside of the

3  building; right?

4      A.  Yep.

5      Q.  And my pointer -- these are the garage doors over here;

6  is that right?

7      A.  Yes, sir.

8      Q.  And then you went past the garage doors, down through

9  here, and then you entered the boiler room; is that right?

10     A.  Yes, sir.

11     Q.  You didn't go into the break room from there because

12  the door was locked; right?

13     A.  We didn't go into the break room because Petty Officer

14  Kolodzik had already cleared the break room.

15     Q.  So you didn't try to get into the break room from the

16  boiler room?

17     A.  Not to my recollection.  That door right there was

18  identified when we were inside of the building and then again

19  when we were in the boiler room.  The break room had already

20  been cleared by Petty Officer Kolodzik.

21     Q.  Here is my question.  You didn't go from the boiler

22  room into the break room?

23     A.  No, sir.

24     Q.  You tried to get through there, didn't you?

25     A.  I don't recall trying to get in through that door,

1   because we had attempted to access that door from the inside and

2   were unsuccessful because it was locked from the outside.

3        Q.  You think that you tried to get in through this way,

4   from the break room into the boiler room?

5        A.  Yes, sir.

6        Q.  Is that what you think?

7        A.  Yes, sir.

8        Q.  And you weren't able to get into the boiler room from

9   the inside?

10       A.  Yes, sir.

11       Q.  In any case, you left the boiler room at some point;

12  right?

13       A.  Yes, sir.

14       Q.  And then you continued around the backside of the

15  building over here checking to see if there were any persons

16  there; right?

17       A.  Yes, sir.

18       Q.  And then you came around the rest of the building --

19  following my pointer -- and you -- at that point you had

20  completed the security sweep of the perimeter of the building;

21  is that right?

22       A.  Yes, sir.

23       Q.  And at some point you also completed a look/see through

24  all of these vehicles that were parked in front of T2; is that

25  right?

```
 1      A.  Yes, sir.

 2              MR. OFFENBECHER:  Could I have just a moment, Your

 3   Honor?  Could I have just a moment, Your Honor?

 4              THE COURT:  All right.

 5              MR. OFFENBECHER:  I don't have any other questions,

 6   Your Honor.

 7              THE COURT:  Redirect.

 8              MS. DUIGNAN:  Yes, Your Honor.  Will you please pull

 9   up Exhibit 361.

10                      REDIRECT EXAMINATION

11    BY MS. DUIGNAN:

12      Q.  Do you recognize that photo?  I know it's been a long

13   time, so...

14      A.  It has been a long time, and I -- vaguely.

15      Q.  Do you remember seeing that area when you were in T2?

16      A.  Maybe if I saw some -- a larger scale photo of it.

17   Again, like I said, that was the first time I'd been in that

18   building.

19      Q.  I understand.  We're going to zoom in a little bit,

20   that might help out.

21              Do you see that area on the top upper left-hand part of

22   the door?

23      A.  Yes, ma'am.  If you're referring to the lock, locking

24   mechanism on the door.

25      Q.  Yes.
```

1      A.  Yes, ma'am.

2      Q.  Do you remember seeing that on the morning when you ran

3  through the building?

4      A.  You know, that's a --

5      Q.  Answer to the best of your recollection.

6      A.  Yeah, that's a small detail.  I can't.  Yeah, I

7  apologize.

8      Q.  Yeah, that's fine.  Is it safe to say that this was

9  your first murder investigation?

10     A.  It was, yes.  That was the first time I'd ever been

11 exposed to anything that traumatic, yep.

12     Q.  And it probably left quite an impression on you?

13     A.  It did, yes.

14         MS. DUIGNAN:  I have no further questions.

15         THE COURT:  Recross.

16         MR. OFFENBECHER:  Just briefly, Your Honor.  Call up

17 defense Exhibit 052, please.

18                    RECROSS-EXAMINATION

19  BY MR. OFFENBECHER:

20     Q.  After Elizondo, can you take a look at 052 just for a

21 moment.  Look at the first couple of lines of that and see if

22 you recognize what that is.

23         THE CLERK:  We just need to clarify.  It's DE-052;

24 correct?

25         MR. OFFENBECHER:  Yes, it is.

1          THE CLERK:  Thank you.

2   BY MR. OFFENBECHER:

3      Q.  Do you recognize what that is?

4      A.  Appears to be Petty Officer Kolodzik's statement from

5   that date.

6      Q.  Right.  And I'm going to direct your attention to the

7   last two -- the last three sentences of that.

8          MR. OFFENBECHER:  Could you call that up, please.

9          MS. DUIGNAN:  Objection, Your Honor.  I don't think

10  this witness has any knowledge of what Petty Officer Kolodzik

11  necessarily saw.  Refreshing his memory with his own statement

12  might be more appropriate.

13         MR. OFFENBECHER:  I can refresh his memory --

14         THE COURT:  That makes sense.  What's the purpose of

15  this?

16         MR. OFFENBECHER:  I'm going to see if it refreshes his

17  memory about which side the door was locked on.

18         MS. DUIGNAN:  But with somebody else's statement?

19         MR. OFFENBECHER:  If it refreshes his memory, sure.

20         MS. DUIGNAN:  Okay.

21         THE COURT:  Okay.

22         MR. OFFENBECHER:  I'm happy to show him his, too.

23         THE COURT:  I don't know what any of them say.  So you

24  know what's best.

25         MR. OFFENBECHER:  Call up the last -- this much of it.

1    BY MR. OFFENBECHER:

2        Q.  Why don't you read that.

3            THE COURT:  To yourself.

4            MR. OFFENBECHER:  Actually, Mr. Johnson, can you give

5    me two lines above that, please.  Hang on just a second.  There

6    you go.

7            THE COURT:  Okay, that's --

8        A.  Okay.

9    BY MR. OFFENBECHER:

10       Q.  Does that refresh your memory at all about whether you

11   were able to gain access to the -- inside the office area from

12   the boiler room?

13       A.  Yes, sir, a little bit it does.  And also this is the

14   first time that I've seen Petty Officer Kolodzik's statement.

15       Q.  Sure, sure.  No, I understand, you haven't seen it

16   before.  But all we're asking is whether, reviewing that now,

17   refreshes your memory about whether you were able to get from

18   the boiler room into the office or break room part from the

19   boiler room on the one hand; or on the other hand, whether it

20   was locked so you couldn't get through?

21       A.  Also -- yes, it does.  But also I can't recall if it

22   was Petty Officer Kolodzik or I that was attempting to gain

23   access into that door.  So it may have been her.  That's what

24   she said in her statement.

25       Q.  So now that you've refreshed your memory and thought

```
 1   back about it, and I know you've never seen that before, do you
 2   think that it was true that you were -- went into the boiler
 3   room and then were unable to get to the other side, the break
 4   room/office side, because it was locked?
 5       A.  Yes, sir.
 6              MR. OFFENBECHER:  Thank you.  I don't have any other
 7   question.
 8              MS. DUIGNAN:  I don't have any further questions
 9   either.
10              THE COURT:  Okay, ladies and gentlemen, we'll take a
11   15-minute recess.  And thank you, sir, you're excused.
12    (Witness excused)
13                                        (Jury not present)
14              THE COURT:  Counsel, I have a 4:30 hearing today, so
15   we're going to stop at 4:29 or -28 or something like that.  15
16   minutes.
17      (Proceedings recessed, 3:07:56 p.m. until 3:27:46 p.m.)
18                                        (Jury not present)
19              THE CLERK:  All rise.  His Honor the Court, the United
20   States District Court is again in session.  Please be seated.
21              THE COURT:  Okay, so counsel, remember, I do have a
22    4:30.
23              MS. LOEFFLER:  I have four very quick witnesses next.
24              THE COURT:  Okay, they are on their way.  Are we going
25   to get them done in an hour?
```

1          MS. LOEFFLER:  One of them is sitting right here ready
2     to go.

3          THE COURT:  Okay.

4          MS. LOEFFLER:  You're waving at somebody, but there is
5     nobody you're waving at.

6          THE COURT:  I know.  But I didn't know why -- it's a
7     very comfortable room they have got apparently.

8          MS. LOEFFLER:  More than I can say for our setup,
9     Judge, let me just mention.

10                                        (Jury present)

11         THE COURT:  Okay, government's next witness.

12         MS. LOEFFLER:  I call Captain Billie Weth to the
13    stand.

14         THE COURT:  Okay.  Pulls out.  And she'll swear you in
15    right here.

16         THE CLERK:  Please raise your right hand.

17          WILLIAM WETH, PLAINTIFF'S WITNESS, SWORN

18         THE CLERK:  Thank you.  Please have a seat.

19         And, sir, if you could please state your full name and
20    spell it.

21    A.  Full name is William Weth.  Last name spelled W-e-t-h.

22         THE CLERK:  And William is common spelling?

23    A.  Yes, common spelling.

24         THE CLERK:  Thank you, sir.

25         THE COURT:  All right, counsel.

1                    DIRECT EXAMINATION

2    BY MS. LOEFFLER:

3        Q.  Captain Weth, I'm referring to you by your title, but

4    what is your current occupation?

5        A.  My current occupation is I am a captain at Coast Guard

6    Fire, Kodiak, Alaska.

7        Q.  And is that a -- is the fire station located on the

8    base?

9        A.  It is located on the base.

10       Q.  How long have you been with the fire station in Kodiak,

11   Alaska?

12       A.  Going on 13 years now.

13       Q.  And it's a -- do you respond to civilian fires or is it

14   Coast Guard related only?

15       A.  We respond to -- since it's Kodiak, it's so small -- we

16   respond to both.  We have a mutual agreement set up with the

17   surrounding communities, because they are volunteers, so we

18   respond to both civilian and to military.

19       Q.  Do you also have oversight ability over EMTs, which I

20   see is right on your shoulder?

21       A.  We're all EMTs.

22       Q.  And by "EMT," I think it's the first time we've used

23   that acronym, people may be familiar, but will you explain what

24   it is?

25       A.  We're all emergency medical technicians at various

1  levels.  There is -- State of Alaska has three different -- or

2  actually four, but we only have three of them.

3       There is your EMT 1, which is like a basic EMT; an EMT

4  2, which is an intermediate; and your EMT 3 which is the more

5  advanced care.  So I can do like cardiac (indiscernible).  One

6  step below a paramedic.

7     Q.  And then -- so you respond to injury and, you know,

8  incidents in Kodiak?

9     A.  We respond from everything from a cardiac arrest to a

10  kid fell off the monkey bars.

11     Q.  Now, turning to April 12th of 2012, were you on duty?

12     A.  Yes, I was.

13     Q.  And did you receive a call to go to a scene at the

14  COMMSTA?

15     A.  Yeah, we received a call to go to T2.

16     Q.  Are you familiar with the COMMSTA?

17     A.  Yes.

18     Q.  Why?

19     A.  Because we go in there every single month checking the

20  fire extinguishers, one of -- our program for fire prevention.

21  We go into every single building on the base and check every

22  single fire extinguisher on the base.

23     Q.  So on April 12th when you were called out, do you

24  recall about when it was?

25     A.  It was right around shift change, so around 7:45 in the

1    morning.

2        Q.  And when you went, who went with you?

3        A.  I had a full engine company.  It was myself, Fire

4    Fighter Smith -- or no, he wasn't on my truck.  Mathis -- well,

5    no, he wasn't on my truck either.  I had three other guys on my

6    truck.  I'm trying to remember.  It was a shift change and it

7    was two years ago, and we flow through people so quick that I

8    don't remember who was on my truck other than I had DeVries,

9    Evenhousing (ph), and I do not remember who my driver was.

10       Q.  That's fine.  I'm going to go to when you got to the

11   building.

12           Did you go into the building to determine what the

13   issue was?

14       A.  Yes, I was the first one into the building from the

15   fire side.

16       Q.  And I think we're going to just hand you the -- well,

17   actually, I think you're going to have to come around.

18       A.  Okay.

19       Q.  You'll see a chart here and a model over there, both of

20   which you looked at in preparation for today; right?

21       A.  Yes.

22       Q.  I think you have a moveable microphone laying in front

23   of you.  Why don't you put it on.  And I have just a few things

24   I want to go through with you.

25           Do you recall which door you made entrance into the

 1   building?

 2       A.  I made entry through the main door, which would have

 3   been right here.

 4       Q.  And when you did that, did you find a victim?

 5       A.  I had to walk a little bit because there was a little

 6   bit of a (indiscernible).  But I found one victim laying

 7   underneath the water fountain here.

 8       Q.  What I'm going to do is I'm going to pull up what's --

 9            MS. LOEFFLER:  This one has been admitted, Kim, 259?

10            MS. DIXON:  Yes.

11    BY MS. LOEFFLER:

12       Q.  What's been admitted as 259.  It will appear on the

13   screen, and I'm just going to ask you about the difference

14   between that picture and how you found the victim.

15       A.  Okay.

16            THE COURT:  The screen?  Okay.

17    BY MS. LOEFFLER:

18       Q.  That's the picture that we had from a trooper.  Was

19   that exactly the position that you found Mr. Hopkins?

20       A.  No, it was not.  He was not in that position when we

21   arrived on scene.

22       Q.  Where was he?

23       A.  He was closer to being underneath that water fountain.

24   He was lying on his right side, so he would have been facing

25   this way towards this door here.  He would have been facing this

1    door laying on his side with his arm up underneath him.

2        Q.  And when you say his arm underneath him, was it his

3    right arm?

4        A.  It was his right arm.  He was laying on his right side

5    kind of like this facing the door with his head underneath the

6    water fountain.

7        Q.  When you -- and actually we can take the picture off

8    now.

9            After you saw him, did you make any efforts to

10   determine whether there was any medical intervention that you

11   could do?

12       A.  I did a quick look to see if there was a chance of

13   sustaining life.  There was too much red stuff on the ground.

14   It's not supposed to be on the outside of your body, it's

15   supposed to be on the inside.  There was no chance for this guy

16   unfortunately, so we made no resuscitation efforts.

17       Q.  Did you go to the other victim?

18       A.  I went to the other victim after -- CGPD, when I made

19   entry, they were coming up this way, because they were still

20   sweeping the building because they weren't sure if somebody else

21   was still in the building.  And they informed me that I had a

22   second patient in this office space.

23       Q.  And did you go in and --

24       A.  I went to the second patient also.

25       Q.  And I will -- actually, you're going to have to look at

1    the screen over there.  This has not been admitted yet.  I'm

2    going to show you an exhibit marked 260.  Actually, I think this

3    is the first victim again, yeah.

4            MS. LOEFFLER:  Is this 260?

5            MS. DIXON:  Uh-huh.

6            MS. LOEFFLER:  I'm sorry, is that 260?

7            MS. DIXON:  Yeah, it is.  That's (indiscernible).

8            MS. LOEFFLER:  That's all right, I'll get to the other

9    with the other.

10    BY MS. LOEFFLER:

11       Q.  Let me follow up again with Mr. Hopkins.

12           When you saw the other victim -- did you touch either

13    victim?

14       A.  I did not touch either victim.

15       Q.  Did you make any effort to secure the scene to make

16    sure that you didn't contaminate the scene?

17       A.  Yeah.  I followed our standard protocols for any scene

18    where we suspect something -- some foul play.  So making entry

19    into each of the rooms, follow the same path in, follow the same

20    path out.  If I didn't need to touch it, I did not touch it.  So

21    I had some of my other firefighters in, that's who did my

22    patient care for me -- or not care, but the diagnostics on my

23    patient.

24       Q.  And were you the one that declared either or both of

25    the victims dead?

1      A.  I declared them both deceased.

2      Q.  Did you get any blood or any other crime scene evidence

3  on you?

4      A.  I had nothing on me.  And I checked -- I even checked

5  the heels of my -- the treads of my boots as I was walking out

6  to make sure that I didn't drag anything else out with me.

7           MS. LOEFFLER:  I have nothing further for this

8  witness.

9           THE COURT:  Cross-examination.

10          MR. OFFENBECHER:  No questions, Your Honor.

11          THE COURT:  All right, the next witness.

12          MS. LOEFFLER:  I would call Andrew DeVries next.

13          THE COURT:  All right, thank you, sir.

14   (Witness excused)

15          THE COURT:  If you'll remain standing, she'll swear

16  you in.

17          THE CLERK:  Please raise your right hand.

18           ANDREW DeVRIES, PLAINTIFF'S WITNESS, SWORN

19          THE CLERK:  Thank you, please have a seat.

20          And sir, if you can please state your name and spell

21  it.

22      A.  My name is Andrew DeVries.  A-n-d-r-e-w D-e, capital V

23  as in Victor, r-i-e-s.

24          THE CLERK:  Thank you.

25          THE COURT:  Counsel.

1                          DIRECT EXAMINATION

2     BY MS. LOEFFLER:

3        Q.  EMT DeVries, I see that you're an EMT 3 on your

4     shoulder board.  Can you explain your title to the jury, please.

5        A.  Yes, ma'am.  I'm a captain with the U.S. Coast Guard

6     Fire & Rescue, Base Kodiak, EMT 3.

7        Q.  When you -- on April 12th of 2012 -- did you have a

8     different rank?

9        A.  Yes, ma'am.  I was a firefighter lead medic at the

10    time.

11       Q.  And you've been promoted since then?

12       A.  Yes, ma'am.

13       Q.  On April 12th were you called out to the COMMSTA in

14    Kodiak for a medical emergency?

15       A.  Yes, ma'am.

16       Q.  And I take it you traveled there, in part, with the

17    captain, who just walked out the door?

18       A.  Yes, ma'am.  I was the lead medic on Engine 42.

19       Q.  When you got to the scene, did you go into the COMMSTA?

20       A.  Yes, ma'am.

21       Q.  Are you familiar with the COMMSTA?

22       A.  Yes, ma'am.

23       Q.  And why are you familiar with the COMMSTA?

24       A.  We're in there every month checking extinguishers and

25    fire safety stuff.

 1      Q.  Did you get involved with any one of the two victims

 2  that were in the COMMSTA that day?

 3      A.  Yes, ma'am, I helped do the primary assessment on Mr.

 4  Hopkins.

 5      Q.  I'm going to show on your screen what's been marked as

 6  Exhibit 260.

 7      A.  Okay.

 8      Q.  It's going to appear next to you.

 9          And is that a different position than you found Mr.

10  Hopkins when you went into the break room?

11      A.  Yes, ma'am.

12      Q.  And there are medical things attached to the individual

13  in that picture.  Did you attach them?

14      A.  Yes, ma'am.

15          MS. LOEFFLER:  I'm going to move 260.

16          MR. OFFENBECHER:  No objection, Your Honor.

17          THE COURT:  All right.

18          MS. LOEFFLER:  We'll just show this briefly.

19          THE COURT:  It will be received.

20                          PLAINTIFF'S EXHIBIT 260 ADMITTED

21  BY MS. LOEFFLER:

22      Q.  So it's a little hard in the bright light, but in the

23  screen next to you, are there some medical devices that you put

24  on Mr. Hopkins?

25      A.  Yes, ma'am.

1      Q.  Can you describe those, please.

2      A.  There are two AED pads, auto electric defibrillator

3  pads, which go on the left rib, lateral ribcage and then also on

4  the upper right chest.  And it's designed to not only read a

5  heart rhythm but also to go over and advise or disadvise a

6  shock.  And so deliver electric shock through the heart.

7      Q.  And I take it you actually -- you did have to put your

8  hands on and touch Mr. Hopkins in order to put on these devices?

9      A.  Yes, ma'am.  We did have to expose his chest, for one;

10  and also we moved him out of the position he was in.

11      Q.  And since the photos that we have are photos that were

12  taken after you had done it, can you just describe where you

13  found him, the difference, and what you did -- how this differs

14  from the position he was in when you found him?

15      A.  Yes, ma'am.  You'll notice a drinking fountain right

16  over top of where he was laying in this picture.  He was

17  underneath the drinking fountain on his right side in, I would

18  call it, almost a fetal position.  His left leg was straight,

19  but his right leg was semi bent.

20          And his arm was unusually -- his left arm was unusually

21  kind of cocked behind his back, left shoulder all the way up to

22  his left ear.  And his right ear was facing closest to the

23  concrete floor that you're seeing.  So he was hunched abnormally

24  underneath that drinking fountain up against kind of a magazine

25  rack that's up on the wall, yeah.

1     Q.  I think we can take the photo down.

2         And was there any -- in addition to the injury to the

3  face, was there another injury to his arm that you saw?

4     A.  Yes, ma'am.  I saw an injury to his left mid tricep,

5  and also there was one in his chest area.

6     Q.  Did you take any efforts, despite turning him over, to

7  preserve the crime scene?

8     A.  Yes, ma'am.  We kind of speculated when entering that

9  it was a crime scene.  And as soon as we saw the large amount of

10  blood loss, you know, we would carefully walk around blood and

11  things and try to retrace our steps in and out, remember what we

12  touched, and if we had to move anything.

13     Q.  So did you get any blood on you, despite all the blood

14  that was on the floor?

15     A.  I don't think I got any blood on me except for maybe a

16  little bit on my exam gloves.

17     Q.  And do you recall the -- what was the -- did you notice

18  anything about the temperature of Mr. Hopkins when you were

19  dealing with him?

20     A.  Yes, ma'am.  That was one of the things we checked, was

21  that he was cold to the touch.

22         MS. LOEFFLER:  I have nothing further for this

23  witness.

24         MR. OFFENBECHER:  No questions.

25         THE COURT:  All right, thank you, sir.  You're

1  excused.

2   (Witness excused)

3         THE COURT:  Government's next witness.

4         MS. LOEFFLER:  Maybe you can send in Mr. Smith as you

5  head out, thank you.

6         MR. OFFENBECHER:  Your Honor, can we approach the

7  sidebar.

8   (Sidebar conference as follows:)

9         MR. OFFENBECHER:  Well, Your Honor, I do want to

10 object to putting on these -- a number of these photographs of

11 the decedents laying in a pool of blood.  There is no -- really

12 no probative value with respect to the government's case.  There

13 is no suggestion that they -- has anything to do with, you know,

14 who did it in this case, which is what the whole case is about.

15 Whether they did all this, you know, their bodies were moved a

16 little bit or not moved a little bit or how they were lying just

17 has nothing to do with this case.  And obviously they are super

18 prejudicial.

19         I had a standing objection earlier.  I assume I still

20 have it to these here.  But putting these photos over and over,

21 it just doesn't advance the state's -- the government's case.

22         MS. LOEFFLER:  Your Honor, I've got crime scene

23 experts to do that.  If I didn't show that the scene wasn't

24 contaminated, I have no doubt the defense would claim that it

25 was a contaminated scene.  I have to bring in everybody that was

1  there to show that they did not contaminate the scene.  It is

2  part of our case that there were not forensic footprints, and

3  these guys didn't contaminate the scene.

4          Now the only thing I introduced -- because this guy

5  put the things on it, that -- we don't have photos from when we

6  first found them, I need to simply show the difference.

7          The next guy I'm calling actually marked in red where

8  the chair was and, you know, he hand wrote them.  I'll put them

9  up, I will take them down.  But I need to show where the bodies

10  were.  And this is the first responding guy, and he actually

11  drew in his own hand, like, where the chair was.  And I have

12  crime scene people, and they turn on what the effects are --

13          MR. OFFENBECHER:  There is no claim of contamination

14  (indiscernible) matter will be.  And putting them up there and

15  just leaving them sit there while we have chitchat is just

16  prejudicial.

17          THE COURT:  Okay.  I was thinking more (indiscernible)

18  government is entitled to show a deceased person.  I don't think

19  it should be really (indiscernible).  I think you should show it

20  and take it down a little quicker.

21          MS. LOEFFLER:  I will.

22          THE COURT:  It's not necessary to put it up

23  (indiscernible).

24          MS. LOEFFLER:  I meant to take it down quicker.

25          THE COURT:  (Indiscernible) take it down.  You can

1  still keep it on the screen (indiscernible) witness

2  (indiscernible).

3          MS. LOEFFLER:  Yeah, that's fine.  I didn't -- I saw

4  with that one, it was up a second too long, and I said, please

5  take it down.

6          THE COURT:  (Indiscernible) I was a defense attorney

7  and (indiscernible) same argument that you're making and Judge

8  (indiscernible).

9          MR. OFFENBECHER:  You were right before.

10         THE COURT:  Was I right?

11         MS. LOEFFLER:  And the families are not here.  I told

12 her not to be here.

13         THE COURT:  Okay.  But my point is, in this kind of a

14 case, these kind of pictures are part of the case.  I don't want

15 you to overly dwell on it.

16         MS. LOEFFLER:  Nope, I just have to (indiscernible).

17  (End sidebar)

18         THE COURT:  Good afternoon, sir.  Are you waiting to

19 be sworn in.

20         MR. SMITH:  Yes, sir.

21         THE COURT:  Madam Clerk.

22         THE CLERK:  Please raise your right hand.

23          DANIEL SMITH, PLAINTIFF'S WITNESS, SWORN

24         THE CLERK:  Thank you.  Please have a seat.

25         And, sir, if you can please state and spell your full

```
 1   name.
 2        A.   Daniel Smith.  D-a-n-i-e-l S-m-i-t-h.
 3             THE CLERK:  Thank you.
 4             THE COURT:  Counsel.
 5                      DIRECT EXAMINATION
 6    BY MS. LOEFFLER:
 7        Q.   Mr. Smith, what's your title?
 8        A.   I'm a fire fighter EMT with the Coast Guard Fire
 9    Department, Kodiak, Alaska.
10        Q.   And did you also respond on April 12th, 2012 to the
11    scene at COMMSTA?
12        A.   Yes, ma'am.
13        Q.   And are you familiar with COMMSTA?
14        A.   Yes.
15        Q.   Why are you familiar with COMMSTA?
16        A.   Because we are expected to inspect the building monthly
17    as well as check all the fire extinguishers in the building to
18    make sure that they are in service every month.
19        Q.   When you went to COMMSTA on April 12th, did you get
20    involved with a response to a victim that was in the office in
21    COMMSTA?
22        A.   Yes.
23        Q.   How did that come about?
24        A.   I was directed by my captain.  We had two victims.
25    Firefighter DeVries was working on the first victim, and Captain
```

1  Weth directed me to attend to the second victim to see if we had

2  a viable patient or not.

3      Q.  I'm going to turn to the second victim and pull up

4  Exhibit 323.  I have two exhibits.  And I will simply ask you,

5  on Exhibit 323, this is a photo that was not taken by you.  Was

6  this the way the victim was found when you got there?

7      A.  No, ma'am.  He was lying face down with his head more

8  underneath the desk.

9      Q.  And this exhibit has red markings on there.  Were they

10  actually put by you?

11      A.  Yes, ma'am.

12      Q.  I'm going to briefly --

13          MS. LOEFFLER:  I would move Exhibit 323, and I'm going

14  to put it up for just a second.

15          MR. OFFENBECHER:  Same objection, Your Honor.

16          THE COURT:  Very well.  It will be received.

17                          PLAINTIFF'S EXHIBIT 323 ADMITTED

18          MS. LOEFFLER:  323.

19   BY MS. LOEFFLER:

20      Q.  So briefly I just want you to say the Xs are there.

21  And what would the Xs depict?

22      A.  The X depicts the location of his office chair.  In

23  order to treat or even ascertain if there were signs of life on

24  Mr. Belisle, the office chair was obstructing my way, and in

25  order to maintain as clean a scene as possible, I elected to

1   move the chair, and notified Captain Weth that I had moved the

2   chair and also made a mental note.

3        Q.  And I'll take down Exhibit 323 now and just ask.

4            The photo that you have where Mr. Belisle is face up,

5   did you actually change his position from under the desk?

6        A.  Yes, ma'am.

7        Q.  And why did you do that?

8        A.  We had to, as part of our protocol in order to

9   determine signs of life, we have to put on electrical pads, ECG

10  pads, in order to make sure that once we hook him up to a

11  monitor on our defibrillator, that there is no electrical

12  activity in the heart.

13       Q.  And did you have any signs that Mr. Belisle was alive?

14       A.  I had no visible signs.  When I checked his pulse, he

15  had no pulse.

16       Q.  And did you check -- did you get any sense of whether

17  he was cold, warm, or what the body temperature was?

18       A.  He was not cold, but he was -- he was a little warm.

19       Q.  And I'm going to turn to Exhibit 324 and just ask

20  you -- you'll see it on your screen.

21           In terms of this exhibit, this is also -- bear your

22  markings showing where you put the chair?

23       A.  In approximation, yes, ma'am.

24           MS. LOEFFLER:  I'm going to move Exhibit 324.

25           MR. OFFENBECHER:  Same objection, Your Honor.

1          THE COURT:  It will be received.

2                          PLAINTIFF'S EXHIBIT 324 ADMITTED

3          MS. LOEFFLER:  Put up 324.

4   BY MS. LOEFFLER:

5      Q.  Again, you signed this, and I take it -- and are the

6   little red marking -- are the red, looks like felt tip markings,

7   yours?

8      A.  Yes, ma'am.

9      Q.  And what were you trying to do with the red felt tip

10  markings?

11     A.  I was trying to indicate that was the location the

12  chair ended up.  I was trying to move it.  And I believe one of

13  my other co-workers who was not called to the witness stand

14  actually may have moved it a little bit more.  So I was trying

15  to show the direction of movement and where it ended up.

16     Q.  But it was originally on top of Mr. Belisle?

17     A.  Yes, ma'am.

18          MS. LOEFFLER:  I have no further questions for Mr.

19  Smith.

20          MR. OFFENBECHER:  No questions, Your Honor.

21          THE COURT:  No cross?  Thank you, sir.  You're

22  excused.

23   (Witness excused)

24          THE COURT:  Next witness.

25          MS. LOEFFLER:  And can you bring in Mr. Mathis.

```
 1            THE COURT:  If you just remain standing, she'll swear
 2  you in.
 3            ROBERT MATHIS, JR., PLAINTIFF'S WITNESS, SWORN
 4            THE CLERK:  Okay, thank you.  Please have a seat.
 5            And, sir, if you can please state and spell your full
 6  name.
 7       A.  Robert E. Mathis, Junior.  Robert is common spelling.
 8  Last name is M-a-t-h-i-s.
 9            THE CLERK:  And Junior?
10       A.  Yes.
11            THE COURT:  Counsel.
12                      DIRECT EXAMINATION
13   BY MS. LOEFFLER:
14       Q.  Mr. Mathis, where do you currently work?
15       A.  I currently work for the City of Seward.
16       Q.  As what?
17       A.  As the deputy fire chief.
18       Q.  And before you were deputy fire chief in Seward, did
19  you do a fire suppression role in Kodiak?
20       A.  Yes, ma'am.  I was a firefighter EMT 3 at Base Kodiak.
21       Q.  How long were you at Base Kodiak?
22       A.  Approximately seven years.
23       Q.  From when to when?
24       A.  From April 1st of 2007 until June 29th of last year.
25       Q.  Turning to your time in Kodiak, did you get called out
```

1   on April 12th to COMMSTA to deal with the two victims of the

2   homicide?

3        A.  Yes, ma'am.

4        Q.  And did you deal particularly with one victim or the

5   other?

6        A.  Yes, ma'am.

7        Q.  Which one?

8        A.  That would have been Petty Officer Hopkins.

9        Q.  And did you make any effort to preserve the crime

10  scene?

11       A.  Yes, ma'am.

12       Q.  What did you do?

13       A.  Upon arrival we did what we needed to do according to

14  our protocols, making sure that we did not interrupt any of the

15  crime scene, trying to avoid any blood, making sure all of our

16  equipment was well out of the area and not touching anything.

17  And then upon our return to the station, immediately documenting

18  what we did have to move.

19       Q.  And did you get any blood on you from the victims?

20       A.  No, ma'am.

21       Q.  Now, I also want to ask you a few other questions just

22  about your familiarity with the area around the COMMSTA.

23            Were you familiar with that area for work reasons?

24       A.  For work reason, yes.

25       Q.  Were you also familiar with it for recreational

 1    reasons?

 2        A.  Yes, ma'am.

 3        Q.  What type of recreational reasons did you spend time

 4    out there?

 5        A.  I used to spend a majority of the summer and throughout

 6    the winters out there fishing right up in that area on the river

 7    and on the lake.

 8        Q.  I'm going to turn to Exhibit 46.

 9            MS. DIXON:  It's already been admitted.

10     BY MS. LOEFFLER:

11        Q.  It's already been admitted.

12            When you look at the -- and this is the COMMSTA; right?

13     This is the rigger shop?

14        A.  Yes, ma'am.

15        Q.  And when you said you liked to fish at Buskin Lake,

16    it's not actually on this photograph, but can you describe to

17    the jury about where it is?

18        A.  If you go to the Y and head back up towards the top of

19    the screen, the road that goes off to the right is actually a

20    dirt road.  The Buskin River runs from just below that road all

21    the way up off to the screen off to the right which is where

22    Buskin Lake is at.

23        Q.  Now, when you look at this Exhibit 46, how many

24    entrances are there to the rigger shop?

25        A.  Three.

1      Q.  Driveway entrances?

2      A.  Three.

3      Q.  And in terms of the one that is closest to the bottom

4  of the screen, how often did you ever see that entrance used?

5      A.  By non-government vehicles, not very often.

6      Q.  When you say by government [sic] vehicles, what type of

7  things --

8      A.  We would see Coast Guard vehicles and the large rigger

9  shop type vehicles going in and out of there, but not a whole

10  lot of them.

11         MS. LOEFFLER:  I don't have anything else for this

12  witness.

13         THE COURT:  Cross-examination?

14         MR. OFFENBECHER:  No questions.

15         THE COURT:  Thank you, sir.  You're excused.

16  (Witness excused)

17         MS. LOEFFLER:  Your Honor, we're calling Seaman

18  Coggins back for one thing that we -- before he left town.

19         THE COURT:  Okay.  All right, sir, you know where to

20  go.  This is what you really look like, huh?  We'll swear you in

21  again.  Madam Clerk.

22         AARON SCOTT COGGINS, PLAINTIFF'S WITNESS, SWORN

23         THE CLERK:  Thank you, please have a seat.

24         And sir, if you can please state and spell your name.

25      A.  Aaron Scott Coggins.  A-a-r-o-n S-c-o-t-t

1  C-o-g-g-i-n-s.

2          THE CLERK:  Thank you.

3          THE COURT:  Counsel.

4                  FURTHER DIRECT EXAMINATION

5  BY MS. LOEFFLER:

6     Q.  Seaman Coggins --

7          MS. LOEFFLER:  Your Honor, may I examine?

8          THE COURT:  Yes.

9          MS. LOEFFLER:  Maybe -- let's put the model down

10 because even I can't see the Judge and the chart.  I'm just

11 going to -- thank you.

12         Perhaps the Judge can see out, but I can't see him.

13 Thanks.

14 BY MS. LOEFFLER:

15    Q.  All right.  Seaman Coggins, when you were on the stand

16 before, I asked you some questions about what cars were at the

17 COMMSTA when you arrived on the morning of April 12th; do you

18 recall that?

19    A.  Yes, ma'am.

20    Q.  And I'm going to put up what's been marked as Exhibit

21 265.

22         Looking at Exhibit 265, and I know this is not when you

23 first got there because the responders are there, but can you

24 recognize your vehicle in that picture?

25    A.  Yes, ma'am.

1      Q.  And is that where you parked the vehicle when you drove

2  in?

3      A.  Yes, ma'am.

4           MS. LOEFFLER:  Move Exhibit 265.

5           MR. CURTNER:  No objection.

6           THE COURT:  It will be received.

7                          PLAINTIFF'S EXHIBIT 265 ADMITTED

8  BY MS. LOEFFLER:

9      Q.  Turning your attention to 265, when you got there, what

10  vehicles were there ahead of you?

11      A.  Mr. Belisle's truck, the blue F-150, ET1 Hopkins' blue

12  Dodge Ram, and then two white government trucks.

13      Q.  And then is that your black Jeep that's sitting next to

14  the dumpster?

15      A.  Yes, ma'am.

16      Q.  And the white car next to it was not there when you got

17  there, was it?

18      A.  No, ma'am.  That's Seaman Henry's silver Xterra.  She

19  had not arrived yet.

20      Q.  And when you arrived and it was earlier in the morning,

21  can you recall whether you had your headlights on?

22      A.  Dark, so I'd hope I'd had my headlights on.

23      Q.  Let me ask you, when you pulled up and parked your car,

24  your black car like there, was there any other car to the left

25  of you?

1    A.  I do not recall a car in that spot.

2    Q.  Well, when you're a passenger -- I mean, as a driver,

3  you would have had to get out to the left; right?

4    A.  Yes, ma'am.

5    Q.  Do you think you would have seen a car if it was to the

6  left or right in front of you?

7    A.  Yes, ma'am, because there is normally not a vehicle

8  there, so it would have been out of place.

9    Q.  One more question.

10        MS. LOEFFLER:  That's it, that's all I have, thank

11  you.

12        THE COURT:  Cross-examination?

13        MR. CURTNER:  Can we leave that up.

14              FURTHER CROSS-EXAMINATION

15  BY MR. CURTNER:

16    Q.  Seaman Coggins, just so I understand, that's Mr.

17  Belisle's truck?

18    A.  No, that is ET1 Hopkins'.

19    Q.  I'm sorry, that's Mr. Belisle's truck?

20    A.  Yes, sir.

21    Q.  And that's Mr. Hopkins' truck?

22    A.  Yes, sir.

23    Q.  And that's the government truck?

24    A.  Yes.

25    Q.  And that's the government truck?

1      A.  Yes, sir.

2      Q.  And that's your Jeep?

3      A.  Yes, sir.

4      Q.  And that's Leah Henry's vehicle?

5      A.  Yes, sir.

6      Q.  And she got there after you; is that right?

7      A.  Yes, sir.

8      Q.  Now, of all these vehicles, you have the smallest one;

9  is that correct?

10      A.  Yes.

11      Q.  And you never parked your vehicle like on the other

12  side of -- now that fenced area, that's around the dumpster?

13      A.  Yes, sir.

14      Q.  And you never parked your vehicle on the other side of

15  that dumpster; did you?

16      A.  No, because I didn't want to be in the way of the

17  dumpster in case the dump truck came that day.

18      Q.  And then in order to get to the dumpster, the truck

19  would have had to come around the side to get to the dumpster?

20      A.  Yes, sir.

21      Q.  And you never parked in front of the dumpster or around

22  the dumpster or in front of those garage doors; is that correct?

23      A.  No, sir.

24      Q.  And you can't remember any other vehicles, but you

25  weren't looking for other vehicles; right?

1    A.  I was not --

2    Q.  Okay, thank you.

3    A.  -- looking for other vehicles.

4         MR. CURTNER:  All right, thank you.

5         THE COURT:  Redirect?

6                   FURTHER REDIRECT EXAMINATION

7   BY MS. LOEFFLER:

8    Q.  I'll just ask again.  Would you have noticed one right

9   in front of you when you got out of the driver's side of the

10  door?

11   A.  Yes, I would have.

12        MS. LOEFFLER:  That's all I have.

13        MR. CURTNER:  Nothing further.

14        THE COURT:  Thank you, sir.  You're excused.

15  (Witness excused)

16        MS. LOEFFLER:  Your Honor, our next witness is the

17  pathologist, which is a pretty long witness, and I don't believe

18  she's here.  We're a little bit -- I think we got a little ahead

19  of schedule.

20        THE COURT:  I don't think anybody minds stopping a few

21  minutes early.  Let's see, raise your hand if you don't want to

22  stop early.

23        All right, ladies and gentlemen, remember the

24  admonition I gave you yesterday.  I know it's -- I gave it to

25  you again today, didn't I?  I read it again today.  But if you

1  have any questions, let me know.  And you can just write a

2  question and we'd be happy to respond to any of your questions,

3  because they are good questions and it's a new experience, so I

4  understand that.

5          So we're going to -- we'll start -- if you can be in

6  the big room about 20 after 8 tomorrow, we're going to try to

7  start at 8:30 sharp.  Okay, thank you all very much.  Have a

8  good evening.

9                              (Jury not present)

10         THE COURT:  Anything else, counsel?

11         MR. CURTNER:  No.

12         MS. DUIGNAN:  Your Honor, I plan on starting with Dr.

13  Lann tomorrow, and I know that you had ordered that we could

14  show the autopsy photos, so I plan on doing that.

15         THE COURT:  I said I wanted to see them first.

16         MS. DUIGNAN:  I have them.  So if you'd like to do

17  that now, we can do that.

18         THE COURT:  If you can leave those with me.  Just as a

19  note, I noticed Juror Number 16 -- I mean 15 appears to be

20  getting more ill.  Parties should watch that.  And I may talk to

21  her tomorrow morning and see how she's feeling, but I was hoping

22  she would be getting better.  Are parties making similar

23  observations, or am I just --

24         MS. LOEFFLER:  I saw her coughing --

25         MR. CURTNER:  She's coughing.

1          MS. LOEFFLER:  -- but I haven't had a chance to -- I

2     can't see over the people when I'm on the back bench here.

3          THE COURT:  It goes from coughing to sneezing to

4     everything else.  Just a concern, because if we get 15 sick

5     jurors.

6          MS. LOEFFLER:  Yeah, that's going to be ugly.

7          MS. DUIGNAN:  May I approach with the photos?

8          THE COURT:  Yes, please.

9          MR. OFFENBECHER:  Is there a designation in the

10    exhibits that I can look at too?

11         MS. DUIGNAN:  They are all marked in the exhibits.

12         UNIDENTIFIED SPEAKER:  184 without the characters at

13    the end.  184 without the characters at the end, and 185 without

14    the characters at the end.

15         MR. OFFENBECHER:  Great, thank you.

16         THE COURT:  So explain to me what you're going to use

17    these for.

18         MS. DUIGNAN:  Dr. Lann is going to explain the nature

19    of the injuries and the process of the autopsy and how they

20    preserve evidence.  And because we have some evidence that will

21    be introduced later on through seizure from the autopsy, that's

22    important for our chain of custody.

23         MR. OFFENBECHER:  I don't know exactly what the Court

24    is looking at because I don't really --

25         THE COURT:  You haven't seen the autopsy pictures?

1          MR. OFFENBECHER:  I have seen the autopsy pictures.
2    There is a big -- I assume they selected less than the full
3    unit.
4          MS. DUIGNAN:  We gave you a set of premarked exhibits.
5          MR. OFFENBECHER:  If you can -- here is the book.  If
6    you can look in --
7          THE COURT:  Just go through them real quick so you
8    know what I'm looking at.
9          MS. DUIGNAN:  Your Honor, we selected the minimum
10   number to illustrate the doctor's testimony.  And later
11   witnesses are relying on the doctor's testimony in order to be
12   able to reconstruct the crime scene.
13         THE COURT:  I understand you need some, I just want to
14   make sure that you need those.  And apparently you do, and you
15   need all of them, is that what you're telling me?
16         MS. DUIGNAN:  Yes, Your Honor.
17         THE COURT:  For the doctor to testify?
18         MS. DUIGNAN:  Yes, Your Honor.
19         MR. OFFENBECHER:  Well, Your Honor, there are a couple
20   of issues.
21         First of all, as we've indicated earlier, this is a
22   case of who shot these individuals, not how they were shot in
23   particular or how they died.  They clearly died from traumatic
24   gunshot wounds.  There is not going to be any issue atop that.
25         Now, the government is entitled to put on its case,

1    and it certainly has put on a number of very gruesome

2    photographs already that are in evidence.

3          The other thing is, their expert's testimony I would

4    respectfully suggest -- I've seen their expert's reports --

5    don't depend on exactly how the shots occurred or how the wounds

6    on these individuals occurred and the placement of them.  But

7    even if they did depend exactly on them, an expert's -- the

8    pictures don't have to be in evidence for the expert to rely on

9    them under Evidence Rule 702, 703 and 704.  Experts can rely on

10   pieces of evidence that are not in evidence --

11         THE COURT:  True.

12         MR. OFFENBECHER:  -- as the Court is well aware of.

13   And we have no objection to the experts relying on these

14   photographs, or any of the autopsy photographs, or any of the

15   other gruesome photographs making it conclusion based thereon.

16   And as the Court is well aware, they may or may not be

17   admissible.  If any issue is raised, which it's not going to be

18   with respect to those, then the Court can reconsider its ruling

19   on the admissibility of these.

20         But these have no probative value.  These terrible

21   photos, close-up photos of these terrible wounds on these

22   individuals, have no probative value for this jury.  They are

23   not going to understand it now, they are not going to understand

24   it after somebody else testifies about it.  They are just going

25   to be gruesome photographs.  And the experts can make their

1  conclusion based on their review of these and testimony and the
2  autopsy report.
3         THE COURT:  Okay.  Well, I think they are relevant and
4  they are admissible.  The question is does the probative value
5  outweigh the potential prejudice.  I don't think -- frankly, in
6  a murder case, people expect there to be bodies, so I don't know
7  how much prejudice -- part of me wants to wait and hear the
8  expert say that -- what he's [sic] using this for.
9         MS. DUIGNAN:  Your Honor, I can certainly set the
10  foundation tomorrow with Dr. Lann, and she can testify about
11  exactly why those photographs are important to illustrate and
12  explain her testimony.
13         THE COURT:  I think I would like to do that.  And it
14  still may be I say okay on this one, not on this one.  I mean,
15  that's very possible, because, you know, to some extent they
16  appear to me to be a little bit duplicative.
17         MS. DUIGNAN:  There were specific reasons for
18  selecting certain angles, which the later crime scene experts
19  will rely upon, and Ms. Loeffler can address the crime scene
20  experts and why those -- why that testimony is important.
21         THE COURT:  I'll just tell you, I don't know, there is
22  something about -- you can make notes there -- 184-B that I'm
23  not sure that's necessary or not, but that's one thing that just
24  comes to mind.  The same with 144 -- 184-E.  Those are the two
25  that stand out.

1          You know, never pleasant to have autopsy pictures when
2     I do child pornography cases, it's never pleasant to show child
3     pornography, but it's part of the case.  So I recognize that I
4     have to just weigh the probative value versus the prejudice.
5          MS. DUIGNAN:  Your Honor, I specifically went through
6     the photos to try to pick the ones that were the least graphic.
7          THE COURT:  You did a good job, because I've seen much
8     worse than this, but that doesn't mean that -- I just told you
9     my areas of concern.
10          MS. DUIGNAN:  Yes, Your Honor.  Thanks.
11          THE COURT:  Anything else?
12          MS. DUIGNAN:  No, Your Honor.
13          THE COURT:  I've got a sentencing at 4:30.  I've got
14     time to kill.  Well, see you tomorrow at 8:20.  We'll start
15     first witness right at 8:30.
16          THE CLERK:  All rise.  This matter stands in recess
17     until tomorrow at 8:30 a.m.
18               (Proceedings recessed at 4:09:43 p.m.)
19
20
21
22
23
24
25

1              CERTIFICATION

2

3      I, LEONARD J. DiPAOLO, RPR, CRR, CCP, court-approved

4    transcriber, certify that the foregoing is correct transcript

5    from the official digital electronic sound recording of the

6    proceedings in the above-entitled matter.

7

8

9    _____        ___9/3/14___

10   Leonard J. DiPaolo, RPR, CRR, CCP        Date

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I-N-D-E-X

WITNESSES:              DIRECT      CROSS     REDIRECT     RECROSS

FOR THE PLAINTIFF:

| Witness | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Cody Jay Beauford | 466 | 495 | 516 | 518 |
| Jason Anthony Bullis (Voir dire) | 527 548/552 | 543/549 | 572/577 | 576 |
| Kevin Ryan O'Connor | 578 | - | - | - |
| Michael Birch Haselden | 591 | 605 | - | - |
| Kelly Kolodzik | 608 | 625 | 636 | - |
| Kristin Alyssa Small | 637 | 644 | - | - |
| Pedro Elizondo | 647 | 661 | 667 | 668 |
| William Weth | 673 | - | - | - |
| Andrew DeVries | 680 | - | - | - |
| Daniel Smith | 687 | - | - | - |
| Robert E. Mathis | 691 | - | - | - |
| Aaron Scott Coggins | 695 | 697 | 699 | - |

EXHIBITS:                                        ADMITTED

FOR THE PLAINTIFF:

| Exhibit | Description | ADMITTED |
|---|---|---|
| 381: | Chart | 468 |
| 384: | Rigger shop organization chart | 470 |
| 361: | Photo - boiler room door (inside) | 538 |
| 267: | Photo - south side of T2 | 572 |
| 352: | COMMSTA watch log - 4/12/12 | 582 |
| 321-A: | Audio recording - Beauford's call to ops desk | 588 |

**Peninsula Reporting**
**110 Trading Bay Dr., Ste. 100, Kenai, AK 99611 907/283-4429**

```
 1   EXHIBITS:                                   ADMITTED

 2   FOR THE PLAINTIFF:

 3   321-B:  Audio recording - O'Connor call to
             911                                 589
 4
     321-C:  Audio recording - O'Connor call to
 5           MilPol                              589

 6   169:    Video                               598

 7   45:     Photo - aerial map of COMMSTA       612

 8   48:     Photo - aerial map                  629

 9   260:    Photo - view of Hopkins             681

10   323:    Photo - Annotated by Dan Smith re:
             moving Belisle                      688
11
     324:    Photo - Annotated by Dan Smith re:
12           moving Belisle                      690

13   265:    Photo - T2 front of building six cars  696

14
     FOR THE DEFENDANT:
15
     DE-069: Photo - T2 front view from road
16           (Government Exhibit 271)            546

17   DE-070: Photo - T2 side view garage         547

18   DE-071: Photo - T2 side view back           549

19   DE-065: Photo - Back of T2
             (Government Exhibit 267)            550
20
     DE-068: Photo - T2 back door                553
21
     DE-064: Photo - back of T2
22           (Government Exhibit 266)            554

23   DE-036: Video 4/21/2012 0300 a.m. OS11      558

24   DE-037: Video 4/21/2012 0300 a.m. OS12      563

25   DE-073: Jason A. Bullis drawing             569
```

1    FOR THE DEFENDANT:

2    DE-035: Photo - side by side white trucks        571

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25