1                    UNITED STATES DISTRICT COURT
                         DISTRICT OF ALASKA
2
   UNITED STATES OF AMERICA,    )      Case No. 3:13-cr-00008-RRB
3                                )
               Plaintiff,        )      Anchorage, Alaska
4                                )      Thursday, April 3, 2014
      vs.                        )      8:32 a.m.
5                                )
   JAMES MICHAEL WELLS,          )      TRIAL BY JURY - DAY 4
6                                )
               Defendant.        )
7                                )

8                    TRANSCRIPT OF PROCEEDINGS
                    Pages 710 - 974, inclusive
9
               BEFORE THE HONORABLE RALPH R. BEISTLINE
10                 UNITED STATES DISTRICT JUDGE

11  A P P E A R A N C E S:
    For Plaintiff:    KAREN LOEFFLER, ESQ.
12                    BRYAN D. SCHRODER, ESQ.
                      KATHLEEN ANN DUIGNAN, ESQ.
13                    U.S. Attorney's Office
                      222 W. 7th Avenue, #9
14                    Anchorage, Alaska 99513
                      Ph: 907/271-5071
15
    For Defendant:    F. RICHARD CURTNER, ESQ.
16                    Federal Public Defender's Agency
                      601 W. 5th Avenue, Suite 800
17                    Anchorage, Alaska 99501
                      Ph: 907/646-3400
18
                      PETER OFFENBECHER, ESQ.
19                    Skellenger Bender, P.S.
                      1301 5th Avenue, Suite 3401
20                    Seattle, Washington 98101-2605
                      Ph: 206/623-6501
21
    Court Recorder:   NANCY LEALAISALANOA
22                    U.S. District Court
                      222 W. 7th Avenue, Suite 4
23                    Anchorage, Alaska 99513
                      Ph: 907/677-6111
24

25

1    A P P E A R A N C E S:  (Continued)

2    Transcribed by:    LEONARD J. DIPAOLO, RPR, CRR, CCP
                        Peninsula Reporting
3                       110 Trading Bay Road, Suite 100
                        Kenai, Alaska 99611
4                       Ph: 907/283-4429

5

     Proceedings recorded by digital sound recording, transcript
6    produced by stenographic transcription service

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2              ANCHORAGE, ALASKA - THURSDAY, APRIL 3, 2014

3       (Defendant present)

4                                          (Jury not present)

5     (Log 8:32:07)

6              THE CLERK:  All rise.  His Honor the Court, the United

7    States District Court for the District of Alaska is now in

8    session with the Honorable Ralph R. Beistline presiding.  Please

9    be seated.

10             THE COURT:  Okay, anything new from the government?

11             MS. DUIGNAN:  No, Your Honor.

12             THE COURT:  Mr. Curtner?

13             MR. CURTNER:  No, Your Honor.

14             THE COURT:  Just -- not quite.  With regard to the

15   autopsy photo issue.  You know, in a murder case, photos of

16   deceased are relevant, and I've already let in photos with

17   regard to the crime scene.  Even though they are graphic,

18   sometime they have to come in.

19             With regard to the autopsy photos, I'm a little more

20   concerned.  On the other hand, looking at the photos, they are

21   not what I consider real autopsy photos.  The photos I see of

22   autopsies are wide open.  These are almost what I would call

23   preautopsy photos.  And to the extent they are relevant, I'm

24   going to allow them in; but if they become cumulative or

25   unnecessary, I will not.  So I'm going to have to rule on a

```
 1  case-by-case basis.  But certainly the expert can refer to the
 2  photos whether they are admitted or not.
 3          MS. DUIGNAN:  Thank you, Your Honor.
 4          THE COURT:  Okay.
 5          MS. DUIGNAN:  Yes.
 6          MR. OFFENBECHER:  And, Your Honor, may I have a
 7  standing objection based on our conversation at the sidebar?
 8          THE COURT:  Yes, absolutely.  Not only do you have a
 9  standing objection, it kept me awake half the night thinking
10  about it.  Okay, so you can sit, stand, or do whatever you want,
11  you've made your record.
12          MR. OFFENBECHER:  And I understand the government,
13  from its conversation, is not going to let them linger on the
14  screen?
15          THE COURT:  No, they are not going to linger, and
16  we're not going to get into the full autopsy.  They have limited
17  it to what I think are fairly select photographs, but even those
18  I'm going to look at a little more critically, okay?
19          MS. DUIGNAN:  Yes, Your Honor.
20          MR. OFFENBECHER:  Thank you.
21          THE COURT:  All right.  I wish it was possible to show
22  the autopsy pictures just so the jury saw them, not so that they
23  are displayed everywhere.  Again, they are preautopsy, they are
24  not -- are there full-blown autopsy photos?
25          MS. DUIGNAN:  There are, Your Honor.  I just -- I'm
```

1  not using them.

2          THE COURT:  All right, good.

3                              (Jury present)

4          THE COURT:  Good morning.  How is everybody doing?

5  You've got a three-day weekend to look forward to.  We don't,

6  but you do.

7          Again, if you have any questions about any issues,

8  just let me know, okay.  All right, government's next witness.

9          MS. DUIGNAN:  The government calls Dr. Meredith Lann

10 to the stand.  Oh, wait, Your Honor, one of the jurors has a

11 question.

12         UNIDENTIFIED JUROR:  My ear --

13         THE COURT:  Oh, sorry about that.  They work pretty

14 well, don't they?

15         UNIDENTIFIED JUROR:  They do.

16         THE COURT:  Okay, testing, 1, 2, 3, testing.  Good

17 morning, Doctor.  Come on in, just remain standing though for a

18 second.  My clerk will swear you in right here.

19         THE CLERK:  Please raise your right hand.

20     MEREDITH LANN, M.D., PLAINTIFF'S WITNESS, SWORN

21         THE CLERK:  Thank you, please have a seat.

22         And, ma'am, if you can please state and spell your

23 full name.

24     A.  Yes.  Excuse me.  My name is Meredith Lann,

25 M-e-r-e-d-i-t-h.  Last name Lann, L-a-n-n as in Nancy.

1              THE COURT:  Okay.

2                         DIRECT EXAMINATION

3    BY MS. DUIGNAN:

4        Q.  Dr. Lann, if you can please tell the members of the

5    jury -- you live here in Anchorage, Alaska; correct?

6        A.  Yes.

7        Q.  And what is your current occupation?

8        A.  I teach anatomy.  So I'm a term associate professor

9    with the University of Alaska Anchorage.

10       Q.  And in April of 2012, what was your occupation then?

11       A.  I was medical examiner for State of Alaska.

12       Q.  In what states are you licensed to practice medicine?

13       A.  Alaska, Texas, and Colorado.

14       Q.  And how long have you been licensed to practice

15   medicine?

16       A.  Ten years.

17       Q.  And what specialty do you practice?

18       A.  I practice pathology, specifically the study of

19   disease.

20       Q.  And do you have any subspecialties?

21       A.  Yes.  I also have a subspecialization in forensic

22   pathology.

23       Q.  And can you explain to the jury what that means?

24       A.  Certainly.  Forensic pathology involves medicolegal

25   investigation of death.  It's a fancy term for finding out why

1    someone has died when that cause is unknown.

2          Usually a person might not have been seen by a doctor

3    for a period of time, or they have died by a violent means.

4    These deaths are usually warranted and given, as per statute

5    here in the State of Alaska, need for investigation.

6          And a medical examiner will investigate the

7    circumstances surrounding the death, as well perform possibly an

8    examination on the person's remains to help them determine cause

9    and manner of death.

10     Q.  Thank you.  And before working for the State of Alaska

11   as a forensic pathologist, where else had you worked?

12     A.  I had performed duties as a medical examiner in Dallas,

13   Texas.  And I completed much of my forensics training in both

14   the states of Colorado and Texas.

15     Q.  And what type of training have you received to practice

16   as a forensic pathologist?

17     A.  It's been a long road.  I have completed by medical

18   degree in San Antonio at University of Texas.  After that,

19   completion of that doctorate, I completed four years of a

20   general pathology residency to include both anatomic and

21   clinical pathology.

22          I then completed a one-year fellowship, which is more

23   specific training for forensic pathology.  In order to be able

24   to practice medicine as a forensic pathologist, however, I would

25   also have to inform you that I had to sit for two large exams,

1    examinations to obtain the certification as most offices require

2    for forensic pathology performance.  These are called the

3    American Board of Pathology certifications.

4              THE COURT:  You didn't say where you did your

5    residency.

6        A.  Thank you.  My residency was completed in Denver,

7    Colorado.

8     BY MS. DUIGNAN:

9        Q.  And you, in fact, are board certified?

10       A.  Yes.

11       Q.  And that's in forensic pathology?

12       A.  Yes.

13       Q.  Are you a member of any specialized medical groups or

14   associations?

15       A.  Yes, I am.  I hold memberships in both the National

16   Association of Medical Examiners as well as the American Academy

17   of Forensic Sciences.

18       Q.  And during your experience as a forensic pathologist,

19   approximately how many autopsies have you performed?

20       A.  About 900.

21       Q.  And of that group, how many of those involved deaths,

22   we'll say, with firearms?

23       A.  I've estimated around 150 cases.

24             MS. DUIGNAN:  Your Honor, at this point the government

25   moves Dr. Meredith Lann as an expert in the field of forensic

1    pathology.

2              THE COURT:  Any voir dire?

3              MR. OFFENBECHER:  No, Your Honor.

4              THE COURT:  She will be received in that capacity as

5    an expert.

6     BY MS. DUIGNAN:

7        Q.  And you said during the month of April 2012, you were

8    working as a medical examiner for the State of Alaska; correct?

9        A.  Correct.

10       Q.  And during that time, did you perform one or more

11   autopsies connected with this case?

12       A.  Yes.

13       Q.  Do you recall performing the autopsies of James Hopkins

14   and Richard Belisle on April 13th, 2012?

15       A.  Yes.

16       Q.  I'd like to turn your attention first to the autopsy of

17   James Hopkins.

18           First of all, let me ask you about your procedure.

19           When you have a case such as this, who else is present

20   at the autopsy?

21       A.  At the time of autopsy, usually I have an assistant to

22   help me with some of the techniques of dissection, as well as

23   people who might be present, such as law enforcement or other

24   trained professionals, to help with recovery of evidence that

25   may otherwise be used for medicolegal reasons.

1     Q.  And do you recall the presence of an FBI person named

2  Vicki Grimes in this case?

3     A.  Yes.

4     Q.  And she would have been there to collect any physical

5  evidence that might have resulted from the autopsy?

6     A.  Yes.

7     Q.  So I'd like to go back to your portion of the autopsy,

8  which is the examination, and first start with James Hopkins.

9          On your screen I'd like to show you what has been

10 marked as prosecution Exhibit 184-A.  It should come up shortly.

11         And looking at that photo, can you identify what that

12 photo shows?

13    A.  Yes.

14    Q.  And what does it show?

15    A.  This is a photo of Mr. Hopkins as he was received in

16 our facility.  He's appropriately clad, however, I do note that

17 his shirt is somewhat pushed up and there is what appears to be

18 medical treatment effects, meaning a couple of bags or plastic

19 items on his chest.

20         His hands are covered with plastic -- excuse me,

21 correction.  His hands are covered with brown paper bags as per

22 protocol when want to prevent contamination of the hands should

23 evidence be retained.

24         This is a picture of Mr. Hopkins as he was received in

25 our office.

1      Q.  And would this assist you in giving your testimony
2  today?
3      A.  Yes.
4           MS. DUIGNAN:  Your Honor, I'd like to move admission
5  of Exhibit 184-A and briefly show it to the jury so Dr. Lann can
6  testify.
7           MR. OFFENBECHER:  Your Honor, I would simply state our
8  objection to this and the subsequent photos based on our
9  previous objection that there is no question about the cause of
10  death for either Mr. Hopkins or Mr. Belisle, and these really
11  aren't in issue in the case, so we object on the basis of 403.
12           THE COURT:  Very well.  I'm going to allow this into
13  evidence -- sorry, I'm going to allow this into evidence, it
14  means the jury will have it back there.  I'm going to have it
15  shown up here just instantaneously so you get a feel of it.
16  It's not that graphic, and there is no dissection involved, but
17  there is no need to play this on extensively.  Just very
18  briefly, if you can just show it and then take it down.
19                          PLAINTIFF'S EXHIBIT 184-A ADMITTED
20           THE COURT:  Okay, good.  You'll have it to the extent
21  you need it during deliberations.
22  BY MS. DUIGNAN:
23      Q.  Talking more about the procedure, when you receive
24  someone in for an autopsy, you had mentioned that they are
25  received in that condition where they are bagged and they are

1    clothed.

2         What is the next step after you receive someone in for

3    your examination?

4    A.  We then perform what's referred to as processing of the

5    body where maybe a radiograph or x-ray maybe performed of

6    certain parts of the body, if we need to look for metallic

7    objects, for example.

8         We also take photographs of the outsides of the body,

9    as you could see one of them here -- there are several others

10   that we would have taken -- as well as obtaining any evidence

11   and making sure that does not get contaminated prior to its

12   release, keeping, of course, a chain of custody with who is

13   given what during this course of processing.

14        After all that is done, we then disrobe the deceased

15   and retain that clothing, if needed, in its state as it's

16   arrived to our office as well.  Then perform another external

17   examination of the body after it has been cleaned to be able to

18   see any further possible wounds or defects or things that may be

19   worthy of noting or photographing, not just wounds but evidence

20   of disease, for example.

21   Q.  Thank you.  And in this case that was done, and then

22   you moved on to the next step of trying to determine what the

23   cause of death was, i.e., where the individual had wounds; is

24   that correct?

25   A.  That's correct.

1      Q.  So I'd like to show you the next photo, which has been

2  marked as 184-B.

3          And if you can just describe for me what this photo

4  shows?

5      A.  Certainly.  This is a photo of Mr. Hopkins as viewed

6  from the front.  And it's limited to have his face and upper

7  chest and shoulders in the photo.

8          In the right side of the photo is a ruler with a

9  number.  And I must refer again to this processing process.  The

10  deceased will get a number assigned to him should a name change

11  or other instance occur.  It creates a unique identification

12  number for the deceased.  So I will refer to that number at

13  times during my autopsy description, if possible.

14          This case -- or excuse me, this photo also shows a

15  wound on the right side of his face just underneath his nose.

16      Q.  And would this have been before or after cleaning?

17      A.  After.

18      Q.  And what is the importance of looking at the wound

19  shape in order to come to your conclusions?

20      A.  The description of a wound needs to be clear and

21  concise, very descriptive, in order to differentiate, for

22  example, a type of wound.

23          For example, this case involves firearm injuries.  We

24  can tell entrance wounds from exit wounds given certain

25  features.

1     Q.  And the importance of the photo in this case is to

2   document essentially those features that you're going to

3   discuss?

4     A.  Yeah, that it's helpful in documenting.

5         MS. DUIGNAN:  Your Honor, I'd like to move 184-B into

6   evidence.

7         MR. OFFENBECHER:  Same objection, Your Honor.

8         THE COURT:  So, Doctor, are you saying this is

9   necessary in explaining your testimony?

10    A.  It's helpful, not necessary.

11        THE COURT:  It's helpful.  I don't know what your

12  testimony is going to be, but, okay, same thing.  Let it in very

13  briefly.  You'll have them.  To the extent you need them

14  further, you'll have them.

15                          PLAINTIFF'S EXHIBIT 184-B ADMITTED

16        THE COURT:  And, Doctor, if you feel you need to

17  display it again to explain your testimony, let me know, okay.

18    A.  Thank you.

19   BY MS. DUIGNAN:

20    Q.  Looking at the photo, can you just -- oh, we took it

21  down for you.  I don't want to have it displayed --

22        THE COURT:  No, she can have it up.

23        MS. DUIGNAN:  Okay.  Can you put it back up for the

24  doctor.

25        THE COURT:  And counsel can have it up if they --

1    BY MS. DUIGNAN:

2      Q.  Looking at the photo, can you describe what you look at

3    to determine whether a wound is an entrance wound or an exit

4    wound?

5      A.  Certainly.  As a bullet enters the body, it has to go

6    through skin in most instances.  This particular area of the

7    face that you saw is just below the nose.  There are many curved

8    features of the face and the nose, which took on a very abraded

9    appearance.  And when I say "abraded," I mean abrasion was

10   present, and that is a scraping of the skin.

11          A bullet has to enter the skin, go through underlying

12   structures, and it can have an effect on the skin by scraping it

13   as it enters.  So I look for that scraping effect, if you will.

14          This wound, which was shown briefly, has marked

15   abrasion or a blackish discoloration with a roughening texture

16   in certain parts of the wound circumference.

17          And also on the right side of the face we had an

18   extension of about, I believe, an inch of stretched-type

19   lacerations, or some areas of what looked like the effect of

20   having been stretched.  That can happen, too, as the bullet

21   travels through.

22          It's a complicated wound in the sense that the

23   underlying facial structures are irregular.  And we did see

24   marked fractures underneath that entrance wound.

25     Q.  Thank you.  I'd like to turn to the next exhibit,

1    184-C, which we'll show on your screen.  And can you please

2    describe what this photo shows?

3        A.  This is a photo taken at the time of autopsy of Mr.

4    Hopkins as well.  It's a view of the back of his head.  The ear

5    is in the top of the photo to orient you.  And the left side of

6    the photo has his top of his head.  There is a wound in the

7    center, which is more specifically on the back right scalp.

8        Q.  And will this assist you in describing the wound in

9    your testimony?

10       A.  Yes.

11             MS. DUIGNAN:  Your Honor, at this point I'd like to

12   move in 184-C.

13             MR. OFFENBECHER:  Same objection, Your Honor.

14             THE COURT:  Same ruling.  Brief.

15                         PLAINTIFF'S EXHIBIT 184-C ADMITTED

16             THE COURT:  Now, that's a dark -- that was too dark.

17   You can keep it on a little longer.  That can't tell you

18   anything, it's too dark.

19             MS. DUIGNAN:  Yeah, you can see it on the screen.  I

20   think when the photos go back to the jury, it will be more

21   apparent that you can see the wound.

22    BY MS. DUIGNAN:

23       Q.  Dr. Lann, you can see it better on your screen; can't

24   you?

25       A.  Yes.

1      Q.   There is no need to keep it up, it's not very helpful.

2           Looking at your screen, if you can take a look at the

3  wound -- and the jury should have this later in the room so they

4  will be able to look at it -- can you explain, looking at the

5  scalp, what you noticed there and what the features of that

6  wound are?

7      A.   Yes.  This is an exit-type wound, meaning it's a little

8  bit more irregular.  It has a stellate appearance, it looks like

9  a star.  As the bullet exits the wound after it's gone through

10 the bone and other contents of the head, the bullet itself may

11 deform, and in that change of shape, as it exits the wound --

12 exits the body, it tends to take on a more irregular shape.

13          This particular wound, again, is stellate, and there

14 are no abrasions whatsoever on the outside of the skin.

15          Another feature which supports this as an exit wound is

16 the skull underlying this wound had the mischaracteristic

17 features of an exit wound.  As the bullet went through the bone,

18 it created an outward beveling of the bone.  And as you may know

19 when you get a rock chip in a window, the window fractures just

20 like the skull would.  As this object goes through it, it

21 creates an external angle to the direction of the rock.  Well,

22 this is the same finding that I documented in this case.

23     Q.   Thank you.  If we can go to the next exhibit, which I

24 believe is 184-D.

25          And can you explain what this photo shows?

1      A.  This is a photograph -- excuse me.  This is a

2  photograph of Mr. Hopkins, his radiograph.  And as I mentioned,

3  that is also known as x-ray.  It's showing the side view of his

4  head and neck region prior to autopsy.

5      Q.  And would this assist you in explaining your testimony?

6      A.  Yes.

7          MS. DUIGNAN:  Your Honor, at this point I move

8  admission of 184-D.

9          THE COURT:  It will be received.

10                           PLAINTIFF'S EXHIBIT 184-D ADMITTED

11         MS. DUIGNAN:  Can we leave this one up a little bit

12  longer so the witness --

13         THE COURT:  Yes, if it's necessary.  As long as --

14  yeah.

15   BY MS. DUIGNAN:

16     Q.  Do you have a pointer up there, Dr. Lann?  If not,

17  we'll get you one.

18     A.  Unfortunately, it's in my purse --

19     Q.  No, that's okay.

20     A.  -- which was retained.

21     Q.  We have one here.

22     A.  Sorry.  Thank you.  Oh, absolutely.  Thank you.

23     Q.  So looking at 184-D, if you can point to the areas that

24  you would consider not normal and kind of explain -- as you had

25  explained to me, there are some white marks there.  If you can

1    explain what the white marks are, the distinctive white marks?

2       A.  Okay.  We see the projection of the x-ray itself.  The

3    head is oriented such that the top of the head is at the top of

4    the photo, the face would be to the right, and the back of the

5    head to the left.  We are viewing the head from the side.

6           So if you can imagine this as the cranial skull cap,

7    this is the facial skeleton, or what we can see of it.  It's a

8    poor projection for some of the small bones, but in general I

9    think you get the picture.  This is the neck with the cervical

10   spine showing up as a white structure.

11          Another white type of debris is present, which is not

12   normal.  This is part of the bullet and projectile as it passed

13   through the skull, and some of these were big enough to retain

14   as evidence.

15          I also see a little irregularity here in the region of

16   his teeth, which is most likely dental work and can show up on

17   x-rays.  Very common.

18      Q.  Based on your examination and also looking at the

19   x-ray, can you describe what the path of the bullet was?  Was it

20   essentially straight on with -- coming through his nose and

21   coming out directly from the back of his skull?

22      A.  The path of the bullet entered the face just under the

23   nose, as we saw in the previous photo.  The depths of the facial

24   skeleton fracturing this whole region of the area where I

25   mentioned the teeth lie -- that's called the maxilla -- anyhow,

1    it went in through that bone and through the base of the skull,

2    which is a cavity, of course, that holds the brain.

3          This base of the skull is a very thick and dense bone.

4    The tract went through that dense bone into a part of the brain

5    and exited again through this bone creating the external

6    beveling, again an exit-type feature, and went out through the

7    scalp, as we saw in the previous photo.

8          The path itself in a three-dimensional description is

9    not directly front to back.  There was a little bit of

10   deviation, a little bit of transfer to the right.  But again,

11   once a bullet goes in and hits bone, it can slightly deviate

12   from its initial path.  You consider the interposing objects,

13   meaning, you know, what was in between where the bullet comes

14   out of the muzzle and where it finally terminates its path,

15   that's what I mean by interposing.

16         Simplistically put, it went front to back through his

17   face, through his skull, brain, the surface covering the brain

18   called dura, and exited the skull in the back of the head.

19   Q.   Thank you.  Looking at the next photo, 184-E, can you

20   please describe what this photo shows?

21   A.   Yes, this is a view of Mr. Hopkins from the right

22   showing the right side of his face and ear.

23   Q.   And, excuse me, what of note was in the photo that made

24   it relevant?

25   A.   He has some purplish discoloration and scratches of the

1  ear.  So bruising, bumps and bruises on the right side of the

2  face.

3          MS. DUIGNAN:  Your Honor, I'd like to move 184-E and

4  briefly display it.

5          THE COURT:  Is that necessary?

6     A.  No.

7          THE COURT:  Okay, not necessary.

8          MS. DUIGNAN:  Okay.  The crime scene experts may rely

9  on this later, so can we have it admitted.

10          THE COURT:  The photo -- well, it's clearly

11  admissible.  Whether or not it's something that -- what do you

12  mean can you have it admitted?  Are they going to want to refer

13  to it?  It can be authenticated, if that's what you mean, it's

14  certainly authenticated, and to the extent it might be necessary

15  in future testimony, it may become admissible.  But at this

16  point it's designated for descriptive purposes only.

17          MS. DUIGNAN:  I was just concerned about the crime

18  scene experts relying on certain wounds to figure out how the

19  victims may have fallen.

20          THE COURT:  I'm saying it is authenticated and it may

21  become relevant, and then I will admit it, if necessary.

22          MS. DUIGNAN:  Okay, Your Honor.

23          THE COURT:  At this point it's not necessary for this

24  witness' testimony, but it's clearly authenticated.

25          MS. DUIGNAN:  Thank you, Your Honor.  Moving to the

1    next photo.

2     BY MS. DUIGNAN:

3        Q.  Can you please look at this photo, 184-F, and describe

4    what it shows.

5        A.  Yes.  This is a photo of Mr. Hopkins' trunk region,

6    which includes the chest and abdomen.  The ruler is at the right

7    side of the photo lining the bottom -- the lower portion of the

8    abdomen.  The wounds of note are in the center of the photo.

9    And there are two defects at the right chest and some irregular

10   defects on the area around the umbilicus, or belly button, of

11   the abdomen, as well as a few of those irregulars -- similar

12   irregular-appearing wounds on the far, far right side of the

13   abdomen.

14       Q.  Did you rely on your examination as documented in this

15   photo in order to come up with your exit and entrance

16   conclusions?

17       A.  Yes.

18               MS. DUIGNAN:  Your Honor, I move for admission of

19   184-F.

20               THE COURT:  Okay, it should be briefly shown.

21                         PLAINTIFF'S EXHIBIT 184-F ADMITTED

22               THE COURT:  That's a little brief.

23               MS. DIXON:  I apologize.

24               THE COURT:  They have got to be able to -- okay.

25    BY MS. DUIGNAN:

1      Q.   Looking back at --

2           MS. DUIGNAN:   Yeah, the doctor needs it.

3      A.   Thank you.

4    BY MS. DUIGNAN:

5      Q.   That's okay.   Looking back at 184-F, looking at the

6    wounds, can you describe the nature of the shape of the wounds

7    based on what you had told us before about the patterns?

8      A.   Yes.   There are two somewhat ovoid wounds of the right

9    chest, and they seem to take on a linear distribution with each

10   other so you can connect them as well upon looking deeper in the

11   skin.   There was a wound track connecting them.   So this is

12   clearly a single wound path.

13          There are abrasions, or as I mentioned the scrape

14   around an entrance wound.   Those were present on both of these

15   defects.   So given that a body can start to dry out if there is

16   a site of abrasion or bleeding, I was not able to determine

17   specifically which one was the entrance and which one was the

18   exit in this particular wound.

19          But given that, the wound track itself didn't even

20   involve the vital organs or chest cavity.   It was a very

21   superficial wound only involving the skin and soft tissues of

22   the right chest.

23          THE COURT:   You know, you can --

24   BY MS. DUIGNAN:

25     Q.   There is some water there.

1          THE COURT:  You can put that picture up if she needs
2    to point what she's talking about.
3          MS. DUIGNAN:  Okay, Your Honor, it might help.
4          THE COURT:  Just for -- not extensively, but it helps
5    when people can see what she's talking about.  So you'll need to
6    use your pointer.
7       A.  Thank you.
8          THE COURT:  And Doctor, you tell me when you think
9    that's necessary in the future, okay.
10      A.  Okay.
11         THE COURT:  When the photo is, okay.
12      A.  This is a complicated wound process here, so I wanted
13   to explain to you.
14         These are the two defects of the right chest.  There is
15   one down here in the darkened part of the photo as well that's
16   similar appearing to this one I'm pointing to in the center of
17   the photo.
18         The right chest is extensively contused or bruised.  It
19   has hemorrhage and some bleeding with maceration or breakage of
20   the tissues underneath, and this linear pattern, which I'm
21   pointing to for transcription purposes, in between those two
22   defects of the right side of the chest.
23         Again, this depth of the wound was remarkable for soft
24   tissue injury only, and we can't tell which one is in and which
25   one is out, just that it does go through that part of the chest.

1    BY MS. DUIGNAN:

2        Q.  And can you explain a little bit more about what you

3    had explained to me about why you can't tell which one is in and

4    which one is out?

5        A.  Yes.  Now, it's difficult to see on this projection,

6    but if I may just refer to my quick little note page here on

7    specifically where that abrasion is.

8            MS. DUIGNAN:  Can the doctor refresh her recollection

9    with her notes?

10           THE COURT:  Yes.

11       A.  Thank you.  Yes.  I have described this wound out of

12   the posterolateral right side of the chest on the --

13   posterolateral right side of the chest.  And it is a defect of

14   up to one half inch in dimension.  You can't see it very well

15   here, sorry.

16           The abrasion itself was only about one-eighth inch, so

17   very small around the edge.  And it encircled the entire wound,

18   which could represent an entrance type feature.  However, upon

19   examining this other wound more anterior, or on the front of the

20   body, the defect itself was a little bit larger.  It was

21   three-quarters inch.  It was more irregular.  Pardon me, get to

22   the right page.

23           Correction, this wound was also pretty round.  It's

24   shown in the projection to have an irregular blackening around

25   the edges.  That is the abrasion that I had to consider as

1    either a shored abrasion, which can happen as the bullet is

2    existing a wound if the skin is abutting something that prevents

3    it from being able to stretch.  It can scrape as well.

4           So given the inability of me to definitively say which

5    one was entrance, which one was exit, I simply just said that

6    the wound is not determined -- the path trajectory is not

7    determined.

8        Q.  And the other two wounds above the belly button, are

9    those caused by any type of firearm, or what was your conclusion

10   regarding those wounds?

11       A.  I don't know what caused these.  They are abrasions.

12   They are scrapes of the skin.  Something impacting the skin, but

13   I do not know.

14       Q.  And can you please explain what a short [sic] abrasion

15   is.  You referred to that term.  Can you explain that in more

16   detail?

17       A.  Yes, a shored abrasion is due to an object, not

18   necessarily a bullet, but anything that exits the body can push

19   that skin outward.  And if the skin meets something like a wall

20   or a tight piece of clothing, even an elastic band from a

21   brassiere or belt line can do that.  If the skin is abutting

22   something to prevent that movement as the object is leaving the

23   body, that skin then scrapes along whatever it is that's up

24   against it.  We call that shored abrasion.

25       Q.  In the location of these wounds when Mr. Hopkins was

1    brought in, you didn't notice any kind of constrictive clothing

2    in that area, did you?

3       A.  No.

4       Q.  Okay, we can take that photo down.

5           Talking a little bit more about shored wounds, because

6    you had explained this to me, you said you had seen them a lot

7    before in your previous practice.  What are some other scenarios

8    that can cause shored abrasions besides tight clothing?

9       A.  Well, I would see this in scenarios of an outdoor

10   shooting.  For example, in Dallas, if someone has multiple

11   gunshot wounds and they are lying on the concrete or lying on

12   the floor of an apartment.

13          For example, just an example, this could happen if

14   something were -- say the floor were pressing against the skin

15   as a bullet exits the body.

16      Q.  Moving on to the next photo, excuse me, 184-G, can you

17   please explain what this photo shows?

18      A.  This is a photo of the back of Mr. Hopkins' left arm.

19      Q.  And can you tell any wound features in this photo?

20      A.  Yes.  There is a graze wound of the back of the left

21   arm.  And the wound features are significant for the fact that

22   it's a superficial graze wound.  You can only see that the soft

23   tissues have been involved.

24          The left -- excuse me, right side of the photo, which

25   is the outer aspect of the arm, has an abrasion associated with

1    this wound.  So we can determine direction in such a small
2    wound.  It does go from left to right, and it's a graze wound at
3    the back of the left arm.
4        Q.  And could you tell from your examination how this wound
5    was necessarily sustained?
6        A.  Can you restate the question, please?
7        Q.  Could you tell from your examination whether it was
8    related to the other two wounds or whether it was a separate
9    wound?
10       A.  I documented it as a separate wound, because no, I
11   cannot determine whether or not this bullet went anywhere else
12   after leaving the back of his arm.
13           MS. DUIGNAN:  Your Honor, at this point I move
14   admission of 184-G.
15           THE COURT:  It will be admitted.
16                         PLAINTIFF'S EXHIBIT 184-G ADMITTED
17           MS. DUIGNAN:  Can we show it briefly?
18           THE COURT:  As long as necessary for the doctor.
19    BY MS. DUIGNAN:
20       Q.  Are there any other features that you need to describe
21   from this photo?
22       A.  No.
23       Q.  Okay, we can take it down.
24           MS. DUIGNAN:  If we can move to the diagram.
25    BY MS. DUIGNAN:

1    Q.  Look at your screen.  If you can look at -- Exhibit 198

2  I'm going to show you.

3         Do you recognize that document?

4    A.  Yes.

5    Q.  And what is that?

6    A.  This is a diagram which I generated to draw onto an

7  adult male schematic.  For descriptive purposes, I've put the

8  wounds in the various parts of the diagram where they were seen

9  at the time of his autopsy.

10   Q.  And would this assist you in giving your testimony?

11   A.  Yes.

12        MS. DUIGNAN:  Your Honor, I'd like to move admission

13 of 198.

14        MR. OFFENBECHER:  No objection, Your Honor.

15        THE COURT:  It will be received.

16                       PLAINTIFF'S EXHIBIT 198 ADMITTED

17        MS. DUIGNAN:  I would like to project it.

18  BY MS. DUIGNAN:

19   Q.  And if you could use your pointer and point out the

20 different wound patterns that you summarized on this chart and

21 how you documented them, please.

22   A.  This is Mr. Hopkins, documentation 12-00459.  I have

23 listed a key here in the middle of the diagram for you.

24        A dot means -- or stands for a gunshot wound entrance.

25 I apologize for my handwriting.

1          The exit is to the right side of the back of the head

2    right here denoted by an X, gunshot wound exit.

3          The next wound is described -- that I described is in

4    the right chest wall.  And I have placed dots where the defects

5    were with parentheses because I don't know exit versus entrance.

6          That is a depiction of my indeterminate gunshot wound

7    as well as the graze wound on the back of the left arm, which we

8    just saw briefly, and it traveled from left to right in that

9    direction.

10     Q.  Thank you.  After looking at all of these wounds as

11   well as the rest of your examination, if you could summarize

12   some of the findings that you made with regards to the cause of

13   death, I think that would be helpful.

14         Which wound do you think would be -- was definitely the

15   most fatal?

16     A.  The cause of death as listed on his death certificate

17   was gunshot wound to the head.

18     Q.  And without knowing the order in which the shots were

19   received, because of course you can't tell that from the

20   examination, can you tell us how that wound -- how quickly that

21   wound would have caused death?

22     A.  In my opinion, this would be immediately fatal.

23     Q.  The other wounds on their own, would they have

24   necessarily been fatal?

25     A.  No.

1      Q.  At this point I'm going to turn to the examination of

2   Mr. Belisle.

3           MS. DUIGNAN:  Can we put up 185-A, please.

4    BY MS. DUIGNAN:

5      Q.  Looking at what's been marked as 185-A for

6   identification, if you can look at the photo.  Can you describe

7   what the photo shows?

8      A.  This is a photo of Mr. Belisle as he was received in

9   our office.  He is appropriately clothed; however, the front of

10  his shirt is open and there are what look like EKG pads.  The

11  first responders very commonly place some sort of rhythm strip

12  on the deceased victims, so that is what we see in this photo.

13          The hands are covered with brown paper bags as well,

14  again for retention of evidence.  And the purpose is to limit

15  contamination.

16     Q.  And this would have been prior to what you had referred

17  to as processing, or the washing of the body and taking of

18  evidence?

19     A.  Yes.

20     Q.  And in this case as well you had mentioned x-rays.

21  Were any of those done?

22     A.  Yes.

23          MS. DUIGNAN:  Your Honor, at this point I'd like to

24  move in 185-A.

25          THE COURT:  Very well, it can be admitted.  Briefly

1   shown.

2                                     PLAINTIFF'S EXHIBIT 185-A ADMITTED

3            THE COURT:  Okay.

4            MS. DUIGNAN:  I'd like to move to 185-B.

5    BY MS. DUIGNAN:

6        Q.  If you can look at 185-B, what does this photo show?

7        A.  This is a photo of the right shoulder of Mr. Belisle

8    where I saw a defect, so it's a fairly close-up photograph with

9    his unique number on the left side of the photo.

10            The wound itself is in the center of the photo and is

11   actually on the back of the right shoulder.  The arm is being

12   held upward so there is a little distortion of what you may see

13   from the side of the photo.

14       Q.  And would this photo assist in giving your testimony

15   regarding the nature of the wound?

16       A.  Yes.

17            MS. DUIGNAN:  Your Honor, at this point I move Exhibit

18   185-B.

19            THE COURT:  It will be admitted.

20                                     PLAINTIFF'S EXHIBIT 185-B ADMITTED

21            MS. DIXON:  That's 185-B.

22            MS. DUIGNAN:  That's what I just moved.

23            MS. DIXON:  I just want to make sure.

24            MS. DUIGNAN:  I thought I said B.  Okay.

25    BY MS. DUIGNAN:

1    Q.  I can briefly show it.  I don't even know whether you

2    can see this well.  But, yeah, if you can use your pointer and

3    just indicate that that is the wound.

4         Where is the wound located?

5    A.  The wound is in the center of the photo, and it's on

6    the back of the right shoulder, sort of to the very edge of the

7    back of the right shoulder before it went in through the

8    shoulder bones and up into the neck.

9    Q.  And what features did you see on this wound that told

10   you what kind of wound it was?

11   A.  The wound has a full abrasion around the edges of the

12   wound, completely around the wound, which is characteristic of

13   an entrance type wound, as well as the wound path which was

14   helpful in describing that this is the only way the bullet could

15   have gotten into the body.

16   Q.  And what did you document about the wound path?  I know

17   you can't see it in the photo, but if you can explain it.

18   A.  When I describe wound paths just in general, I always

19   describe the wounds on the outside surface as well as where

20   internally the hemorrhage is seen.

21        So I can tell you I've described fractures or broken

22   parts of the bones involved.  The right arm bone, called the

23   humerus, was fractured, so were several bones of the upper

24   shoulder.  And the wound track went directly into the second

25   vertebra or bone of the neck.

1    Q.  Moving on to photo 185-C, can you describe what this

2 photo shows?

3    A.  This is a photograph of the x-ray taken prior to

4 processing -- or excuse me, during processing but prior to

5 cleaning of the body.

6        Mr. Belisle's head and neck regions are exposed in the

7 film as well as a bullet in the center of the photo in the

8 region of the right side of the neck, and some personal effects

9 as well.

10    Q.  And would this photo assist you in giving your

11 testimony today?

12    A.  Yes.

13        MS. DUIGNAN:  Your Honor, I move for admission of

14 185-C.

15        THE COURT:  It will be admitted.

16                        PLAINTIFF'S EXHIBIT 185-C ADMITTED

17        MS. DUIGNAN:  Can you publish it.

18  BY MS. DUIGNAN:

19    Q.  If you can use your pointer and first of all kind of

20 point out what the orientation is of the x-ray.  Is it front to

21 back or back to front?

22    A.  Yes, this is an A/P view.  So anterior/posterior, so

23 front to back.  And these are the orbits of the eye, these are

24 the facial bones, this is dentition.

25        As I mentioned before, some people have radiodense,

1  objects within their teeth; it's not uncommon.  More notably

2  there is a radiodense, or white object, here in the right side

3  of the neck.  And there are other items, what looks like a

4  necklace as well as a ring of some sort at the end of the

5  necklace, around the neck region.

6      Q.  And you had mentioned that in the processing portion

7  before you begin the autopsy, that you do these x-rays.  So you

8  hadn't removed anything from his -- from his body yet?

9      A.  That is correct.

10     Q.  So personal effects such as these would be seized and

11 retained by the FBI if they are of evidentiary value?

12     A.  It is possible, yes.

13     Q.  Looking at the pointer, if you could put it back on the

14 white region.  So what did you determine that was?

15     A.  A bullet.

16     Q.  And what happened to the bullet after you conducted the

17 autopsy and recovered it?

18     A.  I placed the bullet into a receptacle, either -- a

19 envelope of some sort, and placed it into the custody of the

20 personnel present at the time of autopsy.

21     Q.  Thank you.  Look at the next photo, 185-D.

22     A.  Excuse me, may I add?

23     Q.  Yes.

24     A.  We photographed the bullet as well.

25     Q.  Thank you.  Next photo, 185-D.

1          And in fact, what is photo 185-D?

2     A.  It's a photograph of the bullet retained from the

3  autopsy of Mr. Belisle.

4          MS. DUIGNAN:  Your Honor, I move for admission of

5  185-D.

6          THE COURT:  It may be admitted.

7                          PLAINTIFF'S EXHIBIT 185-D ADMITTED

8  BY MS. DUIGNAN:

9     Q.  The white mark that you showed on the x-ray, is this

10  what you retrieved from that -- from the portion of Mr.

11  Belisle's neck?

12    A.  This represents the bullet that we did see in the x-ray

13  just now.

14    Q.  So after you pulled it out, you would have pulled it,

15  photographed it, it would have gone to the FBI?

16    A.  Yes.

17    Q.  Thank you.  Moving to 185-E.  What does this photo

18  show?

19    A.  This is a photo of Mr. Belisle after cleaning of the

20  body.  And it depicts his head, neck, and upper trunk region

21  from the right side.

22    Q.  And what can you tell from the photos, from the nature

23  of the wounds on this photo?

24    A.  There are defects in the right chest, right abdomen,

25  and not seen well in the photo there is also another one of the

1  lower left chest.  It's right at the top of the photo.

2      Q.  And would this photo assist you in explaining your

3  testimony?

4      A.  Yes.

5          MS. DUIGNAN:  Your Honor, at this point I move

6  admission of 185-E.

7          THE COURT:  It will be admitted.

8                          PLAINTIFF'S EXHIBIT 185-E ADMITTED

9   BY MS. DUIGNAN:

10     Q.  If you could use your pointer, Dr. Lann, and if you

11  could explain the characteristics -- first of all, point out the

12  wounds that you can see on the photo.

13     A.  Certainly.  In this dark region of the lower portion of

14  the photo on his right chest, there is a defect.  In the right

15  side of the photo, depicting the lower abdomen on the right side

16  again, is a defect.  And then there is another edge of a defect

17  seen at the top of the photo, which represents the left side of

18  the trunk.

19     Q.  And using the process you had before, can you explain

20  what you noted about the characteristics of the wounds?

21     A.  Yes.  This particular wound, let's take this one first.

22  The posterolateral right side of the chest was ovoid, it was

23  rounded, so I will have to say that that is suggestive of an

24  entrance type wound by itself.  But also it had a very clear-cut

25  one-eighth inch circumferential -- meaning, you know, very

1    discrete -- abrasion around the entirety of the wound.  Entrance
2    type features were present.
3          I'll describe the next wound in the photo here on the
4    right side of the abdomen.  Again, it's lower down than the
5    other ones, more closer to the feet, for example.
6          This wound took on more exit type features.  It was
7    irregular; it had bruising around it, although that's not really
8    a definitive finding in itself; it had -- again, this is right
9    abdomen -- had focal, meaning very small amounts, of abrasion as
10   well; there was drying effect -- it takes time to start the
11   autopsy and get to this point, as well it took time for the body
12   to get to our office -- so the edges of the wound were starting
13   to dry out.
14         It was very difficult, but I do see some possible
15   abrasion on this wound.  But I have defined it as an exit wound
16   based on its deeper involvements with other wounds.
17      Q.  Looking at the top wound, I think we have a better
18   photo of that, but we'll move on to that next.
19         You also made some conclusions about the wound that is
20   in the upper part of the screen; correct?
21      A.  Yes.
22      Q.  So let's take this one down and move on to the next
23   photo.  This is 185-F.
24      A.  Okay.
25      Q.  And what does 185-F depict.

1      A.  It's a similar photo, however this is a photo taken

2   from the left side of Mr. Belisle.

3      Q.  So the wound that we saw in the previous picture that

4   was on the top portion of the photo, is that fully visible in

5   this photo?

6      A.  Yes.  It's from the side, so it's still a poor

7   depiction.  I believe I have another one.  Anyway, this picture

8   shows two wounds.  The one that we just saw a part of is also in

9   this photo.

10     Q.  So actually the closer photo that we're talking about,

11  but the top wound?  It's probably the next one we have marked as

12  185-G.

13     A.  Yes.

14     Q.  So going back to this photo, this 185-F, which wounds

15  are depicted in this photo?

16     A.  There are two wounds, one is in the left side of the

17  chest, it's a little bit lower down, meaning it's not high up by

18  the nipple region, it's more near the edge of the rib cage,

19  that's what I mean by "lower down."

20          It's still in the chest region on the left side.  It is

21  also round in its shape.  It has an abrasion.  Excuse me.

22     Q.  Would having a photo admitted assist you in your

23  testimony?

24     A.  Yes, thank you.

25          MS. DUIGNAN:  Your Honor, I'd move admission of 185-F.

1          THE COURT:  All right, it will be admitted.

2                              PLAINTIFF'S EXHIBIT 185-F ADMITTED

3    BY MS. DUIGNAN:

4       Q.  If you can use your pointer and please explain where

5    the wound is and what you were discussing before.

6       A.  I'm sorry, there we go.  This is the round feature of

7    the wound that I was describing.  It has an abrasion associated

8    with it as well as some bruising.

9           The bullet entered at this point and it grazed that

10   lower edge of the rib cage.  There is a connection of this wound

11   to the other wound on the other side of the abdomen upon deeper

12   dissection.  But the features of this wound do indicate that it

13   has -- it's an entrance wound.

14          Moving on to the other wound near the top of the photo,

15   it is irregular, and it had an up to three-eighths inch abrasion

16   as well, and that may represent a shored abrasion.

17          Again, I have described that before, but this is a

18   feature of exit wounds in certain situations.

19      Q.  Would looking at the next photo, 185-G -- go ahead, we

20   can take this one down -- would look at Exhibit 185-G assist you

21   in giving your testimony more about that wound?

22      A.  Yes.

23          MS. DUIGNAN:  Your Honor, I move for admission of

24   185-G.

25          THE COURT:  It will be admitted.

1                        PLAINTIFF'S EXHIBIT 185-G ADMITTED

2    BY MS. DUIGNAN:

3       Q.  Could you describe, again, what this photo shows?

4       A.  This is the photo prior to the cleaning of the body.

5    And it shows two wounds, but more particularly I'll focus on the

6    one we were just talking about.  This is the upper abdomen.  As

7    you see in the far, far left upper corner of the photo there is

8    the umbilicus.  And just above that and below the rib cage, the

9    edge of the rib cage, is a defect.  It's irregular.  It's got

10   blackening around it.  It's really dried.  And there is some

11   discoloration, probably some bruising as well associated with

12   this wound.

13           This wound, when dissected, connected with that -- the

14   right side of the chest.  So this is the exit wound of that

15   wound path.

16           Again, I'll orient you.  This is the umbilicus at the

17   left-hand photo, so the feet would be to the left.  The head

18   would be to the right.  The nipple is visible in the photo as

19   well the other one, not well projected, but the other gunshot

20   wound entrance that traverses the abdomen and exits the other

21   side.  It's here in the lower part of the photo, which is left

22   chest.

23      Q.  And when you didn't have as good a picture on the other

24   photo, you were talking about the nature of this particular

25   wound and you said you had noticed some distinctive features.

1   What were those again?

2       A.  The wound, the entrance wound to the left chest?

3       Q.  The one that's in the photo right here.

4       A.  The current?

5       Q.  Uh-huh.

6       A.  Okay, this wound of the abdomen, it's slightly to the

7   left of the midline.  It has some features of irregularity,

8   meaning just not very well curved edges.  It had some abrasion,

9   which was also irregular in shape.  And it was associated with

10  the other wound on the right side of the chest.

11          Those external features, although not typical of an

12  exit wound, are supportive of an exit-type wound.

13      Q.  And you had also mentioned there were some features of

14  a shored wound.  Where were those features?

15      A.  That is the abrasion of the exit wound.  I referred to

16  the shored abrasion being this blackening around the edge.  And

17  in my report I also have that it had a drying effect.  So it was

18  really hard as far as dimensions, specific dimensions of that

19  abrasion, although it was present.

20      Q.  And again, a shored abrasion is usually caused by being

21  up against something that's pressing against the individual?

22      A.  Yes.

23      Q.  Was Mr. Belisle wearing any tight clothing over that

24  area when he came in?

25      A.  Not that I'm aware of.

1     Q.  If we can take this one down.  Moving to 185-H, can you

2  please describe what this photo shows?

3     A.  This is a photo of Mr. Belisle's right hand showing the

4  back of the thumb and the inner portion of the right index

5  finger.  There is a defect on the right index finger.  It's a

6  jagged tear of the skin with some bleeding.

7     Q.  And looking at the nature of this wound, did you have

8  any conclusions about whether it was caused by a firearm or not?

9     A.  It's unclear what caused this wound.  There is no

10  associated fragment or projectile or anything, it's just a tear

11  of the skin.

12     Q.  Did you make any conclusions about when it was received

13  based on the condition in which he came in?

14     A.  Given the presence of the bleeding and the lack of any

15  evidence of healing grossly, meaning like just by looking at it,

16  there is no way for me to say exactly when.  But it looks

17  around -- at or around the time of death.

18          MS. DUIGNAN:  Your Honor, I'd like to move for

19  admission of 185-H.

20          THE COURT:  It will be admitted.

21                         PLAINTIFF'S EXHIBIT 185-H ADMITTED

22          MS. DUIGNAN:  I'd like to just briefly show it.

23  BY MS. DUIGNAN:

24     Q.  So can you use the pointer just to show where the wound

25  was?

1         And from your examination, there was no way to tell

2    whether this was a defensive wound or a wound received falling

3    or received in some other way?

4        A.  Correct.

5        Q.  Thank you.  We can take it down.  Can we move to

6    Exhibit 199.

7             What does this show?

8        A.  This is a picture of the diagram which I created to

9    help describe Mr. Belisle's constellation of wounds.  It's,

10   again, an adult male anatomical diagram with his identifying

11   features at the top and a depiction of wound paths 1, 2, and 3,

12   which I arbitrarily labeled just to be able to document them in

13   my report.

14       Q.  And would this assist you in giving your testimony

15   today?

16       A.  Yes.

17             MS. DUIGNAN:  I move for admission of 199, Your Honor.

18             THE COURT:  Be admitted.

19                        PLAINTIFF'S EXHIBIT 199 ADMITTED

20             MS. DUIGNAN:  Project it.

21    BY MS. DUIGNAN:

22       Q.  Using your pointer, can you please go through -- I know

23   you named it pretty much from top to bottom, but as you said,

24   you can't tell in which order the wounds were received from the

25   autopsy?

1    A.  Yes, that's correct.

2    Q.  So starting with number 1, if you can please explain

3    what the wound path was?

4    A.  We see an entrance wound of the back of the right

5    shoulder.  And then the recovery site, the circle here is the

6    recovery of the bullet from the neck.

7    Q.  And if you can explain what the entrance path was for

8    the second one?

9    A.  Gunshot wound number 2 entered the right chest, exited

10   the left abdomen.

11   Q.  And the path for wound number 3?

12   A.  Wound number 3 enters the left chest and exits the

13   abdomen.  The paths internally converged; however, the liver and

14   diaphragm were also involved with 2.

15   Q.  And mentioning that, you said that in the dissection

16   process you determined what the wound paths were.  What organs

17   were affected by these paths?

18   A.  For wound number 1, the whole shoulder apparatus as

19   well as the major neurovascular structures of the neck and

20   shoulder were transected or disrupted.

21        In number 2, the bullet enters the right chest, goes

22   through the edge of the ribs into the diaphragm, which is the

23   muscle that assists with breathing.  We have that involved with

24   some bleeding associated in the chest cavity on the right side.

25        The liver was perforated as well as small and large

1    intestine.  After it perforated the liver, it went on through

2    the abdomen, and then exited the abdomen at that point.

3       Q.  And from your overall examination, could you make a

4    determination about which of these wounds was fatal?

5       A.  Gunshot wound paths number 1 and 2 both involved vital

6    organs and could have been fatal.

7       Q.  Each one of them individually?

8       A.  Yes.

9       Q.  And also from your examination, were you able to

10   explain -- we had multiple witnesses talk about the fact that

11   there was, you know, much less blood involved with Mr. Belisle

12   than there was with Mr. Hopkins.  Can you explain why that might

13   happen?

14      A.  It's possible that at a scene, a person may continue to

15   bleed after the wound is sustained.  Of course, if the heart is

16   still pumping, the wound has a pressure of blood to be able to

17   bleed.

18          In some instances, even after a person is deceased, the

19   wound may still drain blood.  That would be my explanation as if

20   it just continued to drain at this scene.  It's speculation

21   here.

22          Mr. Belisle did have some blood within his cavities,

23   and that's not uncommon to see a completely clean scene with the

24   blood still within the body.

25      Q.  And again, judging from your overall examination, I

1  think you made this clear already, you can't tell from the

2  physical examination in what order the shots were received?

3       A.   Correct.

4            MS. DUIGNAN:  I don't have any further questions --

5  hang on one second.  I don't have any further questions.

6            THE COURT:  Cross-examination.

7                          CROSS-EXAMINATION

8   BY MR. OFFENBECHER:

9       Q.   Dr. Lann, good afternoon.

10      A.   Thank you.

11      Q.   Or good morning, excuse me.

12           In the photographs that you saw, each of the decedents

13  that you showed us, there were paper bags surrounding the hands

14  of each of the decedents; weren't there?

15      A.   Yes.

16      Q.   In your experience as a forensic pathologist, what is

17  the reason for that?

18      A.   Prior to transport of a body, we want to protect any

19  evidence which may be retained later.  Or to prevent

20  contamination, simply put.

21      Q.   And why is that important?

22      A.   It's something that we do with any piece of evidence,

23  we want it to be as appropriate as possible for the case to be

24  able to retain what was significant at the scene.

25      Q.   So, for example, the paper bags are put around the

1   decedent's hands to make sure that no DNA or other contaminants

2   come in contact with the decedent's fingers or hands; is that

3   right?

4       A.  That is one reason.  Other issues of blood spatter come

5   into play, but the interpretation of blood spatter is difficult

6   once the body has been moved.

7       Q.  And is another reason is that, for example, there may

8   be some trace evidence on the hands of the decedent; is that

9   right?

10      A.  Yes.

11      Q.  And that would be, for example, if a decedent had had

12  an altercation, a physical altercation with another individual,

13  there might be DNA or other -- or hair or other -- some kind of

14  evidence under their fingernails, for example?

15      A.  There could be.

16      Q.  Or some type of DNA or hair someplace else on their

17  hands; is that right?

18      A.  Yes.

19      Q.  And by putting the paper bag at the scene and bringing

20  it to you, that's done for the purpose of making sure that that

21  DNA of some other person isn't picked up along the way

22  someplace; is that right?

23      A.  Correct, yes.

24      Q.  And -- are you done?  Yeah.

25          And is another reason for putting the bags around the

1    hands is that there might be some other testing of the hands of

2    the decedent; is that right?

3        A.  Yes.

4        Q.  For example, in some cases, not necessarily this case,

5    but in some cases there might be a wiping of the hands to

6    determine whether there was any gunshot residue on the hands of

7    the decedent; isn't that right?

8        A.  Yes.

9        Q.  Because a gunshot residue test is a test that's done on

10   the hands of a person by doing a wipe; is that right?

11       A.  There are many techniques.  That is one of them, yes.

12       Q.  And so a forensic examination can be done, for example,

13   to determine by wiping the hands, determining whether that

14   person has recently fired a firearm; isn't that right?

15       A.  This is out of my area of expertise with the retention

16   of evidence and interpretation of gunshot residue.  It is for

17   those who have been trained in that.

18       Q.  I'm not asking you to interpret.

19       A.  Reasoning.

20       Q.  That's one of the reasons that you put the bag -- the

21   bags are put around the hands though; right?

22       A.  Can you restate the question, please?

23       Q.  Sure.  One of the reasons that the paper bags are put

24   around the hands of the decedent at the scene, and they showed

25   up in your photographs, is that sometimes forensic examiners

1    will do a gunshot residue test on the hands of a person to

2    determine whether they have recently fired a firearm?

3        A.  It is possible.

4        Q.  Now you made some -- an additional finding with respect

5    to each of the autopsies in this case; didn't you?  Let me

6    direct your attention to it.

7            In each case you determined that there was no soot or

8    stippling on the skin at the scene of any of the gunshot wound

9    entrance wounds; is that right?

10       A.  Yes.

11       Q.  What does that mean?

12       A.  That means that with my eye and other magnification,

13   simple magnification techniques in the morgue, am unable to

14   define whether there is visible gunshot residue on the skin.

15       Q.  And the reason you look for that is because by

16   determining whether there is stippling or soot, those are two

17   different kinds of gunshot residue; aren't they?

18       A.  Yes.

19       Q.  The reason you look for that is that sometimes the

20   presence of gunshot residue, such as stippling or soot, will

21   help a forensic examiner such as yourself determine the range

22   from the muzzle, that is how far away the shooter was, from the

23   person who was shot; right?

24       A.  Yes.  The stippling is actually an effect of the

25   gunshot residue, it's a scraping of the skin.  So it is not

1    washed away upon the time of cleaning.

2         The soot is a debris similar to if you ever dealt with

3    firewood in a fireplace, it's similar to that blackening effect

4    of the fingers.  It will be somewhat greasy.  And there is a way

5    to determine whether it's present with examination -- close

6    examination of the entrance wounds.

7         Q.  And so one of the things that you do when you conduct

8    an autopsy, and you did in each of these cases, is you examine

9    the entrance wounds that you have determined to see if there is

10   any soot or stippling; isn't that right?

11        A.  Yes.

12        Q.  And you do that, because if there is soot or stippling,

13   that will indicate that the gun that fired the bullet for that

14   entrance wound was closer to the person who was shot; isn't that

15   right?

16        A.  The interpretation of range is complex, but it is used

17   if there is no interposing object or clothing, for example,

18   between the muzzle and the deceased.  If there is not any

19   interposing object or otherwise, you know, abnormal

20   circumstance, a bullet will exit the muzzle of the gun and enter

21   to the skin with other burned and unburned gun powder particles

22   to a certain range dependent on that firearm and on that

23   ammunition.  There are many variables in play here.

24        Q.  And is it fair to say you're not an expert in

25   determining the range of certain soot or stippling marks on the

1    skin of an individual?

2        A.  I can interpret to a degree.  But no, I would have to

3    defer to a firearms expert who may have test fired a particular

4    weapon if I were to specifically say how far a muzzle was from

5    the victim.

6        Q.  But if there is some soot or stippling on the skin of a

7    person, then there is a way to determine, for example by test

8    firing a weapon, the proximity of the gun to the person who was

9    shot, or to estimate that; isn't that right?

10       A.  That is what I have been taught and told, yes.

11       Q.  And that's why you made these findings about no soot or

12   stippling?

13       A.  Yes.

14       Q.  And if there is no soot or stippling, that generally

15   means that the weapon was further away from the person than if

16   there had been soot or stippling on the skin; is that right?

17       A.  Not necessarily.  If there is an interposing object of

18   some sort or covering of the skin --

19       Q.  No, I understand.  But if it's simply the gun firing

20   into skin, if there is soot or stippling, that indicates that

21   it's closer rather than if there is no soot or stippling would

22   indicate a farther away -- a further distance to the muzzle?

23       A.  The first part of your question is correct.  If there

24   is soot or stippling present, I can make more of a conclusion as

25   to range; if there is an absence of soot or stippling, I cannot

1    make any assumption as to where the muzzle was given that I

2    don't know what -- any interposing target or the nature of the

3    ammunition or gun involved.

4              MR. OFFENBECHER:  Very well.  Thank you.  No other

5    questions.

6              THE COURT:  Redirect?

7              MS. DUIGNAN:  Briefly.  And this is something I

8    probably should have clarified on direct.

9                        REDIRECT EXAMINATION

10   BY MS. DUIGNAN:

11     Q.  When I had asked you about Mr. Belisle's injuries, and

12   you mentioned the injuries on his right hand, do you recall

13   writing in your report that you found a four-by-two inch area of

14   red abrasions that might represent stippling or pseudo

15   stippling?

16     A.  There were tiny pinpoint -- yes, I do remember.

17     Q.  And if you could explain what you meant by that?

18     A.  Yes.  The hand did have a very inconspicuously,

19   somewhat grouped, tiny, red punctate, like pinpoint abrasions.

20   It's unclear what this really was, but they were present on the

21   back of the right hand.

22     Q.  Could it have been like a defensive gesture?

23             MR. OFFENBECHER:  Objection.  She's leading the

24   witness at this point, Your Honor.  It's her witness.

25   BY MS. DUIGNAN:

1      Q.  What could it represent?

2      A.  I don't know.

3              MS. DUIGNAN:  Okay, thank you.

4              THE COURT:  Recross?

5              MR. OFFENBECHER:  No, Your Honor.

6              THE COURT:  Thank you, you're excused.

7   (Witness excused)

8              THE COURT:  What's the plan for the next witness.

9              MR. SCHRODER:  Your Honor, we've got some evidence

10  we're going to admit with the next witness, and we've got some

11  boxes.  So a little setup time might be appropriate.

12             THE COURT:  Do you want to take a recess now?

13             MR. SCHRODER:  Might be a good time for that.

14             THE COURT:  We'll take a 15-minute recess.

15                                      (Jury not present)

16             THE COURT:  You're excused, thank you very much.  All

17  right, I'll be back in --

18             MR. SCHRODER:  Judge, I want to be clear what we're

19  doing.  Ms. Grimes is going to be the next witness.  She's the

20  one who collected the evidence at the autopsy.  We're going to

21  be admitting clothing.

22             THE COURT:  Okay.

23             MR. SCHRODER:  My intent is to have her get it out,

24  identify it, we'll show it very briefly to the jury, then put it

25  away.  It's dark colored clothing so I don't think it's very

1  gruesome.

2          THE COURT:  So it's going to take -- go pretty quick?

3          MR. SCHRODER:  I plan on it going pretty quick.

4          THE COURT:  Okay, all right.  Very well.  Thank you.

5          THE CLERK:  All rise.  Matter stands in a 15-minute

6  recess.

7      (Proceedings recessed, 9:46:31 a.m. until 10:09:48 a.m.)

8                                          (Jury not present)

9          THE CLERK:  All rise.  His Honor the Court, the United

10 States District Court is again in session.  Please be seated.

11         THE COURT:  Are you ready for the jury?  Okay, who is

12 our next witness, do we have one here.

13         MR. SCHRODER:  Yes, right here, Your Honor.

14         THE COURT:  Get up here and get close.  The jury is

15 coming in pretty quick.

16                                          (Jury present)

17         THE COURT:  Okay, we've got the whole team back.

18 Government's next witness.

19         MR. SCHRODER:  Your Honor, government calls Vicki

20 Grimes.

21         THE COURT:  And my clerk will swear you in.  She's

22 right here.

23         VICKI JUNE GRIMES, PLAINTIFF'S WITNESS, SWORN

24         THE CLERK:  Thank you.  Please have a seat.

25         And ma'am, if you could please state and spell your

1   full name.

2        A.  Vicki June Grimes.  V-i-c-k-i J-u-n-e G-r-i-m-e-s.

3             THE CLERK:  Thank you.

4             THE COURT:  Counsel.

5                        DIRECT EXAMINATION

6    BY MR. SCHRODER:

7        Q.  Ms. Grimes, who do you work for?

8        A.  I work for the Federal Bureau of Investigation.

9        Q.  And how long have you worked for the FBI?

10       A.  A little more than 22 years.

11       Q.  Before that, did you ever do any work outside of

12   government?

13       A.  I did.

14       Q.  What kind of things?

15       A.  I was a legal secretary, and then before that we had

16   sporting good stores.

17       Q.  Where are you from originally?

18       A.  West Texas.

19       Q.  Now, what do you do now for the FBI?

20       A.  I'm a supervisor.  A supervisory administrative

21   specialist.

22       Q.  And what's your current -- what are your current

23   responsibilities as an administrative supervisor for the FBI?

24       A.  I supervise different programs for our Anchorage

25   division, one of them being the evidence program, and foreign

1   language program, different programs of that type.

2       Q.  So you currently have responsibility for your office's

3   evidence system?

4       A.  Yes, I do.

5       Q.  Now, have you also in your career been involved in the

6   collection of evidence as well?

7       A.  Yes, I have.

8       Q.  And in what capacity?

9       A.  I was -- I've been a member of the evidence response

10  team.

11      Q.  And how long have you -- what is -- well, you said it.

12          What is an evidence response team?  What do they do,

13  other than what it sounds like, obviously?

14      A.  It's a specialized team that goes out to crime scenes

15  and processes the crime scene, collects the evidence.

16      Q.  And how long have you been with the -- is it referred

17  to as an ERT sometimes?

18      A.  Yes, sir.

19      Q.  And how long have you been with ERT?

20      A.  A little more than eight years.

21      Q.  And have you received specialty training to be a member

22  of the ERT?

23      A.  Yes, I have.

24      Q.  And describe briefly the basic -- the kind of essential

25  training for that?

1      A.  You go to a two-week basic course, which is an overall

2   of the different aspects of collecting evidence, the

3   photography, the fingerprints, that sort of thing.  And then

4   there is specialized training that you can go to that's -- like

5   photography is specialized, or the forensic anthropology course,

6   that sort of thing.

7      Q.  And have you attended some of those specialized courses

8   as well?

9      A.  Yes, I have.

10     Q.  Now, do you have a term for it when you're sent out to

11  do a -- to recover evidence?

12     A.  We call it an ERT callout.

13     Q.  How many callouts have you been involved with as an ERT

14  member?

15     A.  I don't have an exact number, but it's somewhere around

16  50 or more.

17     Q.  And what was the first callout you ever got involved

18  with?

19     A.  It was the Columbia disaster in Texas where the space

20  shuttle broke up on entry.  And we went down to Hemphill, Texas

21  and was there for two weeks recovering the astronauts.

22     Q.  Now, have you been involved in the investigation of the

23  two homicides at Coast Guard COMMSTA Kodiak in April 2012?

24     A.  Yes, I am.

25     Q.  And let's talk about how you first got involved.  What

1   was -- what was the first involvement you had?

2        A.  On April the 13th, I attended the autopsies for Mr.

3   Hopkins and Mr. Belisle.

4        Q.  And were you there in an evidence collection role?

5        A.  Yes.

6        Q.  So how do you go about collecting evidence at an

7   autopsy?

8        A.  Well, we observe the process.  And then as they laid

9   out the evidence, we would document it and then package it for

10  transport.

11       Q.  And you talk about packaging it.  In that gathering and

12  packaging process, what's your goal as far as maintaining the

13  condition of the evidence?

14       A.  We want to maintain it in an original condition as much

15  as possible.

16       Q.  And is that always possible?

17       A.  No, it's not.  If the item that we're collecting is wet

18  or damp, you want to dry that completely before it gets packaged

19  and sealed.

20       Q.  And how do you do that?

21       A.  We have a drying cabinet at our office that we would

22  hang the items up in to dry.

23       Q.  Now, in preparation for your testimony today, have you

24  reviewed the evidence we're going to discuss?

25       A.  Yes, sir.

1      Q.   And to the best of your knowledge, has it been checked
2   into the evidence system there at FBI Anchorage?
3      A.   Yes.
4      Q.   Now, does some of it get sent out on occasion?
5      A.   Yes.
6      Q.   For what purpose?
7      A.   We have sent some items to the lab for analysis.
8      Q.   First thing we're going to look at is a photo, No. 200.
9           And are you familiar with this exhibit?  It's on your
10  screen right next to you.
11     A.   Oh, okay.  Yes.
12     Q.   And how are you familiar with it?
13     A.   It's one of the items we collected at the autopsy.
14     Q.   And what is it?
15     A.   I'm sorry?
16     Q.   What is it?
17     A.   It's a brown wallet.  And I believe it was from Mr.
18  Hopkins.
19     Q.   And is that a fair and accurate representation of Mr.
20  Hopkins' wallet as you took possession of it at the autopsy?
21     A.   Yes, it is.
22          MR. SCHRODER:  Your Honor, government offers Exhibit
23  200 for admission.
24          MR. CURTNER:  No objection.
25          THE COURT:  It will be received.

1                          PLAINTIFF'S EXHIBIT 200 ADMITTED

2    BY MR. SCHRODER:

3       Q.  Now, Ms. Grimes, did you inventory the contents of the

4    wallet as part of your duties?

5       A.  Yes, I did.

6       Q.  And was there money in it?

7       A.  Yes, there was.

8       Q.  Did you review your inventory before coming over here

9    today?

10      A.  Yes, sir.

11      Q.  And how much money was in the wallet?

12      A.  It was $60.  There were three $20 bills.

13      Q.  Now, let's go --

14          MR. SCHRODER:  Kim, let's go to 201.

15   BY MR. SCHRODER:

16      Q.  And are you familiar with this exhibit?

17      A.  Yes, sir.

18      Q.  And again, how are you familiar with it?

19      A.  This is, again, items that we collected at the autopsy.

20      Q.  And what is it?

21      A.  It's U.S. currency.

22      Q.  And who was it collected from?

23      A.  It was from Mr. Belisle.

24      Q.  And is that a fair and accurate representation of the

25   money that was collected from Mr. Belisle as you took possession

1   of it at the autopsy?

2       A.  Yes, sir.

3           MR. SCHRODER:  Your Honor, we move admission of 201.

4           MR. CURTNER:  No objection.

5           THE COURT:  It will be received.

6                        PLAINTIFF'S EXHIBIT 201 ADMITTED

7    BY MR. SCHRODER:

8       Q.  And how much money was there on Mr. Belisle at the

9   time?

10      A.  It was $66.51.

11      Q.  So now we're going to -- we're going to go take a look

12  at some of -- introduce or talk about some of the evidence.  So

13  we will start with Exhibit 218.

14          MR. SCHRODER:  Your Honor, if we may, if I can have

15  Ms. Grimes wear the microphone.  And we'll use this paper

16  colored to cover the table.

17          THE COURT:  That would be fine.

18          MR. SCHRODER:  If it's all right with you, Your Honor,

19  Special Agent Allison will assist her as well.

20          THE COURT:  That's good.

21      A.  Do you want me to --

22   BY MR. SCHRODER:

23      Q.  So Ms. Grimes, you can get out and come around.  And

24  then I think we're going to start with Exhibit 218.  And right

25  behind you there is a microphone.

```
 1                THE COURT:  Yes, ma'am.

 2                UNIDENTIFIED JUROR:  (Indiscernible).

 3                THE COURT:  Okay, thank you, good, good.  Good, thank

 4    you, you're doing a good job.  Make that adjustment.

 5                MR. SCHRODER:  Use this one.

 6                MS. DIXON:  Yeah, I turned it off.  I turned it off.

 7                MR. SCHRODER:  Thank you.

 8                THE COURT:  Now, that's what I call a good juror.

 9    You're all good jurors.  You're all good jurors.

10     BY MR. SCHRODER:

11        Q.  All right, Ms. Grimes, I'm going to ask you to look at

12    Exhibit 218.  Can you identify this exhibit?

13        A.  Yes, sir.

14        Q.  And what is it?

15        A.  It's a Navy T-shirt.

16        Q.  And who did that come from?

17        A.  Mr. Hopkins.

18                MR. SCHRODER:  Your Honor, move admission of 218.

19                THE COURT:  It will be received.

20                         PLAINTIFF'S EXHIBIT 218 ADMITTED

21     BY MR. SCHRODER:

22        Q.  All right, you can hold it up now.

23        Q.  219.  Now, Ms. Grimes, have you -- can you identify

24    this exhibit?

25        A.  Yes, sir.
```

1      Q.  What is it?

2      A.  These are the blue cargo pants from Mr. Hopkins.

3          MR. SCHRODER:  Your Honor, government moves admission

4  of 218 [sic].

5          MR. CURTNER:  No objection.

6          THE COURT:  Received.

7          MS. DIXON:  219.

8          MR. SCHRODER:  219, I'm sorry.

9          THE COURT:  Received.

10                         PLAINTIFF'S EXHIBIT 219 ADMITTED

11  BY MR. SCHRODER:

12     Q.  Next will be 221.  I'm going to ask you to look now at

13  Exhibit 221.  And are you familiar with that exhibit?

14     A.  Yes, sir.

15     Q.  And what is it?

16     A.  It's the metal fragment removed, I believe, from Mr.

17  Hopkins.

18          THE COURT:  You can stand up in the back.

19  BY MR. SCHRODER:

20     Q.  Is this the bullet you collected at the autopsy?

21     A.  Yes, it is.

22          THE COURT:  Do you see -- I don't know if the back row

23  saw the item.  Just pick it up, show them.

24          MS. LOEFFLER:  Maybe Agent Allison can hold it up.

25          THE COURT:  It will be -- once it's admitted into

1  evidence you'll have it.

2          MR. SCHRODER:  Your Honor, we move Exhibit 221 into

3  evidence.

4          THE COURT:  It will be received.

5                          PLAINTIFF'S EXHIBIT 221 ADMITTED

6   BY MR. SCHRODER:

7      Q.  229.  Ms. Grimes, can you identify this exhibit?

8      A.  Yes, sir.

9      Q.  And what is it?

10     A.  It's a black shirt that was from Mr. Belisle.

11         MR. SCHRODER:  Your Honor, the government moves

12  Exhibit 229 into evidence.

13         THE COURT:  Hearing no objection, it will be received.

14                          PLAINTIFF'S EXHIBIT 229 ADMITTED

15   BY MR. SCHRODER:

16     Q.  We have one more exhibit, 230.

17         Ms. Grimes, can you identify this exhibit?

18     A.  Yes, sir.

19     Q.  And what is it?

20     A.  It's a brown shirt from Mr. Belisle.

21         MR. SCHRODER:  Your Honor, the government moves

22  admission of exhibit 230.

23         THE COURT:  Hearing no objection, it will be received.

24                          PLAINTIFF'S EXHIBIT 230 ADMITTED

25   BY MR. SCHRODER:

1      Q.  Ms. Grimes, I believe you can return to the witness

2   stand now.

3          Ms. Grimes, were you involved in collecting evidence --

4   some of the evidence you collected was sent to the FBI crime lab

5   or other crime labs for analysis?

6      A.  Yes, they were.

7      Q.  I'm going to have you take a look at what we've marked

8   as Exhibit 388.

9          Maybe before we move this, it would be worth asking

10  another question as well.

11         Were you involved in another search in this case?

12     A.  Yes, I was.

13     Q.  And where was that?

14     A.  It was the residence of Hank Pennington on Kodiak

15  Island, Chiniak I think is how you pronounce it.

16     Q.  And did you collect evidence from there as well?

17     A.  We did.

18     Q.  And did some of that evidence get sent to the FBI lab

19  or other crime labs?

20     A.  I believe so, yes.

21     Q.  Now, I've got -- can you identify what -- it's two

22  pages, right.

23         So can you identify this exhibit?

24     A.  Yes.

25     Q.  What is it?

1      A.  It's a list of items that were sent to the lab for

2  analysis.

3      Q.  Now, were you involved in the preparing of this chart?

4      A.  Yes.

5      Q.  Did you check the data on this chart?

6      A.  Yes, I did.

7      Q.  And is it accurate?

8      A.  Yes, it is.

9          MR. SCHRODER:  Your Honor, the government moves

10  Exhibit 388 into evidence as a compilation of the data -- or the

11  evidence that was sent to the lab so we can identify the numbers

12  on it.

13          MR. CURTNER:  No objection.

14          THE COURT:  It will be received.

15                          PLAINTIFF'S EXHIBIT 388 ADMITTED

16  BY MR. SCHRODER:

17      Q.  So let's post this.  And what's the top block?

18      A.  It's -- the very top box is the evidence that was sent

19  to the lab for analysis that was taken from the autopsy.

20      Q.  And what is the lower block?

21      A.  It's the items that were sent to the lab from the

22  Pennington residence.

23      Q.  So let's start with the -- let's start on top.

24          Let's look at the first column.  And what's the title

25  of that first column?

1      A.  FBI numbers.

2      Q.  Now, do you mark evidence in some way when you take it?

3      A.  We do.

4      Q.  And does it eventually get assigned some kind of

5  number?

6      A.  It does.

7      Q.  And could you briefly talk about that, about the FBI's

8  system for doing that?

9      A.  Yes, sir.  When we're in the field and we collect

10  items, we number them numerically 1 through whatever.  And then

11  when we get back to the office and it's actually submitted into

12  the evidence vault, it gets automatically assigned a 1-B number.

13  And that's a method of tracking the number -- the items.

14      Q.  So are we seeing those number in that column?

15      A.  Yes, sir.

16      Q.  Now let's go from the top.  What was the first evidence

17  you collected?

18      A.  Belisle cargo pants.

19      Q.  And that was FBI number?

20      A.  182.

21      Q.  And what were the next two?

22      A.  There are hair samples from Mr. Belisle and Mr.

23  Hopkins.

24      Q.  And the jury can -- I don't think you need to read the

25  numbers, they can see those.

1      A.  1-B 201 and 1-B 168.

2      Q.  And how about the next three.  What type of items were

3  those that you collected?

4      A.  Those were metal fragments taken from Mr. Belisle and

5  Mr. Hopkins.

6      Q.  And the next -- actually, we've seen -- Dr. Lann talked

7  about the bag, so I want to ask you why you collect those.

8  But -- so you collected the hand bags.

9          What about the body bags, why do you collect those?

10     A.  In case there is evidence that has come from the body

11  in transport that has fallen off that we've missed.

12     Q.  And how about the last two items?

13     A.  They are dried blood samples I believe for DNA

14  purposes.

15     Q.  And why did you collect those?

16     A.  I believe so we would have a record.

17     Q.  You just said, I'm sorry, I need to pay more attention.

18  I'm just thinking ahead too much.

19          Now, let's go to the lower part, and I think this goes

20  onto the second page for the Chiniak -- the Pennington

21  residence.

22          What are the first four items that were collected

23  there?

24     A.  They are weapons.

25     Q.  And do they all have a common trait to them that you

1  can see there?

2       A.  They do.

3       Q.  And what is that?

4       A.  They are all .44 magnum weapons.

5       Q.  And take a look at the last item and then let's move to

6  the second page.

7       A.  It's a box.

8       Q.  Right.  Let's move to the second page.  So going --

9  looking at that item, and then the next -- over the next few

10 until the bottom, what do all those have in common?

11      A.  They are all ammunition.

12      Q.  And then what was the last item you collected?

13      A.  They are fingerprint lifts.

14      Q.  Do you remember where those were from in Mr.

15 Pennington's home?

16      A.  Yes, sir, I do.

17      Q.  And where were they from?

18      A.  Four of them were from a safe where he kept firearms,

19 and one of them was from a nightstand in the upper bedroom where

20 we found one of the, I believe it's number 1-B 217, one of the

21 revolvers.

22           MR. SCHRODER:  Okay.  Your Honor, no further

23 questions.

24           THE COURT:  Cross-examination.

25           MR. CURTNER:  Thank you.

1                    CROSS-EXAMINATION
2    BY MR. CURTNER:
3        Q.  Good morning, Agent Grimes.
4        A.  I'm not an agent.
5        Q.  Oh, I'm sorry.
6        A.  That's fine.
7        Q.  I guess used to that, I suppose.  What can I call you?
8        A.  Anything you'd like.
9        Q.  Careful.  Ms. Grimes?
10       A.  Yes, that's fine.
11       Q.  Now, you were involved in the collection of evidence,
12   or I guess attempted collection of evidence in this case other
13   than from the autopsy and Mr. Pennington's?
14       A.  I was on additional searches, is that what you're
15   asking?
16       Q.  Yes.  So do you remember conducting a search on April
17   19th of 2012 at the Wells' residence?
18       A.  I'm not sure of a date.  I was at the residence on
19   different occasions.
20       Q.  Did you -- were you part of a search of the septic tank
21   at the Wells' residence?
22       A.  Yes, sir, I was.
23       Q.  And how many other investigators were there?
24       A.  I believe Mr. Allison was there and one of our
25   supervisors.  And I'm not sure -- from other agencies there were

1    other people.

2         Q.   And what did that search involve?

3         A.   We were looking in the septic tank that had been

4    drained.

5         Q.   And you were looking in a septic tank for?

6         A.   For a weapon.

7         Q.   And did you find any weapon there?

8         A.   No, sir, we didn't.

9         Q.   How long was that search, do you think?

10        A.   It was a few hours is all.

11        Q.   And then that was -- after that, a few days later, did

12   you do a search at the landfill?

13        A.   Yes, we did.

14        Q.   You were a part of a team?

15        A.   Yes, sir.

16        Q.   How big was that team?

17        A.   I believe there was -- I don't know exactly, but we

18   have an eight-member team.

19        Q.   Were there other agents involved?

20        A.   Yes.  Other agencies, yes.

21        Q.   Coast Guard, too?

22        A.   Uh-huh.

23        Q.   So you have an eight-member team?

24        A.   Yes, sir.

25        Q.   And how many Coast Guard members were involved in that?

1      A.  A lot.  Probably -- I'm not sure.

2      Q.  Three dozen or so?

3      A.  Probably.

4      Q.  And then so what were you searching for at the

5  landfill?

6      A.  Any type of evidence that would help us solve the

7  crime.

8      Q.  And was that because Mr. Wells, he might have had trash

9  or something in the landfill, is that why you were looking in

10  it?

11      A.  It was my understanding that there was a large dumpster

12  close to his residence, and it was picked up later that day or

13  the next day.  Possibly something could have been disposed of.

14      Q.  So the dumpster next to Mr. Wells' residence was now at

15  the landfill, and so you had to search the landfill to find

16  evidence?

17      A.  Yes, sir, uh-huh.

18      Q.  And did you find any evidence there at all?

19      A.  Not to my recollection.

20      Q.  Do you know -- then it was after that that you went to

21  Mr. Pennington's house to do a search?

22      A.  I believe so, yes, sir.

23      Q.  And he was a friend of Mr. Wells?

24      A.  Yes.

25      Q.  And now when you recovered this evidence, do you have

1  any idea what happened when it was tested at the lab or

2  investigated?

3      A.  No, sir, I don't have the lab reports.

4      Q.  So you don't know what happens to it after you turn it

5  over to the lab or other agents?

6      A.  No, sir.

7      Q.  Agents.

8          Oh, let me ask you about the septic tank.  You said it

9  was drained?

10     A.  It was mostly drained.  We had a truck come in and

11 finish what little was left in it.

12     Q.  But it had been drained -- it had already been drained

13 because there was a problem with the septic system, is that

14 correct?

15     A.  That's my understanding.  I don't know for sure.

16     Q.  And it was drained before the homicides, before April

17 12th?

18     A.  I have no idea about that.

19         MR. CURTNER:  Thank you.

20         MR. SCHRODER:  No questions, Your Honor.

21         THE COURT:  All right, thank you, ma'am.

22  (Witness excused)

23         THE COURT:  Government's next witness.

24         MR. SCHRODER:  Government calls Chief Steve Cartier.

25 Chief, you can come up here.  The witness stand is there on the

1  right.

2          THE CLERK:  Sir, if you can please raise your right

3  hand.

4        STEPHEN MARK CARTIER, PLAINTIFF'S WITNESS, SWORN

5          THE CLERK:  Thank you, please have a seat.

6          And, sir, if you can please state and spell your full

7  name.

8      A.  Stephen Mark Cartier, S-t-e-p-h-e-n M-a-r-k

9  C-a-r-t-i-e-r.

10         THE COURT:  Counsel.

11         MR. SCHRODER:  Thanks, Your Honor.

12                   DIRECT EXAMINATION

13  BY MR. SCHRODER:

14     Q.  Chief, who do you work for?

15     A.  I work for the U.S. Coast Guard.

16     Q.  And how long have you been in the Coast Guard?

17     A.  This June it will be 15 years.

18     Q.  What's your current assignment?

19     A.  I'm currently at Sector Southeastern New England in

20  Woods Hole, Massachusetts.

21     Q.  And how long have you been there?

22     A.  In Woods Hole?

23     Q.  Right.

24     A.  For just over a year.

25     Q.  Where were you before Woods Hole?

1    A.  COMMSTA Kodiak.

2    Q.  What's some of your other assignments before getting to

3    COMMSTA?

4    A.  I've been on the Coast Guard Cutter MACKINAW; Air

5    Station Traverse City; small boat station, Sabine Pass, Texas;

6    small boat station, Oswego, New York; Sector Key West; and then

7    Kodiak.

8    Q.  Now, let's talk about -- the jury has been getting a

9    bit of an education on the rates and ranks of the naval

10   services, especially the Coast Guard.  But you're the first

11   chief we've seen.

12   A.  Yes.

13   Q.  So what are the chief petty officers in the Coast

14   Guard, what level of rank is that?

15   A.  Chief petty officers are E-7s.  They are the -- it's a

16   leadership position, a senior leadership position in the Coast

17   Guard.  And typically we manage shops.  And it's just -- in the

18   Coast Guard, it's a very high and esteemed rank.  We're

19   typically managing people.

20   Q.  We've also talked a little bit about rating, but you're

21   the first one we've seen of your rate.  So what's your rate?

22   A.  I'm a store keeper, so I do finance and supply,

23   purchasing, contracting.

24   Q.  What were the dates you were at COMMSTA Kodiak?

25   A.  I was at COMMSTA Kodiak from January 2011 to

1   approximately May, June 2012.

2       Q.  And how many SKs are there in COMMSTA?

3       A.  I was the only one.  I was independent duty at that

4   unit.

5       Q.  So are you kind of the money man?

6       A.  Yes, I am.  I was.

7       Q.  Does that make you a popular guy sometimes?

8       A.  It definitely did.

9       Q.  Now, where were you on the day of the murders in this

10  case?

11      A.  That morning, I got up.  I lived on Aviation Hill.  I

12  left my house approximately 7:45 and drove to the COMMSTA.  I

13  actually followed a vehicle, an emergency response vehicle, and

14  arrived at the COMMSTA maybe 7:52, 7:53.

15      Q.  Now, did you run into anybody that you needed to assist

16  right away?

17      A.  Well, as I pulled up, I was flagged down by a non-rate

18  E-3, Seaman Leah Henry.  And she came up to my truck, I rolled

19  down the window and asked her what had happened, and she said

20  that Jim and Rich had been shot.  I told her to get in my truck

21  and brought her up to T1, because I saw she was obviously very

22  emotional, and I didn't want -- I didn't feel like she should

23  just be standing around down there.

24      Q.  Now, what happened when you got up to T1?

25      A.  When I got up to T1, I pulled in the parking spot.  I

1  placed a phone call to ITC Scott Reckner just to let him know

2  that something happened, because I saw that his truck wasn't

3  there yet.  He was the shop chief down there.

4        And I went in T1 and, I mean, everybody was kind of in

5  shock and really didn't know what was going on at the time.

6    Q.  Now, let's go talk a little bit about -- you said you

7  lived in a place called Aviation Hill?

8    A.  Yes, sir.

9        MR. SCHRODER:  Kim, can you give me Exhibit 42.  I

10 think that's already been admitted.

11       MS. DIXON:  It has.

12  BY MR. SCHRODER:

13   Q.  And chief, in front of you somewhere there is a couple

14 of laser pointers.  We're going to put that picture -- you can

15 see it on your screen, but we're going to put it up here.

16   A.  All right.

17   Q.  And can you -- with the lights just a bit -- could you

18 show us where Aviation Hill is?

19   A.  I believe Aviation is this loop right --

20       MS. LOEFFLER:  It's shown on his screen.

21  BY MR. SCHRODER:

22   Q.  Oh, no, you've got to show it over here, Chief.  Point

23 over here.

24   A.  I'm sorry.  I believe Aviation Loop is this right here.

25 I'm not a hundred percent sure from this view.

1      Q.  That's on base?

2      A.  It's part of base.  You didn't have to go through the

3  gate to get to Aviation Loop, it was right off of base.

4      Q.  How about I tell you -- sorry about that.  I thought we

5  looked at this.

6          How about if I tell you that that yellow line is

7  Rezanof Drive.  Does that help you?

8      A.  Oh, okay.  Aviation Loop is right here.

9      Q.  There we go.

10     A.  There it is.  Sorry.

11     Q.  And so does that put it kind of in between the Coast

12 Guard base and the airport, it looks like --

13     A.  You had to pass --

14     Q.  -- on the road?

15     A.  You had to pass the airport, and then shortly after

16 that you took a right up into Aviation.

17     Q.  Okay, so you lived Aviation Hill.  Where did Jim

18 Hopkins live?

19     A.  He lived at Aviation as well.

20     Q.  So you were neighbors?

21     A.  Yes.

22     Q.  Did you socialize with him a lot?

23     A.  We saw Jim and Debby almost every night walking, or

24 during the winter out on his snowmobile with his plow on.  And

25 we would always just shop and chat and say hi.  So we definitely

1    saw each other.

2         Q.  And so you saw him regularly?

3         A.  Yes, sir.

4         Q.  And how about at work, did you -- how often did you see

5    Jim Hopkins at work?

6         A.  I saw Jim every day.  At the time I was an E-6, a first

7    class petty officer, and typically you kind of group with the

8    pay grades that you're at.  And so pretty much every day when

9    the rigger shop came up, he would come in and say hi and we'd

10   would chat.  So I saw him every day.

11        Q.  And based on that experience of being neighbors and --

12   so you saw him every day, I think that's kind of what you were

13   saying?

14        A.  Yes, sir.

15        Q.  Based on that experience, what kind of person did you

16   think Jim Hopkins was?

17        A.  I thought Jim was a great guy.  I thought that -- him

18   and I often talked about making chief, it's such a big rank in

19   the Coast Guard, and I looked at him as somebody that would be a

20   model chief.  He took care of his people, he was approachable.

21   Just all around a really great guy.

22        Q.  And you saw him and his wife together.  I mean, what

23   was your impression of their relationship, the times you spent

24   with them?

25        A.  Anytime that we saw them, whether it was when they were

1    walking or out in town, I -- they looked look a happy couple.

2        Q.  Now, knowing Mr. Hopkins and talking with him

3    regularly, did he have any enemies that you were aware of?

4        A.  Not that I was aware of.

5        Q.  Was he involved in any illegal activity that you knew

6    of?

7        A.  No, sir.

8        Q.  Did he have any -- involved in illegal drugs that you

9    knew of?

10       A.  Not that I knew of.

11       Q.  Or have any drinking problems you knew of?

12       A.  Not that I knew of.

13       Q.  Was he a gambler from your understanding?

14       A.  Not that I knew of.

15       Q.  Did he have any debts he couldn't handle that you knew

16   of?

17       A.  Not that I knew of.

18       Q.  Anyone you know that might be looking to do him harm?

19       A.  No, sir.

20       Q.  And how well did you know Rich Belisle?

21       A.  I saw Rich every day as well.  Rich was a boatswain

22   mate and I was a store keeper, so he always made fun of me for

23   being store keeper.  But I saw him pretty much every day as

24   well.  I didn't talk to him as much as Jim because, again, we

25   were first classes and we kind of stuck together.  But I saw

1    Rich pretty much every day as well.

2        Q.  And what was your impression of Rich Belisle?

3        A.  Rich was a great guy as well.  He was somebody, as I

4    was preparing to make chief, knowing that he was a chief at one

5    time, somebody that I would have wanted to be like as a chief

6    petty officer.

7        Q.  Now, you also had another kind of ancillary role in

8    this matter.

9            In September of 2011, were you instructed to conduct an

10   administrative investigation?

11       A.  Yes, sir, I was.

12       Q.  And are you familiar with administrative investigations

13   in the Coast Guard?

14       A.  Yes, sir, I am.

15       Q.  And what are they?

16       A.  Administrative investigation is -- something happens,

17   and the Coast Guard, before they take it maybe to a higher

18   level, they have somebody at the command investigate it,

19   investigate the facts and determine findings based off of the

20   facts.

21       Q.  And have you drafted and prepared administrative

22   investigations before?

23       A.  Yes, sir, I have.

24       Q.  And how are the facts obtained in those kind of

25   records?

1      A.   Through interviews and -- through interviews or

2   whatever the case may be.  If you have to talk to somebody or

3   look at video or whatever the case may be, just a regular

4   investigation.

5      Q.   Is that part of the -- is that a document that's part

6   of the ordinary course of business in the Coast Guard?

7      A.   Yes, sir.

8      Q.   And is the document intended to accurately reflect the

9   act or condition that you're investigating --

10     A.   Yes.

11     Q.   -- the event?

12          Now, what happens when the reports are completed by the

13  investigating officer?

14     A.   Typically the investigating officer will do a standard

15  Coast Guard memo and forward it on up to the command.

16     Q.   We're going to show you what's been identified as

17  Exhibit 8, and you'll see that on your screen just there for

18  now.

19          Are you familiar with that exhibit?

20     A.   Yes, sir.

21     Q.   And how are you familiar with it?

22     A.   I wrote it.

23     Q.   And whose signature is that at the top?

24     A.   It's mine.

25     Q.   Now, who assigned you to do this investigation?

 1      A.  Lieutenant Dave Pizzurro, the executive officer of

 2  COMMSTA Kodiak.

 3      Q.  And once you completed the investigation, what did you

 4  do with it?

 5      A.  I forwarded it up to Lieutenant Pizzurro.

 6      Q.  And what were you investigating?

 7      A.  I was investigating a missing fuel card and the use of

 8  that missing fuel card.

 9              MR. SCHRODER:  Your Honor, the government moves for

10  admission of Exhibit 8.

11              MR. CURTNER:  We would object, Your Honor.  He can

12  describe what his investigation -- what he did in his

13  investigation, but I think this report is -- should not be

14  admitted into evidence.

15              THE COURT:  Well, I'll think about it.

16              MR. SCHRODER:  Your Honor, it goes toward motive.  You

17  ruled already we could start admitting these documents.

18              THE COURT:  He can testify concerning that.

19              MR. SCHRODER:  All right.  Then we'll go into it in a

20  little bit of depth then.  I wasn't going to do that now, but we

21  can.

22              THE COURT:  Well, I'm just -- maybe we need to have a

23  discussion up here so I can understand the issues.

24   (Sidebar conversation as follows:)

25              THE COURT:  So is this like a police report?

1          MR. SCHRODER:  No.  One of the key events in this is
2     when Wells gets a letter of caution.
3          MR. CURTNER:  (Indiscernible).  The question is,
4     police reports don't end up --
5          THE COURT:  He said it's just like a police report,
6     and typically when police officers testify in court, then the
7     come into evidence.  (Indiscernible).
8          MR. CURTNER:  (Indiscernible).
9          MR. SCHRODER:  (Indiscernible) I think part of the
10    importance of it is the fact that other people used it as much
11    as the events and how they used it later.
12         THE COURT:  (Indiscernible) don't want to do it.  I
13    don't know what the answer is to the second one.  I'm not ready
14    to rule on it (indiscernible).
15         MR. SCHRODER:  It's not a law enforcement, it's an
16    internal administrative document.
17         THE COURT:  It is.
18         MR. CURTNER:  The Court's earlier ruling -- the only
19    thing that's relevant is the fact of any discipline that was
20    imposed and not the fact that it was stolen.  The fact that he
21    stole it or that he allegedly stole gas is not an act that is in
22    any way arguably relevant or (indiscernible) even in their
23    theory of the case to the motive of homicide.  That doesn't
24    establish a motive.  It's only if he got disciplined for it.
25         THE COURT:  I'm not worried about that, but I'm just

1    saying (indiscernible) background in the entire pictures to the

2    government's view as to motive.

3                MS. LOEFFLER:  Statement (indiscernible).

4                MR. CURTNER:  The fact that he took gas doesn't give

5    him a motive to (indiscernible) homicide.  The fact that he was

6    disciplined (indiscernible) but there is no discipline.  This is

7    just going to prove that he stole gas and nothing was

8    disciplined, because he never was (indiscernible) and that's the

9    only thing that's relevant.

10               MR. SCHRODER:  The discipline comes in later.  What I

11   was trying to do with this witness was -- you can't take the

12   discipline out of context with the facts of the situation, and

13   these are the facts of the situation where he was later

14   disciplined.  The only reason I was using this witness is

15   because he was the writer.  It was more of an authentication.

16               THE COURT:  As I understand, there was an allegation

17   that he stole some gas?

18               MR. SCHRODER:  Right.

19               THE COURT:  And an investigation followed.  He was

20   aware of the investigation, right or wrong?

21               MR. SCHRODER:  Yes.

22               THE COURT:  And that ultimately no formal action was

23   taken?

24               MR. SCHRODER:  Yes, there was action taken.

25               THE COURT:  Okay, what was that?

1          MR. SCHRODER:  He was given a letter of caution.

2          MS. LOEFFLER:  And they knew -- there were two people

3  that gave statements.  The two people that gave the statements

4  were Jim Hopkins and Rich Belisle, and that's rather important

5  to our motive.

6          THE COURT:  The same matter is admissible, it goes to

7  the (indiscernible).  I'm getting more technical (indiscernible)

8  report, similar to a police report, is admissible.  That's my

9  answer, do you understand?

10          MR. CURTNER:  (Indiscernible).

11  (End of sidebar)

12          THE COURT:  Still here?  Good, thanks.  Okay, counsel.

13  BY MR. SCHRODER:

14     Q.  Okay, we're going to walk through this, Chief Cartier.

15     A.  Yes, sir.

16     Q.  So what were you assigned to do?  If you look at

17  paragraph, the preliminary statement in paragraph 1, what was

18  the purpose of your investigation?

19     A.  A fuel card was used on 30 and 31 August 2011.

20          MR. CURTNER:  I'd like to have the Chief testify about

21  his memory instead of reading a document that's not in evidence.

22          THE COURT:  You can refresh your recollection from the

23  document, but don't read the document.

24     A.  Yes, sir.  Basically the fuel card was found missing,

25  and it showed back up.  And they had me look into whether it was

1    used, if it was used, and I started my investigation at that

2    point.

3      BY MR. SCHRODER:

4        Q.  And what were the dates that the fuel card was used?

5    And you can refer to the document to refresh your memory.

6        A.  30 and 31 August.

7        Q.  And year please, what year was it?

8        A.  2011.

9        Q.  And where was -- based upon your investigation, where

10   was the card normally kept?

11       A.  The card was normally kept in a desk drawer down in the

12   office of the rigger shop.

13       Q.  Whose desk?

14       A.  I don't know whose desk it was.

15       Q.  And what was the -- was there -- you said fuel was

16   purchased.  What was the amount of fuel?

17       A.  Can I look at the --

18       Q.  You can refresh your memory.

19       A.  47.6 gallons.

20       Q.  And what kind of fuel?

21       A.  Diesel fuel.

22       Q.  And how much was the cost?

23       A.  $232.44.

24       Q.  Now, did the card eventually show up again?

25       A.  Yes.

1      Q.   And did you take statements as part of your -- part of

2   your investigation?

3      A.   Yes, sir.

4      Q.   Who gave statements?

5      A.   ITC Scott Reckner; ET1 Jim Hopkins; Mr. Rich Belisle;

6   Mr. Jim Wells; and I believe that was it.

7      Q.   And what did Mr. Wells -- are you familiar with his

8   statement?

9      A.   I am.

10      Q.   And what was Mr. Wells' statement?  What did he say?

11      A.   He said that based off of how much fuel was purchased

12   and based on the fact that two of the other members were

13   going -- were in Shemya, that he must have used it to fuel the

14   line truck based off the amount of fuel that was used.

15      Q.   So Mr. Wells says it must have been to fuel the line

16   truck?

17      A.   Correct.

18      Q.   Now, could you check paragraph 1 of the facts and see

19   if that recollection -- your memory is refreshed about where the

20   card was stored, where it was kept?

21      A.   In Mr. Wells' desk.

22      Q.   So now, Mr. Wells' statement that he must have used it

23   for the line truck --

24      A.   Correct.

25      Q.   -- did you find that statement to be credible, at the

1   end of your investigation?

2            MR. CURTNER:  Objection, Your Honor.

3    BY MR. SCHRODER:

4      Q.  What do you find?  How do you investigate that to see

5   whether that fact was true?

6      A.  Through the Coast Guard Police Department, I pulled the

7   video of that morning from the front gate and found that the

8   line truck never came through the front gate.

9      Q.  Did you see, however, something else come through the

10  front gate?

11     A.  I did.

12     Q.  What was that.

13     A.  Mr. Wells' vehicle.

14     Q.  And how did that, the time of that vehicle coming

15  through the front gate, compare to the times the fuel card was

16  used?

17     A.  Very close.

18     Q.  Now, Mr. Wells also in his statement indicated that he

19  probably used it for the line truck because other members of the

20  crew -- did he indicate where other members of the crew were at

21  that time?

22     A.  They were -- I believe at that time they were boarding

23  a plane to go to Shemya.

24     Q.  And who -- you said you know Chief Reckner.

25          Do you know if Chief Reckner was one of the people who

 1  was going to Shemya that day?

 2      A.  I believe yes, he was.

 3      Q.  Did you, in fact, go see whether Chief Reckner had gone

 4  onto the base that day?

 5      A.  I did.  His vehicle pulled in, in my memory, right

 6  after Mr. Wells' vehicle.

 7          MR. SCHRODER:  Government has no further questions,

 8  Your Honor.

 9          THE COURT:  Cross-examination.

10                      CROSS-EXAMINATION

11   BY MR. CURTNER:

12      Q.  Chief Cartier, just a few questions about your

13  familiarity and knowing Mr. Hopkins.

14      A.  Yes, sir.

15      Q.  Were you aware of any marital problems that he had

16  experienced in his marriage with Debby?

17      A.  After the -- after the murders --

18          MR. SCHRODER:  Objection.  The answer is going to be

19  hearsay, Your Honor.

20          MR. CURTNER:  I'm asking him --

21          THE COURT:  Well, put it in a time frame, first of

22  all, so we know what we're talking about.

23   BY MR. CURTNER:

24      Q.  Well, at any time?  You talked about your opinion about

25  their relationship; correct --

1       A.   Correct.

2       Q.   -- on direct?

3            And do you have, to your own knowledge, an opinion

4  about that, if they had any problems in their relationship?

5       A.   I had never witnessed any problems.

6       Q.   Are you aware of any problems?

7       A.   After the --

8            MR. SCHRODER:  Again, Your Honor, this is only going

9  to come from hearsay.  He said he didn't have any personal

10 knowledge.

11           THE COURT:  Well, you can't testify hearsay.  You

12 can't say what someone else told you; do you understand that,

13 sir?

14      A.   Ah --

15           THE COURT:  Now you understand that.

16      A.   Now I do, yeah.  I didn't witness anything, no.

17           MR. CURTNER:  Your Honor, I think I can ask him what

18 his impression is, his knowledge is, because -- and even if it's

19 hearsay, because they have opened the door when they have talked

20 about his opinion of their relationship, and of course that's

21 going to be based on conversations with Mr. Hopkins as well.  So

22 I think I should be able to ask him what he -- what his

23 impression is, whether it's based on what Mr. Hopkins told him

24 or not.

25           THE COURT:  Sounds like he's testified as to his

1   impression.  He can testify as to his impression based on his

2   observation, but he can't testify as to hearsay.

3               MR. CURTNER:  Well, I think his first testimony was

4   based on hearsay.

5               THE COURT:  Is that true?

6               MR. SCHRODER:  No, Your Honor.  We laid the foundation

7   that he had seen them together on numerous occasions --

8               THE COURT:  I didn't think it was based on hearsay.

9               MR. SCHRODER:  No, it was not.

10   BY MR. CURTNER:

11      Q.  So you don't have any personal information about their

12   relationship or any problems they were having?

13      A.  I didn't know of any problems they were having

14   before -- at the time, no.

15      Q.  Previously in their marriage, anytime in their

16   marriage?

17      A.  I had heard after --

18               THE COURT:  Hearsay is not admissible.  You're not

19   supposed to say what you hear.

20      A.  No.

21   BY MR. CURTNER:

22      Q.  Okay, now you did know that Mr. Hopkins was planning to

23   retire?

24      A.  I had heard that he was planning to retire, yes.

25      Q.  And that he had followed --

1          THE COURT:  Can I just clear this up.  He's not asking

2  you what you've heard, he's asking you what you know.  And you

3  keep saying "I heard."

4      A.  Okay.

5          THE COURT:  Hearsay is not admissible unless it falls

6  in with certain exceptions that I have not heard justified yet,

7  okay?

8      A.  So no, I did not know he was planning to retire.

9   BY MR. CURTNER:

10     Q.  You did not know that he had completed a retirement

11 letter?

12     A.  No, I did not know that.

13     Q.  Now, when you were -- did this investigation about the

14 fuel card -- I'm sorry, what date did you say the fuel card was?

15 Did you say it was August of 2011?

16     A.  Is when it was used.

17     Q.  That's when it was used?

18     A.  Yes, sir.

19     Q.  That's what you were investigating?

20     A.  Yes, sir.

21     Q.  And the card was used on that day to -- for 47 gallons

22  of gasoline?

23     A.  Yes, sir.

24     Q.  And do you know what type of truck Mr. --

25          MR. SCHRODER:  Your Honor, that implied facts that are

 1   not in evidence.  I think he testified it was diesel.

 2    BY MR. CURTNER:

 3       Q.  I'm sorry, diesel fuel, 47 gallons of diesel fuel?

 4       A.  Yes, sir.

 5       Q.  That's what you were investigating?

 6       A.  Yes, sir.

 7       Q.  And do you know about Mr. Wells' truck, what type of

 8   truck he had?

 9       A.  He had a white Dodge.

10       Q.  Was it -- and was it a diesel?

11       A.  I do not know.

12       Q.  Do you know what the capacity of his gas tank was?

13       A.  No, I don't.

14       Q.  Do you know if it could have been a gas tank that would

15   hold 47 gallons of diesel fuel?

16       A.  I don't know that.

17       Q.  Would you be surprised to know that his gas capacity

18   was 34 gallons?

19           MR. SCHRODER:  Objection, Your Honor.  He can ask him

20   if he knows it.  Ask him if he was surprised by it, that's a

21   completely different question.

22    BY MR. CURTNER:

23       Q.  Did you investigate the size of Mr. Wells' gas truck --

24   the gas tank in his truck?

25       A.  I wasn't investigating his truck.

1      Q.  Just use of the card?

2      A.  Just use of the card.

3      Q.  Now on the day that you were doing this investigation,

4  you said you saw a video of Mr. Wells driving on base?

5      A.  Yes, sir.

6      Q.  And there is nothing else, any other video surveillance

7  like at the gas tanks or anything like that?

8      A.  There was nothing else.  What I observed on the video

9  was Mr. Wells drive in and turn towards the gas station, but

10  that's -- there was other things that way.  There was no way to

11  determine whether he went right to the gas station.  There was

12  no video of the gas station.

13      Q.  And on that video it showed Mr. Reckner within ten

14  minutes of that, right?

15      A.  Yes, sir.

16      Q.  Going through the gate too?

17      A.  Yes, sir.

18      Q.  Now, do you know, were the people in the rigger shop,

19  were they planning to fly out that day?

20      A.  Yes, sir.

21      Q.  And so would there have been numerous trips for the

22  crew or the staff to go out to the airport?  That's where they

23  would have flown out of?

24      A.  It was on base.  And I don't know what their routine

25  would have been.

1     Q.  You didn't investigate why they might have been on

2  base?

3     A.  I was only investigating the use of the fuel card.

4     Q.  Okay.  Now, that fuel card, from your investigation,

5  that was found then October 4th after that?

6     A.  If that's what -- I don't have the investigation -- it

7  was found.  I don't know the exact date.

8     Q.  Is it your in report?

9     A.  I don't have it up.

10    Q.  Okay.  We'll put it up and you can refresh your

11 recollection.

12    A.  Correct.  In paragraph 7.

13    Q.  Right, paragraph 7.

14    A.  4 October is when the card was found in the desk upon

15 the return from Shemya.

16    Q.  And that was its normal location.

17        So at the end of your investigation you submitted some

18 findings from your investigation?

19    A.  Yes, sir.

20    Q.  And do you see that on the second page of this report?

21 If this will refresh your recollection?

22    A.  I do.

23    Q.  And was it your finding that it was inconclusive

24 evidence to determine who used the fuel card?

25    A.  Yes, sir.

1    Q.  That was your determination, that was your findings

2  that you came up with?

3          MR. SCHRODER:  Your Honor, if Mr. Curtner is going to

4  read the investigation, we ought to put it into evidence.

5          MR. CURTNER:  I'm just asking him if he can refresh

6  his recollection, if he can remember what his findings were.

7    A.  That there was inconclusive evidence --

8          THE COURT:  Does that refresh your recollection?

9    A.  Yes, sir.

10  BY MR. CURTNER:

11   Q.  So what was your finding?

12   A.  That there was inconclusive evidence to find out

13  exactly who used the fuel card.

14   Q.  And that -- what was the -- you also -- what did you

15  find out about the security and who could have had access to

16  that card, do you remember what you found out on that?

17   A.  The fuel card was not properly secured.

18   Q.  And who would have had access to it?

19   A.  Anyone that probably had access to the rigger shop.

20  That's how -- not everybody at the unit had access to that

21  space, because our cards -- our key access cards only let us

22  into certain spaces.

23   Q.  But anybody who was in the rigger shop could have had

24  access to that card; is that correct?

25   A.  If they knew where it was, yes.

1    Q.  And then did you make some recommendations along that
2  line afterwards?
3    A.  I did.  That the card needed to be locked up.
4    Q.  And then do you recall, based on your report, if there
5  was -- this was considered non-disciplinary?
6    A.  The disciplinary actions weren't up to me.  I was just
7  doing the investigation.  That would be up to the command.
8          MR. CURTNER:  Okay, thank you.  No further questions.
9          THE COURT:  Redirect.
10          MR. SCHRODER:  Just one question to clarify from that,
11  Your Honor.
12                    REDIRECT EXAMINATION
13   BY MR. SCHRODER:
14    Q.  Are you aware of whether Mr. Wells was going to Shemya
15  with the T2 crew that day?
16    A.  I was not aware whether he was or was not going.
17          MR. SCHRODER:  Okay.
18          THE COURT:  Recross?
19          MR. CURTNER:  Just a minute, Your Honor.
20                    RECROSS-EXAMINATION
21   BY MR. CURTNER:
22    Q.  In your investigation, Chief Cartier, do you know who
23  had access to that fuel card when it was at the rigger shop?
24    A.  No, I don't know who had access to it.
25    Q.  And then you only took statements from four people

1  among all the people who would have had access to it; is that

2  correct?

3      A.  Correct.

4      Q.  And there would have been more than that that would

5  have had access to the card?

6      A.  That's not -- I don't know who -- I took statements

7  from who I believe knew where that card was.

8              MR. CURTNER:  Thank you.

9              THE COURT:  Thank you, sir.  Government's next

10  witness.  You're excused.

11      A.  Thank you.

12   (Witness excused)

13              MR. SCHRODER:  Your Honor, the government calls Steve

14  Salus.  Mr. Salus, you can come right up to the front there.

15  There is the witness stand, and stand just inside the door to

16  get sworn in.

17              THE COURT:  And here is the clerk.

18          STEVEN HAROLD SALUS, PLAINTIFF'S WITNESS, SWORN

19              THE CLERK:  Thank you.  Please have a seat.

20              And, sir, if you could please state and spell your

21  full name.

22      A.  Steven Harold Salus.  S-t-e-v-e-n H-a-r-o-l-d

23  S-a-l-u-s.

24              THE CLERK:  Thank you.

25              THE COURT:  All right, counsel.

1                        DIRECT EXAMINATION

2     BY MR. SCHRODER:

3        Q.  Mr. Salus, what do you do?

4        A.  I'm an environmental protection specialist for the

5     Coast Guard on Kodiak.

6        Q.  And is that civilian position?

7        A.  Yes, sir.

8        Q.  And how long have you been a civilian employee at the

9     Coast Guard?

10        A.  Since September of 2003.

11        Q.  What did you do before that?

12        A.  I was active duty Coast Guard.  I was an EMC,

13     electrician's mate chief.

14        Q.  And the jury is getting a tour of the Coast Guard

15     rating system.  So what's an EM do?

16        A.  Basically you're an electrician with the Coast Guard.

17        Q.  And you said you retired as a chief?

18        A.  Yes, sir.

19        Q.  How long were you on active duty?

20        A.  Just shy of 24 years.

21        Q.  And how long did you know Rich Belisle?

22        A.  Since 1997.

23        Q.  Where did you first meet?

24        A.  On the Coast Guard Cutter STORIS.

25        Q.  And where was the STORIS' home port?

1       A.  Home ported out of Kodiak.

2       Q.  And did you become friends at that time?

3       A.  Yeah, we were friends, shipmates.  About halfway

4   through the tour we became really good friends.

5       Q.  And where did you go for your next assignment?

6       A.  To Integrated Support Command Kodiak.

7       Q.  And what's that mean?

8       A.  It's a support center or a base that would support the

9   operational units there on Kodiak.

10      Q.  Is that the same base that's there today?

11      A.  Yes, sir.

12      Q.  Just by -- it's the same name?

13      A.  Base Kodiak today.

14      Q.  And how about Mr. Belisle, what was his next job after

15  he left the STORIS?

16      A.  He was chief of police at ISC Kodiak.

17      Q.  Did you have much job interaction while you were in

18  those jobs?

19      A.  We did.  We had -- I was the command chief, and he was

20  chief of police, so we had personnel issues together to talk

21  about.

22      Q.  And how about -- this idea being a chief, is that -- is

23  there a lot of kind of coordination that goes on at that rank in

24  the Coast Guard?

25      A.  There is.  You're more of a mid manager of junior

1  people and letting the command know what's going on with the

2  people down below.

3     Q.  And where did you retire -- when did you retire, when

4  did you say again?

5     A.  September of '03.

6     Q.  And where did you retire?  To Kodiak?

7     A.  In Kodiak, yes, sir.

8     Q.  And how about Mr. Belisle, were you aware when he

9  retired?

10    A.  I think he retired in '02.

11    Q.  And at that point, did you stay in touch?

12    A.  Oh, yes, sir.

13    Q.  And what part of Kodiak do you live in?

14    A.  I live in Bells Flats.

15    Q.  Was that somewhere near the Belisles?

16    A.  Yes.  About a mile from them by road.  About a half

17  mile as the crow flies.

18    Q.  And did you see Mr. Belisle often?

19    A.  Just about every day.

20    Q.  And under what kind of circumstances?

21    A.  Friendship.  We hunted, fished, built stuff together,

22  wood sheds, split some wood, stuff like that.

23    Q.  Did you socialize together?

24    A.  We did.

25    Q.  And under what kind of circumstances there?

1      A.  Socialized under what kind of circumstances?

2      Q.  How often did you meet together to socialize?

3      A.  We -- about maybe one, two, three times a week.

4  Usually Fridays for sure, we would go have a drink on Friday

5  afternoon.

6      Q.  Anyplace in particular?

7      A.  The Rendezvous.

8      Q.  And where is that located?

9      A.  That's located out towards Bells Flats.

10     Q.  And how would you describe Rich Belisle?

11     A.  Honest, hard working, loyal, family type of guy.  He

12  was the type of guy that you just wanted to hang out with.  You

13  wanted him around.

14     Q.  Did he have any enemies that you were aware of?

15     A.  No, sir.

16     Q.  Was he involved in any illegal activity that you're

17  aware of?

18     A.  No, sir.

19     Q.  Was he involved in any illegal drugs?

20     A.  No, sir.

21     Q.  You said you met at the Rendezvous a couple times a

22  week.  Did he have a drinking problem that you were aware of?

23     A.  Not that I was aware of, no, sir.

24     Q.  Was he a gambler?

25     A.  No, sir.

1      Q.  And to your knowledge, did he have any debts he
2  couldn't handle?
3      A.  Not to my knowledge, no, sir.
4      Q.  Now, you were also involved in another kind of aspect
5  of this case.  So were you involved to organize a search for the
6  potential firearm in this case?
7      A.  Yes, sir, I was.
8      Q.  And how did that come about?
9      A.  Well, we were looking for the weapon.  And one of the
10  things -- one of the places was a drive from the base to Bells
11  Flats right along the waterfront.  And there was a negative -- I
12  think it was a negative 2 or 2-and-a-half tide.  And I wanted to
13  make sure we searched that negative water from the base to Bells
14  Flats.
15              MR. SCHRODER:  Do we have 51 in evidence?
16              MS. DIXON:  Yes, we do.
17              MR. SCHRODER:  Could you bring that up?  What was the
18  last one you gave?
19      (Whispered discussion off the record)
20   BY MR. SCHRODER:
21      Q.  I just want to have you give the jury an idea of where
22  you searched.  I think -- this doesn't have all of it.
23              But there is a laser pointer in front of you, and if
24  you could, it will show up up here on the big screen?
25              THE CLERK:  What exhibit is this?

```
 1              MR. SCHRODER:  42.

 2              MS. DIXON:  Yes.

 3   BY MR. SCHRODER:

 4       Q.  And at least -- does this show at least where you

 5   started the search?

 6       A.  Yes, sir.

 7       Q.  And where was that?

 8       A.  That was right there at the corner of Womens Bay, right

 9   in there.

10       Q.  And how far down did you go?

11       A.  I would imagine it's two miles.  The bay is two miles

12   long, so --

13       Q.  And where did you end the search?

14       A.  At Sometimes Island.

15       Q.  Is that toward the bottom of Womens Bay?

16       A.  No.  Womens Bay goes further back, but that's where the

17   water goes away from the roadside.

18       Q.  And how did you conduct the search?  I mean, how did

19   you do it?

20       A.  There was seven to nine of us.  And we spread out along

21   from the road all the way to the waterline.  And then we even

22   had a little rubber dingy that was pulling along to where they

23   could see the bottom all the way down.

24       Q.  Did you find it?

25       A.  No, sir.
```

1          MR. SCHRODER:  No further questions, Your Honor.

2          THE COURT:  Any cross-examination?

3                    CROSS-EXAMINATION

4     BY MR. CURTNER:

5     Q.  Good morning, Mr. Salus.

6     A.  Good morning.

7     Q.  You used to socialize with Mr. Belisle at the

8     Rendezvous?

9     A.  Yes, sir.

10    Q.  And is that a bar/restaurant out in Bells Flats area?

11    A.  Yes, sir.

12    Q.  It's fairly close to where you live?

13    A.  Yes, sir.

14    Q.  Now, so you -- how often would you go out to the

15    Rendezvous?

16    A.  One, two times a week.

17    Q.  And Mr. Belisle, did he go out more often than that?

18    A.  I don't think so.  Most of the time he and I would go

19    in there together.  We would walk in and they would say, "Okay,

20    where is the other side of you?"

21    Q.  So you guys were like twins going to the Rendezvous?

22    A.  Pretty much, yeah.  If we weren't going to the

23    Rendezvous we were out hunting and fishing and doing our thing

24    outside.

25    Q.  So you've been pretty close to Rich Belisle for quite a

1  while?

2      A.  Yes, sir.

3      Q.  Would he ever talk to you about his daughter Hannah?

4      A.  Sure.

5      Q.  Did he have any problems with Hannah?

6          MR. SCHRODER:  Objection, hearsay.  Calls for a

7  hearsay answer.

8   BY MR. CURTNER:

9      Q.  What do you know about Hannah?

10     A.  What do I know?  Hannah --

11         THE COURT:  So everyone understands.  Hearsay -- you

12 can give your impression, but you can't repeat things that other

13 people told you, that's hearsay.

14     A.  Yes, sir.

15         THE COURT:  But you can testify as to your impression,

16 based on your personal experiences.

17     A.  What I heard about Hannah, was Hannah was being a

18 teenager --

19         THE COURT:  You just started out -- you just

20 started -- did you hear what I just said?

21     A.  Oh, I'm sorry.  What I've seen -- when I say, "When I

22 hear," it's Rich talking to me, that Hannah --

23         THE COURT:  Now wait a second, it sounds like

24 you're -- do you understand what hearsay is?  You cannot repeat

25 what other people have told you.

1      A.   Yes, sir.  What I've seen was Hannah was being a

2  teenager.

3   BY MR. CURTNER:

4      Q.   Well, what do you mean by that?

5      A.   Pushing the limits.  I've got two boys, they push the

6  limits.

7      Q.   How do your boys push the limits?

8      A.   They know how to push my buttons.

9      Q.   My boys do too.  But was it anything -- I mean, you

10  know, we all have different buttons.

11          How did your -- well, for Hannah, was she -- do you

12  know if she was involved with any -- in drugs?

13      A.   I believe she was.

14      Q.   Do you know if at times she would run away from home?

15      A.   I don't know that she ran away from home.  She would

16  take off without telling her mom and dad where she's going.

17      Q.   And would she take off all night?

18      A.   That I couldn't tell you.

19      Q.   Do you know Travis Biocic?

20      A.   Negative.

21      Q.   You don't know anything about him?  Do you know

22  anything about any of Hannah's friends?

23      A.   I talked to one of her boyfriends on the phone one

24  time, but I don't even know who he was.

25      Q.   What was that discussion about?

1    A.  Well, he kept calling the house.

2    Q.  And you told him not to call the house?

3    A.  Yes, sir.

4    Q.  Do you know where Jackson park -- Trailer Park is?

5    A.  Yes, sir.

6    Q.  What do you know about that?

7    A.  Not a whole bunch.  I know that there is drug activity

8    in Jackson's Trailer Park.

9    Q.  Is that well known throughout Kodiak Island?

10   A.  Yes, sir.

11   Q.  And there is a lot of drug activity there?

12   A.  I have no idea.  I've never been in Jackson's Trailer

13   Park.

14   Q.  Do you know if Hannah has been in Jackson Trailer Park?

15   A.  I could not tell you that.  I don't know.

16   Q.  And now you would know about -- if Rich Belisle had any

17   kind of financial problems because he would talk to you about

18   that if he did; right?

19   A.  I would think so, yes, sir.

20   Q.  And so do you know if he had any problems with Hannah

21   involving young men that he didn't approve of?

22   A.  No, sir.

23   Q.  You don't know anything about her going out with older

24   guys or guys with records and trouble, on drugs?

25   A.  I knew she was seeing an older guy, and I want to say

1   that's who I called on the phone, but I'm not too sure, because

2   I don't even know who I was talking to.  And I was going to talk

3   to the 25 year old.

4        Q.  The 25 year old being somebody that Hannah was seeing?

5        A.  Yes, sir.

6        Q.  So you talked to one guy, not to call.  And then this

7   was another guy, the older guy that you --

8        A.  I don't know.  I don't know who it was.  It could have

9   been the same guy, it could have been two different guys.  But

10  before I could talk to the 25 year old, Hannah had broke up with

11  him and was no longer seeing him, so I didn't have to do

12  anything.

13       Q.  And that was just before Rich was killed, right?

14       A.  No, it was afterwards.

15       Q.  It was afterwards?

16       A.  I wouldn't have stepped into Hannah's business if Rich

17  was here.

18       Q.  Now, you were involved in this one search along Womens

19  Bay at low tide?

20       A.  Yes, sir.

21       Q.  And do you know if there were other volunteer searches

22  for that weapon during that time?

23       A.  There was a couple others, yes, sir.

24       Q.  And do you know where --

25       A.  One other for sure.

 1     Q.  Do you know where that was?

 2     A.  There was one from the COMMSTA to Rezanof, and then

 3  there was another one over by the airport.

 4     Q.  Were you involved in those at all?

 5     A.  I was.

 6     Q.  All right, so you were involved in actually three

 7  different searches for this gun?

 8     A.  Yes, sir.

 9     Q.  And none of the searches turned up any guns at all?

10     A.  No, sir.

11          MR. CURTNER:  Thank you.

12          THE COURT:  Redirect?

13                    REDIRECT EXAMINATION

14  BY MR. SCHRODER:

15     Q.  I just want to clear up one timing point, Mr. Salus.

16          You said that the time that you were going to call

17  someone and didn't have to occurred after the murders.  What

18  about the time when you actually made a call, when was that,

19  before or after the murders?

20     A.  That was after the murders also.  Because the calls

21  kept going to Ms. Belisle talking about Hannah, and so I wanted

22  to stop that also.  She didn't need that.

23     Q.  So why did you feel you needed to step in?

24     A.  Rich wasn't there.

25          MR. SCHRODER:  Thanks.

1            MR. CURTNER:  No further questions.

2            THE COURT:  Thank you, sir.  You're excused.

3   Government's next witness.

4    (Witness excused)

5            MS. LOEFFLER:  We call Thomas Eskew.

6       (Whispered discussion off the record)

7            THE COURT:  We'll swear you in once you get there.

8       THOMAS JEFFERSON ESKEW, III, PLAINTIFF'S WITNESS, SWORN

9            THE CLERK:  Thank you, please have a seat.

10           And sir, if you can please state and spell your full

11  name.

12      A.  My name is Thomas Jefferson Eskew, III.

13           THE CLERK:  Please spell your full name.

14      A.  T-h-o-m-a-s J-e-f-f-e-r-s-o-n E-s-k-e-w.

15           THE CLERK:  And III, correct?

16      A.  Yes.

17           THE COURT:  All right, counsel.

18                     DIRECT EXAMINATION

19   BY MS. LOEFFLER:

20      Q.  Mr. Eskew, are you currently employed?

21      A.  Yes, I am.

22      Q.  What do you do now?

23      A.  I'm a telecommunications engineer for Five Rivers

24  Services.  I support the CAMS product line of the U.S. Coast

25  Guard.

1    Q.  Were you previously a uniformed member of the United

2    States Coast Guard?

3    A.  Yes.

4    Q.  For how long?

5    A.  I was in for just over 30 years, from January of '85

6    until February 1st of 2011.

7    Q.  And in your -- what was the rank that you retired at,

8    Mr. Eskew?

9    A.  Senior chief ET, which is an E-8.

10   Q.  When you say "ET," what specialty is that?

11   A.  Electronics technician.

12   Q.  We've had testimony from some chiefs, but I believe not

13   a senior chief.  So can you explain the distinctions of the

14   levels of chiefs in the Coast Guard?

15   A.  Sure.  There are essentially three -- you could say

16   four.

17        A chief is an E-7; a senior chief is an E-8; a master

18   chief is an E-9; and there is a single master chief petty

19   officer of the Coast Guard who is an E-10.

20   Q.  And as a senior chief, what are the types of duties and

21   responsibilities that a senior chief would have in the

22   organization?

23   A.  It varies to some degree depending on where you go.

24   You could be an officer in charge of a communications station.

25   In my case, I was at a larger communications station but I had a

1  commissioned officer as a commanding officer, and I was the

2  engineering officer.

3       Q.  Do you have management functions generally as a chief?

4       A.  Yes.

5       Q.  And what types of people do you supervise in the Coast

6  Guard as a chief?

7       A.  Typically E-6 and below.  On occasion you will

8  supervise civilians.

9       Q.  I want to turn your attention to Mr. Wells.  In your

10  career, did you meet Mr. Wells?

11       A.  Yes.

12       Q.  How often?  I'm going to start chronologically.  When

13  was the first time you met him?

14       A.  I don't remember exactly which year it was.  He and I

15  were both involved in the SAR/SAT program, search and rescue

16  satellite aided tracking.  And I believe the first time I met

17  him was at a conference in Ottawa.

18       Q.  Did you have any working or supervisory relationship at

19  that time?

20       A.  No.

21       Q.  Did you later end up in a situation where you were in a

22  supervisory relationship with Mr. Wells?

23       A.  Yes, I --

24       Q.  I'm sorry.  When was that?

25       A.  I'm sorry.  January of 2001.

1    Q.  Where were you stationed at that time?

2    A.  COMMSTA Kodiak.

3    Q.  What was your role at COMMSTA Kodiak at that time?

4    A.  I was the engineering officer.

5    Q.  As the engineering officer -- we've had some testimony

6  about T1 and T2.

7         Let me -- actually, I'm going to back up again, I'm

8  going to ask a different question.

9         How long were you at COMMSTA Kodiak?

10    A.  On that particular tour I was there for six years.

11    Q.  Did you work with Mr. Wells through that whole six-year

12  period?

13    A.  Yes.

14    Q.  And did your role at COMMSTA change in that six-year

15  period?

16    A.  No.

17    Q.  What was your role at COMMSTA in that period?

18    A.  I supervised ETs; and we had a transition during that

19  time, and the ITs rate, information technology rate, was stood

20  up, so I supervised those people; and I supervised the COMMSTA

21  rigger shop.

22    Q.  When you say "supervised" -- oh, I'm sorry, where did

23  Mr. Wells work at that time?

24    A.  Mr. Wells worked at the rigger shop.

25    Q.  And was he a uniformed member then or was he a

1  civilian?

2      A.  Civilian.

3      Q.  Did you have any -- you said you were his supervisor.

4          Are there evaluations that you do in the Coast Guard?

5      A.  Yes.

6      Q.  Did you have a role in Mr. Wells' evaluations?

7      A.  I did.  I completed his evaluation and submitted that

8  to the civilian personnel people there.  And I suppose worth

9  noting, I did not directly supervise him.

10     Q.  You were farther up the chain?

11     A.  Yes, ma'am.

12     Q.  Did you work with him throughout that six-year period?

13     A.  I did.  I played a very little role at all in actually

14 doing the antenna mechanic thing and out there building antennas

15 and maintaining them.  That was left pretty much to Mr. Wells

16 and to his crew.

17     Q.  Did you see him frequently throughout that six years?

18     A.  Yes, ma'am.

19     Q.  Now, in terms of your interaction with him, I'll just

20 ask you, was he a knowledgeable antenna mechanic?

21     A.  Yes, yes, indeed.

22     Q.  Did you ever have an incident with Mr. Wells in which

23 you had a -- well, that caused you great concern as his

24 supervisor?

25     A.  Yes, ma'am, there was at least one significant

1    incident.

2        Q.  And when I go -- I'm going to ask you about that

3    incident.  Can you put it in the time frame, about?

4        A.  I would estimate summer of 2005.

5        Q.  What was the incident?

6        A.  The incident involved the installation of a remote

7    transceiver that was to go on Attu Island.

8        Q.  Where is Attu island?  Our jury is from Alaska, but go

9    ahead and explain it.

10       A.  It's at the very end of the Aleutian Chain.

11       Q.  What was the issue that the crew was supposed to do at

12   Attu?

13       A.  The remote site that we were putting in out there was

14   deemed very important for covering the EEZ and other areas in

15   that part of the Bering Sea and the North Pacific.  We had

16   worked on it for a long time.  The equipment was installed into

17   a large fiberglass hut, and when we eventually were able to, it

18   was loaded onto a C-130 aircraft, it took an entire pallet.

19           That space was very hard to find because the Loran crew

20   out there, they had to get their supplies, and that was the only

21   way they could do it.

22       Q.  Now a C-130 is a large military transport airplane?

23       A.  Yes, ma'am.

24       Q.  When you say "a pallet," you actually, like, slide it

25   in and you can put not only the equipment, you can put large

1  trucks and machinery and all sorts of things on it; right?

2      A.  Yes, ma'am, that's correct.

3      Q.  So the hut was taken out to Attu.  Was there a problem

4  that developed with the hut?

5      A.  The specific details I don't recall, but it had to do

6  with the power that was to be connected to it.  And it turned

7  out that we were going to need a transformer to correct that

8  issue.

9      Q.  And were you involved in the discussion about whether

10  the hut should be brought back or whether it should be fixed out

11  at Attu?

12      A.  Yes.  The issue had been brought to my attention by my

13  chief, Lyle Phillips.  And I instructed him to let the crew know

14  that we would obtain the required equipment and we will ship

15  that out there and install it on site.

16      Q.  Was there anything -- were you clear about your

17  direction as to where the -- whether the hut should be shipped

18  back or whether it should be fixed in Attu?

19      A.  There was no ambiguity whatsoever.

20      Q.  Did you later learn that your order had been disobeyed?

21      A.  Yes.

22      Q.  How did you find out about that?

23      A.  The chief informed me.  He said, "Senior chief," he

24  said, "you're not going to like this, but the C-130 has returned

25  and the hut is on board."

1    Q.  And who was it -- did you learn by speaking directly to

2    the individual who was it that determined to bring the hut back?

3    A.  If I understand you correctly, the chief was the middle

4    man when I was -- when I gave the direction to leave the hut on

5    site.

6         After the fact, I spoke with Mr. Wells directly about

7    it, and expressed my concern and dissatisfaction over what he

8    had done.

9    Q.  And I'm going to go into that conversation.

10        When you found out it had come back, what was your

11   reaction?

12   A.  I was quite furious, actually, and obviously very

13   concerned about how on earth we were going to get it back out

14   there again.

15   Q.  Did you speak to Mr. Wells?

16   A.  I certainly did.

17   Q.  Can you relay, to the best of your ability, that

18   conversation?

19   A.  I asked him why on earth he had brought the hut back.

20   And he explained to me that there was not a hardware store on

21   Attu, and if there were difficulties installing the new

22   transformer, they were far better off to do it down there at

23   Building T2 at the rigger shop where they have all the tools and

24   pieces and parts.

25        I explained to him that that wasn't his decision to

1    make.  I thought it would be easy enough to install it out

2    there.  And he said something to the effect that he made a

3    command decision.

4         Q.  How did you react to that?

5         A.  Once again, it made me quite angry.  And I dealt with

6    it by, of course, reporting the incident further up the command

7    and letting them know what happened.

8         Q.  Then I'll just ask you.  Why did it make you angry?

9         A.  For one, I was deeply concerned about getting this

10   thing installed out there.  I knew there was going to be a very

11   lengthy delay because of what had happened.  And, of course, one

12   of the bigger parts about it is that I was responsible to make

13   those decisions.  I made my decision.  There is no doubt in my

14   mind that everyone involved was crystal clear as to what I

15   wanted, and yet the hut was returned to Kodiak.

16        Q.  Did Mr. Wells express any type of remorse or apology to

17   you for bringing it back?

18        A.  No, ma'am.

19        Q.  Now, let me ask you.  How long were you in the Coast

20   Guard?

21        A.  Just over 30 years.

22        Q.  Have you ever had any other incident where, I mean,

23   somebody disobeyed a clear direct order like that in your

24   career?

25        A.  Not one of that magnitude.  Simply, yes, there had been

1    several smaller incidents, but not one that had that much

2    significance and that big of an impact.

3        Q.  Is that why you remember it so well?

4        A.  I'm sure that is, yeah.

5        Q.  When you worked or -- did you observe Mr. Wells, how he

6    worked and interacted with others when you were the engineering

7    officer for those six years?  You have to answer audibly because

8    they are making a recording.

9        A.  Oh.  Yes.

10       Q.  And I think you said before he was a very knowledgeable

11   person; is that fair?

12       A.  That's quite true.

13       Q.  And did he have a view of his own knowledge, in other

14   words?

15           MR. CURTNER:  Objection, Your Honor.  I don't see

16   where --

17       A.  I believe I understand your -- oh.

18           MS. LOEFFLER:  Oh, I'm sorry, somebody I think

19   objected.

20           MR. CURTNER:  Objection.  I don't think that's

21   relevant.

22           MS. LOEFFLER:  Your Honor, it's directly relevant to

23   the character that we're going to be discussing throughout this

24   trial.

25           THE COURT:  If you know, you can answer.

1   BY MS. LOEFFLER:

2       Q.  Did you have enough interaction with him to see how he

3   viewed his value and knowledge?

4       A.  Yes.  I thought he was quite conceited at times,

5   actually.

6       Q.  In terms of working with him, was he receptive to

7   change or differences when things were done not the way he

8   wanted to do it?

9       A.  He was only receptive to change if he had played a part

10  in coming up with that change; otherwise, he was resistant and

11  would protest it.

12          MS. LOEFFLER:  I don't have any other questions.

13  Thank you, Mr. Eskew.

14          THE COURT:  Cross-examination.

15                      CROSS-EXAMINATION

16  BY MR. CURTNER:

17      Q.  So Mr. Eskew, you were involved in doing the

18  evaluations for Mr. Wells for about six years?

19      A.  Yes, sir.

20      Q.  And all those evaluations were positive?

21      A.  Yes.

22      Q.  He did very well in all those evaluations that you did

23  based on his performance?

24      A.  I believe I even recommended him for monetary award.

25      Q.  So if somebody that has an exceptional performance

1    evaluation, they can be eligible for a monetary award as sort of

2    a bonus?

3         A.  Yes.

4         Q.  And you nominated Mr. Wells for that?

5         A.  Yes, I did.

6         Q.  On more than one occasion?

7         A.  I don't actually recall that, sir.  But I do recall

8    that one year I gave him an evaluation, it was a very good

9    evaluation, and then I discovered afterwards that you could do

10   the monetary award, and I felt bad that I hadn't done them.  And

11   I made sure to do it the next year, or the next evaluation

12   period.

13        Q.  Because he was very competent in the work he did?

14        A.  Yes.

15        Q.  In fact, when you left COMMSTA, did you ever keep in

16   contact with Mr. Wells asking him for advice on different

17   projects?

18        A.  I did.

19        Q.  How many times do you think that happened?

20        A.  I'm not sure.  I recall that there had been a very

21   difficult problem that I was having at the Master Station

22   Atlantic where I was working.  We had a long piece of Heliax

23   line that was leaking, it was losing air, and I didn't know how

24   best to track it down.  And I just used that as an example.

25            I tried to contact Mr. Wells and get information as to

1    how he would do it, he's the expert.  And it was difficult to

2    reach him, difficult to get a response.  So, you know, I

3    contacted him several times I think on that one issue.

4        Q.  And he was an expert, and in order to help you, you

5    would try to get information from him and you would seek his

6    advice?

7        A.  Yes.

8        Q.  Now, was Mr. Wells safety conscious?  Isn't that an

9    important factor in your evaluations and kind of the work that

10   they do at COMMSTA?

11       A.  Yes, sir, he certainly was.

12       Q.  Let's talk a little bit about his safety

13   consciousness --

14       A.  Okay.

15       Q.  -- if you know?

16       A.  Well, I know that before you do any of the tower

17   climbing, you're supposed to have a safety brief.  He would

18   conduct the briefs each and every time.  He would ensure

19   absolutely that people wore their hard hats, people had their

20   harnesses, all the right equipment.

21           I know that there had been some problem with the types

22   of harnesses they were using and this kind of thing, and Mr.

23   Wells played a role in making sure that all that was addressed,

24   and again, that everyone had the correct equipment.

25       Q.  So with his expertise and his knowledge, did he do

1   training of other people?

2        A.  Yes, he did, routinely.

3        Q.  Can you explain a little bit about what type of

4   training he might be involved in?

5        A.  Tower climbing and tower rescue training and things

6   related to that.

7        Q.  So that was a common part of his job duties to do

8   training?

9        A.  Yes.

10       Q.  Did he actually do some training in other locations,

11  Florida, for example, are you aware of that?

12       A.  I don't recall him doing any training in Florida, but I

13  know there had been a hurricane that came on shore in Florida,

14  and there was a tall tower, a guide tower at the Loran station

15  in Jupiter.  And again, being an expert in the field, Mr. Wells

16  went down there to save that tower and, you know, get it

17  straight and safe again.

18       Q.  Was there another example in Middletown, California

19  where he was called upon with his expertise; do you recall that?

20       A.  I don't recall it.  I don't doubt it, though.

21       Q.  And how about tower climbing conferences, do you know

22  if Mr. Wells participated in tower climbing --

23       A.  Routinely.

24       Q.  -- routinely?

25       A.  Yes, sir.

1    Q.  And would do instruction and teaching there?

2    A.  Pardon me?

3    Q.  Would he do teaching and instruction at those

4    conferences?

5    A.  I actually don't know if he did.  I assume that, yes,

6    there was tower climbing training at some of those conferences,

7    at some of those things.

8    Q.  Now, this incident with the hut at Attu Island, do you

9    recall, was that 2005 or 2003?

10   A.  It might possibly have been as early as 2003.

11   Q.  You can't recall right now --

12   A.  No.

13   Q.  -- the exact date, okay.

14       Now, on that incident, I think there was a discussion

15   about whether -- the hut that was there was not functional; is

16   that correct?

17   A.  I think I follow you.

18   Q.  Okay.  They flew the hut out?

19   A.  Yes.

20   Q.  And it wasn't functional once it got there?

21   A.  Correct.  The hut itself was functional, but there had

22   been an error in determining what type of power was available to

23   connect to the hut.  And that power had to be switched over to

24   something different so that we could hook it up.

25   Q.  So at that time the hut was out there, but it wasn't

1   functional because of the power issue?

2       A.  Correct.

3       Q.  And now that was an important project, I think you

4   said, because -- was it the Donut Hole?  Do you know what the

5   Donut Hole was?

6       A.  Yes.

7       Q.  What is that?

8       A.  The Exclusive Economic Zone.  It's an area in the

9   middle of the Bering Sea that is, in fact, international waters.

10      Q.  Was it important to have communications in that area?

11      A.  Yes.

12      Q.  And at that time there wasn't?

13      A.  There were dead spots.

14      Q.  And this is why this was an important project?

15      A.  Yes, sir.

16      Q.  Now, so once it was discovered that the hut and the

17  power, it was not going to be functional, was there a discussion

18  between you and Chief Phillips and Mr. Wells about how to handle

19  that situation?

20      A.  There was discussion -- I did not directly talk with

21  Mr. Wells at that time.  I talked back and forth with Chief

22  Phillips.

23          And the problem at that time seemed very

24  straightforward and quite simple.  Leave the hut in place and

25  get the correct transformer and ship it out.  It's not a large

1    thing.  It's not much larger than those two boxes sitting there.

2        Q.  Now, would there be a reason to ship the hut back?

3        A.  No, there would not have been any reason to ship it

4    back that made sense.

5        Q.  Did Mr. Wells explain that it would be better if -- to

6    have the hut completely functional and make sure everything --

7    the transmitter is hooked up rather than send that -- have --

8    not be able -- have another problem?  Did you hear that

9    discussion at all?

10       A.  Of course, the discussions that occurred between Chief

11   Phillips and Mr. Wells, I didn't listen in on those, I passed my

12   direction to Chief Phillips.  And he did bring me back some

13   scenarios like that.

14           But I explained to the chief then that that made no

15   sense whatsoever.  Everything had been tested before it ever

16   went out.  We new the transmitters were good, we knew all of the

17   equipment inside the hut was good, and we also knew that if that

18   hut were to come back, it could potentially be months before we

19   could get it out there again.  And, in fact, that ended up being

20   the case.

21       Q.  Because of the weather out there?

22       A.  No.  Because they only get one logistics flight to the

23   Loran station every couple of weeks.  And, in fact, when we got

24   it out there, even though those people, they need to get their

25   food and all of their supplies and things, that hut took an

1   entire pallet.  It took probably 25 percent of the volume on

2   that thing.

3           So we eventually waited until that fall, and there was

4   a high seas driftnet flight that was going out there to do a

5   patrol, and they were able to go ahead and drop it off for us

6   after perhaps a two-month-or-better delay.

7       Q.  So once it was brought back and it was completed, it

8   was sent out and it functioned properly; is that correct?

9       A.  Yes, sir.

10      Q.  Do you know if Chief Phillips agreed with Mr. Wells,

11  that it would be a better idea to fly it back on the C-130?

12      A.  He didn't indicate that to me.  I could sense a little

13  bit of hesitation.  I chalked that off as he didn't feel like

14  having a confrontation with Mr. Wells.

15      Q.  Well, now that's your --

16      A.  You're right, yes, sir, that's my opinion.  I don't

17  know.  Chief Phillips didn't give me any direct indication as to

18  whether or not he agreed with one way or another.  He appeared

19  to agree with me.  I felt he was agreeing with me.

20      Q.  He could have agreed with Mr. Wells as far as you know?

21      A.  He did not say that directly, but --

22      Q.  But you got --

23      A.  -- but that's possible.

24      Q.  And so this was a legitimate debate about which would

25  be the best way to handle this situation, is that correct,

1    whether to fly it back -- maybe not in your mind, but maybe in

2    Chief Phillips' mind?

3         A.  Perhaps.

4         Q.  Now, Mr. Wells --

5         A.  And again, the way I saw it, there was just -- there

6    was no logic to bringing it back whatsoever.  We already knew

7    everything worked.  And the argument that Chief Phillips had

8    brought to me was, and presumably from what Mr. Wells had said,

9    there is no hardware store out there, we might need bolts and

10   this and that.

11        And this thing, you could have sat on the floor in the

12   hut and hooked it up and had it work and be safe, and it could

13   have sat there operating like that until such time as we got the

14   correct hardware.

15        Q.  But as Chief Phillips said, if you had the right tools

16   and everything?

17        A.  Right.

18        Q.  And they had all the right tools at the rigger shop;

19   right?  They had everything they needed to make this complete?

20        A.  Yes, sir, that's correct.  They also had the tools out

21   at Attu.

22        Q.  Didn't Chief Phillips say he wasn't sure about that?

23   Wasn't that one of his concerns?

24        A.  No.  The comment that had been regarded the hardware

25   that might be needed, the bolts and things to secure it into

1  place.

2      Q.  Exactly.

3      A.  The tools that were required were just the most basic

4  generic tools.

5      Q.  Okay, the hardware then?

6      A.  So, right.

7      Q.  That was Chief Phillips' concern?

8      A.  I think -- no.  Chief Phillips relayed a concern that

9  Mr. Wells had.

10     Q.  So Mr. Wells --

11     A.  I mean, I don't believe that was Chief Phillips'

12  concern.

13     Q.  So Mr. Wells had an opinion about this project --

14     A.  Yes.

15     Q.  -- with his many years of experience and expertise --

16     A.  Uh-huh.

17     Q.  -- and you had an opinion that was different; correct?

18     A.  Yes, sir, that's correct.

19     Q.  And so the hut came back.  And you said you were

20  furious; correct?

21     A.  Correct.

22     Q.  Now Mr. Wells, he didn't get furious; did he?

23     A.  Not at that particular time.  Not until the command got

24  involved.

25     Q.  Did you, when you talked to him, was he threatening in

1  any way?

2      A.  No, he was not threatening.

3      Q.  Did you see him ever be violent in any fashion the time

4  that you knew him?

5      A.  No.

6      Q.  Now, you thought that he might be conceited?

7      A.  Yes.

8      Q.  You've known plenty of officers in the Coast Guard, I

9  assume?

10      A.  Yes, sir.

11      Q.  Is it possible to say some of them are conceited?

12      A.  Yes.

13      Q.  You probably deal with a lot of supervisors and

14  employees in your communications job?

15      A.  Yes, sir.

16      Q.  Some of those are conceited?

17      A.  Yes.  Yeah.

18      Q.  But --

19      A.  I'd say it's uncommon, but yes.

20      Q.  In your opinion, Mr. Wells was conceited, but he was

21  never violent; is that correct?

22      A.  Yes, sir, that's correct.

23          MR. CURTNER:  Thank you.

24          THE COURT:  Redirect.

25              REDIRECT EXAMINATION

1    BY MS. LOEFFLER:

2        Q.  Mr. Eskew, when -- Mr. Curtner asked you if -- you said

3    you were furious when the hut came back, contrary to your order;

4    right?

5        A.  Yes, ma'am.

6        Q.  And did you ever see Mr. Wells furious?

7        A.  Yes.

8        Q.  Was it related to this incident?

9        A.  Yes.

10       Q.  Please explain.

11       A.  When confronted by the command, Mr. Wells was quite

12   angry.  There had been a prior incident that had occurred, and

13   the executive officer at that time, Mr. Asa (ph) Daniels --

14            MR. CURTNER:  Your Honor, I'd just ask this witness to

15   testify as to his own personal knowledge.

16   BY MS. LOEFFLER:

17       Q.  Were you there at this conversation?

18       A.  Yes, ma'am, I was there.

19       Q.  Go ahead.

20       A.  Mr. Daniels had brought up this prior incident.  And

21   Mr. Wells knew the rules, knew the regulations.  And the details

22   of that incident, the documentation regarding that prior

23   incident, should have been destroyed.  There was a time limit on

24   that stuff.

25       Q.  How did you know there was a time limit on it?

1        A.  I didn't.

2        Q.  Who said there was a time limit on it?

3        A.  Mr. Wells is the one that was quite furious when that

4    was brought up and insisted that that documentation should no

5    longer exist.  And Mr. Daniels either right there at the time or

6    sometime very shortly thereafter looked in the book and

7    discovered that, in fact, Mr. Wells was exactly right, and that

8    shouldn't have existed.

9        Q.  From the previous incident?

10       A.  Correct, yes, ma'am.

11       Q.  With regard to the -- let me get back to the incident

12   at Attu and ask you a few questions.

13           I take it the Coast Guard is a military organization;

14   right?

15       A.  That's correct, yes.

16       Q.  There is a chain of command in a military organization;

17   right?

18       A.  Yes, ma'am.

19       Q.  And Mr. Wells is a prior Coast Guard member, knows

20   there is a chain of command; right?

21       A.  Yes, ma'am.  He's a retired chief.

22       Q.  Right, prior chief.  And, in fact, does the Coast

23   Guard, as other militaries, value the importance of a chain of

24   command?

25       A.  Absolutely.

1      Q.  So when Mr. Curtner asked you that -- there was a

2   dispute about the best way to -- you know, whether the hut

3   should come back or whether the hut should stay out there, in

4   terms of Mr. Wells' role and yours, who had the right to make

5   the decision?

6      A.  It was my decision to make.

7      Q.  And so when you have a dispute and a discussion,

8   ultimately in a chain of command there is somebody with

9   authority and they get to make the decision?

10     A.  Yes, ma'am, that is correct.

11     Q.  Was that anything unclear or vague in the Coast Guard?

12     A.  I think there was no question about that whatsoever.

13     Q.  Finally, when you said that -- again, you said he was

14  very knowledgeable and he knew his stuff.  But after your tour

15  in Kodiak, would you have liked at any opportunity to work with

16  Mr. Wells again in the chain of the command?

17     A.  I would say no, I wouldn't have.

18            MS. LOEFFLER:  Thank you.

19            THE COURT:  Recross.

20                     RECROSS-EXAMINATION

21   BY MR. CURTNER:

22     Q.  Mr. Eskew, now let me make sure I get this straight.

23         Now when thing happened at Attu in 2003, Mr. Wells was

24  a civilian --

25     A.  Correct.

1    Q.  -- employee, not in the chain of command as far as a

2    military office -- or military member; right?

3    A.  That's correct.

4    Q.  And would you agree that Mr. Wells wanted the Coast

5    Guard to play by the rules?  Had you mentioned that before?

6    A.  Yes.

7    Q.  That would be important for him for the Coast Guard to

8    play by the rules; right?

9    A.  Yes.

10           MR. CURTNER:  Thank you.

11           THE COURT:  All right, thank you, sir.  We're done,

12   you're done, and I think we'll take our lunch break.  If we can

13   come back at 1:10, we'll start at 1:10.  You're done, yeah, you

14   can go.  And you can have the cup.  Okay, you're excused, you

15   can go.

16    (Witness excused)

17                                        (Jury not present)

18           THE COURT:  Counsel, what do we have to look forward

19   to next?  At 1:10, we have -- government has --

20           MR. SCHRODER:  One more.  We've got one more shorter

21   witness, and then Chief Reckner.

22           MR. OFFENBECHER:  Your Honor, is that Mr. Encinas?

23           MR. SCHRODER:  Yes.

24           MR. OFFENBECHER:  I would like to address the Court

25   before Mr. Encinas?  Do it right now?

1            THE COURT:  Is this too soon?

2            MR. OFFENBECHER:  No.  Your Honor, it's not exactly

3  clear to me what Mr. Encinas is going to testify to, but it

4  appears to be more just bare character evidence against Mr.

5  Wells.  The only discovery we've had from the government about

6  Mr. Encinas is that Mr. Wells got mad at him when he removed a

7  stapler from Mr. Wells' desk.

8            He's not -- whatever he's going to testify about as

9  far as I can tell is not mentioned in the trial brief, a copy of

10  which I have here and I can refresh the Court's memory, about

11  six different things.  So I think the government should make an

12  offer of proof with respect to that.  It seems to be just bad

13  character evidence, that Mr. Wells is a bad guy who is hard to

14  get along with rather than the things that you've already ruled

15  on.

16            MS. DUIGNAN:  He was actually there for the warehouse

17  cleaning, and he can testify to the interactions between Mr.

18  Wells and everybody else.  It's part of our mode of evidence

19  that was already ruled admissible, Your Honor.

20            THE COURT:  Briefly.  But so no stapler discussion.

21            MS. DUIGNAN:  I won't discuss the stapler, it's pretty

22  petty, unless the door is opened, of course.

23            THE COURT:  Okay, so stay away from the stapler.

24            MS. DUIGNAN:  And he also has knowledge of the

25  collaring of the trees, and he also has some knowledge about

1  Petty Officer Hopkins.  He was a friend of his.

2          THE COURT:  Okay.  I do want to avoid -- I think

3  that's appropriate, but I want to avoid getting beyond the scope

4  of things we've previous discussed.

5          MS. DUIGNAN:  Your Honor, it will be very brief.  It's

6  those items.

7          THE COURT:  Okay.  Anything else?  One thing I'm

8  thinking about, the parties can be thinking about, is when --

9  ultimately when the jury wants play back of these videos, have

10 you figured out how that's going to happen?  I'm sure you have.

11 But I'll be curious about that.  Okay.

12          MS. DUIGNAN:  Okay.

13          THE COURT:  Thank you.

14          THE CLERK:  All rise.  The matter stands in recess

15 until 1:10 p.m.

16          (Lunch recess, 11:56:54 a.m. until 1:12:27 p.m.)

17                                  (Jury not present)

18          THE CLERK:  All rise.

19          THE COURT:  Are we ready for the jury?

20          MS. DUIGNAN:  Yes.

21          MR. OFFENBECHER:  Yes, Your Honor.

22          THE CLERK:  His Honor the Court is again in session.

23          THE COURT:  The reason I ask is I'm used to coming in

24 here and then people say, "Oh, Judge, I have something to talk

25 about," so that's why I ask beforehand.

```
 1            MR. CURTNER:  Aren't we doing a good job, don't you
 2   think?
 3            THE COURT:  I think everybody is doing a very good job
 4   so far.
 5                                          (Jury present)
 6            THE COURT:  Okay, the government's next witness.
 7            MS. DUIGNAN:  The government calls Petty Officer James
 8   Encinas to the stand.
 9            THE COURT:  Sir, if you'll stand for a second, she's
10   going to swear you in.
11             JAMES ENCINAS, PLAINTIFF'S WITNESS, SWORN
12            THE CLERK:  Thank you, please have a seat.
13            And sir, if you can please state and spell your full
14   name.
15      A.  James Encinas.  James E-n-c-i-n-a-s.
16            THE COURT:  Could you spell that -- I missed the
17   spelling.
18      A.  E-n-c-i-n-a-s.
19            THE COURT:  All right, thank you.  Counsel.
20            JUROR NUMBER 6:  Your Honor, I dropped my phone.
21            THE COURT:  Well, you better get that back.  Thank
22   you.  Is it turned off, that's the key?  She'll get in trouble.
23            JUROR NUMBER 6:  I apologize.
24            THE COURT:  That's all right, no problem.  Okay,
25   counsel.
```

1                      DIRECT EXAMINATION

2    BY MS. DUIGNAN:

3       Q.  Petty Officer Encinas, for what organization do you

4    work for?

5       A.  The Coast Guard, ma'am.

6       Q.  And how long have you been in the Coast Guard?

7       A.  Six years.

8       Q.  And what is your current rank and rate?

9       A.  E-5.  I'm an electronics technician.

10      Q.  And where have you been stationed before previous to

11   where you're stationed now?

12      A.  COMMSTA, and Thousand/Petal for A School.  And then I

13   was an non-rate in Hawaii.

14      Q.  And how long have you been stationed at the

15   communication station in Kodiak?

16      A.  I was there for three years.

17      Q.  Are you still there today?

18      A.  Not at the COMMSTA.

19      Q.  Where are you stationed now?

20      A.  At the electronics support detachment in Kodiak.

21      Q.  But you're still in Kodiak, you're just at a different

22   command?

23      A.  Yes, ma'am.

24      Q.  You're familiar with the organization of Communication

25   Station Kodiak, correct?

 1      A.  Yes, ma'am.

 2      Q.  I'm going to show you an exhibit that's already been

 3  admitted, it's Exhibit 393.  It should come up on your screen.

 4  It's already been admitted so I think we can project it.

 5          Do you recognize what this shows?

 6      A.  Yes, ma'am.

 7      Q.  And what is it?

 8      A.  It's the chain of command.

 9      Q.  And looking at the chart, can you please -- I think you

10  have a pointer up there that has a button on the side that

11  should be on right-hand side.  If you can point it at the screen

12  on the wall so the jury can see it.  And if you can just point

13  to the grouping where you worked when you were at the

14  communication station in Kodiak?

15      A.  I worked here.

16      Q.  Thank you very much.  So you worked at Communication

17  Station Kodiak, but not in the T2 rigger shop?

18      A.  Yes, ma'am.

19          MS. DUIGNAN:  Thank you, we can it off.

20   BY MS. DUIGNAN:

21      Q.  Have you ever been to the building at T2?

22      A.  Yes, ma'am.

23      Q.  And why were you there?

24      A.  You have to check in down there to get sign-offs when

25  you first arrive.  So that was the first time I've been there.

1        Q.  And for what was that?

2        A.  The checking in process.  Safety, for just a safety

3   brief.

4        Q.  And what was the safety brief for?

5        A.  We just have to watch a bear aware video that Mr.

6   Belisle would show us.

7        Q.  And had you spent any other time down at T2 except for

8   that?

9        A.  Yes.  To talk to Petty Officer Shelton.

10       Q.  And who was -- I'm sorry, Petty Officer Shelton?

11       A.  Yes, ma'am.

12       Q.  Who was Petty Officer Shelton?

13       A.  He was the supervisor down there.

14       Q.  So this would have been before Petty Officer Hopkins

15   arrived?

16       A.  Prior, yes, ma'am.

17       Q.  So you were friends with a Petty Officer Shelton who

18   was Petty Officer Hopkins' predecessor down there?

19       A.  Yes, ma'am.

20       Q.  So you'd been to T2 just to visit?

21       A.  Yes, ma'am.

22       Q.  Had you been there before to use any of the equipment?

23       A.  Just to borrow tools here and there.

24       Q.  And what was the policy on that?

25       A.  Just check them out through the supervisor.

1      Q.  Were you stationed at Communication Station Kodiak on
2  April 12th, 2012?
3      A.  Yes, ma'am.
4      Q.  And where were you that morning?
5      A.  Home and then work.
6      Q.  And what time approximately did you arrive at work?
7      A.  I arrived about 30 minutes to an hour late because my
8  son was ill.
9      Q.  And about -- you're saying 30 minutes to an hour late.
10 But approximately what time in the morning, if you can estimate?
11     A.  About 8:30.
12     Q.  So when you arrived there, what did you see upon
13 arriving at work driving up?
14     A.  Just, like, EMS there, military police, my senior
15 chief, chiefs around.  And then they told me to proceed up the
16 hill.
17     Q.  And when you were told to proceed up the hill, where
18 did you go?
19     A.  Straight to the ET shop.
20     Q.  And what was the rest of your day like there?
21     A.  Pretty chaotic.  It was just a lot of emotion.
22     Q.  Was there a point where you were asked to wait in any
23 location?
24     A.  They constantly were moving us.
25     Q.  And was there a point that you were in a conference

1  room?

2      A.  No, ma'am, I wasn't.

3      Q.  So what locations were you at during the day?

4      A.  The basement and the transmitter deck, and then the ET

5  shop itself.

6      Q.  Do you recall seeing anybody there on the day and what

7  their reactions were?

8      A.  Everybody was crying.  Mr. Wells was asleep.  That was

9  about it.

10     Q.  Did you -- you mentioned Mr. Wells.  Did you have any

11 interaction with him before April 12th, 2012?

12     A.  Yes, ma'am.

13     Q.  Was there a time where you were asked to help clean out

14 a big storage area?

15     A.  Yes.  I was helping clean out the warehouse for the

16 change of command.

17     Q.  And can you please describe how you were involved with

18 that.

19     A.  I was there to clean out the warehouse with Petty

20 Officer Beauford and Rich Belisle, and we were just cleaning the

21 warehouse.

22     Q.  And approximately when was that?

23     A.  Prior to the murders.

24     Q.  Do you have an approximate month?

25     A.  I don't, ma'am.

1      Q.  But you said it was in preparation for the change of

2  command?

3      A.  Yes, ma'am.

4      Q.  So would it be fair to say it was probably, you know --

5  it was obviously before the commanding officer was leaving, and

6  that would have been Commander Van Ness?

7      A.  Yes, ma'am.

8      Q.  During the time that you were working in the warehouse,

9  about how long were you assigned there?

10     A.  I was assigned there until the job got done.

11     Q.  And about how long did that take?

12     A.  About a week.

13     Q.  And who was it that assigned you to do that job?

14     A.  My direct supervisor, which was Petty Officer Gross.

15     Q.  And what was his rank and rate?

16     A.  E-6, electronics technician.

17     Q.  So he was an ET1?

18     A.  Yes, ma'am.

19     Q.  And when you were assigned to the warehouse to clean it

20  out, was there a point at which you were directed or getting rid

21  of things?

22     A.  Yes, ma'am.

23     Q.  Can you please describe that.

24     A.  We were getting rid of parts from the Vidmars, screws,

25  bolts, nuts, and et cetera.

1    Q.  And what had been your direction about organizing the

2  warehouse?

3    A.  Clean the warehouse and get rid of this stuff.

4    Q.  So anything that was deemed to be excess --

5    A.  Yes, ma'am.

6    Q.  -- or was there any specific direction?

7        So were you involved in getting rid of those nuts and

8  bolts that you just described?

9    A.  Yes, ma'am.

10    Q.  And who else was working with you?

11    A.  Petty Officer Beauford, Mr. Belisle, and the female

12  non-rates.

13    Q.  And was there a point at which Mr. Wells was involved?

14    A.  He just showed up briefly.

15    Q.  And can you please describe his reaction?

16    A.  When he saw the nuts and bolts, he was pretty upset,

17  and then he left.

18    Q.  Why was he upset?  Could you tell, or --

19    A.  Most of the nuts and bolts are the equipment he uses to

20  do his job.

21    Q.  Was there any expression about moving them someplace

22  else or cleaning them up, or -- was there any discussion about

23  that, or it was just your impression?

24    A.  Just my impression.

25    Q.  And how could you tell he was upset?

```
 1      A.  As soon as he walked in, he just -- he shook his head
 2 and walked back out.
 3      Q.  Did he explode or do anything, make any --
 4          MR. OFFENBECHER:  Objection.  She's leading the
 5 witness.  She's asked him what his reaction was, and the answer
 6 was given.
 7          THE COURT:  Sustained.
 8  BY MS. DUIGNAN:
 9      Q.  Can you just describe more?  Was there any verbal
10 expression?
11      A.  He said something --
12          MR. OFFENBECHER:  Asked and answered.  She's --
13          MS. DUIGNAN:  I don't believe he's described it fully.
14 I just want him to describe it fully, Your Honor.
15          THE COURT:  Okay, overruled.
16  BY MS. DUIGNAN:
17      Q.  Can you just describe fully what you saw?
18      A.  He walked in, he saw all his equipment going into this
19 box, and then he said something, and then he walked out.  I
20 didn't get to hear what he said.
21      Q.  And you -- going back to the T2, you said that you
22 would go down there sometimes to visit.  How would you get in?
23      A.  Use my swipe badge.
24      Q.  Was there any other way that you ever got into the
25 building?
```

 1     A.  No, ma'am.

 2     Q.  You had mentioned that you had contact with Petty

 3  Officer Hopkins.  Can you describe how you knew him?

 4     A.  I was there prior to him arriving.  And I helped him

 5  get qualified to do his job.

 6     Q.  And when you say "get qualified," what does that

 7  entail?

 8     A.  It just entails going over what we do up there and how

 9  to fix basic equipment.

10     Q.  And how much time did you spend with him?

11     A.  What do you mean?

12     Q.  How much time during the day would you spend with Petty

13  Officer Hopkins?

14     A.  Well, he started up the hill until he got qualified, so

15  every day we worked together.

16     Q.  And did you stay in contact with him after he got

17  qualified?

18     A.  Yes, ma'am.  He would come up the hill for meetings and

19  whatnot.

20     Q.  Did you spend any time with him socially at any point?

21     A.  Mostly at work, ma'am.

22     Q.  Did you ever have any occasion to observe him in family

23  activities or with his wife?

24     A.  I know they used to go riding four-wheelers.

25     Q.  Did you ever observe anything or did he ever indicate

1  anything was problematic in his marriage?

2      A.  No, ma'am.

3      Q.  Did you spend any time with Mr. Belisle at all?

4      A.  Just the few times at a bar.

5      Q.  And did you have an opportunity to talk with him at all

6  or socialize with him?

7      A.  Yeah, we used to just socialize at the bar together

8  because we worked together.

9      Q.  Were you aware of any issues, financial problems, or

10 any other problems he was having?

11     A.  No, ma'am.

12         MS. DUIGNAN:  Thank you.  I don't have any questions,

13 but the defense might.

14         THE COURT:  Cross-examination.

15                    CROSS-EXAMINATION

16  BY MR. OFFENBECHER:

17     Q.  Mr. Encinas, good afternoon.

18     A.  Good afternoon, sir.

19     Q.  Mr. Encinas, you indicated when you came to T2, that

20 you swiped in the door?

21     A.  Yes, sir.

22     Q.  And you actually worked at T1; didn't you?

23     A.  Yes, sir.

24     Q.  But you had a card -- your badge was capable of swiping

25  in at T2 as well; is that right?

1      A.  Yes, sir.

2      Q.  And is it true that everyone at T1 had a badge that

3  also would swipe in at T2?

4      A.  Yes, sir.

5      Q.  So all of the persons who worked at -- everybody

6  basically had a badge; right?

7          MS. DUIGNAN:  Objection.  I think this is outside of

8  his knowledge.  I don't think he controlled the badging, sir.

9          MR. OFFENBECHER:  Well, if he doesn't know the answer

10  to the question, he can say he doesn't know the answer to the

11  question, but it's not for you to say that.

12          THE COURT:  If you don't know -- only answer questions

13  you know the answer to obviously.

14      A.  I was just given a badge.  I'm not sure who had what --

15  who had what access.  I just had to go down there to do security

16  round when you have duty, so I had access down there.

17  BY MR. OFFENBECHER:

18      Q.  So you worked at T1?

19      A.  Yes, sir.

20      Q.  You had a badge?

21      A.  Yes, sir.

22      Q.  Your badge worked at T2?

23      A.  Yes, sir.

24      Q.  Did you know that anybody else's badge worked at T2?

25  Did you sometimes go down with some other folks at T1 and their

1    badge worked at T2 too?

2         A.  Yes, sir.

3         Q.  All right, you've talked about an incident that

4    happened at the warehouse sometime before the change of command;

5    correct?

6         A.  Yes, sir.

7         Q.  And you and Mr. Beauford, Mr. Belisle, and the female

8    non-rates were cleaning out the warehouse; is that right?

9         A.  Yes, sir.

10        Q.  And in that warehouse there was some Coast Guard

11   equipment, right, and machinery and so forth; right?

12        A.  Yes, sir.

13        Q.  There was also some personal equipment; is that right?

14        A.  Yes, sir.

15        Q.  For example, the Belisles kept extra tires there;

16   right?

17        A.  I was not aware of that.

18        Q.  Were you aware that they kept, you know, seats to their

19   car or a boat there or anything like that?

20        A.  There was none of that when I was there, sir.

21        Q.  Okay.  And you've described that you were clearing

22   things out; right?

23        A.  Yes, sir.

24        Q.  And there were a number of nuts and bolts that Mr.

25   Wells, I guess, had organized there; is that right?

1      A.  Yes, sir, he did.

2      Q.  And he had the bolts and the nuts in little boxes where

3  they were all separated in different sizes; isn't that right?

4      A.  Yes, sir.

5      Q.  And when you were -- and remember, these were stainless

6  steel bolts and stainless steel nuts and things like that; is

7  that right?

8      A.  Yes, sir.

9      Q.  There was quite a many years of accumulated spare parts

10  there; weren't there?

11      A.  Yes, sir.

12      Q.  And Mr. Wells was known to be a person who wanted to

13  conserve things and retain them and recycle them and not

14  necessarily go down to the hardware store and buy a new one;

15  isn't that right?

16      A.  They were just there and he organized them.

17      Q.  But he had them organized in little boxes for each

18  size; right?

19      A.  Yes, sir.

20      Q.  And when you were getting rid of them, you basically

21  just kind of dumped them all together and took them out the

22  door; right?

23      A.  I --

24      Q.  You didn't personally do that, but that's --

25      A.  I didn't personally do that, but it was told to us from

1    the chain of command to do that.  So you do as you're told.

2        Q.  Right.  And so it went from a large set of organized

3    nuts and bolts, and stainless steel bolts and nuts and so forth,

4    to out the door basically; right?

5        A.  To a big mess in a box.

6        Q.  A big mess in a box.  So it went from organized to a

7    big mess in a box?

8        A.  Yes, sir.

9        Q.  And when Mr. Wells saw this, he shook his head when he

10   walked away; is that right?

11       A.  No.  He said something that I didn't hear and he walked

12   out.  He was upset.

13       Q.  He was upset?

14       A.  Very upset, yes.

15       Q.  Said something, shook his head and walked away?

16       A.  Yes, sir.

17       Q.  Now, you've indicated on direct examination that you

18   knew Mr. Hopkins?

19       A.  Yes.

20       Q.  And you, on direct examination, gave your impressions

21   of his relationship with his wife Deborah.  So in forming your

22   impressions of Mr. Hopkins' relationship with Deborah, were you

23   aware that Mr. Hopkins was planning on leaving his wife as soon

24   as he retired and as soon as their son Patrick graduated from

25   high school?

1                    MS. DUIGNAN:  Objection.  I don't know that this

2      witness has any knowledge of that.

3                    MR. OFFENBECHER:  Well, Your Honor, he's given his

4      impression on direct examination.

5                    THE COURT:  The question was were you aware.  It's a

6      yes or no.

7          A.  Can you ask that again?

8       BY MR. OFFENBECHER:

9          Q.  Sure.  In forming your impression about their

10     relationship, were you aware that Mr. Hopkins was planning on

11     leaving his wife Deborah as soon --

12         A.  He --

13         Q.  Let me just finish it -- as soon as he retired and as

14     soon as their son Patrick graduated from high school in 2012?

15         A.  He never gave that impression off to me.

16         Q.  Are you aware that he was planning on retiring quite

17     soon?

18         A.  Yes, he talked about retiring.  Most people do.

19         Q.  I know that most people talk about retiring, but are

20     you aware that Mr. Hopkins was talking about retiring in the

21     near future?

22         A.  Yes, sir, he was.

23         Q.  Are you aware that he was actually filling out his

24     retirement paperwork the week he died?

25                   MS. DUIGNAN:  Objection.  I don't think there has been

1   any evidence of that.

2          MR. OFFENBECHER:  I have a good faith belief that

3   that's true, and I have a good faith belief that he answer it.

4   It's a yes or no question.

5      A.  He didn't make that aware to me, no, sir.

6    BY MR. OFFENBECHER:

7      Q.  Are you aware that Mr. Hopkins had been having an

8   extramarital affair?

9      A.  No.

10         MS. DUIGNAN:  Objection.

11         MR. OFFENBECHER:  Well, they opened this on direct

12  examination.  I certainly wouldn't be asking these questions

13  if --

14         THE COURT:  I'm not sure they opened it or not.

15         MS. DUIGNAN:  I don't know if this witness would have

16  any direct knowledge of that.

17         THE COURT:  I'm not sure that they opened it or not.

18  He said no, so let's move on.

19   BY MR. OFFENBECHER:

20     Q.  Are you aware that Mr. Hopkins had previously told

21  Deborah that he wanted a divorce?

22         MS. DUIGNAN:  Objection, hearsay.

23         MR. OFFENBECHER:  He's testified on direct examination

24  about what Mr. Hopkins hold him.

25         THE COURT:  It's a yes or no answer.

1     A.  He never mentioned that, sir.

2   BY MR. OFFENBECHER:

3     Q.  Are you aware that Mr. Hopkins' former mistress had

4   been pursuing contact with him on Facebook and e-mail --

5           MS. DUIGNAN:  Objection.  There is absolutely no good

6   faith basis for that.

7           MR. OFFENBECHER:  I have a good faith basis for this

8   question.  He can answer it yes or no.  I wouldn't ask it if I

9   didn't have it.

10          THE COURT:  Well, I think you can answer.

11    A.  No, sir, he never mentioned anything like that.

12  BY MR. OFFENBECHER:

13    Q.  And did he indicate or were you aware when you were

14  forming your impressions of their relationship, that Mr. Hopkins

15  had encouraged Mrs. Hopkins to respond to this person on

16  Facebook and on e-mail?

17    A.  I have no knowledge of that, sir.

18    Q.  Are you aware that the Hopkins family had incurred

19  substantial consumer debt?

20    A.  I wasn't aware of that, sir.

21    Q.  Were you aware that Mrs. Hopkins felt very stressed out

22  about their financial circumstances?

23    A.  I was not aware of that, sir.

24    Q.  Are you aware that Mrs. Hopkins was concerned that Mr.

25  Hopkins was about to leave her without any financial resources?

1      A.  I was not aware of that, sir.

2      Q.  Now, you've also indicated that you went out for drinks

3  with Mr. Belisle and talked with him about issues in his life;

4  right?

5          And you've testified on direct examination that, based

6  on your impressions -- conversations with him -- but your

7  impression is that he didn't have any issues in his life that

8  were extraordinary; is that right?

9      A.  Oh, no, sir.

10      Q.  In forming your impressions, as you've testified on

11  direct examination, were you aware that Mr. Belisle and his wife

12  were having some serious problems with their 16-year-old

13  daughter Hannah at this time?

14      A.  He never mentioned anything like that.

15      Q.  In forming your impressions that you have testified

16  about on direct examination, were you aware that they were

17  concerned that their 16-year-old daughter was dating a

18  26-year-old man who was involved in drugs and was a criminal?

19      A.  He never mentioned anything like that.

20      Q.  Were you aware that the Belisles were concerned that

21  their daughter was not going to school, their daughter was

22  running away for periods of time, and they were concerned about

23  her well-being because she was using drugs?

24      A.  He never mentioned anything like that.

25      Q.  When you were forming your impressions --

1           MS. DUIGNAN:  Objection, Your Honor.  At this point

2    counsel is just testifying to facts not in evidence, obviously

3    unsubstantiated.

4           THE COURT:  Well, counsel -- I said this to the jury

5    before, I can say it again.

6           Questions of counsel is not evidence, is that clear?

7    All right, proceed.

8           MR. OFFENBECHER:  Thank you, Your Honor.

9     BY MR. OFFENBECHER:

10     Q.  Were you aware, in forming your impressions that you

11    have testified about on direct examination, that Mr. and Mrs.

12    Belisle were thinking of sending their daughter away to the

13    Lower 48 for rehab?

14     A.  No, sir.

15           MR. OFFENBECHER:  I don't have any other questions,

16    Your Honor.

17           THE COURT:  Redirect?

18           MS. DUIGNAN:  Briefly, Your Honor.

19                      REDIRECT EXAMINATION

20     BY MS. DUIGNAN:

21     Q.  On cross-examination, Petty Officer Encinas, you

22    testified that as far as the chain of command, you do as you're

23    told.  Was Mr. Wells known to be that kind of person?

24     A.  No, ma'am.

25     Q.  And other than Mr. Offenbecher's testimony about all of

1  these things that have happened, do you have any knowledge of a

2  single one of those?  Do you have any personal knowledge --

3      A.  No, ma'am.

4      Q.  -- to substantiate any of that?

5           MS. DUIGNAN:  Thank you.

6           THE COURT:  Recross?

7           MR. OFFENBECHER:  No, Your Honor.

8           THE COURT:  Thank you, sir.  You're excused.

9   (Witness excused)

10          THE COURT:  Government's next witness.

11          MR. SCHRODER:  Your Honor, the government calls Chief

12  Scott Reckner.

13          THE COURT:  Sir, if you'd just come on in, and if you

14  then remain standing just long enough for her, she'll swear you

15  in.

16          THE CLERK:  Please raise your right hand.

17       SCOTT ALLEN RECKNER, PLAINTIFF'S WITNESS, SWORN

18          THE CLERK:  Thank you, please have a seat.

19          And, sir, if you can please state and spell your full

20  name.

21      A.  S-c-o-t-t A-l-l-e-n R-e-c-k-n-e-r.  Scott Reckner.

22          THE CLERK:  Thank you.

23          THE COURT:  Counsel.

24          MR. SCHRODER:  Thank you.

25                      DIRECT EXAMINATION

1   BY MR. SCHRODER:

2      Q.  Chief, who do you work for?

3      A.  U.S. Coast Guard.

4      Q.  And how long have you been in the Coast Guard?

5      A.  Eleven years.

6      Q.  And what rank and rate are you?

7      A.  I'm a chief petty officer, information systems

8   technician.

9      Q.  What's the shorthand for information systems

10  technician?

11     A.  IT -- ITC to be more accurate.

12     Q.  And what is an information system technician do in the

13  Coast Guard?

14     A.  We handle computers, networks, telephones, that kind of

15  thing.

16     Q.  So are you the IT -- the IT folks for the Coast Guard?

17     A.  Yes.

18     Q.  But is there kind of an engineering side of that where

19  you do some of the -- not just programming or playing with the

20  computers, but you do more than that?

21     A.  Yes.

22     Q.  Like what?

23     A.  We work on telephones, and as part of our Legacy

24  duties, the reason why I'm in the job I am in now, the old

25  Legacy TT rating used to work with towers.

 1      Q.  Let's go back.  You said you've been in the Coast Guard

 2   about 11 years.  Where else have you been assigned in the Coast

 3   Guard?

 4      A.  I was at ESD Charleston, and ESD Cape Cod.

 5      Q.  And what's an ESD?

 6      A.  Electronic support detachment.

 7      Q.  And is the Coast Guard the only branch you've served in

 8   in the military?

 9      A.  No, sir.

10      Q.  What other branches have you been involved in?

11      A.  I was in the U.S. Navy and the U.S. Army.

12      Q.  And just briefly, explain how that came about.

13      A.  Well, I joined the Navy in my early 20s.  I got out

14   after about three years because I was underway all the time, I

15   was away from home a lot, and my wife and I decided it was time

16   to do something different.

17         I stayed at home for about ten months as kind of a

18   stay-at-home dad.  I hadn't had much time with my daughter, so I

19   took advantage of that time, spent time with her.

20         And then I really couldn't get a job, so -- and I kind

21   of missed the military, so I decided to come back in.  And I

22   went in the Army this time, and served four years in the Army.

23      Q.  So what led you to the Coast Guard?

24      A.  Well, after four years in the Army, I didn't, again,

25   like my job, I wanted a change.  And the Army has a pretty good

1   program where you can reclass into a different job.  So I asked

2   to do that and was denied.  I wanted to go into IT, which is

3   what I do now.  It was just kind of getting big back then, the

4   late '90s.

5           So the Army denied my request.  So I got out and went

6   to school, and I got the training I needed to do IT work in the

7   industry as a network administrator, for a couple years.

8           And, again, missed the military life, and stumbled upon

9   the Coast Guard creating a new IT rating, and applied and was

10  accepted.

11      Q.  Now, let's got back to COMMSTA Kodiak for a second.

12          MR. OFFENBECHER:  Mr. Schroder, can I -- is this a

13  point where I can just pull the easel back so we can see the

14  witness?

15          MR. SCHRODER:  Sure.  Could I have 393.

16          MR. OFFENBECHER:  Sorry.

17          MR. SCHRODER:  Yep, it's admitted, right?

18          MS. DIXON:  Uh-huh.

19   BY MR. SCHRODER:

20      Q.  Chief, I just want very quickly to ask you a couple

21  questions.

22          What is this document?

23      A.  Looks like a COMMSTA Kodiak org chart.

24      Q.  And where are you on there?

25      A.  I'm shaded in yellow.

1      Q.  And so what groups were you the supervisor for?

2      A.  The IT division and the rigger shop.

3      Q.  And how big was the IT division?

4      A.  I had two guys.

5      Q.  Those are the two blocks?

6      A.  Those are the two blocks.  The IT1 and the IT2, yes,

7   sir.

8      Q.  So was it more or less of a challenge to supervise the

9   rigger shop?

10      A.  It was more of a challenge.

11      Q.  Why is that?

12      A.  More people and a lot more going on.

13          THE CLERK:  Mr. Schroder, just to clarify, that's

14   Exhibit 393?

15          MR. SCHRODER:  Yes.

16          THE CLERK:  Thank you.

17   BY MR. SCHRODER:

18      Q.  Let's just, to lay a little foundation -- I don't know

19   if this has been done yet -- but how many officers are there --

20   you're an enlisted man; correct?

21      A.  That's correct.

22      Q.  And how many officer are there at the Coast Guard --

23      A.  Three.

24      Q.  -- COMMSTA?

25          Where are those?  Can you point to those?

1     A.   Yeah.   You have the commanding officer at the top.

2     Q.   Right.

3     A.   And then just under him --

4     Q.   You should have a laser pointer there somewhere in

5  front of you.

6     A.   Oh, yeah.   So there is the commanding officer,

7  executive officer, and the operations officer.

8     Q.   And what does the rigger shop do?

9     A.   Primarily we're tasked with maintaining the antennas

10 for the COMMSTA and the antenna fields, and more generally the

11 grounds, the roads in the wintertime, that kind of thing.

12    Q.   Now, are all the antennas that you maintain with the

13 rigger shop, are they all in Kodiak?

14    A.   They are not.

15    Q.   And where are they -- where are some of the other

16 locations?

17    A.   We have remote sites in Ketchikan, St. Paul, Cold Bay,

18 Shemya.

19    Q.   And did Rich Belisle and Jim Hopkins work for you?

20    A.   They did.

21    Q.   How many people worked in the rigger shop?

22    A.   Eight.

23    Q.   Should have left the chart up, I guess.

24    A.   Yeah, it would have helped.   That's fine.   Eight.   And

25 depending on how many non-rates I had, the non-rates are pretty

1   fluid.

2       Q.  And were they all military?  How many were military, I

3   guess I should ask that?

4       A.  Six military and two civilians at the time.

5       Q.  And what were the ranks down there of the military

6   folks?

7       A.  I had an ET1, ET3, and then four non-rates.

8       Q.  And who was the senior military person down there?

9       A.  I was.  After me would have been ET1 Hopkins.

10      Q.  And was he the supervisor of the rigger shop itself?

11      A.  He was.  That was his title.

12      Q.  And who were the civilians who worked there?

13      A.  Mr. Wells and Mr. Belisle.

14      Q.  And how long did you work with Mr. Wells?

15      A.  Almost two years.

16      Q.  And how often did you have contact with him?

17      A.  Almost daily.

18      Q.  How often did you visit the rigger shop?

19      A.  Initially probably a couple times a week.  Depended on

20  what was going on during the day.  You know, I might just pop in

21  once and then not see them for the rest of the day.  I might

22  come in more than that.

23      Q.  Did you see the vehicles driven by the members of the

24  rigger shop?

25      A.  I did.  I drove by every day.

1      Q.  And you're familiar with those?

2      A.  I am.

3      Q.  What kind of vehicle did Mr. Wells drive?

4      A.  He drove a white Dodge truck.

5          MR. SCHRODER:  Can we have Exhibit 99, please.

6          MS. DIXON:  This one?

7          MR. SCHRODER:  Yeah.  Yep.

8   BY MR. SCHRODER:

9      Q.  Can I ask you to look at that on your screen, please.

10         And are you familiar with that exhibit?

11     A.  Yes, I am.

12     Q.  Or what's depicted in that exhibit?

13     A.  It's Mr. Wells' truck.

14     Q.  Is it a fair and accurate representation of Mr. Wells'

15  vehicle about the time of the incident we're talking here?

16     A.  Yes, it is.

17         MR. SCHRODER:  Your Honor, I'd move admission of 99.

18         MR. CURTNER:  No objection.

19         THE COURT:  It will be received.

20                           PLAINTIFF'S EXHIBIT 99 ADMITTED

21  BY MR. SCHRODER:

22     Q.  Now, did you ever see him drive another vehicle?

23     A.  I did.

24     Q.  And how often did you see that?

25     A.  I only saw it maybe a couple times, once or twice.

1     Q.  And what kind of car was it?

2     A.  It was a blue Honda CR-V.

3     Q.  And did he indicate why he drove her car the times that

4  you saw him?

5     A.  I don't think I actually talked to him specifically.  I

6  heard it from someone else.

7     Q.  Where did the defendant usually park his truck?

8     A.  Right at the rigger shop farthest to the right.

9     Q.  And how often did you go in and out of that door?

10    A.  All the time.

11    Q.  So you saw his vehicle quite a bit?

12    A.  Yes.  I had to walk by it to get in the door.

13    Q.  And he has a truck cab, according to the picture on the

14  back; is that correct?

15    A.  That's correct.

16    Q.  Is there a door on the back?

17    A.  There is not.

18    Q.  So can you look in the back?

19    A.  You can.

20    Q.  And the times you went in and out of T2 in the days and

21  weeks before the homicides, did you see anything in the back of

22  the truck?

23    A.  I did.

24    Q.  And what was that?

25    A.  Tires.

1      Q.  Do they seem to be about the right size for the truck?

2      A.  Appeared to me that they were, yes.

3      Q.  Is that unusual in Kodiak to see that?

4      A.  Not at all.

5      Q.  And why not?

6      A.  In wintertime you take off your all seasons and put

7   your studs in.  And a lot of guys with trucks throw the all

8   seasons in the back.

9      Q.  And what time of day -- what time did the duty day

10  start for the civilian personnel at the rigger shop?

11     A.  0700.

12     Q.  And generally, based on your experiences, what time did

13  they actually arrive?

14     A.  Around that time.

15     Q.  And how about the military personnel?

16     A.  0800.

17     Q.  And again, as a practical matter --

18          MR. SCHRODER:  We can take that down, Kim.

19   BY MR. SCHRODER:

20     Q.  As a practical matter, unless I know there is different

21  groups there, how about ET1 Hopkins, what was your experience

22  when he would normally arrive, or about what time?

23     A.  He was usually there pretty early.  So anytime from 07-

24  to 0745 depending on the day and what he had going on.

25     Q.  And how about the rest, the non-rated personnel?

1    A.  The non-rates and the ET3 usually showed up around
2  0730.  Not all of them wore uniforms to the shop, so they would
3  change.  They would run up, grab the flags for the day, that
4  kind of thing.
5    Q.  And why did they have to go get the flags?
6    A.  We did colors on most days.
7    Q.  Okay.
8    A.  At that time we were doing colors all the time because
9  the lights were down.
10   Q.  What does that mean, that the lights were down?
11   A.  Well, we have lights that shine on the American flag,
12  and if it's not lit, you have to take the flag down every day at
13  sunset and then put it back up at 08-.
14   Q.  The morning of April 12th, let's talk about that
15  morning.  How did your morning start?
16   A.  I got up, I was getting ready for work.  Received a
17  phone call from SK1 Cartier asking me what was going on at the
18  rigger shop, did I know what was going on, there was a lot of
19  emergency vehicles down there.
20   Q.  And what did you do next?
21   A.  I hung up with him.  I said some words to my wife.  I
22  called the watch.  I talked to -- I think it was the
23  supervisor -- I can't remember if it was the supervisor or CWO,
24  and I asked what was going on at the rigger shop.  And they told
25  me that Jim and Rich, ET1 and Rich were found down.  And I said,

1   "What do you mean 'down'?"  And they said just -- they just

2   said, "Down."  And so I hung up with them.

3       Q.  Where did you go when you arrived?

4       A.  When I arrived, I pulled over right adjacent to the

5   flag pole area because there was emergency vehicles, CGPD, state

6   troopers.  I got out of the -- of my truck.

7       Q.  Let me ask you to take a look --

8           MR. SCHRODER:  Kim, can we go back to 265, which I

9   think is now admitted.

10          MS. DIXON:  It is admitted.

11   BY MR. SCHRODER:

12      Q.  I want to ask you to look at one picture, another

13   picture.

14          Now, how does this compare to the scene where you drove

15   up that morning?

16      A.  It's consistent with what I saw that day.

17      Q.  Now, I do want to ask you one thing about it.

18          There is a line-up of vehicles in front of the -- and

19   what building is that?

20      A.  That's Building T2.

21      Q.  And there is a line-up of vehicles in front of that.

22   Are you familiar with all of those vehicles?

23      A.  I am.

24      Q.  And if you can start from the right, which looks like a

25   blue pickup.

1      A.  That's ET1 Hopkins' truck.

2      Q.  Next one.

3      A.  Mr. Belisle's truck.

4      Q.  And the next one.

5      A.  That's what we call the little line truck.

6      Q.  All right.  Next one.

7      A.  The dually.

8      Q.  Now, who are those owned by, those two white ones?

9      A.  Those are Coast Guard vehicles.

10     Q.  Does anybody get to drive those home?

11     A.  No, sir.

12     Q.  So they are there all the time?

13     A.  Yes, sir.

14     Q.  Unless you're using them, of course?

15     A.  Yes, sir.

16     Q.  How about the next one?

17     A.  That's Seaman Coggins.

18     Q.  And the next one over there.

19     A.  Seaman Henry.

20         MR. SCHRODER:  All right, you can take that down, Kim.

21  BY MR. SCHRODER:

22     Q.  Now, who normally parks in that spot nearest the door?

23     A.  Mr. Wells.

24     Q.  And have you seen Jim Hopkins park there before?

25     A.  Yes.

1    Q.  Under what circumstances?

2    A.  If Jim Hopkins arrived and Mr. Wells wasn't there, then

3    he would generally park there.

4    Q.  So what did it indicate to you when you saw that

5    Hopkins was parked by that door?

6    A.  I automatically assumed Mr. Wells wouldn't be in that

7    day.

8    Q.  And usually if Mr. Wells was not in basically on time,

9    what did that mean?

10   A.  That means he wasn't coming in.

11   Q.  He didn't arrive late very often?

12   A.  Not very often at all.

13   Q.  Now, when you arrived, who else was outside the rigger

14   shop?

15   A.  There was a CGPD officer kind of blocking the entrance

16   to the driveway.  She stopped me from going in.

17   Q.  Did you try to go in?

18   A.  I did.

19   Q.  Was that a difficult time for you?

20   A.  It was.

21   Q.  Did anyone else arrive when you were standing there?

22   A.  Yeah.  Mr. Wells arrived.

23   Q.  And did you speak to him?

24   A.  I did.

25   Q.  Who spoke first, do you remember?

1    A.  I believe he did.  He pulled up and asked me what was

2  going on.

3    Q.  And what did you -- you told him what you knew?

4    A.  I told him someone shot -- I said someone shot Jim and

5  Rich.

6    Q.  And what was his response?

7    A.  He said, "I had a flat tire."

8    Q.  And how long were you down by the rigger shop at that

9  point?

10    A.  At that point, probably ten minutes maybe.  The time,

11  that whole -- early time period is fuzzy for me.  It was very,

12  very -- it was traumatic.

13    Q.  What did you do when you got to T1?

14    A.  When I got up to T1, I went looking for my people.  And

15  they were in the unclass conference room.

16    Q.  And did all your staff end up up there?

17    A.  Yes.

18    Q.  And did you speak to Mr. Wells kind of throughout the

19  day?

20    A.  Bits and pieces, not much.

21    Q.  For what reasons were you talking to him throughout the

22  day?

23    A.  I knew he was diabetic.  They had been in that room for

24  a long time.  And I was asking him if he needed to have

25  something to eat.

1      Q.  Did he take you up on that?

2      A.  He did not.

3      Q.  Did he say anything else that struck you as important

4  during the day?

5      A.  Not that I recall during that day, no.

6      Q.  And what was the emotional state of the rigger shop

7  crew that morning?

8      A.  We were devastated.

9      Q.  What about Mr. Wells?

10         MR. CURTNER:  Objection, Your Honor, I don't think

11  he's qualified to talk with Mr. Wells' emotional state.

12  BY MR. SCHRODER:

13     Q.  How did he appear to you?

14     A.  He appeared fine.

15     Q.  Now, at some point during that day, did you check your

16  voicemail?

17     A.  I did.

18     Q.  And did you do that by yourself?

19     A.  I did.

20     Q.  Did you eventually do that talking to law enforcement

21  officers?

22     A.  Yes.

23     Q.  And did you play the voicemails for them?

24     A.  I did.

25     Q.  Now, at the point the recording was made -- when you

1    listened to the voicemails, who is on the voicemails?

2        A.  Mr. Wells.

3        Q.  And how long had you known him by then?

4        A.  Almost two years.

5        Q.  And how often had you had occasion to speak to him?

6        A.  Quite often.

7        Q.  Daily?

8        A.  Most days daily, yes.

9        Q.  Had you spoke with him on the phone?

10       A.  I had.

11       Q.  Significant number of times?

12       A.  Yes.

13       Q.  Had he left you voicemails before?

14       A.  He had.

15       Q.  More than once?

16       A.  Yes.

17       Q.  So you were familiar with his voice?

18       A.  Yes.

19       Q.  Were you confident that it was Jim Wells who left the

20   voicemail?

21       A.  Yes.  He identified himself.

22           MR. SCHRODER:  Your Honor --

23    BY MR. SCHRODER:

24       Q.  And have you listened to that recording before we came

25    in here today?

1      A.  Yes.

2            MR. SCHRODER:  Your Honor, the government moves

3  admission of Exhibit 169.

4            MS. DIXON:  It's 159.

5            MR. SCHRODER:  I'm sorry, 159.

6            MR. CURTNER:  No objection.

7            THE COURT:  It will be received.

8                            PLAINTIFF'S EXHIBIT 159 ADMITTED

9   (Audiotape played)

10  BY MR. SCHRODER:

11     Q.  Chief, now let's go back to the time that led up to

12  April 12th.

13            When did you arrive at COMMSTA Kodiak?

14     A.  July 2010.

15     Q.  And what was your assignment prior to coming to Kodiak?

16     A.  ESD Cape Cod.

17     Q.  Before -- now, did you understand before you were

18  coming -- or let's say, when you came to Kodiak, did you have to

19  basically act to try to understand the duties of the rigger

20  shop?  Was that something that was known to you at the time?

21     A.  It was not.

22     Q.  And how did you do that?

23     A.  Initially before I left Kodiak -- Cape Cod, there was

24  an opportunity to get tower qualified, so I got qualified at 300

25  feet.

1        And then once I arrived, I spent time talking to the

2   guys, interjecting myself down in the rigger shop as much as

3   possible and learned as much as possible.

4        Q.  Now, although you're in IT, did you come to enjoy the

5   work at the rigger shop?

6        A.  I did.  It's fun.

7        Q.  Now, does part of the rigger shop duties involve

8   maintenance of towers?

9        A.  Yes.

10       Q.  You mentioned towers.  And how big are those towers?

11       A.  The tallest we have at COMMSTA is 600.

12       Q.  And was Mr. Wells proficient at climbing those towers?

13       A.  He was very good.

14       Q.  How about Mr. Belisle?

15       A.  Very good.

16       Q.  To your understanding, how long had Mr. Wells been

17  there?

18       A.  Over 20 years, I believe.  He was there as an enlisted

19  member at least once, maybe twice, and then had served as a

20  civilian for -- since 1990, I believe.

21       Q.  And how long had Rich Belisle been at T2?

22       A.  Seven years going on eight, I think.

23       Q.  And how would you evaluate Mr. Belisle's level of

24  expertise?

25       A.  He was good.  He understood what he was doing.  If he

1    had any weakness, that might have been the electronics side.

2    But you don't need a vast electronics background to do the job.

3        Q.  And how did Mr. Belisle's experience as a boatswain

4    mate weigh into that position?

5        A.  I thought it helped.  He did a lot of rigging as a

6    boatswain's mate.  We were kind of jack-of-all-trades, I guess,

7    when it comes to some of that stuff.

8        Q.  Now, when you got there, did you kind of jump in and

9    start changing things right away?

10       A.  No, I did not.

11       Q.  And why not?

12       A.  It's not my leadership style.  I like to get a lay of

13   the land, kind of see how it's operating before I make any

14   changes.

15       Q.  And once you kind of got a handle on how things were

16   working down there, were you satisfied with how the rigger shop

17   operated?

18       A.  Initially I was, but as I started to learn more and

19   more, I was not.

20       Q.  And were you comfortable with the role of the civilians

21   in the rigger shop versus the military supervisor?

22       A.  I was not.

23       Q.  And why not?

24       A.  I felt that ET1, his leadership wasn't being respected,

25   and I felt that they were running the shop basically.

1    Q.  And what role was Mr. Wells exercising in the shop that
2    you could observe?
3    A.  It seemed to me he was running the show.
4    Q.  Did you believe he was controlling work in the shop?
5    A.  I do.
6    Q.  And were you satisfied with that?
7    A.  I was not.
8    Q.  Did you act to start to change that at some point?
9    A.  I did.
10   Q.  Now, considering you knew him since 2010, what was your
11   impression of how Mr. Wells viewed himself in the tower
12   maintenance world?
13   A.  I believe he viewed himself as extremely knowledgeable.
14   Q.  How engaged -- well, let me ask this.
15       Was any significant activity -- again, kind of back to
16   that similar question -- but did any significant activity at
17   that time go on in the rigger shop unless Mr. Wells was
18   involved, that you saw?
19   A.  It was my understanding that work wasn't getting done
20   unless Mr. Wells was ready to do the work.
21   Q.  But did you believe -- did you come -- did there come a
22   point where you believed that Mr. Wells was not keeping you, the
23   chain of command, starting with you, adequately informed of his
24   whereabouts and what he was doing?
25   A.  Yes.

1    Q.  And when did that come about?

2    A.  You know, the first time that it became a real issue,

3  they had -- a TAD trip was planned, and I didn't find out about

4  it until about a week before they were getting ready to head

5  out.  And I had to report that up to my boss, and I was not

6  happy about it and neither was he.  So that was probably the

7  first time it really became an issue.

8           THE COURT:  You know, I know everybody knows the

9  acronyms, but I don't know.  Some kind of trip was planned.

10          MR. SCHRODER:  I'm sorry, Your Honor.

11   A.  Temporary assigned duty.

12  BY MR. SCHRODER:

13   Q.  TAD, what does TAD mean?

14   A.  Temporarily assigned duties.

15   Q.  Now, did you also have an issue with Mr. Wells keeping

16  you informed about what he was doing on his personal business

17  when he was gone?

18   A.  Yes.

19   Q.  And what -- give me an example of that.

20   A.  If he wasn't coming to work, I wasn't getting phone

21  calls.  The EO wasn't getting phone calls.  There was times

22  when, you know, he'd take vacation but I wouldn't get the leave

23  chits until days later, stuff like that.

24   Q.  Now, as part of your duties, did you review personnel

25  files of any of your employees?

1      A.  I did.

2      Q.  And who?

3      A.  My civilians.

4      Q.  And where did you obtain those records?

5      A.  They were in my office when I got the job.

6      Q.  And when you originally looked at those, were they well

7   organized?

8      A.  They were not.  They were a bunch of papers in manila

9   envelopes -- or manila folders.

10      Q.  And at some point did you seek to have at least Mr.

11   Wells' personnel record reviewed and organized by personnel

12   specialists?

13      A.  I did.  And I did that for both of the records.

14      Q.  And who did you see about that?

15      A.  Stacy Hofler.

16      Q.  And who is Mrs. Hofler?  What was her role?

17      A.  She was the HR girl over at the base.

18      Q.  And is that something you did -- did you go see Ms.

19   Hofler by yourself?

20      A.  No, I didn't.

21      Q.  Who went with you?

22      A.  The executive officer.

23      Q.  And the executive officer is where in the chain of

24   command?

25      A.  He would be second.

1     Q.   Now, did Ms. Hofler have a record for Mr. Wells?

2     A.   She did not.

3     Q.   Was she the person who maintained local civilian

4  personnel records generally, though?

5     A.   I assume so for the BSU, but not for us.

6     Q.   And did she look at the documents in your file?

7     A.   She did.

8     Q.   And did she help you organize those documents?

9     A.   She did.

10    Q.   Into -- what did she call it when she organized them,

11  what kind of file?

12    A.   The employer supervisor working folder, something to

13  that effect.

14    Q.   And did you take that document and retain it in your

15  files?

16    A.   I did.

17    Q.   And did you look at those -- did you review those files

18  as part of your practice of supervising the civilian employees?

19    A.   I didn't initially go through them with a fine tooth

20  comb, but I did later on.

21    Q.   And did they affect how you dealt with those employees?

22    A.   They did later on, yeah.

23    Q.   Now, are you familiar now with civilian personnel

24  records?

25    A.   I am more so than I was back then, yes.

1      Q.  And have you drafted and prepared those kind of records

2   yourself?

3      A.  I have.

4      Q.  And are they kept in the normal and ordinary course of

5   business when it comes to supervising civilian personnel?

6      A.  They are.

7      Q.  What types of documents do you find in there?

8      A.  Employee evaluations; position descriptions; their

9   hiring, initial hiring documents; training records; disciplinary

10  records; those kind of things.

11     Q.  Now, handing you what's been marked -- I'm giving you

12  the hard copy here.  It's been turned over as Exhibit 3-D.  I'm

13  going to hand you the hard copy of this.

14         Can you identify document Exhibit 3-D?

15     A.  This is Mr. Wells' employee folder.

16     Q.  And did you maintain that record?

17     A.  I did.

18     Q.  And as his supervisor then, were you custodian to that

19  record?

20     A.  I was.

21     Q.  Are the documents in this file routinely and regularly

22  kept in a civilian personnel file in the Coast Guard?

23     A.  They are.

24         MR. SCHRODER:  Your Honor, I move for admission of

25  government Exhibit 3-D.

```
1              MR. CURTNER:  No objection.
2              THE COURT:  It will be received.
3                         PLAINTIFF'S EXHIBIT 3-D ADMITTED
4    BY MR. SCHRODER:
5      Q.  Now the first document I want you to take a look at --
6    we're going to go through some of these, and I think to help you
7    kind of track through what was going on there at the COMMSTA.
8      A.  Okay.
9      Q.  And the first document I want you to look at is 3-D 76.
10             MR. CURTNER:  Are you going to show them on the
11   screen?
12             MR. SCHRODER:  I think we are.
13             MR. CURTNER:  I don't have to find them, okay.
14             MR. SCHRODER:  No.
15   BY MR. SCHRODER:
16     Q.  Now, is this a document -- are you familiar with this
17   document?
18     A.  I am.
19     Q.  Did you examine this as Mr. Wells' supervisor?
20     A.  I did.
21     Q.  Did it have an effect on your decision making at some
22   point on how to deal with Mr. Wells?
23     A.  At some point, yes.
24     Q.  At what type of document is it?
25     A.  It's a letter of reprimand.
```

1      Q.  And what is the date of the document?

2      A.  December 10th, 2003.

3      Q.  And who is it addressed to?

4      A.  Mr. Wells.

5      Q.  Could I get you to read paragraph 1-A.  Can you read it

6   on your screen.  We can make it a little bigger.

7              MR. CURTNER:  I'm sorry, which one was it, Mr.

8   Schroder?

9              MR. SCHRODER:  The page?

10             MR. CURTNER:  Yeah, that's helpful.

11     A.  You want 1 and 1-A or just 1 -- I mean just 1-A?

12    BY MR. SCHRODER:

13     Q.  I want 1-A -- or 1-A, B, and C, actually?

14     A.  "On Friday July 25th, 2003, while still aboard Attu

15   Island, you informed ETC Phillips of your desire to return the

16   ALE radio communications hut to Kodiak.  On Monday July 28th,

17   2003, ETC Phillips informed you that the senior staff at

18   Communication Station Kodiak opposed the return of ALE hut to

19   Kodiak and instructed for the hut to remain on Attu.  On Friday

20   August 1st, 2003, you disobeyed this instruction and shipped the

21   communications hut to Kodiak.  On Monday, August --"

22     Q.  That's -- just those three, Chief.

23     A.  Okay.

24     Q.  And that was a document that you were aware of and

25   considered as part of your supervision of Mr. Wells?

 1      A.  Yes, sir.

 2      Q.  Now, I want to look at document 66, page 66.  Is that

 3  the same one?

 4          MS. DIXON:  Do you want 67?

 5          MR. SCHRODER:  Okay, do that one.

 6          MS. DIXON:  Next page?

 7          MR. SCHRODER:  Yes.

 8   BY MR. SCHRODER:

 9      Q.  Give me just a second.  Go on to 64.

10          THE CLERK:  Mr. Schroder, is that still the same

11  exhibit, 3-D?

12          MR. SCHRODER:  It is, it is.  It's just page 64.

13  Right, Kim?

14          MS. DIXON:  Yes.

15   BY MR. SCHRODER:

16      Q.  And did you examine this as Mr. Wells' supervisor?

17      A.  Yes, sir.

18      Q.  And could I get you to read paragraph 1?

19      A.  Sure.  Can you make it big again?

20          "This memorandum has been drafted to advise you of a

21  new engineering department policy regarding your requirement to

22  notify the supervisors of your activities.  Of particular

23  concern are your instances of temporary assigned duty, TAD,

24  medical travel, leave, or other instances where you're absent

25  from the COMMSTA for one day or more.  Do not regard this -- do

1    not regard this written direction as negative or reflecting

2    poorly on your conduct.  You are a highly valued asset to the

3    COMMSTA Kodiak and Coast Guard District 17.  As engineering

4    officer, I have found on occasion that your supervisors are

5    unaware of your whereabouts, activities, or statuses.  To

6    address this, I am providing you with this specific direction."

7         Q.  Now what was the date of that letter?

8         A.  30 September '04.

9         Q.  Now, did you consider Mr. Wells a highly regarded

10   member of your crew?

11        A.  I did.

12        Q.  But did those problems look familiar to you?

13        A.  They do.

14        Q.  So let's -- now, let's talk a minute about, again,

15   going back to your original time at the COMMSTA.

16            Were you -- was this your first assignment as a chief?

17        A.  It was.

18        Q.  And is there a special training you get to do as a

19   chief?

20        A.  You're required to go to chief petty officer academy.

21        Q.  Where is that?

22        A.  Petaluma, California.

23        Q.  And did you attend that training before coming to

24   COMMSTA?

25        A.  I did not.

 1         Q.  Did you attend that before coming to COMMSTA?

 2         A.  No, I did not.

 3         Q.  When did you attend the chief's academy?

 4         A.  March of 2011.

 5         Q.  How long does that take?

 6         A.  About four weeks.

 7         Q.  And when did you return to COMMSTA?

 8         A.  April sometime.  It was like in the middle of the month

 9    or first week.

10         Q.  But it was 2011?

11         A.  It was 2011, yes, sir.

12         Q.  Now, had you taken any significant actions to change

13    these concerns you had about the rigger shop up to that point?

14         A.  No, sir.

15         Q.  And so at that point did you begin to take action?

16         A.  Well, at that point, yeah, the engineering officer and

17    myself decided to do a letter of expectations.

18         Q.  And I think that's an important point to make.

19             Did you talk to the chain of command about this?

20         A.  Absolutely.  And Stacy Hofler as well.

21         Q.  So you talked to the -- and she, again, is the civilian

22    personnel official?

23         A.  That's right.

24         Q.  And so let's go to Exhibit 3-D 62.  3-D, page 62, I'm

25    sorry, page 62 and 63.  We're having battery issues.

1          Are you familiar with this, this document?
2     A.   Yes, sir.
3     Q.   And were you involved in drafting it?
4     A.   I helped the EO draft it, yes, sir.
5     Q.   But who signed it, or who is it from?
6     A.   It's from the engineering officer, Senior Chief Reed.
7     Q.   So it's not from you, your name is not on the front of
8  the line, I assume?
9     A.   That's correct.
10    Q.   And what conduct were you attempting to change?
11    A.   Basically it was about accountability, where Mr. Wells
12 was, what he was doing, what he had going on.  We just wanted
13 that information to get to us.
14    Q.   And was the conduct your talking about similar to what
15 you saw was going on -- sounded like was going on in 2004?
16    A.   It sounds like the exact same issue.
17    Q.   Now, is this a disciplinary document, per se?
18    A.   It's not.
19    Q.   What was -- what were you trying to do with this
20 document?
21    A.   At this point we were trying to align Mr. Wells'
22 activities with the expectations of the command.
23    Q.   But if you look at it, who is it addressed to?
24    A.   It's addressed to Mr. Belisle.
25    Q.   Now, if we could look to the next page.  Who is it

1  signed by?

2      A.  It's signed by Mr. Wells.

3      Q.  Now why that discrepancy?

4      A.  That's my fault.  It was a clerical error on my part.

5  I had both of the documents in my office and I was putting them

6  in their folders.  I just got the top sheets mixed up.

7      Q.  But was there face-to-face counseling on this?

8      A.  There was.

9      Q.  By who?

10     A.  There was the engineering officer, myself, and Mr.

11 Wells.  And I believe ET1 Hopkins was there, too.

12     Q.  And so when did that occur?

13     A.  That was in April.

14     Q.  Now, let's take a look at --

15         MR. SCHRODER:  Go back to the previous page, Kim.

16  BY MR. SCHRODER:

17     Q.  And if you could look at paragraphs 1-A and B -- or

18 1-A -- yeah, paragraphs 1-A and B which has those subsets to it

19 as well.  And what does that say?

20     A.  "On 29 April 2011, ET CS Reed, ITC Reckner, and ET1

21 Hopkins discussed the following points with you.  You were given

22 the opportunity to ask questions, voice concerns, receive

23 clarification on all subjects, sick time, vacation time.  All

24 time off will be taken in accordance with applicable rules and

25 regulations.  When reasonably able to do so, notify the rigger

1   shop supervisor in advance of time off.  When advanced

2   notification is not possible, notify the rigger shop supervisor

3   ITC or EO via phone or e-mail.  Alternately, you may notify the

4   CWO and request they notify ET1, ITC, and EO via e-mail.

5        Travel.  Travel opportunities will be sent up the chain

6   of command for recommendations and approved by the EO.  Expect

7   to be able to articulate the value of the travel to the unit or

8   the Coast Guard."

9        Q.  Now, what -- you mentioned some issues you had.  Is

10  there anything additional, additional incidents you had that led

11  you to want to issue this letter to Mr. Wells?

12       A.  Up to this point?  Again, it was just not knowing where

13  he was and what he was doing.

14       Q.  Did you find that he was properly notifying you or

15  Petty Officer Hopkins when he took a sick day?

16       A.  He was not, no.

17       Q.  Or a personal day?

18       A.  He was not.

19       Q.  Did this happen more than once?

20       A.  It did.

21       Q.  And read paragraph C while we're at it, that's probably

22  useful, and D.

23       A.  "ET1 Hopkins is a rigger shop supervisor.  I expect ET1

24  to be able to say who is where and what they are doing when ITC

25  or I ask him.  To facilitate this, it is necessary for all shop

1   personnel to keep him informed of their destination when

2   departing the unit.  Trees dropped during the workday are

3   available to all station personnel for use as firewood, first

4   come, first served.  Rigger shop personnel and work hours are

5   only to be utilized to meet mission requirements.  Extra cutting

6   and loading wood beyond mission (indiscernible) is to be done

7   during non-work hours."

8       Q.  Now what led to that paragraph?

9       A.  There was an instance where some trees had gone down

10  and one of the ETs went up and took some of it, and then it was

11  a point of contention.  Some -- they were upset.

12      Q.  Point of contention with who?

13      A.  With Mr. Wells that the trees had been taken.

14      Q.  Now, are you aware of whether Mr. Wells uses wood to

15  heat his home?

16      A.  My understanding is that he does.

17      Q.  Now was Mr. Belisle issued one of these letters?

18      A.  He was.

19      Q.  So what was your -- I mean, what was your goal in

20  writing this letter to those civilians?

21      A.  Our goal was to have them both understand, both of my

22  civilians understand what it was that we expected of them.

23      Q.  And had you had similar issues with Mr. Belisle?

24      A.  Not really.  Not that I can recall.

25      Q.  Now, after the letter was issued to Mr. Belisle, did

1  you have any issues like that with him afterwards?

2      A.  Not at all.  As a matter of fact, when he got that

3  letter that day, he read it, he commented that it seemed

4  reasonable, no worries, and he signed it and that was it.

5      Q.  Now, what was your -- but even though you may not have

6  had some more issues with Mr. Wells, what was your goal of doing

7  this for Mr. Wells?  What do you want to accomplish?

8      A.  I didn't want to single him out.  I wanted it to appear

9  as if we were giving it to both of them so they both understood.

10  I didn't want to just single him out.

11      Q.  Did you continue to have issues with Mr. Wells?

12      A.  I did.

13      Q.  Now, let's talk about -- that summer of 2011, we'll

14  kind of work our way through the year leading up to that.

15      A.  Okay.

16      Q.  The summer of 2011, did you have any major projects

17  that summer?

18      A.  We did.

19      Q.  And what was it?  What was the biggest project?

20      A.  We were erecting towers out on Shemya.

21      Q.  Where is Shemya?

22      A.  It's at the end of the Aleutian Chain.

23      Q.  Why were you putting things in Shemya?

24      A.  Loran station Attu was closing down.  We had some

25  antennas out there, but it was no long going to be manned.  And

1    Shemya is an Air Force station, it's manned, so it seemed like

2    the next logical place.

3         Q.   And why would the Coast Guard need towers out there?

4         A.   It extends your range, mission capabilities.

5         Q.   How many trips did you end up taking for that project?

6         A.   Altogether, I was on the island probably five or six

7    times.

8         Q.   But was there one period that was the major

9    construction effort?

10        A.   Yeah, summer 2011, June 2011.

11        Q.   And who was on that trip?

12        A.   It was pretty much the entire rigger shop.  So myself,

13   ET1 Hopkins, ET3 Beauford, Mr. Wells, Mr. Belisle, some of the

14   ETs from up the hill.  We actually got some TAD personnel from

15   ESD Kodiak.  C3s sent out of Baltimore and Portsmouth as well.

16        Q.   Was there any confrontations with Mr. Wells on that

17   trip?

18        A.   There was.

19        Q.   And what was the issue?

20        A.   The issue was bird diverters.

21        Q.   Which is -- the big question, of course, is what is a

22   bird diverter?

23        A.   A bird diverter, it's basically a wire thing, it's

24   about this big, and you attach it to the antenna.  The antennas

25   are made up of small cable, steel cable.

1           And part of the environmental -- when -- the EPA came

2    back and said you've got to have bird diverters on the antennas.

3    So what that does is allow the bird to see the wire and divert

4    itself from hitting the wire.

5       Q.  And what was Mr. Wells' position on the bird diverters?

6       A.  He did not want to put them on.

7       Q.  And why -- what was your position?

8       A.  I wanted to put them on.

9       Q.  And why?

10      A.  Because we were required to.  It was the law.

11      Q.  Now, did anyone come up with a plan to mitigate -- what

12   was Mr. Wells' concerns about the bird diverter?

13      A.  His concerns were -- at the top of those bird diverters

14   there is a small space that could get tangled up with some of

15   the smaller elements as we raise the tower.

16      Q.  Now, did anyone come up with an idea on how to mitigate

17   the concerns raised by Mr. Wells?

18      A.  Yes, Mr. Belisle.

19      Q.  What decision did you make at the end of that

20   discussion?

21      A.  To put the bird diverters on.

22      Q.  And who witnessed that confrontation?

23      A.  Well, in the truck it was myself, Mr. Wells, and Mr.

24   Belisle.

25      Q.  And what was Mr. Wells' reaction after you made that

1  decision?

2      A.  He was upset.

3      Q.  Now, again -- well, I'll ask that after the next round.

4  We'll do the next set of questions here.

5          So that was June.  Now, when did you return from

6  Shemya?

7      A.  Middle of July.

8      Q.  Now, did you have some issue with Mr. Wells that next

9  month after that in August?

10     A.  Yes.

11     Q.  And what did you understand was going on?

12     A.  It came to my attention that trees were being collared

13  on COMMSTA.

14     Q.  And what is collaring a tree?

15     A.  Basically you cut a ring around the bottom of it, the

16  trunk, a few inches deep, and it slowly kills the tree and dries

17  it out.

18     Q.  And what's the advantage of doing that to a tree?

19         MR. SCHRODER:  I'm sorry, can we have the lights up?

20  Sorry, Nancy.

21     (Whispered discussion off the record)

22   BY MR. SCHRODER:

23     Q.  Now, what advantage does that give to somebody to

24  collar a tree?

25     A.  Once the tree is down, you have pretty cured wood.

 1   Pretty much ready to go at that point.

 2        Q.  And how did you find out about that?

 3        A.  I went down to receive antenna 6, the rigger shop was

 4   down there clearing some guy lanes and other brush clearing

 5   efforts.  So it was a beautiful day, so I took a ride down there

 6   to take a look and see how it was going.

 7            And walking through the site I noticed a bunch of these

 8   trees in succession had these rings around them.  And so I asked

 9   ET1 what that was.  I didn't understand what that was at the

10   time.

11        Q.  And he explained it to you?

12        A.  He did.

13        Q.  Were those trees in a position where they could

14   endanger any of your equipment?

15        A.  They were not.

16        Q.  Now, did you keep that information to yourself?

17        A.  I did not.

18        Q.  What did you do?

19        A.  I went back and I briefed the XO.

20        Q.  And what did the XO do?  At that point, after the

21   briefing, did you go take a look at it again?

22        A.  We did.  He wanted to go look at it.  It was at the end

23   of the day, ET1 Hopkins had already gone home.  And I called

24   ET1, let him know we were on our way, the XO and myself to pick

25   him up, and go out to the site and show the XO.

1      Q.  Now, at some point did you confront Mr. Wells about

2   that?

3      A.  I did.

4      Q.  And when was that?

5      A.  It was August, later on in August that year.  We had a

6   meeting in my office.

7      Q.  And who was there besides you and Mr. Wells?

8      A.  Mr. Belisle and ET1 Hopkins.

9      Q.  And how did -- what did you tell Mr. Wells?

10      A.  I told Mr. Wells that we would not be collaring any

11   trees.

12      Q.  And how did he respond?

13      A.  He initially tried to defend the practice, that, you

14   know, it was preemptive, the trees were next to the roads, and

15   he was just trying to be proactive.

16          But I mentioned to him that some of those trees were so

17   far away from any asset or road that it was obvious what was

18   going on.  And at that point he stopped talking and got quiet.

19      Q.  And what did you instruct him to do?

20      A.  The instruction was no trees would be taken on COMMSTA

21   property without my authorization.

22      Q.  And do you believe you made yourself clear that you

23   were going to make those decisions?

24      A.  I thought I made myself pretty clear.

25      Q.  Now, again, you had these couple incidents.  It's now

 1   August.  Again, what was your goal with counseling Mr. Wells on
 2   this?  What were you trying to accomplish?
 3        A.  I was just trying to, you know, stop the behavior.
 4   They had a job to do, and that's what we're there for.  We're
 5   not there for any of these other things going on.
 6        Q.  Now, let's move on.
 7            You mentioned that -- when was the next time you went
 8   to Shemya after the main trip in June?
 9        A.  Was late September, early October, I think.
10        Q.  And who went on that trip?
11        A.  On that trip it was myself, Rich Belisle, ET1 Hopkins,
12   seaman Pacheco.  I think that's it from the rigger shop.  We
13   took a couple of the ETs to help us out, too.
14        Q.  Now, did Mr. Wells go with you?
15        A.  He did not.
16        Q.  And why not?
17        A.  He had a appointment, I believe, in Anchorage.  He was
18   leaving on the ferry.
19        Q.  Appointment to do what?
20        A.  VA appointment, I think.
21        Q.  And he went via the ferry?
22        A.  He took the ferry over, yes, sir.
23        Q.  And was that just to ride on the ferry, or your
24   understanding, he took his car or not?
25        A.  He took his truck.

1      Q.  Now, did you have a report of anything missing before
2  you left?
3      A.  I did.  A few days before we were getting ready to go,
4  ET1 Hopkins and Mr. Belisle came up and told me that the fuel
5  card was missing.
6      Q.  And where was the fuel card kept?
7      A.  In Mr. Wells' desk.
8      Q.  And what -- did you have time to do much about that
9  before you left for Shemya?
10      A.  No, we were ramping up.  We were packing stuff, getting
11  stuff to the air station.  So I just pretty much made the
12  decision to hold off.
13      Q.  And so you didn't do anything before you got back?
14      A.  That's correct.
15      Q.  And when you left for that trip, the morning you
16  left -- or was it morning?  I guess I shouldn't assume it was
17  morning.
18      A.  It was.  It was morning.
19      Q.  So where did you leave from?
20      A.  From Air Station Kodiak.
21      Q.  And where do you stage the crew before you make that
22  flight?
23      A.  It's called the pass terminal.  The passenger terminal
24  in the hangar.
25      Q.  And when you got to the passenger terminal that

1   morning, did you see Mr. Wells?

2        A.  I did not.

3        Q.  Now, did you have to make any other trips before you

4   got on the plane?

5        A.  I did.  I forgot some items at any house.  I called my

6   wife and asked her to gather them for me, and I ran home to pick

7   them up.  We had been delayed an hour leaving, we were supposed

8   to leave an hour earlier than we did, but the C-130 was delayed

9   for a reason I don't recall now.

10       Q.  And when you came back, at that point did you see Mr.

11  Wells?

12       A.  I did.

13       Q.  And where did you see him?

14       A.  I ran into him in the parking lot of the pass terminal

15  of the hangar.

16       Q.  And what did you do at that point?

17       A.  We walked into the pass terminal.  We conversed, you

18  know, said goodbye.  They came and got us, said they were ready

19  for us.  So we picked up our bags and walked to the C-130.

20       Q.  How long were you there with Mr. Wells?

21       A.  It wasn't very long.  Five minutes, maybe ten.

22       Q.  Now that morning, did you get any gas in your -- do you

23  have a truck?

24       A.  I do.

25       Q.  And what is -- what kind of fuel do you use?

 1      A.  Diesel.

 2      Q.  Did you get any gas that morning?

 3      A.  No, sir.

 4      Q.  Did you use the fuel card to get any gas that morning?

 5      A.  No, sir.

 6      Q.  Now, when you got back, the issue, was it still

 7  outstanding at the point you got back from Shemya?

 8      A.  It was.  We got back on a Thursday, I believe, or

 9  Friday.  And the CO gave us some time off.  And I think that

10  Monday was a holiday.  So I got back in the office on the

11  following Tuesday.  And ET1 came up and he had -- he found the

12  fuel card.

13      Q.  So what did you do?  Did you do something about it

14  then?

15      A.  I did.  I thought it was suspicious that the fuel card

16  was gone and now it's back where it was.

17          So I had IT1 Sanders pull some videotape from the T2

18  building, and I reported what was happening up the chain of

19  command.

20      Q.  And what did the chain of command do?

21      A.  They initiated their administrative investigation.

22      Q.  Now, we actually heard a bit from Chief Cartier, so I

23  won't go through the details of the investigation.  But did you

24  end up getting the investigation for your files?

25      A.  I saw it.

 1      Q.  Right.

 2      A.  I don't believe I actually put the investigation in the

 3  file though.

 4      Q.  Did --

 5      A.  I got the result on the investigation, I guess you

 6  could say.

 7      Q.  So you were aware of what the findings of the

 8  investigation were?

 9      A.  Yes.

10      Q.  Where was the fuel card eventually found?

11      A.  In Mr. Wells' desk.

12      Q.  Now, let's move on to the next item.

13          And you stated earlier that you had had a discussion

14  with Mr. Wells about the tree collaring at the time you

15  discovered it in August?

16      A.  Yes.

17      Q.  At some point did you decide to document the issue?

18      A.  Yes.  We were advised by Stacy Hofler to make sure we

19  documented it, so we did.

20      Q.  So you checked with the human resources staff?

21      A.  Yes, sir.

22      Q.  Had you consulted your chain of command on that?

23      A.  Yes, sir.

24      Q.  But -- we'll have a look here.

25          MR. SCHRODER:  Let's bring up page 60, 3-D page 60.

1    BY MR. SCHRODER:

2        Q.  Is this document familiar, Chief?

3        A.  Yes, sir.

4        Q.  Now whose name is at the top?

5        A.  That's my name.

6        Q.  And who is it to?

7        A.  Mr. Wells.

8        Q.  And what type of document is this?

9        A.  This is a memorandum for record.

10       Q.  And what does it say?  It's a memorandum for record.

11   What's the second part of that subject line?

12       A.  "Establishment of expectations other than performance."

13       Q.  So at this point, any issues with Mr. Wells'

14   performance?

15       A.  Not really, no.

16       Q.  But, again, we got that word "expectations"?

17       A.  Yes.

18       Q.  Now, what's the date on the document?

19       A.  2 November 2011.

20       Q.  Now, let's look at the second page quickly.  What does

21   that indicate?  What does that signature indicate?

22       A.  Mr. Wells received the document.

23       Q.  And how did he receive it?

24       A.  I gave it to him.

25       Q.  And did you talk to him about it?

1    A.  I did.

2    Q.  And who was there for that conversation?

3    A.  Just him and I.

4    Q.  And where did it happen?

5    A.  In my office.

6    Q.  And what did you tell him?

7    A.  That day, kind of the same thing.  You can't take

8  trees, we talked about that; I also had the EO's letter of

9  expectations back in April, we didn't have him sign it, so I

10  needed to get his signature on it, we talked about that; we

11  talked about the fuel card incident.  I told him it didn't look

12  good.  I said -- what I told him was there is paperwork coming,

13  we're not going to be able to fire you because we couldn't

14  actually see you take the diesel from the pumps, but it wasn't

15  good.  And we were just waiting for the CO to get back to take

16  action.

17    Q.  Was that a heated discussion?

18    A.  It became heated, yes.

19    Q.  Did you mention his past personnel record?

20    A.  I did.

21    Q.  Had you reviewed that record by then?

22    A.  I did.  I had it stuck in here dating back quite a

23  ways.  And I had seen stuff even older than that that Stacy

24  Hofler removed.

25        And I told him that it looked like the same trend was

1   happening and it had to stop, like you had to get in line, this
2   stuff was over, you can't just do what you want.  I told him
3   that it was time to get on board with the program.
4        Q.  And what was his reaction?
5        A.  He was upset.  It got heated.  He raised his voice, I
6   raised his [sic] voice.
7        Q.  Now at that point, where were you working?  Where was
8   your desk?
9        A.  I was -- my desk in my office was in T1.
10       Q.  And did that change?
11       A.  It did.
12       Q.  And about when?
13       A.  December of 2011.
14       Q.  And where did you put your desk?
15       A.  I had the rigger shop put a desk in the T2 office for
16  me.
17       Q.  And why did you do that?
18       A.  By this point I was getting concerned that ET1 Hopkins'
19  authority wasn't being respected.  I felt that there was
20  definitely issues with Mr. Wells, and I felt that my presence in
21  the rigger shop would help turn some of that around.
22       Q.  Now, again, going back to this question I've asked
23  before -- you made a comment in there about, "We're not going to
24  be able to fire you."
25            Again, what was your goal at this point?  What were you

1    trying to accomplish with this?

2        A.   Again, we were trying to -- I was trying to get him

3    engaged in the process, engaged in what we do, trying to get him

4    to, you know, stop the shenanigans and let's just come and do

5    work.

6        Q.   I mean, did you still consider him an important part of

7    the shop?

8        A.   I did.  He's very knowledgeable.

9        Q.   Now, you mentioned at the time of the fuel card

10   incident that the defendant went to the -- went to a VA

11   appointment instead of going with the crew to the Shemya -- or

12   to Shemya.

13           You know, based on your experience as the supervisor,

14   your being the supervisor at the time, was he having health

15   problems?

16       A.   He was.

17       Q.   And I don't want to go into details, you're not a

18   doctor, but from your discussions with him, what did you

19   understand the problems to be?

20       A.   At this point I don't think anybody knew.  He didn't

21   know.  He was having a lot of doctors' appointments for several

22   months, you know, and I was getting reports from ET1 and Rich

23   and other people he didn't look well.  Sometimes he would leave

24   early for the day because he was sick.  So I understood him to

25   be sick.  He looked sick to me.

1    Q.   Now, did that lead to him missing some time from work?

2    A.   It did.

3    Q.   And was it all at once or intermittent?  How would you

4    describe the period of time he missed from work, or he missed

5    work and how often that was?

6    A.   It was generally sporadic, but there was significant

7    chunks of time when he wasn't in the office.  I think he was out

8    most of December.  Other days he would come in and leave early,

9    yeah.

10   Q.   And based upon your expectations letters, were you

11   getting notification when he wasn't coming in?

12   A.   I was not.

13   Q.   Now, we talked a little bit earlier about Mr. Wells'

14   level of prominence in the rigger shop when you got there and

15   how he was engaged in all the work; is that accurate?

16   A.   Could you repeat that question.

17   Q.   That was a lousy question, I'm sorry.

18        I think what you said was -- what I asked you earlier

19   was, did much work get done without Mr. Wells being involved?

20   A.   No.

21   Q.   Now, when he was out, did the work stop?

22   A.   It did not.

23   Q.   And how did it get done?

24   A.   We did it.  I had a conversation with the executive

25   officer.  I explained to him that, you know, we're going to

1    continue to do the work.  We may make some mistakes.  If we do,
2    I'll report the mistakes up and we'll learn from them and drive
3    on, but we weren't going to stop work.
4        Q.  And so if Mr. Wells was not there, who became more
5    prominent in getting the work of the shop done?
6        A.  Mr. Belisle.
7        Q.  And how would you describe Mr. Belisle's role in the
8    shop at that point versus what was going on with Mr. Wells?
9        A.  There was no issues.  I mean, he came to work every
10   day, he did the job, he was calling vendors and talking to the
11   other units.  And ET1 was involved, I was involved, you know, it
12   was great.  He really stepped up to the plate and was doing
13   wonderful work.  I was impressed.
14       Q.  Now, would it be fair to say that this tower climbing
15   community is fairly small?
16       A.  It is.
17       Q.  And are there any national groups or associations, you
18   know, related to the tower folks?
19       A.  There is.  There is a national association for all
20   tower climbers, not just us, not just military, it's a National
21   Association of Tower Erectors.
22       Q.  And what's the acronym for that?
23       A.  NATE.
24       Q.  And did they have meetings?
25       A.  They did.

1        Q.   How often?

2        A.   The big one was a yearly kind of convention, if you

3    will.

4        Q.   And did -- when is the first one -- did you go to some

5    of those?

6        A.   I did.

7        Q.   And what was the first one?

8        A.   It was 2011.

9        Q.   And who did you go with?

10       A.   Mr. Wells and Mr. Belisle.

11       Q.   And so you attended one of the things with the

12   defendant.

13            What was your impression -- was your impression that

14   the defendant took pride in his role in that community?

15       A.   Yes.

16       Q.   And based on what, what observations?

17       A.   You know, he would -- Rich and I called it strut.  He

18   would go strut through the exhibition area talking to people and

19   vendors, and completely leave Rich and I --

20            MR. CURTNER:  Objection, Your Honor.  I don't know how

21   he can characterize somebody strutting.  I mean, how is that

22   relevant to this case?

23            THE COURT:  Well, I'll tell you what, we'll let

24   counsel think about it for 15 minutes and we'll come back, okay.

25   Take a 15-minute recess, and you can restate your question.

1                                    (Jury not present)

2            THE CLERK:  All rise.  Matter stands in a 15-minute

3     recess.

4          (Proceedings recessed, 2:39:52 p.m. until 2:59:34 p.m.)

5                                    (Jury not present)

6            THE CLERK:  His Honor the Court, the United States

7     District Court is again in session.

8            THE COURT:  Okay, the jury is coming in.

9            THE CLERK:  Please be seated.

10           THE COURT:  I do have a 4:15 or 4:30 change of plea.

11    I'll do it at 4:30, just to keep that in mind.  So in other

12    words, we'll have to stop at 4:30.  We'll start first thing

13    Monday at 8:30.

14                                    (Jury present)

15           THE COURT:  Okay, we've got everybody back.  Please be

16    seated.  Continued direct examination.

17           MR. SCHRODER:  Thank you, Your Honor.  Did we have a

18    resolution of the question?

19           THE COURT:  You can go on.

20           MR. SCHRODER:  Okay.  So the question has been

21    answered?

22           THE COURT:  I think it was.  That was 15 minutes ago.

23    I'm not sure I remember it.

24     BY MR. SCHRODER:

25        Q.  Chief Reckner, now, was there a NATE convention in the

 1   winter of 2012?

 2        A.   Yes, there was.

 3        Q.   And who attended that convention from COMMSTA Kodiak?

 4        A.   Myself, Mr. Belisle, and ET1 Hopkins.

 5        Q.   And did the defendant attend?

 6        A.   He did not.

 7        Q.   And who made that decision?

 8        A.   I did.

 9        Q.   And did you consult with the chain of command before

10   you did that?

11        A.   I did.

12        Q.   What was the basis for your decision?

13        A.   Mr. Wells had been gone for a large part of the latter

14   part of that year.  He was sick, he was still recovering.  There

15   were disciplinary issues, all that.  I felt Mr. Belisle

16   obviously was going to go, and ET1 Hopkins had extended for a

17   year, and he had done some really great work.  And I felt it was

18   important with the work coming up in that summer that he go to

19   get some knowledge as well.

20        Q.   Now, was there a budget issue there, too?

21        A.   There was.

22        Q.   And how many people could you take?

23        A.   Three.

24        Q.   So you chose ET1 Hopkins?

25        A.   I did.

1      Q.  Now, if you would have had a fourth slot, would you

2   have taken Mr. Wells?

3      A.  I would not have.

4      Q.  And why is that?

5      A.  Again, disciplinary issues we had, his sickness, and

6   the fact that he had been gone, I didn't feel he deserved to go.

7      Q.  And when you notified the command of your decision, did

8   they change or overrule that decision?

9      A.  They did not.

10      Q.  How did the defendant find out about your decision?

11      A.  Not long after he came back, we were sitting down in

12   the office in T2, it was just him and me.  And he asked me what

13   we were doing for NATE this year.

14      Q.  And what did you tell him?

15      A.  I told him that Rich and ET1 and myself were going.

16      Q.  And what was his reaction?

17      A.  He was upset.

18      Q.  Did he indicate his concern about other people going

19   instead of him?

20      A.  He did.  He asked me why ET1 was going, and I told him

21   what I just told you, he had extended, he had done good work,

22   and I felt he needed the knowledge.  Then he pointed at Mr.

23   Belisle's desk.  He said, "Why is he going?  He's just an F'ing

24   rigger."  He didn't say "F'ing."

25          And, again, I reiterated -- I told him, "Take the time,

1  recover, get better, and when we get back, you know, we'll drive

2  on basically."

3       Q.  Now, did you -- but did that lead to a further

4  discussion of his role in the shop?

5       A.  It did.  He asked me what I felt his role was.  And I

6  told him, I said:  Jim, you're the antenna mechanic.  I expect

7  you to be the antenna mechanic."

8       Q.  And how did that discussion -- did that discussion get

9  heated?

10      A.  It was heated.

11      Q.  And how did it end?

12      A.  I ended with a staring contest.  He got quiet and he

13  just looked me in the eye, and I just stared back.  I felt -- I

14  remember thinking to myself, he's trying to intimidate me, I'm

15  not going to allow that to happen, and I just returned his gaze.

16      Q.  How did it break off?

17      A.  It lasted about two minutes.  It was strange.  And then

18  he just kind of turned around and went right back to his

19  computer.

20      Q.  And again, let me ask.  Did you -- you also ended up

21  discussing Mr. Belisle's role, involving role in the shop?

22      A.  I did.  I told Mr. Wells that Rich had done great work,

23  that he has really come around since his absence, since Mr.

24  Wells' absence.  And I told Mr. Wells that, in my opinion, he

25  wasn't that far away knowledge wise from Mr. Wells.

 1       Q.  Now, you talked earlier about there being a discussion

 2  you had over the fuel card incident.  And was formal action ever

 3  taken on that investigation?

 4       A.  There was.

 5       Q.  And what was that action?

 6       A.  The results of the administrative action -- or the

 7  administrative investigation pointed that Mr. Wells had indeed

 8  taken the card.  So the commanding officer drafted a letter, a

 9  letter of caution.

10            MR. SCHRODER:  Kim, can we have 3-D 58.

11            MS. DIXON:  Uh-huh.

12            THE CLERK:  Is this Exhibit 3-D again?

13            MR. SCHRODER:  This is Exhibit 3-D, page 58 and 59.

14   BY MR. SCHRODER:

15       Q.  Probably have a little better resolution on your screen

16  there, Chief, but --

17       A.  Really not that much better.

18       Q.  Well, let's do what we can.  So what type of document

19  is this, did you say it was?

20       A.  This was a letter of caution.

21       Q.  And who is it from?

22       A.  It's from the commanding officer.

23       Q.  What's his name?

24       A.  Commander Peter Van Ness.

25       Q.  And who is it to?

1      A.  Mr. Wells.

2      Q.  Let's take a look at the second page.  Whose signature

3  is on there?

4      A.  Mr. Wells.

5      Q.  What does that indicate?

6      A.  That he received the document.

7      Q.  And who is the -- it says "Copy to CSA."  What's CSA?

8      A.  That's the HR representative.

9      Q.  So who wrote this document?

10      A.  My understanding is the commanding officer and probably

11  the XO also.

12      Q.  And did you write it?

13      A.  I did not.

14      Q.  And do you know whether they consulted with the CSA?

15      A.  I believe they did.  I don't know that for sure, but it

16  would make sense.  That was our practice.

17      Q.  Now, it appears -- let's go back to the first page.

18          It appears paragraph 1 is a recitation of the facts; is

19  that true?  And I'm not going to have you read that, we won't --

20  I think the jury has an understanding of what the incident was

21  about.

22      A.  Yeah, I think that's true.

23          MR. SCHRODER:  So Kim, could you give us paragraph --

24  or paragraph 2.

25    BY MR. SCHRODER:

1     Q.  But I do want you to read paragraphs 2, 3, and 4.  So

2  let's start with paragraph 2.

3     A.  "I'm deeply troubled by the misuse of the general fuel

4  card."

5     Q.  Paragraph 3.

6     A.  "You've been employed as a civilian with the Coast

7  Guard in COMMSTA Kodiak for 20-plus years and you are also

8  retired from the Coast Guard as a chief petty officer.  You have

9  a responsibility to both properly use and properly safeguard

10  this government fuel card.  This unauthorized purchase and

11  supporting evidence of misuse severely undermines my confidence

12  in you.  You're a fiduciary steward of the taxpayers' monies,

13  and you did not fulfill your basic responsibilities.  This

14  letter of caution is imposed to impress upon you the seriousness

15  of these offenses and to serve as a warning that any future

16  misconduct will result in more severe disciplinary action."

17     Q.  Go ahead with paragraph 4.

18     A.  "Your conduct was unacceptable and will not be

19  tolerated.  I consider this letter of caution to be the very

20  minimum action necessary to correct your behavior and maintain

21  good order and discipline in the organization.  Any further

22  misuse of government charge cards under your control or any

23  further instances of misconduct may result in disciplinary

24  action being taken against you, up to and including removal from

25  federal service."

1    Q.  Now, was Mr. Wells counseled on this as well?

2    A.  He was.

3    Q.  And by whom?

4    A.  We did it in the commanding officer's office.  So the

5  CO was there, the XO, the EO, and myself.

6    Q.  And is there a higher level of gravity when the

7  commanding officer chooses to do that himself?

8    A.  There is.

9    Q.  What did the commanding officer tell Mr. Wells?

10    A.  He told him that he doesn't trust him anymore, that it

11  was a trust issue for him, and that trust is gone.

12    Q.  Did Mr. Wells say anything?

13    A.  He kept saying, "You guys think I'm a thief."  And he

14  kept saying, "It just doesn't sit right," over and over again,

15  "it just doesn't sit right."

16    Q.  Now, you saw the signature on the end.  Was that done

17  at the time?

18    A.  It was.

19    Q.  And did Mr. Wells sign that readily?

20    A.  He did not.

21    Q.  What happened?

22    A.  Initially he refused to sign it.  We explained to him

23  that by signing it only signifies that he had received a letter,

24  not that he was admitting to anything.  But he sat there, so I

25  think at some point the commanding officer said something like,

1   "Okay, well, let's just go."

2          So the commanding officer went back to his desk, I

3   left, we all left.  I went back to my office, I called Stacy

4   Hofler and I told her that Mr. Wells wouldn't sign the document.

5   She said, "That's okay.  Just annotate it in his working folder

6   that he didn't sign it," which I did.

7          And I went back to the commanding officer's office to

8   let him know that information.  And when I got there, Mr. Wells

9   was gone and the commanding officer told me that he did, in

10  fact, sign it, which I also annotated in the working folder.

11          MR. SCHRODER:  Let's bring that back up again, could

12  we, please.  One more, one more fact I want to check.  Second

13  page.

14  BY MR. SCHRODER:

15     Q.  Now, what was the date of Mr. Well's signature?

16     A.  24 February 2012.

17     Q.  Now, does that -- what's your memory of when this

18  actual counseling session took place?

19     A.  It happened on that day.  I think the letter is dated

20  earlier in January.  But the circumstances were that Mr. Wells

21  was out of the office quite a bit, and the commanding officer

22  was also out of the office doing some things, and it was really

23  just a scheduling issue.  We were waiting to get both of them

24  back at the COMMSTA on the same day to do the counseling.

25     Q.  Now, that winter while Mr. Wells was out, did projects

 1  get done?

 2      A.  Yes.

 3      Q.  And do you recall a project called the -- lights out,

 4  please -- called The Antenna Book?

 5      A.  I do.

 6      Q.  And what was The Antenna Book?

 7      A.  When I first got to the COMMSTA in 2010, it was more of

 8  a concept.  One of my first command operations briefs, the

 9  commanding officer asked me what the status was.  I really

10  didn't know what it was.  And they explained that they had asked

11  Mr. Wells to produce a book, which would at the end of the day

12  be a reference book of all of our antennas in the inventory.

13      Q.  And so did you say the CO, is that what you said?

14      A.  I did.  Commanding officer, CO.

15      Q.  And did you -- so the project eventually closed down

16  the chain of command to you, I assume?

17      A.  Well, they all worked for me, so ultimately I'm

18  responsible.

19      Q.  And who did you assign it to?

20      A.  Well, it was already assigned to Mr. Wells before I

21  even got there.  So I went and talked to him about it, and, you

22  know, reiterate the fact that he needed to start working on it.

23      Q.  And did it get done?

24      A.  Not by him.

25      Q.  So what did you end up doing with it?

1     A.  Well, after his extended absences and whatnot, The

2  Antenna Book was something the CO wanted, so I had ET1 Hopkins

3  start working on it.  And he created the first chapter in

4  consultation with myself and Rich Belisle.  We all had some

5  input, but he was really running with it.

6        And so we -- he finished the first chapter for antenna

7  1, transmit antenna 1, and that became the template for the rest

8  of the book.

9     Q.  And who else made a significant contribution to that

10  book?

11     A.  Seaman Henry.

12     Q.  And how was it that she was designated to work on that?

13     A.  Well, once we had the first chapter done, she just had

14  to get the information for each of the other antennas.  She was

15  pregnant and she couldn't work down in the rigger shop anymore

16  once she became pregnant.  We do a lot of dangerous work and

17  tools and whatnot.  So she came up the hill to work in the ET

18  shop, the IT shop helping them out.  So she had a lot of extra

19  time.  So I asked her to start with the rest of the chapters.

20     Q.  And did it get done?

21     A.  It ultimately got done.  But she had a lot of -- she

22  had a lot of issues getting it done.

23     Q.  We'll probably hear from her, so we don't need to talk

24  about that.

25     A.  Okay.

1      Q.  But did it get done?

2      A.  Ultimately it got done, yes.

3      Q.  And as the rigger shop supervisor, have you and the

4  crew found it to be useful?

5      A.  It's incredibly useful.  We use it every day.  Not just

6  us, there is a copy out by the ops deck for the operators to

7  use.  Whenever we need to reference an antenna characteristics,

8  we can just open up this book instead of hunting through files,

9  which is the way it was before.  There is a lot of disjointed,

10 unorganized files.

11     Q.  Now, at the point -- when that letter happened, or the

12 counseling happened on the fuel card letter, was that -- how

13 does that relate to the time where Mr. Wells kind of came back

14 from his illness?

15     A.  It was right around the time he got back from

16 recovering from surgery.

17     Q.  And did you notice any change of demeanor by him at

18 that time?

19     A.  I did.

20     Q.  And what did you notice?

21     A.  He was not participating really in much of the shop

22 functions.

23     Q.  Now, earlier you said that prior to that time he was in

24 the middle of all important activity.  Did he remain that way

25 after he returned?

1      A.  He did not.

2      Q.  Were you still working part time in the rigger shop?

3      A.  I was.

4      Q.  And were you in the same office as him?

5      A.  I was.

6      Q.  As part of that process, did you and the crew talk

7  about tasks and projects?

8      A.  We did.  We would discuss it, not only the crew, but

9  Mr. Belisle -- you know, basically the knowledgeable people.  So

10 Mr. Belisle, ET1, myself, and Mr. Wells was in there.  We would

11 discuss whatever we had going on that day or projects coming up

12 or damage -- we had a lot of damaged antennas that winter.  It

13 was one of the worst winters on record in Kodiak, and I think we

14 had six or seven antennas that were broken, so we were

15 discussing that kind of stuff.

16     Q.  Did the defendant participate in those discussions?

17     A.  He mostly would not.  He would have his back to us the

18 way he sat, his back was to us when we sat.  And we would be

19 talking about stuff.  And I was hoping that he would engage.  I

20 mean, he wouldn't, but I would try to get him to engage.

21         I would ask him questions on history of whatever asset

22 we were talking about, or if it to him it sounded like we were

23 heading down the right track as far as repair ideas, I was

24 trying to draw him into the conversation.

25     Q.  Were you successful?

1      A.   Not most of the time.  Mostly one-word answers.

2      Q.   Did you find that unusual, that he wasn't engaged when

3  he came back?

4      A.   I did.  I suspected why, but I did find it unusual.  It

5  was not what it was a year before, a year-and-a-half before.

6      Q.   At the time the defendant returned in February 2012,

7  that time frame, February, March, did you have any kind of

8  internal projects going on in the rigger shop?

9      A.   We had a lot of stuff going on in the rigger shop.

10     Q.   We've heard about -- we've heard a little bit today

11 about a warehouse clean-out.

12     A.   Yeah, yeah.

13     Q.   Was that going on?

14     A.   Yes, yes, we were definitely doing that.

15     Q.   And had you been to the warehouse?

16     A.   Yes.

17     Q.   Were you familiar with the equipment and what was

18 stored in the warehouse?

19     A.   I mean, I knew there was a lot of stuff in there.

20     Q.   And why did it need to be cleaned out?

21     A.   Well, it was a mess.  The commanding officer was

22 transferring that year and he wanted to make sure that before he

23 took his relief through there, that it was cleaned out.

24     Q.   And to your understanding, who was kind of responsible

25 for most of the equipment or gear and parts that were in there?

1      A.  Right.  It was mostly Mr. Wells.  There was a lot of
2  old stuff we didn't need anymore obviously, it was just crap.
3      Q.  And, you know, were the parts and fittings and things
4  you found in there, were some of it for equipment that you
5  weren't even using anymore?
6      A.  Some of it was completely antiquated, yes.
7      Q.  Then why was it -- your understanding, why was that
8  being retained?
9      A.  I never really got a good answer on that.
10      Q.  So who was leading that project?
11      A.  Mr. Belisle.
12      Q.  And are you aware or did you ever approach or are you
13  aware that he was approached about assisting with the project?
14      A.  Mr. Wells or Mr. Belisle?
15      Q.  Yeah, Mr. Wells.
16      A.  He was, yeah.  I asked him to help out.
17      Q.  And what was his response?
18      A.  Well, you know, at that time I would get the required
19  response, which is, "Yes, sure, whatever."  But then there
20  wouldn't be any action.  I mean, he was down there once or
21  twice, but that was when I came to him and I said, "There is
22  some stuff in a box.  We don't know what it is.  Can you come
23  down and take a look?"
24      Q.  And you were then working at least part of the time in
25  T2, right?

1    A.  Yes.

2    Q.  So what was he doing instead?

3    A.  A lot of time on his computer, sometimes he would

4  disappear.

5    Q.  Now, did you take any actions, you know, based upon his

6  failure to participate in that?

7    A.  I didn't really.  You know, my goal was to get him back

8  in as a productive member of the rigger shop by the time we had

9  to fix those antennas in the summer.  So I wasn't pushing him

10  too hard.  I was really just trying to get him into the process,

11  and I was unsuccessful.

12    Q.  Now, what activity was planned for the rigger shop on

13  April 12th of 2012?

14    A.  We were going to climb one of the 300 footers.

15    Q.  And did you discuss that climb prior to that day?

16    A.  We did, the morning before.

17    Q.  And was Mr. Wells in the office during that discussion?

18    A.  He was in the morning, yeah.

19    Q.  Did he engage in any of that discussion?

20    A.  He didn't.

21    Q.  Did anyone tell him he couldn't climb?

22    A.  Not at all.

23    Q.  Now, did you believe he was going to climb that day?

24    A.  I did not.  Based on his, you know, lack of putting any

25  input at all into the evolution, I assumed he was not climbing.

1    Q.  Had you ever seen him not go on a climb?

2    A.  No.

3    Q.  To your understanding as the supervisor, is there a

4  financial benefit for climb for the civilians?

5    A.  There is.

6    Q.  And what is that, as you understood it?

7    A.  They get a differential.  They get an added pay

8  depending on how high they go.

9    Q.  Now, I want to take you back to the day before the

10 murder, April 11th, 2012.

11      Did you work on a project that day with kind of all the

12 persons related to the case, the victims and the defendant?

13   A.  We did.

14   Q.  And what was that?

15   A.  That was a TacSat 4.

16   Q.  So now you're going to have to explain that.

17   A.  TacSat 4 is a project being run by the Navy and the

18 Marine Corps, the Army I think was involved, too.  Basically

19 it's satellite communications for the Arctic.  We were going to

20 have some assets up in the Arctic that summer, and these

21 antennas were going to allow us to communicate with them via

22 satellite at certain times of the day.

23   Q.  So where were you going to put the antenna?

24   A.  On the roof.

25   Q.  Of which building?

 1        A.  Of T1.

 2        Q.  And what was the discussion?  Was there a discussion

 3   about how to do that?

 4        A.  There was.  We were looking at where we were going to

 5   mount them, and then how we were going to run the transmit line

 6   up to it, the cables.

 7        Q.  And were there proposals, competing proposals on how to

 8   run the wire?

 9        A.  There were.  While we were up on the roof, we had

10   pretty much nailed down where we were going to put the antennas.

11   The discussion then turned to how we were going to run the

12   cable.  You know, there is a void or a space, it's like an attic

13   underneath where we were going to put them.  And Mr. Belisle

14   suggested that we run the cable inside and up to the antennas,

15   and Mr. Wells suggested we just throw the cable on shingles, if

16   you will, up to the antennas.

17        Q.  And who made the decision?

18        A.  I did.

19        Q.  And what did you decide?

20        A.  I decided that it would be better to run the cables

21   inside.  It would protect them from the elements and be a more

22   permanent installation in the event that these things became a

23   permanent part of COMMSTA, which often happens.

24        Q.  Now, which decision did you choose?

25        A.  I chose Mr. Belisle's.

1    Q.  And a year ago, a year before that, if you had had --
2  if you'd done the same thing, what kind of reaction would you
3  have expected from the defendant?
4    A.  I would have expected, you know, more push back, more
5  explanation as to why his idea was better and the other idea was
6  not good.  And I didn't --
7    Q.  What did you get?
8    A.  I got nothing.  He just kind of walked away.
9    Q.  Now, we're going to finish up and talk a little bit
10 about the building at T2.
11         Are there tools in the rigger shop?
12    A.  There are.
13    Q.  And why?  I mean, that seems obvious, but I'll let you
14 explain.
15    A.  Well, we maintain antennas and structures and all kinds
16 of things.  So we have all kinds of tools.
17    Q.  Are there tire changing tools?
18    A.  There are.
19    Q.  And are there pneumatic impact guns?
20    A.  There are.
21    Q.  And is there a place to work out of the weather?
22    A.  There is.
23    Q.  Do you allow people to do private work on their
24 vehicles, to some extent, in the rigger shop?
25    A.  I do.  As long as it's not going to take up space for

 1   any long period of time.  A simple tire change is definitely

 2   within -- something that is allowable.

 3        Q.  And let me ask exhibit --

 4             MR. SCHRODER:  Is it 392, Kim?  This one is that high

 5   resolution?  Okay.

 6    BY MR. SCHRODER:

 7        Q.  So Chief, I just wanted you to point out where all that

 8   equipment was on the rigger shop, the equipment, the kind of car

 9   maintenance type or vehicle maintenance type equipment?

10        A.  Sure.  It would be in this area.

11        Q.  And how would you get a car in there?

12        A.  These are doors, quite large.

13        Q.  And how big of -- how big are those doors?  What kind

14   of vehicle can get in there?

15        A.  I drive an F-350, and I can get my truck in there.

16        Q.  Now, let's also point out -- I take it there is tools.

17   It says "repair shop," but there are tools in there?

18        A.  Yes.

19        Q.  And where are there other places where there are tools

20   in the rigger shop?

21        A.  We had tools back on this back wall over here.  We had

22   some stuff down in the garage here, the Bobcat garage.  The wood

23   shop had tools here.

24        Q.  Why is it called the Bobcat garage?

25        A.  That's where we keep the Bobcat.

1      Q.  There you go.

2           So I'm going to want you to look at some photos.  Let

3      start with 274.  These are not yet admitted I don't think.

4               MS. DIXON:  No, they are not.

5               MR. SCHRODER:  All right.  It's not right.

6      (Pause)

7               MR. SCHRODER:  Let's start with this one.

8      (Whispered discussion off the record)

9       BY MR. SCHRODER:

10     Q.  Chief, are you familiar with this exhibit?  Are you

11     familiar with what this depicts?

12     A.  Yes, sir.

13     Q.  And how are you familiar with it?

14     A.  That's the garage area of T2.

15     Q.  Now, have you looked at these photos before?

16     A.  I have.

17     Q.  And is that a fair and accurate depiction of what the

18     shopped area looked like about the time of the murders?

19     A.  It is.

20               MR. SCHRODER:  Your Honor, move admission of 277.

21               MR. CURTNER:  No objection.

22               THE COURT:  It will be received.

23                              PLAINTIFF'S EXHIBIT 277 ADMITTED

24      BY MR. SCHRODER:

25     Q.  What are we seeing here?

 1        A.  You can see the -- you can see telescope.  Here is the
 2   table we were staging for the climb.  There is the light.  These
 3   are all Vidmars full of tools.  These are fittings, washers,
 4   nuts, bolts, that kind of stuff.
 5        Q.  Is this the repair shop area?
 6        A.  It is the repair shop area.
 7        Q.  Which end of it?
 8        A.  This is the end closest to the office.  So the furthest
 9   away from the garage doors.  The garage doors would be over in
10   this area.
11        Q.  What's the telescope for?
12        A.  We use it to look at the top of the towers so you don't
13   always have to climb.  You can get a sense of what's going on by
14   looking.
15        Q.  Exhibit 278.  Chief, I'm going to ask you to look at
16   Exhibit 278.  Are you familiar with this?
17        A.  I am.
18        Q.  And how are you familiar with it?
19        A.  It's the garage area of T2.
20        Q.  Is it a fair and accurate depiction of the way that
21   garage looked about the time of the homicides on April 11th or
22   12th?
23        A.  It is.
24             MR. SCHRODER:  Your Honor, move to admit 278.
25             MR. CURTNER:  No objection.

 1           THE COURT:  It will be received.

 2                          PLAINTIFF'S EXHIBIT 278 ADMITTED

 3   BY MR. SCHRODER:

 4      Q.  Now what part of the garage is this?

 5      A.  Whoever took that picture, their back is to the garage

 6   doors directly behind them.

 7      Q.  And point out some of the stuff we see in this picture.

 8      A.  Okay.  We have a snowplow, we have some welding

 9   equipment right here.  We have some tools.  This is full of

10   tools.  We have an LP air which runs any of our pneumatic tools,

11   like the impact gun right here.  Long hoses.  We have a jack

12   right here for lifting up cars.

13      Q.  All right, 279.  And are you familiar with this

14   exhibit, 279?

15      A.  Yes, sir.

16      Q.  And how are you familiar with it?

17      A.  It's the garage repair area of T2.

18      Q.  Does this show a slightly different angle than the last

19   one?

20      A.  That's correct.

21      Q.  And is it a fair and accurate representation of how

22   that garage looked on April 11th or 12th, 2012?

23      A.  It is.

24           MR. SCHRODER:  Move for admission of 279, Your Honor.

25           MR. CURTNER:  No objection.

1      THE COURT:  It will be received.

2                        PLAINTIFF'S EXHIBIT 279 ADMITTED

3   BY MR. SCHRODER:

4      Q.  Now, is this -- if you look farther past that

5   particular part of the garage, do you see anything of your key

6   equipment farther up there?

7      A.  Sure.  We have some ATVs over here.  This is a

8   sandblaster.  More Vidmars.

9      Q.  Great, thank you.

10         MR. SCHRODER:  Now, Kim, let's move on to 280.  Which

11  one was that one, Kim, 280?  Let's get 283.

12  BY MR. SCHRODER:

13     Q.  Chief, do you see that picture?

14     A.  Yes, sir.

15     Q.  Are you familiar with that?

16     A.  I am.

17     Q.  And how are you familiar with it?

18     A.  That's the wood shop.

19     Q.  And that's the kind of opposite end of the building of

20  the repair garage?

21     A.  That's correct.

22     Q.  And is that a fair and accurate representation of how

23  it looked on about the time of the murders?

24     A.  Yes, sir.

25         MR. SCHRODER:  Move admission of 283, Your Honor.

```
 1            MR. CURTNER:  No objection.
 2            THE COURT:  It will be received.
 3                         PLAINTIFF'S EXHIBIT 283 ADMITTED
 4    BY MR. SCHRODER:
 5       Q.  Could you point out some of the tools in that --
 6       A.  Sure.  We have a chop saw, drill press.  These are full
 7    of drill bits and sandpaper and clamps and that kind of thing.
 8    We have a planer back here.
 9       Q.  Let's move on to Exhibit No. 275, hope we get lucky.
10            And what does this picture depict, Chief?
11       A.  That's the Bobcat garage.
12       Q.  And, again, is that a fair and accurate representation
13    of the garage on that day?
14       A.  Yes, sir.
15            MR. SCHRODER:  Move admission of 275, Your Honor.
16            MR. CURTNER:  No objection.
17            THE COURT:  It will be received.
18                         PLAINTIFF'S EXHIBIT 275 ADMITTED
19            MR. SCHRODER:  Only got two more.
20    BY MR. SCHRODER:
21       Q.  And what is this -- in the Bobcat garage you said it's
22    where they keep the Bobcat.  So what do we see in this picture?
23       A.  We have -- I think that's the forks for the Bobcat we
24    use for moving stuff around.  Immediately behind it is the brush
25    cutter that we use for taking down alders and small trees.  Then
```

1   this is all rigging shop, rigger equipment for rigging up for

2   various lifting evolutions or that kind of thing.

3            MR. SCHRODER:  Kim, 276.

4    BY MR. SCHRODER:

5       Q.  Can you see that photo, Chief?

6       A.  Yes, sir.

7       Q.  And what does that depict?

8       A.  That's the other angle of the Bobcat garage.

9       Q.  Show the opposite wall?

10      A.  Yes, sir.

11      Q.  And, again, is that a fair and accurate representation

12   of how it looked at the time of the murders?

13      A.  Yes, sir, it is.

14           MR. SCHRODER:  Your Honor, move admission of 276.

15           MR. CURTNER:  No objection.

16           THE COURT:  It will be received.

17                           PLAINTIFF'S EXHIBIT 276 ADMITTED

18    BY MR. SCHRODER:

19      Q.  And what do we see in this -- but what are the black --

20   what are the black iron things at the bottom there?

21      A.  So those are the forks I mentioned earlier for the

22   Bobcat.  And this would be the brush cutter.

23      Q.  What do we see on the wall?

24      A.  We have a ladder.  We have straps.  We have ropes

25   and -- yeah.

1      Q.  Rigging equipment?

2      A.  Rigging equipment, yes, sir.

3      Q.  All right, one more.

4          MR. SCHRODER:  281, Kim.

5   BY MR. SCHRODER:

6      Q.  And are you familiar with this photo, Chief?

7      A.  Yes.  Yes, sir.

8      Q.  And what is it?

9      A.  It's the break area.  The non-rate area we often called

10  it.

11     Q.  And is this a fair and accurate representation of what

12  that area looked like at the time of the homicide?

13     A.  Yes, sir.

14         MR. SCHRODER:  Your Honor, government moves Exhibit

15  281 into evidence.

16         MR. CURTNER:  No objection.

17         THE COURT:  Received.

18                         PLAINTIFF'S EXHIBIT 281 ADMITTED

19  BY MR. SCHRODER:

20     Q.  And what are we looking at there?

21     A.  That's one end of that space.  We had some lockers

22  here.  TV, VCR.  Some VHF radios right here.

23     Q.  What do you use the radios for?

24     A.  We use them for when we're working on towers mainly.

25  So if someone -- whenever we climb, we always have at least one,

1  but probably two radios on the tower so that we can communicate

2  back and forth.

3      Q.  Chief, after the homicides at some point when you

4  were -- we're going to bring them back up.  We can leave it up.

5          After the homicides, were you -- at some point did you

6  walk through the T2 building to try to examine whether there

7  were any items missing from the building?

8      A.  Yes, sir, I did.

9      Q.  And did you notice any significant items missing?

10     A.  No, sir, I didn't.

11     Q.  Now, let's look at that.  The TVs, the TV, the radios,

12  were they still there?

13     A.  They were.

14         MR. SCHRODER:  Let's go back to -- what was the last

15  one, 275?  Let's just work our way back.  276, I mean.

16  BY MR. SCHRODER:

17     Q.  Any of the rigging equipment or the ladder missing,

18  Chief?

19     A.  No, sir.

20     Q.  275.  Any of that rigging equipment on that wall

21  missing?

22     A.  No, sir.

23     Q.  Any of the Bobcat parts missing?

24     A.  No, sir.

25     Q.  283.  That saw there in the middle, I'm not a

1    carpenter, but I'd call it a chop saw or a miter saw or

2    something like that.  Is that missing?

3        A.  It was not.

4        Q.  How about the drill press?

5        A.  It was not.

6        Q.  Next one.  Any of the items in this photo, the ATVs,

7    snowplow, any of that missing, Chief?

8        A.  No, sir.

9        Q.  Probably don't have to go -- the welding equipment you

10   showed, was that still there?

11       A.  It was still there.

12            MR. SCHRODER:  Okay, you can go back.  What was the

13   first one we did, 277, 278.

14            MS. DIXON:  (Indiscernible).

15            MR. SCHRODER:  Go to 277.

16    BY MR. SCHRODER:

17       Q.  How about the telescope?

18       A.  It's still there.

19       Q.  Chief, you talked about -- you talked about Mr. Belisle

20   kind of rising -- you know, kind of rising to a higher level.

21   But Petty Officer Hopkins, did you have an occasion in that year

22   to nominate him for any awards?

23       A.  I did.  I nominated him for Sailor of the Year.

24       Q.  And what was the result of that?

25            THE COURT:  Pardon?  I didn't catch that, for

1    something.

2               MR. SCHRODER:  Sailor of the Year, Your Honor.

3               THE COURT:  Sailor.

4    BY MR. SCHRODER:

5        Q.  And what was the result of your nomination?

6        A.  He was actually -- he competed -- his nomination

7    competed at the district level.  He didn't win at the district

8    level, but he did win COMMSTA Kodiak Sailor of the Year.

9        Q.  So he was the COMMSTA Kodiak Sailor of the Year that

10   year?

11       A.  That's correct.

12       Q.  And what kind of -- we're not going to ask you to take

13   a look at the -- we've had the CO take a look at some of those

14   documents -- but what kind of actions did you include in

15   nominating him for Sailor of the Year?  What was the basis of

16   that?

17       A.  It was Sailor of the Year 2011.  Shemya was huge, he

18   was a huge part of that.  All his evolutions.  He was the kind

19   of guy who, as a supervisor, didn't just bark orders, but I got

20   great pictures of him in the trenches with a shovel, like that's

21   the kind of guy he was.  So mostly that.  There were some other

22   things that stood him apart from his peers that year.

23       Q.  Was he proud of that award?

24       A.  He was.

25               MR. SCHRODER:  No further questions, thank you.

```
 1              THE COURT:  Cross-examination.
 2              MR. CURTNER:  Your Honor.  I wonder if we could start
 3   Monday morning.  There is no way I'm going to be able to
 4   complete my cross-examination in the time we have left.
 5              MR. SCHRODER:  We got half an hour, Your Honor.  We
 6   don't have to end it.
 7              MS. LOEFFLER:  45 minutes.
 8              THE COURT:  How about if we go to 4 o'clock?
 9              MR. CURTNER:  I can could that.
10              THE COURT:  Can you start?
11              MR. CURTNER:  I can do that.  I can get started.
12              THE COURT:  That's a fair --
13                          CROSS-EXAMINATION
14    BY MR. CURTNER:
15       Q.  Chief Reckner --
16       A.  Yes, sir.
17       Q.  -- I understand that you were in the Navy?
18       A.  I was.
19       Q.  And then when you couldn't get a job, you went into the
20    Army; is that correct?
21       A.  That's correct.
22       Q.  And you didn't like the Army, so you were a
23    stay-at-home dad for a while?
24       A.  Actually, I liked the Army a lot.  I was actually quite
25    good at it.  I just didn't like my job.
```

1      Q.  Didn't like your job in the Army?

2      A.  That's right.

3      Q.  And then you came to COMMSTA in July of 1974 --

4      A.  2010.

5      Q.  I'm sorry, 2010.  Now, you say you looked through Mr.

6  Wells' personnel file?

7      A.  I did.

8      Q.  And did you go back into his Navy records?

9      A.  I didn't have his Navy records, no, sir.

10     Q.  They weren't in his personnel file there?

11     A.  They weren't.

12     Q.  Did you know, since you were viewing his background,

13  that he had won certain medals and he had certain achievements

14  in the Navy?

15     A.  I did not know that, no.

16     Q.  Did you know he had won the National Defense Service

17  Medal here in the Navy?

18     A.  I did not know that, but I would assume -- he would

19  have got that because we all get that.

20     Q.  How about the Vietnam Service Medal.  Does everybody in

21  the Navy get that?

22     A.  If they serve in Vietnam, they probably got it, yes,

23  sir.

24     Q.  And same way as a Vietnam Campaign Medal, everybody

25  gets that?

1      A.  If they serve in that campaign, they would have got

2  that, yes, sir.

3      Q.  Okay, how about his Coast Guard awards and

4  recognitions, did you review those at all?

5      A.  They are not part of that record, no, sir.

6      Q.  Did you know that he had earned the Coast Guard

7  achievement medal with one gold star?  Is that one everybody

8  gets, too?

9      A.  You've got to earn that one, but a lot of people have

10 it.  I would hope that he would, after 13 or 14 years in the

11 Coast Guard, he would have an achievement medal or two.

12     Q.  How about -- actually, he was in the Coast Guard for 12

13 years.

14     A.  Okay.

15     Q.  Coast Guard Unit Commendation Ribbon?

16     A.  That's a unit ribbon, so something he did as part of

17 the unit and the whole unit got that.

18     Q.  And he was part of that unit?

19     A.  Sure.

20     Q.  And Coast Guard Meritorious Unit Commendation Ribbon?

21     A.  Yes, sir, same thing.

22     Q.  Coast Guard Sea Service Ribbons?

23     A.  Got it for (indiscernible).

24     Q.  It's kind of like how you got your ribbons, because you

25 were there?

1      A.   You were there and you, you know, you did some stuff,

2   you're going to get some ribbons, absolutely.

3      Q.   How about the Coast Guard Achievement Medal, is that

4   something significant?

5      A.   It is, yeah.   It's good to have.

6      Q.   And that's something -- are you aware that Mr. Wells

7   got the Coast Guard Achievement Medal?

8      A.   I wasn't aware of, but again, I would assume that he

9   would.

10      Q.   Why would you assume that?

11      A.   Well, any -- it's one of those medals that you often

12   get at the end of a tour.   So if you've done some really good

13   stuff during tour, then you generally -- or if you do something

14   special, you might get one.

15      Q.   Now that's a pretty significant award; right?

16      A.   It is.   It's good.

17      Q.   Do you have that medal?

18      A.   I have a couple of them, yes.

19      Q.   Couple of those, yes?

20      A.   An Army achievement one, too.

21      Q.   Now, when you came to COMMSTA, when did you go to the

22   chief's academy?

23      A.   It was in March, April, 2011.

24      Q.   So that was after you had gotten there and then you

25   went to the academy?

1          A.   That's correct.

2          Q.   And you went to the leadership and management school

3      there?

4          A.   I went to LAMS in Charleston, South Carolina, it's

5      another school.

6          Q.   Now, when were you promoted to chief?

7          A.   In January 1st, 2010.

8          Q.   So after you were promoted to chief, that's when you

9      were reassigned to COMMSTA, close to that time?

10         A.   I was reassigned -- I was reassigned to COMMSTA.  I got

11     orders before I was promoted to chief.  I was above the cut.  So

12     actually I got orders for COMMSTA -- well, I put in my dream

13     sheet in 2009, and you're right, I actually got hard copy orders

14     in 2010, the winter of 2010.

15         Q.   Now, so this was a new promotion for you to chief.

16     That was something you felt proud of yourself; right?

17         A.   Absolutely.

18         Q.   And of course you were looking to perhaps achieve

19     higher ranks and move up the ranks; is that correct?

20         A.   Yes, sir.

21         Q.   And then when you got to COMMSTA, did you know the

22     history of the rigger shop?  Because Mr. Wells had been there

23     for 22 years.

24         A.   Right.

25         Q.   And did you know they had a long history and reputation

1    for performance there?

2        A.  I quickly learned that the rigger shop was something

3    that a lot of other units relied on for lots of different

4    things.

5        Q.  And they were -- it was a smooth operation?

6        A.  I wouldn't say that.

7        Q.  Well, you had a different impression when you got

8    there?

9        A.  Well, looking through the record, I could see it was

10   not always smooth.

11       Q.  Okay, but wasn't their reputation -- didn't Mr. Wells

12   have a national reputation?

13       A.  These guys -- you know, I'm pretty sure -- those are my

14   words that came out.  I said that he was widely recognized in

15   the Coast Guard tower community as knowledgeable.  And that's

16   true.

17       Q.  Yeah, thank you.  So he did his job and he did it well?

18       A.  He did his job and he did it well at the time.  At the

19   time I did believe that, yes.

20       Q.  Now, in your military career, did you ever have to work

21   with a combination of military and civilian employees?

22       A.  I had, yes.

23       Q.  So there is a big difference there; right?

24       A.  There is a difference.

25       Q.  Civilian employees are civil service, they have

1  different rules and regulations that they have to abide by;

2  right?

3       A.  That's correct.

4       Q.  Military have to follow orders just like the person

5  under your supervision?

6       A.  Well, everybody as a part of the organization has to

7  follow orders, it doesn't matter if you're a civilian or you're

8  a uniformed service member.  Iff you're a part of the

9  organization, you're expected to follow the orders of those

10 above you.

11      Q.  The non-rates have to follow orders.  They have to do

12 what they are told?

13      A.  That's correct.

14      Q.  The ET, electronic technicians, if you tell them to

15 clear out the warehouse, they don't ask questions, they just do

16 what you tell them?

17      A.  That's not entirely true, but yes.

18      Q.  And then when you got to COMMSTA with your -- part of

19 your responsibilities was to do performance evaluations?

20      A.  That's correct.

21      Q.  And you did a performance evaluation that first year

22 you were there for Mr. Wells?

23      A.  I did.

24      Q.  And have you reviewed that lately?

25      A.  It's been a while.

1                MR. CURTNER:  Let's call up defense Exhibit 084.

2      BY MR. CURTNER:

3          Q.  I want you to look at -- on the screen.  Do you see

4      that?

5          A.  I do.

6          Q.  What is that?

7          A.  That's the performance plan and evaluation.

8          Q.  And what's the period for that appraisal period?

9          A.  1 April 2010 to 31 March 2011.

10         Q.  And that was one -- you were the rater in that?

11         A.  I was.  Initially it was Chief Smith, Senior Chief

12     Smith I think at the time.  He initiated that process.  If you

13     look at the date, it was dated in April and I wasn't there yet.

14     But at the end of the marking period, yes, that's me.

15         Q.  So this is your performance evaluations of Mr. Wells?

16         A.  For the time that I had him in my chain of command,

17     yes.

18              MR. CURTNER:  I'd like to admit this as a defense

19     exhibit.

20              MR. SCHRODER:  No objection.

21              MR. CURTNER:  And publish it, please.

22              THE COURT:  Very well.

23                              DEFENDANT'S EXHIBIT DE-084 ADMITTED

24     BY MR. CURTNER:

25         Q.  Okay, so as you can see at the top of this form, the

 1    appraisal period, that's April 1, 2010 to March 31, 2011?

 2        A.  That's correct.

 3        Q.  And the in part V, Roman Numeral V, you see the --

 4    basically the rating that -- overall rating that you provided

 5    for Mr. Wells?

 6        A.  That's correct.

 7        Q.  And you noted he exceeds his performance in the annual

 8    rating; is that correct?

 9        A.  That's correct.

10        Q.  And that was approved by the XO, Lieutenant Pizzurro?

11        A.  That's correct.

12        Q.  Now, let's go to -- into that a little bit.

13            If we go to the second page of that, you can see where

14    there is an area where you have to evaluate Mr. Wells's

15    performance, his applied skill -- his job knowledge and skills;

16    do you see that?

17        A.  Yes, I do.

18        Q.  And you rated him as he exceeds expectations on that;

19    correct?

20        A.  Could you blow that up?

21        Q.  Yes.  Is that your mark?

22        A.  It is.

23        Q.  Is that your evaluation of Mr. Wells' work?

24        A.  At that time, yes, sir.

25        Q.  And then let's go down to where it says "team work."

1    Now, there you felt that he meets expectations; is that right?

2        A.  That's correct.

3        Q.  And if we go to the next page, and go about three boxes

4    down, do you see the quality of his work?

5        A.  Yes, sir.

6        Q.  And when you completed this evaluation of Mr. Wells

7    back in 2011, you found that his quality of work exceeded

8    expectations; didn't you?

9        A.  That's correct.

10       Q.  Same way as safety?

11       A.  Yes.

12       Q.  Do you see down a little bit further, you'll see that

13   he exceeds performance and expectations on safety issues?

14       A.  Yes, sir.

15       Q.  Now, I wonder if we could jump ahead to -- would you

16   agree that's a pretty good evaluation?

17       A.  For that period of marking.

18       Q.  What it refers to; right?

19       A.  Yes.

20       Q.  That's what we're talking about.  And you've completed

21   this; right?

22       A.  I did.

23       Q.  And that was a performance evaluation.  And on page 7

24   of that, there was a narrative --

25       A.  Yes.

1      Q.  -- to explain your evaluation; is that right?

2      A.  That's correct.

3      Q.  I wonder if you can read that narrative that you

4  completed on Mr. Wells' evaluation.

5      A.  Sure.

6      Q.  Start from the beginning.

7      A.  "Mr. Wells has performed well this period.  He provided

8  training and service to several units in and out of D 17.  In

9  addition, he made several trips to Shemya and Attu to remove and

10 relocate HF remote sites from Attu to Shemya.  Applied job

11 knowledge and skills as a lead tower mechanic.  Mr. Wells lead

12 the team that installed the temporary HF remote site on Shemya.

13 He was on site on Attu when the switch was made from the

14 existing HF site to the new site on Shemya, ensuring the switch

15 was successful.  Mr. Wells has been the resident expert for

16 COMMSTA in the planning, procurement, and is a technical advisor

17 for the TCI (indiscernible) tower erection project.  He surveyed

18 the locations for the antenna and equipment hut.  Mr. Wells was

19 a lead on installing the failing antenna for use until the new

20 antennas can be installed.  His knowledge and experience are

21 vital to our success.  Team work."

22     Q.  Team work, yes, let's talk about team work, go ahead.

23     A.  Sure.  "Mr. Wells conducted tower climbing and rescue

24 training for D 17 and D 14 units qualifying over 45 personnel.

25 This greatly enhanced the mission and readiness for those units.

1   Mr. Wells also attended the Coast Guard Tower Conference in

2   Arlington, Virginia.  He trained 12 junior officers and several

3   CEUs, ESUs, R21, DGPS programs in tower inspections and safety."

4        Q.  Okay.  And then the quality of his work?

5        A.  Sure.  "Mr. Wells completed several projects,

6   (indiscernible) repairs and training that may -- that have been

7   of the highest quality."

8        Q.  And then his safety?

9        A.  "Mr. Wells provided tower safety and rescue training to

10  units, including but not limited to D 14, D 17, CEUs, ESUs, R21,

11  DGPS communities.  His constant oversight ensured the safe

12  operation of equipment in the rigger shop.  He continues to

13  serve on the COMMSTA safety board."

14       Q.  Okay, and you wrote that narrative?

15       A.  I did.

16       Q.  And that's all true?

17       A.  It is.

18       Q.  That sounds like a pretty outstanding evaluation of his

19  performance; is that correct?

20       A.  It's pretty good.

21       Q.  Now, let's go to the next page, page 8.  What is that?

22       A.  That is a recommendation for a performance bonus.

23       Q.  So somebody who does have an excellent performance

24  evaluation, they might qualify for a performance-related award?

25       A.  Yes, I would recommend that.

1      Q.   In Mr. Wells' case, as part of this evaluation, you

2  recommended him for a performance award?

3      A.   I did.

4      Q.   And so what amount of award did you recommend?

5      A.   The maximum allowed.

6      Q.   And that basically endorses your evaluation as an

7  excellent work evaluation for Mr. Wells?

8      A.   That's correct.

9      Q.   Now, you would have been then doing the performance

10 evaluation for the following year?

11     A.   Yes, sir.

12     Q.   Do you recall preparing that evaluation?

13     A.   I do.

14     Q.   Do you recall that when you did that evaluation, it's

15 the same form that we just saw?

16     A.   It is.

17     Q.   And do you recall that in that evaluation that you were

18 performing, you were completing, that you felt that Mr. Wells

19 met all the -- everything that was expected in those different

20 areas; is that correct?

21     A.   Yes.  And, in fact, I added some of the core

22 competencies that year, because I felt the year before they were

23 a little light.

24     Q.   Okay, so you felt that the next year, up until March

25 2012, that overall he was meeting expectations; that's what you

1  noticed?

2      A.  As far as I can recall, March 2012 when I signed that

3  document for the 2011, yes.

4      Q.  And as far as applied knowledge and skills, he met

5  those expectations, correct; that was your evaluation?

6      A.  Yes, sir.

7      Q.  And team work, meets expectations?

8      A.  Meets.

9      Q.  Yes.  And you would have noted if he failed to meet the

10 expectations and performance; right?

11     A.  I would have, but there was another occasion later on,

12 a few years later, where I wanted to give Mr. Wells a not meets.

13 And I was informed by Stacy Hofler -- actually, the XO, Mr.

14 Pizzurro, called her when I brought it to his attention.  And

15 she said in order to give a civilian member a not meets, you

16 have to have paperwork and you have to allow that member to

17 correct the action.

18     Q.  Excuse me, Chief, when did you complete this?

19     A.  That was in 2012.

20     Q.  Okay.  And so you had some kind of advice that you're

21 not supposed to check the fails to meet before that?

22     A.  No, it was later on.

23     Q.  But after you completed this?

24     A.  Yes.

25     Q.  When you competed this --

1      A.  We do those every year.

2      Q.  Okay.  When you did your evaluation of Mr. Wells, up

3  until 2012, the end of March 2012, you felt that he met all

4  these expectations?

5      A.  That's correct.

6      Q.  You could have checked failed to meet, but you didn't?

7      A.  That's correct.

8      Q.  And you added another one for communication?

9      A.  Yes.

10     Q.  That was an area that you thought should be evaluated?

11     A.  Correct.

12     Q.  And you found that he meets those expectations?

13     A.  Correct.

14     Q.  Quality of work, again, he meets those expectations?

15     A.  Correct.

16     Q.  Timeliness and quantity of the work, meets

17  expectations?

18     A.  Correct.

19     Q.  Safety, of course, meets expectations?

20     A.  Yes.

21     Q.  Now, that was never completed.  Do you remember doing

22  your first review in October 2011?

23     A.  Yes.

24     Q.  And there is supposed to be a discussion about that

25  evaluation at that time?

```
1         A.  Yes.
2         Q.  But Mr. Wells was not available due to sickness; do you
3    remember that?
4         A.  That's correct.
5         Q.  So he was sick that fall?
6         A.  Right.
7         Q.  And then there should have been another evaluation the
8    end of February 2012, a second discussion?
9         A.  Yes.
10        Q.  And he was not available then because of sickness?
11        A.  Right.
12        Q.  So he had been sick for -- and on sick leave a lot
13   since October 2010 through February of 2011; is that correct?
14        A.  No.  I think you have your dates mixed up.  He was sick
15   from August -- well, October 2011 through February of 2012.
16        Q.  Isn't that what I said?
17        A.  No, you were a year before.
18        Q.  Oh, I'm sorry.  Okay, so you agree, he was sick the end
19   of 2011 and the first part of 2012 through February?
20        A.  Yes, sir, he was.
21        Q.  All right, thank you.
22             MR. CURTNER:  Judge, before I move on, I have other
23   things to talk about, but I think we're done with this section.
24             THE COURT:  Big hand is not to the 12.
25             MR. CURTNER:  Well, I can ask the --
```

1          THE COURT:  All right, all right, all right.  Okay,

2  ladies and gentlemen, how are you doing?  We're spoiling you.

3  You got a three-day weekend.  You may not have heard this

4  before, but I'm going to read it again, okay.

5          I will now say a few words about your conduct as

6  jurors.  First, keep an open mind throughout the trial and do

7  not decide what the verdict should be until you and you fellow

8  jurors have completed your deliberations at the end of the case.

9          Second, because you must decide this case based only

10  on the evidence received in the case and on my instructions as

11  to the law, you must not be exposed to any other information

12  about the case or to the issues it involves during the course of

13  your jury duty.  Thus, until the end of the case, or unless I

14  tell you otherwise, do not communicate with anyone in any way

15  and do not let anyone else communicate with you in any way about

16  the merits of the case or anything to do with it.  This includes

17  discussing the case in person, in writing, by phone or

18  electronic means, e-mail, text messaging, or any Internet chat

19  room, blog, website or other feature.  This applies to

20  communicating with your fellow jurors until I give you the case

21  for deliberations.  And it applies to communicating with anyone

22  else, including your family members, your employer, the media or

23  press and the people involved in the trial.  Although you may

24  notify your family and your employer that you have been seated

25  as a juror in the case.  By now I hope they know that.  Four

1   days into the case they should know you're here.

2          But if you are asked or approached in any way about

3   your jury service or anything about the case, you must respond

4   that you have been ordered not to discuss the matter and to

5   report any contact to the Court.

6          Because you will receive all the evidence and legal

7   instruction you properly may consider to return a verdict, do

8   not read, watch, or listen to any news or media accounts or

9   commentary about the case or anything to do with it.  Do not do

10  any research such as consulting dictionaries, searching the

11  Internet, or using other reference materials.  And do not make

12  any investigation or in any other way try to learn about the

13  case on your own.

14         The law requires these restrictions to ensure the

15  parties have a fair trial based on the same evidence that each

16  party has had the opportunity to address.  A juror who violates

17  these restrictions jeopardizes the fairness of these

18  proceedings.  Any jurors exposed to any outside information,

19  please notify the Court immediately.

20         You got the point?  You know, it's not always easy,

21  but it's necessary.  Now, we're about to take a three-day

22  weekend, that's why I read it to you again.  Some of you are

23  traveling.  Hope you have good, pleasant travels, but you have

24  to be back here ready to go to trial Monday morning to start in

25  the big room at 8:20.  Start at 8:30 sharp.  Any questions about

1   anything about this?  Have a great weekend, thank you.

2                              (Jury not present)

3         THE COURT:  Okay, please be seated.  All right, looks

4   like, sir, you've got to be back here Monday morning, too.

5     A.  Yes, sir.

6         THE COURT:  8:20 ready to go.  You're free for the

7   weekend, too, thank you, you're excused.

8   (Witness excused)

9         THE COURT:  Anything else from the government?

10        MR. SCHRODER:  No, Your Honor.

11        THE COURT:  Anything from the defense?

12        MR. CURTNER:  No, Your Honor, thank you.

13        THE COURT:  I always look at the jury instructions.  I

14   haven't heard the government's response to the request for

15   third-party culpability instruction.  I'll be looking for that.

16   Everything else looks pretty straightforward.  There is not

17   going to be a request for lesser includeds.  So think about

18   that.

19        And I'm serious, what are we going to do if they want

20   to replay one of these videos?

21        MR. CURTNER:  Mr. Johnson has an answer.

22        MR. JOHNSON:  I'm going to make -- for each one of our

23   videos, I'm going to have a DVD for each video that we have

24   individually marked.

25        THE COURT:  And so they will need a DVD player?

1          MR. JOHNSON:  Or a computer.

2          THE COURT:  Or a computer.

3          MR. JOHNSON:  Just a computer of some sort.

4          MR. SCHRODER:  You have a jury room that's all

5  prepared for that, Judge?  We made that recommendation that that

6  could potentially be used.

7          THE COURT:  That's a possibility, okay.  So do you

8  understand what they just said, Nancy?

9          THE CLERK:  I don't know if that room is available.

10          THE COURT:  We'll check on it, if necessary.  But they

11  could probably come back in here and play it somehow in here,

12  too, isn't that right?

13          THE CLERK:  Yes.

14          THE COURT:  So we need to be thinking about it,

15  because I want it to go smooth.  All right, thank you, have a

16  great weekend.

17          THE CLERK:  All rise.  This matter stands in recess

18  until Monday morning at 8:30 a.m.

19              (Proceedings recessed at 4:03:59 p.m.)

20

21

22

23

24

25

1                           CERTIFICATION

2

3       I, LEONARD J. DiPAOLO, RPR, CRR, CCP, court-approved

4   transcriber, certify that the foregoing is correct transcript

5   from the official digital electronic sound recording of the

6   proceedings in the above-entitled matter.

7

8

9   _____        ___9/8/14____
    Leonard J. DiPaolo, RPR, CRR, CCP              Date
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                        I-N-D-E-X

2    WITNESSES:           DIRECT   CROSS   REDIRECT   RECROSS

3    FOR THE PLAINTIFF:

4    Meredith Lann, M.D.    715      756      762        -

5    Vicki June Grimes      765      780       -         -

6    Stephen Mark Cartier   784      800      808       808

7    Steven Harold Salus    810      816      821        -

8    Thomas Jefferson
     Eskew, III             822      832      843       845
9
     James Encinas          850      859      868        -
10
     Scott Allen Reckner    870      951
11

12   EXHIBITS:                               ADMITTED

13   FOR THE PLAINTIFF:

14   184-A:  Photo - Autopsy of Mr. Hopkins' body        720

15   184-B:  Photo - Front head wound                    723

16   184-C:  Photo - Back of head wound                  725

17   184-D:  Photo - Skull fracture with bullet fragments 727

18   184-F:  Photo - Injuries above navel                731

19   184-G:  Photo - Abdomen wound left side             737

20   198:    Diagram of Hopkins' body by Dr. Lann        738

21   185-A   Photo - Mr. Belisle - body before autopsy   741

22   185-B   Photo - Back of right arm                   741

23   185-C   Photo - X-ray of spine with bullet          743

24   185-D   Photo - Projectile taken from neck          745

25   185-E   Photo - Right chest wounds                  746
```

```
 1   EXHIBITS:                                    ADMITTED

 2   FOR THE PLAINTIFF:

 3   185-F:  Photo - Relational body shot left side     749

 4   185-G:  Photo - Abdomen wound left side            750

 5   185-H:  Photo - Right index finger                 752

 6   199:    Diagram of Belisle body by Dr. Lann        753

 7   200:    Photo - Wallet - Mr. Hopkins               770

 8   201:    Photo - Wallet, money Mr. Belisle          771

 9   218:    Shirt of Hopkins                           772

10   219:    Pants of Hopkins                           773

11   221:    Bullet from Belisle's neck                 774

12   229:    Belisle black undershirt                   774

13   230:    Belisle's brown top shirt                  774

14   388:    Chart of evidence collected                776

15   99:     Photo - Wells' white truck                 876

16   159:    Audio recording of voicemaile left for
             Reckner                                    886
17
     3-D:    Wells' personnel record, supervisor's copy 894
18
     277:    Photo - Main shop telescope                941
19
     278:    Photo - T2 main shop equipment             943
20
     279:    Photo - T2 main shop equipment             944
21
     283:    Photo - T2 wood shop                       945
22
     275:    Photo - T2 Bobcat garage                   945
23
     276:    Photo - Bobcat garage                      946
24
     281:    Photo - T2 TV and radios                   947
25
```

```
1    FOR THE DEFENDANT:

2    DE-084: Performance evaluation for Mr. Wells 2010     958

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```