1          UNITED STATES DISTRICT COURT
                DISTRICT OF ALASKA
2
   UNITED STATES OF AMERICA,   )     Case No. 3:13-cr-00008-RRB
3                              )
                Plaintiff,     )     Anchorage, Alaska
4                              )     Tuesday, July 8, 2014
      vs.                      )     9:00 a.m.
5                              )
   JAMES MICHAEL WELLS,        )     IMPOSITION OF SENTENCE
6                              )
                Defendant.     )
7                              )

8                TRANSCRIPT OF PROCEEDINGS
                  Pages 1 - 28, inclusive
9
            BEFORE THE HONORABLE RALPH R. BEISTLINE
10               UNITED STATES DISTRICT JUDGE

11  A P P E A R A N C E S:
    For Plaintiff:    KAREN LOEFFLER, ESQ.
12                    BRYAN D. SCHRODER, ESQ.
                      KATHLEEN ANN DUIGNAN, ESQ.
13                    U.S. Attorney's Office
                      222 W. 7th Avenue, #9
14                    Anchorage, Alaska 99513
                      Ph: 907/271-5071
15
    For Defendant:    F. RICHARD CURTNER, ESQ.
16                    Federal Public Defender's Agency
                      601 W. 5th Avenue, Suite 800
17                    Anchorage, Alaska 99501
                      Ph: 907/646-3400
18
                      PETER OFFENBECHER, ESQ.
19                    Skellenger Bender, P.S.
                      1301 5th Avenue, Suite 3401
20                    Seattle, Washington 98101-2605
                      Ph: 206/623-6501
21
    Court Recorder:   NANCY LEALAISALANOA
22                    U.S. District Court
                      222 W. 7th Avenue, Box 4
23                    Anchorage, Alaska 99513
                      Ph: 907/677-6111
24

25

1    A P P E A R A N C E S:  (Continued)

2                    MARCI LUNDGREN (Telephonic)
                     United States Probation Office
3                    101 12th Avenue, Room 322
                     Fairbanks, Alaska 99701
4                    Ph:  907/456-0266

5    Transcribed by:   LEONARD J. DIPAOLO, RPR, CRR, CCP
                       Peninsula Reporting
6                      110 Trading Bay Road, Suite 100
                       Kenai, Alaska 99611
7                      Ph: 907/283-4429

8
     Proceedings recorded by digital sound recording, transcript
9    produced by stenographic transcription service.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

ANCHORAGE, ALASKA - TUESDAY, JULY 8, 2014

1     (Log 9:00:00)

2      (Defendant present)

5        THE CLERK: His Honor the Court, the United States

6 District Court for the District of Alaska is now in session with

7 the Honorable Ralph R. Beistline presiding. Please be seated.

8        THE COURT: All right. Good morning, are we ready to

9 go from the government's perspective?

10        MS. LOEFFLER: Excuse me, Your Honor.

11        THE COURT: Are we ready to go?

12        MS. LOEFFLER: Yes, we are, Your Honor. Counsel?

13        MR. CURTNER: Yes, Your Honor.

14        THE COURT: Okay. And then we've got the probation

15 officer on the telephone and I think one of the victims on the

16 telephone.

17        All right. Well, we're on the record, United States

18 of America versus James Michael Wells. It's Case No. 3:13-8.

19        And my notes reflect that it was April 25th of 2014

20 after, it looks like a 19-day jury trial, Mr. Wells was

21 committed or found guilty by a jury of his peers of Counts 1

22 through 6 in the indictment.

23        And in particular, defendant was found guilty of Count

24 1 -- in Count 1 of first degree murder of Richard Belisle; and

25 in Count 2 of the first degree murder of James Hopkins.

1        In Count 3 and Count 4 the jury found that the

2   defendant murdered both Mr. Belisle and Mr. Hopkins while they

3   were engaged in the performance of their official duties.

4        And then in Counts 5 and 6, the jury found the

5   defendant murdered both Mr. Belisle and Mr. Hopkins while

6   possessing and carrying a firearm in relation to a crime of

7   violence.

8        So after the verdicts were received, the Court ordered

9   the preparation of a presentence report, which the Court has now

10  received and reviewed.  The parties submitted objections, and

11  the probation officer responded to those objections.  It appears

12  that any remaining objections would not impact the sentence.

13        So is there anything else from the government's

14  perspective that needs to be added to the presentence report?

15        MS. LOEFFLER:  No, Your Honor.

16        THE COURT:  Probation officer have anything to add at

17  this time?

18        MS. LUNDGREN:  No, Your Honor.

19        THE COURT:  All right, counsel?

20        MR. CURTNER:  No, Your Honor.

21        THE COURT:  Mr. Wells?

22        THE DEFENDANT:  No, Your Honor.

23        THE COURT:  Okay.  The Court will accept the

24  presentence report.  It appears that the factual statements that

25  are contained in it are supported by a preponderance of the

1  reasonably reliable evidence, and the Court will therefore adopt

2  the report for purposes of sentencing.

3          It looks like, under the sentencing guidelines, the

4  offense level is 43 with a criminal history category of 1.  This

5  gives a guideline sentencing range for Counts 1 through 4, each

6  of them of life imprisonment; Count 5, ten years to life

7  consecutive; and Count 6 ten years to life consecutive.  And in

8  this situation, the defendant is not eligible for either

9  supervised release or probation.

10          So I have received the sentencing memorandum filed by

11  the parties.  I have received the letters submitted on behalf of

12  Mr. Wells from families -- from his family members and

13  acquaintances.  I obviously was here for the trial, so I am

14  familiar with the facts and with the parties and have a pretty

15  good understanding of the case.

16          Let me ask the government if there are any victim

17  impact statements to be presented today.

18      (Whispered discussion off the record.)

19          MS. LOEFFLER:  We have victims that wish to speak.

20          THE COURT:  Okay.

21          MS. LOEFFLER:  But I don't believe that we have any

22  statements to be presented to the Court today additionally.

23          THE COURT:  Do you want to do that now?  Do you want

24  to do that at this point?

25          MS. LOEFFLER:  That would be fine if that's --

1        THE COURT:  Okay.  I'll let you take charge of that

2   then.

3        MS. LOEFFLER:  Okay.  For anybody that would like to

4   speak, one of the victims, I know two of you do, and anybody

5   else can.

6        Nicola Belisle would like to make a statement, Your

7   Honor.

8        THE COURT:  Okay.  And you can do it right from that

9   microphone or you can come up here, however you're comfortable.

10        MS. BELISLE:  It doesn't matter to me, Your Honor.

11        THE COURT:  Why don't you just go to that microphone

12   and give us your full name.  Good morning.

13        MS. BELISLE:  Good morning, Your Honor.  Thank you.

14   I'm ready.

15        THE COURT:  Yes, but speak right into it.

16        MS. BELISLE:  Okay.  My name is Nicola Belisle.  April

17   11, 2012 was a beautiful day.  The sun was shinning, it was

18   really, really warm, and life was good for us.

19        I remember that evening my husband Richard came home,

20   he was late because he had been down at the Rendezvous putting

21   up an awning, a tent, and fixing a light outside, which now

22   burns continuously.

23        Our youngest child Hannah came home about 9:30, 10

24   o'clock.  She was happy, she was smiling.  We had a good half

25   hour chat, the three of us, and she went to bed.  Rich and I did

1  the same.

2  The next morning Rich got up first as usual.  He made

3  me coffee and he started getting ready for work.  Again, the sun

4  was shinning, it was beautiful.  And I remember as he was

5  getting dressed he was putting on long underwear, and I said,

6  "You won't need that.  It's going to be 50 degrees today."  And

7  he said, "No, it's -- we're climbing the 300 footer today.  It

8  won't be 50 degrees at 300 feet."  He grabbed his coffee, he

9  loved on his puppy, and he went to work.

10  I got in the shower, and as Rich left the house, the

11  same as he did every morning, he knocked on the bathroom window

12  to say that he was going.  And he did that, and he drove up the

13  driveway.

14  By the time I got out of the shower -- I was bitching

15  in my head to my husband because he had used my towel -- he was

16  dead.  And that man destroyed our lives.  He shot Rich before

17  Rich had a chance to finish his morning coffee.  He shot him, he

18  crossed through a few rooms and killed Jim Hopkins, and then he

19  went back and he shot my husband two more times.

20  The visions of that horror haunt me day and night.  I

21  imagine him looking from his house, which is right across the

22  way from ours, watching Rich drive up the driveway that morning

23  waiting for him and following him.

24  Every time I look out of the majority of my home, I

25  see his house.  I still see the lights go on every day.  I see

1  smoke coming out of their chimney.  I see people coming and

2  going.

3           Every time I leave my house, I intersect the road, the

4  main road, the road that he took to go kill my husband.

5           Every time I pass the airport or get on a plane, I'm

6  reminded that that's where he went to switch cars to go hide the

7  fact that he was going to kill my husband.

8           Every time I see that small blue SUV, and I see that

9  SUV all the time driving around town, I'm reminded that that's

10  the car that he drove to kill my husband.

11           Every time I pass Anton Larsen Road, which is the only

12  way to get to town, I'm reminded that this is the road he took

13  when he went to kill my husband.

14           Every time I see an antenna, I'm reminded that because

15  Rich was good at his job and people liked him, people trusted

16  him, that that man went and killed him.

17           Every time I hear an emergency vehicle, I'm reminded

18  that the Alaska State Troopers and the emergency response

19  vehicles went screaming past me as I drove to work that morning.

20  They were racing towards my husband, who was already dead.

21           I am haunted daily with the fact that that man

22  deliberately took Rich's life, took him away from me, from our

23  daughters, our family, our friends, and everyone that knew him.

24           During the trial, I couldn't bear to see any pictures

25  of Rich.  I needed to protect myself from that.  I did not want

that memory, the vision of those pictures to haunt the memory of my husband. But I sat with my dead husband for hours at the funeral home, touching him and praying to God that he would wake up. He looked as if he was just taking a nap.

That haunts me day and night. And I can only imagine Rich's disbelief and horror about being faced with that man with a gun, and I imagine my husband's last moments over and over and over.

I've become almost a recluse. I don't like being out in public, because people with the best of intentions want to express their sympathy, and they have questions.

I had to leave my job that I was very good at and I enjoyed it, but I could no longer speak in front of large groups of people. I imagine that they don't see me or hear the message that I had to share, because now they see me as the wife of that guy who was killed at the COMMSTA.

I've been down Anton Larsen and to the COMMSTA twice since April 12th of 2012. The first time was two days before the one-year anniversary of my husband's murder. It was a practice run for the memorial they were going to hold. We didn't even get halfway up that road and I had a full-blown panic attack. I had a filmstrip running in my head of Rich going to work listening to the radio in his truck drinking his coffee. And then I see that man following behind him to kill him.

In the ten months and three days that it took for him to be arrested, I lived in fear of my life, of my children's lives, and of my husband's best friend Steve's life. I truly believed that that man was going to come after us because we were making so much noise about the investigation.

On more than one occasion, I sat huddled in a closet in my house with a loaded firearm because my dogs had heard something outside.

That man intimidated me on election day of that year. I was working the polls, and he showed up before the polls were even open, and he knew I was there because he parked behind my Jeep, which Rich would drive to work. He and his wife walked right up to me and wished me a good morning. What type of man does that?

About two days later, I left Kodiak because I could not be in the same place where that man was walking free. And I didn't get to go home until February 15th of 2013 when he was arrested.

My family will never be the same. My children will never be the same. Rich and I took an inordinate amount of pride in the fact that our children still had the original set of parents who still loved each other and lived together and were still married. He has destroyed that.

Our girls have become different people now. They've had to change. They've had to grow up in ways that are

1  unimaginable, and they are so hurt beyond belief.

2        And as for the way the defense attorney treated my

3  youngest child during the trial, that is despicable, and I don't

4  know how the defense attorney sleeps at night doing that to

5  children.

6        I loved my husband with all my heart and soul.  He

7  could still make my heart leap when he walked in the room

8  unexpectedly, or when he came home from work and I could see his

9  truck coming down the driveway.  He was a sweet, kind, loving,

10  gentle man.  He loved me and he adored our girls.

11        We were about to become empty nesters.  We were going

12  to retire from our jobs and travel around the country.  We had

13  at least another 40 years ahead of us to live, to love, and

14  enjoy each other, and we were so looking forward to that.

15        We would lie in bed at night and talk about how we

16  were going to visit all the historical sights up and down the

17  East Coast.  Rich was a history buff, and he wanted to share

18  that with me.  He would take so much pleasure in telling me

19  about the battle sights of the American Revolution and how you

20  English people lost the battle at that particular place.  And I

21  was actually looking forward to that.

22        But because of that man, I became a widow at 46 years

23  old.  I'm now classed as a homicide survivor.  Whoever knew

24  there was such a term.  He not only stole my husband and the

25  father of my children and grandfather to my future

1  grandchildren, but he stole our family.  He stole our future, he

2  stole our dreams, he stole my security, and he took away the

3  love of a really great man for me.

4           I have an empty life ahead of me, one filled with pain

5  and fear and loneliness and longing for Rich that I doubt will

6  ever go away.

7           No sentence that you impose on that man will ever be

8  enough for him murdering Rich, because there is no real true

9  justice in this world for murderers.  So I just hope and pray

10  every day that he gets it in the next life and God takes the

11  appropriate action.  May you rot in prison, James Michael Wells,

12  and I hope you rot in hell.

13           THE COURT:  All right, thank you.  Ms. Loeffler.

14           MS. LOEFFLER:  I'm going to see if there is -- is

15  there any of the other family members now that would like to say

16  anything?

17           Judge, if we can continue.  Mrs. Hopkins wants to

18  think about whether she wants to say something.

19           THE COURT:  That will be fine.

20           MS. LOEFFLER:  Can we do that?

21           THE COURT:  Uh-huh.  Mr. Curtner, did you have any

22  witnesses you wanted to present?

23           MR. CURTNER:  No, Your Honor.

24           THE COURT:  All right.  It appears that we don't know

25  if there's going to be any further victim impacts.  I'm ready, I

1  guess, for the government's recommendation then.

2          MS. LOEFFLER:  What we're going to do is Mr. Schroder

3  is going to address the issue of consecutive sentences, and then

4  I have some -- a few sentencing remarks, if we may, Your Honor.

5          THE COURT:  Okay.  I, of course, have read thoroughly

6  all the sentencing memorandums, so I understand I think --

7          MS. LOEFFLER:  They will be short, but I have a few

8  remarks.

9          THE COURT:  Take your time.

10          MR. SCHRODER:  Your Honor, based on the violations of

11  18 U.S. Code 1111 and 1114, murder in the first degree and

12  murder of a federal officer, there is only one sentence

13  available, and that's life imprisonment for those charges.

14          However, as the Court -- the Court has the discretion,

15  as you're aware, to determine whether those sentences are served

16  concurrently or consecutively, and that's not just a symbolic

17  decision for this Court.  It's important for the Court to focus

18  on the men who lost their lives, and that they were two

19  individuals, two families that were shattered, two shipmates

20  that were lost to the Coast Guard and to especially the men and

21  women of COMMSTA Kodiak.

22          And it's for this reason, as we recommended in our

23  sentencing memo, that it is right and just that the Court award

24  two consecutive life sentences for the killing of Richard

25  Belisle -- one for the killing of Richard Belisle and one for

1   the killing of James Hopkins.

2          In addition, the Court must also fashion a sentence

3   for the defendant's convictions under 18 U.S. Code 924, both

4   sections (c) and (j), use of a firearm in a violent crime, and

5   in this case, a murder.

6          By statute, 924(c) and (j) violations must be

7   consecutive to the underlying substantive offense, the murders

8   of Mr. Belisle and Mr. Hopkins.  And the Court has identified

9   that the mandatory minimum for that would be ten years.  But ten

10  years -- a ten-year sentence fails to recognize that a firearm

11  specifically was used to commit the murder, and it was the

12  ultimate violent crime, murder.

13         Under the sentencing factors the Court is tasked to

14  consider in 18 U.S.C. 3553, using those terms, a ten-year

15  sentence, the government believes does not recognize the nature

16  and circumstances of the use of a firearm and the seriousness of

17  that offense.

18         And we talk a lot in this country about the right to

19  bear arms, and certainly the Second Amendment is something that

20  is important to very, very many Alaskans, but with rights come

21  responsibilities.  When a person purposefully and in cold blood

22  uses a firearm to commit murder, the accountability for that act

23  must be clear and it must be uncompromising.

24         James Wells fired multiple shots with a .44 magnum

25  revolver to make sure there were no survivors of his attack.

1   The Court's sentence for that act and that use of a firearm,

2   purposefully and brutally to end two lives, must be no less

3   definitive.

4          But Congress added a provision to 18 U.S.C. 924 in

5   section (j) to address just that, the use of a firearm for

6   murder.  And the statute allows for a consecutive sentence of

7   life imprisonment, and that is the appropriate sentence here.

8          If the life sentence provision of 924(j) should ever

9   apply, it should apply here, a cold-blooded, calculated, planned

10  murder of multiple victims targeted only because they were doing

11  their jobs and trying to do them well.

12         The government recommends consecutive life sentences

13  for the murders of Mr. Belisle and Petty Officer Hopkins.  And

14  then for Counts 5 and 6, the violations of 18 US Code 924(j),

15  also a consecutive life sentence for each.

16         Thank you, Your Honor.

17         THE COURT:  Thank you.

18         MS. LOEFFLER:  Follow up with our further remarks.

19         In the words of the Kodiak D.A., a long-time resident

20  of Kodiak, this was the most cold-blooded murder he had ever

21  experienced to occur on the island.

22         Today the perpetrator of those murders will be

23  sentenced by you to serve the rest of his life in prison, and

24  that is a fair and just sentence to separate him from the

25  community forever, and it's essential for the actions that he

1  did.

2          I want to briefly turn to a few thoughts, and that is
3  I want to turn to the other people here.  The victims and the
4  families who start the rest of their lives today stood before
5  you in this courtroom, they answered questions, they sat through
6  the odd rules that are trial, they represented their families
7  and their husbands well by being honest, straightforward, and
8  following the rules in this courtroom.

9          The Coast Guard had 70 people here, all of whom
10  testified, answered questions that you asked, the defense asked,
11  we asked, fairly, with a presentation that I think made all of
12  us proud that they are here to serve our country.  They stood by
13  their colleagues, they showed up, they showed up whether we
14  requested them and whether the defense requested them, with an
15  idea to their duty, and they represented their two fallen
16  colleagues well and professionally.  And they put a lot of
17  resources into this, not the least of which was one of their
18  very superb attorneys joining the team.

19          And I want to say something else based on -- that the
20  investigation of this case by the FBI, the Coast Guard
21  Investigative Service, it was very hard on the families that
22  they waited ten months for the arrest, but the reason that that
23  wait was there was because these agencies were following every
24  lead, looking at every single fact they could find to put
25  together the best case that they did, and they did a superb job.

1        Today the Court will impose justice the best that our
2    system can do it.  The families will have to move on, the Coast
3    Guard will move forward with their mission, the law enforcement
4    community that worked so well and dedicated on this case will
5    continue with their missions, supported by the fact that this
6    was a job well done and they did their best to serve two fallen
7    men, Richard Belisle and James Hopkins.  And may those two rest
8    in peace, semper paratus.
9        THE COURT:  All right, thank you.  One last chance for
10   the -- for you, ma'am.
11       MS. LOEFFLER:  I'm sorry, Debby, do you want to say
12   something?  Okay.
13       THE COURT:  And you can just stand right there at that
14   microphone.
15       MS. HOPKINS:  Sit there so I can look at him?
16       MR. SCHRODER:  Go ahead.
17       MS. HOPKINS:  You, the day you took my husband away,
18   my lover, my friend, my husband, you destroyed my family.  You
19   never had considered what it would do to my family, especially
20   my grandchildren that never got to meet their grandpa.  The
21   father -- my -- you destroyed my children where my daughter
22   can't even do her work some of the time.
23       When Jim went to -- before we got the orders to go to
24   COMMSTA, Jim asked me for a four-wheeler.  He got it.  And when
25   he got to the COMMSTA, he just cleaned up that rigger shop that

1  was destroyed, and I was right behind him standing there.  And

2  before we got the house, we got more four-wheelers, and that's

3  what we did every single weekend, and you destroyed that for me

4  and my children.  Oh, my God.

5          Every time there was trouble at the rigger shop, my

6  boy, my husband stood up to the captain and took the blame for

7  everything, your crud that you did, and he always said, "Yes,

8  sir," right in front of that captain.  And that's what the

9  captain and Scott Reckner liked about my husband, because he was

10  a dang good guy.

11          We were supposed to retire.  And yes, everybody knows

12  we got a camper, and Jim got his brand new truck because he's a

13  spoiled guy.  We were supposed to retire, travel all over the

14  country, go see my grandchildren that my husband will never,

15  ever, will ever meet because of you, and I hate you for that.

16          I have a grandson that goes up to my husband's picture

17  and say, "Gampy."  What I supposed to tell him?  That you killed

18  him?  And that's what he's going to know, and so is my

19  granddaughter, that a stupid jerk killed my husband because he

20  was stupid.

21          You destroyed his dad.  You destroyed my family, and I

22  don't think this family will ever be the same, especially my

23  grandchildren.  And you better think about that for the rest of

24  your God dang life.  You destroyed my babies.  And like Nicola

25  said, rot in hell.

 1          THE COURT:  All right, thank you.  Anything further?

 2          MS. LOEFFLER:  No, Your Honor.

 3          THE COURT:  All right.  Mr. Curtner.

 4          MR. CURTNER:  Thank you, Your Honor.  Your Honor,

 5   there's no question that this is a tragic incident, and Mr.

 6   Wells has maintained his innocence from the very beginning and

 7   continues to maintain his innocence on this case.

 8          It is our view that at the trial the jury did not

 9   honor the presumption of innocence, but expected us to prove

10   innocence and to prove who did commit these crimes.

11          I think part of this tragedy is that the -- not only

12   is another family destroyed by this process, but the real

13   killer, in our view, is still out there and has not been found

14   yet.  That is our view, and that's what we will continue to try

15   to prove, Mr. Wells' innocence, and who actually committed these

16   crimes.

17          Be that what it is and where we are at now, I need to

18   say on behalf of Mr. Wells that his -- he has maintained his

19   innocence, and his family and the people who know him believe in

20   that innocence, and with good reason.  At his age, without any

21   type of criminal history or history of violence, it's just

22   inconceivable that he would be involved in this.  These are two

23   people he worked with, two people he felt were friends.  And the

24   motives that were presented are just inconceivable that would be

25   any murder -- any motive for murder.

1        So it's our position that Mr. Wells is innocent. He's

2  had -- I think you read the letters from his family, and you

3  know what people can justifiably say about his life and what he

4  has done in this life. And so we plan to continue to fight for

5  his innocence.

6        But at sentencing today, I would just suggest that a

7  life sentence is a life sentence in the federal system, without

8  parole, is sufficient to meet the goals of sentencing, and we

9  would ask the Court to merely impose a life sentence without

10 parole. And we think that's the sentence that should be imposed

11 in this case.

12       THE COURT: All right, thank you. Mr. Wells, what do

13 you have to say? Could you pull the microphone -- there you go.

14       MR. CURTNER: Sure.

15       THE DEFENDANT: A tragedy occurred, and we've all

16 suffered for it. And I know I'm innocent of this crime and will

17 continue to try and prove that, thank you.

18       THE COURT: Well, there's one thing that's absolutely

19 clear to me beyond a reasonable doubt, and that is that James

20 Wells is a cold-blooded murderer.

21       You can fight for your innocence, but that won't make

22 you innocent, because you're guilty. You killed two innocent

23 men, and you did so wilfully and deliberately and maliciously

24 with premeditation. Any objective person who considers the

25 evidence presented would reach the same conclusion the jury did;

1  anyone who says otherwise is simply fooling themselves.

2          And this was an exceptional jury.  Now, they were as

3  diverse as you could get.  Five of the 15 members of the panel

4  were minorities, four of the 12 who deliberated were minorities.

5  They took detailed notes during the trial, they were attentive

6  throughout, they were an impressive and responsible and

7  conscientious jury.

8          And when I met with them briefly after the trial, many

9  were in tears, not out of sympathy for Mr. Wells, but out of

10 sympathy for his family, who by all accounts were good and

11 decent people, and out of sympathy, of course, for the family of

12 the two victims, two men who were also good and decent

13 individuals.  They were hard working, they were fun-loving, and

14 they had families that loved them and relied upon them.  Both of

15 these men had a lot to live for.  But the defendant, Mr. Wells,

16 took it upon himself in a senseless act of true cowardice to

17 become their executioner.  Such a terrible loss for the

18 families, such a terrible loss for the community, such a

19 terrible loss for the Coast Guard.

20         Two defenseless men cut down in their prime by an

21 angry, selfish, jealous, narcissistic, and envious man, who for

22 whatever reason became set on murder and hoped to get away with

23 it.  And he has no remorse.  He doesn't care how many he has

24 hurt, and he still let's his own family believe that he's

25 innocent, and he knows he is not.

1        At trial defendant pointed to everyone he could think

2   of as the murderer.  Third-party culpability was argued, but it

3   didn't work.  Why?  Because defendant was the murderer.  He

4   alone had the motive and the opportunity and the means to carry

5   out these murders, and he did so.  In a very cruel and

6   calculated and vicious manner, defendant murdered Richard

7   Belisle and James Hopkins.

8        Defendant didn't have a theory as to where he was

9   during that critical 34 minutes.  Why?  Because he was murdering

10  his co-workers at the time.

11       Defendant's ears were ringing all day.  Why?  Because

12  he had fired a .44 magnum pistol in a closed building while

13  committing the murders.

14       Defendant's wife's blue SUV was not where she left it

15  at the airport.  Why?  Because defendant used her SUV to travel

16  to the rigger shop to carry out these murders.

17       And defendant murdered these two men with a large

18  caliber weapon, a bear gun, a stolen weapon, stolen years

19  earlier from a friend that he thought could not be traced to

20  him.

21       Defendant wasn't seen on the rigger shop cameras.

22  Why?  Because he knew exactly where they pointed, and he took

23  efforts to avoid them.  The defendant caught these two men,

24  these two co-workers, at a critical time when no one else would

25  be in the building where they would be the most vulnerable,

 1   because he knew exactly what their schedule was.

 2            And defendant's suspicious conduct after the murders,

 3   checking out the cameras at the airport, disparaging the

 4   victims, and his anger at his wife's friend for speaking with

 5   the FBI, all is explained by the fact that he was the murder,

 6   and he knows it.

 7            One might ask, why did the defendant do this?  He

 8   really had nothing to gain and everything to lose.  But that's

 9   the case with nearly every murder.  Anger and envy and jealousy

10   can lead otherwise decent people to do horrific things, and

11   that's what happened here.

12            Defendant killed these two good men because he was on

13   the way out.  He had lost a good standing on the job site, he

14   lost the trust of the commander, he couldn't compete any longer,

15   and he couldn't deal with it in a rational manner, so in

16   desperation, he murdered his competition.  A senseless act of

17   violence that defies rational explanation; but nevertheless,

18   this is exactly what defendant did.  He murdered his colleagues

19   in cold blood.

20            Now, there are number of factors we consider in

21   arriving at a sentence.  We refer to them as the 3553(a)

22   factors.  I think it's been pretty clear and everyone agrees

23   about the horrific nature and circumstances of this crime and

24   the impact it had on the victims.  And I appreciate the two

25   wives being here today, sitting through the trial demonstrating

their character and their courage.  So my condolences go out,
but also I appreciate the fine fashion in which you conducted
yourself throughout this process.

Now, you know, we talk about defendant's history was
painted at trial as being a good family man.  In the more
distance past, he wasn't so bad, but he's no angel.  In the
years before these murders, he was not necessarily an
outstanding citizen, not that he's portrayed to be.  Much of
this didn't come out at trial.  We don't have to go over it
here, but suffice it to say that defendant's frolicking with
prostitutes, his problems at work, his theft of his friend's gun
and other property is not what we would typically see in our
outstanding citizens.  But the focus is not on that, was not on
that.  The focus is on the crime committed and the extreme
injury perpetrated on so many.

Defendant obviously has no respect for the law, and
given his lack of remorse and failure to admit his criminal
acts, he cannot be deterred.  Nevertheless, the message must go
out that such extreme criminal conduct will be dealt with to the
full extent of the law, and deterrence of others must be
considered; this is an important part of this sentence.  And
there is the need to punish.  Murder is simply unacceptable in a
civilized society and it will not be tolerated.

When the Court considers all these factors, the Court
concludes that defendant must receive the maximum sentence

1  reasonably available under the law, which is four consecutive

2  life sentences.  It is the most the Court can do under the law,

3  and is necessary to meet the sentencing goals and to properly

4  sentence defendant for the vicious and premeditated crimes that

5  he committed and that he knows he committed.

6          Now, the victims are also entitled to restitution,

7  which the Court will impose after conducting a restitution

8  hearing tentatively set for September 10th, 2014 at 1:15, with

9  simultaneous briefing to be filed by the close of business

10 August 29th, 2014.

11         So I have said I've looked at the 3553 factors, I sat

12 through 19 days of trial, I've observed a great deal.  The

13 evidence of guilt was overwhelming.  The jury should be

14 commended and not criticized.  The real killer is not still out

15 there.  The real killer is sitting at the table in front of us,

16 and that' the defendant, Mr. Wells.

17                     IMPOSITION OF SENTENCE

18         THE COURT:  So pursuant to the Sentencing Reform Act

19 of 1984, and considering the factors found in 18 U.S.C. 3553(a),

20 it is the judgement of the Court that defendant, James Michael

21 Wells, is hereby committed to the custody of the Bureau of

22 Prisons as follows.

23         On Counts 1 and 3, a life term of imprisonment

24 concurrent to each other and consecutive to all other terms.  On

25 Counts 2 and 4, a life term of imprisonment concurrent to each

1    other and consecutive to all other terms imposed.

2              On Count 5, a life term of imprisonment consecutive to

3    all other terms imposed.

4              And on Count 6, a life term of imprisonment

5    consecutive to all other terms imposed.  So we have four life

6    sentences.

7              This won't bring these good men back, but it serves to

8    express the revulsion we feel for these senseless murders, and

9    hopefully it will help provide some sense of justice for the

10   families of these victims.

11             I've already indicated that restitution is

12   appropriate.  I can't determine the amount until the hearing.

13             It's further ordered that defendant shall pay a

14   special assessment of $600, which will be paid immediately to

15   the Clerk of Court.

16             Now, Mr. Wells, you are advised that you have a right

17   to appeal your conviction and a right to appeal your sentence.

18   The sentence may be appealed on any of the grounds contained in

19   18 U.S.C. 3742.  If you cannot afford to take an appeal, you may

20   ask to do so at public expense by applying for leave to appeal

21   in forma pauperis.

22             If you request it, the Clerk of Court will prepare and

23   file a notice of appeal on your behalf.  If you wish to appeal,

24   you must do so within the 14-day time period allowed by Rule

25   4(b) of the Federal Rules of Appellate Procedure.

1          Does the probation officer have anything to add?

2          MS. LUNDGREN:  No, Your Honor, thank you.

3          THE COURT:  Government?

4          MS. LOEFFLER:  No, Your Honor.

5          THE COURT:  Counsel?

6          MR. CURTNER:  No, Your Honor.

7          THE COURT:  That's it then.  Thank you all very much.

8          THE CLERK:  All rise.  This matter stands adjourned.

9    Court stands adjourned subject to call.

10             (Proceedings adjourned, 9:42:44 a.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        CERTIFICATION

2

3      I, LEONARD J. DiPAOLO, RPR, CRR, CCP, court-approved

4    transcriber, certify that the foregoing is correct transcript

5    from the official digital electronic sound recording of the

6    proceedings in the above-entitled matter.

7

8

9    _____          __9/11/14___

     Leonard J. DiPaolo, RPR, CRR, CCP              Date

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25