1    UNITED STATES DISTRICT COURT

2    FOR THE DISTRICT OF ALASKA

3    UNITED STATES OF AMERICA,      )   Case 3:13-cr-00008-RRB
                                    )
4           Plaintiff,             )   Anchorage, Alaska
                                    )   Monday, April 7, 2014
5       vs.                        )   8:30 o'clock a.m.
                                    )
6    JAMES MICHAEL WELLS,           )
                                    )
7           Defendant.             )
     _____)   **TRIAL BY JURY, DAY 5**

8                    **TRANSCRIPT OF PROCEEDINGS**

9
          BEFORE THE HONORABLE RALPH R. BEISTLINE
10                UNITED STATES DISTRICT JUDGE

11   APPEARANCES:

12   For the Plaintiff:        KAREN L. LOEFFLER
                               U.S. Attorney
13                             BRYAN SCHRODER
                               KATHLEEN ANN DUIGNAN
14                             Assistant U.S. Attorneys
                               Office of the U.S. Attorney
15                             222 West 7th Avenue, #9, Room 253
                               Anchorage, Alaska  99513-7567
16                             (907) 271-5071

17   For the Defendant:        F. RICHARD CURTNER
                               Federal Defender
18                             Office of the Federal Public Defender
                               601 West 5th Avenue, Suite 800
19                             Anchorage, Alaska  99501
                               (907) 646-3400
20
                               PETER OFFENBECHER
21                             Skellenger Bender, P.S.
                               1301 5th Avenue, Suite 3401
22                             Seattle, Washington  98101-2605
                               (206) 623-6501

23

24

25

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 741  Filed 09/23/14  Page 1 of 329
(720) 384-8078  attrans@sbcglobal.net

1  APPEARANCES (Continued):

2  Court Recorder:            NANCY LEALAISALANOA
                              U.S. District Court
3                             222 West 7th Avenue, #4, Room 229
                              Anchorage, Alaska  99513-7564
4                             (907) 677-6111

5  Transcription Service:     A & T Transcripts
                              6299 West 111th Avenue
6                             Westminster, Colorado  80020
                              (720) 384-8078

7

8  Proceedings recorded by electronic sound recording; transcript
   produced by transcription service.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 741  Filed 09/23/14  Page 2 of 329

1          <u>**ANCHORAGE, ALASKA – MONDAY, APRIL 7, 2014**</u>

2

3          (Call to Order of the Court at 8:30 a.m.)

4          (Defendant present; jury not present)

5              THE CLERK:  His Honor the Court, the United States

6    District Court for the District of Alaska is now in session,

7    with the Honorable Ralph R. Beistline presiding.  Please be

8    seated.

9              THE COURT:  Okay.  Do we have our witness handy?

10             MR. SCHRODER:  We do, I think we --

11             THE COURT:  Anything else before we get started?

12   Hearing nothing, we'll bring out witness in and the jurors --

13         (Side conversation)

14             THE COURT:  What?  Nothing else?

15             MS. LOEFFLER:  Oh, I'm consulting with my colleague

16   about --

17             THE COURT:  Okay.

18             MS. LOEFFLER:  -- whether we can just go straight

19   forward or if there's anything we need to bring up.

20         (Side conversation)

21             MS. LOEFFLER:  We're fine, Your Honor.

22             THE COURT:  Okay.  You can just make yourself

23   comfortable here, then we're going to bring the jury in in a

24   second and --

25             CHIEF RECKNER:  Okay.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 3 of 329
(720) 384-8078  attrans@sbcglobal.net

1       THE CLERK:  Want to bring them now?

2       THE COURT:  Pardon -- you can bring the jury in.

3       THE CLERK:  Bring them now?

4       THE COURT:  Yes.

5    (Jury present)

6       THE COURT:  All right, please be seated.  Welcome back,

7    ladies and gentlemen.  You ready to go.  Any questions, any

8    issues?  Yes, sir.  Oh, okay.  We'll get those -- that headset

9    over to you.  And you let us know when you're ready with that

10   thing.  Is that okay?  Testing, one, two, three.

11       All right, sir, you're still under oath.  We're not

12   going to swear you in again.  And we'll just continue where we

13   left off Thursday.  Okay?  All right, counsel.

14       MR. CURTNER:  Thank you, Your Honor.

15   **SCOTT ALLEN RECKNER, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN**

16   **CROSS-EXAMINATION, CONTINUED**

17   BY MR. CURTNER:

18   Q    Chief Reckner, we left off last week with this excellent

19   performance evaluation you did with -- about Mr. Wells that

20   first year you were there.

21   A    Yes, sir.

22   Q    And then the next year you didn't quite complete that

23   evaluation process because Mr. Wells was sick?

24   A    That's correct.  I actually did finish it, but it was

25   after the record was taken.  So there is a finished copy out

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 4 of 329
(720) 384-8078  attrans@sbcglobal.net

1  there, I just don't have access to it right now.

2  Q    All right.  Now let's talk a little bit about Mr. Wells's

3  health problems.  Did you -- in putting together his personnel

4  file, were you able to have access to his health records when

5  he was actually military Coast Guard, in the Coast Guard?

6  A    No, sir.

7  Q    So did you know that he was -- had a medical discharge

8  when he left the Coast Guard?

9  A    I did not know that, no, sir.

10  Q    Did you know that the reason -- there were a couple

11  reasons for that discharge.  One was the idiopathic

12  anaphylaxis?  Do you know what that is?

13  A    I do not.

14  Q    Okay.  Is it --

15        MR. SCHRODER:  Your Honor, objection.  Lack of

16  foundation.   The witness says he hasn't seen the record.

17        MR. CURTNER:  Okay, let's --

18        THE COURT:  (Indiscernible) --

19        MR. CURTNER:  Can we show what's marked as government's

20  Bates stamp 3286?

21  BY MR. CURTNER:

22  Q    On your screen -- is that on your screen, Chief Reckner?

23  A    It is now.

24  Q    Okay.  Now, do you recognize what that is?

25  A    It looks like a memorandum from a medical board.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 5 of 329
(720) 384-8078  attrans@sbcglobal.net

1  Q    Okay.  And it's about Mr. Wells?

2  A    It is.

3  Q    And it talks about -- that he was not fit for duty --

4        MR. SCHRODER:  Your Honor, again, objection.  This

5  is -- the document needs to come in.  The defense -- defend --

6  or the witness can't just read from it if he's not familiar

7  with the document.

8        THE COURT:  Sustained.

9        MR. CURTNER:  Your Honor, this is government's

10 discovery that -- provided to us from Mr. Wells's military

11 file, and it was -- and so we'd move it into evidence and --

12 because Mr. -- Chief Reckner's already discussed his military

13 file, that he was -- and his personnel file that he was --

14 assembled, and this should be part of it.

15       THE COURT:  It wasn't part of it.

16       MR. SCHRODER:  I'm sorry, Your Honor?

17       THE COURT:  It was not part of it, was it?

18       MR. SCHRODER:  It's in the discovery, Your Honor, but

19 it's not anything --

20       THE COURT:  Yeah.

21       MR. SCHRODER:  -- that this witness had anything to do

22 with.

23       THE COURT:  I don't -- I thought it was not part of the

24 personnel file.  That's what he testified.

25       MR. SCHRODER:  It wasn't part of the personnel file

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 6 of 329
(720) 384-8078  attrans@sbcglobal.net

1 that he had.

2          THE COURT:  True.

3          MR. SCHRODER:  All he had was a civilian file, nothing

4 from the military.

5          THE COURT:  I understand.

6          MR. SCHRODER:  So we would object, foundation.

7          THE COURT:  Sustained, at this point.

8 BY MR. CURTNER:

9 Q    So, Chief Reckner, you didn't know anything about some of

10 the medical conditions and the reasons he left Coast Guard back

11 in 1990?

12 A    I do not.

13 Q    Okay.  Do you know about his current medical -- well,

14 the -- in the medical issues he was dealing with when he was

15 under your supervision?

16 A    I'm familiar with them, yes, sir.

17 Q    Now, so you don't have any idea what anaphylaxis is?

18 A    I do not know.

19 Q    Do you know -- have you heard about people having -- being

20 allergic -- having an allergic reaction to bee stings?

21 A    Yes.

22          MR. SCHRODER:  Again, Your Honor, no foundation for

23 this question.  It's just going (indiscernible) --

24          MR. CURTNER:  This is -- I'm asking --

25          MR. SCHRODER:  -- the same --

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 741  Filed 09/23/14  Page 7 of 329

1        MR. CURTNER:  -- him what he knows.

2        MR. SCHRODER:  It's the same issue.

3        THE COURT:  Okay.  You can ask him what he knows on

4    this subject, but it doesn't sound like he's the one to talk to

5    about these things.

6        MR. CURTNER:  Okay.

7    BY MR. CURTNER:

8    Q    Are there bees out in the tree farm or the area where your

9    towers are on Kodiak Island?

10   A    I'm sure there are.

11   Q    Okay.  You've never seen any out there?

12   A    Not that I can recall today.  I --

13   Q    There's no yellowjackets or bees on Kodiak Island during

14   the summer?

15   A    I'm -- again, I'm sure there are.

16   Q    Okay.

17   A    I can't recall the time right now, but I can relate to you

18   that I've seen a bee on Kodiak Island.  I'm sure I have.

19   Q    Now, you do know that Mr. Wells had diabetes?

20   A    I did know that, yes, sir.

21   Q    Type 2 diabetes, correct?

22   A    I didn't know the type.  I just knew he had diabetes.

23   Q    Okay.  And did you know that he was experiencing a lot of

24   nausea and vomiting during the fall of 2011?

25   A    I was aware of some of that, vaguely.  I had heard reports

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 8 of 329
(720) 384-8078  attrans@sbcglobal.net

1  that he was sick.  He had left work early a couple of times

2  because he wasn't feeling well.

3  Q   And you've gone through his leave records.  That's part of

4  your personnel file, right?

5  A   What record?  I'm sorry.

6  Q   I'm -- his leave records.

7  A   Yeah, I had all the -- all of the leave chits went through

8  me, whether sick or vacation.

9  Q   Okay.  So as I understand it, if Mr. Wells were to take

10  any leave, he'd have to -- he'd fill out a request and you

11  would approve it?

12  A   That's correct.

13  Q   And during the time from September 2011 to April 2012, he

14  took a lot of sick leave.  Is that correct?

15  A   He did.

16  Q   And you looked at the leave records, and did you help

17  assemble those leave records from his personnel file?

18  A   I just put them in there.  I would file them as I received

19  them, after I sent them to the timekeeper.

20  Q   Let me show you what's been marked as government's Bates

21  3361.  And see if you recognize that.

22  A   Okay.

23        THE CLERK:  Mr. Curtner, is that part of an exhibit?

24        MR. CURTNER:  Not yet.

25        THE CLERK:  No.  Okay.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 9 of 329
(720) 384-8078  attrans@sbcglobal.net

1          THE WITNESS:  Okay.

2    BY MR. CURTNER:

3    Q    Okay, have you seen that before?

4    A    I've seen something similar to that, yeah.  It looks like

5    it's a report from webTA on his leave taken.

6    Q    Well, let me just ask you this.  During the time from

7    September 11th through April 2012, that's reflected in what's

8    in front of you, correct?

9    A    Yes, sir.

10   Q    Would it be fair to say that Mr. Wells was on leave more

11   than he was at work during that time period?

12   A    I would say that's correct, yes.

13   Q    And you know that all of that was due to his gallbladder

14   removal?

15   A    It -- it was due to his sickness.  That's what I

16   understood, yeah.

17   Q    And do you know what the date was of his gallbladder

18   operation?

19   A    I do not.  February, I believe, sometime.

20   Q    February 9th?  Do you know that?

21   A    I didn't know that off the top of my head, but --

22   Q    Okay.

23   A    -- it sounds accurate.

24   Q    Now, as the supervisor, the chief of the rigger shop,

25   wouldn't you be concerned about the health of your -- the

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 10 of 329
(720) 384-8078   attrans@sbcglobal.net

1  people that work under you?

2  A   Absolutely.

3  Q   And you had no idea what the medical problems were for Mr.

4  Wells that caused him to miss this much work?

5  A   I don't think he knew.  It took a long time for them to

6  figure out what it was.  I remember for months, him going back

7  and forth to the VA.  And I would ask him what's wrong, and

8  he -- he didn't know.  But he was constantly going for tests.

9  It wasn't until right before his surgery, I think, that they

10 figured out it was gallbladder.

11 Q   Okay.  So he was having these intestinal problems,

12 vomiting, nausea, for months?

13 A   As far as I know, yeah.

14 Q   Okay.

15 A   It seemed like he was sick for months, yes, sir.

16 Q   And then he was going to the VA hospital here in Anchorage

17 for tests?

18 A   That's correct.

19 Q   And then after a whole series of tests, they discovered

20 that the gallbladder may be the problem.

21 A   That's how I understood it, yes.

22 Q   And then in February he had his gallbladder removed?

23 A   Right.  And hernia surgery, if I remember correctly.

24 Q   He also had a hiatal hernia that was operated on the same

25 time?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 741  Filed 09/23/14  Page 11 of 329
(720) 384-8078  attrans@sbcglobal.net

1  A     Yeah.

2  Q     And then after that he was off week for -- he was off work

3  for a couple weeks?

4  A     Right.

5  Q     Doctors ordered not to drive.  Is that correct?

6  A     I don't know about that.  I just know he wasn't at work.

7  Q     Okay.  Now, I think during that same time period, Seaman

8  Henry, I -- was pregnant during that time?

9  A     Yes.

10  Q     And you made some medical accommodations for her?

11  A     She -- once she was -- once she found out she was

12  pregnant, she could no longer work in the rigger shop because

13  of the dangerous tools and type of work we do.  So she went up

14  the hill, yes, sir.

15  Q     Okay.  Now, you understood -- I think you testified that

16  Mr. Wells was not 100 percent because of his medical problems.

17  Correct?

18  A     That's correct.

19  Q     And on April 12th, you actually were having him plan -- he

20  was -- planned to climb that 300-foot tower that day?

21  A     As far as I knew, he was not planning on climbing.  He did

22  not engage in any of the preclimb discussions the day before.

23  I assumed he was not climbing.

24  Q     Well, was that decided then?

25  A     It wasn't decided.

1  Q    Who usually climbs?

2  A    Usually it's the civilians and -- and, you know, the

3  active duty too.  By that day -- the day before, when we talked

4  about climbing, he didn't engage at all.  He never said he was

5  climbing.

6  Q    He never said he wasn't climbing?

7  A    That's true.

8  Q    You never told him he didn't have to climb?

9  A    That's true.

10 Q    You never made --

11 A    But in the --

12 Q    -- any accommodations for him because of his health

13 problems?

14 A    Well, he was -- at that point he was 100 percent.

15 Q    He was 100 percent?

16 A    He was back on duty, he was off light duty.  So I assume

17 he was 100 percent at that point.

18 Q    I thought you just testified last week that he wasn't 100

19 percent.

20 A    In April, he was -- he had served his medical leave time

21 and was cleared to work.  I don't think I testified anything

22 other than that.

23 Q    And that means 100 percent to you?

24 A    If the doctor said he could work, I assumed he could work.

25 Q    At 100-percent capability?

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net

1  A    I didn't hear any other percentage.

2  Q    Okay.  I think you also testified about moving your desk

3  down to the rigger shop.

4  A    Yes, sir.

5  Q    And when was that?

6  A    I moved in December of 2011.

7  Q    So Mr. Wells was gone most of that fall.  Is that correct?

8  A    That's correct.

9  Q    He was gone for -- had been sick for a number of months

10  before you moved your desk down there?

11  A    About a month or two.  And not all of that was sick time.

12  A lot of that was leave time, regular vacation time too.  It

13  was a combination of the two.

14  Q    Mostly sick time?

15  A    Probably mostly sick time, yeah.

16  Q    Now, were there any other conflicts at the rigger shop,

17  any personality conflicts there?

18  A    Not that I can recall.

19  Q    You don't recall any other conflicts between staff?  Minor

20  things.

21  A    I'm sure that maybe there were some, but, you know, they

22  don't always make it to the chief level.  So if the first class

23  can handle it, then the first class should handle it.

24  Q    And in your experience, was ET1 Hopkins -- was he handling

25  things in the rigger shop?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 14 of 329
(720) 384-8078  attrans@sbcglobal.net

1  A    At -- for the most part, I'd say yes.  And it -- whatever

2  he couldn't, he'd push up.

3  Q    Didn't he -- didn't you testify you had some concerns

4  about him handling and being in charge of the rigger shop?

5  Wasn't that one of your concerns?

6  A    My concern wasn't about ET1 Hopkins' ability to handle the

7  issues.  My concern was the fact that I felt Mr. Wells was

8  running roughshod over him.  So that's why I wanted to put my

9  desk down there, to have a chief presence in the shop.

10 Q    When Mr. Wells was sick and gone.

11 A    Well, I anticipated Mr. Wells coming back.  And judging

12 from what I had experienced in the months and --

13 Q    Chief Reckner --

14 A    -- time before --

15 Q    -- I put my desk -- sir, you asked the question.  I just

16 want to answer the question for you.

17 Q    Okay, fine.  That would be good, if you'd just answer my

18 questions, okay?

19 A    Sure.

20 Q    You don't have to volunteer beyond what I'm asking you,

21 okay?  Is that all right?

22 A    Sure.

23 Q    You weren't aware of any conflict or personality issues

24 between Mr. Pacheco and Seaman Upchurch?

25 A    I had heard some things that they didn't necessarily get

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 15 of 329

1  along.

2  Q    Okay.  You didn't deal with that at all?

3  A    I did not.

4  Q    How about any concerns about ET1 Hopkins and his treatment

5  or his relationship to the nonrates in the rigger shop?

6  A    Early on, when I -- when I first reported in 2010, Mr.

7  Wells and Mr. Belisle came to my office and we discussed some

8  concerns they had with ET1.  I observed him for a period of

9  time and decided that he was doing fine.

10 Q    Okay.  So Mr. Belisle and Mr. Wells came to you because

11 they had concerns about -- what were their concerns?

12 A    Mostly I think was -- it was how ET1 talked to the

13 nonrates.  I guess he was gruff.  But I didn't find that to be

14 an issue.  I mean, we're a military service.  Sometimes people

15 are gruff.

16 Q    Gruff.  By gruff, do you mean, like, really using bad

17 language, cursing?

18 A    I don't think he used bad language.  I never heard him use

19 bad language talking to the nonrates.

20 Q    You never heard that, but did Mr. Belisle and Mr. Wells

21 come to you because they were concerned about that?

22 A    They never mentioned bad language specifically.

23 Q    They never did?

24 A    They did not to me, no, sir.

25 Q    Now, what is the Coast Guard regulation about having

1  firearms on Coast Guard property in the workplace?

2  A    Generally, you're not supposed to have firearms on Coast

3  Guard property.  I think the -- the rule is outside the fence

4  line, in your car.  But generally, you're not supposed to have

5  them.

6  Q    Generally, you're not supposed to have firearms in the

7  workplace?

8  A    Right.  They -- it's Kodiak, Alaska, so they understand

9  that we have firearms, so we -- many of us live on -- or in

10  Coast Guard housing, which is on Coast Guard property, so we

11  can transport our guns to and from.  So that would be having

12  guns on Coast Guard property.

13  Q    Can I show you something that's been marked as Defense

14  Exhibit DE-103?

15       MR. CURTNER:  Can you put that up on the screen for

16  Chief Reckner?  Oh, and do you have an extra copy, Bruce?

17  BY MR. CURTNER:

18  Q    Do you see that?

19  A    I can.  Can you blow it up a little bit, please?

20       MR. CURTNER:  Yeah, can you, Bruce?  I don't need an

21  extra copy right now.  If you could -- maybe just enlarge the

22  top half.

23  BY MR. CURTNER:

24  Q    Do you recognize that?

25  A    It appears to be a Commandant Instruction.

**RECKNER - CROSS**

1  Q    And what's the subject matter about?

2  A    Workplace violence and threatening behavior.

3  Q    Now, is this something -- are you familiar with this?

4  A    I'm not familiar with it.  I mean, there's so many

5  Commandant Instructions, you -- it's hard to read them all.

6  Q    Didn't you cover this in some of your leadership training?

7  A    I did not.

8  Q    Okay.  I was just interested, if you go to the second page

9  of that document.  Can you -- can we go to that?  Now, at the

10 top of that page it talks about workplace violence or any act

11 or attempted act of physical aggression or harm by an

12 individual that occurs in a workplace.  And this includes some

13 examples.  Do you see that?

14      MR. SCHRODER:  You know -- objection, and foundation,

15 Your Honor.  The witness said he's not familiar with the

16 document.  It's a 1999 document, I notice from the first age,

17 so it's 15 years old.  I think there's got to be some

18 foundation -- better foundation laid that this is accurate and

19 appropriate.

20      THE COURT:  Very well.

21      MR. CURTNER:  Your Honor, this is an official Coast

22 Guard document.  It's my understanding it's still current and

23 it's the latest edition of this document.  And I think I can

24 cross-examine Chief Reckner on whether he's familiar with it.

25 And I'd move it for -- as an exhibit.

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 18 of 329

1          THE COURT:  Well, I don't know if it's official

2     document.  I don't know anything about that.  But you can ask

3     him if he's familiar with it.

4     BY MR. CURTNER:

5     Q    Well, let -- Chief Reckner, let me just ask you this.  Is

6     possessing weapons in the workplace not specifically authorized

7     by competent authority for performing one's duties?  Is that a

8     correct statement of the regulations for firearms in the

9     workplace?

10    A    I would say that's probably accurate, yeah.

11    Q    Okay.  So weapons are prohibited, not generally.  They're

12    prohibited unless there's authority and it's related to one's

13    duties.  Is that correct?

14    A    That's correct.

15    Q    Now, on your shop, on your watch, did anybody bring in

16    weapons, firearms, into the rigger shop?

17    A    Yeah, on occasion.  If someone bought a new firearm and

18    wanted to show it off, they would bring it in.  It'd be safe.

19    And then immediately put right back into their vehicle.

20    Q    But that would be against the regulations, it --

21    A    It is.  But it's common practice on Kodiak.  I bought my

22    .45-70 in the parking lot of the commissary from a senior

23    chief.  It's Kodiak, Alaska.  Everybody has guns.

24    Q    Everybody has guns.  And even though it's against

25    regulations -- because it's not work related at all, right?

1  A    Correct.

2  Q    It's -- it just happens on your watch in your shop?

3  A    Well, on everybody's watch, but yes.

4  Q    Okay.  And who all brought in firearms in violation of the

5  regulations into your shop, under your supervision?

6  A    I'd seen -- well, Mr. Belisle.  I'd -- I'd bought a

7  shotgun from him.  He brought it in, I paid him, I put the

8  shotgun in my car.  I brought in a -- a -- a weapon I purchased

9  at the exchange, showed it around, locked it back up in its

10 case, put it back in the car.  And there were other instances

11 that I -- I heard about but didn't always witness.

12 Q    Now, did Mr. Belisle bring in a Mini-14?

13 A    Not that I ever saw.

14 Q    Okay.  Did you bring in weapons?

15 A    I did.  I just said that.

16 Q    And was that a Kimber 45?

17 A    It was.

18 Q    What is that?

19 A    It's a .45 ACP.

20 Q    What is that?  I'm --

21 A    1911.

22 Q    Huh?

23 A    1911.

24 Q    What is that?

25 A    It's a handgun.

1  Q    Okay.  And, now, did you buy it or sell it, or you were

2  just showing it around?

3  A    I -- I bought it at the Coast Guard exchange and I -- I

4  brought it in to show.

5  Q    Okay.  And that's dif -- that was on a different occasion

6  than you bringing in a shotgun or getting a shotgun from Mr.

7  Belisle?

8  A    That's correct.

9  Q    And Mr. Pacheco, did he bring in a gun, a firearm, a

10 pistol?

11 A    I don't remember, but I wouldn't be surprised if he did.

12 Q    How about ET1 Hopkins?  Did he have an AR .22 in the shop?

13 A    I do remember when he purchased that.  Again, he showed it

14 to us and locked it up in his car.  At no point were weapons

15 just lying around the rigger shop.

16 Q    I didn't ask you that.  I asked you if people brought in

17 firearms under your watch in your shop, in violation of the

18 regulation -- the Coast Guard regulations.

19 A    Yes, they did.

20 Q    And also did Mr. Pacheco have on different occasions a

21 firearm in his vehicle?

22 A    I don't know.  If they had firearms in their vehicle, I

23 wouldn't know.

24 Q    How about Mr. Belisle?  Do you know if he had a firearm in

25 his vehicle?

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net

1  A    I do not.

2  Q    Do you know if he had a firearm in his vehicle on April

3  12th?

4  A    I do not.

5  Q    Now let me ask you a few questions about Debby Hopkins.

6  A    Okay.

7  Q    You were involved with her quite a bit during the

8  investigation --

9        MR. SCHRODER:  Your Honor, we're going to object, as

10 beyond the scope of the direct examination.

11       THE COURT:  Thought there was an agreement that the

12 parties could go beyond the scope in order to avoid recall --

13 additional witnesses.

14       MR. CURTNER:  There was.

15       MR. SCHRODER:  And that's fine, I'm fine with that,

16 Your Honor, as long as the -- as long as counsel asks

17 nonleading questions during that --

18       THE COURT:  I understand, okay.

19       MR. SCHRODER:  -- part of the testimony.

20       THE COURT:  I --

21 BY MR. CURTNER:

22 Q    Just after these homicides, did you go to Debby Hopkins'

23 house?

24 A    I did.

25 Q    And did you remove guns from her house?

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 22 of 329

1 A    I did.

2          MR. SCHRODER:  Objection.  Leading, Your Honor.

3          MR. CURTNER:  Okay.

4          THE COURT:  Sustained.

5 BY MR. CURTNER:

6 Q    What'd you do concerning firearms when you went to Debby

7 Hopkins' residence?

8 A    After comforting her and her son, I loaded up all of her

9 weapons into my wife's van.  We drove them to my house and I

10 secured them to my house, after we called MilPol, and let them

11 know that we were doing so.

12 Q    How many weapons?

13 A    I couldn't remember.  There was a lot.

14 Q    A lot of weapons, were there?

15 A    Yes, sir.

16 Q    Okay.  And where were they located when you took them out?

17 A    Well, actually, let me back up.  I didn't actually take

18 them out.  By the time I got there, they were already loaded up

19 in the van.  My wife and a couple of other wives had already

20 secured them and put them n my wife's van.  I unloaded them

21 into my house.

22 Q    And to your knowledge, did Debby Hopkins ever come to the

23 rigger shop?

24 A    She has.

25 Q    And did she ever come to the rigger shop when ET1 Hopkins

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 23 of 329
(720) 384-8078   attrans@sbcglobal.net

1  was not there?

2  A    She has.

3  Q    Okay.  And do you -- how often did that happen?

4  A    I only can recall one instance, and that -- I heard about

5  it when I was on Shemya, that she had stopped over.

6  Q    Okay.  So you were on Shemya?

7  A    Yes.

8  Q    ET1 Hopkins was on Shemya?

9  A    Yes, sir.

10  Q    And Debby Hopkins was coming over to the rigger shop?

11  A    I heard of one instance, yes, sir.

12  Q    And do you know why she was there?

13  A    I really don't, no, sir.

14  Q    Now, did somebody have to get involved in making sure that

15  didn't happen?

16  A    I believe Senior Chief Reed took care of that.

17  Q    Pardon me?

18  A    Senior Chief Reed.

19  Q    Reed?  How did he get involved?

20  A    I -- I honestly don't know all the specifics.  I really

21  don't know.  You'd have to ask him.

22  Q    Now, at some time this -- during this investigation,

23  investigators asked you about Debby Hopkins' mental state or

24  her personality.  Is that correct?

25  A    I believe they -- they probably did, yeah.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 24 of 329
(720) 384-8078  attrans@sbcglobal.net

RECKNER - CROSS

1   Q    What did you tell them?

2   A    I don't remember exactly what I said.

3   Q    Do you want to look at one of your statements?

4   A    Sure.

5        MR. SCHRODER:  Your Honor, I think I'd object to that.

6   Whatever he said before is hearsay anyway.  It's what he says

7   now that's important.

8        MR. CURTNER:  I just want to refresh his memory, Your

9   Honor.

10       THE WITNESS:  I mean, I can tell you what I think right

11  now, if you want.

12  BY MR. CURTNER:

13  Q    What do you think?

14  A    Well, I think she's -- she's a good person.  I think

15  that --

16  Q    No --

17  A    -- she -- she's socially awkward -- you're asking about

18  her mental state, sir.  I'm trying to answer the question for

19  you.

20  Q    Okay.

21  A    I believe she's socially awkward.

22  Q    Socially awkward.

23  A    In -- in social situations, she can sometimes be awkward,

24  yes, sir.

25  Q    You don't recall telling investigators that she has mental

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 741  Filed 09/23/14  Page 25 of 329
(720) 384-8078  attrans@sbcglobal.net

1  issues?

2  A    I may have said that.

3  Q    That she was damaged?

4  A    I may have said that.

5  Q    And that was your impression, that was your opinion --

6  A    I think what I said was something happened to her, and I

7  believe something hap -- this -- I'm not a psychiatrist.  This

8  is what I said, is -- what I said at the time was I believe

9  something may have happened to her in her past that made her

10  the way she is now.

11  Q    That she was not right in the head.  You said that?

12  A    I don't know if I said that specifically, but I --

13  possibly.

14  Q    Do you want to see -- can we go to, Chief Reckner, Bates

15  stamp 25937?  Do you see toward the bottom -- you can go ahead

16  and just refresh your memory about --

17  A    Uh-huh (affirmative).

18  Q    -- what you told the investigators on April 24th, 2012.

19  A    Okay.

20  Q    Do you remember what you told them then?

21  A    It's right there, so yes, sir.

22  Q    What did you tell them?

23  A    You want me to read all of it?

24  Q    No, just tell us about the part where you said she's not

25  right in the head.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 741  Filed 09/23/14  Page 26 of 329
(720) 384-8078  attrans@sbcglobal.net

1  A    I --

2  Q    If that refreshes your memory --

3  A    Yeah --

4  Q    -- what did you tell them?

5  A    Well, what I was -- what I was telling them was that she

6  has some issues.

7  Q    Yeah, and --

8  A    I said, "Debby's Debby."  I said, "You got to be in a room

9  with her to understand, kind of, where she comes from."  And I

10  did say she's not right in the head.

11  Q    Okay.  And then the next paragraph, you say she doesn't

12  have a grasp on reality.  Right?

13  A    I do.  I did say that, yeah.  And I can explain that if

14  you want me to.

15  Q    I just want to know what you said --

16  A    What -- well, it says right there she -- she gets -- I --

17  it says right there, it says -- I go on to say that sometimes

18  she gets some -- some tidbits of facts mixed up with what's --

19  whatever she's thinking and then the whole thing becomes fact

20  to her sometimes, is what I said.

21  Q    Now, you -- there was some -- was there some discussion

22  about ET1 Hopkins' retirement plans?

23  A    There was some -- a -- a bit of discussion about that,

24  yes.

25  Q    Did Mr. -- did ET1 Hopkins talk to you about his

1  retirement?

2  A    He did.

3  Q    Was he on the fence that month of April about whether he

4  was going to wait another year or go ahead then?

5  A    We talked about it.  He was concerned that he wasn't going

6  to make weight.  He did eventually make weight, and I told

7  him -- you know, I counseled him to stay and he had decided to

8  stay.  That's why he had extended for another year.  He was

9  going to stay and work on making chief, and transfer.

10 Q    And that -- and was that the status -- was that what he

11 was -- his plan was as far as you know on April 11th, 2012?

12 A    Yes.

13 Q    Let me ask you about the NATE conference that you were

14 talking about.

15 A    Okay.

16 Q    That was in San Antonio?

17 A    That year was San Antonio, yes, sir.

18 Q    And that was February 6th, 7th, and 8th?

19 A    That sounds right.

20 Q    Okay.  And Mr. Wells's surgery was on February 9th?

21 A    Okay.

22 Q    And he was sick, and he couldn't have gone to that

23 conference in any event, right?

24 A    I -- I would suppose not, but he told me he wanted to go.

25 Q    His surgery was February 9th.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 741  Filed 09/23/14  Page 28 of 329
(720) 384-8078  attrans@sbcglobal.net

1 A    I'm -- I'm just telling you what he told me, sir.  He told

2 me he wanted to go.

3 Q    And he had to be of course in Anchorage at the hospital

4 the night before, when you guys were in San Antonio.

5 A    I'm not sure when he made his date for surgery, but I -- I

6 know that he asked -- he wanted to go.  He told me that he

7 wanted to go.

8 Q    Chief Reckner, have you had a chance to discuss our

9 conversation today over the weekend about what -- how you were

10 going to answer some of my questions?

11 A    No.

12 Q    No.  Okay.  You didn't talk to anybody from the government

13 since last Thursday?

14 A    I got a phone call -- I can't remember when it was.  I

15 honestly don't even remember what we talked about.  And so it's

16 been that kind of weekend.

17 Q    Yeah.  Okay, now, some of these issues -- I just want to

18 make sure I'm clear on that.  There was this issue with Mr.

19 Wells, in your opinion, about the bird diverters?

20 A    Yes.

21 Q    And there was some type of EPA regulation that they should

22 go up?

23 A    We were -- we were told by the EPA to put bird diverters

24 on, yeah.

25 Q    And there was also some discussion about the -- how that

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 29 of 329
(720) 384-8078   attrans@sbcglobal.net

1   may be a safety issue.  Is that correct?

2   A   A safety issue?  No, I don't recall that.

3   Q   Didn't you testify about it might interfere with some of

4   the tower functions?  I thought you said that.

5   A   I think I testified that Mr. Wells thought it could

6   interfere with some of the elements as we raised it.

7   Q   Yes, and --

8   A   But it wasn't a safety issue that I recall, that had

9   specifically mentioned safety.

10  Q   The bottom line, though, Mr. Wells helped place those bird

11  diverters up --

12  A   He did not.

13  Q   He did not participate at all?

14  A   I don't recall him touching a bird diverter.

15  Q   He would -- he did not refuse to do that?

16  A   We -- we went to the site to put the bird diverters on,

17  and I -- I recall he spent most of that in Building 110.

18  Q   He did not refuse to assist in putting those bird

19  diverters up.  That was your call, and he did not resist that?

20  A   Well, I didn't specifically ask him to help us.  We were

21  going to do it and he came along.

22  Q   Now, in this fuel card incident --

23  Q   Uh-huh (affirmative).

24  A   -- you read the report.

25  Q   I did.

1    Q    And it said that they couldn't determine who had used a

2    fuel card.  That was the finding of the report, the

3    investigation.  Is that correct?

4    A    Yes, sir.

5    Q    And that anyone that had access to T2 could have had

6    access to that card.  Is that correct?

7    A    That's true.

8    Q    Now, you were at the base about the same time as Mr. Wells

9    on September 21st, 2011.  Right?

10   A    I was.

11   Q    And what type of truck do you drive?

12   A    I drive a -- a Ford F-350.

13   Q    Okay.  And is that a diesel?

14   A    It is.

15   Q    And what is the fuel capacity in your tank?

16   A    Twenty-nine gallons.

17   Q    Twenty-nine gallons.

18   A    Yes, sir.  It's a short bed.

19   Q    Okay.  And then you came back from Shemya the same day the

20   card was found.  Is that correct?

21   A    No.  When we came back from Shemya, we all got off the

22   airplane and went home.  The training officer had given us some

23   time off, so it wasn't until the following week that -- that --

24   that it was brought to my attention that the card was back.

25   Q    So it had been found after you and everybody else came

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net

1  back from Shemya?

2  A    Yes.

3  Q    And during that time it was missing, anybody who had

4  access to T2, the rigger shop, would have had access to the

5  card?

6  A    I would --

7  Q    Wasn't that the finding?

8  A    Well, I -- I guess.  But the card was already missing

9  before we left, so --

10  Q    And it could have been returned at any time?

11  A    Sure.

12  Q    Could have been taken at any time, you don't know.  And

13  how many people -- all the people at T1 had access -- they all

14  swipe cards?

15  A    Yes.

16  Q    And there's people from other functions, KSS people who

17  come in from time to time, right?

18  A    Yes.

19  Q    A number of people, a lot of people have access to T2?

20  A    They did at the time, yes.

21  Q    Now, you were instrumental in drafting the EO expectations

22  and clarifications that you provided to Mr. Wells in October

23  2011.  Is that correct?

24  A    Yeah, I helped the -- I helped the senior chief draft it,

25  yes, sir.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 741  Filed 09/23/14  Page 32 of 329
(720) 384-8078  attrans@sbcglobal.net

RECKNER - CROSS

1   Q    And I think there was some confusion about it being --

2   that memorandum that I read was to Rich Belisle.  Was there one

3   to each of them?

4   A    There was.

5   Q    Okay.  And the one that you read, was that to Mr. Wells?

6   A    That had -- the one that I read in court last week had Mr.

7   Belisle's name on it, but as I explained at the time, it was a

8   clerical error on my part.

9   Q    Okay.  And then there was a -- the same type of

10  expectations for Mr. Belisle?

11  A    The only difference was the name at the top.

12  Q    Okay.  Now, in Mr. Wells's expectations -- do you have

13  that handy?

14  A    I do not, no, sir.

15  Q    Can we go to Bates stamp 3809?  Does that look like the

16  last page, the second page of your EO expectations,

17  clarifications?

18  A    Yes, sir.

19  Q    And then that's -- have Jim Wells's signature on -- at

20  the -- just below it?

21  A    Yes, sir.

22  Q    And your main expectation was to have Mr. Wells support,

23  assist, and mentor ET1?  Is that correct?

24  A    Well, not -- not mine.  It's -- this letter comes from

25  the -- from the engineering officer.  So his expectation would

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 33 of 329
(720) 384-8078   attrans@sbcglobal.net

1 be that right there, yes, sir.

2 Q    So the officer above you asked -- was expecting Mr. Wells

3 to mentor ET1?

4 A    Yes.

5 Q    And that was -- you were part of that decision?

6 A    Yes, sir.

7 Q    No further questions.

8          THE COURT:  Redirect.

9          MR. SCHRODER:  Just a couple things, Your Honor.

10                    **REDIRECT EXAMINATION**

11 BY MR. SCHRODER:

12 Q    Just to clarify, there's been a discussion of a couple of

13 different performance evaluations.

14 A    Yes, sir.

15 Q    I just want to clarify that.  The first year you talked

16 about was the year ending -- when does that kind of period end

17 for the civilians?

18 A    March --

19 Q    All right.

20 A    So March 2011.

21 Q    Okay.  And in that period, you gave exceeds, some exceeds

22 marks?

23 A    That's correct.  And I -- I only had Mr. Wells from July

24 through March.

25 Q    Okay.

1  A    I didn't have him for the whole marking period.

2  Q    All right.  And just to clarify, so you had another set

3  you prepared the following year.  Is that correct?

4  A    That's correct.

5  Q    And were there any exceeds that year?

6  A    There were not.

7  Q    Okay.  And was that the year you had discussed with Mr.

8  Curtner that you had talked to the human relations people about

9  potentially marking lower?

10 A    Yes.  ET1 Hopkins and I were having a dis -- we had just

11 finished Mr. Belisle's and we were working on Mr. Wells's.  It

12 was probably a week before the murders.  And there was a -- a

13 factor that we wanted to give him a not meets, so we discussed

14 it with the XO.  He called Stacy Hofler, and then she gave us

15 the guidance on how we could not do that, I guess.

16 Q    Okay.  Mr. Curtner talked to you a little bit about Mr.

17 Wells' health condition, so let's ask -- I just have a couple

18 questions I want to clarify there.  Did you ever see him

19 vomiting or apparently nauseous?  Or did you ever see any of

20 those symptoms?

21 A    No, I did not.

22 Q    And when Mr. Wells came back -- this is kind of related to

23 that issue of climbing in the 12th -- did he ask or ever

24 mention the need for accommodations to you?

25 A    No, he did not.

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 35 of 329

1  Q   Now let's talk a little bit -- you talked a little bit

2  with Mr. Curtner about firearms.  Now, understanding that

3  bringing firearms into the rigger shop was, you know, not --

4  you admitted, not in accordance with the rules.  But let's go

5  over how that -- the practice.  And I think you tried to do

6  that, and I want to let you explain it.  How -- for how -- if

7  you brought a weapon in, what were the circumstances?

8  A   It was always just to either purchase or show.

9  Q   Okay.  And how long was it in the shop?

10  A   A few minutes, generally speaking.  I can't remember

11  anything going longer than maybe 10 or 15 minutes.

12  Q   And did you take any precautionary measures when the

13  firearm was in the shop?

14  A   Yeah, the weapons were always cleared and safed.

15  Q   Uh-huh (affirmative).  And then what happened after the --

16  either the examination or purchase or whatever happened?  What

17  happened to the firearm then?

18  A   They were taken into the member's vehicle and locked up.

19  Q   All right.  Did you ever allow anyone or did you ever see

20  anyone keeping a firearm in the shop for any extended period?

21  A   Never.

22  Q   All right.  Are you familiar with the commissary at Coast

23  Guard Station Kodiak -- or Base --

24  A   I am.

25  Q   -- in Kodiak?  Do they sell firearms there?

Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 36 of 329

**RECKNER - REDIRECT**

1    A    The commissary doesn't, but the exchange does.

2    Q    Okay, the exchange.  Have you bought firearms from the

3    exchange?

4    A    I have.

5    Q    Okay.  And let's go back and talk about the NATE

6    conference issue there.  When did you have -- to the best of

7    your memory, when did you have the discussion with Mr. Wells

8    about whether he was going to the NATE conference?

9    A    It was in January.

10   Q    All right.  And who brought that up?

11   A    He did.

12   Q    And one final thing on the fuel card incident.  You

13   discussed with Mr. Curtner your memory of some of the parts of

14   that investigation.  Did anyone whose -- did you read the

15   statements that were attached to that investigation?

16   A    I did.

17   Q    Did anyone admit to -- that they were probably the one

18   that used the fuel card?

19   A    Mr. Wells did.

20   Q    All right.  And what did he claim he probably did with

21   that?

22   A    He said he must have filled up the line truck.

23   Q    Okay.  Thank you.  No further questions.

24             THE COURT:  Recross.

25                    **RECROSS EXAMINATION**

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 37 of 329
(720) 384-8078   attrans@sbcglobal.net

1  BY MR. CURTNER:

2  Q    Did Mr. Wells, to your knowledge, ever violate the Coast

3  Guard regulations about bringing firearms into the rigger shop?

4  A    Not to my knowledge.

5  Q    And did you ever hear Mr. Wells make any threatening

6  statements to anybody, like, "I'm going to kill you,"

7  "Something bad will happen to somebody," "I'm afraid I'm going

8  to hurt somebody"?  You never heard (indiscernible) --

9        MR. SCHRODER:  Your Honor, beyond the scope of the

10  cross -- of the redirect.

11        THE COURT:  It is beyond the --

12        MR. CURTNER:  Pardon me?

13        THE COURT:  It is beyond the scope, but I'll let him

14  answer it.

15  BY MR. CURTNER:

16  Q    Have you ever heard him make any kind of statements like

17  that?

18  A    No, sir.

19        MR. CURTNER:  That's all I have, Your Honor.

20        THE COURT:  All right.  Do you want to pursue that last

21  question?

22        MR. SCHRODER:  I do not, Your Honor.

23        THE COURT:  All right.  Thank you, sir.  You're

24  excused.  The government's next witness.

25        (Witness excused)

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 741  Filed 09/23/14  Page 38 of 329
(720) 384-8078  attrans@sbcglobal.net

PACHECO - DIRECT

1    MS. DUIGNAN:  The government calls Nathaniel Pacheco.
2  We're checking to see if he's outside, sir.
3    THE COURT:  Okay.  Come on down.  If you'll just keep
4  coming, and you get to that little -- keep coming, and keep
5  that door -- it pulls out.  And then just step on in there,
6  remain standing just for a second.  And my clerk's right over
7  here.  She'll swear you in.
8    THE CLERK:  Please raise your right hand.
9    **NATHANIEL PACHECO, PLAINTIFF'S WITNESS, SWORN**
10    THE CLERK:  Thank you.  Please have a seat.  Sir, if
11  you could please state and spell your full name.
12    THE WITNESS:  Is Nathaniel Pacheco.  N-a-t-h-a-n-i-e-l,
13  P-a-c-h-e-c-o.
14    THE CLERK:  Thank you.
15    THE COURT:  All right.  Counsel.
16                    **DIRECT EXAMINATION**
17  BY MS. DUIGNAN:
18  Q    Mr. Pacheco, where do you currently live?
19  A    I currently live just outside of El Paso, Texas.
20  Q    And -- excuse me -- in the past have you served on active
21  duty in the Coast Guard?
22  A    Yes, ma'am.
23  Q    From what year to what year?
24  A    From 2009 until 2013.
25  Q    And before you got out, what was your last duty station?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 39 of 329
(720) 384-8078   attrans@sbcglobal.net

1  A    Communication Station Kodiak.

2  Q    And what was your rank?

3  A    I was an E-3.

4  Q    What does an E-3 or a nonrate do?

5  A    You do basically whatever you're told, so -- junior

6  personnel.

7  Q    And were you working at Communication Station Kodiak on

8  the day of the murders, April 12th, 2012?

9  A    Yes, ma'am.

10  Q    Where were you that day?

11  A    I was in Shemya, Alaska.

12  Q    And what were you doing there?

13  A    I was performing an -- an inspection.

14  Q    And when did you get back?

15  A    I got back that same day, later in the evening.

16  Q    And briefly, I want to pull up the org chart, which I

17  think is already admitted into evidence.  Exhibit 384.  Do you

18  have a laser pointer up there?

19  A    Yes, ma'am.

20  Q    I just want you to briefly point to the box that

21  represents where you were on that org chart.

22  A    Right here.

23  Q    Okay.  And who is your direct supervisor?

24  A    ET3 Cody Beauford.

25  Q    And who did he report to?

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 741  Filed 09/23/14  Page 40 of 329

1  A   He reported to ET1 James Hopkins.

2  Q   And -- we can take the chart off.  What was the --

3       THE COURT:  Could you speak up just a little louder,

4  please?

5       THE WITNESS:  Yes, Your Honor.

6       THE COURT:  Okay.

7  BY MS. DUIGNAN:

8  Q   What kind of duties were you assigned when you were

9  stationed at the communications station?

10  A   Primarily antenna field maintenance and working on

11  antennas, repairing.

12  Q   And I know you weren't there on the morning of the

13  murders, April 12th, but what was the usual routine of the

14  rigger shop?  Who would normally be there when you arrived to

15  work?

16  A   Generally, both civilian employees would be there before

17  any of us arrived.  ET1 Hopkins would also be probably one of

18  the first to get there.  He got there pretty early.

19  Q   And when did you normally arrive to work on a normal day?

20  A   Shortly after them.  I'd generally get there close to 30

21  minutes early, so sometime around 7:30.

22  Q   When you would go to work, were there any assigned parking

23  spaces?

24  A   No actually assigned spots, no.

25  Q   Were there -- was there a general arrangement for

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 741  Filed 09/23/14  Page 41 of 329

1   individuals parked?

2   A    There was, generally, where everybody parked every day.

3   Q    Can you describe that for us?

4   A    Generally, the first parking spot closest to the building,

5   closest to the front doors, would be Jim Wells.  Next one over

6   would be Rich Belisle.  Next one over would be ET1 Hopkins.

7   And after that, it was just whoever got there first.

8   Q    And if we can pull up Exhibit 392, please, which is the

9   layout.  Do you recognize that diagram?

10  A    Yes, ma'am.

11  Q    And what does it show?

12  A    Shows the rigger shop.

13  Q    Okay.  Using your pointer, can you point to the door that

14  you would normally use in the morning?

15  A    We'd normally use this door right here.

16  Q    And when you got there in the morning, how did you get in

17  through that door?

18  A    Generally, that door -- generally, that door would already

19  be unlocked.

20  Q    And which door has the swipe card?

21  A    This door does.

22  Q    Thank you.

23  A    Yes, ma'am.

24  Q    Mr. Pacheco, at that time when you worked at Communication

25  Station Kodiak, were you qualified to climb the antenna towers?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 741  Filed 09/23/14  Page 42 of 329
(720) 384-8078  attrans@sbcglobal.net

**PACHECO - DIRECT**

1  A    Yes, ma'am.

2  Q    And on days that you would climb, what would you need to

3  do before you went out to climb?

4  A    Typically, we'd start to get all of our climbing gear

5  ready.  Any of the equipment that we need, we'd start staging

6  it, and begin to work on a piece of paperwork; we called it a

7  climbing chit, that'd be routed through the chain of command.

8  Q    And if you were participating in the climb, would you have

9  to have involvement with that directly, or could you not be

10  in --

11  A    Yes, ma'am.  Yeah, everybody that was involved was

12  required to be part of that chit.

13  Q    Prior to joining the Coast Guard, did you have any

14  experience fixing or changing tires?

15  A    Yes, ma'am.  I worked at Terry's Service Center in San

16  Jon, New Mexico for close to a year.

17  Q    And looking at the equipment that you knew T2 and the

18  rigger shop to have, was there appropriate equipment there to

19  be able to work on tires?

20  A    Yes, ma'am.

21  Q    What type of equipment at T2 was there where you could use

22  it to work on tires?

23  A    We had floor jacks, jack stand, and a pneumatic impact

24  gun.

25  Q    And was there any policy about using the equipment for

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 43 of 329
(720) 384-8078   attrans@sbcglobal.net

1 unlimited personal use?

2 A    It was allowed.

3 Q    Did you ever work on the tires in the -- your tires in the

4 garage at T2?

5 A    Yes, ma'am.

6 Q    And did others?

7 A    Yes, ma'am.

8 Q    And who do you know that worked on tires there?

9 A    Most of us that worked there, believe myself, Jim Wells,

10 Rich Belisle, ET1 Hopkins, ET3 Cody Beauford.  We'd all change

11 tires in there.

12 Q    I'd like you to look at your screen and look at an exhibit

13 that's been marked as 147, which is a clip of a video.  I'd

14 like to ask you to watch it and ask if you recognize who's in

15 that video.

16      THE CLERK:  It's up on the projector.  We need

17 (indiscernible).

18      MS. DUIGNAN:  Oh, thank you.  Thank you.  Sorry about

19 that.

20    (Video played)

21 BY MS. DUIGNAN:

22 Q    Do you recognize the vehicle in that video?

23 A    Yes, ma'am.

24 Q    And do you recognize the individuals in that video?

25 A    Yes, ma'am.

**PACHECO - DIRECT**

1        MS. DUIGNAN:  Your Honor, I'd like to move for

2   admission of Exhibit 147.

3        MR. CURTNER:  No objection.

4        THE COURT:  It'll be received.

5     (Plaintiff's Exhibit 147 admitted)

6   BY MS. DUIGNAN:

7   Q    Mr. Pacheco, we're going to play it now for the jury, and

8   then I'm going to ask you to describe what you see.

9     (Video played)

10  Q    So whose car is that pulling up?

11  A    That's my Jeep.

12  Q    Sorry, it's a little bit dark.  We're trying to get

13  contrast better.

14    (Side conversation)

15  Q    The video's now paused while we work on the contrast.

16  Thank you, Nancy.  Who is that who just got out of the Jeep?

17  A    That was myself and ET3 Cody Beauford.

18        THE COURT:  You know --

19        UNIDENTIFIED SPEAKER:  Want me to rewind?

20        THE COURT:  I think so.

21  BY MS. DUIGNAN:

22  Q    And just -- to do this again, so who is that pulling up?

23  A    That is me.

24  Q    And who's getting out right now from the driver's side?

25  A    That's me.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1  Q    And from the passenger side?

2  A    ET3 Cody Beauford.

3  Q    And do you remember where you were walking at this point?

4  A    I was walking to the front door, to open the garage door.

5  Q    And what did you just see yourself do?

6  A    Open the garage door.

7  Q    And who is that coming out of the garage?

8  A    That is me.

9  Q    And what are you doing?

10 A    Inflating my tire.

11 Q    Okay, that's enough.  I'm going to ask you some questions

12 about the work environment.  What was it like to work for Petty

13 Officer Hopkins?

14 A    It was just like any other job.  It wasn't -- wouldn't say

15 it was bad at all.

16 Q    What was it like to work for Mr. Belisle or work with him?

17 A    I enjoyed working with him.  It was always fun and you

18 always got to learn something new.

19 Q    And what was it like to work with Mr. Wells?

20 A    You would also learn a lot from him as well.  And at times

21 it could be more difficult, because things were just set in the

22 way he would do things.

23 Q    Do you recall the incident -- were you at work the day the

24 fuel card went missing?

25 A    Yes, ma'am.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 46 of 329
(720) 384-8078   attrans@sbcglobal.net

1  Q    Where was it normally kept?

2  A    In Jim Wells' desk.

3  Q    And who looked for it?

4  A    Myself and ET1 Hopkins.

5  Q    And was there a time where you had to go out of town?  Did

6  you go out of town to Shemya?

7  A    Yes.

8  Q    Had the fuel card been found before you left for Shemya?

9  A    I -- I don't recall that.

10  Q    Okay.  Do you recall how long the fuel card was gone?

11  A    Several days.

12  Q    Did you have any participation in cleaning out the

13  warehouse?

14  A    Yes, ma'am.

15  Q    And who was in charge of that?

16  A    Rich Belisle was the one organizing everything.

17  Q    And how were you involved in cleaning out the warehouse?

18  What was your job?

19  A    Whatever we were told to tow away, we would tow away, and

20  moving stuff to shelves and better organizing the warehouse.

21  Q    Did Mr. Wells participate in the warehouse cleaning at

22  all?

23  A    No.

24  Q    Was there a time that you were ever told to do things by

25  Mr. Wells and those orders or requests were reversed by

PACHECO - CROSS

1  someone?

2  A    Yes, ma'am.

3  Q    And who was that?

4  A    ET1 Hopkins.

5  Q    Were you working there when Mr. Wells went on his medical

6  leave?

7  A    Yes, ma'am.

8  Q    When he left, was there any change in the operation of the

9  rigger shop, or how did that impact the shop?

10 A    There was not a large impact to our day-to-day operations.

11 Q    Was there any change of Mr. Wells's behavior when he

12 returned from medical leave?

13 A    Yes.  He was in -- less involved and slightly more

14 distant.

15 Q    I don't have any further questions for you.

16      THE COURT:  Cross-examination.

17                  **CROSS-EXAMINATION**

18 BY MR. CURTNER:

19 Q    Morning, Mr. Pacheco.

20 A    Good morning, sir.

21 Q    I'm sorry, what -- when did you start at the rigger shop?

22 A    The -- June of 2009.

23 Q    Okay.  So you've been there for a couple years.

24 A    Yes, sir.

25 Q    And I think when you were first interviewed about what

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 48 of 329
(720) 384-8078   attrans@sbcglobal.net

1  happened on April 12th, that was a few days later?

2  A    I believe it was the next day, sir.

3  Q    Okay.  And then at that time they asked you -- the work

4  environment at the rigger shop.

5  A    Okay.

6  Q    And you said that everybody got along, there was no

7  conflicts.  Right?

8  A    For the most part.

9  Q    Okay.  In fact, I think you made the comment, it was one

10  big, happy family, everybody got along?

11  A    I could say that.

12  Q    And specifically you said there was no conflicts with Jim

13  Wells at the rigger shop.  That's what you told them when you

14  were first interviewed.  Right?

15  A    Yes.

16  Q    Now, Mr. Wells -- did you learn a lot from Mr. Wells while

17  you were there?

18  A    Yes.

19  Q    He had a lot of information?

20  A    Yes.

21  Q    He taught you a lot of things?

22  A    Yes.

23  Q    He helped you with your Jeep at times?

24  A    Yes, sir.

25  Q    Could you tell us about that?

1  A    He helped me identify a problem with my steering box on my

2  Jeep, when I was having problems with it.

3  Q    Okay.  You were trying to deal with that for some time?

4  A    Yes.

5  Q    And couldn't quite figure it out?

6  A    Yes, I was working on it in the rigger shop, and he came

7  out and assisted me in diagnosing that problem.

8  Q    Okay.  And so I think you also said that after surgery, he

9  just wasn't really fully back to work after that.  Right?

10 A    Yes.

11 Q    Okay.  He was just still -- that was just right after

12 his -- the major surgery he had when he was out for a couple

13 weeks.  Is that right?

14 A    Yes.

15 Q    And so did you go on this project in Shemya with Mr. --

16 was -- Mr. Wells was there when there was an issue about bird

17 diverters on an antenna?

18 A    Yes.

19 Q    Okay.  You recall that?

20 A    I do.

21 Q    And do you recall were the bird diverters placed on the

22 tower?

23 A    Yes.

24 Q    And did Mr. Wells show you how to do that?

25 A    I don't recall if he -- who showed me how to do that.

1  Q    Okay.  Was it -- you remember him working there?

2  A    Yes, I do.

3  Q    If you had a question about that, he would assist you.  Is

4  that correct?

5  A    Yes.

6  Q    Okay.  Let me ask you about -- you talked about the front

7  door that's normally unlocked?

8  A    Yes.

9  Q    The first one there, as I understand, usually somebody's

10  there at 7.

11  A    Yes.

12  Q    And the first thing they'll do is with a swipe card,

13  they'll enter the rigger shop?

14  A    Yes, sir.

15  Q    And then the next thing they would probably do would be --

16  unlock that other door that you went through?

17  A    Yes, sir.

18  Q    So typically, every day that door was unlocked, let's say

19  around 7 a.m., as soon as the first person got there?

20  A    Typically, yes.

21  Q    And so anybody could have gone through that door at any

22  time after it was unlocked?

23  A    Yes.

24  Q    And that's where all of you and the nonrates would go in

25  whenever you got there?

1 A    Yes, sir.

2 Q    You knew it would be unlocked?

3 A    Yes, sir.

4 Q    Now, I think you observed while you were there a number of

5 people bring guns into the rigger shop?

6 A    Yes, sir.

7 Q    Do you remember what Mr. Belisle brought into the rigger

8 shop?

9 A    Yes, sir.

10 Q    What did he bring in?

11 A    I remember an older lever-action rifle.

12 Q    Okay.  Was there a Mini-14 that you talked about?

13 A    That was mine.

14 Q    Oh, that was yours that you brought in?

15 A    Yes, sir.

16 Q    Okay.  And there was a Kimber 45?

17 A    Yes, sir.

18 Q    Okay.  That was -- who brought that in?

19 A    I can't recall exactly who brought that in right now.

20 Q    Did you have a -- did you bring in a Dolani (ph)

21 Sportster?

22 A    I did.

23 Q    What's that?

24 A    It's another rifle.

25 Q    Okay.  I've never heard of it.  Is it a hunting rifle?  Is

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 741  Filed 09/23/14  Page 52 of 329
(720) 384-8078  attrans@sbcglobal.net

1   it --

2   A   No, sir, it's an assault rifle.

3   Q   An assault rifle.

4   A   Yes, sir.

5   Q   Is it made in the United States or --

6   A   It is.  The majority of the parts are.

7   Q   Okay.  Where are the other parts --

8   A   Legally, it must be.

9   Q   Okay.  And -- but it's an assault rifle.  Is it, like, a

10  116 or something or Kalashnikov?  What is it?

11  A   Similar.  Variant of a Kalashnikov.

12  Q   Okay.  And then ET1 Hopkins, did you see him bringing any

13  guns in the --

14  A   The only time I recall him bringing a gun in, when we were

15  having a range day --

16  Q   Okay.

17  A   -- a morale range day.

18  Q   An AR .22?  Do you recall that?

19  A   Yes.  Yes, I do.

20  Q   What's an AR .22?

21  A   Should -- a .22 rifle that resembles an AR.

22  Q   AR standing for?

23  A   AR actually is ArmaLite rifle.

24  Q   Okay.  Now, was it -- Mr. Belisle, did he have -- did you

25  know that he was previously in MilPol himself?

1  A   Yes, sir.

2  Q   Okay.  And do you know how long he did that?

3  A   I do not know how long he did that.

4  Q   That's when he was -- before he went civilian?  Is that

5  correct?

6  A   Yes, sir.

7  Q   And did he talk about what el -- what other enforcement

8  agency he was with?

9  A   I'm -- I'm not sure of the actual names.

10  Q   TACLET?  Do you know what that is?

11  A   Yes, I believe he was at a -- a TACLET or something

12  similar.

13  Q   What does that mean?

14  A   A tactical law enforcement detachment.

15  Q   Do you know what they do?

16  A   Not exactly.  Deploy with other groups.

17  Q   Now, I think you also had testified that -- or you had --

18  is it your opinion that a lot of people came in the rigger shop

19  all the time?

20  A   It was fairly high-traffic.

21  Q   High-traffic meaning not just the people who worked there?

22  A   Yes.

23  Q   People from -- up from the main communications station up

24  the hill?

25  A   Yes, as well as from the base.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1  Q    And people from base would come by?

2  A    Yes.

3  Q    Pretty regularly?

4  A    Yes, sir.

5  Q    Okay.  So a lot of people were familiar with the rigger

6  shop?

7  A    Yes, sir.

8  Q    Now, so you would work on your vehicle, obviously at the

9  rigger shop?

10 A    Yes, sir.

11 Q    Did you usually have to have some type of permission

12 before you could use the rigger shop on work hours for any kind

13 of automotive --

14 A    Generally wouldn't do it during work hours.  But other

15 than that, we would just have to notify the watch officer that

16 we were inside the building.

17 Q    Okay.  So that was a requirement.  Before you would do

18 work on your vehicles, you would get some permission or do some

19 notification to somebody?

20 A    Yes, we'd just notify them that we were there.

21 Q    And do you know where there's spare tires in the rigger

22 shop?

23 A    I don't believe there were spares around.  Perhaps studded

24 tires or nonstudded, the extras.

25 Q    There's not a whole lineup of different type, size tires,

1  spare tires for all kind of vehicles?

2  A    No, occasionally they were left in by the people who were

3  swapping out spare -- regular tires to studded tires.  That

4  would be the one time there would be actually tires in there.

5  Q    Now, do you recall -- do you know Debby Hopkins?

6  A    Yes, sir.

7  Q    Do you recall her being at the rigger shop?

8  A    Yes, sir.

9  Q    And how many times do you think she was there in your

10 presence?

11 A    Several times.

12 Q    Several times.  And why would she be at the rigger shop?

13 A    She'd come by to visit her husband or just stop by and

14 visit with us real quick.

15 Q    And would she stop by and visit with -- who?  You and --

16 A    Us, and any of the other personnel that was there.

17 Q    And would she stop in sometimes when ET1 Hopkins was not

18 there?

19 A    Yes, sir.

20 Q    Was that ever an issue?

21 A    I'm not sure whether that was an issue or not.

22 Q    Okay.  Did she refer to you and Cody and -- as your -- as

23 her kids?

24 A    Yes, sir.

25 Q    Okay.  And you've heard that a number of times?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 741  Filed 09/23/14  Page 56 of 329
(720) 384-8078  attrans@sbcglobal.net

PACHECO - CROSS

1  A    Yes, sir.

2  Q    Did -- what did you think of her?

3  A    She's really nice, very energetic.  Kind of different, but

4  was very energetic.

5  Q    And also out there?  Is that what you described her

6  before?

7  A    She's a little out there.

8  Q    What do you mean by that?

9  A    She's always a ball of energy, kind of bouncing around.

10 Q    That's what you mean by out there?

11 A    That's what I would say.

12 Q    Okay.  Now, you talked about the fuel card as well.

13 Everybody knew where the fuel card was, right?

14 A    Yes, sir.

15 Q    It was there -- that's where it was all the time?

16 A    Yes, sir.

17 Q    And anybody could use it.  If they wanted to use it, they

18 knew where it was?

19 A    Yes, sir.

20 Q    Your -- when did you leave Kodiak?

21 A    I believe I left Kodiak in September of last year.

22 Q    And before you left and even now, was there some type of a

23 criminal investigation there --

24      MS. DUIGNAN:  Objection, Your Honor.  I'd like it at

25 sidebar.

1    THE COURT:  Okay.

2        (At sidebar with the Court and counsel)

3        MS. DUIGNAN:  Your Honor, this morning we had

4    disclosed, after learning that there was a continued potential

5    investigation against Mr. Pacheco that he was being

6    investigated for a bar fight, his involvement in a bar fight.

7    Right now there's no action that's been taken.  We called last

8    night to the District Attorney in Kodiak.  They're considering

9    it, but they don't know what they're going to do.  It happened

10   eight months ago.  It's not relevant to the case.  It doesn't

11   impact on his -- in his -- on his honesty, and it's not

12   admissible otherwise.  There certainly --

13       THE COURT:  (Indiscernible).

14       MS. DUIGNAN:  Yes.

15       THE COURT:  What's the relevance (indiscernible)?

16       MR. CURTNER:  Well, Judge, if he's a -- under

17   investigation for a felony assault, which I understand the

18   other person was in the hospital, I think that's relevant to

19   his credibility and also under the circumstance of this case,

20   where (indiscernible) circumstantial based on (indiscernible).

21   So I think that this is, you know, consistent with the

22   testimony we've heard so far.

23       MS. DUIGNAN:  Right.  Now, Your Honor, first of all,

24   there's absolutely no indication that a felony charge is being

25   considered.  If anything, the District Attorney has indicated

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 741  Filed 09/23/14  Page 58 of 329

1    they're looking at a misdemeanor, but they haven't made up

2    their mind.  Moreover, it's not admissible under 609.

3          THE COURT:  (Indiscernible).

4          MR. OFFENBECHER:  The witness has a pending criminal

5    investigation in state case.  The United States Attorney's

6    Office has contacted the other prosecutor about it.  It's

7    clearly admissible under *Davis versus Alaska*.

8          MS. LOEFFLER:  Only if we had -- if there were any

9    promises to him one way or another, but I don't control the

10   state, nor did we (indiscernible) anything.  And under 609, you

11   got to have a felony conviction or a misdemeanor for

12   dishonesty.  There are no convictions whatever.

13         UNIDENTIFIED SPEAKER:  (Indiscernible) --

14         MS. LOEFFLER:  Excuse me, if I may finish.  You know,

15   yes, we contacted him.  But obviously, under *Giglio*, if we had

16   made any promises to anybody.  But I don't control the state,

17   and we have no knowledge.  That's why we called last night and

18   said, "What are you doing?"  I mean, there are no promises.

19   And 609 absolutely covers this.  They have to have a conviction

20   for a felony within 10 years or a misdemeanor involving

21   dishonesty, as opposed to just -- you know --

22         THE COURT:  I think (indiscernible).

23         MR. OFFENBECHER:  Your Honor, it has nothing to do with

24   609.  It's the fact that the witness knows in his mind that he

25   has a criminal investigation pending.  The prosecutor has

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 741  Filed 09/23/14  Page 59 of 329

1  contacted the District Attorney.  In his mind, he has an

2  incentive to curry favor with the prosecutor, with the

3  government, in order to get favorable treatment on his case,

4  his pending assault investigation.  It has nothing to do with

5  evidentiary 609.  It's what's in the witness's mind --

6        MS. DUIGNAN:  (Indiscernible) the witness, the -- just

7  the U.S. Attorney has absolutely no involvement or can

8  influence this case at all.  It's with the state.  So that

9  argument fails.

10        MS. LOEFFLER:  And 609 is the rule that covers it for

11  exactly (indiscernible) exactly designed not to allow people to

12  say, let me just pry into this.  So -- and if there were a

13  promise from me, fine.  But I don't have any control over the

14  state.

15        MR. OFFENBECHER:  Your Honor, they can certainly

16  examine the witnesses (indiscernible) they haven't made any

17  promises about your criminal (indiscernible) --

18        MS. DUIGNAN:  Not in front of the jury.

19        MS. LOEFFLER:  Right.

20        MR. OFFENBECHER:  -- (indiscernible).

21        THE COURT:  Okay.

22        MR. OFFENBECHER:  Jury's (indiscernible).

23        THE COURT:  All right.  Let's just take --

24     (End of sidebar)

25        THE COURT:  We're going to take a 15-minute recess now,

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 741  Filed 09/23/14  Page 60 of 329
(720) 384-8078  attrans@sbcglobal.net

1    and I'm going to finish this.  So we'll take a 15-minute recess

2    and take care of this.

3        (Jury not present)

4        (Side conversation)

5            THE COURT:  Please be seated.  Okay.  Can you put the

6    buzzer on?

7            THE CLERK:  Yes, (indiscernible).

8        (At sidebar with the Court and counsel)

9            THE COURT:  Still on record, okay.  So what's going on

10   here?

11           MS. DUIGNAN:  (Indiscernible) --

12           THE COURT:  You want to cross-examine -- you want to --

13   let me make sure I understand.  You want to ask that question.

14           MR. CURTNER:  Yes.

15           THE COURT:  And he's going to say, (indiscernible)

16   party.  And then what are you going to say?

17           MR. CURTNER:  Then I'm going to ask him if he knows

18   that the District Attorney's been in contact with the U.S.

19   Attorney's Office concerning that investigation.

20           MS. DUIGNAN:  Your Honor --

21           THE COURT:  Then (indiscernible) --

22           MR. CURTNER:  Well, that's --

23           THE COURT:  That's it?

24           MR. CURTNER:  That's it.

25           THE COURT:  (Indiscernible).

1    MS. LOEFFLER:  He doesn't know anything -- I don't

2  know --

3    MS. DUIGNAN:  (Indiscernible).

4    MS. LOEFFLER:  Doesn't know anything about whether --

5  we haven't consulted them on what they want to --

6    MS. DUIGNAN:  No.

7    MS. LOEFFLER:  -- do.  We called them up and asked them

8  about it.

9    MS. DUIGNAN:  We have no --

10   MS. LOEFFLER:  There was no deal, no anything.  The

11 state makes their own decisions, and I believe, Your Honor,

12 this is exactly what 609 says.  I mean, it's meaningless rule

13 that the defense says, well, it goes to bias any time you -- I

14 can circumvent the rule by asking him about a pending

15 investigation that's neither -- where there's no conviction,

16 you know.  We just called to find out, where are you.  And --

17   THE COURT:  Okay.

18   MS. LOEFFLER:  -- if we had some influence, they would

19 have resolved this by now.

20   THE COURT:  (Indiscernible).

21   MS. LOEFFLER:  Yeah.  I mean, I'm concerned that what

22 they're trying to do is get him to take the Fifth Amendment in

23 front of the jury, which they can't do.  So you have to find

24 out --

25   THE COURT:  (Indiscernible) going to ask three

1  questions.  Are you aware of an investigation, ongoing, first

2  question.  The second question --

3       MR. CURTNER:  Is he aware that the U.S. Attorney's

4  Office here has been in contact with the District Attorney's

5  Office concerning (indiscernible).

6       MS. LOEFFLER:  I think that's an improper question,

7  because it implies we had some -- that we have some control

8  over what the state is doing.  One, how would he know about it,

9  and, two, that's an improper implication.  We -- you know, if

10 we had any un -- you know, if we had made any deal with the

11 state, it would absolutely have to be turned over to the

12 defense, but no such deal exists.

13      MR. OFFENBECHER:  You can put on evidence

14 (indiscernible).

15    (Indiscernible speech)

16      THE COURT:  Okay.  (Indiscernible).  Okay, where are

17 we?

18      MS. LOEFFLER:  What -- they just asked -- now they want

19 us to on the evidence that we didn't make a deal.  There is no

20 deal.  They don't get to ask him.  This is talking about way

21 off on the thing.  I mean, as I said, Rule 609 covers it.

22 There's an evidence rule directly on this.

23      MR. OFFENBECHER:  It's a natural inclination of a

24 witness who's under investigation for criminal investigation to

25 want to curry favor with the government to get favorable

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 741  Filed 09/23/14  Page 63 of 329
(720) 384-8078  attrans@sbcglobal.net

1  treatment.

2        MS. DUIGNAN:  With the correct sovereign who has

3  control over his case, perhaps, but not with us.

4        THE COURT:  (Indiscernible) ask him some questions

5  (indiscernible).

6        MS. LOEFFLER:  Yeah, I think you should, so that we're

7  not --

8        THE COURT:  All right, sir, could you come over here?

9  We have a couple questions for you.  Oh, (indiscernible).

10  Okay.  Get up close (indiscernible) so (indiscernible).

11                        VOIR DIRE

12  BY MR. CURTNER:

13  Q    You're aware you're under a criminal investigation from

14  the Kodiak District Attorney's Office right now, is that right?

15  A    Been asked to speak with the police, yes.

16  Q    And there's an ongoing investigation today, right?

17  A    Alls I know is the police have tried to contact me.

18  Q    And (indiscernible) and you know that the U.S. Attorney's

19  Office has been in touch with law enforcement or the

20  prosecutor's office in Kodiak about your investigation?

21  A    Yes.

22        THE COURT:  Okay.  (Indiscernible).

23        MR. CURTNER:  I haven't had to.

24        THE COURT:  (Indiscernible).

25  BY MR. CURTNER:

1   Q    Can you tell me the nature of what you're being

2   investigated for?

3   A    Rather not speak about it.

4   BY MS. LOEFFLER:

5   Q    My only followup, and I know (indiscernible) have you been

6   told repeatedly that the U.S. Attorney's Office has no deal

7   with the state?  Were you informed of that a couple of times?

8   A    Yes.

9   Q    Okay.

10        THE COURT:  I didn't (indiscernible).

11        MS. LOEFFLER:  Whenever we talked, we'd been informed

12  that there is no deal (indiscernible) U.S. Attorney's Office --

13        THE COURT:  Okay.

14        MS. LOEFFLER:  -- and the state.

15        MR. OFFENBECHER:  Based on (indiscernible).

16        THE COURT:  (Indiscernible).

17        MR. OFFENBECHER:  (Indiscernible) final question here.

18  He's indicated that he's not going to say what the nature of

19  the investigation is.  I'm assuming that's because -- his Fifth

20  Amendment privilege against self-incrimination.  He's going to

21  be calling --

22  BY THE COURT:

23  Q    (Indiscernible) your question what's the nature of the

24  investigation.  (Indiscernible) understand (indiscernible)

25  working with that?

1  A    No, sir.

2  Q    (Indiscernible).

3        MS. LOEFFLER:  All right.  I'm not his attorney and I'm

4  not his advisor.

5        THE COURT:  (Indiscernible).

6        MS. LOEFLER:  He has a Fifth Amendment right not to

7  answer any specifics about it.  And --

8        THE COURT:  (Indiscernible) --

9        MS. LOEFFLER:  -- it's not relevant.

10       THE COURT:  -- (indiscernible).

11       MS. LOEFFLER:  Well, it's up to him to decide what he

12  does.  And I think he has a right to do that.  I don't speak

13  for him.

14       THE COURT:  Okay.

15       MR. OFFENBECHER:  (Indiscernible) have to at least be

16  apprised of the (indiscernible) nature of the investigation,

17  otherwise how can (indiscernible) his credibility.  That's the

18  whole point --

19       MR. SCHRODER:  That's -- (indiscernible) just asking

20  more and more questions, to try to get him to take the Fifth.

21       MS. LOEFFLER:  That's right.

22       MS. DUIGNAN:  Exactly.

23       MS. LOEFFLER:  (Indiscernible).

24       MR. SCHRODER:  (Indiscernible) two questions first,

25  then they said three, now --

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net

1    MS. DUIGNAN:  (Indiscernible) --

2    MR. SCHRODER:  -- they want more.

3    MS. LOEFFLER:  And --

4    MR. SCHRODER:  They want as many questions as it's
5    going to take to get him under oath (indiscernible) --

6    MS. LOEFFLER:  And there's a sixth -- there is an
7    evidence rule directly on point, and there is no exception to
8    it, for, we just want to ask him about --

9    UNIDENTIFIED SPEAKER:  (Indiscernible) evidence rule?

10    MS. LOEFFLER:  -- pending -- 609.

11    MS. DUIGNAN:  609.

12    MS. LOEFFLER:  You may not cross-examine a witness
13    about -- when there's no conviction and there is -- and --
14    unless they could show he was testifying to curry favor with
15    us.  He's just told you he's been told repeatedly that he
16    wasn't.  If there was a pending investigation that we were
17    (indiscernible), that would be the exception to Rule 609.  But
18    just, are you under an investigation, is absolutely covered by
19    609, unless he were testifying to curry favor with it.  He
20    isn't.

21    THE COURT:  (Indiscernible).  This sounds to me like
22    you're going to ask two questions (indiscernible) does sound
23    (indiscernible) 609, and I'm not sure that the probative value
24    outweighs the prejudice.  That's (indiscernible) he's being
25    investigated (indiscernible) apparently allegedly

1  (indiscernible) a bar fight that occurred at least eight months

2  after this incident.  And it just doesn't seem to be that

3  relevant.  And to the extent it is, the questions and the

4  problems are -- prejudice outweighing the probative value.

5       MR. OFFENBECHER:  So just so our record's clear, it

6  sounds like the court's ruling we are not offering to impeach

7  him by evidence of conviction of a crime, which is what

8  Evidence Rule 609 is about.  But instead, what we are offering

9  is to ask him a question, that he knows that he has a criminal

10 investigation, an assault felony investigation -- or

11 misdemeanor, it doesn't really matter -- pending in a

12 jurisdiction in which there's cross-jurisdictional changes that

13 (indiscernible) various law enforcement agencies all the time,

14 that he knows that that's pending as he's testifying, he knows

15 that the United States Attorney's Office, who's -- who he's

16 testifying for here, has contacted the District Attorney's

17 Office about that investigation, and he is unwilling to discuss

18 even the nature of the allegations that are against him, based

19 on his Fifth Amendment privilege against self-incrimination.

20      So we're offering to prove that -- we're offering this

21 because it's circumstantial -- I mean, he has an incentive to

22 curry favor with the prosecutors here in hopes that he will get

23 more favorable treatment with his assault case.

24      THE COURT:  (Indiscernible) all the questions

25 (indiscernible).

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 741  Filed 09/23/14  Page 68 of 329
(720) 384-8078  attrans@sbcglobal.net

1       MR. OFFENBECHER:  Right, we're entitled to impeach
2  the --
3       THE COURT:  (Indiscernible).
4       MR. OFFENBECHER:  We're entitled to impeach the
5  credibility of a witness called by the government.  If it
6  wasn't that important, they wouldn't have called him.
7       MS. LOEFFLER:  Your Honor, you can only impeach it
8  within the evidence rules.  As I said, there are two things.
9  609 says -- this is absolutely verbatim.  The exception to 609
10 is if there were some deal or promises made on his behalf.
11 He's told you --
12      THE COURT:  (Indiscernible) --
13      MS. LOEFFLER:  -- umpteen -- we've told him every
14 single time there were -- no deal.  It's not my jurisdiction.
15      MR. OFFENBECHER:  (Indiscernible).
16      MS. DUIGNAN:  (Indiscernible) exceptions
17 (indiscernible) at all (indiscernible).
18    (Indiscernible speech)
19      THE COURT:  (Indiscernible) talking about juror number
20 14, the juror sitting next to her (indiscernible).
21    (Indiscernible speech)
22      MS. LOEFFLER:  Well, and we just make sure that he
23 didn't say anything about the case, that the Marshal --
24      THE COURT:  (Indiscernible) Marshal (indiscernible).
25      MS. LOEFFLER:  Do you want to question -- is it -- do

1  you want to question just to make sure that the Marshal did not

2  say anything about the case whatsoever?  Because I'm fine as

3  long as the Marshal -- as the juror tells you that there was

4  no -- absolutely no discussion of the facts of this case.  And

5  then I'm okay.

6      (Indiscernible speech)

7          THE COURT:  Okay, what -- do you want to do it right

8  now?

9          MS. LOEFFLER:  Yeah, I think we should.

10          THE COURT:  Okay.  Okay, can you bring juror number 14

11  here, and let's step out in the hallway (indiscernible) right

12  here (indiscernible).  (Indiscernible).

13          JUROR NO. 14:  (Indiscernible).

14          THE COURT:  (Indiscernible) say anything to you at all

15  about the case, other than what you've indicated and wrote?

16          JUROR NO. 14:  (Indiscernible).

17          THE COURT:  Okay, (indiscernible).  Any other

18  questions?

19          MS. LOEFFLER:  (Indiscernible).

20          THE COURT:  Okay.

21          JUROR NO. 14:  (Indiscernible), that's all it was.

22          THE COURT:  (Indiscernible) make a note of that.

23          JUROR NO. 14:  He goes --

24          THE COURT:  Okay, go ahead.

25          JUROR NO. 14:  He goes, you know -- he's like, oh,

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 70 of 329
(720) 384-8078  attrans@sbcglobal.net

```
 1  how's -- how's it doing in court, you know, being that you work
 2  there?  I was like, no, it's district court.  He was
 3  (indiscernible) judges, yeah, (indiscernible) said, he goes,
 4  oh, it's Judge so-and-so, and that's (indiscernible).
 5          THE COURT:  That was it?
 6          JUROR NO. 14:  That was it.  He goes, we can't talk
 7  (indiscernible).  So --
 8          THE COURT:  All right, good.  Thank you.  Any -- yes,
 9  sir.  Oh, well, (indiscernible).  Well, I ran into a juror at
10  the airport.  I was going to (indiscernible) from Bethel.  We
11  were standing in line to get McDonalds hamburgers after we
12  rushed out of here.  And I think he had just ordered his
13  hamburger and I was getting ready to order mine, and we
14  recognized each other at that moment.  And as he was kind of
15  approaching me, I said, "You can't -- don't say anything about
16  the case."  And he said, "Can I say it's interesting?"  I said,
17  "Don't say anything else."  (Indiscernible) he's glad he got --
18  he's glad he's got the weekend off.  And I thought, what a
19  small world.
20          UNIDENTIFIED SPEAKER:  (Indiscernible).
21          THE COURT:  I can tell you what happened.  And I got
22  my -- and then -- oh, then his hamburger came and he
23  (indiscernible).
24          MS. LOEFFLER:  This is Alaska, and part
25  (indiscernible).
```

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 741  Filed 09/23/14  Page 71 of 329

1    THE COURT:  Okay.  (Indiscernible) back to the --

2    MR. OFFENBECHER:  (Indiscernible) this is for our

3    objection and our request to examine the witness is the

4    defendant's constitutional right to confront and cross-examine

5    his accusers, in *Davis versus Alaska*.

6    MS. LOEFFLER:  He did get to cross-examine.  *Davis-*

7    *Alaska* doesn't say you can ask questions outside the governing

8    of the evidence rules.  That's why the four were covered at --

9    THE COURT:  (Indiscernible).

10   MS. LOEFFLER:  That's right.

11   THE COURT:  (Indiscernible) confusion and prejudice.

12   (Indiscernible) terms of the context of the case.  All right.

13   You guys probably need a couple of minutes.

14   MS. LOEFFLER:  Yeah, can we have a restroom break?

15   THE COURT:  Yes.

16   (End of sidebar)

17   THE COURT:  Ten more minutes, to make sure everyone's

18   comfortable, okay?

19   THE CLERK:  Thank you.  All rise.  Matter stands in a

20   10-minute recess.

21   (Court recessed at 9:56 a.m., until 10:10 a.m.)

22   (Jury not present)

23   THE CLERK:  All rise.

24   THE COURT:  Wait, wait.  Ready for the jury?

25   MR. OFFENBECHER:  Yes, sir.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 741  Filed 09/23/14  Page 72 of 329
(720) 384-8078  attrans@sbcglobal.net

1        MS. DUIGNAN:  Yes, Your Honor.

2        THE CLERK:  Yeah.

3        THE COURT:  Go and bring the jury in.

4        THE CLERK:  His Honor the Court, the United States

5   District Court is again in session.  Please be seated.

6        THE COURT:  Okay.  The jury's on their way.

7      (Jury present)

8        THE COURT:  Okay.  Please be seated.  Mr. Curtner.

9        MR. CURTNER:  I don't have any other questions for this

10  witness --

11       THE COURT:  Okay.

12       MR. CURTNER:  -- Your Honor.

13       THE COURT:  Redirect.

14       MS. DUIGNAN:  Yes, Your Honor.

15                    **REDIRECT EXAMINATION**

16  BY MS. DUIGNAN:

17  Q    Mr. Pacheco, on cross-examination, Mr. Curtner asked you

18  if Mr. Wells was not fully back to work.  You had said he was

19  distant.  Did you know anything about his medical condition?

20  A    I didn't know much, no, ma'am.

21  Q    Do you know who was familiar with who arrived at T2

22  between 7 and 7:30 a.m.?

23  A    Anybody in the shop would be familiar with the arrivals.

24  Q    And when you say the shop, you mean the rigger shop?

25  A    The rigger shop, yes, ma'am.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 741  Filed 09/23/14  Page 73 of 329
(720) 384-8078  attrans@sbcglobal.net

1  Q    On cross-examination, Mr. Curtner asked you about who knew

2  where the fuel card was located, and you said, "Everyone."  Can

3  you clarify what that "Everyone" means?

4  A    Just everybody in the rigger shop.

5  Q    So just those who worked in the rigger shop?

6  A    Yes, ma'am, just rigger shop personnel.

7  Q    He also asked you if people came into the rigger shop.

8  Was there high traffic normally between 7 and 8 a.m. in the

9  morning in the rigger shop?

10  A    No, ma'am, just us arriving to work in the rigger shop.

11  The only other person would be the watch officer.

12  Q    You also had mentioned on cross-examination that you'd

13  have to notify the watch if you were coming in to work on

14  tires.  Was that all the time, or was that just when nobody was

15  in the building?

16  A    Only if it was after hours or weekends, just so they could

17  be notified that the building was going to be open, people

18  would be inside.

19  Q    I have no further questions.  Thank you.

20                          VOIR DIRE

21  BY THE COURT:

22  Q    I do have a point of clarification, just to avoid any

23  confusion.  There was a video that showing -- showed you

24  putting air in your tire.

25  A    Yes, Your Honor.

1  Q    The -- was -- that was not on April 12th, was it?

2  A    No, Your Honor.

3  Q    Okay.  Some -- because no one indicated when that

4  occurred.

5        MS. DUIGNAN:  Sorry, Your Honor.  We have -- the date,

6  timestamp is on it.  It was April 7th.

7        THE COURT:  Okay.  All right.  Well, that was unclear

8  to me.  Do you have any further -- anything further?

9        MR. CURTNER:  No, Your Honor.

10       THE COURT:  Okay.  Thank you, sir.  You're excused.

11 Government's next witness.

12     (Witness excused)

13       MS. DUIGNAN:  Petty Officer Henry.

14       THE COURT:  You're heading in the right direction.

15 Swear you in over here.

16       THE CLERK:  Okay.  Please raise your right hand.

17        **LEAH HENRY, PLAINTIFF'S WITNESS, SWORN**

18       THE CLERK:  Thank you.  Please have a seat.  And,

19 ma'am, if you can please state and spell your full name.

20       THE WITNESS:  Leah Henry.  L-e-a-h, H-e-n-r-y.

21       THE COURT:  All right, counsel.

22              **DIRECT EXAMINATION**

23 BY MS. DUIGNAN:

24 Q    Petty Officer Henry, what organization do you work for?

25 A    The United States Coast Guard.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 741  Filed 09/23/14  Page 75 of 329
(720) 384-8078  attrans@sbcglobal.net

1  Q   And when did you join the Coast Guard?

2  A   March 1st, 2010.

3  Q   And where are you stationed now?

4  A   I am attached to Base Kodiak MWR.

5  Q   And where were you stationed on April 12th, 2012?

6  A   The Communications Station Kodiak.

7  Q   And those -- even though you're still in Kodiak, those are

8  two different commands --

9  A   Yes.

10  Q   -- is that correct?  What is your job description right

11  now?

12  A   I am a boatswain mate, third-class petty officer.

13  Q   And what does a boatswain's mate do?

14  A   In simple terms, boat operations and navigation.

15  Q   And you said you were third-class petty officer, correct?

16  A   Yes.

17  Q   What was your rank or rate on April 12th, 2012?

18  A   I was a E-3, seaman.

19  Q   And there -- I think there was a point earlier in the

20  investigation where you were known by a different name.  Can

21  you tell us that?

22  A   My last name was Killingsworth, Seaman Killingsworth.

23  Q   You said that you're a boatswain's mate.  Why did you

24  decide to pursue the boatswain's mate rating?

25  A   I wanted to drive a boat, primarily.  I had a lot of good

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 741  Filed 09/23/14  Page 76 of 329
(720) 384-8078  attrans@sbcglobal.net

1  mentors.  Rich Belisle was a huge mentor of mine.

2  Q   On April 12th, 2012, at what shop at Communication Station

3  Kodiak did you work at?

4  A   I was in T2, the rigger shop.

5  Q   And if we can briefly pull up Exhibit 393.  Do you have a

6  laser pointer up there?

7  A   I do.

8  Q   Okay.  If you can just point to where you are on that

9  chart.

10 A   Right there.

11 Q   Thank you.  How did you get to work the morning of April

12 12th, 2012?

13 A   I drove my vehicle.

14 Q   And what car do you drive?

15 A   A 2009 Nissan Xterra.

16 Q   And where did you park it that morning?

17 A   I parked next to Seaman Coggins at T2.

18 Q   And what type of car does he drive?

19 A   He drove a black Jeep Cherokee, I believe.

20 Q   And about what time, if you can remember, did you pull up

21 that morning?

22 A   About 7:45, 7:47.

23 Q   When you pulled up that morning, what other cars did you

24 see parked in front of T2?

25 A   I saw ET1 Hopkins' truck.  Rich Belisle's truck was next

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 741  Filed 09/23/14  Page 77 of 329
(720) 384-8078  attrans@sbcglobal.net

HENRY - DIRECT

1 to his.  Our two work trucks, both white, a -- both Ford.  And

2 then there's a dumpster, and Coggins was parked right in front

3 of the dumpster and I was beside him.

4 Q    When you pulled up to park that morning, did you notice

5 any other cars parked in front of the garage space?

6 A    No, did not.

7 Q    I'd like to pull up Exhibit 265, which I believe has

8 already been admitted.  Do you recognize that photo?

9 A    Yes.

10 Q    And using your pointer, can you point to which vehicle is

11 yours?

12 A    There.

13 Q    Okay.  And that's the silver Xterra?

14 A    Yes.

15 Q    And to the right of that, whose car is that?

16 A    Seaman Coggins'.

17 Q    And to the right of that, what vehicle is that?

18 A    That's our work truck.

19 Q    And what is to the right of that?

20 A    Another work truck.

21 Q    And to the right of the work truck?

22 A    Rich Belisle.

23 Q    And to the right of that?

24 A    ET1 Hopkins.

25 Q    Thank you.  On a normal morning when you pulled up, were

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 78 of 329
(720) 384-8078   attrans@sbcglobal.net

1 there assigned parking spaces at T2?

2 A   They weren't assigned.  There was a unwritten hierarchy of

3 parking.  Generally, Jim Wells would park in the spot that ET1

4 Hopkins was in.  Rich would park next to him.  We had the work

5 trucks.  ET1 Hopkins usually parked right in front of the

6 dumpster, and the nonrates, Seaman Coggins, myself, Seaman

7 Upchurch, and Seaman Pacheco, would kind of fill in to the left

8 of him.

9 Q   And when you pulled up that morning on April 12th and you

10 saw ET1 Hopkins parked in what was normally Jim Wells's space,

11 what did you think?

12 A   I thought Jim wasn't coming in.

13 Q   And why is that?

14 A   Because ET1 wouldn't park there if he knew Jim was coming

15 in.

16 Q   On a normal day, when you would normally arrive at T2, who

17 was already at work?

18 A   Jim Wells and Rich were generally there early, when they

19 started at 7.  And ET1 Hopkins was generally always there

20 before us.  I'm not sure exactly what time he came in.

21 Q   And how would you get into the building on a normal day?

22 A   I would go into the main door.  The first person who

23 arrived at T2 would go in through the card-reader door and

24 unlock the front door.  And everyone else would just follow

25 through that -- that front door.

1  Q    On the day of April 12th, when you pulled up to the

2  building, did you see anybody that you knew outside?

3  A    I saw Petty Officer Haselden.  He was running down the --

4  the road from T1 to T2.  And that was it.

5  Q    And so when you saw him running, what did you do next?

6  Where were you at that time?

7  A    I was pulling into the parking lot of T2.  And so by the

8  time I got out of my vehicle and gotten all my stuff, he was

9  already in the building.  I -- I didn't think much of it.

10  Q    And after you got all your stuff and started heading to

11  the building, what happened next?

12  A    I walked into T2 and Petty Officer Haselden was in there

13  with ET3 Beauford and Seaman Coggins.  Petty Officer Haselden

14  was yelling at me to get out.  And so I walked outside.

15  Q    How far into the T2 building did you get?

16  A    I walked all the way into the main part, where the -- the

17  door had closed behind me, but I didn't make it much further

18  than that.

19  Q    What did you see when you walked in?

20  A    I just saw Petty Officer Haselden bent over.  He was very

21  out of breath.  And ET3 Beauford and Seaman Coggins were just

22  standing there, kind of -- they looked a little distraught.

23  Q    Were you able to look into the break room at all?

24  A    No.  From what I understand, where ET1 was, they were kind

25  of blocking him.

Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 80 of 329
A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1  Q    What did you smell when you first entered the building?

2  A    Initially I -- I just thought it was a -- a gas, some kind

3  of gas leak.

4  Q    And where did you go from there, after you just walked

5  into the T2 building?  What happened next?

6  A    I turned around and walked back outside, and Seaman

7  Coggins had followed me outside and said, "They're down."  And

8  I said, "What do you mean, who's down?"  And he said, "ET1 and

9  Rich, they're down.  They're shot."  And then at that point the

10  first MilPol unit had pulled up, and I directed her inside.

11  Q    Where did you go from there?

12  A    I walked back to my car.  At that time, more fire trucks,

13  ambulance were pulling up.  I directed them inside.  And I was

14  looking for Seaman Upchurch.  I didn't see her truck.  So I was

15  on the phone.  And I saw SK1 Cartier, that was on the main

16  road, driving past, and I flagged him down, went and told him

17  what had happened or what I saw.  And -- and I -- I got in his

18  truck and went up to T1.

19  Q    And where did you remain for the rest of the day?

20  A    In T1.

21  Q    And what happened later that day?  How long were you at

22  work that day?

23  A    I was there until about 10:00 o'clock, 11:00 o'clock that

24  night.

25  Q    And how many people were up at T1 that day?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 741  Filed 09/23/14  Page 81 of 329
(720) 384-8078  attrans@sbcglobal.net

1  A    Majority of the unit.  I'd say a good 50 people.

2  Q    And was there any particular place that you waited or

3  stayed?

4  A    In the conference room, primarily.

5  Q    Who was in the conference room for most of the day with

6  you?

7  A    Seaman Upchurch, Chief Reckner, ET3 Beauford, Seaman

8  Coggins, Jim Wells was there.  There were a lot of other people

9  that were in and out, but primarily that's who was there.

10 Q    How would you describe the general mood?

11 A    Everyone was just very much in shock and disbelief of what

12 had happened.

13 Q    Was there anything you noticed about behaviors that day of

14 anybody in the conference room?

15 A    Nothing out of ordinary for the situation.

16 Q    During the day, did Mr. Wells talk to you at all?

17 A    We spoke briefly, just small exchanges throughout the day.

18 Q    Was there a time where you noticed Mr. Wells doing

19 anything out of the ordinary?

20 A    Sometimes he looked like he was in shock.  Sometimes he --

21 there wasn't a lot of expression.  He was rubbing his ears, and

22 his ears were ringing.  We'd asked him what was wrong, and he

23 said his ears were ringing.  And that -- and that -- we asked

24 him how he was doing throughout the day.  We'd just get kind of

25 a nod.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 741  Filed 09/23/14  Page 82 of 329
(720) 384-8078  attrans@sbcglobal.net

1  Q    How would you describe the work environment at T2 before

2  the murders?

3  A    Interesting, as any workplace is.  I had just gotten back

4  March 1st from maternity leave, so Seaman Upchurch was gone at

5  that point.  It seemed like there was more tension in the -- in

6  T2.  Jim Wells kind of stuck to himself a lot.  Rich seemed to

7  be heading more of the projects.  We were working on a -- on a

8  warehouse project at the time, and so we basically were taking

9  instruction from him and ET1 Hopkins.  It was different.  It

10  was a little different.

11  Q    And to clarify, you had mentioned you were on maternity

12  leave.  From when to when were you gone from the shop?

13  A    I went on maternity -- some prenatal stuff on October --

14  beginning October of 2011.  I came back for a couple weeks in

15  December and then I returned from maternity leave on March 1st

16  of 2012.

17  Q    And how long had you worked on the shop -- in the shop at

18  T2 before you went on maternity leave?

19  A    I'd worked in T2 until I was about five months pregnant,

20  and then I moved up to T1.

21  Q    And approximately what month and year did you move up to

22  T1?

23  A    June, I want to say.  June or July 2011.

24  Q    And when you returned from maternity leave, did you go to

25  T1 or did -- were you assigned back to T2?

Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 83 of 329
A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net

1    A    When I came back in March, I was assigned to T2.

2    Q    Were you part of the group that was assigned to help clean

3    out the warehouse?

4    A    Yes, I was.

5    Q    And to your knowledge, who ordered that?  How --

6    A    Rich Belisle was kind of heading that project.  I'm not

7    quite sure who above him had set that up.

8    Q    Okay.  So who did you take your direction from?

9    A    From ET1 Hopkins and Rich.

10   Q    What were you tasked to do?

11   A    We were primarily cleaning out the warehouse, getting rid

12   of a lot of equipment that was not working anymore or outdated,

13   just cleaning up.

14   Q    And approximately when did this happen?

15   A    I believe they started the project either right when I got

16   back or -- or just a -- maybe a week or so before I got back.

17   Q    From maternity leave?

18   A    Yes.  So that was March.

19   Q    What was Mr. Wells's role in the project?

20   A    He -- he had no role in that.

21   Q    Can you tell me about being assigned an antenna book

22   project?

23   A    Yes.  When I was moved up to T1, because I was pregnant,

24   they assigned me the task of creating an antenna book which

25   would serve as a reference for incoming personnel to

1  familiarize themselves with the antenna fields that we work in.

2  Q    And to your knowledge, how long was that project ongoing?

3  A    It had been quite a while.  It was -- it was assigned to

4  ET1 Hopkins prior to me.  I don't know if he's the one who

5  started it.

6  Q    And by the time you -- when were you assigned the project?

7  A    In about June 2011, when I moved up to T1.

8  Q    And how was it assigned to you?  Who made that decision?

9  A    ET1 Hopkins and Chief Reckner instructed me along the way

10  with -- with what they wanted to see in it.

11  Q    How did you go about gathering the knowledge from the

12  book?

13  A    A lot of research, manuals.  I referred to Jim Wells quite

14  a -- quite a bit.

15  Q    And what kind of information did you get from him?

16  A    Sometimes he was very forthcoming and -- and gave

17  information or he'd reference me to a manual to look at.  Other

18  times he didn't want to talk about it.  It was frustrating.  I

19  don't think he -- he didn't like -- he thought it was pointless

20  that we were doing it.

21  Q    Did you ever seek assistance from anyone else?

22  A    Not really.

23  Q    Okay.  Why was that?

24  A    Jim had the -- the majority of the wealth of information

25  on the antennas.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 85 of 329
(720) 384-8078   attrans@sbcglobal.net

1  Q    Was the project ever completed?

2  A    It was completed prior to me leaving for A School, and

3  that was in March of 2013.

4  Q    Have you ever directly questioned or challenged Mr. Wells

5  about anything?

6  A    Not necessarily.  I think at times it was frustrating,

7  when I needed to complete the project and I wasn't getting

8  answers.  And there weren't a lot of other places -- we were

9  missing a lot of manuals.  So that -- that majority of

10 information, he had.  But a -- never a direct challenge.

11 Q    Did you ever see Mr. Wells go into the boiler room?

12 A    Yes, I did.

13 Q    When was this?

14 A    It was Tuesday or Wednesday -- think Wednesday prior to

15 the murders.

16 Q    Do you know what he was doing?

17 A    I don't.

18 Q    Had you ever seen him go into the boiler room before?

19 A    No.

20 Q    What is in the boiler room?

21 A    There is a locker where ET3 Beauford had some clothes back

22 there.  There's a cleaning locker for the janitors.  Other than

23 that, not much else.

24 Q    Outside of work, did you ever socialize with the Belisles?

25 A    Yes.

1  Q    And how did you do that?  What events did you attend?

2  A    Boxing Day was a -- a tradition of theirs.  Dinner --

3  dinner at the house.

4  Q    Did you ever socialize with Petty Officer Hopkins outside

5  of the office?

6  A    No.

7  Q    Did you ever socialize with Mr. Wells and his family

8  outside of the office?

9  A    Yes.

10 Q    Can you please describe how you did that?

11 A    Dinners as well, go over there for dinner.  And -- and a

12 lot of -- we spent a lot of holidays there.

13 Q    And about how many times would you say you had been to his

14 house prior to the murders?

15 A    Maybe a good 15 times.

16 Q    And before the murders, how would you describe your

17 relationship with Mr. Wells?

18 A    Jim taught me a lot.  He -- he was a person that -- that

19 we could talk to.  Both him and Rich were the ones who -- who

20 guided me as -- as a nonrate, new in the Coast Guard.

21 Q    Thank you.  I don't have any further questions.

22      THE COURT:  Cross-examination.

23                     **CROSS-EXAMINATION**

24 BY MR. CURTNER:

25 Q    Good morning.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 741  Filed 09/23/14  Page 87 of 329
(720) 384-8078  attrans@sbcglobal.net

1  A    Good morning.

2  Q    We've met before, right?

3  A    Yes.

4  Q    Okay.  I think you were asked about the work environment

5  when you were at the rigger shop.  Was ET1 Hopkins -- was he

6  primarily your boss and supervisor there?

7  A    Yes, he was.

8  Q    And how was he as a supervisor?

9  A    He had good days, but he was very disgruntled most of the

10 time.

11 Q    He seem like he was not happy being there?

12 A    I don't think he was happy in general.

13 Q    Okay.  And did that affect the workplace at all?

14 A    Yes.  Yes.

15 Q    Okay.  Could you explain to me and the jury what that was

16 like and how that affected you and --

17 A    I was kind of walking around on -- on eggshells with him.

18 You never knew what kind of mood he was in.  He was -- he was

19 very passive-aggressive.

20 Q    What do you mean by that?

21 A    He -- he was never -- he was never confrontational.  He

22 just -- he liked to give guilt trips.  He liked to -- he didn't

23 care about anything.  It was just like, "F this, F that."  That

24 was what we got a lot from him.

25 Q    Now, at -- you just being a new member of the Coast Guard

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 88 of 329
(720) 384-8078   attrans@sbcglobal.net

1  and a nonrate, you wanted to learn a lot?

2  A    Yes.  Of course.

3  Q    Okay.  And was ET1 Hopkins -- was he very helpful if you

4  asked questions about things?

5  A    At times.  But not -- not generally.

6  Q    And generally, how was that, if you were to ask him a

7  question, trying to learn your job?

8  A    A lot of times it was "Figure it out, figure it out on

9  your own."

10  Q    That was his response?

11  A    More or less.

12  Q    Okay.  And so you felt like Rich Belisle was your mentor?

13  A    Yes.

14  Q    And he had a lot of experience as a boatswain's mate.  Is

15  that correct?

16  A    Yes.

17  Q    That's what you wanted to do.  And Rich was very helpful

18  to you and always trying to assist you to learn?

19  A    He was always available if we had questions.

20  Q    And Jim Wells as well?

21  A    Generally.

22  Q    Okay.  And so they both were kind of the mentors for you

23  and Seaman Upchurch?

24  A    Yes.

25  Q    You guys -- you and Seaman Upchurch were friends?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 89 of 329
(720) 384-8078   attrans@sbcglobal.net

1  A    Yes.

2  Q    And you were both trying to learn?

3  A    Yes.

4  Q    Were both very excited about learning?

5  A    Yes.

6  Q    And did it make a difference to Mr. Wells if you wanted to

7  learn as compared to people who weren't as interested in

8  learning?

9  A    Can you say that question again?  I'm sorry.

10 Q    Okay.  Did it make a difference to Mr. Wells, in your

11 opinion, that you were anxious to learn, that you wanted to

12 learn the information that he had?

13 A    Did it make a difference?

14 Q    Yeah, to you.  Did you notice that?

15 A    To me?

16 Q    Yeah.

17 A    Yeah, he -- he was always available to -- to help us as

18 well.

19 Q    Now, did you and Para -- Seaman Upchurch talk about Mr.

20 Wells and Mr. Belisle as the mentors for the both of you, and,

21 like, which one might have been your personality and which one

22 might have been Seaman Upchurch -- personality?  Can you tell

23 me about that?

24 A    Yes.  We used to joke around that -- that in 20 years we

25 would come back and I would more or less be Rich and -- and she

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 741  Filed 09/23/14  Page 90 of 329
(720) 384-8078  attrans@sbcglobal.net

1 would be Jim.  And she had a -- a close relationship with Jim,

2 and we -- we all -- we -- Para and I both looked up to both of

3 them.  I just, I guess, took more from Rich, and she took more

4 from Jim.

5 Q    Okay.  And that was kind of a standing joke between you

6 and Seaman Upchurch?

7 A    Yes.

8 Q    Now, ET1 Hopkins, did he -- you say he was disgruntled and

9 not happy at work.  Did he talk about retirement?

10 A    He threw it around all the time, often.

11 Q    What would he say about it?

12 A    Just that, "I'm done, I'm retiring."

13 Q    Do you remember him saying things like that just before

14 April 12th, 2012?

15 A    Yes.

16 Q    Do you remember what he was saying at that time?

17 A    He did not directly say anything to me specific about

18 retiring.  It was just, "I'm retiring."  I know he had some

19 issues with the weight standards --

20 Q    Okay.

21 A    -- that previous Monday.

22 Q    So the Monday before the -- the shootings were on a

23 Thursday?

24 A    Yes.

25 Q    And on that Monday he was -- had been talking about

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 741  Filed 09/23/14  Page 91 of 329
(720) 384-8078  attrans@sbcglobal.net

1  retiring?

2  A    Yes.

3  Q    And did you know if he printed out any paperwork for his

4  retirement or anything of that nature?

5  A    I have no idea.

6  Q    Okay.  Now, we talked a little bit about the parking at

7  the rigger shop.  As I understand it, usually Mr. Belisle and

8  Mr. Wells would be the first persons there in the morning?

9  A    Yes.

10 Q    And so they would take those first two spots --

11 A    Yes.

12 Q    -- typically.  Mr. Wells had been there longer, so he

13 might take the first one.  And Mis --

14 A    I'm not sure if that was an arrangement that they made or

15 if that was just who got there first.  I -- I'm --

16 Q    Okay.

17 A    But that was generally how it worked.

18 Q    So that usually the first one there would take the first

19 spot, and the second person there would take the second spot,

20 and then the third person there would have to park around from

21 the other vehicles, the other -- on the other side of the

22 government vehicles?

23 A    Jim Wells would always park in that first spot if he was

24 at work.

25 Q    Okay.  But if he was sick and not there, then ET1 Hopkins

Case 3:13-cr-00008-SLG  Document 741  Filed 09/23/14  Page 92 of 329

1  would take that spot, before any of the nonrates would?

2  A    Yes.

3  Q    Okay.  Now, you got there at 7:45 on April 12th.  Is that

4  correct?

5  A    Around that time.

6  Q    And at that time you told us the cars that you saw parked

7  there, okay.  And those were the cars that were there at 7:45

8  when you got there, to your --

9  A    Yes.

10  Q    -- knowledge?

11  A    Now, you described what you saw when you got there on

12  April 12th.  And then you went up to the main communication

13  center up on the hill, right?

14  A    Yes.

15  Q    And you saw Jim Hopkins come in then?  Or were you -- you

16  saw him up there?

17  A    Jim Hopkins or Jim Wells?

18  Q    I'm sorry.  Jim Wells.

19  A    Yes.

20  Q    Okay.  And did you notice his boots at the time?

21  A    Not really.  I -- no.

22  Q    Did he have work boots on?

23  A    I would be assuming if I said yes.

24  Q    Okay.  Did you know Jim to wear his boots and -- his work

25  boots and they wouldn't be laced up?

HENRY - CROSS

1  A    Yes.

2  Q    Okay.  Was that fairly common?

3  A    Uh-huh (affirmative).

4  Q    So tell me about that, what you observed.

5       MS. DUIGNAN:  Objection.  It's a vague question, Your

6  Honor.  I don't know what day we're talking about.

7       THE COURT:  Very well.

8  BY MR. CURTNER:

9  Q    Day to day.  Normal days.

10 A    It looked like he would just throw his boots on.  You

11 know, he'd have his work clothes on and he -- his -- his boots

12 on without tying them up.

13 Q    But then if they were going to do something work related,

14 climbing or something outdoors, he would lace them up then?

15 A    Yes.

16 Q    Okay.  Now, I think when you saw Jim up there, he was

17 quiet, and you said he was in shock, seemed to be in shock,

18 like everybody?

19 A    Yes.

20 Q    He is a private person.  Is that correct?

21 A    Yes.

22 Q    So it didn't surprise you that when you saw him and he was

23 in shock, from what you all -- everybody had learned, that he

24 would be quiet about it, that that's not out of character?

25 A    No.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 94 of 329
(720) 384-8078  attrans@sbcglobal.net

1  Q    When he first came in when you were there, did he give you

2  a hug?

3  A    I don't remember.  I know at one point he had placed his

4  hands on my shoulders and he gave me a handkerchief.

5  Q    Okay.  So he was very sympathetic, supportive to you

6  during that time?

7  A    Yes.

8  Q    And did you know that Mr. Wells had tinnitus?  Do you know

9  what that is?

10 A    No, I don't.

11 Q    It's called ringing in the ears.  Did you know he had had

12 that for a long time?

13 A    No, I didn't.

14 Q    He never shared that with you?

15 A    No.

16 Q    Okay.  But you had known he was sick for quite a while?

17 A    Yes.

18 Q    Was he noticeably sick before you went on maternity leave?

19 A    I can't really recall.  I know a lot of his illness took

20 place during the time I was gone.

21 Q    Okay.  And so he was sick quite a bit while you were on

22 maternity leave?

23 A    Yes.

24 Q    And then when you came back from maternity leave, did he

25 seem to be still not in good health?

1  A    Yes.

2  Q    Did you notice him -- do you know when he had his surgery?

3  A    I don't.

4  Q    That was in February, while you were still gone?

5  A    It must have been.  I'm not quite sure.

6  Q    Okay.  When you got there back in March 1st, then, would

7  he use the restroom a lot?

8  A    Yes.

9  Q    On a daily basis or --

10 A    Yes.

11 Q    -- how many times a day?  Many times a day?  A few times a

12 day?

13 A    I mean, I -- I would say at least once a day.

14 Q    Okay.  And would he use it for long periods of time?

15 A    Yes.

16 Q    How long?

17 A    Anywhere from 15 to 30 minutes.

18 Q    Okay.  So it was not uncommon when you got back that he

19 would have to use the restroom for long periods?

20 A    Right.

21 Q    Okay.  So this would have been after his surgery when he

22 was back and he was still not in good health, when the

23 warehouse project was going on?

24 A    Yes.

25 Q    Okay.  So he would have still been recovering from that

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 741  Filed 09/23/14  Page 96 of 329

1  surgery at that time?

2  A    I suppose.

3  Q    The antenna book that you were working on, now, that had

4  been started before.  Right?

5  A    Yes.

6  Q    And do you know how long ago it was started, when it

7  began -- when that started?

8  A    I do not.

9  Q    Do you know how much of it was completed when you took

10  over?

11  A    There was a general format that was used.  So there

12  were -- the first couple pages, I guess, of -- of that, of what

13  they wanted.  But over the course of the time, what they wanted

14  in the book changed quite a bit.

15  Q    So it had to be updated?

16  A    Yes.

17  Q    And you think it was ET Hopkins -- ET1 Hopkins that had

18  done the work before you, or maybe a number of people?

19  A    The only one I know is ET1 Hopkins.

20  Q    Okay.  Now, so you would consult with Mr. Wells about

21  that?

22  A    Yes.

23  Q    He never got angry that you were doing that, right?

24  A    No.

25  Q    It was just a matter of whether -- he would answer your

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 741  Filed 09/23/14  Page 97 of 329

1   questions, right?

2   A    Sometimes.  He -- he was frustrated with the fact that we

3   were making the book.

4   Q    He didn't think it was necessary.

5   A    Correct.

6   Q    But he didn't oppose that.  He didn't get upset with you

7   that you were doing this?

8   A    No.

9   Q    And this was during the time he had been sick too, right?

10  A    Right.

11  Q    And you don't -- he was private.  You don't know quite

12  exactly how that was affecting him.  Is that correct?

13  A    Correct.

14  Q    You talked about the boiler room.  Have you used that

15  boiler room before, yourself?

16  A    I used it at one point to make a phone call.

17  Q    Okay.  So usually the rigger shop might be a busy place,

18  people coming and going?

19  A    Yes, with a crew of eight, I mean, as busy as you can get,

20  eight people.

21  Q    It's not very private if you were -- you probably went in

22  there to make a phone call for privacy?

23  A    Yes.

24  Q    Okay.  And so Jim could have been -- Mr. Wells could have

25  been in there making a phone call.  Right?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 98 of 329
(720) 384-8078   attrans@sbcglobal.net

1   A    Perhaps.

2   Q    Jim read a lot at work as well?

3   A    Yes.

4   Q    And so he could have been in there reading, perhaps?

5   A    It was really dark.  I don't -- I don't think he could

6   have been reading.

7   Q    But there's a window in there, right?

8   A    Yes.

9   Q    Okay.  Now, I think you said -- well, so was your

10  testimony that ET1 Hopkins can be frustrating as a supervisor?

11  A    Yes.

12  Q    And did you ever share that concern with Mr. Wells?

13  A    Yes.

14  Q    And what was Mr. Wells' attitude when you said, you know,

15  Mr. Hopkins was difficult to work with?

16  A    He would generally agree.  He would tell us a lot that --

17  that people come and go, and so you only have to deal with them

18  a couple years and -- and then they go.  And --

19  Q    So his advice was live with it, these people come and go

20  all the time, it's not a big deal?

21  A    More or less.

22  Q    Did Mr. Wells or Mr. Belisle ever talk to Chief Reckner

23  about ET1 Hopkins' treatment of you and the other nonrates that

24  you know of?

25  A    Did Jim Wells --

Case 3:13-cr-00008-SLG  Document 741  Filed 09/23/14  Page 99 of 329

1  Q    Uh-huh.

2  A    -- talk to -- who?  I'm sorry.

3  Q    Chief Reckner or anybody --

4       MS. DUIGNAN:  Objection.  This calls for hearsay, Your

5  Honor.

6       MR. CURTNER:  Only if she knows.  If she --

7       THE COURT:  If she --

8       MR. CURTNER:  Do you know --

9       THE COURT:  If she knows.

10 BY MR. CURTNER:

11 Q    Do you know if Mr. Wells ever went to bat for you?

12 A    He said he -- he would at a -- a couple of occasions.  I

13 don't know if it ever happened.

14 Q    Okay.  But that's what you understood, he was going to bat

15 for you if Mr. -- if ET1 Hopkins was not treating you

16 correctly?

17 A    Yes.

18 Q    Okay.  Now, you've been to Boxing Day.  It's a big party,

19 a celebration at the Belisles'.  And you've seen Mr. and Mrs.

20 Wells there before?

21 A    Yes.

22 Q    Okay.  And you and Seaman Upchurch spent a lot of time at

23 the Wells residence.  Is that correct?

24 A    Yes.

25 Q    You got to know Mr. Wells and Nancy Wells pretty well?

Case 3:13-cr-00008-SLG  Document 741  Filed 09/23/14  Page 100 of 329

1   A    Yes.

2   Q    They kind of -- tell me if I'm wrong -- kind of adopted

3   the two of you, sort of supporting you, home-cooked dinners,

4   things like that?

5   A    Both the Belisle family and the Wells family.

6   Q    Both of them, yes.   They both --

7   A    Yes.

8   Q    -- really kind of supported you young people on Kodiak

9   Island?

10  A    Yes.

11  Q    And so you were in their home many times?

12  A    Yes.

13  Q    Including the weekend just before April 12th?   Do you

14  recall that?

15  A    We were planning to have Easter dinner at the Wells

16  residence.

17  Q    Okay.   That was -- Easter Sunday was the Sunday before

18  April 12th --

19  A    Yes.

20  Q    -- that year.   And so did you have dinner there at their

21  house?

22  A    They had problems with the septic tank, and so they

23  actually ended up bringing dinner over to my house.

24  Q    Okay.   So Mr. and Mrs. Wells came to your house and you

25  guys had Easter dinner that Sunday?

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 101 of 329

1  A    Yes.

2  Q    Okay.  Now, do you know Debby Hopkins?

3  A    Yes.

4  Q    Had she been at the -- had she been to the rigger shop

5  before?

6  A    Yes.

7  Q    Have you -- how many times have you seen her at the rigger

8  shop?

9  A    I don't know that I could really give you an accurate

10 number.

11 Q    Can you guess --

12 A    Handful of times.

13 Q    Hmm?

14 A    Handful of times.

15 Q    A handful of times?  Under 10?

16 A    Probably around -- around that.

17 Q    Around 10, okay.  And what would she do at the rigger

18 shop?

19 A    Sometimes she would come to have lunch with ET1 Hopkins.

20 Other times she would come in by herself, when he was gone.

21 Q    And what would she do when she came in by herself?

22 A    She would just kind of hang out for a little bit and check

23 on us, I guess.

24 Q    Who would she hang out with?

25 A    We had the main office.  We were all kind of in there.

HENRY - CROSS

1  Q    All of you being who?

2  A    Myself, Seaman Pacheco, Seaman Upchurch, and ET3 Beauford.

3  Q    Okay.  Okay, and was there -- did you notice any unusual

4  behavior when she was there and Mr. -- and ET1 Hopkins was not?

5  A    Not -- nothing out of the ordinary.

6  Q    Okay.  Would she -- how did she treat Cody Beauford and

7  Aaron Coggins?

8  A    The boys were kind of her boys.  That's -- they were like

9  her kids, kind of.

10 Q    What -- could you explain that a little bit?

11 A    She treated all of us as we were children.  She just -- I

12 don't really know how else to go into that.

13 Q    Well, just whatever your impression was that you remember

14 about her behavior when she was there and ET1 Hopkins was not.

15 A    She didn't have much of a filter.

16 Q    What do you mean by that?

17 A    Just inappropriate comments.  I'm kind of lost for words.

18 I --

19 Q    Pardon me?

20 A    She was -- she was just a very -- she had a lot of

21 gestures, she was kind of -- she's just all over the place when

22 you talked to her.

23 Q    She had weird mannerisms, is that how you would describe

24 it?

25 A    Yes, mannerisms.  Thank you.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 103 of 329
(720) 384-8078   attrans@sbcglobal.net

**HENRY - CROSS**

1  Q    Okay.  Do you know if she had any issues with Seaman

2  Upchurch?

3  A    I know -- that's -- it's more of things that I've heard,

4  and nothing -- she's never directly said anything to me about

5  Seaman Upchurch.

6  Q    You didn't observe that?

7  A    No.

8  Q    Did you go to ET1 Hopkins' funeral?

9  A    Yes.

10 Q    Did you notice any bizarre behavior there on behalf of

11 Mrs. Hopkins?

12 A    Nothing that I observed firsthand.

13 Q    Now, are you sure about that?  Because you talked about a

14 very unusual event at that funeral.

15 A    I did, and I clarified that I did not see that.  That was

16 something that someone else had saw and passed on to me.  I

17 wasn't quite sure if I had seen it or I'd heard it.

18 Q    Now, at times you said that you had seen it.  Right?

19 A    I wasn't quite sure.  It's been two years.

20 Q    You thought you might have seen it?

21 A    Yes.

22 Q    And what is that?

23       MS. DUIGNAN:  Objection.  She already said she didn't

24 see anything.

25       THE COURT:  Sustained.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 104 of 329
(720) 384-8078   attrans@sbcglobal.net

1  BY MR. CURTNER:

2  Q    Are you sure you didn't see anything at the funeral, any

3  bizarre, really unusual, inappropriate behavior by Ms. Hopkins

4  at that funeral?

5  A    Nothing that I saw.

6  Q    You're sure you didn't see it?

7  A    Yes.

8  Q    But other people did?

9  A    Yes.

10       MS. DUIGNAN:  Objection.  She doesn't know what other

11  people saw.

12       THE COURT:  Sustained.

13  BY MR. CURTNER:

14  Q    Do you remember describing Debby Hopkins as "crazy"?

15  A    Yes.

16  Q    And --

17       MS. DUIGNAN:  Objection.  I'm going to ask that counsel

18  use open-ended questions for this part.

19  BY MR. CURTNER:

20  Q    Just -- open-ended question.  Tell me what you -- how you

21  did that.  How did you describe that?

22  A    As I said before, she didn't have much of a filter.  She

23  had very extreme mannerisms.  You never knew quite what she was

24  going to do when you were talking to her.

25  Q    And I'm not putting words in your mouth.  That was --

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 105 of 329
(720) 384-8078   attrans@sbcglobal.net

1  "crazy" was the word you used?

2  A   Yes.

3  Q   Okay.  Oh, just to go back a minute.  The warehouse

4  project, did that involve a lot of heavy equipment?

5  A   I --

6  Q   Some large equipment, some heavy equipment?

7  A   Just a forklift.

8  Q   Pardon me?

9  A   A forklift.

10 Q   Uh-huh (affirmative).  So a lot of the things that had

11 to -- been moved were -- there was some heavy equipment that

12 had to be moved, right?

13 A   Yes.

14 Q   Boxes and stuff?  And this was after Mr. Wells was still

15 recovering from his hernia operation and his gallbladder

16 operation.

17 A   (No audible reply).

18 Q   Now, so you were pretty close to Rich Belisle?

19 A   Uh-huh (affirmative).

20 Q   And did you have any impression from your relationship

21 with Mr. Belisle that he was having issues with his daughter,

22 Hannah?

23       MS. DUIGNAN:  Objection.  This is calling for hearsay.

24       MR. CURTNER:  Your Honor, I'm asking for her

25 impressions of what she observed and --

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 741  Filed 09/23/14  Page 106 of 329

1          THE COURT:  You can't testify what someone else has

2     told you.  You only can testify as to what you've observed.

3          THE WITNESS:  Nothing that I have observed.

4     BY MR. CURTNER:

5     Q    What was your impression from you being there and spending

6     time at the rigger shop?

7     A    At the rigger shop, Rich didn't talk about his home life

8     much.

9     Q    At his home, would he?

10    A    No, it was more conversation with his wife.

11    Q    I'm sorry?

12    A    It would -- it came more from conversations with his

13    wife --

14         MS. DUIGNAN:  Objection again.

15         THE WITNESS:  -- and I.

16         MS. DUIGNAN:  Hearsay.

17         THE COURT:  That's hearsay.

18    BY MR. CURTNER:

19    Q    Just so I understand, conversations you had with Mrs.

20    Hop --

21         MS. DUIGNAN:  Again, objection.  Hearsay.

22    BY MR. CURTNER:

23    Q    -- Mrs. Belisle?

24    A    Yes.

25    Q    Okay.  Do you know if Mr. Belisle kept a loaded gun in his

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net

1  vehicle?

2  A    I never saw it.  I spoke to Nicola --

3         MS. DUIGNAN:  Objection.  Hearsay.

4         THE COURT:  It's hearsay.  You can't test -- you know

5  you can't testify to hearsay.

6  BY MR. CURTNER:

7  Q    Did you have any personal knowledge that he kept a loaded

8  gun in the car?

9  A    No.

10  Q    How about in the rigger shop?

11  A    No.

12  Q    Okay.  Petty Officer, do you know what anaphylaxis is?

13         MS. DUIGNAN:  Objection.  This is beyond the scope, and

14  moreover, it's beyond her knowledge.  Not a doctor.

15         MR. CURTNER:  Well, I think I can ask her if she knows

16  what it is.

17         THE COURT:  Go ahead.

18  BY MR. CURTNER:

19  Q    Do you know what it is?

20  A    Anaphylaxis shock as far as --

21  Q    Yeah.

22  A    -- to allergic reaction?

23  Q    Yeah.

24  A    Yes.

25  Q    What is it?

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 108 of 329

**HENRY - REDIRECT**

1    A    Closing of the airway.

2    Q    Okay.  And do you know what causes that?

3    A    Allergic reaction.

4    Q    And did -- Jim Wells, when he was working -- did he keep a

5    inhaler with him when he was working?

6    A    Yes, I believe so.

7    Q    And do you know why?

8    A    I -- I don't -- I -- I thought he had asthma.

9    Q    Okay.  Did you ever -- did you know if he had a EpiPen

10   with him usually when he would work?

11   A    I don't know.

12   Q    Okay.  You know what an EpiPen is?

13   A    Uh-huh (affirmative).

14   Q    And it's a device -- well, tell us what it is.

15   A    It reverses the effects of anaphylactic shock.

16   Q    Okay.  That's all I have.  Thank you.

17          THE COURT:  Redirect.

18                    **REDIRECT EXAMINATION**

19   BY MS. DUIGNAN:

20   Q    Petty Officer Henry, Mr. Curtner asked you about a number

21   of Mr. Wells's medical conditions.  Did you have any firsthand

22   knowledge of these before he asked you all these questions?

23   A    Not really.  I -- I knew he was going through a lot.

24   Sometimes at dinner it would be a casual conversation.  But I

25   never knew in depth.  The only thing I -- I really knew and saw

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 109 of 329
(720) 384-8078   attrans@sbcglobal.net

1  was that he had his gallbladder removed.

2  Q    You had mentioned that you saw Mr. Wells rubbing his ears

3  in the conference room.  Had you ever seen him do that before?

4  A    Not -- no.

5  Q    Mr. Curtner asked you a number of questions about Mr.

6  Wells using the bathroom.  Had you seen anybody else using the

7  bathroom at work?

8  A    Yes.

9  Q    Were -- was anybody else in there for extended periods of

10  time?

11  A    Yes.

12  Q    Who?

13  A    Seaman Pacheco, Rich Belisle, ET1 Hopkins, all the guys.

14  Q    You have mentioned that you saw Mr. Wells go into the

15  boiler room.  How long was he in there?

16  A    I'd say anywhere between 15 minutes and 30 minutes.

17  Q    Was this during the workday?

18  A    Yes.

19  Q    Is personal reading allowed during the workday?

20  A    I -- I know we couldn't.

21  Q    There was a discussion about Easter dinner and -- and

22  having dinner with Mr. Wells.  Was Mr. Belisle aware that you

23  were going over to the Wells house for dinner?

24  A    Yes.

25  Q    Did you ever have any joking about it?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 110 of 329
(720) 384-8078  attrans@sbcglobal.net

1  A   I had asked him -- in a joking manner, I said -- he -- he

2  had commented back, saying, "Oh, have fun."  He would joke

3  around like that sometimes when we were going to over to the

4  Wells house.  And I had said, "What, Rich, you don't like Jim?"

5  And he said, "No, I'm trying to take his job."

6  Q   You had also mentioned having dinner at the Wells house.

7  Was there any time that you felt uncomfortable with them?

8  A   Not really.  He would make comments, but they were kind of

9  brushed off, just in --

10  Q   What kind of comments?

11  A   -- a joking manner.  That we were like his -- I -- I can't

12  remember exactly the content, but -- context of it.  He would

13  talk about his other girlfriends.  Sometimes it would refer to

14  us, but having -- his wife was there, it was a very light,

15  joking atmosphere.

16  Q   Mr. Curtner had asked you what the advice was about

17  dealing with ET1 Hopkins, and he asked -- he said something

18  along the lines of that Mr. Wells told you to live with it,

19  people come and go.  Your answer was "More or less."  Can you

20  tell us what you mean about "More or less," that that was the

21  advice you got?

22  A   He never told us to, like, just deal with it.  He would

23  just share the frustrations that you have to deal with certain

24  people, but then they move on.

25  Q   I have no other questions.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 741  Filed 09/23/14  Page 111 of 329

1      THE COURT:  Anything else?

2      MR. CURTNER:  Just a few, Your Honor.

3                    **RECROSS EXAMINATION**

4  BY MR. CURTNER:

5  Q   Petty Officer Henry, when the government asked you that

6  question about -- that you had observed Jim with his ears

7  before, you took a long time.  Why was that?

8  A   It -- it's nothing that I ever really paid attention to.

9  It was just that morning that it -- it stood out.

10 Q   Okay.  So you were very observant that morning, but it

11 could have happened before.  Is that what you meant?

12 A   Yes.

13 Q   And do you know if Jim had -- Mr. Wells had any hearing

14 difficulties at all?

15     MS. DUIGNAN:  Objection, Your Honor.  She already

16 testified she didn't know much about his medical history.

17     THE COURT:  Overruled.

18     THE WITNESS:  I knew he had a hard time hearing

19 sometimes, but that's all I know.

20 BY MR. CURTNER:

21 Q   Okay.  And all the guys at the rigger shop would use the

22 restroom for 30 minutes?

23 A   It usually seemed that way.  Mean, 30 minutes, I -- I'm

24 not -- I'm not timing, but --

25 Q   Okay.  Now, when Mr. Belisle said -- about taking Jim's

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 112 of 329

1  job, he meant when Jim retired, he was hoping to move up to

2  that position?

3  A    Yes.

4  Q    And when he was -- he would joke around with you guys

5  quite a bit, right?

6  A    Yes.

7  Q    So if he mentioned something about other girlfriends, that

8  was with Nancy right there.  Is that right?

9  A    Yes.

10 Q    And there -- he was joking around then?  Is that correct?

11 Yeah.

12       THE COURT:  I'm confused.  You're using the word "he,"

13 and you're losing me.

14 BY MR. CURTNER:

15 Q    Mr. Wells.

16 A    Yes.

17 Q    He was joking?

18 A    (No audible reply).

19 Q    Okay.  Thank you.

20       MS. DUIGNAN:  No further questions.

21       THE COURT:  Okay.  Thank you.  Thank you, ma'am.

22 You're excused.  The government's next witness.

23     (Witness excused)

24       MS. LOEFFLER:  Para Upchurch.

25       THE COURT:  Okay.  (Pause) And just remain standing for

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 113 of 329
(720) 384-8078   attrans@sbcglobal.net

1  a second.  She'll swear you in right here.

2       THE CLERK:  Raise your right hand.

3       **PARA UPCHURCH, PLAINTIFF'S WITNESS, SWORN**

4       THE CLERK:  Okay, thank you.  Please have a seat.

5  Ma'am, if you can please state and spell your full name.

6       THE WITNESS:  Para Upchurch.  P-a-r-a, U-p-c-h-u-r-c-h.

7       THE CLERK:  Thank you.

8       THE COURT:  All right.  Counsel.

9       **DIRECT EXAMINATION**

10 BY MS. LOEFFLER:

11 Q    Petty Officer Upchurch, am I using your correct present

12 title and rank in the Coast Guard?

13 A    Yes.

14 Q    How long have you been a petty officer?

15 A    I've been a petty officer for a year and a few months.

16 Q    What class petty officer are you?

17 A    I'm a third class.

18 Q    Okay.  And before being a petty officer, what was your

19 position in the Coast Guard?

20 A    I was a nonrate.

21 Q    We've had some explanation, but in the nonrate -- in the

22 chain of command on the Coast Guard, where does the nonrate

23 fall?

24 A    Almost at the bottom.

25 Q    When did you join the Coast Guard?

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 114 of 329

1  A    Joined the Coast Guard in 2009.

2  Q    What was your first posting?

3  A    After boot camp, my first was COMMSTA Kodiak.

4  Q    And I neglected to mention before, but where do you call

5  home?

6  A    Talkeetna, Alaska.

7  Q    Okay.  When you say after -- so you went to boot camp and

8  then immediately were posted in the COMMSTA Kodiak?

9  A    Yes.

10  Q    How long were you at COMMSTA Kodiak?

11  A    I was there, just total, almost three years.

12  Q    So when did you leave?

13  A    I figure it was September of 2012, in that time.

14  Q    Which building of COMMSTA Kodiak did you work in during

15  your period while you were a nonrate there at COMMSTA?

16  A    I worked in the rigger shop.

17  Q    And when you first got there, were there any other women

18  in the rigger shop?

19  A    No, there was no other women.

20  Q    And did somebody later come that -- another woman join the

21  crew?

22  A    Leah Henry.

23  Q    All right.  Was that something that was a positive or a

24  negative or -- for you?

25  A    It was absolutely positive for me.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 115 of 329

1 Q   We've gone through this a little bit, but briefly, what

2 are the duties of a nonrate?

3 A   To -- the duties of a -- of a nonrate is to do whatever

4 your petty officer tells you to do.

5 Q   Okay.

6 A   Yeah.

7 Q   You're kind of the -- I don't know if the word dogsbody or

8 go-to -- but you basically do everything that somebody asks you

9 to do?  You're the low person?

10 A   The lowest person, yeah.

11 Q   I'm going to go shortly through the routine again on the

12 day of the murder, which was April 12th, 2012.  Were you at

13 work that day?

14 A   I went to work that day.

15 Q   Yeah.  Actually, were you at work the -- that was a

16 Thursday.  Were you at the -- work that week, at the --

17 Wednesday and Tuesday also?

18 A   Yes.

19 Q   Okay.  The normal routine, we've been through it a few

20 times.  I want to go through it briefly, your knowledge of the

21 normal routine of the rigger shop around that time.  Who would

22 get there first?

23 A   Jim and Rich would get there first.

24 Q   And there are two Jims in this case.  There's a -- the one

25 that was your supervisor?  What's the title you used for him?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 116 of 329
(720) 384-8078   attrans@sbcglobal.net

1  A    ET1.

2  Q    Okay.  So when you say Jim, you're referring to Jim Wells?

3  A    Jim Wells.

4  Q    Okay.  I'm just trying to make it --

5  A    Uh-huh (affirmative).

6  Q    -- clear and a distinction.  And would ET1 get there

7  before you?

8  A    ET1 would get there before me, yeah.

9  Q    Do you know when he got there, or was he usually there

10  before you got there?

11  A    I know that ET1 liked to go in early, and he always went

12  in early.  So he was always there way ahead of -- of me.

13  Q    What time would you get there, generally?

14  A    I would try to get there by 7:45, no later.

15  Q    And what was your official hours that you had to be there?

16  A    Our work hours was -- we started at 8:00 o'clock, so --

17  Q    Was there something you had to do right at 8:00 o'clock in

18  the Coast Guard?

19  A    Every Monday, we're required -- the nonrates are required

20  to do colors, so we would put the flag -- put the flag up.  But

21  the light was broken on the flagpole, so at that time we were

22  required to do colors every day.  So --

23  Q    When I say at that time, that's the April of 2012 time?

24  You had to do it every day?

25  A    Every day.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 117 of 329
(720) 384-8078   attrans@sbcglobal.net

1  Q   Okay.  Now, in the COMMSTA -- in the rigger shop, were you

2  aware -- when you would come in, there were certain -- where

3  would the -- actually let me (indiscernible) -- there was an

4  office and a break room in the rigger shop, right?  Maybe we

5  can put up Exhibit -- I think it's 292, which is the -- sure --

6      (Side conversation)

7  Q   Yeah, if we could pull up -- I'm sorry -- 392.  I did know

8  it was the 300.  I just screwed up.  Petty Officer Upchurch,

9  it'll be on your screen next to you, but it'll be also right

10 here, and the jury will be looking there.  And you actually

11 have a laser pointer that I think is right on your desk.  So if

12 I'm asking you kind of -- a few questions about where, you

13 should be able to -- all right, we have it up.  When you would

14 come in the morning, what door would you usually come in?  And

15 you can -- can you use the laser pointer and just point at it,

16 make it -- just point at the screen.

17 A   At that screen?

18 Q   Yes.

19 A   Okay.

20 Q   That'll -- that way the jury can see what you're pointing

21 at, instead of the one right next to you.

22 A   Okay.  So usually, then, I wouldn't be the first one

23 there, so I would always go in the -- okay, I would always go

24 in this door right here.

25 Q   And then where would you go when you came in?  Did you

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 118 of 329

1  have a routine?  Where you would (indiscernible)?

2  A    I did.  I always -- so I would come in this door, because

3  it would be unlocked.  And I would always go this way to my

4  desk, which is right here.  I mean, I had a -- a choice to go

5  either way, but I liked to always go this way.

6  Q    Why?

7  A    Because I -- if I go this way, I would have to walk by all

8  of the other people who work -- like, Pacheco or Beauford or

9  Coggins.  And the bathroom's right there, so I tried -- I tried

10 to just go straight to my desk so I don't have to -- it's

11 really tight in here.  It's easier for me to just go straight

12 to my desk.

13 Q    Now, right above that area, on the top of the screen, is

14 the office.  And who worked in the office?

15 A    In the office it was Jim and Rich and ET1.  And we --

16 Chief Reckner had a desk in there also.

17 Q    Did any of the nonrates have a desk in there?

18 A    No.

19 Q    And when you came to the mor -- in in the morning, was

20 there a normal routine as to where Mr. Belisle, Mr. Wells, and

21 Mr. Hopkins would be, generally, when you came in in the

22 building?

23 A    Most of the time they would be in -- at their desks.  Most

24 of the time they would be in their -- their office.

25 Q    And on -- does the Coast Guard have sort of a uniform

1    regulation that comes into effect in April of the year?

2    A    They do.

3    Q    What is that?

4    A    We -- our ODUs, our uniform that we wear every day,

5    starting April 1st, we have to roll our sleeves.  And then in

6    October and November -- I should know that -- I should -- when

7    it is -- we put sleeves down.

8    Q    Okay.

9    A    So --

10   Q    In terms of rolling up their sleeves -- and I will tell

11   you that this was a new one for me -- it's not like --

12   A    Uh-huh (affirmative).

13   Q    -- just doing this, is it?  You know, I mean, it's not

14   like -- I call rolling up sleeves like, okay, I just did it.

15   It's actually more than that, isn't it?

16   A    It -- it's more -- it is more than that.  You have to make

17   it look nice, and we're taught at school how to do it properly.

18   You don't just roll it up.

19   Q    Okay.  And were you aware of any routine with ET1 Hopkins

20   about where he would do that at the COMMSTA?

21   A    I know that from time -- well, I know that he would

22   sometimes roll the sleeves in our area of the break room, so --

23   Q    And that's a desk -- is that on the table that you --

24   that's shown in Exhibit 392?

25   A    On that table --

1 Q    Yeah.

2 A    -- right there.

3 Q    Now, the door that you came in, I take it -- is it fair

4 that everybody at the rigger shop knew that the first person --

5 that there would be an unlocked door after the first person got

6 there, the one you --

7 A    Everyone who worked in the rigger shop knew that.

8 Q    Okay.  Did you have visitors from Base Kodiak that would

9 come up to the rigger shop at various times?

10 A    Yes.

11 Q    Were there some issues about -- did they ever have some

12 issues about not knowing whether the doors were open or not?

13 A    Yeah.  People who weren't familiar, they wouldn't know

14 what door to go in, so they -- the doors would seem locked.  So

15 sometimes they wouldn't know what door to go in.

16 Q    Also, did you have a role with locking up at night?

17 A    Yes.

18 Q    What was that?

19 A    As a nonrate, my job -- one of my jobs was, at the end of

20 the day, to go around and check -- do you want me -- to check

21 the doors that needed to be locked, to make sure that they were

22 locked.  So I did that every day.

23 Q    Now I want to turn to April 12th of 2012.  And I'm going

24 to briefly go through that day with you.  We had a lot of

25 testimony about it, so I'm going to go shorter than some of the

1    others.  When did you get to work on April 12th, 2012?

2    A    I got to work at 7:41.

3    Q    All right.

4    A    Yeah.

5    Q    And I'm going to pull up Exhibit -- that's already been

6    admitted -- 265.  I think we've seen that a few times, but --

7    and I take it (indiscernible), but can you identify all -- not

8    the emergency vehicles, but the other cars that were there that

9    day?  Do you recognize all the cars?

10   A    Yes.

11   Q    And your car isn't present.  Right?

12   A    My -- my truck's not there.

13   Q    Where was you -- where was your truck that day?

14   A    My -- my truck -- I drove it up to the COMMSTA, the main

15   building.

16   Q    Now, were you familiar with Mr. Wells's truck?

17   A    Yes.

18   Q    And I'm going to show you what's been marked as Exhibit

19   99.

20        (Side conversation)

21   Q    Oh, it's already been admitted, so we'll pull it up.

22        (Side conversation)

23   Q    Okay.  So can you recognize that truck?

24   A    Yes.

25   Q    Whose truck is that?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 122 of 329
(720) 384-8078   attrans@sbcglobal.net

1   A    Well, it looks like Jim's truck.

2   Q    Okay.  When you say looks like, is there the -- well, I'll

3   just leave it there.  Were you -- did the Wells have another

4   car?

5   A    Yes.

6   Q    And what car was that?

7   A    Nancy had a car.

8   Q    I'll show you what's been marked as Exhibit 104.  Oh,

9   that's already been admitted.  I'll show everybody what's been

10  marked as Exhibit 104.  And again, can you recognize -- does

11  that car look familiar to you?

12  A    Yes.

13  Q    Okay.  And it's familiar to you as -- at least it looks

14  like whose car?

15  A    It looks like Nancy's car.

16  Q    Have you actually been in Jim Wells' car -- truck, I'm

17  sorry.

18  A    No.

19  Q    Have you been in this one?

20  A    Yes.

21  Q    And in terms of being in Nancy Wells' car -- well,

22  actually, I'm going to get back to that later.  I want to get

23  back and finish with April 12th, and then I'm going to ask you

24  some other questions.  Turning to -- we can take that off.

25  Thank you.  Turning to the day of April 12th, back again,

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 123 of 329
(720) 384-8078   attrans@sbcglobal.net

1   when -- you said you got there at 7:41.  Did you actually go

2   into the rigger shop?

3   A    Yes.

4   Q    Okay.  When -- how far into the shop did you get before

5   you were stopped by people?

6   A    I was about to turn the corner, the -- the locker wall.  I

7   was about to turn the corner to -- to my desk.  That's when I

8   was -- I stopped right there.

9   Q    When you stopped, were there other people in the building?

10  A    Yeah.

11  Q    Who?

12  A    Beauford and Coggins.

13  Q    Now, when you -- but you -- when you got in that time --

14  by the way, were any of the lockers open or disturbed?  Did you

15  see anything disturbed?

16  A    No.

17  Q    Is that something you would notice?

18  A    I think I would -- I would notice if things were

19  disturbed.

20  Q    Did you have a role in keeping the place clean?

21  A    That was one of my primary duties.

22  Q    And in terms of cleaning, what types of things would you

23  have to do?

24  A    Well, aft -- we worked with a lot of tools, and so after

25  we're done working, I would make sure to put everything away,

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 124 of 329
(720) 384-8078   attrans@sbcglobal.net

1  to keep things, you know -- everything had a place.

2  Q    Right.  Now, when you said you came in and the -- Cody

3  Beauford and Aaron Coggins stopped you, did they tell you what

4  had happened?

5  A    They -- they stopped me and they said, "Para, you don't --

6  I don't think you want to go in there."  And they said, "ET1 is

7  down."  The -- you know, I didn't quite understand --

8  Q    Yeah.

9  A    -- what that meant.

10  Q    What was your first reaction?

11  A    My first reaction was it smelled bad, right, so I was kind

12  of like -- I knew something was going on, but I was -- I didn't

13  understand what was going on.

14  Q    And I don't want to go through it, but later did you

15  actually go back into the building and see?  And I don't need

16  to go into what you saw, but did you go in and see ET1 Hopkins?

17  A    I -- I did, yeah.  I -- I didn't know what was going on,

18  so I went outside, and then still I don't know what's going on,

19  so I went back inside.

20  Q    And you found out what had happened?

21  A    Right.

22  Q    All right.  Now I want to go to a little more about the

23  rigger shop and the various things that -- the various people

24  there and what your relationship was with them.  First of all,

25  I'll just ask you about Mr. Wells.  Did you have a -- what was

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 741  Filed 09/23/14  Page 125 of 329

1  your relationship with Mr. Wells like?

2  A    I -- I worshiped Jim.  My relationship was good with him,

3  because he taught me a lot of things, and I liked him.  He

4  helped me with every question that I, you know, had.  He was

5  willing to show me whatever I was asking him, yeah.  So --

6  Q    Were you also -- did you also become personal friends?

7  A    Yeah.

8  Q    Okay.  Now I'm going to ask you, did you have a similar

9  close relationship with any of the other nonrates?

10 A    Well, with Leah Henry.  She was my really -- she is my

11 really good friend.  So I really like -- like her.

12 Q    Did you have a similar relationship with the male

13 nonrates, or was that a little different?

14 A    Not so much, you know.  Not -- not like with Leah.

15 Q    Uh-huh (affirmative).

16 A    Not with the other nonrates.

17 Q    What was your relationship with Rich Belisle?

18 A    Well, he was awesome, you know.  He -- he also would

19 answer any of my questions and help me, you know.  I could go

20 to him with anything, yeah.

21 Q    Did you do much -- did you have much interaction with

22 Chief Reckner?

23 A    Not so much.  Not so much.

24 Q    In terms of the pecking order -- actually, I should ask

25 more military.  In terms of the supervisory order in the

1  military, who was directly your supervisor?

2  A    ET1 Hopkins.

3  Q    Okay.  And then Reckner was above him?

4  A    Above him.

5  Q    And then in the military, sort of -- who the lower people

6  talk to, does it matter how high up the chain they are?

7  A    We definitely don't want to jump the chain with something

8  important.  Yeah.

9  Q    Now I'm going to ask you a little bit about ET1 Hopkins.

10 Did you have a good relationship with him?

11 A    No.

12 Q    Did you complain to anyone about your relationship with

13 ET1 Hopkins?

14 A    From time to time.  Yeah.

15 Q    Was Mr. Wells one of those people?

16 A    Sometimes I would complain to Jim.

17 Q    Okay.  Do you know whether -- and I'll just ask you only

18 whether you know.  Did you notice that the -- your differences

19 with Hopkins, did they seem to be the same as the men nonrates,

20 or did you -- was it better or worse for you?

21 A    I'm -- I -- I mean, I don't want to separate it -- I don't

22 really want to separate it for men, I don't.

23 Q    Uh-huh (affirmative).

24 A    Because I think all of the nonrates had problems with ET1.

25 So --

1  Q   Okay.

2  A   Yeah.

3  Q   I'm going to ask you a little bit the same with Mr. Wells.

4  You had a very good relationship with him, and I take it that

5  you said he was very, very helpful to you.

6  A   Uh-huh (affirmative).

7  Q   Were -- was he as open and helpful to the other nonrates?

8  A   I know -- yeah, when we were working on something, he --

9  he would help us.  But the difference between -- for me is I

10 would go to him --

11 Q   Okay.

12 A   -- with extra stuff.  So -- but, yeah, I mean, he helped

13 us.

14 Q   Uh-huh (affirmative).  Now I'm going to ask you a little

15 bit about Mr. Wells, because you were with him.  Was there a

16 time when he became pretty ill?

17 A   Yeah.

18 Q   Can you put it about in context in terms of time when you

19 noticed that he was pretty ill?

20 A   Oh, when he started to get sick?

21 Q   Yeah.  I'm not going to get you down to a month.  I'm just

22 saying (indiscernible) --

23 A   Well, it was -- I can just sort of -- I remember it was

24 definitely before Christmas, before the holidays.  And I can't

25 tell you exactly how far before the holidays, but he was sick

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 128 of 329

1  for a while.

2  Q   And because he was ill, was he out, or was there a period

3  where he was not at the rigger shop very often?

4  A   Yeah.  Yeah.

5  Q   Now I want to put in -- in your timing, were you actually

6  at the rigger shop in March of 2011 -- 2012, I'm sorry, the

7  month before the murder?

8  A   I took 30 days of leave in March and I went home, so that

9  was good for me.

10 Q   Yeah.  Okay.  When -- the period when Mr. Wells was ill --

11 let me step back a little bit.  Before that, in terms of the

12 most knowledgeable person about the antennas in the rigger

13 shop, who was the most knowledgeable, to your belief?

14 A   Jim.

15 Q   Okay.  And when you ever -- whenever you use "Jim" you're

16 talking about Jim Wells, because you called ET1, ET1.  Right?

17 A   That's right.

18 Q   All right.  Now, when he was gone, to your observation,

19 did anybody else sort of step up and, you know, try to keep

20 things going?

21 A   Yeah.

22 Q   Who was that?

23 A   Well, ET1 and Rich, they both were working hard to get

24 everything done.

25 Q   Now, we talked a little bit -- mentioned -- you said that,

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 741  Filed 09/23/14  Page 129 of 329

1    you know, again, your relationship with Mr. Wells -- did he

2    have any -- let's just -- let me ask it this way.  Did Mr.

3    Wells like change?

4    A    I don't --

5    Q    Okay, let me --

6    A    Did he like change.  I mean, we're all -- I mean, he's

7    definitely known that he has his ways --

8    Q    Right.

9    A    -- you know.  He would have our way -- I -- like, I'm set

10   in my ways.  You know, people get set in their ways, yeah.

11   Q    And actually, was there a nickname that the others called

12   him that sort of -- as part of that?

13   A    Yeah.  We call him -- well, people would call him Father

14   Time, because he'd been there for a long time.

15   Q    Okay.  I mentioned something when I was talking about Mr.

16   Wells' vehicles -- were you actually -- or at the time of the

17   murders, do you know how many vehicles the Hopkins had?

18   A    They had one.

19   Q    And was that the truck that we saw in the picture that you

20   just looked at?

21   A    Oh, wait, I'm sorry.  Who -- wait, whose vehicle were you

22   asking me about?

23   Q    I -- no, I asked you just back -- at the time of the

24   murders, how many vehicles did the Hopkins have?  Did you --

25   A    Oh, one -- one.

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 130 of 329

1  Q   Okay.  And all I meant was, was that the truck that we saw

2  in the picture, the one that was there the day of the murder?

3  A   Parked at the rigger shop?

4  Q   Yeah.

5  A   Sure.  ET1's truck was there.

6  Q   Want to ask you a little bit again about, with Mr. Wells,

7  you said earlier that you had a good -- you know, that he and

8  his wife were friends of yours.  Right?

9  A   They both were.

10  Q   And did they do things for you --

11  A   Yes.

12  Q   -- to make your life better?

13  A   Yes.

14  Q   What types of things?

15  A   They would -- if I would go to Talkeetna, they would help

16  me with my truck so I wouldn't have to leave it at the airport

17  and pay.  They would, you know, give me a ride to the airport.

18  And they would invite me over to their house from time to time

19  for dinner or -- you know, they -- they knew I liked to eat, so

20  they would feed me.

21  Q   Okay.  So when they would help you -- where would you

22  leave your truck if they were going to drive you to the

23  airport?

24  A   If they were going to drive me to the airport?

25  Q   Yeah.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 131 of 329
(720) 384-8078   attrans@sbcglobal.net

1  A    Well, my truck would stay at their house.

2  Q    All right.  Now, did you return that favor for them?

3  A    Yes.

4  Q    And by say return the favor, can you explain whether you

5  would ever drive them when they went to the airport?

6  A    Sure.  So I -- if they were going to the airport --

7  Q    Uh-huh (affirmative).

8  A    -- I would either -- well, I -- I could go to their house,

9  leave my truck there, ride with them, bring their car back to

10  their house, and then get in my truck and drive home.  So it

11  would work out one or another that I could help them, you know,

12  so they don't have to leave their car, or they'd get picked up

13  at the airport --

14  Q    Okay.

15  A    -- or dropped off.

16  Q    And do you recall, how often did you do that?

17  A    I mean, it wasn't a whole bunch of times, but I did it a

18  time or two.

19  Q    Okay.

20  A    I --

21  Q    And based -- do you believe that Mr. Wells knew that you

22  would be happy to do that any time he asked you?

23  A    I mean, I think so.  I -- yeah.

24  Q    Okay.  I mean, did you offer a number of times to do

25  chores or errands for him because they had done errands for

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 132 of 329

1  you?

2  A    Oh, sure.  I offered to do chores of -- a lot of times.

3  Because I thought I might get more food -- no.  I'm sorry, I

4  don't mean to make jokes, but I'm just --

5  Q    Okay.  Well, I mean, (indiscernible) as a nonrate, you

6  don't make a lot of money in the Coast Guard, do you?

7  A    Well, I make enough, but it -- they -- they both cook

8  good, you know, and it's nice.  It was nice.

9  Q    Now, were you aware that Mrs. Wells had -- were you aware

10 that she left town during the week of the murders?

11 A    I wasn't -- I -- I didn't know she was leaving town before

12 the murders happened, but I found out after that she was out of

13 town.

14 Q    And were you in Kodiak on April 10th and April 11th, if

15 that was the Tuesday and Wednesday before the murders?

16 A    Yes.

17 Q    Did Mr. Wells ever ask you to, you know, help pick up

18 Nancy's car at the airport or ask you anything about helping

19 with cars that day?

20 A    No.

21 Q    Okay.  Or -- meant that week.  Okay.  I'm going to turn

22 back to the day of the murder, which is April 12th, 2012.  How

23 long were you at T1?  And I think -- actually, maybe a little

24 later.  After you went to T2 and you found out what had

25 happened, did you then go up to the T1 building, up the hill?

1   A    I -- I did.

2   Q    And how long were you there that day?

3   A    I was -- I was up there all day until late at night.

4   Q    Did you talk to Mr. Wells that day?

5   A    Yes.

6   Q    And when you talked to him, did you ask him at all about

7   where he was during the time of the murders?

8   A    Yeah.

9   Q    Well, let me back up a little bit.  He wasn't there when

10  you got there, was he?

11  A    He -- he wasn't there when I got there.

12  Q    And he would normally come in at 7:00 o'clock?

13  A    I think so.

14  Q    Okay.  Would you -- did you ask him the day of the murders

15  what had gone on or why he hadn't come in at his normal time?

16  A    Well, I called him, first thing, and I asked him -- I

17  said, "Jim where are you?"  And he said he was on his way, that

18  he had gotten a flat tire.  And he said, "What's going on?"

19  And I said, "Bad things happened," you know.

20  Q    Okay.  And when he said that he had a flat tire at some

21  point, did you have a discussion with him about his wife's car?

22  A    I think later in the day -- we talked about so much -- I

23  mean, it was a long day.

24  Q    Right.

25  A    And I did most of the talking, I think, you know, I'm --

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 134 of 329

1  just think.  But, yeah, I found out Nancy was gone.  And then I

2  kind of -- I think -- I remember asking him, "Oh, why didn't

3  you ask me?"  Would have -- you know, I -- I -- I found out the

4  car, you know, was there.  And so I think I asked Jim something

5  along the lines like, "Oh, why didn't you just ask me?  I would

6  have, you know, returned the car to the house" or whatever.

7  Q    Do you recall what he said in response to that?

8  A    No.

9  Q    Okay.  Now, was there anything about his appearance that

10 day that at least you noted as being somewhat -- that you noted

11 and spoke about?

12 A    Yeah.  There is one thing that I did say was -- I just

13 noticed that he -- for having a flat tire, you know, he looked

14 clean.  Just one thing that I thought is if I changed a tire,

15 I'd be really dirty.

16 Q    Okay.

17 A    But -- I mean, that's just me, because I'm not that good

18 at changing a tire, and I get pretty dirty.

19 Q    Is Mr. Wells good at changing tires, or do you know?

20 A    I would -- I don't know how good.  He's probably better

21 than me.

22 Q    Okay.  Did you -- you said it was a long day.  Were you in

23 a room with Mr. Wells a lot of that day?

24 A    Most of the day.

25 Q    Yeah.  Did you notice any other slightly different action

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 135 of 329

1 that he took that day, or different movement that he did that

2 day?  Anything else unusual?

3 A    I mean, there was just one time that I said that something

4 was weird.

5 Q    And what was that weird thing?

6 A    He just -- he just was going in his ear a little bit.  And

7 I was like, "Jim, what's up," you know.  And he said, "My ear

8 is ringing."  And I asked him, "Oh, does that do that a -- a

9 lot?"  And I don't remember what he said.  But --

10 Q    Uh-huh (affirmative).

11 A    -- I mean, that was the only thing that was weird.

12 Q    Okay.

13      MS. LOEFFLER:  If I can have one second to consult with

14 my colleague, Your Honor.

15      THE COURT:  That's fine.  That's fine.

16      MS. LOEFFLER:  I have nothing further, Your Honor.

17      THE COURT:  Cross-examination.

18                        **CROSS-EXAMINATION**

19 BY MR. CURTNER:

20 Q    Good morning.

21 A    Good morning.

22 Q    Petty Officer Upchurch, can you tell us a little bit more

23 about the -- I guess the work environment at the rigger shop

24 while you were there?

25 A    When I was there?

1  Q    Uh-huh (affirmative).

2  A    The work environment.  I'm just trying to think where to

3  start.  I don't know --

4  Q    Well, let me ask you, ET1 Hopkins, he was basically the

5  direct supervisor there?

6  A    He was.

7  Q    And what was he like?

8  A    He was grumpy.  But, I mean, he -- I mean, he was the

9  first class, so he was in charge, so he would make sure that,

10  you know, the work that needed to get done got done.  So, I

11  mean --

12  Q    How did he feel about you and the other people in the

13  shop?

14  A    I mean, I don't think -- I didn't feel that ET1 -- he

15  didn't -- he definitely didn't want to be friends, you know.

16  It was just work, turn to -- you know, he wasn't the nicest

17  supervisor, you know.

18  Q    Could he be, in fact, mean at time?

19  A    He was mean sometimes, yes.

20  Q    Would he be vulgar at time -- at times?

21  A    Oh, yeah.

22  Q    And how would he be vulgar?

23  A    You want me to tell you?

24  Q    Yeah.

25  A    Okay.  Well, ET1, he -- I mean, he did cuss a lot.  His

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 741  Filed 09/23/14  Page 137 of 329

1  favorite thing was "Fuck it," you know.  He'd complain a lot.

2  Q    And was that kind of a hard supervisor to work under at

3  the time, when you're trying to learn?

4  A    For me, it was hard.

5  Q    Was he critical of everyone, would you say?

6         MS. LOEFFLER:  Your Honor, I'll just ask a foundation.

7  That she knows and was specifically observed, I have no

8  problem --

9         THE COURT:  Very well.

10         MS. LOEFFLER:  -- but not from what other people told

11  her.

12         THE COURT:  Very well.

13  BY MR. CURTNER:

14  Q    Okay, you worked with -- how long did you work with ET1

15  Hopkins?

16  A    For 2-1/2 years.

17  Q    And do you know during that time was he critical of other

18  people?

19  A    He was.  I heard him talk about a lot of people

20  negatively.

21  Q    Okay.  Now, during that same time, of course, you worked

22  with Jim Wells and Rich Belisle.  Did you -- how were -- how

23  did they get along professionally, Rich and Jim?

24  A    Rich and Jim, they -- to me, how it seemed -- I thought we

25  were a team.  It seemed like they got along, to me.  That's

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 138 of 329
(720) 384-8078  attrans@sbcglobal.net

1  how it -- that everybody got along.

2  Q    Now, in their personal lives, socially, they were

3  different, though.  Right?

4  A    They were different.

5  Q    And how -- can -- explain how they were different.

6  A    I'll -- well, I'll start with Jim.

7  Q    Uh-huh (affirmative).

8  A    He was more of a stay-at-home -- it's how it appeared to

9  me.  He liked --

10  Q    Uh-huh (affirmative).

11  A    -- to stay home, he liked to do his chores, he liked to

12  read.  He didn't drink.  And -- okay, and then Rich was the

13  more social person.  Everybody liked Rich, and he was -- he was

14  fun, you know.  But he liked to go to the Rendezvous too, which

15  was cool, you know.  So, yeah, that's -- they were just

16  different --

17  Q    Okay.

18  A    -- like that.

19  Q    So they were different in their own personal lives, but it

20  worked.  They got along well.  You guys were a team?

21  A    Yeah, I thought so.

22  Q    And, in fact, you and Petty Officer Henry, you learned a

23  lot from both of them?

24  A    From both of them.

25  Q    Okay.  Who did you see as your mentor during that time?

1  A    Jim.

2  Q    And why is that?

3  A    Because I'm a lot like Jim.  Leah and I used to joke that

4  she -- she was Rich and I was Jim, that we worked back at the

5  COMMSTA when we're old ladies.

6  Q    And so it was a -- but you kind of identified with Jim as

7  your mentor?

8  A    I did, yeah.

9  Q    He's kind of a Alaskan guy?

10 A    He's a Alaska -- yeah.

11 Q    And you're -- you were born and raised in Alaska?

12 A    Well, I wasn't born in Alaska, but --

13 Q    Oh.

14 A    -- I was raised in Alaska.

15 Q    And -- in Anchorage or where?

16 A    Up north, in the Talkeetna area.

17 Q    Okay, so Talkeetna, that's sort of like Kodiak in some

18 ways?

19 A    It -- it's a small town.  Yeah.

20 Q    Okay.  And people have to be pretty independent and self-

21 sufficient out -- a long ways from Anchorage or anyplace.

22 Right?

23 A    Yeah.

24 Q    Okay.  Now, did you ever hear Rich Belisle say anything

25 negative about Jim at work?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 140 of 329
(720) 384-8078   attrans@sbcglobal.net

1  A    No.

2  Q    Did you ever hear Jim say anything negative at work about

3  Rich?

4  A    No.

5  Q    Did you ever hear Jim say anything negative about ET1

6  Hopkins?

7  A    Jim wasn't -- he didn't talk bad about people.  Mostly it

8  would be me talking bad about ET1 to Jim and he would tell me

9  something very short about don't let him get to you, don't

10 worry about it, you know.

11 Q    Okay.  So you never heard him speak ill about ET1 Hopkins

12 or even Chief Reckner or anybody?

13 A    Not that I can call -- recall, like --

14 Q    Uh-huh (affirmative).

15 A    -- specifically anything.  No.

16 Q    Now, would you agree that you might, though, complain or

17 talk to Jim Wells about ET1 Hopkins's treatment of you?

18 A    I would.  I -- and to Jim and Nancy, sometimes I would

19 vent.

20 Q    So you would be at their house a lot, while they were

21 feeding you?

22 A    Well, not -- yeah, not a lot.  You know, from -- from time

23 to time, yeah.  Yeah.

24 Q    Okay.  On a regular -- 15 or 20 times, you think, or more?

25 A    Oh, yeah.  Yeah.  And on holidays, stuff like that, you

1  know.

2  Q    And sometimes you would vent?

3  A    Sometimes.

4  Q    And they would -- what would -- well, how they -- would

5  they advise you to handle that?

6  A    I remember specifically they told me not to bad-mouth

7  people, to -- up -- up the chain, to just let him do the bad-

8  mouthing, and people would see, you know, for themselves, like,

9  who, you know, had the problem.  Or -- and -- and they would

10  just tell me just to get through being a nonrate, that this was

11  a learning experience to -- you know, I needed to move on, to

12  be a petty officer, you know.  It was encouraging.

13  Q    They advised you to be patient and -- right?

14  A    Yeah.

15  Q    So then you knew Jim Wells for a while, that you could --

16  he was obviously pretty sick during the fall of 2011?

17  A    Uh-huh (affirmative).

18  Q    And that had a pretty im -- pretty big impact on his work?

19  A    Yeah.  He didn't feel good at all, you know.  It's --

20  Q    For --

21  A    -- hard to be a good worker when you are sick.

22  Q    But he was also a pretty private person?  He didn't

23  disclose a lot about some of his ailments.  Is that right?

24  A    Yeah, he's pret -- he's private.

25  Q    Okay.  Now, would you say that Jim Wells enjoyed being

1  your teacher?

2  A    I think so.  He never complained about it.

3  Q    Did he seem like he really enjoyed answering your

4  questions?  Well, he and Rich both, right?

5  A    Both of them, yeah.  I mean, if they had the time, they --

6  and they -- they would help me with whatever I was asking them,

7  you know, questions about -- or the -- yeah.

8  Q    Okay.  Now, do you recall being in the rigger shop office

9  on April 11th, the day before the shootings?

10 A    Yes.

11 Q    Do you remember Mr. -- ET1 Hopkins talking about his

12 retirement letter?

13 A    Yes.

14 Q    What do you recall about that?

15 A    I was at my desk, and he -- each -- each one came in, he

16 was like, "I am so done with this place.  I'm done.  I -- I" --

17 trying -- he said that he wrote his retirement letter and that

18 he was going to turn it in and he was done.

19 Q    That was the day before the shootings?

20 A    I'm pretty positive it was day before.

21 Q    And he told you that he is going to turn in his retirement

22 letter?

23 A    That's what he said.

24 Q    Okay.  Now if I could go back a little bit about the

25 rigger shop.  You -- I think you said you checked the locks

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 143 of 329

1  every day when you left?

2  A    The -- the doors.

3  Q    The doors?

4  A    Yeah.

5  Q    To see if they were locked?

6  A    Uh-huh (affirmative).

7  Q    Even -- well, now, your schedule was 8 to 2 --

8  A    That --

9  Q    -- typically?

10  A    Yeah, 8 to 2.

11  Q    And so if Mr. -- ET1 Hopkins got there -- if he got there

12  early, it could have been 7:15 or 7:30 and still been early,

13  correct, since you guys really start your workday at 8?

14  A    That -- yeah.

15  Q    And then you would usually leave at 2 o'clock?

16  A    At 2.

17  Q    All the nonrates would leave then?

18  A    Yeah, we would all leave.

19  Q    And what if the Coasties -- what if the civilians were

20  still there?  Was anybody there after 2, or would you -- would

21  that be the -- shop be closed then?

22  A    People would still be there after 2, yeah.

23  Q    Would you lock the doors then?  Would you check the doors,

24  or would it be the last person out that would check it?

25  A    I would still lock the doors.  I would still check all the

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 144 of 329

1  doors, make sure they were locked, because one of our doors

2  was -- it had a magnet lock.  So, I mean, it -- if I deadbolted

3  that door, that main front door that we -- we would leave

4  unlocked all during the workday -- if I locked that, it would

5  be fine, because, I mean, you can just go out the magnet door

6  and it'll shut back and lock.

7  Q   Okay.  Do you recall if you checked all the doors on April

8  11th when you left?

9  A   I'm pretty -- it's something I did every day.

10 Q   Okay.  I wonder if we could go to Government Exhibit 392

11 again.  Okay.  Okay, I think that you said your desk was over

12 here?

13 A   That's right.

14 Q   Okay.  Do you know whose desks were back here?  Who is --

15 whose desk is that?  Or do you know?

16 A   That's Chief Reckner's desk.

17 Q   Okay.  And then whose desk was that?

18 A   ET1.

19 Q   And whose desk was that?

20 A   That's Rich's desk.

21 Q   Okay.  And then, you know, where was Mr. Wells's desk?

22 A   Yep, it was -- do you want me to point it out or --

23 Q   Yeah, please.

24 A   Okay.  So right there is Jim's desk.

25 Q   Oh, okay.  And that's the one without a chair?  Normally

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 741  Filed 09/23/14  Page 145 of 329

1 there would be a chair there?

2 A    There's the chair there.

3 Q    So you knew Jim's truck pretty well?  You could turn

4 the --

5 A    I would recognize Jim's truck, I think, yeah.

6 Q    Pardon me?

7 A    I would -- I would recognize Jim's --

8 Q    He -- that's what he would drive every day to work?

9 A    Jim Wells?

10 Q    Jim Wells, yes.

11 A    Yeah.

12 Q    And you know Nancy's car pretty well, right?

13 A    Yeah.

14 Q    You drove it before.  So, in fact, a lot of people at T2

15 knew both of the vehicles.  Right?

16 A    Perhap -- I mean, maybe.  Yeah.

17 Q    Okay.  Now, you -- Mr. and Mrs. Wells, they would give you

18 rides to the airport from time to time?

19 A    Sometimes, yeah.

20 Q    They were nice about that.  And then --

21 A    Just -- not every time.  Yeah, they --

22 Q    Okay.  And then it -- they might ask you to do it once or

23 twice, but that's when they were on longer trips?

24 A    Yeah, they -- they were both gone.  I can't remember where

25 they went for a little while during the winter.  Because I also

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 146 of 329
(720) 384-8078   attrans@sbcglobal.net

1  shoveled the snow off their steps.

2  Q   Okay, so that might be at a time you'd off -- that they --

3  you would offer them a ride to and from the airport when they

4  would be gone for a couple weeks on a vacation or something.

5  Is that correct?

6  A   That's right.

7  Q   And on April that week, do you know if -- when Nancy left

8  that week on Tuesday, do you know what time?

9  A   No.

10  Q   Did you know that she drove right from work and was going

11  to be back in a couple days?  Did you know that?

12  A   I didn't under -- I didn't know that.

13  Q   Okay.  So it would have been unusual that they might just

14  park there for a couple days themselves?

15  A   I mean, it could be usual.  I'm -- I mean, maybe.

16          THE COURT:  If you know.  You don't have to guess.

17          THE WITNESS:  Oh, okay.

18  BY MR. CURTNER:

19  Q   No, no guessing.

20  A   Okay.

21  Q   So -- just a minute, Your Honor.  (Pause) Now, you knew

22  Debby Hopkins.  Is that correct?

23  A   Yes.

24  Q   And how often would Debby be at the rigger shop?  Did she

25  came there sometimes?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 147 of 329

1  A    Sometimes she did.  She was there every day for about the

2  first year, because we had -- we -- our hours changed.  But she

3  would come every day.  But then after our hours changed, she

4  would just be in every once in a while.

5  Q    Okay.  So when did -- what do you mean by hours changed?

6  A    They changed our work hours.  We used to -- in the

7  beginning, the first year I was there, we had a lunch time that

8  we would take.  I can't remember the exact work hours, but they

9  did change to where we didn't take a lunch.

10  Q    Oh, okay.

11  A    So she would come every day for lunch when -- during that

12  time when we had a lunch.  She would come in and eat lunch.

13  And then when we changed our hours to no -- no more lunch, she

14  wouldn't come in.

15  Q    Okay.  So she came almost daily for how long a period of

16  time, do you think?

17  A    Think it was about a year.  Could have been less, a little

18  less, but --

19  Q    She might be there every day, pretty much, or --

20  A    Just about every day.

21  Q    Okay.  And then when you guys didn't have lunches, that's

22  when she would not be around as much?

23  A    Not as much.

24  Q    What kind of personality did she have?

25  A    Well, she -- she -- I mean, she was quirky.  But she

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 148 of 329

1  was -- you know, when she'd come in, she seemed happy to come

2  in.

3  Q    So did you get to know her fairly well?

4  A    Well, not -- not super-well, no,

5  Q    Would she ever act inappropriately, in your opinion, when

6  she was at the rigger shop?

7  A    It's -- I mean, it's hard to say.  She acted different

8  than a lot of other people, that's -- I mean, I'll say that.

9  She -- quirky.

10 Q    How did she react with the male nonrates at the shop?

11 A    She was chatty.  She definitely, you know, would be happy

12 to talk with them and -- yeah.

13 Q    She ever appear flirtatious with them at all, do you

14 think?

15      MS. LOEFFLER:  Objection.  Leading.  At this point this

16 is beyond the scope.  We have an agreement to let them go

17 ahead, but this is a --

18      THE COURT:  Sustained.

19      MS. LOEFFLER:  -- leading question.

20      THE COURT:  Sustained.

21 BY MR. CURTNER:

22 Q    Did you observe anything inappropriate, that nature?

23 A    No.

24 Q    Okay.  Do you remember running into Debby Hopkins the --

25 December of 2011 at the commissary?

Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 149 of 329
A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1  A    Yes.

2  Q    What do you recall from that?

3  A    She is -- she surprised me, that she stopped me in the

4  commissary.  And she was telling -- and what was surprising was

5  she was telling me --

6          THE COURT:  Well, you can't --

7          THE WITNESS:  -- a lot of her problems.

8          THE COURT:  You can't say what she said.  You can just

9  testify as -- your impression.

10         THE WITNESS:  Oh, okay.  My impression of her --

11 BY MR. CURTNER:

12 Q    Well, yes, and --

13 A    -- was that she was upset and she had some things that

14 were bothering her, and she was telling me about those things.

15 Q    Was she teary eyed?

16 A    I don't -- I don't remember that.

17 Q    Visibly upset?

18         MS. LOEFFLER:  Going to -- objection --

19         THE WITNESS:  She was upset.

20         MS. LOEFFLER:  -- leading.

21         THE COURT:  Sustained.

22         MR. CURTNER:  Your Honor, I do think at this point I

23 need to ask her what Debby Hopkins told her, because it's not

24 for the truth of the matter asserted, it's -- it goes to Debby

25 Hopkins' state of mind.  And there's some things that were said

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 150 of 329
(720) 384-8078  attrans@sbcglobal.net

1  in that conversation at the commissary that are critical to be

2  heard.

3         MS. LOEFFLER:  It's still leading and it's still

4  hearsay.  You can ask her, you know -- it's still hearsay.  I

5  mean, I don't know that's not for the truth of the matter, but

6  it's -- you know, he still has to ask nonleading questions.

7  This is his witness at this point.

8         MR. CURTNER:  Judge, can we have a sidebar on this?

9         THE COURT:  Ladies and gentlemen, it's lunchtime.  So

10  if we can take about and -- if you could be back at, say, five

11  after 1, so that gives you a little over an hour.  What do you

12  call the --

13      (Whispered conversation)

14      (Jury not present)

15         THE COURT:  Please be seated.  Okay, let's take this

16  up.

17         MR. CURTNER:  I'm sorry, you want to do this at

18  sidebar, Your Honor, or --

19         THE COURT:  Well, whatever you want.  Sidebar is good

20  as any.

21      (At sidebar with the Court and counsel)

22         MR. CURTNER:  Judge, I'll let Mr. Offenbecher speak.

23         MR. OFFENBECHER:  (Indiscernible).

24         THE COURT:  Ma'am, you're free to go for lunch.  Be

25  back at 5 after 1.  Okay?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 741  Filed 09/23/14  Page 151 of 329

1      UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

2      MS. LOEFFLER:  I'm just going to stand up here for the

3  moment.

4      THE COURT:  That's good.

5      MS. LOEFFLER:  Make it easier.

6      MR. CURTNER:  Yeah, that's fine.

7      MR. OFFENBECHER:  If the witness is permitted to answer

8  the question, she will say that Debby Hopkins was -- met her at

9  the commissary, she was emotionally upset.  She confided in

10  Para Upchurch or -- yeah, Para Upchurch that her husband, Jim

11  Hopkins, was yelling at her all the time, he was calling her

12  fat.  He was mean to her --

13      THE COURT:  (Indiscernible) --

14      MR. OFFENBECHER:  -- and he going to leave her.

15      THE COURT:  Okay, what's the relevance of

16  (indiscernible) --

17      MS. LOEFFLER:  I don't think she was going to say that,

18  because it isn't in the statement.

19      MR. OFFENBECHER:  We (indiscernible) may have a little

20  (indiscernible) -- here's the point, Your Honor.  The fact that

21  Debby Hopkins was having (indiscernible) her husband and her

22  (indiscernible) and her husband was going to leave her

23  (indiscernible).

24      THE COURT:  Okay, but how is that a credible

25  (indiscernible).

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 741  Filed 09/23/14  Page 152 of 329

1     MR. OFFENBECHER:  Well --

2     MS. LOEFFLER:  (Indiscernible).

3     THE COURT:  No, I just want to know how that --

4     MS. LOEFFLER:  (Indiscernible).

5     THE COURT:  -- (indiscernible) --

6     MR. OFFENBECHER:  (Indiscernible).

7     THE COURT:  -- did she kill him?

8     MR. OFFENBECHER:  Yes, Your Honor.

9     THE COURT:  Okay.

10    MR. OFFENBECHER:  That --

11    THE COURT:  That's what you're saying.

12    MR. OFFENBECHER:  That's exactly what we're saying.

13 Her husband was going to leave her destitute.  She had no means

14 of support.  She was -- he had been threatening to leave her.

15 There was marital discord.  All of the experts will testify

16 this is a common motive for murder.  And the reason that the --

17 they were -- the FBI agent was asking questions about this is

18 determining whether there was any discord in the marriage.

19    She will testify -- Ms. Upchurch will testify that

20 Debby believed that -- and told her that she believed that

21 the -- Mr. Hopkins was going to leave her.  That is clearly

22 important evidence, it has nothing to do with hearsay.  It's

23 her own personal state of mind.  "I think my husband's going to

24 leave me.  He's going to leave me destitute, without any means

25 of support."  And then of course there's also the life

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 153 of 329

1  insurance policies, oh, we have the financial incentives for --

2  to have him killed.  But if she believes her husband's going to

3  leave her, that is clearly evidence of motive.

4         MS. LOEFFLER:  The way this one works, Your Honor, is

5  they subpoenaed Debby Hopkins.  They can put her on.  And if

6  there is a prior inconsistent statement from Debby Hopkins, I'm

7  fine with that.  But there is nothing.  And the statements that

8  they're talking about, Para Upchurch said she was depressed.

9  There's nothing in it that said, "My husband's going to leave

10  me and I'm going to be financially destitute."  So let them

11  call Debby Hopkins, and if she --

12         THE COURT:  (Indiscernible) have a statement?

13         MS. LOEFFLER:  Well, they have the same statements we

14  do.

15         THE COURT:  No, they can take their own statements.

16         MS. LOEFFLER:  Well, they can.  I just don't know --

17  because there have been so many things thrown out, I'm not -- I

18  don't necessarily believe that that's what's going to --

19         THE COURT:  Well, why --

20         MS. LOEFFLER:  -- be said.

21         THE COURT:  -- would he want ask it if he didn't know

22  the answer?

23         MS. LOEFFLER:  I don't know.  But it's a -- they're

24  trying to put it in for the truth of the matter.  They're

25  trying to have --

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 741  Filed 09/23/14  Page 154 of 329

1    (Indiscernible speech)

2         MS. LOEFFLER:  They're trying to -- let me finish my

3    statement.  They're trying to have --

4         THE COURT:  (Indiscernible).

5         THE CLERK:  The jury's gone.  You (indiscernible).

6         THE COURT:  (Indiscernible).

7         MS. LOEFFLER:  Okay.  So they want to ask Para, "Did

8    Debby tell you that her husband was leaving her," for the truth

9    of the matter that her husband was going to leave her.  Seems

10   to be that's exactly what they're trying to put it in for, you

11   know.

12        THE COURT:  I thought they were going to put it in for

13   her state of mind.  Not whether it was true or not, but whether

14   she believed it was true.

15        MS. LOEFFLER:  No.

16        THE COURT:  (Indiscernible) that purpose.

17        MS. LOEFFLER:  Okay.  I just -- if she doesn't -- if

18   she says (indiscernible) it's not --

19        THE COURT:  (Indiscernible) --

20        MS. LOEFFLER:  All my question is, it's a nonleading

21   question, right?  If this is their witness, it's a nonleading

22   question.  And if she doesn't say it, they're done.

23        THE COURT:  Yeah.  Okay.

24    (Indiscernible speech)

25        MR. OFFENBECHER:  I'm not loud enough?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 155 of 329
(720) 384-8078  attrans@sbcglobal.net

1    THE COURT:  You're loud enough for me.

2    MS. LOEFFLER:  I know it -- I don't think it's me.  I

3    don't know that anybody's ever had a problem --

4    MR. CURTNER:  Maybe the --

5    MS. LOEFFLER:  -- but it could be.

6    THE COURT:  Attorneys (indiscernible).  Attorneys

7    (indiscernible) ask you again --

8    MS. LOEFFLER:  Okay.

9    THE COURT:  -- to speak into the microphone

10   (indiscernible).

11   MS. LOEFFLER:  That's a good reminder for all of us.

12   THE COURT:  I want to know what's going to happen to

13   her.  What's going to happen when we get back in?  What's -- I

14   can't even remember what -- you're asking a direct question?

15   MR. CURTNER:  Yes.

16   THE COURT:  And what's the question?

17   MS. LOEFFLER:  Nonleading, Your Honor.

18   THE COURT:  (Indiscernible) the question.

19   MR. CURTNER:  I'm asking what did -- "What do you

20   recall Debby Hopkins telling you that day at the commissary?"

21   THE COURT:  Okay.  And --

22   MR. CURTNER:  Now --

23   THE COURT:  -- (indiscernible) at this time advise

24   the -- that's going to confuse the jury, because

25   (indiscernible) that's a leading question (indiscernible),

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 741  Filed 09/23/14  Page 156 of 329

1  advise them, "So, ladies and gentlemen, this is not offered for

2  the purpose of the truth of the matter, it's offered for the

3  purpose of her state of mind."  And --

4          MR. CURTNER:  No.

5          THE COURT:  Or Mr. Hopkins' state of mind

6  (indiscernible).

7          MR. CURTNER:  The leading question would be, "Did she

8  tell you this," "Did she tell you that?"

9          MS. LOEFFLER:  I object to that.

10          MR. CURTNER:  No, but --

11          MS. LOEFFLER:  It's your witness.

12          MR. CURTNER:  -- what I'm going to ask is "What do you

13  recall her telling you?"  Now, if she denies saying things that

14  she told my investigator, I think I have to ask her if she

15  remembers talking to an investigator about this incident.  If

16  she --

17          MR. OFFENBECHER:  She's an adverse witness.

18          MS. LOEFFLER:  Well, if you do that, now

19  (indiscernible) that there's a prior inconsistent statement

20  that --

21          MR. OFFENBECHER:  Right.

22          MR. CURTNER:  Right.

23          MS. LOEFFLER:  This witness -- I mean, you know,

24  basically, it seems to me they're just telling the other

25  witnesses (indiscernible) say what they wanted to say.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 157 of 329

1    THE COURT:  Right --

2    MS. LOEFFLER:  And they can call --

3    THE COURT:  -- they (indiscernible) witness is going to

4  say, they wouldn't be up here arguing like crazy

5  (indiscernible) going to say -- you think she's going to say.

6  (Indiscernible) can say what -- but we don't know what she's

7  going to say.

8    MS. LOEFFLER:  Right.

9    MR. OFFENBECHER:  But if Mr. Curtner asked

10  (indiscernible) --

11    MS. LOEFFLER:  We have to deal with it afterwards.

12    MR. OFFENBECHER:  -- (indiscernible) prior conviction,

13  I don't know what she'd say.  And he certainly

14  (indiscernible) --

15    THE COURT:  Did she talk to the investigator -- did she

16  say he has --

17    MR. OFFENBECHER:  No.

18    THE COURT:  But then you would cross-examine

19  (indiscernible).

20    MS. LOEFFLER:  Right.

21    THE COURT:  So I think we have it worked out.

22    MR. CURTNER:  Okay.

23    MS. LOEFFLER:  And, remember, you have to advise them

24  that a prior inconsistent statement, unless it's under oath, is

25  not for the truth of the matter and can only be used for

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 158 of 329
(720) 384-8078   attrans@sbcglobal.net

1  impeachment.  That's the law.

2          MR. OFFENBECHER:  We're not offering (indiscernible) --

3          MS. LOEFFLER:  Unless it is under oath, a prior

4  inconsistent statement --

5          MR. OFFENBECHER:  (Indiscernible).

6          MS. LOEFFLER:  You're saying you will.  That is the

7  law.

8          MR. OFFENBECHER:  I don't believe (indiscernible).

9          MS. LOEFFLER:  Unless it is under oath, a prior

10 inconsistent statement can be only used for the credibility of

11 the witness.  It may not be used for the truth of the matter.

12 That's the law.

13         MR. OFFENBECHER:  (Indiscernible).

14         MS. LOEFFLER:  I can give you the evidence rule.

15         THE COURT:  You guys are keeping me busy.  Someone will

16 probably send (indiscernible) out on another matter during

17 lunch hour.  Okay, anything else you want to talk about?

18         MS. LOEFFLER:  No, Your Honor.

19         THE COURT:  All right, let's see if the jury has moved

20 by (indiscernible).

21     (End of sidebar)

22     (Side conversation)

23         THE COURT:  They're gone.  They're gone, okay.

24         THE CLERK:  (Indiscernible) --

25         THE COURT:  Okay, 1:05.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 159 of 329
(720) 384-8078  attrans@sbcglobal.net

1    THE CLERK:  All rise.  Matter stands in recess until
2  1:05.

3    (Court recessed at 12:02 p.m., until 1:06 p.m.)

4    (Jury not present)

5    THE CLERK:  All rise.  His Honor the Court, the United
6  States District Court is again in session.  Please be seated.

7    THE COURT:  The jury is on it -- on its way.

8    (Jury present)

9    THE COURT:  Please be seated.  Mr. Curtner, you were
10  examining.

11  BY MR. CURTNER:

12  Q    Petty Officer Upchurch, let's talk back to -- do you
13  recall when you were at the commissary in December of 2011?

14  A    Yes.

15  Q    And do you recall that Deborah Hopkins came up to you, or
16  did you go up to her?

17  A    Think we came together in the same aisle.  You know, it's
18  a small store, so, you know, we came together.

19  Q    And who initiated a conversation?

20  A    We greeted each other, you know, "Oh, hi, Debby."  You
21  know, she -- "Oh, hi, Para."

22  Q    And who started a conversation after that?

23  A    It just start -- I mean, I don't remember exactly who
24  spoke in turn, but, I mean, we just -- you greet someone, you
25  know, and then you just "How are you doing?"  I think I

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 160 of 329
(720) 384-8078  attrans@sbcglobal.net

1  probably said, "How are you doing?"  And then she went on to

2  talk.

3  Q    Now, did Mrs. Hopkins seem unusual to you at all?

4  A    She seemed her usual self.  Yeah.

5  Q    She was her usual -- there's nothing unusual about her

6  when --

7  A    She was her usual unusual self, if that makes sense.

8  Q    Well, could you explain that, please?

9  A    I mean, she definitely -- we're all different, okay, so,

10 but, I mean, she's -- Debby is different, you know.  She -- she

11 doesn't act like normal --

12 Q    She didn't seem depressed at all?

13 A    Well, she went on to talk to me about -- she didn't just

14 call -- say "depressed," because I'm -- I said, "Oh, it sounds,

15 you know, like you're a little depressed."  And she absolutely

16 did not like that word.  But yeah, she seemed like she -- there

17 were a lot of things bothering her, yeah.

18 Q    And can you recall what she told you during that time?

19 A    She said that it was -- she said the holiday time had been

20 had for her and that she had some loved ones, of course, that

21 she missed who had passed away, and that she had been crying --

22      THE COURT:  You know, now you're asking for hearsay.

23      MR. CURTNER:  That's not for the matter -- the truth of

24 the matter asserted.

25      MS. LOEFFLER:  Your Honor, I thought this is the thing

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 741  Filed 09/23/14  Page 161 of 329

1  you ruled on, so I was going to sit down and let him --

2          THE COURT:  No, I know, but I want to clear up, so --

3  because I -- it's going to really complicate the jury, because

4  why am I letting hearsay in now when I haven't for the last

5  four days.  Let me try to explain it.  The testimony that Mr.

6  Hop -- or the statement that Mrs. Hopkins made is not being

7  offered for the truthfulness of it.

8          MS. LOEFFLER:  Okay.

9          THE COURT:  Simply being offered to show her state of

10  mind.  So what is said, you can't say, oh, that must be

11  truthful.  That's not the purpose of it.  It's not being

12  allowed to say, for instance, a -- I think the statement was

13  that a relative had passed away.  Is that what you said?

14          THE WITNESS:  Uh-huh (affirmative).

15          THE COURT:  It's not being offered to prove the

16  truthfulness of that.  It's simply being offered to prove her

17  state of mind.  I think that's about as good as I can explain

18  them.  Is that adequate?

19          MR. CURTNER:  Yes, Your Honor.  Thank you.

20          THE COURT:  Okay.  All right.

21          MS. LOEFFLER:  At this point, yes, Your Honor.

22  BY MR. CURTNER:

23  Q   Do you remember what Debby Hopkins told you about her

24  husband, ET1 Hopkins?

25  A   Yes.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 162 of 329
(720) 384-8078   attrans@sbcglobal.net

1    Q    And what was that?

2    A    She told me that she had been crying a lot lately and that

3    ET1 didn't understand, you know, what was -- she said he would

4    ask, "What's wrong with you," you know, why -- and then

5    sometimes yell and go -- sometimes -- instead of be comforting,

6    he would kind of get mad and maybe yell a little bit at her.

7    Q    Do you remember telling her what kind of things he would

8    yell at her?

9    A    No, I don't remember that.  She probably -- actually, she

10   didn't say what he was yelling at her, just that he was doing

11   that.

12   Q    Okay.  Did she express anything about him being mean to

13   her?

14   A    No, nothing besides, you know, that he didn't understand

15   and he would yell.

16   Q    Now, do you recall back in July of 2013, did one of my

17   investigators come to visit you where you were living in

18   California?

19   A    Yes.

20   Q    That's Barb Brink, that's over here?

21   A    Yes.

22   Q    And do you recall talking -- her asking you the same kind

23   of questions at that time?

24   A    Yes.

25   Q    And do you recall telling Ms. Brink that Debby told you

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 163 of 329
(720) 384-8078   attrans@sbcglobal.net

1  that Jim Hopkins was planning to leave her?

2  A   I -- I -- I did say that I -- I'd heard that, that

3  there -- you know, he --

4         MS. LOEFFLER:  Well, Your Honor, at this point I'm

5  going to object, because she's saying she's heard it.  And now

6  we're talking way-out hearsay.  She's talking about rumors.  If

7  she's not talking about --

8         THE COURT:  Sounds like --

9         MS. LOEFFLER:  -- what Debby told her --

10        MR. CURTNER:  No, I -- I'm sorry.

11  BY MR. CURTNER:

12  Q   I want you to tell me what Debby Hopkins was talking to

13  you about in the commissary December of 2011, and what you told

14  Ms. Brink that she told you at that time.

15  A   Okay.  You know, I don't -- at the commissary she did tell

16  me how she had -- she was really unhappy.  But at that time

17  I -- I don't think that Debby said, oh, he's -- she didn't say,

18  "Oh, he's going to leave me."  She didn't --

19  Q   Well, do you recall --

20  A   -- say that.

21  Q   Do you recall telling Ms. Brink, when she interviewed you

22  back last summer, that Debby told you that Jim yelled at her

23  and called her fat?  Did you tell Ms. Brink that?

24  A   Oh, okay, I do remember Deb -- I do remember Debby saying

25  something along -- she said, oh, you know, he -- "I need to

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 164 of 329

 1 lose weight because he thinks I'm fat."

 2 Q    Okay.  And that's what you told Ms. Brink then?

 3 A    Yes.

 4 Q    And that was the truth?

 5 A    Yes.

 6 Q    And also you told Ms. Brink that Debby was concerned that

 7 Jim would leave her?

 8 A    You know, I -- I -- my -- I don't -- I'm sorry, I don't

 9 remember that part.  I can't think competently.

10 Q    And do you remember Debby Hopkins telling you that Jim was

11 yelling at her a lot, all the time?

12 A    What I said is -- is just about exactly what she told me,

13 you know.

14 Q    And what can you recall that being?

15 A    That she had been crying a lot lately and that he didn't

16 understand what was -- he -- what's wrong with -- what -- what

17 was wrong with her.  And that he wasn't comforting and he would

18 just yell at her.

19 Q    Okay.  And she seemed to be pretty upset at that time

20 about that?

21 A    She did seem -- she seemed upset at the commissary that

22 day, yeah.

23 Q    And did she seem depressed to you at that time?

24 A    She did.  I -- I even told her to get some Vitamin D

25 pills, because I knew it helps.

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 165 of 329

1   Q    Okay.  Now, did you attend the funeral of ET1 Hopkins?

2   A    Yes.

3   Q    And did you observe anything out of the ordinary there?

4   A    Yes.

5   Q    What did you observe?

6   A    At the funeral I just sat in my seat the whole funeral.  I

7 didn't get up.  It was open casket.  So I just sort of

8 observed.  And I -- I noted that Debby at one point was talking

9 to the CO, our CO, Commander Van Ness, and she -- she's very up

10 and down with her mood, but she seemed happily to say, "I'm

11 never going to have to work again in my life."  And that struck

12 me and others as odd.  It's just a weird thing to say.  But

13 it's a funeral.  I mean, none of it's -- I don't know.

14   Q    Anything else unusual at that time or inappropriate?

15   A    Yes.

16   Q    What else?

17   A    Well, I was -- I mean, I'm sitting in my seat, and it was

18 an open casket, so a lot of folks, you know, were up in the

19 front of the room.  And Petty Officer Beauford -- well, Debby

20 was, like, "Come on," you know, like, getting people, you know,

21 talking and having people go up, you know.  And Beauford was up

22 in the front of the room with Debby.  And I was sitting at the

23 time with -- with Jacques Perlans (ph), and he made a statement

24 like, "Oh, my God."  And I -- I'm like, what --

25        THE COURT:  And now we're getting into more hearsay.

1          MS. LOEFFLER:  Your Honor, I object.

2          THE WITNESS:  Okay.

3          MS. LOEFFLER:  I think we're going into hearsay and --

4          THE COURT:  Yeah.

5          MS. LOEFFLER:  -- (indiscernible).

6     BY MR. CURTNER:

7     Q    No, I'm just -- sorry, just what you saw.

8     A    What I saw.

9          THE COURT:  Just what you saw, not what anybody --

10         THE WITNESS:  Okay.

11         THE COURT:  -- said.

12         THE WITNESS:  Okay.  I just saw -- it -- the whole

13    thing was weird.  The whole funeral was weird to me.  Just the

14    way -- it's hard to judge somebody, the way they grieve, you

15    know.  But there's just a lot of -- just the way she acts is

16    really strange.

17    BY MR. CURTNER:

18    Q    And any of her behavior there -- I mean, besides that,

19    anything else you see --

20    A    Just like the -- the up and down with her mood.  I mean,

21    sometimes she seemed really happy.  And I'm not saying -- I'm

22    not trying to say she was happy her husband was dead.  I'm just

23    saying it's just like -- she just seemed, you know -- maybe she

24    was happy to see someone in particular, but she -- it's just

25    strange, all of it.  I'm sorry I don't have specific -- the

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 167 of 329

1   whole thing was weird.

2   Q    During this time that Jim was sick, you worked with him

3   quite -- most of that time before you left in March?

4   A    Worked with -- with Jim?

5   Q    Yeah, uh-huh (affirmative).

6   A    What -- if he was there, I'd work with him.

7   Q    And when he was there, was he using the restroom a lot

8   that you observed?

9   A    Yep.

10  Q    How many times a day, do you think?

11  A    At least a few.  Yeah, every -- we have one bathroom.

12  There was somebody in it always, it seemed like.  But Jim was

13  in it the most.

14  Q    And would he be there long periods of time?

15  A    A long time to me.  Seems like a long time.

16  Q    What would that be to you?

17  A    Well, anywhere from 15 to 30 minutes.

18  Q    Okay.

19  A    Yeah.

20  Q    That was not unusual dur -- when he was sick, right?

21  A    That wasn't unusual.

22  Q    Just a minute.  Just one last question.  At the funeral

23  when you were observing, did you observe any physical contact

24  between Debby Hopkins and Cody Beauford?

25  A    Yes.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 168 of 329
(720) 384-8078  attrans@sbcglobal.net

1    Q    And what did you observe?

2    A    Well, hugging, a lot of hugging, and hanging on.

3    Q    You can tell us.

4    A    Well, I -- I mean, I know what -- I know -- I know what

5    ha -- what happened, but I -- you know, like, the after part,

6    you know, I didn't -- I mean, I can't say that I saw everything

7    that --

8    Q    What --

9    A    -- that I heard about.

10   Q    Okay, so what did --

11   A    But I did see a lot of hugging and a lot of hanging on,

12   just a lot of -- just, like -- it was -- a lot of people were

13   hugging.

14   Q    Thank you.  That's all I have.

15        THE COURT:  Redirect.

16        MS. LOEFFLER:  Yes, Your Honor.

17                    **REDIRECT EXAMINATION**

18   BY MS. LOEFFLER:

19   Q    A couple of questions.  Can everybody hear me?  Okay, I

20   figured.  But I'm just trying to make sure --

21        THE COURT:  Raise your -- if you can't hear, raise your

22   hand.  That's the rule.  And I -- that doesn't mean you need to

23   use the restroom, unless this means -- okay.  One hand means

24   you want them to speak louder.

25        MS. LOEFFLER:  Okay.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 169 of 329
(720) 384-8078  attrans@sbcglobal.net

1  BY MS. LOEFFLER:

2  Q    Petty Officer Upchurch, in March of 2012, you were gone

3  that whole month?

4  A    The whole month.

5  Q    Okay.  And so you got back for, like, the last --

6  basically less than two weeks before the murders happened?

7  A    That's right.

8  Q    Right.  Mr. Curtner asked you a question I think about

9  knowing -- you knew what car -- that the -- both cars that the

10 Wells had, the white one and the blue one?

11 A    Right.

12 Q    Do you have any idea who else knew about Nancy Wells' car?

13 I mean, personally, do you have any idea?  Let me ask the

14 question again.  You're looking confused, so I probably didn't

15 ask a good question.  Do you have any knowledge about how

16 many -- let me ask a better way.  How often did Jim Wells drive

17 Nancy Wells' car to work?

18 A    Oh, I -- I never saw Jim drive Nancy's car to work.

19 Q    Okay.  I'm just going to leave it there.  Oh, and I think

20 you said the -- but have you -- were -- have you ever been in

21 Jim Wells' truck?

22 A    No, I never rode in his truck.

23 Q    Okay.  Did Mr. Wells get along with ET1?

24 A    They -- I mean, they worked together.  I don't think they

25 were friends.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 170 of 329
(720) 384-8078  attrans@sbcglobal.net

1  Q   Okay.  When -- after the murders happened, did you go to

2  the Belisle house, I believe -- the day after the murders,

3  that -- or do you recall, did you go to Nicola Belisle's house?

4  A   I did go to her house.

5  Q   Okay.  And do you know what day it was?

6  A   No.

7  Q   How soon after the murders it was?

8  A   It was -- I was soon after.

9  Q   Okay.  Did you talk to Jim Wells -- or did you relate a

10  conversation to Mrs. Belisle about a conversation that you had

11  had with Jim Wells?

12  A   Will you repeat the question?

13  Q   Yeah, I'll ask it a different way.  Did you talk to Mr.

14  Wells after people had talked to you and give him any idea

15  about whether -- what you thought about whether they were

16  looking at him for the murder or not?

17  A   I talked to Jim after the murders.  I was concerned.  I

18  was concerned about him.

19  Q   Did he make any statement to you in response to a question

20  of the investigators looking at him for the murders?

21  A   I'm sorry, will you repeat the -- I'm sorry, I'm just

22  trying to understand what you're asking me.

23  Q   Sure.  Did you tell Mr. Wells, "You know, they're looking

24  at you for this"?  Do you recall saying anything like that?

25  A   No, I -- I remember asking Jim, are -- "Are they giving

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 171 of 329

1  you a hard time," because they were -- all the questions that

2  started to come out were directed -- the questions they were

3  asking me, it was a lot about Jim.  So I was worried about Jim.

4  Q    Uh-huh (affirmative).

5  A    And I -- I said, you know, "How are you doing?"  You know,

6  "Are they giving you a hard time?"  I -- you know, I --

7  Q    Do you recall a response he gave to you?

8  A    No.

9  Q    Just one second.

10        MS. LOEFFLER:  Your Honor, I'd like to approach with

11  defense counsel.  I want to ask her another question, but I

12  want to make sure counsel knows what it is and I want to

13  approach at sidebar.

14        THE COURT:  Okay.

15     (At sidebar with the Court and counsel)

16        MS. LOEFFLER:  What -- this is what Nicola told me,

17  that at the Friday after the murder, that Para went to her and

18  said, you know that -- said she'd had this conversation with

19  Jim -- you can read it, you guys.  I'm going to -- I wrote it

20  down.  And he [sic] said, "You know they're looking at you for

21  this."  And that Para responded that Jim told her, "I'm

22  innocent until proven guilty."  I wanted to ask her that,

23  because Nicola is going to say that's what Para said to her the

24  next day.  But I didn't want to -- I wanted to bring it to your

25  attention, because Nicola just told me this.  This is what --

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 741  Filed 09/23/14  Page 172 of 329

1   you can read it.  That's what Nicola told me and I wrote it

2   down.

3           MR. OFFENBECHER:  This is what Para said

4   (indiscernible).

5           MS. LOEFFLER:  Yep.

6           MR. CURTNER:  That Jim said to her?

7           MS. LOEFFLER:  Yep.

8           MR. OFFENBECHER:  (Indiscernible).  So -- you know,

9   it's triple hearsay.

10          MS. LOEFFLER:  No, it isn't.  It's --

11          MR. OFFENBECHER:  You're the one who's saying it's

12  hearsay.

13          MS. LOEFFLER:  Well, I'm trying to ask her whether Jim

14  said it to her.  I'm not asking Nicola right now.  I wanted to

15  ask her -- I'm not asking Nicola to testify without asking her.

16  I can show it to her and ask if it reflect -- if she recalls

17  this conversation.

18          MR. CURTNER:  (Indiscernible) she just said she

19  (indiscernible).

20          MS. LOEFFLER:  Well, I can certain -- I mean, I want --

21  kind of refresh her recollection.  It's just hard in a

22  nonleading.  I could show her the statement and see if she

23  recalls it.

24          THE COURT:  This is your writing, what --

25          MS. LOEFFLER:  This is my writing.  Nicola just told me

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 173 of 329
(720) 384-8078  attrans@sbcglobal.net

1   this.  That's why I'm showing it to you, because that's what

2   she told me.  I mean, I'm entitled to ask this witness if Jim

3   ever told her that, but I just -- I'm entitled to ask her that.

4   It's not hearsay.  It's a statement of Jim's.

5          MR. OFFENBECHER:  Right, (indiscernible).

6          MS. LOEFFLER:  Yeah, I -- first I heard it too.  That's

7   why I'm -- wrote it down.  I'm not asking --

8          THE COURT:  Well --

9          MS. LOEFFLER:  -- Nicola.

10          THE COURT:  -- I think that (indiscernible).  My

11   concern is, it seems to me it will refresh her recollection

12   without saying it in front of the jury.

13          MS. LOEFFLER:  That's why I came back here for --

14          THE COURT:  If she says, "I don't remember that," then

15   that ends the inquiry.

16          MS. LOEFFLER:  That's right.  I'm going to go -- can I

17   just approach her again with this and ask her if there was this

18   conversation?  I'm try -- this is why I brought it back here.

19          THE COURT:  Okay.  I think at least we'll get to that

20   step, then we'll see --

21          MS. LOEFFLER:  Okay.

22          THE COURT:  -- what happens after that.

23          MS. LOEFFLER:  All right.  If I'll approach, I'll show

24   it to her and ask if she had this conversation, without --

25          MR. OFFENBECHER:  (Indiscernible) be heard --

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 174 of 329
(720) 384-8078  attrans@sbcglobal.net

1      MS. LOEFFLER:  -- restating what it is.

2      MR. OFFENBECHER:  (Indiscernible) be heard on this

3  (indiscernible).

4      THE COURT:  That's my -- my point is, she may say, "I

5  don't remember," and that ends the inquiry.

6      MS. LOEFFLER:  Okay.

7      THE COURT:  But if she said, "Oh, yes, I remember

8  that," then (indiscernible).

9      MR. OFFENBECHER:  Well -- we'll talk about that

10  (indiscernible).

11      THE COURT:  Well, what's your position with this --

12      MR. OFFENBECHER:  Well --

13      THE COURT:  -- (indiscernible).

14      MR. OFFENBECHER:  -- okay, I'm -- my position is it's

15  incredibly prejudicial for -- you know, he says, "I'm innocent

16  until proven guilty," he's -- it's basically -- he's saying

17  (indiscernible) is proven guilty (indiscernible) here.  And it

18  just (indiscernible) --

19      THE COURT:  No, but what's probative value --

20      MS. LOEFFLER:  Your Honor, it's a state --

21      THE COURT:  -- from the government?

22      MS. LOEFFLER:  Well, the reason they're yelling is

23  because it's a statement of the defendant made right after

24  this, and if she says, "I don't remember it," it's not coming

25  in.  But if she says that, "Yes, he did say this to me," it's a

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 175 of 329
(720) 384-8078  attrans@sbcglobal.net

1 statement of the defendant, it's not hearsay, it's completely

2 admissible --

3          THE COURT:  (Indiscernible).

4          MS. LOEFFLER:  -- and shows consciousness of guilt.

5     (Indiscernible speech)

6          THE COURT:  Well, she just said it was consciousness of

7 guilt.

8          MR. CURTNER:  That's --

9          THE COURT:  (Indiscernible) --

10          MR. CURTNER:  But that's the law that

11 (indiscernible) --

12          MR. OFFENBECHER:  That's a statement of the law.

13          THE COURT:  (Indiscernible) --

14          MS. LOEFFLER:  No, it's a con -- it's completely -- the

15 reason they're going to be yelling is it's a -- we just had

16 this thing about bizarre behavior --

17          THE COURT:  I don't know if (indiscernible) -- that's

18 the kind of thing that we got the jury here to decide.  But my

19 first question is whether she's going to remember at all

20 (indiscernible).

21          MS. LOEFFLER:  And I'm just going to show it to her, so

22 it doesn't go in front of the jury --

23          THE COURT:  (Indiscernible).

24          MS. LOEFFLER:  -- if I may, and ask her if she

25 remembers this.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 176 of 329

1    THE COURT:  Let's do that.  And then if you want to

2   come back and talk about that, we can do it.

3    MS. LOEFFLER:  Okay.

4      (End of sidebar)

5    MS. LOEFFLER:  Your Honor, may I question from the box

6   (indiscernible)?

7    THE COURT:  Yes.

8   BY MS. LOEFFLER:

9   Q   Ms. Upchurch, without saying in -- don't repeat what this

10  is on there.  This is a statement that I have a question, is

11  whether you ever said this to Jim Wells, and please don't

12  repeat out loud what it is, and whether he said this in

13  response.  Do you recall any such conversation?

14  A   I don't -- so much time has gone by, I just can't remember

15  everything.  I don't know if I said this before.  And I don't

16  remember it now, but I -- I -- I can't remember him saying this

17  to me.

18  Q   Okay.

19  A   I just don't remember.

20   MS. LOEFFLER:  Then I will leave it, Your Honor.

21   THE COURT:  Okay, very well.

22   MS. LOEFFLER:  I have nothing further, Your Honor.

23   THE COURT:  Redir -- recross.

24   MR. CURTNER:  No other questions.  Thank you.

25   THE COURT:  Okay, thank you, you're excused.

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 177 of 329

PIZZURRO - DIRECT

1  Government's next witness.

2      (Witness excused)

3      MS. DUIGNAN:  The government calls Lieutenant David

4  Pizzurro to the stand, Your Honor.

5      THE COURT:  Okay.  (Pause) (Indiscernible) keep heading

6  this way.  Just remain standing long enough for her to swear

7  you in.

8      THE CLERK:  Please raise your right hand.

9      **DAVID CHARLES PIZZURRO, PLAINTIFF'S WITNESS, SWORN**

10     THE CLERK:  Okay, thank you.  Please have a seat.  And,

11 sir, if you can please state and spell your full name.

12     THE WITNESS:  David Charles Pizzurro.  D-a-v-i-d, C-h-

13 a-r-l-e-s, P-i-z-z-u-r-r-o.

14     THE CLERK:  Thank you.

15     THE COURT:  All right, counsel.

16                **DIRECT EXAMINATION**

17 BY MS. DUIGNAN:

18 Q    Lieutenant Pizzurro, by what organization are you

19 employed?

20 A    United States Coast Guard.

21 Q    And how long have you been in the Coast Guard?

22 A    Ten years.

23 Q    Can you give the jury a brief overview of your career?

24 A    Absolutely.  I joined the Coast Guard in 2000 at the

25 United States Coast Guard Academy, where I got a four-year

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 178 of 329
(720) 384-8078  attrans@sbcglobal.net

1  degree in electrical engineering.  Was graduated and

2  commissioned in 2004.  Went to Coast Guard Cutter Rush, out of

3  Honolulu, Hawaii, in the engineering department as a damage

4  control assistant.  I was there until 2006, when I transferred

5  to the U.S. Coast Guard Command Control and Engineering Center.

6  I served there from 2006 to 2009, where I transferred to the

7  U.S. Coast Guard Communication Station Kodiak, Alaska, where I

8  served as the executive officer from 2009 to 2012.  From 2012

9  to present, I have served at the U.S. Coast Guard Nationwide

10  Automatic Identification System Project Resident Office in

11  Newport News, Virginia.

12  Q   And, in fact, that's where you're stationed today, is that

13  true?

14  A   Yes, ma'am.  That's correct.

15  Q   I believe you're the first commissioned officer we may

16  have had who's testifying in this trial.  Can you explain

17  briefly the difference between the enlisted ranks and

18  commissioned officers?

19  A   Absolutely.  Commissioned officers are appointed by the

20  President and serve at the leisure of the President.  They are

21  typically responsible for leadership and management aspects of

22  the service and they carry a greater responsibility than petty

23  officers and the enlisted corps.

24  Q   I'm going to briefly pull up the rank chart, which I

25  believe is already admitted into evidence.  381.  We'll start

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 179 of 329
(720) 384-8078   attrans@sbcglobal.net

1  with the enlisted side, just so you can explain it.

2  A   Yes, ma'am.

3  Q   So looking at Exhibit 381, can you just briefly explain to

4  the jury what this depicts?

5  A   Absolutely.  This is the enlisted rating structure within

6  the U.S. Coast Guard.  Starting at E-1, which is the junior

7  recruits.  Typically when people are brought into the Coast

8  Guard, they come in as an E-1.  On through the E-10, E-9,

9  functionally the most senior enlisted rank within the Coast

10  Guard.

11  Q   And all of the enlisted ranks fall below the commissioned

12  officers.  Is that correct?

13  A   That is correct.

14  Q   Okay.  So let's go to page 2.  So looking at page 2, what

15  does this show?

16  A   This is the officer structure for the United States Coast

17  Guard.

18  Q   And looking at the chart, I think you might have a pointer

19  up there.  If you could just point to where your rank falls on

20  the chart?

21  A   Yes, ma'am.  I am a O3, or a lieutenant.

22  Q   Thank you very much.  We heard from Chief Reckner a short

23  time ago and he explained the role of a chief.  Can you

24  explain, to you, what the role of the chief and the Chief's

25  Mess is?

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 180 of 329

**PIZZURRO - DIRECT**

1  A    Absolutely.  Chiefs are the -- the backbone of the Coast

2  Guard, so to speak.  They -- they're the intermediary between

3  the junior enlisted in our service and the officer corps.  They

4  are typically the -- the go-between.  So the officer corps

5  frequently doesn't interact with the junior enlisted on a -- on

6  a daily basis, a low level.  It would be uncommon for the

7  executive officer or the commanding officer to issue orders to

8  the junior enlisted.  We typically work through the Chief's

9  Mess, expressing our desires, our concerns for the unit.  The

10 chiefs take that and turn it into actionable items by the

11 junior enlisted.  Vice versa, the junior enlisted bring their

12 concerns and issues to the chiefs corps and the chiefs corps

13 presents it to the officer corps.

14 Q    And while you were stationed at Communication Station

15 Kodiak -- first, let me ask you from what day to what date were

16 you stationed there?

17 A    I arrived May 26th, 2009 and I departed in May of 2012.

18 Q    And what was your role at Communication Station Kodiak

19 when you served there?

20 A    I was the executive officer of Communication Station

21 Kodiak.

22 Q    And can you explain what the role of an XO or an executive

23 officer is?

24 A    The executive officer is the number 2 position with --

25 within the communication station typically within a unit.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 741  Filed 09/23/14  Page 181 of 329

PIZZURRO - DIRECT

1  They're responsible for administration of the unit, day-to-day

2  operations.  They basically keep the unit functioning, handle

3  administrative, maintenance, supply, procurement.  They're the

4  catch-all of assignments, so to speak.

5  Q    And were you serving in that role on April 12th, 2012?

6  A    Yes, ma'am.

7  Q    I'm going to put the org chart up for you on the easel.

8       (Side conversation)

9  A    Sorry, could you rotate it slightly?  It's too steep of an

10 angle for me.

11          UNIDENTIFIED SPEAKER:  Sorry.  There.

12          THE WITNESS:  Thank you.

13 BY MS. DUIGNAN:

14 Q    Can you see from there, Lieutenant Pizzurro?

15 A    I can.

16 Q    Okay.  And looking at the org chart, where do -- do you --

17 I think you have a laser pointer up there.  Can you point at

18 the box that depicts where you fall on the org chart?

19 A    Yes, ma'am.  The executive officer is number 2, so I'm

20 directly below the commanding officer, but at the -- the top of

21 the chain of command within the unit.

22 Q    And you just mentioned the chain of command.  Can you

23 please explain what the chain of command is, what that concept

24 is?

25 A    Yes, ma'am.  Within military organizations, we're

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 182 of 329
(720) 384-8078   attrans@sbcglobal.net

1  reinforced -- chain of command is basically responsibility and

2  how responsibility travels.  So the chain of command -- the

3  people that work for me consider me to be part of their chain

4  of command.  That's how we delegate responsibility and

5  leadership roles, so that every person working within the Coast

6  Guard clearly knows who works for them and who they work for,

7  all the way up to the President of the United States.

8  Q    And you mentioned that you worked directly for the

9  commanding officer.  Who worked for you?

10  A    Correct.  So everyone at the unit, with the exclusion of

11  the commanding officer, worked for me.

12  Q    And how did the defendant, James Wells, fall into that

13  chain of command?

14  A    James Wells worked in the rigger shop down here, who was

15  part of the rigger shop, which was part of the Information

16  Technology Division, which was part of the Engineering

17  Department, which reported to me as executive officer.

18  Q    And that would have been his chain of command?

19  A    Yes, ma'am.

20  Q    Were you working on the morning of April 12th, 2012?

21  A    Yes, ma'am, I was.

22  Q    And what time did you arrive at work that day?

23  A    Approximately 0750.

24  Q    And when you pulled up, what did you see?

25  A    When I arrived on scene, I stopped at the flagpole.  I saw

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 183 of 329

1   EMS response type vehicles.  I immediately noticed that there

2   was a military police vehicle on scene.  I got out of my

3   vehicle and identified myself to the military police officer.

4   Q    And where did you go from there?

5   A    From there, I spoke with the military police officer to

6   understand what was going on with the scene.  I was told that

7   there were people down, casualties on scene.  No one could

8   identify them or tell me what was actually going on.  At that

9   point I called Commander Van Ness to let him know what was

10  going on.  As commanding officer, he's responsible for the

11  unit, so I notified him of the situation.  Then I went up to

12  COMMSTA Proper and went in to check on the watch.

13  Q    And when you travel in to work in the morning, do you

14  normally wear your uniform or do you wear civilian clothes?

15  A    I generally travel in civilian clothes.

16  Q    And on that day what were you traveling in?

17  A    I was wearing civilian attire that day.

18  Q    Was there -- so at the time that you went up to the watch

19  station after you talked with military police, what did you do

20  next?

21  A    Yes.  So when I arrived at the building, I went into my

22  office, discarded my things that I brought in, my lunch, the

23  cell phone, the things that I use for a normal day.  I went on

24  to the watch floor, which is where COMMSTA conducts its

25  mission.  We're predominantly a long-range communication

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 184 of 329
(720) 384-8078   attrans@sbcglobal.net

1   station, so we're responsible for talking to Coast Guard

2   aircraft when they're conducting search-and-rescue operations,

3   maritime law enforcement operations.  We're responsible for

4   monitoring for distress calls from local mariners in the

5   fishing fleet.  So at that time when I arrived in the building,

6   I went to the watch floor to determine the status of the watch,

7   make sure everything was going appropriately, that we were

8   still meeting mission.  And I ran into Petty Officer Haselden

9   at that time.

10  Q    And how did Petty Officer Haselden appear to you?

11  A    Petty Officer Haselden was clearly distressed.  When I

12  spoke with him, he told me that during part of his round, going

13  through the rigging shop, he saw Petty Officer Hopkins and Mr.

14  Belisle.  They were both injured, bleeding substantially, lots

15  of blood on the scene.  Petty Officer Haselden, who was the

16  communication watch officer, he was the person in charge of the

17  unit day-to-day operations at that time, he was clearly unable

18  to stand his watch based on the emotional stress, trauma he was

19  experiencing.

20      At that time there was another chief qualified as

21  communication watch officer, Chief Gerasimof, who was on the

22  watch floor with me.  I directed him to assume the watch from

23  Petty Officer Haselden, since I felt he was no longer capable

24  of fulfilling his duties.  Chief Gerasimof told me that he was

25  going to assume the watch.  He began to do rounds, checking in

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 185 of 329
(720) 384-8078   attrans@sbcglobal.net

1  with the watch standers, verifying the status of the equipment,

2  status of the unit.

3      I brought Petty Officer Haselden into a room, spoke with

4  him briefly.  Then I assigned Petty Officer O'Connor, who was

5  also on the watch floor as the watch supervisor, to keep an eye

6  on Petty Officer Haselden, be with him, just make sure that he

7  was in a -- he was safe.  I also directed Petty Officer Andrews

8  to notify the Health, Safety,  Work-Life Unit on Base -- excuse

9  me -- on Base Kodiak that I believed we had a critical stress

10  incident and that they should send a response team over to

11  begin debriefing, working with the crew.

12  Q   And you had mentioned that you contacted the Health,

13  Safety, Work-Life Unit.  What is their role in the Coast Guard?

14  A   The Health, Safety, Work-Life Unit is responsible for --

15  they have a wide variety of things they're responsible for.

16  Typically, they deal with medical, so all of our -- our -- our

17  health care is run through this wheel.  They're also

18  responsible for just general work-life issues, so stress

19  management, family advocacy -- advocacy, and various other

20  aspects of life that aren't -- that support the crew and the

21  Coast Guard mission but aren't necessarily mission execution.

22  Q   So why did you notify them that there had been what you

23  termed a critical incident?

24  A   Because I felt that the circumstances that were -- that I

25  was experiencing at that time clearly met the burden of

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 186 of 329
(720) 384-8078   attrans@sbcglobal.net

1   critical stress incident.  The Coast Guard actually has a

2   fairly lengthy definition of critical stress incident.

3   Typically, we would use them for search-and-rescue teams or

4   various people that come across traumatic incidents.  I felt,

5   based on the description I received from Petty Officer

6   Haselden, his behavior, the general behavior of people I had

7   seen that were close to the situation, that we were definitely

8   in the middle of a critical stress incident and we would need

9   to be debriefed.

10  Q    Was there anybody else besides Petty Officer Haselden that

11  you ran into when you first came in -- onto the watch floor?

12  A    No.

13  Q    Okay.  So what did you do next?

14  A    After I was told by Chief Gerasimof that he had assumed

15  the watch, the watch was stable, we were still able to meet

16  mission, I went to my office, I put on my uniform.  From that

17  point, I went back down to the rigging shop to see how I could

18  assist the situation.  I was the senior officer on scene at the

19  time, as a lieutenant, until Commander Van Ness showed up, so I

20  began to fulfill my duties as senior officer.

21         MR. OFFENBECHER:  Excuse me, counsel, at this point

22  could I just move the easel back?

23         MS. DUIGNAN:  Will you still be able to see it if you

24  need it?  We can move it back.

25         THE WITNESS:  Okay.

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 187 of 329

1    MR. OFFENBECHER:  Thank you.

2  BY MS. DUIGNAN:

3  Q    You have mentioned that you were the senior officer on

4  scene.  So how long did that situation last?

5  A    I'm honestly unaware of what time Commander Van Ness

6  actually arrived on scene.  I -- I remained in charge for quite

7  a period of time.  While I was heading back down the hill to

8  the rigging shop, I received a call from Mr. McMahon (ph), and

9  he's the -- the DA, or the Decedent Affairs officer for Base

10  Kodiak.  He notified me that we needed to do spousal

11  notifications for Mr. Belisle, Petty Officer Hopkins.  Told me

12  that either myself or the commanding officer, Commander Peter

13  Van Ness, would need to put on our service dress, which is the

14  uniform I'm wearing today, and go out and notify the spouses

15  before it had been -- got into the public domain that they had

16  an issue.

17  Q    And obviously while this was going on, being in charge,

18  what were your other concerns at the command?

19  A    My other concerns were safety, security, and mission

20  execution.  So we were trying to get accountability for the

21  crew, determine who was present, and then begin to control

22  access to the facility.  So we were closing the security gate

23  and working with MilPol to ensure that we had appropriate

24  for -- an appropriate security posture for the situation we

25  were dealing with.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 188 of 329
(720) 384-8078   attrans@sbcglobal.net

**PIZZURRO - DIRECT**

1   Q    And you mentioned having to relieve Petty Officer Haselden

2   of the watch.  What other actions, if any, did you take in

3   regard to mission execution that day?

4   A    The -- there were no further actions that needed to be

5   taken one -- once Petty Officer Haselden was relieved and Chief

6   Gerasimof had assumed the watch.  They continued through daily

7   execution of the mission, plus at a later time, Phil

8   Jordinelli, my operations officer, who was responsible for the

9   watch and for -- for the mission, showed up and I was able to

10  delegate that authority to him, or he was able to assume that

11  role and keep track of the -- the watch and make sure we were

12  able to meet mission.

13  Q    And can you describe -- because I don't know if you've

14  actually told the jury what you've defined the mission as of

15  Communication Station Kodiak.

16  A    So the mission at Communication Station Kodiak, again, is

17  we support Coast Guard operations in terms of long-range

18  communications.  Coast Guard aircraft can't fly unless they

19  are -- unless somebody's carrying the radio guard.  They're

20  required to check in with the Coast Guard every 15 minutes and

21  every 30 minutes, depending on whether it's a rotary wing, a

22  helicopter, or a fixed-wing asset such as a C-130 aircraft.  So

23  we -- we cover their -- we -- we talk to them while they're

24  flying to make sure we get their operations and their position,

25  so in the event of an aircraft incident we are able to know

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 189 of 329

1  where they were and send appropriate assets to respond.  Also,

2  we pass operational commands from the Coast Guard Command and

3  Control to the aircraft that's on scene.

4      And in addition to aircraft support, we also do search-

5  and-rescue res -- monitoring.  So we listen for the local

6  mariner that's operating offshore in the fishing fleet and we

7  respond to their calls by forwarding them to the appropriate

8  Command and Control resources.

9  Q    You mentioned that at some point Commander Van Ness, the

10 commanding officer, showed up.

11 A    Yes.

12 Q    At that point were there any discussions with him, or how

13 did you work out who was going to do what?

14 A    I don't know that we had a formal discussion about who was

15 going to do what.  We basically -- part of being a CO and an XO

16 is you work together as a team.  Once it became obvious that he

17 was putting on his service dress to notify the spouses, I -- I

18 presumed that I was going to continue to run the unit and

19 handle the rest of the issues that we were facing in terms of

20 operation, stability, security, and notifying the crew and

21 dealing with those type of issues.

22 Q    In your role as executive officer, in the months leading

23 up to the murders were there any problems you were aware of at

24 the communication station, specifically in the rigger shop?

25 A    We had some administrative issues with Mr. Wells within

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 190 of 329
(720) 384-8078   attrans@sbcglobal.net

1  the rigger shop.

2  Q   And when you say administrative issues, what do you mean?

3  A   Administrative issues, just -- administrative issues, the

4  type of issues that don't necessarily warrant significant

5  action but warrant documentation and documenting within a

6  personal record in deficiencies that we were trying to correct.

7  Q   As one of those documents you mentioned, was there ever a

8  letter of expectations issued?

9  A   Yes, ma'am, there was.  There was a letter of expectations

10 issued in April of 2011 by Senior Chief Reed to both Mr. Wells

11 and Mr. Belisle.

12 Q   And why was that done?

13 A   That was done to establish a baseline of performance for

14 both Mr. Belisle and Mr. Wells.  It had come after myself and

15 Chief Reckner had been through a civilian management course run

16 by the CSA, Stacy Hofler.  And part of the discussions we had

17 with her was to establish a -- a working baseline in order to

18 successfully lead, manage, and set expectations that it would

19 be appropriate to issue a memo of expectation to both Mr.

20 Belisle and Mr. Wells.

21 Q   And who, if anybody, did you consult with in drafting that

22 letter?

23 A   That would be the CSA, Stacy Hofler, of Base Kodiak.

24 Q   And were you there when the letters were delivered?

25 A   I was not.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 191 of 329
(720) 384-8078   attrans@sbcglobal.net

1  Q    Were you aware of a fuel card investigation?

2  A    Yes, ma'am, I was.

3  Q    Can you please explain how that came about?

4  A    Absolutely.  In September of 2011, Petty Officer Hopkins

5  and Chief Reckner noticed that the -- the government fuel card,

6  which was used on base to buy diesel fuel --

7         MR. OFFENBECHER:  Your Honor, I would object on the

8  basis of lack of his personal knowledge.

9         MS. DUIGNAN:  Your Honor, he -- assigned to direct the

10  investigation.

11         THE COURT:  I understand he's a -- he's overseeing the

12  investigation.  But you want to lay the foundation, lay -- you

13  want to lay that foundation?

14         MS. DUIGNAN:  Yes, Your Honor.

15  BY MS. DUIGNAN:

16  Q    In your role as executive offer -- office -- excuse me --

17  as your role as XO, executive officer, have you ever had

18  occasion to order investigations?

19  A    Yes, ma'am, I have.

20  Q    And under what circumstances do you order investigations?

21  A    Typically, investigations can be ordered for a large -- a

22  large quantity of things.  When dealing with the military

23  workforce, we have a separate set of codes, Uniform Code of

24  Military Justice.  When there's suspected infractions about

25  that, we could issue a -- an investigation under the Uniform

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 192 of 329

1    Code of Military Justice, looking into alleged offenses of a

2    specific military member.  Also, in addition to that, the Coast

3    Guard has a policy set up for administrative investigations.

4    And administrative investigations could be followed up to any

5    type of incident that required further review.  It is basically

6    a review process to see what happened, why it happened, and how

7    the deficiency could be corrected in the future.

8    Q    And in this case did someone bring to your attention that

9    there were some facts with the missing fuel card?

10   A    Yes.

11   Q    And how was that done?

12   A    It was done through an administrative investigation.

13   Q    And how were you made aware of the facts in order to be

14   able to order the administrative investigation?

15   A    The administrative investigation -- once the fuel card was

16   determined to be missing, after it showed up, Chief Reckner,

17   Petty Officer Hopkins brought up the fact that the fuel card

18   was missing to the attention of the command.  At that point an

19   administrative investigation was launched to look into the

20   facts surrounding the disappearance of the gas card, its

21   return, and the charges that were made on the card that could

22   not be verified.

23   Q    And, in fact, the Coast Guard has a whole manual about how

24   to conduct administrative investigations --

25   A    Yes, ma'am, they do.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 741  Filed 09/23/14  Page 193 of 329

1  Q   -- that correct?  And, presumably, you consulted the

2  manual in that case to determine to convene an administrative

3  investigation.

4  A   Yes, ma'am.

5        MS. DUIGNAN:  Your Honor, at this point I'd like to

6  establish the witness's knowledge of the investigation.

7        THE COURT:  Very well.

8  BY MS. DUIGNAN:

9  Q   So you ordered an investigation of this case about the

10  missing fuel card.  Why did you do that?

11  A   To det -- to determine what actually happened with the

12  fuel card, why it was missing, why the charges were made, where

13  the fuel went from the charges that were made, and how to

14  prevent it from occurring in the future.

15  Q   And what facts were uncovered during the investigation?

16  A   The facts that were uncovered in the investigation was

17  that --

18        MR. OFFENBECHER:  Well, Your Honor, again, he's --

19  there was investigation, there were some findings.

20        MS. DUIGNAN:  But --

21        MR. OFFENBECHER:  He's not speaking from his own

22  personal knowledge, but rather from someone -- what someone

23  reported to him.

24  BY MS. DUIGNAN:

25  Q   Is an administrative investigation a business document

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 194 of 329

1  that is regularly used in the Coast Guard?

2  A   Yes, ma'am, it is.

3  Q   And does it record items that occur during the course of

4  business as -- pursuant to the Administrative Investigations

5  Manual?

6  A   Yes, ma'am.

7       MS. DUIGNAN:  Your Honor, at this point I'd like to

8  have him look at at the adminis -- at the investigation in this

9  case.

10       THE COURT:  Very well.

11       MS. DUIGNAN:  It's been marked for ID.

12       (Whispered conversation)

13  BY MS. DUIGNAN:

14  Q   Can you please look at your screen?  It hasn't been

15  admitted yet.  It's Exhibit 8 for identification.  And if you

16  can look that over.  I think that's only the first page.  I

17  don't know if you have the ability to change pages, so just

18  indicate when you're ready for us to change the page.

19  A   I'm sorry, am I reviewing for something specific or --

20  Q   I just want you to look it over and become familiar with

21  it.

22  A   Yes, ma'am.

23  Q   Is that indeed the administrative investigation of the

24  fuel card in this case?

25  A   Yes, ma'am, it is.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 195 of 329

**PIZZURRO - DIRECT**

1  Q    And whose signature is at the top?

2  A    That is SK -- well, it's SK1 Stephen Cartier.

3  Q    Okay.  And who was it written to?

4  A    It was written to myself at the COMMSTA, at the XO.

5  Q    And presume it was addressed to you because you had

6  ordered him to do an investigation --

7  A    Yes, ma'am.

8  Q    -- under the rules and regulations of the Coast Guard and

9  the Administrative Investigations Manual?

10 A    Yes, ma'am.

11        MS. DUIGNAN:  Your Honor, at this point I'd like to

12 move for admission of the investigation.

13        MR. OFFENBECHER:  Your Honor, we've previously objected

14 to this.  The Court sustained the objection.  He can certainly

15 use this to refresh his memory about the investigation.  I have

16 no objection to that.  But the document itself, the Court has

17 already ruled inadmissible.

18        MS. DUIGNAN:  Well, Your Honor, you said that we could

19 go into the facts if we couldn't admit the investigation.

20        THE COURT:  That's right.

21        MS. DUIGNAN:  So I'd either like to admit --

22        THE COURT:  Well, if you're --

23        MS. DUIGNAN:  -- it or go into the facts.

24        THE COURT:  Well, you certainly can go into the facts,

25 and maybe I'll allow it admitted later if it's determined is

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 196 of 329
(720) 384-8078   attrans@sbcglobal.net

1  appropriate.  But certainly you can go into the facts.

2  BY MS. DUIGNAN:

3  Q   Can you look at the second page of the document, just to

4  refresh your memory?  Looking at that investigation, does --

5  did that document the facts of what had happened in this case

6  with the fuel card?

7  A   Yes, ma'am, it did.

8  Q   And under the Administrative Investigations Manual, what's

9  the goal and intent of an investigation?

10  A   The goal and the intent of the investigation is to

11  determine -- the find -- the finding of acts are to determine

12  what actually happened --

13  Q   And in this case --

14  A   -- and then --

15  Q   -- were facts established through statements and other

16  manners of gathering facts together to assemble, to present to

17  you?

18  A   Yes, ma'am.  Chief Cartier was the investigating officer,

19  so he interviewed all the -- the personnel involved in the --

20  in the issue.  He spoke to the -- the rigger shop, the various

21  people who operate the fuel system on base, and then he even

22  worked with Base Security and then with COMMSTA to pull the

23  appropriate video logs.

24  Q   And do you remember exactly who he interviewed in this

25  case?  Would looking back at the investigation refresh your

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 197 of 329

1  recollection?

2  A    Yes, ma'am, it would.

3  Q    If you look at page 2 and look through the enclosures.

4  A    Yes, ma'am.

5  Q    Who, in fact, did he interview for the investigation?

6  A    During the investigation he in -- he interviewed --

7  those -- as shown in the enclosures.  Petty Officer --

8  Q    And who were those people?

9  A    Yes, ma'am.  Petty Officer Hopkins, who was the ET1 in

10  charge of the rigger shop; Mr. Rich Belisle; Mr. Jim Wells;

11  Chief Reckner, who is the supervisor of the IT department, also

12  the supervisor of the -- the rigger shop.

13  Q    And what other information did Chief Cartier assemble?

14  A    Chief Cartier also pulled the receipt logs from the fuel

15  system for the pumps.  That's shown in enclosure 7.  He pulled

16  the video surveillance video from Base Kodiak, from the front

17  security camera that monitors vehicles coming on base.  That's

18  shown as enclosure 8, video surveillance of BSU.  They were

19  formally known as the Base Support Unit before being renamed

20  the Base Kodiak.  And then emails from Rachelle Bates (ph)

21  was -- was used to explain the time printouts on the fuel

22  receipts.  They were an hour behind due to Daylight Savings.

23  So Petty Officer Cartier verified that information with the --

24  with the CGS people.

25  Q    And after reviewing all of these facts, was there anybody

1  at the command who came to a conclusion about what had happened

2  with the fuel?

3  A    The administration -- the administrative investigation

4  does not directly -- does not point blame to one specific

5  person.  Its purpose was to determine what happened, address it

6  occurring it in the future.  The general consensus amongst the

7  command was that it was Mr. Wells who had used the fuel card

8  inappropriately.

9  Q    And an administrative investigation is used to establish

10  the facts and potentially make recommendations.  Are those

11  recommendations ever binding on the command?

12  A    They're internal to the command, so I wouldn't say that

13  they were binding upon us.  We weren't legally obligated to

14  follow the results of the administrative investigation.

15  However, it would be bad business not to follow the results of

16  our own administrative investigation.

17  Q    And in the end, based on all of the facts that you had

18  received, you had concluded that Jim Wells took the fuel?

19       MR. OFFENBECHER:  Objection.  That's a leading

20  question.

21       MS. DUIGNAN:  Who -- well, he already testified to

22  that.

23       THE COURT:  Okay.

24       MS. DUIGNAN:  I'm using his foundation to lead to the

25  next question.

**PIZZURRO - DIRECT**

1    THE COURT:  Okay.

2  BY MS. DUIGNAN:

3  Q    You had determined that Mr. Wells had taken the fuel.  Why

4  did you --

5    MR. OFFENBECHER:  I object to that.  Mischaracterizes

6  what he actually said, and it's also a leading question.  It's

7  her witness on direct.  I object.

8  BY MS. DUIGNAN:

9  Q    Okay.  Who did you determine took the fuel?

10  A    Mr. Wells.

11  Q    And why was that?

12  A    I'm sorry, can you -- can you expand --

13  Q    What -- why was it --

14  A    -- on that question?

15  Q    -- that you came to that conclusion?

16  A    He was the most logical of -- based on the investigation

17  on the witness statements, Mr. Wells in -- excuse me -- in

18  enclosure number 5 is actually an email from Mr. Wells

19  discussing that if a certain dollar value of fuel was charged

20  on a specific day and the entire rigger shop was in Shemya or

21  accounted for through various locations, then it must have been

22  him and he must have fueled the line truck, which was a -- a

23  heavy vehicle that the COMMSTA owned.  It's bright yellow,

24  typically stored at the rigger shop.  However, on a review of

25  the Base Kodiak security cameras and COMMSTA Kodiak security

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 200 of 329
(720) 384-8078   attrans@sbcglobal.net

**PIZZURRO - DIRECT**

1   cameras on that specific day at approximately that same time,

2   the line truck never left COMMSTA Kodiak and never arrived at

3   Base Kodiak.  So his statement did not match the video evidence

4   that we saw during the administrative investigation.

5        MS. DUIGNAN:  At this point I'd like to admit

6   Government Exhibit 8, Your Honor.

7        MR. OFFENBECHER:  Yeah, same objection.  He's used it

8   to refresh his memory.  He's testified --

9        THE COURT:  I'll reserve on that (indiscernible).

10       MS. DUIGNAN:  Okay.

11  BY MS. DUIGNAN:

12  Q   Was there a time that the commander decided to take action

13  based on the facts that were discovered through the

14  investigation?

15  A   Yes.  About January of 2012, working with the commanding

16  officer, Peter Van Ness, Commander, we decided to issue a

17  letter of caution to Mr. Wells.

18  Q   And how was that letter issued?  How was it given to Mr.

19  Wells?

20  A   The --

21  Q   Was it mailed to him?  Was it --

22  A   Oh, yes, ma'am.

23  Q   -- how was it given to him?

24  A   No, so the -- the letter was presented to Mr. Wells during

25  a meeting in the commanding officer's office.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 741  Filed 09/23/14  Page 201 of 329

1  Q    Can you explain what the significance is of meeting in the

2  commanding officer's office?

3  A    Absolutely.  Typically, most personnel try to avoid the

4  commanding officer.  He -- the commanding officer is seen as

5  the -- the pinnacle of the unit.  They're the ones who have all

6  the authority, all the control.  Unless you're in a command

7  staff type position where you need to be advisory to the

8  commanding officer, you would typically just try to avoid them

9  in general.  It would be the equivalent of you don't want to go

10  see the big boss or the -- you know, the CEO or the president

11  of the company you work for, because it would be seen as

12  uncomfortable.

13  Q    Just bring you back a couple points, I just wanted to

14  clarify something.  You mentioned that you had reviewed the

15  video as part of the investigation.  And --

16  A    Yes, ma'am.

17  Q    -- you hadn't seen the line truck.  What did you see on

18  the video?

19  A    On the video, what I specifically remember seeing on Base

20  Kodiak is that Mr. Wells came on base at about the time that

21  the fuel was pumped, as well as Chief Reckner came on base at

22  about the same time.

23  Q    And what vehicle was Mr. Wells driving?

24  A    He was driving a white Dodge-ish pickup truck with a --

25  with a crew cab on the back.  His typical vehicle.

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 202 of 329

1  Q    Okay.  Going back to the decision to issue the letter of

2  caution, you mention this was delivered in the CO's office --

3  A    Yes, ma'am.

4  Q    -- and the gravity of that.  Who was there?  Who was

5  present?

6  A    Present during the meeting was commanding officer

7  Commander Peter Van Ness; myself, as executive officer; the

8  department head, Senior Chief Bill Reed; and Chief Reckner, who

9  is the -- the rigger shop supervisor within the chain of

10 command.

11 Q    And when Mr. Wells was called to the office to present him

12 the letter, who was the one who was addressing Mr. Wells?

13 A    Was Commander Van Ness.

14 Q    And how exactly was the letter presented?

15 A    I'm sorry, can you --

16 Q    Did -- was he called into the office to present the

17 letter?  If you can just describe what happened.

18 A    We all went into Commander Van Ness's office.  In that

19 Commander Van Ness is the senior officer, we remained standing

20 until he was ready to proceed.  I don't remember if he was

21 behind his desk working or not at the time.  But basically he

22 came over to the conference table.  We all sat down.  He had

23 the letter with him.  He let in -- I -- I honestly can't

24 remember the exact wording that were used.  He discussed the

25 letter with Mr. Wells, went to present it to him, and Mr. Wells

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 203 of 329

1 was not happy to receive the memo and began to oppose it.

2 Q    Did Mr. Wells say anything specifically that you can

3 recall?

4 A    I remember Mr. Wells saying, "No, I didn't do it."  He

5 said, "No, gosh darn it," or the explicit version of that.

6 He -- he was generally resistant to the memo, the fact that it

7 was being issued to him.

8 Q    And was there any process of counseling or words that were

9 given by Commander Van Ness?

10 A    Not that I remember directly.  I -- no.

11 Q    Was he just handed the letter and nothing was said?

12 A    Oh, no.  He -- he -- he was handed the letter and there

13 was a -- a level of counseling going on with Commander Van

14 Ness, Senior Chief Reed, Chief Reckner, and myself,

15 basically --

16 Q    About how --

17 A    -- discussing the circumstances.

18 Q    I'm sorry, didn't mean to cut you off.  I thought you were

19 done.  About how long did that last?

20 A    It -- it was somewhere between five and ten minutes.

21 Q    And how did that meeting end?

22 A    The meeting was -- was -- was awkward, to say the least.

23 Towards the end of the meeting it became obvious that Mr. Wells

24 had no intention of signing the memo.  At -- at that point

25 Commander Van Ness and I looked at each other.  We weren't

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 204 of 329
(720) 384-8078  attrans@sbcglobal.net

**PIZZURRO - DIRECT**

1   really sure how to proceed, because the -- the memo was not

2   admission of guilt, it was a notification that he had been --

3   received a letter of caution.  So we looked at each other for a

4   while.  I think Commander Van Ness kind of realized we weren't

5   making any forward progress with the meeting.  So at that point

6   the commander stood up, which was the indication that the

7   meeting was over.  Senior Chief, Chief Reckner, myself stood

8   up, departed the office.

9   Q   Where did Mr. Wells go?

10  A   Mr. Wells remained in the office for a period of time.  I

11  couldn't tell you how long precisely.  I went into my office

12  and continued with my administrative duties.  Mr. Wells left

13  the office a -- a few minutes later.  Commander Van Ness came

14  out and told me that Mr. Wells did eventually sign the memo for

15  Commander Van Ness.

16  Q   How would you characterize -- when the commanding officer

17  gets up, what is the normal expected reaction?

18  A   The normal expected reaction to a senior officer standing

19  is to stand up.  And it was a clear indication that the meeting

20  was over and that we should depart.

21  Q   And did that happen here?

22  A   For most people, it did.

23  Q   Do you have any knowledge about the process of tree

24  collaring happening at the Communication Station Kodiak?

25  A   Yes, ma'am, I do.

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net

**PIZZURRO - DIRECT**

1  Q    And can you please explain what you know?

2  A    Absolutely.  As far -- you -- you'd like to know --

3  Q    First of all, is that something that's permitted at

4  Communication Station Kodiak?

5  A    No.

6  Q    And did it come to your attention at some point that this

7  was happening on the communication station?

8  A    It did.  Chief Reckner and Petty Officer Hopkins brought

9  it to my attention that we were having tree collaring going on

10 at the communication station on the trees on our property.

11 Q    And after they notified you, what did they do?

12 A    They took me into the antenna field to show me what was

13 going on.  It was Jim Wells who had been collaring trees.

14        MR. OFFENBECHER:  Objection.  Objection, Your Honor,

15 based on his lack of personal knowledge.

16        THE COURT:  Sustained.

17        MR. OFFENBECHER:  Move to strike the answer.

18        THE COURT:  Very well.

19 BY MS. DUIGNAN:

20 Q    Do you have any knowledge about who had access to the

21 fields out there or who was known to gather firewood from the

22 fields?

23 A    Yes, ma'am.

24 Q    And who was that?

25        MR. OFFENBECHER:  Objection, based on lack of personal

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 206 of 329
(720) 384-8078   attrans@sbcglobal.net

1  knowledge again.

2        THE COURT:  Foundation.

3  BY MS. DUIGNAN:

4  Q   Had you ever -- well, let me ask you this.  What was the

5  policy regarding firewood at Communication Station Kodiak?

6  A   Typically, once trees are cut down -- we have to cut down

7  trees at Communication Station Kodiak to prevent -- protect our

8  antennas and our towers.  Many of them are freestanding, some

9  of them are guide, in somewhat rural areas, so lots of trees,

10 lots of grass.  It's a requirement to cut down the trees to

11 keep them from growing into the antennas, into the wires that

12 keep the antennas standing such that we don't damage the

13 antennas, we don't damage the towers and do a substantial

14 amount of financial damage to the equipment.

15     So with that as a result, we do cut down trees.  It's a

16 requirement of our job.  Once those trees are cut down, the --

17 the policy typically then after hours, once a tree's been

18 fallen, you can come in with your own vehicle, on your own

19 time, with your own tools, and remove the excess wood.

20 Q   And that policy was applicable for everyone.  Everyone had

21 access to wood that was legitimately felled?

22 A   Yes, ma'am.

23 Q   Was there ever an issue or an incident that was brought to

24 your attention regarding a dispute over that wood?

25 A   It had been brought to my attention that there had been an

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 207 of 329
(720) 384-8078   attrans@sbcglobal.net

1   issue between Petty Officer Gross (ph) and Mr. Wells.

2        MR. OFFENBECHER:  Your Honor, I -- again, I object on

3   the basis of lack of personal knowledge.  Someone brought this

4   to his attention, apparently.  It's hearsay.

5        THE COURT:  So far, there's no problem.  Someone

6   brought something to his attention.

7   BY MS. DUIGNAN:

8   Q    Can you please finish your answer, Lieutenant Pizzurro?

9   A    Yes, ma'am.  It had been brought to my attention by Chief

10  Reckner that there had been a -- a dispute over the wood.  As

11  executive officer, it -- it's not uncommon to be the arbitrator

12  of such issues when there are issues within the unit that are

13  typically brought to my attention for me to either take action

14  on or -- or -- at least for notification purposes.

15  Q    And who was that dispute between?

16  A    Petty Officer Gross --

17       MR. OFFENBECHER:  I object on the basis of --

18       THE WITNESS:  -- Mr. -- and Mr. Wells.

19       MR. OFFENBECHER:  -- again, lack of personal knowledge,

20  Your Honor.

21       MS. DUIGNAN:  He knows who the dispute was between.  He

22  had to deal with it.

23       THE COURT:  Overruled.

24  Q    So Mr. Wells and Petty Officer Gross?

25  A    Yes, ma'am.

1   Q    And how was that dealt with?

2   A    It was not addressed at my level.  For notification, it

3   was brought to me.

4   Q    Who dealt with it?

5   A    Chief Reckner.

6   Q    So issues with trees had come to your attention in the

7   past?

8   A    Yes, ma'am.

9   Q    And so in the instance of the tree collaring, it was

10  raised to your attention that someone was illegally trying to

11  cut down trees --

12          MR. OFFENBECHER:  Objection.  Again --

13          MS. DUIGNAN:  -- is that fair?

14          MR. OFFENBECHER:  -- she's leading the witness at this

15  point, Your Honor.

16          THE COURT:  Sustained.

17  BY MS. DUIGNAN:

18  Q    What was brought to your attention?

19  A    It was brought to my attention that trees in the antenna

20  field were being collared.

21  Q    And can you explain whether that was something that was

22  allowed or not?

23  A    It is not permissible to collar trees, because there --

24  there's no functional purpose to it.  When you collar a tree,

25  it is effectively functionally dead.  For those who don't know

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 209 of 329
(720) 384-8078  attrans@sbcglobal.net

1  what collaring is, you take a tree, you use a saw and basically
2  cut a ring around the bottom of the tree.  It causes the tree
3  to start losing water, it causes the tree to -- to dry in place
4  and to be dead.  It's much more susceptible to falling over
5  once it's been collared.  The threat of trees falling over is a
6  hazard in the workplace in the antenna field, so it's not
7  advisable and not permissible.
8  Q    So that was not one of the procedures used to try to
9  maintain the antenna field?
10 A    No, ma'am, not that I'm aware of.
11 Q    Were you aware of any other incidents from looking at Mr.
12 Wells's civilian personnel file regarding tree collaring?
13 A    Correct.  Regarding tree collaring, once the -- once the
14 issue had been brought up, we went back into Mr. Wells'
15 personnel file and reviewed through his file, which was -- was
16 quite bulk -- bulky.  His -- his personnel file was several
17 inches thick.  And we were able to find -- we found a memo
18 issued to Mr. Wells indicating that he should not collar trees.
19 It had been from several commands ago.  I don't remember
20 specifically who issued it to him or the date that it was.  But
21 we found that he had been notified in the past that tree
22 collaring was unacceptable.
23 Q    And, in fact, was that one of the things that was
24 addressed in the memo of expectations that you had discussed
25 earlier?

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 210 of 329

1  A    I don't believe it was addressed in the April memo of

2  expectation.  I believe it was addressed by Chief Reckner in a

3  separate memo of expectation in November of 2011.  And it was

4  addressed in a memo of expectation because the previous memo he

5  had been issued for effective -- its effective date had been

6  surpassed.  The memo was old enough that it -- it -- it didn't

7  carry any weight anymore.  So to establish the -- that we could

8  no longer collar trees, to set that precedent, Chief Reckner

9  issued another memo of expectation.

10 Q    How did you find out that that older letter was not, as

11 you put it, carrying weight or effective anymore?

12 A    Was working through the CSA, Stacy Hofler, at Base Kodiak.

13 Q    And why had you contacted her about that?

14 A    She is the -- the touchpoint for civilian workforce

15 management within Kodiak, so being that both myself and Chief

16 Reckner were -- were new at working with civilians in the

17 managerial process, we consulted Stacy Hofler for any actions

18 we were going to take.

19 Q    And what had she advised you about regarding letters of

20 expectation and memos?  Was there some kind of a time, date you

21 mentioned?

22          MR. OFFENBECHER:  Your Honor, again, I would --

23          MS. DUIGNAN:  What did she advise you?

24          MR. OFFENBECHER:  I would object, on the grounds that

25 it's hearsay, not within any exception to the hearsay rule.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 741  Filed 09/23/14  Page 211 of 329

1    MS. DUIGNAN:  I'm looking for the effect on his

2 behavior, Your Honor, not for the truth of the matter asserted.

3    THE COURT:  What do you do as a result of her advice?

4    THE WITNESS:  I'm sorry, Your Honor, could you repeat

5 that, please?

6    THE COURT:  You could say what you did as a result of

7 her advice.

8    THE WITNESS:  As a result of her advice, we issued him

9 a matter -- a memo of expectation directing him not to collar

10 trees.

11 BY MS. DUIGNAN:

12 Q    A new memo of expectation?

13 A    Yes, ma'am, effective November of 2011.

14 Q    We've heard a little bit about cleaning out of the

15 warehouse at Communication Station Kodiak.  Are you aware of

16 that project?

17 A    Yes, ma'am.

18 Q    And how, in fact, did that project come around?

19 A    The general cleaning out of COMMSTA Kodiak was an

20 initiative between -- started by myself and Commander Van Ness.

21 When we both arrived in 2009, there was a large amount of

22 excess government property that had piled up in our various

23 warehouses and cages around the facility.  Unit's somewhat old,

24 from 19 -- the 1940s, we had just stockpiled a lot of stuff

25 over time.  So we began a project over the three years to try

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 212 of 329
(720) 384-8078   attrans@sbcglobal.net

1  and downsize our excess holdings.

2       We started with COMMSTA Proper, going through the

3  electronics technician cages, removing excess of gear,

4  recycling when appropriate, trashing when appropriate, and then

5  submitted to Defense Reutilization organization when

6  appropriate.  And so it had been an ongoing effort to try and

7  downsize our excess property that we had at the unit.

8  Q    And whose decision was it to do this?

9  A    It was mine and the commanding officer.  Initiated by me,

10 supported by the commanding officer.

11 Q    And why did you decide that this was the time to do it?

12 I -- let me ask you this.  When did you decide to do it?

13 A    I'd started in 2009.  It -- it had been an ongoing project

14 since we arrived.

15 Q    And how long did it take to get it done?

16 A    At least three years.

17 Q    Was there any information about why it took so long to

18 complete?

19 A    In some cases, it's just difficult to get people to get

20 rid of excess material.  Specifically with the warehouse, we

21 had a lot of excess tower equipment.  I specifically remember

22 when I arrived on -- arrived at the unit during the first

23 materiel inspection, which is a -- a tour of the unit and our

24 facilities by myself and the commanding officer and with the

25 responsible department head or division chief, when we were

1    going through the warehouse, Mr. Wells was present, and we had

2    a lot of excess tower equipment, light fixtures that had been

3    taken off, guys, cables, anchors, stuff that we would probably

4    never use again, but we had.  When Commander Van Ness asked Mr.

5    Wells, "Why do we have this excess equipment," he -- he

6    indicated that we were keeping it because we might need it in

7    the future.

8    Q    What was the status of the equipment?  Was it serviceable?

9    A    I would say maybe half of it is serviceable.  The rest was

10   scrap.  In -- in general, a lot of the stuff wouldn't have been

11   serviceable.  We would have purchased new, just to ensure that

12   we had the newest, greatest, and ensure that the equipment we

13   were using was safe.

14   Q    And who actually led the project to clean out the

15   warehouse?  The nuts-and-bolts, day-to-day operation of it, to

16   your knowledge?

17   A    During a specific time period -- again, it had been an

18   ongoing project split across multiple divisions.

19   Q    Okay.  And in the end, was there a particular division

20   that brought it up and finished it off?

21   A    Yes, ma'am.  During -- during the final push, once the --

22   once the computers and electronics had been removed by the

23   appropriate divisions within the Engineering Department, the

24   rigger shop was responsible for doing a large majority of

25   removing excess equipment, excess gear from the warehouse.  And

1    that was predominantly by ET1 Hopkins, Petty Officer Hopkins,

2    and Mr. Belisle.

3    Q    Are you aware of the antenna book project?

4    A    Yes, ma'am, I am.

5    Q    And can you explain what that was?

6    A    The antenna book is a reference for Communication Station

7    Kodiak for both the maintainers, so the people who work on the

8    antennas in the towers, and the operators, the people who use

9    the antennas in the towers for their day-to-day mission

10   execution.  It was basically a source of knowledge that could

11   be used as a reference.  Since we have over 40-plus antennas

12   across the property, it allowed us to look up any of the

13   information we needed on a specific tower for reference for

14   either maintenance issues, transmission issues, support issues.

15   Q    Whose --

16   A    It was a guide.

17   Q    Whose idea was it to put together this guide?

18   A    I believe it started at the commanding officer.  I had

19   received a draft copy when I first reported.  I presented it to

20   Commander Van Ness in draft.  He had sent it back down because

21   he wanted it to be more robust, capture more details, be a more

22   practical tool for use within the unit.

23   Q    When did this project start?

24   A    It -- it was ongoing.  It started before I arrived.  I

25   received a draft copy in 2009, and during the three years I was

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 215 of 329

1  there it seemed to be an ongoing, lingering project.

2  Q    And was there any reason that you were aware of why this

3  was lingering?

4  A    I can't think of a specific reason why it was lingering.

5  Q    Okay.  Who initially led up the project?

6  A    I don't know who initially originated the project.  It was

7  being run out of the Engineering Department, out of the rigger

8  shop.

9  Q    And to your knowledge, who worked on it during that time?

10 A    I -- I don't know who -- I don't know that I know

11 specifically who worked on it.  I do know that Mr. Wells is the

12 intended mechanic.  Having been at the unit for 20 years and

13 having -- actually, I take that back.  I don't know how long he

14 had been at the unit, but for a substantial period of time.  He

15 had been there a long time.  In addition to his Coast Guard

16 experience, he was the most knowledgeable of everyone at the

17 unit as far as the antennas go, their maintenance, their

18 capabilities.  So I -- the -- the information would have been

19 coming from Mr. Wells to supplement the book.

20 Q    And was the book ever completed?

21 A    I believe it was completed in 2012, after Seaman

22 Upchurch -- excuse me -- after Seaman Henry had worked on

23 the -- the book extensively during her maternity time.

24 Q    What car did Commander Van Ness drive?

25 A    Commander Van Ness drives a maroon F-150.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 216 of 329
(720) 384-8078  attrans@sbcglobal.net

PIZZURRO - CROSS

1  Q    Do you know what car Petty Officer Hopkins drove?

2  A    Petty Officer Hopkins drove a blue Dodge pickup.  I

3  believe it was a quad-cab.  It was fairly new, two thousand --

4  probably 2011, 2012.

5  Q    Do you know what car Mr. Belisle drove?

6  A    Mr. Belisle drove a single-cab Ford 150.

7  Q    And do you know what car Mr. Wells drove?

8  A    Mr. Wells drove a white pickup truck with a cab on the

9  back.  I believe it was a Dodge.

10 Q    I don't have any other questions at this time.

11       THE COURT:  Cross-examination.

12       MR. OFFENBECHER:  Thank you, Your Honor.

13                       **CROSS-EXAMINATION**

14 BY MR. OFFENBECHER:

15 Q    Mr. Pizzurro, good afternoon.  The -- as the executive

16 officer, you were kind of the general manager in charge of

17 everything as the executive officer of the communication

18 station.  Is that right?

19 A    I would say yes, with exceptions.  I'm not sure I -- I

20 agree to everything.  The commanding officer is ultimately

21 responsible for everything.  As executive officer, I was

22 responsible for most things and I reported to him.

23 Q    Okay.  The commanding officer is the boss.  Right?

24 A    Yes, sir.

25 Q    And you're the next person under that, right?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 217 of 329

1   A    That's correct.

2   Q    And he delegates to you a lot of the day-to-day routine

3   management of the communication station.  Right?

4   A    That is also correct.

5   Q    And then you delegated it on, for the most part, to other

6   folks, then, don't you?

7   A    Yes.

8   Q    But you're the kind of person directly under the

9   commanding officer.  Right?

10  A    Correct.

11  Q    Now, is it fair to say that in the Coast Guard, like many

12  other -- or most other military organizations, there are a lot

13  of rules and regulations.  Right?

14  A    Yes, that's correct.

15  Q    And part of your job as the executive officer of the

16  communication station is to make sure that the rules and

17  regulations are followed.  Is that right?

18  A    That's correct.

19  Q    And that's an important part of your job both as any

20  officer of the Coast Guard, right?

21  A    Correct.

22  Q    And particularly as the executive officer of a station

23  such as a communication station, to make sure that the rules on

24  the base are followed.  Right?

25  A    Yes.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 218 of 329
(720) 384-8078  attrans@sbcglobal.net

PIZZURRO - CROSS

1  Q    Now, one of the rules at COMMSTA, or the communication

2  station, was that the civilian employees as well as the Coast

3  Guard employees were not permitted to have firearms on their

4  person on the station.  Is that right?

5  A    That's correct.

6  Q    And the -- this meant that you couldn't have a firearm --

7  no one could have a firearm on their person.  Right?

8  A    Correct.

9  Q    No one could have a firearm in their vehicle if it was

10 parked on the base as well.  Right?

11 A    The answer is it depends.  I spoke with Base Kodiak about

12 that.  We were a tenant command to Base Kodiak, so we were

13 responsible for following the policies and procedures

14 established by Base Kodiak.  It -- it was my understanding that

15 firearms are not supposed to be in the buildings or within the

16 security fence perimeter of the Communication Station Kodiak or

17 Base Kodiak in general.

18 Q    Okay.  So the answer is you're not supposed to have

19 personal firearms there.  Right?

20 A    Yes.

21 Q    And you consistently stress that with your crew, with the

22 folks that work for you, that there would be no loaded firearms

23 or no firearms at all.  Right?

24 A    Yes.  When -- if that came up or if it was presented to

25 me, yes, I stressed that -- what the policy was, firearms --

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 219 of 329
(720) 384-8078   attrans@sbcglobal.net

1  Q    Well --

2  A    -- are not to be allowed.

3  Q    Is it fair to say that you've always directed your

4  personnel not to bring firearms to the base, and to the best of

5  your knowledge, your wishes were always respected?

6  A    Yes.

7  Q    So as far as you're aware, the folks who were under your

8  command, Mr. Reckner and the various other folks that are under

9  your command, followed your orders not to bring any firearms

10 onto COMMSTA.  Is that right?

11 A    To the best of my knowledge, yes.

12 Q    So if Mr. Reckner or any of the other petty officers or

13 civilian employees or nonrates or any of those other people

14 were bringing firearms onto the base -- for example, at the T2

15 rigger shop -- that was not something that you knew about, was

16 it?

17 A    No, sir.

18 Q    Now, you've talked a bit about this clearing of the

19 warehouse.  Do you remember that?

20 A    I do.

21 Q    And counsel for the government directed your attention to

22 the clearing of one specific warehouse.  Is that right?

23 A    Yes.

24 Q    Well, let me just tell you -- let me just remind you what

25 your answer was.  Your answer is when you first came to COMMSTA

1    in 2009, you noticed that there was -- that hoarding was kind

2    of the part of the culture there, right?

3    A    Yes, sir.

4    Q    And by hoarding, you mean that people had been

5    accumulating things on COMMSTA for -- since the 1940s.  Right?

6    A    Yes, that's accurate.

7    Q    Since long before Mr. Wells was even in the Coast Guard.

8    Right?

9    A    Yes.

10   Q    Well, if people had been accumulating things since 1940,

11   that was before Mr. Wells was in the Coast Guard, wasn't it?

12   A    That's accurate.

13   Q    So since 1940, until you got there in 2009, a period of 60

14   or so years, Coast Guard personnel at the communication station

15   in Kodiak and the other part of Kodiak had been accumulating

16   things that you thought were excessive.  Is that right?

17   A    I don't know that I can speak for previous COs and XOs in

18   commands as to what was accumulated during that time.

19   Q    No, I'm not asking you to speak for them.  I'm just saying

20   what you got -- you testified about this on direct.  When you

21   got there on two -- in 2009, there was a lot of stuff there

22   that you thought -- and you and the CO thought there was too

23   much and you wanted to clean it up.  Right?

24   A    Yes, that is accurate.

25   Q    And this wasn't just focused at a particular warehouse on

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 221 of 329
(720) 384-8078   attrans@sbcglobal.net

1 the base, was it?

2 A    No, it was focused throughout the facility.

3 Q    So throughout the entire facility of U.S. Coast Guard Base

4 Kodiak, both the COMMSTA and the other base as well?

5 A    I can't speak for the other base.

6 Q    Just for the COMMSTA. You thought that there was -- had

7 been an accumulation of too much stuff over a period since the

8 1940s, and you and the CO decided you were going to clean that

9 up. Is that right?

10 A    Yes, that's accurate.

11 Q    And you found that there was stuff in every warehouse,

12 every cage, every nook and cranny that existed. Right?

13 A    Yes.

14 Q    And so part of -- when you guys took over, you and

15 Commander Van Ness, you decided this was going to be one of

16 your jobs, to clean everything up. Right?

17 A    Correct.

18 Q    And you found out probably after you got there, that this

19 was partly an Alaskan cultural thing, wasn't it?

20 A    I'm not sure I understand your question.

21 Q    Well, you're in Newport -- you're in Virginia right now.

22 Is that right?

23 A    Correct.

24 Q    And you have other stations all over the country, don't

25 you? You've stated -- you've worked in other stations all over

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 222 of 329

1  the country.

2  A    Correct, I've worked in other units around the country.

3  Q    And is it fair to say that there can be different cultures

4  in different places, different Coast Guard bases around the

5  country?

6  A    That's fair to say.

7  Q    And is it fair to say that in Alaska, one of the cultures

8  is that people in these outlying stations like Kodiak or

9  someplace -- some other remote station might accumulate stuff,

10 because you can't just go down to the hardware store and buy it

11 when you need a new one?

12 A    No, I'm not sure I agree with that.

13 Q    Okay.  So you don't think that there's kind of a culture

14 in outlying places in Alaska that people kind of save stuff and

15 hoard stuff because they're not sure they're going to be able

16 to buy another one readily?

17        MS. DUIGNAN:  Objection as to the characterization of

18 culture all over Alaska.  Alaska's a very large state with a

19 very diverse culture.  I would ask counsel to limit it to where

20 he's talking about in Kodiak.

21 BY MR. OFFENBECHER:

22 Q    How about Kodiak?

23 A    Typically, when you de-install something, you remove it,

24 you dispose of it, it's excess.

25 Q    That's what you've been taught in the Coast Guard Academy?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 223 of 329

1  A    Through -- through my experience as a Coast Guard officer,

2  that is what I've learned.

3  Q    Okay.  And so the culture of the Coast Guard is that soon

4  as you're done using something, you deservice it and get rid of

5  it.  Is that right?

6  A    If it's not serviceable, yes, you get rid of it.

7  Q    Okay.  And you'd indicated that Mr. Wells told you that he

8  wanted to save some of this stuff because he thought it was

9  serviceable.  Is that right?

10 A    He wanted to save it because he thought it might be useful

11 in the future.  I don't know that that correlates with being

12 serviceable.

13 Q    All right.  But Mr. Wells, with his years of experience,

14 told you that he thought that some of these things might be

15 useful in the future and that's why he wanted to keep them.

16 That's right.  Is that right?

17 A    Yes, that could be his motivation for why he wanted to

18 keep them.

19 Q    Thank you.  And just so we're clear, this was a basewide

20 project, not something just directed at one warehouse, was it?

21 A    Basewide is a mischaracterization.

22 Q    I'm sorry, COMMSTA.  By COMMSTA, I mean base.

23 A    Yes.

24 Q    Okay.  The -- and it was not something that was just

25 directed at Mr. Wells, is that right?  But it was a project

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 224 of 329
(720) 384-8078   attrans@sbcglobal.net

1  over three years, over 60 -- you know, 60 years of

2  accumulation.  Is that right?

3  A    Yes.

4  Q    Now, there were two civilian employees in the T2 rigger

5  shop.  Is that right?

6  A    That's correct.

7  Q    Mr. Belisle and Mr. Wells.  Right?

8  A    Yes.

9  Q    And is it fair to say that when you first showed up in

10 2009, that you would candidly admit you were perhaps a little

11 biased against the civilian employees?  I mean -- is that

12 right?

13 A    From a managerial standpoint, yes.  I had never managed

14 civilians before.  They are somewhat different from managing

15 active-duty personnel.

16 Q    And so you were a little bit biased against the civilian

17 employees.  Right?

18 A    I believe that's what I said in my testimony, yes.

19 Q    And you described it as kind of the whole kind of blue

20 suit versus civilians kind of a thing, blue suits, slash,

21 civilian kind of a thing.  Right?

22 A    That's correct, blue suit being active duty.

23 Q    Right.  So the Coast Guard blue suits, kind of a rivalry

24 between the blue suits and the civilian employees.  Right?

25 That's how you described it in your statement.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1  A    I don't know if rivalry is accurate, but yes.

2  Q    Well, can you bring up DE-116?  (Indiscernible) Take a

3  look at that for me, please.

4  A    Is there a specific section you'd like me to focus on?

5  Q    Sure.  Down at the bottom, page 9, 24601.  Does that

6  refresh your memory about whether you consider it to be kind of

7  a blue suiter, slash, civilian rivalry?

8  A    Says from my statement -- I don't believe I used "rivalry"

9  correct in that sentence.  It -- in terms of -- we're a team,

10 it was not an opponent-based thing as -- we were not opponents.

11 So I think rivalry is a mischaracterization of the word I used,

12 or I did not intend it in that meaning.

13 Q    But that is the word you used, isn't it?

14 A    That is the word that is shown there, yes, and the word I

15 used.

16 Q    Now, you've talked a bit about the fuel card investigation

17 on direct examination.  I want to ask you a couple of questions

18 about that.  Is that right?  Okay.

19 A    Yes.

20 Q    All right.  Can you bring up G008, please?  Page 2,

21 please.  Top of the page, findings.  Mr. Pizzurro, I'd like you

22 to review the page that's been highlighted for you and see if

23 that refreshes your recollection about what the findings of Mr.

24 Cartier's administrative investigation were.

25       MS. DUIGNAN:  Objection, Your Honor.  I believe he

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 226 of 329
(720) 384-8078   attrans@sbcglobal.net

1  already testified as to what the findings were.  I don't think

2  there's a question that he has to refresh his recollection

3  about.

4          MR. OFFENBECHER:  Well --

5          THE COURT:  You may be right, but it won't hurt to ask

6  again, I suppose.  Go ahead.

7  BY MR. OFFENBECHER:

8  Q   Does that refresh your recollection about what the

9  conclusions, the findings of Mr. Cartier were?

10  A   Yes, sir, it does.

11  Q   And do you recall what they were, what the first finding

12  was?

13  A   Yes, sir.  Would you like me to read it?

14          MS. DUIGNAN:  Your Honor --

15          MR. OFFENBECHER:  No, not --

16          MS. DUIGNAN:  Objection.  I -- why don't we just move

17  it into evidence, Your Honor?

18          MR. OFFENBECHER:  I'm not asking him to read it.

19          THE COURT:  We're getting closer all the time.  It's

20  moved --

21          MS. DUIGNAN:  He's asking him to read it.

22          MR. OFFENBECHER:  Okay.

23          MS. DUIGNAN:  It's not --

24          MR. OFFENBECHER:  I'm just asking a question.

25          THE COURT:  I'm about ready to --

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 227 of 329
(720) 384-8078   attrans@sbcglobal.net

1  BY MR. OFFENBECHER:

2  Q    You recall that the conclusion -- the finding of the

3  administrative finding was that there was inconclusive evidence

4  to determine who used the fuel card?

5  A    That's correct.  That is what the report says.

6  Q    And do you recall that another finding was that the fuel

7  card was not properly secured and that anyone with access to

8  building T2 could have used it or had access to it.  Right?

9  A    It -- it does say that, yes, sir.

10 Q    Well, that was the finding of the administrative

11 investigation that you commissioned, isn't it?

12 A    That's correct.

13 Q    And then there were some recommendations with respect to

14 administrative investigation, weren't there?

15 A    There were.

16 Q    And the recommendations of Mr. Cartier were that the

17 general fuel card needs to be locked in a secure location and

18 have a sign-out procedure, right?

19 A    Correct.

20 Q    And they recommended that the rigger shop personnel be

21 trained on the proper use of the fuel card.  Right?

22 A    That's correct.

23 Q    And --

24       MS. DUIGNAN:  Your Honor, at this point I object.  We

25 might as well just move the document in.  And the only

1  statement --

2        THE COURT:  What exhibit number is it?

3        MS. LOEFFLER:  8.

4        MS. DUIGNAN:  Government Exhibit 8.

5        THE COURT:  It'll be received.

6     (Plaintiff's Exhibit 8 admitted)

7  BY MR. OFFENBECHER:

8  Q   So, Mr. Pizzurro -- right, well, if it's been received,

9  then let's -- could you publish it, please?  Can you highlight

10 the top paragraph, please?  So just a moment ago -- now the

11 jury can see it as well.  Mr. Pizzurro, the findings that Mr.

12 Cartier made in -- at your direction was that there is

13 inconclusive evidence -- determine who used the fuel card.  Is

14 that right?

15 A   That's correct.

16 Q   And Mr. Cartier determined that the fuel card was not

17 properly secured and that anyone with access to building T2 had

18 access to it.  Right?

19 A   If they knew where the card was, yes.

20 Q   Right.  Now, during your direct examination, you indicated

21 that a number of different individuals were interviewed for

22 this particular investigation.  Is that right?

23 A   That's correct.

24 Q   And you determined the people who were interviewed by Mr.

25 Cartier by looking at the enclosure that was at the bottom of

**PIZZURRO - CROSS**

1  it.  Is that right?

2  A   That's correct.

3  Q   But, in fact, nobody was actually interviewed at all, were

4  they?  Well, Mr. -- just take a look.  Can you highlight that?

5  This is the enclosure we're talking about.  Right?

6  A   Okay.

7  Q   And this -- these are the materials that Mr. Cartier

8  relied upon in making his conclusions.  Is that right?

9  A   Correct.

10  Q   And it indicates that there is a written statement from

11  ET1 Hopkins.  Right?

12  A   Correct.

13  Q   A written statement from Mr. Belisle.  Right?

14  A   Correct.

15  Q   A written statement from Mr. Wells.  Right?

16  A   Yes.

17  Q   And you've already shown us the email from Mr. Wells.

18  Right?  And then a written statement from ITC Reckner.  Right?

19  A   Correct.

20  Q   So these were actually written statements that were

21  submitted to Mr. Cartier.  Right?

22  A   That's correct.

23  Q   They're not interviews; there's no indication here that

24  there was any interview, any personal interview by Mr. Cartier,

25  is there?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 230 of 329

1  A    Mr. Cartier spoke with them directly -- or Petty Officer

2  Cartier spoke with them directly in order to get a written

3  statement.  It's typical Coast Guard procedure that an

4  investigating officer who's assigned to an investigation

5  would -- would speak with a member, may not necessarily take

6  notes of the conversation that occurred, and then ask the

7  member for a written statement.

8  Q    But in this case all that you were provided were the

9  written statements of each of these individuals.  Is that

10  right?

11  A    That's correct.

12  Q    And you did get a chance to personally review the video in

13  this case, didn't you?

14  A    I did.

15  Q    And what you determined from the video is that there were

16  two individuals with access to the gas card who entered the

17  base that day at approximately the time the gas was -- the

18  diesel was taken.  Isn't that right?

19  A    That's correct.

20  Q    And the two individuals who entered the base that day were

21  Mr. Reckner and Mr. Wells.  Is that right?

22  A    That's correct.

23  Q    And do you recall that Mr. Wells indicated, because of the

24  volume of the fuel that had been taken, that it must have been

25  the line truck that was fueled.  Is that right?

1  A    Yes, that is what he said in the email to Petty Officer

2  Cartier.

3  Q    And that was Mr. Wells' conclusion because of the volume

4  of fuel that had been dispensed, it was consistent with the

5  line truck as opposed to a personal truck.  Right?

6  A    That is what he conveyed in email, yes.

7  Q    And you've indicated earlier that it would be bad business

8  not to follow your own administrative investigative lead.  Is

9  that right?

10 A    The findings of the investigation, yes, sir.

11 Q    Mr. Pizzurro, you're familiar with Deborah Hopkins.  Is

12 that right?

13 A    I am.

14 Q    How would you characterize her?

15 A    Eccentric would be the best description of her character

16 that I can think of.

17 Q    And when you say eccentric, what do you mean?

18 A    She's different, more excited.

19 Q    More excited about what?

20 A    Just talks about a lot of subjects, goes in a lot of

21 different directions.

22 Q    Has difficulty following a straight line in terms of

23 conversation?

24 A    I don't know.

25 Q    But you found it difficult to talk with her, didn't you?

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 232 of 329

1  A    Yes.

2  Q    As a matter of routine, if she was present, you would

3  avoid being with her or talking with her.  Is that right?

4  A    Yes, that's accurate.

5        MS. DUIGNAN:  Objection.  Leading.

6        THE COURT:  Sustained.

7  BY MR. OFFENBECHER:

8  Q    There was a period of time when she was coming in a lot to

9  see Petty Officer Hopkins down at T2, wasn't there?

10 A    I don't have direct knowledge of that, no.

11 Q    Did you hear about that?

12       MS. DUIGNAN:  Objection.  Hearsay.

13       THE COURT:  Sustained.

14 Q    At some point did you have conversations with Petty

15 Officer Hopkins -- excuse me, strike that.  You and Mr. Wells

16 also had some common interests, didn't you?

17 A    Photography.

18 Q    And when you say photography, what do you mean?

19 A    We both had Canon cameras, liked to take pictures.

20 Q    And did you discuss that?  Was that kind of a thing you

21 would discuss when you'd get together?

22 A    Within the workplace, yes.  I don't think we got together

23 socially more than two or three times while I was Kodiak.

24 Q    And that wouldn't be unusual for the executive officer not

25 to socialize with the folks, the civilian folks.  Is that

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 233 of 329

1 right?

2 A    I'm sorry, could you repeat the question?

3 Q    It would not be unusual that you as the executive officer

4 would not routinely socialize with a person in the rigger shop,

5 for example, one of the civilians in the rigger shop.

6 A    Sorry, could you repeat your question one more time?  I --

7 I think I understand, but I'm not following.

8 Q    Was it unusual that you as the executive officer weren't

9 socializing regularly with Mr. Wells or some of the other folks

10 in the rigger shop?

11 A    No, it's not unusual for the command staff not to

12 associate with everyone within a unit.

13 Q    Because there is some kind of -- there are some levels of

14 separation, aren't there?

15 A    Yes, sir.

16 Q    And part of the Coast Guard or military culture is to at

17 least in some degree maintain those levels of separation

18 between the officers and the other folks.  Right?

19 A    Yes.

20 Q    Now, you indicated in your -- you indicated that when you

21 first arrived -- and we've heard some testimony about this

22 antenna book.  You indicated when you first arrived in 2009,

23 there actually was a draft antenna book, wasn't there?

24 A    That's correct.

25 Q    And this -- most of the information that went into the

1  draft antenna book would have come from Jim Wells.  Isn't that

2  right?

3  A   I don't know where specifically the information came from.

4  Jim Wells did have a large quantity of antenna information.

5  Q   And he was generally known as kind of the guy with the

6  most basis of knowledge about antenna stuff.  Right?

7  A   Yes, he was the most experienced with it at the unit.

8  Q   And someone, anyway, by 2009 had written the first draft

9  of the antenna book.  Isn't that right?

10 A   Yes.

11 Q   And so when you got there, you reviewed the first draft of

12 the antenna book, and then you and the CO decided you wanted to

13 make improvements to it.  Is that right?

14 A   That's correct.

15 Q   And so when you talk about the antenna project, you're

16 really talking about a second draft of the antenna book,

17 because there was already one there in 2009, wasn't there?

18 A   Yes.

19 Q   You've also indicated back -- when you first came to

20 COMMSTA, both you and Mr. Reckner did not have any experience

21 supervising civilians.  Right?

22 A   That's correct.

23 Q   And so you went to a course on managing civilians to kind

24 of learn some more about that.  Is that right?

25 A   That's correct.

1  Q    And partly as a result of your going to the course on

2  managing civilians, you came back and sat down and wrote this

3  letter of expectations to both Mr. Wells and to Mr. Belisle.

4  Isn't that right?

5  A    That's correct.

6  Q    And this is because of things you had learned at your

7  civilian management course.  Is that right?

8  A    That's correct.

9  Q    Now, you also indicated that when you arrived at -- during

10 the course of your work after 2009, you spent some time

11 reviewing the civilian personnel file of Mr. Wells.  Is that

12 right?

13 A    That's correct.

14 Q    And it was several inches thick.  Is that right?

15 A    That is also correct.

16 Q    And it contained a number of different letters and

17 evaluations of Mr. Wells's performance over all of the years.

18 Right?

19 A    That's correct.

20 Q    And part of the -- one of the things that were included in

21 there is the U.S. Coast Guard performance plan and evaluation.

22 Is that right?

23 A    I'm not familiar with that document.

24 Q    Okay.  Can you bring up Defense Exhibit 84, please?  Can

25 you highlight the top for me, please?  Little bit more than

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 741  Filed 09/23/14  Page 236 of 329

1  that, please.  Take a look at that and see whether that

2  refreshes your memory about what that is.

3  A    Yes, sir, I've seen this form before.

4  Q    So that's a U.S. Coast Guard performance plan and

5  evaluation, isn't it?

6  A    That's correct.

7  Q    And this is a form that needs to be filled out for each

8  employee every year.  Isn't that right?

9  A    That's correct.

10 Q    And it's an important government document, isn't it?

11 A    Yes.

12 Q    Well, it's kept in the normal business of the Coast Guard.

13 Right?

14 A    Correct.

15 Q    And it's used to evaluate an employee's performance?

16 A    That is also correct.

17 Q    It's used for any disciplinary proceedings.  Right?

18 A    I'm not sure that that's correct.

19      MR. OFFENBECHER:  Counsel, do you have any objection to

20 the admission of 084?

21      MS. DUIGNAN:  Just one moment.

22      (Side conversation)

23      MS. DUIGNAN:  I think it's already admitted as

24 Government Exhibit 3D.

25      MR. OFFENBECHER:  Okay.  All right  3D?

    1        MS. LOEFFLER:  Yeah.

    2        MS. DUIGNAN:  I believe so, yes.  If you want to move

    3   it again.

    4      (Side conversation)

    5        MS. DUIGNAN:  No objection.

    6        THE COURT:  Do you want both the -- admitted?

    7        MR. OFFENBECHER:  I don't think it's government's --

    8      (Side conversation)

    9        MR. OFFENBECHER:  So DE-084, please.

   10        THE COURT:  DE-084 (indiscernible) --

   11        THE CLERK:  3D is admitted.

   12        THE COURT:  It has been?

   13        THE CLERK:  D-084 is not admitted --

   14        THE COURT:  It can be admitted.

   15      (Defendant's Exhibit DE-084 admitted)

   16        THE CLERK:  -- just identified.

   17        MR. OFFENBECHER:  It's admitted.  Thank you.  All

   18   right, can you publish it, please?  Can you highlight the top

   19   four lines or so, please?  May we publish it, please?

   20        THE COURT:  Yes.

   21        MR. OFFENBECHER:  Thank you.

   22        THE COURT:  Yes.  Yes.

   23        MR. OFFENBECHER:  Thank you.  Mr. Johnson, can I get

   24   the whole top of it, please, that says "U.S. Coast Guard"?

   25   BY MR. OFFENBECHER:

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1  Q    So, Mr. Pizzurro, this is the U.S. Coast Guard performance
2  plan and evaluation that we talked about.  Right?
3  A    Yes, sir.
4  Q    And as we can see here, the purpose of it is to document
5  job expectations, and it says performance of the employee.
6  Right?
7  A    Correct.
8  Q    And the ratings that are given in this performance plan
9  and evaluation can impact a variety of personnel actions
10 concerning promotions, rewards, pay, and retention of the
11 employee.  Right?
12 A    Yes.
13 Q    And this particular -- Defense Exhibit DE-084 is the
14 performance plan and evaluation for James Wells for the period
15 of 1 April 10 through 31 March 11.  Isn't that right?
16 A    That is correct.
17 Q    And that's a period during which you were the executive
18 officer of COMMSTA.  Is that right?
19 A    That is also correct.
20 Q    All right, can you move down to the next section, part 2?
21 And these are instructions to the rating officials, which
22 includes you, David Pizzurro.  Right?
23 A    Correct.  As the approving official.
24 Q    And this -- the rating official here was Mr. Smith, wasn't
25 it?  Do you recognize that signature?

1  A    I don't recognize Mr. Smith's signature offhand.

2  Q    Do you remember him being the ITC in 5 April 2010?

3  A    He was the ITC that came before Chief Reckner.  I don't

4  remember the exact date --

5  Q    All right, well --

6  A    -- Chief Smith departed.

7  Q    All right.  Well, somebody who signed that who was the ITC

8  on 5th of April 2010?

9  A    Correct.

10  Q    And these are instructions for completing it, including a

11  work plan -- is optional, but is included to clarify

12  performance standards.  Right?

13  A    Correct.

14  Q    And this is signed by you, as David Pizzurro, the XO, the

15  executive officer of the COMMSTA.  Is that right?

16  A    Yes, sir, that's correct.

17  Q    And it was signed on 5 April 2010.  Right?

18  A    Correct.

19  Q    Now going to section 5, please.  And on the first page of

20  the rating that we're looking at of this exhibit there's kind

21  of an overall annual rating of the employee here, isn't there?

22  A    Yes, sir, there is.

23  Q    And the overall annual rating can either be that the

24  employee exceeds expectations, right?

25  A    Correct.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 240 of 329
(720) 384-8078   attrans@sbcglobal.net

1  Q    Or meets expectations, right?

2  A    Correct.

3  Q    Or fails to meet expectations?  Right?

4  A    Yes, sir.

5  Q    And in this case, for the annual rating, you and Mr. Smith

6  or whoever that was that was the ITC, had indicated that Mr.

7  Wells exceeded the expectations, which indicates that not more

8  than one core competency rated meets and none failed -- rated

9  fails to meet.  Is that right?

10 A    Yes, sir, that's what's indicated there.

11 Q    So Mr. Wells' overall rating was that he exceeds

12 expectations.  Right?

13 A    During that period, yes.

14 Q    Next page, please.  Excuse me just a second.

15      THE COURT:  Are you about through, or -- you're getting

16 close to --

17      MR. OFFENBECHER:  No, I'm not through.  This may be a

18 good time to break, so we can get the machinery back on --

19      THE COURT:  Okay, let's take a 15-minute recess.  You

20 got 15 minutes.  You can do whatever you want.

21      MR. OFFENBECHER:  Okay, Your Honor.  Thank you.

22      THE CLERK:  All rise.  Matter stands in a 15-minute

23 recess.

24      (Court recessed at 2:51 p.m., until 3:11 p.m.)

25      (Jury not present)

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 241 of 329
(720) 384-8078   attrans@sbcglobal.net

1       THE CLERK:  All rise.  His Honor the Court, the United

2  States District Court is again in session.  Please be seated.

3  You want the jurors?

4       THE COURT:  Pardon?  Yeah, she's getting the jurors.

5    (Jury present)

6       THE COURT:  Please be seated.  Continue cross-

7  examination.

8       MR. OFFENBECHER:  Thank you, Your Honor.

9  BY MR. OFFENBECHER:

10  Q    Mr. Pizzurro, again, just to reorient ourselves and --

11  Defense Exhibit 84 here, this was your evalu -- the evaluation

12  of Mr. Wells from 1st of April 2010 to 31st of March 2011, you

13  testified.  Right?

14  A    Correct.

15  Q    Page 2, please.  Now, during the evaluation there are

16  several different core competencies that each individual

17  employee is rated on.  Is that right?

18  A    That's correct.

19  Q    Let's just take a quick look at what both the ratings were

20  and what the criteria are that you rate the employee on.  Okay?

21  A    Okay.

22  Q    In this case there was applied job knowledge and skills.

23  Is that right?

24  A    That's correct.

25  Q    And the box checked is that Mr. Wells exceeded the core

1    competencies, the performance standards in this particular

2    field.  Is that right?

3    A    That's correct.

4    Q    And what are the performance standards that are evaluated

5    in this particular section?

6    A    So in that particular section, maintains knowledge in

7    current procedures, policies, and practices; demonstrates

8    quality, thoroughness, and accountability in work activities;

9    uses sound judgment and rationale in making decisions or

10   problem solving; communicates effectively to accomplish work

11   assignments.

12   Q    And he got an exceeds in that.  Right?

13   A    He did.

14   Q    All right.  The next one.  This one is an optional one

15   that rates employees or supervisors and whether a person meets

16   or exceeds the competencies.  Is that right?

17   A    That is correct.

18   Q    And in this case Mr. Wells met the competencies.  Right?

19   A    That is correct.

20   Q    And what were the perform -- what are the performance

21   standards by which he is measured in this -- on this level?

22   A    So he'd be marked under B as team player, because his WG

23   billet was not a leadership billet.

24   Q    Uh-huh (affirmative).

25   A    So based on that.  Uses effective interpersonal skills in

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 243 of 329

1  working with others; interacts with others to collectively

2  resolve problems, accomplish mutual goals, and foster an

3  atmosphere of trust; shares information, ideas to improve

4  quality of services and products.

5  Q   And so those are the criteria about which Mr. Wells was

6  rated to have met the core competency.  Right?

7  A   That's correct.

8  Q   Next page, please.  On this page he's rated on two of

9  them.  The middle one, this is employee's, slash, supervisor's

10 quality of work.  Again, he exceeds the core competencies.

11 Right?

12 A   Correct.

13 Q   And what are the performance standards here that you're

14 evaluating him on?

15 A   Delivers quality products and services.  Work is accurate,

16 thorough, and complete.  Continually improves products and

17 services.

18 Q   Good.  Next one.  With respect to safety, again, Mr. Wells

19 exceeds the core competencies.  Can you explain to the jury

20 upon what criteria you are evaluating Mr. Wells' performance?

21 A   Based on what's there, understands support and adheres to

22 applicable workplace requirements; reports safety evaluations

23 promptly and appropriately.

24 Q   Thank you.  Next page.  This next page demon -- is this a

25 description of what work he does.  Right?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 244 of 329
(720) 384-8078   attrans@sbcglobal.net

1  A    Correct.

2  Q    And then the next page -- and go on to performance plan

3  and evaluation page 7.  This is a narrative that's already been

4  presented to the jury through Mr. Reckner.  We'll pass that to

5  the next page, please.  And this final page.  Do you recognize

6  that?

7  A    I do.

8  Q    And on this final page, can you highlight the performance

9  award, please?

10      (Side conversation)

11 Q    For this period -- you can just follow my pointer.  For

12 this period, Mr. Wells was nominated for a performance award.

13 Is that right?

14 A    That's correct.

15 Q    And the amount of the performance award was kind of a

16 bonus, was the maximum amount allowed, right?

17 A    That is correct.

18 Q    And this was approved and he was actually nominated by Mr.

19 Reckner, that's right?

20 A    Correct.

21 Q    And this was reviewed and endorsed by you as the XO.  Is

22 that right?

23 A    That's correct.

24 Q    Thank you.  No further questions on that.  Can you bring

25 up DE-083, please?  And just to summarize, that was his

**PIZZURRO - CROSS**

1  performance evaluation for one -- that one-year period.  Right?

2  A    That's correct.

3  Q    But the -- over the course, the long course of a -- an

4  employee's history, there's one of these evaluations done every

5  year, isn't there?

6  A    That's correct.

7  Q    Can you bring up 083, please?

8      (Side conversation)

9          UNIDENTIFIED SPEAKER:  Should we just go ahead and

10 admit these and -- this point?  I think it'd go a lot quicker

11 if we just do it this way.

12         MS. DUIGNAN:  I have no objection.

13         MR. OFFENBECHER:  Thank you.  Could you publish it,

14 please?

15         THE COURT:  What is it?

16         MR. OFFENBECHER:  It's performance and -- plan and

17 evaluation for the --

18         THE COURT:  I mean what exhibit is it?

19         MR. OFFENBECHER:  -- preceding year.

20         THE COURT:  What exhibit is it?

21         MR. OFFENBECHER:  It's DE-083.

22         THE COURT:  It will be admitted, without objection.

23     (Defendant's Exhibit DE-083 admitted)

24         MR. OFFENBECHER:  Thank you, Your Honor.

25 BY MR. OFFENBECHER:

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 246 of 329
(720) 384-8078  attrans@sbcglobal.net

1  Q   All right, so let's look at the top again.  So this is Mr.

2  Wells' evaluation from April 1st of '09 to 31 March of '10.  Is

3  that right?

4  A   That's correct.

5  Q   And this is during the period of time when you came on

6  board.  Right?

7  A   Yes.

8  Q   You came on board kind of in the middle of this?

9  A   In May, yes.

10 Q   Okay.  Now the rating section, please.  Again, this is the

11 overall annual rating for that one-year period.  Right?

12 A   That's correct.

13 Q   And Mr. Wells exceeds the -- in general exceeds the

14 performance standards.  Is that right?

15 A   That's correct.

16 Q   Go back up to who began this evaluation.  In the middle

17 there, yeah.  You came in in the middle of this period, so

18 actually the XO was Mr. Crider before you.  Is that right?

19 A   That's correct.

20 Q   So he began this evaluation, right?

21 A   Correct.

22 Q   And then at the end you signed it because you kind of took

23 over that position.  Right?

24 A   That's correct.

25 Q   All right.  Next page, please.  Okay, now, we're not going

1  to read all this again, but we're just going to go quickly to

2  make sure we understand what his evaluation was for the

3  preceding year, the year that you came on board.

4  A    Okay.

5  Q    Again, he exceeded applied job knowledge and skills,

6  right?

7  A    Correct.

8  Q    Next one.  He exceeded in the teamwork department, didn't

9  he?

10  A    Yes.

11  Q    Next one, please.  In the quality of work in this year,

12  Mr. Wells was again -- exceeded the expectations.  Right?

13  A    That's correct.

14  Q    Down to safety.  Safety, same thing.  He exceeded the

15  expectations, didn't he?

16  A    That's also correct.

17  Q    And go on to page 5 of this evaluation.  And it was

18  indicated here that Mr. Wells meets expectations in all areas,

19  no serious performance deficiencies noted at this time.  Right?

20  A    Correct.

21  Q    And then page 7, please.  The bottom, please.  This is the

22  final rating, which is more of a narrative of Mr. Wells'

23  performance during that particular time.  Is that right?

24  A    I -- I've not read it, but I would have to review it to

25  give you a final answer, but yes.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 741  Filed 09/23/14  Page 248 of 329

1  Q   Well, let me go to the last page, page 8.  The signature

2  page, signatures, please.  This indicates that it was nominated

3  by Mr. Smith, who was the ITC before Mr. Reckner, right?

4  A   Correct.

5  Q   And that it was reviewed by you, right?

6  A   Correct.

7  Q   And you signed off on it.  Right?

8  A   That's correct.

9  Q   Now go to the preceding page, please.  Highlight that,

10 please.  This is the narrative section where the Coast Guard --

11 the -- indicates in narrative form how Mr. Wells did during

12 this year period from '09 to '10.  Right?

13 A   That's correct.

14 Q   Could you please read that to the jury?

15 A   "Mr. Wells has performed well during this reporting

16 period.  He has provided his expertise, training, and service

17 to numerous units in the D17 AOR.  The following are a few

18 highlights broken down by core competencies:  applied job

19 knowledge and skills:  is a master rigger, regularly sought

20 after for his knowledge and skills, as well as known tower

21 expert; displayed exceptional knowledge in all phases of this

22 work rating -- of this rating cycle, i.e., antenna maintenance,

23 electronics support to both COMMSTA and several District 17

24 units.  Mr. Wells represents the Coast Guard at the National

25 Association of Tower Directors event; regularly provides

1  recommended changes and updates to the Coast Guard Tower

2  Manual; attends radio frequency safety training; trained the

3  trainer class; provided training to" -- that say -- I can't see

4  what that says.

5  Q    "Seventy-eight," perhaps.

6  A    "Seventy-eight dis" -- yes, "seventy-eight districts, 17

7  Coast Guard members, on tower safety and rescue.

8      "Teamwork:  coordinated tower rescue training with CEU

9  Juneau for District 17 units; prepared and conducted training

10 for new members on rigger shop equipment; active member and

11 regularly contributes to COMMSTA's Chief's Mess; involves other

12 in planning activities; keeps supervisor informed of status of

13 all projects.

14     "Quality of work:  Completed several major projects;

15 casualty repairs and training have been of the highest quality.

16 Mr. Wells has been praised by several Coast Guard units.  Works

17 to improve Coast Guard safety program by providing updated and

18 relevant information.  All work is accurate and completed on

19 time.

20     "Safety:  Mr. Wells assisted in ensuring building T2 was

21 in compliance for a Safety Mobile Assistance Response Training

22 Team inspection; provides instructions to new members of the

23 rigger shop on safe operation of electrical and mechanical

24 equipment; ensured all personnel involved in tower climbing

25 adhered to the -- to all safety and tower climbing regulations.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 741  Filed 09/23/14  Page 250 of 329

1  As a valued member of COMMSTA Safety Board, Mr. Wells provides

2  numerous unit safety improvements, improvement recommendations,

3  actively supports all workplace safety requirements" --

4  Q    Thank you.

5  A    -- or "safety regulations."

6  Q    Thank you.  And then on the final page, both you and Mr.

7  Smith, Mr. Reckner's predecessor, have signed off.  Is that

8  right?

9  A    That's correct.

10  Q    And then in the performance award section, Mr. Wells was

11  again recommended for a performance award.  Is that right?

12  A    That's correct.

13  Q    And again, you and Mr. Smith recommended the maximum bonus

14  or performance award to Mr. Wells for his performance from '09

15  to '10.  Is that right?

16  A    That's correct.

17  Q    Thank you.  You can take that one down.  Put up DE-082,

18  please.

19          MR. OFFENBECHER:  I move to admit this one again.

20          MS. DUIGNAN:  Which one is this?

21          MR. OFFENBECHER:  This is '08 to '09.  The --

22          MS. DUIGNAN:  At this point, Your Honor, this is

23  outside of this witness's knowledge.  This is before the time

24  that Lieutenant Pizzurro was assigned to the command.

25          MR. OFFENBECHER:  Your Honor, he testified on direct

1   examination that he examined Mr. Wells's entire personnel file.

2   This is part of Mr. Wells's entire personnel file.  In coming

3   to his conclusions about whether there should be any discipline

4   or anything else, he's read this through.  These are official

5   government records in the Coast Guard personnel file.  We can

6   bring in the commandant of the Coast Guard or someone to, you

7   know, authenticate them if we want to, but this is something he

8   reviewed and he testified about on direct.

9         MS. DUIGNAN:  Your Honor, I would agree that they're

10  personnel records of the Coast Guard, but I think we'd have to

11  establish some more foundation about when Lieutenant Pizzurro

12  reviewed them to make them relevant.

13        THE COURT:  Okay.

14        MR. OFFENBECHER:  Well, he testified on direct

15  examination that he rev -- an inch-thick file.

16        THE COURT:  Are you going to go over every one of the

17  records in the file?

18        MR. OFFENBECHER:  I'm not, Your Honor, I -- and I'm

19  going to shortcut it to go a little bit quickly.  But I think

20  the jury -- the government has made a point of Mr. Wells'

21  employment record, casting doubt on it, and I think the

22  official government record of the Coast Guard is to the

23  contrary.  And I think the jury's entitled to know that.

24        MS. DUIGNAN:  Objection.   I -- well, I don't believe

25  that we can clarify that on redirect.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 252 of 329

1    THE COURT:  Okay, we can -- I don't need talking

2  objections.  Go ahead and -- you can admit this one.

3    (Defendant's Exhibit DE-082 admitted)

4    MR. OFFENBECHER:  Thank you.  082, can you put that up

5  for me, please?  Again, just the top section.

6  BY MR. OFFENBECHER:

7  Q   This indicates -- and I'll just kind of go through it with

8  you to -- so it goes a little more quickly, Mr. Pizzurro, but

9  check me if I'm wrong.  This is from April of '08 to March of

10  '09.  Is that right?

11  A   That's correct.

12  Q   The overall rating of Mr. Wells, again, in this

13  performance evaluation -- Ms. Johnson -- is that he exceeds the

14  competencies.  Is that right?

15  A   That's correct.

16  Q   Next page.  Again, he exceeds the job knowledge and

17  skills.  Is that right?

18  A   That's correct.

19  Q   I don't even think we need to -- can you see that without

20  me being the --

21  A   I can, yes.

22  Q   Okay.  Good.  Why don't you just take it back to square 1.

23  Okay, in teamwork, he again exceeds the same performance

24  evaluation.  Is that right?

25  A   Yes.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 741  Filed 09/23/14  Page 253 of 329

1  Q   On the next page, quality of work again exceeding

2  performance standards.  Is that right?

3  A   Correct.

4  Q   Safety again exceeding performance standards.  Is that

5  right?

6  A   That's correct.

7      (Side conversation)

8  Q   Then go to page 7, please.  Again, this is the narrative

9  report.  Is that right?

10 A   Correct.

11 Q   Could you read this section, please?

12 A   "Mr. Wells has performed well during this reporting

13 period.  He's provided his expertise, training, and services to

14 numerous units in District 17 AOR.  The following are a few

15 highlights, broken down by core competencies:  applied job

16 knowledge and skills:  Mr. Wells' vast knowledge and expertise

17 of antenna systems are regularly sought after by numerous units

18 through the Coast Guard.  Mr. Wells represents the Coast Guard

19 at the National Association of Tower Events -- or Tower Erector

20 Events each year; attended the Coast Guard Tower Conference,

21 attended rigger school; recertified as a master rigger;

22 provides recommended changes and updates to the Coast Guard

23 Tower Manual.

24     "Teamwork:  coordinated tower rescue and training with CEU

25 Juneau for District 17 units; prepared and conducted training

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 254 of 329

1  for new members on rigging shop equipment; assisted members

2  from CEU Miami and CAMSLANT Chesapeake with the inspection of

3  two 300-foot NAVTEX towers.  During the recent tower

4  replacement project at ESU Kodiak, Mr. Wells assisted Sage

5  contractors with the realignment of the new microwave system

6  antenna.  Active member and regularly contributes to the

7  COMMSTA Chief's Mess; involves others in planning activities;

8  performed tower inspection and tower climbing training to LORAN

9  Station Port Clarence members; valued member of the COMMSTA's

10 Chiefs Mess.

11     "Quality of work:  completed several major projects;

12 casualty repair and training have been of the highest

13 quality."  Thank you.  "Mr. Wells consistently produces work of

14 the highest quality and has been praised by several Coast Guard

15 units; works to improve the Coast Guard Tower Manual by

16 providing updated and relevant information; all work is

17 accurate and completed on time; seeks to improve Coast Guard

18 products and services.

19     "Safety:  Mr. Wells provided tower safety and rescue

20 training in units in District 17 AOR; ensured all rigger shop

21 personnel were familiar with the safety and operation of all

22 equipment; active member and contributor of COMMSTA Safety

23 Board; strictly enforced all safety regulations."

24 Q    Just one question.  What's D17 AOR?  What does that mean?

25 A    The Coast Guard is broken down into districts.  District

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 255 of 329

1   17 is the Alaska District, and AOR is Area of Responsibility.

2   So it would be referring to the geographic area that is within

3   District 17.

4   Q    And also it says that he's a valued member of the

5   COMMSTA's Chief's Mess.  What does that mean?

6   A    The Chief's Mess is the group -- it's an informal name for

7   the chiefs of the unit.  They get together; it's similar to the

8   Officer Ward Room.  You have the Chief's Mess where the chiefs

9   go.

10  Q    Officer Ward Room would be where the officers get together

11  and --

12  A    Correct.

13  Q    -- discuss different topics?

14  A    Correct.

15  Q    And the Chief's Mess is where the chief petty officers

16  would get together and discuss topics of interest to all of

17  them?

18  A    That's correct.

19  Q    And then to the last page.  Again, Mr. Wells was

20  recommended for a performance award again?

21  A    He was.

22  Q    And he was recommended to get the maximum performance

23  award that could be done.  Is that right?

24  A    That's correct, but it was not endorsed by Lieutenant

25  Crider, and I do not know why.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 256 of 329

1 Q    At least on the copy that we have, right?

2 A    Okay.  That's fair.

3         MR. OFFENBECHER:  All right, you can take that one

4 down, please.  Your Honor, there -- I have two additional

5 years, from '07 to '08 and '06 to '07, that I would like to

6 introduce through this witness.

7         THE COURT:  On same -- the same basic thing?

8         MR. OFFENBECHER:  Yes.  I think it's important that we

9 at least the -- he does exceed the expectations, but I think

10 the jury should at least hear the narrative, because each of

11 the narratives is different about Mr. Wells's activities.

12         THE COURT:  Okay, briefly.

13         MR. OFFENBECHER:  Very well.  I move to admit 081.

14 First page, please.

15         THE COURT:  These two can be admitted, for quick -- so

16 they'll be part of the evidence, but I don't want to delay the

17 long period of --

18         MR. OFFENBECHER:  Yes, Your Honor.  Thank you.

19      (Defendant's Exhibits DE-080 and DE-081 admitted)

20 BY MR. OFFENBECHER:

21 Q    Mr. Pizzurro, again, this is for the period from '07 to

22 '08.  Is that right?

23 A    That's correct.

24 Q    And again, Mr. Wells meets or exceeds all expectations, in

25 the middle, please.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1  A     Correct.

2  Q     And on the last page, Mr. Smith and Mr. Crider, the XO,

3  recommend the performance award in the maximum amount.  Is that

4  right?

5  A     That's correct.

6  Q     And on the preceding page.  Again, this is the narrative

7  section.  Is that right?

8  A     That's correct.

9  Q     And this is the narrative of his particular performance

10 during this year.  Is that right?

11          THE COURT:  During the year of the report?

12          MR. OFFENBECHER:  Right, during the year of '07 to '08.

13          THE WITNESS:  That is correct.

14          MR. OFFENBECHER:  Your Honor, would it be quicker if I

15 just read this?

16          THE COURT:  It's fine with me.

17          MR. OFFENBECHER:  All right.

18 BY MR. OFFENBECHER:

19 Q     Mr. Pizzurro, follow along and see if I'm reading this

20 correctly.

21 A     Okay.

22 Q     "Mr. Wells has performed well during this reporting

23 period.  He has provided his expertise, training, and service

24 to numerous units in D17 AOR.  The following are a few

25 highlights, broken down by core competencies:  applied job

1  knowledge and skills:  regularly sought after for his knowledge

2  and skill as a well-known tower expert.  Mr. Wells represents

3  the Coast Guard at the National Association of Tower Erector

4  events ea -- Erectors event each year; provides recommended

5  changes and updates to the Coast Guard's Tower Manual.

6      "Teamwork:  coordinated tower rescue and training with CEU

7  Juneau for D17 units; prepared and conducted training for new

8  members on rigger shop equipment; assisted members from CEU

9  Juneau and CEU Oakland in the repair of the top-loading element

10  at LORSTA Fallon."  What's LORSTA Fallon?

11  A    It's a LORAN station.

12  Q    And that's a navigational device, radio navigation device.

13  Right?

14  A    That's correct.

15  Q    "Mr. Wells, along with the other team members, were

16  recognized by the chief of operations, NAVCEN Alexandria."

17  What's NAVCEN mean?

18  A    The navigation center.  It's -- it's a Coast Guard unit

19  that monitored the LORAN stations when they were still in

20  existence.

21  Q    "For outstanding teamwork.  He performed the inspection

22  and relighting of LORSTA Port Clarence tower; performed tower

23  inspection and relighting of LORSTA Port -- Point Clarence" --

24  is it Point or Port?

25  A    Point, I believe.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 741  Filed 09/23/14  Page 259 of 329

1  Q   Point, yeah.  "Replaced TLE at LORSTA Narrow Cape."

2  What's TLE?

3  A   It's -- honestly, I do not know.

4  Q   Okay.  "Provided forklift" --

5  A   That's out of my specialty.

6  Q   -- "training to COMMSTA personnel; active member and

7  regularly contributes to COMMSTA's Chief's Mess; involves

8  others in planning and activ -- in planning activities

9     "Quality of work:  completed several major projects,

10  casualty repairs and training that -- been of the highest

11  quality.  Mr. Wells has been praised by several Coast Guard

12  units.  Works to improve the Coast Guard's Tower Manual by

13  providing updated and relevant information.  All work is

14  accurate and completed on time.

15     "Safety:  Mr. Wells assisted in ensuring building T2 was

16  in compliance for MLC safety inspection."  What's MLC mean?  Do

17  you know?

18  A   It's Maintenance Logistics Command.

19  Q   "Provides instruction to new members of the rigger shop on

20  the safe operation of electrical and mechanical equipment;

21  trained newly-qualifying tower climbers in the safety

22  procedures required for tower rescue.  As a valued member of

23  COMMSTA's Safety Board, Mr. Wells provides numerous unit safety

24  improvement recommendations, actively supports all workplace

25  safety regulations."  Is that right?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 260 of 329

1  A    That's correct.

2  Q    Thank you.  We're done with that one.  And, finally, 080.

3  Again, the reporting period here is from '06 to '07.  Is that

4  right?

5  A    That's correct.

6  Q    And on this one, he meets all expectations.  Is that

7  right?

8  A    That is correct.

9  Q    And at the end here -- actually on page 2, excuse me,

10  about -- you can see that -- yeah, page 2, he exceeds

11  expectations on applied job knowledge and skills.  Right?

12  A    Correct.

13  Q    He exceeds expectations on teamwork.  Next page, please.

14  He meets expectations on communications, meets expectations on

15  quality of work, meets expectations on timeliness and quality

16  of work, and meets expectations on employee and supervision.

17  Is that right?

18  A    That's correct.

19  Q    And then on the last page, he is recommended for -- again

20  for a performance award.  Is that right?

21  A    Correct.  That is correct.

22  Q    Although there's no amount indicating -- indicated there.

23  Is that right?

24  A    That's correct.

25  Q    And then the page preceding that, please.  And finally the

1  narrative on this one.  "Mr. Wells has performed well during

2  this reporting period.  He has provided his expertise and

3  training to numerous services in D17 AOR.  The following are a

4  few highlights, broken down by core competencies:  applied job

5  knowledge and skills:  regularly sought after for his knowledge

6  and skill as a well-known tower expert; represents the Coast

7  Guard at several events each year; commended on several

8  occasions on thoroughness and quality of work.

9      "Teamwork:  coordinated tower rescue and training with CEU

10  Juneau for D17 units; prepared and conducted training for new

11  members on rigger shop equipment; worked with local fire

12  department on the design of tower for the wireless fire

13  detection system; assisted CEU Juneau in repairing LORANSTA St.

14  Paul's tower.

15      "Communications:  worked proactively to keep supervisor

16  advised of all rigger shop activities; active member of

17  COMMSTA's Chief Mess and Safety Board; provides valuable input

18  to over -- to improve overall quality of service.

19      "Quality of work:  completed several major projects,

20  casualty repairs, and training that -- been of the highest

21  quality.

22      "Timeliness and quality of work:  quickly restored

23  COMMSTA's communication ability by repairing transmission lines

24  damage -- damaged during cable vault fire; completes projects

25  in a timely manner.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 262 of 329

1   "And safety:  assisted with creating tower safety

2   checklist; ensured all members of the rigger shop were

3   instructed in the safe operation of the equipment."  Is that

4   correct?

5   A    That's correct.

6         MR. OFFENBECHER:  Your Honor, we'd move for the

7   admission of 080.  And I have no other questions.

8         THE COURT:  It'll be admitted.  Recro -- redirect.

9         MS. DUIGNAN:  Yes, Your Honor.

10                    REDIRECT EXAMINATION

11  BY MS. DUIGNAN:

12  Q    Lieutenant Pizzurro, when did you actually review Mr.

13  Wells's personnel file?  Do you recall?  Was it when you first

14  arrived at the command or later on?

15  A    It was not until later on.

16  Q    What caused you to review it?

17  A    Believe --

18  Q    Was there any reason that you decided to review it later

19  on?

20  A    Yeah.  I believe when we -- we specifically reviewed it

21  was during the CS -- after the civilian training for how to

22  manage civilians.  Part of what came out was how to build a

23  properly-documented employee binder.  Both Mr. Wells' and Mr.

24  Belisle's binders were not very well documented.  So we sat

25  down with the CSA, Stacy Hofler, both myself and Chief Reckner,

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 263 of 329
(720) 384-8078   attrans@sbcglobal.net

1  and we went through the process of organizing and cleaning the

2  records, and during that time we did a record review to

3  determine what needed to be retained and what needed to be

4  disposed of.

5  Q    Okay.  Mr. Offenbecher ran through you -- in great detail

6  through, I guess, Mr. Wells's last three or four performance

7  evaluations, but he omitted the most recent one.  Can you

8  please tell me about the one that you had prepared for 2011 to

9  2012?

10 A    Yes, ma'am, I can.  Specifically, that one was in the

11 process of being drafted and submitted at the time of the

12 incident.  Both Petty Officer Hopkins and Chief Reckner had

13 come to me, because there was a -- a category -- I believe it

14 was teamwork, but I don't know offhand -- that they were

15 interested in marking him below the standard of meets, based on

16 their observation of him during that period.  We had not issued

17 somebody a -- a -- a mark below meets before, so we contacted

18 Stacy Hofler, the CSA, to get feedback from her as far as how

19 we would do that, whether it was acceptable, what additional

20 documentation is required.

21     In speaking with Stacy Hofler, she informed us that she

22 could not mark him as does not meet for teamwork, that it would

23 be to meet him with -- mark him as meet, unless we had

24 submitted sufficient documentation well in advance of the

25 marking period specifically laying out an improvement plan and

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 264 of 329

1    then a -- giving him a period of time to execute his improve --

2    improvement plan and show whether he was capable of improving

3    with that specific category.

4    Q    What does it take to give a fails to meet rating?

5    A    I -- I don't know offhand.  I -- I can't remember the

6    specifics, but there was a significant paperwork burden

7    required by the command to give somebody a does not meet.

8    Q    And after contacting Stacy Hofler, you received advice

9    that made you determine it was not met in this case?

10        MR. OFFENBECHER:  Objection.  That's leading the

11   witness at this point.

12   BY MS. DUIGNAN:

13   Q    Why didn't you give it here?

14   A    We did not have sufficient documentation at that time to

15   mark as does not meets, nor did we have enough time to produce

16   such documentation and allow for an implementation plan to -- a

17   corrective plan to show that he was capable of improving in

18   that category.

19   Q    Okay.  Referring to -- you mentioned that you reviewed the

20   entire personnel file of Mr. Wells after that course.  Is that

21   true?

22   A    Yes.  We went --

23   Q    Okay.

24   A    -- through it.  I don't -- I wouldn't say that I read

25   every single word within the document, but yes, we went through

1  it.

2  Q    But you went through it to organize it?

3  A    Yes, ma'am.

4  Q    Can you pull up Exhibit 3D, Government Exhibit 3D, which

5  is already admitted.

6       (Side conversation)

7  Q    How far back -- let me ask you this.  How far back in his

8  record did you review when you assembled it?

9  A    I honestly don't know the answer to that.

10 Q    Okay.

11 A    We would have looked at everything that was in the

12 document, but I can't tell you what the oldest one was.

13 Q    So at one point would it surprise you there were at least

14 seven letters of reprimand in that file?

15      MR. OFFENBECHER:  Your Honor, "Would it surprise

16 you" --

17      MS. DUIGNAN:  It's already admitted, Your Honor.

18      MR. OFFENBECHER:  -- is not a legitimate question to

19 ask a witness on direct examination.

20 BY MS. DUIGNAN:

21 Q    Okay, how many letters of --

22      MR. OFFENBECHER:  I object to it --

23      MS. DUIGNAN:  -- reprimand -- that's an open-ended

24 question, Your Honor.  It's already admitted into evidence.

25      THE COURT:  Okay.  Go ahead.

1    THE WITNESS:  I can't say with any certainty how many

2  letters of reprimand he had specifically in his file.  But I

3  know of one specifically that -- that we came across when we

4  were reviewing the documentation from Commander Braum (ph) over

5  an --

6    MR. OFFENBECHER:  Well, he's -- Your Honor, he's

7  answered the question.  He doesn't know how many there were.

8    MS. DUIGNAN:  We just read --

9    MR. OFFENBECHER:  That's the question.

10    MS. DUIGNAN:  -- in painstaking detail through about

11  four evaluations, Your Honor.  I'm just trying to summarize

12  and --

13    THE COURT:  So --

14    MS. DUIGNAN:  -- move this along.

15    THE COURT:  -- he's not saying how many, he's telling

16  that he did -- he recalls one.  That's what he's referring to,

17  I think.  Go ahead, finish your sentence.

18    THE WITNESS:  There was one specific one addressing a

19  hut in Attu, where it would -- had been shipped from Attu,

20  which is an island in the very far end of the Aleutian Chain.

21  It had been brought back to Anchorage against the instructions,

22  orders of the commanding officer, who I believe was Commander

23  Braum, and he had a -- a -- the letter of reprimand in there

24  specifically addressing that.

25  BY MS. DUIGNAN:

1  Q   Are there any others that you recall without refreshing

2  your recollection?

3  A   No, none specifically.

4       MS. DUIGNAN:  Your Honor, at this point I'd like to go

5  up and bring a copy of the file and refresh his recollection

6  with Exhibit 3D.

7       THE COURT:  Very well.

8       MS. DUIGNAN:  Your Honor, may I approach the witness?

9       THE COURT:  Yes.

10      MS. DUIGNAN:  I've handed the witness Exhibit 3D.

11 BY MS. DUIGNAN:

12 Q   Can you briefly just page through it and review it?

13 A   You're specifically referring to the memo of January 4th,

14 2012?

15 Q   Well, that's one of them.  Can you go through all the way

16 back and just count how many letters of reprimand there are?

17 A   Yes, ma'am.

18      (Pause)

19      THE COURT:  Why don't we go off the record, just to

20 save tape.

21      THE CLERK:  Off record.

22      (Off record at 3:47 p.m.; on record at 3:48 p.m.)

23      (Jury present)

24      MS. DUIGNAN:  Are we ready?

25      THE CLERK:  (Indiscernible) one moment.  Back on

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 268 of 329
(720) 384-8078   attrans@sbcglobal.net

1  record.

2       THE WITNESS:  Based on a review of his record, I found

3  four letters of reprimand.

4  BY MS. DUIGNAN:

5  Q    Okay.  Do those include the ones that you had issued

6  starting in 2011 and 2012?

7  A    We did --

8  Q    Or letters -- or -- I'm sorry, let me rephrase my

9  question.  You're just referring to letters of reprimand.  Did

10  you look at letters of caution?

11  A    Yes, ma'am, I did.

12  Q    Okay.

13  A    Can I give you the summary?  In summary, four letters of

14  reprimand, two letters of caution, one letter of expectation,

15  one letter for the record, and one letter of notification.

16  Q    Okay, thank you.

17  A    Nine in total.

18  Q    And what were the date ranges of those?

19  A    The most recent was from January 4th, 2012, and it looks

20  like they're going back as far as -- there's one here from

21  1993.

22  Q    Mr. Offenbecher went into great detail about performance

23  evaluations.  What documents are used to document disciplinary

24  matters?

25  A    Disciplinary matters are typically documented in memos of

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 269 of 329

1  reprimand, notification, expectation, caution.

2  Q    And he also asked you about the antenna book.  What was

3  the reason it was redrafted in 2009?

4  A    Commanding officer wanted to put additional information in

5  it to make the tool more useful to both the rigger shop, the

6  Engineering Department as a whole, and the operators, and the

7  Operation Division.

8  Q    I have no further questions.

9           THE COURT:  Recross.

10          MR. OFFENBECHER:  No questions.

11          THE COURT:  Thank you, sir.  You're excused.  The

12  government's next witness.

13     (Witness excused)

14          MS. LOEFFLER:  We call Commander Peter Van Ness.

15          THE COURT:  Sir, if you can just head on up here,

16  you'll see the -- and that door there pulls out.  So you pull

17  that out and step into the box, and then remain standing for

18  just a second.  My clerk will swear you in.

19          THE CLERK:  Please raise your right hand.

20          **PETER VAN NESS, PLAINTIFF'S WITNESS, SWORN**

21          THE CLERK:  Okay, thank you.  Please have a seat.  And,

22  sir, if you can please state and spell your full name.

23          THE WITNESS:  My name is Peter Van Ness.  P-e-t-e-r,

24  last name V-a-n, capital N-e-s-s.

25          THE CLERK:  Thank you.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 270 of 329
(720) 384-8078   attrans@sbcglobal.net

1    THE COURT:  All right, counsel.

2    MS. LOEFFLER:  Before we go further, Special Agent

3 Sturgis, can you take down the chart, just because I -- if I'm

4 not using it, I like to be able to see everybody --

5    THE COURT:  Okay.

6    MS. LOEFFLER:  -- including the judge, who seems kind

7 of an important figure here.

8    THE COURT:  (Indiscernible).

9    MS. LOEFFLER:  I can't see you.  Thank you.

10                    **DIRECT EXAMINATION**

11 BY MS. LOEFFLER:

12 Q    Commander Van Ness, I'm using your title, but I'd like to

13 rather hear it from you.  What's your -- what is your rank in

14 the Coast Guard?

15 A    I'm a commander in the Coast Guard.  It's a 05.

16 Q    Okay.  And we just had Lieutenant Pizzurro, so, you know,

17 where's your rank compared to his?

18 A    He's a lieutenant, an 03, so two ranks senior to.

19 Q    Where are you stationed now?

20 A    I'm stationed in D.C. now, at Coast Guard Headquarters.

21 Q    Where was your previous station?

22 A    At Communication Station Kodiak.

23 Q    What dates were you at Communication Station Kodiak?

24 A    I -- I took command in Kodiak in July of 2009 and

25 transferred command, left Kodiak in 2012 --

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 271 of 329
(720) 384-8078   attrans@sbcglobal.net

1  Q    Okay.

2  A    -- June of 2012.

3  Q    And I think we heard this before, but your role in

4  Communication Station Kodiak -- you said you were a commander,

5  but what's the other title for you?

6  A    Yes, ma'am, I'm -- I was the commanding officer.  I was in

7  charge of the station.

8  Q    Now, your office was located in which building on -- at

9  COMMSTA?

10 A    In T1.

11 Q    Okay.  Did you go to T2 very often?

12 A    Not very often.

13 Q    It wouldn't be with -- well, I guess -- we haven't had the

14 head guy testify yet, so kind of what's your role versus the

15 role of people below you at the -- at COMMSTA?

16 A    So you're asking what -- what did I do as a commanding

17 officer?

18 Q    Yeah.  I'm sorry, that's a better way to put it.

19 A    Okay.  Well --

20 Q    What do you do as commanding officer?

21 A    I was in -- overall in charge of the unit, so in charge of

22 ensuring we executed our mission, which is communications for

23 the North Pacific and Arctic region and State of Alaska.  We

24 support both Coast Guard units, military units, and then the

25 maritime public, so ships, commercial and fishing,

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 741  Filed 09/23/14  Page 272 of 329

1 recreational.  And we're -- we're basically a long-range

2 communication station, so we were designed to use long-range

3 radios and satellite communications.

4 Q   Okay.  Now, when you said that you would sometimes go down

5 to T2, how would you get into the building when you went to T2?

6 A   There were two doors, and we had card readers, so I would

7 just card into the building.

8 Q   Were you aware that the other door would be open when

9 somebody was there?

10 A   I -- I am aware now.  I -- I honestly -- I think I became

11 aware of that after the fact, but I -- I couldn't tell you that

12 that was something I paid a lot of attention to.

13 Q   Okay.  And the other thing I want to ask you, one other

14 sort of geographical view of T2.  We had some testimony --

15 there's some windows in the back of T2.  How tall are you?

16 A   I'm just over six foot, about 6'1".

17 Q   Where do the windows come on you?

18 A   They'd be probably right at -- right at my forehead or

19 maybe a little above my head.

20        THE COURT:  Okay, get some water.  It's right behind

21 you.  I've been keeping up to them -- with you too.  That's why

22 I know when you need a break.  Okay, thank you.  Sorry.

23 BY MS. LOEFFLER:

24 Q   Okay.  I'm going to ask you about the two victims of the

25 murder.  Did you know both Mr. Belisle and Mr. Hopkins?

1  A    Yes, ma'am.

2  Q    Okay.  And was that in your capacity as the commander of

3  the whole COMMSTA?

4  A    That's correct.

5  Q    And what was your view of ET1 Hopkins and his work at

6  COMMSTA while you were the commander?

7  A    He had a strong work ethic.  He was dependable and did a

8  good job, worked hard.

9  Q    Okay.  And did you -- were you aware of any issues with

10  him?

11  A    No.

12  Q    Now I want to turn to Mr. Belisle.  Did you also have

13  interactions with him?

14  A    I did.

15  Q    And what was your view of him?

16  A    He was also a very -- very hard worker, very caring, spent

17  a lot of time with the junior personnel.  He was prior service

18  and really took the young -- the seamen and young electronics

19  technicians kind of under his wing.

20  Q    And I -- going back to Mr. Hopkins for just a second, ET1

21  Hopkins.  Were you actually involved and did he receive an

22  award from COMMSTA in the year before his death?

23  A    He -- he did.  He was recognized as the Sailor of the

24  Year, which is -- we selected one crewmember.  The Chief's Mess

25  would make a recommendation to the command.  And he was

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 274 of 329

1    selected as the member to -- to be recognized for outstanding

2    performance for the year.  As a result of that, he was -- he

3    was recognized in -- in an ceremony at (indiscernible) the

4    year.  He received an achievement medal, and his name was also

5    put forward to the State of Alaska to compete with all -- all

6    the Coast Guard commands in Alaska.

7    Q    Turning to Mr. Wells, did you also know Mr. Wells?

8    A    I did.  I do.

9    Q    Okay.  And what is your view of his knowledge in terms of

10   the antennas and the work that he had to do?

11   A    Very knowledgeable.  He was our -- our go-to expert on

12   antenna maintenance.

13   Q    What is your view of him as an employee in the sort of

14   supervision chain?

15   A    Where did he fall in the chain or --

16   Q    No --

17   A    -- was it --

18   Q    -- okay, let me ask a better question, then.  You said he

19   was very knowledgeable.  Were there any issues with his

20   conduct, separate from his knowledge?

21   A    Yes, we had had some issues with conduct.

22   Q    Okay.  And do you have a view, without getting into

23   specifics yet, of how easy he was to work with in terms of his

24   conduct?

25          MR. OFFENBECHER:  Your Honor, I would object, on

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 741  Filed 09/23/14  Page 275 of 329

1 grounds of lack of personal knowledge.  The witness has

2 testified he hardly ever went to T2, which is where Mr. Wells

3 and the other folks were.

4       MS. LOEFFLER:  Your Honor, I think you -- he's --

5       MR. OFFENBECHER:  Anything -- excuse me --

6       MS. LOEFFLER:  -- he's well aware --

7       MR. OFFENBECHER:  -- I'm not (indiscernible).

8       MS. LOEFFLER:  I can lay a foundation if he wants to.

9 I'd be happy to do that.  Mr. --

10       THE COURT:  Very well.

11 BY MS. LOEFFLER:

12 Q    -- Van Ness -- Commander Van Ness, did you interact with

13 Mr. Wells during his time as -- COMMSTA?

14 A    I did.

15 Q    How often?

16 A    Several times a week.

17 Q    Okay.  And that's over a period of the three years you

18 were there?

19 A    Yes.

20 Q    Do you feel that, based on your interactions several times

21 a week, you could comment on sort of how he was as an employee,

22 in terms of working with others, versus his knowledge that you

23 testified about earlier?

24 A    Yes.

25 Q    Okay.  And I will go back and ask the same question.

1    Setting aside his knowledge, in terms of an employee, how easy

2    was he?

3    A    It could be difficult at times.  He was very

4    knowledgeable, but we -- we had some conduct issues and some --

5    some problems.  Most of them were dealt with by folks who

6    worked for me and I would just be informed of things that were

7    going on.

8    Q    Okay.  Because most things didn't rise to your level.

9    Right?

10   A    That's correct.  The -- the information would have been

11   not necessarily my -- I would not be required to personally

12   interact.

13   Q    Okay.  Now I want to go briefly into something called the

14   antenna book.  When you got there, was there something from

15   you, directives from you about an antenna book?

16   A    Yes.  Well, there -- there was a -- it was a project that

17   had been started prior to my command, but it was explained to

18   me, and -- and so I -- I was very interested in seeing it

19   finished and put together.  And the idea was that it would

20   effectively be a -- a full catalog of -- of all of the antennas

21   and all of the technical information we needed about those at

22   the COMMSTA.  And as a -- my background is -- is C4IT,

23   communications computers, but I'm not necessarily a HF, high-

24   frequency radio antenna expert.  So something I was interested

25   in is having a reference.  I knew it was something that would

**VAN NESS - DIRECT**

1  help out the command.  So, yes, it was something I -- I asked

2  and kind of pressed the XO to push forward.

3  Q    Okay.  And do you know whether Mr. Wells participated in

4  that project while you were the CO of the COMMSTA?

5  A    Well, he would have had to have participated in at least

6  some of it, because he held a lot of the information.  But it

7  took a very, very long time to get that book put together.

8  Q    Okay.  I'm going to turn to the day of the murder, April

9  12th, 2012.  And then I'm going to go back to a few other

10  questions.  But was that a normal morning for you in terms of

11  before it happened?  I'm not -- obviously it's not normal after

12  the murders happened.  But beforehand, were there some issues

13  going on in your life that morning?

14  A    Well, I -- I -- I had some personal -- I was -- I was sick

15  that morning.  My -- I have some young children and they had

16  been sick, and then my wife was sick that weekend, and I woke

17  up and I wasn't feeling well.  I had a -- stomach flu.

18  Q    So did you call in, say you weren't coming in?

19  A    Well, I -- I called my boss, who's actually down in

20  California, just to let him know that I was sick.  And then

21  I -- I believe I sent an email to the XO.

22  Q    Okay.  And after that I assume events happened that caused

23  you to come to work?

24  A    Yes.  I got -- I got a phone call.  In fact, I was in -- I

25  was in the restroom.  The phone rang.  There was a voicemail

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 278 of 329

**VAN NESS - DIRECT**

1   from the -- the watch officer at the communication station.  It

2   wasn't real clear, just that someone had been injured.  And

3   then there was a followup call eventually from -- from my

4   executive officer.

5   Q   In response to that, what did you do?

6   A   I -- I got dressed and went into work.

7   Q   Okay.  And do you recall about what time you got into work

8   that day?

9   A   It was shortly after 8 o'clock, about 8 -- 8:15, 8:20.

10  Q   Okay.  When you were driving in, who was in front of you?

11  A   Jim Wells.

12  Q   Okay.  And I'm going to pull up Exhibit 105.

13      (Side conversation)

14  Q   Oh, I'm sorry.  It's Exhibit 99.  Thank you, Kim.  It's

15  Exhibit 99.  Okay.  And can you recognize that vehicle?

16  A   It's Jim Wells's truck.

17  Q   Okay.  Now, when you came in that morning -- and we can

18  take it off.  I just -- okay, thank you.  You said you followed

19  him in.  Was that his normal time of work?

20  A   No.  He would normally been in earlier than that.

21  Q   When you pulled up, what was the first thing you saw?

22  A   The -- when I pulled up to the communication station,

23  there were emergency vehicles, there were police cars.  There

24  was a -- some type of police SUV -- military police SUV parked

25  across the road, going up to the communication station.  So

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 279 of 329

1  there was a lot of activity going on around T2.

2  Q   Did you see -- did you know at that time what had happened

3  in T2?

4  A   I -- I didn't have all the details.  I had received a

5  phone call from my executive officer on the way in.  I was

6  driving in.  I -- I pulled over, answered the phone.  I -- I

7  believe he had told me that -- there had been two people who'd

8  been shot.  But I -- I said, "You know what, I'm going to be

9  there in five minutes.  Let's not talk about this on the phone.

10  I'll be right there."  And then I drove down the road, turned

11  onto Anton Larsen Road, which is the road that goes out to the

12  communication station.  And that's -- and I ended up following

13  Mr. Wells into the station.

14  Q   When you got there, did you see Chief Reckner?

15  A   I did.

16  Q   Where was he?

17  A   He was -- he was standing on the road right there by the

18  military police vehicles.

19  Q   Okay.  What condition was he in when you got there?

20  A   He was -- he was upset.  He had been crying, sobbing.  I

21  believe he had his hands on his knees when I walked up to him.

22  Q   Did you also talk to Mr. Wells when you first got there?

23  A   I didn't talk to -- necessarily, we didn't have a --

24  Q   No.

25  A   -- conversation, but I believe we walked up within, you

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 280 of 329

1  know, a few -- few seconds of one another.  We had pulled in

2  together, and Scott --

3  Q    Did somebody -- I'm sorry, I want to cut you off because I

4  want to get to the conversation.  But did somebody inform --

5  was it you or did somebody inform Mr. Wells what had happened

6  in your presence?

7  A    Well, Scott Reckner said in -- and whether it to was to me

8  or Mr. Wells, just in general, as we walked up, "Someone shot

9  Jim and Rich."

10  Q    Okay.  Did Mr. Wells respond to that?  Did he make a

11  statement in response to that statement?

12  A    He did.  Something -- I don't remember the exact words,

13  but it was something along the lines of, "My goodness," "My

14  God," "Oh, my goodness.  I had a flat tire," was his statement.

15  Q    Did that strike you as unusual at the time?

16        MR. OFFENBECHER:  Objection.  Calls for speculation on

17  his part.  That's -- when it strikes --

18        THE COURT:  Overruled.  Does it strike him as un -- you

19  can answer.

20        THE WITNESS:  Yes.  It -- it just struck me as out of

21  place.  I mean, we're -- we're talking about two people being

22  shot, and -- and my only thought was, what does a flat tire

23  have to do with this, like, why are we -- it just seemed a --

24  an odd comment.

25  BY MS. LOEFFLER:

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 281 of 329

**VAN NESS - DIRECT**

1  Q    Now, after this happened, did you then go up to T1?

2  A    I did.

3  Q    What was your first action when you got to T1?

4  A    Well, I had two things in mind as I went up.  Number 1

5  being I told the XO I'd talk to him, so I was looking for the

6  XO.  And then the other -- the executive officer -- and then

7  the other -- the other thing I was worried about was the watch.

8  There's a lot going on here, but we have a 24/7, 24-hours-a-

9  day, 7-days-a-week radio watch, multiple people working all the

10 time, and I wanted to make sure we were still doing our mission

11 as a unit, or if we weren't able to do it, then we would have

12 somebody else taking over that mission.  So that was one of my

13 number 1 concerns, was to get into the watch deck and make sure

14 that we were still able to do what we were supposed to be

15 doing.

16 Q    Now, after -- had you ever been involved in something like

17 this before, even though you were a commander in the Coast

18 Guard?

19 A    No.

20 Q    Okay.  Did you seek advice from authorities about how you

21 should handle the situation?  I'm sorry, from people in the

22 Coast Guard about sort of what the step is to deal with this in

23 your unit.

24 A    I -- I don't know that it was -- it was that conscious.  I

25 think I just had some things in mind.  You know, I was -- I was

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 282 of 329
(720) 384-8078   attrans@sbcglobal.net

1   worried about -- I wanted to get more information from the

2   executive officer, find out if he had more details.  I

3   obviously needed to know what was going on from law

4   enforcement, so I figured out who was in charge from law

5   enforcement.  I need to let my boss know what was going on, so

6   the Coast Guard was aware.

7        Again, our -- our command, even though we were in Kodiak,

8   we worked for the area -- Communications Area Master Station,

9   which is down in Point Reyes, California, just north of San

10  Francisco.  So my direct reporting chain was California and not

11  over there at Base Kodiak.  So I wanted to make sure that

12  the -- the command down there was aware of the fact we had lost

13  two people.

14  Q   Now, both people that you lost at the time -- were married

15  at the time.  Correct?

16  A   That's correct.

17  Q   And did you then get involved in what's been called

18  spousal notification?

19  A   Absolutely.

20  Q   And I suspect it's common sense, but what was it that you

21  needed to do?

22  A   So one of the questions I asked was, you know, has anyone

23  told Deb and -- and Nicola about this.  And I called the base

24  CO, talked to the commanding officer of Base Kodiak.  He also

25  happened to be my next-door neighbor.  He was aware that

1  something was going on at the communication station.  As I was

2  leaving the house, he was also leaving the house, heading into

3  work, and we just spoke very briefly, and I told him I'd get

4  back to him.  So when I called him, we talked about it.  He

5  said, "I'll go with you."

6      And then the chaplain happened to arrive at the

7  communication station right around the time I was having this

8  conversation, so our -- our Catholic chaplain, myself, the

9  commanding officer of the base, and -- Carl Moore (ph) --

10 and -- and I believe it was one of the local police officers

11 from Kodiak went -- went with me, and we went to Nicola's

12 office.

13 Q   When you say Nicola's office, is that Mrs. Belisle?

14 A   Mrs. Belisle, yes.

15 Q   Okay.  Did you do the notification at her office or at her

16 house?

17 A   At her office.

18 Q   All right.  When you went to her office -- and I assume --

19 I don't want to go into what you -- you told her what happened

20 at -- did you tell her what happened at the office?

21 A   Yes.

22 Q   What was her reaction?

23 A   She was hysterical, very, very upset.  In fact, I -- I

24 don't know that we even had to say anything.  When we walked in

25 in uniform -- she had already heard.  Kodiak's a small town.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 284 of 329

**VAN NESS - DIRECT**

1  They were aware something was going on at the communication
2  station by that point.  I think -- I don't remember the exact
3  time, but I believe it was around 10 o'clock in the morning, so
4  it had been, you know, two hours or so.  Word gets out.  And so
5  when we walked in in uniform --
6  Q    Did she blurt out a name?
7  A    Yes.
8  Q    What was that name?
9  A    Jim Wells.
10       MR. OFFENBECHER:  Your Honor, I object.  I move to
11  strike.  It has absolutely no relevance.  I move to strike it.
12  And --
13       MS. LOEFFLER:  Your Honor, this is not for the truth of
14  the matter, and I would like you to instruct them so.  But the
15  last time defense counsel asked an -- a responding MilPol this
16  exact question, and alleged that it was all Scott Reckner.  So
17  all I want to do is point out that, one, it's an excited
18  utterance, and, two, this was not something solely from Scott
19  Reckner.
20       MR. OFFENBECHER:  It's an accusation by the widow of
21  this person on the spot.  It's entirely inappropriate.  I move
22  to strike.
23       THE COURT:  First of all, it's not being offered for
24  the truth of the matter.  It's offered for her reaction upon
25  receiving.  So it's being offered for her state of mind.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 285 of 329
(720) 384-8078   attrans@sbcglobal.net

1    Whether that's relevant or not, I'm going to have to think

2    about it.

3         MR. OFFENBECHER:  Your Honor, there's no possible

4    relevance to that statement.  There's no legitimate purpose for

5    asking that question.

6         MS. LOEFFLER:  Your Honor --

7         THE COURT:  Okay.

8         MS. LOEFFLER:  -- it's exactly responsive to what

9    defense counsel brought up previously, and that's --

10        THE COURT:  Well, let's discuss it, but listen -- we

11   got to -- let's move on to the next question.

12        MS. LOEFFLER:  Okay, I will.

13   BY MS. LOEFFLER:

14   Q    Now, when you went back to COMMSTA -- I assume after you

15   made the notifications, did you go back to the COMMSTA?

16   A    Well, that day -- so after spending some time at Nicola's

17   office, Ms. -- Mrs. Belisle's office, we went to Mrs. Hopkins'

18   house and notified her.  And then from there I believe I

19   went -- I went back over to the base.  We had scheduled a

20   conference call.  There was a conference call coming up with

21   both the district command up in Anchor -- up in Juneau and

22   the -- the Pacific Area Command, to just discuss what was going

23   on and -- and bring everybody up to speed.  So I went back over

24   to the base, the main conference room at the base, for a

25   conference call.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 286 of 329

**VAN NESS - DIRECT**

1  Q   Okay.  At some point did you return to the COMMSTA and

2  call sort of an -- and have kind of an all-hands meeting with

3  people?

4  A   Yes, I'm -- I -- the answer to your original question was,

5  yes, I did eventually return to the communication station and

6  we -- I had -- there -- we have a representative, like a

7  counselor, that's part of the Kodiak Coast Guard staff, and he

8  was at that conference call and had recommended -- he said, "In

9  a situation like this, you need to keep people up to date on

10  what's going on.  The best thing you can do right now is just

11  get the crew together and share with them what you do know."

12  So that's -- that's exactly what I did.  When I got back, I

13  asked the --

14  Q   Where did you do that, so I can write this up -- but where

15  physically in T1 did you have --

16  A   In --

17  Q   -- that meeting?

18  A   In -- in the basement of T1.  The basement of T1 is a

19  very, very large open space and we would use that to gather the

20  whole crew together.

21  Q   And did you gather the whole crew together?

22  A   We did.

23  Q   Did you give a -- you know, sort of tell them what was

24  going on, as you said was your -- was what you were told to do?

25  A   Yes.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 287 of 329
(720) 384-8078   attrans@sbcglobal.net

1    Q    Did you notice -- actually, did you notice Mr. Wells

2    during that presentation?

3    A    Yes.

4    Q    And what did you notice about him during that

5    presentation?

6    A    Well, it -- it was common practice -- I mean, it's one of

7    those things where, you know, every -- everybody kind of has

8    their place they commonly sit or stand.  Mr. Wells would

9    stand -- there were big cement pillars -- there was four

10   pillars in the basement.  He would commonly stand at one of the

11   pillars.  And just my observation during that meeting was that

12   he never looked up at me during the entire -- when I was

13   talking or answering any questions, he had a ballcap on and he

14   just looked at the floor the whole time.

15   Q    Did you -- you said earlier that you don't normally get

16   involved in sort of disciplinary matters -- I'm sorry -- down

17   the chain.  But did you get involved in a disciplinary matter

18   that involved Mr. Wells?

19   A    Yes.

20   Q    And how did -- did this involve a fuel card?

21   A    Correct.

22   Q    How did this come to your attention?

23   A    Well, it was -- it was brought to my attention by the

24   executive officer.

25   Q    Okay.  And did the chief -- was an investigation

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1  initiated?

2  A    Yes.

3  Q    Did Chief Reckner have an ability to initiate an

4  investigation on his own?

5  A    No, he -- the investigation would be initiated by the

6  executive officer.

7  Q    Okay.  I'm going to turn to what's been admitted as

8  Exhibit 8.

9      (Side conversation)

10 Q    Well, actually, let me just turn to Exhibit 8, and I'm

11 going to turn to page 7.  Okay.  With regard -- did you

12 actually receive the results of the investigation as the

13 commander?  Was that one of the commander -- was that one of

14 the things that you reviewed?

15 A    Yes.  Actually, the results would go back to the executive

16 officer as the initiating official, but then he shared them

17 with me as the commanding officer.

18 Q    And you -- did you make a decision to take some

19 disciplinary action based on the results of the investigation?

20 A    I did.  I issued a letter of caution.

21 Q    Okay.  And what led you to decide to do that?

22 A    Just based on the -- the results of the investigation and

23 ask -- asking some questions, I felt it was appropriate.

24 Q    What types of questions did you ask?

25 A    I -- I guess -- you know, I -- I got the investigating

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 289 of 329
(720) 384-8078   attrans@sbcglobal.net

**VAN NESS - DIRECT**

1  officer, the executive officer, and Scott Reckner as the

2  supervisor, and we -- we discussed what -- what the

3  investigation said, what had gone on, and I -- I felt that

4  action needed to be taken, that it -- it was obvious that the

5  fuel card had been misused.

6  Q   Okay.  And to you, it was obvious the fuel card had been

7  misused by whom?

8  A   Jim Wells.

9  Q   Why do you say that?

10  A   It -- it was in his custody, and we could not account for

11  where -- where the fuel went.  And it had been used to purchase

12  over $200 worth of fuel.

13  Q   Now I'm going to turn to Exhibit -- page 7 of Exhibit 8.

14  If we could display that.  And we can perhaps expand that thing

15  so that -- your recollection in part of the investigation, this

16  is a statement by Mr. Wells, saying that the fuel would have

17  been used for refueling the 20-ton big line truck.  What's

18  that?

19  A   What is the line truck?

20  Q   Yeah.

21  A   It's -- basically think of a bucket truck that the phone

22  company would use.  It's just a -- it's a utility vehicle to

23  work on the antennas.

24  Q   And based on that statement, did you ask for any followup

25  as to whether the line truck had actually been filled by the

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 290 of 329
(720) 384-8078   attrans@sbcglobal.net

1 missing fuel?

2 A    Well, that -- that's exactly what I asked.  I said, "Well,

3 is there fuel in the truck?"  And there wasn't.  I mean, there

4 was some, but not -- not $200.  It hadn't been filled.

5 Q    Okay.  And before making a decision to issue a letter of

6 reprimand, did you believe that this was an accurate statement

7 of what had happened?

8 A    Mr. Wells' statement that he --

9 Q    Yes.

10 A    -- filled the line truck?

11 Q    Yeah.

12 A    No.

13 Q    Okay.  If we can pull up Exhibit 3D, page 60.

14    (Side conversation)

15 Q    I've been corrected, and I'm referring it -- as reprimand.

16 It's a letter of caution.  And I'll pull it up.  Now, this has

17 actually got your initials at the top of it, right, Commander

18 Van Ness?

19 A    Yes, that's my signature.

20 Q    Okay.  And it's dated January 4th, 2012.  And the incident

21 described in the fuel card incident is in August of 2011.  So

22 can I ask you how -- why it took so long to get to this date?

23 A    It shouldn't have, but yes, it took a long time.  We --

24 the investigation -- I -- I couldn't tell you how many weeks

25 that took, but that would have been a couple.  And then the

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 291 of 329
(720) 384-8078   attrans@sbcglobal.net

1  report back to the XO worked through the administrative issues,
2  and by the time it -- it got to me, we had a discussion about
3  it.  I asked for this to be drafted.  I edit it, sign it.
4  It -- it took a while.  We were also delayed -- I had several
5  business trips in there.  I believe I was on leave part of that
6  time.  And then Mr. Wells was also -- had taken some leave and
7  was ill and had not been to work for a while.
8  Q    Okay.  And going back -- before I go into sort of the last
9  couple of -- area of questions, according to the investigation,
10 during the time -- before the -- right before the time the
11 truck, the -- I'm sorry.  According to the investigation, when
12 the fuel was taken, where was Mr. Wells going at that time?  Do
13 you know?
14 A    The day of the -- that the fuel was -- was actually pumped
15 out of the pump, I believe he was at work, but he had gone over
16 to the base and came back.
17 Q    Okay.
18 A    And we were able to tell that by the videocamera at the
19 main gate.
20 Q    Right.
21 A    And I believe he had a -- a trip coming up to Anchorage.
22 Q    Okay.  Now, you said that the -- we showed that the letter
23 of caution was dated January 4th, 2012.  Did you present it to
24 Mr. Wells on that date?
25 A    No, I did not.  It was late February.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 292 of 329

1   Q    Okay.  Why did it take so long from the -- from January

2   4th to get to the end of February before the presentation

3   happened?

4   A    Again, similar reasons.  He had been sick and on leave,

5   and then my schedule.  It was just a matter of -- we had

6   actually scheduled it two or three times, and for whatever

7   reason, either I had a conflict or he had a conflict, and it

8   just took that long to work out getting us in the same room.

9   Q    Did you personally present the letter of caution to Mr.

10  Wells?

11  A    I did.

12  Q    Where did that meeting take case -- take pl --

13  A    In my -- in my office.

14  Q    Why did it take place in your office?

15  A    I just felt it was appropriate, as the commanding officer,

16  if I was going to take disciplinary action, that it should be

17  in my office.

18  Q    Okay.  Who else was there?

19  A    The executive officer, the engineering officer, Senior

20  Chief Reed; the supervisor, Senior Chief -- or, I'm sorry,

21  Chief Reckner, Scott Reckner; and I don't remember whether Troy

22  Loudermilk (ph) was there or not.  He's the master chief.  I --

23  I do not believe he was in the room.

24  Q    Okay.  Who conducted the meeting?

25  A    I did.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 293 of 329
(720) 384-8078   attrans@sbcglobal.net

**VAN NESS - DIRECT**

1  Q   Can you, to the best of your recollection, describe what

2  your conversation was to Mr. Wells when you presented him the

3  letter of caution?

4  A   Well, I -- I gave him the letter, said, "I'm -- I'm

5  issuing you a letter of caution as a result of this

6  investigation.  I believe there was misuse of the credit card

7  and I believe you're responsible for the misuse.  And I want to

8  let you -- you know, I brought here to let you know that I'm

9  issuing a letter of caution, and I need your signature on it to

10 acknowledge that you've received it."

11 Q   What was his response?

12 A   Well, there was some conversation in there.  I believe,

13 you know, that Scott Reckner spoke up for a minute, the XO may

14 have said a word or two, but I -- I -- Mr. Well -- I remember

15 Mr. Wells saying, "This isn't right."  And I -- beyond that, I

16 can't recollect a --

17 Q   Okay.

18 A   -- whole lot of the conversation.

19 Q   How long did the conversation go on?

20 A   Ten, fifteen minutes, and then there was a lot of back-

21 and-forth about it.  So we were probably in there almost an

22 hour.

23 Q   Okay.  When you say that you asked him for his signature,

24 what was the purpose of getting his signature?

25 A   It's -- it's an acknowledgment that he has seen the

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 294 of 329
(720) 384-8078   attrans@sbcglobal.net

1  letter.

2  Q    Was he willing to sign it at first?

3  A    No.

4  Q    How long did it take to get him to sign it?

5  A    Well, he -- he was not willing to sign it, and after a

6  period of time discussing it and -- I finally said, "Okay,

7  fine.  We'll take this over to the -- the civilian staff

8  advisor over at the -- the base and we'll discuss where we go

9  from here, if you're not willing to sign it."  And at that

10 point I stood up.  The rest of the individuals in the meeting,

11 my XO, Chief Reckner, they -- they left the office, and Mr.

12 Wells was still sitting in the chair.  And --

13 Q    And after you had stand -- how long did he stay sitting in

14 the chair?

15 A    Enough that it was a little bit of an uncomfortable

16 situation, especially as the commanding officer.  Because

17 normally when you stand up as a commanding officer, everyone

18 else stands up and that's the end of the meeting.  So as they

19 walked out of the -- they walked out of the room, Mr. Wells was

20 sitting there.  He was just kind of looking down at the table.

21 And -- and I said, "You know, all right, if -- if you're not

22 going to sign it, then we just -- we need to go to the next

23 step."

24 Q    And did he finally sign it?

25 A    He did.  He told me that, you know, he was -- what really

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 295 of 329
(720) 384-8078   attrans@sbcglobal.net

1  upset him that -- was that I just didn't trust him, and, you

2  know, he kind of shook his head and grabbed the folder, signed

3  it, and walked out of the office.

4  Q    When he said he was upset that you didn't trust him, did

5  you tell him that?

6  A    I did.  I did.  During the course of the meeting, I -- I

7  had said -- I -- well, I think that's -- that's the question

8  that came -- he asked, you know, like, "Are you saying you

9  don't trust me?"  And I said, you know, "No, I don't.  I don't

10 trust you.  You got to go back down there and prove to me that

11 I can trust you.  You got -- go back down, work hard, and prove

12 that I can."

13 Q    I have nothing further.

14       THE COURT:  Cross-examination.

15                  **CROSS-EXAMINATION**

16 BY MR. OFFENBECHER:

17 Q    Mr. Van Ness, good afternoon.

18 A    Good afternoon.

19 Q    You talked before about there being a lot of rules and

20 regulations in the Coast Guard.  Right?

21 A    Yes, sir.

22 Q    And one of the rules and regulations in -- as the CO of

23 the COMMSTA, you were in charge of enforcing the rules and

24 regulations.  Right?

25 A    Yes, sir.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1  Q    And one of the rules and regulations you had was that

2  there were to be no guns on the COMMSTA.  Is that right?

3  A    That is correct.

4  Q    And so your order was -- to everyone on the COMMSTA was no

5  one brings their personal weapons onto the COMMSTA.  Right?

6  A    That's correct.

7  Q    And so if someone had in fact been bringing their personal

8  weapons onto the COMMSTA, they would have been violating your

9  orders.  Right?

10 A    That's correct.

11 Q    And they would have been violating U.S. Coast Guard

12 regulations, wouldn't they?

13 A    Yes.

14 Q    And they would have been subject to perhaps a letter of

15 caution or reprimand or some other form of discipline.  Is that

16 right?

17 A    Yes.  Depending on whether they were military or civilian,

18 it might be different.  But yes, there would be some type of

19 reprimand.

20 Q    And so if you had found out, for example, that one of the

21 chief petty officers under your command or one of the civilians

22 under your command or one of the nonrates had been bringing

23 weapons onto the COMMSTA, or, for example, the T2, then you

24 probably would have commissioned an investigation like you did

25 for Mr. Wells.  Right?

VAN NESS - CROSS

1   A    That's correct.

2   Q    And you would have had someone like Mr. Cartier conduct

3   that investigation, right?

4   A    Yes.

5   Q    And you --

6   A    And -- and just to clarify --

7   Q    Yeah.

8   A    -- that would normally be done by the executive officer,

9   would convene that investigation.  But --

10  Q    Sure.

11  A    -- and -- and it would depend on the circumstance.  It

12  doesn't always call for an investigation.  If it's obvious what

13  had happened, maybe just a letter of reprimand or a -- what we

14  would call a -- a administrative remark sheet for a military

15  member might be issued; it wouldn't necessarily need an

16  investigation.

17  Q    Okay.  So if it was obvious that there had been a

18  violation of regulations, like bringing guns onto the COMMSTA,

19  then there might be -- for a civilian there might be a letter

20  of caution or perhaps a letter of reprimand, even.  Is that

21  right?

22  A    Perhaps, yes.

23  Q    And for a military member, like a chief petty officer,

24  there would have been the military equivalent of that.  Is that

25  right?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 298 of 329

1  A    Yes.

2  Q    And you might have had an investigation by someone like

3  Mr. Cartier or perhaps not.  It might have just been -- come

4  right from the XO.  Is that right?

5  A    That's correct.

6  Q    If the XO had known about those kinds of rule violations?

7  A    Yes.

8  Q    So if a person had been bringing guns a lot and continued

9  to engage in that behavior, that person's personnel file would

10 probably have a number of letters of caution or similar letters

11 of reprimand for violating Coast Guard regulations.  Right?

12 A    Yes.

13 Q    Now, you indicated on direct examination your meeting with

14 Mr. Wells and some of the other folks regarding the fuel card

15 letter of caution.  Right?

16 A    I'm sorry, I didn't understand the question.

17 Q    Yeah.  It probably wasn't very well articulated.  You had

18 a meeting with Mr. Wells and Mr. Reckner and some other folks

19 about the fuel card violation.  Right?

20 A    Correct.

21 Q    About the fuel card incident, right?

22 A    Yes.

23 Q    And you testified about that on direct examination, right?

24 A    Yes.

25 Q    And that was in your office, right?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 299 of 329
(720) 384-8078   attrans@sbcglobal.net

1  A    Yes, it was in my office.

2  Q    And is it fair to say that when -- in describing Mr.

3  Wells' reaction to this, that Mr. Wells did not act in an angry

4  fashion.  Is that right?

5  A    That is correct.  He -- a -- I would say he acted sad.

6  Q    All right.  He acted sad rather than angry, right?

7  A    Correct.

8  Q    And he shook his head and he just said to you, he said,

9  "What really upsets me is I've lost your confidence."  Right?

10  A    I -- I believe the word was "trust," but yes.

11  Q    Trust.  He's lost his trust.  So he was sad that he had

12  lost your trust in this matter.  Right?

13  A    That is what he said.

14  Q    Because he indicated that he didn't -- hadn't done this,

15  and he was sad that he'd disappointed you in this way.  Is that

16  right?

17  A    He indicated that he was disappointed that I didn't trust

18  him.

19  Q    And his reaction, in your mind, was much like a child

20  after being chastised, saying, "Dad, I'm so sorry," is kind of

21  the way it came across to you.  Right?

22  A    I -- I believe that's what I had told one of the

23  investigating officers.

24  Q    Mr. Van Ness, when you first came to the COMMSTA, or

25  during your period there, did you get -- did you conduct some

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 300 of 329

1  kind of a self-review of the security of the whole -- of the
2  COMMSTA as part of your duties as the CO?

3  A   Well, I -- I had a command security officer, Phil
4  Jordinelli, so he would actually be the one to oversee the
5  security review.  But yes, we did a security review.

6  Q   And during your -- the course of your tenure there, was
7  there more than one security review or just that security
8  review?

9  A   It -- it was annual.

10  Q   And did Mr. Jordinelli or you or any of the other folks
11  who conducted that detect any deficiencies in the security of
12  the COMMSTA?

13  A   There were always things that needed to be done.  There
14  weren't major deficiencies but there was alway -- there
15  always -- was always a work list of a light that needed to be
16  fixed, fencing that may have not been tall enough in a certain
17  place that needed to be extended.  That -- there were -- there
18  was a work list.

19  Q   But with respect to -- not thing -- just things that
20  needed to be fixed, but things that needed to be changed, there
21  were also some other things that you and Mr. Jordinelli and
22  other folks that conducted the security reviews felt ought to
23  be changed.  Is that right?

24  A   I -- I'm not sure what you're getting at.  I -- maybe if
25  you can -- I don't remember, so if you can help me --

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 301 of 329

1  Q    Sure.

2  A    I don't know what you're getting at.

3  Q    Sure.  Well, as far as -- or as far T2, for example, there
4  was no fence around it, right?  There was no perimeter fence
5  around T2?

6  A    That -- that's correct.

7  Q    And that's really a security deficiency if you have an
8  enclosed military installation.  Right?

9  A    Yes.  We -- we would -- we would like to have had a fence
10  around T2.  We'd like to have a fence around every antenna, but
11  part of -- part of any security assessment is a risk
12  assessment, and you have to balance the cost of the security
13  measures, you know, against the -- the risk that's out there.
14  And while that was something we would obviously have liked to
15  have had, the risk was not there.  It was a workshop, it was
16  not a secure building, with a garage and workshop.  That we
17  just -- we were not able to justify funding for that fence.

18  Q    So the -- you didn't feel that the risk was high enough to
19  fund a fence?

20  A    That we were -- correct.  There was no way we could get
21  funding for that fence.

22  Q    There was a fence around T1, is that right?

23  A    That is correct.

24  Q    And there was kind of a -- an operating gate so that one
25  had to open the gate to get into the T1 area?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 302 of 329
(720) 384-8078   attrans@sbcglobal.net

1 A    That's correct, because of the watch.  It's a classified

2 space.

3 Q    And one had to card in with a card in order to open that

4 gate?

5 A    Correct.

6 Q    Either through the vehicle entrance or for the

7 passenger -- or, excuse me, the pedestrian entrance?

8 A    That's correct.

9 Q    So there was a fairly -- there was some level of security

10 there.  Is that right?

11 A    Yes.

12 Q    But with respect to T2, there was no fence around T2 to

13 fence it off from the public, really, was there?

14 A    No, there was not.

15 Q    One could -- anyone could simply drive up from Kodiak or

16 from anywhere on Kodiak Island up from the airport and just

17 drive right into T2 or drive around the back of T2.  Right?

18 A    Correct.

19 Q    Or anyone who was down at Anton Larsen Bay or the ranch or

20 the golf course, coming that direction, they could just drive

21 right up and park right in the back of T2 or park in front of

22 T2 if they wanted to.  Right?

23 A    Yes.

24 Q    And if the door were open as it was during the day, they

25 could simply open the door and walk in.  Right?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 303 of 329
(720) 384-8078   attrans@sbcglobal.net

**VAN NESS - CROSS**

1  A    Yes, they could.

2  Q    You've indicated that there were difficulties with Mr. --

3  you testified with performance issues with Mr. Wells during the

4  period of this time.  But is it fair to say that you

5  characterize those as minor performance issues in the big

6  picture?

7  A    That's correct.  Most of them didn't make it to my level

8  other than just informing me that the supervisor was taking

9  care of something.

10  Q    Is it fair to say that you indicated that you've had a lot

11  more difficult problems in the three years you've been there

12  than your problems with Mr. Wells?

13  A    Yes.

14  Q    Also indicated Mr. Wells' reaction when Mr. Reckner or

15  someone told you all that the two folks had been killed, and

16  you testified that he said, "My goodness gracious, oh, my God,"

17  something like that, "I had a flat tire."  Right?

18  A    Yes, that's correct.

19  Q    Do you think you he possibly was thinking or meaning to

20  convey, "My goodness" --

21       MS. LOEFFLER:  Objection, Your Honor.

22       MR. OFFENBECHER:  -- "oh, my God" --

23       MS. LOEFFLER:  He can't possibly know what he -- what

24  Mr. Wells was meaning to convey.

25       MR. OFFENBECHER:  Well, the -- no, on direct

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 304 of 329

1  examination he was asked to characterize it as whether it was
2  unusual or odd.
3        MS. LOEFFLER:  That was his own impression.  He can't
4  possibly speculate as to what was in Mr. Wells' mind.
5        THE COURT:  I agree with that.  So you can ask his
6  impressions, but --
7        MR. OFFENBECHER:  Right, I just -- yeah, I -- ask his
8  impressions.  I'm just cross-examining on his impressions.
9        THE COURT:  I understand.
10       MR. OFFENBECHER:  He's indicating it was inappropriate.
11 BY MR. OFFENBECHER:
12 Q   Let me ask you again.  He said, "Oh, my good -- oh, my
13 God, oh, good gracious," something like that.  Is that right?
14 A   Yes.
15 Q   And he said -- after that he said, "I had a flat tire."
16 Is that right?
17 A   That's correct.
18 Q   Is it possible that he meant, "I would have been
19 killed" --
20       MS. LOEFFLER:  Your Honor --
21       MR. OFFENBECHER:  -- "if I hadn't had" --
22       MS. LOEFFLER:  -- object again.
23       MR. OFFENBECHER:  -- "the flat tire."
24       MS. LOEFFLER:  It's just speculation.  He's asking him
25 what was in Mr. Wells' mind again.

1    THE COURT:  Do you know the answer to those kind of

2  questions, what was in the defendant's mind?

3    THE WITNESS:  No, sir.

4    THE COURT:  Okay.  I -- sustained.

5  BY MR. OFFENBECHER:

6  Q   So you don't really know what he meant when he said that,

7  about "My goodness gracious, oh, my God."  Is that right?

8  A   I assume he meant he had a flat tire.  I mean, that --

9  I -- I'm not sure what you're asking me.

10 Q   Well, I -- well, I'm asking -- you -- you've now indicated

11 that you assumed he had a flat tire.  Do you think possibly he

12 was indicating that he didn't get killed because he had a --

13    MS. LOEFFLER:  Objection.  It --

14    MR. OFFENBECHER:  -- flat tire?

15    THE COURT:  Sustained.

16    MR. OFFENBECHER:  I don't have any other questions,

17 Your Honor.

18    THE COURT:  Redirect.

19    MS. LOEFFLER:  Sure, Your Honor.

20    THE COURT:  Okay.

21    MS. LOEFFLER:  I know it's 4:30.

22              **REDIRECT EXAMINATION**

23 BY MS. LOEFFLER:

24 Q   When we talked about security in T2 versus T1, you

25 mentioned that T1 had classified material and that was the

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 306 of 329

1  watch and all.  Right?

2  A    Correct.

3  Q    Was there anything in T2 that was of anything -- that type

4  of significance or level?

5  A    There was no classified material in T2.

6  Q    And you said it's a repair shop, right?  It's got tools.

7  A    Correct.

8  Q    Okay.  So when Mr. Offenbecher asked you -- the door was

9  open during the day, right?  So if somebody wanted to steal

10 something, did they need a gun?

11 A    No.

12 Q    Okay.  Let me just ask you briefly about this -- the gun

13 thing.  You're not supposed to have a gun on Coast Guard

14 property.  Right?

15 A    Correct.

16 Q    But there are lots of exceptions to that, aren't there?

17 A    There are.

18 Q    Okay.  Like, I assume you lived on the base.  Did you have

19 weapons in your house?

20 A    I don't -- I don't own a weapon, no.

21 Q    Okay.  Do others?

22 A    But -- but -- yes.  And that's permitted.

23 Q    Okay.  And I -- I'm just going to ask you whether on --

24 was there a -- was it a violation of the policy if people had a

25 gun in their car, locked up in their car on -- in T2, outside

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 307 of 329

1 | the perimeter of the fence?

2 | A    No.

3 | Q    Okay.  And we have heard some testimony that people would

4 | come in, show off their new gun that they had bought, and put

5 | it back in the car.  Was that something that you had a problem

6 | with, or anybody ever rise to your -- come to your attention?

7 | A    I was not aware of that.

8 | Q    Okay.

9 | A    And that would not be appropriate.

10 | Q    All right.  But in the car, you didn't have a problem

11 | with, if they were locked up in the car in the parking lot?

12 | A    The -- the -- I -- I'll be honest, I -- I don't remember

13 | the exact policy.  My concern or my understanding or my

14 | enforcement of the policy would have been the -- the fenced

15 | area of T1.  But there again, that was not something -- we did

16 | not go out and do inspections of vehicles.

17 | Q    Okay.

18 | A    The base policy was unloaded.

19 | Q    Okay.

20 | A    And it could be transported.  We had told people not to

21 | bring their weapons to work.

22 | Q    Okay.  I don't have anything further.

23 |         THE COURT:  Redirect -- recross.

24 |                 **RECROSS EXAMINATION**

25 | BY MR. OFFENBECHER:

Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 308 of 329

VAN NESS - RECROSS

1  Q   (Indiscernible) with issues that counsel has raised.

2  Would you have considered it to be a violation of Coast Guard

3  policy and your orders if a gun were, for example, brought

4  in -- bought and sold in T1?

5  A   Absolutely.  That would be in appropriate.

6  Q   And were you aware that some of the petty officers and

7  others --

8       MS. LOEFFLER:  Your Honor, if I may, I think counsel

9  meant to say T2.  Because the question that he asked was buying

10 and selling in T1.

11      MR. OFFENBECHER:  I did mean T2.  Thanks.

12 BY MR. OFFENBECHER:

13 Q   T2.  That'd be a violation of the orders too, wouldn't it?

14 A   It would still be, yes --

15 Q   Still be a violation --

16 A   -- it would still not be appropriate.

17 Q   Okay.  And were you aware that the -- some of the -- both

18 the Coast Guard staff and also the civilians were purchasing

19 and buying and selling firearms inside T2?

20 A   I was not.

21      MS. LOEFFLER:  Again, I object, Your Honor.  I don't

22 think that was what the testimony was.

23      THE COURT:  Well, either way, he's not aware that that

24 was going on, if it was.  Right?

25 BY MR. OFFENBECHER:

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 309 of 329
(720) 384-8078  attrans@sbcglobal.net

VAN NESS - RECROSS

1   Q   You weren't aware of that, were you?

2   A   I was not.

3   Q   If it happened, it would be a violation of your orders,

4   wouldn't it?

5   A   Yes.

6   Q   And it could result in a reprimand, letter of caution, or

7   some other discipline.  Right?

8   A   It could.

9   Q   No other questions.

10          THE COURT:  Anything else?

11          MS. LOEFFLER:  No, I'll leave it, Your Honor.

12          THE COURT:  All right.

13          MS. LOEFFLER:  Nothing.

14          THE COURT:  Thank you, sir.  You're excused.  We're

15   about done for the day, unless you had a wit --

16      (Witness excused)

17          MS. LOEFFLER:  Yes, Your Honor, but you might remember,

18   we have video testimony tomorrow.

19          THE COURT:  Okay.

20          MS. LOEFFLER:  And it starts at 9 a.m., because it's

21   the video, live testimony.

22          THE COURT:  Okay.

23          MS. LOEFFLER:  So I think you might want to -- do you

24   want the jury to -- what do you want us to do, and you might

25   want to let --

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 741  Filed 09/23/14  Page 310 of 329

          THE COURT:  Well, do you have something between 8:30

and 9?

          MS. LOEFFLER:  We'd be starting something that is

nowhere near going to finish.  I can do it if you want to,

but --

          THE COURT:  Well, I -- let me think about that.

          MS. LOEFFLER:  I can tell you who the witness and I

think they --

          THE COURT:  They -- everybody knows --

          MS. LOEFFLER:  -- know who it is.

          THE COURT:  -- who the witness is, yeah.

          MS. LOEFFLER:  Dr. Meloy is our next witness.

          THE COURT:  Yeah.  Then he's going to be here at 9

o'clock, right, by video?  Point --

          MS. LOEFFLER:  No.  Senior Chief Reed is --

          THE COURT:  Reed is going to be --

          MS. LOEFFLER:  -- video --

          THE COURT:  -- here by video starting at 9 o'clock.

          MS. LOEFFLER:  Right.

          THE COURT:  You don't have one that can go from 8:30 to

9 without interrupting.  How long is Reed going to be, roughly?

          MS. DUIGNAN:  Mr. Schroder?

          MR. SCHRODER:  Twenty minutes to a half-hour on direct,

Your Honor.  May -- probably shorter, probably 15 to 20

minutes.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 741  Filed 09/23/14  Page 311 of 329

1    THE COURT:  So we're talking about less than an hour?

2    MR. SCHRODER:  I don't know what the cross is going to

3    be, Your Honor.  The cross of the other people in the chain of

4    command at this point has been --

5    THE COURT:  I don't see what's wrong with getting

6    started at 8:30 with --

7    MS. LOEFFLER:  Okay.

8    THE COURT:  -- and then we'll take a break and --

9    MR. SCHRODER:  Oh, I was talking about Reed.  Reed --

10   MS. LOEFFLER:  No, no, eight --

11   MR. SCHRODER:  Reed, we can't start till 9.

12   THE COURT:  Are we communicating?

13   MR. SCHRODER:  I don't think we --

14   MS. LOEFFLER:  Okay, we're (indiscernible).

15   MR. SCHRODER:  I don't think we are, Your Honor.  I

16   apologize.

17   MS. LOEFFLER:  If I can --

18   THE COURT:  Start over again.

19   MS. LOEFFLER:  -- Senior Chief Reed has to drive to

20   Little Rock, Arkansas, just --

21   THE COURT:  All right.  And Reed is going to start 9

22   o'clock.

23   MR. SCHRODER:  Right.

24   MS. LOEFFLER:  Do you want us to start before that at

25   8:30 with someone else?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 741  Filed 09/23/14  Page 312 of 329

1           THE COURT:  And you say you have someone who can start,

2   and that Reed will only be an hour or less?

3           MR. SCHRODER:  I think that's correct.

4           THE COURT:  So it won't be -- really inconvenience the

5   8:30 person to get started, then take a long coffee break and

6   come back --

7           MR. OFFENBECHER:  Your Honor --

8           MS. LOEFFLER:  I'll do that.

9           MR. OFFENBECHER:  -- we --

10          MS. LOEFFLER:  Of course.

11          MR. OFFENBECHER:  And we might have a matter to rai --

12  to discuss at 8:30 that would be productive for the use of that

13  time as well.

14          THE COURT:  Okay, all right.  You talked me into it.

15  So we start at 9 tomorrow.  We'll start at 9, we'll start at

16  8:30.

17          MS. LOEFFLER:  Okay.

18          THE COURT:  Okay.  So we'll stand in recess.  You get

19  to go back there.  But I have -- I might bring you back for one

20  more -- have a couple questions to ask.  So we'll stand in

21  recess until tomorrow, unless I call you back in.

22          MR. OFFENBECHER:  Your Honor, could we approach at

23  sidebar, though?

24          MS. LOEFFLER:  Well --

25          MR. OFFENBECHER:  I was thinking now, but

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 313 of 329
(720) 384-8078  attrans@sbcglobal.net

1    (indiscernible) tomorrow be a --

2             THE COURT:  Oh, I thought you said tomorrow.

3             MR. OFFENBECHER:  We can do it tomorrow.

4             THE COURT:  No, I'm -- I'm going to talk to you right

5    now.  I'm going to -- the jury's going to take a -- is going to

6    the little room.  They probably are done for the day, but if

7    necessary, we'll call them back.  And I'll find out what

8    everybody wants to talk about.  Okay?  You can bring them in

9    here.  This is my law clerk, helping bring the jurors back and

10   forth.

11       (Jury not present)

12            THE COURT:  Okay.  What was your subject?

13            MR. OFFENBECHER:  My subject, Your Honor -- there's a

14   question before the Court regarding counsel's questioning of

15   the last witness about what Nicola -- Nicola, excuse me --

16            THE COURT:  Okay.  That's my issue.  Good.  That's what

17   I want to talk about.  That's why I said I wanted the jury to

18   stay here for a minute till it gets resolved.

19            It sounds to me like the statement is an excited

20   utterance in response to a startling event, but I'm still not

21   sure if -- so you have exception to the hearsay rule if it's

22   appropriate.  Because Ms. Belisle had no personal knowledge as

23   to who killed her husband.  She was simply explaining --

24   reacting emotionally to receiving this knowledge.  Is it

25   admissible or not?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 314 of 329

1          MS. LOEFFLER:  Yes, Your Honor, under two grounds.

2     There are two reasons.

3          THE COURT:  Okay, tell me.

4          MS. LOEFFLER:  Okay.  The first reason is in response

5     to the exac -- I started doing what's good for the goose is

6     good for the gander.  But Mr. --

7          THE COURT:  Well, that's not -- that's -- I want to

8     know what, legally --

9          MS. LOEFFLER:  That was, it is not for the truth of the

10    matter.  She doesn't have any personal knowledge of the murder.

11         THE COURT:  That's clear as a bell.

12         MS. LOEFFLER:  Absolutely.  But defense counsel stood

13    up and argued that he could ask the -- Ms. Small, the military

14    police officer, about Reckner's statement and then he gave a

15    whole speech to the jury about how this was all here because of

16    Reckner and it was admissible, it wasn't for the truth of the

17    matter, it was to show that everything was caused by Reckner.

18    And I think I'm entitled to -- simply to two things.  One, to

19    respond to that and say, no, I mean, Reckner wasn't the only

20    thing.

21         The other thing is, the relationship between Wells and

22    Belisle at the time of the murder.  And the only thing I'm

23    putting it in for is saying that Belisle and Wells were not

24    these great buddies at the time of the murder.  Those are my

25    two reasons.  I don't have another one.  That's it.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 315 of 329

 1          THE COURT:  I -- I'm thinking of -- go ahead.

 2          MR. OFFENBECHER:  No. no.  I think you're --

 3          THE COURT:  No, I'll -- no, no, no.

 4          MR. OFFENBECHER:  -- probably thinking the right

 5   things, Your Honor.

 6          THE COURT:  No, I'm not.  I mean --

 7          MR. OFFENBECHER:  No, I think you are.

 8          THE COURT:  No, you don't know what I'm thinking.

 9          MR. OFFENBECHER:  Your Honor, first of all, the Court

10   accurately said, "What is the relevance of this?"  We're not --

11          THE COURT:  And she answered that.

12          MR. OFFENBECHER:  No, she didn't.  We're not taking a

13   vote on it.  Her -- the first reaction of this poor woman when

14   she finds out that her husband is killed, she blurts out

15   someone's name.  How can that be relevant to the jury's voting

16   on whether he's guilty or not guilty?  It's -- we have no idea

17   what the basis of that is, we have no idea where that comes

18   from.  It's the first thing out of her mouth.  It's -- the fact

19   that it's an excited utterance, it -- it's -- what's it offered

20   for the -- what's it offered for, to show what?  I mean --

21          THE COURT:  Answer that question.  It's offered to

22   show --

23          MS. LOEFFLER:  Was offered to show --

24          MR. OFFENBECHER:  What?

25          MS. LOEFFLER:  -- the two things.  One, that Chief

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 316 of 329

1  Reckner was not some guy running off everything and saying,

2  "Oh, I'm after Wells" and nobody else above him.

3           THE COURT:  Okay.

4           MS. LOEFFLER:  And the second reason it was offered is

5  to show that the relationship between Jim Wells and Rich

6  Belisle at the time of the murder was not buddy-buddy friends.

7  And that was a question that we asked --

8           THE COURT:  Okay.  And the third reason is -- behind

9  your shoulder there.

10          MR. OFFENBECHER:  I was just -- oh, I don't want to

11 get -- the -- they made that -- that was in the opening

12 statement, Your Honor --

13          THE COURT:  I know that.

14          MR. OFFENBECHER:  -- that they --

15          MS. LOEFFLER:  Right.

16          MR. OFFENBECHER:  -- were going to blame Reckner.

17          MS. LOEFFLER:  Right.

18          MR. OFFENBECHER:  And he's not the only one who had the

19 same initial --

20          MS. LOEFFLER:  He's not the only one --

21          MR. OFFENBECHER:  -- reaction.

22          MS. LOEFFLER:  -- who had the exact same reaction.  And

23 that's all we're trying to do.  And I'm happy to have you

24 instruct them it is not for the truth --

25          THE COURT:  Here's what I'm thinking of --

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 317 of 329
(720) 384-8078  attrans@sbcglobal.net

1        MS. LOEFFLER:  -- it --

2        THE COURT:  -- instructing.

3        MR. OFFENBECHER:  Here --

4        THE COURT:  Go ahead.  I know you're going to say --

5        MR. OFFENBECHER:  Here -- well, here -- I haven't

6 addressed the second one.  Here's the reason that what Mr.

7 Reckner said about Jim Wells is relevant, and it has nothing to

8 do with what Ms. Belisle says.  Mr. Reckner said it to the

9 police officers who were there, who then began an

10 investigation, and the investigation focused on Mr. Wells.

11 That's why it's relevant, for its effect on the investigators

12 and generating this investigation.

13        On the other hand, what Ms. Belisle said has no

14 relevance at all to how the investigation went forward.  And

15 the --

16        MS. LOEFFLER:  Let me mention there was a police

17 officer --

18        MR. OFFENBECHER:  I am not --

19        MS. LOEFFLER:  -- there too.

20        MR. OFFENBECHER:  -- finished, counsel.

21        THE COURT:  Okay, wait, wait.  I know all of what

22 you're going to say.

23        MS. LOEFFLER:  Okay.

24        THE COURT:  Then I'll -- and I know what he's going to

25 say.  But go ahead, let him finish.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 318 of 329
(720) 384-8078  attrans@sbcglobal.net

1      MS. LOEFFLER:  Okay.

2      MR. OFFENBECHER:  I just want the common courtesy of

3  letting me --

4      THE COURT:  Okay.

5      MR. OFFENBECHER:  -- finish.

6      THE COURT:  Give him the common -- okay.  Hurry up.  We

7  got a jury waiting, and I want to instruct them something

8  before they go home, because I don't want them to go home

9  sleeping on something that a -- it's -- if I advise --

10     MR. OFFENBECHER:  Well --

11     THE COURT:  -- them tonight, it's much better than if I

12 advise them tomorrow.  That's what I'm thinking.

13     MR. OFFENBECHER:  I totally agree with you.  I -- and,

14 Your Honor, I -- regardless of the Court's ruling, I'm moving

15 for a mistrial based on this.  There's no legitimate reason to

16 ask -- it's like everybody voting on who -- you know, who

17 killed these poor guys.  When -- the first thing out of your

18 mouth, "Jim Wells," that's the first thing I think of.  We

19 could go around and get everybody's reaction.

20     The reason Mr. Reckner's reaction is important is

21 because it started the investigation.  The investigation was

22 focused after that.  That has nothing -- that's the rationale

23 of that.  This rationale has no -- has nothing to do with that.

24     The second thing, Your Honor, is that Ms. Belisle's

25 reaction, even if it's based on, you know, she thinks that

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 319 of 329

1  there's a conflict between Jim Wells and Rich Belisle, again is

2  based not on her personal knowledge but what Jim -- but what

3  Rich Belisle told her about her conflict, if any -- about Jim

4  Wells' conflict with Rich Belisle.  So what she's saying is

5  "Rich Belisle came home, told me a bunch of stuff about what

6  happened at work, and that's why I'm saying Jim Wells as the

7  first thing out of the box."  It's not based on her personal

8  knowledge.  It's based on hearsay.  That is what Rich Belisle

9  told her.

10         The logical inference is so attenuated that it

11  couldn't -- it has absolutely no possible relevance.  The fact

12  that it's an excited utterance doesn't make it relevant.  And

13  in this case it's incredibly prejudicial under 403, and that's

14  why you should strike it and you should direct the jury not to

15  consider it.  And, frankly, Your Honor, you should grant a

16  mistrial, because there's no legitimate reason for it.

17         THE COURT:  Okay.  Your response?

18         MS. LOEFFLER:  By the way, there was -- Trooper Dupras

19  was present.  So were --

20         THE COURT:  I know.  There were six people, including

21  the base commander.

22         MS. LOEFFLER:  Right.

23         THE COURT:  Is it base or post?  I can't rem --

24         MS. LOEFFLER:  It was the --

25         THE COURT:  Coast Guard --

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 320 of 329
(720) 384-8078   attrans@sbcglobal.net

1    MS. LOEFFLER:  The base commander.  But there was also

2  a police officer there.  Mr. Offenbecher said -- Reckner's

3  was -- because there was an officer there.

4    THE COURT:  There was five or six people there --

5    MS. LOEFFLER:  There was an officer there too.

6    THE COURT:  -- including --

7    MS. LOEFFLER:  And --

8    THE COURT:  -- the chaplain.

9    MS. LOEFFLER:  And this didn't start the investigation.

10  And if he wants to make that speech at closing that it did, I'm

11  entitled to show it didn't.

12    MR. OFFENBECHER:  Finally, Your Honor, excited

13  utterance has to be based on one's observations.  It can't be

14  based on something else that you -- somebody told you two years

15  ago or a week ago about Jim Wells or a month ago about Jim

16  Wells or even the night before.  An excited utterance has to be

17  based on --

18    THE COURT:  Excited utterance is a statement relating

19  to a startling event or condition made while the declarant was

20  under the stress of the excitement that it caused.  She just

21  was told that her husband had been murdered.

22    MR. OFFENBECHER:  Right.  But Jim -- but -- no, but it

23  has to be based on your observation of something.  It can't

24  be -- you can't, you know, walk in and say, well, you know,

25  somebody's been murdered and I'm guessing that it's so-and-so.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 321 of 329

That has nothing to do with the observation of him being
murdered.  It has to be a -- you know, it has to be as a result
of the actual observation --

THE COURT:  Okay.

MR. OFFENBECHER:  -- of something.  It can't be just
based on her fund of knowledge from the last year of her
conflicts with Jim Wells.

THE COURT:  Okay.  Government's response?

MS. LOEFFLER:  Your Honor, I think -- well, the
relationship between Wells and Belisle at the time is
important.  And I know they've objected when Nicola Belisle
tried to explain it.  I think it goes to that and I also think
that if the defense want to say, oh, Reckner said something
about it being Wells, and therefore he started the whole
investigation, we're entitled to show, one, that isn't true,
and two, it was not -- you know, it's not a true statement.
And so I don't think they can say, "I'm going to make that
argument to the closing, but I'm going to ban the government,
them putting on evidence that that's not true."

MR. OFFENBECHER:  Well, how does having, you know, Ms.
Belisle's statement that it was Jim Wells prove it isn't true?
All it does is more -- you know, if anything, it's additional
evidence on that.  But it doesn't disprove what they're
suggesting it disproves.

THE COURT:  Okay.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 322 of 329

1    MR. OFFENBECHER:  It's -- the fact that it's an excited

2  utterance doesn't mean that every excited utterance is

3  relevant.  It's not.

4    THE COURT:  I understand.  I started our discussion off

5  by saying this --

6    MR. OFFENBECHER:  Yeah.  It --

7    THE COURT:  -- (indiscernible), but I don't know that

8  it's relevant.  That's why I began our discussion.

9    MR. OFFENBECHER:  And it's incredibly prejudicial.

10  Couldn't possibly be more prejudicial than the widow of one of

11  the decedents right out of the box saying, "Jim Wells is

12  guilty."  It's the most prejudicial thing in 34 years I think

13  I've ever heard in court.

14    THE COURT:  I'll bet you you've heard more prejudicial.

15  Come on.

16    MR. OFFENBECHER:  Only in this case.

17    THE COURT:  Okay.

18    MR. OFFENBECHER:  It couldn't possibly be more

19  prejudicial, Your Honor.  It's the worst possible thing than

20  the poor widow of this guy saying, "I think it's Jim Wells who

21  killed my husband."

22    MS. LOEFFLER:  She didn't say that.

23    MR. OFFENBECHER:  It's like -- it's the worst possible

24  thing you could think of.

25    MS. LOEFFLER:  Didn't ask her that.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 741  Filed 09/23/14  Page 323 of 329

1        THE COURT:  Okay.  Government?

2        MS. LOEFFLER:  By the way, she didn't say that.  You

3   know --

4        THE COURT:  No, I know.  She said two words.

5        MS. LOEFFLER:  That's why -- I mean, she said more than

6   that, but I limited it to those two words.  And I -- you know,

7   I did it to confront exactly, you know, misleading statements

8   by the defense that aren't true.  If they can introduce

9   Reckner's on the theory that it shows that only Scott Reckner

10  was doing this, and that also goes to this relationship they're

11  trying to say that Wells and Belisle were not getting along at

12  the -- you know, at the time of the murder.  I don't want

13  anybody to think that she had personal knowledge and I'm happy

14  with any instruction you give to say that.

15       MR. OFFENBECHER:  If she didn't have personal

16  knowledge, then it's absolutely not relevant, has no probative

17  value, and any probative value --

18       MS. LOEFFLER:  Reckner didn't have personal knowledge

19  either.

20       THE COURT:  Okay.  Don't interrupt him.  He's going to

21  get mad.

22       MS. LOEFFLER:  Okay.  I'm sorry.  We're going to keep

23  going for hours.

24       MR. OFFENBECHER:  Tell me when you're done.

25       THE COURT:  Okay.  Could we bring the jury back in?

1       (Jury present)

2       THE COURT:  You're back already?  Okay, this will be

3   real brief, okay.  But I need -- please be seated.  I need a

4   cautionary -- I'm concerned about a comment that was made

5   during the last witness when a question was asked -- or when

6   the commander and those with him conveyed to Mrs. Belisle that

7   her husband had been killed, and her response was -- you

8   remember what her response was.  She said a name.

9       I have to make it clear to you that she had no personal

10  knowledge of that.  And so that statement cannot be used by you

11  as evidence of that event.  It could be limited, very, very

12  limited.  It explains possibly, and maybe not, her

13  relationship -- her impr -- her personal impression of the

14  relationship between her husband and Mr. Wells and the

15  information she conveyed at the time to the commander and those

16  there.  But it is not evidence of -- against Mr. Wells as to

17  who committed this crime, because she didn't know.  She simply

18  did not know.  It's an emotional reaction.  That was it.  And

19  to give it more weight than that would be highly inappropriate.

20  Tells you her reaction, and possibly limited to other ways.

21  But it is not, cannot, should not be used in any way to suggest

22  that the defendant committed the crimes he's charged with,

23  because she didn't know.

24      Can I be any clearer than that?  I'm even using hand

25  expressions, aren't I?  Is that thorough enough for the

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 325 of 329

1 | government's perspective?

2 |      MS. LOEFFLER:  That's fine, Your Honor.

3 |      THE COURT:  Anything else I can say beyond what -- I'm

4 | trying to make it as clear as a bell.  This is very, very

5 | limited.  It's what we call an excited utterance.  It's an

6 | emotional response.  But it has no evidentiary basis as to the

7 | issue you have before you as to who committed these crimes.

8 | Very, very limited as to her emotional response at the moment

9 | and the impression possibly that she had with regard to her

10 | husband's relationship with the defendant.  And of course

11 | whatever impressions might have been created in the minds of

12 | those standing before her at the moment.

13 |      Okay.  9 o'clock tomorrow.  If you can be there five to

14 | 9, so we can -- we have a 9 o'clock video deposition tomorrow.

15 | Remember, don't -- well, the whole thing.  Don't talk about the

16 | case, don't read anything about it, let anybody talk to you

17 | about it.  Keep an open mind until this matter is concluded.

18 | Okay, thank you all very much.

19 |    (Jury not present)

20 |      THE COURT:  Okay, the jury's left the room.  If their

21 | body language is any indication, they understood what I was

22 | talking about -- I mean, that was a pretty good -- had a pretty

23 | good dialogue, and they seemed to clearly understand that this

24 | was not evidence as to who committed the crime.

25 |      Okay, 8:30 tomorrow.  We'll start with any other issues

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 326 of 329

1 that the parties might have.  I did a text order that requires

2 some briefing from the defendant as soon as possible.  Anything

3 else that we can do this evening?

4        MR. OFFENBECHER:  Your Honor, I wasn't clear.  I just

5 briefly looked at the text order.  Is the text order -- can we

6 make that offer of proof tomorrow morning at 8:30?

7        THE COURT:  Yes.  Yes.

8        MR. OFFENBECHER:  That's what I was thinking.

9        THE COURT:  Yeah.  Yes.  Yeah.

10        MR. OFFENBECHER:  Just make it in court.

11        THE COURT:  Well, that's fine.  If you make it in

12 court, that'd make it a little easier, but then I won't have --

13 I'll have to, as usual, respond immediately to your response

14 instead of have time to think about it.

15        MR. OFFENBECHER:  Right.  I'm just not sure I can --

16        THE COURT:  I understand.

17        MR. OFFENBECHER:  -- write one tonight.

18        THE COURT:  Listen, I used to be an attorney.  We used

19 to work all night.  But that was the old days.  We'll stand in

20 recess till --

21        MR. OFFENBECHER:  Thank you, Your Honor.

22        THE COURT:  -- 8:30 tomorrow morning.

23        THE CLERK:  All rise.  This matter stands in recess, to

24 reconvene tomorrow at 8:30 a.m.

25        (Proceedings concluded at 4:57 p.m.)

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 327 of 329
(720) 384-8078  attrans@sbcglobal.net

1    CERTIFICATE

2    I certify that the foregoing is a correct transcript from the
     electronic sound recording of the proceedings in the above-
3    entitled matter.

4
     ___s/Teresa K. Combs___          _____8/24/14_____
5    Teresa K. Combs, Transcriber        Date

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 741  Filed 09/23/14  Page 328 of 329
(720) 384-8078  attrans@sbcglobal.net

**INDEX**

| | DIRECT | CROSS | REDIRECT | RECROSS | FURTHER REDIRECT |
|---|---|---|---|---|---|
| PLAINTIFF'S WITNESSES | | | | | |
| Scott Allen Reckner | | 978 | 1008 | 1012 | |
| Nathaniel Pacheco | 1013 | 1022 | 1047 | | |
| Leah Henry | 1049 | 1061 | 1083 | 1086 | |
| Para Upchurch | 1088 | 1110 | 1143 | | |
| David Charles Pizzurro | 1152 | 1191 | 1237 | | |
| Peter Van Ness | 1245 | 1270 | 1280 | 1283 | |

| PLAINTIFF'S EXHIBITS | | ADMITTED |
|---|---|---|
| 8 | Fuel card investigation report | 1203 |
| 147 | Video, T2 camera 4/7/12, 14:46:41 to 14:51:50 - Nate Pacheco airing tires | 1019 |

| DEFENDANT'S EXHIBITS | | ADMITTED |
|---|---|---|
| DE-080 | Performance evaluation for Mr. Wells, 2006 | 1231 |
| DE-081 | Performance evaluation for Mr. Wells, 2007 | 1231 |
| DE-082 | Performance evaluation for Mr. Wells, 2008 | 1227 |
| DE-083 | Performance evaluation for Mr. Wells, 2009 | 1220 |
| DE-084 | Performance evaluation for Mr. Wells, 2010 | 1212 |

Case 3:13-cr-00008-SLG   Document 741   Filed 09/23/14   Page 329 of 329
A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net