1    UNITED STATES DISTRICT COURT

2    FOR THE DISTRICT OF ALASKA

3    UNITED STATES OF AMERICA,        )    Case 3:13-cr-00008-RRB
                                      )
4            Plaintiff,               )    Anchorage, Alaska
                                      )    Tuesday, April 8, 2014
5        vs.                          )    8:38 o'clock a.m.
                                      )
6    JAMES MICHAEL WELLS,             )
                                      )
7            Defendant.               )
     _____ )    **TRIAL BY JURY – DAY 6**

8
                   **TRANSCRIPT OF PROCEEDINGS**
9
            BEFORE THE HONORABLE RALPH R. BEISTLINE
10                 UNITED STATES DISTRICT JUDGE

11   APPEARANCES:

12   For the Plaintiff:        KAREN L. LOEFFLER
                               U.S. Attorney
13                             BRYAN SCHRODER
                               KATHLEEN ANN DUIGNAN
14                             Assistant U.S. Attorneys
                               Office of the U.S. Attorney
15                             222 West 7th Avenue, #9, Room 253
                               Anchorage, Alaska  99513-7567
16                             (907) 271-5071

17   For the Defendant:        F. RICHARD CURTNER
                               Federal Defender
18                             Office of the Federal Public Defender
                               601 West 5th Avenue, Suite 800
19                             Anchorage, Alaska  99501
                               (907) 646-3400
20
                               PETER OFFENBECHER
21                             Skellenger Bender, P.S.
                               1301 5th Avenue, Suite 3401
22                             Seattle, Washington  98101-2605
                               (206) 623-6501
23

24

25

Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 1 of 265

1   APPEARANCES (Continued):

2   Court Recorder:              NANCY LEALAISALANOA
                                 U.S. District Court
3                                222 West 7th Avenue, #4, Room 229
                                 Anchorage, Alaska  99513-7564
4                                (907) 677-6111

5   Transcription Service:       A & T Transcripts
                                 6299 West 111th Avenue
6                                Westminster, Colorado  80020
                                 (720) 384-8078

7

8   Proceedings recorded by electronic sound recording; transcript
    produced by transcription service.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 2 of 265
(720) 384-8078   attrans@sbcglobal.net

1     **ANCHORAGE, ALASKA - TUESDAY, APRIL 8, 2014**

2

3     (Call to Order of the Court at 8:38 a.m.)

4     (Defendant present; jury not present)

5         THE CLERK:  His Honor the Court, the United States

6  District Court for the District of Alaska is now in session,

7  with the Honorable Ralph R. Beistline presiding.  Please be

8  seated.

9         THE COURT:  All right, good morning.  We're back on the

10 record, United States of America versus Wells, case 13 -- 3-13-

11 8.  So what's on the agenda from counsel's side before I start?

12 From the government?  Anything from the government?

13        MS. LOEFFLER:  This is a defense -- I think the defense

14 has an issue.

15        THE COURT:  What's your issue?

16        MR. OFFENBECHER:  Well, Your Honor, I think Mr. Curtner

17 filed a pleading yesterday, a copy of the transcript.  We'd

18 like to recall Mr. Van Ness to try to refresh his memory now

19 that we have a transcript of his contact with Nicola Belisle.

20 Remember, we had the incident where she -- he said, "Your

21 husband has died," and according to Mr. Van Ness, the first

22 words -- the only two words --

23        THE COURT:  Okay.

24        MR. OFFENBECHER:  Yeah.  So the transcript clarifies

25 what she really said.  We want to refresh --

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1    THE COURT:  Do you have that here?

2    MR. OFFENBECHER:  I do.

3    MS. LOEFFLER:  Your Honor, I actually have the CD,

4  because there's stuff on the CD that is not on the transcript.

5  We just had this discussion.  But we also brought in the CD,

6  because it's not -- I think the witness will tell you -- well,

7  actually, no, I know some of the stuff isn't on the transcript.

8    MR. OFFENBECHER:  Goes on to the next page, Your Honor.

9    THE COURT:  Well, I'm just looking for the initial

10  contact.

11    MR. SCHRODER:  The initial contact's at the beginning,

12  Your Honor.  That's about 10 or 11 minutes in.

13    THE COURT:  Okay.  Well --

14    MR. OFFENBECHER:  This is the first mention of Mr.

15  Wells.

16    MR. SCHRODER:  That's not true, Your Honor.

17    MS. LOEFFLER:  That's not true.

18    THE COURT:  Well --

19    MS. LOEFFLER:  That is not true.

20    THE COURT:  -- how am I supposed to resolve this?

21    MS. LOEFFLER:  Well, I have the tape.  If they're

22  telling --

23    THE COURT:  Okay.

24    MS. LOEFFLER:  -- you it's -- you -- we can hear it on

25  the tape, and I've got the actual -- I know what minute.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 4 of 265
(720) 384-8078  attrans@sbcglobal.net

1    THE COURT:  Okay.  Well, play it, then.

2    MS. LOEFFLER:  We don't want to play it in front of the

3  jury.  It's --

4    THE COURT:  Well, the jury's not here.  You want to --

5  what -- how do you want to -- what do you propose?

6    MS. LOEFFLER:  Well, I guess what I want to do is

7  simply respond to what they want.  I just don't want them to

8  say it's not on the tape, because I have it.  It is on the

9  tape.  And I didn't say it was the first thing she said.  I

10  only asked if there was a name, because I didn't want to go

11  beyond that.  So -- but -- you know --

12    (Side conversation)

13    MS. LOEFFLER:  Yeah, he doesn't remember that -- this

14  part that they're going to ask about.  Now, if they want to put

15  him on the stand and he says, "I don't remember that," I mean,

16  I'm not going to in any way object to that.  But --

17    THE COURT:  Okay.  So Mr. -- let's start all over

18  again.

19    MS. LOEFFLER:  Yeah.

20    THE COURT:  Mr. Offenbecher, your request, what is it?

21    MR. OFFENBECHER:  My request is to recall Mr. Van Ness

22  and see if I can refresh his recollection about what Ms.

23  Belisle actually said.

24    THE COURT:  For what purpose?

25    MR. OFFENBECHER:  To clarify what was said.  The

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1   impression was given yesterday that she simply said that --

2         THE COURT:  It was a --

3         MR. OFFENBECHER:  -- Mr. Van Ness came in and said,

4   "Your husband has died," and the -- oh, the first two words out

5   of her mouth were "Jim Wells."  And indeed, what this says

6   is -- she ends this passage by saying, "Jim wouldn't hurt Rich.

7   Jim wouldn't hurt Rich."  So just -- it puts it in context.

8   The context it was left at is that Ms. Belisle was accusing Mr.

9   Wells of the homicide.

10         THE COURT:  Okay.  Well, what's wrong with them doing

11   that?

12         MR. SCHRODER:  Your Honor, it's not -- the point is,

13   it's not in context.  If you -- I mean, one, Van Ness said he

14   heard a certain thing.  The things -- the language that he

15   heard is on the tape, it's not in the transcript.  So that's a

16   problem.

17         THE COURT:  Okay.

18         MR. SCHRODER:  The other thing is, it's -- this thing

19   was an emotional blender.  I mean, you should --

20         THE COURT:  I understand.

21         MR. SCHRODER:  -- it -- you know.  So having -- cutting

22   one thing out of there and saying that, you know, that was the

23   important thing, it's out of context.

24         MR. OFFENBECHER:  That's what they've done, Your Honor.

25   That's what they did yesterday.  That's why we had an

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1  objection.

2       MR. SCHRODER:  Well, we were very specific and very

3  limited in response to the defense opening the door.

4       MS. LOEFFLER:  I didn't --

5       MR. SCHRODER:  And we stopped.

6       MS. LOEFFLER:  I didn't ask him was it the first words.

7       MR. SCHRODER:  Yeah.

8       MS. LOEFFLER:  I asked, "Did she say a name?"  And

9  because I didn't want to -- I mean, I didn't -- there --

10 there's worse stuff --

11      THE COURT:  Okay, here's what --

12      MS. LOEFFLER:  -- on here, I know.

13      THE COURT:  -- I'm inclined to do.

14      MS. LOEFFLER:  Okay.

15      THE COURT:  Call the jury back in and say, "Ladies and

16 gentlemen, after further consideration, I'm telling you to

17 completely ignore that comment."

18      MS. LOEFFLER:  I mean, Your Honor, then I want them --

19 then I would also want them to strike the speech Mr.

20 Offenbecher gave about -- in front of the jury, which was all

21 about how when Reckner said something, it was because Reckner

22 started the whole investigation, and on and on and on.  It was

23 a whole speech.  And I want them ins --

24      THE COURT:  Are you talking about the opening

25 statement?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 742  Filed 09/23/14  Page 7 of 265

1        MS. LOEFFLER:  What?

2        THE COURT:  Are you talking about the opening

3   statement?

4        MS. LOEFFLER:  No, I'm not talking about the opening

5   statement.  I said when --

6        THE COURT:  I'm going to make it very clear to this

7   jury that comments of counsel are not evidence.  I've already

8   told them that once, but I'm going to drive it home here in a

9   few minutes.  Because I'm getting a lot of speaking objections

10  and I'm getting a lot of questions on cross-examination that

11  suggest an answer that the witness doesn't know the answer to.

12  And I'm very concerned about that, and I'm going to tell the

13  jury, clear that up, that it's -- I've already told the -- of

14  course, they probably can't remember -- in my initial

15  instructions that questions of attorneys are not evidence.  I'm

16  going to drive it home in a few minutes.

17       MS. LOEFFLER:  Your Honor, I mean, if they want to put

18  him on and ask if this refreshes his memory, fine.  I'm okay

19  with that.

20       THE COURT:  Okay.  Is he here?

21       MS. LOEFFLER:  He's standing right outside the door.

22       THE COURT:  Well, I don't see why -- here's my

23  situation.  I don't see why, if you can get him to say that

24  statement, why they can't get further statements in later in

25  the discussion.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 8 of 265

1          MS. LOEFFLER:  Well, and that's what I just said.  If

2     they go -- ask him on the stand and they can -- I just withdrew

3     an objection to that and said --

4          THE COURT:  Okay.

5          MS. LOEFFLER:  -- if they put him on and see if it

6     refreshes his recollection, go ahead.  That's what I --

7          THE COURT:  I'm just trying to be fair to both sides.

8          MS. LOEFFLER:  Yeah.

9          THE COURT:  That's all I'm trying to do.  I can

10     understand, and I ruled yesterday before I got all this new

11     information, and things keep changing here quicker than I can

12     keep up with everybody, that this appeared to me to be an

13     excited utterance, that it appeared to be -- have limited

14     probative value, and I think I said because it responds to the

15     argument that Chief Reckner was the one that began the

16     investigation along these lines, and it also demonstrates her

17     impression with regard to relationship.

18          But if there's more to it -- you know, I ruled based on

19     what I knew.  That's all I can do is rule based on what I know.

20     And it sounds like there must be more out there than what I

21     know.  And I'm trying to clean it up.  How can we clean it up?

22     Both parties know more what's on the tape and what's in the

23     transcript than I have.  I want it clean.  I'm going to tell

24     the jury again, questions of attorneys are not evidence.

25          Both of you are officers of the court, so give me some

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 9 of 265
(720) 384-8078  attrans@sbcglobal.net

1  guidance.

2       MR. OFFENBECHER:  Well, Your Honor, we're offering to

3  put the witness on the stand to refresh his memory about what

4  was actually said by the wit -- by Ms. Belisle.

5       MS. LOEFFLER:  Your Honor, as I said, if it refreshes

6  his memory, I just said okay.

7       THE COURT:  Okay.  All right.  That's just one of many

8  issues.  The other issue is the government's sealed motion,

9  which you want to respond to a sealed motion in open court, it

10  sounds like.

11      MR. OFFENBECHER:  I'm sorry, Your Honor?

12      THE COURT:  We ended the day yesterday by I -- telling

13  everybody that I filed a order and I wanted to have that

14  responded to.  You said, "Can I do it tomorrow morning?"

15      MR. OFFENBECHER:  Right.

16      THE COURT:  And I thought what -- and I said, well, I'd

17  prefer it in writing so I had some advance, but I -- then left.

18  And I got thinking afterwards, what good is file -- is

19  responding in open court to a sealed motion.  It eliminates the

20  purpose of the whole thing.

21      MR. OFFENBECHER:  And that's why we filed this morning

22  a sealed --

23      THE COURT:  Well, I didn't -- this morning, I -- I

24  didn't get it.

25      MR. OFFENBECHER:  Right.  Well, we were writing it all

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 742  Filed 09/23/14  Page 10 of 265
(720) 384-8078  attrans@sbcglobal.net

1　night and we filed it first thing this morning, Your Honor.

2　　　　THE COURT:  Okay.  I haven't read it yet.  So we all

3　have got plenty of things to do -- and I checked when I got

4　here this morning.  I must be getting here too early.  There

5　was nothing here when I got here at 7:30.

6　　　　MR. OFFENBECHER:  Well, I was up at 4, so --

7　　　　THE COURT:  Okay.

8　　　　MR. OFFENBECHER:  But we got it filed as soon as we

9　could this morning, Your Honor.

10　　　　THE COURT:  Okay.  Well --

11　　　　MR. OFFENBECHER:  Sorry you haven't seen it.

12　　　　THE COURT:  -- that's all right.  We're human beings.

13　Okay.  So what are we going to do?  We're going to wait till 9

14　o'clock and -- no.  Yeah, we -- we're stuck, because the jury's

15　coming at 9 to hear this video.  And apparently after the video

16　we're going to call the commander back.  Is that right?

17　　　　MR. OFFENBECHER:  That's fine, Your Honor.

18　　　　THE COURT:  Is that the plan?

19　　　　MS. LOEFFLER:  And I think that's what it is, yeah.

20　　　　THE COURT:  Is that -- I mean, I --

21　　　　MS. LOEFFLER:  And then our next witness after that'll

22　be Dr. Meloy.

23　　　　THE COURT:  So is everybody happy?

24　　　　MS. LOEFFLER:  Yes.  Somebody just handed me another --

25　apparently Angela Birchfield, who is Mr. Hopkins' stepdaughter,

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 742  Filed 09/23/14  Page 11 of 265
(720) 384-8078  attrans@sbcglobal.net

1    is arriving in Alaska tomorrow, and she wants to watch the

2    trial as a family member, so I am raising that --

3            THE COURT:  Okay, well, the --

4            MS. LOEFFLER:  -- as an exception to the exclusionary

5    rule.  She's a child.

6            THE COURT:  Well, we don't even know if she's going to

7    be a witness at this point.

8            MS. LOEFFLER:  Not for us.

9            THE COURT:  Well --

10           MR. OFFENBECHER:  She'll be a defense witness, Your

11   Honor.

12           MS. LOEFFLER:  Well --

13           THE COURT:  Maybe.  We'll see.  Okay.  So what's your

14   question?

15           MS. LOEFFLER:  My question is whether she can --

16           THE COURT:  I can't answer that question --

17           MS. LOEFFLER:  -- come -- Your Honor, whether she can

18   have the family member exception to --

19           THE COURT:  I --

20           MS. LOEFFLER:  -- the exclusionary rule.

21           THE COURT:  Probably.  But I'll -- based on all our

22   pleadings we've done to date.  But I -- I've got to give it a

23   little more thought.

24           MS. LOEFFLER:  Okay.

25           THE COURT:  They can respond.  But it sounds like she's

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 742  Filed 09/23/14  Page 12 of 265
(720) 384-8078  attrans@sbcglobal.net

1  a family member, sounds like the -- we've briefed the issue of

2  victims are entitled to be present during the trial.  Oh, here

3  it is.  Thank you.

4          MR. OFFENBECHER:  Thank you, Your Honor.

5          THE COURT:  Gives me something to read.  Oh, we got 10

6  minutes.  What else?  So I still don't -- what do you plan to

7  do in the -- well, you -- to -- you've got a whole long

8  transcript you want to --

9          MR. OFFENBECHER:  No, Your Honor.  I simply want to

10  refresh -- and I can just hand that to the Court.  I've marked

11  the part I want to refresh his memory with.  It's this part

12  right here.  I've shown it to the witness already, I've shown

13  it to (indiscernible).  That's all I want to (indiscernible).

14          THE COURT:  You want him -- all this in yellow, you

15  want him to say?

16          MS. LOEFFLER:  Well, wait a minute.  I want to see that

17  first.

18          MR. OFFENBECHER:  Well, if he even remembers that

19  that's what the witness said.  He's testifying what -- he

20  remembered the witness saying two words, "Jim Wells."

21  (Indiscernible) refresh his memory and see if he remembers her

22  saying that (indiscernible) --

23          MS. LOEFFLER:  Can I see what parts he's going to --

24          THE COURT:  Sure.

25          MR. CURTNER:  Page 19.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 742  Filed 09/23/14  Page 13 of 265
(720) 384-8078  attrans@sbcglobal.net

1       MS. LOEFFLER:  -- he wants to ask him?

2       MR. OFFENBECHER:  (Indiscernible) marked what part,

3   I've showed you.

4       MS. LOEFFLER:  Your Honor -- you didn't show it to me,

5   because I didn't see it.  You were showing it to my colleagues.

6   I'd like to see it.  Thank you.

7       THE COURT:  So how does this play -- come to play with

8   where we left with the excited utterance issue?

9       MR. OFFENBECHER:  Well, we objected to the -- to it.

10  You overruled the objection, you gave a curative instruction.

11      THE COURT:  And so this is the -- this is to even the

12  playing field, is what you're saying?

13      MS. LOEFFLER:  Yeah.  Okay.  That's fine.

14      MR. OFFENBECHER:  To place in context the testimony

15  that was given, yes.

16      MS. LOEFFLER:  Mr. Offenberger [sic], here's the --

17      THE COURT:  Okay.

18      MS. LOEFFLER:  Mr. Offenbecher, here's the transcript.

19  I'm sorry.

20      THE COURT:  But you're not asking me to reconsider my

21  ruling based on whatever else is in that transcript,

22  apparently.

23      MR. OFFENBECHER:  Yeah.

24      THE COURT:  Because I haven't seen anything else in

25  that transcript.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 742  Filed 09/23/14  Page 14 of 265
(720) 384-8078  attrans@sbcglobal.net

1      MR. OFFENBECHER:  No, Your Honor.  I mean, we've made

2  our record yesterday.  We moved for a mistrial --

3      THE COURT:  Well --

4      MR. OFFENBECHER:  -- you denied the mistrial.

5      THE COURT:  Well, that's true.  But now you're giving

6  me additional information that would -- that might cause me to

7  reconsider my ruling, and I will do that if you have further

8  information on the subject.  Remember, I don't have everything

9  that you two have.

10      MR. OFFENBECHER:  Well, I would ask up to --

11      THE COURT:  And now -- wait a second --

12      MR. OFFENBECHER:  -- reconsider your ruling on a

13  mistrial.

14      THE COURT:  I -- well, I -- the government's not even

15  listening.  Are you listening to what we --

16      MS. LOEFFLER:  Well, Your Honor, I was turning to

17  the -- I am, but I was turning to the CD, the part that we --

18  to determine whether it was something, if we needed to, that we

19  could play for you.  I'm sorry, I went --

20      THE COURT:  Okay.

21      MS. LOEFFLER:  -- double check that.

22      THE COURT:  I just want to clean up this issue now

23  rather than two years from now.  So you got some time to think

24  about it.  I'm trying to figure out what exactly defense is

25  asking.  And I don't -- I think what they're asking is just to

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 742  Filed 09/23/14  Page 15 of 265
(720) 384-8078  attrans@sbcglobal.net

1    clean up the record so they can put everything in context.

2         MR. CURTNER:  Right.

3         THE COURT:  They're not asking me to reconsider my

4    ruling as of 4 o'clock yesterday on the excited utterance

5    issue.

6         MR. CURTNER:  Right.

7         THE COURT:  And so at this point I will only respond to

8    requests that are made, I won't dive in.  Okay, anything else?

9         MS. LOEFFLER:  No.

10        THE COURT:  So you've got eight minutes to come up with

11   other problems.

12        THE CLERK:  All rise.  Matter stands in a recess until

13   9 a.m.

14        (Court recessed at 8:51 a.m., until 9 a.m.)

15        (Jury not present)

16        THE CLERK:  All rise.  His Honor the Court, the United

17   States District Court is again in session.  Please be seated.

18        THE COURT:  Okay.  We're waiting for this gentleman to

19   call in.  Is that right?

20        MS. LOEFFLER:  I think -- the way I would look -- and

21   it's just my video -- it says "Place a call."  So I don't know

22   who, but -- what?

23        (Side conversation)

24        MS. LOEFFLER:  Whoever the court technical person is, I

25   suspect would know whether --

1    THE COURT:  Do we call somebody?

2    UNIDENTIFIED SPEAKER:  They're calling in.

3    THE COURT:  They're calling in.  And I'm still not

4 satisfied with this other issue, so we're going to have to

5 discuss it.  Because it sounds like now the defendant wants to

6 submit hearsay, so --

7    MS. LOEFFLER:  Your Honor, can I tell where you -- the

8 part that he did, I may be fine with.  Just if -- we put in --

9    THE COURT:  I'm just read -- I just --

10    MS. LOEFFLER:  -- a -- I know.

11    THE COURT:  -- now got the transcript.

12    MS. LOEFFLER:  Yeah.  That's the transcript.  There's

13 some stuff that isn't on the transcript, that's on the CD,

14 which we brought in.  But if he wants to ask questions about

15 the part he circled, I'm okay with that.  I think it -- even if

16 it's hearsay --

17    THE COURT:  It doesn't --

18    MS. LOEFFLER:  We were not introducing the -- just the

19 sentence "Jim Wells," in order to say that Nicola knew that Jim

20 Wells did it.  And I kept it to that.

21    THE COURT:  Well, you're going to have to show me where

22 it says "Jim Wells" too.

23    MS. LOEFFLER:  It's on the CD, and I can --

24    THE COURT:  Okay, I don't see it --

25    MS. LOEFFLER:  -- dial it up.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 742  Filed 09/23/14  Page 17 of 265
(720) 384-8078  attrans@sbcglobal.net

1    THE COURT:  -- on the transcript.

2    MS. LOEFFLER:  It's not on the transcript, it's on the

3  CD.

4    THE COURT:  Okay.

5    MS. LOEFFLER:  It's on the actual tape.  The

6  transcript -- there's a lot of stuff that isn't on it, because

7  people are screaming.

8    THE COURT:  Oh -- I see that screaming, a lot of

9  screaming.

10    MS. LOEFFLER:  Yeah.  I have the CD.  We have --

11  Special Agent Allison has the -- I mean, the only thing we can

12  do to show you where it is is play the CD, that part.

13    THE COURT:  Well, okay.

14    MS. LOEFFLER:  And I'm happy to do that.

15    THE COURT:  Okay.

16    MR. OFFENBECHER:  Your Honor, it sounds like counsel

17  has no objection to us refreshing his memory on this part of

18  it.

19    MS. LOEFFLER:  I don't.  I'm just -- I --

20    THE COURT:  But --

21    MS. LOEFFLER:  Okay, go ahead.

22    THE COURT:  -- I just want to clear the record up.

23  First you're saying you object, you want a mistrial.  Then

24  you're saying you don't have objection, then you're saying CD

25  says one thing, the transcript says something else.  I want

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 742  Filed 09/23/14  Page 18 of 265
(720) 384-8078  attrans@sbcglobal.net

1  it --

2      MS. LOEFFLER:  No, no --

3      THE COURT:  -- clean.

4      MS. LOEFFLER:  Okay.  The defense attorney objected and

5  said a mistrial.

6      THE COURT: Right.

7      MS. LOEFFLER:  Now they have a solution they want.  I'm

8  okay with that solution.  The part that he circled --

9      THE COURT:  Well, if everybody's okay with the

10  solution, then I'll get out of it.  But I'm just learning about

11  the transcript and this other stuff.  So --

12      MS. LOEFFLER:  I'm trying to help.  If I'm not, I'm

13  (indiscernible) --

14      THE COURT:  Oh -- no, no, I'm not --

15      MS. LOEFFLER:  -- just trying to say, their solution

16  I'm okay with if he asks about that area --

17      THE COURT:  Okay.

18      MS. LOEFFLER:  -- that's what I'm trying to do.

19      THE COURT:  I just wonder why we're not getting this

20  person on the --

21      MS. LOEFFLER:  Can we -- do we have to go

22      (Side conversation)

23      THE CLERK:  Can I go off record?

24      THE COURT:  Yes.  Well --

25      THE CLERK:  Off record.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 742  Filed 09/23/14  Page 19 of 265
(720) 384-8078  attrans@sbcglobal.net

1      (Off record at 9:07 a.m.; on record at 9:08 a.m.)

2      (Jury not present)

3         THE CLERK:  Okay.

4         THE COURT:  Mr. Schroder.

5         THE CLERK:  On record.

6         MR. SCHRODER:  Sir.

7         THE COURT:  Are you ready to begin?

8         MR. SCHRODER:  I am ready -- I -- assuming we can

9   confirm that's -- I've never met Senior Chief Reed, so --

10        THE COURT:  Why don't you see if he can hear us and see

11   us, et cetera.

12        MR. SCHRODER:  Mr. Reed, is that you we're seeing on

13   the screen?

14        MR. REED:  Yes, sir, and I can hear you.

15        MR. SCHRODER:  Okay.  And you are William Reed?

16        MR. REED:  I am.

17        MR. SCHRODER:  Okay.

18        THE COURT:  All right.  Sir, can you stand, and my

19   clerk will swear you in.

20        THE CLERK:  Are we waiting for jurors?

21        THE COURT:  Oh, good point.  We're missing half the --

22        MR. SCHRODER:  You can sit down, Senior Chief.

23        THE COURT:  Can sit down.  We're going to swear --

24        MR. SCHRODER:  We have to wait for the jury to come in.

25        THE COURT:  We're going to swear you in in front of the

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 742  Filed 09/23/14  Page 20 of 265
(720) 384-8078  attrans@sbcglobal.net

1  jury.  Okay.  All right, sir, what's happening is we're

2  bringing the jury in now, and as soon as they get here we'll

3  swear you in, and then there'll be questions from both sides.

4  Can you hear me?

5          MR. REED:  Yes, sir.

6          THE COURT:  Can you see me?  No.

7          MR. REED:  No.

8          THE COURT:  But you can see the attorneys, right?

9          MR. REED:  I can see one, yes.

10          THE COURT:  Which one can you see?  The one standing?

11          MR. REED:  Yes, sir, the one standing.

12          THE COURT:  Okay, so whoever questions will have to

13  stand at the podium.

14      (Jury present)

15          THE COURT:  Okay.  Good morning.  We almost started

16  without you, we got so excited about what we were doing.  Okay,

17  please be seated.  Ladies and gentlemen, how are you doing?  So

18  far, so good, all right.  The next witness is appearing by

19  videoconference, and you'll need to get ear things over here.

20  You might have to turn it up.  I don't know how -- if this'll

21  make it more difficult.  So testing, one, two, three, got you,

22  okay.  All right, sir, if you'll stand, my clerk will swear you

23  in.

24          THE CLERK:  Okay, sir, please raise your right hand.

25          **WILLIAM THOMAS REED, PLAINTIFF'S WITNESS, SWORN**

1    **(Testifying by videoconference)**

2    THE CLERK:  Okay, thank you.  You may have a seat.

3    And, sir, if you can please state and spell your full name.

4    THE WITNESS:  My name is William Thomas Reed.  W-i-l-l-

5    i-a-m, R-e-e-d.

6    THE COURT:  All right.  Mr. Schroder.

7    **DIRECT EXAMINATION**

8    BY MR. SCHRODER:

9    Q    Senior Chief Reed, are you in the Coast Guard?

10   A    No, sir, I'm retired Coast Guard.

11   Q    And when did you retire?

12   A    My retirement date was December 1st, 2012.

13   Q    And what was your rank when you retired?

14   A    Senior chief, E-8.

15   Q    And what was your rating?

16   A    Electronics technician.

17   Q    And what's a chief?

18   A    Well, a chief is many -- many different things to many

19   different people.  But I believe most chiefs would tell you

20   that going from E-6 to E-7 is the biggest step in any enlisted

21   man's career.  You're held in very high esteem and held to much

22   higher standard when you become a chief.  And you're expected

23   to exemplify the Coast Guard core values of honor, respect, and

24   devotion to duty.  And your -- your job changes as -- you are

25   not so much a hands-on technician or -- or whatever it was that

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 742  Filed 09/23/14  Page 22 of 265
(720) 384-8078  attrans@sbcglobal.net

1  you were before, but now you're a mentor, and you're expected

2  to -- to train and lead people below you.

3  Q    And how long were you in the Coast Guard?

4  A    Twenty-eight years.

5  Q    And what was your last assignment before you retired?

6  A    My last assignment was COMMSTA Kodiak.  I was the

7  engineering officer.

8  Q    And what were your responsibilities as engineering

9  officer?

10  A    I was the department head for the Engineering Department,

11  which included the ET shop, the IT shop, and the rigger shop.

12  Q    All right.  We -- we've had -- we have a diagram, but --

13  of the COMMSTA chain of command, but we can't really show you

14  that, so let me just clarify, who was your direct supervisor?

15  A    I reported to the XO.

16  Q    All right.  And those -- the people --

17  A    Lieutenant Pizzurro.

18  Q    And the people who worked for you are those people you

19  just described, those sections?  Is that --

20  A    Yes, sir.

21  Q    All right.  So as supervisor of the rigger shop, you were

22  ultimately the -- Jim Wells and -- or Jim Hopkins -- Jim Wells

23  as well as Rich Belisle, also -- all worked for you?

24  A    Yes, they did.

25  Q    Right.  Now let's talk about some events that led up to

Case 3:13-cr-00008-SLG  Document 742  Filed 09/23/14  Page 23 of 265

1 the homicides on April 12th, 2012. When did you arrive at

2 COMMSTA Kodiak?

3 A    I arrived August 2010.

4 Q    And when was your arrival in relation to Chief Reckner?

5 A    Within a couple of months after he arrived.

6 Q    And did it take you a little while to get to know the

7 staff and operations of your different groups, including the

8 rigger shop?

9 A    It did.

10 Q    And -- but once you got to know those groups -- and let's

11 focus on the rigger shop -- did you see some issues that you

12 wanted to correct?

13 A    There -- there were quite a few issues that needed to be

14 corrected down by the rigger shop.

15 Q    And can you give us your best example?

16 A    Well, my best example would be tracking time that the

17 civilian employees worked, would come in and -- and leave,

18 their vacation hours, things like that.

19 Q    Okay.  Were you also -- can you tell us about the antenna

20 book?  Was that an issue you dealt with?

21 A    When I first arrived to COMMSTA, the commanding officer

22 had a number of things he wanted done, and one of them was he

23 wanted an antenna book created that would contain all the

24 information on the antennas and transmission lines that the

25 watch standers, the ETs, or anybody could use and look at and

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 742  Filed 09/23/14  Page 24 of 265
(720) 384-8078  attrans@sbcglobal.net

**REED - DIRECT**

1  track when the antenna was dock -- was installed, maintenance

2  that was done, preventive and corrective, and when things

3  needed to be replaced, and also more for the watch stander's

4  benefit would be the technical aspects of the antenna, what

5  frequencies and what ranges the antennas were best at, so the

6  watch standers would know which antennas to use when they were

7  working the radios.

8  Q    Now, when you got that project, was there -- do you

9  remember there being a draft antenna book?

10  A    No.

11  Q    And so where was the information that you were going to

12  draw from to create the antenna book?

13  A    As I understand it, there were a number of folders kept in

14  various places down in the rigger shop that -- that had some of

15  the information.  Some of the information was in various

16  folders on -- on the computers, but it needed to be

17  consolidated into something that somebody could pick up and

18  quickly reference and find the information they needed, and it

19  needed to be kept up to date.

20  Q    Now let's talk about the personnel just a second.  Based

21  upon your observations, what role was Mr. Wells exercising in

22  the rigger shop?

23  A    From what I could tell, Mr. Wells pretty much ran things

24  down there the way he pleased and -- and did what he wanted

25  down there.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 742  Filed 09/23/14  Page 25 of 265

**REED - DIRECT**

1 Q    Now I want to -- I know I can't show you any items on the

2 screen, but I want to talk to you about a document I believe

3 you're familiar with called the EO expectations letter or memo.

4 Are you familiar with that document?

5 A    I am familiar with it.  I wrote it.

6 Q    Okay.  And that's been introduced in evidence here at the

7 trial under Exhibit 3D.  You said you wrote that letter.  And

8 when do you remember that the time was that you wrote it?  The

9 time period?

10 A    April 2011.

11 Q    And you said you wrote it, so whose name is on the "From"

12 line?

13 A    My name is on the "From" line.

14 Q    All right.  And who else was involved in drafting that

15 letter?

16 A    Chief Reckner had input on the drafting of the letter.

17 Q    And did you also discuss that with the chain of command

18 above you?

19 A    I did.

20 Q    And what were you trying to do with that letter?  What was

21 your goal?

22 A    There were some issues with what was going on down in the

23 rigger shop, and I wanted to correct those.  One of the issues

24 with having a civilian employee in a place for an extended

25 period of time who has different military people coming in and

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 742  Filed 09/23/14  Page 26 of 265
(720) 384-8078  attrans@sbcglobal.net

1  out as a supervisor is they can get confused on what that

2  particular supervisor might be looking at and focusing on.  And

3  I wanted it to be clear at what my expectations were.

4  Q   All right.  Did it go to -- which of the civilians did it

5  go to?

6  A   It went to both.

7  Q   Okay.  And had you had any issues with Mr. Belisle?

8  A   No, I hadn't.

9  Q   Had you had issues related to that letter with Mr. Wells?

10  A   Yes.

11  Q   And what kind of issues?

12  A   Well, the -- the antenna book, for one thing.  Mr. Wells

13  was considered to be the expert down there, and so he had been

14  asked many times to take the lead on getting this antenna book

15  created.  And as far as I know, nothing ever really came of it.

16  I had to have a nonrate who -- who had -- had gotten pregnant

17  and couldn't work down there anymore -- she came up and worked

18  outside my office, and I put her to creating that book.

19      Also, there were a lot of problems with where he was at

20  during the workday and what he was or was not doing.  He would

21  frequently just leave during the day.  The ET1 down there

22  didn't know where he was at, the chief, Chief Reckner, did not

23  know where he was at.  He would just come and go as he pleased.

24  At one point I was looking for him, and I found out he wasn't

25  even on the island.  He had left to -- to go over to Anchorage

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 742  Filed 09/23/14  Page 27 of 265

1  for some reason.  And so I really was trying to stress to him

2  that as his chain of command, we needed to know where he was at

3  and what he was working on.

4  Q  Senior Chief, what -- so did you -- was Mr. Wells

5  counseled on that letter?

6  A  He was.

7  Q  By whom?

8  A  Chief -- Chief Reckner, ET1 Hopkins, and I were there and

9  we presented him the letter.  I talked to him, sat down -- I --

10 I went through the letter section by section, told him what I

11 expected, offered him the opportunity to make comments and ask

12 questions.  And then I left.

13 Q  Okay.  Did --

14 A  And Chief Reckner and ET1 and Mr. Wells were still in the

15 room.

16 Q  Now, did you have any issues with Mr. Belisle after that?

17 A  I didn't have any issues Mr. Belisle before that.

18 Q  But did -- after the letter, did you continue to have

19 issues with Mr. Wells?

20 A  I did.

21 Q  Now let me -- I'm going to --

22 A  We did.

23 Q  -- ask you -- the next topic I wanted to talk is -- or

24 talk about is the -- a tree collaring memo from Chief Reckner

25 which is also in that file.  Did you have anything to do with

1  writing that memo?

2  A    Not really, no.

3  Q    Did Chief Reckner inform you about the issues in that

4  memo?

5  A    He did.

6  Q    All right.  And did you know that he had issued a memo to

7  Mr. Wells?

8  A    I did.

9  Q    So he -- on those matters, the ones where you were not

10  dealing with Mr. Wells yourself, were you kept informed by

11  Chief Reckner?

12  A    I was.

13  Q    And did you, again, further inform the command about those

14  issues?

15  A    I did.  I -- I talked to the XO about issues fairly

16  frequently.

17  Q    So now let's move on to -- I want to talk briefly about

18  the NATE conference for that year.  Are you allowed that -- are

19  you familiar with the NATE -- what a NATE conference is?

20  A    Yes, in a way.  I've never been, but I'm aware that it's

21  the antenna conference that the riggers go to to -- to get

22  training and -- and network.

23  Q    And were you aware that Mr. Wells didn't go to that

24  conference in 2012?

25  A    I was aware of that.

1  Q    And did you discuss that issue with Chief Reckner?

2  A    I did.

3  Q    And what was your position?

4  A    If -- if you refer back to the memo that I provided Mr.

5  Wells and Mr. Belisle, in April it talks about travel, and

6  before I arrived at the COMMSTA, it -- it appeared to me that

7  travel was just at the whim of -- of the civilians.  When --

8  when Mr. Wells decided they needed to go somewhere and do

9  something, it was just approved and they -- they went.  As --

10  as -- person who approves these travels or purchases for

11  equipment, I needed to be a good steward of the taxpayers'

12  dollar.  And in that memo it stated that any travel requests

13  needed to come up to my level and I would approve it, and it

14  would be based on needs of the Coast Guard and needs of the

15  unit.  And if I could not explain or they could not explain

16  what benefit either the unit or the Coast Guard would get from

17  their traveling to that, then it wasn't necessary to go and I

18  wasn't willing to spend the money.

19  Q    So did you make the decision on who went to that

20  conference?

21  A    I was pretty much the final decision, yes.

22  Q    And what dec -- why'd you make -- what decision did you

23  make and why?

24  A    I -- the -- the people that went were people who I felt

25  needed the experience, the training, and the networking.  Mr.

**REED - DIRECT**

1  Wells had been in this field for an extremely long time, had

2  been to many of these conferences, and I -- I really could not

3  justify his going.  My thought was the people who went would

4  benefit and they could bring back the knowledge and -- and

5  materials and whatever they gained from it and share it with

6  the others.  One of the reasons -- beyond the fact that Mr.

7  Wells probably knew most of this information, he was not real

8  good at sharing the information he had.  So if I sent him, what

9  he gained would have stayed with him.  When I sent the others,

10 I expected it to be brought back and shared with a -- with the

11 other people in the shop.

12 Q    Now, did you inform the command about that decision?

13 A    Mr. Wells was pretty upset about it, I'm sure --

14          MR. CURTNER:  Objection.  That's not --

15          THE WITNESS:  -- he talked to the command, and I can't

16 imagine that I did not --

17          MR. CURTNER:  And, I'm sorry, Your Honor, that's --

18          THE WITNESS:  -- talk to them and -- and have their --

19          MR. CURTNER:  It's not responsive to the question.

20          THE COURT:  Okay.  So that was -- restate the question.

21 BY MR. SCHRODER:

22 Q    Let me ask the first question, then.  What was Mr. Wells'

23 reaction to that decision?

24 A    He was mad.  He was very upset.

25 Q    And the next was did you inform -- did you keep the chain

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

**REED - DIRECT**

1  of command above you informed about that?

2  A    I don't remember specifically speaking to anybody about

3  that, but I would be hard pressed to say that I would not have.

4  Q    Okay.

5  A    And I'm sure it would have got to the CO, the XO, and they

6  would have asked me.

7  Q    Now let's move on.  I want to talk about the fuel card

8  incident.  Were you involved in the investigation for that?

9  A    I was not directly involved in that --

10  Q    Yeah.

11  A    -- investigation, no.

12  Q    But were you aware of it?

13  A    I was aware of it.

14  Q    And was there any formal action taken on that

15  investigation?

16  A    The CO drafted a letter that he presented to Mr. Wells.

17  Q    So that -- did -- were you involved in drafting that at

18  all?

19  A    Was not.

20  Q    Okay.  And was this document given to Mr. Wells?

21  A    It was.

22  Q    And was he counseled on it?

23  A    He was.

24  Q    And who was involved in that counseling?

25  A    The commanding officer was there.  The executive officer

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 32 of 265
(720) 384-8078   attrans@sbcglobal.net

**REED - DIRECT**

1   was there.  I was there.  Chief Reckner was there.  And I

2   believe the command master chief was there.

3   Q   Now, you talked about at the beginning kind of what it's

4   like to be a chief.  And from a chief's perspective, is it --

5   is there a higher level of seriousness when the commanding

6   officer chooses to make -- to counsel somebody like that?

7   A   Extremely so, yes.

8   Q   All right.  So what was Mr. Wells' reaction to being

9   handed the letter?

10  A   He was very unhappy with it, and he -- he was very upset,

11  felt like we had lost his trust.  And he didn't want people to

12  think he had done it.

13  Q   And --

14  A   He -- he also initially refused to sign the document.

15  Q   Right.  And what happened at that point?  Did you stay

16  there and wait for that, or did you leave?

17  A   We were in there for quite a while.  I don't remember the

18  exact amount of time.  There was a little bit of discussion.  I

19  told him -- when he said he didn't want people to think he had

20  done it, I told him we do think he had done it, because that's

21  what all the evidence points to and he was really the only

22  person who could have done it.  After a while, the CO asked us

23  all to leave and -- and he and Mr. Wells were in there alone.

24  I don't know what happened after that.

25  Q   Okay.  Also, in your position as the engineering officer

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 742  Filed 09/23/14  Page 33 of 265

1  in the chain of command for the rigger shop, were you -- prior

2  to that, that time of that letter, were you aware that Mr.

3  Wells was having some health issues?

4  A    I was.

5  Q    All right.  And again, from your observations, was he gone

6  quite a bit in the preceding weeks or months?

7  A    He was gone more than he was there.

8  Q    Okay.  Now, again, from your observations, how was the

9  rigger shop accomplishing the -- were they accomplishing the

10 mission with him gone?

11 A    Well, initially when Mr. Wells was gone, everything would

12 grind to a halt.  They -- they could do basic things, brush

13 clearing and -- and some -- some maintenance type issues.  But

14 the major things were always held up:  "Well, Mr. Wells isn't

15 here, we can't do this."  "Mr. Wells isn't here, we can't do

16 that."  But after a while, with his extended absences and we

17 couldn't rely on when he would be there to take care of things,

18 Chief Reckner, ET1, and Mr. Belisle started doing the things

19 that needed to be done and seemed to be managing quite well.

20 Q    Now, again, in your leadership position, in the weeks

21 prior to his death, was Petty Officer Hopkins honored by the

22 COMMSTA?

23 A    He was.  He was selected the Enlisted Person of the Year

24 for the COMMSTA that year.

25 Q    And I got just one other brief question.  Where did you

1  live when you were in Kodiak?

2  A    I lived in Coast Guard housing.

3  Q    And did you live in -- anywhere near the vicinity of the

4  Hopkins family?

5  A    I lived on -- on one street corner that was a T, and he

6  lived catty-corner from me, basically the next house, kind of,

7  across the street.

8  Q    Were you familiar with the automobiles that the Hopkins

9  family had?

10  A    They had -- they had a pickup truck.

11  Q    And to your knowledge, did they have any other cars?

12  A    As far as I know, that was the only vehicle they had.

13  Q    All right.

14        MR. SCHRODER:  Your Honor, no further questions.

15        THE COURT:  Cross-examination.

16                    **CROSS-EXAMINATION**

17  BY MR. CURTNER:

18  Q    Mr. Reed, good morning.  If you can't hear me, just let me

19  know, please.

20  A    Yes, sir.

21  Q    So you've been retired now for over a year, almost a year

22  and a half?

23  A    Yes, sir.

24  Q    And --

25  A    Close to a year and a half.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 35 of 265
(720) 384-8078  attrans@sbcglobal.net

1  Q    Okay.  And so civilian life's a lot different?

2  A    It is.  It's very relaxed.

3  Q    Okay.  It's relaxed.  For example, I assume that that's

4  not the haircut you had when you were in the military?

5  A    No, sir.  When -- after 28 years of shaving and haircut, I

6  got out.  I told my wife I wasn't going to shave or cut my hair

7  for a year.  And she said, "You're not going to cut your hair

8  for a year."

9  Q    Okay.  And I've heard that from -- that's not unusual for

10 retired military to grow -- not shave again, not cut their

11 hair.  That's not unusual, right?

12 A    No, sir.

13 Q    And that's quite different than your normal experiences

14 while you were in the military.  Right?

15 A    Correct.

16 Q    Now -- so in the same respect, you -- it was quite

17 different when you got to COMMSTA Kodiak to have a couple

18 civilian employees in your organization?

19 A    I had previously been course chief at the Electronics

20 Technician A School for the Coast Guard.  And while I was

21 there -- when I first took over, we had 10 instructors that

22 were military that worked for me.  During -- we had a large

23 expansion and had to double our throughput.  I had 10 civilian

24 instructors that worked for me for several years.  Most of them

25 are retired military.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 742  Filed 09/23/14  Page 36 of 265
(720) 384-8078  attrans@sbcglobal.net

1  Q   Okay.  I think, though, in the military, you expect

2  anybody under your supervision, any lower rank, to completely

3  follow your orders, and there's no question about that.  Isn't

4  that correct?

5  A   I expect them to follow them, and if they have a question

6  or an issue, to bring it up and it would be considered.  And

7  they may still have to follow the same order; it could be

8  adjusted.

9  Q   Okay.  But, you know, in the military there's a very

10  strict command, there's a very strict hierarchy of -- that's

11  what the military's based on is rank and file, following the

12  orders of the -- anybody above them in a supervisory role?  Is

13  that correct?

14  A   Generally speaking, that is correct, yes.

15  Q   And, now, you talked about Mr. Wells.  Did he have any

16  authority as far as -- like in the military hierarchy?  Was he

17  considered in the organizational chart for COMMSTA to have any

18  authority to order anybody to do anything?

19  A   Not by rank.  But by knowledge and experience, the ability

20  to tell people this needed to be done, and generally it would

21  get done.

22  Q   Exactly, that's my point.  So he didn't have any authority

23  except his wealth of information and knowledge and experience.

24  Is that correct?

25  A   I would say that's correct, yes.

1  Q   And he couldn't order any military personnel to do

2  anything any more than, let's say, a civilian janitor that

3  comes into COMMSTA to do cleaning could order anybody to do

4  something.  Now, the janitor -- or -- would not have the same

5  expertise as Mr. Wells, but would have the same authority as

6  Mr. Wells as far as ordering military.  Is that correct?

7  A   I suppose that would be technically correct.  But the

8  reality is, most of the people down in the shop followed his

9  lead.

10 Q   His lead.  In fact, you mentioned that a chief -- one of

11 the important functions of a chief is to be a mentor.  Correct?

12 A   That is correct.

13 Q   And, in fact, when you -- do you remember the memo of

14 expectations that you wrote in -- for Mr. Wells and Mr.

15 Belisle?

16 A   Do, and I specifically -- in there I recognized their

17 history as being a chief and expect them to assist and mentor

18 and train other people in the rigger shop.

19 Q   In fact, in your memo you specifically stated your

20 expectation that Jim Wells would be a mentor to ET1 Hopkins.

21 Correct?

22 A   That is correct.

23 Q   Because that's an important function.  Correct?

24 A   It is.

25 Q   Now, when you first got to COMMSTA, that was just after

**REED - CROSS**

1  Chief Reckner got there?

2  A    Yes, it was.

3  Q    And you and Chief Reckner talked a lot about the

4  atmosphere or the function of the rigger shop, right?

5  A    At the time I arrived, Chief Reckner was fulfilling his

6  own position, the electronics chief's position, and my

7  position.  So we did talk about the rigger shop.  But we talked

8  about the entire department, because we had had a few key

9  personnel missing and -- and we were all trying to get up to

10 speed on the entire department, yes.

11 Q    Okay.  And did -- now, did Chief Reckner go to some

12 training on how to handle civilian employees as opposed to

13 military rank and file?

14 A    He did have some training on civilian employees, yes.

15 Q    And so did you and he discuss how to bring in -- the

16 rigger shop into line, to sort of impose a military type of

17 rule there as far as keeping civilians in line.  I think that's

18 what you guys talked about, right?

19 A    We talked about the issues in the -- in the rigger shop

20 and discussed options for bringing them in, which included

21 things like the memo --

22 Q    Okay.

23 A    -- or memos, as they were.

24 Q    Bringing them into line.  Right?

25 A    If that's the way you want to phrase it, yes, sir.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 742  Filed 09/23/14  Page 39 of 265
(720) 384-8078  attrans@sbcglobal.net

1  Q   I think that's the way other people phrased it.  I think

2  you phrased it in some sense, didn't you?

3  A   I don't recall using that phrase, but the idea was, yes,

4  we wanted the shop to work as a unit, and if that required

5  bringing them into line, then yes, they needed to -- we

6  explained what was expected and then we expected that that

7  would be how things were done.

8  Q   Now, when you first got to COMMSTA, I mean, there were

9  some bigger personnel issues than the rigger shop when you got

10  there.  Do you recall that?  Chief Filling (ph), did you have

11  issues with --

12  A   No, I don't actually.

13  Q   You don't -- Chief Filling, the -- did you -- in previous

14  interviews, did you --

15  A   Chief Filling?

16          MR. SCHRODER:  Objection, Your Honor.  Beyond --

17          THE WITNESS:  Chief Filling was not --

18          MR. SCHRODER:  -- the scope of direct.

19          THE WITNESS:  -- was not part of the rigger shop.  But

20  he did work for me.

21  BY MR. CURTNER:

22  Q   Okay.  What I'm saying is you had personnel issues besides

23  the rigger shop while you were at COMMSTA?

24  A   That is correct.

25  Q   They were more significant than what you were dealing with

1  the rigger shop.  Correct?

2  A    I would not say they were more significant.  I would say

3  they were different.

4  Q    Now, the antenna book -- now, there had been manuals and

5  maintenance logs and things in the rigger shop for years as far

6  as maintaining the antennas.  Is that correct?

7  A    From what I could tell, they had not been properly

8  maintained and they were very out of date.

9  Q    Okay.  So, basically, the antenna book not just

10  consolidated, but had to be updated.  Is that correct?

11  A    That is correct.  And we were looking for the maintenance

12  that had not been done within however many years be performed

13  on -- on the antennas that -- that needed it.

14  Q    Now, isn't it true that ET1 Hopkins was requested to

15  update the antenna book?

16  A    Not personally.  He was -- he was told it needed to be

17  done and needed to get done.

18  Q    So was --

19  A    But to the best of my recollection, Mr. Wells was the one

20  that had been asked to do this, because he was the one who had

21  been there, would be able to find these assorted files that

22  were scattered all around, and put the information together

23  along with what was written and his knowledge combined.

24  Q    So ET1 Hopkins, he was -- it was his responsibility.

25  Correct?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 742  Filed 09/23/14  Page 41 of 265
(720) 384-8078  attrans@sbcglobal.net

**REED - CROSS**

1  A    To see that it got done, yes.  And it was my

2  responsibility to see that it got done.

3  Q    And it wasn't Mr. Wells's responsibility.  He was asked

4  for his -- the information he might have.  Correct?

5  A    It was his responsibility insofar as the one asked to do

6  it, yes.

7  Q    Now, you understand that Mr. Wells was pretty sick most of

8  the fall of 2011 and the early part of 2012?

9  A    I understand he was sick.  I was not privy to his actual

10  medical information, so I -- I don't know how sick.  But I know

11  he missed a -- a lot of time, so I assume he was sick, yes.

12  Q    You didn't know about his surgeries?

13  A    As I said, Mr. Wells didn't always keep us informed that

14  he had actually gone to medical appointments, and I didn't even

15  know he had left the island sometimes.

16  Q    Now, if Mr. Wells were to take any sick leave or annual

17  leave, regular leave, he would submit a written request to

18  Chief Reckner.  Isn't that correct?

19  A    That's what we had hoped would happen, yes.

20  Q    Well, and Chief Reckner approved all the time he was gone

21  during that period that he was sick.  Isn't that correct?

22  A    As I remember, that's correct.  But frequently it was

23  after he came back.

24  Q    Well, as I understand regulations, that you put in for

25  annual leave -- a request before you go, but if you have sick

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 742  Filed 09/23/14  Page 42 of 265
(720) 384-8078  attrans@sbcglobal.net

1  leave, you have a certain time afterwards.  For example, if I

2  couldn't come in to my office because I had the flu, I don't

3  have to put a request in ahead of time, I could put the request

4  in and it would be approved when I get back in the office.

5  Isn't that correct?

6  A    That is correct.

7  Q    And it's the same it works with the Coast Guard.  Right?

8  A    For the Coast Guard, if -- if you can't come in because

9  you're sick, you're expected to go to the doctor and inform

10 your command.

11 Q    Yeah.  And my -- I am too.  So -- but that's always

12 approved -- it has to be approved by the chief.  And it was

13 approved for all of Mr. Wells's leave when he -- during this

14 time he was sick.  Isn't that right?

15 A    Far as I know, yes.

16 Q    Now, in fact, I think when you were asked these questions

17 before, you hadn't seen Mr. Wells for about four months prior

18 to April 12th, 2012.  Right?

19 A    Sporadically, if I saw him at all, yes.

20 Q    I think your statement was you saw him hardly at all for

21 those four months.  Do you recall that?

22 A    Correct.

23 Q    Okay.  So whatever was going on in the rigger shop, you

24 and Chief Reckner talked about that quite a bit?

25 A    I'm -- I'm not sure what you're asking.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

**REED - CROSS**

1  Q    You were -- would be informed by Chief Reckner about what

2  was going on at the rigger shop during that time?

3  A    Yes.

4  Q    That was the basis of your knowledge of what was going

5  down?

6  A    (No audible reply).

7  Q    And, in fact, you talked about the NATE conference; that's

8  when Mr. Wells was actually in surgery, right?  Is that

9  correct?

10  A    I do not recall him being in surgery at that time, but

11  it's possible, yes.

12  Q    Oh, just one further question.  When you are on Kodiak

13  Island, is it necessary to register your vehicle with the State

14  of Alaska?

15  A    (Indiscernible).

16  Q    I'm sorry?

17  A    (Indiscernible).

18  Q    Okay, so, for example, when you came up to Kodiak, did you

19  bring up a vehicle?

20  A    Three vehicles, yes, sir.

21  Q    Three vehicles?  And --

22  A    Sir.

23  Q    -- were they registered outside of Alaska?

24  A    They were registered in Arkansas, yes, sir.

25  Q    And then -- so when you were active military, you don't

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 742  Filed 09/23/14  Page 44 of 265
(720) 384-8078  attrans@sbcglobal.net

1  have to register in the state you're in because your residence

2  is actually in Arkansas?

3  A    Correct.  Yes, sir.

4  Q    Okay.  Thank you, Mr. Reed  That's all I have.

5        THE COURT:  Redirect.

6                    **REDIRECT EXAMINATION**

7  BY MR. SCHRODER:

8  Q    Just a couple of questions, Mr. Reed, or Senior Chief

9  Reed.  I just want to clear up this idea of what the antenna

10 book -- what that project was like when you started.  Mr.

11 Curtner talked about something that was there that needed to be

12 modified.  Was there any structural book that was there when

13 you got there that you modified?

14 A    Not that I was aware of.  I -- I had never seen or heard

15 of one, no.

16 Q    And then Mr. Curtner also asked you about the phrase you

17 put into the EO's expectations letter about Mr. Wells being a

18 mentor to ET1 Hopkins.  Based on your observations, did he live

19 up to that request?

20 A    No, sir.

21       MR. SCHRODER:  No further questions, Your Honor.

22       THE COURT:  Recross.

23       MR. CURTNER:  No.

24       THE COURT:  All right.  Thank you, sir.  We're done.

25 Ladies and gentlemen, I think we're going to have to take a

1   recess long enough to take the equipment down, so I'll be maybe

2   10 minutes or so.  So we'll stand in recess.  She's coming

3   around.  That door should open -- one, two, three, four -- now.

4   Oh, yeah.

5       (Witness excused)

6       (Jury not present)

7       THE COURT:  Okay.  We're going to -- we're still going

8   to stay on the record for a minute and then we'll go on recess.

9   Counsel, I need to know what's happening now.  My understanding

10  is that we're going to now call Commander Van Ness because

11  for -- briefly, to clarify his testimony with regard to his

12  meeting with Mrs. Belisle.  Is that -- that's the next thing

13  that's going to happen.  True?

14      MR. OFFENBECHER:  Yes, Your Honor.

15      THE COURT:  And I had previously indicated that that

16  meeting, after having reviewed the transcript, was clearly a

17  very startling event.  It involved crying and screaming and

18  comments, very spontaneous, that lasted for some time.  First,

19  I am told, and I accept counsel's representation, that the

20  first name actually mentioned was Jim Wells, and I allowed it

21  for a very limited purpose yesterday.

22      Defendant object -- objected at the time, now seeks to

23  use this same interview but to place the comments in context,

24  and the parties have agreed to proceeding in -- to proceed in

25  this fashion, despite the fact that -- well, because I've

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 46 of 265
(720) 384-8078  attrans@sbcglobal.net

1  previously ruled that it's hearsay but falls within a limited

2  exception.  And I think that by placing it in context, after

3  having reviewed the transcript, clearly limits any prejudice,

4  especially given the limiting instruction I already gave.

5         So my understanding is that the commander's going to

6  come in, I'll tell him he's still under oath, and that you're

7  going to begin questioning.  Is that right?

8         MR. OFFENBECHER:  Yes, Your Honor.

9         THE COURT:  Then you'll cross.

10        MS. LOEFFLER:  The only cross will be if he goes

11  through that little area.  I won't do anything beyond the area

12  that he circled.

13        THE COURT:  Okay.

14        MS. LOEFFLER:  And if it's a cross, it's going to be

15  very, very short.

16        THE COURT:  And then he's going to be excused.  Is that

17  right?

18        MS. LOEFFLER:  That's my understanding.

19        THE COURT:  Is that right?

20        MR. OFFENBECHER:  Yes, Your Honor.

21        THE COURT:  Now, am I missing something?  Is there

22  something more that's going to come up as soon as he gets on

23  the airplane and leaves?  I want to make sure we get this under

24  control.  The government's --

25        MS. LOEFFLER:  Not that I know of.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1    THE COURT:  -- satisfied with this resolution.

2    MS. LOEFFLER:  Yes, Your Honor.

3    THE COURT:  The defense satisfied with this resolution?

4    MR. OFFENBECHER:  Well, Your Honor, we objected and

5    moved for a mistrial, that's our position.  But now, having

6    heard the Court's ruling that it's admissible and the Court's

7    curative instruction, we feel it is appropriate for the Court

8    to permit him to be recalled and to clarify this part of it.

9    And that's what we're asking to do, and that's what the Court's

10   permitting.

11   THE COURT:  Okay.  Let's -- 10 minutes enough to get

12   this taken down?  Okay.  We've got a 10-minute recess.

13   THE CLERK:  All rise.  Matter stands in a 10-minute

14   recess.

15   (Court recessed at 9:49 a.m., until 10:10 a.m.)

16   (Jury not present)

17   THE CLERK:  All rise.  His Honor the Court, the United

18   States District Court is again in session.

19   THE COURT:  Okay.

20   THE CLERK:  Please be seated.

21   MR. OFFENBECHER:  Your Honor, do you want the witness

22   to sit back here or retake the stand right now?

23   THE COURT:  Either one is fine.  Where is he?

24   MR. OFFENBECHER:  He's right back here.

25   THE COURT:  Okay.  And we can bring the witness in

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 742  Filed 09/23/14  Page 48 of 265
(720) 384-8078  attrans@sbcglobal.net

1   the -- you can come on up and get comfortable.  We'll bring the
2   jury at the same time, see what happens.
3        MR. OFFENBECHER:  Your Honor, are going to remind the
4   witness about the oath at this point?
5        THE COURT:  I'll do it in front of the jury, yeah.
6        MR. OFFENBECHER:  Thank you, Your Honor.
7        THE COURT:  They're bringing them in, yeah.
8      (Side conversation)
9      (Jury present)
10        THE COURT:  All right, please be seated.
11        MR. OFFENBECHER:  Your Honor, at this time we'd briefly
12   recall Commander Van Ness.
13        THE COURT:  All right.  Sir, you're still under oath.
14   We won't swear you in again.
15        MR. VAN NESS:  Yes, sir.
16        THE COURT:  Okay, counsel.
17        MR. OFFENBECHER:  Thank you, Your Honor.
18        **PETER VAN NESS, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN**
19              **RECROSS EXAMINATION, CONTINUED**
20   BY MR. OFFENBECHER:
21   Q   Commander Van Ness, good morning.  Good morning.
22   A   Good morning.
23   Q   Yesterday you spoke about an event that occurred on April
24   12th of 2012, when you were called upon to notify Mrs. Belisle
25   about the passing of her husband.  Do you recall that?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 49 of 265
(720) 384-8078  attrans@sbcglobal.net

1  A    Yes, I do.

2  Q    And you gave some testimony about what Ms. Belisle said

3  when you talked with her, and that was at the end of the

4  testimony yesterday.  Is that right?

5  A    I -- I don't remember exactly when it was, but yes, I did

6  testify to that.

7  Q    It's fair to say that this was a fair -- very emotional

8  time when you did the notification?

9  A    Extremely.

10 Q    And this morning I have provided you an official FBI

11 transcript of the -- that event.  Is that right?

12 A    That's correct.

13 Q    And I gave that to you about an hour, hour and a half ago.

14 Is that right?

15 A    That's correct.

16 Q    And I asked you to use that to refresh your memory of what

17 had happened during your encounter with Mrs. Belisle.  Is that

18 right?

19 A    Yes, sir.  I read through it twice.

20 Q    And counsel for the government was there as well.  Right?

21 A    Correct.

22 Q    Could you call up 116, please -- or 118?  I'm sorry.  Can

23 you take a look at what's been marked as Defendant's Exhibit

24 118?  Let me just ask you, is that the transcript that we've

25 just been discussing?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 50 of 265
(720) 384-8078   attrans@sbcglobal.net

1  A   Yes, sir, it is.

2  Q   That's a -- the official transcript of the interview --

3        MR. SCHRODER:  Your Honor, I'd just object to calling

4  it an official transcript.  It's a transcript, somebody typed

5  it up.  There's no official part of it.

6        THE COURT:  Okay.  Very well.

7        MR. OFFENBECHER:  It's a FBI transcript, right?

8        MR. SCHRODER:  That's correct.

9  BY MR. OFFENBECHER:

10  Q   Says "Federal" --

11  A   Yes, it was prepared.  Yes.  Is --

12  Q   Says "Federal Bureau of Investigation" across the top?

13  A   It does say that.

14  Q   Okay.  And you've looked through it, and it's a tape

15  recording -- just so I can direct your attention to it -- it's

16  a tape recording of your contact with Mrs. Belisle that

17  morning.  Is that right?

18  A   It -- it's a tape recording of Officer Dupras' contact,

19  yes, which I --

20  Q   Okay.

21  A   There were multiple people there in and out of the room.

22  Q   Okay.  Well, you were with Alaska State Trooper Dennis

23  Dupras, right?

24  A   Correct.

25  Q   And he was wearing a microphone that was recording the

1  conversation.  Right?

2  A    I was not aware of it at the time, but yes, that is what

3  happened.

4  Q    Okay.  And you can tell from the first page of the

5  transcript -- go to 25040, please -- and you've reviewed this,

6  that when -- you're walking in the door of Mrs. Belisle's

7  employment, and you indicate, "We're looking for Nicola

8  Belisle."  Right?

9  A    Yes, that's correct.

10  Q    And so that's the event of the advisement of the initial

11  notification to her?

12  A    It is.

13  Q    So I'd like to direct your attention to about page 18 of

14  the transcript.  Several minutes into the conversation, this

15  highly emotional conversation, there was discussion of Jim

16  Wells.  Is that fair to say?

17  A    Yes, that's correct, on page 18.

18  Q    And Mr. Dupras was the person who was actually asking the

19  questions.  Is that right?

20  A    I believe so.  The transcript just disappeared.

21  Q    Can you bring it back up to that page, please?  The bottom

22  again, please.

23  A    So, yes, the transcript indicates "D.D.," which is Officer

24  Dupras.

25  Q    And Officer Dupras -- you were present with Officer Dupras

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 52 of 265
(720) 384-8078   attrans@sbcglobal.net

1  during this conversation.  Is that right?

2  A    I honestly do not know.  There was a kitchenette, a

3  hallway, and another office that we were in and out of over the

4  course of this.  There was quite a few people there, including

5  her office mates and her daughter and --

6  Q    Okay.  Well, this was the event, though, as we just

7  discussed, where you did the initial notification.  Right?

8  A    It is.

9  Q    And Mr. Dupras was with you.  Is that right?

10 A    He was with me, yes, when we entered the building.  We

11 were in the same office space.

12 Q    Okay.

13 A    I do not know that I was present during this particular

14 question.

15 Q    Okay.  Do you recall that Mr. Dupras asked Ms. Belisle,

16 "Has he had problems with anybody," referring to Mr. Belisle?

17 A    No, I -- I do not remember this part of the conversation.

18 Q    Okay.  Well, let me just ask you what it is and then

19 perhaps we'll get a stipulation from counsel that that's in

20 fact what the transcript of this says.  Does the transcript --

21 or is it fair to indicate that an -- that Mr. Dupras said, "Has

22 he had any problems with anybody," and Ms. Belisle said, "Just

23 Jim"?

24 A    Yes, that is what it says on the transcript.

25 Q    And then Ms. Belisle said again, "Just Jim."  Is that

1  right?  At the top of --

2  A    That's correct, that's what it says.

3  Q    And in the transcript then, Mr. Dupras said, "Did he say

4  what kind of problems with Jim?"  Is that right?

5  A    That is what it says.

6  Q    And then Ms. Belisle said, "Jim didn't do his job."  Is

7  that right?

8  A    Correct.

9  Q    And then Ms. Belisle said the following:  "Jim wouldn't

10  hurt Rich.  He doesn't -- he spends all his life on the

11  toilet."

12  A    Yes, that is what the transcript says.

13  Q    And then Mr. Dupras says, "Jim does?"

14  A    Correct.

15  Q    And then Mrs. Belisle said, "Jim wouldn't hurt Rich."

16  A    Correct.

17  Q    And that's what the transcript says.  Is that right?

18  A    That is what the transcript says.

19  Q    And you don't have any question that's what -- exactly

20  what happened at that point, right?

21  A    That is what I'm reading on the transcript.

22  Q    And then a couple of lines down, Mr. Dupras wants to

23  clarify which Jim she was talking about, and she clarifies that

24  she was talking about Jim Wells.  Isn't that right?

25  A    I don't know that it's on my screen, but yes, I remember

Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 54 of 265

1    reading something along those lines.

2    Q    Okay. Pull it down just a little bit. She says -- Mr.

3    Dupras says, "Jim. Who do you mean, Jim?" And Mrs. Belisle

4    says, "Jim Wells." Right?

5    A    Correct.

6    Q    Referring to the conversation that you've just had. Is

7    that right? Commander, is your recollection that you do not

8    recall this conversation?

9    A    I do not recall this conversation.

10      MS. LOEFFLER: And, Your Honor, based on our previous

11    conversations, I agree to stipulate to having him do this, so

12    we can move this on.

13      THE COURT: Okay.

14      MS. LOEFFLER: So that's why we're --

15      THE COURT: That's why you're not objecting.

16      MS. LOEFFLER: That's why I'm not objecting, Your

17    Honor.

18      THE COURT: Okay.

19      MS. LOEFFLER: I agreed to stipulate to this.

20      MR. OFFENBECHER: And counsel stipulates that that is

21    in fact what the transcript says?

22      MS. LOEFFLER: Yes, it's what the transcript says.

23      THE COURT: Well, I -- it appears that -- I'm looking

24    at it as well. That's what it says.

25      MR. OFFENBECHER: Thank you. We don't have any other

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG Document 742 Filed 09/23/14 Page 55 of 265
(720) 384-8078 attrans@sbcglobal.net

1  questions.

2         THE COURT:  Cross-examination?

3         MS. LOEFFLER:  No, Your Honor.

4         THE COURT:  Thank you, sir.  Now you're excused.  Okay,

5  leave the chair.  The government's next witness.

6      (Witness excused)

7         MS. DUIGNAN:  The government calls Chief Mills to the

8  stand, Your Honor.

9         THE COURT:  Okay.

10         THE CLERK:  And, Mr. Offenbecher, I wanted to clarify.

11  That exhibit was DE-118.  Correct?

12         MR. OFFENBECHER:  That's right, yes.

13         THE CLERK:  Okay, thank you.

14         THE COURT:  All the way up to the front.  Let's see,

15  there's a door that pulls out.  You can just pull the door out.

16  And then if you remain standing just for a minute, she's going

17  to swear you in over here.

18         THE CLERK:  Please raise your right hand.

19         **JERE MILLS, PLAINTIFF'S WITNESS, SWORN**

20         THE CLERK:  Okay, thank you.  Please have a seat.  And,

21  ma'am, if you can please state and spell your full name.

22         THE WITNESS:  Jere Mills.  J-e-r-e, last name, M-i-l-l-

23  s.

24         THE CLERK:  Thank you.

25         THE COURT:  All right, is that chair comfortable?  We

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 742  Filed 09/23/14  Page 56 of 265
(720) 384-8078  attrans@sbcglobal.net

1   just put it there and I don't know if it's been adjusted.  Is

2   that okay for you?

3              THE WITNESS:  It's fine, sir.

4              THE COURT:  Okay.  All right.  Counsel.

5                        **DIRECT EXAMINATION**

6   BY MS. DUIGNAN:

7   Q    Good morning.  Chief Mills, can you please explain what

8   organization do you work for?

9   A    I work for the U.S. Coast Guard.

10  Q    And how long have you been in the Coast Guard?

11  A    Sixteen years in July.

12             THE COURT:  And can you just pull the mic down just a

13  little bit, so it's a little closer to you?  Okay.

14  BY MS. DUIGNAN:

15  Q    What is your current rank and rate?

16  A    E-7, chief yeoman.

17  Q    And can you please explain to the jurors what a yeoman

18  does?

19  A    Basically, I'm an administrative assistant.  I do travel

20  claims, TDY orders, PCS orders, which are new transfer, memos,

21  letters, that -- those kind of -- and I'm keeper of the records

22  as well.

23  Q    And, Chief, where are you currently stationed?

24  A    I'm currently stationed at COMMSTA Kodiak.

25  Q    And were you stationed there on April 12th, 2012?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 57 of 265
(720) 384-8078   attrans@sbcglobal.net

1   A    Yes, I was.

2   Q    Please pull up Exhibit 83.  If you look at the screen in

3   front of you, there's going to be an exhibit.

4   A    Yes.

5   Q    Do you recognize what that document is?

6   A    Yes, it's a -- an enlistment contract.  It looks like it's

7   ET1 Hopkins' indefinite enlistment contract.

8   Q    Go to page 2.  And looking over that document, can you

9   explain whether that's a document you would normally keep in

10  the course of your duties?

11  A    Yes, it is.  It's kept in section 1 of the personnel

12  record.

13  Q    And does it appear to be properly completed and executed?

14  A    Yes, it does, ma'am.

15       MS. DUIGNAN:  At this point I'd like to offer Exhibit

16  83 into evidence.

17       MR. OFFENBECHER:  No objection.

18       THE COURT:  Be received.

19       (Plaintiff's Exhibit 83 admitted)

20       (Side conversation)

21  BY MS. DUIGNAN:

22  Q    Looking at the screen, you said that it was an indefinite

23  contract.  What does that mean?

24  A    That means that it takes him out to his 30-year mark from

25  when he first joined the Coast Guard.

1  Q    Okay.  So the last enlistment contract -- what date is on

2  the contract?

3  A    I can't see it from here.

4  Q    Oh, the second -- we need the second page.

5  A    The -- the date of the contract is up on the -- it's on

6  the first page.  That's the date he signed it.  It would be

7  in -- right -- right there, yeah.

8  Q    Okay.  In block 5?

9  A    Yes.  So February 17th, 2006 -- is that what it says?

10 Q    Okay.  And so when you say indefinite, that means that it

11 would take him through to the end of his career?

12 A    Till 30 years.

13 Q    Thank you.  How long have you been stationed at

14 Communication Station Kodiak?

15 A    I got there in July of 2011.

16 Q    And did you ever have any occasion to socialize with

17 anybody who worked at the rigger shop in T2?

18 A    Yes, I did.  Usually on a daily basis they'd come up.  I'm

19 in the front office, so -- I'm not quite sure.  I -- I think

20 they would be checking with either supervisors or just kind of

21 connecting with everybody else up at the top, usually.

22 Q    How frequently did you see the defendant, James Wells?

23 A    On a -- on a daily basis.  They would usually come up

24 every day.

25 Q    And were you aware of the dates he was on medical leave?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 742  Filed 09/23/14  Page 59 of 265
(720) 384-8078  attrans@sbcglobal.net

MILLS - DIRECT

1  A    I don't remember the exact dates.  I do know he left late

2  in 2011.  He came back at around February 2012.

3  Q    Before he left on medical leave, did you interact with him

4  regularly?

5  A    Yes.  I have -- I had a -- a mastiff puppy that I used to

6  walk down there.  Or I would just walk down there because I

7  would need either paperwork or kind of just get out of my

8  office.  So I'd go down there and -- and talk to everybody.

9  Q    How would you describe your interactions with mis --

10 demeanor before he left for medical leave at the end of 2011?

11 A    Friendly.  Talkative.  Just a normal everyday

12 conversation, "How are you doing," you know, "How are the

13 kids," that is, "How is Kodiak treating you," that kind of

14 deal.

15 Q    And did you have any interactions with him after he

16 returned from medical leave in -- I think you said March of

17 2012?

18 A    I did.  I didn't -- I still went down to the rigger shop,

19 not really too often, maybe twice a week.  But they still came

20 up generally about every day.

21 Q    And at that point did you notice any difference in Mr.

22 Wells' demeanor?

23 A    Yeah.  He was not talkative at all.  He didn't -- he would

24 kind of just stand in the front office.  He wouldn't say hi, he

25 wouldn't ask me how I was doing.  Not that, I mean, everybody

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 60 of 265
(720) 384-8078   attrans@sbcglobal.net

1  has to do that.  But when you're there every day, it's kind

2  of -- just generally, people -- people talk and say hi.  But he

3  seemed withdrawn and -- and wasn't talkative at all.

4  Q    Thank you.  I don't have any further questions.

5        THE COURT:  Cross-examination.

6                  **CROSS-EXAMINATION**

7  BY MR. CURTNER:

8  Q    Chief Mills, do you know how serious Mr. Wells's medical

9  conditions were?

10 A    No, I don't know exactly.

11 Q    Did you know that when he came back from medical leave, he

12 had just gone through gallbladder surgery and hernia surgery?

13 A    No, I did not.

14 Q    Do you have any idea how that surgery and how his illness

15 may have affected him?

16 A    Actually, I do.  I just went through gallbladder surgery

17 myself in December.

18 Q    Okay.  And so that's a significant surgery, correct?

19 A    It was.

20 Q    Okay.  That's all I have.  Thank you.

21        THE COURT:  Redirect?

22        MS. DUIGNAN:  No, Your Honor.

23        THE COURT:  All right.  Thank you, ma'am.

24        THE WITNESS:  Thank you.

25        THE COURT:  You're excused.  The government's next

 1  witness.

 2      (Witness excused)

 3      MS. LOEFFLER:  The government's next witness is Dr.

 4  Reid Meloy.

 5      (Side conversation)

 6      MS. LOEFFLER:  I just need to figure out technology.

 7  Just give me a sec so she can instruct me.

 8      THE COURT:  Okay.

 9      (Side conversation)

10      THE COURT:  All right, sir, we've got a seat for you

11  right up front.

12      THE CLERK:  Sir, if you can please raise up your right

13  hand.

14      **JOHN REID MELOY, PLAINTIFF'S WITNESS, SWORN**

15      THE CLERK:  Okay, thank you.  Please have a seat.  And,

16  sir, if you can please state and spell your full name for the

17  record.

18      THE WITNESS:  Yes.  My name is John Reid Meloy.  R-e-i-

19  d, M-e-l-o-y.

20      THE CLERK:  And "John's" common spelling?

21      THE WITNESS:  I'm sorry, J-o-h-n.

22      THE CLERK:  Thank you.

23      THE COURT:  Counsel.

24                    **DIRECT EXAMINATION**

25  BY MS. LOEFFLER:

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 742  Filed 09/23/14  Page 62 of 265
(720) 384-8078  attrans@sbcglobal.net

1  Q    Dr. Meloy, what's your profession?

2  A    I'm a forensic psychologist.

3  Q    What is a forensic psychologist?

4  A    It's a individual who is a psychologist and then applies

5  the -- the science of psychology to issues of the law.

6  Q    What's your educational background to become a forensic

7  psychologist?

8  A    I received a master's degree at the University of Illinois

9  in 1974 and then I received another master's degree at

10  McCormick Theological Seminary in 1975.  And then I received

11  a -- a Ph.D. in 1981 from United States International

12  University, and then was licensed as a psychologist in 1982 and

13  was board certified in forensic psychology in 1991.

14  Q    Can you give me a brief summary of your work experience to

15  date in the field of forensic psychology?

16  A    Yes.  I was -- as soon as I was licensed, I was given an

17  opportunity to set up and direct a -- a treat -- a psychiatric

18  treatment unit, a small 24-bed unit in a maximum-security

19  setting.  And this was to treat individuals who were charged

20  with felonies and also had a psychiatric disorder.  And I did

21  that for four years.  That was called a psychiatric security

22  unit.  And then following that -- and that was -- actually in

23  San Diego, California.  And then following that, in 1986 I was

24  appointed chief of the Forensic Mental Health Division for San

25  Diego County.  And then I spent approximately 11 years in

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 742  Filed 09/23/14  Page 63 of 265
(720) 384-8078  attrans@sbcglobal.net

1  public service, running the various treatment and diagnostic

2  programs for San Diego, which included treatment of men and

3  women in custody, treatment of individuals who were found not

4  guilty by reason of insanity and released back to the community

5  in what we call a involuntary outpatient program.  And then

6  also I was in charge of the court diagnostic clinic, which

7  provided evaluations for the judges in San Diego County.

8  Q   At some point -- I want to go over this thing -- at some

9  point you said -- you talked about that you did this public

10  service.  Did you go out and -- in the private area?  And when

11  was that?

12  A   Yes, that -- that began in -- full-time in about 1997, and

13  then since then I have been doing consulting in forensic

14  psychology, mostly criminal work, some civil work that has

15  arisen out of criminal behaviors.  And I've been doing that

16  full-time since nine -- about 1997.

17  Q   Okay.

18      THE COURT:  Okay.  I'm hearing -- I'm getting a

19  feedback, and I don't know if it's coming from that microphone

20  or this microphone or your microphone, but it's a little bit

21  disturbing.  Let's be --

22      MS. LOEFFLER:  Let me push this here, and maybe that'll

23  solve the problem.

24      THE COURT:  And your -- you might be a little close to

25  the microphone.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 742  Filed 09/23/14  Page 64 of 265
(720) 384-8078  attrans@sbcglobal.net

 1          THE WITNESS:  I'm a little close, okay.

 2          THE COURT:  Yeah.  But let's keep going.

 3          MR. OFFENBECHER:  Your Honor, could we approach just

 4  for one just brief moment?

 5          THE COURT:  All right.

 6          MR. OFFENBECHER:  Counsel.

 7     (At sidebar with the Court and counsel)

 8          MR. OFFENBECHER:  Your Honor, I apologize for the

 9  interruption.  It's just something I forgot to do.  I just want

10  to make sure that we have our -- a continuing objection to his

11  testimony in terms of (indiscernible), because I understand

12  that the Court still has -- is going to determine whether it's

13  admissible.

14          THE COURT:  (Indiscernible) I thought they already

15  (indiscernible), now you're (indiscernible).

16          MS. LOEFFLER:  (Indiscernible).

17          THE COURT:  Okay.

18          MR. OFFENBECHER:  Right.  And one other thing, Your

19  Honor.  I don't know whether Ms. Loeffler intends to do this,

20  but -- to tender the witness a an expert.

21          MS. LOEFFLER:  Of course (indiscernible).

22          MR. OFFENBECHER:  I don't think it's necessary.  It

23  makes it give the imprimatur of the Court that he is an expert.

24  You've already ruled that you're going to let him answer

25  questions, but --

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 742  Filed 09/23/14  Page 65 of 265
(720) 384-8078  attrans@sbcglobal.net

MELOY - DIRECT

1    THE COURT:  Well, that's standard.  But if she wants

2    to -- she -- present him as an expert, she can present him.

3    I'll let you voir dire if you want to voir dire.

4    MR. OFFENBECHER:  Well, we've indicated our objections

5    to it, but --

6    THE COURT:  Okay.

7    MR. OFFENBECHER:  -- (indiscernible) --

8    THE COURT:  Your objection is based on relevance, not

9    on his expertise, right?

10    MR. OFFENBECHER:  Right.

11    THE COURT:  Okay.

12    (End of sidebar)

13    THE COURT:  All right, counsel.

14  BY MS. LOEFFLER:

15  Q    Dr. Meloy, I think when we had that break I was asking you

16  about your private consultation services, and I think you had

17  said that you had -- most of it involves criminal matters?

18  A    Correct.

19  Q    Okay.  And obviously we're the prosecution side and we

20  hired you for this case.  Correct?

21  A    Yes.

22  Q    Okay.  Do you also work for the defense?

23  A    Yes.

24  Q    What's about the -- you know, do you have a percentage

25  weight of how much you're on the defense side and how much

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 742  Filed 09/23/14  Page 66 of 265

**MELOY - DIRECT**

1  you're on the prosecution side?

2  A    Yeah.   Of course it varies through the years, but right

3  now it's running about probably 60 percent defense, 40 percent

4  cases where I'm retained by the prosecution.

5  Q    Okay.   And in your private area, what is the -- what are

6  the consultations and the work that you've done?

7  A    Typically, the cases that I work are homicide cases, and

8  they're complex or unusual homicide cases, multiple homicide

9  cases, serial homicide cases, sexual homicide cases.   And then

10  also I have -- I do a lot of work in the area of threat

11  assessment.   So one way I like to think about what I do is a

12  threat assessment focuses on preventive work, working with

13  various government entities, corporations, universities, to

14  help manage people that are at risk for being violent.   And

15  then the court work I do is typically postoffense work, so it's

16  after an event has happened, where I've been brought in to help

17  understand why a particular event occurred or why an individual

18  did what he did.

19  Q    Now, have you been studying and researching in the field

20  of targeted and other -- basically, these types of events?

21  A    Yes.

22  Q    What types of -- and I don't want you to go through

23  everything, but how many -- have you written lots of papers

24  and -- in this area?

25  A    Yes, I have.

1  Q    What type of research have you done?

2  A    Well, we have done a series of studies specifically on

3  multiple homicides where an individual will kill more than one

4  individual at the same time.  Those studies started in 1997 and

5  there have been I think seven to date.  And then we have one

6  that's currently in press that has yet to be published.  I also

7  have done work in the area of targeted violence in terms of

8  understanding the behaviors that are seen prior to an event

9  like this occurring, and the psychological motivations that are

10 involved in some cases and the psychiatric disorders that are

11 involved in some cases.

12     Then this work has appeared through the years in various

13 forensic psychiatric and psychological journals, and then it's

14 also appeared in a number of books that I've either written,

15 co-written, or have edited or co-edited.

16 Q    Have you been qualified as an expert in -- sir, we have a

17 hand.  I think somebody's having trouble hearing -- me.

18     MS. LOEFFLER:  Okay, how about -- maybe if I stand

19 back, if I was causing the echo.

20     THE COURT:  I don't know, but you need to speak into

21 the microphone.

22     MS. LOEFFLER:  Okay, sorry.  Usually, I think my voice

23 is too loud, so I was trying to do this.  Okay.  Here we are.

24 BY MS. LOEFFLER:

25 Q    Dr. Meloy, have you been qualified as an expert to testify

1  in both state, federal, and local courts?

2  A    Yes, I have.

3  Q    Do you recall how many times?  Do you know?

4  A    Well, I've been qualified in several federal

5  jurisdictions.  I'm currently retained in two other federal

6  cases at present.  I've also been retained and qualified as an

7  expert in about 24 different states.

8  Q    Okay.

9          MS. LOEFFLER:  Your Honor, I would move Dr. Meloy as an

10 expert in targeted, intended workplace multiple-homicide

11 violence.

12         THE COURT:  Any voir dire?

13         MR. OFFENBECHER:  No, Your Honor.

14         THE COURT:  He can be received in that capacity.

15 BY MS. LOEFFLER:

16 Q    Okay.  Now, Dr. Meloy, did you produce a report in this

17 case?

18 A    Yes, I did.

19 Q    And I want to make very clear, you did not examine Mr.

20 Wells and you're not going to testify about Mr. Wells.  Right?

21 A    Correct.

22 Q    You're going to talk about the principle -- psychological

23 principles that appear in these types of violence?

24 A    Yes, the data that's been generated as well as the

25 understanding and interpretation of that information that's

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 69 of 265
(720) 384-8078   attrans@sbcglobal.net

1   been uncovered by our own research group as well as other

2   groups that have been studying these matters for 20, 25 years.

3   Q    Okay.  And did you prepare a Power -- basically, a

4   slide -- PowerPoint to help explain your testimony to the jury?

5   A    Yes.  Along with my report, then I prepared a PowerPoint,

6   which is a -- a visual summary of the report.

7         MS. LOEFFLER:  Okay.  And I would -- Your Honor, I'm

8   not going to move it in, but I am going to display it and it

9   has been produced.

10        THE COURT:  Okay.

11        MS. LOEFFLER:  Okay.  So, Kim, if we could pull up --

12  we marked it as Exhibit 10, so that it is marked.

13        THE COURT:  Very well.

14  BY MS. LOEFFLER:

15  Q    And, Dr. Meloy, I think the easiest thing is -- we should

16  have a wireless mouse, that if you just do the side button you

17  go -- you'll be able to go to the next slide.

18  A    Okay.

19  Q    And I'd rather put it in your hands --

20  A    Okay.

21  Q    -- if I may do that.

22  A    Sounds good.

23  Q    Let's see how this works.  Okay.

24        (Side conversation)

25  Q    So this is just who you are in your -- where you work,

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 70 of 265
(720) 384-8078  attrans@sbcglobal.net

1  right?

2  A    Yes.  This is a -- this is who I am professionally and

3  this is also -- I have a -- a clinical appointment as a

4  professor of psychiatry at University of California San Diego.

5  Q    And let's go to the next slide, please.  Right.

6  A    Would -- would you like me to just speak to the --

7  Q    Well, I'm going to ask you questions.

8  A    Okay.

9  Q    But I will -- but I want to --

10  A    Okay.

11  Q    So just in terms of retention, that means that we hired

12  you, right?

13  A    Correct.

14  Q    And what did we hire you to do and what did you do at the

15  beginning of that hiring process?

16  A    Yes.  You hired me to -- for my expertise in targeted and

17  intended violence, workplace violence, multiple-homicide, and

18  then the personality psychological characteristics of those who

19  commit such acts.  Initially you provided me with records

20  specific to this case, which I did review.  I recognized that

21  those were not all the records, but I did review material

22  specific to this case.  And then I issued a report in November,

23  approximately six months later, seven months later, on the

24  general scientific findings concerning the four areas noted

25  above.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 742  Filed 09/23/14  Page 71 of 265
(720) 384-8078  attrans@sbcglobal.net

1  Q   Okay.  And if I can turn to the -- have you turn to the

2  next slide now.  I want to make clear the limits of what you

3  are testifying to.

4  A   Yes.

5  Q   And what are you not testifying to?

6  A   Yes, I -- I have no opinions about Mr. Wells specifically

7  and I'm not going to be testifying about any motivations,

8  psychological characteristics, or personality characteristics

9  specific to -- to Mr. Wells.

10  Q   Okay.  But what you are going to be doing and we'll --

11  before we turn to the next slide -- is sort of explaining

12  for -- the jury can then decide what applies, right?  You're

13  not going to talk about facts?

14  A   I'm not going to talk about that at all.

15  Q   You're going to talk about what the research shows of

16  characteristics for these types of targeted and multiple

17  homicides?

18  A   Yes.  All the various motivations as well as the data that

19  we -- that we have.

20  Q   Now I'd like to you turn to the next slide, please.  Okay.

21  You've said the -- titled this slide Two Modes of Violence.

22  And can you explain to the jury what you mean by that?

23  A   Yes.  For -- for about the past half-century, actually

24  going back now a little bit further than that, back to the

25  1940s, there have been researchers, and they began with animal

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 742  Filed 09/23/14  Page 72 of 265
(720) 384-8078  attrans@sbcglobal.net

1   research, looking at the fact that there appear to be two

2   different modes of violence in mammals in general and in humans

3   in particular.  And this research has evolved through the

4   decades.  Again, it actually began with cats back in the -- in

5   the 1940s, and then has been applied now to humans for about

6   the past 30 years.

7       And it -- there's strong scientific evidence, in my

8   opinion, that there are two different kinds of violence that

9   have different biological bases in human beings and in other

10  mammals.  The first one is called targeted or intended

11  violence, and that also in the research is referred to as

12  predatory violence.  And this is the -- simply put, this is --

13  this is hunting.  And we know from an evolutionary perspective,

14  if we go way back to when we were -- our ancestors, that those

15  that were very good at hunting were the ones that were able to

16  survive and they engaged in what's referred to as predatory

17  violence.  And that is now referred to, in more contemporary

18  times, as targeted or intended violence.

19  Q   By targeted and intended violence -- I'm going to break it

20  even more into some --

21  A   Sure.

22  Q   -- what I would call -- that means, like, if you kill

23  somebody, you were trying to kill that person?  Is that a --

24  A   Yeah.  Typically -- and I'll talk about this in a bit --

25  but you plan and prepare for it, you've made a decision that

1  you're going to do this, and then you carried it out in an

2  intended fashion.

3  Q    And what's the other one?

4  A    The other one is much more common.  And this is what's

5  referred to as emotional or reactive violence, otherwise known

6  as affective.  Affect is a word we refer to describe emotion.

7  And this is the kind of emotion that occurs and the kind of

8  violence that occurs when we're -- when we're threatened.  And

9  the -- the analogy I use with animals is the difference between

10 how, for instance, a -- a cat would behave when it's being --

11 when it's cornered by another animal, with its claws out and

12 its teeth baring and making lots of noise and its hair standing

13 up on end, versus the same cat in the back yard, stalking a

14 wounded bird, where it's very quiet, the hair's not standing up

15 on end, it's very focused, and it tends to not make any noise

16 whatsoever.  And this was actually how some of this research

17 was first -- this difference was first discovered.

18 Q    Now I'm going to ask you to turn to the next slide,

19 because you were just talking about the affective, emotional,

20 or reactive violence.  And in this slide can you -- I'm sorry.

21 A    There we go.

22 Q    Okay.

23 A    Okay.

24 Q    In this slide can you explain what types of workplace

25 violence this is?  What are the characteristics?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1  A    Well, this is, again, the most common violence that we

2  see.  It's also the most common violence we see in the

3  workplace.  It's a reaction to a threat.  And what happens is

4  actually two basic things in the body.  We feel typically very

5  angry or very fearful.  Like, for instance, if there was a -- a

6  stranger approaching your child and you didn't know what their

7  intent was, immediately you would feel a sense of vigilance and

8  fear, if not anger.  And that is accompanied by what we call

9  autonomic arousal, so your breathing accelerates, your heart

10 rate accelerates.  We've all had this experience where we felt

11 threatened.  And this is something you don't control.  This is

12 coming out of the deeper -- called the limbic portions of the

13 brain.

14      And this is purely defensive.  This kind of violence is

15 purely defensive.  And the purpose of it is to make the threat

16 go away.  It's as simple as that.  You do things, you're

17 behaving in ways to make the threat go away.  In fact, two of

18 the things we do is we tend to try to look bigger than we are

19 in the face of a threat, and in a sense we're wired to do that

20 so that the threat will -- will leave us and go someplace else.

21 Q    So can I ask you, in this type --

22 A    Sure.

23 Q    I'm sorry.  In this type of violence, you would ex -- that

24 would be something where you would hear -- you know, there's

25 screaming, there's loud -- you would actually -- a threat would

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 742  Filed 09/23/14  Page 75 of 265
(720) 384-8078  attrans@sbcglobal.net

1  be conveyed and there's an immediate reaction?

2  A    Yeah, the --

3  Q    Yeah.

4  A    -- reaction is immediate.  And one of the common things

5  that all mammals do, including humans, is we yell, we vocalize.

6  So your dog does this, your cat does this, we do this typically

7  before we're going to be affectively violent.  And part of that

8  is to just make the -- just make the threat go away, whatever

9  it might be.  And again, this is the most common mode of

10  violence that we see in the workplace, is people getting mad at

11  each other, yelling at each other, and on occasion, you know,

12  assaulting each other.

13  Q    And I'm going to ask you to go to the next slide.  We have

14  a --

15            JUROR NO. 12:  Your Honor?

16            THE COURT:  Yes.

17            JUROR NO. 12:  I'm sorry, but I forgot to take my phone

18  out of my pocket when we were --

19            THE COURT:  Is it turned off?

20            JUROR NO. 12:  Huh?

21            THE COURT:  Is it turned off now?

22            JUROR NO. 12:  No, but it's on silent.

23            THE COURT:  Well, turn it off.  And just hand it down

24  to Ruth, and she'll take care of it.  And get -- how's that?

25  Thank you very much for bringing that to -- attention.  That's

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 742  Filed 09/23/14  Page 76 of 265
(720) 384-8078  attrans@sbcglobal.net

1  an easy problem.

2      MS. LOEFFLER:  Yeah, I thought somebody else couldn't

3  hear me, and I was thinking, I can't yell any louder.

4  BY MS. LOEFFLER:

5  Q   Okay, let me go to this slide, which you -- you've titled

6  Targeted or Intended Violence.  And can you explain, using the

7  slide that you have here, what is targeted or intended or what

8  you call predatory violence?

9  A   Yes.  This is again -- the -- the simple term for this,

10  and other -- other terms are -- used are predatory or

11  instrumental.  It's also -- it comes out of our -- out of

12  the -- the whole notion of hunting.  Typically, this involves

13  planning, tactical planning.  It's purposeful and it's

14  opportunistic.  In other words, there typically is thought

15  given to when and where this violence should occur.  So

16  opportunism is not -- it's not impulsive.  You know, it -- it

17  may happen very quickly, but it's in a sense striking while the

18  iron is hot.  There's a plan involved in that.

19  Q   Let me ask you -- there -- you talked about opportunistic

20  versus impulsive.  Is the affective or emotional reactive

21  violence much more impulsive?

22  A   Yes.

23  Q   Okay.

24  A   Yes.

25  Q   And when you set opportunistic for targeted and intended

**MELOY - DIRECT**

1  violence, how does that relate to planning and --

2  A   Well, planning is typically finding an opportunity where

3  the act could be carried out successfully.

4  Q   Okay.  And that goes to this -- the predatory as opposed

5  to the affected?

6  A   Yes.  And again, the analogy here is -- is hunting.  If

7  you're a hunter, you're -- are going to look for the -- the

8  opportunity to kill the game in terms of geography, location, a

9  whole variety of other characteristics.  But the actual act

10  itself may be quite sudden.

11  Q   Okay.  Let me turn to some of the other things that you

12  mentioned on here.  You said that there is no imminent threat.

13  Is that -- how does that play in?

14  A   That's a important distinguishing characteristic, because

15  it means that in -- in reactive violence, the other kind, the

16  affective violence, typically, there's always an imminent

17  threat.  And it's -- it -- it may be one person or several

18  persons that are about to do something to you or do something

19  to a loved one.  Typically --

20  Q   That's in the emotional reactive you're talking about?

21  A   Yeah, exactly.

22  Q   Okay.

23  A   And in this case, typically, when you look carefully at

24  all the -- the fact pattern in a case, you won't find any

25  imminent threat toward the individual that has carried out the

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 78 of 265
(720) 384-8078  attrans@sbcglobal.net

**MELOY - DIRECT**

1   act.

2   Q    In a predatory case?

3   A    In a predatory case, correct.

4   Q    Okay.  Okay.  Now I'm going to turn to -- if we can turn

5   to the next slide --

6   A    Sure.

7   Q    -- please.

8        (Side conversation)

9   Q    Okay.

10  A    I'm trying.

11  Q    Kim, can you go help him out, or maybe our battery went.

12  A    Yeah, I'm -- I'm hitting the button, but it's --

13  Q    Let's see if we can do it.

14  A    -- nothing --

15  Q    Oh, that works.  Oh, well, in that case, we've got

16  somebody who can take of this.

17  A    Okay.

18  Q    Okay.

19  A    Thanks.  I'll let you do that.

20       (Side conversation)

21  A    Okay.

22  Q    You've done -- I take it you've done a lot of research

23  and -- you talked about how this analogy works with animals,

24  but this is stuff that you studied with people in real violence

25  and real acts of homicide.  Right?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 742  Filed 09/23/14  Page 79 of 265
(720) 384-8078  attrans@sbcglobal.net

**MELOY - DIRECT**

1  A    Correct.

2  Q    For how many years?

3  A    About 20, 25.

4  Q    Okay.  I want to turn to the workplace violence and let

5  you go through and explain to the jury the statistics that your

6  research has shown.

7  A    Yes.  Now a couple of comments.  This is not my research

8  here.  This is federal government data from several sources.

9  You can see at the bottom I put National Center for Victims of

10  Crime and the Bureau of Labor Statistics.  These are two groups

11  that generate national data.

12       Workplace violence is the leading cause of workplace

13  injury, but it's usually minor.  There are about 500,000 acts

14  of workplace violence in the United States each year.  But it's

15  typically simple as -- you know, a simple assault, a battery,

16  some kind of attack that does not result in serious physical

17  injury to the person.  However, and -- here's data from --

18  typically, the data lags a couple years.  That's why it says

19  2014 and I'm showing you 2012 data.  And this data, just to

20  note, was not in my report because the data hadn't come out

21  yet, and the report was --

22  Q    So it's just updated statistics?

23  A    This is updated data.

24  Q    Okay.  Why don't you go ahead --

25  A    But --

**MELOY - DIRECT**

1  Q    -- and look at --

2  A    -- there have -- in nine -- 2012 there were 463 homicides

3  in the workplace.  That is a very rare event, when you think

4  about the millions of people that are working in the U.S.

5  About 375 of those were intentional shootings, meeting --

6  meaning that it was intended violence and a firearm was used.

7  Okay, it doesn't -- the report -- this -- these bureau reports

8  don't specify what the firearm was.  But about 375 were

9  intentional.  10 percent were done by a co-worker and 6 percent

10  by a -- a spouse.  So you can see again how rare this -- if you

11  look at 10 percent, that's about 38 people throughout the --

12  you know, the millions of people that are working.

13       And the last point I make up here is just one that I think

14  we need to all remember, and that is violence in the workplace

15  is actually very rare, and it -- and it's actually the safest

16  environment that we can be in.  And it occurs -- it's about

17  five people per thousand employees are victimized by violence,

18  so that's about .5 percent.  So it tends to be very, very low.

19  Q    Okay.  Can we turn to the next slide and just have you

20  explain statistics --

21       (Side conversation)

22  A    Yes.  Now, this is another -- just a visual way to look at

23  this.  And notice, however, just as a first point of reference,

24  this is 2010 data, so this is a couple years before the

25  previous slide.  But I wanted to show you how most of the

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 742  Filed 09/23/14  Page 81 of 265
(720) 384-8078  attrans@sbcglobal.net

1  violence in the workplace is done during a -- a felony crime

2  such as robbery.  So this could be like in a -- in a 7-Eleven

3  store or retail market, something along those lines.

4      And work associates come next, and you can see that in

5  sort of -- it's kind of a darker maroon color.  And then

6  relatives is the little blue, and then other personal

7  acquaintances is the yellow.  But I -- this is proportionally

8  in terms of where most of the homicides occur in a workplace

9  settling.

10 Q  Okay, if we can turn, Kim, to the next slide.  And this is

11 a pie chart with some of -- does it have some of the same

12 percentages?

13 A  Yes.  You can't see this because of the -- just the

14 lighting, but the green are -- are robberies.

15 Q  Okay.

16 A  And then the -- the maroon on the left is part of the pie

17 chart that is co-workers, and then the yellow is -- I think the

18 yellow is partners or ex-partners, but I can't quite see that.

19 But again --

20 Q  If you look at --

21 A  -- propor --

22 Q  -- your screen you can see it.

23 A  Propor -- yes.  That's --

24 Q  Uh-huh (affirmative).  Okay.

25 A  That's it.  The yellow is spouses, intimates, and exes.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 742  Filed 09/23/14  Page 82 of 265

1  The green is robberies and other criminal perpetrators.  And

2  then the maroon is co-workers and former co-workers.  So again,

3  just -- this visually represents how -- the proportion --

4  Q    Now I want to --

5  A    -- of homicides.

6  Q    -- ask you some followups (indiscernible).  You said

7  that -- you had -- that yellow part is spouses and intimates.

8  And I just want to ask you, of the spouses and intimate

9  workplace violence, are -- how much is affective versus

10 predatory, the -- you know, the emotional versus the planning

11 and opportunistic?

12 A    Typically, when it's -- when it's -- when it comes into

13 the workplace, it's likely to have a predatory or planned

14 component to it.  However, of course, in the home it tends to

15 more affective, more emotionally driven.  But usually when it

16 comes into the workplace, there's some planning and preparation

17 to do that.  And that happens about -- and when you have an

18 abusive domestic relationship, about 10 percent of the time it

19 will be brought into the workplace.

20 Q    Now, do you have a breakdown from your experience and your

21 research of -- and your work of male versus female, when it

22 comes into the workplace?

23 A    Yeah.  This -- virtually always males that engage in --

24 spouses, intimates, and exes -- typically, it's the male

25 that -- that does the killing.

1 Q   Okay.  Now, if there are -- when you talk about one -- and

2 let me ask you again to break down the percentage of it that's

3 more than -- if the killing is more than one person in the

4 workplace?  How often is that if --

5 A   That is -- that's -- that's extremely -- that's an

6 extremely rare event.  And actually, the -- the Bureau of Labor

7 statistics doesn't even put out that data.  So I can't tell you

8 federal or national data on multiple homicides in the

9 workplace.

10 Q   Okay.  I want to turn to the next slide, please.  And then

11 you just have a list of what the highest-risk professions are

12 for workplace violence?

13 A   Yes.  Again, this probably won't surprise anybody.  But

14 law enforcement, mental health, security guards, bartenders,

15 retail sales employees have the highest risk for -- for being a

16 victim of violence in the -- in their work setting.

17 Q   Now I want to turn to the next slide, please, Kim.  And

18 you've listed that as targeted homicides in the workplace other

19 than robbery.  For targeted again, can you -- what does

20 targeted mean?

21 A   Targeted means that in a -- that a target or targets have

22 been selected in advance.  And then there's planning and

23 preparation surrounding that.

24 Q   And for target -- I kind of use it like it means if you

25 kill somebody, that was -- you actually wanted to kill that

1  person.

2  A    Correct.

3  Q    Okay.  Now, when you say -- the first one, you said most

4  involved -- I guess one perpetrator and one victim?

5  A    Yes.  Now, what I've excluded here are robberies.  And

6  what I'm focusing here now are in the other -- individuals who

7  would perpetrate a workplace targeted homicide.  Typically,

8  it's one perpetrator and one victim.

9  Q    Okay.

10 A    Typically, it's a firearm that's utilized.  And then this

11 is typically the -- the pattern we see motivationally, that

12 there's a grievance, and a grievance is a reaction to an

13 accumulation of losses or humiliations.  These grievances may

14 be delusional, meaning that the person is psychotic, so they

15 have -- they've lost contact with reality, or they could be

16 real.  They could be real events that have happened and -- or

17 both.  And then a decision is made to intend to be violent.

18 And then typically these individuals will begin to move on a

19 pathway toward the violent act itself.

20 Q    Now, I -- as you mentioned in this slide, that some of

21 these people have grievances and those are people that are

22 psychotic and mentally ill.  And that -- that's some of the

23 basis for workplace violence other than robbery.  Right?

24 A    Correct.

25 Q    Does it also happen with people that don't have any

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 85 of 265
(720) 384-8078   attrans@sbcglobal.net

1  diagnosed mental illness?

2  A   Correct.

3  Q   Okay.  And you're going to get into some of the

4  motivations for that type?

5  A   Yes.  Yes.

6  Q   Okay.  I'll turn to the next slide then, please, Kim.  And

7  can you tell us what this -- please just go through and

8  explain what this (indiscernible).

9  A   Yeah.  This is the elaboration of a -- of the pathway to

10  violence.  This was first talked about specifically by Robert

11  Fein and Bryan Vossekuil at the U.S. Secret Service in their

12  publications in the 1990s.  It was then elaborated upon by Ted

13  Calhoun and Steve Weston in their work that was published in

14  '03.  And they literally put the stages here.

15      But this is -- this is simplified, so it's a schematic.

16  But typically individuals will move along the pathway.  So

17  the -- the grievance is the point at which they blame others

18  for the circumstance in their life or the problem.  They take

19  no personal responsibility for it.  "Other people did this to

20  me" or other person -- "Another person did this to me."

21  Q   And then when you say violent ideation, what does ideation

22  mean?

23  A   Violent ideation is thoughts.  So a person could begin to

24  have fantasies, thinking a lot about the possibility of being

25  violent to solve their problems.  But what's important about

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 742  Filed 09/23/14  Page 86 of 265
(720) 384-8078  attrans@sbcglobal.net

1  this stage is that at this point there is a -- there's a

2  decision to intend to be violent, and there's no other way I'm

3  going to solve my problem.  Violence is the only alternative.

4  And that occurs at that stage.  Then, typically, the person

5  would --

6  Q    Dr. Meloy, I'm going to ask you to -- is -- not lean

7  towards your mic, or just push the microphone --

8  A    Oh.

9  Q    -- back a little bit, because I think it's not me, it's

10  you --

11  A    Okay.

12  Q    -- that's buzzing.  Go ahead.

13  A    The next one is then the person typically will begin to

14  research and plan, so they may start thinking specifically

15  about how they would carry out a violent event or, you know, a

16  violent act.  And this obviously is especially important if

17  they've never done this before.  And they then would begin to

18  formulate and think about alternative plans to do so, how they

19  would carry this out.  Then, once those decisions have become

20  narrowed in terms of how they're going to do it, they begin to

21  prepare.  So that preparation -- and I'm going to talk about

22  this a little bit later.  But the preparation obviously

23  involves thinking about the targets, the movement of the

24  targets, thinking about the weapons that are going to be

25  utilized, how the target's going to be approached, how the

1 person's going to leave the situation.  Sometimes in these

2 cases, actually suicide is very much a part of it, so there's

3 no plan to leave, there's a plan to kill the self after

4 they've -- after they've killed the target.

5     After the preparation is done, then there's oftentimes

6 what we call probing or breaches.  And this is where you're --

7 if you don't know about the security that's protecting the

8 target, you will plan -- or you will do things to test the

9 security and probe to see how easily the target can be

10 accessed.  And --

11 Q    Now -- and let me just ask you, you said -- you mentioned

12 at the beginning, that is in situations where somebody doesn't

13 know --

14 A    Correct.  Correct.

15 Q    -- the -- okay.

16 A    Where you need to gather information.  And this is

17 basically doing intelligence work on -- on the target.  And

18 then the last stage is the attack that is then carried out.

19 Now, another important thing to note on this is -- two things.

20 One is notice that line that says escalation.  So people can

21 travel up this pathway and they can also deescalate.  Most

22 people never get by -- never go beyond the violent ideation.

23 They may have very angry or violent thoughts toward their

24 employer, their supervisor, their spouse, but they never do

25 anything.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 88 of 265
(720) 384-8078  attrans@sbcglobal.net

**MELOY - DIRECT**

1  Q    Okay.

2  A    In --

3  Q    Now I want to turn to --

4  A    And -- and very few people progress, but some people will

5  even get up to probing and breaches and decide they're not

6  going to do it, and then they just back off.  So people that

7  actually get to the point of the attack, it's a very, very

8  small number.

9  Q    Let me turn to the next slide, Kim.  Thank you.  You said

10 there's no such thing as snapping.  Can you -- is there sort of

11 a general -- what you would say, a general myth that is not

12 supported by the studies of the actual crimes?

13 A    Yes.  And this is a myth.  You -- you still hear this

14 talked about a lot on television and you'll see this in the

15 print media and the electronic media, where people will talk

16 about how, oh, that person must have snapped, meaning that

17 they've completely lost their mind, they're out of control,

18 they don't know what they're doing, and they're like a -- a

19 rubberband that has broken and snapped.

20      And what we found in the research, not only our group but

21 all other groups, that when you begin to study targeted

22 violence, there's typically no such thing as snapping, that

23 snapping in fact isn't, in my opinion, a legitimate

24 psychological or psychiatric term.  It has no meaning.  But

25 it's very popular -- very popular in the press.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 742  Filed 09/23/14  Page 89 of 265
(720) 384-8078  attrans@sbcglobal.net

1  Q    When you say it has no psychological meaning, it also

2  doesn't have any basis in the reality of what causes these

3  murders.  Right?

4  A    Correct.

5  Q    Okay.  Can we turn to the next slide, please, Kim.  Okay.

6  So you also have some information on when -- you said

7  earlier -- let me say, you testified earlier that most

8  workplace violence involves -- or targeted is one person?

9  A    Correct.

10  Q    But you also studied and analyzed multiple murders --

11  A    Correct.

12  Q    -- of civilians, were --

13  A    Correct.

14  Q    Okay.  Because I take it you've also testified in murders

15  of, you know, noncivilians, but we're going to focus now on

16  civilians in this case, okay.

17  A    Correct.

18  Q    Okay.  So when you talk about multiple murder of

19  civilians, what are you generally talking about?

20  A    In our research that we've specifically done, we've

21  defined that as three or more fatalities, excluding the

22  perpetrator, where there are killings that occurred at the same

23  time in the same location.  This number is fairly arbitrary,

24  but it's one that's -- that's widely used among people that do

25  this kind of research.  And I'm going to show you the -- just

Case 3:13-cr-00008-SLG  Document 742  Filed 09/23/14  Page 90 of 265

 1  the list of studies in a moment very briefly, so it's not

 2  boring.

 3      But these are virtually always committed by males.  If you

 4  think back to the multiple murders that have gotten so much

 5  attention just in the past two years, just the recent Ivan

 6  Lopez case at Ft. Hood, the previous Ft. Hood shootings with

 7  Makik Hasan in 2009; Aurora, Colorado, James Holmes; Adam

 8  Lanza, these that have gotten a -- a huge amount of press

 9  coverage -- typically, these are virtually always done by

10  males.  And typically, the violence is always targeted and

11  intended.

12      And even when the news will initially report and they'll

13  have what I call entertainment profilers come on TV and say

14  that this person snapped, then over the course of days you will

15  see more data coming out on the case and being reported that

16  indicates there was much more targeted and intended violence.

17  And as a real-time example, we're starting to see that in the

18  Ivan Lopez case, where this morning there was much more detail

19  about his movements around the Ft. Hood base.

20  Q   Let me go on to the next slide, so you can explain how you

21  know that this sort of TV thing of snapping isn't true.  Kim.

22  A   Well, from a science -- behavioral science perspective,

23  this -- you know, I -- I didn't want to just assert this

24  without us figuring out if it was true or not.  And so since,

25  again, ninety sev -- since 1997, these are the things we've

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 742  Filed 09/23/14  Page 91 of 265
(720) 384-8078  attrans@sbcglobal.net

**MELOY - DIRECT**

1   done to look at whether or not these individuals lose control
2   in our -- in a highly emotional state, because we didn't think
3   they were.  But we needed evidence, we needed to test this
4   hypothesis.

5      And what has happened is there have been now lots of
6   surveillance videos of these shootings occurring.  And they're
7   not pleasant to watch, but when you do watch them, you see the
8   tactical movement of the individual in the video.  These are
9   typically security videos.  The -- the Washington Navy yard is
10  a good example where that security was -- was shown on the
11  news.

12     And then, also, we were able to get the transcripts and
13  talk to a lot of people who had survived these multiple
14  homicides.  In other words, they were not specifically
15  targeted, but observed the perpetrator, and invariably they
16  described the person as calm, controlled, deliberate, cool.
17  Those are the kind of words they used.  They do not describe
18  them as being highly emotional, angry, scared.  You do not get
19  those kinds of words as descriptors.
20  Q   Okay.
21  A   Secondly are self-descriptions.  I've interviewed about
22  four or five individuals that have committed mass murder and
23  have asked them about this, "How'd you feel at the time?"  And
24  invariably what they said to me is, "I didn't feel anything."
25  So you have the self-report from my personal forensic

1  evaluations, but also other people that have done these

2  evaluations.

3  Q    And does that -- I'm going to ask you a little bit --

4  there's a word, "empathy," that I think most of us are familiar

5  with.   And how does that fit into your studies of targeted and

6  predatory intentional violence?

7  A    Well, typically there's no empathy at the -- at the time

8  of the killings, because that would inhibit the -- the

9  killings.

10  Q    Okay.

11  A    The other -- the third source of data here is that

12  invariably with the investigation, a lot of data comes out that

13  they planned and they prepared their acts for days, weeks, or

14  months beforehand.   And then, lastly, it's just a -- a

15  evolutionary comment, that this is, I think, an evolved

16  biological advantage for all mammals.   And again using hunting

17  as an analogy, a hunter with typically -- if they -- if they

18  shift into a mode of affective violence when they're hunting

19  and get really emotional, they're going to miss the target and

20  they're going to fail as a hunter.

21  Q    Okay.

22  A    So this -- this predatory mode in a sporting context, in a

23  food-gathering context, is very important, and I think we

24  are -- we all have a capacity to do this.   And those -- our

25  ancestors that did it well were the ones that survived.   In

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 93 of 265
(720) 384-8078   attrans@sbcglobal.net

1  fact, none of us would be here unless their ancestors did that

2  well.

3  Q   Okay.  The next slide is just -- is -- and -- I know it's

4  important to you that it's footnoted all the studies you've

5  done, but I'm going to move on to the one after that.  You've

6  done a --

7  A   Yeah, this is -- the -- this just lists all the studies --

8  Q   Okay.

9  A   -- we did in this area.

10 Q   Let's go to the next one.

11 A   Yeah.

12 Q   All right.  When we talk -- now we're talking here -- when

13 you said, "In our research," are you talking about predatory,

14 what you called the opportunistic, the planned targeted

15 violence?

16 A   Correct.  And these are -- this is multiple homicide

17 research that we've done, but this is just our studies, okay.

18 And so the samples here are -- in our work are fairly small.

19 We had 30 multiple murders and -- we had 30 adult multiple

20 murders and 34 adolescent multiple murders.

21 Q   Okay.  And what were your ver -- on how much was psychotic

22 or, you know, what the --

23 A   In our study -- and there are other people that have done

24 studies like this too that come in with lower figures for

25 psychosis.  But in ours, two-thirds were psychotic at the time.

1  In other words, they lost contact with conceptual reality and

2  had created their own bizarre internal -- typically very

3  paranoid reality.

4  Q    And the victims of those types, of the psychotic, were

5  they --

6  A    They're typically strangers.   They target strangers.

7  Q    Okay.   And, again, this is the mass ones where the -- the

8  psychotic, where they shoot everybody and they don't know these

9  people --

10 A    Yes, but in --

11 Q    -- (indiscernible) --

12 A    -- their mind, they think they do.

13 Q    Okay.

14 A    And that -- that all these people are conspiring against

15 them.   And that, paradoxically, is why a psychotic multiple

16 murderer will have many more victims, because he believes the

17 people that he's killing, for instance, at a shopping center

18 are all conspiring against him.

19 Q    Now I want to go to the nonpsychotic.   If we can -- Kim,

20 we can have the next slide, please.   Okay.   So going through

21 this slide, I'd ask you -- you said there are fewer victims.   I

22 think you just said that a minute ago.

23 A    Correct.

24 Q    Okay.   And what is it about -- you said in the next one --

25 what's the next point?   Would you describe what you mean there?

1  A   Well, typically the -- in the nonpsychotic mass murders --

2  multiple murders, there typically is specific targeting of one

3  or more people that have angered or humiliated the individual.

4  Q   And the next, you said they're narcissistically sensitive.

5  And could you please describe what that means?

6  A   Yeah.  A -- narcissism comes in two forms.  One is what I

7  call healthy narcissism, which is self-confidence and it's

8  something that we all -- we all need.  But in these cases what

9  you see are individuals that are pathologically narcissistic.

10 In other words, they have a very inflated view of themselves.

11 In their mind, they are much more important than the facts

12 would indicate.  The metaphor I use is that is a balloon being

13 inflated with air.  If a balloon is inflated with air and is

14 very, very large, much larger than it in fact should be, just a

15 slight pinprick will deflate that balloon.  And --

16 Q   And that's -- is that the -- sort of the second part of

17 the sentence, when you said these people are more reactive and

18 tense?

19 A   Yes.  Yes.

20 Q   To what type of actions are they more --

21 A   Well, what they --

22 Q   -- reactive and tense?

23 A   What they react to -- it -- the pinprick is like any kind

24 of criticism.  So criticism that -- that we might view as being

25 very slight, in their mind is very, very wounding, very

1  wounding, and this is the sensitivity.  So they deflate very

2  fast inside themselves, and with that deflation comes two

3  emotions.  One is intense shame, leading very quickly to anger

4  that typically is felt very deeply.  And these are -- we have

5  found in our studies that this is typically a humiliating loss

6  in love or work or both.  So this could be something that

7  happened at home with a spouse, it could be something that

8  happens at work.  Those are typically the two settings where

9  this occurs, or both.

10  Q    Now, when you said that sort of -- you said the reaction

11  is basically narcissistically sensitive.  In the humiliations

12  in a workplace, is it something that somebody sort of

13  objectively would think, or is it a reaction of the person

14  themselves that is --

15  A    No, it's a --

16  Q    -- sort of different than normal?

17  A    It's a reaction of the person themselves.  That's --

18  that's the -- that's a rejection sensitivity.  That's a

19  narcissistic sensitivity that comes from the individual's

20  personality.  So the objective observer will -- would say -- if

21  they saw the facts of the event, would say, well, what's the

22  big deal.  But within the person, you get this very strong

23  emotional reaction.

24  Q    And you said you get a -- anger.  But in the terms of the

25  predatory violence, is the anger outwardly expressed verbally?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 742  Filed 09/23/14  Page 97 of 265
(720) 384-8078  attrans@sbcglobal.net

1  A    It could be, it could -- it could not be.

2  Q    Okay.

3  A    Some people feel deeply and don't show emotion.  Other

4  people react -- whenever there's the slightest annoyance you

5  get an outburst of behavior.  And that -- and that varies.

6  It's very much a part of our -- how our personalities are put

7  together.

8  Q    Okay.  Going to turn to the next slide, Kim.  And what did

9  you -- what's sort of your summary of what are the triggering

10  events up the scale to action?

11  A    Yeah.  We found about 80 percent of these multiple

12  homicides have a triggering event.  And this is something we

13  wrote in '04 that summarizes the different events that can

14  trigger.  So this, again, came out of a study that was

15  published in a science journal in 2004.  Adult triggers include

16  a termination from a job or envy over another's promotion;

17  bankruptcy; confrontation by employer; actual or perceived

18  abandonment by a sexual intimate; jealousy; erotomanic beliefs;

19  child support issues; or property damage; or trespass.  Most

20  precipitance occurred within hours or days of the mass murder,

21  although direct causality could not be established.

22  Q    When you said there are triggering events -- but you've

23  also previously said there's no snapping.  Can you explain the

24  difference and why those are not the same terms?

25  A    Yes.  The way I -- the way I formulate is like a

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 98 of 265
(720) 384-8078   attrans@sbcglobal.net

1    triggering event typically starts a clock.  So there may be a

2    specific decision at that point in time, "Yes, I'm going to do

3    this, I'm going to carry it out at this time.  I'm going to go

4    to this particular place, it's going to occur at this hour of

5    the day."  In other words, the details may be formulated right

6    there at the end.  And what we've found is that this typically

7    occurs within hours or days of the event.  And you -- you can

8    see that -- for instance, in the -- in the -- Ivan Lopez at Ft.

9    Hood, you can see some data on the triggering event in term --

10   Q    But what about a nonpsychotic or non --

11   A    Yes.

12   Q    -- (indiscernible).

13   A    In a non -- in a nonpsychotic case, you -- you

14   specifically will get a triggering event.  And oftentimes it is

15   a -- it's a loss or a experience that's humiliating for the

16   person.

17   Q    That they term that way?

18   A    That they would term that way --

19   Q    Okay.

20   A    -- or they feel that way.

21   Q    And is that based on the narcissistic sensitivity that you

22   talked about, the slide before?

23   A    Correct.

24   Q    Okay.  Now I want to turn to the next slide.  Thank you,

25   Kim.  And what have your studies shown of just sort of the

1  general characteristics of --

2  A    Yeah.

3  Q    -- multiple murderers?

4  A    Most of these are in the -- males in their fourth decade

5  of life, meaning that they're -- that they're in their -- let's

6  see -- they're in their forties typically when they do this.

7  They typically have a psychiatric history, both a clinical

8  diagnosis and a personality disorder.

9  Q    And that's the two-thirds you said before on an earl -- if

10  I can break in, the two-thirds you said on an earlier slide?

11  A    Well, yes, but we found pretty much across the board, even

12  with the individuals that are not psychotic, will also have

13  personalities that are striking in how different they are from

14  other people, and typically personalities that have over time

15  created problems in -- with other people who are close to them.

16  And that's essentially what a personality disorder is.

17  Q    Want to turn to the next slide, please.  And it's just

18  more of the -- and, again, are we talking about characteristics

19  in predatory versus the emotion?

20  A    This -- this is -- these are targeted multiple-homicide

21  perpetrators, further characteristics.

22  Q    Okay.  And what are the other characteristics?

23  A    Individ -- these typically -- these individuals are single

24  or divorced.  One of the surprising things we found is

25  typically they don't use drugs or alcohol before they do the

Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 100 of 265

1  targeted violence, and the reason that surprised us was

2  because, for instance, most people that are involved in a

3  homicide, like if we take a homicide in a marriage, either one

4  or both partners are drunk at the time, and most other

5  homicides will involve drugs or particularly alcohol.  Alcohol

6  is a very risky drug in terms of violence towards self and

7  others.

8      But what we realized when we saw these very low levels of

9  alcohol use was it had a very specific reason and it -- because

10 it could impede tactical success.  You want to have a clear

11 mind if you're going to carry out an act of targeted homicide.

12 And that seemed to be an explanation that made great sense in

13 understanding the data which -- and the data said there was

14 very, very low use of alcohol amongst the perpetrators when

15 they carried out these crimes.

16     We even had a few cases where the person had -- was

17 alcohol dependent, he was an alcoholic, and he would blog,

18 and -- this was a case in Pennsylvania.  Two days before the

19 mass murder he carried out, he blogged that he was going to

20 stop drinking because he wanted to have a clear mind before he

21 did it.

22 Q   And let me turn up -- you actually said "He wants a clear

23 mind," you didn't make it impersonal.  Was that on purpose or

24 is that just (indiscernible) --

25 A   Oh, it's just a reflection of the gender reality of a

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 101 of 265

**MELOY - DIRECT**

1  multiple homicide.

2  Q   Okay, your next one -- on the next point you say 80

3  percent do not communicate a direct threat to the target

4  beforehand?

5  A   Correct.

6  Q   And is that something -- well, I guess that's a study that

7  you (indiscernible) --

8  A   Yeah, found that in multiple -- in multiple studies, not

9  only our group, but other groups too, in that people carrying

10  out targeted violence typically don't communicate a direct

11  threat.  Why?  Because it would impede their success.  So they

12  don't warn the target beforehand.  And that began with Secret

13  Service findings in the nineteen -- mid-1990s.  And then we've

14  done other research, which I'm not talking about today, on --

15  in Europe and in the U.S. concerning public figures.  And

16  there's -- they don't warn the target beforehand.

17      However, 60 percent do leak their intent to third parties,

18  so they'll tell family, friends, strangers, they'll put it on

19  social media what they're going to do, either directly and very

20  clearly or kind of covertly.  You know, they'll -- they'll use

21  some words that sort of describe what they're going to do.

22  It's like they can't contain themselves.

23  Q   So 60 percent do, 40 percent don't?

24  A   Correct.

25  Q   All right.  I'm going to go the next slide, please, Kim.

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 102 of 265

1  And this is just to let people know, although we think it's

2  going -- happening more and more?  Is that --

3  A   The -- the -- there has been a slight -- a slight increase

4  in the past year, but this again is just a slide I wanted to

5  present, because lots of people think that mass murder is -- is

6  an epidemic in the United States.  It's not.  This has been --

7  and this is not to diminish the pain and suffering in these

8  cases, but it's to show that basically the trend line -- and

9  you can see the incidents there is the blue line at the

10 bottom -- the trend line has been very flat for the past 30

11 years.

12 Q   All right.  Can we go to the next slide?  So what are the

13 personality and psychological characteristics -- and again, I

14 would take it that the characteristics are not -- every single

15 person isn't going to display all of these, right?

16 A   Oh, correct.

17 Q   So what in general does your research show --

18 A   Well --

19 Q   -- and your work?

20 A   -- again, this is a compilation of what we know, not only

21 our research but other people that have studied this.

22 Typically, targeted workplace homicide is motivated by a sense

23 of rejection, a felt injustice, and a determination to seek

24 revenge.  I had mentioned a grievance.  This elaborates on it a

25 little bit.  The grievance is a thinking pattern which blames

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 103 of 265

1  everyone else.  There's typically an emotional wound that is

2  angry and ashamed.  Typically, there's a humiliating event,

3  either loss of status or some other perceived rejection, and

4  that it could be a com -- delusional, could be psychotic, or it

5  could be very reality based.

6  Q   Let me ask you, in terms of before the attack happens, if

7  it's a predatory situation, this is the planned and

8  premeditated -- you said there's a grievance.  But on your

9  studies does the individ -- is it something you can visibly see

10 in the individual beforehand or is there any conclusion you

11 could reach of how the individual tends to act before the event

12 happens?

13 A   Behaviors can vary a lot.  We -- we -- you know, we see

14 different characteristics.  We see withdrawal in some

15 characteristics, in some -- you know, in some cases.  Other

16 cases, people will -- who have been -- who appeared very sullen

17 and kind of depressed -- and this is a -- a real paradox --

18 once they've gone into a predatory mode and the -- in the last

19 days, they tend to -- it tends to lift their spirits.  And so

20 the naive viewer would say, well, things must be getting a lot

21 better.  But that's not the case.  In fact, the guy has gone

22 tactical.

23 Q   Okay.

24 A   So you do -- you do get different characteristics before

25 the event unfolds.  You'd have some individuals who begin to go

1  into what Park Dietz referred to as the pseudo-commando

2  appearance, where they'll want to look like they are a commando

3  and will purchase equipment and outfits to look that particular

4  way.  You see that in a minority of cases.

5  Q   Okay.  Can we have the next slide, please?  And, again,

6  this is really a continuation of the previous slide, isn't it,

7  in terms of what characteristics --

8  A   Yes.  The vengeful thoughts will develop into violent

9  fantasies.  But again, most people go no further than this.

10  They -- you know, they say, "What am I having these thoughts

11  for?  This is not good."  They may get help for their thinking.

12  They might -- they might see a mental health professional.

13  They may talk to friends about this, about how their thoughts

14  are disturbing them.  In a -- in a very practical way, they

15  could consider other choices.  They could get a new job.  They

16  could end up being divorced.  They could just accept the

17  situation and figure it can't be changed.  But a very few see

18  violence as a dec -- as a solution, and then they make a

19  decision to act.

20      Gavin de Becker made this formulation about -- about 17

21  years ago.  He calls it JACA, which is important to understand

22  the -- sort of the decision-making inside a person.  And it has

23  four points to consider here.  The act -- the person decides

24  the act is justified; there's no alternative other than

25  violence; he accepts the consequences of doing what he's going

1  to do; and then he believes he has the ability to do this act.

2  So that's the JACA, the J -- the justification, alternative,

3  consequences, ability.

4  Q    Can we go to the next slide?  Now, again, we're going --

5  the continuum that you showed before talked about, then, if

6  somebody -- we're talking an act where somebody actually does

7  it.  They go to a research, planning, and preparation stage.

8  And what are some of the things you see -- and, again, I take

9  it this doesn't appear in all cases?

10  A    Correct, yeah.  This is, again, just further elaboration

11  of those -- those three points on the pathway.  Research --

12  typically, there's consideration of the weapons, the targets,

13  the timing, the approach, and -- and how the person is going to

14  escape, or if they're going to commit suicide, how they're

15  going to do that.  And then the planning is where you had the

16  same -- notice the same words here, but the last word is

17  different -- weapons, targets, timing, approach, and escape

18  plan are selected.  So there's choices made at that point.  And

19  then the preparation of -- if you're unfamiliar with the target

20  or the location where the target's going to be, you do

21  intelligence gathering, you might do surveillance, you could

22  boundary probe for security.  You're going to look at the

23  behavioral patterns of the victims, when are they in that

24  particular location, when do they leave, who's going to be with

25  them, who's not going to be with them, are they going to be

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 106 of 265

1  alone.

2      You may -- if you're unfamiliar with the weapons you've

3  chosen, you're going to practice in the use of those chosen

4  weapons.  If you're going to build a bomb, you figure how to do

5  that, especially if you've never done that before.  And if

6  you're going to use a particular firearm and you're not used to

7  practicing with that firearm, you may go to a shooting range.

8  We've seen that in a number of cases, particularly with the --

9  the adolescent shooters.  Seung Cho at -- at Virginia Tech went

10  to a shooting range.  You see a lot of practice in that -- in

11  that area.

12      And then, typically, all this is done in secrecy.  And we

13  think, some of us, that that secrecy brings with it a certain

14  excitement called clandestine excitement.  This was a term from

15  a -- a sociologist at University of Pennsylvania.  And that if

16  the person also has skill in deception, they -- they're going

17  to be better at this, that they'll be able to keep this hidden.

18  Because the more -- the closer you get to carrying out the

19  event to the final -- end of the pathway, the riskier it is

20  that you may be interdicted or caught given what you're about

21  to do.  So there's -- secrecy is very important.  Deception may

22  be very important.  And then what some of these people will do

23  is they sabotage themselves by leaking their intent to a third

24  party.  However, from their perspective, the good news is the

25  third parties typically don't say anything to anybody, because

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 742  Filed 09/23/14  Page 107 of 265

1  they think they weren't serious.

2  Q    Now -- well, let me go to the next slide, Kim.  Thank you.

3  You talked a little bit about the shame, and is that

4  narcissistic sensitivity you were talking about before?

5  A    Correct.

6  Q    And the anger.  Is the anger -- when somebody gets into a

7  predatory mode, again, is the anger displayed, or how is -- the

8  anger manifest itself?

9  A    Typically, the -- as soon as they're in a -- a -- a

10  predatory mode, the anger will dissipate, that they don't feel

11  it.  So they become calm when they're in a predatory mode, even

12  though it may have been initially stimulated by being angry

13  about a particular situation or -- or a particular individual.

14  Q    When you say it's magnified by the narcissistic traits of

15  the subject, can you explain that, please?

16  A    Yes.  It is -- again, the notion of the -- the inflated

17  balloon.  These individuals tend to be what we call grandiose.

18  They're -- they can be a legend in their own mind, so they

19  believe that they have certain characteristics that are

20  extremely important, that are special, that nobody else has,

21  and that's part of the inflation of the self that can be easily

22  punctured.  And then they also have a strong sense of

23  entitlement.  And entitlement is another characteristic of

24  narcissistic pathology.  It means "I want what I want when I

25  want it," you know, like, "I -- I'm owed that, give it to me."

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 108 of 265

1  And I always think about this, that there are -- there's
2  reasonable entitlement.  That's -- I -- I -- I think of the
3  American Airlines pilots that -- that almost lost their entire
4  pension plans after they've been flying for 25 years, and they
5  were angry about that.  I think that's reasonable entitlement.
6  But then you have unreasonable entitlement, where people
7  believe, for instance, they should -- they don't have to do
8  anything and other people should just take care of them or give
9  them money or treat them to certain things.  And they get angry
10 if they're not -- you know, if they're not taken care of in
11 that way.

12     So that entitlement then rolls into the -- the -- the fact
13 that these individuals typically are very self-focused, and the
14 more self-focused you are, the less empathy you have for other
15 peo -- the less you care about other people, the less empathy
16 you have for others.
17 Q   And then, again, you went on to the next one.  You talked
18 about criticism.  And how does somebody who actually does this
19 type of targeted behavior take criticism versus what other
20 people might in the workplace?
21 A   They don't take it well.  If -- and it -- and it -- and
22 it -- it goes deep.  They may not show it, but it cuts deep, it
23 cuts to the bone, and it is then carried with them.  And then
24 this becomes the source of the formulation of the grievance,
25 you know, that they have -- they begin to feel a grievance

MELOY - DIRECT

1  toward a person or persons or an institution or something along
2  those lines.
3  Q   Okay.  And I think we went through this, that -- you
4  said -- you have as -- that males convert it into anger, but
5  sometimes it's expressed openly and sometimes it's not.
6  A   Correct.
7  Q   Okay.  But in the predatory violence, if somebody decides
8  "I'm going to do this," do they actually convey the threat
9  beforehand?
10 A   I -- I'm not sure what your --
11 Q   Okay.
12 A   -- question is.
13 Q   I think you testified earlier that in predatory violence,
14 let's say --
15         THE COURT:  Asked and answered.
16         MS. LOEFFLER:  -- at the workplace -- I'm going to
17 narrow it down to there.
18         THE COURT:  You -- I think they were going to -- asked
19 and answered.  I think we've gone over this.
20         MS. LOEFFLER:  Okay.  I can move on.  Go on -- I'm
21 happy to do that.
22 BY MS. LOEFFLER:
23 Q   And you have the last comment that says, "Emotional states
24 may be more apparent in nonpsychotic shooters."  Can you
25 explain that, please?

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net

1  A    That they're -- because they're reality based and they're

2  based in certain occurrences that have occurred, typically,

3  they tend to be more obvious, especially in retrospect.

4  Q    Okay.  Now I'm going to go -- there's a -- the last couple

5  of slides that you put together.  You call them WAVR.  And does

6  that have to do with your --

7  A    Yeah --

8  Q    -- the -- your predictive role?

9  A    This is an instrument we developed for assessing workplace

10  targeted violence.  And because I mentioned this in my report,

11  I wanted to also put this up here in the slides.  And these

12  are -- these are risk indicators that we look at in this

13  instrument.  We -- we teach instrument -- "we" being my co-

14  developer, Dr. Stephen White, and I, and two various government

15  agencies -- the corporations and universities.  And they'll use

16  this in their threat assessments for targeted violence in their

17  particular setting.  So these are some of the red-flag

18  indicators.  And then the next slide --

19  Q    If I can do that, Kim.

20  A    -- are the other -- the other risk factors that we also

21  look at in these cases.  Now, this isn't a predictive

22  instrument, because the science is not there yet that says it's

23  predictive.  But all these factors are apparent in the research

24  in terms of targeted violence as well as in the experience of

25  individuals that work in these areas.

1  Q   Okay.  I want to ask you a little bit -- there's one that

2  says there's a history of violence, criminality, or conflict.

3  In terms of the workplace ones that you've seen, can you

4  describe how that fits into the history of violence,

5  criminality, or conflict?

6  A   Well, yes.  The -- typically, in a workplace, depending on

7  the nature of the workplace, people are screened out if they

8  have any history of -- of -- especially violent criminality.

9  Of course, we know that's the case if you're going to work in a

10 more sensitive profession like -- like law enforcement or the

11 mental health field, like there's -- there's screening for all

12 that.  And you're not going to see individuals with a history

13 of violent criminality.

14     However, we have seen, and other people have seen that do

15 this kind of work, that you will get histories of chronic

16 conflict with those in authority over the person in the

17 workplace.  And so that's why we put in the term "conflict"

18 there.

19 Q   Okay.  And then I have one final sign, which is -- I know

20 this is your sort of professional ethics cautionary note, so go

21 ahead --

22 A   Right.

23 Q   -- Dr. Meloy.

24 A   The -- yeah, this is just a note about the presentation of

25 this instrument, the WAVR 21.  What it does not do, it does not

1  predict violence, but it does help organize data for threat

2  assessment teams, and we have one published reliability study

3  but no validity studies yet.

4  Q   I don't have anything further at this time.

5          THE COURT:  All right, thank you.

6          THE WITNESS:  Thank you.

7          THE COURT:  Cross-examination.  You want the screen

8  left up or do you want --

9          MR. OFFENBECHER:  Your Honor, we have our own copy of

10  the --

11         THE COURT:  Okay.

12         MR. OFFENBECHER:  -- PowerPoint slides.  Because it's

13  numbered, has numbered pages, when theirs didn't, so --

14         THE COURT:  Okay.

15         MR. OFFENBECHER:  -- I think we'll just use that.

16                      **CROSS-EXAMINATION**

17  BY MR. OFFENBECHER:

18  Q   Dr. Meloy, good morning.

19  A   Hello.

20  Q   You were hired by the United States Attorney's Office to

21  give this kind of generic testimony about the psychology of

22  what you study.  Is that right?

23  A   Correct.

24  Q   And, of course, you get paid for what you do.  Is that

25  right?

1    A    Correct.

2    Q    And in this case, how much have you been paid at this

3    point?

4    A    I don't know.

5    Q    Well, right before you stood up here -- you get paid by

6    the hour?

7    A    Correct.

8    Q    And you get paid $400 an hour?

9    A    Correct.

10   Q    And right before you stood up here, the prosecutor handed

11   me a stack of your bills here.  Is it fair to say that you gave

12   her those?

13   A    Yes, those have been sent to the -- to the U.S. Attorney's

14   Office once -- once every 30 days.

15   Q    So let me just see if this sounds right.  One for $4,600,

16   one for $300, one for $1,300, another for $1,600, another for

17   $1,500, another for $10,000, another for $6,800, another for

18   $800, another for $3,900, another for $3,400, and then perhaps

19   one more in here as well for another $1,900.  Does that sound

20   about right?

21   A    Yes.

22   Q    And that doesn't include the -- what you're going to be

23   paid for your testimony here today and your travel up here.  Is

24   that correct, sir?

25   A    Correct.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 114 of 265

1  Q   So I'd like to take a look at one of the slides that you

2  had, but I'd like to put it up here.  It's the pie chart

3  that we looked at --

4  A   Uh-huh (affirmative).

5  Q   -- earlier.  And it's at 29861.  But I'm going to put it

6  up on the overhead here because I think the jury had a hard

7  time seeing the actual writing on it.  I think it's important

8  for the jury to see.  So can we call up --

9  A   Good.

10      THE CLERK:  And that's in Exhibit 10, Plaintiff Exhibit

11  10, or do you have a different exhibit number for that?

12      MS. LOEFFLER:  It is part of Exhibit 10.

13      THE CLERK:  Okay, thank you.

14  BY MR. OFFENBECHER:

15  Q   Yeah, (indiscernible).  All right, so what I'm going to do

16  is --

17      (Side conversation)

18  Q   Yeah, well, why don't you run the -- yeah, run the

19  PowerPoint at 29861.  And for the parts that were difficult to

20  read, perhaps you can just read to the jury what they are.

21  A   Yeah, I'll be happy to.

22  Q   And while we're getting there, let me -- when that comes

23  up, we'll deal with that.  But let me just be clear about

24  something I think that you're clear about, but I just want to

25  make sure the jury understands as well.  The fact that a

1  homicide or a violent act occurs at the workplace doesn't

2  necessarily mean that it's a co-worker who's involved.  Right?

3  A    Correct.

4  Q    It may be that a homicide or -- oh, yeah, that comes in

5  fine.

6  A    Yeah, that's good.

7  Q    It may be that a homicide or a violent act that occurs at

8  the workplace has nothing to do with co-workers at all.  Is

9  that right?

10  A    Correct.

11  Q    Because there are a whole variety of different motivations

12  why people attack each other and cause violence to each other

13  and kill each other.  Right?

14  A    Correct.

15  Q    And sometimes that occurs at the workplace, right?

16  A    Correct.

17  Q    And sometimes it occurs someplace else, right?

18  A    Correct.

19  Q    So, for example, a homicidal act that occurs at the

20  workplace could be a co-worker, but it could be a spouse or

21  some other intimate or some other person motivated by something

22  else.  Right?

23  A    Correct.

24  Q    And -- or if it's actually a workplace grievance, that

25  could conceivably be a homicide that occurs at the 7-Eleven

1  store or someplace else.  Right?

2  A    Correct.

3  Q    So there's no real relationship between the workplace --

4  in other words, when you say workplace violence, you don't mean

5  workmate violence or co-worker violence.  Right?

6  A    Correct.  It's a geographical designation.

7  Q    It's where the event occurs, right?

8  A    Good.  Yes.

9  Q    All right.  So -- now, so this is part of your slide --

10  excuse me, part of your presentation.  And I think we can see

11  now better what you were talking about, because the numbers are

12  here.  So you indicated in your direct examination that the

13  majority of perpetrators where the homicide occurs at the

14  workplace are robbers or some other kind of perpetrators.  Is

15  that right?

16  A    Yes.  Those are typically violence felonies that are

17  occurring.

18  Q    And then the -- there's customers and clients, which I'm

19  assuming is this kind of bright-red section right here.  Is

20  that right?

21  A    Correct.

22  Q    And that's about 11 percent, customers --

23  A    Correct.

24  Q    -- and clients.  Right?

25  A    Correct.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 742  Filed 09/23/14  Page 117 of 265

1  Q    And then co-workers and former co-workers are this kind of

2  maroon section of the pie right here?

3  A    Correct.

4  Q    And so that's another 11 percent, right?

5  A    Correct.

6  Q    And that's so -- the co-workers and former co-workers are

7  about the same percentage, you know, percentagewise, as

8  customers and clients?

9  A    Correct.

10  Q    And then you have a section -- and I'm assuming that's

11  this yellow section here called spouses, intimates, and exes.

12  Is that right?

13  A    Correct.

14  Q    Who are you referring to there?

15  A    Those would be spouses, intimates or exes of the person

16  that's -- that's at their worksite.  And exes refers to, like,

17  ex-spouses or ex-intimates.

18  Q    And by intimate, you mean an intimate, romantic, or --

19  A    Yeah, sex --

20  Q    -- or sexual --

21  A    -- sexual intimacy.

22  Q    Okay.

23  A    Right.

24  Q    And so the person who's at his or her workplace is the

25  victim of the homicide, but -- and it's at the workplace,

1   right, but it's caused by someone who's not a co-worker, but a

2   spouse or an intimate or an ex-intimate.  Is that right?

3   A   Correct.

4   Q   And then you have another slice here, about 3 percent, in

5   orange, I'm assuming.  And that's for other kind of personal

6   acquaintances.  Is that right?

7   A   Correct.

8   Q   So that if one -- for co-workers and former co-workers,

9   about 11 percent.  If one included acquaintances with the

10   spouses, intimates, and exes, that total would be about 12

11   percent.  Right?

12   A   Correct.

13   Q   And so if you included spouses, intimates, and exes at 9

14   percent and acquaintances at 3 percent, that's about the same

15   or maybe a little more than co-workers, just in terms of the

16   statistics.  Right?

17   A   Correct.

18   Q   And that's for homicides that occur at the workplace.

19   Right?

20   A   Correct.

21   Q   Now, you've talked about -- in your direct examination

22   about many different types of motives for a homicide.  Is that

23   right?

24   A   Yes.

25   Q   And is it -- it's fair to say, from your testimony so far,

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 119 of 265
(720) 384-8078   attrans@sbcglobal.net

**MELOY - CROSS**

1  that because of the human condition there can be any number of

2  different types of motives for a homicide.  Is that right?

3  A    Many, yes.

4  Q    Okay.

5  A    Many.

6  Q    And in your experience, you've had experience with many

7  different types of motives for homicide?

8  A    Correct.

9  Q    And it's not -- surely not limited just to kind of a

10  grievance between two co-workers that occurs.  Is that right?

11  A    That is correct.  If you look at all homicides, that is

12  correct.

13  Q    Okay.  And even homicides that occur at the workplace are

14  sometimes because of some other personal grievance between the

15  two folks.  Right?

16  A    Yes, it could be a -- it could be grievance.  Typically

17  they -- they -- when you eliminate the -- the robberies and

18  the -- and the customer/client, and you're talking about where

19  there has been a relationship, typically grievance does emerge

20  as a important motive.

21  Q    Well, you had experience with a number of different

22  motives for homicide in the course of your long career that

23  don't involve any kind of co-worker grievance.  Is that right?

24  A    Yeah, correct.

25  Q    For example, in the state -- case of Colorado versus

Case 3:13-cr-00008-SLG  Document 742  Filed 09/23/14  Page 120 of 265

1  Petrosky, that was a mass murder after a spousal estrangement,

2  where the defendant killed his wife, her lover, and a police

3  officer.  Is that right?

4  A    Correct.

5  Q    And you worked on that case, didn't you?

6  A    Correct.

7  Q    And in the case of People versus Danny Palm, that was the

8  murder of an antisocial victim who had frightened and

9  intimidated a community for years and was subsequently shot to

10 death by a retired Navy officer on behalf of his family and

11 neighbors.  Right?

12 A    Correct.

13 Q    And that was his motivation in that case.  Right?

14 A    Correct.

15 Q    And in the case of People versus Gerald Atkins, there was

16 testimony about an assault at a Ford plant, which actually was

17 a workplace, right, in Detroit, which resulted in the homicide

18 of a manager and the wounding of two police officers.  Right?

19 A    Correct.

20 Q    But that was about some kind of erotomanic delusional

21 disorder.  Is that right?

22 A    Correct.

23 Q    And in your experience in these types of homicides about

24 what kind of motivations there are, in the case of State versus

25 Russell Dean, that was a homicide case in which the common-law

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 121 of 265

1  husband of a stalking victim ambushed and killed the stalker.
2  Is that right?
3  A    Correct.
4  Q    And also, in your experience in the case of People versus
5  Ronald Blamey, which I think is a California case, wasn't it?
6  A    I think so.  I'll have to look in my -- have to look at
7  what you're looking at --
8  Q    All right, well --
9  A    Yes.
10  Q    -- let's just assume for a moment.  Just for -- you
11  remember the Blamey case.  You were retained and you worked in
12  the case of a spousal homicide and then the subsequent staging
13  of a sexual homicide at a distant location.  Right?
14  A    Correct.
15  Q    And when we say staging, what do you mean?
16  A    Staging is where a homicide perpetrator will deliberately
17  alter the setting or evidence or positioning of the body in
18  order to mislead the police investigation.
19  Q    So, for example, a person might, you know, intend to kill
20  someone, kill them, and then make it look like a robbery, for
21  example --
22  A    Correct.
23  Q    -- by grabbing the person's wallet or grabbing some things
24  or throwing the things out of the drawers.  Right?
25  A    Correct.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 122 of 265

1  Q   So sometimes people try to disguise what they did by

2  making it look like a robbery or making it look like a -- some

3  kind of sexual assault --

4  A   Cor --

5  Q   -- when, in fact, it was -- they just wanted to kill that

6  person.  Right?

7  A   Correct.

8  Q   All right.  And in the case of Nevada versus Peter Berna,

9  you worked on a case whose -- of a man accused of murdering his

10 wife and then staging that as an automobile accident.  Right?

11 A   Correct.

12 Q   In terms of other motivations, in the May versus Franklin

13 County case -- excuse me, in the People versus Christopher

14 Fegan (ph) case, you worked in a case that involved the death

15 of the father and the wounding of the mother of the estranged

16 girlfriend following several weeks of stalking behavior.

17 Right?

18 A   Correct.

19 Q   So that was a little -- a different kind of motivation,

20 wasn't it?

21 A   Correct.

22 Q   And in the state of -- in the case of Wisconsin versus

23 Zapata, you worked on a case where a defendant was convicted

24 for the murder of an ex-spouse quite a while ago.  Isn't that

25 right?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 123 of 265
(720) 384-8078   attrans@sbcglobal.net

1    A    Correct.

2    Q    In the case of -- Arizona versus Henry Fischbacher was a

3    case you worked on as well, wasn't it?

4    A    Yes.

5    Q    In that case, that was also a spousal homicide case,

6    wasn't it?

7    A    Correct.

8    Q    And in the case of Oregon versus Kathleen Blankenship, you

9    worked again for the defendant, who had murdered her husband in

10   that case.  Is that right?

11   A    Correct.

12   Q    And then in the case of Kansas versus Dana Chandler, the

13   defendant was convicted of double first-degree murder, two

14   counts of first-degree murder.  She was the ex-wife of the

15   victim and his girlfriend.  Right?

16   A    Correct.

17   Q    And so that's just -- that's not all the cases you've

18   worked on, is it?

19   A    Correct.

20   Q    But it's a smattering of the cases which demonstrate that

21   the motives for a homicide can be very varied.  Is that right?

22   A    Correct.

23   Q    Now, in your presentation earlier and in your PowerPoint

24   presentation, you talked about the fact that a grievance could

25   be any of the motivations for a homicide.  Is that right?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 124 of 265
(720) 384-8078  attrans@sbcglobal.net

1  A    Correct.

2  Q    So when we say the word "grievance," we mean some kind of

3  beef that the person has with another person, not necessarily

4  an employment grievance.  Is that right?

5  A    Correct.

6  Q    So the grievance could be, for example, a dispute between

7  a husband and wife.  Is that right?

8  A    Correct.

9  Q    And could be a dispute between a person and his or her

10  lover.  Is that right?

11  A    Correct.

12  Q    Or a -- an ex-husband or an ex-intimate or any other kind

13  of grievance that might happen between two individuals?

14  A    Correct.

15  Q    So throughout these materials, when you have made your

16  presentation here today, when you spoke about a grievance, you

17  didn't mean like a labor grievance or -- necessarily, or a

18  grievance at the workplace between co-workers, but you just

19  meant a -- any kind of a personal grievance between two

20  individuals.  Is that right?

21  A    Yes.  It's -- when I speak of it, I'm talking about more

22  of a -- very much so, a emotional reaction, and then the

23  blaming of some other person for the person's circumstance.

24  Q    And you indicated that in your research, as part of your

25  presentation here today on direct examination -- you indicated

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 125 of 265

 1  that typically a triggering event may be one or a series of

 2  events that is a humiliating loss either in love --

 3  A    Uh-huh (affirmative).

 4  Q    -- or in work.  Is that right?

 5  A    Correct.

 6  Q    Because, as we've seen from your pie chart, a good

 7  percentage of these homicides that you've talked about are the

 8  result of some kind of romantic or intimate relationship gone

 9  bad in some way.  Is that right?

10  A    Yes, a proportion of them are.

11  Q    And you also indicated in your materials in your -- during

12  your presentation here today that, across the board, most adult

13  multiple murderers are in their fourth decade of life.  Is that

14  right?

15  A    Yeah.  That was our average.  That was our average age in

16  our adult studies.

17  Q    And you indicated that they -- most adult multiple

18  murderers, and you said this was across the board, have a

19  psychiatric history of both a clinical diagnosis and a

20  personality disorder.  Is that right?

21  A    And/or, yeah.  So they could either have a clinical

22  diagnosis or a personality disorder or both.

23  Q    Okay.  If your material says "and," do you think that's

24  just a typographical error?

25  A    It should have been "and/or."

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 126 of 265
(720) 384-8078  attrans@sbcglobal.net

1  Q    Okay.

2  A    Yeah.

3  Q    And you've also indicated that extreme anger seems to be

4  the central emotion fueling these events.  Is that right?

5  A    It usually starts out with -- with felt shame that's --

6  then is converted into anger, typically very quickly.

7  Q    All right, can you call up -- Mr. Johnson, if you'd call

8  up 20 -- 29872, please.

9       (Whispered conversation)

10          THE CLERK:  Mr. Offenbecher, is that still in Exhibit

11  10?

12       (Side conversation)

13          THE COURT:  What exhibit is this?

14          MR. OFFENBECHER:  It's Exhibit -- Your Honor, we've

15  marked it as DE-106, and I'd move for the admission of it.

16  It's identical to the government's, it just has page numbers on

17  it so it's a little easier for me to navigate.

18          THE COURT:  Okay, very well.  It'll be admitted.

19       (Defendant's Exhibit DE-106 admitted)

20  BY MR. OFFENBECHER:

21  Q    So again, this is the slide that in your direct

22  examination, where you said most adult multiple murderers are

23  males in their fourth decade; they have a psychiatric history,

24  both a clinical diagnosis and a personality disorder.  But

25  you're indicating now that that's a typographical error.  That

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 127 of 265

1 should be "or," right?

2 A    Yes.

3 Q    And then you say, "We wrote," and you're referring to some

4 kind of a publication that you and some other folks wrote in a

5 journal.  Right?

6 A    Yes, that came out in '99.  Yeah.

7 Q    You say, "We wrote that extreme anger appears to be the

8 central emotion fueling these events."  Right?

9 A    Correct.

10 Q    And it's often caused by the perception that others are

11 persecuting or treating one unfairly.  Is that right?

12 A    Correct.

13 Q    Often the paranoid ideation or a depressed mood complicate

14 and intensify the brooding anger of the perpetrators.  Is that

15 right?

16 A    Correct.

17 Q    Okay.  You can take that one down.

18      MR. OFFENBECHER:  Your Honor, would this be a good time

19 for the break?

20      THE COURT:  It would be, unless you're going to finish

21 up in three minutes.

22      MR. OFFENBECHER:  No, I think probably just -- it would

23 be good time for the break.

24      THE COURT:  Okay, all right.  Well, we'll come back at

25 10 after 1, okay.  And, sir, the same goes to you.  See --

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 128 of 265
(720) 384-8078  attrans@sbcglobal.net

1    THE WITNESS:  Thank you.

2    THE COURT:  -- you here at --

3    THE WITNESS:  Thanks.

4    THE COURT:  -- 1:10.

5    (Jury not present)

6    THE COURT:  Okay, need me for anything else before we

7  break?

8    MR. OFFENBECHER:  No, Your Honor.

9    MS. LOEFFLER:  No.

10    THE COURT:  Okay.

11    THE CLERK:  Okay, all rise.  This matter stands in

12  recess until 1:10.

13    MS. LOEFFLER:  Oh, yeah, wait, one thing.  Apparently,

14  the motion that -- we don't have whatever the motion they --

15  whatever they filed this morning.  We've just -- we've checked

16  a few times.  It was never served on us.  I don't know why --

17    THE COURT:  Should be.

18    MS. LOEFFLER:  -- it wasn't.

19    MR. OFFENBECHER:  No, I -- no, Your Honor, I think that

20  was filed, since it was an offer of proof as to what the

21  defense case --

22    THE COURT:  Oh -- I thought part of it would be served

23  on the government.

24    MS. LOEFFLER:  If they cite any law or whatever, we'd

25  like some opportunity to respond, and we haven't got anything.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 129 of 265
(720) 384-8078  attrans@sbcglobal.net

1    THE COURT:  Well, I just presumed it went to both

2  sides, but --

3    MS. LOEFFLER:  No, we don't have it.

4    MR. OFFENBECHER:  The original offer of proof we filed

5  a number --

6    THE COURT:  I understand.

7    MR. OFFENBECHER:  -- a couple of weeks ago -- yeah.

8    THE COURT:  I understand.

9    MR. OFFENBECHER:  Yeah.

10    THE COURT:  But it's -- if it requires the government

11  to respond, at least portions of it need to go to the

12  government, I would think.  I mean --

13    MR. OFFENBECHER:  It's 99-percent fact based.  But I'd

14  be happy to --

15    THE COURT:  Well, I've got to look at it.  I've just

16  presumed --

17    MR. OFFENBECHER:  Okay.

18    THE COURT:  I presumed part went to the government and

19  part didn't.  I don't know why I presumed that.  So what's

20  going on here?

21    (Side conversation)

22    THE CLERK:  Off record.

23    (Court recessed at 11:58 a.m., until 1:14 p.m.)

24    (Jury not present)

25    THE CLERK:  All rise.  His Honor the Court, the United

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 130 of 265
(720) 384-8078  attrans@sbcglobal.net

1  States District Court for the District of Alaska is again in

2  session.  Please be seated.

3       THE COURT:  Okay, they're bringing the jury in.

4    (Jury present)

5       THE COURT:  Okay.  Welcome back.  Please be seated, and

6  we'll pick up with cross-examination where we left off.

7  Counsel.

8       MR. OFFENBECHER:  Thank you, Your Honor.  Excuse me,

9  Your Honor, one of the jurors has a question.

10      THE CLERK:  Oh.

11      THE COURT:  That works pretty well, doesn't it?  See,

12  he didn't hear me.  That works pretty well, doesn't it?

13      UNIDENTIFIED JUROR:  Yes, sir.

14      THE COURT:  Okay.  All right, counsel.

15      MR. OFFENBECHER:  Thank you, Your Honor.

16  BY MR. OFFENBECHER:

17  Q   Dr. Meloy, good afternoon.

18  A   Hello.

19  Q   Dr. Meloy, I -- we have up here one of the slides from

20  your PowerPoint presentation.  And I just wanted to -- these

21  are some of the studies that you and other folks in your field

22  have done.  Is that fair to say?

23  A   Yes.

24  Q   And many of these are referred to or quoted in your

25  PowerPoint presentation here today?

Case 3:13-cr-00008-SLG  Document 742  Filed 09/23/14  Page 131 of 265

1  A    Yes.

2  Q    And, indeed, the one -- the -- about three up from the

3  bottom that says, "Meloy, et al., Behavioral Sciences and the

4  Law," is a separate article that is called "A Comparative

5  Analysis of North American Adolescent and Adult Mass

6  Murderers."  Right?

7  A    Correct.

8  Q    And you have quoted from that particular article at

9  several places in your presentation and in your report to the

10  government.  Is that right?

11  A    I quoted once from that article and then once from an

12  earlier paper, I think.

13  Q    Okay.  One second -- yeah.

14  A    And then once from the '99 paper.

15  Q    Okay.  You can take that down.  Can you put up Defense

16  Exhibit 107, please?  Dr. Meloy, I'm -- ask you to take a look

17  at your small screen there.  Defense Exhibit 107.  That's

18  probably a very small screen for you.  But is it fair to say

19  that that's the article we just talked about entitled "A

20  Comparative Analysis of North American Adolescent and Adult

21  Mass Murderers"?

22  A    Correct.

23  Q    That's one of the articles that you relied on in your

24  presentation.  Right?

25  A    Correct.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1  Q    I'd like to -- now, I'm not going to introduce this in

2  evidence.  I'd just like to direct your attention for about two

3  or three minutes to a couple of sections.  You've talked during

4  your direct examination a good deal about the statistics or

5  probabilities -- or the statistics, essentially, of your field.

6  And so I'd like to direct your attention to this article, just

7  go over a few things.  On page 6590, "Histories of Violence,"

8  please.  This is a paragraph in your article entitled

9  "Histories of Violence."  Is that right?

10  A    Correct.

11  Q    And you indicate there that 42 percent of the adolescents

12  and 43 percent of the adults had a history of violence.  Is

13  that right?

14  A    Correct.

15  Q    And you define that variable as at least one violent act

16  against a person, animal, or, for adolescents, only property,

17  before the mass murder.  Right?

18  A    Correct.

19  Q    And that violence ranged from assaults or injuries of

20  sexual intimates, family members, neighbors, acquaintances, or

21  strangers, killing a pet or killing a person.  Is that right?

22  A    Correct.

23  Q    And the most frequent fe -- victim was a female sexual

24  intimate.  Right?

25  A    Correct.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 742  Filed 09/23/14  Page 133 of 265

1  Q   All right.  Can you go to the next paragraph, please?

2  Some of your other findings with respect to substance abuse.

3  You indicated in your study that 62 percent of the adolescents

4  had a history of substance abuse, including alcohol, marijuana,

5  cocaine, amphetamine, LSD, PSP, inhalants, and heroin.  Right?

6  A   Yes.  And it's PCP.

7  Q   PCP, excuse me.  Sorry.  And among the adult subjects,

8  only 10 percent had consumed alcohol just prior to or during

9  the mass murder.  Right?

10  A   Correct.

11  Q   Go to the next page, please, psychiatric histories.  In

12  your study you indicated that 50 percent of the adult subjects

13  and 23 percent of the adult adolescent subjects had a

14  psychiatric history.  Is that right?

15  A   Correct.

16  Q   And that the adults typically met criteria for paranoid

17  schizophrenia, delusional disorder, or major depression.  Is

18  that right?

19  A   Correct.

20  Q   Then you spoke also regarding the adolescents' records

21  being somewhat limited?

22  A   Correct.

23  Q   And you indicated that your findings were in stark

24  contrast to the 40 percent of adult mass murderers who were

25  judged to be psychotic and the additional 27 percent who

1  exhibited behaviors suggested -- suggestive of psychosis.
2  Right?
3  A   Yes, that's one comparing the adolescents to the adults.
4  Q   Right.  And then the next page, please.  On threats.  You
5  indicated in your study that in 66 percent of the adult mass
6  murderers and 58 percent of the adolescent mass murderers,
7  verbal or writtening -- written threatening statements were
8  made, usually to third parties.  Right?
9  A   Correct.
10 Q   And then, on precipitating events, finally, you indicate
11 here that 59 percent of the adolescents and 90 -- I'm sorry, 59
12 percent of the adolescents and 90 percent of the adults had a
13 precipitating or triggering event before the mass murder.
14 Right?
15 A   Correct.
16 Q   You defined that event -- such an event as "significantly
17 mentally or emotionally disturbing to him or obvious from
18 scrutiny of the perpetrator's history."  Right?
19 A   Correct.
20 Q   And such events for the adolescents included "the loss of
21 a real or fantasy relationship with a girl," comma, "a family
22 dispute, suspension from school, insults by peers, termination
23 from a job, anger over hospitalization, a physical injury, and
24 denial of entry into the military."  Right?
25 A   Correct.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 135 of 265

1  Q   And then adult triggers included termination from a job or

2  envy over another's promotion, bankruptcy, confrontation by an

3  employer, actual or perceived abandonment by a sexual intimate,

4  jealousy, erotomanic beliefs, child support issues, or property

5  damage, or trespass.  Is that right?

6  A   Correct.

7  Q   And that most precipitance occurred within hours or days

8  of the mass murder, although no direct causality could be

9  established.  Is that right?

10  A   Correct.

11  Q   And with respect to family disputes of the adolescents,

12  what are you referring to there?

13  A   As best I can recall, if I can -- could you enlarge that

14  for me again?

15  Q   Sure.

16  A   Typically, it was some kind of conflict that the

17  adolescents would have with one or both parents, not with a

18  sibling.

19  Q   Great, thank you.  You --

20  A   Uh-huh (affirmative).

21  Q   -- can take that down.  Dr. Meloy, during your

22  presentation -- if you could put up 29877, from the PowerPoint.

23  You talked about research, planning, and preparation.  Remember

24  that?

25  A   Uh-huh (affirmative).  Yes.

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net

1 Q   And in the preparation section -- we've got that up here

2 and that has been admitted.

3        THE CLERK:  Is this Exhibit DE-106 again?

4        MR. OFFENBECHER:  Thank you.

5        THE CLERK:  Thank you.

6 BY MR. OFFENBECHER:

7 Q   You indicated in the preparation section that, you know,

8 often the perpetrator would get -- engage in intelligence

9 gathering and surveillance and boundary probes.  Right?

10 A   Correct.

11 Q   And what do you mean by boundary probes?

12 A   Typically, it was to check out security.  So there would

13 be a scrutiny of where security was or wasn't, oftentime -- and

14 that security obviously could be a security guard or it could

15 be surveillance cameras or security cameras.  And typically how

16 that would be checked out is the person would scrutinize where

17 that -- those individuals or cameras were before the event, or

18 they would engage in behavior to see how close they'd get to

19 the target before they were stopped.  And that would be in

20 cases where the target was -- where there was naturally

21 security surrounding that target.  So it's a way to kind of

22 test and probe to see how close one could get.

23 Q   And to gather information about the place where you're

24 going?

25 A   Yes, and to -- and to learn how -- whether or not you were

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 137 of 265
(720) 384-8078   attrans@sbcglobal.net

1  going to be stopped when you were actually attempting to carry

2  out the act.

3  Q    Sure.  So would this top one, intelligence gathering,

4  surveillance, boundary probes, in the vernacular would that be

5  known as kind of casing the joint?

6  A    Yes.

7  Q    And by that, we mean this boundary probe could include,

8  for example, physically going to the place where the intended

9  target is, right?

10  A    Yes.

11  Q    And to see what the reaction of security, if there is --

12  was any, would be.  Right?

13  A    Yes.

14  Q    Or going physically to the place and looking to see, for

15  example, whether there are any cameras in view in the place

16  where one drove?

17  A    Yes.

18  Q    So one could either do that on foot or perhaps in a car to

19  make those observations.  Right?

20  A    Correct.

21  Q    And the purpose of that casing the joint ahead of time, or

22  these boundary probes and surveillance, would be to try to make

23  a plan that one could execute later that would be more

24  successful after one had done this.  Right?

25  A    Correct.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 138 of 265
(720) 384-8078  attrans@sbcglobal.net

1  Q    And, finally, could you go to 29876, please?  Same -- Dr.

2  Meloy, again, in your PowerPoint presentation you talked about

3  psychological characteristics of the folks that you've talked

4  about.  And you've indicated during your direct examination

5  that a lot of folks -- a lot of people have frustrations at

6  their jobs, for example, or in their other relationships.

7  Right?

8  A    Absolutely.

9  Q    And a lot of people get passed over for promotions or they

10 get demoted or they get fired.  Right?

11 A    Correct.

12 Q    Or they get a letter of reprimand or some other kind of

13 disciplinary thing that happens in their employment

14 circumstances.  Right?

15 A    Correct.

16 Q    And a lot of people also have personal rejections in their

17 intimate relationships.  Isn't that right?

18 A    Correct.

19 Q    People get divorced, people decide to go outside the

20 marriage, or any number of different things can happen to a

21 personal or intimate relationship.  Is that right?

22 A    Correct.

23 Q    And as you've just testified, there can be disputes

24 between a child and a parent that can become very active as

25 well.  Is that right?

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 139 of 265

1   A    Correct.

2   Q    But most individuals -- as you've indicated here, most

3   individuals don't take it any further than that.  Is that

4   right?

5   A    Correct.

6   Q    Most individuals don't get to the step of any kind of a

7   violence -- any kind of violence.  Is that right?

8   A    Correct.

9   Q    So most individuals -- few people see that violence is a

10  solution, and most individuals consider other types of choices.

11  Right?

12  A    Correct.

13  Q    For example, in a job situation, getting a new job, right?

14  A    Correct.

15  Q    In a intimate situation, getting a new partner.  Right?

16  A    Correct.

17  Q    Or whatever the situation is, just kind of accepting the

18  way it is.  Right?

19  A    Correct.

20  Q    And those kind of people don't see violence as the

21  ultimate solution and don't act out on that.  Is that right?

22  A    Correct.

23  Q    So a person who sees the personal grievance, whatever it

24  is, as being only a temporary situation that is likely to pass

25  or that is going to pass, is a person who is less likely to

1  seek violence as the only solution to that situation.  Is that

2  fair to say?

3  A   Correct.

4       MR. OFFENBECHER:  I don't have any other questions,

5  Your Honor.

6       THE COURT:  Redirect.

7       MS. LOEFFLER:  Yes, Your Honor.

8                   **REDIRECT EXAMINATION**

9  BY MS. LOEFFLER:

10 Q   Dr. Meloy, I think, as you pointed out, most people don't

11 act on any of this stuff you're talking about.  Right?

12 A   Correct.

13 Q   So when you're researching cases when the event actually

14 happened, which is a pretty rare circumstance, somebody

15 actually murdered somebody?

16 A   Correct.

17 Q   Okay.  So Mr. Offenbecher asked you about, you know, most

18 people don't act on these frustrations and grievances, and

19 that's true, right?

20 A   Yes.

21 Q   Okay.  And when they do act, let's say, when you talked

22 about somebody with narcissistic sensitivities, the -- is the

23 action logical?  Does it seem to somebody outside that this is

24 a logical, common-sense thing to do?

25 A   Typically not.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 141 of 265

1  Q    Okay.  And the point you were making is none of these

2  actions are somewhere you would -- or any of these, murder

3  something, where somebody sitting outside would go, "Okay,

4  that's a logical thing that I would expect someone to do"?

5  A    Occasionally that happens, but usually it seems very

6  illogical and irrational to the observer.

7  Q    Okay.  And, now, when you talked about -- we -- you know,

8  had the pie chart up, and we don't need to put it back up

9  again.  And you pointed out -- what was the pie chart

10 encompassing?  What types of murders?

11 A    Basically, homicide in the workplace.

12 Q    Okay.  And we -- the -- by far, the biggest was robbery.

13 Right?

14 A    Correct.

15 Q    Okay.  And what's the goal usually when somebody's trying

16 to do a robbery?

17 A    To rob something.

18 Q    And is like -- finance and money what they're trying to

19 get?

20 A    Yeah.  Usually -- usually through -- typically how it's

21 defined is through force and fear, they're trying to take

22 somebody else's possession or object, so that could be any

23 number of things that the -- the perpetrator thinks has value

24 to them.

25 Q    And those types of things, is it very hard to figure out

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 142 of 265
(720) 384-8078   attrans@sbcglobal.net

1  the motivation?

2  A    Well, typically it would be to see if there was any

3  valuables at the -- left at the crime scene that would

4  obviously have served the purpose of material gain for the

5  perpetrator.  And typically -- an investigator, which, you

6  know, police investigator, which I am not, would look at the

7  scene and at least tentatively rule out a robbery if there were

8  valuable goods that were left behind.

9  Q    Okay.  Now, you also pointed out on your pie chart that

10  one of the other, you know, big areas of, you know, violence is

11  domestic.  Right?

12  A    Yes, correct.  Whatever the -- the figure -- a portion

13  of -- you're speaking of workplace homicides?

14  Q    Yeah.

15  A    Yes, a portion of them are.

16  Q    Well, I want to go outside the workplace.  Where do most

17  domestic violence incidents happen?

18  A    Spousal killings usually happen in the home.

19  Q    And with men, what's the --

20  A    Yeah -- typically --

21  Q    What's the (indiscernible) --

22  A    -- typically on -- women kill with knives in the kitchen.

23  Men kill with a gun in the bedroom.

24  Q    Okay.  In terms of the workplace and domestic violence

25  homicides, how often is it multiple victims?  Do you know?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 143 of 265
(720) 384-8078  attrans@sbcglobal.net

1  A    Very rarely.

2  Q    And --

3  A    In fact, multiple victims represent -- I think it's less

4  than 1 percent of homicides in general.  So it's a very small

5  number of cases.

6  Q    And how often by women?

7  A    Very rare.  About 90 percent of all violence is committed

8  by males.  And that figure typically stands when you're looking

9  at other -- when you're looking specifically at homicide.  And

10 then when you get into multiple murder, especially the kind of

11 research we've done, multiple murder outside of the home by a

12 woman is exceedingly rare.  Now, women do kill in the home, but

13 typically two conditions apply:  they're psychotic; and they

14 kill their children.

15    Extrafamilial, which -- a term we use to describe going

16 outside the home, where it's a domestic killing, is -- or where

17 there's multiple killings outside the home, the multiple

18 homicides are committed by -- by men.  In the years that I've

19 been involved in this kind of consulting on cases and research

20 and testimony, I have -- I can think off the top of my head of

21 two multiple murders committed by women outside the home.

22 Q    Now -- and I want to go also to the -- I want to eliminate

23 the nonpsychotic --

24 A    Yes.

25 Q    -- okay, the nondiagnosed or --

1   A    Yeah.

2   Q    -- clinical mentally ill.  And again, if you're talking

3   about a domestic situation, how often -- I mean, and you've got

4   more than one.  I mean, usually they target the actual spouse,

5   ex, or the person they have a grievance against, right?

6   A    Correct.  Correct.

7   Q    And how often do you end up with sort of a collateral

8   damage, somebody else that's not connected?

9   A    Very rarely.  Typically, it's -- if it is a -- if

10  there's -- if there's three people involved, it will be the --

11  the spouse or the ex-spouse, plus another person that's either

12  involved with the spouse or the perpetrator thinks that there's

13  a intimate relationship there.

14  Q    Okay.  And I think I just have one last area, and that is

15  on the -- I know I don't -- I don't have your article up in

16  front of me, but when you put up the statistics, when you're

17  including a history of violence among -- you're also including

18  the mentally ill and the psychotic in that group where you

19  said, I think, 43 percent had a history of violence?

20  A    Correct.  That was -- that was a combining of both the

21  psychotic and the nonpsychotic multiple murders.

22  Q    And even in those, 40 -- 57 percent, then, wouldn't have

23  any history of violence?

24  A    Correct.

25  Q    Okay.  So was a history of --

1        THE CLERK:  Ms. Loeffler --

2        MS. LOEFFLER:  -- violence predict -- very

3   predictive --

4        THE CLERK:  Can you pull the mic?  You're starting to

5   fade when you look down.  Thank you.

6        MS. LOEFFLER:  Oh, I'm sorry.  I'm sorry.

7   BY MS. LOEFFLER:

8   Q   Okay.  Actually, I'm going to go -- ask I think a -- one

9   other area.  Mr. Offenbecher asked you about one of the

10  thing -- one of the items you said, characteristics and

11  planning and preparation and research for an actual incident.

12  And he talked about, you recall, casing the joint.  And the

13  purpose of casing the joint, that applies to what type of

14  people that commit this?

15  A   Well, it would be an individual who wasn't familiar with

16  where the target was going to be and needed information on the

17  location and security surrounding where they attempt -- where

18  they were planning on carrying out the act.

19  Q   Okay.  I don't have anything further.

20       THE COURT:  Redirect -- recross.

21       MR. OFFENBECHER:  No, Your Honor.  No, Your Honor.

22       THE COURT:  Thank you, sir.  You're excused.

23       THE WITNESS:  Okay.  Thank you.

24   (Witness excused)

25       THE COURT:  The government's next witness.

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 146 of 265

1    MR. SCHRODER:  Your Honor, the government calls Special

2  Agent Derek Espeland.  And, Your Honor, just kind of for

3  notification of everybody, Special Agent Espeland's going to be

4  introducing photos and evidence from the -- from different

5  crime scenes and searches.  What we've done is taken some

6  photos that show where the particular pieces of evidence were

7  found.  A couple of those are -- you know, there's blood in

8  those.  And I -- and we -- we've minimized those as much as we

9  can, but I think -- they're the only ones I could find that

10  show the area that needed to be shown.

11    THE COURT:  Okay.

12    MR. SCHRODER:  So we'll minimize those.

13    THE COURT:  Sounds --

14    MR. SCHRODER:  And we've notified the families of that.

15    THE COURT:  Okay, very well.  Heading in the right

16  direction.  That door pulls out.  If if you'd just, once you

17  get in there, remain standing.

18    THE CLERK:  Raise your right hand.

19    **DEREK ESPELAND, PLAINTIFF'S WITNESS, SWORN**

20    THE CLERK:  Thank you.  Please have a seat.  And, sir,

21  if you can please state and spell your full name.

22    THE WITNESS:  My name is Derek Espeland.  First name is

23  spelled D-e-r-e-k.  Last name is spelled E-s-p-e-l-a-n-d.

24    THE CLERK:  Thank you.

25    THE COURT:  Counsel.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 147 of 265
(720) 384-8078  attrans@sbcglobal.net

1                    **DIRECT EXAMINATION**

2   BY MR. SCHRODER:

3   Q    Special Agent Espeland, who do you work for?

4   A    I work for the FBI.

5   Q    And how long have you worked for the FBI?

6   A    Going on 15 years.

7   Q    And what did you do before that?

8   A    I was in the United States Marine Corps for approximately

9   nine years, some college, and then worked in the private sector

10  in the hazardous materials industry.

11  Q    And what do you do in the Marine Corps?

12  A    I was in infantry.

13  Q    And what type of -- just -- I want to get this on the

14  record briefly.  What type of training do you get when you join

15  the FBI?

16  A    You generally get how to conduct an investigation, how to

17  collect evidence in pursuit of an investigation, firearms,

18  defensive tactics, how to drive an automobile in -- in a law

19  enforcement manner.

20  Q    And since becoming an FBI agent, how many investigations

21  would you estimate that you've participated in?

22  A    Probably close to 100.

23  Q    And what is your current assignment with the FBI in

24  Alaska?

25  A    I'm currently assigned to the Joint Terrorism Task Force,

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 148 of 265

1  but I'm also a member of the Anchorage FBI Evidence Response

2  Team.

3  Q   And how long have you been with the Evidence Response

4  Team?

5  A   Approximately nine years.

6  Q   And the -- is there specialized training that goes along

7  with that as well?

8  A   Yes, there is.

9  Q   And could you briefly -- again, briefly describe that?

10  A   There -- first of all, there's a -- at least a two-week

11  basic Evidence Response Team, where they go through all

12  collection -- manner of collecting general evidence and trace

13  evidence, photography, chain of custody.  And then advanced

14  training can include postblast investigation, advanced

15  photography, human remains collection.  Think those are the

16  ones that -- that I've been to specifically.

17  Q   Now, you said you've been on the Evidence Response Team

18  nine years.  Does that make you one of the more senior members?

19  A   In this office, yes.

20  Q   Okay.  And as a senior member of the Evidence Response

21  Team, when you get a callout, what kind of responsibilities do

22  you go or you get assigned?

23  A   Generally speaking, I'm oftentimes a team leader.  Many

24  times I'm a photographer, evidence custodian, and only

25  occasionally, it seems to be, an, in fact, searcher, which is

1  the -- oftentimes the more entertaining part of it.

2  Q    And were you involved in the investigation of the two

3  homicides at Coast Guard COMMSTA Kodiak at April -- on April

4  12th, 2012?

5  A    Yes, I was.

6  Q    And when did you get involved?

7  A    As soon as the FBI was alerted to the fact that the -- the

8  incident happened, that the -- that the crime happened, the

9  Evidence Response Team was gathered and said to be ready to

10  deploy as soon as we could to Kodiak, to conduct our search.

11  Q    And when did you actually get deployed to Kodiak?

12  A    I think it was the day -- the day of.

13  Q    Okay.  So you were among one of the first groups of the

14  FBI to arrive?

15  A    Yes.

16  Q    And it all sounds like it happened pretty quickly.

17  A    Yes.  We collected all -- as much tools and collection

18  items as we -- as we could fit into a Chevy Suburban, and

19  people, and loaded up into a Coast Guard C-130, and off we

20  went.

21  Q    Now, did anybody start processing the crime scene before

22  you arrived?

23  A    Not that I'm aware of.  The paramedics that were there

24  and -- and the law enforcement that showed up with them.

25  Q    So were you aware that the bodies had been probably moved

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 150 of 265

1  before you got there?

2  A    Most likely, yes.

3  Q    Yeah.

4  A    Yes, I was.

5  Q    Now, I wanted to talk briefly, just kind of generally,

6  about how you process a crime scene, to give the jurors an idea

7  of your process.

8  A    Well, of course, you -- you -- you arrive on scene and

9  you -- you take into consideration what -- what the crime scene

10  is.  In this case it was primarily indoors.  You approach the

11  scene and basically you look at -- to where the evidence might

12  be.  Most importantly is we photograph the -- the scene.

13  Before we even enter the scene, we -- we photograph the outside

14  of the structure, in this case, the -- the rigging shop, and

15  then we slowly -- we work our way in.  Before -- in this case,

16  before we entered, we donned tie-back suits so that we didn't

17  bring anything from the outside into the inside of the crime

18  scene.

19  Q    So what -- once you had the -- you're in and you've

20  photographed the area, what do you do next?

21  A    Once you have documented the -- the -- the scene

22  photography, then assignments are made as to look and see --

23  actually while the photography is going on, you're looking at

24  where do you think your evidence is going to be.  In this case

25  there was -- there was obvious -- there was -- there were two

1  people deceased in the building, but we're now looking for

2  where will the trace evidence be, where could fingerprints be,

3  where would other general evidence be.  And then we're -- we --

4  we collect those in a fashion as, you know, trace evidence

5  first because it is -- it can be transient, it can be moved by

6  wind or our movements.  So we collect that evidence first, and

7  then we methodically move into the other evidence categories.

8  Q   All right.  Now I want to show you what's been marked as

9  Government Exhibit 392.  And is one of the -- and it's already

10  admitted.  Are one of the things you do, number rooms?

11  A   Correct.

12  Q   Okay.  Now, I don't think we need to run through all the

13  rooms here in the -- this instance, but I want you to talk

14  about the two main rooms where the bodies were found.

15  A   Correct.

16  Q   Is it accurate to say that most of the evidence you

17  collected was from those two rooms?

18  A   Yes.

19  Q   So if you could identify the office area at the top there,

20  do you know -- remember what room number that was?

21  A   That was Room -- we labeled -- they could either be

22  labeled alphabetically or numerically.  We chose numerically in

23  this case.  That was Room 1.

24  Q   Okay.  And then down slightly lower, what's been

25  identified as the break room, where Petty Officer Hopkins' body

1  was found, what room was that?

2  A    That was Room 2.

3  Q    All right.  Thanks, Kim.  We'll need that again later.

4  All right.  Let's talk just a moment about the process of

5  gathering and seizing evidence, again kind of briefly.  What's

6  your goal as far as maintaining the condition of the evidence?

7  A    Well, we -- what you want to do is collect the evidence in

8  the best manner that it can be, to represent how it was found.

9  We package the evidence in that manner as well for when it --

10  in some cases it is shipped to the laboratory.  You want it to

11  be in as pristine a condition as -- as you found it in as is

12  humanly possible.

13  Q    Now, is it always possible to do that?  Let's say --

14  A    It's --

15  Q    Let's say with wet items.

16  A    Wet items are -- are difficult, because they -- you

17  have -- you have to package those and -- and they are

18  eventually going to dry.

19  Q    Do you look for -- for example, in a crime scene like

20  this, are you specifically looking for blood evidence?

21  A    Yes.

22  Q    And how do you do that?

23  A    Well, obvi -- most people I think understand what -- what

24  blood looks like, but there are other ways to look for it.

25  Flashlights, different light sources that we have, we can -- we

1  can look for blood.  We can also -- there are ways we could

2  chemically test if we saw a stain somewhere.  There's a simple

3  phenolphthalein test that we could use to test to see if that

4  stain is -- is blood or possibly blood.  That's one way.

5  Q   And how -- you know, let's talk a minute about documenting

6  the evidence.  Once you've got it collected, do you mark or

7  identify it in some way?

8  A   Yes, we do.

9  Q   And --

10  A   Every item is listed with the case number, the date, the

11  location from where it was seized, two persons who are --

12  are -- are named on each piece of evidence, the -- and -- and

13  the initials of the -- of the person collecting it.

14  Q   And is that assigned on scene?  Are those numbers assigned

15  on scene?

16  A   Yes.  The -- the numbers of each evidence are -- are --

17  are numbered.  They're on scene, yes.

18  Q   Okay.  Now, once packaged and numbered, where do you store

19  the evidence?

20  A   In -- in this particular case, because our searches were

21  going on over -- over a course of days, we did temporary

22  storage at the U.S. Coast Guard Investigation Service, and then

23  eventually the evidence was transported back to the FBI and

24  some of the evidence was transported back to either a state

25  laboratory or the FBI Laboratory.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 154 of 265
(720) 384-8078   attrans@sbcglobal.net

1  Q    And does the FBI -- once it gets back here to Anchorage --
2  you have a evidence storage facility, I take it --
3  A    Correct.
4  Q    -- here in Anchorage.  Is -- does the -- and it's got the
5  number you've assigned on scene.  Is there a -- is there then
6  an evidence cataloging system that the FBI uses?
7  A    Yes.  Then once we return, we enter the evidence into
8  our -- into our system, and then the evidence custodian, who's
9  employed by our office, assigns a it a 1B number, which is for
10 evidence.
11 Q    Okay.  Then each piece of evidence gets a distinct number?
12 A    Correct.
13 Q    All right.  Now, in preparation for your testimony today,
14 have you reviewed the evidence that we're going to discuss?
15 A    Yes, I have.
16 Q    All right.  And since this evidence has been checked into
17 the evidence facility, to the best of your knowledge, has it
18 been in the custody of the FBI division -- Anchorage Division?
19 A    Yes, with the exception of the items that were sent to the
20 various laboratories.
21 Q    Now, you talked earlier about photographing crime scenes.
22 Do you generally take photographs of all the different pieces
23 of evidence?
24 A    Yes, we do.
25 Q    And is that before or after it's collected?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 742  Filed 09/23/14  Page 155 of 265

1  A   We -- we take pictures before, during, and -- and after

2  all the evidence has been collected we do what are exit photos.

3  So we take a photograph of -- to explain -- from beg -- from

4  beginning to end, we take pictures of what the scene looks like

5  before we got there; we're taking pictures all the way through

6  that; and then as we leave we take pictures of everything, of

7  the -- all the rooms and everything as we leave them.

8      (Side conversation)

9  Q   And what we're going to do, I think, to try to help make

10 more sense to the jury on this, is show some photographs of the

11 evidence, the room, and then the evidence in context, so they

12 can see, before we actually introduce the evidence.  And we're

13 trying to find the first one.

14     (Side conversation)

15 Q   Exhibit 362, please.  Now, do you recognize this image?

16 A   I do.

17 Q   And how do you recognize it?

18 A   I took that photograph.

19 Q   Okay.  And what room in COMMSTA Kodiak -- and you can give

20 the room number or --

21 A   This is the break room, which was -- we labeled as Room 2.

22 Q   All right.  And you said you took it?

23 A   Yes.

24 Q   All right.  Is this picture with -- consistent with how

25 you found Room 2 of the rigger shop when you were doing your

1  crime scene processing?

2  A    Yes, it is.

3        MR. SCHRODER:  All right.  Your Honor, want to show it

4  very briefly here.  I mean, there's no -- there's not a lot of

5  blood, but you can see Petty Officer Hopkins' legs in it, so --

6  at the far end.

7        THE COURT:  You show whatever you feel is necessary.

8        MR. SCHRODER:  I'd move for admission of the exhibit,

9  Your Honor.

10       THE COURT:  Yeah, it'll be -- it may be admitted.

11    (Plaintiff's Exhibit 362 admitted)

12  BY MR. SCHRODER:

13  Q    Now, what is -- what direction are you shooting or

14  photographing this shot, so you can set it up for the jury.

15  A    As far as north-south or --

16  Q    That's not really a great question, is it.  So -- but

17  is -- are what we seeing is Petty Officer Hopkins' legs in

18  this?

19  A    Correct.

20  Q    And where's the evidence that we're going to discuss?

21  What part of the room is it in?

22  A    It's towards the petty officer's -- between myself and

23  petty officer is where some of it was found.

24  Q    Okay.  So we can take that down.  Now I want to show you

25  what's been marked as Government Exhibit 297.  And, again, I --

1  are you familiar with this exhibit?

2  A    I am.

3  Q    And who took it?

4  A    I did.

5  Q    And is this picture consistent with how you found Petty

6  Officer Hopkins' body, with a blue shirt lying next to it?

7  A    Yes.

8  Q    Is it a fair and accurate representation of what you saw?

9  A    Yes, it is.

10       MR. SCHRODER:  I'd move for admission of Government

11  297.

12       THE COURT:  Hearing no objection, it can be received.

13       (Plaintiff's Exhibit 297 admitted)

14       MR. SCHRODER:  And again apologize, ladies and

15  gentlemen.  We'll do this just very briefly, so put that on the

16  screen.

17  BY MR. SCHRODER:

18  Q    And what I want to point out is what's in blue just to the

19  edge of the screen there?

20  A    That's a -- a military dress shirt.

21  Q    Okay.  We can take it off, Kim.  All right.  Now I want

22  you to take a look at what's been marked as Government Exhibit

23  303.  And do you recognize this exhibit?

24  A    I do.

25  Q    And, again, how do you recognize it?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 158 of 265
(720) 384-8078   attrans@sbcglobal.net

1  A    I took the photograph.

2  Q    And is it a fair and accurate representation of how you

3  find the blue shirt lying next to Petty Officer Hopkins' body

4  on April 12th, 2012?

5  A    Yes, it is.

6      MR. SCHRODER:  Your Honor, we move Exhibit 303 into

7  evidence.

8      THE COURT:  Hearing no objection, it'll be received.

9      (Plaintiff's Exhibit 303 admitted)

10      MR. SCHRODER:  Please display that.

11  BY MR. SCHRODER:

12  Q    Petty Officer -- or Special Agent Espeland, what is the

13  number 8 --

14  A    That is the --

15  Q    -- next to it?

16  A    -- evidence item tag that we assigned to that piece of

17  evidence.

18  Q    Okay.  And do you see any special characteristics of this

19  military dress ODU blouse?

20  A    Yes.  One sleeve is rolled up in what looks to be the --

21  an NBC roll.  Is --

22  Q    And what's -- let me ask you -- question about that.

23  You're -- you were a member of the Marines and you're -- you

24  said you -- do you have any specialty in NBC -- what --

25  warfare, or NBC?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 159 of 265
(720) 384-8078   attrans@sbcglobal.net

1  A    Correct.  Nuclear, biological --

2  Q    And what -- what's that mean?

3  A    -- chemical is what -- it's -- is the acronym for.

4  Q    All right.  So you have some expertise in that.

5        THE COURT:  Okay, wait.  Now, you spoke over each

6  other.

7        MR. SCHRODER:  I'm sorry, Your Honor.

8        THE COURT:  Answer your question.

9  BY MR. SCHRODER:

10  Q    Go ahead and answer the question.

11  A    The -- NBC is what I'm referring to is -- it's just a

12  military acronym for nuclear, biological, chemical.

13  Q    And the -- does the -- do the Marines roll their sleeves

14  in the same way?

15  A    Yes, they do.

16  Q    And what's the purpose of that?

17  A    The -- the purpose is that, there are portions of the year

18  where the military rolls their sleeves up and then there's a

19  portion of the year where the military rolls their sleeves

20  down.  In this case it was apparently that time of year when

21  you could have your sleeves rolled up.  The method by which

22  they do that is they roll the sleeve in such a fashion on the

23  arm so that in the event of a nuclear, biological, or chemical

24  attack, you could roll down your sleeves quickly, with just a

25  quick tug and be able to expose your arm with the clothing to

1  provide some form of protection.

2  Q    Now we're going to ask you -- we can take that down, Kim.

3  We're going to ask you to look at -- Daryl, Government Exhibit

4  216.  Now, are you familiar with this exhibit?

5  A    Yes, I am.

6  Q    And how are you familiar with it?

7  A    It is evidence item 8 from the photograph.

8         MR. SCHRODER:  All right.  The government moves

9  admission of Exhibit 216, Your Honor.

10        MR. CURTNER:  No objection.

11        THE COURT:  Be received.

12     (Plaintiff's Exhibit 216 admitted)

13  BY MR. SCHRODER:

14  Q    Now I want to show you another series of photographs.

15  Let's start with Exhibit 310.  And are you familiar with this

16  photograph?

17  A    Yes, I am.

18  Q    And how are you familiar with it?

19  A    I took the photograph.

20  Q    And is it a fair and accurate representation of how you

21  found a bullet jacket evidence item in that room when you were

22  searching in April of 2012?

23  A    Yes, it is.

24        MR. SCHRODER:  Your Honor, the government moves for

25  admission of Exhibit 310.

1    THE COURT:  Be received.

2    (Plaintiff's Exhibit 310 admitted)

3  BY MR. SCHRODER:

4  Q    And where was that in the room, the break room?

5  A    That was, if you recall, the first photograph of -- well,

6  that was basically in about the middle of the break room,

7  halfway between the two entrances to that room --

8  Q    All right.

9  A    -- more or less.

10  Q    And -- we can take that down, Kim.  If I could have 311.

11  Do you recognize this image?

12  A    I do.

13  Q    And what is it?

14  A    That is a casing from -- not casing, but a part of a

15  bullet.

16  Q    Okay.  And what -- is that a fair and accurate

17  representation of how you found that portion of the bullet --

18  A    Yes, it --

19  Q    -- in April 2012?

20  A    Yes, it is.

21    MR. SCHRODER:  Your Honor, the government moves for

22  admission of Exhibit 311.

23    THE COURT:  Be received.

24    (Plaintiff's Exhibit 311 admitted)

25    MR. SCHRODER:  If you could display that, Kim.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 162 of 265
(720) 384-8078   attrans@sbcglobal.net

1  BY MR. SCHRODER:

2  Q    And again, what does the 13 mean?

3  A    The 13 is the -- the evidence number itself.

4  Q    Okay.  And what are those marks and lines along the little

5  placard there?  What does that show you?

6  A    Those are -- those are scale markings for photography, so

7  that in the event that our photography unit back at the

8  laboratory needed to make that photograph much larger, they

9  could do that within scale.

10 Q    Okay.  Now, as an FBI agent and a -- as a former Marine

11 infantry -- officer, I believe?

12 A    No, enlisted.  Sorry.

13 Q    Oh, there you go.  So are you familiar with firearms?

14 A    Yes.

15 Q    And have you had -- how would you describe your

16 familiarity with firearms?

17 A    I've been firing military and civilian weapons for 25

18 years now.

19 Q    Now, we're going to have some specific witnesses talk

20 about this, but just briefly, from -- some jurors who might not

21 understand the basic structure of ammunition, what is a jacket?

22 A    A jacket is a -- a -- is a metal coating, basically, that

23 goes around the projectile.  Not all of them have them, but

24 some do.  Gives them a little extra strength.  There is the

25 casing which is ejected from the rifle once it's fired.  The

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 163 of 265
(720) 384-8078   attrans@sbcglobal.net

1  jacket and the projectile exit the barrel.  And when they

2  impact things, they can -- they can look like this.

3  Q    Okay.  Now the government -- 226.  We'd like you to take a

4  look at Government Exhibit 226.  And can you identify that

5  exhibit?

6  A    That is evidence item 13 from the photograph.

7  Q    All right.

8  A    It is the -- the jacket.

9       MR. SCHRODER:  Your Honor, the government moves for

10  admission of Exhibit 226.

11       THE COURT:  Will be received.

12       (Plaintiff's Exhibit 226 admitted)

13  BY MR. SCHRODER:

14  Q    Now I'm going to have you look at Government Exhibit 312.

15  And are you familiar with this exhibit?

16  A    I am.

17  Q    And what is it?

18  A    That is a -- a red bowl on top of the refrigerator in the

19  break room, Room 2.

20  Q    Now is that the same room Petty Officer Hopkins' body was

21  found in?

22  A    Correct.

23  Q    And how close is that to where his body was found?

24  A    That's fairly close, with -- within 10 or so feet.

25       MR. SCHRODER:  Your Honor, the government moves

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 164 of 265
(720) 384-8078   attrans@sbcglobal.net

1 admission of Exhibit 312.

2       THE COURT: Hearing no objection, it will be received.

3     (Plaintiff's Exhibit 312 admitted)

4 BY MR. SCHRODER:

5 Q   All right. And would you point -- you got a laser pointer

6 up there. Maybe point out what the -- you were talking about a

7 bowl?

8 A   There -- let's see, make sure I got this thing --

9 Q   Or do you have -- there we go.

10 A   There we go. This is the red bowl up here. It doesn't

11 come up on the screen very well.

12 Q   So now I'm going to have you look at Government Exhibit

13 313. And are you familiar with that exhibit?

14 A   Yes, I am.

15 Q   And what is it?

16 A   That is the red bowl, more of a closeup shot.

17 Q   And is it a fair and accurate -- are you the photographer?

18 A   I am.

19 Q   And is it a fair and accurate representation of the bowl?

20 A   Yes, it is.

21       MR. SCHRODER: Government moves for admission of 312,

22 Your Honor.

23       THE COURT: Be reviewed.

24       MR. SCHRODER: 313, I'm sorry.

25       THE COURT: Be received.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG Document 742 Filed 09/23/14 Page 165 of 265
(720) 384-8078 attrans@sbcglobal.net

1   (Plaintiff's Exhibit 313 admitted)

2   BY MR. SCHRODER:

3   Q   All right.  I'm going to ask you to look at Exhibit 227.

4   And can you identify that exhibit?

5   A   That is the red bowl from the photograph.

6       MR. SCHRODER:  Your Honor, the government moves for

7   admission of Exhibit 227.

8       THE COURT:  Hearing no objection, it will be received.

9   (Plaintiff's Exhibit 227 admitted)

10  BY MR. SCHRODER:

11  Q   Now I'm going to ask you to look at photo Exhibit 306.

12  And again I'll -- this has Petty Officer Hopkins' body in it.

13  We'll just show it briefly.  Are you familiar with this

14  exhibit?

15  A   Yes, I am.

16  Q   And how are you familiar with it?

17  A   I took the photograph.

18      MR. SCHRODER:  All right.  So if we could -- Your

19  Honor, moves for -- we move for admission of Exhibit 306.

20      THE COURT:  Will be received.

21  (Plaintiff's Exhibit 306 admitted)

22  BY MR. SCHRODER:

23  Q   Just briefly.  And I see a placard in there.  What is that

24  placard?

25  A   That placard is evidence label number 10.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 166 of 265

1  Q    And there's another one in there as well, up higher.

2  A    9.

3  Q    Okay.  So --

4  A    Which is on top of the microwave.

5  Q    All right.  So we can take that down.  And now I want

6  Exhibit 304, please.  All right, are you familiar with this

7  photograph?

8  A    Yes, I am.

9  Q    And who took it?

10  A    I took it.

11  Q    And is it a fair and accurate representation of the

12  microwave in the break room in April 2012?

13  A    Yes, it is.

14        MR. SCHRODER:  All right.  Move for admission of 304,

15  Your Honor.

16        THE COURT:  Will be received.

17     (Plaintiff's Exhibit 304 admitted)

18  BY MR. SCHRODER:

19  Q    And what does this depict?

20  A    That is a -- a slug on top of the microwave, right next to

21  the number 9 placard.

22  Q    Okay.  And, okay, Kim, now give me 305, please.  And are

23  you familiar with this exhibit?

24  A    Yes, I am.

25  Q    Again, how are you familiar with it?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 167 of 265
(720) 384-8078   attrans@sbcglobal.net

1  A    I took the picture.

2  Q    And is it a fair and accurate representation of that

3  portion of the bullet on the microwave?

4  A    Yes, it is.

5        MR. SCHRODER:  Your Honor, the government moves for

6  admission of 305.

7        THE COURT:  Received.

8     (Plaintiff's Exhibit 305 admitted)

9  BY MR. SCHRODER:

10 Q    I think you've already said what we're seeing there, so --

11 now if we could move to look at Exhibit 236, please.  And

12 you're familiar with that exhibit?

13 A    I am.

14 Q    And what is it?

15 A    That is the -- the bullet from the -- from the photograph.

16 Q    All right.  Item 9?

17 A    Yes, it is.

18       MR. SCHRODER:  Government moves for admission of 236,

19 Your Honor.

20       THE COURT:  Be received.

21    (Plaintiff's Exhibit 236 admitted)

22       MR. SCHRODER:  And I think we have one more item.

23 Could you give me Exhibit 338?

24    (Side conversation)

25 BY MR. SCHRODER:

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 168 of 265

1  Q   Are you familiar with this exhibit?

2  A   Yes, I am.

3  Q   And how are you familiar with it?

4  A   I took the photograph.

5  Q   All right.  Your Honor, the government moves for -- is it

6  a fair and accurate picture of the trash can, lower portion of

7  the trash can as you photographed it in April 2012?

8  A   Yes, it is.

9      MR. SCHRODER:  Your Honor, the government moves for

10 admission of 338.

11     THE COURT:  Be received.

12     (Plaintiff's Exhibit 338 admitted)

13     MR. SCHRODER:  All right.  Special Agent Allison, if we

14 could look at 237, please.

15     (Side conversation)

16 BY MR. SCHRODER:

17 Q   Are you familiar with this exhibit?

18 A   Yes, I am.

19 Q   And what's -- well, let's -- hold on just a second, keep

20 it out for a second.  And what is it?

21 A   That's a -- a trash can with what appears to be a hole in

22 it from a projectile.

23 Q   All right.  And is this the trash can you seized from Room

24 2?

25 A   Yes, it is.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 169 of 265
(720) 384-8078  attrans@sbcglobal.net

1    MR. SCHRODER:  Your Honor, the government moves for

2 admission of 237.

3    THE COURT:  Hearing no objection, it'll be received.

4    (Plaintiff's Exhibit 237 admitted)

5 BY MR. SCHRODER:

6 Q   And were you aware, was anything found inside the trash

7 can?

8 A   The -- there were a few fragments found inside the trash

9 can.

10 Q   Special Agent Allison, if you could show those to the

11 witness.  Are they mark -- they're marked with the same exhibit

12 number.  Are those the -- those are the fragments that came out

13 of the garbage can?

14 A   Yes, they are.

15 Q   All right.

16    (Side conversation)

17 Q   Okay.  So let's move -- we can probably put that back in

18 the packaging.  So -- now I want to also talk briefly about the

19 room that Mr. Belisle's body was found in.

20 A   Okay.

21 Q   Which room was that?

22 A   That would be Room 1.

23 Q   Okay.  Now I'm going to have you take a look at -- where's

24 your cheat sheet, Kim, the one you just gave me -- Government

25 Exhibit 363.  Are you familiar with that exhibit?

1   A   Yes, I am.

2   Q   And how are you familiar with it?

3   A   I took the photograph.

4   Q   Okay.  And is it a fair and accurate representation of the

5   room in the office in April 2012?

6   A   Yes, it is.

7       MR. SCHRODER:  The government moves for admission of

8   336.

9       THE COURT:  Hearing no objection --

10      MS. LOEFFLER:  It's 363.

11      THE COURT:  -- it will be received.

12      UNIDENTIFIED SPEAKER:  Or -- I'm sorry.

13      MR. SCHRODER:  Oh, 363, Your Honor.  I'm sorry.

14      THE COURT:  362?

15      MR. SCHRODER:  363.

16      MS. LOEFFLER:  363.

17      THE COURT:  C -- 363 will be received.

18      (Plaintiff's Exhibit 363 admitted)

19      MR. SCHRODER:  And again, you can show it just briefly.

20  BY MR. SCHRODER:

21  Q   And what are we seeing in the foreground of this picture?

22  A   In the -- in the foreground is the body of Mr. Belisle.

23  Q   Is that where you found the body when you arrived?

24  A   Yes, it is.

25  Q   All right.  All right, we can take that down, Kim.  Now

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 171 of 265
(720) 384-8078   attrans@sbcglobal.net

1  let's look at Exhibit 364.  And are you familiar with this

2  exhibit?

3  A    Yes, I am.

4  Q    And how are you familiar with it?

5  A    I took the photograph.

6  Q    All right.  So again we'll show this -- Your Honor -- is

7  it a fair and accurate representation of the area around where

8  Mr. Belisle's body was found?

9  A    Yes, it is.

10        MR. SCHRODER:  Your Honor, the government moves for

11  admission of Exhibit 364.

12        THE COURT:  Hearing no objection, it'll be received.

13      (Plaintiff's Exhibit 364 admitted)

14  BY MR. SCHRODER:

15  Q    Now, there -- the blood is there, but what did you find

16  intermixed or under that blood?

17  A    Intermixed in the floor, they -- we found one bullet was

18  lodged in the floor and another one was through the floor and

19  was found underneath.

20  Q    Okay.

21      (Side conversation)

22  Q    And are you familiar with this exhibit?

23  A    Yes, I am.

24  Q    All right.  And how are you familiar with it?

25  A    I took the photograph.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1  Q    And is a fair and accurate representation of one of the

2  bullets you found in the floor --

3  A    Yes, I removed it --

4  Q    -- near Mr. Belisle's body?

5  A    I removed it from the floor.

6  Q    All right.

7        MR. SCHRODER:  The government moves for admission of

8  317.

9        THE COURT:  Hearing no objection, it'll be received.

10       (Plaintiff's Exhibit 317 admitted)

11  BY MR. SCHRODER:

12  Q    Okay.  And again, just briefly.  What does this show?

13  A    That's the slug pretty much in the center, next to the

14  paper with the scale on it.  Just below that is the hole from

15  which it came.

16  Q    All right.  Now, one point about this.  You talked about

17  the jacket and the projectile.  Can you see that more clearly

18  here?

19  A    Yes.  This has a -- this has a -- looks to be a copper

20  jacket on the outside of it.

21       (Side conversation)

22  Q    Your Honor --

23       (Side conversation)

24  Q    Could you take a look -- this is Exhibit 335.  Could you

25  take a look at that, Special Agent Espeland?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 173 of 265

1  A    Yes.

2  Q    And are you familiar with it?

3  A    Yes, I am.

4  Q    And how are you familiar with it?

5  A    I took the photograph.

6  Q    And is a fair and accurate representation of the floor

7  marked with the bullet holes that you took that day?

8  A    Yes, it is.

9        MR. SCHRODER:  The government moves Exhibit --

10  admission of 335, Your Honor.

11       THE COURT:  Hearing no objection, it will be received.

12       (Plaintiff's Exhibit 335 admitted)

13  BY MR. SCHRODER:

14  Q    And again, briefly, could you indicate where the two

15  bullet holes were found?

16  A    In the almost dead center of this photograph was where one

17  was found, and then up in the far upper left corner is where

18  the other one was found.

19       (Side conversation)

20  Q    Now I want to have you take a look at Government Exhibit

21  317.  I think that's -- oh, never mind.

22       (Side conversation)

23  Q    Okay.  So now we want to take a look at three -- 238.  And

24  it -- are you familiar with that exhibit?

25  A    Yes, I am.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 174 of 265

1  Q   And what is it?

2  A   That is a bullet.

3  Q   And is that one of the ones you --

4  A   Yes, the copper slug.

5  Q   Okay.  That one that was fairly intact that you just

6  identified?

7  A   Yes.

8       MR. SCHRODER:  Government moves for Exhibit --

9  admission of 238, Your Honor.

10      THE COURT:  Hearing no objection, it will be received.

11    (Plaintiff's Exhibit 238 admitted)

12      MR. SCHRODER:  Exhibit 318, please.

13  BY MR. SCHRODER:

14  Q   And are you familiar with this exhibit?

15  A   Yes, I am.

16  Q   How are you familiar with it?

17  A   I took the photograph.

18  Q   This a fair and accurate representation of a portion of a

19  bullet that you pulled from Mr. -- under Mr. Belisle's body?

20  A   Correct.

21      MR. SCHRODER:  And, Your Honor, the government moves

22  for admission of two -- 318.

23      THE COURT:  It'll be received.

24    (Plaintiff's Exhibit 318 admitted)

25  BY MR. SCHRODER:

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 175 of 265
(720) 384-8078   attrans@sbcglobal.net

1  Q    And can you explain to the jury what this shows?

2  A    This shows I had -- we had to -- the -- there was a hole

3  in the floor, and in order to retrieve the evidence we had to

4  cut a hole in the floor to -- to locate this piece of evidence.

5  So what that shows is the -- the hole we cut, the photograph

6  with a scale in there next to the bullet.

7  Q    Take that down.  And, Special Agent Allison, 239, please.

8  Are you familiar with that exhibit?

9  A    Yes, I am.

10  Q    All right.  And what is it?

11  A    It is the bullet from that photograph.

12       MR. SCHRODER:  Your Honor, the government moves for

13  admission of 229.

14       THE COURT:  It will be received.

15       MR. SCHRODER:  239, I apologize.

16       THE COURT:  Will be received.

17       (Plaintiff's Exhibit 239 admitted)

18  BY MR. SCHRODER:

19  Q    Now, in addition to those two rooms, Special Agent

20  Espeland, did you search other rooms other than where the

21  bodies were found?

22  A    Yes, we did.

23  Q    Did you search the entire building, basically?

24  A    Yes, we did.

25  Q    All right.  Now, did you -- we've talked about the

1  evidence that was collected here that we're admitting, but did

2  you also collect other evidence that was submitted to labs for

3  analysis?

4  A    Yes, I did.

5  Q    And going to ask you to identify --

6       (Side conversation)

7  Q    Going to ask you to look at Government Exhibit 389.  And

8  are you familiar with this exhibit?

9  A    Yes, I am.

10 Q    And how are you familiar with it?

11 A    I helped -- helped make this exhibit.

12 Q    All right.  And what is it that we're looking at?

13 A    This is a -- a table, a chart of physical evidence sent

14 for the lab analysis from the crime scene and also a list of --

15 another table of physical evidence sent for the lab analysis

16 from Mr. Wells' residence.

17 Q    Okay.  And I think -- we show the next page.

18 A    And then a -- a table of evidence seized from Mr. Wells's

19 blue Honda CR-V, Mr. Wells's white Dodge pickup, and physical

20 evidence sent for analysis from Mr. and Mrs. Wells' person.

21 Q    And were you involved personally with each of those

22 searches?

23 A    Yes, I was.

24 Q    And did you check the data on this chart?

25 A    Yes, I did.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 177 of 265
(720) 384-8078  attrans@sbcglobal.net

1  Q    And is it accurate?

2  A    I believe there was one anomaly.

3  Q    And if we go to line -- I believe it's line --

4  A    The tire --

5  Q    -- line with --

6  A    The tire castings.

7  Q    Tie -- I mean, what's the anomaly there?

8  A    The anomaly -- it says 1B141 and 1B142.  It should be

9  1B041 and 1B042.

10        MR. SCHRODER:  And we've made the correction on the

11  original, Your Honor, so --

12        THE COURT:  All right.

13        MR. SCHRODER:  Move for admission of 389.

14        MR. CURTNER:  No objection.

15        THE COURT:  Will be received.

16     (Plaintiff's Exhibit 389 admitted)

17  BY MR. SCHRODER:

18  Q    Okay.  This will help us walk through this set of evidence

19  a little quicker with the jury, so -- now if you could tell us

20  when it -- we'll -- and we'll work each section separately.  So

21  let's start with the crime scene.  Can you tell us what types

22  of evidence you collected that went out for lab analysis?

23  A    We collected latent fingerprints.  We collected tire

24  castings from outside the facility.  We collected vacuum

25  sweepings from in -- the interior of the facility; some debris,

1    which included a possible frag -- tooth fragment; an empty soda

2    can, which was a -- specifically a Diet Coke with -- flavored

3    with lime; and also a -- a glove found in the hallway inside

4    the facility.

5    Q    And were you involved with all the collection of those

6    items?

7    A    Yes, I was.

8    Q    All right.  And let's go from the top.  What's the first

9    kind of evidence you collected?

10   A    Those are fingerprints collected from the -- from with --

11   inside the facility.

12   Q    All right.  Now, as individual pieces of evidence, do

13   numbers get assigned to fingerprints?

14   A    Yes, they did.

15   Q    And what is the purpose of those numbers?

16   A    That's for -- for tracking, so that we know that evidence

17   item such-and-such then becomes evidence item 1B such-and-such.

18   Q    And what were the 1B numbers assigned in to the

19   fingerprints in this case?

20   A    We have 1B45 through 1B74; 1B76 through 1B93; 1B40; and

21   1B244.

22   Q    So, again, I want to kind of continue along this theme of

23   explaining to the jury a bit about how you do this process.

24   What is the process of identifying and collecting fingerprints?

25   A    The -- the process is you -- we look for surfaces where it

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 179 of 265

1  would be likely to recover a latent fingerprint.  You can

2  use -- we can search for fingerprints using flashlights, an

3  alternate light source, which uses different UV light spectrum.

4  But you -- you look -- you're looking for logical places where

5  you might find a fingerprint:  doors, door knobs, other places

6  where people tend to just -- table tops, where -- where

7  people -- where a person would touch and might leave a

8  fingerprint.

9  Q    So identifying is your first step?

10 A    Correct.

11 Q    Do you initially document the print before you take any

12 other action?

13 A    We -- we -- we locate -- we locate the print and then we

14 try to preserve the print.  We photograph the print.  If the

15 fingerprint is difficult to pick up on the camera, then we

16 might apply either some fingerprint powder onto the fingerprint

17 to make it stand out more visibly for the -- for the

18 photography portion.

19 Q    So sometimes you have to enhance the print?

20 A    Correct.

21 Q    And once you've done that, how do you actually collect it?

22 A    Then in some cases we can just collect the item that the

23 fingerprint is on, we could submit that.  On other cases -- in

24 most of these cases, we collected them on scene using a variety

25 of methods.  We used a material called Microsil, which is a --

1  a -- a two-part compound that you mix together and you -- you

2  gently spread over the fingerprint.  It eventually dries, and

3  you can pull the -- you pull that off, I guess kind of like

4  Silly Putty in a way, and you can preserve that.

5      Other ways, we can use basic tape, if that is all we have.

6  We also had -- we have specific latent fingerprint lifters and

7  also gel lifters that -- they're just basically an adhesive

8  surface that you can mark --

9  Q    Now --

10 A    -- and label.

11 Q    Now, do all -- does every mark left by a finger somewhere

12 leave a fingerprint?

13 A    Not always.

14 Q    Okay.

15 A    Some people do not leave fingerprints.  Some surfaces

16 don't take fingerprints.

17 Q    So do you make a quality determination of the print before

18 you pick -- you try to lift it?

19 A    If we believe it's to be a -- if we believed it was a

20 fingerprint, we -- we -- we try to collect it.

21 Q    And what actually then goes to the lab?

22 A    The -- the -- the actual -- either the -- in this case,

23 the -- the Microsil castings of the fingerprints that we did or

24 the fingerprint lift -- lifters or lift kits that we used.

25 That is the actual part that goes to the laboratory.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 181 of 265

1  Q   All right.  Now I want to concentrate on a couple of the

2  prints that the lab witness will talk about later.  So I want

3  to show you what's been marked as Government Exhibit 63, a

4  photograph.

5      (Side conversation)

6  Q   Are you familiar with this exhibit?

7  A   Yes, I am.

8  Q   And how are you familiar with it?

9  A   I took the photograph.

10 Q   All right.  And is fair and accurate representa -- what

11 door is that?

12 A   This is the door from -- leading from Room 3 into Room 4.

13 Room 4 was a -- basically like a garage.

14 Q   And it's a fair and accurate representation of that door?

15 A   Yes.

16     MR. SCHRODER:  All right.  Government moves for

17 admission of Exhibit 196.

18     THE COURT:  It will be received.

19     (Plaintiff's Exhibit 196 admitted)

20 BY MR. SCHRODER:

21 Q   Now, what are we seeing on this door?

22 A   We see on this door is -- all -- you'll see fingerprint

23 powder which is discoloring the door -- the door is green.

24 Where it is getting lighter is where we've applied a white-

25 colored fingerprint powder, white or gray.  The yellow markings

1 are -- are basically yellow stickies with a photography scale

2 on them for identifying where fingerprints are on that door.

3    (Side conversation)

4 Q    All right.  Now could you point out where that door is

5 that's -- that is in that last photograph?

6 A    As you're looking at the image there at the very bottom

7 where it says garage, there is a -- a door --

8 Q    And I think you -- do you have the laser pointer?

9 A    Yes.

10 Q    You'd probably point to --

11 A    Here's the doorway that -- where we got those latent

12 fingerprints from.

13 Q    And just to save time, so we don't have to go back again,

14 I'm going to have you look at a photo pretty soon of some

15 double doors.

16 A    Correct.

17 Q    And where are those?

18 A    Those are -- those are here.

19 Q    Okay.

20 A    So this is Room 3, Room 4, into Room 5, which is what is

21 called the locker room.  So --

22 Q    Right.

23 A    -- those doors go between those rooms.

24 Q    Now we can go back to Exhib -- let's go to Exhibit 202B.

25    (Side conversation)

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 183 of 265

1  Q    Are you familiar with this exhibit?

2  A    Yes, I am.

3  Q    And what is it?

4  A    I -- it's -- it's the back side of the same door.

5  Q    Okay.  And is it a fair and accurate representation of the

6  other side of the door we just introduced when you photographed

7  it in April 2012?

8  A    Yes, it is.

9         MR. SCHRODER:  Your Honor, the government moves for

10  admission of 197.  197.

11        THE COURT:  Be received.

12     (Plaintiff's Exhibit 197 admitted)

13  BY MR. SCHRODER:

14  Q    And again, what are we seeing there, quickly?

15  A    Again, this is where we applied fingerprint powder to the

16  back side of the door and we were able to develop some

17  fingerprints that are indicated by the little yellow rectangles

18  on the door.

19  Q    So there are prints on both sides of that door.

20  A    Yes, there were.

21  Q    Now if we could go to 202B.  And are you familiar with

22  this exhibit?

23  A    Yes, I am.

24  Q    And how are you familiar with it?

25  A    I took the photograph.

1  Q    All right.  And is it a fair and accurate representation

2  of the fingerprints you photographed --

3  A    Yes.

4  Q    -- on that same door?

5  A    Yes.

6        MR. SCHRODER:  The government moves for admission of

7  202B, Your Honor.

8        THE COURT:  Be received.

9      (Plaintiff's Exhibit 202B admitted)

10 BY MR. SCHRODER:

11 Q    And what number was this?  Which print number was it?

12 A    This was number 27.

13 Q    Kim, give me 203B, please.  Are you familiar with this

14 exhibit?

15 A    Yes, I am.

16 Q    And what is it?

17 A    That is the back side of the door -- the back side of the

18 door we just saw.

19 Q    Is that the same view we've seen earlier or --

20 A    Yes, it is.  Just a -- more of a closeup.

21       MR. SCHRODER:  Your Honor, the government moves the

22 admission of Exhibit 203B.

23       THE COURT:  Will be received.

24     (Plaintiff's Exhibit 203B admitted)

25 BY MR. SCHRODER:

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 185 of 265
(720) 384-8078   attrans@sbcglobal.net

1  Q   Now, what are we seeing on here?  Can you blow that up a
2  little bit, Kim.  Is that possible?
3  A   Those are -- again, those are latent prints that we
4  developed, and they have been tagged with numbers 28, 29, and
5  30 from top to bottom.
6  Q   Okay.  Now I want to move to that different set of doors
7  that we just talked about.  If I could have 205A, Kim.  And are
8  you familiar with this exhibit?
9  A   Yes, I am.
10 Q   And is it a fair and accurate representation of those
11 double doors that you pointed out as you photographed them in
12 April 2012?
13 A   Yes.
14     MR. SCHRODER:  Your Honor, the government moves for
15 admission of 205A.
16     THE COURT:  Will be received.
17     (Plaintiff's Exhibit 205A admitted)
18 BY MR. SCHRODER:
19 Q   And what is this showing?
20 A   This is showing from -- moving the direction of from the
21 wood shop, Room 4, into Room 5, which is the locker room.
22 Q   Okay.  And what are we seeing -- where do we see yellow
23 tags there?
24 A   We have -- on the double doors we've got a -- a number of
25 yellow tags on the upper middle of the left door and the door

1  knob itself.  You'll see fingerprint powder, the -- the darker
2  stains are fingerprint powder.  And on the right door you see
3  it -- three yellow markers on there as well.
4  Q    Does fingerprint powder come in two colors or multiple
5  colors?
6  A    It comes in -- it comes in several colors.
7  Q    All right.  So -- 205B, please.  Are you familiar with
8  this exhibit?
9  A    Yes, I am.
10  Q    And what is it?
11  A    That is the right side door.
12  Q    Is it a fair and accurate representation of that door just
13  from a slightly enlarged perspective?
14  A    Yes, it is.
15        MR. SCHRODER:  Your Honor, the government moves for
16  admission of 205B.
17        THE COURT:  Will be received.
18    (Plaintiff's Exhibit 205B admitted)
19  BY MR. SCHRODER:
20  Q    I think that's probably -- you explained that with the
21  last one, I think.  So let's move on to 211.  And are you
22  familiar with this exhibit?
23  A    Yes.  That is the back side of the door that was on the
24  right in the previous photograph.
25  Q    And is it a fair and accurate representation of that scene

1   as you photographed it in April 2012?

2   A   Yes, it is.

3        MR. SCHRODER:  Your Honor, the government moves for

4   admission of 211.

5        THE COURT:  Will be received.

6   (Plaintiff's Exhibit 211 admitted)

7   BY MR. SCHRODER:

8   Q   And where -- and you say this is the back side of the same

9   door?

10  A   Correct.

11  Q   210, please.  And are you familiar with this exhibit?

12  A   Yes, I am.

13  Q   And what is it?

14  A   That is a -- a -- the door knob or -- on one of the doors.

15  Q   And is it a fair and accurate representation of the door

16  knob as you photographed it from those double doors?

17  A   Yes, it is.

18        MR. SCHRODER:  Your Honor, the government moves for

19  admission of 210.

20        THE COURT:  Be received.

21  (Plaintiff's Exhibit 210 admitted)

22  BY MR. SCHRODER:

23  Q   Then I think our last photo of that area is 205C.  And are

24  you familiar with this exhibit?

25  A   Yes, I am.

1  Q    And what is it?

2  A    It is a -- a latent fingerprint with a marking -- a marker

3  with a -- it, number 35.

4  Q    And was that taken from the same door?

5  A    Yes, it was.

6  Q    Is that a fair and accurate representation of that print

7  and the placard?

8  A    Yes, it is.

9       MR. SCHRODER:  Your Honor, the government moves for

10 admission of 210.

11      THE COURT:  Will be received.

12      UNIDENTIFIED SPEAKER:  That's 205C.

13      MR. SCHRODER:  Oh, 205C.  I'm sorry.

14      THE COURT:  It'll be received.

15      (Plaintiff's Exhibit 205C admitted)

16 BY MR. SCHRODER:

17 Q    Now I'd like you to look at Government Exhibit 246 here.

18 Now, did you seize that door knob that you --

19 A    Yes, we did.

20 Q    Just show the jurors.  And are you familiar with this

21 exhibit?

22 A    Yes, I am.

23 Q    And what is it?

24 A    Those are the -- the door knobs from those doors.

25      MR. SCHRODER:  Government moves for admission of

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 189 of 265
(720) 384-8078  attrans@sbcglobal.net

1   Exhibit 246.

2           THE COURT:  Where is it?

3           MR. SCHRODER:  Oh, show the judge -- should see it.

4           THE COURT:  I see a box.  It'll be received.

5       (Plaintiff's Exhibit 246 admitted)

6   BY MR. SCHRODER:

7   Q    Now let's move on to the next room.  And can I show --

8   have you show Exhibit 361?  I think that's already been

9   admitted.  And you could post that to the jury.  And, just

10  quickly, what door is that?

11  A    That is the door from the break room -- or that is a

12  doorway into the boiler room from the break room.

13  Q    Okay.  And could we see Exhibit 206B, please?  And are you

14  familiar with this exhibit?

15  A    Yes, I am.

16  Q    And how are you familiar with it?

17  A    Those are -- I took the photograph.

18  Q    And what does it show?

19  A    It shows the latent fingerprints that have been developed

20  on that door --

21  Q    All right.

22  A    -- leading into the boiler room.

23  Q    Is that a fair and accurate representation of that door as

24  you fingerprinted it?

25  A    Yes.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 190 of 265

1      MR. SCHRODER:  Government moves for admission of 206B,

2 Your Honor.

3      THE COURT:  Be received.

4    (Plaintiff's Exhibit 206B admitted)

5 BY MR. SCHRODER:

6 Q    And what do we see in there?

7 A    You -- you see a -- a -- a wood door or at least a painted

8 door with black fingerprint powder with fingerprints that have

9 been developed --

10 Q    Okay.  And --

11 A    -- with the powder.

12 Q    All right.  And what numbers are those?

13 A    There -- are 15 -- 14, 15, 13, and 16.

14 Q    Okay.  Could we have Exhibit 206C, please?  Doing okay.

15 And are you familiar with this exhibit?

16 A    Yes.

17 Q    And what is it?

18 A    That is a closeup of a -- of a latent fingerprint.

19 Q    All right.  Is it from that same door?

20 A    Yes, it is.

21 Q    All right.

22      MR. SCHRODER:  Government moves for admission of 206C,

23 Your Honor.

24      THE COURT:  Be received.

25    (Plaintiff's Exhibit 206C admitted)

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1  BY MR. SCHRODER:

2  Q    What does that show?

3  A    It's -- it's a -- a closeup of the -- the latent

4  fingerprint.  You can see the --

5  Q    Can you see some of the attributes of a fingerprint in

6  that one?

7  A    Yes.  Yes.

8  Q    All right.  So let's -- we'll move on to the next section.

9  Could we see Exhibit 209, please?  And are you familiar with

10 this exhibit?

11 A    Yes, I am.

12 Q    And what is it?

13 A    That is a door for what I would call to the back side of

14 the Room 6, or workshop area.

15 Q    And how are you familiar with it?

16 A    I took the photograph.

17 Q    That a fair and accurate representation of that back door

18 as you photographed it when you were there in April 2012?

19 A    Yes, it is.

20        MR. SCHRODER:  Your Honor, the government moves for

21 admission of 209.

22        THE COURT:  Be received.

23     (Plaintiff's Exhibit 209 admitted)

24 BY MR. SCHRODER:

25 Q    And what are we seeing there?

1 A    We see there is a -- you've got a -- I would call it an
2 arctic entryway for that door.  And you've got a screen door
3 that's open, that goes into a -- a dark -- more of a -- a gray
4 door inside there --
5 Q    And if we could have --
6 A    -- or is it green?
7 Q    -- 208?
8 A    It's light.
9 Q    And are you familiar with this exhibit?
10 A    I am.
11 Q    And what is it?
12 A    That is the -- it is that doorway inside the enclosure,
13 and it has evidence tag markers for latent fingerprints that
14 were developed.
15 Q    And is that a fair and accurate representation of that
16 door as you fingerprinted it?
17 A    Yes.
18        MR. SCHRODER:  Your Honor, the government moves for
19 admission of 208.
20        THE COURT:  Be received.
21    (Plaintiff's Exhibit 208 admitted)
22 BY MR. SCHRODER:
23 Q    Now I want you to look at 213.  And are you familiar with
24 this exhibit?
25 A    Yes.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 193 of 265

1  Q   And what is it?

2  A   That's a -- a closeup of a -- of the palm print --

3  Q   And was that --

4  A   -- on the door.

5  Q   Is that from that same door that you just showed us?

6  A   Yes, it is.

7  Q   Okay.  Is it a fair and accurate representation of the

8  palm print as you photographed it in April 2012?

9  A   Yes.

10       MR. SCHRODER:  Government moves for admission of two

11  oh -- is that 208?

12       UNIDENTIFIED SPEAKER:  213.

13       MR. SCHRODER:  213, Your Honor.

14       THE COURT:  Be received.

15     (Plaintiff's Exhibit 213 admitted)

16  BY MR. SCHRODER:

17  Q   Now, we got one more section in our tour of the

18  fingerprinting.  So if we could look at Exhibit 207D, one more

19  set.  Now, are you familiar with this exhibit?

20  A   Yes, I am.

21  Q   And what is it?

22  A   That is a -- a -- a black glove that was found in the

23  hallway outside of Room 1.

24  Q   Okay.  Is a fair and accurate representation of where you

25  found that glove?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 194 of 265

1  A    Yes.

2  Q    All right.  That you photographed in April 2012?

3  A    I did.

4       MR. SCHRODER:  The government moves for admission of

5  207D, Your Honor.

6       THE COURT:  It'll be received.

7       (Plaintiff's Exhibit 207D admitted)

8       MR. SCHRODER:  All right, we're going to -- why don't

9  we go to the -- 392.  So we want to show the jurors where this

10 was found, make sure it's clear to them.

11 BY MR. SCHRODER:

12 Q    All right.  Could you use the laser pointer and show where

13 that photo depicted and -- where that glove was found?

14 A    That would be right here.

15 Q    Okay.  All right, Kim, if we could have 207C.  And what

16 does this depict?

17 A    That depicts the -- it's a -- more of a medium shot of the

18 black glove with the evidence tag 15 by it.

19 Q    And are you -- did you take this photo?

20 A    I did.

21 Q    And is it a fair and accurate representation of the black

22 glove?

23 A    Yes, it is.

24      MR. SCHRODER:  Your Honor, the government moves for

25 admission of 207C.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 195 of 265
(720) 384-8078   attrans@sbcglobal.net

1      THE COURT:  Be received.

2      (Plaintiff's Exhibit 207C admitted)

3      MR. SCHRODER:  And I think we'll just move to the next

4  one.  They'll be able to see that one probably better.  Can we

5  have 207B?

6  BY MR. SCHRODER:

7  Q    And are you familiar with this exhibit?

8  A    Yes.

9  Q    And what is it?

10  A    That's the -- a closeup of the glove.

11  Q    And -- this a fair and accurate representation of that

12  glove as you photographed it?

13  A    Yes.

14      MR. SCHRODER:  Your Honor, the government moves for

15  admission of 207B.

16      THE COURT:  It'll be received.

17      (Plaintiff's Exhibit 207B admitted)

18  BY MR. SCHRODER:

19  Q    And, finally, 207A, please.  And are you familiar with

20  this exhibit?

21  A    Yes.

22  Q    And what is it?

23  A    That's a closeup with -- of the black glove with the

24  evidence placard 15, which also has a scale on it.

25      MR. SCHRODER:  Your Honor, the government moves for

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 196 of 265

1 admission of 207A.

2 　　　　THE COURT:  Be received.

3 　　　(Plaintiff's Exhibit 207A admitted)

4 BY MR. SCHRODER:

5 Q　Show that.  Now, did you seize that black glove?

6 A　Yes, we did.

7 Q　And I want to you to look at Exhibit -- I think it's 247,

8 Special Agent Allison.  And are you -- for -- do you recognize

9 that exhibit?

10 A　Yes, I do.

11 Q　And what is it?

12 A　That's the -- the black glove that was seized from the

13 photograph --

14 　　　　MR. SCHRODER:  Your Honor, the government offers 247

15 for admission.

16 　　　　THE COURT:  Be received.

17 　　　(Plaintiff's Exhibit 247 admitted)

18 BY MR. SCHRODER:

19 Q　All right.  Let's go back to our chart, 389, and work our

20 way through that a bit more.  I want to ask about some of the

21 specifics.  You identified those things you seized, but I want

22 to ask about some of the specifics just briefly.  So what are

23 tire castings?

24 A　Those are -- each tire leaves a -- a mark or it can leave

25 a mark in mud or -- or on pavement.  That is similar to a

1    fingerprint in it -- being able to identify it to a tire brand.

2    And so a tire casting is -- if we identify a tire impression,

3    in this case, was in the mud or dirt, we are able to collect

4    that tire casting using a material called dental stone, where

5    we -- we make a form around what we want to cast, we pour in

6    the dental stone and then allow it to dry.  And then we collect

7    that and submit that to laboratory for -- for identification.

8    Q    And did you actually take some tire castings in this case?

9    A    Yes, we did.

10   Q    And where did you take them from?

11   A    They were from one of the entrances to the rating station.

12        (Side conversation)

13   Q    Yeah.  We're going to show you Exhibit 43.  Now, could you

14   use that laser pointer --

15   A    Yes.

16   Q    -- and show the gra -- the jurors where --

17   A    So the tire casting was found here.

18   Q    Okay.

19   A    Sorry for the --

20   Q    And --

21   A    -- shake.

22   Q    -- did you collect tire castings in other areas?

23   A    No, we did not.

24   Q    Now, at some point did you get information that the

25   suspect vehicle might have turned in to a different entrance?

1  A    Yes, we did.

2  Q    And where was that?

3  A    I was led to believe it was down here.

4  Q    Now, at that point did you take tire castings from that

5  area?

6  A    We did not.

7  Q    And why not?

8  A    Because the weather of Kodiak prohibited -- the -- the

9  rain had washed away any good tire impression we might have

10 found there.

11 Q    Now going back to 398 -- or 389, I'm sorry.  What evidence

12 did you collect -- in the line under tire castings?

13 A    That's vacuum sweepings.

14 Q    All right.  And what are those?

15 A    Those are -- those are some of the first items we

16 collected when the -- when the search of the crime scene began.

17 That was where we used a -- a vacuum with a filter on it, a

18 special filter, to collect trace evidence that might be present

19 in the crime scene.  So that --

20 Q    And what areas did you sweep?

21 A    That was in the -- the entranceway that -- that we chose

22 to enter the building through and around the doorway -- or Room

23 1 and 2.

24 Q    And where else?  Did you -- was that it?

25 A    I believe that was it.  I would have to look at the

1  evidence log if -- to refresh my memory.

2  Q   Okay.

3       MR. SCHRODER:  May I approach, Your Honor?

4       THE COURT:  Yes.

5  BY MR. SCHRODER:

6  Q   Would you review that and let us know if that refreshes

7  your memory?

8  A   Yes, I will.

9  Q   Now, you said you took vacuum sweepings near the door.

10 Were there any other areas?

11 A   Yeah.  Around the bodies in Room 1 and Room 2.

12 Q   Okay.  Now going to the next line.  I think you actually

13 talked about -- when you use the term "debris," what does that

14 mean?

15 A   Well, there was miscellaneous material on the floor, but

16 really much -- defied description.  So we called it debris.

17 And we thought that there was a -- there was a -- a material in

18 there that looked like it could be part of a tooth.

19 Q   Okay.  And what's on the next line?

20 A   The next line is -- an empty soda can, des -- further

21 described as a Diet -- Diet Coke with lime.

22 Q   And why did you seize that?

23 A   We seized that because it was in the bathroom immediately

24 adjacent to Petty Officer Hopkins' body.  It was the only thing

25 in the trash can, if I recall.  Or a paper towel was with --

1  there.

2  Q    And the fin -- actually, the final one, I think we've

3  admitted that into evidence, is that correct?

4  A    Correct.

5  Q    Think -- a black glove.  All right.  Now, as part of your

6  process when you go into a crime scene, do you try to identify

7  what will be important pieces of evidence?

8  A    Yes.

9  Q    And is that part of your training or part of your

10  experience, or how does -- how do you develop that?

11  A    It -- it -- it's part of both.  In this case -- or in a

12  general search warrant where it's not, say, an emergency

13  situation where a crime has just happened, where it's -- we

14  know kind of what to expect there, we have an idea of what

15  we're looking for and it is in the search warrant, and so when

16  we would go through that particular scene, we would identify

17  places like -- if we were looking for computer evidence, well,

18  then we would look for a computer -- if there was a computer

19  hard drive or something like that.

20      In this case we knew that two persons had been shot inside

21  the station, so we were looking for evidence of that, which

22  would include bullets, bullet casings, blood, hand prints, boot

23  prints, anything that might indicate who was there at the time

24  of the -- of the scene -- of that crime.

25  Q    Now, you found ballistics evidence.  We've introduced some

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 201 of 265
(720) 384-8078   attrans@sbcglobal.net

1  of that.

2  A    Correct.

3  Q    Did you identify any other evidence that you -- was

4  recognizable to you immediately as key evidence?

5  A    Well, there -- of course, there was -- there was blood.

6  There was -- I thought the --

7  Q    Did you take samples of the blood?

8  A    Yes, we did.

9  Q    Okay.  Did you find any evidence -- and even if you don't

10 see a lot of that key evidence, do you collect evidence anyway?

11 A    Yes, we do.

12 Q    And why is that?

13 A    We do a very -- we do a very thorough search to look for

14 all forms of evidence, be it trace or -- or general evidence,

15 to look to see if there's other evidence left behind by the

16 person who committed the crime that might lead us down that

17 path.

18 Q    And why do you do that?

19 A    Because we don't know who did this crime, so any -- we've

20 got one chance of that crime scene to process it fully and to

21 develop clues or evidence that might prove who did this crime.

22 Q    Did you find any evidence that you identified related to

23 the killer leaving the scene?

24 A    I would -- no, we did not.

25 Q    Did you find any -- anything like any bloody footprints?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 202 of 265
(720) 384-8078   attrans@sbcglobal.net

1   A    No, we did not.

2   Q    Did you find any bloody fingerprints or hand prints?

3   A    No, we did not.

4   Q    And based on your experience, what was your evaluation of

5   the scene because of that?

6   A    That the -- whoever committed this crime did so in such a

7   manner where he didn't -- did not leave -- or left a limited

8   amount of evidence behind as proof that he or she was there.

9        MR. SCHRODER:  Your Honor, we're done with the crime

10  scene.  We're going to move into some of the things with some

11  of the search warrants.  I don't know if you're looking for an

12  opportunity to --

13       THE COURT:  You tell me.  You want to take --

14       MR. SCHRODER:  I'd be happy to move on, but we're going

15  to probably be another half-hour, maybe more.

16       THE COURT:  Okay.  Well, you want to take a recess now,

17  take a 15-minute recess, and come back at 3?

18    (Jury not present)

19       THE COURT:  Okay.  See you in 15 minutes.

20       THE CLERK:  All rise.  Matter stands in a 15-minute

21  recess.

22    (Court recessed at 2:43 p.m., until 3:09 p.m.)

23    (Jury not present)

24       THE CLERK:  His Honor the court, the United States

25  District Court is again in session.  Please be seated.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1    (Jury present)

2         THE COURT:  Okay.  Please be seated.  Continue direct

3    examination.

4    BY MR. SCHRODER:

5    Q    Special Agent Espeland, in addition to searching the crime

6    scene, were you also involved in other searches as well?

7    A    Yes, I was.

8    Q    And which ones?

9    A    I was involved with the first search of the residence, the

10   search of the blue CR-V, the white pickup truck, and also the

11   person of Mr. Wells and Mrs. Wells.

12   Q    All right.  And were those searches conducted pursuant to

13   search warrants?

14   A    Yes, they were.

15   Q    Which of those was conducted first?

16   A    After the crime scene, the residence was next.

17   Q    And I want to show you what's been marked as Government

18   Exhibit 63.  And are you familiar with that example?

19   A    Yes, I am.

20   Q    And what is it?

21   A    That is the exterior of the Wells residence in Kodiak.

22   Q    All right.  And do you recognize the image, or --

23   A    Yeah -- yes, I do.

24   Q    Did you take it?

25   A    Yes, I did.

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 204 of 265

1  Q    All right.  And what part of the -- what's it of,

2  basically?

3  A    That is the -- the front of the residence, looking at it

4  from the driveway.

5  Q    All right.  And is that a fair and accurate representation

6  of the front of the Wells residence in April 2012?

7  A    Yes, it is.

8         MR. SCHRODER:  The government moves for admission of

9  Exhibit 63.

10        MR. CURTNER:  No objection.

11        THE COURT:  Will be received.

12     (Plaintiff's Exhibit 63 admitted)

13  BY MR. SCHRODER:

14  Q    That's not a great shot, but -- and what -- so what are we

15  seeing?  Could you point out some of the things we're seeing

16  here?

17  A    Well, there is a -- you got a --

18  Q    Hang on, we're going to do a little screen correction

19  here.  Okay.

20     (Side conversation)

21  Q    So could you point out some of the places that you

22  searched here?

23  A    The -- to the -- on the left side of the photo is the --

24  the garage door.  We did search the garage.  As you go across

25  to the far right side, you see a person walking away.  Behind

1  that person is a doorway that leads underneath the house, where

2  there was personal things stored.  And then we searched the --

3  the interior of the residence as well.

4  Q    Okay.  You can take that down.  Could I have Exhibit 53,

5  please?  And are you familiar with this exhibit?

6  A    Yes, I am.

7  Q    And what is it?

8  A    That is a -- a -- a photograph from the front of the house

9  looking out -- down the driveway.

10  Q    And did you take that photograph?

11  A    Yes, I did.

12  Q    It was a fair and accurate representation of the driveway

13  at the Well -- Wells residence in April 2012?

14  A    Yes, it is.

15       MR. SCHRODER:  The government moves for admission of

16  Exhibit 53, Your Honor.

17       THE COURT:  Be received.

18    (Plaintiff's Exhibit 53 admitted)

19  BY MR. SCHRODER:

20  Q    And where's the house in proportion to this?

21  A    It's -- it's behind me, or behind the -- I'm taking the

22  photograph.  I'm standing on the deck.

23  Q    And how -- oh, you're on the --

24  A    I believe I'm on the deck --

25  Q    Okay.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 206 of 265
(720) 384-8078   attrans@sbcglobal.net

1  A    -- of this photo.

2  Q    All right.  All right, could we have Exhibit 54, please?

3  And are you familiar with this exhibit?

4  A    Yes, I am.

5  Q    And what is it?

6  A    It is a -- an overall shot from the deck, looking down at

7  the garage and -- and beyond.

8  Q    Just give a little perspective of the house and the

9  driveway.

10 A    So I'm -- the photograph was taken from the deck that was

11 on the front of the house, and I'm looking down into the

12 garage.

13 Q    Okay.  And you took this photo?

14 A    Yes, I did.

15      MR. SCHRODER:  Your Honor, the government moves for

16 admission of Exhibit 54.

17      THE COURT:  Will be received.

18      (Plaintiff's Exhibit 54 admitted)

19 BY MR. SCHRODER:

20 Q    Now, can't really -- you've been there, so give us some

21 perspective.  How steep is the driveway?

22 A    The driveway is -- is very steep.  On a -- a -- a wet day,

23 a rear -- a rear-wheel-drive van would have trouble navigating

24 that driveway.

25 Q    And how much kind of flat area is there once you get to

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 207 of 265
(720) 384-8078   attrans@sbcglobal.net

1  the top of the driveway?

2  A    There's a -- there's -- there's a fair amount to park.

3  There's -- along the side of the garage there's an area to --

4  to park a vehicle.  There's -- there's room for a number of

5  vehicles at the top --

6  Q    Okay.

7  A    -- of the driveway.

8  Q    Now I want to show you what's been marked as -- is that

9  55 -- 55, Government Exhibit 55.  And are you familiar with

10  this exhibit?

11  A    Yes, I am.

12  Q    And what is it?

13  A    It is the -- a -- a shot looking directly into the garage

14  from the driveway.

15  Q    All right.  And how is this different from the shot --

16  shots of the garage before?

17  A    Well, the garage door is -- is open.  You can see inside.

18  And I'm at ground level.

19  Q    And did you take this photo?

20  A    Yes, I did.

21  Q    And is it a fair and accurate representation of the Wells

22  garage in April 2012?

23  A    Yes, it is.

24         MR. SCHRODER:  Government moves for admission of 55.

25         THE COURT:  It'll be received.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 208 of 265
(720) 384-8078   attrans@sbcglobal.net

1    (Plaintiff's Exhibit 55 admitted)

2  BY MR. SCHRODER:

3  Q    And is there a vehicle in there?

4  A    Yes.

5  Q    Okay.  Can you point to that?

6  A    The vehicle is here.  The hood is up.

7  Q    And can we have Government Exhibit 62, please?  And are

8  you familiar with this exhibit?

9  A    Yes, I am.

10  Q    And what is it?

11  A    That's a -- just another image on the front of the garage

12  with the door open.

13  Q    Is it a fair and accurate representation of the full width

14  of the garage door?

15  A    Yes, it is.

16        MR. SCHRODER:  Government moves for exhi -- admission

17  of Exhibit 62.

18        THE COURT:  Be received.

19    (Plaintiff's Exhibit 62 admitted)

20  BY MR. SCHRODER:

21  Q    And can we have Exhibit 56, please?  Are you familiar with

22  this exhibit?

23  A    Yes, I am.

24  Q    And what does it show?

25  A    It's more of a closeup shot of the vehicle and the garage

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 209 of 265
(720) 384-8078   attrans@sbcglobal.net

1    itself.

2    Q    Is that a fair and accurate representation of the inside

3    of the garage --

4    A    Yes, it is.

5    Q    -- in April 2012?

6    A    Yes.

7        MR. SCHRODER:    Government moves for admission of six --

8    56.

9        THE COURT:    Will be received.

10       (Plaintiff's Exhibit 56 admitted)

11   BY MR. SCHRODER:

12   Q    And could we have 57, please?    Are you familiar with this

13   exhibit?

14   A    Yes.

15   Q    And what is it?

16   A    That is a -- a -- a photo of the garage, looking alongside

17   the vehicle on the -- as you're looking at the vehicle, the

18   driver's side vehicle.

19   Q    Is it a fair and accurate representation of the interior

20   of the garage alongside the vehicle?

21   A    Yes, it is.

22       MR. SCHRODER:    Your Honor, the government moves for

23   admission of 57.

24       THE COURT:    Will be received.

25       (Plaintiff's Exhibit 57 admitted)

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 210 of 265
(720) 384-8078   attrans@sbcglobal.net

**ESPELAND - DIRECT**

1  BY MR. SCHRODER:

2  Q    Now let's talk about this for just a moment.  Does this

3  kind of -- does this kind -- situation kind of present

4  difficulties in conducting a search?

5  A    Yes, it does.

6  Q    And how is that?

7  A    Well, as you can look, there -- there's, one, a -- a lot

8  of material inside this garage.  Two, it is not a -- not, I

9  would say, in a organized way.  So we try to conduct a search

10  of -- of -- of a garage in a methodical way, and it's -- it's

11  oftentimes difficult to do that when -- I mean, the search

12  location is what it is, but it -- it's -- it's difficult.  You

13  have no idea what's -- what's in there, what you might find.

14  Trip and fall hazards that we're concerned about, as well as

15  just -- you have to move things around to be able to search

16  other things in there.

17  Q    Could we have Exhibit 60, please?

18      (Side conversation)

19  Q    How about 59?  And are you familiar with this exhibit?

20  A    Yes, I am.

21  Q    And what is it?

22  A    This is the underside of the house I spoke of, from one of

23  the first photos of the residence.

24  Q    And is a fair and accurate representation of that area of

25  the house?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 211 of 265

1  A    Yes, it is.

2         MR. SCHRODER:  Government moves for admission of

3  Exhibit 59.

4         THE COURT:  Be received.

5      (Plaintiff's Exhibit 59 admitted)

6  BY MR. SCHRODER:

7  Q    And, again, does that make seizure -- or your searches

8  difficult?

9  A    Yes, it did.

10  Q    And could we -- I have one more.  Okay, 58, then, please.

11  Now, that -- that'll help, yeah.  And what is -- what are you

12  looking at here?

13  A    This is the exterior of that storage area under the house.

14  So you see -- you see the -- you'll see the -- the deck is

15  above it.  Underneath the deck is the -- a storage area

16  underneath the house.  There are a number of tanks, like

17  compressed air tanks, possibly, and then more stuff underneath

18  the deck.

19  Q    Is that a fair and accurate representation of that

20  entrance to the -- I'll call it a crawlspace, for lack of a

21  better word.

22  A    Yes.

23         MR. SCHRODER:  Your Honor, the government moves for

24  admission of 58.

25         THE COURT:  Will be received.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 212 of 265

1    (Plaintiff's Exhibit 58 admitted)

2  BY MR. SCHRODER:

3  Q    And I think we have one more of those, Exhibit 61.  And

4  are you familiar with this exhibit?

5  A    Yes, I am.

6  Q    And what is it?

7  A    It's the -- again, underneath the house.  This would be

8  looking at the left side of the crawlspace.

9  Q    Right.  This a fair and accurate representation of that

10 space as you photographed it in April 2012?

11 A    Yes.

12        MR. SCHRODER:  Government moves for admission of 61.

13        THE COURT:  Be received.

14    (Plaintiff's Exhibit 61 admitted)

15 BY MR. SCHRODER:

16 Q    Now could you briefly describe how you organized the

17 search of the house?

18 A    Well, like any scene, we -- we document the scene by

19 photography, so I took hundreds of photographs just before we

20 could even search the house.  And then once that is done,

21 the -- the team leader of that search makes a decision as to

22 how we're going to label the rooms, how we're going to proceed,

23 where -- where do we think the most evidence will be.  And then

24 we -- we divide up our labors and we conduct the search of the

25 residence.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 213 of 265
(720) 384-8078   attrans@sbcglobal.net

1  Q    Now, did you find any ammunition in the residence when you

2  searched it?

3  A    Yes, we did.

4  Q    And did you find it in any kind of significant amounts?

5  A    Yes, we did.

6  Q    I'm going to ask you to look at Government Exhibit 175.

7  And are you familiar with this exhibit?

8  A    Yes, I am.

9  Q    And how are you familiar with it?

10 A    I took the photograph.

11 Q    All right.  And what does it depict?

12 A    It depicts a cabinet with various calibers of -- of

13 ammunition and some weapons-cleaning materials.

14 Q    All right.  Is that a fair and accurate representation of

15 the interior of that cabinet as you photographed it in April

16 2012?

17 A    Yes.

18      MR. SCHRODER:  Your Honor, the government moves for

19 admission of 175.

20      THE COURT:  Be received.

21   (Plaintiff's Exhibit 175 admitted)

22 BY MR. SCHRODER:

23 Q    Okay, could you point out what we're seeing there?

24 A    You have --

25 Q    I mean just briefly.

1  A    -- just ammunition here and more ammunition here.  There's

2  a -- weapons-cleaning things here.

3  Q    All right.

4  A    And -- and other things that I --

5  Q    You mentioned?

6  A    -- don't recall --

7  Q    All right.

8  A    -- what they were.

9  Q    Could we have Exhibit 177, please?  And are you familiar

10  with this exhibit?

11  A    Yes, I am.

12  Q    And how are you familiar with it?

13  A    I took the photograph.

14  Q    And what does it depict?

15  A    This depicts that material coming out and being

16  inventoried.  It's the photograph of what was inside that

17  cabinet.

18  Q    Is this a fair and accurate representation of the material

19  you pulled out of that cabinet?

20  A    Yes.

21        MR. SCHRODER:  Your Honor, government moves for

22  admission of Exhibit 177.

23        THE COURT:  Be received.

24     (Plaintiff's Exhibit 177 admitted)

25  BY MR. SCHRODER:

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 742  Filed 09/23/14  Page 215 of 265

**ESPELAND - DIRECT**

1  Q   I think you've kind of described -- and how are you

2  separating it out?  You can see up on the top -- the table

3  there that it's starting to be separated.  So how did you

4  separate things out?

5  A   We -- we knew that the general caliber of the bullets at

6  the crime scene fit in the .40-to-.45-caliber range just by

7  size alone.  So we were in this photograph -- see, were trying

8  to organize it in such a way as looking -- looking for

9  ammunition of that style or -- or size --

10 Q   All right.

11 A   -- caliber.

12 Q   And I'm going to ask you to take a look at --

13     (Side conversation)

14 Q   178, please.  Exhibit 178.  And are you familiar with this

15 exhibit?

16 A   Yes.

17 Q   And what is it?

18 A   It is a -- it's a closeup of the white table that was in

19 the background of the previous photograph, with more of a -- I

20 would say more of a closeup shot of some of the ammunition.

21 Q   And it's a fair and accurate representation of that

22 ammunition?

23 A   Yes.

24     MR. SCHRODER:  Your Honor, the government moves for

25 admission of 178.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 216 of 265
(720) 384-8078  attrans@sbcglobal.net

1    THE COURT:  Be received.

2       (Plaintiff's Exhibit 178 admitted)

3  BY MR. SCHRODER:

4  Q    And in the top corner of the picture is something that's

5  camouflaged looking.  What is that?

6  A    That is a -- a camouflage pouch that contains some -- some

7  ammunition.

8  Q    All right.  176, please.  And are you familiar with this

9  exhibit?

10  A    Yes, I am.

11  Q    And what is it?

12  A    It is a photograph with the camouflage pouch open, showing

13  the -- 12 rounds that are inserted inside the pouch in an

14  organized fashion, along with other ammunition that's in the

15  background of the photo.

16  Q    Okay.

17       MR. SCHRODER:  The government moves for admission of

18  176.

19       THE COURT:  It'll be received.

20       (Plaintiff's Exhibit 176 admitted)

21       MR. SCHRODER:  And 179, please, Kim.

22  BY MR. SCHRODER:

23  Q    And what is this?

24  A    This is a closeup with scale photograph of -- of the

25  camouflaged pouch with the 12 rounds of ammunition inside.

1  Q    And are you -- how are you familiar with this exhibit?

2  A    I took the photograph.

3  Q    And is it a fair and accurate representation of that pouch

4  as you photographed it at the scene in April 2012?

5  A    Yes.

6        MR. SCHRODER:  Your Honor, the government moves for

7  admission of 179.

8        THE COURT:  Will be received.

9        (Plaintiff's Exhibit 179 admitted)

10 BY MR. SCHRODER:

11 Q    We'll see the qual -- yeah, I think you can point it.

12 Now, are all of those rounds the same?

13 A    No, they're not.

14 Q    And could you point out any difference you see?

15 A    Most -- most obviously is the one on the bottom left that

16 is a -- would be called a hollowpoint type of round.

17 Q    The rest of them are a more normal --

18 A    They -- they look --

19 Q    -- at least head?

20 A    Yes, they look more similar than -- than that one.

21 Q    All right.  That's good too.  And now I'm going to ask you

22 to look at -- did you seize that pouch?

23 A    Yes, we did.

24 Q    All right.  And I'm going to ask you to look at Government

25 Exhibit 240.  And do you recognize that exhibit?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 218 of 265
(720) 384-8078  attrans@sbcglobal.net

1  A   Yes, I do.

2  Q   And what is it?

3  A   It's the camouflage pouch.  Two of the rounds are -- are

4  missing from inside.

5  Q   And where are those?

6  A   They are inside the -- the evidence bag.  They were

7  removed by the laboratory and placed in those containers.

8  Q   Okay.  Thank you.

9       MR. SCHRODER:  Now let's go back to -- ask Special

10  Agent Allison, put those away.  Oh, move for admission of 240.

11       THE COURT:  It'll be received.

12     (Plaintiff's Exhibit 240 admitted)

13  BY MR. SCHRODER:

14  Q   Now let's go back to our chart at 389.  Now, did you seize

15  all that ammunition that you --

16  A   Not all of it.

17  Q   Okay.

18  A   We -- we seized a lot of ammunition --

19  Q   Okay.

20  A   -- but --

21  Q   And was it based -- was it size related?

22  A   Yes.

23  Q   All right, caliber related?  Are you aware of what

24  happened to that ammunition?

25  A   I was -- we -- we seized it and it -- it -- it came back

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 219 of 265

1 to our facility, I assume for further examination.

2 Q    All right.  And would you take a look at the chart?  Are

3 those different collections of ammunition depicted on the

4 chart?

5 A    Yes.

6 Q    And what are the FBI numbers for those items?

7 A    We have 1B346, 1B113, 1B110, 1B108, 1B125.

8 Q    And there's also a couple of lines under the first line of

9 ammunition, under 1B106 and 1B107.  What were those items?

10 A    Was a -- one was a black belt and -- that also had a

11 holster attached to it.  That was a -- the black belt was

12 1B0 -- 106, and 1B107.

13 Q    All right.  And now moving on.  What -- did you find any

14 items -- let -- let's look at the next four items.  We have --

15 114's a pair of boots.  1B122 towel with stain.  130, swabs

16 with stain.  And 131, paper towel with stain.  Why did you

17 seize those items?

18 A    We seized those items because they had stains on them that

19 appeared to be in a reddish color, that could possibly be

20 blood.

21 Q    Now let's talk about the last two items on this page,

22 1B105 and 1B316.  What were those?

23 A    Those -- the 1B105 is a 44 Mag Ruger Super Blackhawk

24 revolver.  The serial number is 8107900.  And then 1B316 is a

25 .45-caliber ACP Ruger P345 semiautomatic pistol, serial number

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 220 of 265
(720) 384-8078  attrans@sbcglobal.net

1  66468380.

2  Q    Okay.  And why'd you seize those?

3  A    They -- they fit the general caliber of -- of a murder

4  weapon we'd be looking for.

5  Q    All right.  Now, what's the -- that Blackhawk, is that --

6  what's the color of that gun?

7  A    I believe it was black, or dark colored.

8  Q    Right.  Did you see any silver revolvers when you were in

9  that residence?

10 A    I don't recall one, no.

11 Q    Okay.  Now, were there other firearms in the residence?

12 A    There were.

13 Q    And did you seize those?

14 A    Not all of them, no.

15 Q    Okay.  And why not?

16 A    Because they didn't fit the -- the bullet -- or caliber

17 size found at the crime scene.

18 Q    Did you lift any fingerprints at the Wells residence?

19 A    No, we did not.

20 Q    And why not?

21 A    Because we would expect to find fingerprints of Mr. Wells

22 at the residence.

23 Q    Now let's move on to the next search.  What was the -- and

24 I remember you talked about the two car searches.  Which was

25 the -- did you do those at the same time or one after the

1  other?

2  A    No, we did them separately.

3  Q    Which was the first one?

4  A    I believe the CR-V was the first one.

5  Q    And where did you -- where'd you search that vehicle?

6  A    That one was searched at the Kodiak Police Department.

7  Q    All right.  And what were you looking for?

8  A    We were looking for trace evidence that might connect that

9  vehicle to the crime scene.  We were looking for a weapon,

10 looking for a -- other trace evidence that might be present.

11 Q    Are you familiar with the term "transfer evidence"?

12 A    Yes, I am.

13 Q    And what does that mean?

14 A    That is where a -- a -- an evidence from one place is

15 transferred to another.  For example, if a -- a hair from one

16 person gets on another person's clothes, that's transference.

17 Or if fibers from a -- from a vehicle carpet were to be on your

18 shoes and you found those carpet fibers somewhere else.

19 Q    All right.  So let's -- now let's go to Exhibit 107.  And

20 you're familiar with this exhibit?

21 A    Yes, I am.

22 Q    And what is it?

23 A    That is the CR-V, I believe CR-V.

24 Q    And who took that photo?

25 A    I did.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 222 of 265

1   Q    And is it fair and accurate representation of the vehicle

2   as you photographed it in April 2012?

3   A    Yes.

4         MR. SCHRODER:  Your Honor, we move to admit Exhibit

5   107.

6         THE COURT:  Be received.

7         (Plaintiff's Exhibit 107 admitted)

8   BY MR. SCHRODER:

9   Q    Now, how do you go about searching a vehicle?

10  A    Again, like every other searches, we -- you begin with

11  photographs, get an idea of -- as you're doing your

12  photographs, where you're likely to find the evidence you're

13  looking for.  So we -- we photograph the exterior and the

14  interior of the vehicle, and then be -- and then begin our

15  search for what we're looking for.

16  Q    Now, was there any evidence collected in the search that

17  you collected for lab purposes?

18  A    Yes.

19  Q    Let's go back to 290 -- 389.  If we could go to page 2.

20  And is there a -- can you point out where the section is where

21  you -- evidence you seized from -- or evidence you took from

22  the search of the blue CR-V?

23  A    Yes.  The first line, 1B94 through 1B95 were -- were

24  vacuum sweepings from the front driver's side and console area.

25  1B96 were vacuum sweepings from the front passenger side.  1B97

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 223 of 265
(720) 384-8078  attrans@sbcglobal.net

1  were vacuum sweepings from the passenger compartment on the

2  driver's side.  In this case it's described as rear driver's

3  side.  1B98, vacuum sweepings from the rear passenger side.

4  And 1B99 and 1B100 were vacuum sweepings from the rear area of

5  the CR-V.

6  Q    And does that pretty much cover most of the area in the

7  car --

8  A    Yes.

9  Q    -- those sections?  All right.  And yeah, the next three,

10 we talk about a rock, a -- and a couple swabs.  Why were those

11 collected?

12 A    The rock had a discoloration on it that -- it appeared to

13 be red, so we -- we seized that.  And then the 1B102, swab from

14 the interior -- driver's interior door, looked of -- appeared

15 to be of forensic value, so we swabbed that as well as the --

16 the steering wheel.

17 Q    And that was 1B103?

18 A    Correct.

19 Q    And, finally, 1B104 is impressions of tires.  And why did

20 you take those?

21 A    We took the impressions of the tires to be able to compare

22 those to the tire casts that we took from the crime scene at

23 the rigger shop.

24 Q    All right.  So let's talk about the other vehicle you

25 searched.  And what vehicle was that?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 224 of 265

1  A    That was the white Dodge pickup owned by Mr. Wells.

2  Q    And can we have one -- Exhibit 127?  Are you familiar with

3  this exhibit?

4  A    Yes, I am.

5  Q    And how are you familiar with it?

6  A    I took the photograph.

7  Q    And where was it?

8  A    This would be in the Alaska State Troopers facility.

9  Q    And this is a fair and accurate representation of the

10 vehicle as you took the picture in April 2012?

11 A    Yes.

12       MR. SCHRODER:  Your Honor, the government moves for

13 admission of 127.

14       THE COURT:  Be received.

15    (Plaintiff's Exhibit 127 admitted)

16 BY MR. SCHRODER:

17 Q    Now I want to direct you to Exhibit 102.  And what is this

18 exhibit?

19 A    This is the passenger side compartment of the Chevy pickup

20 truck.

21 Q    And is this -- was taken as part of --

22 A    I'm sorry, Dodge.

23 Q    -- your search?

24 A    I'm sorry?

25 Q    Was this taken as part of your search?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 225 of 265
(720) 384-8078   attrans@sbcglobal.net

1  A    Yes, it was.

2  Q    All right.  And is this a fair and accurate representation

3  of -- which side of the vehicle was this?

4  A    This is the passenger side.

5  Q    Is this a fair and accurate representation of the

6  passenger side?

7  A    Yes.

8        MR. SCHRODER:  Government moves for admission of 102.

9        THE COURT:  Will be received.

10       (Plaintiff's Exhibit 102 admitted)

11 BY MR. SCHRODER:

12 Q    109, please -- or let's -- and what do we see in here?

13 A    We see a -- a -- a lot of stuff.  Looks like a boot box,

14 some soda boxes, packing or outdoor equipment in the back

15 compartment.

16 Q    Okay.  Could we have Exhibit 109?  And are you familiar

17 with this exhibit?

18 A    Yes.

19 Q    And what is it?

20 A    This is the driver's side.

21 Q    And is this how you're familiar with it -- how are you

22 familiar with it?

23 A    I -- I took the photograph.

24 Q    And is it a fair and accurate representation of the

25 vehicle from the driver's side --

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 226 of 265
(720) 384-8078   attrans@sbcglobal.net

1  A    Yes.

2  Q    -- in April 2012?

3  A    Yes.

4       MR. SCHRODER:  The government moves for admission of

5  109.

6       THE COURT:  Be received.

7       (Plaintiff's Exhibit 109 admitted)

8  BY MR. SCHRODER:

9  Q    Now -- first the obvious question.  Did you find any items

10 in the car that were obviously related to the murder, such as a

11 gun, ammunition, or any bloody clothing?

12 A    We found one piece of ammunition, but -- but no gun, no

13 bloody clothes.

14 Q    All right.  And were you directly involved with searching

15 all parts of the vehicle?

16 A    Yes.

17 Q    Including the driver's side area?

18 A    Yes.

19 Q    Did you notice any particular smells in the vehicle when

20 you were in there?

21 A    No, I did not.

22 Q    Now, at the time of the search, were you aware of a

23 potential alibi the defendant related to a low tire or a tire?

24 A    Yes.

25 Q    All right.  And I'm going to ask you -- did you find any

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 227 of 265
(720) 384-8078  attrans@sbcglobal.net

1  tires in the pickup?

2  A   Yes.

3  Q   And I'm going to ask you to look at Exhibit 128.  And are

4  you familiar with this exhibit?

5  A   Yes, I am.

6  Q   All right.  And what is it?

7  A   That is the -- the back -- the bed of the pickup truck.

8  Q   And is that consistent with -- did you take that photo?

9  A   Yes, I did.

10 Q   Is that consistent with the way you saw it when you

11 searched in April 2012?

12 A   Yes.

13      MR. SCHRODER:  All right.  Your Honor, the government

14 moves for admission of 128.

15      THE COURT:  Will be received.

16   (Plaintiff's Exhibit 128 admitted)

17 BY MR. SCHRODER:

18 Q   Now, did any of the tires you found in that pickup appear

19 to be the right size for the pickup?

20 A   Yes.

21 Q   And did you examine any of those tires?

22 A   Yes, I did.

23 Q   And which one?  Is it any of the ones depicted in this

24 photo?

25 A   Yes.

1  Q   And which one?

2  A   I -- I believe it's the one in the foreground.

3  Q   Okay.  All right.  And did you examine it in the truck or

4  did you take it out?

5  A   I took the tire out of the truck.

6  Q   And how did you remove it?

7  A   With -- with my hands, I -- I moved it out and -- and

8  brought it outside of the truck to examine it.

9  Q   And --

10 A   To see if it -- what size the tire was.

11 Q   When you let it to the ground, what happened?

12 A   When I set it down, let go, it -- it bounced up.  Clearly,

13 it was not flat.

14 Q   Okay.  Now let's go back to Exhibit 390 -- 89, try to

15 finish this off.  Page 2.  So is there a section there on

16 evidence that was seized from the white pickup?

17 A   Yes.

18 Q   And what's that section?

19 A   Well, we took vacuum sweepings of the front driver's side

20 floor, vacuum sweepings of the front driver's side seat.  We

21 also swabbed the driver's door handle and swabbed the steering

22 wheel from the Dodge for forensic value.

23 Q   Okay.  And what else did you --

24 A   We --

25 Q   -- take there?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 742  Filed 09/23/14  Page 229 of 265

ESPELAND - DIRECT

1  A    1B213 is one exam glove.  1B215 is a cartridge case.

2  Q    Okay.  And the other numbers, 1B205, 206, 208, and 209.

3  Is that correct?

4  A    Correct.

5  Q    All right.  Now, you were involved in one more search that

6  you mentioned.  And what was that?

7  A    That was a -- the -- the search of the -- the person of

8  Mr. Wells and Mrs. Wells.

9  Q    All right.  And when you say the person, what were you

10  searching for?  What'd you get?

11  A    In this case we had a search warrant to obtain hair

12  samples --

13  Q    All right.

14  A    -- from their person.

15  Q    All right.  And where was that done?

16  A    That was done at Ted Stevens International Airport.

17  Q    And was it done in a public area?

18  A    No, it was not.

19  Q    Where'd you do it?

20  A    We did it in a -- a room outside of the public area --

21  Q    Okay.

22  A    -- back in in the Airport Police area.

23  Q    Okay.  And what were the evidence numbers assigned to

24  those samples?

25  A    1B329 and 1B330.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 230 of 265
(720) 384-8078  attrans@sbcglobal.net

1    MR. SCHRODER:  Your Honor, I have no further questions.

2    THE COURT:  All right.  Cross-examination.

3                    **CROSS-EXAMINATION**

4  BY MR. CURTNER:

5  Q    Good afternoon, Special Agent Espeland.

6  A    Afternoon.

7  Q    I wonder if we could go to Government Exhibit 363, please.

8    (Side conversation)

9  Q    I just want to ask one quick question about that.  Now,

10 this is the office space, is that correct?

11 A    Correct.

12 Q    And then that window in the back, does that go to the back

13 of the rigger shop building?

14 A    I -- it goes to the back side of the overall building.  I

15 don't believe it is part of the -- I'm not sure if I understand

16 your question.

17 Q    Well, if you're looking out that window, what would you

18 see?

19 A    You would see, I believe, the hillside behind the

20 building.

21 Q    Behind the building, so this is -- this perspective is

22 looking out that window, out the back of the rigger shop?

23 A    Correct.

24 Q    And do you know how tall the very bottom in that window

25 is?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 742  Filed 09/23/14  Page 231 of 265

1  A    I -- I don't recall the exact height, no.

2  Q    Okay.  I mean, would it be fair to say it's under six

3  foot?

4  A    I don't believe so.

5  Q    The bottom of the window.

6  A    The bottom window from the floor?

7  Q    Yeah.

8  A    Possibly.

9  Q    Okay.

10  A    I -- I don't -- I don't have the measurement in front of

11  me.

12  Q    You didn't -- okay.  Did you take measurements there?

13  A    Measurements of that room were taken, but I don't know

14  that we measured the height of the window.

15  Q    Okay.  Thank you.  Now, you took -- you looked at quite a

16  few fingerprints from the scene.  Did you show us all the

17  fingerprints that were lifted from there?

18  A    All of them, I do not believe so, no.

19  Q    Okay.  So other areas, other doors, other places that you

20  took fingerprints?

21  A    Yes.

22  Q    How many total fingerprints?

23  A    I believe there were a total of 52 fingerprints taken.

24  Q    Okay.  And then what other locations did you look --

25  A    The -- I'm sorry.  The door to Room 1, there were

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 232 of 265
(720) 384-8078  attrans@sbcglobal.net

1  fingerprints taken from there.

2  Q    And they were sent to the lab, or do you know, or --

3  A    They were -- they were collected.

4  Q    Okay.  Where else?  What -- besides what you showed us.

5  A    I believe the -- I'd have to -- I would need to consult

6  the evidence and the -- the latent print log to --

7  Q    You --

8  A    -- to be --

9  Q    Do you have that --

10  A    -- completely accurate.

11  Q    Do you have that available to you?

12  A    I don't have it up here with me.

13        MR. SCHRODER:  I could give it to him.

14        MR. CURTNER:  Thank you.

15     (Side conversation)

16        MR. SCHRODER:  We're going to mark it as 365, Your

17  Honor.

18        THE COURT:  Very well.  Thank you.

19  BY MR. CURTNER:

20  Q    Officer, so do you recall now what other locations you

21  took fingerprints from?

22  A    There were -- there were fingerprints taken from Room 1,

23  Room 2.  There were closet doors in Room 2 that were taken.

24  There was the east door interior and -- I'm sorry, the interior

25  of the east door of Room 1.

1  Q   I wonder if we could bring up the sketch of the T2

2  building.

3     (Side conversation)

4  Q   Okay, I'm sorry.  This might be easier if -- with your

5  pointer, if you could show the areas where you lifted

6  fingerprints.

7  A   So the first six fingerprints were taken from Room 1,

8  which is here.  And they were taken from the door jamb, the

9  right door jamb and -- and left door jamb of that room.

10  Q   Okay.

11  A   The -- there was another one taken from the door itself

12  from that room.  There was four latents -- I'm sorry, five

13  latent prints taken from the door of Room 7, which is this

14  room, the boiler room.

15  Q   Which door?

16  A   We -- I believe it's this door here.

17  Q   Okay.

18  A   Let's see.  No, it said the back door, so it would be --

19  it'd be this one.

20  Q   Oh, the -- you did lift prints from that back door?

21  A   According to this latent print log, yes.

22  Q   And do you know if it was the interior of the door or the

23  exterior of the door?

24  A   It says "back door."

25  Q   Oh.  So you don't know if it was --

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net

1    A    I didn't -- I didn't write down "interior" or "exterior"
2    here.
3    Q    Okay.
4    A    Then there were four more latents on this date taken from
5    the Room 2 closet door frame and closet door, which would be
6    this.
7    Q    Okay.
8    A    So that's a -- an entryway into the boiler room, but we
9    called it a closet because -- and called it part of this room.
10   Q    Okay.
11   A    We -- again, we took more of the east door or -- East Door
12   1, interior, exterior --
13   Q    Does that -- can you tell if that points to north
14   anywhere?  Is that --
15   A    I believe -- I believe north is -- is up here.  So --
16   Q    So --
17   A    -- I believe that would be -- I think it's -- trying to
18   recall.  The east door, I'm -- I'm suspecting, is -- is this
19   one.  I don't have a better description of it --
20   Q    That's the --
21   A    -- on -- on here.
22   Q    That's the exterior door -- that's the entryway into the
23   locker room?
24   A    I have -- I have on this log as East Door Number 1.  I
25   would -- I don't have a better -- I don't have an answer for

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 235 of 265
(720) 384-8078   attrans@sbcglobal.net

1  you as to which of these doors is east door.  I forget how we,

2  I guess, labeled them Door 1 or 2 or 3.

3  Q    Okay.  Do you know if it was interior or exterior?

4  A    There -- there were -- they were interior.

5  Q    Okay.

6  A    Moving on was Room 4, which is here, which is the interior

7  of the door and the exterior of the door, so that would be this

8  door here.  Then there was Room 3, where we took a number of

9  latent fingerprints from the -- the right double door.  Here.

10  Then there was Room 6.  This is all Room 6 here, where we took

11  latents from that exterior -- the exterior door, apologies.

12  That's this one here.

13  Q    I think you showed us a picture of that arctic entry.

14  A    Correct.

15  Q    And you took some lifts from the screen door or the

16  interior door?

17  A    It was the interior.

18  Q    Any lifts on the screen door?

19  A    No.

20  Q    Did you look, or there was no prints, or --

21  A    I don't recall the -- I don't recall that we lifted any

22  from there.

23  Q    Okay.

24  A    And then -- well, we do have five lifts from the north

25  door on the north door -- the exterior of that door.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 236 of 265
(720) 384-8078  attrans@sbcglobal.net

1  Q    Okay.

2  A    So not -- not the screen, but the exterior of the door.

3  Q    Uh-huh.

4  A    That is -- that is what I have on my latent print log.

5  Q    Now, imagine -- was -- were you sort of selective?  Did

6  you get more obvious prints, or would it be fair to say there

7  were probably a lot more fingerprint evidence within that whole

8  building?

9  A    There were probably other latent prints.  We were looking

10  where -- more logically where a person would come and go from

11  this building.

12  Q    Okay.  Now, did you -- you didn't -- you talked about

13  there was no bloody footprints.  Did you see any other

14  footprints anywhere that you might be interested in?

15  A    I don't recall collecting any that we thought were -- we

16  have methods to be able to capture footprints off of floors,

17  both photographically and with electrostatic measures.  We did

18  not collect any that I'm aware of.

19  Q    Mr. Johnson, can we go to Bates stamp 1384?

20        THE CLERK:  Is that part of an exhibit, Mr. Curtner?

21        MR. CURTNER:  I don't know if this has been admitted.

22  Can we mark this as a defense exhibit?  121.  I'll -- we'll

23  show it on the screen first, I think.  Is it here?

24        THE WITNESS:  I see it.

25  BY MR. CURTNER:

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 742  Filed 09/23/14  Page 237 of 265

1  Q   Do you recognize that -- I'm sorry.  Do you recognize

2  that?

3  A   I see a -- a -- what appears to be a boot print on a door.

4  Q   Was that one of the photographs you took in the -- at the

5  crime scene?

6  A   If it's a photograph that -- a photograph from that crime

7  scene would be one I took, yes.

8  Q   Okay.  And do you know if it's -- what door that is?

9  A   I do not know which door that is --

10 Q   Did you do anything --

11 A   -- looking at it.

12 Q   -- or take an image other -- did you do anything with that

13 footprint on the door?

14 A   Not that I'm aware of, no.

15 Q   Can we go to Bates stamp 1382?

16       THE CLERK:  I'm sorry, is that still part of the same

17 exhibit?

18       UNIDENTIFIED SPEAKER:  I'll make it DE-122.

19       THE COURT:  (Indiscernible).

20       THE CLERK:  Thank you.

21 BY MR. CURTNER:

22 Q   Okay, I don't think we need to -- we can move on.  I'm

23 sorry.  Well, just let me ask you, do you recall if at -- you

24 took any fingerprints from the boiler room -- the door to the

25 boiler room from the closet?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1  A   Yes, there were fingerprints.

2  Q   Okay.  Is that the same door that the footprint was on, or

3  do you know?

4  A   I don't know.

5  Q   Let's talk about the tire cast that you took.  Now, you

6  were at the crime scene on April 12th, 2012?

7  A   Pardon me.  Yes.

8  Q   And, I'm sorry, what date did you take the tire cast from

9  the scene?

10 A   I again would have to look at the -- at the evidence log.

11 Q   Okay.  Could you do that?  Do you know if that was the

12 same day or a couple days later?

13 A   I -- again, I'd have to look at the evidence log to

14 confirm the date.

15 Q   So we -- is that -- that's not the -- you don't --

16 A   That would --

17 Q   -- need the fingerprint log.

18 A   This is the latent print log.  I would need the evidence

19 log.

20     (Side conversation)

21     MR. SCHRODER:  May I approach, Your Honor?

22     THE COURT:  Very well.

23     MR. CURTNER:  I'm sorry, Your Honor, could we admit --

24 I'd move for the admission of the -- Defense Exhibit 121, a

25 picture of the footprint that was taken at the crime scene.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 239 of 265

1      MR. SCHRODER:  Your Honor, I object.  I don't think

2   we've established it was the crime scene.  Mr. -- what Mr.

3   Espeland said is if it was at the crime scene, he took it, but

4   he didn't remember taking that particular photo.

5      THE COURT:  Okay.  Well, we'll have to lay a better

6   foundation.

7   BY MR. CURTNER:

8   Q   Okay.  Maybe we should go back to the photograph of the

9   footprint the -- on the door.  Do you have a photo log?  Can

10  you tell from your photo log the day and the place you took

11  that photograph?

12  A   I would need to see the -- I would need to see that photo

13  log, yes.

14  Q   And you don't have that up there, do you?

15  A   I do not.

16  Q   Hold on.  You're here in Anchorage, right?

17  A   Yes.

18  Q   Okay.  Maybe it would be better if we just -- if we could

19  recall you at a -- other time, perhaps, when we had a chance to

20  look at your photo log and your evidence log.  Would that be

21  all right?

22  A   Sure --

23  Q   Okay.

24  A   -- yes.

25  Q   Let me ask you about, though, the tire casting.  Or do you

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 240 of 265
(720) 384-8078  attrans@sbcglobal.net

1  know when you took that tire cast?

2  A    I have it on the 14th of April.

3  Q    Okay.  So that would have been a couple days after you

4  first got to the crime scene?

5  A    Yes.

6  Q    And so there -- where there any tire castings taken the

7  day of the crime scene?

8  A    No.

9  Q    Nobody requested that or --

10  A    It was a developing situation, and for reasons -- we -- we

11  didn't have information that we needed to go get a tire

12  casting --

13  Q    Okay.

14  A    -- that I'm aware of.

15  Q    Now, that parking lot, is that pavement?  Is that cement?

16  Is that --

17  A    It's --

18  Q    -- unpaved?

19  A    -- unpaved.

20  Q    Okay.  And it was wet during that time?

21  A    Always wet in Kodiak.

22  Q    Yes.  And there's probably -- that would be a logical

23  place to have tire -- the tracks.  Correct?

24  A    Yes.

25  Q    Okay.  Did -- so did you ever on the 14th or any time go

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 742  Filed 09/23/14  Page 241 of 265

1  back and look for any kind of tire tracks, like, in the back of

2  the building?

3  A    For the -- for the purpose of looking for tire castings,

4  no, we did not go -- we did -- I went behind the building, but

5  I did -- was not looking for tire -- a place for tire castings

6  or --

7  Q    Okay.  Or footprints?

8  A    I did not -- I did not see footprints.

9  Q    Okay.  How about tire casting -- did you ever look for a

10 tire casting to the west of T2, where the big garage is and the

11 two doors?  Did you look for tire cast anywhere around that

12 area?

13 A    No.

14 Q    How about next to -- you know the dumpster that was -- had

15 the fence around it?

16 A    Yes.

17 Q    Did you look for any tire casting there?

18 A    We did not.

19 Q    Okay.  And the one place you did look was on the second

20 driveway that goes into the building from --

21 A    It would --

22 Q    -- Anton Larsen Bay Road?

23 A    It would be easier to describe it with the photograph, if

24 that would help.

25 Q    If we could go back to the diagram of the --

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 242 of 265

1        MR. OFFENBECHER:  392.

2        MR. CURTNER:  392.

3   BY MR. CURTNER:

4   Q    Okay, so if this is the layout at the building, this is

5   north -- oh, I'm sorry.  What's the aerial photo of COMMSTA?

6   Do you know?  It was Government Exhibit 45.  Do you have --

7   okay, I think it was your testimony this was the area that you

8   took a tire cast?

9   A    Correct.

10  Q    Okay.  And it wasn't up here?

11  A    No.

12  Q    You didn't take any from up here or around this way at

13  all?

14  A    No.

15  Q    Okay.  Now, do we have a -- Government Exhibit 46 would be

16  the next photo in line.  Okay, so this is the location there

17  that you took the tire cast?

18  A    Correct.  On the upper -- the upper corner of that

19  intersection.

20  Q    And nothing from this driveway?

21  A    No, we did not take tire castings from there.

22  Q    Okay.  Let's move on to the search of the Wells residence.

23  I -- did you have a pretty large search team there?

24  A    Yes, we did.

25  Q    How many were on the search team?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 742  Filed 09/23/14  Page 243 of 265

1  A   I don't have an exact number.

2  Q   Can you esti --

3  A   We -- we had a -- there was an admin log that kept -- and

4  documented everything that was there.

5  Q   Was it over 10?

6  A   At times there was more than 10, I believe.

7  Q   Over 20 at any time?

8  A   I can't be sure of the number.

9  Q   Okay.  At least a dozen for most of the time?

10  A   I -- I would say that would be a -- an adequate

11  description of the number of people there.

12  Q   And how many days were you in the process of the search?

13  A   The evidence recovery log from the search of that

14  residence, I -- I want to say we were there for more than one

15  day.

16  Q   Two or three days?

17  A   I don't -- I don't have a exact -- they were long days.  I

18  don't exactly know.  I would say at least a day, possibly a day

19  and a half.

20  Q   Well, you -- I think --

21  A   But I would need to see the evidence recovery log to be

22  absolute about that.

23  Q   I think one of your reports said April 14th through the

24  16th.  Would you be comfortable with that, or would you want to

25  see your -- come back with your evidence log?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 244 of 265

1  A    I -- we have the evidence log here.  I'd rather --

2  Q    Oh.

3  A    -- refer to that.

4  Q    Okay.  If we could.

5       MR. SCHRODER:  May I approach, Your Honor?

6       THE COURT:  Very well.  Thank you.

7  BY MR. CURTNER:

8  Q    Okay, I'm sorry.  How many days?

9  A    We were there from the 14th through the 16th --

10 Q    Okay.

11 A    -- of April 2012.

12 Q    And you're comfortable with that?

13 A    Yes.

14 Q    Okay.  Now, in one of the photos that you took, looking

15 down the driveway, did you see a police vehicle at the end of

16 the driveway?

17 A    I know there was one at -- during the search at some

18 point, yes.

19 Q    So during those three days, the 14th through the 16th,

20 was -- were Mr. and Mrs. Wells allowed back into their

21 residence during the search?

22 A    I believe they -- I'd have to look at the -- again, I was

23 the photographer, I was not the team leader of the search.  I

24 didn't control their movements.  But they would have been

25 allowed -- if they were allowed -- they would have been allowed

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 245 of 265
(720) 384-8078   attrans@sbcglobal.net

1  to leave, and if they left, they were not allowed to come back

2  until we were done.

3  Q    So fair to say you didn't see them for three days while

4  you were doing the search?

5  A    I don't recall seeing them during the -- the search.

6  Q    And do you know -- perhaps you don't -- that -- whether

7  they were under surveillance while you were doing the search?

8  A    I -- I would say possibly.  I -- I was in -- heavily

9  involved with the search.

10 Q    Okay.  Now, we saw a lot of pictures of the house, and you

11 remember seeing tires in those photographs?

12 A    Yes, there were tires.

13 Q    Okay.  And you saw the compressed air tanks?

14 A    Yes.

15 Q    And some of the hoses that were in the photographs were

16 air hoses?

17 A    I -- I don't know.  I did not examine them.

18 Q    Now, you talk about the ammunition.  Are -- how much have

19 you been in Kodiak other than on this case?

20 A    Only very -- very few times.

21 Q    Okay.  Would you agree that it's not unusual for folks in

22 Kodiak to have lots of guns and ammunition?

23 A    It's not unusual for any Alaskan to have lots of ammo and

24 guns.

25 Q    And especially if somebody lived there in a rural place

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 246 of 265
(720) 384-8078   attrans@sbcglobal.net

1  for over 20 years, they would collect perhaps a lot of

2  ammunition over the years?

3  A    They could, yes.

4  Q    And if somebody were hunting on Kodiak Island -- which is

5  very typical.  Is that correct?

6  A    I -- I'm led to believe, yes.

7  Q    Lots of deer there to hunt, but there's also lots of

8  pretty big bears on Kodiak Island, so --

9  A    Yes.

10 Q    -- people have to be armed for bear protection.  Is that

11 correct?

12 A    Yes.

13 Q    Now -- so you conducted the search of Mrs. Well's car --

14 was the Honda CR-V?

15 A    Yes.

16 Q    And so you were looking for -- what were you looking for

17 in going through her car?

18 A    We were -- we were looking for any indication that -- any

19 evidence that might lead us back to the crime scene.

20 Q    So transfer evidence, anything that if somebody had been

21 at the crime scene and then got in the car, they might have

22 left some type of evidence there.  Right?

23 A    Yes.

24 Q    And it could be blood, but it could be fibers, it could be

25 hair?  There's a lot of things that you would be looking for?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 247 of 265
(720) 384-8078   attrans@sbcglobal.net

1    A    Correct.

2    Q    And, in fact, I mean, you would take the -- explain how

3    you sweep for that.  How does -- how thorough is that?

4    A    The -- you -- we identify sectors or compartments of the

5    vehicle and we -- we use -- it was laughingly called a forensic

6    vacuum cleaner, which has a special filter to capture the

7    evidence that you're vacuuming into it.  And we vacuum each of

8    those com -- sections that we described in the evidence log.

9    For example, the -- the driver's area, the passenger area, the

10   rear passenger area, and also then the -- I guess the cargo

11   area of the CR-V.

12   Q    Okay.  So it's very thorough.  You have a filter that

13   captures everything you vacuum up?

14   A    Yes.

15   Q    And that can go to the lab and be examined?

16   A    Correct.

17   Q    Okay.  And that's through the entire car?

18   A    Correct.

19   Q    And then it's all kept in the lab or within -- in the

20   evidence.  Right?

21   A    Correct.

22   Q    And do you know how long it took to search the -- that

23   particular vehicle?

24   A    I believe it took a couple hours.

25   Q    Okay.  Do you know -- did you do any fingerprinting of

1  that vehicle interior?

2  A    No, we did not.

3  Q    No fingerprints on -- no -- on the steering wheel

4  or windows --

5  A    Not that I'm aware of --

6  Q    -- or anything?

7  A    -- no.  No.

8  Q    Handles, door handles?

9  A    No.

10  Q    Okay.  Now, there was the -- then you -- the next day, I

11  think you searched the truck.  Is that correct?  If the Honda

12  was on the 15th, did you search the truck on the 16th?

13  A    I would prefer to refer to the -- the -- the evidence log

14  for that search as well.

15  Q    Okay.

16      (Side conversation)

17      MR. SCHRODER:  Your Honor, we have marked the evidence

18  recovery log for the CR-V 368, and evidence recovery log for

19  the white pickup 369.  May I approach?

20      THE COURT:  You -- that -- fine.

21  BY MR. CURTNER:

22  Q    April 16th?

23  A    The Honda CR-V was on April 15th --

24  Q    Uh-huh (affirmative).

25  A    -- 2012, and the -- excuse me -- the Dodge pickup four-by-

1    four was on April 16th, 2012.

2    Q    Okay.  Thank you.  And then -- so that's the same process

3    of vacuuming your forensic vacuum through the whole vehicle?

4    A    Correct.

5    Q    And obtaining and --

6    A    Are we speaking of the CR-V or the Dodge, right?

7    Q    The Dodge, right.  Yeah.

8    A    Dodge.  Okay, vacuum sweepings were of the driver's side

9    floor and the front driver's side seat.

10   Q    And you're basically still looking for any kind of

11   transfer or trace evidence?

12   A    Correct.

13   Q    If somebody had been at the crime scene and then in the

14   truck there -- very well could have left evidence in there?

15   A    Possibly, yes.

16   Q    Now, you also search the back of the truck?

17   A    Yes.

18   Q    Do you remember seeing a pair of rain pants in there that

19   were camouflage exterior pants that were dirty?  Do you recall

20   that?

21   A    I don't recall those, no.

22   Q    Okay.  Now, you said that you checked the tire --

23   A    Yes.

24   Q    -- the one tire in the back?

25   A    Yes.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 250 of 265
(720) 384-8078  attrans@sbcglobal.net

1    Q    And did you check the tire pressure on that tire?

2    A    I did not.

3    Q    Okay.  Do you know if somebody else checked the tire

4    pressure?

5    A    I believe they were -- it was done later.

6    Q    And do you know what that tire pressure was when it was

7    checked?

8    A    I believe it was around 20 psi.

9    Q    Yes.  And that's much less than one would normally expect

10   in the type of a tire?

11   A    Yes.

12   Q    And you -- do you remember who did that?

13   A    I -- I bel -- I believe it might have been -- I -- I don't

14   know exactly.  It might have been Agent Allison, it could have

15   been a trooper.  I don't -- I did not, so I don't know who did

16   that.

17   Q    One of the investigators.

18   A    Yes.

19   Q    Okay.  Now, I think one last question.  You talked about

20   also doing a search of the person of Mr. Wells and Mrs. Wells.

21   A    Yes.

22   Q    And that was here in Anchorage --

23   A    Correct.

24   Q    -- at the airport?

25   A    Correct.

1  Q   Now, do you remember what month that was?

2  A   No.

3  Q   Okay.  Is that anywhere in your logs?

4  A   We would have a -- there would be a -- a -- a -- an FD302

5  written about that.

6  Q   Okay.

7  A   Documentation of some sort.

8  Q   So do you have your 302s with you?

9  A   I do not.

10 Q   Can you bring up Bates stamp 8733?

11     THE CLERK:  Is that part of an exhibit, Mr. Curtner?

12     MR. CURTNER:  No, just -- I think Special Agent

13 Espeland can just look at that and see if that looks like

14 his -- the 302 that he completed, or the report.

15     THE WITNESS:  This is actually an FD1057, which

16 documents the search warrant.

17 BY MR. CURTNER:

18 Q   And what's the date?

19 A   It says at approximately 6 p.m. on November 14th, 2012.

20 Q   Okay.  So this is months later?

21 A   Correct.

22 Q   And then you were then taking hairs, hair samples from

23 both Mr. and Mrs. Wells?

24 A   Yes.

25 Q   And what was the purpose of that?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 742  Filed 09/23/14  Page 252 of 265

ESPELAND - REDIRECT

1  A    Pursuant to the execution of a search warrant to obtain

2  hair samples from them two -- from Mr. and Mrs. Wells.

3  Q    And that's so you can also see if there would be any

4  evidence that would put Mr. Wells at the crime scene?

5  A    It would be to collect his hair and hair follicles from

6  his head for further examination, and from Ms. -- and Mrs.

7  Wells as well.

8  Q    Okay.  And were you involved in other searches at -- in

9  this case?

10 A    Yes.

11 Q    How many -- just estimate.  How many searches do you think

12 you might have been involved in in this case?

13 A    I was -- I was involved with one more.

14 Q    One more.

15 A    Yes.

16 Q    Okay.  Just a minute.  Great, thank you.  That's all the

17 questions I have.

18        THE COURT:  Redirect.

19        MR. SCHRODER:  A couple, Your Honor.  Can we have 46,

20 please, Kim?

21                  REDIRECT EXAMINATION

22 BY MR. SCHRODER:

23 Q    How would you describe, Special Agent Espeland, that

24 parking area and entrances, sizewise, around that building?

25 A    It's a -- a -- a fairly large -- fairly large area that

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 253 of 265

1  comprises the property of that particular facility.

2  Q    Would it be practical for you to take tire castings

3  everywhere in that parking lot and those entrances?

4  A    It would not be practical, no.

5  Q    So how do you decide when and where you're going to take

6  castings?

7  A    Based on information that we received from the

8  investigative team, we -- we chose where -- based on the

9  information from -- that we got indicated that might -- that

10  would probably be the best place to look for -- for tire

11  castings.

12  Q    So you acted upon information?

13  A    Correct.

14  Q    All right.  And did -- and I think you said in your direct

15  examination you had gotten some information later --

16  A    Correct.

17  Q    -- that encoura -- you thought you might go collect more

18  tire castings?

19  A    That is correct.

20  Q    But why weren't you able to do that?

21  A    The -- we did go outside and look, and the -- the weather

22  had erased -- or -- or would have -- the -- the tire

23  impressions would not have been of any value.

24  Q    Mr. Curtner asked you if you took fingerprints of the CR-

25  V.  Did you?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 254 of 265

1  A    We did not.

2  Q    And why not?

3  A    Because we would expect to find fingerprints of Mr. Wells

4  and/or Mrs. Wells inside there.  We didn't expect anybody else

5  had driven that vehicle.

6  Q    How about for the white truck?  Same thing?

7  A    Same thing.

8        MR. SCHRODER:  All right.  No further questions, Your

9  Honor.

10        THE COURT:  Recross.

11    (Side conversation)

12        MR. CURTNER:  Nothing further.

13        THE COURT:  All right, thank you.  Thank you, sir.

14  You're excused.  What's the government's plan now?

15    (Side conversation)

16    (Witness excused)

17        MS. LOEFFLER:  The next witness is the fingerprint

18  person, and we're not going to get very far, Your Honor.

19        THE COURT:  Okay.  You want to start at 8:30 in the

20  morning?

21        MS. LOEFFLER:  That'd be great.

22        MR. SCHRODER:  (Indiscernible).

23        THE COURT:  Any objection, counsel?

24        MR. OFFENBECHER:  No, Your Honor.

25        MR. CURTNER:  No, Your Honor.

Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 255 of 265

1    THE COURT:  Any objection, ladies and gentlemen?

2    MR. CURTNER:  Did you say 8:30?  No.

3    THE COURT:  8:30 tomorrow morning.  We'll stand in

4  recess.  Remember, the same admonition.  No newspapers, no

5  anything.  Do what you're supposed to do, stay out of trouble,

6  okay?  Thank you.

7       (Jury not present)

8    THE COURT:  So -- please be seated.  Fingerprint won't

9  probably take too long.  Is that an hour witness or so?

10   MS. LOEFFLER:  Excuse me?

11   THE COURT:  Fingerprint probably is not that long a

12  witness, is it?

13   MS. LOEFFLER:  Kathleen?

14   MS. DUIGNAN:  Probably about -- I'm guess -- Your

15  Honor, I'm guessing about an hour.

16   THE COURT:  Okay.  And then what do we have to look

17  forward -- tomorrow, then?

18   MS. LOEFFLER:  Then we've got the crime scene analysis

19  from FBI Agent Robert Morton.

20   THE COURT:  Okay.

21   MS. LOEFFLER:  And -- let's see.  I'm not -- maybe or

22  maybe not, another crime scene guy.  And then we have a series

23  of people related to the blue car, all the --

24   THE COURT:  Okay.  What do the parties want me to do

25  with regard to these motions?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 742  Filed 09/23/14  Page 256 of 265

1    (Side conversation)

2        MS. LOEFFLER:  It's not going to be relevant to anybody

3    that we'd --

4        THE COURT:  I know it's not, but --

5        MS. LOEFFLER:  -- call tomorrow.

6        THE COURT:  -- I still don't want to wait till the last

7    second and then have to make all these big decisions.

8        MS. LOEFFLER:  I mean, if --

9        THE COURT:  I'm reading, and it's complicated.

10        MS. LOEFFLER:  Right.  I mean, our position -- if

11    you're -- I mean, our position is that, you know, that it --

12    before they try to introduce anything, you know, any more of

13    this Hannah Belisle stuff, I'm going to ask for a proffer and

14    decision by the Court.  And that's what we put it out there --

15        THE COURT:  No, I -- you did fine.  I understand, and

16    I'm reviewing it and studying it and --

17        MS. LOEFFLER:  Uh-huh (affirmative).

18        THE COURT:  -- I don't know if I have all the

19    information, is what I'm wondering.  I keep thinking --

20        MS. LOEFFLER:  If --

21        THE COURT:  -- is there more out here that I need to

22    know to make a educated ruling, or am I just getting part of

23    the picture.

24        MS. LOEFFLER:  Ask us any question you want.  I can

25    give you my side.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 257 of 265
(720) 384-8078  attrans@sbcglobal.net

1        THE COURT:  I know your side.

2        MS. LOEFFLER:  Okay.  Well, when -- I didn't know if

3   you were saying you didn't have enough from us, so I'm --

4        THE COURT:  I think I have --

5        MS. LOEFFLER:  Okay.

6        THE COURT:  -- enough from you.  I mean, I understand

7   the defense doesn't have to give away their theory of the case,

8   but pretty well they did in opening argument state what they

9   have in mind.  It's hard to -- me to fully answer the issues

10  before me when I'm not sure I have all the facts.  So I'll just

11  have to wait and see how things go.  Because I've read

12  everything that I've been -- received from both sides, and I

13  still am not clear as to whether -- as to what the right answer

14  is.  And so that's where it stands.  I'll still read.  My law

15  clerks are reading.

16       MS. LOEFFLER:  Your Honor, I'll only say that if you're

17  in a position where we need to make a ruling, we still have got

18  nothing from the defense, and I think we have a right --

19       THE COURT:  Well, I'm starting to think --

20       MS. LOEFFLER:  -- at least to make an argument.  We

21  have --

22       THE COURT:  I agree, that's one --

23       MS. LOEFFLER:  -- to know more than --

24       THE COURT:  -- of the difficult issues, you know.

25  Defense doesn't -- at some point they have to reveal their

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 258 of 265

1   position, because the trial's going to end.  And I -- and I'd

2   feel more comfortable with more input from both sides on some

3   of these issues.  That avoids making a wrong decision and

4   having to redo it.  Right now I have a pretty good idea of

5   what's going on, but I haven't been able to connect all the

6   dots.  That's what I'm trying to do, and I don't connect all

7   the dots.

8         MR. OFFENBECHER:  Well, Your Honor, perhaps Mr. Curtner

9   and I can discuss that and see whether we have a proposal for

10  the Court.

11        THE COURT:  Well, you're going to have to give me more

12  dots.

13        MR. OFFENBECHER:  We got dots.

14        THE COURT:  I know you do, but it's -- I got two people

15  working on trying to connect them, and I'm using -- the

16  government's filed a very good brief on their position and I've

17  read it again and agin, and I'm considering the response.  But

18  I just want to have a clear picture, or else things are going

19  to really slow down in the days to come, okay, because we may

20  have to have discussions with witnesses outside the presence of

21  the jury so that I can make rulings.  And that can really slow

22  the process down.  And there -- as I understand the law the

23  government has given me in its briefing, I think it's accurate.

24  I haven't seen any suggestion that it's not, that -- the law.

25  Okay?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 259 of 265

1   MS. LOEFFLER:  Thank you, Your Honor.

2   THE COURT:  All right.  Thank you all.  At 8:25

3   tomorrow, so we can start right at 8:30.

4   THE CLERK:  All rise.  Matter stands in recess until

5   tomorrow at 8:30 a.m.

6   (Proceedings concluded at 4:22 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 260 of 265
(720) 384-8078  attrans@sbcglobal.net

1                                CERTIFICATE

2  I certify that the foregoing is a correct transcript from the
   electronic sound recording of the proceedings in the above-
3  entitled matter.

4
   ___s/Teresa K. Combs_____     _____8/26/14_____
5  Teresa K. Combs, Transcriber          Dat

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 261 of 265
(720) 384-8078   attrans@sbcglobal.net

1                              **INDEX**

2                                                              FURTHER
                      DIRECT     CROSS   REDIRECT   RECROSS   REDIRECT
3
   PLAINTIFF'S WITNESSES
4
   William Thomas Reed      1325     1338       1348
5     (By videoconference)
   Peter Van Ness                                         1352
6  Jere Mills               1360     1364
   John Reid Meloy          1366     1416       1444
7  Derek Espeland           1451     1534       1556

8  PLAINTIFF'S EXHIBITS                                        ADMITTED

9  53       Photograph - Wells residence                       1509

10 54       Photograph - Wells residence                       1510

11 55       Photograph - Wells residence                       1512

12 56       Photograph - Wells residence                       1513

13 57       Photograph - Wells garage door                     1513

14 58       Photograph - Wells house/outside garage            1516

15 59       Photograph - Wells house crawlspace                1515

16 61       Photograph - Wells garage                          1516

17 62       Photograph - Wells residence - garage              1512

18 63       Photograph - Wells residence                       1508

19 83       Enlistment contract                                1361

20 102      Photograph - inside Mr. Well's white truck cab     1529

21 107      Photograph - Nancy Wells' CR-V                     1526

22 109      Photograph - inside white truck                    1530

23 127      Photograph - Mr. Wells' truck search               1528

24 128      Photograph - Mr. Wells' truck bed search           1531

25 175      Photograph - ammunition cabinet                    1517

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1                       **INDEX** (Continued)

2    PLAINTIFF'S EXHIBITS                              ADMITTED

3    176       Photograph - ammunition pouch               1520

4    177       Photograph - ammunition in Wells home        1518

5    178       Photograph - pouch on table                  1520

6    179       Photograph - open pouch                      1521

7    196       Photograph - fingerprints, wood shop         1485

8    197       Photograph - fingerprints, back side wood shop
               door                                         1487
9
     202B      Photograph                                   1488
10
     203B      Photograph                                   1488
11
     205A      Photograph                                   1489
12
     205B      Photograph                                   1490
13
     205C      Photograph                                   1492
14
     206B      Photograph                                   1494
15
     206C      Photograph                                   1494
16
     207A      Photograph                                   1500
17
     207B      Photograph                                   1499
18
     207C      Photograph                                   1499
19
     207D      Photograph                                   1498
20
     208       Photograph                                   1496
21
     209       Photograph                                   1495
22
     210       Photograph                                   1491
23
     211       Photograph                                   1491
24
     213       Photograph                                   1497
25
     216       Uniform coat (blue blouse)                   1464

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 263 of 265
(720) 384-8078  attrans@sbcglobal.net

1                              **INDEX** (Continued)

2    PLAINTIFF'S EXHIBITS                                 ADMITTED

| | | |
|---|---|---|
| 226 | Jacket of bullet | 1467 |
| 227 | Red bowl | 1469 |
| 236 | Bullet fragments on microwave | 1471 |
| 237 | Trash can with fragments | 1473 |
| 238 | Bullet | 1478 |
| 239 | Bullet jacket and fragments | 1479 |
| 240 | Camouflage ammunition pouch | 1522 |
| 246 | Door knob | 1493 |
| 247 | Black glove | 1500 |
| 297 | Photograph | 1461 |
| 303 | Photograph - Mr. Hopkins' ODU blouse | 1462 |
| 304 | Photograph - T2 microwave | 1470 |
| 305 | Photograph - T2 microwave with fragments | 1471 |
| 306 | Photograph - T2 microwave and refrigerator | 1469 |
| 310 | Photograph - bullet jacket on floor | 1465 |
| 311 | Photograph - bullet jacket closeup | 1465 |
| 312 | Photograph - T2 refrigerator and broken bowl | 1468 |
| 313 | Photograph - T2 refrigerator and broken bowl | 1469 |
| 317 | Photograph - bullet from floor - office | 1476 |
| 318 | Photograph - bullet under floor - office | 1478 |
| 335 | Photograph - floor by Mr. Belisle - removed | 1477 |
| 338 | Photograph - trash can | 1472 |
| 362 | Photograph - T2 (Room 2) | 1460 |

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 264 of 265
(720) 384-8078  attrans@sbcglobal.net

1                 **INDEX** (Continued)

2 <u>PLAINTIFF'S EXHIBITS</u>                              <u>ADMITTED</u>

3 363      Photograph                             1474

4 364      Photograph                             1475

5 389      Chart lab – evidence collected        1481

6 <u>DEFENDANT'S EXHIBITS</u>                            <u>ADMITTED</u>

7 DE-106   Dr. Meloy's PowerPoint presentation     1430

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 742   Filed 09/23/14   Page 265 of 265
(720) 384-8078  attrans@sbcglobal.net