```
 1              UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF ALASKA

 3  UNITED STATES OF AMERICA,    )  Case 3:13-cr-00008-RRB
                                 )
 4          Plaintiff,           )  Anchorage, Alaska
                                 )  Wednesday, April 9, 2014
 5      vs.                      )  8:32 o'clock a.m.
                                 )
 6  JAMES MICHAEL WELLS,         )
                                 )
 7          Defendant.           )
    _____)  TRIAL BY JURY - DAY 7
 8
                    TRANSCRIPT OF PROCEEDINGS
 9
              BEFORE THE HONORABLE RALPH R. BEISTLINE
10                 UNITED STATES DISTRICT JUDGE

11  APPEARANCES:

12  For the Plaintiff:       KAREN L. LOEFFLER
                             U.S. Attorney
13                           BRYAN SCHRODER
                             KATHLEEN ANN DUIGNAN
14                           Assistant U.S. Attorneys
                             Office of the U.S. Attorney
15                           222 West 7th Avenue, #9, Room 253
                             Anchorage, Alaska  99513-7567
16                           (907) 271-5071

17  For the Defendant:       F. RICHARD CURTNER
                             Federal Defender
18                           Office of the Federal Public Defender
                             601 West 5th Avenue, Suite 800
19                           Anchorage, Alaska  99501
                             (907) 646-3400
20
                             PETER OFFENBECHER
21                           Skellenger Bender, P.S.
                             1301 5th Avenue, Suite 3401
22                           Seattle, Washington  98101-2605
                             (206) 623-6501
23

24

25
```

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 743  Filed 09/23/14  Page 1 of 217

1  APPEARANCES (Continued):

2  Court Recorder:              NANCY LEALAISALANOA
                                U.S. District Court
3                               222 West 7th Avenue, #4, Room 229
                                Anchorage, Alaska  99513-7564
4                               (907) 677-6111

5  Transcription Service:       A & T Transcripts
                                6299 West 111th Avenue
6                               Westminster, Colorado  80020
                                (720) 384-8078

7

8  Proceedings recorded by electronic sound recording; transcript
   produced by transcription service.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 743  Filed 09/23/14  Page 2 of 217
(720) 384-8078  attrans@sbcglobal.net

1    <u>**ANCHORAGE, ALASKA - WEDNESDAY, APRIL 9, 2014**</u>

2

3    (Call to Order of the Court at 8:32 a.m.)

4    (Defendant present; jury not present)

5    THE CLERK:  All rise.  His Honor the Court, the United

6    States District Court for the District of Alaska is now in

7    session, with the Honorable Ralph R. Beistline presiding.

8    Please be seated.

9    THE COURT:  Please be seated.

10    THE CLERK:  Please be seated.

11    THE COURT:  So what do you want to do about the juror's

12    question?  One of our Marshals is really popular, apparently.

13    MS. LOEFFLER:  I mean, I think we -- she said something

14    to us and we told her the other day -- that she knew somebody,

15    and we told her to immediately go over to defense to tell them.

16    So I assumed you knew.  And I don't have any issue as long

17    as --

18    THE COURT:  Would --

19    MS. LOEFFLER:  -- she -- you know, you can ask her, but

20    as long as she says, "I've never talked to them about the case

21    at all, never will, they've never talked to me about the case,"

22    I don't have any problem unless the defense does.

23    THE COURT:  There's two notes, aren't there?

24    MR. OFFENBECHER:  Yeah.  Yes.

25    THE COURT:  I just have one with me, (indiscernible) --

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 3 of 217
(720) 384-8078  attrans@sbcglobal.net

```
 1              MS. LOEFFLER:  So one --

 2              THE COURT:  Oh.

 3         (Side conversation)

 4              MS. LOEFFLER:  It's -- they're both the same.  Two of

 5    the jurors apparently --

 6              THE COURT:  I understand that.  I've --

 7              MS. LOEFFLER:  -- know one of the Marshals.

 8              THE COURT:  -- read them both, I just got -- now I got

 9    them both in front of me.

10              MS. LOEFFLER:  Okay.  Sorry.

11              THE COURT:  Juror number 12 and juror number 6, okay.

12    It's on the table.

13              MS. LOEFFLER:  Yeah.  So my thing would be -- would

14    just be to, if you have the jury, just say, you know -- or you

15    can bring in the jurors and just say --

16              THE COURT:  What do you -- oh --

17              MS. LOEFFLER:  -- "I know you know the Marshal,

18    it's" -- oh -- if it -- as long as it -- if you, the judge,

19    says, "It's okay with me, as long as neither one of you" --

20              THE COURT:  I can do that to the whole group.  I'll

21    just say --

22              MS. LOEFFLER:  No --

23              THE COURT:  -- "Ladies and gentlemen, if you know any

24    of the -- of the Marshals, as apparently a couple of you do" --

25              MS. LOEFFLER:  Yeah.
```

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 4 of 217
(720) 384-8078  attrans@sbcglobal.net

1    THE COURT:  -- "if it's going to affect your
2  deliberations in any way whatsoever, please let us know.
3  Otherwise, there's no problem."
4    MS. LOEFFLER:  Right.  That'd be great.
5    MR. OFFENBECHER:  Right.  And that they should, of
6  course, not discuss the case with the Marshal.
7    THE COURT:  Oh, of cour -- okay.  Is that good from the
8  defense as well?
9    MR. OFFENBECHER:  Yes, Your Honor.
10    THE COURT:  And obviously the Marshal knows she's not
11  supposed to talk to anyone.  That's --
12    MR. OFFENBECHER:  Sure.
13    THE COURT:  That goes unsai -- okay, what's -- what
14  from the government?
15    MS. LOEFFLER:  Oh, no, I'm only standing because I have
16  to run out and get an exhibit.  So when we're ready to call the
17  witness, I'm going to run out for a minute.
18    THE COURT:  Okay.  Anything from the defense?
19    MS. LOEFFLER:  Oh, yes, Your Honor, there is one issue.
20    THE COURT:  Okay.
21    MS. LOEFFLER:  Angela Birchfield is here.  She's the
22  stepdaughter of Jim Hopkins.  And I just -- under victim
23  exclusion, she would like to sit in a bit.
24    THE COURT:  Where is she?  Let's see -- oh, she's not
25  here?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 5 of 217
(720) 384-8078  attrans@sbcglobal.net

 1          MS. LOEFFLER:  She's --

 2          MS. DUIGNAN:  She was going to come tomorrow.

 3          MS. LOEFFLER:  Oh, she was going to come tomorrow.

 4          THE COURT:  Okay.  Well, let's talk about it later,

 5   then.

 6          MS. LOEFFLER:  Okay.

 7          THE COURT:  She's coming, right?

 8          MS. LOEFFLER:  Yeah.

 9          THE COURT:  And the question is whether she can sit in.

10   She is a victim.  Unless the defense can convince me there's

11   some reason that wouldn't apply, then she can sit in.  But

12   we'll cross that bridge when we get to it on one of our next

13   breaks, okay?

14          MS. LOEFFLER:  Okay.

15          THE COURT:  Go ahead and get your person.  I'm just

16   looking at a couple instructions I might read to start off

17   today.

18          MR. OFFENBECHER:  Your Honor, when the Court's done

19   with that, I had one other --

20          THE COURT:  Oh, yes, sir, go ahead.

21          MR. OFFENBECHER:  The -- since you're talking about the

22   instructions, I think it would be appropriate, since we had an

23   expert witness testify yesterday and there'll be another one

24   today, that the Court simply give the pattern jury

25   instruction --

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 6 of 217
(720) 384-8078  attrans@sbcglobal.net

1          THE COURT:  Again?

2          MR. OFFENBECHER:  -- regarding experts.

3          THE COURT:  Again?  I already gave it.

4          MR. OFFENBECHER:  At the beginning of the case.

5          THE COURT:  Yeah.  You want me -- yeah, so I gave it at

6     the beginning of the case.

7          MR. OFFENBECHER:  Right.

8          THE COURT:  Do you want me to give it now, again?

9          MR. SCHRODER:  I guess what I'd like to figure out,

10    Your Honor, is how many times you're going to give it.  I mean,

11    if they're going to request you give it every time an expert

12    testifies --

13         THE COURT:  No.  No, no, no, no.

14         MR. SCHRODER:  So -- or you've already given it, it's

15    appropriate to give it at the end.  I don't see any need to

16    repeat it every time.

17         THE COURT:  No, I'm not.  I'm just thinking for a

18    minute here, looking -- I do need to remind them that questions

19    of counsel are not evidence.  And I think, you know, I -- I've

20    given it one -- the expert once already.  If you want me to

21    give it again at the end of the case, I'll -- it's going to be

22    included in the packet.

23         MR. SCHRODER:  Yeah.

24         THE COURT:  They're going to have that instruction.

25    Everything I've already read is part -- is going to be part of

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 7 of 217
(720) 384-8078  attrans@sbcglobal.net

```
 1  the packet.  Here it is.  That's what I've already done.
 2  That's -- that's history.  Okay.  Let's bring in your wit --
 3  where she -- she's gone now.  Oh, you're the witness?  Okay.
 4           MR. OFFENBECHER:  We have the witness, Your Honor.
 5           THE COURT:  Okay, who's going to question her?
 6           MS. DUIGNAN:  I am, Your Honor.
 7           THE COURT:  Oh, okay, so we got our team.  Go ahead and
 8  bring the jury in.  That's fine.  You can come up and get
 9  comfortable.  So I'll go ahead and, just to make everybody
10  happy, I will give the expert one, just because I'm giving
11  several others.
12           MR. OFFENBECHER:  Thank you, Your Honor.
13           THE COURT:  The jury's coming in.  Usually people stand
14  when it comes in, okay?
15      (Jury present)
16           THE COURT:  Okay.  Please be seated.  Well, good
17  morning, ladies and gentlemen.  How are you doing?  You know,
18  you are one heck of a good jury.  You're here on time, you
19  look -- you're looking sharp as can be, and you got your ears
20  on.  Can you hear me?
21           UNIDENTIFIED JUROR:  Yes, sir.
22           THE COURT:  That's important you hear this part.  I got
23  a couple notes here this morning.  I could just say that, you
24  know, I've told you before you're to make your decisions based
25  on testimony in the court, nothing else.  Apparently some of
```

1   you may have known or had -- one of the Marshals.  Unless

2   that's a problem for you, unless that would affect your ability

3   to be a fair juror, that's fine with us.  But you can't talk

4   with the Marshals or anything of that nature.

5           And we always rely on you to tell if something has

6   happened that think -- that you think might, you know, impact

7   your ability to be fair.  If you're good with it and everyone

8   else is good with it, just keep doing what you're doing.  Does

9   that make sense?  But what's really good is that you told us.

10  You see, that's the good thing.  So there's no secrets.  Does

11  that satisfy counsel?

12          MR. CURTNER:  Yes, Your Honor.

13          MR. SCHRODER:  Yes, Your Honor.

14          THE COURT:  Now, I have given you some instructions

15  already.  I'm going to just every once in a while remind you of

16  some of these instructions, because sometimes, with all the

17  things that are going on, it's easy to forget it.

18          I've told you before you're to make your decision based

19  solely on the evidence presented here in the courtroom.  Let me

20  tell you what evidence is.  The evidence you are to consider in

21  deciding what the facts are consists of the sworn testimony of

22  any witness, the exhibits that we've been receiving, and any

23  facts to which the parties have agreed upon.  That's it.  Okay.

24  Sworn testimony, the exhibits that we've been admitting, and

25  any facts that the parties agree on.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 9 of 217
(720) 384-8078  attrans@sbcglobal.net

1    There are a number of things that are not evidence.
2  And I just want to remind you, these are not evidence.  The
3  statements and arguments of attorneys are not evidence.
4  Questions and objections of the attorneys are not evidence.
5  Testimony that I instruct you to disregard -- I think I've done
6  that once so far -- is not evidence.  And anything you may see
7  or hear when the court is not in session, even if what you see
8  or hear is done by one of the parties, is not evidence.  Pretty
9  clear?  Okay.  And we've had the -- you'll have all these
10  instructions with you.

11    Here's one.  You may hear testimony from persons who,
12  because of education or experience, are permitted to state
13  opinions and the reasons for their opinions.  Such opinion
14  testimony should be judged like any other testimony.  You may
15  accept it or reject it and give it as much weight as you think
16  it deserves, considering the witness's education and experience
17  and the reasons given for the opinion, and all the other
18  evidence in the case.

19    And you'll have all these.  I'm going to have a packet
20  of instructions for each one of you, so you'll all have all the
21  instructions when it gets to the end of the trial.  Okay.  The
22  government's next witness.

23    MS. DUIGNAN:  The government calls Jennifer Raymond to
24  the stand.

25    THE COURT:  All right.  And if you'll stand, my clerk

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 743  Filed 09/23/14  Page 10 of 217
(720) 384-8078  attrans@sbcglobal.net

1  will swear you in.

2  THE CLERK:  Please raise your right hand.

3  **JENNIFER RAYMOND, PLAINTIFF'S WITNESS, SWORN**

4  THE CLERK:  Okay, thank you.  Please have a seat.  And,

5  ma'am, if you can please state and spell your full name.

6  THE WITNESS:  Jennifer Raymond.  J-e-n-n-i-f-e-r, R-a-

7  y-m-o-n-d.

8  THE CLERK:  Thank you.

9  THE COURT:  All right, counsel.

10  **DIRECT EXAMINATION**

11  BY MS. DUIGNAN:

12  Q    Ms. Raymond, by whom are you employed?

13  A    I'm employed at the laboratory at the Federal Bureau of

14  Investigation in the Latent Print Operations Unit.

15  Q    And in what city and state is the lab located?

16  A    It's in Quantico, Virginia.

17  Q    What is your title?

18  A    I'm a physical scientist forensic examiner.

19  Q    And what does that entail?  What are your duties?

20  A    I routine -- routinely receive items of evidence.  I then

21  inventory those items of evidence and process them in the

22  effort to detect any latent prints that might be there.  If any

23  latent prints are detected, I then compare those prints to the

24  prints of known individuals who are submitted to me, or they

25  can be run through our automated system.  I then will prepare a

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 11 of 217
(720) 384-8078  attrans@sbcglobal.net

1  report of my findings and will testify in court when requested
2  to do so.
3  Q   And how long have you been employed by the FBI lab?
4  A   Approximately six years.
5  Q   What is your educational background?
6  A   I have a bachelor's of science in forensic science from
7  the University of Central Oklahoma.
8  Q   What specialized education and training have you received
9  in the area of fingerprint and palm print identification?
10  A   I can -- successfully completed an 18-month training
11  course at the FBI in the Latent Print Operations Unit.  This
12  training consisted of numerous comparisons, so learning how to
13  properly evaluate and compare prints, as well as the biology,
14  the history of fingerprints, how the automated system works and
15  how to properly use it, as well as numerous comparison tests,
16  moot courts, oral boards, and then a final comprehensive test
17  in which I completed the course.
18  Q   During your career, how many fingerprint and palm print
19  comparisons have you done?
20  A   Hundreds of thousands.
21  Q   And how many of those comparisons resulted in
22  identifications?
23  A   Thousands.
24  Q   Have you been qualified and testified as an expert before
25  in the field of fingerprint and palm print analysis?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 12 of 217
(720) 384-8078  attrans@sbcglobal.net

1      MS. DUIGNAN:  At this point, Your Honor, the government

2  moves that Jennifer Raymond be declared as an expert in the

3  field of fingerprint and palm print examinations.

4      THE COURT:  Any voir dire?

5      MR. CURTNER:  No, Your Honor.  Thank you.

6      THE COURT:  She'll be received in that capacity.

7  BY MS. DUIGNAN:

8  Q   Ms. Raymond, what is a latent print?

9  A   Well, on the palmar surfaces of the hands as well as the

10  soles of the feet is this specialized type of skin known as

11  friction ridge skin.  And it's designed to help us with

12  gripping items.  So whenever this friction ridge skin becomes

13  coated with a substance such as sweat or oil, dirt, grease,

14  anything, and then comes into contact with the surface, there

15  is a possibility for a reproduction of the friction ridges to

16  appear on that surface.  Because these are chance reproductions

17  and just mainly done with, like, the common handling of items,

18  they're often very fragmentary in nature and require a chemical

19  process or powder or some sort of forensic light source in

20  order to be visible.

21  Q   And what is a known print?

22  A   A known print is just the intentional reproduction of the

23  friction ridge skin.  So a known fingerprint would be done

24  usually in black printer's ink on a contrasting background such

25  as fingerprint card, and it would be done by -- in a very

Case 3:13-cr-00008-SLG  Document 743  Filed 09/23/14  Page 13 of 217

1  controlled setting, taking the finger and rolling it from nail

2  to nail into the printer's ink, and then rolling it again from

3  nail to nail in the corresponding block of the fingerprint card

4  that can be done for the fingerprints, palm prints, or

5  footprints, whatever area of friction ridge skin that you would

6  need.

7  Q    How is it possible for persons to leave latent prints?

8  A    Like I said before, that friction ridge skin has to be

9  coated with some sort of a substance.  Like I said, sweat, oil,

10 dirt, paint, anything -- it has to be coated with a substance

11 in order to leave a reproduction of that arrangement behind.

12 Q    And what kinds of surfaces can a person leave a latent

13 print on?

14 A    The potential to leave a latent print is for any item.  In

15 the laboratory we typically divide evidence into two different

16 categories, because we use different processes on different

17 types of items.  The two categories we tend to divide evidence

18 into is porous and nonporous.

19     So a nonporous surface would be something like this table

20 in front of me.  If I put a drop of water on it, the water's

21 just going to bead up and sit on top.  A latent print will do

22 the same thing.  So a latent print left in sweat or oil,

23 whenever I touch this table, it's going to be just left sitting

24 on top of the surface.  And so it's easily wiped away, just

25 like that droplet of water would be easily wiped away.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 14 of 217
(720) 384-8078  attrans@sbcglobal.net

1    A porous surface is an item such as paper.  So if I
2    touched paper or put a droplet -- droplet of water on paper,
3    it's going to absorb into the paper.  A latent print does the
4    same thing.  It kind of absorbs into the paper and is better
5    preserved in a porous item.
6  Q    Is it possible for a person to touch a surface and not
7    leave a latent print?
8  A    Absolutely.
9  Q    And how does that happen?
10  A    Well, the person could be wearing gloves.  That's the
11    easiest thing.  Also, if nothing's coating the friction ridges,
12    if their hands are extremely dry, the chances of leaving a
13    latent print are very slim.  Also, very textured surfaces
14    aren't very good for leaving latent prints, just because the
15    friction ridge arrangement won't be able to be distinguished
16    from that texture.
17  Q    What does it take for a latent print to be usable for
18    comparison?
19  A    There needs to be enough information in that print, so
20    there needs to be a -- a large enough quantity of information.
21    And then the quality of that information also needs to be
22    sufficient.  So it's -- that's kind of hard to understand.  But
23    as the quantity of information goes up in the latent print, the
24    quality can go down.  And then vice versa.  As the quality goes
25    up, the quantity to -- can go down.  So each latent print is

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 743  Filed 09/23/14  Page 15 of 217
(720) 384-8078  attrans@sbcglobal.net

1    judged on its own merit.  Every latent print is different.

2    Even this one person putting the same print down several times,

3    those prints will all be different and all have to be assessed

4    whether they're usable or not on each one's own value.

5    Q    How long does a latent print last on a surface?

6    A    That just depends on the contact with the surface, the

7    type of surface.  Like I said, the porous surfaces, where the

8    print kind of soaks in, prints will last a lot longer on those

9    surfaces than, say, a nonporous surface, especially a sur -- a

10   nonporous surface that comes into a lot of contact with other

11   items.  Friction will definitely destroy latent prints on

12   nonporous surfaces.

13        Also, temperature, humidity, or dryness, that will also

14   affect latent prints just because of the -- the matrix that

15   they're left in.  Like a print left in sweat, if it's a hot,

16   dry day, that's going to essentially evaporate, because sweat

17   is mostly water.  So it just depends on temperature, rather the

18   type of surface and how much contact that surface comes into

19   contact with.

20   Q    Can two different people have the same fingerprints or

21   palm prints?

22   A    No.  Fingerprints and palm prints are unique to each

23   individual, and they're also unique in small areas on one

24   individual.  Fingerprints are formed within the womb, and

25   they -- there are genetic and environmental factors that go

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 16 of 217
(720) 384-8078   attrans@sbcglobal.net

**RAYMOND - DIRECT**

1 into how the friction ridge arrangement is actually formed.  So

2 genetics of course -- say, identical twins would have the same

3 genetics, right?  But because each fetus would go through its

4 own environmental factors -- on might have their hand gripped,

5 the other one might have it pressed against the uterine wall --

6 those are different forces that are playing upon that skin on

7 the hand when it's trying to be developed, so it's going to

8 cause different friction ridge arrangements.  So it's the

9 combination of the genetic as well as the environmental factors

10 that the fetus is going through that makes that friction ridge

11 arrangement entirely unique to that individual.

12          THE COURT:  So you're saying that identical twins do

13 not have the same fingerprints?

14          THE WITNESS:  They do not.  Each -- each fetus goes

15 through --

16          THE COURT:  Okay.

17          THE WITNESS:  -- their own separate experience in the

18 womb, which makes them different.

19 BY MS. DUIGNAN:

20 Q    And does a person's fingerprints or palm prints ever

21 change?

22 A    They do not.  The only way a person's fingerprints or palm

23 prints could change is through permanent scarring.  The

24 friction ridge arrangement is formed in the wound before birth

25 and it remains persistent throughout a person's life until

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 17 of 217
(720) 384-8078  attrans@sbcglobal.net

**RAYMOND - DIRECT**

1  decomposition occurs after death.  Any kind of permanent

2  scarring would alter that friction ridge arrangement, but then

3  the scar becomes permanent.

4  Q    How are fingerprints compared?

5  A    The methodology used for comparing fingerprints is known

6  as ACE-V, and that stands for analysis, comparison, evaluation,

7  and verification.  So when I'm looking at a latent print, the

8  first step is the analysis phase.  And what I'm doing is I'm

9  looking at the print, I'm looking at the surface that it was

10  developed on, what the -- the matrix or the -- the stuff that

11  it may have been left in was, as well as looking at the detail

12  within the print.

13       There are three levels of detail in the print.  The first

14  level of detail, think of it as like the big picture.  So the

15  first level of detail, I'm looking at the overall ridge flow

16  and the pattern type.

17       There are three different types of patterns.  There's a

18  whirl that looks basically like a circle; there's a loop, which

19  the ridges come in from one side, they actually curve around

20  and flow out on the same side that they came in on, and there's

21  an arch, which just basically flows in from one side, kind of

22  makes a rise or a wave, and flows out on -- on the other side.

23       So I'm looking for these pattern types and I'm looking for

24  that overall ridge flow.  I'm trying to decide if it's a

25  fingerprint, if it's a palm print, it might be a footprint.

1  And then once I've made all of this assessment on level 1, I
2  then kind of zoom it, and I'm going to look at level 2 detail.
3      Level 2 detail is what's commonly referred to as the
4  points.  There are three basic types of points or details.  The
5  first one is an ending ridge, where the ridge just kind of
6  flows and then abruptly stops.  There's a dividing ridge, where
7  the ridge flows and then actually splits into two or more
8  ridges.  And then there's the dot, which basically looks like
9  the period of -- at the end of a sentence.  It's a ridge that's
10  as wide as it is long.  And I'm looking at all of the level 2
11  detail then within this print, all of the points.  But not only
12  am I looking at what type of point it is, what type of
13  characteristic it is, but I'm also looking at where it is in
14  the print and I'm looking at its relationship to other
15  characteristics in the print.
16      Just as important as the -- the points or the
17  characteristics, the -- are the continuous ridges.  If I have a
18  characteristic up here and I have three continuous ridges and
19  then another characteristic, those continuous ridges are just
20  as important as those characteristics were.
21  Q    And this is all part of the analysis?
22  A    This is all part of the analysis.
23  Q    Okay.
24  A    This is all just trying to assess the print, see if it's
25  usable, see if there's enough quantity and quality of

1  information there.

2      The next level of detail is third-level detail, so I'm

3  going to zoom in even more.  This may or may not be present

4  depending on the quality of the latents, but if it is present,

5  it's the actual ridge shapes, the widths, the bumps that it

6  makes out.  And it might get skinny and it might get fat.

7  That's all very important too, and it's all very unique to the

8  print.  And also the pores that might occur along the ridges.

9      Along each of your friction ridges is a little, tiny -- or

10  little, tiny sweat pores.  And if the print is clear enough,

11  those sweat pores will be visible as well, and those are also

12  very unique to each individual and each ridge.  So I'll also

13  take that into consideration.

14      One I have decided that the latent print and the known

15  print are both of -- of usable quality and quantity of

16  information, I'll then move on to the comparison phase.  And

17  this is when I put both the latent print and the known print

18  side by side and I'm looking back and forth at all that

19  information that I looked at in analysis, and I'm trying to

20  decide -- I'm just looking to see if there -- if a -- the

21  information is in agreement or if it's not in agreement.  So

22  I'm looking for similarities and differences between the two.

23      After I've done that, I then move on to the evaluation

24  phase, which is where I come to a decision.  I can come to one

25  of three decisions.  There's an identification, an exclusion,

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 743  Filed 09/23/14  Page 20 of 217
(720) 384-8078  attrans@sbcglobal.net

1  or an inconclusive.  An identification decision is where all of

2  the information contained within the latent print and the known

3  print"s in agreement, so I can conclude that the two prints

4  came from the same individual.  An exclusion decision is

5  reached when information contained within the latent print and

6  the known print are not in agreement, so they could not have

7  been made by the same individual.  And an inconclusive decision

8  is reached when there's not sufficient area in the known print

9  to be able to come to an identification or an exclusion

10  decision.  So the print -- the latent print may be from, like,

11  the extreme side of the finger, and that's just not recorded in

12  the known print that I have.  That's what our indivi -- our

13  inconclusive decisions mean.

14  Q    Those are the first three steps, right?  So you went

15  through analysis, comparison, and evaluation?

16  A    Yes, ma'am.

17  Q    And so what's the last step?

18  A    The last step is the verification phase.  And this is when

19  another qualified examiner -- look at the same prints.  They do

20  their own ACE or analysis comparison and evaluation, and they

21  come to their own conclusion.  And this is used as a form of

22  peer review and quality control.

23  Q    And so that's the entire method --

24  A    That's --

25  Q    -- we went through, analysis, comparison, evaluation,

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1  verification?

2  A    Yes.

3  Q    Are palm prints compared the same way?

4  A    Yes, they are.

5  Q    Have you seen -- can I have you look at Government Exhibit

6  394?  Pull it up on your screen.  Do you recognize Exhibit 394?

7  A    Yes.

8  Q    And what is it?

9  A    It's a table that was created when I was preparing for

10 testimony, and it contains the FBI number that's assigned by

11 the agents whenever the evidence is collected.  It also

12 contains the latent lift number which is assigned to each

13 latent lift that I receive back at the laboratory.  It contains

14 the laboratory number or the questioned item number that is

15 assigned to each item of evidence whenever it comes through the

16 laboratory.  And then it also contains the type of latent print

17 that was detected on each one of those items.  And this is for

18 items that have -- were not identified.

19 Q    And have you had a chance to review it and look it over in

20 preparation for your testimony?

21 A    Yes.

22 Q    Does it appear to be accurate and record everything the

23 way you performed it?

24 A    Yes.

25      MS. DUIGNAN:  At this point, Your Honor, I'd move into

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 743  Filed 09/23/14  Page 22 of 217
(720) 384-8078  attrans@sbcglobal.net

1   evidence Exhibit 394.

2        MR. CURTNER:  No objection.

3        THE COURT:  Will be received.

4     (Plaintiff's Exhibit 394 admitted)

5   BY MS. DUIGNAN:

6   Q   And can you please explain what the table shows?  Does it

7   show all of the examinations you did in this case?

8   A   No.  It only -- it only shows the exhibits that still have

9   latent prints that have been identified.

10  Q   Okay.  And first I should ask you, so in the examination

11  in this case, how many usable prints did you compare?

12  A   There were 26 total latent prints from the crime scene and

13  three additional latent prints from other items that were

14  submitted.

15  Q   And in total, how many were you able to identify out of

16  that group?

17  A   Eighteen total latent fingerprints were identified of the

18  22 latent fingerprints that were developed.

19  Q   And so what did that leave remaining?

20  A   That left these -- these remaining, which was four latent

21  fingerprints, three latent palm prints, and one latent

22  impression from the crime scene.

23  Q   And can you explain what an impression is?

24  A   An impression is a designation that's given to a latent

25  print when the examiner can't quite determine what area that it

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 23 of 217
(720) 384-8078  attrans@sbcglobal.net

**RAYMOND - DIRECT**

1  came from.  So in this case, the impression -- I couldn't tell

2  whether it was a fingerprint or a palm print based on the

3  frac -- the small nature of the impression.

4  Q    And first I think I'm going to start with the last

5  exhibit.  So can you explain what the number Q2 is?

6  A    Q2 is just an item number that was assigned at the

7  laboratory.

8  Q    Okay.  And so when items come into the laboratory, how do

9  you process them?

10  A    It depends on -- are you asking me how it comes into the

11  laboratory or how I physically process the item?

12  Q    Well, do they come in assigned with a number already?

13  A    They do come in assigned with a number.  The FBI number

14  column is the number that's assigned from the field.  And

15  whenever it comes in, it actually goes into our Evidence

16  Control Unit, and they assign it a laboratory number, which is

17  the number that's in the very first column, the Q number.

18  Q    And in this case, were you able to -- I notice that

19  there's no number for the lift number.  Can you explain why?

20  A    That was an actual physical item of evidence that I

21  processed in the laboratory.

22  Q    And at this point I'd like to get Exhibit 247.  If we can

23  turn the lights on for a minute.  Can you get Exhibit 247,

24  please?  Have you had a chance to look at Exhibit 247?

25  A    Yes.

**RAYMOND - DIRECT**

1  Q    And what is it?

2  A    It's a black -- looks like nitrile type glove.

3  Q    And when that comes into the laboratory, how is it

4  processed?  How did you process this one, I should ask.

5  A    I processed this using a semiporous processing sequence,

6  which basically is a combination of our nonporous processing

7  sequence and our porous processing sequence, because it has

8  properties of both.  If you'd like me to go through the entire

9  sequence, or just --

10 Q    I -- let me just ask you this.

11 A    Uh-huh (affirmative).

12 Q    In that glove, were you able to identify some of the

13 prints?

14 A    Yes.  I was able to develop five fingerprints and a palm

15 print on the inside of the glove, using a chemical called DFO.

16 And I was able to identify all five fingerprints through

17 automated searches.

18 Q    So one of the unidentified prints was the palm print.  Can

19 you explain what process you went through for that?

20 A    The palm print, I -- I didn't have any palms to compare.

21 No palms were available for comparison, so it never got

22 compared.

23 Q    Was the palm print on the same side as the fingerprints

24 inside the glove?

25 A    Yes, it was.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 743  Filed 09/23/14  Page 25 of 217
(720) 384-8078  attrans@sbcglobal.net

1  Q    And how did you identify the five fingerprints inside of
2  the glove?
3  A    The fingerprints were identified as a result of an
4  automated search.
5  Q    And do you remember who they linked up to?
6  A    Pedro Elizondo.
7  Q    And what side was the palm print in relation to the
8  fingerprints?
9  A    They were all on the same side, on the inside of the
10 glove.
11 Q    Moving to the -- if we could bring the exhibit back up.
12 Moving to Q67, can you explain what that item was?
13 A    It was a door knob.
14 Q    And again, how did you compare that in your process?
15 A    That came in previously processed in the field, so it
16 actually already had a palm print that was visible on it, and
17 so I just had it photographed.  That palm print I was able to
18 also search in the automated system and no identifications were
19 effected.
20 Q    Okay.  And is it fair to say that looking at rest of the
21 items, that you would have used the same process for all of the
22 remaining items?
23 A    Yes, all of the lifts would have had visible prints
24 already on them.  I would get those photographed and then
25 compare them or search them as appropriate.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 26 of 217
(720) 384-8078  attrans@sbcglobal.net

RAYMOND - DIRECT

1    Q    Okay.  We can take the lights up.  How many searches did

2    you do in this case for the unidentified prints?

3    A    I don't remember the exact number of searches, but I did

4    search every print that was unidentified from the crime scene

5    with the exception of one that wasn't suitable for searching.

6    Q    You had mentioned that you compared the prints against

7    first known prints that you had received.  Can you explain what

8    those were?

9    A    I received a list of people to compare for elimination

10   purposes, and this just means that those individuals all had

11   legitimate reason to have access to the crime scene and their

12   prints could be left at the crime scene for a -- a legitimate

13   reason.  I believe there are apart -- about eight individuals

14   that were requested.

15   Q    Okay.  And how would you receive the copies of the known

16   prints to compare in this case?  How is that process done?

17   A    I received names, date of births, and social security

18   numbers for each individual and was able to do what we call a

19   subject search in the automated system, and they had records

20   within the system that I was able to pull fingerprint cards

21   for.

22   Q    And what other searches do you do after you do the

23   elimination searches?

24   A    So after I manually compared the -- the people that were

25   requested, I then took the unidentified prints and I put them

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 743  Filed 09/23/14  Page 27 of 217
(720) 384-8078  attrans@sbcglobal.net

**RAYMOND - DIRECT**

1  into the automated system and searched them as latent prints.

2  Q    And when you say the automated system, what --

3  A    Uh-huh (affirmative).

4  Q    -- is that system?

5  A    During this case, there are actually two different systems

6  that I used.  IAFIS is our older system that has since gone

7  offline and has been replaced with NGI.  IAFIS stands for

8  Automated -- or Integrated automated Fingerprint Identification

9  System.  And NGI stands for Next Generation Identification.

10 Q    And what is the difference between them?

11 A    NGI is just kind of the new and improved version.  The way

12 that it -- it calculates which prints are more likely to be

13 ID -- you know, ID or hits, matches, is very -- is improved.

14 And NGI also has a palm print database, so we are now able to

15 search palm prints, where we weren't able to do in IAFIS.

16 Q    And what is the level of development of that palm print

17 database?

18 A    It's still very small, because it's very new.

19 Q    And can you explain what types of individuals would be

20 entered into these systems?

21 A    There are several different databases.  There's the

22 criminal database, which consists of people who have arrest

23 records that have been entered into the system, and there are

24 government employees also that are in that system.  For

25 example, I'm in that system because of my job.  There's also

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 743  Filed 09/23/14  Page 28 of 217
(720) 384-8078  attrans@sbcglobal.net

1  the civil database that consists mainly of military and law

2  enforcement.  Could be some bank tellers and teachers,

3  whoever's requested to be submitted into that system.  And then

4  there's another file called the unsolved latent file.  And

5  that's -- that file is set up to enter latent prints that were

6  searched but did not get identified to anybody.  Those prints

7  get entered into that file, and then any new known cards that

8  are submitted into the system are automatically run against

9  that file.  And then if an identification or a possible

10 identification is made based on the computer, they will send it

11 to whoever submitted that latent for a manual comparison by

12 that examiner.

13 Q   And the prints that were unidentified in this case, were

14 they entered into any system?

15 A   Yes.  All of the unidentified prints that were searched

16 were also added to the unsolved latent file, and when they were

17 searched, they were searched against the criminal and the civil

18 files.

19 Q   Is everybody in the community included in these database?

20 A   No, only people that would have a reason to be entered to

21 the databases would be entered.

22 Q   Is there any kind of a time-date stamp on fingerprints or

23 palm prints?

24 A   No, there's no way to tell how old a fingerprint or a palm

25 print is, just based on the fingerprint or palm print alone.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 29 of 217
(720) 384-8078  attrans@sbcglobal.net

RAYMOND - CROSS

1  Q    And can you explain -- you had mentioned environmental

2  factors before.  Can you explain how long fingerprints could

3  last?

4  A    Depending on the item -- like I said, temperature,

5  weather, it -- it could last for a long time or it could last

6  for seconds.  I mean, I could touch this table and then do

7  that, and, you know, it could be gone, you know.  Or I could

8  touch this piece of paper -- we've developed items -- on porous

9  items we've developed prints 10, 20 years after they were

10 touched.

11 Q    Thank you.  I don't have any further questions right now.

12         THE COURT:  Cross-examination.

13                    **CROSS-EXAMINATION**

14 BY MR. CURTNER:

15 Q    Good morning, Ms. Raymond.

16 A    Good morning.

17 Q    When did you first do a performance or a lab report on the

18 prints that were provided in this case?  Do you recall?

19 A    Can I refer to my report --

20 Q    Yes, uh-huh (affirmative).

21 A    -- to be accurate?  Thank you.  The very first report was

22 issued on June 22nd of 2012.

23 Q    Wasn't there a report -- okay.  And what did that report

24 involve?

25 A    That report involved processing the -- the black glove --

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 743  Filed 09/23/14  Page 30 of 217
(720) 384-8078  attrans@sbcglobal.net

1  Q    Uh-huh (affirmative).

2  A    -- item Q2, and also I received a fingerprint card for

3  James Michael Wells, and it included comparing that fingerprint

4  card.

5  Q    Okay.  And then is that the time you made the

6  identification of that glove actually belonging to Mr.

7  Elizondo?

8  A    Yes.  I did automated searches as well, and that's when

9  that identification occurred.

10  Q    So that was the first involvement in this case is when you

11  examined that glove and you eliminated Mr. Wells's fingerprints

12  being in there?

13  A    Yes, sir.

14  Q    And you did identify Mr. Elizondo's prints as being there?

15  A    Fingerprints, yes.

16  Q    And then what was your next report?

17  A    Let's see, my next report was issued December 14th 2012.

18  Q    Okay.  And how many possible latent prints lifts did you

19  receive at that time?

20  A    It looks like about 53.

21  Q    Fifty-three.

22  A    Fifty-three lifts.

23  Q    Okay.  And then -- so those are lifts from the crime

24  scene, all?

25  A    Yes.

1  Q    And were they all a value that you could do an examination

2  of?

3  A    Twenty-six of the fingerprints -- twenty-fix fingerprints,

4  palm prints, and impressions total were of -- of value or

5  usable for comparison purposes on those lifts.

6  Q    Okay.  So that'd be another 25 or 7 or whatever -- I think

7  27 that were somebody's fingerprints but there wasn't enough

8  there to make any identification of?

9  A    Correct.

10 Q    Okay.  So 27 fingerprints from the scene, latent lifts

11 that were not a good enough quality to make an identification

12 of?

13 A    The prints that were on the them were not of -- of

14 value --

15 Q    Okay.

16 A    -- correct.

17 Q    So that left you with 26 that you could examine?

18 A    Correct.

19 Q    Then in that process you eliminated a number of people?

20 A    I did.

21 Q    Okay.  Now, I think you said you did comparisons with

22 eight known?  Is that correct?

23 A    Let's see, I did -- I believe it was approximately eight

24 individuals, yes, that I did.

25 Q    Do you remember who the individuals were?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 743  Filed 09/23/14  Page 32 of 217
(720) 384-8078  attrans@sbcglobal.net

1  A    I can tell you.  Get the right page here.  Okay.  The

2  individuals that were requested for comparison besides James

3  Michael Wells, who was also requested in the first submission,

4  were Cody J. Beauford, Para Danielle Upchurch, Aaron Scott

5  Coggins, Nathaniel Wesley Pacheo [sic], Richard William

6  Belisle, James Armon (ph) Hopkins, and Scott Allen Reckner.

7  Q    Okay, so you were able to take the prints that were of

8  quality to examine, and you compared those to those eight

9  people?

10 A    Oh, I'm sorry, there was one other person.  At the time

11 she was submitted as Leah Henry, at the time.  And I wasn't

12 able to find her prints at that time.

13 Q    So when you went through that comparison of known prints

14 of those eight individuals and --

15 A    Uh-huh (affirmative).

16 Q    -- the prints that you had, the latent prints that were of

17 value to examine --

18 A    Uh-huh (affirmative).

19 Q    -- after that process, then, there were, I think, six --

20 seven different fingerprints that were quality or value, but

21 you couldn't identify.  Is that correct?

22 A    The -- there was -- there were eight if you include the

23 palm print from the glove.  So seven just from those lifts and

24 the door knob.

25 Q    Okay.  Now looking at your Government Exhibit 394 -- do

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 743  Filed 09/23/14  Page 33 of 217
(720) 384-8078  attrans@sbcglobal.net

1  you have that in front of you?

2  A    I have a copy of it, yes.

3  Q    Okay.  And then it looks like the first four prints

4  were -- that were unidentified were from the door between the

5  Bobcat garage and the woodshop?  Is that correct?

6  A    I was not there when those prints were taken.  That's what

7  the lift said, so --

8  Q    Okay.

9  A    -- that's --

10  Q    Your exhibit indicates that the --

11  A    The exhibit indicates that, yes, but I can't confirm that.

12  Q    Okay.  Your exhibit indicates that Q24 --

13  A    Uh-huh (affirmative).

14  Q    -- that was the location it was found?

15  A    Uh-huh (affirmative).

16  Q    And Q25?

17  A    According to this, yes.

18  Q    And Q31?

19  A    Yes.

20  Q    And Q27?

21  A    Yes.

22  Q    Now, on those unidentified prints, were you just recently

23  asked to examine those again to try to identify who those might

24  be?

25  A    Yes, I was.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 34 of 217
(720) 384-8078  attrans@sbcglobal.net

1  Q    How long ago was that?

2  A    My final report -- my final report's dated March 26th,

3  2014.

4  Q    Okay.  A couple weeks ago.

5  A    Yes.

6  Q    And then what kind of comparison did you do at that time?

7  A    I relaunched all of the unidentified prints that were

8  suitable.  I relaunched those in the NGI system, because it had

9  come on line in May of 2013.

10  Q    Okay.  So this is your new, improved system?

11  A    Yes.

12  Q    And were you looking for Mr. Wells's prints as a

13  comparison?

14  A    I had already compared Mr. Wells' prints.

15  Q    Now, in your report, though, didn't you eliminate him

16  again -- or exclude him, I'm sorry.

17  A    He was excluded from all the fingerprints.

18  Q    Okay.  And, now, according to your exhibit, another

19  unidentified fingerprint was from the boiler room door.  Is

20  that correct?  That was Q66?

21  A    Q66.  Yes.

22  Q    And so that fingerprint remains unidentified even under

23  the new, improved system.  Is that correct?

24  A    Correct.

25  Q    And Mr. Wells was excluded from that fingerprint that

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 35 of 217
(720) 384-8078  attrans@sbcglobal.net

**RAYMOND - REDIRECT**

1 indicates it was found on the boiler room door.  Is that

2 correct?

3 A    Correct.

4 Q    And then going to Q40.

5 A    Uh-huh (affirmative).

6 Q    According to your exhibit, that's from the repair shop

7 north door exterior?

8 A    Uh-huh (affirmative).

9 Q    And that is -- also still remains unidentified after your

10 just -- most recent examination.  Is that correct?

11 A    Correct.  Let me make sure that I searched that palm for

12 sure.  I believe that I did.  Yes, and it still remains

13 unidentified.

14 Q    And Mr. Wells was specifically excluded at that time?

15 A    I have not been able to compare palm prints for Mr. Wells.

16 Q    Okay.  Just a minute.  No further questions.  Thank you.

17       THE COURT:  Redirect.

18 Q       MS. DUIGNAN:  Just briefly, Your Honor.

19                   **REDIRECT EXAMINATION**

20 BY MS. DUIGNAN:

21 Q    Had you received any palm print cards from anybody at the

22 communication station?

23 A    No, ma'am.

24 Q    And I'm not sure if the amount's right.  How -- you said

25 you had received 52 prints originally that came in to you --

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 36 of 217

1 A    I think it's --

2 Q    -- total?

3 A    -- lifts.  Lift cards.

4 Q    Lifts, rath -- lifts.

5 A    Yes.

6 Q    Fifty-two.

7 A    Yes.

8 Q    And you had mentioned how many you were able to use was

9 26?

10 A    There were 26 latent prints of value.  I don't know for

11 sure if it was on 26 different lifts, but --

12 Q    Okay.

13 A    -- there were 26 latent prints of value.

14 Q    So that would leave another 26, not 27, that were

15 unusable, if my math's right?

16 A    Sure.

17 Q    Okay.  Because --

18 A    I would --

19 Q    -- Mr. Curtner was saying --

20 A    -- have to count the list again.

21 Q    -- 27.  I wasn't sure.  I mean, 26 and 26 are 52.  In your

22 experience, how frequently -- what -- what's the percentage of

23 usable lifts when you get a whole bunch of lifts that come in?

24 A    It -- it varies.  We -- I help to actually teach the

25 Evidence Response Team how to do latent prints, and we always

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 37 of 217
(720) 384-8078   attrans@sbcglobal.net

1 try to encourage that if you bother to lift it, send it in.  So
2 even if they would lift, you know, the same print two or three
3 times and, you know, only one of them was good, we encourage
4 them to send all of them in.  So, you know, the percentage of
5 lifts -- it -- it definitely varies.  You know, some people
6 send in only the very good ones.  We encourage them to send in
7 everything.  So it -- it just really varies.  These lifts all
8 seem to have been done very well, though.  They just -- the
9 prints just weren't of value.
10 Q    Okay.  And if someone had been in the criminal or the
11 military database when you ran through this, you would have
12 been able to identify the other prints.  Is that correct?
13 A    This system's not perfect, but it -- it's highly likely
14 that if the prints that were in the system were good quality,
15 that -- that they -- that would have probably hit.
16 Q    Thank you.
17        THE COURT:  Redirect -- recross.
18                **RECROSS EXAMINATION**
19 BY MR. CURTNER:
20 Q    This -- the criminal database --
21 A    Uh-huh (affirmative).
22 Q    -- is that completely inclusive of anybody who might have
23 been charged or convicted of a crime?
24 A    It is inclusive -- it would be inclusive of anybody who
25 was arrested on federal charges for sure.  State and local,

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 743  Filed 09/23/14  Page 38 of 217
(720) 384-8078  attrans@sbcglobal.net

1  they sometimes submit in -- to the federal system and sometimes

2  they don't.

3  Q    Okay.  So that could be 50-percent inclusive of everybody

4  who's been charged with a crime or 90-percent, or who knows?

5  A    I have no idea of the number.

6  Q    All right, thank you.

7  A    No idea.

8         THE COURT:  Anything more on that subject?

9         MS. DUIGNAN:  No further questions, Your Honor.

10        THE COURT:  All right.  Thank you, ma'am, and you're

11  excused.  The government's next witness.

12     (Witness excused)

13        MS. LOEFFLER:  I'm sorry, the United States calls

14  Robert Morton.

15        THE COURT:  Okay.

16     (Side conversation)

17        THE COURT:  Go ahead.  Head up here.  There's a little

18  door there that pulls out.  Once you get there, you'll just

19  remain standing, and she'll swear you in.

20        THE CLERK:  Please raise your right hand.

21        **ROBERT J. MORTON, PLAINTIFF'S WITNESS, SWORN**

22        THE CLERK:  Thank you.  Please have a seat.  And, sir,

23  if you can please state and spell your full name.

24        THE WITNESS:  My name is Robert J. Morton.  That's M-o-

25  r-t-o-n.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 39 of 217
(720) 384-8078  attrans@sbcglobal.net

MORTON - DIRECT

1    THE CLERK:  And Robert's common spelling?

2    THE WITNESS:  Yes, ma'am.

3    THE CLERK:  Thank you.

4    MS. LOEFFLER:  Just a minute, Your Honor.  I was --

5    THE COURT:  Okay.

6    MS. LOEFFLER:  -- just getting exhibits lined up.

7    **DIRECT EXAMINATION**

8    BY MS. LOEFFLER:

9    Q    Mr. Morton, where do you work?

10   A    I work for the FBI and I work at the National Center for

11   the Analysis of Violent Crime.

12   Q    Okay.  What is your title with the FBI at the National

13   Center for the Analysis of Violent Crime?

14   A    I'm a supervisory special agent.

15   Q    What does a supervisory special agent mean versus -- we've

16   had some people who've said they're special agents.

17   A    It just means I have -- a slightly higher rank.

18   Q    Okay.  Now, what is the National Center for --

19   something -- of Violent Crime (indiscernible) --

20   A    The National Center for the Analysis of Violent Crime.

21   Q    Analysis.  I knew there was a word missing.  Analysis of

22   Violent Crime.  Explain.

23   A    It's basically a clearinghouse for state, local,

24   international law enforcement agencies.  And what we do is we

25   basically assist them in unusual, bizarre, or repetitive

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 743  Filed 09/23/14  Page 40 of 217
(720) 384-8078  attrans@sbcglobal.net

1  crimes.

2  Q    And how long have you worked there?

3  A    I've worked there for 16 years.

4  Q    And what types of -- what has been your role, if you can

5  give us a brief history of 16 years of work there.

6  A    Basically, as a supervisor there, you provide assistance

7  in -- in these unusual cases by doing a number of different

8  things, including crime scene analysis.

9  Q    And I -- we're going to get into the crime scene analysis.

10  Somebody's wiggling.  Am I standing too close or -- I'm okay.

11  Okay, thank you.  Are there other types of things that you have

12  consulted on in addition to your crime scene analysis duties?

13  A    Yes, there are.

14  Q    Okay.  What types of other things?

15  A    I've consulted on all types of serial murder cases, sexual

16  murder cases, domestic homicide cases, serial sniper cases,

17  just to name a few.

18  Q    And before you joined the National Center for the Analysis

19  of Violence Crime, did you have a career in law enforcement in

20  the FBI before that?

21  A    Yes, I did.  I spent -- as an agent, I spent 10 years in

22  the Chicago office.

23  Q    What types of things did you do in the Chicago office?

24  A    I worked not only terrorism, but I spent the greatest

25  majority of my time working violent street gangs.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 41 of 217
(720) 384-8078   attrans@sbcglobal.net

1  Q   Okay.  And I -- are there some, I mean, fairly well-known
2  cases that you have been -- testified in and worked the crime
3  scene?
4  A   Yes.  As part of my duties there, I was one of the team
5  leaders on the FBI's Evidence Response Team.
6  Q   Okay.
7  A   I went to the Oklahoma City bombing case, the Atlanta
8  Olympic bombing case, and 9-11 as well.
9  Q   Okay.  Now, what types of training have you had, both
10 training and experience, in crime scene analysis?
11 A   I've had a number of training blocks in crime scene
12 analysis.  Like I said, I was a -- an FBI ERT team leader.  I
13 also have a certification from the International Association of
14 Identification, which is an independent body, as a senior crime
15 scene analyst.  In order to obtain that, you are required to
16 not only have a prerequisite amount of experience and training,
17 but actually take a 400-question exam and then periodically --
18 it's about every four years, I believe -- you have to renew
19 that, take another exam to show that you're certified.
20 Q   Have you also taught in the area of -- that you -- in
21 these -- your areas of expertise?
22 A   Yes, I have.  I've taught not only in the United States
23 and law enforcement agencies, but all over the world.
24 Q   And did that include Alaska?
25 A   Yes, it did.

1  Q    Okay.  And I just -- where have you taught in Alaska?

2  A    I taught at the Alaska Peace Officer Association at a

3  meeting down in Kenai probably -- I guess 10 years ago.  And we

4  also -- the FBI put on a violent crime seminar here in

5  Anchorage a number of years ago as well.

6  Q    And have you been qualified as an expert in federal and

7  local courts around the country?

8  A    I've been certified in state courts, yes.

9          MS. LOEFFLER:  I would move Mr. Morton as an expert in

10 crime scene analysis at this point.

11         THE COURT:  Voir dire?

12         MR. OFFENBECHER:  No.

13         THE COURT:  He'll be received in that capacity.

14 BY MS. LOEFFLER:

15 Q    Now, Special Agent Morton, did you do a crime scene

16 analysis of the murders of Rich Belisle and James Hopkins?

17 A    Yes, I did.

18 Q    And can you get me through the procedure that you used to

19 do a crime scene analysis?

20 A    Yes.  A -- a crime scene analysis is basically a process

21 where you take a number of factors at the crime scene,

22 interaction between the offender and the victim, the nature of

23 who the victim is, the circumstances when that crime took

24 place, as well as the location where that crime took place.

25 Q    Now, did you physically travel to the COMMSTA in Kodiak to

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 743  Filed 09/23/14  Page 43 of 217
(720) 384-8078  attrans@sbcglobal.net

1  do your analysis?

2  A    No, I did not.

3  Q    And is that an important thing as part of your crime scene

4  analysis to you?

5  A    Sometimes it can be, but a -- a lot of times, based on the

6  cases that I look at, particularly in older homicide cases, the

7  crime scenes a lot of times have changed, and the benefit of

8  going directly to the scene is -- is -- is not so important

9  anymore.

10 Q    Okay.  So do you look at evidence that actually preserves

11 what the scene was at the time?

12 A    Yes, I do.

13 Q    Okay.  And did you in this case?

14 A    Yes, I did.

15 Q    And so we're talking about photographs, right?

16 A    Photographs, correct.

17 Q    Is that something that you commonly rely on to do a crime

18 scene analysis?

19 A    Yes, it is.

20 Q    Okay.  Now, in terms of -- let me just stop there a

21 second.  I'm sorry, I wanted to make sure somebody had left,

22 okay.  In terms of the analysis in this case, did you look at

23 the crime -- what did you look at with regard to Mr. Hopkins

24 and Mr. Belisle?

25 A    I reviewed all the crime scene photographs.  I reviewed

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 44 of 217
(720) 384-8078  attrans@sbcglobal.net

1    the autopsy reports.  I reviewed the autopsy photographs.  I

2    reviewed any of the investigative reports that dealt with that

3    building and that scene.

4    Q    And you talked earlier about what you're looking for as

5    the physical interactions.  And can you explain to the jury

6    what you mean by "I look at the physical interactions"?

7    A    Yes, I can.  And in any crime there's an action that goes

8    on between an offender and a victim.  An -- an offender has a

9    certain plan and goes forward interacting with that victim.

10   Now, based on that interaction, the victim can have a -- a

11   cause or effect with that offender or not, depending upon how

12   the -- the crime is set up.

13   Q    Before I get into your conclusion on this case, I think I

14   neglected to ask you how many crime scene analyses have you

15   done or reviewed in your career?

16   A    I really don't count.

17   Q    Okay.  Let me -- I know this is something that you hate

18   from lawyers, but are you talking over 100?

19   A    Yes.  I mean, I -- I -- I routinely look at between 60 and

20   70 cases a year.

21   Q    Okay.  Now, is there a specific type of crime scene

22   analysis or do you look at all of the -- I mean, have -- let me

23   ask it a better way.  In terms of your experience with murder

24   sites, do you have a familiar experience with all different

25   types of murders?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 743  Filed 09/23/14  Page 45 of 217
(720) 384-8078  attrans@sbcglobal.net

1   A    Yes, I do.

2   Q    Okay.  And based on that experience, in your analysis in

3   this case were you able to draw a conclusion of the nature of

4   the crime in this case?

5   A    Yes, I wa -- yes, I was.

6   Q    I'm going to ask you for your conclusion and then I'm

7   going to go through all the bases for that, if I may.  What was

8   the conclusion that you reached?

9   A    I believe that in this case the offender targeted Mr.

10  Hopkins and Mr. Belisle for a personal cause.

11  Q    When you say targeted for personal cause, can you explain

12  what you mean by that, please?

13  A    Yes.  It's -- it's a -- it's a label, if you will, that

14  basically identifies a set of characteristics where an -- an

15  offender has a -- a conflict with a victim or victims, and the

16  choice by the offender to end that conflict is in this case a

17  murder.

18  Q    Okay.  Now, when you say personal cause, I'm going to ask

19  you what led to that conclusion.  Did you eliminate some other

20  types of motives for murder?

21  A    Yes.  And through that process you -- I would have

22  eliminated a number of things, such as robbery, a random event,

23  et cetera.

24  Q    Okay.  Why did you eliminate robbery?

25  A    Because nothing was taken.

1   Q    Okay.  Why did you eliminate random event?

2   A    Because the nature of the facility, of the layout of the

3   building, and the fact that two victims, who just happened to

4   be there at the same time, were murdered kind of eliminated it

5   for me.

6   Q    I'm going to go to the -- actually, well, let's pull up

7   Exhibit -- I think it's 392, the chart, so I can go through

8   that.

9        (Side conversation)

10  Q    So I think you said a minute ago that a random event you

11  eliminated in part of the layout in the facility.  And I'll you

12  just to explain that a little further, Special Agent Morton.

13  A    Yes.  Not only is it the nature of the facility, but if

14  you think about it, if it's a random event, one of the other

15  things I look at is you look at victimology of the -- of the

16  two victims.  In other words, the lifestyle of those victims,

17  what they do for a living, how they make their living, how old

18  they are, et cetera; the crime rate of the community in

19  general; and a number of other things.

20  Q    When you say the lifestyle of the victims, can you further

21  elucidate that, please?

22  A    Yes.  If -- if -- if they're married, if they're in a -- a

23  stable relationship, if they have a steady job, if they're not,

24  to be crass -- if they're not a drug dealer engaged in -- in --

25  in those kind of activities.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 743  Filed 09/23/14  Page 47 of 217
(720) 384-8078  attrans@sbcglobal.net

1  Q   Now, did you also look at the -- we're going to come back

2  to this -- a second, but I want to get in -- did you try to do

3  an analysis to reach a conclusion of how the actual murders

4  come down within -- in the building?

5  A   Yes, I did.  Part of doing that crime scene assessment is

6  to determine -- is best as can be determined, the interactions

7  between that offender and that -- and those victims.

8  Q   I'm going to ask you -- let me start with Mr. Belisle.

9  And I am going to show you what's been marked as Exhibit 370.

10  If I put it on the doc cam, can -- so the jury can't see it?

11          UNIDENTIFIED SPEAKER:  Uh-huh (affirmative).

12          MS. LOEFFLER:  Counsel, 370 is the one I handed you,

13  that's this one.

14          MR. OFFENBECHER:  Yeah.

15      (Side conversation)

16  BY MS. LOEFFLER:

17  Q   Is 370 a photograph that you used in your analysis and

18  that actually has some of your handwriting on it?

19  A   Yes, it is.

20  Q   Okay.  And is it useful to help explain how you determined

21  your conclusion as to the shooting of Mr. Belisle?

22  A   Yes, it is, ma'am.

23          MS. LOEFFLER:  I'm going to move 370, but I'm going

24  to -- oh, that works much better.  And this is, Your Honor, one

25  of the pictures, but it has to use -- it's necessary to explain

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 48 of 217
(720) 384-8078  attrans@sbcglobal.net

1  this testimony.

2       THE COURT:  It has been admitted?

3       MS. LOEFFLER:  It has not, because this is the one that

4  has his handwriting on it.

5       THE COURT:  Okay, so are you seeking --

6       MS. LOEFFLER:  I'm moving the -- 370.

7       THE COURT:  Any objection?

8       MR. OFFENBECHER:  Subject to earlier discussion, Your

9  Honor.

10       THE COURT:  Okay.  It will be admitted.

11    (Plaintiff's Exhibit 370 admitted)

12  BY MS. LOEFFLER:

13  Q    So on 370, with Mr. Belisle, those are actually your

14  drawings on it?

15  A    Yes, ma'am.

16  Q    And I'm just going straight to -- what was your conclusion

17  about how the interactions with Mr. Belisle happened?

18  A    Based on the physical evidence that was there -- in other

19  words, the trajectory of the bullets, where the rounds were

20  recovered inside of the floor -- I determined that it appeared

21  Mr. Belisle was sitting with his back to the door, probably in

22  a chair.  The first shot struck him on the left side, going

23  through and exiting into the floor over to where -- closest to

24  the wall.  And then he fell down face down and it was sometime

25  after that that he received the other two wounds.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 743  Filed 09/23/14  Page 49 of 217
(720) 384-8078  attrans@sbcglobal.net

1  Q   Okay.  And I'm going to show you what's been marked as

2  Exhibit 371 and ask you, does that -- also a photograph from

3  the crime scene that has your actual notation on it?

4  A   Yes, it is.

5  Q   And is this part of -- will help to explain why you

6  believe that that's the order of shots of Mr. Belisle?

7  A   Yes, it does.

8       MS. LOEFFLER:  I move Exhibit 371.

9       THE COURT:  It'll be received.

10      (Plaintiff's Exhibit 371 admitted)

11 BY MS. LOEFFLER:

12 Q   Okay.  Okay, we just had 370 up, and what is it about 371

13 that led to your conclusion?

14 A   If --

15 Q   Oh, by the way, you have a -- you should have a laser

16 pointer there, so if you could explain it to the jury with a

17 laser pointer.

18 A   This is the round that I think was the first round, that

19 would have entered his left side and exited his right side,

20 striking the floor.  This is the second round that was fired

21 through his right side that exited.  He was found originally

22 face down, right on top of this bullet hole.  And if you look

23 at the pictures, the trajectory actually matches up with the

24 shot to the right side -- right of the chest, going here and

25 entering the floor.

MORTON - DIRECT

1  Q    Okay.

2  A    That's how I determined my sequence of events.

3  Q    Okay.  I will take this off now.  Thank you.  And Mr.

4  Belisle -- were there two shots or were there any more shots

5  into Mr. Belisle?

6  A    There was three.

7  Q    Okay.  So now I'm going to go -- we don't have to show the

8  photos of Mr. Hopkins -- well, let me ask, was it a little --

9  was it difficult to piece together the analysis for Mr.

10 Belisle?

11 A    Yes, it was.

12 Q    Okay.  Why?

13 A    It was very confusing, simply because of the fact that

14 there's a number of wounds, some of which started on the left

15 side -- one of which started on the left side, two of which

16 were in the right side.  And to figure out the -- the sequence

17 of events and matching it up to the evidence took me some time.

18 Q    With regard to Mr. Hopkins, what was your conclusion?

19 A    I believe that the offender entered into the facility,

20 shot Mr. Belisle first, stepped out, and then first shot to Mr.

21 Hopkins was the one into his face.

22 Q    Let me put the chart at -- 392 back up, please.  So using

23 your later -- laser pointer, can you explain how you believe

24 the interactions between the perpetrator and the two victims

25 happened?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 51 of 217
(720) 384-8078   attrans@sbcglobal.net

**MORTON - DIRECT**

1   A    Yes.  The offender entered here, walked over here, shot

2   Mr. Belisle here, stepped out, fired at Mr. Hopkins.  After

3   that, based on the evidence, I can't really give you a sequence

4   of the shots that occurred other than the fact that he shot

5   twice more into Mr. Belisle and once more into Mr. Hopkins.

6   Q    Okay.  Now, based on those interactions, you said earlier

7   that you thought this was a personal cause homicide.  What was

8   it about the shooting that led you to that conclusion?

9   A    Based on the wounds and the locations and the positions of

10  the victims, this offender's choice in this matter was

11  basically to just confront them with a gun and shoot them.

12  Doesn't appear to be any verbal interaction at all, based on

13  their body positions and their wounds.

14  Q    Okay.  And is there anything about the patterns of the

15  shots that led you to that?

16  A    Yes, the -- both first shots to both victims were

17  obviously incapacitating, at a minimum.  The other shots that

18  followed were definitely done to ensure that the victims were

19  killed.  It was a coup de grace shot --

20  Q    You said coup de grace.

21  A    -- or shots.

22  Q    That's a French term.  Can you -- what does in the

23  meantime?

24  A    It's a French word that means basically "the end."

25  Q    Okay.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 52 of 217
(720) 384-8078   attrans@sbcglobal.net

1  A    Finishes it.

2  Q    And based on or experience, is that consistent with sort

3  of random -- or the, you know, nonpersonal murders that you've

4  seen?

5  A    Yes.  It -- it reflects the -- the need of the offender to

6  ensure that these victims are dead.

7  Q    Now, based on, again, your analysis and your experience,

8  did you reach a conclusion as to whether one or both of these

9  appeared to be the targets of the murderer?

10 A    It -- based on their daily routine, where they're both

11 into the building at an early hour, if an offender was going to

12 target either one separately, there would have been better

13 times or choices to do that.  Offenders choose victims if

14 they're -- if they're going to commit a -- a murder like this

15 based on availability and vulnerability, availability just

16 meaning that the offender chooses a time when they can get to

17 the victim.  Vulnerability means that they're in a position

18 where the offender has the advantage to take advantage of the

19 situation and complete their crime.  In this case, by basically

20 going into a building and attacking two people, it shows that

21 both victims were intended targets.

22 Q    Now, is there anything about the weapon or the load in the

23 weapon that affected your conclusions or had any impact on your

24 conclusions?

25 A    Yes, it did.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 743  Filed 09/23/14  Page 53 of 217
(720) 384-8078  attrans@sbcglobal.net

1  Q    And can you explain that, please?

2  A    Yes.  The -- the choice of the weapon -- very obviously, a

3  .44 Magnum is a very powerful handgun.  The use of that was

4  deliberate by the offender, shows that the offender was

5  competent with it, confident with it, and -- and brought it

6  with him because he knew it would inflict enough damage to kill

7  these two victims.

8  Q    How long would it take to do this?

9  A    Not very long.

10  Q    If I can have just a minute.  I have nothing further at

11  this time.

12        THE COURT:  Cross-examination.

13    (Side conversation)

14        MR. OFFENBECHER:  Just a minute, Your Honor.

15                    **CROSS-EXAMINATION**

16  BY MR. OFFENBECHER:

17  Q    Mr. Morton, good morning.

18  A    Good morning.

19  Q    Mr. Morton, you've indicated that you have done a number

20  of different crime scene analysis -- analyses before, right?

21  A    Yes, sir.

22  Q    Hundreds, perhaps.  Is that right?

23  A    If not more, yes, sir.

24  Q    Okay.  And you've indicated that one of the cases you

25  worked was the Atlanta bombing case.  Is that right?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 54 of 217
(720) 384-8078   attrans@sbcglobal.net

1  A    I worked that case from an evidence standpoint, sir.

2  Q    And what was your involvement in that case?

3  A    I was again a -- a team leader on the Evidence Response

4  Team and I picked up evidence in that case.

5  Q    Did you do the crime scene analysis on that case?

6  A    No, I did not.

7  Q    Okay.  Did the FBI do the crime scene analysis on that

8  case?

9  A    I don't think a crime scene analysis was done in that

10  case.

11  Q    So the FBI was not involved in any crime scene analysis?

12  A    The FBI -- in other words, it was -- it was a bombing

13  scene.  The -- the -- our Explosives Unit may have done some

14  kind of assessment of what the bomb was, but I did not do that.

15  Q    Okay.  Did the FBI do any of the other followup on the

16  Atlanta bombing investigation?

17  A    Yes, they did.

18  Q    As it turns out, the FBI had the wrong man in the Atlanta

19  bombing investigation.  Isn't that right?

20  A    Oh, eventually they caught Eric Rudolph.

21  Q    Right, but he -- person who was originally indicated as a

22  suspect turned out to be the wrong person, is that right?

23  A    That's correct, sir.

24  Q    Now, Mr. Morton, you've indicated in your report and also

25  in your -- you've provided a report to the government in this

1 case.  Right?

2 A    Yes, sir, I did.

3 Q    And that report was provided on October 11th, 2013.

4 Right?

5 A    Yes, sir, I believe that's correct.

6 Q    You've indicated in your report that complete

7 information -- and also in your direct examination that

8 complete information about the victim of a crime is an

9 important part of the crime scene analysis.  Is that right?

10 A    Yes, it is, it's part of it.

11 Q    Well, you indicated in your report that it's an important

12 part of the crime scene analysis?

13 A    That's correct, sir.

14 Q    Because an individual's personality and lifestyle will

15 affect their chances of becoming a victim.  Right?

16 A    That's correct.

17 Q    And so as you testified in your direct examination, one of

18 the things you want to do is find out -- you're assuming

19 there's some kind of conflict in this case between the

20 perpetrator and the victims.  Right?

21 A    That's correct.

22 Q    And you want to find out if you can figure out what that

23 conflict might be.  Right?

24 A    That's correct.

25 Q    And so your job, as you testified on direct examination,

1  would be to eliminate any other motives for this.  Is that

2  right?

3  A    As best that I can, yes, sir.

4  Q    Such as robbery or some other random event, right?

5  A    Correct.

6  Q    But part of what you want to know is about the personal

7  lives of the decedents in order to determine whether there were

8  any other controversies in their lives.  Right?

9  A    That's correct.

10  Q    That's part of your job in attempting to determine what

11  kind of a motive there is.  Right?

12  A    That's correct.

13  Q    So, for example, you would want to look into the personal

14  lives of the decedents to find out what was going on in their

15  lives, any controversies that might make them the victim of a

16  violent crime.  Right?

17  A    That's correct.

18  Q    Now, in this case you have indicated on direct examination

19  that you reviewed the autopsy reports, right?

20  A    Correct.

21  Q    Autopsy photos, right?

22  A    Correct.

23  Q    You also reviewed the photographs, all the crime scene

24  photographs in this case?

25  A    Yes, sir.

1  Q    And that's how you came to your conclusion in this case.

2  Is that right?

3  A    That's correct.

4  Q    Were there any other items that you reviewed in

5  preparation for your opinion in this case?

6  A    Yes.  As far as the analysis was concerned, I also looked

7  at investigative reports concerning the movement of vehicles

8  around that facility as well.

9  Q    Okay.  Investigative reports around the movement of the

10 facil -- vehicles.  Anything else?

11 A    Not that I can recall.

12 Q    So in preparation, you were not provided, for example, the

13 interviews of Hannah Belisle in this case.  Is that right?

14 A    Not to my knowledge, sir.  I don't remember reviewing

15 those.

16 Q    You remember reviewing the interviews of Deborah Hopkins

17 in this case?

18 A    Again, I don't remember specifically reviewing those.

19 Q    Do you remember reviewing the interview of Nicola Belisle

20 in this case?

21 A    I don't recall, sir.

22 Q    Do you remember interview -- reviewing the interview of

23 Angela Birchfield?

24 A    I don't recall.

25 Q    Do you remember the interview of Jillian Martinez?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 58 of 217
(720) 384-8078  attrans@sbcglobal.net

1  A    No, sir.

2  Q    Do you remember the interview of Anthony Pecoraro?

3  A    Now.

4  Q    Do you remember the interview of Carsten Stoeckler?

5  A    No, sir.

6  Q    Well, let's look about -- at the information you've

7  indicated would be important, any controversies in the

8  individuals' lives or any other motives for homicide, because

9  that's really a subject that you're familiar with.  Right?

10  A    Correct.

11  Q    So, for example, you would want to find out about the

12  financial circumstances of the decedents to determine whether

13  there were any possible financial motives for a homicide.

14  Right?

15  A    Yes, sir, in general.

16  Q    So -- well, in particular, you would want to know if any

17  particular person stood to gain financially from the death of

18  either of the decedents.  Right?

19  A    Yes, sir.

20  Q    For example, if there were a large life insurance policy

21  that was going to go to someone as a result of the death of

22  the -- one of the decedents, you would want to know that,

23  wouldn't you?

24  A    Yes, that would be one factor weighed against the other

25  factors.

MORTON - CROSS

1  Q   Right.  But that's information -- if you were going to

2  look at the whole big picture, that's information you would

3  want to know.  Right?

4  A   Yes, sir.

5  Q   And were you provided any such information in this case?

6  A   I was provided general information concerning the victims.

7  Q   I'm sorry?

8  A   I was provided general information concerning the victims.

9  Q   Okay.  Were you provided any information that anyone stood

10 to gain financially from the death of either of the decedents

11 in this case?

12 A   Not that I can recall.  I'm sure everybody has life

13 insurance, so -- I don't recall anything unusual in that

14 aspect.

15 Q   Okay.  I just want to know whether the government provided

16 you in this case any information that any person would stand to

17 gain financially from the death of one of the decedents.  Any

18 specific information, not just general information about life

19 insurance.

20 A   I -- I remember hearing about life insurance, which is why

21 I brought that up, sir.

22 Q   What do you remember about life insurance?

23 A   One or both of them had life insurance, just like

24 everybody else does, sir.

25 Q   Everybody has life insurance?

1  A    Almost everybody has life insurance.

2  Q    Okay.  Who was the beneficiary in this case of the life

3  insurance policies?

4  A    I believe both wives were the beneficiaries.

5  Q    And what were the amounts of the life insurance in this

6  case?

7  A    I don't recall, sir.

8  Q    Were there any other benefits that would go to any person

9  at all as a result of the death of the decedents in this case?

10  A    Not to my knowledge.

11  Q    The prosecutors didn't give you any other information on

12  that, did they?

13  A    No.

14  Q    You would also want to know in evaluating any possible

15  motives whether there had been any conflict between either of

16  the two spouses about how either of the decedents' property

17  would be distributed in the event of the decedents' death,

18  wouldn't you?

19  A    Sometimes, yes.

20  Q    Well, if there had been any controversy between either of

21  the decedents and their spouses about how property would be

22  distributed in the event of the decedent's death, if there'd

23  been any controversy or argument between them, that's something

24  you would want to know, right, to weigh in the big picture?

25  A    Yes.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 743  Filed 09/23/14  Page 61 of 217
(720) 384-8078  attrans@sbcglobal.net

MORTON - CROSS

1  Q    And you weren't provided any of that type of information

2  in this case, were you?

3  A    No.

4  Q    An intimate or romantic relationship can also provide a

5  motive sometimes for a violent act such as a homicide.  Right?

6  A    That's correct.

7  Q    So you would want to know about the nature of the romantic

8  or marital relationship of a decedent in order to form an

9  opinion about a possible motive, wouldn't you?

10 A    Yes.

11 Q    And you testified on direct examination that you -- your

12 understanding is that there was no such problem in the

13 marriages of either of these folks.  Right?

14 A    Not at the time of the incident.

15 Q    Okay.  Were you aware of it at any other time?

16 A    I was aware there -- there was one incident involving Mr.

17 Belisle, yes.

18 Q    Okay.  And what was the incident involving Mr. Belisle

19 that you're aware of?

20 A    I believe it was infidel -- infidelity.

21 Q    And do you know when that was?

22 A    I have no idea, sir.

23 Q    So in forming your opinion, you would want to know whether

24 either of the spouses had been having any extramarital

25 relationships, basically.  Right?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 743  Filed 09/23/14  Page 62 of 217
(720) 384-8078  attrans@sbcglobal.net

1  A    Correct.

2  Q    Because that's the kind of a thing that could precipitate

3  in some cases a homicide or some other violent act.  Right?

4  A    That's correct.

5  Q    And you would want to see, for example, if the surviving

6  spouse is all of a sudden intimately involved with another

7  partner, wouldn't you?

8  A    Yes, sir, based upon other factors in the case as well,

9  yes.

10 Q    You would want to know that because that might be evidence

11 of some other premar -- predeath marital relationship.  Right?

12 A    It may.

13 Q    And you weren't provided any such information in this

14 case, were you?

15 A    No.

16 Q    You would want to know generally in forming your opinion

17 whether either decedent or their spouse upon discovering any

18 infidelity made any threatening statements to the other spouse.

19 Right?

20 A    Yes, sir.

21 Q    Any ultimatum-driven statements about the infidelity.

22 Right?

23 A    That's correct.

24 Q    And did the prosecutors in this case provide you any such

25 information?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 743  Filed 09/23/14  Page 63 of 217

1   A    Other than what I stated earlier, that I generally knew

2   that there had been an infidelity earlier in the -- in the

3   relationship, but at the -- at the time of the incident there

4   was no such thing.

5   Q    And the -- no information regarding that was provided to

6   you.  Isn't that right?

7   A    Correct.

8   Q    About any threat?

9   A    Correct.

10  Q    Were there -- were there any information about any threats

11  being made regarding infidelity at any time?

12  A    Not that I recall, sir.

13  Q    You've indicated in your report that it would be important

14  for you to find out whether either of its decedents or their

15  spouses had engaged in any high-risk behaviors.  Right?

16  A    Correct.

17  Q    And when you say high-risk behaviors, what do you mean?

18  A    High-risk behavior are -- are things like dealing in

19  criminality, engaging in other very reckless conduct that puts

20  them in a position where somebody would commit a violent crime

21  against them.

22  Q    And you would include in that -- in reckless conduct other

23  infidelities, for example, like swinging and things like that?

24  A    That may have -- that may have a bearing, yes, sir.

25  Q    You would also -- because that might generate negative

1  emotions or jealousy in another person?

2  A    It may.  Yes, sir.

3  Q    In determining what motive might be for a homicide, you

4  would also want to know whether either of the wives of the

5  decedents believed that her husband was planning on abandoning

6  her, on leaving his wife.  Wouldn't you want to know that?

7        MS. LOEFFLER:  I'm going to object.  Assumes facts not

8  in evidence.  Been brought up lots of times.  Nobody's -- well,

9  sorry, I'll stop.

10        THE COURT:  Well, I have told the jury very clearly,

11  the questions of attorneys are not evidence.  I'll say it

12  again.  Go ahead.  Go ahead.

13        MR. OFFENBECHER:  Sure.

14  BY MR. OFFENBECHER:

15  Q    Well, you would agree, wouldn't you, that the actual or

16  perceived abandonment of a sexual intimate like a marital

17  partner could be a reason for a homicide.  Is that right?  And

18  that's information that you'd at least want to know.  Right?

19  A    Yes, sir.

20  Q    You would want to know whether either of the decedents had

21  been perhaps disparaging or engaged in angry talk with his

22  spouse about their attractiveness, for example, or made other

23  disparaging comments.  Is that right?

24  A    Yes, sir, that may have some bearing.

25  Q    And you would want to know, in terms of determining

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 743  Filed 09/23/14  Page 65 of 217
(720) 384-8078  attrans@sbcglobal.net

1  motive, whether one of the spouses was imminently intending to

2  leave the other spouse, because that could generate negative

3  emotions.  Right?

4  A    Yes, it may.

5  Q    You would want to know, in determining the overall motive,

6  whether the mistress or whatever word you would want to use,

7  the paramour, of one of the decedents was engaging in any kind

8  of stalking behavior of the decedent.  You would want to know

9  that, wouldn't you?

10  A    Yes, sir.

11  Q    And were you provided any such information about that in

12  this case?

13  A    No, sir.

14  Q    You would want to know if the spouse who had been cheating

15  on his other spouse had incurred --

16       MS. LOEFFLER:  I'm going to object again, Your Honor.

17  They're -- this is just rank speculation.

18       MR. OFFENBECHER:  No, it's not.  This all comes from

19  FBI interviews, Your Honor.

20       THE COURT:  Well, all I'm saying is, first of all, let

21  me rule.  We can go on and on and on.  That's why I keep

22  cautioning the jury, questions of attorneys are not evidence.

23  Sometimes you get questions because people are entitled to ask

24  questions, and later the evidence supports it or doesn't

25  support it.  That's why we tell you don't place weight on

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 743  Filed 09/23/14  Page 66 of 217
(720) 384-8078  attrans@sbcglobal.net

1  questions.  That's all I can say.

2  BY MR. OFFENBECHER:

3  Q    And I'm -- just to be clear, I'm just asking you whether

4  these are factors that could be important and whether you have

5  any information on it, that's all.

6  A    Yes, sir, they could be important.

7  Q    Sure.  And information that the spouse had encouraged his

8  spouse to directly engage with the jilted mistress on Facebook

9  and email and so forth, that would be information you'd want to

10 know if it was there.  Right?

11 A    Correct.

12 Q    And you weren't provided any such information in this

13 case, were you?

14 A    No, sir.

15 Q    In terms of financial problems, financial problems can

16 sometimes cause emotions or get people into trouble where

17 there's violence or homicide.  Right?

18 A    Yes, sir.

19 Q    So you would want to know in determining the motive and

20 doing your crime scene analysis and what you call victimology.

21 Right?

22 A    Correct.

23 Q    You call it victimology?

24 A    Yes, sir, I do.

25 Q    You would want to know whether either the decedent or his

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 67 of 217
(720) 384-8078  attrans@sbcglobal.net

1    spouse or associates were experiencing some financial problems,

2    wouldn't you?

3    A    Yes, sir.

4    Q    Or had high anxiety or stress over debt levels, right?

5    A    Yeah, it may have -- that may have a bearing.

6    Q    That could have a bearing in your determination of the

7    motive or the reason for the homicide.  Right?

8    A    Correct.

9    Q    And were you provided any such information by the

10   prosecutors about that?

11   A    Other than I originally stated, I received general

12   information about the victims.

13   Q    All right.  And here's my question.  Did you receive any

14   information that either of these decedents or their spouses

15   were -- had financial problems or were suffer -- were

16   experiencing stress over high debt?

17   A    Not that I recall.

18   Q    There are other possible motivations that you as a

19   professional look at, other facts that could provide a

20   motivation for homicide besides the ones we've talked about.

21   Right?

22   A    Yes, sir.

23   Q    For example, if a decedent has -- is either a law

24   enforcement officer or is a former law enforcement officer,

25   that's a fact that could be important to you.  Right?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 743  Filed 09/23/14  Page 68 of 217

1   A    It may, yes, sir.

2   Q    And that's because a former law enforcement officer may

3   have made enemies of people in the criminal life.  Isn't that

4   right?

5   A    That's correct.

6   Q    And so one of the things you want to look at is whether a

7   former law enforcement or a law enforcement officer has made an

8   enemy of the -- by arresting someone or prosecuting someone,

9   and then that criminal might want to come back and get revenge.

10  Right?

11  A    That's possible, yes, sir.

12  Q    And so that's a fact you would want to know about whether

13  either of the decedents had been a former criminal -- a former

14  law enforcement officer?

15  A    Yes, sir.

16  Q    And the prosecutors didn't provide you any information

17  about that in this case, did they?

18  A    Not per se.  I don't recall that either one of them was a

19  law enforcement officer, sir.

20  Q    And you weren't provided any information that either of

21  these decedents had been involved in law enforcement, were you?

22  A    No.

23  Q    You know from your experience that the other family

24  members besides the spouse -- for example, the children or

25  other relatives -- can also generate emotions that might result

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 743  Filed 09/23/14  Page 69 of 217
(720) 384-8078  attrans@sbcglobal.net

1  in some kind of violence or homicide.  Right?

2  A    They may, yes, sir.

3  Q    For example, one's children sometimes can, you know --

4  there can be conflict between a parent and a child?

5  A    Correct.

6  Q    And that that family conflict can sometimes go -- not

7  usually, but sometimes escalate into some kind of violent

8  misconduct.  Right?

9  A    Yes, sometimes it can.

10 Q    And so you would want to know whether either of the

11 decedents in this case was experiencing a significant

12 disciplinary problem with a child that could possibly have

13 escalated into a violent confrontation, wouldn't you?

14 A    Yes, sir.

15 Q    And the prosecutors in this case didn't give you any

16 information that there was any such disciplinary problem in

17 this case, did they?

18 A    No, sir.

19 Q    You would want to know, in determining your motive, as

20 you -- as you've indicated, and the personal circumstances of

21 the decedent -- you would want to know whether any of the close

22 family members of the decedents or associates were closely and

23 intimately involved with individuals who are criminals or

24 involved in drug dealing or things like that.

25        MS. LOEFFLER:  Objection, Your Honor.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 70 of 217
(720) 384-8078  attrans@sbcglobal.net

1    MR. OFFENBECHER:  Is that --

2    MS. LOEFFLER:  This one I know -- for the reasons that

3 we've stated before.

4    MR. OFFENBECHER:  Your Honor, this is straight from the

5 FBI interviews.  I'm asking the questions.

6    THE COURT:  Well, listen.  I -- people can come up with

7 all kinds of theories.

8    MS. LOEFFLER:  Okay.

9    THE COURT:  Counsel are asked to -- are allowed to ask

10 questions.

11    MS. LOEFFLER:  Right.

12    THE COURT:  Questions are not evidence.  And someti --

13 and we have to keep telling you that, because if it comes in

14 the courtroom, probably someone says, "Well, I heard it in

15 court."  That's why I told you, ladies and gentlemen, if you

16 heard it in the courtroom it's not evidence unless it comes

17 from a witness or through the exhibits or agreement of the

18 parties.  Can I be any clearer?  I think I've done a good job

19 of explaining that.  So I'm allowing some leeway.

20    MR. OFFENBECHER:  All right.  And --

21    THE COURT:  But --

22    MR. OFFENBECHER:  -- just so we're clear, all I'm --

23 yeah --

24    THE COURT:  Your job is to ask the questions --

25    MR. OFFENBECHER:  Right.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1      THE COURT:  -- but it's not evidence.

2      MR. OFFENBECHER:  Right.

3      THE COURT:  Okay.

4  BY MR. OFFENBECHER:

5  Q   And it's not evidence.  I'm just asking you, if that fact

6  were there, would it be important to your determination, and

7  you're answering the question.

8  A   It -- it -- it --

9      THE COURT:  So your question --

10      THE WITNESS:  -- may be, yes.

11      THE COURT:  Let me ask --

12      MR. OFFENBECHER:  Yeah.

13      THE COURT:  -- it -- your questions are hypothetical,

14  in the event.

15      MR. OFFENBECHER:  Right.  If there were any such

16  information, exactly.

17  BY MR. OFFENBECHER:

18  Q   If there were any such information, that might be

19  important to you, right?

20  A   It may be, yes, sir.

21  Q   And the prosecutors did not provide you any information on

22  that topic, did they?

23  A   No, sir.

24  Q   You would also want to know, Mr. Morton -- in determining

25  whether there's anybody who might be interested in harming

1  these individuals, you would want to know whether either of the

2  decedents had recently taken any legal action against a violent

3  or criminal person that -- and thus might end up being the

4  object of that person's revenge.  Right?

5  A    I'm -- I'm not clear on your question.

6  Q    Yeah, because I didn't articulate it very well.  Let me

7  try again.  You would want to know whether the decedent, one of

8  the decedents or their close family members, had recently taken

9  legal action against some other criminal person.  For example,

10  if there -- had taken out a restraining order or something like

11  that, you would want to know, because that person against whom

12  the restraining order was taken might want to seek revenge for

13  that, right?

14  A    Again, that may be, yes.

15  Q    And you weren't provided in this case by the prosecutors

16  any information regarding that, were you?

17  A    No.

18  Q    Now, as a trained criminal investigator, you would expect

19  there to be interviews of close family members regarding these

20  topics, right?

21  A    Correct.

22  Q    And you would expect the investigating agency, in this

23  case the FBI or the Coast Guard Investigative Service, to

24  conduct close interviews of those family members to determine

25  the facts that we've just talked about.  Right?

1  A    Yes, sir.

2  Q    And if you were a trained criminal investigator and these

3  people were interviewed and they made false statements to the

4  investigators, that would be something that you would want to

5  know about too, isn't it?

6  A    Correct.

7  Q    Because the fact that a spouse or close family member made

8  false statements in official investigation to the FBI or the

9  Coast Guard Investigative Service would be something that would

10 cause you suspicion about what the true motives for the

11 homicide were.  Right?

12 A    Yes, sir, again, it may.

13 Q    And in this case, the government has not provided you any

14 such information, have they?

15 A    No, sir.

16 Q    Mr. Morton, you talked on direct examination about whether

17 both of these individuals were targets of the perpetrator or

18 whether just one of them was a target of a perpetrator.  Is

19 that right?

20 A    That's correct.

21 Q    Now, in this case, the person who came into the T2 rigger

22 shop shot and killed Mr. Belisle first, you indicated.

23 A    Well, he shot Mr. Belisle first.

24 Q    That's your analysis?

25 A    Correct.

1  Q    And then shot Mr. Hopkins.  Is that right?

2  A    Correct.

3  Q    And that's based on your assessment of the physical

4  evidence and the photographs?

5  A    Correct.

6  Q    Is it fair to say that your experience sometimes -- and in

7  your experience in Chicago and all around the country in these

8  cases, that sometimes a single person is targeted but there are

9  other people who are present at the scene and that they are

10 killed so that they won't be a witness to the targeted

11 homicide?

12 A    Such things are possible, yes, sir.

13 Q    Well, surely in your years in Chicago there have been

14 instances in which a per -- an individual was targeted and

15 somebody else was there, for example, a spouse, a co-worker, a

16 friend, somebody walking down the street who might be a witness

17 to the crime.  Right?

18 A    Would -- would somebody else be at the crime and be a

19 witness?  Is that what you're asking me, sir?

20 Q    Right.

21 A    There could be, yes.

22 Q    And that the person who killed the targeted person didn't

23 want there to be a witness to the crime.  Right?

24 A    That could be possible too, yes, sir.

25 Q    And that person who was merely a witness to the targeted

1  event would also be killed so that there wouldn't be any

2  witnesses.  Is that right?

3  A    That's entirely possible.

4  Q    And you've had cases where that's happened before.  Right?

5  A    Not in this set of circumstances, though.

6  Q    Right.  But I'm just talking about generally, the fact

7  that there --

8  A    Yeah, generally, if you -- I'll -- let me -- I'll answer

9  your quest -- generally, if you look at certain murder cases,

10  there are instances where there's more than one -- the victim

11  is there and somebody else is there and somebody else will get

12  shot.  That usually falls along the lines, though, when you're

13  talking about people involved in criminality.

14  Q    Now, in this case, the perpetrator came in and shot Mr.

15  Belisle, right?

16  A    Yes, sir.

17  Q    And, in fact, the perpetrator shot everybody that was at

18  the T2 rigger shop that morning.  Is that right?

19  A    That's correct.

20  Q    So that if somebody else had come in earlier that day out

21  of schedule and just happened to be in the break room, that

22  person might have been killed as well.  Right?

23  A    Only if you go along the theory that -- that the -- one of

24  the victims was killed because they were a witness instead of

25  both victims being targeted.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 76 of 217
(720) 384-8078  attrans@sbcglobal.net

1  Q    And that happens sometimes, you said?

2  A    Possible, yes.

3  Q    Part of your -- the premise of your opinion that they're

4  both targets rather that -- one, is that they were both --

5  these two individuals both were in the building at the time the

6  shooting occurred.  Is that right?

7  A    That's one of the factors, yes, sir.

8  Q    That assumes that the person who did the shooting actually

9  knew the schedules of both of the persons.  Right?

10  A    Yes, it does.

11          MR. OFFENBECHER:  I don't have any other questions,

12  Your Honor.

13          THE COURT:  Redirect.  It is break time, but if we can

14  finish it up before break, I -- unless everybody's -- is that

15  okay, try to finish this witness?

16          MS. LOEFFLER:  Yes, Your Honor.

17          THE COURT:  Okay, good.

18                    **REDIRECT EXAMINATION**

19  BY MS. LOEFFLER:

20  Q    Special Agent Morton, first, if somebody was a military

21  police officer a decade before these events, would that weigh

22  really heavily in your analysis of motivation?

23  A    No, it would not.

24  Q    Okay.  So the time period of these alleged statements

25  would actually matter?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 743  Filed 09/23/14  Page 77 of 217

1  A    Yes, they would.

2  Q    Okay.  Now, Mr. Offenbecher asked you about the fact that

3  sometimes when somebody's killing one person, there are

4  circumstances when someone else might get killed as sort of

5  collateral damage, I'm going to call that.

6  A    Yes.  Yes, ma'am --

7  Q    Okay.

8  A    -- that's possible.

9  Q    Did that appear to apply at all in this circumstance?

10  A    No, it did not.

11  Q    Why not?

12  A    The -- the choice of the building, first of all, to walk

13  in there to shoot someone, there's vehicles parked outside, so

14  whenever the offender's entering the building, he knows there's

15  more than one person in there to begin with.  The layout of the

16  building being very unusual, this -- this offender had to

17  confront one victim, turn around and confront the other victim

18  almost immediately.

19  Q    Because there -- let me just ask that.  Because there's

20  lots of rooms.  If you don't know the building, other --

21          MR. OFFENBECHER:  Objection.  That's a leading question

22  now --

23          MS. LOEFFLER:  I haven't finished --

24          MR. OFFENBECHER:  -- on redirect.

25          MS. LOEFFLER:  -- the question.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 743  Filed 09/23/14  Page 78 of 217
(720) 384-8078  attrans@sbcglobal.net

1    MR. OFFENBECHER:  It's leading.

2    THE COURT:  But it starts -- it sounds leading.

3    MS. LOEFFLER:  Okay.  I'm leading as a foundation.

4    THE COURT:  Okay.

5    MS. LOEFFLER:  Okay.

6    MR. OFFENBECHER:  Now --

7 BY MS. LOEFFLER:

8 Q    You said the building was unusual.  Explain to the jury

9 why you mean it's unusual.

10 A    The building's unusual because, unless you had a -- a key

11 card to get into the building, the only door that was unlocked

12 was a door that -- that led into that, basically, locker

13 storage room.  So when you entered that building, you would

14 have had to make an immediate left and then make a right and go

15 around into the office where Mr. Belisle was, come out of

16 there, stand into that same central hallway, and then engage

17 with Mr. Hopkins.

18 Q    And let's put up 392 again for a sec.  Okay, there we go.

19 So when you -- whoops, we just went up and we went down again.

20 Okay.  So --

21    (Side conversation)

22 Q    So if you look at this building, and you don't know the

23 building, and you come in, how are you going to know where

24 people are?

25 A    I don't think you are, because you come in here.  There's

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1  a locker room.  This is where Mr. Belisle was.  This is where
2  Mr. Hopkins was.  So when you come in here, you're basically
3  not looking at anybody or anything.  You're looking basically
4  at a -- at a storage area.  It's not a public building, so
5  there's no main entrance where you can walk up to a desk and
6  say, "I need something."  So whoever comes in here has to hunt
7  out and find the victim, the first victim here, Mr. Belisle,
8  come back out, and then engage with Mr. Hopkins.
9  Q   Okay.  And is this building -- have -- if somebody -- if
10 there -- if you don't know the schedule, are there places --
11 lots of places in this building where people could be?
12     MR. OFFENBECHER:  Objection.  That's a leading
13 question.
14     MS. LOEFFLER:  No, it isn't.  Didn't ask him yes or no.
15 Well, actually, I did.  I'll come back and I'll phrase it
16 again.
17     THE COURT:  Okay.
18     MS. LOEFFLER:  How's that.
19 BY MS. LOEFFLER:
20 Q   Okay, if you don't know this building, are -- is there
21 anything about it that would make it difficult if you're trying
22 to target somebody?
23 A   Yes.  I mean, from a tactical standpoint of an offender
24 going into this building to kill somebody, it would be a -- it
25 would be a disaster, because when -- the minute you enter the

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 743  Filed 09/23/14  Page 80 of 217

1   building, you have no idea where anybody could be in that large

2   complex.

3   Q    Now let me go back to Mr. Offenbecher's question about the

4   circumstances in which somebody wants to kill one person and

5   ends up killing the other.  In your experience, what types of

6   circumstances does that happen?

7   A    That would happen, like, within a -- a -- a drug killing,

8   organized crime kind of killing, those kind.

9   Q    Now, is that in your opinion something that happened here?

10  A    No, not at all.

11  Q    Why not?

12  A    First of all, the -- the -- the nature of these victims

13  overall in general in their lifestyle does not indicate they're

14  involved in any organized crime or in any drug dealing

15  themselves.  And in -- in any kind of drug murder the victim is

16  usually the person who's engaged in that -- in that activity.

17  Q    Now, is there anything about the actual shootings and the

18  number of times they were shot that also enters into your

19  analysis?

20  A    Yes, it does.  The number of times shooting reflects the

21  offender's goal, if you will, to walk into that building, and

22  his goal when -- when he went in there with that large-caliber

23  handgun was to -- was to kill both of those victims.

24  Q    Now, Mr. Offenbecher asked you a whole lot of questions

25  suggesting domestic violence motives.  Is that consistent with

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 743  Filed 09/23/14  Page 81 of 217
(720) 384-8078  attrans@sbcglobal.net

1 what you saw in the crime scene?

2 A    No, it's not.

3 Q    Why not?

4 A    Because offenders choose to -- if an -- in other words --

5 let me back up here.  If someone decides to kill a spouse

6 because of --

7 Q    Yeah.

8 A    -- whatever the reason -- conflict in the marriage --

9 there's always -- there's a -- there's a time that they can

10 pick when the victim is available and vulnerable.  There's --

11 there are much better times to choose than when they're at

12 work, when there's going to be other people there.  So in other

13 words, if I wanted to kill a spouse, why not do it at home when

14 you're right there with the victim.  Why not do it on the way

15 there, why don't you do it alone -- since you know the routine

16 so -- so well, why don't you do it at a time when you know

17 they're going to be alone by themselves, and then you only have

18 to engage with one person.

19 Q    How many cases have you seen of domestic violence where

20 there is a -- well, I'm going to call it a collateral damage

21 victim or an -- who has nothing to do with whatever the

22 conflicts are.

23 A    If one spouse -- in other words, if one spouse targets

24 just the one spouse, I have never seen that.

25 Q    Okay.  And Mr. Offenbecher asked you about -- if there was

1  a martial infidelity in something, that could enter an

2  analysis.  Right?

3  A    Correct.

4  Q    Does it turn on whether it's recent or whether it's years

5  in the past?  I mean, does that affect --

6          MR. OFFENBECHER:  Objection.

7          MS. LOEFFLER:  I'm sorry, I --

8          MR. OFFENBECHER:  It's a leading question.

9          MS. LOEFFLER:  I can -- Your Honor, I have to follow up

10  on the statements he made.  I can ask him --

11          THE COURT:  I -- okay.

12          MS. LOEFFLER:  Okay --

13          THE COURT:  Go ahead, ask the question.

14          MS. LOEFFLER:  Okay.

15  BY MS. LOEFFLER:

16  Q    If a -- I'm asking you a hypothetical question.  If a

17  marital infidelity happened years in the past, does that affect

18  at all your analysis of whether it has relevance or not to a

19  crime scene?

20  A    It -- it can, and -- and if I may explain.  The -- the --

21  the focus on just who the victims are and what the victims do

22  is only one portion of the analysis.  You have to weigh that

23  against the other -- the other -- the other things that are

24  going on in the incident.  In other words, how the offender

25  chooses to approach the victim, how the offender engages the

1  victims, how the offender chooses to kill the victims.  It --
2  it's not -- it's not the central factor, it's a factor.
3  Q    Okay.  Now, Mr. Offenbecher asked you about the fact of
4  whether somebody -- I think it was something about life
5  insurance or -- well, let me ask you this.  With regard to
6  military victims, would you -- do you have any understanding of
7  whether they would have life insurance or not?
8  A    Yes, they would.
9  Q    Okay.  And whether they would or wouldn't, would that
10 affect any -- your analysis here?
11 A    I -- I assumed that they did have it, because they were
12 either in the military or retired.
13 Q    Okay.  And with regard to working people, people that are
14 lucky enough to have, you know, government jobs or even, you
15 know, jobs with employers that can afford this type of thing,
16 which everybody doesn't have, would you expect to -- there be
17 financial benefits to people whose spouses are murdered on the
18 job?
19 A    I'm -- yes, there would be some -- some kind of benefit
20 financially.
21      (Side conversation)
22      MS. LOEFFLER:  One second, Your Honor.
23 BY MS. LOEFFLER:
24 Q    Your Honor -- I'm sorry, I didn't mean Your -- you're not
25 Your Honor, you're the witness.  Mr. Morton, Mr. Offenbecher

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 84 of 217
(720) 384-8078   attrans@sbcglobal.net

1  asked you whether if somebody had a restraining order that

2  could be relevant to motive.  Do you recall that?

3  A    Yes, he did.

4  Q    Okay.  And if the person the restraining order was against

5  wasn't on the island, would that matter?  If they're not

6  physically capable of doing it at the time, would that be a

7  relevant inquiry?

8  A    Yes, that would basically eliminate them for my analysis

9  purposes.

10 Q    Okay.  Mr. Offenbecher asked you a lot of questions about

11 marital issues and conflicts that can happen in a marriage.

12 Did any of his questions change your conclusion in this case

13 about the targeting of the two individuals?

14        MR. OFFENBECHER:  Your Honor, the questions weren't

15 evidence.  The questions about whether he had been provided

16 information, he indicated he hadn't been provided that

17 information.

18        THE COURT:  I don't know if that's an objection or not,

19 but if it is, it's overruled.

20        THE WITNESS:  I'm sorry, could you repeat the question?

21 BY MS. LOEFFLER:

22 Q    Okay.  Based on what has gone on in the courtroom today,

23 do you have any difference in your view of what the -- your

24 conclusions as to the killing of these two people?

25 A    No, I do not.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 743  Filed 09/23/14  Page 85 of 217
(720) 384-8078  attrans@sbcglobal.net

1  Q   Why not?

2  A   Simply because the information that I -- that I received

3  and asked for concerning these victims in particular -- like I

4  said, it's only a small portion of -- of -- of -- of the

5  analysis process, looking at the victimology.  If there is

6  nothing that jumps out in the beginning, based upon the

7  interaction of the offender with the victims, it really becomes

8  a negligible issue.

9  Q   Okay.  And with regard to this crime scene, what was the

10  most important information that you saw that led to your

11  conclusion?

12  A   I think the fact that both victims were at work at their

13  usual time, and the offender chose at that time to walk into

14  that building and basically shoot both of them to death.

15  Q   Nothing further.  Thank you.

16        THE COURT:  Recross.

17              **RECROSS EXAMINATION**

18  BY MR. OFFENBECHER:

19  Q   Mr. Morton, you've indicated that at the National Center

20  for the Analysis of Violent Crime, your principal occupation is

21  dealing with unusual, bizarre, and repetitive crimes.  Right?

22  A   That's correct.

23  Q   That was your direct examination, right?

24  A   That's correct.

25  Q   So the average spousal homicide is really not a bizarre,

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 86 of 217
(720) 384-8078  attrans@sbcglobal.net

1  unusual, or repetitive crime, is it?

2  A    I don't know what an average spousal murder is, sir.

3  Q    Okay.  Well, what's an unusual, bizarre, or repetitive

4  crime for you?

5  A    Repetitive crimes are serial murder cases.

6  Q    Okay.

7  A    To most -- and that can incur -- include anything from

8  murder to rape to anything else that occurs on a serial basis.

9  Bizarre crimes basically can be any kind of crime scene that

10 doesn't appear in a -- in a manner that local police are used

11 to seeing.  In other words, most sexual murders fall within

12 that bound because of the bizarre interactions of that offender

13 with the victims.  Unusual crimes can be absolutely anything,

14 from -- from a -- a serial burglar who hasn't been caught in 25

15 years to a unusual domestic homicide case.

16 Q    Okay.  Now -- excuse me.  You indicated in your direct

17 examination that the fact that the in --

18        MS. LOEFFLER:  Your Honor, I'm going to object as

19 beyond the scope of --

20        MR. OFFENBECHER:  No, no, this -- I --

21        MS. LOEFFLER:  -- redirect.  If we're going back to the

22 direct examination --

23        THE COURT:  Well, I'm concerned about our -- I thought

24 we were about ready for a break.  Are you -- is it --

25        MR. OFFENBECHER:  Sure.  I -- it might be a good idea

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 87 of 217
(720) 384-8078  attrans@sbcglobal.net

1  to take a break.

2         THE COURT:  Okay.  We'll take a 15-minute recess.  All

3  right, you've got 15 minutes, sir.

4         THE CLERK:  All rise.  Matter stands in a 15-minute

5  recess.

6      (Jury not present)

7         THE COURT:  Okay, 15 minutes.

8         THE CLERK:  Off record.

9      (Court recessed at 10:22 a.m., until 10:42 a.m.)

10      (Jury not present)

11        THE CLERK:  All rise.  His Honor the Court, the United

12  States District Court is again in session.  Please be seated.

13        THE COURT:  Okay.  They're coming in.

14      (Jury present)

15        THE COURT:  Okay, please be seated.  I guess we're at

16  recross.

17  BY MR. OFFENBECHER:

18  Q   Right.  Just a couple more questions, Mr. Morton.  You

19  provided your report to the government in this case on October

20  11th, 2013.  Right?

21  A   Yes, sir.

22  Q   And one section of your report is entitled Victimology.

23  Right?

24  A   Correct.

25  Q   And you would agree with the following statement in that:

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 743  Filed 09/23/14  Page 88 of 217

1  "Complete information about the victim of a violent crime is an

2  important part of the crime analysis process"?

3  A    Yes, sir.

4        MR. OFFENBECHER:  I don't have any other questions,

5  Your Honor.

6        MS. LOEFFLER:  I have one, Your Honor.

7              **FURTHER REDIRECT EXAMINATION**

8  BY MS. LOEFFLER:

9  Q    Do you care about rumors and innuendo in an investigation?

10 A    No, ma'am, not at all.

11 Q    Thank you.

12       THE COURT:  Anything else, counsel?

13       MR. OFFENBECHER:  No, Your Honor.

14       THE COURT:  All right.  Thank you, sir.  You're

15 excused.  The government's next witness.

16    (Witness excused)

17       MS. DUIGNAN:  The government calls Special Agent

18 Strause to the stand.

19       THE COURT:  Okay.

20    (Side conversation)

21       THE COURT:  Okay, you'll see that door there opens out,

22 I think.  Step on up, remain standing just long enough for our

23 clerk to swear you in.

24       **ANGELA STRAUSE, PLAINTIFF'S WITNESS, SWORN**

25       THE CLERK:  Okay, thank you.  Please have a seat.  And,

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 89 of 217
(720) 384-8078  attrans@sbcglobal.net

STRAUSE - DIRECT

1  ma'am, if you can please state and spell your full name.

2          THE WITNESS:  Angela Strause.  A-n-g-e-l-a, S-t-r-a-u-

3  s-e.

4          THE CLERK:  Thank you.

5          THE COURT:  Counsel.

6                    **DIRECT EXAMINATION**

7  BY MS. DUIGNAN:

8  Q    Special Agent Strause, by whom are you employed?

9  A    The Federal Bureau of Investigation.

10 Q    And how long have you been employed there?

11 A    Approximately four years.

12 Q    And where are you currently assigned?

13 A    I'm assigned at the Anchorage Division.

14 Q    And what division are you assigned to?

15 A    I work on the Violent Crime Squad.

16 Q    And what do they do?

17 A    We investigate matters involving drugs, guns, gangs,

18 crimes against children, human trafficking, that sort of thing.

19 Q    And do you have any collateral duties?

20 A    I do.  I am a member of the Evidence Response Team, and

21 basically that -- we respond to crime scenes and collect

22 evidence and we also execute search warrants.

23 Q    And what kind of training have you had for that position?

24 A    There's specialized training for approximately two weeks

25 in Quantico, Virginia, where we run through crime scenarios and

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 90 of 217
(720) 384-8078   attrans@sbcglobal.net

1  evidence collection and preservation and that sort of thing.

2  Q    What is your education?

3  A    I have a bachelor of science degree in legal studies and a

4  minor in business and management.  And I also have a law

5  degree.

6  Q    Before you joined the FBI, what did you do before that?

7  A    I was a paralegal for approximately eight years, and prior

8  to that I was in the military.

9  Q    And where did you serve?

10 A    I served overseas in Misawa, Japan and also at the

11 National Security Agency in Maryland.

12 Q    And what branch of the military were you in?

13 A    The Air Force.

14 Q    For how many years?

15 A    For four years.

16 Q    How did you get involved in this particular case?

17 A    On April 12th, 2012, we received a call from the Coast

18 Guard Investigative Service, located in Kodiak, requesting ERT

19 assistance to help process the crime scene.

20 Q    And when did you arrive on April 12th?

21 A    We arrived at approximately 3 p.m. that day and we were

22 taken to the Coast Guard Police Department for a briefing on

23 what -- what was the crime scene, essentially.  And then after

24 that we were taken to the crime scene.

25 Q    And how were you involved in processing the crime scene?

Case 3:13-cr-00008-SLG  Document 743  Filed 09/23/14  Page 91 of 217

ASDF

1  A    Essentially, when were arrived on scene, because it was --
2  we were told it was a crime scene, we're -- we wear Tyvek
3  uniforms.  Basically, it's to preserve -- or to -- so that we
4  don't introduce any new substances to the crime scene.  We all
5  wore Tyvek, entered the crime scene.  We designate the roles
6  for each individual.  Essentially, we have a photographer or
7  somebody who sketches the scene, someone who acts as the
8  evidence custodian, and then we have searchers.
9  Q    And what was your position or participation on the
10  Evidence Response Team or ERT and --
11  A    On that day --
12  Q    -- as part of the (indiscernible)?
13  A    Every scene is different, but on that day I was a searcher
14  and collector.  Eventually at some point we processed and
15  developed and lifted prints as well.
16  Q    When you first arrived that day, what was the first thing
17  that the -- that you did?
18  A    The first thing that we did, typically the photographer
19  will enter the crime scene first and they take overall
20  photog -- or photographs of the entire scene.  And they take
21  it -- it's a very, you know, regimented way of taking
22  photographs of each room and the crime scene as it is the way
23  we -- when we arrive on scene.
24  Q    Before you had arrived at the crime scene, had you
25  received any information about the crime?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 743  Filed 09/23/14  Page 92 of 217

1  A    Yes.  We knew it was a shooting.  We basically just knew

2  it was two Coast Guard employees, it was a shooting, and -- and

3  really we didn't have a lot of information at that point.

4  Q    So what are the types of things you look for when you

5  first arrive at the crime scene?

6  A    Like I said, because we knew it was a shooting, we were

7  looking for -- you basically look for anything like shell

8  casings or, you know, bullet fragments, bloody footprints, any

9  kind of, you know, signs of entry, anything that's disturbed,

10  any signs of a struggle, basically that sort of thing.

11  Q    And what other information about the building do you look

12  for?

13  A    Basically, access points, entry and exit points, how many

14  rooms, what the scene looks like when we get there, you know,

15  any -- if anything's disturbed, that sort of thing.

16  Q    And what did you notice about this particular crime scene?

17  A    There were two individuals who had been shot.  There

18  was -- there was a blood pool around the first victim that we

19  encountered.  There didn't appear to be any broken windows or

20  anything like that.  They were in two separate rooms,

21  essentially.  When you walked in, we could see the first

22  individual in a large pool of blood and the other individual

23  was in a side office, kind of -- his -- his head was, like,

24  under the desk.

25  Q    And as part of your investigation, do you look around the

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 93 of 217
(720) 384-8078  attrans@sbcglobal.net

1  victims to see if there's any evidence you can collect?

2  A    Absolutely.  We collect vacuum sweepings, essentially,

3  where -- all around the -- the foyer area.  We collected vacuum

4  sweepings and then we submit that sort of thing to our lab to

5  see if they can find any trace evidence.

6  Q    What did you notice, if anything, about the blood pools

7  and blood spatter?

8  A    When we arrived there, I mean, we were informed that

9  medical personnel had already kind of moved the bodies, so we

10  knew that the bodies had been moved from their original

11  location.  However, there were no bloody footprints around at

12  all.  There -- the blood spatter was undisturbed around Mr.

13  Hopkins' body.  There was -- there was -- essentially, all the

14  blood spatter was intact.  There was no smears or smudges.

15  Q    And can you comment of what you noticed, if anything,

16  about entry points?

17  A    As -- as far as we could tell, there were -- like I said,

18  there was no broken windows.  I physically did not check to see

19  whether anything was -- any of the windows were locked.  We --

20  we gained access through the main door, which was not a key

21  swipe door, it was just a, you know, regular man door.  But

22  everything else seemed to be secure.

23  Q    First I'd like to pull up some photos on your screen

24  and --

25  A    Okay.

**STRAUSE - DIRECT**

1  Q    -- have you look at them.

2  A    Sure.

3  Q    If I can first start with 372A.

4       (Side conversation)

5           MS. DUIGNAN:  I'm going to show these briefly, Your

6  Honor, if we --

7           THE COURT:  All right.  They're admitted, right?

8           MS. DUIGNAN:  I don't -- this one isn't yet.  I'm going

9  to have the agent look at it first.

10          THE COURT:  Okay.

11 BY MS. DUIGNAN:

12 Q    Can you please describe what this shows?

13 A    This characterizes Mr. Hopkins.  This is in the break

14 room.  There's a pool of blood to the left.  He is laying face

15 up.  His head is under the -- the water fountain.  And in the

16 background you can see the entrance to the boiler room.  On the

17 right is the entrance to the bathroom.

18 Q    Is this one of the photos you took right -- or that

19 someone in the team took right after the -- you entered the

20 murder scene?

21 A    Yes, this was after we arrived.

22 Q    And you were actually there at the murder scene, had the

23 opportunity to view the scene?

24 A    Yes, I did.

25 Q    Does this accurately depict the scene as you came in?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 743  Filed 09/23/14  Page 95 of 217
(720) 384-8078  attrans@sbcglobal.net

1  A    Yes, it does.

2         MS. DUIGNAN:  Your Honor, I move for admission of 372A.

3         THE COURT:  Will be received without objection.

4    (Plaintiff's Exhibit 372A admitted)

5  BY MS. DUIGNAN:

6  Q    I'd like to briefly put it up for two questions.  Special

7  Agent Strause, can you explain what you noticed about the blood

8  pooling in the area?

9  A    The blood is coagulated and it's kind of spread pretty far

10 to the left.  The blood spatter that I was talking about,

11 it's -- it's not really visible in this photo, but you can --

12 we could see it as, you know, we were live there.  Essentially,

13 the blood spatter behind him into the foyer of the -- the

14 boiler room area was undisturbed.  And that's what I mean about

15 there were no smears, there were no smudges of the blood

16 spatter.

17 Q    Had you looked for footprints or any other sign that --

18 A    Yes, we did.  We looked for any -- any signs of

19 disturbance, and there were none.

20 Q    Can you zoom in on the upper -- I'm sorry -- the upper

21 left part of the door in the background?  Right -- yeah, right

22 in there.  Uh-huh (affirmative).  Can you please describe what

23 that shows?

24 A    That shows the entry to the boiler room, and the -- the

25 deadbolt was locked from the in -- from that -- from that side.

1  Q    Thank you.  I'm going to show you another photo on the

2  screen.

3  A    Okay.

4  Q    372B, please.

5       (Side conversation)

6  Q    Can you please describe what this shows?

7  A    Yes.  So that's the same door we just saw entering into

8  the boiler room.  However, the -- the lock was -- the -- the

9  bolt -- the slide lock was opened, and we opened the door.

10 Q    Okay.  And when was that taken?

11 A    That was taken the day we -- one of the days that we were

12 processing the crime scene.  After we had -- I -- I believe the

13 bodies may have been removed at that point and we made entry

14 into the boiler room.

15 Q    Okay.  But you had to unlock the door to get in there;

16 A    Yes, we did.

17 Q    So that was a change to the crime scene?

18 A    Yes.

19 Q    Okay.

20       MS. DUIGNAN:  Can we please admit 372B?

21       THE COURT:  Hearing no objection, it will be admitted.

22       (Plaintiff's Exhibit 372B admitted)

23       (Side conversation)

24 BY MS. DUIGNAN:

25 Q    Can you please look at what has been marked as 372C?

1   A    Yes.

2   Q    And what does that show?

3   A    It depicts a boot print impression on the -- on the boiler

4   room door.

5   Q    And does it accurately depict what you noticed at the

6   scene at the -- on April 12th, 2012?

7   A    Yes, it does.

8   Q    Did -- you didn't actually take that photo, though?

9   A    No, I didn't take the photo.

10  Q    But did you have observation of the scene when you were

11  there that day?

12  A    Yes, I did.

13         MS. DUIGNAN:  I move for admission of 372C, Your Honor.

14         THE COURT:  It'll be received without objection.

15     (Plaintiff's Exhibit 372C admitted)

16  BY MS. DUIGNAN:

17  Q    Can you please notice what you had -- can you please

18  describe what you noticed about that footprint that day?

19  A    The footprint -- there were a couple things we noticed

20  with the footprints.  If we're going to try to take a lift, for

21  example, of a footprint, a lot of times a footprint will either

22  be in a -- you know, there'll be dust and you can actually lift

23  the print using a -- an electrostatic dust lifter; or it will

24  be an impression in some sort of surface.  And you can -- then

25  what we do is we -- we would put a dental cast in there, let it

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 743  Filed 09/23/14  Page 98 of 217
(720) 384-8078  attrans@sbcglobal.net

**STRAUSE - DIRECT**

1  harden, and then lift it that way, and then our lab can examine
2  those.
3      This print was sort of unique in the sense that it
4  couldn't be lifted from the door.  So when that happens, what
5  we do is we take a lot of photographs of the print and in a
6  very high resolution, so that our lab can analyze the -- the
7  print photograph as if it was something that was lifted.
8  Q   If we can go to 372D.  And if you look at 372D, what does
9  that show?
10 A   This shows the same boot print with a scale.  The scale
11 is -- we typically take photographs with a scale so that a size
12 of the boot can be determined.  Again, this is something where
13 we would send it off to the lab for processing if we're unable
14 to lift it from the surface.
15 Q   And, in fact, does that depict the print as you noticed it
16 on that day?
17 A   Yes.
18          MS. DUIGNAN:  I move for admission of 372D.
19          THE COURT:  Without objection, it'll be received.
20      (Plaintiff's Exhibit 372D admitted)
21 BY MS. DUIGNAN:
22 Q   And can you please describe on which side of the door this
23 print was noticed?
24 A   This was on the interior door of the boiler room, the side
25 facing the opposite of the break room.  So it was the interior

1  boiler room door on the inside.

2  Q    Okay, so from -- looking at the previous picture, where

3  you had noticed that the deadbolt was locked, was it on the

4  deadbolt side or was it on the other side of the door?

5  A    It was on the other side.

6  Q    Okay.  And when you had mentioned in the first photo that

7  you had actually had to unlock the door in order to be able to

8  see this print.

9  A    Yes, we did.

10  Q    Okay.  So the FBI was the one who actually unlocked --

11  A    Yes.

12  Q    -- the door?

13  A    We unlocked the door.

14  Q    Was there anything else that you noticed about this print?

15  A    Just that we couldn't lift it using traditional means.  We

16  attempted to lift it using a gel lifter, but there was no --

17  there was no impression on the -- the lift, so we didn't even

18  submit it.

19  Q    Thank you.  I'd like to pull up Exhibit 287 just for the

20  witness.  Do you recognize what this photo shows?

21  A    Yes, I do.

22  Q    And what does it show?

23  A    This was -- this is a photo of the office where Mr.

24  Belisle and Mr. Wells, Mr. Hopkins, and Chief Reckner worked.

25  It's facing looking out of the office.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 100 of 217
(720) 384-8078  attrans@sbcglobal.net

1  Q    Excuse me.  On this day, did this depict the scene as you

2  had found it?

3  A    Yes, it does.

4         MS. DUIGNAN:  Your Honor, I'd move for admission of

5  287.

6         THE COURT:  Will be received.

7      (Plaintiff's Exhibit 287 admitted)

8      (Side conversation)

9  BY MS. DUIGNAN:

10  Q    And I'm pulling up Exhibit 389.

11  A    Okay.

12  Q    It's already been admitted, so put it up on the screen.

13  Can we go to the second page, 2?  Looking at this chart, have

14  you had a chance to review this chart?

15  A    I have.

16  Q    And what does it show?

17  A    This is a summary of items that were collected from

18  various -- the crime scene, as well as other searches that we

19  conduct as members of the ERT.

20  Q    And looking at this chart, can you tell me whether any of

21  these items were sent to the lab for biological and trace

22  testing?

23  A    Yes, several of the items were sent.

24  Q    And I know there might be a number, but can you say which

25  ones?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 101 of 217
(720) 384-8078  attrans@sbcglobal.net

1   A    Yes.  Could you flip back to page 1?

2   Q    Yes.

3   A    So from page 1, we submitted -- obviously we submitted the

4   fingerprints.  But for biological screening, we submitted 1B1

5   and 1B -- 1 -- 1B1 through 1B6, which were vacuum sweepings;

6   1B39, which was the debris, possible tooth; 1B44, which was the

7   empty soda can, Diet Coke with lime; 1B15, which was the glove

8   from the hallway.  From the residence, from the Wells's

9   residence, we submitted the -- 1B114, one pair of boots; 1B122,

10  one towel with stain; 1B130, swabs of stain from gray tote,

11  Room F; 1B131, one paper towel with stain.

12  Q    And these -- can you back up from the microphone a little

13  bit, Special Agent Strause, or push it away.  I'm sorry, we're

14  getting a little feedback.

15  A    Sure.

16  Q    And all of these items were collected from the scene at

17  the rigger shop.  Correct?

18  A    The first set, yes.

19  Q    Okay.

20  A    And then some were collected from the residence.

21  Q    Okay.  So can you move on to those, please?  Which ones

22  were submitted?

23  A    I read the first page, so if we can flip to the second

24  page.  These are from the CR-V, the Wells's blue Honda CR-V.

25  1B94 through 1B95, vacuum sweepings from the front driver's

1  side and console; 1B96, vacuum sweepings from the front

2  passenger side; 1B97, vacuum sweepings from the rear driver's

3  side; 1B98, vacuum sweepings from the rear passenger side; 1B99

4  through 1B100, vacuum sweepings from the rear area; 1B101, one

5  rock; 1B102, swab from the driver's interior door; and 1B103,

6  swab from the steering wheel.

7  Q    Okay.  And what other items were submitted for biological

8  and trace testing from this list?

9  A    From Wells's white Dodge pickup, we submitted 1B205,

10 vacuum sweepings from the front driver's side door -- or floor,

11 excuse me; 1B206, vacuum from the front driver's side seat;

12 1B208, swab of driver door handle from Dodge; 1B209, swab of

13 steering wheel from the Dodge; 1B213, one exam glove.

14 Q    And what are the last two items that you submitted?

15 A    They were hair samples from James and Nancy Wells, items

16 1B329 and 1B330.

17 Q    And when were those taken?

18 A    Those were taken in November of 2012.

19 Q    And how were they taken?  What was the reason for taking

20 them?

21 A    Essentially, when we send things off to the lab they --

22 they will test it against known samples.  So the -- the lab had

23 the samples from the -- Mr. Hopkins and Mr. Belisle.  They

24 compared samples from the blue CR-V, and it was -- they

25 couldn't exclude Mr. Belisle's hair, so a request was sent back

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 743  Filed 09/23/14  Page 103 of 217

STRAUSE - DIRECT

1  to our office to obtain hair samples from James and Nancy Wells

2  for exclusion or possible identification.

3  Q   And as a result of submitting those items, was any other

4  followup required?

5  A   No other followup was required, no.

6  Q   Were there also items submitted from the autopsy seizure?

7  A   Yes, there were.

8  Q   And what were those items?

9  A   I believe they're on the next page.

10     (Side conversation)

11  Q   We're pulling up Exhibit 388.  Has this been admitted?

12        UNIDENTIFIED SPEAKER:  Yes.

13        MS. DUIGNAN:  Okay, we're going to display it because

14  it's been admitted.

15  BY MS. DUIGNAN:

16  Q   And from this list, what items were submitted for trace or

17  biological testing?

18  A   Is there a page 2 to this?  I know we submitted -- I'm

19  sorry, can you go back to page 1?  I know we submitted the --

20  the shirt for Mr. Belisle, both shirts that Mr. Belisle was

21  wearing as well as the pants and the shirt of Mr. Hopkins.

22  Q   Okay.

23  A   But I don't see those on here.

24  Q   I think they're -- maybe pull up Exhibit 253.

25     (Side conversation)

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 743  Filed 09/23/14  Page 104 of 217

1  Q    I think we've already admitted these, so --

2       (Side conversation)

3  Q    I don't think we need to show the exhibit you said you had

4  submitted.

5  A    Yes.  We submitted --

6  Q    I'm sorry, which items of clothing?

7  A    -- Mr. Hopkins' pants and shirt.  And then two shirts by

8  Mr. -- worn by Mr. Belisle.

9  Q    Okay.  And all of the items that you just mentioned that

10 you sent in for trace and biological testing, where were they

11 sent?

12 A    They were sent both to the Quantico lab in Virginia, as

13 well as some items were sent to the state crime lab here in

14 Alaska.

15 Q    And based on your review of the lab results that came

16 back, did you take any other actions?

17 A    No.

18 Q    And why is that?

19 A    The results didn't warrant further investigation.

20 Q    Does the FBI perform gunshot residue testing on a person's

21 hands to determine whether they fired a weapon recently?

22 A    No.

23 Q    And why is that?

24 A    The FBI discontinued the process several years ago because

25 it was deemed unreliable.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 105 of 217
(720) 384-8078  attrans@sbcglobal.net

1  Q    In this case, were you asked to perform a simulated

2  gunshot residue test on Mr. Wells's hands the day of the

3  murders, April 12th?

4  A    Yes, I was.

5  Q    And why did you do that?

6  A    I received a request from the case agent to -- to conduct

7  a simulated exam on Mr. Wells, to observe his demeanor and

8  reaction.

9  Q    And did he consent to this testing?

10 A    He did consent.

11 Q    And what was his reaction?

12 A    From what I observed, he appeared to be flustered.

13 Q    Thank you.  I don't have any further questions.

14       THE COURT:  Cross-examination.

15                    **CROSS-EXAMINATION**

16 BY MR. CURTNER:

17 Q    Good morning.

18 A    Good morning.

19 Q    So as I understand your testimony, when you first got to

20 the rigger shop that morning, the first thing you do is check

21 out the scene?

22 A    We got there in the afternoon, and yes --

23 Q    In the afternoon.

24 A    -- we typically will walk around the building, and the

25 photographer will take photos all around the building, and then

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 743  Filed 09/23/14  Page 106 of 217

**STRAUSE - CROSS**

1  we will make entry into the building.

2  Q    And you mentioned that there were no broken windows,

3  right?

4  A    There were no broken windows.

5  Q    But you didn't see if any of them were locked or unlocked?

6  A    I did not.

7  Q    Okay.  Now I wanted to -- parts of your evidence taking

8  was to vac -- take -- vacuum around the bodies in the location?

9  A    We vacuumed the foyer.  I did not vacuum around the

10  bodies.

11  Q    I'm sorry, what do you mean by the foyer?

12  A    The -- the main entry area where --

13  Q    Uh-huh (affirmative).

14  A    -- the locker -- the locker room, I suppose, is what it's

15  called in certain things -- we vacuumed in that area.  We did

16  not vacuum around the bodies so as to not disturb the blood

17  pool.

18  Q    Okay.  So I'm not quite understanding.  Just one locker

19  room, is that the only place you vacuumed?  Or did you go

20  through the whole facility or --

21  A    No.

22  Q    -- areas around the office and --

23  A    We did not.  We did the main foyer area.  We took -- I

24  believe there were six vacuum sweepings that we did in that

25  general area.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 107 of 217
(720) 384-8078  attrans@sbcglobal.net

1  Q   Now, the reason you do that is that -- I think we heard

2  some testimony already that there's a filter that can absorb or

3  you can contain any of the fibers or anything that might be on

4  the ground?

5  A   Yes, that's correct.

6  Q   Any debris?

7  A   Yes.

8  Q   And any hair?

9  A   Yes.

10 Q   And so if you vacuum up any hair whatsoever, it would be

11 able -- available for the laboratory to inspect?

12 A   Yes.

13 Q   And then later on you took hair samples from Mr. Wells

14 or -- correct?

15 A   Yes.

16 Q   And none of his hair was seen at the -- found at the scene

17 at all.  Is that correct?

18 A   Well, those vacuum sweepings were not tested.

19 Essentially, when -- when we collect the sweepings we submit

20 them to the lab.  They will preserve them until we develop a

21 subject for them to test against.  In this case, because Mr.

22 Wells had a reason to be in the office and his -- his hair

23 would likely be found there, they did not test it against Mr.

24 Wells's hair.

25 Q   So you didn't even see if the -- any of Mr. -- for any

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 108 of 217
(720) 384-8078   attrans@sbcglobal.net

1  evidence of Mr. Wells being there that day?

2  A    No, because it would be of no evidentiary value.

3  Q    Okay.  Let me ask you about the footprint on the door.

4  A    Yes.

5  Q    Now, you took that picture, the pictures, the phot --

6  A    I did not take the photo.

7  Q    You didn't take the photos.  Do you remember what days the

8  photos were taken?

9  A    They were taking -- taken on April 12th and April 13th --

10 Q    Okay.

11 A    -- of 2012.

12 Q    And was that boot print -- was that on the inside of the

13 door or the outside of the door?

14 A    It was on the inside of the boiler room door.

15 Q    Okay.  So if -- somebody from the inside of the boiler

16 room --

17 A    Yes.

18 Q    -- would have had to put that footprint on the door?

19 A    Yes.

20 Q    And how high was that boot print on the door?

21 A    It looked like it was just below and to the left of the

22 door knob.

23 Q    So, for example, somebody would have had to go like this?

24 A    Yes, I believe so.

25 Q    As if they were trying to push that door in?

Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 109 of 217

1  A    Potentially.

2  Q    Now, how many searches were you involved in altogether?

3  A    I don't know the number offhand.  I did a number of

4  searches.

5  Q    You were involved in the crime scene for a couple days?

6  A    Yes.

7  Q    And then you were -- were you involved with the first

8  search of the residence of Mr. and Mrs. Wells?

9  A    Yes, I was.

10 Q    And how many days was that?

11 A    I believe it lasted for at least two days.

12 Q    All right.  And during that time, Mr. and Mrs. Wells

13 weren't allowed into the home.  Is that correct?

14 A    They were -- anyone is permitted to be on the scene when

15 we're conducting a search.  However, if they choose to leave,

16 they're not allowed back until we've released the scene.

17 Q    So they weren't there the whole time you were searching

18 the house?

19 A    They were not.

20 Q    And how many searches were you involved with at their

21 home?

22 A    I don't recall.

23 Q    Okay.

24 A    Several.

25 Q    Two, three, four?  How many is several?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 110 of 217

1   A    I'm not sure.  I -- if you have a specific itemization --

2   I know that I was involved in several searches.  I don't know

3   the number offhand.

4   Q    Okay.  You were involved in the search of the Honda --

5   A    Yes.

6   Q    -- Mrs. Wells' car, and Mr. Wells' Dodge?

7   A    Yes.

8   Q    Okay.  You also searched the Penningtons' home?

9   A    Yes.

10  Q    And who are the Penningtons?

11  A    They were friends of Mr. and Mrs. Wells, and they

12  consented to a search of their residence.

13  Q    Were you involved in a -- another search April 24th, 2012,

14  of the Wells home?  Do you recall that?

15  A    I don't recall that date specifically.  I know I was

16  involved in several searches.

17  Q    And that was a search when no evidence -- or nothing of

18  evidence -- evidentiary value was seized?  Is that correct?

19  A    I can't say for certain.

20  Q    Did you -- were you involved in another search in August

21  of 2012 for electronic equipment, computers, cell --

22  A    Yes, I was.

23  Q    Okay.  And that was in August?

24  A    Yes.

25  Q    And what did you take at that time?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 111 of 217
(720) 384-8078   attrans@sbcglobal.net

1   A    We took -- I believe we took Mr. Wells's iPhone and some

2   electronic equipment.  I'm not certain of what else we took.

3   Q    How many phones do you think were -- or any type of

4   electronic data devices do you think were seized during your --

5   during this investigation?

6   A    I don't know.

7   Q    Okay.  Do you -- computers, any indication of that?

8   A    I'm sorry, I didn't --

9   Q    Do you know how many computers?

10  A    I don't know.

11  Q    Do you know about any kind of disc of digital information

12  was taken?

13  A    I don't know how many were taken.

14  Q    Do you -- flashcards, cameras, anything of digital

15  information at all?

16  A    I know those items were in the search warrant, but I don't

17  know how many were taken.

18  Q    Okay.  Do you recall at some point -- I imagine all the

19  electronic devices and the -- that would hold data information

20  was thoroughly investigated by the FBI once it was seized?

21  A    That's submitted to our Computer Analysis Unit.  Some --

22  we have some local and some to be sent off, potentially,

23  depending on the amount.  I can't speak to that.  I did not

24  conduct an investigation of any of the electronic equipment.

25       (Side conversation)

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 112 of 217
(720) 384-8078   attrans@sbcglobal.net

1  Q    Could we show the agent DE-119?  That's a two-page

2  document, Agent.  Do you recognize that?

3  A    Can I see the second page, please?

4  Q    Yes.

5  A    Yes, I do.

6  Q    Okay, can you tell us what that is?

7  A    The -- this is a list of electronic items that were

8  returned to you, it looks like, on March 5th of 2013, items

9  that were previously seized.

10 Q    Okay.  And then that -- on the second page, that's your

11 signature for returning the property to me?

12 A    Yes, it is.

13       MR. CURTNER:  If we could have this admitted as an

14 exhibit, please.

15       MS. DUIGNAN:  No objection.

16       THE COURT:  It'll be received.

17    (Defendant's Exhibit DE-119 admitted)

18       MR. CURTNER:  All right, and if we could publish it to

19 the jury.  Let's go to -- first page.

20 BY MR. CURTNER:

21 Q    So this is on March 5th, 2013, and this is property that

22 had been thor -- examined by the FBI and returned to me because

23 it had no evidentiary value.  Is that correct?

24 A    Yes, I believe so.

25 Q    Okay.  So we're talking about -- I think the first three

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 743  Filed 09/23/14  Page 113 of 217
(720) 384-8078  attrans@sbcglobal.net

1  items are hard drives, computer hard drives.  Is that correct?

2  A    That's what it says, yes.

3  Q    And then there's a cell phone and a Kindle.  Correct?

4  A    Yes.

5  Q    Okay.  There's a card reader.  Go down to number 9.  There

6  is a flash card.  I think -- number 10 is an iPhone.  Correct?

7  A    Yes.

8  Q    All right.  And then there's some number of flashcards

9  after that.  Those are all cards that might have digital

10  information in them?

11  A    Correct.

12  Q    And a memory stick, I think, if you go down to number 24.

13  Correct?

14  A    Yes.

15  Q    And a couple more cell phones?

16  A    Yes.

17  Q    Then we go down to -- toward the bottom of the page -- oh,

18  there's another cell phone, item number 28?

19  A    Yes.

20  Q    And then another computer, item 29.  Correct?

21  A    Yes.

22  Q    So more flashcards -- and I think on -- if you go to the

23  second page, there was number -- item 35 is computer memory.

24  A    Yes.

25  Q    And 36, another computer model and --

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 114 of 217
(720) 384-8078  attrans@sbcglobal.net

STRAUSE - REDIRECT

1  A    Yes.

2  Q    -- another memory, some more flashcards.  If we go down to

3  44 and 45, two external hard drives?

4  A    Yes.

5  Q    And then two more IPs?

6  A    Correct.

7  Q    Okay.  So all those items were seized from the Wells

8  residence over time?

9  A    Yes.

10 Q    And they were all returned to me on that date?

11 A    Yes.

12 Q    Now, from all the evidence that you obtained from the

13 Wells's home, from their vehicles, and from their friends'

14 home, there was no followup.  The results didn't warrant any

15 followup.  What does that mean?

16 A    That means we didn't develop any information that directly

17 related to the homicide.

18 Q    Thank you.  That's all I have.

19      (Side conversation)

20          THE COURT:  Redirect.

21          MS. DUIGNAN:  Yes, Your Honor.

22                  **REDIRECT EXAMINATION**

23 BY MS. DUIGNAN:

24 Q    Briefly.  Mr. Curtner asked you about the height of the

25 footprint that you noticed there.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 115 of 217

1  A    Yes.

2  Q    Was it consistent with somebody perhaps checking the door?

3  A    Yes.

4  Q    Also, you mentioned that the windows -- that you had

5  noticed the windows weren't broken.

6  A    Correct.

7  Q    Can you also describe whether anything around the windows

8  was disturbed or not?

9  A    Nothing was disturbed that I noted or anyone else on the

10  team noted.  No.

11  Q    Thank you.

12                  **RECROSS EXAMINATION**

13  BY MR. CURTNER:

14  Q    Is it normal to check a door by kicking it?

15  A    I would say it could be, yes.

16  Q    I think that was a rhetorical question.  Thank you.

17  That's all I have.

18          MS. DUIGNAN:  Nothing further.

19          THE COURT:  All right.  Thank you, sir.  You're --

20  thank you, ma'am.  You're excused.

21          THE WITNESS:  Thank you, sir.

22      (Witness excused)

23          THE COURT:  Government's next witness.  That door just

24  pulls open.  And you can just step in there and remain

25  standing.  My clerk will swear you in.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 116 of 217
(720) 384-8078  attrans@sbcglobal.net

1    THE CLERK:  Please raise your right hand.

2    **DENISE ANDERSEN, PLAINTIFF'S WITNESS, SWORN**

3    THE CLERK:  Okay.  Thank you.  Please have a seat.

4  And, ma'am, if you can please state and spell your full name.

5    THE WITNESS:  My name is Denise Andersen.  D-e-n-i-s-e,

6  A-n-d-e-r-s-e-n.

7    THE CLERK:  Thank you.

8    THE COURT:  Counsel.

9    **DIRECT EXAMINATION**

10 BY MR. SCHRODER:

11 Q    Special Agent Andersen, who do you work for?

12 A    I work for the Coast Guard Investigative Service as a

13 special agent.

14 Q    And I think you might be our first Coast Guard

15 Investigative Service agent, so why don't you tell the jury

16 just briefly about what the Coast Guard Investigative Service

17 does.

18 A    We investigate felony crimes, internal and external to the

19 Coast Guard, anything covered under the Coast Guard missions:

20 assaults, sexual abuse, things of that nature.

21 Q    What kind of cases does CGIS investigate external to the

22 Coast Guard?

23 A    Externally, anything under the jurisdiction of the Coast

24 Guard:  maritime law enforcement, environmental crimes.

25 Q    And how long have you worked for CGIS?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 117 of 217

1   A    Seven years.

2   Q    And what did you do before you were a CGIS agent?

3   A    Before CGIS, I was a chief corpsman on the Coast Guard

4   Cutter Healy.

5   Q    Okay.  And what -- we -- I think the jury probably now

6   understands what a chief is.  We've had enough people of

7   different ranks.  But what's a corpsman?

8   A    A corpsman -- as an individual duty corpsman, I was

9   responsible for everybody's health care on the ship, out in the

10  middle of the Bering Sea or over the North Pole.  I was pretty

11  much the sole responsibility of the active-duty folks for their

12  medical care.

13  Q    Now, what type of training do you get when you join CGIS?

14  A    We go through 22 weeks of training at Glynco FLETC,

15  Federal Law Enforcement Training Center.  The first part is a

16  criminal investigator training program, followed by a special

17  agent basic training program through NCIS.  So it covers

18  constitutional law, criminal investigations for external, and

19  then we cover the UCMJ under the NCIS training.

20  Q    So you learn about kind of court martial practice, through

21  that part?

22  A    Yes, sir.

23  Q    Internal disciplinary matters?

24  A    Yes, sir.

25  Q    Okay.  Since becoming a CGIS investiv -- agent -- how many

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 118 of 217

1   investigations have you participated in, would you estimate?

2   A    Too many to count.  Probably hundreds.

3   Q    And what's your current assignment with CGIS?

4   A    Currently I am the resident agent in charge for the

5   Anchorage office here.

6   Q    And as part of that assignment, have you participated in

7   the investigation into the murders of Jim Hopkins and Rich

8   Belisle?

9   A    Yes, I have.

10  Q    Now, at one point were you asked to interview the times

11  that the victims as well as the defendant arrived and departed

12  from work in the days preceding the murders?

13  A    I did.

14  Q    And how did you go about obtaining that information?

15  A    I obtained the video from the T2 rigger shop and then

16  reviewed that.

17  Q    And what were the dates you were able to examine?

18  A    May I look at my --

19  Q    We can -- we can go over that.  But it was --

20  A    Okay.

21  Q    -- was it a long period?

22  A    It was April 2nd of 2012 until the 12th of April.

23  Q    All right.  And were you able to identify what each of the

24  men dro -- each of those men drove?

25  A    I could, yes.

1  Q    And what kind of vehicle did Mr. Belisle drive?

2  A    Mr. Belisle drove a Ford F-150, dark blue.

3  Q    Okay.  And how about ET1 Hopkins?

4  A    He drove a Dodge, larger supercrew type truck.

5  Q    And what about the defendant?

6  A    The defendant drove a white Dodge, larger truck, with a

7  cab topper over the back.

8  Q    And in the two-week period, did you ever see any of the

9  three drive another vehicle?

10 A    I did not, no.

11 Q    And did you ever see Petty Officer Hopkins dropped off

12 versus driving his vehicle?

13 A    Not in these two weeks.  No, I did not, no.

14 Q    So in general, who arrived first in the morning?

15 A    Of the 11 days, it was between Mr. Belisle and the

16 defendant.  Five of those days, the defendant was present for

17 work, and I would say three of those five days he showed up

18 prior to Mr. Belisle.

19 Q    And about what time is that?

20 A    Anywhere between 6:56, I believe, and 7:01.

21 Q    And Mr. Belisle -- after Mr. Belisle and the defendant

22 arrived -- I mean, generally when -- did ET1 Hopkins arrive at

23 a -- kind of a set a -- time as the other two?

24 A    Generally after the Mr. Belisle and the defendant, he

25 arrived, and anywhere between -- I believe it was 7:05 and

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 743  Filed 09/23/14  Page 120 of 217
(720) 384-8078  attrans@sbcglobal.net

1  7:12.

2  Q   Okay.  Now we're going to -- I'm going to put a chart up

3  on the screen for you to look at.  And are you familiar with

4  this exhibit?

5  A   Yes, I am.

6  Q   And were you involved in the preparation of this cart?

7  A   I did prepare it, yes.

8  Q   And did you check -- have you checked the data on this

9  chart?

10  A   I have.

11  Q   And is it accurate?

12  A   It is accurate.

13       MR. SCHRODER:  The government offers Exhibit 383, Your

14  Honor.

15       MR. CURTNER:  No objection.

16       THE COURT:  It'll be received.

17    (Plaintiff's Exhibit 383 admitted)

18  BY MR. SCHRODER:

19  Q   All right.  Now let's go from the top, and we'll just kind

20  of explain this a little bit.  What were the first three days?

21  A   The first three days are April 2nd, 3rd, and 4th.

22  Q   And did you see the defendant arrive or depart any of

23  those three days?

24  A   I did not.

25  Q   And we're going to focus -- I think we're going to

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 121 of 217

1 focus -- you have a -- both arrival and departure times,

2 correct?

3 A    Correct.

4 Q    And let's kind of talk about that.  What's the first

5 column?

6 A    The first column under arrival?

7 Q    The first column, period.

8 A    First column is the date.

9 Q    Okay.  And then what are the next three columns?

10 A    It is the arrival for Mr. Belisle, the defendant, and Mr.

11 Hopkins.

12 Q    And then how about the final three columns?

13 A    Final three columns are the departure times, again, for

14 Mr. Belisle, the defendant, and Mr. Hopkins.

15 Q    All right.  Now what I want to do is kind of -- well, I

16 think we already kind of walked through what the -- how the

17 columns are grouped.  And I think we're going to focus on

18 the -- but I do want to do one thing.  Let's look at the 5th,

19 because there's kind of an unusual notation there, so I want

20 the jury to understand what you did.  Let's walk through on the

21 5th.  Arrival times first.  What was Mr. Belisle's arrival

22 time?

23 A    0710.

24 Q    And then how about Mr. Wells?

25 A    Mr. Wells, 0658.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 122 of 217
(720) 384-8078   attrans@sbcglobal.net

1  Q    And then there's a second entry.  So can you explain what

2  that means?

3  A    So if we're going across, we have Mr. -- or the defendant

4  arrives at 0658 in the morning.  And --

5  Q    And you have -- there's a -- actually, there's a laser

6  pointer in front of you --

7  A    Okay.

8  Q    -- so maybe that might help.

9  A    Okay, so we have the defendant arrives at 0658 in the

10  morning.  Come over to departure, he departs again at 1141.  He

11  arrives again at 1236 and then departs at 1529.

12  Q    Okay.  So that just shows if someone leaves during the day

13  and comes back.

14  A    Correct.

15  Q    All right.  Now, as I've said, what we're most -- I think

16  what we're most interested in is the arrival -- understanding

17  the arrival times more than the departure times.  So let's take

18  one person at a time.  And could you walk through -- you don't

19  have to necessarily go every line, but kind of walk through Mr.

20  Belisle and what his schedule was.

21  A    Okay, generally, Mr. Belisle would arrive -- let me try to

22  stop the shaking.  Generally, he would arrive anywhere

23  between -- we have 6:56 and 7:01.  And I think there's one late

24  day here, with 7:10.

25  Q    So it looks like right around -- pretty close to 7

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 123 of 217
(720) 384-8078   attrans@sbcglobal.net

1   o'clock?

2   A    Correct.

3   Q    And how about the defendant?

4   A    The defendant, of the 11 days, there's five days -- one,

5   two -- five days that were reviewed.  And he arrived anywhere

6   from 0658 or 0656 through to 7 o'clock.

7   Q    And is there one day that's later?

8   A    Yes, the date of the incident is 0823 on the 12th of

9   April.

10  Q    Now, how about ET1 Hopkins?

11  A    ET1 Hopkins ranged anywhere from 7:05, 7:08, 7:12, 7:14 --

12  the latest is the 7:29 and the 7:46 on the 11th.

13       MR. SCHRODER:  And I don't think I have any further

14  questions, Your Honor.

15       THE COURT:  Cross-examination.

16       MR. CURTNER:  Thank you.

17                 **CROSS-EXAMINATION**

18  BY MR. CURTNER:

19  Q    Could -- Officer, could we go back to the chart, please?

20       (Side conversation)

21  Q    Good morning.

22  A    Good morning.

23  Q    Now, I was wondering, these three days -- now, you're

24  aware that Mr. Wells was in Anchorage for medical appointments

25  those three days?  Is that correct?

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 124 of 217

1  A    I did not know that at this time, no.

2  Q    Pardon me?

3  A    I was not aware that those were specifically the three

4  days he was in Anchorage.

5  Q    Now, you remember testifying at the grand jury about this

6  chart?

7  A    I'd have to review.

8  Q    Okay.  Do we have -- hold on a minute, let me --

9       (Side conversation)

10 Q    Agent, could you look at this page?

11 A    Yes, sir.

12 Q    Do you recognize that?

13 A    I do.

14 Q    That's grand jury proceedings in this case?

15 A    Yes, sir.

16 Q    And this is when you're describing the -- this chart to

17 the grand jury?  Correct?

18 A    I believe -- if it was this chart, yes.  I don't recall

19 which chart it was.

20 Q    Well, if you want to look up further, but this is the --

21 these are the times when -- that people arrived at D2 from

22 April 12th -- 10th, 12th, 11th?

23 A    Oh, yes, sir.  I'm reading it now.

24 Q    Okay.  And you see that -- when you were explaining this

25 chart to the grand jury, the prosecutor said, well, Mr. Wells

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 125 of 217

1  was at medical appointments those three days and didn't come to

2  work at all.  Do you remember that now?

3  A    I'm sorry, who did you say said it?

4  Q    Mr. Cooper.

5        MR. SCHRODER:  Your Honor, that's hearsay.  It's -- she

6  didn't say that.

7        MR. CURTNER:  She was there.  She would be aware that

8  he wasn't --

9        THE COURT:  She -- you just ask her if she remembers

10  that she did or she doesn't -- either she does or she doesn't.

11       THE WITNESS:  I -- I don't remember this.  Only reading

12  right now.

13  BY MR. CURTNER:

14  Q    Okay.  You were at the grand jury?

15  A    Yes, sir.

16  Q    You were explaining the chart?

17  A    Yes, sir.

18  Q    There was an absence of three days for Mr. Wells?  Yes?

19  A    Okay.  Yes, sir.

20  Q    And was it your understanding that he was in Anchorage for

21  medical appointment?  That's why he wasn't at work?  Or not?

22  A    Hold on one second, let me read.

23  Q    Go ahead and read it, take your time.

24  A    Reading this, I see that he did say that -- that was

25  somebody else's testimony.

1       MR. SCHRODER:  Objection.  That's a hearsay response,

2  Your Honor.  She's not testifying --

3       THE COURT:  We're getting --

4       MR. SCHRODER:  -- from her memory.

5       THE COURT:  The question is does she re -- did she know

6  what -- she said no.  She looked at the testimony, didn't

7  refresh her recollection.

8  BY MR. CURTNER:

9  Q    Now let me ask you, does that refresh your memory of --

10 when you made this chart, why Mr. Wells wasn't there?

11 A    I don't remember this.

12 Q    Okay.

13 A    It's Ms. Wise (ph) that did the testimony for the grand

14 jury for this.

15 Q    Okay.  So we could bring in that agent to say that he was

16 in Anchorage.  Okay.  Well, let's go back to the chart, then,

17 your chart.  Okay, so you noted all the times that Mr. Belisle

18 would get to work during this time period.  Right?

19 A    Yes, sir.

20 Q    And so he could come in anywhere from around -- usually

21 around 7 a.m.  And -- but as late as 7:10, according to this

22 chart, for this short period of time.  Is that right?

23 A    Correct.  There's one day on the 5th, 7:10.

24 Q    And then Mr. Hopkins -- well, has mentioned more of a

25 variety of times.  He could show up any time from -- what's the

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 127 of 217
(720) 384-8078   attrans@sbcglobal.net

1  earliest -- 7:05?  But he could come in as late as almost 7:30

2  or --

3  A    7:30, 7:46.

4  Q    Okay.  One day it was 7:30, the next week it was 7:46.  So

5  he was more variable about when he might get to work?

6  A    Yes, sir.

7  Q    Okay.  And then Mr. Wells was pretty consistent in getting

8  to work at 7 a.m.; 6:58; 7 o'clock; 6:59; 6:56; 7 o'clock.  Is

9  that true?

10  A    Yes, sir.

11  Q    And, now, it appears to me -- and tell me if I'm wrong --

12  that if he came in at 7 and took off 11:41 and came back 45

13  minutes later, that that might be his lunch hour?

14  A    Yes, sir.

15  Q    Okay.  So these are lunch hours when he -- on the 5th and

16  the 6th and these other days that he came in early and left for

17  about 45 minutes?

18  A    Yes, sir.

19  Q    Okay.  And then each day he usually would work till 3

20  o'clock, past 3 o'clock, typically?

21  A    Yes, sir.

22  Q    Okay.

23          MR. CURTNER:  That's all the questions I have, Your

24  Honor.

25          THE COURT:  Redirect.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 128 of 217
(720) 384-8078  attrans@sbcglobal.net

1    MR. SCHRODER:  Your Honor, I don't have any additional

2 questions, but there's a matter I'd like to clear up.  I didn't

3 realize -- we had given Mr. Curtner an amended version of this

4 this morning.

5    THE COURT:  Uh-huh.

6    MR. SCHRODER:  And I thought that was the one -- I

7 didn't realize that was not the one that was on the screen.

8    THE COURT:  Okay.

9    MR. SCHRODER:  So I just would like to point out -- I'd

10 like -- I think what I'd like to do is put the new one up on

11 the --

12    THE COURT:  Okay.

13    MR. SCHRODER:  -- projector and point out the sections

14 where the changes were.  Oh.  Oh, I'm sorry.  Ours was the

15 acc -- we -- the one we put up was the accurate one, so now I'm

16 double confused.  So the one they saw was acc -- was correct,

17 so -- thank you.

18    MR. CURTNER:  This is correct?

19    MR. SCHRODER:  The one we put up on screen was correct,

20 and the one I handed you was correct.

21    MR. CURTNER:  Okay.

22    MR. SCHRODER:  So --

23    THE COURT:  Does that clear that up?

24    MR. SCHRODER:  That clear -- well, I'm not sure I

25 cleared it up, Your Honor.  I think I'm going to quit while I'm

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 129 of 217

1  behind.

2          THE COURT:  Okay.  All right, thank you.  Thank you,

3  ma'am.

4          THE WITNESS:  Thank you.

5      (Witness excused)

6          THE COURT:  What's the plan now?

7          MR. SCHRODER:  You know, Your Honor, I think we were

8  trying to -- we moved a little faster than we expected this

9  morning --

10          THE COURT:  Nothing wrong with that.

11          MR. SCHRODER:  -- so I figure maybe an early lunch

12  might be -- this might be a good day for that.

13          THE COURT:  Any --

14          MR. SCHRODER:  Or we can see if we got -- we were

15  rushing these people over, but --

16          THE COURT:  Well, I -- you know --

17          MR. SCHRODER:  -- I don't know if they're here yet.

18          THE COURT:  We can -- I have to -- we can't start again

19  till 1, but that's a long lunch as you -- do you mind a long

20  lunch.  They don't care.  Okay, we'll see you -- if you could

21  be there at the big room at five to 1, we'll try to start about

22  1.

23      (Jury not present)

24      (Side conversation)

25          THE COURT:  Anything else we need before?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 743  Filed 09/23/14  Page 130 of 217

1    MR. SCHRODER:  Not from the government.

2    THE CLERK:  All rise.

3    THE COURT:  (Indiscernible) before (indiscernible)

4    comes out (indiscernible).

5    THE CLERK:  Okay.  This matter stands in recess until 1

6    p.m.

7    (Court recessed at 11:37 a.m., until 1:06 p.m.)

8    (Jury not present)

9    THE CLERK:  All rise.  His Honor the Court, the United

10   States District Court for -- is again in session.  Please be

11   seated.

12   THE COURT:  Okay.  Well, bring in -- the jury in.  And

13   the government's next witness.

14   MR. SCHRODER:  Oh, go ahead and get up there.

15   THE COURT:  Please.

16   MR. SCHRODER:  Please.  Start getting into my command

17   mode when I stand up here.

18   MS. LOEFFLER:  Think you're still in the Coast Guard,

19   huh?

20   MR. SCHRODER:  Got to have command of the bridge.

21   THE COURT:  Jury's going to come in a minute.

22   Everybody usually stands for them, so --

23   (Jury present)

24   THE COURT:  Please be seated.  The government's next

25   witness is?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 131 of 217
(720) 384-8078  attrans@sbcglobal.net

1      MR. SCHRODER:  Your Honor, the government calls Special
2  Agent Holly Steeves.
3      THE COURT:  Okay, she's going to swear you in.
4      THE CLERK:  Please raise your right hand.
5          **HOLLY STEEVES, PLAINTIFF'S WITNESS, SWORN**
6      THE CLERK:  Okay, thank you.  Please have a seat.  And,
7  ma'am, if you can please state and spell your full name.
8      THE WITNESS:  Holly Steeves.  S-t-e-e-v-e-s.
9      THE CLERK:  And your first name?
10     THE WITNESS:  H-o-l-l-y.
11     THE WITNESS:  Thank you.
12     THE COURT:  All right, counsel.
13              **DIRECT EXAMINATION**
14  BY MR. SCHRODER:
15  Q   Special Agent Steeves, who do you work for?
16  A   I work for the Federal Bureau of Investigation.
17  Q   And what do you do for the FBI?
18  A   I am a special agent forensic examiner.
19  Q   And how long have you worked for the FBI?
20  A   About 18-1/2 years.
21  Q   And where have you worked?
22  A   I started out in Los Angeles and then went to the
23  Providence, Rhode Island resident agency out of the Boston
24  Division, and then here to Anchorage.
25  Q   And how long have you been here?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 743  Filed 09/23/14  Page 132 of 217

1  A    I have been here since October of 2003.

2  Q    All right.  We've heard this before, but just to get on

3  the record, what kind of essential training do you get when you

4  start with the FBI?

5  A    There's a set curriculum of about eight different courses.

6  Most of them are held at regional computer forensic --

7  Q    Now, I --

8  A    -- laboratories.

9  Q    That was your -- sorry, I don't mean to interrupt, but

10 your basic FBI training.

11 A    Oh, I beg your pardon.

12 Q    We won't go into -- we'll go into that in a minute.

13 A    It's about a 17-week course at the FBI Academy.

14 Q    All right.  And since you've become an FBI agent, how many

15 investigations would you estimate you've participated in?

16 A    Hundreds.

17 Q    And what is your current assignment up here in Anchorage?

18 A    I am a forensic examiner.  I'm also the Computer Analysis

19 Response Team coordinator for the Anchorage Division.

20 Q    And what is a forensic examiner?

21 A    A forensic examiner examines digital media for evidentiary

22 purposes.

23 Q    Okay.  And how long have you been doing that?

24 A    Since -- I've been certified since January of '09 -- 2009.

25 I'm sorry.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 133 of 217
(720) 384-8078  attrans@sbcglobal.net

1  Q    Okay.  So in the last four or five years now, how many

2  pieces of digital media would you estimate that you've examined

3  as a forensic examiner?

4  A    Over -- hundreds.

5  Q    And let's talk a minute.  You were about to take off and

6  tell us about your training.  So let's talk about your

7  training.  Is there a training curriculum to be a computer

8  forensic examiner?

9  A    There is.

10 Q    And what is that?  Could you describe it a bit?

11 A    Sure.  There's about eight courses, different courses, as

12 well as on-the-job training and hands-on, underneath a mentor,

13 a forensic certified examiner.

14 Q    And did you complete that curriculum?

15 A    Yes, I did.

16 Q    And how long did it take you?

17 A    Took me about two years.

18 Q    Okay.  And is that about the normal length of time?

19 A    One to three years.

20 Q    Okay.  And did you -- as part of that, did you go to

21 specific locations for training?

22 A    Yes.  Most of the training was at regional computer

23 forensic laboratories.

24 Q    And what are those?

25 A    Those are laboratories set up across the country.  There's

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 743  Filed 09/23/14  Page 134 of 217
(720) 384-8078  attrans@sbcglobal.net

1  about 16 of them nationally.  And their sole purpose is to
2  examine digital media.
3  Q   And are those law enforcement enfor -- you say laboratory.
4  Is that private, law enforcement?  I mean, what kind of
5  entities run those places?
6  A   It's both.  It's local, state, and federal law enforcement
7  officers working together.
8  Q   And you've attended a number of those courses?
9  A   Yes.
10  Q   Okay.  How many?  Do you remember?
11  A   There's eight in the curriculum, and then I've had
12  additional ones since then.  For the initial basic
13  certification, there's about eight.
14  Q   And during the course of the curriculum, do you also do
15  on-the-job training?
16  A   Correct.
17  Q   And you mentioned a mentor.  Is that how you -- do you
18  work through a mentor to do that?
19  A   A mentor or a coach, yes.
20  Q   Okay.  And what -- what's the -- how do they define a
21  mentor or a coach?
22  A   They're a fully-certified forensic examiner.
23  Q   Okay.  Now at the end of the curriculum do you receive a
24  certification from the FBI?
25  A   Yes.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 135 of 217
(720) 384-8078  attrans@sbcglobal.net

1 Q    And did you receive that certification?

2 A    Yes, I did.

3 Q    And have you received additional certifications as well?

4 A    Yes, I have.

5 Q    In what kind of areas?

6 A    The initial certification is basically in Windows or

7 Microsoft-based systems.  On top of that, then you can get

8 additional certifications.  I hold a certification for

9 Macintosh systems, for cameras, for cell phones, GPS units, and

10 what we call live capture, which means systems that are open

11 and live.

12 Q    So now let's talk first about kind of generally how you do

13 the work that you do.  And probably -- is the best examination

14 maybe a computer hard drive?

15 A    Certainly.

16 Q    All right.  So let's talk about how you would prepare a

17 computer hard drive, a piece of digital media, to examine it.

18 What are the steps you would take?

19 A    Okay.  So the first thing we would do is just -- we would

20 remove the hard drive out of what you would know as the box of

21 the machine or the laptop itself.  And we then set it behind a

22 hardware right blocker.  It's basically a device that's --

23 that's created -- and it's a little -- it's got its own little

24 program -- that keeps the exam machine, my computer, from

25 writing to that original evidence.  We then make an image of

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 136 of 217
(720) 384-8078   attrans@sbcglobal.net

1    that, a bit-for-bit copy, an exact match, and that's the copy

2    that we work with.

3    Q    All right.  And how do you confirm that you've made that

4    bit-for-bit exact match?

5    A    We do what -- we take what's called a -- a hash.  It's a

6    mathematical algorithm and it's considered a digital

7    fingerprint.  It's -- it's only for that image, so it gives us

8    a mathematical number, that we then do the same thing of the

9    image or working copy that we've made, and those two need to

10   match so that we know we have the exact same data that we're

11   dealing with.

12   Q    Now, what ha -- what would happen if you changed, let's

13   say, just something simple, like a period or a comma, from one

14   drive to another?

15   A    Those hashes would no longer match.

16   Q    And how many times is a hash value obtained in the process

17   you go through?

18   A    Three times.  Once from the original, as I mentioned; once

19   from the image that we make; and then, again, after we process

20   that image to be able to review that data, we then hash the

21   image again to prove that we have not changed that data.

22   Q    Okay.  So now you've got your image set up and checked.

23   What is the process of actually examining the drive?

24   A    We use different tools, but basically the industry

25   standard application is what's called the forensic analys --

1  Forensic Tool Kit, or FTK.  It's made by AccessData.  And it

2  processes all the bits and bytes, the data, the ones and zeros,

3  into -- it -- and indexes them, so that we can then search it,

4  and it makes it a lot easier for people to -- human-readable

5  format, so to speak.

6  Q   Okay.  And what's the role of a search warrant in your

7  examination?

8  A   A search warrant needs to be used so that I can confine

9  what is -- what is evidence out of my data set.

10 Q   Okay.  So is that a -- in other words, like a guide to

11 your examination?

12 A   Correct.

13 Q   Okay.  Now, when did you first become involved in this

14 case?

15 A   Shortly after the murders.

16 Q   And if a piece of digital media is examined in a case

17 related to the FBI Division in Anchorage, do you usually get

18 involved with it at some point at the outset?

19 A   Yes.

20 Q    And why is that?

21 A   Because only forensic certified examinations in the bureau

22 are allowed to do the imaging.

23 Q   Okay.  Now, do some -- do the investigation --

24 investigating agents sometime actually do the exam?

25 A   Yes.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 743  Filed 09/23/14  Page 138 of 217

1  Q    And how does that work?

2  A    We would -- like a -- process with the application, as I

3  had mentioned previously, and then set it up so that they're

4  able to review it.  It's -- it -- it helps them to be able to

5  do that basic review of what we call active or logical files.

6  Q    And why is it helpful to have the case agents do that

7  review?

8  A    Because they know the investigations better than we do.

9  Q    Okay.  Now, if a more technical kind of a review is

10  involve -- or is required, do you get involved in those?

11  A    If I'm asked to, yes.

12  Q    And did you personally examine some digital media in this

13  case?

14  A    Yes, I did.

15  Q    All right.  And were you asked to conduct a forensic

16  examination of a hard drive in this case?

17  A    Yes, I was.

18  Q    And what was on the media that you were asked to examine?

19  A    It was the hard drive from the computer that was used by

20  Rich Belisle on 4/12 of 2012.

21  Q    Okay.  And what were you requested to investigate or to

22  review?

23  A    The activity on April 12th of 2012 on that computer.

24  Q    All right.  And was there a search warrant for Mr.

25  Belisle's hard drive?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 139 of 217

1  A    No, there wasn't.  It was government property.  But we did

2  receive a consent letter from the United States Coast Guard.

3  Q    Now, what tools did you use -- you mentioned some a moment

4  ago.  But what tools did you use in this case to

5  examine that hard drive?

6  A    I would have used AccessData's FTK imager to image, and

7  then AccessData's Forensic Tool Kit to process.

8  Q    Okay.  And did you find evidence that Mr. Belisle's

9  computer was used on the morning of April 12th, 2012?

10 A    Yes, I did.

11 Q    And what was the first activity you saw?

12 A    The first activity on the 12th of April was the launching

13 of Internet Explorer.

14 Q    And what time was that?

15 A    That was at 7:02.

16 Q    Okay.  And did you find any indication that Mr. Belisle

17 turned on his electronic mail?

18 A    At 7:03, there's indication that Outlook, Microsoft

19 Outlook, which is what -- in email, and Acrobat were both --

20 Acrobat, I'm sorry -- were both launched.

21 Q    All right.  And any indication of email activity in that

22 account?

23 A    Inside, under R.W. Belisle, on the exchange information

24 that I had, in deleted items there were six emails that were

25 modified at 7:03, 7:05, and 7:07.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 743  Filed 09/23/14  Page 140 of 217

STEEVES - DIRECT

1  Q    And what was the last time you were able to determine

2  there was possible user activity on the account?

3  A    There was an email that was created in the inbox at 4:11

4  that was modified on 7:07.  There was -- and there were two

5  emails that were created that morning at 4:26 and 4:39.  Those

6  three emails in particular -- there's remnants of those emails

7  in two temporary files.  The date of creation of those

8  temporary files was seven oh ten, and that's the last time that

9  I saw any activity there could have been.

10 Q    You said date of the creation was 7/10?

11 A    I -- I beg your pardon.  The time of the creation was

12 7:10.  The date was 4/12 of 2012.

13 Q    Okay.  So that was the last user activity you saw?

14 A    Correct.

15 Q    Now, did any emails come in between 7:10 that last time

16 you noted, and let's say 7:40, 45?

17 A    There's an email at 7:23 that remains unread.

18 Q    Now, were you also asked to examine a cellular phone?

19 A    Yes, I was.

20 Q    And did the cell phone you examined have any text naming

21 on it to indicate whose phone it was?

22 A    It had an email associated with it.

23 Q    And who was that email associated with?

24 A    That was -- it was either JimWells69hotmail@hotmail.com,

25 or JamesWells69@hotmail.com.  I don't recall.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 141 of 217
(720) 384-8078  attrans@sbcglobal.net

1  Q   All right.  Was there any text on the phone itself

2  indicating whose phone it was?

3  A   No.

4  Q   Okay.  Now, is the process of examining a cell phone

5  similar to examining a hard drive?

6  A   Yes.

7  Q   And -- but are there differences?

8  A   Yes.

9  Q   And what's -- if there's any signif -- what are the

10 significant difference or differences?

11 A   The significant difference is that with a cell phone or

12 any other mobile device, we can't rock -- write-block that

13 device.  We have to -- by powering that device on, and it has

14 to be powered on to -- for it to talk to our tools, we -- it is

15 written to, but it -- the system side of it's written to and

16 not the user files.  It --

17 Q   And do you also make an image of that?

18 A   If an -- if I'm able to, yes.

19 Q   Okay.  And if you create an image, then does your working

20 with that image continue to affect it?

21 A   No.  It's a forensic image and it would not affect the

22 image after that.

23 Q   All right.  Now, in this case, were you able to make a

24 copy of the phone?

25 A   There was another --

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 142 of 217
(720) 384-8078   attrans@sbcglobal.net

1  Q   An image, let's say.

2  A   I'm sorry?

3  Q   I'm sorry.  I'm probably using the wrong terminology.  But

4  did you make an image of the phone in this case?

5  A   I obtained an image of the phone from another law

6  enforcement officer.

7  Q   And did you verify that copy was accurate?

8  A   I was able to verify the image, yes.

9  Q   And what types of activity were you used to look for, or

10 were you asked to look for?

11 A   I was asked to look for activity on April 12th of 2012.

12 Q   Okay.  And did you confirm that the data you were

13 searching for was within the parameters of the search warrant

14 in that case?

15 A   Yes.

16 Q   And what did you determine about the GPS function of that

17 phone being on in the morning of April 12th, 2012?

18 A   That phone showed that the location -- GPS attributes of

19 the phone were turned off as of October 31st of 2011.

20 Q   So they'd been off for a number of months?

21 A   Correct.

22 Q   All right.  And what were you able to find out about

23 actual use of the cell phone during that morning of April 12th?

24 A   As far as the use when -- and looking at the call logs was

25 really what I turned to.  And in -- there was an incoming call

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 143 of 217
(720) 384-8078   attrans@sbcglobal.net

1  at 8:10, that was the first call that morning, and an outgoing

2  call at 8:12.

3  Q    And those were the first calls that you saw on that

4  morning?

5  A    The first calls of that day, April 12th, 2012.

6        MR. SCHRODER:  Your Honor, we don't have any additional

7  questions on direct.

8        THE COURT:  Cross-examination.

9                    **CROSS-EXAMINATION**

10 BY MR. CURTNER:

11 Q    Good afternoon.  Now, in your analysis, typically you use

12 KTF -- that's the Forensic Tool Kit?

13 A    AccessData Forensic Tool Kit?

14 Q    Uh-huh (affirmative).

15 A    Yes.

16 Q    Okay.  And with that you're capable of going into any kind

17 of a digital media, hard drives, phones, and going -- and

18 basically imaging and searching all the information that's in

19 that particular device.  Is that correct?

20 A    I'm not sure I understand your question.  Forensic Tool

21 Kit is utilized to process an image.

22 Q    Right.

23 A    And -- and not -- sometimes you can use it for phones.

24 But yes, you can use it to search the image --

25 Q    And then what --

1  A     -- if that's what you're asking me.

2  Q     Okay.  And then when you have an image from a computer,

3  for example, you can search all the files that are in there,

4  correct?

5  A     You can search all of the active files, correct.

6  Q     Can you look through deleted files as well?

7  A     You can look through active deleted files, yes.

8  Q     Okay.  So if there's any deleted files that maybe somebody

9  thought that they were deleted, it still would be in the hard

10 drive and you can discover those as well.  Correct?

11 A     You could possibly, yes.

12 Q     Okay.  Is that what typically you do in your business, is

13 look for any kind of evidence or information that might be in

14 any kind of digital media?

15 A     Yes.

16 Q     Now, can I assume that you did the analysis for any of the

17 digital media that was recovered from Mr. Wells or his

18 residence?

19 A     No.

20 Q     You didn't do that yourself?

21 A     No, I did not.

22 Q     Okay.  All right.  That's all the questions I have.  Thank

23 you.

24         THE COURT:  Redirect.

25         MR. SCHRODER:  None, Your Honor.

1    THE COURT:  Thank you.  You're excused.  The
2    government's next witness.

3        (Witness excused)

4        MR. SCHRODER:  Petty Officer Newby, the witness stands
5    right up there in the corner, through the little swinging door.

6        THE COURT:  That door pulls out.  And you just step in
7    there, remain standing, and she'll swear you in.

8        THE CLERK:  Please raise your right hand.

9        **VANCE NEWBY, PLAINTIFF'S WITNESS, SWORN**

10   THE CLERK:  Okay, thank you.  Please have a seat.  And,
11   sir, if you can please state and spell your full name.

12   THE WITNESS:  Vance Newby.  V-a-n-c-e, N-e-w-b-y.

13   THE CLERK:  Thank you.

14   THE COURT:  All right, counsel.

15                    **DIRECT EXAMINATION**

16   BY MR. SCHRODER:

17   Q    Petty Officer Newby, who do you work for?

18   A    The U.S. Coast Guard.

19   Q    Commandant will be happy to hear that.

20   A    ITC (indiscernible).

21   Q    Where are you currently assigned?  That's the next
22   question.

23   A    COMMSTA Kodiak.

24   Q    All right.  And what's your rank?

25   A    IT1.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 743  Filed 09/23/14  Page 146 of 217

1  Q    And what -- I think we've heard, but just as a reminder,

2  what is an IT?

3  A    We repair most of the phones, computers, servers, cabling

4  infrastructure, camera system, things of that nature.

5  Q    And how long have you been in the Coast Guard?

6  A    Twelve years.

7  Q    And where have you been assigned, just -- can -- state

8  briefly your other assignments before you got to COMMSTA

9  Kodiak?

10 A    U.S. Coast Guard Cutter Polar Sea, TRACEN Petaluma, for

11 ITA school.  And then ESU Seattle, and then COMMSTA Kodiak.

12 Q    What kind of cutter is the Polar Sea?

13 A    It's a polar roller.

14 Q    What does that mean?

15 A    It's a -- breaks ice in Antarctica.

16 Q    All right.

17 A    The Polar Sea and the Polar Star are both designed to go

18 south.

19       THE COURT:  Okay, you talk too fast.  What did you say?

20 It's a what?

21       THE WITNESS:  It's a polar roller.

22       THE COURT:  I got that.  What is that?

23       THE WITNESS:  It's a icebreaker.

24       THE COURT:  Okay.  I know what you mean.  All right.

25 BY MR. SCHRODER:

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 147 of 217
(720) 384-8078   attrans@sbcglobal.net

1  Q    And what were your duties on -- what are your current

2  duties at COMMSTA?

3  A    Repair all the phones and computers and servers, camera

4  systems.

5  Q    And did you have similar responsibilities in April 12th,

6  2012?

7  A    Yes, sir.

8  Q    All right.  Now, does COMMSTA have a videocamera system?

9  A    Yes, sir.

10 Q    And do your -- some of your responsibilities include that

11 system?

12 A    Yes, sir.

13 Q    And how many cameras are there?

14 A    Fifteen.

15 Q    And where are -- well, I'm not going to ask you where

16 they're placed, there's too many of them.  But are the video

17 images recorded from those cameras?

18 A    Only the exterior cameras.

19 Q    And on what kind of media -- how are those recorded?

20 A    They're stored on an external hard drive attached to a

21 server.

22 Q    And how much time is recorded?  Is it a set date or time,

23 or how's that happen?

24 A    We have about 20 days' worth of recordings before they

25 start overriding themselves.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 148 of 217
(720) 384-8078  attrans@sbcglobal.net

1   Q    Okay.  And so about 20 days?

2   A    Yes, sir.

3   Q    Twenty days' worth.  And are the cameras controllable?

4   A    They are.  They're all -- all the exterior ones are

5   pan/tilt/zooms.

6   Q    Okay.  And where are they controlled?

7   A    They're controlled from the CWO Terminal --

8   Q    Okay.

9   A    -- which is on the ops deck.

10  Q    All right.  And how do they view those?  Are they on a

11  computer screen here?  How does the --

12  A    They're on a large monitor --

13  Q    And CWO is -- if --

14  A    -- on the wall.

15  Q    -- you could remind us, what's -- oh, sorry.

16       THE COURT:  Somebody talk -- who's going to talk first?

17       MR. SCHRODER:  How about me?

18       THE COURT:  Okay.

19  BY MR. SCHRODER:

20  Q    The -- what -- you used the term "CWO."  I just wanted you

21  to remind the jury what that is.  What's a CWO?

22  A    Command watch officer.

23  Q    All right.  And so the command watch officer has control.

24  How do they view those?

25  A    They view them on a large television mounted to the wall.

**NEWBY - DIRECT**

1  Q   And who has control of the camera, where they point?

2  A   The CWO.

3  Q   All right.  Now let's talk first about, is there a camera

4  on the T2 building, the rigger shop?

5  A   There is.

6  Q   And do you have any knowledge about where it was trained

7  on the morning of April 12th, 2012?

8  A   Yes.  It was trained on the flag.

9  Q   And why is it trained on the flag?

10 A   So they could see if the flag is furled or caught up or if

11 the winds are too high and they need to put up the storm flag.

12 Q   Okay.  Now I want to look -- I think it's 47, Kim.

13     (Side conversation)

14 Q   Now, is there also a camera -- there -- I know there's a

15 number of cameras at the T1 building, but is there one on a

16 pole?

17 A   There is.  There's one on the outside of T1, in the left-

18 hand side of that screen.

19 Q   Okay.  And you've got -- you got a laser pointer up there

20 somewhere, you should.

21     THE CLERK:  And just to clarify, we are seeing Exhibit

22 47?

23     MR. SCHRODER:  It's Exhibit 47, yes.

24     THE CLERK:  Thank you.

25     MR. SCHRODER:  Which has already been admitted, I

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 150 of 217
(720) 384-8078   attrans@sbcglobal.net

1    believe.

2         THE CLERK:  Yes.

3         MR. SCHRODER:  Okay.

4         THE WITNESS:  It's over here somewhere on a pole.

5    BY MR. SCHRODER:

6    Q    Okay.  And are you aware of where the -- kind of the view

7    of that camera was the morning of the murders?

8    A    This camera usually points at these two parking lots, so

9    you can see who's parked out front.  They occasionally use it

10   to check Antenna 15, which is up on this hill.  It's a

11   rotatable antenna, and they need to see --

12   Q    Okay.

13   A    -- occasionally where that antenna's pointed.  I believe

14   that day it was pointed down the hill, which is pretty normal.

15   Q    Okay.  And I -- do you know where the camera is on the T2

16   building?  I -- are you aware of that?

17   A    Yes, sir.

18   Q    And about where?  Could you show us?

19   A    Let's see.  This is T2, so it would be right about there.

20   Q    Okay.

21   A    If I can keep my hand steady enough.

22   Q    All right.  And then show us again where that view was

23   that morning.

24   A    And normally that camera points right at the flag, which

25   is right here.

1  Q    Okay.

2  A    It has this view, right here.  They -- well, yeah.

3  Q    Okay, that's good.  Thank you.  All right, we're done with

4  that.  Now just a couple questions, kind of work-related

5  questions.  Did you also know the two victims, Rich Belisle and

6  Jim Hopkins?

7  A    Yes.

8  Q    And did you know them as co-workers?

9  A    Yes, sir.

10 Q    Any social interaction?

11 A    Not outside of work.

12 Q    All right.  And how well did you know Mr. Belisle?

13 A    Fairly well.

14 Q    And how did you find him to be as a co-worker?

15 A    Great.

16 Q    And how about Mr. Hopkins?

17 A    Also --

18 Q    Did you know him?

19 A    Yeah.

20 Q    And how'd you find him to be as a co-worker?

21 A    Also great.

22 Q    What was your impression of his work ethic?

23 A    Good.

24 Q    Okay.  And how about -- you know, there's been some

25 testimony that he could kind of be gruff, but was that -- did

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 152 of 217

1    you see that side of him or did you see --

2    A    I didn't see --

3    Q    -- other sides?

4    A    -- that side of him.  The side I saw was more as a -- a

5    peer, not a subordinate.  So when he came up the hill to --

6    for, like, all hands or anything like that, he would come over

7    and -- by IT1 Sanders and I -- or ITC Sanders now, at our desk,

8    and kind of smoke and joke and talk for a little bit before

9    the -- all hands.

10   Q    Did you find he had a good sense of humor?

11   A    He had a great sense of humor.

12   Q    Are you aware of what kind of vehicle Mr. Wells drove?

13   A    Yes, sir.

14   Q    And what kind?

15   A    It was a white pickup truck.

16   Q    Okay.  Now, the jury's going to see some more testimony on

17   this this afternoon, but since I've got you on the stand, prior

18   to your testimony today, did you review video and assist in

19   identifying a group of vehicles?

20   A    Yes, sir.

21   Q    All right.  And are you aware of what the time frame of

22   that was?

23   A    Yes, sir.

24   Q    Okay.  And do you know -- could you tell the jury?

25   A    I believe 0630 to 0830.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 153 of 217

1  Q    All right.  And how did you participate in identifying

2  this vehicle, or identifying the vehicle?

3  A    I -- we -- they're co-workers, so we recognized the

4  vehicles --

5  Q    Okay.

6  A    -- and know who drives what usually.

7  Q    But how did you see the vehicles?  Describe the process of

8  what you did.

9  A    They showed the vehicles coming in to work, and we -- the

10 vehicle drives by, you just say who's in the vehicle.  You say

11 whose vehicle that was.

12 Q    All right.

13       (Side conversation)

14       MR. SCHRODER:  May I approach, Your Honor?

15       THE COURT:  Yes.

16 BY MR. SCHRODER:

17 Q    I'm handing you what's been marked as 390.  Is there an

18 indication on any of those lines of that document that you

19 helped identify a vehicle?

20 A    Yes, sir.

21 Q    And what -- what's that indication?

22 A    It's my initials --

23 Q    All right.

24 A    -- on the left-hand side.

25 Q    And which line -- on which line did you put your initials?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 154 of 217
(720) 384-8078  attrans@sbcglobal.net

1   A    At 071606.

2   Q    And what vehicle did you identify?

3   A    A light-blue Jeep SUV.

4   Q    And who was -- whose car was that?

5   A    That's actually Dylan Baker's girlfriend at the time.  His

6   truck was in the shop, getting worked on.

7   Q    All right.

8           MR. SCHRODER:  No further questions, Your Honor.

9           THE COURT:  Cross-examination.

10          MR. SCHRODER:  Want me to leave that up there, Rich,

11  (indiscernible)?

12          MR. CURTNER:  That's fine.

13                        **CROSS-EXAMINATION**

14  BY MR. CURTNER:

15  Q    Good afternoon.

16  A    Good afternoon.

17  Q    Now, as I understand from the ops deck at the main

18  building at COMMSTA, you have control over all the

19  videocameras, surveillance cameras?

20  A    Only the exterior ones are pan/tilt/zooms.  The interior

21  cameras are fixed.

22  Q    Okay.  And then how many extra cameras are there from --

23  that you control from that site?

24  A    Nine.

25  Q    Nine different cameras.  And they go -- the two you

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 155 of 217

1  describe, but they also go to other locations on the island?

2  A    There's a cou -- few cameras that we have at a place

3  called R2, which is our receive site.  There's a few cameras

4  out there.

5  Q    Okay, and there's also other exterior cameras around the

6  T1 building itself?

7  A    Yes, sir.

8  Q    One for the loading dock in the back?

9  A    Yes, sir.

10  Q    And do you know what -- where else any other exterior

11  cameras are located?

12  A    Think that's about it mounted on the outside of the

13  buildings of T1 and T2 and then R2.

14  Q    Okay, I'm sorry, you have -- how many do you have at R2?

15  A    I think there are two or three cameras at R2.

16  Q    Okay.  And then there's one at T2?

17  A    I believe so.  I think there's -- I think I have a list of

18  them all.  Could I see that to refresh my memory?  Thank you,

19  sir.

20  Q    Okay, does it help?

21  A    It does.  Thank you, sir.

22  Q    Okay.  No problem.  How many at your other site?

23  A    At R2?

24  Q    Yeah.

25  A    Exterior cameras only, or do you want interior ones as

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 156 of 217
(720) 384-8078   attrans@sbcglobal.net

1  well?

2  Q    Exterior.

3  A    Exterior.  Just one.

4  Q    One there, okay.  And how many at -- do T --

5  A    No, two.

6  Q    There's --

7  A    (Indiscernible) there's two exterior cameras.

8  Q    Two exterior cameras there.

9  A    One on a tower, one on -- above the front door.

10  Q    Okay.  And then on the rigger shop itself?

11  A    Three, sir.

12  Q    There's three at the rigger shop?

13  A    Yes, sir.

14  Q    Okay, I think you identified one being on the exterior

15  corner of the building.

16  A    Yes.

17  Q    And where are the other two?

18  A    Back gate T1, and T1 back.  They're on the back side of

19  the building.

20  Q    Of T2 or T1?

21  A    T1.

22  Q    Okay, I'm sorry.  No, T2 is the rigger shop, right?

23  A    Yes, sir.

24  Q    How many video -- exterior videocameras are there on the

25  rigger shop T2 building?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 157 of 217
(720) 384-8078  attrans@sbcglobal.net

1  A    Think just the one.  Yeah, I think it's just that back

2  one.

3  Q    Okay.  So there's three.  Then that leaves six exterior

4  cameras at the T1 now?

5  A    Yeah.

6  Q    Okay, so the first one you talked about was on the tower

7  at T1, the main station, looking at the parking lot.  Is that

8  correct?

9  A    Yes, sir.

10  Q    And that could be controlled from the ops deck?

11  A    Yes, sir.

12  Q    You can control the focus or the depth of field or the

13  angle of the --

14  A    You can zoom in and out.  It can pan left or right and --

15  Q    Okay.

16  A    -- it can tilt up and down.

17  Q    Okay.  You can all -- you can do all those controls from

18  inside the ops deck?

19  A    Yes, sir.

20  Q    And somebody outside the ops deck would not know where

21  that camera -- what you're controlling from there.  Is that

22  correct?

23  A    You can look at the camera and see where it's pointed.

24  Q    If you see it moving.  Now, sometimes I notice, some of

25  those films, they look like they go out to the valley.  Is that

NEWBY - CROSS

1  looking at the other tower?

2  A    It's probably looking at the RLPA, Antenna 15, that's up

3  on the hill.

4  Q    Okay.  And so for -- if there was a scene on the video

5  that just looks like Kodiak or Alaska, it's not the parking lot

6  or any buildings.  That's what that would be?

7  A    Probably, yes, sir.

8  Q    Same camera, though, can focus both ways?

9  A    Yes, sir.

10 Q    And then the camera at T2, is that also movable?

11 A    Yes, sir.

12 Q    Okay.  So you could point it at the flagpole?

13 A    Yes, sir.

14 Q    And I think, in reviewing some of the -- this video, it

15 was focused on the flagpole all evening of that April 11th and

16 April 12th, wasn't it?  Was it moved?

17 A    Prior to the 12th, it was almost always trained directly

18 on the flagpole.

19 Q    Even in the evenings?

20 A    Yes, sir.

21 Q    And normally would the flags be down after -- at sunset

22 or --

23 A    It depends if the -- the lights are working or not.  If

24 the light are working, then they can leave the flag up.  If the

25 lights are not working, they take the flag down and put it up

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 159 of 217

1  again each morning.

2  Q    Okay.  And what else can you focus the T2 camera on?  From

3  the ops deck, looking at the view from the camera, what else

4  can you focus on?

5  A    Which camera?

6  Q    The one at T2 in the corner of the building.

7  A    You can pan around, look at that parking lot right there

8  in front of T2.

9  Q    All right.

10 A    That's about it.

11 Q    Okay.  So that's -- there are four other exterior cameras

12 at T1?  I know there's one at the loading dock, right?

13 A    Yes, sir.

14 Q    Okay, that's -- think that's 2 at T1?  What other ones

15 are --

16 A    There's another one on the pole in the back side of -- of

17 T1, on that back fence.

18 Q    What is -- what's the view on that?

19 A    It looks down the back of T1, the back of the building.

20 Q    Okay.  And what other exterior cameras are there?

21 A    There's one on the back gate of T1.  Loading dock.  R2

22 tower -- that's the other site.  That one's not the one we're

23 talking about.  Sorry, my list is kind of hard to read.  It's

24 black on black.  And then T2 back.

25 Q    T2 back.  What does that mean?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 160 of 217
(720) 384-8078  attrans@sbcglobal.net

1   A    You're just asking about the different cameras and their

2 locations?

3   Q    Uh-huh (affirmative).  Does that mean there's one at the

4 back --

5   A    Do you --

6   Q    -- of T2?

7   A    Yeah.

8   Q    Okay, so where would that view be of?

9   A    Usually the equipment that's parked back there.

10   Q    And is -- it's on the T2 building.

11   A    Is it?  Well, that's --

12   Q    I'm ask --

13   A    -- it's labeled.  I don't remember where that one's

14 trained exactly.

15   Q    Do you remember reviewing any video from that camera of

16 behind the T2 rigger shop building?

17   A    No.

18   Q    Okay.  That's all the questions I have.  Thank you.

19         THE COURT:  Redirect.

20                  **REDIRECT EXAMINATION**

21 BY MR. SCHRODER:

22   Q    Just to try to clarify, do you remember whether that back

23 camera, T2, that we just discussed, do you remember where that

24 was -- if that was there on April 12th?

25   A    Oh.  That's right.  We installed that one afterwards.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 743  Filed 09/23/14  Page 161 of 217

1  Q   Okay.  So that --

2  A   That was the -- the -- that took the last slot on the

3  software that we have that this camera system runs on.  We have

4  15 slots on the software we purchased.  You can buy more, but

5  we haven't.

6  Q   So that's a new camera since --

7  A   Yes, sir.

8  Q   -- the homicides?

9  A   Since the homicides, it's --

10  Q   All right.

11  A   -- a new camera.

12        MR. SCHRODER:  That's all, Your Honor.

13        THE COURT:  Recross.

14        MR. CURTNER:  Nothing further.  No, thanks.

15        THE COURT:  Thank you, sir.  You're done.  That's it.

16        THE WITNESS:  Thank you, Your Honor.

17        THE COURT:  The next witness.

18        THE WITNESS:  Should I just leave this stuff up here?

19        MR. SCHRODER:  You could bring it back.

20        THE COURT:  One -- drop it back on --

21        MR. SCHRODER:  Yeah.

22        THE COURT:  -- your way out.

23     (Witness excused)

24        MR. SCHRODER:  Chief, you can just come right to the

25  front, and the witness stand's up there in the corner.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 162 of 217
(720) 384-8078  attrans@sbcglobal.net

SANDERS - DIRECT

1    THE COURT:  And you come around there.  That door pulls
2  out.  And you just step into the witness box and remain
3  standing for a second.  My clerk over here will swear you in.
4    THE CLERK:  Please raise your right hand.
5    **JOSHUA SANDERS, PLAINTIFF'S WITNESS, SWORN**
6    THE CLERK:  Thank you.  Please have a seat.  And, sir,
7  if you can please state and spell your full name.
8    THE WITNESS:  Spell the whole thing?  Joshua Sanders.
9  J-o-s-h-u-a, S-a-n-d-e-r-s.
10    THE CLERK:  Thank you.
11    THE COURT:  Counsel.
12    **DIRECT EXAMINATION**
13  BY MR. SCHRODER:
14  Q   Chief Sanders, who do you work for?
15  A   I work for the U.S. Coast Guard, currently in Sault Ste.
16  Marie, Michigan.
17  Q   All right.  What command are you assigned to in Sault Ste.
18  Marie?
19  A   Electronic Support Detachment.
20  Q   And where did you work for before you were in Sault Ste.
21  Marie?
22  A   I worked for COMMSTA Kodiak.
23  Q   And what was your assignment at COMMSTA Kodiak?
24  A   I was the IT1.
25  Q   All right.  And what does that mean?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 743  Filed 09/23/14  Page 163 of 217

SANDERS - DIRECT

1  A    I ran the -- I supervised --

2          THE COURT:  Okay, could you get -- pull that microphone

3  closer or -- closer, or do something, or --

4          THE WITNESS:  That better?

5          THE COURT:  We'll see.  If the hand goes up, that means

6  they can't hear you.

7          THE WITNESS:  I -- what was the question again?

8  BY MR. SCHRODER:

9  Q    Question was, what did the IT1 do at COMMSTA?

10 A    I was in charge of maintaining the computers, the

11 telephones, the paging system, and the camera system.

12 Q    And how long have you been in the Coast Guard?

13 A    Just over 18 years.

14 Q    And we just heard some kind of more extensive testimony

15 about the video system, so we're not going to go into any of

16 that -- any real depth here.  But does the COMMSTA have a

17 videocamera system?

18 A    Yes.

19 Q    And is -- when you were there, did you have some

20 responsibility for that system?

21 A    Yes.

22 Q    And are the video images recorded?

23 A    Yes.

24 Q    And how are they recorded?  Onto what kind of media are

25 they recorded onto?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1  A    We use a program that runs off of a server and it records

2  onto an external hard drive.

3  Q    All right.  And were you at work on the day of April 12th,

4  2012?

5  A    Yes.

6  Q    And were you asked to provide evidence from that -- or

7  copies or parts or something from that video system?

8  A    I was.

9  Q    And initially what did you provide?

10 A    I provided burned copies on a CD to the law enforcement.

11 Q    And did you eventually provide more?

12 A    I did.

13 Q    And what did you provide after that?

14 A    I provided the entire external hard drive.

15 Q    And what would that have -- hard drive generally, what

16 would that have contained?

17 A    About a month and a half worth of external video.

18 Q    Okay.  Now, before your testimony today, did you review a

19 group of video segments?

20 A    I did.

21 Q    And what cameras were involved in those segments?

22 A    The T2, out across the parking lot, and a T1, across the

23 parking lot and -- and our front gate.

24 Q    And what time frame did those video segments cover?

25 A    I believe it was 6:30 to 8:30.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 165 of 217
(720) 384-8078   attrans@sbcglobal.net

1  Q    All right.

2           MR. SCHRODER:  Your Honor, the government moves to

3  introduce Exhibit 148, which is from the T1 camera, from 6:45

4  to 7:45; Exhibit 149, which is the T2 camera, from 6:45 to

5  7:45; Exhibit 150, which is the T1 camera, from 7:30 to 8:30;

6  and Exhibit 151, which is the T2 camera, from 7:30 to 8:30.

7           MR. OFFENBECHER:  Are you going to just -- you just

8  want to do them in bulk or --

9           MR. SCHRODER:  Yes.

10           MR. OFFENBECHER:  And are you going to show them here

11  or --

12           MR. SCHRODER:  No, not right -- no.  Just --

13           MR. OFFENBECHER:  Okay --

14           MR. SCHRODER:  -- in case -- so there's parts, whatever

15  we need to use.

16           MR. OFFENBECHER:  Okay.  These are the ones that we

17  already have?

18           MR. SCHRODER:  Yes.

19           MR. OFFENBECHER:  Yeah.  No objection.

20           MR. SCHRODER:  Yeah.

21           THE COURT:  They all will be received --

22           MR. SCHRODER:  Okay.

23           THE COURT:  -- without objection.

24      (Plaintiff's Exhibits 148 through 151 admitted)

25           MR. SCHRODER:  And I don't have any further questions.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 166 of 217
(720) 384-8078  attrans@sbcglobal.net

1   Thank you, Chief.

2        THE COURT:  Cross-examination.

3                  **CROSS-EXAMINATION**

4   BY MR. OFFENBECHER:

5   Q    Mr. Sanders, good afternoon.

6   A    Good afternoon.

7   Q    Mr. Sanders, during the course of your work at the

8   COMMSTA, did you become acquainted with Jim Hopkins?

9   A    Yes.

10  Q    And would you say that you were -- had fairly close

11  contact with him?

12  A    At times.

13  Q    How long were you and Mr. Hopkins both at the COMMSTA?

14  A    I think the whole three years.

15  Q    The whole three years were both -- you overlapped during

16  that period of time.  During that period of time, did you also

17  become acquainted with Deborah Hopkins?

18  A    Yes.

19  Q    How did that happen?

20  A    We would see them out in town together.

21  Q    Okay.  And did you also see Deborah Hopkins at T2 or on --

22  at the COMMSTA?

23  A    Yes.

24  Q    Where at the COMMSTA did you see Mrs. Hopkins?

25  A    T2.

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 167 of 217

SANDERS - CROSS

1  Q    And on -- was that during normal business hours?

2  A    Yes.

3  Q    And at some point was -- did there become an issue about

4  Mrs. Hopkins being at T2 when -- well, was there ever an issue

5  in terms of that?

6  A    Yes.

7  Q    And describe for the jury what the issue was?

8  A    Well, it's been a while.  If I remember correctly, while

9  most of the rigger shop was out in -- doing a project on an

10 island, she came in and said a few things to a few of the

11 people who had to stay behind, and it made them feel

12 uncomfortable.

13 Q    And that was brought to your attention?

14 A    It was.

15 Q    And did you in your position as the IT1 -- you were the

16 IT1, is that right?

17 A    Yes, I was.

18 Q    In your position as the IT1, did you -- you were called

19 upon to handle that?

20 A    Yes.

21 Q    Some of the folks who were left behind at the rigger shop

22 brought that to your attention?

23 A    Yes, they did.

24 Q    And did you resolve that issue?

25 A    I did.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 168 of 217
(720) 384-8078  attrans@sbcglobal.net

SANDERS - CROSS

1 Q    During the course of your overlap of three years with Mr.

2 Hopkins, did you get an impression about the status of the

3 relationship between Jim Hopkins and Deborah Hopkins?

4 A    Is this -- you're asking me about a feeling?

5 Q    Yeah, your impressions.

6 A    Yes.  I had an impression of their marriage.

7 Q    I'm sorry?

8         THE COURT:  You're talking very soft.

9         THE WITNESS:  Sorry.

10         THE COURT:  Get right up to the microphone.

11         THE WITNESS:  Yes.

12 BY MR. OFFENBECHER:

13 Q    What were your impressions of their marriage?

14 A    It was very good, strong.

15 Q    Do you recall telling others that Jim Hopkins had told you

16 that Deborah Hopkins --

17         MR. SCHRODER:  Objection.  Leading.

18         THE COURT:  Sustained.

19         MR. SCHRODER:  And hearsay.

20         THE COURT:  Sustained.

21 BY MR. OFFENBECHER:

22 Q    But do you have -- do you recall having conversations

23 about the status of their marriage with others?

24 A    No.

25 Q    Well, let me direct your attention to the time when you

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 169 of 217
(720) 384-8078   attrans@sbcglobal.net

SANDERS - CROSS

1  resolved this issue about Mrs. Hopkins coming to the T2 rigger

2  shop.  All right?  We've just talked about that, right?

3  A    Yes, sir.

4  Q    And Leah Killingsworth and Para Upchurch were two of the

5  folks who brought that to your attention, weren't they?

6  A    Yes, sir.

7  Q    And they were concerned about Mrs. Hopkins coming to the

8  T2 rigger shop, weren't they?

9  A    Yes, sir.

10 Q    And you took them aside and talked to them about that,

11 didn't you?

12        MR. SCHRODER:  Objection.  Leading, Your Honor.  This

13 has got to be a direct examination.  We didn't --

14        THE COURT:  I understand.  I understand.

15        MR. OFFENBECHER:  But, Your Honor, this gentleman has

16 come from --

17        THE COURT:  Did -- well, just ask, "Did you?"

18        MR. OFFENBECHER:  He's come from -- all the way across

19 the country.  We can make him stay here and do it on direct

20 examination --

21        THE COURT:  You still can't lead on direct examination.

22        MR. OFFENBECHER:  I'm not -- I'm just trying to direct

23 his attention to a particular conversation.  It's not a lead --

24 I'm not trying to lead him to the answer.

25        THE COURT:  Okay.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 743  Filed 09/23/14  Page 170 of 217
(720) 384-8078  attrans@sbcglobal.net

SANDERS - CROSS

1  BY MR. OFFENBECHER:

2  Q    All right.  So let's start over again.  You remember

3  the -- there was this problem at the rigger shop?

4  A    I do.

5  Q    And you remember that Ms. Upchurch and Ms. Killingsworth

6  brought that to your attention?

7  A    I do.

8  Q    And as part of your resolution of that issue as the IT1,

9  you took them into a conference room and had a conversation

10  with them?

11  A    I don't remember that.

12  Q    And do you remember talking to them about the status of

13  the relationship?

14  A    I do not.

15  Q    Okay.

16      MR. OFFENBECHER:  And, Your Honor, can we take a

17  sidebar for just a moment?

18      (At sidebar with the Court and counsel)

19      MR. OFFENBECHER:  I don't want there to be a lot of

20  screaming and yelling about this.  My next question is, I'm

21  going to direct him to exactly what he said to Para and Leah,

22  because I intend to introduce that evidence as a prior

23  inconsistent statement from her of what he (indiscernible) say

24  in here today.  And I want to make sure that he's had a full

25  and fair opportunity to deny it now.  And I just don't want

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 171 of 217
(720) 384-8078   attrans@sbcglobal.net

1  people coming back and saying, "You didn't him a chance to

2  (indiscernible)."

3          THE COURT:  What'd you -- what'd he say?

4          MR. OFFENBECHER:  He said Jim Hopkins -- he said --

5  they were complaining about it.  He said Jim Hopkins said,

6  "Don't worry about it, this is all going to be over soon.  I'm

7  leaving my wife as soon as my son graduates from high school,"

8  which was that year.

9          THE COURT:  And what's your evidence of that?

10          MR. OFFENBECHER:  This gentleman said it to Leah and

11  Para.

12          MS. LOEFFLER:  (Indiscernible).

13          THE COURT:  And what's your evidence (indiscernible) --

14          MR. SCHRODER:  (Indiscernible) evidence of that.

15          MS. LOEFFLER:  Neither Leah or Para (indiscernible).

16          MR. SCHRODER:  (Indiscernible) have a statement of Leah

17  or Para.

18          THE COURT:  Would you (indiscernible).  It's not

19  evidence that he said.  You got to have evidence that

20  (indiscernible) statement (indiscernible).

21          MR. OFFENBECHER:  No, no, we have two witnesses who'll

22  say he said that.  It's a prior inconsistent statement.

23          MR. SCHRODER:  It's not a prior inconsistent statement

24  that he made.  It's a prior inconsistent statement as Leah and

25  Para are giving you this hearsay.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 172 of 217
(720) 384-8078  attrans@sbcglobal.net

1           MR. OFFENBECHER:  (Indiscernible).

2           MR. SCHRODER:  It's not a prior inconsistent statement

3    of him unless he said it, unless he makes it.

4           MR. OFFENBECHER:  He did say --

5           MR. SCHRODER:  He made a statement --

6           MR. OFFENBECHER:  He did.  (Indiscernible) --

7           MR. SCHRODER:  How do we have a statement of him?

8           MR. OFFENBECHER:  That's what I'm getting right now.

9           THE COURT:  Okay, wait a second.  He says he doesn't

10   remember a conversation.  You disagree with him.

11          MR. OFFENBECHER:  Okay, I've laid a foundation to

12   introduce the -- you know, the statement.  Then fine.

13          THE COURT:  I'm not sure that's --

14          MS. LOEFFLER:  (Indiscernible).

15          THE COURT:  -- how -- you've laid the foundation.  He

16   says he doesn't remember having a conversation.  What --

17          MR. OFFENBECHER:  I'm just trying to refresh his memory

18   about it and I'm going to see if that --

19          THE COURT:  And how does it refresh his memory?

20          MR. OFFENBECHER:  By asking him the specific language

21   that he used to -- I have two witnesses who are going to say he

22   said it.  I'm going to use the specific language that he used

23   with two of the witnesses who have already testified to --

24          THE COURT:  They've already testified, and you didn't

25   ask them when they testified, did you?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 173 of 217
(720) 384-8078  attrans@sbcglobal.net

1    MR. OFFENBECHER:  Well, it wasn't a prior inconsistent

2  statement until Mr. Sanders testified.  I would have asked them

3  then.  In fact, it's -- it would have been hearsay then to ask

4  them what Mr. Sanders said.

5    THE COURT:  That's true.

6    MR. OFFENBECHER:  But now that Mist -- I -- so I

7  couldn't.  But now that Mr. Sanders is here, I want to direct

8  his attention specifically to this statement.  If he denies

9  having made it, then I'm going to introduce the prior

10  inconsistent statement.  I've only -- I could have done it at

11  the podium but I wanted to do it here.

12    THE COURT:  Wouldn't do you any good.  That's what

13  you're supposed to do.  But --

14    MR. OFFENBECHER:  Yeah.

15    THE COURT:  -- you don't have anything in writing to

16  show him, do you.  So you have to do it out loud?  Is that what

17  you're saying?

18    MR. OFFENBECHER:  No.  No.  I have -- we have a defense

19  interview with Ms. Upchurch, Ms. Killingsworth, done by Ms.

20  Brink.  I know it's --

21    MS. LOEFFLER:  (Indiscernible).

22    THE COURT:  Well --

23    MR. OFFENBECHER:  As long as I can call -- sure, if I

24  can call the witness --

25    MS. LOEFFLER:  (Indiscernible).

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 743  Filed 09/23/14  Page 174 of 217

1    MR. SCHRODER:  (Indiscernible) hearsay (indiscernible).

2    MR. OFFENBECHER:  Well, that's why I'm --

3    MS. LOEFFLER:  (Indiscernible).

4    MR. OFFENBECHER:  That's why I'm asking.

5    THE COURT:  If you want to bring him back here and ask

6  him the question here so that we can find out what his answer's

7  going to be?

8    MR. OFFENBECHER:  Sure, that's fine.

9    THE COURT:  I mean, is there a problem with that?

10   MR. OFFENBECHER:  No, that's fine.

11   THE COURT:  So there's no surprises?

12   MR. OFFENBECHER:  Yeah, I think that's (indiscernible).

13   THE COURT:  Counsel, object to that procedure?

14   MS. LOEFFLER:  (Indiscernible).

15   THE COURT:  Okay.

16   MS. LOEFFLER:  (Indiscernible).

17   THE COURT:  All right.  Sir --

18   MR. OFFENBECHER:  (Indiscernible).

19   THE COURT:  -- will you come back here for a second?

20 Okay, come out and come around.  We'll do it in hallway, I

21 don't care.  If you want to go in the hallway, let's go in the

22 hallway.

23   MR. CURTNER:  (Indiscernible) hear it, Judge.

24   THE COURT:  Well, I know.  Okay.  All right.  Let's

25 come up here close to the microphone.  We need to get -- he

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 743  Filed 09/23/14  Page 175 of 217

1  wanted to ask you a question, okay.

2         MR. OFFENBECHER:  Okay.

3         THE COURT:  (Indiscernible) speak loud enough

4  (indiscernible).

5         MR. OFFENBECHER:  Okay.

6                           VOIR DIRE

7  BY MR. OFFENBECHER:

8  Q   Mr. Sanders, I've directed your attention already to the

9  time when Ms. Upchurch and Ms. Killingsworth approached you

10  about Deborah being at the rigger shop, right?

11  A   Yes.

12  Q   And do you recall them coming to talk to you?

13  A   I do.

14  Q   It was up at T1, right?

15  A   I don't recall.

16  Q   Okay.  Where do you think it was?

17  A   I -- I really don't recollect.

18  Q   Did they call you on the phone?

19  A   No.  I was going down every day to see them in the rigger

20  shop, so it could have easily been down there.

21  Q   Why were you doing that?

22  A   Because everybody else was out on that island and I was

23  their supervisor.

24  Q   Okay.  And so you saw Ms. Hopkins down there as well?  All

25  right, so (indiscernible) I'm going to lead you just so we can

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 176 of 217
(720) 384-8078  attrans@sbcglobal.net

SANDERS - VOIR DIRE

1  get there, okay?  You -- they complained about Mrs. Hopkins

2  being down there, right?

3  A    Yes.

4  Q    And you -- in dealing with that, you told them something,

5  right?

6  A    I do not recollect telling them anything.  I don't even

7  remember the resolution.

8  Q    Let me see if I can refresh your recollection.

9            MR. SCHRODER:  This is not your statement.

10           MR. OFFENBECHER:  Whoa, whoa, whoa, I'm doing --

11           MS. LOEFFLER:  I --

12           MR. OFFENBECHER:  -- this examination right now.

13           MS. LOEFFLER:  (Indiscernible).

14           THE COURT:  (Indiscernible).

15           MR. OFFENBECHER:  I can refresh it with anything I want

16  to.

17           THE COURT:  (Indiscernible).

18           MR. OFFENBECHER:  I can refresh it with, you know, a

19  plate of spaghetti, as we say.

20           THE COURT:  As long as you tell him it's a plate of

21  spaghetti.

22           MR. OFFENBECHER:  Okay.  All right.

23           MR. SCHRODER:  So whose statement is he refreshing?

24  BY MR. OFFENBECHER:

25  Q    Do you remember bringing --

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 177 of 217
(720) 384-8078   attrans@sbcglobal.net

1    MR. SCHRODER:  Judge, he needs (indiscernible).

2        MR. OFFENBECHER:  Right.  Para Upchurch, everybody see,

3  it's a interview with Para Upchurch.

4        MS. LOEFFLER:  By who?

5        MR. OFFENBECHER:  The next one will be Mrs.

6  Killingworth -- Mrs. Killingsworth, okay?

7        MS. LOEFFLER:  By who?

8        MR. OFFENBECHER:  With -- when -- our in -- the Federal

9  Public Defender's investigators.

10        THE COURT:  Okay.  (Indiscernible).

11  BY MR. OFFENBECHER:

12  Q    Okay, so just so you know, they're -- these are interviews

13  that were done with Para Upchurch and Leah Killingsworth by the

14  Federal Public Defender's investigators.  Okay?

15        THE COURT:  (Indiscernible).

16  BY MR. OFFENBECHER:

17  Q    So we're not making this up, it's the real thing, okay?

18  So do you remember taking them aside and telling Para Upchurch

19  and Leah Killingsworth -- "IT Sanders pulled Para and Leah

20  aside into the conference room and told them they did not need

21  to worry.  He said that everyone knows that Deborah is crazy

22  and that Jim had told him he was only going to stay with

23  Deborah until their son turned 18, and then he was going to

24  leave her."  Remember that?

25  A    I do not.

1  Q    You don't remember saying that?

2  A    I do not.

3  Q    Okay.  Do you remember -- this is an FBI interview by

4  Denise Andersen and CGIS Agent Pritchard of Leah Killingsworth,

5  Leah -- she had a different name then.  Okay.  This is FBI

6  (indiscernible) know what it is.  Well, okay.  Good.  Here's a

7  question to Leah Killingsworth:  "Do you know what his plans

8  were," referring to Mr. Hopkins.  "He had his trailer and he

9  wanted to travel around.  Apparently he made some comments to

10  other people, Chief Sanders, ITC Chief Sanders when he was

11  here, that once him and Debby -- once their kid turned 18, that

12  was -- that was the end of them.  Because we all had, like,

13  weird feelings about Debby.  She was crazy.  I don't know if

14  she was part of his plan or not, but (indiscernible) he just

15  wanted to travel around, and basically, he never took leave,

16  so" -- and the rest of it's not important.

17        MR. SCHRODER:  (Indiscernible) that, that's not even a

18  statement that he made.  That's a statement somebody made that

19  (indiscernible).

20        MS. LOEFFLER:  (Indiscernible).

21        MR. OFFENBECHER:  (Indiscernible).

22        THE COURT:  (Indiscernible).

23        MR. OFFENBECHER:  Yeah.

24        THE COURT:  Ask the question.

25        MR. OFFENBECHER:  Okay.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 743  Filed 09/23/14  Page 179 of 217

SANDERS - CROSS

1  BY MR. OFFENBECHER:

2  Q   Do you recall making statements to anybody, including Ms.

3  Killingsworth or Para Upchurch, that Jim Hopkins said -- that

4  you said, "Don't worry about it, Jim's going to leave her as

5  soon as their son turns 18"?

6  A   I do not remember that, no.

7        MR. OFFENBECHER:  Okay.  That's the reason I'm saying

8  (indiscernible) fair --

9        THE COURT:  Fair opportunity.

10       MR. OFFENBECHER:  -- opportunity to (indiscernible).

11       MR. SCHRODER:  Well, let's -- where are we going from

12  here?  We're done.

13       MS. LOEFFLER:  (Indiscernible).

14       THE COURT:  New subject.  New subject.

15       MR. SCHRODER:  Right, new subject.

16    (End of sidebar)

17       THE COURT:  Ladies and gentlemen, thanks for staying.

18  Okay.  Next question.

19                 **CROSS-EXAMINATION, CONTINUED**

20  BY MR. OFFENBECHER:

21  Q   Mr. Sanders, did you form any opinions about Mrs. Hopkins'

22  mental status?

23  A   Yes.

24  Q   What are -- what were they?

25  A   That she was high-energy.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 180 of 217
(720) 384-8078  attrans@sbcglobal.net

1  Q    Do you remember telling people that she was crazy?

2  A    Yes.

3  Q    I don't have any other questions.

4           THE COURT:  Redirect.

5           MR. SCHRODER:  No questions, Your Honor.

6           THE COURT:  Thank you, sir.  You're excused.  Nex --

7  government's next witness.

8       (Witness excused)

9           THE COURT:  We got a spot for you, right up here.  And

10 when you get there, you're going to see there's a gate.  It

11 pulls open.  And just remain standing.  My clerk will swear you

12 in.

13          THE CLERK:  Please raise your right hand.

14          **JACOB GERASIMOF, PLAINTIFF'S WITNESS, SWORN**

15          THE CLERK:  Okay, thank you.  Please have a seat.  And,

16 sir, if you can please state and spell your full name.

17 A    Jacob, J-a-c-o-b, Gerasimof, G-e-r-a-s-i-m-o-f.

18          THE CLERK:  Thank you.

19          THE COURT:  Counsel.

20                    **DIRECT EXAMINATION**

21 BY MS. LOEFFLER:

22 Q    Chief Gerasimof, where do you work?

23 A    Communication station Kodiak.

24 Q    And what organization do you work for?

25 A    United States Coast Guard.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 181 of 217
(720) 384-8078  attrans@sbcglobal.net

1    Q    How long have you been with the United States Coast Guard?

2    A    Approximately 14 years.

3    Q    And what is your -- I know you said your rank is chief,

4    but can you explain exactly what level a chief you are, sir?

5    A    I'm a E-7, chief petty officer, in the Coast Guard.

6    Q    And what's your area of operations at COMMSTA Kodiak?

7    A    I work in the Operations Department at the communication

8    station, primarily dealing with the operations of the watch,

9    the communications, and I over -- oversee a section there

10   and -- and just deal with the communications side of -- of the

11   unit, operational.

12   Q    Now I want to ask you, how long have you been at COMMSTA

13   Kodiak?

14   A    At this time, I've -- I'm coming up -- in July I'll have

15   been there four years.

16   Q    And you were there April 12th of 2012?

17   A    Yes, ma'am.

18   Q    Are you -- I mean, how big an organization is COMMSTA

19   Kodiak?

20   A    COMMSTA Kodiak's approximately 60, 65 personnel.

21   Q    And during your time there, did you get fairly familiar

22   with what cars various people drove?

23   A    Yes, ma'am.

24   Q    Okay.  I'm going to put on the overhead Exhibit 390.

25        MS. LOEFFLER:  And, counsel, do you want this -- I'm

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 182 of 217
(720) 384-8078   attrans@sbcglobal.net

1  going to use it if you agree to put it in, or I'll put it in

2  later.  It's up to whoever has the witness.

3          MR. OFFENBECHER:  What is it?

4          MR. CURTNER:  It's just a chart.

5          MS. LOEFFLER:  It's the chart.

6          MR. OFFENBECHER:  Yeah.

7          MS. LOEFFLER:  I'll go through it.

8          MR. CURTNER:  That's fine.

9          MR. OFFENBECHER:  Uh-huh (affirmative).  Go ahead.

10          MS. LOEFFLER:  May it be introduced?

11          MR. OFFENBECHER:  Sure.

12          MR. CURTNER:  Sure.

13          MS. LOEFFLER:  Okay.  I'm going to -- it sounds like we

14  have an agreement to 390, which will make everything go faster.

15          THE COURT:  390 will be received without objection.

16      (Plaintiff's Exhibit 390 admitted)

17  BY MS. LOEFFLER:

18  Q   So in preparation for your --

19          THE COURT:  Okay, stay --

20          MS. LOEFFLER:  You're right.  Sorry.

21  BY MS. LOEFFLER:

22  Q   In preparation for your testimony, did you -- actually

23  back at April 12th, did you do something to try to identify the

24  various cars that drove to COMMSTA on April 12th, 2012?

25  A   Yes, that's correct, ma'am.  I was on the operations deck

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 743  Filed 09/23/14  Page 183 of 217
(720) 384-8078  attrans@sbcglobal.net

1    and was reviewing the video footage with the state highway

2    patrol officer that was there, present.

3    Q    Okay.  And last night, in order -- in preparation for --

4    oh, I had somebody raise their hand, I think.  Oh, no, okay.  I

5    thought --

6          UNIDENTIFIED SPEAKER:  Yeah, I think he needs to move a

7    little closer.

8          THE COURT:  Okay.

9          MS. LOEFFLER:  Okay.

10          THE WITNESS:  All right.

11          THE COURT:  There we go.

12   BY MS. LOEFFLER:

13   Q    In preparation for your testimony last night, did you also

14   review the video again and do something to identify which

15   cars -- where you can hook them up with the owner?

16   A    That's correct, ma'am.  Yes, I did.

17   Q    And on Exhibit 390, there's some initials there.  And

18   we'll do -- the first one -- with that -- that J.S.G., when you

19   see it on the side, is that you?

20   A    Yes, ma'am.

21   Q    Okay.  So if I recall -- I used to be good at this.

22   There's a zoom.  Kim, help.  Oh, here's the zoom, I'm sorry.

23   Here we go.  There we go.  So --

24          THE COURT:  Now it's blurry.

25   BY MS. LOEFFLER:

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 743  Filed 09/23/14  Page 184 of 217
(720) 384-8078  attrans@sbcglobal.net

**GERASIMOF - DIRECT**

1  Q   -- I'm going to -- look on the left.  There's something

2  that says "630 hours, dark-colored SUV," and it has a "T1

3  camera vehicles."  Did you verify with your initials on the

4  right whose vehicle that was?

5  A    Yes.  Yes, ma'am, that's Petty Officer Fortier's (ph)

6  vehicle.

7  Q   Okay.  And the next one that has your initial is a dark

8  Land Rover.  It says "to T1."  And has that got your initials

9  on it too?

10  A    Yes, ma'am.

11  Q   Okay.  And that says on the T2 cameras, it's 6:55.  Do you

12  see that?

13  A    Yes, ma'am.

14  Q   All right.  I'm going to try to, if I may, pull up Exhibit

15  155.  And I'll give a little example of -- oh, I don't think

16  this has been introduced yet.  Counsel, is there any objection

17  to showing the side-by-side videos, so we can show what we did?

18  It's --

19         MR. OFFENBECHER:  Side-by-side of --

20         MS. LOEFFLER:  T1 and T2.  Has the cars coming in.

21         MR. OFFENBECHER:  No.

22         MS. LOEFFLER:  Okay.  I would move Exhibit 155.

23  It's --

24         THE COURT:  It --

25         MS. LOEFFLER:  -- derivative of the exhibits we've put

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 185 of 217
(720) 384-8078  attrans@sbcglobal.net

1  in before.

2      THE COURT:  It'll be received, without objection.

3    (Plaintiff's Exhibit 155 admitted)

4      MS. LOEFFLER:  Okay.  Let's pull up 155, and for

5  example, Kim, can we turn to 7 o'clock on the T2 camera with --

6  oh, I'm sorry, let's get you to get it up first.

7      THE COURT:  And you stay near the microphone while

8  you're --

9    (Side conversation)

10      MS. LOEFFLER:  I'm sorry, 156.  I did not enter -- I

11  want to withdraw 155, because I didn't -- and put in 156.

12      THE COURT:  Okay.  156 is admitted without objection.

13    (Plaintiff's Exhibit 156 admitted; Plaintiff's Exhibit 155

14  withdrawn)

15      MS. LOEFFLER:  Right, 156.  Okay.  If we can display

16  that.  And then -- if you'll hold for just a second, Kim,

17  before you play it.

18  BY MS. LOEFFLER:

19  Q    From the camera view on the left is which camera?

20  A    The camera view on the -- the left side, that's --

21      THE COURT:  What's that?

22      THE CLERK:  She'll need to move the mic back.

23      THE COURT:  Okay.

24      THE CLERK:  Thank you.

25      THE COURT:  Okay.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 186 of 217
(720) 384-8078  attrans@sbcglobal.net

1  BY MS. LOEFFLER:

2  Q    Camera view on the left side is what camera?

3  A    That's the one that is attached to the T2 building there.

4  Q    Okay.  And the camera view on the right is which camera?

5  A    It's from up on -- up at T1.

6  Q    And it's looking down the -- the windows that we see on

7  that building, is that the T2 building?

8  A    That's correct, ma'am, that's the T2 building.

9  Q    And then Anton Larsen Bay Road would be sort of out in

10  front of that?

11  A    That's correct.  Anton Larsen, you can see on the T1

12  building, the camera, T1 side on the right side, you can Anton

13  Larsen Road to the left of the building there.  It winds up --

14       THE COURT:  He's using his hand, but it's not -- you

15  need to use a pointer.

16  BY MS. LOEFFLER:

17  Q    Oh, there's -- I'm -- there is a laser pointer, should be

18  right in front of you.

19  A    Nice.

20  Q    So can you explain that again what you're looking at?

21  A    All right.  So on the -- the T1 camera right here, this is

22  T2, the rigger shop, and then the road just kind of curves

23  right up that way.  So anybody going up the road, you're going

24  to see their vehicle.

25  Q    Now, on T -- the T2 camera, can you -- you're looking at

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 187 of 217
(720) 384-8078  attrans@sbcglobal.net

1  what?

2  A    So this is the parking lot for T2.  The road comes up this

3  way.  There's a bridge right here.  You can't see the bridge

4  and the camera view, and it winds around.  Anton Larsen Road

5  contin -- would continue on up, but we turn right and we come

6  up into T1, which is up in here.  Or -- or if you're going to

7  T2, you'd pull right into this gravel, gravel road here.  And

8  then -- and there's additional roads -- or driveways up Anton

9  Larsen, if you keep going there.  There's two more that you can

10  access the T2 building or parking lot.

11  Q    And just if people are wondering what's wandering around,

12  if you look at the T1 camera --

13  A    A couple deer.

14  Q    -- they're deer.  Okay.  So people see movements,

15  that's --

16  A    Yes.

17  Q    -- those are deer actually wandering around.  Okay, Kim,

18  if we can move to 7:22 on the T2 camera, so you're -- the one

19  on the left.

20       (Side conversation)

21  Q    We want 7 o'clock and 22 seconds on the T2 camera.

22       (Side conversation)

23  Q    Yeah, we'll just -- we'll do a few examples of -- if it --

24  and then --

25       (Side conversation)

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 188 of 217
(720) 384-8078  attrans@sbcglobal.net

GERASIMOF - DIRECT

1  Q   We're going up to 7 o'clock and 22 seconds on the T2

2  camera.

3      (Side conversation)

4          THE CLERK:  Is that a different exhibit or is that

5  the --

6          UNIDENTIFIED SPEAKER:  No, it's the same one.

7          THE CLERK:  -- the same exhibit?

8          UNIDENTIFIED SPEAKER:  It's the same one.

9          THE CLERK:  Okay, thank you.

10     (Side conversation)

11 BY MS. LOEFFLER:

12 Q   There it is.  Okay.  So if we put that up just to show

13 what we did, the T2 camera says 7 o'clock -- actually, this is

14 not the one.  I want the -- 22 seconds, there we go.  And you

15 should see another car.  All right, that one.  Can we stop?

16 All right.  And did you identify that, if we can -- now I'm

17 going to switch to the dock camera quickly.  And I'll point --

18 zoom it up.  We had 7:22 -- and there's probably a pointer

19 other than -- here, I need -- I'm going to steal your pen.

20         THE CLERK:  Ms. --

21         MS. LOEFFLER:  Okay.

22         THE CLERK:  -- Loeffler, it may be helpful if you just

23 put the lapel mic on.  That way you can move around.

24         MS. LOEFFLER:  Oh, I'm --

25         THE CLERK:  Thank you.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1     MS. LOEFFLER:  Yeah, I'm probably driving people crazy.

2  Hold on a second.  That's the way we can do it.

3     (Side conversation)

4  BY MS. LOEFFLER:

5  Q    Okay.  So we had the 7 o'clock and 22 seconds right here.

6  And on the right, are those your initials?

7  A    Yes, ma'am.

8  Q    Okay.  And whose car was it?

9  A    That's Petty Officer King, Carissa King.

10 Q    Right.  I'm going to do -- basically, on this, everywhere

11 that your initials -- everywhere it says J.S.G. --

12 A    Yes.

13 Q    -- did you last night verify that you knew whose car it

14 was and that this chart was accurate as to the times?  Did you

15 actually view them and double check it?

16 A    Yes, ma'am.

17 Q    Okay.  So every time it says J.S.G., you've verified by

18 your initials that that's -- chart's correct and you know who

19 that car belongs to?

20 A    Yes, ma'am.

21 Q    I have nothing further.

22     THE COURT:  Cross-examination.

23     MR. OFFENBECHER:  I don't have any questions, Your

24 Honor.

25     THE COURT:  Thank you.  You're excused.  The

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 743  Filed 09/23/14  Page 190 of 217

JORDINELLI - DIRECT

1   government's next witness.

2        (Witness excused)

3          MS. LOEFFLER:  Chief Jordinelli.

4        (Side conversation)

5          THE COURT:  Right up here, sir.  And the door pulls

6   out.  You just step in the box and stay standing.  My clerk

7   will swear you in, and she's over here.

8          THE CLERK:  Please raise your right hand.

9          **PHILLIP JORDINELLI, PLAINTIFF'S WITNESS, SWORN**

10          THE CLERK:  Okay, thank you.  Please have a seat.  And,

11  sir, if you can please state and spell your full name.

12          THE WITNESS:  Phillip Jordinelli.  P-h-i-l-l-i-p, J-o-

13  r-d-i-n-e-l-l-i.

14          THE CLERK:  Thank you.

15          THE COURT:  Counsel.

16                    **DIRECT EXAMINATION**

17  BY MS. LOEFFLER:

18  Q    Chief Jordinelli, what organization do you work for?

19  A    I work for the United States Coast Guard on Kodiak, at the

20  communication station.

21  Q    How long have you worked for the United States Coast

22  Guard?

23  A    Since 1990.

24  Q    And what is your rank with the United States Coast Guard?

25  A    I'm a chief warrant officer.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 191 of 217

1 Q   And as much as we've had almost every rank that I can

2 think of, but no admirals, what is a chief warrant officer?

3 A   It's a commissioned officer who was enlisted and we kept

4 our -- our rating designations.  So I'm a communicator.  I work

5 as a communications specialist.

6 Q   Okay.  How long have you been at COMMSTA Kodiak?

7 A   I first was stationed there in 1996 to 2000, 2001, I

8 think.

9 Q   Uh-huh.

10 A   And then I came back in 2008 as a warrant officer.  And

11 I'm there currently.

12 Q   Okay.  So you've been there from 2008 to the present on

13 your second tour at COMMSTA Kodiak?

14 A   Correct.

15 Q   Okay.  And at COMMSTA Kodiak, were you there on April 12th

16 of 2012?

17 A   I was.

18 Q   And as part of -- well, was one of the thing you were

19 asked to do, sit down and review video and see if you could

20 identify cars that were on the T1 and T2 video?

21 A   Yes, I was.

22 Q   Okay.  And in preparation for your testimony, last night

23 did you review them again and do some initialing at my request?

24 A   Yes, I did.

25 Q   Okay.  Let me take through -- an example.  And I will put

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 743  Filed 09/23/14  Page 192 of 217

1   on the -- showing you what's been admitted as Exhibit 390.

2   Okay.  Let's see if I can zoom in now.  Are there -- oh, I have

3   the lapel mic.

4   A    Okay.

5   Q    Are there initials on this chart, Exhibit 390, that you

6   did last night?

7   A    Yes, I did.

8   Q    You have a laser pointer on you.  Perhaps you can point at

9   them and explain which scrawl on this is yours?

10  A    Okay.  So I did -- so I did -- okay, here I am here.  So

11  I -- this one, I -- that's not my initials, but I did that

12  before on Kodiak.  But I think that's Aaron Coggins.  I did

13  this one here, which is OS2 Tyler Miller.  And I think I did

14  Baker -- oh, Stone, ET1 Stone.  That's my initial right there.

15  Looks like a B, but it's P.J.  And then I did this one down

16  here also, which is Tyler Miller again, which --

17  Q    And in order to do that for each one, did you actually

18  review the -- well, let's pull up the side-by-side video,

19  actually, and let's turn to --

20       (Side conversation)

21  Q    So if we can put this up, we are going to go to 7:09:40 on

22  the T1 video.

23            THE CLERK:  And that's Exhibit 156, again?

24            MS. LOEFFLER:  This is Exhibit 156.

25            THE CLERK:  Thank you.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 193 of 217
(720) 384-8078   attrans@sbcglobal.net

JORDINELLI - CROSS

1    MS. LOEFFLER:  That ends up -- I think we have to do it
2  offline and then we can do it on, to get it to the right spot.
3    (Side conversation)
4  Q    All right, I'm having a little bit of a -- my fault -- in
5  lining them up.  Let me go back to Exhibit 390, if I can.  So
6  every place that has your initials, you actually verified last
7  night --
8  A    Yes.
9  Q    -- that that was a car that you recognized?
10  A    That's correct.
11  Q    And then you verified that the names on the chart were the
12  right people.  I mean, they had the right names for who was
13  connected to that car?
14  A    That's correct, yes.
15    MS. LOEFFLER:  I have no other questions for this
16  witness.
17    THE COURT:  Cross-examination.
18    (Side conversation)
19                    CROSS-EXAMINATION
20  BY MR. CURTNER:
21  Q    Chief Warrant Officer, is that correct?
22  A    That's correct.
23  Q    Okay.  I wonder -- now, see, you -- you've looked at this
24  chart and then you've looked at a number of videos or all the
25  videos.  Is that correct?  Or this part --

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 194 of 217
(720) 384-8078  attrans@sbcglobal.net

1  A    That's correct.

2  Q    Okay.  I wonder if I could call your attention to -- if we

3  could turn down the lights a minute.  I see this notation:

4  "White truck with white topper in trees under water tank."

5  What does that mean?  Do you know?

6  A    No, I do not.

7  Q    Okay.  And that's -- this is the view from the T2 video?

8  A    Yes.  Those comments were put in by -- I didn't put those

9  comments in.

10 Q    Okay.

11 A    I only identified the vehicles --

12 Q    Now, do you remember --

13 A    -- that I could identify.

14 Q    Okay.  And do you remember, though, watching the video

15 from the T2 video that was pointed at the flag?

16 A    Yes.

17 Q    Do you ever recall in reviewing these videos that

18 sometimes you would see headlights coming down Anton Larsen Bay

19 Road toward COMMSTA from the direction of, say, the airport?

20 A    Yes.

21 Q    Okay.  And that would be basically just headlights in the

22 trees, is about (indiscernible) --

23 A    Correct, yes.

24 Q    And it would be just below the water tower?

25 A    Yes.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 743  Filed 09/23/14  Page 195 of 217
(720) 384-8078  attrans@sbcglobal.net

JORDINELLI - REDIRECT

1  Q    And that's on the other side of the bridge before you get

2  to the COMMSTA building?

3  A    Yes.  There's a -- there's a -- some foliage, and then

4  there's a river, and then there's a road.

5  Q    Okay.  So when you're watching this video --

6  A    Uh-huh (affirmative).

7  Q    -- that's -- might be -- that would be referring to -- you

8  can't identify a vehicle, but you can see it coming through the

9  trees and the headlights when it's below the tower?

10 A    Yes.

11 Q    Before it gets down to the bridge and into the COMMSTA?

12 A    Correct.

13 Q    And that's seen in a couple of different places.  Is that

14 correct?

15 A    Yes.

16 Q    All right.  That's all I have.  Thank you.

17       MS. LOEFFLER:  If I can --

18       THE COURT:  Redirect.

19       MS. LOEFFLER:  Whoops, wait a minute.  I did want that

20 up.  Sorry.

21                    REDIRECT EXAMINATION

22 BY MS. LOEFFLER:

23 Q    Just to be clear, Chief Jordinelli, so where Mr. Curtner

24 was referring to the white truck with white topper, there's no

25 initials in that block, right?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 196 of 217

1    A    That's correct.

2    Q    So you did not initial things if you didn't know what it

3    was?

4    A    Right.  If I didn't absolutely know what vehicle that was,

5    I wouldn't initial it.

6    Q    Okay.  Thank you.  I have nothing further.

7    A    Uh-huh (affirmative).

8         THE COURT:  Anything else, Mr. Curtner?

9         (Side conversation)

10         MR. CURTNER:  Can we go back to this 390?

11                      **RECROSS EXAMINATION**

12   BY MR. CURTNER:

13   Q    Do you -- excuse me.  Do you know, in the second column

14   it's got the -- looks like "approximate time"?

15   A    Uh-huh (affirmative).  Yes.

16   Q    Do you know what the -- in the paren, the different

17   numbers are there?  I mean, it's got a very specific time,

18   let's say 6:42 -- 6 o'clock, 42 minutes, 45 seconds.

19   A    Right.

20   Q    Do you know what -- is that a plus or minus 20 seconds?

21   A    I'm not sure when they -- that video system has a timer on

22   it.  And there's two cameras, there's a T2 and the T1, and both

23   of them were on timers.  So I'm not sure how they -- if

24   that's -- that's something that the -- the CGI officer did.

25   But that's off the data from the video.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 197 of 217

1  Q    It seem to change per minute, or is that -- or you don't
2  know what that is?
3  A    I don't know what that is, no.
4  Q    Okay.  Thank you.
5           THE COURT:  Is that it?
6           MS. LOEFFLER:  Yes, Your Honor.
7           THE COURT:  Thank you.  You're excused.
8           THE WITNESS:  Thank you.
9      (Witness excused)
10          THE COURT:  Government's next witness.
11          MS. LOEFFLER:  Chief Anderson.
12          THE COURT:  Pull that out.  Yeah, can you just step in
13  the box, and then she'll swear you in.
14          THE CLERK:  Please raise your right hand.
15      **RAYMOND JOHN ANDERSON, PLAINTIFF'S WITNESS, SWORN**
16          THE CLERK:  Thank you.  Please have a seat.  And, sir,
17  if you can please state and spell your full name.
18          THE WITNESS:  My full name is Raymond John Anderson.
19  That is spelled R-a-y-m-o-n-d, J-o-h-n, A-n-d-e-r-s-o-n.
20          THE CLERK:  Thank you.
21                      **DIRECT EXAMINATION**
22  BY MS. LOEFFLER:
23  Q    Chief Anderson, what organization do you work for?
24  A    United States Coast Guard.
25  Q    How long have you been with the United States Coast Guard?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 198 of 217
(720) 384-8078   attrans@sbcglobal.net

1  A    Approximately 14 years.

2  Q    And where are you currently stationed?

3  A    Communication Station Kodiak, Alaska.

4  Q    And you said that you are a chief.  What type of chief are

5  you in the Coast Guard?

6  A    And --

7  Q    Or I said you were a chief, but what's your rank?

8  A    I'm a operations specialist chief, E-7.

9  Q    Okay.  What's an operations specialist chief?

10 A    Operations specialist, we run the operations and

11 communications for the Coast Guard.

12 Q    Okay.  Were you in COMMSTA Kodiak on April 12th, 2012?

13 A    Yes, ma'am.

14 Q    Okay.  And on that day or around that time, were you

15 actually part of a group that tried to identify cars off a

16 video?

17 A    Yes, ma'am.

18 Q    And last night, did I ask you to do it again?

19 A    Yes, ma'am.

20 Q    Okay.  I'm going to show you what's been marked as Exhibit

21 390.

22      (Side conversation)

23 Q    Okay.  On Exhibit 390 -- you've got a little pointer next

24 to you.  Perhaps you can point out your initials.

25 A    This one right here --

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 743  Filed 09/23/14  Page 199 of 217

1  Q   Yeah.

2  A   -- this second one from the top.

3  Q   Uh-huh (affirmative).  In order -- before you initialed

4      something, what did you do?

5  A   I identified that vehicle with the person whose vehicle it

6  was, essentially.

7  Q   So on 390, where it's got your initials on the second one

8  down, where it says -- I can't pronounce that, something --

9  A   Siobhan.

10  Q   Oh, Siobhan Carman.

11  A   Yes, ma'am.

12  Q   If the video showed the car, what did you do -- what did

13  you make sure --

14  A   If --

15  Q   -- before you put your initials on it?

16  A   I make sure that that was that -- that was, in fact,

17  her -- her vehicle.

18  Q   Okay.  And we have keyed one up, the -- let's see, it's

19  7:05:55, I think one of these which has your initials.

20      (Side conversation)

21  Q   Okay, we've lined one up.  If you would look at the

22  screen, we are going to -- okay.  And we'll see a car come up.

23      (Side conversation)

24  Q   You want to run it back a little bit so that we can see

25  that?  It's on 7:05:38 on the T2 camera.  Let's try that.  So

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 200 of 217
(720) 384-8078   attrans@sbcglobal.net

1  if we're looking on the left-hand camera, let's look at

2  7:05:38.  And then we'll see it on the T1 camera.  Should be at

3  7:05:55, we'll see it on the T1 camera.

4  A    The one that's pulling up right there?

5  Q    Yeah.  Now I want to turn to Exhibit 390, and where on 390

6  it has the -- there it is.  This car.  Did you identify that

7  car?  And I'll -- the Ford Flex?

8  A    Yes, ma'am.

9  Q    Whose car was it?

10 A    That's the Gainers'.

11 Q    Okay.  And when you identified it on the video last night,

12 did you initial it?

13 A    Yes, ma'am.

14 Q    Did you do that same routine everywhere that your initials

15 appear on this document?

16 A    Yes, ma'am.

17 Q    Okay.  And just to be clear, where there -- where it's

18 blank or there are no initials, that's because you either

19 couldn't identify the car or something like that.

20 A    That's correct.

21 Q    All right.

22       MS. LOEFFLER:  I have no more questions for this

23 witness.

24       THE COURT:  Cross.

25                        CROSS-EXAMINATION

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 201 of 217
(720) 384-8078  attrans@sbcglobal.net

1  BY MR. CURTNER:

2  Q    Very quickly.  So when you're watching these videos and

3  you see the Gainers' car come --

4  A    Yes, sir.

5  Q    -- into view, while you were watching it, did you see it

6  coming down the hill by the water tower, or at least the

7  headlights, before you saw it come into the view of the T2

8  camera?

9  A    I -- I don't recall.

10  Q    You don't recall that at all?

11  A    No, sir.

12  Q    Okay.  You know what I'm talking about, though.

13  A    Yes, absolutely, through the trees.

14  Q    Yeah.

15  A    Yes, sir.

16  Q    Just below the water tower.

17  A    Yes, sir.

18  Q    Coming from the airport toward COMMSTA.

19  A    Yeah, I don't -- I don't recall.  I'd have to watch the

20  video again, I mean.

21  Q    Watching all these videos, you remember -- see any

22  headlights coming through those trees?

23  A    Saw them, yes.

24  Q    Okay.  Thank you.

25          THE COURT:  Anything else?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 202 of 217
(720) 384-8078  attrans@sbcglobal.net

1       MS. LOEFFLER:  No.

2       THE COURT:  Thank you, sir.  You're excused.  And the

3   government's next witness.

4       (Witness excused)

5       MS. LOEFFLER:  Your Honor, it might be a good time for

6   the afternoon break, because we're not positive where the --

7   the next two witnesses are outside or not.  We need to go

8   double check --

9       THE COURT:  Okay.

10      MS. LOEFFLER:  -- if we may.

11      THE COURT:  You want to take 15 minutes.  Well, thank

12  you.  We'll take 15 minutes, ladies and gentlemen.

13      (Jury not present)

14      THE COURT:  Okay.

15      MS. LOEFFLER:  Your Honor, I just want to tell you for

16  scheduling, I believe we have three more witnesses for today

17  who are in Alaska -- or in Anchorage.

18      THE COURT:  Uh-huh (affirmative).  Okay.

19      MS. LOEFFLER:  And then we're going to run out.

20      THE COURT:  Okay.

21      MS. LOEFFLER:  You know --

22      THE COURT:  So we won't finish -- so we're not going to

23  use the whole afternoon?

24      MS. LOEFFLER:  Excuse me -- no, we won't.  But we

25  are --

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 203 of 217
(720) 384-8078   attrans@sbcglobal.net

1       THE COURT:  Okay.

2       MS. LOEFFLER:  We will be one witness ahead of

3  schedule.

4       THE COURT:  Keep it up, okay.

5       MR. CURTNER:  You want to sentence somebody this

6  afternoon.

7       MS. LOEFFLER:  Yeah, we can.

8       THE COURT:  I didn't know that.  Otherwise, I would

9  have.  Thank you.

10      THE CLERK:  All rise.  This matter stands in a 15-

11  minute recess.

12     (Court recessed at 2:29 p.m., until 2:50 p.m.)

13     (Jury not present)

14      THE CLERK:  All rise.  His Honor the Court, the United

15  States District Court is again in session.

16      THE COURT:  Good afternoon, sir.  They're going to

17  bring the jury --

18      THE CLERK:  Please be seated.

19      THE COURT:  Please be seated.  Or be standing; the

20  jury's coming in.  Whatever you want to do.

21      MS. LOEFFLER:  Mr. Bors, do you want to sit?  Is it

22  more comfortable for you?  Or the -- I'm sure the judge will

23  let you if it's --

24      THE COURT:  I don't care.  Jury's going to come walking

25  in that door, then you can sit dow -- you don't have to stand

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 204 of 217
(720) 384-8078  attrans@sbcglobal.net

**BORS - DIRECT**

1  if you don't want to.  Everyone else is going to.  You okay?

2          MR. BORS:  Yeah, I'm okay.

3          THE COURT:  All right.

4          MS. LOEFFLER:  Okay.

5      (Jury present)

6          THE COURT:  Please be seated.  Sir, you -- hate to get

7  you up and down, but we need to swear you in.

8          MS. DUIGNAN:  Government calls Mr. Arthur Bors to the

9  stand.

10          THE COURT:  Okay, sir.  Can you stand for one more

11  time?

12          MR. BORS:  Sure.

13          THE COURT:  And she's going to swear you in.

14          THE CLERK:  Please raise your right hand.

15          **ARTHUR BORS, PLAINTIFF'S WITNESS, SWORN**

16          THE CLERK:  Okay.  Thank you.  Please have a seat.

17  And, sir, if you can please state and spell your full name.

18          THE COURT:  Could you state and spell your full name?

19          THE WITNESS:  My name's Art Bors, Arthur Bors.  A-r-t-

20  h-u-r, B-o-r-s.

21          THE CLERK:  Thank you.

22          THE COURT:  B-o-r-s, okay.  Very well.  Counsel.

23          **DIRECT EXAMINATION**

24  BY MS. DUIGNAN:

25  Q   Mr. Bors, in what city and state do you live?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 205 of 217

1  A    Kodiak, Alaska.

2  Q    And do you recall the morning of April 12th, 2012?

3  A    Yes.

4  Q    What -- where do you work?

5  A    At the golf course in Kodiak.

6  Q    And let me show you what I have as Exhibit 390.  It's

7  going to be up on the screen.

8       (Side conversation)

9  Q    Mr. Bors, can you see that chart?

10 A    Yes.

11      THE COURT:  And if it's helpful, it's also right on

12 your left.  It's right to your left as well, if it's easier.

13      THE WITNESS:  Oh.  Oh, okay.

14      THE COURT:  Either way.

15 BY MS. DUIGNAN:

16 Q    And whose name is this?

17 A    That's my name.

18 Q    And whose initials are these?

19 A    Pardon?

20 Q    Are these your initials?

21 A    Yes.

22 Q    Where were you going on the morning of April 12th at

23 approximately 7:25?

24 A    I was going to the golf course.

25 Q    And how do you get to work?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 206 of 217
(720) 384-8078  attrans@sbcglobal.net

1   A    I drive my personal vehicle. Is -- is that what you want?

2   Q    And what kind of personal vehicle do you have?

3   A    A 1996 Ford Ranger pickup truck.

4   Q    And what color is it?

5   A    Deep red, dark red.

6   Q    And you had a chance with me last night to look over the

7 video and see a red truck drive towards the golf course. Is

8 that right?

9   A    Yes.

10  Q    And you believe, based on that timing, that that was your

11 truck?

12  A    Yes.

13  Q    I have no further questions.

14         THE COURT: Cross-examination.

15         MR. CURTNER: I have no questions for Mr. Bors. Thank

16 you.

17         THE COURT: All right. Thank you, sir. That was

18 quick. You're all done. The government's next witness.

19    (Witness excused)

20         MS. DUIGNAN: Mr. James Schilbach to the stand.

21         THE COURT: Way up here. Just head this way, sir, and

22 there's a door that pulls out. If you can step into the box

23 there, remain standing for just a second. My clerk over here

24 will swear you in.

25         THE CLERK: Please raise your right hand, sir.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 207 of 217
(720) 384-8078   attrans@sbcglobal.net

1    **JAMES RICHARD SCHILBACH, PLAINTIFF'S WITNESS, SWORN**

2         THE CLERK:  Thank you.  Please have a seat.  And, sir,

3    if you can please state and spell your name -- your full name.

4         THE WITNESS:  James Richard Schilbach.

5         THE COURT:  Spell.  Spell it, please.

6         THE WITNESS:  S-c-h-i-l-b-a-c-h.

7         THE CLERK:  And James is common spelling?

8         THE WITNESS:  I'm sorry, I can't hear you.

9         THE COURT:  Common -- James is the common spell -- J-a-

10   m-e-s?

11        THE WITNESS:  Yes.

12        THE COURT:  Show -- okay, very well.  Counsel.

13                      **DIRECT EXAMINATION**

14   BY MS. DUIGNAN:

15   Q    Mr. Schilbach, where do you live?  What city and state?

16   A    Kodiak, Alaska.

17   Q    And do you recall where you were the morning of April

18   12th, 2012?

19   A    Yes, I do.

20   Q    And first of all, where do you work?

21   A    I work on the Coast Guard base.

22   Q    And that morning, were you driving your car?

23   A    Yes, I was.

24   Q    And what kind of car do you have?

25   A    1998 white Tacoma pickup truck.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

**SCHILBACH - DIRECT**

1  Q    Did you have the chance to review some video with me last

2  night?

3  A    Yes, I did.

4  Q    And did you in fact see a video where you were able to

5  recognize your truck?

6  A    Yes, I did.

7  Q    I'm going to show you what has been marked as Government

8  Exhibit 390.  It's going to appear on the screen to the left of

9  you as where -- as well as the overhead.

10     (Side conversation)

11  Q    Mr. Schilbach, can you read this exhibit on your screen?

12  A    Yes.

13  Q    Okay.  And do you notice your initials on this chart?

14  A    Yes, I do.

15  Q    And I'm going to point to two lines.  I want you to

16  confirm whether those indeed are your initials.  Are those your

17  initials where I'm pointing to right now?

18  A    Yes.

19  Q    And one more spot.  And those -- your initials as well?

20  A    Yes, they are.

21  Q    And do they indicate that you viewed the video and you

22  recognize your truck on that video?

23  A    Yes.

24  Q    I have no further questions.

25          THE COURT:  Cross-examination.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 209 of 217
(720) 384-8078   attrans@sbcglobal.net

1                        CROSS-EXAMINATION

2    BY MR. CURTNER:

3    Q    Hello, Mr. Schilbach.  We've talked before, right?

4    A    Yes, we have.

5    Q    You work on base.  Who do you work for on the base?

6    A    Kodiak Support Services.

7    Q    That's known as KSS?

8    A    Yes.

9    Q    And what do they do?

10   A    They're a maintenance contract for the Coast Guard.

11   Q    Okay.  And do they also do work at the COMMSTA buildings?

12   A    Yeah.  Yes, they do.

13   Q    And you've done work for them at the rigger shop, at the

14   T2 building?

15   A    Yes, I have.

16   Q    Okay.  How many times do you think you you've been into

17   that building?

18   A    At least two that I can recall.

19   Q    And other members of KSS have also done work in that

20   building?

21   A    Yes, they have.

22   Q    Okay.  And so you and other people at KSS would be

23   familiar with the building?

24   A    Yes.

25   Q    Okay.  Thank you.  That's all I have.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 210 of 217
(720) 384-8078  attrans@sbcglobal.net

SCHILBACH - REDIRECT

1    THE COURT:  Anything else?

2    MS. DUIGNAN:  Just one followup question, Your Honor.

3    THE COURT:  Very well.

4                **REDIRECT EXAMINATION**

5  BY MS. DUIGNAN:

6  Q    Mr. Schilbach, do you have a swipe card or any way to get

7  into the building?

8  A    No.

9  Q    Thank you.  No further questions.

10    THE COURT:  Anything else?  Thank you, sir.  You're

11  done.

12    THE WITNESS:  Thank you.

13    THE COURT:  Have a good day.  Government's next

14  witness.

15    (Witness excused)

16    MS. LOEFFLER:  We had one witness left here in

17  Anchorage, but I believe Mr. Curtner is -- he didn't know we

18  were on the list, and you have your stuff for him, right, Mr.

19  Curtner?

20    MR. CURTNER:  That's correct.  I didn't bring my book

21  for tomorrow, and he was on tomorrow's list.

22    MS. LOEFFLER:  So we're out of witnesses that are

23  presently available.

24    MR. CURTNER:  But I think we wanted to address the

25  Court on --

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 211 of 217

1      MR. OFFENBECHER:  I had one -- oh, I'm sorry.  I had

2 one other thing.  I wanted to approach the sidebar.

3      (At sidebar with the Court and counsel)

4      MR. OFFENBECHER:  Your Honor, I wanted to make sure --

5 I wasn't sure that I'd made my record clear with respect to Mr.

6 Sanders.

7      THE COURT:  Uh-huh (affirmative).

8      MR. OFFENBECHER:  I had asked him -- and I just want to

9 make sure I've done that.  I'd asked him whether he remembered

10 having the conversation with Leah and Para --

11      THE COURT:  Yes.

12      MR. OFFENBECHER:  -- about that.  But I'm not sure that

13 I asked him a direct question whether he remembers Jim Hopkins

14 having said that to him, that he was going to leave his wife as

15 soon as his son turned 18.  And so if (indiscernible) I didn't,

16 I'm offering that, and I want to be able to ask him that

17 question as well, and --

18      THE COURT:  Is he in town?

19      MR. OFFENBECHER:  He's right there.  I asked him to

20 hang around.

21      THE COURT:  Oh, well, one -- so what do you want to --

22 like -- now, okay, we can do it.

23      MR. OFFENBECHER:  Right.  Did --

24      THE COURT:  (Indiscernible).

25      MR. OFFENBECHER:  -- Jim Hopkins tell you that --

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 743  Filed 09/23/14  Page 212 of 217

1          THE COURT:  You want to do it here in sidebar?

2          MR. OFFENBECHER:  I'm just doing that as a courtesy to

3     the Court and counsel.

4          THE COURT:  Okay.

5          MR. OFFENBECHER:  But I think it (indiscernible) --

6          THE COURT:  Okay.  Well, go ahead.

7          MR. OFFENBECHER:  -- think it's (indiscernible)

8     statement of intention in the future.  And I think if he's --

9     Jim Hopkins told Mr. Sanders that, he more likely had told his

10    wife, which is of course what it's all about.

11         MR. SCHRODER:  It's hearsay (indiscernible) unless it's

12    tied to state of mind, and a witness who may be a potential

13    perpetrator, it's not relevant.

14         THE COURT:  (Indiscernible) clearly hearsay.  I'm going

15    to kind of follow the Rules of Evidence as close as I can,

16    especially with regard to hearsay, where there's so much

17    hearsay being thrown around here.  Okay, so that's my ruling.

18    You've made your record.

19         MR. OFFENBECHER:  Okay, so -- I'm offering to prove

20    that Mr. Sanders said that Mr. Hopkins told Mr. Sanders that he

21    was going to leave his wife.

22         (Indiscernible speech)

23         (End of sidebar)

24         THE COURT:  Anybody else have anything they want to

25    say?  The government, anything else on your mind?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1    MS. LOEFFLER:  No, Your Honor.

2    THE COURT:  Counsel?

3    MR. OFFENBECHER:  No, Your Honor.

4    THE COURT:  Ladies and gentlemen?  Do you want to just

5  hang out in the little room until 4:30, or would you like to go

6  home early?  Your choice.  Okay, well, we'll see you tomorrow

7  at 8:25.  Okay?  Do you have a question, any questions?  Just

8  leave the notes on the chair, and we'll see you tomorrow at

9  8:25.  All the same admonitions I give you all the time.

10 Pretty clear, aren't they.  All right, thank you.

11   UNIDENTIFIED JUROR:  (Indiscernible).

12   THE COURT:  8:25, two five.  Want to start at 8:30.

13 Eight two five.

14   (Jury not present)

15   THE COURT:  8:25.

16   MS. LOEFFLER:  Okay.

17   THE COURT:  Thank you.

18   THE CLERK:  All rise.  This matter stands in recess

19 until tomorrow at 8:25 a.m. -- 8:30.

20   (Proceedings concluded at 3:03 p.m.)

21

22

23

24

25

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 214 of 217
(720) 384-8078  attrans@sbcglobal.net

1                          CERTIFICATE

2   I certify that the foregoing is a correct transcript from the
electronic sound recording of the proceedings in the above-
3   entitled matter.

4

         s/Teresa K. Combs               8/29/14
5   Teresa K. Combs, Transcriber      Date

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 743  Filed 09/23/14  Page 215 of 217

**INDEX**

|                          | DIRECT | CROSS | REDIRECT | RECROSS | FURTHER REDIRECT |
|--------------------------|--------|-------|----------|---------|------------------|
| **PLAINTIFF'S WITNESSES** |        |       |          |         |                  |
| Jennifer Raymond         | 1579   | 1598  | 1604     | 1606    |                  |
| Robert J. Morton         | 1608   | 1622  | 1645     | 1654    | 1657             |
| Angela Strause           | 1658   | 1674  | 1683     | 1684    |                  |
| Denise Andersen          | 1685   | 1692  |          |         |                  |
| Holly Steeves            | 1700   | 1712  |          |         |                  |
| Vance Newby              | 1714   | 1723  | 1729     |         |                  |
| Joshua Sanders           | 1731   | 1735  |          |         |                  |
| Jacob Gerasimof          | 1749   |       |          |         |                  |
| Phillip Jordinelli       | 1759   | 1762  | 1764     | 1765    |                  |
| Raymond John Anderson    | 1766   | 1770  |          |         |                  |
| Arthur Bors              | 1773   |       |          |         |                  |
| James Richard Schilbach  | 1776   | 1778  | 1779     |         |                  |

| PLAINTIFF'S EXHIBITS |  | ADMITTED |
|------|------|------|
| 148 | Video - T1 COMMSTA camera, 4/12/12, 6:45 to 7:45 | 1734 |
| 149 | Video - T2 COMMSTA camera, 4/12/12, 6:45 to 7:45 | 1734 |
| 150 | Video - T1 COMMSTA camera, 4/12/12, 7:30 to 8:30 | 1734 |
| 151 | Video - T2 COMMSTA camera, 4/12/12, 7:30 to 8:30 | 1734 |
| 156 | Video - side by side of T1 and T2 video | 1754 |
| 287 | Photograph - Hopkins desk | 1669 |
| 370 | Photograph - annotated by Morton re Belisle | 1617 |
| 371 | Photograph - annotated by Morton re Belisle removed | 1618 |
| 372A | Photograph | 1664 |
| 372B | Photograph | 1665 |
| 372C | Photograph | 1666 |

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG Document 743 Filed 09/23/14 Page 216 of 217
(720) 384-8078 attrans@sbcglobal.net

1    **INDEX** (Continued)

2    PLAINTIFF'S EXHIBITS                                          ADMITTED

3    372D     Photograph                                          1667

4    383      Time schedule of T2 arrivals and departures         1689

5    390      Chart of vehicles identified on T1 and T2 cameras   1751

6    394      Table by Ms. Raymond                                1591

7    DEFENDANT'S EXHIBITS                                         ADMITTED

8    DE-119     FBI receipt of property                           1681

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 743   Filed 09/23/14   Page 217 of 217
(720) 384-8078   attrans@sbcglobal.net