1   UNITED STATES DISTRICT COURT

2   FOR THE DISTRICT OF ALASKA

3   UNITED STATES OF AMERICA,        )   Case 3:13-cr-00008-RRB
                                     )
4            Plaintiff,              )   Anchorage, Alaska
                                     )   Thursday, April 10, 2014
5       vs.                          )   8:33 o'clock a.m.
                                     )
6   JAMES MICHAEL WELLS,             )
                                     )
7            Defendant.              )
    _____ )   **TRIAL BY JURY – DAY 8**

8
                    **TRANSCRIPT OF PROCEEDINGS**
9
            BEFORE THE HONORABLE RALPH R. BEISTLINE
10                UNITED STATES DISTRICT JUDGE

11  APPEARANCES:

12  For the Plaintiff:        KAREN L. LOEFFLER
                              U.S. Attorney
13                            BRYAN SCHRODER
                              KATHLEEN ANN DUIGNAN
14                            Assistant U.S. Attorneys
                              Office of the U.S. Attorney
15                            222 West 7th Avenue, #9, Room 253
                              Anchorage, Alaska  99513-7567
16                            (907) 271-5071

17  For the Defendant:        F. RICHARD CURTNER
                              Federal Defender
18                            Office of the Federal Public Defender
                              601 West 5th Avenue, Suite 800
19                            Anchorage, Alaska  99501
                              (907) 646-3400
20
                              PETER OFFENBECHER
21                            Skellenger Bender, P.S.
                              1301 5th Avenue, Suite 3401
22                            Seattle, Washington  98101-2605
                              (206) 623-6501
23

24

25

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 1 of 209

1  APPEARANCES (Continued):

2  Court Recorder:            NANCY LEALAISALANOA
                              U.S. District Court
3                             222 West 7th Avenue, #4, Room 229
                              Anchorage, Alaska  99513-7564
4                             (907) 677-6111

5  Transcription Service:     A & T Transcripts
                              6299 West 111th Avenue
6                             Westminster, Colorado  80020
                              (720) 384-8078

7

8  Proceedings recorded by electronic sound recording; transcript
   produced by transcription service.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 744  Filed 09/23/14  Page 2 of 209

1    **ANCHORAGE, ALASKA - THURSDAY, APRIL 10, 2014**

2

3        (Call to Order of the Court at 8:33 a.m.)

4        (Defendant present; jury not present)

5            THE CLERK:  All rise.  His Honor the Court --

6            THE COURT:  (Indiscernible) the jury.

7            MS. LOEFFLER:  No, Your Honor, I just -- there was one

8    thing that you asked me to bring up --

9            THE CLERK:  Okay.  His Honor the Court, the United

10   States District Court for the District of Alaska is now in

11   session, with the Honorable Ralph R. Beistline presiding.

12   Please be seated.

13           THE COURT:  Yes.

14           MS. LOEFFLER:  Your Honor, Angela Birchfield is here,

15   who is the stepdaughter of --

16           THE COURT:  Okay.  I --

17           MS. LOEFFLER:  And you asked me to bring in -- she

18   wants to sit in, and you asked me to bring it up.

19           THE COURT:  Hearing no objections, that's fine.

20           MS. LOEFFLER:  Okay.

21           THE COURT:  Okay, is that the only issue?

22           MS. LOEFFLER:  That was the only issue, but you asked

23   me --

24           THE COURT:  Do you have a witness?

25           MS. LOEFFLER:  -- to bring it up when she was here.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 3 of 209
(720) 384-8078  attrans@sbcglobal.net

1   THE COURT:  Yes, good.  Do you have a witness?

2   MS. DUIGNAN:  Yes, we do, Your Honor.  He's right here

3  in the courtroom.

4   THE COURT:  Do we have a jury?  Okay, we got everything

5  we need.

6   MS. DUIGNAN:  That's it.

7   (Jury present)

8   THE COURT:  All right, please be seated.  Good morning,

9  ladies and gentlemen.  How are you doing?  What a great group.

10  You look better every day.  This is day 8.  Getting to be kind

11  of like a family here.  Okay, does the government have a

12  witness?

13   MS. DUIGNAN:  Yes, Your Honor.

14   THE COURT:  All right.

15   MS. DUIGNAN:  The government calls Don Rudat to the

16  stand.

17   THE COURT:  Sir, if you can just remain standing once

18  you get in the box there, and my clerk will swear you in over

19  here.

20   THE CLERK:  Please raise your right hand.

21   **DON ALEEN RUDAT, PLAINTIFF'S WITNESS, SWORN**

22   THE CLERK:  Thank you.  Please have a seat.  And, sir,

23  if you can please state and spell your full name.

24   THE WITNESS:  Don Rudat.  D-o-n, A-l-e-e-n, for Allen,

25  Rudat, R-u-d-a-t.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 4 of 209

1       THE CLERK:  Thank you.

2       THE COURT:  All right.  Counsel.

3                    **DIRECT EXAMINATION**

4    BY MS. DUIGNAN:

5    Q    Mr. Rudat, what city and state do you live in?

6    A    I live in Spanish Fort, Alabama.

7    Q    And for what organization do you work?

8    A    I work for the Aviation Training Center for the Coast

9    Guard in ATC Mobile.

10   Q    And what is your role there?

11   A    I'm the Sensors Communications Training Branch chief for

12   all aviation platforms.

13   Q    Are you a civilian employee or a contractor or what --

14   A    Yes, ma'am, I am a Coast Guard civilian since 2006.

15   Q    Were you in Kodiak, Alaska on April 12th, 2012?

16   A    Yes, ma'am.

17   Q    And why were you there?

18   A    I was part of a three-man team that was here for -- in

19   Kodiak to do training with our MH-60 and 65 personnel as well

20   as test a new satellite that was launched in orbit earlier that

21   season.  That's what I was here for.

22   Q    And how long were you in Kodiak?

23   A    Two weeks, ma'am.

24   Q    Early on the morning of April 12th, what were you doing?

25   A    I woke up early that morning, checked some emails I could

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 5 of 209
(720) 384-8078  attrans@sbcglobal.net

1  remote into my desktop back in Mobile, cleared my work account,

2  got delayed with some email traffic, and then I departed for a

3  walk that morning at approximately 6:40.

4  Q    Where were you staying in Kodiak?

5  A    I was staying at the Comfort Inn, right outside the

6  airport there.

7  Q    And you said that you left at 6:40 to take a walk.  Where

8  did you head to?

9  A    Yes, ma'am.  I walked out towards the COMMSTA, down Anton

10 Larsen Road.

11 Q    And have you taken that walk before?

12 A    Yes, ma'am, I had taken that walk at least once prior to

13 that on that same trip.

14 Q    Have you had a chance to review video in this case?

15 A    Yes, ma'am.

16 Q    I'm going to pull something up on the screen in front of

17 you.

18 A    Yes, ma'am.

19 Q    If you look at your screen, do you see something moving on

20 the screen?

21 A    Yes, ma'am.

22 Q    And what is that?

23 A    That would be myself.

24 Q    And we're going to pull up one more clip.

25     (Side conversation)

1  Q   Okay, the first clip you saw was 7:08 and nine seconds.

2  We're going to pull up a second clip.

3  A   All right.

4  Q   While we're waiting for the second clip, on the first --

5  okay, wait.  Sir, look at the second clip.  What do you see on

6  this video?

7  A   That's myself, going back towards the Comfort Inn.

8  Q   Okay.  And what time was that?

9  A   That was at 7:12:11, it looked like.

10 Q   Okay.  The first clip, at 7:09 that you testified about,

11 which direction were you walking?

12 A   Yes, ma'am, I was walking from the Comfort Inn out towards

13 the golf course, in that direction.

14 Q   Okay.  And on the second clip that we showed you coming

15 back at 7:12, what direction were you walking?

16 A   Yes, ma'am.  From the direction of the golf course back

17 towards the Comfort Inn.

18 Q   Okay.

19      MS. DUIGNAN:  I -- I'd like to move for admission of

20 these clips or at least publish them to the jury.  I think the

21 video's already admitted.

22      THE CLERK:  What exhibit number is that?

23      MS. DUIGNAN:  148.

24      THE COURT:  Is that true, it's already admitted?

25      (Side conversation)

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1     THE CLERK:  Yes.

2     THE COURT:  Okay, 148's already been admitted, so

3  you're free to publish it as you wish.

4     MS. DUIGNAN:  If we can start with the first one.

5  BY MS. DUIGNAN:

6  Q    So that's you walking in the direction of the golf course?

7  A    Yes, ma'am.

8     THE COURT:  Let me -- was the jury able to see that?

9  Okay.

10  BY MS. DUIGNAN:

11  Q    And is that you walking in the opposite direction, about

12  7:12:08?

13  A    Yes, ma'am.

14  Q    Can we pull up Exhibit 75 -- oh, well, for the witness.  I

15  don't think it's been admitted yet.  Looking at your screen at

16  this exhibit, do you recognize what it is?

17  A    Yes, ma'am, this is the communications compound.

18  Q    Okay.  And is it an aerial photo of the area?

19  A    Yes, ma'am.

20  Q    Does it appear to be a fair and accurate representation of

21  the area?

22  A    Yes, ma'am.

23  Q    And would it assist in your testimony?

24  A    Yes, ma'am.

25     MS. DUIGNAN:  I move for admission of Government

Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 8 of 209

1  Exhibit 75.

2         MR. CURTNER:  No objection.

3         THE COURT:  It'll be received.

4      (Plaintiff's Exhibit 75 admitted)

5  BY MS. DUIGNAN:

6  Q   I think you have a laser pointer up there, Mr. Rudat.

7  A   Yes, ma'am.

8  Q   If you can just point out to the jury on the map what road

9  it was that you were walking down, from what direction to what

10 direction?

11 A   All right, this is Anton Larsen Road right through here.

12 This is the road that I was walking down.  Right about here is

13 where I turned around at 7:10.

14 Q   Okay.

15 A   And approximately right here is where I heard the --

16 Q   What did you hear around that area?

17 A   All right, ma'am, it sounded like a -- a steel -- metal

18 grate being dropped on concrete.

19 Q   Okay.  And if you can take your pointer again.  Was that

20 about the point that you were passing by the COMMSTA?  If you

21 could just point where that was again?

22 A   Yes, ma'am, right about in here.

23 Q   Okay.  And the area that you saw in the video where you

24 came back -- the -- you've had a chance to review the video

25 about --

1   A    Yes, ma'am.

2   Q    So --

3   A    That's --

4   Q    -- was it just before you came into view of the video or

5   just after, or about when do you think that was, looking at the

6   video?

7   A    Just before that, ma'am.

8   Q    Okay.  Besides hearing that noise at that point, did you

9   hear or see anything else on your way back?

10  A    No, ma'am.

11  Q    And the noise that you heard, could you tell what

12  direction that came from?

13  A    It came from the -- the maintenance building.

14  Q    Okay, so that would be building T2?

15  A    Yes, ma'am.  I'm not familiar with the actual building

16  numbers, but it was the lower maintenance building.

17  Q    Okay.  Closest to the road?

18  A    Yes.

19  Q    And walking on your way back, about how long did it take

20  you to get back to the hotel?

21  A    Approximately 30 minutes, ma'am.

22  Q    Okay.  And what time did you arrive back at the hotel?

23  A    At 7:40.

24  Q    And did you -- was there anything else that happened along

25  the way that made you know those times exactly?

1  A    Yes, ma'am.  As I stated earlier, I was delayed getting

2  out the door.  I originally wanted to depart the hotel about 6

3  a.m.  I got caught up in some email traffic and -- with the

4  folks back in Mobile.  I knew I had to be in the lobby at the

5  hotel to meet the rest of my crew at 8:30 that morning, so I

6  was anxious to get at least an hour-long walk in.  And I

7  departed after I got done with all my email traffic that

8  morning.  It was 6:40 when I departed.  I went out 30 minutes,

9  turned around, and came straight back.  So that's how I know my

10 time was good.  I also had a phone call as soon as I crossed

11 the ri -- the -- the bridge on the river, just past the COMMSTA

12 on the return leg, from my boss back in Mobile at 7:14.  So --

13 Q    Thank you, Mr. Rudat.  I don't have any other questions.

14 A    Yes, ma'am.

15       THE COURT:  Cross-examination.

16       MR. CURTNER:  Thank you, Your Honor.

17                    **CROSS-EXAMINATION**

18 BY MR. CURTNER:

19 Q    Good morning, Mr. Rudat.

20 A    Good morning, sir.

21 Q    Now, were you first questioned about what you saw on

22 that -- on your walk on April the 12th, that same day?

23 A    Yes, sir, that evening.

24 Q    And you were asked about what vehicles you may have seen

25 during your walk?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 744  Filed 09/23/14  Page 11 of 209
(720) 384-8078  attrans@sbcglobal.net

1 A    Yes, sir.

2 Q    Do you recall that interview?

3 A    Right.

4 Q    Did you -- when you were on your walk, did you see a

5 number of vehicles?

6 A    Yes, sir, there were a number of vehicles.

7 Q    And was it your practice to, like, wave at people when

8 they come by, and they might wave back?

9 A    Yes, sir.

10 Q    Okay.  So most of those vehicles that you saw, you saw who

11 was driving and you waved, and most of them waved -- I guess

12 they all waved back to you, right?

13 A    Well, sir -- yeah, the -- the traffic that's coming

14 towards me --

15 Q    Uh-huh (affirmative).

16 A    -- if -- especially if I'm trying to share the road, going

17 against the flow of traffic, I would wave.

18 Q    Okay.  Now -- so they asked you what vehicles you may have

19 seen.  You saw a lot of milit -- a lot of personnel in uniform

20 driving to the COMMSTA?  Is that correct?

21 A    Yes, sir.

22 Q    You also mentioned that you saw something that stood out,

23 a red pickup truck.  Do you recall that?

24 A    Yes, sir.  I believed it was a red pickup.

25 Q    Okay.  And why did that stand out to you?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 12 of 209
(720) 384-8078   attrans@sbcglobal.net

1  A   Well, the traffic that I did see going was -- majority of

2  traffic was going at that time towards the COMMSTA, mostly in

3  uniform.  The one individual that stuck out in my mind was a

4  civilian with a beard --

5  Q   Okay --

6  A   -- going in towards the COMMSTA.

7  Q   A civilian.  What did that civilian look like?  You had a

8  chance to see the civilian, right?

9  A   Just that brief moment on the road.

10 Q   Did you describe him as a heavyset person?

11 A   No, sir, I wouldn't say he was heavyset, but --

12 Q   Did you describe him as having a dark beard, well trimmed?

13 A   Yes, sir.

14 Q   Okay.  And so what you told law enforcement that day is

15 that you did notice a red pickup truck with the person driving

16 having a well-trimmed dark beard.  Is that correct?

17 A   Yes, sir.

18 Q   Okay.  And everyone else that you saw that day was in

19 uniform, and that's what your statement was?

20 A   The majority of personnel that I remember, yes, sir.

21 Q   And I think you said that the only thing that was out of

22 the ordinary that stuck out was that one truck?

23 A   Yes, sir.

24 Q   Okay.  Now, when you heard this metal noise or what you

25 heard, did you also -- that's when you glanced over?

Case 3:13-cr-00008-SLG  Document 744  Filed 09/23/14  Page 13 of 209

1  A    Yes, sir.

2  Q    And then at that time you described also seeing a black

3  pickup?

4  A    Yes, sir.

5  Q    And you said that was on the far side of the building?

6  A    No, sir.  If you want to bring the picture back up, I'll

7  be happy to point it out.

8  Q    Well, I wonder if you could just -- have you looked at

9  your interview from April 12th?  You haven't looked at that?

10 A    No, sir.

11 Q    Okay.  Let's -- if we could go to Bates number 24926.

12 We're going to bring up something on your screen that's -- and

13 see if you can identify it.

14 A    All right, sir.

15 Q    Just look it over and -- have you seen that before?

16 A    No, sir.

17 Q    Does that look like a tran -- does that look like what you

18 were -- that -- the information you gave on that day?

19 A    Yes, sir.

20 Q    Okay.  If you go down toward the bottom, they asked you,

21 "Do you notice any vehicles parked there right after you talked

22 about turning around and hearing the sound?"  Do you see that?

23 A    Yes, sir.

24 Q    And you said there was a black pickup?

25 A    Yes, sir.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 744  Filed 09/23/14  Page 14 of 209
(720) 384-8078  attrans@sbcglobal.net

1 Q   Okay.  And then you were asked what side of the building?

2 Do you see that?

3 A   Yes, sir.

4 Q   And you said it would be on the far side, going toward

5 Larsen's Bay?

6 A   Yes, sir.

7 Q   Okay.  And that would be the west side of the building,

8 right?

9 A   Yes, sir, it's the crotch where the two wings join

10 together.

11 Q   Is that what you said then?

12 A   No, sir, that's what I said right there.

13 Q   Okay.  And the only -- now, were there any other vehicles

14 that you noticed that day?

15 A   There were GOVs parked at the maintenance facility.

16 Q   You never saw anything that was like a blue SUV type of

17 vehicle?

18 A   No, sir.

19 Q   Either on your walk or when you looked over?

20 A   No, sir.

21 Q   Did you also talk about seeing a motorcycle?

22 A   Yes, sir.

23 Q   And how did you describe that motorcycle?

24 A   I saw the motorcycle down at the -- the end of Anton

25 Larsen Bay Road.  I'm not sure what the main drag is towards

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 15 of 209
(720) 384-8078   attrans@sbcglobal.net

1  the hotel.

2  Q    Uh-huh (affirmative).

3  A    But the motorcycle had come by at that point in time, and

4  struck me as odd, because it was fairly cold yet, that somebody

5  would be riding a motorcycle, but --

6  Q    Okay.  And was it a red motorcycle or a black motorcycle?

7  A    No, sir, I didn't have the color in mind that I recall.

8  Q    But was it, like, a street bike or a dirt bike?

9  A    I wasn't 100-percent positive, sir.

10 Q    I think at the time you thought it was, like, a small 250

11 dirt bike, is that how you --

12 A    Yes, sir.

13 Q    Okay.  Thank you.

14         THE COURT:  Redirect.

15         MS. DUIGNAN:  Yes, Your Honor.  Can we pull up Exhibit

16 265?  It's already been admitted.

17                  **REDIRECT EXAMINATION**

18 BY MS. DUIGNAN:

19 Q    Mr. Rudat, when you were walking past the building here --

20 A    Yes, ma'am.

21 Q    -- you said you had -- I know this may be taken a little

22 bit later than when you actually walked past.

23 A    Right.

24 Q    But can you point out with your pointer what vehicles you

25 saw?

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net

1  A   Yes, ma'am.  The vehicle I saw, the black pickup, was

2  parked right in this vicinity.

3  Q   Okay.  And had -- what other vehicles?  You said you saw

4  the government vehicles?

5  A   Yes, ma'am, these vehicles right here.

6  Q   Okay.  But the other vehicles in the picture weren't

7  there --

8  A   No, ma'am.

9  Q   -- at the time?  Thank you.

10 A   Thank you.

11 Q   And -- I'm sorry -- when you referred to -- you said you

12 saw the truck parked at the crotch.  What do you mean by the

13 crotch?

14 A   That's the -- where the two buildings join together, right

15 here.

16 Q   Okay.  Thank you.

17 A   Yes, ma'am.

18 Q   And if we can bring up Exhibit 75.  I think you were asked

19 by Mr. Curtner where you had seen vehicles along here.  I don't

20 know if this photo will help you show what you had explained to

21 him, but did you notice all of the vehicles that you had seen

22 on your walk?

23 A   No, ma'am.  On -- on the way out, the vehicles that were

24 outbound were coming up from behind me.  So there wasn't a --

25 an opportunity or need to actually wave and make con -- you

1   know, eye contact with them or anything.  Generally, it's the

2   traffic coming towards me.  I don't know that I waved at

3   anybody on the way out.  It was on the way back that I waved at

4   a -- a passerby.

5   Q   Okay.  And did you see any vehicles passing by or near

6   Bridge 6?

7   A   I'm not familiar with which one is Bridge 6, ma'am.

8   Q   Okay.  The area by -- let me ask you this.  Can you point

9   out where you were when you saw the red truck?

10  A   Yes, ma'am.  It's well past the bridge and way back to the

11  left, on the way back towards the hotel.

12  Q   So it's off the photo?

13  A   Yes, ma'am, offscreen.

14  Q   Mr. Curtner also asked you what other vehicles you saw

15  parked around T2.  Was there anything else of notice there, any

16  equipment or anything else around?  Dumpsters?

17  A   No, ma'am.  There was the snow -- I call them the

18  snowcats, the tracked snow vehicles that were parked up in this

19  general vicinity.

20  Q   Okay.  So that's what you could see from the road?

21  A   Yes, ma'am.

22  Q   I don't have any other questions.  Thank you.

23  A   Thank you, ma'am.

24          THE COURT:  Recross.

25          MR. CURTNER:  Just briefly.  We need that up.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 18 of 209
(720) 384-8078   attrans@sbcglobal.net

1                    **RECROSS EXAMINATION**

2  BY MR. CURTNER:

3  Q   Mr. Rudat, so you walked down this road about this far?

4  A   Yes, sir.

5  Q   Okay.  Do you know -- is this a lake?  Is this Buskin Lake

6  right there?

7  A   Yes, sir, that's what I've been told.

8  Q   Okay.  And then that's the Buskin River?

9  A   Yes, sir.

10  Q   And is that a road that goes back to the lake area?

11  A   I believe so, sir.

12  Q   Okay.  And those would have been the snowcats you saw when

13  you saw the black pickup?

14  A   Yes, sir.

15  Q   Okay.  All right, thank you.

16         MS. DUIGNAN:  Your Honor, I have one more question.

17         THE COURT:  Okay.

18           **FURTHER REDIRECT EXAMINATION**

19  BY MS. DUIGNAN:

20  Q   When you were walking along there, how would you describe

21  the terrain?  Is it hilly, flat?  How would you describe it?

22  A   The terrain to either side is very hilly.  The road itself

23  is pretty flat and level and it's all past the COMMSTA, where

24  it drops back around a hill and -- and on a slight decline.

25  Q   Thank you, sir.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 19 of 209
(720) 384-8078  attrans@sbcglobal.net

1  A    Yes, ma'am.

2       THE COURT:  Okay, thank you, sir.  You're excused.  The

3  government's next witness.

4       (Witness excused)

5       MS. DUIGNAN:  The government calls Special Agent

6  Bottary to the stand.

7       THE COURT:  You just need to come up, make your way

8  around there.  That door pull -- that little door pulls out.

9  And come into the box there and remain standing, and my clerk

10 will swear you in.  She's right here.

11      THE CLERK:  Please raise your right hand.

12      **SEAN MICHAEL BOTTARY, PLAINTIFF'S WITNESS, SWORN**

13      THE CLERK:  Okay.  Thank you.  Please have a seat.

14 And, sir, if you can please state and spell your full name.

15      THE WITNESS:  My first name's Sean, spelled S-e-a-n.

16 Michael, last name Bottary.  Spelled B as in Boy, o-t-t-a-r-y.

17      THE COURT:  (Indiscernible).

18      THE CLERK:  Thank you.

19                    **DIRECT EXAMINATION**

20 BY MS. DUIGNAN:

21 Q    Special Agent Bottary, for what organization do you work?

22 A    The Coast Guard Investigative Service.

23 Q    And how long have you been in the Coast Guard

24 Investigative Service?

25 A    Approximately eight years.

Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 20 of 209

1  Q    Where are you currently stationed?

2  A    I'm currently stationed in Bahrain, which is in the Middle

3  East.

4  Q    And what is your position there?

5  A    Special agent.

6  Q    Where were you stationed before you went to Bahrain?

7  A    I was stationed here, with the FBI's Joint Terrorism Task

8  Force.

9  Q    And you were still a part of the Coast Guard Investigative

10 Service at that time, assigned there?

11 A    Yes, ma'am.

12 Q    Were you involved in investigating this case?

13 A    Yes, I was.

14 Q    And how did you get involved?

15 A    The morning of April 12th, I received the phone call from

16 my boss in Seattle.  As part of the FBI, I was sitting in their

17 spaces and knew their management.  Told me about the case, or

18 the -- what was going on, and requested that I go to the upper

19 management at FBI Anchorage and request assistance from them.

20 Q    As part of your investigation in this case, was there a

21 point at which you listened to voicemail messages to the -- of

22 the victims?

23 A    Yes, ma'am, it was.

24 Q    And did you in fact listen to the voicemailbox of Petty

25 Officer Hopkins in this case?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 21 of 209
(720) 384-8078   attrans@sbcglobal.net

1  A    Yes, I did.

2  Q    And who assisted you in getting into the voicemailbox?

3  A    I was assisted by Petty Officer Newby, one of the petty

4  officers assigned to COMMSTA Kodiak, who had systems knowledge

5  of the -- the voicemail.

6  Q    When you listened to the voicemailbox, did you find any

7  messages of interest?

8  A    Yes.

9  Q    Did you have a chance to review them before coming into

10  court today?

11  A    Yes, I did.

12  Q    I'd like to pull up what has been marked as Government

13  Exhibit 170 and 170 Alpha.  They should appear on the screen in

14  front of you.  Did you have a -- if you can just read over that

15  portion of the transcript.  Does that appear to be a fair and

16  accurate transcription of the voicemail?

17  A    Yes, it does.

18        MS. DUIGNAN:  Your Honor, at this point I'd like to

19  move for admission of 170 and 170 Alpha.

20        MR. OFFENBECHER:  I have no objection, Your Honor.

21        THE COURT:  It will be received without objection.

22     (Plaintiff's Exhibits 170 and 170A admitted)

23  BY MS. DUIGNAN:

24  Q    Special Agent Bottary, I'm going to publish them.  I'd

25  like to play them for the jury.

1  A    Yes, ma'am.

2  08:58:41

3       (Audio played)

4  08:59:20

5  Q    Special Agent Bottary, was that your voice at the end of

6  the recording?

7  A    Yes, it was.

8  Q    And, in fact, when you played the message, did you verify

9  the time and date on the message?

10  A    Yes, I did.

11  Q    And did you double check that with Coast Guard IT

12  personnel?

13  A    With Petty Officer Newby, yes.

14  Q    I'd like to turn to the weeks following the murders.  Were

15  you assigned at some point to conduct surveillance on the

16  defendant?

17  A    Yes, ma'am, I was.

18  Q    Was there a time you were assigned to watch him, where you

19  personally observed him changing tires on his truck?

20  A    There was.  That was the 2nd of May.

21  Q    And what watch were you on that day?

22  A    That would have been the noon-to-4-p.m., or 12-to-1600

23  watch.

24  Q    And at what time did you observe the defendant changing

25  his tires?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 23 of 209
(720) 384-8078   attrans@sbcglobal.net

**BOTTARY - CROSS**

1  A    At approximately 12:20.

2  Q    And do you recall what tires he changed?

3  A    The tires that were changed were driver's side, both front

4  and rear, and then also passenger side rear.

5  Q    And can you describe the vehicle in which he was changing

6  these tires?

7  A    It was a -- it was a Dodge Ram truck.

8  Q    What equipment did he use to change these tires?

9  A    He used the -- it was a hose coming out of the garage, to

10 which I believe was a pneumatic type of a tool.

11 Q    And how long did it take him to change all three tires?

12 A    All three tires were changed in approximately 14 minutes.

13 Q    Did he appear to have any trouble changing any of the

14 tires?

15 A    No, ma'am.

16 Q    I have no further questions.

17       THE COURT:  Cross-examination.

18                      **CROSS-EXAMINATION**

19 BY MR. OFFENBECHER:

20 Q    Special Agent Bottary, good morning.

21 A    Good morning, sir.

22 Q    During the voicemail -- collection of the voicemail

23 message clip that we just heard, you made reference to "This is

24 the second message."  Is that right?

25 A    That's correct.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 24 of 209
(720) 384-8078   attrans@sbcglobal.net

**BOTTARY - CROSS**

1  Q    This was, however, the -- only this message from --

2  referencing Jim was the only message that you intended to

3  record.  Is that right?

4  A    I'm sorry, can you say that again?

5  Q    Well, let me make -- ask you a clearer question.  There

6  were two messages that you recorded that day.  Right?

7  A    On that one, yes.

8  Q    You've just played us what you've described as the second

9  message.  Right?

10 A    Correct.

11 Q    And there was another message ahead of that message.  Is

12 that right?

13 A    Yes, there was.

14 Q    And it was a message to -- again to Mr. Hopkins on his

15 voicemail, right?

16 A    Yes.

17 Q    And the -- it was a message about someone who had -- he

18 had had a -- some kind of a car accident with.  Is that right?

19 A    That's correct.

20 Q    And it was a message from someone saying, "Hey, this guy's

21 going to come contact you.  Your cars hit each other when

22 the" --

23        MS. DUIGNAN:  Objection, Your Honor.  Lack of

24 relevance.

25        MR. OFFENBECHER:  Well, Your Honor, I think he's

1  entitled -- if he said it's the second message, he's entitled

2  to explain what the first message is on Mr. Hopkins' voicemail

3  that morning.

4       THE COURT:  I don't know if it's relevant or not, but

5  he can answer the question.

6  BY MR. OFFENBECHER:

7  Q    It was a message to Mr. Hopkins, right?

8  A    Correct.

9  Q    It was about a car accident that had happened, right?

10 A    Something along those lines, yes.

11 Q    And someone said, "Somebody's going to come talk to you

12 about that."  Is that right?

13 A    Yes.

14 Q    Now, you've indicated that you were conducting

15 surveillance of Mr. Wells on May 2nd of 2012.  Is that right?

16 A    Yes, sir.

17 Q    And this was part of a larger program of surveillance of

18 Mr. Wells over -- since the time of April.  Isn't that right?

19 A    Correct.

20 Q    And you were one of many FBI agents, more than perhaps 10,

21 who conducted a routine surveillance of Mr. Wells and his wife

22 during this period of time.  Is that right?

23 A    That's correct.

24 Q    And the incident that you've described which concerns

25 changing the tire was Mr. Wells changing the tire at his house

Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 26 of 209

1 in Bells Flats, right?

2 A    Yes.

3 Q    And you were surveilling him from a position across -- a

4 little bit across the valley, from a hill.  Is that right?

5 A    Correct.

6 Q    And you had set up a surveillance position, or the FBI had

7 set that up.  Is that right?

8 A    That was correct.

9 Q    And you were conducting 24-hour surveillance -- 24-7

10 surveillance of Mr. Wells's house.  Right?

11 A    For the most part, yes.

12 Q    And did you also have cameras set up there surveilling Mr.

13 Wells?

14 A    I'm not entirely sure if those cameras were up and

15 running, but that was an option that was explored by the case

16 agent.

17 Q    Okay.  Were there what looked like cameras set up on the

18 hill?

19 A    There was equipment, but I -- I was not aware of whether

20 or not they were running.

21 Q    Okay.  So there was camera equipment there, right?

22 A    Correct.

23 Q    And then there were actual agents there who had

24 binoculars, right?

25 A    Yes.

1 Q   And the agents were there 24-7 with binoculars on Mr.

2 Wells and his wife at their house.  Right?

3 A   Yes.

4 Q   And that's how you happened to be there from 1220 to 1600

5 on May 2nd of 2012?

6 A   From 12 to 1600, yes.

7 Q   12 to 1600.  Sorry.

8 A   Roger.

9 Q   And on the other -- when you got there, somebody was there

10 ahead of you with the binoculars, watching Mr. Wells.  Right?

11 A   That's correct.

12 Q   And when you left, somebody took over from you with the

13 binoculars, watching Mr. Wells.  Right?

14 A   That would have been correct, yes.

15 Q   And there was also surveillance that was conducted of Mr.

16 Wells when he went away from his house, wasn't there?

17 A   There may have been at times.  I don't know if I was

18 personally involved in those operations.

19 Q   All right.  So you didn't do the actual following around

20 of Mr. Wells and his wife in a car?

21 A   To the best of my knowledge, no.

22 Q   Okay.  You're aware that other agents were doing that,

23 though, don't -- aren't you?

24 A   Yes.

25       MR. OFFENBECHER:  I don't have any other questions,

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 28 of 209
(720) 384-8078   attrans@sbcglobal.net

1  Your Honor.

2         THE COURT:  Redirect.

3         MS. DUIGNAN:  Your Honor, Mr. Offenbecher mentioned the

4  first voicemail.  Rule of completeness, that the government

5  would like to move for admission of Exhibit 158, which is the

6  whole voicemail.

7         THE COURT:  That's fine with me.

8         MR. OFFENBECHER:  No objection.

9         THE COURT:  Okay.  It'll be received.

10      (Plaintiff's Exhibit 158 admitted)

11        MS. DUIGNAN:  We'd like to publish it to the jury at

12  this time.

13        THE COURT:  Very well.

14  09:06:20

15      (Audio played)

16  09:08:40

17        MS. DUIGNAN:  That's in, Your Honor.  I have nothing

18  further.

19        THE COURT:  Okay.

20        MR. OFFENBECHER:  Just one question, Your Honor.

21                    **CROSS-EXAMINATION, CONTINUED**

22  BY MR. OFFENBECHER:

23  Q    Just to be clear, those are both messages that you took

24  from that morning.  Is that right?

25  A    From that inbox, yes.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 29 of 209
(720) 384-8078  attrans@sbcglobal.net

1  Q    Yeah.  Okay.

2          THE COURT:  Okay.  Thank -- looks like you're done.

3  Thank you, sir.

4          THE WITNESS:  Yes, sir.

5          THE COURT:  I think -- is he done?

6          MS. DUIGNAN:  Yes, Your Honor.

7          THE COURT:  All right.  The government's next witness.

8      (Witness excused)

9          MR. SCHRODER:  Your Honor, the government calls

10  Lieutenant Will Ellis.

11          THE COURT:  All right, sir, if you can just make your

12  way up to the box here, come to the door.  It pulls out, to get

13  in.  And then remain standing, just for -- this door right

14  here, the first one.  And then my clerk's over here, and she'll

15  swear you in.

16          THE CLERK:  Okay.  Please raise your right hand.

17          **WILLARD SAMUEL ELLIS, PLAINTIFF'S WITNESS, SWORN**

18          THE CLERK:  Thank you.  Please have a seat.  And, sir,

19  if you can please state and spell your full name.

20          THE WITNESS:  My name is Willard Samuel Ellis.  W-i-l-

21  l-a-r-d, last name is Ellis, E-l-l-i-s.

22          THE CLERK:  Thank you.

23          THE COURT:  All right, counsel.

24                      **DIRECT EXAMINATION**

25  BY MR. SCHRODER:

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 744  Filed 09/23/14  Page 30 of 209
(720) 384-8078  attrans@sbcglobal.net

1  Q    Lieutenant Ellis, who do you work for?

2  A    The Alaska Wildlife Troopers.

3  Q    And how long have you worked for wildlife troopers?

4  A    I've worked for the troopers for almost 24 years, and I

5  shifted from -- into the Alaska Wildlife Trooper Division in

6  2001.

7  Q    Okay.  And so how long -- what were you doing before you

8  were a wildlife trooper, then, for the -- for --

9  A    Alaska State Trooper.

10 Q    All right.  And is that sometime referred to as blue-shirt

11 troopers?

12 A    Yes.

13 Q    And how long did you do that?

14 A    I did that for about 10 years.

15      MR. SCHRODER:  Too much or not enough?

16      UNIDENTIFIED JUROR:  Not enough.

17      MR. SCHRODER:  Okay.  We'll get him closer.

18 BY MR. SCHRODER:

19 Q    Usually it's too much, so -- so you were a blue-shirt

20 trooper for 10 years, and now you work for the wildlife

21 troopers.  What's your position with the wildlife troopers?

22 A    I'm a -- the regional commander for Kodiak and Dutch

23 Harbor.

24 Q    All right.  And what did you do before you were a trooper?

25 A    I worked for the Coast Guard.

1  Q   And what position did you hold in the Coast Guard?

2  A   I was a lieutenant when I got out of active duty, and then

3  I went into reserve status.

4  Q   All right.  And how long -- are you still in reserve

5  status?

6  A   Yes, I am.

7  Q   And what do you do as a reservist for the Coast Guard?

8  A   I'm the reserve chief of staff at the -- our Pacific Area

9  Headquarters down in Alameda, California.

10 Q   And what's your current rank in the reserves?

11 A   Captain.

12 Q   Now, what type of law enforcement training did you do,

13 briefly, before you became a trooper?

14 A   Through the Coast Guard --

15 Q   Or as -- becoming a trooper.  Let's say --

16 A   Oh, as a trooper.

17 Q   -- becoming a trooper.  I'm sorry.

18 A   I went to our academy down in Sitka.  It was a 15-week

19 program at the academy followed with a 15-week field training

20 program afterwards, up in Palmer.

21 Q   And is the training any different for a wildlife trooper?

22 A   No, it isn't.

23 Q   So how would you describe the kind of authority

24 relationship between -- in the Department of Public Safety

25 between the wildlife troopers and the blue-shirt troopers?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 32 of 209
(720) 384-8078   attrans@sbcglobal.net

1  A    They're -- they're two divisions.  Everybody comes in at

2  the core.  The fundamental employee is the state trooper.  And

3  just like in other departments in the municipality where they

4  might specialize into narcotics or something like that, we have

5  two divisions in Alaska.  And one will -- is the regular Alaska

6  State Troopers, and then we have the Division of Wildlife

7  Troopers.  And that would be the focus on natural resource

8  protection.

9  Q    So are both sides of the house sworn law enforcement

10 officers?

11 A    Yes, sir.

12 Q    Now -- so is a -- do you do much investigating now that

13 you're a -- you're in an officer position?

14 A    No, sir.

15 Q    All right.  But did you do criminal investigations as a

16 blue-shirt trooper?

17 A    Yes.

18 Q    Did you do your share of traffic enforcement too?

19 A    I did, yes.

20 Q    Where were you assigned as a blue-shirt trooper?

21 A    My first assignment was here in the -- Palmer.  I did that

22 for four years.  My second assignment was out in Cold Bay and

23 Alaska Peninsula.  And then from there I went to Petersburg.

24 From Petersburg I went to Juneau, where I was the patrol

25 sergeant.  And then it was at Juneau that I did the transfer

1   into the Wildlife Division.

2   Q    How many criminal investigations would you guess you've

3   participated in over the years?

4   A    I would say probably over 500.

5   Q    Yeah.  Now, did you end up getting involved in the

6   investigation of the two homicides at Coast Guard COMMSTA

7   Kodiak on April 12th, 2012?

8   A    Yes, I did.

9   Q    And how did -- when did you get involved?

10  A    When I came on duty there as I was coming into post, I

11  heard traffic that there had been a death out at the Coast

12  Guard base and that two of my wildlife troopers were

13  responding.  So I went out to see what was going on.

14  Q    And what was your role when you arrived?  What role did

15  you take on?

16  A    When I came out there, basically what I did for the most

17  part was help -- outside helping with the protection of the

18  scene.  We were -- they were doing next-of-kin notifications

19  and there was this process of turning it over to the FBI.  So

20  we were basically securing where we thought the crime scene

21  was, and I was out there assisting with that.

22  Q    And was that -- just to be clear, was that in any way

23  related to your Coast Guard role?

24  A    Oh, absolutely not.

25  Q    Now, were you the first trooper to arrive?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 34 of 209
(720) 384-8078  attrans@sbcglobal.net

1  A    No.

2  Q    And who was there before you?

3  A    Well, when I came there, there was Sergeant Chris Hill,

4  Trooper Dupras, Trooper Alan Jones, and Sergeant Bill Fusey

5  (ph).

6  Q    Now, did you end up -- you say you started work on

7  securing the scene.  Did you end up taking kind of a different

8  role, changing the course of what -- the investigation you were

9  doing more than just securing the scene?

10 A    Yeah, after, you know, mil -- Coast Guard military police

11 was there.  They -- after they got the tape up and the area

12 secured out there, eventually I came up into the -- the

13 COMMSTA, what they called the T1 building there, and was

14 remaining on scene until the chance for the FBI to get out

15 there.  They sent their team to do the crime scene, and then --

16 till the evening, until we finally broke.

17 Q    And so what kind of work were you doing when you were up

18 at T1?  What were you trying to accomplish up there?

19 A    Part of it was just -- you know, we had everybody still

20 there, so on scene for part of it was security, just to make

21 sure everything was okay.  And then during the course of that

22 time I had the chance to talk with Chief Reckner there, and he

23 was sort of giving me some more background information on the

24 employees in his shop there.  Sergeant Fusey had been looking

25 at some of the other video there, and then once the FBI came

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

**ELLIS - DIRECT**

1  in, they started dividing up the assignments into different

2  parts, and I was there till -- I broke later on that evening.

3  Q    Now, kind of into the evening, were you -- was there any

4  specific kind of aspect of the investigation as something you

5  were trying to determine during that evening?

6  A    Yeah, one of the things, you know, I was interested in was

7  how was entry and exit made from the building.

8  Q    And how did you go about doing that?

9  A    Well, part of it during -- earlier in the day when Trooper

10 Jones was there, I had him go ahead and search the perimeters

11 outside around the COMMSTA to see if there was any signs of

12 where somebody might have drove in through a back road or

13 walked in, see if we could find any events like that that we

14 would need to secure and hold until the FBI got there.  And

15 then later on that evening, after the FBI was on scene, they'd

16 been doing some interviews.

17      I had a opportunity to go into the -- the part of the

18 COMMSTA where they did the -- had the videos, and wanted to

19 take a look at the -- some of the videos.  Particularly, they

20 had one where they'd seen a white pickup that evening before.

21 But while I was up there, I saw that they had the two cameras,

22 the one for the T1 building and the T2 building, and the T1

23 actually looked down on the T2.  And so I was looking there

24 to -- because you can see the back of the building there.  And

25 I was curious to see if, you know, they had any video of

1  somebody exiting out from there.  You could see the windows;

2  did any lights come in, like a gun -- gunshot flash, something

3  like that that might help pin down the timeline or just provide

4  some more clues to what we were looking for.

5  Q   And in the course of that investigation, when you viewed

6  the videotape, did you come up with something?  Did you kind of

7  boil it down and find something that you thought -- I guess,

8  let me ask another question more general, though, first.  I

9  mean, it seems common sense; but why is it important to try to

10 determine how the criminal got in and out of the scene?

11 A   Part of it is you're trying to get a timeline down, and

12 that can be critical.  As you know certain things occur, you

13 know, that helps lead who might -- been -- who might have been

14 there, who might not have been there.  You know, you get your

15 timeline established.  It's usually a -- pretty much of a -- a

16 fundamental thing to a -- an investigation.  And then entry and

17 exit, again, that'll help you lead where you might find some

18 more evidence, anything that might help you develop more leads,

19 point you in a direction of a suspect.

20 Q   So viewing the videotape, at a -- some point, did you come

21 up with -- did you see something you thought you wanted to

22 investigate as far as, you know, ingress or egress and somebody

23 leaving the scene?

24 A   Yes, I did.  They -- there was a point where it shows

25 where Jim Hopkins' vehicle had came in, and then -- so we know

**ELLIS - DIRECT**

1  that he was in the building at that point there.  And then

2  looking -- you could see cars going by the T1 building there --

3  excuse me, the T2 building, the one that was down closest to

4  the road.  And -- and so looking to see what -- you know, if

5  somebody drove away from the crime scene, they would have to be

6  going during a certain point in that timeline.  And I saw a

7  white pickup go by shortly after Jim Hopkins got there, but

8  there's only about a 35-second difference between that, so I

9  didn't figure that one might have, might not have.

10       But there was another vehicle, it was a blue SUV type of

11  van type of vehicle, and that was -- passed about -- just under

12  six minutes after Jim Hopkins' vehicle got there.  And so that

13  was sort of, you know, in a timeline.  That would probably been

14  a period where somebody could have got away from the building

15  there.  And then I didn't see any more vehicles shortly after

16  that time frame go by.

17  Q    Now I'm going to ask you to take a look at an exhibit.

18  Did we ask you to look at a piece of videotape this morning?

19  A    Yes, we did.

20  Q    I'm going to ask you to take a look at this exhibit on

21  your screen next to you, Exhibit 154.

22       (Side conversation)

23  A    Okay.

24  Q    And did you -- do you see that?

25  A    Yes, sir.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

**ELLIS - DIRECT**

1  Q   And is that -- are you familiar with that exhibit?

2  A   Yes.

3  Q   And is that the recording -- the piece of tape that you

4  just talked about to the jury?

5  A   Yes.

6  Q   All right.

7       MR. SCHRODER:  All right, the government moves to admit

8  154.

9       MR. CURTNER:  No objection.

10      THE COURT:  It'll be received.

11   (Plaintiff's Exhibit 154 admitted)

12 09:19:50

13   (Video played)

14      MR. SCHRODER:  We'd like to show that to the jury.

15 Now -- Kim, could you stop that for a minute?

16      UNIDENTIFIED SPEAKER:  It is.

17 BY MR. SCHRODER:

18 Q   Okay.  Lieutenant Ellis, could you take -- there's a laser

19 pointer up there.  And could you point to the area of the scene

20 that -- where we're going to see what you were looking at, just

21 so they can focus on that?

22 A   Right there.

23 Q   Okay.

24   (Side conversation)

25 Q   Now, Lieutenant Ellis, did you have a lot of ability to

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 39 of 209
(720) 384-8078  attrans@sbcglobal.net

1    work with that video, to enlarge it or en -- try to enhance the

2    image or anything like that?

3    A    No, sir.

4    Q    All right.  So that was the image you had in your mind at

5    the time?

6    A    Yes.

7    Q    All right.  Now, at some point did you try to make some

8    efforts that evening to locate what you thought might be that

9    car, or at least look for what you thought might be that car?

10   A    Yes, I did.  I -- I drove down to the airport and checked

11   the -- the parking areas there to see if -- to document what I

12   could find as far as, you know, blue, dark-colored SUV or a --

13   or a van.

14   Q    Okay.  And did you pick the airport because some -- your

15   experience as a trooper?

16   A    Yes.  In looking, again, at a -- a timeline there, you

17   know, if somebody -- the person that killed the -- the two

18   victims there, they might want to get off the island, so the

19   airport would be a logical place to go if you're trying to get

20   out of there real quick.  And then the other thing had come out

21   during the investigation after -- after they had done their

22   interview was that Mr. Wells' wife had flown out of town, and

23   that their -- and I thought her vehicle might be there.  I

24   didn't know what it was that might have provided an opportunity

25   to swap out vehicles, and it's close enough to the COMMSTA that

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 40 of 209
(720) 384-8078  attrans@sbcglobal.net

1  it would within a reasonable timeline to try to get back and
2  forth.

3  Q   But you said you didn't -- you weren't aware specifically
4  of what her car was?

5  A   No, I didn't know what type of car she had.

6  Q   All right.

7      (Side conversation)

8  Q   And I'm going to ask you to pick up that laser pointer
9  again.

10     (Side conversation)

11 Q   Lieutenant Ellis, you're -- we're going to have to see if
12 we can admit this first before we do that.  Are you familiar
13 with what this photo depicts?

14 A   Yes, it's the airport.

15 Q   And are you -- have you been in that area a number of
16 times?  You've worked how many years in Kodiak?

17 A   Since 2004.

18 Q   Is that a fair and accurate depiction of what the airport
19 looked like and the layout of the airport at about the time of
20 the murders?

21 A   Yes.

22     MR. SCHRODER:  Your Honor, move for admission of 52.

23     MR. CURTNER:  No objection.

24     THE COURT:  It'll be received.

25     MR. SCHRODER:  All right.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 41 of 209
(720) 384-8078  attrans@sbcglobal.net

**ELLIS - DIRECT**

1       (Plaintiff's Exhibit 52 admitted)

2       (Side conversation)

3   BY MR. SCHRODER:

4   Q    Okay, we'll try to go quickly.  Using your laser pointer,

5   first off, can you show us from which dire -- where'd you come

6   from the COMMSTA?

7   A    Right here.  This is the road coming out of the COMMSTA.

8   Q    And what's the name of that road?

9   A    I refer to that as the Anton Larsen Road there.

10  Q    And then what's the road you turn onto?

11  A    Right here, the road to the airport.

12  Q    How about the -- that main road in -- the road in between?

13  The one you have to -- the one you turn right onto from Anton

14  Larsen Bay Road?

15  A    Oh, right here?

16  Q    Yes.

17  A    Chiniak Highway.

18  Q    All right.  And I just want to make that point with the

19  jury.  You're familiar with that road.

20  A    Yes, sir.

21  Q    Does that road run all the way south to Bells Flats?

22  A    Yes.

23  Q    And does it run all the way north to Kodiak?

24  A    Yes.

25  Q    And is that a -- considered a main road in Kodiak?

Case 3:13-cr-00008-SLG  Document 744  Filed 09/23/14  Page 42 of 209

**ELLIS - DIRECT**

1   A    Yes.

2   Q    All right.  So now, where did you turn into the airport?

3   A    Right here.

4   Q    All right.  And where did you start looking first?

5   A    I came right in here and started checking the parking lot

6   at the hotel first.

7   Q    And what's the name of that hotel?

8   A    It's now called the Comfort Inn.

9   Q    What did it used to be known as?

10  A    The Buskin Beach Inn, and there was something in between

11  that time.  It might have been the Comfort Inn still then.  But

12  it's Comfort Inn now, so --

13  Q    Okay.

14  A    -- it's had at least two other --

15  Q    All right.

16  A    -- owners.

17       (Side conversation)

18  Q    Let's -- we're going to put up another one that's a little

19  bit more of a closeup.  All right.  So once you left -- where's

20  the Comfort Inn in this one?

21  A    Right there.

22  Q    So once you left the Comfort Inn, where did you go?

23  A    I came up here and started checking the long-term parking

24  areas.

25  Q    All right.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 744  Filed 09/23/14  Page 43 of 209
(720) 384-8078  attrans@sbcglobal.net

1  A    Just worked my way up like that.

2  Q    All right.  Now, did you end up photographing some

3  vehicles while you were doing that?

4  A    Yes.  If I saw a -- a dark-color -- again, looking for a

5  dark-blue-colored or a dark-colored SUV or a minivan, van.

6  Q    Okay.  So you took some of those pictures?

7  A    Yes, sir.

8  Q    Now, at some point did you find a vehicle that you came

9  upon and struck your interest?

10 A    Yes.

11 Q    And where was that vehicle located?

12 A    Right where that one vehicle is, right in that area there.

13 Q    And what about that vehicle caught your interest?

14 A    Well, it was parked -- it was out there basically by

15 itself.  There was two other vehicles that were closer to the

16 buildings that were there.  It was parked out, angled out, like

17 you could drive it right on out to the road and get -- you

18 know, exit the airport pretty easily there.  The tires were

19 canted to the right.  Looked like somebody sort of just pulled

20 it in rather quick.  It was in a -- a two-hour tow-away area

21 too.

22 Q    Did you -- the color influence that interest in it?

23 A    Yes.  It was a -- blue colored, it was a SUV, and it also

24 had a Coast Guard sticker on the windshield.

25 Q    Okay.  What was the profile like?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 744  Filed 09/23/14  Page 44 of 209

1  A    The profile looked like sort of your -- your SUV,

2  crossover SUV, like a -- a -- CR-V or a Subaru Forester, those

3  type of designs --

4  Q    And how did that com --

5  A    -- or a RAV4, Toyota RAV (indiscernible), something like

6  that too.

7  Q    And how did that compare to the video image that you'd

8  seen?

9  A    The vehicles that I've looked at coming down there, that

10  one resembled the closest, I thought, to what I'd seen in the

11  video.

12  Q    All right.  And now I want to show you --

13      (Side conversation)

14  Q    Now, are you familiar with this exhibit?

15  A    Yes, I am.

16  Q    And what is it?

17  A    It's a picture of a -- of a blue Honda CR-V that I took at

18  the airport.

19  Q    Okay.  And, again, what were the distinguishing features

20  for you of this car?

21  A    The blue color and that it was an SUV.

22  Q    All right.  Now, we're also going to ask you to look at

23  Exhibit 104 -- now, who took this picture?  Let me make --

24  ask --

25  A    I did.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 744  Filed 09/23/14  Page 45 of 209
(720) 384-8078  attrans@sbcglobal.net

**ELLIS - DIRECT**

1  Q    -- that question.  All right, good.

2       (Side conversation)

3  Q    Now I ask you to look at -- on your screen at Government

4  Exhibit 103.  Are you familiar with this exhibit?

5  A    Yes, I am.

6  Q    And how are you familiar with it?

7  A    I took the picture.

8  Q    Now, did you take it at the same time as the previous one?

9  A    Yes, I did.

10 Q    All right.  And was that -- that was when you encountered

11 the vehicle that evening of April 12th?

12 A    Yes.

13 Q    And is it a fair and accurate representation of how you

14 found the vehicle that evening?

15 A    Yes.

16       MR. SCHRODER:  Your Honor, the government moves for

17 admission of 103.

18       MR. CURTNER:  No objection.

19       THE COURT:  Will be received.

20       (Plaintiff's Exhibit 103 admitted)

21 BY MR. SCHRODER:

22 Q    Now -- and you said there were a couple other vehicles.

23 Are those two vehicles behind it the closest ones you saw too

24 at that evening?

25 A    Yes.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1 Q   All right.  Now I'm looking at some of the terrain there

2 too.  Is there -- are -- is there any curbing in that parking

3 lot at the time?

4 A   No.

5 Q   Or any barriers --

6 A   No.

7 Q   -- parking barriers?  And when you approached the car,

8 did -- you said you saw a Coast Guard sticker?

9 A   Yes.

10 Q   And did you examine the car any further?

11 A   I did.  I did a walk around the car.

12 Q   And what did you -- did you see anything of interest when

13 you did the walkaround?

14 A   When I looked in on the passenger side, I saw mail, and

15 the mail was addressed to Mr. Wells.

16 Q   Okay.  Now I want to cover something else here quickly.

17        UNIDENTIFIED SPEAKER:  (Indiscernible).

18        MR. SCHRODER:  Oh, I'm sorry, to -- no, no, no, I want

19 the airport parking lot, the last one of those, 50 --

20        UNIDENTIFIED SPEAKER:  51.

21        MS. LOEFFLER:  I think it's 51.

22        MR. SCHRODER:  51.  Yeah.

23 BY MR. SCHRODER:

24 Q   Now, would you -- could you point out with your laser

25 pointer the area of long-term parking?  I mean -- okay, now

1  short-term, that's what I (indiscernible).

2  A    Oh, short-term?

3  Q    Yeah, short-term.

4  A    Right there.

5  Q    Now, is there kind of a designed traffic flow through

6  there, from your memory, or a common traffic flow?  Maybe

7  that's a better term.

8  A    Right.  People can come in through -- they'll usually come

9  around that way there if they're going to drop them off right

10  by the airport, and then if they're going to park they'll come

11  in down through this area here and park in there.

12  Q    All right.  But you said earlier there's -- there aren't

13  any barriers --

14  A    No.  No.

15  Q    -- to prevent somebody from cutting through short --

16  A    If somebody knew what they were doing, they could come

17  right in and park right up there if they wanted to.

18  Q    All right.

19  A    But just usually people dropping people off at the

20  airport, that's sort of the traffic pattern they --

21  Q    Have you ever seen anybody not follow that pattern?

22  A    Yes.

23  Q    Now let's go back to 103, please.  Now, you'd talked

24  something -- now, when you saw this vehicle -- you'd mentioned

25  this earlier, but I want to give you a chance -- to ask that.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 744  Filed 09/23/14  Page 48 of 209
(720) 384-8078  attrans@sbcglobal.net

1    I mean, you -- based on your years of doing traffic enforcement

2    and dealing with cars, I mean, what was your impression of how

3    that car had pulled in?

4    A    Were -- I guess -- when you look at, like, these vehicles

5    here, you can see how they sort of pulled up and lined up.

6    This one to me -- my impression was it looked like somebody had

7    just sort of come on, turned around, pulled in, stopped, and

8    got out of their car.

9    Q    And what factors did you -- did you look at any other

10   facts besides the angle, how it pulled in?

11   A    The tires.

12   Q    And what did -- what do you mean by that?

13   A    Looks like -- you know, a lot of times, at least, when I

14   go to park, I'll -- I'll straighten out the tires or something

15   like that, when I'm coming into a parking lot.  And in that

16   case they -- they're turned like somebody's in the process of

17   making the turn, that came in there and just stopped the car

18   and -- and got out.

19   Q    Now, after you take -- and did you take the pictures the

20   first time you were down there, when you first saw the vehicle?

21   A    Yes.

22   Q    Yeah.  So where did you go after that?  What'd you do

23   after you had identified the vehicle?

24   A    I drove back up to the COMMSTA and let the FBI know about

25   the vehicle.

1 Q    Okay.  And then after you did that, what'd you do next?

2 A    Went back down there and stayed on the scene and --

3 Q    Okay.

4 A    -- protected it till they sent some other people to take

5 control of it.

6 Q    Stayed on the scene with that vehicle?

7 A    Yes.

8 Q    And then at some point you said -- were you relieved by

9 other agents?

10 A    I believe two Coast Guard CGIS agents.

11 Q    Okay.  And was that you -- the end of your activity in the

12 case?

13 A    Then -- yeah, I was done at that point.  Yes.

14 Q    All right.

15         MR. SCHRODER:  No further questions, Your Honor.

16         THE COURT:  Cross.

17                    **CROSS-EXAMINATION**

18 BY MR. CURTNER:

19 Q    Lieutenant Ellis, have you -- you wrote a report based on

20 this case.  Is that correct?

21 A    Yes, I did.

22 Q    And did you review that recently?

23 A    Yes, I did.

24 Q    Okay.  And actually was that -- that report's dated April

25 12, 2012?

1  A    Yes.

2  Q    And your notes there are what you noted having seen --

3  having reviewed the video from the T1 camera --

4  A    Yes.

5  Q    -- on April 12th?

6  A    Yes.

7  Q    And I think in your notes there are five different times

8  and different things that you noted in your notes.  Is that

9  correct?

10  A    Yes.

11  Q    Okay.  So the first thing you note is a -- at 7:01:04 on

12  April 12th is a light appears in the T2 building?

13  A    Yes.

14  Q    Okay.  Then the next thing that you noticed from watching

15  that video was at 7:02:58, a white pickup with a white cab goes

16  by?

17  A    Yes.

18  Q    And do you know whose vehicle that was now?

19  A    No, I do not.

20  Q    Okay.  Now, the next thing you noted was at 7:08, when Mr.

21  Hopkins' vehicle pulls in the T2?

22  A    Yes.

23  Q    Okay.  And then the fourth thing you noted was the white

24  pickup with the white cab heading back toward town at --

25  A    Yes.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 51 of 209
(720) 384-8078  attrans@sbcglobal.net

1    Q    -- 7:09:11?

2    A    Yes.

3    Q    Okay.  And then the final thing you noticed -- you noted

4    from that review of the video was at 7:14:32, you describe a

5    blue SUV, slash, van going towards town?

6    A    Yes.

7    Q    And that's the first time that you noticed that vehicle?

8    A    Yes.

9    Q    Okay.  And you described it as an SUV or it could have

10   been a van?

11   A    Yes.

12   Q    That's the -- what you saw in the video?

13   A    Yes.

14   Q    Okay.  Now, you also reviewed the video from the night

15   before.  Is that correct?

16   A    Yes.

17   Q    And in your notes you indicate that -- you noted after

18   reviewing the video from the night before, that there was --

19   from -- and that was from the T2 camera angle?

20   A    Yes.

21   Q    And you noted a white full-size pickup with a white camper

22   was recorded pulling in and then leaving the T2 parking area,

23   2228 hours -- that'd be 10:28 in the evening.  And at 2236 --

24   again at 2236 hours --

25   A    Yes.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 744  Filed 09/23/14  Page 52 of 209
(720) 384-8078  attrans@sbcglobal.net

1  Q   -- 10:36, okay.

2  A   Yes.

3  Q   Wonder if we could look at that video together for a

4  minute?

5  A   Yes.

6  Q   Okay.  And that would be Defense Exhibit 36.  I think it's

7  been admitted.  Okay, now, does that look familiar?

8  A   It does.

9  Q   That was the white truck that you noted in your notes from

10 10:28 that evening?

11 A   Yes.

12 Q   And could you tell by watching that video what direction

13 that truck had entered into the area from?

14 A   Probably want to look at it again.  I think it came --

15 Q   Let's -- go ahead.

16 A   But I think it came up and circled around, but I'd have

17 to --

18 Q   Do you know if it came from the north or the south?

19 A   I want to -- I think it came from town.

20 Q   From town.

21 A   The town side.

22 Q   Okay.  Let's look at it again.  And what I want you to pay

23 attention to is the way the lights light up the background

24 behind the flagpole.  Okay?

25 A   Okay.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 744  Filed 09/23/14  Page 53 of 209
(720) 384-8078  attrans@sbcglobal.net

1  Q    Okay, does -- from that does it appear that the truck may

2  be coming from Anton Larsen Bay?

3  A    Yes, it does.

4  Q    And toward the flagpole, and --

5  A    Yes.

6  Q    -- turning around?  Okay.

7  A    Yes.

8  Q    And let's look at Defense Exhibit 37.  It's already been

9  admitted.  This is the second time you noted this truck that

10 night.  Okay, this is the video that you saw when you wrote the

11 note about the -- at -- the same truck coming by.  It's 10:36.

12 A    Yes.

13 Q    And it looks like it's coming from the same direction.

14 A    Yes.

15 Q    Okay.  And, again -- but this time it comes closer to the

16 T2 building?

17 A    Yes.

18 Q    Now, in your experience as a criminal investigator, would

19 it be possible that somebody might come by twice to check out

20 the layout of the building?

21 A    It's possible, yes.

22 Q    Maybe to look at the surveillance cameras?

23 A    Could be, yes.

24 Q    To see what -- if there's any vehicles there, or just to

25 check it out, if they were interested in, correct?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1  A    Yes.

2  Q    Now, how many -- how much video did you watch from the

3  night before, for April 11th?  Did you watch a lot of times?

4  A    No, it was mainly that one, because Sergeant Fusey had

5  looked and said they'd found a -- a vehicle coming in that time

6  frame.  So I just wanted to see what the vehicle looked like in

7  the video.

8  Q    So that was Jason Bullis who alerted you to that?

9  A    No, Sergeant Fusey.

10 Q    Oh, okay.  And then he said you should check the video at

11 that time.  Did you see any other vehicles when you were

12 looking at that vehicle, at any time that day or --

13 A    Not that I remember right now.

14 Q    Let me see if I can show you what -- Defense Exhibit 129.

15 Just look at it first, and see if this looks like the same

16 video footage from that evening, if you can look on your

17 screen.  You see the timestamp on the top of that?

18 A    Oh, right up here?

19 Q    Yes.

20 A    Okay.  Yeah.

21 Q    What's that?

22 A    April 11th, 2012, 10:58.

23 Q    So it had been about 20 minutes after the second time you

24 saw the white truck come by, right?

25 A    Yes.

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 55 of 209

1  Q    Okay.  Now, did -- what was -- what did you notice

2  different about that video footage?  Did you see the headlights

3  coming down the hill under the water tower?

4  A    I think if you're talking the -- sort of up higher in --

5  Q    Yes.

6  A    -- profile in the picture --

7  Q    Uh-huh (affirmative).

8  A    Yes.

9  Q    Okay.  And did you see two sets of headlights coming down?

10 A    I wasn't -- I wasn't sure if it was two, or just the same

11 set of headlights.

12 Q    Okay.

13 A    Or -- or you mean the two -- like, there was two lights on

14 it, or two separate vehicles?

15 Q    Two separate vehicles.

16 A    That, I couldn't tell.  I'd --

17 Q    Oh --

18 A    -- probably have to look at it a little bit more and study

19 it.

20 Q    Okay.  Well, we'll look at it again.  I just wanted to --

21 we'd like to admit Defense Exhibit 129.

22        MR. SCHRODER:  I haven't heard any foundation laid that

23 he knows -- that he viewed this video before, Your Honor.  I

24 mean, it's part of the -- it -- it's admitted, it's

25 authenticated and admitted.  I'm just not sure that he provides

1  any relevance.

2      THE COURT:  So is it admitted already?

3      MR. SCHRODER:  It's part -- it's -- yes, it is part of

4  the big -- well, I --

5      THE COURT:  Well, then what's the --

6      MR. SCHRODER:  No, it's not.

7      THE COURT:  What's the --

8      MR. SCHRODER:  I think it is -- it's not.  I don't

9  think it is.

10     MR. CURTNER:  Judge, he's viewed the videos.  It's --

11 all the videos are -- as far as I know, are coming in.  This is

12 a -- I think relevant, and he can explain why.

13     THE COURT:  It can be received.

14    (Defendant's Exhibit DE-129 admitted)

15     MR. CURTNER:  Thank you.

16 BY MR. CURTNER:

17 Q   Okay, so let's watch this again, Lieutenant Ellis.  Let's

18 watch -- and I want you to pay attention to those headlights

19 and see if you see two vehicles, and see if you can figure out

20 where those vehicles are coming from.  That's the first

21 vehicle, right?  Do you see a second one behind it?

22 A   Okay.  Yeah, I see it now.

23 Q   Okay.  And that's one vehicle pulling up to the T1 main

24 building.  And the other vehicle doesn't come into view, must

25 have gone down Larsen -- Anton Larsen Bay Road?

1  A   Could have, yes.

2  Q   And when -- watching that video, number 1, you can see --

3  those lights would have been coming from what direction?

4  A   They'll be coming up from the -- from the town side there.

5  Q   Okay.  So they would be coming from the airport, from

6  Rezanof, from that area down Anton Larsen Bay Road anyhow --

7  A   Yeah --

8  Q   Both of those vehicles, right?

9  A   (No audible reply).

10 Q   Now let's go to Defense Exhibit 128.  And if you could

11 watch that on your screen for a minute.  It might be a minute

12 long.  (Pause) Think it's done.  Now, that was the same truck

13 that you noted at 10:28 on April 11th.  Is that correct?  We

14 just watched it again?

15 A   Uh-huh (affirmative).

16 Q   And -- but it was a longer version?

17 A   Yes.

18 Q   Okay.  So it was longer in front of the time you saw the

19 truck?

20 A   Yeah.  Before, yeah.

21 Q   Right, before.

22 A   Preceding it, yes.

23 Q   And did you notice any headlights coming through the trees

24 below the water tower, like we did with that last vehicle?

25 A   I didn't see it, but we can look at it again.

1    MR. CURTNER:  Okay, let's -- I'd like to --

2    THE WITNESS:  So you're -- are you pointing --

3    MR. CURTNER:  -- move for admission and publish this to

4    the jury, and Lieutenant Ellis can look again.

5    MR. SCHRODER:   No objection.

6    THE WITNESS:  You're -- you're talking about by the

7    water tower, look for by the water tower?

8    BY MR. CURTNER:

9    Q    Yes, if there were -- if this truck were coming from

10   Rezanof area, the airport, the Kodiak area, down Anton Larsen

11   Bay Road, let me know if you see the headlights coming down

12   that way, like the one that came behind it, 20 minutes.  And

13   we'll look at it together.

14   THE COURT:  So can be received.

15   (Defendant's Exhibit DE-128 admitted)

16   MR. CURTNER:  Can you publish it?

17   BY MR. CURTNER:

18   Q    Now, this will be a little bit longer, because we want to

19   make sure -- it takes some time to come below the water tower

20   and into the parking lot at T2.  So we'll make sure that we're

21   not missing these headlights if they come down.  Let me know if

22   you see them.

23   (Pause)

24   A    I see lights now.  Is that where you're referring to?

25   Q    This is when it pulls in.  And this is -- you've already

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 744  Filed 09/23/14  Page 59 of 209

1  testified that --

2  A    Right.

3  Q    -- it looks like it's coming from the direction of Anton

4  Larsen Bay Road.  And the fact that we didn't see any

5  headlights coming from the other direction just confirms your

6  earlier opinion.  Correct?

7  A    Yes, but I thought you said there were some headlights

8  coming from the water tower.

9  Q    No, there wasn't.  That's my point.

10  A    Oh, okay.  All right.

11  Q    Now, you were -- the next task you had in this was to go

12  to the airport and look at vehicles?

13  A    Yes.

14  Q    Now, at that time when you went there, what time was that?

15  A    That was probably a little before 9:30.

16  Q    In the morning or evening?

17  A    Evening.  In the evening, yeah.

18  Q    Okay.  When did you take the pictures?

19  A    Would have been close to somewhere around 9:30, 9:35,

20  somewhere in that period there.

21  Q    So the photos you showed us of the CR-V were from that

22  night?

23  A    Yes.

24  Q    Oh, okay.

25  A    On the 12th.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 744  Filed 09/23/14  Page 60 of 209
(720) 384-8078  attrans@sbcglobal.net

1   Q   Okay.

2   A   Yeah.

3   Q   And at the time, did you already have a theory that Mr.

4   Wells had switched cars and that was the car you were looking

5   for?

6   A   I thought that could be a possible -- possibility, yes.

7   Q   That was your theory when you drove through the airport?

8   A   Yes.

9   Q   And discussed that with other law enforcement?

10  A   Yes.

11  Q   Okay.  How many -- so when you drove to the airport, how

12  many blue vehicles did you note?

13  A   I think it was six, maybe.  Whatever is in my report.  I

14  took -- anything I thought looked like one of his vehicles, I

15  took a picture of it.

16  Q   Okay.  I don't think I saw -- I don't think I see in your

17  report how many vehicles you saw.  Do you think it was six?

18  A   Yeah.  I -- what I -- I took pictures of them, so if you

19  got the pictures, you'll see what I saw.

20  Q   I don't have your other pictures, so --

21  A   Okay.

22  Q   That's okay.  If you say it's six, I'll take that.  Unless

23  you -- want to --

24  A   I -- I -- there was a -- I can -- I remember, like, taking

25  the three -- I think there was three van, like minivan, like

Case 3:13-cr-00008-SLG  Document 744  Filed 09/23/14  Page 61 of 209

**ELLIS - CROSS**

1  Caravan type pictures, and I would take -- you know, I took

2  pictures of the license plates of those.  And I think one was,

3  like, a Ford Expedition.  And it might have been two other

4  ones.  I'd have to take a look at the pictures.  I could walk

5  you through them, what we saw.

6  Q    Okay.  Well, let's just move on a little bit.  I mean, we

7  may come back to that, I don't know.  But -- so at the airport

8  where the -- Mrs. Wells' CR-V was parked, that's in front of

9  the MarkAir terminal, the old MarkAir terminal?

10 A    I -- I don't know.  I -- it wasn't MarkAir when I was

11 there.  Was -- it -- it was parked towards the end of the --

12 the parking there when I -- when I showed where that white car

13 was in.  That overall picture was down in that area there.

14 Q    I wonder if we could show Government's Exhibit 103 again.

15 Okay.  So what's this building?

16 A    I don't know what that building's used for.

17 Q    It's not being used -- was it being used at the time?

18 A    I don't think so, no.

19 Q    And so does it -- was under con -- was there construction

20 going on there at the time?

21 A    Not that I remember.

22 Q    All right.  When you went up to this vehicle, did you

23 notice that there were keys in the vehicle?

24 A    No, I didn't see keys.

25 Q    You didn't see any keys, okay.  Let's go to Exhibit --

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 62 of 209
(720) 384-8078   attrans@sbcglobal.net

1 Government Exhibit 51. Okay, so that blue CR-V that you took a

2 photograph, would that be about where that vehicle was now, in

3 this photo?

4 A Yes.

5 Q Okay. So -- and is -- I think you testified that

6 normally, usual traffic patterns is somebody to drive -- this

7 road wasn't -- there was no road directly to the terminal.

8 This is the Alaska Air terminal. Right?

9 A Yes.

10 Q These terminals are not in use anymore. Right?

11 A Well, the one -- one's now in use. It's a restaurant now.

12 Q Okay. There's a bar or restaurant --

13 A Yes. Yeah.

14 Q -- the -- or a bar -- the lounge. And -- but so typically

15 people -- the regular pattern would be come down through the

16 airport, have to kind of make the loop. There's a cargo win --

17 Alaska Cargo window, correct? And then people might park here

18 if they're going right into the terminal. Is that correct?

19 A Yeah, if they're going --

20 Q Is usually the dropoff zone.

21 A -- in there. Or what a lot of people do is they just pull

22 up in front of the terminal and let the people unload and they

23 immediately take off. Or they'll then go to parking from

24 there.

25 Q Or they might park there because the plane's coming in,

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 744  Filed 09/23/14  Page 63 of 209
(720) 384-8078  attrans@sbcglobal.net

1  they're going to pick somebody up.

2  A    Exactly.  Yeah.

3  Q    Or they're going to see somebody off --

4  A    Uh-huh (affirmative).

5  Q    -- and drop people off.  So there's --

6  A    Yes.

7  Q    It's not -- most people park there for, you know, a little

8  while.

9  A    Short-term.

10 Q    Short-term.  Which is -- but if they're going to park

11 there for a little bit longer, they might -- this area here,

12 it's not uncommon for people to park there for a couple hours?

13 A    They could, yes.

14 Q    Or a coup --

15 A    I think most people tend to park as close -- you know, the

16 closest parking spot they can find, so --

17 Q    But if they -- people park down there for days, a couple

18 days at a time, right?

19 A    Not anymore.

20 Q    Not anymore, but back then?

21 A    (Indiscernible).

22 Q    Okay, now there's enforcement.  There wasn't enforcement

23 back then.  Right?

24 A    Not that I'm aware.  I don't know how actively they

25 enforce that.

1  Q   And I think you talked about -- let's go back to -- I'm

2  sorry, let's go back to 103.  So if you're pulling down this

3  way and pulling up here, do you think that's unusual to not

4  have your tires exactly straight?

5  A   I -- usually -- not totally unusual, but it was something

6  that caught my attention, yes.  Because if you look at the

7  vehicle behind it, you can see how they sort of lined up the

8  tires, that -- sort of that tan-colored vehicle behind it.  And

9  it may be -- I'm used to parking -- I tend to straighten out

10 the wheels when I pulled into a park -- parking spots.

11 Q   How many people do you think in Kodiak might just pull up

12 there coming from this direction and have the tires a little

13 bit angled?

14 A   Well, some probably do, yeah.

15 Q   Okay.  That's all.  Thank you.

16         THE COURT:  Redirect.

17                 **REDIRECT EXAMINATION**

18 BY MR. SCHRODER:

19 Q   I don't think we need to show them to you, Lieutenant

20 Ellis, but I just want to refer you back to those two videos of

21 the white truck the night before the murders.  So what we were

22 looking at is a view from -- it's safe to say, from a

23 videocamera -- surveillance camera?

24 A   Yes.

25 Q   Did it appear that the white truck was in any way trying

**ELLIS - RECROSS**

1  to avoid the camera?

2  A    No.

3  Q    No further questions.

4         THE COURT:  Recross.

5                  **RECROSS EXAMINATION**

6  BY MR. CURTNER:

7  Q    Is it possible that the truck didn't know the camera was

8  there until it pulled up a second time and saw the camera?  Is

9  that possible?

10  A    Yes.

11         THE COURT:  Anything else?

12         MR. SCHRODER:  Nothing, Your Honor.

13         THE COURT:  Thank you, sir.  You're excused.  What's

14  the government's plan now?

15     (Witness excused)

16         MR. SCHRODER:  Your Honor, the government calls Trooper

17  Alan Jones.

18         THE COURT:  So I'm just trying to get a sense of -- you

19  know, we usually break about 10:15, in that time frame.  Is

20  this a long witness or short?

21         MR. SCHRODER:  It's not long, but we're introducing a

22  few pictures, so I -- 15 minutes is probably about right,

23  unless there's --

24         THE COURT:  Okay.

25         MR. SCHRODER:  -- some kind of extensive cross.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 744  Filed 09/23/14  Page 66 of 209
(720) 384-8078  attrans@sbcglobal.net

1    THE COURT:  Okay.  All right.  Sir, just head on up to

2 the chair, way up here.  You'll see there's a box.  You kind of

3 come in -- the door pulls out.  And just remain standing for a

4 second and my clerk is right over here, and she'll swear you

5 in.

6    THE CLERK:  Please raise your right hand.

7    **ALAN WARREN JONES, PLAINTIFF'S WITNESS, SWORN**

8    THE CLERK:  Okay.  Thank you.  Please have a seat.

9 And, sir, if you can please state and spell your full name.

10    THE WITNESS:  Alan Warren Jones.  A-l-a-n, W-a-r-r-e-n,

11 J-o-n-e-s.

12    THE CLERK:  Thank you.

13    THE COURT:  Counsel.

14    **DIRECT EXAMINATION**

15 BY MR. SCHRODER:

16 Q    Trooper Jones, who do you work for?

17 A    The Department of Public Safety, Alaska Wildlife Troopers.

18 Q    And how long have you been a wildlife trooper?

19 A    Since about '92.

20 Q    Okay.  And we don't need to go over, I don't think, the

21 trooper -- wildlife trooper relationship.  Your boss just -- is

22 Lieutenant Ellis your boss?

23 A    Yes, he is.

24 Q    Yeah, he just did that for us.  So what did you do before

25 you worked as a wildlife trooper?

1  A    I was an aircraft mechanic in Ketchikan for about 20

2  years.

3  Q    Okay.  And what -- again, just to get on the record, what

4  type of law enforcement training did you receive, becoming a

5  wildlife trooper?

6  A    The Alaska State Troopers, Wildlife Troopers, all go

7  through the same academy in Sitka, and I did that.

8  Q    Okay.  And are you -- were -- so you're a -- as a wildlife

9  trooper, you're a sworn law enforcement officer?

10 A    Yes, I am.

11 Q    Yeah.  And have you conducted criminal wildlife

12 investigations?

13 A    Yes.

14 Q    And sometimes do you get involved in law enforcement cases

15 outside of wildlife, fish and wildlife cases?

16 A    On occasion.

17 Q    Yeah.  And, now, were you involved in the investigation of

18 the two homicides at Coast Guard COMMSTA Kodiak on April 12th,

19 2012?

20 A    Yes.  The initial day I was.

21 Q    And when did you get involved?

22 A    I arrived on scene about 10, 12 minutes after 8.

23 Q    Okay.  And were you the first trooper to arrive?

24 A    No.  Dennis Dupras was already there.

25 Q    All right.  Was the FBI there by that time?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1  A     No.  As I recall, they came midday or midafternoon.

2  Q     Okay.  When you arrived, what were you tasked to do?

3  A     Trooper Dupras requested that I make a route around the

4  building to secure any evidence type things that I might find.

5  Q     Okay.  And what did you do?  Did you find anything on that

6  first round?

7  A     Initially I found two doors on the north wall, I believe

8  everybody was calling it, the north side of the building.  On

9  that -- on the north face of the building there was a boiler

10  room door, it appeared like.  It was a steel door with two

11  large vents in it that was partly ajar.

12  Q     Okay.

13  A     And there was also -- about 20 feet down that same wall,

14  there was a -- I'd call it an Arctic entryway that has a screen

15  door that was partly ajar.

16  Q     Okay.  Did you check the door behind the screen door?

17  A     I did not.

18  Q     All right.  Did you check the doors out in front of the

19  building?

20  A     By that time there were numerous people there, so no, I

21  did not.

22  Q     And -- so what'd you do next?  What'd you do after that

23  initial check?

24  A     I requested some of the numerous Coast Guard people that

25  were there to have one of them keep track of the doors and -- I

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1  was thinking more along the lines of fingerprints or whatever,

2  to keep the doors from being disturbed.  And then I went around

3  the building and -- a second time and took photographs at a

4  slow pace all the way around the building.

5  Q   Okay.  So we're going to look at some of those

6  photographs.  I'm going to --

7      (Side conversation)

8  Q   So we'll start with Exhibit 272.  And are you familiar

9  with this exhibit?

10 A   Yes, it looks like one of the photographs I took.

11 Q   So is it a fair and accurate representation of the COMMSTA

12 Kodiak rigger shop building on April 12th when you photographed

13 it?

14 A   Yes.

15      MR. SCHRODER:  Your Honor, the government moves

16 admission of 272.

17      MR. OFFENBECHER:  No objection.

18      THE COURT:  Will be received.

19      (Plaintiff's Exhibit 272 admitted)

20 BY MR. SCHRODER:

21 Q   Okay.  So tell us what we're seeing here.

22 A   A handmade sign that is -- gives the name of the building.

23 Q   And what part of the building is that located on, to your

24 memory?

25 A   The front of the building, I would say, possibly the south

1   wall that -- that -- where all the cars would park in front of,

2   that -- for entry and exit.

3   Q    Okay.  So let's look at Exhibit 271.

4        (Side conversation)

5   Q    Are you familiar with this exhibit as well?

6   A    Yes, I am.

7   Q    And this has already been admitted, but can you describe

8   what this is?

9   A    That is a photograph taken from the roadway, the main

10  roadway of the south face of the building, the main parking

11  lot, parking area for the building.

12  Q    Okay.  Could we have Exhibit 266, please?

13       (Side conversation)

14       MR. SCHRODER:  Nancy, we're going to --

15       UNIDENTIFIED SPEAKER:  266 was admitted on the 2nd.

16       MR. SCHRODER:  Oh, 266 was admitted on the 2nd.  We're

17  just going to look at it quickly.

18  BY MR. SCHRODER:

19  Q    And what is this shot, Trooper Jones?

20  A    The east side of the building, taken from, again, the

21  road -- the main roadway.

22  Q    And this was taken by you?

23  A    It looks like one that would have been, yes.

24  Q    All right.  And go to 267.

25       (Side conversation)

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 71 of 209
(720) 384-8078   attrans@sbcglobal.net

1          MR. OFFENBECHER:  I'm sorry, which one, counsel?

2          MR. SCHRODER:  267.

3     BY MR. SCHRODER:

4     Q    And are you familiar with this?

5     A    Yes, I am.

6     Q    Did you take the photo?

7     A    Again, it looks like one that I would have, yes.

8     Q    And where were you when you took the photo?

9     A    There's an embankment behind on the north side of the

10    building, and I had climbed up on top of the embankment,

11    looking down onto the building.

12    Q    All right.  The next one I have is 268.  And are you

13    familiar with this exhibit?

14    A    Yes.

15    Q    And how are you familiar with it?

16    A    It, again, looks like a photograph that I would have taken

17    that date -- that morning.

18    Q    Is it a fair and accurate representation of the scene as

19    you saw it on April -- morning of April 12th, 2012?

20    A    Yes, it is.

21         MR. SCHRODER:  The government moves for admission of

22    268, Your Honor.

23         MR. OFFENBECHER:  No objection.

24         THE COURT:  It'll be received.

25         (Plaintiff's Exhibit 268 admitted)

1   BY MR. SCHRODER:

2   Q    And what does this depict?

3   A    Again, it's the north face of the building, to the -- the

4   west end of the north -- north face of the building.

5   Q    Now 269.  And, Trooper Jones, are you familiar with this

6   exhibit?

7   A    Yes, I am.

8   Q    And what is it?

9   A    It's a photo of the west side of the building, the roll-up

10  doors for the garage.

11  Q    And is that a fair and accurate representation of that

12  part of the building as you found it on the morning of April

13  12th, 2012?

14  A    Yes, it is.

15          MR. SCHRODER:  Your Honor, the government moves for

16  admission of 271.

17          MR. OFFENBECHER:  No objection.

18          THE COURT:  It'll be received.

19          MR. SCHRODER:  Two -- wait a minute.  Is that what I

20  said?

21      (Side conversation)

22          MR. SCHRODER:  Okay, 269.  I got ahead of myself, Your

23  Honor.

24          THE COURT:  269 will be received.

25      (Plaintiff's Exhibit 269 admitted)

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net

1  BY MR. SCHRODER:

2  Q    Now 271.

3       (Side conversation)

4  Q    Now, once you completed the photographs, Trooper Jones,

5  did you have another tasking?

6  A    Yes.  I -- I walked the roadway approximately a quarter-

7  mile each way --

8  Q    All right.

9  A    -- the primary road.

10 Q    And how far north did you go?

11 A    I --

12 Q    Let's say north toward the golf course.  I know that's

13 kind of -- it's not exactly --

14 A    Okay --

15 Q    -- true north, but --

16 A    Approximately a quarter of a mile.

17 Q    All right.  And do you remember where you turned around?

18 A    There's a main antenna building up there that's called --

19 something to do with the Helix building.

20 Q    Okay.  And what were you looking for?

21 A    Any tracks, vehicle type tracks that would have turned

22 around, or any discarded items from the roadway over into

23 the -- into the ditch.

24 Q    All right.  Were you looking for any foot traffic as well,

25 anything that was obvious to you?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1  A    Anything disturb -- any kind of disturbance in the grass

2  or --

3  Q    Okay.

4  A    -- or snow.

5  Q    Now, to be fair, what was -- what were the conditions

6  along the side of the road there?

7  A    That night there had been a heavy freezing, and so there

8  wasn't necessarily frost, but -- but the grass and the -- any

9  snow that was left and -- and the gravel would have been very

10  hard, frozen, crunchy, to where my footprints weren't really

11  discernible.

12  Q    Now, did you walk both sides of the road?

13  A    Yes.  I walked up on one side and back to the -- to the

14  rigger shack and the other riggers building.

15  Q    And then did you walk toward town?

16  A    I did.  For --

17  Q    And how far did you go?

18  A    Down past the filtration plant, again, about a quarter of

19  a mile.

20  Q    And, again, did you walk both sides of the road?

21  A    Yes, I did.

22  Q    On either one of those two walks, did you see anything of

23  interest, evidentiary interest?

24  A    Not for this case, no.

25  Q    All right.  And you also talked about when you took that

1  picture you were on the hill behind -- the one photo we saw,

2  you were on the hill behind T2.  Did you walk around up there

3  up -- too?

4  A    Yes, I did.

5  Q    And were you looking for the same kind of things?

6  A    Yes, any disturbance in the grass.

7  Q    And did you see anything?

8  A    I did not.

9        MR. SCHRODER:  Government has no further questions,

10  Your Honor.

11        THE COURT:  Cross.

12        MR. OFFENBECHER:  Your Honor, will this be a good time

13  for the break, then?

14        THE COURT:  I don't know.  You got -- can you do it in

15  five minutes, or not?

16        MR. OFFENBECHER:  Probably not five minutes.

17        THE COURT:  Well, can you go -- what do you want, a

18  break or -- take it?  Keep going, or not?  Keep going, that

19  means -- we're going to have to get our signals better.  I

20  don't know what up and down -- does this mean you want a break,

21  or does this mean keep going?  I don't know what this means.

22        UNIDENTIFIED JUROR:  Keep going.

23        THE COURT:  Keep going, okay.

24        MR. OFFENBECHER:  All right.  We'll do that.

25        THE COURT:  We got to get our signals better.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1        **CROSS-EXAMINATION**

2   BY MR. OFFENBECHER:

3   Q    Trooper Jones, good morning.

4   A    Good morning.

5   Q    So, Trooper Jones, I'd like to take a look at some of the

6   same photographs with you that you just reviewed with the

7   government, but take a little better look at them.  And then

8   there'll be some additional photographs, all right?

9   A    Very good.

10  Q    They may have some different numbers, but they're the same

11  group of photographs that you took.  That morning -- can you

12  call up 127A, please?

13           THE CLERK:  This is Defense Exhibit?

14           MR. OFFENBECHER:  Right.

15           THE CLERK:  127A.  Thank you.

16  BY MR. OFFENBECHER:

17  Q    Trooper Jones, this is a -- fair to say it's a face sheet

18  that -- of your photographs that you took?

19  A    Yes.  I don't -- I don't know as I've ever seen it before,

20  but --

21  Q    Okay.  It's Alaska State Trooper Alan Jones, and on the

22  bottom it says -- on the bottom -- "Photos of the outside of

23  T2."  Right?

24  A    It does say that, yes.

25  Q    Okay.  All right.  So let's go first to Government Exhibit

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 77 of 209
(720) 384-8078   attrans@sbcglobal.net

1  75, please.

2      (Side conversation)

3  Q    Okay.  So, Trooper Jones, let's just take a quick look at

4  Government's Exhibit Number 75.  Do you see that here?

5  A    Yes, I do.

6  Q    Just so that we can get oriented to what you did with

7  respect to the T2 rigger shop.  So I'm -- I've got the pointer

8  there.  Can you see that?

9  A    Yes.

10  Q    So I'm circling around -- that's the T2 rigger shop,

11  right?

12  A    That is correct.

13  Q    And this is T1, the main communication station.  Right?

14  A    Yes.

15  Q    And so when you indicated that you went to T2 and that you

16  walked around and took some photos, you walked in a

17  counterclockwise direction around T2.  Is that right?

18  A    That is correct.

19  Q    And then the photographs that you just talked about with

20  the government were taken from various points all around this

21  building right here, weren't they?

22  A    That is correct.

23  Q    And then you indicated that you also took a walk down the

24  road, looking for evidence.  Right?

25  A    Yes.

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net

1  Q   And so when you indicated that you were walking towards

2  the golf course, you were walking here.  This here is Anton

3  Larsen Bay Road, isn't it?

4  A   That is correct.

5  Q   And if you go in this direction up here, you're headed

6  towards the golf course and the ranch and Anton Larsen Bay.

7  Right?

8  A   Yes.

9  Q   And if you go this way on Anton Larsen Bay Road, you cross

10 this bridge over the Buskin River that you talked about, right?

11 A   Yes.

12 Q   So this is the Buskin River right here.  Right?

13 A   That is correct.

14 Q   And then this is the Buskin Lake out here.  Right?

15 A   Yes.

16 Q   And then if you come from T2 and you go along, you cross

17 over the bridge, just on the other side here is that water

18 treatment plant you talked about.  Right?

19 A   Down a couple hundred yards, yes.

20 Q   Down this way a little bit?

21 A   Yes.

22 Q   All right.  And then there's a little road right here that

23 you can turn around and head down to the lake.  Right?

24 A   That is correct.

25 Q   So you could cross the river here, turn, and go down this

Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 79 of 209

1  little road, down to access to the Buskin Lake, which is right

2  in here.  Right?

3  A    Yes.  I did not walk there, but you could do that, yes.

4  Q    Right.  Yeah, right.  So when you said that you went out

5  onto Anton Larsen Bay Road and you walked about a quarter of a

6  mile, first you walked about a quarter of a mile where my

7  pointer's going, out here.  Right?

8  A    Yep.  Yes, sir.

9  Q    And then you went out to Anton Larsen Bay and you walked

10  about a quarter of a mile down this way.  Right?

11  A    That is correct.

12  Q    And you went -- remind me, as far as the treatment plant

13  or close to it?

14  A    There's a electrical vault that's about 100 or 200 yards

15  past the filtration plant.  That is where I turned around.

16  Q    Okay.  And when you were walking on the -- you were

17  walking the road here, is -- does this photograph show as far

18  as you went, or did you go a little further?

19  A    A little further.

20  Q    Okay.  You went to that Helix building you talked about?

21  A    Yes.

22  Q    All right.  And as you were walking down the road, is it

23  fair to say that you were looking for evidence of a crime.

24  Right?

25  A    That is correct.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 744  Filed 09/23/14  Page 80 of 209
(720) 384-8078  attrans@sbcglobal.net

1 Q    You were looking, first of all, for any people that might

2 be there.  Right?

3 A    Yes.

4 Q    So, for example, if there was a car up here about a -- and

5 you went about a quarter of a mile.  Right?

6 A    Correct.

7 Q    So you -- if there were a car there, somebody in the car,

8 that would be something you would be interested in.  Right?

9 A    That is correct.

10 Q    Or if someone had -- if there was someone hiding in the

11 woods back there, that would be something that you would be

12 interested in.  Right?

13 A    Also correct.

14 Q    Or if somebody had -- if there was a gun thrown out on the

15 side of the road, that would be something you were interested

16 in.  Right?

17 A    Yes, sir.

18 Q    Or if there was some ammunition or a ski mask or something

19 like that, that might be related to a crime, that's what you

20 were looking for when you walked a quarter of a mile up the

21 road here.  Right?

22 A    That is correct.

23 Q    And, similarly, when you walked down Anton Larsen Bay,

24 that's the same stuff that you were looking for.  Right?

25 A    Yes.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 744  Filed 09/23/14  Page 81 of 209
(720) 384-8078  attrans@sbcglobal.net

1   Q    Evidence of this crime that had occurred.  Right?

2   A    Yes, sir.

3   Q    And you didn't find anything in a quarter of a mile this

4   way or a quarter of a mile that way, did you?

5   A    That is correct.

6   Q    Can you call up G-45, please?

7        THE CLERK:  And that's Government Exhibit 45?

8        MR. OFFENBECHER:  Yes.

9        THE CLERK:  Yeah, okay.

10       MR. OFFENBECHER:  And that's been admitted already.

11  BY MR. OFFENBECHER:

12  Q    So just again, so we're clear, Trooper Jones, this is the

13  T2 facility.  Right?

14  A    Yes, it is.

15  Q    Obviously, you didn't take this photograph.  It's taken

16  from a plane or a helicopter or something.  Right?

17  A    Looks like it.  I didn't take it.

18  Q    Okay.  And, again, you walked in a counterclockwise

19  direction around here to take your photographs.  Right?

20  A    Yes, sir.

21  Q    And the road that you searched was out towards the golf

22  course and ranch and Anton Larsen Bay, this way.  Right?

23  A    That is -- that is correct.

24  Q    Sewage treatment plant out that way, right?

25  A    Water treatment plant.

JONES - CROSS

1  Q    Water treatment plant.

2  A    I believe it's drinking water.

3  Q    Sure.  Okay, thanks.  All right, you can take that one

4  down, please.  Now, you indicated during your direct

5  examination that you found a couple of doors immediately on the

6  back of the building that seemed to be ajar.  Is that right?

7  A    Yes, sir.

8  Q    Can you call up Defense Exhibit 127B, please?  Can you

9  take a look at your screen there and see if that appears to be

10 one of the photographs that you took of the back doors?

11 A    Yes, it does appear to be.

12 Q    Does it fairly represent what you saw that day when you

13 were doing the inspection that Trooper Dupras had instructed

14 you to do?

15 A    Yes, it does.

16        MR. OFFENBECHER:  Move the admission of 127B.

17        MR. SCHRODER:  No objection.

18        THE COURT:  It will be received.

19     (Defendant's Exhibit DE-127B admitted)

20        MR. OFFENBECHER:  Can we publish it, please?

21 BY MR. OFFENBECHER:

22 Q    So, Trooper Jones, you indicated that you saw two doors on

23 the back of the building.  Is that right?

24 A    Yes.

25 Q    And this is one of those doors that you saw.  Right?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 83 of 209
(720) 384-8078  attrans@sbcglobal.net

1  A    That is correct.

2  Q    And it was -- when you saw it, the door was ajar.  Is that

3  right?

4  A    Yes.

5  Q    And did you understand this to be what you described as

6  the boiler room door on the back side of the building?

7  A    That was my assumption, but yes.

8  Q    Okay.  All right, can you move to 127C, please?  Take a

9  look at 127C on your screen, please.  Do you recognize that?

10  A    Yes.

11  Q    What is it?

12  A    It appears to be the same door, a closer picture of it.

13         MR. OFFENBECHER:  Your Honor, I'd move for the

14  admission of 127C.

15         MR. SCHRODER:  No objection.

16         THE COURT:  Be -- will be received.

17      (Defendant's Exhibit DE-127C admitted)

18         MR. OFFENBECHER:  And publish it to the jury.

19  BY MR. OFFENBECHER:

20  Q    All right, Trooper Jones, you've indicated that this is a

21  closer shot of that boiler room door.  Is that right?

22  A    That is correct.

23  Q    And you took this photograph here to show that the

24  boiler -- this door was ajar.  Is that right?

25  A    That is correct.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 84 of 209
(720) 384-8078  attrans@sbcglobal.net

1  Q   All right.  Move to -- 127D, please.

2          THE CLERK:  And just to clarify, these are DE-127D.

3  Right?

4          MR. OFFENBECHER:  Right.

5          THE CLERK:  Thank you.

6          MR. OFFENBECHER:  Sorry about that.

7          THE CLERK:  Uh-huh (affirmative).

8  BY MR. OFFENBECHER:

9  Q   Can you take a look at that one, Trooper Jones?

10 A   Yes.

11 Q   Do you recognize that?

12 A   Yes.

13 Q   What is it?

14 A   It is a picture of the arctic entryway screen door that I

15 took, or one just like it.

16 Q   Okay.  Does it appear to be the same door that you took a

17 photograph of that day?

18 A   Yes.

19         MR. OFFENBECHER:  I'd move for the admission of 127D.

20         MR. SCHRODER:  No objection.

21         THE COURT:  It will be received.

22     (Defendant's Exhibit DE-127D admitted)

23         MR. OFFENBECHER:  Publish it, please.

24 BY MR. OFFENBECHER:

25 Q   So, Trooper Jones, this is the second door on the back

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 85 of 209
(720) 384-8078  attrans@sbcglobal.net

 1  that seemed to you to be ajar.  Is that right?

 2  A    That is correct.

 3  Q    And this is the arctic entryway to the repair shop or

 4  garage.  Right?

 5  A    It's an arctic entryway.  I -- I never did go inside to

 6  see what --

 7  Q    Okay.  So you don't know --

 8  A    -- what was on --

 9  Q    -- really know what's behind this.  Is that right?

10  A    That is correct.

11  Q    But these -- this is one of the two doors on the back side

12  of the building that seemed to be ajar.  Is that right?

13  A    Yes, it is.  Yes.

14  Q    All right.  Can you move on to 127E, please?  Do you see

15  what's on 127E?

16  A    Yes, I do.

17  Q    Recognize it?

18  A    Yes, I do.

19  Q    What is it?

20  A    Again, it's a closer picture of that same door, showing

21  that slightly ajar.

22        MR. OFFENBECHER:  Move for admission of 127E.

23        MR. SCHRODER:  No objection.

24        THE COURT:  Received.

25        (Defendant's Exhibit DE-127E admitted)

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 744  Filed 09/23/14  Page 86 of 209

1  BY MR. OFFENBECHER:

2  Q   Again, Trooper, this is a, again, a tighter shot that you

3  took that day of that arctic entry door, the second door that

4  was ajar.  Is that right?

5  A   It sure appears to be, yes.

6  Q   Thank you.  Can you call up Government's Exhibit 392,

7  please?  Trooper Dupras -- excuse me -- Trooper Jones, you've

8  not seen this before, have you?

9  A   No.

10 Q   All right.  Assume for a moment that this is the north or

11 the back side of the building.  And I'll just direct your

12 attention with this so you can see it.  Is it fair to say that

13 the one door, the boiler room door, would have been this door

14 that we saw the photographs of?

15 A   Yes, it is.

16 Q   And is it fair to say that the arctic entry door that was

17 ajar that we just saw the photographs would be this door over

18 here?

19 A   Yes, it is.

20 Q   All right.  You can take that down.  Can you call up DE-

21 127I, please?  Do you recognize that?

22 A   Yes.

23 Q   What is it?

24 A   It's a photo, again, of the front of the building, parking

25 area.

1     MR. OFFENBECHER:  Move for the admission of 127I.

2     MR. SCHRODER:  No objection.

3     THE COURT:  Will be received.

4     (Defendant's Exhibit DE-127I admitted)

5 BY MR. OFFENBECHER:

6 Q    Again, Trooper Jones, this -- in your shooting of the

7 photographs of the perimeter of the building, this is the --

8 one of the photographs that you took that morning.  Right?

9 A    Yes, it could be.  It --

10 Q    Well, does it look about the same as it did that morning

11 when you were taking photographs?

12 A    Yes.  Yes.

13 Q    Okay.  And just so we're clear, these are the two garage

14 bay doors that you would say would probably be the west end of

15 the building?

16 A    Going towards the golf course, yes.

17 Q    Okay.  So out towards this direction is out towards the

18 golf course.  Right?

19 A    Yes.

20 Q    And the -- those two doors that we saw that were ajar,

21 they're kind of around the corner, back here, aren't they?

22 A    Yes.

23 Q    And you didn't really deal much with these front doors

24 here, did you?

25 A    No.

1  Q   As part of your search of the perimeter or documentation

2  of the perimeter, you did take photographs of all these cars

3  here, though, didn't you?

4  A   Yes, I did.

5  Q   And then you took photographs all the way around the whole

6  building.  Right?

7  A   That is correct.

8  Q   All right.  Can you go to 127J, please?  Do you recognize

9  what that is?

10  A   Yes.

11  Q   What is it?

12  A   A picture, basically, of the same front face of the

13  building, maybe 30, 40 feet -- my standing 30, 40 to the --

14      MR. OFFENBECHER:  Move for the admission of 127J.

15      MR. SCHRODER:  No objection.

16      THE COURT:  Be received.

17      (Defendant's Exhibit DE-127J admitted)

18  BY MR. OFFENBECHER:

19  Q   Again, this is a little bit more towards the flagpole,

20  right?

21  A   Yes.

22  Q   From your point of view.  But looking back there, the

23  garage door's on the west end and around the back there is

24  those doors that were ajar.  Right?

25  A   Correct.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 744  Filed 09/23/14  Page 89 of 209
(720) 384-8078  attrans@sbcglobal.net

**JONES - CROSS**

1  Q    And then in the foreground here, there's a dumpster area.

2  Is that right?

3  A    Yes.

4  Q    And there's a three-sided fence that's around that

5  dumpster.  Right?

6  A    Yes.

7  Q    And that's three or four feet away from the wall of the

8  building.  Right?

9  A    Yeah, something like that.

10  Q    Okay.  Have 127K, please.  Trooper Jones, do you recognize

11  that?

12  A    Yes, I do.

13  Q    Is that one of the photos you took that day?

14  A    It could be, yes.  Yes.

15  Q    Okay.  Does it appear to be the same as when you were

16  there?

17  A    Yes, it does.

18  Q    Okay.

19        MR. OFFENBECHER:  I'd move admission, 127K, please.

20        MR. SCHRODER:  No objection.

21        THE COURT:  Received.

22     (Defendant's Exhibit DE-127K admitted)

23  BY MR. OFFENBECHER:

24  Q    All right.  And from what vantage point is this photograph

25  taken, Trooper Jones?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 744  Filed 09/23/14  Page 90 of 209
(720) 384-8078  attrans@sbcglobal.net

1 A    The east side, I guess you would say, towards town side.

2 Q    Okay.  A minute ago we saw the cars that were parked in

3 front.  Are those those cars?

4 A    Yes.

5 Q    And so this is kind of the east corner, showing one side

6 of the building, that kind of looks up towards T1, right?

7 A    Yes.

8 Q    And then the back side that you took the photographs of

9 the doors would be around over there, wouldn't it?

10 A    That is correct.

11 Q    All right.  Can you move to 127L, please?  Do you see that

12 photograph, Trooper Jones?

13 A    Yes, I do.

14 Q    Do you recognize it?

15 A    Yes.

16 Q    What is it?

17 A    The -- a full-on shot of the east face, that same side of

18 the building.

19 Q    All right.

20        MR. OFFENBECHER:  Move for the admission of 127L.

21        MR. SCHRODER:  Objection.  It's already --

22        THE COURT:  Recei --

23        MR. SCHRODER:  -- Government 260.

24        MR. OFFENBECHER:  Right, Your Honor.  I just have a

25 different set of --

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 744  Filed 09/23/14  Page 91 of 209

1    THE COURT:  Received.  Received.

2    MR. OFFENBECHER:  -- numbers.  It's easier this way.

3    (Defendant's Exhibit DE-127L admitted)

4  BY MR. OFFENBECHER:

5  Q   Do you recognize that -- again, this is the side of the

6  building that kind of goes this direction -- would be up

7  towards T1.  Right?

8  A   More or less, yes.

9  Q   Okay.  And the doors that were ajar were back in this area

10  here?

11  A   That is correct.

12  Q   Have 127N, please.  Can you take a look at that, please?

13  A   Yes, sir.

14  Q   Do you recognize it?

15  A   Yes.  Possibly one of the pictures that I took.

16  Q   Okay.  Does this appear to be a representation of what it

17  looked like that day?

18  A   Yes.

19    MR. OFFENBECHER:  Move for admission of 127N.

20    MR. SCHRODER:  No objection.

21    THE COURT:  Received.

22    (Defendant's Exhibit DE-127N admitted)

23  BY MR. OFFENBECHER:

24  Q   All right.  So just so we're clear, you're working your

25  way, you're almost around -- back around the back side of the

Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 92 of 209

1  building now.  Right?

2  A    That is correct.

3  Q    And it looks like there's a road, really, that goes kind

4  of all the way around the building, isn't there?

5  A    It appears, yes.

6  Q    Well, you were there --

7  A    Yes.

8  Q    -- and there's a road there, isn't there?

9  A    Yes.

10 Q    And so when you were working your way around the building,

11 you were just walking around this road or from this vantage

12 point and taking photographs all the way around?

13 A    Farther off the road, but yeah, that's -- that's the area

14 I was taking photos from.

15 Q    Sure.  Sure.  But just -- this part where I have my

16 mark -- my pointer right now is a road that kind of goes around

17 the whole building.  Right?

18 A    Yes.

19 Q    Can you get me 127Q, please?  Recognize that?

20 A    Yes, I do.

21 Q    Does that appear to be back side as you continue around

22 the door -- around the building?

23 A    Yes, it does.

24       MR. OFFENBECHER:  Move for the admission of 127Q.

25       MR. SCHRODER:  No objection.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 93 of 209
(720) 384-8078   attrans@sbcglobal.net

1          THE COURT:  Received.

2      (Defendant's Exhibit DE-127Q admitted)

3  BY MR. OFFENBECHER:

4  Q    So now you've come almost for -- full circle, and you're

5  looking down, back -- and down the north side of the building.

6  Is that right?

7  A    Yes.

8  Q    Those two doors that were ajar were kind of back in here.

9  Right?

10 A    Yes.

11 Q    And you could see here the road that goes all the way

12 around the building.  Right?

13 A    Yes.

14 Q    Now can you put up 127S, please?  You recognize this,

15 Trooper Jones?

16 A    Yes.

17 Q    Is this the back side of the building that you took from

18 the hill there?

19 A    Yes, it is.

20         MR. OFFENBECHER:  Move for the admission of 127S.

21         MR. SCHRODER:  No objection.

22         THE COURT:  Will be received.

23     (Defendant's Exhibit DE-127S admitted)

24 BY MR. OFFENBECHER:

25 Q    So in this photograph, you went up -- there's kind of a

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net

1 hill that's behind T2 on the north side, right?

2 A    Yes.

3 Q    And so you climbed up in that hill, where there's a lot of

4 trees and brush and so forth.  Right?

5 A    That is correct.

6 Q    And you took this photograph, looking down on the back of

7 the north side of T2, right?

8 A    Yes.

9 Q    And those two doors that you identified earlier that were

10 ajar, this is that boiler room door over here, isn't it?

11 A    That one that I assumed was boiler room door, yes.

12 Q    Right.  You called it -- or somebody called it the boiler

13 room door.

14 A    Correct.

15 Q    That's one that was ajar.  Right?

16 A    Yes, it is.

17 Q    And then the other door, the -- with the arctic entry that

18 had the screen door that was ajar is this one over here that

19 I'm circling with my pointer.  Right?

20 A    Yes, it is, sir.

21 Q    Now to DE-127T, please.  Do you recognize that, Trooper

22 Jones?

23 A    Yes.

24 Q    What is it?

25 A    Again, it's a picture taken with my standing approximately

Case 3:13-cr-00008-SLG  Document 744  Filed 09/23/14  Page 95 of 209

1  20, 30 feet to the counterclockwise direction.

2        MR. OFFENBECHER:  Yeah.  I'd move for the admission of

3  127T.

4        MR. SCHRODER:  No objection.

5        THE COURT:  Received.

6     (Defendant's Exhibit DE-127T admitted)

7  BY MR. OFFENBECHER:

8  Q   So now you're standing up on the hill, a little bit

9  further down, looking through the trees, down onto T2.  Is that

10 right?

11 A   Yes.

12 Q   And those two doors that were ajar are right there.

13 Right?

14 A   That is correct.

15 Q   Okay, now 127X, please.

16       THE COURT:  Okay, we're getting way beyond their break

17 time.  Are you about done?

18       MR. OFFENBECHER:  I'm getting close, but I just have

19 a -- I have about three or four more.

20       THE COURT:  Okay.  We'll take a 15-minute break.  Thank

21 you.

22    (Jury not present)

23       THE CLERK:  All rise.

24       THE COURT:  Okay, come back in 15 minutes.

25       MR. OFFENBECHER:  Okay.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 744  Filed 09/23/14  Page 96 of 209

 1          THE CLERK:  Matter stands in a 15-minute recess.

 2      (Court recessed at 10:29 a.m., until 10:51 a.m.)

 3      (Jury not present)

 4          THE CLERK:  All rise.  His Honor the Court, the United

 5  States District Court is again in session.  Please be seated.

 6          THE COURT:  Okay, Nancy, did you have a exhibit issue

 7  you need -- you wanted to clar --

 8          THE CLERK:  Yes, Your Honor.  Exhibit -- Plaintiff's

 9  Exhibit 271 and 266, they were both admitted on Oct -- on April

10  2nd, but under defense numbers, which is DE-064 and DE-069.  So

11  I just want to clarify it on the record that we'll have --

12          THE COURT:  Okay.

13          THE CLERK:  -- the plaintiff's number --

14          THE COURT:  So that (indiscernible) --

15          THE CLERK:  -- admitted today.

16          THE COURT:  So they haven't been admitted today?

17          THE CLERK:  I'll have them admitted today under the

18  plaintiff's number.

19          THE COURT:  Okay, so everybody's happy?

20          THE CLERK:  I would be happy.

21          MR. SCHRODER:  Do I need to move admission of those?

22          THE CLERK:  They were admitted under the defense

23  exhibits only, so if --

24          MR. SCHRODER:  I would move admission of those for the

25  government, Your Honor.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 744  Filed 09/23/14  Page 97 of 209
(720) 384-8078  attrans@sbcglobal.net

1          THE COURT:  Okay.

2          THE CLERK:  Thank you.

3     (Plaintiff's Exhibits 271 and 266 admitted)

4          THE COURT:  So now everybody's happy.  They can be

5     admitted.  Okay, let's bring the jury in.

6     (Jury present)

7          THE COURT:  Okay, please be seated.  All right, ladies

8     and gentlemen, I -- that was too long.  Next -- tell me if you

9     get uncomfortable, okay?  I went too long last time.  I kept

10    thinking, when they say a few pictures, that means a few

11    pictures.

12         MR. OFFENBECHER:  I voted for the break before I

13    started.

14         THE COURT:  I know, and you --

15         MR. OFFENBECHER:  I'm not taking responsibility for --

16         THE COURT:  I'm --

17         MR. OFFENBECHER:  -- that one.

18         THE COURT:  I'm -- who do you think is taking

19    responsibility?  I'm taking responsibility.  Won't happen

20    again.  Sorry.  Okay.  Continue.

21         MR. OFFENBECHER:  May I proceed?

22         THE COURT:  Yeah, please.

23         MR. OFFENBECHER:  Thank you, Your Honor.

24    BY MR. OFFENBECHER:

25    Q    All right, Trooper Jones, just a few more pictures here

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 744  Filed 09/23/14  Page 98 of 209

1  that you took, and --

2        THE COURT:  Yeah.

3  BY MR. OFFENBECHER:

4  Q   -- one other one, to make sure we understand what the

5  scene looks like.  Can you bring up DE-127U, please?  All

6  right, that's -- can you take a look at that?

7  A   Yes.

8  Q   Do you recognize what it is?

9  A   Yes.

10 Q   What is it?

11 A   It's a photograph of the back side, north side of the

12 building, the west end again.

13 Q   It's one of the photos that you took on the day of the

14 event, right?

15 A   Very much like one, if not it.

16        MR. OFFENBECHER:  Okay.  I'd move for the admission of

17 127U.

18        MR. SCHRODER:  No objection.

19        THE COURT:  Received.

20     (Plaintiff's Exhibit DE-127U admitted)

21 BY MR. OFFENBECHER:

22 Q   Now, this -- Trooper, this is, again, the north side of

23 the building.  Is that right?

24 A   Yes.

25 Q   And the garage doors are kind of around the corner here.

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 99 of 209

1  Right?

2  A    That is correct.

3  Q    And there's a road that kind of comes around through here

4  and all the way around the building.  Right?

5  A    Yes.

6  Q    And the -- you were at this point in that berm that's kind

7  of up behind the back of the north side of the building.

8  Right?

9  A    Yes.

10  Q    Where there's some scrub trees and some other bushes and

11  things like that.  Is that right?

12  A    Yes.

13  Q    And you took this photograph from there.  Right?

14  A    Correct.

15  Q    And you testified at your direct examination that part of

16  what you were doing is looking for other things that might be

17  of interest, of evidentiary value up in the woods back here.

18  Is that right?

19  A    Yes.

20  Q    And would that be the same things that you were looking

21  for as you were walking down the road towards the golf course

22  and walking down the road towards the water treatment plant?

23  A    Correct.

24  Q    So you would be looking for, for example, if there's

25  anybody hiding in the woods back there?  You would be looking

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 100 of 209
(720) 384-8078   attrans@sbcglobal.net

1    for that, right?

2    A    Yes.

3    Q    And you would be looking for -- if anybody had, you

4    know -- like there was a quad vehicle stored back there that

5    somebody had abandoned, right?

6    A    Sure.

7    Q    Or a motorcycle or something like that.  Right?

8    A    Yes.

9    Q    And you would be looking, for example, if someone had

10   discarded a gun or ammunition back there.  Right?

11   A    Yes.

12   Q    Or a disguise or something like that.  Right?

13   A    Correct.

14   Q    So that's the kind of things you were looking for as you

15   were searching in the back of that berm there.  Right?

16   A    Correct.

17   Q    All right.  All right, can we move now to Defense Exhibit

18   127W?  Do you recognize this one, Trooper Jones?

19   A    Yes.

20   Q    What is it?

21   A    A photo of the arctic entryway door.

22        MR. OFFENBECHER:  I move the admit -- move to admit

23   127W.

24        MR. SCHRODER:  No objection.

25        THE COURT:  Received.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 101 of 209
(720) 384-8078  attrans@sbcglobal.net

1     (Defendant's Exhibit DE-127W admitted)

2  BY MR. OFFENBECHER:

3  Q    So we're almost all the way around the building now.  And

4  is it fair to say that this is the arctic entry door that you

5  found ajar?

6  A    Yes.

7  Q    And that the other room that you think might be a boiler

8  room door was -- is kind of back over here.  Right?

9  A    Correct.

10 Q    And this is that road that we talked about that goes all

11 the way around the T2 rigger shop.  Right?

12 A    Yes.

13 Q    Can you bring up 127X, please?  Trooper Jones, take a look

14 at that and see if you recognize what that looks like.

15 A    A photograph of the roll-up doors on the west side of the

16 building.

17          MR. OFFENBECHER:  Move for the admission of 127X.

18          MR. SCHRODER:  No objection.

19          THE COURT:  Received.

20     (Defendant's Exhibit DE-127X admitted)

21 BY MR. OFFENBECHER:

22 Q    So just so we're clear, you've come down the -- from the

23 berm there and now you're looking where -- at the west side of

24 the building.  Right?

25 A    Correct.

1  Q    North side's over here.  Right?

2  A    What we've been calling the north side, yes.

3  Q    Yeah.  It's a little bit off of north, but you can call it

4  that.  And then those other two doors are back there.  Right?

5  A    Correct.

6  Q    And then what is this feature right here that I'm circling

7  with my pointer?

8  A    A three-sided fence around the dumpster.

9  Q    Okay.  So there's a three-sided fence here, and then

10  there's a dumpster in the middle of it.  Right?

11  A    Yes.

12  Q    And you indicated earlier that the distance between this

13  side of the fence and the wall of the building is what, three

14  or four feet, something like that?

15  A    Yeah, standard side -- sidewalk width, I suppose, or along

16  that -- those lines.

17  Q    Okay, standard sidewalk width, so that if one were, for

18  example, over here and one wanted to walk down to the door, one

19  would just simply walk past this dumpster fence.  Right?

20  A    Correct.

21  Q    All right.  Can we call up 127Y, please?  Recognize that

22  photo, Trooper Jones?

23  A    Yes.

24  Q    And is that a photo of looking just a little bit more

25  counterclockwise, looking more at the dumpster and the garage

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 103 of 209

1    doors?

2    A    That is correct.

3         MR. OFFENBECHER:  Move the admission of 127Y.

4         MR. SCHRODER:  No objection.

5         THE COURT:  Received.

6         (Defendant's Exhibit DE-127Y admitted)

7    BY MR. OFFENBECHER:

8    Q    So, again, you're walking your way around.  Here are those

9    garage doors you were talking about.  Here's the three-sided

10   dumpster fence.  Right?

11   A    Correct.

12   Q    And then here's the walkway, kind of the sidewalk way

13   where you walk down the front of the building.  Right?

14   A    Correct.

15   Q    Can you open 120 -- DE-131, please?  Trooper Jones, can

16   you take a look at that, please?

17   A    Yes, sir.

18   Q    Now, this is not a photo that you took that day, but a

19   photo of some other day.  Is that right?

20   A    Yeah.  I -- that --

21   Q    Could be that day --

22   A    -- appears --

23   Q    -- you're not sure?

24   A    No, it looks like it's warmed up quite a bit.

25   Q    Okay.  Is that -- just taking a look at it, is that a fair

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 104 of 209

1  and accurate representation of the dumpster as opposed to

2  the -- juxtaposition of the dumpster and the wall there?

3  A    Yes, it is.

4        MR. OFFENBECHER:  All right.  I move for the admission

5  of 131, please.

6        MR. SCHRODER:  Your Honor, we'd object as cumulative,

7  and foundation.  I'm not -- I'd like to have a little more idea

8  of when this was taken.

9        MR. OFFENBECHER:  Well, is a photograph given to us by

10 the -- taken a few days after -- it's one of the F -- we can

11 bring an FBI agent in to admit it, if you'd like.

12       MR. SCHRODER:  (Indiscernible) have counsel represent

13 it was about the same time, then I'm fine with that.  No

14 objection.

15       THE COURT:  It will be received.

16     (Defendant's Exhibit DE-131 admitted)

17 BY MR. OFFENBECHER:

18 Q    Now, again, you didn't take this photograph.  But does

19 this -- does the building and the dumpster fence and the

20 dumpster appear to be about the same place as when you were

21 there?

22 A    Yes.

23 Q    And when you said that it was at least three or four feet

24 or enough room to walk between the dumpster fence, that's it

25 right there.  Right?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 105 of 209

1   A    That is correct.

2   Q    And the wall right here.  Right?

3   A    Yes.

4   Q    And so when you were saying there was three or four feet

5   or sidewalk width to walk down the side of the building, you

6   were talking about this spot right here, weren't you?

7   A    Yes, sir.

8   Q    Can take that one down.  Now, Trooper Jones, when you were

9   securing the scene and taking these photographs, you had a

10  purpose in mind.  Right?

11  A    That is correct.

12  Q    You were trying to document the scene as best you could.

13  Right?

14  A    Yes.

15  Q    And you were trying to find any evidence of the crime that

16  had occurred.  Right?

17  A    That is correct.

18  Q    And also trying to identify any possible sources of exit

19  or entry into the building.  Right?

20  A    Yes, sir.

21  Q    And you noticed in your photos that you took some -- took

22  particular care to take photos of those two doors that were

23  ajar on the north side of the building.  Right?

24  A    That is correct.

25  Q    You took a photograph of each door.  Right?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 106 of 209

1  A    Yes.

2  Q    And then you took a very tight photograph to show that

3  those doors were ajar.  Right?

4  A    Yes, sir.

5  Q    And the reason you did that is because in your training,

6  you know that a door ajar like that can be evidence of an entry

7  or attempted entry into the building.  Right?

8  A    Yes.

9           MR. OFFENBECHER:  No other questions, Your Honor.

10          THE COURT:  Redirect.

11          MR. SCHRODER:  No redirect, Your Honor.

12          THE COURT:  Thank you, sir.  You're excused.  The

13  government's next witness.

14     (Witness excused)

15          MR. SCHRODER:  Your Honor, the government calls

16  Charlene Bell.

17          THE COURT:  Okay, all the way up to the front here.

18  And you can just make your way into the witness box.  That door

19  pulls out.  And remain standing just for a second, and she'll

20  swear you in right here.

21          THE CLERK:  Please raise your right hand.

22          **CHARLENE ANN BELL, PLAINTIFF'S WITNESS, SWORN**

23          THE CLERK:  Okay, thank you.  Please have a seat.  And,

24  ma'am, if you can please state and spell your full name for the

25  record.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 107 of 209
(720) 384-8078   attrans@sbcglobal.net

1      THE WITNESS:  Charlene Ann Bell.  C-h-a-r-l-e-n-e, A-n-

2  n, B-e-l-l.

3      THE CLERK:  Thank you.

4      THE COURT:  Counsel.

5              **DIRECT EXAMINATION**

6  BY MR. SCHRODER:

7  Q   Ms. Bell, please -- where do you live?  Did you say

8  Kodiak?  Did you already say that?

9  A   No, I did not.  But, yes, I --

10  Q   Okay.  Where do you live, then?

11  A   I live in Kodiak.

12  Q   All right.  And where in Kodiak do you live?

13  A   In Bells Flats.

14  Q   And let's -- we're going to put up a picture and let you

15  show us where that is.

16  A   Okay.

17  Q   And are you fa -- could you look at that on your screen?

18  A   Uh-huh (affirmative).

19  Q   Are you familiar with that exhibit?

20  A   Yes.

21  Q   Have you seen it before?

22  A   Yes.

23  Q   And do you know what it is?

24  A   It's a map of Bells Flats area.

25  Q   And that's the area where you live?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 108 of 209

1  A    Yes.

2  Q    Understanding you're not a cartographer, but from what you

3  can see, does that look like Bells Flats area, looking -- a

4  fair and accurate representation of Bells Flats?

5  A    Yes.

6          MR. SCHRODER:  Your Honor, the government moves for

7  admission of 72.

8          MR. CURTNER:  No objection.

9          THE COURT:  It'll be received.

10         (Plaintiff's Exhibit 72 admitted)

11     (Side conversation)

12  BY MR. SCHRODER:

13  Q    Well, we'll move -- we'll have you show us that later.

14  We'll charge the system for a minute --

15         THE CLERK:  Just push it one time.

16         MR. SCHRODER:  -- let it charge.

17         UNIDENTIFIED SPEAKER:  I --

18         THE COURT:  Push it one time.

19         UNIDENTIFIED SPEAKER:  Now it's red.

20  BY MR. SCHRODER:

21  Q    Okay.  So where's the road -- if -- you got a laser

22  pointer in front of you there, I think.  And can you show us

23  the road, the main road from Kodiak, from the town or from the

24  base?

25  A    This road here.

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 109 of 209

**BELL - DIRECT**

1  Q   All right.  And then what is that -- is -- where's what --
2  where is what you call Bells Flats?
3  A   This area here.
4  Q   That whole area in there?
5  A   Yes.
6  Q   Okay, thank you.  And I'm going to have you look at that
7  again in a minute, but let me ask you a couple questions first.
8  Do you know the defendant, James Wells?
9  A   Yeah.
10 Q   And how long have you known him?
11 A   I've known who he is probably eight years.
12 Q   Yeah.  And are you aware of where he lives in Kodiak?
13 A   Yes.
14 Q   And where is that?
15 A   On Middle Bay Drive.
16 Q   Okay.  And is that in Bells Flats?
17 A   Yes.
18 Q   Okay.  And let me take you back to the morning of April
19 12th, 2012.  What time did you leave for work that morning?
20 A   It was 7:22.
21 Q   Okay.  And does leaving at 7:22 -- all things being
22 relative, we're talking about Kodiak -- does that make your
23 drive a little slower if you leave at 7:22?
24 A   Actually, 7:22, it would be faster.
25 Q   Ah.  Now --

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 110 of 209

1  A    The buses come in about 7:26, 7:27.

2  Q    So I got it the wrong way.  So it helps if you get out by

3  7:22.

4  A    Yes.

5  Q    All right.  And did you see Mr. Wells that morning?

6  A    I -- yes.

7  Q    And where did you see him?  If you could point out on the

8  chart roughly where you saw him.

9  A    Here at that intersection.

10  Q    Okay.  And what's the -- what are the two roads that go

11  into that intersection?

12  A    It's Rezanof Drive, or Chiniak Highway, and Sargent Creek

13  Road.

14  Q    All right.  And where were you headed?

15  A    I was headed to work.

16  Q    And which way was he going?

17  A    He was coming off of the -- off of Rezanof on -- turning

18  onto Sargent Creek Road, into the flats.

19  Q    And were that -- his direction and his route consistent

20  with him driving home to his residence?

21  A    Yes.

22  Q    Now, did you find that to be unusual, seeing him there at

23  that time?

24  A    Yes.

25  Q    And why?

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 111 of 209

1  A    I would only see him drive into the flats in the

2  afternoon, evening time frame.

3  Q    Okay.

4  A    At the end of a workday.

5        MR. SCHRODER:  No further questions, Your Honor.

6        THE COURT:  Cross.

7        MR. CURTNER:  No questions.

8        THE COURT:  All right, thank you.  Thank you, ma'am.

9        THE WITNESS:  Thank you.

10       THE COURT:  You're excused.  Government's next witness.

11       MR. SCHRODER:  Your Honor, the government calls Annette

12 Ecret.

13       THE COURT:  Okay, ma'am, if you'd just make your way up

14 here, and that -- and get into the box.  Take a -- pull the

15 door towards you.  Remain standing just for a second, and

16 she'll swear you in.

17       THE CLERK:  Please raise your right hand.

18       **ANNETTE K. ECRET, PLAINTIFF'S WITNESS, SWORN**

19       THE CLERK:  Okay, thank you.  Please have a seat.  And,

20 ma'am, if you can please state and spell your full name.

21       THE WITNESS:  Annette K. Ecret.  A-n-n-e-t-t-e, middle

22 initial K, last name Ecret, E-c-r-e-t.

23       THE CLERK:  Thank you.

24       THE COURT:  Okay, counsel.

25                   **DIRECT EXAMINATION**

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 112 of 209
(720) 384-8078  attrans@sbcglobal.net

1  BY MR. SCHRODER:

2  Q   Ms. Ecret, where do you live?

3  A   Kodiak.

4  Q   And what part of Kodiak do you live in?

5  A   Bells Flats.

6  Q   Now, do you know the defendant, James Wells?

7  A   I do.

8  Q   And how long have you known him?

9  A   Roughly 17 years.

10 Q   And are you aware of where he lives in Kodiak?

11 A   I am.

12 Q   And where is that?

13 A   He lives off of Middle Bay Drive.

14 Q   And is that also in Bells Flats?

15 A   It is.

16 Q   Okay.  Now I want to take you back to the morning of April

17 12th, 2012.  Did you see Mr. Wells that morning?

18 A   I did.

19 Q   And where did you see him?

20 A   I had just rounded a curve off of Lake Orbin, headed out

21 of the flats, when I passed Mr. Wells.

22 Q   Okay.  Now I'm going to show you a little map and let you

23 try to point that out for us.

24      THE CLERK:  This is -- for the record, this is Exhibit

25 72?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 744  Filed 09/23/14  Page 113 of 209

1        MR. SCHRODER:  72, yeah.

2        THE CLERK:  Thank you.

3   BY MR. SCHRODER:

4   Q    Now, you've got a little laser pointer up there in front

5   of you.  Now, could you point to where you -- the area where

6   you saw Mr. Wells?

7   A    Sorry.  I'm shaking.

8   Q    That's all right.

9   A    Right in that area.

10       THE COURT:  You're doing good compared to a lot of

11  people.  That thing usually shakes all over the place.  What

12  you can do is use the --

13       MR. SCHRODER:  Okay.

14       THE COURT:  -- bar as a brace.

15       THE WITNESS:  Okay.  Sorry if I make you sick.

16  BY MR. SCHRODER:

17  Q    Okay, great.

18  A    Right there.

19  Q    And it actually says "Lake Orbin" there.  So there's some

20  water there?

21  A    Yes, sir.

22  Q    All right.  Now, when you saw him, which direction were

23  you headed?

24  A    I was headed -- headed out of Bells Flats.

25  Q    And were you headed toward work?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 114 of 209

1   A   Yes, I was headed toward the Coast Guard base.

2   Q   And which way was he going?

3   A   He was headed into the flat.

4   Q   And what dir -- what was -- was the direction that he was

5   going consistent with how he would go home to his residence?

6   A   Yes.

7   Q   And what time did you see him?

8   A   Approximately 7:25.

9   Q   And did you check a clock somewhere?

10  A   I did.  I checked the clock in my truck.

11  Q   All right.  And what time did that clock indicate?

12  A   7:25 a.m.

13  Q   And did you find it unusual to see in -- Mr. Wells go home

14  at that time of day?

15  A   I did.

16  Q   And what did you think about that?

17  A   I honestly thought -- because it was the first sunny day.

18  I honestly thought, good for him, he took the day off.

19  Q   All right.

20  A   And we waved.

21  Q   Okay.

22          MR. SCHRODER:  All right, no further questions, Your

23  Honor.

24          THE COURT:  Cross-examination.

25                      **CROSS-EXAMINATION**

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 115 of 209
(720) 384-8078   attrans@sbcglobal.net

ECRET - CROSS

1  BY MR. CURTNER:

2  Q    Good morning.

3  A    Good morning.

4  Q    So you've known Mr. Wells and Mrs. Wells for a while?

5  A    Correct.

6  Q    (Indiscernible) -- and that day you saw Jim Wells, he

7  looked normal to you.  Right?

8  A    He did.

9  Q    He waved to you and you waved back?

10  A    He did.

11  Q    Okay.  That's all.  Thank you.

12        THE COURT:  Redirect.

13        MR. SCHRODER:  None, Your Honor.

14        THE COURT:  Thank you, ma'am.  You're excused.

15        THE WITNESS:  I'm done?

16        THE COURT:  You're done.  The government's next

17  witness.

18     (Witness excused)

19        MR. SCHRODER:  Your Honor, the government calls Lynn

20  Concepcion.

21        MS. LOEFFLER:  We have a hand from a juror, Your Honor.

22        THE COURT:  Yes.

23        JUROR NO. 3:  (Indiscernible).

24        THE COURT:  Okay, well, we'll see what happens. Thanks

25  for telling us.  And you're juror number 3.  Right?  All right.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 116 of 209
(720) 384-8078   attrans@sbcglobal.net

1  Just please remain standing just long enough to be sworn in.

2  　　　　THE CLERK:  All right.  Please raise your right hand.

3  　　**LYNN CONCEPCION-GLOVER, PLAINTIFF'S WITNESS, SWORN**

4  　　　　THE CLERK:  Thank you.  Please have a seat.  And,

5  ma'am, if you can please state and spell your full name.

6  　　　　THE WITNESS:  My name is Lynn Conception-Glover.  My

7  last name is C-o-n-c-e-p-c-i-o-n, hyphen, G-l-o-v-e-r.

8  　　　　THE CLERK:  And your first name?

9  　　　　THE WITNESS:  Lynn, L-y-n-n.

10 　　　　THE COURT:  All right, counsel.

11 　　　　　　　　　**DIRECT EXAMINATION**

12 BY MR. SCHRODER:

13 Q    Ms. -- I've been calling you Ms. Concepcion.  Should I

14 call you Ms. Concepcion-Glover?

15 A    No, Ms. Concepcion's fine.

16 Q    Okay, fine.  Who do you work for?

17 A    I work for Alaska Communications.

18 Q    And what is your -- what do you for A -- Alaska

19 Communications?  I think a lot of people kind of know them by

20 an acronym.  What's that?

21 A    ACS.

22 Q    Right.  And what do you do for them?

23 A    I'm a legal technician.

24 Q    And how long have you been employed by ACS?

25 A    I've been there for about eight years.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 117 of 209

**CONCEPCION-GLOVER - DIRECT**

1  Q   And have you been in the same position for eight years?

2  A   Yes, I have.

3  Q   Now, what's the nature of the business of ACS?  What do

4  they do?

5  A   We're a telecommunications company.

6  Q   And how much of the state do you cover?

7  A   Most of the state.

8  Q   All right.  And do you cover -- when I think of

9  telecommunications, I think of things like local phone service,

10  long-distance phone service, cell service.  What kinds of those

11  services do you provide?

12  A   All of those, land line, wireless, and Internet.

13  Q   Okay.  And how -- did I ask you how much of the state you

14  cover, all the state?

15  A   Most of the state, yes.

16  Q   Okay.  Do you cover Kodiak?

17  A   Yes, we do.

18  Q   And what kind of services do you provide in Kodiak?

19  A   We provide all three, land line, wireless, and Internet.

20  Q   Okay.  And is the telephone business a regulated industry?

21  A   Yes, it is.

22  Q   And are there recordkeeping requirements because of that?

23  A   Yes.

24  Q   And do you keep phone usage records?

25  A   Yes, we do.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 118 of 209

**CONCEPCION-GLOVER - DIRECT**

1  Q   And do you keep billing records?

2  A   Yes.

3  Q   Now, your duties as a legal technician include any

4  responsibility for account records that are requested by some

5  sort of legal process?

6  A   Yes.

7  Q   And are your records computerized or still primarily

8  paper?

9  A   Mostly computerized.

10  Q   And does the information go into your account records

11  digitally as well?

12  A   Yes.

13  Q   Now, in the normal and ordinary course of business, is the

14  information about transactions put into your computers or files

15  at or near the time of the event?

16  A   Yes, they are.

17  Q   And do they accurately reflect those acts, conditions, or

18  events?

19  A   Yes.

20  Q   And it's -- are those records recorded and maintained as a

21  regular practice of your company?

22  A   Yes, they are.

23  Q   And how long do you maintain records?

24  A   We keep land line records -- depending on the type of

25  records.  But call records, we keep for two years.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 119 of 209
(720) 384-8078   attrans@sbcglobal.net

1 Q    Okay.  Was your company served with a subpoena to provide

2 the records that you've reviewed for today's testimony?

3 A    Yes, we were.

4 Q    And what, if anything, did your company produce?

5 A    I produced screenshots of subscriber information and Excel

6 spreadsheets of calling data.

7 Q    Okay.  Now I'm going to show you what the government has

8 marked as Exhibit Number 27, and have you -- it's on the screen

9 right next to you.  And have you reviewed those documents in

10 preparation for your testimony today?

11 A    Yes, I did.

12 Q    And can you identify those exhibits?

13 A    These are calling records.

14 Q    All right.  And are you aware of the subscriber those

15 calling records are for?

16 A    Yes.

17 Q    And who's that?

18 A    James Wells.

19 Q    In what location?

20 A    In Kodiak.

21 Q    And do you have the phone number?

22 A    I -- I don't have it on me.

23 Q    If I showed you your subscriber information, would that

24 help refresh your recollection?

25 A    Yes.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 120 of 209
(720) 384-8078  attrans@sbcglobal.net

1      MR. SCHRODER:  May I approach, Your Honor?

2      THE COURT:  Yes.

3      THE WITNESS:  The phone number is 907-487-2415.

4   BY MR. SCHRODER:

5   Q   And do these documents actually reflect call records for

6   that number during the period of April 2012?

7   A   They do reflect the call records that were captured by our

8   switch.

9      MR. SCHRODER:  The government moves for admission of

10  Exhibit 27, Your Honor.

11     MR. OFFENBECHER:  No objection, Your Honor.

12     THE COURT:  It'll be received.  And you have a little,

13  soft voice.  Could you have the microphone a little closer?

14     (Plaintiff's Exhibit 27 admitted)

15     THE WITNESS:  Yes.

16     THE COURT:  Okay.

17  BY MR. SCHRODER:

18  Q   Now just a couple questions, briefly, Ms. Concepcion.

19  Does the date the -- and we'll put that data up there.  And can

20  you give us an idea of what -- and maybe even Ms. Dixon could

21  blow up a section for you.  Why don't you go to the next page,

22  Kim?  Let's just blow up the section we're going to want to

23  look at anyway, from just the 12th, right.  Or -- no, you have

24  to get a little higher than that.

25     (Side conversation)

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 121 of 209

1    Q    Now, just to give the jury an idea what those columns

2    mean, could you kind of run across and say what those columns

3    are, the ones that are important, anyway?

4    A    Do you have the -- the actual column?  I mean, you've

5    taken out -- I need to read them.

6    Q    Oh, the -- are the markers at the top?

7    A    Yes, please.

8    Q    Yeah, I don't think we received one with the general --

9    with the markers at the top.  So could you -- generally, could

10   you just tell us -- so --

11   A    The first column is the date.

12   Q    -- date --

13   A    And the second column is the time.

14   Q    Right.

15   A    The third column is the call duration.

16   Q    Right.

17   A    The fourth column, I believe, is the from number.

18   Q    Okay.  And then the second -- you -- the -- those columns

19   5 and 6 would be from and to, one or the other?

20   A    Yes.

21   Q    All right.  So what I want to ask you, though, is does

22   data like this, we see in this document, is it stored for all

23   calls in Kodiak?

24   A    No, it's not.

25   Q    Okay.  So which calls would not be stored and which calls

1  would be stored?

2  A    Local calls are typically not stored on this type of data

3  because we don't charge for local calls.

4  Q    Okay.  So what was the first call listed on April 12th?

5  A    It looks like an incoming call from 916-607-3401.

6  Q    And that -- what time was that?

7  A    8 --

8  Q    -- you got a -- your laser pointer there; maybe you

9  could --

10 A    It was at 8:12 and 44 seconds.

11 Q    And was that a local call or a local noncell -- it

12 looks -- what kind of call was that that caused it to be

13 recorded?

14 A    It looks like a long-distance call.

15 Q    All right.  Now, if a local call was made before that on

16 that day that did not go through a cell phone or long-distance,

17 or -- I think you said a GCI switch -- just a purely local

18 call, would that have been recorded?

19 A    No.

20        MR. SCHRODER:  No further questions, Your Honor.

21        THE COURT:  Cross-examination.

22        MR. OFFENBECHER:  No questions, Your Honor.

23        THE COURT:  Thank you, ma'am.  The government's next

24 witness.

25        (Witness excused)

1    (Side conversation)

2        MS. LOEFFLER:  Your Honor.

3        THE COURT:  Yes.

4        MS. LOEFFLER:  We have two witnesses, I think, left in

5    Alaska for today, and the next one, we have a whole bunch of

6    evidence we have to reel in.

7        THE COURT:  So you want another recess?  That'll make

8    up for the long haul we went last time.  So what are you

9    saying?

10       MS. LOEFFLER:  We're going to have two witnesses left

11   for today.  That's all -- we're trying to get everybody here as

12   fast as we can, Your Honor, but --

13       THE COURT:  Okay.  No --

14       MS. LOEFFLER:  -- they don't --

15       THE COURT:  -- I -- I'm not -- I'm just asking you the

16   bottom line.

17       MS. LOEFFLER:  The bottom line is we have two witnesses

18   left for today, Mr. Mills --

19       THE COURT:  Ergo --

20       MS. LOEFFLER:  -- and Mr. Woods.

21       THE COURT:  -- therefore, what do you --

22       MS. LOEFFLER:  Therefore, we'd like to break early so

23   that we can get all the evidence in for the next witness, and

24   then whatever schedule you want to do.  I'm just trying to let

25   everybody know we got two witnesses left.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 744  Filed 09/23/14  Page 124 of 209

```
 1          THE COURT:  Okay.  And how long are they, about,
 2  roughly?
 3          MR. SCHRODER:  I would guess an hour, maybe a little
 4  more, depending on cross-examination --
 5          THE COURT:  Each?
 6          MR. SCHRODER:  -- for the first one.
 7          THE COURT:  Oh, okay.  The first one.
 8          MS. LOEFFLER:  And I would guess the second one, about
 9  the same, an hour or a little more --
10          THE COURT:  So we have about --
11          MS. LOEFFLER:  -- depending on the combination --
12          THE COURT:  -- three hours left of testimony today?
13          MS. LOEFFLER:  Yeah.
14          THE COURT:  And you don't care how we deal with it?
15          MS. LOEFFLER:  I do not, Your Honor.
16          MR. SCHRODER:  Well, I --
17          MS. LOEFFLER:  Other than --
18          MR. SCHRODER:  Yeah, our next witness, I think he's not
19  here from the hotel, so I think it doesn't --
20          THE COURT:  Okay.  So what do you think?  You know as
21  much as I know.  Long lunch?  This means -- so do you want to
22  come start at 1?  Is that what you're suggesting?
23          MR. SCHRODER:  We can start earlier, Your Honor,
24  (indiscernible) --
25          MS. LOEFFLER:  Whatever you want to do.
```

1    THE COURT:  Twelve thir -- do you want to start at
2  12:30?  Take an hour and 10 minutes now, go eat.  You'll be
3  first in line at the restaurant.  Come back, and that way that
4  gives us from 12:30 -- I have a hearing at 4:30, so that'll
5  give us time to do everything.

6    MS. LOEFFLER:  I think so.

7    THE COURT:  Any objection from the defense --

8    MR. CURTNER:  No.

9    THE COURT:  -- proceeding in this fashion?

10    MR. CURTNER:  No.  We're good.

11    THE COURT:  Okay.  So we're going to stand in recess,
12  and then we'll come -- if you can be back at 12:30, and we'll
13  try to get going right at 12:30.  Made up for our long early
14  morning.

15    (Jury not present)

16    MR. OFFENBECHER:  When -- Your Honor, when are we
17  coming back?

18    THE COURT:  12:30.

19    MR. OFFENBECHER:  Thank you.

20    THE COURT:  That gives you an hour and 10 minutes to do
21  what you want.

22    MR. CURTNER:  We could have started at 9 and come back
23  at 1.

24    THE COURT:  I could have done all kinds of things.  I
25  want -- this is a collaborative effort.  Please be seated.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 126 of 209

1  We'll just -- it's going to take a minute to bring the jury

2  down, because they're not expecting -- did you call them?

3         THE CLERK:  Yeah.

4         THE COURT:  Okay.

5         THE CLERK:  Stay on the record?  Off record, recess?

6         THE COURT:  We're done.  Everybody -- we're off record.

7  We're just -- so you're free to go.

8         MS. LOEFFLER:  Oh, I thought you were --

9         THE CLERK:  Okay.  All --

10        MS. LOEFFLER:  -- you know, I -- you know, we just

11 follow you, Judge.  Whatever you tell us --

12        THE CLERK:  Adjourn -- recess.

13        MS. LOEFFLER:  -- you're sitting there.  We figure

14 we're supposed to be sitting here.

15        THE CLERK:  Matter stands in recess until 12:30.

16     (Court recessed at 11:22 a.m., until 12:34 p.m.)

17     (Jury not present)

18        THE CLERK:  All rise.

19        THE COURT:  Ready for the jury?  Ready for the jury?

20        MR. SCHRODER:  Yes, Your Honor.

21        THE COURT:  Okay.

22        THE CLERK:  His Honor the Court, the United States

23 District Court is again in session.  Please be seated.

24     (Jury present)

25        THE COURT:  Okay, you ready to go?  Please be seated.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 127 of 209

1  Ready?  Get that thing connected.  All right.  The government's

2  next witness.

3        MR. SCHRODER:  Your Honor, the government calls Brett

4  Mills.

5        THE COURT:  Okay.  Okay, you and that doggone cell

6  phone -- just put it on the -- what -- yeah, that's good.  Is

7  it turned off?

8        JUROR NO. 6:  (Indiscernible).

9        THE COURT:  Oh, that's no -- all right.  It's a new age

10 we're living in.  All right, sir, if you'll just stand in the

11 box there, remain standing just for a second.  She'll swear you

12 in, right here.

13       THE CLERK:  Please raise your right hand.

14       **BRETT ASHLEY MILLS, PLAINTIFF'S WITNESS, SWORN**

15       THE CLERK:  Thank you.  Please have a seat.  And, sir,

16 if you can please state and spell your full name.

17       THE WITNESS:  My name is Brett, B-r-e-t-t, Ashley, A-s-

18 h-l-e-y, Mills, M-i-l-l-s.

19       THE CLERK:  Thank you.

20       THE COURT:  All right, counsel.

21                    **DIRECT EXAMINATION**

22 BY MR. SCHRODER:

23 Q   Mr. Mills, who do you work for?

24 A   I work for the FBI at the FBI Laboratory in Quantico,

25 Virginia.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 744  Filed 09/23/14  Page 128 of 209
(720) 384-8078  attrans@sbcglobal.net

MILLS - DIRECT

1  Q    And what do you do for the FBI Laboratory?

2  A    I'm a firearms, toolmarks examiner for the laboratory.

3  Q    And how long have you been a fire mark -- firearm,

4  toolmarks examiner?

5  A    Since 1995.  And I was qualified in 1998.

6  Q    And why don't you explain that a little bit.  How -- what

7  does that mean, that you were qualified?  What kind of training

8  do you get to be a firearm, toolmarks examiner?

9  A    It's a in-house training process, somewhat equivalent to

10 what would be an apprenticeship.  You work side by side with

11 qualified examiners.  You read the literature.  You study.  You

12 work basically regular cases or assist in working the regular

13 cases.  You tour the manufacturers of firearms and of tools, so

14 you can see how -- as they're manufacturing, what is producing

15 the unique marks to each individual tool or firearm.

16      After we go through this process, we then will go through

17 a series of oral boards, which is a -- a testing procedure,

18 much like a college exam or anything like that.  Then there's a

19 series of mock trials.  And if you have passed all of those,

20 then you become qualified as an examiner for the FBI.

21 Q    And were you qualified as an examiner?

22 A    Yes, sir, I was.

23 Q    So explain to the jury a little bit about what a firearms

24 and toolmarks examiner does.

25 A    A firearm -- basically, my job description is -- is that

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 129 of 209

1  I will receive evidence from federal, state, local law
2  enforcement agencies, and sometimes even from international law
3  enforcement agencies.  And the request will be, for example,
4  if -- if we have bullets and cartridge cases from a crime
5  scene, can we determine -- and there is a suspect gun -- can we
6  determine if these bullets or cartridge cases were fired in
7  this gun or were not.  And we'll go ahead, we'll write a report
8  of our opinion, and then if called upon, we can testify in the
9  court of law.
10  Q    Okay.  And how about the toolmark side?  Are -- and are
11  those things connected?  Is there a reason that you're
12  qualified to do both?
13  A    Yes, sir.  Most people know about firearms because not
14  only it's a little more glamorous on the television and in the
15  movies, but there's more cases that involve firearms, whether
16  it just being a robbery or a homicide case.  But when you look
17  at the -- the plain aspect of it from our standpoint of view in
18  the field, a toolmark or a tool is -- instead of something that
19  provides mechanical advantage -- that's how Webster would
20  define it -- it's basically the harder of two objects, leaving
21  marks.  So anything could turn into a tool.  A rock can turn
22  into a tool, a screwdriver, a hammer.  But it's something that
23  will actually mar a softer surface.  That's where the toolmark
24  exam comes in.
25       Firearms, the barrel is the tool.  The bullet is the

MILLS - DIRECT

```
 1  softer object or the cartridge cases.  So they're -- basically
 2  coincide with each other.
 3  Q    And have you ever taught courses on either firearms
 4  examinations or toolmark examination?
 5  A    Yes, sir, I have.
 6  Q    And where have you taught these courses?
 7  A    We teach -- it's the -- the class is called Techniques in
 8  Firearms Identification, and we just have usually about 12
 9  examiners from around the United States.  We have also taught
10  overseas in Ireland, Israel, and South Africa.  And we teach
11  them unique cases that we've seen over time and give them
12  practical problems to see if, you know, their skill set
13  increases, much like ours has.
14  Q    And have you testified previously in the field of firearms
15  and toolmark examinations?
16  A    Yes, I have.
17  Q    In what courts have you testified?
18  A    I've -- I've testified in federal, state, territorial
19  courts of the United States, international courts of the United
20  Kingdom, Indonesia, and islands in the Caribbean.
21  Q    And have you been declared an expert in those courts?
22  A    Yes, sir, I have.
23  Q    How many times would you estimate?
24  A    A little over 70, sir.
25  Q    All right.
```

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 131 of 209

1    MR. SCHRODER:  Your Honor, the government moves Brett

2 Mills be declared an expert in the area of firearm and toolmark

3 examination and comparison.

4    THE COURT:  Any voir dire?

5    MR. CURTNER:  No.

6    THE COURT:  He'll be received in that capacity.  Very

7 well.

8 BY MR. SCHRODER:

9 Q   Now, Mr. Mills, before we start looking at some evidence

10 here, I want to ask one question.  The jury might end up

11 with -- on their mind -- is were you asked in this situation to

12 look at ammunition and determine what type of firearm was used?

13 Were you asked to do that in this case?

14 A   No, sir.

15 Q   And do you know why not?

16 A   It was previously examined by the State of Alaska's crime

17 lab.

18 Q   All right.  Now we're going to take a look at some

19 ammunition -- Mr. Allison -- have you take a look.  And have

20 you previously examined these items before testifying today?

21 A   Yes, sir, I have.

22    (Side conversation)

23    THE CLERK:  Sorry, what exhibit number is this?

24    MR. SCHRODER:  We are -- we have out Exhibit Numbers

25 238, 239, 236, 240, and 221.  I believe they've all been

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 132 of 209
(720) 384-8078  attrans@sbcglobal.net

1   admitted.

2       (Side conversation)

3   BY MR. SCHRODER:

4   Q    Now, under what circumstances did these items originally

5   come into your possession?

6   A    They were submitted from the FBI field office in

7   Anchorage, Alaska to the laboratory, and examinations were

8   requested to see if the ammunition that was submitted had the

9   same class characteristics or design characteristics by a

10  manufacturer were the same as the ones that were from victims'

11  bodies.

12  Q    And can you give us an example of what you mean by design

13  and class characteristics?

14  A    When a manufacturer -- the three big ones would be

15  Winchester, Federal, or Remington.  When they design a bullet,

16  they have certain goals that they would like to reach.  For

17  example, if they make a hollowpoint.  A hollowpoint is a hollow

18  cavity in the nose of the bullet.  The idea is to facilitate

19  expansion so that the diameter of the bullet increases as it

20  penetrates soft tissue and creates a larger wound track.

21       So in order for them to become unique and declare that

22  they have probably what's, you know, the best bullet or

23  whatever, they'll do certain design characteristics that are

24  unique to their own manufacturing process.  It could be the

25  number of slits, it could be the -- the weight of the bullet,

1  the hardness of the lead, the -- the base shape of the bullet.

2  These characteristics are for a particular bullet of a

3  particular manufacturer.  So that's what I'm talking about when

4  I describe class characteristics.

5  Q  So how did you go about doing your examination and the

6  comparisons?

7  A  On the ammunition that was submitted, it -- they were

8  complete cartridges.  And if I can show you, a complete

9  cartridge -- most people, you'll hear them called bullets.  But

10 a complete cartridge consists of a primer, a cartridge case,

11 and a bullet.  And within the cartridge case itself is the --

12         THE COURT:  Could you hold it up a little higher?

13         THE WITNESS:  Oh, I'm sorry, sir.

14         THE COURT:  I'm not sure everybody can see.

15         THE WITNESS:  The primer is what ignites the powder.

16 The cartridge case is what houses the powder or the propellant.

17 And the bullet itself -- this is the bullet where I talk about,

18 you know, class characteristics on how they went to facilitate

19 expansion.

20         So this one happens to be a Winchester.  And they

21 actually put a little groove coming across the bottom here.  So

22 this would be unique to a Winchester product.

23 BY MR. SCHRODER:

24 Q  And so, again, how do you go about the process of

25 comparing those, then?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 134 of 209

1  A    Well, once -- once I receive and write up my generalized

2  notes of the individual cartridge, I -- I will pull it.  It's

3  a -- basically a kinetic energy bullet-puller which will pull

4  the bullet out of the cartridge case without damaging it.  It

5  allows me to look the powder if -- if I'm doing a gunshot

6  residue test.  But it'll allow me to actually see the -- the

7  base shape of the bullet.  I can get an accurate weight of the

8  bullet.  Just an overall better view of the general class

9  characteristics.

10  Q    Okay.  Now, based upon your examination of these items,

11  what conclusion did you reach?

12  A    After I pulled the bullets, I started going through -- we

13  have a reference ammunition file.  And the ammunition file has

14  been around in the FBI Lab since approximately 1932.  We have

15  around -- I believe the last count was over 17,000 different

16  types of cartridges in different types of calibers from

17  different manufacturers.

18      So we put -- I personally put in the components of the

19  general class characteristics -- base shape, weight, number of

20  slits, the type of bullet; in this case these were

21  softpoints -- to see what type of list would come back.  Then I

22  go and do a hand search of the ammunition file to see if I find

23  anything that has the same class characteristics.  And in this

24  case I did find that these were consistent with the Winchester

25  240-grain softpoint.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 135 of 209

1  Q   And that was the rounds that you found in that camouflage

2  case?

3  A   Yes.  There were a dozen rounds that were in this pouch.

4  Q   And the portions of the bullets and jackets that you found

5  were consistent with that.  Is that what you're saying?  Is

6  that your --

7  A   Yes, sir.

8  Q   -- testimony?  Okay.

9  A   Yes, sir.

10 Q   All right.  Now I want to talk a little bit about

11 clothing.  Did you test clothing in this case?

12 A   Yes, sir, I did.

13 Q   And to kind of streamline the process, we're not going to

14 get that out at this point.  But from the information you were

15 provided, whose cloth -- information you knew, whose clothing

16 were you provided to examine?

17 A   The two victims', sir.

18 Q   And what kind of examination did you do of that clothing?

19 A   It's referred to as gunshot residue.  It's a test for

20 lead -- vaporous lead, lead particulate, and then partially

21 burnt and unburnt gunpowder.  It's the nitrites that are left

22 on the residue.  It can give us an approximate muzzle-to-

23 garment distance if there's any patterns that are left.

24 Q   And what conclusions were you able to reach based upon

25 your examination of the clothing?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 136 of 209

1  A    No conclusions could be reached on a distance

2  determination.  The only positive test result I had was for

3  bullet wipe around the holes of the bullets in the garments.

4  Q    Now I want to show you what's been marked as Government

5  Exhibit 237.

6         THE COURT:  I don't think they even understood what you

7  said.  Bullet what?

8         THE WITNESS:  Bullet wipe.  It's --

9         THE COURT:  Oh, bullet wipe.

10        THE WITNESS:  Yes, sir.  It just leaves vaporous or

11 particulate lead that is adhered to the surface of the bullet,

12 and as it passes through it just creates a ring around.  When

13 you process it, it'll --

14        THE COURT:  Okay.

15        THE WITNESS:  -- light up as purple.

16 BY MR. SCHRODER:

17 Q    So the holes -- basically, the holes in the shirt that

18 appear to bullet holes were bullet holes?

19 A    They're consistent with, yes, sir.

20 Q    Yeah.  Right.  So -- I'm going to ask you look at to

21 Government Exhibit 237.  That's the trash can.  And have you

22 seen this before?

23 A    Yes, sir, I have.

24 Q    And, again, under what circumstances did this item come

25 into your possession?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1  A    It was submitted to the lab for examination by my unit.

2  Q    Okay.  And describe the examination you made of that item.

3  A    There was --

4       (Side conversation)

5  Q    We'll move along here short -- what examination did you

6  make of that item?

7  A    There was a hole and some impacts at the lower six inches

8  from the floor on the surface of this trash can.  And it was

9  asked if I could render an opinion as to what might have caused

10  those.  I tested the impact and the hole for, basically,

11  vaporous lead, particulate lead, and for copper.  And it was

12  positive on impact 1.  It was for copper and lead.  It was

13  positive for lead, negative for copper, on hole 1 and it was

14  consistent with the impact and the passage of a bullet or

15  bullet fragment.  And then within the trash can itself were

16  lead fragments that were left inside.

17  Q    Kim, could we see Exhibit 138?

18       (Side conversation)

19  Q    And I'm just going to ask you to take a look at those --

20  that photo.  Now, did you -- are the holes you examined and

21  tested?

22  A    Yes, sir.  The top one was basically a hole impact, number

23  1.  It's furthest from the floor, up and to the right.  That

24  one tested positive for lead and copper.  And then lower down

25  toward the floor, the larger hole, that one tested positive for

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 744  Filed 09/23/14  Page 138 of 209

1  lead but negative for copper.

2  Q   All right.  The fact that they tested positive or negative

3  for one or the other, does that allow you to reach any specific

4  conclusions?

5  A   It just is consistent with the passage of a bullet, sir.

6  Q   Okay.  All right.  Now let's move on.  I want to show you

7  Government Exhibit 231 -- two -- Exhibits 231 and 225.  Now,

8  are you familiar with these exhibits?

9  A   Yes, sir, I am.

10  Q   And under what circumstances did they come into your

11  possession?

12  A   They were submitted to the laboratory for examinations of

13  a nail that was located in that tire.

14  Q   And did you examine those items?

15  A   Yes, sir, I did.

16  Q   And can you describe what type of examination you did?

17  A   First, I had to get the nail out of the tire, so I had our

18  Special Photo Unit photograph it in place.  Once it was then

19  photographed and documented as how it was received in the

20  laboratory, I then took a two-by-four and pressed in from

21  the -- basically the tip of the nail, so I wouldn't damage or

22  create any marks on it.  Pushed it back out of the tire so I

23  could examine to see if there were any toolmarks that were on

24  the head of the nail or on the shank.

25  Q   Okay.  And that kind of foreshadows my next question.  Why

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 139 of 209
(720) 384-8078   attrans@sbcglobal.net

1  did you remove the nail?

2  A   I couldn't get that tire underneath my scope.  It --

3  Q   Okay.

4  A   We use a comparison microscope or a stereo microscope.

5  Q   Yeah.  Could you have done a complete examination with the

6  nail in the tire?

7  A   No, sir.

8  Q   Okay.  Now I'm going to ask you, you got in front of you

9  what's marked as Government Exhibit 225.  And are you familiar

10  with that exhibit?

11  A   Is -- is this the nail, sir?

12  Q   It is.

13  A   Yes, sir.

14  Q   Yeah.  And what -- is that the nail you removed from the

15  tire?

16  A   Yes, sir.

17       MR. SCHRODER:  Your Honor, the government moves for

18  admission of Exhibit 225.

19       MR. CURTNER:  No objection.

20       THE COURT:  It'll be received.

21    (Plaintiff's Exhibit 225 admitted)

22  BY MR. SCHRODER:

23  Q   Now, what conclusion did you reach as a result of your

24  examination of the tire and nail?

25  A   After -- after removing the nail from the tire and then

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 140 of 209

1 examining the nail itself, I noted that there were toolmarks

2 present on the head of the nail and along the shank of the

3 nail.

4 Q    Okay.  And what was your conclusion about -- did you make

5 any conclusions about what those marks were?

6 A    Out of -- out of the different marks that I saw on the

7 head of the nail, there were marks that were consistent with

8 the nail having been struck by what I refer to as an automatic

9 nailer.  It could either be a pneumatic or a powder-actuated.

10 It's a -- a plunger system, plunger comes down, strikes it, and

11 forces the nail down in.

12 Q    Okay.

13 A    The other marks -- there was abrasion marks along the --

14 one side of the edge.  I have -- I can't tell you what the

15 source is for those.  There was a score mark approximately two-

16 thirds through the nail that wound up running perpendicular the

17 entire way.  I couldn't tell you the source of that one.  And

18 then there were marks along the shank that really abraded the

19 metal, but, again, the source, I could not give you -- there

20 weren't any class characteristics for me to tell you what type

21 of tool might have made that.

22 Q    So why don't we have -- I'm going to have you look at an

23 exhibit, a photo, Number 137.  And are you familiar with that

24 exhibit?

25 A    Yes, sir, I am.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 141 of 209
(720) 384-8078  attrans@sbcglobal.net

1  Q    And how are you familiar with it?

2  A    This was what was photographed by the Special Photo Unit

3  in the laboratory.

4  Q    And is it a fair and accurate depiction of the nail in the

5  tire as you examined it?

6  A    Yes.  What was received in the laboratory, yes, sir.

7         MR. SCHRODER:  Your Honor, the government moves for

8  admission of 137.

9         MR. CURTNER:  No objection.

10        THE COURT:  Will be received.

11     (Plaintiff's Exhibit 137 admitted)

12     (Side conversation)

13 BY MR. SCHRODER:

14 Q    And, Mr. Mills, maybe Ms. Dixon could enlarge that a

15 little.  But I'd like you to point out some of those things

16 that you just discussed.

17 A    Yes, sir.

18 Q    And I think there's a laser pointer up there in front of

19 you.  All right.  So if you could -- let's talk first about the

20 mark you said that indicated a tool strike, a -- an automatic

21 nailer strike?

22 A    There was an arc coming across back up over here, and

23 there was the faint outline coming in.  It was not a complete

24 circle, as you would expect to see.  There are nailguns that

25 have different types of pistons.  You could have a -- a full

1 circle, half-circle, a crescent moon circle.  And so all I

2 could tell you is, is that it's consistent with, basically, a

3 piston-driven, but I couldn't tell you the actual size or shape

4 of the piston head.

5      There was a score mark that runs across this direction,

6 and I can't tell you the source of it.  There were really no

7 toolmarks or class characteristics that were left.  And there

8 were some abrasion marks along this edge right here.  Again, I

9 couldn't tell you what the source was.  They were uniform,

10 coming across the surface.

11 Q   Okay.  Now, when I look at those abrasions I see silver

12 metal versus another color.  Does that indicate, you know, any

13 kind of timing freshness of those marks?

14 A   Usually when you -- when you do actually see silver -- and

15 this is just from what we've seen working in the lab, whether

16 something is corroded or not -- you -- you're basically

17 removing any type of protection that a -- a manufacturer might

18 have put on it, or corrosion that has built up over the years.

19 But it -- it is what we call fresh metal.

20 Q   Okay.  And let's go back for just a moment to that score

21 mark you talked about.  Based upon its condition, could you

22 make any determination about how recent it was, whether it was

23 recent or not?

24 A   No, sir, I cannot.

25 Q   Okay.  And another question I wanted to ask you is that --

1  what size of nail is this?

2  A    It's referred to as a 16-penny common nail.  Before the

3  advent of the nailguns that we have today and the newer nails

4  that they're actually using -- they're smaller, the shanks are

5  smaller, the head size are smaller -- these were the ones that

6  normal carpentry work was done, where you just took a regular

7  hammer and nailed away on boards or whatever you were applying

8  it to.

9  Q    So it's a pretty sturdy nail?

10  A    Oh, yes, sir, it's very --

11  Q    And about how long is it?

12  A    If I may check my notes, Your Honor?  I believe this --

13  it's three -- three to three and a half inches for a 16-penny.

14  And the shank diameter is .130, I believe.

15  Q    And that's actually fine, probably, Mr. Mills.  I wasn't

16  looking for exact numbers --

17  A    Oh.

18  Q    -- as much as just to give the jury an idea of the size.

19  Now, again, you had contact with the nail.  From the -- kind of

20  the layman's eye, it appears that surface on the top is a

21  little bit rough.  Is that -- it's not a smooth, shiny surface.

22  Is that common or uncommon for a 16-penny nail?

23  A    Well, it depends on the manufacturer.  Manufacturers, when

24  they actually design nails -- again, it's -- it's a

25  manufacturing process -- they might coat it.  There's different

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 144 of 209

1    types of coating materials.  There's galvanized nails.  This

2    nail had actually been used and there was actually still paint

3    residue or what appeared to be paint residue on the surface.

4    So there -- there's a number of things that could mask anything

5    during that time period.

6    Q    Now, you mentioned bef -- you just mentioned that the nail

7    might have been used before.  Being used, is there anything

8    pretend -- preventing it from being reused?

9    A    No, sir.

10   Q    All right.  Now, you've talked about the marks that you

11   see there.  Give me a moment to check my notes.  Now, does that

12   nailhead -- does it have any marks that would indicate

13   hammering?

14   A    There was nothing that I saw during my examination, sir.

15   There was the marks that I described, the scoring, the

16   abrasions along the edge, down at the 4, 5 o'clock position,

17   and then the outline of what appears to be a piston to me.

18   Those --

19   Q    Okay.

20   A    -- were the only marks that I saw.

21   Q    All right.  And what would a nail look like if it was

22   hammered?

23   A    Well, normally, depending on the size of nails and the

24   type of hammers that are used, it's usually -- the surface

25   is -- is abraded, and if there's any imperfections left on the

1   surface of the hammer, it will transfer to the surface.  Again,

2   harder object versus softer object.

3       So nails that I've seen and personally have examined, when

4   you try and hammer them in, and depending on the type of wood,

5   you usually start abrading the surface.  It could be very fine

6   striations.  If you're using a -- a true -- say, a 20-ounce

7   framing hammer with a diamond head, you're going to leave some

8   very distinctive marks.

9       You can also have different types of nailheads.  They can

10  have a diamond pattern to them, they could have different types

11  of materials.  So it all depends on the individual nail itself.

12  Q    Okay.  But this head did not have that kind of pat -- or

13  this nailhead didn't have that type of pattern?

14  A    No, sir, I didn't see anything that --

15  Q    All right.

16  A    -- looked that way.

17  Q    All right.  Now, you talked about -- you used the word

18  "abrasions."  I mean, if the nail was in a tire and driven on,

19  what would you expect to see on the surface?

20  A    I would expect to see abrasions.  Abrasions, for the field

21  of firearms, toolmarks, is marks that would be generated by,

22  say, something like a sanding process or a grinding process or

23  a filing process.  You're literally just shaving off materials

24  with an abrasive type of material.

25  Q    Now, did you have occasion in this case also to compare

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 146 of 209
(720) 384-8078   attrans@sbcglobal.net

1  that marking to markings made by any actual automatic nailers?

2  A    Yes, sir.  I had four -- actually, it was three nailers

3  and a brad nailer that were submitted to the laboratory, sir.

4  Q    And where were those submitted from?

5  A    From the FBI field office in Anchorage.

6  Q    All right.  And how did you do -- how do you do that

7  comparison?

8  A    For -- the pneumatic nailgun was a Hitachi that was sent

9  in.  I actually measured the -- the throat passage, if you want

10  to, of the nailgun, along with the feed ramp.  That one, I

11  never -- I did not have to test fire, because it would have

12  basically -- you couldn't do a comparison because it would be

13  like shooting a .22 out of a .38.  It was just different sizes.

14      The next two nailguns were powder actuated.  You take,

15  basically, a blank cartridge, load it into the back.  You can

16  then load up a nail inside of it, and then you fire it.  One of

17  them was a low velocity, which would be just piston driven.

18  It's more of what had -- the process has gone through since the

19  evolution of the nailgun from the '40s.  The older version was

20  just a true powder-actuated.  They would -- you could regulate

21  how much force was put upon the nail or spike or whatever

22  you're driving by the amount of powder, so they had color

23  coding on that one.  But on that one there would be no

24  toolmarks that would transfer to the surface because there was

25  no harder object.  It's literally just gas pressure that was

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 147 of 209
(720) 384-8078  attrans@sbcglobal.net

1 slamming into the back end of it.

2 Q   So there was -- you basically didn't have anything to

3 compare, at least for this size of nail?  Or did you say one of

4 them you could compare?

5 A   One of them I could compare.  The -- it was a Hilty

6 powder-actuated gun.  It had a piston to it.  The class

7 characteristics were different.

8 Q   Okay.

9 A   And then for the other powder-actuated gun, which was a

10 Jobmaster, there was no piston, so I couldn't really -- there

11 was nothing to actually compare to for a toolmark exam.

12 Q   Now, you talked a moment ago about there being marks --

13 some marks along the shaft.  And we might be able to put that

14 on the overhead and -- yeah, let's try that and see if it

15 works.

16 A   If you could focus that on that area right there.

17        THE CLERK:  And what exhibit is that, Mr. Schroder?

18        MR. SCHRODER:  This is the one we just admitted.

19        THE CLERK:  Okay.

20        MR. SCHRODER:  225, (indiscernible).

21 BY MR. SCHRODER:

22 Q   Does that help, Mr. Mills?

23 A   Yes, sir.

24 Q   All right.  I'm going to have to hold and try to read my

25 notes at the same time.

1      (Side conversation)

2  Q    So what -- where are the marks you observed on the shaft

3  that you noticed and you've talked about?

4  A    Right here, along the shank.  Right here, where you see

5  the -- the silvery metal.  There's a groove on this side and

6  directly opposite on the other side.

7  Q    And were you able to come to a conclusion about those

8  marks?

9  A    No, sir, I couldn't tell you the source of those.

10  Q    All right, thank you.  Now, you -- a moment ago you talked

11  about the other markings you had identified on the head of the

12  nail, the --

13      (Side conversation)

14  Q    Let me ask you one -- another question, though, from your

15  original examination while Kim's doing that.  Was the head of

16  the nail above or below the tread line of the --

17      (Side conversation)

18  Q    When you found it, was the head of the nail above or below

19  the tread line of the tire?

20  A    When I received it in the laboratory, it was below the

21  tread line, sir.

22  Q    So now, again, blow that -- if we could have that enlarged

23  just -- again.

24      (Side conversation)

25  Q    And I want to kind of walk back through the other marks

Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 149 of 209

1   that you've talked about.

2       (Side conversation)

3   Q   So we have the circular mark.  We have the -- this

4   abrasion -- or not abrasion.  What'd you call this along the

5   bottom?

6   A   Yes, sir, it was abraded and --

7   Q   Abrasion.

8   A   -- the -- the striations were going at about a 45-degree

9   to the surface of the edge.

10  Q   Forty-five-degree down?

11  A   Yes, sir.

12  Q   Okay.  So is that indicative of any way of striking that

13  nail?  Can you come to that conclusion or not?

14  A   No, sir, I could not.  There were -- it was not the same

15  class characteristics that you would normally expect to see

16  from a hammer.

17  Q   Okay.  And how about this striation across the middle?  Is

18  that indicative of any kind of strike of that nail?

19  A   No, sir.  Not that I could see.

20  Q   So what is the only mark on the head of that that's

21  indicative of the strike of that nail?

22  A   That I could see, would just be the part up here, where

23  you have an arc coming across over here, and then the other

24  portion that was back up over here.

25  Q   Okay.  And, again, what is your conclusion of what made

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 150 of 209

1 that mark?

2 A    It's consistent with a -- a piston type application,

3 whether it be pneumatic or powder actuated, of a nailgun.

4         MR. SCHRODER:  No further questions. Your Honor.

5         THE COURT:  Cross-examination.

6                     **CROSS-EXAMINATION**

7 BY MR. CURTNER:

8 Q    Mr. Mills, how many firearm and toolmark reports did you

9 complete in this case?  Do you know?

10 A    Either it was 10 or 12, sir.

11 Q    Ten or twelve different reports?

12 A    Well, submissions that we had.  Some of them were

13 combination reports.  But there were 10 or 12 submissions that

14 I reported out on.

15 Q    Okay.  So the first one was in October of 2012, and that

16 was the clothes you talked about?

17 A    Yes, sir.

18 Q    And at that time you were looking for gun residue on the

19 clothing of the two victims.  Is that correct?

20 A    The gunshot residue, yes, sir.

21 Q    So as you explained, when a bullet is fired through

22 clothing, it can leave gun residue, gunshot residue?

23 A    It'll -- it'll leave -- whether you have the -- there's

24 several things that come out.  When a -- a firearm is fired,

25 the bullet's not the only thing that will come out of the

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 744  Filed 09/23/14  Page 151 of 209

1    barrel.  You also have hot gases, vaporous lead, particulate

2    lead, and then you can have partially burnt and unburnt

3    gunpowder, and it travels in a cloud.  So if that is close

4    enough to a garment, it will adhere to it in a pattern.  And

5    then when the bullet passes through itself, any lead residue

6    that's left on the surface will usually leave what we call

7    bullet wipe.  It's just a ring around the hole.  So those are

8    the residues that I was testing for.

9    Q    Okay.  The other residues you explained, could that be on

10   the clothing of the person who shot the gun --

11   A    It --

12   Q    -- or on their hand or anyplace?

13   A    Normally, the only time we ever see on a -- an individual

14   who has fired a gun is if they -- say, a -- a sweatshirt,

15   someone tucked it inside of it, and you have the discharge

16   being absorbed by that clothing.  Normally, the hand is too far

17   away and everything is going beyond the barrel, so you normally

18   don't see anything back on a subject's clothes.

19   Q    But you could, and you could at least test for that,

20   couldn't you?

21   A    The bureau -- the -- if you're talking about the gunshot

22   residues for the hands, the bureau no longer does that because

23   there's so many different types of cross-contaminants for

24   nitrites.

25   Q    And how about the clothing, like the sleeve or anything

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 152 of 209

1    like that?  Is that something you could test for?

2    A    Our unit does not.  I don't know about the Chemistry Unit,

3    sir.

4    Q    Okay.  You wouldn't do it in your unit yourself?

5    A    No, sir.

6    Q    Okay.  And then the second, I think, report in December

7    2012 was about the trash can.  Is that correct?

8    A    Do you have a date on that one, sir?

9    Q    December 10th, 2012.

10   A    Yes, sir, that sounds correct.

11   Q    Okay.  And then in January 2013, did you do another report

12   when there were a lot of items that were provided to you from

13   an address on Pavloff Circle?  Do you recall that, January

14   11th?

15   A    Is -- is this the one with the cartridges, sir?

16   Q    Yes.  I think that there were about 465 items from the

17   Wells residence that was submitted to you.

18   A    Yes, sir.

19   Q    Okay.  And so all that was submitted to your lab for

20   testing.  And did you test all of it, analyze all of it, or

21   most of it, or --

22   A    No, sir, only -- only the evidence that was submitted to

23   the Firearms, Toolmarks Unit.  The specimen listing, if -- it

24   went from questioned item 21 as -- as far as it went, I believe

25   to Q500, and then K12, which was a Ruger revolver, that was

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 153 of 209
(720) 384-8078  attrans@sbcglobal.net

1   submitted.  But if there were any gaps within the specimen

2   listing, that could have gone to another unit.

3   Q   Okay.  Well, I think if you look at your list, from Q35

4   through Q500, that's all from the Wells residence or from

5   Pavloff Circle?

6   A   Yes, sir, that is correct.

7   Q   Okay.  I think the report you did on February 25th, 2013,

8   that was a -- with one of the nailguns?  Was that correct?

9   A   Is that the one with the --

10  Q   The Hilty.

11  A   -- Hitachi nailgun, sir?

12  Q   I think it was the Hilty.  K24.

13  A   K24.

14  Q   Then I think you said -- did some other nailgun testing in

15  March of 2013.

16  A   Can I see a copy of the lab reports?  I don't have those.

17  You all have -- I just have my notes itself.

18  Q   Yes.  We can just show you -- that would be at -- it'd be

19  Bates stamp 18013.  I'm sorry, no, the -- that's the --

20  that's -- it would be 18045.  Four six, I'm sorry.  That's the

21  cover page.  Your report starts at 18046.

22  A   Yes, sir, this is dated February 25th.  It's the -- the

23  tire, the nail, the Hitachi nailgun, another Hitachi nailgun,

24  and then more than likely, on the second page, through 23, are

25  the stick nails that were provided.

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 154 of 209

1  Q   Okay.  And then so let me go back a little bit.  So when

2  you got the tire, the nail was in it.  Correct?

3  A   That is correct --

4  Q   Is that --

5  A   -- sir, yes.

6  Q   And was it in that type of box or that box when you

7  received it?

8  A   It was in that box, sir.

9  Q   Okay.  When you rem -- and so the nail was still -- and

10 you removed the nail.

11 A   That is correct, sir.

12 Q   And so you removed it by pushing it out from the inside?

13 A   That is correct, sir.

14 Q   And you would not have modified that nail in any way by

15 doing that?

16 A   No, sir, because I wasn't touching the head or the shank.

17 Q   Okay.

18 A   I was pushing on the back side, at the tip of the nail,

19 with a two-by-four.

20 Q   So you wouldn't have bent the nail?

21 A   No, sir, the nail was already bent.

22 Q   Okay.  And you wouldn't have modified the tip of it at

23 all?

24 A   I didn't examine the tip.  But, no, sir, the tip was

25 already bent.  That's why I used a softer material than the

Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 155 of 209

1  nail itself.

2  Q    So the tip was already bent and the nail was already

3  bent --

4  A    That is correct.

5  Q    -- when you observed it.  Do you know what processing or

6  testing was done on that nail and tire before you received it?

7  A    I do know it went to some type of tire testing center, is

8  all I know.  I do know it was examined before I received it.

9  Q    Now, so it's your testimony that that nail at some point

10  had been hit with a nailgun?

11  A    At some point, yes, sir.

12  Q    You don't know when?

13  A    No, sir.

14  Q    Or where?

15  A    No, sir.

16  Q    Now, I understand you probably look at a lot more firearms

17  and firing pins than nailguns, but is there a way to examine or

18  check different type of nailguns to match it with that

19  particular nail?

20  A    The problem is, we didn't have the full class

21  characteristics.  It was just a partial arc in two different

22  locations.  So I couldn't tell you if it was a full piston or a

23  half-piston, or even a crescent moon type piston.  There are

24  different types of manufacturers.  Plus, there's really not a

25  database on nailheads, because there have been so many

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 156 of 209

1    different types of manufacturers.  We don't normally see them

2    in any type of criminal case.

3    Q    Okay.  So it doesn't sound like that's something that

4    would be very practical to try to -- I mean, to match, because

5    you do that on cartridges, all the time, right?  Trying to

6    match it to a firing -- a firearm?

7    A    To a gun, yes, sir.

8           MR. CURTNER:  Just a minute, Your Honor.

9    BY MR. CURTNER:

10   Q    Okay, in the beginning of your testimony I think you

11   testified about some Winchester cartridges?

12   A    Yes, sir.

13   Q    Are those pretty common?  The one -- the type of cartridge

14   you identified, or --

15   A    Are you talking about this specific brand or the --

16   Q    Yes --

17   A    -- make?

18   Q    -- Winchester.

19   A    Winchester is one of the top three, yes, sir.

20   Q    And is it something you can buy at Wal-Mart?

21   A    You could buy it -- any -- anybody, basically, who sells

22   ammunition, yes.

23   Q    Okay.  And is -- it's a fairly common type of ammunition

24   for .44 cartridges.  Is that correct?

25   A    That is correct, yes, sir.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 157 of 209
(720) 384-8078  attrans@sbcglobal.net

MILLS - REDIRECT

1  Q    Okay.  That's all, thank you.

2         THE COURT:  Redirect.

3         MR. SCHRODER:  Just one, Your Honor.

4                    **REDIRECT EXAMINATION**

5  BY MR. SCHRODER:

6  Q    Mr. Curtner asked you about firing -- gunshot residue

7  getting on the clothes of someone who was firing a weapon?

8  A    That is correct.

9  Q    So -- and I don't know that I'm looking for a quantitative

10  number from you.  But assuming it's not somebody who fires it

11  out of the pocket of a hoodie, somebody firing a gun in a

12  normal manner, what's the likelihood that you would find any

13  gunshot residue on the shooter's clothing?

14  A    I -- that's way outside my area of expertise.  I would

15  assume that if there was a viable test, that we would be

16  conducting those.  But to date, no.

17  Q    But the FBI does not conduct any kind of -- any -- does

18  not conduct that test?

19  A    No, sir.  There are very few labs that still do.

20  Q    Okay.  Thank you.

21         THE COURT:  Recross.

22         MR. CURTNER:  No, thank you.

23         THE COURT:  Thank you.  You're excused, sir.

24         THE WITNESS:  Thank you, sir.

25         (Witness excused)

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net

1     THE COURT:  Next -- government's next witness.

2     MS. LOEFFLER:  The United States calls Aaron Woods to

3  the stand.

4     MR. OFFENBECHER:  Your Honor, can we approach at

5  sidebar for just a minute?

6     THE COURT:  Okay, sir, you can just remain -- the jury

7  box --

8     (At sidebar with the Court and counsel)

9     MR. OFFENBECHER:  Your Honor, I understand from counsel

10  that they're going to attempt to introduce through this witness

11  a video dramatization that they've done with some agents

12  driving in cars around the scene.  And we just got it last

13  night at about 8:30 and took a look at it.  But it essentially

14  involves two cars kind of driving from the direction of T2,

15  down the airport, people getting out of one car, getting in

16  another car, and then driving.  So it's kind of a dramatization

17  or reenactment.  And we do object to that.  It's not a

18  reenactment, really, because it's really just their theory of

19  the case.  There's no evidence that actually happened, but

20  they've tried to articulate that they're in the case by having

21  actors kind of act it out and then taking video of it.  And we

22  object to that.  It's simply a dramatization of their theory.

23  The jury doesn't need any video for that.  I can imagine that

24  (indiscernible), and so --

25     MS. LOEFFLER:  That's actually -- Your Honor, let me

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 159 of 209
(720) 384-8078  attrans@sbcglobal.net

1  tell you what it actually is.  It's not a bunch of people.

2  Special Agent Woods -- one of the things he calculated was the

3  time it takes --

4          THE COURT:  That's the witness we have now?

5          MS. LOEFFLER:  Yes.

6          THE COURT:  Okay.

7          MS. LOEFFLER:  What he did is he -- the part that we

8  were showing is him driving his car to exactly where we found

9  Nancy Wells' car, getting out into another car, getting back

10 and driving out.  And he's going to testify of the time that it

11 took him to do that.  Now --

12         MR. OFFENBECHER:  (Indiscernible).

13         MS. LOEFFLER:  -- all -- that's all he's -- that's all

14 that's on it.

15         MR. OFFENBECHER:  (Indiscernible) --

16         MS. LOEFFLER:  It's a vide --

17         MR. OFFENBECHER:  -- testified how long it takes to

18 drive to the airport, get out of the car, get into another car,

19 and drive someplace else.  Having the -- reenact -- having a

20 dramatization of it on video makes it act like it really

21 happened and it puts in the jury's mind that it really

22 happened.  We might as well -- you know, we can -- if that --

23 that's going to come in, we can do a video reenactment, a

24 dramatization of what we think happened, somebody --

25         THE COURT:  Okay.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 744  Filed 09/23/14  Page 160 of 209

1     MR. OFFENBECHER:  -- drove in from the north --

2     MS. LOEFFLER:  Isn't that --

3     MR. OFFENBECHER:  -- parked behind the building, got

4  out --

5     THE COURT:  (Indiscernible).

6     MS. LOEFFLER:  Your Honor, he's not claiming --

7     THE COURT:  It -- it's (indiscernible) he's telling you

8  what he thinks happened.  If --

9     MS. LOEFFLER:  Okay.  Yes.

10     THE COURT:  -- someone parked in the (indiscernible) --

11  what?

12     MS. LOEFFLER:  Okay.  He's not pretending

13  (indiscernible) -- you know, we just had, if I counted, four or

14  five pictures of the same door introduced.  Instead of doing a

15  picture, "I drove here, I drove here," it's a very short clip

16  of saying, "Here's what I did."  The car that he's climbing

17  into, by the way, is not a blue CR-V.

18     THE COURT:  Okay, (indiscernible) --

19     MS. LOEFFLER:  He didn't try to make it exactly the

20  same.

21     MR. OFFENBECHER:  (Indiscernible).

22     MS. LOEFFLER:  He's just saying, "Here's how long it

23  takes, let me show you."  It's about a minute and 15 seconds.

24  Because he said, "Here's what I'm doing, I'm driving here."  I

25  don't see any reason why the person can't actually -- it's just

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 744  Filed 09/23/14  Page 161 of 209

1  like a picture, saying --

2          THE COURT:  Okay.

3          MS. LOEFFLER:  -- "Okay, here's exactly what I did."

4  All he's demonstrating is "What I did."  I don't -- why is

5  it -- wait -- why is it any different than introducing four

6  pictures of the same door?

7          MR. OFFENBECHER:  Because that's the real evidence and

8  the real case.  What you have done is taken the theory of what

9  you think happened, although there's no evidence it happened.

10  You've taken actors who are not the real people in cars that

11  are not the real cars.  You've taken a video of it, and parked

12  the car, and you're trying to (indiscernible) -- dramatization

13  is all it is.  And that comes in when -- you know, we'll

14  (indiscernible) do a dramatization of who we think drove down

15  from the ranch and par -- where they parked and go through the

16  whole thing, you know.  It's -- there's no reason why anybody

17  couldn't do that as well.  If that's their theory -- that's our

18  theory.  We can do videos all day long.

19          He can testify to how long it takes to drive from T2

20  down to the airport, if he got out of a car, got in another car

21  and drove.  There's no objection to that.

22          THE COURT:  Okay.

23          MR. OFFENBECHER:  Just the video.

24          MS. LOEFFLER:  I don't think that he should be able to

25  select what evidence we use a -- he didn't, like, dress anybody

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 744  Filed 09/23/14  Page 162 of 209

1  up.  He did not put a car that looked like her car.  It's going

2  to be the exact same --

3      THE COURT:  (Indiscernible) I don't know what's on the

4  tape.  So I'm going to excuse the jury (indiscernible).

5      MS. LOEFFLER:  Okay.

6      THE COURT:  I'll -- and I'll determine whether or not

7  the prejudicial value outweighs the probative.

8      MS. LOEFFLER:  Okay.

9      THE COURT:  Isn't that my job?

10      MS. LOEFFLER:  Absolutely.  We'll --

11      THE COURT:  Okay.

12      MS. LOEFFLER:  -- be happy to give it to you.

13      THE COURT:  Okay.

14  (End of sidebar)

15      THE COURT:  All right.  We'll take a quick recess,

16  ladies and gentlemen.  We don't want to keep you here too long.

17  I've learned my lesson this morning.  It shouldn't be too long.

18  (Jury not present)

19      THE COURT:  Okay.  Please be seated.  The jury -- the

20  jury's gone.  We're going to dis -- have a quick display of

21  what you propose to do so I can evaluate its appropriateness.

22  While we're setting it up, let me address another issue, okay,

23  that I forgot to.

24      Juror number 3 indicated that she was aware of the ACS

25  records custodian.  Is that a concern for the government?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 744  Filed 09/23/14  Page 163 of 209

1    MS. LOEFFLER:  It is not, Your Honor.

2    THE COURT:  Is that a concern for the defendant?

3    MR. CURTNER:  No, Your Honor.

4    THE COURT:  And -- so is it -- Mr. Wells, is that a

5    concern for you?

6    THE DEFENDANT:  No, Your Honor.

7    THE COURT:  So as far as everyone is concerned, that

8    juror can remain as a juror?  Is that right?  From the

9    government?

10   MS. LOEFFLER:  Yes, Your Honor.

11   THE COURT:  Is that right, from the defendant?

12   MR. CURTNER:  Yes, Your Honor.

13   THE COURT:  Is that right, Mr. Wells?

14   THE DEFENDANT:  Yes, sir.

15   THE COURT:  Okay.  I agree.  I mean, she was literally

16   a records custodian.  So I -- but I want to make sure everyone

17   understands that she will remain as a juror.  She was very

18   candid, very forthright, indicating that was a relative of

19   hers.  But I don't see how that could be prejudicial one way or

20   the other.  The parties apparently agree with me.  Okay, I'm

21   ready to look at this -- you can put it on my stream here.

22      (Side conversation)

23   THE CLERK:  What exhibit number is it?

24   UNIDENTIFIED SPEAKER:  171.

25   THE CLERK:  Thank you.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 744  Filed 09/23/14  Page 164 of 209

1      (Side conversation; pause)

2              THE COURT:  That's it?

3              MS. LOEFFLER:  That's it.

4              THE COURT:  Okay.  I think it's con -- it can be used.

5      It's not -- it dem -- it apparently is being offered to

6      demonstrate the witness's testimony.  It's not unduly

7      prejudicial.

8              MR. OFFENBECHER:  All right.

9              THE COURT:  But your objection is preserved for the

10     record.

11             MR. OFFENBECHER:  Right.  Your Honor, I would also

12     object on the grounds that it's not -- it's obviously not the

13     same conditions as when this event is alleged to have occurred.

14     It's in the afternoon sometime, it's a clear day without any

15     clouds.  And it looks like to me in the afternoon rather than

16     the morning.  We have no when idea it was done, although it

17     suggests that it was done very recently, and perhaps not at the

18     same time.

19             The person who drives this drives a -- the wrong way on

20     a one-way street in order to park the car.  There's simply no

21     evidence from which to come to the conclusion that --

22     apparently their suggestion is that Mr. Wells drove the wrong

23     way on a one-way street.  They've simply made that up out of

24     whole cloth.

25             This is a dramatization of their theory of the case,

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 165 of 209

1  and as I've indicated to the Court, I mean, that's -- if they
2  can dramatize their theory with a video, then it seems to be
3  the defense ought to be able to dramatize their theory of the
4  video as well.

5       THE COURT:  I don't know if I disagree with that.

6       MR. OFFENBECHER:  Yeah.  And in addition, Your Honor,
7  we don't know how fast the car was going.  It looks like it was
8  speeding, which suggests the -- I mean, we just have -- they're
9  just making that part up of how fast the car was going.
10 There -- there's no way to judge, even if their theory was
11 correct, how fast.  So it looks like kind of a getaway run.
12 And there -- there's just no way to determine, because it's
13 made -- it's their theory that they're dramatizing.  They're
14 just trying to input -- implant that in the jury's mind.

15      And it is more prejudicial, because -- and the other
16 thing is this.  It's not something that's outside the ken of
17 the jury to know.  The jury -- you know, they've got their
18 theory of the case.  Their theory of the case is that Mr. Wells
19 was in his wife's car; he drove to the airport; he switched
20 cars; and then he drove home.  That's their whole theory of the
21 case.  Jurors don't need a video to understand that.  This is
22 not some obscure scientific principle or some weird science
23 that they need the agent to show them on video.

24      Everybody in the jury can understand that.  You go, you
25 get out of a -- you park the car, you get out of the car, you

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 744  Filed 09/23/14  Page 166 of 209

 1  get another car, you drive home.  That's the whole deal.

 2  There's nothing particularly peculiar about that theory of the

 3  case, and so doing a dramatization of this lends undue

 4  credibility to the government's theory of the case, and the

 5  Court ought to exclude it under 403.

 6      THE COURT:  Your response.

 7      MS. LOEFFLER:  Okay.  Do you want a response?  I --

 8  okay.

 9      THE COURT:  Might as well.

10      MS. LOEFFLER:  Okay.  Well, I didn't know -- because I

11  thought you'd ruled, Judge, and I'll go --

12      THE COURT:  I have, but --

13      MS. LOEFFLER:  -- on -- let me go back.

14      THE COURT:  -- you know, we're making a record.

15      MS. LOEFFLER:  It's -- first of all, I don't -- I mean,

16  I know he wants to cross-examine and it was speeding and

17  everything, but, in fact, that's not the case.  It's not true,

18  it's not --

19      THE COURT:  I presume that's -- that foundation is

20  going to be laid in that regard.

21      MS. LOEFFLER:  Yeah, the foundation's going to be laid

22  of exactly what he was doing.  He needs -- he's testifying as

23  to what time it would take to do that, which is perfectly fine.

24  They can cross-examine about this.  And this illustrates, in

25  fact, so that everybody can see, you know, whether -- exactly

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 167 of 209
(720) 384-8078   attrans@sbcglobal.net

1   what he was doing, so that, in fact, you can cross-examine and
2   you can say, "What did you do?"  "I did exactly this."
3        He's going to explain what speed he went, why he did
4   it, where he went, and, in fact, it makes it easier for
5   everybody.  The defense can say, "Oh, you went the wrong way."
6   Good.  We showed them exactly what he did and it is the exact
7   basis for what he's going to say about this.  And it just
8   illustrates exactly, you know, how he's going to say, "This is
9   what I did, this is the method that I did, and I had somebody
10  videotape it so you can see the method that I used and what I'm
11  testifying about."
12       MR. OFFENBECHER:  Your Honor, we have no objection to
13  the agent testifying how long --
14       MS. LOEFFLER:  Well --
15       MR. OFFENBECHER:  -- it takes to drive from T2 to the
16  airport, get out of his car, and drive to Mr. Wells' house.
17  That's going to come in.  That seems to be a fair thing that
18  the jury doesn't know already.  But to watch somebody get out
19  of the car, jump in another car, is a dramatization.  It has no
20  place in a court of law.
21       THE COURT:  I'm presuming the appropriate foundation
22  will be laid.  It appears that it's being -- it -- it's being
23  presented to demonstrate the witness's testimony.  It's clear
24  that it's not the same time of year.  That's going to have to
25  be cleared up.  It's not to be -- it's -- I wouldn't call it a

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 168 of 209

1    dramatization.  It simply demonstrates the witness's testimony

2    with its pluses and negatives.  It's not -- it doesn't go to

3    the ultimate question.

4         It's -- and the government is entitled to present its

5    case.  Defendant is entitled to present his case.  That's what

6    we're -- that's what we have trials for.  And I've looked at it

7    and I've concluded that it's not unduly prejudicial under the

8    circumstances.  So that's it.  Let's bring the jury back.

9      (Side conversation)

10     (Jury present)

11        THE COURT:  Okay.  Sir, if you'll please be seated, my

12   clerk will swear you in.

13        THE CLERK:  Please raise your right hand.

14        **AARON W. WOODS, PLAINTIFF'S WITNESS, SWORN**

15        THE CLERK:  Thank you.  Please have a seat.  And, sir,

16   if you can please state and spell your full name.

17        THE WITNESS:  Yeah.  My name is Aaron W. Woods.  A-a-r-

18   o-n, W-o-o-d-s.

19        THE CLERK:  Thank you.

20        THE COURT:  All right, counsel.

21        **DIRECT EXAMINATION**

22   BY MS. LOEFFLER:

23   Q    Special Agent Woods, who do you work for?

24   A    I work for Coast Guard Investigative Service, ma'am.

25   Q    How long have you been in the Coast Guard Investigative

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 169 of 209
(720) 384-8078  attrans@sbcglobal.net

1  Service?

2  A    I'm going on my ninth year.

3  Q    Okay.  What is the Coast Guard Investigative Service?

4  A    Coast Guard Investigative Service is the criminal arm of

5  the Coast Guard.  We conduct criminal investigations on behalf

6  of the United States government for matters that fall under the

7  jurisdiction of the Coast Guard.

8  Q    Now, we've had somebody -- I think previously one from the

9  CGIS.  We've also had people from military police, sometimes

10  called MilPol, for the Coast Guard.  What's the difference with

11  the two organizations?

12  A    Well, CGIS is criminal investigators.  We conduct felony

13  investigations for the Coast Guard.  Military police conducts

14  security and well-being, welfare for the base.  Typically, they

15  do traffic enforcement, misdemeanor type offenses.

16  Q    Okay.  So -- and let me go back into your history.  You

17  said you were in military -- at CGIS for how many years?

18  A    Nine, ma'am.  Yeah.

19  Q    What did you do previously?

20  A    Well, I've been with the Coast Guard for approximately 23

21  years.  Twenty of that, I was a -- a -- a boat operator,

22  maritime law enforcement.  And I also did a four-year stint as

23  a military police in Kodiak.

24  Q    And where are you current -- presently stationed?

25  A    I -- I'm presently the resident agent in charge of their

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 170 of 209

1  Kodiak field office.

2  Q    And how big is the Kodiak field office?

3  A    Two agents.

4  Q    Okay.  And in terms of the rank, who's the number 1 and

5  who's number 2?

6  A    I would be number 1 and Special Agent Sturgis is my

7  partner.

8  Q    Okay.  So he's your partner, but you're actually the boss

9  of this young man over here?

10 A    Yes, ma'am.

11 Q    Okay.  And so while the trial's been going on, you've been

12 holding down the shop in Kodiak?

13 A    Yes.  Yeah.

14 Q    All right.  So at -- oh, you did say that you were with

15 the military police for what years in Kodiak?

16 A    From 1998 to 2002.

17 Q    All right.  And during that time period did you work with

18 Mr. Belisle?

19 A    I did.  I worked for him for three years, approximately.

20 Q    Okay.  And what was the scope of the enforce -- of your

21 enforcement duties when you were with military police?

22 A    I was the watch captain.  I did patrol duties and managed

23 the shift.

24 Q    Okay.  And what type of criminal enforcement duties do you

25 now do now with the Coast Guard Investigative Services, versus

1  what you did with the military police before?

2  A    Yeah, I -- I -- I conduct felony investigations.  I'm also

3  the internal affairs arm for the Coast Guard.  We do everything

4  from homicide investigations to fraud to pollution type cases,

5  Clean Water Act violations, things of that nature.

6  Q    And is there a specific area in Kodiak that you cover?

7  Are there areas where you have jurisdiction and areas where

8  other do -- others do?

9  A    My office is responsible for the entire Kodiak

10 Archipelago, clear out to Dutch Harbor, is our area range,

11 where we go.

12 Q    And I think you mentioned it, but how long have you been

13 living on Kodiak?

14 A    In total, just a little over seven years.

15 Q    Now, on April 12th, 2012, were you on island?  Were you in

16 Kodiak?

17 A    No, ma'am, I was not.

18 Q    Where were you?

19 A    I was -- I was on the east coast, attending to some family

20 business.

21 Q    When did you get back?

22 A    It was -- I believe it was the 22nd of April was when I

23 returned to the island.

24 Q    Okay.  And when you got back from the east coast, did you

25 get involved in the investigation into the murders that had

1  happened while you were gone?

2  A    Yes, ma'am.

3  Q    Okay.  Now, since the murders have happened, have you been

4  to COMMSTA Kodiak?

5  A    Yes, I have.

6  Q    How many times?

7  A    A lot.  I -- I wouldn't even begin to know a number.

8  Q    Okay.  So, now, you're familiar with the T1 and T2

9  buildings at this point?

10  A    Yes.  Yes, I am.

11  Q    Were you before?

12  A    No, I had never been there.

13  Q    Okay.  I guess I'm going to ask you how that could be when

14  you were the C -- one of the two CGIS agents for COM -- for

15  Kodiak?

16  A    Well, the -- the comm station is essentially its own --

17  its own entity, and we just didn't have any calls out there.

18  And when I was with military police, the same.  I never had

19  occasion to have any issues out there.

20  Q    Okay.  Now I want to show you what's been --

21       (Side conversation)

22  Q    I want to show you Exhibit 287.  It's been previously

23  admitted.  Oh.  We keep trying to charge the batteries every

24  chance we get.  Now, on the computer, on 287 -- are you

25  familiar with the military of something called a CAT card?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 173 of 209
(720) 384-8078  attrans@sbcglobal.net

**WOODS - DIRECT**

1  A    Yes, ma'am.  Yes, I am.

2  Q    What's a CAT card?

3  A    It's a company access card.  It's a military ID with a

4  chip in it that you have to insert into a device, a card

5  reader, that allows you access to the computer.

6  Q    Can you see the CAT card in this Exhibit 287?

7  A    I can.  It's sitting on top of the (indiscernible) --

8  Q    You have a pointer in front of you.  Perhaps you can point

9  to it.

10  A    I believe that's it right in --

11  Q    Okay.

12  A    -- that area.

13  Q    And does it appear to have the card in it?  Maybe we can

14  zoom it in a little.

15  A    I can see it there.  It does not have a card in it.

16  Q    Okay.  So that would be the slot you'd have to put one in

17  if you wanted to use your computer?

18  A    Yes, ma'am.

19  Q    Now I want to turn your attention to some items involving

20  the parking lot in the Kodiak Airport.  Are you familiar with

21  the Kodiak Airport area?

22  A    Yes, I am.

23  Q    Okay.  Have you used it both personally and

24  professionally, been involved there?

25  A    Yes, I have.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 174 of 209

1  Q   Okay.  Want to turn your attention to what's been marked

2  as Exhibit 32A.

3      (Side conversation)

4  Q   Can you tell me what that is?

5  A   That is the Kodiak Airport parking lot.

6  Q   It is a photograph that you took?

7  A   No, it is not.

8  Q   Is it a photograph that your partner took?

9  A   That looks like the photo that Special Agent Sturgis took,

10 ma'am, yes.

11 Q   Or were you with him when he took it?

12 A   I was.

13 Q   Okay.  Now, in this photograph it is not in the same

14 condition as it was at the time of the murder was -- is it?

15 A   No, it is not.

16 Q   Are you able to -- what were you doing in this photograph?

17 A   We were trying to depict the size and scope of the parking

18 lot, the side where the airport terminal rests on as opposed to

19 the side where we discovered the defendant's wife's vehicle.

20 Q   Okay.  And so knowing that this is not at the same time,

21 can you explain the differences of this and then show what

22 you -- why you were taking this photograph?

23 A   Well, the --

24 Q   Or -- I'm sorry, why Mr. Sturgis was taking the

25 photograph.

1   A    Yes.  First of all, the difference is, is that it's --

2   it's blacktop now.  Because during the time of the -- the crime

3   it was under construction.  They had just began construction.

4   It was -- it was dirt.  There was not parking lot dividers in

5   there.

6   Q    Did you take some action when you took this photograph to

7   demonstrate where the car, the blue car had been found, and try

8   to do some actions in this photograph in a series, to show

9   exactly where they were versus the Alaska Airlines?

10  A    Yes, we did.

11  Q    Okay.

12        MS. LOEFFLER:  Okay.  I would move Exhibit 32A.

13        MR. OFFENBECHER:  Could I voir dire for just one second

14  on that?

15        THE COURT:  Yes.

16                        VOIR DIRE

17  BY MR. OFFENBECHER:

18  Q    Special Agent Woods, I think you were describing some of

19  the differences from the way it looks right now, from before.

20  Weren't you?

21  A    Yes, sir.

22  Q    And I think you -- there might have been an interruption

23  when you were describing that.  So you've indicated that it's

24  different now because it was under construction then.  Right?

25  A    They -- they had just began the -- the process, yes, sir.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 176 of 209

1    THE COURT:  My -- here's what I'm not clear about.  Is

2  this photo the way it was then or now?

3    THE WITNESS:  It is the way it is now, Your Honor.

4    THE COURT:  Okay.  Go ahead.

5  BY MR. OFFENBECHER:

6  Q   So this is -- this photograph was taken on February 11th,

7  2014.  Right?

8  A   Yes, sir.

9  Q   So -- and what you're saying and what you were saying on

10  direct examination is that it's different from back in April of

11  2012?

12  A   Yes, it's nicer.  Yes, sir.

13  Q   Okay.  It's nicer because, for one thing, it's blacktop

14  now?

15  A   Yes.

16  Q   And back in two thousand --

17    MS. LOEFFLER:  Your Honor, what I'd like to do is have

18  you just either -- I mean, it -- it's different, it's a

19  different time.  I think you can rule whether it comes in or

20  not as opposed to cross-examining on it.  If you don't want it

21  in, that's fine.  But I think now --

22    THE COURT:  Well, just --

23    MS. LOEFFLER:  -- we're just cross-examining.

24    THE COURT:  I mean, it's been authenticated.  He took

25  the pic -- he was there when the picture was taken.  That's

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 177 of 209
(720) 384-8078  attrans@sbcglobal.net

1  what it looks like now.

2       MR. OFFENBECHER:  I just wanted to be able to complete

3  the differences before the jury talks about it.

4       MS. LOEFFLER:  I think -- I thought I made it clear

5  it's not the same time, and that's what -- we're going to talk

6  about what he did.

7       THE COURT:  Okay.  Well, it can come in, and then we

8  can go through the whole thing.  He can explain the

9  differences.

10     (Plaintiff's Exhibit 32A admitted)

11          MS. LOEFFLER:  Okay.

12          THE COURT:  But it's hard for them to understand what

13  we're talking about when all they have is a white -- nothing.

14          MS. LOEFFLER:  Okay.

15          THE WITNESS:  Yes.

16          MS. LOEFFLER:  So is it in so I can --

17          THE COURT:  Yes.

18          MS. LOEFFLER:  -- display -- okay.

19                  **DIRECT EXAMINATION, CONTINUED**

20  BY MS. LOEFFLER:

21  Q    All right.  So, Special Agent Woods, there's a series of

22  photographs.  And you put the date right on it, so -- right?

23  It's very clear it's not taken at the same time as the murder.

24  Right?

25  A    I did not put the date on it, ma'am --

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 178 of 209

1  Q    Oh.

2  A    -- but it is not taking -- taken on the date of the crime,

3  no.

4  Q    Right.  Now, when you and -- when you were with Special

5  Agent Sturgis to do num -- a number of these photos, what were

6  you trying to do?

7  A    We were attempting to show how far away the vehicle was

8  found from the airport terminal itself.

9  Q    Okay.  And has distances changed in the parking lot at

10 all?

11 A    No.

12 Q    Okay.  But there are differences in terms of how the

13 parking lot looks today or when you took this, which is only a

14 couple of months ago, versus what it looked like at the time of

15 the murder?

16 A    Yes, ma'am.

17 Q    Okay.  Now, in terms of showing the distances, did you

18 place an item where the blue car was found in order to be able

19 to show the jury the distance?

20      MR. OFFENBECHER:  Your Honor, I would object, on the

21 grounds that she's leading now.  She can ask him what he did

22 and he can answer.

23 BY MS. LOEFFLER:

24 Q    Okay.  What did you do?

25 A    We placed a orange road cone in the approximate location

Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 179 of 209

1  of where the defendant's wife's vehicle was located the day of

2  the crime.

3  Q    Okay.  And do you have a -- this one's a little hard to

4  see, but in the --

5  A    It is in that -- where'd you go -- there you go.  Right

6  there.

7  Q    Okay.  That's the road cone?

8  A    Yes, that is the road cone, right there.

9  Q    All right.  Now if I can pull up what has been marked but

10 not admitted as Exhibit 32C.

11     (Side conversation)

12 Q    And what is this?

13 A    That is a closer -- a midrange image of the same road

14 cone.

15 Q    And was that taken at the same time?

16 A    Yes.

17 Q    Okay.  So it's also not at -- on April 12th, 2014?

18 A    No, it is not.

19 Q    I'm sorry, 2012.

20 A    Or, I'm sorry, 2012.

21 Q    Now I'm getting the dates moved up.  Okay.

22     MS. LOEFFLER:  I would move Exhibit 32C.

23     MR. OFFENBECHER:  Same comment, Your Honor.

24     THE COURT:  Can come in.  It's clearly not intended to

25 depict things on April 12th.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 180 of 209

1    (Plaintiff's Exhibit 32C admitted)

2  BY MS. LOEFFLER:

3  Q    All right.  So in this picture, what are we looking at?

4  A    Again, that is the midrange shot, closer image of the same

5  road cone, which is located right there.

6  Q    And where were -- where was the shot being taken from?

7  A    In the middle of the parking lot, essentially.

8  Q    Okay.  Let's look at Exhibit 32E, which has also not been

9  admitted.  And what is this photo showing?

10  A    That is an image of an -- a -- taken from the road cone in

11  the direction of the airport terminal.

12  Q    And when you say the airport terminal, what airline

13  terminal is that?

14  A    Alaska Airlines.

15        MS. LOEFFLER:  Okay.  I'd move 32E.

16        THE COURT:  It'll be admitted.

17        MR. OFFENBECHER:  Sa -- yeah.

18    (Plaintiff's Exhibit 32E admitted)

19    (Side conversation)

20  BY MS. LOEFFLER:

21  Q    All right.  So can you point with your pointer where the

22  entrance to the passenger terminal is for Alaska Airlines?

23  A    Yes, ma'am.  It is right there.  You can just see the top

24  of the door.

25  Q    All right.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 181 of 209

1  A    That's one side.  There's a -- on the opposite side

2  there's another entrance.

3  Q    And again, so we're clear, that the distances are the

4  same, but the configuration of the parking lot's a little

5  different when you took these?  Oh, and I'm sorry, when Special

6  Agent Sturgis took them.

7  A    Yes.

8  Q    And what is the differences in terms of what the parking

9  lot looks like versus what it looked like in April of 2012?

10 A    It has blacktop.

11 Q    Okay.  What about the curves?

12 A    And -- and the -- and the parking lot dividers.  The curbs

13 are in there.  They were not at the time.

14 Q    Let me show you what's been admitted as Exhibit 103.  Now,

15 where you -- where the cone was in the picture we just looked

16 at, where was that in relation to this photo?

17 A    We -- using a -- more images than just one, we used

18 several images of the same profile of the vehicle to try to

19 replicate the location of where that -- where that vehicle was.

20 Q    Okay.  And again, so this one is taken in 2012 and shows

21 you the gravel and all?

22 A    Yes, ma'am.

23 Q    Versus the blacktop?

24 A    Yes.

25 Q    Now I want to turn to Exhibit -- what's been admitted as

1  Exhibit 51.  And Exhibit 51, what is that, Special Agent Woods?

2  A    That is an aerial of the Kodiak Airport.

3  Q    Okay.  Now, are you familiar with any videocamera that's

4  inside the Alaska Airlines terminal?

5  A    Yes, I am.

6  Q    Where is that camera?

7  A    It is located in the Goldstreak entryway, which is right

8  in there.

9  Q    Okay.  And how far outside of the building does that

10  camera cover?

11  A    That camera covers an angle which extends, essentially,

12  an -- one-eighth of the parking lot.  It cuts right across by

13  this pole and catches the roundabout right there, and catches

14  vehicles as they come around this turn.

15  Q    Okay.  Now if we can zoom back out again.  If you are --

16  this is, again -- is this the parking lot as it was before or

17  as it is now?

18  A    That is as it was before.

19  Q    Okay.  What was the traffic pattern for that parking lot

20  back in 2012?  Using your pointer.

21  A    The traffic pattern, people would enter from Rezanof,

22  coming down Airport Way, drive down this road, either -- and

23  typically come around this -- this road, and then can drop off

24  or you can enter in and park your vehicles in these --

25  Q    Were there --

1  A    -- sections here.

2  Q    -- any signs -- was there any signage at the time saying

3  which way you should go or "One Way" or anything like that?

4  A    No, I -- not in the main parking lot.  I'm -- I do not

5  recall any -- any placarding at that point, no.

6  Q    What was the normal traffic pattern, though?

7  A    Most people would come in and -- and try to follow the

8  pattern as best as they could.  Come down in if they were

9  dropping off.  If they were -- if they were simply parking,

10 they would just pull out and do a path of least resistance and

11 park their vehicles out toward the end.

12 Q    Have you seen people do that?

13 A    Yes, I have.

14 Q    Have you done it?

15 A    Yes, I have.

16        MR. OFFENBECHER:  Objection.  She's leading the

17 witness.

18        MS. LOEFFLER:  I don't think so.

19        THE COURT:  Sustained.

20        MS. LOEFFLER:  Okay.

21        THE COURT:  Well, I'm not sure that was leading, but --

22        MS. LOEFFLER:  I don't think so.

23        THE COURT:  -- anyhow --

24        MS. LOEFFLER:  May I ask whether he's ever done it?

25        THE COURT:  You already asked him that.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 184 of 209

1          MS. LOEFFLER:  Okay.

2          THE COURT:  And did you answer?  He answered.

3          THE WITNESS:  I started to, Ju -- I -- yes, I answered.

4          THE COURT:  Okay.

5          MS. LOEFFLER:  Okay.

6          THE COURT:  The answer was "Yes," right?

7          THE WITNESS:  It was -- it was "Yes."

8          THE COURT:  Okay.

9   BY MS. LOEFFLER:

10  Q    Now, Special Agent Woods, did you in this -- as part of

11  this case, at any time attempt to drive the route from Mr.

12  Wells' house to COMMSTA?

13  A    Yes.  Yes, I have.

14  Q    Did you do any efforts to time what time it would take to

15  drive from his house to COMMSTA?

16  A    Yes, we did.

17  Q    Can you -- how many times --

18  A    Yes, I did.  I'm sorry.

19  Q    -- did you do that?

20  A    I -- I did it multiple times.  Probably -- probably

21  between six and twelve times.

22  Q    Did you redo it recently, in essence, in preparation for

23  testifying here?

24  A    Yes, I did.

25  Q    When did you redo it?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 185 of 209
(720) 384-8078   attrans@sbcglobal.net

1  A    I did it on the 24th of March.

2  Q    Okay.  Which would be, by time of year, how many days

3  before April 12th?  I mean, it's -- I'm not talking about 2012.

4  I'm just going to ask you the -- is March 24th somewhat near

5  April 12th?

6  A    Yes, it's -- it's close.

7  Q    Okay.  Because we're about at the same time now.

8  A    Yes, ma'am.

9  Q    Now, when you did that, did you also -- let me ask you

10  what you did that --

11  A    The day that I -- that I marked it off on the -- on the

12  24th of March, I started at the bottom of the driveway at

13  Pavloff Circle, which is in Bells Flats, which is the

14  defendant's residence, and I drove from there to the state

15  airport.  I entered the state airport.  I simulated changing

16  vehicles and then drove from the state airport to building T2

17  at COMMSTA Kodiak.

18  Q    Okay.  Now, I'm going to put up the -- do we have the

19  posterboard map so we can -- if we could put that up on the

20  easel.  Do we have the -- yeah.  Yes, map, please.

21       (Side conversation)

22  Q    Could you not -- we showed it only in opening, so I can

23  show it -- if you will show it to the jury -- to Mr. Woods

24  without showing it to the jury, please.  We showed it --

25            THE CLERK:  What exhibit number is this?

**WOODS - DIRECT**

1  BY MS. LOEFFLER:

2  Q    Can you describe what that is?

3  A    It is -- it's a map of the Kodiak road system, covering

4  Bells Flats out to -- including Buskin Lake.

5           THE COURT:  Exhibit number?

6           MS. LOEFFLER:  I'm sorry, Your Honor.  I'm looking --

7           THE COURT:  I can't see it.  It's --

8           MS. LOEFFLER:  -- for the exhibit number I have in --

9           THE COURT:  -- right at the corner.

10          THE WITNESS:  73.

11          THE COURT:  73.

12          MS. LOEFFLER:  Exhibit number 73.  And I believe that

13  has not been admitted.

14      (Side conversation)

15  BY MS. LOEFFLER:

16  Q    Would that be useful in illustrating your testimony as

17  where you went and what you did?

18  A    Yes, ma'am.

19          MS. LOEFFLER:  Your Honor, I would like to use it as a

20  demonstrative exhibit for this witness.  I don't need to move

21  it in, but I do want to show it so he can demonstrate his

22  testimony.

23          MR. OFFENBECHER:  No objection.

24          THE COURT:  That's fine.

25          MS. LOEFFLER:  All right, let's turn it around, then.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 187 of 209

1       (Side conversation)

2           MS. LOEFFLER:  I'm not admitting it, I'm using it as a

3   demonstrative exhibit.  The jury has seen it in the opening,

4   but --

5       (Side conversation)

6           MS. LOEFFLER:  Well, if the defense has no objection,

7   I'll move it -- I'll move Exhibit 73 in.  Makes it easier.

8           MR. OFFENBECHER:  You were going to use it as

9   demonstrative exhibit?

10          MS. LOEFFLER:  Uh-huh (affirmative).

11          MR. OFFENBECHER:  Okay.

12          THE COURT:  Oh, you're not --

13          MS. LOEFFLER:  I --

14          THE COURT:  -- communicating.

15          MR. OFFENBECHER:  Yeah.

16          THE COURT:  She's moving it into evidence.  Do you

17  object or not?

18          MR. OFFENBECHER:   No objection, Your Honor.

19          THE COURT:  It'll be received.

20      (Plaintiff's Exhibit 73 admitted)

21          MS. LOEFFLER:  Okay.  Thank you.

22      (Side conversation)

23          MS. LOEFFLER:  I'm sorry, I thought we -- I thought

24  this was the only way we can do this.  All right.  We'll put

25  that up.  All right.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 188 of 209
(720) 384-8078  attrans@sbcglobal.net

1  BY MS. LOEFFLER:

2  Q    So, Special Agent Woods, can you explain, using the map

3  and a pointer, where you drove?  And this is on March 24th?

4  A    Yes, ma'am.

5  Q    Okay.

6  A    Starting in this location at the Wells residence, I drove

7  down this road onto Rezanof, toward the direction of the base,

8  passing the base and entering the state airport here.  I

9  simulated changing vehicles, left the airport, and completed

10  the drive out to building T2 at COMMSTA Kodiak.

11  Q    And did you record the time that it took you to do that?

12  And I don't want to get to that yet, but did you --

13  A    Yes, I did.

14  Q    What speed limits did you -- or did you make any effort to

15  coordinate it with certain speed limits?

16  A    Yes.  I followed the posted speed limits.  In the section

17  in Bells Flats there is no posted speed limit, so I did that at

18  30 miles an hour.

19  Q    Okay.  Now, the day that you did this, what time of day

20  did you do it?

21  A    Believe it was 10 minutes to 9, approximately, in the

22  morning, 9 a.m.

23  Q    Okay.  And you drove from Bells Flats toward the COMMSTA?

24  A    Yes, I did.

25  Q    Now, at 7 -- let's say between 7 and 8 in the morning on a

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 189 of 209

1  normal workday, which way does the traffic pattern go?

2  A   7 and 8 in the morning, the traffic pattern is going from

3  Bells Flats toward the direction of the Coast Guard base.

4  Q   And not from the Coast Guard base back?

5  A   No.

6  Q   Okay.  Now I'm going to show you what's been marked as

7  Exhibit 53 -- or admitted as Exhibit 53.  Can you with your

8  pointer show where you started -- or can you recognize Exhibit

9  53?  What is it?

10  A   Yes, I can.  That's a -- that's an image depicting the

11  driveway of the Wells residence from the -- from the dwelling.

12  Q   Okay.  Where did you start your timing?

13  A   I -- I began right where the Alaska State Trooper vehicle

14  is parked, right there.  That's where I started my time.

15  Q   Okay.  So you didn't drive up the driveway all the way to

16  the --

17  A   No, I did not.

18  Q   All right.  Now, what were the road conditions on the day

19  that you did this drive?

20  A   They were -- they were nice.  They were dry, pleasant road

21  conditions.

22  Q   Have you reviewed the -- all -- a lot of photographs in

23  this case?  Are you able to say what the conditions looked like

24  on April 12th of 2012?

25  A   The -- the images that I saw from April 12 were relatively

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net

1  acceptable driving conditions.

2  Q    Now I also want to show you what's been admitted as

3  Exhibit 390.  And I'm just going to put it on the overhead.

4      (Side conversation)

5  Q    Have you reviewed the video evidence in this case from the

6  COMMSTA cameras T1 and T2 a number of times?

7  A    Yes, ma'am.  Yes.

8  Q    Okay.  On Exhibit 390 there is a mark -- I'm sorry, get my

9  pen to the right place -- showing that at 7:14:32 -- excuse

10 me -- a blue SUV exits toward Rezanof on the T1 camera?  Are

11 you familiar with at least -- that has been identified by

12 anybody.  You know what car we're talking about?

13 A    Yes, ma'am.

14 Q    Okay.  And so if you -- if -- at 7:14:32, there was that

15 car.  Let me ask you, when you did the drive at the speed limit

16 along the way, you said that you turned into the airport in

17 addition to just driving the regular road.

18 A    Yes, I did.

19 Q    And what were you trying to simulate when you did that?

20 What were you trying to calculate?  Sorry.

21 A    I was -- I was trying to calculate the time that it would

22 take to drive from Mr. Wells's residence to the airport, change

23 vehicles, and then drive to the COMMSTA and building T2.

24 Q    And did you do a video clip of the part into the airport?

25 A    Yes, I did.

1  Q    And what was the purpose of doing that?

2  A    The purpose was to -- was to show how one -- if you wanted

3  to, how you could circumvent the video at the -- bless you --

4  at the Alaska Airlines terminal.

5          MR. OFFENBECHER:  Your Honor, I would object again, for

6  the same reasons that I've stated before, before the Court.

7  This is purely conjecture on the part of the witness.

8          THE CLERK:  Mr. Offenbecher, kind of pull the

9  microphone.  I'm having --

10         MR. OFFENBECHER:  Oh.

11         THE CLERK:  -- a hard time hearing you.

12         THE COURT:  Okay, go ahead.  I'm thinking.

13         MS. LOEFFLER:  I would now move Exhibit -- okay.  I

14  would now move Exhibit 171.  I think the Court's already ruled,

15  so it --

16         THE COURT:  Is this the video that was --

17         MS. LOEFFLER:  Yes.

18         THE COURT:  Ladies and gentlemen, this video is

19  presented solely to demonstrate defendant's [sic] testimony and

20  for no other purpose.  I can't say it any clearer than that.

21  He's testified as to what he did.  Apparently he timed some

22  things.  This is to demonstrate what he did and to explain his

23  testimony.  But for no other purpose.  Clear?  Okay.

24      (Plaintiff's Exhibit 171 admitted)

25  BY MS. LOEFFLER:

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 744  Filed 09/23/14  Page 192 of 209

1  Q    Special Agent Woods, what's on the clip?

2  A    The clip is me driving a silver SUV, driving onto Rezanof

3  Drive, entering the Kodiak Airport, parking at that road cone

4  that depicted the approximate location of the vehicle, changing

5  vehicles, and then leaving.

6  Q    Okay.  And with the video, somebody could -- can somebody

7  tell how fast -- or at least get an idea of how fast you drive

8  and what you did and how you changed vehicles, so that they can

9  evaluate whether that's a fair or not fair depiction?

10  A    Could you repeat the question?

11  Q    Yeah.  Let me not ask the question.  I think I'm going to

12  play 171 and then let you describe it.  If we can show 171 now.

13       (Side conversation)

14  A    Would you like me to give a play-by-play or just let it --

15  Q    I would like you to explain what you're doing while we

16  play it, please.

17  A    I --

18       MR. OFFENBECHER:  Your Honor, I -- if we can stop for

19  just one second.  I think the Court might have misspoke when

20  its -- when it gave that --

21       THE COURT:  Yes.

22       MR. OFFENBECHER:  -- curative instruction.  The -- this

23  is merely to evaluate the witness's testimony, not the --

24       THE COURT:  That's what I --

25       MR. OFFENBECHER:  -- defendant's testimony.

1     THE COURT:  I misspoke.  If I said that, I misspoke.

2     MR. OFFENBECHER:  All right.

3     THE COURT:  It's -- he's on the stand, he's testifying.

4  This is giving you a visual impression of what he's saying, but

5  that's it, okay.

6     MS. LOEFFLER:  Special Agent Woods --

7     MR. OFFENBECHER:  Thank you, Your Honor.

8  BY MS. LOEFFLER:

9  Q    -- what we'll do is we'll play it now and you can describe

10  what you're doing --

11  A    Yes, ma'am.

12  Q    -- and where you are.

13  A    Yes.  I'm leaving Anton Larsen Drive and I'm turning right

14  onto Rezanof Drive.

15  Q    So you're driving from the COMMSTA on this?

16  A    I'm driving from the COMMSTA on this video.  I'm -- got my

17  left-turn signal on, I'm entering Airport Way and the state

18  airport.

19  Q    Once you enter the airport, what speed are you driving?

20  A    The posted speed limit is 20 miles an hour, and that is

21  what I was doing.

22     (Side conversation)

23  A    I'm executing a right-hand turn past the streetlight.  And

24  then pulling into the parking lot.

25  Q    Now, the truck that you had there, did you -- there's a

1  cone in front of that truck.  Can you stop for a second?

2  There's a cone in front of that truck.  What's that cone

3  depict?

4  A    That -- that was the same cone that was in the prior

5  images, depicting what is the approximate location where the --

6  the vehicle was parked on April 12th, 2012.

7  Q    Did you pick up the cone and put it back, or was it there

8  the whole time?

9  A    No, it's -- it's not changed location.  We set it up there

10 from that day and it hasn't moved an inch.

11 Q    Okay.  If you can play.  And I'll ask you what you were

12 doing.

13 A    And I'm exiting my one vehicle.  And I'm entering the Ford

14 Explorer.

15 Q    Okay.  Keep going.

16 A    And I'm departing the airport.

17 Q    And then did you drive the Ford Explorer out at the same

18 posted speed limit?

19 A    Yes, I --

20        MR. OFFENBECHER:  Objection.  She's leading the

21 question --

22        MS. LOEFFLER:  What --

23        MR. OFFENBECHER:  -- the witness (indiscernible).

24        MS. LOEFFLER:  -- at what speed did you drive --

25        THE COURT:  Sustained.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 195 of 209

1 BY MS. LOEFFLER:

2 Q    -- the Ford Explorer out, Special Agent Woods?

3 A    It's actually an Expedition.  I misspoke.

4 Q    I'm sorry.

5 A    But it -- 20 miles an hour is the speed limit out, as well

6 as what I drove.

7 Q    That -- we don't need the -- we can stop it now.

8 (Indiscernible) out.  Okay.  Now, when you did -- did you time

9 all parts of that trip?

10 A    Not on that -- not on that trip, ma'am, no.  Well, it --

11 technically, it is timed, because it's on video, because I was

12 not timing it the same way that I did on the -- the day of the

13 24th.

14 Q    The day of the 24th, did you time your whole trip?

15 A    Yes, I did.

16 Q    Okay.  So I'm going to ask you to -- which way did you go

17 on the 24th?

18 A    On the 24th, I drove from Pavloff Circle to the state

19 airport, from the state airport to building T2 at the COMMSTA.

20 Essentially, the exact opposite of what you saw in the video.

21 Q    Okay.  Now, how long did that trip take?

22 A    On the 24th, when I did the -- the -- the entire trip?

23 Q    Hold on a second.  The question -- let me just ask this.

24 Yes, how long did the entire trip take?

25 A    The entire trip, from beginning to end, took me 13

1  minutes, 27 seconds.

2  Q    Did in -- that include the time driving into the airport

3  and switching cars?

4  A    Yes, it did.

5  Q    Okay.  Now I'm going to ask you to do some math

6  calculations.

7  A    Okay.

8  Q    Starting at -- let me get back to Exhibit 390.  Starting

9  at the time that is listed on Exhibit 390 for the small blue --

10  the SUV outbound on the T1 camera is seven four -- at 7:14:32?

11  A    Yes.

12  Q    And if you add -- 7:14:32, and you add the 13 minutes and

13  27 seconds, what do you come up with?

14  A    27:59.

15  Q    Okay.  You mean -- okay, 7:27:59.

16  A    Yes, ma'am, I'm sorry.

17  Q    Okay.  And would that be the time -- well -- okay, let

18  me -- what do you -- what does that time depict?

19       MR. OFFENBECHER:  I -- objection, Your Honor.  I guess

20  I don't really understand what the question is.

21       MS. LOEFFLER:  Okay, then I'll back it -- I'll do it

22  (indiscernible).

23  BY MS. LOEFFLER:

24  Q    So in order to drive from the COMMSTA, if you left at

25  7:14:32, according to your -- what you did --

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 197 of 209

**WOODS - DIRECT**

1  A    Yes.

2  Q    -- and one drove to the airport --

3  A    Yes.

4  Q    -- to the spot where the blue car was found and drove to

5  the base of Mr. Wells' driveway, leaving at 7:14:32 from the

6  COMMSTA, what time would you have arrived, according to your

7  calculations, at the base of Mr. Wells' driveway?

8  A    I would arrive at 7:27:59.

9  Q    Okay.  So one second less than 7:28?

10  A    Yes, ma'am.

11  Q    All right.  Now I want to turn to Exhibit 170, which has

12  previously been admitted.  Just a second.  And this is a --

13  have you listened to the tape of the voicemail left on Mr.

14  Hopkins's voicemail at the COMMSTA?

15  A    Yes, I have.

16  Q    Okay.  And I'd like to play Exhibit 170.

17  02:14:22

18      (Audio played)

19  02:14:39

20      (Side conversation)

21  Q   Are you aware of the time that the phone messages placed

22  from Mr. Wells to the two individuals -- oh, okay, we cut it

23  off before the time was there.  But we don't have to wait --

24      (Side conversation)

25  02:15:02

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 198 of 209

1       (Audio played)

2    02:15:04

3    Q    Okay.  Do you know when the times are?

4    A    Yes, I do.

5    Q    What times are they?

6    A    The first call -- the first voicemail is placed at 7:30.

7    Q    Okay.  And so how many minutes is it after that -- at

8    least according to your calculations, how many minutes would be

9    left to get up the driveway and make the phone call?

10   A    Two minutes.

11   Q    Okay.  I'm going to switch to another area.  Special Agent

12   Woods, were you involved in a search warrant -- did you seize

13   certain items at a search warrant at Mr. Wells' house?

14   A    Yes, I did.

15   Q    I'm going to show you what have been marked as Exhibit

16   215, 222, and 223.  And, Special Agent Allison, if you could

17   just show them to the witness, I'm going to ask him if these

18   are the items that he seized from the house.  (Pause) Is that

19   one of the items you seized?

20   A    That is one of the items I seized, yes.

21   Q    Oh, in -- I'm sorry, what exhibit number was that?

22        UNIDENTIFIED SPEAKER:  215.

23        MS. LOEFFLER:  And would you also show him 222 and 223?

24   I would move Exhibits 215, 222, and 223.

25        MR. OFFENBECHER:  No objection, Your Honor.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 199 of 209
(720) 384-8078   attrans@sbcglobal.net

1    THE COURT:  They'll be received.

2      (Plaintiff's Exhibits 215, 222, and 223 admitted)

3    MS. LOEFFLER:  I don't have anything further.

4    THE COURT:  All right.  Cross-examination.  Okay, so

5  the record is absolutely clear -- thank you for correcting

6  me -- but the video was presented solely to demonstrate the

7  witness's testimony and for no other purpose.  I misstated

8  before, you corrected me, but now it's clear.

9    MR. OFFENBECHER:  Thank you, Your Honor.  I -- I'm sure

10 it was that you just misspoke --

11   THE COURT:  Clear before, but I hate to make those kind

12 of mistakes.

13   MR. OFFENBECHER:  Could this -- would this be a time we

14 could take our afternoon break for just a moment?

15   THE COURT:  Last time you advised me to, I didn't take

16 your advice, and we went almo -- so let's take a 15-minute

17 recess.

18   MR. OFFENBECHER:  Thank you.

19     (Jury not present)

20   THE COURT:  Anything else before we stand in recess?

21   MS. LOEFFLER:  No, not from the government.

22   MR. OFFENBECHER:  No.

23   THE COURT:  Okay.  So we got 15 minutes.

24     (Side conversation)

25   THE CLERK:  Fifteen-minute recess.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 744  Filed 09/23/14  Page 200 of 209

1    (Court recessed at 2:20 p.m., until 2:39 p.m.)

2    (Jury not present)

3         THE CLERK:  All rise.  His Honor the Court, the United

4    States District Court is again in session.

5         THE COURT:  Okay, the jurors are on their way.

6    (Jury present)

7         THE COURT:  Okay, please be seated.  And cross-

8    examination.

9         MR. OFFENBECHER:  Your Honor, we don't have any

10   questions of this witness.

11   (Side conversation)

12        THE COURT:  Well, thank you.  Okay.  We're done for the

13   day.  Is that right?

14        MR. OFFENBECHER:  Yes.

15        MS. LOEFFLER:  Yes, Your Honor.

16        THE COURT:  You see, I made a horrible mistake this

17   morning and gave you too long without a recess.  We're make --

18   it -- we're doing everything we can to make up for that now.

19   We're preparing for a long weekend.  Any objection to that?

20        UNIDENTIFIED JUROR:  No.

21        THE COURT:  Okay.  I'm going to read you -- I've read

22   it to you many times, but I'm going to read it to you again.

23   Let's see, where is it.  We're about to take another break.

24   Remember, until the trial is over, do not discuss the case with

25   anyone, including your fellow jurors, members of your family,

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 744  Filed 09/23/14  Page 201 of 209

1  people involved in the trial, or anyone else, and do not allow

2  others to discuss the case with you.  This includes discussing

3  the case in Internet chat rooms or through Internet blogs,

4  Internet bulletin boards, emails, or text messaging.  If anyone

5  tries to communicate with you about the case, please let me

6  know about it immediately.

7       Do not read, watch, or listen to any news reports or

8  other accounts about the trial or anyone associated with it,

9  including any online information.  Do not do any research such

10  as consulting dictionaries, searching the Internet, or using

11  other reference materials.  And do not make any investigation

12  about the case on your own.  Finally, keep an open mind until

13  all the evidence has been presented and you've heard the

14  arguments of counsel, my instructions on the law, and the views

15  of your fellow jurors.  If you need to speak with me about

16  anything, simply give a signed note to the bailiff to give to

17  me.

18       Now, I know it's tough not reading the newspaper.  I

19  said if you have a spouse, friend, significant other, they can

20  cut out any articles, and you read the rest of the paper.  But

21  just try to avoid it.  I mean, you're the one -- I see the

22  press (indiscernible) up.  You're here all time.  And that's

23  the important thing.

24       Juror number 3, thank you for (indiscernible) us about

25  that witness you know.  We've decided that's not an issue,

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 744  Filed 09/23/14  Page 202 of 209

1 unless it is with you. Is there a problem with that?

2        JUROR NO. 3: No.

3        THE COURT: You're okay with it? Okay. You can still

4 be fair to both sides?

5        JUROR NO. 3: Yes.

6        THE COURT: Okay. Counsel, anything else you want me

7 to advise them before we recess for the weekend? Now, I'll let

8 you know, we're coming back tomorrow at 8:30, okay? We are,

9 honestly, because we've got jury instructions to work on. So

10 it's not like we're just going to bed, spending the weekend --

11 we're going to be working. But you get the weekend off.

12 Defend -- anything else, counsel, that I need to instruct them

13 about?

14        MR. CURTNER: No, Your Honor, not that I know of.

15        THE COURT: Okay. Have a great weekend. Monday

16 morning at 8:25.

17    (Jury not present)

18        THE COURT: Okay, you're done, sir. You're free to go.

19 Thank you very much.

20    (Witness excused)

21        THE COURT: Please be seated. Now, counsel, do you

22 want to come -- do you want to -- tomorrow we've got it set for

23 8:30. Do you want to make it 9?

24        MR. CURTNER: Yes.

25        THE COURT: Do we have --

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 744  Filed 09/23/14  Page 203 of 209

1      MS. LOEFFLER:  That would be nice.

2      THE COURT:  I told them 8:30, just to make them feel

3 like -- but --

4      MR. OFFENBECHER:  Feel like we're really working.

5      THE COURT:  I don't think we have more than an hour

6 tomorrow.  We're just going to talk about any problems there

7 might be and go over jury instructions.

8      MS. LOEFFLER:  Okay.

9      THE COURT:  Is -- and I'm going to give you each -- I

10 could probably almost go over the jury instructions now.  I'll

11 give two to each of you, and the government's going to have to

12 make more copies if you want.  But all these are are a copy of

13 every instruction everyone has given me.  Okay, so some may be

14 duplicative, some may -- obviously aren't applicable.  We --

15 we've already -- for instance, defendant has already said

16 they're not less -- looking for lesser included.  But it's in

17 the packet.

18      MS. LOEFFLER:  Okay.

19      THE COURT:  So when we meet tomorrow, we'll be

20 struck -- we'll be running lines through the ones that we know

21 aren't going to be, and we'll focus on a couple that there

22 might be arguments over.

23      MS. LOEFFLER:  Okay.

24      THE COURT:  I see relatively few areas of disagreement

25 in what I've seen proposed.  So don't look at it and say, oh,

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 204 of 209
(720) 384-8078  attrans@sbcglobal.net

1  no, what's that doing there; it's there because one or the

2  other of you submitted it, that's why it's here.  Okay.  Nancy,

3  any problems about the exhibits?

4          THE CLERK:  No.  What time are we meeting tomorrow?

5          THE COURT:  Tomorrow at 9 o'clock.

6          THE CLERK:  Thank you.

7          THE COURT:  So I'm being good to everybody.

8          MR. CURTNER:  Thank you, Judge.

9          THE COURT:  And we'll be done by 10, probably.  Because

10  I have another -- I have sentencings that are some -- at 10

11  o'clock.

12          MS. LOEFFLER:  Okay.

13          THE COURT:  So it's no more than an hour tomorrow.  See

14  you then.  Thank you all very much.

15          MS. LOEFFLER:  Thank you.

16          THE CLERK:  All rise.  This matter stands in recess

17  until tomorrow at 10 a.m. -- at 9 a.m.

18      (Proceedings concluded at 2:45 p.m.)

19

20

21

22

23

24

25

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 205 of 209
(720) 384-8078  attrans@sbcglobal.net

1

CERTIFICATE

2   I certify that the foregoing is a correct transcript from the
electronic sound recording of the proceedings in the above-
3   entitled matter.

4

    s/Teresa K. Combs               9/7/14
5   Teresa K. Combs, Transcriber      Date

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 744  Filed 09/23/14  Page 206 of 209
(720) 384-8078  attrans@sbcglobal.net

1                              **INDEX**

2                                                              FURTHER
                        DIRECT   CROSS   REDIRECT   RECROSS   REDIRECT
3    PLAINTIFF'S WITNESSES

4
     Don Aleen Rudat          1790    1796      1801      1804      1804
5    Sean Michael Bottary     1805    1809
     Willard Samuel Ellis     1816    1835      1850      1851
6    Alan Warren Jones        1852    1862
     Charlene Ann Bell        1893
7    Annette K. Ecret         1898    1901
     Lynn Concepcion-Glover   1902
8    Brett Ashley Mills       1913    1936      1943
     Aaron W. Woods           1954
9
     PLAINTIFF'S EXHIBITS                                      ADMITTED
10
     27       Wells' home phone records                        1906
11
     32A      Photograph - Kodiak Airport parking lot          1963
12
     32C      Photograph - Kodiak Airport parking lot          1966
13
     32E      Photograph - Kodiak Airport parking lot          1966
14
     52       Photograph - aerial map (further)                1827
15
     72       Photograph - Kodiak Bells Flats area             1894
16
     73       Map with distances                               1973
17
     75       Photograph - aerial map of T1 and T2             1794
18
     103      Photograph - Nancy Wells' blue CR-V at airport   1831
19
     137      Photograph - Wells' tire with nail               1927
20
     154      Video - T1 COMMSTA camera, 4/12/12, 7:14:30 to
21            7:14:33                                           1824

22   158      Audio recording, Hopkins voicemail               1814

23   170      Audio recording, Hopkins voicemail               1807

24   170A     Transcript of Hopkins voicemail                  1807

25   171      Video - by Special Agent Woods                   1977

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 744  Filed 09/23/14  Page 207 of 209

1    **INDEX** (Continued)

2    <u>PLAINTIFF'S EXHIBITS</u>                                    <u>ADMITTED</u>

3    215     Coast Guard ceremonial sword with name of
             John A. Stein                                      1985
4
     222     19-inch blade Japanese sword (Stein's)             1985
5
     223     29-inch blade Japanese sword (Stein's)             1983
6
     225     Nail pulled from Wells' tire                       1925
7
     266     Photograph - T2, from west side (DE-064)           1883
8
     268     Photograph - T2, showing second entrance and part
9            of third                                           1857

10   269     Photograph - T2, showing garage doors              1858

11   271     Photograph - T2, east side (DE-069)                1883

12   272     Photograph - rigger shop sign                      1855

13   <u>DEFENDANT'S EXHIBITS</u>                                    <u>ADMITTED</u>

14   DE-127B Photograph - T2                                    1868

15   DE-127C Photograph - T2                                    1869

16   DE-127D Photograph - T2                                    1870

17   DE-127E Photograph - T2                                    1871

18   DE-127I Photograph - T2                                    1873

19   DE-127J Photograph - T2                                    1874

20   DE-127K Photograph - T2                                    1875

21   DE-127L Photograph - T2                                    1877

22   DE-127N Photograph - T2                                    1877

23   DE-127Q Photograph - T2                                    1879

24   DE-127S Photograph - T2                                    1879

25   DE-127T Photograph - T2                                    1881

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 744   Filed 09/23/14   Page 208 of 209
(720) 384-8078  attrans@sbcglobal.net

1                          **INDEX** (Continued)

2       DEFENDANT'S EXHIBITS                              ADMITTED

3       DE-127U  Photograph - T2                            1884

4       DE-127W  Photograph                                 1887

5       DE-127X  Photograph                                 1887

6       DE-127Y  Photograph                                 1889

7       DE-128   Video - T2 COMMSTA camera, 4/11/12         1844

8       DE-129   Video - T2 COMMSTA camera, 4/11/12         1842

9       DE-131   Photograph                                 1890

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25