1          UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF ALASKA

3   UNITED STATES OF AMERICA,      )   Case 3:13-cr-00008-RRB
                                   )
4          Plaintiff,             )   Anchorage, Alaska
                                   )   Monday, April 14, 2014
5       vs.                        )   8:35 o'clock a.m.
                                   )
6   JAMES MICHAEL WELLS,           )
                                   )
7          Defendant.             )
    _____)   **TRIAL BY JURY – DAY 10**

8                  **TRANSCRIPT OF PROCEEDINGS**

9          BEFORE THE HONORABLE RALPH R. BEISTLINE
10                UNITED STATES DISTRICT JUDGE

11  APPEARANCES:

12  For the Plaintiff:        KAREN L. LOEFFLER
                              U.S. Attorney
13                            BRYAN SCHRODER
                              KATHLEEN ANN DUIGNAN
14                            Assistant U.S. Attorneys
                              Office of the U.S. Attorney
15                            222 West 7th Avenue, #9, Room 253
                              Anchorage, Alaska  99513-7567
16                            (907) 271-5071

17  For the Defendant:        F. RICHARD CURTNER
                              Federal Defender
18                            Office of the Federal Public Defender
                              601 West 5th Avenue, Suite 800
19                            Anchorage, Alaska  99501
                              (907) 646-3400
20
                              PETER OFFENBECHER
21                            Skellenger Bender, P.S.
                              1301 5th Avenue, Suite 3401
22                            Seattle, Washington  98101-2605
                              (206) 623-6501

23

24

25

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 746  Filed 09/23/14  Page 1 of 227

1  APPEARANCES (Continued):

2  Court Recorder:            NANCY LEALAISALANOA
                              U.S. District Court
3                             222 West 7th Avenue, #4, Room 229
                              Anchorage, Alaska  99513-7564
4                             (907) 677-6111

5  Transcription Service:     A & T Transcripts
                              6299 West 111th Avenue
6                             Westminster, Colorado  80020
                              (720) 384-8078

7

8  Proceedings recorded by electronic sound recording; transcript
   produced by transcription service.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 746  Filed 09/23/14  Page 2 of 227
(720) 384-8078  attrans@sbcglobal.net

1      <u>**ANCHORAGE, ALASKA - MONDAY, APRIL 14, 2014**</u>

2

3      (Call to Order of the Court at 8:35 a.m.)

4      (Defendant present; jury not present)

5          THE CLERK:  All rise.  His Honor the Court, the United

6   States District Court for the District of Alaska is now in

7   session, with the Honorable Ralph R. Beistline presiding.

8   Please be seated.

9          THE COURT:  All right, good morning.  How's everybody

10  doing?

11         MS. LOEFFLER:  Good.

12         THE COURT:  Mr. Curtner, how are you doing?

13         MR. CURTNER:  I'm doing good.

14         THE COURT:  I can't keep up -- this -- motions are

15  coming in as I'm walking out the door, so I haven't -- I do see

16  a couple motions came in over the weekend that are not ripe,

17  but make -- some make good sense.  The government's motion in

18  limine appears to have some validity to it.  But I'm -- I

19  haven't seen the defense response.  As does the defendant's

20  motion for reconsideration of 171 appears to have some validity

21  to it, so I can take those up at some time when there's a break

22  in the action.

23         Speaking of breaks in the action, we'll stop today at

24  10:50 so we can go to the ceremony next door.  I'd like to

25  resume at 12:30, if that would be okay, just to keep things

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 3 of 227
(720) 384-8078  attrans@sbcglobal.net

1  moving.  It's Thursday that we have to take the long lunch,

2  from 11:30 to 1:30.

3          Did you get a -- Mr. Curtner, a chance to reassess your

4  witness for the 25th?

5          MR. CURTNER:  Yes, Your Honor.  We are planning I think

6  to put our witnesses on through the 23rd, hopefully.

7          THE COURT:  Okay.  We had one juror, if you remember,

8  that had to leave the 27th, just to keep that in mind.

9          MR. CURTNER:  Yeah.  I think we hope -- if the

10  government's done by this Wednesday, we'll start Thursday, and

11  we should be done by the following Wednesday.

12          THE COURT:  Okay.  And then we'll just have to see how

13  things look then and discuss it with this juror.  Okay, does

14  that answer all the questions that you have for me?

15          MS. LOEFFLER:  No.  I -- going to ask for the witness

16  list and the Jencks from the defense.

17          THE COURT:  Okay.  I'm -- presume that's on its way to

18  you.  If you --

19          MS. LOEFFLER:  Well, I just -- I don't know.  Is it?

20          MR. CURTNER:  We're putting together a witness list,

21  but I don't know if we have any Jencks.  You know, we have --

22  we don't have any recorded conversation -- interviews or

23  anything like that, so -- but we can discuss it --

24          THE COURT:  Starting to sound like --

25          MR. CURTNER:  -- during the break.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 4 of 227
(720) 384-8078  attrans@sbcglobal.net

1          THE COURT:  -- the prosecutor.

2          MR. CURTNER:  Pardon me?

3          THE COURT:  You're starting to sound like a prosecutor.

4          MR. CURTNER:  I wouldn't --

5          MS. LOEFFLER:  We turned our Jencks over 11 --

6          THE COURT:  I'm not talking about this case.

7          MS. LOEFFLER:  Okay.

8          THE COURT:  I'm talking about -- I hear that a lot.

9          MS. LOEFFLER:  But I also want to know when I'm going

10   to get the witness list, Your Honor.  We're --

11          THE COURT:  Well, today.  We already said you get it

12   today.

13          MS. LOEFFLER:  Okay.  Thank you.  That --

14          THE COURT:  I thought you'd have it this morning, but

15   apparently they need a few more hours.

16          MR. CURTNER:  We've been working all weekend for --

17          THE COURT:  I know you've been working all weekend.

18   Anything else?  But I need -- they're entitled to that.  You

19   know that if the -- what's good for one side is good for the

20   other side, okay.  Anything else?

21          MR. OFFENBECHER:  Your Honor, just -- it looks like

22   I -- we've just been handed some tables and calculations which

23   I can kind of show to the Court.  And apparently it's going to

24   be part of Mr. Sturgis's testimony, as I understand it, this

25   morning.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 5 of 227
(720) 384-8078  attrans@sbcglobal.net

1          THE COURT:  Okay.

2          MR. OFFENBECHER:  I guess --

3          MS. LOEFFLER:  Yep.

4          MR. OFFENBECHER:  -- I would like to have a chance to

5    look at them -- they just were handed to me about four or five

6    minutes ago -- before the witness testifies.  It's a little

7    more -- the timing and so forth, the calculated time, the

8    actual time, the driving times are a little more calculated.

9    And since I got caught a little bit flat-footed last Thursday

10   in a similar type of situation, as I've indicated in our

11   motion, I guess I object to them putting this evidence on and

12   introducing these exhibits without me having, you know, more

13   than five or ten minutes to review them.

14         THE COURT:  Okay, who's that?  The next witness?

15         MS. LOEFFLER:  It is the witness.  And, Your Honor --

16   and what it is, is instead of doing math -- you know, the olden

17   days, you would sit there with a -- with an easel, and say --

18         THE COURT:  Well, we'll get started --

19         MS. LOEFFLER:  -- "Here's my math."  We --

20         THE COURT:  -- and if you need longer than necess --

21   you're going to have a pretty long break at 10:50.  I don't

22   know how long this witness is, but --

23         MS. LOEFFLER:  I don't -- I mean, I'll be done before

24   10:50, but it's his calculations of -- you know, we -- I mean,

25   I don't think they're surprised that he -- that it's exactly

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 6 of 227
(720) 384-8078  attrans@sbcglobal.net

1  what he's going to do.  But what we did this weekend is we

2  typed it up and -- so we could hand it to people --

3           THE COURT:  Okay, well --

4           MS. LOEFFLER:  -- so we're not doing it on the stand.

5           THE COURT:  -- we'll see what happens.  We'll get

6  going --

7           MR. OFFENBECHER:  I'd just like a --

8           THE COURT:  -- and if defendant needs a little more

9  extra time to -- before cross-examination, we'll accommodate

10 him.

11          MS. LOEFFLER:  Okay.

12          THE COURT:  But you've got it right now, so you can

13 read it as we're going.

14          MR. OFFENBECHER:  Right, I -- yeah, math was never my

15 strong suit, Your Honor --

16          THE COURT:  Okay.

17          MR. OFFENBECHER:  -- so I would like some -- be able to

18 do the calculations as well over the weekend.

19          THE COURT:  Well, that's not going to happen.  Okay,

20 we'll bring the jury in.  Counsel should have gotten the jury

21 instructions over the weekend too.  My secretary sent them

22 out --

23          MR. SCHRODER:  We did, Your Honor.

24          THE COURT:  -- Friday, I think.

25          MS. LOEFFLER:  We did.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 7 of 227
(720) 384-8078  attrans@sbcglobal.net

1     (Jury present)

2          THE COURT:  Well, good morning, ladies and gentlemen.

3     How are you doing?  Please be seated.  Glad to see you back.

4          UNIDENTIFIED JUROR:  Yeah.  My (indiscernible), Your

5     Honor.

6          THE COURT:  Okay, good.  All right.  So everybody got

7     to do what they had to do.  We had a long weekend; we got a

8     busy week ahead of us, though.  Today, we stop at -- I don't

9     know if I told you, we have to stop at 10:50 because of a

10    ceremony that I have to be involved in in the next courtroom,

11    and then we'll resume as 12:30, so there'll be a little bit of

12    an early -- a little longer lunch.  And then Thursday we're

13    going to take a long lunch, from about 11:30 to 1:30, just for

14    your planning purposes.

15         Okay.  Any issues, any problems?  You doing okay?  Look

16    great, okay.  The government's next witness.

17         MS. LOEFFLER:  The government calls Special Agent Joe

18    Sturgis to the stand.

19         THE COURT:  All right.

20         THE CLERK:  Please raise your right hand.

21    **JOSEPH MICHAEL STURGIS, PLAINTIFF'S WITNESS, SWORN**

22         THE CLERK:  Thank you.  Please have a seat.  And, sir,

23    if you can please state and spell your full name.

24         THE WITNESS:  Joseph Michael Sturgis.  J-o-s-e-p-h, M-

25    i-c-h-a-e-l, S-t-u-r-g-i-s.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 8 of 227
(720) 384-8078  attrans@sbcglobal.net

1    THE CLERK:  Thank you.

2    THE COURT:  All right.

3                    **DIRECT EXAMINATION**

4  BY MS. LOEFFLER:

5  Q    Special Agent Sturgis, where do you work?

6  A    I work at the Coast Guard Investigative Service Resident

7  Agent Office, Kodiak, Alaska.

8  Q    How long have you worked for -- and is CGIS the acronym

9  that you use for Coast Guard Investigative Service?

10 A    Yes, ma'am.

11 Q    How long have you been with CGIS?

12 A    Just at three years.

13 Q    And what is CGIS?

14 A    It's the Coast Guard's investigative arm for felony-level

15 crimes.  Basically we do felony-level crimes that have a Coast

16 Guard nexus.

17 Q    And did you do some training before you joined CGIS in law

18 enforcement?

19 A    Yes, ma'am.

20 Q    What type of training?

21 A    Federal law enforcement training.

22 Q    Okay.  Now, before you joined CGIS, what did you do?

23 A    I was an aviation electronics technician.

24 Q    With what organization?

25 A    The Coast Guard.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 9 of 227

**STURGIS - DIRECT**

1  Q    How long have you been with the Coast Guard?

2  A    Fifteen years.

3  Q    Okay.  You said you were an aviation electronics

4  technician.  And what type of educational background do you

5  have for that?

6  A    They send us through an A school that teaches about

7  electronics, aviation.  But I've also -- went to Embry-Riddle

8  Aeronautical University, and I have a bachelor's of science in

9  professional aeronautics.

10 Q    Prior to your 15 years -- is it a total of 15 years in the

11 Coast Guard or 18?  I don't --

12 A    Total -- total of 15 years in the Coast Guard.  I did

13 three years prior in the Army National Guard in Alabama.

14 Q    Okay.  When did you get to Kodiak?

15 A    I arrived in Kodiak in 2011.

16 Q    Okay.  So before the murders, how long had you been in

17 Kodiak?

18 A    Just about 11 months.

19 Q    Now, I didn't ask you, do you have a rank -- I know you're

20 not in uniform.  The CGIS doesn't appear to wear uniforms.  Can

21 you sort of explain the difference to the jury?

22 A    I'm a AET1, which is first-class petty officer, E-6.  I

23 would be below a chief in the -- in a Coast Guard uniformed

24 side.  But as an agent, they consider me a special agent.

25 Q    Okay.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 10 of 227
(720) 384-8078   attrans@sbcglobal.net

1    A    And I no longer carry the rank structure.

2    Q    But who's your boss?

3    A    Special Agent Aaron Woods is the resident agent in charge

4    in Kodiak, and I work directly for him.

5    Q    Okay.  Now I want to turn to April 12th, 2012.  And were

6    you present on Kodiak Island on the day of the murders?

7    A    Yes, ma'am.

8    Q    Okay.  Were there any other CGIS agents present?

9    A    Not at the time that I received the call.

10   Q    Okay.  When you received the call, what did you do?

11   A    I drove out to the T2 building and assessed the situation.

12   Q    Now, had you ever been to COMMSTA before?

13   A    Not inside either building.  I drove by, just for an area

14   familiarity type of -- they give us an area of -- of

15   responsibility, and that area of responsibility was included in

16   my actual tour of the base at Kodiak.

17   Q    Okay.  I take it you've been in the building lots of times

18   now?

19   A    Yes, ma'am.

20   Q    All right.  I want to turn now to a --

21        (Side conversation)

22   Q    They're way ahead of me.  I want to turn in -- to a

23   timeline of certain actions on April 12th, 2012.  And did you

24   have a role in creating the -- in the time and distance

25   calculations were -- that were on the chart that the jury has

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 746  Filed 09/23/14  Page 11 of 227
(720) 384-8078  attrans@sbcglobal.net

1  seen?

2  A    Yes, ma'am.

3  Q    Okay.  And throughout the investigation had you taken

4  various steps to determine time periods of relevance in the

5  case?

6  A    Yes, ma'am, I have.

7  Q    Okay.  Now, did those steps involve any efforts to

8  investigate the accuracy of time displays that appear on the

9  electronic devices that have been shown to the jury?

10 A    Yes, ma'am.

11 Q    Okay.  So I'm going to start with the base camera.  Where

12 is that camera located?

13 A    The actual camera is on the front gate guard shack for

14 Base Kodiak.

15 Q    Okay.  And that guard shack is sort of how far from

16 Rezanof Drive?

17 A    Approximately 20 feet.

18 Q    Okay.  Now, do you know what type of camera -- in other

19 words, what turns that camera on and off?

20 A    It's a motion-activated camera.

21 Q    Okay.  Now, do you know where the feed from that camera

22 plays?  In other words, where somebody can watch it?

23 A    Yes, ma'am.  It -- it plays a direct feed into the Coast

24 Guard Police Department dispatch desk.

25 Q    Where is the Coast Guard Police Department dispatch desk?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1  A    It's in -- it's in the admin building.  Directly as you

2  come through the gate, there's a large building to the right,

3  maybe 20 feet past the gate, and it -- it plays in that

4  building.

5  Q    Okay.  So that's the one on the base, right?

6  A    Yes, ma'am.  On --

7  Q    All right.

8  A    -- the main base.

9  Q    Now, did you make an effort to determine whether that

10 video, the time on that video, was accurate versus, you know,

11 actual time?

12 A    Yes, ma'am, I did.

13 Q    Okay.  I'm going to show you a series of exhibits.

14      (Side conversation)

15 Q    First I want to show you Exhibit -- actually, I want to --

16 94.  And just a second before we go to the exhibit.  How many

17 different methods did you use to determine whether there was a

18 time difference between what was on the video and what was real

19 time?

20 A    Three that I was able to -- to find.  Three different

21 methods.

22 Q    Okay.  Let me turn to what's been marked as Exhibit 94.

23 And can you tell us what that is?

24 A    It's a picture of the display of Base Kodiak front gate

25 and the software in the system that it plays on.  In front of

1  that display TV is someone holding their iPhone that we

2  verified was satellite linked, so it had the correct time

3  displayed on the cell phone.  And it's being held up next to

4  the actual player time.

5          MS. LOEFFLER:  I move Exhibit 94.

6          THE COURT:  They're thinking.

7          MS. LOEFFLER:  I'm sorry, Your Honor?

8          THE COURT:  They're thinking.

9          MS. LOEFFLER:  Oh.

10          MR. OFFENBECHER:  There are just a couple of questions,

11  Your Honor.

12          THE COURT:  Very well.

13                          VOIR DIRE

14  BY MR. OFFENBECHER:

15  Q   So, Special Agent Sturgis, if I can see this, which is

16  difficult, but -- it appears that the time on the screen, the

17  video screen that you're holding -- are you holding this phone

18  here or is that somebody else?

19  A   I'm actually taking the picture.  That's someone else

20  holding up an --

21  Q   Okay.

22  A   -- iPhone that we verified was satellite linked.

23  Q   Okay.  So the time on the screen, which appears to be the

24  base camera, is that right?

25  A   Yes, sir.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 746  Filed 09/23/14  Page 14 of 227
(720) 384-8078  attrans@sbcglobal.net

1  Q   It's 9:06:31 p.m.  Is that right?  Can you read that?

2  A   I may be looking at something different than you are, sir.

3  Q   Well, I was just looking at the time stamp along the

4  bottom there.  It says 9:06:31 p.m., doesn't it?

5  A   The actual system time is at the top right.  At the very

6  bottom is information for video input.  Basically, it -- it

7  could be something that they're reviewing.  They're -- if that

8  makes any sense.

9  Q   Okay, but there -- there's a time stamp along the bottom

10  that says 9:06:31.  Right?

11      MS. LOEFFLER:  Your Honor, I guess I'm --

12      THE WITNESS:  Yes, sir, but if --

13      MS. LOEFFLER:  -- going to object at this point.  I'm

14  not sure this is voir dire or just --

15      THE COURT:  Cross-examination, it --

16      MS. LOEFFLER:  Yeah.

17      THE COURT:  -- sounds like.

18      THE WITNESS:  Can -- I -- I can explain this to you if

19  you give me a second.

20      MR. OFFENBECHER:  I'll do it on cross-examination if

21  you'd like.

22      THE COURT:  Okay.

23      THE WITNESS:  Yes, sir.  It's -- at the bottom it says

24  4/16/2012.  And the actual date is 4/18/2012.  So it's a --

25  it's a video that they were reviewing at the time.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 746  Filed 09/23/14  Page 15 of 227
(720) 384-8078  attrans@sbcglobal.net

1    MR. OFFENBECHER:  I'll just do it on cross, Your Honor.

2    THE COURT:  Okay.

3    MR. OFFENBECHER:  That's fine.

4    THE COURT:  Go ahead.  It can be admitted.

5    MS. LOEFFLER:  Okay.

6    (Plaintiff's Exhibit 94 admitted)

7                    **DIRECT EXAMINATION, CONTINUED**

8    BY MS. LOEFFLER:

9    Q    Okay.  Special Agent Sturgis, now, this one was not the

10   day of the -- it wasn't April 12th, right?

11   A    No, ma'am.

12   Q    But you have other things that we're going to get to that

13   checked on April 12th, right?

14   A    Yes, ma'am.

15   Q    Okay.  What day did -- was this picture taken?

16   A    April 18th, 2012.

17   Q    Okay.  And if you look at the upper right hand, the time

18   on the -- the upper right-hand corner, what you said is the

19   time on the camera video is what time?

20   A    The actual camera video is showing 10:54.

21   Q    And what's the actual time that it --

22   A    10:36.

23   Q    What's the difference?

24   A    Approximately 18 minutes.

25   Q    Okay.  Now, that was taken a few days after the murder,

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 746  Filed 09/23/14  Page 16 of 227
(720) 384-8078  attrans@sbcglobal.net

1  where you're also -- did you also do efforts on the day of the

2  murder to see if there was still that difference?

3  A    Yes, ma'am.

4  Q    Okay.  I'm going to turn to Exhibit 95.  That's actually

5  just a easier picture to see it, I think, of this.

6         MS. LOEFFLER:  And I'd move Exhibit 95.  It's easier to

7  read.

8         MR. OFFENBECHER:  Subject to the same cross-examination

9  I think --

10        THE COURT:  It'll be received.

11     (Plaintiff's Exhibit 95 admitted)

12        MS. LOEFFLER:  Okay, let's put it up.  All right.

13  BY MS. LOEFFLER:

14  Q    So that's where you can see the differences, right?

15  Closer?

16  A    Yes, ma'am.  It's just a closer view.

17  Q    All right.  Now I want to go to Exhibit 96.

18  A    What this is is the video from behind the dispatch desk.

19  And you can kind of make out the actual player display on the

20  lower right-hand side of the screen.  What we're looking at is

21  a clock that hangs in the dispatch area of the Coast Guard

22  Police Department.

23  Q    And --

24  A    The -- and the clock is actually reversed because --

25  Q    So let me just ask --

1  A    -- it's a reflection.

2  Q    -- for a second.  Is this a fair and accurate depiction of

3  a photo that was taken on the day of the murder, in order to

4  show the time difference?

5  A    Yes, ma'am.

6       MS. LOEFFLER:  I'd move Exhibit 95 -- 6.

7       THE COURT:  It'll be admitted.

8       (Plaintiff's Exhibit 96 admitted)

9  BY MS. LOEFFLER:

10 Q    Let's show you 96.  Now, this one's hard, because you

11 circled the clock on this, but is this looking directly at the

12 clock, or what's it looking at?

13 A    It's actually a reflection in the -- the glass that

14 surrounds the dispatch.  If you look here, this is, you know,

15 obviously a clock, and this is 12, 1, 2, 3, 4, 5, 6, going

16 backwards, because it's in a reflection.  If you can see, this

17 hand right here is the hour hand, this hand right here is the

18 minute hand.

19 Q    And looking at the other one circled, were you able by

20 looking at these two to determine whether there was a

21 difference again with the video display versus actual time?

22 A    Yes, ma'am.  It's approximately 18 minutes, from looking

23 at this clock in the reverse and what's on the player.

24 Q    Now I'm going to pull up Exhibit 97, please.  And I'll ask

25 you what was the purpose of Exhibit 97?

STURGIS - DIRECT

1  A    What we did is -- I took a picture of the display the day

2  of, while I was reviewing it, just to ensure that we had a good

3  shot of the screen.  If you know, any pictures on iPhones or

4  cameras have stuff called metadata that's attached to the

5  photographs.  In that metadata, a time-date stamp is also

6  attached.  And what I did here is I brought the metadata from

7  the picture up over the top of the actual camera display.  And

8  it's just another way to determine what the actual time was.

9           MS. LOEFFLER:  I'd move Exhibit 97.

10          THE COURT:  It'll be received.

11      (Plaintiff's Exhibit 97 admitted)

12  BY MS. LOEFFLER:

13  Q    Okay.  So in Exhibit 97, the part that you have circled

14  with all the little computer marks, what's that?

15  A    That is the metadata from the actual picture that -- that

16  I took of the screen --

17  Q    And --

18  A    -- the -- the whole picture --

19  Q    And if you'll look closely, it says --

20  A    -- this is the metadata.

21  Q    -- 4/12, so that's the date of the murders?

22  A    Yes, ma'am.

23  Q    Okay.  And again, looking at this, were you able to tell

24  what the difference was between actual time and what the video

25  camera displayed?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 19 of 227
(720) 384-8078  attrans@sbcglobal.net

1  A    Yes, ma'am, I was, because this is the actual time of the

2  player system, right here.  And when I took the picture, it

3  captured the actual time.  When I opened the metadata on the

4  picture, it shows the time-date stamp from my phone picture.

5  So when you open that metadata up, it actually gives what the

6  time on the phone was and what the time on the player was.

7  Q    And are they different?

8  A    This time -- yes, they're different by approximately 18

9  minutes.  This time down here is what's actually being reviewed

10 on the screen.

11 Q    Okay.  Now, you -- you've said that -- so we've had three

12 different examples, and -- that -- do they all come up with the

13 same time difference?

14 A    Yes, ma'am, it's -- it's approximately 18 minutes.

15 Q    Did you actually check this another way?

16 A    Yes, ma'am, I did.

17 Q    What was that?

18 A    I looked at the base camera, which is all on the same

19 server, which means they maintain the same times for different

20 cameras.  All the cameras relate back to the one server.  So by

21 watching a different camera that's attached to the guard shack

22 I could look at the base flag.  And the Coast Guard colors is

23 what we call it.  We raise the colors 0800 every morning.  So I

24 looked at the base camera and looked for when colors was

25 raised.  And they do colors by a master clock.  And when they

Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 20 of 227

1  raise colors, it's usually right around 8:00 o'clock, within a

2  minute.  And it was 18 minutes, approximately 18 minutes off.

3  Q   Okay.  So all of the ways you looked at it came out 18

4  minutes off?

5  A   Yes, ma'am.

6  Q   Okay.  Now, in terms of the timeline and the exhibits that

7  you worked on to get the timeline, did you correct for the 18-

8  minute difference?

9  A   Yes, ma'am, I did.

10  Q   Now I want to go -- to talk to you about the T2 and the T1

11  cameras --

12  A   Yes, ma'am.

13  Q   -- and ask you some of the same questions.  Did you do

14  anything to check the accuracy of the times that are on those

15  two cameras when the video was run?

16  A   Yes, ma'am, I did.

17  Q   Now, for the T1 camera, were there any time issues?

18  A   No, ma'am.  It's -- it's set to a server which they

19  usually maintain.  Normally a server doesn't lose time, it's

20  just -- nationally, a computer server typically doesn't lose

21  time, but they -- they check it.  Because of the significance

22  of exact time for phone and telephone or radio calls that come

23  into the communications station, they maintain that.  Looking

24  at --

25  Q   So if I --

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 21 of 227
(720) 384-8078  attrans@sbcglobal.net

1  A   -- the T1 --

2  Q   Okay.

3  A   -- software, looking at the server, the -- the time was

4  correct.

5  Q   Okay.  And I was going to put up Exhibit --

6      (Side conversation)

7  Q   -- 148, simply to -- if you play it, we can just see if

8  there's a time on it, and ask you whether this is one that's

9  accurate.

10     (Side conversation)

11 Q   Okay.  So is there a -- the time that's written over on

12 the little red -- is that correct when you're showing the T1

13 camera?

14 A   Yes, ma'am.

15 Q   Okay.  Now I want to -- that's fine.  I'm going to go to

16 the T2 camera.  And was there a -- is there a timing issue with

17 the T2 camera?

18 A   The actual time of the T2 camera is also connected to the

19 server and it is accurate.  But the camera that is in the T2 --

20 at the T2 building has a time-date stamp on the camera screen,

21 and that is incorrect.  The actual --

22 Q   By how much?

23 A   Approximately six minutes.

24 Q   Okay.

25 A   It's -- it's a little fast.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 746  Filed 09/23/14  Page 22 of 227
(720) 384-8078  attrans@sbcglobal.net

**STURGIS - DIRECT**

1  Q    Let me pull up Exhibit 152 and see if what -- we can

2  give --

3       (Side conversation)

4  Q    I'm sorry, 151.  Yeah, I have the wrong number.  Thank

5  you.  151.  And in terms of the -- which is correct and which

6  is not correct, can you explain that to the jury?

7  A    Yes, ma'am.

8  Q    Go ahead.

9  A    This is the correct time, because it's the time that's

10 dictated by the server and the software.  This is an actual

11 camera-specific time and date.  That camera is not maintained

12 for time and date because it's connected to the server and the

13 server play time.  So even though this says it's 7:35:26, it's

14 actually 7:30.  So it's approximately five to six minutes.

15 Q    So in the ones, would it have the little letters, like

16 this says April?  If somebody sees something with the letters

17 on the video, is that accurate or not accurate?

18 A    That is not accurate.

19 Q    Okay.

20 A    The date is accurate, but the time is not accurate.

21 Q    And did you also verify this with colors?

22 A    Yes, ma'am, I did.

23 Q    Okay.  Now I want to turn and ask you -- we've done time.

24 Now I want to go to distance.

25 A    Yes, ma'am.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 746  Filed 09/23/14  Page 23 of 227

1  Q    And I'll ask you if you calculated some distances on the

2  maps that we have previously showed the jury.  And this is

3  Exhibit 74.  I think the --

4       (Side conversation)

5  Q    Okay.  We're going to do it on the overhead.  Thank you.

6  A    Okay.

7       (Side conversation)

8  Q    Oh, it's 73.  Thank you, Kim.  Demonstrating that my math

9  doesn't equal the witness's.  Exhibit 73, okay.  Did you

10 participate in the distances that are on this map?

11 A    Yes, I did.

12 Q    Okay.  And did you calculate the distances between the

13 certain places that are marked on this map?

14 A    Yes, ma'am, I did.

15 Q    Can you explain the method you used to calculate the

16 distances?

17 A    I took three separate vehicles and used the odometer

18 readings, making the drive from right here on Pablof (ph)

19 Circle out to T2.

20 Q    And did you record the distances in different segments?

21 A    Yes, ma'am, I did.

22 Q    What are the segments that you sort of divided it up?

23 A    All the segments that I recorded was each time you went to

24 a different point, and either a speed limit change or -- or a

25 significant point, like here, here, here, and here.

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 24 of 227

1  Q    You've pointed to "here," but I --

2  A    I apologize --

3  Q    -- I'm just on the map --

4  A    -- I'm sorry.

5  Q    -- Wells residence to --

6  A    To the front gate camera, to the airport, and to the

7  COMMSTA building.  I apologize.

8  Q    Okay.  Now, you said you did this three times?

9  A    Yes, ma'am.  I used three separate vehicles.

10  Q    Was there any difference in the three vehicles?

11  A    Yes, ma'am.  There was -- two -- two vehicles came out to

12  8.5.  And the third vehicle came out to 8.8.  And I used the --

13  the furthest distance that I had as a known.

14  Q    Why?

15  A    I figured it would be the longest route possible, so

16  that's the one I used.

17  Q    Okay.  Now, so the distances that you have put up on

18  the -- or that you calculated on this map, is that accurate for

19  the -- you know, depending -- using the longer odometer that

20  you talked about?

21  A    Yes, it was 8.8.  The --

22  Q    Okay.

23  A    -- distance is accurate.

24  Q    Now, did you also calculate mathematically the time that

25  it would take to travel each of these segments?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 746  Filed 09/23/14  Page 25 of 227
(720) 384-8078  attrans@sbcglobal.net

**STURGIS - DIRECT**

1  A   Yes, ma'am, I did.

2  Q   And how many times have you done that?

3  A   Many, many times.

4  Q   Okay.  And in preparation for your testimony today, did

5  you create a chart, so that you didn't have to do the math on

6  the stand, laying out exactly how the math came out?

7  A   Yes, ma'am, I did.

8  Q   Okay.  And is that Exhibit 391, which has not been

9  admitted?

10  A   Yes, ma'am.

11  Q   Okay.  I'm going to get to this, but is this the --

12  Exhibit 391 is a chart that you created with your mathematical

13  calculations?

14  A   Yes, ma'am, it is.

15  Q   And I'm going to introduce it a little later, but I just

16  want to ask you to identify what type of math calculations you

17  did.

18  A   I did a distance over speed, using the marked speed

19  limits, and came up with the actual time it would take if you

20  were driving the exact speed limit from point A to point B --

21  Q   Okay.  And I'm going to --

22  A   -- and so forth.

23  Q   I'm going to get to that a little later, but I want to

24  turn to Exhibit 395.  And I'll ask you what that is.

25  A   This is a -- kind of a breakdown of some of the math that

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 26 of 227
(720) 384-8078   attrans@sbcglobal.net

**STURGIS - DIRECT**

1    I used to determine if it -- I was -- for each segment the

2    speed and the distance and what actual times I came up with.

3    Q    And when you did this -- this has an "actual" and

4    "previous."  Were there some errors on the chart that's Exhibit

5    73 in terms of what you think is the drive time using the

6    actual speed limits?

7    A    There was some differences.  Using different speed limits,

8    you're going to get different times.  That's just the nature of

9    the equation.  If you use a -- a higher speed limit, you're

10   going to get a shorter time if -- for the same distance.  So

11   what I did is I used the marked speed limits and we used

12   approximate speed limits.

13   Q    And does this chart show some difference between speed

14   limits you had done previously and the ones that -- when you

15   went back and checked the speed limits?

16   A    Yes, ma'am, it does.

17   Q    Okay.

18        MS. LOEFFLER:  I'd move Exhibit 395.

19        THE COURT:  Hearing no objection, it will be received.

20        (Plaintiff's Exhibit 395 admitted)

21        MS. LOEFFLER:  Let me just put it up.

22        (Side conversation)

23   BY MS. LOEFFLER:

24   Q    So what you have is actual and previous.  And is there any

25   difference in the distances on this?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1   A    Yes, ma'am, there are.  There's a difference here.  This

2   is the posted speed limit.  This is the speed limit that we --

3   approximate.

4   Q    That you used previously?

5   A    Yes, that we used previously.  And --

6   Q    And is there another one --

7   A    -- there's a --

8   Q    -- where the speed limit --

9   A    -- there's another one here at the turnoff at Sargent

10  Creek through Bells Flats, and this was the approximate,

11  because it was unmarked.  We used this initially and then we

12  went back and used this one.

13  Q    Why did you change it to 25 if it was unmarked?

14  A    Rev --

15  Q    How'd you --

16  A    Just reviewing state regulations and statutes, it says

17  offroad residential areas are -- are considered 25 or 55.  So

18  it was -- it was better to use the smaller number for being

19  able to determine what people use as a known, a 25-mile-an-

20  hour, due to state regulation.

21  Q    Okay.  And so when we get to Exhibit 391, the actual on

22  this exhibit is what you're going to have used, or is that what

23  you're going to have used to calculate the times that are on

24  Exhibit 391?

25       MR. OFFENBECHER:  Object on the grounds of leading the

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 746  Filed 09/23/14  Page 28 of 227
(720) 384-8078  attrans@sbcglobal.net

1  witness, Your Honor.

2         THE COURT:  I think it's okay, just to get through

3  this.

4  BY MS. LOEFFLER:

5  Q    Special Agent Sturgis?

6  A    Yes.  Yes, ma'am.

7  Q    Okay.  Now I want to turn to certain questions about Mr.

8  Wells' truck and the small blue SUV that the jury has seen.

9  First I'm going to show you what's Exhibit 91.

10      (Side conversation)

11         MS. LOEFFLER:  And I believe it's a certified copy,

12  Your Honor, so I would move 91 under authentication.

13         MR. OFFENBECHER:  No objection, Your Honor.

14         THE COURT:  It'll be received.

15      (Plaintiff's Exhibit 91 admitted)

16  BY MS. LOEFFLER:

17  Q    Okay.  So this is a certified copy from DMV of a -- of --

18  actually, whose vehicle?

19  A    Mr. Wells'.

20         MS. LOEFFLER:  All right.  And then I'll move Exhibit

21  92.

22      (Side conversation)

23         MS. LOEFFLER:  It's a certified copy, and I move 92,

24  from DMV.

25         THE COURT:  It'll be received.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 29 of 227
(720) 384-8078   attrans@sbcglobal.net

1    (Plaintiff's Exhibit 92 admitted)

2   BY MS. LOEFFLER:

3   Q    Okay.  And which vehicle is that?

4   A    That is Mrs. Wells' vehicle.

5   Q    Now I want to show you what's previously been admitted as

6   Exhibit 99.  All right, and ask you what that is?

7   A    That's Mr. Wells's truck.

8   Q    Okay.  And I'm going to show what's previously been

9   admitted as Exhibit 104.  And what's that?

10  A    That's Mrs. Wells's vehicle.

11  Q    Okay.  Now I'm going to ask that we use the -- did you --

12  let me step back.  Did you help create sort of a -- the

13  timeline for various movements of these vehicles on the day of

14  the murder?

15  A    Yes, ma'am.

16  Q    Okay.  And I -- would it help explain your testimony to

17  put that -- those hard posterboards of the timeline?

18  A    Certainly.

19       MS. LOEFFLER:  Okay.  What I'd like to do is set those

20  up to help demonstrate his testimony, if we may.

21       THE COURT:  Very well.

22       MS. LOEFFLER:  It's Exhibit 385.

23       THE CLERK:  Think it's the lapel mic by the podium.

24    (Side conversation)

25       MS. LOEFFLER:  Maybe we can move it a little closer so

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 30 of 227
(720) 384-8078  attrans@sbcglobal.net

```
 1   the judge isn't just looking --
 2            THE COURT:  I -- I'm okay.  Don't worry about --
 3            MS. LOEFFLER:  Are you okay, Judge?
 4            THE COURT:  I'm good.
 5            MS. LOEFFLER:  Okay.  You're the one that matters on
 6   this.  If you're okay --
 7            THE COURT:  Have these been admitted?
 8            MS. LOEFFLER:  They are not admitted.  We marked them.
 9   I'm going to use them for demonstrative purposes.
10            THE COURT:  Okay.  But they're marked?
11            MS. LOEFFLER:  Yes.
12            THE COURT:  Okay.
13            MR. OFFENBECHER:  Well, they probably -- if they
14   haven't been admitted, they probably shouldn't be shown to the
15   jury, then.
16            THE COURT:  Well, they're demonstrative, though, isn't
17   it?
18            MS. LOEFFLER:  If they're -- I mean, if they want them
19   admitted, I will, but I was going to use it to illustrate his
20   testimony.
21            THE COURT:  Well, it -- do you want to admit it?
22            MS. LOEFFLER:  I'll move -- I'll admit them if
23   they're --
24            MR. OFFENBECHER:  Well, Your Honor, I object to it.
25            MS. LOEFFLER:  Okay.
```

1          MR. OFFENBECHER:  May I be heard on the sidebar?

2          MS. LOEFFLER:  I don't have a problem not admitting

3    them.  I just want to use them for demonstrative exhibits.

4          (At sidebar with the Court and counsel)

5          THE COURT:  Okay.

6          MR. OFFENBECHER:  (Indiscernible) objection is this,

7    Your Honor.  The -- they include conclusions about what's on

8    the video.  "Small blue SUV arrives (indiscernible).  Small

9    blue SU" (indiscernible) that's for the jury to determine

10   whether it's a small blue SUV.  One of their experts calls it a

11   gray something, or a gray van, or a gray SUV van.  They are

12   recharacterizing it to fit their case and then telling the jury

13   it's a small blue SUV.  It's for the jury to decide what it is.

14         They can say there's something that -- you know, some

15   blob car on the video goes by.  But these are key issues, and

16   we're going to have a bunch of people testifying about whether

17   it is a blue SUV or it isn't a blue SUV.  But they're assuming

18   that it is.  And so putting that is prejudicial, so we object

19   to that.

20         And also, the characterization of Mr. Wells's truck is

21   also (indiscernible) -- I mean, the jury has to decide.

22         MS. LOEFFLER:  Your Honor, the witness is going to

23   testify -- and the times are already up there.  I didn't know

24   that there was any dispute that that's Mr. Wells's

25   (indiscernible).  We didn't make -- you know, there's nothing

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 32 of 227
(720) 384-8078   attrans@sbcglobal.net

1 saying this is Nancy Wells's car, these are -- we've already

2 had testimony. He's just going to illustrate for each one of

3 these and he's going to testify, here's the small blue SUV

4 going away from the rigger shop. It's obvious what it is,

5 that's what he's going to say. It makes it easier to explain

6 to the jury. We're going to have the picture up there. He's

7 going to say here's the small SUV going away from the rigger

8 shop.

9          MR. OFFENBECHER: We're going to (indiscernible) --

10         MS. LOEFFLER: I don't understand what's --

11         MR. OFFENBECHER: Well, I'll tell you what --

12         MS. LOEFFLER: -- (indiscernible).

13         MR. OFFENBECHER: (Indiscernible) what he says, we're

14 going to argue about whether it is a blue SUV. Whether it's

15 gray, whether it's a Bronco, whether -- what kind of car it is

16 (indiscernible).

17         THE COURT: Okay, that's a good reason why it should

18 not be admitted, but I think it can be used to illustrate his

19 testimony, because it's his testimony that it is a small

20 blue --

21         MS. LOEFFLER: (Indiscernible) going to say.

22         THE COURT: -- SUV. But I -- it is a -- apparently an

23 issue of dispute, so I don't think --

24         MS. LOEFFLER: And I wasn't planning on admitting it.

25 I was using it just to illustrate his testimony.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 746  Filed 09/23/14  Page 33 of 227

1         MR. OFFENBECHER:  The problem is, you can't unring that

2    bell, Judge, as we know.  You tell them it's a blue SUV,

3    arrives at the -- or blue SUV going away from

4    (indiscernible) -- and he testifies about that, and the rest of

5    the case is going to be about whether it is a blue SUV.  So

6    it's hard to unring that bell once you -- you've got a little

7    thing that says "Blue SUV arrives here."  What they should say,

8    if they want to be fair about this, is that, you know, whatever

9    kind of vehicle, you know, passes by the camera.

10        The other thing is it says, "Arrives near the rigger

11   shop."  There's nothing that suggested actually arrives.  All

12   it does is pass from left to right on the camera, then it

13   passes from right to left going away from the rigger shop.  But

14   it doesn't -- there's nothing that says it arrives.

15        This assumes that a person driving that is the

16   murderer, and they're saying blue SUV murderer arrives in the

17   rigger shop.  But that's not what the video shows.  The video

18   just shows a car going by on the road.

19        THE COURT:  Okay.

20        MR. OFFENBECHER:  It's just too prejudicial.  That's

21   the ultimate issue in the case, Your Honor.  It's a

22   characterization of the government's case.  They're -- the --

23   making a -- you know, a visual out of it and then having him

24   testify about it, when that's what the jury's going to decide

25   later.  It's just -- that part's not fair.  I mean, all the

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 746  Filed 09/23/14  Page 34 of 227
(720) 384-8078  attrans@sbcglobal.net

1  rest of this stuff is factual, but that's not factual.

2          THE COURT:  Okay, your concern is this

3  (indiscernible) -- okay.

4          MS. LOEFFLER:  Your Honor, I think we already had a ton

5  of witnesses call it a small blue SUV.  We've called it that

6  every time.  If they're --

7          THE COURT:  (Indiscernible) --

8          MS. LOEFFLER:  -- and they can certainly --

9          THE COURT:  -- small blue something.

10          MS. LOEFFLER:  Yeah.

11          MR. OFFENBECHER:  It's a blob, and then on the way

12  back, it's gray.

13          MS. LOEFFLER:  Well, I can --

14          MR. OFFENBECHER:  So --

15          MS. LOEFFLER:  I can take it -- if they want to -- if

16  he wants to use black magic marker and say "SUV," I don't care.

17          MR. OFFENBECHER:  I don't --

18          MS. LOEFFLER:  Or we'll put a piece of yellow over the

19  thing that says "SUV."

20          MR. OFFENBECHER:  (Indiscernible) --

21          MS. LOEFFLER:  It's obviously small and blue.  I mean,

22  (indiscernible) --

23          MR. OFFENBECHER:  No, it's not obviously --

24          MS. LOEFFLER:  -- it's clear --

25          MR. OFFENBECHER:  -- anything.  We're going to have --

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 746  Filed 09/23/14  Page 35 of 227
(720) 384-8078  attrans@sbcglobal.net

1          MS. LOEFFLER:  Well --

2          MR. OFFENBECHER:  -- experts testifying it could be any

3     number of 10 cars, 10 different cars, none of which are

4     SUV -- not -- some of which are SUV, but not all of the

5     (indiscernible).  The other thing is (indiscernible) and says

6     "arrives near the rigger shop."

7          THE COURT:  Well, I don't -- you could say vehicle.

8          MR. OFFENBECHER:  Yeah.

9          THE COURT:  Whether it arrives or passes by, that's --

10         MS. LOEFFLER:  I mean -- and that's cross-examination.

11         THE COURT:  -- (indiscernible) --

12         MS. LOEFFLER:  I don't think it --

13         THE COURT:  That sounds like it's a cross-examination.

14         MR. OFFENBECHER:  Well --

15         THE COURT:  It arrives versus -- because it does arrive

16    in order to pass time.

17         MR. OFFENBECHER:  No, it doesn't.  It just passes by on

18    the road, passes through the camera vision.  Arriving means you

19    go someplace if you stop.  That's arrival.

20         THE COURT:  I don't know if that's what it means or

21    not.  But so if we can just say small vehicle or blue vehicle.

22         MS. LOEFFLER:  Yeah, I think (indiscernible) --

23         MR. OFFENBECHER:  Small vehicle passes through the

24    camera --

25         MS. LOEFFLER:  Your Honor, I think we're entitled to

 1  say blue.  Enough people have said it.  (Indiscernible) the

 2  witness is going to say --

 3          THE COURT:  (Indiscernible) --

 4          MS. LOEFFLER:  -- it's blue.

 5          THE COURT:  Okay.

 6          MS. LOEFFLER:  And then (indiscernible) --

 7          MR. OFFENBECHER:  I don't think he will.

 8          MS. LOEFFLER:  Fine.

 9          THE COURT:  Blue vehicle.

10          MS. LOEFFLER:  I'll just take the -- I'll cover up the

11  "SUV" with a sticky so --

12          THE COURT:  Okay, blue vehicle.

13          MS. LOEFFLER:  -- nobody can see that.  Just -- we'll

14  take --

15          THE COURT:  Okay.

16          MS. LOEFFLER:  -- "vehicle" out --

17          THE COURT:  Okay.

18          MS. LOEFFLER:  -- "small blue."

19          THE COURT:  Okay.

20          MS. LOEFFLER:  And I'll take the -- I'll put a yellow

21  sticky over the "SUV."  And I wasn't planning on admitting them

22  anyway.

23          THE COURT:  Okay.  Well, we won't admit, it's subject

24  to cross-examination and argument.  It just illustrates his

25  testimony.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 746  Filed 09/23/14  Page 37 of 227
(720) 384-8078  attrans@sbcglobal.net

1      MS. LOEFFLER:  Yeah.

2      THE COURT:  It's not going to go into evidence.

3      MS. LOEFFLER:  Right.

4      MR. OFFENBECHER:  And you're going to change

5  (indiscernible) --

6      THE COURT:  Yes.

7      MS. LOEFFLER:  (Indiscernible) sticky on

8  (indiscernible).  Okay.

9      THE COURT:  That's fine.

10      MS. LOEFFLER:  Okay.

11      THE COURT:  That's fine.  (Indiscernible).

12   (End of sidebar)

13   (Side conversation; pause)

14      THE COURT:  Okay.  We've made some modifications.

15  This -- these documents are just for illustrative purposes,

16  they're not exhibits.  They're just to illustrate the witness's

17  testimony.  Counsel.

18  BY MS. LOEFFLER:

19  Q   Special Agent Sturgis, do you -- I just want to make sure,

20  you have the laser pointer, and can you see the --

21      THE COURT:  And just so the -- what I said is clear,

22  what exhibit am I referring to?

23      MS. LOEFFLER:  385.

24      THE COURT:  385.  Okay, very good.

25      MS. LOEFFLER:  Okay.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 746  Filed 09/23/14  Page 38 of 227
(720) 384-8078  attrans@sbcglobal.net

**STURGIS - DIRECT**

1  BY MS. LOEFFLER:

2  Q    And, now, you've reviewed, I take it -- and apparently

3  every time I move it aside, I create problems.  Thank you, sir.

4  Have you reviewed the videos from the base camera and T1 and T2

5  in this case?

6  A    Yes, ma'am, I have.

7  Q    And I don't -- I'll just -- how many times?

8  A    Plenty -- plenty of times.

9  Q    Okay.  Now, in terms of the base camera, on April 12th,

10  what is the first reference point of Mr. Wells' movements that

11  you can see from the video evidence?

12  A    At 0648.

13  Q    Okay.  Now --

14  A    Right here.

15  Q    And that's the first thing on the timeline?

16  A    Yes, ma'am.

17  Q    Now, at 0648, what is it that you see based on the video

18  evidence?

19  A    I see Mr. Wells's white truck passing from the flats

20  towards the airport.

21  Q    Okay.  And I would ask to pull up -- it has not yet been

22  admitted -- Exhibit 142.  And does Exhibit 142 -- can you tell

23  us what it is?

24      (Side conversation)

25  Q    Looking at the screen on Exhibit 142, can you tell us what

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 39 of 227
(720) 384-8078   attrans@sbcglobal.net

1  that is?

2  A   That is the video footage from the base front gate of Mr.

3  Wells's truck at 6:48.

4       MS. LOEFFLER:  I would move Exhibit 142.

5       MR. OFFENBECHER:  No objection.

6       THE COURT:  It'll be received.

7       (Plaintiff's Exhibit 142 admitted)

8  BY MS. LOEFFLER:

9  Q   And I'll put on the dock camera what's been marked as

10 Exhibit 142A.

11      (Side conversation)

12 Q   All right.  And this is a -- I don't -- you're looking at

13 the screen.  It's a hard copy.  But what is that hard copy of?

14 A   Of the same thing.

15 Q   Okay.  So it's a -- the screen capture in a hard copy.

16 A   Yes, ma'am.

17      MS. LOEFFLER:  Okay.  I -- I'd move Exhibit 142A.

18      MR. OFFENBECHER:  No objection.

19      THE COURT:  It'll be received.

20      (Plaintiff's Exhibit 142A admitted)

21      (Side conversation)

22 BY MS. LOEFFLER:

23 Q   So that's a just a screen capture off the video?

24 A   Yes, ma'am.

25 Q   All right.  What direction was Mr. Wells' truck heading at

1  6:48:23, according to the video?

2  A    Towards the airport.

3  Q    Okay.  Now, when is the next videocamera that captured

4  Mr. -- captures Mr. Wells' truck on that day?

5  A    7:22, right there.

6  Q    Okay.  And I will pull up Exhibit 143, please.  And turn

7  to the time of approximately 7:22 in the morning.  Can you tell

8  us what that was that you just saw?

9  A    That was Mr. Wells's truck driving from the direction of

10  the airport towards Bells Flats.

11        MS. LOEFFLER:  And I would move Exhibit 143.

12        MR. OFFENBECHER:  No objection, Your Honor.

13        THE COURT:  It'll be received.

14     (Plaintiff's Exhibit 143 admitted)

15        MS. LOEFFLER:  If we can play that.  Tell us what's --

16  okay.

17  BY MS. LOEFFLER:

18  Q    So what do they -- what was the -- what did the jury just

19  see?

20  A    They saw Mr. Wells's truck going from the direction of the

21  airport towards Bells Flats.

22  Q    And now I'm going to put on the dock camera what we have

23  marked as Exhibit 143A, and ask you what that is.

24  A    That's the still shot from the video.

25        MS. LOEFFLER:  Okay.  I'd move Exhibit 143A.

1    MR. OFFENBECHER:  No objection.

2    THE COURT:  It'll be received.

3    (Plaintiff's Exhibit 143A admitted)

4  BY MS. LOEFFLER:

5  Q    So that's just, again, screen shot off the camera?

6  A    Yes, ma'am.

7  Q    All right.  Now, the two pictures of Mr. Wells's truck,

8  one going one way, and this last one we looked -- is going

9  which way?

10  A    Going towards the flats.

11  Q    What's the time gap between these two views of Mr. Wells'

12  truck on the morning of April 12th?

13  A    Approximately 34 minutes.

14  Q    Okay.  In that 34 minutes, is there any other camera or

15  evidence -- camera evidence of where he was?

16  A    No, ma'am.

17  Q    Okay.  Now I want to ask you a few further questions at

18  this point based on your distance and time calculations of how

19  long it would take for a vehicle to travel some of the other

20  places mentioned in the time, using the speed limits as the

21  calculating point.

22  A    Yes, ma'am.

23  Q    Okay.  Now, again, using the calculations that you have

24  done and taking this 6:48:23 time, approximately how long would

25  it have taken Mr. Wells, if he was driving the speed limit, to

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

**STURGIS - DIRECT**

1 get to the airport turnoff?

2 A    Approximately two minutes.

3 Q    Okay.  And if you add it to the time -- so, again, driving

4 the speed limit, he'd get -- he would get to the airport

5 approximately what time?

6 A    6:50.

7 Q    And to get from the airport to the COMMSTA, again, driving

8 the speed limit, how long would that take according to your

9 calculations?

10 A    Approximately three minutes.

11 Q    All right.  And I also want you to ask -- did you do a

12 distance-time calculation from the turnoff to the airport to

13 the location where Mrs. Wells' car was found?

14 A    Yes, ma'am, I did.

15 Q    And what was that time calculation?

16 A    The calculation was approximately a minute.

17 Q    Now, in your calculation did you any time for potentially

18 changing cars, if somebody were to get out and change cars?

19 A    Not in my calculation, no.

20 Q    Did you review Exhibit 171, the -- Mr. Woods' video, just

21 to determine the amount of time in his video from the turnoff

22 and the things that the jury saw?

23 A    Yes, ma'am, I did.

24 Q    And how much was that?

25 A    A minute 50 seconds.

1 Q    Okay.  Now, based on these driving times, did you do any

2 calculation to see whether there would have been time to have

3 committed the murder based on the video evidence that you saw?

4 A    Yes, ma'am.

5 Q    And what did you find?

6      MR. OFFENBECHER:  Your Honor, I would object.  It calls

7 for an awful lot of speculation on the part of the witness

8 about what happened, what didn't happen.  I'm not exactly sure

9 what kind of recreation he did, but it simply calls for

10 specification on the part of the witness about facts that --

11     THE COURT:  So what are you asking, counsel?  Not

12 you -- not --

13     MS. LOEFFLER:  Let me come around so I can see you,

14 Your Honor.  I was trying not to just do math calculations of

15 each one, but I'm just saying, if you take out the drive time,

16 is there time left over.  That's what I'm trying to establish.

17 If you take out the time --

18     THE COURT:  Well, you could ask that question.

19     MS. LOEFFLER:  Okay, I will do it that way.  I'm happy

20 to do it that way (indiscernible).

21     THE COURT:  Is there time left over.

22     MS. LOEFFLER:  Yeah.  Okay.

23 BY MS. LOEFFLER:

24 Q    Special Agent Sturgis, if you take this 34-minute time gap

25 and you subtract the time it would take to drive to the

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 746  Filed 09/23/14  Page 44 of 227
(720) 384-8078  attrans@sbcglobal.net

1  airport, to drive down to the spot where Mrs. Wells' car -- to

2  drive to the COMMSTA, and back, is there still time left over

3  within that gap?

4  A    Yes, ma'am.

5  Q    About how much time?

6  A    Approximately 20 to 22 minutes.

7  Q    Okay.  Now I want to ask you -- turn to a few other

8  calculations that you did.  And starting with -- did you --

9  based on the video, when did Mr. Belisle get to work on the

10  morning of April 12th?

11 A    Around 7 o'clock.

12 Q    And I will pull up Exhibit 148.

13      (Side conversation)

14      THE COURT:  Are you still needing these boards?

15      MS. LOEFFLER:  I am, Your Honor, but I'm --

16      THE COURT:  Okay.  All right.

17      MS. LOEFFLER:  -- happy to move them so you can --

18      THE COURT:  No.

19      MS. LOEFFLER:  -- see.

20      THE COURT:  No, I'm good.  But once you no longer need

21 them, take them down.

22      MS. LOEFFLER:  I will do that.  We're going to --

23      THE COURT:  I've --

24      MS. LOEFFLER:  -- go back to the boards.

25      THE COURT:  I've pretty well studied the back of them.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1       MS. LOEFFLER:  Okay.

2       (Side conversation)

3    BY MS. LOEFFLER:

4    Q   I'm sorry, it's Exhibit 149.

5       (Side conversation)

6    Q   Let's show Exhibit 149.  Okay.  And what time is that on

7    the clock, Special Agent Sturgis?  Who is that arriving?

8    A   That's Mr. Belisle.

9    Q   Okay.  And can you point on your time chart to the time

10   for Mr. Belisle's arrival?  Okay.  Now --

11      THE COURT:  I don't know if the jury's looking at the

12   picture or at the time chart.

13   BY MS. LOEFFLER:

14   Q   Okay.  Did you -- and you pointed to the -- just -- the

15   judge can't see what you did.  You pointed to the time chart

16   and you're trying to match it with the picture as well?

17   A   Yes, ma'am.

18   Q   All right.  Now, when did Mr. Hopkins arrive, according to

19   the T2 camera?

20   A   7:08.

21   Q   And can we switch to 7:08?  And is that Mr. -- which one

22   is Mr. Hopkins?

23   A   That's Mr. Hopkins.

24   Q   Okay.  And, again, now I'm having you point on the

25   timeline.  Does that show the arrival of Mr. Hopkins?  Okay.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1  A   Yes, ma'am.

2  Q   And for the record -- although the judge can't see it, you

3  pointed to the part of -- on the timeline.  Okay.  Are you

4  aware of where both men lived?

5  A   Yes, ma'am, I am.

6  Q   Where did Mr. Belisle live?

7  A   He lived in Bells Flats.

8  Q   Where did Mr. Hopkins live?

9  A   He lived at Aviation Hill, on the Coast Guard base.

10  Q   Okay.  And if we can pull up Exhibit 51, I'll ask you to

11  point out where he lived.

12     (Side conversation)

13  Q   Can I ask you what Exhibit 74 is?

14  A   It's a general overview map of the area between Bells

15  Flats past the base and up towards the COMMSTA.

16  Q   And it's -- is it similar to Exhibit 73, except it doesn't

17  have the time and distances on it?

18  A   Yes, ma'am.

19  Q   All right.

20        MS. LOEFFLER:  I'd move Exhibit 74.

21        MR. OFFENBECHER:  No objection, Your Honor.

22        THE COURT:  It'll be received.

23     (Plaintiff's Exhibit 74 admitted)

24  BY MS. LOEFFLER:

25  Q   Okay.  So looking at Exhibit 74, can you point out with

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 47 of 227
(720) 384-8078   attrans@sbcglobal.net

1    your pointer approximately where Aviation Hill is?

2    A    Yes, ma'am.

3    Q    Where is that?

4    A    That's Aviation Hill.

5    Q    Okay.  So that's, like, the round circle of -- that's in

6    between the BSU main gate and the Kodiak Airport?

7    A    Yes, ma'am.

8    Q    And in order to get to the COMMSTA from Aviation Hill, how

9    do you have to drive?

10   A    You would have to make a left on Rezanof, drive past the

11   airport, and make a left on Anton Larsen Bay Road.

12   Q    Okay.  So with regard to Mr. Belisle and Mr. Hopkins,

13   could either of them get to the COMMSTA without going by the

14   airport?

15   A    No, ma'am.

16   Q    All right.  All right, now, going back to your math

17   calculations, knowing the time that they both arrived or

18   appeared to pull in to T2, can you calculate approximately,

19   working backwards, when Mr. Belisle would have had to have

20   passed the airport to get to work?

21   A    Yes, ma'am.  Approximately 6:56, 6:57.

22   Q    What about Mr. Hopkins?

23   A    The same, approximately 7:04, 7:05.

24   Q    Okay.  When you say the same, you're just calculating

25   the --

1  A    Yes, same calculation.

2  Q    -- the time driving backwards from when they arrived?

3  A    Yes, ma'am.

4  Q    All right.  Now, are you familiar where the Comfort Inn

5  is?

6  A    Yes, ma'am, I am.

7  Q    Can you see Rezanof Road from the Comfort Inn?

8  A    Yes, ma'am.

9  Q    Okay.  And I think this is the one where -- Exhibit 51.

10     (Side conversation)

11  Q    Okay.  Yes, it's been admitted.  Can you show on this map

12  where the Comfort Inn is?

13  A    Right there.

14  Q    All right.  And from the parking lot of the Comfort Inn,

15  where's Rezanof Drive?

16  A    It's right there.

17  Q    All right.  Can you see it from the Comfort Inn parking

18  lot?

19  A    Yes, ma'am, you can.

20  Q    All right.  Now I want to ask you some questions about the

21  small blue car we've seen on the videos from COMMSTA.  How many

22  times have you watched these videos?

23  A    A lot of times.

24  Q    And we'll pull up Exhibit 155, which is the T1 camera.

25  And ask you, Kim, to go to approximately 7:09 on the Exhibit

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 49 of 227
(720) 384-8078  attrans@sbcglobal.net

1  155.

2      (Side conversation)

3  Q   155.  It's not been admitted, so I'll have you take a look

4  at it first and see if you recognize this video.

5  A   Yes, ma'am.

6      (Side conversation)

7  Q   What is this video, Special Agent Sturgis?

8  A   This is the T1 camera that looks down the hill at the back

9  side of T2 building.  And it's the video, around 7:09, from

10 April 12, 2012.

11      MS. LOEFFLER:  Okay.  I'd move Exhibit 155.

12      MR. OFFENBECHER:  No objection.

13      THE COURT:  It will be received.

14      (Plaintiff's Exhibit 155 admitted)

15      MS. LOEFFLER:  Yeah, can you start over, Kim, and can

16 we play it slowly?  Okay, stop.  Can you just back up a frame

17 or two and then pause it?  I want to ask a question.  Okay,

18 stop.

19 BY MS. LOEFFLER:

20 Q   Now, Special Agent Sturgis, at what time does this vehicle

21 come into view on the camera?

22 A   7:09:21.

23 Q   Okay.  And is that one of the numbers that you have on the

24 timeline?

25 A   Yes, ma'am, approximately.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 746  Filed 09/23/14  Page 50 of 227
(720) 384-8078  attrans@sbcglobal.net

1  Q    Okay.  So the timeline says 7:09:20?

2  A    Yes, ma'am.

3  Q    All right.  And how long after Mr. Hopkins came in does

4  this blue vehicle come into view?

5  A    Less than a minute.

6  Q    Okay.  Now, reviewing the T2 camera, is there a place

7  where you believe you can tell where the blue car first goes by

8  the T2 camera?

9  A    Yes, ma'am, there is.

10  Q    Let's play the T2 camera, and I'll ask you to explain

11  that.  I would ask to pull up Exhibit 149, from about 7:07.

12  And before we pull it up --

13      (Side conversation)

14  Q    All right.  Now, the T2 camera that we're looking at in

15  Exhibit 149 -- and I think you said earlier that the time in

16  the purple -- or in the maroon is correct, but the time with

17  the numbers on the top is six minutes off?

18  A    Yes, ma'am.

19  Q    All right.  Turning to the T2 camera, we obviously see

20  cars pulling into COMMSTA and into the parking lot.  Is there a

21  place on the T2 camera where you can see cars on Anton Larsen

22  Bay Road?

23  A    Yes, ma'am, you can -- you can see vehicles as they

24  approach and as they leave, right about there.

25  Q    Okay.  Can you identify them from that?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 746  Filed 09/23/14  Page 51 of 227
(720) 384-8078  attrans@sbcglobal.net

1  A    Not from this view --

2  Q    Okay.

3  A    -- but, you know, from reasoning how -- how many vehicles

4  go by and how many vehicles turn up, you can -- you can make

5  your own determination on the --

6  Q    Well, I'm going to play the T --

7  A    -- how many vehicles.

8  Q    -- this T2 video, and then I'm going to ask you -- explain

9  to the jury what that -- determination you had from watching

10 this video.

11 A    Yes, ma'am.

12 Q    So we can play Exhibit 149, please.  And point out to the

13 jury when you can see cars going by.

14 A    Just kind of focus in this area right here.

15 Q    Stop.  All right, go back.  So that's what you mean is --

16 what do you see?

17      MR. OFFENBECHER:  Well, Your Honor, I think the witness

18 should be able to testify rather than the attorney.

19      MS. LOEFFLER:  I just asked, "What do you see?"  I

20 think that's the witness testifying.

21      THE WITNESS:  I see headlights and the shape of a

22 vehicle right here.

23 BY MS. LOEFFLER:

24 Q    Okay.

25 A    Coming towards the COMMSTA and golf course area.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 746  Filed 09/23/14  Page 52 of 227
(720) 384-8078  attrans@sbcglobal.net

1   Q    Okay.  Can we continue to play, Kim?  Thank you.

2   A    That's one; there's two; there's three; there's four.

3   Q    Okay.  Now, we saw -- did you see the first three that you

4   talked about appear again on the camera?

5   A    As they passed this area, they turn and come up this road

6   right here.  And that's the first three vehicles that I was

7   able to see.

8   Q    The fourth one that we saw go by, does that turn up?

9   A    No, ma'am.

10  Q    And how does that correlate with the blue vehicle that we

11  see on the T1 video?

12  A    It follows the same -- from the T1 video you see the same

13  three vehicles come in.  And then the -- the blue vehicle

14  followed towards the golf course.

15  Q    Okay.  So can you reach any conclusion about what you

16  saw -- the fourth vehicle there and the one that we see go by

17  toward the golf course?

18  A    Yes, ma'am.  I believe it to be the blue vehicle that goes

19  by here and then goes towards the golf course.

20  Q    Okay.  Now, of those four cars, could you determine

21  whether any of them had their headlights on?

22  A    Yes, ma'am, you can.

23  Q    And what was your determination there?

24  A    The first three vehicles had headlights on.  The fourth

25  vehicle didn't appear to have their headlights on.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 746  Filed 09/23/14  Page 53 of 227
(720) 384-8078  attrans@sbcglobal.net

**STURGIS - DIRECT**

1  Q   Did you also do some calculations based on your viewing of

2  the video of the time it took for various cars to go by where

3  you can see them on T2 and where you can see them turn up

4  around the T1 camera?

5  A   Yes, ma'am.

6  Q   And are those on Exhibit 390, the chart that you did?

7  A   Yes, ma'am, they are.

8  Q   Let's pull up 390.

9      (Side conversation)

10 Q   I'm going to put it on -- Special Agent Allison, can you

11 get me the hand mic, because I have to stand over here, and I'm

12 not sure whether we can hear when I do that.  On Exhibit 390 --

13 I'm looking -- can -- am I okay?  Okay.  You had parentheses in

14 the column that says "T2 approximate time."  What are the

15 numbers in those parentheses?

16 A   That's the -- the difference between the time a vehicle

17 passes through the trees and then it actually shows up on

18 frame.  It's approximate.

19 Q   Okay.  Did you do that for -- and the blue car -- I

20 remember -- can look at the one that says -- let's see, this is

21 the easiest way -- that comes out as unknown on your -- let me

22 get my -- the one that says "unknown."  What is that?

23 A   That's the small blue vehicle that turns on the T1 camera

24 going towards the golf course.

25 Q   Did you do any time calculation in order to determine the

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 54 of 227
(720) 384-8078   attrans@sbcglobal.net

**STURGIS - DIRECT**

1  amount of time that that car took from where it can be seen on

2  the bushes coming in, and the amount of time it took going out?

3  A    Yes, ma'am, I did.

4  Q    And can you tell the -- what was the difference?

5  A    From the time you see that vehicle through the trees and

6  the time it shows up on the T1 camera is approximately 29

7  seconds.

8  Q    On the way in?

9  A    On the way in.

10  Q    What was the time difference on the way out?

11  A    Fifteen seconds.

12  Q    Okay.  Now I want to go back to Exhibit 155.  And, Kim,

13  I'm going to ask you to play approximately 7 -- start at 7:14.

14      (Side conversation)

15  Q    Okay.  Can I have you go back and just stop it when we see

16  this blue vehicle.  Okay, that's great.  Thank you.  Now,

17  Special Agent Sturgis, approximately when do you see the blue

18  vehicle reappear, heading toward -- on Anton Larsen Bay Road

19  toward the airport?

20  A    07:14:32.

21  Q    Okay.  And can you point to the timeline when you have

22  that on the timeline?  Okay.  You have it at 31.

23  A    Yes.

24  Q    Is --

25  A    Appro -- yes, ma'am.

Case 3:13-cr-00008-SLG  Document 746  Filed 09/23/14  Page 55 of 227

1  Q    Okay.  Now starting 7:14:32, did you take -- do a

2  mathematical calculation of how long it would take to travel

3  from the point where this blue vehicle is first seen back to

4  Mr. Wells's house?

5  A    Yes, ma'am, I did.

6  Q    Did you include an approximate time for driving down to

7  where the -- Ms. -- Mrs. Wells' car was found at the airport?

8  A    Yes, ma'am, I did.

9  Q    First I'm going to ask you to explain what you did.

10 A    Okay.

11 Q    Yeah.  Would it help you if I put up the chart that you

12 did --

13 A    Yes, ma'am, it --

14 Q    -- the numbers on?

15 A    Yes, ma'am, it would.

16     (Side conversation)

17 Q    Exhibit 391.  And I had not moved it in previously.  I'm

18 going to ask you if that's the chart with your calculations on

19 it?

20 A    Yes, ma'am, it is.

21     MS. LOEFFLER:  I'd move Exhibit 391.

22     MR. OFFENBECHER:  I do have an objection, Your Honor,

23 same objection I had earlier.

24     THE COURT:  Well, it can be received subject to cross-

25 examination, but to demonstrate his testimony.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1          MR. OFFENBECHER:  Your Honor, can we --

2          THE COURT:  Yeah.

3          MR. OFFENBECHER:  -- be heard at the sidebar?

4      (At sidebar with the Court and counsel)

5          THE COURT:  Okay, you wanted more time to calculate,

6  right?

7          MR. OFFENBECHER:  I do.  But --

8          THE COURT:  Okay.

9          MR. OFFENBECHER:  -- it also --

10         THE COURT:  Oh, (indiscernible).

11         MR. OFFENBECHER:  -- has the same thing -- problem that

12  the other thing does.  They're characterizing what it is.

13         THE COURT:  Okay.

14         MS. LOEFFLER:  I can black out the -- I'll put it on

15  the overhead and I'll black out the --

16         THE COURT:  Okay.

17         MS. LOEFFLER:  -- word "SUV."

18         THE COURT:  Okay.

19         MS. LOEFFLER:  Okay.  (Indiscernible).

20         THE COURT:  Good.  Thank you.

21      (End of sidebar)

22      (Side conversation)

23         MS. LOEFFLER:  Judge, it's admitted, right?  We can use

24  it?

25         THE COURT:  Yes.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1    (Plaintiff's Exhibit 391 admitted)

2        MS. LOEFFLER:  Okay.  I think I need to zoom out a

3  little bit so we can see what this is.  All right.

4  BY MS. LOEFFLER:

5  Q   Special Agent Sturgis, can you tell me what you did to

6  make this chart?

7  A   Yes, ma'am.  I calculated the distance between the COMMSTA

8  to Rezanof Drive.  And that's this calculation right here.

9  Q   You said the distance.  Did you calculate -- how did you

10 calculate the drive time?

11 A   The drive time is from point A to point B.  And I

12 calculated that by taking the distance and dividing it by the

13 speed limit, listed speed limit, and this was the time that I

14 came up with.

15 Q   Okay.

16 A   And -- go --

17 Q   In -- so in each one of these segments -- so that one is

18 the time from COMMSTA to Rezanof Drive, Airport Way?

19 A   Yes, ma'am.

20 Q   All right.  What's the next one, the one that says a

21 minute fifty?

22 A   This is Agent Woods's turnaround time that was displayed

23 during his testimony.

24 Q   Okay.

25 A   I -- I got that from the video.  And the only reason I

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 58 of 227
(720) 384-8078  attrans@sbcglobal.net

1  used that time was because there's no way for me to calculate

2  how long it would take someone to get out of one vehicle, get

3  in another, and that type of situation.  So I used his time of

4  display.

5  Q   And just to be clear -- and I think I asked you earlier,

6  if you just do a distance calculation, what was your time?

7  A   Fifty-four seconds.

8  Q   Okay.  Now, then what was the amount of time from driving

9  at the airport turnoff to Base Kodiak where the videocamera is?

10 A   Two minutes and eight seconds, right -- right here.

11 Q   Okay.  And then you have a calculation for how long to

12 drive, using the speed limits from Base Kodiak, the camera, to

13 Mr. Wells' residence.

14 A   Yes, ma'am.

15 Q   All right.  Now I'm going to ask you what you did under

16 the calculated time column.  And would you explain that to the

17 jury, please?

18 A   What I did is I used the knowns from the video footage.

19 Known when the small blue vehicle leaves the camera view, from

20 T1.  Used my calculation for the speed limit at that distance,

21 how long it would take to get from this point, COMMSTA to

22 Rezanof Drive, Airport Way.

23 Q   So you start at 7:14:31, and when you add that time, what

24 do you get for that part of the segment?

25 A   7:17:36.

1  Q    Okay.  Explain the next segment, please.

2  A    The next segment is Agent Woods with his demonstration

3  time, added to the 17:36, which came out to 7:19:26.

4  Q    And then did you calculate from there to the base camera?

5  A    Yes, ma'am.  That's this calculation right here.

6  Q    How much time would that take to drive?  Again, driving

7  the speed limit, based on your calculations.

8  A    Two minutes eight seconds.

9  Q    And what does -- if you add that to the other time, what

10 time comes out?

11 A    7 -- 7:21:34.

12 Q    How does that compare to the actual time that Mr. Wells is

13 seen driving toward his home back through the base camera?

14 A    This was the known time that he passed, heading back

15 towards his house in -- in Bells Flats.  And this was my

16 calculated time.  It's about 35 seconds difference.

17 Q    Okay.  And then the amount of time that you calculated

18 with a speed limit driving from where the base gate sees him to

19 getting back to Mr. Wells's residence.

20 A    Yes, ma'am.  It's about seven minutes thirty-nine seconds.

21 Q    Okay.  And what would -- when would that put him home if

22 that were the -- if he was driving the speed limit?

23 A    7:29:13.

24 Q    And you have an actual time as 7:30.  Why do you have that

25 listed there?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 746  Filed 09/23/14  Page 60 of 227
(720) 384-8078  attrans@sbcglobal.net

**STURGIS - DIRECT**

1  A    That's the -- the known time that Mr. Wells made the phone

2  call to Mr. Hopkins.

3  Q    Okay.

4      (Side conversation)

5  Q    Now, did you look at the -- I asked you whether you made

6  a -- looked at some more video evidence.  And that is the time

7  it took Mr. Wells to actually get to the COMMSTA on April 12th

8  when he came into work.

9  A    Yes, ma'am.

10 Q    And can you explain to the jury what you used to figure

11 out what his actual drive was?

12 A    I -- the same method as before.  I -- I looked at the base

13 camera for when he came back towards the airport.

14 Q    And when was that?  What time did he go past the base

15 camera, heading back to work?

16 A    8:16.

17 Q    And what time, according to the video, did he arrive at

18 COMMSTA?

19 A    8:23.

20 Q    And how did that compare to your mathematical

21 calculations?

22 A    It was -- it was pretty close.  I mean, it's a -- it's

23 a -- about the same time.

24 Q    Now, did you also review the camera to determine drive

25 times home?

1  A    Yes, ma'am, I did.

2  Q    And explain to the jury what you did there.

3  A    I looked for when Mr. Wells left, April 12th, later in the

4  evening, sometime around 9 to 10 o'clock, when he left work,

5  heading back towards home.  I took the time when he left out of

6  the camera frame view from the COMMSTA and when he showed back

7  up on the front gate --

8  Q    Okay.

9  A    -- camera.

10  Q    And what time difference was that?

11  A    It was approximately five minutes.

12  Q    How did that compare to your calculations?

13  A    Well, if you use the three minutes here and eliminate

14  the -- the vehicle exchange one minute and fifty seconds, and

15  use the two minutes here, if you add those two times together,

16  it's approximately five minutes.

17  Q    Okay.  Now, we can take down -- Special Agent Allison, we

18  can take down the time chart now.

19      (Side conversation)

20          THE COURT:  It's about --

21  BY MS. LOEFFLER:

22  Q    I'm showing you what's been admit --

23          THE COURT:  It's about break time, so -- I don't want

24  to do what I did the other --

25          MS. LOEFFLER:  I do have a few more minutes, so why

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 746  Filed 09/23/14  Page 62 of 227

 1  don't we take the break, so we don't end up with the --

 2          THE COURT:  Okay.

 3          MS. LOEFFLER:  -- looking like the lawyers have mis --

 4          THE COURT:  Okay.

 5          MS. LOEFFLER:  -- identified --

 6          THE COURT:  Let's take a -- 15 minutes.

 7          MS. LOEFFLER:  Okay.

 8      (Jury not present)

 9          THE COURT:  Okay, we'll stand in recess for 15 minutes.

10          THE CLERK:  Okay.

11          THE COURT:  Mr. Offenbecher, this will give you some

12  more time to do your math.

13          THE CLERK:  All rise.

14          MR. OFFENBECHER:  Thank you, Your Honor.

15          THE CLERK:  Matter stands in a 15-minute recess.

16      (Court recessed at 9:58 a.m., until 10:17 a.m.)

17      (Jury not present)

18          THE CLERK:  All rise.

19          THE COURT:  Okay, well, bring in -- the jury in.

20          THE CLERK:  His Honor the Court, the United States

21  District Court is again in session.

22      (Jury present)

23          THE COURT:  Okay.  Please be seated.  Welcome back.

24  Remember, we have to stop about 10 till.  So go for it.

25          MS. LOEFFLER:  Okay.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 746  Filed 09/23/14  Page 63 of 227
(720) 384-8078  attrans@sbcglobal.net

1  BY MS. LOEFFLER:

2  Q   Special Agent Sturgis, I'm going to put back up Exhibit

3  390.  And who did this chart?

4  A   I did.

5  Q   What was the purpose of it?

6  A   It was to identify the vehicles that were seen on T1 and

7  T2 cameras.

8  Q   Okay.  And what did you do in order to do it?

9  A   I reviewed both camera systems and went through with --

10 with several of the COMMSTA people, people that worked there at

11 the COMMSTA, to identify the -- the vehicles.

12 Q   From the time frame in which the murders were committed,

13 were there any vehicles that either drove by or drove onto the

14 COMMSTA property that you were not able to identify?

15 A   Yes, ma'am, one.

16 Q   Which one?

17 A   The small blue vehicle.

18 Q   Okay.  Take that down.  Now I want to turn to another few

19 areas of testimony.  Looking at the video on the T2 camera in

20 preparation for the testimony today -- and I think it's Exhibit

21 151.  Do I have that?

22     UNIDENTIFIED SPEAKER:  Uh-huh (affirmative).

23 BY MS. LOEFFLER:

24 Q   Did you -- were you able to on the camera to determine

25 when Mr. Acosta dropped off ET3 -- I'm -- or, sorry, Petty

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 746  Filed 09/23/14  Page 64 of 227

**STURGIS - DIRECT**

1  Officer 3 Cody Beauford?

2  A   Yes, ma'am.

3  Q   And I'm going to pull up Exhibit 151.  Turn to

4  approximately 7:34, Kim.  And ask you if this -- this has been

5  admitted, right?

6          UNIDENTIFIED SPEAKER:  Yes.

7          MS. LOEFFLER:  All right.  So let's pull it up for the

8  jury.

9  BY MS. LOEFFLER:

10  Q   And ask you to identify when Mr. Acosta drops off Cody

11  Beauford.

12  A   You'll have to zoom out a little.

13      (Side conversation)

14  Q   What are we seeing, Special Agent Sturgis?

15  A   That's Petty Officer Acosta's truck pulling up and

16  dropping Petty Officer Beauford off.

17  Q   And what time is that, that that happened?

18  A   7:34.

19  Q   Okay.  Now, were you also -- can you see -- if you'll stop

20  for a second -- on this video when Mr. Bullis drives by?

21  A   Yes, ma'am.

22  Q   Approximately when is that?

23  A   7:35.

24  Q   Okay.  Could we go ahead and continue playing this, Kim?

25  And I will ask you just to point out when that's the case.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 65 of 227
(720) 384-8078  attrans@sbcglobal.net

1   A    Yes, ma'am.  That's, I believe, Petty Officer Spencer's

2   black Ford truck.  And that's Petty Officer Bullis.

3   Q    Okay.  So based on the video evidence, can you describe to

4   the jury the timing of -- between when Mr. -- when Petty

5   Officer Beauford was dropped off and when Mr. Bullis drove down

6   the road next to COMMSTA?

7   A    Petty Officer Beauford was dropped off around 7:34, and a

8   minute later, Petty Officer Bullis drives past.  You can

9   actually see it a little better on the T1 camera.

10      (Side conversation)

11  Q    Now I want to turn to a little -- a different area.  Do

12  you recall the video that was played about the white truck

13  that's seen the night before on April 11th?

14  A    Yes, ma'am.

15  Q    Did you do any further review concerning that video to

16  determine whether -- where that -- make any determination

17  whether -- where that truck came or went from?

18  A    Yes, ma'am, I did.

19  Q    Can you explain what you did?

20  A    I broadened the scope of the time when the truck does the

21  turnaround or -- around 10:28 and 10:36.  Basically, I

22  broadened the scope before or after, to see if you can see when

23  the vehicle comes in and when it leaves.

24  Q    What did you find from the longer video?

25  A    I found a vehicle that was consistent at 10:06, driving in

1   towards the golf course.  And then I found a vehicle that was

2   consistent at 11:26, leaving the golf course and back towards

3   Rezanof.

4   Q    Okay.  Now I'm going to show you what's been marked as

5   Exhibit 373.

6        (Side conversation)

7   Q    Can I ask you if you can recognize what Exhibit 373 is?

8   A    Yes, ma'am.  It's the Coast Guard police rounds and

9   building checks for April 12th.

10  Q    Are you familiar with this document?

11  A    Yes, ma'am, I am.

12  Q    And how many pages is the document?

13  A    I believe it to be --

14  Q    Oh --

15  A    -- one -- one page here, but there's usually a second page

16  with it.

17  Q    And is this a document that you've seen before and can

18  recognize?

19  A    Yes, ma'am, it is.

20        MS. LOEFFLER:  I'd move Exhibit 373.

21        MR. OFFENBECHER:  No objection, Your Honor.

22        THE COURT:  It'll be received.

23       (Plaintiff's Exhibit 373 admitted)

24  BY MS. LOEFFLER:

25  Q    Turning to the first page of Exhibit 373, is there a zone

**STURGIS - DIRECT**

1   on Exhibit 373 that corresponds to the area near COMMSTA?

2   A   Yes, ma'am.  Zone 6 is the golf course, COMMSTA zone.

3   Q   Can we -- Kim, can we expand the area in the right column

4   that says Zone 6 and the little handwritten numbers next to it?

5   Okay.  What are the handwritten numbers next to the area that

6   says Zone 6?

7   A   It's the round time and the person who did the round.  The

8   first number is a four-digit number that is the time in -- in

9   military time.

10  Q   So --

11  A   The sec --

12  Q   -- 2144 is what -- can we --

13  A   9 -- 9:44 p.m.

14  Q   Okay.  So what does that document show happens at 9:44

15  p.m.?

16  A   A Zone 6 round occurred at 9 -- around 9:44 p.m.

17  Q   Were there other rounds that night by military police?

18  A   Yes, ma'am, there was.

19  Q   And when were they?

20  A   One was at 0229, is what it looks like, by Officer 253.

21  And then at 0608 by Officer 250.

22  Q   Did you look on the actual video from that night to see if

23  you could verify that the rounds were done?

24  A   Yes, ma'am, I did.

25  Q   What did you see?

Case 3:13-cr-00008-SLG  Document 746  Filed 09/23/14  Page 68 of 227

1  A    I see at 0214 through 17, I believe, approximate times.

2  One vehicle goes towards the golf course and one vehicle goes

3  away from the golf course.

4  Q    Okay.  And what about the -- at the 6 o'clock one?

5  A    Yes, ma'am, same, same scenario.  One vehicle at about the

6  6:08 time frame drives out to the golf course and then comes

7  back from the golf course area.

8  Q    Are you familiar with any procedure from military police

9  if there are anomalies or things that they record?

10  A    Yes, ma'am.  If they -- if there's a -- anything out of

11  the ordinary, anything that wouldn't -- they would have picked

12  up on, like a vehicle parked in a odd place or -- or people

13  moving around, or anything out of the ordinary, they would have

14  reported it back to dispatch and dispatch would have entered it

15  into their system.

16  Q    Was there any such thing for that night?

17  A    Not that I can -- not that I can recall.  I looked through

18  the -- the charts and I didn't see anything.

19  Q    I have no other -- nothing further, Special Agent Sturgis.

20         THE COURT:  Cross-examination.

21         MR. OFFENBECHER:  Thank you, Your Honor.

22                    **CROSS-EXAMINATION**

23  BY MR. OFFENBECHER:

24  Q    Special Agent Sturgis, good morning.

25  A    Good morning, sir.

1  Q    Could you pull up Government's 395, please?  Do you have

2  that one, Kim?

3       (Side conversation)

4  Q    Can you take a look at that, Special Agent Sturgis?

5  A    Yes, sir.

6  Q    You testified about this this morning, didn't you?

7  A    Yes, I did.

8  Q    And this exhibit was admitted, wasn't it?

9       MS. LOEFFLER:  It was.

10      THE WITNESS:  I believe so.

11 BY MR. OFFENBECHER:

12 Q    Yes, it was.

13 A    Yes, sir.

14 Q    Can you publish it, please?  So just so we're clear here,

15 this is Government's Exhibit 395 that you've talked about.  And

16 you have different columns here for actual -- for speed limit

17 you have two different columns, right?

18 A    Yes, sir, I do.

19 Q    And then for time you have two different columns.  Right?

20 A    Yes, sir.

21 Q    And on the -- this actual, as I -- if I understand it,

22 were the actual -- what you're now testifying is the correct

23 ones.  Right?

24 A    Yes, sir, that's -- that's correct.

25 Q    And then the previous one refers to another exhibit that

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 70 of 227
(720) 384-8078  attrans@sbcglobal.net

1  was previously admitted.  Right?

2  A    Yes, sir, it is.

3  Q    And, similarly, over here on the time, the calculations --

4  you have what you now understand to be the correct numbers.  Is

5  that right?

6  A    Yes, sir.

7  Q    And then over here you have what were the previously -- on

8  the previous exhibit, you had the numbers.  Right?

9  A    Yes, sir, that's correct.

10  Q    And the previous exhibit was Government Exhibit Number 73,

11  wasn't it?

12  A    I'm not sure what the number is, but --

13  Q    But it's another one of the government's exhibits, right?

14  A    Yes, sir, it is.

15  Q    And the calculations on that other government exhibit

16  that's already been admitted are incorrect, aren't they?

17  A    Yes, they are.

18  Q    And that exhibit has already been admitted.  Right?

19  A    The -- the actual calculations are correct.  It's the

20  speed limit that -- that changes those calculations.

21  Q    Sure.  And the way that you've done all these times is by

22  sitting down with a calculator and a pencil and figuring them

23  out.  Right?

24  A    Yes, sir, that's correct.

25  Q    It's just a question of you measuring how far the distance

1   is, right?

2   A   Yes, sir.

3   Q   And then doing a division problem with the time.  Right?

4   A   With the speed, yes, sir.

5   Q   Speed.  And so you -- and so you're just -- you sit down

6   at your desk and do this.  Right?

7   A   Yes, sir.

8   Q   Now, can you call up Government's Exhibit Number 74

9   (indiscernible).  Take a look at that for a second.  You can go

10  ahead and publish that as well.  This is Government's Exhibit

11  Number 74.  That's been already admitted into evidence.  And

12  you testified earlier that the Wells residence is down here and

13  that the Kodiak Airport's here, the main base is over here.

14  Right?

15  A   Yes.  Yes, sir.

16  Q   And in terms of the geography here, this Bells Flats is

17  kind of a residential area that's a bit off Rezanof Drive,

18  isn't it?

19  A   Yes, sir, it is.

20  Q   And then the main base is here -- a bit off Rezanof Drive

21  as well.  Right?

22  A   Yes, sir.

23  Q   And the only thing that really connects them is this one

24  road that comes right down along the water here.  Isn't that

25  right?

**STURGIS - CROSS**

1  A    Rezanof Drive, yes, sir.

2  Q    So if you want to get from here -- and I'm pointing here

3  to the residential area of Bells Flats to the main base --

4  you've got to go on this single-lane road, don't you?

5  A    It's a double lane, but yes, sir.

6  Q    Right.  And then when you get up here to the airport, you

7  similarly -- you have to follow Rezanof all the way around

8  until you get over to the airport here.  Right?

9  A    Yes, sir.

10  Q    And then you have to turn in and go to the air -- if you

11  want to go to the airport.  Right?

12  A    Yeah.  You make a right turn off of Rezanof if you're

13  trying to get to the airport.

14  Q    And then the town is up this way, right?

15  A    Yes, sir.

16  Q    And if you wanted to go on to Rezanof, you'd go up that

17  way.  Right?

18  A    Yeah.  If you want to go to Kodiak, you'd stay on Rezanof.

19  Q    Now, when you were talking about the car that you saw go

20  through the T1 camera -- do you remember that?

21  A    Yes, sir.

22  Q    Through the vision -- you indicated that at one point it

23  was going past the rigger shop towards the golf course, and you

24  were referring to going in this direction out Anton Larsen Bay

25  Road.  Right?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 746  Filed 09/23/14  Page 73 of 227

1  A    Yes, sir, towards the golf course.

2  Q    And this would be out towards the golf course and the Red

3  Cloud Ranch and basically Anton Larsen Bay, if you went all the

4  way out there?

5  A    Yes, sir.  The golf course is about right there, I

6  believe.

7  Q    Okay.  And so you -- the golf course is in this area?

8  A    Yeah, somewhere in that -- that general area right there.

9  Q    Okay.  And then beyond that would be Red Cloud Ranch and

10  then, ultimately, Anton Larsen Bay?

11  A    Yes, sir.

12  Q    Now, when you're driving along here, there's also some --

13  there's some shipping that's down in this area, isn't there?

14  A    Yes, sir, the Lash docks is right in this area somewhere.

15  Q    And they're called the Lash docks.  Right?

16  A    That's the common known term for it, sir.

17  Q    And there's -- for example, Sampson Tug and Barge has a

18  facility there?

19  A    I believe so.

20  Q    And also A1 Timber.  There's some logging that -- shipping

21  that goes in and out of there?

22  A    Yes, sir, there is.

23  Q    And so you can see, for example, that there are container

24  barges that get unloaded there.  Right?

25  A    Yes, sir.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 746  Filed 09/23/14  Page 74 of 227
(720) 384-8078  attrans@sbcglobal.net

1  Q    And the containers get put on trucks and the trucks

2  drive -- if they're going to go anywhere along here, they got

3  to go along Rezanof Drive, don't they?

4  A    Yes, they do.

5  Q    And similarly, if the logs are unloaded here at the Lash

6  docks, they need to be put on a logging truck, and if they're

7  going to go anywhere, they've got to go here on Rezanof Drive

8  on this one road, don't they?

9  A    Yes, they do.

10 Q    And, similarly, if the folks in Bells Flats want to go to

11 work in the morning, they need to get onto Rezanof Drive if

12 they're working in the town or if they're working at the base.

13 Everybody's got to go up this one road, don't they?

14 A    Yes, sir.

15 Q    And, similarly, if there are folks that are working out of

16 COMMSTA, if they're coming from here on the base or from

17 Aviation Hill or here from the flats, they pretty much all got

18 to go on West Rezanof Drive and go out Anton Larsen Bay Road,

19 don't they?

20 A    That is true.

21 Q    And then if there are folks in the town who are coming to

22 work, say, down in the flats or down here at the main base at

23 Kodiak, those folks in the town have to come down Rezanof Drive

24 and drive down along here, don't they?

25 A    Yes, they do.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 75 of 227
(720) 384-8078   attrans@sbcglobal.net

1  Q   And then if there -- folks down here have kids in school

2  who are going to school on a schoolbus, they would have to get

3  on a schoolbus and that schoolbus would have to pick people up

4  along the way and then head up Rezanof Drive, wouldn't it?

5  A   Yes, sir.

6  Q   And at the airport here -- let me just see if there --

7  there's the airport.  Now, is it fair to say that the traffic

8  patterns at different times of day are going to be different

9  along Rezanof Drive?

10  A   Yes, sir.

11  Q   And they're going to be different because, for example,

12  here at the airport, if a plane or two comes in and unloads a

13  lot of folks, then there's going to be more traffic than there

14  would be at another time.  Isn't that right?

15  A   That is correct.

16  Q   Or if there were a lot of folks who were getting onto a

17  plane at the airport there, there would be more traffic of

18  folks coming to the airport.  Right?

19  A   Yes, sir.

20  Q   And they would all be coming on Rezanof Drive, wouldn't

21  they?

22  A   They would.

23  Q   And if there were schoolbuses, for example, if it was time

24  for school, there would be more schoolbus traffic.  Is that

25  right?

1  A    Yes, sir.

2  Q    And, similarly, if the log -- logging facility was

3  unloading logs or if the container facility was loading up

4  trucks, there would be trucks here on West Rezanof Drive.

5  Isn't that right?

6  A    Yes, sir, there could be trucks there.

7  Q    So the amount of traffic which all would have to go on

8  Rezanof Drive would vary depending on the time of day.  Is that

9  right?

10 A    Yes, sir.

11 Q    Would vary depending on the amount of shipping traffic

12 that there was here at the Lash dock.  Right?

13 A    Yes, sir.

14 Q    It would vary depending on the number of airport planes

15 that are coming in, right?

16 A    That's correct.

17 Q    And any other number of factors that -- you know, that

18 could affect traffic on a particular day or at a particular

19 time.  Right?

20 A    Yes, sir.

21 Q    For example, if it were late at night, you'd probably

22 expect less traffic on Rezanof Drive.  Right?

23 A    Yes, sir.

24 Q    But if it were more near the time that folks were going to

25 work or going to school, then you'd expect more traffic,

1  wouldn't you?

2  A    Yes, sir.

3  Q    Can you bring up G45, please?

4        THE CLERK:  Is that Government Exhibit 45?

5        MR. OFFENBECHER:  Yes.

6        THE CLERK:  Thank you.

7        MR. OFFENBECHER:  I'm sorry.

8  BY MR. OFFENBECHER:

9  Q    Now, Special Agent Sturgis, you've talked a bit about the

10 different views of the cameras from T1.  T1's up here on the

11 top.  Right?

12 A    Yes, sir, that's correct.

13 Q    And then this is T2 down here, right?

14 A    Yes, sir.

15 Q    And you've talked about view of, basically, cars that are

16 coming by here in view of the T1 camera.  Right?

17 A    Yes, sir.

18 Q    And then the T1 camera kind of shoots down here, so you

19 can kind of see vehicles.  You get a little glimpse of them,

20 just because they kind of go right by -- through there

21 someplace.  Right?

22 A    Yes, sir, that's correct.

23 Q    And then the T2 camera, which is on the side of the

24 building here, is kind of looking out at the flagpole here.  Is

25 that right?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 78 of 227
(720) 384-8078  attrans@sbcglobal.net

1  A    That is correct.

2  Q    But it's not looking out in this direction, is it?

3  A    No, sir.

4  Q    It's pretty much looking right in this little cone right

5  here.  Right?

6  A    Yes, sir.

7  Q    And so you can kind of see every once in a while something

8  come through the trees up here.  Right?

9  A    Yes, you -- yes, sir, you can.

10 Q    But you can't really see any cars going right here, can

11 you?

12 A    No, sir.

13 Q    And this is about as far here -- this corner of the

14 building coming down from the T1 camera, that's about as far as

15 you can see, isn't it?

16 A    Yes, sir, that's correct.

17 Q    So when you're looking from the T1 camera, all those shots

18 we have, that's probably the end of the view that we have --

19 you -- that you have.  Right?

20 A    Yes, sir, that is.

21 Q    So is it fair to say, isn't it, that anybody who was

22 driving -- now, this is Anton Larsen Bay Road over here, right?

23 A    Yes, sir, it is.

24 Q    And you showed us just a minute ago how the golf -- if you

25 keep going out there you're going to go to the golf course,

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 79 of 227
(720) 384-8078  attrans@sbcglobal.net

1  right?

2  A    That's correct.

3  Q    And if you keep going even further, you're going to go to

4  the Red Cloud Ranch, right?

5  A    Yes --

6  Q    And if you --

7  A    -- you -- and you'll pass --

8  Q    -- keep going even further, you're going to get to Anton

9  Larsen Bay, if you go all the way to the end.

10  A    Yes, sir, that's correct.

11  Q    Is it fair to say that if you are driving down -- someone

12  is driving down Anton Larsen Bay Road from Anton Larsen Bay or

13  Red Cloud Ranch or the golf course, and they don't go as far as

14  here, then they're not going to get caught on the T1 camera,

15  are they?

16  A    No, sir, they're not.

17  Q    And if they drive down from Anton Larsen Bay or the Red

18  Cloud Ranch or the golf course and they turn down this road

19  right here to -- into the back of the -- of T2, they're not

20  going to get caught on the T1 camera over here, are they?

21  A    No, sir, they're not.

22  Q    And they're not going to get caught on the T2 camera

23  either --

24  A    No.

25  Q    -- are they?

**STURGIS - REDIRECT**

1  A    No, sir.

2  Q    Because the T2 camera's just looking out here at the

3  flagpole, isn't it?

4  A    Yes.

5  Q    So anyone that comes down Anton Larsen Bay Road and turns

6  right here and goes in to park by the garage doors here or even

7  parks in the back of T2, that -- any person who drives a car

8  like that is never going to be seen on either of those cameras,

9  are they?

10  A    No, sir, they're not.

11  Q    I don't have any other question (indiscernible).

12       THE COURT:  Redirect.

13       MS. LOEFFLER:  Yes, Your Honor.

14              **REDIRECT EXAMINATION**

15  BY MS. LOEFFLER:

16  Q    Special Agent Sturgis, I don't think anybody's actually

17  explained where Kodiak town is on any of the maps we did.  So

18  can you explain to the jury where Kodiak town is?

19  A    Yes, ma'am, I can.  If -- if you can bring the map back up

20  it'll -- it'll --

21  Q    Can we bring up --

22  A    -- be a little easier.

23  Q    -- Exhibit 74, I think.

24       (Side conversation)

25  Q    Just -- where is it?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 81 of 227
(720) 384-8078   attrans@sbcglobal.net

**STURGIS - REDIRECT**

1  A    Okay.  If you continue to travel down Rezanof Drive, it
2  comes up here and it goes around the bend and it comes back
3  into town.  It's -- it -- it -- it's really not very far from
4  there.  But -- and I know from this map it's not very clear.
5  But if you continue this way towards the north part of the map,
6  northeast side, you -- it takes you right into Kodiak.
7  Q    Okay.  Do you recall how many -- about how many miles that
8  is?
9  A    It would -- I would guess that it's probably -- from the
10 airport into town, it's approximately five to seven miles.
11 Q    Okay.  Now, in the morning, which way does the traffic
12 pattern go, if you're talking Bells Flats toward the base or
13 toward town?
14 A    In the morning, roughly, the traffic pattern is leaving
15 this area, which is a residential area.  A lot of people live
16 out in Bells Flats.  And most people either work at the base or
17 for the base or for the Coast Guard in one way or the other.
18 And those that don't, typically, most of the traffic pattern is
19 going towards town.
20 Q    Okay.  And I think I didn't ask you that.  Is there a turn
21 lane into the base from the -- West Rezanof?
22 A    Yes, ma'am.  If -- if you're coming back from town or the
23 airport, there's a little turn-in lane that turns in to the
24 base.
25 Q    Do you know when the buses -- schoolbuses go in the

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 82 of 227
(720) 384-8078   attrans@sbcglobal.net

1 morning?

2 A    I would -- I would guess.  I'm not sure.

3 Q    I'm not going to ask you to guess.  Now I want to just go

4 back a little bit to the comparisons you made between the

5 videocamera evidence and your calculations.

6 A    Yes, ma'am.

7 Q    Did you actually calculate the -- were you able to

8 determine how long it took Mr. Wells to go when he drove to

9 work on the morning of April 12th, when he drove by the base

10 camera and arrived at the COMMSTA?

11        MR. OFFENBECHER:  That's been asked and answered

12 already, Your Honor.

13        MS. LOEFFLER:  Your Honor, I'm going back -- I think

14 it's redirect based on his traffic discussions.  I want to --

15        THE COURT:  Well, it -- go ahead.

16        MS. LOEFFLER:  Okay.

17 BY MS. LOEFFLER:

18 Q    Okay, did you actually look at the actual time it took him

19 to drive that distance on the morning of April 12th and when he

20 showed up at work?

21 A    Yes, ma'am, I did.

22 Q    And how did that compare with your calculations?

23 A    It was pretty close.  I believe his approximate time was

24 around seven minutes, and I calculated around five minutes.

25 Q    And on the morning of the murder were there, you know,

Case 3:13-cr-00008-SLG  Document 746  Filed 09/23/14  Page 83 of 227

1  emergency vehicles and things on the road by 8:23?

2        MR. OFFENBECHER:  Objection.  She's leading the

3  witness.

4  BY MS. LOEFFLER:

5  Q   Were there vehicles on the road by 8:23 that were more

6  than there would normally be?

7  A   Yes, ma'am.  Any time something of a significant factor

8  that -- that would cause awry -- Kodiak's a small town.  Living

9  in Kodiak for the past three years, if there's emergency

10  vehicles or -- or responding vehicles, a lot of people slow

11  down and look and see what's going on, because most people know

12  each other, so they're concerned.

13  Q   And let me ask you -- I want to go to two other

14  calculations.  And that's simply the actual -- you put on your

15  chart the time from 7:22 when Mr. Wells is seen driving back

16  toward his house, and then you had a time when you know he was

17  there based on other evidence.  Can you explain that?

18  A   Yes, ma'am.  He drives by the front gate, heading back

19  towards Bells Flats.  We no longer have him on any kind of

20  camera, so we don't know exactly if -- if and when he made any

21  stops or turns.  But we do know that he made a phone call to

22  Mr. Hopkins at 7:30.

23  Q   And how did that time correlate with the mathematical

24  calculation that you did?

25  A   It was very close.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 84 of 227
(720) 384-8078   attrans@sbcglobal.net

**STURGIS - RECROSS**

1  Q   Okay.  I have nothing further.

2         THE COURT:  Redirect -- recross.

3                    **RECROSS EXAMINATION**

4  BY MR. OFFENBECHER:

5  Q   Just one question I had.  In your direct examine -- or in

6  your -- in the cross-examination you indicated it was a two-

7  lane highway.  But there's -- what we're talking about is that

8  there's one lane each way.  Right?

9  A   Yes, sir, that's correct.  Yes.

10  Q   So if you're going north towards the base there's only one

11  lane of traffic, and if you're coming south towards the base

12  there's only one lane of traffic.  Right?

13  A   Yes, sir.  I grew up in a kind of a rural area, and one

14  way means one way and --

15  Q   Yeah.

16  A   -- a two-lane highway is one way going towards the

17  direction and one way going the other way.

18  Q   Okay.  Thanks very much.

19         THE COURT:  Is that it?

20         MR. OFFENBECHER:  That's it.

21         MS. LOEFFLER:  That's it, Your Honor.

22         THE COURT:  All right.  Thank you, sir.  You're

23  excused.  Ladies and gentlemen, we're taking a long recess.

24  They're having a ceremony here, a naming ceremony for the

25  building, and that starts at 11 o'clock.  So if we could come

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 746  Filed 09/23/14  Page 85 of 227
(720) 384-8078  attrans@sbcglobal.net

1  back at 12:30 and we'll resume test -- can we have a witness at

2  12:30?

3      (Witness excused)

4          MR. SCHRODER:  Will be here.

5          THE COURT:  Okay.  You've got a long break.  Don't get

6  lost.

7      (Jury not present)

8          THE COURT:  Okay, please be seated.  Okay, see

9  everybody at 12:30.

10         MS. LOEFFLER:  Okay.

11         THE CLERK:  All rise.  Matter stands in recess until

12 12:30 p.m.

13     (Court recessed at 10:46 a.m., until 12:35 p.m.)

14     (Jury not present)

15         THE CLERK:  All rise.  His Honor the Court, the United

16 States District Court is again in session.

17         THE COURT:  Okay.  We're bringing the jury in.

18         THE CLERK:  Please be seated.

19     (Jury present)

20         THE COURT:  Okay.  We've got the whole team back.

21 Please be seated.  The government's next witness.

22         MR. SCHRODER:  Your Honor, the government calls Gary

23 Bolden.

24         THE COURT:  Sir, if you just want to make your way up

25 front here.  That door pulls out.  If you step in the witness

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 746  Filed 09/23/14  Page 86 of 227
(720) 384-8078  attrans@sbcglobal.net

 1  box, my clerk will swear you in.

 2          THE CLERK:  Please raise your right hand.

 3          **GARY CHARLES BOLDEN, PLAINTIFF'S WITNESS, SWORN**

 4          THE CLERK:  Okay, thank you.  Please have a seat.  And,

 5  sir, if you can please state and spell your full name.

 6          THE WITNESS:  Gary Charles Bolden.  G-a-r-y, Charles,

 7  C-h-a-r-l-e-s, Bolden, B-o-l-d-e-n.

 8          THE CLERK:  Thank you.

 9          THE COURT:  All right, counsel.

10                          **DIRECT EXAMINATION**

11  BY MR. SCHRODER:

12  Q   Mr. Bolden, what do you do for a living?

13  A   I'm the director of forensics at Standards Testing Labs in

14  Massillon, Ohio.

15  Q   And what does Standard Testing Labs do?

16  A   Standards Testing Labs is an independent testing lab that

17  does all types of testing for tires and wheels, the tire

18  industry, and -- and products related to tires and wheels.

19  Q   And you just said you're the director of forensics.  How

20  long have you been doing at that job -- doing that job?

21  A   I've been in that position for about five years.

22  Q   And what does the director of forensics do?

23  A   Well, my primary responsibility is analyzing tires and

24  wheels that have been involved in failures and accidents where

25  there is property damage or personal injury.  I analyze those

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 746  Filed 09/23/14  Page 87 of 227
(720) 384-8078  attrans@sbcglobal.net

1  products to determine why they failed and report on those.

2  Q   And what did -- is -- what did you do before you were

3  doing forensics for STL?

4  A   Well, my previous title was principal engineer, and

5  essentially I was doing the same thing, when I became the

6  director of the department.  I just had additional

7  administrative duties.

8  Q   And how long have you been with Standards Testing Lab?

9  A   I would say a little over 16 years now.

10  Q   All right.  And you said it's in -- where did you say

11  they're located?

12  A   In -- in Massillon, Ohio.  It's near Canton, Ohio, where

13  the Football Hall of Fame is.

14  Q   Now, is that a -- an important area in the tire world?

15  A   Well, it's very close to Akron, Ohio, which is considered

16  to be the capital of the -- the rubber capital of the world.

17  Q   Now -- and have you ever worked for any of the tire

18  manufacturers?

19  A   I did.  I worked for Goodyear Tire and Rubber Company for

20  30 years.

21  Q   Okay.  And what did you do when you worked for Goodyear?

22  A   I held a number of positions.  Quality control engineer,

23  quality assurance engineer, on both the corporate level and on

24  the plant level.  In the plant level, I was -- became very

25  familiar with all of the manufacturing processes involved in

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 88 of 227
(720) 384-8078   attrans@sbcglobal.net

**BOLDEN - DIRECT**

1  the manufacture of tires.  I also had a position as manager of

2  product service, where I was responsible for handling standard

3  warranty -- warranty claims, where tires are adjusted that have

4  not served the customer as they should.  And they would get an

5  adjustment on those tires.

6  Q    So, all total, how many years have you been in the tire

7  business?

8  A    Over 46 years now.

9  Q    And let's go -- for a moment, let's go back a little

10  farther.  Do you have an undergraduate degree?

11  A    I do.  I --

12  Q    And what was that in?

13  A    I have a bachelor of science in civil engineering from the

14  University of Akron.

15  Q    Now, is the tire business learned and taught in school?

16  A    No.  The -- the tire business hires their engineering

17  people and they draw from all of the engineering disciplines as

18  well as mathematicians and chemists, and they learn the tire

19  business as on-the-job training.

20  Q    Are you a member of any professional societies?

21  A    Yes, sir.

22  Q    And could you tell us what those are?

23  A    ASTM, which is the American Society for Testing of

24  Materials.  That's a -- an association that makes testing

25  standards for all types of materials and products.  I also

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 746  Filed 09/23/14  Page 89 of 227
(720) 384-8078  attrans@sbcglobal.net

**BOLDEN - DIRECT**

1  belong to SAE, which is the Society of Automotive Engineers.

2  They are an association that deals with, essentially, the

3  transportation industry overall.  And also the Tire Society.

4  The Tire Society is a -- a group that focuses strictly on

5  tires, tire research, tire development, and I belong to that

6  group too.

7  Q    And over the years, have you published papers on the issue

8  of the tires and tire-related topics?

9  A    Yes, I -- I have author or co-authored five papers, three

10  of them dealing with impacts and how they relate to tires, one

11  of them on interfacial component tearing -- in other words,

12  when a tire fails or comes apart, the fracture surfaces have

13  certain characteristics, and you use those characteristics to

14  determine under what conditions the tire may have failed.  So I

15  wrote a paper on that.  And I also -- let's see.  Let me check

16  my CV.

17       Oh, yes.  I also co-authored a paper involved with vehicle

18  controllability with tire disablements, where we actually

19  prepared tires to fail at predetermined speeds, either by

20  blowing out or by throwing the tread and belt package.  And

21  just -- to determine what the effects of that dis -- tire

22  disablement would be on the controllability of the vehicle.

23  And I participated in that paper as well.

24  Q    Now, have you presented any of those papers in peer-review

25  settings?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

**BOLDEN - DIRECT**

1  A    Yes.  I've presented papers at iTECH, which is a -- a -- a

2  semiannual conference where people from the tire industry and

3  related industries come together.  And I presented several of

4  those papers in that setting.

5  Q    Now, have you testified in court before?

6  A    I have, yes.

7  Q    And have you been declared an expert before?

8  A    Yes.

9  Q    On how many occasions?

10  A    Over 50 times, I would say.

11  Q    And did that include federal court?

12  A    Yes.

13       MR. SCHRODER:  Your Honor, the government moves that

14  Gary Bolden be declared an ex -- as an expert witness in the

15  field of tire forensic examination.

16       THE COURT:  Ex part -- any voir dire?

17       MR. CURTNER:  No, Your Honor.  Thank you.

18       THE COURT:  He can be received in that capacity.

19  BY MR. SCHRODER:

20  Q    Now, Mr. Bolden, first I want you to take a look at --

21  there's a tire sitting on the table there, and we have the

22  other item there, Mr. Allison?  Why don't you take a look at

23  these two items.  And are you familiar with these?

24  A    Yes, I am.

25  Q    And under what circumstances did those come into your

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 746  Filed 09/23/14  Page 91 of 227
(720) 384-8078  attrans@sbcglobal.net

BOLDEN - DIRECT

1  possession?

2  A    They were sent to me, I believe, in May of 2012.

3  Q    All right.  And how was the tire packaged when you

4  received it?

5  A    It came to me in a wooden crate.  The tire was still

6  mounted on the rim, and the -- it was pressurized.  And the --

7  the tire wheel assembly was actually bolted to the bottom of

8  the -- the crate, so that it couldn't shift in shipment.

9  Q    Now, from your examination of the tire in the crate, would

10  it have been possible for the nail in the tire to have been

11  disturbed in that crate shipment?

12  A    No, that -- that would not have been possible.

13  Q    And did you make an examination of these items?

14  A    I did.

15  Q    When you first got it, was -- where -- when you got it,

16  was the nail still in the tire?

17  A    Yes.  Yes, the nail was still in the tire.

18  Q    So what was the first part of your examination?

19  A    Well, first I removed it from the shipping crate, and the

20  first thing I did was check the inflation pressure.  And I

21  believe the gauge pressure at that time was 20 psi.

22  Q    And did you find any -- what the -- the technical term is

23  "damage" to the tire?

24  A    I could not see any -- any damage other than the fact that

25  the -- the nail was in the tire and -- and had obviously

1  penetrated the tire.

2  Q    Did you examine the nail and how it was inserted?

3  A    Yes.

4  Q    And did you do that closely?

5  A    Yes, I did.

6  Q    All right.  Where was it inserted?

7  A    It was at the 3 o'clock position.  I used the serial

8  number as the reference 12 o'clock position.  So the -- the

9  nail was in about the 3 o'clock position in groove number 1,

10  which, as it was mounted on this wheel, would have been the

11  outermost groove in the tire.

12  Q    Okay.  And we're going to talk in a few minutes about that

13  inspection a little more closely, but I want to kind of get

14  back to explaining to the jury what the total process was.  So

15  once you examined the outside of the tire, what did you do

16  next?

17  A    Well, after I examined the outside of the tire, we

18  inflated it to 80 psi -- 80 psi is the -- the maximum rated

19  inflation pressure for this tire -- and checked it for leaks by

20  spraying a -- a liquid leak detector around the nail.  And

21  there was a slow leak.

22  Q    And that's how you would describe it?

23  A    Yes.

24  Q    Okay.

25  A    Yeah, there were very im -- almost imperceptible bubbles

1  coming from around the nail.

2  Q    Let me go back just a minute and ask you a followup

3  question.  You said you inflated it to 80 psi, which you said

4  was the rated level on this tire.  I think for those familiar

5  with a standard vehicle tire, that seems pretty high.

6  A    That -- that --

7  Q    So is this different from kind of the standard car tire?

8  A    Yes.  This tire is -- is actually called a light truck

9  tire.  In fact, that's part of the -- the size designation.

10  The first two letters of the size designation is LT, which

11  stands for light truck.  And it's for use in pretty heavy-duty

12  light truck service.  Most of the automobiles that you operate

13  and drive in every day, passenger type vehicles, their maximum

14  inflation pressure would probably be no more than 35 psi.

15  Q    But is that level of -- kind of max level of 80 psi, is

16  that uncommon for a light truck tire?

17  A    No.  In fact, it's -- it's required for a tire with this

18  rating.  It's a -- it's called a load range E tire.  And you

19  need the 80 psi for it to be able to carry a specified load.

20  Q    Now, at some point did you take it off the rim?

21  A    I did.

22  Q    And how did you do that?

23  A    Well, we have tire equipment at our laboratory, and it was

24  very carefully dismounted from the rim so that I could see what

25  the interior surface of the tire looked like, and especially

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 746  Filed 09/23/14  Page 94 of 227
(720) 384-8078  attrans@sbcglobal.net

**BOLDEN - DIRECT**

1 where the -- the nail had penetrated the tire.

2 Q    And, again, did you look at that closely?

3 A    I did.

4 Q    All right.  Now, after you examined both the inside and

5 outside of the tire, what did you do next?

6 A    The next thing we did was have the tire X-rayed.

7 Q    Okay.

8 A    So it was taken to a -- an offsite facility that does X-

9 rays, and -- and we had the tread area X-rayed.

10 Q    And did the results of that X-ray add anything significant

11 to your analysis?

12 A    No, it's -- it's -- simply confirmed that there was no

13 structural damage to the tire.

14 Q    Okay.

15 A    The nail had penetrated between the steel belt cords.  It

16 displaced those belt cords very slightly but would have not

17 affected the -- the tire's ability to perform its -- its

18 intended use.

19 Q    Okay.  Now, once you'd done all those examinations, what

20 did you do next?  What kind of testing did you do?

21 A    After that, we -- we brought it back to the lab and we

22 photographed it before we remounted it, because we wanted to

23 get photographs obviously of the interior of the tire as well.

24 So we photographed it to document all of my observations during

25 my analysis.  And then I remounted the tire and we were

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 95 of 227
(720) 384-8078   attrans@sbcglobal.net

1  requested to run a dynamic air loss test.

2  Q    And what does that mean?

3  A    Well, a dynamic test -- of course, we did a static test --

4  I guess we did a -- I'm getting ahead of myself.  The first

5  thing we did was a static air retention test, where we

6  inflate -- inflated it to 80 psi and let it sit statically.  In

7  other words, we just set it on the ground.  It was not loaded.

8  It was not operated in any fashion.  It was just sitting there

9  with 80 psi in it, and -- and we measured it periodically over

10  a period of about 13 or 14 days.

11  Q    And what was the result of that static test?

12  A    The result of that test is it -- it lost, I believe,

13  about -- let's see.  Okay.  After 13 days, it lost 7 psi, which

14  would be approximately half a psi per day, statically.

15  Q    And so then -- how do you do -- you talked about the other

16  test being a dynamic test.  How do you do that?

17  A    Yeah.  The dynamic test, we take that same tire and we put

18  it on what's called a dynamometer.  On the dynamometer we're

19  able to load the tire against a rotating wheel.  So we can

20  actually simulate actual use of the -- of the tire if -- as if

21  it were on a vehicle operating on the highway.  We can regulate

22  the amount of speed that the tire rotates.  We can also

23  regulate the amount of load on that tire.

24      And so what we did is place it on the dynamometer.  We

25  also used what's called a rotary air union, which attached to

1   the valve in the -- in the wheel, so that we could actually

2   measure the inflation pressure of the tire without stopping the

3   test.  And we ran a 24-hour test and we checked the air

4   pressure every hour for that 24-hour period.

5   Q   So do you put weight on the tire as part of that?

6   A   Yes.  We loaded the tire at 80 percent of its maximum

7   rated load.  That figure is used because the -- the wheel or

8   the -- the dynamometer wheel that rotates is curved.  And we

9   want to have the same amount of deflection of the tire as if it

10  were actually on a flat surface.  So in order to have that same

11  deflection, we -- we can't load it as heavily, so we use the

12  80-percent load level as opposed to 100-percent load.  And that

13  gives us the same amount of deflection as if it were on a flat

14  surface.

15  Q   And what speed do you run it at?

16  A   On this particular test, we ran at 62 miles per hour.

17  Q   And is there any specific reason you selected that?

18  A   Well, part of it was convenience.  The dynamometers are

19  actually two -- two-position machines.  In other words, we can

20  run two tires on one machine simultaneously.  And we happened

21  to have an available position open on a machine that was

22  operating at 62 miles an hour, so we elected to put it on that

23  machine.

24  Q   Now, assuming for argument that 62 miles an hour is a

25  little fast for the average speed in -- on the roads in Kodiak,

**BOLDEN - DIRECT**

1  would you expect a higher average speed of your test to cause

2  more air loss or less?

3  A    Definitely, because the -- the --

4  Q    I don't --

5          THE COURT:  "Definitely."

6  BY MR. SCHRODER:

7  Q    I don't think I answered that -- I --

8  A    Okay -- oh --

9  Q    -- must not have asked that question very well.  So I said

10  kind of more loss or less loss?

11  A    Well, it would -- it would create more loss at the higher

12  speed because of the -- it's -- it's flexing many more times

13  per second than it would be at a lower speed.

14  Q    And you said you ran the test for 24 hours.  And if you

15  could help us with the math.  How many miles would that have

16  equaled?

17  A    I believe the -- the total mileage after 24 hours was

18  1,488 miles.

19  Q    And what was the result -- psi -- was there a loss of psi

20  on the test?

21  A    There was.  It -- it went down to 62.8 psi, which is a

22  loss of 17.2 psi.

23  Q    And did that -- how did that affect your conclusions after

24  that test and the static test?

25  A    Well, it's still a very -- a relatively slow air loss

Case 3:13-cr-00008-SLG  Document 746  Filed 09/23/14  Page 98 of 227

1    considering the -- the test that it was subjected to.  It would

2    essentially mean that you would only have to adjust air

3    pressure in this tire maybe every three to four hundred miles.

4    Q    And how would -- that kind of slow air loss, would that be

5    quickly noticeable by a driver?

6    A    Well, no, it would not.  It would take, you know, as I

7    say, at least three or four hundred miles before we get to a

8    level where you have to add pressure.  And it may not even be

9    perceived by the driver at that level, depending on what his

10   driving habits are.

11   Q    Now, at any time did you remove the nail?

12   A    I did not.

13   Q    All right.  Now let's go back to your observation of the

14   tire and the nail.  If a nail -- based on your experience, if a

15   nail enters a tire, does it normally go below the level of the

16   tread?

17   A    No, it would not.  You know, this -- this nail was located

18   in a groove, which is the depression between the adjacent ribs

19   or lugs of the tire.  And if -- if a nail is picked up in

20   service, it will be at the same level as -- as the tread

21   surface itself.  It can't -- because the -- the pavement is

22   what would actually force the nail into the tire, and the

23   pavement can't get down between the grooves.  So it could not

24   go below the level of the -- the upper surface of the tread.

25   Q    Now, but if the nail's picked up on the road, is there a

Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 99 of 227

**BOLDEN - DIRECT**

1   way that the nailhead can get pushed down below the level of

2   the tread?

3   A    It can.

4   Q    And how's that -- how would that happen?

5   A    Well, it would -- it could be a number of things.  Any

6   debris that you might run over that could actually get down in

7   the groove could push that nail below the tread surface.  Or,

8   depending on what kind of surface you're -- you're running on,

9   if you're running on, like, a -- a heavy gravel road, the

10  stones would tend to push that nail deeper into the groove.

11  Q    Now, any estimate on how long that would take for that to

12  happen?

13  A    There's really no way of predicting that.  It just depends

14  on how the -- the vehicle is used and where it's run.

15  Q    All right.  So now I want to show you what's been marked

16  as Government Exhibit 93 -- I believe it's 93C -- that has not

17  been admitted yet.  And are you familiar with this exhibit?

18  A    Yes.

19  Q    And how do you recognize it?

20  A    Well, it's a photo that I took during my analysis process.

21  Q    And is this picture consistent with how you found the nail

22  in the tire when you received it?

23  A    It is, yes.

24       MR. SCHRODER:  Your Honor, I'd move admission of

25  Government Exhibit 93L.

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 100 of 227

1        MR. CURTNER:  No objection.

2        THE COURT:  Be received.

3        MR. SCHRODER:  C, I'm sorry.

4        THE COURT:  Be received.

5     (Plaintiff's Exhibit 93C admitted)

6        MR. SCHRODER:  My handwriting's not very good.

7  BY MR. SCHRODER:

8  Q    Now, you talked about a nailhead being -- it's pushed into

9  the groove, and you said this one was down into the groove?

10 A    Yes, it was well below the -- the surface of the adjacent

11 lugs.

12 Q    And what would you expect to see on the nailhead if it

13 were pushed into the groove by debris, as you've talked about?

14 A    Well, I would expect to see contact abrasions with

15 whatever object pushed it down into the -- into the groove.

16 And by the same token, even if it were not down in the groove,

17 if it were at the -- at the level of the tread, you would

18 expect to see abrasions from the pavement.

19 Q    Okay.  And do you -- did you find any of those abrasions?

20 A    No.

21 Q    And is that consistent with what you see on the screen

22 here?

23 A    That's correct.

24 Q    And which groove was the nail in?

25 A    It's groove number 1, which is the groove closest to the

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 746  Filed 09/23/14  Page 101 of 227

**BOLDEN - DIRECT**

1  serial number side of the tire.  And as it was mounted on this

2  rim, it would have been the outboard groove, the groove closest

3  to the outside of the vehicle.

4  Q    Okay.  Now I want to show you what's been marked as

5  Government Exhibit 93D.  And are you familiar with this

6  exhibit?

7  A    I am.

8  Q    And how are you familiar with it?

9  A    It's another photo that was taken during my analysis.

10  Q    And is this consistent with how you found the nail on the

11  tire when you received it?

12  A    It is, yes.

13        MR. SCHRODER:  Your Honor, the government moves for

14  admission of 93D.

15        MR. CURTNER:  No objection.

16        THE COURT:  Will be received.

17     (Plaintiff's Exhibit 93D admitted)

18  BY MR. SCHRODER:

19  Q    Now, is part of your analysis to examine the hole made by

20  the nail?

21  A    Well, as much as -- as that is possible in this case

22  without removing the nail.

23  Q    Okay.

24  A    So I did -- at -- at -- at least looked at the -- the area

25  immediately surrounding the shank of the nail.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 746  Filed 09/23/14  Page 102 of 227

1  Q    Yeah.  Now, this process you described a moment ago of a

2  possible way that a nail could work into the grooves of a tire,

3  what kind of hole would you expect if that had happened, if you

4  checked the inside like this?

5  A    Well, initially the -- the hole would -- would just

6  essentially conform to the -- the shape of the puncturing

7  object.  But over time, as -- as the tire was used in service

8  with that nail in it, the hole would become enlarged, the

9  material around the -- surrounding the shank of the nail would

10  have appearance of wear.  The -- the tearing edges would --

11  would round off so there would be -- and -- and the -- the hole

12  itself would actually enlarge, eventually to the point where

13  the puncturing -- puncturing object would be ejected.

14  Q    Okay.  Now, what did you see when you examined this tire,

15  this hole?

16  A    Well, in this case, the -- you can see the material is --

17  is tightly adhered to the shank of the nail.  And that's pretty

18  typical of a tubeless tire.  This is a tubeless tire.  And when

19  a -- a -- a tubeless tire is initially punctured, the tendency

20  of the tire is to seal around the puncturing object.  And

21  that's what has occurred here.

22  Q    All right.  Any indication of that working action that you

23  talked about?

24  A    No, there's no -- no evidence of any wear or working in

25  the hole or wallowing of any sort.

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 103 of 227

1  Q    Okay.  Now, we can see -- we can kind of see from this

2  picture now the angle of the nail coming in.  But, I mean, what

3  angle did the nail go into the tire?  How would you describe

4  that?

5  A    Well, it -- it's -- it's difficult to tell from -- from --

6  from this photograph, but the -- essentially, it was

7  perpendicular to the tangent of the tread surface.

8         MR. SCHRODER:  Your Honor, I'd like to, if we could,

9  have Mr. Bolden come down and kind of show that with the tire

10 and the nail.

11        THE COURT:  That -- that's fine.  If he's going to be

12 speaking, he's going to have --

13        MR. SCHRODER:  We'll have to put on the microphone.

14        THE COURT:  Put on the microphone.

15 BY MR. SCHRODER:

16 Q    There's a cord -- corded microphone --

17 A    Okay.

18 Q    -- up there.  It's probably best to, yeah, go around and

19 put that on.

20      (Side conversation)

21 A    Well, I don't -- I don't want to take it --

22 Q    You can -- I think it's open.  I think you --

23 A    Can I take it out?  Okay.

24 Q    -- can take it out of the packet.

25 A    Okay.  Now, what I mean by perpendicular to the tread

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 104 of 227
(720) 384-8078   attrans@sbcglobal.net

**BOLDEN - DIRECT**

1  surface, if you look at the tire from the side, and if you can

2  imagine a -- a plane that goes straight across where -- or even

3  the -- or even the table -- like, to be perpendicular with

4  that, it would go straight in vertically.

5  Q   And is it --

6  A   That's what --

7  Q   -- is that unusual to have a nail go into a tire

8  perpendicularly like that?

9  A   It -- it's very unusual, especially for a tire -- a -- a

10  nail of this size.

11  Q   Okay.  And are you aware of what size that is?

12  A   I believe it's a 16-penny nail --

13  Q   And is it dif --

14  A   -- about three and a half inches in length.

15  Q   Thank you.  And is it difficult to pick up a nail that way

16  on the road?

17  A   Yes, it is.  The reason it's difficult is, if you can

18  imagine this tire rolling down the road and here's the nail,

19  somehow standing straight up, and you --

20        THE COURT:  Excuse me.  You can stand up -- yes.

21        THE WITNESS:  Like that.  If you can see how -- maybe I

22  could turn this so you can see it better.  You can see that it

23  would go in the -- the tread, not --

24        THE COURT:  Feel free to stand up if you want.

25        MR. WALLACE:  Not at a vertical orientation, but at an

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 105 of 227
(720) 384-8078   attrans@sbcglobal.net

**BOLDEN - DIRECT**

1  oblique angle to the tread.

2  BY MR. SCHRODER:

3  Q    Now, also, the -- was -- you said it was vertically, for

4  lack of a better term, perpendicular.  Was there also an angle

5  to which way the nail went in?

6  A    Yes.

7  Q    Side -- kind of toward the sidewall or not?

8  A    Correct.  I'm trying to locate the -- here's the actual

9  location.  Looking at -- at the tread from -- from the front of

10 the tire, it -- it actually went in at an angle, something like

11 that.

12 Q    And how difficult would it be to pick up that nail

13 perpendicularly and at an angle?

14 A    Well, the -- the -- the key I think is the -- is the --

15 the first orientation would be extremely difficult.  And -- but

16 I have seen -- I have seen tires come in from the side in a --

17 in a similar fashion.

18 Q    Okay.  But the perpendicular, that was a bigger factor for

19 you?

20 A    Definitely, yes.

21 Q    Okay.  All right.  I think we can -- Mr. Bolden, you can

22 return to the witness stand.

23 A    Okay, thank you.

24 Q    Now, Mr. Bolden, based on all the factors you considered

25 and your experience with tires, what is your conclusion about

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 106 of 227

**BOLDEN - DIRECT**

1 whether this tire was ever used with the nail inserted?

2 A  My opinion is that the -- this tire was not used with that

3 nail in it.

4 Q  And does the fact that it had a slow leak, does that -- is

5 that part of your consideration?

6 A  Certainly.  The -- the fact that it's leaking so lowly --

7 so slowly would indicate it would -- you would have to drive

8 several hundred miles at least before it would need any

9 additional air pressure.

10 Q  And would the head of the nail show that type of mileage,

11 in your opinion?

12 A  Oh, definitely.  And -- and the condition of the head of

13 this nail is such that there are virtually no abrasions, road

14 abrasions or debris abrasions, on the surface of the -- the

15 nailhead.

16 Q  And does the angle at which the tail -- the nail entered

17 the tire, is that part of your conclusion?  How does that

18 affect it?

19 A  Well, it is.  It -- the -- the way the -- the nail is

20 oriented, perpendicular to the tread but at an angle from the

21 side, would be consistent with being manually inserted.  I say

22 that because if the tire was on the vehicle, to get access to

23 that groove -- it's the outermost groove -- the natural thing

24 would be to come in from an angle from the side and be

25 perpendicular to the -- the tread.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 107 of 227
(720) 384-8078  attrans@sbcglobal.net

1  Q    And so what was your final conclusion about how this nail

2  was inserted?

3  A    My conclusion is that it was inserted manually.

4        MR. SCHRODER:  All right.  Your Honor, no further

5  questions.

6        THE COURT:  Cross-examination.

7                    **CROSS-EXAMINATION**

8  BY MR. CURTNER:

9  Q    Mr. Bolden, you've been in the tire business for a long

10 time.  Is that correct?

11 A    Yes, sir.

12 Q    And in -- when you were working at Goodyear, you were

13 primarily involved in quality control?

14 A    A good portion of that time was in quality control, yes.

15 Q    So your emphasis was on tire failures and if tires for

16 some reason had some type of -- it was defective or something

17 like that?

18 A    I touched on that, yeah.  The -- I -- I, you know, was

19 concerned with the manufacturing process, keeping -- checking

20 the -- to see that all the components were in -- in control as

21 the tire was being manufactured.  We looked at -- for defects

22 in the finished product.  And I also got involved in looking at

23 tires that come back from the field for adjustments.  And then,

24 finally, I got into the forensic end, where I would actually

25 analyze failed tires.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 108 of 227

1  Q    Uh-huh (affirmative).  And so before you got into the

2  forensic end of it, you were basically looking at quality

3  control.  Correct?

4  A    For the most part, yes.

5  Q    And then when you went into the -- into private sector,

6  you were still looking at defective tires, tire failures,

7  product liability cases, things of that nature?

8  A    That was the -- yeah, that would be the forensic aspect.

9  Q    And so those would be primarily civil cases.  Is that

10 correct?

11 A    For the most part, yes.

12 Q    Yeah.  So if somebody -- if there was an accident, and it

13 might be due to a failure of the tire involved in an accident,

14 you would perhaps be involved in that sense?

15 A    Correct.

16 Q    And would you normally be involved with a plaintiff or the

17 tire company when you were doing that examination, or both?

18 A    Well, of course, when I was with Goodyear, it would have

19 been for the company.  But once I went to STL, we do work for

20 all -- all sorts of individuals and -- and entities.  We -- we

21 work for not only the -- the tire manufacturers, we also do

22 work for trucking companies, tire importers, tire dealers,

23 individuals, defendants, and plaintiffs.

24 Q    Okay.  And, now, you've been qualified about 50 times as

25 an expert?

**BOLDEN - CROSS**

1  A    I would say, yes.

2  Q    And how many criminal cases would that have been?

3  A    I don't know that I've actually testified in any criminal

4  cases.  I may have.  I just don't recall.

5  Q    So you've been qualified in -- as an expert in civil

6  cases, civil litigation?

7  A    Certainly, yes.

8  Q    And so was a -- something you haven't really testified

9  about before as an expert in court, as far as flat tire, the --

10  or a nail in a tire.  Is that correct?

11  A    Well, I -- I would testify about the tire.  I'm not really

12  concerned with the other issues of the case.

13  Q    Now -- and also I think in your forensic analysis in Ohio,

14  you're typically involved with accidents or tires that are on

15  paved roads.  Is that correct?

16  A    Not always.

17  Q    Most of the time?

18  A    Well, more frequently than -- than otherwise.  But I've

19  had all sorts of situations.

20  Q    Okay.  But primarily the accidents in Ohio are going to

21  be -- or anywhere you go are going to be on paved roads.  Isn't

22  that correct?

23  A    For the most part.

24  Q    Do you know anything about the road conditions in Kodiak,

25  Alaska?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 746  Filed 09/23/14  Page 110 of 227

1  A    Not specifically, I don't, no.

2  Q    Okay.  Now, when you first were hired for this case, you

3  were hired by the FBI at first to examine this tire?

4  A    Correct.

5  Q    And did they give you any kind of indication about what

6  you might be looking for when they gave you this tire?

7  A    No.  Actually, I -- I had my case opening form, and what I

8  wrote down was "Analyzing test tire for air loss and nail

9  puncture."

10 Q    Okay.  And they didn't -- did you ever talk to an FBI

11 agent about your examination?

12 A    I -- yes, regarding my analysis.

13 Q    Okay.  Before you did your analysis, was there any

14 indication that the question would be whether it was picked up

15 on a roadway or not?

16 A    No.

17 Q    Okay.  And I think one of the things you testified about

18 was that there were no abrasions on the head of this.  Now,

19 that's an important part of your conclusion.  Is that correct?

20 A    That is correct.

21 Q    And let's go back, if we could, to Government Exhibit 93C.

22 Yeah, this picture.  This is the one you just identified?

23 A    Yes.

24 Q    Now, you don't see or note any abrasions on that

25 particular nailhead?

1  A    No, sir.

2  Q    Let's go to -- if we could show Government Exhibit 137.  I

3  think it was admitted yesterday -- or last week.  Okay.  Is

4  that the same tire and the same nailhead?

5  A    Yes.

6  Q    And do you notice any abrasions in that particular

7  photograph?

8  A    No.

9  Q    You don't notice any shiny part along the edge that might

10  be some type of wear or abrasion?

11  A    It looks like it might be polished a little bit.

12  Q    Was that the -- how you examined it?

13  A    I think so.

14  Q    And did you notice it at the time?

15  A    Yes.  It's not on the surface of the nailhead.

16  Q    It's on the edge of the nailhead?

17  A    Yes.

18  Q    Is this a new nail, in your opinion?

19  A    No.

20  Q    It's an old nail?

21  A    Yes, it's a -- the -- the nailhead looks as though it's

22  very well weathered.

23  Q    Okay.  Do you know if -- let me go -- let's look at --

24  just a minute.  Let me ask you about the photographs you took.

25  Now, your testimony was that these photographs were taken on --

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 112 of 227
(720) 384-8078   attrans@sbcglobal.net

**BOLDEN - CROSS**

1  when you received the tire?

2  A    No, they were taken after I did my analysis.

3  Q    And when would that -- when would you have taken the

4  photos?

5  A    It would have been -- I -- I think I -- I actually took it

6  out of the crate -- I have a date here.  Yeah, I took it out of

7  the crate on 6/22.  And I'll look at my exam notes.  Yeah,

8  apparently those dates are -- are erroneous.  My exam notes

9  reflect 5/18 that -- that I actually did the analysis.  So we

10  received the tire before 6 -- 6/4.

11  Q    Do you have your report that you drafted for this case?

12  A    Yes.

13  Q    When you look at the very front of that, does it indicate

14  when you received this tire?

15  A    Yes, it says 6/4/12, and obviously that can't be correct,

16  because it's 5/18 on my examination sheet.

17  Q    Okay.  So you think you got this tire in May, is that

18  correct?

19  A    Yes.

20  Q    But your report erroneously has the tire being received in

21  your lab on June 4th, 2012?

22  A    That's correct.

23  Q    Any explanation of what that must --

24  A    It's approximately a -- a typographical error on my part.

25  Q    And you also note in your report that you tested the tire

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 113 of 227

BOLDEN - CROSS

1  pressure of this tire?

2  A    I did.

3  Q    And that was on -- what's the date on that?

4  A    I did an air retention test, it looks like between 7/17

5  and 7/31.

6  Q    Okay.  If you look at your report, does it indicate that

7  on June 22nd you measured the tire pressure?

8  A    That would have been coming out of the crate.

9  Q    On June 22nd?

10 A    It -- it -- it looks -- well, that's what the report says.

11 Q    You did the report, right?

12 A    I did.

13 Q    Okay.  Now, do -- are you aware of what the tire pressure

14 was on this tire when it was first taken by the FBI?

15 A    No, I don't believe so.

16 Q    You were never given that information before or after?

17 A    I may have been told that, but I don't recall.

18 Q    Let -- let's look at -- if you can just -- I want to

19 refresh your memory.  Let's look at Defense Exhibit DE-134.

20 This is a -- for your -- it should be on your screen there.

21 Now, if you could read that to yourself.  Was there anything

22 that might refresh your memory of what the tire pressure was in

23 this tire when it was first taken by the FBI?

24      MR. SCHRODER:  Objection, Your Honor.  He would have no

25 knowledge of that other than what's written on the screen.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 114 of 227
(720) 384-8078   attrans@sbcglobal.net

1 There would be no familiarity.

2      MR. CURTNER:  I'm asking him if he has any knowledge of

3 it.

4      THE COURT:  This is not his document,

5 (indiscernible) --

6      MR. SCHRODER:  It's not his document, and he said he

7 didn't receive advance information, so --

8      MR. CURTNER:  No, I'm not saying advance.  I asked him

9 if he ever was aware of the tire pressure of the tire when it

10 was first seized by the FBI, and I think he --

11      THE COURT:  I think he said, "No."  I mean, is that

12 still your answer?

13      MR. CURTNER:  I don't think he said, "No."  I think

14 he -- trying to remember, and I'm trying to help him.

15      THE COURT:  Well, he said, "No," and now you're

16 refresh -- trying to refresh his recollection from this

17 document.

18      THE WITNESS:  No, I -- I had no recollection of this at

19 all.

20 BY MR. CURTNER:

21 Q   Okay.  If a tire of this sort had a tire pressure of 20 or

22 25 degrees -- pounds per square inch, would that be something

23 that would be noticeable by the driver?

24 A   Well, of course.

25 Q   Okay.  It wouldn't be a flat tire, necessarily?

Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 115 of 227

1 A    It would be pretty -- pretty close to flat.

2 Q    But it would be something you could still drive on?

3 A    Well, you would destroy the tire.  And there's no evidence

4 that this tire was ever run at that level.

5 Q    Now, when you ran the air loss test -- let's talk about

6 the dynamic air loss --

7 A    Yes.

8 Q    -- test, okay.  Now, that is -- you ran it in your lab?

9 A    Correct.

10 Q    And what is the temperature that you run that in?

11 A    The laboratory is maintained at 100 degrees, plus or minus

12 5, Fahrenheit.

13 Q    So you're doing the study on the tire to see how much air

14 loss would take place in an atmosphere -- in a room that's 100

15 degrees?

16 A    Yes.

17 Q    Okay.  And then you would put weight on it?

18 A    Yes.  The tire was loaded.

19 Q    How much?

20 A    It was loaded to 2,732 pounds.

21 Q    And you run at 100 -- that's 62 miles per hour.  Is that

22 correct?

23 A    Yes, sir.

24 Q    Okay.  Now, do you know what the air temperatures would

25 have been in Kodiak about the time that this tire was first

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 116 of 227

1  obtained by the FBI?

2  A    No, sir.

3  Q    Okay.  If it were about freezing, would that make a

4  difference, do you think, in the air loss?

5  A    Possibly, but I can't imagine it would be anything of any

6  significance.

7  Q    Isn't it true that -- let's say, when you live in Alaska

8  and you -- if you have your tires over the winter and they're

9  not used, and it's cold temperatures, they might lose air just

10 without a nail.  Is that correct?

11 A    Well, all tires lose pressure over time, yes.

12 Q    Especially under cold temperatures?  Would you agree?

13 A    Well, if -- if you're talking about a -- a -- a fixed

14 inflation pressure -- in other words, if you inflate it to 80

15 psi and it's 100 degrees, and you take that same tire and put

16 it at zero degrees, it will drop in pressure slightly.

17 Q    There would be more air loss if you had a nail in it or

18 any kind of --

19 A    It's not air loss, it's just the fact that the temperature

20 differential would make the pressure go down slightly.

21 Q    Right.  Even in -- without any kind of defect or hole in

22 the tire.  Right?

23 A    Yes.

24 Q    And if there was some kind of a hole in the tire or a

25 nail, it would even be more emphatic as far as the air loss

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 117 of 227

1  under low temperatures.  Would that be correct?

2  A    Well, of course, if there's a hole in the tire that's

3  allowing air to escape, it would -- the pressure would go down.

4  Q    Okay.  Would it be a much different atmosphere to test a

5  tire, then, in Kodiak, Alaska at freezing temperatures than it

6  would be in your 100-degree lab.  Wouldn't you agree?

7  A    The -- the temperature has nothing to do with this.  Air

8  pressure loss is -- is -- is a gradient.  It's a matter of

9  gradient differential between atmospheric pressure and the

10  pressure that's in the tire.  It really isn't temperature

11  sensitive.

12  Q    Okay.  Now, when you -- let me go back to these

13  photographs.  I just want to make sure I understand that you --

14  do you know when you took the photographs for your report in

15  this case?  Is there any documentation in your file about the

16  date that you took the photographs?

17  A    No, sir.

18  Q    Could they have been as late as August?

19  A    I don't know specifically when they were taken.  They were

20  taken after I did my analysis.

21  Q    Okay.  You didn't take any photographs before your

22  analysis?

23  A    Correct.

24  Q    After your analysis, and maybe as late as August, is when

25  you took photographs.  Is that correct?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 118 of 227

**BOLDEN - CROSS**

1  A    I don't know anything about August.  I would -- it would

2  be -- they would be taken long before August.

3  Q    Okay.  Well, those photographs have megadata on them, and

4  we could tell by looking at the photographs when they were

5  taken.  Would that be correct?

6  A    I doubt it.

7  Q    Okay.  Now, you said that, in your opinion, this nail was

8  inserted manually?

9  A    That's my opinion, yes.

10 Q    And how would one insert a nail in a inflated tire

11 manually, in your opinion?

12 A    Well, there's any number of ways you can do it.  You could

13 do it with a pair of pliers and -- and a -- a hammer.  You

14 could do it with a nailgun.  There's a variety of nailguns

15 that -- it could be a pneumatic nailgun, it could be a -- a --

16 the type of gun that you would use that has a -- an explosive

17 charge in it.

18 Q    Okay.

19 A    There's -- you know, those are three methods that -- that

20 I can think of at the moment.

21 Q    So if a hammer as a way of inserting that nail in the tire

22 was eliminated, then you would be -- it would have to be a

23 nailgun.  Is that correct?

24 A    If it -- if it were not a hammer, it would have to be one

25 of those other methods.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 119 of 227

1  Q    A nailgun or a nailgun.  Some type of nailgun.

2  A    Yes.

3  Q    Was there another one besides a nailgun?

4  A    There -- there may be other ways of doing it, but those

5  are the ones that I can think of.

6  Q    And have you had any experience with nailguns?

7  A    I mean, I -- I have some small nailguns that I use in --

8  you know, in my home.

9  Q    In your professional opinion, in your expert opinion, do

10 you think you could fire a bent nail through a nail gun?

11 A    It depends on how much it was bent, I suppose.

12 Q    Well, what if it's bent seven degrees?

13 A    I -- I don't know.

14 Q    How about the nail that you saw here?

15 A    I have no idea.

16 Q    And I think you also testified, your opinion is based on

17 the fact that, in your opinion, that nail was perpendicular.

18 A    That's only one of the reasons.

19 Q    That's one of the reasons.  It's one of the factors in

20 your opinion, is that correct?

21 A    Yes.

22 Q    Now, is it possible when you have a nail in a tire, you

23 could put some kind of a pin or something that's straight, once

24 the ti -- the nail is removed, in order to find out what that

25 angle is?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1  A    Sure.

2  Q    And if that ang -- would you be surprised if the angle of

3  that hole was 25 degrees?

4  A    I believe it is 25 degrees in -- in the orientation from

5  the side.  But not tangent to the tread.  It's -- the --

6  tangent to the tread, it's almost vertical.

7  Q    Tangent to the tread.  The hole from the inside -- to the

8  inside of the tire is perpendicular, straight --

9  A    If you look at --

10  Q    -- not 25 degrees?

11  A    -- if you look at the tire from the side, the path of the

12  nail is straight in, perpendicular to the tread.  If you look

13  at it from the tread, it's at an angle from the side.  I just

14  demonstrated that a little bit ago.

15  Q    Okay.  So you accept that's a 25-degree oblique angle from

16  the entry of that nail.  Is that correct?

17  A    From the side, yes.

18  Q    Okay.  And you never examined this particular tire once

19  that nail was out.  Is that correct?

20  A    That's correct.

21  Q    So it's your opinion that that nail that was in that tire

22  was shot in there with a nailgun?

23  A    Well, either a nailgun or a hammer.  I -- I don't know.

24  Q    Now, that's because on asphalt, you explained how that

25  nail might enter a tire.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 121 of 227

1  A    Correct.

2  Q    But in dirt roads and -- is it possible that a nail could

3  be partially embedded in gravel or dirt, that it would be

4  possible to pick up a nail that way?

5  A    Certainly you could pick up a nail that way.

6  Q    And --

7  A    And there would be abrasions on the head of the nail if

8  that happened.

9  Q    Uh-huh (affirmative).  Thank you.  That's all.

10        THE COURT:  Redirect.

11                  **REDIRECT EXAMINATION**

12  BY MS. SCHRODER:

13  Q    Just a couple of questions, Mr. Bolden.  Did you do the

14  dynamic test before or after the photos?

15  A    The dynamic test was done after the photos.

16  Q    Okay.  And let's bring up 93 -- okay.

17      (Side conversation)

18        THE CLERK:  That's 93C, correct?

19        MR. SCHRODER:  Yes, please.

20        THE CLERK:  Okay.

21  BY MR. SCHRODER:

22  Q    And is -- what you call the polished part, is that visible

23  in this photo?

24  A    Yes.

25  Q    And does that change -- is that what you would call an

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 122 of 227
(720) 384-8078   attrans@sbcglobal.net

**BOLDEN - RECROSS**

1  abrasion that would drive a nail into the groove of the tire?

2  A    No.

3  Q    What would that kind of abrasion look like?

4  A    It would be a -- a linear striation.  In other words, it

5  would be like a scratch that would go across the face of the

6  nail --

7  Q    Okay.  But you saw that --

8  A    -- the nailhead.

9  Q    -- when you did your analysis.  Is that true?

10  A    Yes.

11  Q    All right.  Now one final point.  And I just -- I'm -- I

12  want to try to clarify this.  I'm going to take one shot at it.

13  A    Okay.

14  Q    Does temperature affect how a tire leaks through a nail,

15  if there's a nail in it?

16  A    No.  It's simply if -- a matter of the pressure

17  differential between what's inside the tire and what is outside

18  the tire.

19  Q    Thank you.

20      MR. SCHRODER:  No further questions, Your Honor.

21      THE COURT:  Recross.

22              **RECROSS EXAMINATION**

23  BY MR. CURTNER:

24  Q    Mr. Bolden, what type of camera did you use to document

25  your work on this case?

1  A   We have a professional photographer that does this.  He

2  has several cameras.  I'm not certain exactly which one he

3  used.

4  Q   So you don't know the type of camera that was used to take

5  these photographs?

6  A   It was a -- a single-lens reflex digital camera.  And he

7  has several of those.

8  Q   Okay.  And do you know the date of your report?

9  A   The date of my report is April 16th of two thousand -- or,

10 excuse me, August 16th of 2012.

11 Q   And do you know if the metadata in the photographs

12 indicate that that's the same date that the photographs were

13 taken?

14 A   No, they would not have been taken the same day that I

15 wrote the report, no.

16 Q   So if the scientific evidence from those photographs was

17 that they were taken the same day as your report, that would

18 have to be wrong?

19 A   That's correct.

20 Q   Okay.

21     THE COURT:  Anything else?

22     MR. SCHRODER:  Nothing, Your Honor.

23     THE COURT:  Thank you, sir.  You're excused.  The

24 government's next witness.

25     (Witness excused)

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

**SHEM - DIRECT**

1       MS. LOEFFLER:  Robert Shem.

2       THE COURT:  Sir, if you can -- that door pulls open,

3 and you can just come into the witness box, remain standing for

4 a second.  My clerk will swear you in.

5       **ROBERT J. SHEM, PLAINTIFF'S WITNESS, SWORN**

6       THE CLERK:  Okay.  Thank you.  Please have a seat.

7 And, sir, if you can please state and spell your full name.

8       THE WITNESS:  Yes.  Robert J. Shem.  First name Robert,

9 R-o-b-e-r-t.  Last name Shem, S-h-e-m, as in Mary.

10       THE CLERK:  Thank you.

11       THE COURT:  All right, counsel.

12       **DIRECT EXAMINATION**

13 BY MS. LOEFFLER:

14 Q   Mr. Shem, where do you work?

15 A   I work at the state crime laboratory.

16 Q   What do you do with the state crime laboratory?

17 A   I'm a forensic firearm and toolmark examiner.

18 Q   How long have you been a forensic firearm and toolmark

19 (indiscernible) -- oh, in the state crime lab, it's the Alaska

20 State Crime Lab.  Right?

21 A   That's correct.

22 Q   How long have you been a forensic firearm and toolmark

23 examiner for the State of Alaska?

24 A   I've been with the state for 27-plus years.  I've been in

25 the field for about 34.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 125 of 227

1  Q   Okay.  So what were the seven years before?  What were you
2  doing?
3  A   I was -- I got my training in Illinois.  I worked for the
4  Illinois Department of Law Enforcement, doing the same work.  I
5  was trained there and I worked there for a little over six
6  years, and then I came to Alaska.
7  Q   What's the background and training that you had before you
8  could be certified as a firearms and toolmark examiner?
9  A   Well, I was a -- I -- I was a -- actually enrolled in the
10 first student instructor type training that I'm aware of in the
11 country.  Before that it was always on-the-job training, where
12 you would work with a senior examiner and kind of learn as you
13 go.  But this is actually a training program that was set up by
14 the Illinois Department of Law Enforcement at their Training
15 and Applications Laboratory.  And it was a two-year training
16 course.  And I actually finished it ahead of time, in 20
17 months, because I was proficient in the topics.  And then I
18 worked for the satellite labs there for about four additional
19 years.  And then when I heard of the opening in Alaska, I
20 applied for and received a position up here.
21 Q   Can you explain what firearms and toolmark examinations
22 entail?
23 A   Yes.  Basically, what we do is, like many of the sections,
24 we do what's known as comparative analysis.  We compare knowns
25 to unknown.  And the purpose for doing that is to examine

1  evidence to see if we can help answer questions that come up in

2  the course of a criminal investigation.  And specifically what

3  I do is I'll look at evidence such as firearms, fired bullets,

4  discharged cartridge cases, items with clothing patterns on

5  them, items with serial numbers that have been removed.  In the

6  case of a toolmark examination, I might look at a -- bolt

7  cutters and a cut lock shackle, that type of evidence, looking

8  for toolmarks that are left behind on the evidence.

9  Q   Okay.  Are you also familiar with something called an

10 armorer's school?

11 A   Yes, ma'am.

12 Q   What's that?

13 A   An armorer school is basically a factory -- factory school

14 that's set up to help people in the field, armorers, that is,

15 individuals who work on firearms typically in -- in police

16 agencies, to repair the police officers' guns.  And so I've

17 been to a number of armorer schools as well.  They give you a

18 familiarization with taking guns apart and putting them back

19 together.

20 Q   Have you also taught courses in the area of firearms and

21 toolmarks?

22 A   Yes.  I've given instruction to police agencies in how to

23 use the criminal laboratory and how to properly package and

24 submit evidence.  I've also been involved with the Association

25 of Firearm and Toolmark Examiners and several of the regional

1  forensic associations, where I've given instruction in terms of

2  giving presentations on research related to casework, and also

3  I've hosted some workshops on muzzle-to-target distance

4  determination examinations.

5  Q   Are you a member of professional organizations related to

6  your field?

7  A   Yes.  I'm a member of the Midwestern Association of

8  Forensic Scientists, the Northwest Association of Forensic

9  Scientists, and also a life paid member with distinguished

10 status with the Association of Firearm and Toolmark Examiners.

11 Q   Have you had executive functions in any of those

12 organizations?

13 A   Yes.  With the Association of Firearm and Toolmark

14 Examiners, which is an association of my peers, the same folks

15 that do the type of work I do, we have about 1,000 members in

16 probably about three dozen countries or more around the -- the

17 world.  And -- and I actually served on the board of directors

18 for -- I believe it was six years, and one of those years

19 serving as the association president.

20 Q   Have you been qualified as an expert in the area of fire

21 mark -- firearms and toolmark examinations over the last 27

22 years?

23 A   Yes, I've been qualified to testify in both the state and

24 federal courts of Illinois and Alaska.

25 Q   Okay.  And -- I don't know, do you -- how many times have

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 128 of 227

**SHEM - DIRECT**

1  you been qualified as an expert in this area?

2  A   Yeah, I've -- I've lost count a long time -- it's been

3  hundreds of occasions.

4        MS. LOEFFLER:  Okay.  I would move Mr. Shem as an

5  expert in the field of firearms and toolmark analysis.

6        MR. CURTNER:  No objection.

7        THE COURT:  He'll be received in that capacity.

8  BY MS. LOEFFLER:

9  Q   Mr. Shem, in addition to your professional interest in

10  firearms, do you also have a personal interest outside of work

11  in the area?

12  A   Yes, I'm a real avid duck hunter.  I do a lot of shotgun

13  shooting and a little bit of rifle hunting and bow hunting,

14  that type of thing.

15  Q   Okay.  Now I want to turn your attention to the case that

16  brought you here.  Were you submitted any items to analyze in

17  the present case involving certain homicides in Kodiak?

18  A   Yes, ma'am.

19  Q   Okay.  And did you issue a report on -- actually, I want

20  to turn -- you issued a number of reports, I take it, in this

21  case?

22  A   I did.

23  Q   Okay.  I want to turn to your first report.  And did you

24  do one in May of 2012?

25  A   Yes, I -- I -- looking at my notes, which I have here

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 129 of 227
(720) 384-8078   attrans@sbcglobal.net

1  actually in my reports, the first report I issued was on May

2  7th of 2012.

3  Q    And what was it that was submitted to you to analyze?

4  A    I received a -- a number of bullets and bullet fragments

5  as well as service firearms to compare against those.

6  Q    Okay.  Now, in analyzing the bullets, what were you

7  looking for?

8  A    Well, several things.  The first thing I wanted to do was

9  to see if I can determine the caliber.  And that is whether

10 they were fired from, say, a .22 caliber, a 9 millimeter

11 caliber, a .44, .45 caliber.  And then beyond that, to

12 determine what type of rifling impressions are engraved on the

13 surface of the bullets.  That would give me the -- an idea of

14 what type -- specific firearms makes and models that could have

15 fired the bullets.

16       Inside rifles and handguns, if you look down the inside of

17 the barrel, you'll see a series of raised and lowered areas

18 which are arranged in a spiral fashion.  And this -- it's

19 designed to stabilize the bullet.  Well, that rifling that's

20 put inside the gun barrel will also leave its -- its signature,

21 if you will, on the bullets.  And so we look at the rifling to

22 determine what -- to narrow down the focus from just the

23 caliber to specific makes and models.  And then after that, I

24 cross-compared the bullets to see if they were all fired from

25 the same firearm or from multiple firearms.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 130 of 227

1  Q   Okay.  Now, were there specific item numbers on the

2  bullets that were -- that you were analyzing in this report?

3  A   There were.

4  Q   Okay.  And in your report did you list the item numbers?

5  A   Yes.  In the report there I have an item 13A, 34, 37, 38,

6  62, 7, and 9.  And that included several items that appeared to

7  be nonbullet fragments as well, metal --

8  Q   Okay.

9  A   -- fragments.

10       MS. LOEFFLER:  And if I can have the witness handle --

11  handed Exhibits 21 -- 221, 226, 236, 238, and 239.  I'm

12  sorry --

13       UNIDENTIFIED SPEAKER:  One more time.

14       MS. LOEFFLER:  All right.  Let's start with just 221,

15  226.  We might be able to --

16  BY MS. LOEFFLER:

17  Q   And I'll just ask you, in your report, did you take notes

18  so that you could match the items to the items that have been

19  handed to you?

20  A   I did.  And I can actually look at the package and see

21  here, this first item you handed me is -- was our item 13A.

22  It's a suspected bullet fragment, Room 2, under table.  And

23  then the other one is item 63, projectile from neck.

24  Q   Okay.  And we've previously admitted those exhibits.  So

25  now I'm going to go to the analysis of the bullets.  Did you

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 131 of 227

1  take photographs of the various bullets that you analyzed as
2  part of your report?
3  A   I did.
4  Q   And would that help explain to the jury how you analyzed
5  the bullets?
6  A   Yes, ma'am.
7  Q   Okay.
8      (Side conversation)
9  Q   So if I can pull up what's been marked as 374.  It --
10 there are six pages in 374.  Actually, maybe the fastest thing
11 is, why don't we hand you 374, so -- a hard copy, so you can
12 verify that these are all that same report.  Okay, that's best.
13 A   Yes, ma'am.
14 Q   Okay.  Now, did the report relate to some of the item
15 numbers you have in front of you?
16 A   They do.
17 Q   Okay.  Were you able to make a ballistics analysis of the
18 bullets that were submitted to you that are in Exhibit 374?
19 A   Yes, I was able to reach a number of conclusions.
20     MS. LOEFFLER:  I'd like to move Exhibit 374, so that we
21 can show it to the jury when we go through it.
22     MR. CURTNER:  No objection.
23     THE COURT:  It will be received.
24     (Plaintiff's Exhibit 374 admitted)
25 BY MS. LOEFFLER:

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 132 of 227

1  Q   Let's pull up the first page of Exhibit 374.  And was this

2  one of the bullets submitted to you?

3  A   Yes, that was the bullet that would have been submitted

4  as -- me double check my pictures here and my notes, make sure.

5  That would have been submitted as item 37 from the troopers.

6  Q   Okay.  And what was the -- from your report, where did

7  item 37 come from?

8  A   It said it was under the body in Room 1.

9  Q   Okay.  And is there anything that you can see on this

10  bullet that helps you make a firearms analysis or a toolmark

11  analysis of this bullet?

12  A   Yes.  When you examine the bullet, it's -- it's in

13  relatively decent shape in terms of its terminal impact, so

14  there's not a lot of distortion.  What I was able to determine

15  is that it was .44 caliber, and in addition to that we have

16  rifling characteristics of five lands and grooves with a right-

17  hand twist.  Another view of the bullet --

18  Q   You have a -- should have a pointer there, a laser

19  pointer, so you can explain to the jury -- when you say rifling

20  characteristics, can you show them --

21  A   Yes.

22  Q   -- what you mean?

23  A   Yes, this -- this rectangular area that's -- that's

24  inclined to the right, if you were to turn the bullet up on its

25  base, is one land impression.  There's another land impression

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 746  Filed 09/23/14  Page 133 of 227

1    right here.  And in between is what's known as a groove

2    impression.  So you -- when you look down the -- the barrel of

3    the firearm, you'll see five raised and lowered areas which are

4    arranged in a spiral.  And that allows this bullet, which --

5    bullet -- tend -- typically tend to be heavy at the base.

6    It -- it allows the bullet, which is heavy at the base, to fly

7    with the light end forward.  So if you can imagine, when you

8    play badminton, the -- the rubber end of the shuttlecock goes

9    forward and the feathers trail.  Well, a bullet would tend to

10   want to do the same thing that -- the heavy end would want to

11   swap ends with the light end.  But the rifling spins the bullet

12   like a top, which -- like a football player throwing a

13   football.  And in that case the lighter end could stay forward,

14   and that gives you some -- a bit of a streamlining effect and

15   more accuracy.

16   Q    And that's why there's always a twist on it, so that the

17   lands and grooves aren't perfectly straight?

18   A    That's correct.

19   Q    Okay.  Now let me turn to the second page of Exhibit 374.

20   And just -- what is this?

21   A    That's a -- the -- the same bullet in the last picture,

22   and -- plus a picture of its base.  So they're on different

23   scales, but this is the same bullet.  You're looking at the

24   base, with the concave base and the rounded heel.  And when you

25   look at the bullet, it's up.  You can see one knurled cannalure

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 134 of 227

1  and a forward edge to the jacket that's straight with a lead

2  core.

3  Q   Let me turn to the next page of Exhibit 374,

4  (indiscernible).

5  A   By the way, these markings on the base are my identifying

6  marks that I --

7  Q   Okay.

8  A   -- placed on there with a scribe.  And this here would be

9  Exhibit Number -- looking at my notes here, was called item

10  number 38 by the troopers.  That was the -- said it was under

11  body in Room 1.

12  Q   Okay.

13  A   This is a bullet jacket with the core lost.

14  Q   Were you able to determine anything from this bullet?

15  A   Yes.  Again, it was .44 caliber.  It has five lands and

16  grooves with a right-hand twist.  And after straightening out

17  the jacket, I was able to compare it microscopically to the

18  other bullets, and I was able to make what's known as a cross-

19  identification.  I was able to say that this bullet and the

20  previous bullet were fired from the same gun, same revolver.

21  Q   And then I'm going to ask you to -- Kim, can we go to the

22  next page?  This should be the fourth page in.  It's going

23  slowly, it's -- okay.  And where did this item come from?

24  A   This one was identified as -- as coming from Rich Belisle,

25  from his neck.  And this was our item number 62.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 135 of 227
(720) 384-8078  attrans@sbcglobal.net

1  Q   Okay.  And then I will turn to the next page, please.

2  A   That's a picture of the base of that last bullet we just

3  looked at, item number 62.

4  Q   And this item?

5  A   And this item here was identified as item number 9, and I

6  was -- the tag said it was on top of the microwave.

7  Q   Okay.  Now, in your analysis of what these -- were items

8  9, 13A, 37, 38, and 62 -- were you able to determine any

9  characteristics connecting them?

10  A   Yes.  They were .44 caliber.  They show five lands and

11  grooves with a right-hand twist.  And they all were fired from

12  the same gun.

13  Q   Okay.  And can you explain to the jury how you know they

14  were all fired from the same gun?

15  A   When you place the bullets on comparison microscope and

16  place them side by side -- a comparison microscope is basically

17  two compound microscopes that are connected by an optical

18  bridge.  This allows you to take one of the bullets and -- and

19  one of the other bullets, place them on the two microscopes,

20  and then by using prisms that are in the optical bridge, you

21  can actually move the two side by side so that you can line

22  them up.

23      And basically what we look for in addition to the land

24  and -- and groove impressions lining up properly, we also look

25  for the individual striated mark, because that is the -- the

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 136 of 227

1  scratches that are left behind on the bullets during the

2  manufacturing process.  So in other words, when the gun is

3  manufactured, you have toolmarks that are left in there.  Those

4  toolmarks then leave a series of scratches on there.  And under

5  the microscope they look reminiscent of a -- a bar code on --

6  that you'd see on a product in the store.  So say, for example,

7  you buy a box of Kellogg's Corn Flakes and a second box of

8  Kellogg's Corn Flakes and cut the bar codes off, you can line

9  up those lines and see that they line up properly.  On the

10 other hand, if you take a -- a box of -- the bar code off a box

11 of Raisin Bran and try to compare that against the corn flakes,

12 you'll see although they look somewhat similar, the patterns

13 don't line up right.  So that's the type of pattern that we'd

14 be looking for under the microscope, and that's what we'd use

15 to identify the particular gun.

16 Q    Now, were you also asked to compare these bullets that you

17 said were all fired from the same gun to certain weapons?

18 A    I was.

19 Q    What was submitted to you with these bullets originally?

20 A    Initially, on the first report -- first go-around, I was

21 asked to look at a .44 Magnum caliber Ruger New Model Super

22 Blackhawk revolver and also a .45 automatic Ruger pistol, a

23 Model P345.

24 Q    With regard to the .44 Ruger Blackhawk, what did you

25 determine?

1  A    Well, I could tell right away that was the wrong gun,

2  because the Ruger has six lands and grooves with a right-hand

3  twist, not five.

4  Q    And, in fact, in -- what's the most common lands and

5  grooves, or are there among gun manufacturers?

6  A    Well, for the most part, what I'll see across the board is

7  mostly six right.  That's used -- that's a pretty common,

8  pretty ubiquitous rifling class, if you will.  Marlins have a

9  lot of 16 right.  But for the most part, six right is -- is

10 very, very common.  Five right usually indicates to me that

11 we're looking for a Smith & Wesson manufactured firearm or

12 perhaps a Taurus or a Llama.  And it -- six left, for example,

13 would be a Colt revolver.  So you have a variety of different

14 rifling classes depending on different manufacturers.

15 Q    Okay.  On this first report, were you given a second

16 weapon that you were asked to see if it compared to the

17 bullets?

18 A    Yes.  That was a .45-caliber Ruger pistol.

19 Q    All right.  Did you check that to determine whether it

20 could have fired these bullets?

21 A    Being a .45 caliber, the bullet's slightly larger

22 diameter, and it -- and again, it's a different rifling class

23 as well.  But -- so either one of those excludes that gun as a

24 possibility.

25 Q    Okay.  Now, was there -- I think we could turn the lights

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 138 of 227
(720) 384-8078   attrans@sbcglobal.net

1   up, since it's the afternoon.  Thank you.  Was there anything

2   else that you could conclude about the weapon that could have

3   fired these bullets from your analysis?

4   A    Well, I was able to determine that the likely -- at the

5   one manufacturer of ammunition that I could include as a

6   possibility for this ammunition was 240-grain jacketed

7   softpoint bullet manufactured by Winchester.  And that

8   particular bullet is -- is placed in a cartridge that's marked

9   under product code Q4240.  There could possibly be some obscure

10  other cartridge manufacturer that has a similar bullet, but for

11  the most part, of all the ammunition I had a chance to screen

12  through, that was the only one I found that was like that, so I

13  was keeping my eyes open for that type of ammo.

14  Q    Okay.  Now, with regard to the five lands and grooves

15  right twist, does that help you in any way identify the

16  manufacturer, what -- or the make or model of a weapon that

17  could have shot these bullets?

18  A    Yes.  What we do is when we don't have a firearm submitted

19  or we're getting firearms that prove not to be the gun we're

20  looking for, by looking at the rifling class, the caliber, and

21  the number of lands and grooves, we can refer to a database

22  that's -- that's maintained by the FBI, and it's actually

23  assembled with the assistance of laboratories all around the

24  country, because I've sent samples in to them as well.  And

25  this database is referred to as the General -- General Rifling

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 139 of 227

1  Characteristics File.  And in General Rifling Characteristics

2  File, you'll see that in the .44-caliber class, which is what

3  we're dealing with here, five lands and grooves -- the guns

4  that you have found out here in the -- in the real world that

5  could fire that would include Smith & Wesson, Taurus, and Llama

6  revolvers.

7  Q   Now, did -- before you came to testify today, did you take

8  a look just on the percentages, based on your experience of the

9  frequency that you see these three types of guns, the Smith &

10 Wesson .44, a Taurus .44, or a Llama .44?

11 A   Yes.  I took a look at my original database I put together

12 years ago, which goes from, like, 1986 to about 2004, I

13 believe, before they -- they converted our data over to a

14 centralized database.  And -- and in that, I looked at a number

15 of firearms -- I believe it was about -- about 20 of them, 21

16 of them.  And it turns out that 90 percent of the five right

17 .44-caliber firearms that I saw were -- were Smith & Wesson and

18 1 percent was Taurus.  And I didn't see any -- did not see any

19 of the Llamas in casework up here.  So, you know, to kind of

20 wrap that up, it would be that of the next ten five right .44s

21 I expect to come across my desk, I would think that nine of

22 them would probably be Smith & Wessons and one would be a

23 Taurus.

24 Q   And I think I just want to clear something.  I think you

25 said 90 percent Smith & Wesson and 1 percent Taurus.

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 140 of 227

**SHEM - DIRECT**

1  A    I'm sorry, 10 percent Taurus --

2  A    Okay.

3  Q    -- yeah.  I was going to make sure your math was right,

4  Mr. Shem.  Okay.  Now, with regard to this case, were you later

5  submitted other weapons to test against these bullets?

6  A    I was.

7  Q    And did you ever find any that could have fired these

8  bullets?

9  A    No.  I found ones that either were the same class, but I

10  would -- I didn't find the patterns that I was looking for, so

11  I was looking at -- basically looking at Raisin Bran versus,

12  you know, corn flakes in terms of looking at the striated

13  patterns.  Or I found that there were things that eliminated

14  it.  Several of the guns I had, had had special porting on the

15  muzzle of the barrel that's referred to -- it's manufactured by

16  Mag-na-port, and that porting leaves distinctive marks on the

17  bullets.  And so I was able to either eliminate the guns that

18  came in or find no matching characteristics.

19  Q    With regard to the weapons that could have shot these,

20  were any of the weapons that could have shot these a revolver?

21  A    Yes, all -- that's all I could find in the -- in the

22  listing on the General Rifling Characteristics File, were

23  revolvers.

24  Q    Okay.  And what's the difference between a revolver and a

25  semiautomatic?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 141 of 227

1  A    Well, a semiautomatic, there's -- there's not too many

2  semiautomatics that can fire a .44 Magnum.  But the ones that

3  are available have different rifling class.  And the

4  semiautomatic is -- you know, is the firearm that doesn't have

5  the revolving cylinder.  It's the one that's got the slide that

6  reciprocates back and forth on the top of the firearm.  And

7  semiautomatic pistol is designed to be fed and loaded through a

8  magazine, so you may have anywhere from about seven to about

9  twenty cartridges in a magazine.  And those then are -- are

10  cycled from the magazine through the firearm with the gun

11  working as a machine, reciprocating back and forth and -- and

12  removing the fired casings and feeding new ones.  But there's

13  very few guns that will fire the .44 Magnum that are pistols.

14  And from what we're dealing with here, we're dealing with a

15  revolving handgun, that is, a -- a handgun that's got the

16  revolving cylinder.

17  Q    Is there any difference in terms of what happens to the

18  cartridges between a seventy -- semiautomatic and a revolver

19  when you fire the weapon?

20  A    Yes.  In a semiautomatic the cartridges are deposited in

21  the shooting environment.  So if a person wanted to police the

22  area after he was done, he'd have to crawl around and -- and

23  find them under tables and stuff.  And the revolver, other

24  hand, the cartridges stay with the gun until you choose to

25  unload it.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 142 of 227
(720) 384-8078  attrans@sbcglobal.net

1  Q    Okay.  And by the way, the bullets that you looked at,

2  that you testified about, could a 400 -- .460-caliber Smith &

3  Wesson Magnum have shot those bullets?

4  A    No, that's a -- a larger diameter bullet, and so this --

5  these are .44-diameter bullets.

6  Q    Okay.  Were you submitted another group of bullets in

7  December of 2013?

8  A    I was.

9  Q    Do you recall how many?

10 A    Very many.  I can't remember the exact number.  It was --

11 because I had a very large collection of cart -- of bullets

12 that were basically brought in with a lot of dirt and debris on

13 them, as if they were fired into a dirt bank.

14 Q    Could you compare all of those bullets to the ones that

15 you just testified about?

16 A    I found a number of lead bullets that weren't worth

17 comparing at all.  And so those were quickly screened out and

18 examined and found that they didn't have any marks on them that

19 I could work with.  So they were of no value to try to cross-

20 compare against the bullets from this particular case.  And

21 then the ones -- the jackets I did find, I found to be either

22 different rifling class or different caliber.  So I didn't find

23 anything in that big group of fired components that were

24 recovered, that were consistent with what we were looking for.

25 Q    Okay.  And when you said you couldn't compare a bunch of

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 143 of 227

**SHEM - DIRECT**

1  the lead, can you explain why?

2  A   Yes.  Lead bullets, if they're fired into a dirt bank or

3  into the ground, would typically be basically sandblasted.  And

4  so the fine marks that are left on there would be abraded away.

5  And so that basically what you get is kind of a -- an amorphous

6  lump of metal that looks a bit like a bullet and has some --

7  some suggestion of rifling but no individual characteristics.

8  The -- the -- the bar code is gone, if you will.

9  Q   Now, I take it, as part of your career, have you done a

10  lot of -- well, both career and personally, have you done a lot

11  of shooting of firearms?

12  A   I have.

13  Q   And are you familiar with a .44?

14  A   I am.

15  Q   Okay.  And have you ever shot them without headgear on?

16  A   Yes, I've -- I've shot them -- both my own personal .44

17  revolver, out deer hunting in Kodiak, and I've fired --

18  accidentally fired a .44 several times in the laboratory over

19  30-some -- or 30-some-odd years.  Once in a while, you forget

20  to put your headphones on.  And -- and so I've actually done

21  that in the laboratory inadvertently.

22  Q   Is there physical effect that you had from that?

23  A   Yes, the -- when you're -- particularly when you're

24  shooting indoors, the re -- the recip -- the reverberating

25  sound is -- punches you pretty hard.  It's -- it's -- it -- it

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 144 of 227

**SHEM - CROSS**

1  leaves your ears ringing the rest of the day pretty good.

2  Q    Okay.  I don't have anything further.

3        THE COURT:  Timewise, is it long or short?  Should we

4  take the recess or not?

5        MR. CURTNER:  If I say short, will you believe me?

6        THE COURT:  I'll give it a try.

7                       **CROSS-EXAMINATION**

8  BY MR. CURTNER:

9  Q    Good afternoon, Mr. Shem.  So as I understand it, from

10  your examination, these bullets could have been fired by three

11  different weapons, possibly?

12  A    Well, yes.  I mean, it -- obviously, it could have been

13  fired by any gun that's .44 caliber with five lands and grooves

14  at a right-hand twist.

15  Q    But more than likely it would be a Smith & Wesson?

16  A    Correct.

17  Q    And it also could be a Taurus?

18  A    Yes.  And based on what we see up here, it -- a minor

19  chance, but obviously a realistic chance.

20  Q    Now, Smith & Wesson .44s, are they pretty common in

21  Alaska?

22  A    I believe so.  The Smith & Wesson and the Ruger are

23  probably two of the more common sidearms you'd carry in bear

24  country.

25  Q    So you've probably seen many of them in Alaska over the

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 145 of 227

1  years?

2  A    Yes.  Alaska's a pretty good stronghold for a .44.

3  Q    The -- so you tested two Rugers and they were eliminated

4  right away?

5  A    Yes.  I -- I tested at least two.  Let me double check

6  here real quick in my notes.  One Ruger Redhawk, which -- or

7  Blackhawk, which was six right, so that was an elimination.

8  And then there was the Ruger pistol, but that was a different

9  caliber.

10  Q    That was a .45.

11  A    Yes.

12  Q    And do you know, from your reports, were those both

13  related to Mr. Wells?

14  A    Let me check real quick here.  One of them just said "top

15  shelf closet, Room K," and the other one said "bag marked Room

16  K safe."  So I'm not sure what "Room K" is.

17  Q    Okay.  Now, you tested a couple Smith & Wesson 629s as

18  well, is that correct?

19  A    I did.

20  Q    Two or three?

21  A    I eliminat -- or I -- I tested -- this particular case, in

22  terms of Smith & Wessons, I had a Smith & Wesson 29-3, a Smith

23  & Wesson 629-1, and then another 629-1.

24  Q    And those were all eliminated as well?

25  A    Well, two of them were eliminated on Mag-na-port, and

1  the -- no, I take that back.  All three of them were eliminated

2  because all three of those were ported revolvers, so they all

3  had the port marks left on the bullets when they're test fired.

4  Q   Okay.  So if a Smith & Wesson 629 was ported, you could

5  eliminate that immediately?

6  A   Pretty much.  I'd have to do the test fires first to make

7  sure that the parts are leaving the marks, but in my

8  experience, the -- they leave pretty decent marks.  In fact,

9  one of the publications I did for a professional journal

10 concerned that on a case we had years ago.

11 Q   Okay.  So -- and could you explain what porting is?

12 That's --

13 A   Yes.  What -- basically, what happens is, there's a

14 company called Mag-na-port in Michigan, which will take the

15 guns and use electric machining to machine away the metal so it

16 produces a couple of vents which will allow some of the muzzle

17 blast to be directed upward and to the rear.  This will keep

18 the gun from jumping so much, so that a person can get a second

19 shot off without so much recoil.  So -- and the porting

20 itself -- as the bullet passes these ports, even though they

21 don't have any burrs in them, the bullet's under a lot of

22 pressure inside the barrel.  And -- and therefore, as it passes

23 these ports, those ports act like a -- like a plane, like a

24 wood plane, and they basically peel off a little piece of metal

25 along the surface.  So you usually see a pretty good scratch

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 147 of 227

1  from each port.

2  Q    Okay.  And then the last question -- I think you also

3  examined a couple Taurus .44s and they were eliminated as well?

4  A    I did, and the -- and the Tauruses were inconclusive, in

5  that what I ref -- what I referred to as an inconclusive C,

6  based on our association's meanings that -- we have an

7  inconclusive A, B, and C.  A means that we see some details

8  that suggest that might be the gun; B, really can't say either

9  way; and C, tend -- we're tending to eliminate it, because we

10  don't see anything at all, it looks very close.  So both of

11  those were what we refer to as an inconclusive C, which because

12  they were the same rifling class, you -- I can't eliminate them

13  completely, but they seem like they were eliminated in terms of

14  not having any marks that seemed to line up.

15  Q    Oh, just one last question.  The ammunition that you

16  examined for these bullets, that pretty common ammunition in

17  Alaska as well?

18  A    The -- the type of ammo?

19  Q    Yeah, the Winchester .44 --

20  A    You know, nothing right now is very common at all, because

21  of recent shortages in ammunition.  But I wouldn't expect that

22  to be rare ammunition when it is available.  So when -- when we

23  have a healthy supply of ammunition, I would expect that to be

24  available on the shelves.

25  Q    Shelves at Wal-Mart or gun stores or --

**SHEM - REDIRECT**

1  A    Yes, sir.

2  Q    And -- okay, thank you.  That's all I have.

3        THE COURT:  Redirect.

4        MS. LOEFFLER:  Yes, Your Honor.  But it's very short, I

5  promise.

6        THE COURT:  Well, okay.  Promise, now.

7        MS. LOEFFLER:  It's one question.

8        THE COURT:  Okay.

9                    **REDIRECT EXAMINATION**

10  BY MS. LOEFFLER:

11  Q    Could a Model Smith & Wesson 629 possibly be the murder

12  weapon or be connected to these bullets?

13  A    Yes, ma'am.

14  Q    That's all.

15        THE COURT:  Redirect -- recross?

16        MR. CURTNER:  No.

17        THE COURT:  Take a 15-minute recess.  Thank you, sir.

18  You're excused.

19      (Witness excused)

20      (Jury not present)

21        THE COURT:  Okay, 15 minutes.

22        THE CLERK:  All rise.  Matter stands in a 15-minute

23  recess.

24      (Court recessed at 2:05 p.m., until 2:24 p.m.)

25      (Jury not present)

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 746  Filed 09/23/14  Page 149 of 227

1          THE CLERK:  All rise.  His Honor the Court, the United

2    States District Court is again in session.

3          THE COURT:  Okay, the --

4          THE CLERK:  Please be seated.

5          THE COURT:  -- jury's on its way.

6      (Jury present)

7          THE COURT:  Okay.  Please be seated.  The government's

8    next witness.

9          MR. SCHRODER:  Your Honor, the government calls John

10   Stein.

11         THE COURT:  Okay.  Up here, sir.  If you make your way

12   up here, and then this -- that door pulls out, that little door

13   into the witness box.  And then you just step into the witness

14   box and remain standing just for a second here.  And this

15   lady's going to swear you in.

16         THE CLERK:  Please raise your right hand.

17         **JOHN STEIN, PLAINTIFF'S WITNESS, SWORN**

18         THE CLERK:  Okay, thank you.  Please have a seat.  And,

19   sir, if you can please state and spell your full name.

20         THE COURT:  Okay, she just -- she's sitting over here.

21   That voice came out of nowhere.  She said, "Could you please

22   state and spell your full name?"

23         THE WITNESS:  Okay.  Is this working?

24         THE COURT:  It's working.

25         THE WITNESS:  I'm -- name?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 150 of 227

1    THE COURT:  Your full name.

2    THE WITNESS:  Yeah.  I'm John Stein.

3    THE COURT:  Spell your -- John, J-o-h-n?

4    THE WITNESS:  J-o-h-n.

5    THE COURT:  Stein is?

6    THE WITNESS:  Stein, S-t-e-i-n.

7    THE COURT:  S-t -- very well.  Counsel.

8                    **DIRECT EXAMINATION**

9  BY MR. SCHRODER.

10  Q    Mr. Stein, are you currently employed?

11  A    No, sir, I'm retired.

12  Q    And were you ever in the Coast Guard?

13  A    Yes, sir, I spent about 20 years in the Coast Guard.

14  Q    And what did you do when you were in the Coast Guard?

15  A    I was an electronics technician.

16  Q    And where were some of the places that you were assigned?

17  A    My first assignment was the Coast Guard Communication

18  Station on Kodiak Island.

19  Q    And did you do more than one tour on -- at COMMSTA Kodiak?

20  A    Yes, I -- I went back there later on in 1981.

21  Q    And when you were at COMMSTA Kodiak, did you know the

22  defendant, Jim Wells?

23  A    Yes, I certainly did.

24  Q    And what was your professional relationship with him?

25  A    At that time I was the electronics officer of the

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 151 of 227

1 communication station, and Jim Wells was the technician in

2 charge of our -- our receiver site.

3 Q   So did he work for you?

4 A   Yes, he certainly did.

5 Q   And did you also do things together outside of work?

6 A   Yes, I know him personally.  We hunted and fished together

7 occasionally, things like that.

8 Q   All right.  Now, do you have -- when did you leave the

9 Coast Guard?

10 A   Pardon me?

11 Q   When did you leave the Coast Guard?  When did you retire?

12 A   Okay, I retired in October of 1989.

13 Q   And where were you assigned when you retired?

14 A   My last assignment was Coast Guard Headquarters.

15 Q   And did you stay in Washington, D.C. when you retired?

16 A   No, I immediately returned to my home in Kodiak.

17 Q   Okay.  And did you have a home you owned in Kodiak?

18 A   Yes, I did, uh-huh (affirmative).

19 Q   Okay.  Now, when you got back to Kodiak, did you go to

20 work right away?

21 A   No.  I took a -- about a year of vacation.

22 Q   All right.  And what'd you do during that year besides

23 hang --

24 A   Pretty much nothing.

25 Q   -- around?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 152 of 227

1   A    Fishing.  Hunting.

2   Q    And do you have a -- did you have an interest in

3   airplanes?

4   A    Oh, yes.  I -- okay, I got to be honest here.  I'm -- I'm

5   a flight instructor.  I did teach flying --

6   Q    Okay.

7   A    -- when I was out there.

8   Q    All right.  And after that year of semi-retirement, what

9   did you do after that?

10  A    I got a job as a schoolbus driver, and did that for five

11  years.

12  Q    Okay.  Now, what did you do after you stopped being a

13  schoolbus driver?

14  A    I began touring around the world.  I left Kodiak Island

15  and --

16  Q    And what kind of places did you travel?

17  A    I went all over Central and South America and Australia

18  and Asia.

19  Q    And did you keep the house in Kodiak?

20  A    No, I eventually sold that.

21  Q    All right.  And you -- I guess I didn't ask you this

22  before, but do you have an interest in firearms?

23  A    Yes, I've been interested in firearms since I was a kid,

24  and when I -- when I was stationed at Point Barrow, my second

25  duty station, I acquired a federal firearms license.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 153 of 227
(720) 384-8078   attrans@sbcglobal.net

STEIN - DIRECT

1  Q    So you bought -- you sold firearms at one point?

2  A    Yes.

3  Q    Did you also own firearms?

4  A    Yeah, quite a few.

5  Q    And what kind?  Have you owned some -- different kinds?

6  Could you describe some of the ones you've owned, just

7  generally?

8  A    Well, I'm -- I -- I like handguns.  I own about 25 or 30

9  handguns right now.  And I'd use them skeet shooting and --

10 that's about it.

11 Q    And did you ever sell a gun -- did you sell many guns when

12 you had a federal firearms license?

13 A    Did I sell many?

14 Q    Did you sell many?

15 A    A few, yeah.

16 Q    Yeah.  Did you sell any to -- remember ever selling any to

17 the defendant, Jim Wells?

18 A    Yes, I sold one gun to Mr. Wells, uh-huh (affirmative).

19 Q    Do you remember what it was?

20 A    It was a Ruger, a Super Blackhawk.

21 Q    All right.  Now, when you decided to go traveling, what

22 did you do with -- what'd you do with your guns at that point?

23 A    Well, I had a huge gun safe, and at one point I cleaned

24 out my house and I moved the gun safe into Jim Wells's house.

25 Q    All right.  Was it heavy?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 154 of 227

**STEIN - DIRECT**

1  A    Pardon me?

2  Q    The gun safe?  Was the gun safe heavy?

3  A    Was -- oh, yeah.  It was -- it was at least 500 pounds,

4  yeah.

5  Q    All right.  Did you help move it into Mr. Wells house?

6  A    Yes, I did.

7  Q    And where was it located when -- in the house?

8  A    We took it in through the garage and then we went upstairs

9  into the living quarters and we parked the safe up -- up there

10 at the top of the stairs.

11 Q    All right.  And when you left it, when you left to go

12 traveling and left the safe there, did you -- was it locked?

13 A    Yeah, I believe it was, uh-huh (affirmative).

14 Q    Okay.  And who had the combination?

15 A    Jim Wells had the combination.

16 Q    All right.  And did you give it to anybody else?

17 A    No.

18 Q    All right.

19 A    No.

20 Q    Now, when you went traveling on that particular occasion,

21 did -- were you traveling anyplace in particular at that time?

22 A    In particular?

23 Q    Yeah.  Was there a location you liked to visit at that --

24 about that time?

25 A    Yeah.  I -- I -- I had -- I had some friends in Honduras.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1  Q    Okay.

2  A    And I would go down there for months at a time.

3  Q    All right.  Now, when you returned -- after you left

4  Honduras, did you come back to Kodiak?

5  A    Yes.

6  Q    And was that -- how -- a few months later?

7  A    Yeah.  I -- I don't like to get bogged down in dates here,

8  because this was a long time ago, and I -- I don't have any

9  written record to refer to --

10  Q    Right.

11  A    -- no.

12  Q    So when you came back, did you go visit the Wells, the

13  Wells family?

14  A    Yes, of course.  Uh-huh (affirmative).

15  Q    And did you check your gun safe?

16  A    Yeah, immediately, uh-huh (affirmative).

17  Q    And what did you find?

18  A    Well, when I entered the house, I found the door to the

19  safe wide open.

20  Q    Okay.  And did you maintain any kind of a list of your

21  firearms?

22  A    Yes, I had a detailed inventory.

23  Q    All right.  So did you note whether anything was missing

24  from the safe, any firearms?

25  A    Yeah.  I noticed right away that a -- a Smith & Wesson

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 156 of 227

1  revolver was missing, a Model 629.  And a rifle scope was

2  missing.  And I think that's all I noticed at the time.

3  Q   All right.  At the time, how many Smith & Wesson Model

4  629s did you own?

5  A   I owned two of them.

6  Q   And what was the sizes of the two, the barrel sizes?

7  A   Okay.  These are identical guns, both Model 629s.  One had

8  a -- one had a six-inch barrel, one had a four-inch barrel.

9  Q   Which was the one that was missing?

10 A   The six-inch.

11 Q   And did you ask Mr. Wells about that firearm?

12 A   Yes, I did.

13 Q   And what did he say to you?

14 A   He said he didn't know anything about it.

15 Q   And were you satisfied with that answer?

16 A   No, I -- no, I was kind of upset.  This is a expensive

17 gun, and I really wanted it back.

18 Q   Did you press him on the issue?

19 A   A little bit, yeah.

20 Q   All right.  Now -- oh, let's -- one more question.  What's

21 a -- Model 629, what caliber of handgun is that?

22 A   That -- it's a .44 Magnum.

23 Q   All right.  Now, after you talked to Mr. Wells about it,

24 did you decide you needed to take any more action based upon

25 that missing gun?

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 157 of 227

**STEIN - DIRECT**

1  A    Yes.  After we -- after I moved my gun collection down to

2  my brother's house in Wisconsin, we took another inventory and

3  made sure that this gun really was missing.  And then I

4  reported it to the police.

5  Q    Okay.  And did you make an oral report or was it in

6  writing?

7  A    I -- I sent the report in writing.

8  Q    Okay.  Now, do you remember the full contents and details

9  of that report?

10  A    All I said was that -- I told them where the gun

11  disappeared from, I think, and the serial numbers of the --

12  both the gun and the scope.  And that's about all, I think.

13  Q    And do you have it in your memory what the serial number

14  of that gun was?

15  A    No.

16  Q    All right.  I'm going to ask you to look at Government

17  Exhibit --

18      (Side conversation)

19  Q    -- 232A.  Now, you can look -- right next to you is a

20  computer screen.  And I don't know how well you can see it.  If

21  you can't see it very well, I could give you a written -- a

22  hand -- a paper copy.

23  A    Well, it looks pretty clear.

24  Q    Okay.

25          THE COURT:  That looks clear to you?

1  BY MR. SCHRODER:

2  Q    You're reaching like you're looking for your glasses.

3  A    Yeah.

4  Q    Would it be easier for me to give you a paper copy to look

5  at?

6  A    No, I -- I have the glasses, yeah.

7  Q    Okay.

8  A    What did you want to ask?

9  Q    I just want to ask you are you familiar with this letter?

10 A    Of course.

11 Q    And is it signed?

12 A    Yes.

13 Q    And who's it signed by?

14 A    Yes, I signed it.

15 Q    And is this the report you made that was -- you just

16 discussed?

17 A    Yes, uh-huh (affirmative).

18 Q    And did you make it at least within a few weeks of the

19 actual loss of the gun?

20 A    Yes, this is August -- and -- okay.

21 Q    Okay.  And did you have personal knowledge of the facts?

22 A    Yes, I believe.

23 Q    All right.

24      MR. SCHRODER:  Your Honor, the government moves for

25 admission of Exhibit 232A.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1      MR. CURTNER:  No objection.

2      THE COURT:  It'll be received.

3   (Plaintiff's Exhibit 232A admitted)

4  BY MR. SCHRODER:

5  Q   All right.  So, Mr. Stein, I'm going to have you give us a

6  couple of highlights of this.

7      (Side conversation)

8  Q   Now let's blow up paragraph 5, just to make that clear.

9  And it says the -- what does that say?

10 A   You're asking me?

11 Q   Yes.

12 A   "The lost firearm is a Smith & Wesson Model 629.  This is

13 a stainless-steel .44 Magnum with six-inch barrel.  Serial

14 number is AJI2172."

15 Q   Okay.  Now, it looks like there might have been a write-

16 over there, where it says the "four" and the "six" there?

17 A   It looks -- it looks like it's covering up a plus sign.

18 Q   Okay.  Right.  But is there any doubt in your mind which

19 of your two firearms that was missing?

20 A   No, that's exactly the one.

21 Q   Okay.  All right.  And did you check that serial number

22 against your list?

23 A   I'm sure I did.

24 Q   Okay.  Right.

25 A   I wouldn't -- I wouldn't have remembered that, you know --

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 160 of 227
(720) 384-8078   attrans@sbcglobal.net

STEIN - DIRECT

1  Q    Without it?

2  A    Right.

3  Q    All right.  And let's look at the number at the top.

4  There's a handwritten number.  In the blue, Kim.  Now, did

5  you -- when you reported this to the police, did they give that

6  case number to you?

7  A    No, you know, I -- I -- they didn't send me anything back.

8  Q    Okay.

9  A    So this is the first time I've seen -- you know, when you

10 showed me this letter, that's the first time I saw those

11 numbers.

12 Q    Does that look -- whose -- does that look like your

13 handwriting?

14 A    No.

15 Q    Okay.  All right.  And then at the bottom, let's look at

16 number 7.

17 A    Well, wait a minute, I take that back.  Maybe I did write

18 that down.  Maybe I had a phone call or something.

19 Q    Does that trigger your memory at all, looking at that?

20 A    Fax -- well, apparently --

21 Q    Well, that's okay.  Let's go back -- I want to look at --

22 A    Yeah.

23 Q    -- paragraph 7.

24 A    Okay.

25 Q    And what does that say?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 161 of 227
(720) 384-8078   attrans@sbcglobal.net

1  A    Says, "For further information, you contact Mr. Jim

2  Wells," and phone number.

3  Q    All right.  And, now, you said you moved the safe and the

4  firearms.  Why were you so concerned with documenting it and

5  making this police report?

6  A    Pardon me?

7  Q    Why were you so concerned with making a police report on

8  this?

9  A    Well, I was very concerned about the -- this pistol going

10 missing, and I didn't know who had it.  And if it was involved

11 in a crime, it would reflect very poorly on me.

12 Q    Now, did you ever get an explanation from Mr. Wells

13 subsequently about what happened to that gun?

14 A    No.

15 Q    All right.  Now I want to -- what was your rank in the

16 Coast Guard when you retired?

17 A    CWO3.

18 Q    And what does that mean?  What is CWO?

19 A    Chief warrant officer.

20 Q    All right.  And as a chief warrant officer, did you ever

21 have occasion to use a sword?

22 A    Yes.

23 Q    For operational purposes?

24 A    No.

25 Q    For what?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 162 of 227

1  A    Ceremonial purposes.

2  Q    All right.  And did you own such a sword?

3  A    Pardon me?

4  Q    Did you own a ceremonial --

5  A    Yeah.

6  Q    -- sword?

7  A    Yes, I certainly did.

8  Q    And were there any markings on the sword that indicated it

9  was yours?

10  A    Yeah.  My name is engraved on the blade.

11  Q    All right.  And did it have a case?  Did it come in a

12  case?

13  A    Yes.

14  Q    And did that have any markings that indicated it was

15  yours?

16  A    Well, my initials are painted on it somewhere, on the lid

17  or -- I guess, or --

18  Q    Okay.  Now I'm going to ask you to look at Government

19  Exhibit 215.  Yes, it's already admitted.  Now, are you

20  familiar with that?  And look at the case too.

21  A    Yes, sir.  That's --

22  Q    All right.

23  A    -- those are my initials and "USCG" on there.

24  Q    And have you looked at those before your testimony today?

25  A    Yes.  Yeah.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 163 of 227
(720) 384-8078   attrans@sbcglobal.net

**STEIN - DIRECT**

1   Q    Okay.

2   A    You showed them to me.

3   Q    Yeah.  And is that your sword?

4   A    Yes, that's my name engraved right there on the blade.

5   Q    All right.  Now, other than when you looked at it before

6 in your trial preparations, when was the last time you'd seen

7 that sword?

8   A    Just before I sold my house.

9   Q    Okay.  And where was it?

10   A    It was standing in the closet, in the bedroom.

11   Q    All right.  And at some point did you realize that it was

12 missing?

13   A    Yes.  I intended to ship that sword to my brother, because

14 he had been promoted to officer grade.  And when it came time

15 to ship the guns and the sword, I couldn't find the sword.

16   Q    Okay.  And was -- when you sold your house, were -- was

17 Mr. Wells involved in assisting you with that at all?

18   A    Yeah, I believe Jim and Nancy cleaned the house for me.

19   Q    Now, when you -- did you get notified at some point that

20 this sword may have been found?

21   A    Yes.  An FBI agent called me at home.

22   Q    All right.  And at the time when you found out about that,

23 did you mention any other items that the FBI might want to look

24 for?

25   A    Uh-huh (affirmative).  When he told me he had found my

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 164 of 227
(720) 384-8078  attrans@sbcglobal.net

1  Coast Guard sword, I said, "Well, if you found the sword, you

2  probably found a couple of Japanese swords too."

3  Q    Okay.

4  A    Because they were also missing.

5  Q    All right.  Now, when you said -- where did you obtain

6  these Japanese ceremonial swords?

7  A    Where did I obtain them?

8  Q    Yeah, where'd you get those?

9  A    Oh, I bought those when I was stationed in Japan.

10 Q    All right.  And were they expensive items?

11 A    No.  I -- I consider them souvenirs.

12 Q    All right.  And when was the last time you had seen those

13 items, the swords?

14 A    They were -- they were kept in the closet, right alongside

15 my ceremonial sword.

16 Q    All right.  Now I'm going to ask you to take a look at

17 Government Exhibit 222.

18 A    Yeah, that's -- that would be my sword, yeah.

19 Q    And also Government Exhibit 223.

20 A    Yes, same thing.

21 Q    All right.  Now, did Mr. Wells -- did you give those

22 swords to Mr. Wells or give him permission to have those?

23 A    Absolutely not.

24 Q    Now, another firearm question.  Are you familiar with the

25 term "ported" or "Mag-na-ported" with a firearm?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 746  Filed 09/23/14  Page 165 of 227

1  A    Yes, I am.

2  Q    And have any of your firearms ever had that treatment done

3  to them?

4  A    No, I have never owned a ported gun and never will.

5  Q    Okay.

6        MR. SCHRODER:  No further questions, Your Honor.

7        THE COURT:  Cross-examination.

8                    **CROSS-EXAMINATION**

9  BY MR. CURTNER:

10 Q    Good afternoon, Mr. Stein.

11 A    Morning.

12 Q    How are you doing?

13 A    Afternoon.

14 Q    Now, you've known -- how long have you known Mr. Wells?

15 A    I met Mr. Wells in 1981.

16 Q    Over 30 years.  And how long did you work with him?

17 A    Four years.

18 Q    Four years, okay.  Was he a pretty good person to super --

19 you were his supervisor?

20 A    Yes.  I -- he was an excellent technician.

21 Q    So he was a good person for you to supervise?

22 A    Yeah, very easy to get along with, and did his job.

23 Q    Okay.  Now -- then you got -- so you've known him for a

24 number of years?

25 A    Pardon me?

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 166 of 227

1  Q    You've known him for a long time, then, even after he --

2  you were supervising him?

3  A    Oh, yeah, uh-huh (affirmative).

4  Q    You were still friends?

5  A    In fact, he sold my house for me.

6  Q    Okay.  Oh, let's -- we'll talk about that in a minute.

7  But -- so when you -- the time he was working with you and the

8  time you guys went hunting and fishing, did you ever see him to

9  be violent?

10 A    No, never.

11 Q    You ever see him even lose his temper?

12 A    No, I don't believe I have.

13 Q    Okay.  So you had remained friends through many years,

14 even when you were driving the schoolbus?

15 A    Uh-huh (affirmative).

16 Q    Did you know his children?

17 A    Yes, they were -- I used to eat dinner at his house quite

18 often.

19 Q    Okay.  And do you remember -- what's his -- the children's

20 names?  Do you remember?  The names of his three children, do

21 you remember those?

22 A    Matt, Elizabeth, and Cable.

23 Q    Cable, okay.  Now, you -- I think you were interviewed a

24 couple times about this case.  Right?

25 A    Oh, yeah, uh-huh (affirmative).  I got a --

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 167 of 227
(720) 384-8078  attrans@sbcglobal.net

1  Q    Two days apart?

2  A    I got a lot of visitors.

3  Q    And about this case?

4  A    Yeah.

5  Q    Now -- so when you were first interviewed, would that have

6  been May 17th of last year?

7  A    I -- I haven't kept notes.

8  Q    Okay.  Have you had a chance to review what you said

9  earlier?

10 A    No.

11 Q    You haven't?

12 A    No, I haven't -- I haven't kept any notes, and we just --

13 when I get a visitor, we usually rehash what was said last

14 time.  That's about it.

15 Q    Okay.  Do you remember the first time an FBI agent talked

16 to you about this and you couldn't -- at that time you couldn't

17 remember Cable or Liz's -- or, no, I'm sorry, Matt and Liz's

18 name.  Is that right?

19 A    Right, uh-huh (affirmative).

20 Q    But you remembered Cable's name?

21 A    Oh, yeah, uh-huh (affirmative).

22 Q    Okay.  Now, you drove -- when you drove the schoolbus,

23 those kids were on your schoolbus for a number of years.

24 Right?

25 A    Right.  Uh-huh (affirmative).

1   Q   Okay.  And -- but back in -- last year, you couldn't
2   remember two of their names.  Is that -- that's what --
3   A   Yeah.
4   Q   All right.
5   A   I'm getting a little --
6   Q   Okay.  Me too.  But that happens.  So how long did you
7   drive the schoolbus?
8   A   Five years.
9   Q   And why did you quit driving the schoolbus?
10  A   It was time to move on, you know.
11  Q   Was there any kind of --
12  A   I wanted to -- I wanted to travel.
13  Q   Okay.  Was there any kind of incident or anything when you
14  quit?
15  A   Any kind of what?
16  Q   Incident or anything happen?
17          MR. SCHRODER:  Objection.  Relevance, Your Honor.
18          THE WITNESS:  No.
19          THE COURT:  I don't know what you're talking about, so
20  I don't know if it's relevant.
21  BY MR. CURTNER:
22  Q   Was there anything that happened unusual when you quit
23  driving the schoolbus?
24  A   Absolutely not.
25  Q   Okay.  Now let's talk about the house, then.  When you

1  went traveling, you had Jim and Nancy sell your house for you?

2  A    Jim, yeah, uh-huh (affirmative).

3  Q    Jim did.

4  A    I -- I gave him power of attorney.

5  Q    Okay.  So you gave him a power of attorney so he could

6  sell your house when you were gone.  And so you trusted him

7  quite a bit, then?

8  A    Uh-huh (affirmative).

9  Q    And they cleaned your house?

10  A    I believe they did, yeah.

11  Q    Okay.  So what did that entail?  Did it take them a long

12  time to clean your house?

13  A    I wasn't there, I don't think, at the time.  I -- they --

14  I think they cleaned it after I left.

15  Q    They had to clean it in order sell it?

16  A    Hmm?

17  Q    They had to clean the house so that they could sell your

18  house?

19  A    Yeah, right.

20  Q    Okay.  Now, didn't you put a lot of your things in storage

21  before you left?

22  A    No, I sold just about everything.

23  Q    Okay.  You -- when you left, you wanted to travel light.

24  Is that correct?

25  A    Yeah.  The only thing I -- the only thing I didn't want to

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 170 of 227

STEIN - CROSS

1  sell was my gun collection.

2  Q   Okay.  And -- but everything else, all your personal

3  items, you either put in storage or --

4  A   Well, I -- I had a --

5  Q   -- gave away or --

6  A   -- I had a house sale and sold all the other stuff,

7  stereo, books, and kitchen stuff.

8  Q   Do you remember telling the FBI agent that you thought

9  your swords were in storage?  Did you ever say that?

10 A   Did I what?

11 Q   Did you ever tell the FBI agent that your swords -- you

12 thought your swords were in storage when you left?

13 A   I still didn't understand the question.

14 Q   Okay.  Do you remember telling one of the agents here when

15 they asked you questions about the swords --

16 A   The sword.

17 Q   The sword --

18 A   Swords.

19 Q   Okay -- yes.  Did you ever say that you thought that you'd

20 put them in storage?

21 A   No, I didn't.  I -- I didn't put them in the safe, no.

22 No, I did -- I -- I intended to do that and then I -- for some

23 reason or other, I did not.

24 Q   Now -- so did you -- I know we're talking back what --

25 we're talking almost 20 years?  We're talking 1997, '96?  '96.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 171 of 227

1  So did you ever pay Mr. and Mrs. Wells for taking the power of
2  attorney and selling the house for you?
3  A    Pay him?
4  Q    Yeah.
5  A    I don't think so.
6  Q    Did you ever pay them for cleaning out your house so they
7  could sell it?  Did you ever give them anything?
8  A    No, I don't -- no, I -- I don't believe that.  Never paid
9  them any -- I don't think I did.
10 Q    Are you sure -- could it be possible that you let them
11 have those swords because you were traveling and you wanted to
12 get rid of things, and that you -- that was something for
13 them -- well, all the work that they did on your house?
14 A    No, I had already promised that sword to my brother.
15 Q    Okay.
16 A    My brother was a chief petty officer in the Navy and he
17 got promoted to lieutenant JG.  And he called me, and I asked
18 him if he'd bought a sword; he said, "No."  So I said, "Would
19 you like mine?"  And he said, "Yes, absolutely."  So I said, "I
20 will ship it down to you with the guns."
21 Q    Okay.  Now, as I recall, you were interviewed twice within
22 two days.  Do you remember that?  One agent talking to you,
23 then two more -- two days later another agent came to talk to
24 you?
25 A    If you say so.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 172 of 227

1  Q   Well -- the first interview, do you remember saying that

2  you spent -- well, you lived with the Wells for a while.  Is

3  that correct?

4  A   Yeah, uh-huh (affirmative).

5  Q   And the first time you told them it was for two months?

6  A   You know, I really don't remember.  I -- I had a bunk

7  there for a while and I -- I only -- I only slept there a few

8  times.  But mostly I was traveling and I was just using their

9  house as an address.

10 Q   Okay.  Do you remember the second time you talked to the

11 FBI agents, you said you lived there for two weeks?

12 A   Yeah, something like that, uh-huh (affirmative).

13 Q   Okay.  But the first time, it was two months?

14 A   I don't know.

15 Q   Do you remember the first time you were interviewed about

16 your gun, you said it was a 625 Smith & Wesson?

17 A   Yeah, I made a mistake.

18 Q   Okay.  Then the next time you said it was a 629.  Is that

19 correct?

20 A   Yeah.  I own a 625.

21 Q   Okay.  But you -- so --

22 A   But, yeah, it was a 629, not a 5.

23 Q   But the first time you said it was a 625?

24 A   That's right.  I made a mistake.

25 Q   Now, I think when you were talking about traveling and you

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 173 of 227
(720) 384-8078  attrans@sbcglobal.net

1 were telling the FBI agents how you traveled all around, the

2 first time you said it was for -- you had been traveling for

3 six months?  Do you recall that?

4 A    Yeah.  Again, I -- I -- I don't have a -- I don't have my

5 diaries from that period and I can't tell you exactly.

6 Q    Okay.  Well, I understand.  Now, did you at some point two

7 days later tell them it was actually for five years that you

8 were traveling?

9 A    Well, I did travel for five years.

10 Q    The first time you said it was six months?

11 A    That was one trip.

12 Q    And the next time they asked you about that trip, you said

13 it was for five years?

14 A    All I can say is off and on, I traveled for five years.  I

15 did -- I didn't spend much time in Kodiak without a home, so --

16 Q    The letter that we just looked at, Government's Exhibit

17 232A, can we put that on the screen again for -- oh -- for Mr.

18 Stein?  Okay, so do you see that letter in front of you?

19 A    What's -- what's the question?

20 Q    Okay.  The question is, you wrote that in August of 1997?

21 A    Right.

22 Q    And the first paragraph, you report the loss of a firearm.

23 Is that correct?

24 A    Right.

25 Q    You didn't use the word "stolen" or somebody had taken.

1  You said it was lost, there was a loss of a firearm.  Is that

2  correct?

3  A    Yeah.

4  Q    And the second paragraph of that letter, you said that you

5  rented out your house in 1996.  Is that what you wrote?  June

6  1996?

7  A    Okay.

8  Q    And then you -- then you say you put most of your

9  household goods in storage at Kodiak Transfer.  Do you recall

10  that?

11  A    Yeah.  You know, I don't remember that, but I wrote it

12  down, so I guess it must be true.

13  Q    Okay.  So when you rented your house in 1996 --

14  A    Yeah, I guess.

15  Q    -- you did put your household goods in storage?

16  A    Yeah, I -- I'm not going to disagree with anything in the

17  letter here.

18  Q    Okay.  Now -- then you said that when you returned

19  traveling in January 1997, that's when you first notice that

20  a -- your gun was missing.

21  A    Okay.

22  Q    Paragraph 3.

23  A    I guess so, yeah.

24  Q    So you noticed that your firearm was missing in January,

25  and you wrote this letter in August, eight months late --

1  later.  Right?

2  A    Yeah.

3  Q    And you didn't mention any swords in this letter at all.

4  Correct?

5  A    I -- I wrote the letter because I was having difficulty

6  getting a -- police to accept my -- my problem.  I -- I took --

7  I went to the Kodiak Police, I went to the -- I think I went to

8  the Kodiak troopers too.  But since there was no crime

9  committed, nobody was interested.  I couldn't get -- I even

10 called the Wauwatosa City Police, and they were bored by it

11 all.

12 Q    Well, you -- asked if there was some reason you were

13 concerned about the missing gun, and didn't you -- weren't you

14 concerned about collecting insurance for it?

15 A    Was I what?

16 Q    Were you concerned about -- you had it insured.  Is that

17 correct?

18 A    No.  No.

19 Q    You didn't have your gun insured?

20 A    None of my gun --

21 Q    Are you sure about that?

22 A    None of my guns were insured.

23 Q    You didn't file a claim for insurance?

24 A    I don't think so.

25 Q    Did you have a -- NRA insurance?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 176 of 227
(720) 384-8078   attrans@sbcglobal.net

1  A    Oh, NRA, yeah.  I -- I've never collected anything --

2  those guys either.

3  Q    Did you try to collect from them for this gun?

4  A    Apparently I did.  That's -- that's when I found out they

5  don't pay off.

6  Q    Okay.  So -- now, when you got back to Kodiak in January

7  1997, do you know if Matt Wells was there?

8  A    What about -- what about Matt?

9  Q    Was he there when you went back and you saw the safe at --

10  or that was open?

11  A    I believe Matt was still in the home, yeah.

12  Q    Okay.  So he would have been there to see that, right?

13  A    Yeah.

14  Q    Matt's a pretty good kid?

15  A    Far as I know.

16  Q    Okay.  You know he's a police officer now.  Did you know

17  that?

18  A    Yeah, uh-huh (affirmative).

19  Q    Okay.  And was Cable there?

20  A    I think Cable had already moved to Juneau.

21  Q    All right.  Now, how well did you know Cable?

22  A    Probably since I met Jim, somewhere around there.

23  Q    Since he was a kid?

24  A    Yeah.

25  Q    And did you ever shoot guns with him?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 177 of 227
(720) 384-8078   attrans@sbcglobal.net

1  A    Was I --

2  Q    Did you ever -- you and Cable ever shoot those handguns

3  together?

4  A    Yes.  Oh, yeah.  One -- at least once.

5  Q    Okay.  And was that the two Smiths and -- Smith & Wesson

6  629s?

7  A    Yeah, we had both of them.

8  Q    Okay.  You shot one and he shot the other?

9  A    (No audible reply).

10 Q    And, now, when they asked you about this gun, didn't you

11 think -- didn't you say that you thought maybe Cable took it?

12 A    I -- yeah, I was thinking that one of the kids might have

13 borrowed it.

14 Q    Okay.  Now, you said Cable really liked that gun.  Right?

15 A    Yeah.  He -- I gave him a choice when we went shooting.

16 He could have the short barrel or long barrel.  He immediately

17 grabbed the long barrel, and so he liked that gun, yeah.

18 Q    And didn't you say when they first asked you about this,

19 you thought maybe Cable grabbed the pistol?

20 A    Grabbed it?

21 Q    Yeah.  I think that's what your words were.

22 A    Well, he -- yeah, he was -- he was pretty excited.  Yeah,

23 he, okay, grabbed, the gun, "Yeah, I want to shoot this."

24 Q    Did you also tell them that he boogied off with it?

25 A    That he what?

**STEIN - CROSS**

1  Q    Boogied off with it, took off with it.

2  A    Say that again.

3  Q    Boogied.

4  A    Boogied off with it?

5  Q    Yeah.

6  A    No, I never said that.

7  Q    Okay.  And --

8  A    We were -- we were standing right to each other shooting,

9  so --

10  Q    I know.  And he liked the gun when you were shooting?

11  A    Yeah.

12  Q    And this is before you left.  And then when you came back

13  and you thought the gun was missing, your first thought was

14  maybe Cable took off with it.

15  A    Yeah.  Well, you know, Cable was in Alaska and he was -- I

16  think he was learning to fly.  And I thought he might want to

17  have a -- a -- a heavy handgun for flying across country.  So I

18  thought he had -- he would have a reason or -- to keep it or

19  use it, you know.  So that's all I suggested, maybe he had it.

20  Q    He had it and he took it with him to Juneau?

21  A    Yeah, sure.

22  Q    Okay.  Your Smith & Wesson 629s, what kind of handle --

23  grips did they have?

24  A    I don't remember.

25  Q    Okay.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 746  Filed 09/23/14  Page 179 of 227

**STEIN - CROSS**

1  A    I usually replace the wooden grips on my guns with rubber
2  ones.
3  Q    So more than likely, your guns that you had, you had
4  rubber grips on that you replaced from the wooden ones?
5  A    Yeah.  I -- I -- I really like rubber grips, so --
6  especially on a hand -- a Magnum.
7  Q    Yeah, especially on a .44 Magnum, it's a lot easier to
8  shoot if you have a rubber grip that you can exchange.  Right?
9  And that's what was on your --
10 A    Yes.
11 Q    -- two guns?
12 A    Yeah.
13 Q    Thank you.  I just want to ask you about a license --
14 federally licensed firearms dealer.
15 A    Yeah.
16 Q    Were there a lot of people who did that on Kodiak?
17 A    Yes.  Of the NR -- I mean the FF -- the BATF told me that
18 there were something like 180 dealers on Kodiak Island.
19 Q    A hundred and eighty federally-certified --
20 A    Dealers.
21 Q    -- firearms dealers?
22 A    Yeah.
23 Q    On Kodiak Island?
24 A    Yeah.  A huge number.
25 Q    Yeah.  And is that a -- is there a reason for that?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 180 of 227

**STEIN - REDIRECT**

1  A    Hmm?  The reason?

2  Q    Yeah.

3  A    Well, everybody uses the FFL to buy handguns.  You know,

4  the -- the -- you can -- you can buy them wholesale.  And if

5  you want to, you can sell legally, and so forth.  And it's --

6  it's -- and it's free, you know, it's only -- at that time I

7  think it was $50 a year or something like that.  So if you --

8  if you like guns, yeah, the FFL was a great -- great idea.

9  Q    Okay, all right.  Thank you.

10        THE COURT:  Redirect.

11                    **REDIRECT EXAMINATION**

12  BY MR. SCHRODER:

13  Q    Mr. Stein, is there any -- Mr. Curtner talked to you a bit

14  about whether -- your impression that maybe Cable Wells might

15  have had that gun.  Did you ever see any evidence of that?

16  A    No.  No.

17  Q    Okay.  Was it based on anything more than the fact that

18  he'd liked the gun one time when you went shooting?

19  A    No.  No.

20  Q    Mr. Wells ever tell you that?

21  A    Did Mr. Wells tell --

22  Q    That Cable might have the gun?

23  A    No, he certainly did not.

24  Q    Now I'm going to show you what's been marked as Government

25  Exhibit 232B.  Now, do you know what -- are you familiar with

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 181 of 227

1  this exhibit, Mr. Stein?

2  A    It looks like part of my inventory.

3  Q    All you're seeing is the first page.  So -- but is that

4  what it is, the first page of your inventory?

5  A    I have to take your word for that.

6  Q    Well, what do we need to do to help you -- I can give you

7  a paper copy if that would help.  Or if you'd like to look at

8  another page, we can show you other pages too.

9  A    Boy, it's hard for me to read.

10      (Side conversation)

11  Q    Does that help?

12  A    Yeah.  Okay.

13  Q    Now, is -- are you familiar with this document now?

14  A    Well, if it's part of my gun collection, I guess I am.

15  Q    Yeah.  So how did you take this inventory?  What did

16  you -- it looks like it's not handmade.  How did you do -- did

17  you put the information into it?

18  A    Well, I typed it up on my computer.

19  Q    You had a computer back in 1995?

20  A    Yeah, I --

21  Q    Kind of an earlier adopter at that point?

22  A    Yeah.  Coal burning, right.

23  Q    And did you check -- as you put those in there, did you

24  check each handgun -- each firearm to make sure you had the

25  right information on those firearms?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 182 of 227
(720) 384-8078   attrans@sbcglobal.net

1   A    Well, yeah, I did the best job I could.

2   Q    All right.

3        MR. SCHRODER:  Your Honor, the government moves for

4   admission of 232B.

5        MR. CURTNER:  I'm sorry, did he identify this as his?

6        THE COURT:  He said he typed it up on his computer, the

7   coal-burning one.

8        MR. CURTNER:  I missed that.

9        THE COURT:  Okay.

10       MR. CURTNER:  No objection.

11       THE COURT:  It'll be received.

12     (Plaintiff's Exhibit 232B admitted)

13       MR. SCHRODER:  Could we go to page 2?  Can we blow up

14  that middle section?

15  BY MR. SCHRODER:

16  Q    Now, are there -- let me -- I'm going to -- want you to

17  look at that for a moment.

18  A    Okay.

19  Q    All right.  And is there info for -- on that page, is

20  there information for one or two handguns?

21  A    Yeah, I got two.

22  Q    And which ones?

23  A    The -- the six-inch barrel was the one that was marked

24  stolen.

25  Q    All right.  And what is the serial number for the one with

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 183 of 227
(720) 384-8078   attrans@sbcglobal.net

1  the six-inch barrel?

2  A    For the stolen one?

3  Q    Yes.

4  A    Looks like AJL.  I can't tell -- that looks -- yeah,

5  AJL2172.

6  Q    Okay.  And I want to go back to 232A.  Let's blow up that

7  paragraph 5.  And what's the serial number listed there for

8  that missing firearm, Mr. Stein?

9  A    Yeah, it's hard -- hard to tell if it was an I or an L.

10  It looks like I put a I, period.

11  Q    Okay.  What's the number behind it?  If we blow -- we'll

12  blow that up a little bigger.  That's maybe too big.

13  A    Okay, it's an L.

14  Q    Okay.  So one more time.  Fair to -- get a compromise.

15  A    I'd have to say that's an L.

16  Q    And then what's -- what are the numbers?

17  A    What's the what?

18  Q    What's the full serial number?

19  A    A -- A -- AJL2172.

20  Q    All right.  Thank you.  No further questions.

21          THE COURT:  Recross.

22          MR. CURTNER:  No, thank you.

23          THE COURT:  All right.  Thank you, sir.  You're all

24  done.

25          THE WITNESS:  All right.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 184 of 227
(720) 384-8078   attrans@sbcglobal.net

1          THE COURT:  The government's next witness.  You're free

2  to go.  Thank you.  Watch that --

3          MS. DUIGNAN:  The government calls Mr. Terry Stein.

4          THE COURT:  Watch that step going down.  Okay, is there

5  a witness coming?

6      (Witness excused)

7          MS. DUIGNAN:  Yes, Your Honor.  He's right outside.

8  We're bringing him --

9          THE COURT:  Okay.

10         MS. DUIGNAN:  -- in now.

11         THE COURT:  All right, sir, if you can come -- we got a

12 seat for you up here.  That door pulls out, and you can just

13 step into the witness box.  And remain standing just long

14 enough for her to swear you in.

15         THE CLERK:  Please raise your right hand.

16      **TERRENCE LEE STEIN, PLAINTIFF'S WITNESS, SWORN**

17         THE CLERK:  Okay.  Thank you.  Please have a seat.

18 And, sir, if you can please state and spell your full name.

19         THE WITNESS:  Terrence Lee Stein.  S-t-e-i-n.

20         THE CLERK:  And your full name, sir.

21         THE WITNESS:  Terrence, T-e-r-r-e-n-c-e.  Lee, L-e-e.

22 Stein, S-t-e-i-n.

23         THE CLERK:  Thank you.

24         THE COURT:  All right, counsel.

25                     **DIRECT EXAMINATION**

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 185 of 227
(720) 384-8078  attrans@sbcglobal.net

STEIN - DIRECT

1  BY MS. DUIGNAN:

2  Q   Mr. Stein, what city and state do you live in right now?

3  A   Wauwatosa, Wisconsin.

4  Q   And we just heard from John Stein.  Are you related to

5  John Stein?

6  A   That's my older brother.

7  Q   Okay.  And how much older is he than you?

8  A   Ten years.

9  Q   Do you recall a time when your brother shipped a gun safe

10 to you in Wauwatosa?

11 A   I do.

12 Q   And when -- approximately when was that?

13 A   Approximately in 1996.

14 Q   And can you tell me why you received that safe?

15 A   Well, I needed a safe at the time, and he was willing to

16 ship it to me.  If I paid the shipping costs, I could have it.

17 So it also came with his weapons that he didn't want to leave

18 behind when he went to Nicaragua.

19 Q   And what did you do upon receiving the safe?

20 A   I opened it and inventoried the contents and wrote down

21 their serial numbers and descriptions.

22 Q   And why did you make an inventory of the safe?

23 A   It just seemed the right thing to do, because I was going

24 to put my weapons in the same safe with his stuff, and I

25 didn't -- just didn't want to have any discrepancy as to what

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 186 of 227

**STEIN - DIRECT**

1  was there.

2  Q   And when did you make these notes about what was in the

3  safe?

4  A   When I opened the safe, right at the time.

5  Q   If you saw those notes again, would you recognize them?

6  A   I would.

7  Q   Can we please bring up Government Exhibit 242?  On your

8  screen -- if you look at the screen.

9  A   Yes, those are my notes.

10 Q   Okay.  Can we scroll through all the pages?

11 A   Yes.  Yes.

12 Q   Sorry about that.  We'll take out that page.  If you can

13 just look at all the pages first.

14 A   Yes.  Yes.

15 Q   Is that the last page?  And what do those notes show?

16 A   The make and model of the firearm, long gun, handguns, and

17 their serial numbers, basically.

18 Q   If you can go back to the first page.  Can you scroll

19 through one more time?  I'm sorry, what was on page 4 that I

20 promised you we'd remove, but it was still there?

21 A   That's actually the combination to the safe.

22 Q   So those indeed are all of your notes in Exhibit

23 Government 242?

24 A   That's correct.

25 Q   And they're complete and accurate, and you recognize them

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 187 of 227

1  from the time that you inventoried the safe in 1990 -- I think

2  you -- did you say 1996 or '97?

3  A    '96.

4  Q    In 1996.

5        MS. DUIGNAN:  Your Honor, I move for admission of 242.

6  Mine has page 4, which I'd like to remove at some point,

7  because obviously we don't want to put the safe combination

8  into evidence.

9        THE COURT:  Any objection?

10       THE WITNESS:  Thank you.

11       MR. CURTNER:  No.

12       THE COURT:  It'll be received, without the page 4.  Any

13  of the jurors who may have memorized that number, please

14  disregard it.

15     (Plaintiff's Exhibit 242 admitted)

16       MS. DUIGNAN:  Yeah, we won't show it all now, we'll

17  just --

18       THE COURT:  Thank you.

19       MS. DUIGNAN:  -- publish the first page.

20  BY MS. DUIGNAN:

21  Q    So there are approximately -- about four or five other

22  pages besides this?

23  A    Correct.

24  Q    Okay.  And if we can take the -- if we could take the

25  exhibit down, because I don't want to page through the one with

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 188 of 227

STEIN - DIRECT

1  the combination in it.  But if we can slowly page through
2  again, I want you to count up how many weapons you see that
3  you --
4  A    Oh.
5  Q    -- inventoried on --
6  A    Okay.
7  Q    -- your screen.
8  A    One, two, three --
9  Q    Okay, next page.
10  A    -- four, five, six, seven, eight, nine, ten, eleven,
11  twelve.
12  Q    Okay.  So how many weapons total did you inventory from
13  the safe?
14  A    Twelve.
15  Q    And looking at your notes again, going through them, did
16  you notice a weapon, a model -- a Smith & Wesson stainless 629,
17  serial AJL2172 in your notes?  If we go back through again.
18  A    No, it's not necessary.  There's only one.
19  Q    Okay.  And that indeed has a different serial number?
20  A    Correct.
21  Q    Was there a time that you took this list and went over it
22  with your brother?
23  A    Yeah.  It was upon one of his visits to my house.  And he
24  went through the safe again at that time, just to make sure
25  that the items that he had marked as missing were actually

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 189 of 227

1   missing.

2   Q   Okay.  And can we pull up the exhibit that we just

3   previously entered, the inventory?  We're pulling up Exhibit

4   232B.  I want you to take a look at this and see if you --

5   A   Okay.

6   Q   -- recognize it.

7   A   Oh, yes, that's -- that's my brother John's.

8   Q   Okay.  And at the time that you went through the safe with

9   him, did he have a list for comparison?

10  A   Just my list.  I had -- he had sent me a list and had some

11  circled items that were missing from wherever he was at the

12  time.  And I had that in my possession.

13  Q   Okay.

14  A   But I -- it was just in a bunch of papers that he had sent

15  me, so --

16  Q   Can we go to the page with the circle?  Looking at this

17  page, do you recognize this page?

18  A   Yes.

19  Q   Was that indeed the circled list that you were talking

20  about?

21  A   Yeah, that's what I'm talking about.  Yeah.  That's a

22  circle.

23  Q   Oh, can we show it on the screen?  I'm sorry.  It was

24  already admitted into evidence.

25  A   Yeah.

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 190 of 227

**STEIN - DIRECT**

1  Q    Okay.  And so that's the list that you had in comparison

2  with your list?

3  A    Yeah.  He sent me a copy of that.

4  Q    And as a result of comparing his list to your list and the

5  items in the safe, do you know any actions that either one of

6  you took as a result of that?

7  A    I believe my brother went to the Wauwatosa Police

8  Department and made a missing firearm report.  I -- I didn't

9  know exact -- I don't know when he did that.

10 Q    Okay.

11 A    That's 18 years ago.  I don't remember that, so --

12 Q    I have no further questions.

13      THE COURT:  Cross-examination.

14      MR. CURTNER:  No questions, Your Honor.

15      THE COURT:  Thank you, sir.  You're excused.

16      THE WITNESS:  Thank you.

17  (Witness excused)

18      THE COURT:  The government's next witness.

19      MS. DUIGNAN:  We'd call retired Trooper Jim Sine to the

20 stand, Your Honor.

21      THE COURT:  That door pulls out to the witness box.

22 And you step in it, remain standing, and my clerk over here

23 will swear you in.

24      THE CLERK:  Raise your right hand.

25          **JAMES P. SINE, PLAINTIFF'S WITNESS, SWORN**

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 191 of 227
(720) 384-8078   attrans@sbcglobal.net

SINE - DIRECT

1     THE CLERK:  Okay.  Thank you.  Please have a seat.

2 And, sir, if you can please state and spell your full name.

3     THE WITNESS:  James P. Sine.  James, J-a-m-e-s.  P as

4 in Paul.  Last name is Sine, S-i-n-e.

5     THE CLERK:  Thank you.

6     THE COURT:  Counsel.

7                    **DIRECT EXAMINATION**

8 BY MS. DUIGNAN:

9 Q   Mr. Sine, did you used to be a trooper for the Alaska

10 State Police?

11 A   Yes, ma'am.

12 Q   And when did you serve, sir?

13 A   From 1987 till 2003.

14 Q   And what happened in 2003?

15 A   I retired medically.

16 Q   Okay.  Were you contacted regarding this case a few months

17 ago?

18 A   Yes, ma'am.

19 Q   And have you had a chance to review your notes in

20 preparation for your testimony?

21 A   Yes, I have.

22 Q   Did you take any type of a report of a weapon that was of

23 interest to this case?

24 A   I did receive information concerning what you're speaking

25 of.  However, the report that was taken, a report number was

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 192 of 227

**SINE - DIRECT**

1   drawn, and at that time we were doing what we call accident --
2   or participant forms.  And if we had a case that had no
3   justifiable leads or anything that could be followed up at --
4   at the time, we would initiate a case number and issue a
5   participant form to the person that made the complaint.  They
6   would then in turn fill out appropriate information in it and
7   that report would be forwarded to Juneau.
8   Q   And do you recall giving an -- a participant form number
9   to an individual?
10  A   Yes, I do.
11  Q   And on what date did you give out a participant number?
12  A   I would have to have my notes --
13  Q   Okay.
14  A   -- to give you the exact date.
15  Q   Can we pull up Government Exhibit 241?  If you look at
16  your screen, you should see Government Exhibit 241.  Are --
17  what are those?
18  A   It's a photocopy of my notebook, and the date on the
19  notebook is 8/21 of '97.
20  Q   Okay.  And you recognize those notes?
21  A   Yes, I do, ma'am.  They --
22  Q   And you would have taken them at the time that you were
23  giving out a participant number in this case?
24  A   Yes, ma'am.
25  Q   Indeed, on that page is there a participant number that

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 193 of 227

1 you recorded?

2 A    On this particular page there is the number.

3 Q    And what is that number?

4 A    That number is 97, and there's a hyphen, and it's 38911.

5 Q    Thank you.  Do you have an independent recollection of

6 this case?

7 A    I do.  After I was contacted about the case and the -- the

8 notebook, I took the opportunity to review my notes and the

9 notebook and recall pieces of the original complaint.

10 Q    And do you recall speaking to an individual who called you

11 about this particular participant number that you issued?

12 A    Yes, I did.

13 Q    And what do you recall?

14 A    I do not recall the individual's name.  I just recall that

15 there had been a theft of a firearm, a revolver, and the other

16 item that I remember having been stolen was a scope of some

17 type, that it had been taken from a safe, and that the person

18 had made the complaint -- was either -- the safe was located in

19 Bells Flats or had been at one time in the Bells Flats area of

20 Kodiak.

21 Q    And do you recall what kind of weapon was taken in this

22 case?

23 A    The only thing I recall is that it was a revolver, a

24 handgun.

25 Q    But that was the participant number revol -- related to

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 194 of 227

**SINE - CROSS**

1  that revolver that you recorded in your notes?

2  A    Yes, ma'am, it is.

3  Q    I have no further questions.

4         THE COURT:  Cross-examination.

5                    **CROSS-EXAMINATION**

6  BY MR. CURTNER:

7  Q    So as I understand, there was no investigation whatsoever

8  on what -- this information?

9  A    If -- if I may expound.  Normally when we give out a

10 participant form, the person would fill out that form and it

11 would be sent back either to the post or directly to Juneau.

12 If there was some form of a lead that we could follow up on,

13 then we would take action at that time.

14 Q    That -- that's your -- but you didn't take any action at

15 all on this?

16 A    No.  No, sir, I didn't.

17 Q    All right.  Okay, thank you.

18         THE COURT:  Redirect.

19         MS. DUIGNAN:  No further questions.

20         THE COURT:  Thank you, sir.  You're excused.  The

21 government's next witness.

22    (Witness excused)

23         MS. LOEFFLER:  The government calls Robert Pletnikoff.

24         THE COURT:  Okay, sir, have a seat for you right at the

25 front.  When you get up there, that door pulls out.  Just step

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 195 of 227
(720) 384-8078   attrans@sbcglobal.net

1   into the witness box, remain standing just for a second.  And

2   my clerk is right here.  She'll swear you in.

3          THE CLERK:  Please raise your right hand.

4      **ROBERT MITCHELL PLETNIKOFF, PLAINTIFF'S WITNESS, SWORN**

5          THE CLERK:  Okay, thank you.  Please have a seat.  And,

6   sir, if you can please state and spell your full name.

7          THE WITNESS:  Robert Mitchell Pletnikoff.

8          THE COURT:  And spell that.

9          THE WITNESS:  Commercial -- commercial fisherman.

10         THE COURT:  Okay.  And it's Robert, standard spelling?

11         THE WITNESS:  Yes.

12         THE COURT:  And would -- how do you spell your middle

13  name?

14         THE WITNESS:  Mitchell.

15         THE COURT:  M-i-t-c-h-e-l-l?

16         THE WITNESS:  Yes.

17         THE COURT:  And how do you spell your last name?

18         THE WITNESS:  Pletnikoff.  P as in Papa, l-e-t-n-i-k-o-

19  f-f.

20         THE CLERK:  Thank you.

21         THE COURT:  Did you get that?  Okay.  All right, sir,

22  and just pull that microphone fairly close to you.

23         THE CLERK:  Oh, we have a hand.

24         UNIDENTIFIED SPEAKER:  Right.  One last time on the

25  spelling of the last name?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 196 of 227

PLETNIKOFF - DIRECT

1      THE COURT:  It's -- this is my version.  P-l-e-t-n-i-k-

2  o-f-f.  Did you get that?  Is that right, sir?

3      THE WITNESS:  Yes, it is.

4      THE COURT:  Okay.

5                    **DIRECT EXAMINATION**

6  BY MS. LOEFFLER:

7  Q    Mr. Pletnikoff, where do you live?

8  A    Kodiak, Alaska.

9  Q    How long have you lived in Kodiak?

10  A    Since 1988.

11  Q    And what's your profession?  What do you do in Kodiak?

12  A    I'm a commercial fisherman and I do a little marine

13  surveying, and I got the Kodiak Boat Watch.

14  Q    Okay.  And --

15      THE COURT:  What -- I didn't catch the last one.

16      THE WITNESS:  I do the Kodiak Boat Watch.  I -- I

17  maintain --

18      THE COURT:  Oh, Boat Watch.

19      THE WITNESS:  -- boats and I also run my tender for

20  salmon.

21      THE COURT:  Okay.

22  BY MS. LOEFFLER:

23  Q    Do you know Mr. Jim Wells?

24  A    Yes, I do.

25  Q    How long have you known him?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 197 of 227
(720) 384-8078  attrans@sbcglobal.net

1   A   At least 20 years.

2   Q   Okay.  Can you describe your relationship with Mr. Wells?

3   A   Well, we've done a few things together, like cut wood and

4   did some hunting.  And not a real close friend, but I know him

5   quite a while.

6           THE COURT:  Okay.

7           MS. LOEFFLER:  Okay.

8           THE COURT:  Can you just pull the mic around the --

9   push it towards you a little bit more?  Okay.  That top should

10  bend down.  Okay, raise your hand if you can't hear.  Okay, go

11  ahead.

12  BY MS. LOEFFLER:

13  Q   Mr. Pletnikoff, have you ever -- you said you did some

14  hunting and fishing.  So have you ever seen Mr. Wells with

15  firearms?

16  A   Yes, I did.

17  Q   What types of firearms?

18  A   Mr. Wells had a rifle, 7 millimeter, and some kind of a

19  pistol sidearm.

20  Q   Can you give an idea about on the -- when the pistol --

21  was a semiautomatic or a revolver?

22  A   I think it was a -- I believe it was a stainless revolver.

23  Q   Okay.  And any idea on the size?

24  A   It was a large revolver, probably a .357, .44, something

25  in that nature.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 198 of 227
(720) 384-8078   attrans@sbcglobal.net

PLETNIKOFF - CROSS

1  Q    Okay.  And when did you see him with that revolver?  To

2  the best of your knowledge.

3  A    I believe it was 1998.

4  Q    And what was it in your family that allows you to put it

5  around that time frame?

6  A    I was coming up the mainland with my brother at the time

7  on our boats, and I know it was that year because my mother

8  died in '99.

9  Q    Okay.

10  A    And my brother was still in Kodiak.

11  Q    I don't have any fur -- thing further.  Thank you, Mr.

12  Pletnikoff.

13  A    Thank you.

14       THE COURT:  Cross-examination.

15                    **CROSS-EXAMINATION**

16  BY MR. CURTNER:

17  Q    Good afternoon, Mr. Pletnikoff.

18  A    Hi.

19  Q    So you have known Mr. and Mrs. Wells, Jim and Nancy Wells,

20  for a long time?

21  A    Yes, I have.

22  Q    And how did you first meet them?

23  A    My wife worked with his wife at the -- my -- I -- we have

24  a handicapped son, and she worked with the KANA in -- in Infant

25  Learning Services, and she helped us out quite a bit.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 199 of 227

1    Q    Now, who did that?

2    A    Mrs. Wells.

3    Q    Mrs. Wells works at KANA?  What is that --

4    A    She used -- it's the Kodiak Island Medical -- or Kodiak

5    Area Medical Association.

6    Q    Okay.  And so you got to know her through that?

7    A    Yes.

8    Q    And you said she helped you quite a bit?

9    A    She helped my son quite a bit, yes.

10   Q    How -- could you explain how that happened?

11   A    She -- she knew how to get ahold of, you know, the

12   services and the help he needed.  He has autism, and -- and she

13   was quite helpful.

14   Q    Okay.  Was she pretty good at what she did there?

15   A    Seemed to be, yes.

16   Q    And so you got to know her and Jim through that

17   relationship?

18   A    I got to know Jim later.

19   Q    Okay.  Were you -- did you do things together as couples?

20   A    A few times.  You know, we -- we hunted a few times and --

21   and then we cut wood more than once, several times, cutting

22   wood.

23   Q    Okay.  Now, I think you've been asked a lot about if you'd

24   ever seen Jim Wells with a handgun?

25   A    Yes.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 200 of 227
(720) 384-8078   attrans@sbcglobal.net

1  Q    Many times?  Number of times?

2  A    I've seen him with sidearms, but I -- I couldn't identify

3  what he had at the -- at the time.  I've -- I've only -- can

4  identify one time when I seen the sidearm with him, that I know

5  of.

6  Q    Okay.  So you were first interviewed about this in --

7  April 23rd, 2012, shortly after --

8  A    Yes.

9  Q    -- the shootings?

10 A    Correct.

11 Q    And at that time you said you were not sure what kind of

12 firearm he might have had, what kind of handgun.  Is that

13 correct?

14 A    That's correct.  I wasn't sure.  I was confused.

15 Q    Well, that was a long time ago.

16 A    It was a long time ago.

17 Q    You saw it maybe one time in 1998.

18 A    Yeah, that's correct.  That -- you know, I -- I thought it

19 over -- I had more than just Jim out hunting.  So I had another

20 fellow by the name of Henry and another fellow by the name of

21 Malcolm, and Malcolm had a -- a blued pistol, and of course, he

22 died, so it -- he's not around anymore, so -- it was not him.

23 And the other two guys, Mr. Wells and Henry, they both had

24 stainless pistols.  And I can't describe the holster, as I --

25 as I stated in the statement there.  I tried to describe the

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 201 of 227

1    holster, but they were both different, and I'm not sure which

2    is which.

3    Q    Okay. So you were asked quite a bit about whether you

4    were sure that Mr. Wells had a stainless gun. Is that -- a

5    stainless-steel gun. Is that correct?

6    A    That's right.

7    Q    And at that time when you were first interviewed, you

8    said, "I think it was stainless," but you didn't know.

9    Correct?

10    A    That -- I had to think it over. It was a long time ago.

11    Q    Right. Now, this hunting trip was on the mainland.

12    That's -- so it's -- you have to travel by boat or airport from

13    Kodiak to get to the mainland?

14    A    Yes.

15    Q    And this was a time Mr. Wells was hunting caribou?

16    A    Correct.

17    Q    And he was there by himself?

18    A    Yes.

19    Q    And so he -- did he get stuck there for a few days?

20    A    Yes, he did.

21    Q    And he was weathered in or --

22    A    I believe -- yeah.

23    Q    And then -- so you went actually in your boat to pick him

24    up?

25    A    Well, I was coming up the mainland, so I stopped and got

1  him.  He was supposed to rendezvous with me, but he didn't make

2  it that far.

3  Q    Okay.  And did it seem to be like he was stuck there for a

4  couple of days waiting for you -- did you say rescue or

5  salvage -- in -- was that --

6  A    Well, the weather was bad, and, yeah, he had to wait.

7  There was no way to get out of there.

8  Q    Now -- so -- and you know this is 1998, going back that

9  far.  Do you remember when you saw him with a firearm, was it

10  ever out of the holster?

11  A    Not out of the holster.  I saw him when he came aboard my

12  boat with the firearm.

13  Q    And he had a firearm on the side?

14  A    Yes, he did.

15  Q    And it was in a holster?

16  A    Yes, he did.

17  Q    And it was covered up, everything except the handle.  Was

18  that correct?

19  A    The handle was -- I -- I could see the handle of the

20  pistol, yes.

21  Q    And what kind of handle was on that pistol?

22  A    I believe it was either dark wood or brown plastic, or

23  something like that.

24  Q    It was brown.

25  A    And the stainless back part of the handle.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 203 of 227

1  Q   Well, so -- all you could see when that gun is in the
2  holster is the hammer.  Is that correct?
3  A   The back part -- yeah, a little bit of the top.
4  Q   You could see the hammer and you could see the helm -- the
5  handle?
6  A   I believe so.
7  Q   And all the revolver was inside the holster.  Right?
8  A   The -- well, I believe he had a western style holster.  I
9  could see -- I could see that was a stainless pistol.
10 Q   Now, at the time, though, when you first asked -- they
11 asked you that, you couldn't remember.
12 A   Yeah.  Well, I thought it over and I -- I was probably
13 confused with Henry, because Henry had a different type of a
14 holster.
15 Q   Okay.  Did --
16 A   I -- I -- I stated that I -- I couldn't identify the
17 holster accurately.
18 Q   So do you think you remembered this when you were in front
19 of the grand jury?  Do you remember that?
20 A   I remember that, because I'm not the only person that saw
21 the gun.  I talked to somebody else, and they -- they -- they
22 saw --
23 Q   Now, Mr. --
24 A   -- the same gun.
25 Q   -- Pletnikoff --

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 204 of 227
(720) 384-8078   attrans@sbcglobal.net

1 A    Yes.

2 Q    -- you were called as a witness in front of a grand jury.

3 Is that correct?

4 A    Yes.

5 Q    And they asked you these same kind of questions.  Is that

6 right?

7 A    That's correct.

8 Q    And you reviewed your grand jury testimony from that time?

9 A    Yes.

10 Q    And you said, "I can't tell much about the pistol because

11 it was in a holster."  Do you remember testifying about that

12 under oath?

13 A    I did.  I did.

14 Q    And you said that you couldn't see much of the gun because

15 it was in the holster.  Is that right?

16 A    That's correct.

17 Q    And you said it was hard to tell, looking at the end of

18 the pistol, whether it was a stainless-steel pistol or not.

19 Remember that?

20 A    I do.

21 Q    And --

22 A    But I -- I know what a stainless-steel pistol looks like,

23 sir.

24 Q    Okay.  When you testified under oath to the grand jury,

25 you said, "I'm not sure it was stainless."  Right?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 205 of 227
(720) 384-8078  attrans@sbcglobal.net

1  A    And -- and I went and thought it over, and I -- well, I --

2  and my first assumption was -- was it a blued gun or was it

3  Malcolm's gun.  It was a long time ago when I was thinking

4  about that.  And -- and Mr. Wells and Henry both had stainless

5  pistols.  I -- I remember it very clearly.

6  Q    Well, when you were in front of the grand jury and you

7  were going to testify honestly under oath at that time -- this

8  was in December of last year.

9  A    Yes.

10 Q    Do you recall that?

11 A    Yes.

12 Q    Actually, December of 2012.  Do you recall being in front

13 of the grand jury in December 2012?

14 A    Yes, I do.

15 Q    And at that time you said you'd have to be speculating,

16 because you weren't sure it was stainless.  Do you remember

17 saying that under oath?

18 A    Yes, I did.

19 Q    Okay.  And you said all you could see when it was in the

20 holster was the butt end.  Do you remember saying that?

21 A    Yeah.

22 Q    And I think it was Mr. Cooper, the prosecuting attorney

23 that questioned you, at the time?

24 A    Yes.

25 Q    And you told him again, you were not sure it was

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 206 of 227

1  stainless.  Do you remember that?

2  A    Yes.

3  Q    And that the whole top was covered?  Do you remember

4  saying that?

5  A    Yes.

6  Q    Okay.  Now, when you testified to that in front of the

7  grand jury under oath, did Mr. Cooper -- was he satisfied with

8  your answers?

9  A    No, he wasn't.

10 Q    And what did he do when he was not satisfied that you

11 didn't --

12 A    He asked me to go think it over and see what the -- what

13 I -- what I could remember a little better.

14 Q    Okay.  And when he told you to think it over, did he read

15 you the federal perjury statute?

16 A    Yes, he did.

17 Q    Okay.  And then he told you to think it over after he read

18 you the perjury statute and he asked you to talk to your

19 lawyer?

20 A    Yes, he did.

21 Q    And then so you left?

22 A    I did.

23 Q    And you came back, and that's when you remembered it was

24 stainless.  Right?

25 A    On my first assumption was stainless, and then I wasn't

 1  sure.  And then I was sure, yes.

 2  Q    And after he read that perjury statute to you and you

 3  talked to your lawyer, then that's when he said --

 4  A    Yeah.

 5  Q    -- then you remembered?

 6  A    Right.

 7  Q    That's all I have.  Thank you.

 8         THE COURT:  Recross -- redirect.

 9                  **REDIRECT EXAMINATION**

10  BY MS. LOEFFLER:

11  Q    Mr. Pletnikoff, before the grand jury, when you were --

12  were you interviewed by agents of the FBI?  Before you did the

13  testimony in the grand jury?  Do you recall?

14  A    Yes.

15  Q    And did you tell them the same thing you've said here

16  about the stainless pistol in that interview?

17  A    Yes, I did.

18  Q    And I'll just ask you, what's the truth?  Did you see a

19  stainless pistol or not?

20  A    A stainless pistol, I told them.  Yes.

21  Q    I don't have anything further.  Thank you, Mr. Pletnikoff.

22         THE COURT:  Recross.

23                  **RECROSS EXAMINATION**

24  BY MR. CURTNER:

25  Q    And the whole time you've known Jim Wells, have you ever

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 208 of 227
(720) 384-8078  attrans@sbcglobal.net

1  known him to be violent at all?

2       MS. LOEFFLER:  Objection, Your Honor.  Beyond the scope

3  of cross, recross, redirect, and whatever.

4       THE COURT:  Overruled.  You can answer.

5       THE WITNESS:  Pardon?

6       THE COURT:  You can answer the question.

7       THE WITNESS:  Not to me, hasn't ever been violent, but

8  he's lost his temper with my wife a few times.

9  BY MR. CURTNER:

10 Q   And that is because they talked about politics or

11 something.  Right?

12 A   I believe so.

13 Q   Never violent over -- if they don't share the same kind of

14 politics or something like that.  Right?

15 A   Yeah, I guess.

16 Q   Yeah.  Thank you.

17      THE COURT:  Want to follow up on that, or not?

18      MS. LOEFFLER:  No, Your Honor.

19      THE COURT:  All right.  Thank you, sir.  You're

20 excused.

21      THE WITNESS:  Thank you.

22    (Witness excused)

23      THE COURT:  What's the government's plan now?

24      MR. SCHRODER:  I think we've got two more that'll

25 probably both be short.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 209 of 227

 1          THE COURT:  How's the jury doing?  Want to go for it?

 2     And we might get out a little early?  Okay.  All right.  You

 3     tell me if you want a break.  It's not -- no longer my

 4     responsibility.

 5          MR. SCHRODER:  Your Honor, the government calls Luke

 6     Robinson.

 7          THE COURT:  Okay.  I think what I heard him say is they

 8     have two more and then we'll be done for the day.  Is that

 9     right?

10          MR. SCHRODER:  Two, and I expect they'll be short, Your

11     Honor.

12          THE COURT:  Okay.  All right, sir, if you can just make

13     your way up to the front here.  Come right around here.  And

14     that door pulls out, you can just step into the witness box.

15     Remain standing just for a second.  She'll swear you in.

16          THE CLERK:  Please raise your right hand.

17          **LUKE PAUL ROBINSON, PLAINTIFF'S WITNESS, SWORN**

18          THE CLERK:  Thank you.  Please have a seat.  And, sir,

19     if you can please state and spell your full name.

20          THE WITNESS:  Luke Paul Robinson.  L-u-k-e, P-a-u-l, R-

21     o-b-i-n-s-o-n.

22          THE CLERK:  Thank you.

23          THE COURT:  All right, counsel.

24                        **DIRECT EXAMINATION**

25     BY MR. SCHRODER:

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 210 of 227
(720) 384-8078   attrans@sbcglobal.net

1  Q    Mr. Robinson, where do you live?

2  A    Ko -- St. Cloud, Minnesota.

3  Q    And what do you do there?

4  A    I'm a caterer.

5  Q    And did you live in Kodiak at one point?

6  A    Yes, I did.

7  Q    And when did you live in Kodiak?

8  A    Through 2000.

9  Q    Did you graduate from high school there?

10 A    I did.

11 Q    And what year was that?

12 A    1998.

13 Q    And when you were in high school, were you friends with

14 Matt Wells?

15 A    I was.

16 Q    And what is his relationship to the defendant, Jim Wells?

17 A    That's his son.

18 Q    Okay.  And did you spend some time with Mr. Wells too?

19 A    I did.

20 Q    All right.  Did your parents, growing up, own firearms?

21 A    They did.

22 Q    So did you have a -- are you a firearm owner?

23 A    No.  Well, I own a shotgun.

24 Q    Yeah.  But do you have some familiarity with firearms

25 because of your parents and maybe owning a shotgun as well?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 211 of 227

ROBINSON - DIRECT

1  A    Yes.

2  Q    All right.  Did your father own any resolvers --

3  revolvers, I'm sorry.

4  A    Yes, he does.

5  Q    Yeah.  And did he tend toward one particular maker?

6  A    Yes.

7  Q    Which one?

8  A    Smith & Wesson.

9  Q    Now, when you were in high school, did you have occasion

10  to go to Matt Wells's house?

11  A    I did.

12  Q    How often?

13  A    Twice a month.

14  Q    All right.

15  A    On the weekends.

16  Q    Now, did you ever see any firearms while you were there?

17  A    I did.

18  Q    And on how many occasions was that?

19  A    One in particular.

20  Q    All right.  And could you describe what you saw?

21  A    Yeah.  There were rifles out -- they had just gotten back

22  from a hunting trip.  There were rifles out by the kitchen

23  table and a revolver on the table, some bags and things like

24  that.

25  Q    And how would you describe the revolver that you saw?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 212 of 227
(720) 384-8078   attrans@sbcglobal.net

1  A    It was a silver pistol.

2  Q    Yeah.  And are you -- not -- obviously not intimately

3  familiar with those things.

4  A    Right.

5  Q    But how would that compare to what you saw that your

6  father owned?

7  A    It's comparable to something that he had, I guess, yeah.

8  Q    All right.  And what was the time of this, and maybe in

9  relation to your high school years?

10  A    I'd have to say it was -- had to be before my senior year,

11  so freshman to junior year, sometime.

12  Q    Okay.  All right.  No further questions.

13        THE COURT:  Cross-examination.

14                    **CROSS-EXAMINATION**

15  BY MR. CURTNER:

16  Q    Mr. Robinson, what can you tell me about the Wells family

17  from when you knew them back then?

18  A    Very nice people.

19  Q    Okay.  You got to know both Jim and Nancy?

20  A    Yes.

21  Q    What can you tell us about them?

22  A    Great parents.  I mean, really wonderful people.  So I --

23  I don't know what more you want, but --

24  Q    Okay.

25  A    -- you know, the let me over their house all the time.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 213 of 227
(720) 384-8078  attrans@sbcglobal.net

1  Jim was my baseball coach.  You know, really great.  They'd

2  drive us to and from this town and back, and -- I don't know,

3  really great.

4  Q    Okay.  So you had a really good relationship with them

5  while you were there?

6  A    Absolutely.

7  Q    And Matt, was he a friend at the time?

8  A    Absolutely.

9  Q    And was he there this one time they came back from the

10 hunting trip?

11 A    Yeah.

12 Q    Okay.  Did you ever -- known, the time you were there, Jim

13 Wells to be violent or anything?

14 A    Absolutely not, no.

15 Q    Okay.  Ever see him lose his temper or anything -- with

16 the kids or anything, or coaching --

17 A    No.  Absolutely not.

18 Q    -- at all?  Okay.  Always had a pretty good demeanor --

19 A    Yes.

20 Q    -- in your presence?  Now, when did you first get drawn

21 into this?  Was it the first time somebody talked to you about

22 this?

23 A    Oh, I'd have to say it was eight months ago, I got a call

24 from the FBI.

25 Q    Okay.  And then they were asking about any firearms at the

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 214 of 227

1  Wells residence?

2  A    Yes.

3  Q    And this one time, you may have seen -- when they were

4  coming back from a hunting trip, you saw a revolver?

5  A    Right.

6  Q    And at that time you said it possibly could be --

7  A    Right.

8  Q    -- a Smith & Wesson?

9  A    Exactly, yeah.

10  Q    Because you didn't know?

11  A    I have no clue.

12  Q    You told them you didn't know what the make or model was?

13  A    Right.

14  Q    You didn't know if it was a .357?

15  A    Yeah.  I think that was my stab in the dark.

16  Q    Okay, that was your guess, was --

17  A    Yeah.

18  Q    -- a .357.  And was Matt there then at that time?

19  A    What time?

20  Q    Well, when you saw this gun?

21  A    Yeah.  Yeah, we were on way up to his room.

22  Q    Okay.  And that's still your testimony.  You saw a

23  handgun, maybe it was a .357; you didn't know what model it

24  was?

25  A    Yeah.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 215 of 227
(720) 384-8078   attrans@sbcglobal.net

1  Q    All right.  That's all I have.

2         THE COURT:  Redirect.

3                    **REDIRECT EXAMINATION**

4  BY MR. SCHRODER:

5  Q    What color was it?

6  A    Silver.

7  Q    No further questions.

8         MR. CURTNER:  Nothing further.

9         THE COURT:  Thank you, sir.  You're excused.  The

10  government's next witness.

11     (Witness excused)

12         MR. SCHRODER:  Your Honor, we'd like to recall Mr. Gary

13  Bolden.

14         THE COURT:  Okay.  All right, sir, you know how we do

15  this, right?

16         MR. BOLDEN:  Yes, sir.

17         THE COURT:  Okay.  I'm not going to swear you in again,

18  but you're still under oath.  Okay.  Okay, counsel.

19     **GARY CHARLES BOLDEN, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN**

20                **FURTHER REDIRECT EXAMINATION**

21  BY MR. SCHRODER:

22  Q    Mr. Bolden, I just want to clarify one issue.  On cross-

23  examination there was some discussion about dates of your

24  report versus dates in your notes.  Have you had the

25  opportunity to review your notes and review the report?

1  A    Yes, I have.

2  Q    And have you figured out -- is there a way to clarify

3  that?

4  A    Yes.  I -- I made a timeline based on the records that are

5  in my file.

6  Q    And what does your timeline show?

7  A    Well, I can just run through it just for the record.  I

8  have a case opening dated 5/18 of 2012.

9  Q    And that's the 5/18 you were talking about with Mr.

10  Curtner.  Is that correct?

11  A    Yes, I believe so.

12  Q    All right.

13  A    The evidence, the tire and -- and wheel with the nail in

14  it, was released from the FBI on 6/1 of 2012.  It was received

15  at STL from the FBI on 6/4 of 2012.  It was removed from the

16  crate on 6/22/12, and that's when it was measured for air

17  pressure at 20 psi.  And I think I -- I misspoke regarding the

18  validity of that date.

19      It was dismounted and photographed and the -- the tire was

20  X-rayed.  There's a -- a -- an X-ray request dated 6/5 of 2012.

21  The tire was then remounted on 7/17 of 2012 for the static air

22  test.  And the dynamic air test was then started on August 3 of

23  2012, completed on August 4th of 2012.

24      My report was written in 8/16 of 2012, and it was shipped

25  to -- the -- the evidence was then shipped to the FBI

1 headquarters in Quantico, Virginia on October 29 of 2012.

2 Q   There's one of those dates I want to ask you about again.

3 A   Okay.

4 Q   You talked about -- you said you were -- you said you sent

5 an X-ray request on -- you said 6/5.

6 A   Yes.

7 Q   All right.  Is that just the day after -- would you have

8 done that just the day after receiving the tire?

9 A   Let me check that again.  July 5th of 2012.

10 Q   So it was in fact July.  It was 7/5, not 6/5.

11 A   Yes.  Yes.

12 Q   All right.

13 A   I'm sorry.

14 Q   And so the -- did you check the dates of your report?

15 A   Yes.

16 Q   And are those dates accurate?

17 A   They are.

18 Q   All right.  No further questions.

19       THE COURT:  Cross-examination.

20 **FURTHER RECROSS EXAMINATION**

21 BY MR. CURTNER:

22 Q   Mr. Bolden, on this tire, do you see the kind of white

23 markings around the rims on both edges?  Do you see that?

24 A   Not from here, I don't.

25 Q   You want to take a closer look?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 746  Filed 09/23/14  Page 218 of 227

1  A    If I'm permitted.

2         THE COURT:  Where are these white markings?  Do you

3  want to (indiscernible) --

4         MR. CURTNER:  (Indiscernible).

5         THE COURT:  Yeah.

6  BY MR. CURTNER:

7  Q    If you'll see along -- maybe -- let me get over -- okay,

8  do you see this white along this edge?

9  A    Yes.

10 Q    (Indiscernible) --

11 A    It's not white, it's -- it's just a lighter color.

12 Q    Is -- and it's also on this edge?

13 A    Yeah.

14 Q    And why is it lighter?

15 A    That was a result of running on the dynamometer.

16 Q    Okay, so that's not road wear?

17 A    No.

18 Q    And that's not road wear, that's from your dynamic test,

19 the static air loss test you did on it?

20 A    Correct.  It's a --

21 Q    When you ran it for 24 hours.

22 A    It's a steel road wheel and it -- it has grooves worn in

23 it from being used.  And apparently that transferred to the

24 tire.

25 Q    Okay.  And so your photographs that you took, you took

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 219 of 227

1  before the test?  Is that your testimony?

2  A    I believe so, yes.

3  Q    Okay.  Let's look at a -- Government Exhibit 93B.  If we

4  can -- do you see that?

5       (Side conversation)

6  Q    Do you see that?

7  A    I do.

8  Q    Okay.  Is that a photograph that you took as part of your

9  report?

10  A    Yes.

11  Q    And when would that photograph been taken, then?

12  A    Well, it was taken -- I don't keep dates on when the

13  photographs were taken, but I believe it was taken after the

14  tire was X-rayed and before it was remounted for the static air

15  test.  So that would not be a result of the dynamometer.

16  Q    Do you see the white --

17  A    Yes.

18  Q    -- around the edges?

19  A    The lighter coloration.

20  Q    Now, you just testified that was from the testing.

21  A    I -- I believe that was.

22  Q    But now you're saying it wasn't from the testing?

23  A    I -- I believe that it was on there when I received the

24  tire.

25  Q    But you just said it wasn't from road wear, you said that

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 746  Filed 09/23/14  Page 220 of 227

1  the -- around the edges would have to be from your testing.

2  A    It's -- it's typical of that type of wear that I see on

3  dynamometer-run tires.

4  Q    So you're testifying today that you're absolutely certain

5  that the photographs you took were -- what date again?

6  A    I don't have a date for the -- for the photos, but I would

7  say it was taken before 7/17.

8  Q    Bef -- and you -- did you take photographs before the

9  dynamic test?  This would have been before the dynamic test.

10 A    Correct.

11 Q    So this photograph would have been after what date --

12 would have been before what date?

13 A    7/17 of 2012.

14 Q    Okay.  And that's -- you're sure about that?

15 A    That's the best I can estimate.  I don't -- like I say, I

16 don't keep dates on when the photos were taken.

17 Q    Okay.  So this photograph you see, that was one you took

18 as part of your report?

19 A    Yes.

20      MR. CURTNER:  I'd ask that this be admitted as an

21 exhibit, Your Honor.

22      MR. SCHRODER:  No objection.

23      THE COURT:  It'll be received.

24   (Plaintiff's Exhibit 93B admitted)

25      MR. CURTNER:  Thank you.

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 221 of 227

1        THE COURT:  Is that it?  Oh.

2        MR. CURTNER:  That's all.

3        THE COURT:  Okay.  Re -- whatever.

4        MR. SCHRODER:  No further questions, Your Honor.

5        THE COURT:  Okay.  All right.  Thank you, sir.  You're

6   excused.  What's the government's plan now?

7        (Witness excused)

8        MS. LOEFFLER:  I think -- sorry, I think we're out of

9   witnesses for the day, Judge.

10       THE COURT:  Okay.  Okay, all right.  We'll start

11  tomorrow at 8:30.  If you could be in the big room at 8:25

12  tomorrow.  Remember the standard admonition.  Thank you all

13  very much.  See you tomorrow.

14       (Jury not present)

15       THE COURT:  Okay, counsel, did the government -- please

16  be seated.  Did you get your Brady or whatever you were asking

17  for?  What materials did you want from the --

18       MS. LOEFFLER:  I wanted the witness list and the

19  witness order for this week.

20       THE COURT:  Okay.  Did you get it?

21       MS. LOEFFLER:  And Jencks.

22       THE COURT:  Did you get it?

23       MS. LOEFFLER:  No.

24       THE COURT:  Okay.  Give it to her.

25       MR. CURTNER:  I'm not going home till they get it,

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 222 of 227
(720) 384-8078  attrans@sbcglobal.net

1  so --

2          MS. LOEFFLER:  Okay.

3          MR. CURTNER:  -- you'll get it this evening.

4          THE COURT:  You promise?

5          MR. CURTNER:  I promise.  Boy Scout honor.

6          THE COURT:  Did you hear that?

7          MS. LOEFFLER:  Yeah.

8          THE COURT:  Does that mean she has to sit around her

9  office till midnight?

10          MR. CURTNER:  No.  I pick up something at 8 o'clock.

11  It'll be before -- it'll be by 6.

12          MS. LOEFFLER:  Now, you did tell me that you were -- I

13  did offer to drive it to your office, right?

14          MR. CURTNER:  No.

15          THE COURT:  Okay.  We'll, wait a second --

16          MS. LOEFFLER:  Let me just make that fair.

17          MR. CURTNER:  -- I don't care about that.

18          MS. LOEFFLER:  I know.

19          THE COURT:  6 p.m.

20          MS. LOEFFLER:  I just don't want --

21          THE COURT:  All I know is --

22          MS. LOEFFLER:  -- to be misrepresented.

23          THE COURT:  -- that you'll get it by 6 p.m. tonight.

24          MS. LOEFFLER:  Yeah, thank you.  I appreciate it,

25  because tonight's Passover, and I would like to have some

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 746  Filed 09/23/14  Page 223 of 227

1  opportunity --

2      THE COURT:  Well, I'm just trying to -- that makes

3  sense to me.

4      MS. LOEFFLER:  Yep.

5      THE COURT:  6 o'clock tonight.

6      MR. CURTNER:  I'll do that.

7      THE COURT:  And what -- so that's going to be your

8  proposed witness list, right?

9      MR. CURTNER:  Yes.

10     THE COURT:  Good.  Then that'll give me something to

11 work with as well.

12     MR. CURTNER:  Oh, you want a copy too?

13     THE COURT:  I would like a copy.

14     MR. CURTNER:  Yes.

15     THE COURT:  Okay.  See you tomorrow at 8:25.

16     THE CLERK:  All rise.  This matter stands adjourned and

17 it stands in recess until tomorrow at 8:30 in the morning.

18     (Proceedings concluded at 3:52 p.m.)

19

20

21

22

23

24

25

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 224 of 227
(720) 384-8078  attrans@sbcglobal.net

1                          CERTIFICATE

2    I certify that the foregoing is a correct transcript from the
     electronic sound recording of the proceedings in the above-
3    entitled matter.

4
         s/Teresa K. Combs                    8/31/14
5    Teresa K. Combs, Transcriber        Date

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 225 of 227
(720) 384-8078  attrans@sbcglobal.net

1                          **INDEX**

2                                                              FURTHER
                          DIRECT    CROSS   REDIRECT   RECROSS   REDIRECT
3      PLAINTIFF'S WITNESSES

4
       Joseph Michael Sturgis 2041    2101      2113      2117
5      Gary Charles Bolden    2119    2140      2154     2155/      2248
                                                          2250
6      Robert J. Shem          2157    2177      2181
       John Stein              2183    2198      2213
7      Terrence Lee Stein      2218
       James P. Sine           2224    2227
8      Robert Mitchell
         Pletnikoff            2229    2231      2240      2240
9      Luke Paul Robinson      2243    2245      2248

10     PLAINTIFF'S EXHIBITS                                    ADMITTED

11     74       Map without distances                           2079

12     91       DMV record - Mr. Wells' truck                   2061

13     92       DMV record - Mrs. Wells' CR-V                   2062

14     93B      Photograph - tire                               2254

15     93C      Photograph - nail in tire groove                2133

16     93D      Photograph - nail in tire                       2134

17     94       Photograph - base camera time with iPhone       2048

18     95       Photograph                                      2049

19     96       Photograph - clock reflection                   2050

20     97       Photograph - metadata                           2051

21     142      Video                                           2072

22     142A     Photograph - still shot                         2072

23     143      Video                                           2073

24     143A     Photograph - still shot                         2074

25     155      Video - T1 COMMSTA camera, 4/12/12, 7:09:10 to
                7:14:33                                          2082

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 226 of 227
(720) 384-8078   attrans@sbcglobal.net

1                              **INDEX** (Continued)

2     PLAINTIFF'S EXHIBITS                                    ADMITTED

3     232A    J. Stein's lost firearm report to Alaska State
              Troopers                                          2192
4
      232B    J. Stein's inventory list                        2215
5
      242     Inventory list by T. Stein (without page 4)      2220
6
      373     MP round log                                     2099
7
      374     Photographs – bullets and jackets analysis of
8             Mr. Shem                                          2164

9     391     Chart by Sturgis, chart with time and distances  2090

10    395     Chart with speed and distances                   2059

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 746   Filed 09/23/14   Page 227 of 227
(720) 384-8078  attrans@sbcglobal.net