1      UNITED STATES DISTRICT COURT

2         FOR THE DISTRICT OF ALASKA

3  UNITED STATES OF AMERICA,      )    Case 3:13-cr-00008-RRB
                                  )
4           Plaintiff,            )    Anchorage, Alaska
                                  )    Tuesday, April 15, 2014
5      vs.                        )    8:34 o'clock a.m.
                                  )
6  JAMES MICHAEL WELLS,           )
                                  )
7           Defendant.            )
   _____)    **TRIAL BY JURY – DAY 11**

8
              **PARTIAL TRANSCRIPT OF PROCEEDINGS**
9
          BEFORE THE HONORABLE RALPH R. BEISTLINE
10               UNITED STATES DISTRICT JUDGE

11  APPEARANCES:

12  For the Plaintiff:        KAREN L. LOEFFLER
                              U.S. Attorney
13                            BRYAN SCHRODER
                              KATHLEEN ANN DUIGNAN
14                            Assistant U.S. Attorneys
                              Office of the U.S. Attorney
15                            222 West 7th Avenue, #9, Room 253
                              Anchorage, Alaska  99513-7567
16                            (907) 271-5071

17  For the Defendant:        F. RICHARD CURTNER
                              Federal Defender
18                            Office of the Federal Public Defender
                              601 West 5th Avenue, Suite 800
19                            Anchorage, Alaska  99501
                              (907) 646-3400
20
                              PETER OFFENBECHER
21                            Skellenger Bender, P.S.
                              1301 5th Avenue, Suite 3401
22                            Seattle, Washington  98101-2605
                              (206) 623-6501
23

24

25

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 747  Filed 09/23/14  Page 1 of 151

 1  APPEARANCES (Continued):

 2  Court Recorder:            NANCY LEALAISALANOA
                               U.S. District Court
 3                             222 West 7th Avenue, #4, Room 229
                               Anchorage, Alaska  99513-7564
 4                             (907) 677-6111

 5  Transcription Service:     A & T Transcripts
                               6299 West 111th Avenue
 6                             Westminster, Colorado  80020
                               (720) 384-8078
 7

 8  Proceedings recorded by electronic sound recording; transcript
    produced by transcription service.
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 747  Filed 09/23/14  Page 2 of 151
(720) 384-8078  attrans@sbcglobal.net

1       **ANCHORAGE, ALASKA - TUESDAY, APRIL 15, 2014**

2

3       (Call to Order of the Court at 8:34 a.m.)

4       (Defendant present; jury not present)

5           THE CLERK:  All rise.  His Honor the Court, the United

6   States District Court for the District of Alaska is now in

7   session, with the Honorable Ralph R. Beistline presiding.

8   Please be seated.

9           THE COURT:  Okay.  You ready with a witness?

10          MR. SCHRODER:  We are, Your Honor, but one issue we'd

11  like to address before we get to --

12          THE COURT:  Okay.

13          MR. SCHRODER:  -- the end of -- since we're getting

14  close to the end of our case is --

15          THE COURT:  Okay.

16          MR. SCHRODER:  -- the stipulations.

17          THE COURT:  Okay.  Do you have them handy?

18          MR. SCHRODER:  I do.

19          THE COURT:  I have them all interspersed.  Did you just

20  want me to read them, or you read them, or --

21          MR. SCHRODER:  Either way, Your Honor.  One is a

22  stipulation -- I better get near a mic.

23          MS. LOEFFLER:  Yeah.

24          MR. SCHRODER:  So one is a stipulation of a document

25  which is the civilian personnel document that talks about Rich

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 747   Filed 09/23/14   Page 3 of 151
(720) 384-8078  attrans@sbcglobal.net

1  Belisle being hired as a Coast Guard civilian.

2          THE COURT:  Why don't you just say as we come in this

3  morning, "Your Honor, we have some stipulations I'd like to

4  read into the" --

5          MR. SCHRODER:  Great.

6          THE COURT:  -- "record."  Read them into the record,

7  move them in.  I'll ask counsel, "Is that true?"  They'll say,

8  "Yes."  And then I'll admit whatever you want admitted.

9          MR. SCHRODER:  Great.

10         MS. LOEFFLER:  And just for counsel, I think, we didn't

11  intend to read the stipulation as to authentication, because

12  once the exhibits come in, we didn't think that was something

13  the jury needed, unless you want it to, nor the Sixth Amendment

14  stipulation, because I think that's a law issue.  So we

15  weren't --

16         THE COURT:  Okay.

17         MS. LOEFFLER:  -- going to read those --

18         THE COURT:  Okay.

19         MS. LOEFFLER:  -- to the jury.

20         THE COURT:  That's fine with me.

21         MR. OFFENBECHER:  The Sixth Amendment regarding the --

22         MS. LOEFFLER:  That was the one about Reed's testimony.

23         MR. OFFENBECHER:  Yeah.

24         MR. CURTNER:  On video.

25         MR. OFFENBECHER:  Okay.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 747  Filed 09/23/14  Page 4 of 151
(720) 384-8078  attrans@sbcglobal.net

 1         MS. LOEFFLER:  So -- okay.

 2         THE COURT:  Okay.  And I -- do you have your witness --

 3   next witness handy?

 4         MR. OFFENBECHER:  Your Honor, I do have one other issue

 5   I think that --

 6         THE COURT:  Yes.

 7         MR. OFFENBECHER:  -- we should address.  I -- I'm

 8   assuming that the government is going to try to -- is going to

 9   offer the exhibits through Mr. Doran, who is the first witness,

10   that are the recreation videos on --

11         THE COURT:  Uh-huh (affirmative).

12         MR. OFFENBECHER:  -- April 19th and 20th.  Is that

13   right?

14         MR. SCHRODER:  Yes.

15         MR. OFFENBECHER:  Today?

16         MS. LOEFFLER:  Not Mr. Doran.

17         MR. SCHRODER:  Yeah.

18         MS. LOEFFLER:  Oh, yeah, right.  Yeah, of course.

19         MR. OFFENBECHER:  Am I right?  Yeah.

20         MS. LOEFFLER:  Sorry.

21         MR. OFFENBECHER:  And so we do have an objection to

22   that, based on the fact that the conditions were not similar.

23   And the Court -- and so I just wanted to make sure that you

24   understand what that is.  I don't want to make a big fuss in

25   front of the jury, and I think the Court could -- the next

1  person who's going to testify is Mr. Vorder Bruegge, who is the

2  government's expert from the FBI on the videos. And the Court

3  may wish to reserve ruling on that, on the admissibility of the

4  April 19th and April 20th videos until Mr. Vorder Bruegge is

5  heard on whether the conditions -- the different conditions

6  might make a difference in his judgment.

7          THE COURT: Okay. Counsel?

8          MR. SCHRODER: Your Honor, they -- we've already

9  stipulated to the authenticity of all of these videos.

10         THE COURT: True.

11         MR. SCHRODER: So it's -- it's just an issue of

12  relevance, and I think you'll see that by comparing the cars,

13  which is what happens with Dr. Vorder Bruegge, I think it's

14  clearly relevant. And I think you'll see just visually that

15  any slight differences that might have happened in a week's

16  time from when the two were done does not seriously affect the

17  comparison.

18         THE COURT: Well, just as long as it's highlighted that

19  this is not done on the day of the incident, it's done --

20         MR. SCHRODER: We're making it very clear that -- the

21  dates that this was done.

22         THE COURT: Okay. And that would go probably to the

23  weight.

24         MR. SCHRODER: Right.

25         THE COURT: I'm right?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 747  Filed 09/23/14  Page 6 of 151
(720) 384-8078  attrans@sbcglobal.net

1          MR. SCHRODER:  I agree with that, Your Honor.

2          THE COURT:  Good.  Okay, let's bring the jury in.

3          MR. OFFENBECHER:  Your Honor, may I simply make the

4     objection --

5          THE COURT:  Oh, yes.  Your --

6          MR. OFFENBECHER:  -- now, then?

7          THE COURT:  -- record is clear as a bell.  I think you

8     even made it earlier in the --

9          MR. OFFENBECHER:  Very well.  Thank you.  Then I'll

10    just -- I'll remain silent.

11         THE COURT:  You object to those exhibits.

12         MR. OFFENBECHER:  Pardon me?

13         THE COURT:  What are the exhibit numbers, so we know

14    what we're -- he's -- the gov -- the --

15         MR. SCHRODER:  Exhibit 168 is the video.

16         THE COURT:  Okay, the defendant's objecting to 168 as

17    not being an accurate representation of events at the time in

18    question.  Is that --

19         MR. OFFENBECHER:  And should be excluded under 403.  So

20    I've made --

21         THE COURT:  Oh, the probative value is outweighed by

22    the prejudice?

23         MR. OFFENBECHER:  Yes.

24         THE COURT:  Okay.  I disagree with you on that, but

25    that's fine.  That's why we have appeals.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 747   Filed 09/23/14   Page 7 of 151
(720) 384-8078  attrans@sbcglobal.net

1   MR. OFFENBECHER:  You're the judge.

2   THE COURT:  That's right.  Remember that.  Okay,

3 counsel.

4   THE CLERK:  So is it admitted, 168, or not?

5   THE COURT:  It will be when they offer it.

6   THE CLERK:  Okay, thank you.

7   THE COURT:  Okay, we'll bring the jury in.

8  (Jury present)

9   THE COURT:  Well, please be seated.  Good morning,

10 ladies and gentlemen.  How are you doing?  Anything we can do

11 to help you out.  Okay.  How about we keep moving along --

12 moving on down the road, then?  The government's next witness.

13   MR. SCHRODER:  Your Honor, before we bring our next

14 witness, we'd like to --

15   THE COURT:  Okay.

16   MR. SCHRODER:  -- address two stipulations to the Court

17 and to the jury.

18   THE COURT:  Okay.  And I think I told you, ladies and

19 gentlemen -- I know I did, but you've probably forgotten,

20 because it was in the initial instructions, that stipulations,

21 where the parties agree as to facts or evidence, can be

22 admitted and you're to accept those stipulations as true.  And

23 apparently there are some stipulations.

24   MR. SCHRODER:  There's two, Your Honor.  The first is

25 a -- captioned as a stipulation as to jurisdiction.  And it

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 747  Filed 09/23/14  Page 8 of 151

1   reads:  "Come now the parties, the United States of America and

2   James Wells, and stipulate and agree to the following fact:

3   The United States Coast Guard Communication Station Kodiak,

4   Alaska is within the special maritime and territorial

5   jurisdiction of the United States, in that it is located on

6   land reserved or acquired for the use of the United States as

7   defined in 18 U.S.C. Section 7(3)."

8         THE COURT:  So that means that we're the right court to

9   try this matter.  Is that what you're saying?

10        MR. SCHRODER:  We're the right court, and, Your Honor,

11   it is a -- it is public land for purposes of jurisdiction --

12        THE COURT:  Okay.

13        MR. SCHRODER:  -- for the murder.

14        THE COURT:  Okay.

15        MR. SCHRODER:  For the charge.

16        THE COURT:  Okay, that's a stipulation.  Is that right,

17   Mr. Curtner?

18        MR. CURTNER:  It is correct, Your Honor.

19        THE COURT:  Okay, next.

20        MR. SCHRODER:  Now, second is a stipulation as to

21   authenticity and admissibility of document exhibit.  "Come now

22   the parties, the United States of America and James M. Wells,

23   and stipulate and agree to the authenticity and admissibility

24   of the following, pursuant to Federal Rule of Evidence 803(6),

25   901 and 1003:  that the item eviden -- item of evidence

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 747  Filed 09/23/14  Page 9 of 151
(720) 384-8078  attrans@sbcglobal.net

1  designated as Government Exhibit 82, a document entitled

2  'Notification of Personnel Action,' effective date 11/13/2005,

3  for Rich Belisle, signed and dated 11/18/2005.  The parties

4  specifically stipulate and agree that the exhibit and any

5  portions therefrom meet the authenticity requirements of the

6  Federal Rules of Evidence without the need to call witnesses

7  for authentication purposes.  In addition, the parties agree

8  that the document is admissible as a record kept in the

9  ordinary course of business and is not subject to a hearsay

10  exception."

11      And the document -- I would move for Exhibit of -- 82,

12  Your Honor.

13          THE COURT:  All right.  Any objection?

14          MR. CURTNER:  No, Your Honor.

15          THE COURT:  So --

16          MR. SCHRODER:  And we'll just show it quickly so the

17  jury can see what it is.

18          THE COURT:  Okay.  Exhibit 82 will be --

19          MR. SCHRODER:  82.

20          THE COURT:  -- admitted.

21      (Plaintiff's Exhibit 82 admitted)

22          MR. SCHRODER:  Again, it is a personnel action -- Kim,

23  if you could blow up the first part.  And it is a career

24  conditional appointment for Rich Belisle.  And the date --

25  effective date at the top is 11/13/2005.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 747  Filed 09/23/14  Page 10 of 151
(720) 384-8078  attrans@sbcglobal.net

DORAN - DIRECT

1          THE COURT:  Okay.  That'll be admitted.  Very well.

2          MR. SCHRODER:  Thank you, Your Honor.

3          THE COURT:  All right.  The government's --

4          MR. SCHRODER:  And we call --

5          THE COURT:  -- next witness.

6          MR. SCHRODER:  -- Alex Doran.

7          THE COURT:  Okay.  Good morning, sir.  That door pulls

8     out, you step into the witness box.  And then my clerk over

9     here will swear you in.

10         THE CLERK:  Please raise your right hand.

11    **RUSSELL ALEXANDER DORAN, PLAINTIFF'S WITNESS, SWORN**

12         THE CLERK:  Thank you.  Please have a seat.  And, sir,

13    if you can please state and spell your full name.

14         THE WITNESS:  Russell Alexander Doran.  First name is

15    R-u-s-s-e-l-l.  Last name is D-o-r-a-n.

16         THE CLERK:  Thank you.

17         THE COURT:  All right.  Counsel.

18                      **DIRECT EXAMINATION**

19    BY MR. SCHRODER:

20    Q    Special Agent Doran, who do you work for?

21    A    The FBI.

22    Q    And how long have you worked for the FBI?

23    A    Just over four years.

24    Q    And what'd you do before that?

25    A    I was a -- an accountant with a CPA background.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 747  Filed 09/23/14  Page 11 of 151
(720) 384-8078  attrans@sbcglobal.net

1  Q    And what kind of training do you receive when you join the

2  FBI?

3  A    Well, you go to the FBI Academy, which when I went through

4  was 21 weeks.

5  Q    And where's that located?

6  A    It's in Quantico, Virginia.

7  Q    What do you learn in that training?  What kind of things?

8  A    Everything from, you know, how to conduct an

9  investigation, evidence collection, firearms training,

10  defensive tactics.

11  Q    And since becoming an FBI investigation -- how long -- how

12  many invest -- or FBI agent, how long -- how many

13  investigations would you estimate that you've participated in?

14  A    I've participated -- numerous.  Over 50.

15  Q    All right.  And what's your current assignment with the

16  FBI in Alaska?

17  A    I'm on the National Security Squad.

18  Q    And were you involved with the investigation of the two

19  homicides at Coast Guard COMMSTA Kodiak on April 12th, 2012?

20  A    I was.

21  Q    When did you get involved?

22  A    I believe I -- I flew down there on the -- the -- the day

23  after.

24  Q    Okay.  Now, did you become aware at some point after you

25  arrived that there was a video of a small blue SUV nearing

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 747   Filed 09/23/14   Page 12 of 151
(720) 384-8078   attrans@sbcglobal.net

1 building T2 consistent with the time of the murders?

2 A    Yes.  Yes, I did.

3 Q    And were you tasked with trying to assist to identify that

4 vehicle?

5 A    Yes, I was.

6 Q    And did you try to identify other similar vehicles?

7 A    Yes.

8 Q    And how did you do that?

9 A    We worked with the -- the Alaska State Troopers and they

10 ran a search through APSIN, which is the Alaska state database,

11 to pull all the registered vehicles that were blue Honda CR-Vs

12 within the -- the year range of the suspected vehicle that were

13 registered on Kodiak Island.

14 Q    Okay.  So which was -- what was the suspected vehicle?

15 A    It was a -- I believe was 2001 blue Honda CR-V.

16 Q    Okay.  And did -- you were a -- who was that owned by?

17 A    That was owned by Jim and Nancy Wells.

18 Q    All right.  Now, you talked about a year group that you

19 looked at.  Why did you pick a part -- did you do -- it was

20 more than just 2001?

21 A    It was -- the range I believe was 1999 to 2003.

22 Q    And why did you pick that year group?

23 A    Well, one, it included the -- the -- the subject vehicle,

24 but also had to do with the -- the model.  Honda changed the

25 model on the -- for their design model on the CR-V after 2003,

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

## DORAN - DIRECT

1  so it didn't look -- it didn't have a similar shape to it.

2  Q    And did you look for a particular color?

3  A    Yeah, it was the -- the blue.

4  Q    Okay.  Now, how many vehicles did you find registered on

5  Kodiak that met that criteria?

6  A    There were six, which one was -- one of those was the --

7  the Wells vehicle.

8  Q    Okay.  Of the five remaining, were all of those on Kodiak

9  Island?

10  A    No.

11  Q    And remember where they were?

12  A    Two of them were not on the island.  One was actually --

13  can't remember the exact island name, but it was on one of the

14  Aleutian Islands.  So it had been registered there, but the --

15  the actual address was not Kodiak Island, so --

16  Q    Okay.

17  A    -- it wouldn't have been on the island.  The other vehicle

18  was registered to a woman that had left Kodiak in 2005, I

19  believe since -- been registered in -- in Oregon.  But it still

20  showed up when they -- they ran the report.

21  Q    All right.  So how many did that leave you that were on

22  Kodiak at the time?

23  A    Not including the Wells vehicle, that was three other blue

24  CRVs.

25  Q    And were you able to identify all the owners of those

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 747  Filed 09/23/14  Page 14 of 151

1  vehicles?

2  Q    We did.  And once you identified them, what did you do?

3  A    We located them.  We interviewed them and took pictures of

4  their -- of their vehicle.

5  Q    All right.  And you remember the names of those folks?

6  A    I believe one was -- I can remember the last name.  One

7  was Patterson, one was Penn, and one was Opao.

8  Q    Okay.  And based on those rounds of initial interviews,

9  was there any information that caused you to do additional

10 investigation?

11 A    No.

12 Q    Now, were you also involved with part of the investigation

13 that actually dealt with the Wells vehicle itself?

14 A    Yes.

15 Q    All right.  And what did you do with the Wells vehicle?

16 A    We -- we took the vehicle and basically attempted to

17 recreate a video for comparison purposes of the -- the vehicle

18 on the path which we saw on the -- on the camera from the day

19 of, driving down -- I believe it's Rezanof, onto Anton Larsen

20 Road, right in front of the riggers building.

21 Q    All right.  And what was the date where you did that?

22 A    We did it on the 19th, April 19th.

23 Q    All right.  So that was one week after the murders?

24 A    Yes.

25 Q    All right.  And what was the legal authority you had to

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 747   Filed 09/23/14   Page 15 of 151
(720) 384-8078   attrans@sbcglobal.net

1    conduct that recording -- or conduct that rerecording?

2    A    We'd had a -- a search warrant on the -- on the vehicle.

3    Q    And what was your role in the process?

4    A    I was actually driving the vehicle.

5    Q    And were there other agents involved?

6    A    Yeah, there were two or three other agents.

7    Q    Okay.  And what did they do?

8    A    One of the agents was up in the -- the COMMSTA building,

9    manning the -- the camera, making sure the camera was

10   positioned as close as possible to where it was positioned on

11   the day of the murder.  So it was a similar -- similar view.

12   The other two agents were down in the area where I was, setting

13   up cones, so we knew where the -- you know, where the camera

14   cut off and where it started.  So we know what speed, because

15   we were conducting it at different speeds so they'd know

16   what -- what speed I needed to be at when I hit certain points.

17   Q    And what was the weather that day?

18   A    I believe it was overcast.

19   Q    All right.

20   A    It's Kodiak.

21   Q    And what was the time of day you ended up doing the

22   recording?

23   A    Midafternoon.

24   Q    All right.  And why was weather and time of day important

25   or an issue with what you were doing?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 747  Filed 09/23/14  Page 16 of 151
(720) 384-8078  attrans@sbcglobal.net

1    A    Well, you know, we wanted to try to get something as close

2    to -- as possible as we could to, you know, the -- the

3    conditions on the morning of.

4    Q    And so describe the process of what you did that day.

5    A    We ba -- once the camera was in position, we basically

6    started from as slow a speed as possible, five miles per hour,

7    driving inbound, meaning towards the -- the rigger shop, and

8    then coming outbound from the rigger shop at both those -- the

9    same speed.  So at five miles per hour, and then we just went

10   up in five-mile-per-hour increments.

11   Q    Okay.  And what was the purpose of that?

12   A    Again, to -- we didn't at that point know what speed

13   the -- you know, the Wells vehicle was leaving the -- the --

14   the rigger shop on -- on the morning of.  So we just wanted to

15   get -- get different comparisons, so that when the -- you know,

16   the -- the experts, if you will, would then review it and

17   compare, they had multiple options to choose from.

18           MR. OFFENBECHER:  Your Honor, I would object to the

19   witness's characterizing it as the "Wells vehicle."  He can

20   certainly indicate what he's seen in the video, which is a blue

21   car.  But whether or not it's the Wells vehicle is a matter for

22   the jury to decide.

23           THE COURT:  The -- sustained.  Just refer to it as "the

24   blue vehicle."  Is that good enough?  "The blue vehicle" or

25   "the vehicle."

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 747   Filed 09/23/14   Page 17 of 151
(720) 384-8078   attrans@sbcglobal.net

1       MR. OFFENBECHER:  Whatever he saw in the video.

2       THE COURT:  Okay.

3       THE WITNESS:  Okay.  The blue vehicle.

4       THE COURT:  Is that what you saw in the video?

5       THE WITNESS:  Yes.

6       THE COURT:  Okay.

7       THE WITNESS:  Yes.  Yes.

8       MR. OFFENBECHER:  Ask the jury to disregard any other

9  answer.  Thank you, Your Honor.

10      THE COURT:  And I'll grant that request.

11 BY MR. SCHRODER:

12 Q   All right.  So how many passes did you make totally?

13 A   We made 14 passes.

14 Q   Is that 14 each way or --

15 A   No --

16 Q   -- 14 loops?

17 A   -- seven in, seven out, going from five to thirty-five

18 miles per hour.

19 Q   And after you completed a -- after you completed the

20 passes, did you get a copy of the recording?

21 A   I -- I believe -- one of the -- the agent that was working

22 up at the -- the camera shop did.

23 Q   All right.  Now, have you reviewed a copy of that

24 recording before your testimony today, what's now marked as

25 Government Exhibit 168?

1 A    I have.

2 Q    And did it show the runs that you did on T1 in front of

3 the camera with the blue vehicle on that day?

4 A    Yes, it did.

5        MR. SCHRODER:  Your Honor, the government moves for

6 admission of 168.

7        THE COURT:  Yes, subject to our earlier discussion.

8        MR. SCHRODER:  Yes.

9        THE COURT:  It will be admitted.

10      (Plaintiff's Exhibit 168 admitted)

11        MR. SCHRODER:  All right.  And we'd like to show a

12 couple clips from that.  Okay.

13      (Side conversation)

14 08:51:41

15      (Video played)

16 BY MR. SCHRODER:

17 Q    Now, what was that we just saw, Special Agent Doran?

18 A    That would have been one of the inbound trips.  It looked

19 like one of the first ones, since it was fairly slow.

20 Q    All right.  And what was that?

21 A    That would be one of the -- the returning outbound.

22 Q    All right.  And that was at the same speed?

23 A    Yes.  The -- the outbound speed was always at the same

24 speed as the inbound.

25 Q    All right.  So now let's go to the next clip.  We'll do

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 747   Filed 09/23/14   Page 19 of 151
(720) 384-8078   attrans@sbcglobal.net

1  one more.  And what was that?

2  A    That was obviously a -- another inbound with -- I don't

3  know if that's the last one or not, but it was fairly quick.

4  Q    We'll come up on it here shortly.  Now, was the only

5  difference in the runs base -- was it just speed?

6  A    Yes.

7  Q    All right.  You can take that down.

8       (Video ends)

9  08:54:30

10  Q    Now, during part of your investigation in Kodiak, did you

11  ever have occasion to drive out to Anton Larsen Bay?

12  A    Yes, I did.

13  Q    And when did you do that?

14  A    The -- the first time, it would have been three or four

15  days after I was there, so three or four days at -- or four

16  days after the -- the murders.

17  Q    Now, did you do that on your own?

18  A    No, I had another agent with me.

19  Q    And who went with you?

20  A    Special Agent David Price.

21  Q    So from an investigator's suspect -- or perspective, what

22  were you trying to find during that trip?

23  A    The -- the purpose of our trip -- the primary purpose was

24  we were attempting to locate a -- a white truck that had --

25  that we had also seen on that video the morning of, that we

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 747  Filed 09/23/14  Page 20 of 151
(720) 384-8078  attrans@sbcglobal.net

1  presumed would have passed that blue vehicle as it was exiting

2  the -- the rigger shop.

3  Q    Okay.  And so it was the white truck that you see on the

4  morning of -- the morning video, near the time that the blue

5  vehicle went in?

6         MR. OFFENBECHER:  Objection.  He's leading the witness

7  now.

8         THE COURT:  To clear up --

9         MR. SCHRODER:  I could make that --

10        THE COURT:  -- make --

11        MR. SCHRODER:  -- unclear, if you want, Your Honor.

12        THE COURT:  We're trying -- can you clarify your

13  answer?

14        THE WITNESS:  We were -- basically had seen a white

15  vehicle, a white truck, that we presumed would have been a

16  witness, could have identified the person that was in the blue

17  vehicle.  At that time we were attempting to locate -- we had

18  not located the owner of that or the driver of that white

19  truck.  We thought that maybe that person worked down there or

20  lived down there, so we were attempting to locate the -- the

21  owner or driver of that white truck.

22  BY MR. SCHRODER:

23  Q    Okay.  And how did you intend to attempt to identify the

24  owner of the truck at -- by driving out Anton Larsen Bay Road?

25  A    Well, we knew it as -- eventually dead-ended, so we were

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 747   Filed 09/23/14   Page 21 of 151
(720) 384-8078   attrans@sbcglobal.net

1    going to -- again, we had -- nobody had driven out there.  We

2    would drive out there, see what was out there.  Maybe there's a

3    place of business, maybe there was a -- you know, construction

4    going on.  We were just going to, you know, see if that person

5    had gone up there once, maybe they would go out there a second

6    time or third time, and they'd be out there a couple days

7    later, for whatever purpose they were there the -- that morning

8    of the 12th.

9    Q    All right.  And when you made that drive -- how far is the

10   drive?

11   A    All the way to -- the road dead-ends.  I want to say eight

12   or ten miles.

13   Q    And how long did it take you to get out there?

14   A    To the very end, probably about an hour.

15   Q    And did -- so what were the conditions like that made it

16   so that it took you that long?

17   A    Road conditions deteriorated -- they're -- pretty quick

18   out there.  It's -- I believe it's only paved out to maybe

19   the -- the -- there's a golf course half a mile, a mile down

20   the road, and after that it turns into a -- you know, gravel,

21   rocky road, and being breakup, and it winds up through the pass

22   over the mountains, you know, very -- lots of potholes, still

23   snow and ice on the road.  So it was fairly treacherous,

24   anyway.

25   Q    Did you -- you made -- did you make it during the daytime?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 747   Filed 09/23/14   Page 22 of 151
(720) 384-8078   attrans@sbcglobal.net

1  A    The first time I went out there, yes, it was the -- the

2  middle of the day.  I don't remember the exact time.  It was

3  daylight.

4  Q    Would you have wanted to try that drive at night?

5  A    It wouldn't be ideal.  I mean, you could do it, but it

6  certainly, you know, wouldn't be fun.

7  Q    Now, did you encounter any buildings on the way out?

8  A    Like I said, there's a -- a golf -- I believe it's a golf

9  course or driving range.  A little pro shop is, like I said,

10  maybe a half-mile, mile down the road.  If you keep going a

11  little bit further, there's a -- a ski lift with a small

12  building there.  They call it a ski chalet.  But, you know,

13  there's -- there was not -- it was not in use at that time of

14  year that we could tell.  And then as you keep going further,

15  there's a couple of what I would call a -- I hate to call --

16  you know, hesitant to call them residences, but homesteads, you

17  know, buildings, places people probably lived at one point;

18  they could have been living there at the time.  Some abandoned

19  vehicles.  And the -- in terms of buildings, that's all we saw.

20  Q    Okay.  Let's talk about the ski chalet part first.  Did

21  you see any signs of activity out there?

22  A    No.  When we were there, it was completely empty.

23  Q    Okay.  And how about these -- what you called -- what

24  did --

25  A    Homestead, or --

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 747   Filed 09/23/14   Page 23 of 151
(720) 384-8078   attrans@sbcglobal.net

1  Q    Homesteads.

2  A    -- you know.

3  Q    What did those look like?

4  A    Well, you know, older, what I would -- you know, your

5  typical -- I don't want to say typical -- your -- your, you

6  know, Alaskan housing in the woods.  You know, the cover --

7  that time of year they were still covered in snow.  You know,

8  the vehicles that were there were -- were covered in snow.

9  Nothing -- nothing -- looked undisturbed.  It looked like it

10 had been there, unused, for, you know, certainly most of the

11 winter, at that time of year.

12 Q    And how could you tell that?  I mean, what about the

13 conditions there that led you to believe that?

14 A    Well, at that point we hadn't seen the vehicle, so we

15 were -- you know, we were thinking, okay, we'll inter -- or

16 stop and talk to -- you know, if there's houses, maybe the --

17 you know, the person would know them as a neighbor.  And we

18 just didn't see any of that stuff.  So we were looking for, you

19 know, essentially somebody to talk to that would have possibly

20 seen something on the -- the day of the murders.  And we

21 just -- I mean, there was -- the snow was -- again, you know,

22 snow in the driveways were -- was still, you know -- there

23 hadn't been tire tracks driven over it.  There was no fires

24 burning from the stoves that made it look like there was

25 somebody in there to go talk to.  So we didn't stop to -- we

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 747   Filed 09/23/14   Page 24 of 151

1  didn't stop and knock on any of the doors.  But to us it didn't

2  appear that there was anybody actively living -- living there

3  that would have been of assistance to us.

4  Q    Did you see any vehicles out there?

5  A    At the houses or -- or --

6  Q    Yeah.

7  A    At the --

8  Q    Yes.

9  A    -- houses -- yeah, there were probably a couple, but

10 again, they were -- would have been covered in snow or looked

11 like they hadn't been moved in a while.

12 Q    Did you also stop and talk to the people at the golf

13 course?

14 A    On our return trip, we -- we stopped and talked to the

15 people at the golf course.

16 Q    And, now, on the drive, did you encounter any major

17 hazards on the road that you had to deal with?

18 A    When we got back to the -- as we got closer to the --

19 there's a dock at the -- it kind of ends into a -- a bay or a

20 lagoon, or I don't know what they call it.  But there's a -- a

21 small boat dock there, and there were, I don't know, a dozen or

22 so vehicles.  But before we got to that, there was a fairly

23 large boulder that -- you know, that had kind of slid into the

24 road that we had to move out of the way.

25 Q    Okay.  Now, at the end of the road, did you find any cars?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 747  Filed 09/23/14  Page 25 of 151
(720) 384-8078  attrans@sbcglobal.net

1 A    Well, it's not the exact end of the road, but like I said,

2 at that boat dock, which is maybe a -- a mile before the road

3 technically dead-ends, there were a -- a dozen or so vehicles.

4 Q    Okay.  And did you find anything that caught your interest

5 in those -- I mean, what was your understanding of what those

6 vehicles -- what that area was where those vehicles were found?

7 A    As it was explained to us by one of the -- the troopers

8 who was familiar with the area, that the -- there's a fairly --

9 a number of people that live in some of that remote or

10 outerlying islands that would park their vehicles there for

11 when they did decide to -- to come to Kodiak Island.  A lot of

12 them I believe were -- explained to us as Russian Orthodox or

13 the -- the -- the -- a Believer.  I don't know exactly what

14 they're referred to.  But they were a community -- a small

15 community on one of the other islands, so a lot of those

16 vehicles are parked there for when they do take their boats in,

17 to dock their boats at the dock, and then would take their car

18 into -- to the -- to the main city of Kodiak.

19 Q    And did you see any vehicles that caught your interest?

20 A    Well, we were looking for the -- the -- the white truck,

21 which we knew from the video had a camper on it.  And we didn't

22 see -- we didn't see a truck with a camper.  We did see a white

23 truck.  It didn't -- to our -- from what we remembered, didn't

24 exactly match the description on the vehicle.  But we still,

25 nonetheless, to be thorough, took the license plate.  And

1  eventually when we got back to -- to town, had the -- had one

2  of the troopers run the -- run the registration on it.

3  Q    Okay.  And once you had that information, registration

4  information, what did you do?

5  A    Well, it -- it came back to somebody that lived on -- one

6  of the individuals that was known to live on the -- Raspberry

7  Island, one of the -- the Russian Believers, True Believers,

8  whatever -- whatever they're called.  And we eventually then

9  took a -- a floatplane ride over to -- to identi -- try to

10 identify that person.

11 Q    Okay.  And once you went out and made your investigation

12 out on the island, was there any more investigation to be done

13 at that point?

14 A    No.  It was -- it was -- you know, there was -- there was

15 nothing to follow up on.

16 Q    And how did you get out there?

17 A    We took a floatplane ride.

18 Q    Okay.

19 A    From one of the -- the wildlife troopers.

20 Q    Now I want to clarify a couple of things.  So --

21      (Side conversation)

22 Q    Let's take a look -- I'll deal with one other issue.

23      MR. SCHRODER:  Now I want to go back to dealing with --

24 Your Honor, I want to go back to dealing with the objection by

25 Mr. Offenbecher, because I think I was a little slow on the

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 747  Filed 09/23/14  Page 27 of 151

1  uptake on this.

2          THE COURT:  Okay.

3  BY MR. SCHRODER:

4  Q   But the video that you took on the 19th, whose car was

5  that?

6  A   The car we were in was -- was Jim -- Jim Wells's car.

7  Q   I mean, it wasn't an unknown car, was it?

8  A   No, it was a car we had -- obtained from the -- the search

9  warrant of their vehicle.

10         MR. SCHRODER:  So I guess I want to readdress that

11 objection, Your Honor.  There's nothing wrong with him

12 referring to that car as "the Wells blue SUV," because that's

13 exactly what it was.

14         THE COURT:  In that context.  In that context, yes, it

15 was --

16         MR. SCHRODER:  All right.

17    (Side conversation)

18 BY MR. SCHRODER:

19 Q   We're going to bring up Exhibit 155, Special Agent Doran,

20 and we'll look at that.  Okay.  And did you just see a vehicle

21 go by down the road?

22 A   Yes.

23 Q   And was that the white truck you were looking for, or was

24 it a different one?

25 A   No, I believe that -- that was the white truck we were

1  looking for.  I -- assume this is the -- the -- yeah, on the

2  12th, so --

3  Q    This is the 12th, at -- that was 7:09 in the morning.

4  A    Yes, so that was the white truck we were attempting to

5  locate the owner of --

6  Q    And are you --

7  A    -- or the driver of.

8  Q    And are you aware of whether that driver was later

9  located?

10 A    I believe he was.

11        MR. SCHRODER:  No further questions, Your Honor.

12        THE COURT:  Cross-examination.

13        MR. OFFENBECHER:  Thank you, Your Honor.

14                    **CROSS-EXAMINATION**

15 BY MR. OFFENBECHER:

16 Q    Special Agent Doran, good morning.

17 A    Morning.

18 Q    It's Doran, isn't it?

19 A    I go by Doran, yes.  That's --

20 Q    Yeah.  Sorry.

21 A    That's all right.

22 Q    The -- you just saw the 155 video, and you saw a vehicle

23 going from left -- a white truck going from left to right in

24 the video.  Right?

25 A    Right to left.

1  Q    Right to left.

2  A    Yes.

3  Q    So that's -- when you were going out Anton Larsen Bay Road

4  to the golf course to the ranch, and out to Anton Larsen Bay,

5  that's the vehicle that you were looking for.  Is that right?

6  A    Yes.

7  Q    And you weren't instructed to look for any other vehicle.

8  Is that right?

9  A    We weren't instructed to.  We were just following up on

10 possible leads.

11 Q    Now, you found when you got to the end of Anton Larsen --

12 you were able to drive to the end of the Anton Larsen Bay Road?

13 A    Yes.  We drove all the way past the dock to -- that ended.

14 Q    And this was several days after the 12th.  Is that right?

15 A    It was three or four days after, yes.

16 Q    And so you drove as far as the golf course?  Right?

17 A    Uh-huh (affirmative).

18 Q    And then you stopped on the way back and actually talked

19 to somebody at the golf course.  Right?

20 A    Yes.

21 Q    But on your way out, then you stopped where the buildings

22 are.  Right?

23 A    We -- yeah, when we slowed down.  We didn't actually stop

24 and talk to anybody, obvious --

25 Q    Okay.  So what -- you did -- so you didn't stop at the

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 747   Filed 09/23/14   Page 30 of 151
(720) 384-8078   attrans@sbcglobal.net

1  golf course on the way out?

2  A    No.

3  Q    You didn't stop at the buildings on the way out?

4  A    No.

5  Q    You didn't stop anywhere else until you got to Anton

6  Larsen Bay Road.  Is that right?

7  A    Until we got to the dock at Anton Larsen.

8  Q    Till the dock at --

9  A    Yes.

10  Q    -- Anton Larsen Bay.  Is that right?

11  A    Yes.

12  Q    And you stopped to -- and you moved a rock off the road,

13  so you could --

14  A    Uh-huh (affirmative).

15  Q    -- continue on?

16  A    Uh-huh (affirmative).

17  Q    And then you observed a number of vehicles that were

18  parked out by the dock or the bay there -- area.  Right?

19  A    Yes.

20  Q    And there were a dozen or so vehicles there?

21  A    Yes.

22  Q    And is your understanding that a number of those vehicles

23  belonged to folks that used the dock facility, right?

24  A    Yes.

25  Q    To go out to their homes where they lived in various parts

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 747  Filed 09/23/14  Page 31 of 151
(720) 384-8078   attrans@sbcglobal.net

1  out in land -- Anton Larsen Bay.  Right?

2  A    Yeah.

3  Q    And other places.  Right?

4  A    Yes.

5  Q    Like Raspberry Island or some of the other islands out

6  there.  Right?

7  A    Yes.

8  Q    So folks would drive out there, get in their boats and go

9  out to their homes, and then come back and use the cars.

10 Right?

11 A    That's how it was explained to me, yes.

12 Q    Then after you observed a dozen or so cars there, you

13 turned around and drove back.  Right?

14 A    We actually continued on until the road -- it goes another

15 mile or so and it essentially dead-ends.  So we turned around

16 at that point.

17 Q    You turned around at that point.

18 A    Uh-huh (affirmative).

19 Q    And then you drove back?

20 A    Yes.

21 Q    And you drove back past the buildings that are -- that

22 ranch area that you've talked about right?

23 A    You -- you're saying "ranch."  I don't know what -- what

24 you mean.

25 Q    Okay.  Well, just a -- the buildings that are kind of in

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 747  Filed 09/23/14  Page 32 of 151
(720) 384-8078  attrans@sbcglobal.net

1  the middle there.

2  A    Yeah, the -- the -- the homesteads, the houses, yes.

3  Q    It's never been described to you as the Red Cloud Ranch

4  before, right?

5  A    I'm -- no, I'm not familiar with the Red Cloud Ranch, no.

6  Q    Okay.  But the group of buildings that we've described

7  for --

8  A    Yes.

9  Q    -- that you described.

10 A    Yes.

11 Q    So you drove past those buildings again, right?

12 A    Yes.

13 Q    You didn't stop again, right?

14 A    No.   There's no reason to.

15 Q    And then you drove as far as the golf course, right?

16 A    Yes.

17 Q    And at the golf course you did stop.  Is that right?

18 A    We did.

19 Q    And you got out of your car there, right?

20 A    Yes.

21 Q    And you went in and you talked to some of the folks at the

22 golf course, right?

23 A    We did.

24 Q    After you were done talking with the folks at the golf

25 course, you got back in your car?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 747   Filed 09/23/14   Page 33 of 151
(720) 384-8078   attrans@sbcglobal.net

1  A    Yes.

2  Q    And then you continued to drive down towards the COMMSTA

3  and back to Rezanof.  Right?

4  A    Yes.

5  Q    Did you do -- did you get out of your car any other time?

6  A    I don't remember getting out of my car, no.

7  Q    Okay.  Did you conduct any other investigation other than

8  what you've told us here today?

9  A    Other than what I observed, no.

10 Q    And you've indicated you didn't see at the homesteads -- I

11 think you called them.  Right?

12 A    Yeah.  I mean, I said it because I -- it didn't look like

13 they were an actual residence.

14 Q    So you didn't see any signs of anybody actually living

15 there at the time, right?

16 A    No.

17 Q    But it's possible someone could have been living there?

18 A    It's possible.

19 Q    And what kind of a vehicle did you drive out there in?

20 A    I don't remember exactly, because we were -- it's not -- I

21 wasn't on the island with my own vehicle, so we were kind of

22 borrowing vehicles as we could.  It probably would have been

23 one of the CGS vehicles, would have been a small SUV, most

24 likely.

25 Q    But you can't recall?

1  A    No, not -- not -- not specifically.  It could have been a

2  rental car, for that matter.  I don't remember.  Again, we had

3  multiple vehicles.  We were swapping in and out.

4  Q    Now, you recall the video that was taken on April 12th of

5  the blue car.  Right?

6  A    Yes.

7  Q    You were familiar with that generally.  Right?

8  A    Yes.

9  Q    And you recall that that video was taken -- there were two

10 different video clips that were of interest.  Is that right?

11 A    I don't remember two.  I remember one specifically.

12 Q    Okay.  Well, there was one video clip of a car going from

13 left to right at about 7:09.  Right?

14 A    Oh, yes.  Yes.  Inbound and outbound, yes.

15 Q    Right.  And then there was another video clip of a car

16 going from right to left at about 7:14.  Right?

17 A    Yes.

18 Q    And when you were trying to replicate your experiment a

19 few days later, those were the two clips that you had in mind.

20 Right?

21 A    Correct.

22 Q    So the -- one left-to-right clip was at 7:09 a.m.  Right?

23 A    Yes.

24 Q    And the other one was at 7:14, going from right to left.

25 Right?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 747   Filed 09/23/14   Page 35 of 151
(720) 384-8078   attrans@sbcglobal.net

1  A    Yes.

2  Q    Now, on the video that you did on April 19th, you did 14

3  different passes.  Is that right?

4  A    Yes.

5  Q    And you did pass -- seven passes from left to right?

6  A    Yes.

7  Q    Seven passes from right to left.  Is that right?

8  A    Yes.

9  Q    And you did this -- these particular passes, you did at

10 9:40 a.m.  Is that right?

11 A    I -- I -- I don't rem -- I thought it was in the

12 afternoon.

13 Q    Well, I'm talk -- first of all, let's look at the 19th.

14 You -- first, you did the -- you did the passes on the 19th.

15 Right?

16 A    Yes.

17 Q    And those passes were done at about 3:20 or 3:19 in the

18 afternoon.  Right?

19 A    Correct.

20 Q    And then the next day, you did some additional passes.  Is

21 that right?

22 A    We did.

23 Q    And on that occasion you did six passes total.  Right?

24 A    That sounds right.

25 Q    And that would be three passes from left to right and

Case 3:13-cr-00008-SLG   Document 747   Filed 09/23/14   Page 36 of 151

1  three passes from right to left.  Is that right?

2  A    That's correct.

3  Q    And you did that at 9:40 in the morning on the 20th.

4  Right?

5  A    That sounds about right.  It was in the middle.

6  Q    Okay.  Well, can you pull up Defense Exhibit Number 136B,

7  please?  Can you take a look at that?  Look at the timestamp on

8  it, please.  Are you familiar with the timestamp on the --

9  that's used on these?

10  A    Yes.

11  Q    And does that refresh your elect -- your recollection

12  about what time the passes were made on the 20th?

13  A    Yeah.  Maybe it was in the morning, so 9:47's about right.

14  Q    Okay.  The -- this --

15  A    That would -- yeah, that's -- that's right.

16  Q    It's 9:40, isn't it?

17  A    Okay, yes.

18  Q    All right.  And then can you look at 136, even?  136,

19  even.  Take a look at that and the timestamp on that one,

20  please.  And again, does that refresh your recollection about

21  when the video passes were done on the 19th?

22  A    Yeah.  I didn't dispute the fact that it was at 3:30 in

23  the afternoon.

24  Q    Was at 3:19 in the afternoon.  Right?

25  A    Yes.

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net

1    MR. OFFENBECHER:  Can you take that down, please?  Have

2 just a moment, Your Honor?  No other questions, Your Honor.

3    THE COURT:  Redirect.

**REDIRECT EXAMINATION**

4

5 BY MR. SCHRODER:

6 Q    Special Agent Doran, I just want to give you an

7 opportunity to make clear, why didn't you stop at those

8 buildings that you've referred to as homesteads?

9 A    Again, we were looking -- if there would have been a

10 reason to stop, I -- it looked like there was somebody there to

11 just speak with that would have been able to possibly identify

12 the vehicle or something that we thought would have -- could

13 have provided value to the investigation, we would have

14 stopped.  We didn't see anything that we felt justified or

15 warranted stopping.

16 Q    Thank you.

17    THE COURT:  Recross.

18    MR. OFFENBECHER:  No, Your Honor.

19    THE COURT:  Thank you, sir.  You're excused.  The

20 government's next witness.

21    (Witness excused)

22    MS. LOEFFLER:  The United States calls Amanda Sanford.

23    (Side conversation)

24    THE COURT:  Head -- you're heading in the right

25 direction.  And you'll see -- go on -- and that door pulls out.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 747  Filed 09/23/14  Page 38 of 151
(720) 384-8078  attrans@sbcglobal.net

**SANFORD - DIRECT**

1  And you just step in the witness box, remain standing just for
2  a second.  She'll swear you in.
3       THE CLERK:  Please raise your right hand.
4       **AMANDA VIVIAN SANFORD, PLAINTIFF'S WITNESS, SWORN**
5       THE CLERK:  Thank you.  Please have a seat.  And,
6  ma'am, if you can please state and spell your full name.
7       THE WITNESS:  Amanda Vivian Sanford.  A-m-a-n-d-a, S-a-
8  n-f-o-r-d.
9       THE CLERK:  Thank you.
10      THE COURT:  S-a-n, you said?
11      THE WITNESS:  Yes, S-a-n --
12      THE COURT:  Okay.
13      THE WITNESS:  -- f-o-r-d.
14      THE COURT:  Okay.  So I can tell already you have a
15  soft voice, so speak right into that microphone.
16      THE WITNESS:  Okay.
17      THE COURT:  All right.  Counsel.  And your --
18               **DIRECT EXAMINATION**
19  BY MS. SCHRODER:
20  Q   Ms. Sanford, where do --
21      THE COURT:  -- microphone has got to be near your --
22      MS. LOEFFLER:  Oh, yes.  I'm sorry.
23      THE COURT:  Okay.
24      MS. LOEFFLER:  We have a little height difference --
25      THE COURT:  Yes.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 747  Filed 09/23/14  Page 39 of 151

SANFORD - DIRECT

1    MS. LOEFFLER:  -- here among the prosecutors.

2  BY MS. LOEFFLER:

3  Q    Ms. Sanford, where do you live?

4  A    Kodiak, Alaska.

5  Q    How long have you lived in Kodiak?

6  A    My family moved in '87.  I moved back there to live in

7  2004.

8  Q    Okay.  Where do you work?

9  A    Kodiak Area Native Association.

10  Q    Okay.  And what is the Kodiak Area Native Association?

11  A    It's a medical and health facility for Alaska Native

12  beneficiaries.  They also have other programs housed within

13  there that serve non-Natives as well.

14  Q    Do you know Mr. and Mrs. Wells?

15  A    I do.

16  Q    How long have you known them?

17  A    Since the mid -- oh, late -- late '90s.

18  Q    Okay.  And where does Mrs. Wells work?

19  A    She's retired.

20  Q    I'm sorry.  Did she work with you?

21  A    Yes, she did.

22  Q    Okay.  Okay.  Let me just ask you, in terms of the working

23  hours, do you know when Mrs. Wells -- what her normal working

24  hours would have been?

25  A    Anywhere between 8 and 8:30 to 5.

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 747  Filed 09/23/14  Page 40 of 151

1  Q    Okay.  Now I want to turn your attention to April of 2012

2  and ask you whether you attended a conference on behalf of your

3  work?

4  A    I did.

5  Q    And where was that conference located?

6  A    Here in Anchorage.

7  Q    Okay.  Did you -- do you recall when the conference was?

8  A    Yeah.  I think it began on the 11th of April, and then I

9  think it was, like, a Wednesday, Thursday, Friday, potentially.

10 Q    Okay.  Do you -- I know from -- living in Kodiak, you, I'm

11 sure, heard about the murders in Kodiak.  Was -- the conference

12 start before or after the --

13 A    It started before.

14 Q    Okay.  How did you get to the airport to fly to Anchorage?

15 A    Nancy picked me up at my home and drove me there to the

16 airport.

17 Q    Okay.  Now I'm going to show you Exhibit 51, which you'll

18 see -- you can see up here or you can see it on the screen next

19 to you, Ms. Sanford.

20 A    Oh.  Okay.

21 Q    What airline did you fly out on?

22 A    Oh, I don't remember if it was Alaska or Era, but it was

23 the building on the far corner.

24 Q    Yeah, kind of -- you have actually -- I think you have a

25 laser pointer --

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 747  Filed 09/23/14  Page 41 of 151
(720) 384-8078   attrans@sbcglobal.net

1  A    Is that this?

2  Q    -- in front of you.  And if you push the button on the

3  red, can you just -- the terminal that you're referring to, can

4  you point to it on the screen?

5  A    Yeah.  This terminal here.

6  Q    All right.  What vehicle did Mrs. Wells pick you up in?

7  A    Her vehicle.

8  Q    Which is what (indiscernible) --

9  A    Oh.  A -- a Honda, like, a little --

10  Q    Okay.

11  A    -- sport utility vehicle.

12  Q    Okay.  And what color is it?

13  A    Blue.

14  Q    All right.  And to the best of your recollection, where

15  did the two of you park in order to go into the terminal?

16  A    To the best of my recollection, we were somewhere in this

17  general parking area.

18  Q    Okay.  And I'm going to show you what's been marked as

19  Exhibit 28.  It hasn't been admitted, so you'll have to look at

20  the screen next to you.  And ask you if you recognize that?

21  A    Yes, I do.

22  Q    Okay.  And what is that?

23  A    It was a drawing -- I don't know who drew it.  But

24  somebody drew it, of the airport terminal and parking area.

25  Q    And does it have your signature on it?

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 747  Filed 09/23/14  Page 42 of 151

1  A    It does.

2  Q    Okay.  And what was your signature reflecting, Ms.

3  Sanford?

4  A    That I parked -- or that Nancy had parked somewhere within

5  that circle --

6          MS. LOEFFLER:  Okay.  I'd move --

7          THE WITNESS:  -- that day.

8          MS. LOEFFLER:  -- Exhibit 28.

9          MR. CURTNER:  No objection.

10         THE COURT:  It'll be received.

11    (Plaintiff's Exhibit 28 admitted)

12  BY MS. LOEFFLER:

13  Q    And on the exhibit, the terminal that's sort of written up

14  in the upper corner, is that the Alaska Air terminal or the --

15  A    I'm assuming so, yeah.  When he drew it.

16  Q    Okay.  Now I'm going to turn to Exhibit 32C.  And this

17  one -- this has been admitted.  See the cone at the end of

18  Exhibit 32C?

19  A    Yes.

20  Q    And was that where the car was parked when you left Mrs.

21  Wells?

22  A    I don't believe so, no.

23  Q    Okay.  And I'll show you one more, Exhibit 32E.  That's

24  just looking the other way again.  Was that where the car was?

25  A    I don't believe so, no.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 747  Filed 09/23/14  Page 43 of 151

1  Q    That's all I have.  Thank you.

2        THE COURT:  Cross-examination.

3                    **CROSS-EXAMINATION**

4  BY MR. CURTNER:

5  Q    Good morning, Ms. Sanford.

6  A    Good morning.

7  Q    Could you tell me a little bit about how you met the Wells

8  family?  This -- when did -- do you recall when that was?

9  A    Yeah.  I went to school with their son Matt --

10 Q    Uh-huh (affirmative).

11 A    -- the youngest of their kids.  And so I probably knew who

12 they were in junior high, just -- of knowing who they are, just

13 living in Kodiak.  But then probably met them more officially

14 in high school.  I don't know the exact date that I would have

15 met them, but it's when I got to know them more.

16 Q    Okay.  When did you graduate high school?

17 A    1998.

18 Q    And was Matt in your grade?

19 A    He was.

20 Q    So you knew him through jun -- grade school, junior high,

21 or --

22 A    Well, I don't think I knew him in grade school.  I knew

23 him in junior high and high school.

24 Q    And did you start dating Matt?

25 A    I did.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1  Q    When was that?

2  A    My senior year.

3  Q    Okay.  And during that time did you get to know the Wells

4  family then?

5  A    Uh-huh (affirmative).

6  Q    All right.  Now, what's Matt like?

7  A    Oh, he's a nice kid, was always into athletics, education,

8  very smart.  We were both co-valedictorians our senior year.

9  So nice guy, you know.

10 Q    Okay.  So your senior year when you graduated from Kodiak

11 High School, you were co-valedictorian?

12 A    With Matt, yeah.

13 Q    And then --

14      MS. LOEFFLER:  Your Honor, I'm only going to object to

15 leading.  I don't have a problem with him --

16      THE WITNESS:  Oh.

17      MS. LOEFFLER:  -- going into this, but it's really

18 direct examination.  So I'd ask that it be nonleading.

19      MR. CURTNER:  I'm sorry, I thought it was cross-

20 examination.

21      THE COURT:  It's kind of a --

22      MS. LOEFFLER:  Well, it's cross-examining --

23      THE COURT:  Well --

24      MS. LOEFFLER:  -- it's beyond the scope.

25      THE COURT:  The cross is beyond the -- we were going to

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 747  Filed 09/23/14  Page 45 of 151

1  do this nonleading because -- so we wouldn't have to call

2  witnesses back.

3          MR. CURTNER:  Okay.

4  BY MR. CURTNER:

5  Q    So Matt was your co-valedictorian?

6  A    Yes.

7  Q    Okay.  And you guys went to the prom together, is that --

8  A    We did.  Oh.

9          MS. LOEFFLER:  Objection, Your Honor.  I -- I'd just

10  ask that it be nonleading.

11          THE COURT:  Okay, very well.  Sustained.

12          MR. CURTNER:  Okay.

13  BY MR. CURTNER:

14  Q    Did you guys date through your senior year?

15          MS. LOEFFLER:  Objection, Your Honor.  I just asked

16  that they be nonleading questions.

17          THE COURT:  Sustained.

18  BY MR. CURTNER:

19  Q    What kind of relationship did you have with Matt Wells

20  during your senior year in high school?

21  A    So Matt and I dated -- I don't know exactly for how long

22  we dated our senior year.  But we dated and we actually -- when

23  we went to prom we weren't dating, but his parents said he

24  still had to take me.  So -- but yeah, so it was a -- a period

25  of time that Matt and I dated, spent some time over at his

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 747  Filed 09/23/14  Page 46 of 151
(720) 384-8078  attrans@sbcglobal.net

1  house for dinners, did the normal senior thing.  We did

2  something on Senior Skip Day, you know, those sort of things,

3  and ended up back at their house, because we broke a window in

4  my truck and we knew we needed to go somewhere, and that was

5  the best place to go, because we wouldn't -- you know, it was

6  like, just fix the -- fix what happened, and there was no

7  lecturing or anything like that.  So --

8  Q  Okay.  So you got to know Mr. and Mrs. Wells as parents?

9  A  I did.  Yes.

10  Q  And what was your impression of them as parents?

11  A  Oh, very good parents.  I mean, they just were very

12  dedicated to their kids.  You know, family time was very

13  important to them.  I mean, Matt even came out in my job with

14  Nancy at KANA -- that it was important that when we worked, we

15  worked.  When it was family time, it was family time.  You

16  know, there was always baseball trips, and I know that Jim was

17  very involved with that, you know.  They -- fun times around

18  the dinner table, those sort of things.

19  Q  Okay.  Now -- so you graduated in 1998.  Did you leave

20  Kodiak at that time?

21  A  I did.  I went to college at the University of Washington

22  in Seattle.

23  Q  Okay.  And did you get a degree there?

24  A  I did.

25  Q  And then when did you return back to Kodiak?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 747  Filed 09/23/14  Page 47 of 151
(720) 384-8078  attrans@sbcglobal.net

1  A    In January of 2004.

2  Q    Okay.  When you returned back to Kodiak in 2004, where did

3  you -- did you get a job?

4  A    I did.  I -- I worked for a period of time as a substitute

5  teacher, and then in the summer, in August, I applied at the

6  Kodiak Area Native Association.  Then I had heard about the

7  Infant Learning Program, and that seemed something that I would

8  be interested in.  It works with kids with disabilities and

9  developmental delays from birth to three years old.

10 Q    And did you work with Nancy Wells in that position?

11 A    I did.  She was the one who interviewed me for the

12 position, uh-huh (affirmative).

13 Q    Okay.  And so what was she like as your supervisor?  Was

14 she your supervisor?

15        MS. LOEFFLER:  I'm going to object on relevant grounds.

16        THE COURT:  Okay.  You can ask this, but it's getting

17 kind of --

18 BY MR. CURTNER:

19 Q    If you could just explain your experience working at KANA

20 with Mrs. Wells.

21 A    Yeah.  So I was a part-time employee at KANA.  It was a --

22 a grant-funded position, so that is what it allow -- it -- it

23 had allowed.  And, you know, Nancy was just -- she wanted to

24 really make sure that, you know, we did the best for the

25 families when we were working and that we also had to do the

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 747  Filed 09/23/14  Page 48 of 151
(720) 384-8078  attrans@sbcglobal.net

1  best for our families when we were at home, and so that, you

2  know, division and balance was very important to her.  She was

3  very dedicated to the families that she worked with even now.

4  There's -- some of them are 16 years old, and the parents will

5  still go back and, you know, ask for advice and want to talk to

6  her, when she was working.  I'm sure they probably still try to

7  get in touch with her now that she's not, just because that's

8  the type of person that she was.

9      So very good boss, very -- she drove me to get my master's

10  degree in early childhood special education, knew that that was

11  going to be important for me taking over in the position.

12  And -- but always reminded me that family was first --

13  Q    Okay.

14  A    -- was very important.

15  Q    Okay.  So she encouraged you to get a master's degree?

16  A    She did.

17  Q    And you did?

18  A    I did.

19  Q    Now, where are you working now?

20  A    I work for the Infant Learning Program still.  I'm the

21  program coordinator.  I took over when she retired a year ago.

22  Q    So now you're working in the position Mrs. Wells had?

23  A    I am.

24  Q    And she was always encouraging you to (indiscernible) --

25          MS. LOEFFLER:  Objection.  Leading, Your Honor.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 747   Filed 09/23/14   Page 49 of 151
(720) 384-8078   attrans@sbcglobal.net

1      THE COURT:  Sustained.  We're getting kind of far out.

2      MR. CURTNER:  Okay.

3  BY MR. CURTNER:

4  Q   Well, during the time that you were working at KANA, was

5  Mr. Wells ever involved in any activities at KANA?

6  A   He was.  So every year he would come and do the -- he

7  would be Santa Claus for the kids in our program.  So we,

8  again, worked with kids, birth to three, with developmental

9  delays and disabilities.  And there was many times where those

10 kids couldn't go to Wal-Mart to get pictures with Santa or to

11 the photography shop, because their parents knew that they

12 needed extra time to be able to go and be warmed up and sit

13 down.  And so they would -- we would have Jim come in and sit

14 for two to three hours as we would do this event, so kids had

15 time to warm up.  And so he would -- most years that happened.

16 And just allowed the kids to kind of warm up to him rather

17 than -- you know.

18 Q   And he did that for a number of years?

19 A   Uh-huh (affirmative).

20 Q   Okay.  Now, did you ever know Jim Wells to ever be violent

21 or angry at all?

22 A   No.

23     MS. LOEFFLER:  Objection.  Leading.

24     THE COURT:  Sustained.

25 BY MR. CURTNER:

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 747  Filed 09/23/14  Page 50 of 151
(720) 384-8078  attrans@sbcglobal.net

1  Q    I don't want to put words in your mouth.

2  A    Okay.

3  Q    But let me just ask you -- I don't -- is that a leading

4  question?

5         THE COURT:  Go ahead, you can ask the question.

6         MR. CURTNER:  Thank you.

7  BY MR. CURTNER:

8  Q    Did you ever know Mr. Wells to be violent or lose his

9  temper or be angry?

10 A    No.

11        MS. LOEFFLER:  I thought I just -- same objection.

12        THE COURT:  Okay.  But -- that's okay.  Just to get it

13 on, we can --

14        MS. LOEFFLER:  Okay.  Fine.

15        MR. CURTNER:  I'm sorry, did --

16        THE COURT:  She said, "No."

17        MR. CURTNER:  -- you an --

18        THE WITNESS:  No.  No.

19 BY MR. CURTNER:

20 Q    Okay.

21 A    I did not.

22 Q    And don't be afraid to just answer the questions, all

23 right?

24 A    Okay.

25 Q    Now, on April -- what day was it that Nancy took you to

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 747  Filed 09/23/14  Page 51 of 151
(720) 384-8078  attrans@sbcglobal.net

1  the airport?

2  A    I believe we flew out -- I -- I've been trying to think if

3  the conference started on a Wednesday or if it started on

4  Thursday.  But we flew out the night before the conference

5  started, so it was, you know, after work, close to 4:30, 5.  I

6  don't remember the exact time.  So it was the --

7  Q    Okay, so --

8  A    -- day before the conference started that we flew to

9  Anchorage.

10 Q    Okay.  So you -- she would have taken you to the airport

11 late in the afternoon or --

12 A    Uh-huh (affirmative).

13 Q    -- after work?  And is it common practice in Kodiak if

14 you're being dropped or going to the airport to park right

15 there in front of the terminal?

16 A    Yes.

17 Q    All right.  Now, when there's a flight leaving or coming

18 in, what is the traffic like around the airport?

19 A    I -- I mean, I think it depends on if it's an Alaska

20 flight, if it's an Era flight, so, you know, it's -- we're a

21 pretty small town, so it's not horrible.  But there's, you

22 know, traffic flow in and out.  Busy pickup curb area, those

23 sort of things.

24 Q    Okay.  And, now, is it -- where you saw this cone --

25 A    Uh-huh (affirmative).

SANFORD - CROSS

1  Q    -- that they showed you, that was way down toward the
2  MarkAir terminal?
3  A    Yes.
4  Q    MarkAir's not there anymore?
5  A    No.
6  Q    There's no real traffic down there?  Is that correct?
7  A    No, it's pretty quiet.
8  Q    So you can park down there and you wouldn't be in the way
9  of people coming and going from the Alaska Airlines terminal?
10 A    Correct.
11 Q    Okay.  And then on that day when Nancy and you went to the
12 airport, did you see Jim Wells?
13 A    I did.
14 Q    And when did he come by?
15 A    We were waiting for the -- to board, so sometime bef --
16 you know, from when we checked in from when we left, came by to
17 say goodbye.
18 Q    Okay.  So he just stopped in, said goodbye, and sent you
19 guys off?
20 A    Yeah.
21 Q    All right.  Think that's all I have.  Thank you.
22 A    Thank you.
23            THE COURT:  Redirect.
24                    **REDIRECT EXAMINATION**
25 BY MS. LOEFFLER:

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 747  Filed 09/23/14  Page 53 of 151
(720) 384-8078  attrans@sbcglobal.net

**SANFORD - REDIRECT/RECROSS**

1  Q   Mrs. Sanford -- and so just -- we're clear, you were not

2  on the island on April 12th.  Right?

3  A   Correct.

4  Q   Okay.  And did you ever interact with Mr. Wells at work,

5  at the COMMSTA rigger shop?

6  A   I did not.

7  Q   Thank you.  I have nothing further.

8          THE COURT:  Recross.

9                    **RECROSS EXAMINATION**

10  BY MR. CURTNER:

11  Q   Did Mr. Wells ever have a different appearance in -- since

12  you've known --

13          MS. LOEFFLER:  Objection, Your Honor.  Beyond the scope

14  of cross, recross, redirect.

15          MR. CURTNER:  I'll withdraw the question, Your Honor.

16          THE COURT:  Okay.  Thank you, ma'am.  You're done.

17          THE WITNESS:  Thank you.

18      (Witness excused)

19          THE COURT:  The government's next witness.

20          MR. SCHRODER:  Your Honor, the government calls Dr.

21  Richard Vorder Bruegge.

22          THE COURT:  Sir, that door pulls out, and just step

23  into the witness box.  And remain standing, and my clerk's

24  right over here.  She'll swear you in.

25      **RICHARD W. VORDER BRUEGGE, PLAINTIFF'S WITNESS, SWORN**

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 747   Filed 09/23/14   Page 54 of 151
(720) 384-8078   attrans@sbcglobal.net

**VORDER BRUEGGE - DIRECT**

1    THE CLERK:  Okay, thank you.  Please have a seat.

2    THE WITNESS:  Thank you.

3    THE CLERK:  And, sir, if you can please state and spell

4  your full name.

5    THE WITNESS:  My name is Richard, middle initial W,

6  last name Vorder Bruegge.  It's two words.  First word Vorder,

7  is spelled capital V, as in Victor, o-r, d, as in Delta, e-r.

8  Second word Bruegge is spelled capital B, as in Baker, r-u-e-g-

9  g-e.

10    THE CLERK:  And Richard is common spelling?

11    THE WITNESS:  Richard is common spelling.

12    THE CLERK:  Thank you.

13    THE COURT:  All right, counsel.

14                **DIRECT EXAMINATION**

15  BY MR. SCHRODER:

16  Q   Dr. Vorder Bruegge, where do you work?

17  A   I work for the Federal Bureau of Investigation in

18  Quantico, Virginia.  I am located within the Forensic Audio,

19  Video and Image Analysis Unit at the Digital Evidence

20  Laboratory, within the Technol -- Technical -- we just changed

21  our section name and I -- Technical Analysis and Support

22  Branch.

23  Q   And how -- what was the previous name?

24  A   The previous name -- we didn't have branches.

25  Q   How long -- now, how long have you been conducting

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 747   Filed 09/23/14   Page 55 of 151
(720) 384-8078   attrans@sbcglobal.net

1 forensic examinations of photographs and videos?

2 A    It'll be 20 years in January.

3 Q    All right.  And what's your educational background?

4 A    I have a bachelor of science degree in engineering from

5 Brown University in Providence, Rhode Island.  I also have a

6 master of science and a Ph.D. in geological science, all from

7 Brown University.

8 Q    And where did you work before you worked for the FBI?

9 A    I worked for a company called Science Applications

10 International Corporation.  It's what we refer to as a beltway

11 bandit in the D.C. area.  I provided support to NASA and to the

12 Department of Defense.

13 Q    Okay.  And how long have you been working for the FBI?

14 A    It will be 20 years in January.

15 Q    Okay.  And could you briefly explain what sort of

16 specialized training in photograph, video, and image analysis

17 that you were -- received as part of your job in the FBI?

18 A    When I joined the FBI, I was enrolled in a program of

19 photography and video that provided information about how

20 photography works, the basics of video processing.  It also

21 involved courses in actually tours of location where clothing

22 is made, because we do a lot of clothing analysis.  It also

23 involved a lot of image processing work, how video works and

24 how to enhance imagery to get more detail out of images.

25 Q    And are you a member of any professional associations?

1  A    Yes, I am.

2  Q    Which ones?

3  A    I am a fellow of the American Academy of Forensic

4  Sciences.  I'm also a member of the International Association

5  for Identification.  I am a member of a organization called the

6  SPIE.  SPIE is a French acronym that basically -- translate as

7  the Society for Photographic Instrumentation and Engineering.

8  I'm also a member of the I triple E, which is the Institute of

9  Electrical and Electronics Engineers.

10  Q    And have you published any papers in conjunction with your

11  position as an examiner?

12  A    Yes, I have.

13  Q    And could you give us an example or examples?

14  A    In the late '90s I published a paper on photographic

15  comparison of blue jeans from surveillance video.  I've also

16  published papers related to biometric processing of facial

17  images.

18  Q    And what sort of forensic examinations are conducted in an

19  image an -- kind of an image analysis in your lab?

20  A    There are four basic types of examinations conducted in

21  the Forensic Audio, Video, and Image Analysis Unit.  The first

22  is enhancement, image enhancement or video enhancement.  The

23  second is photographic comparison.  This can involve looking at

24  what we refer to as a questioned object or person in something

25  like a surveillance image, with either the actual person and

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 747  Filed 09/23/14  Page 57 of 151
(720) 384-8078  attrans@sbcglobal.net

1   object or photographs of that person or object.

2       The next type is photogrammetric examinations, and

3   "photogrammetry" is spelled p-h-o-t-o-g-r-a-m-m-e-t-r-y.

4   Photogrammetry is a -- a -- determining measurements from

5   photographs.

6       The last type of examination that we conduct is

7   authentication examinations or manipulation detection,

8   determine if an image has been forged or if there's a computer-

9   generated element to it or if it's been altered in some way.

10  Q   Now, have you been qualified as an expert in forensic

11  image analysis and video analysis examinations in federal,

12  state, and international courts?

13  A   Yes, I have.

14  Q   And how many?

15  A   More than 40.

16  Q   All right.

17      MR. SCHRODER:  Your Honor, the government offers Dr.

18  Vorder Bruegge as an expert in forensic image analysis and

19  video analysis.

20      MR. OFFENBECHER:  No objection, Your Honor.

21      THE COURT:  He'll be received in that capacity.

22  BY MR. SCHRODER:

23  Q   Now, Dr. Vorder Bruegge, were you provided with recorded

24  images to analyze in this case?

25  A   Yes, I was.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 747  Filed 09/23/14  Page 58 of 151
(720) 384-8078  attrans@sbcglobal.net

1  Q    And what were you provided?

2  A    I was provided with a hard drive that contained video

3  files that depicted the camera view that showed a outdoor

4  scene.

5  Q    Okay.  And for what dates?

6  A    The dates of the images included April 12th, 2012, as well

7  as April 19th and April 20th.

8  Q    And what were you requested to do with these items?

9  A    I was told that there was a questioned vehicle that passed

10  on April 12th around 7 in the morning, proceeding from left to

11  right and then from right to left.  And I was asked to compare

12  that questioned vehicle or those two sequences of questioned

13  vehicle with images of a known vehicle that were recorded on

14  the 19th and 20th, to determine if I could say anything about

15  whether the questioned vehicle and the known vehicle could be

16  the same vehicle or whether they could be eliminated as not

17  being the same vehicle.

18  Q    And does that include working to determine dimensions?

19  A    Yes, it does.

20  Q    And did you -- how do you determine dimensions in a

21  situation like that?

22  A    Well, this is where photogrammetry comes in.  There are

23  two basic ways to perform a photogrammetric examination.  One

24  involves what we refer to as an analytical approach.  The

25  analytical approach basically involves taking information about

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 747  Filed 09/23/14  Page 59 of 151
(720) 384-8078  attrans@sbcglobal.net

1    the camera, things about the lens, the focal length of the

2    lens, the type of camera that's being used, as well as

3    information about the scene itself:  How far away from the

4    camera is the object that you're interested in measuring; are

5    there any known scale measurements within the scene that you

6    can use for reference when you're determining information about

7    that.

8         The second way is using a technique that's called reverse-

9    projection photogrammetry.  Reverse-projection photogrammetry

10   takes out a lot of the complex math that's involved with

11   compensating for lens defects, in that it makes use of the

12   original camera that was used.  You're effectively in a

13   reverse-projection photogrammetry examination reconstructing

14   the scene and putting a scale object, such as a ruler or

15   another vehicle in this case, back into the scene to use that

16   as a scale.  Through reverse-projection photogrammetry, you

17   make sure that the camera, when you are going back at your

18   scale object, is pointing in the same place and is lined up in

19   the same way as the original recording.  So that once you put

20   that scale object back where the original object was, you can

21   determine whether it's the same size, whether it's longer,

22   whether it's shorter, whether it's taller, and so on.

23   Q    Now, as part of that analysis, have you prepared an

24   exhibit to help you explain your process?

25   A    Yes, I have.

1  Q    And what was that composed of?  What type of presentation?

2  A    I prepared a PowerPoint exhibit that includes multiple

3  images from my examination.

4         MR. SCHRODER:  Your Honor, the government offers Dr.

5  Vorder Bruegge's PowerPoint presentation as a demonstrative

6  exhibit, Exhibit 129.  And I'm going to give Dr. Vorder Bruegge

7  the controller so he can --

8         THE COURT:  So I don't know what you mean when you say

9  as a demonstrative exhibit.  Is it -- you want it admitted

10  or --

11         MR. SCHRODER:  Well, I -- I'd be happy -- there are

12  certain parts of it I'm going to want to admit, Your Honor.

13         THE COURT:  Okay.

14         MR. SCHRODER:  If the defense has no objection, I'd be

15  happy to admit the whole thing.

16         THE COURT:  Well, for now it can be received as a

17  demonstrative exhibit.

18         THE WITNESS:  Thank you.

19      (Side conversation)

20  BY MR. SCHRODER:

21  Q    Now, what's the first slide?  What -- what's that

22  information?

23  A    The first slide merely corresponds to administrative

24  information regarding the case number.  The top character is

25  70A-AN-15667.  Corresponds to the FBI case file number in this

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 747  Filed 09/23/14  Page 61 of 151
(720) 384-8078  attrans@sbcglobal.net

1  case.  The lower series of characters, 12-12-13-256-HD, refer

2  to the laboratory request for examination under which I did

3  this work.

4  Q    All right.  Moving to the next slide.  Let's see -- all

5  right.  And there's that term you used, "reverse-projection

6  photogrammetry."

7  A    Yes.  I'm basically titling what this exhibit is going to

8  demonstrate, the first part of this exhibit, the dimensional

9  analysis.

10  Q    All right.  Now if you can go to the next slide.

11  A    There we go.

12  Q    This -- you talk about -- your title slide here talks

13  about "questioned vehicle."  And that brings up a point -- I

14  think you've kind of touched on that.  But what is a questioned

15  vehicle?

16  A    Yes.  I -- I mentioned earlier the process of conducting a

17  photographic comparison.  In the laboratory, when we get a

18  questioned specimen such as a surveillance videotape, there may

19  be people or objects contained therein that we don't know

20  about.  And so they are questioned.  They are the unknown, if

21  you will.  When we have a known object or vehicle, we refer to

22  it as a known.  And so this title slide merely reflects the

23  fact that the next series of images that are going to be shown

24  depict the questioned vehicle in this case as it moves from

25  left to right across the screen.

**VORDER BRUEGGE - DIRECT**

1  Q   So now if you could -- what was the date and time of the

2  initial -- the images in this slide you're going to go through

3  first?

4  A   Yes.  So -- so as it says in the title slide, it's -- this

5  is the video from April 12th, 2012, at around 7:09 a.m.

6  Q   So if you could walk us through this series.

7  A   Okay.  So this is the first full-frame image of this video

8  sequence.  And the questioned vehicle is a small feature in the

9  upper left-hand corner.  There are two vehicles that you can

10  see on the -- pretty easily on the far left-hand side.  The

11  questioned vehicle in this case is immediately above those, and

12  it has just started to enter the frame.

13  Q   And I think you --

14  A   So then I proceed to the --

15  Q   I think you have a button on there too that's also a laser

16  pointer, if you want to do that.

17  A   Okay.

18  Q   I see it.  You're just a little high.

19  A   Yeah.

20  Q   Maybe --

21  A   Yeah.

22  Q   There's another laser pointer up there too, so maybe that

23  one --

24  A   That one might be better.

25  Q   Yeah.

**VORDER BRUEGGE - DIRECT**

1   A    Okay.  That --

2           MS. LOEFFLER:  There we go.

3           THE WITNESS:  There we go.  Okay, so we're looking at

4   the area right in here.  And we will watch as the vehicle moves

5   from left to right, across this scene, to behind this building.

6   So then I move to the next frame.  And you can see the

7   movement.  And then the next frame.  And the next frame.  And

8   the next frame.  And the vehicle is out.

9   BY MR. SCHRODER:

10  Q    Now, this same thing that you -- you talk about "enlarged

11  area of interest."  What does that mean?

12  A    Yes.  So everything else outside of where the vehicle is

13  is not really of interest at this time in the examination.

14  We're interested in the vehicle.  So I'm merely showing in the

15  next series of slides, as indicated in the title slide here,

16  that I'm enlarging the area of interest, so that you can see it

17  more clearly.

18  Q    Okay.  And if you could walk us through this series.

19  A    So here we have the same area that we were looking at.

20  Again, we're looking on the left-hand side here at where the

21  vehicle first comes into place.  Now, as you review the video,

22  it's possible to see how the vehicle moves across, and you can

23  tell that there is a vehicle moving across because you compare

24  the frame before and there's nothing there.  So as I move ahead

25  and show you the movement of the vehicle.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 747  Filed 09/23/14  Page 64 of 151
(720) 384-8078  attrans@sbcglobal.net

1  Q    All right.  Now, for purposes of comparison, did you

2  compare all five of those frames?

3  A    Yes, I did.

4  Q    And -- but for when you're doing the comparison coming up,

5  your actual -- I don't know what you call -- matching -- did

6  you use one particular frame?

7  A    Yeah.  For -- for this demonstration, I'm only going to

8  show you the one frame that best depicts the comparison for

9  both the overall profile of the vehicle as well as the

10  dimensions of the vehicle.

11  Q    And which inbound frame was that?

12  A    That is the next one that I'm going to be showing you.

13  Q    Okay.  Please do.

14  A    So, again, in the interest of letting you know you're

15  seeing everything I saw, this shows the full-frame image, and

16  you can pretty clearly see the vehicle there now that you're

17  accustomed to looking at this area.

18  Q    And did you enlarge that as well?

19  A    I did.  So now this frame, this title slide, is marked

20  "questioned vehicle," and it indicates "cropped and enlarged to

21  ALI area of interest."

22  Q    Okay.  All right, go ahead and show us that.

23  A    So there we have the vehicle.

24  Q    All right.  Now, when we discussed this in advance, you

25      used a term about this level of enlargement.  You -- you'd

1    refer to it as "noiser."  What does that mean?

2  A    Yes.  So image processing today is a -- is done on

3  computers and it's -- involves a lot of electrical processing

4  techniques.  And a lot of the processing techniques that are

5  used for image processing have come out of processing

6  techniques used for enhancement of things like audio signals.

7  So sometimes you get a -- the terminology is shared between

8  audio and video and images.  And so we talk about there being

9  noise in a picture.  You can think about it being the blur in

10  an image, or if you have a -- a grainy video image, you see a

11  lot of speckle.  That is referred to as noise.

12    Noise basically is artifacts that occur in images, and

13  those artifacts can occur through a variety of reasons.  It can

14  just be electric signal noise that -- it's not a perfect

15  signal.  It can also be that you're at the limit of resolution.

16  When you're looking at something that's very far away, you can

17  get atmospheric features that cause there to be reflections or

18  blurring in a scene.

19    We've all seen, driving down the highway on a hot day, it

20  appears as though the -- there's waves coming up from the --

21  from the road surface.  That sort of interference causes noise

22  in the signal.  It's not really there, but you're visually

23  seeing it.

24    So another artifact that is going to cause noise in a

25  video signal like this is the way that it's recorded, using

1  what we refer to as compression.  Compression is the way of

2  making a -- a digital signal smaller.  We're all familiar with

3  our digital camera images being jpgs.  That's a type of

4  compression that causes noise and defects in the visible --

5  visible quality of an image.

6  Q    Now, what is your next sequence?

7  A    My next sequence -- now that I've shown you the questioned

8  vehicle that I'm going to be comparing, my next sequence shows

9  the known vehicle that was driven by the scene from left to

10  right on April 19th.

11  Q    Okay.  If you can go to the next slide.  Now, what was the

12  date and time there?

13  A    This is April 19th, 2012, at 3:23 p.m.

14  Q    Now, you mentioned earlier that you also received some

15  video from the 20th of April.  And did you look at that?

16  A    Yes, I did.

17  Q    And why did you decide to compare the video from the 19th

18  instead of the video from the 20th?

19  A    Well, I actually compared all of the video.  I'm

20  demonstrating the 19th because another factor that comes into

21  play when conducting a comparison like this is lighting

22  conditions.  Lighting conditions, particularly outdoor lighting

23  conditions, have a significant effect on what things look like.

24  If you have -- under ideal circumstances, you would like to

25  have as much as the scene be exactly the same as possible,

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 747  Filed 09/23/14  Page 67 of 151
(720) 384-8078  attrans@sbcglobal.net

**VORDER BRUEGGE - DIRECT**

1  particularly when you're dealing with something that's at the

2  extreme range of your visibility.

3      One example of how lighting conditions can affect the

4  clarity or the appearance of something is that objects in

5  nature reflect light differently depending on the light that's

6  coming at them.  A bright, sunny day, objects are going to look

7  different than when it's a cloudy day, because you have this

8  strong light source, and it may be a very strong, bright

9  sunlight, versus the kind of gray light that you get from an

10  overcast day.

11  Q   So do you take all that into account when you're doing

12  your analysis?

13  A   Yes, I do.

14  Q   All right.  And why did you choose to demonstrate -- you

15  said you looked at both days.  Why did you -- in your

16  presentation here, why'd you choose the 19th?

17  A   The lighting in -- on April 19th more closely approximates

18  the lighting of April 12th, whereas the April 20th video was

19  recorded in bright sunlight.  And so the April 19th video more

20  accurately allows for a one-to-one comparison of the

21  conditions.

22  Q   Okay.  Now, for the purpose of the presentation here, did

23  you streamline the selection of the known vehicle --

24  A   Yes, rather --

25  Q   -- a bit?

**VORDER BRUEGGE - DIRECT**

1  A   -- than show all of the frames that were recorded on April

2  19th, I've just selected the one image that I'm going to show

3  for this demonstration.

4  Q   Okay.  Please continue.

5  A   So in this case you see the vehicle -- this is the known

6  Honda CR-V in the upper left-hand corner.  You'll notice the

7  same objects in the foreground, the fence -- the fences up

8  front, the building in the back, the bay behind the vehicles.

9  You will note, however, there isn't as much snow in the

10 background in this frame.

11 Q   Now if you could go to your next slides.

12 A   So this title slide indicates that I'm going to show you

13 the cropped and enlarged area of interest for this known Honda

14 CR-V.  And that's what we're looking at in this image.

15 Q   All right.  Now moving on to your next set of slides.

16 What is the -- now you talk about -- this is the overlay

17 comparison.  What is -- what does "document alignment of

18 cameras" mean?

19 A   So I -- I mentioned earlier that in this reverse-

20 projection photogrammetry approach, you want to be sure --

21 you're basically reconstructing the event that you were

22 interested in measuring.  You want to make sure that the camera

23 is pointed at the same place, so that all the features -- the

24 fixed objects in the scene line up.  And so the next few

25 slides -- what I'm going to be showing you is that the features

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 747   Filed 09/23/14   Page 69 of 151
(720) 384-8078   attrans@sbcglobal.net

1 line up.  So I've basically validated that the camera is

2 effectively in the same position, so that when I put my scale

3 into the scene I don't have to worry about there being some

4 offset affected with this -- with the camera not being

5 correctly aligned.

6 Q    And could you demonstrate that, please?

7 A    Yes.  So this is the original video.  You'll notice the

8 snow on the ground.  This is from the April 12th.  And the next

9 frame is going to show you the April 19th video image.  What

10 you want to look at is the fixed objects in the scene,

11 including the fence, the building in the background, even the

12 hydrant on the right-hand side of the image.  And I'm going to

13 flick back and forth between these, and it's best to focus on a

14 particular object and see the alignment as I do that.  It's

15 particularly important in the background where the vehicle of

16 interest is.  And you can even look at the trees in the

17 background and you see that the trees in the background and

18 even the bay in the back, features are lined up.

19 Q    Now, once you have them -- the scene aligned, what do you

20 do then?

21 A    Well, now I'm -- this series -- as this title slide

22 indicates, I'm just going to show you that alignment with the

23 cropped and enlarged area of interest as well.

24 Q    You know, Dr. Vorder Bruegge, before we do that, could we

25 go back one slide?  I want to ask you a question about that

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 747  Filed 09/23/14  Page 70 of 151
(720) 384-8078  attrans@sbcglobal.net

1  slide.  Now, if you look to the far right and along the top,

2  there appears to be an edge.

3  A    Yes.

4  Q    And what does that indicate to you?  What does --

5  A    Yes.

6  Q    What -- how is that part of the process?

7  A    So -- so the edge that you see -- and, actually, it's

8  pretty obvious if I flick back and forth, so I'm going to go

9  back one more, and you will see that as I go back.  You see

10  that it's kind of greenish tint versus blueish.  That reflects

11  the different lighting conditions, where with this greenish

12  tint reflects more green in the scene and brown.

13      The edge that you're seeing represents -- there isn't a --

14  a precise alignment of the camera.  It's slightly shifted on

15  the 19th to the left a little bit.  But in this case it's

16  insignificant in the analysis.

17  Q    But you're still able to align the key objects in the

18  frame?

19  A    That's correct.  It's because those objects are so far

20  away that this slight offset is insignificant.

21  Q    Okay.  So go ahead.

22  A    So now we have the image -- the cropped and enlarged

23  image.  This is the questioned vehicle from April 12.  And then

24  we have the known vehicle on the 19th.  And if you look

25  closely, for example, at the roof line, you'll see a -- a

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 747   Filed 09/23/14   Page 71 of 151
(720) 384-8078   attrans@sbcglobal.net

1  little shift up and down.  And that's associated with the

2  video-recording process in which video is laid down in lines,

3  and the -- the technical term is called interlacing, where

4  video is recorded as a series of lines that actually -- if

5  you -- there's a -- 640 of them.  And -- I'm sorry, there's 480

6  lines.  Two hundred and forty are laid down first as numbers 1,

7  3, 5 -- odd numbers, and then they're laid down as 2, 4, 6.

8  Video recorders save space by only recording half of the lines

9  in a single image.  And so you get this offset sometimes if

10  you've got an odd frame and an even frame.

11  Q    Now --

12  A    Oh --

13  Q    -- once you've -- once you have the vehicles aligned, were

14  you able to do a more quantitative size comparison?

15  A    Yes, I was.

16  Q    And how do you do that?

17  A    Well, this image that you're looking at on the screen

18  right now is the known vehicle, the 2001 Honda CR-V.  I know

19  from manufacturers' specifications that are available online

20  what the length of that vehicle is.  So I have my known vehicle

21  and I can say I know what this vehicle's length is, so I can

22  say that's what this vehicle's length is.  And then when I can

23  compare that length to the questioned vehicle's length.

24  Q    And how does that involve -- I think a lot of jurors have

25  probably heard of the concept of pixels.  Does that involve you

1  dealing with pixels?  And could you explain what a pixel is and
2  how that works?
3  A    Yes.  So -- so digital images, video is recorded in a grid
4  of pixels.  I mentioned earlier the 480 lines actually
5  represents 480 lines of pixels.  There are 640 of those across
6  a video scene in the old-style video that this is, not HD.  HD,
7  it goes out beyond 1,000 pixels in -- in width, which is why
8  you can get such high resolution.

9      But pixels basically break the image down into little
10 squares, and it's like looking at a -- at a scene through a
11 screen.  And every one of those holes in the screen can have
12 one color and one brightness.  Okay, so in a -- and this is
13 another reason for why there is a -- the edge of resolution
14 that we're dealing with.

15     If you've got a pixel that in the scene matches up to a --
16 an edge, if you will, where half of the pixel represents
17 something like the car and half of the pixel represents the
18 snow behind it, then you may have a dark -- you -- you're
19 combining a dark car piece with a bright snow background piece,
20 and you're going to get a blurred edge, because that pixel can
21 only be one color.  And so it's got to figure out, is it -- is
22 it dark, is it light, is it something in between.  And that
23 introduces the noise.

24     So in this case, I can go back to that original image
25 that's only 640 pixels across, and I can go down and see where

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 747  Filed 09/23/14  Page 73 of 151
(720) 384-8078  attrans@sbcglobal.net

**VORDER BRUEGGE - DIRECT**

1    the edge of the vehicle is and where those blurred edges are,

2    and measure the length of the vehicle in pixels.  In this case,

3    this vehicle, this known Honda CR-V at that location, is 37

4    pixels across.  And knowing the overall length of the vehicle,

5    I can figure out how big a pixel is in terms of its -- its true

6    size at the location of that vehicle by simply dividing the

7    length of that vehicle by 37 pixels.  And then I know how big

8    each pixel is.

9    Q    Now, is there an error rate to that?

10   A    Well, that's -- that's part of the -- that introduces the

11   error rate, or the uncertainty in the calculation.  I can't see

12   anything inside a pixel, okay.  That pixel resolution defines

13   how accurately I can measure something.  And in the case of

14   measuring a length, I've got to measure something at the front

15   and I've got to measure something at the back.  So I've got two

16   pixels, and so each of those pixels adds an uncertainty to

17   the -- to the measurement.

18   Q    And so what's the -- what is your error rate?

19   A    So in this case I've got a -- a length error of plus or

20   minus 10 inches.  The pixels actually are about 4.7 inches

21   apiece at this location.  But in order to be conservative,

22   round up to 5, so plus or minus 10 inches is 5 inches on the

23   front and 5 inches on the back.  When we're talking about the

24   height of the vehicle, I know that the road surface is fixed,

25   so, you know, the vehicle can't slide down underneath the road

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 747   Filed 09/23/14   Page 74 of 151
(720) 384-8078   attrans@sbcglobal.net

1  surface.  So I've got the top pixel for the height of the

2  vehicle, so that's a error -- uncertainty of plus or minus five

3  inches.

4  Q    So could you show us how you've indicated that on your

5  presentation?

6  A    So in the next slide, I simply indicate I've got the known

7  length of the vehicle, which is approximately 177.60 inches.

8  And that's over 37 pixels.

9  Q    And now show us how that projects or how you line that up

10  on the next slide.

11  A    So the next slide, I have the known -- the questioned

12  vehicle as it passes through, and that shows the position of

13  the vehicle in approximately the same place.

14  Q    So how did the images compare?

15  A    To the degree that you can detect the overall shape and

16  size of this questioned vehicle, it corresponds to the known

17  vehicle in terms of the shape and size in the length, the

18  overall length, the height, and the general profile of the

19  vehicle.

20  Q    So in the last two slides, which I believe are 29 and 30,

21  do they accurately reflect the video images as you've analyzed

22  them?

23  A    Yes, they do.

24  Q    And are they fair and accurate images from those videos?

25  A    Yes, they are.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1  Q   And does it also accurately annotate the lengths that

2  you've determined using the process of reverse-projection

3  photogrammetry that you described today?

4  A   Yes, it does.

5       MR. SCHRODER:  Your Honor, the government moves for

6  admission of slides 29 and 30, which have been separately

7  marked as Exhibits 130 and 131.

8       MR. OFFENBECHER:  No objection, Your Honor.

9       THE COURT:  It'll be received.

10      (Plaintiff's Exhibits 130 and 131 admitted)

11  BY MR. SCHRODER:

12  Q   and you talked about -- the -- this is a length

13  comparison.  Did you also do any other size comparison?

14  A   Yes, the height.

15  Q   And could you show us -- is that next in your

16  presentation?

17  A   Yes.  So here is the known vehicle with a known height of

18  approximately 65.9 inches.  And then showing the same marking

19  on the known -- the questioned vehicle from April 12th.

20  Q   And, again, these I believe are slides 31 and 32.  Again,

21  do they accurately reflect the video that you analyzed and are

22  they fair and accurate images of that video?

23  A   Yes, they are.

24  Q   And do they accurately annotate the heights you've

25  determined using reverse-projection photogrammetry?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 747   Filed 09/23/14   Page 76 of 151
(720) 384-8078   attrans@sbcglobal.net

1  A    Yes, they do.

2         MR. SCHRODER:  Your Honor, the government moves for

3  admission of slides 31 and 32, which have been separately

4  marked as Exhibits 132 and 133.

5         THE COURT:  Hearing no object --

6         MR. OFFENBECHER:  No objection, Your Honor.

7         THE COURT:  They'll --

8         MR. OFFENBECHER:  Yeah.

9         THE COURT:  They'll be received.

10        (Plaintiff's Exhibits 132 and 133 admitted)

11        MR. OFFENBECHER:  No objection.

12 BY MR. SCHRODER:

13 Q    Oh, yeah.  And let's make that -- that's a good point.  In

14 this -- the shot of the questioned vehicle, are we seeing the

15 entire vehicle in that shot, from your analysis?

16 A    We are not seeing the bottom of the vehicle.

17 Q    And why is that?

18 A    It is obscured behind the vehicles in the foreground.

19 Q    Okay.  Now, what did you -- after you did that analysis,

20 what'd you do next?

21 A    I also prepared slides to show the side-by-side

22 comparison, base --

23 Q    And if you could -- please go ahead and show us those.

24 A    So, again, we start with the questioned -- oh, forgive me.

25 This is -- actually, this shows the vehicle going from right to

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 747   Filed 09/23/14   Page 77 of 151
(720) 384-8078   attrans@sbcglobal.net

1  left.

2  Q    Ah, so --

3  A    7:14 a.m.

4  Q    Okay.  So you did another set of comparisons for the

5  vehicles going the other direction?

6  A    That is correct.

7  Q    All right.  Please go ahead and show us those.

8  A    So in this case we have the questioned vehicle.  Rather

9  than show you every single frame as I did in the previous left

10  to right, I'm only showing you the one that I'm using for this

11  comparison.

12  Q    Okay.  And go ahead and show us the enlarged version.

13  A    So this -- as indicated, this is the cropped and enlarged

14  view of the vehicle proceeding from right to left.  And then as

15  in the previous demonstration, I proceed to show the known

16  vehicle as it moves from right to left.

17  Q    Okay.  Go ahead and show us that.

18  A    This one is at 3:21 p.m. on April 19th.  And as before,

19  cropped and enlarged to show the known vehicle.  And then,

20  again, the overlay comparison to show the vehicle going from

21  right to left.  The comparison of the questioned and known.  We

22  start with the questioned vehicle, and we have the known

23  vehicle.

24  Q    Could you go -- do that a couple of times?  That's hard to

25  see just going once.  Okay.  Thank you.  And now, what was your

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 747  Filed 09/23/14  Page 78 of 151
(720) 384-8078  attrans@sbcglobal.net

1   final point of comparison?

2   A    The final point of comparison is the side-by-side

3   comparison analysis of the questioned and known vehicles.  And

4   this, again, in the interest of showing the process, shows the

5   questioned vehicle first as it went from left to right.  Then

6   we move on to the known vehicle as it moved from left to right.

7   And finally we have the side-by-side comparison of the

8   questioned vehicle on the left from April 12th and the known

9   vehicle from April 19th on the right.

10  Q    And does -- what I believe, slide 49 -- accurately reflect

11  the video you analyzed?

12  A    Yes.

13  Q    And is it a fair and accurate comparison -- a fair and

14  accurate reflection of those videos?

15  A    Yes, it is.

16        MR. SCHRODER:  Your Honor, the government moves for

17  admission of slide 49, which has been separately marked as

18  Exhibit 134.

19        MR. OFFENBECHER:  No objection.

20        THE COURT:  It will be received.

21     (Plaintiff's Exhibit 134 admitted)

22        MR. SCHRODER:  Your Honor, we have no further

23  questions.

24        THE COURT:  It's about break time.  Do you want to take

25  the break or you --

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 747   Filed 09/23/14   Page 79 of 151
(720) 384-8078   attrans@sbcglobal.net

1       MR. OFFENBECHER:  Yeah, I think that's probably a good

2   idea.

3       THE COURT:  Okay.  We'll take a 15-minute recess and

4   come back in 15 minutes for cross-examination.

5       (Jury not present)

6       THE COURT:  Okay, 15 minutes.

7       THE CLERK:  All rise.  Matter stands in a 15-minute

8   recess.

9       (Court recessed at 10:09 a.m., until 10:31 a.m.)

10      (Jury not present)

11      THE CLERK:  His Honor the Court, the United States

12  District Court is again in session.  Please be seated.

13      THE COURT:  Okay.  The jury should be on their way.

14      (Jury present)

15      THE COURT:  Okay, please be seated.  And cross-

16  examination.

17      MR. OFFENBECHER:  Thank you, Your Honor.

18                    **CROSS-EXAMINATION**

19  BY MR. OFFENBECHER:

20  Q   Dr. Vorder Bruegge, good morning.

21  A   Good morning.

22  Q   You indicated in your direct examination that the -- you

23  have a number of different things that you do in the laboratory

24  that you're working on.  Is that right?

25  A   Yes, sir.

1  Q    And one of those is a photo enhancement and comparison.

2  Is that right?

3  A    That is correct.

4  Q    And by photo enhancement and comparison, you attempt to

5  digitally enhance the video or still images that you obtain.

6  Is that right?

7  A    Yes, sir.

8  Q    And then you try to compare the -- those images with other

9  images to determine whether you can identify a particular

10  questioned photograph.  Is that right?

11  A    Or -- or an object in the photograph, yes.

12  Q    Exactly.  So if you get an object in a photograph, you

13  want, if possible, to be able to identify it to some other

14  known object?

15  A    That is correct.

16  Q    And by that way, you help solve crimes.  Is that right?

17  A    Yes, sir.

18  Q    All right.  And the other thing that you do is

19  photogrammetry.  Is that right?

20  A    Yes, sir.

21  Q    And that's a way of, with the photographs, measuring items

22  that -- objects that appear in a photograph or a video.

23  A    That is --

24  Q    Isn't that right?

25  A    That is correct.

1 Q    And then you also indicate that you do authentication.

2 That is, determine whether a photograph has been fooled with or

3 has been forged or something like that.  Is that right?

4 A    That is correct.

5 Q    Is it fair to say that in this case you were asked to do

6 and you did do the first of those, but not the last?

7 A    The first two of those, yes, sir.

8 Q    Okay.

9 A    The comparison and the photogrammetry, yes.

10 Q    So you did the photo enhancement and comparison and

11 photogrammetry, but not the third one.  Is that right?

12 A    That is -- that is correct.

13 Q    And to perform your work here, you were provided some

14 questioned video footage.  Is that right?

15 A    That is correct.

16 Q    And, well, there was something -- video footage on April

17 12th at 7:09 of a vehicle going from left to right through the

18 frame.  Is that right?

19 A    That is correct.

20 Q    And then you were also provided another video that -- of a

21 vehicle going from right to left at -- on the same day, April

22 12th, but at 7:14?

23 A    That is correct.

24 Q    And then you were also provided a number of different

25 video clips of vehicles on April 19th and April 20th, making

1  several passes from left to right and several passes from right

2  to left.  Is that right?

3  A    That is correct.

4  Q    And then you chose some of the passages or some of the

5  video clips from the April 19th and 20th that you thought best

6  illustrated your point.  Is that right?

7  A    I chose the images that were most conducive for an

8  accurate comparison.

9  Q    Sure.  Sure.  Exactly.  So you wanted the ones that

10  would -- you could compare the best because they had the

11  clearest picture of the known vehicle.  Is that right?

12  A    That is correct.

13  Q    I mean, you didn't pick the blurriest one, right?

14  A    No.

15  Q    And you know that the passes were made at different

16  speeds.  Right?

17  A    I don't know that -- the specific speeds.

18  Q    Okay.  Did it appear that in some of the passes the

19  vehicles were going faster than other times?

20  A    Yes.

21  Q    And is it fair to say that the ones you selected were the

22  ones that were going at the slower speed, so you get a clear

23  picture of the known vehicle?

24  A    I can't say that I did or did not select specific speeds

25  for any particular -- for that reason, no.

Case 3:13-cr-00008-SLG  Document 747  Filed 09/23/14  Page 83 of 151

**VONDER BRUEGGE - CROSS**

1   Q    So you just picked the ones that had the clearest picture

2   of the known vehicle for the comparison?

3   A    What I tried to do was to find pictures of the known

4   vehicle where the known vehicle appeared in a location that

5   corresponded to an image of the questioned vehicle.  So the --

6   the clarity, although a factor certainly in the analysis for me

7   to conduct a photogrammetric examination, I was most interested

8   in obtaining pictures where the vehicle was in the same place,

9   so that I could make that measurement accurately.

10  Q    So for the measurement piece of this, you wanted to have

11  the cars -- you know, you had the two questioned videos and you

12  wanted to pick some videos from the known ones where the car

13  would be in -- as close to the same spot in -- on the road

14  there, so that you could do the best possible job you could

15  with the measuring of the vehicles?

16  A    That is correct.

17  Q    And when the -- this was originally tasked to you by the

18  FBI -- by the way, you've -- you created a report as a result

19  of your work here, didn't you?

20  A    That is correct.

21  Q    And you submitted that to the -- was an official FBI

22  report that was reviewed by your peers and so forth.  Is that

23  right?

24  A    That is correct.

25  Q    And you submitted that to the FBI and to the U.S.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 747   Filed 09/23/14   Page 84 of 151
(720) 384-8078   attrans@sbcglobal.net

1  Attorney's Office in this case.  Isn't that right?

2  A    It went back to the FBI office, that --

3  Q    Oh --

4  A    -- per our procedure.

5  Q    Okay.  Let me just make sure we're on the same page.  Can

6  you show G135 to the witness, please?

7        THE CLERK:  I'm sorry, that's Government Exhibit 135?

8        MR. OFFENBECHER:  Yes.

9        THE CLERK:  Thank you.

10 BY MR. OFFENBECHER:

11 Q    Let's take a quick look at that, and can you flip through

12 the pages for him?  Does this appear to you to be a -- take

13 your time looking through it -- but does this appear to you to

14 be the copy of the report you made?

15 A    Yes, it does.

16 Q    And this was made -- back to that page right there.  Your

17 report's dated February 14th of 2013.  Is that right?

18 A    That is correct.

19 Q    And this report is -- was made by you after you had

20 conducted the examinations that you've talked about here in

21 court today.  Is that right?

22 A    That is correct.

23 Q    And the report contains your opinions and conclusions

24 about your examination.  Right?

25 A    Yes, sir.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 747   Filed 09/23/14   Page 85 of 151
(720) 384-8078   attrans@sbcglobal.net

1  Q    It includes your summary of your examination.  Is that
2  right?

3  A    Yes, sir.

4  Q    And the details of your examination here?

5  A    Yes, sir.

6  Q    All right, you can take that down.  Now, Dr. Vorder
7  Bruegge, you also work with a gentleman named Chris Iber.  Is
8  that right?

9  A    That is correct.

10 Q    Does he work in the same space with you?

11 A    Yes, he does.

12 Q    Does he do the same kind of work as you do?

13 A    He does the same type of analyses that I do, yes.

14 Q    And do you consider him to be a reputable, valued
15 colleague there?

16 A    Absolutely.

17 Q    And also, do you know the -- a person by the name of
18 Gerald Richards?

19 A    Yes, I do.

20 Q    How do you know him?

21 A    Gerald Richard was -- is a former FBI agent.  He was
22 responsible for my training in some part.

23 Q    Okay.  And do you know him also as a person who works in
24 the same field that you do?

25 A    Yes.  I believe he continues to do image analysis

1   examinations as a private consultant now.

2   Q   And as a private consultant, do you consider him to be a

3   reputable and -- person in this field?

4   A   Yes.

5   Q   All right.  So let's go to your actual opinions and

6   conclusions in this case.  So when you were originally tasked

7   in this case, you were tasked to see whether you could -- you

8   were given the two videos, the left-to-right video and the

9   right-to-left video, right?  Right?

10  A   Yes, sir.

11  Q   Yeah, sorry.  I just -- we have to have it on the audio.

12  And your task was to see if you could determine if the known

13  vehicle, the April 19th and 20 vehicle, could be identified as

14  either of the questioned vehicles on April 12th.  Right?

15  A   That is correct.

16  Q   And so when you set about your task, your work here,

17  that's -- that was your goal, to see if you could identify the

18  known vehicle as either of those vehicles in the April 12th?

19  A    I believe I testified earlier that I was -- I compared

20  them to determine if I could say they were the same or whether

21  they were different.  Yes, sir.

22  Q   And your -- well, you were trying to see if you could

23  identify them exact -- you know, exactly, say if -- that one,

24  or one wasn't.  Right?

25  A    Whether they are the same or different.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 747   Filed 09/23/14   Page 87 of 151
(720) 384-8078   attrans@sbcglobal.net

1  Q    Okay.

2  A    Our -- we do not try to identify it for the purpose of

3  saying that's got to be it.  We are there as arbiters to

4  determine is it the -- is it the same one or is it a different

5  one.

6  Q    Exactly.

7  A    So I am not trying to prove that it is the same one.

8  Q    No, no, no, I didn't mean that at all.  I meant that you

9  were being totally, you know, fair about it, but it -- but if

10  it turned out that you could identify the vehicles, either of

11  those vehicles in the first two passes as being the known

12  vehicle, then you certainly would have done that.  Right?

13  A    Yes.

14  Q    And I'm not suggesting for a moment that you didn't do

15  that fairly or you were -- had some bias.  But that was the

16  task that you were about --

17  A    Yes, sir.

18  Q    -- to see how close of an identity you could -- that could

19  fairly be made?

20  A    That's correct.

21  Q    All right.  And your conclusion in this case, after

22  looking at all of the videos and the work that you've done

23  was -- is that it was not possible to identify or eliminate the

24  questioned vehicles as depicted -- that we've seen as being the

25  known 2001 Honda CR-V.  Right?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 747   Filed 09/23/14   Page 88 of 151
(720) 384-8078   attrans@sbcglobal.net

1  A    That is correct.

2  Q    So in doing your report here, you've indicated that you

3  examine the videos for certain class characteristics.  Is that

4  right?

5  A    That is correct.

6  Q    And when you speak of class characteristics, what are you

7  speaking of?

8  A    So when conducting a photographic comparison, we generally

9  look at class and individual identifying characteristics.

10  Class characteristics, as the name suggests, are those things

11  that put objects or people into classes.  So, for example, if

12  we're talking about a -- a comparison of people, we have the

13  classes of male and female.  We also have classes that may be

14  associated with hair color or with the shape of the face or

15  size.  The same thing applies to objects.  With vehicles, we

16  can talk about classes like sedans, pickup trucks, SUVs.  Those

17  are types of class characteristics that we -- that we might

18  look at.

19  Q    And when looking at class characteristics of automobiles,

20  in -- for example, in this case you would look, for example, at

21  the overall length of a vehicle.  Is that right?

22  A    That is correct.

23  Q    That's a class characteristic, isn't it?

24  A    Yes, sir.

25  Q    And the overall height of a vehicle, that would be a class

1  characteristic, wouldn't it?

2  A    Yes, sir.

3  Q    And if you were able to, you might also look at, for

4  example, the number and shape of the windows on an automobile.

5  Right?

6  A    That is correct.

7  Q    That would be a more specific class characteristic,

8  wouldn't it?

9  A    You could -- yes, you can -- with different classes you

10 can narrow things down, certainly.

11 Q    So there are some very general ones, like the size of the

12 car or the type of the car, right?

13 A    That is correct.

14 Q    And then there are more specific class characteristics,

15 like the shape of the windows, the shape of the headlights,

16 detail on the trim, the shape of the windshield, things like

17 that.  Isn't that right?

18 A    Yes, sir.

19 Q    And the more of those specific class characteristics that

20 you have, the more likely you are to be able to identify a

21 particular vehicle with the make and model and so forth.

22 Right?

23 A    That is correct.

24 Q    And if you have a suspect vehicle, where you actually know

25 the make and model, then you're more likely to be able to show

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 747   Filed 09/23/14   Page 90 of 151
(720) 384-8078   attrans@sbcglobal.net

1  some identity between those.  Is that right?

2  A    That is correct.

3  Q    Or more similarity.  Is that fair to say?

4  A    That is correct.

5  Q    And if that's what -- your goal, you would want more of

6  those class characteristics.  Right?

7  A    That is correct.

8  Q    Now, if a questioned vehicle and a suspect vehicle share

9  some general similar class characteristics, then that can point

10  you to a group of automobiles that could be considered as

11  possible matches for that.  Right?

12  A    That is correct.

13  Q    Now, in this case, the overall size is one of those

14  general class characteristics.  And the more specific class

15  characteristics that you have, the narrower you can make that

16  group of vehicles that this could be a part of.  Is that right?

17  A    Yes, sir.

18  Q    Now, there's also individualizing or unique

19  characteristics of a vehicle.  Isn't that right?

20  A    That is correct.

21  Q    Explain to the jury what you mean by that.

22  A    Well, individual identifying characteristics are those

23  that allow you to separate an object or a person from a class.

24  So, for example, going back to people, we could talk about

25  freckle patterns, moles, scars.  With automobiles, the ultimate

1  individual identifying characteristic is the vehicle
2  manufacturing number that's right on the dashboard or on the
3  door of your car.  A license plate is another individual
4  identifying characteristic that can be used, assuming the
5  license plate has not been transferred from one vehicle to
6  another.
7  Q    And in terms of just looking at a photograph, for example,
8  at the side of a vehicle, like, you know, you're doing in this
9  case, for example, if it had a big dent in the side of the
10 vehicle -- in the questioned vehicle and there was also a big
11 dent in exactly the same place and the same configuration on
12 the suspect vehicle, then that would be an individualizing or
13 unique characteristic that could help you do identity.  Right?
14 A    In -- in some cases, if you can see the details of the
15 dent.  I've worked enough vehicle cases to know that some
16 things that you may think are unique to your car may be
17 associated with manufacturing defects.  Some trim on some
18 minivans would peel off in the same place and it was a
19 manufacturing defect.  But if you were looking at a single
20 vehicle, you might think that was an individual identifying
21 characteristic.  So a large dent, if you can -- if you can see
22 the shape of it, you may be able to determine that it's more
23 individual than just a dent.
24 Q    Or like a big rust spot in a particular place on the
25 questioned vehicle, and you also found that on the known

1  vehicle, then that would help you narrow it down to perhaps

2  even being able to identify that as the questioned vehicle?

3  A   That is correct.

4  Q   Now, in your presentation here today -- can you bring up

5  Government's Exhibit 131, please?  Some of the slides in your

6  PowerPoint presentation included a little -- two -- an -- a

7  little arrow, line with an arrow on two -- both sides of it,

8  such as this one at Government's Exhibit Number 131.  Is that

9  right?

10  A   Yes, sir.

11  Q   And you also did this for the height in some of the slides

12  as well.  Is that right?

13  A   That is correct.

14  Q   And is fair to say that when -- what you're superimposing

15  is some writing and a little scale over the photograph.  Is

16  that right?

17  A   That is correct.

18  Q   You're not suggesting that you measured that particular

19  distance in this photograph, are you?

20  A   The distance in that photograph that the arrows indicate

21  is approximately 177.6 inches, yes.  So --

22  Q   And you got the 177.6 inches because you know from the

23  manufacturer's information that the 2001 Honda CR-V is two

24  thousand -- is that size, right?

25  A   That's correct.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 747  Filed 09/23/14  Page 93 of 151
(720) 384-8078  attrans@sbcglobal.net

1  Q    And that would be from the very front of the car to the

2  back of the car.  Is that right?

3  A    That's correct.

4  Q    And, now -- but you're not suggesting that you measured

5  the car that's here, you're just -- you've indicated -- could I

6  have the pointer, please -- that you have -- you've

7  superimposed a scale up there for everyone to look at and

8  determine for themselves whether they think this car -- how it

9  compares to the known length of 177.6 inches.  Right?

10  A    Well, no, I've -- in my report I have written that I

11  believe this is the dist -- the length of that vehicle and that

12  image, yes.

13  Q    Okay.  So the tolerance for -- you -- you've indicated

14  that you have a certain tolerance in your report for the

15  suspect, the questioned vehicle.  Is that right?

16  A    That is correct.

17  Q    And because of the limits of the -- both the photographs

18  and the process of photogrammetry, you're not able to tell with

19  any precision what the actual length of the questioned vehicle

20  is in either of the clips.  Is that fair to say?

21  A    No, it is not fair to say.

22  Q    Okay.  You've indicated that you can tell with -- within a

23  certain tolerance.  Is that a more accurate way to say that?

24  A    That is correct.

25  Q    So you're able to tell both with the left or right

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 747   Filed 09/23/14   Page 94 of 151
(720) 384-8078   attrans@sbcglobal.net

1  vehicle -- well, let's look at the left or right vehicle first.

2  You've indicated with respect to the left or right vehicle that

3  you can determine that it is a -- the -- this known length of

4  177.6 inches plus or minus 10 inches.  Is that right?

5  A    That is correct.

6  Q    That means there -- as far as you are able to determine

7  with all of your scientific analysis, that there is a 20-inch,

8  basically, range of cars that could fit there.  It could be

9  this size or it could be 10 inches smaller than this, which

10 would be 167 inches.  Right?

11 A    That is correct.

12 Q    Or it could be 10 inches larger than this, which would be

13 187 inches.  Is that right?

14 A    That is correct.

15 Q    So the car -- the length of the car that -- that's the

16 questioned vehicle in either of these could be anywhere from

17 167 inches long to 187 inches long.  Isn't that right?

18 A    That is correct.

19 Q    And there's one other complicating factor when you're just

20 looking straight on here.  And tell me if I'm right on this.

21 That you're not looking directly at a -- perpendicular to the

22 car.  Right?

23 A    That's correct.

24 Q    And so the image that you have, depending on which way the

25 car is going, is going to have a little bit of the back of the

1  car in the image if it's going -- if it's that oblique angle.

2  Right?

3  A    From left to right.

4  Q    From left to right, it's -- you're going to have a little

5  bit of the back of the vehicle there.  Right?

6  A    That is correct.

7  Q    And if you're going from right to left, you're going to

8  have a little bit of the front of the vehicle there.  Right?

9  A    That is correct.

10 Q    Because you're not really looking directly perpendicularly

11 at the end?

12 A    That's correct.

13 Q    So when you put your scale up here, you're really -- when

14 you're kind of looking about where this end is or this end is,

15 depending on which way you're going, you're actually also

16 measuring a little bit of the back of the vehicle or the front

17 of the vehicle.  Right?

18 A    That's correct.

19 Q    So merely putting the scale up here is a little bit

20 difficult to know if you're actually measuring from the very

21 front to the very back.

22 A    But the known vehicle is at the same angle.

23 Q    Right.

24 A    And so the scale applies.

25 Q    The scale applies to that vehicle as well?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 747  Filed 09/23/14  Page 96 of 151
(720) 384-8078  attrans@sbcglobal.net

1    A    And -- and both the -- since they are arranged in the same

2    way, the road -- going the same direction on the road.

3    Q    Right.  That's -- yeah, sure.  Understand.  So the -- in

4    this case, because of the limited resolution of the images, of

5    the questioned vehicles -- and you talked about limited

6    resolution before.  What did you mean by that?

7    A    The -- since each pixel is about five inches across,

8    that's a limited resolution.  We can't see at a high resolution

9    to where we can see individual details.  So it precludes our

10   ability to see things like those class characteristics of

11   number of windows, as you've said earlier, what type of hubcaps

12   there are, for example.

13   Q    So with respect to the two videos -- you have the video on

14   April 12th of going left to right.  Correct?

15   A    Yes.

16   Q    And there is insufficient detail on the photographs to

17   determine the make and model of that automobile.  Right?

18   A    That is correct.

19   Q    And then you have a separate video of a vehicle going from

20   right to left on April 12th.  Is that right?

21   A    That is correct.

22   Q    And that's at the time marked 7:14?

23   A    Yes, sir.

24   Q    And the first one is the time marked 7:09.  Is that right?

25   A    Yes, sir.

1  Q    And with respect to the 7:14, similarly, there is

2  insufficient detail on that photograph or that video sequence

3  to determine the make and model of that automobile.  Correct?

4  A    That is correct.

5  Q    So it's fair to say that there is no way to tell with

6  certainty if the questioned vehicle that's going from left to

7  right is the same questioned vehicle as the vehicle going from

8  right to left.  Is that right?

9  A    On the basis of photographic comparison, that is correct.

10 Q    I don't have any other questions.

11         THE COURT:  Redirect.

12                      **REDIRECT EXAMINATION**

13 BY MR. SCHRODER:

14 Q    Let's talk about the concept of limited resolution for a

15 minute.  In our modern CSI world, why didn't you just take this

16 into the lab and make it perfect?  That's a big question, I

17 realize, but I think it's kind of a common thought that

18 that's -- that capability's out there.

19 A    I have to quote Mr. Scott from "Star Trek."  "I can't

20 break the laws of physics."  It's -- it's physically

21 impossible.  It -- when -- when we used to talk about working

22 with film, we talk about the limited resolution being the grain

23 of the film.  Basically, film photography involved using

24 particles of silver in an emulsion on film, and when light

25 struck those particles, they would become fixed and there's

1  only a fixed size that they get down to.  And you basically --

2  if you look at some old photographs that are super-enlarged and

3  zoomed in, you begin to see the speckle in there.  Those are

4  the individual grains of -- of film.  What you see in between

5  those silver grains is what we refer to as empty magnification.

6  You can zoom in as much as you want and get down to that silver

7  grain, but the picture that it represents, you're not going to

8  get any more detail.

9      With video, we've got those pixels, and we can't go into

10 those pixels any more than where that -- those pixels are.  So

11 if I zoom in to where I can see two pixels next to each other,

12 no matter how much I zoom in, I'm not going to see anything

13 else.  I'm going to get empty magnification.

14 Q   Now, Mr. Offenbecher asked you about a couple of your

15 colleagues.  And he asked you about a gentleman named Gerry

16 Richards.  And he asked you -- I don't remember the exact

17 term -- if he was reputably and something -- other term.  And

18 you hesitated for just a moment.  Was there a reason for that

19 hesitation?

20 A   I have not witnessed -- I -- I have not spoken to Mr.

21 Richards in a number of years, and I have not had a chance to

22 observe him conducting forensic examinations for a while.  So I

23 would not feel comfortable speaking to his technical

24 qualifications.  I don't think he's set foot in our laboratory

25 in over 10 years, so I -- I cannot speak -- I -- don't get me

1  wrong.  He has a -- a long and storied career and is someone I

2  would trust.  But I have not witnessed him conducting

3  examinations in the last few years, whereas I have on a regular

4  basis reviewed Mr. Iber's work.

5  Q    Now, Mr. Offenbecher made a com -- suggested something

6  about identifying a group of vehicles.  I mean, were you ever

7  tasked to identify what possible vehicles might fit into the

8  comparison you did, the size, the shape, any of that?  Were you

9  asked to do that?

10  A    No, I was not.

11  Q    And is that something your lab would do?

12  A    Not -- we conduct examinations to try to identify the make

13  and model of vehicles.  But when we have a comparison involving

14  a questioned and a known vehicle, we're just comparing the

15  questioned and the known vehicle.

16  Q    All right.  And there was a discussion of the scale you

17  used, like -- that kind of made it sound like the line was the

18  important thing.  I mean, when you're comparing the size of the

19  two images in this picture, are you comparing them by using a

20  line or how are you really comparing the two?

21  A    The -- the comparison in this case was the -- the photo

22  comparison -- the -- the photogrammetry just allows me to put a

23  number on that scale.  I was looking at the profile of the

24  vehicle as well as the overall length and height of it.

25  Q    Okay.  But how do you -- how -- you talked about earlier,

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 747   Filed 09/23/14   Page 100 of 151
(720) 384-8078   attrans@sbcglobal.net

1  I think, but how -- what do you count to get the length and the

2  height?

3  A    Well, I'm counting the pixels.

4  Q    Right.  And the -- was the number of pixels comparable

5  between the two -- the length and the height of the known and

6  questioned vehicles?

7  A    Yeah, within -- within a pixel on each one, yes.

8  Q    All right.  And you talked about profiles.  How did the

9  profiles of the two vehicles compare?

10  A    To the degree that I can see them, the profiles are the

11  same.

12  Q    All right, thank you.

13        MR. SCHRODER:  No further questions, Your Honor.

14        THE COURT:  Recross.

15                    **RECROSS EXAMINATION**

16  BY MR. OFFENBECHER:

17  Q    Well, the problem with the photos here is this:  The --

18  to -- the degree to which you can see them.  Is that right?

19  A    That's correct.

20  Q    Because the photos are very poor resolution, aren't they?

21  A    Yes, they are.

22  Q    And that's not your fault because you didn't do a good

23  job.  Right?

24  A    No, it's -- that's --

25  Q    You're doing the best --

1  A    -- that's right, it's not my fault.

2  Q    What you've told us is that you've done the best job you

3  can with these photos, right?

4  A    That's correct.

5  Q    But they're of poor resolution, and -- right?

6  A    Correct.

7  Q    And you can't really see much detail on the cars, can you?

8  A    That's correct.

9  Q    And so all you can really determine is that they're kind

10 of generally of the same profile.  Is that right?

11 A    That is correct.

12 Q    And in term -- and that's one thing.  And then in terms of

13 size, you've indicated all you can really tell is that the

14 questioned vehicle on left to right or the questioned vehicle

15 right to left are within the size parameters of length between

16 167 inches and 187 inches.  Right?

17 A    That is correct.

18 Q    And you can tell that the questioned vehicle from left to

19 right or the questioned vehicle from right to left are in a

20 height group of cars that are 60.9 inches to 70.9 inches.  Is

21 that right?

22 A    60.9 to 70.9 -- if I may review my --

23 Q    Sure.

24 A    -- notes just to make sure.  60.9 to 70.9.  Yes, sir.

25 Q    So I had that right.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 747   Filed 09/23/14   Page 102 of 151
(720) 384-8078   attrans@sbcglobal.net

1  A    Yes, sir.

2  Q    Did you -- and do you recall in your bench notes making

3  any attempt to compare this with some other cars?

4  A    I -- I don't recall.

5  Q    You talked about Mr. Richards and he's a person that you

6  would trust.  Mr. Iber works in the same space with you,

7  doesn't he?

8  A    Yes, sir.

9  Q    You guys consult with each other all the time, don't you?

10 A    Yes, sir.

11       MR. OFFENBECHER:  I don't have any other questions,

12 Your Honor.

13       THE COURT:  Anything else?

14       MR. SCHRODER:  No further questions, Your Honor.

15       THE COURT:  Thank you, sir.  You're excused.  The

16 government's next witness.

17    (Witness excused)

18       MS. LOEFFLER:  The United States calls Neil Schmidt.

19       THE COURT:  All right, sir, come up to the box there.

20 The door pulls out, and you can just step into the box and

21 remain standing.  My clerk will swear you in.

22       **NEIL SCHMIDT, PLAINTIFF'S WITNESS, SWORN**

23       THE CLERK:  Okay, thank you.  Please have a seat.  And,

24 sir, if you can please state and spell your full name.

25       THE WITNESS:  Neil Schmidt.  N-e-i-l, S-c-h-m-i-d-t.

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 747   Filed 09/23/14   Page 103 of 151

1       THE CLERK:  Thank you.

2       THE COURT:  All right, counsel.

3       MS. LOEFFLER:  Before going further, I think -- I need

4   to show the defense something, Your Honor, if I may.

5       THE COURT:  Okay.

6       MS. LOEFFLER:  Counsel, I don't know whose witness this

7   is.  I'm sorry, Your Honor, I had --

8       THE COURT:  Okay.

9       (Side conversation)

10                      **DIRECT EXAMINATION**

11  BY MS. LOEFFLER:

12  Q    Mr. Schmidt, where do you work?

13  A    I work for Honda, basically.

14  Q    And you say it base -- how long have you worked for Honda?

15  A    In June, it'll be 20 years.

16  Q    What types of things have you done for Honda?

17  A    Well, it's all on the automotive side, mainly.  When I

18  came there, even though I had an engineering degree, I had to

19  work in the -- their service shop for a little while to get a

20  little more experience.  Worked on their tech line, where the

21  dealers call for assistance, and then spent a good -- probably

22  close to 10 years in service engineering, where you're helping

23  dealers fix cars, writing service bulletins, analyzing broken

24  parts, that kind of thing.  And then most recently, working

25  with the legal department.

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 747   Filed 09/23/14   Page 104 of 151

1  Q    Okay.  And what's your title with Honda?

2  A    Right now, I'm a -- technical specialist is my title.

3  Q    What's a technical specialist?

4  A    I -- it -- it's kind of a -- a weird term, but basically,

5  I go out and I investigate products, Honda products that are

6  subject of a claim or a lawsuit against Honda.  So if someone

7  has a problem with a car, motorcycle, whatever, I go out, look

8  at the product, look at the scene, investigate, and then work

9  with attorneys and experts and everybody else.

10 Q    How familiar are you with Honda models of all sorts of

11 years?

12 A    I would say very.

13 Q    Okay.  And when you say very -- well, let me

14 (indiscernible) -- are you also familiar with competitors'

15 models, to some extent?  And explain why.

16 A    Yeah.  I mean, I -- I've been a -- a automotive enthusiast

17 since I was a -- a little kid.  I remember back when I was 10

18 years old, we moved from Ca -- Nebraska to California.  We had

19 a '66 Mustang and we traded it for a '67 convertible, and I

20 remember being able to tell the difference between a '65, a

21 '66, a '67, '68.  Yeah, I've always just been a -- a car

22 enthusiast.  I've been -- got involved in racing cars in 1984.

23 Q    What type of car racing did you do?

24 A    I did my own stuff, autocross, and -- at some track days.

25 Then I helped assist a bunch of professional teams that were

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 747   Filed 09/23/14   Page 105 of 151
(720) 384-8078   attrans@sbcglobal.net

1  racing Hondas as well.

2  Q    Okay.  So I'm going to get back to how long have you had

3  an interest in cars and the automotive industry.

4  A    Gosh, probably -- I would say most of my life.  But

5  probably 40 years or so, 30, 40 years.

6  Q    Have you testified in courts before as an expert?

7  A    Yes.

8  Q    How many times?

9  A    I've testified in court seven times before today.

10 Q    Okay.  And what types of cases?

11 A    Out of the seven, three of those were criminal cases and

12 the other four were civil cases.

13       MS. LOEFFLER:  I would move Mr. Schmidt as an expert in

14 Hondas, and with his associated knowledge of related vehicles.

15       THE COURT:  Any voir dire?

16       MR. CURTNER:  No, Your Honor.

17       THE COURT:  All right.  He can be received in that

18 capacity.

19 BY MS. LOEFFLER:

20 Q    Now, Mr. Schmidt, were you contacted at some point by the

21 FBI in relation to the case that brought you here today?

22 A    Yes.

23 Q    What were you asked to do?

24 A    I was asked to assist them in attempting to identify a

25 vehicle that was on a videotape.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 747   Filed 09/23/14   Page 106 of 151
(720) 384-8078   attrans@sbcglobal.net

1  Q   Okay.  I'm going to show you what's been admitted as

2  Exhibit 155.  It's been admitted, so I'm going to play it.

3      (Side conversation)

4  Q   And I'm going to ask you whether this is the video.  If

5  you'll take a look at it.  And if we could play it slowly, so

6  we can look at it.  All right.  Is this the video that you were

7  asked to look at?

8  A   Yeah, that's the portion of the video.  There's an -- I

9  think there's a portion where the vehicle's going the other

10 direction.

11 Q   And could we play that, Kim, also?  (Indiscernible).  And

12 is that the -- did you view both of those?

13 A   Yes.

14 Q   Now, were you actually provided a copy of this video

15 versus just having it played for you?

16 A   Yes, I was.

17 Q   Okay.  In what format?

18 A   Basically the same format we saw there, the same player,

19 so I could go back and forth.

20 Q   Okay.  And how often have you viewed it?

21 A   Probably dozens of times.  I don't know how many, I didn't

22 count.  But many times.

23 Q   What were you asked to do?  I think you said it before,

24 but I (indiscernible) --

25 A   We were -- they were trying to identify the vehicle that's

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 747   Filed 09/23/14   Page 107 of 151

1  in that video and determine if it was a Honda CR-V --

2  Q    Okay.

3  A    -- of a certain generation.

4  Q    Now, were you able to make any conclusion as to the likely

5  make and model of this vehicle?

6  A    Yes.

7  Q    And what was your conclusion based on viewing it?

8  A    That in -- in my opinion, that's about a 70-percent chance

9  that that is a first-generation Honda CR-V.

10 Q    And I want to ask you what about the video led you to that

11 conclusion?

12 A    A number of things.  The -- the size and shape and

13 proportions of the vehicle is one part of that.  Another part

14 of that is the color of the vehicle.

15 Q    What about the color struck you?

16 A    Well, there's not a lot of bright -- that's a relatively

17 bright blue.  There's not a lot of bright-blue SUVs, or bright

18 blue isn't used as a very common color on SUVs.  That's -- we

19 call that Electron Blue Pearl -- was our name that year.  Or --

20 we only used it for two years on the CR-V.  Every other CR-V's

21 been, like, a darker, navy blue.  So it's a -- relatively rare

22 to see a brighter blue SUV.

23 Q    Okay.  Now, you keep using the term FUB -- "SUV."  What

24 about the video led you to a conclusion that the video showed

25 an SUV?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 747   Filed 09/23/14   Page 108 of 151
(720) 384-8078   attrans@sbcglobal.net

**SCHMIDT - DIRECT**

1  A    Again, just the overall proportions and the stance of the

2  vehicle, the, you know, ground clearance, the -- the shape.  I

3  mean, it's -- it's not a minivan, it's not a car.  It's -- it's

4  an SUV.  It's --

5  Q    Okay.  I'm going to show you what's been introduced as

6  Exhibit 104.  Now, can you identify the make and model of that

7  vehicle?

8  A    Yeah.  I mean, that's -- just from the picture --

9  Q    Yeah.

10  A    -- that's the bright blue, and it's either a 2000 or 2001

11  Honda CR-V.

12  Q    Okay.  And I'm also going to show you what's been --

13      (Side conversation)

14  Q    Now I want to turn to a little -- few more questions about

15  where your impression came from.  But first of all, can you

16  identify the vehicle in the video with 100-percent certainty?

17  A    No, I cannot.

18  Q    Okay.  And I want you to break down, to the best that you

19  can, what was it that led you to your 70-percent certainty.

20  You said that it was an early model.  Where does that

21  conclusion come from?

22  A    As, you know, time goes on, every manufacturer changes

23  their cars every few years, fuel economy, everything else.

24  SU -- SUVs and cars in general are getting more sleek, rounded.

25  The windows are -- lay down more, everything's a little

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 747   Filed 09/23/14   Page 109 of 151
(720) 384-8078   attrans@sbcglobal.net

1  rounder.  This is a relatively boxy SUV, where the windows are

2  a little more upright, the front's a little flatter, so it's an

3  earlier generation in that respect.  It's an old styling.

4  Q    Now -- by the way, did the early-model Honda have running

5  lights?

6  A    Not in the United States, no.  Did not have daytime

7  running lights.

8  Q    What are running lights?

9  A    Daytime running lights are -- they ba -- it's basically

10 the headlight filament is on at a very low power during -- any

11 time the vehicle's moving, to provide extra visibility for --

12 excuse me -- for other cars to see.

13 Q    Now, in terms of -- you talked about body size and

14 proportions.  Can you explain what you saw in the video about

15 that?

16 A    You look at wheel base, so the distance between the front

17 and rear wheels.  You look at overhang, so how much of the body

18 is sticking out in front of the wheels and behind the wheels.

19 You look at the height of the vehicle from the ground to the

20 bottom of the windows, from the bottom of the windows to the

21 top of the windows.  Again, we're talking about overall

22 proportions here.  It's just -- you know, familiarity with the

23 vehicle is what -- you know, that's how you can identify cars.

24 Q    Okay.  How many times and from what angles have you viewed

25 a Honda CR-V, early model?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 747   Filed 09/23/14   Page 110 of 151

SCHMIDT - DIRECT

1  A    Gosh.  I don't -- I don't know that I could put a number
2  on it.  I -- I was -- I was model engineer for the CR-V from
3  1997 to 2005.  So I had -- I mean, that was my -- that was my
4  job, was to take care of the CR-V.  So I drove CR-Vs, I worked
5  on CR-Vs.  That's -- that's what my job was, was dealing with
6  CR-Vs all the time.  So I was seeing those cars from every
7  angle and every color and every possible way, I think.
8  Q    Okay.  Now, were you asked at some point to see if you
9  could find a brochure, an actual Honda brochure of a CR-V from
10 around this model?
11 A    Yes.
12 Q    Okay.  And were you able to get one from Honda?
13 A    I went back to Service Engineering, where I used to work,
14 and we had -- we have a collection of brochures, but they had
15 one of each.  And I knew if I brought them up here I might not
16 get them back, so I couldn't use those.
17 Q    Well, that's certainly true.  I'm going to show you what's
18 been marked as Exhibit 28.
19      (Side conversation)
20 Q    Sorry, I have it -- Exhibit 224.  Counsel.  I'm going
21 to -- Special Agent Allison, if you'll put it up.  I only have
22 one.  What is Exhibit 224?
23 A    It's a brochure -- excuse me.  It's a brochure for the
24 2000 Honda CR-V.  Excuse me.
25 Q    Now, is there any difference in models between 2000 and

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 747   Filed 09/23/14   Page 111 of 151
(720) 384-8078   attrans@sbcglobal.net

1 2001, from any --

2 A    2000 and 2001 are basically the same.  2001 is the last

3 year of that generation, so -- there's a Special Edition which

4 only came in a couple colors, which -- I don't remember if that

5 was 2000 or 2001.  But the car is essentially identical between

6 2000 and 2001.

7 Q    Okay.  And this one actually has one in blue, right?

8 A    Correct.

9 Q    Okay.

10        MS. LOEFFLER:  Now I would move Exhibit 224.

11        MR. CURTNER:  No objection.

12        THE COURT:  It'll be received.

13    (Plaintiff's Exhibit 224 admitted)

14 BY MS. LOEFFLER:

15 Q    Okay.  Let me -- Special Agent Allison, if you'll get it

16 back.  Where'd you actually get this one, if you couldn't take

17 Honda's?

18 A    I found it on eBay.

19 Q    I just want to make sure, did you get reimbursed for what

20 it cost you to get it on eBay?

21 A    Yes, I did.

22 Q    Okay.  And is our -- by the way, are you being paid

23 anything other than the travel expenses for your trip here?

24 A    No.

25 Q    Okay.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 747   Filed 09/23/14   Page 112 of 151

**SCHMIDT - DIRECT**

1    (Side conversation)

2  Q    So, Mr. Schmidt, this is just -- this is, like, the glossy

3  brochure, right, which has one of a blue CR-V?

4  A    Yes.

5  Q    And there are other colors in here too.  Right?

6  A    Yes.

7  Q    Now, after you first talked to the agents, were you asked

8  whether there are other models that -- based on your

9  experience, that are close enough in this that could raise your

10  level of confidence from 70 percent if you included some other

11  models?

12  A    Yes.

13  Q    Okay.  What were you asked?

14  A    I was asked what other models would be -- if it wasn't a

15  CR-V, what other models could it be that would -- you know, I

16  can probably say, you know, with relative certainty that that's

17  one of those models.

18  Q    And what other models did you identify?

19  A    The Toyota RAV4, the Ford Escape, and I think the Hyundai

20  Sante Fe were the other three that identified as probably

21  get -- get me up into the nineties as far as percentiles.

22  Q    Why did you have the Honda CR-V as a higher percentage

23  than those?

24  A    Well, again, based on my familiarity with the car, what I

25  see in the video, and the color, that kind of puts it near the

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 747   Filed 09/23/14   Page 113 of 151

SCHMIDT - CROSS

1   top.

2   Q    Okay.  I don't have anything further.

3        THE COURT:  Cross-examination.

4                        **CROSS-EXAMINATION**

5   BY MR. CURTNER:

6   Q    So, Mr. Schmidt, how long have you been involved with the

7   Legal Department part of Honda?

8   A    It's just over seven years now.

9   Q    Okay.  And I imagine that most of your involvement there

10  is about product liability issues?

11  A    Actually, in Califor -- I'm based in California, so I do a

12  lot of warranty or lemon law.  But yes, the other --

13  Q    I'm sorry, what is that?

14  A    Lemon law, where if you think your car is a lemon, under

15  certain statutes, you can ask to have it bought back.  So

16  there's a lot of that litigation in California.

17  Q    So in your legal involvement, it's basically the lemon law

18  or some kind of a failure of a vehicle or some kind of defect

19  in a vehicle?  Is that correct?

20  A    That's typically the allegation, yes.

21  Q    Have you ever testified as an expert before in trying to

22  identify a vehicle from a blurred image?

23  A    No, I have not.

24  Q    Okay.  This is the first time?

25  A    Yes.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 747   Filed 09/23/14   Page 114 of 151
(720) 384-8078   attrans@sbcglobal.net

1  Q   Now, you were first contacted by the FBI in this

2  particular case back in November 20th of 2012.  Is that

3  correct?

4  A   Yes.

5  Q   Okay.  And at that time, obviously, you worked for Honda?

6  A   Yes.

7  Q   And it was clear that they were looking to identify this

8  blurred image as a Honda CR-V.  Is that correct?  That was

9  your -- that's what they asked you to do?

10  A   They wanted -- yeah, if I could determine if the vehicle

11  in the video was a Honda CR-V.  Correct.

12  Q   And when you -- and you examined that video, same thing we

13  saw here today.  Right?

14  A   Yes.

15  Q   Okay.  And when you were asked if that was a Honda CR-V,

16  your answer was you could not be certain?

17  A   Correct.

18  Q   And if you thought it might be, it's because of the

19  correct size and proportion.  Is that correct?

20  A   Size, proportion.  I don't know if I -- you know, I think

21  I was looking at color at that time as well.

22  Q   And you said at that time that it's similar to a Toyota

23  RAV4?

24  A   Yes.

25  Q   Same size and proportion?

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 747   Filed 09/23/14   Page 115 of 151

1   A    Yes.

2   Q    And also a Volvo -- did you say at the time it could be

3   same size and proportion as a Volvo?

4   A    No, I wasn't -- the comparison I was making there was that

5   the CR-V's a little unique, in that the taillights are all

6   above the -- they're up in the -- where the windows are, which

7   is a relatively unique thing in the automotive world.  And I

8   said Volvo was one of the other few manufacturers that had

9   lights up in that area as well.

10  Q    Okay.  Now, you -- and at that first interview, you

11  actually had the VIN number for the car that was the suspect

12  car.  Is that correct?

13  A    Yes.

14  Q    And you were able to look up from the VIN number the make,

15  the model, and the color?

16  A    Yes.

17  Q    And so by that first interview, you knew that by the VIN

18  number it was Electron Blue Pearl?  That's what you could tell

19  from the VIN number?

20  A    Yes.

21  Q    Then again, you were questioned a second time, on November

22  26th, 2012?  Do you recall that?

23  A    Yes.

24  Q    And at that time you said that it might be

25  (indiscernible) -- well, this is when you said it could also be

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net

1  similar to a Ford Escape?

2  A    Yes.

3  Q    And the Santa Fe?

4  A    I think so, yes.

5  Q    All right.  And then -- was there a third time that you

6  actually met with the prosecuting attorneys and you looked at

7  some other videos?  Would that be December of last -- of 2012?

8  A    December of 2012.  I don't remember exactly when I met

9  with the --

10  Q    Did they show --

11  A    -- prosecuting attorneys.

12  Q    -- you some other videos besides that one of the 12th,

13  another video of what they said was the suspect CR-V?

14  A    Another vide -- I'm not sure what -- by another video.

15  Q    That was taken afterwards, April 19th?  It was easier --

16  did they ask you to identify that?

17  A    I don't know if they asked me -- they showed me that

18  video.  I don't know if they asked me to identify it, but I've

19  seen that video.

20  Q    Okay.  So you've seen the vide -- this blurred thing?

21  A    Yes.

22  Q    And you've seen also a video of a -- what they told you

23  was a CR-V that they took at a later date?

24  A    Yes.

25  Q    It was a much better quality.  Is that right?

1  A    Well, it was better -- easier to see, yes.

2  Q    Yes.  And after examining that video -- this is your third

3  interview -- that's when you said you were 70-percent sure?

4  That's as close as you could get.  Is that right?

5  A    Well, that's -- that's the number I've always said.  I've

6  never changed my number.

7  Q    Okay.  And that's after viewing both videos and running

8  the VIN number, and the third time that they discussed this

9  with you?  That's when you said -- that's -- maybe you repeated

10 it, but you said it -- you were 70 percent?

11 A    Okay, yes.

12 Q    And then the last time they interviewed you, did they ask

13 you what else might be consistent in size, shape and

14 proportion?  Didn't you say that based on size, shape, and

15 proportion, there were 22 vehicles close enough in size, shape,

16 and proportion that could be that suspect vehicle?

17 A    I -- yeah, there was a number of -- of vehicles.  I don't

18 remember the exact number.

19 Q    The number was 22.

20 A    Okay.

21 Q    That's all I have.  Thank you.

22        THE COURT:  Redirect.

23              **REDIRECT EXAMINATION**

24 BY MS. LOEFFLER:

25 Q    Mr. Schmidt, when you said a little earlier that to get

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 747   Filed 09/23/14   Page 118 of 151

SCHMIDT - REDIRECT

1  from 70 percent to 90 percent you only added a few vehicles,

2  why didn't you add all 22 in order to get your sort of sense of

3  confidence from 70 to 90?

4  A    Well, I -- I felt those other vehicles were highly

5  unlikely that it was one of those.  There was enough -- you

6  know -- again, the size and shape and proportion are similar,

7  but there's other features and just general appearance that I

8  could throw them out based on what I saw.

9  Q    Okay.  Now, the other thing about the 70 percent, was

10  there anything about the VIN number or anything -- did that fit

11  into your conclusion that you were about 70-percent confident

12  in identification was a Honda CR-V?

13  A    No.

14  Q    Okay.

15  A    I don't think -- the VIN didn't have any effect on it.

16  Q    All right.  And what was your conclusion based on?

17  A    Again, it was based on viewing the video and my

18  familiarity with the vehicle.

19  Q    Okay.  I don't have anything else.

20        THE COURT:  Recross.

21        MR. CURTNER:  No, Your Honor.

22        THE COURT:  Thank you, sir.  You're excused.  The

23  government's next witness.

24     (Witness excused)

25        MS. LOEFFLER:  Daryl Allison.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 747  Filed 09/23/14  Page 119 of 151
(720) 384-8078  attrans@sbcglobal.net

ALLISON - DIRECT

1    **DARYL ALLISON, PLAINTIFF'S WITNESS, SWORN**

2        THE CLERK:  Okay.  Thank you.  Please have a seat.

3   And, sir, if you can please state and spell your full name.

4        THE WITNESS:  Daryl Allison.  D-a-r-y-l, A-l-l-i-s-o-n.

5        THE CLERK:  Thank you.

6        THE COURT:  All right, counsel.

7                    **DIRECT EXAMINATION**

8   BY MS. LOEFFLER:

9   Q    Special Agent Allison, where do you work?

10  A    I work for the Federal Bureau of Investigation.

11  Q    How long have you been with the Federal Bureau of

12  Investigation?

13  A    It was 10 years last October.

14  Q    And what squad are you assigned to?

15  A    I'm currently assigned to the Violent Crimes Squad.

16  Q    Okay.  And what did you do before you joined the Federal

17  Bureau of Investigation?

18  A    I was a computer programmer for approximately eight years,

19  and then before that I was a CPA.

20  Q    What led you to join the FBI?

21  A    That's just what I've always wanted to do.  I became a CPA

22  to get into the FBI, because that's what they were looking for

23  at the time.

24  Q    Okay.  Now I want to turn to the present case, and have

25  you had a role in this case?

ALLISON - DIRECT

1  A    Yes, I was a -- the lead case agent.

2  Q    Okay.  I want to turn and ask you about one specific area,

3  and that's simply the investigation into the cars, the

4  questioned car, and what you did with regard to that in this

5  case.  I want to ask you a few questions about that.  After

6  viewing that we've seen as Exhibit 155, did you lead any

7  investigation for -- to search for cars beyond Mrs. Wells' blue

8  CR-V?

9  A    Yes.  We made two efforts to track down as many vehicles

10 as we could that were what we considered to be similar in size,

11 shape, and proportions.

12 Q    Can you describe the first effort and what it was?

13 A    The first effort, we went to the Alaska DMV and got a list

14 of all the registered vehicles, or vehicles that were

15 registered on Kodiak Island.  From that we took all the -- the

16 Honda CR-Vs, all the Toyota RAV4s and all the Ford Escapes, and

17 we attempted to track down as many of those as we could.

18 Q    Why did you limit it to CR-Vs, RAV4s, and Escapes at that

19 point?

20 A    That was just the investigative team -- that's just our

21 assessment of what we thought was similar in size, shape, and

22 proportion to what we saw on the video.

23 Q    And that wasn't consulting with any experts at that point?

24 A    No, it was not.

25 Q    Okay.  I'm going to show you what's been marked as Exhibit

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 747   Filed 09/23/14   Page 121 of 151

1  140A.  And this has not been ad -- can you tell us what Exhibit

2  140A is?

3  A    That was a questionnaire that we -- we devised to come up

4  with just a consistent set of questions to ask the owners or

5  registered owners of the vehicles that we found.

6  Q    Okay.  And why did you use sort of a -- and this is a

7  blank questionnaire, right?

8  A    Yes, it is.

9  Q    Okay.  Why did you use a set questionnaire in that

10  investigation?

11  A    Just to -- to ensure some consistency between, you know,

12  what -- the -- the questions that we asked all the vehicle

13  owners.

14        MS. LOEFFLER:  Okay.  I'd move Exhibit 140A.

15        THE COURT:  Hearing no objection, it'll be received.

16     (Plaintiff's Exhibit 140A admitted)

17  BY MS. LOEFFLER:

18  Q    Okay.  So if you can go through the -- Exhibit 140A.  We

19  don't need to read all the questions.  But what was the purpose

20  of Exhibit 140A?

21  A    The purpose was just to determine if -- if the -- the

22  registered owners had been driving the vehicles in the area of

23  the COMMSTA on April 12th, 2012.

24  Q    Okay.

25  A    How often they drive down Anton Larsen Road in general.

1  Q   Now, based on the efforts that first time, were the -- was

2  the investigative team able to find all of the cars that you

3  had sent out as a list that you wanted found?

4  A   No, we didn't find all of them.  We found a majority of

5  them.  We only -- I believe we only spent about a week trying

6  to find, and I think there was over 300.  We found a good

7  majority of them, I believe.

8  Q   Okay.  Now, after -- did you do a second investigation

9  into cars?

10  A   Yes.  After consulting with Neil Schmidt, we -- we -- we

11  went back, we revised the list.  We kept the same three

12  vehicles that -- the -- the CR-V, the RAV4, and the Escape, but

13  this time we limited it to only blue or shades of blue.  You

14  know, we kept purple in there and things -- you know, like I

15  said, shades of blue.  And we added the Hyundai Santa Fe.

16  Q   Okay.  And I'm showing you what's been marked as Exhibit

17  140B, and I'll ask you what that is.

18  A   That's a revised questionnaire that we used for the second

19  search.

20  Q   And this is a blank one again, right?

21  A   Yes, it is.

22      MS. LOEFFLER:  I'd move Exhibit 140B.

23      MR. OFFENBECHER:  No objection.

24      THE COURT:  It will be received.

25      (Plaintiff's Exhibit 140B admitted)

1  BY MS. LOEFFLER:

2  Q    What were the changes between 140A and 140B?

3  A    We -- we added some questions for -- for people that were,

4  you know -- because of the way the questions were worded on the

5  first questions, some people said they were unsure, such as --

6  we asked the question, "Were you in possession of your vehicle

7  at the time."  Some people weren't -- couldn't say for sure

8  that they were.  You know, some people were out of town.  Even

9  though their garage -- their vehicle may have been garaged at

10 the time, they weren't comfortable saying, "I was in possession

11 of it."  So we added some questions that would allow them --

12 you know, indicate whether or not -- like, the vehicle had

13 been -- they thought the vehicle had been stolen or tampered

14 with or they saw any indication that the vehicle had moved

15 without their permission.

16 Q    How successful was this second set of attempts to

17 investigate cars?

18 A    We were able to find --

19        MR. OFFENBECHER:  Objection.  It calls -- I object,

20 Your Honor.  It calls for a conclusion on the part of the

21 witness about success, which -- she can ask him what happened,

22 but --

23        THE COURT:  Overruled.

24        THE WITNESS:  We were able to speak with all of the

25 owners or registered owner of all of the vehicles except for

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 747   Filed 09/23/14   Page 124 of 151

ALLISON - DIRECT

1    two.  One of those owners was deceased and the other was --

2    BY MS. LOEFFLER:

3    Q    Well, obviously you didn't speak to Mr. Wells, so --

4    A    Yes.  Yeah.

5    Q    -- I'll just leave that there.  Okay.  And what was the

6    goal of the second investigation?

7    A    Well, it was the same -- really the same as the first.  We

8    were trying to -- to see if we could talk to as many of the

9    owners of the vehicles that were similar in size, shape, color

10   to the -- the one that was on the -- on the video, see if we

11   could, you know, maybe -- if there was any potential that any

12   of those vehicles were the one in the video, and we weren't

13   able to find one.

14   Q    Now -- yeah, based on this search, did you do any

15   investigative followup?

16   A    There was no -- no followup necessary.

17   Q    Okay.  What did you do with the -- when we looked at

18   Exhibit 140B -- this is a blank one.  Did you get back filled-

19   up one -- filled-out ones?

20   A    Yes, ma'am.  They were all filled out.

21   Q    What did you do with the ones that were filled out?

22   A    I turned them over to the U.S. Attorney's Office, to be

23   discovered to the defense.

24   Q    I don't have anything further.

25          THE COURT:  Cross-examination.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 747   Filed 09/23/14   Page 125 of 151
(720) 384-8078   attrans@sbcglobal.net

1            **CROSS-EXAMINATION**

2   BY MR. OFFENBECHER:

3   Q    Special Agent Allison, good morning.

4   A    Morning.

5   Q    So the original list -- just so we're clear -- and I

6   wasn't clear on this -- the original list was of -- the

7   universe of vehicles was automobiles that were registered on

8   Kodiak Island.  Is that -- reg -- state registered on Kodiak

9   Island?

10  A    It was actually all vehicles.  So there was boats,

11  motorcycles, trailers, combines.  Believe it or not, there's a

12  couple on Kodiak.  So it was all vehicles that were registered

13  on the island.

14  Q    And registered with whom?

15  A    The Department of Motor Vehicles.

16  Q    The Alaska Department of Motor Vehicles?

17  A    Yes.

18  Q    And so you're aware, aren't you, since you've been here at

19  the trial, that folks in the Coast Guard don't need to and

20  often do not register their cars with the Alaska Department of

21  Motor Vehicles, do they?

22  A    Yes, I'm aware of that.

23  Q    So that your survey would not include -- not have included

24  cars that were owned by Coast Guard personnel who had not

25  registered their cars with the State of Alaska?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 747   Filed 09/23/14   Page 126 of 151
(720) 384-8078   attrans@sbcglobal.net

1  A    In general, yes, it would not, yes.

2  Q    So let's turn to Exhibit -- Government Exhibit Number 140.

3  Can you put that up for me, please?

4       MS. LOEFFLER:  Counsel, do you want A or B

5  (indiscernible)?

6       MR. OFFENBECHER:  A.  Sorry.  Thanks.  Well, actually,

7  let's go to B.  Let's go to B.  Sorry.

8      (Side conversation)

9  BY MR. OFFENBECHER:

10 Q    This is the revised one.  This is, like, the updated

11 questionnaire.  Right?

12 A    That's correct.

13 Q    And you sent this out to people who had cars that met your

14 criteria?

15 A    No, we did not send these out.  We actually went and found

16 these people or spoke to them on the phone.

17 Q    Okay.  So sometimes you called them on the phone when you

18 identified them.  Right?

19 A    That's correct.

20 Q    And sometimes you went and asked them these questions?

21 A    In person, yes.

22 Q    And you asked them the questions because you -- and you

23 asked them -- each one of them the same questions because you

24 wanted to have, you know, kind of a consistent process.  Right?

25 A    Yes.  There were a number of investigators involved, so we

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1    wanted to make sure it was consistent?

2    Q    So it wasn't just one person.  It wasn't you, for example,

3    who did all these, right?

4    A    Not all of them, no.

5    Q    It was a bunch of different agents, some CGIS agents and

6    some FBI agents.  Right?

7    A    There were several, yes.

8    Q    So with -- let's look at the questionnaire.  With respect

9    to the first one, the first question, it says, "Did you drive

10   your vehicle on Anton Larsen Bay Road in April of 2012,

11   specifically 4/12/12, the day of the double homicide at

12   COMMSTA?  Answer:  "Yes" or "No."  Right?

13   A    Yes.

14   Q    And then the second question -- well, if you had been --

15   submitted this or asked this question of a person who was the

16   murderer of Mr. Belisle and Mr. Hopkins or was in any way

17   involved in the murder of Mr. Belisle and Mr. Hopkins, how

18   would you expect them to answer that first question?

19   A    Oh, I would expect them to lie.

20   Q    Well, what -- which box do you think that they would

21   check?

22   A    I would expect they would check "No."

23   Q    All right.  So a second question:  "Is there any reason

24   that you would have been driving your vehicle in that area

25   during that time?"  And then you have a "Yes" or a "No" box.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 747   Filed 09/23/14   Page 128 of 151
(720) 384-8078  attrans@sbcglobal.net

1  Right?

2  A    Yes, I do.

3  Q    So if this question was being answered by someone who had

4  murdered Mr. Hopkins and Mr. Belisle or been in any way

5  involved in that with their car, how would you expect them to

6  answer that question?

7  A    I would expect them to answer "No."

8  Q    So say -- the next question:  "Were you in possession of

9  your vehicle or do you know where it was at that time?"  And

10  you have a "Yes" or a "No" box.  How would you expect them to

11  answer that question, if they'd been involved in these murders?

12  A    Really depends on how they answered the first question.  I

13  mean, they could say they were in possession of their vehicle;

14  if they told me they weren't there, why would it matter if they

15  said they were in possession of the vehicle?

16  Q    Okay.  But if you asked them whether they were driving

17  their car near the COMMSTA, you would expect them to say "No"

18  if they were involved in it.  Right?

19  A    I think I answered yes, I did.

20  Q    All right.  So let's go to number 140A.  This is your

21  first questionnaire, and some of the folks got the -- these

22  questions.  Right?

23  A    That was the first round, yes.

24  Q    So your first question says, "Where were you between 7

25  a.m. and 8 a.m. on April 12th of 2012, referenced homicide?"

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 747   Filed 09/23/14   Page 129 of 151

1  Right, that's the question?

2  A    That's correct.

3  Q    Now, if someone were the murderer of Mr. Hopkins and Mr.

4  Belisle or were involved in the murder, would you expect them

5  to tell you that they were at the COMMSTA at the rigger shop

6  that day?

7  A    Of course not.

8         MR. OFFENBECHER:  I don't have any other questions.

9         THE COURT:  Redirect.

10                  **REDIRECT EXAMINATION**

11  BY MS. LOEFFLER:

12  Q    Special Agent Allison, why did you rely -- look through

13  DMV records from the State of Alaska registered, as opposed to

14  some broader class?

15  A    Well, we had to limit it somehow.  We couldn't look for

16  every vehicle on the -- on the planet.

17  Q    Okay.  And in addition to you -- you've answered Mr.

18  Offenbecher's questions about, you know, what you would expect

19  the murderer to do.  Did you look for other linkages throughout

20  the questionnaire?

21  A    Yes.  We -- we looked to see if any of the people

22  involved, you know, knew the victims, knew Mr. Wells --

23  Q    Okay.

24  A    -- you know, or their family.

25         MS. LOEFFLER:  I don't have anything further.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 747   Filed 09/23/14   Page 130 of 151
(720) 384-8078  attrans@sbcglobal.net

1    RECROSS EXAMINATION

2   BY MR. OFFENBECHER:

3   Q    Well, Special Agent Allison, if a person were the murderer

4   of Mr. Hopkins and Mr. Belisle or involved with the murder of

5   Mr. Hopkins or Belisle, would you expect them to indicate they

6   had any relationship with Mr. Hopkins or Belisle, or would you

7   think they would want to distance themself from that?

8   A    I would expect that they wouldn't distance themselves too

9   much, because then it would be easy for us to tell if they were

10  lying.  If they had some relation, it'd be pretty easy us --

11  for us to figure it out.

12  Q    If you were pursuing the investigation.  Right?

13  A    Yes.

14  Q    But if there were any of these questions that had any

15  connections to the Hopkins or Belisle family that could in any

16  way implicate them, you wouldn't expect them to tell you the

17  answer to that, would you?

18  A    I'm sorry, can you repeat that?

19  Q    Sure.  On redirect examination, you indicated that you

20  asked other questions besides whether "your car was at the

21  COMMSTA."  Right?

22  A    Yes, that's correct.

23  Q    You asked questions, for example, "Do you know anybody who

24  would want to harm or kill Richard Belisle or James Hopkins?"

25  Right?

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 747   Filed 09/23/14   Page 131 of 151

1   A    Yes.

2   Q    Would you expect that the -- any person who was involved

3   in the homicide would give you an answer?  How do you expect

4   they would answer that question?

5   A    Well, if they were involved, I would expect they would say

6   "No."  But that really wasn't -- the purpose of the question

7   was to look for any other leads that we might be able to find,

8   not to implicate the person we're talking to.

9   Q    You weren't trying to see if that person was involved in

10  the homicide?

11  A    Of course, but we wouldn't expect them to say they were.

12  But we might through -- through this questionnaire find other

13  leads to follow up on.

14          MR. OFFENBECHER:  I don't have any other questions.

15          THE COURT:  Anything else?

16          MS. LOEFFLER:  No, Your Honor.

17          THE COURT:  Thank you, sir.  What's the government's

18  situation?

19      (Witness excused)

20          MS. LOEFFLER:  Your Honor, this might be a good time to

21  break for lunch.  We have -- yeah, I think we have three more

22  witnesses --

23          THE COURT:  Okay.

24          MS. LOEFFLER:  -- I think, today, and we -- but to let

25  you know, we've told the defense exactly who we had today

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 747   Filed 09/23/14   Page 132 of 151
(720) 384-8078   attrans@sbcglobal.net

1  and --

2        THE COURT:  Okay.

3        MS. LOEFFLER:  -- who we have tomorrow.

4        THE COURT:  Okay, all right.  We'll come back at 1

5  o'clock then.  Stand in recess till 1 o'clock.

6     (Jury not present)

7        THE COURT:  Okay, the jury's gone.  Please be seated.

8  Anything else you want to talk about?  Yes, sir.

9        MR. CURTNER:  Yes, Your Honor.  Two of the witnesses I

10 expect this afternoon to testify, from what I have reviewed

11 over their Jencks materials, is that they may be referring to

12 statements made by Mr. Wells and/or Nancy Wells over a year and

13 a half after April 12th, 2012.

14        THE COURT:  Okay.

15        MR. CURTNER:  And I certainly think anything that they

16 may say that was hearsay from Mrs. Wells would be hearsay not

17 admissible.  But I'd also say that any statements that they may

18 refer to from Mr. Wells a year and a half after the homicides

19 is not relevant, it's not probative, and can only be

20 prejudicial.  And it's -- so I'd ask that they not be either

21 one -- and this is Mr. Wells's sister and brother-in-law --

22 that they would -- any statements that they may testify about

23 from Mr. Wells and especially Mrs. Wells a year after the

24 homicide is not admissible.  So I'd rather address that now

25 before they get on the stand.

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 747   Filed 09/23/14   Page 133 of 151

1          THE COURT:  Sure.  I'm glad you did.  I'll hear from
2    the government first with regard to Mrs. Wells.
3          MR. SCHRODER:  Your Honor, I don't believe there's any
4    statements we're going to elicit about -- from Mrs. Wells.
5          THE COURT:  Be clearly hearsay anyhow, wouldn't it?
6          MR. SCHRODER:  But I --
7          THE COURT:  Okay.  Prob --
8          MR. SCHRODER:  Unless there's another exception, it
9    would be, Your Honor.
10         THE COURT:  Okay, all right.  Good.
11         MR. SCHRODER:  I don't believe there are any.
12         THE COURT:  Problem's solved.
13         MR. SCHRODER:  So --
14         MR. CURTNER:  Statements from Mrs. Wells and Mr. Wells?
15         MR. SCHRODER:  No.
16         THE COURT:  No, no, no, no.  I said --
17         MR. SCHRODER:  No.
18         THE COURT:  -- start with Mr. Wells.
19         MR. SCHRODER:  Start with Mr. Wells.
20         THE COURT:  So we've just checked one of the
21    problems --
22         MR. SCHRODER:  Right.
23         THE COURT:  -- solved.  All right.
24         MR. SCHRODER:  Mr. Wells would be a statement of a
25    party opponent, and so I -- really never heard that there's a

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 747   Filed 09/23/14   Page 134 of 151

1 time limit on that, but they --

2 　　　　THE COURT:  I haven't heard of that either.  I --

3 　　　　MR. SCHRODER:  -- you know, we -- we have -- we have

4 heard statements of -- defense has asked a number of witnesses

5 about seeing Mr. Wells -- whether they ever saw him angry.  I

6 think that this will -- these statements -- and the Court's

7 actually reviewed this statement.  I think it was --

8 　　　　THE COURT:  Okay.  Well --

9 　　　　MR. SCHRODER:  -- your order was Docket 390.

10 　　　　THE COURT:  I've looked at it, yes.

11 　　　　MR. SCHRODER:  And, you know, make statements related

12 to that.  And I think it's clearly relevant.

13 　　　　THE COURT:  Okay.  No hearsay from Mr. Wells.  It

14 sounds like --

15 　　　　MR. SCHRODER:  No.

16 　　　　THE COURT:  -- Mr. Wells' statements against interests,

17 if that's what they are --

18 　　　　MR. SCHRODER:  Right.

19 　　　　THE COURT:  -- can be addressed.  Anything else?

20 　　　　MR. SCHRODER:  Not from the government, Your Honor.

21 　　　　THE COURT:  All right.  Anything else from counsel?

22 　　　　MR. CURTNER:  No, Your Honor.

23 　　　　THE COURT:  Thank you very much.

24 　　　　MR. OFFENBECHER:  What time, Your Honor?

25 　　　　THE COURT:  1 o'clock.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 747  Filed 09/23/14  Page 135 of 151

1      MR. OFFENBECHER:  Thank you.

2      THE CLERK:  All rise.  Matter stands in recess until 1

3  p.m.

4      (Court recessed at 11:41 a.m., until 1:04 p.m.)

5      (Jury not present)

6      THE CLERK:  All rise.  His Honor the Court, the United

7  States District Court for the District of Alaska is again in

8  session.  Please be seated.

9      THE COURT:  We're ready?

10     MR. SCHRODER:  We're ready, Your Honor.

11     THE COURT:  All right.

12     (Jury present)

13     THE COURT:  Okay, please be seated.  The government's

14 next witness.

15     MR. SCHRODER:  Your Honor, the government calls Theresa

16 Kiele.  If you could come right up front here to the right.

17     THE COURT:  Good afternoon.  That door -- get into the

18 witness box, that door pulls out.  Then you just come on in,

19 remain standing for a second, and she'll swear you in right

20 over here.

21     THE CLERK:  Please raise your right hand.

22     **THERESA KIELE, PLAINTIFF'S WITNESS, SWORN**

23     THE CLERK:  Okay, thank you.  Please have a seat.  And,

24 ma'am, if you can please state and spell your full name.

25     THE WITNESS:  Theresa Kiele.  T-h-e-r-e-s-a, K-i-e-l-e.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 747   Filed 09/23/14   Page 136 of 151
(720) 384-8078   attrans@sbcglobal.net

1    THE CLERK:  Thank you.

2    THE COURT:  All right, counsel.

3              **DIRECT EXAMINATION**

4  BY MR. SCHRODER:

5  Q    And, Ms. Kiele, you're kind of softspoken, so --

6  A    Okay.

7  Q    -- keep -- stay up with that microphone.

8  A    Okay.

9  Q    Do you know the defendant, Jim Wells?

10 A    Yes, I do.

11 Q    And how do you know him?

12 A    He's my brother.

13 Q    And how close in age are you?

14 A    One year.

15 Q    All right.  So you, in effect, grew up together.  Is that

16 correct?

17 A    Yes.

18 Q    And have you remained in touch over the years?

19 A    Yes.

20 Q    Have you -- did you have contact with him both before or

21 after the murders in Kodiak?

22 A    Yes.

23 Q    And prior to the murders, did he ever talk to you about

24 his co-workers that were the victims?

25 A    Yes.

1  Q    And what did he say about them?

2  A    He sat on the edge of the couch and got all fired up

3  and --

4  Q    Ma'am, I -- before the murders.

5  A    Before the murders?

6  Q    Before the murders, what did he say about them?

7  A    What did he ever say about them?  That they were friends,

8  good friends.

9  Q    Okay.

10  A    Close friends.

11  Q    And to that extent, when -- after the murders, did you

12  send your brother anything in the mail?

13  A    Yes.

14  Q    And what did you send him?

15  A    A sympathy card.

16  Q    Now, did you see him after the murders as well?

17  A    Yes.

18  Q    And where did that visit take place?

19  A    At our house.

20  Q    And did the topic of the co -- the murdered co-workers

21  come up?

22  A    Yes.

23  Q    And how did it come up?

24  A    In a conversation of what happened that day.

25  Q    And what was his reaction?

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 747   Filed 09/23/14   Page 138 of 151

1  A    Angry, fired up, really animated about them.

2  Q    And what did he say about -- did he talk about their

3  qualifications to the job?

4  A    Yes.  He said they were unqualified, incompetent, and he

5  had taught them everything that they knew, that they didn't

6  have the technical abilities for electronics and for -- for

7  being electricians, that they weren't qualified for that.

8  Q    And given the things he'd said before, did that strike you

9  as unusual?

10  A    Shocked me.

11  Q    Thank you.  No further questions.

12          THE COURT:  Cross-examination.

13          MR. CURTNER:  No questions for this witness.

14          THE COURT:  All right.  Thank you, ma'am.  You're

15  excused.

16          THE WITNESS:  Thank you.

17      (Witness excused)

18          THE COURT:  The government's next witness.

19          MR. SCHRODER:  Donald Kiele, Your Honor.  Mr. Kiele, if

20  you'll come forward up to the witness stand on the -- right

21  there.

22          THE COURT:  Okay, sir, as you kind of approach the

23  witness stand, you got to go around.  And that door pulls out,

24  and then you just step into the box there, and remain standing

25  for a second.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 747   Filed 09/23/14   Page 139 of 151

1          MR. KIELE:  Thank you, Your Honor.

2          THE COURT:  And my clerk right here will swear you in.

3          THE CLERK:  Please raise your right hand.

4          **DONALD CECIL KIELE, PLAINTIFF'S WITNESS, SWORN**

5          THE CLERK:  Thank you.  Please have a seat.  Sir, if

6 you can please state and spell your full name.

7          THE WITNESS:  My name is Donald Cecil Kiele.

8          THE COURT:  Spell.

9          THE CLERK:  Spell.

10          THE WITNESS:  Pardon?

11          THE COURT:  She wants you to spell it.

12          THE WITNESS:  Oh.  K-i-e-l-e.

13          THE CLERK:  Your full name, sir, Donald and

14 (indiscernible) --

15          THE WITNESS:  Donald Cecil Kiele, K-i-e-l-e.

16          THE COURT:  Donald is D-o-n-a-l-d, right?

17          THE WITNESS:  Correct.

18          THE COURT:  How do you spell Cecil?

19          THE WITNESS:  C-e-c-i-l.

20          THE CLERK:  Thank you.

21          THE COURT:  Very good.  Counsel.

22                      **DIRECT EXAMINATION**

23 BY MR. SCHRODER:

24 Q   Mr. Kiele, do you know the defendant, Jim Wells?

25 A   I do.

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 747   Filed 09/23/14   Page 140 of 151

1  Q    And how do you know him?

2  A    He's my brother-in-law.

3  Q    And are you married to Theresa Kiele?

4  A    I am.

5  Q    And how long have you been married to Theresa?

6  A    Forty-two years.  It'll be forty-three here in a month or

7  so.

8  Q    All right.  And have you known Jim Wells the entire time

9  of your marriage?

10 A    Yes.

11 Q    All right.  And have you had -- did you have contact with

12 him before and after the homicides in Kodiak?

13 A    Correct.

14 Q    Now, before the murders, did Jim ever talk about his co-

15 workers that were the victims?

16 A    He would come through Seattle on many occasions, and --

17 and the only person I ever remember him talking about was Rich

18 Belisle.

19 Q    And what did he say about Mr. Belisle?

20 A    That they were off to some conference, somewhere.  And he

21 would generally come by and see us or -- that they would meet

22 up -- and down in -- at the airport and -- and go on their

23 conferences.

24 Q    Okay.  And after the -- did you see him after the murders?

25 A    We did.

1  Q    And where did that happen?

2  A    We met them for dinner at the end of June.  And went to

3  dinner and then came back to our house to talk for a while.

4  Q    And did he talk about his dead co-workers on any of those

5  visits?

6  A    He did.

7  Q    And what did he say about them?

8  A    We were sitting in our living room and he was asked a

9  question by my daughter, that -- she said, "Gee, I'm so sorry

10  for your -- your friends and -- and their families.  How are

11  they doing?"  And he kind of went into a rant about -- that

12  they were incompetent, that they were unqualified to have their

13  jobs, that Rich was a -- an alcoholic, a drunk, is what he

14  called him.  Talked about that their work -- you know, he was

15  the only one there that knew what was going on and they didn't

16  deserve to have their jobs.

17  Q    All right.

18       MR. SCHRODER:  Thank you, Your Honor.  No further

19  questions.

20       THE COURT:  Cross-examination.

21                    **CROSS-EXAMINATION**

22  BY MR. CURTNER:

23  Q    Mr. Kiele, do you know when this conversation took place?

24  A    Yes.  It was the end of June 2012.

25  Q    And are you sure about that?  Could it have been later in

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 747   Filed 09/23/14   Page 142 of 151

1  the fall or around Thanksgiving?

2  A    Yeah, I'm real positive about that.

3  Q    On June?

4  A    June.

5  Q    Okay.  And when was the first time you were -- mentioned

6  this conversation to anybody?

7  A    I'm not sure what you mean.

8  Q    When did you first -- were you interviewed, and did you

9  tell anybody about this conversation in June?

10 A    I believe it was December.

11 Q    In December.  And do you know, did your -- you were

12 interviewed a number of times by the FBI, you and your wife?

13 A    We were interviewed by the FBI in December for the first

14 time.  We had a phone call -- my -- my wife had a phone call.

15 Q    Okay.

16 A    I wasn't -- wasn't on it before that.

17 Q    Then after that interview in December, did your wife end

18 up sending some cookie recipes to the agents?  Do you know?

19 A    I don't know.

20 Q    Okay.  All right.  Thank you.

21      THE COURT:  Redirect.

22      MR. SCHRODER:  No further questions, Your Honor.

23      THE COURT:  Thank you, sir.  You're excused.

24      THE WITNESS:  Thank you.

25      (Witness excused)

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1          THE COURT:  Government's next witness.

2          MR. SCHRODER:  The government's going to call Patrick

3   Hopkins, Your Honor.

4       (Pause)

5          THE COURT:  Right up here, sir.  And you'll -- to get

6   to the box, that door pulls out, and you can just step in the

7   box.  And then remain standing for just a second, because she's

8   going to swear you in.

9          THE CLERK:  Please raise your right hand.

10         **PATRICK HOPKINS, PLAINTIFF'S WITNESS, SWORN**

11         THE CLERK:  Okay, thank you.  Please have a seat.  And,

12   sir, if you can please state and spell your full name.

13         THE WITNESS:  Spell?

14         THE CLERK:  Yeah --

15         THE COURT:  State and spell --

16         THE CLERK:  -- and --

17         THE COURT:  -- your full name.

18         THE WITNESS:  Sorry.  Patrick Hopkins.  P-a-t-r-i-c-k,

19   H-o-p-k-i-n-s.

20         THE CLERK:  Thank you.

21         THE COURT:  Counsel.

22                    **DIRECT EXAMINATION**

23   BY MR. SCHRODER:

24   Q    Mr. Hopkins, where do you live?

25   A    Groton, Connecticut.

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 747   Filed 09/23/14   Page 144 of 151

1  Q    And who is your father?

2  A    Jim Hopkins.

3  Q    And were you living with your parents in Kodiak at the

4  time of your -- of his death?

5  A    I was.

6  Q    And how old were you at the time?

7  A    Eighteen.

8  Q    Were you still attending school?

9  A    I was.

10 Q    And which school?

11 A    Kodiak High.

12 Q    And how did you get from your home to Kodiak High in the

13 mornings?

14 A    The bus.

15 Q    All right.  What time did that bus come for you in the

16 morning?

17 A    7:30.

18 Q    Okay.  Now I'm going to ask you a few questions, just a

19 few questions about the morning of April 12th.  Were you aware

20 when your father left for work that morning?

21 A    I was.

22 Q    And how was that?  How were you aware?

23 A    He shout -- shouted upstairs, telling me he was leaving.

24 Q    Okay.  And were you awake at the time?

25 A    I was.

1  Q    And where was your bedroom in relation to the main living

2  area in the house?

3  A    Upstairs.

4  Q    All right.  Now, at some point after he called out to you,

5  did you go downstairs?

6  A    Yes.

7  Q    And about how long after that?

8  A    About five minutes.

9  Q    All right.  And where was your mother when you came

10 downstairs?

11 A    She was downstairs.

12 Q    And what did you do when you got down there?

13 A    Grabbed a cup of coffee and waited for my bus.

14 Q    Okay.  And what time do you generally leave -- did you

15 leave from the house to go get the bus?

16 A    7:25.

17 Q    And so where was the bus stop located?

18 A    Right across the street.

19 Q    And did you go meet the bus that morning?

20 A    I did.

21 Q    And from the time you left the house until the time you

22 got on the bus, did you see your mother come out of the house

23 at all?

24 A    I did not.

25 Q    And is it -- is your house -- was your house visible from

1  the bus stop?

2  A    It was.

3  Q    And how many vehicles did your family -- automobiles or

4  trucks did your family own at the time?

5  A    One.

6  Q    Okay.

7          MR. SCHRODER:  No further questions, Your Honor.

8          THE COURT:  Cross-examination.

9          MR. OFFENBECHER:  I don't have any questions, Your

10  Honor.

11          THE COURT:  All right.  Thank you, sir.  You're

12  excused.  The government's next witness.

13      (Witness excused)

14          MR. SCHRODER:  That's our witnesses for today, Your

15  Honor.  We have -- final set tomorrow morning, but we're trying

16  to get everybody into town.

17          THE COURT:  So you're telling us we're done for the

18  day?

19          MR. SCHRODER:  I am.

20          THE COURT:  Holy moley.  Okay.  Well, ladies and

21  gentlemen, do you want to -- same choice we had last week.  Do

22  you want to go in the small room and wait till 4:30, or do you

23  want to go on home?  So we'll stand in recess till 8:25

24  tomorrow morning.

25          MR. SCHRODER:  Thank you, Your Honor.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 747   Filed 09/23/14   Page 147 of 151
(720) 384-8078   attrans@sbcglobal.net

1          THE COURT:  And we'll stay here for (indiscernible).

2      (Jury not present)

3          THE COURT:  Please be seated.  Okay, counsel, anything

4  to address?

5          MR. OFFENBECHER:  Your Honor, I do have one thing.  It

6  appears that the government's going to call Ms. Hannah Belisle

7  tomorrow as a witness.  And --

8          THE COURT:  Ms. --

9          MR. OFFENBECHER:  Hannah Belisle --

10          THE COURT:  Okay.

11          MR. OFFENBECHER:  -- the daughter of Mr. Belisle.  And

12  we had put her on our witness list.

13          THE COURT:  I saw that.

14          MR. OFFENBECHER:  But they're going to call her.

15  That's fine, of course.  But I think with respect to the

16  Court's earlier sequestration order and the exception to the

17  sequestration order, it seems to me it would be appropriate --

18  and I'm asking the Court, during the -- simply during the

19  testimony of Hannah Belisle, that her mother be excused from

20  the courtroom, since the subject matter about which she'll be

21  testifying will be very similar.  And similarly, that

22  question's going to come up with the Hopkins family as well.

23          THE COURT:  Okay.  Well, I'm not quite ready to deal

24  with that.

25          MR. OFFENBECHER:  Okay.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1          MR. SCHRODER:  And just to be on the record, Your

2    Honor, we would object to that.  They're victims and they have

3    a right to be here.

4          THE COURT:  Yeah.  I think what I'm going to do is

5    stand in recess, seal the courtroom, and take up a few items

6    just with counsel.  Okay.  So we'll stand in recess.  Tomorrow

7    we'll start at about 8:30.

8        (Court recessed at 1:20 p.m., to proceed in a sealed

9    matter - transcribed separately)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 747  Filed 09/23/14  Page 149 of 151

1                          CERTIFICATE

2    I certify that the foregoing is a correct transcript from the
     electronic sound recording of the proceedings in the above-
3    entitled matter.

4
     _____s/Teresa K. Combs_____        _____9/8/14_____
5    Teresa K. Combs, Transcriber           Date

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1                              **INDEX**

2                                                          FURTHER
                        DIRECT   CROSS   REDIRECT   RECROSS   REDIRECT
3
    PLAINTIFF'S WITNESSES
4
    Russell Alexander
5     Doran                 2270    2288     2297
    Amanda Vivian Sanford   2298    2303     2313     2313
6   Richard W.
      Vorder Bruegge        2314    2339     2357     2360
7   Neil Schmidt            2363    2373     2377
    Daryl Allison           2379    2385     2389     2390
8   Theresa Kiele           2396
    Donald Cecil Kiele      2399    2401
9   Patrick Hopkins         2403

10  PLAINTIFF'S EXHIBITS                                    ADMITTED

11  28      Photograph - drawing of airport terminal          2302

12  82      SF-50 hiring Belisle as GS employee               2269

13  130     Vorder Bruegge presentation slide 29              2335

14  131     Vorder Bruegge presentation slide 30              2335

15  132     Vorder Bruegge presentation slide 31              2336

16  133     Vorder Bruegge presentation slide 32              2336

17  134     Vorder Bruegge presentation slide 49              2338

18  140A    Questionnaire                                     2381

19  140B    Questionnaire                                     2381

20  168     Video by Doran                                    2278

21  224     Brochure - Honda CR-V                             2371

22

23

24

25

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 747   Filed 09/23/14   Page 151 of 151
(720) 384-8078   attrans@sbcglobal.net