1   UNITED STATES DISTRICT COURT

2   FOR THE DISTRICT OF ALASKA

3   UNITED STATES OF AMERICA,      )   Case 3:13-cr-00008-RRB
                                   )
4          Plaintiff,              )   Anchorage, Alaska
                                   )   Wednesday, April 16, 2014
5      vs.                         )   8:38 o'clock a.m.
                                   )
6   JAMES MICHAEL WELLS,           )
                                   )
7          Defendant.              )
    _____)   **TRIAL BY JURY – DAY 12**

8
                     **TRANSCRIPT OF PROCEEDINGS**
9
              BEFORE THE HONORABLE RALPH R. BEISTLINE
10                 UNITED STATES DISTRICT JUDGE

11  APPEARANCES:

12  For the Plaintiff:       KAREN L. LOEFFLER
                             U.S. Attorney
13                           BRYAN SCHRODER
                             KATHLEEN ANN DUIGNAN
14                           Assistant U.S. Attorneys
                             Office of the U.S. Attorney
15                           222 West 7th Avenue, #9, Room 253
                             Anchorage, Alaska  99513-7567
16                           (907) 271-5071

17  For the Defendant:       F. RICHARD CURTNER
                             Federal Defender
18                           Office of the Federal Public Defender
                             601 West 5th Avenue, Suite 800
19                           Anchorage, Alaska  99501
                             (907) 646-3400
20
                             PETER OFFENBECHER
21                           Skellenger Bender, P.S.
                             1301 5th Avenue, Suite 3401
22                           Seattle, Washington  98101-2605
                             (206) 623-6501
23

24

25

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 1 of 239
(720) 384-8078  attrans@sbcglobal.net

1  APPEARANCES (Continued):

2  Court Recorder:           NANCY LEALAISALANOA
                             U.S. District Court
3                            222 West 7th Avenue, #4, Room 229
                             Anchorage, Alaska  99513-7564
4                            (907) 677-6111

5  Transcription Service:    A & T Transcripts
                             6299 West 111th Avenue
6                            Westminster, Colorado  80020
                             (720) 384-8078

7

8  Proceedings recorded by electronic sound recording; transcript
   produced by transcription service.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 2 of 239
(720) 384-8078   attrans@sbcglobal.net

1      <u>**ANCHORAGE, ALASKA - WEDNESDAY, APRIL 16, 2014**</u>

2

3      (Call to Order of the Court at 8:38 a.m.)

4      (Defendant present; jury not present)

5          THE CLERK:  All rise.

6          THE COURT:  Ready for the jury?

7          THE CLERK:  His Honor the Court, the United States

8   District Court --

9          THE COURT:  Yes or no?  Yes or no?  Are we ready for

10  the jury?

11         MR. CURTNER:  Judge, just one heads-up.

12         THE COURT:  No.

13         MR. CURTNER:  No.  No, I just want to give you a heads-

14  up that we're still trying to live up to our schedule we gave

15  you for witnesses, but we're still waiting for some

16  transportation orders --

17         THE COURT:  Okay.

18         MR. CURTNER:  -- for witnesses that are scheduled for

19  tomorrow and Friday.  Just want to let you know that.

20         THE COURT:  I'll get on that -- is -- I thought the

21  magistrate was addressing those.  If not, I'll take care of it.

22         MR. CURTNER:  Yeah, okay.  I mean, I think he's been

23  addressing them, but we still need transportation orders,

24  because --

25         THE COURT:  I understand.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 748  Filed 09/23/14  Page 3 of 239
(720) 384-8078  attrans@sbcglobal.net

1      MR. CURTNER:  -- we got people traveling from out of

2  state.

3      THE COURT:  Well, okay.  I'll get right on that, next

4  time you --

5      MR. CURTNER:  Thank you.

6      THE COURT:  -- when -- as soon as you quit filing

7  motions at the last minute.  Did the government get the most

8  recent motion?

9      MR. SCHRODER:  We did.

10     MS. DUIGNAN:  We just got it, Your Honor, yes.

11     THE COURT:  Can you -- and do you have a response yet

12  or --

13     MR. SCHRODER:  (Indiscernible).

14     MS. DUIGNAN:  We haven't typed a response, but I can

15  make an oral response, Your Honor.

16     THE COURT:  No -- well, is it timely?  Is -- do we have

17  to address it this minute?  Is it this next witness?

18     MS. DUIGNAN:  It's not this next witness, but it will

19  be a witness this morning, Your Honor.

20     THE COURT:  Okay.  Well, let's get this next witness

21  going and -- okay, we'll get the jury.

22     (Jury present)

23     THE COURT:  Good morning, ladies and gentlemen.

24  Everybody holding up?  Looking good.  Okay, please be seated.

25  All right, the government's next witness.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

TOGLIA - DIRECT

1      MR. SCHRODER:  Your Honor, the government calls Angelo
2  Toglia.
3      THE COURT:  And, sir, if you just pull that door open,
4  it'll get you into the witness box.  Remain standing, and my
5  clerk here will swear you in.
6      THE CLERK:  Okay.  Please raise your right hand.
7      **ANGELO TOGLIA, JR., PLAINTIFF'S WITNESS, SWORN**
8      THE CLERK:  Okay, thank you.  Please have a seat.  And,
9  sir, if you can please state and spell your full name.
10     THE WITNESS:  Angelo Toglia, Jr., A-n-g-e-l-o, last
11 name T-o-g-l-i-a.
12     THE CLERK:  Thank you.
13     THE COURT:  All right.  Counsel.
14                    **DIRECT EXAMINATION**
15 BY MR. SCHRODER:
16 Q   Mr. Toglia, who are you employed by?
17 A   Collision Research and Analysis in Gig Harbor, Washington.
18 Q   And what do you do for Collision Research and Analysis?
19 A   Automobile accident reconstruction and forensic analysis
20 of video and photographs.
21 Q   And how long have you been employed by Collision Research?
22 A   For over 12 years.
23 Q   And what's your position with them, your title?
24 A   A research engineer.
25 Q   And how -- what business -- I mean, you kind of mentioned

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 5 of 239

1  it, but what business is Collision Research in?  What kind of

2  work do you do?

3  A   The reconstruction and analysis of transportation and

4  industrial accidents, also research into various areas of

5  accident reconstruction techniques and collision safety.

6  Q   All right.  And how many accidents have you -- would you

7  estimate you've investigated for Collision Research?

8  A   Definitely in the hundreds, many hundreds.

9  Q   And where did you work prior to working at Collision

10  Research?

11  A   At Exponents Test and Engineering Facility in Phoenix,

12  Arizona.

13  Q   And what kind of activities -- are you involved in kind of

14  the broad range of activities at Collision Research, ordinarily

15  specialize in some --

16  A   Yes, I am.  I specialize in automobile accident

17  reconstruction as well as reconstruction of other types of

18  accidents.  And also, as I think I mentioned earlier, the

19  forensic analysis of videos and photographic images.

20  Q   So does Collision Research get involved with matters

21  outside of strict accident reconstruction?

22  A   Yes, we do.

23  Q   And does that include the video analysis you just talked

24  about?

25  A   Yes, the forensic analysis, right.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1  Q    So, you know, what skills do you bring to the table that

2  allows you to assist in these other kinds of investigations?

3  A    My education, training, and experience as a mechanical

4  engineer, specifically accident reconstruction techniques and

5  photogrammetry, or the forensic analysis of the -- the video

6  and still images.

7  Q    Okay.  Now, we'll get back to that in a moment, but let's

8  talk about your educational background for just a moment.  Do

9  you have an undergraduate degree?

10 A    Yes, I do.

11 Q    And from where?

12 A    I have a mast -- sorry, bachelor of science in mechanical

13 engineering from the University of Arizona.

14 Q    And how about a post -- do you have postgraduate degree?

15 A    Yes, I do.

16 Q    From where?

17 A    University of Arizona.  It's a master's of engineering

18 degree.

19 Q    And are you certified as a professional engineer?

20 A    Yes, I am, in four states.

21 Q    And are you a member of any professional societies?

22 A    Yes, several societies, such as SAE, the Society of

23 Automotive Engineers; ASME, a mechanical engineering society;

24 and also a society called Triple AM.

25 Q    And what's Triple AM?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 7 of 239

1    A    The Association for the Advancement of Automotive

2    Medicine.

3    Q    Now, have --

4    A    Think I got that one right.

5    Q    Now, have you had any specialized training while you've

6    been at Collision Research?

7    A    Yes, I have.

8    Q    And what types?

9    A    Training in the area of photogrammetry and using software

10   associated with photogrammetry and three-dimensional scene

11   generation and analysis.

12   Q    Okay.  And have you -- you know, maybe this is a good

13   time -- the jury's heard the term "photogrammetry," but could

14   you remind them what that means?

15   A    Well, I've published several papers in the area of

16   photogrammetry.  And in citing one of my papers, I'll tell you

17   that photogrammetry is the art, science, and technology of

18   extracting reliable dimensional information from a set of

19   visual images.

20   Q    And how many papers have you published on these kind of

21   topics, related topics?

22   A    Three -- three.  I have three publications overall, two

23   related to the area of photogrammetry.

24   Q    And have those been -- any of those papers been presented

25   in a peer-review setting?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 8 of 239
(720) 384-8078  attrans@sbcglobal.net

1  A    Yes, they all have.

2  Q    All right.  Now, has photography always been kind of an

3  important aspect of accident reconstruction?

4  A    Absolutely.

5  Q    And how is video and especially the advent of computers --

6  how's that in -- how's that integrated all that into your work?

7  A    Well, certainly videocameras are becoming more and more

8  common with respect to surveillance cameras.  Videos that were

9  seen and dash cameras, like -- such as on police vehicles,

10  onboard cameras and -- and such, that were seeing a lot of

11  video images that are -- have not been as prevalent in prior

12  years.

13  Q    So how much of your work now includes working with

14  computers and video or still images?

15  A    I don't know that I could put a percentage on it, but

16  certainly within the last couple of years it's becoming more

17  and more prevalent again as these video images are capturing

18  more and more activities, both vehicles, security cameras

19  capturing these activities.

20  Q    And have you been trained in the use of computer tools

21  that allow you to do that type of analysis?

22  A    Yes, I have.

23  Q    And could you describe -- just briefly describe that

24  training?

25  A    Several programs associated with performing the

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 9 of 239
(720) 384-8078  attrans@sbcglobal.net

1  photogrammetry analysis.  It's a -- a lot of math.  And so with

2  the increase in computer power, now there are software programs

3  that do the calculations for you, and using those programs has

4  made the analysis much more commonplace and easier to perform.

5  Q    And have you used some of those tools in this case?

6  A    Yes, I have.

7  Q    Now, have you been declared an expert before in court?

8  A    Yes, I have.

9  Q    On how many occasions?

10  A    One time in state court.

11  Q    All right.  And have you also testified as an expert at

12  mediations and depositions?

13  A    Yes, I have.  Mediations, arbitrations, and hearings,

14  several times.

15       MR. SCHRODER:  All right.  Your Honor, the government

16  moves Angelo Toglia be declared as an expert witness in the

17  field of video analysis, computer modeling, and accident

18  reconstruction.

19       THE COURT:  Any voir dire?

20       MR. CURTNER:  No, Your Honor.

21       THE COURT:  He'll be received in that capacity.

22  BY MR. SCHRODER:

23  Q    Now, you briefly described the process of what you do a

24  little bit at Collision Research, but I want to talk a little

25  bit more about what that means before we start talking about

Case 3:13-cr-00008-SLG  Document 748  Filed 09/23/14  Page 10 of 239

1 this case in particular.  What kind of products are you able to

2 produce for clients in your work?

3 A    Generally with respect to our work product, we're looking

4 at reports obviously that -- written reports.  But in terms of

5 presenting a reconstruction, a more typical reconstruction, we

6 make two-dimensional and three-dimensional diagrams as well as

7 physical models to demonstrate the reconstruction that we're

8 presenting.

9 Q    Now, were physical models -- was that kind of the

10 traditional way of doing work in your field?

11 A    Yes, actually building a -- a model with vehicles and

12 the -- and the scene, and putting trees and guardrails and

13 things like that in actual physical models, yes.

14 Q    And in the modern era, how's that -- how has that changed?

15 A    With the advent, again, of computer power, we're doing a

16 lot of that in the computer now and creating a three-

17 dimensional scene within the computer.

18 Q    And can you integrate the computer models and the video?

19 A    Yes.  The software programs, the photogrammetry programs

20 that we've been referring to, allow you to tie in photographs,

21 images from both cameras and videos into this three-dimensional

22 world that is created.

23 Q    And have you integrated computer models and video in

24 previous cases?

25 A    Yes, numerous times.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 748  Filed 09/23/14  Page 11 of 239
(720) 384-8078  attrans@sbcglobal.net

**TOGLIA - DIRECT**

1  Q   And could you give a -- kind of briefly describe what --
2  maybe what you did in one or -- one of those cases?
3  A   Similar to the -- the work performed in this case with
4  respect to going out to the site, documenting it in some
5  fashion that lets you reconstruct this three-dimensional world,
6  and bring that into a computer and -- and overlaying images
7  from either a videocamera or a photograph.
8  Q   Now, have any of these cases you've done been criminal
9  cases?
10  A   Yes, they have.
11  Q   And have you worked for the prosecution or the defense?
12  A   For both sides, in both civil and criminal cases.
13  Q   And what is the advantage to integrating images into a
14  computer model?  What can you do with it once you have that
15  integration done?
16  A   It lets you make comparisons between what you're seeing on
17  the image and what you could be -- what you're trying to
18  represent in your model world.
19  Q   And what kind of comparisons were you able to make, or how
20  did that work in this case?
21  A   In this case we were looking at size comparisons, overall
22  geometry, as well as color comparisons.
23  Q   Of what types of items?
24  A   Of a vehicle.
25  Q   All right.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 748  Filed 09/23/14  Page 12 of 239
(720) 384-8078  attrans@sbcglobal.net

1  A   Or -- or I should say, sorry, multiple vehicles.

2  Q   All right.  So you stated that you reviewed the videos in

3  this case and -- or did you review the videos in this case in

4  preparation for your testimony today?

5  A   Yes, I have.

6  Q   And did you receive images that you worked with from the

7  COMMSTA Kodiak cameras from the 12th, 19th, and 20th of April?

8  A   I'm not sure if we received the images.  I -- I have a

9  recollection of extracting the images ourselves using the --

10 the viewing programs.  I think we extracted the images from the

11 video software itself.

12 Q   All right.  So you had a larger amount of video?

13 A   Yes.  Oh, much -- yes.

14 Q   Okay.  Now, did you enhance those videos in any way?

15 A   No, not at all.

16 Q   Did you change them in any way?

17 A   No.  With the exception of zooming in or enlarging, the

18 videos were the video images were not altered in any way.

19 Q   And as part of that analysis have you prepared an exhibit

20 to help explain your process?

21 A   Yes, I have.

22 Q   All right.  And what's that composed of?

23 A   It's a PowerPoint presentation consisting of several

24 slides, as well as a -- a video that's embedded in the

25 presentation.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 13 of 239
(720) 384-8078   attrans@sbcglobal.net

1  Q   And what's the purpose of the video?  What does that show?

2  A   It shows the overall -- you'll see the three-dimensional

3  model that was created, and how you can move around and view

4  the model from any perspective.

5  Q   And were you personally involved with the measurements,

6  the surveying type activity that happened to make the model?

7  A   Yes.  I actually visited the COMMSTA site and performed an

8  onsite survey.

9  Q   And is the computer model a true and accurate

10 representation of that exterior section around COMMSTA Kodiak

11 that you --

12 A   Yes.

13 Q   -- surveyed?

14 A   Yes, it is.

15       MR. SCHRODER:  Your Honor, the government has

16 prepared -- Mr. Toglia's compared a computer mod or a slideshow

17 that is Exhibit 111, that we would like to use as a

18 demonstrative exhibit.

19       THE COURT:  Very well.

20       MR. SCHRODER:  Okay.

21       THE CLERK:  What exhibit number is that?

22       MR. SCHRODER:  111.

23       THE CLERK:  Thank you.

24    (Side conversation)

25       MR. SCHRODER:  And, Your -- again, Your Honor, if I may

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 748  Filed 09/23/14  Page 14 of 239
(720) 384-8078  attrans@sbcglobal.net

1  approach, I think we'll let Mr. Toglia control the slides.

2          THE COURT:  That's fine.

3          THE WITNESS:  Thank you.  Okay.

4  BY MR. SCHRODER:

5  Q   So, Mr. Toglia, before we just -- we go into the --

6  exactly how this was done, could you very briefly explain to

7  the jurors how you prepare and construct the computer model?

8  A   The computer is -- the computer model is generated --

9  the -- the first step in that is a site visit, so I, as I

10 indicated, visited the site, performed what's called a total

11 station survey of the site, which gives me an accurate three-

12 dimensional representation of the landmarks, the terrain, the

13 buildings, and the surrounding area.  And then I can take that

14 data back to the office and then import it into these software

15 programs that we're going to be showing you, to actually

16 generate a three-dimensional photorealistic model of the -- of

17 the scene.

18 Q   Okay.  Is that what you did in this case?

19 A   Yes.

20 Q   And did you -- you said you visited Kodiak as part of your

21 work?

22 A   Yes, I did.

23 Q   All right.  So we can go to your next slide.  Now, what

24 does this depict?

25 A   This is an aerial photograph of the Coast Guard base on

1  Kodiak that was taken in August of 2010.

2  Q    Now, where did you get this photograph?

3  A    As you can see down in the lower right-hand corner, this

4  is a -- a Google photograph.

5  Q    And I think you have a -- it's a -- I think you have a

6  laser pointer up there --

7  A    Yes, I do.

8  Q    -- that -- okay.  So --

9  A    It's down here.

10 Q    All right.  Now, was this -- this was not taken on --

11 obviously on the date of the incident.  But based upon your

12 visit to COMMSTA Kodiak, does the depiction of the buildings,

13 roads, and the layout -- is it the same as when you visited it

14 at the time?

15 A    Yes, it is.

16 Q    All right.  Okay, go to the next slide.  Now, what is

17 the -- can you explain what this depicts?  Let's start there.

18 A    What this slide shows is starting the same aerial that we

19 were just looking at, we're showing the field of view of the T1

20 camera, which is located at the top of the utility pole, in the

21 corner over here, the area from which these lines are -- are

22 generating.  I think the jury's probably familiar with the fact

23 that we've got the T1 building here, and this is the T2

24 building.

25      And so what these colored lines are showing is the field

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 748  Filed 09/23/14  Page 16 of 239
(720) 384-8078  attrans@sbcglobal.net

1    of view of the camera.  The pink lines show the overall field

2    of view of the camera, which is shown down in the lower right-

3    hand corner here.  So this is a full-frame image of what that

4    videocamera was recording.

5        There's a dashed line through this area here, and what

6    that represents is the fact that, at about this location over

7    here -- I guess for the record should I describe -- should --

8    in terms of here, though, the middle of the -- the

9    photograph -- down in the lower right-hand photograph you can

10   see that there's some terrain there through which you cannot

11   actually see behind.  So that's kind of the purpose of the --

12   the dashed line here to show that the camera can't actually see

13   back this far.

14       But the pink lines give the overall view, shown down in

15   this lower right-hand photograph, and then the yellow box is a

16   zoomed-in portion of that.  So that's what is depicted by the

17   yellow line right here.  And again there is a dashed portion

18   that corresponds to this berm in the lower right-hand corner of

19   the yellow box, through which the video will not provide a -- a

20   view of what's behind there.  And then if we zoom in to that

21   yellow area which is shown in the lower left, into the green

22   box, that's a very zoomed-in view and that's depicted by the

23   green line right here, from the green to the pink line.  So

24   that's the field of view of the camera, between the T2 building

25   and the edge of the frame.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 748  Filed 09/23/14  Page 17 of 239
(720) 384-8078  attrans@sbcglobal.net

**TOGLIA - DIRECT**

1  Q    And this particular image, what day and time is this?

2  A    The image in the lower right-hand corner here, the full-

3  frame image is taken on April 12th, 2012, at a time of

4  approximately 7:09 --

5  Q    Okay.

6  A    -- a.m.

7  Q    Now go -- if you go to your next slide, what does this

8  slide depict?

9  A    This is a similar slide, showing the field of view of the

10 T2 camera.  So this is the T2 building over here with the

11 camera located in this corner.  And then the field of view

12 extends down in this direction.  As kind of a reference, you

13 can see the spherical water tower down here in the lower center

14 portion of the image.  And it's represented here in the zoom in

15 the pink box.

16 Q    All right.  If you could move ahead.  Now, what is -- is

17 there a series of slides under this heading of "Scene

18 Generation"?  What does that mean?

19 A    Yes.  We're going to overlay the survey data that I

20 acquired on top of -- again, starting with this aerial

21 photograph that we've already seen.  And then I can overlay

22 these yellow lines which are a scaled representation.  This is

23 actually the survey data that I collected while I was out at

24 the scene.

25 Q    And what kind of equipment did you use to do that?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 18 of 239
(720) 384-8078   attrans@sbcglobal.net

1  A    It's called a Nikon Total Station, piece of surveying

2  equipment.

3  Q    And is that a fairly state-of-the-art piece of equipment?

4  A    Yes, it's a state-of-the-art surveying tool with an

5  accuracy of several millimeters of a kilometer.

6  Q    Okay.  Now, why -- we see the area that you surveyed, but

7  why didn't you survey the entire area around the communication

8  station?

9  A    The area that I surveyed, as you can see through the

10 yellow lines here, included the road over here on Anton Larsen,

11 approaching driveway, portions of the T2 and the T1 buildings,

12 as well as the parking lot and areas through -- in front of the

13 T1 building over here.  So I concentrated on the areas that

14 were visible in that field of view that we were just looking at

15 from the T1 camera.

16 Q    But did you have additional survey data?

17 A    Yes, I did.

18 Q    And where'd you get that?

19 A    I received additional data from COMMSTA, and that is

20 represented by the pink lines on this exhibit.  And you can see

21 that the COMMSTA data overlays very well with the data that I

22 took in terms of some of the common areas, the roads and

23 driveway areas, as well as the -- the parking lot and portions

24 of the building.

25 Q    And do some of the survey points overlap with your survey?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 748  Filed 09/23/14  Page 19 of 239
(720) 384-8078  attrans@sbcglobal.net

1  A    Yes, they do.

2  Q    And were they consistent with your survey?

3  A    Yes, they are.

4  Q    Moving ahea -- moving on to your next slide.

5  A    Can I say one more thing about --

6  Q    You can.

7  A    -- this before we --

8  Q    You can.

9  A    The -- one of the things that I gained from the COMMSTA

10 survey, if you noticed that the COMMSTA survey includes the

11 complete buildings as opposed to the -- just the front kind of

12 portions of the buildings that I surveyed.  So having this

13 information was helpful when generating the 3-D scene.  You'll

14 see as we move through the scene that we were able to have

15 complete buildings, and that was -- was a useful piece of

16 information that came from this data.

17 Q    Okay.  Moving on.  Now -- the -- hear you talk, used that

18 term "photogrammetry" again.  So what was this next stage of

19 the process?

20 A    This is the photogrammetry analysis, the -- the part where

21 I'm now taking an image -- so this is a -- a full-frame image

22 from the subject T1 camera.  And I'm importing that into the

23 software program.  And if I advance to the next slide, what

24 you'll see is, I then go into this program.  And these little

25 triangles here are points that I identify and pick in the

1   software.  And what I'm doing is going through this image and
2   telling the software program I know where all these points are
3   in three-dimensional space because I conduct this survey.  So I
4   know where the corners of the roof are, this fence line, some
5   fence posts down here in the lower right, some parking lot
6   stripes over in this area on the right side, as well as from
7   fence posts over on the right, and the fire hydrant and -- and
8   posts over there on the right side as well.
9       So I'm telling the software program that I know where all
10  of these three-dimensional points are, and by having that
11  information, the software program is -- is able to crunch the
12  math and determine how this photograph aligns with my three-
13  dimensional data.  And you can in fact see that by the white
14  lines.  Those are actual survey points and the lines that are
15  connecting them that I took out at the scene.  And you can see
16  that there's good alignment of landmarks such as the fence
17  here.  There's actually a little kink in the fence, and how the
18  fence direction changes down at the bottom right of this
19  photograph, and how parking lot stripes and other structures
20  such as the fence and building edges all line up.
21  Q   So what's the next step?
22  A   The next step then is to -- let me back up one more --
23  I'll go back.  I apologize.  What -- once the three-dimensional
24  data is aligned in the software program, the software is able
25  to calculate the parameters of the camera from which this is

1    taken from.  So if you're familiar with how your still camera

2    works and you can zoom in and out and get different

3    perspectives of what you're looking at -- the software program,

4    because it's lined up all of these landmarks, can say, okay,

5    you're at a focal length or a zoom factor of -- of whatever it

6    ends up being.

7         And I take that information and, in advancing to the next

8    slide -- because one of the things that I surveyed was the

9    location of the cameras, in this three-dimensional scene that's

10   created, we do something that's called camera matching.  And

11   what that involves is, again, because I know where the camera

12   was located within the software, I put a virtual camera at that

13   location, and because of our photogrammetry analysis we know

14   the parameters of that camera that are necessary in order to

15   give us the right view, like what we're seeing here, and that

16   allows us -- that allows me to overlay this three-dimensional

17   scene, which you can see is very similar, if I flip back and

18   forth a little bit -- you can see how it's very similar to the

19   white line survey data, but now we're looking at a scene that's

20   fully rendered and generated in three dimensions.  And you can

21   see in the upper left-hand portion of this where there is no

22   three-dimensional model, it's still the background of the video

23   image.

24   Q    Okay.  Now moving on.  Now, what is this we're going to

25   see here?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 748  Filed 09/23/14  Page 22 of 239

1  A    This is the video that is going to show the completed
2  three-dimensional model and how we can move through it and look
3  at things from different perspectives.
4  Q    Now, I notice that there's -- there seems to be terrain in
5  there.
6  A    Yes, there is.
7  Q    And how --
8  A    And as it moves around -- and I'm not sure how this is
9  going to work without --
10 Q    I think we're going to probably have to move it --
11 A    -- without a mouse.
12 Q    -- from here --
13 A    Yeah.
14 Q    -- and you can describe it.  And if you'd like to pause,
15 let Ms. Dixon know.
16 A    Okay.  So if you can -- think if you move the mouse
17 around, you'll get a play bar.  There you go.  So play, and
18 then we'll want to stop it pretty shortly into it, right here.
19 If you look in the background, you can see how there is some
20 terrain information here, and that's -- some of this is pretty
21 far away from the area that I surveyed.  This surrounding
22 terrain was data that was acquired from the U.S. Geological
23 Survey, so that's where we got that information.  Go ahead and
24 continue.
25     And so what we're going to do, you can see that this is a

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 748  Filed 09/23/14  Page 23 of 239

1 completely -- what's called rendered three-dimensional model.
2 Can you pause it there, please? Okay, go ahead and let it run.
3 Sorry. I'll try to give you a couple seconds' lag. So we're
4 going to orbit around and take a look at the T2 building here,
5 and then if you can pause it about there.

6      You can see the camera is located in the background over
7 here at the top of this utility pole. And we're looking
8 essentially eastward from Anton Larsen Bay Road here. And,
9 again, this is the T2 building, which due to the combination of
10 the survey files that I was able to use, we've got a -- a
11 complete model of those buildings. Go ahead and -- and
12 continue.

13      And now what we're going to do -- again, remember that
14 this is a -- a three-dimensional model and we can look at
15 things from any perspective. So we're going to move around to
16 the point where we're behind the camera. So if you can pause
17 it there for a second. Again, the camera is -- its known
18 location is we -- I know that from the survey that I took out
19 at the scene. And now we're actually going to move into this
20 camera location. Go ahead and play it.

21      And you see we're going to get a perspective from within
22 that camera. We're going to go right into that sphere there.
23 And if you can pause it. And remember what I mentioned in
24 terms of -- with the camera that is within this three-
25 dimensional model, just like a real camera, we can zoom in

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 748  Filed 09/23/14  Page 24 of 239
(720) 384-8078  attrans@sbcglobal.net

1  or -- or zoom out.  So you'll notice that this is a pretty

2  wide-angle view here.  And if you can play the video, you'll

3  see that we're going to zoom in to a magnification that is

4  going to represent what was seen with the actual video.  And we

5  can fade that out.  Go ahead and pause it there, please.

6      So now we've faded out the model.  And just as you saw --

7  saw a static representation earlier of the overlaid model, this

8  was a -- a dynamic fading, so you can see how that comparison

9  works.  And we have image -- pixels over here of a vehicle on

10  the left side of the T2 building.  Go ahead and continue to run

11  it.  And we're going to outline those pixels in pink, just so

12  you can see an outline.  And then we're going to superimpose a

13  three-dimensional model.  If you could pause it there.  Thank

14  you.

15      Now, this model is a three-dimensional model -- an

16  accurate three-dimensional model of a vehicle.  And remember,

17  again, because we're working in a three-dimensional

18  environment, just like in the real world, in addition to moving

19  that model left and right and up and down, we can also move it

20  closer to us and farther, away, because we're in three

21  dimensions.  And just like in the wor -- real world, if you

22  move it closer it's going to appear bigger, and if you move it

23  farther away, it's going to appear smaller.  So we move it back

24  and forth until it appears the right side, such that it

25  overlays the pixels that were outlined in the color there.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 25 of 239
(720) 384-8078   attrans@sbcglobal.net

1  Okay, go ahead and continue.

2      And so now we're going to leave that model there in the

3  three-dimensional world as we fade back from the image to the

4  three-dimensional model.  And then we're going to work our way

5  kind of through the model and end up kind of back where we

6  started, on the other side of Anton Larsen Bay Road.  And

7  that's the video.

8  Q   Now, once you had the computer model in place and you were

9  able to do -- superimpose those images of vehicles, what was

10  your next step?

11 A   The next step is to compare those -- compare those

12 vehicles to the pixels that we were seeing on the image.

13 Q   And how many frames of video show -- and, well, let's go

14 to the 12th, the day of the incident -- how many videos -- or

15 frames of videos showed the blue car northbound through that T1

16 camera?

17 A   There were -- there are five frames of video.

18 Q   And what -- we can probably go to your next slide.  And

19 just for -- as a starting point, which one is this one?

20 A   This is the first of five images that show the vehicle

21 heading northbound.

22 Q   Okay.  Can you run through the -- those?

23 A   And I'll just play through -- this is number 2.

24     (Side conversation)

25 Q   Just -- and you can point out where the vehicle is.

1  A    So this is the vehicle in the background over here.  I'll

2  go back in case you were not noticing that.  It's starting over

3  here on the left-hand side and then progresses through --

4  here's number 3.  Number 4, the vehicle starts to go behind the

5  T2 building.  And, number 5, you can see just a portion of the

6  vehicle from behind the T2 building.

7  Q    Okay.  Now let's talk about how you did the analysis.  Do

8  you go frame by frame?

9  A    Yes, we -- I analyzed each individual frame separately.

10  Q    And what did you do for each frame?

11  A    As I indicated when the video was playing, I take a three-

12  dimensional model, a -- a scale model of a vehicle, and place

13  it within the three-dimensional environment such that it

14  overlays -- let's step back to this one here -- such that it

15  overlays the pixels that we see on the image.

16  Q    Okay.  So do you have a series of slides here that will

17  depict that?  And just to depict this process first, before we

18  go back and look at those images on the 12th, this is not from

19  the 12th.  Correct?

20  A    Correct.  This is an image from video recorded on the

21  19th.

22  Q    And why did you use this for your demonstration of the

23  process?

24  A    If I can -- I'll flip back to show you that on the 12th

25  there are numerous vehicles in the parking lot over here, and I

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 748  Filed 09/23/14  Page 27 of 239
(720) 384-8078  attrans@sbcglobal.net

1  think the jury probably noticed that the vehicle's somewhat

2  obscured by those vehicles in the parking lot.  So if I go

3  forward to slide 17 from the 19th, you can see that this gives

4  an unobstructed view of the vehicle on Anton Larsen Bay Road.

5  Q    So continue ahead and explain your process.

6  A    So now what I'm showing is a zoomed-in portion of that

7  image.  And again, just to be clear, I'm not doing any sort of

8  enhancing or changing of the video image into -- going from

9  slide 17 to slide 18.  All we're doing is -- all I'm doing is

10  zooming in on it so you can get a -- a better look at it.  And

11  then I can superimpose again the three-dimensional model.  So

12  this is a three-dimensional model of the vehicle.

13  Q    Now let's stop there for a minute.  Where do you get the

14  image that you used for these?

15  A    By image, I'm sorry, do you mean --

16  Q    The computer image --

17  A    -- of the model?

18  Q    The computer image of the vehicle.  Where do you get that?

19  A    The computer model -- we have several sources that we

20  acquire three-dimensional vehicles from.  You can go on the

21  Internet and -- and purchase models of various vehicles.

22  Q    But do you -- obviously the dimensions are important, so

23  do you verify those dimensions?

24  A    Yes, I independently check those measurements such as

25  wheel base and overall length and width and height, to make

**TOGLIA - DIRECT**

1  sure that they are accurate.

2  Q    And what kind of sources do you use for your information

3  for that?

4  A    In terms of the dimensional information, there are lots of

5  sources out there.  There -- there's one called Expert Auto

6  Stats, as well as Road and Track, Car and Driver, Edmonds, MSN,

7  Cars.com, all sorts of sources with respect to vehicle

8  dimensions.

9  Q    And, now, how do you align the vehicle -- the model with

10  the image of the vehicle?

11  A    Well, we're working in a three-dimensional world, so as I

12  indicated before, we can actually move it around left to right,

13  top to bottom, and -- and in and out.  And we move it around in

14  such a way that -- if I go back and forth here, you can see how

15  the image of the model overlays the -- the image of the video.

16  Q    All right.  And what was the next step in your process?

17  A    Then I think we're going to fade out to show an outline of

18  the model, so you can see how that encompasses the -- the

19  pixels seen on the video.

20  Q    And how did you -- how's the outline created?

21  A    The outline is created by me once the model is actually

22  positioned.  So the actual analysis is done with the model, and

23  then I created the outline from the location of the model so we

24  could fade the model away and see the pixels behind it.

25  Q    But does the outline accurately reflect the overall shape

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 29 of 239
(720) 384-8078   attrans@sbcglobal.net

1  and geometry of the vehicle?

2  A    Yes, it does.

3  Q    All right.  All right, now that we've been through your

4  process, let's take a look at how you've done that on the

5  northbound frames for that morning.

6  A    Okay.  As --

7  Q    So if you -- go ahead, describe the sequence.

8  A    As I indicated there, I analyzed each individual frame.

9  So this will be frame number 1, with a portion of the vehicle

10  visible on the left-hand side of the image.  And then the

11  three-dimensional model will fade in and then fade out to the

12  outline, and then back to the original image, just for

13  comparison purposes.  And I'll kind of step through these,

14  because it's the same process for each of the images.  So you

15  can see the -- the raw image, the overlaid model, and then the

16  outline.  That's number 3.  Here's number 4.  Raw image, the

17  model, and the outline.  And then the fifth of the northbound

18  images, the same thing.  There's the outline.

19  Q    And did you do -- obviously, you started here.  Did you do

20  an enlargement of this?

21  A    Right.  Obviously we're working with a small portion of

22  the image there, so give the jury a better view and

23  understanding of what I did.  This is an example of one of

24  those images.  It's the third image with the vehicle kind of

25  centered between the -- the T2 building and the edge of the

1  frame over here.  And by fading in the model --

2  Q    Now --

3  A    -- we get that.

4  Q    Now, what you -- you have a gray shaded portion there.

5  What does that represent?

6  A    That represents the vehicles in the parking lot.  If I go

7  back and forth, you can see that there is at least one vehicle

8  here that's partially obscuring a portion of the vehicle in the

9  background.  So to represent that or take that into account,

10  that's what the gray area is -- is there for.

11  Q    All right.  Now -- and explain that in this light as well.

12  A    So this is the same thing with respect to the outline that

13  we saw before and the gray area.  Then if I go back and forth,

14  you can see how the gray area and the outline is showing that

15  portion of the vehicle that is obstructed by the vehicles in

16  the parking lot.

17  Q    And for this particular comparison, what is the -- what's

18  the vehicle that you -- you've used in this comparison?

19  A    The -- the --

20  Q    The model of vehicle.

21  A    The model vehicle that we're looking at is a Honda CR-V.

22  Q    Okay.  Now, is -- the model -- these last two slides, 38

23  and 39, let's go back to there.  Do they accurately reflect the

24  video from T1 that's been admitted?

25  A    Yes, they do.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 748  Filed 09/23/14  Page 31 of 239

TOGLIA - DIRECT

1  Q    And do they fairly and accurately represent the images of

2  those vehicles as well as the comparison images of the computer

3  image and outline that you've accurately rendered in the

4  computer?

5  A    Yes, they do.

6         MR. SCHRODER:  Your Honor, the government moves for

7  admission of slides 38 and 39, which have been separately

8  marked as Exhibits 112 and 113.

9         THE COURT:  Hearing no objection, they'll be

10  admitted --

11         MR. SCHRODER:  All right.

12         THE COURT:  -- 112 and 113.

13     (Plaintiff's Exhibits 112 and 113 admitted)

14     (Side conversation)

15         THE WITNESS:  And I generated some boards of those --

16  BY MR. SCHRODER:

17  Q    Did you do --

18  A    -- that the jury could --

19  Q    Did you do some enlargements as well?

20  A    Yes, I did.

21         MR. SCHRODER:  Let's show those to Mr. Curtner, the

22  first two.

23     (Side conversation)

24         MR. SCHRODER:  If you could put those up on the easel

25  just for a moment.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1          THE WITNESS:  Yes, that's fine.

2          THE COURT:  Are these what's admitted?

3          MR. SCHRODER:  Yes, those are the just the enlargements

4   of the --

5          THE COURT:  Okay.

6          MR. SCHRODER:  -- actual exhibits that are admitted,

7   so -- I just want to make that clear, Mr. Toglia.  What are

8   these --

9          THE COURT:  Well, that -- you didn't answer my

10  question.  Are these two admitted?

11         MR. SCHRODER:  Do we need to admit those separately,

12  Your Honor?

13         THE COURT:  No, I'm just asking the question.  Are

14  these two admitted, or just the smaller ones?

15         MR. SCHRODER:  The smaller ones are admitted.

16         THE COURT:  Okay.  So --

17         MR. SCHRODER:  So I would -- if we need to admit these

18  separately, I will move to admit them as -- we'll give them a

19  couple separate numbers.  It's -- I don't want there to be any

20  confusion, so -- give me a couple extra numbers, Kim.

21     (Side conversation)

22         THE COURT:  Any objection to admitting these other two?

23         MR. CURTNER:  No, Your Honor.

24         THE COURT:  All right.  They'll be received, whatever

25  they are -- whatever numbers they are.  Do you know the

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 748  Filed 09/23/14  Page 33 of 239
(720) 384-8078  attrans@sbcglobal.net

1  numbers, counsel?

2     (Plaintiff's Exhibits 112A and 113A admitted)

3        MR. SCHRODER:  We're getting them right now.

4     (Side conversation)

5        MR. SCHRODER:  They'll be 112A and 113A.

6        THE COURT:  Very well.

7  BY MR. SCHRODER:

8  Q    And just to be clear, Mr. Toglia, what are these -- what

9  are the -- what do they represent?

10  A    These are enlargements of the two slides, number --

11  numbers 38 and 39.

12  Q    All right.  We can take those down.  And now moving on to

13  your next slide.  And what is this?

14  A    This is just fading back to the -- the raw image.  You

15  might want to dim the lights again.

16  Q    All right.  Now, once you've superimposed a vehicle model,

17  do you check the position of the vehicle in the computer model?

18  Once you've got lined up on the image, do then you check it in

19  the computer model?

20  A    Yes.  We look at the resulting position and see where it

21  is.

22  Q    All right.  And at the end of doing that, I mean, how do

23  you assure that the car is in the correct place on the road?

24  A    Well, I don't assure that the car is on the correct place.

25  I place the three-dimensional model of the vehicle on top of

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 748  Filed 09/23/14  Page 34 of 239
(720) 384-8078  attrans@sbcglobal.net

1   images, and it turns out that the vehicle is located in the

2   center -- in the approximate center of the lane here.  So

3   that's kind of a check that everything was done correctly.

4   Q    And what would indicate that you have a problem with the

5   alignment when you perform that check?

6   A    Well, again, keeping in mind that we're working in three

7   dimensions, if I move the vehicle closer to the camera, it

8   would be off in the -- say, the dirt area over here.  And if I

9   had to push it farther away to match the size of pix -- or

10  match the size of model with the pixels, then it would be on

11  the other side of Anton Larsen Bay Road here.

12  Q    So that checks your accuracy?

13  A    Yes, it does.

14  Q    All right.  Now moving on.

15  A    And in addition, I -- if I can also say that of course we

16  make sure that the -- that the wheels are on the ground.  So

17  sometimes there's a little adjustment of an inch or so just to

18  put the wheels in the right spot.

19  Q    Okay.  All right.  Moving to your next sequence.

20  A    So what this sequence shows then is the five completed

21  overlays of the model of the vehicle heading northbound on

22  Anton Larsen Bay Road, and then the inset down in the lower

23  left shows the relative placement of the vehicle for each of

24  those frames.  And I'll just kind of step through those.  This

25  is frame 2, frame 3, 4, and 5.  And as you can see from that

**TOGLIA - DIRECT**

1   progression, you get the sense of the vehicle driving

2   northbound on the highway.

3   Q   All right.  And let me ask you another question now.

4   There are certain objects in this photo that show color.  Most

5   obvious I think is probably the stop sign and the green box

6   below it.  And you visited COMMSTA.  Correct?

7   A   Yes, I did.

8   Q   And were those objects there when you visited?

9   A   Yes, both the sign and the -- the green box here were

10   present.

11   Q   And what was the color of the stop sign when you were

12   there?

13   A   Stop sign was red.

14   Q   And what color was the box?

15   A   The box was green.

16   Q   And --

17   A   And in additional items, there -- there is a fire hydrant

18   with some posts over on the right side here, and those were

19   painted red.

20   Q   So are the colors you're seeing in the video consistent

21   with the colors you observed personally when you were there?

22   A   Yes, they are.

23   Q   So based on your visit plus your study of the videotape,

24   does it appear the colors are accurate in this video?

25   A   Yes, they are.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 748  Filed 09/23/14  Page 36 of 239

1  Q    Now, how many frames were there that showed the

2  southbound -- the blue car southbound toward the rigger shop?

3  A    Heading southbound, there were four frames.

4  Q    And did you -- again, did you analyze each frame?

5  A    Each individual frame, yes.

6  Q    And could you show those to the jury, and highlight where

7  the car is?

8  A    The car starts off here, partially behind the T2 building.

9  And then this is the second frame, third frame.  Here's a car

10 moving southbound.  And then, fourth frame, partially out of

11 the image.

12 Q    And you've described a -- the northbound -- the comparison

13 process you did northbound.  Did you do a similar process on

14 the southbound frames?

15 A    Exactly the same thing, yes.

16 Q    All right.  Now, -- but before we go to that, let me -- I

17 want to discuss some other photos that we'd like to talk about.

18 And these are -- we've numbered these as Exhibits 173A through

19 I.  We might do this -- might be easier to do this --

20      (Side conversation)

21      MR. SCHRODER:  Maybe it might be easier first to have

22 Mr. Toglia look at them (indiscernible).  May I approach, Your

23 Honor?

24      THE COURT:  Yes.

25 BY MR. SCHRODER:

1  Q    Mr. Toglia, if you could just look at those and see if you

2  recognize those.

3  A    Yes, I do.

4  Q    And what do those nine photos depict?

5  A    They depict the five northbound frames and the four

6  southbound frames acquired on April 12th that I analyzed.

7  Q    And you've shown the jury those images in your slideshow

8  up to this point.  Is that correct?

9  A    Yes, I have.

10  Q    All right.  And are they fair and accurate images of the

11  five frames inbound and four frames outbound from the same

12  camera on the same date?

13  A    Yes, they are.

14       MR. SCHRODER:  Your Honor, the government moves for

15  admission of Exhibit 173A through I.

16       MR. CURTNER:  No objection.

17       THE COURT:  They'll be received.

18    (Plaintiff's Exhibits 173A through 173I admitted)

19       MR. SCHRODER:  All right.  Yeah, let me -- I'll quickly

20  show these to the jury.  Mainly, we've introduced them for the

21  jurors to use later in the jury room, but we'll show you

22  quickly what they are.  And, again, there is A, B, C --

23  BY MR. SCHRODER:

24  Q    Mr. Toglia, can you see where the vehicle is on that and

25  point that out to the jury?  The coloring's not great on the

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 38 of 239
(720) 384-8078  attrans@sbcglobal.net

1  (indiscernible).

2  A    Yes.  It's over here.

3  Q    Okay.  That was E.  This is F.  I think we're starting the

4  southbound.  That's G, H.  They look better on the film, it's

5  just the screen projection is not as accurate.  All right, Kim,

6  we can switch back.  Now, Mr. Toglia, if could move on to your

7  analysis of the southbound frames.

8  A    This is the -- the first of the four images.  You can see

9  the vehicle's starting to appear from behind the T2 building

10  there.  And, again, it's the same process where I overlay the

11  three-dimensional model and then I'll fade away to the outline.

12  And I do that for each of the -- here's the second image that

13  gives a view of the large portion of the vehicle, the model

14  overlay, the outline.  The third image, here's the vehicle

15  right there.  Fading the model in, to the outline.  And then

16  the fourth and final of the southbound images.  There's the

17  model and the outline.

18  Q    All right.  And let's look -- I believe it's slide 62.

19  And what did you do in this slide?

20  A    Similarly -- this -- this is just a closeup view, again,

21  to show the jury what was being done.  This is one of the

22  frames, the -- the second frame, I believe, from the southbound

23  sequence, showing a -- just a -- a closer view of the -- of the

24  image with the three-dimensional model overlayed and --

25  Q    And then, again, what's the gray portion?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 39 of 239
(720) 384-8078  attrans@sbcglobal.net

**TOGLIA - DIRECT**

1  A    Similarly as before, the gray area indicates that

2  portion -- if I flip back for you, you can see the vehicles

3  again in the parking lot that partially obscure the vehicle on

4  the highway.  And then fading out to the outline as before, the

5  gray-shaded area represents that same area.  And then a fade

6  back just to the original image for comparison purposes.

7  Q    And so do slide 63 and 64 accurately reflect the video

8  from T1 that's already been admitted?

9  A    Yes, they do.

10 Q    And is it a fair and accurate image of that video along

11 with -- does it accurately reflect a comparison of the image to

12 your computer image and outline that you've accurately rendered

13 in the computer model?

14 A    Both of them do, yes.

15        MR. SCHRODER:  Your Honor, the government moves for

16 admission of slide 63 and 64, which have been marked as

17 Exhibits 114 and 115.

18        MR. CURTNER:  No objection.

19        THE COURT:  They'll be received.

20    (Plaintiff's Exhibits 114 and 115 admitted)

21        MR. SCHRODER:  And then, again, we also have

22 posterboards of those which we'll mark as 114A and 115A.

23        THE CLERK:  Are 114A and 115A also admitted?

24        THE COURT:  Hearing no --

25        MR. SCHRODER:  I'm going to move for admission of 114A

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 40 of 239
(720) 384-8078   attrans@sbcglobal.net

1  and 115A.

2       THE COURT:  Hearing no objection, they'll be admitted.

3     (Plaintiff's Exhibits 114A and 115A admitted)

4       MR. SCHRODER:  If you could just show those briefly to

5  Mr. Toglia.  Or you can put them up on the board.  I just want

6  him to identify --

7       THE WITNESS:  Yeah.  I can --

8       MR. SCHRODER:  -- on the record --

9       THE WITNESS:  I can see them on the easel.

10       MR. SCHRODER:  Yeah.

11  BY MR. SCHRODER:

12  Q    And are one thirt -- 114 and 115a the enlargements that

13  you prepared from your slides that have just been admitted?

14  A    Yes.

15  Q    Okay.  We can take those down.  Now moving on to your next

16  portion of your presentation, one -- you've identified the

17  southbound -- or compared the southbound images.  Now, what did

18  you do next?

19  A    Well, to finish up with the southbound images, as before,

20  we're looking at a full-frame image with an inset of the placed

21  model in the -- in the model world.  And as I step through

22  these four images, you can see the vehicle progressing.  Again,

23  the results ended up with the vehicle being located in about

24  the center of the southbound lane, which is consistent with

25  what you would expect, and so as I flip through these, you can

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 748  Filed 09/23/14  Page 41 of 239
(720) 384-8078  attrans@sbcglobal.net

1  get the sense of the vehicle driving southbound.

2  Q    All right.  Now, were you also asked to compare other

3  vehicles behind a Honda -- besides a Honda CR-V?

4  A    Yes, I was.

5  Q    And were you asked to compare similar vehicles or not

6  similar vehicles?

7  A    Both.  We looked at vehicles similar in size and geometry

8  as well as other vehicles that were different.

9  Q    Okay.  So let's start with the -- kind of the differing

10  vehicles.  What are the first two comparisons you're going to

11  show the jury?

12  A    We're going to look at a Dodge Durango, which is a

13  significantly larger vehicle, and then a Honda Accord, which is

14  a different type of vehicle.

15  Q    So let's -- first let's look at the Durango.  Let's go to

16  your next slide.

17  A    So on each of these sequences what you'll see is that we

18  start with a -- a raw image of the number 3 frames, headed

19  northbound.  And we -- I chose that frame because it has the

20  most -- the most portion of the vehicle visible.  And so then

21  instead of inserting a Honda CR-V, I acquired a three-

22  dimensional model of, in this case, a Dodge Durango and

23  superimposed that over the pixels in that area.  And, actually,

24  the way that this is done, because these vehicles that you're

25  going to see aren't necessarily the same size and shape, I

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 748  Filed 09/23/14  Page 42 of 239
(720) 384-8078  attrans@sbcglobal.net

1   aligned the front wheels.  So I took the front wheels of the

2   Durango and put them in the same spot as the front wheels of

3   CR-V was -- or were.

4   Q    And, did you obtain online -- like, some one of your

5   sources an image of the Durango, a computer model of Durango?

6   A    Yes, a 3-D model of a Durango, correct.

7   Q    And did you verify -- take steps to verify those

8   dimensions?

9   A    Yes.  All the models that I'll be showing you are checked

10   for dimensional accuracy.

11   Q    And how much larger is the -- do you know how much larger

12   the Durango is, kind of length and height, than a --

13   A    It -- it's about two feet longer than the Honda CR-V, and

14   I believe half or maybe three-quarters of a foot taller.

15   Q    Okay.  So go ahead to your next slide.

16   A    So zooming in again, just to show the jury a closer look

17   at what is being done, this is the slide that we saw before

18   with the Honda CR-V and the gray shaded area blocking out -- or

19   representing the vehicles that are in the parking lot.  And

20   then putting the Durango, the front wheels of the Durango in

21   the same location as the CR-V front wheels, you can see how

22   much bigger the Durango looks.  And when I proceed to slide 75

23   and outline the Durango as we did with the CR-V outline, you

24   can see that the outline is significantly bigger than the blue

25   color -- blueish-color pixels that are in the center area over

TOGLIA - DIRECT

1  here.

2  Q    And does that seem consistent with the image of the blue

3  vehicle?

4  A    No, the outline is not consistent with the blue vehicle.

5  Q    Can you go on to your next slide?

6  A    And that of course makes sense, because when you

7  compare -- what this slide shows is a direct comparison of the

8  CR-V with the Durango, and as I indicated, the Durango is

9  approximately two feet longer, so you would expect the outline

10 like this to be larger than these pixels in the middle because

11 the Durango is in fact itself that much bigger than the Honda.

12 Q    Now moving on to your next comparison.

13 A    So I did --

14 Q    And what was this?

15 A    I did the same thing with the Accord.  We -- so here is

16 the Honda Accord.  The Accord is a four-door sedan, so unlike a

17 sport utility vehicle.  It's a different type of vehicle, kind

18 of different overall geometry.  And then zooming in, going

19 through the same sequence of first locating the CR-V, and then

20 putting the Honda Accord with the front wheels at the same

21 location and drawing that outline, you can see how the outline

22 of the Honda Accord doesn't match the -- the blue pixels

23 either.  And again --

24 Q    And --

25 A    I'm sorry.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 748  Filed 09/23/14  Page 44 of 239
(720) 384-8078  attrans@sbcglobal.net

1  Q    Go ahead.  I was going to say --

2  A    Yeah.

3  Q    -- does that make sense when you compare the two vehicles?

4  A    Again, that -- that does -- it is consistent with -- when

5  you compare the two vehicles side by side, you can see how the

6  Honda -- the -- sorry, the Accord is lower and longer than

7  the -- than the CR-V.

8  Q    So what can you determine from looking at alternate types

9  of vehicles from this comparison, say, a larger SUV or a sedan

10 like the Accord, compared to the image that you've looked at?

11 A    Well, what this helps me do is -- is now I have kind of a

12 whole set of class of vehicles of both size and geometry that I

13 can eliminate as being potentially consistent with what we see

14 on the video.  In other words, vehicles that are significantly

15 larger or significantly smaller than the CR-V or different

16 geometry, like a -- like the four-door sedan like we saw, or

17 pickup truck, as compared to a SUV, those vehicles are not

18 going to be consistent with what's shown on the -- on the video

19 image.

20 Q    But did you also compare similar vehicles?

21 A    Yes, I did.

22 Q    And what vehicles were you asked to compare?

23 A    Specifically the Ford Escape, the Hyundai Santa Fe, and

24 the Toyota RAV4.

25 Q    And do you have a depiction of -- kind of a quick

1  depiction of those?

2  A    Right.  Here's a -- a -- a comparison of Internet images

3  that I pulled of the other vehicles, the Escape in the upper

4  right, the RAV4, and the Santa Fe.  And you can see that all

5  these vehicles are sport utility type vehicles and they have

6  dimensions and geometries that are pretty similar to the

7  subject Honda CR-V in the upper left.

8  Q    And so which did you compare first?

9  A    First we're going to take a look at the Ford Escape.

10  We're going -- kind of -- since you've seen this several times,

11  we'll kind of go a little faster each time through them.  Just

12  looking at the -- the zoomed-in portion, starting first with

13  the CR-V.  And then putting the Escape on top of it, again,

14  aligning the front axle.  Fading out to an outline, and you can

15  see that this outline, the Ford Escape, matches the -- the

16  image -- the pixels on the image pretty well.  And that is not

17  a surprise when you take a look at the geometries of the two

18  vehicles.  The Ford Escape and the Honda CR-V are actually very

19  similar with respect to overall length and wheel base and

20  height.

21  Q    And what was the next one you compared?

22  A    And this is the Santa Fe.  Fading the Santa Fe in, again

23  fading out to the outline.  You can see how it gives a pretty

24  good representation of the pixels.  And, again, when you

25  compare the overall vehicle geometry -- and I should point out

1   here that what I'm doing in these comparisons is making one of

2   these vehicles kind of transparent.  That's why the -- the --

3   the Hyundai in this case is kind of a -- whitish and it's

4   transparent, so you can see through it, to kind of get an idea

5   of how it compares to the Honda.  Otherwise, they're so similar

6   that they -- they would just block each other out.  So that's

7   why one of the vehicles seems kind of transparent.

8   Q    And what was the next comparison?

9   A    The final comparison is of a Toyota RAV4, which is

10  actually a little bit shorter than the CR-V, but it's very

11  similar in terms of geometry, sport utility vehicle.  And

12  again, that outline -- it's a little bit shorter over here, but

13  the overall geometry is pretty consistent in terms of the front

14  end.  Wheel base is a little bit shorter.  But pretty

15  comparable to a CR-V.

16  Q    Now, were you also asked to compare video taken from that

17  same camera on other dates?

18  A    Yes, I was.

19  Q    And what video was that?

20  A    Video that was acquired on the 19th, a week later.

21  Q    Okay.  And what camera took those video images?  Was it

22  the same camera?

23  A    This is the same T1 camera that mounted on the top of the

24  utility pole.

25  Q    And what were you told about that car before you started?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 748  Filed 09/23/14  Page 47 of 239
(720) 384-8078  attrans@sbcglobal.net

TOGLIA - DIRECT

1  A    This vehicle, the -- the vehicle and the images of the

2  4/19 video, I -- was -- was represented to me that this is the

3  suspect Honda CR-V.

4  Q    And does that information alter how you do this analysis

5  in any way?

6  A    No, absolutely not.  I go through the exact same procedure

7  whether I know what the vehicle is or not.

8  Q    All right.  And in this case, how many northbound frames

9  were there?

10  A    I believe there were 13 frames.

11  Q    All right.  Now, that's significantly different.  What

12  does that indicate to you?

13  A    That -- that's an indication that, since the camera speed

14  is going to be relatively constant, because there are more

15  frames, that -- mean the vehicle was traveling more slowly.  So

16  it's traveling more slowly on the highway, which meant the

17  camera was able to capture more frames in this area here.

18  Q    And were you asked to calculate any kind of speed?

19  A    No, I wasn't.

20  Q    Now, for expediency's sake -- are you going to show all

21  those frames or --

22  A    No, we're not.

23  Q    Okay.  So go ahead and continue with your analysis.

24  A    So this, start -- starting with the raw frame, with the

25  vehicle located in the middle of the -- the field of view of

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 48 of 239
(720) 384-8078   attrans@sbcglobal.net

 1  here, and then superimposing the -- the Honda CR-V, which again

 2  in this case we know that the vehicle in the video is the CR-V.

 3  Fading out to the outline, and then we'll go to the zoomed-in

 4  view to give you a better look, zooming in first the model and

 5  then to the outline.  And you can see how well the outline goes

 6  around the wheels.

 7      And I should point out that even though this is a -- a

 8  low-quality video and we're far away, you can still see aspects

 9  of the video, such as the -- the wheels here, some darker

10  pixels in the back, some window areas up here.  So even though

11  you can't see high-definition lines of different structures,

12  you can still get an idea of where some of those features are.

13      And this next sequence then in the 13 slides, one after

14  the other, of the model vehicle in place.  I'll just step

15  through those so you can get an impression of -- of those.

16  Q   All right.  And did you also analyze the southbound video

17  as well?

18  A   Yes, I did.

19  Q   And kind of -- can you give us your kind of streamlined

20  analysis of that?

21  A   Yep.  Here's the southbound.  We'll zoom in.  And, again,

22  you can actually see there's a lighter area here that's

23  consistent with headlights and some darker pixels in this area

24  consistent with the black bra that's on the front of the

25  vehicle.  And, again, you can see wheels, kind of some window

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 748  Filed 09/23/14  Page 49 of 239
(720) 384-8078  attrans@sbcglobal.net

1  areas up here as well.  And then we fade in the model to the

2  outline, which agrees really well.  And then I'll give you a

3  sequence of images with the super-imposed model, just kind of

4  stepping through that for you.

5  Q    Now if we could go back to slides eight -- nine -- 119 and

6  I think it's 120.  Let me actually make sure here of something.

7  A    I think we might want to go back to the northbound.

8  Q    I think we do want to go back to the northbound.  100 and

9  101.  Now, do slides 100 and 101 accurately depict the images

10 of the videos?

11 A    Yes, they do.

12 Q    And do they accurately depict the comparison of the

13 computer image and the outline that you've rendered --

14 accurately rendered and the computer model?

15 A    Yes, they do.

16         MR. SCHRODER:  Your Honor, the government moves for

17 admission of slides 100 and 101, separately marked as Exhibits

18 116 and 117.

19         MR. CURTNER:  No objection.

20         THE COURT:  They'll be received.

21     (Plaintiff's Exhibits 116 and 117 admitted)

22         MR. SCHRODER:  And we'll also ask to move in

23 Exhibits -- the enlargements, 116A and 117A.

24         THE COURT:  And hearing no objection, they will be

25 received.

**TOGLIA - DIRECT**

1    (Plaintiff's Exhibits 116A and 117A admitted)

2        MR. SCHRODER:  If you'd put those up just briefly so

3    Mr. Toglia can analy -- or can identify those.

4    BY MR. SCHRODER:

5    Q    And, Mr. Toglia, what are those?

6    A    Those are enlargements of the -- of the slide that we just

7    saw, of the -- the closeup view of the 4/19 video heading

8    northbound.

9    Q    Okay.  All right.  And now let's go forward.  I want you

10   to look at 119 and 120.  Okay, we're there, good.  And, again,

11   are those fair and accurate images of the video?

12   A    Yes, they are.

13   Q    And fair and accurate images of the comparison you've done

14   with the computer image and the outline that you've accurately

15   rendered in the computer model?

16   A    Yes, they are.

17       MR. SCHRODER:  Your Honor, the government moves for

18   admission of Exhibits 119 and 120 -- or 118 and 119.  I

19   apologize.

20       MR. CURTNER:  No objection.

21       THE COURT:  They'll be received.

22   (Plaintiff's Exhibits 118 and 119 admitted)

23       MR. SCHRODER:  And then we're going to move for

24   admission of the enlargements, at 119A -- 118A and 119A.

25       THE CLERK:  Are the enlargements admitted, Your Honor?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 748  Filed 09/23/14  Page 51 of 239
(720) 384-8078  attrans@sbcglobal.net

1      THE COURT:  Pardon?

2      THE CLERK:  You didn't answer if the enlargements are

3  admitted.

4      THE COURT:  There's no objection.  They're admitted.

5      (Plaintiff's Exhibits 118A and 119A admitted)

6  BY MR. SCHRODER:

7  Q   And again, could you identify those, Mr. Toglia?

8  A   These are enlargements of the slides that we just saw,

9  taken 4/19, of the vehicle headed southbound.

10 Q   Okay.  Now, again, moving back to just finish up with your

11 presentation, and I believe we're at slide 127 or 128.  Now,

12 did you also -- to assist the jury, did you produce a

13 comparison slide of both the video on 4/12 and the video on

14 4/19?

15 A   Yes, I did.

16 Q   And which did -- which images did you choose to compare on

17 each of those dates?

18 A   I chose the image from 4/12 that showed the most of the

19 vehicle, and the image -- the corresponding image from 4/19

20 that gave the best comparison between the two in terms of

21 location of the vehicle on the -- on the highway.

22 Q   And did you also do southbound comparison as well?

23 A   Yes, I did.

24 Q   And do those slides 128 and 129 reflect -- accurately

25 reflect the video from T1 that you analyzed?

Case 3:13-cr-00008-SLG  Document 748  Filed 09/23/14  Page 52 of 239

**TOGLIA - DIRECT**

1  A    Yes, they do.

2  Q    And are they fair and accurate images from that video?

3  A    Yes.

4       MR. SCHRODER:  Your Honor, the government moves for

5  admission of 128 and 129, separately marked as Exhibits 120 and

6  121.

7       MR. CURTNER:  No objection.

8       THE COURT:  They'll be received.

9     (Plaintiff's Exhibits 120 and 121 admitted)

10      MR. SCHRODER:  And, similarly, for the enlargements,

11 which will be 120A and 121A.  We move for admission of those as

12 well.

13      MR. CURTNER:  No objection.

14      THE COURT:  And they'll be received.

15    (Plaintiff's Exhibits 120A and 121A admitted)

16 BY MR. SCHRODER:

17 Q    And could you identify those for the record, Mr. Toglia?

18 A    Yes.  These are the two comparison slides that -- each

19 have an image from 4/12 and -- and from 4/19, one pair headed

20 northbound, the other pair headed southbound.

21      MR. SCHRODER:  All right.  Your Honor, the government

22 has no further questions.

23      THE COURT:  Okay.  All right, Mr. Curtner.

24                   **CROSS-EXAMINATION**

25 BY MR. CURTNER:

TOGLIA - CROSS

1  Q    Good morning, Mr. Toglia.

2  A    Good morning.

3  Q    Going back to your background, have you always worked in

4  the private sector?  Have you ever worked for law enforcement?

5  A    No I have -- well, I've been hired by law enforcement

6  agencies, but not worked directly for them.

7  Q    Okay.  And then when were you hired on this particular

8  case?

9  A    I was notified, I believe, at the end of 2012, maybe

10  September, October time frame.

11  Q    And you were at -- in Kodiak in -- when?  In August two

12  thousand --

13  A    No, I was in Kodiak February of 2013.

14  Q    Okay.  And then how much would a project like this -- how

15  much would you charge for this proj -- or how much did you bill

16  the government for this particular -- your work in this case?

17  A    I would have to look at the invoices to see what the total

18  is.

19  Q    Do you have any idea?  Do you want to look at your

20  invoices or --

21  A    Sure, if you have them.

22  Q    Yes, please.

23         MR. CURTNER:  Can I approach, Judge --

24         THE COURT:  That'd be fine.

25         MR. CURTNER:  -- the witness?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 54 of 239
(720) 384-8078   attrans@sbcglobal.net

1  BY MR. CURTNER:

2  Q    Have you had a chance to review those?

3  A    Yes, I have, briefly.

4  Q    And do you have an estimate of how many -- how much you've

5  billed so far?

6  A    Well, there's a -- a piece of paper that's attached, and

7  the invoices are at a -- monthly invoices with different

8  amounts, obviously, on them.  There's a -- a piece of paper

9  that appears to have totaled those values to be about 66,000.

10 Q    Okay.  And then is that -- or -- is that -- you have other

11 billings to submit for your testimony, for example?

12 A    Yes, there will be additional billings, yes.

13 Q    Do you have any idea how much that might be?

14 A    The last invoice here appears to go through February, so

15 certainly the -- the month of -- the month of March, trial

16 preparation, and then obviously a couple days before here for

17 trial.

18 Q    Okay.  Could you estimate how much that's going to cost?

19 A    No, not without seeing the invoice.  Certainly, being here

20 for two days would be a few more thousand dollars.

21 Q    Okay.  So you're over 70,000 by this time, you think,

22 maybe?

23 A    Could be.  Could be.

24 Q    And can I have that back?  Now, I understand from what you

25 did in this particular case -- when you do a survey --

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 748  Filed 09/23/14  Page 55 of 239
(720) 384-8078  attrans@sbcglobal.net

**TOGLIA - CROSS**

1  typically in accident reconstruction, you're able to examine

2  known items, known objects, and survey them and incorporate

3  them in your analysis?  Is that correct?

4  A    That's correct.

5  Q    So, for example, if there was an automobile accident, you

6  could survey a particular -- debris from the accident, tire

7  tracks.  You could do a survey of the accident scene, just like

8  you did at the COMMSTA.  Is that correct?

9  A    Absolutely.

10  Q    And so -- and that's fairly accurate?

11  A    Very accurate.

12  Q    And so, for example, everything that you surveyed at -- on

13  Kodiak at the COMMSTA building and the surrounding area, you

14  could go there and measure everything, have your data and make

15  accurate measures of everything that's there?

16  A    Yes.

17  Q    Now, it's different when there's something that's not

18  there, right?  It's just a -- maybe a video image.  That's --

19  you can't measure that exactly.

20  A    Well, you're -- you're talking about a survey out at the

21  scene in a busy -- in a video image.  So I'm not sure how --

22  Q    Well, I think it's your testimony that you created this

23  three-dimensional world.

24  A    That's correct.

25  Q    And most of that three-dimensional world is based on

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 748  Filed 09/23/14  Page 56 of 239
(720) 384-8078  attrans@sbcglobal.net

1  accurate measurements of everything you surveyed out there?

2  A    That's correct.

3  Q    And then you have to bring in a model or something from

4  a -- image from a -- the videocamera into your three-

5  dimensional world.  Is that right?

6  A    Yes, that's correct.

7  Q    You can't actually measure that image yourself.

8  A    I'm not sure what you mean by measure, but the -- the

9  purpose of the photogrammetry, the software programs, is to

10  align three-dimensional or sometimes two-dimensional data with

11  an image.

12  Q    So I think you -- in your testimony you described that

13  your purpose here was to make a comparison, when you're

14  describing this process, of what you see and what you're trying

15  to show.  Is that correct?

16  A    That's correct.

17  Q    Okay.  So in this case, what you see is the area about

18  COMMSTA -- everything you surveyed, and that's accurate?

19  A    That's correct.

20  Q    And then you're -- what you're trying to show is a CR-V

21  that would compare with the video image.

22  A    No, I'm not trying to show that.  I'm making comparisons

23  of numerous vehicles to the image that we see in the video

24  frames.

25  Q    But all your models were based on a CR-V.  Is that

1  correct?

2  A    No, that's not correct.

3  Q    Well, the model that you showed us in all your

4  illustrations was a CR-V from the very beginning.  Is that

5  correct?

6  A    One of the models was a CR-V, yes.

7  Q    How many of these images were of a CR-V and how many of

8  them were of a Durango?

9  A    If I remember correctly, we had the five northbound and

10 the four southbound images, so that would be nine taken on the

11 12th with the CR-V, and then the 13 northbound and seven

12 southbound, taken on the 19th.  That's another 20 with the CR-

13 V.  And then we had imag -- or I had images of the Durango that

14 made comparisons with a -- with a single image taken on the

15 12th.  But it wasn't necessary to make those comparisons for

16 every single image.  There would be no point in doing that.

17 Q    Okay.  Wonder if we could go to Government's Exhibit 173A

18 and look at that.  Can we bring that up?

19     (Side conversation)

20 Q    Now, I think -- so this is one of the videos that you

21 reviewed from April 12th?

22 A    It appears to be, yes.

23 Q    And what is the distance from the camera that we're

24 looking from to that vehicle?

25 A    I think you just pointed to the vehicle in the parking

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 58 of 239
(720) 384-8078  attrans@sbcglobal.net

1 lot, but --

2 Q    I'm sorry, that vehicle that -- the subject vehicle,

3 miss --

4 A    Right.  It -- it's approximately 1,100 feet from the

5 camera to Anton Larsen Bay Road.

6 Q    It's about a quarter of a mile?

7 A    That's about right.  Less than that.

8 Q    Okay.  Now -- and how many pixels -- do you under -- how

9 many pixels would be available in that frame from that

10 distance?

11 A    I have not calculated that.

12 Q    You haven't calculated the number of pixels or how that

13 might affect the image?

14 A    It -- it doesn't affect the image.  It has -- the image

15 has as many pixels as it has coming from the -- the

16 videocamera.  And I have not counted the pixels to know how

17 many exist between the left side of the frame and the -- say,

18 where the left side of the T2 building is.

19 Q    But would you agree this is a fairly primitive camera,

20 surveillance camera --

21 A    I don't know that --

22 Q    -- as far as the quality of the --

23 A    -- it's a primitive camera, but it's a low-resolution

24 camera.

25 Q    It's a low-resolution.  And then have you -- and the data

1  was compressed.  Do you understand what that means?

2  A    I know what compressed means.

3  Q    Okay.  And do you understand the data of the pixels was

4  compressed in this case?

5  A    We extracted the -- extracted the video frames from the

6  video source itself, and I don't know that there's any

7  compression when that process is performed.

8  Q    Now, for example, I see in this particular -- you talked

9  about the stop sign?

10  A    Yes, I did.

11  Q    Now, in your three-dimensional world, that's real easy to

12  see that's a stop sign, is that correct?

13  A    Yes, I think it's pretty easy to see that's a stop sign in

14  the video image as well.

15  Q    Well, now, if this were an eye chart, could you be able

16  to -- from this image, if you didn't know it was a stop sign,

17  identify the letters?

18  A    Probably not.

19  Q    And how about that sign?  Can you read that sign?

20  A    Definitely not.

21  Q    And that sign, how much closer to the camera is -- are

22  these compared to out in Anton Larsen Bay Road?

23  A    I don't know what the -- the distance is off the top of my

24  head.  They're certainly closer, and a lot smaller objects

25  also.

**TOGLIA - CROSS**

1  Q   Okay.  But when you were doing your analysis, there was no

2  way you had of improving the video image that you were dealing

3  with?

4  A   I wouldn't say that there's no way we had of improving,

5  but we specifically did not alter the video images.

6  Q   Did you try to enhance the image?

7  A   No.  We just enlarged them.

8  Q   Okay.  Well, if I could go back.  There's a -- one other

9  question I had back -- that last exhibit.  I was noticing -- do

10 you know what this is?  It looks like a cloud or a ball.  Or do

11 you know what that might be?

12 A   I'm not sure what that is.  We could maybe identify it

13 with assistance from the aerial, but as I sit here, I don't

14 know what that is.

15 Q   Okay.  And I think the other thing we -- you discussed was

16 about the colors, like the green and the red.  If there were

17 two different colors represented in one pixel, would that make

18 a difference?  Would it be -- if, for example, one pixel were

19 to cover some of the red and some of the green, would it be one

20 color?

21 A   Yes, it would be -- a pixel is one color.

22 Q   Okay.  So would -- it might be red, it might be green, it

23 might be some combination -- it wouldn't be -- wouldn't show

24 two colors within one pixel?

25 A   A single pixel would not show more than one color,

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 61 of 239
(720) 384-8078  attrans@sbcglobal.net

1  correct.

2  Q    Now, when you did the -- your model, when you were talking

3  about a model that you did in your demonstration here, in your

4  slideshow, you were using a model of a CR-V, a Honda early-

5  generation CR-V.  Is that correct?

6  A    For some of the analysis, yes.

7  Q    Well, for all the driving through and everything, and the

8  first images we saw all along were the -- was the early-

9  generation model CR-V.  Is that correct?

10 A    Yes.  Yes, it was.

11 Q    And that's exactly the suspect -- or the model that they

12 demonstrated to you on the 19th, the video on the 19th.  That

13 was Nancy Wells's car, correct?  Same model, make?

14 A    Yes, that's my understanding.

15 Q    And when you were making comparisons with that image and

16 the CR-V, you understand that there's -- because of poor

17 pixelation, there's a certain amount of length variation based

18 on the pixels.  For example, there's a plus or minus 10 inches

19 on the length that you could estimate, then that's -- a Durango

20 would be over 20 inches.  That would easily be outside of the

21 range of the image that you saw?

22 A    That's correct.  I -- actually, plus or minus 12 inches is

23 going to be pretty close to the Durango, which is about two

24 feet longer.  So if you go plus 10 on one side and minus 10 on

25 the other side, that's going to get you to the two feet.  So

**TOGLIA - CROSS**

1  that's pretty close to the Durango.

2  Q    Pretty close.  But a Durango usually is longer and bigger

3  than that image?

4  A    Yes.  As I indicated and demonstrated, yes.

5  Q    And because of the poor pixelation, it's difficult to

6  completely identify the height or the length of a vehicle in

7  that image from 4/12?

8  A    Absolutely.  It's difficult to discretely define those

9  parameters, yes.

10  Q    And wouldn't it be the same for distance, if you -- if

11  a -- if there's a pixel as -- almost five inches in length

12  from -- and as far as the scene, wouldn't it make a difference

13  perhaps in five inches one way or another on the distance,

14  where it would be in the road?

15  A    I'm not -- I'm sorry, I'm not sure I understand your

16  question.

17  Q    Okay.  So if you're looking at that blurred image from

18  that video and you know it could be up to 10 inches -- up to 20

19  inches longer and it could be possibly up to 10 inches higher

20  or lower, like the Accord, couldn't it be five or ten inches

21  further away than you might see it, that you could actually

22  depict?

23  A    Well, first of all, I'd like to correct you, because I

24  don't think it can be 20 inches longer, because we show that

25  the Durango was definitely significantly larger than those

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 63 of 239
(720) 384-8078   attrans@sbcglobal.net

TOGLIA - CROSS

1  pixels.

2  Q   Well, if we had testimony that because of the pixelation,

3  the range, the parameters of what might fit that particular

4  picture was 10 inches, plus or minus, would that be 20 inches,

5  then?

6          MR. SCHRODER:  Your Honor, object to that.  It was --

7  the testimony was plus or minus five inches on either end, for

8  a total of 10.  Not 10 inches on either end, for a total of 20.

9          MR. CURTNER:  No, I think it was 10 inches on either

10  side on -- as far as length, and five inches up and down --

11          MR. SCHRODER:  No.

12          THE COURT:  Well, it's not my job to remember that,

13  so --

14          MR. CURTNER:  Okay.  I'm sure they'll remember.  So --

15  BY MR. CURTNER:

16  Q   So you made -- after you did your model -- after you used

17  the model of the CR-V and you did those comparisons, correct,

18  then you look -- then you looked at the Durango?

19  A   Yes.

20  Q   And, easily, the blurred image is not a Durango.  That's

21  clear, right?

22  A   Correct.

23  Q   And then you looked at a sedan, the Accord.  Clearly, that

24  was -- we can eliminate that?

25  A   Yes, that's correct.

TOGLIA - CROSS

1  Q   So we could eliminate, like, any big truck or any small

2  sedan.  That's easy.

3  A   I agree.

4  Q   Now, when you looked at the escape and compared that, we

5  cannot eliminate that blurred image to be an Escape, can we?

6  A   That is correct.  We cannot eliminate the Escape.

7  Q   And the Santa Fe.  We can't eliminate a Santa Fe as

8  possibly being that blurred image.  Right?

9  A   That is correct, based on my analysis.

10 Q   And the RAV4 as well?

11 A   That is correct.

12 Q   Now, did you compare the Grand -- the Jeep Grand Cherokee,

13 models '93 through '98?  Did you do that comparison?

14 A   I did not.

15 Q   How about the Chevy S10 Blazer, years '95 to 2005?

16 A   No, I did not.

17 Q   How about the Nissan Pathfinder, 1985 through 1995?

18 A   No, I did not.

19 Q   How about the Isuzu Rodeo, '98 through 2004?

20 A   No.

21 Q   And how about the Subaru Forester, 2009 through 2013?

22 A   I did not.

23 Q   So if they were the -- basically the same proportional

24 size and dimensions, would they also not be able to be

25 eliminated if he had tried that?

TOGLIA - CROSS

1  A    Depending on their size and geometry, overall geometry,

2  they may be similar or dissimilar.

3  Q    But you didn't examine those?

4  A    Correct, I did not.

5  Q    Now, the other thing they asked you about was -- I think

6  you were -- in your report you mentioned the color of this

7  particular vehicle.  Right?

8  A    Yes, I believe so.

9  Q    As being similar to what you saw on April 19th?

10  A    Correct.

11  Q    But I think you noticed that it could be -- apparent color

12  can change due to different variations in the ambient

13  conditions.  Right?

14  A    Certainly, lighting conditions, shadows and things like

15  that, can slightly alter color.  Sure.

16  Q    Okay.  And so, for example, if the 4/12 video were under

17  poor lighting conditions early in the morning, that might be

18  completely different than the 4/19 video, where the conditions

19  are in bright light or better light during the afternoon?

20  A    Well, first of all, I wouldn't agree that necessarily

21  bright light is better light.  In -- in fact, in terms of

22  photography, what we call flat light is actually optimal

23  lighting conditions.  If you have bright light, you're probably

24  familiar with the fact that you can get areas of dark shadows

25  and washed-out brightness and you can't really see a lot of

**TOGLIA - CROSS**

1  details in those areas.  So what's called flat light, like you
2  get in overcast skies, is actually optimal lighting conditions.
3  Q    Okay.  So it might -- if -- it might be different between
4  early-morning light and afternoon light?
5  A    There could be a -- a difference, sure, but a -- a blue
6  car isn't going to appear red just because the sun's shining a
7  little brighter.
8  Q    And then how about if there were other things in the
9  ambient conditions, like shadows, lighting, snow, reflections,
10  anything like that?  Would that possibly impact the -- what you
11  can -- what you see as far as color in a poor image like that?
12  A    Well, again, I don't know that snow in the background
13  would affect the color of something in the foreground.  Again,
14  it does tend to wash out objects that are in that background
15  area.  But I don't know that there's going to be a significant
16  change in color due to any of those factors.
17  Q    And the other question I think that you addressed in your
18  report was whether that vehicle you saw on April 12th, going
19  by, whether it was pulling into T2 building or going down Anton
20  Larsen Bay Road.  Right?
21  A    Yes.
22  Q    In your opinion, from your analysis, is that it was going
23  down Anton Larsen Bay Road?
24  A    That is correct.
25  Q    That's all I have.  Thank you.

1    THE COURT:  Anything else?

2    MR. SCHRODER:  Yes, Your Honor.

3                **REDIRECT EXAMINATION**

4  BY MR. SCHRODER:

5  Q    That last question about going down Anton Larsen Bay Road,

6  do you have any way of determining from the video you analyzed,

7  whether or not this vehicle turned in to the back side of T2?

8  A    In to the back side of T2?

9  Q    In to a farther entrance into T2.  I mean, do -- can you

10 tell whether this vehicle continued up Anton Larsen Bay Road or

11 whether it might have turned in to another entrance to --

12 A    No, one -- once --

13 Q    -- T2?

14 A    No.  Once it disappears behind the building, I have

15 nothing upon which to analyze the vehicle's position at that

16 point.

17 Q    And were you asked to compare any other cars?

18 A    Yes.

19 Q    But -- besides the ones --

20 A    Oh.

21 Q    Those -- that list of cars that the defense counsel asked

22 you, were you asked to compare any of those?

23 A    No, I was not.

24 Q    All right.  Now let's go back to this thing with the

25 Durango.  And the jury can remember the evidence, but if the

1 evidence showed that the Honda was 177 inches and the error

2 rate of that measurement by that witness was plus or minus 10

3 inches total, then how does the Durango compare to that?

4 A    I'm sorry, can you say that again?

5 Q    Yeah.  How --

6 A    I'm not sure what you mean by the evidence to error of the

7 177.

8 Q    You were here for the evidence -- Mr. Curtner was asking

9 you questions based on the evidence as he remembered it.  So

10 let's say that the evidence is that there's plus or minus 10

11 inches, not plus or minus 20 inches on length.  Plus or minus

12 10 inches from the Honda.  Then how much longer would a

13 Durango, as you used it -- how much longer would it be?

14 A    That's plus or minus a foot.  A Durango is about two feet

15 longer than the Honda CR-V.  So in the -- in the outline, if

16 you -- if you remember the overlay that I had with the Durango

17 and the CR-V, because the Durango is two feet longer, it's

18 about a foot longer in front and about a foot longer in the

19 rear -- not exactly, because, remember, I lined up the front

20 axle.  But let's say it's a foot in the front and a foot in the

21 rear, that's in the ballpark of a 10-inch -- plus or minus 10

22 inches that you're talking about.

23 Q    So you're saying the Durango would still be a foot longer?

24 A    The -- the Durango is two -- is two feet longer, but

25 it's -- it's a foot in front and a foot in the rear.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 69 of 239
(720) 384-8078   attrans@sbcglobal.net

**TOGLIA - REDIRECT**

1   Q   But it's -- so two feet longer is -- let's do the math.

2   Two feet longer is how many inches?

3   A   Twenty-four inches.

4   Q   So if the error rate that we talked about was 10 inches,

5   and we subtract 10 inches from 24 inches, what do we get?

6   A   Right.  You still have an additional 14 inches.

7   Q   So even with the error rate, how much longer is the

8   Durango?

9   A   Fourteen inches.

10  Q   All right.  So -- and let me make clear what you did.

11  Were you asked to do that?  Were you asked to count pixels and

12  do a size comparison that way?

13  A   No, I was not.

14  Q   How did you do your size comparison?

15  A   By overlaying the three-dimensional models as you saw in

16  the exhibits.

17  Q   All right.  And, finally, based on the conditions you

18  observed -- counsel asked you kind of some general questions

19  about conditions and lighting.  But you observed conditions on

20  these two sets of videos.  Correct?

21  A   Yes, I did.

22  Q   And were the conditions you saw on those videos adequate

23  for you to do a comparison?

24  A   Yes, they were.

25           MR. SCHRODER:  No further questions, Your Honor.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 70 of 239
(720) 384-8078   attrans@sbcglobal.net

1            THE COURT:  All right.  Anything else?

2            MR. CURTNER:  No, Your Honor.

3            THE COURT:  Thank you, sir.  You're excused.  Ladies

4    and gentlemen, we'll take a 15-minute recess.

5        (Witness excused)

6        (Jury not present)

7            THE COURT:  Okay.  Please be seated.  Here's a -- is

8    the motion in limine filed by the defense this morning.  Here's

9    two cases that might -- and a case for each side that might be

10   on point.  If you can just look at that during the break, and

11   then we'll talk about it later.  Anything else before -- you

12   have your next witness ready to go.  Who's doing that?

13           MR. SCHRODER:  It will be Ms. Loeffler.

14           MR. CURTNER:  She's your witness?

15           MS. LOEFFLER:  No.

16           THE COURT:  She's your witness.

17           MR. SCHRODER:  You say -- you said who -- you said

18   who's doing that, Your Honor.

19           THE COURT:  You got -- okay.

20           MR. SCHRODER:  I interpret that meaning who's going to

21   do the questioning, so --

22           THE COURT:  I understand.  So she's not here.  Okay.

23           MR. SCHRODER:  She'll be here.

24           THE COURT:  Okay.

25           THE CLERK:  All rise.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 748  Filed 09/23/14  Page 71 of 239
(720) 384-8078  attrans@sbcglobal.net

1          THE COURT:  Here, just take a look at these cases.

2    They may be relevant to the issue.

3          THE CLERK:  Matter stands in a 15-minute recess.

4       (Court recessed at 10:10 a.m., until 10:31 a.m.)

5       (Jury not present)

6          THE CLERK:  All rise.  His Honor the Court, the United

7    States District Court is again in session.  Please be seated.

8          MR. OFFENBECHER:  Your Honor?

9          THE COURT:  Yes.

10          MR. OFFENBECHER:  May I address the Court on an issue

11   that just came up during break?

12          THE COURT:  Okay.

13          MR. OFFENBECHER:  This wasn't an issue we anticipated,

14   and I think it supersedes -- at least it comes before the issue

15   that we presented in our motion.  The -- this morning when we

16   got to court, we were handed some exhibits, Government's 24D --

17   looks like A through D, which are excerpts of the transcript of

18   the interrogation of Mr. Wells.  And each of them is, you know,

19   maybe three pages long and they've been marked as exhibits,

20   24D1 and so forth, 24A -- or 20A, 24A, 24C, and so forth.  So

21   there's four -- it looks like one, two, three, four, five, six,

22   seven.  So there's seven short snippets, some are one page

23   long, some are four pages long, something like that.

24          THE COURT:  Okay.  All right.

25          MR. OFFENBECHER:  So the point -- as the Court is

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 748  Filed 09/23/14  Page 72 of 239
(720) 384-8078  attrans@sbcglobal.net

1　aware, we would have suppressed Mr. Wells's entire

2　interrogation, which covered two days and was six separate

3　interviews with the FBI.

4　　　　　THE COURT:  Long ago.

5　　　　　MR. OFFENBECHER:  Right.  That was denied.

6　　　　　THE COURT:  And that's resolved.

7　　　　　MR. OFFENBECHER:  Sure.  It's done.  The -- today, we

8　assumed that the government was going to introduce Mr. Wells's

9　interrogation.  But as it turns out, it looks like they're just

10　offering these just -- little snippets of his interrogation

11　rather than the entire interview -- the course of the

12　interviews that he had.  And when we suggested that the jury

13　ought to have a transcript to play along, we were assuming,

14　until the -- until -- frankly, till the break, when we looked

15　at this and asked counsel what they were thinking about, that

16　they would be listening to the complete interrogation and

17　watching it on the transcript.

18　　　　　But it appears now, unless somebody corrects me, that

19　they're just intending to introduce six different small audio

20　snippets from the entire interrogation, and then introduce

21　these small snippet transcripts of those pieces.  And we

22　certainly would object to that under the rule of completeness.

23　We would -- it's Evidence Rule 106.  They certainly cannot take

24　small snippets of the defendant's statements out of context.

25　　　　　And we've done some research over the break and --

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 748  Filed 09/23/14  Page 73 of 239
(720) 384-8078  attrans@sbcglobal.net

1 which supports that. *United States v. Collicott* -- that's C-o-

2 l-l-i-c-o-t-t -- at 92 F.3d 973, Ninth Circuit, 1996, which

3 says -- quotes, "The rule of completeness was designed to

4 prevent the government from offering a misleadingly tailored

5 snippet of a statement."

6        And so if the government is going to offer Mr. Wells's

7 statements, then the jury ought to be able to hear the entire

8 statement as the rule of completeness suggests, in all

9 fairness.  The rule of completeness, which is codified at Rule

10 106, which is a -- an old and venerated rule, says:  "If a

11 party introduces all of part of a writing or recorded

12 statement, an adverse party may require the introduction at

13 that time of any other part of or any other writing or recorded

14 statement that, in fairness, ought to be considered at the same

15 time."  This is exactly what the rule was intended to prevent.

16        Would also cite *United States v. Castro Cabrera*, at 534

17 F.Supp. 2d 1156, which is a case in the Ninth Circuit -- I'm

18 not sure which court it was -- in which the court rules that

19 the government can't just introduce in a criminal case of --

20 the pieces of a defendant's statement that support its theory

21 of the case, but must in fairness permit the entire statement

22 to be --

23        THE COURT:  Okay.

24        MR. OFFENBECHER:  -- introduced.

25        THE COURT:  Government?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 748  Filed 09/23/14  Page 74 of 239
(720) 384-8078  attrans@sbcglobal.net

1          (Side conversation)

2          MS. DUIGNAN:  Your Honor, first of all, the rule of

3  completeness does not apply to defendant statements.  I believe

4  if you look at the hearsay exception for which we are

5  introducing those statements, it's 801(d)(2)(A), statements of

6  a party opponent.  The government is entitled to introduce the

7  statements it deems fit in its case, and the rule of

8  completeness at Rule 106 is unavailing to a defendant.

9          I believe Mr. Offenbecher cited *United States v.*

10  *Collicott*.  But, actually, a direct quote taken from that same

11  case says, "Rule 106 does not compel admission of otherwise

12  inadmissible hearsay evidence."

13          Moreover, there's additional case law from the Ninth

14  Circuit on that same point.  I would refer the Court to *United*

15  *States v. Ortega*, at 203 F.3d 675, a Ninth Circuit case, where

16  defendants cannot introduce inadmissible hearsay to avoid

17  subjecting themselves to cross-examination.

18          (Side conversation)

19          MR. OFFENBECHER:  We're not introducing anything,

20  period.  We're just saying --

21          THE CLERK:  Can you move the microphone, Mr.

22  Offenbecher?

23          MR. OFFENBECHER:  Oh, sorry.

24          THE COURT:  I don't --

25          MS. DUIGNAN:  I -- I'm not quite done yet, and I gave

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 748  Filed 09/23/14  Page 75 of 239
(720) 384-8078  attrans@sbcglobal.net

1   counsel the --

2          THE COURT:  You were very polite.

3          MR. OFFENBECHER:  Sure.  No, no.  If you're not done,

4   go ahead.

5          THE COURT:  You were very polite.

6          MS. DUIGNAN:  Moreover, you cannot introduce

7   statements -- noninculpatory statements to humanize themselves.

8   And I would also cite to *United States v. Vallejos*, at 742 F.3d

9   902, a Ninth Circuit case decided in 2014.

10         THE COURT:  Okay.

11         MS. DUIGNAN:  And I believe that case law states that

12  we have the ability to introduce the statements that we wish to

13  from the defendant's statement, a total of which was recorded

14  at approximately -- the first day was 50 minutes, the second

15  day was an hour and a half -- that we are not obligated to play

16  the entire recording for the jury.  The transcripts that we

17  intend to use are the transcribed portions of the excerpts that

18  we intend to introduce, Your Honor.

19         MR. OFFENBECHER:  Well, Your Honor, first of all, we

20  are not offering these.  The government is offering --

21         THE COURT:  I understand the obvious.

22         MR. OFFENBECHER:  Okay.  But I don't want to belabor

23  the obvious.  This is --

24         THE COURT:  Okay.

25         MR. OFFENBECHER:  The -- a party -- we could do this --

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 748  Filed 09/23/14  Page 76 of 239
(720) 384-8078  attrans@sbcglobal.net

1    THE COURT:  But also, the government is saying that
2  they don't -- that he can't avoid testifying at by using --
3  I -- I'm reading between the lines -- by using statements that
4  are exculpatory.  Is that what you're saying?

5    MS. LOEFFLER:  Yeah.  (Indiscernible) --

6    MS. DUIGNAN:  Well, also that the rule of completeness,
7  Your Honor, does not --

8    THE COURT:  I --

9    MS. DUIGNAN:  -- apply to defendant's statements.

10    THE COURT:  That's why the rule of completeness --

11    MS. DUIGNAN:  Yes.

12    THE COURT:  -- doesn't apply to defendants.

13    MS. DUIGNAN:  And the portions that we're introducing
14  are not misleading.

15    MR. OFFENBECHER:  But --

16    THE COURT:  Well, I don't know that.  I don't have
17  anything.  But go ahead.

18    MR. OFFENBECHER:  But, Your Honor, it's a long
19  transcript, and what they've done is they've taken -- they've
20  just started their excerpts on parts that they think are going
21  to help them, without putting it in the context that the agent
22  and Mr. Wells did.

23    The rule of completeness does apply to defendants.
24  It's simply a rule that makes perfect sense that one party,
25  whether it's a defendant or not -- a party can't take a

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 748  Filed 09/23/14  Page 77 of 239
(720) 384-8078  attrans@sbcglobal.net

1  complete statement, pick out little pieces of it that it thinks
2  supports its case, present them to the jury, and then prevent
3  the defendant from putting the rest of it in context.  It --
4  it's not just the defendant, it's anybody.  It's just --
5          THE COURT:  I under --
6          MR. OFFENBECHER:  -- it's common-sense rule.
7          THE COURT:  Listen, I understand what both sides are
8  saying.  I don't have the statements.  I can't make a --
9          MS. DUIGNAN:  Your Honor, may --
10         MR. OFFENBECHER:  We have copies of them for you.
11         MS. DUIGNAN:  -- I offer cop -- I was going to --
12         THE COURT:  Pardon?
13         MS. DUIGNAN:  -- offer copies of the exhibits to you,
14  Your Honor.
15         THE COURT:  You're going to offer --
16         MS. DUIGNAN:  To review.
17         THE COURT:  -- copies of the redacted --
18         MS. LOEFFLER:  No.
19         THE COURT:  -- statements.
20         MS. LOEFFLER:  We'll give him the whole thing.
21         THE COURT:  Okay.
22         MS. LOEFFLER:  We'll give him the whole thing so he can
23  see what they are.
24         THE COURT:  Yeah.  The -- how could I -- that's -- I
25  can't make a decision without knowing the big picture.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 748  Filed 09/23/14  Page 78 of 239
(720) 384-8078  attrans@sbcglobal.net

1          MS. LOEFFLER:  Right.

2      (Side conversation)

3          MR. OFFENBECHER:  We've got a complete -- we got the

4  whole transcript, Your Honor.

5          THE COURT:  Well, that's a -- see, you have -- now --

6          MS. LOEFFLER:  And --

7          THE COURT:  And --

8          MS. LOEFFLER:  -- the other thing is -- I'll have to

9  double check, but I think we turned over the snippets.  But I

10 have to double check that.  I think we turned over exactly what

11 we were going to play a long time ago, to avoid this -- exactly

12 this type of thing.  But I do have to double check that,

13 because I'm not absolutely positive.  But I think we absolutely

14 did.  It wasn't something that they're suddenly surprised that

15 we weren't playing the whole statement.

16         THE COURT:  So here's my understanding of what's

17 happening.  Apparently there are statements that you have a

18 re -- transcript of and a recording of, but the recording is

19 not clear, and so you want to provide a transcript to the jury

20 so they can follow along with the recording.

21         MS. LOEFFLER:  Right.

22         THE COURT:  You're going to ask me, I presume, to read

23 that instruction that says --

24         MS. LOEFFLER:  Yeah.

25         THE COURT:  -- "If there's a conflict between what you

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 748  Filed 09/23/14  Page 79 of 239
(720) 384-8078  attrans@sbcglobal.net

 1  hear and what you read, it's what you hear that applies."
 2  But --
 3          MS. LOEFFLER:  Right.
 4          MS. DUIGNAN:  Yes, Your Honor.
 5          MS. LOEFFLER:  Just like drug cases.  Same thing.
 6          THE COURT:  I understand that.
 7          MS. LOEFFLER:  Okay.  And --
 8          THE COURT:  And -- but --
 9          MS. LOEFFLER:  -- Your Honor, the other thing I just
10  want to let you know is we do have a section of the rule of
11  completeness right in the trial brief.  We had -- we actually
12  briefed this before the trial.
13          THE COURT:  Okay.  So what do you want me to do?  I've
14  got -- obviously, I have to take the transcript, I have to take
15  the proposed --
16          MS. LOEFFLER:  Yeah, take a look at them and -- I'm
17  sorry, Your Honor.
18          THE COURT:  I know what I have to do, but --
19          MS. LOEFFLER:  Right.
20          THE COURT:  -- how long is this going to take?  A long
21  time.
22          MS. DUIGNAN:  Your Honor, I believe if you look at the
23  excerpts that we're intending to introduce, you will see
24  they're not misleading and they're not taken out of context.
25          THE COURT:  Well, that'll be helpful.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 748  Filed 09/23/14  Page 80 of 239
(720) 384-8078  attrans@sbcglobal.net

1        MS. DUIGNAN:  Can I --

2        THE COURT:  You --

3        MS. DUIGNAN:  -- approach, Your Honor?

4        THE COURT:  I'll take everything anybody has to give

5   me.

6        MR. OFFENBECHER:  I mean -- obviously, Your Honor --

7   may I approach?

8        THE COURT:  Yes.  Yeah.

9        MR. OFFENBECHER:  You'll need to read the whole

10  transcript to figure out what was taken out of context.

11       MS. LOEFFLER:  Right.  That's right.

12       THE COURT:  So you have a witness, and this is the

13  first thing you want to talk about?

14       MS. DUIGNAN:  We have two other witnesses before this

15  witness is called, that Ms. Loeffler was going to call.

16       THE COURT:  Well, why don't we take care of that --

17       MS. LOEFFLER:  Okay.

18       THE COURT:  -- and that can give me some time to review

19  this.

20       MS. LOEFFLER:  Okay.  I have two short witnesses.

21  They're -- one's sitting right here, ready to go, and the other

22  one's sitting right outside.

23       THE COURT:  Well, let's take care of that and --

24       MS. LOEFFLER:  Okay.

25       THE COURT:  Now, but the other issue with regard to

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1  silence, I don't think you can present his silence.

2          MS. LOEFFLER:  There wasn't -- nobody's presenting --

3  well, I -- you were going to go ahead -- that was the sixth

4  interview.  No -- after he invoked.  Nobody's presenting

5  anything after he invoked.  I think what they -- in their

6  motion, it was sort of a bait-and-switch, Your Honor.

7          After he invoked, nobody presented anything.  They're

8  trying to say that you can't put on the statements -- when they

9  refer to the Bates numbers, that's the statements that were

10  given before he invoked.  There's no doctrine of retrotaint.

11  You know, you can't --

12          THE COURT:  Well, you see -- I only know what people

13  tell me.  And if what they're telling me is misleading, I can't

14  give an accurate ruling.

15          MS. LOEFFLER:  That's why you have --

16          MR. OFFENBECHER:  Your Honor, we've given you --

17          MS. LOEFFLER:  -- the transcripts.  You can look at the

18  transcripts --

19          MR. OFFENBECHER:  We've given you the whole transcript

20  (indiscernible).

21          MS. LOEFFLER:  -- and you can see what we're playing --

22          THE CLERK:  Mr. Offenbecher --

23          MS. LOEFFLER:  -- and you can see exactly when he

24  invoked, and none of it is from interview 6.

25          MR. SCHRODER:  Do they have -- does he have interview

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 748  Filed 09/23/14  Page 82 of 239
(720) 384-8078  attrans@sbcglobal.net

1  6?

2          MS. LOEFFLER:  Does he have -- you need all of them.

3  I --

4          MR. OFFENBECHER:  We've got all of them.

5          MS. LOEFFLER:  Okay.

6          THE COURT:  Is that what you just handed me?

7          MR. OFFENBECHER:  Yes.  You have all six interviews --

8          THE COURT:  So I'll put them up here by my head and now

9  I'll know the answers?

10          MR. OFFENBECHER:  Well, they're very interesting

11  reading.  I think the jury would be interested in them, so --

12          MS. LOEFFLER:  Yeah, but -- go --

13          THE COURT:  Okay.  Let's --

14          MS. LOEFFLER:  -- ahead, Kathy.

15          THE COURT:  -- call your --

16          MS. DUIGNAN:  Your Honor, if they were going to file

17  the suppression motion, the deadline was August 30th.

18          THE COURT:  This -- these motions are coming in real

19  late.  I mean, I'm getting them as I walk into court in the

20  morning.  Okay.  Next witness.  Let's bring the jury in.

21          MS. LOEFFLER:  Joshua Honour.

22          THE COURT:  And the jury's going to be coming in here

23  in a second, so you can just -- you stand here in the witness

24  box.  That door pulls out.

25          (Jury present)

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 748  Filed 09/23/14  Page 83 of 239
(720) 384-8078  attrans@sbcglobal.net

HONOUR - DIRECT

1      THE COURT:  Okay.  Please be seated.  The government's

2  next witness is?

3      MS. LOEFFLER:  Joshua Honour, Your Honor.

4      THE CLERK:  Sir, if you can please stand and raise your

5  right hand.

6  **JOSHUA CHRISTIAN HONOUR, PLAINTIFF'S WITNESS, SWORN**

7      THE CLERK:  Okay, thank you.  Please have a seat.  And,

8  sir, if you can please state and spell your full name.

9      THE WITNESS:  Joshua Christian Honour.  That would be

10  J-o-s-h-u-a, middle name C-h-r-i-s-t-i-a-n, last name H-o-n-o-

11  u-r.

12      THE COURT:  All right.  Counsel.

13                     **DIRECT EXAMINATION**

14  BY MS. LOEFFLER:

15  Q   Mr. Honour, what do you do?

16  A   Currently I -- I am in the Grand County Sheriff's

17  Department in Utah.

18  Q   Okay.  Did you previously work in Alaska?

19  A   I did, Base Kodiak, Coast Guard Police Department.

20  Q   And with what organization were you at the time?

21  A   Base Kodiak, with the Coast Guard Police Department.

22  Q   Okay.  What years were you at Base Kodiak with the Kodiak

23  Police Department?

24  A   2010 to 2013.

25  Q   Okay.  So were you on duty on the night of April 11th,

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 748  Filed 09/23/14  Page 84 of 239
(720) 384-8078  attrans@sbcglobal.net

1  2012 and the early-morning hours of -- night of April 11th and

2  early-morning hours of April 12th?

3  A    That is correct.

4  Q    Okay.  And with the military police department, is there

5  something called rounds that you all would do?

6  A    That is correct.

7  Q    What was rounds?

8  A    Rounds were designated areas that we had specified under

9  zones for each specific place for housings, buildings, that we

10  would control each one of those rounds.  And we would examine

11  any buildings, parking lots, roads, and keep notes and report

12  any vehicles, persons are out of place, anything suspicious,

13  and check each building, make sure they're locked, everything

14  was secured.

15  Q    Okay.  Now I want to turn to what's been previously

16  admitted as Exhibit 373.

17      (Side conversation)

18  Q    Can you tell us what Exhibit 373 is, Mr. Honour?

19  A    Say again?

20  Q    Can you tell us what this document is?

21  A    Oh.  This document would be the -- the rounds sheet that

22  we -- we kept at dispatch, that we record all the times for

23  the -- the watches, and which officer conducted rounds and at

24  what time it happened, and also it includes the date and the

25  section and all applicable areas that would be checked for each

1  individual round.

2  Q    And this one, where it says "rounds" and it's highlighted

3  in yellow, "2200 to 10 o'clock," can you translate that into

4  nonmilitary time?

5  A    I can.

6  Q    Yeah.

7  A    That would be 10 in the evening until 10 in the morning.

8  Q    And it's actually hard to see it.  Ms. Dixon, maybe we

9  could expand where it says "date," actually the "date" part, so

10  that we can see what date this is for?  Can you read the --

11  does it look like 12 April 2012?

12 A    It does.

13 Q    And did you in fact review this this morning before

14 testifying?

15 A    I did.

16 Q    Okay.  Now, there's something on this called Zone 6.  And

17 what was Zone 6?

18 A    Zone 6 was comprised primarily of all the buildings and

19 locations located on Anton Larsen Road, starting from Rezanof,

20 heading all the way down to the ski chalet.  It would include

21 Mag area, the water-cleaning building itself, Buskin pumphouse,

22 Buskin Lake, the T1, T2, and other parts of the comm station,

23 as well as the golf course, and the ski chalet itself.

24 Q    Now, were you on duty on this night of the night of the

25 11th, morning of the 12th?

1  A    I was.

2  Q    And I know these initials are hard, but were you able to

3  determine -- when did you -- what rounds did you do that

4  evening?

5  A    For that -- that particular Zone 6, I did the -- the

6  second round, which would be for the -- on the -- the right

7  side.  It would show the number 253.  That would be my officer

8  designated number.  And it would show for the time to be

9  approximately 0219, for 2 in the morning.

10  Q    Okay.  Now if we can pull up Exhibit 48, please.  It's

11  a -- yeah.  It's a -- just an aerial.  So what time of the

12  morning did you do rounds in Zone 6?

13  A    It would be approximately 02 a.m.

14  Q    And do you recognize Exhibit 48?  I know you haven't been

15  in Kodiak in a while, but --

16  A    I -- I do.

17  Q    Okay.  Can you -- using that -- and I know it doesn't show

18  the whole area -- can you explain what you would have done on

19  rounds on that morning?

20  A    I certainly can.  I would start from Rezanof, heading down

21  Anton Larsen --

22  Q    I think you actually have a pointer sitting in front of

23  you.

24  A    Okay.  There we go.  So prior to this, you -- there would

25  be a few other things that could be checked.  It would be

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 748  Filed 09/23/14  Page 87 of 239
(720) 384-8078  attrans@sbcglobal.net

HONOUR - DIRECT

1  Beaver Pond area and a few side -- dirt roads that you could go

2  on.  It would be all -- small areas that you could check and

3  always verify there's no vehicles, persons back there at

4  unauthorized areas, and report those.  After that you would

5  head up the Magazine area, where we checked to verify that the

6  gate and the locks were all secured, there's no persons,

7  anything like that, nothing damaged analyzed.

8       After that you see the small road that comes back here, so

9  this would be the archery range there.  We check the gate for

10 the archery range, come down this small road that we could

11 follow all the way down, and check to make sure there's no

12 vehicles.  This was all flat area, so you could see with the

13 side alley lights from the vehicle and a flashlight and see

14 that there were no persons, vehicles, back in this area coming

15 around.

16 Q   You said something called side alley lights.  What are

17 those?

18 A   On our vehicles themselves we had side alley lights that

19 were attached to the emergency lights on top.  You could hit

20 a -- a little button and it would show a light off to each

21 side, plus our takedown lights.  And then we also had our --

22 our flashlights and searchlight as well, so we can --

23 Q   Okay.

24 A   -- use those to illuminate anything during the -- the

25 nighttime.  And then there's another gate here you could check,

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 748  Filed 09/23/14  Page 88 of 239
(720) 384-8078  attrans@sbcglobal.net

1  it'll be back behind.  So that way to other parts of Coast

2  Guard property, and then you could get around back here.  This

3  would be the N23, for the water purification building.  And you

4  could check any vehicles, persons back here; follow along this

5  side on the -- the outer side of the -- the building.  And

6  there would be one small gate you could check, make sure it's

7  locked and secured, and the main entrance for vehicles that get

8  through, you could check that as well, and just verify that

9  there were no alarms sounding off for anything and the door was

10  secured.

11      After that, come back on -- make a left onto Anton Larsen

12  and follow that down, and there'd be a -- the Y here.  You come

13  down this, would be a small dirt road which would lead to a

14  small parking lot down in that area for Buskin Lake and the

15  Buskin pumphouse.  There'd be another gate.  Check the gate.

16  Check the -- the pumphouse and the gate around that, make sure

17  it's all locked, there's no people down that way.  Come back

18  down this way across the bridge, drive past using the side

19  alley lights again, if you wished, if you needed it, just

20  verify there's no unauthorized vehicles or anything out of --

21  out of the normal during that time of day, off on this side of

22  that road on that package.

23      Come down this way, and then keep on going.  Eventually

24  you get to -- you get to the golf course.  And off to your left

25  there'd be a -- a large parking area.  You'd check the parking

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 748  Filed 09/23/14  Page 89 of 239
(720) 384-8078  attrans@sbcglobal.net

1    area, and then you'd pull up to a small road that was on the --

2    the right side of the golf course itself, that had another

3    gate.  You check the gate and then check the building, do a

4    full round around the building itself, checking the -- the golf

5    course and then checking all the doors, windows.  After

6    everything was verified clear, there was no people or vehicles,

7    anything out of place, report the completeness of the round to

8    dispatch, who would then log the time and individual there.

9    Q    And what would you do if you saw a vehicle along any of

10   these side roads along the way, anything that seemed in a

11   dif -- inappropriate?

12   A    I would immediately notify dispatch.  I would pull up on

13   the vehicle, shining the lights I had from the vehicle,

14   takedown lights, spotlighting the light into the vehicle

15   itself.  I'd check the outside for the vehicle first for any

16   signs of any -- any people, anything out of normal.  I would

17   then get out of the vehicle.  Prior to that -- sorry.  Prior to

18   that, I would run make, model, and license plate of the vehicle

19   to dispatch, and then they could run that through Cyberlinks

20   and E911 to check to see if there's any prior history of that.

21       After that I would go and I'd make an approach to the

22   vehicle, check the exterior of the vehicle, shine a light

23   through the window, see if there's any -- any people around,

24   and report any findings or discrepancies to dispatch.

25   Q    Now, did you actually look at the logs for the morning of

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 90 of 239
(720) 384-8078  attrans@sbcglobal.net

1  2012 before testifying today?

2  A    I did.

3  Q    And were there any things that you reported from that

4  morning in your rounds around 2 o'clock?

5  A    Negative.  There was nothing to report.

6  Q    Now let me ask you something else.  In your -- I guess you

7  said you were two and a half years doing these types of -- this

8  is one of your duties.  Was that one of your duties the whole

9  two and a half years?

10 A    Correct.  I had another one before that.

11 Q    Okay.  Was it unusual to find cars or people or things in

12 the middle of the night along Anton Larsen Road?

13 A    No.  We would typically have individuals from -- lots of

14 times from 2 that would be down on Coast Guard property and

15 they would assume that it was a -- a quiet place that they

16 could -- they could hang out with their friends, do whatever

17 they -- they thought they wanted to do, off on the side roads,

18 anything like that.  Or bear viewing -- a lot of people do it

19 at nighttime, bear viewing, trying to find bears.  So it was --

20 it could be common that there would be people down that way.

21 Q    Okay.  And if there were, what would you do if you saw any

22 of these people or cars on your rounds?

23 A    Again, I would make my approach, call it in to dispatch,

24 run all the information, plate.  If I found people, I would

25 make contact with those individuals.  I would run their

1  driver's license, any other information, verify E911 and

2  Cyberlinks, and give all the information to dispatch.  And if

3  everything came back clear, I would have the person go back in

4  the vehicle and leave Coast Guard property.

5  Q    Okay.  I have nothing further.

6          THE COURT:  Cross-examination.

7                    **CROSS-EXAMINATION**

8  BY MR. CURTNER:

9  Q    So, Mr. Honour, I understand you were, like, on a 12-hour

10  shift that night?

11  A    That's correct.

12  Q    And you made the rounds around this area once that --

13  during your shift or one --

14  A    Just during that 02 -- there -- we would typically have

15  multiple rounds that we'd run throughout the entire evening to

16  stay busy and just to keep everything secured, that weren't

17  always called in every time.

18  Q    But during this shift, you only made one rounds in that

19  area?  Is that correct?

20  A    Correct.

21  Q    And then I assume that when you're making your rounds,

22  you're not driving fast on Anton Larsen Bay Road.  Is that

23  correct?

24  A    That is correct.  We're always following the posted speed

25  limit.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 748  Filed 09/23/14  Page 92 of 239

1  Q   Or even slower as you're looking around to see --

2  A   Correct.

3  Q   -- if there's anything that you should note.  Okay.  And

4  then -- so you're just checking Coast Guard property.  Is that

5  correct?

6  A   That's correct.

7  Q   And the golf course, that's Coast Guard property?

8  A   That's located on Coast Guard property, that, and then all

9  the way down to the ski chalet.  So --

10 Q   Okay.  That night did you go past the Coast Guard -- the

11 golf course?

12 A   I did not.

13 Q   Okay.  And at the golf course, of course, there's a big

14 parking lot, there's -- you've known people to go out there in

15 the evening when it looks like it's quiet.  They might be

16 looking for bears, they might be partying, or anything like

17 that?

18 A   Correct.

19 Q   Do you ever go past the chalet toward -- you know where

20 Red Cloud Ranch is?

21 A   Negative.  The furthest we'd ever go would be to the ski

22 chalet itself, to the parking lot area, and then check the gate

23 for the -- the ski building.

24 Q   So any houses or buildings beyond the ski chalet would be

25 private property?

1  A    Correct.

2  Q    And that's something you wouldn't check?

3  A    That's correct.

4  Q    You wouldn't go down the Anton Larsen Bay itself and check

5  the parking lot there, would you?

6  A    No.

7  Q    And you didn't that day either.  Is that correct?

8  A    Correct.

9  Q    That's all I have.  Thank you.

10         THE COURT:  Redirect.

11         MS. LOEFFLER:  No, Your Honor.

12         THE COURT:  Thank you, sir.  You're excused.  The

13  government's next --

14         THE WITNESS:  Thank you, Your Honor.

15         THE COURT:  -- witness.

16     (Witness excused)

17         MS. LOEFFLER:  Kelly Kolodzik.

18         THE COURT:  You've been here before?

19         MS. LOEFFLER:  Yes, she has.

20         THE COURT:  Okay.  All right, well, you still --

21  we're -- it's been a while, so we're going to still swear you

22  in.  If you'd just remain standing.

23         THE CLERK:  Please raise your right hand.

24         **KELLY KOLODZIK, PLAINTIFF'S WITNESS, SWORN**

25         THE CLERK:  Thank you.  Please have a seat.  And,

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 748  Filed 09/23/14  Page 94 of 239
(720) 384-8078  attrans@sbcglobal.net

1   ma'am, if you can please state and spell your full name.

2           THE WITNESS:  Kelly Kolodzik.  First name K-e-l-l-y.

3   Last, K-o-l-o-d-z-i-k.

4           THE CLERK:  Thank you

5           THE COURT:  Okay, counsel.

6                       **DIRECT EXAMINATION**

7   BY MS. LOEFFLER:

8   Q   Petty Officer Kolodzik, welcome back.  Let me ask you what

9   role you had or what was your duty station on April 12th, 2012?

10  A   Coast Guard Police Department, Kodiak, Alaska.

11  Q   And as part of the Coast Guard Police Department -- we

12  just had another witness -- did you do rounds in Zone 6 on the

13  early-morning hours of April 12th, 2012?

14  A   Yes.

15  Q   What's Zone 6?

16  A   Zone 6 consists of several buildings and areas along Anton

17  Larsen Road.

18  Q   And I'm going to ask you, did you review your log and

19  the -- the military police log for the night of April 11th and

20  the early-morning hours of April 12th prior to testifying, last

21  night?

22  A   Yes.

23  Q   Okay.  Now, can you describe to the jury what your

24  practice was for doing rounds on Zone 6 -- oh, let me -- I'm

25  sorry, I need to back up a second.  What time of the morning

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 748  Filed 09/23/14  Page 95 of 239

1  did you do rounds on Zone 6, on the morning of April 12th?

2  A    Approximately 0600.

3  Q    Okay.  And describe what rounds are in Zone 6.

4  A    We basically just drive up Anton Larsen Road, verifying

5  that the buildings look -- appear secure, that the gates are

6  locked, and that there's no suspicious activity.

7  Q    Okay.  And did you do that on the morning of April 12th?

8  A    Yes.

9  Q    And how far up the road do you go?

10 A    If weather permits and the road conditions are -- are

11 allowed, we can go all the way up to the ski chalet.

12 Q    Okay.  What types of things are you looking for?

13 A    People out at unusual hours, vehicles, animals that have

14 been hit in the road, that -- anything that looks out of place.

15 So it -- it could usually be just people, usually people and

16 vehicles that don't belong there.

17 Q    Okay.  Now, did you look back at your logs?  Was there

18 anything that you noted on the morning of April 12th -- until

19 the murders?  And I'm not asking you about that.  You already

20 testified about that.  I'm not going back into that.  Was there

21 anything on your rounds that you saw?

22 A    Negative.

23 Q    Was there any -- what was the last incident that had been

24 reported at all?

25 A    It was a vehicle that had been left at the Cutterman's

1  Club on base.

2  Q    Okay.  What's the Cutterman's Club?

3  A    Cutterman's Club has a gym and, like, recreational area

4  for the members that belong to the cutters out -- that are

5  stationed in Kodiak.

6  Q    Would you actually patrol any of the trails around Anton

7  Larsen Bay Road?

8  A    Frequently.

9  Q    Okay.  And what are you looking for there?

10  A    People and vehicles again.  Nobody's really permitted to

11  be in those areas.  After hours there's really no reason to be

12  back there, so --

13  Q    That being said, was it unusual to find people and cars

14  and things around there in the middle of the night?

15  A    Not at all.  There were people there all the time.

16  Q    Doing what types of things?

17  A    Drinking, fogging up windows, so --

18  Q    I don't have anything further.  Thank you, Petty Officer.

19        THE COURT:  Cross.

20        MR. CURTNER:  I'm not going to follow up on that, no.

21        THE COURT:  Okay.  All right.  Thank you.  Okay.  The

22  government's next witness is?

23      (Witness excused)

24        MS. LOEFFLER:  The next witness, Your Honor, is the

25  witness that --

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 748  Filed 09/23/14  Page 97 of 239
(720) 384-8078  attrans@sbcglobal.net

1          MS. DUIGNAN:  Kirk Oberlander.

2          MS. LOEFFLER:  Is Kirk Oberlander.

3          THE COURT:  Okay.  Well, let's just let you go for five

4     minutes and I'll review these things I've got to review.  This

5     will not be very long, okay, I don't think.

6          (Jury not present)

7          THE COURT:  Okay, please be seated.  I have reviewed

8     these documents, the transcripts of the various interviews that

9     the government wishes to use.  I found nothing inappropriate in

10    those, and they can be utilized.  Now that I've had a chance to

11    look at all this, I do recall that it was the subject of a

12    prior motion in limine that the magistrate judge ruled on, that

13    I adopted, that I reviewed again because it was requested by

14    the defense in their trial brief.  And so this is not new to me

15    either, this packet.  The rule of completeness does not apply

16    to a defendant under these circumstances.  In other words, it

17    doesn't permit otherwise inadmissible hearsay.

18         So the government's free to go as you proposed.  And

19    we'll now address this issue that you -- trying to confuse me

20    about with regard to the *Miranda* issue in silence.  Do you want

21    to respond to that?

22         MS. DUIGNAN:  Yes, Your Honor.  We do believe it's

23    misleading.  First of all, the --

24         THE COURT:  Well, let's start -- let me -- so that I

25    understand what's going on, apparently during -- is it included

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 748  Filed 09/23/14  Page 98 of 239
(720) 384-8078  attrans@sbcglobal.net

1  in any of these exhibits?

2       MS. DUIGNAN:  No, Your Honor.

3       THE COURT:  Okay.  So in his testimony, your witness

4  will be asked to describe this interview, and an accusation or

5  allega -- accusation was made and defendant didn't respond,

6  post-*Miranda*.

7       MS. DUIGNAN:  First of all, Your Honor, the defendant

8  was not under arrest.  That -- that's issue number 1.  Number

9  2, we don't plan on playing any --

10       THE COURT:  Well, then why was he given his *Miranda*?

11       MS. DUIGNAN:  In an abundance of caution, he was

12  advised --

13       THE COURT:  Okay.

14       MS. DUIGNAN:  -- they advised the agents to give him

15  that because they planned on confronting him with evidence of

16  guilt --

17       THE COURT:  Okay.  So he was --

18       MS. DUIGNAN:  -- as we have --

19       THE COURT:  -- advised of his *Miranda* rights.  He

20  hadn't been arrested.

21       MS. DUIGNAN:  Correct.

22       THE COURT:  Okay.

23       MS. DUIGNAN:  Yes, Your Honor.  And he had waived --

24  and he affirmatively waived his *Miranda* rights.  And,

25  moreover --

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 748  Filed 09/23/14  Page 99 of 239

1          THE COURT:  Well --

2          MS. DUIGNAN:  -- the interviews that defense counsel

3    are referring to where the defendant actually invoked his right

4    to silence, or interview 6 --

5          THE COURT:  Yes.

6          MS. DUIGNAN:  -- we are introducing nothing from

7    interview 6.  We only plan on introducing statements from

8    interview 5.  So we're --

9          THE COURT:  That's fine.

10          MS. DUIGNAN:  -- baffled as to why --

11          THE COURT:  That's fine --

12          MS. DUIGNAN:  -- this is an issue.

13          THE COURT:  -- but the issue is when you -- when

14    allegation was made against him, he apparently remained silent.

15    And you --

16          MS. DUIGNAN:  He actually said, "I have no reasonable

17    theory to offer."  And those are the statements that we're

18    offering that are in the excerpt that you heard --

19          THE COURT:  Well, that's not what -- "I have no

20    reasonable theory to offer"?  I --

21          MS. LOEFFLER:  That's not silence.

22          MS. DUIGNAN:  It's not silence.

23          THE COURT:  That's not silence?

24          MS. DUIGNAN:  No.  Exactly, Your Honor.

25          THE COURT:  Well, I've been researching silence.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 100 of 239
(720) 384-8078  attrans@sbcglobal.net

1      MS. DUIGNAN:  We didn't brief this issue, Your Honor.

2 It was the defense who briefed it.

3      THE COURT:  Okay.  Well, if he responded to a question

4 in that fashion, that's admissible.  If he remained silent

5 under *Miranda*, my research suggests it's not admissible.  So --

6      MS. DUIGNAN:  But he did not.  We plan on offering the

7 statements from interview 5, which we've provided Your Honor as

8 part of our excerpts.  That's what we plan on offering.

9      THE COURT:  This, in my right hand?

10     MS. DUIGNAN:  Yes, Your Honor.

11     THE COURT:  And can you refer me to the part where

12 the -- he allegedly remained silent?

13     MS. DUIGNAN:  That would be in interview 6, so it's

14 not --

15     THE COURT:  So it's not even --

16     MS. DUIGNAN:  -- in any of the excerpts.

17     THE COURT:  It's not even going to be offered.

18     MS. DUIGNAN:  No, Your Honor.

19     MR. OFFENBECHER:  Which parts of -- which one of these

20 exhibits, just so we're clear, is from interview 5?  Is there

21 anything from the end of interview 5?

22     MS. DUIGNAN:  For -- yes.  Yes, from the end of

23 interview 5, there's the portions in Exhibit 24, I believe.

24 24 -- yes, exactly.  Well, before they got on the record for

25 him to invoke in interview 6.  So that would be Exhibit 24D, I

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 101 of 239

1    believe.

2              THE COURT:  I thought you said the only thing you're

3    going to offer is interview 5.

4              MS. DUIGNAN:  Correct.  That is part of interview 5,

5    Your Honor.

6              THE COURT:  Okay.

7              MS. DUIGNAN:  I was answering Mr. Offenbecher's --

8              THE COURT:  I understand, but --

9              MS. DUIGNAN:  -- question.

10             THE COURT:  -- I don't know why he's asking about

11   interview 6, then.

12             MS. DUIGNAN:  I don't know either.

13             THE COURT:  Okay.

14             MR. OFFENBECHER:  Your Honor?

15             THE COURT:  Yes.

16             MR. OFFENBECHER:  Can I just respond?

17             THE COURT:  Yes.

18             MR. OFFENBECHER:  First of all, the supposed authority

19   that the government cites, which doesn't really refer to the

20   interrogation, but in their trial brief they cite *United States*

21   *v. Caldicott*, which is the case that we cited -- *Collicott*.

22   Just so the record's clear, in *Collicott*, the Ninth Circuit

23   Court of Appeals reversed a conviction for violation of the

24   rule of completeness, Evidence Rule 106.  It's unclear to me

25   why they've cited that for that proposition, but the court

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 102 of 239

1  clearly held that the conviction was a drug conviction, had to

2  be reversed and amended for a new trial, for error in --

3          THE COURT:  Okay.

4          MR. OFFENBECHER:  -- violating the --

5          THE COURT:  Want to respond to that?

6          MR. OFFENBECHER:  -- rule of completeness.

7          MS. DUIGNAN:  Well, number 1, Your Honor, we cited it

8  for the law in the case.  I would certainly say that our facts

9  are nothing like what Mr. Offenbecher's referring to in

10 *Collicott*.  We're not introducing anything about the

11 defendant's right to invoke.  We're not introducing anything

12 about his silence.  We're just introducing his statements.

13         As far as the rule of completeness is concerned,

14 there's nothing that is offered in those excerpts that is

15 misleading in any way.

16         THE COURT:  I've reviewed that.  It appears to be

17 complete in terms of the subjects raised in discussion.

18         MR. OFFENBECHER:  Well, you would need to read the

19 entire transcript, of course, to figure that out.  But the --

20 it sounds like the Court's going to rule on that.  I just want

21 to make the record clear that the authority they've cited in

22 their brief, the conviction was reversed for this exact

23 purpose --

24         THE COURT:  Okay, well --

25         MR. OFFENBECHER:  -- for this exact rationale.  So --

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1    you know, finally, Your Honor, with respect to the excerpt, it

2    looks like 24D is the excerpt --

3            THE COURT:  24D.

4            MR. OFFENBECHER:  24D.  I -- is what I asked to find

5    out, "Is that the part of 5 that you're introducing?"

6        (Side conversation)

7            THE COURT:  24D.  I have it in my hand.

8        (Side conversation)

9            THE COURT:  Are you saying this is incomplete?

10           MR. OFFENBECHER:  No, I'm just trying to figure out

11   which part they're in -- I have a full transcript here that

12   I've marked, and I'm trying to figure out which part of

13   twenty -- of the fifth interrogation they're going to.

14           MS. DUIGNAN:  Pages 67 to 72, Your Honor.

15           MR. OFFENBECHER:  So, Your Honor, at this point the

16   agents are asking questions and I'm certainly going to abide

17   the Court's ruling that the questions and answers --

18           THE COURT:  Okay, can you go pull up 203 F.3d 675?  203

19   F.3d 675?  It -- it's cited in the government's trial brief, so

20   it's not a secret.  Okay, go ahead.

21           MR. OFFENBECHER:  Your Honor, I think the portion of

22   transcript 24D at the end is the portion that they would be --

23   that would be in play.  It's page 3, bottom of 3 of 24D.  And

24   the top of 4 of 24D, where they basically -- they go through a

25   series of asking him questions and he says at the bottom of

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 748  Filed 09/23/14  Page 104 of 239

 1  page 3, "Well, I don't have a theory at the moment."  And then

 2  at the top they say, "Do you have anything -- basically, do you

 3  have anything to add to any of that?"  And he says, "No.  No."

 4       And, you know, this -- Your Honor, after he's been

 5  advised of his rights to remain silent, he's basically saying,

 6  "No, I don't have anything."  And --

 7       THE COURT:  Okay.

 8       MR. OFFENBECHER:  -- so I would suggest to the Court

 9  that that ought to be excluded as an implication of his right

10  to silence.

11       THE COURT:  So what --

12       MS. DUIGNAN:  No, Your --

13       THE COURT:  Interesting.

14       MS. DUIGNAN:  Well, Your Honor, he doesn't invoke until

15  interview 6.  He's just answering the agent's question with a

16  "No."  It has nothing to do with saying he doesn't want to

17  speak anymore.  He certainly is free to engage in this entire

18  conversation, and then at the end he just answers their

19  question with a "No."

20       MS. LOEFFLER:  And he waived.

21       MS. DUIGNAN:  Has nothing to do with his right to

22  silence after had waived.  And I believe we litigated this

23  months ago.  And he signed a form and he affirmatively waived,

24  and you decided in adopting Judge Roberts' ruling that it was

25  totally proper.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 105 of 239

1          MS. LOEFFLER:  Actually, if you -- tell him to go -- if
2    you looked at page 72, you can see it's a couple of questions
3    later when he terminates.

4          MR. OFFENBECHER:  Well, yeah --

5          MS. LOEFFLER:  He invokes later.  You can read it
6    farther down the page, in Bates number 24681, Judge, if you
7    have it in front of you.

8          THE COURT:  I understand that.  This doesn't seem to --
9    there doesn't seem to be anything incomplete about this.  The
10   rule of completeness does not require hearsay to be submitted
11   or otherwise inadmissible evidence, so --

12         MR. OFFENBECHER:  The -- this issue, Your Honor, is
13   simply this -- for the Court to determine whether that's an
14   invocation of his right to remain silent.  Our position is that
15   when they -- at the top of page 4, when they say, "Do you have
16   anything to add to that," he says, "No.  No."  And then a
17   question later, he says, "We better -- I think we better
18   terminate this thing."  If that's an invocation --

19         THE COURT:  Well, that's not going to be permitted.

20         MS. LOEFFLER:  No.

21         MS. DUIGNAN:  Exactly.

22         MR. OFFENBECHER:  Right.  That's our position.

23      (Side conversation)

24         THE COURT:  Sounds like a reasonable question that you
25   can ask in an interview, and that does not amount to invoking

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 106 of 239

 1  one's right to silence, to me.

 2          MR. OFFENBECHER:  Very well.  That's the only argument

 3  we have --

 4          THE COURT:  Okay.

 5          MR. OFFENBECHER:  -- on that issue, Your Honor.

 6          THE COURT:  Well, take a -- five minutes to catch your

 7  breath.  I'm going to go read that, (indiscernible).

 8          THE CLERK:  All rise.  Matter stands in a five-minute

 9  recess.

10      (Court recessed at 11:11 a.m., until 11:22 p.m.)

11      (Jury not present)

12          THE COURT:  Oh, by -- okay, please do.

13          MR. OFFENBECHER:  Yeah.

14          THE CLERK:  On record.

15          MR. OFFENBECHER:  Yeah, I -- I'm sorry.  The --

16          THE CLERK:  I'm not on --

17          MR. OFFENBECHER:  I -- based on my legal research, I

18  made a statement on *Collicott* that I think was incorrect.  And

19  I --

20          THE COURT:  That's what I couldn't un -- I was going to

21  say, explain to me what you just said.

22          MR. OFFENBECHER:  No.  No, I was wrong, and I just want

23  to correct it.  I don't want to be wrong.

24          THE COURT:  Well, I don't want you to be either.

25          MR. OFFENBECHER:  No, no.  So I made a misstatement,

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 107 of 239

1  and I'm -- I just want to correct it. *Collicott*, the

2  conviction was reversed, but now upon having reviewed the

3  research again, it appears to me that it was not reversed on

4  106 grounds, but it was reversed for error in admitting other

5  testimony in the case.

6          THE COURT:  Right.

7          MR. OFFENBECHER:  So I misstated the holding and I

8  apologize to the Court for --

9          THE COURT:  That's all right.  We got two people trying

10  to figure out where you found that in this decision.

11          MR. OFFENBECHER:  Yeah.  Yeah.  No, I misstated that,

12  because --

13          THE COURT:  Okay.

14          MR. OFFENBECHER:  -- I hadn't read the case until after

15  the break.  And so I --

16          THE COURT:  Okay.

17          MR. OFFENBECHER:  -- apologize to the Court and I

18  wanted to correct that misstatement.

19          THE COURT:  Thank you.  Appreciate that.  Also in the

20  *Ortega* case, it says specifically, precluding defendant from

21  eliciting his own exculpatory hearsay statements during cross-

22  examination did not violate the confrontation clause.  So --

23          MR. OFFENBECHER:  Well, we're not suggesting that we're

24  wrong on the legal principle.  I just wanted to correct my

25  misstatement of that case.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 748  Filed 09/23/14  Page 108 of 239

1          THE COURT:  Well, I know.  I was trying to -- I

2    understand.  I pulled all the cases.  My rulings stand.  Let's

3    get your witness in here.  And was I clear in my -- it's pretty

4    clear what I'm saying is that you're allowed to use the

5    extracts that you want to use, and that the rule of

6    completeness under these facts does not apply in this case.

7    Okay.

8          MR. OFFENBECHER:  Thank you, Your Honor.

9          THE COURT:  Let's bring the jury in.  Now, we have to

10   break at 12, so keep that in mind as you're moving along, a

11   little before 12, five to 12.  Jury's coming in here.  Okay,

12   please be seated.  The government's next witness is?

13         MS. DUIGNAN:  The government calls Special Agent Kirk

14   Oberlander to the stand.

15         THE COURT:  All right.  She'll swear you in here in a

16   second.

17         THE CLERK:  Please raise your right hand.

18         **KIRK OBERLANDER, PLAINTIFF'S WITNESS, SWORN**

19         THE CLERK:  Okay, thank you.  Please have a seat.  And,

20   sir, if you can please state and spell your full name.

21         THE WITNESS:  My name is Kirk Oberlander.  K-i-r-k, O-

22   b-e-r-l-a-n-d-e-r.

23         THE CLERK:  Thank you.

24         THE COURT:  All right, counsel.

25                         **DIRECT EXAMINATION**

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 109 of 239

1  BY MS. DUIGNAN:

2  Q    Special Agent Oberlander, for what organization do you

3  work?

4  A    The Federal Bureau of Investigation.

5  Q    And how long have you been with the FBI?

6  A    About five and a half years.

7  Q    Where are you currently assigned?

8  A    To the Anchorage Division.

9  Q    And to what squad?

10  A    I work for the White-Collar Squad.

11  Q    And what squad were you assigned to before that?

12  A    I've previously been assigned to the Violent Crimes Squad

13  and the Cyber National Security Squads.

14  Q    And what collateral duties do you hold in addition to your

15  primary duties?

16  A    I'm a SWAT team member and a firearms instructor.

17  Q    What kind of training have you received to become an FBI

18  agent?

19  A    Our initial entry -- training is 22 weeks at Quantico,

20  Virginia, and -- so the initial training is 22 weeks at

21  Quantico.

22  Q    And what other specialized training have you received?

23  A    I've received training in SWAT tactics, also firearms

24  instructor school.  I've gone to several in-services which are

25  conferences that are specialty training for investigative

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 110 of 239

1  techniques, things like that.

2  Q    And what is your education?

3  A    I have a bachelor of science in civil engineering from the

4  U.S. Coast Guard Academy.

5  Q    And what year did re -- you receive that?

6  A    2000.

7  Q    And what did you do before becoming a special agent with

8  the FBI?

9  A    I was on active duty in the U.S. Coast Guard for eight

10  years, serving on Coast Guard cutters, doing search-and-rescue

11  and law enforcement on the high seas, counter drug interdiction

12  and migrant interdiction and fisheries enforcement, homeland

13  security.

14  Q    And do you have any Coast Guard affiliation now?

15  A    I do.  I'm still a lieutenant commander in the Coast Guard

16  Reserves.

17  Q    Were you involved in investigating the murders in Kodiak

18  on April 12th, 2012?

19  A    Yes.

20  Q    And how were you involved in investigating?  How did you

21  become involved?  How did you get called?

22  A    I received a call about 9:30 on the morning of the 12th,

23  said, "Pack your bags, you're going to Kodiak."

24  Q    Was there a point that day where you interviewed the

25  defendant, James Wells?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 111 of 239
(720) 384-8078  attrans@sbcglobal.net

1  A    Yes.

2  Q    And when did you interview him?  On what dates?

3  A    Interviewed him the evening of the 12th, and again on the

4  morning of the -- or late morning of the 13th.

5  Q    And turning to the evening of the 12th, at approximately

6  what time did that interview start?

7  A    It started about -- I believe 1920, so 7:20 p.m.

8  Q    And about how long was that interview?

9  A    It -- the in -- that interview was over a period of about

10  two hours but was broken up into smaller sections.  And the

11  actual interview was only about 50 minutes.

12  Q    And the following day, you had interviewed him for

13  approximately how long the next morning?

14  A    About 30 min -- a hour and 30 minutes.

15  Q    And when you first arrived in Kodiak, what duties did you

16  receive?

17  A    We were --

18  Q    Were you assigned to a -- what kind of duties were you

19  assigned?  Were you interviewing people, gathering evidence?

20  What were you doing?

21  A    Yes.  We were following leads that were coming in.  We

22  received a briefing from the investigators that were initially

23  there, the Alaska state trooper, and then I started doing

24  interviews of some of the people that were assigned to me by

25  the case agent.

1  Q   And where did you conduct most of the interviews that day?

2  A   At building T1 at the COMMSTA.

3  Q   And where did you conduct the interviews of the defendant?

4  A   The interview on the 12th was conducted in the

5  storekeeper's office, and the interview on the 13th was in the

6  master chief's office.

7  Q   Turning to the interview on April 12th at 7:20 p.m., was

8  one of the topics discussed during the first interview the

9  defendant's reason for not being at the communication station

10 that morning?

11 A   Yes.

12 Q   Have you had a chance to review the recording marked as

13 Government Exhibit 20A and the transcript marked as 20A-1?

14 A   Yes.

15 Q   And are those recordings of discussions you had with the

16 defendant that evening about that topic?

17 A   Yes.

18 Q   And you had a chance to review them before coming in to

19 testify today?

20 A   Yes.

21 Q   Are they accurate recordings of this part of the

22 interview?

23 A   Yes.

24     MS. DUIGNAN:  Your Honor, at this point I'd move for

25 admission of Exhibits 20A and 20A-1.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 113 of 239

1          THE COURT:  Which -- are the transcripts or are the

2   tapes?

3          MS. DUIGNAN:  Both, Your Honor.  The transcript is

4   synced to the tape and if admitted --

5          THE COURT:  Okay.

6          MS. DUIGNAN:  -- I would move it.

7                              VOIR DIRE

8   BY THE COURT:

9   Q    Let me just make sure.  Did you say that you listened to

10  the interview and reviewed the transcript?

11  A    Yes, sir.

12  Q    Does the transcript accurately reflect what is in the

13  interview?

14  A    Yes.

15  Q    Okay.  To the best of your understanding?

16  A    Yes, sir.

17  Q    Okay.

18         MS. DUIGNAN:  I'd move for admission of Exhibit 20A --

19         THE COURT:  Any objection?

20         MR. OFFENBECHER:  Just simply for our earlier

21  discussion.

22         THE COURT:  Okay.  So now what do you propose to do?

23         MS. DUIGNAN:  I propose to play that portion of the

24  recording with the transcript.

25         THE COURT:  They don't have the transcript?

1          MS. DUIGNAN:  It will be synced on the screen, Your

2     Honor.

3          THE COURT:  Got you, okay.  I'm trying to figure out

4     how we're doing this.  Okay, so I have to read you an

5     instruction.  You're about to hear and watch a recording that

6     has been received in evidence.  A transcript of the recording

7     is being provided to help you identify speakers and to help you

8     decide what the speakers say.  Remember that the recording is

9     the evidence, not the transcript.  If you hear something

10    different from what appears in the transcript, what you hear is

11    controlling.  Listen carefully.  The transcript will not be

12    available during your deliberations.  Understand?  In other

13    words, the transcript is just a means to help you.  The

14    recording is the evidence.  Okay.  Yes.

15         JUROR NO. 2:  Are we just going to hear it one time?

16         THE COURT:  You're going to just hear it one time, and

17    it's going to be admitted to evidence.  And when you

18    deliberate, you can listen to it as many times as you want.

19         JUROR NO. 2:  Okay.  But the transcript only --

20         THE COURT:  The trans -- good point.  The transcript is

21    just to help you understand what is said, and that will not be

22    available.  Okay.

23         THE CLERK:  So, Your Honor, to clarify, we are

24    admitting 20A only?

25         THE COURT:  I -- now, did you ask both be admitted?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 748  Filed 09/23/14  Page 115 of 239
(720) 384-8078  attrans@sbcglobal.net

1          MS. DUIGNAN:  I did, Your Honor, because 20A-1 is

2     synced --

3          THE COURT:  Oh --

4          MS. DUIGNAN:  You'll see when we play.  It comes up

5     there.  So it's --

6          THE COURT:  So you want the --

7          MS. DUIGNAN:  -- a package.

8          THE COURT:  But the transcript is not this paper.

9          MS. DUIGNAN:  We -- and we can separate out 20A to go

10    back with the recording if that's --

11         THE COURT:  Okay.  Well, listen.  The transcript -- if

12    it -- there's no objection, the transcript could be admitted.

13    So I withdraw my comment to you.  (Indiscernible) the first

14    mistake during the whole trial, okay.  Maybe.  All right,

15    counsel.

16         MS. DUIGNAN:  Thank you, Your Honor.

17       (Plaintiff's Exhibits 20A and 20A-1 admitted)

18    11:33:08

19       (Audio played)

20    11:33:12

21         MS. DIXON:  I apologize.  Can I -- Judge, is there --

22    can I get just a moment to try to get the screen to pop up?

23         THE COURT:  Yes.

24         MS. DIXON:  Thank you.

25         MR. OFFENBECHER:  Your Honor, perhaps while they're

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 116 of 239
(720) 384-8078  attrans@sbcglobal.net

1 working on that, there's a brief matter we can take up at

2 sidebar.

3       THE COURT: Okay.

4     (At sidebar with the Court and counsel)

5       THE COURT: Yes, sir.

6       MR. OFFENBECHER: I do object to (indiscernible) the

7 transcript (indiscernible) video -- the audio recording --

8 yeah. Sorry. If they're just going to do snippets of the

9 transcript, I do object to the transcript itself being admitted

10 into evidence. I think it's fair for them to listen to the

11 audio pursuant to your ruling, but as I think your earlier

12 inclination --

13       THE COURT: I read from the pattern -- well, no, I read

14 the pattern, that says the transcript will not be admitted.

15       MR. OFFENBECHER: Yeah. (Indiscernible).

16       THE COURT: That's what I read from, and no --

17 anything -- I didn't connect that --

18       MR. OFFENBECHER: Yeah.

19       THE COURT: But I know (indiscernible) have the option,

20 but many of the transcripts do. I mean, that's -- if I'm

21 convinced that it's accurate.

22       MR. OFFENBECHER: I think it -- I think what it does is

23 it kind of emphasizes the prejudice from taking little parts of

24 it. I know you've already ruled on that issue, but it

25 emphasizes -- you know, makes it look like this is the whole

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG Document 748 Filed 09/23/14 Page 117 of 239
(720) 384-8078 attrans@sbcglobal.net

1  statement when it's not, really.

2          MS. DUIGNAN:  (Indiscernible).

3          THE COURT:  (Indiscernible).

4          MS. DUIGNAN:  (Indiscernible).  Your Honor, after

5  you --

6          THE COURT:  I'm not (indiscernible).

7          MS. DUIGNAN:  -- listened to the recording and you

8  compared the transcript, we have an opportunity to look at it,

9  maybe we can --

10         THE COURT:  (Indiscernible) I'm not going to not -- I'm

11 not going to (indiscernible) for any reason I think that it's

12 prejudicial, I will -- I have the knowledge going into the

13 trial (indiscernible) change my mind on this.  Okay.

14         MR. SCHRODER:  Unfairly prejudicial.

15         THE COURT:  Unfairly prejudicial.

16         MR. SCHRODER:  (Indiscernible).

17     (End of sidebar)

18         THE COURT:  How are you doing with that?  You got it?

19         MS. DIXON:  I'm ready to go.

20         THE COURT:  Okay, good.

21         MS. LOEFFLER:  She hasn't made a mistake yet.

22         THE COURT:  Okay, good.  She's ahead of me.

23 11:35:59

24     (Audio played)

25 11:36:17

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 748  Filed 09/23/14  Page 118 of 239

1     (Side conversation)

2          THE COURT:  So it -- what -- is the problem

3     coordinating the transcript with the --

4          MS. DIXON:  Correct.  The box keeps disappearing, and

5     I'm not sure why.  Because we've tested it a number of times.

6          MS. DUIGNAN:  We've tested it a number of times and

7     it's worked, and it rolls along with the recording.  If we

8     can't get this sorted out, perhaps we'd take a very brief

9     recess and I can make -- do it the old-fashioned way.  And we

10    can --

11         THE COURT:  That's the way --

12         MS. DUIGNAN:  -- make copies.

13         THE COURT:  -- I'm used to, the old-fashioned way.

14         MS. DUIGNAN:  Yes, Your Honor.

15         THE COURT:  Well, try again, and if you can't, then

16    we'll take the -- try the old-fashioned way.  But if I were

17    you, I'd be having somebody back in the office working on the

18    old-fashioned way.  Keep trying this way, but --

19         MS. DUIGNAN:  Your Honor --

20         THE COURT:  -- so we're not wasting our time.

21         MS. DUIGNAN:  Your Honor, I was just going to ask that.

22    So if it's --

23         THE COURT:  Okay.

24         MS. DUIGNAN:  -- not working right now in the next try,

25    how about we take a brief recess to make copies, or we can make

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 119 of 239

1   an early lunch and make copies, and then finish up, and we'll

2   have all --

3           THE COURT:  Well, that --

4           MS. DUIGNAN:  -- the transcripts when we come back.

5           THE COURT:  Let's not quite give up yet.

6           MS. DUIGNAN:  Okay, Your Honor.  (Pause) Your Honor, at

7   this point I think we need to take that recess and do it the

8   old-fashioned way.

9           THE COURT:  Okay.  Start at 1 o'clock, okay.  Stand in

10  recess till 1 o'clock.

11      (Jury not present)

12          THE COURT:  Anything else, counsel?  Please be seated.

13  What's happening?

14          MR. CURTNER:  I just want to let you know, Judge, that

15  we're still trying to get our witnesses lined up.

16          THE COURT:  I've already taken care of that.

17          MR. CURTNER:  Yeah.  Because we have somebody that

18  needs to fly in order --

19          THE COURT:  I've taken care of it during the last

20  break.  In other words --

21          MR. CURTNER:  Great.

22          THE COURT:  -- I've talked to the people who --

23          MR. CURTNER:  Great.

24          THE COURT:  I talked to someone who knows someone else.

25

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 120 of 239

1            MR. CURTNER:  You know somebody who knows somebody,

2    okay.  That's good.  Thank you.

3            THE COURT:  All right.  1 o'clock, sir.

4            THE WITNESS:  Yes, sir.

5            THE CLERK:  Okay.  All rise.  Matter stands in recess

6    until 1 p.m.

7        (Court recessed at 11:40 a.m., until 1:06 p.m.)

8        (Jury not present)

9            THE CLERK:  All rise.

10           THE COURT:  Ready for the jury?

11           MS. DUIGNAN:  Yes, Your Honor.

12           THE COURT:  Okay.  Bring them in.

13           THE CLERK:  His Honor the Court -- is again in session.

14    Please be seated.

15       (Jury present)

16           THE COURT:  Okay, please be seated.  And we'll continue

17    with direct examination, the new way or the old-fashioned way?

18           MS. DUIGNAN:  I believe we're going to go with the old-

19    fashioned way, so we don't run into any more difficulty, Your

20    Honor.

21           THE COURT:  Okay.  Do we have --

22           MS. DUIGNAN:  But the recording does work, so I want

23    permission to hand out the transcript marked as 20A-1 --

24           THE COURT:  Okay.

25           MS. DUIGNAN:  -- which corresponded to what you had

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 121 of 239

1   admitted before.

2          THE COURT:  Very well.

3      (Side conversation)

4          MS. DUIGNAN:  Does everybody have a copy of the

5   transcript?

6          THE COURT:  Missing one.

7          MS. DUIGNAN:  Okay.  Your Honor, with your permission,

8   we'd like to publish Exhibit 20A, which is the recording, and

9   have the jurors follow on their 20A-1.

10         THE COURT:  All right, very well.

11  01:08:49

12     (Audio played)

13  01:12:16

14     THE COURT:  Okay, if you can return the transcripts,

15  just pass them down.  The government, next.

16              **DIRECT EXAMINATION, CONTINUED**

17  BY MS. DUIGNAN:

18  Q    Special Agent Oberlander, that same evening during that

19  interview, did you also discuss the defendant's knowledge about

20  rigger shop routines?

21  A    Yes.

22  Q    And have you had a chance to review recordings marked as

23  Exhibit 20B, Government Exhibit 20B, and the transcript marked

24  20B-1?

25  A    Yes.

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 122 of 239

1 Q    And is that an accurate recording of the interview as you

2 recall it, those excerpts of the interview that evening?

3 A    Yes.

4 Q    And have you reviewed the transcript in relation to the

5 recording?

6 A    Yes.

7 Q    And was that transcript an actual transcription -- was it

8 an accurate transcription of the recording?

9 A    Yes.

10       MS. DUIGNAN:  Your Honor, I move for admission of

11 Exhibits 20B and 20B-1.

12       THE COURT:  Okay.  Very well.  Will be admitted and you

13 can play the recording, with the same admonition to the jurors

14 about the recording is the evidence, the transcript is just to

15 assist.  And distribute the transcript, please.

16    (Plaintiff's Exhibits 20B and 20B-1 admitted)

17       THE WITNESS:  Thank you.

18       THE COURT:  Okay.

19       MS. DUIGNAN:  Does everyone have a transcript?

20 01:13:58

21    (Audio played)

22 01:15:26

23 BY MS. DUIGNAN:

24 Q    Special Agent Oberlander, did you also participate in a

25 interview of the defendant the next morning, on April 13th,

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 123 of 239
(720) 384-8078  attrans@sbcglobal.net

1  2012?

2  A    Yes.

3  Q    And approximately what time did that interview start?

4  A    About 11:20.

5  Q    And was there anything else scheduled at the command that

6  morning?

7  A    Yes.  I believe at 9 o'clock the command hosted CISM

8  training, Critical Incident Stress Management.  They brought in

9  counselors and -- and people to talk to the crew about, you

10  know, how -- how to deal with the stress of the situation

11  and -- and the grief.

12  Q    And so you started the interview after that training

13  concluded?

14  A    Yes.

15  Q    And so starting at about 11:30, how long approximately did

16  you interview during that session?

17  A    For about a hour and a half.

18  Q    And during that interview, did you have a chance to talk

19  further about the routines of those who worked at the rigger

20  shop?

21  A    Yes.

22  Q    Have you had a chance to review the recording marked as

23  Government Exhibit 24A?

24  A    Yes.

25  Q    And have you had a chance to compare it to the transcript

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 124 of 239
(720) 384-8078  attrans@sbcglobal.net

1  marked as Government Exhibit 24A-1?

2  A    Yes.

3  Q    And were both of those items accurate, to your

4  recollection?

5  A    Yes.

6  Q    And the -- was the transcript accurate as to what the

7  recording reflected?

8  A    Yes.

9        MS. DUIGNAN:  Your Honor, at this point I'd move 24A

10 and 24A-1.

11       THE COURT:  Very well.  They'll be received.  And so if

12 we can just pass the last ones down and then we'll distribute

13 the new one.

14     (Plaintiff's Exhibits 24A and 24A-1 admitted)

15     (Side conversation)

16       THE COURT:  This is a one-page document, 24A.

17     (Side conversation)

18       THE COURT:  Okay.

19       MS. DUIGNAN:  Does everyone have a copy of 24A?  Okay.

20 01:18:26

21     (Audio played)

22 01:18:59

23 BY MS. DUIGNAN:

24 Q    And during that same interview did you discuss the working

25 relationships between those who worked at the rigger shop and

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 125 of 239

1 the defendant?

2 A    Yes.

3 Q    And have you had a chance to review the recording marked

4 as Government Exhibit 24B?

5 A    Yes.

6 Q    And have you had a chance to review the transcript marked

7 as Government Exhibit 24B-1?

8 A    Yes.

9 Q    And was the recording an accurate recording of the --

10 those portions of the interview as you recall them?

11 A    Yes.

12 Q    And was the transcript an accurate transcription of the

13 portions of the recording that you listened to?

14 A    Yes.

15       MS. DUIGNAN:  Your Honor, I move 24B and 24B-1 for

16 admission and publication to the jury.

17       THE COURT:  All right, very well.  So now I think you

18 need to pass those down, and we'll pass out 24B-1.  So 24B and

19 B-1 will be admitted.

20     (Plaintiff's Exhibits 24B and 24B-1 admitted)

21       MS. DUIGNAN:  Does everyone have a copy of the

22 transcript?

23       THE COURT:  Okay.

24       MS. DUIGNAN:  I see affirmative response.

25 01:20:31

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 126 of 239

1    (Audio played)

2    01:22:09

3    BY MS. DUIGNAN:

4    Q    Special Agent Oberlander, during that same interview did

5    you further discuss what the defendant told you about the low

6    tire and his actions following that?

7    A    Yes.

8    Q    And have you had a chance to review Exhibits -- Government

9    Exhibit 24C and Exhibit 415 before today?

10   A    Yes.

11   Q    And are those accurate recordings of portions of the

12   interview that you had with Mr. Wells?

13   A    Yes.

14   Q    And have you had a chance to also review the transcripts

15   of those recordings marked as Exhibits 24C-1 and 415-1?

16   A    Yes.

17   Q    And are those accurate transcriptions of those recordings?

18   A    Yes.

19        MS. DUIGNAN:  Your Honor, at this point I'd move both

20   of those records and the transcripts into evidence.

21        THE COURT:  Okay, let me -- it's 24C-1, and did you say

22   something about 415 --

23        MS. DUIGNAN:  415.  Four one five.

24        THE COURT:  So it's two different ones?

25        MS. DUIGNAN:  Yes, Your Honor.  I figure we could play

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 127 of 239

1  them sequentially because they're --

2         THE COURT:  Okay.

3         MS. DUIGNAN:  -- the same topic.

4         THE COURT:  Very well.

5         MR. OFFENBECHER:  Your Honor, our only objection is the

6  one I've stated earlier, to not providing the entire transcript

7  (indiscernible).

8         THE COURT:  Okay.  So 24C-1 and 20 -- and 415-1 will be

9  received.

10     (Plaintiff's Exhibits 24C-1 and 415-1 admitted)

11        UNIDENTIFIED SPEAKER:  (Indiscernible) 24C.

12        THE COURT:  Okay, you should have two different ones.

13 Okay.  Go ahead.

14        MS. DUIGNAN:  Okay, we're going to start with the

15 recording at 24C first.

16 01:24:28

17     (Audio played)

18 01:28:14

19        THE CLERK:  Just to clarify, the audio is 24C?

20        MS. DUIGNAN:  24C.

21        THE CLERK:  Okay.  That one hasn't been admitted, Your

22 Honor.

23        THE COURT:  24C can be admitted.

24     (Plaintiff's Exhibit 24C admitted)

25        THE CLERK:  Thank you.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 748  Filed 09/23/14  Page 128 of 239

1    MS. DUIGNAN:  And now we're going to turn to recording

2  at 415, which I believe was admitted.

3    THE COURT:  Yes.

4    (Plaintiff's Exhibit 415 admitted)

5  01:28:46

6    (Audio played)

7  01:29:40

8  BY MS. DUIGNAN:

9  Q   At this point, Special Agent Oberlander, I'd like you to

10 look at your screen.  I've pulled up what's been marked as

11 Government Exhibit 34.  Do you recognize that?

12 A   I do.

13 Q   And what is that?

14 A   That is a drawing that the defendant made when asked to

15 describe the rigger shop.

16 Q   And do you recall when he made that drawing?

17 A   That was the interview that started at about 11:20 on the

18 13th.

19 Q   And what did you ask him to do?

20 A   Asked him to describe the rigger shop layout and label

21 different areas, desks, offices, work areas, cameras, doors,

22 windows, pretty much provide as much description as he could

23 about the layout of the rigger shop.

24    MS. DUIGNAN:  Your Honor, I'd offer Government Exhibit

25 34 into evidence.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 129 of 239

1          MR. OFFENBECHER:  No objection.

2          THE COURT:  It will be received.

3      (Plaintiff's Exhibit 34 admitted)

4      (Side conversation)

5  BY MS. DUIGNAN:

6  Q    That's okay, and this is not, I know, necessarily the best

7  projection of it.  But looking -- you have a laser pointer up

8  there, I believe.

9  A    Yes.

10  Q    And if you could use it to point at the screen.  I know

11  the angle of this is sideways, I think, is sideways, so it's --

12  if you can describe what the orientation is using the laser

13  pointer.

14  A    The rigger shop was described as a L shape.  He labeled

15  the boiler room back here, kind of his offices in -- in this

16  area, labeling each of the desks.  And believe that was a couch

17  there; a door here; a -- a bathroom, or head, here, with

18  lockers kind of in this general direction.  I believe there

19  were three doors here.  I don't recall which one he mentioned

20  was the electronic lock.  But these lines here were depicting

21  the view of the only camera that was at T1 -- or, sorry, T2.

22  And how it was described is that camera looked out across the

23  parking lot and was really only used to monitor the flagpole

24  that was across the street.  And he had mentioned that it was

25  mounted about 12 feet up on -- right underneath the -- the roof

1  line of -- of the rigger shop.

2  Q    Thank you.  We can take that down.  And during that same

3  interview on April 13th of 2012, did you discuss driving times

4  between certain points in Kodiak with the defendant?

5  A    Yes.

6  Q    And did you discuss how long trips take between certain

7  points?

8  A    Yes.

9  Q    And did you ask him about a 34-minute gap in time?

10 A    Yes.

11 Q    Have you had a chance to review the recording at Exhibit

12 24D?

13 A    Yes.

14 Q    And is that an accurate recording of those portions of the

15 interview?

16 A    Yes.

17 Q    And have you had a chance to review Exhibit 24D-1?

18 A    Yes.

19 Q    And is that an accurate transcript of the recording as you

20 heard it?

21 A    Yes.

22       MS. DUIGNAN:  Your Honor, I move admission of 24D and

23 24D-1.

24       MR. OFFENBECHER:  Subject to our --

25       THE COURT:  It will be received.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 131 of 239

1    (Plaintiff's Exhibits 24D and 24D-1 admitted)

2         MR. OFFENBECHER:  -- earlier objection.

3         MS. DUIGNAN:  Does everybody have a copy of the

4    transcript?  Affirmative nods from all the jury members.  Okay,

5    ready to go.

6    01:34:31

7         (Audio played)

8    01:38:42

9         MS. DUIGNAN:  I have no further questions.

10        THE COURT:  All right.  Cross-examination.  If you can

11   just pass those down to the end.

12        MR. OFFENBECHER:  Excuse me just a moment, Your Honor.

13                    **CROSS-EXAMINATION**

14   BY MR. OFFENBECHER:

15   Q    Special Agent Oberlander, good afternoon.

16   A    Good afternoon.

17   Q    Give me just one second.  Now, you interviewed Mr. Wells

18   over a period of two days.  Is that right?

19   A    There were periods of two days that I interviewed him,

20   yes.

21   Q    Well, you interviewed him on April 12th, right?

22   A    Yes.

23   Q    And then you interviewed him again on April 13th, didn't

24   you?

25   A    Yes.

1   Q    So it was over two days?

2   A    It was approximately two hours during a two-day period.

3   Q    Okay.  And the -- what you -- we heard today on the audio

4   and people have reviewed in the transcript are just excerpts

5   from the interviews that you did during that period of time.

6   Right?

7   A    Correct.

8   Q    They don't include all of the questions and all of the

9   answers that Mr. Wells gave.  Is that right?

10  A    Correct.

11       MR. OFFENBECHER:  Your Honor, may I approach the

12  witness?  I just want to -- we don't have these electronically,

13  but I just wanted to refresh his memory so he can use this to

14  refresh his memory about the context of -- in the interview.

15       THE COURT:  Very well.

16  BY MR. OFFENBECHER:

17  Q    Special Agent Oberlander, I've just handed you a stack of

18  papers.  And just go through them with me so you can identify

19  them.  There's DE-161, Defense Exhibit 161.  Right?

20  A    Yes.

21  Q    There's a little blue sticker on there.  It says "Defense

22  Exhibit."

23  A    I see it.  Thank you.

24  Q    Then there's Defense Exhibit 162.  Right?

25  A    Yes.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 133 of 239
(720) 384-8078   attrans@sbcglobal.net

1    Q    Defense Exhibit 163.  Right?

2    A    Yes.

3    Q    Defense Exhibit 164.  Right?

4    A    Yes.

5    Q    Defense Exhibit 165.  Right?

6    A    Yes.

7    Q    Now take a look at Defense Exhibit 161, and would you see

8    if that refreshes your memory about that first interview that

9    you had with Mr. Wells.  That interview was --

10            MS. DUIGNAN:  I --

11            MR. OFFENBECHER:  -- the first interview --

12            MS. DUIGNAN:  -- object -- objection, Your Honor.  I

13   don't think he had to have his memory refreshed about the first

14   interview of Mr. Wells.  There wasn't a question there.

15   BY MR. OFFENBECHER:

16   Q    Okay.  How long was the first interview that you had with

17   Mr. Wells on April 12th?

18   A    Can you characterize the interview?  I -- are you asking

19   about the first recording or the first interview?

20   Q    Right.  Right, because there -- you actually had some more

21   conversation with him that wasn't recorded.  Right?

22   A    Yes.

23   Q    Okay.  Well, I'm just asking about the recorded

24   transcripts of interview that you have in front of you.  Okay?

25   A    Can you ask the question again?  I'm sorry.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 134 of 239
(720) 384-8078  attrans@sbcglobal.net

1 Q    Sure.  I was going to let you look at this to refresh your

2 memory about when the first transcribed interview started and

3 when it ended and how long it was.

4 A    Okay.

5 Q    So let me just see if I can help get through it quickly,

6 or we can do it really slow, but -- take a look at that first

7 transcript, DE-161.  It was on April 12th, 2012, wasn't it?

8 A    Yes.

9 Q    It began -- the transcript begins at 7:21 p.m.  Is that

10 right?

11 A    Yes.

12 Q    And it ends at 7:52 p.m.  Is that right?  Or you tell me

13 when it ends, actually.

14 A    It was 31 minutes and 25 seconds long, so doing the math,

15 yes, that would be 7:52.

16 Q    So your first interview was 31 minutes and 25 seconds

17 long, right?

18 A    Yes.

19 Q    And take a quick look at that and see if that appears to

20 be a fair and accurate transcript of that first 30-minute

21 interview.

22 A    Appear -- it -- yes, it appears to --

23 Q    I mean, this is the official FBI --

24 A    Right.

25 Q    -- interview, isn't it?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 135 of 239

1   A    Yes.

2   Q    It's an FBI transcription?

3   A    Yes.  But again, the recording is the actual evidence.

4   This is just a interpretation of what the recording is.

5   Q    Right.  But this isn't something that we provided.  This

6   is an FBI transcript of that interview, isn't it?

7   A    Correct.

8   Q    You've looked this over before, haven't you?

9   A    Yes, but it's been a while.

10  Q    Okay.  Any reason to believe it's not accurate?

11  A    No.

12  Q    Okay.  And it's a total of 35 pages long, isn't it?

13  A    Yes.

14  Q    All right.  Take a look at Defense Exhibit 162, the next

15  one.  That's a transcript, again, an official FBI transcript of

16  the second interview -- transcribed interview that you did with

17  Mr. Wells that day.  Right?

18  A    It is a continuation of that evening, yes.

19  Q    Okay.  It's an interview that you and Mr. Bottary did?

20  A    Yes.

21  Q    Of Mr. Wells?

22  A    Yes.

23  Q    On April 12th?

24  A    Yes.

25  Q    Following the one we just talked about?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 136 of 239
(720) 384-8078   attrans@sbcglobal.net

1    A    Yes.

2    Q    And it begins at 8:04 p.m.  Isn't that right?

3    A    Yes.

4    Q    And it ends at 8:15 p.m.  Is that right?

5    A    Yes.

6    Q    And, again, it's an official FBI transcript, and you don't

7    have any reason to believe that's not a correct transcript of

8    this interview.  Right?

9    A    Correct.

10   Q    And this interview is a total of 12 pages long, isn't it?

11   A    Yes.

12   Q    Now, at this point in time, the -- when you conducted this

13   one interview or two interviews, how you want to characterize

14   it, but the interviews that are reflected in these two

15   transcripts, it was 7:21 when you began these.  Right?

16   A    Yes.

17   Q    And Mr. Wells had been at the COMMSTA at T1 since about 8

18   o'clock in the morning.  Right?

19   A    I don't know when he got there exactly.

20   Q    Okay.  Do you know whether he ever left the COMMSTA that

21   day?

22   A    I don't know, no.

23   Q    All right.  So let's go on to DE-163.  And this is an

24   interview -- another session that occurred on April 12th of

25   2012.  Right?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 137 of 239
(720) 384-8078  attrans@sbcglobal.net

1  A    Yes.

2  Q    And this is the official transcript by the FBI of that

3  interview.  Right?

4  A    Yes.

5  Q    And this one began at 9:05 p.m. that evening.  Right?

6  A    Yes.

7  Q    And it concluded at 9:09 p.m. that evening.  Right?

8  A    Yes.

9  Q    And you have no reason to believe that this is not a fair

10 and accurate transcription of your interview with Mr. Wells at

11 that point, right?

12 A    Correct.

13 Q    And this one is a total of two pages -- three pages long,

14 right?

15 A    Two pages.

16 Q    Two pages, right.  All right.  Then look at DE-164.  This

17 is, again, yet another continuation of your interview with Mr.

18 Wells on April 12th.  Right?

19 A    Yes.

20 Q    And this one began at 9:22 p.m., didn't it?

21 A    Yes.

22 Q    And it ended at 9:30 p.m.  Is that right?

23 A    Yes.

24 Q    And so it was a total of about seven minutes and twenty-

25 seven seconds long.  Right?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 138 of 239
(720) 384-8078  attrans@sbcglobal.net

1  A    It's listed as seven minutes and twenty-eight seconds, but

2  yes.

3  Q    Okay, seven twenty-eight.  And the official FBI transcript

4  is about six pages long of that one?

5  A    Yes.

6  Q    Take a look at DE-165.  Now, this is the official FBI

7  transcript of your continued interview the next morning.

8  Right?

9  A    Yes.

10 Q    And this was on a Friday, it was April 13th, 2012.  Is

11 that right?

12 A    Two thou -- Friday the 13th --

13 Q    Two --

14 A    -- 2012, right.

15 Q    -- twelve -- right, yeah.  And this interview with Mr.

16 Wells began at about 11:25 a.m.?

17 A    Correct.

18 Q    And it ended about 12:51 p.m.  Is that right?

19 A    Correct.

20 Q    And so this interview was about an hour and 25 minutes

21 long?

22 A    Correct.

23 Q    And looking through this, this appears to you to be the

24 official FBI transcript of this interview, doesn't it?

25 A    Yes.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 139 of 239

1  Q    Any reason to believe -- you don't have any reason to

2  believe that's not an accurate transcription of the whole

3  interview.  Right?

4  A    Correct.

5  Q    And this interview takes up a total of 73 pages with

6  respect to the interview on the 13th, doesn't it?

7  A    Yes.

8  Q    All right, you can put that down now.  Take -- do you have

9  the transcript 20A with you, the excerpt that's been -- that

10  was already reviewed and admitted?

11  A    Yes.

12  Q    Take a look at transcript 20A, and we'll just go quickly

13  through this.  The -- if you look at the first page of 20A,

14  which the jury has reviewed and has been played, if you go

15  about a third of the page down where it says, line 11, "Coast

16  Guard Investigative Services:  Ah-hum."  And then there's open

17  bracket and then three dots in there and another bracket.

18  Right?

19  A    Yes.

20  Q    And that reflects the fact that there is some text that's

21  missing there.  Right?

22  A    Yes.

23  Q    Because this is not a continuous transcript of the events

24  that occurred there.  Right?

25  A    Correct.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1  Q    Every time that there is this open bracket, dot, dot, dot,

2  closed bracket, that means that some of the text of the

3  transcript of your interview with Mr. Wells has been deleted

4  and this part has been moved up.  Right?

5  A    I don't know the mechanics of it, but it's not there.

6  Q    Right.  There's a gap, there's something missing.

7  A    Right.

8  Q    That's what you put the dots for, to say something's been

9  taken out?

10  A    Correct.

11  Q    And so there's one of those on 20A there about a third of

12  the way down.  Right?

13  A    Yes.

14  Q    And then on page 2 of 20A, right down near the bottom,

15  there's an indication of line 10, and then it jumps to line 6,

16  with another dot, dot, dot, gap there.  Right?

17  A    Yes.

18  Q    And so that line 10 is from one page, right?

19  A    Yes.

20  Q    And the line 6 is obviously from a different page in the

21  transcript.  Right?

22  A    Correct.

23  Q    And you're not really aware how much has been deleted

24  there, are you?

25  A    Not at this moment, no.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 141 of 239
(720) 384-8078  attrans@sbcglobal.net

1  Q    Okay.  I mean, it could be just the next page, line 6, or

2  it could be several pages down the road, line 6.  Right?

3  A    It could be, yes.

4  Q    So you can't tell from looking at that how much of it's

5  been deleted?

6  A    No.

7  Q    And then go to page 3 of the Exhibit 20A.  And about two-

8  thirds of the way down the page, there's another spot where

9  there's a -- there's line 20 with some text on it.  Right?

10  A    Correct.

11  Q    And then below that there's a bracket, dot, dot, dot,

12  bracket, again.  And then it begins up again on line 11.

13  Right?

14  A    Yes.

15  Q    And so, again, there's a gap there.  Right?

16  A    Correct.

17  Q    And you're not sure whether that's the next page or

18  several pages down the road.  Right?

19  A    Correct.

20        THE CLERK:  I'm sorry, just to clarify, I have 20A as

21  the audio and 20A-1 as the transcript.

22        MR. OFFENBECHER:  Sure.  You're absolutely right.  I

23  should be --

24        THE CLERK:  Is this --

25        MR. OFFENBECHER:  -- saying 20A dash --

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 142 of 239
(720) 384-8078  attrans@sbcglobal.net

 1        THE CLERK:  Thank you.

 2        MR. OFFENBECHER:  -- 1 for the transcript excerpt.

 3  Apologize for that.

 4  BY MR. OFFENBECHER:

 5  Q    So let's look at -- okay, that's -- and so every time that

 6  we see the dot, dot, something's been deleted from even this

 7  excerpt.  Right?

 8  A    Yes.

 9  Q    Take a look at 24C-1.

10  A    I do not have a copy of that one.  I only have 20B-1 and

11  20A-1.

12  Q    Well, actually, 24 David, right?  Do you have 24 David up

13  there?

14  A    No, I have 20 -- 20 Bravo dash 1 and 20 Alpha dash 1.

15  Q    24 David dash 1 is what I'd like to you to see.

16        MS. DUIGNAN:  Your Honor, we have copies.  We can

17  approach the witness and --

18        THE COURT:  Very well.

19        MS. DUIGNAN:  -- give him copies.

20        MR. OFFENBECHER:  Sure.

21        THE WITNESS:  Thank you.

22  BY MR. OFFENBECHER:

23  Q    Okay.  See that one now?

24  A    David dash 1, 24 David --

25  Q    That --

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 143 of 239
(720) 384-8078  attrans@sbcglobal.net

1   A   -- dash --

2   Q   That's it.

3   A   Yes.

4   Q   This is one that we just heard here in court, right?

5   A   Yes.

6   Q   And if you'll turn to page 2 of that, about a third of the

7   way down the page, you'll see there's another one of those gaps

8   where something's been removed from the transcript.  Right?

9   A   Correct.

10  Q   And it goes from line 2 to line 25.  Right?

11  A   Correct.

12  Q   And we can't really tell from that whether that's line 2

13  on the same page or 25, or whether there's pages missing in the

14  middle.  Right?

15  A   Correct.

16  Q   And then on page 3, about a fourth of the way down, again,

17  there's a dot, dot, dot, and it goes from line 17 to line 2.

18  Right?

19  A   Correct.

20  Q   And, again, we can't tell how big of a gap that is?

21  A   Correct.

22  Q   And then just three lines later, it goes from line 4 to

23  line 25, right?

24  A   Correct.

25  Q   And another gap, we can't tell how big that gap is.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 144 of 239
(720) 384-8078   attrans@sbcglobal.net

1  Right?

2  A    Correct.

3  Q    And then, finally, on this exhibit, down at the bottom of

4  page 3, it goes from line 10, and then there's another gap,

5  dot, dot, dot, right?

6  A    Correct.

7  Q    To line 23.  Right?

8  A    Correct.

9  Q    And we don't know how much of the text or even how many

10  pages have been deleted there, do we?

11  A    Correct.

12       MR. OFFENBECHER:  I don't have any other questions,

13  Your Honor.

14       THE COURT:  Redirect.

15                    **REDIRECT EXAMINATION**

16  BY MS. DUIGNAN:

17  Q    I believe Mr. Offenbecher kept referring to an official

18  transcript.  Can you describe what that is?  Is there an

19  official transcript?  What is the --

20  A    Evidence --

21  Q    Go ahead.

22  A    The evidence is the recording, as the judge stated

23  earlier.  We have employees or we contract out people to do the

24  transcripts.  But we treat -- the official record is the -- is

25  the evidence of the recording.  The transcript is, again,

1  completed to assist in getting through the evidence.

2  Q    And what is the policy of -- what is the policy, if you

3  wind up taking breaks or stepping out of the room, regarding

4  recording?

5  A    To stop the recording.  It's their standard practice.

6  There isn't necessarily a policy.  But the practice is, when

7  you step out of the room to take a break, you would stop the

8  recording.

9  Q    And I believe Mr. Offenbecher said something about the

10  interview on April 13th being a continued interview.  I'd like

11  you to clarify, what happened on the evening of April 12th?

12  Where did everybody go?

13  A    Okay.  When we stopped the recording at 9:30 on the night

14  of the 12th, Mr. Wells went home or was free to go wherever he

15  needed to go.  And we asked to speak with him again the next

16  day after he reported to the command as -- for the CISM

17  training or whatever; he needed to do that.  And then we asked

18  to speak with him again on -- on the morning of the 13th, when

19  he was done with what he needed to do.

20  Q    Thank you.  I have no further questions.

21          THE COURT:  Recross.

22          MR. OFFENBECHER:  Just briefly, Your Honor.

23                    **RECROSS EXAMINATION**

24  BY MR. OFFENBECHER:

25  Q    Just so we're clear on this, the -- Special Agent

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 146 of 239
(720) 384-8078   attrans@sbcglobal.net

1  Oberlander, you're not suggesting that those dot, dot, dot,
2  gaps, where it goes from five to, you know, twenty-five, are
3  where you stepped out of the room, are you?
4  A    That may be included in those dot, dot, dots, but I -- not
5  every dot, dot, dot is where we stopped the recording or
6  stepped out of the room, no.
7  Q    Well, you know that large sections of text have been taken
8  out of these excerpts, don't you?
9        MS. DUIGNAN:  Objection, Your Honor.  Text -- we're
10  talking about the recording is the official evidence.
11        MR. OFFENBECHER:  Well, Your Honor, they've only played
12  small portions.  And if the government's going to suggest
13  that's because he stepped out of the room all those times, it's
14  simply not true.
15        MS. DUIGNAN:  We're not suggesting that.
16        MR. OFFENBECHER:  All right.  So I guess the
17  government's stipulating that the gaps are not -- and if we can
18  just make this clear.  The government is not suggesting that
19  those gaps represent times when the agent stepped out of the
20  room, but rather, as the agent testified, they are places where
21  portions of the transcript have been eliminated.  Then I'll be
22  done.
23        THE COURT:  I think that's probably accurate in -- that
24  both is the case.
25        MS. DUIGNAN:  It's accurate.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 147 of 239

1       THE COURT:  Sometimes he stepped out of the room, some

2   represent portions that were not used, and some are a

3   combination of both.

4       MR. OFFENBECHER:  Well, Your Honor, I think that if you

5   look at the actual --

6       THE COURT:  Listen --

7       MR. OFFENBECHER:  -- text of the transcripts, when he

8   steps out of the room, he shuts the -- shuts it off and then

9   turns it back on.  So it's a different --

10      THE COURT:  Yeah.

11      MR. OFFENBECHER:  -- recording.  So --

12      THE COURT:  Okay.

13      MR. OFFENBECHER:  -- I don't think it's fair to say

14  that they get --

15  BY MR. OFFENBECHER:

16  Q   Am I right, Special Agent?

17      MS. DUIGNAN:  Is there --

18      MR. OFFENBECHER:  I'm asking the question.

19      THE COURT:  I wasn't there.

20      MS. DUIGNAN:  Is there a question?

21      THE COURT:  Yeah, I wasn't there, so I don't know.

22      MR. OFFENBECHER:  Yeah.

23  BY MR. OFFENBECHER:

24  Q   So when you stepped out of the room, you actually turned

25  the recorder off.  Right?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 748  Filed 09/23/14  Page 148 of 239

1  A    Yes.

2  Q    And then the reason that there's four of them for that

3  first day is because you just started it up again and there was

4  another transcript.  Right?

5  A    Correct.

6  Q    So when you stepped out of the room, it wasn't one of

7  those little dot, dot, dots on the thing, it was -- you

8  actually started a new one of these little transcripts?

9  A    Correct.

10 Q    Thank you.  No other questions.

11         THE COURT:  Okay.  Anything else?

12         MS. DUIGNAN:  No.  Nothing further.

13         THE COURT:  All right, thank you, sir.  The

14 government's next witness.

15    (Witness excused)

16         MR. SCHRODER:  Your Honor, the government calls Special

17 Agent Doug Klein.

18         THE COURT:  Okay, sir, that witness door pulls out.

19 Just step in the box, and my clerk will swear you in.

20         THE CLERK:  Please raise your right hand.

21         **DOUGLAS KLEIN, PLAINTIFF'S WITNESS, SWORN**

22         THE CLERK:  Okay, thank you.  Please have a seat.  And,

23 sir, if you can please state and spell your full name.

24         THE WITNESS:  My -- my name is Douglas Klein.  D-o-u-g-

25 l-a-s, last name K-l-e-i-n.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 748  Filed 09/23/14  Page 149 of 239

1     THE CLERK:  Thank you.

2     THE COURT:  All right, counsel.

3                 **DIRECT EXAMINATION**

4  BY MR. SCHRODER:

5  Q    Special Agent Klein, who do you work for?

6  A    I'm a special agent with the FBI.

7  Q    And how long have you worked for the FBI?

8  A    Just shy of 15 years.

9  Q    And what did you do before that?

10 A    I was at --

11     MR. SCHRODER:  Sir -- sorry.

12     THE WITNESS:  Sorry about that.

13 BY MR. SCHRODER:

14 Q    What did you do before you worked for the FBI?

15 A    Prior to the FBI, I was a computer programmer with FedEx.

16 Q    And could you briefly describe your training as a special

17 agent for the FBI?

18 A    The -- I went through the FBI Academy.  I spent roughly

19 four months at the FBI academy, and then ongoing training over

20 the past 15 years.

21 Q    And since becoming an FBI agent, how many investigations

22 have you participated in?

23 A    I -- hundreds.  Hundreds and hundreds.  That's a guess.

24 Q    Now, what's your current assignment with the FBI in

25 Alaska?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 150 of 239
(720) 384-8078   attrans@sbcglobal.net

1  A    I'm currently assigned to our Cyber Squad, working

2  national security intrusions.

3  Q    And were you involved in the investigation of the

4  homicides at Coast Guard COMMSTA Kodiak on April 12th, 2012?

5  A    Yes, sir, I was.

6  Q    And when were you sent to Kodiak?

7  A    That day, April 12th.

8  Q    Now, when you were -- what were you assigned to do on the

9  afternoon or early evening of April 13th, 2012, the day after

10  the murder?

11  A    Special Agent Matt Judy and I were assigned to go to the

12  airport and watch a blue Honda CR-V that was believed to be

13  owned and driven by Mrs. Wells.

14  Q    Okay.  And why were you conducting surveillance on the CR-

15  V?

16  A    Law enforcement involved in this investigation were in the

17  process of obtaining a search warrant for that vehicle, and so

18  Special Agent Judy and I, our job was to know where that

19  vehicle was, when and if that search warrant was granted.

20  Q    Now, did you see James Wells, while you were conducting

21  that surveillance?

22  A    Yes, sir, we did.

23  Q    And were you familiar with his appearance at that time?

24  A    Yes.  I had seen him earlier in the COMMSTA, and with the

25  beard, he's fairly recognizable.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 151 of 239
(720) 384-8078   attrans@sbcglobal.net

1  Q   Okay.  And what time did you see him?

2  A   At 6:30 p.m. on April 13th.

3  Q   And what did you see him do?

4  A   At 6:30, Mr. Wells was driving a red Ford Ranger.  He

5  pulled into the airport parking lot and parked kind of midway

6  between the Alaska Air terminal and Island Air office building.

7  Q   And did he get out of the car?

8  A   Yes, sir, he did.

9  Q   And where'd he go?

10 A   He tried to walk into the Gear Up Coffeeshop, which was

11 apparently closed.  And at -- when he realized it was closed,

12 he then walked into Island Air.

13 Q   Okay.  And about how long was -- and where's Island Air in

14 relation to the coffeeshop?

15 A   As I recall, if you were to walk out -- oh, I'm sorry, in

16 relation to the coffeeshop, if you're at the Alaska Air

17 terminal, looking out across the parking lot, the coffeeshop

18 would be, I'd guess, roughly straight and Island Air, if I

19 recall, is just off to the left.

20 Q   That the same -- is Island Air and the coffeeshop in the

21 same building?

22 A   Yes, sir.

23 Q   All right.  And when you saw him go into Island Air, about

24 how long was he in there?

25 A   I would guess maybe five minutes, give or take.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 152 of 239

**KLEIN - CROSS**

1  Q   And what did he do when he came out of Island Air?

2  A   After exiting Island Air, he got back into his pickup

3  truck.  He drove to the opposite end of the airport parking

4  lot, parked the truck, and then walked into Servant Air.

5  Q   And about how long was he in there?

6  A   Again, about five minutes --

7  Q   All right.

8  A   -- give or take.

9  Q   Yeah.  And what did he do then?

10 A   He exited Servant Air, got back into his truck, moved the

11 truck back almost to the original parking spot, and then walked

12 into the main Alaska Airlines terminal.

13 Q   And then what happened after that?  What did you see him

14 do after that?

15 A   Shortly after 7 o'clock, Mr. Wells came walking out with a

16 woman that I assume was his wife, and the two of them entered

17 the -- the same pickup truck and took off.

18 Q   Okay.

19         MR. SCHRODER:  Your Honor, I have no further questions.

20         THE COURT:  Cross-examination.

21                    **CROSS-EXAMINATION**

22 BY MR. CURTNER:

23 Q   Agent Klein, you -- so you were doing surveillance on the

24 Honda CR-V at the parking lot?

25 A   Yes, sir.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 153 of 239
(720) 384-8078  attrans@sbcglobal.net

1  Q    And do you know when that surveillance was initiated?

2  A    It was actually initiated at roughly 11 p.m. on April

3  12th.

4  Q    Okay.  And who was doing the surveillance at that time?

5  A    Myself and Special Agent Matt Judy.

6  Q    Okay.  So you and Special Agent Judy started surveillance

7  on that vehicle the night of April 12th, around 11 p.m.?

8  A    Yes, sir.

9  Q    And maintained that throughout the night?

10 A    At roughly 8:30, 8:45, we -- Matt Judy and I were relieved

11 long enough that we could shower, change clothes, and grab a

12 bite to eat.

13 Q    So somebody was watching that vehicle from the night of

14 the 12th, 11 p.m. on.  Is that correct?

15 A    Correct.

16 Q    Okay.  Now -- so then you were onsite at -- on the evening

17 of April 13th at 6:30?

18 A    Yes, sir.

19 Q    And that's when Mrs. Wells was returning to Kodiak?

20 A    Her -- that's when Mr. Wells arrived at the airport.  Mrs.

21 Wells' flight arrived closer to 7.

22 Q    Okay.  Now, you did also observe Mr. Wells go into the

23 terminal.  Did you follow him into the terminal?

24 A    I did not.  Special Agent Judy did, but I did not.

25 Q    Okay.  And she watched him -- I'm sorry.  Mr. Judy.

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 154 of 239

KLEIN - CROSS

1  A    Correct.

2  Q    Okay.  Special Agent Judy watched him go into the restroom

3  there?

4  A    Yes, sir.

5  Q    And he was in that restroom for 13 minutes, at the

6  restroom at the airport?

7  A    I have no idea.

8  Q    Do you -- wonder if you could look at the report -- the

9  Bates stamp 21365.  Oh.

10     (Side conversation)

11 Q    Do you see that on your screen?

12 A    Yes, sir.

13 Q    Okay.  And is this an FBI investigation report?

14 A    Yes, it is.

15 Q    By Special Agent Judy and yourself?

16 A    Correct.

17 Q    Are those your initials next to your name at the bottom?

18 A    No, those are not my initials.

19 Q    Okay.  That's your name there that's part of this report?

20 A    That is correct.

21 Q    And you see there where it says that Mr. Wells entered the

22 bathroom at 6:43 p.m.?

23          MR. SCHRODER:  Objection, Your Honor.  Calls -- it's

24 going to call for hearsay.  Special Agent --

25          MR. CURTNER:  This is (indiscernible) --

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 155 of 239

1      MR. SCHRODER:  Special Agent Klein did not see it.  He

2  stated it was Special Agent Judy who followed him in.

3  BY MR. CURTNER:

4  Q   Did you discuss this with Agent Judy?

5  A   I discussed it enough to understand that Mr. Wells entered

6  the restroom.  How long he was in there was not a topic of the

7  conversation.

8  Q   Would you disagree with the -- what's in the -- Officer

9  Judy's report?

10     MR. SCHRODER:  Objection.  Still calls for hearsay

11  response, Your Honor.

12     THE COURT:  Sustained.

13  BY MR. CURTNER:

14  Q   Okay, so you don't know if that report's accurate or not?

15  A   To the best of my knowledge, that report is accurate.

16  What occurred between 6:43 and 6:56, I cannot say.

17  Q   Even though it says it in the report?

18  A   I can tell you he --

19     MR. SCHRODER:  Objection, Your Honor.

20     THE COURT:  Sustained.

21     MR. CURTNER:  Okay, that's all I have.  Thank you.

22     THE COURT:  Redirect.

23     MR. SCHRODER:  Your -- I don't have any other --

24  just -- questions.  I'm sorry, Your Honor.

25     THE COURT:  Okay.  You're excused, thank you.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 748  Filed 09/23/14  Page 156 of 239

1          THE WITNESS:  Thank you.

2      (Witness excused)

3          MR. SCHRODER:  I was moving along.

4          THE COURT:  Okay.  We only have one chair up here.  The

5  next witness is?

6          MR. SCHRODER:  Olivia Terry.  Ms. Terry, right up here

7  on the right is the witness stand.  You can come right up

8  there.

9          THE COURT:  Good afternoon, ma'am.  You just kind of

10  make your way around.  There's a little door that pulls out.

11  And you step right into the box.  And then remain standing for

12  just long enough for her to swear you in.

13          THE CLERK:  Please raise your right hand.

14      **OLIVIA MATSUURA TERRY, PLAINTIFF'S WITNESS, SWORN**

15          THE CLERK:  Okay, thank you.  Please have a seat.  And,

16  ma'am, if you can please state and spell your full name.

17          THE WITNESS:  Olivia Matsuura Terry.  O-l-i-v-i-a, M-a-

18  t-s-u-u-r-a, Terry, T-e-r-r-y.

19          THE CLERK:  Thank you.

20          THE COURT:  All right, counsel.

21                      **DIRECT EXAMINATION**

22  BY MR. SCHRODER:

23  Q    Ms. Terry, where do you live?

24  A    Kodiak.

25  Q    And how long have you lived in Kodiak?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 157 of 239
(720) 384-8078  attrans@sbcglobal.net

**TERRY - DIRECT**

1   A    Since 1989.

2   Q    And what do you do there?

3   A    Recently retired.

4   Q    And when did --

5   A    To general manager for a air service.

6   Q    And when did you retire?

7   A    December of 2013.

8   Q    Okay.  And what was the air service that you worked for?

9   A    Island Air.

10  Q    And how long were you with Island Air?

11  A    Since 1989.

12  Q    Okay.  And were you working on the evening of April 13 --

13  well, let me start -- let me go back one question.  So were you

14  aware of the homicides that took place at Communication Station

15  Kodiak on the 12th of April?

16  A    Yes.

17  Q    And were you working the next day, on April 13th, 2012?

18  A    Yes.

19  Q    And toward the end of your day at Island Air, did you have

20  any visitors that struck you as unusual or visitors that took

21  action that struck you as unusual?

22  A    Yes.  We were -- I think I was waiting on one more flight

23  to land, and I was at my desk.  And an older man came into the

24  office, so I got up from around my desk to go to the front

25  counter, and I asked him if I could help him.  And he didn't

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 158 of 239
(720) 384-8078   attrans@sbcglobal.net

1  answer me.  He just stared up at one of the security cameras

2  that was angled to look down at the front counter.  And he just

3  stood there and stared at it, and then looked over at the

4  garbage can.

5  Q    Now, did you recognize the man?

6  A    No.

7  Q    Okay.  But could you describe him for the jurors?

8  A    He -- he had, like, salt-and-pepper, kind of shaggy-

9  looking hair and a beard, and just a -- a hat.  And do I need

10  to tell you how tall or --

11  Q    No --

12  A    No.

13  Q    -- that's fine.

14  A    Yeah.

15  Q    Does he --

16  A    Just a lot of hair.

17  Q    Okay.  And what did -- did you try to speak to him --

18  A    Yes.

19  Q    -- or did you speak to him?

20  A    He --

21  Q    And --

22  A    -- I -- I asked him if I could help him.  And he -- he

23  wouldn't answer me.

24  Q    So what did you do at that point?

25  A    So I -- I -- I got kind of a very uncomfortable feeling,

1  so I went back to my desk and I brought out a -- a co-worker, a

2  pilot, and I asked him to come out front because the -- the man

3  in the lobby made me feel very uncomfortable.  And I said, you

4  know, "I don't -- he's not answering me, so come out there, I'm

5  scared."  So he came out to the front and he proceeded to ask

6  the man if, you know, "Can we help you," or --

7        MR. CURTNER:  Objection.  Hearsay.

8        MR. SCHRODER:  Not offered for the truth of the matter

9  asserted, Your Honor, just for the situation and response.

10       THE COURT:  Okay.  So they had a contact.

11       MR. SCHRODER:  So they had a contact.

12 BY MR. SCHRODER:

13 Q   What did the man respond, or he did he respond?

14 A   No.

15 Q   Okay.

16 A   No.

17 Q   And what did he do next?

18 A   Then he turned, kind of stepped back, and then walked

19 along the wall that we have couch -- our couch, and we have

20 pictures on the wall.  And in that far corner there was another

21 surveillance camera, and he just walked along and then stopped

22 and stood up -- or stood there and stared at the camera in the

23 corner.

24 Q   And what did he do next?

25 A   After staring at that, he just turned around and walked

**TERRY - DIRECT**

1  back toward us to go out the front door.  And we stood at the

2  front counter and just watched him.

3  Q   And did you watch him after he left?

4  A   Yes, we watched him until we -- until he was out of -- out

5  of sight.

6  Q   And where did -- did you see him do anything after --

7  A   He --

8  Q   -- he left?

9  A   At that time, we had two large Dipsy Dumpsters out in the

10 parking lot, and he kind of walked over in that direction by

11 the garbage cans.

12 Q   Okay.  And then what did he do?

13 A   And then he turned and walked in front of Alaska Airlines

14 in the parking lot --

15 Q   Okay.

16 A   -- just kept walking till we couldn't see him.

17 Q   All right.  Now I -- I'd like you to look at a couple of

18 photos.

19 A   Okay.

20 Q   And have you reviewed some photos before coming in here

21 today?

22 A   Yes.

23 Q   All right.  So if we could have 32A.

24     (Side conversation)

25 Q   Oh, 32B, I'm sorry.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 161 of 239
(720) 384-8078   attrans@sbcglobal.net

1  A    Oh.

2       (Side conversation)

3  Q    Ms. Terry, if you look at that screen right next to you,

4  and I'm going to ask you are you familiar with that exhibit,

5  what it depicts?

6  A    Yes.  That's the front of our -- our building.

7  Q    Now I'm going to ask you to look down at the -- there's a

8  date stamp in the bottom right corner.  And what does that say?

9  A    February the 11th, 2014.

10 Q    So this wasn't, obviously, the day that you saw the man in

11 Island Air, because that was in 2012?

12 A    Right.

13 Q    But is this still a fair and accurate depiction of how --

14 what your building looked like at that time?

15 A    Yes, pretty much exactly the same.

16       MR. SCHRODER:  Your Honor, the government moves 32B in

17 for admission.

18       MR. CURTNER:  No objection.

19       THE COURT:  It'll be received.

20       (Plaintiff's Exhibit 32B admitted)

21 BY MR. SCHRODER:

22 Q    Now, could you point out your office entrance?  Now,

23 there's a -- in front of you there on the desk should be a

24 laser pointer.  There you go.  You got to push it and hold it.

25 There you go.

1   A    This is the entrance to the lobby of Island Air.

2   Q    And what's the other door down there to the right?

3   A    And this is the entrance to our coffeeshop, Gear Up.

4   Q    All right.  Now let's go to 31A, then, please, Ms. Dixon.

5   I'm going to have you look at another one.  Are you familiar

6   with this exhibit?

7   A    Yes.

8   Q    And how are you familiar --

9   A    That's our lobby.

10  Q    -- with it?

11  A    That's our -- our lobby.

12  Q    Okay.  And, again, if you look at the date stamp, it

13  doesn't appear to be the time of April 2012, but is this a fair

14  and accurate representation of your lobby in -- on -- at least

15  the structure of it, how it looked in April 2012?

16  A    Yep, it's the same.

17       MR. SCHRODER:  Your Honor, the government moves for

18  admission of 31A.

19       MR. CURTNER:  No objection.

20       THE COURT:  It'll be received.

21    (Plaintiff's Exhibit 31A admitted)

22  BY MR. SCHRODER:

23  Q    Now if you could show us, when the man came in, where did

24  he stand?

25  A    Okay.  So the front door is off this way.  So he walked in

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 163 of 239

**TERRY - DIRECT**

1  and he stood right about here, staring up here.

2  Q   And what is that you're pointing to now?

3  A   That's our surveillance camera, security camera.

4  Q   Okay.

5  A   And then at the time we had a garbage can right here.  So

6  he looked -- stared there and then down at the garbage can.

7  And I was standing right here behind the counter.

8  Q   All right.  And off to the right there, where we see a

9  table and a couch, what's that area?

10  A   That's just part of the lobby.

11  Q   Okay.  Now I'd like to look at 31B.  And are you familiar

12  with this exhibit?

13  A   Yes.

14  Q   And what is it?

15  A   It's the other half of the -- the other end of the lobby.

16  Q   And this is a fair and accurate representation of at least

17  the structure of how your lobby looked --

18  A   Yes.

19  Q   -- back in April 2012?

20  A   Uh-huh (affirmative).

21       MR. SCHRODER:  Your Honor, move for admission of 31B.

22       THE COURT:  It'll be received.

23       MR. CURTNER:  No objection.

24     (Plaintiff's Exhibit 31B admitted)

25  BY MR. SCHRODER:

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 164 of 239
(720) 384-8078   attrans@sbcglobal.net

1  Q    Now, what are we seeing in this picture that is relevant

2  to what you've testified about?

3  A    Well, after standing at the other end, looking at the

4  surveillance camera, then he walked down and started at that

5  one.

6  Q    Okay.  And then that was the second place he looked?

7  A    Yes.

8  Q    And that -- it was after that --

9         THE COURT:  If you --

10        MR. SCHRODER:  -- that he left?

11        THE COURT:  Just move back from the mic, just a little.

12 Okay.

13        THE WITNESS:  I'm sorry.

14 BY MR. SCHRODER:

15 Q    That -- that's fine.  And did -- and then after he looked

16 at that camera, what did he do?

17 A    Then he turned around, walked back towards me, and then

18 out the front door.

19 Q    Did he say anything to you on the way out?

20 A    No.

21 Q    Okay.

22 A    He never said anything.

23 Q    All right.

24        MR. SCHRODER:  No further questions, Your Honor.

25 A    Okay.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 165 of 239
(720) 384-8078   attrans@sbcglobal.net

**TERRY - CROSS**

1          THE COURT:  Oh -- cross --

2          MR. SCHRODER:  The defense counsel will probably have a

3    question or two for you.

4          THE COURT:  All right.  Cross-examination.

5                    **CROSS-EXAMINATION**

6    BY MR. CURTNER:

7    Q    Good afternoon, ma'am.  Did you have a chance to review

8    any prior statements you made about this case, about this

9    thing?

10   A    Yes.

11   Q    Okay.  And do you remember in your statement you said that

12   he -- this man made a comment about the coffeeshop being

13   closed?

14   A    No.

15   Q    You don't remember that?

16   A    No.

17   Q    Well, let me show you a summary of your statement.  If we

18   could show 22648.  Is that on your screen?  Do you see that?

19   A    Yes.

20   Q    This is -- have you seen this before?

21   A    Yes.

22   Q    Okay.  And so can you -- just to yourself, can you look up

23   and read that second paragraph, to yourself?

24   A    Yes.  I've read that.

25   Q    Okay.  And in there you said -- does this refresh your

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 166 of 239

TERRY - CROSS

1  memory?

2  A    Actually, no.  It --

3  Q    You --

4  A    It doesn't.

5  Q    Is this what you said back in -- when you were first

6  interviewed on April 13th, 2012?

7  A    I don't recall the man answering or saying anything.

8  Q    You don't recall it now?

9  A    Because the reason -- no.  Yeah.  That's the reason why I

10 went and got my co-worker, because he wouldn't answer me.  I

11 wouldn't have got the co-worker if he was just asking me about

12 the coffeeshop.

13 Q    But did --

14 A    So I don't -- I am not positive on this --

15 Q    Well, isn't this what you told the FBI agent when he

16 interviewed you that day, that same day?

17 A    I mean, it says that there, but I --

18 Q    The agent wrote down that you told them that the man made

19 a comment about the coffeeshop being closed.  Is that correct?

20 A    I guess so.  I don't recall today.

21 Q    You don't recall it now?

22 A    No.

23 Q    Okay.  But that's the statement you made that day?

24 A    I guess so.

25 Q    Okay.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

**TERRY - CROSS**

1          THE COURT:  Don't guess.

2          THE WITNESS:  Well, it -- yes, okay.  Yes.

3  BY MR. CURTNER:

4  Q    Thank you.  Now, the coffeeshop is connected with Island

5  Air.  Is that correct?

6  A    Yes.

7  Q    And so the lobby goes back and forth?

8  A    Right.

9  Q    Sometimes Island Air is open when the coffeeshop is

10  closed?

11  A    Yes.

12  Q    Okay.  Because sometimes you can go right to the

13  coffeeshop if you just want coffee?

14  A    Right.

15  Q    Or you can go to the coffeeshop if you're waiting for a

16  plane at Island Air, and back and forth.  Is that right?

17  A    Yes.

18  Q    Okay.

19  A    They can let you in if we're -- if we're closed, if our

20  sign is closed.

21  Q    And then you -- and when the FBI asked you about this and

22  you talked about the garbage can, you said that you gave them

23  consent to search it.  Is that correct?  Did they look in the

24  garbage can?

25  A    I don't -- I don't remember.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 168 of 239

1  Q    Okay.  All right.  That's fair enough.  Thank you.

2  A    Uh-huh (affirmative).

3         THE COURT:  Redirect.

4                    **REDIRECT EXAMINATION**

5  BY MR. SCHRODER:

6  Q    Ms. Terry, just to make clear, what's your memory now of

7  whether the man said anything to you or not?

8  A    Honestly, from what I can remember right now, is he didn't

9  say anything.  I -- I -- you know, I -- I don't know what else

10  to say from --

11  Q    (Indiscernible).

12  A    -- my memory -- is the reason why I had brought the pilot

13  out, was because he didn't answer me.

14  Q    And one more question.  Do the -- do those cameras in your

15  office -- do they record?

16  A    No.

17  Q    Thank you.

18         THE COURT:  Recross.

19         MR. CURTNER:  Nothing further.

20         THE COURT:  Thank you, ma'am.  All done.

21         THE WITNESS:  Oh.

22         THE COURT:  You're done.  No, you --

23         THE WITNESS:  Oh.

24         THE COURT:  -- get to go.

25         THE WITNESS:  Okay.

1          THE COURT:  Thank you.

2      (Witness excused)

3          THE COURT:  What's the government's situation?

4          MS. LOEFFLER:  We have our next witness, Hannah

5  Belisle.

6          THE COURT:  Okay.  Do you want to take a break now or

7  do you want to do it --

8          MS. LOEFFLER:  Oh, I --

9          THE COURT:  Okay.  We'll --

10         MS. LOEFFLER:  -- I'm getting some hands.  All right.

11         THE COURT:  -- take a 15-minute recess.

12         MS. LOEFFLER:  All right.  All right.

13         THE COURT:  We've learned our lesson.

14     (Jury not present)

15         THE COURT:  Okay, counsel, 15 minutes.  See you in a

16 few minutes.

17         THE CLERK:  All rise.  Matter stands in a 15-minute

18 recess.

19     (Court recessed at 2:21 p.m., until 2:37 p.m.)

20     (Jury not present)

21         THE CLERK:  All rise.

22         THE COURT:  We're ready?

23         MR. OFFENBECHER:  Your Honor, we have -- one thing I

24 needed to just address before -- which would -- maybe should be

25 at the sidebar.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 170 of 239

1          THE COURT:  Okay.

2      (At sidebar with the Court and counsel)

3          MR. OFFENBECHER:  Oh, this might be fixed already.  I

4 don't think (indiscernible) questions (indiscernible).

5          THE COURT:  So what are you going to (indiscernible).

6          MS. LOEFFLER:  I asked her -- I asked Hannah whether

7 she wanted her mother in and out, and I ordered her mother out.

8          THE COURT:  Okay.  Well --

9          MS. LOEFFLER:  She's not in.

10         THE COURT:  -- I ruled that she can stay if she wants.

11 So the victim -- because of victim's right --

12         MS. LOEFFLER:  Right.

13         THE COURT:  (Indiscernible) so I don't think it's

14 improper to keep her out either.  (Indiscernible) --

15         MS. LOEFFLER:  No, her daughter didn't necessarily want

16 her, and I told --

17         THE COURT:  (Indiscernible) --

18         MS. LOEFFLER:  -- her she had to be here -- that

19 (indiscernible) daughter's choice.

20         THE COURT:  Yeah, (indiscernible).

21         MS. LOEFFLER:  And I told them -- I told her mother not

22 to be here.  So she's not here.

23         THE COURT:  (Indiscernible).

24         MS. LOEFFLER:  (Indiscernible).

25         MR. OFFENBECHER:  (Indiscernible).

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 748  Filed 09/23/14  Page 171 of 239

1      (End of sidebar)

2          THE COURT:  Okay.  So I guess the answer is that

3   question was denied as moot.

4          THE CLERK:  Okay.  Are we ready for the jurors?

5          THE COURT:  Yeah, I am.  But I don't know what happened

6   to (indiscernible).

7          THE CLERK:  Okay.

8      (Jury present)

9          THE COURT:  Okay.  Please be seated.  The government's

10  next witness.

11         MS. LOEFFLER:  The United States calls Hannah Belisle

12  to the stand.

13         THE COURT:  Okay.  All right, ma'am, if you'd just keep

14  coming.  Come around here.  Get to that box.  The door -- if

15  you pull it open and then step in, and then remain standing

16  just for -- long enough for her to swear you in.

17         THE CLERK:  Okay.  Please raise your right hand.

18  **HANNAH JOSEPHINE BELISLE, PLAINTIFF'S WITNESS, SWORN**

19         THE CLERK:  Okay.  Thank you.  Please have a seat.

20  And, ma'am, if you can please state and spell your full name.

21         THE WITNESS:  Hannah Josephine Belisle.  H-a-n-n-a-h,

22  J-o-s-e-p-h-i-n-e, B-e-l-i-s-l-e.

23         THE CLERK:  Thank you.

24         THE COURT:  Okay, you've got a little bit of a soft

25  voice, so kind of stay close to the microphone, but not too

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 748  Filed 09/23/14  Page 172 of 239

1    close that it --

2              THE WITNESS:  Okay.

3              THE COURT:  -- has feedback.  Okay.  Counsel.

4              MS. LOEFFLER:  All right.

5                      **DIRECT EXAMINATION**

6    BY MS. LOEFFLER:

7    Q    Ms. Belisle -- yeah, look over here.  I'm asking you the

8    questions.

9    A    Okay.

10   Q    Are you a little nervous?

11   A    Yeah.

12   Q    Okay.

13   A    Yeah.

14   Q    How old are you?

15   A    I'm 18.

16   Q    And where do you live?

17   A    Kodiak, Alaska.

18   Q    Where do you go to school?

19   A    Kodiak High School.

20   Q    And how long before graduation?

21   A    It's on the 18th, so, like, a month and a few days.

22   Q    Okay.  What year are you in?  Well, I said graduation,

23   so --

24   A    2014, yeah.

25   Q    Okay.  Do you work in addition to going to school?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 173 of 239
(720) 384-8078   attrans@sbcglobal.net

1  A    Yeah, I work at Java Flats.  It's a coffeeshop out in the

2  flats.  And I work at the Pillar Creek Hatchery.

3  Q    What do you do at the Pillar Creek Hatchery?

4  A    I take care of little fish.  Yeah.

5  Q    All right, what's your relationship to Rich Belisle?

6  A    He's my dad.

7  Q    How old were you when he died, when he was killed?

8  A    Sixteen.

9  Q    Okay.  Where were you?

10 A    I was laying in my bed.

11 Q    Okay.  I'm going to ask you just a few questions about

12 your father.  Can you sort of describe your father, who he was

13 to you?

14 A    The best man I ever met in my entire life.

15 Q    What's your favorite thing about him?

16 A    Probably just, like -- he seemed very intimidating, but he

17 was the nicest person, like, ever created.

18 Q    Okay.  Now I'm going to take you back for a few minutes to

19 the time before he died, when you were 16.  And then I'm going

20 to ask you a little bit about your life now.  Back -- what was

21 going on in your life before your father was killed?

22 A    A lot.  I was kind of going down the wrong path, hanging

23 out with some shady people.  But I was kind of going to school.

24 Q    Can you describe yourself back then?  Because I'm going to

25 ask you the next question about the difference then and now,

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 748  Filed 09/23/14  Page 174 of 239

1  but what were you like back then?

2  A   I was a teenager, like -- I wasn't making the best

3  decisions back then.  I wasn't hanging out with the best people

4  and --

5  Q   Okay.

6  A   Yeah.

7  Q   Well, I'm going to ask you now, how do you feel about

8  yourself now?

9  A   I've definitely, like, changed a lot.  I went through

10 treatment.  I dealt with a lot of, like, emotional stuff, and

11 with drug stuff.

12 Q   Okay.  Now I'm going to go back -- again, back to that

13 time.  And were you -- before your father was killed, were you

14 getting along with your family?

15 A   Not with my mom, but with my dad, yeah.

16 Q   Did you ever have a time when you didn't get along with

17 your dad?

18 A   I mean, probably.  I'm a teenager.

19 Q   Was there a difference between his role and how you dealt

20 with him and how you dealt with your mom back then?

21 A   Yes, definitely.

22 Q   Okay.  Now, before your father was murdered, you mentioned

23 before that you -- afterwards, you'd gone through drug rehab.

24 A   Uh-huh (affirmative).

25 Q   Were you involved in drugs?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 748  Filed 09/23/14  Page 175 of 239

1   A    Yes.

2   Q    And kind of what level?  Can you describe what you were

3   into?

4   A    What do you mean?

5   Q    Okay.  I mean, there's some people that are in -- you

6   know, in trouble every single day.  I just -- well --

7   A    Oh.  Like, I've never been in trouble, like, with the law.

8   I was just in a experimental phase, I guess you could call it.

9   Q    Okay.  Did you ever run away from home?

10  A    Yeah, I did.

11  Q    About when was that, do you recall?  Can you put it in

12  perspective to when your father was murdered?

13  A    Like, two or three weeks before he died, I think, to a

14  month, like, around that time.

15  Q    How did you end up back at home again?

16  A    Well, I was at work at this pizzeria in town, in Kodiak,

17  and my car was parked out in the staff parking lot.  And my dad

18  had called the front, because it's a pizzeria and it's, like, a

19  Costco too, kind of.  And my dad and Steve, his best friend,

20  had drove into town and took my car and brought it back out to

21  my house, and then my dad waited for me in front of the

22  pizzeria, for me to come home.  And I snuck around the back and

23  had my friends pick me up.  And then, maybe, like, two, three

24  hours later, I showed up at my sister's house, asking her to

25  take me home.

1  Q    Okay.  Did you end up at home?

2  A    Yeah.

3  Q    Okay.  I want to ask you about a few issues.  You said you

4  hung around with some people that, you know, were maybe some

5  trouble back then.  By the way, do you hang around with the

6  same people now?

7  A    No, not at all.

8  Q    Okay.  But I'm going to ask you about a few of those

9  people.  Did you know somebody named -- I think I'm going to --

10  Travis Biocic?

11  A    Yeah.

12  Q    Who was he?

13  A    He was one of my boyfriends.

14  Q    And -- did you have more than one back then?

15  A    Well, not at, like, the same time, but --

16  Q    Okay.

17  A    -- like, in that time frame.  Yeah, he was just a --

18  Q    Okay.

19  A    -- guy --

20  Q    How did you know him?

21  A    I met him through Erin Smith Phillips McCoy.  She -- I

22  was -- she was my best friend at the time and I was hanging out

23  with her a lot, and he was --

24  Q    Now, did you break up with Mr. Biocic?

25  A    Yeah.  Well, it was kind of like a mutual thing.  He

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 748  Filed 09/23/14  Page 177 of 239

**BELISLE - DIRECT**

1  showed up to Erin's house and got all of his stuff with another

2  girl, and kind of took of.  And so I -- that was just the end

3  of that.

4  Q    Okay.  Was he ever mean to you?  Did you have any fights

5  with him?

6  A    Just that he cheated on me.

7  Q    Okay.

8  A    Like, he wasn't mean, though.

9  Q    Did you ever owe him money?

10 A    No.  No.

11 Q    Did he ever owe you money?

12 A    No.

13 Q    Did he ever threaten you?

14 A    No.

15 Q    Did you ever threaten him?

16 A    No.

17 Q    Do you know if he even knows your father?

18 A    No, he doesn't.

19 Q    Okay.

20 A    He didn't.

21 Q    Then did you know somebody named Dylan Froehlich?

22 A    Yes.

23 Q    And how do you know Mr. Froehlich?

24 A    He was another boyfriend.

25 Q    And about when was that?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 178 of 239
(720) 384-8078   attrans@sbcglobal.net

1  A    Like, my eighth grade, freshman year.

2  Q    Okay.  That was -- so that was before you were 16?  That

3  was a while ago?

4  A    Oh, yeah.  Yeah.

5  Q    Now, did you ever do drugs with Mr. Froehlich?

6  A    No, never.

7  Q    Okay.  And does he owe you any money?

8  A    Nope.

9  Q    Do you owe him any money?

10 A    Nope.

11 Q    Have you -- well, let me just ask, have you ever owed

12 anybody that you can think of any money?

13 A    Just one time, and I owed my buddy Daniel $50, like --

14 because I needed gas to get out the road, and the next day I

15 paid him back --

16 Q    Okay.

17 A    -- when I cashed my check.

18 Q    All right.  Did Mr. Froehlich ever threaten you?

19 A    No.  No.

20 Q    Did you ever threaten him?

21 A    No.

22 Q    Now, does he know your father?  Did Mr. Froehlich know

23 your father?

24 A    Yeah, I think he, like, came over and helped chop wood one

25 time or something.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 179 of 239
(720) 384-8078   attrans@sbcglobal.net

**BELISLE - DIRECT**

1   Q   Okay.

2   A   I don't --

3   Q   Do you know anyone named Jason Barnum?

4   A   Who -- no.

5   Q   Okay.

6   A   Is --

7   Q   Have you ever met any -- have you ever heard of the guy in

8   Kodiak that has a tattoo on his eyeball, that --

9   A   Oh.

10   Q   -- somebody calls Eyeball?

11   A   Yeah.  Yeah.  I've heard of him, but I've never met him.

12   Q   Okay.  Have you ever seen him?

13   A   Only, like, when Daryl showed me a picture of him in the

14   airport, like, two years ago.

15   Q   You mean Daryl -- that means Special Agent Allison over

16   there? That guy?

17   A   Oh, yeah.  Sorry.

18   Q   No, that's all right.  That guy, right?

19   A   Yeah.  Him.

20   Q   Okay.  Now --

21          THE COURT:  That was -- the -- that last question, the

22   answer was unclear, though.

23          MS. LOEFFLER:  Okay.

24          THE COURT:  Is --

25          MS. LOEFFLER:  The -- I'm sorry if it was unclear.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 180 of 239
(720) 384-8078   attrans@sbcglobal.net

1      THE COURT:  You said, "Have you ever seen it?"

2  BY MS. LOEFFLER:

3  Q    Have you ever seen him?

4  A    Not in person, no.

5  Q    Okay.  So what you saw was a picture that Mr. Allison --

6  Special Agent Allison showed you?

7  A    Yes.

8  Q    All right.  And do you know -- and to your knowledge,

9  have -- let me ask you this.  Have you ever had -- oh, do you

10  know somebody -- actually, I don't have the first name.  Last

11  name Fretz (ph)?

12  A    Walter.

13  Q    Oh, Walter Fretz.  Who's he?

14  A    He was another boyfriend at the time.

15  Q    Was that before or after the -- your father was killed?

16  A    After.

17  Q    Oh, okay.  And is -- did you have any -- do you owe him

18  any money?  Does -- okay.

19  A    Nope.

20  Q    Mr. Biocic -- I forgot to ask you.  After your father was

21  murdered, was that before or after after you had broken up with

22  him?

23  A    Before.

24  Q    Okay.  After your father was murdered, did you see Mr.

25  Biocic at any time?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 181 of 239

1  A    Yeah.  I was in the car with Walter and he came up and

2  said, "I'm really sorry for your loss."  And I gave him the

3  bird, and Walter rolled up the window, and we drove off.

4  Q    Have you ever seen him since then?

5  A    Well, I saw him, like, two days ago.  He was driving out

6  in the flats when I was walking around.

7  Q    Okay.  Now, before the murder, did you attend any

8  counseling with your father?

9  A    Yeah.  Me and my dad went to counseling together to find a

10  way to not deal with, but, like, work with my mom.

11  Q    Okay.

12  A    Yeah.

13  Q    All right.  Did that help?

14  A    Oh, yeah.  Yeah.  It did.  Me and my dad, I feel like that

15  made us a lot closer --

16  Q    Okay.

17  A    -- going there and both -- we were both talking about how

18  my mom has her moments.

19  Q    Okay.  Can you think of anyone that you know that have --

20  would have wanted to harm your father?

21  A    No.

22  Q    Can you think of anybody that wants to harm you?

23  A    No.

24  Q    Have you ever heard anybody even say a bad word about your

25  father?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1 A    No.

2 Q    And how are you doing now?

3 A    Like -- like, what do you mean?  Like, in --

4 Q    I mean, how -- where are you in your life?  Are you -- in

5 terms of -- previously you talked about when you were 16 and

6 there was all this stuff going on.

7 A    Oh, I'm -- I'm doing, like, really well.  I'm on track to

8 graduate.  I got two jobs.  I have a dog.  Like, I'm -- I'm

9 doing pretty good for my age, I guess.

10 Q    Okay.  I don't have anything further.  Thank you, Ms.

11 Belisle.

12 A    Yeah.

13        THE COURT:  Cross-examination.  Now he's going to ask

14 you some questions.

15        THE WITNESS:  Okay.

16                   **CROSS-EXAMINATION**

17 BY MR. OFFENBECHER:

18 Q    Ms. Belisle, good afternoon.  Let me see, first of all, we

19 are very sorry for your loss.

20 A    Thank you.

21 Q    Ms. Belisle, as part of this whole process, you have had

22 several interviews with the person you referred to as Daryl.

23 Right?

24 A    Yes.

25 Q    And the person you're referring to is Special Agent Daryl

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 183 of 239
(720) 384-8078   attrans@sbcglobal.net

1  Allison, who's sitting at the end of the table over here.

2  Right?

3  A    Yes.

4  Q    And particularly during the year of -- that your father

5  died, Mr. Allison met with you on three different times to

6  interview you.  Right?

7  A    I don't really remember.  Like, it -- it could have been

8  three times, yeah.

9  Q    Well, most recently he met with you last Saturday, or a

10  Saturday ago, on April 5th, here at the United States

11  Attorney's Office.  Right?

12  A    Yes.

13  Q    And that was one time that he sat down and interviewed

14  you.  Right?

15  A    Yeah.

16  Q    And he asked you questions?  Right?

17  A    Yes.

18  Q    And he was taking some notes.  Right?

19  A    Yes.

20  Q    And then on the other occasions that he met with you, he

21  actually recorded those interviews.  Right?

22  A    Yes.

23  Q    And so you recall that you had an interview with him in

24  May of -- May 10th of 2012 with Special Agent Allison and

25  another FBI agent?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 184 of 239
(720) 384-8078   attrans@sbcglobal.net

1  A    I'm -- I'm sorry, can you repeat that?

2  Q    Sure.  I'm just trying to refresh your recollection, but

3  you -- about the different interviews you've had with Special

4  Agent Allison.

5  A    Okay.

6  Q    And the other interviews were tape recorded, weren't they?

7  A    Yes.

8  Q    And this last one last Saturday wasn't tape recorded.

9  Right?

10  A    Yeah, he -- he wrote notes down.

11  Q    Okay.  So I just want you to know that we do have -- well,

12  let me just see if this make -- refreshes your memory.  Do you

13  remember an interview in May of 2012 which would have been just

14  about a month after your father died?

15  A    I -- I don't remember that.  I don't really remember

16  anything around that time.  It was all kind of a blur.

17  Q    Okay.  Your -- remember your mom being present for one of

18  the interviews?

19  A    Yeah.

20  Q    And then you remember having a couple of other interviews

21  in September and August as well?

22  A    I don't know.  I didn't --

23  Q    All right.  Well, take your time.

24  A    I don't really remember when the interviews were, but I do

25  remember getting -- talking to him.

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 185 of 239

BELISLE - CROSS

1  Q   Okay.  Well, I just want you to know that we have the

2  transcripts of those interviews there, and I know that

3  you're -- have a -- it might be hard to remember sometimes what

4  you've said.  Okay?  So we have the transcripts here, and if at

5  any time when I ask you a question about anything and you want

6  to recall what you said to Special Agent Allison, I'm just

7  saying this so that you know we've got them here, we can stop,

8  you can refresh your memory with the transcript of that

9  interview.  Okay?

10  A   Okay.

11  Q   And if you feel more comfortable answering the question

12  after you've refreshed your memory with the transcript, I just

13  want you to know that we've got them, so you can take your

14  time.  Okay?  You understand?  So we're not in a rush on that,

15  and you just take your time.  Okay?

16  A   Okay.

17  Q   Now, when Special Agent Allison interviewed you about your

18  father's death, you knew that was an important thing, right?

19  A   Yeah.

20  Q   And you knew that he was trying to investigate your

21  father's murder.  Right?

22  A   Yes.

23  Q   And you knew that it was important for you to give

24  truthful answers to all the questions that he gave.  Right?

25  A   Yes.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 186 of 239

1  Q   And so you -- and he actually told you on several

2  occasions, you know, "It's really important for you to be

3  honest with us."  Right?

4  A   Yes.

5  Q   And he told you that even if you admitted that you used

6  drugs or did something like that, that you weren't going to get

7  in trouble for that.  Right?

8  A   Yes.

9  Q   And so he said, "I just" -- he said, "Ms. Belisle, I just

10  want you to be honest with us," right?

11  A   Yes.

12  Q   And you tried as hard as you could at that time to be

13  honest with him, didn't you?

14  A   I -- yes, I was honest with him.

15  Q   I'm sorry?

16  A   Yes, I was honest with him.

17  Q   Okay.  Now, during your direct examination here today by

18  Ms. Loeffler, you indicated that during this period of time you

19  were having some problems with your folks.  Right?

20  A   With my mom mostly, yeah.

21  Q   Okay.  Well, during this period of time, you had

22  actually -- you had run away, right?

23  A   Yes.

24  Q   And you were living with Travis Biocic.  Right?

25  A   Not really.  I stayed with him at his sister's house maybe

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 187 of 239
(720) 384-8078  attrans@sbcglobal.net

**BELISLE - CROSS**

1 twice, and other than that, I slept in my car at the helicopter

2 pad.

3 Q    Okay.

4 A    Yeah.

5 Q    Well, do you remember on August 9th having one of these

6 interviews with Mr. Allison?

7 A    I -- I don't remember dates.

8 Q    Okay.

9 A    I'm sorry.

10 Q    Well, let me -- can you call up DE -- the August 9th

11 interview (indiscernible)?  DE-156.

12        MS. LOEFFLER:  Can I have a page number, counsel?

13        MR. OFFENBECHER:  Two -- I'll give it to you as soon as

14 she has it up and I see it too.  It's 26298.  The bottom.  I'm

15 sorry, (indiscernible).  We'll pass on that.

16 BY MR. OFFENBECHER:

17 Q    Let me just ask you this.  You ran away about two or three

18 weeks before your dad died.  Right?

19 A    Yes.

20 Q    And during that time you were -- your boyfriend was Travis

21 Biocic.  Right?

22 A    Yes.

23 Q    And you spent part of the time with Travis Biocic there,

24 staying with him, and then part not staying with him.  Is that

25 right?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 188 of 239
(720) 384-8078   attrans@sbcglobal.net

**BELISLE - CROSS**

1  A   I -- I only, like, stayed with him when I ran away, like,
2  maybe twice, like -- for, like, two days.  And then --
3  Q   Okay.
4  A   -- I kind of just slept in my car.
5  Q   Okay.  Were you also -- who -- Erin Smith is one of your
6  best friends.  Right?
7  A   Yes.
8  Q   She's not one of your best friends now?
9  A   No.  No.
10 Q   Okay.  And you went through a number of people that you
11 talked about.  Travis Biocic, right?
12 A   It's Biocic.
13 Q   Biocic.
14 A   Yeah.
15 Q   Sorry.  And then Dylan Froehlich as well?
16 A   Yes.
17 Q   He was a friend of yours back then?
18 A   Yes.
19 Q   And Walter Fretz was a friend of your back then as well?
20 A   Yes.
21 Q   Everett Grass was another person who was a friend of yours
22 back then?
23 A   Yeah.  He was dating Erin, so yeah.
24 Q   And did sometimes you stay over at their house with --
25 Everett Grass's house?

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 189 of 239

1  A    Yes.

2  Q    And sometimes you would not necessarily run away for a

3  long period of time, but you wouldn't come home, right?

4  A    Yeah.

5  Q    And you would stay at Everett Grass's house with Erin and

6  Everett?

7  A    Yeah.

8  Q    And they lived in the Jackson Trailer Park area?

9  A    Yeah.

10 Q    And the Jackson Trailer Park area is an area that -- where

11 a lot of people who, you know, were involved in drugs.  Right?

12 A    Not everyone in Jackson's does drugs, if that's what

13 you're saying.

14 Q    No, that's not what I'm suggesting at all.  But there were

15 a lot of people in the Jackson Trailer Park who were using

16 drugs or dealing in drugs, right?

17 A    I mean, I -- I don't know everyone that lives there.  I

18 don't know their life stories.  I -- yeah, I don't -- I'm not

19 sure.

20 Q    Okay.  So that Jackson Trailer Park was not known to you,

21 anyway, to be a place where people who use drugs hang out?

22 A    Well, yeah, but I -- I know that not everyone in Jackson's

23 Trailer Court was doing drugs.

24 Q    Okay.

25 A    Since there's a lot of, like, families that live in

1  Jackson's.

2  Q   Well, you were doing drugs when you were there, right?

3  A   Yeah.  That doesn't mean --

4  Q   Okay.

5  A   -- everyone was.

6  Q   Okay.  Well, let me just see if some of the other people

7  that we know about -- Travis Biocic was using drugs.

8  A   Well, yeah, I'm sure.  Yeah.

9  Q   But you knew that he was using drugs, didn't you?

10 A   Yeah.

11 Q   Okay.  Dylan Froehlich was using drugs, wasn't he?

12 A   Yeah.

13 Q   Walter Fretz was using drugs, wasn't he?

14      MS. LOEFFLER:  Your Honor, I'm going to object to the

15 relevance of just are people using drugs.  I don't know why it

16 has any relevance to this case.

17      MR. OFFENBECHER:  Well, this door was certainly opened

18 before.

19      THE COURT:  Overruled.

20 BY MR. OFFENBECHER:

21 Q   Walter Fretz was using drugs too, wasn't he?

22 A   Yes.

23 Q   And this person named Mr. Barnum, who the special agent

24 showed you a photograph of, this person was known to you to be

25 a drug user or drug dealer as well.  Right?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 191 of 239
(720) 384-8078   attrans@sbcglobal.net

1          MS. LOEFFLER:  It gets in hearsay, Your Honor.  If she
2    doesn't know her [sic], and he's asking her to repeat rule --
3    rumors, I don't think that's a --
4          MR. OFFENBECHER:  She --
5          MS. LOEFFLER:  -- proper question.
6          MR. OFFENBECHER:  She can simply answer the question if
7    she knows the answer.
8          MS. LOEFFLER:  (Indiscernible).
9          THE COURT:  Just answer what you know.  Don't guess,
10   don't speculate, and don't repeat rumors.
11         THE WITNESS:  Okay.
12         THE COURT:  Okay?
13         THE WITNESS:  Can you say that question again?
14   BY MR. OFFENBECHER:
15   Q    Sure.  I'm going to ask you to look at Defendant's Exhibit
16   42.  Go and look at your little screen there.  Do you see a
17   picture there?
18   A    Yeah.
19   Q    Do you recognize what that is?
20   A    It's a creepy guy, yeah.
21   Q    Okay.  Is that the person that -- the photograph that
22   Special Agent Allison showed you?
23   A    Yeah.
24   Q    And he showed you and he asked you some questions about
25   that person.  Right?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 192 of 239

BELISLE - CROSS

1  A    Yes.

2  Q    And you know him perhaps as Eyeball?

3  A    Yes.

4  Q    Do you also know him by his name, Jason Barnum?

5  A    No, I -- no.

6  Q    Okay.  You just know him as Eyeball?

7  A    Yeah, that's -- like, everyone in Kodiak just says Eyeball

8  rather than the other name.

9  Q    So everybody in Kodiak kind of knows this guy, generally,

10 anyway, right?

11 A    Well, I mean, with a face like that in a small town, I

12 mean, everyone's going to know, like -- yeah.

13 Q    Sure.  Yeah, okay.  And you knew that he was involved in

14 drug use or drug dealing as well.  Right?

15 A    Yeah.

16 Q    Okay.  Now --

17      MS. LOEFFLER:  I guess I'm going to object, unless --

18      MR. OFFENBECHER:  -- you indicated --

19      MS. LOEFFLER:  -- she has personal knowledge or whether

20 it's just based on rumors.  I think that --

21      THE COURT:  Well, I --

22      MR. OFFENBECHER:  Well, she can do it on redirect,

23 (indiscernible) --

24      THE COURT:  I've instructed -- I have instructed you --

25      MR. OFFENBECHER:  She can't --

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 193 of 239
(720) 384-8078   attrans@sbcglobal.net

1    THE COURT:  -- don't guess, don't repeat rumors.  But
2  if you know something, you can answer the question.
3    THE WITNESS:  Okay.
4  BY MR. OFFENBECHER:
5  Q   All right.
6  A   I -- I don't know --
7  Q   (Indiscernible) --
8  A   -- for a fact that he was doing drugs.  I've never seen
9  him in real life before, so I have -- I don't know.
10  Q   Okay.
11  A   I mean, I could only guess.
12  Q   Okay.  But that was his reputation in the community,
13  anyway?
14    MS. LOEFFLER:  Objection, Your Honor.  I don't think
15  the reputation is a -- it's -- again, she has no personal
16  knowledge.
17    THE COURT:  Sustained.  Remember, if you know
18  something, that's fine.
19    MR. OFFENBECHER:  But you never --
20    THE COURT:  (Indiscernible).
21  BY MR. OFFENBECHER:
22  Q   You never bought drugs from Jason Barnum, anyway.  Right?
23  A   No.  No.  No.
24  Q   Okay.  All right.  And do you know whether Travis Biocic
25  ever bought drugs from Jason Barnum?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 194 of 239

1  A    I have no idea.

2  Q    How about Dylan Froehlich?

3  A    Dylan -- I don't know.  Yeah, I don't know.

4  Q    Well, Dylan -- the reason you hesitate is because Mr.

5  Barnum used to live at Dylan -- where Dylan Froehlich lived.

6  Right?

7  A    Yes, but I don't know for a fact that he got drugs from

8  him.

9  Q    Okay.  Dylan -- Dylan's father also lived there, right?

10  A    Yes.

11  Q    And what's his name?

12  A    Dave.

13  Q    Dave Froehlich.  Right?

14  A    Yes.

15  Q    And Dave Froehlich was friends with Jason Barnum.  Right?

16  A    I mean, I guess, like, if someone's staying at their

17  house, obviously they know each --

18  Q    Okay.

19  A    -- other somehow.

20  Q    Okay.  Well, anyway, Jason Barnum was living with -- at

21  the Froehlich house.  Right?

22  A    Yes.

23  Q    And do you recall -- and you would frequent the Froehlich

24  house occasionally, wouldn't you?

25  A    No.  Me and Dylan broke up, like, my freshman year.  I

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 195 of 239

1  stopped hanging out with him because he started hanging out

2  with scary people.  So --

3  Q    Like Mr. Barnum, right?

4  A    Yeah.  So I've -- no, the last time I was over at that

5  house was forever ago.

6  Q    Well, when you say forever ago, what do you mean?

7  A    Probably the last time I was over at that house was

8  maybe -- like, inside the house, probably, like, three years

9  ago, four years ago.

10 Q    Okay.  How --

11 A    But I've -- I've picked up people from that house and,

12 like, taken them to town before.

13 Q    So you have access to a car back in -- when you were 16

14 years old, right?

15 A    Yes.

16 Q    Okay.  And so sometimes you would drive your friends to

17 different places, right?

18 A    Yes.

19 Q    And do you remember on one occasion, well, you would drive

20 over there and pick your friends up, like Dylan Froehlich, to

21 go do something.  Right?

22 A    No, I -- I never gave Dylan a ride in my -- my car, I

23 don't believe.  Yeah --

24 Q    Okay.

25 A    -- I've never --

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 196 of 239

1  Q    Okay, who would you pick up over at the Froehlich house?

2  A    Well, I was hanging out with Chelsea Stevens for a little

3  bit, and so I'd pick her up over there.  But, yeah, that's it.

4  Q    Do you recall one occasion with -- Erin Smith was your

5  best friend then.  Right?

6  A    Yeah.

7  Q    Do you recall on one occasion when you and Erin drove over

8  to the Froehlich house and Mr. Barnum was working in the yard

9  there?

10 A    No.

11 Q    You don't recall that?

12 A    No.  I've never seen him in person before.  I said that

13 earlier.

14 Q    Is there any reason why Erin would report that, do you

15 think?

16       MS. LOEFFLER:  Objection.  Hearsay.  Trying to repeat

17 other people's statements.

18       MR. OFFENBECHER:  Well, she --

19       MS. LOEFFLER:  Tell me what she knows.

20       MR. OFFENBECHER:  If she has any reason, that's fine.

21       THE COURT:  If you can answer.

22       THE WITNESS:  I -- I have no idea why she said that.

23 BY MR. OFFENBECHER:

24 Q    Okay.

25 A    Maybe she got me confused with someone else.  Yeah, I have

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 748  Filed 09/23/14  Page 197 of 239

1  no idea.  I've never seen him, like, face to face, though.

2  Q    Okay.  But Erin was your best friend back then, right?

3  A    Yeah.

4  Q    Okay.  All right, so on direct examination you testified

5  that you had some -- you were having some problems with your

6  parents, but you said it was just with your mom.  Right?

7  A    Yeah, some -- yes.

8  Q    Okay.  Do you think that -- what kind of problems were you

9  having with your mom?

10 A    Well, I was a teenage girl, and so I had a lot of

11 emotions, and I felt like I -- I felt like I was 16 and didn't

12 need to be parented anymore, I guess you could say.

13 Q    Uh-huh (affirmative).

14 A    But obviously I did.

15 Q    Uh-huh (affirmative).  Well, one of the problems is that

16 you were -- you talked about that -- is you were staying away

17 from the home at night.  Right?

18 A    Yeah.

19 Q    And that was upsetting to your parents, right?

20 A    Yeah.

21 Q    That was upsetting to your dad as well as your mom, wasn't

22 it?

23 A    Well, if my mom's upset, then my dad's going to be upset.

24 Q    Okay.  And your dad was very supportive of your mom,

25 wasn't he?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 198 of 239

**BELISLE - CROSS**

1  A    Yes.

2  Q    So as it turns out, both of your parents were pretty upset

3  with the way you were behaving during those -- during this

4  period of time?

5  A    Yeah.  Well, I was kind of, like, mean to my mom.  So of

6  course my dad's going to be like, "Don't be mean to your mom."

7  Q    Sure.  And if during this period of time they were

8  concerned that you were using drugs as well.  Right?

9  A    Yeah.

10  Q    They were concerned with the people that you were hanging

11  out with.  Right?

12  A    Yes.

13  Q    And that included that list of people that the prosecutor

14  went through with you.  Right?

15  A    Yes.

16  Q    And also Mr. Everett Grass.  Is that right?

17  A    Yes.

18  Q    And part of the reason they didn't like Mr. Biocic --

19  is -- did I say that right?

20  A    Biocic.

21  Q    Biocic, sorry.  Biocic is because he was substantially

22  older than you.  Right?

23  A    Yes.

24  Q    Was, like, 22 or something like that?

25  A    I think so.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 199 of 239
(720) 384-8078  attrans@sbcglobal.net

**BELISLE - CROSS**

1  Q    And you were 16.  Right?

2  A    Yep.

3  Q    And sometimes your parents would have to go find you and

4  bring you home.  Isn't that right?

5  A    No.  I mean, the only -- the one time was when I had run

6  away for that two weeks.  We've never, like -- it wasn't like

7  hide-'n-seek.

8  Q    Okay.  Well, you had -- you used to text back and forth

9  with your dad and your mom, right?

10 A    Yeah.  Yeah.

11 Q    And do you remember having text exchanges where your mom

12 would order you to come home and you would refuse to do that?

13 A    Yes.

14 Q    Do you remember having text exchanges with your dad in

15 which he would order you to come home and you wouldn't do that?

16 A    Yes.

17 Q    You do remember that, don't you?

18 A    Yeah, I remember, but, like, it wasn't like they were --

19 hold on, let me --

20 Q    Take your time.

21 A    What was -- what was your question?  I didn't --

22 Q    Sure.

23 A    -- really understand.

24 Q    Sure.  I'll ask you again.  Sometimes your parents would

25 have to go out and find you and bring you home.  Right?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 748  Filed 09/23/14  Page 200 of 239

1  A    No.  Just -- just the one time when they, like, went --
2  when my dad took my car.  The --
3  Q    Okay.  Tell us about that time.
4  A    I -- I did earlier.  But I was working at the pizzeria
5  and --
6  Q    Oh, right, okay.  Yeah, we --
7  A    Yeah.
8  Q    Yeah.  No, but I'm talking about, like, when your dad had
9  to come to Jackson Trailer Park and knock on doors to try to
10 find you.  Do you remember that?
11 A    Knock on doors to find me.  No.
12 Q    You don't remember that?
13 A    Huh-uh (negative).
14 Q    You never remember your dad having to come try to find
15 where you are to bring you home?
16 A    Maybe, like -- yeah, I -- I don't really remember.  This
17 was a long time ago.
18 Q    Okay.  Well, then --
19 A    Like --
20 Q    Let me pull up Defense Exhibit Number 150 and have you
21 just take a look at page D6660.  And look at the top there.
22     (Side conversation)
23 Q    These appear to be text messages between you and your dad?
24 A    Yeah.
25 Q    Take your time.  Take a look at that and see if that

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 201 of 239
(720) 384-8078   attrans@sbcglobal.net

1  refreshes your memory, okay?

2  A    I don't know what you want me to say.  I understand I was

3  really mean to my dad.  That's something I worked on.  I was

4  mean to both my parents, and that's something I worked on when

5  I was in treatment.  And I -- he forgives me.  I don't know why

6  you're trying to make out to be this horrible person.

7  Q    No, I'm sure that he does forgive you.

8         THE COURT:  So what was the question?

9         MR. OFFENBECHER:  I just wanted to see if that -- I

10 think she just needs a minute, Your Honor.

11        THE COURT:  So, ma'am, if you need to take a break, you

12 just tell me, okay?

13        MR. OFFENBECHER:  I think it's a -- it might be a good

14 time for a break, Your Honor.

15        THE COURT:  What do you think?  Do you want to take a

16 recess, or not?

17        THE WITNESS:  No, I'm okay.

18        THE COURT:  Okay.  All right, take some water, that

19 pitcher there.  You just put your thumb to -- put that --

20 right.

21        THE WITNESS:  Okay.  Okay.

22 BY MR. OFFENBECHER:

23 Q    Go ahead and take a minute.  Okay, just take a look at

24 those -- the top of those text messages.  I know it's upsetting

25 to look at, because they're between you and your dad, right?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 202 of 239

BELISLE - CROSS

1    A    Yep.

2    Q    But it was a pretty tumultuous relationship, wasn't it?

3    A    I don't know what that word is.

4    Q    There was a lot of energy going back and forth between you

5    and your mom and your dad.  Right?

6    A    Yes.  I was a teenager.

7    Q    Yeah, I know.  You indicated you were a teenager.  But,

8    for example, in this text, you indicate to your dad, "I'm not

9    coming home tonight.  You guys are crazy.  I'll come home

10   tomorrow."  Right?  Right?

11   A    Yeah.

12   Q    And your dad says, "Your mom is on your [sic] way to pick

13   you up.  Call her."  Right?

14   A    Yeah.

15   Q    Because you were refusing to come home, right?

16   A    (No audible reply).

17   Q    And then he says, "Wrong answer.  Your mom will be there

18   to pick you up.  I would not push this."  Right?

19   A    (No audible reply).

20   Q    And then you said -- and then your dad said, "You had

21   better get ahold of her now, or I guarantee you will regret it.

22   She's going to Wal-Mart, looking for you, then to the troopers

23   to list you as a runaway."  Right?

24   A    (No audible reply).

25   Q    And then later on at the bottom, he says, "If you don't

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 203 of 239

1  come home tomorrow, you will no longer have a call [sic], a

2  car, a job, or a phone.  Just so you know what you're trading

3  in to be a drama queen."  Right?

4  A    Yeah.  And then --

5  Q    Yeah.

6  A    -- it says, "On my way."

7  Q    I'm sorry?

8  A    It says, "On my way."

9  Q    Okay.

10  A    Like I went home.

11  Q    Right.  And do you recall your dad ever having to -- your

12  mom having to go to Wal-Mart to look for you now?

13  A    I don't remember that, no.

14  Q    Okay.  Do you recall your dad ever having to go out to

15  look for you?

16  A    Just when he picked me up at -- or when he tried to pick

17  me up at Big Al's.

18  Q    Okay.  But you do remember him, now that you've seen it,

19  threaten to call the troopers to come get you?

20  A    Yeah.

21  Q    Okay.  Now, part of the conflict that you were having with

22  your parents at the time involved they were threatening to send

23  you to rehab.  Right?

24  A    I -- I don't remember that ever coming up.

25  Q    You don't remember ever talking with your parents about

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 204 of 239

1  being sent to rehab?

2  A    No, just -- no.  I don't remember, like, having a

3  conversation with them about me going.  I remember me being

4  shipped off, like, after my dad died.  I never had a

5  conversation with them that I remember.

6  Q    Okay.  Well, did you know that they were considering

7  sending you to rehab?

8  A    No.

9  Q    Do you remember telling your best friend, Erin Smith, that

10 you were very, very angry and concerned that they were going to

11 send you to rehab?

12 A    No.  I don't remember that.

13 Q    You know that your parents thought that you were using

14 cocaine.  Right?  Right?

15 A    Yeah.

16 Q    And you were using cocaine.  Right?

17 A    Yes.

18 Q    And they wanted you to go to rehab for cocaine, didn't

19 they?

20 A    Well, I -- I guess so.

21 Q    Okay.  And you didn't like the idea of going to rehab, did

22 you?

23 A    Of course not.

24 Q    Because you would have been separated from your friends,

25 right?

1  A    Yeah.

2  Q    And you would have been separated from the drugs, right?

3  A    That's -- that wasn't my main concern.

4  Q    Was mainly your friends?

5  A    Yeah.

6  Q    And you were pretty tight with your friends back then,

7  right?

8  A    Yeah.  Yeah.

9  Q    And so you didn't want to be involved -- you didn't want

10  to be sent away to rehab.  Right?

11  A    Yeah.

12  Q    You certainly didn't want to be sent away off island, off

13  Kodiak, to rehab.  Right?

14  A    Yeah.

15       THE COURT:  You -- you're -- stay near the microphone.

16  BY MR. OFFENBECHER:

17  Q    And your parents were pretty insistent that your lifestyle

18  had to stop and change.  Right?

19  A    Yes.

20  Q    And they were concerned about you smoking, your lying to

21  them, and the people you were hanging out with.  Right?

22  A    Yes.

23  Q    And you wanted to have some say over what was going to

24  happen in your life.  Right?

25  A    Of course.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 206 of 239
(720) 384-8078   attrans@sbcglobal.net

1  Q   And your dad told you that the only way you were going to

2  have any say in your life is to follow his rules, basically.

3  Right?

4  A   Yes.

5  Q   And he had a -- kind of a contract with you, didn't he?

6  A   Yeah.  Yeah.

7  Q   And you had to follow the rules of the contract or all

8  bets were off.  Right?

9  A   Yeah.

10  Q   Like, he was going to take away your car, your job, and

11  everything else.  Right?

12  A   Yes.

13  Q   And you knew that there -- that your folks -- well, I

14  think you've answered this.  You're saying that you did not

15  know that your friends -- that your folks were planning on --

16  or thinking about sending you to rehab.  Right?

17  A   Not that I remember.

18  Q   Is it possible that's true?

19       MS. LOEFFLER:  Obje -- Your Honor, I'm going to object.

20  Asked her to speculate on things she doesn't know.

21       THE COURT:  Sustained.

22  BY MR. OFFENBECHER:

23  Q   So when Mr. Allison was asking you questions -- well,

24  remember, there were three interviews that were tape recorded

25  with Mr. Allison and one that was not tape recorded here just

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 207 of 239

1  last week, or the 5th.  Right?

2  A    Yeah.

3  Q    And Mr. Allison was perfectly -- in all of those he was

4  perfectly nice to you.  I mean, he didn't pressure you or

5  anything, did he?

6  A    No, not at all.

7  Q    He seemed like a very nice gentleman.  Right?

8  A    He is, yes.

9  Q    Yeah.  And he told you that it was very important for you

10  to be honest, right?

11  A    Yes.

12        MS. LOEFFLER:  Objection.  Cumulative.  He just

13  asked -- we went through all of these at the beginning.

14        MR. OFFENBECHER:  I'm just directing her attention to a

15  particular statement.

16        THE COURT:  Okay, go ahead.

17  BY MR. OFFENBECHER:

18  Q    Do you recall him asking you to be very honest about your

19  drug use back in 2012?

20  A    Yes.

21  Q    And do you remember him asking you on several different

22  occasions were you using drugs.  He said, "Don't mean you're an

23  addict, but were you using drugs at all at the time of your

24  father's death?"

25  A    Yes.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 748  Filed 09/23/14  Page 208 of 239

**BELISLE - CROSS**

1 Q    And do you remember telling him that you only smoked weed?

2 A    Yes.

3 Q    And when you told Special Agent Allison in that interview

4 that you only smoked weed, that wasn't true, was it?

5 A    No.  But, I mean, if you're a 16-year-old girl and an FBI

6 agent's asking you if you ever done drugs, you're probably not

7 going to be all, like, "Yeah."

8 Q    Yeah.  So you weren't -- but it wasn't true what you told

9 him.  You weren't being honest with him, were you?

10 A    Well, not at the time.  But I've -- I mean, obviously I've

11 told him otherwise.

12 Q    Okay.  In fact, last Saturday you told him otherwise,

13 right?

14 A    Yeah, and I told him before that --

15 Q    Okay.

16 A    -- pretty sure.

17 Q    Okay.  Well, he asked you -- when he first asked you, you

18 said you were only smoking weed.  And that wasn't true, right?

19 A    Yes.

20 Q    And the -- but he had told you during the course of the

21 interview he -- "You're not even going to get in trouble for

22 this, because, you know, we're not after people who are just

23 using.  We're just trying to find out about your dad's murder."

24 Right?

25 A    Yes.  He told me that.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 209 of 239
(720) 384-8078   attrans@sbcglobal.net

1 Q   But you lied to him anyway, didn't you?

2 A   It's kind of intimidating, like, FBI asking you about your

3 drug habits.

4 Q   So you lied to him?

5 A   At first.

6 Q   Now, he also asked you some questions about your friends,

7 like Travis Biocic.  Right?

8 A   Yes.

9 Q   And in that same interview he asked you whether Travis

10 Biocic had any involvement in drugs as well, didn't he?

11 A   I -- I do not remember.

12 Q   Okay.  Would you like me to refresh your memory with a

13 copy of the transcript?

14 A   Sure.

15    (Side conversation)

16 Q   At 26299, can you take a look at that, at the top?  And

17 the -- at the very top there it says "22," which is the age of

18 Mr. Biocic.  Right?

19 A   Yes.

20 Q   And he -- you were -- there was in the middle of a

21 conversation about Mr. Biocic, wasn't it?

22 A   Yes.

23 Q   And Mr. -- Special Agent Allison here, he said about Mr.

24 Biocic, "Any involvement in drugs," right?

25 A   Yes.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 748  Filed 09/23/14  Page 210 of 239

**BELISLE - CROSS**

1  Q    And you said, "Not that I know of."

2  A    Yes.

3  Q    And that wasn't true, was it?

4  A    I -- I guess not, because he does do drugs.

5  Q    So when you told Special -- Special Agent Allison was

6  asking about your friends and whether they use drugs, wasn't

7  he?

8  A    Yes.

9  Q    Because he was investigating your father's murder, wasn't

10  he?

11  A    Yes.

12  Q    And he must have thought that that was an important

13  question to you ask you or he wouldn't have asked that

14  (indiscernible) --

15       MS. LOEFFLER:  Your Honor, objection.  How would he

16  know -- how would she know what the agent was thinking?

17       MR. OFFENBECHER:  He asked you the question about

18  your --

19       MS. LOEFFLER:  Objection, Your Honor.

20       MR. OFFENBECHER:  I'm on the next --

21       THE COURT:  Sustained.

22       MR. OFFENBECHER:  -- question.

23       THE COURT:  He's already moved on.

24       MS. LOEFFLER:  Thank you.

25       MR. OFFENBECHER:  Thank you.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 748  Filed 09/23/14  Page 211 of 239

1  BY MR. OFFENBECHER:

2  Q    Now, so he asked you the question about whether Travis

3  Biocic was involved in drugs, and you said, "No," right, "not

4  that I know of"?

5  A    Yeah.

6  Q    And that wasn't true, was it?

7  A    No.

8  Q    Were you concerned that Mr. Biocic was go -- do you need a

9  minute?

10 A    No, I'm good.

11 Q    Okay.  And that statement to the special agent wasn't true

12 either?

13        MS. LOEFFLER:  Objection, Your Honor.  This is the

14 third time we've asked the same question.

15        THE COURT:  Sustained.

16        MS. LOEFFLER:  Cumulative.

17        THE COURT:  Sustained.

18 BY MR. OFFENBECHER:

19 Q    You purchased drugs from Mr. Biocic on more than one

20 occasion, right?

21 A    Like, twice, probably.  Maybe three times.

22 Q    And when you purchased drugs on other occasions, who did

23 you purchase them from?

24 A    Just some kid in Jackson's.  Yeah.

25 Q    You would just purchase drugs from kids in Jackson?

BELISLE - CROSS

1  A    Not just random kids.  It was this guy named Loren.

2  Q    Okay.  Who else?

3  A    That's it.

4       MS. LOEFFLER:  Objection, Your Honor.  Relevance.

5       THE COURT:  I'm sure that it's relevant.  I mean --

6       MR. OFFENBECHER:  But, Your Honor, this was gone -- in

7  direct examination she asked her whether she was into drugs.  I

8  didn't call the witness.

9       MS. LOEFFLER:  (Indiscernible) ask her every person.

10      THE COURT:  She -- but, I mean, she's testified that

11 she -- she's purchased drugs from several people.  Do you need

12 more than that?

13      MR. OFFENBECHER:  If they're people who were involved

14 in this case, yes.

15      THE COURT:  Okay.

16      MS. LOEFFLER:  Well, then --

17      THE COURT:  The --

18      MS. LOEFFLER:  -- (indiscernible) of these people -- I

19 object, Your Honor.  He's just fishing for names of people.

20      THE COURT:  Why don't you -- if they're people involved

21 in the case, you know the names to ask about.

22 BY MR. OFFENBECHER:

23 Q    Sure.  Did you ever pur -- you purchased through Mr.

24 Biocic, right?

25 A    Yes.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 748  Filed 09/23/14  Page 213 of 239

1  Q   Have you purchased drugs through Mr. Froehlich?

2  A   No, I never bought drugs from him.

3  Q   Did you ever get any drugs from him?

4  A   No.

5  Q   You --

6  A   I've never done drugs with -- with Dylan Froehlich.

7  Q   How about Everett Grass?

8  A   It's possible.

9  Q   Okay.  How about Erin Smith?

10 A   Yes.

11 Q   How about Casey Brennick?

12 A   No.

13 Q   Not with Casey Brennick.

14 A   No, I've never done drugs with Casey.  He wouldn't -- he

15 wouldn't let that happen.  He wouldn't, like, let me do that.

16 Q   Okay.  Now, right before you ended your relationship with

17 Mr. Biocic -- well, let's put this in context.  You ended your

18 relationship with Mr. Biocic just a short bit before your dad

19 died.  Right?

20 A   Yes.

21 Q   And right before that, you purchased what you thought was

22 cocaine from Mr. Biocic.  Right?

23 A   Yes.

24 Q   And you and a friend used the cocaine, right?

25 A   Yes.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 214 of 239
(720) 384-8078   attrans@sbcglobal.net

1  Q    And you and your -- how did you use the cocaine?

2        MS. LOEFFLER:  Objection, Your Honor.  Relevance.

3        THE COURT:  "How did you" -- I don't know what that

4  means, "How did you use the cocaine?"  She just said she used

5  the cocaine.

6  BY MR. OFFENBECHER:

7  Q    You used the cocaine?

8  A    Yes.

9  Q    Did you in -- did you snort it, or how'd you use t?

10       MS. LOEFFLER:  Objection.  Relevance.

11       THE COURT:  Overruled.  You can -- if you can answer

12 that.

13       THE WITNESS:  Yeah, I snorted it.  I mean, it's

14 cocaine.

15 BY MR. OFFENBECHER:

16 Q    And you and one of your friends became sick from the use

17 of this.  Right?

18 A    Yes.

19 Q    And you think maybe perhaps that was because it was --

20 turned out to be methamphetamine rather than cocaine.  Right?

21 A    Yeah.  Yeah, we -- we call it steak and shrimp when

22 someone, like, cuts it with meth.  And it's just -- I don't

23 know, people are really shady.

24 Q    Yeah.  So you call it steak and shrimp?

25 A    Yeah.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 748  Filed 09/23/14  Page 215 of 239

1  Q    Okay.

2  A    Yeah.

3  Q    And that's when you -- you purchase cocaine, right?

4  A    Yeah.  It's when people, like, do that -- it's like

5  cutting cocaine, like putting baking soda in it, but it's --

6  instead they do it with -- with meth, just so -- to screw

7  people over.

8  Q    Okay.  And you think that Travis Biocic might have been

9  doing that to screw you over?

10 A    I don't think he did it intentionally.  I thought his

11 brother did it, just because.

12 Q    Who's his brother?

13 A    Drew Horning.

14 Q    I'm sorry?

15 A    Drew Horning.

16 Q    Drew Horning?

17 A    Yeah.

18 Q    Okay.  And was Drew Horning the source of Mr. Biocic's

19 cocaine or steak and shrimp?

20 A    That I know of, yeah.

21 Q    Okay.  That's where you thought he got it?

22 A    Yeah.  No, that's -- that's where I know that Travis got

23 it, through Drew.  Yeah.  But I don't know where Drew got it.

24 Probably someone in Anchorage or here, because --

25 Q    Okay.  And so sometimes people will cut the cocaine with

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 216 of 239
(720) 384-8078  attrans@sbcglobal.net

1  methamphetamine.  Right?

2  A    Yeah.  And -- yeah.

3  Q    And you thought they do that in order to harm the person

4  that they're giving it to?

5  A    I think they just do it to get rid of the methamphetamine,

6  because at the time no one was doing it.  So they just needed

7  to get rid of it.

8  Q    But, anyway, you got sick?

9  A    Yeah.  Yeah.

10  Q    And your friend got sick?

11  A    Yes.

12  Q    And you broke up with Mr. Biocic very shortly after that.

13  Right?

14  A    Yes.

15  Q    You became angry and you yelled at Mr. Biocic as a

16  consequence of this, right?

17  A    Yes.  I mean, I wasn't happy that he sold me something

18  that wasn't what I was trying to get.

19  Q    Sure.  And so you expressed your anger at him by yelling

20  at him.  Right?

21  A    Yes.

22  Q    And is it fair to say that you kind of hate Mr. Biocic

23  now?

24  A    Yeah.

25  Q    Do you remember -- you referred to him to Special Agent

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 217 of 239

1    Allison as a scumbag?

2    A    Yeah.  The -- a lot of people in Kodiak are.

3    Q    Lot of people in Kodiak are --

4    A    Scumbags.

5    Q    Now, Ms. Belisle, the night before your father died, you

6    were at a party with some of your friends that you've described

7    here, weren't you?

8    A    I don't really remember what I was doing.  I just remember

9    that morning, when I was -- yeah, I don't remember, really.  I

10   remember coming home and, yeah, going to bed.

11   Q    Well, you remember having an interview on September 4th

12   over two thousand -- September 4th with Special Agent Allison

13   about these events.  Right?

14   A    Yeah, probably.  Yeah.

15   Q    Well, you remember -- he told you that he had just met

16   with Casey Brennick, right?

17   A    Okay.

18   Q    And Casey Brennick had said that you were at a party with

19   Casey and Travis and some other folks the night before the

20   homicides.  Right?

21   A    I --

22         MS. LOEFFLER:  Objection, Your Honor.  I don't know if

23   she's testifying from this person's knowledge or just what the

24   agent asked.  I think it's hearsay what the agent asked.

25   There's no question to what this witness knows.

1          MR. OFFENBECHER:  Well, that's how the agent just
2     brought her attention to it.  She agreed that she was at the
3     party in the transcript, Your Honor.
4          MS. LOEFFLER:  I think she just said --
5          THE COURT:  Well --
6          MS. LOEFFLER:  -- she was at a part -- you know, a --
7          THE COURT:  I don't know.  I'm concerned that you just
8     say, "Okay, okay" because you want to agree with counsel.  Just
9     listen to the question.  If you know the answer, answer the
10    question.  If you don't know the answer, say so.  So let's get
11    started over --
12         MR. OFFENBECHER:  Oh --
13         THE COURT:  -- so we know what we're all talking about.
14    BY MR. OFFENBECHER:
15    Q    Okay.  So you do remember that you were at a party the
16    night before your dad died, right?
17    A    I don't remember that, no.
18    Q    You don't remember that, okay.  Can you give the witness a
19    copy of DE-154, please?
20         MS. LOEFFLER:  You have a page number, counsel?
21         MR. OFFENBECHER:  6317.  Right at the center.
22    BY MR. OFFENBECHER:
23    Q    Take a look at that, Ms. Belisle.  Little bit lower,
24    please.  Little bit lower, please.
25         MS. LOEFFLER:  Your Honor, I'm going to object to this

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 219 of 239

1  as -- I think it's -- the questions mischaracterize what's on

2  the screen.

3         THE COURT:  Question mischar -- okay.  Well, make

4  sure --

5  BY MR. OFFENBECHER:

6  Q    Well, let me see if I can --

7  A    Oh.

8  Q    Have you taken a look at that?

9  A    Yeah.  I wasn't at a party, I was just -- I was just

10 getting a tattoo in my friend's living room.

11 Q    Okay.

12 A    So it's not really a party.

13 Q    Okay.  But Casey Brennick was there, right?

14 A    Yeah.  I think he was in the back room.

15 Q    Okay.  Who else was there that you remember?

16 A    Okay, I remember my friend Andrea was there, my friend

17 Matt.  I'm pretty sure Erin was there.  And that's all I really

18 remember being there.

19 Q    Do you remember Travis Biocic was there too, right?

20 Biocic, right?

21 A    I don't remember that.  But he could have been.

22 Q    Okay.  Do you remember Travis's brother, Drew, was there

23 as well, right?

24 A    No, I don't remember that.

25 Q    Is it possible he was there, though?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 748  Filed 09/23/14  Page 220 of 239

1  A    Probably not.  I didn't hang out with him.

2  Q    Okay.  You remember -- and you did say -- talk about Erin.

3  How about Everett Grass?  Do you remember he was there too?

4  A    I mean, probably.  It was Erin's house that we were at.

5  Q    Okay.  So it was Andrea, Matt, Erin, Everett, Casey was

6  there but maybe in the back room.  Anybody else that you

7  remember being there?

8  A    No, I -- no.

9  Q    And what were you doing there?

10 A    I was getting a tattoo.

11 Q    Okay.  What was everybody else doing there?

12 A    Watching me get a tattoo.

13 Q    Okay.  And were people using alcohol?

14 A    Probably.

15 Q    Were people smoking weed?

16 A    Probably.

17 Q    Were people using cocaine?

18 A    Probably.

19 Q    Were people using methamphetamine?

20 A    No.

21 Q    And you were getting a tattoo.  Was anybody else getting a

22 tattoo there?

23       MS. LOEFFLER:  Objection.  Relevance, Your Honor.

24       MR. OFFENBECHER:  That's fine.

25       THE COURT:  I don't know if that's relevant, what

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 221 of 239

1  anyone else was doing.

2         MR. OFFENBECHER:  That's fine.

3  BY MR. OFFENBECHER:

4  Q    And how long were you there at the party?

5  A    I -- I don't remember.

6  Q    What else do you remember?

7  A    I remember going to Wal-Mart after I got my tattoo and

8  getting some lotion to put on it, and then going home.

9  Q    Do you remember talking about your dad at that party?

10 A    No.

11 Q    Do you remember saying what a good dad he was?

12 A    I -- I don't remember the conversation.  I wa -- I was

13 getting a tattoo.  I wasn't focused on anything else except for

14 the pain.

15 Q    Do you remember saying how tough he was and how he had all

16 these guns?

17 A    No.

18 Q    Do you remember saying how nothing could ever happen to

19 him because he's such a bad guy?

20        MS. LOEFFLER:  Objection, Your Honor.  I think

21 counsel's just testifying.

22        MR. OFFENBECHER:  No.  Your Honor, I -- obviously I'm

23 asking her questions directly from another witness who's going

24 to testify.

25        THE COURT:  Okay, go ahead.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 222 of 239

1  BY MR. OFFENBECHER:

2  Q    Do you remember saying how your dad had all these guns?

3  A    I don't remember that.

4  Q    You don't remember saying anything about your dad, that

5  nothing could happen to him?

6  A    No, I don't remember that.

7  Q    Okay.  So you don't remember saying anything about your

8  dad in front of these people?

9  A    No.  I was getting a tattoo.  I don't remember any of

10  that.

11  Q    Now, do you remember telling Special Agent Allison about

12  what happened the morning that your dad passed?

13  A    Yeah.

14  Q    Do you remember telling him that you were home --

15  A    Yes.

16  Q    -- is that right?  And do you remember telling him a lot

17  of details of what happened there?

18  A    Yeah, I remember that morning like it was yesterday.

19  Q    And you told him that when you got up in the morning, you

20  had a bad feeling in your stomach about the day, didn't you?

21  A    Yeah.

22  Q    And you told him a number of other details about that day,

23  right?

24  A    Yeah.

25  Q    About hearing your dad, about hearing your mom, a number

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 748  Filed 09/23/14  Page 223 of 239

1  of things like that.  Right?

2  A    (No audible reply).

3  Q    Is it true that you were actually still at the place where

4  you had the party the night before on the morning of -- that

5  your dad died?

6  A    No.

7  Q    Isn't it true that you actually didn't go home that night?

8  A    No.

9  Q    Do you think there's any reason why Mr. Biocic, Mr.

10  Brennick, Mr. Grass, all of your friends, would say that you

11  were still at the party, you found out that your dad had died?

12  A    I was in school when I found out that my dad was killed.

13  Q    Is there any reason those people would say that?

14  A    I don't know.

15  Q    But your testimony is that you were at home that morning?

16  A    Yeah, I was at home.

17  Q    And you weren't still at the party with your friends?

18  A    No, I wasn't.

19  Q    Now, Mr. Biocic -- you were only dating him for about a

20  month or two.  Right?

21  A    Yeah.

22  Q    But had he also been a friend because he was in the circle

23  of friends that you were in?

24  A    What do you mean?

25  Q    Well, he -- had you had social relationships with Mr.

1  Biocic other than just having dated him, I guess is what I'm
2  asking.
3  A    I mean, yeah.  I -- I mean, I'm not -- you're saying --
4  Q    Okay.
5  A    -- I just met him and started dating him, no.
6  Q    No.  You had known him before, just as one of the folks?
7  A    Yeah.
8  Q    And then you started dating him for a while, and then you
9  stopped dating him for a while?
10  A    Yeah.
11  Q    And by the time that your dad died, you didn't like him,
12  you thought he was a scumbag, and you flipped him off shortly
13  thereafter.  Right?
14  A    Yeah.
15  Q    And were -- had you ever socialized with him in the months
16  or the year before your dad died?  Socialized with him, like
17  going to parties, or anything like that?
18  A    Well, yeah.  We were dating.
19  Q    Okay.  But before the time you were dating.
20  A    Oh, no.  He, like, came in -- he was here and then he came
21  into Kodiak and he was there for, like, three weeks, and then
22  we started, like, hanging out.  Because he was staying at Erin
23  and Everett's place.
24  Q    And that's how you met him, through your friend Erin and
25  Everett?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 748  Filed 09/23/14  Page 225 of 239

1  A    Yeah.

2  Q    And were you aware that he had grown up on Kodiak Island?

3  A    Yeah.

4  Q    Were you aware that he had grown up on the Red Cloud Ranch

5  on Kodiak Island?

6  A    No.

7  Q    Had you ever been out to the Red Cloud Ranch?

8  A    No.

9  Q    Do you know where that is?

10 A    No.

11 Q    Okay.  So when you -- after you broke up, you were dating

12 Mr. Fretz.  Is that right?

13 A    Yeah.

14 Q    And, in fact, you were dating Mr. Fretz right about the

15 time that your dad passed away.  Right?

16 A    Yeah.  I -- I started dating him, like, the day after or

17 something like that.

18 Q    You remember talking with Special Agent Allison about Mr.

19 Fretz as well.  He asked you questions about all your friends,

20 right?

21 A    Yes.

22 Q    And he asked you questions about whether Mr. Fretz did

23 drugs.  Is that right?

24 A    Yes.

25 Q    And you told him that Mr. Fretz -- just as you did Mr.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 226 of 239
(720) 384-8078  attrans@sbcglobal.net

1 Biocic, that Mr. Fretz was not involved with drugs either.

2 Right?

3 A    Probably.

4 Q    And that wasn't true either, was it?

5 A    No.

6        MR. OFFENBECHER:  I don't have any other questions,

7 Your Honor.

8        THE COURT:  Okay, I think --

9        MS. LOEFFLER:  I have, like -- a question.

10        THE COURT:  You have, like, what?

11        MS. LOEFFLER:  I have, like, two questions

12 (indiscernible) --

13        THE COURT:  Okay.

**REDIRECT EXAMINATION**

15 BY MS. LOEFFLER:

16 Q    Ms. Belisle, did any of the people that Mr. Offenbecher

17 talked about ever threaten you?

18 A    No.

19 Q    Did they ever threaten your father, to your knowledge?

20 A    No.

21 Q    Do you have any idea why any of those people he mentioned,

22 any -- expressed in any way that they might want to harm your

23 father?

24 A    No.

25 Q    Nothing further.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 227 of 239
(720) 384-8078   attrans@sbcglobal.net

          THE COURT:  All right.  Thank you, ma'am.  You're

    excused.  Let's just take a brie -- a 10-minute recess and then

    we can come and -- do you have another witness?

          MS. LOEFFLER:  We do not, Your Honor.

          THE COURT:  Oh, okay.

          MS. LOEFFLER:  We are going to rest, subject to

    evidence -- am I missing something?

          THE COURT:  Okay.

          MS. LOEFFLER:  All right.  Let me talk to my team.

          THE COURT:  All right, so let's just come back tomorrow

    at -- you want to start tomorrow?

          MR. OFFENBECHER:  Pardon?

          THE COURT:  Do you want to start -- do you have a

    wit -- unless you have --

          MR. CURTNER:  Yes.

          MR. OFFENBECHER:  Yeah.

          THE COURT:  -- a witness right now.

       (Side conversation)

          MR. CURTNER:  Yeah, we --

          THE COURT:  Okay.  So government has rested.  That

    means the government is through with its --

          MS. LOEFFLER:  If I may (indiscernible) -- just subject

    to reconciling the evidence --

          THE COURT:  Okay, we got to go --

          MS. LOEFFLER:  -- and making sure we have that.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1        THE COURT:  We're going to go -- make -- through -- we

2  got all the exhibits squared away.  Then we'll stand in recess,

3  and tomorrow at 8:25, and 8:30 we'll start with defense

4  witnesses.  Okay?  So see you then.  Same admonition as always.

5     (Jury not present)

6        THE COURT:  All right, please be seated.  All right, so

7  did you have a question, Nancy, about the exhibits?

8        THE CLERK:  Oh.  Yes, I did want to clarify if Exhibit

9  415 was admitted.  That's the audio recording.

10       MS. DUIGNAN:  We had moved for admission of those --

11       THE COURT:  Okay, it will be admitted.

12       MS. DUIGNAN:  -- and thought they were admitted.

13       THE COURT:  It'll be admitted, okay.

14       MS. DUIGNAN:  Was there another one that was missing,

15  Nancy?

16       THE CLERK:  No, that's it.

17       MS. DUIGNAN:  Okay.

18       THE COURT:  Okay, so all the exhibits have been

19  addressed.  Where did Ms. Loeffler go?  Didn't she say she had

20  something else to raise?

21       THE CLERK:  She's coming.

22       THE COURT:  Oh.

23       MR. SCHRODER:  I don't think --

24       THE COURT:  Here she is.

25       MR. OFFENBECHER:  Your Honor, could we make our Rule 29

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 229 of 239

1  motion now?

2        THE COURT:  Yeah.  I'm going to get the exhibits taken

3  care of.  Ms. Loeffler, you said there was something you wanted

4  to get squared away with regard to exhibits?

5        MS. LOEFFLER:  Well, Your Honor, whenever I finish a

6  case, I always say --

7        THE COURT:  Sure.

8        MS. LOEFFLER:  -- subject to reconciling with the clerk

9  to make sure that ours matches theirs and that we've gotten --

10       THE COURT:  Right.

11       MS. LOEFFLER:  -- all our exhibits in.  It doesn't stop

12  the case, but I don't want the Court to say you're completely

13  over until --

14       THE COURT:  No, that's fine.

15       MS. LOEFFLER:  -- we've done that.

16       THE COURT:  We can do that, make sure all the

17  exhibit -- we -- while you were back, Nancy had a question, but

18  as far as she's -- Nancy's concerned, all the exhibits have

19  been addressed.  Is that right?  There's no big question marks

20  in -- that we're aware of.

21       MS. LOEFFLER:  Yeah.  I don't know.  I just want to

22  make sure --

23       THE COURT:  Okay.

24       MS. LOEFFLER:  -- that ours match --

25       THE COURT:  All right.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 748  Filed 09/23/14  Page 230 of 239

 1          MS. LOEFFLER:  -- and that we have everything in that
 2    we thought we had in.
 3          THE COURT:  Okay.  Mr. Offenbacker -- Mr.
 4    Offenbecher --  you see, she's --
 5          MR. OFFENBECHER:  You didn't know my --
 6          THE COURT:  -- getting me started on it.
 7          MR. OFFENBECHER:  I know.  See --
 8          THE CLERK:  The microphone, Mr. Offenbecher.
 9          MR. OFFENBECHER:  -- that's just her way of
10    (indiscernible).
11          THE COURT:  I know.  I know.
12          MR. OFFENBECHER:  That's okay.  I'm --
13          THE CLERK:  The microphone.
14          MR. OFFENBECHER:  -- a big boy.
15          THE COURT:  All right.  Well, you should hear
16    "Beastline," "Bustline," "Buttline."  I get it all over the
17    place.
18          MR. OFFENBECHER:  I've been needed before --
19          THE COURT:  Okay.
20          MR. OFFENBECHER:  -- (indiscernible) years.  Your
21    Honor, at this time we'd ask the Court to dismiss the case,
22    based on Rule 29, on the grounds that the government has failed
23    to take -- make a case sufficient to take to the jury on each
24    and every element of the charged crimes.
25          THE COURT:  Any opposition?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 231 of 239

 1          MR. SCHRODER:  How much do you want, Your Honor?  We

 2    oppose.

 3          THE COURT:  Okay.

 4          MR. SCHRODER:  I think we -- the elements of murder,

 5    unlawfully killed the victim, killed with malice aforethought,

 6    premeditated, and the jurisdictional element of either at a

 7    federal location or of a federal officer.  We'll start with the

 8    fourth element, Your Honor, because that's the easiest one.

 9          We admitted Petty Officer Hopkins' enlistment contract

10    through YNC Mills.  Mr. Belisle's civilian personnel hiring

11    documents were admitted by stipulation.  And COM -- the COMMSTA

12    Kodiak -- that COMMSTA Kodiak is part of special maritime and

13    territorial jurisdiction of the U.S. was also stipulated.

14    That's a legal finding that the Court makes that we've met that

15    jurisdiction element, because it's in the special maritime and

16    territorial jurisdiction.

17          Going to premeditation, Your Honor, we'll work our way

18    backwards.  Element 3.

19          THE COURT:  Yeah.

20          MR. SCHRODER:  Defined by the Ninth Circuit as planning

21    and deliberation.  Whoever committed the murder, Mr. Wells,

22    carefully got in and out of T2, among other things, avoiding

23    the T1 camera; left minimal forensics at the crime scene; got

24    rid of the murder weapon; and used his wife's car to avoid

25    being seen going in and out of the unit, planning to do it

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 232 of 239

 1   while his wife was out of town.  So that shows certainly

 2   planning and deliberation, Your Honor.

 3        Element 2, malice aforethought, that the killing was

 4   deliberate and intentional.  The -- Mr. Wells used a .44 Magnum

 5   handgun, a gun that was going to be sure to kill; fired

 6   multiple shots into each victim, and, as Mr. Morton put it,

 7   including coup de gras shots to finish the killing.

 8        On the element 1, that the defendant killed the

 9   victims, the BSU camera shows him going toward the airport at

10   8:48 and away at 7:22.  Thus, he was within the area of two or

11   three miles of the murder for 34 minutes.  He accounted for

12   that, about 10 minutes' worth of time, and provided an alibi of

13   a spare tire that we put on evidence shows was a false alibi,

14   and the spare tire was made -- was basically evidence that he

15   constructed.

16        His wife's car was at the airport, moved from the

17   original parking spot.  A vehicle consistent with the wife's

18   car is seen going toward T2 at 7:09 and coming out at 7:14.

19   Mr. Rudat goes by at 7:10, 7:11, and hears a loud noise which

20   would be consistent with the shots.  Mr. Belisle signed on to

21   his computer at about -- and was last -- his last action was at

22   about 7:10.  And we know that Petty Officer Hopkins had not

23   signed on to his computer and had gone over to roll up his

24   sleeves in the break room when he was killed.

25        The firearm was a -- something with a five -- had a

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 748  Filed 09/23/14  Page 233 of 239

1   five right twist, most commonly a Smith & Wesson revolver, a

2   Model 629 or Model 29.  We know that Mr. John Stein left a 629

3   with Wells in 1997, which was missing when Mr. Stein got back.

4   The defendant never had a -- didn't have a -- any explanation

5   for why that gun was gone.  And the other item missing from

6   Stein, the swords, were found in the defendant's possession

7   even after the time of the murders.

8       As far as motive, Your Honor, the defendant was

9   certainly a proud man and proud of his position.  Nothing had

10   happened in that shop in recent years without him being

11   involved.  He did things his way.  I think we've shown that.

12   And sometime -- and, well, sometimes he was challenged.  He had

13   never really been pressed by his bosses.  But that changed the

14   time before the murder.  The command at COMMSTA Kodiak was not

15   going -- they were going to bring him into the fold.  They'd

16   had numerous challenges to him, numerous disciplinary actions,

17   and then the last thing, he got sick, he went out, and when he

18   came back, they'd moved on without him.  And the two men

19   most -- who were stepping up to the plate to make him

20   irrelevant in that office were Richard Belisle and Jim Hopkins.

21       THE COURT:  All right, thank you.  The motion for

22   judgment of acquittal is denied.  The government's presented

23   sufficient evidence to allow the matter to proceed.  I have

24   before me also, at Docket 627, the government's motion in

25   limine regarding character evidence.  Defendant can respond to

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 234 of 239
(720) 384-8078   attrans@sbcglobal.net

1  that, but, you know, then you seal -- open-the-door issue,

2  which the parties can address before you begin your case

3  tomorrow.  Okay?  Anything else for me this evening?

4          MS. LOEFFLER:  No, Your Honor.

5          MR. SCHRODER:  No, Your Honor.

6          MR. CURTNER:  No, Your Honor.

7          THE COURT:  All right.  See you tomorrow at 8:25.

8          THE CLERK:  All rise.  Matter stands in recess until

9  tomorrow at 8:30 a.m.

10      (Proceedings concluded at 3:50 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 235 of 239
(720) 384-8078  attrans@sbcglobal.net

1           CERTIFICATE

2  I certify that the foregoing is a correct transcript from the
   electronic sound recording of the proceedings in the above-
3  entitled matter.

4
       s/Teresa K. Combs                    9/4/14
5  Teresa K. Combs, Transcriber        Date

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 236 of 239
(720) 384-8078  attrans@sbcglobal.net

1                                    **INDEX**

2                                                                    FURTHER
                         DIRECT    CROSS   REDIRECT   RECROSS   REDIRECT
3    PLAINTIFF'S WITNESSES

4
     Angelo Toglia, Jr.      2473    2522      2536
5    Joshua Christian
       Honour                2552    2560
6    Kelly Kolodzik          2563
     Kirk Oberlander         2578    2600      2613      2614
7    Douglas Klein           2618    2621
     Olivia Matsuura Terry   2625    2634      2637
8    Hannah Josephine
       Belisle               2641    2651      2695
9
     PLAINTIFF'S EXHIBITS                                        ADMITTED
10
     20A     Audio recording of Wells' statements                  2584
11
     20A-1   Audio recording of Wells' statements transcript       2584
12
     20B     Audio recording of Wells' statements                  2591
13
     20B-1   Audio recording of Wells' statements transcript       2591
14
     24A     Wells' statement excerpt, page 29                     2593
15
     24A-1   Wells' statement excerpt, page 29, transcript         2593
16
     24B     Wells' statement excerpt, pages 34, 44                2594
17
     24B-1   Wells' statement excerpt, pages 34, 44,
18           transcript                                            2594

19   24C     Wells' statement excerpt, pages 62 through 65         2596

20   24C-1   Wells' Statement excerpt, pages 62 through 65,
             transcript                                            2596
21
     24D     Wells' statement excerpt, pages 67 through 72         2600
22
     24D-1   Wells' statement excerpt, pages 67 through 72,
23           transcript                                            2600

24   31A     Photograph - Island Air lobby                         2631

25   31B     Photograph - Island Air lobby                         2632

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 237 of 239
(720) 384-8078   attrans@sbcglobal.net

1                            **INDEX** (Continued)

2    PLAINTIFF'S EXHIBITS                                    ADMITTED

3    32B      Photograph - Island Air outside               2630

4    34       Drawing by Mr. Wells of T2                     2598

5    112      Toglia's slide 38                              2500

6    112A     Toglia's slide 38 enlargement                 2502

7    113      Toglia's slide 39                              2500

8    113A     Toglia's slide 39 enlargement                 2502

9    114      Toglia's slide 63                              2508

10   114A     Toglia's slide 63 enlargement                 2509

11   115      Toglia's slide 64                              2508

12   115A     Toglia's slide 64 enlargement                 2509

13   116      Toglia's slide 100                             2518

14   116A     Toglia's slide 100 enlargement                2519

15   117      Toglia's slide 101                             2518

16   117A     Toglia's slide 101 enlargement                2519

17   118      Toglia's slide 119                             2519

18   118A     Toglia's slide 119 enlargement                2520

19   119      Toglia's slide 120                             2519

20   119A     Toglia's slide 120 enlargement                2520

21   120      Toglia's slide 128                             2521

22   120A     Toglia's slide 128 enlargement                2521

23   121      Toglia's slide 129                             2521

24   121A     Toglia's slide 129 enlargement                2521

25   173A -
     173I     Photographs - Toglia's slides                 2506

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 238 of 239
(720) 384-8078   attrans@sbcglobal.net

1                              **INDEX** (Continued)

2  <u>PLAINTIFF'S EXHIBITS</u>                                              <u>ADMITTED</u>

3  415      Audio recording, Wells' statements                    2597

4  415-1    Audio recording, Wells' statements transcripts        2596

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 748   Filed 09/23/14   Page 239 of 239
(720) 384-8078   attrans@sbcglobal.net