1          UNITED STATES DISTRICT COURT

2           FOR THE DISTRICT OF ALASKA

3  UNITED STATES OF AMERICA,      )   Case 3:13-cr-00008-RRB
                                  )
4          Plaintiff,             )   Anchorage, Alaska
                                  )   Thursday, April 17, 2014
5      vs.                        )   8:34 o'clock a.m.
                                  )
6  JAMES MICHAEL WELLS,           )
                                  )
7          Defendant.             )
   _____)   **TRIAL BY JURY – DAY 13**

8          **PARTIAL TRANSCRIPT OF PROCEEDINGS**

9
        BEFORE THE HONORABLE RALPH R. BEISTLINE
10              UNITED STATES DISTRICT JUDGE

11 APPEARANCES:

12 For the Plaintiff:        KAREN L. LOEFFLER
                             U.S. Attorney
13                           BRYAN SCHRODER
                             KATHLEEN ANN DUIGNAN
14                           Assistant U.S. Attorneys
                             Office of the U.S. Attorney
15                           222 West 7th Avenue, #9, Room 253
                             Anchorage, Alaska  99513-7567
16                           (907) 271-5071

17 For the Defendant:        F. RICHARD CURTNER
                             Federal Defender
18                           Office of the Federal Public Defender
                             601 West 5th Avenue, Suite 800
19                           Anchorage, Alaska  99501
                             (907) 646-3400
20
                             PETER OFFENBECHER
21                           Skellenger Bender, P.S.
                             1301 5th Avenue, Suite 3401
22                           Seattle, Washington  98101-2605
                             (206) 623-6501

23

24

25

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 750   Filed 09/23/14   Page 1 of 224
(720) 384-8078  attrans@sbcglobal.net

1   APPEARANCES (Continued):

2   Court Recorder:          NANCY LEALAISALANOA
                             U.S. District Court
3                            222 West 7th Avenue, #4, Room 229
                             Anchorage, Alaska  99513-7564
4                            (907) 677-6111

5   Transcription Service:   A & T Transcripts
                             6299 West 111th Avenue
6                            Westminster, Colorado  80020
                             (720) 384-8078

7

8   Proceedings recorded by electronic sound recording; transcript
    produced by transcription service.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 750   Filed 09/23/14   Page 2 of 224
(720) 384-8078  attrans@sbcglobal.net

1    __ANCHORAGE, ALASKA - THURSDAY, APRIL 17, 2014__

2

3        (Call to Order of the Court at 8:34 a.m.)

4        (Defendant present; jury not present)

5            THE CLERK:  His Honor the Court, the United States

6    District Court for the District of Alaska is now in session,

7    with the Honorable Ralph R. Beistline presiding.  Please be

8    seated.

9            THE COURT:  Good morning.  Who has something?

10           MS. LOEFFLER:  Yes, Your Honor.  But it needs to be

11   taken up either at sidebar or in the back hall.

12           THE COURT:  Okay.

13       (At sidebar with the Court and counsel)

14           THE COURT:  Yes.

15           MS. LOEFFLER:  404(b), (indiscernible) we said we had

16   no intention of introducing all of the evidence we have of the

17   sexual proclivities of Mr. Wells.  And to date --

18           THE COURT:  Yeah.

19           MS. LOEFFLER:  -- we are still taking the position --

20           THE COURT:  Right.

21           MS. LOEFFLER:  -- of today --

22           THE COURT:  I got it.

23           MS. LOEFFLER:  -- that we would not do it.  But under

24   404(2)(B) --

25           THE COURT:  Yeah.

1    MS. LOEFFLER:  -- if the defendant offers evidence of a

2 trait of the victim, the government has a right to rebut it and

3 offer evidence of the defendant's same trait.  And if we get

4 into -- I want to put everyone on notice that if we get into

5 the sex life in great detail of the victim, we're going to be

6 asking to put in all of his stuff, the pages of prostitute

7 notes.  And I don't -- I want everybody to know that.  I know

8 to date we are saying not --

9    THE COURT:  We're okay so far.

10   MS. LOEFFLER:  We're okay so far.

11   THE COURT:  But it's close --

12   MS. LOEFFLER:  It's --

13   THE COURT:  -- in terms of character.

14   MS. LOEFFLER:  It's close.

15   MR. OFFENBECHER:  (Indiscernible) 404(b) evidence.

16 (Indiscernible) be -- this is that defendant's violent

17 character or nonviolent (indiscernible).  These are two totally

18 separate issues.  Just because -- if the sexual activity --

19 the -- one of the witnesses in the case is at issue, that

20 doesn't make the defendant's sexual activity relevant.  I mean,

21 that's not the rule.  It's like, you know, open season on

22 everybody just because it's -- yeah, so it's one issue

23 (indiscernible) --

24   THE COURT:  I think I can agree with you on that,

25 unless you can --

 1          MR. OFFENBECHER:  Yeah.

 2          THE COURT:  -- con -- yeah --

 3          MS. LOEFFLER:  Let me read the actual rule, because it

 4  doesn't say that.  The rule -- there's a separate rule for

 5  character for violence.  It says --

 6          THE COURT:  Okay.

 7          MS. LOEFFLER:  -- "The following exceptions apply in a

 8  criminal case, subject to the limitations on Rule 412," which

 9  is the sexual assault case.  "A defendant may offer evidence of

10  the alleged victim's pertinent trait, and if the evidence is

11  admitted, the prosecutor may offer evidence to rebut it and

12  offer evidence of the defendant's same trait."  The stuff about

13  a homicide case and victim's traits for peacefulness is the

14  next section.

15          THE COURT:  Okay.

16          MS. LOEFFLER:  And this is just -- and I'm reading the

17  rule flat-out.  So it is not limited to what counsel says.

18          MR. OFFENBECHER:  (Indiscernible).

19          MS. LOEFFLER:  And --

20          MR. OFFENBECHER:  (Indiscernible).

21          MS. LOEFFLER:  I'm (indiscernible) the rule.

22          MR. OFFENBECHER:  That makes no sense.  It's the --

23  we're not -- first of all, we're not introducing evidence --

24  well, regarding the victim's sexual activity.  I mean, some of

25  it.  But the reason that it's relevant is because that there

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 750   Filed 09/23/14   Page 5 of 224
(720) 384-8078  attrans@sbcglobal.net

1  may be another person that he's involved with, a person who's

2  stalking him.  That has nothing to do with the defendant's

3  sexual misconduct.  We understand that if we put in just any

4  more --

5      THE COURT:  You're right on the verge on the character

6  issue.

7      MR. OFFENBECHER:  Yeah.  Yeah, no, I said that.

8  Actually --

9      THE COURT:  And I told you that yesterday.  So that's a

10  separate issue.

11      MR. OFFENBECHER:  That's a separate issue.  That we

12  understand to be -- I think we probably -- we're there.  But --

13      THE COURT:  Okay, I hope so, because --

14      MR. OFFENBECHER:  Yeah.  Yeah -- no, I said --

15      THE COURT:  -- we got the Santa Claus, we've got the --

16      MR. OFFENBECHER:  Yeah, yeah, (indiscernible) --

17      THE COURT:  -- baseball coach, we've got --

18      MR. OFFENBECHER:  I get it.  I get it.  I think that --

19  that's right.  But the -- there's absolutely no connection

20  between --

21      THE COURT:  I know that.  This is a new issue.

22      MR. OFFENBECHER:  -- (indiscernible) from this 404(b)

23  thing.  The reason that the sexual activity of Mr. and Mrs.

24  Hopkins is relevant is because there may be another person who

25  has a motive.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 750   Filed 09/23/14   Page 6 of 224
(720) 384-8078  attrans@sbcglobal.net

1          THE COURT:  I understand that, but (indiscernible) --

2          MR. OFFENBECHER:  That has nothing to do with the

3   defendant's (indiscernible) --

4          THE COURT:  Okay.  I don't know the answer -- I don't

5   think you're right on that.  That doesn't make sense to me that

6   would be the application, but maybe it is.  So we'll research

7   it.  It's not the next witness.  And so I'll have to deal with

8   it.

9          MS. LOEFFLER:  Right.  I'm not saying I know it exactly

10  applied.  I'm giving everybody a warning --

11         THE COURT:  I understand.

12         MS. LOEFFLER:  -- and I'm also giving a warning -- and

13  the other one is, if we get a big tour of, you know, here's the

14  happy, healthy family life, I want everybody on notice that we

15  will be applying to the Court -- now, I haven't done all the

16  research, and the judge will have to rule.

17         THE COURT:  You've been doing research, I've --

18         MS. LOEFFLER:  But I have to let --

19         THE COURT:  -- been doing research --

20         MS. LOEFFLER:  -- people know --

21         THE COURT:  You're letting us know as clear as a

22  bell --

23         MS. LOEFFLER:  -- beforehand -- okay.

24         THE COURT:  You've let us know as clear as a bell.

25         MS. LOEFFLER:  That's what I want to do.  I wanted to

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 750  Filed 09/23/14  Page 7 of 224

1  let you know.

2  THE COURT:  Well, I haven't even decided what's going

3  in and what's not going in.

4  MS. LOEFFLER:  Yeah.

5  THE COURT:  And I'm going to have to do preliminary

6  examinations of some of these witnesses --

7  MS. LOEFFLER:  Yeah.

8  THE COURT:  -- to draw the dots, which are --

9  MS. LOEFFLER:  Right.

10  THE COURT:  -- just all over the place right now.

11  MR. OFFENBECHER:  I (indiscernible).

12  THE COURT:  (Indiscernible).

13  MR. OFFENBECHER:  No, no, particularly -- no, I was

14  going to ask you do it with respect to Ms. Birchfield, frankly,

15  to see whether it's relevant or not, what she knows, because

16  she was kind of cut off in the middle of her interview, about

17  her extent of knowledge and whether they were actively engaged

18  in swinging.  So I think you are going to have to examine

19  that --

20  THE COURT:  Swinging is a new -- I haven't decided the

21  swinging issue.

22  MR. OFFENBECHER:  I know.  I know.  The -- so I'm --

23  just in terms of how it's going to play out, I mean, we have

24  Mr. DiTallo, Dr. Gan --

25  THE COURT:  See, the problem is -- now, I understand

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 750   Filed 09/23/14   Page 8 of 224
(720) 384-8078  attrans@sbcglobal.net

```
 1   what you -- oh, it's -- okay, (indiscernible) --
 2            MR. OFFENBECHER:  (Indiscernible) scheduling.
 3            THE COURT:  Okay.
 4            MR. OFFENBECHER:  I mean, when you want to address
 5   those is the question.  Mrs. Hopkins is, like, the fourth
 6   witness today.
 7            THE COURT:  Okay.
 8            MR. OFFENBECHER:  So we're probably -- till the mor --
 9   I would say at least till the morning break --
10            THE COURT:  I have to break at 11 --
11            MR. OFFENBECHER:  -- maybe till noon.
12            THE COURT:  I have to break at 11:30 today.  Can't come
13   back till 1:30.
14            MR. OFFENBECHER:  Okay.
15            THE COURT:  I'm a little concerned about doing these --
16            MR. OFFENBECHER:  Yeah.
17            THE COURT:  -- voir dires in open court, because then
18   you --
19            MR. OFFENBECHER:  Yeah.
20            THE COURT:  -- absolutely ruin the whole purpose of
21   protecting people.
22            MR. OFFENBECHER:  Okay.
23            THE COURT:  So we're going -- I don't know what we'll
24   do.
25            MR. OFFENBECHER:  Well, when --
```

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 750   Filed 09/23/14   Page 9 of 224
(720) 384-8078  attrans@sbcglobal.net

1          THE COURT:  (Indiscernible) sealed courtroom.

2          MR. OFFENBECHER:  Here's what I would suggest, that we

3   do the -- take up Mrs. Hopkins and those issues after the

4   Court's -- after your noon break.

5          THE COURT:  Okay.  Well, let's get the morning going.

6          MS. LOEFFLER:  We have one other issue with --

7          THE COURT:  Oh.

8          MS. LOEFFLER:  -- Dr. Gan, and that is we got no expert

9   notice on her.  Now, in order to move things, I don't have any

10  problem -- we don't have any problem with her testifying about

11  her treatment of him, his medical records, his condition.  But

12  if she wants to give -- opine, give opinions on disease in

13  general -- we got no expert report.  It was due last

14  November --

15         THE COURT:  Okay.

16         MS. LOEFFLER:  -- and we still don't have one.  But her

17  testimony as to her treatment of him, no problem.

18         THE COURT:  Okay.  She's -- as a treating physician,

19  not as an expert.

20         MS. LOEFFLER:  Yeah.

21         MR. CURTNER:  That's correct.

22         THE COURT:  That's fine.

23         MR. OFFENBECHER:  (Indiscernible).

24         THE COURT:  They -- I stop at 11:30, no matter what,

25  and then we start at 1:30, no matter what.  Okay, I want to

1  talk to her.

2      (Side conversation)

3      (End of sidebar)

4          THE COURT:  Okay, we're bringing the jury in.

5      (Jury present)

6          THE COURT:  Ms. Loeffler, what was that cite you gave

7  me?  Four oh what?

8          MS. LOEFFLER:  Excuse me?

9          THE COURT:  What was that cite you gave me?

10         MS. LOEFFLER:  404(b) -- (a) -- I'm sorry --

11 404(a)(2)(B) --

12         THE COURT:  Okay.

13         MS. LOEFFLER:  -- Your Honor.

14         THE COURT:  Good morning.  How are you doing?  Boy, you

15 look better every day.  This must be good for you.  Okay, any

16 issues, questions, problems?  We're moving forward.  Defense

17 first witness.

18         MR. CURTNER:  Thank you, Your Honor.  The defense would

19 call Dr. Song-Qing Gan.

20         THE COURT:  Okay, just make your way up this way.  You

21 keep going around there.  There's a door there that pulls out.

22 If you can just pull that out.  Step in the box just for a

23 second.  She'll swear you in.

24         THE CLERK:  Please raise your right hand.

25             **SONG-QING GAN, DEFENDANT'S WITNESS, SWORN**

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 750  Filed 09/23/14  Page 11 of 224
(720) 384-8078  attrans@sbcglobal.net

**GAN - DIRECT**

1    THE CLERK:  Okay, thank you.  Please have a seat.  And,

2  ma'am, if you can please state and spell your full name.

3    THE WITNESS:  My name is Song-Qing Gan.  Spelling, S --

4  S-o-n-g, dash, Q-i-n-g, last name G-a-n.

5    THE COURT:  Okay, counsel.

6    MR. CURTNER:  Thank you, Your Honor.

7                    **DIRECT EXAMINATION**

8  BY MR. CURTNER:

9  Q    Dr. Gan, what is your occupation?

10  A    Internal medicine physician at the VA.

11  Q    How long have you been a physician?

12  A    Since 1996.

13  Q    Okay.  And how long have you worked at the VA Healthcare

14  Center?

15  A    Since 1997.

16  Q    And are you board certified in any specialty?

17  A    In internal medicine.  I'm American board certified in

18  internal medicine.

19  Q    Now, in your position as a physician at the Veterans

20  Healthcare Center, was one of your patients James Wells?

21  A    Yes.

22  Q    Okay.  Do you recognize Mr. Wells in court today?

23  A    Yes.

24  Q    And how long were you treating Mr. Wells?  How long have

25  you been treating Mr. Wells?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

**GAN - DIRECT**

1  A    Oh, a long time.  Maybe since '90.

2  Q    Okay, so he's been --

3  A    Yeah.

4  Q    -- your patient for many years?

5  A    Yes.

6  Q    Now, do you know some of the -- his -- Mr. Wells's medical

7  history?

8  A    Yes.

9  Q    What could you tell us about Mr. Wells's medical history?

10 A    Well, his medical history's included diabetes, arthritis,

11 tinnitus, and blood pressure problem, and maybe cholesterol

12 problem.

13 Q    Okay.  Can you talk to us a little bit about his diabetes?

14 Has that been a long-term diagnoses for Mr. Wells?

15 A    Yes, as far as I could remember.

16 Q    And what kind of medications would you prescribe for Mr.

17 Wells as far as his diabetes?

18 A    I remembered I prescribe Glipizide, Metformin, and all

19 that.  I -- we can refer back to records and what else did I --

20 have prescribed.

21 Q    One of the medications you prescribed was Metformin?

22 A    Yes.

23 Q    And that's a diabetic medication?

24 A    Yes.

25 Q    Now, did Mr. Wells -- while you were treating him, did he

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 750  Filed 09/23/14  Page 13 of 224
(720) 384-8078  attrans@sbcglobal.net

**GAN - DIRECT**

 1  have complaints about some kind of side effects from that

 2  particular medication?

 3  A   Yes, he did complain about the side effect of the

 4  medication.  And I remember he complained about diarrhea over

 5  the years, yeah.

 6  Q   Okay.  And is that something that -- it's known as a

 7  possible side effect of that particular medication?

 8  A   Yes, it is well-known side effects.

 9  Q   Okay.  Now, you also said that he has tinnitus?  Tinnitus?

10  How do you pronounce that?

11  A   Tinnitus.

12  Q   Okay.  And what is that?

13  A   Well, basically is a ringing in the ear from background.

14  Even though there is no background noises, people can hear

15  those background noises.

16  Q   And it's referred sometimes, ringing in the ears?

17  A   Yes.

18  Q   Okay.  And has that been a long-term diagnosis for Mr.

19  Wells?

20  A   Yes.

21  Q   And how about -- is there also -- do you know if he

22  suffers from idiopathic anaphylaxis?

23  A   Well, just as far as I remember, I've been prescribing a

24  medication called a epinephrine pen for him, just -- yeah, for

25  that reason.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 750  Filed 09/23/14  Page 14 of 224

**GAN - DIRECT**

1  Q    And what is an EpiPen?

2  A    Well, EpiPen is a -- injectable medications that patients

3  could self-inject if they have a allergical anaphylactic

4  reaction to things we call allergens, you know, like -- like

5  bee stings or something like that.

6  Q    Okay.  So if somebody suffers from anaphylaxis and -- what

7  does that look like when they get a bee sting or something like

8  that?

9  A    Well, they could have huge welts.  They could have

10  (indiscernible) as a breath and closing down their throat.  And

11  in severe cases, people need to visit emergency room or even

12  die from it.

13  Q    Okay.  So it's a -- potentially a fatal condition if you

14  suffer that, right?

15  A    Yes.

16  Q    And the EpiPen is to treat it immediately?

17  A    Yes.

18  Q    Okay.  Now let me see if we could bring up Exhibit --

19  Defense Exhibit DE-135.  Is that on your screen up there?

20  A    (No audible reply).

21  Q    Is that a record that the VA keeps on Mr. Wells, to your

22  knowledge?

23  A    Yes.

24  Q    And does it indicate the different type of disabilities

25  that the VA has recognized for Mr. Wells?  Does that include

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 750  Filed 09/23/14  Page 15 of 224

**GAN - DIRECT**

1  the tinnitus?

2  A   Yes.  I think -- yes, as since April 26th, 1990.

3  Q   Okay.  And did that also reflect his diabetes?

4  A   Yes.  Well, he has diabetes, but it says not service

5  connected.

6  Q   It's not service connected, but he has that medical

7  condition.  Is that correct?

8  A   Yes.

9  Q   And then how about the -- the second indication there is

10  the allergic rhinitis and angioneurotic edema.  What is that?

11  A   I'm thinking he is talking about he's allergic to --

12  reaction to allergens.

13  Q   So that would be the same as anaphylaxis, basically?

14  A   I would say basically, yeah.

15  Q   And that -- what -- from what date is that?

16  A   That's April 26th, 1990.

17  Q   And this is -- you recognize this as one of the records

18  you would keep in your medical files for Mr. Wells?

19  A   Yes.

20        MR. CURTNER:  We'd move for admission of Defense

21  Exhibit 135.

22        MS. DUIGNAN:  No objection.

23        THE COURT:  It'll be received.

24     (Defendant's Exhibit DE-135 admitted)

25  BY MR. CURTNER:

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 750  Filed 09/23/14  Page 16 of 224

**GAN - DIRECT**

1  Q    Thank you, Dr. Gan.  If I could call your attention to the

2  fall of 2011.  Were you seeing Mr. Wells at that time?

3  A    Yes.

4  Q    And did he complain of any symptoms or any problems back

5  in the fall that you dealt with him -- with?

6  A    Yes.  I think he -- complaining of GI symptoms.

7  Q    Okay.  Would that include nausea, vomiting, things of

8  that --

9  A    Yes.

10 Q    And so did you see him a number of times with those

11 problems?

12 A    Yes, I thought so.

13 Q    Okay.  And then from that examination and dealing with

14 those medical problems, did you refer him to other specialists?

15 A    Yes, I did.

16 Q    And who did you refer him to?

17 A    If I remember correctly, I referred him to a -- a

18 gastroenterologist, and eventually diagnose him gallbladder

19 problem.  And his gallbladder was taken out --

20 Q    Okay.

21 A    -- subsequently.

22 Q    So did -- what kind of testing would he be going through

23 in order to try to diagnose the problems he was suffering at

24 the time in the fall of 2011?

25 A    Well, he eventually had a test called ejection fraction of

1  his gallbladder, showed a dysfunction of his gallbladder.  So

2  that's why it was taken out.

3  Q   Okay.  And do you remember the date that the gallbladder

4  was taken out?

5  A   Not a date -- I thought it was February 2012.

6  Q   Okay.  So --

7  A   Uh-huh (affirmative).

8  Q   -- after what, several months of his dealing with this

9  problem, it ended up in the gallbladder removal?  Is that

10  correct?

11  A   Yes.

12  Q   And are there any postoperative symptoms from a

13  gallbladder removal that somebody might experience?

14  A   Yes.

15       MS. DUIGNAN:  Objection.  This calls for an opinion.

16       MR. CURTNER:  Your Honor, she's his treating physician.

17  I think she can testify about whatever --

18       THE COURT:  She can testify about him, what she knows

19  about him.

20       MR. CURTNER:  Okay.

21  BY MR. CURTNER:

22  Q   Dr. Gan, do you know of any postoperative symptoms that

23  Mr. Wells might have experienced from this gallbladder removal?

24  A   Oh, would have to refer to the records.

25  Q   Okay.  You can't recall personally on your own, right now?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 750  Filed 09/23/14  Page 18 of 224
(720) 384-8078  attrans@sbcglobal.net

**GAN - CROSS**

1  A    No.

2  Q    How about the Metformin?  Do you recall back in 2012, were

3  you still prescribing him Metformin?

4  A    Yes.

5  Q    And was that still a potential cause of diarrhea that he

6  has complained about?

7  A    Yes.  I remember seeing records that he was taking it.

8  Q    And all through the first part of 2012?

9  A    Yes.

10  Q    Okay.  That's all I have, Dr. Gan.  Thank you.

11        THE COURT:  Cross-examination.

12        MS. DUIGNAN:  Yes, Your Honor.

13                    **CROSS-EXAMINATION**

14  BY MS. DUIGNAN:

15  Q    Good morning, Dr. Gan.

16  A    Hi, good morning.

17  Q    You mentioned that Mr. Wells had tinnitus from a diagnosis

18  since 1990.  Correct?

19  A    Correct.

20  Q    So it's been quite a long time that that he's had this

21  condition.  He's been rated for it by the VA?

22  A    Yes.

23  Q    And you treat a lot of VA individuals at -- obviously, in

24  your job, correct?

25  A    Yeah.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 750  Filed 09/23/14  Page 19 of 224

1  Q    Would you say that a very high percentage of veterans come

2  in with tinnitus?  It's a very common condition to be rated

3  for?

4  A    Not very high, but frequently seen condition.

5  Q    For people that are in the sea services or people that

6  have shot ammunition, you see that condition quite a lot, don't

7  you?

8  A    Quite often.

9  Q    You mentioned that Mr. Wells had been on the Metformin for

10  quite a while.  Is that correct?

11  A    Correct.  As far as I can remember.

12  Q    Going for -- back for many, many years?

13  A    Uh-huh (affirmative).

14  Q    And when someone comes in with complaints to you, you

15  would normally note them in the medical record.  Is that right?

16  A    Yes.

17  Q    Especially ones that would be chronic?

18  A    Yes.

19  Q    Now going to the treatment for the gallbladder disease

20  that you mentioned --

21  A    Uh-huh (affirmative).

22  Q    -- you saw Mr. Wells on a number of occasions before he

23  had his gallbladder removed.  Is that right?

24  A    Correct.

25  Q    And you saw him probably at least on -- I would say six

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 750  Filed 09/23/14  Page 20 of 224

1  different occasions.  Does that sound right?

2  A    I have to refer back to record.  I don't know if I see him

3  for that many times for that particular condition.

4  Q    Okay.  Do you remember seeing him on November 4th of 2011,

5  when he complained about nausea?

6  A    I think I did.

7  Q    And do you remember specifically noting in your records

8  that he had no diarrhea at that time?

9  A    Yeah, I remember I said that.

10  Q    And do you remember seeing him on November 10th of 2011

11  for the same complaint of nausea?

12  A    November 10th of what?

13  Q    Of 2011.

14  A    I have to refer back to the records, yeah.  I --

15  Q    Do --

16  A    -- I -- I don't remember.  Either I saw him or I've called

17  him.  We have to look at the record.  If the records say yes,

18  it must be yes.

19  Q    Well, why don't we pull up the record for you.  Could we

20  have Government Exhibit 412, please?  And if we go to -- I

21  think it's the fifth page.  We're trying to pull up the exact

22  pages of the records for you now.

23  A    Okay.

24  Q    When you see the page for November, let us know, so we can

25  stop flipping through the pages.

1        (Side conversation)

2   Q    Does that look like November 10th?

3   A    Can we go to last page and see -- I signed that page?  Let

4   me see.  Because it says receipt acknowledged by me, but I

5   don't know if physically see him or not.

6   Q    But your name's on that document as acknowledging --

7   A    Right.

8   Q    -- that's correct?

9   A    Right.  So this is how work gets documented in the VA.  If

10  somebody else see the veteran and wants me to have particular

11  knowledge about something, they send me this view alert, and I

12  will sign off and then take action if necessary.  But that

13  doesn't mean I physically saw the patient.

14  Q    Okay.  But you did sign off on the fact that you received

15  information that his chief complaint was nausea in November of

16  2011?

17  A    I would say yes.

18  Q    And the records say that on November 21st of 2011, he came

19  in with that same complaint of nausea and said there was no

20  improvement?

21  A    Yeah.

22  Q    And he came in again on December 9th of 2011 with the same

23  symptoms --

24  A    Uh-huh (affirmative).

25  Q    -- and again was seen.  And then he came in on January

1  9th, 2012, with gagging, nausea, and dry heaves.  Would you say

2  that was correct?

3  A    Yeah.

4  Q    And then on January 17th of 2012, that's when you

5  recommended the gallbladder removal?

6  A    I don't know if I remembered it or GI recommended.

7  Because typically, if I remember correctly, I think the GI

8  doctor call me and says has this problem.  So we recommended

9  the surgical removal.  So, yeah, ultimately, I made a referral.

10 Q    Right.  And then on January 31st of 2012, the records show

11 that his gallbladder was actually removed.

12 A    Okay.

13 Q    And then on February 22nd of 2012, there was a followup

14 with his treating -- his surgeon at that time, which reported

15 that he had no nausea, no dry heaves, and he felt much better.

16 There were no other complaints.  Is that correct?

17 A    Okay.

18 Q    And the next time you saw him and the last time in this

19 record before the murders was on April 12th, 2012, for a

20 routine followup.  Is that correct?

21 A    I saw him that day, but I don't know anything else.  Yeah.

22 Q    But you saw him on April 2nd of 2012?

23 A    Yeah, must be.  Whatever the record says.

24 Q    Okay.

25 A    Yeah.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 750  Filed 09/23/14  Page 23 of 224

**GAN - REDIRECT/RECROSS**

1  Q    And the record said that he was doing well since the

2  gallbladder removal and there were no other complaints, none at

3  all.  In fact, he was seeing you because he was going on a

4  trip.  The records say that, don't they?

5  A    Okay.  Yeah.

6  Q    I have no further questions.

7  A    Okay.

8         THE COURT:  Redirect.

9                    **REDIRECT EXAMINATION**

10 BY MR. CURTNER:

11 Q    Now, Dr. Gan, you did have a chance to review Mr. Wells'

12 medical records before you came here today?

13 A    I did.

14 Q    And do you recall in those records that he indicated that

15 Metformin caused severe diarrhea, and that was in 2012,

16 sometime in 2012.  Wasn't that right?

17 A    Yeah.

18 Q    Okay, that's all.  Thank you.

19         THE COURT:  Anything else?

20                    **RECROSS EXAMINATION**

21 BY MS. DUIGNAN:

22 Q    Dr. Gan, one followup question.  When in 2012 was that?

23 Because I looked through the records and I couldn't find it.

24 A    Well, you -- you know, I know him for many years.  I just

25 remember he -- he has been complaining about that problem --

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 750  Filed 09/23/14  Page 24 of 224
(720) 384-8078  attrans@sbcglobal.net

**DITALLO - DIRECT**

1  Q    But --

2  A    -- over the years.

3  Q    But you didn't note it in his medical record?

4  A    If not, not.  Yeah.

5  Q    Thank you.

6        MR. CURTNER:  Nothing further.

7        THE COURT:  Okay, thank you.  Thank you, Doctor.  The

8  government's next -- or the defendant's next witness.

9        (Witness excused)

10       THE COURT:  Make your way forward.  That door pulls

11 out, that little swingy door pulls out.  And then just remain

12 standing for a second, and my clerk will swear you in.

13       THE CLERK:  Please raise your right hand.

14    **MICHAEL ANTHONY DITALLO, DEFENDANT'S WITNESS, SWORN**

15       THE CLERK:  Okay, thank you.  Please have a seat.  And,

16 sir, if you can please state and spell your full name.

17       THE WITNESS:  Michael Anthony DiTallo.  M-i-c-h-a-e-l,

18 D-i-T-a-l-l-o.

19       THE CLERK:  Thank you.

20                    **DIRECT EXAMINATION**

21 BY MR. CURTNER:

22 Q   Good morning, Mr. DiTallo.

23       THE COURT:  Okay.  Someone's blowing into the

24 microphone.

25       THE WITNESS:  I moved it.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 750  Filed 09/23/14  Page 25 of 224

1      THE COURT:  Oh, you didn't it, okay.  All right.

2 BY MR. CURTNER:

3 Q    Yeah, you don't have to get too close.

4 A    The security gave me a workout this morning.

5 Q    We've heard that before, so -- Mr. DiTallo, where are you

6 employed?

7 A    I'm employed at two places, Dynamic Safety, LLC, which is

8 a consulting firm, and I also am employed by Northwestern

9 University in Chicago, Illinois.

10 Q    And tell me a little bit about your -- the business you're

11 employed in, Dynamic -- what is that?

12 A    Safety.

13 Q    Pardon me?  Yeah.  Could you tell us about your business

14 that you're employed with?

15 A    Sure.  We're a consulting firm that does crash

16 investigation and crash reconstruction and other forms of

17 engineering throughout the world.

18 Q    And how long have you worked there?

19 A    I've worked there since 2001.

20 Q    What's your position with that comp -- with Dynamic

21 Safety?

22 A    I'm a managing member, one of the partners.

23 Q    And what's your other position that you hold?

24 A    At Northwestern University?

25 Q    Yeah, uh-huh (affirmative).

**DITALLO - DIRECT**

1  A   I'm -- I'm currently a faculty member adjunct, and I hold

2  the position of lecturer.

3  Q   Okay.  So what type of education have you had for your

4  occupation and for being able to teach at the Un --

5  Northwestern?

6  A   Sure.  I have about 120 semester units toward a four-year

7  degree, a bachelor's degree in criminal justice, which I did

8  not complete.  I -- I started into law enforcement early in my

9  career and was a police officer.  So my education goes to being

10  a police officer and working in the field of traffic

11  investigation and reconstruction, ultimately doing consulting

12  in that field.  I've got well over 1,000 hours of specialized

13  classes in that area, with a broad spectrum of classes.  And I

14  currently teach the upper division classes, that -- most of

15  them which I've developed.  I consult for Northwestern

16  University.  I write in text -- I'm a technical editor.  And I

17  work on cases, I have for years, about 26 years now.

18  Q   Okay.  And do you have certifications in this

19  occupation --

20  A   I do.

21  Q   -- in your specialty?  And could you describe those for

22  us?

23  A   Sure.  The State of Illinois is the only state in the

24  United States that allows any sworn police officer to sit for a

25  battery of exams in the field of crash investigation and

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 750   Filed 09/23/14   Page 27 of 224
(720) 384-8078   attrans@sbcglobal.net

1   reconstruction.  And at the -- you have to be a -- a full-time

2   or a part-time police officer to qualify with prior education

3   and training to sit for that exam.  It's two days long.  I've

4   sat for that exam, passed all the tests, and have that

5   certification, which is on my resume.

6       In addition to that, there's a national accreditation, and

7   that is a similar process where you submit an application based

8   on the totality of your experience.  You can sit for a day's

9   worth of battery of exams.  If you pass it all, then you have

10  the national accreditation.  And I've done that as well.

11  Q   Okay.  And do you belong in any professional

12  organizations?

13  A   I started the one that's in California, which is CAARS.

14  And -- and then -- because I was a police officer and I'm from

15  California, at the time.

16  Q   What's CARS?  What's -- what does CAARS stand for?

17  A   California Accident Reconstructionists.

18  Q   Okay.

19  A   And then I -- I belong to several others that are through

20  the United States, including the Society of Automotive

21  Engineers.

22  Q   So you mentioned your law enforcement background.  Could

23  you tell us about your whole work experience and your

24  background in that sense?

25  A   Sure.  I started, like I said, as a police officer.  I

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 750  Filed 09/23/14  Page 28 of 224
(720) 384-8078  attrans@sbcglobal.net

**DITALLO - DIRECT**

1 worked in California for about 10 years full-time.  Most of my

2 time was in traffic units, where I did crash reconstruction,

3 did normal enforcement, education.  A lot of my career I rode

4 on police motorcycle.  And then at the time, going through my

5 education as a police officer to become a reconstructionist,

6 which involved crash investigation and reconstruction type

7 classes.  And then ultimately I wanted to take Northwestern's

8 Classes.  So even in California, the Northwestern curriculum

9 has a huge reputation.  And I was lucky enough to be able to

10 write a grant, and my -- my chief at the time allowed myself

11 and the -- my co-workers to attend the classes.  And while I

12 was sitting in the class, I -- I was offered a full-time job to

13 join the faculty.  And I shortly left police work, and my wife

14 was kind enough, and we moved to Illinois, and I've been there

15 since 1996.

16 Q   And maybe you could explain some of your teaching

17 experience as well.

18 A   My teaching experience is pretty vast.  I started out, of

19 course, teaching crash investigation classes, but most of my

20 career I've taught the reconstruction classes.  So it starts

21 from our first reconstruction class, which is vehicle dynamics,

22 and it goes all the way up to three-dimensional computer

23 simulation.

24     We have -- I haven't encountered them in a while -- 14 or

25 15 specialized courses.  They're all adult education through

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 750  Filed 09/23/14  Page 29 of 224
(720) 384-8078  attrans@sbcglobal.net

**DITALLO - DIRECT**

1  Northwestern University.  As I said, I'm an employee there.
2  And we teach anywhere from three days to two weeks, depending
3  on what class it is, and we're teaching year round and
4  worldwide.  So we would teach, for instance, on campus, where
5  classes are currently going on.  We may have a mixture of 40
6  students; a third of them will be police officers from around
7  the world, mostly in the U.S., certainly some from foreign
8  lands.  We will have some medical experts, doctors,
9  chiropractors, spinal mechanical engineers.  We'll have some
10  other types of engineers, civil and mechanical, aeronautical.
11  And then occasionally we get a -- a few lawyers and insurance
12  people that sit through the classes.  So these are all students
13  in the same class learning the curriculum.
14      And we also teach it at specialty locations.  As an
15  example, every other year I teach at Ford, General Motors.
16  I've taught at just a -- a plain engineering firm, like my own,
17  that has several employees that need to get trained and brought
18  up to speed in the -- in the subject matter.  And we teach the
19  same classes in other spots around the world, like Botswana,
20  Singapore, places like that, Canada.
21  Q    Have you ever taught photogrammetry and computer
22  simulation classes?
23  A    Yes.  We teach photogrammetry, the mathematical solution
24  and the basis within our crash investigation classes.  So it's
25  taught pretty early on.  And that's the basics, the

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 750   Filed 09/23/14   Page 30 of 224

**DITALLO - DIRECT**

1   mathematical solution and the premise of -- of photogrammetry.

2   And then we -- we don't touch it again until we get all the way

3   to computer simulation.  And yes, I do teach computer

4   simulation using the programs -- that's called Human Vehicle

5   and Environment, which is a three-dimensional computer program

6   with a suite of physics packages.  And photogrammetry can be

7   used within those suites.

8   Q    Okay.  And have you done analysis in different cases where

9   you had to analyze videos and photographs using photogrammetry?

10  A    Absolutely.  And that's getting more and more commonplace

11  today, because there's so many security videocameras that are

12  out.  Think about police cars that have videocameras inside of

13  them, or emergency vehicles.  A lot of my clients, whether it's

14  an insurance company or a trucking fleet, they have cameras

15  inside of their vehicles.  One might be looking at the driver,

16  one might be looking out at the road.  So there's lots of

17  sources.

18      We have, as another example, tollways, where everyone gets

19  to pay a toll to go through a -- a certain area on the highway

20  in Illinois.  And all of those have videocameras that are

21  recording things.  So there's all kinds of sources of what we

22  call a data recorder, or video, as a -- as one of the EDRs

23  (ph).  And we've performed several analysis using that.

24  Q    Okay.  And have you been published?  Have you written

25  articles that have been published in your -- and reviewed by

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 750   Filed 09/23/14   Page 31 of 224
(720) 384-8078   attrans@sbcglobal.net

**DITALLO - DIRECT**

1  peers on your -- in your specialty?

2  A    Well, I've written curriculum for classes, and then at --

3  at the university, we're more pressured to write textbooks.  So

4  I have two textbooks that I've written in that are used at

5  Northwestern University.  One is on crash investigation and the

6  other is in the field of crash reconstruction.

7  Q    Now, have you been --

8  A    And I've been a technical editor on both -- both those

9  books as well.

10  Q    Okay.  Now, have you been qualified before in court as an

11  expert in crash investigation and reconstruction?

12  A    Yes, sir.

13  Q    How many times?

14  A    Fifty or so times.

15  Q    Okay.

16      MR. CURTNER:  Your Honor, I would offer Mr. DiTallo as

17  a expert in crash investigation and reconstruction.

18      THE COURT:  Any voir dire?

19      MR. SCHRODER:  No objection, Your Honor.

20      THE COURT:  He'll be received in that capacity.

21  BY MR. CURTNER:

22  Q    So, Mr. DiTallo, were you hired by my office to do

23  something in this particular case?

24  A    I was.

25  Q    And so what was the task?  What would -- what were you

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 750  Filed 09/23/14  Page 32 of 224
(720) 384-8078  attrans@sbcglobal.net

1  hired to do in this case?

2  A   Originally I was hired to review the work that was done by

3  a consultant hired by the prosecution.

4  Q   Okay.  And could you explain a little bit about what you

5  did in that realm and what you did as far as your work and --

6  A   Sure.  I initially received materials.  I reviewed those

7  materials and made suggestions and asked for additional

8  materials.  Along that process, it was determined that I was

9  not going to receive all the additional materials.  And I had

10 just made a recommendation while I was working on the case to

11 do my own analysis.  And ultimately that was approved and then

12 I began doing my own analysis versus just reviewing another

13 consultant's analysis.

14 Q   So maybe you could explain that a little bit.  What

15 materials, when you first got involved in this case, did you

16 receive and that you reviewed?

17 A   Well, I received the photographs, I received survey

18 measurement data.  I received some reports.  I received videos.

19 Q   Do you --

20 A   I think that --

21 Q   Do you remember, did you receive other expert reports?

22 Did you receive other information from other experts in the

23 field that had looked at the same materials?

24 A   Yes.

25 Q   And do you recall who those were?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 750   Filed 09/23/14   Page 33 of 224
(720) 384-8078   attrans@sbcglobal.net

1  A    Mr. Vorder Bruegge, FBI Agent Vorder Bruegge; Mr. -- FBI

2  Agent Iber; a -- I think it's a -- an email, possibly, or a

3  report from FBI Agent Richards, which was most recent, meaning

4  I didn't have that initially.  I had the others initially.  And

5  then Mr. Toglia.

6  Q    Okay.  So you --

7  A    Those were the reports that I remember.

8  Q    Now, the main thing you were asked to look at, evaluate,

9  and analyze was a surveillance videocamera from April 12th,

10  2012 and the images from that videocamera.  Is that correct?

11  A    Correct.

12  Q    And could you describe basically what you received in

13  that, as far as the video that you looked at?

14  A    Sure.  I received a copy of a video from a security camera

15  from the incident area.  And actually there were two of them,

16  one labeled T1 and T2, that were video -- it -- it was a video

17  of a -- a security camera.  In addition to that, I received --

18  and that was on 4/12/2012.  In addition to that, I received two

19  videos -- ultimately received two videos, one on 4/19 and one

20  on 4/20, that were done by Mr. Toglia.

21  Q    Okay.  And did you review Mr. Toglia's work and his report

22  as far as his analysis of -- trying to identify the particular

23  vehicle that was in the four -- April 12/2012 videos

24  (indiscernible)?

25  A    I did -- I did review his report.  And I started to review

1  his work, and that's where I had asked for additional

2  materials, not all of which I ever did receive.

3  Q   Okay.  So explain now what kind of analysis -- when you

4  had all the materials, and what kind of analysis did you

5  proceed with then?

6  A   I proceeded with trying to analyze using an ultimately

7  reverse-projection photogrammetry to compare -- do a comparison

8  between vehicles and that of the vehicles seen in two

9  directions, northbound and southbound, on the 4/12/2012

10  videotape from the security camera.  In addition to that, I

11  tried to sharpen and look at the images or still images from

12  that same video to see if I could identify that vehicle that's

13  seen in that video.

14  Q   And then -- so did you do vehicle research when you were

15  doing your analysis?

16  A   I did.

17  Q   What did that include?

18  A   Well, that includes looking at vehicle specification data.

19  That ultimately included getting some three-dimensional vehicle

20  models to be used from a source that does them accurately, and

21  those were tested and looked at, so that I ultimately used them

22  in my analysis.

23  Q   Okay.  And maybe you could explain to us a little bit

24  about what reverse-projection photogrammetry is.  Is that --

25  that's what you used?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 750  Filed 09/23/14  Page 35 of 224

**DITALLO - DIRECT**

1    A    Yes.

2    Q    And explain how -- what that is and how you did it.

3    A    Well, the -- the simplest way to describe it is, it's a --

4    when you're going to use a computer system and use software

5    to -- to build in camera parameters that match a video that you

6    have, so that you can ultimately have scaling or measurements

7    or a ruler in -- in the process -- the -- when you're

8    concluded, that you can use and -- and draw from.

9    Q    Okay.  So --

10   A    Draw in the sense of gleaning information.

11   Q    Okay.  So you reviewed this video from April 12th, 2012,

12   and you tried to see if there was a reasonable comparison with

13   the other vehicles that you did your research on?

14   A    Correct.

15   Q    Okay.  And in that course of your analysis and -- did you

16   create some video files to demonstrate the comparison that you

17   went through?

18   A    Yes, I did.

19   Q    And I wonder if we could bring up Defense Exhibit 167 and

20   just show it to Mr. DiTallo right now.

21          THE COURT:  It's on the screen to your left.

22          THE WITNESS:  Oh, thank you.

23   BY MR. CURTNER:

24   Q    So do you recognize this video file?

25   A    I do.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 750   Filed 09/23/14   Page 36 of 224
(720) 384-8078   attrans@sbcglobal.net

1  Q    And is that something you prepared in your --

2  A    It is.

3  Q    -- analysis?

4  A    It is.

5        MR. CURTNER:  I'd ask that we be able -- this be

6  admitted into evidence and that we could -- or, I'm sorry, this

7  is going to be a demonstrative exhibit for --

8        THE COURT:  Okay.

9        MR. CURTNER:  -- that -- Mr. DiTallo.  So if we could

10 display that on the screen.

11       THE COURT:  Any opposition?

12       MR. SCHRODER:  The only thing I'm concerned about, Your

13 Honor, is that I'm not sure it's the same one I have.

14       THE COURT:  Well, I don't know.

15       MR. SCHRODER:  So -- the one I have doesn't start this

16 way.

17       MR. CURTNER:  Well, there's, I think, five different

18 video files.

19       MR. SCHRODER:  I only got one.

20       MR. CURTNER:  You only got one?

21       MR. SCHRODER:  I only got one.

22       MR. CURTNER:  Well, we can play it now and you can tell

23 me if you recognize it, so --

24       THE COURT:  Why don't you play it before you put it up,

25 so he can take a look at it on his screen.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 750  Filed 09/23/14  Page 37 of 224
(720) 384-8078  attrans@sbcglobal.net

1       (Pause)

2           MR. SCHRODER:  It's not -- Your Honor, it's not the

3   same one I saw.  There's one additional vehicle in this one.

4           MR. CURTNER:  Any objection to this being a --

5           MR. SCHRODER:  I don't have an objection to everything

6   but the final vehicle, because I've never seen that before.

7           THE COURT:  (Indiscernible) --

8           MR. CURTNER:  Your Honor, I think he can cross-examine

9   him on the final vehicle.  We can have Mr. DiTallo testify

10  about -- as a demonstrative exhibit of what his testimony

11  included.  It's just the same as Mr. DiTallo's exhibit, pretty

12  much.

13          MR. SCHRODER:  I don't object to the rest of it, Your

14  Honor.  I've seen the rest of it.  But I think it's not

15  appropriate if we're not provided with the material.

16          THE COURT:  Well, so four of the five we know we can go

17  with, then I'll have to look at the fifth one and see what we

18  do with it.

19          MR. SCHRODER:  It's the final vehicle they showed

20  there, Your Honor.  That's the one I haven't seen.

21          THE COURT:  Well, why --

22          MR. CURTNER:  We'll stop before the final vehicle.

23      (Side conversation)

24          MR. CURTNER:  Your Honor, maybe we should take a short

25  break here so they can review this, and then Mr. DiTallo can

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 750  Filed 09/23/14  Page 38 of 224
(720) 384-8078  attrans@sbcglobal.net

1   continue with his --

2           THE COURT:  Okay.  Let's take a recess.

3           MR. SCHRODER:  Your Honor -- okay.  I want to be heard

4   on this --

5           THE COURT:  We're going to -- we're stopping at 11:30

6   today.  We're going to take a long lunch from 11:30 to 1:30,

7   just so you know for planning purposes.  Okay, so let's -- this

8   should be a very brief recess, I think.

9           MR. CURTNER:  Yes.

10          THE COURT:  I've said that before.

11      (Jury not present)

12          THE COURT:  Okay.  What -- please be seated.  What do

13  you want to do?

14          MR. SCHRODER:  My only concern is, Your Honor, we've

15  done a little research on some of these, and I can't do that.

16          THE COURT:  On the last vehicle.

17          MR. SCHRODER:  On the last vehicle.

18          THE COURT:  Which vehicle is the last vehicle?

19          MR. SCHRODER:  I oppose the last vehicle.

20          THE COURT:  What is it?  What kind of vehicle is it?

21          MR. SCHRODER:  Subaru Forester.

22          MR. CURTNER:  Your Honor, I mean --

23          THE COURT:  I mean, you guys would be crying like crazy

24  if the same thing happened to you.  Right?

25          MR. CURTNER:  Well, no.  We've been getting stuff at

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 750   Filed 09/23/14   Page 39 of 224
(720) 384-8078  attrans@sbcglobal.net

```
 1   the last minute -- I mean, every morning we get stuff at the
 2   last minute, so, you know -- and I don't want to delay the
 3   trial.  But, you know, I thought we had provided everything to
 4   the government and -- if there's one vehicle in here, I think
 5   they can look at and they can -- you know, it's just --
 6           THE COURT:  Talk to their expert about it and --
 7           MR. CURTNER:  Yeah.
 8           MR. OFFENBECHER:  Yeah.  Perhaps the government could
 9   offer what research it's done on all of these vehicles that --
10   besides the size of them.  That -- there -- there's really --
11   they're all --
12           MR. SCHRODER:  I don't think I have to --
13           THE COURT:  (Indiscernible) -- no, I -- he's ask -- I'm
14   not asking you.
15           MR. SCHRODER:  I'm sorry.
16           THE COURT:  So what do you want to do?  Show --
17           MR. SCHRODER:  Besides, Your Honor, I mean, you know,
18   these were due in November.
19           THE COURT:  I know that.
20           MR. SCHRODER:  So --
21           THE COURT:  So what's your proposal?
22           MR. CURTNER:  My proposal is that we --
23           THE COURT:  Well, we'll -- just can't use the last
24   vehicle for now.  Get as far as you can on this one.  If you
25   think it's important to come back tomorrow with this after the
```

1  government's had a chance to look at it, that's fine.

2        MR. CURTNER:  Okay.

3        THE COURT:  Can you do it without the last vehicle?

4     (Side conversation)

5        THE COURT:  What does that mean?

6        MR. CURTNER:  He's going to look here for about five

7  minutes for this, and make sure we don't have any other

8  problems.

9        THE COURT:  So you don't need me for this?  Is this

10 going to --

11       MR. CURTNER:  No.

12       THE COURT:  Is it going to take five minutes, is what

13 you're telling me?

14       MR. CURTNER:  What do you think, about -- five minutes,

15 I think.

16       THE COURT:  Okay, well, call me when you're ready.

17 We'll stand in recess.

18       THE CLERK:  All rise.  The matter stands in a five-

19 minute recess.

20     (Court recessed at 9:25 a.m., until 9:37 a.m.)

21     (Jury not present)

22       THE CLERK:  All rise.  His Honor the Court, the United

23 States District Court is again in session.

24       THE COURT:  Okay.  We get everything resolved?

25       THE CLERK:  Please be seated.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 750  Filed 09/23/14  Page 41 of 224

**DITALLO - DIRECT**

1    MR. CURTNER:  I think we have, Your Honor.

2    THE COURT:  Okay.  Are you ready for the jury?

3    MR. CURTNER:  Yeah.

4    THE COURT:  Okay, ready for the jury.

5       (Jury present)

6    THE COURT:  Okay, please be seated.  Mr. Curtner, where

7  were we?

8    MR. CURTNER:  Thank you, Your Honor.

9  BY MR. CURTNER:

10  Q    So, Mr. DiTallo, in this particular case, you know that

11  the -- one of the possible vehicles that might be identified --

12  and this was a Honda CR-V of a certain generation?  Is that

13  correct?

14  A    Correct.

15  Q    And in your research did you look at other vehicles that

16  might basically fit the parameters of those dimensions?

17  A    I did, ultimately, yes.

18  Q    And so in your analysis, then, did you prepare some media

19  files that demonstrate what your analysis included?

20  A    Yes, I did.

21  Q    Okay.  I wonder if we could play that and you can walk us

22  through the video files.  And the first one is Defense Exhibit

23  167.  If we could have the lights down.  This is a -- what you

24  prepared?

25  A    Yes.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 750  Filed 09/23/14  Page 42 of 224

**DITALLO - DIRECT**

1  Q    And what do we see here?

2  A    That is a image, a single-frame image from the security

3  videotape on 4/12/2012.

4  Q    And this is the same --

5  A    For a -- the -- the northbound veh -- northbound travel.

6  Q    And this is the same video footage that other experts have

7  reviewed.  Is that correct?

8  A    Yes.

9  Q    Okay.  And, then, so let's go forward, then.  And what's

10  going on here?

11  A    So once I -- I -- I -- I should probably stop and discuss

12  how I get to this point just a little bit --

13  Q    Yes, please.

14  A    -- if that's all right.  So what I --

15  Q    Because I want you to --

16  A    -- did was I took the measurements that Consultant Toglia

17  measured out at the crash site -- or not -- not at the crash

18  site, but at the site, excuse me -- and I used those

19  measurements to build a three-dimensional environment, and I

20  used a -- a 3-D model program called Rhinoceros.  So when I --

21  what I was able to do with that modeling program and those

22  measurements, in addition to using computer satellite data, was

23  to build a three-dimensional environment.  And I coupled that

24  with, ultimately, in Rhinoceros, solving for all the parameters

25  that I needed to solve for, like focal length and, ultimately,

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 750  Filed 09/23/14  Page 43 of 224
(720) 384-8078  attrans@sbcglobal.net

**DITALLO - DIRECT**

1  the correction fact -- or certainty error rates, which is

2  basically the pixel distance, based on where the camera is in

3  relationship to the -- the veh -- the vehicle we're trying to

4  identify.

5  So once I was able to establish that, I went and I started

6  initially with a -- the CR-V vehicle.  And ultimately I'm going

7  to transpose the CR-V vehicle in on this frame on top of the

8  vehicle we're trying to identify.  So you're going to

9  ultimately see through each vehicle I looked at, and I picked

10 two frames going northbound in the security video and then two

11 frames going southbound, because they were the -- the two best

12 frames that show the vehicle the most.  So I -- those were the

13 ones that -- that I focused on.

14 So in each one, as you look at the vehicle, you're going

15 to see the -- the vehicle transposed.  You're going to see my

16 sight come in.  And you're going to notice how you go from the

17 video to the three-dimensional environment like that, how those

18 landmarks stay exactly where they were in the video.  So if you

19 focus in on the fire hydrant or the fence or the building,

20 you'll see that the angle of view in the Rhinoceros program has

21 matched that of the security video.

22 So now that I have the vid -- the vehicle transposed,

23 the veh -- the vehicle that was in the security tape fades out

24 and you see the model that I've -- that I've studied.  So

25 ultimately for the vehicles I believe are a reasonable match to

1  whatever vehicle's in the security video, I kept that in and

2  ultimately created this video that you'll see for each one of

3  the models that -- that I've kept in the good pile, as you

4  might say. Okay. Those vehicles that were -- that I looked at

5  that were dimensionally way off, I -- I didn't keep and I

6  didn't proceed with this kind of a video or comparison.

7      And then all I did here was enlarge in the same view and

8  do the same exact thing so that you could try to see it a

9  little bit better. And of course I studied this and looked at

10  how they overlayed and how they compared to make my decision

11  whether I was going to -- to keep the vehicle or not, starting

12  with the -- the CR-V.

13  Q   Okay. So what model is this that you're using in this?

14  A   I believe that was a Toyota RAV4 that we started with.

15  Q   Okay. And so you had -- you created your own three-

16  dimensional world, so to speak, just using the information that

17  you got from Mr. Toglia's measurements?

18  A   Correct. He had two surveys. That survey data was used

19  along with looking at some aerial photographs that were

20  available on the Internet to -- to build a three-dimensional

21  environment.

22  Q   Okay. And --

23  A   And that was coupled with the -- the -- the reverse-

24  projection photogrammetry. So in other words, now we have a --

25  a ruler inside of this environment --

Case 3:13-cr-00008-SLG  Document 750  Filed 09/23/14  Page 45 of 224

**DITALLO - DIRECT**

1  Q    And so in --

2  A    -- or a scale.

3  Q    In your opinion, was -- that first vehicle, the RAV4, was

4  that a reasonable comparison with the blur, the video of the --

5  from 4/12?

6  A    Yeah.  The video we're trying to identify from 4/12, yes.

7  Q    Okay.  And then -- so this is the second comparison you

8  did?

9  A    It's a -- it is one of the ones I compared, yes.  I'm not

10  sure which order I did them in, but -- other than I started

11  with the CR-V.

12  Q    Okay.  So here, what are you doing in this?

13  A    I'm doing exactly the same thing.

14  Q    Except that you're using a model of the --

15  A    Ford Escape.

16  Q    -- Ford Escape.

17  A    Correct.

18  Q    And, in your opinion, does that match the image of -- from

19  4/12?

20  A    Yeah, at a -- reasonably.

21  Q    Reasonable comparison.

22  A    Yes.

23  Q    Okay.  Can we go through and --

24  A    The other thing I might add is, you know, there's -- I

25  have no better certainty of what vehicle is going northbound as

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 750   Filed 09/23/14   Page 46 of 224
(720) 384-8078  attrans@sbcglobal.net

**DITALLO - DIRECT**

1  to what vehicle is -- is going southbound.  I mean, I have no

2  idea.  So I did this in both directions.  That's why you have

3  four -- two frames each way.

4  Q   Okay.  So this is the first frame you did for a number of

5  vehicle comparisons?

6  A   Correct.

7  Q   Okay.  If we can go through this.  And that vehicle is

8  superimposed then on the 4/12 image.  Is that correct?

9  A   Correct.

10 Q   And then you did a Blazer, an S10 Blazer from those years?

11 A   Yes.

12 Q   And, again, that can't be eliminated because it's a

13 reasonable comparison from the video you had?

14 A   Correct.

15 Q   And you also did a model -- do you recall what model this

16 is?

17 A   I missed the -- the title.  It might -- it might be the

18 Rodeo.  I think that's the Rodeo.

19 Q   Okay.

20 A   Have to go back.  I apologize.  Oh, it's the CR-V.

21 Q   CR-V, yes.  And would you agree the CR -- the Honda CR-V

22 from those years would have been a -- it can be eliminated as a

23 reasonable comparison.  Is that correct?

24 A   That's correct.

25 Q   And you did a -- now if we could stop there a minute,

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 750  Filed 09/23/14  Page 47 of 224
(720) 384-8078  attrans@sbcglobal.net

1   Bruce.  Which --

2   A    That was a Nissan Pathfinder.

3   Q    Yeah, and there were certain years.  Why were there

4   certain years in the models that you're looking at?

5   A    Every make and model of vehicle has a certain year range,

6   which it's pretty much the same vehicle, the same -- the same

7   body dimensions.

8   Q    Okay.  So --

9   A    And -- and so there's a document called Sisters and Clones

10  that basically provides people like myself information about

11  year ranges of manufacturing.  And so --

12  Q    So --

13  A    -- the '85 to '95 was generally the same body style

14  vehicle --

15  Q    Okay.  And --

16  A    -- for -- for that Nissan Pathfinder.

17  Q    And so those years of the Pathfinder would be the same --

18  within the same parameters of the measurements that you were

19  working with?

20  A    Correct.

21  Q    Okay.  And then -- so we'll see this comparison.  And in

22  your opinion, that can't be eliminated as a reasonable

23  comparison.  Is that correct?

24  A    Correct.

25  Q    Then you looked at the Rodeo for those years?

1  A    Yes.

2  Q    And the Rodeo for those years, Isuzu Rodeo.  Same

3  comparison there?

4  A    Correct.

5  Q    And then the last one will be the Santa Fe.  And the same

6  there.  Is that correct?

7  A    That's correct.

8  Q    We can stop there, Bruce, as soon as this is over.  So in

9  your opinion, all of those vehicles that you -- we just went

10 through cannot be eliminated with the -- as a reasonable

11 comparison to the video from 4/12, the image on that?

12 A    That's correct.  And there could be other vehicles.  I --

13 I stopped at the -- the ones that I did and -- and that's as

14 far as I went.  But that -- I mean, that -- that -- I could

15 have searched even longer to try to find other possible

16 comparisons.

17 Q    Now, you didn't do a comparison with the Durango, is that

18 correct?

19 A    Well, I did look at a Durango, but I ruled it out because

20 of -- it's dimensionally so much bigger.

21 Q    Okay.  And did you --

22 A    But -- so I didn't -- I did -- ultimately produced this

23 product, because it didn't make sense.

24 Q    And how the --

25 A    It wasn't one to keep as a reasonable comparison to me.

**DITALLO - DIRECT**

1  Q   Okay.  And then -- and same with a sedan or anything like

2  that?

3  A   No.  I tried to stay with smaller SUVs, cross fit -- you

4  know, crossover vehicles.

5  Q   Okay.  So let's see if we can walk through Defense Exhibit

6  168 and you can talk about that as well.  And we can go -- I

7  don't think we need to stop, necessarily, but you can

8  narrate --

9  A   Sure.

10  Q   -- what we're doing here.

11  A   Yes.  So this is a -- same -- same vehicle, or this is the

12  RAV4, same year range, same comparison, except the difference

13  here you see is that this is a different frame.

14  Q   And so in order to --

15  A   So if you look up here now, the vehicle going northbound

16  is -- advanced one -- at the additional frame.  It's a little

17  further north.

18  Q   And so you took -- you did this whole series of

19  comparisons from a different frame?

20  A   From --

21  Q   Is that correct?

22  A   -- two frames northbound, two frames southbound.

23  Q   And for the --

24  A   Correct.

25  Q   -- whatever vehicle was northbound in the -- in these

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 750   Filed 09/23/14   Page 50 of 224
(720) 384-8078  attrans@sbcglobal.net

1  frames, did you come up with the same comparison with the

2  vehicles you tested?

3  A    I did.

4  Q    And in each case, the model that you selected for these

5  particular vehicles matched -- or was a reasonable comparison

6  with the 4/12 video.  Is that correct?

7  A    Yeah, I wouldn't say they matched.  I'd say they were a

8  reasonable --

9  Q    Reasonable comparison.

10 A    -- comparison.  Yes.

11 Q    It's impossible to match them.  Is that correct?

12 A    It's im -- to me it's impossible to match them, yes.

13 There's another way to do a comparison similar to this that I

14 might mention, and I think that was done by Mr. Vorder Bruegge.

15 And he took a -- a known dimension of the CR-V for the overall

16 length.  And he -- you know, he illustrated that with a -- a

17 horizontal line showing that dimension of the overall length.

18 Now, when you're looking at these, you're looking at the sides

19 of the vehicle.  And the measurement of the overall length that

20 you get from data is at the longest part of the car.  And every

21 vehicle manufacturer data source, that's the measurement you

22 get, at the very longest part.

23      So his application was absolutely, theorywise, correct,

24 to -- to look at a dimension like that.  But the problem is, is

25 that you're looking at the side of the car, not at the very

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 750   Filed 09/23/14   Page 51 of 224
(720) 384-8078   attrans@sbcglobal.net

1   middle of the car.  And most cars together are not rectangles.

2   They have shape to them.  So the overall length on a corner,

3   end to end, can be different than the overall length in the

4   middle.  And the middle is the one that's reported when you

5   look at vehicle specification data.

6       So that's why I chose to use a three-dimensional model.

7   It's one of the reasons why I chose to try to match up what I

8   was looking at in the 4/12 video to try to find models that

9   were similar in comparison to what I was looking at.  Because

10  I -- I couldn't feel I could identify the -- the vehicle in

11  that 4/12 video.  So I chose to take the actual model and place

12  it on top of that 4/12 video and look to see how it fit.

13  Q   Now, would have --

14  A   And then, ultimately, I went back and looked at some

15  overall height, overall length dimensions.

16  Q   Now, would have -- would it been any advantage to doing an

17  outline from the model and superimposing that over the image?

18  A   Well, I think that would have been an excellent thing to

19  do if you really felt that you could identify the actual shape

20  of the vehicle.  But, to me, looking at the 4/12 video and

21  trying to study it, I -- I don't believe you can -- you can do

22  that, because ultimately there isn't enough clarity, there

23  isn't enough resolution to pick out the shape of the car to

24  draw that line.  So I did not do that.

25  Q   Okay.  Let's go through Defense Exhibit 168 -- or 169.

**DITALLO - DIRECT**

1  And I think we can just walk through this again and you can

2  narrate it, so --

3  A    Okay.  So, again, the -- the vehicle that we're trying to

4  identify is --

5         THE CLERK:  They're not admitted.

6         THE COURT:  Okay, this --

7         THE WITNESS:  -- up here --

8         THE COURT:  This is just -- it's just for

9  identification, hasn't been admitted.

10        MR. CURTNER:  Right, this is just for demonstrative

11  purposes.

12        THE WITNESS:  And so the vehicle's -- whatever vehicle

13  this is is now going southbound.

14  BY MR. CURTNER:

15  Q    Now, hold on a minute.  Can you -- all right, let's go

16  through this process and I'll ask you a few questions.

17  A    Okay.

18  Q    So, again, you're taking the same models, same years, same

19  com -- models that you had created for the other --

20  A    All right.  So certainly, at least in court today,

21  we're -- this is going by kind of fast.  But when you're

22  sitting at your computer, you can just stop it and study it and

23  look at the -- the two vehicles on top of each other.

24  Q    Let's stop it -- let's keep going and we'll stop at one of

25  these.  Do you recall what vehicle this is?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 750   Filed 09/23/14   Page 53 of 224
(720) 384-8078  attrans@sbcglobal.net

**DITALLO - DIRECT**

1  A    I don't.  I'm afraid I don't.

2  Q    Okay, let's do the Blazer.  This is the Blazer.

3  A    Okay.

4  Q    And then when we -- Bruce, if you could stop when we do

5  the overlay.  No, go ahead.  Can you do the enlargement, then

6  the over -- (indiscernible).  Okay, when this overlay -- you

7  can stop it.

8  A    See -- right there, it's on top of each other.

9  Q    Okay.

10 A    So you can see the mixture of my environment coming into

11 the -- to the video.

12 Q    And in your professional opinion, that's a reasonable

13 comparison of those two vehicles?

14 A    Correct.

15 Q    Okay.  Go ahead.  (Pause) Okay, then let's go to 170.  And

16 before we start, from your analysis, can you determine then the

17 make or model of the vehicle that was going northbound?

18 A    I cannot.

19 Q    Could you do that for the vehicle that was going

20 southbound?

21 A    I cannot.

22 Q    Could you possibly say that there was the same vehicle in

23 each image?

24 A    My certainty is the same, so, no, I cannot.

25 Q    Okay.  So let's go through 170.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1    THE CLERK:  Okay, Mr. Curtner, that's DE-170.  Correct?

2    MR. CURTNER:  Yes.  Yes.

3    THE CLERK:  Thank you.

4  BY MR. CURTNER:

5  Q    So you're doing the same comparison with the RAV4, but

6  this is another frame?

7  A    Correct.  So now it's moved a little further southbound.

8  I specifically chose not to put the -- park the vehicles in my

9  environment, so that you could see the vehicle on the road.

10  Q    These are the same eight vehicles that you've compared in

11  the last three video files, right?

12  A    Yes, they are.  And, again, southbound had -- these two

13  frames had the majority of whatever vehicle that is in the

14  video depicted, so that's why it shows those two to present.

15  Q    Okay, and if we could go to Defense Exhibit 34.  And

16  maybe -- could you -- let's just start that, Mr. Johnson.  What

17  is -- stop there.  So what is -- what are you doing here?  This

18  is your -- something you prepared for your testimony?

19  A    Correct.

20  Q    And what do we see here?

21  A    This is taking the CR-V and placing all the vehicles that

22  I analyzed with a -- with a direct overlay, comparing the

23  alignment at the front tire, so you could look at how they

24  overlayed on another.

25  Q    Okay.  And so this is a side view comparison of the Honda

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 750  Filed 09/23/14  Page 55 of 224
(720) 384-8078  attrans@sbcglobal.net

1  CR-V and the Toyota RAV4?

2  A    Correct.

3  Q    And what's your opinion about that?

4  A    That they -- they overlap reasonably well.

5  Q    Okay.  If we could go to the next one.  Think there may be

6  enough time we can run through this and you can explain --

7  A    Sure.  That's the Ford Escape.

8  Q    Okay.

9  A    So the same process is used on all of these, including

10  this one.  So the -- the blue image that you see is the -- the

11  CR-V, and the Ford Escape is on -- is on top of it, in an

12  opaque fashion, aligned at the front axle.

13  Q    And so for the Escape and the Grand Cherokee, are they --

14  or your opinion that there's a reasonable comparison there?

15  A    All of these, yes.

16  Q    Okay.  And you also did it with the Nissan Pathfinder?

17  A    I did.

18  Q    And the Blazer?

19  A    Yes.

20  Q    And the Isuzu Rodeo, for those years.

21  A    Correct.

22  Q    And the Santa Fe?

23  A    Yes, sir.

24  Q    And your opinion is they pretty much overlap --

25  A    They --

1  Q    -- the reasonable certainty?

2  A    They -- they compare reasonably well.

3  Q    Okay.  So this is your -- the work product and your ana --

4  this demonstrates your analysis in this case.  Correct?

5  A    It does.

6  Q    And so wonder if you could share with us your opinions and

7  conclusions based on what you did.  First -- and -- if you

8  would.

9  A    Sure.  I'm just going to read from my report, if that's

10 all right.

11 Q    Okay.  Or you can just refresh -- you can look at that

12 and -- if you look at your opinions and conclusions -- I'll go

13 to the first one first.  Can you explain --

14 A    Okay.

15 Q    -- that, what your conclusion was and --

16 A    Did you want me to read it out loud or --

17 Q    Or you can just explain it to the jury.

18 A    Oh, perfect.  Okay.  So due to the quality of the

19 4/12/2012 security tape, the video, I didn't feel it was

20 possible to have any precision in measurements at all to -- to

21 be able to outline the car to take any measurements from any of

22 the images, northbound or southbound, to i -- or to identify

23 that vehicle as to exactly what it is, by brand or model.  So,

24 ultimately, I think that I can't exclude or -- I can't exclude

25 the CR-V and I can't exclude the ones that I ultimately chose

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 750   Filed 09/23/14   Page 57 of 224
(720) 384-8078   attrans@sbcglobal.net

1  to put in, into my analysis.

2  Q    Okay.  And did you also address an issue about the color

3  in your analysis of this vehicle from 4/12?

4  A    I did.

5  Q    What did you do there?

6  A    Well, in Photoshop, again, by still images, I looked at

7  the -- the -- the image, and as I tried to look at the color

8  along what you can see, the value of that color changes.  I

9  mean, to me it looks like it's blue, a darker blue, a shade of

10  blue.  But as you go across it and you actually look at what

11  the color value is, those values change.  And so you can't --

12  to me, you can't tell with any certainty, because it's not even

13  close to consistent based on the qualify of the image that you

14  have, the quality of the video.

15  Q    Okay.  And then, finally, did you have an opinion as far

16  as Mr. Toglia's report and his comparison with different

17  vehicle models?

18  A    Sure.  I mean, essentially, I think I wrote that -- let me

19  just review it to make sure that I have the words correct.  So

20  in Mr. Toglia's report he indicated that the color, the size,

21  and the shape in question is consistent with the CR-V.  And I

22  agree with that, that it -- that assessment is correct.  I just

23  think that there are other vehicles that possibly could be as

24  well --

25  Q    Okay --

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 750  Filed 09/23/14  Page 58 of 224
(720) 384-8078  attrans@sbcglobal.net

1  A    -- based on my analysis.

2  Q    And, in fact, Mr. Toglia included RAV4, the Escape, and

3  the Santa Fe as being in that same category of vehicles that

4  could be consistent with the image we have from 4/12.  Is that

5  correct?

6  A    That's correct.  Yes, he did.

7  Q    And then you went beyond that and examined and compared

8  other vehicles with those same type of dimensions?

9  A    I did.

10 Q    And then -- so then you eliminated the -- in addition to

11 the RAV4 and the Ford Escape and the Hyundai Santa Fe --

12       MR. SCHRODER:  Your Honor, objection.  Leading.

13       THE COURT:  Sustained.

14 BY MR. CURTNER:

15 Q    What other vehicles did you eliminate?

16 A    The BMW X --

17 Q    Or, I'm sorry, that you could not eliminate.

18 A    That I --

19 Q    Oh, I'm sorry, what did --

20 A    The -- the ones that I eliminated.  Is that the list that

21 you'd like me to read?

22 Q    No, I -- you can elimi --

23 A    Well, you've seen the ones that I -- I -- I -- I could

24 not --

25 Q    Well, let's just --

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 750  Filed 09/23/14  Page 59 of 224

1 A   -- eliminate.

2 Q   Okay.  And what --

3 A   So --

4 Q   -- additional vehicles can you not eliminate --

5 A   Well --

6 Q   -- that we just saw?

7 A   Additional than what we just saw, I haven't -- I haven't

8 looked at any additional ones.

9 Q   How about the ones that we just ran through?

10 A   Sure.

11 Q   In addition to the ones that Mr. Toglia --

12 A   Oh.

13 Q   -- said you could not eliminate, which ones -- additional

14 vehicles did you say we cannot eliminate?

15 A   Okay.  So we have the Honda CR-V.  We have the Toyota

16 RAV4, the Ford Escape, the Nissan Pathfinder, the Chevy S10

17 Blazer, the -- the Hyundai Santa Fe, and the Isuzu Rodeo.

18 Q   Okay.  And so in your professional opinion, any of those

19 vehicles could possibly be the vehicle that we saw on the 4/12

20 video.  Is that correct?

21 A   Yes, or others.

22 Q   And there may even be others beyond that?

23 A   There may be.

24 Q   That you didn't actually do a comparison?

25 A   Correct.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 750   Filed 09/23/14   Page 60 of 224
(720) 384-8078  attrans@sbcglobal.net

**DITALLO - CROSS**

1  Q    But that may have the same dimensions?

2  A    They may have similar or reasonable dimensions.

3  Q    All right, thank you.  That's all I have.  Thank you.

4        THE COURT:  Cross-examination.

5                    **CROSS-EXAMINATION**

6  BY MR. SCHRODER:

7  Q    Good morning, Mr. DiTallo.

8  A    Good morning, sir.

9  Q    So let me just reiterate a point that I read in your

10 report, that you say you agree with Mr. Toglia that the color,

11 size, and shape of the vehicle in question in the 4/12 video is

12 consistent with the suspect's CR-V.  Isn't that what you said

13 in your report?

14 A    Right, it is --

15 Q    So they are consistent.

16 A    -- one that it could be --

17 Q    Okay.

18 A    -- yes.

19 Q    So -- and I believe you also said, if I'm not mistaken,

20 that you understand that the data that you used to create your

21 3-D world -- and Rhinoceros, I believe, was the program you

22 used?

23 A    It is, sir.

24 Q    Came from Mr. Toglia?

25 A    It did, yes.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 750  Filed 09/23/14  Page 61 of 224
(720) 384-8078  attrans@sbcglobal.net

1  Q   So -- and I take it you are being reimbursed for your work

2  in this case?

3  A   I have been, yes, sir.

4  Q   All right.  And I also take it that you being able to use

5  that data has saved money for the client.  Is that correct?

6  A   It has, sure.

7  Q   So you didn't have to go to Kodiak and do a survey and do

8  all those things.  Correct?

9  A   Correct.  Although we talked about it.

10 Q   Right.  Now I want to ask you a question about -- just a

11 little question about this color issue.  Originally were you

12 work -- what model were you originally working with?  Was it

13 the CR-V or was it some of these others?  Did you start with

14 the CR-V?

15 A   Yes, sir, I started --

16 Q   Okay.

17 A   -- with the CR-V.

18 Q   And what color did you use to -- for the CR-V?

19 A   I -- I -- I used the shape --

20 Q   Okay.

21 A   -- for the CR-V.

22 Q   Okay.  But you had a color in your video?

23 A   Yes.

24 Q   And where did that color come from?

25 A   Just what -- the color that was available in the program.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 750  Filed 09/23/14  Page 62 of 224
(720) 384-8078  attrans@sbcglobal.net

1  Q    Okay.  Is that a CR-V color?

2  A    No.

3  Q    All right.

4  A    I mean, that -- perfectly the same color, no, sir.

5  Q    Okay.  So you don't know whether that's a color available

6  in the CR-V model?

7  A    I'm not trying to match the color --

8  Q    Okay.

9  A    -- in my example.  I'm trying to match the overlay.

10  Q    Understand.  But you did pick out a color that was

11  somewhat -- kind of that purpley-blue.  It was -- it's supposed

12  to kind of reflect what -- the color you see in the video.

13  Correct?

14  A    Sort of, but --

15  Q    All right.

16  A    -- realize that the software doesn't have the exact paint

17  chip colors that automobile manufacturers use.

18  Q    No, understand.  Understand that.

19  A    Sure.

20  Q    So -- and how about -- did you research the color options

21  for the Grand Cherokee?

22  A    Just that a blue color was available.

23  Q    A -- but you don't know what kind of blue?

24  A    Other than it's not baby blue.  But I don't need which --

25  Q    All right.

1  A    -- shade of blue.

2  Q    All right.  And how about the Nissan Pathfinder?

3  A    Also available in blue.

4  Q    A blue, but you -- do you know what color of blue, what

5  shade of blue?

6  A    No.

7  Q    All right.  And how about the S -- the S10 Blazer?

8  A    Also available in blue.

9  Q    But do you know what shade of blue?

10  A    No.

11  Q    Okay.

12  A    Other than not light blue.

13  Q    Okay.  And how about the Isuzu Rodeo?

14  A    Same answer.

15  Q    All right.  So blue, but you don't know what color blue?

16  A    Right.  It comes in a --

17  Q    So --

18  A    I would call -- I would call a -- a darker blue, a blue --

19  not a light blue, but I don't have the exact match, because --

20  Q    Sure.

21  A    -- I don't have the exact match of the blue of the

22  security video vehicle.

23  Q    Sure.

24  A    So I --

25  Q    But all those images you showed of vehicles, you don't

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1  know whether that blue is available on that vehicle, that color

2  blue is available on the vehicle?  You don't know that?

3  A    The color that I depicted the vehicles --

4  Q    Correct.

5  A    -- on will never match the exact color of the

6  manufacturer.

7  Q    But you didn't make an attempt to match any of the

8  manufacturer's colors on any of those cars.  Correct?

9  A    I didn't, because you can't do that.  I mean, it's not --

10  and it wasn't what I was doing.

11  Q    No, I understand that.  But --

12  A    Yes.

13  Q    -- I guess what I'm saying is, to portray the vehicle in

14  that color doesn't accurately portray what that vehicle may

15  look like, because it's not matching the color.  Is that

16  correct?

17  A    It doesn't portray the exact color blue.

18  Q    Okay.  Thank you.

19  A    Absolutely.

20  Q    Now, I went back and I looked through some of your -- the

21  material that you were provided, and I didn't see that you were

22  provided any video from the 19th of April.  Is that correct?

23  A    I was.

24  Q    Okay.  And did you compare the 19 April video with the

25  12th of April video?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1  A    I viewed it, yes.  But --

2  Q    But did you do any --

3  A    -- I wasn't --

4  Q    -- kind of comparison or analysis?  I didn't see it in

5  your report.  So did you do any kind of analysis?

6  A    No.

7  Q    Okay.  Thank you.

8  A    I will say -- let me just say that -- when you say

9  analysis, I think -- I'm assuming you're saying am I comparing

10 that video to any other video, and that I did not do.

11 Q    Okay.

12 A    I obviously looked at the 19th video and --

13 Q    Right.

14 A    -- watched it and -- and -- and looked at the differences

15 in the resolution from that day as comparison to the resolution

16 and clarity on the 12th.

17 Q    But you didn't proceed to compare the two days' worth of

18 video.

19 A    No, because I wanted to actually start with a -- a slate

20 of looking at what possible vehicles, not with the premise

21 that, you know, it had to be that -- that vehicle that was used

22 on the 19th in the video.  In other words, I want to look at

23 all the possibilities, because I couldn't match or identify

24 exactly what the vehicle was on the 12th.

25 Q    Well, let me ask my question again.

1  A    Sure.

2  Q    Did you compare the 4/12 video in the -- did you produce a

3  product comparing the 4/12 video and the 4/19 video?

4  A    No, sir.

5  Q    All right.

6  A    No.

7  Q    Now, you also -- you mentioned that you looked at Dr.

8  Vorder Bruegge's report.

9  A    Yes, sir.

10  Q    And isn't it true that when you reviewed that report, you

11  also reviewed his length and height conclusions?

12  A    Correct.

13  Q    All right.  And that you reached the conclusion in your

14  report that his estimates were reasonably close?

15  A    I did.

16  Q    All right.

17  A    I did it a much different way than he did it.

18  Q    Sure.  But --

19  A    But it turns out that it is.  Now, as an example, if it

20  isn't -- if it isn't the CR-V that is depicted on the 12th, and

21  therefore the overall length dimension is different than 168

22  inches, rounded up, then his estimate would change based on his

23  division by the pixel count.

24  Q    But --

25  A    So then -- so then the pixel height difference that he's

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 750  Filed 09/23/14  Page 67 of 224
(720) 384-8078   attrans@sbcglobal.net

1  rounded up to five inches would be different.  Does that make

2  sense?

3  Q    No.

4  A    Okay.  He calculated the error or certainty rate based on

5  the -- the height the pixels are from one another, based on the

6  distance -- you know, you -- you determine it based on the

7  distance the camera is from the target or the vehicle we're

8  trying to identify.  So I went through all the -- the math to

9  try to do it independent of anything but the specifics of the

10 scene, the environment, the camera location, the focal lens,

11 the aspect ratios, and where the vehicles are on the road.

12      The way Mr. Vorder Bruegge did it, which is another way to

13 do it, was he took the -- the known length, based on how long a

14 CR-V is, and he divided it by how many pixels he counted across

15 the horizontal plane in the 12th video.

16 Q    So you're --

17 A    And that's how he determined that measurement.  So what

18 I'm suggesting, at that hundred and sixty-eight inches -- and

19 he used a hundred and sixty-seven --

20 Q    Right.

21 A    -- point six -- is different, that division has to be

22 different.  So the answer would be -- would be different.

23 Q    So you're saying -- you're just --

24 A    But --

25 Q    You're just saying if he calculated on the 12th video

1  using the known length, there could be error in this because of

2  doing it that way?

3  A   Right.  Exactly.  Where mine isn't based on a specific

4  vehicle, it's based on where the -- where the camera actually

5  is and where the road actually is and where the unknown vehicle

6  is actually on the road.  And it's independent of an overall

7  length.

8  Q   Now let's talk about another issue.  In your report, you

9  mentioned that images suggested there was a rear-mounted spare

10  tire on the -- on -- that's page 8 of your report.

11  A   I mentioned that there -- there's a possibility based on

12  the -- the vehicle, the CR-V, the suspect vehicle, which has a

13  rear-mounted tire.

14  Q   Right.

15  A   And that's the possibility that exists.

16  Q   But you --

17  A   So --

18  Q   I believe you said the -- when you look at the images, the

19  scaled-up images suggest the presence of a tire.  It's the

20  second full paragraph on page 8.

21  A   Yes, sir, I'm -- I'm reading the --

22  Q   That would indicate to me that you're saying you can -- in

23  at least one of the views, you can see visual image -- part of

24  the visual image com -- would indicate to you there could be a

25  spare tire on the back.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 750  Filed 09/23/14  Page 69 of 224
(720) 384-8078  attrans@sbcglobal.net

**DITALLO - CROSS**

1  A   Now, that -- that's not the conclusion I was trying to

2  reach.  I'm not suggesting that my work and my analysis, or

3  looking at the 12th video -- no, that -- that I can see a spare

4  tire.  I cannot.

5  Q   So what do you mean when you say the scaled-up images

6  suggest the presence of a tire?

7  A   I believe I was looking at Mr. Toglia's work.  And

8  that's -- if you -- this is a carryover paragraph to the

9  paragraph above that, which is describing Mr. Toglia's work,

10 where I believe his image is, his scaled-up images are

11 suggesting that.

12 Q   And what's a scaled-up image?

13 A   I -- one of the exhibits or items that -- that I had in --

14 as far as his work, it could have been in his report.  I don't

15 remember exactly which one it was.

16 Q   Okay.

17 A   But I was referring to Mr. Toglia.

18 Q   To --

19 A   You see that that paragraph carries over.

20 Q   What -- you're referring to what he produced.

21 A   Correct.

22 Q   All right.  But just one quick note.  I mean --

23 A   Sure.

24 Q   -- your interpretation of giving the examples that you

25 provided or -- that image is something -- is an SUV, some small

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 750  Filed 09/23/14  Page 70 of 224
(720) 384-8078  attrans@sbcglobal.net

1 SUV of some type?

2 A    I think it is an -- yeah, an SUV or a crossover type

3 vehicle --

4 Q    All right.

5 A    -- something small, maybe a small van, something like

6 that.

7 Q    Okay.  And then, last, I want to talk to you about your

8 report that there was a number of vehicles that you found to be

9 inconsistent dimensionally with the image.  Is that correct?

10 A    Yes, sir.

11 Q    And let me just go through a couple of those.  The BMW X5?

12 A    Correct.

13 Q    The Ford Explorer?

14 A    Yes, sir.

15 Q    The Hyundai Tucson?

16 A    Yes, sir.

17 Q    The Jeep Liberty?

18 A    Yes, sir.

19 Q    The Kia Sportage?

20 A    Yes, sir.

21 Q    RS 300, Lexis?

22 A    Correct.

23 Q    Mazda MPV?

24 A    Yes.

25 Q    And that's kind of a minivan crossover type vehicle, isn't

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 750  Filed 09/23/14  Page 71 of 224

1  it?

2  A    It is, sir.  Yes.

3  Q    That was too big?

4  A    Yes.

5  Q    Okay.  The Mercedes Benz ML3 --

6  A    It could be too big or too small.  It just didn't --

7  Q    Oh, okay.

8  A    -- it didn't fit.

9  Q    Well, I noticed you had a Suzuki Sidekick in there.  And

10 if my memory of the Suzuki Sidekick is correct, it was probably

11 too small.

12 A    Correct.

13 Q    All right.  So may --

14 A    Excellent memory.

15 Q    Mercedes Benz ML320?

16 A    Yes.

17 Q    Mitsubishi Montero?

18 A    Correct.

19 Q    And then I think you already mentioned the Dodge Durango

20 being too big?

21 A    Correct.

22 Q    And that -- that's too large, is that correct?

23 A    It was, yes, for me.

24 Q    All right.  Thank you.

25       MR. SCHRODER:  No further questions, Your Honor.

1          THE COURT:  Redirect.

2                    **REDIRECT EXAMINATION**

3   BY MR. CURTNER:

4   Q    Mr. DiTallo, I wonder if you can go to page 5 of your

5   report.  Do you see in the middle of your report, where you

6   discuss color values of the pixels in the vehicle?  Do you see

7   that?

8   A    Correct.

9   Q    Okay.  So did you look for color values in the pixels of

10  the video from April 12th?

11  A    I did.  That's what I did.

12  Q    How do you do that?

13  A    You put an image inside of a -- a software that can handle

14  that.  I use Photoshop.

15  Q    Okay.

16  A    And then there are applications within Photoshop to

17  actually click on the images or select them.  And it reports

18  the -- the value of the color numerically, in a -- in an RBG

19  sense.

20  Q    And what is -- that mean?  What is a RGB?

21  A    Well, it's a -- red -- you know, red, blue, green sense

22  of -- of a -- a color dialogue, if you will.

23  Q    Okay.

24  A    And -- and so I was looking at the colors to see how that

25  changed as you selected across, up and down the image from the

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 750  Filed 09/23/14  Page 73 of 224

1  video.

2  Q    Okay.  So in this case on the 4/12 video, you looked at

3  a -- random pixels from that vehicle?

4  A    Random pixels from the image from the security video, yes.

5  Q    Okay.  So you might look at that image, you might take one

6  pixel, and then you could find out what color that pixel is?

7  A    Right, because each pixel has a color and a brightness.

8  Q    So what did you find on the three random pixels you

9  selected for the 4/12 video?

10  A    That there was great variance.

11  Q    Well, could you explain -- when -- let's say, what's the

12  first one that you noted there?

13  A    147, 150, and 243.

14  Q    So that's kind of shades of red -- the percentage of red,

15  green, blue?

16  A    Correct.

17  Q    And that would -- how you -- come -- how you would come up

18  with a color?

19  A    Correct.

20  Q    Okay, so that was one pixel.

21  A    It's like mixing paint.

22  Q    Right.

23  A    Okay.

24  Q    And then so the next pixel, what was that -- how did that

25  come out?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 750   Filed 09/23/14   Page 74 of 224
(720) 384-8078  attrans@sbcglobal.net

1  A    61, 68, 158.

2  Q    So that's quite a big difference from the other pixel?

3  A    Correct.

4  Q    And then the third one you looked at?

5  A    101, 116, 185.

6  Q    So you had -- is that different than the first two?

7  A    It is.

8  Q    Okay.  So you have three different colors by just looking

9  at the pixels, trying to identify the color on -- from 4/12

10 video.  Correct?

11 A    Three different values of the colors, yes.

12 Q    Okay.  Did you do the same thing for -- you did look at

13 the April 19th video.  Correct?

14 A    Correct.

15 Q    And you looked at the color there in the pixels?

16 A    I did.

17 Q    And what did you come up -- were they identical?

18 A    They were not identical, no.

19 Q    So what was the first one -- you came out with a sample

20 random pixel for April 19th?

21 A    152, 160, 240.

22 Q    Okay, that's different than anything you'd seen on the

23 other vehicle.  Right?

24 A    Correct.

25 Q    And then what was the next one you looked at?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 750   Filed 09/23/14   Page 75 of 224

1  A    40, 48, 104.

2  Q    And that's, again, different from any of the others.

3  A    Yes.

4  Q    And then the last one you looked at?

5  A    80, 96, 152.

6  Q    So there's no pixels that had the same color values from

7  the April 19th video as the one from April 12th?

8  A    Well, they -- they weren't very similar to each other and

9  they weren't similar to the other video, yes.

10  Q    So you couldn't determine that -- the -- whatever you saw

11  on April 19th was the same as what you saw on April 12th.  Is

12  it pos --

13  A    Well, ultimately, I couldn't determine that the 12th

14  video -- what color that was.

15  Q    All right.  Okay.  Thank you.

16  A    Sure.

17            THE COURT:  Recross.

18                    **RECROSS EXAMINATION**

19  BY MR. SCHRODER:

20  Q    Let's talk about color for a minute.

21  A    Sure.

22  Q    So if you do the process that you went through and you've

23  described in your report, and look at -- and let's say a car,

24  for example, because that's what we're talking about -- would

25  you expect to see absolutely consistent pixel color across the

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 750   Filed 09/23/14   Page 76 of 224
(720) 384-8078   attrans@sbcglobal.net

1  whole image?

2  A    No.

3  Q    Especially if it was outside, potentially --

4  A    Correct.

5  Q    -- there would be some variance?

6  A    There would be.

7  Q    All right.

8  A    Of course, the higher resolution you have, the more

9  consistent --

10 Q    The better --

11 A    -- they would be.

12 Q    The better it is.  Right?

13 A    Now, I would -- contrast also changes that.

14 Q    Sure.

15 A    So there's resolution, there's contrast, there's noise.

16 So there's all kinds of factors that will go into that.

17 Q    Okay.  But if you have a blue car, every pixel making up

18 the picture of the blue car is not going to be the same color

19 blue?

20 A    No, not in a -- a security video out in the environment.

21 Q    Or any video?  I mean, there's going to be some variance,

22 right?

23 A    You know, I don't know in every video if there's a --

24 Q    Okay.

25 A    -- way to do it in a --

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 750  Filed 09/23/14  Page 77 of 224
(720) 384-8078  attrans@sbcglobal.net

1  Q    Okay.

2  A    -- in a -- you know, a virtual world.

3  Q    Right.  And I think mainly the point you were getting at

4  was you couldn't accurately define the color by what you pulled

5  off.  Is that --

6  A    Correct.

7  Q    Okay.  Now, did you -- have you prepared anything to show

8  the jury what those colors look like, those RGB values?

9  A    I have not, no.

10  Q    Could I ask you to take a look at your monitor there?

11  A    Sure.

12  Q    Government Exhibit 419.  And feel free to check those RGB

13  values to see if they're correct.

14  A    Well, I'll trust you, sir, that --

15  Q    Okay.

16  A    -- they'll be correct.

17  Q    So do -- and do you believe that's probably consistent

18  with the color blocks you pulled off, the pixels?

19  A    Well, I -- first of all, I don't know if this monitor

20  can -- can have the resolution --

21  Q    Understand.

22  A    -- to produce them exactly the same.

23  Q    Understand.

24  A    You've got the numbers, I'm sure, correct.

25  Q    Right.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 750  Filed 09/23/14  Page 78 of 224
(720) 384-8078  attrans@sbcglobal.net

1  A    And there's --

2         MR. SCHRODER:  Your Honor, the government moves --

3         THE WITNESS:  And there's difference.

4  BY MR. SCHRODER:

5  Q    There is differences.  No, I agree.

6         MR. SCHRODER:  Government moves for Exhibit 419 --

7  admission of 419.

8         MR. CURTNER:  No objection.

9         THE COURT:  It -- it'll be received.

10        (Plaintiff's Exhibit 419 admitted)

11 BY MR. SCHRODER:

12 Q    I guess I just have one question.  I just want the jury to

13 understand there's variances, and I want them to see for

14 themselves what those variances are.  Is it fair to say that

15 all of those colors are a variant of blue or a purple-blue?

16 A    I believe so, yes.

17 Q    All right.  No further questions.

18        THE COURT:  Let's see, one, two, three -- we're done,

19 aren't we?  Do you want to keep going?

20        MR. CURTNER:  Oh, I just -- just one question and then

21 I --

22            **FURTHER REDIRECT EXAMINATION**

23 BY MR. CURTNER:

24 Q    Mr. DiTallo --

25 A    Yes, sir.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 750  Filed 09/23/14  Page 79 of 224
(720) 384-8078  attrans@sbcglobal.net

1  Q    -- it wasn't a red vehicle.  We know that, right?

2  A    Correct.

3         MR. CURTNER:  And, Judge, I just wanted to move to

4  admit our Defense Exhibit Number 34, and then we're done.

5         THE COURT:  Any objection?

6         MR. SCHRODER:  No objection.

7         THE COURT:  It'll be received.

8      (Defendant's Exhibit DE-034 admitted)

9         MR. CURTNER:  Okay, thank you, Mr. DiTallo.

10         THE WITNESS:  Thank you.

11         THE COURT:  Did you want to finish up?  Oh, is --

12         MR. SCHRODER:  We're done.

13         THE COURT:  If -- you get one last shot to respond to

14  that last question.

15         MR. SCHRODER:  I don't have any --

16         THE COURT:  Okay.  Thank you, sir.

17         MR. SCHRODER:  I don't have any further questions, Your

18  Honor.

19         THE WITNESS:  Thank you, Your Honor.

20         THE COURT:  You're excused.  What's the plan now?

21      (Witness excused)

22         MR. CURTNER:  Your Honor, I got one more witness for

23  this morning, but we might want to take a break, and, you know,

24  we'll be done before --

25         THE COURT:  11:30, that we got to stop then.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 750  Filed 09/23/14  Page 80 of 224
(720) 384-8078  attrans@sbcglobal.net

1          MR. CURTNER:  Yeah, we'll be done way before then.

2          THE COURT:  Okay.  Ten minutes.  Is that sufficient?

3          MR. CURTNER:  That's --

4          THE COURT:  Okay.  Sounds good.

5          MR. CURTNER:  Give them 15 because we'll be done.

6    We'll be done.

7          THE COURT:  Will that be -- 15 will do it?  Okay.

8          MR. CURTNER:  Yeah.

9          THE COURT:  Fifteen.

10         THE CLERK:  All rise.  Matter stands in a 15-minute

11   recess.

12        (Court recessed at 10:25 a.m., until 10:44 a.m.)

13        (Jury not present)

14        THE CLERK:  All rise.  His Honor the Court, the United

15   States District Court is again in session.

16         THE COURT:  Okay, we'll bring the jury in.

17         THE CLERK:  Please be seated.

18         THE COURT:  I did -- counsel, do you want to each read

19   this real quick?  Two quick juror notes.

20         MR. OFFENBECHER:  Two separate notes?

21         THE COURT:  No -- yeah, two separate notes.  You can

22   read them and hand them off.  I'll make copies at the next

23   break.

24        (Jury present)

25        (Side conversation)

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 750  Filed 09/23/14  Page 81 of 224
(720) 384-8078  attrans@sbcglobal.net

1    THE COURT:  Okay.  Please be seated.  Defense next

2 witness.

3    (Side conversation)

4    MR. CURTNER:  Your Honor, the defense calls Deatrich

5 Sheffield.

6    THE COURT:  Okay.

7    MS. LOEFFLER:  I need to have a quick consultation with

8 counsel.

9    THE COURT:  Okay.  Good morning.  That door pulls out,

10 and you just step into the box.  And then remain standing, and

11 my clerk, who's sitting over here, will -- she's going to swear

12 you in in a minute.  Nancy, are you still there?

13    THE CLERK:  I'm still here.  Oh, I thought they were

14 waiting.  I'm sorry.

15    **DEATRICH SHEFFIELD, DEFENDANT'S WITNESS, SWORN**

16    THE CLERK:  Okay, thank you.  Please have a seat.  And,

17 ma'am, if you can please state and spell your full name.

18    THE WITNESS:  Deatrich Sheffield.  D-e-a-t-r-i-c-h,

19 Sheffield, S-h-e-f-f-i-e-l-d.

20    THE CLERK:  Thank you.

21    **DIRECT EXAMINATION**

22 BY MR. CURTNER:

23 Q    Good morning, Mrs. Sheffield.

24 A    Good morning.

25 Q    Where do you work?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 750   Filed 09/23/14   Page 82 of 224
(720) 384-8078   attrans@sbcglobal.net

1  A    At the Federal Public Defender Agency.

2  Q    And what's your position there?

3  A    Criminal investigator.

4  Q    How long have you been a criminal investigator?

5  A    Total, about 12 years.

6  Q    And at the Federal Defender Office, or other offices?

7  A    Two years at the Federal Defender's Office.

8  Q    And before that?

9  A    I was a state criminal investigator.

10  Q    Okay.  Now, were you involved in the investigation in this

11  case?

12  A    Yes.

13  Q    And one of the jobs you had or one of the tasks you had in

14  this investigation, did you review a spreadsheet of vehicles

15  that were registered on Kodiak Island?

16  A    Yes.

17  Q    And we got that from the government?

18  A    Yes.

19  Q    How many vehicles were on that spreadsheet that you

20  received?

21  A    There was, like, 4,000-plus vehicles on the original.

22  Q    Okay.  So those are 4,000 vehicles that were -- in the

23  government document that were registered on Kodiak Island?

24  A    Right.

25  Q    And did you go through that list?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 750  Filed 09/23/14  Page 83 of 224
(720) 384-8078  attrans@sbcglobal.net

1    A    Yes.

2    Q    And how did you do that?  What did you do as far as

3    working with that list?

4    A    I went through the list and eliminated specific vehicles

5    that did not fit in the criteria that I was working with.

6    Q    What criteria were you working with?

7    A    According to the government's FBI report, they had

8    determined that the videos showed -- I want to say plus or

9    minus 10 inches, plus or minus 5 inches off of the Honda CR-V.

10   Any vehicle that was plus or minus 10 inches in length and plus

11   or minus 5 inches in -- in height could also be that questioned

12   vehicle.

13   Q    Now, you had a chance to look at a video from April 12th,

14   2012 that was taken at the -- on Kodiak Island?

15   A    Yes.

16   Q    And did you recognize what that was on that video as far

17   as the camera and what was in the area of view?

18   A    Yes, I recognized the location and what the camera was

19   focused on.

20   Q    Okay.  And so you were -- did you review the videos

21   from -- that were submitted in discovery from that camera?

22   A    Yes.

23   Q    And which camera videos did you watch -- did you review?

24   A    The T1 video --

25   Q    Well, whatever --

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 750  Filed 09/23/14  Page 84 of 224
(720) 384-8078  attrans@sbcglobal.net

1  A    -- camera footage was the ones that I watched for dealing

2  with the registered vehicles in Kodiak.

3  Q    Okay.  So you saw the -- what we call the suspect vehicle

4  that was -- the blue thing that was going by on April 12th at

5  7:09?

6  A    Yes.  That was from the T1 camera.

7  Q    From the -- and you saw the suspect blue thing --

8          MS. LOEFFLER:  I guess I'm going to object to leading,

9  Your Honor, and ask it be done in a nonleading manner.

10         THE COURT:  Sustained.

11 BY MR. CURTNER:

12 Q    Did you view that video throughout the morning of April

13 12th, 2012?

14 A    Yes.

15 Q    And you knew what the government was --

16         MS. LOEFFLER:  Objection.  Leading.

17         THE COURT:  Sustained.

18 BY MR. CURTNER:

19 Q    Did you review a report from the FBI, Richard Vorder

20 Bruegge?

21 A    Yes.

22 Q    Okay.  And then from that -- and what did you gather from

23 that report as far as the identification -- possible

24 identification of that vehicle?

25 A    He had determined from watching that same video that the

1  questioned --

2        MS. LOEFFLER:  I guess I'm going to object, Your Honor,

3  if she's just going to repeat the testimony of another witness.

4  I'm not -- I'm objecting to --

5        MR. CURTNER:  Your Honor, this is how -- explains how

6  she did what she's going to tell the jury she did in this case

7  (indiscernible).

8        MS. LOEFFLER:  I don't have a problem with that

9  question.  The -- if she explains what she did as opposed to

10  just repeating the testimony of other witnesses.

11        THE COURT:  Can she do that?  Can she just explain --

12        MR. CURTNER:  Yeah.

13        THE COURT:  -- what she did?

14  BY MR. CURTNER:

15  Q   What information did you have from that FBI report and

16  what did you do with it?

17  A   It told the dimensions that they thought were possible for

18  this questioned vehicle.

19  Q   And do you remember what those dimensions were?

20  A   It was plus or minus 10 inches in length of the Honda CR-V

21  and plus or minus five inches in height of the dimensions of

22  the Honda CR-V.

23  Q   Okay.  So you had that information.

24  A   Yes.

25  Q   And did you use that with the spreadsheet of 4,000

1 vehicles that you had?

2        MS. LOEFFLER:  Objection.  Leading.  And we'll ask her

3 what she did, I have no objection to that.

4        THE COURT:  Okay.

5 BY MR. CURTNER:

6 Q    What did you do with --

7 A    I then took the registered list that they gave us of all

8 vehicles on Kodiak and I filtered it for any blue vehicles that

9 fit within those dimensions.  The Honda CR-V was 177.6 in

10 length and 65.9 in height, so I eliminate -- any vehicle that

11 was not plus or minus 10 from that in length or plus or minus 5

12 in height from that.

13 Q    Okay.  So let me show you what's been identified as

14 Defense Exhibit 159 on the screen, please.  Can you identify

15 that?

16 A    Yes.  This is the filtered list that I created.

17 Q    Okay.  So what does this list represent from your work?

18 A    This is -- the list that they gave us, I took out some of

19 the columns that were irrelevant to what I was using, just

20 extra columns, addresses and numbers from the DMV that didn't

21 mean anything.  I took those out and I added one column that

22 just showed -- for each of these vehicles I went to the

23 manufacturer's site and found out the exact dimensions of those

24 vehicles.  So I added that column, and then I filtered out any

25 vehicles where the dimensions did not fit within the parameters

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 750   Filed 09/23/14   Page 87 of 224
(720) 384-8078   attrans@sbcglobal.net

1  that I just stated.

2  Q    Okay.  So you --

3  A    And the ones that were not blue, I eliminated too, so --

4  Q    Okay.  So you --

5  A    -- color and dimension.

6  Q    So you took the large list --

7  A    Uh-huh (affirmative).

8  Q    -- and you culled it down to the list you have in front of

9  you?

10  A    Right.

11  Q    And that list is based on --

12  A    It's based on color and the dimensions.

13        MR. CURTNER:  I'd move for admission of Defense Exhibit

14  159.

15        MS. LOEFFLER:  I'm sorry, Your Honor.  I'm sorry, I got

16  sidetracked.

17        THE COURT:  Okay.  He's moved for admission of 159,

18  this exhibit.

19        MS. LOEFFLER:  I'm trying to -- you know, I'm going to

20  object, Your Honor, based on -- I think you're going to have to

21  rule after cross, based on what I believe are going to be

22  significant errors.

23        THE COURT:  Well, why don't we just take it, we'll use

24  it for demonstrative purposes --

25        MS. LOEFFLER:  Of course.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 750   Filed 09/23/14   Page 88 of 224
(720) 384-8078   attrans@sbcglobal.net

1       THE COURT:  -- and we can proceed, and I'll rule when
2    the time gets --
3       MS. LOEFFLER:  And I don't mind showing it to the jury
4    for demonstrative purposes --
5       THE COURT:  That's fine.
6       MS. LOEFFLER:  -- and you can rule at the end, so we
7    can move things --
8       THE COURT:  That makes sense.
9       MS. LOEFFLER:  -- if that would be okay.
10      THE COURT:  Very well.
11      MR. CURTNER:  We can show this.
12   BY MR. CURTNER:
13   Q    So this is the spreadsheet that you created from the large
14   list that you started with?
15   A    Yes.
16   Q    And so maybe you can go through each column, just
17   identifying what's in each column?
18   A    The first column is going to tell you the make of the
19   vehicle, then the model of the vehicle, then the year.  Then
20   the next one after that basically just tells you -- that's
21   something that the DMV enters in as far as whether -- what
22   class of vehicle, four-door or -- and they have codes for --
23   for what they mean.  The next one is the color, the license
24   plate, the dimensions, then the actual serial number on the
25   vehicle, and the address, city, state, and then the name of the

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 750  Filed 09/23/14  Page 89 of 224

1  owner --

2  Q    Okay.

3  A    -- or owners.

4  Q    Now, we're not going to go through this entire list, but

5  this is what you created yourself?

6  A    Yes.

7  Q    And how many different vehicles are you your list?

8  A    Two hundred and sixty-three.

9  Q    Okay.  And so did you also take out other vehicles that

10  might have been within the parameters, this measurement, and

11  also the same color that might have been on the original list?

12  A    I did not take out any that were within the dimensions and

13  the same color.

14  Q    Okay.  And this was based on the report you had got from

15  the FBI?

16  A    Right, it was just based on dimensions and color.

17  Q    Now, did you then review -- did you see in the discovery

18  that was submitted FBI interviews of different vehicle owners?

19  A    Yes.

20  Q    And did you have a chance to review all that and go

21  through that -- all those surveys?

22  A    Yes.

23  Q    And do you know which type of vehicle owners were surveyed

24  in that?

25  A    It looks like from their interviews that they interviewed

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 750  Filed 09/23/14  Page 90 of 224
(720) 384-8078  attrans@sbcglobal.net

1  all of the people on the list who had Honda CR-Vs, Ford

2  Escapes, Toyota RAV4s, and I'm pretty sure it's a Honda

3  Santa -- Hyundai Santa Fe.

4  Q    The Hyundai Santa Fe?

5  A    Yeah.

6  Q    Okay.  And did you count that -- how many surveys they

7  did?

8  A    That was roughly 95.

9  Q    And so that was 95 that were on your list?

10  A    Yeah.

11  Q    And then that left how many that were not on your -- that

12  were on your list that were not interviewed?

13  A    I think it's 186.

14  Q    Hundred and sixty-eight or --

15  A    Or 68 -- may --

16  Q    It would be 263 minus --

17  A    Yeah.

18  Q    -- 95?

19  A    Yeah.  Would be minus the 95 --

20  Q    We --

21  A    -- from the 263.

22  Q    We've been struggling with math this whole trial, so --

23  and that includes -- how many vehicles on your list then were

24  not interview -- what type of make and models that were on your

25  list that were not interviewed?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 750  Filed 09/23/14  Page 91 of 224
(720) 384-8078  attrans@sbcglobal.net

1 A    There were quite a few other vehicles on there that they

2 did not interview.  The -- I know the -- the BMW X3, there was

3 Toyota 4Runners, there were -- I'd have to -- without seeing

4 the list.  But there were quite a few other vehicles that they

5 did not --

6 Q    Okay.  Now --

7 A    -- interview.

8 Q    -- during your investigation, did you actually travel to

9 Kodiak Island?

10 A    Yes.

11 Q    And so did you happen in your investigation to see other

12 vehicles that might meet the description in the parameters of

13 your list?

14        MS. LOEFFLER:  I'm going to object, Your Honor.

15 There's no foundation that she has the expertise by looking at

16 a vehicle to see the size, dimensions, or anything else on it.

17        MR. CURTNER:  She's an investigator.  She can tell

18 about her investigation and what --

19        THE COURT:  Well, why don't you lay a better

20 foundation.  Would she stand on the corner and watch the cars

21 go by, what -- you know --

22        MR. CURTNER:  No.

23 BY MR. CURTNER:

24 Q    Tell us how you happened to notice vehicles on Kodiak

25 Island during your investigation that you did followup

1  investigation with?

2  A    We did in the multiple times that we were down there take

3  note of any other vehicles that we saw that were blue -- I

4  think you could categorize as SUV type vehicles that were

5  similar to all the vehicles that I knew were on the list.

6  Q    And so did you keep a list of those vehicles?

7  A    Yes.

8  Q    And did you investigate those as far as the ownership and

9  things of that nature?

10 A    Yes.

11 Q    And how many did you investigate?

12 A    In two days that we were there, I saw 85.

13 Q    Okay.  And then were you able to eliminate some of those

14 as --

15 A    And then, yes, when I came back, when I looked at the

16 dimensions, they were 10 of them that were slightly outside of

17 the dimensions.

18 Q    But there were 75 that were within the dimensions?

19 A    That were within, yes.

20 Q    Okay.  Now, during your investigation, you reviewed the

21 video from the T1 camera at COMMSTA.

22 A    Yes.

23 Q    And did you review it for April 12th?

24 A    Yes.

25 Q    And did you also review it for April 11th?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 750  Filed 09/23/14  Page 93 of 224

1  A    Yes.

2  Q    How many hours did you spend reviewing video footage in

3  this investigation?

4  A    Probably more than 50 to 100.

5  Q    Okay.  Let's go to Defense Exhibit 35, that's already been

6  admitted.  You can publish that.  Do you recognize this?

7  A    Yes.

8  Q    Okay.  And so is this something that you created?

9  A    Yes.

10 Q    And what's on the left-hand side?

11 A    On the left-hand side are vehicles that I took snapshots

12 from, from the night of April 11th.

13 Q    At two different times?

14 A    At two different times, yes.  And they're stamped on

15 there.

16 Q    Okay.  So during your investigation -- and you've reviewed

17 the video from the T2 camera.  Is that correct?

18 A    Yes.  That's from the T2 camera.

19 Q    From the night before?

20 A    Yes.

21 Q    And you noted these two vehicles and you took snapshots of

22 them?

23 A    Yeah.

24 Q    And then what's on the right?

25 A    It is Mr. Wells' vehicle.

1 Q    And you knew that vehicle?

2 A    Yes.

3 Q    And so you made this defense exhibit.  You created this,

4 is that correct?

5 A    Yes.

6 Q    Now, during your investigation, you also reviewed videos

7 from other different cameras, like from the airport?

8 A    Yes.

9 Q    And what video did you -- what video footage did you

10 review from the airport itself?

11 A    The airport cargo area from Alaska Airlines had a

12 videocamera on the inside of their office that pointed outward,

13 and you could see through the door the -- part of the parking

14 lot of the airport right outside of their office.

15 Q    So how did you know about the videocamera or that video

16 footage?  When was the first time that you became familiar with

17 that?

18 A    We received a copy from the government.

19 Q    Okay.  And then how many hours did you review that?

20 A    I reviewed two different days.

21 Q    Okay.  Do you remember what days you reviewed?

22 A    It was April 10th, and then April 12th.

23 Q    Well, let's see if we can go to Defense Exhibit 30.  If

24 you could just look at that on your screen.  And tell me if you

25 re -- this -- watch the video and tell me if you recognize it.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 750  Filed 09/23/14  Page 95 of 224
(720) 384-8078  attrans@sbcglobal.net

1  A    Yes.

2  Q    What does it depict?

3  A    This is the camera inside the Alaska Airlines cargo

4  office.

5  Q    Okay.  And tell me if -- during the course of this video

6  if you see something you recognize.

7           MS. LOEFFLER:  Do we have a date on this?

8           MR. CURTNER:  April 10th.

9           MS. LOEFFLER:  Okay.

10          THE COURT:  Of what year?

11          MR. CURTNER:  2012.

12 BY MR. CURTNER:

13 Q    Do you recognize something there?

14 A    Yes.

15 Q    What do you recognize?

16 A    That is the 2001 Honda CR-V owned by Nancy Wells.

17          MR. CURTNER:  Okay, I'd move for admission of Defense

18 Exhibit 30.

19          MS. LOEFFLER:  I thought it was already admitted, but I

20 have no objection.

21          THE COURT:  It'll be received.

22      (Defendant's Exhibit DE-030 admitted)

23          MR. CURTNER:  So if we could play that.

24 BY MR. CURTNER:

25 Q    Okay, so this is the video footage you reviewed.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 750   Filed 09/23/14   Page 96 of 224
(720) 384-8078   attrans@sbcglobal.net

1  A    Yes.

2  Q    And it's from inside the Alaska Airlines cargo office?

3  A    Yes.

4  Q    And what do you see out that window?

5  A    Yeah.  If you look straight out that window, you will see

6  the vehicle pull around, going from left to the right of the

7  screen.

8  Q    And where is that office located?

9  A    It's located right -- actually, still connected to the

10 airport main building, it's -- at the far end of it.

11 Q    Is it part of the Alaska Airlines terminal right there?

12 A    Yeah.  The terminal would be right next to it on the

13 right, if you're looking this way.

14 Q    Okay.  And was that Nancy Wells's car that you recognized?

15 A    Yes, that vehicle that just went by.

16 Q    Okay.  Let's go to Defense Exhibit --

17 A    Right there.

18 Q    -- 31.  If we could play that, and I'll ask you to -- also

19 if this is video footage you reviewed, and if you can identify

20 what's on there, from April 10th, 2012.  Can you publish that?

21 Is -- oh, I'm sorry.  If you can review it first.

22       MS. LOEFFLER:  I don't object to it, if you want to

23 just play it.

24       MR. CURTNER:  Let's publish it and we'll start over.

25       THE COURT:  So this is Exhibit what, now?

1    MR. CURTNER:  31.  Defense Exhibit 31.

2    THE COURT:  It'll be admitted without objection.

3    (Defendant's Exhibit DE-031 admitted)

4  BY MR. CURTNER:

5  Q   And, Mrs. Sheffield, just tell me what you recognize from

6  this video footage.

7  A   And right as you see it pulling around, that is Mr. Wells'

8  white pickup truck.

9  Q   Okay.  Now, where was that on April 10th, 2012, in

10  relation to Mrs. Wells's vehicle?

11  A   It was not too long after.  Less than an hour.

12  Q   Okay.  And -- okay, that's fine.  So did you also continue

13  to review that video footage on April 12th, then?

14  A   Yes.

15  Q   And what times did you review the footage from April 10th

16  from that same vantage point?

17  A   I started at 6 a.m. and went through -- past 8:30 --

18  Q   Okay.  And during --

19  A   -- a.m.

20  Q   Go ahead, I'm sorry.

21  A   a.m.

22  Q   a.m.  And that's about two and a half hours?

23  A   Yeah.

24  Q   And during that two and a half hours, were you looking to

25  see if that blue CR-V came through again?

1  A    Yes.

2  Q    Did you see it?

3  A    No.

4  Q    How about Mr. Wells's truck?  Did you see that come in the

5  same location?

6  A    No.

7  Q    Okay.  Did you happen to go into that office?

8  A    Yes.

9  Q    And could you describe what it's like in the office?

10 A    I basically walked into the office just to get an idea of

11 kind of what it looked like.  When you walk in, there's two

12 counters with -- with screens, where there's -- where they take

13 your baggage and cargo, kind of similar to what you would see

14 in an airport as far as -- and then I just turned around to

15 see -- get an idea of what the view looked like looking out

16 that window, which is kind of similar to what the camera -- and

17 how much I could see.

18 Q    Okay.  Did you notice any videocameras when you were in

19 there?

20 A    I did not.

21 Q    Okay.

22 A    But I was not specifically at that point looking for

23 exactly where the camera was, because I already knew what the

24 camera showed.  I was just looking to see how good of a view I

25 had from --

1      MR. CURTNER:  Okay, thank you.  That's all the

2  questions I have, Your Honor.

3      THE COURT:  Cross-examination.

4      MS. LOEFFLER:  Yes, Your Honor.

5                **CROSS-EXAMINATION**

6  BY MS. LOEFFLER:

7  Q   Ms. Sheffield, good morning.

8  A   Good morning.

9  Q   Now, we can pull up Government's Exhibit 51, please.  Oh,

10 yes.  Sorry.  I think I'm there.  Okay.  So on -- Government's

11 Exhibit 51 shows the airport in 2012.  Right?

12 A   I think so.  I mean, that's what it looked like.  I don't

13 know for sure if that's when it was.

14 Q   Well, there was a difference between 2012 and the present

15 in how the airport -- small -- the two-hour parking looked

16 like, wasn't there?

17 A   Oh, from the construction.

18     Well, how about there's curbs and things there now that

19 weren't there in 2012.  Right?

20 A   Yes.  Yes.

21 Q   Okay.  So if I have the -- do we have a pointer?  Sorry,

22 Kim.  In terms of the airport in 2012, there were no curbs down

23 the middle, were there?

24 A   No.

25 Q   Okay.  So the camera that you just testified about, if

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 750   Filed 09/23/14   Page 100 of 224
(720) 384-8078  attrans@sbcglobal.net

1    I -- let me know if I'm being accurate, but it -- looking out

2    that window, you can sort of see this area on the camera.

3    A    Correct.

4    Q    Okay.  So if a car came down, went over here, went over --

5    I mean, all of this area of the parking lot would not get

6    caught by the camera?

7    A    No.

8    Q    So the only thing it would catch, let's say, for a car --

9         THE COURT:  You know, I am -- these kind of answers,

10   "No," I don't know if that means "Yes" or "No" --

11        MS. LOEFFLER:  Okay.

12        THE COURT:  -- the way your question was posed.

13        MS. LOEFFLER:  Let me go try to -- I'm sorry.  Let's

14   try this again.

15   BY MS. LOEFFLER:

16   Q    So the camera that you were looking at only catches this

17   part of the parking lot.  Is that right?

18   A    That is correct.

19   Q    Okay.  And so it doesn't catch anything moving around in

20   here, right?

21   A    No, it doesn't.

22   Q    Now, the parking lot as you viewed it on all of these

23   photos that were from 2012, was there anything obstructing

24   anybody from driving in around here?

25   A    No.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 750   Filed 09/23/14   Page 101 of 224

1 Q    Okay.  And that wouldn't be on that camera, would it?

2 A    No.

3 Q    Okay.  So I want to go back to the -- Defense Exhibit 159.

4 That's your spreadsheet --

5 A    Correct.

6 Q    -- Ms. Sheffield.  And you prepared kind of a short memo

7 that went along with it.  Right?

8 A    Correct.

9 Q    Okay.  And that memo was provided to the government two

10 days ago, and the --

11 A    I think --

12 Q    -- spreadsheet?

13 A    I think so.

14 Q    Okay.  So in the memo, you stated that you went through

15 all the Bates-stamped discovery and you listed certain numbers,

16 right, the Bates stamp numbers?

17 A    Right.

18 Q    Okay.  That would be 23268 to 23958, the first set?

19 A    If that -- if that's what I --

20 Q    Do you have your memo in front of you?

21 A    I don't have it in front of me, but --

22        MS. LOEFFLER:  Counsel, can you give her a copy of the

23 memo, so --

24        (Side conversation)

25        MS. LOEFFLER:  We have another copy.  Counsel.  Can we

1  just give that to her?

2  BY MS. LOEFFLER:

3  Q    Now, on your memo, it says that you reviewed -- and you

4  have two sets of Bates numbers.  Right?

5  A    Correct.

6  Q    Okay.  And the Bates numbers are the numbers that the

7  government puts on discovery when it gives to the defense.

8  Right?

9  A    Correct.

10  Q    Okay.  And the first set of numbers, 23268, 23958, that

11  was a list of these two-page interviews that the government

12  sent to defense in approximately January of this year.  Is that

13  right?

14  A    Correct.

15  Q    Okay.  And so there were approximately 694 pages of

16  discovery in that group, right?

17  A    I think so, yeah.

18  Q    Okay.  And since each of the interviews -- or the

19  interview sheets is two pages, that was about 350 different

20  cars on that, right?

21  A    Correct.

22  Q    And, in fact, the government interviewed -- if you read

23  through them, there were -- the first shot through when they

24  were interviewing people -- there are about 290 owners that

25  were identified.  Right?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 750   Filed 09/23/14   Page 103 of 224
(720) 384-8078  attrans@sbcglobal.net

1  A    Roughly.  I could -- let's say roughly.  I don't know for

2  sure the exact number, but --

3  Q    Okay.  So you weren't trying to suggest that the

4  government hadn't found -- had only found 95 owners of cars,

5  were you?

6  A    No.  Just 95 that were -- those were the only 95 that were

7  on my list.  Not that they had only interviewed 95 people.

8  Q    Okay.  Well, and, in fact, they interviewed more than 95

9  blue car owners, didn't they?

10 A    Correct.

11 Q    Okay.  So let me ask about your list.  Your list was not

12 created off the actual interviews that the government did, was

13 it?

14 A    No.

15 Q    Okay.  So what you did is you took a group of DMV -- a DMV

16 spreadsheet and you said, let's filter everything that's blue.

17 A    Blue and within the dimensions.

18 Q    Right.

19 A    Correct.

20 Q    Now, if the agents had actually got -- you just looked at

21 things that had the code BLU.  Right?

22 A    Correct.

23 Q    Okay.  Well, there were other codes that could be blue,

24 like light blue, dark blue.  Are you familiar at all with what

25 other codes could have included blue cars?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 750   Filed 09/23/14   Page 104 of 224
(720) 384-8078  attrans@sbcglobal.net

1  A   I -- I -- I don't know.

2  Q   Okay.

3  A   I mean, if it was not a code that I recognize -- I did any

4  ones that I -- that I knew were of the blue.

5  Q   Well, were you aware that the FBI went beyond the ones

6  that were BLU and actually went out and interviewed owners of

7  cars that were other codes that could be similar to that?

8  A   Yeah, they did other colors that weren't even blue at all.

9  Q   Did they also do other blue ones?

10  A   That were not on my list?

11  Q   Yeah.

12  A   Yes.

13  Q   So I'm not quite sure what your list is trying to depict,

14  because -- well, let me go back.  On your list -- you said in

15  your memo, "I went through all the Bates-stamped discovery that

16  I could find where they interviewed SUV owners registered on

17  Kodiak Island."  And you said, "This includes Bates numbers

18  23268, 23958, and 27411 to 27467."  That's correct, right?

19  A   Yes.

20  Q   And you said, "Based on the government's discovery listed

21  above," you did note that it looks like they interviewed all

22  the owners of Ford Escapes and CR-Vs, et cetera.  Right?

23  A   Yes.

24  Q   But your report doesn't list all of the people that they

25  interviewed that had blue SUVs that were matching, does it?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 750   Filed 09/23/14   Page 105 of 224
(720) 384-8078   attrans@sbcglobal.net

1  A    Any of the ones that were on the original list that said

2  they were blue that were in the dimensions.

3  Q    Well, let me give you a number --

4  A    If there were others --

5  Q    -- of these.

6  A    -- that did not -- said a different color, did not say

7  blue, they were excluded, or if they were outside of the

8  dimensions they were also excluded.

9  Q    I will show you what I have marked a series of exhibits,

10  starting with 421A.  And they all have Bates numbers on them

11  within your list, and --

12      (Side conversation)

13  Q    So pulled up in front of you is Bates number 27411.  And

14  in your report, that's the -- one of the numbers -- in fact,

15  it's the first of the second category of numbers, right, in

16  your memo that you said you reviewed, 27411 to 27467?

17  A    Correct.

18  Q    Okay.  So Bates number -- what's been marked as Exhibit

19  421A, 2411 is the fist in the second -- number in the second

20  category -- excuse me, second list of Bates numbers, isn't it?

21  A    Correct.

22  Q    And it is a blue car?

23  A    Correct.

24  Q    It's got the license number and the VIN number.  It was

25  clearly interviewed by the FBI.  Right?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 750   Filed 09/23/14   Page 106 of 224
(720) 384-8078  attrans@sbcglobal.net

1  A    Correct.

2  Q    And it's not on your spreadsheet, is it?

3  A    If it's not on the spreadsheet, it may have

4  (indiscernible) -- depending on what the DMV -- if they did not

5  list the specific type of vehicle, so I was unable to tell, or

6  if it did not list it as being blue on the DMV -- there must

7  have been some reason why on the DMV record it -- it was not

8  clear to me that it was a blue vehicle within the

9  specifications.  Some of the DMV records did not list things

10 enough clearly, and so I eliminated it out of caution, because

11 if -- I was not sure.

12 Q    Okay.

13 A    So that would have just included more vehicles in the list

14 if -- but if I was unsure, then I just eliminated it.

15 Q    So -- okay.  So if the -- if, in fact, the government

16 located, you know, like, a hundred and some blue vehicles, you

17 would agree with that, because you weren't actually looking

18 through the FBI's work to see how many blue vehicle -- SUVs

19 they found.

20 A    No, mine just -- it was just the 95 that were on my list.

21 And that is --

22 Q    Okay.

23 A    -- correct, there may have been other blue vehicles --

24 like I said, based on what the DMV writes in there, they just

25 write very short --

1  Q    Okay.

2  A    And sometimes they will list the make but not the model

3  and it'll be blank, or other things like that.  And since I

4  couldn't be positive whether or not it did fit, then I would

5  have excluded it just out of caution.  So there could be more

6  vehicles that potentially should have been on the list that

7  they maybe interviewed that I did not include.

8  Q    Okay.  So -- and in other words, you just looked at the

9  discover -- you can actually go to the DMV and get registered

10  vehicles in Kodiak.  It's not four thousand, right, it's, like,

11  thirty-some thousand?

12  A    The list that they gave us was not that big.

13  Q    I mean, you're --

14  A    I mean, there was a --

15  Q    -- you're an investigator.  You could have gone to DMV and

16  gotten the whole list of registered vehicles.  Right?

17  A    Correct.

18  Q    And you also could have gone -- if you weren't sure what

19  the vehicle was on the DMV list, you could have gone to a car

20  area -- you could have -- and checked the VIN number and found

21  out what model and make the car was, right?  There were

22  resources out there where you can check a VIN number and find

23  out what the car is.

24  A    Correct, most of the time.

25  Q    Okay.  But you didn't do any of that?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 750   Filed 09/23/14   Page 108 of 224

1  A    I did use another search engine for some of them to try to

2  figure out what specific vehicle it was, if it didn't say.  And

3  probably 50 to 75 percent of the time when I used that other

4  search engine, it would tell me, but not always.

5  Q    Okay.  But if the FBI went and did that, that would be a

6  good thing, that would be a good investigation in terms -- in

7  trying to find all of the blue cars?

8  A    Correct.

9  Q    Okay.  So let me take anoth -- a look at a few more.  And

10 on your memo itself, you also listed a number of vehicles that

11 the government didn't interview, right?

12 A    Correct.

13 Q    And on some of those you listed vehicles that your own

14 expert has excluded.  Right?

15 A    That is correct.  I only based it on the dimensions, not

16 on any other specifications of the vehicle.  I was just at the

17 time when I did it looking at whether they fit within the

18 dimensions.

19 Q    Okay.

20 A    So if there were other reasons why they may have been

21 excluded, I only looked at dimensions --

22 Q    So --

23 A    -- and color.

24 Q    -- your bottom line is that there may be more than 95 blue

25 CR-Vs, RAV4s, Santa Fes, and Escapes that the government

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 750   Filed 09/23/14   Page 109 of 224
(720) 384-8078  attrans@sbcglobal.net

1  interviewed.  Right?  There may be more than 95?

2  A    Yes, there may be more.

3  Q    And you agree that it looks like they found everybody

4  except two.  Right?

5  A    It looks like they -- of those vehicles?

6  Q    Yeah.

7  A    Yes, it did.

8  Q    And you actually had all of these reports.  Now, did you

9  do any followup on any of the blue vehicles where the owners

10  were found and interviewed and information was put on the

11  sheets that were provided to you?

12  A    Some of them, but not nearly close to all of them, no.

13  Q    Okay.  And do you have notes -- since you're testifying

14  today, did you write notes and do reports of any of that?

15  A    In the case of our interviews, I think we made notes of

16  the interviews we did with specific people.

17  Q    Okay.

18       MS. LOEFFLER:  Well, Your Honor, I'd like the

19  production under Jencks.

20       MR. CURTNER:  Your Honor, these are investigative

21  memos.  There not any -- and that's not Jencks material.

22       MS. LOEFFLER:  It is if the witness testified about it.

23       THE COURT:  I --

24       MR. CURTNER:  She did not testify on direct that his

25  note --

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 750   Filed 09/23/14   Page 110 of 224
(720) 384-8078  attrans@sbcglobal.net

1        THE COURT:  Let's move on, and I'll address that during

2   the recess.

3        MS. LOEFFLER:  Okay.  I don't have any other questions.

4        THE COURT:  Okay.  So we can -- this witness is not

5   leaving town.  We can call her back if necessary.  Redirect.

6        MR. CURTNER:  Just briefly, Your Honor.

7        THE COURT:  No, you're still here.

8        MR. CURTNER:  I'm sorry?

9        THE COURT:  She was -- she started to leave.  I told

10  her to wait for you.

11       MR. CURTNER:  Oh, yeah.  You better wait.

12       THE WITNESS:  Okay.  I'm here.

13                   **REDIRECT EXAMINATION**

14  BY MR. CURTNER:

15  Q   So you didn't include in your list of possible vehicles,

16  let's say, for example, minivans?

17  A   Not -- I think there were a -- there were a few.  I think

18  there were a few, like, Dodge Caravans, that were the smaller

19  ones that fit within the size.

20  Q   Okay.  And you didn't -- but you include vehicles that

21  were different colors within blue that you noted?

22  A   No.

23  Q   And you didn't look at or have access to any vehicles that

24  might have been on the island that weren't registered because

25  they were owned by military personnel.  Is that correct?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 750   Filed 09/23/14   Page 111 of 224
(720) 384-8078  attrans@sbcglobal.net

1  A    Correct.  I would have had no way of knowing if they were

2  not registered.

3  Q    And the government didn't provide you with 30,000 possible

4  vehicle registrations, did they?

5  A    No.

6  Q    And would you have time to look up 30,000 vehicles while

7  in -- during your -- doing your job?

8  A    No.  We barely had time to do the ones we had.

9  Q    Yeah.  How big is our investigative staff?

10 A    We have three investigators.

11 Q    Okay.

12      MR. CURTNER:  That's all I have, Judge.  Thanks.

13      THE COURT:  Anything else?

14      MS. LOEFFLER:  I have some -- yeah.  Okay.

15                    **RECROSS EXAMINATION**

16 BY MS. LOEFFLER:

17 Q    As an investigator, you can go to DMV and find out how

18 many cars are registered on the island.  Right?

19 A    Yes.

20 Q    Okay.  And if there are 30,000 -- I mean, that's an

21 enormous step.  You give them a subpoena, they give you the

22 list.  Right?

23 A    Correct.

24 Q    Okay.  So you just didn't do that investigation.  It's not

25 that it's not possible or difficult.  Right?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 750   Filed 09/23/14   Page 112 of 224
(720) 384-8078  attrans@sbcglobal.net

1  A    Correct, we did not do that.

2  Q    Now, of the cars that you listed that were not

3  interviewed, did you an investigation to determine whether

4  those vehicles were off island at the time, had never been on

5  the island, were bought after the time of the murders, anything

6  like that?

7  A    Yes.  I did check for any vehicles that were purchased

8  after, but did not -- was not able to interview everyone to

9  determine whether for some reason their vehicle was not on the

10 island that day --

11 Q    But that is --

12 A    -- no.

13 Q    -- what the FBI did on all of the blue vehicles, the --

14 all of the blue vehicles that they listed -- you and put in the

15 interview sheets.

16 A    They did that with all of the vehicles that they

17 determined --

18 Q    Right.

19 A    -- but not all of the other ones that I think should be

20 included as well.

21 Q    But you didn't interview the owners of those vehicles

22 either, did you?

23 A    No.

24 Q    Okay.  One second.  Turning to your report, if you -- do

25 you have it in front of you, Ms. Sheffield?

1  A    No.  Like, you can put it up on the screen or --

2  Q    Okay.  Defense Exhibit 159.  If you look down to -- you

3  can show it.  It's in for demonstrative purposes.  Oh, okay.

4  If you look down at the ninth or tenth box, you have two

5  nineteen nine Chevrolet models that look to be exactly the

6  same, with different sizes?

7  A    Yes.  Because when I looked them up on the other search

8  engine, one was a two-door and one was a four-door.

9  Q    Okay, but the bottom number looked the same but you looked

10 it up on something else, okay.

11 A    I -- yeah, I went to another search engine that told me

12 the -- because the DMV did not specify two-door or four-door on

13 a lot --

14 Q    Right.

15 A    -- of them, and so when I went to the other search engine,

16 it did tell me the difference, and so that's why --

17 Q    Yeah --

18 A    -- I put the different dimensions.

19 Q    So in order to actually do the most that you can, you

20 might want to go to a place like NICB or Edmonds and look up

21 all of the VIN numbers if you wanted to do a thorough job in

22 finding all the cars.  Right?

23 A    Correct.

24 Q    Okay.  And the FBI did that, didn't they?

25 A    They did do an Edmonds, yes, and I think the other one

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 750   Filed 09/23/14   Page 114 of 224
(720) 384-8078   attrans@sbcglobal.net

 1  too.

 2  Q    Thank you.

 3          THE COURT:  Okay --

 4          MR. CURTNER:  Nothing further.

 5          THE COURT:  All right, thank you.  You're excused.  And

 6  did you want a break now?  Will we have a witness available at

 7  1:30?

 8      (Witness excused)

 9          MR. OFFENBECHER:  Right.  I think we have some inquiry

10  before that (indiscernible).

11          THE COURT:  Okay.  So -- but the jury should come back

12  at 1:30?  I don't know what you mean by inquiry.  From me, of

13  the --

14          MR. OFFENBECHER:  Well, you'd indicated there were some

15  matters you wanted to take up.

16          THE COURT:  Right, so I'm trying to figure out -- can

17  you come back at 1:30?  That's two hours to eat.  You can eat

18  and eat and eat.  And we'll see what happens at 1:30.  Okay?

19  So we'll stand in -- and we'll stay here.

20      (Jury not present)

21          THE COURT:  Do we have copies of the jury questions?

22  Please be seated.  So we'll just -- I'm just distributing a

23  couple of minor questions from jurors that we can take up after

24  lunch.  There was two -- there's two copies, right?  I mean two

25  separate questions.  Okay.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 750  Filed 09/23/14  Page 115 of 224

1          Now, with regard to the 1:30, I just think that the

2    order -- for me to rule on some of these things I have to

3    hear -- see it in a different order than the defense has

4    proposed.  So that -- let's have a brief little conference.

5          (At sidebar with the Court and counsel)

6          THE COURT:  Okay, I would think, for me to make a

7    ruling with regard to this witness, I'd have to hear from this

8    one and possibly this one, certainly this one, before I can

9    make a ruling with regard to this one.  And you -- when I say

10   "this," everybody is looking at my witness list, so I'm not --

11   I'm speaking --

12         MR. OFFENBECHER:  Okay.

13         THE COURT:  -- in code, but everyone knows what I'm

14   talking about.

15         MR. OFFENBECHER:  Sure.

16         THE COURT:  And --

17         MR. OFFENBECHER:  (Indiscernible) -- so we're talking

18   about in terms of an offer of proof outside the presence of the

19   jury?

20         THE COURT:  Well, for sure, I'm going to have an offer

21   of proof with regard to this one outside the presence of the

22   jury.  These, I'm not even sure this is -- I don't know whether

23   I need an offer of proof with these -- with regard to these

24   two.

25         MR. OFFENBECHER:  No, I think with respect to Ms.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 750   Filed 09/23/14   Page 116 of 224
(720) 384-8078   attrans@sbcglobal.net

1  Birchfield, you might.  The problem, Your Honor, is that it may

2  be that none of these witnesses would even need to be called.

3       THE COURT:  That --

4       MR. OFFENBECHER:  I mean, the -- Mrs. Hopkins, you

5  know, admits --

6       THE COURT:  Do you want to question her outside the

7  presence of the jury?  I mean, how do -- we going to do this?

8       MR. OFFENBECHER:  Well, the -- yeah, I think it -- we

9  just take it as it comes as far as Mrs. Hopkins.  You know, if

10 she admits all of -- for the most part, these three people are

11 impeachment witnesses, if you want to know the truth.  And if

12 she admits it all, then we don't even call those witnesses.

13      MS. LOEFFLER:  I don't know what "it all" is, because

14 of course we had disputes about some of the stuff.  And the

15 only other thing I would say is, you know, whether they can

16 call impeachment if an -- witnesses are governed by Evidence

17 Rule 608(b), which says that you can impeach, but if it is

18 impeachment on a collateral matter, it cannot be -- produce

19 extrinsic evidence.  So depending how they want to impeach the

20 wit -- I mean, if you decide that they're calling them to say

21 so-and-so didn't do this, you can't call the extrinsic

22 evidence.

23      THE COURT:  (Indiscernible) everybody here all bright

24 lawyers.  Just how am I supposed to do this?

25      MR. SCHRODER:  I mean, you're looking at it more from

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 750  Filed 09/23/14  Page 117 of 224

1  the relevance standard which (indiscernible) me, like -- you're

2  saying --

3          THE COURT:  Right.

4          MR. SCHRODER:  -- you want to hear these other

5  witnesses (indiscernible) --

6          THE COURT:  Well, I've got to make some ruling --

7          MR. SCHRODER:  -- relevant.

8          THE COURT:  -- as to whether or not these questions for

9  her are relevant, appropriate, probative.

10         MR. OFFENBECHER:  Well --

11         THE COURT:  Here's the deal --

12         MS. LOEFFLER:  (Indiscernible) jury to see

13  (indiscernible) at least quickly run (indiscernible), you know,

14  and (indiscernible) without the jury.

15         MR. OFFENBECHER:  Well, the relevance is

16  (indiscernible) --

17         MS. LOEFFLER:  (Indiscernible) --

18         MR. OFFENBECHER:  Relevance of the questions isn't

19  going to change.  I mean, they're -- it's relevant --

20         THE COURT:  (Indiscernible) --

21         MR. OFFENBECHER:  Sure.

22         THE COURT:  -- determine whether or not the third-party

23  culpability -- already let it --

24         MR. OFFENBECHER:  Uh-huh (affirmative).

25         THE COURT:  -- extensively with regard to Hannah.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 750   Filed 09/23/14   Page 118 of 224
(720) 384-8078  attrans@sbcglobal.net

1          MR. OFFENBECHER:  Uh-huh (affirmative).

2          THE COURT:  Now we've moved on with regard to Mrs.

3    Hopkins.  And I understand that the Constitution requires that

4    I permit the defendant an opportunity to present third-party

5    culpability, providing it's probative and relevant and

6    admissible.

7          MR. OFFENBECHER:  And also we -- we're entitled to an

8    opportunity to rebut the evidence that the government put on

9    during its case in chief.

10         THE COURT:  To some extent, the -- to the extent that

11   it's relevant and not collateral, that's true.  And --

12         MR. OFFENBECHER:  They put it on, and so --

13         THE COURT:  Yeah, I understand.

14         MR. OFFENBECHER:  -- became relevant.

15         MS. LOEFFLER:  (Indiscernible) --

16         MR. OFFENBECHER:  The statements of --

17         MS. LOEFFLER:  -- (indiscernible) --

18         MR. OFFENBECHER:  -- counsel are not evidence, counsel.

19         THE COURT:  Okay, (indiscernible) -- listen --

20         MS. LOEFFLER:  (Indiscernible).

21         THE COURT:  Listen, I'm -- I want to hear an answer.

22         MS. LOEFFLER:  (Indiscernible) --

23         THE COURT:  What do you want me to do?

24         MS. LOEFFLER:  I think (indiscernible), Judge, is you

25   have to call her in.  They have to --

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 750  Filed 09/23/14  Page 119 of 224

1          THE COURT:  Who?

2          MS. LOEFFLER:  You have to call in Debby Hopkins.

3          MR. SCHRODER:  First question is do we give the other

4   three (indiscernible) --

5          MS. LOEFFLER:  The other three --

6          MR. SCHRODER:  -- to see if they provide relevance

7   before --

8          MR. OFFENBECHER:  I mean --

9          MR. SCHRODER:  -- they get a shot at (indiscernible) --

10         MS. LOEFFLER:  Yeah, but I think that --

11         MR. OFFENBECHER:  (Indiscernible).  (Indiscernible) no

12  impeachment (indiscernible).

13         MS. LOEFFLER:  They're calling this impeachment, they

14  got to put on Debby first.  I think you got to put Debby first

15  if you're trying to call them on --

16         MR. OFFENBECHER:  That's the only reason that we're

17  calling --

18         MS. LOEFFLER:  You're only calling them for

19  impeachment, you got to do that first, because then

20  (indiscernible) --

21         MR. SCHRODER:  My guess is that's not the only reason

22  that they'd call them.

23         MS. LOEFFLER:  Well, I don't know.  I mean, I'm relying

24  on -- he's saying --

25         MR. OFFENBECHER:  Well, you --

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 750  Filed 09/23/14  Page 120 of 224

1          MS. LOEFFLER:  -- they're calling them for impeachment.

2          MR. OFFENBECHER:  Listen, all of these witnesses were

3   interviewed by the FBI, (indiscernible) --

4          MS. LOEFFLER:  So what?

5          THE COURT:  Okay.  I'm try -- I made (indiscernible)

6   very simple decision I have to make in the next 15 seconds.

7   Who was your next witness going to be?  (Indiscernible)

8   appropriately.  And I may be having to make rulings without all

9   the evidence.  That's my --

10         MR. OFFENBECHER:  Well --

11         THE COURT:  That's my difficult position on that.  I --

12  I'll do it, but -- you want to call witnesses back?  Who knows.

13         MR. OFFENBECHER:  But --

14         THE COURT:  I can only base -- make rulings based on

15  what I know.  It has --

16         MR. OFFENBECHER:  Well, I guess we --

17         THE COURT:  -- (indiscernible) --

18         MR. OFFENBECHER:  -- I know what your rulings are going

19  to be.  I mean, what's relevant or not relevant.  I mean, with

20  respect to Angela Birchfield, I think a -- an offer of proof

21  outside the presence of the jury is appropriate, maybe even ex

22  parte -- I mean with a sealed court.  Because it's not exactly

23  clear what her testimony would be on (indiscernible).

24         THE COURT:  It's not clear what Mr. Stoeckler's

25  testimony will be either.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 750   Filed 09/23/14   Page 121 of 224

1        MR. OFFENBECHER:  Well, if he testifies that -- you

2  know, I can only work off -- you know, they've interviewed him

3  (indiscernible) the U.S. Attorney's Office, so they know what

4  it is.  And we also -- we're working off the same transcript

5  (indiscernible) --

6        MR. SCHRODER:  Well, you've interviewed him as well --

7        MS. LOEFFLER:  Yeah, (indiscernible) --

8        MR. SCHRODER:  -- which we know (indiscernible) --

9        THE COURT:  I've read -- I've reviewed --

10       MR. SCHRODER:  -- we don't have those (indiscernible).

11       THE COURT:  I've reviewed the transcripts, and they

12  don't add any -- much clarity --

13       MR. OFFENBECHER:  Well, he --

14       THE COURT:  -- to my issue.

15       MR. OFFENBECHER:  Yeah.  He had a relationship with Ms.

16  Hop -- Mrs. Hopkins.  The point --

17       THE COURT:  After.

18       MS. LOEFFLER:  After the murder.

19       THE COURT:  I don't know the relationship before.

20  That's an --

21       MR. OFFENBECHER:  Right.

22       THE COURT:  -- important point.

23       MR. OFFENBECHER:  Well, we don't know whether he's

24  going to tell the truth about that or not, but we don't know

25  whether Mrs. Hopkins is telling the truth.  But what we do

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 750  Filed 09/23/14  Page 122 of 224

know, under Evidence Rule 608, is that Mrs. Hopkins
(indiscernible), so (indiscernible) --

    (Indiscernible speech)

        MR. OFFENBECHER:  -- admissible on cross.

        THE COURT:  I read that -- I'm not sure that she lied
about it.  So -- I've read the transcript, and you -- I've
read -- I don't know, she (indiscernible) --

        MS. LOEFFLER:  Your Honor, I think the -- since they're
saying they want to call these others as impeachment witnesses,
you can't, obviously, impeach people before you call them.  I
know you have to take her --

        THE COURT:  (Indiscernible).

        MS. LOEFFLER:  -- outside the presence of the jury, let
them ask the questions so that you can rule whether they're
relevant --

        THE COURT:  Okay.

        MS. LOEFFLER:  -- as opposed to, you know --

        THE COURT:  Okay.  Let's be -- let's try to have -- be
ready at 1:20.  I'm -- you can't believe what I'm doing at
noon, so --

        MS. LOEFFLER:  Okay.

        MR. OFFENBECHER:  Which -- no -- with Mrs. Hopkins?

        THE COURT:  Yes.

        MR. OFFENBECHER:  Okay.

        THE COURT:  That's what you wanted.  No, I don't know

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 750   Filed 09/23/14   Page 123 of 224

1  (indiscernible).  I don't know if you people know what you

2  want.

3         MS. LOEFFLER:  Well, Your Honor, I'm trying to -- you

4  know, I mean, (indiscernible) we don't want to tell you, we

5  don't want to tell you (indiscernible).  The only way you can

6  rule -- because as you've said, there's a lot of

7  (indiscernible) don't have enough -- is for them to get

8  (indiscernible) that in front of you and see where they're

9  going (indiscernible) saying.  And you rule, and you move on.

10         THE COURT:  Okay, have a great lunch.  We'll see you at

11  1:20 (indiscernible) --

12         MR. OFFENBECHER:  Your Honor, just one more thing.

13  Just so we're clear on this issue that counsel

14  (indiscernible) --

15         THE COURT:  (Indiscernible) as far as I know.

16         MR. OFFENBECHER:  Yeah.  Yeah.

17         THE COURT:  If that changed my mind, that's fine.

18         MS. LOEFFLER:  No, I think that that's probably right.

19  I'm just trying to apply the --

20      (End of sidebar)

21         THE CLERK:  All rise.  Matter stands in recess until

22  1:30 p.m.

23      (Court recessed at 11:32 a.m., until 1:29 p.m.)

24      (Jury not present)

25         THE CLERK:  His Honor the Court, the United States

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 750   Filed 09/23/14   Page 124 of 224

1 District Court for the District of Alaska is again in session.

2 Please be seated.

3       THE COURT: Okay. We're back on the record. Did

4 the -- counsel want to respond to the jury notes?

5       MR. CURTNER: Yeah, I don't see any issues with either

6 note, Your Honor.

7       MS. DUIGNAN: Your Honor, I can offer the page from

8 April 2nd, 2012, the medical record, if defense counsel don't

9 object. And that would just clarify the whole matter.

10       THE COURT: Okay. Okay. Offered as an exhibit?

11       MS. DUIGNAN: Yes, Your Honor.

12       MR. CURTNER: Well, no -- I think the evidence is what

13 it is, and that -- you know, they have to refer to the evidence

14 that they heard.

15       MS. DUIGNAN: Then we'd like to recall her.

16       THE COURT: Well, you can do that.

17       MR. CURTNER: Well, Dr. Gan has already went back to

18 work at the VA hospital.

19       THE COURT: They can recall her to clear up --

20       MR. CURTNER: Oh.

21       THE COURT: -- a simple question. I mean, it doesn't

22 have to be this second.

23       MS. DUIGNAN: Okay. Yes, Your Honor.

24       THE COURT: Okay. What's the plan?

25       MR. CURTNER: Well -- can we try to resolve this after

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 750  Filed 09/23/14  Page 125 of 224
(720) 384-8078  attrans@sbcglobal.net

1  we're done today?  Because maybe we can agree to --

2          THE COURT:  Resolve what?

3          MR. CURTNER:  The issue of whether we're going to in --

4  be any more exhibits for this witness.

5          THE COURT:  Oh, okay.  Yes.  That subject, I've moved

6  on from.

7          MR. CURTNER:  Oh, okay.  Which one are you on, then?

8          THE COURT:  I want to know what you're going to do

9  next.

10         MR. OFFENBECHER:  Your Honor, the --

11         MR. CURTNER:  Oh.

12         MR. OFFENBECHER:  We have the order of witnesses as

13  indicated in our witness list.  And with respect to presence in

14  the courtroom, Your Honor, I think we should speak briefly at

15  the sidebar.

16         THE COURT:  Okay.  So we're taking up where we left

17  off.

18      (At sidebar with the Court and counsel)

19         MR. OFFENBECHER:  Your Honor, Angela Birchfield is the

20  daughter of Deborah Hopkins.  She has asked me that her mother

21  be excused from the courtroom when she testifies, which

22  (indiscernible).  And I'm also going to ask that she --

23         THE COURT:  (Indiscernible).

24         MR. OFFENBECHER:  Surprising, isn't it?  But she did.

25         MS. LOEFFLER:  (Indiscernible).

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 750   Filed 09/23/14   Page 126 of 224

1          MR. OFFENBECHER:  She asked us a couple of weeks ago,

2     and (indiscernible) today that she doesn't want her mom in the

3     courtroom when she testifies.  So I would ask that that be

4     done.  And then we're planning on --

5          THE COURT:  What -- let's take one step at a time.

6          MR. OFFENBECHER:  Sure.

7          THE COURT:  Any objection to that?

8          MS. DUIGNAN:  We have no objection to that.  In fact, I

9     think Mrs. Hopkins will agree to be out of the room.

10          THE COURT:  Okay.  So --

11          MR. OFFENBECHER:  Okay.  And, vice versa, I think

12     because there the subject matter is so intertwined, I don't

13     think that Angela Birchfield should be in the courtroom

14     listening to her mother's testimony.  The -- you know, they're

15     both victims of a crime, I -- we understand that.  But at the

16     same time, the rule is that if there's some danger of one of

17     them (indiscernible) -- person (indiscernible) their testimony

18     and another one -- it's okay for them to be out of the

19     courtroom for one witness, and there's no real reason why

20     they -- she ought to be in here listening to her mother's

21     testimony.

22          MS. LOEFFLER:  We disagree with that one, because we

23     briefed this, Your Honor, and the rule is the defendant has a

24     very heavy burden of proving that the witness will alter her

25     testimony and --

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 750  Filed 09/23/14  Page 127 of 224

1          MR. OFFENBECHER:  (Indiscernible) --

2          MS. LOEFFLER:  Well, but that's (indiscernible) --

3          MR. OFFENBECHER:  -- (indiscernible).

4          MS. LOEFFLER:  That --

5          THE COURT:  My concern is more -- that there is more --

6  is it healthy for them to listen to each other's testimony?

7          MS. LOEFFLER:  Well, Debby is not going to be there

8  when Angela testifies.

9          THE COURT:  (Indiscernible).

10          MS. LOEFFLER:  Debby is not going to be there when

11  Angela testifies.  We've already spoken to her.  She --

12          THE COURT:  (Indiscernible) --

13          MS. LOEFFLER:  -- understands that.

14          MR. OFFENBECHER:  All right, this is (indiscernible).

15          THE COURT:  (Indiscernible).

16          MR. OFFENBECHER:  (Indiscernible).

17          MS. LOEFFLER:  She (indiscernible) --

18          MR. OFFENBECHER:  That's their choice.

19          MS. LOEFFLER:  That's their choice.  That's what the

20  law says.

21          MR. OFFENBECHER:  (Indiscernible) if the Court's

22  (indiscernible) --

23      (Indiscernible speech)

24          MR. OFFENBECHER:  There is a narrow exception for

25  victims of a crime, but the exception to that rule is that if

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 750  Filed 09/23/14  Page 128 of 224

 1  there's danger to the defendant's right to a fair trial by the

 2  witnesses tuning their testimony up -- look, we're not

 3  excluding her from the whole trial, we're just (indiscernible)

 4  seems perfectly fair.

 5          MS. LOEFFLER:  Your Honor, we actually briefed the law

 6  on this, the --

 7          THE COURT:  (Indiscernible) I agree with the government

 8  on the law.  My -- like I said, and I think that's appropriate

 9  (indiscernible) victim, but on the other hand, I'm more

10  concerned about just whether it's good to have mother and

11  daughter listen about these (indiscernible).  And I think there

12  should be some sensitivity -- just got to think about that.

13  I'm not going to tell her she can't be here.  I'm going to

14  advise her --

15          MS. LOEFFLER:  Well, we don't have any prob --

16          THE COURT:  -- (indiscernible) that would be

17  (indiscernible) --

18          MS. LOEFFLER:  That --

19          THE COURT:  -- that they not be here for each

20  other's --

21          MS. LOEFFLER:  That's fine.

22          THE COURT:  -- testimony.  Okay.  So with that --

23  what's the -- what's happening now?

24          MR. OFFENBECHER:  Well, I think we should proceed with

25  Mrs. Hopkins testifying.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 750  Filed 09/23/14  Page 129 of 224

1          THE COURT:  Okay, then you're going to ask the

2     questions you're going to ask, they're going to object, and

3     I'll sustain the objection.  (Indiscernible) --

4          MR. OFFENBECHER:  Well, I want -- I'm going to make an

5     offer of proof.  I think it's appropriate for me to make an

6     offer of proof before that, a full offer of proof about --

7          THE COURT:  In the courtroom?

8          MR. OFFENBECHER:  In the courtroom, without -- yeah,

9     without the witnesses (indiscernible), yeah.

10          MS. LOEFFLER:  (Indiscernible) --

11          THE COURT:  (Indiscernible) --

12          MS. LOEFFLER:  -- an offer of proof without the

13     witness.  I think you'll have to ask the witness --

14          THE COURT:  (Indiscernible) the offer of proof, the

15     offer of proof is going to be given in a area -- sensitive

16     areas (indiscernible) providing (indiscernible).

17          MR. OFFENBECHER:  We should close the courtroom, then.

18          THE COURT:  All right, that -- that's I'm asking.

19          MR. OFFENBECHER:  That's fine.  Let's close the

20     courtroom.  I want to make a full offer of proof --

21          THE COURT:  How long will it be for you to get to this

22     point?  Will we go for a while, are you going to get to this

23     point -- will it be the first thing out of the --

24          MR. OFFENBECHER:  Well, it's not going to be the first

25     thing out of the box, but, I mean, it's going to -- it's not --

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 750  Filed 09/23/14  Page 130 of 224

1 you know, it's not going to -- we're not going to be here for

2 an hour and a half either. I mean, it's --

3         THE COURT: Okay.

4         MR. OFFENBECHER: It's going to be --

5         THE COURT: Well, should we get started? You get to

6 the point where it's appropriate to take a break, excuse the

7 jury, seal the courtroom, and we'll -- you make your offer of

8 proof, and then the government has to respond.

9         MS. LOEFFLER: Your Honor, I think the offer of proof

10 (indiscernible) answer the questions (indiscernible). You

11 can -- I don't -- I'm not comfortable with the defense just

12 saying this is what she's going to say. Because --

13         MR. OFFENBECHER: Well, I agree.

14         MS. LOEFFLER: Okay. (Indiscernible).

15         THE COURT: You can ask the questions in front of all

16 of us --

17         MS. LOEFFLER: Right. That's fine.

18         THE COURT: -- and seal the courtroom.

19         MS. LOEFFLER: That's fine.

20         MR. CURTNER: Did you admit my Exhibit 159? That was

21 the spreadsheet of Deatrich Sheffield.

22         THE COURT: (Indiscernible).

23         MS. LOEFFLER: What -- my comment is, I don't have a

24 problem, but you've got to take all -- the law requires you to

25 take all that identity stuff out of it.

1          MR. CURTNER:  (Indiscernible) we will (indiscernible).

2          MS. LOEFFLER:  Yeah.  Then I don't have an objection.

3    You got to clean it.

4          THE COURT:  (Indiscernible).  (Indiscernible) --

5          MR. CURTNER:  We'll redact (indiscernible).

6          MS. LOEFFLER:  Yeah.

7          THE COURT:  -- (indiscernible).

8          MS. LOEFFLER:  I just want to know what you did

9    (indiscernible).

10         MR. OFFENBECHER:  (Indiscernible) part of my offer of

11   proof (indiscernible).

12         MS. LOEFFLER:  (Indiscernible).

13         MR. OFFENBECHER:  Sorry to inconvenience you.

14         THE COURT:  (Indiscernible).

15         MR. OFFENBECHER:  Part of my offer of proof includes

16   what I believe the transcript -- what -- I would impeach her

17   with the transcript.  That's not necessarily her testimony.

18   I'm not sure exactly what she'll say.  I'm happy to ask her out

19   of the presence of the jury, but I'm -- part of the offer of

20   proof is going to be what the transcript says, so -- that's

21   fine.

22         THE COURT:  See, the -- you don't understand my

23   problem.  It's a circle.

24         MS. LOEFFLER:  (Indiscernible).

25         THE COURT:  I can't make -- you know, I'm in a circle.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 750  Filed 09/23/14  Page 132 of 224
(720) 384-8078  attrans@sbcglobal.net

1          MR. OFFENBECHER:  Well, let's see what she says, what

2   she -- see --

3          MS. LOEFFLER:  (Indiscernible) ask her the questions,

4   you'll hear what she says, we'll have the argument, and then --

5          MR. OFFENBECHER:  Okay.

6          MS. LOEFFLER:  -- (indiscernible) to the jury.

7          MR. OFFENBECHER:  Good.

8          MS. LOEFFLER:  (Indiscernible) because we don't have

9   (indiscernible) at all.

10          THE COURT:  At this point, I don't.

11          MS. LOEFFLER:  (Indiscernible).

12          THE COURT:  (Indiscernible) keep sealing the courtroom

13   and unsealing the courtroom, and sealing the courtroom

14   (indiscernible) --

15          MR. OFFENBECHER:  So I'll go as far as

16   (indiscernible) --

17          THE COURT:  Go (indiscernible) --

18          MR. OFFENBECHER:  -- and then I'm going to tell you

19   the --

20          THE COURT:  Okay.

21          MR. OFFENBECHER:  -- (indiscernible).

22       (End of sidebar)

23          THE COURT:  Okay.  If we can bring the jury in.

24          MR. OFFENBECHER:  Your Honor, were you going to make a

25   statement to -- regarding the folks in the courtroom?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 750   Filed 09/23/14   Page 133 of 224

```
 1          THE COURT:  No.

 2          MR. OFFENBECHER:  No.

 3          THE COURT:  Was I supposed to make a statement?

 4          MR. OFFENBECHER:  Oh, I think you said it was your

 5   advice that you were going to give them.

 6          THE COURT:  Oh, yeah -- no, to the people standing up

 7   here talking.

 8      (Jury present)

 9          THE COURT:  All right, welcome back.  Defense, next

10   witness.

11          MR. OFFENBECHER:  Your Honor, we'll call Deborah

12   Hopkins.

13          THE COURT:  Okay.  All right, ma'am, you see how we've

14   been doing this.  Just remain standing, she'll swear you in.

15          THE CLERK:  Raise your right hand.

16      DEBORAH HOPKINS, DEFENDANT'S WITNESS, SWORN

17          THE CLERK:  Okay, thank you.  Please have a seat.  And,

18   ma'am, if you can please state and spell your full name.

19          THE WITNESS:  Debby Hopkins.  D-e-b-o-r-a-h -- oh,

20   sorry -- Hopkins, H-o-p-k-i-n-s.

21          THE CLERK:  Thank you.

22          THE COURT:  Okay.  All right, ma'am, if you can pull a

23   little closer to the microphone but not too close.  Is that

24   microphone movable or is your chair movable?

25          THE WITNESS:  Yeah.
```

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 750  Filed 09/23/14  Page 134 of 224

1      THE COURT:  Okay.  All right.  Counsel.

2      MR. OFFENBECHER:  Thank you, Your Honor.

3                   **DIRECT EXAMINATION**

4  BY MR. OFFENBECHER:

5  Q    Mrs. Hopkins, good afternoon.

6  A    Hi.

7  Q    Let me see, first of all, we're very sorry for your loss.

8  A    Thanks.

9  Q    Mrs. Hopkins, the time shortly before your husband passed

10 was a time when he was planning on his retirement, wasn't it?

11 A    Yes.

12 Q    And he had thought about that for a while, hadn't he?

13      MS. DUIGNAN:  Objection.  Leading.

14      THE COURT:  Sustained.

15 BY MR. OFFENBECHER:

16 Q    Tell us about his plans for retirement.

17 A    He spent his time in the military and he wanted to travel.

18 Q    And it was shortly before he passed on that he was

19 preparing his retirement letter.  Right?

20 A    Yes.

21 Q    And you had talked with him about that?

22 A    It was both of our decisions.

23 Q    And you agreed with that decision, right?

24 A    Yes.

25 Q    And that had been a topic of conversation between you

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1  folks in the few weeks before that.  Right?

2  A    It was on about six months prior.

3  Q    And was it in summer that you were planning on -- he was

4  planning on retiring?

5          MS. DUIGNAN:  Objection again.  Leading.

6          THE COURT:  Sustain --

7          MR. OFFENBECHER:  Your Honor, I'm just trying to direct

8  her attention to it.

9          THE COURT:  I understand, but follow the Rules of

10 Evidence --

11         THE WITNESS:  I don't remember back then.

12 BY MR. OFFENBECHER:

13 Q    You don't remember exactly when it was?

14 A    Right.

15 Q    Well, just before he passed on, he got a job offer, didn't

16 he?

17 A    Yes.

18 Q    And that was a job offer to work in Italy, wasn't it?

19 A    Yes.

20 Q    Tell the jury about that.

21 A    It was one of my husband's best friends from school.  He

22 builds towers in Italy, and him and my husband was talking

23 about my husband coming there and working for him.  And this --

24 his friend said, "Come work -- work with me."  And my husband

25 was so happy.  And he asked me if he could retire.  And all I

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 750   Filed 09/23/14   Page 136 of 224

1  told him is, "Just make sure you have a job before you retire."

2  And he's like, "We're going to have to leave right away.  After

3  I get out, we got enough time to go see our baby girl and our

4  grandchildren, and then we'll head to Italy," and -- where he

5  could start his schooling and work.

6  Q    And that -- and he had gotten that job offer from a high

7  school friend, right?

8  A    Yes.

9  Q    It was a friend named Chris Goodyear, right?

10 A    Yes.

11 Q    And it was going to be a good job because he was going to

12 get good pay?

13 A    Yes.

14 Q    Was going to be about $70,000 a year?

15 A    I think so.

16 Q    Okay.  Now, your husband had always provided for you and

17 taken good care of you.  Is that fair to say?

18 A    Yeah.

19 Q    And he had a job in the Coast Guard the entire time that

20 you had been together.  Right?

21 A    No.

22 Q    Okay.  Tell the jury about that.

23 A    He was in the Navy before -- he was in the Navy -- Navy.

24 And he met me -- and he was in the Navy for 11 years, 11

25 months, and joined -- got out of there, because he was burned

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 750   Filed 09/23/14   Page 137 of 224

1  out for going over on the boats, and missing out on his

2  children's lives.  And so he went -- got out of the Navy and

3  went into the Coast Guard.

4  Q    And when did he go into the Coast Guard?

5  A    I'm not sure.

6  Q    Okay.  Well -- and for most of this period of time -- so

7  he was bringing home a paycheck either in the Navy or the Coast

8  Guard.  Right?

9  A    Yes.

10  Q    And for most of this period of time, you were not employed

11  otherwise outside the home.  Right?

12  A    I was sometimes.

13  Q    You were, like, working at Christmastime and so forth?

14  A    Yeah.

15  Q    But for the most time, you didn't have necessarily a

16  separate career.  Is that fair to say?

17  A    What do you mean?

18  Q    Like a long-term job or occupation that you served at?

19  A    No.  He always liked me to be home with him and the kids.

20  Q    Sure.  And you did that, right?  And --

21  A    Yes.

22  Q    -- you did that gladly.  And so he was the person who

23  provided financially for you and the family.  Right?

24  A    Yes.

25  Q    And one of the things he did to provide well for you is to

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 750   Filed 09/23/14   Page 138 of 224
(720) 384-8078   attrans@sbcglobal.net

1  make arrangements for you and the family if he passed first.
2  Right?
3         MS. DUIGNAN:  Objection.  Leading.
4         THE WITNESS:  I don't know anything about that.
5         THE COURT:  Okay.
6  BY MR. OFFENBECHER:
7  Q   Okay.  Well, let me ask you a little different question
8  then.  Did Mr. Hopkins make any arrangements financially for
9  you and the family in the --
10 A   Like I said, I don't know nothing about that.
11 Q   Okay.  Well, let me direct your attention to a couple
12 things.  You knew he was in the Coast Guard.  Right?
13 A   Yes.
14 Q   And you knew that if an active-duty serviceman in the
15 Coast Guard died, they would get a military death benefit of
16 $100,000.  Right?
17        MS. DUIGNAN:  Objection, Your Honor.  This is true for
18 anybody in the military.  I don't know what the relevance is
19 here.
20        THE COURT:  Well, I don't know if she knows the answer
21 to that, so you can answer the question.
22        THE WITNESS:  I knew about the money, but I wasn't
23 worried about it.
24 BY MR. OFFENBECHER:
25 Q   Okay.  You knew about the money, though, right?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 750   Filed 09/23/14   Page 139 of 224
(720) 384-8078   attrans@sbcglobal.net

1    A    Yeah.

2    Q    And you also knew that he had a --

3          MS. DUIGNAN:  Objection.  Leading.

4          THE COURT:  Sustained.

5          MR. OFFENBECHER:  Sure.

6    BY MR. OFFENBECHER:

7    Q    Did you know whether he had --

8          MS. DUIGNAN:  Objection.  Leading.

9          MR. OFFENBECHER:  It's not a leading question.  Come

10   on.

11         MS. DUIGNAN:  "Did you know" is "Yes" or "No."  It

12   calls for a "Yes" or "No" answer.

13         MR. OFFENBECHER:  It's not a leading question.

14         THE COURT:  Well, I don't know, until the rest of the

15   sentence is finished.

16         MR. OFFENBECHER:  Come on.

17   BY MR. OFFENBECHER:

18   Q    I'm going to ask you a question about life insurance,

19   okay?  Here's the question.  Did you know whether Mr. Hopkins

20   had a life insurance policy on his life?

21   A    No.

22   Q    So you didn't know that there was a $400,000 life

23   insurance policy?

24   A    No.

25   Q    And that you were the beneficiary of the life insurance

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 750   Filed 09/23/14   Page 140 of 224
(720) 384-8078   attrans@sbcglobal.net

1  policy?

2  A    My husband don't talk to me about stuff like that.

3  Q    You knew, didn't you, that he had some family Smith Barney

4  accounts where there was money.  Right?

5  A    Yeah.

6  Q    And you knew that in the event of his death, that money

7  would come to you.  Right?

8  A    I was not involved in that, because Jim and his father

9  left me out of that, because they'll cause -- they just didn't

10  want to talk to me about it.

11  Q    Okay.  So there was some controversy in the family about

12  that.  Right?

13  A    No.  They just didn't want to talk to me or let me --

14  involved in it.  So I didn't ask any more questions about it.

15  Q    Okay.  Well, let's look at the Smith Barney accounts.  You

16  knew about the Smith Barney accounts.

17  A    All -- all I know, he had Smith and Barney's.  I didn't

18  know exactly what he had.

19  Q    Okay.  Did you know how much they were worth?

20  A    No.

21  Q    Did you -- and there -- he -- but Mr. Hopkins didn't want

22  you to know about them, right?

23  A    He told me about them, but I just told him I don't want --

24  know about that, because I'm not worried about that stuff right

25  now.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 750   Filed 09/23/14   Page 141 of 224
(720) 384-8078  attrans@sbcglobal.net

1  Q   So there was no controversy about the Smith Barney

2  accounts and whether --

3  A   No.

4  Q   Let me finish the question.  There was no quest -- there

5  was no controversy about the Smith Barney accounts and whether

6  you would have access to that money in the event that your

7  husband passed?

8  A   No.

9  Q   That's not a fair statement.  Right?

10 A   Like I said, he -- I barely -- I stay out of that.  He

11 deal -- he deals with that.

12 Q   Well, after your husband passed, there was some money that

13 came to you.  Right?

14 A   Yes.

15 Q   About how much money was that?

16 A   I don't know offhand.

17 Q   Well, where do you suppose the money came from?

18 A   I guess my husband.

19 Q   Okay.  It came from the Smith Barney accounts.  Right?

20 A   Yeah.

21 Q   And there was about two or three hundred thousand dollars

22 of those, wasn't there?

23 A   Objection, Your Honor.  She already said she didn't know.

24      THE COURT:  Sustained.

25 BY MR. OFFENBECHER:

1 Q   So you -- go ahead.

2 A   I don't know any -- how much money.

3 Q   Well, do you know now how much money there was?

4 A   There wasn't $200,000.

5 Q   Do you think there's -- well, after your husband passed,

6 there was a trust set up to manage your money.  Right?

7 A   Like I said, I didn't know what he was doing.

8 Q   Okay.  After your husband passed away, there was a trust

9 set up to handle your money, wasn't there?

10 A   Yes.

11 Q   And your brother, Anthony Pecoraro, who's a lieutenant

12 commander in the Navy, was the trustee, wasn't he?

13 A   Yes.

14       MS. DUIGNAN:  Objection.  Leading.

15       THE COURT:  Well --

16       MR. OFFENBECHER:  Well, Your Honor, I'm just --

17       THE COURT:  -- it's already done.

18       MS. DUIGNAN:  Why doesn't he just ask who, you know.

19 He doesn't have to --

20       THE COURT:  I understand, but it's already done, so --

21 BY MR. OFFENBECHER:

22 Q   All right.  Who was the trustee of your trust?

23 A   My brother.

24 Q   What's his name?

25 A   Tony Pecoraro.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 750   Filed 09/23/14   Page 143 of 224

1  Q    Is he in the Navy?

2  A    Yes.

3  Q    What rank does he have?

4  A    Lieutenant commander.

5  Q    And what was the purpose of having a trust over the money

6  that you got from your husband's estate?

7  A    To make sure nobody got to it and -- like family members.

8  Q    And who was worried about that?

9  A    He was.

10 Q    Who was?

11 A    And me.  Him and -- my brother and my -- and me were.

12 Q    So you're -- when you say "him," you mean your brother and

13 you were?

14 A    Yeah.

15 Q    And who were you worried about getting to your money?

16 A    When families get into -- see a big sum of money they like

17 to beg for it or say, "Oh, I need money for something."  And I

18 didn't want that.

19 Q    Uh-huh (affirmative).  Did you also have family

20 obligations based on your family situation to pay some money?

21 A    What are you talking about?

22 Q    Well, in your family, wasn't -- weren't there -- you

23 required or your brothers and sisters required to help care for

24 someone?

25 A    No.

**HOPKINS - DIRECT**

1 Q   So you didn't pay any money to your family?

2 A   No.

3 Q   Okay.  So let's go back to the trust.  The trust -- one

4 purpose was to keep it away from your family, you'd said.

5 Right?

6 A   Right.

7 Q   Was there another purpose for it?

8 A   No.

9 Q   Was one purpose to keep you from spending the money too

10 quickly?

11 A   No.

12 Q   Do you remember what the type of trust it was?

13 A   Like I -- when that was happening, I was on medication,

14 that I don't remember what I was doing.

15 Q   So you don't have a memory of that period of time --

16 A   No.

17 Q   -- after your husband passed away?

18 A   No.

19 Q   What kind of medication were you on?

20 A   I don't remember.

21 Q   How long were you on the medication?

22 A   I think three weeks.

23 Q   And do you think that the trust was set up during that

24 period of time?

25 A   Yes.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 750   Filed 09/23/14   Page 145 of 224
(720) 384-8078  attrans@sbcglobal.net

1  Q    And so you don't know exactly why the trust was set up?

2  A    Yes.

3  Q    So you mean yes, you don't know?

4  A    I -- I don't know.

5  Q    Now, Mrs. Hopkins, the -- you've been interviewed on a

6  number of occasions by special agents from the FBI or law

7  enforcement of some type.  Right?

8  A    Yes.

9  Q    The first time, Trooper Dupras -- do you know who he is?

10 A    Yes.

11 Q    He came out actually on the 12th to interview you.  Right?

12 A    Yes.

13 Q    And he tape recorded that interview.  Right?

14 A    Yes.

15 Q    And then you've been interviewed on a number of other

16 occasions including back in Connecticut, where you were by some

17 FBI agents back there.  Right?

18 A    Yes.

19 Q    And those agents were all very polite and nice, fair to

20 say?

21 A    Uh-huh (affirmative).

22 Q    And they recorded those conversations as well, right?

23 A    Yes.

24 Q    So I just want you to know that we have copies of the

25 transcripts of those conversations here if at any time during

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1   the course of the examination today you want to stop and

2   refresh your memory about what you might have said.  Okay?

3   A    Okay.

4   Q    All right.  Now, on April 12th, when you were contacted by

5   Trooper Dupras, he asked you some questions about, you know,

6   who might have done this or how things were going down at the

7   shop, right, the rigger shop?

8   A    I don't recall that.

9   Q    Well, he asked you some questions about whether your

10  husband was getting along with everyone down there.  Right?

11  A    Yes.

12  Q    And you indicated to Trooper Dupras that he -- your

13  husband got along well with everybody except Para and Leah;

14  they kind of piss him off.  Right?

15  A    Yes.

16  Q    And he always -- your husband always complained about the

17  girls because they were kind of always getting their way.

18  Right?

19  A    Say that again?

20  Q    Your husband complained about the girls because they were

21  always --

22       MS. DUIGNAN:  Objection.  Hearsay.

23       THE COURT:  Sounds like hearsay, but you can ask her

24  impression.

25       MR. OFFENBECHER:  Sure.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 750   Filed 09/23/14   Page 147 of 224
(720) 384-8078   attrans@sbcglobal.net

1  BY MR. OFFENBECHER:

2  Q    You -- you've indicated -- you indicated already that your

3  husband -- your -- he didn't get along -- the person he didn't

4  get along, Leah and -- were Leah and Para, because they kind of

5  pissed him off.  Right?

6  A    Right.

7  Q    And you indicated that as far -- your impression was that

8  your husband didn't really have any conflicts with anybody at

9  work.  Right?

10  A    No.  Oh, right.  Sorry.

11  Q    Correctly, right?

12  A    Right.

13  Q    Right.  And you -- they specifically asked you about his

14  relationship with Mr. Wells.  Right?

15  A    Yes.

16  Q    And they said they -- you didn't exactly know Mr. Wells's

17  last name, but they referred to him as the guy with the big

18  gray beard.  Right?

19  A    Yes.

20  Q    In fact, you referred to Mr. Wells as Santa Claus, right?

21  A    I never did.

22  Q    Okay.  Well, do you recall -- you don't ever recall

23  referring to him as Santa Claus?

24  A    I heard in town he was.

25  Q    That he played Santa Claus.  You probably --

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 750   Filed 09/23/14   Page 148 of 224
(720) 384-8078   attrans@sbcglobal.net

1 A    He --

2 Q    -- heard that in court here, right?

3 A    No.

4         MS. DUIGNAN:  Objection.

5         THE WITNESS:  I --

6         MS. DUIGNAN:  Hearsay.

7         MR. OFFENBECHER:  Can you bring up --

8         THE COURT:  Overruled.

9         MR. OFFENBECHER:  -- DE-19 real quick?

10         THE COURT:  We're getting kind of bogged down here.

11 The question was -- I'm not even sure what the question -- did

12 she call him Santa -- did she hear -- what was the question?

13 Let's start with what the question is.

14         MR. OFFENBECHER:  Sure.

15 BY MR. OFFENBECHER:

16 Q    They asked you some questions about whether he had any

17 conflicts in the shop, and you said no.  And then they asked

18 you some questions about Mr. Wells.  Right?

19 A    Right.

20 Q    And you said you thought he was nice, he had a nice

21 relationship, he had to work with him, and they were getting

22 stuff --

23         MS. DUIGNAN:  Objection.  We're just reciting a whole

24 bunch of statements here.  What was the question?

25 BY MR. OFFENBECHER:

1 Q    What did you tell him your -- hi -- your husband's

2 relationship with Mr. Wells?

3 A    My husband was coming home pissed off, because Wells

4 wasn't doing what he was told by my husband.

5 Q    Well, that's not what you told Trooper Dupras, is it?

6 A    I don't remember.

7 Q    All right.  Well, bring up DE-19, at page 25709.  If

8 you'll look on your screen there, I'm going to show you a

9 transcript of the questions that the troopers asked you and the

10 answers that you gave, okay?  And see if that refreshes your

11 memory about what you told the troopers about your husband's

12 relationship with Mr. Wells when you were asked on the day that

13 your husband passed.

14        MR. OFFENBECHER:  Hang on just one second.  Sorry, Your

15 Honor, have just a little technical problem.  Can you bring up

16 a Bate number?

17    (Side conversation)

18 BY MR. OFFENBECHER:

19 Q    Mrs. Hopkins, could you take a look at that?  And assume

20 for a moment that the -- you -- your answers are where it says

21 "DH."  Down a little, please.  So does that refresh your

22 recollection about whether you referred to Mr. Wells as Santa

23 Claus?

24 A    Yes.

25 Q    You did, didn't you?

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 750   Filed 09/23/14   Page 150 of 224

1  A    Yes.

2  Q    And they asked what your husband's relationship with Mr.

3  Wells, who you referred to as Santa Claus, was.

4  (Indiscernible).

5       MS. DUIGNAN:  Counsel, what statement are you using?

6       MR. OFFENBECHER:  I'm using her statement that was made

7  to -- let's see -- it's the April 12th statement, Defense

8  Exhibit 19 -- April 12th, by Trooper Dupras, page 25709.  I'll

9  wait till you're ready.

10 BY MR. OFFENBECHER:

11 Q    Okay, so, Mrs. Hopkins --

12 A    Yeah.

13 Q    You ready now?  Okay.  All right, so back to where we

14 were.  So you did refer to him as Santa Claus, right, you

15 remember that.  And then they asked you what was your husband's

16 relationship with him, and you said you thought it was nice.

17 Right?

18 A    Yeah.

19 Q    And then they said, "Uh-huh."  And you said, "And usually

20 he's -- Jim Wells is a nice guy."  You said that to them that

21 day, didn't you?

22 A    That was the -- towards the beginning when I first met

23 him.

24 Q    Well, they asked you the -- that wasn't the question that

25 you were asked by the agents.  Go back up to the top of the

1  page, please.  The question was, "You said that he didn't have

2  any conflicts with anybody at work.  Right?"

3  A    Uh-huh (affirmative).

4  Q    And you said, "No."  Right?

5  A    Right.

6  Q    And then they asked in the next question, "What was your

7  husband's relationship with Mr. Wells?"  Right?

8  A    Right.

9  Q    And you said, "I thought it was nice."  Right?

10  A    Right.

11  Q    Down, please.  And then you said, "And usually he's -- Jim

12  is -- Wells is a nice guy."  Right?

13  A    Right.

14  Q    And then they asked you, "Right.  When you guys went out

15  to -- saw Rich at Boxing Day, he would be at the Boxing Day

16  celebrations?"  And you said, "Right," didn't you?

17        MS. DUIGNAN:  Objection.  I don't think that's what it

18  says.

19  BY MR. OFFENBECHER:

20  Q    All right.  I'll read it.  "Right.  When you guys went out

21  to -- you said you saw Rich at Boxing Day, he would have Boxing

22  Day celebrations over" -- you said, "Right" -- "at his house.

23  Who would attend those, those celebrations from the shop?"  And

24  you said, "His neighbors, Jim, whatever his last name is,"

25  referring -- right?

1  A    Yeah.

2  Q    And then they said, "The guy with the beard, he'd be

3  there?"  And you said, "Yeah."  Right?

4  A    Yeah.

5  Q    They also asked you during this same interview whether you

6  had heard of anybody on the base who was a time bomb waiting to

7  happen or going to explode or something like that.  Right?

8         MS. DUIGNAN:  Objection.  Relevance.  Outside of this

9  witness's expertise.

10         THE COURT:  Overruled.

11 BY MR. OFFENBECHER:

12 Q    Remember them asking you that in a different interview in

13 July?

14 A    I don't recall.

15 Q    All right.  Can you bring up DE-21, please?  This is the

16 July 30th, 2012 interview, 26064.  Bottom of the page, please.

17 Ms. Hopkins, take a look at that, again, assuming that the "DH"

18 is you speaking, and see if that refreshes your recollection

19 about whether they asked you whether there was anybody who was

20 like a time bomb waiting to happen.

21 A    I said I never heard that.

22 Q    You had never heard that anybody was --

23 A    Yeah.

24 Q    -- time bomb waiting to happen, right?  All right.  Now,

25 Mrs. Hopkins --

1    MS. DUIGNAN:  Objection, Your Honor.

2    MR. OFFENBECHER:  -- you folks had --

3    MS. DUIGNAN:  -- none of this is relevant to what her

4  impressions are.  I think the next sentence said, "And how

5  about in town?"  She said, "I don't know anybody in town

6  either."  So clearly this is just not relevant.  It's outside

7  of the witness's expertise.

8    MR. OFFENBECHER:  Your Honor, I'm moving on to a

9  different topic now.

10    THE COURT:  Okay.

11  BY MR. OFFENBECHER:

12  Q   Mrs. Hopkins, you -- is it fair to say that you and Mr.

13  Hopkins had a number of guns?

14  A   Yes.

15  Q   Okay.  And you had about how many guns?

16  A   Can't count -- count how many.

17  Q   Okay.  Do you remember telling the police that you had

18  about eight --

19    MS. DUIGNAN:  Objection.

20    MR. OFFENBECHER:  -- or so guns?

21    MS. DUIGNAN:  Lack of relevance to this.

22    MR. OFFENBECHER:  Well, Your Honor --

23    THE COURT:  Overruled.  Overruled.

24    MR. OFFENBECHER:  -- I can refresh her memory.

25  BY MR. OFFENBECHER:

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 750   Filed 09/23/14   Page 154 of 224
(720) 384-8078  attrans@sbcglobal.net

1  Q    Do you remember telling the law enforcement folks that you

2  had about eight guns?  Does that sound about right?

3  A    Yeah.

4  Q    And that your son had two guns?

5  A    Yeah.

6  Q    And that Mr. Hopkins had a Smith & Wesson .44-caliber --

7        MS. DUIGNAN:  Objection.  Leading.

8        THE COURT:  Sustained.

9  BY MR. OFFENBECHER:

10  Q    Did your husband --

11        MS. DUIGNAN:  Objection.

12        THE COURT:  What kind of guns did your husband have.

13        MS. DUIGNAN:  He can ask what kind of guns he had.

14        THE WITNESS:  I don't know what all -- kind of guns he

15  had.

16        THE COURT:  I'm not asking the question.  I'm just

17  telling him.

18        MR. OFFENBECHER:  But, Your Honor, it seems to me that

19  I ought to be able to at least finish the question before the

20  objection comes, so --

21        MS. DUIGNAN:  Your Honor, any (indiscernible) --

22        MR. OFFENBECHER:  -- here's the question.

23  BY MR. OFFENBECHER:

24  Q    Here's the question, Mrs. Hopkins.  Your -- did your

25  husband have any guns?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1  A    Yeah.

2            MS. DUIGNAN:  Objection.  Leading.

3            THE COURT:  Overruled.  Overruled.

4            MR. OFFENBECHER:  May we have a sidebar, Your Honor?

5            THE COURT:  No, not -- I overruled the objection.

6            MR. OFFENBECHER:  Yeah.

7  BY MR. OFFENBECHER:

8  Q    Did your husband have any guns?

9            THE COURT:  Asked and answered.  She --

10            MR. OFFENBECHER:  Okay.

11            THE COURT:  She said, "Yes."

12  BY MR. OFFENBECHER:

13  Q    Do you know what kind of guns he had?

14  A    Not offhand.

15  Q    Okay.  Did your husband keep his guns in a particular

16  place?

17  A    He kept them in the closet.

18  Q    Did your husband keep any guns in the drawer in the

19  bedroom?

20  A    No.

21  Q    Do you know whether your husband had a Smith & Wesson .44?

22  A    He did not have one.

23  Q    Can you bring up Defense Exhibit Number 20, please?

24  25707.  Bot -- right -- bottom middle.

25            MS. DUIGNAN:  Which interview is this from?

1      MR. OFFENBECHER:  It's the April 23rd interview by CGIS

2  Agents Denise Anderson and CGIS Special Agent Pritchard.

3      MS. DUIGNAN:  Your Honor, I object to him reading this

4  transcript.  There's nothing inconsistent in here.

5      THE COURT:  Doesn't appear to me to be inconsistent,

6  but maybe there's more to it than I can see.

7      (Side conversation)

8  BY MR. OFFENBECHER:

9  Q   Mrs. Hopkins, can you take a look at that and see if that

10 refreshes your recollection about whether your husband kept one

11 of the guns in the drawer in the house?

12 A   In the drawer, yeah.

13 Q   Right.  He did, right?

14 A   Yeah.  But it wasn't upstairs in the -- by -- in the

15 bedroom.

16 Q   Which drawer was it in?

17 A   In the hallway downstairs.

18 Q   Go to the preceding page, please.  So you remember being

19 questioned?  Does that refresh your recollection about whether

20 he had a Smith & Wesson?

21     MS. DUIGNAN:  I didn't think that was the question,

22 Your Honor.

23 BY MR. OFFENBECHER:

24 Q   Okay.  Did your husband have a Smith & Wesson?

25 A   I don't know offhand.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 750   Filed 09/23/14   Page 157 of 224
(720) 384-8078  attrans@sbcglobal.net

1  Q   Do you recall confirming for them that -- for the agents

2  that he did?

3       MS. DUIGNAN:  I don't think that's what it says in the

4  transcript.

5  BY MR. OFFENBECHER:

6  Q   You just don't know, right?

7  A   I don't know.

8  Q   Did you ever carry a gun yourself?

9  A   No.

10 Q   Did you ever shoot a gun?

11 A   Yes.

12 Q   Where would you shoot a gun?

13 A   At the gun range.

14 Q   But you never actually had a gun that you carried on your

15 person?

16 A   No.

17 Q   Never had a gun that you carried in your car?

18 A   No.

19 Q   You never actually pulled a gun out?

20      MS. DUIGNAN:  Objection.  Leading.

21 BY MR. OFFENBECHER:

22 Q   Did you ever actually pull a gun out?

23 A   No.

24 Q   Did you ever actually pull a gun out when there was a

25 trooper present?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1      MS. DUIGNAN:  Objection.  Leading.

2      MR. OFFENBECHER:  She can say -- answer "Yes" or "No."

3      THE WITNESS:  They asked for it.

4  BY MR. OFFENBECHER:

5  Q    Pardon?

6  A    They asked me for my gun --

7  Q    Okay.

8  A    -- that was in the drawer.

9  Q    Tell the jury about that.

10  A    They ask -- they came to the house and they asked me if I
had a pistol.  And I said, "Yes, it's in my drawer down here."
And I pulled it out for them, and it was in the packet where --
or a sling, where it had all the bullets right next to it.  It
wasn't loaded or anything.  My husband always carried it when
we went four-wheeling or to go to the shooting range.

16  Q    Do you remember ever telling -- who's Jillian Martinez?

17  A    My neighbor.

18  Q    She a good friend of yours.  She was at one point, anyway?

19  A    Was.

20  Q    Did -- you remember ever telling Ms. Martinez that you
pulled a gun out of your car in front of the troopers?

22  A    No.

23  Q    The day that your husband passed, a bunch of women came
and took all of the guns out of your house.  Right?

25  A    Yes.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 750   Filed 09/23/14   Page 159 of 224

1 Q   And one of the guns was not taken right away, was the .44.

2 Right?

3        MS. DUIGNAN:  Objection.  I don't think there's been

4 any evidence that there's been a .44.

5        THE COURT:  Sustained.

6 BY MR. OFFENBECHER:

7 Q   Do you remember there being any gun that was left behind

8 and had to be taken away?

9 A   No the FBI has my .460.  And the ladies from the COMMSTA

10 took out the rest of the guns.

11        MR. OFFENBECHER:  Your Honor, I wonder if this would be

12 a good time for a break.

13        THE COURT:  Okay.  We'll take a 10-minute recess.

14      (Jury not present)

15        THE COURT:  All right, please be seated.  Yes.  You

16 ready?

17        MR. OFFENBECHER:  Right.  I'd like to make an offer of

18 proof, but not --

19        THE COURT:  Okay.

20        MR. OFFENBECHER:  Not with the wit -- actually not with

21 the witness present, but we can go ahead and do it --

22        THE COURT:  No.  Let's just seal the courtroom and

23 we'll go -- get right into it.

24        MR. OFFENBECHER:  Okay.

25      (Court recessed at 2:09 p.m., to proceed in a sealed

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 750   Filed 09/23/14   Page 160 of 224
(720) 384-8078  attrans@sbcglobal.net

1  matter - transcribed separately; public proceedings reconvened

2  at 3:07 p.m.)

3      (Jury not present)

4          MR. OFFENBECHER:  Your Honor, just so we're clear, you

5  said --

6          THE CLERK:  Back on record.

7          MR. OFFENBECHER:  -- "Yes" on the Stoeckler, right?

8  Yeah.

9          THE COURT:  Yes, I did.

10         MR. OFFENBECHER:  Yeah.

11     (Jury present)

12         THE COURT:  So that -- was that a long enough recess?

13         UNIDENTIFIED JUROR:  Yeah.

14         THE COURT:  Okay, all right.  We'll -- we're -- we'll

15  get moving quickly along.  We're going to continue with the

16  direct examination --

17         MR. OFFENBECHER:  Oh, going to need Mrs. Hopkins.

18         THE COURT:  -- of Mrs. Hopkins.  Okay, we're back,

19  we're resuming.  Ms. Hopkins, you're still under oath.  We're

20  not going to swear you in again.

21         THE WITNESS:  Okay.

22         THE COURT:  Just -- and there's water and there's

23  everything you need right there, if you want to get some water.

24  Okay, counsel.

25         MR. OFFENBECHER:  Thank you, Your Honor.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 750  Filed 09/23/14  Page 161 of 224

1 BY MR. OFFENBECHER:

2 Q   Mrs. Hopkins, good afternoon again.  Mrs. Hopkins, at some

3 point -- prior to coming to Kodiak -- you had been in Kodiak --

4 let me just try to get a frame of reference.  You'd been in

5 Kodiak for about three years when your husband passed away.  Is

6 that right?

7 A   Yes.

8 Q   And prior to that, your husband was stationed in

9 Connecticut.  Right?

10 A   Yes.

11 Q   And he was working at the Coast Guard Academy, wasn't he?

12 A   Yes.

13 Q   And prior to you moving to Kodiak, your husband had --

14 would -- had actually been from that part of the country, is

15 that right?

16 A   Yeah.

17 Q   Went to high school there?

18 A   No.  Vermont, he did.

19 Q   I'm sorry?

20 A   In Vermont.

21 Q   In Vermont, right.  In the northeast.

22 A   Yeah.

23 Q   And during the time that you lived in Connecticut and he

24 worked at the Coast Guard Academy --

25 A   Yeah.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 750   Filed 09/23/14   Page 162 of 224
(720) 384-8078   attrans@sbcglobal.net

1  Q   -- your -- I'm sorry?

2  A   Yes, he did.

3  Q   Right.  During that time, he had an extramarital affair,

4  didn't he?

5  A   Yes.

6  Q   And you found out about that, didn't you?

7       MS. DUIGNAN:  Objection.  Leading.

8       THE COURT:  Sustained.

9  BY MR. OFFENBECHER:

10 Q   Did your husband have an affair?

11 A   Yes.

12 Q   Did you find out about it?

13 A   He told me.

14 Q   And what did he tell you?

15 A   He was seeing another lady.

16 Q   Did he telling you anything else about it?

17 A   He said he was just seeing her, he wasn't having sex with

18 her.

19 Q   Okay.  Did he say anything about having a divorce with

20 you?

21 A   A divorce with me?

22 Q   Yeah.

23 A   He just showed me the divorce papers.

24 Q   Okay.  Did he come home one day with divorce papers?

25 A   Yeah, I just said that.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 750   Filed 09/23/14   Page 163 of 224
(720) 384-8078  attrans@sbcglobal.net

1 Q    Okay.

2 A    He came home with divorce papers.

3 Q    Okay.  And is that because he wanted to take up with this

4 other woman?

5 A    I wasn't sure if he wanted to or she was pushing him.

6 Q    All right.  And what did you do?

7 A    I told him he wasn't going to have the divorce, I wasn't

8 going to give it to him.

9 Q    And what did you tell him you'd do if he divorced you?

10 A    Take him to the cleaners.

11 Q    Then you moved thereaf --

12       THE COURT:  You know, I don't know if I caught the time

13 frame of that.

14 BY MR. OFFENBECHER:

15 Q    What was the time frame on that?

16       THE COURT:  The time -- that was before you came to

17 Alaska, so it was back -- do you remember how long before you

18 came --

19       THE WITNESS:  It was, like, almost seven months prior,

20 before --

21       THE COURT:  So -- okay, so it was before they came to

22 Alaska.

23 BY MR. OFFENBECHER:

24 Q    Seven months before you came to Alaska.  Right?

25 A    Yeah.

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net

1  Q   All right.  And you had been in Alaska three years when he

2  passed, right?

3  A   Yes.

4  Q   All right.  So after you came to Kodiak, your husband

5  still had some contact with this woman.  Right?

6  A   I did not know he was still talking to her, what -- what

7  he was doing.

8  Q   Okay.  You didn't know about -- that he was talking to

9  her.  Right?

10 A   Right.

11 Q   But at one point you became aware that he was.  Right?

12 A   Yeah.

13 Q   And it was because he was corresponding on his Facebook

14 account.  Right?

15 A   I think he was, yeah.

16 Q   And at one point in Kodiak, he handed you his computer

17 (indiscernible) --

18        MS. DUIGNAN:  Objection.  I'm sorry.  Leading.  I

19 thought he was finished.  Please ask --

20        MR. OFFENBECHER:  Well --

21        MS. DUIGNAN:  -- the question.

22 BY MR. OFFENBECHER:

23 Q   Did he ever hand you his computer with respect to this

24 woman?

25        MS. DUIGNAN:  Objection.  Leading.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 750   Filed 09/23/14   Page 165 of 224
(720) 384-8078   attrans@sbcglobal.net

1          MR. OFFENBECHER:  No --

2          THE COURT:  Overruled.

3          THE WITNESS:  He -- yeah, he handed me the computer,

4   told me to tell her to knock it off, it's not going to happen

5   no more.

6   BY MR. OFFENBECHER:

7   Q    And so you corresponded directly with this woman, then?

8   A    Yeah, just one time.

9   Q    Telling her that she shouldn't do that, right?

10  A    Right.

11  Q    Now, Mrs. Hopkins, did you and your husband have any

12  financial problems?

13  A    No.

14  Q    Did you have any debt?

15  A    Like, what kind of debt?

16  Q    Well, any kind of debt.

17  A    Everybody has bills to pay --

18  Q    Okay.

19  A    -- and that's what we had.

20  Q    Okay.  Did you, for example, have a mortgage on a car, a

21  truck that you owned?

22  A    We -- mean, we had car payments.

23  Q    Okay.  And did you have also car payments on your RV?

24  A    Yes.

25  Q    Okay.  Did you have car payments on the quads that you had

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 750   Filed 09/23/14   Page 166 of 224
(720) 384-8078  attrans@sbcglobal.net

1  as well?

2  A    Yes.

3  Q    Did you have car pay -- did you have payments on anything

4  else besides that?

5  A    No.

6  Q    For a period of time, you had two cars.  Right?

7  A    Yes.

8  Q    By then, most recently, before Mr. Hopkins passed, you

9  scaled back to one car.  Right?

10  A    Yes.

11  Q    And you were -- had scaled back to one cell phone as well

12  in the family.  Right?

13  A    Yes.

14  Q    And that was so that you could save money.  Is that right?

15  A    We just decided we only need one cell phone when --

16  because Kodiak was a bad town with -- with the weather and

17  everything, so we thought if somebody's going to go out in

18  town, the -- bring the cell phone, just in case something

19  happens.

20  Q    Okay.  Were you at all stressed out over the financial

21  circumstances that you were on?

22  A    No.  I wasn't.

23  Q    Do you recall telling your daughter that -- Angela

24  Birchfield that you were stressed out over your financial

25  circumstances?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 750   Filed 09/23/14   Page 167 of 224

1  A    At first I was, when we got the camper and everything.

2  I'm like -- or the truck.  I'm like -- everybody gets stressed

3  out in trying to figure everything out.  Everybody does.

4  Q    Okay.  So you were stressed out a little bit by --

5  A    Yeah.

6  Q    -- your financial --

7  A    Just the first month, I was.

8  Q    Okay.  After the first month, you weren't stressed out

9  anymore?

10  A    No.

11  Q    Do you remember telling your neighbor, Jillian Martinez,

12  that you were really stressed out over your financial

13  circumstances?

14  A    I don't remember that.

15  Q    Okay.  Do you remember the agents asking you questions

16  about your financial circumstances?

17  A    Yeah.

18  Q    And do you remember telling them that your --

19        MS. DUIGNAN:  Okay.  Where are we looking at right now?

20  If you can give me a transcript and a page number, that would

21  be helpful, please.

22        MR. OFFENBECHER:  Sure.  It's Defense Exhibit 21, July

23  30th interview with Deborah Hopkins by FBI, at page 26059.

24        MS. DUIGNAN:  26059's not a page number in the

25  transcript.  The actual page number at the bottom would be

1  really helpful.

2        MR. OFFENBECHER:  I've given you the Bates number.

3        MS. DUIGNAN:  Yeah, but the Bates number doesn't help

4  me.  Do you have the page number?  It's on -- it should be on

5  the bottom of yours, if we produced it in discovery.

6        MR. OFFENBECHER:  Sure.  Take a look at DE-21.

7        MS. DUIGNAN:  Can you pull it up on the screen?  I

8  don't have the defense exhibits.  If you'd just tell me

9  which -- I have my own copies, but I need to have the real page

10 number.

11       MR. OFFENBECHER:  I can give you the page number.

12       MS. DUIGNAN:  Please.

13       MR. OFFENBECHER:  On page 39.

14       MS. DUIGNAN:  Just one moment, please.  Thank you.

15       MR. OFFENBECHER:  You ready, counsel?

16       MS. DUIGNAN:  Yes, thank you.

17 BY MR. OFFENBECHER:

18 Q    But do you remember talking with the agents about that?

19 A    Yes.

20 Q    And do you remember telling them that you thought your

21 financial status was good?

22 A    Yes.

23 Q    And do you remember telling them that your financial

24 situation wasn't stressed?

25 A    Yes.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1  Q    Okay.  Mrs. Hopkins, do you recall about six weeks or so

2  after your husband passed away that you began a sexual

3  relationship with Carsten Stoeckler?

4  A    Yes.

5  Q    And who was Carsten Stoeckler?

6  A    One of the shipmates on base.

7  Q    And he was a person that you and your husband had known

8  before he passed away?

9  A    Yes.

10  Q    And that you and your husband had socialized with before

11  your husband passed away?

12  A    Yes.

13  Q    Along with some other folks, right?

14  A    Right.

15  Q    And do you recall that that was on more than one occasion

16  that you had a sexual relationship with him?

17  A    Yeah.

18  Q    And do you recall also corresponding with him by text?

19  A    Yes.

20  Q    And do you recall that you corresponded with him through

21  the rest of 2012?

22  A    What do you mean?

23  Q    Well, you texted with him, texted messages back and forth?

24  A    Yeah.

25  Q    And you did that for many -- several months after your

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 750   Filed 09/23/14   Page 170 of 224
(720) 384-8078   attrans@sbcglobal.net

1  initial relationship with him?

2  A   Yeah.

3  Q   Mrs. Hopkins, do you also remember that when you were

4  living in Connecticut in July, at the end of July of 2012, that

5  some FBI agents came out and talked with you.  Right?

6  A   Yeah.

7  Q   And the focus of their conversa -- of the questions that

8  they asked you were about Carsten Stoeckler, your relationship

9  with Carsten Stoeckler.  Right?

10  A   Yeah.

11  Q   And they asked you whether you --

12       MS. DUIGNAN:  Objection.  I don't think there's any

13  inconsistent -- inconsistency here.  She's answered the

14  questions.  I don't know where counsel's going with this.

15       MR. OFFENBECHER:  Well, she's --

16       THE COURT:  Okay, go ahead, ask your question.  We'll

17  see.

18       MR. OFFENBECHER:  Okay.

19  BY MR. OFFENBECHER:

20  Q   They came out and asked you questions about your

21  relationship with Carsten Stoeckler.  Right?

22  A   Right.

23  Q   And when they asked you whether you had any type of

24  relationship with Carsten Stoeckler, you said, "No," didn't

25  you?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 750  Filed 09/23/14  Page 171 of 224

1    MS. DUIGNAN:  Objection.  Leading.

2    THE COURT:  Sustained.

3  BY MR. OFFENBECHER:

4  Q    When they asked you whether you had any type of

5  relationship with Carsten Stoeckler, what did you say?

6    MS. DUIGNAN:  Objection -- never mind.  Let him finish.

7    THE COURT:  Okay.

8    MS. DUIGNAN:  It's open ended.

9    THE WITNESS:  At that time I didn't have a

10  relationship.  It was just texting.

11  BY MR. OFFENBECHER:

12  Q    Okay.  But the question they asked you was broader than

13  that, wasn't it?

14  A    Right.

15  Q    They asked you, since the beginning of that year until

16  July 30th, whether you had had any kind of relationship with

17  him.  Right?

18  A    After my husband died?

19  Q    Right.

20  A    Yeah, as a friend at first, and everybody -- like I said,

21  everybody makes a mistake in their lives.

22  Q    No, I'm not asking you to -- I'm not judging you about

23  whether you made a mistake.  I'm just asking you how you

24  answered the question to the FBI when they came out and asked

25  you the question.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 750   Filed 09/23/14   Page 172 of 224
(720) 384-8078  attrans@sbcglobal.net

1  A    I think I said, "No."

2  Q    Mrs. Hopkins, is it fair to say that you spent -- you came

3  down to the rigger shop on a number of different occasions.

4  Right?

5  A    Yeah, to see my husband for lunch.

6  Q    Sure.  And you would come down fairly frequently to have

7  lunch with him.  Right?

8  A    Yeah.

9  Q    And so you were kind of familiar with the layout of the

10 rigger shop, right?

11 A    Yes.

12 Q    And you were familiar with, you know, what door to go into

13 and how you could get into the rigger shop when you got there.

14 Right?

15 A    Yeah.

16 Q    You knew about which doors were locked, swiped doors, and

17 which doors were normally open during the course of the day.

18 Right?

19 A    Yeah.

20 Q    You know which doors would normally have a slide bolt on

21 the back of them --

22        MS. DUIGNAN:  Objection.  Leading.

23        THE WITNESS:  I would not --

24        THE COURT:  Sustained.

25        THE WITNESS:  -- know that.

1  BY MR. OFFENBECHER:

2  Q   You wouldn't know that, okay.  The -- let me ask you this,

3  Mrs. Hopkins.  This -- you also came down to the rigger shop

4  sometimes when your husband wasn't there.  Right?

5  A   Yeah.

6  Q   And you would hang out with some of the folks down there?

7  A   No, I would go there and write my husband a love letter

8  and say, "I love you."  See --

9  Q   Okay.  Did you chat with any of the folks who were there?

10 A   I just said "Hi" to them and I left.

11 Q   Okay.  Did anybody ask you ever to not come down there

12 when he wasn't there?

13 A   Chief -- Senior Chief Reed did.

14 Q   Senior Chief Reed told you not to go down there anymore?

15 A   Yeah, and then my husband did.

16 Q   And your husband told you not to go down there anymore --

17 A   Yeah.

18 Q   -- too.  Now, in your interviews, Mrs. Hopkins, you've

19 indicated that your husband went to work at 6 o'clock in the

20 morning, right?

21 A   Yeah.

22 Q   And that was pretty routine, right?

23 A   Yeah.

24 Q   He would also go at the same time, wouldn't he?

25 A   Yeah.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 750   Filed 09/23/14   Page 174 of 224
(720) 384-8078  attrans@sbcglobal.net

1      MR. OFFENBECHER:  I don't have any other questions,

2  Your Honor.

3      THE COURT:  Cross-examination.

4              **CROSS-EXAMINATION**

5  BY MS. DUIGNAN:

6  Q   Mrs. Hopkins, how did you find out about your husband's

7  murder?

8  A   I think Captain Van Ness and the captain from the base and

9  a couple chaplains, and I think a couple of the cops from base

10 came to the house.

11 Q   Would it be fair to say that when you saw them walking up,

12 you knew something was bad?

13 A   Yeah.  Yeah.

14 Q   When military folks see people coming to their door in

15 uniform in the middle of the morning, that's pretty bad, isn't

16 it?

17 A   Yes.

18 Q   You didn't react very well when you were told the news,

19 did you?

20 A   No.  I think I almost slammed the door on my -- the

21 captain's fingers.

22 Q   And pretty shortly after being told that, you mentioned

23 that you were drugged up for about three weeks --

24 A   Yeah.

25 Q   -- is that correct?  And you were given something called

 1    Loranzepram [sic]?  Is that --

 2    A    I think --

 3    Q    -- what it's called?

 4    A    -- I remember that.

 5    Q    And that drug had a side effect for you where you don't

 6    really remember very much from that time.  Is that true?

 7    A    Yes.

 8    Q    Did you kill your husband?

 9    A    No.

10    Q    Where were you that morning that your husband was killed?

11    A    In the house, cleaning, then sat on the couch, waiting for

12    my son to come down.

13    Q    And how many cars did you have in your house, again?

14    A    One.

15    Q    And where was it that morning?

16    A    At the COMMSTA.

17    Q    Mr. Offenbecher spent a lot of time asking you

18    embarrassing questions.

19    A    Yeah.

20         MR. OFFENBECHER:  Is that --

21         MS. DUIGNAN:  How do you feel --

22         MR. OFFENBECHER:  Is that a question?  I object to that

23    statement, Your Honor.  It's simply a statement for the jury.

24         MS. DUIGNAN:  Did you believe Mr. Offenbecher's

25    questions were embarrassing?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 750   Filed 09/23/14   Page 176 of 224

1          MR. OFFENBECHER:  I object.  I'd like a ruling.

2          THE WITNESS:  Yes.

3          THE COURT:  She restated the question.

4          MS. DUIGNAN:  I restated the question.

5    BY MS. DUIGNAN:

6    Q    Did you believe Mr. Offenbecher's questions were

7    embarrassing?

8    A    Yes.

9    Q    Were they very difficult for you to answer in front of a

10   roomful of people?

11   A    Yes.

12   Q    But, yet, you essentially told us everything that was

13   embarrassing in your life, didn't you?

14   A    Yes.

15   Q    And by telling us about having sex with somebody else six

16   weeks after, how did that make you feel?

17   A    Like crap.

18   Q    How do you feel about that decision?

19   A    I should not have made that, never have -- should

20   happened.

21   Q    What were you feeling at that time in your life?

22   A    Missing my husband.  Missing that contact with him.

23   Q    Mr. Offenbecher also earlier in your examination suggested

24   a lot of things about money that may have come to you.  Do you

25   have any control over that money?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 750   Filed 09/23/14   Page 177 of 224

1  A    No.

2  Q    It's in a trust, isn't it?

3  A    Yes, it is.

4  Q    And the trust is controlled by somebody else, isn't it?

5  A    Yes, it is.

6  Q    And you have no access to it at all, correct?

7  A    Not at all.

8  Q    How do you feel about that money, I mean in relation to

9  having your husband?

10  A    I'd rather have my husband than the money.

11  Q    Mr. Offenbecher also asked you about a time where you had

12  difficulties with your marriage.  Right?

13  A    Right.

14  Q    Can you please explain how that worked out and when was

15  it?

16  A    Which --

17  Q    When was it?  When was that that you had those problems in

18  your marriage?

19  A    When Jim was having the affair and he realized it wasn't

20  what he wanted, and he made the wrong choice.  And he -- in my

21  heart, anybody who makes the wrong -- wrong decision, you

22  forgive and forget.  And I forgive -- forgave my husband.  And

23  we went on with life.

24  Q    And after that, what were your plans when you left Kodiak?

25  You mentioned you had planned on traveling with your husband?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 750   Filed 09/23/14   Page 178 of 224
(720) 384-8078  attrans@sbcglobal.net

1  A    Yeah.  We -- we were -- I did not know about the job at

2  first in Italy.  But I told him I wanted to travel.  I wanted

3  to go see our grandchild, that -- Jim never got to see our

4  first grandson.  And go see -- well, go see our grandchild and

5  go see our daughter, and then start traveling the world or

6  around the country again.  And -- because that's what we

7  want -- like to do.  We like to spend time together.  And Jim

8  came up and told me he had a job, got offered a job in Italy by

9  Chris.  And I told him that's his decision, and he -- just make

10  sure he has the job before he gets out of the military.

11  Q    Would it be fair to say that you were very supportive of

12  your husband?

13  A    Yes.

14  Q    And how many times did you move over the course of your

15  Coast Guard career and Navy career?

16  A    Let's see.  About 16, 17 times.  Maybe 18.

17  Q    So would it be fair to say that over the course of an

18  almost 20-year career, moving 18 times is a little stressful?

19  A    Yeah.

20  Q    Yeah.  And during that time, Mr. Offenbecher had asked you

21  if you worked.  Wouldn't you say that it's probably difficult

22  to find a job when you're moving 18 times in support of a

23  military spouse?

24  A    Yeah, it's hard.

25  Q    And, in fact, you raised two children.  Isn't that

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 750   Filed 09/23/14   Page 179 of 224
(720) 384-8078  attrans@sbcglobal.net

1 correct?

2 A   Yes, it is.

3 Q   Would you consider that to be a job?

4 A   Full-time job.

5 Q   When was your anniversary?

6 A   April 22nd.

7 Q   And before your husband was murdered on April 12th, how

8 many years had you been married?

9 A   Nineteen years.

10 Q   What were your plans for your twentieth anniversary?

11        MR. OFFENBECHER:  Objection, Your Honor.  This is

12 beyond the scope of relevance.  She's -- counsel has certainly

13 done everything she can to make the witness sympathetic, but --

14        THE CLERK:  Can -- move that microphone, Mr.

15 Offenbecher?  I can't pick you up.

16        MR. OFFENBECHER:  Sorry.  But at some point it is

17 beyond the scope of the direct.

18        THE COURT:  Overruled.

19 BY MS. DUIGNAN:

20 Q   What were your plans for your twentieth anniversary?

21 A   We were -- we were going to head back to Anchorage and

22 spend a couple weeks in -- staying in Anchorage and having fun,

23 going -- exploring around Anchorage and -- and spending --

24 spending two weeks with each other.

25 Q   And when was your last grandchild born?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 750   Filed 09/23/14   Page 180 of 224
(720) 384-8078  attrans@sbcglobal.net

1  A    In December.

2  Q    And what were the plans between you and your husband as

3  far as going to visit your grandbaby?

4  A    Are we talking about my granddaughter or my grandson?

5  Q    Your grandson.

6  A    Okay.  Jim want -- when Nolan (ph) was born, was being

7  born, Jim wanted to go but Jim couldn't take leave.  So he sent

8  me to go watch my grandson be born.

9  Q    And were there supposed to be plans in order for Jim to

10  actually meet his grandson?

11  A    Yes.

12  Q    And what happened with those plans?

13  A    I think they got denied or something.  I wasn't sure what

14  happened.

15  Q    And wasn't there supposed to be a time in April where you

16  were finally going to take that trip and go visit your

17  grandchild?

18  A    Yeah.

19  Q    Did that ever happen because of the murders?

20  A    Never happened.

21  Q    Thank you.  I have no further questions right now.

22        THE COURT:  Redirect.

23        MR. OFFENBECHER:  Just briefly.

24                    **REDIRECT EXAMINATION**

25  BY MR. OFFENBECHER:

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 750  Filed 09/23/14  Page 181 of 224

1  Q   Mrs. Hopkins, your -- counsel asked you a few questions

2  about your plans after your husband retired.  Do you remember

3  that?

4  A   Uh-huh (affirmative).

5  Q   Did you think that your husband was going to stay with you

6  after he retired?

7  A   Yes.

8  Q   Did you think that your marriage was going to continue

9  after he retired?

10 A   Yes.

11 Q   Do you recall telling your daughter that you didn't think

12 that Jim was going to stay with you after he retired and after

13 your son graduated from high school?

14 A   No.

15 Q   Do you recall telling your daughter that you thought that

16 your marriage would probably come to an end after he retired?

17 A   No.

18 Q   No other questions.

19      THE COURT:  Recross.

20      MS. DUIGNAN:  No further questions.

21      THE COURT:  All right.  Thank you, ma'am.  Defense next

22 witness.

23    (Witness excused)

24      MR. OFFENBECHER:  Angela Birchfield, Your Honor.

25      THE COURT:  Okay, you've seen how we do it.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 750   Filed 09/23/14   Page 182 of 224

1    MS. BIRCHFIELD:  Yeah.

2    THE CLERK:  Please raise your right hand.

3    **ANGELA MICHELLE BIRCHFIELD, DEFENDANT'S WITNESS, SWORN**

4    THE CLERK:  Okay, thank you.  Please have a seat.  And,

5  ma'am, if you can please state and spell your full name.

6    THE WITNESS:  Angela M. Birchfield.  A-n-g-e-l-a, M as

7  in Michelle, B-i-r-c-h-f-i-e-l-d.

8    THE CLERK:  Thank you.

9    THE COURT:  Counsel.

10    MR. OFFENBECHER:  Thank you, Your Honor.

11                    **DIRECT EXAMINATION**

12  BY MR. OFFENBECHER:

13  Q    Ms. Birchfield, good afternoon.

14  A    Hello.

15  Q    First of all, we're very sorry for your loss as well.  Ms.

16  Birchfield, can you -- first of all, let me just say, you've

17  been interviewed by the FBI as well.  Right?

18  A    Yes.

19  Q    And you've been sitting in here during the testimony here

20  today, and for several days.  Right?

21  A    Yes.

22  Q    First of all, let's say -- please tell the jury who you

23  are in relationship to this case.

24  A    I'm one of the victim's stepdaughters.

25  Q    Okay.  You're related to Jim Hopkins.  Right?

1   A    Yep.  He was my dad.

2   Q    Okay.  And the woman who just testified is your mom.

3   Right?

4   A    That's my mother.

5   Q    Deborah Hopkins is your mother.  Right?

6   A    Yes.

7   Q    How old are you, Ms. Birchfield?

8   A    Twenty-four.

9   Q    Where do you live?

10  A    I live in Western North Carolina.

11  Q    And what do you do there?

12  A    I'm a detention officer.  I work in corrections at our

13  local detention facility.

14  Q    Is that the Grant County Sheriff's Office?

15  A    Yes.

16  Q    Now, you were interviewed by law enforcement officers in

17  this case as well, right?

18  A    I was.

19  Q    And they identified themselves and they made a tape

20  recording of that interview, didn't they?

21  A    They did.

22  Q    And they did that with your permission, right?

23  A    Yes.

24  Q    So, as I've -- you've probably seen, we have a copy of

25  that here.  If you'd care to refresh your memory with that,

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 750   Filed 09/23/14   Page 184 of 224
(720) 384-8078   attrans@sbcglobal.net

1  you're welcome to do that at any time.

2  A    I've already looked it over.

3  Q    Okay.  And if you need to do that here today, just let me

4  know, okay?  So you haven't always lived in North Carolina,

5  right?

6  A    No.

7  Q    Where else have you lived?

8  A    All over.  Washington, Illinois, Connecticut, Vermont,

9  California.

10  Q    Even though you've been away from your mom and dad, have

11  you kept -- did you keep contact with them?

12  A    I have.

13  Q    And prior to your dad passing away, did you maintain

14  regular communication with your mom?

15  A    I did.

16  Q    And did you do that by telephone and other means as well?

17  A    Yes.

18  Q    Did you talk to her frequently on the phone?

19  A    Most of the time.

20  Q    Okay.  Now, Ms. Birchfield, the -- you are also the

21  trustee of the estate which manages your mother's money.  Is

22  that right?

23  A    I am.

24  Q    Can you tell the jury about that, please?

25  A    When my father was killed, the life insurance policy that

1  was to be awarded to my mom was put into a trust.  As Mr.

2  Offenbecher's previously stated, she was a homemaker, so it was

3  to ensure her living for the next several years.  And the trust

4  was just to secure it from being spent quickly, since that was

5  about all she would have to live off of.  So my uncle, Anthony

6  Pecoraro, had originally taken the trust over, and then it was

7  recently turned over to me in February of this year.

8  Q    And so you are now the trustee of your mom's trust?

9  A    I am.

10 Q    And the purpose of that is to make sure that the money

11 lasts?

12 A    That's correct.

13 Q    And that it doesn't all get spent right away.  Right?

14 A    Yes.

15 Q    And what, approximately, is the amount of money in the

16 trust right now?

17 A    There's been some recent payments, but I would say

18 probably about 185,000.

19 Q    And that's -- well, were you there when she -- when the

20 estate was settled up?  You -- the -- you weren't the trustee,

21 right?

22 A    No.

23 Q    Your uncle, Mr. Pecoraro, was, or Lieutenant Commander

24 Pecoraro was?

25 A    That's correct.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 750   Filed 09/23/14   Page 186 of 224
(720) 384-8078  attrans@sbcglobal.net

**BIRCHFIELD - DIRECT**

1  Q   Okay.  But now you're -- you handle her bank account and

2  you handle her funds.  Right?

3  A   I handle the trust.  She handles her own bank account.

4  Q   Okay.  And you're in charge of disbursing money to her as

5  the trustee?

6  A   Yes.

7  Q   All right.  Ms. Birchfield, did you have conversations

8  with your mother about whether she thought your dad was going

9  to stay with her?

10  A   What do you mean?

11  Q   Well, whether their marriage would come -- whether their

12  marriage was likely to come to an end?

13  A   That statement was a personal opinion of mine, not

14  something she had told me.

15  Q   Okay.  Well, let me direct your attention to Defense

16  Exhibit 14.

17  A   Uh-huh (affirmative).

18  Q   At page D-4064.

19  A   Where it talks about the divorce?

20  Q   No.  Yeah, it's D-4064.  Just hang on, we'll take a look

21  at it.  Hang on just a second, it'll come up.  All right, line

22  5 through 8.  Line 5 through 8, please.

23  A   That was at the time she was discussing the fact that he

24  was talking about a divorce when she had made that statement to

25  me.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 750   Filed 09/23/14   Page 187 of 224
(720) 384-8078  attrans@sbcglobal.net

1    MS. DUIGNAN:  Your Honor, I'd just ask for a time frame
2 on this.
3    THE COURT:  That makes sense.
4    MR. OFFENBECHER:  Okay.
5 BY MR. OFFENBECHER:
6 Q   Okay, you indicated here that your mother said she made it
7 known that she didn't think --
8    MS. DUIGNAN:  Objection.  I don't think we got the time
9 frame --
10    MR. OFFENBECHER:  Okay.
11    MS. DUIGNAN:  -- and now counsel's just reading.
12    THE COURT:  Okay.
13    MR. OFFENBECHER:  Okay.
14 BY MR. OFFENBECHER:
15 Q   You in -- well, take a look at the top part there.
16 A   Uh-huh (affirmative).
17 Q   When they moved to Ala -- this is when they moved to
18 Alaska, right?
19 A   (No audible reply).
20 Q   And then directing your attention to line 5, the --
21    MS. DUIGNAN:  Objection, Your Honor.  Is there a
22 question here?  I don't think we've had a question yet.
23    MR. OFFENBECHER:  Trying to direct her attention to the
24 sent -- to the particular statement.
25    MS. DUIGNAN:  For --

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 750   Filed 09/23/14   Page 188 of 224
(720) 384-8078   attrans@sbcglobal.net

1          THE COURT:  So you -- are you --

2          THE WITNESS:  I'm reading it.

3          MS. DUIGNAN:  For why?

4          THE COURT:  -- refreshing her recollection --

5          THE WITNESS:  I've read it.

6          THE COURT:  -- is what you're doing?

7          MR. OFFENBECHER:  I am.

8          MS. DUIGNAN:  For --

9          THE COURT:  Okay.

10         MR. OFFENBECHER:  Okay.

11         MS. DUIGNAN:  Your Honor, I just want to clarify, for

12  what?  For the time frame?

13         THE WITNESS:  If you can move down a couple lines.

14         MR. OFFENBECHER:  Yeah.  Move down, please.

15         THE COURT:  Okay, the que --

16         MS. DUIGNAN:  I'm sor --

17         THE COURT:  -- let's get it clear, so everybody

18  understands what's going on.

19         MR. OFFENBECHER:  Okay.

20         THE COURT:  The question -- no one has mentioned

21  anything about a -- I mean, the time frame is still unclear.

22  So maybe --

23  BY MR. OFFENBECHER:

24  Q    Well, you made this statement in -- November 14th of 2012.

25  Right?

1  A    Yes.

2  Q    And at the beginning of this paragraph you talked --

3         MS. DUIGNAN:  Objection, Your Honor.  I mean, the time

4  frame about when this discussion occurred, not when the

5  statement was made.

6         MR. OFFENBECHER:  Trying to get there.

7         THE COURT:  Okay.  Get --

8         MS. DUIGNAN:  Okay.

9         THE COURT:  Try to get there.

10 BY MR. OFFENBECHER:

11 Q    The time frame about when this discussion -- when you

12 formed your -- well, you've indicated this was your opinion,

13 that their marriage wasn't going to last.  Right?

14 A    Yes.

15 Q    But this -- and this statement seems to reflect the fact

16 that your mom told you she didn't think it was going to last.

17 Right?

18 A    I think that was an error on my part during the interview.

19 Because it sounds like something that she would have told me

20 upon talking about the divorce originally.  And if that had

21 been something she had told me when they moved to Alaska, it

22 was very early on in the move.

23 Q    Very early on in the move to Alaska?

24 A    Yes.

25 Q    But what you've indicated to the agents was, "She just,

1  you know, made it known" -- no --

2      MS. DUIGNAN:  Objection.  I don't think there's

3  anything inconsistent yet, so I don't know why counsel's

4  reading from the statement.

5  BY MR. OFFENBECHER:

6  Q   So what you're saying is that your mom did tell you that

7  she thought their marriage would come to an end, as far as the

8  marriage goes, sometime after they moved to Alaska?

9  A   That's what -- that is what is in my statement, yes.

10  Q   Go to page 4068, please.  With line 10, please.

11  A   Uh-huh (affirmative).

12  Q   Does that refresh your memory about what you think the

13  status of your parents' marriage was?

14  A   In the last couple of years, as in the time they were in

15  Connecticut.

16  Q   Okay.  Well, let's look at what the question was.  Put it

17  up to 7, please.  The question that you were asked by the

18  investigator who had come out to interview you was, "Can you

19  think of anything else about your parents' relationship that

20  the investigator that's handling this case should know?"

21      MS. DUIGNAN:  Objection, Your Honor.  I don't think

22  this has anything to do, though, with what Mrs. Hopkins would

23  have known or what Mrs. Hopkins would have said, which is the

24  only relevant thing here.

25  BY MR. OFFENBECHER:

1  Q    So this just reflects your opinion?  Is that right?

2  A    Yes.

3  Q    Your opinion was that their marriage was -- has been on

4  the fence --

5          MS. DUIGNAN:  Objection, Your Honor.  I don't think --

6          MR. OFFENBECHER:  -- of divorce --

7          MS. DUIGNAN:  -- (indiscernible).

8          MR. OFFENBECHER:  -- for the la -- let me just finish.

9          THE COURT:  Well, just ask her --

10          MS. DUIGNAN:  Well, wait --

11          THE COURT:  Ask her opinion.  If she can give it, fine.

12  If she needs to refresh her recollection, then we'll go to the

13  next step.

14          MR. OFFENBECHER:  All right.

15  BY MR. OFFENBECHER:

16  Q    Without refreshing your recollection, did you have an

17  opinion when the investigator asked you that question about

18  whether your parents' marriage had been on the fence of divorce

19  for the last couple years?

20  A    That was my personal opinion, not based on any solid

21  facts.

22  Q    Okay.  Well, it was based on your conversations with her,

23  right?

24  A    It was just based on my perception of their marriage.

25  Q    Okay.

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net

1  A   Which -- I was from the outside looking in.  I was several

2  miles away.  And at the time of their move, I mean, we didn't

3  speak very much at that point.  You had asked me earlier if we

4  had talked all the time, and we had most of the time, up until

5  the move, around that time, when -- I mean, it's very hard to

6  keep contact when you're transferring with the military and

7  coming into a new house and -- I mean, this was my perception

8  of their marriage, not words directly out of her mouth to me.

9  Q   And your perception was based on your conversations with

10  your folks, right?

11  A   Yes.

12  Q   Because there was no -- really any other source of it

13  except talking with your mom and dad.  Right?

14  A   Yeah.

15  Q   Ms. Birchfield, have you noticed some -- any change in

16  your mother in terms of being secretive since her husband

17  passed away?

18  A   She went through a period where she didn't talk to her

19  brother and I very often, which I guess everyone deals with

20  grief in their own way.  I mean, she just kind of wanted some

21  space for herself and to be alone, and she didn't want to share

22  her personal life with me.  If that's the period you're talking

23  about, then yes, that went on for a couple weeks to a few

24  months, maybe.

25  Q   You described it to the investigators as being secretive,

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 750   Filed 09/23/14   Page 193 of 224

1  right?

2  A    Yes, that's the wording I used.

3  Q    Did you also have some information -- well, let me just

4  ask you this.  Is it fair to say that your mom and dad, you

5  thought, were fairly big spenders financially?

6          MS. DUIGNAN:  Objection.  Leading.

7  BY MR. OFFENBECHER:

8  Q    Well, what's your opinion on that?

9  A    Can you ask the question again?

10  Q    Sure.  You have reviewed your statement recently, right?

11  A    Uh-huh (affirmative).

12  Q    So you know what I'm talking about, don't you?

13  A    Uh-huh (affirmative).

14  Q    Why don't you tell the jury about that.

15  A    I thought that they were a little extravagant in their

16  spending, as far as four-wheelers go and hunting season came

17  around.  And my dad was a very avid hunter, so that was always

18  kind of a costly time of year.  And the big diesel truck.  I

19  mean, I'm driving just a little, cheap vehicle, so, I mean, it

20  was a little costly as far as I was concerned.  But that's the

21  way that they had always kind of lived.

22  Q    Always kind of lived in what way?

23  A    New vehicles.  They would occasionally have, you know, a

24  four-wheeler or -- I don't know, two vehicles at a time.  I

25  mean, like he -- you would ask about loans, a car loan, a loan

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 750   Filed 09/23/14   Page 194 of 224

1 for a sport utility vehicle; I mean, it's pretty common.

2 Q  And do you recall indicating that, basically, they spent

3 what they didn't have?

4 A  As far as pulling loans, yeah.

5     MR. OFFENBECHER:  I don't have any other questions,

6 Your Honor.

7     THE COURT:  Cross-examination.

8                    **CROSS-EXAMINATION**

9 BY MS. DUIGNAN:

10 Q  Good afternoon, Mrs. Birchfield.

11 A  Good afternoon.

12 Q  What do you do for a living?

13 A  I'm a detention officer at the local corrections facility

14 in Grant County, North Carolina.

15 Q  And how did you find out your father had been murdered?

16 A  I had received a phone call on April 12th, saying that he

17 was shot.  At -- at that time I didn't know that he was

18 murdered.

19 Q  When did you find that out?

20 A  Several hours after the fact.  I'd called my mother's

21 house, and she wasn't able to talk to me at that point, so one

22 of the other women from the COMMSTA answered the phone and told

23 me.

24 Q  And Mr. Offenbecher asked you a number of questions about

25 your parents' relationship.  When you described issues that you

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 750   Filed 09/23/14   Page 195 of 224

1  found out about your parents' relationship, exactly when was

2  that?

3  A    The -- with the exception of the statement earlier, I

4  guess the -- most of it had taken -- had -- had been going on

5  while they were in Connecticut.

6  Q    So just to be -- put it in perspective for a timeline,

7  would that be about six or seven years ago?

8  A    Probably more like five years.

9  Q    Five years ago.  And you had mentioned that their

10 relationship seemed to be pretty strong in the last two years.

11 Isn't that true?

12 A    Yeah.  After I had -- or -- yeah.

13 Q    When you were pregnant with your grandson, you --

14 A    Or --

15 Q    -- had mentioned that you were making plans for them to

16 come visit with you.  Isn't that right?

17 A    Yeah.  When I got pregnant with my son, my dad became

18 very -- much more family oriented than I was used to, and --

19 and they had -- they had kind of mended a lot at that point and

20 he had become more involved.

21 Q    And there were plans to come visit you just after the

22 murders happened, but that didn't occur, obviously.  Right?

23 A    Yes.

24 Q    Mr. Offenbecher asked you a lot about financial status.

25 You've been able to handle the finances.  Did you see anything

1   that appeared out of line with normal commercial spending on a

2   vehicle?

3   A    No.

4   Q    Did your parents have a mortgage on a home of any type?

5   A    They did not.

6   Q    And, in fact, their only debt was for vehicles, wasn't it?

7   A    The -- the vehicles and the four-wheelers.

8   Q    Mr. Offenbecher also asked you about a lot of things about

9   how many times you were able to talk with your mom.  That was

10  by telephone, correct?

11  A    Yes.

12  Q    How long has it been -- just to be clear, you never lived

13  in Kodiak with your parents?

14  A    No.

15  Q    And before the murders, what would have been the last time

16  that you would have seen your dad?

17  A    Probably about four years.

18  Q    I have no further questions.

19         THE COURT:  Redirect.

20         MR. OFFENBECHER:  Just a moment, Your Honor.  Briefly.

21                    **REDIRECT EXAMINATION**

22  BY MR. OFFENBECHER:

23  Q    Ms. Birchfield, you indicated that things changed after

24  you got pregnant, right?

25  A    Yes.

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net

1  Q    Sorry.  And, actually, that was kind of a response to

2  the -- things had definitely been on the fence for the last

3  couple of years, right?  And then things changed when you got

4  present -- pregnant?

5  A    They had changed before that.  He just became more family

6  oriented, like -- I mean, we had talked more.  My dad and I had

7  picked up our conversation.  My mother and I had picked up how

8  frequently we had spoke.  We all just kind of talk -- started

9  talking a little bit more.

10 Q    And why is that?  Do you -- did you speculate about why

11 that was?

12         MS. DUIGNAN:  Objection to speculation.

13         MR. OFFENBECHER:  Well --

14         THE COURT:  If she knows.

15         MR. OFFENBECHER:  -- why was it, if she knows, her

16 impression.

17         THE WITNESS:  I couldn't tell you.

18         MR. OFFENBECHER:  Okay.  No other questions, Your

19 Honor.

20         THE COURT:  Recross.

21         MS. DUIGNAN:  No questions, Your Honor.

22         THE COURT:  Thank you, ma'am.  Defense next witness.

23    (Witness excused)

24         MS. LOEFFLER:  Could we have the name of the next

25 witness?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 750   Filed 09/23/14   Page 198 of 224
(720) 384-8078   attrans@sbcglobal.net

1          MR. OFFENBECHER:  Jillian Martinez.

2          MS. LOEFFLER:  I'd like a sidebar, Your Honor.

3          THE COURT:  Okay.

4      (At sidebar with the Court and counsel)

5          THE COURT:  (Indiscernible).

6          MS. LOEFFLER:  I think they're calling her to ask prior

7   statements that the witnesses have all already admitted.  So if

8   they want to ask her questions about -- so I don't think that

9   there's going to be anything relevant in this other than

10  calling this neighbor to ask things that were said to -- from

11  Mrs. Hopkins to the neighbor.  He asked her the questions.  She

12  admitted all the things that they said before.  I don't think

13  there's --

14         MR. OFFENBECHER:  (Indiscernible) -- well, maybe the --

15  I think counsel's right, that many of the things that Ms.

16  Martinez would have brought in would be impeachment, so --

17         THE COURT:  Okay.

18         MR. OFFENBECHER:  -- I'm not going to go there --

19         THE COURT:  Okay.

20         MR. OFFENBECHER:  -- those things.

21         MS. LOEFFLER:  And I think --

22         THE COURT:  He's not going to go for impeachment, he's

23  going to go --

24         MS. LOEFFLER:  Okay.

25         THE COURT:  -- for nonimpeachment.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 750   Filed 09/23/14   Page 199 of 224
(720) 384-8078   attrans@sbcglobal.net

1          MR. OFFENBECHER:  Got 15 other little tabs here, but --

2          THE COURT:  Fifteen other little tabs.  That's

3  (indiscernible) --

4          MS. LOEFFLER:  Then I'll just object (indiscernible) --

5          THE COURT:  Object, and you can (indiscernible) --

6          MS. LOEFFLER:  Okay.

7          THE COURT:  -- not relevant, and I'll sustain your

8  objection.

9          MS. LOEFFLER:  Okay.

10          MR. OFFENBECHER:  I think I understand the Court's

11  ruling that --

12          THE COURT:  What -- I don't even know what -- any idea

13  what you have in mind.

14          MS. LOEFFLER:  I don't either.

15          THE COURT:  She's the neighbor who she talked to about

16  her finances, and that's already been addressed.  What else is

17  on --

18          MR. OFFENBECHER:  Well, I don't think

19  (indiscernible) --

20          THE COURT:  -- divorce is any issue?

21          MR. OFFENBECHER:  I don't think the finances

22  (indiscernible) --

23          MS. LOEFFLER:  (Indiscernible).

24          THE COURT:  Well, I don't know why --

25          MR. OFFENBECHER:  Yeah.  Okay.  Yeah.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 750   Filed 09/23/14   Page 200 of 224
(720) 384-8078  attrans@sbcglobal.net

MARTINEZ - DIRECT

1    THE COURT:  Okay, well no -- you do what you're

2  supposed to, and don't do anything wrong, (indiscernible).

3    MR. OFFENBECHER:  Okay.  (Indiscernible).

4    (End of sidebar)

5    THE COURT:  You got up here already.  Could you stand

6  up, please, and she'll swear you in when we --

7    THE CLERK:  Okay.  Ma'am, please raise your right hand.

8    **JILLIAN R. MARTINEZ, DEFENDANT'S WITNESS, SWORN**

9    THE CLERK:  Okay, thank you.  Please have a seat.  And,

10  ma'am, if you can please spell -- state and spell your full

11  name.

12    THE WITNESS:  Jillian R. Martinez.  J-i-l-l-i-a-n, R,

13  Martinez, M-a-r-t-i-n-e-z.

14    THE CLERK:  Thank you.

15    THE COURT:  All right, counsel.

16    MR. OFFENBECHER:  Thank you, Your Honor.

17    **DIRECT EXAMINATION**

18  BY MR. OFFENBECHER:

19  Q   Ms. Martinez, good afternoon.  Can you indicate -- where

20  do you live?

21  A   The same address I was at, 2019A Aviation Loop.

22  Q   Okay.  And that's on Kodiak, right?

23  A   Yes.

24  Q   And what's your relationship with Deborah Hopkins or what

25  was your relationship with Deborah Hopkins?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 750   Filed 09/23/14   Page 201 of 224

1  A    She was my neighbor and friend.

2  Q    And when you say neighbor, how close together did you

3  live?

4  A    She was in the attached -- it -- it's a duplex.  So I was

5  on the A side, she was on the B side.

6  Q    Okay.  And when did you first meet and get to know Deborah

7  Hopkins?

8  A    Shortly after they moved in.

9  Q    About when would that have been?

10  A    Oh, goodness.  I moved in about June 20th, I want to say,

11  of '09.  And they were there shortly -- I don't remember the

12  time frame exactly, but it really wasn't very long.  It was

13  transfer season, so they were moving in shortly thereafter.

14  Q    So within weeks, maybe, or months?

15  A    Weeks.

16  Q    Okay.  And is it fair to say that you two hit it off right

17  away?

18  A    She was fun.

19  Q    Pardon?

20  A    She was fun, loud --

21  Q    Okay.  Well --

22  A    -- boisterous.  Yes, we hit it off.

23  Q    Okay.  And you were friends for the entire period that

24  Mrs. Hopkins still lived there, right?

25  A    About six months leading up to Jim's death, we weren't

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 750   Filed 09/23/14   Page 202 of 224
(720) 384-8078  attrans@sbcglobal.net

MARTINEZ - DIRECT

1  talking.

2  Q    You weren't talking?

3  A    No.

4  Q    Okay.  Prior to that, were -- did you spend a lot of time

5  together?

6  A    We were together a lot.  Our husbands were at work.  We

7  would sit outside, we would talk, smoke cigarettes --

8  Q    Okay.

9  A    -- watch the world go by.

10  Q    Okay.  Did you sometimes, though, do other kind of social

11  activities with her?

12  A    No, we weren't really, other than a couple of times going

13  fishing, when my husband was on the boat, we would -- they

14  would invite me and my sons out.

15  Q    Okay.  And your husband is -- was Coast Guard as well?

16  A    He's Coast Guard.

17  Q    Okay.  And when you say on the boat, he was out on a ship

18  at sea?

19  A    Yes.

20  Q    Okay.  And did you get -- well, let me just ask you this.

21  What sense did you get of Deborah Hopkins' character?

22  A    Can --

23         MS. LOEFFLER:  I guess -- Your Honor, I guess --

24         THE WITNESS:  -- you rephrase that?  I mean, it -- it's

25  like --

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 750   Filed 09/23/14   Page 203 of 224
(720) 384-8078   attrans@sbcglobal.net

1         MS. LOEFFLER:  -- I'm going to object.  What's the

2 relevance of a character -- neighbor's character assessment?

3         THE COURT:  I don't know.

4         MS. LOEFFLER:  Well, I guess I'm asking you to rule

5 whether it's relevant or not.  And I object --

6         THE COURT:  Doesn't sound like it.  Unless I know more

7 about it, I'll sustain the objection.

8         MR. OFFENBECHER:  Fine.

9         MS. LOEFFLER:  Thank you.

10 BY MR. OFFENBECHER:

11 Q    Is she a person who you spoke a lot with?

12 A    Yes.

13 Q    Okay.  Did you have a lot of conversations?

14 A    Yes.

15 Q    Did she share a lot of her private life with you?

16 A    We had -- I mean, who doesn't.  When you get a couple

17 living together, you know, you talk.  You know, we talked about

18 our families, our kids.

19 Q    Did you -- and for -- over that period of time, did you

20 have a sense about whether she was emotionally stable or

21 instable?

22         MS. LOEFFLER:  I'm going to object, Your Honor.

23 Relevance.

24         MR. OFFENBECHER:  Well, if she's emotionally unstable,

25 I think --

1       MS. LOEFFLER:  I just -- that's --

2       MR. OFFENBECHER:  -- that's relevant.

3       MS. LOEFFLER:  -- going to go (indiscernible).

4       THE COURT:  Well, I don't even know what you mean when

5  you use that phrase, so you're going to have to lay a better

6  foundation than that.

7  BY MR. OFFENBECHER:

8  Q    All right.  Did you get a sense of -- well, let me just

9  ask you this.  When she first came to Kodiak Island, were you

10 aware that she was taking some medication?

11 A    She told me about it, yes.

12 Q    Okay.  And did she discontinue that medication shortly

13 thereafter?

14 A    Yes, she did.

15 Q    And did you notice a difference in her behavior after

16 that?

17 A    She was just hyper.

18 Q    When you -- yeah.

19 A    She was full of energy, always full of energy.  I don't

20 know where she got it, but she was full of it.

21 Q    And that was different from when she first came to the

22 island?

23 A    It may have been that she just met me, but she was a bit

24 more mellow.  She was still Deb.  Deb was loud, fun.

25 Q    Okay.  Did you ever talk with Mrs. Hopkins about financial

1  issues that were burdening her?

2  A   We talked about money.  We talked about how we could save

3  money.  And --

4  Q   Okay.

5  A   -- it was nothing more than I would talk with any of my

6  other friends who aren't in any more debt than I knew them to

7  be.

8  Q   Okay.  Well, do you recall her talking -- indicating to

9  you that she was stressed out about her financial situation?

10 A   There were times -- I mean, everybody gets stressed.

11 Q   I'm not asking whether everybody's stressed.  Here --

12 here's my question.

13 A   Yes, there are times.  Everybody gets stressed.

14 Q   Okay.  Here's my question.  Did Mrs. Hopkins indicate to

15 you that she was stressed out by her financial situation?

16         MS. LOEFFLER:  I'm going to object, Your Honor.  Is

17 this a prior inconsistent or prior consistent statement?  We've

18 been asked -- the witness has been asked the question.  Mrs.

19 Hopkins was; she answered it.  I don't -- I think that there

20 isn't a foundation for asking this witness hearsay about Mrs.

21 Hopkins.

22         MR. OFFENBECHER:  It's not hearsay, it's circumstantial

23 evidence of --

24         MS. LOEFFLER:  Hearsay.

25         MR. OFFENBECHER:  -- Ms. Hop -- tell me when you're

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 750   Filed 09/23/14   Page 206 of 224
(720) 384-8078  attrans@sbcglobal.net

1  done.  It's circumstantial evidence of Mrs. Hopkins' state of

2  mind.  If she told this witness that she was stressed out over

3  her financial situation --

4       THE COURT:  I think she addressed it in her testimony,

5  but I'll let you ask the question.

6       MR. OFFENBECHER:  Okay.

7  BY MR. OFFENBECHER:

8  Q   Did Mrs. Hopkins indicate to you that she was stressed out

9  over her financial circumstances?

10 A   At times, yes.

11 Q   And what in particular was stressing her out?

12 A   Bills.

13 Q   I'm sorry?

14 A   Bills.  A -- you have to pay them.  Sometimes things get

15 tight.

16 Q   Did she indicate to you that any of her debts were

17 stressing her out?

18 A   Specifically, no.

19 Q   Did she indicate to you that there was any stress or

20 family conflict over bonds that Jim's grandmother had?

21       MS. LOEFFLER:  Objection.  Leading.

22       THE COURT:  Sustained.

23 BY MR. OFFENBECHER:

24 Q   Did she ever discuss with you that topic?

25 A   Yes.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 750   Filed 09/23/14   Page 207 of 224
(720) 384-8078   attrans@sbcglobal.net

1  Q    Okay.  What did she tell you?

2  A    That there were some, and that they were in Jim's name.

3  That the family -- apparently at least one of the family

4  members wanted to keep it that way, where she wouldn't be able

5  to touch it.

6  Q    And how did she feel about that?

7        MS. LOEFFLER:  Objection.  How does this witness know

8  how she felt?

9  BY MR. OFFENBECHER:

10 Q    Well, did she tell how she felt about it?

11       THE COURT:  Sustained.

12       MS. LOEFFLER:  Thank you.

13       MR. OFFENBECHER:  The question I want to ask is how

14 Mrs. Hopkins felt about what the family was doing.

15       MS. LOEFFLER:  Same objection.

16       THE COURT:  Sustained.  Found -- it takes a foundation.

17 BY MR. OFFENBECHER:

18 Q    Ms. Martinez, did Mrs. Hopkins discuss with you whether

19 Jim and Deborah had any family obligations on her side of the

20 family, to help support family?

21 A    There were times that she would talk about her mother

22 wanting support.

23 Q    And it was to -- was it with respect to any particular

24 obligation that they had?

25 A    No.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 750   Filed 09/23/14   Page 208 of 224

1  Q   Do you recall indicating that they were -- the

2  grandparents were taking care of a baby with other family

3  members that they were supporting?

4  A   Something about a -- a niece or nephew, I -- something.

5  I -- I don't recall any details.

6  Q   Okay.  Well, do you recall that they had to send at least

7  $500 a month for that?

8       MS. LOEFFLER:  Objection, Your Honor.  I'd like a page

9  number or -- otherwise, we're just having -- testifying.

10      MR. OFFENBECHER:  August 10th --

11      MS. LOEFFLER:  I mean, I --

12      MR. OFFENBECHER:  I'm happy to give you a page

13 number --

14      MS. LOEFFLER:  Okay.

15      MR. OFFENBECHER:  -- counsel.

16      MS. LOEFFLER:  Page number, please.

17      MR. OFFENBECHER:  August 10th, 2012 interview.  Page D-

18 49 -- 4291.

19      MS. LOEFFLER:  Okay.  One second.  Thank you.

20      MR. OFFENBECHER:  Go ahead and bring that up, please.

21 Bottom of the page, and then top of the next page.  Go ahead

22 and read that, then go down, please.

23      (Side conversation)

24 BY MR. OFFENBECHER:

25 Q   Go ahead and look at that, Ms. Martinez, as it comes up.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 750   Filed 09/23/14   Page 209 of 224
(720) 384-8078  attrans@sbcglobal.net

1  Down to line 13.

2  A   Okay.

3  Q   All right.  So does that refresh your memory about what we

4  just talked about?

5  A   Yes.

6  Q   Go ahead and tell the jury about that.

7  A   Why don't you read it?  It's my statement.  I mean --

8  Q   Well, I would be happy --

9  A   -- just because I can --

10  Q   -- to do that, but --

11  A   -- read that and recall, does it mean that I'm going to be

12  able to say, "Oh, yeah, now I remember."  Yes.  Vaguely, I do

13  remember that.  I'm sorry, it's been how many months?

14  Q   Okay.  Well, so you do remember that Deborah told you that

15  they had a family obligation, right?

16  A   Yes, essentially.

17  Q   And that it involved support of a niece or nephew or

18  something like that.  Right?

19  A   Uh-huh (affirmative).

20  Q   And that they were expected to send 500 dol -- each of the

21  kids, including Deborah Hopkins and her family, were expected

22  to send $500 a month to do this.  Right?

23  A   I guess so.

24  Q   And that Deborah, essentially, really couldn't afford

25  that.  Right?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 750   Filed 09/23/14   Page 210 of 224
(720) 384-8078  attrans@sbcglobal.net

1  A    Not that they couldn't afford it, but why should they.

2  Q    Okay.  Well, what you told the agent was that they really

3  couldn't afford it.  Right?

4  A    As far as I'm aware at the time, yeah.  I mean, but --

5  really.

6  Q    But that's what you told the agent.  Right?

7  A    If that's what it says, then that's what it was.

8       MR. OFFENBECHER:  No other questions, Your Honor.

9       THE COURT:  Cross-examination.

10                    **CROSS-EXAMINATION**

11 BY MS. LOEFFLER:

12 Q    Mrs. Martinez, hello.

13 A    Hello.

14 Q    My name is Karen Loeffler.  Thank you.  The time period

15 that you were next-door neighbor to Debby Hopkins, I think you

16 said you all would chat and talk and smoke and -- and was Mrs.

17 Hopkins a talker?

18 A    Oh, yes.

19 Q    Can she keep a secret to save her life?

20 A    Probably not.

21 Q    Okay.  So whatever was going on, it would come out of her

22 mouth, right?

23 A    Oh, absolutely.

24 Q    Okay.  Now, the last -- when you were living next to them,

25 before Mr. Hopkins was murdered, did you see them together?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 750   Filed 09/23/14   Page 211 of 224

1  A    All the time.  If -- if he was home, they were pretty much

2  inseparable.  You never really saw one without the other.

3  Q    Thank you.

4            THE COURT:  Redirect.

5            MR. OFFENBECHER:  I don't have any other questions,

6  Your Honor.

7            THE COURT:  Okay, thank you, ma'am.  You're excused.

8            THE WITNESS:  Thank you.

9      (Witness excused)

10            THE COURT:  Defense next witness.

11            MR. OFFENBECHER:  Your Honor, that's all the witnesses

12  we have for today.

13            THE COURT:  Okay, 8:25 tomorrow.  Same admonitions.

14  Keep an open mind.  Don't watch the TV.  Don't read the

15  newspaper.  What else am I supposed to tell you.  Don't

16  Internet.  Did I forget anything?

17            UNIDENTIFIED JUROR:  Don't talk to anybody about it.

18            THE COURT:  Don't talk to anybody, okay.  All the same

19  things.  You're doing great.  We'll see you tomorrow at 8:25.

20  Thank you.

21      (Jury not present)

22            THE COURT:  Okay.  Jury has left the room.  I want to

23  clear up this notes from jurors.  Both parties have told me

24  that they don't care that the "first witness was my wife's

25  former employer.  She no longer works for her," et cetera, et

1　cetera.  You've looked at that, you've considered that.  That's

2　not an issue with the government?

3　　　　　MS. LOEFFLER:  Let me just ask one question.

4　　　(Side conversation)

5　　　　　MS. LOEFFLER:  Yeah, I think we have to do what we did

6　with the last one.  If --

7　　　　　THE COURT:  Let's see --

8　　　　　MS. LOEFFLER:  Your Honor, if you'll just ask the

9　juror --

10　　　　　THE COURT:  Which one is --

11　　　　　MS. LOEFFLER:  -- whether that would affect their

12　ability to be fair in the case, and if the juror says it would

13　not, then we're perfectly happy with it.

14　　　　　THE COURT:  This is that gentleman.  Do you want me to

15　bring him in and ask him or should I --

16　　　　　MS. LOEFFLER:  Just -- or you can do it back there.

17　But if you ask him that --

18　　　　　THE COURT:  Oh --

19　　　　　MS. LOEFFLER:  -- and he said -- I'm perfectly

20　comfortable if he says it wouldn't affect anything, but --

21　　　　　THE COURT:  Okay.  What about the defense?

22　　　　　MR. CURTNER:  That's fine with --

23　　　　　THE COURT:  Could you bring in juror number 14?  And

24　you can just -- Ruth?

25　　　　　UNIDENTIFIED SPEAKER:  Yes.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 750   Filed 09/23/14   Page 213 of 224
(720) 384-8078   attrans@sbcglobal.net

1          THE COURT:  I don't care if he just stands right here

2    at the door.  Or -- yeah, just -- he'll just stick his head in,

3    right?  Is that good enough?

4          MR. CURTNER:  Yeah, that's fine.

5          THE COURT:  All right.  You guys need to sit down,

6    so -- just be comfortable.  Everybody please be seated.  And

7    maybe that mic can be a little close, so he can talk into that

8    mic.  Yes, sir.

9          JUROR NO. 14:  Yes, sir.

10         THE COURT:  "Defendant's first witness was my wife's

11   former employer.  She no longer works for her.  She quit in

12   November 2012.  She is -- was the doctor's nanny."  Anything

13   about that affect your ability to be a fair juror?

14         JUROR NO. 14:  Not at all.

15         THE COURT:  You wouldn't hold it against either side,

16   right?

17         JUROR NO. 14:  Not at all.

18         THE COURT:  Thank you, sir.  You can go back to the

19   beautiful room you've got there.

20         JUROR NO. 14:  Thank you.

21         THE COURT:  That satisfy everybody?

22         MS. LOEFFLER:  Absolutely, Your Honor.

23         THE COURT:  Does that satisfy everybody?

24         MR. OFFENBECHER:  Certainly.

25         MR. CURTNER:  Yes.

1          THE COURT:  Okay.  And did you solve the other problem?

2          MS. LOEFFLER:  I think we just have to talk to counsel.

3  And we're either going to solve it or we're going to bring the

4  witness back.

5          THE COURT:  Okay.  For --

6          MS. LOEFFLER:  And that -- (indiscernible) --

7          THE COURT:  -- just this one question, not to reopen

8  the door to anything?

9          MS. LOEFFLER:  No, no, no, no.

10         MS. DUIGNAN:  No.

11         MS. LOEFFLER:  Not anything else.  Just to make sure

12 that we -- it was April 2, and it's on the medical records, so

13 we'll decide either whether --

14         THE COURT:  I know, but --

15         MS. LOEFFLER:  -- we can put that in or we'll --

16         THE COURT:  I -- or you can stipu -- I don't care how

17 you do it, but, you know, the trial's not over.  If there's

18 confusion, we clear it up during the trial.

19         MS. LOEFFLER:  Right.

20         THE COURT:  It's a lot easier to clear it up now than

21 wait till a question during deliberations.

22         MS. LOEFFLER:  Right.  No, no, no.  We're -- we'll

23 either work it out or we'll bring her back --

24         THE COURT:  Okay.

25         MS. LOEFFLER:  -- quickly.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 750  Filed 09/23/14  Page 215 of 224

```
 1            THE COURT:  All right.  Now, what other problems?
 2            MR. CURTNER:  Well, Judge --
 3            THE COURT:  I knew the --
 4            MR. CURTNER:  Well, no, I'm just telling you -- giving
 5    you a heads-up.  The -- we're still trying to get witnesses
 6    here for tomorrow.
 7            THE COURT:  Okay.
 8            MR. CURTNER:  We have a couple witnesses coming from
 9    out of state that may not get in till 11 tonight, 2 a.m.
10    tomorrow.  We have a number of witnesses coming from Kodiak.
11    And I think they get in at 9 o'clock --
12            THE COURT:  That's good.
13            MR. CURTNER:  -- from the flight from Kodiak.  So we're
14    going to try to have some people here at 8:30.  I just can't
15    promise it.  Then we --
16            THE COURT:  All right.
17            MR. CURTNER:  We got the problem with the Marshals --
18            THE COURT:  Why did you tell me this before the -- the
19    jury's coming in at 8:30, unless --
20            MR. CURTNER:  Well, I'm going to try to get somebody --
21    I think we can hopefully get some people here --
22            THE COURT:  Okay.
23            MR. CURTNER:  -- at 8:30.
24            THE COURT:  Well, I -- good.
25            MR. CURTNER:  We're going to try.
```

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 750   Filed 09/23/14   Page 216 of 224

1          THE COURT:  Good, okay.  So what else?

2          MR. CURTNER:  And --

3          THE COURT:  What's the other problem?

4          MR. CURTNER:  Well, the other problem is Casey Brennick

5    is in custody in Kodiak.  And the Marshals -- he's got a

6    hearing in Kodiak on Monday.  The Marshals have been contacting

7    me during the trial, saying that they can't bring him this

8    weekend from Monday because he's got a hearing there, unless

9    Steve Wallace, the prosecutor, the DA there, lets him go.  And

10   I talked to Mr. Wallace, and he says, "If he's not here because

11   he's under a federal subpoena, we're not going to hold him in

12   contempt.  I'm sure Judge Beistline can make sure the Marshals

13   bring him."  So if they bring him this weekend, then --

14         THE COURT:  Where are the Marshals?  They're all --

15         DEPUTY U.S. MARSHAL:  Sir.

16         THE COURT:  Okay.  Do you hear what -- do you hear this

17   discussion?

18         DEPUTY U.S. MARSHAL:  I do.  My understanding is we

19   have to writ him out, and because of the case -- he had a

20   hearing on Monday, and he's state primary, that we couldn't

21   take him out until we got the blessing or his court date got

22   changed down in Kodiak.

23         THE COURT:  So I --

24         DEPUTY U.S. MARSHAL:  So if it gets changed and

25   everything's okay, from my understanding is we'll be able to

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 750  Filed 09/23/14  Page 217 of 224

1  bring him this weekend.

2       THE COURT:  Good.

3       MR. CURTNER:  I just --

4       THE COURT:  So what can I do to accom --

5       MR. CURTNER:  I'm going to call Mr. Wallace and find

6  out if there's --

7       THE COURT:  That's fine with me.

8       MR. CURTNER:  Okay, I'll tell him that.

9       THE COURT:  Okay.  The next issue?

10      MR. CURTNER:  No, that's it.  I think just -- to that

11  matter, we're trying to get all our people here.

12      THE COURT:  Well, keep doing it.  I'm worried that

13  you're going to be done Tuesday and still have witnesses that

14  we're waiting around for on Wednesday.  Can you get those

15  Wednesday witnesses here Tuesday?

16      MR. CURTNER:  I think we have just about everybody

17  lined up for -- yeah, for Tuesday, yeah.  I think --

18      THE COURT:  But you have a whole list --

19      MR. CURTNER:  Oh.

20      THE COURT:  -- for Wednesday.

21      MR. CURTNER:  Oh, yeah.

22      MR. OFFENBECHER:  Why don't we cipher on that, Your

23  Honor.  We --

24      THE COURT:  Yeah, because I really think that --

25      MR. OFFENBECHER:  We hear you.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 750  Filed 09/23/14  Page 218 of 224

1            THE COURT:  -- the way things are going --

2            MR. CURTNER:  Uh-huh (affirmative).

3            THE COURT:  -- we're going to be just about done

4   Tuesday, sitting around looking at each other, because you've

5   got a witness that's not scheduled till Wednesday.  And I'd

6   like to --

7            MR. CURTNER:  We're try --

8            THE COURT:  -- avoid --

9            MR. CURTNER:  Yeah.  We're going to try to --

10           THE COURT:  -- that.

11           MR. CURTNER:  I think most of our experts are on

12   Tuesday, so -- I think some of these people we might be able to

13   move up.

14           THE COURT:  And some of them -- you're not going to

15   have to use all of them, maybe.

16           MR. CURTNER:  Right.  I don't think so.  And --

17           THE COURT:  Okay.

18           MR. CURTNER:  -- the -- I think Mr. Barnum's coming

19   tomorrow.

20           THE COURT:  We'll have to see where that goes.

21           MR. CURTNER:  Yes.  Okay.

22           MS. LOEFFLER:  That's, Your Honor, all I'm going to

23   bring up.  I think for a whole lot of these witnesses tomorrow,

24   we're going to have to be doing the same thing, you know, cite

25   without the jury.  Because if they're going to ask a lot of

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 750   Filed 09/23/14   Page 219 of 224

1   people about -- and, you know, we don't represent any of these
2   people and they're not -- but if you start asking people about
3   their drug habits, somebody's going to have to -- and it's you,
4   Judge -- going to have to advise them of their Fifth Amendment
5   rights.
6           MR. OFFENBECHER:  Oh.
7           MS. LOEFFLER:  -- that you know --
8           THE COURT:  I don't know what they're going to be
9   asking, but --
10          MS. LOEFFLER:  I don't either, but I think we're going
11  to have to take them all up --
12          THE COURT:  -- I guess I better get that --
13          MS. LOEFFLER:  -- out --
14          THE COURT:  -- down, get that script down.
15          MS. LOEFFLER:  And we -- you know, I mean, we filed a
16  brief on it, we're going to be arguing, I think, that most of
17  these witnesses have to be excluded.  And so there's going to
18  have --
19          THE COURT:  Have to -- what do you mean by that, have
20  to be excluded?
21          MS. LOEFFLER:  Because I think they're trying to call a
22  whole bunch of people to talk about drug use with Hannah
23  Belisle.
24          THE COURT:  Okay.
25          MS. LOEFFLER:  And she answered the questions.  Under

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 750   Filed 09/23/14   Page 220 of 224

1  Rule 608 -- I mean, I can --

2          THE COURT:  Some may have to be excluded, but some may

3  not --

4          MS. LOEFFLER:  Right.  I think --

5          THE COURT:  -- depending on --

6          MS. LOEFFLER:  -- we're just going to have to do the

7  procedure, Your Honor, and you're going to have to make rulings

8  just like you did for Mrs. Hopkins.

9          THE COURT:  Some -- just like she admitted to some of

10  the things that would eliminate the need for others; others she

11  didn't admit that might require others.

12          MS. LOEFFLER:  Yeah, and we're going to have arguments

13  about it.  We're just going to take it outside -- I think

14  outside the presence of the jury.  I'm not tell -- I don't want

15  to make the argument today.  I think you have to hear the facts

16  and then we have to do it.  But I just wanted to give you a

17  heads-up that I think there -- that's going to be our position

18  for a lot of these witnesses.

19          THE COURT:  I understand.

20          MS. LOEFFLER:  Okay.

21          THE COURT:  So keep -- everybody keep working, keep

22  moving ahead, keep friendly.  Okay.  We'll see you tomorrow at

23  8:25.

24          MR. OFFENBECHER:  Thank you, Your Honor.

25          THE CLERK:  All rise.  This matter stands in recess

1  until tomorrow at 8:30 a.m.

2       (Proceedings concluded at 4:16 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1                              CERTIFICATE

2    I certify that the foregoing is a correct transcript from the
     electronic sound recording of the proceedings in the above-
3    entitled matter.

4
     _____s/Teresa K. Combs_____        _____9/11/14_____
5    Teresa K. Combs, Transcriber           Date

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 750   Filed 09/23/14   Page 223 of 224
(720) 384-8078   attrans@sbcglobal.net

1                              **INDEX**

2                                                              FURTHER
                          DIRECT   CROSS   REDIRECT   RECROSS  REDIRECT
3
  DEFENDANT'S WITNESSES
4
  Song-Quing Gan         2719    2726      2731      2731
5 Michael Anthony
    DiTallo              2732    2768      2780      2783      2786
6 Deatrich Sheffield     2789    2807      2818      2819
  Deborah Hopkins        2842    2882      2889
7 Angela Michelle
    Birchfield           2890    2902      2904
8 Jillian R. Martinez    2908    2918

9 PLAINTIFF'S EXHIBITS                                        ADMITTED

10 419      Blue-color pixels                                 2786

11 DEFENDANT'S EXHIBITS                                       ADMITTED

12 DE-030   Video - Alaska Airlines cargo clip, 4/10/12       2803

13 DE-031   Video - Alaska Airlines clip, 4/10/12             2805

14 DE-034   Side views, DiTallo's slide                       2787

15 DE-135   Mr. Wells' medical record                         2723

16

17

18

19

20

21

22

23

24

25

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net