<pre>
 1                 UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF ALASKA

 3   UNITED STATES OF AMERICA,     )   Case 3:13-cr-00008-RRB
                                   )
 4            Plaintiff,           )   Anchorage, Alaska
                                   )   Friday, April 18, 2014
 5       vs.                       )   8:35 o'clock a.m.
                                   )
 6   JAMES MICHAEL WELLS,          )
                                   )
 7            Defendant.           )
     _____)   TRIAL BY JURY - DAY 14
 8
                      TRANSCRIPT OF PROCEEDINGS
 9
              BEFORE THE HONORABLE RALPH R. BEISTLINE
10                 UNITED STATES DISTRICT JUDGE

11   APPEARANCES:

12   For the Plaintiff:        KAREN L. LOEFFLER
                               U.S. Attorney
13                             BRYAN SCHRODER
                               KATHLEEN ANN DUIGNAN
14                             Assistant U.S. Attorneys
                               Office of the U.S. Attorney
15                             222 West 7th Avenue, #9, Room 253
                               Anchorage, Alaska  99513-7567
16                             (907) 271-5071

17   For the Defendant:        F. RICHARD CURTNER
                               Federal Defender
18                             Office of the Federal Public Defender
                               601 West 5th Avenue, Suite 800
19                             Anchorage, Alaska  99501
                               (907) 646-3400
20
                               PETER OFFENBECHER
21                             Skellenger Bender, P.S.
                               1301 5th Avenue, Suite 3401
22                             Seattle, Washington  98101-2605
                               (206) 623-6501
23

24

25
</pre>

```
 1  APPEARANCES (Continued):

 2  For witness Jason        JOSEPH VAN DE MARK
    Barnum:                  Supervising Attorney
 3                           Office of Public Advocacy
                             900 West 5th Avenue, Suite 525
 4                           Anchorage, Alaska  99501
                             (907) 269-8135
 5
    Court Recorder:          NANCY LEALAISALANOA
 6                           U.S. District Court
                             222 West 7th Avenue, #4, Room 229
 7                           Anchorage, Alaska  99513-7564
                             (907) 677-6111
 8
    Transcription Service:   A & T Transcripts
 9                           6299 West 111th Avenue
                             Westminster, Colorado  80020
10                           (720) 384-8078

11
    Proceedings recorded by electronic sound recording; transcript
12  produced by transcription service.

13

14

15

16

17

18

19

20

21

22

23

24

25
```

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 752  Filed 09/23/14  Page 2 of 112
(720) 384-8078  attrans@sbcglobal.net

1    **ANCHORAGE, ALASKA - FRIDAY, APRIL 18, 2014**

2

3        (Call to Order of the Court at 8:35 a.m.)

4        (Defendant present; jury not present)

5            THE CLERK:  All rise.  His --

6            THE COURT:  Are we ready for the jury, or do we have to

7    talk?  Please be seated.  You ready for the jury?

8            MR. CURTNER:  Your Honor, Mr. Barnum, Jason Barnum, is

9    here.  I don't know if you wanted to do a voir dire with him

10   before the jury comes in, or we could just -- and --

11           THE COURT:  No, I want to find out if he has any

12   relevant testimony.

13           MR. CURTNER:  Okay.  So you want to hear from him

14   first?

15           THE COURT:  Isn't that what we decided?

16           MR. CURTNER:  Yes, I think so.  So I don't -- do you

17   want -- you don't want the jury (indiscernible) --

18           THE COURT:  No.

19           MS. LOEFFLER:  No, without the jury.

20           MR. CURTNER:  Right.

21           MS. LOEFFLER:  Your Honor, yeah -- I mean, there's no

22   relevance to Mr. Barnum at all, other than trying to --

23           THE COURT:  I don't know.

24           MS. LOEFFLER:  -- frighten the jury, so -- no, he has

25   the -- now -- let's make the record and bring him, and you can

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 752   Filed 09/23/14   Page 3 of 112
(720) 384-8078  attrans@sbcglobal.net

1  do it without the jury.

2         THE COURT:  Is he handy?

3         MS. LOEFFLER:  The jury can't be here.

4         MR. CURTNER:  And, Your Honor, he's represented by Joe

5  Van De Mark, who's here.

6         THE COURT:  Where is he?

7         MR. VAN DE MARK:  Hello, Your Honor.

8         THE COURT:  Okay, he's represented by counsel.  So we

9  got a -- no problems in the world that --

10         MR. VAN DE MARK:  (Indiscernible).

11         THE COURT:  Yeah.  Are you happy there, or do you want

12  to sit up here?

13         MR. VAN DE MARK:  I'd prefer to sit up there if --

14         THE COURT:  There's a chair there, if you want, for

15  now, at least.

16         MR. VAN DE MARK:  Yeah.  I assume when the jury's here,

17  then I'll leave --

18         THE COURT:  Yeah.

19         MR. VAN DE MARK:  -- if we get that far.

20         THE COURT:  Yeah.  Right there.  Okay, so you're going

21  to ask him the questions --

22         MR. CURTNER:  Yes.

23         THE COURT:  -- so we can judge whether there's any

24  relevance, and then provide a --

25         MR. CURTNER:  Yes.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 752   Filed 09/23/14   Page 4 of 112
(720) 384-8078  attrans@sbcglobal.net

1        THE COURT:  So we look at the *Miller* factors,

2   obviously, see the probative value of the evidence on the

3   central issue.  Can you tell the jury we'll be a few minutes,

4   so they can get comfortable?  (Pause) You get to sit right

5   there in that chair.  Actually, you can just remain standing,

6   sir, for a second.  She's going to swear you in, right here.

7        THE CLERK:  Okay.  Please raise your right hand.

8        **JASON BARNUM, DEFENDANT'S WITNESS, SWORN**

9        THE CLERK:  Thank you.  Please have a seat.

10       THE COURT:  Okay, sir, your attorney's sitting right

11  next to you, and this attorney over here is going to ask you

12  some questions.  We're going to determine whether or not you

13  have anything relevant to add to today's proceedings.  So --

14       THE CLERK:  And, first, sir, can you please state and

15  spell your full name?

16       THE WITNESS:  Jason Barnum.  J-a-s-o-n, B-a-r-n-u-m.

17       THE CLERK:  Thank you.

18       THE COURT:  All right, counsel.

19                    VOIR DIRE

20  BY MR. CURTNER:

21  Q   Mr. Barnum, are you represented by counsel at this time?

22  A   Yes.

23  Q   And who's that?

24  A   Mr. Joseph Van De Mark.

25  Q   Okay.  And he's here in the courtroom?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 752   Filed 09/23/14   Page 5 of 112
(720) 384-8078  attrans@sbcglobal.net

1  A   Yes, sir.

2  Q   And you know that you can speak with him privately any

3  time you wish.  Is that correct?

4  A   Okay.

5  Q   And just let the judge know that you want to do that.

6  A   Yes, sir.

7  Q   Now, Mr. Barnum, were you on Kodiak Island the month of

8  April 2012?

9  A   Yes, sir.

10  Q   And how long were you on Kodiak Island during that time?

11  A   Probably about close to a month.

12  Q   All right.  Where did you stay when you were on Kodiak

13  Island during the month of April 2012?

14  A   I stayed in a couple different places.

15  Q   Okay.

16  A   I stayed with a friend, Benton, and I stayed with a fellow

17  named David.

18  Q   Do you remember David's last name?

19  A   Not -- no, it doesn't come to me right now.

20  Q   David Froehlich?  Could it be Dav --

21  A   Yes, sir, that's him.

22  Q   David Froehlich.  And this -- do you -- was -- does he

23  have a son named Dylan?

24  A   I believe so.

25  Q   Okay.  And so you were at their home for a while?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 752   Filed 09/23/14   Page 6 of 112
(720) 384-8078  attrans@sbcglobal.net

1   A    Yes, sir.

2   Q    And you were there when they were both there, at different

3   times?

4   A    Yes, sir.

5   Q    Okay.  Now, do you recall April 12th, 2012, that

6   particular day?

7   A    Yeah.

8   Q    And what -- what's -- what do you remember about that day

9   when you were on the island?

10  A    My friend said that some folks got killed.

11  Q    Okay.

12  A    And --

13  Q    So you were on the island when that homicide happened --

14  A    Yes, sir.

15  Q    -- homicides happened, okay.  How long did you -- after

16  that did you leave Kodiak?

17  A    A couple days, probably.

18  Q    And where did you go from there?

19  A    Back to Anchorage.

20  Q    How did you leave Kodiak Island?

21  A    I left on a -- a ferry.

22  Q    Okay.  Now, while you were on Kodiak Island, were you ever

23  questioned by the FBI?

24  A    No, sir.

25  Q    Or any other law enforcement agency?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 752   Filed 09/23/14   Page 7 of 112
(720) 384-8078  attrans@sbcglobal.net

1  A    No, sir.

2  Q    And later on, were you questioned by the FBI?

3  A    When I was first incarcerated, they came to my -- came to

4  the jail three months after.

5  Q    Okay.  Do you remember when you were first incarcerated?

6  A    Yes.  It was September 12th, 2012.

7  Q    And then so when did the FBI come to see you?

8  A    Probably about three months later.

9  Q    And what happened when they came to see you?

10 A    They asked to show me some pictures.

11 Q    Okay.  Did they -- were they there to talk to you about

12 Kodiak?

13 A    Yeah.  They kept on telling me that I wasn't a suspect,

14 but they kept on trying to show me pictures.

15 Q    Okay.  So they came to tell -- to talk to you at the jail?

16 A    Yes, sir.

17 Q    You were in jail on something else?

18 A    Yes, sir.

19 Q    You were in jail on some other charges?

20 A    Yes, sir.

21 Q    And so they questioned you about Kodiak Isl -- they wanted

22 to question you about Kodiak Island, but they said you were not

23 a suspect.  Is that correct?

24 A    Yes, that's what they said.

25 Q    And then what happened then?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 752   Filed 09/23/14   Page 8 of 112
(720) 384-8078  attrans@sbcglobal.net

1  A    I told them that I didn't want to talk to them, and they

2  proceeded to look at me like I should talk to them.  And they

3  kept on trying to ask me questions and show me pictures.

4  Q    Okay.  What kind of photographs?  What kind of pictures?

5  A    I really wasn't paying too much close attention, but

6  mostly I seen, like, older folks' pictures, just not really too

7  much --

8  Q    And these are pictures of people?

9  A    Yes, sir.

10  Q    Okay.  And do you know how many?  Do you remember how

11  many?

12  A    There was more than a dozen, probably.

13  Q    And were they all men?

14  A    I don't believe so.

15  Q    So you saw men and women photographs?

16  A    Yes, sir.

17  Q    And they asked you if you knew any of these people?

18  A    Yes, sir.

19  Q    Okay.  Now, was there anything else that took place in

20  that interview?

21  A    No, not really.

22  Q    All right.  Did you -- do you recognize anybody in the

23  courtroom that might have been there when they talked to you?

24  A    I don't know.  This guy right down here looks kind of

25  familiar.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 752   Filed 09/23/14   Page 9 of 112
(720) 384-8078  attrans@sbcglobal.net

1  Q    This -- you're referring to Agent Daryl Allison?  Is that

2  correct?

3  A    Yes, I think that was him.

4  Q    Okay.  He's the one that came to talk to you in December

5  two thousand --

6  A    I'm not positive, but he looks familiar.

7  Q    Okay.  Now, so why were -- what were you charged with when

8  you were in custody back at that time?

9  A    In September?

10 Q    Yes.

11 A    Attempted murder on the police.

12 Q    Okay.

13       MR. CURTNER:  Your Honor, that's all the questions I

14 would have for Mr. Barnum for the jury.

15       THE COURT:  Okay.  Cross-examination.

16       MS. LOEFFLER:  Let me just consult for a second with

17 my --

18       THE COURT:  Sure, no rush.

19 BY MS. LOEFFLER:

20 Q    Mr. Barnum, my name is Karen Loeffler, and I'm one of the

21 prosecutors on the case.  Can you please describe Richard

22 Belisle?

23 A    Richard Belisle?

24 Q    Do you know who he is?

25 A    No.  I can't say that I would know who he is.  I'm not

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 752  Filed 09/23/14  Page 10 of 112
(720) 384-8078  attrans@sbcglobal.net

1  good with names.  I'm more better with faces.

2  Q    Okay.  Do you know anybody named Jim Hopkins?

3  A    I'm not good with names.  I'm --

4  Q    Okay.

5  A    -- good with faces.

6  Q    All right.  Do you -- can you describe the buildings of

7  COMMSTA Kodiak?

8  A    COMMSTA Kodiak?  What is that?

9  Q    Okay.  Have you ever been in -- do you know something

10 called the rigger shop?

11 A    The wigger shop?

12 Q    Okay.

13        THE COURT:  No, it's rigger.

14        THE WITNESS:  Oh, rigger.

15 BY MS. LOEFFLER:

16 Q    Rigger shop.

17 A    Oh, I don't know.

18 Q    Okay.

19 A    Kodiak really didn't give me too much into -- pay much

20 attention to that place.

21 Q    Okay.  Now, the morning of the 12th of April, when Mr.

22 Curtner asked you -- that somebody told you some folks got

23 killed.  Right?  (Indiscernible).

24 A    Yep.

25 Q    Okay.  And I don't need to go into great deal of -- but

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 752  Filed 09/23/14  Page 11 of 112
(720) 384-8078  attrans@sbcglobal.net

1  what condition were you in that morning?

2  A    Probably about the same condition I am in every morning

3  that I'm on the streets.

4  Q    Is it pretty bad?

5  A    Usually.

6  Q    Yeah.  And I don't need -- I don't want to go into great

7  detail, but I -- but you have a problem with drugs, don't you?

8  A    I --

9          UNIDENTIFIED SPEAKER:  No.

10         THE WITNESS:  -- no -- plead the Fifth, whatever.

11 BY MS. LOEFFLER:

12 Q    All right.  Yeah --

13 A    Drugs had a problem with me.

14 Q    Right.  That's why your attorney's --

15         THE COURT:  (Indiscernible) --

16         MS. LOEFFLER:  -- here.  You can do whatever he says.

17         THE COURT:  You don't want to answer that question.

18         THE WITNESS:  Okay.

19         MS. LOEFFLER:  Okay.

20         THE COURT:  That's what you're saying?  I'm not giving

21 you the answer.  I'm saying is that what you're telling us,

22 that you don't want to answer the question?

23         THE WITNESS:  Yeah, I'm not going to --

24         THE COURT:  Okay.

25         THE WITNESS:  -- answer that question.

1  BY MS. LOEFFLER:

2  Q    Okay.  And did you kill Richard Belisle and Jim Hopkins?

3  A    I don't want to answer that question.

4  Q    Okay.

5  BY THE COURT:

6  Q    Do you know Hannah Belisle?

7  A    Doesn't sound familiar to --

8  Q    Okay.

9       THE COURT:  All right.  Well, there's not been a

10 sufficient connection.  We'll keep him here all day, and if

11 something develops to make a better connection, we'll see where

12 we go, unless you have -- unless you can change my mind.

13      MR. CURTNER:  Well, Your Honor, the thing is that --

14 and this is all about the investigation and the nature of the

15 investigation in this case.  And the FBI questioned Hannah

16 Belisle about Mr. Barnum --

17      THE COURT:  Right.

18      MR. CURTNER:  -- a number of witnesses about Mr.

19 Barnum.  We have other witnesses that will come in to testify

20 about certain -- I think the Court's aware with our ex parte

21 filings.

22      THE COURT:  Well, that's what I'm saying.  If you make

23 further -- that's why I want to keep him here.  And if you --

24 based on what you've just told me right here, there's no

25 probative value.  And it's just too extensive.  But maybe

1  there's more I don't know about or more evidence you can

2  develop.  So I'm not saying "No," I'm saying, based on what

3  you've told me at this point, it's not sufficient.  That's all

4  I'm saying.

5        MR. CURTNER:  Okay.  We can change your mind now, but

6  maybe we can do it later.

7        THE COURT:  Oh, absolutely.  I have a open mind.  I can

8  only judge evidence base -- as it comes in, not as I think it

9  may come in or could come in.  Okay.

10       MR. CURTNER:  Well, Your Honor, just -- I don't think

11 I'm going to be able to change your mind today, but could we

12 have Mr. Barnum under subpoena so he could return to the jail

13 today with the --

14       THE COURT:  That's right, he can stay --

15       MR. CURTNER:  -- Marshals -- can --

16       THE COURT:  -- (indiscernible) --

17       MR. CURTNER:  -- they have a busy schedule.  If they

18 could return him to the jail.

19       THE COURT:  That's fine.  Now I'll hear the -- this is

20 not like the first time I've heard this issue.  I understand

21 the government's position, I understand your position.  I've

22 got what we call the *Miller* factors I have to look at.  I've

23 been very generous in ruling for the defendant in these kind of

24 issues.  I have to find some connection, more than what I've

25 been given this morning.  That's all I'm saying.  But I'm not

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 752  Filed 09/23/14  Page 14 of 112
(720) 384-8078  attrans@sbcglobal.net

 1   closing the door.

 2           MR. CURTNER:  I understand, okay.  And just for the

 3   Court's -- we have some witnesses that were supposed to be here

 4   at 9 o'clock from Kodiak, and they didn't make the plane.

 5           THE COURT:  Oh, my gosh.

 6           MR. CURTNER:  And we have two witnesses that flew

 7   across the country to be here, but they're not going to be here

 8   until maybe ni -- one at 9 and 9:00, I think.

 9       (Side conversation)

10           THE COURT:  Oh, do we have witnesses by 9:30?

11           MR. CURTNER:  Oh, yeah.  In fact --

12           THE COURT:  Your -- oh, you have witnesses, then.

13           MR. CURTNER:  We could probably start at 9 for the

14   jury.  I --

15           THE COURT:  Okay.

16           MR. CURTNER:  -- think.  Let me -- can I let you know?

17           THE COURT:  Sure, absolutely.  Counsel, any questions?

18   Thanks for coming.  You understand where we are?

19           MR. VAN DE MARK:  My understanding is you're going to

20   send him back to HA --

21           THE COURT:  Yeah.

22           MR. VAN DE MARK:  -- and you may bring him back.  If he

23   comes back --

24           THE COURT:  He may be called back --

25           MR. VAN DE MARK:  -- can I be notified?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 752  Filed 09/23/14  Page 15 of 112

1          THE COURT:  Yeah, absolutely.  Mr. Curtner will notify

2   you.

3          MR. VAN DE MARK:  Okay.

4          THE COURT:  And that you're --

5          MR. VAN DE MARK:  Will it be -- just speak with him

6   (indiscernible) I'm trying to figure schedules.

7          THE COURT:  Well, I have --

8          MR. CURTNER:  It'll be afternoon.

9          MR. VAN DE MARK:  Afternoon, all right.

10          THE COURT:  All right, thanks.  Okay, so do we have a

11   witness to -- waiting out there?  Is that what we have?

12       (Witness excused)

13          MR. CURTNER:  We do.

14          THE COURT:  Okay, let's at least get that witness

15   going.

16          MR. CURTNER:  Yeah.

17          THE COURT:  And keep me posted, and I'll tell the jury

18   they can take an early lunch or what we decide.  And we'll --

19   can we bring -- is she going to get the witness?

20          MR. CURTNER:  She's going to go get the witness.

21          THE COURT:  Then you can go get the jury.

22          MR. CURTNER:  This will be a very short witness, Your

23   Honor.

24          THE COURT:  Okay.  Then there's another one moving?

25          MR. CURTNER:  I hope.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 752  Filed 09/23/14  Page 16 of 112
(720) 384-8078  attrans@sbcglobal.net

1      MS. DUIGNAN:  Your Honor, can we have a statement of
2  who the witness is?

3      THE COURT:  Yes, who's the witness?

4      MS. DUIGNAN:  I think we may need a sidebar.

5      THE COURT:  Okay.

6      MR. CURTNER:  Judge, Rebecca Wilkerson (ph).

7      THE COURT:  All right.  You can come in -- the jurors
8  can keep coming this way.  Oh, we got -- oh, the chairs got
9  moved.  Sorry.

10     (Jury present)

11     THE COURT:  All right.  Little musical chairs here.
12  Please be seated.  And you wanted to have a sidebar
13  (indiscernible - away from microphone).

14     (At sidebar with the Court and counsel)

15     THE COURT:  Okay.

16     MS. DUIGNAN:  We would like some proffer of what this
17  witness is going to testify to.  What we believe she's going to
18  testify to is a probation record of Mr. Biocic.  But it hasn't
19  become relevant yet, so we object.

20     THE COURT:  Okay.

21     MR. CURTNER:  Sorry, what's the objection?

22     MS. DUIGNAN:  Relevance.  Lack of relevance.

23     MR. CURTNER:  Your Honor, she's going to introduce
24  records from the Department of Corrections that show that Mr.
25  Biocic's address and -- is 8 Mile -- 8.5 Anton Larsen Bay Road.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 752  Filed 09/23/14  Page 17 of 112

1 There's been a lot of testimony about the investigation not

2 going in that direction, about the homestead or Red Cloud

3 Ranch, and things of that nature.

4       THE COURT:  But all she's going to say is --

5       MR. CURTNER:  She's just bring -- introducing a record

6 from jail.

7       THE COURT:  Okay.

8       MS. DUIGNAN:  Again, we object.  There's no connection

9 yet.  Without calling Mr. Biocic or ruling on the relevance of

10 Mr. Biocic, putting in his address records or Correction

11 records are absolutely -- yeah, exactly.  There's not a date on

12 it either.  This is what we were handed.  We can show it to

13 Your Honor.  But there's no date to show when --

14       THE COURT:  Okay.  (Indiscernible) this witness

15 probably doesn't know the date.

16       MS. DUIGNAN:  Probably not.

17       MR. CURTNER:  The dates are on there.

18       MS. DUIGNAN:  But it just shows -- starts -- date of

19 the records, but it doesn't show actually -- it doesn't connect

20 it to anything.  There's, like, a number of dates, all the

21 same.

22       MR. OFFENBECHER:  (Indiscernible).  I'm sorry.  The

23 point is that Mr. Biocic, who was a boyfriend of Hannah

24 Belisle, was with Hannah Belisle a night before the homicide,

25 and he's familiar with this property.  He grew up on this

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 752  Filed 09/23/14  Page 18 of 112
(720) 384-8078  attrans@sbcglobal.net

1  property.  He shows it as his address.

2          THE COURT:  All this witness is going to say --

3          MR. CURTNER:  (Indiscernible) introduce this

4  (indiscernible).  He used this address (indiscernible) for the

5  Department of Corrections several times.

6          MS. DUIGNAN:  But there's no connection to 2012.

7          MR. OFFENBECHER:  He's familiar with the property, he

8  grew up there.

9          THE COURT:  Well, what are the questions are -- what

10  are the questions (indiscernible).

11          MR. CURTNER:  I'm just going to ask her to introduce

12  this record as a record normally kept in the course of business

13  at the Department of Corrections.

14          THE COURT:  Okay.

15          MR. CURTNER:  And --

16          THE COURT:  (Indiscernible) is that the only question

17  (indiscernible).

18          MR. SCHRODER:  Well, the other problem is, Your Honor,

19  we're basically introducing a criminal record.  That's what

20  we're doing.

21          THE COURT:  Well, I'm not going to (indiscernible) say

22  anything --

23          MR. SCHRODER:  So --

24          THE COURT:  -- want to just get it into -- before, so I

25  can rule later once I see that there's a connection.  I can't

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 752  Filed 09/23/14  Page 19 of 112
(720) 384-8078  attrans@sbcglobal.net

1  do anything until I see anything about Biocic.  So far his name

2  is just on the witness list.

3          MR. OFFENBECHER:  No, that --

4          THE COURT:  I'm trying to get this lady in and out

5  without admitting it, but at least getting (indiscernible).

6          MR. OFFENBECHER:  Yeah.  All we're trying to introduce,

7  Your Honor, is the fact that Mr. Biocic lists the -- this

8  property as his address.

9          THE COURT:  I understand that.

10         MR. OFFENBECHER:  It's --

11         THE COURT:  (Indiscernible).

12         MR. SCHRODER:  But we're doing it through a criminal

13 record.  We're not introducing something that just says his

14 address.  It's through a probation officer, so it's going to

15 tell the jury that this guy's a criminal.  He hasn't even been

16 on the stand yet.

17         MS. LOEFFLER:  (Indiscernible).  I think that they

18 (indiscernible) come in (indiscernible) probation officer says

19 (indiscernible), I think that that would be appropriate.

20 (Indiscernible) she says, "I knew he was living there, but

21 (indiscernible)."

22         THE COURT:  Is this witness (indiscernible) --

23         MR. CURTNER:  No, no, she (indiscernible).  Is a record

24 custodian.

25         THE COURT:  (Indiscernible) bring her back, but this is

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 752  Filed 09/23/14  Page 20 of 112
(720) 384-8078  attrans@sbcglobal.net

1    in the wrong order.  (Indiscernible) bring something in, they

2    lay a foundation (indiscernible) determine its relevance,

3    (indiscernible) right procedure.  So --

4         MR. SCHRODER:  And we've filed something, Your Honor,

5    to say it's improper to put on a witness just to put in a

6    criminal record.

7         THE COURT:  (Indiscernible).

8         MR. SCHRODER:  And that's what this is.

9         MR. OFFENBECHER:  I'm just trying to show his

10   address --

11        MR. SCHRODER:  No, no, no.

12        MR. OFFENBECHER:  -- (indiscernible).

13        MR. SCHRODER:  No, no, no.

14        THE COURT:  (Indiscernible).

15        MR. SCHRODER:  You're back-dooring your criminal

16   records.

17        MS. DUIGNAN:  (Indiscernible).

18        THE COURT:  So I'm going to excuse this witness.  Do

19   you have another witness?

20        MR. CURTNER:  (Indiscernible).  Let me see

21   (indiscernible).

22       (End of sidebar)

23        THE COURT:  Okay, was that a fun trip you had?  Well,

24   the bottom line is, we can't use you right now, so you get to

25   go back.  We might call you later.  Okay.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 752  Filed 09/23/14  Page 21 of 112
(720) 384-8078  attrans@sbcglobal.net

1          MS. WILKERSON:  Okay.

2          THE COURT:  But you've got the experience.  That's the

3    important thing.

4          MS. WILKERSON:  I've been on this rodeo before.

5          THE COURT:  Okay, thank you.  And I -- we're seeing if

6    there's another witness out there.  Oh, good morning, ladies

7    and gentlemen.

8          UNIDENTIFIED JUROR:  Good morning.

9          THE COURT:  How are you doing?  Who is this other

10   witness, so that we don't have to do this --

11         MR. CURTNER:  We have two witnesses that should be here

12   momentarily, Commander Musman and Commander Tlapa.

13         UNIDENTIFIED SPEAKER:  This is Commander Musman,

14   (indiscernible).

15         THE COURT:  Okay, good morning, sir.  If you can just

16   come in here.  Get in the witness box there; that door pulls

17   out.  And just remain standing, and my clerk will swear you in.

18         THE CLERK:  Please raise your right hand.

19         **JONATHAN MUSMAN, DEFENDANT'S WITNESS, SWORN**

20         THE CLERK:  Okay.  Thank you.  Please have a seat.

21   And, sir, if you can please state and spell your full name.

22         THE WITNESS:  Jonathan Musman.  J-o-n-a-t-h-a-n, M-u-s-

23   m-a-n.

24         THE CLERK:  Thank you.

25         THE COURT:  All right, counsel.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 752  Filed 09/23/14  Page 22 of 112
(720) 384-8078  attrans@sbcglobal.net

1                    DIRECT EXAMINATION

2    BY MR. CURTNER:

3    Q    Good morning, Commander Musman.

4    A    Good morning.

5    Q    How are you doing?

6    A    Good.

7    Q    Where are you employed?

8    A    I'm employed with the U.S. Coast Guard, currently in San

9    Pedro, California.

10   Q    Okay.  And so how long you been in the Coast Guard?

11   A    Since 1992.

12   Q    What -- how old were you when you joined the Coast Guard?

13   A    Eighteen.

14   Q    All right.  And you've been to the Coast Guard Aca -- oh,

15   I'm sorry.

16          UNIDENTIFIED JUROR:  These --

17          THE COURT:  That's not working.  See, you wore out our

18   battery, but we got a whole pile of these things, so -- is that

19   better?

20          UNIDENTIFIED JUROR:  That works, sir.

21          THE COURT:  Good.

22   BY MR. CURTNER:

23   Q    We'll just start over.  So you're employed with the Coast

24   Guard?

25   A    I am.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 752  Filed 09/23/14  Page 23 of 112
(720) 384-8078  attrans@sbcglobal.net

MUSMAN - DIRECT

1  Q    And you joined when you were 18?

2  A    I did.

3  Q    And tell me about -- a little bit about your Coast Guard

4  career.

5  A    I went to the Coast Guard Academy from 1992, graduated in

6  1996.  And then did a -- four years on ships, and then went to

7  civil engineering graduate school, and then went to Civil

8  Engineering Unit Juneau, from 2002 to 2005.  And then went to

9  another ship, and then land for a couple of years.  And three

10  more years on a ship, and now land for two years.  And I'm

11  going back to a ship for two years.

12  Q    Okay.  So what's in your future with the Coast Guard?

13  A    I'm slated to be the executive officer on the Coast Guard

14  Cutter Bertholf in Alameda, California.

15  Q    When does that start?

16  A    In July.

17  Q    In July, okay.  Excuse me.  So -- and tell me about your

18  rank.  What rank are you?

19  A    I'm a commander.

20  Q    And what -- maybe you could explain to the jury what that

21  means.

22  A    It's the fifth level of officer ranks.  Every -- it's a

23  pyramid promotion system.  It's best-qualified promotion.  So

24  every time the selection rate goes -- goes down a little bit.

25  So from -- when -- when you -- when I graduated from the

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 752  Filed 09/23/14  Page 24 of 112
(720) 384-8078  attrans@sbcglobal.net

MUSMAN - DIRECT

1 academy I was an ensign, and then I made lieutenant junior

2 grade, and that just means basically you didn't get in trouble

3 for the first two years. And then the next two and a half

4 years, to make lieutenant, is -- is almost the same thing. But

5 then to make lieutenant commander and commander, it goes to

6 about a -- between a 60- and 80-percent selection rate. And so

7 a good chunk of people get phased out. And then at the next --

8 at the next promotion it goes to 50 percent, and then after

9 that it's about 5 percent, I think.

10 Q    Okay.  And what -- so you're in the upper echelon of

11 ranking for the Coast Guard, is that correct?

12 A    Somewhat.

13 Q    Okay.

14 A    There's 2,000 people above me.

15 Q    And a lot below you.

16 A    What's that?

17 Q    Many below you too.

18 A    Yes.

19 Q    Now, so you've been out to sea quite a bit, but also on

20 land?

21 A    I have.

22 Q    And have you been in Juneau, Alaska?

23 A    I was.  From 2002 to 2005, I was stationed in Juneau.

24 Q    And what were you doing in Juneau when you were stationed

25 there?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 752  Filed 09/23/14  Page 25 of 112

1  A    I was a civil engineer at the Civil Engineering Unit --

2  Unit, mainly in charge of the tower program, all the LORAN

3  towers and radio towers that we had in Alaska.  We did our own

4  inspections on them and repairs.  And then we'd often get

5  called because we were one of the only units that still

6  actually went out and did physical work on towers.  We'd get

7  called to go do emergency repairs other places in the country.

8  Q    Okay.  When you were stationed in Juneau, Alaska, did you

9  get a chance to meet Jim Wells?

10  A    I did.

11  Q    Do you see him in the courtroom today?

12  A    I do.

13  Q    Okay.  And could you tell us about your -- how you got to

14  know Mr. Wells.

15  A    I believe it was in the early summer of 2002.  We -- we

16  routinely go out to LORAN station, and there'd be about a -- a

17  week-long trip to go do a routine tower inspection, which means

18  we pull all the guy wires and shoot the alignment of the tower,

19  and then climb the tower and replace any light -- lightbulbs

20  that need to be fixed, do a full inspection as you go up and go

21  down.  And it's a every-two-year evolution.  So, typically, it

22  would be just Jim and myself out there, working side by side

23  for a week at a time in a pretty remote location.

24  Q    Okay.  So how many days a year do you think you might be

25  working in that capacity with Mr. Wells?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 752   Filed 09/23/14   Page 26 of 112
(720) 384-8078  attrans@sbcglobal.net

1   A    I would say over the three years I was there, probably

2   somewhere between 30 and 60 days a year we'd be out in the

3   field.

4   Q    Okay.  So each of those years you were in Juneau, you

5   might spend 30 to 60 days working with Mr. Wells out in remote

6   sites, just the two of you?

7   A    Yeah.  Sometimes traveling, and just doing training,

8   because's Jim's body of knowledge was way -- way bigger than a

9   brand-new lieutenant.

10  Q    You said --

11  A    So we'd train -- we'd train a lot of the other -- a lot of

12  the units so they could climb their own tower, if they needed

13  to go up and do a -- a light repair or something like that.

14  Q    So was Mr. Wells a good working partner for you during --

15  A    He was.

16  Q    And was he -- would you consider him a mentor, then, or a

17  teacher for some of the younger --

18  A    Absolutely.

19  Q    Was he good in that capacity?

20  A    Absolutely.

21  Q    Okay.  Now, you've been kept -- when did you leave Juneau,

22  then?

23  A    In the summer of 2005.

24  Q    And then did you come back to Alaska after that?

25  A    I did.  I -- I was selected to be the commanding officer

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 752   Filed 09/23/14   Page 27 of 112
(720) 384-8078   attrans@sbcglobal.net

1 of the Coast Guard Cutter Hickory in Homer. And from 2009 to

2 2012 I was -- I was in that job. And I saw Jim somewhat

3 regularly during that period.

4 Q    Okay.  So for those three years you were stationed in

5 Homer, Alaska?

6 A    I was.

7 Q    And you were the commander of the ship then --

8 A    I was.

9 Q    -- the Hickory?  And so how often would you see Mr. Wells

10 during that time?

11 A    I would say between once every three to six months.

12 Q    And was that in a work capacity or just in a social

13 capacity?

14 A    In a social capacity.  We would -- if I would -- if the

15 ship would tie up in Kodiak, he'd -- he'd usually swing by and

16 have a cup of coffee or just catch up.  And a couple times as

17 he was coming through on his way to or from Anchorage for

18 appointments, he'd stop at -- in my house or we'd meet

19 somewhere for a -- a meal.

20 Q    Okay.  Now, in your career, working with Mr. Wells, was he

21 also known as an expert in his field nationwide?

22 A    Yes.

23 Q    And could you explain a little bit about if you and he

24 traveled in that capacity?

25 A    We did.  We -- and I -- I can't remember the -- the

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 752   Filed 09/23/14   Page 28 of 112
(720) 384-8078   attrans@sbcglobal.net

**MUSMAN - DIRECT**

1   hurricanes, but it was in 2004, 2005.  There was a -- a period

2   where there were two back-to-back hurricanes in Florida, and

3   the first one came and it ended up -- we had a tall tower in

4   Jupiter, Florida, a 625-foot tower that -- the guy wires,

5   one -- the tower had been keeled over so much by the wind that

6   one level of guy wires actually wrapped around another level of

7   guy wires.  And we went out, and they couldn't get a commercial

8   contractor to come take a look at it, so they called us to come

9   from Juneau to just evaluate it and see what the level of

10  problem was.  So I went and Mr. Wells went.  And we -- we got

11  down there and we took a look at it and said, this is going to

12  be a pretty significant issue.

13      And during that period, a second hurricane -- hurricane

14  was forecast to come over the same area, and there was a

15  feeling that that could destroy the tower and its current

16  situation.  So we mobilized a team of people, and I -- I would

17  say Jim and I led the team.  And we ended up -- through

18  tightening one set of guy wires and loosening the other, we

19  ended up getting the guy wire untangled in a undamaged manner,

20  and then the -- we got the tower realigned and all the -- the

21  guy wires tensioned.  Then the next hurricane came through, and

22  there weren't any problems.  So it was a -- I -- I would say it

23  was a pretty significant two weeks of my life.

24  Q    Okay.

25  A    And it was really, really a challenging evolution.  And I

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 752   Filed 09/23/14   Page 29 of 112
(720) 384-8078   attrans@sbcglobal.net

**MUSMAN - DIRECT**

1  would say that there was no way I would have even thought about

2  leading that team without Jim by my side.

3  Q    So you and Mr. Wells did this project side by side?

4  A    Absolutely.

5  Q    Now, have you -- when's the last time you talked to Mr.

6  Wells?

7  A    About two weeks before the -- the murder in Kodiak.

8  Q    You know about the homicides in Kodiak?

9  A    I do.

10 Q    And so you saw Mr. Wells a couple weeks before that?

11 A    Yes.  I don't know the exact date.  I haven't -- I didn't

12 ever research what the exact date was, but it was -- it was

13 within two or three weeks of -- of this -- of the murders.  And

14 he was coming from Anchorage, going to -- waiting for the ferry

15 to go to Kodiak.  We -- we had breakfast at the Duncan House

16 Cafe in Homer, and we were there for, I would say, almost --

17 probably two hours.

18 Q    Okay.  And during that time did you have a chance to

19 discuss with him how things were going in life, how things were

20 going at work?

21 A    Yes.

22 Q    And was your impression that he was -- did he have any

23 problems at work, or did it seem like he enjoyed his work?

24 A    I -- I specifically asked him if he was going to retire

25 and -- and start getting into photography full-time.  And he

Case 3:13-cr-00008-SLG  Document 752  Filed 09/23/14  Page 30 of 112

**MUSMAN - CROSS**

1  said he was enjoying the work and he was enjoying his time at

2  work, and had no intentions at that point to retire.  And --

3  and Nancy still had, I think, two years left to -- in her job

4  before she could retire.  So he was planning on just waiting

5  until she got done and then see if he -- he wanted to stop at

6  that point.

7  Q    Okay.  And so he didn't have any complaints about work or

8  talk about any kind of problems at work?

9  A    No.  I -- I had a lot of family issues going on, and I was

10 midway through my next transfer from Homer to Los Angeles.  And

11 I had -- so that, I would say, dominated our conversation.

12 Q    All right.

13        MR. CURTNER:  I think that's all the questions I have,

14 Your Honor.  Thank you.

15        THE COURT:  Cross-examination.

16        MS. DUIGNAN:  Yes, Your Honor.

17                      **CROSS-EXAMINATION**

18 BY MS. DUIGNAN:

19 Q    Good morning, Commander Musman.

20 A    Good morning.

21 Q    I don't think we've met.  I'm actually Captain Kathleen

22 Duignan in the U.S. Coast Guard.  Nice to meet you.

23 A    Good morning.

24 Q    You met Mr. Wells about 10 years ago, correct?

25 A    Yes, 2002.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 752  Filed 09/23/14  Page 31 of 112

1  Q    And you met him, essentially, traveling.  You lived in

2  Juneau and he lived Kodiak at the time?

3  A    That's correct.

4  Q    So you never had a direct supervisory relationship over

5  him --

6  A    No.

7  Q    -- is that right?  And you called the defendant on the day

8  of the murders to offer your condolences, didn't you?

9  A    I did.

10 Q    And you called him shortly after that, a few days later --

11 A    I did.

12 Q    -- as well, and he never called you back?

13 A    He did not.

14 Q    And you knew he had had a run-in -- he told you about

15 that -- with his chain of command in 2005 for failing to keep

16 them informed about his whereabouts and traveling without

17 permission?

18 A    Yes.

19 Q    And do you remember saying that if you had been his

20 commanding officer, you would have had the same concerns as his

21 command had, based on that?

22 A    Yes.

23 Q    You mentioned the fact that when you had breakfast with

24 him, that he was very happy at his job and was planning on

25 staying.  Right?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 752   Filed 09/23/14   Page 32 of 112
(720) 384-8078   attrans@sbcglobal.net

**MUSMAN - CROSS**

1  A    Yes.

2  Q    But about a year before that he was talking to you about

3  retirement.  Isn't that correct?

4  A    I -- I think -- I know that he had spoken about retirement

5  when Nancy was sick and he -- he didn't -- he wanted to spend

6  time with her.

7  Q    But he changed his mind between those times that you

8  talked?

9  A    Yes.  The last time I spoke with him, he was happy at work

10  and wanted to continue on.

11  Q    Did he tell you during that time that in February of 2012

12  he had received a letter of caution from the commander --

13          MR. CURTNER:  Objection, Your Honor, this is beyond

14  the --

15          MS. DUIGNAN:  -- of COMMSTA Kodiak?

16          MR. CURTNER:  Your Honor, this is a -- beyond the scope

17  of cross-examination.

18          MS. DUIGNAN:  Oh, I believe he opened the door when he

19  asked if he was aware about his work performance.

20          THE COURT:  Sustained -- overruled.

21  BY MS. DUIGNAN:

22  Q    Are you aware that in February of 2012, the commanding

23  officer of COMMSTA Kodiak personally issued him a letter of

24  caution for stealing fuel for his -- from -- for his personal

25  vehicle with a government fuel card?

1  A    No, I'm not aware of that.

2  Q    And were you aware that in 2003 he received a letter of

3  reprimand from the commanding officer of COMMSTA Kodiak for

4  purposefully violating a direct order?

5  A    Not aware of that.

6  Q    And were you also aware that he received a letter of

7  reprimand from the commanding officer in COMMSTA Kodiak for

8  unethical conduct?

9  A    I'm not aware of that.

10         MS. DUIGNAN:  I have no further questions, Your Honor.

11         THE COURT:  Redirect.

12                    **REDIRECT EXAMINATION**

13  BY MR. CURTNER:

14  Q    Commander Musman, do you know Mr. Wells's reputation for

15  violence?

16  A    No.

17  Q    Okay.  Do you -- would you say he has a reputation for

18  being a nonviolent person?

19         MS. DUIGNAN:  Objection.  Beyond the scope.

20         THE COURT:  Well, he just said, "No, I don't know

21  his" -- I thought he said, "No."  You --

22  BY MR. CURTNER:

23  Q    He had --

24  A    I do not.

25  Q    -- for violence -- did you know if he had a reputation for

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 752   Filed 09/23/14   Page 34 of 112
(720) 384-8078   attrans@sbcglobal.net

1  nonviolence?

2  A    I -- I don't have any frame of reference.  From my time

3  with him, there was never anything that would indicate either

4  direction.  I don't -- I --

5  Q    You never saw him be violent or angry?

6  A    No.

7  Q    Thank you.

8                    **RECROSS EXAMINATION**

9  BY MS. DUIGNAN:

10  Q    Commander Musman, do you have any training in targeted and

11  workplace violence?

12  A    None.

13  Q    Thank you.

14        THE COURT:  Done?  Okay, thank you, sir.  Excused.

15  Defendant's next witness.

16     (Witness excused)

17        THE COURT:  You can just make your way into this box up

18  here.  Pull the door; it opens by pulling out.  And remain

19  standing.  And here -- she'll swear you in.

20        THE CLERK:  Please raise your right hand.

21          **GREG TLAPA, DEFENDANT'S WITNESS, SWORN**

22        THE CLERK:  Okay, thank you.  Please have a seat.

23        THE WITNESS:  Okay.

24        THE CLERK:  And, sir, if you can please state and spell

25  your full name.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 752  Filed 09/23/14  Page 35 of 112
(720) 384-8078  attrans@sbcglobal.net

**TLAPA - DIRECT**

1      THE WITNESS:  It's Greg Tlapa.  It's G-r-e-g, T-l-a-p-

2  a.

3      THE COURT:  All right.  Counsel.

4                **DIRECT EXAMINATION**

5  BY MR. CURTNER:

6  Q    Good morning, Commander Tlapa.

7  A    Who's speaking?

8  Q    I am.

9  A    Oh.  Hello.

10  Q    I'm sorry.  Maybe I need to be a little bit taller.

11      THE COURT:  And I didn't catch the spelling of that

12  last name.

13      THE WITNESS:  T-l-a-p-a.

14      MR. CURTNER:  Okay.  I'm over here, so --

15      THE COURT:  Now, okay.

16  BY MR. CURTNER:

17  Q    Where are you employed?

18  A    Right now I'm a student at the U.S. Naval War College in

19  Newport, Rhode Island.

20  Q    Okay.  And can you tell us why you're a student there and

21  what you do there?

22  A    Sure.  So the -- all of the services have -- except the

23  Coast Guard have senior service schools where they educate

24  their -- their staff in professional military matters, and so

25  I'm there as a Coast Guard representative in a class of about

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 752  Filed 09/23/14  Page 36 of 112
(720) 384-8078  attrans@sbcglobal.net

**TLAPA - DIRECT**

1  100.  Two Coast Guard representatives and 98 or so other

2  services --

3  Q    Okay.

4  A    -- members of the other services.

5  Q    So how long do you think you'll be in that war college?

6  A    Another two months.

7  Q    All right.  How long have you been there?

8  A    I've been there eight months.  Ten-month program.

9  Q    All right.  Well, let's -- could you tell us a little

10  about your career in the Coast Guard?

11  A    Yeah.  It's been a combination of short duty for civil

12  engineering and ship tours.  So most recently I was on an ice-

13  breaker, the Healy, works up in the Arctic.  And before that I

14  was stationed -- my Alaska tours were in Homer, Kodiak, and

15  Juneau.

16  Q    All right.  So when did you join the Coast Guard?

17  A    I went to the Coast Guard Academy in 1990.

18  Q    And so what is your current rank?

19  A    I'm a commander.

20  Q    And so what -- what's in your future now as -- after you

21  complete the war college?

22  A    I have orders to Stuttgart, Germany, and AFRICOM, in the

23  operations planning.

24  Q    Now, since you've been in the Coast Guard, have you got to

25  know Jim Wells?

**TLAPA - DIRECT**

1    A    Yes.

2    Q    When did you meet Mr. Wells?

3    A    I met -- I'm not sure of the month, but the year was 1999.

4    Q    Okay.  And how did you know Mr. Wells?

5    A    My first interaction with him was through -- through tower

6    work, engineering, out of -- I was an engineer out of Juneau.

7    And we ran a series of LORAN stations that were pretty remote.

8    And so Jim being the rigger out of Kodiak, he would typically

9    work in concert with the tower engineer in Juneau and visit all

10   these sites and perform maintenance on them.

11   Q    And was he a good -- did he perform well in that capacity?

12   A    Yes.

13   Q    All right.

14   A    Exceptional.

15   Q    Okay.  Maybe you could explain a little bit about his

16   expertise or his work.

17   A    Well, I can tell you that he was -- he was pretty

18   aggressive in doing the right thing for the right reason.  And

19   on -- at least on one occasion I put him in for a -- for a cash

20   award, which is pretty rare in civilian employment in the Coast

21   Guard, which he got.

22   Q    Okay.  Now, did you get to know him on a social basis as

23   well?

24   A    Yes.

25   Q    And could you tell us a little bit about that?

**TLAPA - DIRECT**

1  A    Sure.  So when I lived in Kodiak is really -- so the first

2  time I met him, I was living in Juneau for three, three and a

3  half years.  And our friendship started as a professional

4  friendship and then it kind of grew from there.  And when I got

5  stationed in Kodiak a couple years later, that allowed -- with

6  the closer proximity allowed us to start doing things in our

7  off time.  And so it wasn't uncommon to go out to dinner with

8  Jim and Nancy, go fishing with them, did some log cutting with

9  them, split -- split some firewood.  I helped them design and

10 install a septic system at his house, did some concrete work

11 with him, stuff, like that.

12 Q    So you got to spend a lot of time with Mr. Wells during

13 that time period?

14 A    Yes.

15 Q    And this is apart from your professional relationship when

16 you were down in Juneau?

17 A    Yes.

18 Q    Okay.  And then -- so during the time you got -- how many

19 years did you spend a lot of time with him in that context?

20 A    Well, that was in Kodiak.  I was two years there.  And

21 then when I left Kodiak, I went to Homer.  And right at that

22 time, Jim was having quite a bit of medical issues and he was

23 traveling to Anchorage.  And so he'd take the ferry over and --

24 pretty common, would spend the night at our house.  And, you

25 know, he'd interact with my family, my wife, my kids.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 752  Filed 09/23/14  Page 39 of 112
(720) 384-8078  attrans@sbcglobal.net

1    Q    Okay.  So -- and that's more recently, then?

2    A    That was between 2006 and 2009.

3    Q    That he would come and stay at your home?

4    A    Yes.

5    Q    All right.  Would -- did you leave then after 2009?

6    A    Yes.

7    Q    All right.  Now, as you've known Mr. Wells over these many

8    years, have you never known him to demonstrate anger or a

9    temper, lose his temper at all?

10   A    Never.

11   Q    And do you think he has a reputation in the community for

12   being nonviolent?

13   A    I don't know.

14   Q    Okay.  In your experience, you've never seen him violent,

15   angry --

16   A    No.

17   Q    -- lose his temper?  Okay, that's all I have.  Thank you.

18        THE COURT:  All right, cross-examination.

19                    **CROSS-EXAMINATION**

20   BY MR. SCHRODER:

21   Q    Good morning, Commander Tlapa.

22   A    Good morning.

23   Q    Now, when was the last time you saw -- or you saw Jim

24   Wells before the murders in Kodiak?

25   A    Was when I was -- was -- the year was probably 2011.  And

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 752  Filed 09/23/14  Page 40 of 112
(720) 384-8078  attrans@sbcglobal.net

1  I was in Washington, D.C.  I was stationed at Coast Guard

2  Headquarters and he was out on the east coast for something.

3  And he gave me a call and said, "Hey, I'm in town," and we had

4  him over for dinner.

5  Q    And I believe in -- statement you gave to the FBI you

6  talked about that.  And isn't it true that over the next few

7  months, until the time of the murders, basically, your contact

8  with him was emails?  I believe that's what I read.

9  A    Yes.

10  Q    And I also believe that -- what you'd stated is that the

11  last couple months before the murders you'd sent emails but not

12  gotten any replies at that point.  Is that correct?

13  A    Yeah.  I have -- I mean, it's getting to be a a while now.

14  It's a couple years ago.  So my recollection of email traffic

15  is a little iffy.

16  Q    I understand.

17  A    But I mean to your point, yeah, our -- our contact had

18  started to wane.

19  Q    Now, as the antenna engineer in Juneau, isn't it true that

20  you don't have any supervisory authority over anybody at

21  COMMSTA Kodiak?

22  A    That's correct.

23  Q    So you didn't have any supervisory authority over Mr.

24  Wells.  Correct?

25  A    Correct.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 752  Filed 09/23/14  Page 41 of 112

1 Q   So were you aware that in -- are you aware -- is your

2 basis of knowledge of him -- are you aware that in February of

3 2012 he received a letter of caution from the commander of

4 COMMSTA Kodiak for using a government card to put fuel in his

5 personal vehicle?

6 A   No.

7 Q   And are you aware that in 2003 he received a letter of

8 reprimand from the commanding officer of COMMSTA Kodiak for

9 violating a direct order?

10 A   No.

11 Q   And are you aware that he'd previously received a letter

12 of reprimand from the commanding officer of COMMSTA Kodiak for

13 unethical conduct?

14 A   No.

15 Q   No further questions.

16       THE COURT:   Redirect.

17                    **REDIRECT EXAMINATION**

18 BY MR. CURTNER:

19 Q   So, Commander, your testimony is based on over a decade of

20 knowing Mr. Wells, knowing his family, him being at your home.

21 During that time, he -- did he ever talk about conflicts at

22 work?

23 A   No.

24 Q   And so your testimony is about the man you know.  Is that

25 correct?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 752  Filed 09/23/14  Page 42 of 112
(720) 384-8078  attrans@sbcglobal.net

1  A    Yes.

2  Q    Thank you.  Thank you, Commander.

3           THE COURT:  Recross.

4                    **RECROSS EXAMINATION**

5  BY MR. SCHRODER:

6  Q    Is it fair to say that your relationship with Mr. Wells is

7  separate now and it was a long time been separate from his work

8  relationship?  Or let me put it a better way.  Do you have any

9  knowledge of the working conditions or the working situation at

10 the rigger shop in COMMSTA Kodiak in the past few years?

11 A    No.

12 Q    Okay.

13          MR. CURTNER:  Nothing further.  Thank you, Commander.

14          THE COURT:  All right, thank you.  Okay, what's the

15 status now?

16     (Witness excused)

17          MR. CURTNER:  Well, I need to check on our travel

18 arrangements with the --

19          THE COURT:  Okay.

20     (Side conversation)

21          MR. CURTNER:  Your Honor, we have a -- one more witness

22 right now that that's trying to get through security.

23          THE COURT:  Okay.  All right.

24          MS. LOEFFLER:   Can we know who it is you --

25          MR. CURTNER:  Carver, Gary Carver.

Case 3:13-cr-00008-SLG  Document 752  Filed 09/23/14  Page 43 of 112

1     (Pause)

2        THE COURT:  I don't see that name on the witness list.

3 Is --

4        MR. CURTNER:  Carver -- did you look over to the next

5 day -- I mean, the next page.

6        THE COURT:  Oh, way at the top, hidden at the top.

7        MR. CURTNER:  Well, it's actually at the bottom, but --

8        THE COURT:  Mine's at the top.

9        MR. CURTNER:  To the top of the next page, yes.

10    (Pause)

11       THE COURT:  Okay.  You just head toward this way, sir,

12 please.  And you'll notice there's a -- this lady will open the

13 door for you.  You get to step into the witness box.  And then

14 just remain standing for a second, and she'll swear you in.

15 Get comfortable.

16       MR. CARVER:  I don't know how I did that, but I did.

17       THE COURT:  You did good.  You did well.  Okay, you've

18 just been through security, so get yourself reoriented.

19       MR. CARVER:  It's been one of those mornings.

20       THE COURT:  I can tell -- well -- all right.  Okay,

21 there you go.  Now if you just -- she's going to swear you in,

22 right here.

23       THE CLERK:  Please raise your right hand.

24      **GARY ALLAN CARVER, DEFENDANT'S WITNESS, SWORN**

25       THE CLERK:  Okay.  Thank you.  Please have a seat.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 752  Filed 09/23/14  Page 44 of 112
(720) 384-8078  attrans@sbcglobal.net

1  And, sir, if you can please state and spell your full name.

2      THE WITNESS:  My full name is Gary Allen Carver.  G-a-

3  r-y, A-l-l-e-n, C-a-r-v-e-r.

4      THE CLERK:  Thank you.

5      THE COURT:  Counsel.

6              **DIRECT EXAMINATION**

7  BY MR. CURTNER:

8  Q   Good morning, Mr. Carver.

9  A   Good morning.

10 Q   How long have you been in Anchorage?

11 A   About 10 minutes.

12 Q   Where do you live?

13 A   I live in Kodiak.

14 Q   How long have you lived in Kodiak?

15 A   About 15 years.

16 Q   Okay.  And are you employed now?

17 A   I am.

18 Q   What do you do now?

19 A   I'm a consultant.  I have my own company.

20 Q   What type of company?  What do you --

21 A   I do --

22 Q   -- what kind of consulting do you do?

23 A   I do paleoseismological consulting.

24 Q   What does that mean?

25 A   I study faults for mainly engineering applications, active

**CARVER - DIRECT**

1  faults that generate ground breakage and earthquakes.

2  Q    Okay.  And how long have you been consulting?

3  A    Oh, my.  Off and on, for about 30 years.  I was a

4  university professor for 25 years before moving up here, and I

5  consulted some then.  And I've been consulting since I've been

6  up in Alaska.

7  Q    Well, let's talk a little bit about your prior life as a

8  professor.

9  A    Yes.

10 Q    And you have a doctorate in that?

11 A    I do.

12 Q    And where were you a professor?

13 A    Humboldt State University.

14 Q    Where's that?

15 A    It's in Northern California.

16 Q    How long were you a professor there?

17 A    About 25 years.

18 Q    And what did you teach there?  What was your --

19 A    Geology.

20 Q    Okay.  Then -- so when did you move to Kodiak?

21 A    1998.

22 Q    You retired from the university then?

23 A    I did.

24 Q    And where do you live in Kodiak?

25 A    I live on Mill Bay Drive.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 752   Filed 09/23/14   Page 46 of 112
(720) 384-8078  attrans@sbcglobal.net

**CARVER - DIRECT**

1   Q    All right.  What's -- what part of Kodiak does that refer
2   to?
3   A    It's out in the Bells Flats area.
4   Q    Do you know Jim Wells?
5   A    I know Jim Wells.
6   Q    And how do you know Jim Wells?
7   A    He's a neighbor and a person that I've known since I moved
8   there.
9   Q    How did you first meet Mr. Wells?
10  A    I think probably the first time I can recall meeting Mr.
11  Wells was when I was teaching a geology class with the Kodiak
12  College and he was one of the students there.
13  Q    Okay.  And that was maybe the first time you met him?
14  A    Probably, although I may have met him before that.  That's
15  the first time I recall.
16  Q    And since then, since you're neighbors, have you been able
17  to socialize with him?
18  A    We've socialized and been neighbors, yes.
19  Q    Okay.  Can you tell us a little bit about that, how often
20  you might see Mr. Wells and what kind of activities you had?
21  A    Well, I would see Mr. Wells sometimes every other day, you
22  know, waving as we drove down the road or that sort of thing.
23  We -- a couple times a year we would have dinner with the
24  Wellses, commonly on their anniversary -- they would -- dinner,
25  we would go to, and -- and sometimes Thanksgiving.  And -- and

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 752  Filed 09/23/14  Page 47 of 112
(720) 384-8078  attrans@sbcglobal.net

1  occasionally other times.  I occasionally went duck hunting

2  with Mr. Wells on a -- on -- on several occasions, went fishing

3  with him a number of times.

4  Q    Okay.  So you shared some holidays with him and his

5  family?

6  A    Yes.

7  Q    And also you did hunting and fishing with Mr. Wells?

8  A    Yes.

9  Q    All right.  So do you think you got to know him pretty

10  well over the years?

11  A    Yeah, fairly well.

12  Q    Did you ever see him -- well, when you knew him did he

13  ever talk about his work, his occupation?

14  A    Not -- not so much really his -- the -- the work, but I

15  knew what he did and -- and on a couple of occasions, one

16  occasion in particular when a plane ran into the tower out

17  at -- at the (indiscernible) cape, we went out and looked at

18  the cable that had been broken down on that and such.

19  Q    Okay.  So he didn't talk about work very much with you?

20  A    Not a great deal.

21  Q    Did he ever say anything negative, though, about work, or

22  has complained about work

23  A    No, I never heard him say anything negative about it.

24  Q    Okay.  Have you ever known him to be -- but did he ever

25  talk about how he enjoyed his work?

1  A    Yeah.  He did sometimes talk about it.  I remember him

2  showing the slides one time when they took a tower down -- out

3  and -- and -- in -- in Northern Alaska.

4  Q    So he seemed like he enjoyed what he was doing?

5  A    Yeah, I think he did.

6  Q    Okay.  Now, have you ever seen Mr. Wells the times you've

7  been with him lose his cool or lose his temper?

8  A    I've never seen him really lose his cool or lose his

9  temper, no.

10  Q    Okay.  Have you ever seen him be violent?

11  A    No, not at all.

12  Q    Do you know if he has a reputation in the Bells Flats

13  community for being violent?

14  A    Not one that I'm aware of.

15  Q    Okay.  So would you say he has a reputation for

16  nonviolence?

17  A    Yeah.

18  Q    Okay.  Thank you, Dr. Carver.  They'll have a few

19  questions for you.

20         THE COURT:  All right, counsel.

21                    **CROSS-EXAMINATION**

22  BY MR. SCHRODER:

23  Q    Good morning, Dr. Carver.

24  A    Good morning.

25  Q    In your neighborhood, do people generally have reputations

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 752   Filed 09/23/14   Page 49 of 112
(720) 384-8078   attrans@sbcglobal.net

1  for violence or nonviolence?

2  A    Not generally.

3  Q    And you said you're a neighbor of Mr. Wells.  Correct?

4  A    Yes, I live down the road from him.

5  Q    And from what I understand, your interaction with him was

6  outside of his workplace.  Correct?

7  A    Pretty much.

8  Q    Although I think, if I remember correctly, you might have

9  actually been to his workplace on occasion?

10 A    I did visit the -- the -- the rigging shop --

11 Q    Right.

12 A    -- a couple of times.

13 Q    But, again, my -- to my memory, you didn't have a lot of

14 interreact -- or a lot of react -- a lot of interaction with

15 anybody other than Mr. Wells.  Is that correct?

16 A    That's correct.

17 Q    And you said he didn't talk about work much.  So isn't it

18 true that you really don't have much insight into the work

19 environment at the rigger shop where he worked at COMMSTA

20 Kodiak.  Isn't that true?

21 A    That's probably true.

22 Q    And, again, going back, you said your contact with him

23 was -- you kind of laid out how that was.  But in the year

24 before the homicides, isn't it true that you had probably less

25 contact than you had in the past?

**CARVER - CROSS**

1   A    I don't know.

2   Q    Well, and isn't it true that he was ill during part of

3   that time, so wasn't around as much?

4   A    If that's true, I -- it's not something that's apparent to

5   me.

6   Q    Okay.  All right, no further questions.

7            THE COURT:  Redirect.

8            MR. CURTNER:  No.  Thank you, Dr. Carver.

9            THE COURT:  All right.  Thank you, sir.  Be careful

10   going through security.

11           THE WITNESS:  Right.

12           THE COURT:  No, they'll let you out a lot easier.

13           THE WITNESS:  I may need help.

14           THE COURT:  All right.

15           THE WITNESS:  Thank you.

16      (Witness excused)

17           THE COURT:  Mr. Curtner, what's -- we're waiting,

18   looking?

19           MR. CURTNER:  We're waiting for the next bus.  The -- I

20   think the next witnesses should arrive in Anchorage around 1

21   o'clock.  So I would suggest, unfortunately, that we have a

22   long lunch hour and come back at 1:30.

23           THE COURT:  That's more than a long lunch hour.

24           MR. CURTNER:  Well, that's -- things beyond our

25   control, Your Honor.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 752  Filed 09/23/14  Page 51 of 112
(720) 384-8078  attrans@sbcglobal.net

1          THE COURT:  You're telling me that you can't have a
2     witness here till maybe 2 o'clock.
3          MR. CURTNER:  No, I think 1:30.
4          THE COURT:  The plane lands at -- okay.  1:30.
5          MR. CURTNER:  Sorry.
6          THE COURT:  Don't look at me.  So what do you want to
7     do, ladies and gentlemen?  I mean, can you find something to do
8     for the next four or five hours?  Go back to -- take a nap or
9     whatever.  So we'll stand in recess till 1:30.
10         (Jury not present)
11         THE COURT:  Okay, please be seated.  Counsel, is there
12    anything we can accomplish this morning?
13         (Side conversation)
14         MS. LOEFFLER:  Your Honor, the only thing I want to do
15    is, assuming --
16         (Side conversation)
17         MS. LOEFFLER:  Might be useful to find out who they're
18    calling today, because if it's the list of Biocic, Grass, you
19    know, Brennick, Froelich, we're going to have to take all this
20    outside the presence of the jury first.  So I suspect we should
21    need to know who they're calling.  They're a bunch of witnesses
22    like the ones they called this morning, we don't have any
23    objection to.  The other stuff, I think we're going to have to
24    take it all outside the presence of the jury.
25         THE COURT:  Well, we've got a witness list.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 752  Filed 09/23/14  Page 52 of 112
(720) 384-8078  attrans@sbcglobal.net

1          MS. LOEFFLER:  So may be worthwhile to find out what

2     the schedule is.

3          THE COURT:  Well, it's going to be just -- you know, I

4     think we can rely on the witness list.  I see you have Mrs.

5     Belisle.

6          MR. CURTNER:  Your Honor, we're not going to call Mrs.

7     Belisle.

8          THE COURT:  Okay, so that takes that one off.

9          MR. CURTNER:  And Casey Brennick, unfortunately, can't

10    be here till Monday.

11         THE COURT:  Okay.  And you've already called Hannah.

12    So we got Travis, we've got Everett, we've got Erin.  And so

13    Rebecca, was that the lady that came and left?

14         MR. CURTNER:  Yes.

15         THE COURT:  Okay.  Is there anyone that we can take

16    care of today that's listed on the 14th?  I'm not requiring,

17    I'm just raising the issue.

18         MR. CURTNER:  They are all, I think, traveling from --

19         THE COURT:  Okay.

20         MR. CURTNER:  -- out of Anchorage.  But we -- yeah, the

21    good news is we're going to try to consolidate those last --

22    the three days into two.

23         THE COURT:  Okay, so that's good news.  So that means

24    that the government for any rebuttal has to be ready, if there

25    is any rebuttal, on Wednesday morning, the 23rd.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 752  Filed 09/23/14  Page 53 of 112
(720) 384-8078  attrans@sbcglobal.net

1          MS. LOEFFLER:  Yeah.  We were -- that's what we're

2     planning on.

3          THE COURT:  All right.  You know, I -- I've referred to

4     the *Miller* factors, I've referred to them before.  And kind of

5     a rule of thumb that I've been following; that's why I've

6     allowed these other witnesses that apparently are coming in

7     later today, is because they have some knowledge of the victims

8     or the victims' family, at least tangentially.  So that gives

9     the -- give their testimony at least some probative value.  And

10    I --

11         MR. OFFENBECHER:  Your Honor, could --

12         THE COURT:  And I've had that testimony already

13    present -- I think it's testimony, but if there's any issues in

14    that regard -- I think Hannah presented connections sufficient

15    to allow some of them.  But anyhow --

16         MR. OFFENBECHER:  Your Honor, could you give us the

17    cite to that *Miller* case that you're referring to again, just

18    to make sure we're on the same page?

19         THE COURT:  Well, I'm referring to *Stever*, but it's

20    in -- it -- you all cited *Stever* to me, S-t-e-v-e-r.

21         MR. OFFENBECHER:  Right, okay.  That --

22         THE COURT:  And then in --

23         MR. OFFENBECHER:  Got it.

24         THE COURT:  -- on page 749 of *Stever* --

25         MR. OFFENBECHER:  Right.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 752  Filed 09/23/14  Page 54 of 112
(720) 384-8078  attrans@sbcglobal.net

1    THE COURT:  -- it lists the *Miller* factors --

2    MR. OFFENBECHER:  Right.  Got it.

3    THE COURT:  -- under --

4    MR. OFFENBECHER:  So we're on the same --

5    THE COURT:  -- keynote 12.

6    MR. OFFENBECHER:  Yeah.  We're on the same page.

7    MS. LOEFFLER:  Your Honor, just to be clear, we're not

8  saying that they couldn't possibly call these people, but what

9  we are saying is that the concern is that -- and I sent a -- an

10  email to Mr. Curtner last night -- that if they're going to

11  come on and ask them about drug use, they have to be advised of

12  their rights.  Somebody's got to -- I hope there's somebody

13  from CJA in case they want to talk to an att -- I mean, this is

14  the first time that's come up.  But they -- you know --

15    THE COURT:  I don't know if that's what they're going

16  to ask them.

17    MS. LOEFFLER:  I don't know.  But if they are, that

18  stuff all has to be done outside the presence of the jury,

19  because you can't have them -- you know, you can't call

20  somebody to assert a Fifth Amendment right and you also can't,

21  you know, call somebody in order to get inadmissible evidence

22  in solely through impeachment.  And so all I'm saying is, not

23  that they may not have something relevant, they -- they're

24  friends of Hannah Belisle's --

25    THE COURT:  True.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 752  Filed 09/23/14  Page 55 of 112
(720) 384-8078  attrans@sbcglobal.net

1          MS. LOEFFLER:  -- and there may certainly be things

2   that nobody would object to that, you know, they can go into.

3   But we're going to have to find out if they're going to ask any

4   questions that could invoke the -- you know, the -- that these

5   guys might want to invoke on.  They got to be instructed, and

6   I -- hopefully there'll be an attorney here, so that if they

7   want to consult with somebody they can do that, with none of us

8   trying to tell them what they can and can't do.

9          MR. OFFENBECHER:  Well, Your Honor, I guess -- oh, can

10  I respond to that?

11         THE COURT:  Go ahead.

12         MR. OFFENBECHER:  Yeah.  The concern, of course --

13  we're not going to ask them any questions that we think will

14  cause them to incriminate themselves.  But, of course, at the

15  same time, the government can't -- should not, anyway, style

16  the situation so that they tend to invoke by bringing in

17  lawyers and advising of their rights.  There's no reason to

18  advise these witnesses of their rights any more than the

19  special agent did when he sat down and interviewed them and

20  told them, "Well, listen, we don't prosecute people for drug

21  crimes," when he spoke with Hannah, these other people, "We're

22  not going to prosecute you.  All we want to know is the truth."

23         So the concern, of course, is that by trying to

24  structure this as an advisement of rights, that the net result

25  is that the witnesses for the defendant end up not testifying,

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 752  Filed 09/23/14  Page 56 of 112

1  out of an excess of caution by their lawyers.  And so that's

2  what we're --

3          THE COURT:  Do you understand, once again, it's a

4  definite balancing test, as usual?

5          MS. LOEFFLER:  Well, I don't think that's it.  It's not

6  either the defense or our -- neither one of us get to say, "Oh,

7  don't worry on the stand.  You don't have any -- if they ask

8  you about drugs," you know, if they -- I mean, unfortunately,

9  you know, or fortunately or unfortunately, you know, the law is

10 possession of drugs is a crime.  You're going to ask somebody a

11 question that could incriminate them by somebody.

12         The judge -- you know, I mean, the -- this is something

13 we've done before with witnesses.  They have to -- you have to

14 tell them -- advise them of their rights outside the presence

15 of the jury.  Mr. Curtner's done this lots of times.  In fact,

16 we've called him for witnesses.  You know, have a CJA attorney.

17 The guy can talk to the attorney.  If they say, "I don't care,"

18 great.  If they -- but it's not the place for either counsel to

19 tell them, "Oh, don't worry about your rights."  You know,

20 that's why we have to do it outside the presence of the jury.

21 If the witnesses say, "I don't care, and I'm happy to answer

22 those questions," we're done with that.  But --

23         THE COURT:  I'm not sure that --

24         MS. LOEFFLER:  -- it's their choice, not ours.

25         THE COURT:  I'm not sure I have to.  I mean, there's

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 752  Filed 09/23/14  Page 57 of 112

1    case law on this subject.  But some -- I think it's highly

2    discretionary, as usual.  I'll just have to play it case by

3    case, I guess.

4            MS. LOEFFLER:  I just think we're going to -- you know.

5    I mean, I think there's -- I mean, I think you do have an

6    obligation --

7            THE COURT:  Well --

8            MS. LOEFFLER:  -- before anybody asks them --

9            MR. CURTNER:  You show me the case.

10           MS. LOEFFLER:  -- a question --

11           THE COURT:  You show me the case.

12           MR. OFFENBECHER:  Yes.  You do not.

13           MS. LOEFFLER:  Okay, we'll go find it.

14           THE COURT:  Okay.

15           MS. LOEFFLER:  We got time.  We'll come back with it.

16           THE COURT:  What -- no, no, what do you mean, you got

17   time.  You got four hours.

18           MS. LOEFFLER:  That's what I mean.  We'll go get you a

19   case.  No, I --

20           THE COURT:  Yeah.

21           MS. LOEFFLER:  I was answering you, say, fine, Your

22   Honor --

23           THE COURT:  Oh, okay.

24           MS. LOEFFLER:  -- I will go off and we'll bring back

25   something.  How do you want to get it as fast as we can to both

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 752  Filed 09/23/14  Page 58 of 112
(720) 384-8078  attrans@sbcglobal.net

1  you and the defense counsel?

2          THE COURT:  Just the email's fine.  Yeah, I think it's

3  kind of discretionary.  I understand there's a 1992

4  Kosinski opinion on the subject.  There's a -- you know, I

5  usually -- I have done both ways, depending on the

6  circumstances.

7          MS. LOEFFLER:  Well, maybe we can set a time -- I don't

8  know, you want to reconvene at --

9          THE COURT:  No, I -- you know, I'll figure out what to

10 do one way or the other.  You can -- either party can send me

11 whatever authority you think I --

12         MS. LOEFFLER:  Okay.

13         THE COURT:  -- would help.

14         MS. LOEFFLER:  All right, let's go --

15         THE COURT:  My clerk's working on it, has been working

16 on it --

17         MS. LOEFFLER:  Let's go --

18         THE COURT:  -- before you people even thought about the

19 issue.

20         MS. LOEFFLER:  Okay.  So let's go -- if you'll let us,

21 we'll go back and we'll --

22         THE COURT:  Oh, yeah, you're -- I can't do anything --

23 I've got all kinds of things to do this morning.

24         MS. LOEFFLER:  Okay.

25         THE COURT:  So we'll just see you at 1:25.  Well, I

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 752  Filed 09/23/14  Page 59 of 112
(720) 384-8078  attrans@sbcglobal.net

 1  have a --

 2          MS. LOEFFLER:  Okay, we'll try to get you something

 3  before that.

 4          THE COURT:  Yeah, okay.

 5          MS. LOEFFLER:  As soon as we can.

 6          THE COURT:  All right, thank you.

 7          MR. OFFENBECHER:  Thank you, Your Honor.

 8          THE CLERK:  All rise.  This matter stands in recess

 9  until 1:30.

10      (Court recessed at 9:41 a.m., until 1:33 p.m.)

11      (Jury not present)

12          THE CLERK:  All rise.  His Honor the Court, the United

13  States District Court for the District of Alaska is again in

14  session.  Please be seated.

15          THE COURT:  Okay.  Are we ready?

16          MS. LOEFFLER:  I think we are.  If we can quickly go to

17  sidebar, I think we have a problem solved.  It's solved.  I

18  just want to put it on the record.  I think the problem's been

19  solved, and I just want to put it on the record, so the --

20          THE COURT:  Okay.

21          MS. LOEFFLER:  Okay.

22      (At sidebar with the Court and counsel)

23          THE COURT:  Just wait, and start the sentence off,

24  (indiscernible).

25          MS. LOEFFLER:  I think it's soft.  My only concern has

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 752  Filed 09/23/14  Page 60 of 112
(720) 384-8078  attrans@sbcglobal.net

1    been anybody invoking themselves in front of the jury and
2    somehow --

3             THE COURT:  (Indiscernible).

4             MS. LOEFFLER:  -- end up mistrying our case.  What I
5    just talked to --

6             THE COURT:  I have that same concern.

7             MS. LOEFFLER:  Right.  And what I understand is the
8    defense is not going to ask them about drug use and criminal
9    behavior.  So we -- if we don't run into that, then I'm fine
10   with that and we should go forward.  That was my biggest
11   concern.  I don't want to find out --

12            THE COURT:  (Indiscernible) all the research
13   (indiscernible).

14            MS. LOEFFLER:  (Indiscernible) right, but it did say --

15            THE COURT:  (Indiscernible).

16            MS. LOEFFLER:  You were absolutely right, but it --

17            THE COURT:  (Indiscernible).

18            MS. LOEFFLER:  -- did say --

19            MR. OFFENBECHER:  In your wise --

20            MS. LOEFFLER:  Right.

21            MR. OFFENBECHER:  -- discretion.

22            MS. LOEFFLER:  Right, with your wise discretion.

23       (Indiscernible speech)

24            THE COURT:  -- told you that a long time ago,
25   (indiscernible).

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 752  Filed 09/23/14  Page 61 of 112

1      MS. LOEFFLER:  Uh-huh (affirmative).

2      THE COURT:  But if -- if you like research, that's

3  perfectly --

4      MS. LOEFFLER:  Well, I did.  Because it did say it was

5  a good thing (indiscernible) --

6      THE COURT:  (Indiscernible).

7      MR. OFFENBECHER:  I think you're --

8      MS. LOEFFLER:  So are we --

9      MR. OFFENBECHER:  -- (indiscernible) ahead of us

10  (indiscernible).

11      MS. LOEFFLER:  Are we all set that there's not going to

12  be questions -- because I have no desire to ask him about

13  criminal behavior.

14      MR. CURTNER:  No, we're fine now.  We

15  (indiscernible) --

16      MS. LOEFFLER:  Okay.

17      MR. CURTNER:  -- no objection -- we're not going to be

18  talk -- asking him about anything that they need to invoke the

19  Fifth Amendment on.

20      MS. LOEFFLER:  Okay, good.

21      THE COURT:  That solves the problem.

22      MS. LOEFFLER:  That solves the problem.

23      MR. CURTNER:  And we only have two witnesses, because

24  one of our witnesses again missed the flight today from Kodiak.

25  So we'll bring -- drag him in Monday.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 752  Filed 09/23/14  Page 62 of 112
(720) 384-8078  attrans@sbcglobal.net

1          THE COURT:  (Indiscernible).

2          MR. CURTNER:  I know.  I know.  Just --

3          MS. LOEFFLER:  Okay.

4          MR. CURTNER:  And just one more thing.  When we're done

5     here with these witnesses, I'd like to talk to you briefly.

6     Mr. Wells has asked for a contact visit at the jail with -- his

7     two sons are up here this weekend.  And we can talk about that

8     later.  I just -- you know, that's -- you know --

9          THE COURT:  Well, is that going to get into character

10    (indiscernible)?

11         MR. CURTNER:  Oh --

12         THE COURT:  Counsel (indiscernible).

13         MR. CURTNER:  The contact visit (indiscernible)?

14         THE COURT:  No, character evidence, if the sons are

15    going to visit.

16         MR. CURTNER:  Oh, no, no, no.  They're going to testify

17    about facts.  But --

18         THE COURT:  Well, that's really out of my --

19         MR. CURTNER:  I know.

20         THE COURT:  Contact visit, you --

21         MR. CURTNER:  I -- he wanted me ask if -- we'll talk

22    about it.

23         THE COURT:  I'm not against (indiscernible) --

24         MS. LOEFFLER:  (Indiscernible).

25         MR. CURTNER:  I -- okay.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 752  Filed 09/23/14  Page 63 of 112
(720) 384-8078  attrans@sbcglobal.net

**GRASS - DIRECT**

1      (End of sidebar)

2           THE CLERK:  Get the jurors?

3           THE COURT:  Yes, please.  Get the jurors.

4      (Jury present)

5           THE COURT:  Okay, please be seated.  Defense next

6   witness.

7           MR. CURTNER:  Your Honor, the defense calls Everett

8   Grass.

9           THE CLERK:  Okay.

10          THE COURT:  All right, sir, if you'd just remain

11  standing for a second, she will swear you in.

12          THE CLERK:  Please raise your right hand.

13      **EVERETT JOSEPH GRASS, DEFENDANT'S WITNESS, SWORN**

14          THE CLERK:  Thank you.  Please have a seat.  And, sir,

15  if you can spell and -- state and spell your full name.

16          THE WITNESS:  Everett Joseph Grass.  E-v-e- -- e-r-e-t-

17  t, J-o-s- --

18          THE CLERK:  E-v- --

19          THE WITNESS:  -- e-p-h, Grass, G-r-a-s-s.

20          THE COURT:  All right.  Counsel.

21          THE CLERK:  Thank you.

22                        **DIRECT EXAMINATION**

23  BY MR. CURTNER:

24  Q    Good afternoon, Mr. Grass.  Where do you live?

25  A    Kodiak, Alaska.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 752  Filed 09/23/14  Page 64 of 112

**GRASS - DIRECT**

1  Q   Where do you live in Kodiak?

2  A   315 Eagle Way.

3  Q   Okay.  How long have you lived there?

4  A   Twenty-four years.

5  Q   Pardon me?

6  A   Twenty-four years.

7  Q   How old are you?

8  A   Twenty-four.

9  Q   Okay.  So you were born there?

10  A   Yes.

11  Q   And raised there?

12  A   Yes.

13  Q   And lived there most of your life, all your life?

14  A   Yes.

15  Q   Okay.  Do you know Travis Biocic?

16  A   Yes, I do.

17  Q   How do you know Travis?

18  A   Grew up with Travis.

19  Q   Okay.  How old were you when you first met Travis?

20  A   About seven years old.

21  Q   And where were you living when you met Travis?

22  A   Jackson's Trailer Court.

23  Q   Okay.  And is that where Travis moved?  I'm --

24  A   Yeah.

25  Q   -- sorry, is that where Travis moved to when you met him?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 752  Filed 09/23/14  Page 65 of 112
(720) 384-8078  attrans@sbcglobal.net

**GRASS - DIRECT**

1  A    Yes.

2  Q    And he was a neighbor in the Jackson Park --

3  A    Yes.

4  Q    -- Trailer Court?  Okay.  Now, was there a time when

5  Travis moved out of Jackson Park --

6  A    Yes.

7  Q    -- and moved someplace else?

8  A    Yes, there was.

9  Q    Where is that?

10  A    Out Antone Ways, because his parents --

11  Q    Anton Ways?

12  A    Antone.

13  Q    Antone.

14        THE COURT:  Pull that microphone a little closer,

15  please.  Just a little closer.  Not too close.  Don't --

16  that's better.  That's better.

17  BY MR. CURTNER:

18  Q    And where is that located?

19        THE COURT:  Okay, where's what located?

20  BY MR. CURTNER:

21  Q    Where is the place that Travis lived with his parents?

22  A    Out past the golf course.

23  Q    Okay.  Let me show you a map on that screen.  Maybe you

24  can recognize it.  Defense Exhibit 158.  Can you see that?

25  A    Yes.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 752  Filed 09/23/14  Page 66 of 112
(720) 384-8078  attrans@sbcglobal.net

**GRASS - DIRECT**

1  Q    Does that look familiar?

2  A    Yes.

3  Q    Do you recognize that as a -- what do you recognize that

4  as being?

5  A    That's the road out to Anton Larsen.

6  Q    Okay.  And you recognize that road?

7  A    Yes.

8        MR. CURTNER:  If we could move for admission of Defense

9  Exhibit DE-158.

10       MS. LOEFFLER:  No objection, Your Honor.

11       THE COURT:  It'll be received.

12       (Plaintiff's Exhibit DE-158 admitted)

13       THE CLERK:  It may be on sleeping.  If you'd just hit

14  it one more time.

15    (Side conversation)

16       THE CLERK:  Sorry, Your Honor.  I think it went to

17  sleep mode, so just has to warm up again.

18       THE COURT:  So what do we do to wake it up?

19    (Side conversation)

20       THE COURT:  Want to use the overhead?

21       THE CLERK:  It -- it's the screen.  It's not going to

22  make a difference.

23       THE COURT:  It was on our screen here.

24       MR. CURTNER:  Yeah, I saw it on our screen.

25    (Side conversation)

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 752  Filed 09/23/14  Page 67 of 112

**GRASS - DIRECT**

1  BY MR. CURTNER:

2  Q    Is that the map you were just looking at?

3  A    Yes.

4  Q    Okay.  Do you recognize the -- where the -- what road is

5  this?

6  A    Rezanof.

7  Q    Okay.  And that goes into Kodiak Town?

8  A    Yeah.  Out there where you were just pointing at is

9  Minoshka (ph), White Sands.

10 Q    Okay.  And then -- so what's here?

11 A    The airport.

12 Q    Then what's this road?

13 A    Anton Way.

14 Q    Okay, Anton Way?

15 A    I believe so.  I don't really know the actual name of it.

16 Q    Okay.  You've driven out this road, though?

17 A    Yeah.

18 Q    And do you know where the golf course is?

19 A    Yes.

20 Q    Okay.  So is the place where Travis lived with his

21 parents -- is that out this way?

22 A    Yes.

23 Q    And is it all -- do you know where Anton Larsen Bay Dock

24 is?

25 A    Yeah.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1 Q    Okay.  So it's not that far.  Right?

2 A    No.

3 Q    Is that about the place where he lived?

4 A    Yeah.

5 Q    Did you know it as the Red Cloud Ranch?

6 A    I didn't know any specific name of it as -- other than --

7 Q    Okay.  But that's --

8 A    -- Anton Bay --

9 Q    That's about the area that you remember --

10 A    Yes.

11 Q    -- Travis living?

12 A    Yes.

13 Q    Okay.  And he lived there for a while with his parents.

14 Is that correct?

15 A    Yes.

16 Q    Wonder if we could go to Defense Exhibit 39.  These have

17 already been admitted, I think.  I'm sorry, did we admit this?

18 Okay.

19      (Side conversation)

20 Q    Right.  Okay, do you recognize this building?

21 A    Yes.

22 Q    What's that?

23 A    The main house.

24 Q    That's the main house where?

25 A    Out at Anton Ranch.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 752  Filed 09/23/14  Page 69 of 112
(720) 384-8078  attrans@sbcglobal.net

1  Q    That's the main house where Travis was living?

2  A    No.  He was living in the house across the road from

3  there.

4  Q    Okay.  Let's go to -- so he wasn't living in this house?

5  A    No.

6  Q    And there's another house across the street?

7  A    Yes.

8  Q    Let's go to Defense Exhibit 40.

9        MS. LOEFFLER:  Your Honor, my only objection is I'd

10  like a foundation as to time.  We just gave "was living," and

11  I'd simply -- if we can lay a foundation of when he was living

12  there and when he wasn't (indiscernible) --

13        THE COURT:  Very well.

14        MR. CURTNER:  Okay.

15  BY MR. CURTNER:

16  Q    So you met Travis when you were both seven, about that

17  age?

18  A    Yes.

19  Q    Were you about the same age?

20  A    Yes.

21  Q    Okay.  And so when did he move out that area?

22  A    When he was 20, maybe later.  I'm not quite sure.

23  Q    Like, four years ago?

24  A    Yeah, about four years ago.

25  Q    Okay.  So if we could go to the Defense Exhibit 40.  Do

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 752  Filed 09/23/14  Page 70 of 112
(720) 384-8078  attrans@sbcglobal.net

**GRASS - DIRECT**

1  you recognize that building?

2  A    Yes.

3  Q    That's across the street from the other building?

4  A    Yes.

5  Q    And that's where he was living?

6  A    Yes.

7  Q    Okay.  Now, did you go out there and do things with Travis

8  out at that place?

9  A    Yes, I did.

10  Q    Let me show you Defense Exhibit 38.  38.  And do you

11  recognize those little buildings?

12  A    Yes.

13  Q    And those are out there at the same place, the same

14  location?

15  A    Yes.

16  Q    Okay.  Now -- so when you went out there, would you spend

17  some time out there?

18  A    Yeah, I'd spend a few days out there, go camping and

19  stuff, and --

20  Q    A few days at a time, perhaps?

21  A    Yeah.

22  Q    Okay.  And what'd you guys do out there?  Did you do any

23  hunting?

24  A    Yes.

25  Q    All right.  Would you do shooting, shooting rifles and --

1  A    Yes.

2  Q    -- pistols and stuff?

3  A    Yes.

4        MS. LOEFFLER:  I'm going to object to the leading at

5  this point.

6        THE COURT:  Sustained.

7  BY MR. CURTNER:

8  Q    What kind of things would you and Travis do out at this

9  place?

10  A    Hunt, fish, anything (indiscernible).  I mean, you had to

11  live on the land there.

12  Q    Okay.  And Travis lived there year-round sometimes?

13  A    Not really year-round.  He'd go out there to help his

14  parents, and a lot of times he'd come and live with me in town,

15  to work and other things, because it's easier access.

16  Q    So when he lived with you, where were you living?

17  A    Jackson's Trailer Court.

18  Q    Okay.  Now, do you know Hannah Belisle?

19  A    Not on a personal note.

20  Q    Not on a personal note.

21  A    I never really hung out with her or nothing.  The only

22  time she came around my house is when I was fishing and stuff.

23  Q    Okay.  Do you know Erin Smith?

24  A    Yes.

25  Q    Who's she?

**GRASS - DIRECT**

1  A    That's the mother of my child.

2  Q    Okay.  And so how many children do you have with Erin?

3  A    One.

4  Q    One child.

5  A    Yes.

6  Q    And are you living together now?

7  A    Yes.

8  Q    In Jackson Park?

9  A    Well, no, we're not --

10  Q    No.

11  A    -- living together.  I am currently playing for -- paying

12  for a place for her and my baby to stay.

13  Q    Okay.  Back when you knew Hannah, was she best friends

14  with Erin?

15  A    I couldn't really say best friends.  I mean, they hung out

16  occasionally when I was around town.  But I guess they talked a

17  lot.

18  Q    Okay.  And then do you know if Travis was dating Hannah

19  any time?

20  A    That all occurred while I was out fishing, that whole

21  dating period.

22  Q    Okay.  Now, did you come back from fishing, and do you

23  recall a party at your place in Jackson Park around April of

24  2012?

25  A    Yes.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 752   Filed 09/23/14   Page 73 of 112
(720) 384-8078   attrans@sbcglobal.net

**GRASS - DIRECT**

1  Q    Okay.  And that's when you lived at 754 Jackson Lane?

2  A    745.

3  Q    745, I'm sorry.  Jackson Lane?

4  A    Yes.

5  Q    And what was that -- where were you living?  In a house,

6  in a trailer?

7  A    Trailer.

8  Q    And was there an addition to the trailer?

9  A    Yes, there was.

10 Q    What was that?

11 A    The addition?

12 Q    Yeah.

13 A    Was just an extension on the trailer, half of a house --

14 Q    Okay.

15 A    -- like.

16 Q    Is that called the loft or something or --

17 A    Yes.

18 Q    Okay.  Now -- so do you remember the party you had there?

19 A    Vaguely.

20 Q    Vaguely?  Or --

21 A    Yes.

22 Q    Why is that?

23 A    Just so long ago.

24 Q    Okay.  About two years ago.

25 A    Yeah.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 752  Filed 09/23/14  Page 74 of 112
(720) 384-8078  attrans@sbcglobal.net

**GRASS - DIRECT**

1  Q   Do you remember a lot of people being there?

2  A   Yeah, there was quite a few people.

3  Q   How many would you say?

4  A   Twenties, thirties, maybe.

5  Q   Okay.  So a lot of people were at this party at your

6  place --

7  A   Uh-huh (affirmative).

8  Q   -- in Jackson Park.  Right?

9  A   Yes.

10 Q   And were -- a party.  Were you guys --

11      MS. LOEFFLER:  And I guess I'm going to object, unless

12 we have a time.  I don't think there's any relevance if there

13 was a party at some point.  I think we need to hone in.

14      THE COURT:  Very well.  Makes sense.

15 BY MR. CURTNER:

16 Q   Okay.  Do you remember April 12th, 2012, when there was a

17 double homicide at the Coast Guard station?

18 A   Kind of, sort of.  I remember bringing flowers out to

19 Hannah after it happened, with Travis and Erin.  That's about

20 it.  I mean, I remember Erin getting a phone call at some

21 point, saying -- stating that Erin's -- or Hannah's father had

22 been shot.

23 Q   Okay.  Do you remember when you heard about it?

24      THE COURT:  Okay, you got to be able -- we can't quite

25 hear you.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 752  Filed 09/23/14  Page 75 of 112
(720) 384-8078  attrans@sbcglobal.net

**GRASS - DIRECT**

1    UNIDENTIFIED JUROR:  I'm hearing (indiscernible).

2    THE COURT:  Okay.  So get as close as you can without

3  getting too close.  Okay.  I was going to ask that question,

4  because it -- the -- your voice gets a little soft.  So let's

5  keep going, and tell us when you can't hear.  Ask the last

6  question.

7    MR. CURTNER:  Yes.

8  BY MR. CURTNER:

9  Q    Everett, do you remember when you heard the first time

10  about Hannah's dad being shot?

11  A    Yes, but I didn't know it was Hannah's dad at the time.

12  Q    Okay.  Do you remember, in relation to that, when the big

13  party was at your place?

14  A    The big party at my place was two days before that

15  incident.

16  Q    Okay.  Now, are you sure it was two days before?

17  A    Yes.

18  Q    Okay.  We'll talk about that in a minute, all right?  But

19  the party that you know was two days -- or now you remember two

20  days before, was there drinking going on?

21  A    Yes.

22  Q    How much drinking?

23  A    To drink, I don't know.  Excessive drinking.  I couldn't

24  tell you the exact --

25  Q    Okay.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 752  Filed 09/23/14  Page 76 of 112
(720) 384-8078  attrans@sbcglobal.net

**GRASS - DIRECT**

1   A    -- amount.

2   Q    There was excessive drinking going on at the party?

3   A    Yes.

4   Q    Was -- who was there?

5   A    Me, Erin, Travis, and the a named Andrea -- I'm not quite

6  sure who was all there.  There was just so many people, it's

7  hard to figure out a bunch of names, but --

8   Q    Okay.  Out of 20 or 30 people, do you remember Travis

9  being there?

10  A    Yes.

11  Q    Do you remember Casey Brennick being there?

12  A    Yes.

13  Q    Do you remember Walter Fretz being there?

14  A    Yes.

15  Q    Okay.  Is -- Travis is your friend?

16  A    Yes.

17  Q    And is Casey Brennick a friend of yours?

18  A    Yes.

19  Q    And Walter Fretz, is he a friend?

20  A    Yes.

21  Q    And where does he live compared to you?

22  A    Walter Fretz?

23  Q    Yeah.

24  A    Across the road at that time.

25  Q    Okay.  And do you remember somebody named Drew --

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 752  Filed 09/23/14  Page 77 of 112
(720) 384-8078  attrans@sbcglobal.net

**GRASS - DIRECT**

1   A    Yes.

2   Q    -- at the party?  And who's Drew?

3   A    Well, Drew Horning.  He's Travis's stepbrother.

4   Q    Okay.  That's -- so he was there too.  And Erin was there?

5   A    Yes.

6   Q    And was Hannah Belisle there that night?

7   A    Yes.

8   Q    Okay.  And did this party go all night long?

9   A    No.

10  Q    No?

11  A    We went to sleep.

12  Q    What time do you think it ended?

13  A    Probably 3 in the morning, 3 to 4 in the morning.

14  Q    Okay.  Was Hannah there at 3 or 4 in the morning, then?

15  A    Yes, I believe so.

16  Q    Okay.  And do you remember Hannah getting a phone call

17  when she was at your place?

18  A    I'm not sure if it was her.  I don't believe she was at my

19  place when she got a phone call to go home.

20  Q    Okay, sometime she got a phone call to go home.

21       THE COURT:  Seems like -- is -- are the two of you

22  communicating?

23       THE WITNESS:  Who?

24       THE COURT:  Yeah, the two.  I'm not sure if your answer

25  was in response.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

**GRASS - DIRECT**

1    THE WITNESS:  I'm not really -- can you -- can -- can
2  you ask the question again, please?
3  BY MR. CURTNER:
4  Q    Did -- do you remember Hannah getting a phone call when
5  she was at your place to go home?
6  A    I remember someone getting a phone call.  But I'm not sure
7  if it was Hannah to go home, or if it was Erin calling me to go
8  pick her up from her -- her parents' house.
9  Q    A call from -- it was either a call for Hannah to go home
10  or a call for you to pick up Erin?
11  A    I'm not sure if it was.  I'm not really --
12  Q    It was one or the other?
13  A    I have no clue, honestly.
14  Q    And if you -- did you go pick up Erin?
15  A    Yes, I did.
16  Q    And where did you go pick up Erin?
17  A    At Mandy Smith's house.
18  Q    At Mandy Smith's house.
19  A    Yes.
20  Q    Now, who is --
21    MS. LOEFFLER:  Your Honor, I'm going to object to
22  relevance to this line of questioning.
23    THE COURT:  Is it going somewhere?
24    MR. CURTNER:  Yes, it is.
25    THE COURT:  Well, is --

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 752   Filed 09/23/14   Page 79 of 112
(720) 384-8078  attrans@sbcglobal.net

GRASS - DIRECT

1      MR. CURTNER:  Okay.

2      THE COURT:  We'll give you a few more.

3  BY MR. CURTNER:

4  Q   Now, what do you know about Manda Smith's house?  Who's

5  that?

6  A   Erin's mother.

7  Q   Okay.  And also related to Casey Brennick?

8  A   Yes.

9  Q   And what happened at the -- what happened at their house

10 that night?

11 A   Which night?

12 Q   Well, the night of the party.

13 A   We weren't there at the night of the party.

14 Q   Okay.  Do you remember something happening at their house

15 just around the same time you heard about Hannah's father being

16 shot?

17 A   No.

18 Q   Now, Everett, we talk --

19 A   I was at home when --

20 Q   I'm sorry?

21 A   I was at home when I found out about --

22 Q   Okay.

23 A   -- Hannah's father.

24 Q   Now, you remember talking to me exactly two weeks ago?

25 A   Yes.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 752  Filed 09/23/14  Page 80 of 112
(720) 384-8078  attrans@sbcglobal.net

1 Q   And my investigator, Barb Brink, who (indiscernible) --

2        MS. LOEFFLER:  Can I see the statement, Your Honor?  If

3 we're going to try to impeach, I think under 613, I'm entitled

4 to see what they're referring to.

5        THE COURT:  You are.

6        MS. LOEFFLER:  If I can have just a minute?

7        THE COURT:  Uh-huh (affirmative).

8     (Pause)

9        MS. LOEFFLER:  Counsel, I've reviewed it.  Go ahead.  I

10 don't know what you're asking, but at least I've reviewed it.

11 Thank you.

12        MR. CURTNER:  Okay.

13 BY MR. CURTNER:

14 Q   So, Everett, do you remember you and I and Ms. Brink

15 having a conversation two weeks from today, two weeks ago?  Do

16 you recall that?

17 A   Yes.

18 Q   And where did we meet?

19 A   Above Safeway, in Kodiak.

20 Q   Okay.  That was an attorney's office?

21 A   Yes.

22 Q   That was Mr. Steve Gray's office?

23 A   Yes.

24 Q   And I asked you some of these same questions.  Is that

25 correct?

Case 3:13-cr-00008-SLG  Document 752  Filed 09/23/14  Page 81 of 112

**GRASS - DIRECT**

1  A    Yes.

2  Q    And do you remember telling me then, and Ms. Brink also,

3  that the night of the party -- I think at that time you said

4  there were 30 or 40 people there.  Is that right?

5  A    I believe so, yes.

6  Q    And you said that Hannah had spent the night at your place

7  the night of the party.  Do you remember that?

8  A    Yes, but I also stated that it's not a very clear couple

9  of days in my memory.

10  Q    Okay.  But you remember our conversation from two --

11  A    Yes.

12  Q    -- weeks ago?

13  A    Yes.

14  Q    Right.  You weren't drinking or anything then?

15  A    No.

16  Q    And you remember telling me that in the morning after the

17  party, that's when you guys got word that Hannah's father was

18  shot?  Do you remember telling me that then?

19  A    Yes, sir, I do remember telling you that then.

20  Q    Right.  And then you told me that Walter -- did you say

21  Walter Fretz gave her a ride home that morning?

22  A    Yes, I did.

23  Q    All right.  And do you also -- telling me that what you

24  remember about that morning are the police cars and emergency

25  vehicles; you heard all those at that same morning.  Do you

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 752  Filed 09/23/14  Page 82 of 112

**GRASS - DIRECT**

1  remember telling me that?

2  A    Yes.

3  Q    Okay.  And then I think you were talking about -- did

4  you -- remember telling me that there had been a party at Mandy

5  Smith's house earlier that night?

6  A    Earlier the night before when?  Before the murders?

7  Q    The -- before your party.

8  A    Before my party?

9  Q    Yeah.

10 A    I'm not really sure.

11 Q    Okay.  So at that time you told me that Hannah was at your

12 place when she got the call about her father.  Is that correct?

13 A    Yes, I thought so.

14 Q    That's what you thought then.  And you were tell -- you

15 weren't lying to me then?

16 A    I wasn't really -- I couldn't really tell the truth,

17 either.  I do not remember then.

18 Q    But now you remember differently, or do you remember the

19 way we remembered -- you remembered two weeks ago?

20 A    After thinking about it for a while, it's kind of coming

21 to -- coming together differently -- differently.

22 Q    Okay, that's what you told me two weeks ago, but now you

23 remember it better?

24 A    I've kind of pieced things together.

25 Q    And who have you talked to about this since you and I

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 752   Filed 09/23/14   Page 83 of 112
(720) 384-8078  attrans@sbcglobal.net

1  talked?

2  A    About this?

3  Q    Yeah.

4  A    Nobody.

5  Q    Hmm?

6  A    Nobody.  I talked to a couple FBI agents, but that's about

7  it.

8  Q    I'm sorry, a couple who?

9  A    Of FBI agents.

10  Q    Since you and I talked, you talked to FBI agents?

11  A    Yes.

12  Q    Is that right?

13  A    Yes.

14  Q    That's what you said.  When was that?

15  A    Okay, two days later.  I mean, it was just a brief

16  conversation when we were trying to get ahold of Dylan

17  Froehlich.

18  Q    So that conversation with the FBI agents, that made you

19  remember better what happened?

20  A    No.

21  Q    Okay.  That's all the questions I have.  Thanks.

22          THE COURT:  All right.  Cross-examination.

23                      **CROSS-EXAMINATION**

24  BY MS. LOEFFLER:

25  Q    Mr. Grass, my name's Karen Loeffler.  I'm going to ask you

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 752   Filed 09/23/14   Page 84 of 112
(720) 384-8078   attrans@sbcglobal.net

**GRASS - CROSS**

1  some questions here.  When Mr. Curtner asked you about when

2  your friend Travis Biocic lived out at one point at that bunch

3  of buildings way out on Anton Larsen Road --

4  A    Uh-huh (affirmative).

5  Q    -- remember that?

6  A    Yes.

7  Q    But he stopped living there at the beginning of 2011.

8  Isn't that right?

9  A    Around January, right.

10  Q    Of 2011 --

11  A    Yes.

12  Q    -- is that right?

13  A    He started living at my place around January -- maybe

14  February 15th.

15  Q    Okay.  So he wasn't living there at the time of the murder

16  of Hannah Belisle's father, was he?

17  A    No.

18  Q    Okay.  Now -- and do you even know Mr. Belisle?

19  A    No.

20  Q    Okay.  Or Jim Hopkins?

21  A    No.

22  Q    Do you know anything about the layout of the rigger shop

23  at COMMSTA?

24  A    I didn't even know what the building looked like until

25  today.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 752   Filed 09/23/14   Page 85 of 112
(720) 384-8078  attrans@sbcglobal.net

1  Q   Okay.  With regard to --

2           THE COURT:  All right, just -- can I just do -- I want

3  to do a test.  Can you hear out there?  Can you at the back

4  hear?  Raise your hand if you can't hear.  If a question comes

5  up and you don't hear it, raise your hand and we'll repeat it.

6  Or if an answer, okay.  Because I'm, what, 10 feet away, and

7  sometimes it's a little blurry for me.  But I'm a lot older

8  than all of you.

9           MS. LOEFFLER:  You just got an offer of his earphones,

10  Judge.

11          THE COURT:  All right.  We got other ones.  Okay.  I

12  just want to make sure everybody can hear.

13  BY MS. LOEFFLER:

14  Q   Mr. Grass, after the murder, I think you said in response

15  to a question from Mr. Curtner that you and some of these other

16  people he named drove up toward Hannah Belisle's house.

17  A   Yes.

18  Q   Why were you doing that?

19  A   We were bringing her flowers.

20  Q   Okay.  And do you have any dispute with Hannah Belisle or

21  her family?

22  A   No.

23  Q   They ever owe you money?

24  A   No.

25  Q   You owe them money?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 752  Filed 09/23/14  Page 86 of 112
(720) 384-8078  attrans@sbcglobal.net

**GRASS - CROSS**

1  A    No.

2  Q    Okay.  Let's see.  With regard to this party, do you have

3  a set memory of exactly what day this party occurred?

4  A    I mean, I can't be positive.

5  Q    Okay.

6  A    I mean, I know it was sometime before it happened.

7  Q    You weren't keeping diaries and time logs of --

8  A    No.

9  Q    -- when the party was?

10  A    No.

11  Q    Okay.  So do you know anything about Hannah getting a

12  tattoo the day before the murder?

13  A    Yes.

14  Q    Okay.  And do you know she went home the night that she

15  got the tattoo?

16  A    Yes, I believe she went home the night she got the tattoo,

17  because I had to go -- I got a call from Erin to go pick up

18  Erin from her mother's house.  And then on the way home, Erin

19  showed me a picture of a tat and said, "Hey, this is the new

20  tattoo Erin -- or Hannah just got."  And I said, "Cool," and --

21  Q    Okay.

22  A    -- we continued on the way home.

23  Q    What was the tattoo of?

24  A    Oh, I don't even remember.

25  Q    Okay.  I don't have anything further.  Thank you.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 752  Filed 09/23/14  Page 87 of 112
(720) 384-8078  attrans@sbcglobal.net

BIOCIC - DIRECT

1      THE COURT:  Redirect.

2      MR. CURTNER:  No -- nothing further.

3      THE COURT:  All right, thank you, sir.  You're excused.

4  Defendant's next witness.

5      (Witness excused)

6      MR. CURTNER:  Defense is going to call Travis Biocic.

7      THE COURT:  Okay.  So just head on up to the front

8  here, go through the door, and then step into the witness box.

9  Remain standing, and she'll swear you in.

10      THE CLERK:  Please raise your right hand.

11      **TRAVIS DWAYNE BIOCIC, DEFENDANT'S WITNESS, SWORN**

12      THE CLERK:  Thank you.  Please have a seat.  And, sir,

13  if you can please state and spell your full name.

14      THE WITNESS:  Travis Dwayne Biocic.  T-r-a-v-i-s, D-w-

15  a-y-n-e, B-i-o-c-i-c.

16      THE CLERK:  Thank you.

17      THE COURT:  Counsel.

18      MR. CURTNER:  Thank you.

19                **DIRECT EXAMINATION**

20  BY MR. CURTNER:

21  Q   Mr. Biocic, where do you live?

22  A   Currently, Kodiak, Alaska.

23  Q   Okay.  How long have you lived out there?

24  A   I've been back for about three months.  I've lived in

25  Kodiak for probably 16 to 17 years.

Case 3:13-cr-00008-SLG  Document 752  Filed 09/23/14  Page 88 of 112

BIOCIC - DIRECT

1  Q    So when you lived on Kodiak Island, what -- where did you

2  live?  What different locations?

3  A    Jackson's Trailer Park, Anton Larsen Bay is pretty much

4  the only two places I lived out there.

5  Q    Okay.  Let me show you a map that's been identified and

6  admitted as Defense Exhibit 158.  Do you recognize this area?

7  A    Yes, sir.

8  Q    Okay.  And then so do you recognize this road?

9  A    I do.  That's leaving Kodiak, the City of Kodiak.

10 Q    And then do you recognize what this road would be?

11 A    Yes, sir.  That's Anton Larsen Bay Road.

12 Q    Okay.  And so you know where the golf course is?

13 A    Yes.  And the --

14 Q    Now, what was -- was there a name to the place you were

15 living out on that road?  You were living out there on that

16 road for a while, right?

17 A    Yes, sir.  About two years.

18 Q    Okay.  You lived there about two years?

19 A    I lived at Red Cloud Ranch, the fourth thumbnail there.

20 Q    Okay.  That was the name of it, right?

21 A    Yes, sir.

22 Q    This is where you were living for -- with -- for two

23 years?

24 A    Yes, sir.

25 Q    And who were you living there with?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 752  Filed 09/23/14  Page 89 of 112
(720) 384-8078  attrans@sbcglobal.net

**BIOCIC - DIRECT**

1  A   My father and his girlfriend, Jennifer Walker Horning, and

2  my little brother, Andrew Horning.

3  Q   Okay.  Let me show you some pictures and see if you can

4  identify these.  Defense Exhibit 39.  Do you recognize that?

5  A   That's the ranchhouse we lived in.

6  Q   Okay.  So you lived in that house?

7  A   Yes, sir.

8  Q   All right.  With your father and his girlfriend?

9  A   Yes, sir.

10 Q   And then let's go to Defense Exhibit 38.  And do you

11 recognize these buildings?

12 A   Yes, sir.  The building on the right is the chicken coop

13 that me and my father built.

14 Q   This one?  I'm sorry, this one?

15 A   Yes, sir.

16 Q   That's the chicken coop, okay.

17 A   The building in the middle is just an old shed that was

18 out there.  We never used it for anything.  There was all kinds

19 of stuff in there.

20 Q   This one?

21 A   We actually used the left side of it for hay storage,

22 because we had goats and horses out there.

23 Q   Okay.  And this?

24 A   I'm sorry, I'm really colorblind.  I can't see that.

25 Q   Do you remember --

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 752   Filed 09/23/14   Page 90 of 112
(720) 384-8078  attrans@sbcglobal.net

1   A    Are you referring to the little window there in the --

2   that's the --

3   Q    Yeah, whatever -- is there --

4   A    That's the Quonset hut --

5   Q    -- are there more --

6   A    -- that's the --

7   Q    -- buildings there?

8   A    That's the Quonset hut that's attached to the house.

9   That's where the kitchen was.

10  Q    Okay.  And then this is the main house that --

11  A    That's the main house --

12  Q    -- you were living in?

13  A    -- yes, sir.

14  Q    Okay.  Let's look at Exhibit -- Defense Exhibit 40.  And

15  what are these buildings?

16  A    That is the cabin that's across the street that we used

17  for guests.

18  Q    Okay.  So a guest can stay out there?

19  A    Yes, sir.

20  Q    And then is there also some buses out there and trailers

21  or --

22  A    That bus is my father's bus, I believe.  They lived at

23  that in Mayflower before they moved out to Anton's.

24  Q    This bus?

25  A    Yes, sir.

1  Q    They lived in the bus?

2  A    Yes, sir.

3  Q    Okay.  And then this is -- whose trailer is that?

4  A    It's -- the roof is falling in, the floor's caving out.  I

5  don't know whose that is.  That's been there forever.

6  Q    Okay.  And then what's --

7  A    You're talking about that little trailer that's --

8  Q    This --

9  A    -- next to the --

10  Q    This one.

11  A    Yeah, just a rotting-out trailer that's been sitting there

12  forever, before we even moved in.

13  Q    Okay.  And then what's that back here?

14  A    Back where?

15  Q    Back -- there's some more buildings back here.

16  A    Oh.  That was an old horse barn that was there.  It's --

17  same thing, falling apart, run down.

18  Q    Okay.  So this was all part of the ranch out there?

19  A    Yes, sir.

20  Q    Okay.  And you lived there for a couple years?

21  A    Yes, sir.

22  Q    Now, you said you had some animals.  What kind of animals

23  did you have?

24  A    We had three pygmy goats.  We had a pig for a while until

25  we got it fat enough to eat it.  We had two horses and a couple

BIOCIC – DIRECT

1  handfuls of chickens.

2  Q   Okay.  And did you live out there year-round?

3  A   Yes, sir.

4  Q   Okay.  Did you have friends come out and visit?

5  A   Usually, yes.

6  Q   Yeah.  What friends did you have come out there?

7  A   My buddy Casey Brennick would come out there often.  Jaren

8  Nixon (ph) would come out there and we'd go hunt rabbits.

9  Everett would visit me out there.  Some of Drew's friends would

10 go out there and some of my dad's friends.

11 Q   Okay.  So you had a lot of friends come out to the ranch?

12 A   Not really a lot, but occasionally people would stop in

13 and visit.

14 Q   Was it a fun place to have your friends come out?

15 A   Definitely was.

16 Q   And, now, Casey Brennick's a good friend of yours?

17 A   Yes.

18 Q   Okay.  And so you and he would hunt out there?

19 A   Not with Casey, no.

20 Q   Okay.  What --

21 A   Me and Casey would drive four-wheelers out there, dirt

22 bikes.

23 Q   You ever shoot guns out there too?

24 A   Yeah.  A lot.

25 Q   Okay.  Now, do you know Hannah Belisle?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 752   Filed 09/23/14   Page 93 of 112
(720) 384-8078  attrans@sbcglobal.net

1  A    I do.

2  Q    And how do you know Hannah?

3  A    I know Hannah because she was a friend of a friend, and we

4  dated for a short period of time.

5  Q    What is a short period of time for you?

6  A    Maybe a month.

7  Q    A month, okay.  Do you remember when you met Hannah?

8  A    I do.

9  Q    When was that?

10  A    I met Hannah before I finished my last sentence in jail.

11  Q    I'm -- what's -- do you know when that would be?

12  A    That would be early 2011, the end of 2010, probably.

13  Q    Okay.  So you met her in 2010, 2011?

14  A    I'd probably say 2010.

15  Q    Okay.  And then were you dating then?

16  A    No.

17  Q    Oh, that's when you met her.  When did you --

18  A    Yes.

19  Q    -- start dating?

20  A    I got out January 29th.  We probably started dating second

21  week of February.

22  Q    Which year?

23  A    2012.

24  Q    Okay.  So you got out of jail January -- the end of

25  January 2012.

**BIOCIC - DIRECT**

1  A    Yes, sir.

2  Q    And you started dating her in February?

3  A    Yes, sir.

4  Q    And, now, when did you break up with her?

5  A    I didn't break up with her.  She broke up with me.

6  Q    Okay.  When was that -- when was the breakup?

7  A    I'm not exactly sure of the date.  It was probably a week

8  and a half prior to her father being murdered.

9  Q    Okay.  Now, that was April 12th, so that would have put it

10  in early April, do you think?

11  A    Sounds about right.

12  Q    All right.  Now, during that time, from February through

13  March and Apr -- and till early April, were you -- would Hannah

14  stay with you?

15  A    Occasionally.

16  Q    How often would she stay with you?

17  A    A few times throughout the week.

18  Q    Okay.  So usually every week she stayed with you a few

19  times?

20  A    Yeah.  I was living with her best friend's boyfriend, so

21  she would -- she would often stay with Erin also.  And they

22  would do their own thing.

23  Q    Okay.  Now, let's use some names here.  So where was that?

24  A    Jackson's Trailer Park --

25  Q    And who --

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 752   Filed 09/23/14   Page 95 of 112
(720) 384-8078   attrans@sbcglobal.net

**BIOCIC - DIRECT**

1  A    -- at Everett Grass's house.

2  Q    Okay.  So she would stay with -- at Everett's quite a bit?

3  A    Yes.

4  Q    And Erin was Everett's --

5  A    Girlfriend.

6  Q    -- girlfriend at the time.  And while you were dating her,

7  she would stay there with you quite a bit, a couple times a

8  week?

9       MS. LOEFFLER:  Again, I object to the leading at this

10  point, Your Honor.

11       THE COURT:  Sustained.

12  BY MR. CURTNER:

13  Q    How often would she stay with you at Everett and Erin's

14  trailer in Jackson Park while you were dating her?

15  A    A few times throughout the week.

16  Q    And -- about every week during the time you were dating.

17  Is that right?

18  A    Yes, sir.

19  Q    And did Everett cause a problem with her family at all?

20  A    Not that I knew of.

21  Q    Okay.  Now, do you remember a time just before Hannah's

22  father got shot that there was a big party at Everett and

23  Erin's?

24  A    What day?

25  Q    Well, let's say April 11th, in the evening of Ap --

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 752  Filed 09/23/14  Page 96 of 112

**BIOCIC - DIRECT**

1      MS. LOEFFLER:  Your Honor, I don't think the -- it's

2 appropriate for the -- counsel to put the day on it.  He can

3 ask the witness if he remembers a party and ask the witness

4 when it was.

5 BY MR. CURTNER:

6 Q    Do you remember a party?

7 A    I remember frequently partying.  I'd just got out of

8 prison, with no paperwork, and I was drinking most of the week.

9 Q    Do you remember being with Hannah when she was there at a

10 party at Everett and Erin's house?

11 A    I do.

12 Q    And do you remember where that was in relation to -- you

13 heard about Hannah's father getting shot, right?

14 A    Yes, sir.

15 Q    You heard it that morning when it happened, right?

16 A    Yes, sir.

17 Q    And when you heard about it that morning when it happened,

18 Hannah was at Everett's then?

19      MS. LOEFFLER:  Objection.

20      THE WITNESS:  No, sir.

21      MS. LOEFFLER:  Leading.

22      THE COURT:  Sustained.

23 BY MR. CURTNER:

24 Q    Who was there when you first heard about --

25 A    Erin Smith Phillips was there.  Everett Grass was there,

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 752  Filed 09/23/14  Page 97 of 112

**BIOCIC - DIRECT**

1  myself.  I believe that was it.  And we went across the street

2  and grabbed Walter Fretz, and he gave us a ride out to the

3  flats.  We brought flowers and we brought Erin Smith out there

4  to comfort and console with Hannah.  She was already out in the

5  flats.

6  Q    Now, that morning when you heard that phone call, when you

7  got that phone call or you were notified, was there a party the

8  night before?

9  A    No.  I don't believe so.  I think we all stayed at

10  Everett's.

11  Q    There was not a party the night before you got that phone

12  call in the morning?

13  A    Not that I remember.

14  Q    Now, do -- now, Travis, you remember talking to me two

15  weeks ago?

16  A    Yes.

17  Q    And where did we meet?

18  A    We met above Safeway in Kodiak.

19  Q    And --

20  A    At Gray's office.

21  Q    Now, who's that?

22  A    Steve Gray.

23  Q    He's an attorney?

24  A    Yes.

25  Q    Okay.  And we met in his office.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 752  Filed 09/23/14  Page 98 of 112

**BIOCIC - DIRECT**

1  A    Yes, sir.

2  Q    Okay.  Now, you remember me asking you these same

3  questions two weeks ago?

4  A    Yes, sir.

5  Q    You remember talking about there being a party --

6        MS. LOEFFLER:  Counsel, can -- under 613, may I please

7  review the statement?

8        MR. CURTNER:  Yeah.  Do we have a clean copy of that?

9     (Pause)

10       MS. LOEFFLER:  Your Honor, I'm -- from the statement I

11 have, I'm not sure anything he's saying is inconsistent, so

12 I -- you might want to look at it.

13       THE COURT:  Well, if it's not inconsistent, then I

14 don't know what you want to do with it.

15       MR. CURTNER:  Well, let's see if it's inconsistent.  I

16 can ask him about it.

17       THE COURT:  Okay, ask him --

18       MS. LOEFFLER:  Okay.  I don't have --

19       THE COURT:  -- your question.

20       MS. LOEFFLER:  -- a problem with that.  It just -- it's

21 cryptic, so I --

22       THE COURT:  Okay.

23       MS. LOEFFLER:  -- can't tell.

24       THE COURT:  All right.

25 BY MR. CURTNER:

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 752  Filed 09/23/14  Page 99 of 112

**BIOCIC - DIRECT**

1  Q    So, Travis, you remember that conversation?

2  A    I do remember the conversation, yes.

3  Q    Okay.  And that you remember talking about Hannah getting

4  a tattoo?

5  A    I remember that day, being Downtown Kodiak, on Main Street

6  there, at Mandy Smith's house, when Hannah got a tattoo, yes.

7  Q    Okay.  And then you remember that after -- and that was a

8  party at Casey -- they called it Casey's house, but that was --

9  Mandy Smith was Casey's --

10 A    Wasn't really a party.  We were hanging out during the

11 day, watching movies.  And she got a tattoo, and then she left.

12 Q    Well, you remember saying that after she got the tattoo at

13 the party at Casey's, you came -- she came and stayed at

14 Everett's.  Do you remember saying that?

15 A    I do remember saying that, and I was unclear on that.  She

16 did not stay at Everett's house that night.

17 Q    Okay.  This -- that's what you told me two weeks ago.

18 Right?

19 A    Yes, sir.

20 Q    And --

21 A    It is what I told you two weeks ago.

22 Q    And Ms. Brink was there as well, right?  Okay.

23 A    (No audible reply).

24 Q    And you also said that you had been drinking a lot that

25 night at Everett's.  Right?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 752   Filed 09/23/14   Page 100 of 112
(720) 384-8078   attrans@sbcglobal.net

**BIOCIC - DIRECT**

1  A    Yes.

2  Q    And you also told me that while you were sitting in

3  Everett's living room, that's when Hannah got a phone call and

4  she was very upset.  Remember that?

5  A    Yes.

6  Q    And that's when I think you told me you were there and

7  Erin and Walter Fretz, right, and Everett and Hannah?

8  A    I was mistaken.  It was Erin that got the phone call, and

9  we drove Erin from Everett's house to the flats.

10 Q    Now, that's not what you --

11 A    I know that's not what I told you.  That's what I just

12 said.

13 Q    Okay.

14 A    I was wrong.  I was mistaken.

15 Q    You were mistaken when we talked two weeks ago?

16 A    When we talked two weeks ago, yes.

17 Q    And when you said she was upset, you weren't referring to

18 Hannah?  Or you were referring to Hannah two weeks ago, but not

19 now?

20 A    I thought that's what it was, but it was two years ago.

21 My memory is not clear.

22 Q    And remember telling me it was definitely early in the

23 morning, like, around 9 or 10?

24 A    Everything I wrote on the -- everything that's written

25 there, I told you two weeks ago, yes.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 752   Filed 09/23/14   Page 101 of 112

1  Q    Okay.

2  A    I was mistaken on some of the information.

3  Q    So who have you talked to about this since you and I

4  talked two weeks ago?

5  A    Nobody.

6  Q    Nobody.

7  A    No, sir.

8  Q    And so how did you come from the mistaken conversation you

9  had with me to what you're saying today?

10 A    Had time to think about it.

11 Q    Since we talked?

12 A    (No audible reply).

13 Q    Okay.  Now, when did you leave Kodiak about this time?

14 A    I left Kodiak on April 20th.  I took the ferry over to

15 Homer.  The very next day, I flew out of Anchorage.

16 Q    So you left Kodiak on April 20th, 2012?

17 A    Yes, sir.

18 Q    Okay.

19      MR. CURTNER:  That's all the questions I have for

20 Travis.

21      THE COURT:  All right, thank you.  Cross-examination.

22                    **CROSS-EXAMINATION**

23 BY MS. LOEFFLER:

24 Q    When you talked to defense counsel two weeks ago, who was

25 asking the questions?  Is that the --

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 752   Filed 09/23/14   Page 102 of 112

1  A    I'm not sure of his name.  Sorry.

2  Q    Okay.

3  A    The man that was just --

4        THE COURT:  That handsome fellow at the end?

5        THE WITNESS:  Yeah, the man that was talking to me.

6        MS. LOEFFLER:  Okay.

7        MR. CURTNER:  Let the record reflect he's identified

8  me.

9        MS. LOEFFLER:  And --

10        THE WITNESS:  Yeah.

11  BY MS. LOEFFLER:

12  Q    -- let me mention, my name's Karen Loeffler, so let -- you

13  know --

14  A    Hi, Karen.

15  Q    -- who you're talking to.

16  A    Okay.

17  Q    Okay, thank you, Mr. Biocic.  And let me just ask you, and

18  all I want you to hear -- and I understand you said you were

19  drinking a lot at that time.  What's your best memory of --

20  well, let me back it up this way.  In terms of the murder, did

21  Hannah get the tattoo the day before the murder?

22  A    Yes, ma'am.

23  Q    What's your best memory today of what -- the day Hannah

24  got the tattoo, whether she spent the night at somebody's house

25  or whether she went home?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 752  Filed 09/23/14  Page 103 of 112

1 A    Was her telling us that she had to leave, that she had to

2 go home, because her parents were calling her.

3 Q    Okay.  Now, after the murder --

4 A    While we were at Casey's house.

5 Q    -- did you do something to --

6          THE COURT:  Okay, wait a second.  You --

7          MS. LOEFFLER:  I'm sorry.

8          THE COURT:  You spoke over him.

9 BY MS. LOEFFLER:

10 Q    I did speak over you.

11 A    Oh.

12 Q    I -- that's my fault.  I should have -- what's your best

13 memory, Mr. Biocic?

14 A    Her saying that she had to leave and go home while we were

15 at Casey's house, after she got the tattoo.

16 Q    Okay.  Now, after the murders, did you do something to,

17 you know, try to express what you felt about her father being

18 murdered?

19 A    Not that I know of.

20 Q    Okay.

21 A    I -- I'm not sure.

22 Q    I was going to ask, did you take -- try to take flowers to

23 her?

24 A    Oh.  Yes.

25 Q    Okay.  Should have asked it better that way.  Now, did you

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 752  Filed 09/23/14  Page 104 of 112

1  know her father?

2  A    No.

3  Q    Why did you want to bring her flowers?

4  A    Because I hurt her probably a week or two before that.

5  Q    Okay.

6  A    I cheated on her.  She broke up with me.

7  Q    Do you have any reason to dislike Hannah Belisle or her

8  family?

9  A    No, ma'am.

10  Q    Okay.  And does she owe you money or you owe her money or

11  any of that?

12  A    No, ma'am.

13  Q    Let me ask you something.  I don't think Mr. Curtner ever

14  asked you when you actually lived out at that ranch or bunch of

15  buildings out on Anton Larsen Bay Road.

16  A    The last time I was ever out at Anton Larsen Ranch was

17  probably the day prior to me getting arrested and serving one

18  year in prison, which was January 29th, 2011, to --

19  Q    So you haven't been there since then?

20  A    -- to January 29th, 2012.  I haven't been there since

21  then.

22  Q    Okay.  When you said -- so you haven't been there since

23  January 11th, 2011?

24  A    January twenty -- twenty --

25  Q    I'm sorry, January 20th, 2011?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 752   Filed 09/23/14   Page 105 of 112
(720) 384-8078  attrans@sbcglobal.net

1  A    Yes.  Yes.

2  Q    Okay.  So when the murders happened, you hadn't been there

3  for, I don't know, a year and and a half, or long time?

4  A    Yes, ma'am.

5  Q    Okay.  Now, just a second, Mr. Biocic.  Let me just check

6  with my counsel and -- I don't have anything else.  Thank you.

7           THE COURT:  Redirect.

8           MR. CURTNER:  No further questions for this witness.

9           THE COURT:  All right, thank you, sir.  You're excused.

10  Defendant's next witness.

11      (Witness excused)

12      (Side conversation)

13           MR. CURTNER:  Sorry, Your Honor, that's the last of our

14  witnesses that actually made the flight today from Kodiak, so

15  that's -- we don't have anybody else to present today.  Sorry.

16           THE COURT:  Here's what I think.  I think we're going

17  to be done next week.  Is anybody going to disagree with me on

18  that?

19           MR. CURTNER:  No, sir.

20           THE COURT:  Okay.  Wanted to end with some good news.

21  And you hear what we -- see, we got witnesses from all over,

22  and everyone's trying their best.  And people are having

23  problems getting flights in, so don't blame anyone for this,

24  especially me.  But don't blame counsel or anyone else.

25           So the good news is it's Friday.  And we're going to

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 752   Filed 09/23/14   Page 106 of 112

1   stand in recess for the weekend, and then we'll start at 8:25

2   Monday and hit it pretty hard next week.  I have an instruction

3   that I'm going to read you.  I should have it right here.

4   You've heard it before, but because we're taking a long

5   weekend, I'll read it to you again.

6          Remember, until the trial is over, do not discuss the

7   case with anyone, including your fellow jurors, members of your

8   family, people involved in the trial, or anyone else, and do

9   not allow others to discuss the case with you.  This includes

10  discussing the case in Internet chat rooms or through Internet

11  blogs, Internet bulletin boards, emails, or text messaging.  If

12  anyone tries to communicate with you about the case, please let

13  me know about it immediately.

14         Do not read, watch, or listen to any news reports or

15  other accounts about the trial or anyone associated with it,

16  including any online information.  Do not do any research, such

17  as consulting dictionaries, searching the Internet, or using

18  other reference materials, and do not make any investigation

19  about the case on your own.  Finally, keep an open mind until

20  all the evidence has been presented and you've heard the

21  arguments of counsel, my instruction of the -- on the law, and

22  the views of your fellow jurors.  If you need to speak to me --

23  with me about anything, simply give a signed note to the

24  bailiff to give to me.

25         You know, ladies and gentlemen, I just appreciate your

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 752   Filed 09/23/14   Page 107 of 112

1  attention, your good work.  Good people.  Thank you for being

2  here.  We got another week.  Have a great weekend.  We'll stand

3  in recess.

4      (Jury not present)

5      THE COURT:  Okay, the jury has left.  Please be seated.

6  So what can we look forward to Monday?

7      MR. CURTNER:  Think we have a full lineup, as long as

8  people get on the plane in Kodiak, so --

9      THE COURT:  Maybe they just -- head a little earlier,

10  like try starting Sunday.

11      MR. CURTNER:  Oh, yeah.

12      THE COURT:  That --

13      MR. CURTNER:  Although, you know, we don't really

14  control transportation for people --

15      THE COURT:  I understand.

16      MR. CURTNER:  -- under subpoena to --

17      THE COURT:  I'm not criticizing.  But I --

18      MR. CURTNER:  But we do have, I think, somebody

19  scheduled first thing Monday morning at 8:30, that I know he'll

20  be here.

21      THE COURT:  Okay.  Anything else I need to be aware of,

22  need to be working on?

23      MR. CURTNER:  No, Your Honor.  Just a -- on behalf of

24  Mr. Wells -- I mentioned this at sidebar, but his sons are

25  coming in this weekend, and, you know, they have a new policy

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 752   Filed 09/23/14   Page 108 of 112

at the jail that there aren't any contact visits for those people in federal custody.  And so I just wanted to see if there's any way the Court might inquire about -- if the jail would allow a one-hour contact visit with his family this weekend.  He's been in custody for 14 months and --

THE COURT:  Well, you know, I do -- and people ask me these things all the time, and I let the jail run their own policy.  I have no opposition to it, but I'm certainly not going to order the jail on how to conduct their business. But -- sorry.  Anything else?

MR. CURTNER:  No, thank you.

THE COURT:  Anything from the government?

MS. LOEFFLER:  No.

MR. SCHRODER:  No, Your Honor.

MS. DUIGNAN:  No.

THE COURT:  Does anyone want to see the piles of documents I found in support of my view on the *Miranda*, or you trust me?

MR. OFFENBECHER:  I'd like to see them, Your Honor.

MS. LOEFFLER:  I found them, Your Honor, too, but I -- you know, I found some too.

THE COURT:  They cover -- every district has a case in point supporting the position I took this morning, including the United States Supreme Court.  So, anyhow, have a great weekend.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 752   Filed 09/23/14   Page 109 of 112

1          MR. OFFENBECHER:  Thank you, Your Honor.

2          MS. LOEFFLER:  You know what, Judge, when you're right,

3  you're right.

4          THE COURT:  Thank --

5          THE CLERK:  All rise.  This matter stands in recess

6  until Monday at 8:30 a.m.

7       (Proceedings concluded at 2:30 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 752  Filed 09/23/14  Page 110 of 112

1          CERTIFICATE

2    I certify that the foregoing is a correct transcript from the
     electronic sound recording of the proceedings in the above-
3    entitled matter.

4
     ___s/Teresa K. Combs___          _____9/12/14_____
5    Teresa K. Combs, Transcriber          Date

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net

1                              **INDEX**

2                                                                FURTHER
                          DIRECT   CROSS   REDIRECT   RECROSS   REDIRECT
3
   DEFENDANT'S WITNESSES
4
   Jonathan Musman         3001    3009      3012      3013
5  Greg Tlapa              3014    3018      3020      3021
   Gary Allen Carver       3023    3027
6  Everett Joseph Grass    3042    3062
   Travis Dwayne Biocic    3066    3080
7
   DEFENDANT'S EXHIBITS                                         ADMITTED
8
   DE-158   Map                                                    3045
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 752   Filed 09/23/14   Page 112 of 112
(720) 384-8078   attrans@sbcglobal.net