<pre>
 1                 UNITED STATES DISTRICT COURT

 2                  FOR THE DISTRICT OF ALASKA

 3   UNITED STATES OF AMERICA,     )   Case 3:13-cr-00008-RRB
                                   )
 4          Plaintiff,             )   Anchorage, Alaska
                                   )   Monday, April 21, 2014
 5       vs.                       )   8:30 o'clock a.m.
                                   )
 6   JAMES MICHAEL WELLS,          )
                                   )
 7          Defendant.             )
     _____)   TRIAL BY JURY – DAY 15
 8
                     TRANSCRIPT OF PROCEEDINGS
 9
             BEFORE THE HONORABLE RALPH R. BEISTLINE
10                 UNITED STATES DISTRICT JUDGE

11   APPEARANCES:

12   For the Plaintiff:        KAREN L. LOEFFLER
                               U.S. Attorney
13                             BRYAN SCHRODER
                               KATHLEEN ANN DUIGNAN
14                             Assistant U.S. Attorneys
                               Office of the U.S. Attorney
15                             222 West 7th Avenue, #9, Room 253
                               Anchorage, Alaska  99513-7567
16                             (907) 271-5071

17   For the Defendant:        F. RICHARD CURTNER
                               Federal Defender
18                             Office of the Federal Public Defender
                               601 West 5th Avenue, Suite 800
19                             Anchorage, Alaska  99501
                               (907) 646-3400
20
                               PETER OFFENBECHER
21                             Skellenger Bender, P.S.
                               1301 5th Avenue, Suite 3401
22                             Seattle, Washington  98101-2605
                               (206) 623-6501
23

24

25
</pre>

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 1 of 206
(720) 384-8078  attrans@sbcglobal.net

```
1   APPEARANCES (Continued):

2   For Witness Arek          BENJAMIN R. CRITTENDEN
    Walter Parsley:           Law Office of Benjamin R. Crittenden
3                             750 West 2nd Avenue, Suite 101
                              Anchorage, Alaska  99501
4                             (907) 771-9002

5   Court Recorder:           NANCY LEALAISALANOA
                              U.S. District Court
6                             222 West 7th Avenue, #4, Room 229
                              Anchorage, Alaska  99513-7564
7                             (907) 677-6111

8   Transcription Service:    A & T Transcripts
                              6299 West 111th Avenue
9                             Westminster, Colorado  80020
                              (720) 384-8078
10

11  Proceedings recorded by electronic sound recording; transcript
    produced by transcription service.
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 753  Filed 09/23/14  Page 2 of 206
(720) 384-8078  attrans@sbcglobal.net

1        **ANCHORAGE, ALASKA - MONDAY, APRIL 21, 2014**

2

3        (Call to Order of the Court at 8:30 a.m.)

4        (Defendant present; jury not present)

5            THE CLERK:  His Honor the Court, the United States

6    District Court for the District of Alaska is now in session,

7    with the Honorable Ralph R. Beistline presiding.  Please be

8    seated.

9            THE COURT:  Okay.  Good morning.

10           MS. LOEFFLER:  Good morning.

11           MR. OFFENBECHER:  Morning, Your Honor.

12           MR. CURTNER:  Morning.

13           THE COURT:  What's up?

14           MS. LOEFFLER:  I think the next witness is in custody,

15   and I just --

16           THE COURT:  Okay.

17           MS. LOEFFLER:  -- want to know whether they're going to

18   bring somebody in clothes or are they going to haul him in --

19           THE COURT:  Who is it?

20           MS. LOEFFLER:  -- jail garb.

21           MR. CURTNER:  Casey Brennick.

22           MS. LOEFFLER:  And I think if he's -- he should be

23   wearing, at least, civilian clothes when they bring him in.

24   That's my only comment.

25           MR. CURTNER:  I don't have any civilian clothes for

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 3 of 206
(720) 384-8078  attrans@sbcglobal.net

1  him.  I -- you know, we subpoenaed him and he happens to be in
2  custody.

3       THE COURT:  What do you want me to do about it?  I
4  don't have any clothes either.

5       MS. LOEFFLER:  I think you should -- I mean, there used
6  to -- they get clothes for clients all the time.  I'm sure they
7  can come up with some clothes for him so we're not bringing him
8  in in jail garb, and explaining -- you know, telling everybody
9  on the jury that this guy's in custody.

10      THE COURT:  All right.  Mr. Curtner?

11      MR. CURTNER:  Judge, do you want to go -- do you want
12 me to go to my clothing warehouse and see if we can find some
13 clothes for --

14      THE COURT:  Well, what is this gentleman going to --
15 this is Casey Brennick, he's a friend of Biocic, and he's going
16 to testify for about one minute.  Right?

17      MR. CURTNER:  No, about 10 minutes.

18      THE COURT:  Ten minutes.

19      MR. CURTNER:  Be the long -- about the same as Mr.
20 Biocic and Mr. --

21      THE COURT:  So what's he -- is it --

22      MR. CURTNER:  -- Grass.

23      THE COURT:  He's in custody.  We want from now -- from
24 Kodiak.  And you didn't give me any warning about this issue.
25 So what's -- why can't he testify in custody?  Is that somehow

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 753  Filed 09/23/14  Page 4 of 206
(720) 384-8078  attrans@sbcglobal.net

1  prejudicial or --

2         MS. LOEFFLER:  Yeah, I think if -- you know, I mean,

3  like, they didn't ask Mr. Biocic about whether -- his criminal

4  record and all.  To bring him in in prison garb and simply --

5  obviously present visually to the jury that he's in custody --

6  which isn't relevant to the case.  I don't think they're going

7  to ask him about his criminal record, as they didn't about Mr.

8  Biocic.  They're just going to visually present it to the jury.

9  So I think that they should just get some clothes on him.

10        THE COURT:  Well, it won't hurt to get some clothes on

11  him, because --

12        MR. CURTNER:  Well, you know, I mean, Your Honor, every

13  trial I've been in where the government's brought in jailhouse

14  witnesses, I don't ever remember them being -- if they were in

15  custody, being dressed otherwise.

16        THE COURT:  So obviously if he's in custody, that

17  issue's clear, that someone's going to ask him why he's in

18  custody.

19        MR. CURTNER:  I can ask him why he's in custody, but --

20        MS. LOEFFLER:  Well, I don't think that's appropriate.

21        THE COURT:  I know --

22        MR. CURTNER:  Well --

23        THE COURT:  Well, I mean, that's the big question mark.

24  Who's going to -- if someone walks in here in custody, jury's

25  going to want to know why he's in custody.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1      MR. CURTNER:  And I could ask him that.  One of the
2  issues is he's going to testify that he was questioned by the
3  FBI about having and trying to sell the very weapon that they
4  were looking for when he was a convicted felon.  And I think
5  that goes to his testimony and the fact that he --
6      MS. LOEFFLER:  He wasn't a felon at the time, is my --
7  I'm sorry, Mr. Curtner.  Go ahead.  I'm sorry.
8      MR. CURTNER:  I understand that he had a felony
9  conviction at the time.
10      THE COURT:  I don't know.
11    (Side conversation)
12      MS. LOEFFLER:  And, Your Honor -- I'm sorry, Your
13  Honor, you know, when we bring in co-defendants in drug cases
14  that have pled, they're going to talk about what they've pled
15  to.  That's different than bringing somebody in.
16      THE CLERK:  (Indiscernible).
17      THE COURT:  What?
18      THE CLERK:  The witness.
19      THE COURT:  I don't need him right now.  I got to
20  figure this out.  As usual, I got -- how much warning did I
21  get?
22      MR. CURTNER:  Your Honor, and Mr. Brennick's attorney,
23  or an attorney from the Public Defender Office, is here.  This
24  is not his attorney in Kodiak, but he's from the Public
25  Defender Office on Mr. Brennick's behalf.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 6 of 206
(720) 384-8078  attrans@sbcglobal.net

1          THE COURT:  Well, he's going to be asked about the

2     email, I suppose.

3          MR. CURTNER:  Yes.

4          THE COURT:  And the issue is whether or not his

5     custodial situation should be publicized to the jury without an

6     explanation.  So the question that they'll probably ask us is

7     why is he in custody.  And you'll say that's irrelevant.

8          MS. LOEFFLER:  Yeah.

9          THE COURT:  And --

10         MR. CURTNER:  Well, and one other thing, Your Honor,

11    is, again, like Mr. Biocic and Mr. Grass, we interviewed him a

12    couple weeks ago.  At that time he was at the Kodiak Jail.

13    So --

14         MS. LOEFFLER:  I don't know what that -- I don't

15    understand why that's relevant.  But there's nothing about

16    whatever his criminal history is.  I mean, if they want to put

17    in his criminal history, then you got the whole 609 --

18         THE COURT:  Well, his criminal --

19         MS. LOEFFLER:  -- issue.  But if you don't, then you're

20    clearly telling them that without having a relevance reason to

21    put it in.  All I'm saying is put some clothes on him.

22         THE COURT:  Do you have some clothes for him?

23    Nobody --

24         MR. CURTNER:  Who?

25         THE COURT:  Anybody.  Anybody got any clothes they can

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 7 of 206
(720) 384-8078  attrans@sbcglobal.net

1   volunteer?

2           MS. LOEFFLER:  How tall is he?  What does he look like?

3   I don't know.  I don't know what he looks like.  But --

4           THE COURT:  Okay, let's hold him off until we get some

5   clothes.  Let's call your next witness.

6           MR. CURTNER:  Okay, let me see who's here.

7           THE COURT:  So the answer is "No," we don't need him

8   till we get some clothes.  You people might have clothes.  I

9   don't know.

10      (Side conversation)

11          THE COURT:  All we need is some clothes.

12          MR. OFFENBECHER:  I've run out, Your Honor.

13          THE COURT:  You -- what you -- probably --

14          MR. OFFENBECHER:  I've totally run out.

15          THE COURT:  You've run out.

16          MR. OFFENBECHER:  Sorry.

17          THE COURT:  You've run out.  You're already recycling.

18  Okay, is this the next witness?

19          MR. CURTNER:  Yes.

20          THE COURT:  And who is this?

21          MR. CURTNER:  This is Mr. Hank Pennington.

22          MR. OFFENBECHER:  He's got clothes, Your Honor.

23          THE COURT:  Okay, good.

24          MS. LOEFFLER:  I'm sorry, who's our next witness?

25          THE COURT:  Hank Pennington.  Yes, sir.  You can just

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 753  Filed 09/23/14  Page 8 of 206
(720) 384-8078  attrans@sbcglobal.net

1    go ahead and make yourself -- way up here.  We're still getting
2    our -- organized for this morning, but -- and, yes, we can
3    bring the jury in.  We're going to -- the jury's just going to
4    come in here in a second.  Everyone usually stands for the
5    jury.  And then after that, then, we'll swear you in and get
6    this done, okay.
7        (Jury present)
8        THE COURT:  Okay, please be seated.  Good morning,
9    ladies and gentlemen.  How you doing?  You look good.  Every
10   week, you look better.  What are you doing?  Eating well, or
11   something.  Okay.  We're going to continue into -- this is, I
12   guess, week 4, and it is -- the defense's first witness for the
13   day is?
14       MR. CURTNER:  Mr. Hank Pennington.
15       THE COURT:  All right, sir.  If you'll stand one more
16   time.
17       MR. PENNINGTON:  You bet.
18       THE COURT:  My clerk, she's right over here.  She'll
19   swear you in.
20       THE CLERK:  Please raise your right hand.
21       **HENRY MCKINLEY PENNINGTON, DEFENDANT'S WITNESS, SWORN**
22       THE CLERK:  Thank you.  Please have a seat.  And, sir,
23   if you can please state and spell your full name.
24       THE WITNESS:  Okay.  Hank is actually a nickname.
25       THE COURT:  Okay.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 9 of 206

**PENNINGTON - DIRECT**

1    THE WITNESS:  My legal name is Henry McKinley
2 Pennington.  H-e-n-r-y, M-c-K-i-n-l-e-y, Pennington, P-e-n-n-i-
3 n-g-t-o-n.
4    THE COURT:  All right.
5    THE CLERK:  Thank you.
6    THE COURT:  Very good.  Thank you, sir.  Counsel.
7                **DIRECT EXAMINATION**
8 BY MR. CURTNER:
9 Q   Mr. Pennington, normally you go by Hank?
10 A   Yes.
11 Q   Okay.  Well, Mr. Pennington, how long -- where do you
12 live?
13 A   Chiniak, Kodiak.
14 Q   Where is Chiniak?
15 A   Chiniak's 35 miles outside of the town of Kodiak, on the
16 road system.
17 Q   How long have you lived there?
18 A   In Chiniak, it's -- I think we moved there in '77.  I
19 moved to Kodiak in '75.
20 Q   Okay.  Now, what were you doing before you moved to
21 Kodiak?
22 A   I was in graduate school at Humboldt State --
23 Q   Where --
24 A   -- in Northern California.
25 Q   And what kind of degrees do you have?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 753  Filed 09/23/14  Page 10 of 206
(720) 384-8078  attrans@sbcglobal.net

PENNINGTON - DIRECT

1  A    Got a bachelor's and master's in fishery science.

2  Q    And what were you doing when you moved to Kodiak, then?

3  A    I moved there to work for the University of Alaska in a

4  position called marine advisory agent.  Easiest way to

5  characterize that is it's the ocean version of the old Farm

6  Extension agents.  I worked between the university and

7  communities of Alaska.

8  Q    Maybe you could explain that a little bit about what that

9  entails.

10 A    It's a problem-solving position.  When communities or

11 fishermen or individuals have problems that the university can

12 help with, we as agents put together solutions.

13 Q    Okay.  And so how long -- now, you had that job -- when

14 did you start that job?

15 A    In -- November 1st of '75.

16 Q    And were you doing something else at that time?  Did you

17 have a teaching position or --

18 A    It's actually a faculty rank position, so I was registered

19 as an -- on the faculty as an instructor and ultimately an

20 assistant professor.  And the teaching I did was workshops and

21 short courses around the state rather than full formal classes

22 in the university classrooms.

23 Q    Okay.  So that might be two job descriptions, but one job

24 you were working for the university?

25 A    Yeah.  It was many hats.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 753  Filed 09/23/14  Page 11 of 206
(720) 384-8078  attrans@sbcglobal.net

1  Q    Okay.  And how long did you do that?

2  A    I retired August 1st of '97.

3  Q    And what'd you do when you retired?

4  A    We had already started a photography business.  I was

5  writing for the newspaper.  And, frankly, a lot of fishing.

6  Q    Well, that's good.  So what do you mean by "we," as far as

7  your photography business?

8  A    My wife and I.

9  Q    And what type of photography business was that?

10 A    It was principally her business, full-spectrum wedding and

11 portraiture, advertising, senior photos, and things like that.

12 My job was to help her as needed on those.  I did industrial

13 photography, scientific photography, worked with her doing ad

14 photography.

15 Q    Okay.  So even though you did some fishing, you were still

16 involved in work?

17 A    Oh, yes.

18 Q    And you said you were -- were you a writer as well?

19 A    Yeah, I -- since before I retired, I've written a weekly

20 outdoor column for the Kodiak Daily Mirror.

21 Q    Are you still doing that?

22 A    Yes.

23 Q    Okay.  So that's been a -- quite a few years you've done

24 that?

25 A    Over 20.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1  Q    And do you keep busy with other community efforts while

2  you've been in Kodiak?

3  A    Less so since we started spending winters out of state,

4  but currently I'm a co-sponsor with the paper in one of the

5  prizes for the upcoming king salmon derby.

6  Q    Okay.  You've been involved with that for a while?

7  A    I'm sorry to laugh, but our involvement in it before was

8  as participants, and my wife won it two years ago -- three

9  years ago.

10  Q    Okay.  Now, do you know Jim Wells?

11  A    Yes.

12  Q    Do you see him in court today?

13  A    Yes.

14  Q    Okay.  How long have you known Mr. Wells?

15  A    Over 20 years.  I couldn't put an exact date on it.  I --

16  I suspect we met shortly after he got on the island, because I

17  mean, it just seems like forever.

18  Q    All right.  And how did you meet Mr. Wells?

19  A    Initially, he was a student in a photography course that I

20  was co-teaching at the local community college.

21  Q    Okay.  And so did you keep up a relationship with him

22  since then?

23  A    A growing relationship.  It started out just casual

24  acquaintancy there, but we shared photo interests and continue

25  to do that, and we shot more and more together.  We -- we've

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 13 of 206
(720) 384-8078   attrans@sbcglobal.net

1  flown out on the island for bear photography.  We've gone to

2  Denali.  He's met my wife and I down in the southwest.  He and

3  his wife, in fact, both on some of the occasions.  But we've --

4  more than anything else, we were photographers together and --

5  and did a fair bit of traveling.

6  Q    Okay.  So what type of photography would you and Mr. Wells

7  do together?

8  A    You know, it was kind of split.  He had longer and better

9  lenses than I did, so he shot more wildlife than I did.  I had

10  more interest in -- I shot the wildlife, but I had more

11  interest in landscapes.  So I shot more landscape than he did,

12  but they were real compatible in the places we went.

13  Q    Okay.  And so did you have -- do you and your wife have a

14  pretty good friendship with Mr. Wells and his wife?

15  A    Yes.

16  Q    And you've maintained that over the years?

17  A    Yes.

18  Q    Okay.  Now, have you been hunting with Mr. Wells?  What

19  kind of sports activities have you done with Mr. Wells?

20  A    I'm -- in looking back, I think we've only managed to hunt

21  together twice or possibly three times.  First time we hunted

22  together was with his son, Matt, and I can't recall whether he

23  was still in high school or he'd re -- I think he'd returned

24  from college.  And we went duck hunting.  And then several

25  years later, after Matt was out of college, he came back up,

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 14 of 206
(720) 384-8078   attrans@sbcglobal.net

1  and my wife and I hunted with the two of them.  My wife could

2  only hunt the first day, so it was a foursome the first day and

3  the -- the second day was just Matt and Jim and I.

4  Q    Okay.  And when you were hunting with Mr. Wells, did you

5  ever see him with any type of a handgun or revolver?

6  A    No.

7  Q    Would that be an issue, say, for example, if you were

8  hunting and there were bear in the neighborhood or if you were

9  doing bear photography?

10  A    Hunting, no.  I usually don't even carry a handgun myself

11  for bear if I've got a rifle along.  Bear photography, the only

12  time it came up that I can recall at all, we were going out to

13  a remote area and he asked if I was bringing a firearm, and I

14  said yes, I was bringing a shotgun and a rifle.  He said,

15  "Good."  And --

16  Q    Then did he bring a gun?

17  A    No.

18  Q    All right.  Now -- so what type of socializing did you and

19  your family and Mr. Wells's family do over the years?

20  A    You know, it was principally two or three times a year,

21  we'd get together for dinner, typically at their house.  Or

22  when we'd travel together, that was an every-night affair.  And

23  then as his job schedule allowed more so than mine, being

24  retired, we fished together principally for halibut, and more

25  recently, king salmon in Kodiak waters.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 15 of 206
(720) 384-8078  attrans@sbcglobal.net

1  Q    So did your family spend holidays together?

2  A    Thanksgiving, and Jim typically, when he could, organized

3  a Valentine's gathering.  He would bring in Maine lobster for a

4  large group of friends and we'd have a big gathering at his

5  house for Valentine's Day.

6  Q    Now, was that a -- kind of a special event with the Wells

7  family?

8  A    Oh, yes.

9  Q    And do you know how many years that you attended that or

10  you were part of that?

11  A    I would say over the span of 20 years, at least half the

12  time.  Call it 10 years.

13  Q    Okay.

14  A    I mean, it was -- it -- it was probably more than that,

15  but --

16  Q    Was that somewhat of a tradition on Valentine's Day?

17  A    Yes.

18  Q    Okay.  Now, were you aware of Mr. Wells's job and where he

19  worked?

20  A    Yes.

21  Q    And how were you aware of that?

22  A    Through conversation, everything else, and there were

23  three or four instances where he needed documentary photography

24  both for a -- tower work they were doing, both for reports, and

25  for his training, I understand.  Well, in fact, I -- I

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 753  Filed 09/23/14  Page 16 of 206
(720) 384-8078  attrans@sbcglobal.net

PENNINGTON - DIRECT

1  photographed one training session.  He did some training.  But

2  he was using the photographs for the -- the training and the

3  documentation of his work.

4  Q    Okay.  So these were projects that Mr. Wells was working

5  on?

6  A    They -- projects he was in charge of, yeah.

7  Q    And he would ask you to photograph it?

8  A    Yes.

9  Q    And for what reason?

10 A    For his use and the Coast Guard's use in documentation of

11 the activity.

12 Q    And during those times, did you get to know some of his

13 co-workers?

14 A    Yeah.

15 Q    And who did you know?  Who'd you meet?

16 A    Rich Belisle.  The last one was in antenna repair, and the

17 only names I can recall, and I can't put last names on them,

18 are Para, young woman, dark hair --

19 Q    Uh-huh (affirmative).

20 A    -- and Leah or Lisa, young woman, blonde hair.  There were

21 other people around, but those are the ones that I remember,

22 because just by virtue of where I was -- oh, and the -- the

23 last session, the CO and the XO, commanding officer and -- and

24 executive officer of the communications station were there

25 taking photographs as well, and we had, in slow times,

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1  opportunity --

2  Q    The --

3  A    -- opportunity to talk quite a bit, mostly about

4  photography.

5  Q    Okay.  So you got to talk to the CO and XO about

6  photography?

7  A    Yes.

8  Q    Now, you mentioned Rich -- Mr. Belisle, Rich Belisle?

9  A    Yeah.

10 Q    Did you get to know him at all?

11 A    Not as well as I wanted to.  We shared an interest in

12 antique muzzle loaders, antique muzzle loading, and I had some

13 interest in early Coast Guard history.  Rich put me in touch

14 with people he knew at the Coast Guard Museum, if I recall, in

15 Connecticut.  I don't have those emails anymore, I don't think,

16 but, anyway, he -- I exchanged a series of emails with the

17 museum.

18     And then early on as we were getting acquainted, Rich used

19 to keep his crab pots in Kalsin Bay, the place we fish, and

20 over the course of summer, on weekends, if -- if the weather

21 was right and we were out, we'd see him out there and, you

22 know, drift the boats side by side and talk.  I -- I really

23 enjoyed him and looked forward to getting better acquainted,

24 and just never had the opportunity.

25 Q    Okay, so you got to meet him at the rigger shop?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 753  Filed 09/23/14  Page 18 of 206
(720) 384-8078  attrans@sbcglobal.net

**PENNINGTON - DIRECT**

1  A    At the rigger shop, and then outside of it a little bit.

2  Q    Okay.  Now let me ask you about February of 2012.  Do you

3  remember that time frame?

4  A    Yeah.

5  Q    And what can you recall about that time frame as far as

6  Mr. Wells was concerned?

7  A    He'd been ill enough -- and I don't remember exactly when

8  his surgery was, but before the surgery, and certainly after in

9  the recovery period.  But we really couldn't socialize at all.

10  But meanwhile, my wife and I decided to buy a boat in Anchorage

11  and were trying to figure out how to get it back to Kodiak.

12  And Jim made frequent trips over in a truck, and, as an island

13  courtesy on Kodiak, and probably all islands, you know, if

14  you're taking a vehicle off island to go somewhere, you ask

15  your friends if you need anything to come back on the truck.

16      And I took with Jim to see if, in fact, that spring, while

17  we -- we were leaving the end of February -- while we were

18  gone, if he wouldn't pick up the boat and bring it back and

19  deliver it to our house.  And I stopped in in the last day or

20  two days of February to check on Jim's health and well-being at

21  the time and to reconfirm that he was in fact taking his truck

22  to Anchorage and what the dates were.  And then we -- finding

23  that, as my wife and I passed through Anchorage on our way

24  south, we went to the dealership and bought the boat with

25  arrangements on -- I'm pretty sure it was April 4th, but I -- I

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 753  Filed 09/23/14  Page 19 of 206
(720) 384-8078  attrans@sbcglobal.net

1    could be wrong on that.  But at -- anyway, on Jim's next trip

2    over, when Jim was coming back home to pick up the boat and

3    bring it back on the ferry, and we'd reimburse him for the cost

4    and he'd deliver it to our house.

5    Q    And was there that traditional Valentine's Day party that

6    February?  Do you recall?

7    A    No.  There -- I don't -- I'm almost certain there wasn't.

8    Q    And you know why?

9    A    I don't recall when his surgery was, but he was -- he was

10   not in good shape.

11   Q    Was he having medical issues at that time?

12   A    Diarrhea.

13   Q    That was one of the things he was struggling with at the

14   time?

15   A    Yeah.

16   Q    And was your impression that that's why he had to cancel

17   the Valentine's Day traditional party or dinner?

18   A    I think it was actually Nancy who canceled it.

19   Q    Okay.  But he was --

20   A    She --

21   Q    -- having that kind of diarrhea, medical problems --

22   A    Yeah.

23   Q    -- back in February 2012?

24   A    Well, and -- as well, I think, when -- when I stopped

25   there the end of February to check on him, because the day

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 20 of 206
(720) 384-8078  attrans@sbcglobal.net

1   before or two days before, when driving into town, I'd met the

2   shop's big line truck, I think they call it, coming around the

3   corner, and I'd seen the silhouette of a hardhat and long hair.

4   And I thought, oh, Jim's well enough to get away from the shop.

5   And when I stopped in, I checked on that.  In fact, it had been

6   Rich, with long hair and the hardhat, that I -- the silhouette

7   that I'd seen.  It wasn't Jim.  He -- he was pretty well stuck

8   at the shop.

9   Q    And what do you mean by stuck at the shop?

10  A    Couldn't -- my impression, my recollection was that it --

11  you know, his diarrhea was too --

12          MR. SCHRODER:  Objection.  Hearsay, Your Honor.

13          MR. CURTNER:  Yeah, he -- he's not saying what anybody

14  else said.  He's telling us what his impression was at that

15  time.

16          MR. SCHRODER:  I think we need a foundation for what

17  that impression is, Your Honor.

18          THE COURT:  Right.  I agree.  Sustained.

19  BY MR. CURTNER:

20  Q    You can just tell us what you know, Mr. Pennington.

21  Not -- don't tell us what other people may have told you.

22  A    Okay.  I'm trying to recollect if that was the instance or

23  the one before that Jim -- at that point in time, I -- when I

24  tried to confirm that was Jim, Jim said, "No, I was having

25  diarrhea that day and I couldn't get" --

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 21 of 206
(720) 384-8078   attrans@sbcglobal.net

1        MR. SCHRODER:  Objection, Your Honor.

2        THE WITNESS:  -- "out of the shop."

3        THE COURT:  Sustained.

4   BY MR. CURTNER:

5   Q    Okay.  I'm sorry, Mr. Pennington.

6   A    I didn't understand.  Excuse me.

7   Q    Okay.  Well, let's talk about the -- late February, when

8   he went into the -- you went into the rigger shop?

9   A    Yep.

10  Q    And you talked to Mr. Wells?

11  A    Yep.

12  Q    And who else was there?

13  A    Jim Belisle -- or Rich Belisle and Jim Hopkins -- Hopkins.

14  Yeah, they were both there.

15  Q    Okay.  And you had a conversation with Mr. Wells?

16  A    And Rich and -- and Jim Hopkins.

17  Q    So what was that like?

18  A    A lot of laughter, kidding around, kind of at my expense.

19  Q    Your expense.  Why is that?

20  A    The subject had come up about long hair, and -- and we

21  were kidding around that Hopkins didn't have long hair and he

22  needed to retire soon so he could have long hair too.  That was

23  the -- at my expense came when I was getting ready to leave, I

24  took my hat back to expose my receding hairline, said, "But I

25  got you all beat."

1  Q    Okay.

2  A    And that was -- that was parting shot as I left the shop.

3  Q    All right.  Was that a jovial, joking conversation you had

4  with everybody?

5  A    Oh, yeah, very much so.

6  Q    Did you see -- seemed any tension there between Mr. Wells,

7  Mr. Belisle, Mr. Hopkins at all?

8  A    No.

9  Q    Was the atmosphere pretty -- I mean, that was how you --

10 the atmosphere you normally saw at the rigger shop when you did

11 go there?

12 A    Yeah.

13 Q    Okay.  Now, you've known Mr. Wells for many years.

14 A    Yeah.

15 Q    You ever known him to be violent?

16 A    No.

17 Q    Do -- you ever known him even to lose his temper?

18 A    Quite the reverse.  Places where I would have lost my

19 temper, he didn't.

20 Q    Can you give me one example?

21 A    Oh, we were halibut fishing and he -- he hooked an

22 enormous halibut, fish of a lifetime, and after an hour and a

23 half of fighting it and all -- it was -- felt like the final

24 trip up to the boat, the line parted.  And, you know, anybody

25 else, I -- I've fished with, when they've lost a big fish like

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 753  Filed 09/23/14  Page 23 of 206
(720) 384-8078  attrans@sbcglobal.net

1  that, threw a little tantrum and ripped -- or Jim groaned and

2  sat down and started laughing.  He said, "You know, I don't

3  know if I'm happy or not.  I'm not sure I wanted that fish up

4  here."  And, you know, that -- that was a big disappointment to

5  him, but he was able to put it in bigger context of what would

6  we do with the thing after he caught it.

7  Q    All right.  Well, thank you, Mr. Pennington.

8  A    Yeah.

9  Q    Mr. Schroder will have some questions.

10 A    Cool.

11       THE COURT:  All right, cross-examination.

12                   **CROSS-EXAMINATION**

13 BY MR. SCHRODER:

14 Q    Mr. Pennington, when were these instances where you did

15 photography work for the rigger shop?

16 A    Man.  They had a -- I don't know the technical names of

17 the antenna, but they had one antenna that was damaged by wind.

18 That was the most recent incident when the XO and CO were there

19 as well.  And I'd have to say that was the year before.  And

20 then prior to that, several years before that.

21 Q    So that -- you're saying that was -- that last time you

22 did it was at least a year before the homicides?

23 A    Well, at -- at least the previous summer.

24 Q    Okay.  And you'd stated that you socialized two to three

25 times a year, but -- with the Wells, but in that particular

1  year, isn't it true that you just said that you really didn't

2  have as much opportunity because of Mr. Wells' illness?

3  A    That's correct.

4  Q    So you hadn't really spent as much time with him that --

5  A    Telephone contact was the principal contact during that

6  period, yeah.

7  Q    And isn't it true that he didn't talk much about the

8  office in that last year before the murders?

9  A    He never did.

10 Q    Okay.  So your only experience -- you didn't really have

11 a -- other than -- what'd you make, one visit, you said, in

12 February?

13 A    And the one before, it -- reconstructing back, I was gone

14 in the fall, down to our place in Colorado.  I got the call

15 from my wife there when her mother died around Thanksgiving.

16 And I typically left first part of November on those trips, so

17 it would have been before November.

18 Q    So in the -- that last year before the murders, you might

19 have made a couple of trips up to the COMMSTA, up to the rigger

20 shop?

21 A    At most, yeah.

22 Q    All right.  So you really wouldn't have a lot of insight

23 into the work environment at the rigger shop, based upon a

24 couple of visits and really no discussing with Mr. Wells.

25 Isn't that correct?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 753  Filed 09/23/14  Page 25 of 206

1  A    I -- I thought it would have stood out if I saw any
2  tension, because I had the chance to work on that antenna job
3  and saw, you know, a lot of interaction in that time period.
4  Then there was a break in the period, and then -- the end of
5  February.  And I didn't see any difference.
6  Q    But you didn't -- but you said the antenna job was this --
7  at least the summer before?
8  A    Yeah.
9  Q    All right.  And you talked about the hunting trips with
10  Mr. Wells.  When were those hunting trips?
11  A    The one duck hunting with Matt while he was either still
12  in high school or just out of college had to have been 10 years
13  ago.  And the one with my wife and Jim and Matt, five, six
14  years ago.  Hunting was a very small part of our relationship.
15  Q    Okay.  But you did do some fishing together?
16  A    Yeah.
17  Q    All right.  And did you -- after the homicides, did you do
18  some fishing together?
19  A    Did a lot.
20  Q    A lot.  And so you so you spent time on -- was it your
21  boat?
22  A    Yes.
23  Q    And how many days do you think you spent out on the boat
24  that -- was this the summer after the homicides --
25  A    Yes.

1  Q    -- the spring and summer?

2  A    Yeah.  With allowances for schedules, my schedule or

3  the -- the weather and tides, at least once a week, and usually

4  I'd bet twice a week, over the course of the summer.

5  Q    Okay.  So that's quite a few days.

6  A    You bet.

7  Q    Yeah.  And did you spend half a day at a time?

8  A    It was typically tide driven.

9  Q    Okay.

10 A    So our typical day was six hours or less.

11 Q    Okay.  So six hour -- but sometimes you were as -- out as

12 long as six hours?

13 A    You bet.

14 Q    Any days you were out longer than that?

15 A    I doubt it.  Maybe.  But it wouldn't have been much more.

16 Eight hours would have been the max.  Just -- I've got a limit

17 that --

18 Q    And during that time, did Mr. Wells ever have a problem

19 with diarrhea?

20 A    No.

21 Q    So it's correct to say that from what you've seen,

22 personally experienced that summer, you didn't see a diarrhea

23 problem?

24 A    Not -- not that summer, no.

25 Q    And the only information you have about that is

PENNINGTON - REDIRECT

1  information you've gotten from somebody else?

2  A    Yes.

3  Q    No further questions, Your Honor.

4         THE COURT:  Redirect.

5                    REDIRECT EXAMINATION

6  BY MR. CURTNER:

7  Q    Mr. Pennington, when you and Mr. Wells were fishing the

8  summer -- that summer --

9  A    Uh-huh (affirmative).

10 Q    -- was he -- seemed to have recovered from his illness?

11 Did he -- was he as sick as he was in February?

12 A    No.  By no means.  He was, you know, agile, moving around

13 the boat.  He never -- you know, he -- he'd certainly fully

14 recovered from the surgery.

15 Q    Okay.  And so he was noticeably ill back in early 2012?

16 A    Yeah.

17 Q    And he had -- he was noticeably more healthy --

18 A    Yes.

19 Q    -- by the summertime?

20 A    Much more so.

21 Q    All right.  Thank you.

22         THE COURT:  Recross.

23         MR. SCHRODER:  No more questions, Your Honor.

24         THE COURT:  Thank you, sir.  You're excused.

25         THE WITNESS:  Thank you.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 28 of 206
(720) 384-8078  attrans@sbcglobal.net

SANDERSON - DIRECT

1    (Witness excused)

2         THE COURT:  Defense next witness.

3         MR. CURTNER:  Cable Wells -- oh, I'm sorry.

4    (Side conversation)

5         THE COURT:  Who?

6         MR. CURTNER:  Doris Sanderson.

7         THE COURT:  Doris Sanderson.  That door pulls out.  You

8    can just pull it out, and step in there.  And then remain

9    standing for a second, and ma'am, she -- and this lady right

10   over here will swear you in.

11        THE CLERK:  Please raise your right hand.

12        **DORIS SANDERSON, DEFENDANT'S WITNESS, SWORN**

13        THE CLERK:  Thank you.  Please have a seat.  And,

14   ma'am, if you can please state and spell your full name.

15        THE WITNESS:  Doris Sanderson.  D-o-r-i-s, S-a-n-d-e-r-

16   o -- s-o-n.

17        THE CLERK:  Thank you.

18        THE COURT:  All right.  Counsel.

19                    **DIRECT EXAMINATION**

20   BY MR. CURTNER:

21   Q    Good morning, Mrs. Sanderson.

22   A    Good morning.

23   Q    Where do you live?

24   A    Right now, I live in Honolulu, Hawaii.

25   Q    Okay.  Where were you living back in 2012?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 29 of 206
(720) 384-8078   attrans@sbcglobal.net

1  A    I was living in Kodiak, Alaska.

2  Q    What were you doing there at that time?

3  A    I was a teller at the commissary.  Well, actually at the

4  time, I was working in the warehouse.

5  Q    Okay.

6  A    And then I'd moved to the store and became a teller.

7  Q    All right.  Now, do you recall -- were you there when

8  there was a double homicide at one of the Coast Guard base --

9  A    Yes, sir.

10  Q    -- installations?  And do you recall about what time it

11  was?

12  A    I was on my way to work that morning.  I didn't find out,

13  well, until later on what exactly happened.  The base went

14  through a lockdown later on that morning.  And --

15  Q    Do you remember the date of that?

16  A    I know that -- I believe it's April 12th.  I don't know --

17  Q    Okay.

18  A    -- the day of the week or anything.

19  Q    Now, at that time was -- did you recall seeing something

20  in the newspaper about some vehicles that law enforcement was

21  looking for?

22  A    That was probably a few days later.

23  Q    Okay.  Let me show you what's been marked as Defense

24  Exhibit 32.

25       (Side conversation)

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 753  Filed 09/23/14  Page 30 of 206

**SANDERSON – DIRECT**

1  Q    Can you see that on your screen?

2       THE COURT:  That screen right there.

3       THE WITNESS:  Yes, sir.

4  BY MR. CURTNER:

5  Q    Do you recognize that?

6  A    Yes, sir.

7  Q    And do you recognize that's something that you saw back in

8  April of 2012?

9  A    The white pickup.

10 Q    Okay.  And this was in the Kodiak Daily Mirror?

11 A    Yes.

12      MR. CURTNER:  I'd move for admission of Defense Exhibit

13 32.

14      MS. DUIGNAN:  Objection, Your Honor.  I don't think

15 this meets any of the hearsay exceptions.

16      MR. CURTNER:  Your Honor, this is only to explain why

17 she took the actions she did after what -- looking at this

18 newspaper article.

19      MS. DUIGNAN:  I think she's already explained that.

20      THE COURT:  Well, I can't read everything there.  Is

21 there something objectionable about what's in the small print?

22      MR. CURTNER:  I'm only -- it's only for the pictures of

23 the truck -- the two vehicles that they were looking for and

24 the headline.

25      THE COURT:  Okay.  For that limited purpose.  Might

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 753  Filed 09/23/14  Page 31 of 206

**SANDERSON - DIRECT**

 1  have to do some redacting, I don't know.  It can be admitted

 2  for that purpose.

 3      (Defendant's Exhibit DE-032 admitted)

 4          MR. CURTNER:  Thank you.  And if we could publish that,

 5  Your Honor.

 6          THE COURT:  Very well.

 7          MS. DUIGNAN:  Your Honor, it's not redacted right now,

 8  though.

 9          MR. CURTNER:  Okay.

10          THE COURT:  I know.  Can just flash it up so we know

11  what we're talking about.

12          MR. CURTNER:  All right.

13          THE COURT:  Okay.  Bam.

14  BY MR. CURTNER:

15  Q   You recognize that?

16          THE COURT:  Okay, now take --

17          THE WITNESS:  I --

18          THE COURT:  -- it down.

19          THE WITNESS:  -- believe I passed the white truck on my

20  way to work that morning, yes, sir.

21  BY MR. CURTNER:

22  Q   Okay.  But you remember hear -- or seeing that newspaper

23  article that the -- law enforcement was looking for a white

24  truck that might be --

25  A   I --

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 32 of 206
(720) 384-8078  attrans@sbcglobal.net

1    Q    -- connected to the homicides?

2    A    -- don't believe what led me up to giving the information

3    I did -- they were stopping people at the front gate, asking if

4    anybody had any information, and that was when I told them that

5    I possibly saw the white truck that morning.  I don't remember

6    if it was -- it had to have been after I saw the article,

7    because it clearly stated that they were looking for the

8    public's help.

9    Q    Right.  The FBI was looking for the public's help, and you

10   tried to help.  Right?

11   A    Yes.

12   Q    And so you were interviewed about what you may have seen?

13   A    I was interviewed and asked as the circumstances of when I

14   thought I saw the white truck, yes.

15   Q    Okay.  And what did you report at that time?

16   A    I told the agent that I was speaking to that on my way to

17   work that morning I was on the corner of what they call Dead

18   Man's Curve, and the white truck passed me at the end of it.

19   And shortly after that, I pulled over to let the ambulance go

20   by.

21   Q    Okay.  Can we have -- bring up the map, Mr. Johnson?

22        (Side conversation)

23   Q    Let's bring up Defense Exhibit 179.  Does that look

24   familiar?  Do you recognize what that is?

25   A    You're not going to be able to tell unless you had, like,

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 33 of 206
(720) 384-8078   attrans@sbcglobal.net

SANDERSON - DIRECT

1  a closer-up view of the road where it was at.  Dead Man's

2  Curve -- I don't -- I don't know how --

3  Q   Well, first of all -- I'm sorry, Mrs. Sanderson, you --

4  A   Yes.

5  Q   -- recognize a map of the area --

6  A   Yes.

7  Q   -- that you're talking about?

8  A   Yes.

9       MR. CURTNER:  Okay.  We'd move for admission of Defense

10  Exhibit 179.

11      MS. DUIGNAN:  No objection.

12      THE COURT:  It'll be received.

13     (Defendant's Exhibit DE-179 admitted)

14      MR. CURTNER:  If we can publish that.

15  BY MR. CURTNER:

16  Q   Okay, so you recognize this area?

17  A   Yes.

18  Q   And you were -- were you living in Kodiak at the time, the

19  city?

20  A   Yes.

21  Q   And where were you working?

22  A   I was working at commissary warehouse on base.

23  Q   Okay.  So at the time you saw this white truck, were you

24  driving to work?

25  A   Yes.

SANDERSON - DIRECT

1  Q    And what time would that have been?

2  A    It was in between 7:15 and 7:40, 7:45.

3  Q    Okay.  Now, you said -- I think you said 7:50 originally

4  when you were interviewed.  Do you recall that?

5  A    I don't know exactly what I said to the gentleman, but my

6  clock in my vehicle at the time was set fif -- twelve to

7  fifteen minutes fast.  I usually left my house in between 7 and

8  7:15, depending on the road conditions, the weather, and

9  traffic.  It used to take me 15 to 20 minutes to get to work,

10 and it was 12 miles.

11 Q    Okay.  So -- and this is about the same time you saw the

12 white truck as you saw ambulances?

13 A    The ambulance passed me shortly after the vehicle did.

14 Q    Now -- okay, so you mentioned Dead Man's Curve.  Where

15 along this road would Dead Man's Curve be?  Would it be --

16 A    I -- it's on the ocean, so it looks like by the map.  But

17 I can't really tell that it would be right there.

18 Q    About this area.  That -- why do they call it Dead Man's

19 Curve?

20 A    Because it's a really sharp corner.  It's down where that

21 kind of like L shape is.

22 Q    Here?

23 A    Right there.

24 Q    Okay.

25 A    And there's a pullout right there.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 35 of 206
(720) 384-8078  attrans@sbcglobal.net

1  Q    There's, like, a parking area where you overlook the

2  ocean?

3  A    Yes.

4  Q    Okay.  And so, to your memory -- if we can go back to

5  the -- okay, so that would have been there?

6  A    Yes.

7  Q    And that is about where you saw the white truck --

8  A    Yes.

9  Q    -- in that morning.  And which direction was it headed in?

10 A    It was headed toward town.

11 Q    Okay.  So about the same time -- around the same time

12 you -- the ambulances were headed out toward this way?

13 A    Yes.

14 Q    And you were headed out to work.  The white truck was

15 going in this direction back toward town?

16 A    Yes.

17 Q    Okay.  And that's what you reported as what you recognized

18 in your opinion was the same truck that they had been looking

19 for?

20 A    Yes.

21 Q    And that was -- was there anything distinctive about it?

22 A    The custom cab on the back of the truck.

23 Q    Okay.

24 A    I had never seen another vehicle driving at -- in Kodiak

25 the whole seven years I lived there that was the same color,

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

SANDERSON - CROSS

1  make, and model with that same camper shell on it.

2  Q   Okay.  And that was -- now, that was May 2nd that you

3  reported this, that you had this interview?

4  A   I don't know the exact date.

5  Q   Was it a couple weeks after the homicides or when you saw

6  it?  Was it a couple weeks later?

7  A   I don't recollect how long it was.

8  Q   Okay.  It wasn't that day?

9  A   No.

10 Q   It was after the article came out in -- April 23rd?

11 A   Whatever day the -- the newspaper came out.  It came out

12 usually on Fridays.

13 Q   Okay.  And -- but you are -- you know that it was that

14 time in the morning and it was headed toward Kodiak at that

15 time?

16 A   Yes.

17     MR. CURTNER:  That's all the questions I have, Your

18 Honor.

19     THE COURT:  Cross-examination.

20              CROSS-EXAMINATION

21 BY MS. DUIGNAN:

22 Q   Hello, Ms. Sanderson.

23 A   Hi.

24 Q   Did you know either of the victims?  Did you know Rich

25 Belisle?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 753  Filed 09/23/14  Page 37 of 206
(720) 384-8078  attrans@sbcglobal.net

1  A    Yes, I did.  He was a -- he just maybe two or three weeks
2  before had been my forklift instructor.
3  Q    Okay.  And did you know the Hopkins at all?
4  A    Very well.  Debby Hopkins was a cashier of mine when I
5  worked at the exchange.
6  Q    So when the article came out, you wanted to be helpful?
7  A    Absolutely.
8  Q    Had you ever met Mr. Wells?
9  A    I don't recall meeting him.  His wife shopped at the
10  commissary on a regular basis.
11  Q    Did you see any base sticker on this truck?
12  A    Not that I recall.
13  Q    Okay.  And you said that you saw it at about 7 o'clock or
14  7:30 in the morning?
15  A    It was probably closer to 7:15 to 7 -- 7:40.  Like I said,
16  the clock in my vehicle was set fast.  So I usually got to work
17  20 to 15 minutes before my supervisor was there to unlock the
18  warehouse I worked in.
19  Q    Okay.  So you're not really sure about the time?
20  A    Not exact, no.
21  Q    Thank you very much.
22        THE COURT:  (Indiscernible).
23        MR. CURTNER:  No other questions.  Thank you.
24        THE COURT:  Thank you, ma'am.  You're excused.  Defense
25  next witness.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 753  Filed 09/23/14  Page 38 of 206
(720) 384-8078  attrans@sbcglobal.net

**DEMI - DIRECT**

1   (Witness excused)

2         THE COURT:  Ma'am, you can just make your way forward

3   here and come around there.  That door pulls open.  That's the

4   witness box.  Step into that.  Remain standing just for a

5   second, and my clerk will swear you in.

6         THE CLERK:  Please raise your right hand.

7         **LAURA ANNE DEMI, DEFENDANT'S WITNESS, SWORN**

8         THE CLERK:  Okay, thank you.  Please have a seat.  And,

9   ma'am, if you can please state and spell your full name.

10        THE WITNESS:  Laura Anne Demi.  L-a-u-r-a, A-n-n-e, D-

11  e-m-i.

12        THE CLERK:  Thank you.

13        THE COURT:  All right, counsel.

14                      **DIRECT EXAMINATION**

15  BY MR. CURTNER:

16  Q   Good morning, Mrs. Demi.

17  A   Good morning.

18  Q   Where do you live?

19  A   I -- right now, I live in Yakima, Washington.

20  Q   Okay.  Do you know where -- where were you living in 2012,

21  April of 2012?

22  A   Kodiak.

23  Q   All right.  Now, you -- and you recall there being a

24  tragic homicide there that April?

25  A   Yes, sir.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 753  Filed 09/23/14  Page 39 of 206
(720) 384-8078  attrans@sbcglobal.net

DEMI - DIRECT

1  Q    And do you recall seeing a newspaper article?  There were

2  certain vehicles that the FBI was looking to see if anybody had

3  any observation of?

4  A    Yes, sir.

5  Q    Do you recall -- did you recognize those vehicles?

6  A    Yes, sir.

7  Q    Do you know Mr. Wells?

8  A    Not personally, no.

9  Q    You've seen him before?

10  A    Yes.

11  Q    You've seen his truck before?

12  A    Yes.

13  Q    Now, where do you live?  And -- where were you living

14  that --

15  A    At that time I lived on Bells Flats Road, which was right

16  around the corner from where they live.

17  Q    Okay.  And how long had you lived there?

18  A    About 13 years.

19  Q    And during that time did you see Mr. Wells driving his

20  truck?

21  A    Yes, sir.

22  Q    Do you think you were familiar with it?

23  A    Yes.

24  Q    Okay.  And you -- did you recognize the blue SUV that was

25  in the paper as well?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 753  Filed 09/23/14  Page 40 of 206
(720) 384-8078  attrans@sbcglobal.net

**DEMI - DIRECT**

1   A    Yes, sir.

2   Q    Now -- so when that article was in the paper, did you

3   contact law enforcement?

4   A    I did.  I called the Coast Guard Investigative Services.

5   Q    And what did you report?

6   A    That I had seen the vehicle on the morning of the incident

7   on my way home.  I had left work early, because I was upset

8   and -- that I had saw the vehicle in a weird spot that -- it

9   was kind of parked inside the road and not -- and, you know, on

10  the side.  And so I told them that's what I had saw.

11  Q    Okay.  And so you reported seeing the white truck that --

12  A    Yes, sir.

13  Q    -- was in the newspaper?

14  A    Yes, sir.

15  Q    About -- parked on the side of the road?  What did you --

16  A    Uh-huh (affirmative).

17  Q    What did you see?

18  A    It was -- it was parked mostly inside the road, but, you

19  know, I mean, on the edge of the road.  And it was -- vehicles

20  don't need -- you know, it was just odd.

21  Q    Okay.

22  A    So I told him that's what I had seen.

23  Q    And what time did you see that truck?  That was on April

24  12th?

25  A    Yes, sir.

1  Q   And what time did you see it?

2  A   I don't recall, because I know I had left work early.  And

3  I want to say it was probably 10, 9:30, 10, somewhere around

4  there.  I don't --

5  Q   Do you remember telling the agents that it was 10:42

6  because -- 10:42 in the morning that day?

7  A   Possibly.  I mean, I don't remember telling them that.

8  But I -- it was on a cell phone, and I've got gone through two

9  of them since then, so I don't have that information anymore.

10 But --

11 Q   At the time you had a text message or something that --

12 A   Yeah.

13 Q   -- told you the time?

14 A   Uh-huh (affirmative).

15 Q   And that was 10:42 in the morning?

16 A   Okay.  I mean, I don't re --

17 Q   What --

18 A   I -- I don't recall that time, but probab -- you know, if

19 that's what I had told them, then that's probably what it was.

20 Q   Now, you'd already gone to work that morning?

21 A   Yes.

22 Q   And then you were headed home.  And so --

23 A   Yes.

24 Q   -- it had to be midmorning by that time --

25 A   Uh-huh (affirmative).

DEMI - DIRECT

1  Q    -- correct?  Had been after 10?

2  A    Yeah.  It was -- yeah.

3  Q    Okay.  And you -- hold on a minute.  Could you bring up

4  Defense Exhibit 179 again?  Now, you recognize this map?

5  A    Yes.

6  Q    And this is -- where would you work?  Where were you

7  working at the time?

8  A    I worked at the administration building, right on base.

9  Q    Okay.  So this would have been around here?  Is this the

10  base?

11  A    It's right through the gate, wherever the --

12  Q    Okay.

13  A    -- gate -- if --

14  Q    This area's where --

15  A    Yes.

16  Q    -- basically where it is?

17  A    Uh-huh (affirmative).

18  Q    And Bells Flats is -- where's -- what's this?  Is this

19  Bells Flats?

20  A    That is the fairgrounds, I believe.

21  Q    Okay.  Tell me when I get to the Bells Flats area.

22  A    Well, that's past -- it's -- that first river is where I

23  live.  So keep going the other direction.

24  Q    This way?

25  A    No, the other way.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 753  Filed 09/23/14  Page 43 of 206
(720) 384-8078  attrans@sbcglobal.net

1  Q    Okay.

2  A    Keep going.  That -- all that area is in Bells Flats, and

3  I lived on the first -- the first turnoff.

4  Q    And what's the name of that first turnoff?

5  A    Sargent Creek Road.

6  Q    Okay.  And so would that have been -- tell me -- is it

7  just right off Rez --

8  A    It's right off of that -- to the -- to the right of your

9  red dot.  You're at -- that's Sargent Creek right there.

10 Q    Oh, okay.  So that's about where you saw the white truck?

11 A    A little farther --

12 Q    Tell me --

13 A    -- inland.

14 Q    This way?

15 A    No, inland, towards the mountains.

16 Q    This -- okay.

17 A    Okay.

18 Q    Which way?

19 A    Like you're driving towards the -- no, take a left right

20 there, please.

21 Q    Take a left?

22 A    Yeah, that way.

23 Q    Okay.

24 A    Right in there.

25 Q    Oh, that's where you saw the truck.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1   A    Right in that area, right there, where that cross-hatch

2   is.  Yeah.

3   Q    Okay.  That's --

4   A    Uh-huh (affirmative).

5   Q    That's accurate?

6   A    Uh-huh (affirmative).

7   Q    And that -- so you saw that white truck that you reported

8   as -- recognized as Mr. Wells' at 10:42 and -- 10:40 in the

9   morning on April 12th, 2012?

10  A    Yes, sir.

11  Q    And, in fact, when they asked you about that, did they

12  show you a photograph of the area?

13  A    I provided a photograph.

14  Q    You provided a photograph of that area?

15  A    Uh-huh (affirmative).

16  Q    Which had been this area?

17  A    Uh-huh (affirmative).

18  Q    And so you told them specifically where you had seen it at

19  10:42 that morning?

20  A    Yes.

21  Q    And they also -- did you take them out to that spot?

22  A    Yes, they took me there.

23  Q    You showed them around that area where you saw the truck

24  at 10:42 on the 12th?

25  A    Yes, sir.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 753  Filed 09/23/14  Page 45 of 206
(720) 384-8078  attrans@sbcglobal.net

DEMI - CROSS

1  Q    Thank you.  That's all I have.

2  A    Okay.

3            THE COURT:  Cross-examination.

4                   CROSS-EXAMINATION

5  BY MS. DUIGNAN:

6  Q    Good morning, Ms. Demi.

7  A    Good morning.

8  Q    Did you know Richard Belisle?

9  A    Yes.

10 Q    How did you know him?

11 A    Family friends.

12 Q    And, in fact, when you left work early that day, it's

13 because you had heard the news that he had been killed?

14 A    Yes, ma'am.

15 Q    Were you upset that day?

16 A    Very.

17 Q    And when you were asked about seeing vehicles, you wanted

18 to be helpful --

19 A    Yes.

20 Q    -- right?  Because --

21 A    Yes.

22 Q    -- Rich Belisle was a very good friend of yours?

23 A    Yes.

24 Q    I have no further questions.

25 A    Okay.

```
 1            THE COURT:  Recross --

 2            MR. CURTNER:  Nothing further.

 3            THE COURT:  -- or redirect.

 4            MR. CURTNER:  Thank you.

 5            THE COURT:  All right, thank you, ma'am.  You're

 6    excused.

 7            THE WITNESS:  (Indiscernible), thank you.

 8        (Witness excused)

 9            THE COURT:  Defense next witness.  All right, sir, if

10    you can just make your way up toward the front here and come

11    around the corner.  And that door pulls out, and just step into

12    the witness box.  And if you look right over this way -- remain

13    standing just --

14            MR. WELLS:  Okay.

15            THE COURT:  -- for a second, and she'll swear you in.

16            THE CLERK:  Please raise your right hand.

17        CABLE ERIC WELLS, DEFENDANT'S WITNESS, SWORN

18            THE CLERK:  Okay, thank you.  Please have a seat.  And,

19    sir, if you can please state and spell your full name.

20            THE WITNESS:  Cable Eric Wells.  C-a-b-l-e, E-r-i-c, W-

21    e-l-l-s.

22            THE CLERK:  Thank you.

23            THE COURT:  All right, counsel.

24                        DIRECT EXAMINATION

25    BY MR. CURTNER:
```

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 753  Filed 09/23/14  Page 47 of 206
(720) 384-8078  attrans@sbcglobal.net

1  Q   Mr. Wells, what's your relationship to Jim Wells?

2  A   I'm his oldest son.

3  Q   Okay.  And where were you born?

4  A   San Francisco.

5  Q   When did you live in Kodiak?

6  A   Were -- an infant, I think about first or second grade,

7  and then moved back about 1990.

8  Q   How old were you when you moved back to Kodiak?

9  A   Fourteen.

10  Q   Okay.  And then were you in school at Kodiak?

11  A   Yeah.  I went to high school in Kodiak.  Yeah.

12  Q   When did you graduate high school?

13  A   '94.

14  Q   Okay.  So between 1990 and 1994, you were in high school?

15  A   Correct.

16  Q   And living with your parents?

17  A   Yes.

18  Q   Now, what happened after high school?

19  A   Graduated high school, and then did a year of college in

20  Fairbanks.  Came back to Kodiak after that year and then kind

21  of part-time college at Kodiak Community College, and then

22  moved to Juneau in the -- December '96.

23  Q   All right.  And are you still living in Juneau now?

24  A   No, I live in Klawok, on Prince of Wales Island.

25  Q   What's -- what kind of occupation do you have?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 753  Filed 09/23/14  Page 48 of 206

WELLS - DIRECT

1   A    I'm a airline pilot.

2   Q    Okay.  And do you have -- what -- do you have a family

3   there?

4   A    I have a girlfriend and a six-year-old daughter.

5   Q    What's your daughter's name?

6   A    Tya (ph).

7   Q    So let me take you back to your high school days.  Did you

8   know a man named John Stein at the time?

9   A    Yes, I did.

10  Q    How did you know Mr. Stein?

11  A    He was a friend of my father's from the Coast Guard.

12  Q    Okay.  And did you do things with Mr. Stein?

13  A    We did shooting with John Stein, and -- and reloading ammo

14  and stuff to shoot.

15  Q    Was Mr. Stein into reloading?

16  A    Yes.

17  Q    Okay.  And where would you shoot with Mr. Stein?

18  A    Usually at their trap at the Coast Guard trap range, or at

19  the -- the gun range in Kodiak.

20  Q    All right.  What was the name of the trap range?

21  A    I'm not sure of the name of the trap range.  It was on the

22  Coast Guard base there.

23  Q    Okay.  And then what was the other place you --

24  A    The Kodiak Island Sportsman Association.

25  Q    What was -- what is that?

1    A    It's a indoor gun range with, like, a outdoor rifle range

2    in the back.

3    Q    So would you shoot targets there?

4    A    We'd do some target shooting and we would do -- usually go

5    to do a -- like, a competition shooting, they're -- like, a

6    plate match or a bowling pin match.

7    Q    What -- could you explain that a little bit?

8    A    A plate match would be usually with .22 rim-fire pistols.

9            THE COURT:  Okay.  Just pull --

10           THE WITNESS:  Yes.

11           THE COURT:  -- the microphone a little closer.

12           THE WITNESS:  Oh, okay.  Sorry.  .22 rim-fire pistols,

13   shooting at about a six-inch steel plate in timed competition

14   with other -- other shooters.  And then the bowling pins, we'd

15   be shooting a -- a -- old used bowling pins in time competition

16   with other shooters with -- usually, like, a .45 pistol.

17   BY MR. CURTNER:

18   Q    And what type of shooting did you do the most?

19   A    Usually just the competition shooting.

20   Q    With the .22 or the --

21   A    The .22 and the .45.

22   Q    Okay.  And so what kind of weapon -- what kind of gun did

23   you use most of the time when you were doing that?

24   A    It would be a Ruger Mark II for the plate match shooting

25   and a 1911 Colt -- I think it was a Colt automatic pistol.

1  Q    Okay.  Now, when you went out to the shooting range at the

2  Kodiak Island Sportsmanship Asso -- Sportsman's Association,

3  who'd normally go out with you?

4  A    That would be my dad, my brother, and John.

5  Q    Okay.  And how often did you do (indiscernible)?

6  A    I think we would usually try to make most of the

7  competition shootings.  But, you know, high school --

8  everything I -- you know, I don't have an exact count for --

9  for --

10 Q    Okay.  Usually if there was a competition, you tried to

11 go?

12 A    Tried to go, yeah.

13 Q    Now, did you know anything about Mr. Stein's -- what a --

14 what kind of -- what guns he had?

15 A    In -- most of what was used was those two pistols.  He had

16 a Thompson submachine gun as well that we got to use before.

17 And, you know, those are the ones that I vividly remember,

18 because that's what we used.

19 Q    You remember the Thompson machine gun?

20 A    Yes.  Yes.

21 Q    Okay.  What do you remember about that?

22 A    It's a lot of fun to shoot.  But, yeah, it's a .45-

23 caliber, you know, World-War-II-era, fully-automatic machine --

24 machine gun, man portable.

25 Q    Now, would you reload for that?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 753  Filed 09/23/14  Page 51 of 206
(720) 384-8078  attrans@sbcglobal.net

**WELLS - DIRECT**

1  A    Yes.

2  Q    And how long would it take you to reload bullets for a

3  machine gun?

4  A    You could spend a couple days loading ammunition for it.

5  And then you --

6  Q    Is that what you would do yourself?

7  A    Oh, we -- we would go there, me and my brother and John

8  and my dad, and, you know, we'd, you know, take turns on the

9  loading press, putting ammunition together.

10 Q    So it might take a couple days for the machine gun to

11 get -- to reload the bullets?

12 A    Yes.  You could do 30 rounds in about three seconds, just

13 pulling the trigger down.  So you went through the ammo real

14 fast.

15 Q    So if you did a couple days of reloading, how long would

16 it take to shoot it off?

17 A    You could probably do that in an hour or two.

18 Q    Okay.  Did you ever see a .44 Magnum stainless-steel

19 revolver?

20 A    The only gun I remember was a -- couldn't swear that it

21 was a .44, but it was just a big silver revolver.  John had one

22 that -- he had a -- a double feed on it.

23 Q    And what is a double feed?

24 A    You had a bullet that didn't leave the barrel and then

25 fired again, and the bullets -- two -- two bullets were in the

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 52 of 206
(720) 384-8078  attrans@sbcglobal.net

1  barrel, and the barrel blew up and expanded.

2  Q    Now, were you there when that happened?

3  A    Not when that happened, no.

4  Q    Did he show you that, though?

5  A    He did show us the gun, yeah.

6  Q    Was that the only stainless-steel revolver that you

7  recall?

8  A    That's the one that I vividly remembered, because it was

9  the -- the object lesson of watching the loads.

10  Q    Okay.  That was a lesson for you?

11  A    Yeah.

12  Q    And did you ever shoot one of his stainless-steel

13  revolvers?

14  A    I may have.  I couldn't recall one way or the other.  I

15  mean, it wasn't a -- wasn't a gun that we'd normally use --

16  Q    Okay, did you ever --

17  A    -- if we did.

18  Q    If you'd shot it, where would you have shot it at?

19  A    Probably at the range.

20  Q    Okay.  And you don't recall shooting it anywhere else?

21  A    No.

22  Q    Now, the machine gun, the Thompson machine gun -- well,

23  first of all, do you remember Mr. Stein having a gun safe at

24  your home?

25  A    I -- there was a gun safe, is what I was told.  It arrived

1  when I was away at college.

2  Q    It wasn't there when -- it didn't get -- wasn't there when

3  you were --

4  A    It was not -- it was not brought to the house while I was

5  living there.

6  Q    Do you ever -- did you ever see it?

7  A    I never -- never saw it.

8  Q    Okay.  And but you knew it was in the home?

9  A    Knew it was in the home, yes.

10  Q    And was that something that was accessible?

11  A    No.

12  Q    Why is that?

13  A    Was put in the attic.  It was not our stuff to play with.

14       MS. DUIGNAN:  Objection.  If he didn't see it, how does

15  he know that?  Pers -- he only testified to personal knowledge.

16       THE COURT:  Sustained.  Sustained.

17  BY MR. CURTNER:

18  Q    Mr. Wells, did you ever see your father have a stainless-

19  steel revolver?

20  A    No.

21  Q    You've never seen one in the home when you were there?

22  A    No.

23  Q    And would you go back over the years and visit?

24  A    Usually over for, like, either Thanksgiving or Christmas,

25  yes.

1    Q    Did you ever see a stainless-steel revolver there?

2    A    No.

3    Q    Okay.  Was your father ever violent with you or --

4    A    No.

5    Q    -- your siblings?

6    A    No.

7    Q    Would he ever raise a hand to you at all?

8    A    No.

9    Q    Okay.  Have you ever seen him violent?

10   A    No.

11   Q    Thank you.  That's all I have.  They're --

12   A    Okay.

13   Q    They'll have some questions.

14   A    Okay.

15        THE COURT:  All right, cross-examination.

16                    **CROSS-EXAMINATION**

17   BY MS. DUIGNAN:

18   Q    Good morning, Mr. Wells.

19   A    Good morning.

20   Q    You said you moved out of the house and away from Kodiak

21   in 1995.  Is that correct?

22   A    In the original interview with the CGIS agent, yes, I

23   double -- had to go double check old resumes to -- or it had

24   been a while.  So --

25   Q    So it was 1995?

1   A    It was '96.  '96, yes.  Christ --

2   Q    It was '96?

3   A    Christmas Day, '96.  Took the ferry out.

4   Q    And that's when you moved to Juneau?

5   A    It's, yes, when I moved to Juneau.

6   Q    And how old were you then?

7   A    Without getting a calculator out, it was probably 19 or

8   20.

9   Q    Okay.  But you said when you were in high school you knew

10  John Stein?

11  A    Correct.

12  Q    And you shot weapons with him before on --

13  A    Correct.

14  Q    -- multiple occasions?

15  A    Yes.

16  Q    And you said you had seen one of the .44 revolvers on a

17  previous occasion.

18  A    It was a revolver.  I could not swear to the caliber, you

19  know.  We -- you know, it was a cal -- revolver he had in the

20  home, but, you know --

21  Q    But you know weapons pretty well.  It sounds like you were

22  talking about the fact you shot a .45 with him and a .22 with

23  him.

24  A    Yes.

25  Q    And -- a different weapon.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 753  Filed 09/23/14  Page 56 of 206
(720) 384-8078  attrans@sbcglobal.net

1    A    But those were the -- those were the guns that we normally

2    used.  So --

3    Q    So you had seen a stainless-steel revolver at one point

4    that he showed you, correct?

5    A    Yes.

6    Q    And you mentioned that it had a double feed?

7    A    Yes.

8    Q    Can you pull up Exhibit 232B, please?

9         (Side conversation)

10   Q    If you look at that, can you identify the revolver that

11   you saw?

12   A    No.

13   Q    So looking at that list, that doesn't refresh your memory

14   at all --

15   A    No, I --

16   Q    -- about what you saw?

17   A    -- I couldn't recall a single serial number on any of

18   these guns.  I --

19   Q    Well, do you -- you can take it down.  Do you recall a

20   description of the weapon you saw?  How big was it?

21   A    Was a full-size pistol.  I don't know what --

22   Q    So it could have an eight-inch barrel?  Does that sound

23   right?

24   A    I -- possibly.  I don't know.

25   Q    And your test -- your sworn testimony is you never saw

1 another .44-caliber pistol other than that one?

2 A    Correct.

3 Q    You knew that John Stein had left at some point.  He left

4 Kodiak to travel internationally?

5 A    I knew, yes, he left to -- to travel, yeah.

6 Q    And you mentioned that you knew he went to countries in

7 Central America when you were interviewed, didn't you?

8 A    My parents had told me, yes, he'd gone to South America.

9 Q    Okay.  And you never returned to Kodiak to visit your

10 parents the entire time you were in college?

11 A    I did go back probably for Christmas, yes.

12 Q    Okay.  So you would go back during Christmases.  So you

13 were home -- you were in the home during the time that Mr.

14 Stein's safe was there?

15 A    Correct, yes.

16 Q    But you never saw it?

17 A    Never saw it.

18 Q    But you knew your parents were holding things for Mr.

19 Stein?

20 A    Yes.

21 Q    And you remember at some point that Mr. Stein's brother

22 Terry received a safe and weapons that were shipped from

23 Kodiak.  Correct?

24 A    Only from knowledge of my parents, who told me that

25 they --

**WELLS - REDIRECT**

1  Q    But you told investigators that?

2  A    Yes.

3  Q    And you also told investigators that you thought John

4  Stein was dead.  Correct?

5  A    I said it was a possibility.  I hadn't heard anything

6  about his whereabouts or --

7  Q    Well, you told investigators that you thought he had

8  dementia?

9  A    Correct.  That's what I had been told from my parents.

10 Q    Where did you hear that?

11 A    From my parents.

12       MR. CURTNER:  Your Honor, this is hearsay.  You know,

13 he could --

14       MS. DUIGNAN:  Would you be --

15       MR. CURTNER:  We want him to testify about what he

16 knows.

17 BY MS. DUIGNAN:

18 Q    Would you be surprised to learn that that's not correct?

19 A    Yes.

20 Q    Thank you.

21       THE COURT:  Redirect.

22                 **REDIRECT EXAMINATION**

23 BY MR. CURTNER:

24 Q    You got to know Mr. Stein a little bit when you were in

25 high school.  Right?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 753  Filed 09/23/14  Page 59 of 206
(720) 384-8078  attrans@sbcglobal.net

1    A    Correct.

2    Q    And so you wouldn't be surprised if he did have some kind

3    of mental dementia or something?

4    A    No.  The -- you know, I had heard he'd turned his pilot's

5    license and his medical in.  That was because of issues he'd

6    had.  He couldn't keep them.

7    Q    He couldn't keep his medical license or his pilot

8    license --

9    A    Yeah.

10   Q    -- because of (indiscernible) --

11        MS. DUIGNAN:  Objection.  The witness said he -- this

12   was all hearsay, so now he's saying that he knows.

13        THE COURT:  Sounds like it's hearsay.

14   BY MR. CURTNER:

15   Q    So you wouldn't be surprised if he had some kind of

16   issue --

17        MS. DUIGNAN:  Objection.  He should be asking direct

18   questions on direct, not cross.

19        THE COURT:  Sustained.

20        MR. CURTNER:  That's all, Mr. Wells.

21   A    Okay.

22        THE COURT:  Re -- anything else?

23        MS. DUIGNAN:  No, Your Honor.

24        THE COURT:  Thank you, sir.  You're excused.

25   A    Okay.  Thank you.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

**WELLS - DIRECT**

1    (Witness excused)

2         THE COURT:  Okay.  Next witness is?

3         MR. CURTNER:  Matthew Wells.

4         THE COURT:  Okay.  All right, sir, that box -- that

5    door pulls out.  Just step into the witness box.  And remain

6    standing for a second, and she'll swear you in.

7         THE CLERK:  Please raise your right hand.

8         **MATTHEW WELLS, DEFENDANT'S WITNESS, SWORN**

9         THE CLERK:  Okay.  Thank you.  Please have a seat.

10   And, sir, if you can please state and spell your full name.

11        THE WITNESS:  It's Matthew Wells.  M-a-t-t-h-e-w, W-e-

12   l-l-s.

13        THE CLERK:  Thank you.

14        THE COURT:  Counsel.

15                    **DIRECT EXAMINATION**

16   BY MR. CURTNER:

17   Q    Mr. Wells, what's your relationship to Jim Wells?

18   A    He's my father.

19   Q    Okay.  And where do you live?

20   A    Currently, I reside in St. Helen's, Oregon.

21   Q    And what's your occupation?

22   A    I'm a police officer for the City of Portland.

23   Q    Now, so did you live in Kodiak with your parents?

24   A    Yes.

25   Q    Where were you born?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 753  Filed 09/23/14  Page 61 of 206
(720) 384-8078  attrans@sbcglobal.net

1  A    I was born in Kodiak.

2  Q    Okay.  And what year was that?

3  A    1980.

4  Q    Was there a time then when your family left Kodiak after

5  you were born?

6  A    Yes.  We were stationed in Point Reyes, and then from

7  there moved to Federal Way, and then back to Kodiak.

8  Q    What year did you move back to Kodiak?

9  A    In 1990.

10  Q    So how old were you then?

11  A    It -- it was before August, so I think I was nine when we

12  moved back.

13  Q    Okay.  Nine, almost ten?

14  A    Correct.

15  Q    And then -- so how long did you stay in Kodiak?

16  A    Until I graduated from high school in '98 and then went to

17  college.

18  Q    So when you returned in 1990, you were there, eight years

19  of school, until you graduated high school?

20  A    That is correct.

21  Q    And then -- so when you graduated high school in 1998,

22  where did you go?

23  A    I attended University of Portland.

24  Q    Okay.  How long were you at the university?

25  A    Four years.  I graduated in 2002.

1  Q    What was your degree in?

2  A    I had a major in sociology, with an emphasis in criminal

3  justice.

4  Q    Now, were you also involved with -- how'd you get involved

5  in police work?

6  A    Part of my major for our senior year, we had to do what

7  was called a practicum for a full year.  And at the time, North

8  Precinct was about five miles away from university.  And I got

9  tied into the North Precinct detectives, so I did an internship

10 with them for my senior year.

11 Q    And did you attend any kind of a police academy while you

12 were there?

13 A    Uh-huh (affirmative).  I was accepted into -- at the time

14 it was a federal program called Police Corps.  It was a 24-week

15 academy.  And then the contract was if you attend -- or if you

16 pass the academy and you go to work for a police agency for a

17 minimum of four years, they would reimburse up to $30,000 for

18 college.

19 Q    So what year did you do that?  Were you still in school at

20 that time?

21 A    No.  I started the academy in the fall of 2002 and then

22 graduated in the spring of 2003.

23 Q    And that was just after you graduated from college?

24 A    That's correct.

25 Q    And then after that did you get a job with the Portland

1  Police Department?

2  A    Yeah.  I was hired with Portland March 27th of 2003.

3  Q    So how long have you been there?

4  A    I just hit 11 years.

5  Q    What do you do for the Portland Police Department?

6  A    I still work patrol.  I work night-shift patrol.

7  Q    Are you married?

8  A    I am.

9  Q    What's your wife's name?

10  A    Cassandra.

11  Q    And what does she do?

12  A    She's also a police officer.  She currently works for the

13  Mounted Patrol Unit, so she rides horses.

14  Q    Okay.  And you and your wife have a child?

15  A    Yes.  Our son, Connor, was born -- he's just hit nine

16  months.

17  Q    Well, tell me a little bit about growing up in Kodiak.  Do

18  you ever go hunting with your father?

19  A    Yes.

20  Q    Could you tell me about that?

21  A    We've been on many deer hunts.  We went to the Brooks

22  Range in Northern Alaska on a sheep hunt once.  In Kodiak we

23  went goat hunting.  I was lucky enough to draw a road system

24  goat tag, so you could actually drive to the hunting area.  And

25  that was while I was in high school.

1  Q    Now, who would you hunt with besides your father?

2  A    The trip to Northern Alaska was with his friend, Tim

3  Quinton (ph).  We would go hunt with John Stein.  We did a fly-

4  in trip for deer.  That was actually when I shot my first deer,

5  and that trip was with John Stein.  And then for major game,

6  that's who I'd go hunt with, with my father.

7  Q    Okay.  And how about Mr. Pletnikoff?  He ever go with you?

8  A    Oh, yes.  Mr. Pletnikoff had a big fishing boat, so we'd

9  go out on his boat.  And there's at least two deer hunts that I

10  can recall that we went with him on his big boat.

11  Q    Okay.  Now, do you know -- during all those hunting trips,

12  did your father ever have a stainless-steel revolver?

13  A    No.

14  Q    Okay.  Do you know his weapons, his guns?

15  A    Uh-huh (affirmative).

16  Q    And did you -- you've probably had a lot of fire training

17  yourself.

18  A    That's correct.

19  Q    You know what a Smith & Wesson .44 Magnum revolver is?

20  A    Yes.

21  Q    Okay.  And did you ever see any in your father's

22  possession?

23  A    No.

24  Q    Okay.  Now let me -- what kind of handguns did your father

25  have?

WELLS - DIRECT

1  A    The -- he had a .44 Magnum, the Ruger, and then the other

2  handgun that he bought was -- I believe it's a .44-caliber

3  semiautomatic.

4  Q    Okay.  Did you ever see him use either one of those

5  weapons, those guns?

6  A    We'd go out and shoot the .44, but he bought the .45 after

7  I'd already -- had moved out of the house.  So I've never shot

8  that gun with him, and I don't know if it's ever been shot.

9  Q    Do you know where you got the .44 Ruger?

10  A    No.  I'm not sure where I got that gun from.

11  Q    Okay.  Let me show you what's been marked as Defense

12  Exhibit 182.  Do you see that on the screen?

13  A    Oh, sorry.  Yes.

14  Q    Do you recognize that?

15  A    I do.

16  Q    Okay.  Can you describe what it is?

17  A    It's my dad's .44 Magnum, his Ruger.  It's a blued large-

18  frame pistol, obviously, with wooden handles.

19  Q    And so you recognize that particular gun?

20  A    I do.

21  Q    That was your father's?

22  A    Yes.

23  Q    Okay.  Would he take that sometimes on hunting trips?

24  A    Yes, he and I both would.

25  Q    Okay.  And it's not something you used yourself too -- or

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 66 of 206
(720) 384-8078  attrans@sbcglobal.net

**WELLS - DIRECT**

1   you would take it --

2           MS. LOEFFLER:  Counsel, if you want to show it, I don't

3   object to it.

4           MR. CURTNER:  Oh, I'm sorry.  Let's move for admission

5   of Defense Exhibit DE-182.

6           THE COURT:  Will be received.

7       (Defendant's Exhibit DE-182 admitted)

8   BY MR. CURTNER:

9   Q   Okay, that's your dad's .44 Ruger?

10  A   That is correct.

11  Q   Now, did your dad also have some holsters?

12  A   He did.

13  Q   What kind of holsters did he have?

14  A   He had two large -- or large-frame revolver holsters.  I

15  believe they're Uncle Mike's.

16  Q   Okay.  Let me show you what's been marked as Defense

17  Exhibit 181.  You see that on your screen?

18          MS. LOEFFLER:  I have no objection to that either,

19  counsel.

20          MR. CURTNER:  Okay.

21          THE WITNESS:  I do.  I do now.

22          MR. CURTNER:  Okay, let's -- move for admission of

23  Defense Exhibit 181.

24          THE COURT:  It'll be received.

25      (Defendant's Exhibit DE-181 admitted)

WELLS - DIRECT

1  BY MR. CURTNER:

2  Q    Do you recognize those?

3  A    Yes.

4  Q    What are those?

5  A    Those appear to be his two black Uncle Mike's nylon

6  holsters.

7  Q    Okay.  Now, would that been one of the holsters that would

8  have held the .44 Ruger?

9  A    Correct.

10 Q    Now, if you put a .44 Ruger in, let's say, the holster on

11 the left in this picture, what would you see of that Ruger?

12 A    If the weapon was holstered, generally -- well, you'd

13 obviously see the -- the handle.  You'd see the wooden handles

14 protruding.  The strap is designed to go behind the hammer, so

15 you'd see the hammer exposed.  And then you'd see a little bit

16 of the rear portion of the gun exposed.

17 Q    Okay.  So you would definitely see the whole handle?

18 A    Correct.

19 Q    And your father's handle on his .44 Ruger was a brown

20 wooden handle?

21 A    That is correct.

22 Q    And it's always had a brown wooden handle?

23        MS. LOEFFLER:  Objection to the leading at this point,

24 Your Honor.

25        THE COURT:  Sustained.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 753  Filed 09/23/14  Page 68 of 206
(720) 384-8078  attrans@sbcglobal.net

1  BY MR. CURTNER:

2  Q    What kind of handle was on the .44?

3  A    A brown wooden handle, and to my knowledge --

4  Q    Did you ever see any other kind of handle on it?

5  A    No, that's the original handle from when he had the gun.

6  Q    And then -- now, if we go -- let's go back to 182.  So if

7  it was in that holster, everything in front of the hammer would

8  be inside the holster?

9  A    You probably would see a little bit of the rear end of the

10  gun, but how much, I couldn't say.  But the majority of that

11  handgun would be concealed by the holster.

12  Q    But you definitely would see all of the handle?

13  A    You would see the handle and you would see the hammer

14  protruding.

15  Q    And the hammer's silver?

16  A    Correct.

17  Q    Stainless.  Okay.  And that's the handgun that you and

18  your father would take if you were hunting anyplace that you

19  might need bear protection?

20  A    That is correct.

21  Q    Okay.  So you did this hunting when you were living at

22  home from 1990 through 1998?

23  A    That's correct.

24  Q    Did you go back during the summers and --

25  A    Yes, I would go back.

WELLS - DIRECT

1  Q    -- after you left for college?

2  A    I would go back and work for a moving company back home

3  during the summer.  And I maintained my residency in Alaska,

4  because I was a student at the time.  So I was able -- I may

5  have gone on a couple solo hunting trips, going back during the

6  summers, but I don't recall any with my dad.

7  Q    Okay.  So over the years you've had a number -- you've

8  been home quite a bit?

9  A    Yes.  I try to make it home once a year, at least.

10  Q    And did you ever see a stainless-steel revolver at your

11  dad's?

12  A    No.

13  Q    Now, did you know John Stein?

14  A    Yes.

15  Q    Tell me about John Stein.  What do you --

16  A    John Stein was a friend of my father's that lived in

17  Kodiak when we were -- moved back in 1990.  So we did a lot of

18  stuff with John, a lot of shooting, hunting, as I mentioned.

19  We'd go over to his house, reload ammo.  So a lot of -- a lot

20  of gun stuff with John.

21  Q    Okay.  You would shoot at the Kodiak Island

22  Sportsmanship -- Sportsman's Association?

23  A    That is correct.

24  Q    And who would go on those trips?

25  A    I would go, my brother would go, John would go, my dad

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 753  Filed 09/23/14  Page 70 of 206
(720) 384-8078  attrans@sbcglobal.net

**WELLS - DIRECT**

1  would go, and then some combination thereof.

2  Q    And what would you do at the range?

3  A    Just target practice.

4  Q    Okay.  And what kind of gun would you use there?

5  A    I remember shooting a lot -- John had a Ruger Mark II.  If

6  you're familiar, it's a little .22 target pistol with a thick

7  barrel.  It's a great gun for kids to shoot.  I don't

8  specifically recall any other guns actually being shot there.

9  I mean, obviously John had a lot of guns.

10 Q    Did he have a Thompson machine gun?

11 A    He did.

12 Q    Do you remember that?

13 A    Yes.

14 Q    Did you fire that?

15 A    Yes.  I would shoot at our house quite often.  That was

16 mainly the -- the gun that we would reload for, because it had

17 to shoot a specific .45 round.  You couldn't put standard

18 issue -- or not -- it had to shoot a specific ball ammo .45 out

19 of it.  It had to be reloaded.

20 Q    Okay.  So you would help reload all the bullets?

21 A    Uh-huh (affirmative).  Not all of them, but we would

22 help -- go to John's house and help reload.

23 Q    And how many would you go through in a afternoon, do you

24 think?

25 A    The one that stands out in my mind was Fourth of July.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 753  Filed 09/23/14  Page 71 of 206
(720) 384-8078  attrans@sbcglobal.net

1  I'm not sure which year it was, but it was when our house was

2  under construction, because we were shooting out the open

3  windows on the portion that was new.  And I think we loaded up

4  13 magazines full of -- of .45 ammo, and they're 30 -- 30-round

5  mags each.

6  Q   Okay.  And did you ever have a incident with that

7  Thompson?

8  A   That is the day that the incident happened.  It's a World-

9  War-II-issue Thompson machine gun, so it's not the tommy gun

10  that we're all familiar with with the big drum magazine from

11  the gangster movies.  This one was just the World-War-II issue.

12  It'd only take a straight magazine.  And we were firing it that

13  day enough that the barrel actually became unseated from the

14  receiver.  So when the bolt went forward, it -- it had an open

15  spot in the chamber.  The round cooked off, it blew out the

16  side of the casing, and then I had a powder burn probably from

17  my elbow down to my wrist because of the -- it was a left-

18  ejecting or -- gun, so I was basically holding it like this,

19  and got a nice powder burn down my arm for it.

20  Q   Okay.  Now, did Mr. Stein have a gun safe at your house,

21  at your parents' home?

22  A   I don't recall.  He had a gun safe.  I don't recall it

23  ever being at our house.

24  Q   Do you remember seeing it?

25  A   I remember seeing it at his house, yes.

1  Q    What'd you see in the gun safe?

2  A    Lots of guns.  I mean --

3  Q    What do you mean by lots?

4  A    The -- if you're familiar with gun safes, on the door they

5  usually have pockets that you can put revolvers in.  And the

6  times that the gun safe was open, there -- the door was lined

7  with pockets and there was just -- it seemed like every pocket

8  had a -- had a pistol in it.  He had rifles in it.

9  Q    Okay.  Now, you've been asked a number of times about

10 firearms that your father may have owned or possessed in the

11 home.  Is that right?

12 A    That is correct.

13 Q    And you've always been cooperative with the FBI?

14 A    That is correct.

15 Q    Did you give them a list of all the guns that you knew

16 your father had?

17        MS. LOEFFLER:  Objection.  Leading.

18        MR. CURTNER:  Tell me --

19        THE COURT:  Well, I don't know if that's leading,

20 but --

21 BY MR. CURTNER:

22 Q    Just tell us what they asked you about and how you

23 cooperated.

24 A    In my first initial interview with the FBI, it was a CGIS

25 agent that came and interviewed me at work, and I gave him a

**WELLS - DIRECT**

1  list of -- these are all the guns that my father owned.  The

2  only one that was -- he didn't have is a 7-millimeter rifle

3  that I had in my possession.  So I gave them a list, these are

4  all the guns that I know that my father owns.

5  Q    And did that list include a Smith & Wesson?

6  A    No.

7  Q    Did it include any kind of a stainless-steel revolver?

8  A    No.

9  Q    And you were cooperating and honestly giving them all the

10 guns that you knew your father had at the time you were growing

11 up in the home?

12 A    Yes.  I gave them every gun that I knew should have been

13 in the house.

14 Q    Did he ask you questions about a lot of ammunition at your

15 home, at your father's home?

16 A    Not during my initial interview.

17 Q    Okay.  Later on?

18 A    Yes.

19 Q    What did they ask you about?

20 A    They asked a lot about -- he'd had ammunition that he

21 didn't have weapons for.  There was 9-millimeter ammo there.  I

22 know there was -- I think some .243.  So I explained where a

23 lot of thing -- or a lot of that ammunition came from.

24 Q    Where did it come from?

25 A    The 9-millimeter ammo and the .223, which is a -- the

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 753  Filed 09/23/14  Page 74 of 206

1  standard ammo for an AR-15 rifle, came from me.  We get issued

2  a lot of ammo at work, so I would obviously take it and I'd

3  take it home.  We'd go and shoot, because I'd bring my pistols

4  or my rifle home with me, my AR-15, go and shoot, do some

5  target practice.  And then a lot of the other stuff came from

6  John Stein when he left Kodiak.

7  Q    So tell me about that.  When he left Kodiak, would he

8  leave some of his ammunition with your dad?

9            MS. LOEFFLER:  Objection.  Leading.

10           THE COURT:  Sustained.  If you know.

11 BY MR. CURTNER:

12 Q    Did they show lots of ammunition?

13 A    That's correct.

14 Q    And what was your impression about where that ammunition

15 came from?

16 A    That -- that --

17           MS. LOEFFLER:  Objection.  Lack of foundation.

18 BY MR. CURTNER:

19 Q    Now, you lived there.  You reloaded --

20 A    Correct.

21 Q    -- with Mr. Stein and your dad.

22 A    That is correct.

23 Q    You've seen all that ammunition?

24 A    Correct.

25 Q    Would it be fair to say your dad --

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 753  Filed 09/23/14  Page 75 of 206
(720) 384-8078  attrans@sbcglobal.net

1          MS. LOEFFLER:  Objection.  Leading.

2          THE COURT:  Sustained.

3     BY MR. CURTNER:

4     Q    Did people ever leave Kodiak and perhaps leave things with

5     your father?

6     A    Well, the ammunition that I am aware of that was there and

7     the reloading equipment came from John Stein when he left

8     Kodiak.

9     Q    And was your father the kind of person that would keep

10    anything that might be useful sometime in the future?

11    A    That is very correct.

12    Q    Okay.  That's not unusual?

13    A    No, that is not unusual.

14    Q    And so -- now, when you were interviewed, did you tell the

15    FBI or the investigators about Mr. Stein?

16    A    Yes.  I came up during the grand jury proceeding.

17    Q    Okay.  And you told them that Mr. Stein had some -- what

18    did you tell them about Mr. Stein?

19    A    Well, that was -- the question was where did all this

20    stuff come from.  And I explained the relationship with John

21    Stein and that all this stuff had been from Mr. Stein when he

22    left, and that explained why he had all this ammunition that

23    didn't fit the guns that he currently owned.

24    Q    Okay.  And did he also ask you about friends you had in

25    high school that you might have --

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 753  Filed 09/23/14  Page 76 of 206
(720) 384-8078  attrans@sbcglobal.net

1  A    In a later interview, yes.

2  Q    And so did you tell them all the friends you had in high

3  school?

4  A    The ones that were relevant, yes, that I might have -- may

5  or -- have gone hunting with.

6  Q    How many names did you give them?

7  A    I gave them a friend of mine, Jeremiah Johnson, and then

8  Luke Robinson, whose name -- I couldn't -- last name I couldn't

9  remember at the time, but they correctly found the right

10 person.

11 Q    Okay.  That was Luke Robinson?

12 A    That is correct.

13 Q    And you provided that name to them?

14 A    That is correct.

15 Q    Because you were cooperating and providing the information

16 you could?

17 A    Yes.

18 Q    Now, while you were in the home, did your father ever

19 raise a hand to you or your siblings?

20 A    No.

21 Q    Was he ever violent at all?

22 A    No.

23 Q    Did you ever see him violent?

24 A    No.

25 Q    And, Mr. Wells, you're a police officer, you're under

1  oath.  Did you ever see your father with a stainless-steel

2  revolver?

3  A    Never in my life.

4  Q    Thank you.

5        THE COURT:  Cross-examination.

6        MS. LOEFFLER:  Yeah.

7                      **CROSS-EXAMINATION**

8  BY MS. LOEFFLER:

9  Q    Mr. Wells, Mr. Curtner just asked you about your father's

10 temperament.  But in the grand jury, one of the grand jurors

11 asked you about your father's temperament --

12 A    Correct.

13 Q    -- also.  Right?

14 A    Uh-huh (affirmative).

15 Q    And did you tell them that you're kind of quick-tempered

16 and he's quick-tempered?

17 A    I draw a distinction between being a violent person and

18 being quick-tempered, but yes, that's what I testified to.

19 Q    Okay.  I mean, is that true?  You're quick-tempered and

20 he's quick-tempered?

21 A    I can be, yes.

22 Q    Okay.  How about your father?

23 A    Yes.

24 Q    Okay.  Now, with regard to the -- Mr. Stein --

25 A    Uh-huh (affirmative).

1  Q    -- when he left, did he stay with your parents?

2  A    I don't recall him staying at the house.  I'm aware that

3  he did, but I don't -- like I said, I don't have any memory of

4  him being at the house.

5  Q    Okay.  You're aware that he did, but you have no memory of

6  it?

7  A    That's correct.

8  Q    And you also said, I guess, repeatedly, that the safe

9  could have been there but you just don't recall.  Isn't that --

10 A    Yeah.

11 Q    -- the case?

12 A    I've tried to picture where the safe was, and I -- I can't

13 draw a mental image of it being in the sunroom.

14 Q    Okay.  But you don't remember -- I mean, I assume you

15 answered when the officer -- when the agents asked you a number

16 of times, you said, "Don't remember it.  Could have been

17 there."  Right?

18 A    I don't think that's exactly how I phrased things, but

19 that would be the gist of it.

20 Q    Okay.  Now let's pull up Exhibit -- I think it's 232A,

21 which has been admitted.  Okay.  And if you can expand

22 paragraph 2.  Well, before we do that, Mr. Wells, this is a

23 letter dated 21 August 1997.  And I take it that your memory

24 from, I don't know, 15 years ago -- maybe I have my math

25 wrong -- or more -- is likely to be more vague than something

1  that was written at the time.

2  A    That would be a fair assumption, yes.

3  Q    Okay.  Let's pull up paragraph 2.  This is a letter

4  from -- it's been admitted -- from Mr. Stein that says, "In

5  June of 1996, I rented out my house, I put most of my household

6  goods in storage.  I decided to leave my gun safe and the guns

7  with a friend, who was provided the combination to the safe."

8  Do you see that?

9  A    Uh-huh (affirmative).

10  Q    Okay.  And the friend that Mr. Stein -- if the friend that

11  Mr. Stein is talking about is Mr. Wells, your father, would

12  that surprise you at all?

13  A    No, it doesn't surprise me.

14  Q    Okay.  And his -- I -- just out of common sense, something

15  he wrote in '97 would probably be more accurate than a memory

16  from 15, 20 years ago?

17  A    Yes.

18  Q    Okay.  Now -- and Mr. Robinson -- Luke Robinson was the

19  name -- that was a friend of yours.  Right?

20  A    That is correct.

21  Q    Okay.  And somebody that cared a lot about your family?

22  A    Well, I couldn't -- I would assume so, but I'm not going

23  to --

24  Q    Yeah --

25  A    -- testify to that.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 80 of 206
(720) 384-8078  attrans@sbcglobal.net

1  Q   So if he saw a silver revolver in the home, would you have

2  any reason to doubt him?

3  A   I can't testify as to what he saw or why he saw or why he

4  would have --

5  Q   That's fine.  That's all I have.  Thank you, Mr. Wells.

6  A   Uh-huh (affirmative).

7        THE COURT:  Redirect.

8                    **REDIRECT EXAMINATION**

9  BY MR. CURTNER:

10  Q   If Luke Robinson were at your family home, you would have

11  been there with him.  Is that correct?

12  A   Yeah.  I can't imagine a circumstance where he would have

13  been there without me.

14  Q   And whenever he was at your home, you -- there was never

15  a -- to your memory -- to your knowledge, there was never a

16  stainless-steel revolver there?

17  A   That is correct.

18  Q   Okay.  Thank you.

19        THE COURT:  Recross.

20        MS. LOEFFLER:  Quickly.

21                    **RECROSS EXAMINATION**

22  BY MS. LOEFFLER:

23  Q   How many stainless-steel revolvers did Mr. Stein have?

24  A   I couldn't tell you.

25  Q   You don't know what he had, because he had tons of

1  weapons, right?

2  A    Yeah.  Correct.  He had a lot of guns.

3  Q    And they were pretty important to him?  I mean, his gun

4  collection was a pretty big deal to him, wasn't it?

5  A    Oh, I couldn't testify to how -- the personal value of his

6  firearms to him.

7  Q    Okay.  Thank you.

8         MR. CURTNER:  None.

9         THE COURT:  All right, thank you, sir.  You're excused.

10        THE WITNESS:  Thank you, Your Honor.

11     (Witness excused)

12        THE COURT:  Let's take a recess, 15-minute recess.

13     (Jury not present)

14        THE COURT:  Okay.  Please be seated.  All right, Mr.

15  Curtner, your plans now?

16        MR. CURTNER:  What's that?

17        THE COURT:  What is your plan now?

18        MR. CURTNER:  I got 10 more on my list.  I think that

19  they will all be here today.  They're all short.

20        THE COURT:  Okay.  What I'm wondering about is Mr.

21  Brennick.  How's that going?

22        MR. CURTNER:  (Indiscernible) -- I don't know.

23     (Side conversation)

24        MR. CURTNER:  I guess he has civilian clothes.

25        MS. LOEFFLER:  (Indiscernible).

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 753  Filed 09/23/14  Page 82 of 206

1          THE COURT:  Okay.  Do you want to do it right after the

2   break, take him right after the break?

3          MR. CURTNER:  Sure.  Yeah, that would be best.

4          THE COURT:  Yeah, I think that would be the convenient

5   way to do it.  We can just have him seated in the witness box

6   when the jury comes back.  That way he can come in as you feel

7   comfortable to get him here.  And there should be a -- no

8   problem.  Anything else that the parties are concerned about?

9          MR. OFFENBECHER:  Just one other brief housekeeping

10  matter, Your Honor.  And then I don't know if you want to

11  discuss this now.  But I just noticed, reviewing the

12  instructions last night, two friendly amendments to what the

13  Court has.  And I just thought I'd put those out there --

14         THE COURT:  Sure.

15         MR. OFFENBECHER:  -- in plenty of time.  First, I did

16  not see, and maybe I just missed it, a presumption of innocence

17  instruction in the end-of-trial instruction.

18         THE COURT:  It's there.

19         MR. OFFENBECHER:  Okay, good.

20         THE COURT:  I give it at the beginning and I give it at

21  the end.

22         MR. OFFENBECHER:  Perfect.  And then with respect to

23  the third-party culpability instruction, which is good --

24         THE COURT:  I've redrafted it, so it may -- I've

25  already redrafted it.

1           MR. OFFENBECHER:  Oh, okay.  Well, may -- we'll just

2  take a look at it, then.

3           THE COURT:  Okay.

4           MR. OFFENBECHER:  I was just -- my editorial suggestion

5  was instead of the use of the term "third party," that the

6  Court simply use the term "another person."

7           THE COURT:  I redrafted it and used "another person,"

8  frankly.

9           MR. OFFENBECHER:  Great.

10          THE COURT:  But you haven't seen my draft yet, but I

11  just did it over the weekend and --

12          MR. OFFENBECHER:  Okay.

13          THE COURT:  So I want to make sure that we get Mr.

14  Brennick in here.  We -- we'll take 15 minutes from now.

15  Everybody get comfortable.  But I want him in the -- where's

16  the Marshal -- in the witness box, seated, and we want to make

17  sure we can see him before we bring the jury in, to make sure

18  everybody's comfortable with that.  Okay?  Ruth, you got more

19  notes, or not?

20          UNIDENTIFIED SPEAKER:  No.

21          THE COURT:  Okay.  We'll take 15 minutes.  Thank you.

22          THE CLERK:  All rise.  Matter stands in a 15-minute

23  recess.

24      (Court recessed at 9:58 a.m., until 10:15 a.m.)

25      (Jury not present)

1          THE CLERK:  All rise.  His Honor the Court, the United

2   States District Court is again in session.

3          THE COURT:  All right, please --

4          THE CLERK:  Please be seated.

5          THE COURT:  -- be seated.  Okay.  We've got Mr.

6   Brennick.  That's you, sir?

7          MR. BRENNICK:  Yes, sir.

8          THE COURT:  Okay.  We got Mr. Brennick in the jury box.

9   I checked myself, my clerked checked; his shackles are not

10  visible.  So we did that.  Anything else you want us to do?

11         MS. LOEFFLER:  No, (indiscernible).

12         THE COURT:  There's an issue that we -- I always think

13  about it when I get home at night.  Have you resolved the issue

14  about the -- what's the issue that you had -- you were going to

15  talk among yourself and resolve, and you keep saying you're

16  going to talk among yourselves and resolve it, but no one's

17  told me you've resolved it.  And I always think about it when I

18  get home, and now I've forgotten what --

19         MS. LOEFFLER:  I'm sorry, Your Honor, I don't --

20         THE COURT:  Oh, come on.

21         MS. LOEFFLER:  I can't remember.  I don't know --

22         THE COURT:  You were going to talk about it, you're

23  going to work it out.  It was having to bring the doctor back

24  or not.

25         MR. OFFENBECHER:  Motion for prejudgment of acquittal,

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 753  Filed 09/23/14  Page 85 of 206
(720) 384-8078  attrans@sbcglobal.net

1    I think.

2         MS. LOEFFLER:  Oh, I think we're bringing the doctor

3    back for, you know, a minute.

4         THE COURT:  Okay.  That's all I wanted to know.

5         MS. LOEFFLER:  Oh, yes.

6         MR. OFFENBECHER:  Your Honor, you also haven't ruled on

7    the motion to strike 171.

8         THE COURT:  Well, I've got that in draft form.

9         MR. OFFENBECHER:  Okay.

10        THE COURT:  Okay.  All right.  Sir, what's going to

11   happen is we're going to bring the jury in.  You can stand.

12   Everyone's going to stand when they get here.  Then I'll swear

13   you in, and then we'll -- each party will have a few questions

14   for you.  Okay?

15        MR. BRENNICK:  Okay.

16        THE COURT:  All right.  Mr. Curtner, you said you had

17   someone else here from your office?

18        MR. CURTNER:  He -- Lars Johnson is from the State

19   Public --

20        THE COURT:  Okay.

21        MR. CURTNER:  -- Defender Office.

22        THE COURT:  Good.  Good.  Just for the record, he's

23   here.  Welcome, sir.

24      (Jury present)

25        THE COURT:  Okay.  We've got everyone back.  Mr.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 753  Filed 09/23/14  Page 86 of 206
(720) 384-8078  attrans@sbcglobal.net

**BRENNICK - DIRECT**

1  Brennick, if you'd remain standing for a second.  Everybody

2  else can be seated.  And my clerk will swear you in.  She's

3  right over here.

4          THE CLERK:  Please raise your right hand.

5          **CASEY BRENNICK, DEFENDANT'S WITNESS, SWORN**

6          THE CLERK:  Okay, thank you.  Please have a seat.  And,

7  sir, if you can please state and spell your full name.

8          THE WITNESS:  Casey Brennick.  C-a-s-e-y, B-r-e-n-n-i-

9  c-k.

10          THE CLERK:  Thank you.

11          THE COURT:  Okay, counsel.

12          MR. CURTNER:  Thank you.

13                    **DIRECT EXAMINATION**

14  BY MR. CURTNER:

15  Q    Mr. Brennick, were you on Kodiak Island in April of 2012?

16  A    Yes.

17  Q    Okay.  Do you know Travis Biocic?

18  A    Yes.  He's a good friend of mine.

19  Q    All right.  You know Everett Grass?

20  A    Yes, sir.  He's another good friend of mine.

21  Q    And how long have you three guys been good friends, do you

22  think?

23  A    Ever since middle school.

24  Q    Okay.  So you guys grew up through middle school, high

25  school, and how old are you now?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 753  Filed 09/23/14  Page 87 of 206
(720) 384-8078  attrans@sbcglobal.net

1  A    Twenty-three.

2  Q    And those guys are about the same age?

3  A    Yeah, they're a little bit older than me.

4  Q    And so you guys have been friends all these years?

5  A    Yes, sir.

6  Q    Do you remember where Travis was living back in -- when

7  you knew him, when you knew -- back on the island?

8  A    He was living out at Anton, the little farm out there.

9  Q    Okay.  Tell me a little bit about that place.

10 A    It's just pretty much out in the middle of nowhere.  We'd

11 go out there all the time, hang out, and go out hunting and

12 whatnot.  So --

13 Q    Now, out there where?  Now, just describe as how you would

14 go there from the City of Kodiak.

15 A    You'd go past the airport and then you'd take a right, and

16 then go past the -- go past the Coast Guard base, and then go

17 past the golf course.  And then you'd go all the away up past

18 the ski chalet and all the way out to the end of the road.

19 Q    Okay.  And has that got a name?

20 A    What's that?

21 Q    The place where Travis lived.

22 A    I -- I just call it Anton Larsen.

23 Q    Okay.  Do you know it as the Ranch at all, or --

24 A    No.

25 Q    Okay.  So as I understand it, you would come out from

Case 3:13-cr-00008-SLG  Document 753  Filed 09/23/14  Page 88 of 206

**BRENNICK - DIRECT**

1  Kodiak on Rezanof Drive?

2  A    Yes.

3  Q    And then turn right.  What's the road you turn right on?

4  A    I do not know.

5  Q    Okay.  It'll be Anton Larsen Bay Road?

6  A    Yeah, I believe so.

7  Q    It goes out to Anton Larsen Bay.  Right?

8  A    Yeah.

9  Q    And then it goes -- you said the Coast Guard base.  You --

10 do you know the communications station out here, it's called

11 COMMSTA?  COMMSTA?

12 A    No, I don't.  I -- I just call it Coast Guard base,

13 because that's where all the MilPol and everything, so --

14 Q    Where was it?

15 A    Military police.

16 Q    All right, that station on Anton Larsen Bay Road?

17 A    Yes.

18 Q    So you -- you've driven by it.  How many times do you

19 think you've driven by that?

20 A    A couple of hundred.

21 Q    Okay.  And so did you drive by that, then the -- and then

22 the golf course?

23 A    Yes, Your Honor.

24 Q    Okay.  And then out to where Travis lived?

25 A    Yes, sir.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 89 of 206
(720) 384-8078  attrans@sbcglobal.net

1  Q    So did you and Travis and Everett -- you guys spend a lot

2  of time out there, like, in summers?

3  A    Oh, yeah.  Yeah.

4  Q    And hunting?

5  A    Yeah, we got out there and stay the night out at his house

6  or stay a couple weeks and just hang out and have fun.

7  Q    Shooting?

8  A    Yeah, go out hunting and fishing, all that stuff.

9  Q    Okay.  Where would you fish?

10 A    We'd go fishing by the -- right by the boat ramps, over

11 there.

12 Q    In Larsen -- Anton Larsen Bay.

13 A    Yeah.

14 Q    Okay.  And then would you just shoot guns too?

15 A    Yeah.  We'd go out shooting.

16 Q    Okay.  Do that a lot at targets, or what did you shoot at?

17 A    Yeah, we -- we shot --

18         MS. LOEFFLER:  I'm going to object to the lead --

19         THE WITNESS:  -- at a lot of targets.

20         MS. LOEFFLER:  If I may, Your Honor, I'll just object

21 to the leading at this time --

22         THE COURT:  Sustained.

23         MS. LOEFFLER:  -- and ask --

24         THE COURT:  Sustained.

25 BY MR. CURTNER:

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 753  Filed 09/23/14  Page 90 of 206
(720) 384-8078  attrans@sbcglobal.net

**BRENNICK - DIRECT**

1  Q   What would you shoot at?

2  A   We'd go shooting at targets that we'd bring out.  We'd go

3  buy targets at Wal-Mart and then go shooting.

4  Q   What kind of guns?

5  A   All kinds of guns, like rifles, pistols.  I mean, you name

6  it, whatever we had, we used, you know.

7  Q   Okay.  Do you remember what kind of pistols?

8  A   No, I don't.  Don't remember.

9  Q   Okay.  How many different pistols do you think you guys

10  might have shot out there?

11  A   About five or six, mainly rifles.  We'd go out deer

12  hunting most of the time, so it's rifles, shotguns.  Only had a

13  couple of pistols, you know.  So --

14  Q   Now, do you remember April 12th of 2012?

15  A   No, I don't.

16  Q   You don't remember that date?

17  A   Well, I -- I don't remember specifically.

18  Q   You don't remember anything about that day?

19  A   Like, not -- not really.  Not to my full knowledge.

20  Q   What do you mean, not to your full knowledge?

21  A   Like, not that I remember.  I mean --

22  Q   Where were you that day?

23  A   Where was I that day?

24  Q   Yeah.

25  A   Like I say, I don't remember.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 91 of 206
(720) 384-8078  attrans@sbcglobal.net

1 Q   Where were you the night before?

2 A   Could have been out -- or it could have been at a party

3 with my -- at my sister's house.

4 Q   Who's your sister?

5 A   Mandy Smith.

6 Q   Where does she live?

7 A   She live -- she lived on 610 Mill Bay Drive.

8 Q   Okay.  And that's in town, in Kodiak?

9 A   Yeah.

10 Q   So what do you remember -- what do you think you remember?

11 A   We were probably -- I believe that was the day we were

12 having a party, all of us, all my friends and my nieces and --

13 just bunch of friends getting together at my sister's house,

14 having a good time.

15 Q   Was there an occasion for the party?  Was it somebody's

16 birthday, or what?

17 A   No, just -- just get-together.

18 Q   And who was there?

19 A   I don't remember who was all there.  I know Everett,

20 Travis, Matt Reed (ph), Hannah, Erin, my niece Tina, and

21 that's -- that's all I could remember who was there.

22 Q   Walter?  Was Walter Fretz (ph) there?

23 A   No.  I don't believe so.  I don't know Walter Fretz.

24 Q   So do you remember that party, then?

25 A   A little bit.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 753  Filed 09/23/14  Page 92 of 206
(720) 384-8078  attrans@sbcglobal.net

1   Q    Okay.  And that was the night before April 12th?

2   A    To be exact, I don't know.

3   Q    You don't know.

4   A    Yeah.  I'm not sure.

5   Q    Now, you -- you've talked about this before.  Right?

6   A    Yeah.

7   Q    Okay.  Do you recall -- when was the first time anybody

8   asked you what you were doing that night?

9   A    What do you mean?

10  Q    Do you remember talking to one of the agents that's in

11  court today?

12  A    Yeah.  Yeah.

13  Q    Who'd you talk to?

14  A    Talked to you.

15  Q    No, I'm not an agent.  I'm a lawyer.

16  A    There -- I -- I don't really remember.

17  Q    Okay.  Do you notice -- recognize anybody here you may

18  have talked to back in September of 2013?

19  A    I believe this gentleman right here.

20  Q    Are you referring to Mr. Allison, at the end of this

21  table?

22  A    Yes, sir.

23  Q    Okay.  What do you recall about that conversation?

24  A    I believe it was about a weapon that I had tried to sell

25  in the past.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 93 of 206
(720) 384-8078  attrans@sbcglobal.net

1  Q    Now, do you remember the date of that conversation?

2  A    No, Your Honor.  No, sir.

3         MS. LOEFFLER:  Your Honor, I'm going to object if we're

4  trying to refresh recollection or impeach.  You first have to

5  ask the questions about what he remembers now.  And I think

6  we're just going to statements for some reason.  We haven't set

7  any foundation.

8         THE COURT:  Okay.

9  BY MR. CURTNER:

10 Q    Okay, you remember the conversation?

11 A    Yeah.

12 Q    Okay.  A -- a little bit.

13        THE COURT:  Okay, we're talking about the conversation

14 with the agent.

15        MR. CURTNER:  Yes.

16        MS. LOEFFLER:  I guess I'd -- I'd object to foundation.

17 You have to ask him what he knows now first before you're

18 trying to --

19        THE COURT:  I understand that.

20        MS. LOEFFLER:  And that's my objection.

21 BY MR. CURTNER:

22 Q    What do you remember now about that conversation?

23 A    He came and asked me about a gun that I tried to sell, and

24 I told him everything about it, that I tried to sell it to a

25 buddy.  And he didn't end up wanting it, so then I didn't sell

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 753  Filed 09/23/14  Page 94 of 206

**BRENNICK - DIRECT**

1  the gun.  It was my father's ri -- or pistol.  And then he

2  didn't want it, so I ended up not selling it.  And I told him

3  the whole story about it, and then they went and checked it

4  down in Washington --

5  Q    Mr. Brennick, do you rem -- I'm asking you about the

6  conversation.  Do you remember anything else about that

7  conversation you had with Agent Allison?

8  A    No, I don't.

9  Q    Do you remember talking about the party at all?

10 A    No.  I don't.

11 Q    Do you remember telling the agent what type of gun you

12 were trying to sell?

13 A    Yes.  Yeah --

14 Q    What --

15 A    -- it was a -- a State of Alaska, the Fiftieth Anniversary

16 .45, I believe.

17 Q    A .45?

18 A    Yeah.

19 Q    Okay.  Do you remember -- I'm sorry, you don't remember

20 anything -- talking about the party?

21 A    No.

22 Q    Okay.  Let me try to refresh your memory.

23       (Side conversation)

24 Q    This --

25            MS. LOEFFLER:  I'm sorry, counsel, can you give me a

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 95 of 206
(720) 384-8078   attrans@sbcglobal.net

1 page number on --

2          MR. CURTNER:  We're going to start at page 2.  It's

3 defense Bates stamp 6377.

4          MS. LOEFFLER:  I'm there.  I don't --

5          MR. CURTNER:  It should be on your screen, Mr.

6 Brennick.

7          MS. LOEFFLER:  I don't see anything about a party on

8 this.

9          MR. CURTNER:  Oh, we'll get there.

10          MS. LOEFFLER:  Well, I just asked about the party, Your

11 Honor.  I don't -- I object to trying to impeach him with a

12 part -- which doesn't -- well, I'll wait and see what the

13 question is --

14          THE COURT:  Okay.

15          MS. LOEFFLER:  -- the foundation is.

16 BY MR. CURTNER:

17 Q    Have you talked about this conversation since that date

18 with FBI agents or Coast Guard investigators?

19 A    What -- what was that?

20 Q    Have you had a chance to listen to that interview when you

21 were interviewed, or have you looked at a transcript of what

22 you said on that day?

23 A    No.

24 Q    Okay.  Well, look at the -- just to refresh your memory,

25 just read that first paragraph to yourself --

**BRENNICK - DIRECT**

1          MS. LOEFFLER:  Which paragraph on what page, counsel?

2          MR. CURTNER:  This is the top of page 2, where it's

3    Special Agent Allison giving the date and time.

4          MS. LOEFFLER:  Okay.

5    BY MR. CURTNER:

6    Q    Have you read that first paragraph?

7    A    Yes, Your -- yes, sir.

8    Q    Okay.  And it's -- the date on it is?

9    A    The date is September 4th, 2013.

10   Q    Okay.  And it's -- who's doing the questioning?

11   A    Special Agent Allison.

12   Q    And it's a recorded interview of you.  Right?

13   A    Yes, sir.

14   Q    Okay.  And, now, was this the first time anybody asked you

15   about what happened on April 12th, 2012?

16   A    Yes, sir.

17   Q    Okay.  Now, if you go down later, down that page, do you

18   recall what -- how this conversation came up with the gun?

19         MS. LOEFFLER:  Your Honor, I'm going to object to going

20   into this.  There's nothing inconsistent with what the witness

21   just said.  And I think it's improper to try to impeach him if

22   it's consistent.  So --

23         MR. CURTNER:  I'm just trying to refresh his memory.

24   Let me ask you, Mr. Brennick --

25         MS. LOEFFLER:  (Indiscernible).

1  BY MR. CURTNER:

2  Q    -- do you remember how this topic of the gun came up?

3  A    No, I don't.

4  Q    Okay.  Read that and see if that helps you, the rest of

5  that page.

6       (Pause)

7  A    Okay.

8  Q    Okay.  So do you recall what Agent Allison was

9  investigating when he talked to you?

10 A    Marco DeCastro.

11 Q    Up above that, what was he investigating?

12 A    The double homicide --

13 Q    And --

14 A    -- that occurred on the Coast Guard base.

15 Q    And he asked you back then if you recall April of 2012.

16 Right?

17 A    Yes.

18 Q    Then he brought up the name of Marco DeCastro.  Now, who

19 is that?

20 A    That was a friend of mine.

21 Q    And what did the trooper tell you about Mr. DeCastro?

22      MS. LOEFFLER:  I can object again.  No foundation.  I

23 don't have a problem if he asks what his knowledge is, but he's

24 just asking him what the transcript is.  I mean, you can use it

25 to reflect -- fresh, you can use it to impeach, but you got to

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 753  Filed 09/23/14  Page 98 of 206
(720) 384-8078  attrans@sbcglobal.net

**BRENNICK - DIRECT**

1  ask him the questions first.

2        MR. CURTNER:  Why was --

3        MS. LOEFFLER:  What his knowledge is.

4  BY MR. CURTNER:

5  Q    Why was the agent asking you about Mr. DeCastro?

6  A    About the double homicide on the Coast Guard base.

7  Q    Well, how did Mr. DeCastro come up?

8  A    Because he was arrested, from what it says.

9  Q    Arrested about that time?

10 A    Yeah.

11 Q    And why was he asking you about Mr. DeCastro?

12       THE COURT:  Seems to me that --

13       MS. LOEFFLER:  Okay.

14       THE COURT:  -- you have to go to the next page,

15 you're --

16       MR. CURTNER:  Okay, go to -- I'm sorry.  Go to page 3.

17 BY MR. CURTNER:

18 Q    You can read that, if it helps refresh your memory,

19 because this is a transcript of you in that conversation,

20 right?  That's yours --

21 A    Yeah, because I'm having a hard time remembering.

22 Q    Yeah, this will help you.

23 A    Okay.

24 Q    Okay, so how did Mr. DeCastro become part of this

25 conversation?

1   A    About the gun?

2   Q    Yes.

3   A    He asked me if I had a weapon for sale.

4   Q    Who did?

5   A    Marco DeCastro.  And I told him I might, and -- and I

6   texted him back, saying that I had my -- one of my dad's guns

7   for sale, because I was trying to make some money at the time

8   to get diapers and wipes and whatnot.  And he -- he asked me

9   how much I wanted it -- wanted to sell it for, and I asked him

10  for -- I believe it was, like, five, six hundred bucks.  And he

11  said it was too much at the time.  And didn't end up selling

12  the gun to him or anything.

13  Q    Now, was there a text message?  Do you remember talking

14  about a text message on the phone?

15  A    Well, no, not that I remember.  But, yeah, it says in

16  here.

17  Q    Text message from whom?  The text was from you.  Is that

18  right?

19  A    Yeah.  Yeah.

20  Q    To Marco DeCastro?

21  A    Yeah.

22  Q    And the text message, did you -- did they show you the

23  text message?

24  A    No.

25  Q    Did they ask you if the text message was about you trying

1  to sell the gun to DeCastro.  Right?

2  A    Yeah.

3  Q    And, now, if you look at the bottom of page 3 that's in

4  front of you, very -- at the bottom, does it say what Magnum --

5  what caliber?

6  A    .44 Magnum.

7  Q    Hmm?

8  A    A .44 Magnum.

9  Q    So you recall it was a .44 Magnum, not a .45.  Right?

10  A    Yeah, I suppose.

11  Q    Okay.  Now if you go to the next page, was -- that would

12  be page 4.  Do you see the -- just the top paragraph?

13  A    Yeah.

14  Q    You talk about the .44 Magnum, right?

15  A    Yes, sir.

16  Q    And then at that time what do you -- what were you asking

17  for?

18  A    Believe $800 and some dope.

19  Q    Okay.  For -- what was the other offer you were making?

20  A    And a couple hundred bucks in cash.

21  Q    With -- a couple hundred bucks in cash because -- $800

22  worth of what?

23  A    Says $800 and some dope.

24  Q    So you were trying to get either $800 and some dope or

25  $800 worth of dope and a couple hundred dollars cash.  Right?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 101 of 206
(720) 384-8078  attrans@sbcglobal.net

BRENNICK - DIRECT

1   A    Yes.

2   Q    Okay.  And when you were asked about this .44 Magnum, you

3   told them, "I truthfully don't know."  Right?  Do you remember

4   that?  Look at the bottom of that page.

5        MS. LOEFFLER:  Your Honor, I'm going to object.  I

6   think that's misleading.  If you go through the whole

7   transcript, I think you'll hear he told exactly what he said

8   here.  So I --

9        MR. CURTNER:  Your Honor, we can go through it, but

10  about six or seven times Mr. Brennick says, "I truthfully don't

11  know."

12       MS. LOEFFLER:  Oh, that's okay.  Ask him the question.

13  We're just reading transcript parts without asking him the

14  question first.

15  BY MR. CURTNER:

16  Q    You remember the agent asking you about a .44 Magnum.

17  Right?

18  A    Yes.

19  Q    And then what did you tell him -- when he was asking you

20  about this, if you ever owned one, what did you tell him at the

21  bottom -- at line 24, on the bottom of page 4?

22  A    "To my knowledge, I truthfully don't know."

23  Q    Okay.  Now if you go to page 5.  What is the next thing

24  you said?

25       MS. LOEFFLER:  Your Honor, I'm going to object.  This

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 102 of 206
(720) 384-8078   attrans@sbcglobal.net

1  is a completely different topic.  And again, you got to ask him

2  what he knows now and not just try to --

3        THE COURT:  Sustained.  Sustained.

4        MS. LOEFFLER:  Okay.

5  BY MR. CURTNER:

6  Q   Do you remember, right after that question about the gun,

7  you talking about Hannah?

8        MS. LOEFFLER:  And I object, Your Honor.

9        THE COURT:  Sustained.  This moves to a different

10  subject.  So he can ask him about this new subject.

11  BY MR. CURTNER:

12  Q   Okay, let me ask you about a new subject.  Hannah at the

13  party.  Do you remember that?

14  A   Yeah.

15  Q   Do you remember what you said?

16        MS. LOEFFLER:  Your Honor, I think you have to ask him

17  what he knows, not just the state -- he's going -- just trying

18  to read a statement.

19        THE COURT:  All right, ask the questions, and if it

20  requires refreshing, then you can go to the refreshing part.

21  BY MR. CURTNER:

22  Q   You remember Hannah Belisle being at the party the night

23  before the double homicide at your house?

24  A   Yes.

25  Q   Okay.  And do you remember where that was?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 103 of 206

1   A    It was on 610 Mill Bay.

2   Q    And you remember that that was the night of -- the night

3   before the homicide.  You remember that.  Right?

4   A    Yes.

5   Q    Okay.  And who was there?

6   A    There was me, Hannah, Everett, Matt, Travis, Erin Smith,

7   Tina Smith, and I believe that was it.

8   Q    Okay.  And what did you tell them at that time about the

9   party and Hannah?

10  A    I don't remember what I told them.  I -- I know that we

11  were -- involved drinking and smoking weed and having a good

12  time.  She was getting a tattoo of shooting stars, and that was

13  about it.

14  Q    Okay.  And do you remember that she -- you telling them

15  that she was there all night?

16  A    Yeah.

17  Q    Until when?

18  A    Till morningtime, and then she left.

19  Q    Do you remember why she left?

20  A    I -- I don't know.  She left, and then she wasn't

21  answering the phone for my niece or anybody.  And then she

22  finally told my niece that her dad had gotten shot and she

23  didn't want to talk to anybody at that time.

24  Q    Do you remember saying that she freaked out when she was

25  at the party the next -- that morning, then left?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 104 of 206
(720) 384-8078   attrans@sbcglobal.net

1          MS. LOEFFLER:  Counsel, what page, what --

2          THE WITNESS:  No.

3    BY MR. CURTNER:

4    Q    You don't remember saying that?

5    A    No.

6    Q    Okay.  Do you remember the agent then going back about the

7    gun, asking you about the gun again.  Right?

8    A    Yeah.

9    Q    And do you remember him saying it was a pretty specific

10   description --

11         MS. LOEFFLER:  Objection, Your Honor.  Again, he's got

12   to ask the question, not just read transcripts.

13         THE COURT:  Sustained.

14   BY MR. CURTNER:

15   Q    Do you recall exactly what type of gun the agent was

16   looking for when he talked to you on September 4th, 2013 that

17   was reflected in the text that you sent?

18   A    All I remember is that it was a State of Alaska Fiftieth

19   Anniversary pistol.  And that's all I remember.  It was in a

20   case with a knife and a -- that's about it.

21   Q    Now if you look at page 8 of your interview, then.  Can

22   you go there?  If you go down to the middle -- line 12, do you

23   remember what that gun was -- how it was described?

24   A    To the middle line?

25   Q    Yeah.  What were they looking for?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 105 of 206
(720) 384-8078  attrans@sbcglobal.net

1  A    A .44 Magnum Smith & Wesson stainless-steel 629.

2  Q    And that's what you were trying to sell in your text

3  message.  Right?

4  A    I -- I don't know.  That's -- I mean, when I tried selling

5  it, I told them it was in a case and a -- a State of Alaska

6  pistol.

7  Q    But the text message says specifically -- they asked you

8  about this.  It was specific.  A .44 Magnum Smith & Wesson 629,

9  stainless steel.  That's what they asked you about.  Right?

10 A    I guess, yeah.

11 Q    And if you go down to line 17, what did you say again?

12 A    "Yeah, I don't remember, truthfully don't remember."

13 Q    Okay.  Do you recall how many times you told them you

14 don't remember?

15 A    No.

16 Q    Do you remember they kept asking you if you would

17 remember?

18 A    No, not to my knowledge.

19 Q    Okay.  Did you finally say something about, "Well, may --

20 oh, that was my dad's gun."  Do you remember that?

21 A    Yeah.

22 Q    So that was the first time anybody asked you about that

23 gun or the party.  Is that right?

24 A    Yeah.

25 Q    When was the next time somebody talked to you about those

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 106 of 206
(720) 384-8078  attrans@sbcglobal.net

1  two subjects?

2  A    You and -- you and the lady over in Kodiak.

3  Q    My investigator, and that's --

4  A    Yeah.

5  Q    -- a couple weeks ago?

6  A    Yeah.

7  Q    Okay.  And do you remember that conversation?

8  A    Yeah.

9  Q    You remember telling me that --

10        MS. LOEFFLER:  Objection, Your Honor.  We're still --

11        MR. CURTNER:  Well --

12        MS. LOEFFLER:  We're -- now we're trying to put in the

13  defense conversations without asking him the question.  If --

14        MR. CURTNER:  Okay.

15        MS. LOEFFLER:  If he denied something, I don't have a

16  problem, but we're just reading statements.

17        THE COURT:  Sustained.  (Indiscernible) --

18        MR. CURTNER:  Mr. Brennick, tell --

19        THE COURT:  Did he deliver the statement to the -- do

20  you have the statement?

21        MS. LOEFFLER:  Yeah -- no, I don't.  If I can have just

22  a minute to --

23        THE COURT:  Sure.

24        MS. LOEFFLER:  -- look at it.

25        THE COURT:  That's fine.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 107 of 206
(720) 384-8078   attrans@sbcglobal.net

1      MS. LOEFFLER:  Thank you.  (Pause) Okay, I'm ready.

2      THE COURT:  Okay.  Very well.

3  BY MR. CURTNER:

4  Q   And, Mr. Brennick, this was a little over two weeks ago.

5  Right?

6  A   Yes.

7  Q   In Kodiak?

8  A   Yes.

9  Q   And what do you remember telling me and my investigator at

10 that time?

11 A   Everything that we talked about?

12 Q   Yeah.  What -- and what you can remember.

13     MS. LOEFFLER:  I'm going to object to that, Your Honor.

14     MR. CURTNER:  Okay.

15     MS. LOEFFLER:  If he wants to --

16     THE COURT:  Sustained.

17     MS. LOEFFLER:  -- impeach him with something, I have no

18 objection, but just "Tell me everything you told me," I

19 don't -- I think it's all hearsay.

20     THE WITNESS:  Yeah, it's kind of hard to remember.  I

21 mean --

22 BY MR. CURTNER:

23 Q   Well, let's just talk about the party.  What did you tell

24 my investigator and myself about the party the night before the

25 homicide and the next morning?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 108 of 206

**BRENNICK - DIRECT**

1  A    That we were drinking and smoking weed and I passed out

2  around midnight or so, and then woke up the next morning.  And

3  she was taking off -- or Hannah was taking off, and then

4  couldn't get ahold of her.  And then we found out that her dad

5  had died, got shot.

6  Q    And do you remember us asking you how did Hannah find out

7  about her father?

8  A    Yeah.  From her mom.

9  Q    And did you say what happened when she found out from her

10 mom?

11 A    She -- I mean, she took off.

12 Q    She ran out of the house?

13 A    Yeah.

14 Q    Your sister's house?

15 A    Yeah.

16 Q    Where she was that morning?

17 A    Yes.

18 Q    And by morning -- what do you mean by morning?  Did you

19 tell us morning meant, like, till noon?

20 A    Yeah.

21 Q    And did you tell us about what Hannah was talking about

22 that night or during the party?

23 A    She was saying that her dad was a great guy and that he

24 was -- he had lots of guns in his house, and just really bad-

25 ass guy, pretty much.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 109 of 206
(720) 384-8078  attrans@sbcglobal.net

1  Q    Okay.

2  A    Pretty much bragging about her dad.  So --

3  Q    And all the guns he had?

4  A    Yeah.

5  Q    And how bad he was?

6  A    Yeah.

7  Q    Okay.  You remember that?

8  A    Just, like, proud that, you know, her dad was really cool.

9  Q    Okay.  And that was over the night when you guys were

10 partying, right?

11 A    Yeah.

12 Q    Until the next morning when she got the call and she had

13 to leave?

14 A    Yeah.  She took off right away.

15      MR. CURTNER:  That's all I have.  Thank you.

16      THE COURT:  Cross-examination.

17                   **CROSS-EXAMINATION**

18 BY MS. LOEFFLER:

19 Q    Mr. Brennick, so what does "bad-ass" mean to you?

20 A    Awesome dad, pretty much.  I mean, just --

21 Q    Okay.

22 A    I mean, shit, I brag about my dad all the time, you know,

23 how -- how cool he is and how much of a bad-ass he is.  I mean,

24 it's not mean, anything, it's just saying, you know, proud that

25 he's your father.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 110 of 206

BRENNICK - CROSS

1  Q    Okay.  Now, when Mr. Curtner keeps saying this was the

2  night of the 12th, do you have any idea, by date, what night it

3  was?

4  A    No, I don't.

5  Q    Okay.  Let me see.

6  A    I mean, I've -- I mean, I know it was around the time, but

7  I don't know specifically the date, the hours, the -- I mean,

8  you know, so I'm just --

9  Q    So it was around the date that her father was killed, but

10 you don't have the exact dates?

11 A    It -- I mean, it was -- it was within the day or two --

12 Q    Okay.

13 A    -- to where she wasn't talking to me, she wasn't talking

14 to her boyfriend, she wasn't talking to nobody.  And then

15 finally she answered my niece and told her that her dad had

16 gotten shot and she didn't want to talk to nobody, and hung up

17 the phone.

18 Q    Okay.

19 A    And my niece called me and all our friends and told us the

20 same thing, and we were really, really bummed out that that had

21 happened to her.

22 Q    Okay.  And, in fact, did -- were you one of the group that

23 drove up and tried to get flowers to her?

24 A    Yes.

25 Q    Okay.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 111 of 206
(720) 384-8078  attrans@sbcglobal.net

1  A    Yeah.

2  Q    Now, when Mr. Curtner asked you about the time that you

3  used to spend at that place you call Anton --

4  A    Yeah.

5  Q    -- he didn't put any dates on that.  When was the last

6  time you were there?

7  A    About two, maybe three months before.

8  Q    Okay.  Before the murders?

9  A    Yeah.  Because my friends had moved out of that place.

10  Q    Okay.  And that was -- Mr. Biocic had moved out of it?

11  A    Yeah.

12  Q    And how long -- do you know when he had moved out of it?

13  Could it have been a year before?

14  A    It -- it could have.

15         MR. CURTNER:  Objection, Your Honor.  Now --

16         THE WITNESS:  -- I -- I don't --

17         MR. CURTNER:  -- she's leading.

18         THE WITNESS:  -- I'm not --

19         THE COURT:  Pardon?

20         THE WITNESS:  -- 100-percent sure.

21         THE COURT:  Did I hear an objection?

22         MR. CURTNER:  I think she's leading now, so --

23         MS. LOEFFLER:  Well, I'm --

24         THE COURT:  Well, it --

25         MS. LOEFFLER:  -- cross-examining --

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 112 of 206

1          THE COURT:  It's --

2          MS. LOEFFLER:  -- I'm allowed to lead.

3          THE COURT:  -- cross-exam -- I understand.  You can --

4          MS. LOEFFLER:  Okay.

5          THE COURT:  -- lead on cross-examination.

6          MS. LOEFFLER:  Okay.

7   BY MS. LOEFFLER:

8   Q    So if Mr. Biocic thought he had moved out in January of

9   2011, is that consistent maybe with your memory?

10  A    Yes.

11  Q    Okay.  Now, when Mr. Curtner asked you -- he asked you a

12  bunch of questions about this taped statement.  And did he show

13  it to you or -- before he asked you to come in here?

14  A    No.

15  Q    Okay.

16  A    Actually, when they first came and talked to me, they

17  didn't even tell me who they were until the end.

18  Q    Okay.

19  A    Until they were done talking to me.

20  Q    All right.

21         MS. LOEFFLER:  If I can have just a minute.

22         THE COURT:  Sure.

23         MS. LOEFFLER:  All right, wait a minute, let me

24  (indiscernible).  Thank you.

25  BY MS. LOEFFLER:

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 113 of 206
(720) 384-8078  attrans@sbcglobal.net

1  Q    The gun that Mr. Curtner asked you about that -- the one

2  with the -- which is the State of Alaska -- that -- or you

3  remember as the State of Alaska on with the -- I don't -- how

4  did you describe it?

5  A    It -- it's -- it's State of Alaska Fiftieth Anniversary

6  rifle in a case with a knife and a -- a local piece on there.

7  Q    Okay.  You said rifle, but it's a pistol.  Right?

8  A    Yeah.  A pistol.

9  Q    Did you ever actually have that --

10 A    No.

11 Q    -- pistol?

12 A    No.

13 Q    Did you sell it to Mr. DeCastro?

14 A    No.  My -- actually, they went and checked down in

15 Washington.  I called -- called my dad right after I had talked

16 to that investigator --

17      MR. CURTNER:  Objection, Your Honor.  This is not of

18 his personal knowledge.

19      THE COURT:  Well, he knows he called his dad.

20      MR. CURTNER:  Okay.

21      MS. LOEFFLER:  Did you call --

22      MR. CURTNER:  But he --

23 BY MS. LOEFFLER:

24 Q    -- your dad, looking --

25 A    I called my father, I told him what was going on, and he

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 753  Filed 09/23/14  Page 114 of 206

**BRENNICK - REDIRECT**

1   pulled the weapon out, waited for the --

2           MR. CURTNER:  Objection, Your Honor.

3           THE WITNESS:  -- police to get there, and they --

4           THE COURT:  Sus --

5           MR. CURTNER:  Your Honor, I'm sorry, I got --

6           THE WITNESS:  -- checked the gun.

7           THE COURT:  (Indiscernible) -- that's sustained.

8           MS. LOEFFLER:  Yeah, I -- okay.

9           MR. CURTNER:  Thank you.

10  BY MS. LOEFFLER:

11  Q    Let me just ask you, you called your father and asked

12  about the gun.  I won't ask you what your father said to you.

13  You called him and asked about the gun?

14  A    Yes.

15  Q    Was he -- where was he?

16  A    He was down in Washington.

17  Q    So did you physically ever have it?

18  A    No.

19  Q    Thank you.

20          THE COURT:  Cro -- redirect.

21                  **REDIRECT EXAMINATION**

22  BY MR. CURTNER:

23  Q    So, Mr. Brennick, I understand you may not remember a

24  specific date.  Is that correct?

25  A    Yes.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 115 of 206

1  Q    But you remember that day --

2         THE CLERK:  Could somebody move that mic?

3         THE COURT:  Okay, what's going on here?

4         UNIDENTIFIED SPEAKER:  Some kind of a huge beep back

5  here.

6         THE CLERK:  It's the podium mic.

7         THE COURT:  Yeah, I'm hearing that too.  Someone's

8  doing something.

9         MR. CURTNER:  Am I too close?

10        THE CLERK:  Thank you.

11        THE COURT:  Okay.

12        MR. CURTNER:  I'm sorry.

13        THE COURT:  Okay.  Thank you for bringing -- okay.

14  BY MR. CURTNER:

15  Q    But you do remember that was the day that Hannah's father

16  was killed, right?  You remember that?

17  A    Not -- well, not 100-percent for sure.

18  Q    When you talked to the agent, when you talked to me,

19  that's how you remembered that.  Right?

20  A    Yeah.  I -- I mean, I suppose.  But I wasn't 100-percent

21  sure.

22  Q    And so after our conversation, did you talk to any FBI

23  agents or other law enforcement agents?

24  A    I talked to the Coast Guard a couple of days later.

25  Q    After I came to talk to you?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1   A   Yes.

2   Q   Okay.  Thank you.  That's all I have.

3           THE COURT:  Recross.

4                   **RECROSS EXAMINATION**

5   BY MS. LOEFFLER:

6   Q   Did the Coast Guard agent tell you what to say?

7   A   No.

8   Q   Thank you.

9           THE COURT:  All right.  I think we're done with this

10  witness, are --

11          MR. CURTNER:  Yes.

12          THE COURT:  I have something -- one more -- we got to

13  take a brief recess.  This will be less than 10 minutes.

14  Sorry, but we have one other thing we got to take care of.  So

15  let's stand in recess for less than 10 minutes.  That's my

16  hope.

17      (Jury not present)

18          THE COURT:  Okay, please be seated.  Who's the

19  defendant's next witness?

20          MR. CURTNER:  Collette Francisco.

21          THE COURT:  Collette Francisco.  Okay.  When they're --

22  let me know when they -- okay, thank you, sir.  You're excused.

23  Let's take -- I told them 10 minute -- let's take a few minutes

24  to get things in order.  But I can pass out an instruction,

25  modified, the one that we talked about earlier, to -- one to

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 117 of 206
(720) 384-8078   attrans@sbcglobal.net

1  each side.  And we'll come back in five or six minutes, okay.

2       (Witness excused)

3            THE CLERK:  All rise.  Matter stands in a brief recess.

4       (Court recessed at 10:54 a.m., until 11:01 a.m.)

5       (Jury not present)

6            THE CLERK:  All rise.  His Honor the Court, the United

7   States District Court is again in session.  Please be seated.

8            THE COURT:  Okay.  Let's -- can we bring the jury in?

9            MR. CURTNER:  Yes.

10           THE COURT:  Okay.  Let's bring the jury in.

11      (Jury present)

12           THE COURT:  Okay, please be seated.  The defendant's

13  next witness.

14           MR. CURTNER:  The defense calls Collette Francisco.

15           THE COURT:  Good morning, ma'am.  If you can just keep

16  working your way around here.  And pull that door open.  Push

17  that chair -- got pushed back a little bit.  And then remain

18  standing just for a second, and she'll swear you in.

19           THE CLERK:  Please raise your right hand.

20           **COLLETTE FRANCISCO, DEFENDANT'S WITNESS, SWORN**

21           THE CLERK:  Okay.  Thank you.  Please have a seat.

22  And, ma'am, if you can please state and spell your full name.

23           THE WITNESS:  Collette Francisco.  C-o-l-l-e-t-t-e, F-

24  r-a-n-c-i-s-c-o.

25           THE CLERK:  Thank you.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 118 of 206

FRANCISCO - DIRECT

1          THE COURT:  All right, counsel.

2                      **DIRECT EXAMINATION**

3    BY MR. CURTNER:

4    Q    Good morning, Mrs. Francisco.

5    A    Good morning.

6    Q    Where do you live?

7    A    In Kodiak, Alaska.

8    Q    Okay.  And were you there -- living there in April 2012?

9    A    Yes, I was.

10   Q    Okay.  Do you recall the date April 12th, 2012?

11   A    Yes.

12   Q    And what do you recall about that day?

13   A    As far as what I was doing?

14   Q    Yes.

15   A    Oh, okay.  I had a doctor's appointment over here in

16   Anchorage, so a -- a co-worker of mine was bringing me to the

17   airport.  And I was going to take the morning jet, but she had

18   to be to work by 7.  So she brought me pretty early.  She

19   picked me up from my residence about 6:30.

20   Q    Okay.

21   A    And we got to the airport maybe about 6:45.

22   Q    Okay.  So you were driving from Kodiak itself in -- toward

23   the airport?

24   A    Yes.

25   Q    Your friend was driving you?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 119 of 206

1  A    Yes.

2  Q    Okay.  Now, so you left around 6:30 and you got to the

3  airport around 6:45?

4  A    I believe so.

5  Q    Now, do you remember there being a newspaper --

6  something -- pictures of vehicles in the newspaper that the FBI

7  was asking about?

8  A    Yes.

9  Q    Okay.  Did you recogni -- was there a blue SUV in those

10 photographs?

11 A    Blueish-purple.

12 Q    Purple?  You --

13 A    Blueish-purple

14 Q    Blueish-purple.

15 A    Uh-huh (affirmative).

16 Q    Do you remember -- did that look familiar to you?

17 A    Yes.

18 Q    Why?

19 A    I recognized it at -- as Nancy's vehicle.

20 Q    Okay.  So when you saw it in the paper, you recognized

21 that was Nancy Wells's car?

22 A    Yes.

23 Q    Okay.  Now, after you saw the newspaper photographs, did

24 you report anything to the FBI or investigators?

25 A    I'm not sure which one first.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 120 of 206
(720) 384-8078  attrans@sbcglobal.net

**FRANCISCO - DIRECT**

1  Q   Okay.  What do you -- what did you report?  What did you

2  see?

3  A   I reported going into -- going to the airport.  And going

4  to the airport, I noticed what looks like Nancy's vehicle.  And

5  I said to my friend, "What's Nancy doing out here this time in

6  the morning," because I normally would pass her -- I think we

7  must work similar hours, because -- and -- because normally I

8  would pass her on the road.  And she said, "Nancy who?"  And

9  it -- she -- she didn't recognize Nancy Wells' name.

10  Q   Okay.  Now, you work -- you live in Kodiak?

11  A   Yes.

12  Q   And where do you work?

13  A   I work at the base.

14  Q   And then do you know where Mrs. Wells lives?

15  A   Yes.

16  Q   Where?

17  A   In Bell Flats.

18  Q   And then where does she work?

19  A   Well, at the time, she was working for KANA.

20  Q   Okay.  So at that time you might pass each other on

21  Rezanof Drive?

22  A   Yes.  We did.

23  Q   When you guys were both going to work?

24  A   Yes.  And I'm usually --

25  Q   Okay.

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 121 of 206

FRANCISCO - DIRECT

1   A   -- driving, but that morning I was a passenger.

2   Q   Okay.  Now, so you saw this vehicle sometime between 6:30

3   and 6:45 on the morning of April 12th.  Is that correct?

4   A   Correct.

5   Q   And I wonder if we could bring up the map, Mr. Johnson.

6           THE CLERK:  What exhibit number is that?

7           MR. CURTNER:  Yes, let me find out.  I -- 179.

8           THE CLERK:  DE-179?

9           MR. CURTNER:  Yes.

10          THE CLERK:  Thank you.

11  BY MR. CURTNER:

12  Q   Okay, so this -- Mrs. Francisco, does this look familiar?

13  A   Yeah, I guess.

14  Q   Okay.

15  A   I'm not used to looking at it on a map.

16  Q   I'm sorry.

17          UNIDENTIFIED SPEAKER:  (Indiscernible).  Yeah.  There

18  you go.

19          THE WITNESS:  Okay.  All right.

20          UNIDENTIFIED SPEAKER:  Thank you.

21          THE WITNESS:  Sorry.

22  BY MR. CURTNER:

23  Q   All right.  So you -- you've not really looked at this

24  kind of map before?

25  A   No.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 122 of 206
(720) 384-8078   attrans@sbcglobal.net

**FRANCISCO - DIRECT**

1  Q   All right.  Well, let's see if we can -- that's Kodiak,

2  the city.

3  A   Okay.

4  Q   This is the airport.

5  A   Okay.

6  Q   And this is the Coast Guard base, on Rezanof.

7  A   Uh-huh (affirmative).

8  Q   Does that look familiar?

9  A   Yes.

10 Q   Okay.  And then Bells Flats is out here someplace?

11 A   Okay.

12 Q   Or do you recall?

13 A   If we're going past the base, yes, that would be Bell

14 Flats.

15 Q   Okay.  Now -- so that morning -- normally you would drive

16 from town out to where you worked, right?

17 A   Correct.

18 Q   And sometime -- and a lot of times you would see Mrs.

19 Wells driving this way into town?

20         MS. DUIGNAN:  Objection.  Leading.

21         THE COURT:  Sustained.

22 BY MR. CURTNER:

23 Q   Well, you tell me.  Is that right?  You tell me.

24 A   Okay, normally -- I -- I live in town, so I'm going

25 towards the airport.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 123 of 206
(720) 384-8078   attrans@sbcglobal.net

FRANCISCO - DIRECT

1  Q    Uh-huh (affirmative).

2  A    Nancy's coming from Bells Flats.  And somewhere between

3  after she's passed the base and maybe me getting closer to the

4  base, I would pass her in the morning.

5  Q    Okay.  And that's not uncommon?

6  A    No.

7  Q    Now show me on this map, if you could, where you saw the

8  blue SUV between 6:30 and 6:45 that morning of the 12th.  Would

9  it -- where -- so you're coming from here, toward the airport?

10 A    Uh-huh (affirmative).

11 Q    Your friend's driving you?

12 A    Yes.

13 Q    Stop me when you think I'm in the area made --

14 A    Probably about right there.

15 Q    Okay.

16 A    It was at Self Help.

17 Q    Okay.  So about --

18 A    Which is close to the airport.

19 Q    Okay.  So maybe about there on the map.  Let me see if Mr.

20 Johnson will put an arrow there.  Does that look about right?

21 A    Is that right before you get to the airport?

22 Q    If that's the airport --

23 A    Yes.

24 Q    That look about -- where you saw the blue SUV?

25 A    Yes.  It was moving.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 124 of 206
(720) 384-8078   attrans@sbcglobal.net

1  Q    It was moving.

2  A    Uh-huh (affirmative).

3  Q    Which direction was it moving?

4  A    Towards town.

5  Q    Okay.  So at that place at that time, you were headed to

6  the airport and the SUV -- the blue SUV was driving this way

7  into town?

8  A    Correct.

9  Q    Okay.  And that's what you reported to law enforcement?

10 A    Yes.

11 Q    That all I have.  Thank you.

12          THE COURT:  Re --

13          THE WITNESS:  Okay.

14          THE COURT:  Cross.

15          UNIDENTIFIED JUROR:  Your Honor, (indiscernible) cell

16 phone.

17          THE COURT:  Turn it off, and just --

18          UNIDENTIFIED JUROR:  (Indiscernible).

19          THE COURT:  Just put it on the chair, please.  All

20 right, thanks.  Okay.

21                    **CROSS-EXAMINATION**

22 BY MS. DUIGNAN:

23 Q    Good morning, Mrs. Francisco.

24 A    Good morning.

25 Q    That morning on April 12th, you were out much earlier than

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 753  Filed 09/23/14  Page 125 of 206

1  normal.  Isn't that right?

2  A    Correct.

3  Q    You were headed to the airport because your friend was

4  dropping you off?

5  A    Correct.

6  Q    And you were on your way to a medical appointment, I think

7  you said, in Anchorage?

8  A    Yes, I was.

9  Q    And that was about 6:45 in the morning?

10  A    Yes.

11  Q    Wasn't it still dark out then?

12  A    In April -- maybe a little bit, yeah, it --

13  Q    Was --

14  A    It is.  It is.

15  Q    And when you originally reported this car, you said you

16  couldn't be certain that it was Nancy in the car.

17  A    I did not see Nancy as -- as I recognize -- as I usually

18  would recognize Nancy, I did not recognize her --

19  Q    Okay.

20  A    -- as the driver.

21  Q    Okay.  And you said you couldn't be sure about whether you

22  saw a Coast Guard sticker on the car?

23  A    If I identified it as Nancy's car, it would have had to

24  have had a sticker on it, because that's how I identified.

25  Q    Right.  But you couldn't remember seeing it?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 126 of 206
(720) 384-8078   attrans@sbcglobal.net

**FRANCISCO - REDIRECT**

1  A    I could -- no, I couldn't.

2  Q    And you also mentioned that you normally see Nancy driving

3  to work in the morning when you're going to work.  Right?

4  A    Correct.

5  Q    And that would normally be much later in the day, wouldn't

6  it?

7  A    It is.  It's usually somewhere between maybe 7:30 and 8

8  o'clock, because I go to work at 7:45, give or take.

9  Q    Okay.  Nancy would go to work much later too, normally?

10  A    I would see her and assume that she's going to work, but

11  I -- I don't know for sure she's going to work.  But I see -- I

12  see her every morning around that time.

13  Q    And you remember telling her husband you really couldn't

14  be sure whether it was Nancy's car when you first saw it?

15  A    Yes.

16  Q    Do you know Susan McEntee?

17  A    No.

18  Q    Okay.  That's fine.  Thank you.

19          THE COURT:  Redirect.

20                      **REDIRECT EXAMINATION**

21  BY MR. CURTNER:

22  Q    So, Mrs. Francisco, you know it was a blue SUV.  Right?

23  A    Yes.

24  Q    And you know it was before 6:45, is that right?

25  A    Yes, around that time, uh-huh (affirmative).

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 127 of 206
(720) 384-8078  attrans@sbcglobal.net

1   Q    Okay.  Thank you.

2             THE COURT:  Recross.

3                    **RECROSS EXAMINATION**

4   BY MS. DUIGNAN:

5   Q    Just one last question --

6   A    Okay.

7   Q    -- Mrs. Francisco.  When you pointed to the area on the

8   map, did you recognize that as -- you thought it was the Self

9   Help?

10  A    Did I recognize it as a -- no.

11  Q    Oh, okay.  The map confused you, didn't it?

12  A    Yes.

13  Q    Okay.

14  A    I've never seen a map like that.

15  Q    Okay.  And where did you say that you saw this car again?

16  A    It was by -- it was driving past the Self Help, which

17  would be past -- whichever way -- it would be past, right by

18  the Self Help.

19  Q    Oh, okay.

20  A    Like, passing the Self Help building.

21  Q    About how far away is that from the airport?

22  A    It's relatively close.

23  Q    Okay.  Thank you.

24  A    Less than probably five minutes.  I don't know.

25  Q    Thank you.  Anything else?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 128 of 206
(720) 384-8078   attrans@sbcglobal.net

NELSON - DIRECT

1          MR. CURTNER:  No.  Thank you, Mrs. Francisco.

2          THE WITNESS:  Okay, thank you.

3          THE COURT:  Thank you, ma'am.  Defendant's next

4    witness.

5       (Witness excused)

6          MR. CURTNER:  I think Mr. Wilton Nelson will be coming

7    through the door next.

8          THE COURT:  Okay, Wilton Nelson.  All right, sir, if

9    you can just make your way to the front here, kind of wind

10   around, and then -- the jury box, that door pulls out.  And

11   then you just step in, remain standing for a second, and my

12   clerk over here will swear you in.

13         THE CLERK:  Please raise your right hand.

14         **WILTON THOMAS NELSON, DEFENDANT'S WITNESS, SWORN**

15         THE CLERK:  Okay.  Thank you.  Please have a seat.

16   And, sir, if you can please state and spell your full name.

17         THE WITNESS:  Wilton Thomas Nelson.  W-i-l-t-o-n, T-h-

18   m-o-a-s [sic], N-e-l-s-o-n.

19         THE CLERK:  Thank you.

20         THE COURT:  All right, counsel.

21                    **DIRECT EXAMINATION**

22   BY MR. CURTNER:

23   Q    Good morning, Mr. Nelson.

24   A    Good morning.

25   Q    How are you?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 129 of 206

NELSON - DIRECT

1   A    Good.

2   Q    Where do you live?

3   A    Kodiak, Alaska.

4   Q    What do you do there?

5   A    I operate equipment, drive truck.

6   Q    Okay.

7           THE COURT:  You do what?  You operate equipment, what?

8           THE WITNESS:  Operate equipment and drive truck

9   commercially.

10          THE COURT:  Get a little closer to the microphone,

11  please.

12  BY MR. CURTNER:

13  Q    Okay, I'm sorry.  Maybe you could repeat that for --

14  A    I operate heavy equipment and drive truck commercially.

15  Q    Okay.  Now, were you living there and doing that in --

16  April 12th, 2012?

17  A    Yes, I was.

18  Q    Okay.  And do you recall that particular day?

19  A    Yes, I do.

20  Q    That was the day of -- why do you recall that day?

21  A    I was transporting a excavator to a job site at the water

22  treatment facility and the Coast Guard base there.  And I was

23  driving a tractor-trailer, and there was a lot of commotion

24  after we showed up to the work there.

25  Q    Now -- okay, so let's start at the beginning of the day.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 130 of 206
(720) 384-8078  attrans@sbcglobal.net

1  What time do you start work?

2  A    I started work around 7 o'clock.  Right before 7, I showed

3  up at the high school and picked up an excavator and trucked it

4  out to the water treatment facility.  And roughly --

5  Q    Okay --

6  A    -- 7:20, 7:30, somewhere around there, I showed up out

7  there.

8  Q    And so where's the high school?

9  A    It's in the middle of town.

10  Q    And you're driving -- what are you driving?

11  A    A tractor-trailer combination.

12  Q    And what are you hauling out there?

13  A    Excavator.

14  Q    Okay.  And is that an extra-wide, or do you need any kind

15  of an escort for that or --

16  A    No, there's no permits required.

17  Q    Okay.  So where were you headed to?

18  A    To the --

19  Q    Where were you taking it?

20  A    -- water treatment facility on the Coast Guard base.

21  Q    Okay.  And which -- where is that water treatment

22  facility?

23  A    It's Anton Larsen Way there.  It's the facility that's

24  right before the COMMSTA there.

25  Q    Okay.  Now, did you recall on that particular day seeing

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 131 of 206
(720) 384-8078   attrans@sbcglobal.net

1  anything unusual that was worth reporting to law enforcement?

2  A   I didn't think anything noteworthy at the time.  Later on,

3  I was asked if I seen any vehicles or anything on the side of

4  the road, and I had seen a blue SUV on the side of the road.

5  That was all I had noticed.

6  Q   Okay.  And had you seen pictures in the paper of -- they

7  were looking for a blue SUV?

8  A   Yes, I had.

9  Q   Then it was a couple days after that that you reported

10 what you saw?

11 A   Yes.

12 Q   Let me -- let's look at a map, Defense Exhibit 179.  Okay,

13 does that look somewhat familiar?

14 A   Yes.

15 Q   All right, so let's start your day.  You started, like, at

16 7?

17 A   Yes.

18 Q   And this is Kodiak.  Where would the high school be

19 compared to, you know, the City of Kodiak?

20 A   It would be in the City of Kodiak there, right about where

21 the N is there, I believe.

22 Q   About -- kind of this side of town?

23 A   Yes, right about where your laser is.

24 Q   Okay.  So you got there around 7, and you picked up the

25 heavy equipment?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 753  Filed 09/23/14  Page 132 of 206

**NELSON - DIRECT**

1  A    Yes.

2  Q    And then -- so then you would have to drive it out

3  Rezanof?

4  A    That's correct.

5  Q    Okay.  And then -- where were you headed?  Were you

6  headed -- do you recognize this?

7  A    Yes.

8  Q    And where's the water treatment plant?

9  A    It's just this side of the bridge, of the COMMSTA there.

10 Q    Around here?

11 A    Yes.

12 Q    Okay.  So that was your journey that morning.  What kind

13 of speed do you think that you're going then?

14 A    The speed limit's 45.  You know, 35 through town there,

15 and then 45, and then 55 out by the Boy Scout Lake there.

16 Q    Okay.  Then so --

17 A    So --

18 Q    -- what time would it have been, do you think, by the time

19 you got in this area?

20 A    I -- I'd say roughly 7:25, 7:30.

21 Q    Okay, 7:25 or 7:30.  Okay, and then that's when you would

22 have turned off toward the water treatment plant?

23 A    That's correct.

24 Q    Now, where did you see a blue SUV?

25 A    The first bridge.  I believe it was Bridge Number 6 that

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 133 of 206
(720) 384-8078   attrans@sbcglobal.net

NELSON - DIRECT

1  you come to on Anton Larsen Way there, just past the state

2  facility there.

3  Q    Okay, now, if you're driving with the heavy equipment and

4  you turn right here, tell me about where the stop -- where

5  you --

6  A    Right about there.

7  Q    Right around there?

8  A    Yeah.

9  Q    Okay.  That's where you would have seen the blue SUV?

10  A    That's correct.

11  Q    And by that time would it have been at least 7:30?

12  A    Yeah, roughly 7:30.

13  Q    Okay.  And then what did you notice about that blue SUV?

14  A    I just noticed that it was parked off the side of the road

15  there at the intersection as I was driving by.  I couldn't tell

16  whether there was somebody in it or not.  I just was driving

17  past.

18  Q    Was it aim -- what -- was it on the side of the road or on

19  an off road?

20  A    There's an intersection of two roads.  There's a dirt road

21  that connects to the main road there, and as I recall, it -- it

22  just kind of looked like the back of an SUV on the side of the

23  road.  I just --

24  Q    Do you know how far off the -- was it on the dirt road,

25  then?

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 134 of 206

1   A    Yes, it was.

2   Q    And how far off the main road?

3   A    Maybe 30 or 40 feet.  It was pretty close to the

4   intersection, I know.

5   Q    And was it pointed toward the road or the other --

6   A    I believe it was pointed away from me.

7   Q    Okay.  And what would it have been pointed at, then?  Do

8   you know?

9   A    Away from the main road there.

10  Q    Okay.  Is the river right there too?

11  A    Yes.

12  Q    Okay.  So it would have been pointed toward the river, not

13  to --

14  A    Yes, towards --

15  Q    -- Anton Larsen Bay Road?

16  A    -- the river.

17  Q    And so -- then you took the heavy equipment to the water

18  treatment plant?

19  A    That's correct.

20  Q    And did you come by later?

21  A    Yes, I did.

22  Q    How long -- how much later?

23  A    It was probably an hour to an hour and a half.  We were --

24  Q    And was the --

25  A    We were demoing the old water tanks there, and so they

1  were -- they were loading the trailer full of old stuff to get

2  hauled out to the recycle center out of Bells Flats.  So I -- I

3  made a trip -- several trips back and forth.

4  Q   Okay.  And -- but did you see the blue SUV when you went

5  back?

6  A   I did not see it there when I left again.

7  Q   All right, thanks.  That's all the questions I have.

8       THE COURT:  Cross-examination.

9              **CROSS-EXAMINATION**

10 BY MS. DUIGNAN:

11 Q   Good morning, Mr. Nelson.

12 A   Good morning.

13 Q   You said that you had seen the photos on the news, looking

14 for these vehicles.  Correct?

15 A   That's correct.

16 Q   And that's when you stepped forward?

17 A   Yes.

18 Q   That's right.  Do you recall when you talked with

19 investigators, that you said that it was common to see vehicles

20 in the area where you saw that blue truck?

21 A   Yes.

22 Q   And that you also said that it looked like the vehicle was

23 looking for fish, the way it was parked by the river?

24 A   Yes, like somebody was stopped on the side of the road

25 and --

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

**NELSON - REDIRECT**

1 Q    And do you know that -- or do you recall when you passed

2 by the communication station?

3 A    Yes.  Or --

4 Q    And --

5 A    -- I didn't actually go all the way to the communication

6 station that morning.  I -- I stopped at the water treatment

7 facility before then.

8 Q    Okay.  And that was around 7:40-ish, you think?

9 A    Yeah, probably 7:35, 7:40, when I got there to the water

10 treatment facility.

11 Q    And you said that you didn't notice anybody in the truck

12 when you saw it.  Right?

13 A    No.

14 Q    And it didn't really have any distinguishing features that

15 you noticed?

16 A    No.

17 Q    And do you recall telling investigators you thought it was

18 a blue Dodge Durango?

19 A    Yeah, roughly, you know, Dodge Durango, small SUV.

20 Q    Thank you.  I don't have anything further.

21 A    Thank you.

22        THE COURT:  Redirect.

23                **REDIRECT EXAMINATION**

24 BY MR. CURTNER:

25 Q    A small SUV.  I mean, is the Durango, different years,

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 137 of 206
(720) 384-8078  attrans@sbcglobal.net

NELSON - REDIRECT

1  smaller than other years?  Do you know?

2  A   I -- I would have said like a '90s Durango, was kind of

3  just at a glance as I was traveling by --

4  Q   That's what you --

5  A   -- midsize SUV, smaller, you know.

6  Q   Okay.  That's what you saw.

7  A   Not like a Suburban or something like that.

8  Q   All right, thank you.

9          THE COURT:  Recross.

10         MS. DUIGNAN:  No further questions.

11         THE COURT:  Thank you, sir.  You're excused.

12 Defendant's next --

13         THE WITNESS:  Thank you.

14         THE COURT:  -- witness.

15    (Witness excused)

16         MS. DUIGNAN:  Who are we calling, counsel?

17         MR. CURTNER:  Dale Rice, I think.

18         THE COURT:  Have a spot for you right up front here.

19 Sir, just make your way up, and then kind of go around here.

20 And then we need to have you step in the witness box, pull that

21 door open.  Step up and remain standing just for a second.

22 She's going to swear you in.

23         THE CLERK:  Please raise your right hand.

24         **DALE LARKIN RICE, DEFENDANT'S WITNESS, SWORN**

25         THE CLERK:  Okay, thank you.  Please have a seat.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 138 of 206
(720) 384-8078  attrans@sbcglobal.net

1  Okay, sir, and if you can please state and spell your full
2  name.
3        THE WITNESS:  I can't hear.
4        THE COURT:  Okay, state and spell your full name.
5        THE WITNESS:  Dale Larkin Rice.  D-a-l-e, L-a- -- L-a-
6  r-k-i-n, R-i-c-e.
7        THE COURT:  All right.  Thank you, sir.  Counsel.
8                    **DIRECT EXAMINATION**
9  BY MR. CURTNER:
10 Q    Good morning, Mr. Rice.
11 A    Morning.
12 Q    Please let me know if you can't hear what I'm asking you.
13 Okay?
14 A    Yeah.
15 Q    Okay.
16 A    Most of it.
17 Q    No, but if you can't hear me or if you want me to repeat
18 something, please let me know.
19 A    All right.
20 Q    Okay.  Where do you live, Mr. Rice?
21 A    Kodiak, Alaska.
22 Q    How long have you lived out there?
23 A    We've been back there since '85.
24 Q    Okay.  Were -- did you live there before then?
25 A    I was transferred there in '74 through '80 with the Coast

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 753  Filed 09/23/14  Page 139 of 206
(720) 384-8078  attrans@sbcglobal.net

1  Guard.

2  Q    Okay.  And what happened in 1985?  Did you -- were you in

3  the Coast Guard active duty?

4  A    I retired from the Coast Guard.

5  Q    You retired that year?

6  A    Yeah.

7  Q    Now, when you were in the Coast Guard, did you meet Jim

8  Wells?

9  A    Yes, I did.

10  Q    And do you see Mr. Wells in court today?

11  A    Yes, I do.

12  Q    When did you first meet Mr. Wells?

13  A    It had been June of '78, when I was transferred to the

14  Storis.

15  Q    Okay.  You were on the ship the Storis?

16  A    The ship.

17  Q    And Mr. Wells was too?

18  A    Yes.

19  Q    What can you tell me about that?  When -- what you were

20  doing when you first met Mr. Wells, what he was doing?

21  A    I was a damage controlman, doing maintenance on the ship.

22  He was an electronics technician.

23  Q    Did you work closely to get -- with Mr. Wells?

24  A    No, not really close, unless he needed something welded.

25  Q    Okay.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 140 of 206
(720) 384-8078  attrans@sbcglobal.net

**RICE - DIRECT**

1  A    But we lived in the same quarters.

2  Q    All right.  How long did you live together, then?

3  A    Two years.

4  Q    All right.  Get to know each other pretty well back then?

5  A    Yeah.  We got together a lot on off-duty time.

6  Q    Okay.  Now -- so how long have you known Mr. Wells all

7  together, then?  I don't know if you've added up the years.

8  A    That's about 28 years.

9  Q    Twenty-eight years that you've known him, okay.  Now,

10 where are you living now on Kodiak?

11 A    We're living in Bells Flats, in --

12 Q    And how much property do you have there?

13 A    We've got about six acres.

14 Q    Okay.  Can you tell me a little bit about it?  Can you

15 describe where you live, how much -- what do you have there

16 besides -- big house?

17 A    No, it's kind of on a -- a small hill.  We're secluded

18 from the neighbors, pretty much.  We have pastureland, we have

19 some greenhouses.

20 Q    Okay.  Is -- now, have you raised kids there?

21 A    Yes, we did.

22 Q    How many?

23 A    We count 11 now.  There was a foster child included with

24 that.

25 Q    Okay.  And that's you and your wife raised your family

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 141 of 206

1 there?

2 A    Yeah.  Well, yeah.  My ex-wife was one of the daughters

3 that we -- we count, but --

4 Q    Okay.

5 A    -- she did live with us for a while.

6 Q    How long you been married to Marie?

7 A    April of '77 is when we got married.

8 Q    Okay.  Now, during that time, would you consider yourself

9 good friends with Mr. Wells --

10 A    Yes, I would.

11 Q    -- over the years?

12 A    Yes.

13 Q    One of your best friends, do you think?

14 A    Yeah.

15 Q    Okay.  Would he come out to your property?

16 A    Yes.  Quite a bit.

17 Q    Were his children about the same age as your children?

18 A    Yes, they were.

19 Q    Okay.  So did you spend a lot of time when all the kids

20 were growing up together?

21 A    Yeah.

22 Q    Would you do, like, holidays together?

23 A    Yes.

24 Q    Can you tell me a little bit about what kind of holidays

25 you might spend with the Wells family?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 142 of 206
(720) 384-8078  attrans@sbcglobal.net

RICE - DIRECT

1  A    The Fourth of July, we'd go out to the beach, fireworks,

2  picnics.

3  Q    Okay.  Other holidays, Christmas, Thanksgiving?

4  A    I think we had some Thanksgivings together.

5  Q    Okay.

6  A    I think we visited around Christmas, but I'm not sure.

7  Q    Okay.

8  A    We spent time at each other's homes for Christmas.

9  Q    So over the years, did you get -- you think you knew Mr.

10 Wells pretty well?

11 A    I think so.  He -- he kept bees on our property.

12 Q    He kept bees on your property?

13 A    Yeah, when he was living on base still.

14 Q    The -- what year would that have been?

15 A    '79, then.

16 Q    Sometime ago?

17 A    Yeah.

18 Q    Okay.  Now, did you know a time when he got sick?

19 A    When he what?

20 Q    When he was ill.

21 A    I was aware of that.

22 Q    Pardon me?

23 A    I was aware that he was having some health problems.

24 Q    Okay.  And you remember that?

25 A    Yeah.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 143 of 206
(720) 384-8078  attrans@sbcglobal.net

RICE - CROSS

1  Q    Okay.  Now, in the years that you've known Mr. Wells, have

2  you ever known him to be violent?

3  A    No.

4  Q    Do you -- ever known him to say anything in a threatening

5  manner?

6  A    No.

7  Q    Have you ever known him to lose his temper?

8  A    I've known him to be dissatisfied with something, but I

9  wouldn't call it losing his temper.

10  Q    You've never seen him lose his temper, then --

11  A    No.

12  Q    -- get really mad, the whole time you've known him.  Okay.

13  You've never seen him do anything violent?

14  A    No.

15  Q    That's all I have.  Thank you.

16         THE COURT:  Cross-examination.

17                    **CROSS-EXAMINATION**

18  BY MS. DUIGNAN:

19  Q    Good morning, Mr. Rice.

20  A    Good morning.

21  Q    Do you remember talking to investigators about Mr. Wells,

22  a while ago?

23  A    A year or so ago.

24  Q    About a year or so ago?

25  A    Yes.

**RICE - CROSS**

1  Q   Do you remember saying at that time that you really didn't

2  have any frequent contact with Mr. Wells during the past couple

3  of years?

4  A   I have -- I have been sick the last few years, and --

5  Q   Okay.

6  A   -- I have not been out doing a lot of things with him, no.

7  Q   And did Mr. Wells ever talk to you about work?

8  A   Not really.

9  Q   Do you recall saying that he never talked to you about

10 work?

11 A   No.

12 Q   Okay.  Do you remember talking about when Mr. Wells would

13 invite you on the Coast Guard property to gather coal --

14 A   Yes.

15 Q   -- to use?  And did he also give you wood from the Coast

16 Guard property?

17 A   No.

18 Q   Do you remember telling the investigators that he did give

19 you wood from the Coast Guard property?

20 A   No, I don't.  We got wood chips one time, but --

21 Q   Okay.  Do you remember talking about -- to investigators

22 about the time of the murders, and you had tried to call Mr.

23 Wells, because you thought he might have been one of the people

24 killed?

25 A   Yes.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 145 of 206

**RICE - CROSS**

1 Q    But Mr. Wells didn't return your phone calls, did he, at

2 that time?

3 A    No, he didn't.  That was the afternoon of that day, but --

4 Q    But he didn't return your phone calls to say how he was

5 for quite a while, did he?

6 A    Well, we called at the house, so I don't -- don't know

7 when he or if he did get the call.

8 Q    Okay.  Do you remember saying that Nancy didn't travel a

9 lot for work?

10 A    No, I don't.

11 Q    If you --

12 A    I knew she traveled at times, I may have --

13 Q    Do you remember telling --

14 A    -- said it --

15 Q    I'm sorry.  Go ahead.

16 A    I may have said it wasn't a lot, but I don't know.

17 Q    Okay.  So you don't remember saying that?

18 A    No.

19 Q    But you do recall saying that you haven't had a lot of

20 contact with Mr. Wells during the last six or seven years?

21 A    Yes, our -- we adopted some children, we had preschool

22 children.  A -- a social group changed since we had the younger

23 children.  And me being sick limited a lot of what we did.

24 Q    Thank you, sir.

25          THE COURT:  Anything else?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 146 of 206

**RICE - DIRECT**

1        MR. CURTNER:  No, Your Honor.  Thank you, Mr. Rice.

2        THE COURT:  Thank you, sir.  You're excused.

3   Defendant's next witness.  Next witness is?

4      (Witness excused)

5        MR. CURTNER:  Marie Rice.

6        THE COURT:  All right, ma'am, you just make your way up

7   kind of toward the front here.  Okay, take a hard right when

8   you get there.  And the witness -- by -- that door pulls out,

9   and you just step into the box and remain standing just for a

10  second.  She's going to swear you in.

11       THE CLERK:  Please raise your right hand.

12       **MABEL MARIE RICE, DEFENDANT'S WITNESS, SWORN**

13       THE CLERK:  Okay, thank you.  Please have a seat.  And,

14  ma'am, if you can please state and spell your full name.

15       THE WITNESS:  I'm Mabel Marie Rice.  M-a-b-e-l, M-a-r-

16  i-e, R-i-c-e.

17       THE CLERK:  Thank you.

18       THE COURT:  All right, counsel.

19                    **DIRECT EXAMINATION**

20  BY MR. CURTNER:

21  Q    Good morning, Mrs. Rice.  How are you?

22  A    Good.

23  Q    Okay.  Are you married to Dale Rice --

24  A    Yes, I am.

25  Q    -- who just left?

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 147 of 206

**RICE - DIRECT**

1  A   Yes.

2  Q   Okay.  How long you guys been married?

3  A   Oh, we were married in 1977.

4  Q   Okay.  It's been a while.

5  A   Yes.

6  Q   And where do you live?

7  A   Kodiak.

8  Q   What part of Kodiak?

9  A   We live at Bells Flats.

10 Q   Okay.  And so you and your husband raised some children

11 there?

12 A   Yes.

13 Q   How many?

14 A   Eleven.

15 Q   Now, do you know Jim Wells?

16 A   Very well.

17 Q   How long have you known Mr. Wells?

18 A   Since probably about 1978 or so --

19 Q   Okay.

20 A   -- thinking.

21 Q   How do you know Mr. Wells?

22 A   Jim and Nancy had children that were the age of ours, and

23 Dale and Jim served together in the Coast Guard, was the basic

24 reason we knew each other.

25 Q   Okay.  And you're also neighbors?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 148 of 206
(720) 384-8078  attrans@sbcglobal.net

**RICE - DIRECT**

1   A    Yes.

2   Q    So over the years, did you have a lot of interaction with

3   the Wells family?

4   A    Lots.

5   Q    Okay.  And maybe you could tell me about that.

6   A    Well, with raising kids in Kodiak the same age, we, you

7   know, did a lot of things together.  We did -- the most fun

8   thing was going crabbing, with crab pots, and taking the kids

9   out and harvesting crab pots, going to the crab cooker on base.

10  And then we would go to either one of our house and shuck crab

11  for hours.

12  Q    Okay.

13  A    That was fun.

14  Q    So you know Matt Wells?

15  A    Yes.

16  Q    And Cable?

17  A    Yes.

18  Q    And --

19  A    And Elizabeth.

20  Q    -- Elizabeth.  All right.  And they're basically the same

21  ages as some of your children?

22  A    Our first litter.

23  Q    Okay.  So you got to know the whole family pretty well?

24  A    Yes.

25  Q    All right.  And would you do social events, holidays,

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 149 of 206

1 things of that nature?

2 A    Yes, very much.  And they would host a -- a Valentine's

3 lobster dinner with us and several close friends.  That was a

4 fun tradition.

5 Q    Okay, that was a tradition between your family and Mr.

6 Wells' and maybe a couple other families?

7 A    Right.

8 Q    How many years do you think that you participated in that?

9 A    Maybe six years or so.

10 Q    Okay.  So over those years, do you feel like you know Mr.

11 Wells pretty well?

12 A    I think so.

13 Q    Do you -- ever known him to have been violent in any way?

14 A    No.

15 Q    Do you -- ever known him to lose his temper or to say

16 anything threatening?

17 A    No.

18 Q    You ever see him raise a hand to his children at all?

19 A    No.

20 Q    Okay.  Do you ever -- do you think that, in your

21 community, in Bells Flats, he has a reputation for being a

22 peaceful and nonviolent person?

23 A    As far as I know.

24 Q    Okay.  And then from your own personal knowledge --

25 A    Yes.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 150 of 206
(720) 384-8078   attrans@sbcglobal.net

**RICE - CROSS**

1  Q    -- you would agree with that?

2  A    Yes.

3  Q    All right.  That's all I have.  Thank you.

4       THE COURT:  Cross-examination.

5                    **CROSS-EXAMINATION**

6  BY MS. DUIGNAN:

7  Q    Good morning, Mrs. Rice.

8  A    Good morning.

9  Q    When's the last time that you had one of the Valentine's

10 Day lobster dinners with Mr. Wells?

11 A    Maybe six years ago.

12 Q    Would it be fair to say that that's probably the last time

13 you socialized regularly together?

14 A    With those dinners, we saw each other, you know,

15 intermittently.  We adopted four -- we brought into our home

16 four grandchildren, and your social life kind of changes when

17 you add that element.  And their children were pretty much

18 grown.  So we -- that kind of changed our lifestyle a bit.

19 Q    All right.  I don't have any other questions.  Thank you.

20      THE COURT:  Anything else?

21      THE WITNESS:  Okay.

22      MR. CURTNER:  No.  Thank you, Mrs. Rice.

23      THE COURT:  Thank you, ma'am.  You're excused.

24 Defendant's --

25      MR. CURTNER:  Your Honor --

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 151 of 206

1          THE COURT:  -- next witness.

2          MR. CURTNER:  -- it might be a good time for the lunch

3  break, I think.

4          THE COURT:  Okay.  1 o'clock?  Is that fair?  All

5  right, stand in recess till 1 o'clock -- you be back at five to

6  1, we'll try to start at 1.  Grab your phone on the way out.

7      (Jury not present)

8          THE COURT:  Okay.  Let's -- please be seated.  What's

9  the plan for the this afternoon?

10          MR. CURTNER:  Judge, I just went through 10

11  witnesses --

12          THE COURT:  Good work.

13          MR. CURTNER:  -- and I got --

14          THE COURT:  So 10 more?

15          MR. CURTNER:  -- five, I think, for this afternoon.

16          MS. LOEFFLER:  Your Honor, I think the -- I'm not sure,

17  but I think the five for this afternoon are all more of the

18  Jason Barnum thing.  So I'm going to ask that we have a --

19  outside the presence -- out -- if I'm wrong, Mr. Curtner --

20          MR. CURTNER:  No.  No, that's correct.

21          MS. LOEFFLER:  I think we need to have this

22  discussion -- I think it's another --

23          THE COURT:  Are they in custody?

24          MS. LOEFFLER:  No, I don't think --

25          MR. CURTNER:  No.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 152 of 206
(720) 384-8078  attrans@sbcglobal.net

1          MS. LOEFFLER:  -- so.

2          THE COURT:  Okay.

3          MS. LOEFFLER:  But I think we're going to -- I mean,

4    I -- my position is it's irrelevant, and so I think you're

5    going to have to hear for yourself and make your own

6    determination.  I think that's what all the witnesses are this

7    afternoon.

8          THE COURT:  Is that right?

9          MR. CURTNER:  Yes.

10         THE COURT:  I see that you have -- Daniel Reisberg was

11   listed for today as well.

12         MR. CURTNER:  I'm sorry?  Oh, no, we're not calling Mr.

13   Reisberg, Dr. Reisberg.

14         THE COURT:  Okay.  So he's off.

15         MR. CURTNER:  Yes.

16         THE COURT:  So we're moving to --

17         MS. LOEFFLER:  That was a long weekend.

18         THE COURT:  Okay.  So now we're down to --

19         MR. CURTNER:  The bottom five on what -- one, two,

20   three, four, five on the list.

21         MS. LOEFFLER:   Think there's five.

22         THE COURT:  Well, how are we going to do this?

23         MR. CURTNER:  Well --

24         MS. LOEFFLER:  I think you're going to have to bring

25   them in, you know, and have a --

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 153 of 206
(720) 384-8078  attrans@sbcglobal.net

1          THE COURT:  Well, I just told the jury to come back --
2     should I tell them to come back later?
3          MS. LOEFFLER:  I think -- and tell them to come back at
4     1:30 and we can -- you'll have --
5          THE COURT:  Would you tell them 1:30?
6          MS. LOEFFLER:  -- a decision one way or another.
7          THE COURT:  Okay.  You're going to have to run, Ruth.
8     Or maybe you're not.  Maybe they're still here.  Okay.  So I'm
9     going to have to have an offer of proof, and we're going to
10    have to have them all -- are they -- they're not in custody.
11         MR. CURTNER:  No.
12         THE COURT:  So it's going to be bam, bam, bam, bam.
13         MR. CURTNER:  Uh-huh (affirmative).  We had our
14    pleadings -- I think we made an offer of proof in our pleadings
15    and we --
16         THE COURT:  I understand.  But things have --
17         MR. CURTNER:  And these are the dots --
18         THE COURT:  Things have changed since then.
19         MR. CURTNER:  Huh?
20         THE COURT:  Things have changed since then.
21         MR. CURTNER:  Okay.
22         THE COURT:  Because now I've seen Mr. Barnum.  I hadn't
23    seen Mr. Barnum.  Did you tell them 1:30?
24         UNIDENTIFIED SPEAKER:  Yes.
25         THE COURT:  Good work.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 154 of 206
(720) 384-8078  attrans@sbcglobal.net

1          UNIDENTIFIED SPEAKER:  They're just on their way out.

2          THE COURT:  Okay.  All right.

3          MS. LOEFFLER:  Okay.

4          THE COURT:  1 o'clock, and we'll just --

5          MR. CURTNER:  1 o'clock.

6          THE COURT:  -- go through them and we'll see if there's

7   any relevance.

8          THE CLERK:  All rise.  Matter stands in recess until 1

9   p.m.

10         THE COURT:  So what if -- just, hypothetically, what if

11  none of them are relevant?

12         MR. CURTNER:  If you don't let them testify, that's all

13  I have for today.  But we'll have -- we have a full lineup for

14  tomorrow, that we'll get through tomorrow.

15         THE COURT:  Good work.  Okay, thanks.

16         THE CLERK:  All rise.  Matter stands in recess until 1

17  p.m.

18      (Court recessed at 11:42 a.m., until 1:01 p.m.)

19      (Jury not present)

20         THE CLERK:  All rise.  His Honor, the United States

21  District Court for the District of Alaska is now again in

22  session.  Please be seated.

23         THE COURT:  Please be seated.  Let's go down the list.

24  First one is?

25         MR. CURTNER:  Christine Burton.  She's coming through

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 155 of 206

1    security, hypothetically.  And, Judge, just so you know, one of

2    the witnesses on the list didn't get through security.

3              THE COURT:  Well, why didn't they?

4              MR. CURTNER:  Because, allegedly, he had a gun in his

5    backpack.

6              THE COURT:  You know, that's not permissible.

7              MR. CURTNER:  Pardon me?

8              THE COURT:  That's not permissible.

9              MR. CURTNER:  Well, unless it's a Smith & Wesson 629,

10   but -- no, I know.  So he's not in custody.  I think that we

11   have a CJA attorney representing him, so -- can we have him

12   brought -- this is not my idea.  Can he be the fourth witness

13   if --

14             THE COURT:  Is he in the building?

15             MR. CURTNER:  Yeah, he's --

16             THE COURT:  Okay.

17             MR. CURTNER:  He's not going anywhere.

18             THE COURT:  So I don't understand --

19             MS. LOEFFLER:  Because apparently it was loaded.

20             THE COURT:  Who did you -- the gun was loaded?

21             MS. LOEFFLER:  That's what I hear, the gun was loaded.

22             THE COURT:  Oh, my goodness.  Okay, so what do we got

23   here now?  You just --

24             MR. CURTNER:  We have three witnesses to the incident

25   at the AC store, I think, that we provided information --

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 753  Filed 09/23/14  Page 156 of 206
(720) 384-8078  attrans@sbcglobal.net

1          THE COURT:  Okay.  So that's marginally relevant, is

2     what the government's going to say.  Right?

3          MR. CURTNER:  That's what they'll say.

4          THE COURT:  Okay.  And then --

5          MS. LOEFFLER:  I'm going to say it's less than

6     marginally relevant, actually --

7          THE COURT:  Okay.

8          MS. LOEFFLER:  -- but we haven't gotten there yet,

9     so --

10          THE COURT:  Okay, I'm just setting --

11          MS. LOEFFLER:  -- I'll wait until we --

12          THE COURT:  -- the stage.  Okay.  And so who -- you --

13     you've given the name of someone who's not on this list, so

14     that's what threw me off, so --

15          MR. CURTNER:  Who's that?

16          MS. LOEFFLER:  No.

17          THE COURT:  The person that you said is your next

18     witness.

19          MR. CURTNER:  Oh.  Christine Burton?  She's --

20          MS. LOEFFLER:  I think she is on the list.  I think.

21          THE COURT:  She's not on the -- oh, she's -- you --

22     over to the next day.

23          MR. CURTNER:  Maybe I gave you an old -- did I give you

24     the old list?

25          THE COURT:  No.  No, no, you just gave -- I went like

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 157 of 206
(720) 384-8078  attrans@sbcglobal.net

1  this, thinking you were talking about Tuesday, and she's on

2  tomorrow's.  And she --

3          MS. LOEFFLER:  No, Your Honor, he gave an up -- maybe

4  what it is is that we asked them over the weekend for an

5  updated list for Monday and Tuesday.

6          THE COURT:  Oh, I didn't get that.

7          MS. LOEFFLER:  And -- I'm sorry.  They sent it to us.

8  So we have an updated list.

9          THE COURT:  I'm working from the list I've always been

10  working on.

11          MS. LOEFFLER:  Here.

12          MR. CURTNER:  Well, we just consolidated everybody as

13  much as we --

14          THE COURT:  Okay, that's helpful.  That would be

15  interesting.  Did -- it didn't get sent to me?

16          MR. CURTNER:  No, I'm afraid, Your Honor, I --

17          MS. LOEFFLER:  (Indiscernible) -- I mean, you can take

18  a look at it for a sec.

19          MR. SCHRODER:  That's got all our notes on it.

20          MS. LOEFFLER:  I know, but he can give it back.  I

21  just --

22          THE COURT:  Well --

23          MS. LOEFFLER:  It's got --

24          THE COURT:  -- I don't need all your notes.

25          MS. LOEFFLER:  Okay.  It should --

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 158 of 206

THE COURT:  I don't want your notes.

MS. LOEFFLER:  Well, our notes are just who's --

MR. CURTNER:  Do you have a clean --

MS. LOEFFLER:  -- doing what.

MR. CURTNER:  -- copy?

THE COURT:  I just want a clean copy.

MS. LOEFFLER:  Okay.

(Side conversation)

THE COURT:  Okay, just tell me, then.  Who are they today?

MR. CURTNER:  Yeah.  We have five witnesses for today.

THE COURT:  Okay.

MR. CURTNER:  Christine Burton, Linda Hinson, Lindsey Fisher --

THE COURT:  Okay.  So we're going over the next day.  Christine Burton, Linda Hinson --

MR. CURTNER:  Lindsey Fisher.

THE COURT:  -- Lindsey Fisher.

MR. CURTNER:  And then Arek Parsley, who's the one in custody.  And then Officer Thyen.  He's a APD officer.

THE COURT:  Now I know what you're doing.  See, I've been studying these other ones you --

MR. CURTNER:  Oh, I'm sorry.

THE COURT:  I've been studying the --

MR. CURTNER:  I thought you had --

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 753  Filed 09/23/14  Page 159 of 206

```
 1            THE COURT:  -- last five here.
 2            MR. CURTNER:  I thought I'd sent you our updated list.
 3            THE COURT:  Okay.  Well, at least now I know what
 4   you're up to.
 5            MR. CURTNER:  Yeah.  These --
 6            THE COURT:  Okay.
 7            MR. CURTNER:  -- are all witnesses related to the
 8   Barnums.
 9            THE COURT:  Okay.  Tell me why they're relevant.
10            MR. CURTNER:  They're relevant because it puts Mr.
11   Barnum, first of all, in Kodiak at the time of the homicides.
12            THE COURT:  Undisputed.
13            MR. CURTNER:  It has him acting bizarrely, talking
14   about the homicides, saying he didn't do it when it --
15            THE COURT:  Okay.
16            MR. CURTNER:  -- wasn't asked.  He had been -- the --
17   coming into that store for maybe a couple weeks.
18            THE COURT:  Okay.
19            MR. CURTNER:  And -- with bizarre behavior.
20            THE COURT:  Okay, and --
21            MR. CURTNER:  And also acting like he's shooting
22   people.
23            THE COURT:  Okay.
24            MR. CURTNER:  And then he leaves town right after --
25            THE COURT:  Okay.
```

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 160 of 206
(720) 384-8078   attrans@sbcglobal.net

1           MR. CURTNER:  -- the homicides.  And then, when he does

2    get arrested here in Anchorage on -- for burglaries and

3    stealing firearms, that's when he shoots a police officer,

4    and -- which --

5           THE COURT:  Shoots at --

6           MR. CURTNER:  Which would be argued an overreaction to

7    somebody who was being picked up --

8           THE COURT:  Okay.

9           MR. CURTNER:  -- on burglary charge, but not for

10   somebody who might be a murder suspect.

11          THE COURT:  Okay.  That's -- I'm not one bit surprised

12   at what you've just told me, now that I know the names of the

13   witnesses.  What's your response?

14          MS. LOEFFLER:  Well, Your Honor, I think that

15   there's -- you know, the position is there's actually no

16   relevance.  They've tried and tried again to try to tie Jason

17   Barnum to Hannah Belisle and got nowhere.  So we now know, yes,

18   there's no dispute that he was on the island.  And what they're

19   saying basically is he was on the island.  My understanding is

20   that he went to the convenience store, got pissed off because

21   somebody wouldn't sell him cigarettes.  And I'm not sure this

22   is all that they're going to say, because I haven't talked to

23   them.

24          THE COURT:  Okay.

25          MS. LOEFFLER:  But my understanding is -- and, you

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 161 of 206
(720) 384-8078  attrans@sbcglobal.net

1  know, threw something down and said, "I didn't do it."  I don't

2  know how that makes it relevant.  I believe that there will be

3  evidence that he pointed at somebody and went like this.

4          THE COURT:  Okay.

5          MS. LOEFFLER:   Somebody's going to say one thing,

6  somebody else is going to say, "That's a game he" --

7          THE COURT:  Okay.

8          MS. LOEFFLER:  -- "used to play with my kids."  They

9  would do it to him, he would do it back --

10         THE COURT:  Okay.

11         MS. LOEFFLER:  -- is what I think.  I'm not -- you

12  know.  And then -- now we're going to try to call some -- the

13  cop that he shot in Anchorage, you know, which had nothing to

14  do with this, which had to do with a response to a burglary.

15  You know, the only time you -- which happened way after these

16  murders.  I mean, the case law that we gave you before

17  certainly says, you know, unless the M.O. was exact -- and

18  certainly the M.O. of shooting a cop when he's confronting him

19  about burglaries has nothing to do with what went on here.

20         THE COURT:  Okay.  So in my view, if the offer of proof

21  is no more than it's been made, then it's not relevant.

22         MS. LOEFFLER:  Okay.

23         THE COURT:  But I'm willing to give you some time to

24  see if there's more than you think there is.  I'm -- I'll be

25  willing to listen.  But there's -- I am not aware of any

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 162 of 206
(720) 384-8078   attrans@sbcglobal.net

1    evidence that Jason Barnum knew any of the victims or knew any

2    of the victims' families or the facility where this occurred,

3    that he had any -- I -- contact of the general location, that

4    he has anything to offer that is relevant.  And my concern is

5    that, although he may enjoy the opportunity to come forward and

6    take part in this, he has nothing relevant to add, nothing

7    meaningful to add, and he carries the potential of just

8    confusing the issue.  And, you know, I have an obligation to

9    maintain the integrity of this proceeding and to avoid

10   unnecessarily -- drama if it's just unrelated and unnecessary

11   sideshows.  And I'm afraid that's the direction we're heading.

12           Now, you know, I looked at these *Miller* factors.  I've

13   permitted the defense to develop third-party culpability

14   theories that I've called the Hannah theory, the widow theory,

15   the paramour theory, the Brennick theory, and other potential

16   theories.  So I've given the defendant many opportunities and

17   plenty of opportunities to argue this theory.  But at some

18   point I think there has to be a limitation.  And I haven't seen

19   any connection, reasonable connection, between Jason Barnum and

20   these murders that would permit the case to proceed.  But if

21   you want to make your record and bring them in, I'm happy to

22   allow you to do so.

23           MR. CURTNER:  And that's what we'll do, Your Honor.

24           THE COURT:  Okay.  And if the government tells me I'm

25   wrong in that regard, let me know if I'm missing something.

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 163 of 206

1   I -- is there something I'm overlooking here?

2           MS. LOEFFLER:  No, Your Honor.  And I think that -- I

3   mean --

4           THE COURT:  I mean, you -- both of you know the

5   background of this far more than I do.  But I've base -- I'm

6   basing my decision on the offer of proof and what I do know

7   about the case.

8           MS. LOEFFLER:  Yeah, I -- I'm -- mean, I think the

9   defendant's going to put their offer of proof on with the

10  people and --

11          THE COURT:  Let's go.  Go for it.

12          MS. LOEFFLER:  -- that's what we should do.

13          THE COURT:  Okay.  This the first one?

14          UNIDENTIFIED SPEAKER:  Christine Burton.

15          THE COURT:  Good afternoon, ma'am.  You can head on

16  forward.  Yeah, just keep coming up here, and you take a hard

17  right there, and then come into the jury box, and pull that

18  door open.  And just remain standing --

19          THE CLERK:  Remain standing, ma'am.

20          THE COURT:  -- for a second.  She's going to swear you

21  in.

22          THE CLERK:  That's okay.

23          THE COURT:  That's all right.

24          THE CLERK:  Raise your right hand.

25          THE COURT:  Right hand.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 164 of 206

BURTON - DIRECT

1    CHRISTINE BURTON, DEFENDANT'S WITNESS, SWORN

2    (By offer of proof)

3    THE CLERK:  Thank you.  Please have a seat.  Okay.

4  And, ma'am, if you can please state and spell your full name.

5    THE WITNESS:  Christine Burton.  C-h-r-i-s-t-i-n-e, B-

6  u-r-t-o-n.

7    THE CLERK:  Thank you.

8    THE COURT:  Okay.  Counsel.

9    DIRECT EXAMINATION

10  BY MR. CURTNER:

11  Q    Good afternoon, Ms. Burton.

12  A    Uh-huh (affirmative).

13  Q    Where do you live?

14  A    In Kodiak.

15  Q    And where do you work?

16  A    Nowhere right now.  I was working at AC in Bells Flats.

17  Q    Okay.  And what is the AC?

18  A    Alaska Commercial Company.  It's a little convenience

19  store.

20  Q    Were you working there in April of 2012?

21  A    Yes.

22  Q    Now, when you were working there -- how long had you been

23  working there?

24  A    I've been working for them off and on for eight years.

25  Q    And do you recall somebody who became known to you as

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 753  Filed 09/23/14  Page 165 of 206

1  Jason Barnum coming into your store?

2  A    Yes.

3  Q    How many times did he come into the store?

4  A    Maybe a dozen.

5  Q    Over what period of time?

6  A    About a month, month and a half.

7  Q    Okay.  What did you observe when he came into your store?

8  A    He was high a lot, kind of -- a little off.

9  Q    What do you mean by a little off?

10  A    Not necessarily nice.

11  Q    He was -- was he not nice?  Explain what you mean.

12  A    One time, we refused to sell him cigarettes because he

13  didn't have an ID, and he proceeded to call one of my cashiers

14  a bitch.  And one time he came in and people were accusing him

15  of something, and he threw down what he had in his hand and

16  said, "I didn't F-in' do it."

17  Q    Okay.  Now, do you remember specifically April 12th of

18  2012?  Do you remember when the homicides took place?

19  A    Uh-huh (affirmative).

20  Q    Do you remember seeing him that day?

21  A    No.  It -- maybe later in the day --

22  Q    Uh-huh (affirmative).

23  A    -- or the next day.

24  Q    Okay.  When do you remember seeing him on that day or

25  about that time?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 166 of 206

BURTON - DIRECT

1  A    It would have been in the afternoon.

2  Q    Okay.  And what happened?

3  A    He came in for a drink and a pack of smokes.

4  Q    And did anything happen then?

5  A    No, he was very cordial.

6  Q    Well, when was the time he said, "I didn't do it, I didn't

7  do it"?

8  A    It would have either -- I think it was the next

9  afternoon --

10  Q    Okay, what happened?

11  A    -- that he came in.

12  Q    Okay.

13  A    He was -- Kodiak's a small town.

14  Q    Uh-huh (affirmative).

15  A    Everybody starts rumors.  It doesn't matter if it's true

16  or not.  And it gets around in a matter of seconds.

17  Q    Uh-huh (affirmative).

18  A    He had heard that he was being accused of the murders,

19  and --

20  Q    Uh-huh (affirmative).

21  A    -- he got upset, said he didn't F-in' do it.

22  Q    Okay.  Now, before that, did you -- were you concerned

23  about him being in the store, coming in?  Did you call anybody?

24  A    I did not.

25  Q    Okay.  You didn't call anybody, okay.  So -- you know

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 167 of 206

1   Dylan Froehlich?

2   A    I do.

3   Q    Did you call him or you did not call him?

4   A    I talked to him.  I did not call him.

5   Q    Oh, okay.  And what'd you talk to him about?

6   A    I just told him that he made my girls uncomfortable, and

7   if he was going to be in there, maybe Dave should be in with

8   him.

9   Q    Oh, so you told Dave about Jason Barnum making your --

10  A    Yes.

11  Q    -- girls -- you mean your -- the --

12  A    My employees.

13  Q    Your employees uncomfortable, okay.  And do you remember

14  when that was?

15  A    I -- I don't know if it was before or after.  I just know

16  that I had that conversation with him, because he said that

17  Jason had just gotten out of prison and that everyone was

18  giving him a hard time, and Dave trusted his girls around him,

19  and he wasn't a bad guy.

20  Q    Okay.  And then did you -- was there any incident when he

21  was, like, pointing his finger like a gun?

22  A    Yes.

23  Q    When was that?

24  A    It would have been after the murders.

25  Q    How long after?

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 168 of 206

**BURTON - DIRECT**

1  A    The next day.

2  Q    What happened then?

3  A    Or the day after that.  He just drove through.  He was in

4  the vehicle with Dylan Froehlich.  My son was outside along

5  with two other people.  And my son was playing with his fingers

6  like a gun.  Whether he pointed it at him or not, I don't know.

7  But Jason came through and pretended like he was shooting out

8  the window, hollering, "I didn't F-in' do it."

9  Q    Okay.  Did you see him after that?

10 A    Yes.

11 Q    How often -- how long was he around after that?

12 A    Maybe a week, two at the most.

13 Q    Okay.  And was his attitude different at all after that?

14 A    Actually, he came in and apologized for his behavior once.

15 The next time he came in, he was so drunk or high or whatever

16 he was, you couldn't really understand what he was saying.

17 Q    Okay.  Was that the last time you saw him?

18 A    Uh-huh (affirmative).

19 Q    All right.  Thank you.

20 A    Uh-huh (affirmative).

21      THE COURT:  Okay.  Oh, do you want cross?

22      MS. LOEFFLER:  I just have one thing I wanted to ask.

23 (Indiscernible).

24                    **CROSS-EXAMINATION**

25 BY MS. LOEFFLER:

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 169 of 206
(720) 384-8078   attrans@sbcglobal.net

1  Q    It's Ms. Burton, isn't it?

2  A    Yes.

3  Q    Okay.  When you said something about your son being

4  outside, would your kid -- how many kids do you have?

5  A    I have five that are biologically mine and one that I have

6  on every weekend, holidays.

7  Q    Well, you have six, then, that you're --

8  A    Yes.

9  Q    -- responsible for?

10 A    Yes.

11 Q    So -- and I don't want to go in -- through the ages, but I

12 wanted to ask you about this incident about -- I don't know

13 what the figures -- do your kids -- do any of your kids do

14 that, and did they -- would they do it when they're hanging

15 out?

16 A    All of them.

17 Q    Okay.

18 A    Every one of them.

19 Q    All right.  They like to make the little, you know, --

20 A    They -- they like --

21 Q    -- "bang, bang" with the fingers?

22 A    With their fingers, with toy guns, it doesn't matter.

23 They like to.

24 Q    Okay.

25 A    We live on a ranch.  They go hunting, they enjoy it.  They

1  play around.

2  Q   Okay.  So the day that was somewhere near the murder

3  when --

4  A   Uh-huh (affirmative).

5  Q   -- Mr. Barnum may have done this, you don't know whether

6  he was responding to the kids or not, but he could have been?

7  A   Yeah.  I -- I -- he very well could have been.  I mean, I

8  wasn't paying attention to my son, I was paying attention to

9  him, because the truck he was in was loud.

10  Q   Okay.  Thank you.  That's all I had.

11  A   Thank you.

12                      REDIRECT EXAMINATION

13  BY MR. CURTNER:

14  Q   Just one question.  So -- Ms. Burton, did Mr. Barnum scare

15  you at all?

16  A   He made me uncomfortable.  I don't want to know -- I don't

17  know if I would say scared, but he made me uncomfortable.  He

18  looked kind of creepy, but he never did anything to me --

19  Q   Okay.

20  A   -- that made me scared of him.

21  Q   All right, thank you.

22          THE COURT:  Okay, thank you, ma'am.  We may call you

23  back.  We may not.  And we'll see.  Next.

24      (Witness excused)

25          MR. CURTNER:  Linda Hinson.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 171 of 206

1        THE COURT:  We got a spot for you up here, ma'am.  Just

2  make your way up, take a hard right when you get there, and

3  then step into the witness box.  That door pulls out.  And then

4  just remain standing for a second here, and this lady right

5  here's going to swear you in.

6        THE CLERK:  Please raise your right hand.

7        **LINDA ELLEN HINSON, DEFENDANT'S WITNESS, SWORN**

8                      **(By offer of proof)**

9        THE CLERK:  Okay, thank you.  Please have a seat.  And,

10 ma'am, if you can please state and spell your full name.

11       THE WITNESS:  Linda Ellen Hinson.  H-i-n-s-o-n.

12       THE CLERK:  And Linda's the common spelling?

13       THE WITNESS:  Pardon me?

14       THE CLERK:  Linda --

15       THE COURT:  How do you spell Linda?

16       THE CLERK:  -- is the common spelling?

17       THE WITNESS:  L-i-n-d-a.

18       THE CLERK:  Thank you.

19       THE COURT:  Okay.  All right, counsel.

20       MR. CURTNER:  Thank you.

21                      **DIRECT EXAMINATION**

22 BY MR. CURTNER:

23 Q    Good afternoon, Ms. Hinson.  Where do you live?

24 A    Kodiak Island.

25 Q    And where do you work?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 172 of 206

1  A    AC.

2  Q    How long have you worked at the AC?

3  A    Ten years.

4  Q    Okay.  Can you tell the judge what that is?

5  A    It's Alaska Commercial Convenience Store.

6  Q    And were you working back in April of 2012?

7  A    Yes.

8  Q    Do you remember somebody that -- known to you now as Jason

9  Barnum?

10  A    The tattoo guy?

11  Q    Yeah.

12  A    Yeah.

13  Q    What do you know about him?

14  A    I know that he was an ex-convict, he had a drug problem,

15  and he threatened me when he came in the store.

16  Q    Threatened you?

17  A    Yes, he did.

18  Q    Okay.  How many times did he threaten you?

19  A    Just one.

20  Q    How did he threaten you?

21  A    Well, by calling me names, and he'd come driving through

22  the parking lot, put his arm across like he was pulling a

23  trigger.

24  Q    Okay.  And you felt that was a threat?

25  A    Yes, I did, and I called the troopers.

**HINSON - DIRECT**

1  Q   Okay.  And so the -- it caused you to be put in fear by

2  his behavior.  Is that correct?

3  A   Not necessarily fear for myself, but fear for the people

4  that come in and out of the store.

5  Q   Okay.  Do you -- how often did he come into the store

6  while you were working there?

7  A   Well, I couldn't give you the exact number of times.  We

8  have regulars that come in and out of there.  He was in there a

9  few times with some children, buying candy.  He tried to buy

10 cigarettes.  I wouldn't sell to him; he didn't have an ID.

11 Q   Okay.  And was he ever belligerent or did he act bizarrely

12 there at all?

13 A   He acted like he was on drugs.

14 Q   Okay.  Was -- did he appear that way a lot?

15 A   Most of the time.

16 Q   Okay.  And what do you mean by appearing like he's on

17 drugs?  What does that mean to you?

18 A   Slurred speech, red eyes, sweating bullets.

19 Q   Okay.  You saw him on -- be that way more than once?

20 A   Yes.

21 Q   Usually every time he came in?

22 A   Just about.

23 Q   Okay.  Did you call -- do you know where he was living?

24 A   All I know is he was staying up the road.

25 Q   Okay.  And you don't know who -- what -- he was living

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 174 of 206
(720) 384-8078   attrans@sbcglobal.net

1  with at the time?

2  A   No, I don't.

3  Q   Do you ever -- do you recall him being at the store on

4  August -- on April 12th, 2012?

5  A   You know, that's, like, two years ago.  I --

6  Q   I understand.

7  A   -- have a lot of people -- I generally have 100, 120

8  customers a day on my shift.

9  Q   Okay.

10  A   So to be specific and tell you that I remember, I don't.

11  Q   Okay.  Thank you.  Do you remember around -- you remember

12  when the homicides took place.  Right?

13  A   Yes, I do.

14  Q   And about that time or shortly after that, do you remember

15  him coming in?

16  A   I know he was in there, but I can't tell you if it was

17  before or after the homicide.

18  Q   Okay.  Well, what did he -- about that time, then, what

19  did you observe?

20  A   As far as what?

21  Q   About what he did.  What was he like when he came in?

22  A   The first time he came in, he wanted cigarettes.  He did

23  not have an ID.  I did not recognize him.  You couldn't tell

24  how old he was by the way he was tattooed.  He called me a

25  bitch and he said he'd get me --

HINSON - DIRECT

1  Q    And he said he'd get you.

2  A    -- and he left.

3  Q    Was that around April 12th?

4  A    I don't know, sir.

5  Q    All right, okay.  That's fine.  And was that the same day

6  or -- that he threatened you with his -- like, the shooting --

7  A    No, that was about three days later, when I stepped out

8  front of the store.

9  Q    And that's when he threatened you, looked like he was

10 going to shoot you?

11 A    Right, like he was trying to shoot me.

12 Q    Okay.  Thank you.  That's all I have.

13      THE COURT:  Cross.

14      MS. LOEFFLER:  No.  Thank you.

15      THE COURT:  Thank you, ma'am.  We may or may not --

16      THE WITNESS:  Am I done?

17      THE COURT:  -- call you back.  We -- just figure out

18 what's going on here.

19   (Witness excused)

20      MR. CURTNER:  Lindsey Fisher, Judge, next.

21      THE COURT:  Okay.  Morning -- afternoon.  Just keep

22 your -- keep on going.

23      MS. FISHER:  All right.

24      THE COURT:  And then that door pulls out.  Just come on

25 in, stand for a second.  This lady's going to swear you in.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 176 of 206
(720) 384-8078  attrans@sbcglobal.net

1    THE CLERK:  Please raise your right hand.

2        **LINDSEY FISHER, DEFENDANT'S WITNESS, SWORN**

3            **(By offer of proof)**

4    THE CLERK:  Okay, thank you.  Please have a seat.  And,

5  ma'am, if you can please state and spell your full name.

6    THE WITNESS:  It's Lindsey Fisher.  L-i-n-d-s-e-y, F-i-

7  s-h-e-r.

8    THE CLERK:  Thank you.

9    THE COURT:  All right.  Counsel.

10   MR. CURTNER:  Thank you.

11           **DIRECT EXAMINATION**

12  BY MR. CURTNER:

13  Q    Ms. Fisher, where do you live?

14  A    In Oregon.

15  Q    Okay.  What do you do there?

16  A    A stay-at-home mom --

17  Q    All right.

18  A    -- full-time student, and reservist in the Coast Guard.

19  Q    Good.  Would -- did you live in Kodiak for a while?

20  A    I did, three years.

21  Q    When?  Three years?

22  A    Uh-huh (affirmative).  From '09 to 2012.

23  Q    When did you leave Kodiak?

24  A    August -- or June 2012.

25  Q    What were you doing in Kodiak at that time?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 177 of 206

1  A   Stationed at the Coast Guard base, at the clinic.

2  Q   Okay.  So I'm sure you're aware of the homicides there --

3  A   I am.

4  Q   -- in April.

5  A   Uh-huh (affirmative).

6  Q   Do you recall anything unusual that happened on April

7  13th?

8  A   Thinking back, I remember having a discussion with the

9  clerks at the corner store.

10 Q   At the AC store?

11 A   At the AC store, yes.  And --

12 Q   Uh-huh (affirmative).

13 A   -- you know, reading over my testimony, I -- I -- I don't

14 really remember much.  I don't -- like, I can't really piece

15 things together.  Honestly, I'm -- I don't remember much.  I

16 just know, discussing with them, what they had saw, and then

17 trying to take action, notifying the police department or the

18 military police because of suspicious activity that was going

19 on.  Because we were told by the Coast Guard, "If you see

20 anything, hear anything, let us know," because of everything

21 that just happened.

22     And I don't know if maybe I -- hearing from them what they

23 saw and having the long discussions with them, that maybe it

24 made me feel like I saw something happen.  I do remember

25 hearing about -- or seeing the vehicle with the guy come by,

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 178 of 206

1  pretending to shoot, but I don't --

2  Q    Well, okay.  Best you can remember, what do you remember

3  seeing on that day?  You filed a poli -- a report on this?

4  A    I did.  Yes.

5  Q    And did you -- have you looked at that report lately?

6  A    I did.  And all it says on there is what I was informed by

7  the people working at the store, what I told the police.

8  Q    Okay.  Can I just show you the screen -- it's been marked

9  as Defense Exhibit 200 -- just to see --

10        THE COURT:  Be right to your left there.

11 BY MR. CURTNER:

12 Q    Just to see if you recognize that.

13 A    I do.

14 Q    Just tell the judge what that is.

15 A    It's the form I -- I wrote to the military police that

16 day.

17 Q    Okay.  And so that was your handwriting there?

18 A    Yeah.

19 Q    And did you -- so looking at that, and you've had a chance

20 to review it, do you remember what you actually observed

21 yourself?

22 A    I don't remember.  It's been two years.  Like, I had a lot

23 going on around that time frame, so I just -- I don't really

24 remember.  I wish I could.

25 Q    Okay.  But you did file that report?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 179 of 206

1  A    I did.  I did.

2  Q    Did anybody follow up with you on that?

3  A    I don't really remember.  It's been a long time.  I may

4  have had a brief discussion with someone about it, maybe a

5  month -- a couple weeks later, but I don't really remember.

6        MR. CURTNER:  Your Honor, I'd like to admit this

7  exhibit just for purposes of this hearing.

8        THE COURT:  Okay.  It'll be admitted for the hear --

9  this hearing.

10     (Defendant's Exhibit DE-200 admitted for offer of proof

11 hearing only)

12       MR. CURTNER:  Okay.  I think that's all the questions I

13 have -- you.

14       THE COURT:  Okay.  Cross-examination.

15                  **CROSS-EXAMINATION**

16 BY MS. LOEFFLER:

17 Q    Ms. Fisher -- do I have the right name?

18 A    Yes, ma'am.

19 Q    Okay.  So if I have this right, you heard from the clerks

20 at the store some stuff, and because of the -- what had

21 happened, because of Rich Belisle and Jim Hopkins being

22 murdered, at the Coast Guard they had said if you see anything

23 weird and whatever, report it.

24 A    Yes, ma'am.

25 Q    Okay.  So looking back today, you reported something to

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 180 of 206
(720) 384-8078   attrans@sbcglobal.net

**FISHER - CROSS**

1  the Coast Guard because you were concerned of the safety of

2  people in the community?

3  A   Yes, ma'am.

4  Q   Okay.  And so you're not sure with what -- if what's on

5  this was something that you actually saw or whether what you

6  were doing was telling the Coast Guard, "Here's what I heard

7  from these other people; just do something about it and make

8  sure everybody's safe."

9  A   Yes, ma'am.

10 Q   Okay.  I don't have anything else.

11          THE COURT:  All right.

12      (Side conversation)

13          MS. LOEFFLER:  Judge, if you'll look at the one that

14 you have, having flashed it for a second -- do you have a hard

15 copy in front of you or do you have it?

16          THE COURT:  No, I have it on the screen.

17          MS. LOEFFLER:  Okay.  I don't, but I think if you read

18 the first line it says, "I heard from Christine Burton."

19          THE COURT:  That's --

20          MS. LOEFFLER:  Is that right?  That's what I'm try --

21          THE COURT:  "I was --

22          MS. LOEFFLER:  "I was informed by" --

23          THE COURT:  -- "informed by Christine" --

24          MS. LOEFFLER:  -- "Christine Burton."

25          THE COURT:  Yes, that's what it says.

**FISHER - CROSS**

1    MS. LOEFFLER:  Okay.

2  BY MS. LOEFFLER:

3  Q    So that's -- this is what people told you and then you

4  reported it?

5  A    Yes, ma'am.

6  Q    Okay.  That's it.

7         THE COURT:  Okay.  Cross-examination.

8         MR. CURTNER:  No, Your Honor.

9         THE COURT:  Thank you, ma'am.  You may or may not be

10  called back, so --

11         THE WITNESS:  Okay.

12         THE COURT:  -- stay around.  Next witness.

13     (Witness excused)

14         MR. CURTNER:  Yes.  Is Officer Thyen.

15         THE COURT:  All right.  Good afternoon, sir.  If you

16  can just keep moving up this way.  Got a seat for you here.

17  Take a hard lef -- right.  Then just step in the box.  The door

18  pulls out.  Remain standing for a second, and my clerk will

19  swear you in.

20         THE CLERK:  Please raise your right hand.

21         **DANIEL THYEN, DEFENDANT'S WITNESS, SWORN**

22              **(By offer of proof)**

23         THE CLERK:  Thank you.  Please have a seat.  And, sir,

24  if you can please state and spell your full name.

25         THE WITNESS:  It's Daniel Thyen.  Last name is spelled

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 182 of 206
(720) 384-8078   attrans@sbcglobal.net

1    T-h-y-e-n.

2         THE COURT: All right, counsel.

3            **DIRECT EXAMINATION**

4    BY MR. CURTNER:

5    Q    Good afternoon, Officer Thyen.

6    A    Good afternoon.

7    Q    Do you know a gentleman by the name of Jason Barnum?

8    A    I do.

9    Q    How did you meet Mr. Barnum?

10    A    I never really met Mr. Barnum.

11    Q    Okay. What do you know about Mr. Barnum?

12    A    I know that he's currently incarcerated at the Anchorage

13    Jail for attempted murder on me.

14    Q    On you?

15    A    Correct.

16    Q    Can you briefly tell us what happened on that day?

17    A    It's a process of investigating a series of burglaries

18    that happened the night before and the morning of that date,

19    believe September 12th of -- or, I'm sorry, September 13th of

20    2012.

21    Q    Okay. So you were investigating some burglaries?

22    A    Correct, myself and two other officers -- well, multiple

23    other officers, but two other officers were in a room at the

24    Merrill Field Inn, contacting possible people involved in this

25    based on investigation that -- come forth so far. While in

1 that room, Mr. Barnum appeared from a bathroom where he had

2 been hiding and fired a -- a shot that hit me.

3 Q    Okay.  So as I understand it, he was in a motel room with

4 some other people?

5 A    That is correct.

6 Q    And you and several other officers went in --

7 A    That is correct.

8 Q    -- and investigated or whatever.  And then -- so he took a

9 shot at you?

10 A    Well, he put his arm out the bathroom and proceeded to

11 fire a pistol, and one round did hit me, yes.

12 Q    Okay.  How many rounds did he fire?

13 A    I don't know.

14 Q    Did you have any discussion with him at all before he just

15 started shooting at you?

16 A    No.  Did not know he was hiding in the bathroom.

17 Q    Okay.  And that case is still pending?

18 A    That is correct.

19 Q    All right.  Thank you.  That's all I have.

20        THE COURT:  Cross.

21                    **CROSS-EXAMINATION**

22 BY MS. LOEFFLER:

23 Q    Mr. -- Officer Thyen?

24 A    Yes.

25 Q    Do I have that right?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 184 of 206

**THYEN - CROSS**

1  A    That's perfect.

2  Q    First of all, how are you?

3  A    I'm fine.

4  Q    Okay, good.  The second thing was, was Mr. Barnum, like,

5  high?  Was there a bunch of drug stuff going on in there, do

6  you know?

7  A    Well, I don't actually know all of the circumstances of

8  that case, because it is still pending, and I --

9  Q    Right.

10  A    -- basically know my portion of it.  They've asked me not

11  to --

12  Q    Okay.

13  A    -- do anything else at this point.

14  Q    Well, the shot -- the shots that he fired and the shot

15  that hit you, were that -- did that appear to be a reaction as

16  opposed to -- they didn't lure you in and shoot you, I take it?

17  A    No.  There was an active investigation.  We were actually

18  in the room for quite some time and he was -- he was basically

19  hiding in the bathroom, hoping that we would just -- I'm sure

20  just eventually leave and he would be able to go on his merry

21  day.

22  Q    Okay, thank you.  I don't have anything further.

23        THE COURT:  Redirect.

24        MS. LOEFFLER:  Thank you, Officer.

25                    **REDIRECT EXAMINATION**

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 185 of 206

**THYEN - REDIRECT**

1  BY MR. CURTNER:

2  Q    Just a -- do you know what kind of gun you were shot with?

3  A    Not off the top of my head, no.  I -- I believe it was a

4  .45-caliber, but I'm not -- it was a stolen gun that was stolen

5  that morning.

6  Q    Oh, okay.  And -- okay.  Well, thank you for coming down,

7  officer.

8  A    Yes.

9         THE COURT:  Recross.

10        MS. LOEFFLER:  No, Your Honor.

11        THE COURT:  Thank you, sir.  We're --

12        THE WITNESS:  Thank you, Your Honor.

13        THE COURT:  We're still thinking about what we're going

14 to do, so --

15        THE WITNESS:  I understand.

16        THE COURT:  -- don't go too far.  Okay.  We have a

17 witness downstairs?

18    (Witness excused)

19        MR. CURTNER:  Yes.

20        THE COURT:  We can bring him up?

21        MR. CURTNER:  Be very brief.

22        THE COURT:  You going to call that --

23        THE CLERK:  Well, we have jurors coming on the way to

24 the room.

25        THE COURT:  Oh, we don't want the jurors.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 753  Filed 09/23/14  Page 186 of 206

1    THE CLERK:  Yeah.  So if we can -- oh, stay on -- the
2  big one?

3    THE COURT:  Stay in the big room -- or in the little --
4  one or the other, yeah.  Just not in the hall.  I don't care
5  where they are, just -- I know they won't be here when he's
6  coming in.  So are they on their way?  This is -- these jurors
7  are right on time every -- pretty impressive group.

8    (Side conversation)

9    MR. CURTNER:  And, Your Honor, just so you know, Mr.
10  Parsley's attorney's here, if he needs him here.

11    THE COURT:  Where's -- there --

12    MR. CURTNER:  Ben Crittenden.

13    THE COURT:  How do you do?

14    MR. CRITTENDEN:  Oh, pretty good.

15    THE COURT:  Seen you before.  So he -- did he just get
16  appointed?

17    MR. CURTNER:  Yeah.

18    THE COURT:  So what's going on?  What is going on?

19    THE CLERK:  So they'll bring him.

20    THE COURT:  I --

21    THE CLERK:  Jurors are in the room.

22    THE COURT:  Okay.

23    THE CLERK:  (Indiscernible).

24    THE COURT:  Jurors in this room, so we'll bring up the
25  witness.  And you're just going to question him about the

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 753  Filed 09/23/14  Page 187 of 206

1  Kodiak part --

2          MR. CURTNER:  Yes.  Yes.

3          THE COURT:  -- not about anything here today.

4          MR. CURTNER:  No.

5          THE COURT:  Okay.  All right.

6          MR. CURTNER:  I don't want (indiscernible).

7       (Side conversation)

8          MR. CRITTENDEN:  So -- are we bringing up the -- Mr.

9  Parsley before the jury?

10         THE COURT:  Yes.  The jury's not coming in.

11         MR. CRITTENDEN:  I mean, I just want to be clear that,

12 you know, I mean, as long as we don't have any questions about

13 what happened this morning, his intentions for coming to the

14 court or anything like that, or anything about guns.

15         MR. CURTNER:  No, no.

16         MR. CRITTENDEN:  Then -- I don't think we should

17 (indiscernible).

18         THE COURT:  I'm curious about all that, but that's not

19 relevant.

20         MR. CURTNER:  You might find out later.

21      (Pause)

22         THE COURT:  What is this gentleman's name, by the way?

23         MR. CURTNER:  Arek Parsley.

24         THE COURT:  Parsley.  And, Judge, if you want, we'll

25 send you our witness list for tomorrow.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 753  Filed 09/23/14  Page 188 of 206
(720) 384-8078  attrans@sbcglobal.net

1            THE COURT:  I would like that, just for the fun of it,
2    because -- so I know what's going on.
3            MR. CURTNER:  I don't think there's any new names on
4    it, but --
5            THE COURT:  Good.
6            MR. CURTNER:  -- it's another full day.
7            THE COURT:  Okay, tomorrow.  And then Wednesday we can
8    take rebuttal, and then Wednesday afternoon, if there's no
9    surrebuttal, we can do a closing -- closing arguments.
10           MR. CURTNER:  It will be ready Wednesday afternoon.
11           THE COURT:  Okay.  How long do you want?  I'm just
12   trying to generate discussion here.  Government hasn't
13   responded to that.  Ms. Loeffler, did my outlines shock you or
14   anything?
15           MS. LOEFFLER:  Well, we're trying to figure out
16   whether -- we were sort of figuring out that closing would be
17   Thursday.  But let me --
18           THE COURT:  Well, let's go for Wednesday afternoon.
19           MS. LOEFFLER:  Let's finish this, and then could we
20   have a discussion?
21           THE COURT:  Sure.  All right, you can step right in
22   here.  All right.  All right, okay.  Good afternoon, sir.  If
23   you can just raise your right hand.  She's going to swear you
24   in.  We got a few questions for you.
25           **AREK WALTER PARSLEY, DEFENDANT'S WITNESS, SWORN**

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 189 of 206

1        **(By offer of proof)**

2            THE CLERK:  Okay.  Thank you.  Please have a seat.

3    And, sir, if you can please state and spell your full name.

4            THE WITNESS:  Arek, A-r-e-k, Walter, W-a-l -- W-a-l-t-

5    e-r, Parsley, P-a-r-s-l-e-y.

6            THE CLERK:  Thank you.

7            THE COURT:  All right, counsel.

8                        **DIRECT EXAMINATION**

9    BY MR. CURTNER:

10   Q    Good afternoon, Mr. Parsley.  Where do you live?

11   A    I live in Kodiak.

12   Q    And where do you work?

13   A    I work for American President Lines.

14   Q    Where's -- that's in Kodiak?

15   A    Yes, sir.

16   Q    Now, were you working there and living there in April

17   2012?

18   A    Yes, sir.

19   Q    And while you were there, did you happen to be aware of a

20   person by the name of Jason Barnum?

21   A    Yeah.

22   Q    What do you know about Mr. Barnum?

23   A    I know he's got lots of tattoos on his face.  I know that

24   there was a lot of people using methamphetamines when he was in

25   town.  And he disappeared directly after this whole thing went

1  down with Mr. Wells.  I mean, it was -- it was, like, poof, he

2  was gone.

3  Q   And so how long did you see him in town?

4  A   It -- been a couple of weeks at least before

5  (indiscernible) from the time I first noticed him until he --

6  until he just -- just like I said, the -- the whole thing went

7  down on the Coast Guard base, and then it was like, what about

8  that guy.  And then nobody saw him anymore.

9  Q   Okay.  So it was a couple weeks' time.  Did you see him,

10  like, on a daily basis or --

11  A   Yeah.  He was down on the docks quite frequently.

12  Q   Is that where you work?

13  A   Yeah.  I work on Pier 2 in Kodiak.

14  Q   Do you know what he was doing down there?

15  A   I assumed he was working on a boat, but --

16  Q   You might see him every day for a couple weeks?

17  A   Yeah.

18  Q   And then you remember the homicides?

19  A   Yeah.

20  Q   You didn't see him after that?

21  A   No, sir.

22  Q   Okay.  That's all.

23       THE COURT:  Cross-examination.

24                    **CROSS-EXAMINATION**

25  BY MS. LOEFFLER:

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 191 of 206

1  Q    Mr. Parsley --

2  A    Yes, ma'am.

3  Q    -- I -- said -- when you would run into him was on the

4  docks?  Is that where you would just see him?

5  A    Yeah, I -- I -- yeah.  Just sitting?  No, I -- I work

6  there.

7  Q    Okay.

8  A    I -- I have a big shop that looks out over --

9             THE COURT:  No, that's -- you --

10            THE WITNESS:  -- most of Pier 2.

11            THE COURT:  That's not what she said.  That -- she said

12  that's where you would just see him?

13            THE WITNESS:  Yeah.  No, I --

14            MS. LOEFFLER:  Okay.

15            THE WITNESS:  -- I saw him around town.  I apologize.

16  BY MS. LOEFFLER:

17  Q    All right.  And, I mean, he's kind of a striking guy.  But

18  did you have any real interactions with him, or you just --

19  this is just a guy that you saw?

20  A    I saw him and I -- you know, I see somebody that it's --

21  striking like that, and pay attention.  It's a small town.

22  Q    Right.

23  A    I -- I kind of take a lot of responsibility for the place,

24  so --

25  Q    Now, when you said that, you know, you know people were

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 192 of 206
(720) 384-8078   attrans@sbcglobal.net

1 doing lots of meth --

2 A    Uh-huh (affirmative).

3 Q    -- I'm assuming that says, like, rumors and things and --

4 you know, that you know this guy's involved in meth from

5 talking to various people.  Right?

6 A    I -- I play music in town, and so I've spent a lot of time

7 in local bars.  And I've had -- you can tell when --

8 Q    Right.

9 A    -- some -- and there's a -- there was a lot of people that

10 were high.

11 Q    Right.

12 A    You -- you can't -- it's hard to mistake.

13 Q    Right.

14 A    So --

15 Q    Now, when you said Poofy (ph) was gone after the murder, I

16 take it that you didn't see him leave, or know if he left the

17 same day, or what day.  You just know that he wasn't in town

18 afterwards?

19 A    I -- yeah, he just -- I -- I'd seen him down on the docks

20 and downtown quite frequently, almost on a daily basis, and

21 then after the murders went -- happened, he was gone.

22 Q    Right.

23 A    Like, he -- I didn't see him downtown, I didn't see him on

24 the docks, I didn't see him anywhere.

25 Q    Okay.  That's fine.  Thank you, Mr. Parsley.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 193 of 206

1          THE COURT:  Redirect.

2          MR. CURTNER:  No, Your Honor.  Thank you.

3          THE COURT:  All right, thank you, sir.  You're excused.

4    Anything else, Mr. Curtner?

5       (Witness excused)

6          MR. CURTNER:  No, that's our proffered evidence.

7          THE COURT:  Okay.  Going to make any more argument?

8          MR. CURTNER:  Well, yes, just briefly, Your Honor.

9    And, Your Honor, just to make clear that -- you know, it's our

10   position that this doesn't have to be necessarily connected to

11   either the Belisle family or the Hopkins family.  This would be

12   an example of a potential -- of random violence by a

13   potential -- a very potential person to create a crime of

14   random violence.  And so I think that what makes this offer of

15   proof effective is the nature of the threats to the clerk at

16   about this time I think were significant.  And, I mean, as she

17   described it, it's more than bizarre behavior.  It was threats

18   to her, and for really no apparent reason.  And also the fact

19   that he was completely unprovoked when he tried -- he's tried

20   with attempted murder on a police officer.

21          And so -- and we don't have -- I understand that there

22   have been presentence reports filed with the Court perhaps on

23   Mr. Barnum that we don't have access to but the Court has.  And

24   I think if that's part of the record, you can see that Mr.

25   Barnum is a candidate for random violence that would perhaps

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 753  Filed 09/23/14  Page 194 of 206

1    defy reason.  But I think that there's enough evidence not only

2    that he was there on the island, but threatening people.  And

3    because of his history both before and after this, his criminal

4    history, I think that this is a very potential -- another

5    person who could have committed this as an act of random

6    violence.  That's our argument.

7              THE COURT:  Okay.  Government.

8              MS. LOEFFLER:  Your Honor, what I hear the evidence

9    has, is we've got a -- basically ugly, scary guy who was on the

10   island and has a criminal history.  That obviously doesn't make

11   him in any way a candidate in this case.  And, actually, the

12   only -- we have a person who said he called her an ugly name

13   and he threatened her.  But it has nothing to do with this

14   case.

15             Now, we have the other people from there who talked

16   about a day or two days later, he said, "I didn't do it."  The

17   one woman said, "I think the finger pointing may have been at

18   my son, because my son did it back to him."  We'd be this whole

19   sidelight trial and -- on her sons, and there's no connection

20   to this murder at all.  There's no evidence he even had a car

21   or that he'd ever heard of any of these people, that he knew

22   what COMMSTA was.

23             It's not sufficient just to say the guy's a scary dude

24   and he's on the island and he's high on meth and that he

25   threatened -- there's one person of the five that came in --

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 195 of 206
(720) 384-8078  attrans@sbcglobal.net

1    the other guy's the cop in Anchorage -- who said, you know, "I

2    think that he was threatening me."  That has nothing to do with

3    the case, it's just -- we got a bad -- you know.  And that's

4    it.  There's no evidence he's actually ever even assaulted

5    anybody on the island.

6          THE COURT:  Okay, I agree.  I'm going to do a written

7    order, but the bottom line is I don't think that Mr. Barnum nor

8    these last few witnesses should be permitted to testify.

9          I've looked at the *Miller* factor, as I've suggested

10   many, many times.  And my obligation is to permit the defendant

11   ample opportunity to present what we refer to as third-party

12   culpability theories, even if the evidence is weak and

13   speculative.  That's why I've allowed five theories to come in.

14   And the one thing that guided me was if there was some

15   connection between any of these witnesses and the deceased or a

16   family member of the deceased or the facility or anything, as

17   limited as that connection might be, I've allowed it in.

18   I've -- I -- I've called it the Hannah theory, the widow

19   theory, the paramour theory, the Brennick theory, and others.

20        So I'm -- defendant has many opportunities to make a

21   third-party culpability argument.  But when you look at *Miller*,

22   it can't -- it just -- there has to be some connection.  And at

23   the same time, I said -- as I said before, I have an obligation

24   to maintain the integrity of these proceedings and not allow

25   them to go down all kinds of roads that lead really nowhere.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 196 of 206

1          So I'm going to grant the -- I guess it would be the
2  government's exclusionary motion, or what would you --
3          MS. LOEFFLER:  It would be a motion in limine, except
4  because we didn't have the names of these five --
5          THE COURT:  Okay.
6          MS. LOEFFLER:  -- we didn't put their names in
7  anything, it just --
8          THE COURT:  I will grant that.  And I've got a written
9  order that I'll try to get out this afternoon.  So that leaves
10  no more witnesses today.  Is that right?
11          MR. CURTNER:  No, Your Honor.
12          MS. LOEFFLER:  Your Honor, can I ask --
13          THE COURT:  You mean "Yes, Your Honor"?  Yes, there are
14  no more witnesses?  No --
15          MR. CURTNER:  Are you calling me, Your Honor?
16          THE COURT:  Are there any more witnesses today?
17          MR. CURTNER:  No.
18          THE COURT:  Okay.  Can I at least call the jury back
19  and let them go home?
20          MS. LOEFFLER:  Yes, but I would ask you --
21          MR. CURTNER:  Yes.
22          MS. LOEFFLER:  -- one other thing.  This is just the
23  timing thing, you know.  I think I spoke quickly.  Assuming
24  that they have -- you know, they have four experts slated for
25  tomorrow, then we're going to have a rebuttal.  I would ask

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 753  Filed 09/23/14  Page 197 of 206

1   that we do all the closings starting first thing Thursday

2   morning, because it allows the jury to be awake.  It's going to

3   be long closings.  They'll be --

4           THE COURT:  How long?

5           MS. LOEFFLER:  -- relaxed, and I'm going to -- the

6   other thing is we have to get our electronics -- you know, we

7   want to be able to put the evidence up on the screen.  And I

8   would like to have an evening --

9           THE COURT:  Okay.  Thursday morning at 8:30.

10          MS. LOEFFLER:  That would be perfect.  Thank you.

11          THE COURT:  I'm going to tell the jury we can

12  anticipate closing arguments Thursday morning at 8:30, unless

13  something unsuspected occurs.

14          MS. LOEFFLER:  That'd be great.

15          THE COURT:  That will give rebuttal and surrebuttal

16  Wednesday morning.

17          MS. LOEFFLER:  I'm sorry, you're -- now you're confu --

18          THE COURT:  Rebuttal and surrebuttal would be

19  Wednesday.

20          MS. LOEFFLER:  Right.

21          THE COURT:  And then final discussions with regard to

22  jury instructions, go to the -- and that's what we'll do.

23          MS. LOEFFLER:  Yeah.  Thank you.

24          THE COURT:  That's -- you know, that gives us something

25  to work towards.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 198 of 206

1          MS. LOEFFLER:  Yeah.

2          MR. CURTNER:  And, Judge, just got one question.

3          THE COURT:  Yeah.

4          MR. CURTNER:  As far as -- in case -- we got a busy

5    schedule tomorrow.  Would you need more than -- if we don't get

6    through Tuesday, would you need all Wednesday for rebuttal, do

7    you think, or part of it?

8          MS. LOEFFLER:  Probably not.

9          MR. CURTNER:  Okay.  So if we run over into Wednesday,

10   that's not going to disrupt?

11         MS. LOEFFLER:  No, I think we're all be -- I mean,

12   that's why I asked for Thursday morning, because I think that

13   they're -- unless -- I mean, you know --

14         MR. CURTNER:  We'll be ready by Thursday.

15         MS. LOEFFLER:  Okay.  Great.

16         THE COURT:  Okay.  Yeah, so we bring the jury in and

17   tell them they -- hope they had a great lunch.

18      (Jury present)

19         THE COURT:  Please be seated.  So you ready for an

20   exciting afternoon?  You're probably -- you know, I've been

21   doing this twenty-plus years.  You were the -- probably the

22   most prompt jury that I've ever had.  Right on time, thing --

23   things (indiscernible).

24         Well -- but here's the -- I don't know if it's good

25   news or bad news.  We're done for the day -- you're done for

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 199 of 206
(720) 384-8078  attrans@sbcglobal.net

1  the day.  Here's what I understand.  We're going to come at

2  8:30.  We're going to have a heavy day tomorrow, probably go

3  all day.  And then we'll have a little more evidence

4  probably -- let's see, tomorrow's Tuesday, right -- no.  Yeah,

5  tomorrow's Tuesday.  We'll have all day Tuesday, probably some

6  evidence Wednesday into the -- I don't know when.  Maybe

7  noonish, maybe it'll go further.  And then we're going to

8  excuse you.  We're going to finish things up here, and we

9  anticipate closing arguments Thursday morning.  Okay.  So

10 that's the -- that's kind of the -- that means that if they go

11 all morning, that means that the jury would be able to begin

12 deliberations noon or so Thursday.  And that's the process.

13       Now, it's a little different -- once you begin

14 deliberations, then you don't get to go out to lunch, but --

15 you're together.  We bring lunch in to you and you continue,

16 basically the same hours, 8:30 to 5.  And if you're done by

17 Friday, fine.  If not, you can come back Monday, whatever is

18 needed.

19       The sad thing about this is we have to pick three of

20 you as alternates.  And you guys have done really well, stuck

21 with us.  Usually we don't -- we usually pick two alternates,

22 but we picked three because we thought it was going to be -- we

23 knew it was going to be a month-long trial.  You're all with

24 us, so I'm pretty impressed.  But again, remember how we picked

25 the alternates.  We have your name in a fancy spindle, we give

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 753  Filed 09/23/14  Page 200 of 206

1   it a crank of a yank, we pick three names out, and those get to

2   be the alternates.  But we don't do that until the very, very

3   end; you've heard closing arguments, you -- I've read you the

4   instructions, and then we do that.

5           But it's important now, as we get to this stage of the

6   trial, that you avoid news media, that you avoid the newspaper,

7   that you avoid anything of that nature.  And, of course,

8   remember, once this is over with, you can go -- read all the

9   papers you want and do what -- you can have a great time.  But

10  for now, you got to do -- you got to follow the admonition.

11          Okay.  The only thing I had is one of you had to leave

12  on a trip.  Ma'am, did you have a trip scheduled the --

13          UNIDENTIFIED JUROR:  Yeah, but I changed it.

14          THE COURT:  Okay, don't even worry about that, then.

15  Okay, you're ahead of us.  Okay.  Well, this is not unusual

16  for -- as we get towards the end of a trial that things kind of

17  get sporadic.  So this is not unusual.  And that's just where

18  we are.  So thank you all very much.  We'll see you tomorrow at

19  8:30.

20      (Jury not present)

21          THE COURT:  Okay, the jury is gone.  Please be seated.

22  Who do we have tomorrow, now?

23          MR. CURTNER:  Okay, we start off with Chris Iber and --

24          THE COURT:  Is --

25          MR. CURTNER:  -- Gerald Richards.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 201 of 206

1          THE COURT:  Are these experts?

2          MR. CURTNER:  Yes.

3          THE COURT:  Okay.

4          MR. CURTNER:  And then Cesar Acosta, Ryan Miller, Casey

5     Jones are Coast Guard personnel.

6          THE COURT:  Okay.

7          MR. CURTNER:  Then Bruce Currie and Jaco Swanepoel are

8     experts.

9          THE COURT:  Okay.

10         MR. CURTNER:  I guess we can scratch Jason Barnum.

11         THE COURT:  Well, let's see.  Joanne Olsen?

12         MR. CURTNER:  Joanne Olsen may be a very -- just for

13    some DMV records, possibly.  It would only be a --

14         THE COURT:  Okay.

15         MR. CURTNER:  -- just a few minutes.

16         THE COURT:  Okay.  And then?

17         MR. CURTNER:  And then we may have one of my

18    investigators, briefly.

19         THE COURT:  Okay, and that's it, then --

20         MR. CURTNER:  Oh, and then Anthony Pecoraro is also on

21    our list.

22         THE COURT:  Okay.  He's on your -- and you -- he's

23    still on the list now?

24         MR. CURTNER:  Yes.

25         THE COURT:  Okay.  So the government is aware of all

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 753  Filed 09/23/14  Page 202 of 206

1    that, right?

2           MS. LOEFFLER:  Yes, Your Honor.

3           THE COURT:  Okay.  And then you need to have your

4    rebuttal, if any, Wednesday morning, 8:30.  And then any --

5           MS. LOEFFLER:  Yeah.

6           THE COURT:  -- surrebuttal would follow immediately

7    thereafter.

8           MR. CURTNER:  And we'll get your rebuttal witnesses

9    tomorrow?

10          MS. LOEFFLER:  As soon as you're done with your case,

11   we'll send your list.

12          MR. CURTNER:  Okay.

13          MS. LOEFFLER:  Okay, yes.  So the answer to that is

14   "Yes."

15          THE COURT:  Okay.  Let's see, where's your compadre,

16   compar -- he's not here.

17          MR. CURTNER:  He's working on something else, but

18   he's --

19          THE COURT:  Okay.  And I was just going to tell him

20   that the instruction that he was interested in --

21          MR. CURTNER:  Oh.

22          THE COURT:  -- wasn't -- the -- is 35.  He said, "Did

23   you have the reasonable doubt listed twice," and it's -- the

24   second time is instruction 35.  So I got a little concerned he

25   might be working off the wrong pattern, but I think he may have

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 203 of 206

1    just overlooked it.  Then I --

2           MR. CURTNER:  I'll make sure --

3           THE COURT:  -- submitted the other one, which I'm

4    referring to as third-party liability.  Think about that, let

5    me know what you have to say, the sooner the better.  And if

6    there's --

7           MR. CURTNER:  Yeah, I'll -- we'll do that by tomorrow.

8           THE COURT:  If there's anything else in terms of jury

9    instructions, let me know, because it looks like they're pretty

10   well finalized.

11          MR. CURTNER:  Okay.

12          THE COURT:  All right.  We don't -- listen, we got all

13   afternoon.  What else do you want to talk about?  Come on.

14          MS. LOEFFLER:  We've got work to do, Your Honor.  It --

15          THE COURT:  Mr. Curtner, anything else?

16          MR. CURTNER:  No.  I got a lot of people to get ready

17   for tomorrow, so we --

18          THE COURT:  Okay.  Nancy, anything else?

19          THE CLERK:  No, I'm good.

20          THE COURT:  Okay, good.  Thank you.

21          MR. CURTNER:  All right.

22          THE CLERK:  All rise.  This matter stands in recess

23   until tomorrow at 8:30 a.m.

24       (Proceedings concluded at 1:54 p.m.)

25

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 753   Filed 09/23/14   Page 204 of 206
(720) 384-8078  attrans@sbcglobal.net

CERTIFICATE

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

s/Teresa K. Combs                    9/13/14
Teresa K. Combs, Transcriber          Date

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1                            **INDEX**

|                          | DIRECT | CROSS | REDIRECT | RECROSS | FURTHER REDIRECT |
|--------------------------|--------|-------|----------|---------|------------------|
| **DEFENDANT'S WITNESSES** |        |       |          |         |                  |
| Henry McKinley Pennington | 3100   | 3114  | 3118     |         |                  |
| Doris Sanderson          | 3119   | 3127  |          |         |                  |
| Laura Anne Demi          | 3129   | 3136  |          |         |                  |
| Cable Eric Wells         | 3138   | 3145  | 3149     |         |                  |
| Matthew Wells            | 3151   | 3168  | 3171     | 3171    |                  |
| Casey Brennick           | 3177   | 3200  | 3205     | 3207    |                  |
| Collette Francisco       | 3209   | 3215  | 3217     | 3218    |                  |
| Wilton Thomas Nelson     | 3219   | 3226  | 3227     |         |                  |
| Dale Larkin Rice         | 3229   | 3234  |          |         |                  |
| Mabel Marie Rice         | 3237   | 3241  |          |         |                  |
| Christine Burton (By offer of proof) | 3255 | 3260 | 3261 |      |                  |
| Linda Ellen Hinson (By offer of proof) | 3262 |   |          |         |                  |
| Lindsey Fisher (By offer of proof) | 3267 | 3270 |        |         |                  |
| Daniel Thyen (By offer of proof) | 3273 | 3274 | 3276 |         |                  |
| Arek Walter Parsley (By offer of proof) | 3280 | 3282 |    |         |                  |

| **DEFENDANT'S EXHIBITS** |                                                        | **ADMITTED** |
|--------------------------|--------------------------------------------------------|--------------|
| DE-032                   | Newspaper article with pictures, white truck - redacted | 3122        |
| DE-179                   | Kodiak aerial map - overview                           | 3134         |
| DE-181                   | Photograph - Wells' holsters                           | 3157         |
| DE-182                   | Photograph - Mr. Wells' gun, Ruger .44                 | 3157         |
| DE-200                   | Linda Fisher's police report (admitted for offer of proof hearing only) | 3270 |

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net