```
 1                UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF ALASKA

 3   UNITED STATES OF AMERICA,     )   Case 3:13-cr-00008-RRB
                                   )
 4            Plaintiff,           )   Anchorage, Alaska
                                   )   Tuesday, April 22, 2014
 5        vs.                      )   8:30 o'clock a.m.
                                   )
 6   JAMES MICHAEL WELLS,          )
                                   )
 7            Defendant.           )
     _____)   TRIAL BY JURY - DAY 16
 8
                     TRANSCRIPT OF PROCEEDINGS
 9
              BEFORE THE HONORABLE RALPH R. BEISTLINE
10                 UNITED STATES DISTRICT JUDGE

11   APPEARANCES:

12   For the Plaintiff:        KAREN L. LOEFFLER
                               U.S. Attorney
13                             BRYAN SCHRODER
                               KATHLEEN ANN DUIGNAN
14                             Assistant U.S. Attorneys
                               Office of the U.S. Attorney
15                             222 West 7th Avenue, #9, Room 253
                               Anchorage, Alaska  99513-7567
16                             (907) 271-5071

17   For the Defendant:        F. RICHARD CURTNER
                               Federal Defender
18                             Office of the Federal Public Defender
                               601 West 5th Avenue, Suite 800
19                             Anchorage, Alaska  99501
                               (907) 646-3400
20
                               PETER OFFENBECHER
21                             Skellenger Bender, P.S.
                               1301 5th Avenue, Suite 3401
22                             Seattle, Washington  98101-2605
                               (206) 623-6501
23

24

25
```

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 754  Filed 09/23/14  Page 1 of 217

1    APPEARANCES (Continued):

2    Court Recorder:              NANCY LEALAISALANOA
                                  U.S. District Court
3                                 222 West 7th Avenue, #4, Room 229
                                  Anchorage, Alaska  99513-7564
4                                 (907) 677-6111

5    Transcription Service:      A & T Transcripts
                                  6299 West 111th Avenue
6                                 Westminster, Colorado  80020
                                  (720) 384-8078

7

8    Proceedings recorded by electronic sound recording; transcript
     produced by transcription service.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net

1          **ANCHORAGE, ALASKA - TUESDAY, APRIL 22, 2014**

2

3          (Call to Order of the Court at 8:30 a.m.)

4          (Defendant present; jury not present)

5               THE CLERK:  His Honor the Court, the United States

6     District Court for the District of Alaska is now in session,

7     with the Honorable Ralph R. Beistline presiding.  Please be

8     seated.

9               THE COURT:  Who wants to talk to me?

10              MR. SCHRODER:  Me, Your Honor.

11              THE COURT:  Yes, sir.

12              MR. SCHRODER:  The first two witnesses coming up this

13    morning are both related to the FBI video program.  We believe

14    there are probably going to be a -- what was expected to be

15    expert testimony.  Neither of them has been noticed as expert,

16    so I move that they not be qualified as experts or allowed to

17    give expert opinion testimony.

18              THE COURT:  Okay.

19              MR. SCHRODER:  In addition, Mr. Richards, who's sitting

20    in the stand, was originally retained by the government.  We

21    decided not to use him.  I talked to him last night.  He's

22    indicated he's now retained by the defendant and has done

23    additional work for them, and we've seen no report of that.  So

24    I'd ask he not be allowed to testify on additional work that

25    has been reported.  Reports were due in this matter from

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 3 of 217
(720) 384-8078   attrans@sbcglobal.net

1  experts at the end of November for the defendant, and we've

2  seen nothing of that.

3        THE COURT:  Okay, coun -- all right.

4        MR. OFFENBECHER:  Well, Your Honor, first of all, Mr.

5  Iber was noticed as a government expert in this case.

6        THE COURT:  So what does that have to do with anything?

7        MR. OFFENBECHER:  Well, it's difficult for them -- it

8  seems to me it's difficult for them to complain that we

9  haven't -- they haven't given notice of a -- as an expert

10  witness, when they -- he was their expert, they retained him.

11  It turned out to be Brady material, and they've now -- and they

12  decided not to call him, and since they decided not to call

13  him, we'd call him -- we're calling him as a witness.  They --

14  they've had a copy of his report for about two years, so it

15  seems that that there's --

16        THE COURT:  Okay.  What about the additional --

17        MR. OFFENBECHER:  We're not asking him to talk about

18  any additional material.  We're just talk -- asking him to talk

19  about what they did for the government, nothing else.

20        THE COURT:  Okay.

21        MR. SCHRODER:  My point, Your Honor, is that if we

22  don't get notice -- even though we might have noticed Mr. Iber,

23  if we don't get notice that the defense is going to use them

24  ahead of time, then we have no opportunity to deal with the

25  issues with our experts.  That's the whole point of it.  It's

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1 not supposed to be an ambush with the experts, and that's

2 exactly what's gone on here.

3      MR. OFFENBECHER:  It's not exactly what's going on,

4 Your Honor.  They retained Mr. Richards back in 2012.  He gave

5 them -- they asked him for an opinion.  He gave an opinion that

6 hurts their case, and they just walked away from him.  Now,

7 we -- when we got the 302 that was disclosed to us as Brady

8 material, that Mr. Richards had given the opinion that's

9 favorable to the defense, we contacted Mr. Richards.  He

10 contacted Mr. Schroder a long time ago and said, "Look I've

11 just been contacted by the defense.  They're asking me to

12 testify as an expert witness.  Is that okay with you?"  And of

13 course it was.  And so --

14      MR. SCHRODER:  That is not true, Your Honor.

15      THE COURT:  So someone's lying to me.  One of you two

16 is lying to me?

17      MR. SCHRODER:  Well, I don't know that it's lying,

18 but --

19      THE COURT:  Okay.  Well --

20      MR. SCHRODER:  -- my memory of the conversation with --

21      THE COURT:  -- "not true" means lying.

22      MR. SCHRODER:  -- Mr. Richards was that he had been

23 contacted by the defense.  I realize that.  I never got further

24 information.  I told him, "Let us know if you're going to

25 actually come and do anything."  And I never got that response.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 754  Filed 09/23/14  Page 5 of 217

1          MR. OFFENBECHER:  Well, Your Honor --

2          MR. SCHRODER:  I mean, again, Your Honor --

3          MR. OFFENBECHER:  -- he's -- Mr. Schroder's known about

4    this for at least days.  For him to do this, you know, five

5    minutes after --

6          THE COURT:  Let me see --

7          MR. OFFENBECHER:  -- 8:30, that's what you call an

8    ambush, Your Honor.

9          THE COURT:  Let me just -- and calm down, okay.

10          MR. OFFENBECHER:  Yeah.

11          THE COURT:  Every morning I come in here and I get hit

12    with something new.  Now, I'm looking at the defendant's

13    witness list that was given to me sometime ago.  And I see

14    Gerald Richards' name on there.  And that's Gerald Richards,

15    right?

16          MR. RICHARDS:  Yes, sir.

17          THE COURT:  So the government knew about it sometime

18    ago, because it's on the -- no -- well, they knew about it at

19    least a week or two ago, because it's on the witness list.

20          MR. SCHRODER:  Your Honor, they -- they've got a number

21    of witnesses that they've put on the witness list and haven't

22    called, including expert witnesses.

23          THE COURT:  Okay.  Well, he can --

24          MR. SCHRODER:  I was able to get ahold of Mr. Richards

25    last night and confirm that he was actually coming.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 6 of 217
(720) 384-8078  attrans@sbcglobal.net

1          THE COURT:  Okay.  Well, it sounds to me the -- that he

2  was on notice.  He can't go anything beyond what's in his

3  report.  If they do, that's inappropriate, period.  And you

4  object if he does.

5          MR. SCHRODER:  I will, Your Honor.

6          THE COURT:  But because he was on the witness list that

7  I had several weeks ago, this is too last-minute for me resolve

8  at this time other than to allow him to testify.  What's next?

9  That's with regard to this gentleman.  I don't know who the

10 next one is.

11         MR. SCHRODER:  Well, but let me make anoth -- let me --

12 although --

13         MR. OFFENBECHER:  That's fine, Your Honor.

14         MR. SCHRODER:  Your Honor, I understand what you're

15 saying, but here's kind of the point.  We didn't get that

16 witness list till after our case in chief was done, and at that

17 point it's already too late.  Because we can't deal with things

18 with our experts; they've already gone home.

19         MR. OFFENBECHER:  Your Honor, the -- Mr. Richards

20 yesterday said he'd been -- had a contact with Mr. Schroder.

21 He said, "Is it okay with you, Mr. Offenbecher, if I go meet

22 with Mr. Schroder and tell him about my testimony?"  I said,

23 "Absolutely.  Go talk to Mr. Schroder."  Mr. Schroder has been

24 to Mr. Richards' house in Virginia -- in Maryland, excuse me,

25 to interview him about two years ago about exactly what this

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 754  Filed 09/23/14  Page 7 of 217
(720) 384-8078  attrans@sbcglobal.net

1   testimony is.  This cannot be a surprise to him.  He and Mr.
2   Cooper went to Maryland, to this man's house, and got exactly
3   the testimony you're going to hear here.
4           THE COURT:  Well, you know, if the government needs
5   to -- more time in its rebuttal case, I'll deal -- I'll allow
6   it, probably.
7           MR. OFFENBECHER:  Sure.
8           THE COURT:  What else?
9           MR. OFFENBECHER:  That's all --
10          THE COURT:  Okay.
11          MR. OFFENBECHER:  -- Your Honor.
12          THE COURT:  I don't know anything about this other
13  gentleman.  Should we -- can you tell me about Chris I --
14          MR. OFFENBECHER:  Mr. Iber was retained by the
15  government on April 20th of 2012, right after the homicides.
16  He's a -- an examiner with the FBI, a photographic technologist
17  with the FBI.  He was asked to provide some analysis of the
18  videos that we've all seen here.  Mr. Iber was asked to do --
19  see if he could determine the make and model of the car -- this
20  is the questioned vehicle in the videos.  And on April 20th of
21  2012, Mr. Iber, with the FBI, said, "Due to the insufficient
22  detail of the questioned vehicle, I cannot make a conclusion as
23  to the make or model of the vehicle.  I can't do it."  So --
24          THE COURT:  Okay.  That's short testimony.
25          MR. OFFENBECHER:  Yeah.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 8 of 217
(720) 384-8078  attrans@sbcglobal.net

1    THE COURT:  That's going to be a minute testimony, just

2 about.

3    MR. OFFENBECHER:  Yeah.  Well, maybe a minute.

4    MR. SCHRODER:  Yeah, I suspect not, because there was

5 also a followup extensive email my -- by Mr. Iber, which is I

6 think the reason he's being called, not because of the report.

7    MR. OFFENBECHER:  It was an email to Mr. Allison, the

8 FBI agent.

9    MR. SCHRODER:  Understand.  But, I mean, I want the

10 Court to understand that it's not going to be a minute.

11 Because there -- there's going to be much more than what Mr.

12 Offenbecher just recited.

13    MR. OFFENBECHER:  I don't know.

14    THE COURT:  Well, what's -- get what's in the report,

15 and then don't get into anything else unless I have a chance to

16 consider it.

17    MR. OFFENBECHER:  Well, Your Honor, if we call Mr.

18 Iber, we'll just stick to the report that I just said.

19    THE COURT:  No emails?

20    MR. OFFENBECHER:  No emails.

21    THE COURT:  Okay.  That solved that problem.  If you --

22    MR. OFFENBECHER:  That's fine.

23    THE COURT:  You've just said if you call him.

24    MR. OFFENBECHER:  Right.  Right.

25    THE COURT:  You don't even know if you're going to call

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 754  Filed 09/23/14  Page 9 of 217
(720) 384-8078  attrans@sbcglobal.net

1   him.  You just want to get my mind working early in the
2   morning.
3          MR. OFFENBECHER:  Well, Your Honor, I didn't take the
4   podium this morning.
5          THE COURT:  Okay.  Is --
6          MR. OFFENBECHER:  I was ready to go.
7          THE COURT:  Is the jury here, all?  Are they in the
8   little room?
9          UNIDENTIFIED SPEAKER:  Yes.
10         THE COURT:  Everybody ready to go?
11         MR. OFFENBECHER:  Yes, sir.
12         THE COURT:  Okay.  Let's bring the jury in.
13      (Jury present)
14         THE COURT:  Please be seated.  Good morning, ladies and
15   gentlemen.  How are you doing?  You look good.  Or is it my
16   eyes?  You're looking good -- better every day.  We're
17   continuing forward.  The schedule I talked about yesterday
18   still appears to be good.  We'll see.  Counsel, your -- defense
19   next witness is?
20         MR. OFFENBECHER:  Thank you, Your Honor.  Your Honor,
21   the defense would call Gerald Richards.
22         THE COURT:  All right, sir, if you could just stand for
23   a second, my clerk will swear you in over here.
24         THE CLERK:  Please raise your right hand.
25         **GERALD B. RICHARDS, DEFENDANT'S WITNESS, SWORN**

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 754  Filed 09/23/14  Page 10 of 217
(720) 384-8078  attrans@sbcglobal.net

1    THE CLERK:  Thank you.  Please have a seat.  And, sir,

2 if you can please state and spell your full name.

3    THE WITNESS:  My name is Gerald, G-e-r-a-l-d, B.

4 Richards, R-i-c-h-a-r-d-s.

5    THE CLERK:  Thank you.

6    THE COURT:  All right, counsel.

7                    **DIRECT EXAMINATION**

8 BY MR. OFFENBECHER:

9 Q    Where do you live, Mr. Richards?

10 A    I live at 15307 Alan Drive, Laurel, Maryland.

11 Q    What is your occupation?

12 A    My current occupation is as a private consultant.  I

13 basically do private consulting, education, and also

14 examination of questioned documents and photographs.  As a

15 examiner of questioned documents and photographs, I have a

16 company, Richards Forensic Services.

17    As an educator, I basically teach graduate-level courses.

18 I've taught 10 years at the George Washington University and

19 also 10 years at Oklahoma State University, a online course.

20    As a consultant, I've consulted for numerous

21 organizations, both government and nongovernment, including

22 Secret Service, FBI, Justice Department, CIA, and NSA.

23 Q    What is your educational background, sir?

24 A    I have a bachelor of science degree in photography and I

25 also have a master of science degree in education.  In addition

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 754  Filed 09/23/14  Page 11 of 217
(720) 384-8078  attrans@sbcglobal.net

1  to that, I've taken postgraduate courses at the George

2  Washington University and the University of Virginia regarding

3  law and forensics.

4  Q    Have you taken any additional courses at the University of

5  Virginia in crime lab photography?

6  A    Yes, I -- I have.

7  Q    Okay.  Can you give the jury a brief history of your work

8  history?

9  A    Yes.  For approximately three years I was a public

10 relations representative for an insurance company in Illinois.

11 In 1970 I joined the Federal Bureau of Investigation as a

12 special agent.  I was assigned to training for 14 weeks, an

13 intensive training course.  Upon completion of that, I was

14 assigned to the Atlanta division, investigating both criminal

15 foreign counterintelligence matters.  And then later to the

16 Baltimore division, doing the same type of work.

17     While in the Baltimore division, I was reassigned to

18 headquarters as a supervisor in the document -- in the

19 Documents Section, which also included the Special Photographic

20 Unit.  Eventually I became chief of the Special Photographic

21 Unit, which ended up being at that time the largest unit in the

22 laboratory.  From that position I retired from the FBI in 1993.

23     The first day of 1994, I started my own consulting

24 business and have done that for 21 years, for a total of

25 approximately 41 years doing this type of work.

1 Q   So just to summarize, from 1987 to 1993, you were the

2 chief of the Special Photographic Unit of the FBI Laboratory.

3 Is that right?

4 A   That's correct.

5 Q   Now, after you retired from the FBI as chief of the

6 Special Photographic Unit, what kind of work did you do?

7 A   Well, basically, I did the same type of work as a private

8 consultant, working for law firms, for organizations, what have

9 you, doing examinations of questioned documents, questioned

10 photographs, photographic materials.  And as I said before, I

11 did a lot of work, far as training, education.  I worked for

12 the Smithsonian, giving lectures and -- and putting on programs

13 for them for a while.  And also the universities that I

14 mentioned.

15 Q   Did you also act as a consultant to the FBI?

16 A   Yes, I did.  For five years after I retired, I was under

17 contract to the FBI to assist with training the people who were

18 in my old units during that time, and assist with that and

19 their moot courts as they went through the training process.

20 Then after that contract was over, I was actually called back

21 about 10 years later to help them with some moot courts and

22 training also.

23 Q   And when you say your old unit at the FBI, you're

24 referring to the document and photographic training and

25 examination department?

1   A    Well, you -- were mentioned too, I was unit chief of two

2   units, actually, the Document Operations and Research Unit,

3   which was one of the units I was chief of, and then I was also

4   chief of the Special Photographic Unit.  That's the one that

5   handled all photography for the FBI.  Basically, we did all

6   surveillances, all examinations, approximately three to four

7   hundred forensic examinations a year.  Handled all the

8   equipment for the FBI, the camera equipment, approximately

9   4,000 35-millimeter cameras, to give you an example.  And

10  anything else that involved imaging or photography at that

11  time, with the exception of video.

12  Q    Okay.  Now, Mr. Richards, just to give the jury just a

13  brief understanding -- we're going to talk about some vehicle

14  identification here in just a moment, but what other kinds of

15  identification or photographic analysis work did you perform

16  for the FBI and then after you left the FBI?

17  A    Sure.  There are many -- of course, each -- each case is

18  absolutely unique.  You never have two that are identical.  But

19  many of the types of things we did is try to individ --

20  identify individuals, which is one of the most difficult things

21  to do, is to individual -- identify an individual.  Much easier

22  many times to identify objects or clothing, such as clothing

23  worn by a bank robber during a bank robbery.  Many times this

24  can be identified uniquely to that individual, or at least to

25  that -- that clothing which is linked to the individual.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 14 of 217
(720) 384-8078  attrans@sbcglobal.net

1    We also did measurements, photogrammetry, different types

2  of photogrammetry, including reverse-projection photogrammetry,

3  to try to find heights or dimensions of certain things with

4  photographs.  Again, going back to a -- to the bank robbery

5  analogy, many, many, many of our cases were to determine the

6  height of a bank robber.  This had two -- two basic results.

7  Either you could say they were approximately the same size as

8  the bank robber.  You couldn't identify him from that.  Or you

9  can eliminate him, which many times is just as important.

10  Q    And you did that for a variety of different objects and

11  subjects.  Is that fair to say?

12  A    Yes, sir, all kinds of objects.  As a matter of fact, I

13  had a case here in Alaska many, many, many years ago where I

14  had to try to measure -- I guess they were elk antlers that

15  were -- it was a poaching case.  And, basically, we had to

16  measure the points between the antlers to try to determine if

17  it was the same -- same set of antlers that were in the picture

18  that would have been taken of it.

19  Q    Mr. Richards, could you just very briefly indicate to the

20  jury the scope of the professional organizations that you

21  belong?

22  A    Yes.  I'm a retired fellow of the American Academy of

23  Forensic Sciences.  I've been in that organization for over 25

24  years.  I'm a -- I'm a diplomat to the American Board of

25  Forensic Document Examiners.  I'm a member of the American

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 754  Filed 09/23/14  Page 15 of 217

**RICHARDS - DIRECT**

1   Society of Questioned Document Examiners.  I have been a member

2   of the American Society of Photogrammetry and Remote Sensing

3   and certified by them in the area of photogrammetry.  The Mid-

4   Atlantic Association of Forensic Scientists, which I was

5   president of twice, and there's probably another half-dozen

6   more.

7   Q    Okay.  Can you indicate briefly if you've received any

8   awards as a result of your work in this field?

9   A    Yes.  I've received -- well, not for this particular area,

10  but I've received the medal of -- excuse me, the --

11  Q    That the National Intelligence Medal?

12  A    National Intelligence Medal of Achievement -- I'm sorry,

13  I'm having a memory lapse here -- for work I've done in the

14  foreign counterintelligence area, which involved the same types

15  of things, many times trying to identify faces, do dimensions

16  of objects in the intelligence world.  I've also won the Ordway

17  Hilton Award from the American Academy of Forensic Sciences for

18  outstanding work, and also from the American Society of

19  Questioned Document Examiners I've won the Ordway Hilton Award,

20  which is given out for innovation in creating equipment.  Some

21  of the equipment that's used actually in every lab in the world

22  now, I had invented back in 'seventy -- '75, and -- and was --

23  it's now become commercially available.

24  Q    What are the areas of your expertise?  Can you explain

25  those to the jury?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 16 of 217
(720) 384-8078  attrans@sbcglobal.net

**RICHARDS - DIRECT**

1  A    Yes.  I have three expertises, actually, that I was --

2  basically by the bureau or other people.  The first one is in

3  the identification of questioned documents, handwritings,

4  things along that line, typewriting, et cetera.  The second

5  area is forensic photography.  With my bachelor of science

6  degree with photography, I basically conducted examinations of

7  all different types of photographic materials, photographic

8  situations.  And in order to do that, I was trained in the FBI

9  Laboratory for a full, solid three years before I was allowed

10 to testify, just pure training.  And in that particular case --

11 in those two particular cases, once I was allowed to testify,

12 then I was allowed to go out in court.

13     The third area of expertise is espionage tradecraft.

14 That's toys the spies use, basically.  And all of the major

15 espionage cases from about 1980 through 1993, I either worked

16 on or testified if they ever went to court, regarding the

17 photographic equipment, the documentation, et cetera.

18 Q    You talked about testifying in court.  Have you ever been

19 qualified as an expert in any federal court, state court, local

20 court, any other court?

21 A    Yes.  I've been qualified numerous, numerous times in

22 federal court, state court, local courts, court-martial

23 proceedings, and a number of foreign courts I've testified.

24 Q    As an expert witness, is that right?

25 A    Yes, as an expert witness.

1        MR. OFFENBECHER:  Your Honor, at this time we would

2   tender Mr. Richards as an expert witness in this field.

3        MR. SCHRODER:  Subject to my previous objection, Your

4   Honor.

5        THE COURT:  All right.  He'll be received in that

6   capacity.

7        MR. OFFENBECHER:  Thank you, Your Honor.

8   BY MR. OFFENBECHER:

9   Q    Mr. Richards, I'm going to ask you some questions now

10  about your involvement in this case, United States versus

11  Wells, and your examination of materials.  What was your first

12  contact with this case?

13  A    My first contact was a phone call from Mr. Dan Cooper back

14  in -- September 20th of 2012.

15  Q    And who's Dan Cooper?

16  A    Dan Cooper's one of the attorneys that was working for the

17  prosecution in this matter.

18  Q    He's an assistant United States attorney who was

19  previously on this case?

20  A    Yes, sir.

21  Q    And do you know who he was working with on the case?

22  A    Mr. Schroder.

23  Q    Mr. Schroder, the gentleman sitting here at the table.  Is

24  that right?

25  A    Yes, sir.

**RICHARDS - DIRECT**

1  Q    And when Mr. Cooper contacted you, what did he engage you

2  for?

3  A    He advised me that they had a videotape of a vehicle that

4  they wished for me to review and determine if I could determine

5  what the make and model of the vehicle is and also any unique

6  individualizing characteristics that I could positively

7  identify the vehicle as being the vehicle that he had known

8  photographs of.  He had a known vehicle that he had photographs

9  of and he wanted me to compare that to the questioned vehicle,

10  which was the one in the videotape.

11  Q    And were you then -- and did you agree to undertake that

12  test?

13  A    Yes, I did.

14  Q    And were you hired by the United States Attorney's Office

15  for the District of Alaska for that purpose?

16  A    Yes, I was.

17  Q    And after you were hired by the United States Attorney's

18  Office, were you provided materials to review?

19  A    Yes, I was.

20  Q    Can you just indicate to the jury briefly what the

21  materials were?

22  A    There was actually two sets of materials I was provided.

23  The first was a CD disc that had the sequence of images on it

24  of the questioned vehicle in this case, and also had a number

25  of files on it with some known vehicles that were driven in the

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 19 of 217
(720) 384-8078  attrans@sbcglobal.net

1  same area.  In addition to that, there were files of still

2  photographs of two vehicles that were to be used to compare

3  with the -- the -- with the questioned videos.

4      After that, I had contacted Mr. Cooper and told him that

5  they are relatively low resolution, relatively low quality.  If

6  he could get me the -- at least a one-generation copy from the

7  original source, which happened to be a hard disc, I'd

8  appreciate that.  And also, since I did not have the original

9  playback program -- I was using Photoshop for my examination at

10 the time -- that they used to play that back, if he would send

11 me that and I could examine that to see if I could discern any

12 more information from the videos.

13 Q   And this was in the -- back in the fall of 2012.  Is that

14 right?

15 A   This would have been all in October or maybe early

16 November of 2012.

17 Q   And did the United States Attorney's Office provide you

18 the materials you requested?

19 A   Yes, they did.

20 Q   And what did you do then?

21 A   Well, I conducted my examination -- basically conducted

22 examination to look for the questioned vehicle in the video

23 where they indicated it was -- should be located, and then came

24 with the best possible prints I could, and also using the

25 actual live video too, and made a comparison with the -- or

**RICHARDS - DIRECT**

1  tried to make a -- a comparison with the known vehicles that

2  they had sent me.  However, because of the extreme poor quality

3  of the questioned video, a comparison in this case was somewhat

4  meaningless.

5  Q    All right.  So can you call up DE-195, please?  And can

6  you flip through the pages, just (indiscernible)?  One more,

7  please.  All right, back to the first, please.  Mr. Richards,

8  do you recognize the photographs that have been shown to you on

9  DE-195?

10  A    Yes.  This is a combination of the images from both discs,

11  actually what I thought was the best images on -- on the -- I

12  received.  There are only nine images total that the questioned

13  vehicle is located in.  There are five of them that indicate

14  the vehicle traveling from left to right and there are four of

15  them indicating the vehicle traveling from right to left at the

16  time specified by Mr. Cooper.

17      I put them here in order and have actually numbered them

18  A, B, C, D, E, F, just for my own -- for my own ease in going

19  through them.  The first five you see --

20  Q    Mr. --

21  A    -- there, the four here --

22  Q    Mr. Richards, I'm going to move to admit them first.

23  We'll put them up on the screen and then you can illustrate

24  them, okay?

25  A    Oh, yes.  Okay.

1 Q    Sorry.

2         MR. OFFENBECHER:  Your Honor, at this time I'd move to

3 admit Defense Exhibit 195.

4         MR. SCHRODER:  Your Honor, we would object to the last

5 two pages.  That's what I referred to as the additional work

6 Mr. Richards has done, that we were provided no report.

7         THE COURT:  Okay, and -- the last two pages or -- I

8 don't --

9         MR. SCHRODER:  I believe it's the last two.

10         MR. OFFENBECHER:  Your Honor, they're just blowups of

11 the previous shots.

12         MR. SCHRODER:  Well, Your Honor, there's markups on the

13 last two.  If you --

14         MR. OFFENBECHER:  Well --

15         MR. SCHRODER:  -- go look at the last two pages.

16         THE COURT:  I see four pictures on one page, is what

17 I'm looking at.

18         MR. OFFENBECHER:  Right, that's the first page.  And

19 then there's a -- several more pages.  The last two pages are

20 simply a blowup of the first page, where Mr. Richards has

21 written with his pen the number of pixels, that's all.  He's

22 just explaining (indiscernible).

23         MR. SCHRODER:  And look at the last one, please.

24 There's marks on the page, Your Honor.  That's what I'm talking

25 about.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 754  Filed 09/23/14  Page 22 of 217
(720) 384-8078  attrans@sbcglobal.net

1          MR. OFFENBECHER:  Right.  They're pen marks that he put

2     on there.

3          MR. SCHRODER:  That's still what I'm talking about.

4          THE COURT:  Well, can you give me some foundation as to

5     the -- what are they?

6          MR. OFFENBECHER:  Oh, sure.  Your Honor, I think Mr.

7     Richards can do that for you, but in the previous page, what

8     he's done on number G -- back up one, please.  Back up one,

9     please.  This is the photograph.  He's then made a closeup of

10    whatever kind of car is there, and then the next page is simply

11    a blowup which shows what all the witnesses have testified so

12    far.  The picture is made up of pixels, which are little

13    squares.  Next page, please.  The pictures are made up of

14    little squares.  As Mr. Vorder Bruegge testified, you count up

15    the squares to determine the length and height of the vehicle,

16    that's all.  It's just a blowup of the previous frame.

17         MR. SCHRODER:  Your Honor, the defense had Mr. Vorder

18    Bruegge's report.  We have no report on this.

19         MR. OFFENBECHER:  If there's no report -- the report

20    was made to the FBI.

21         THE COURT:  Okay, well --

22         MR. SCHRODER:  Not on this, Your Honor.

23         MR. OFFENBECHER:  It's just to illustrate his

24    testimony, Your Honor.

25         MR. SCHRODER:  It's a matter that hasn't been reported

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1  to us, Your Honor.

2          MR. OFFENBECHER:  Your Honor, I said --

3          MR. SCHRODER:  It's improper for him to --

4          THE COURT:  Okay, wait --

5          MR. SCHRODER:  -- testify -- it without us having the

6  report.

7          MR. OFFENBECHER:  Your Honor, I sent these to Mr.

8  Schroder.  I said, "If you have" --

9          THE COURT:  Well, I (indiscernible) --

10          MR. OFFENBECHER:  -- "any problem, you let me know."

11  He didn't.

12          THE COURT:  Okay.  It was purely demonstrative

13  (indiscernible) it will allow, and then we'll allow -- were --

14  further cross-examination or recall of witnesses if necessary,

15  even telephonic.

16          MR. OFFENBECHER:  Very well.  Thank you, Your Honor.

17          MR. SCHRODER:  Now, is this being just admitted for

18  demonstration purposes, Your Honor?

19          THE COURT:  Just for demonstration purposes.

20          MR. SCHRODER:  All right.

21          MR. OFFENBECHER:  Publish it, please.  Back to page 1,

22  please.

23  BY MR. OFFENBECHER:

24  Q   All right, now, Mr. Richards, the jury has seen the video

25  before several times and seen a number of these stills, so I'm

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 24 of 217
(720) 384-8078  attrans@sbcglobal.net

1  just -- we're just going to go through these briefly.  If you

2  can just indicate to the jury.  I think you testified on direct

3  examination that there were five frames of the video -- well,

4  let me just ask you this.  There are basically two video

5  sequences.  Is that right?

6  A    That's correct.

7  Q    And one of the se -- the first video sequence is the

8  sequence that's at 7:09, with the vehicle going left to right.

9  Is that right?

10 A    That is correct.

11 Q    And from that video, how many single frames where the

12 suspect vehicle or the questioned vehicle is in the frame or is

13 in the picture are there?

14 A    There are five, and I've labeled them at the beginning of

15 each one of the subtitles there, A, B, C, D, E.

16 Q    Now, you have a pointer up there at hand, or should I

17 hand --

18 A    I --

19 Q    -- you one?

20 A    -- didn't bring mine with me.

21       MR. OFFENBECHER:  Your Honor, may I approach the

22 witness briefly?

23       THE COURT:  Very well.

24 BY MR. OFFENBECHER:

25 Q    I'm just going to let you use this with the --

1  A    Surely.

2  Q    -- that little button right there.  Mr. Richards, can you

3  just briefly indicate the sequence of these still shots and

4  what they represent?

5  A    Yes.  A is our first picture, that's shown with the A down

6  here.  And the vehicle in question is just entering the left

7  side of the frame.  You can just barely see the hood of it.

8  The -- it continues on in the next frame, B, until you can see

9  a little more.  And then, again, it's almost fully -- the --

10  the one -- the right side of it is somewhat fully viewable,

11  just the front portion of it, in -- in C.  And then D and E is

12  it going behind the building.

13  Q    Okay.

14  A    Behind the building, up in this left-hand corner.

15  Q    So in that one the car is just disappearing behind the

16  building, is that right?

17  A    Just disappearing behind the building, yes.

18  Q    All right.  Now we're going to go to the next page,

19  please.  Yeah.

20  A    Okay, this is the second time that was given to me, where

21  the vehicle was, and --

22  Q    Is this the vehicle going from right to left, there, now?

23  A    Right to left, in this direction.  And this is number F.

24  This is number G.  You can see that is probably the best

25  picture of all nine of them.  There are only six of them, of

Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 26 of 217

**RICHARDS - DIRECT**

1  the nine, that are even worth looking at, because you can't see

2  much of anything in the -- the other -- the other three.  So

3  this is probably about the best of them.  And then you have --

4         THE COURT:  And you're referring to G when you say

5  "this"?

6         THE WITNESS:  G, yes, right here.  And this is -- the

7  way you can see the motion of -- and, actually, the next

8  pictures that follow are of this frame, this specific frame.

9  And then G, H, and I are the last two when it is going out of

10  frame to the left.

11 BY MR. OFFENBECHER:

12 Q    Okay.  Can you go to the next page, please?  Now, when you

13 say G, I notice that here there's a little G down in the

14 corner.  Is that right?

15 A    That's correct.

16 Q    And so are you referring to the G in the previous

17 sequence?  Is that right?

18 A    Yes.  And because the other frames, we're showing them in

19 sequence, this one is that individual, and this is the area of

20 question.  It is approximately a fifth of a mile from the

21 camera.

22         THE COURT:  So my concern is there are two G's?

23         THE WITNESS:  No, there's -- there's only one G.  This

24 is an enlargement --

25         THE COURT:  Okay.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 754  Filed 09/23/14  Page 27 of 217
(720) 384-8078  attrans@sbcglobal.net

1    THE WITNESS:  -- of that same frame.

2    THE COURT:  Oh --

3    MR. OFFENBECHER:  Back up one page, please.

4  BY MR. OFFENBECHER:

5  Q    So G in the upper right-hand corner, right?

6  A    Yes.

7  Q    And then the next page is simply a full-page shot of that

8  same --

9  A    Of that same image.

10 Q    Same frame, right.

11 A    And then the next two are enlargements of just this area.

12 Q    All right.  So just go to those briefly.  So that's an

13 enlargement just of the car.  Is that right?

14 A    Both of those are of just the car.

15 Q    And the next page, please.  And so --

16 A    This --

17 Q    Yeah, go ahead.

18 A    This is also just an enlargement of the car.  But as we

19 get it larger and larger, we can see that there's no real

20 detail in the picture whatsoever.  Our eyes tend to assimilate

21 as to -- we know it's a car in our minds, but the actual detail

22 there is of just nothing but a mass of blocks that we put

23 together in our mind as a vehicle.

24 Q    So in terms of measuring or comparing a vehicle or trying

25 to identify a vehicle, what is the import of the pixels?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 28 of 217
(720) 384-8078  attrans@sbcglobal.net

1  A    Well, the pixels are -- makes up the picture, period.

2  All -- all digital photographic pictures, whether it's your

3  iPhone, your -- your home camera, if you keep blowing them up,

4  this is what you're going to see.

5      A pixel -- pixel is a picture element.  That's the name of

6  it, basically.  And it's the smallest unit within the pixel --

7  with a picture that has any -- any meaning whatsoever.  It will

8  be somewhere between black and white.  There's usually 256

9  levels of gray or color in that particular pixel.  So you can

10 see white ones, you can see gray ones, you can see black ones.

11 But those are what make up the image.

12     As we get more and more of those pixels together and we

13 get farther away from them, we can actually see an image.  Most

14 of us see this same phenomenon every day.  When you read your

15 local newspaper this morning and you looked at the pictures in

16 the newspaper --

17         THE COURT:  They didn't read the paper this morning.

18         THE WITNESS:  Sorry about that.  Before you -- you came

19 to court, when you looked at the picture there, you saw a

20 picture --

21         THE COURT:  Well, don't talk about the -- oh, you're

22 talk --

23         THE WITNESS:  You saw a picture in the paper.  But if

24 you took a magnifying glass, what you would see is little dots.

25 Those are representative of much like pixels.  The picture

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 29 of 217

1  isn't really a -- a -- a smooth picture.  It's made up of many,

2  many little dots.  Our digital pictures are made up of many,

3  many little squares.

4  BY MR. OFFENBECHER:

5  Q    Okay.  Now can you back up one again, please.  Back up one

6  again, please.  All right.  So this is the -- what you've

7  indicated G is the best picture of any of the questioned

8  vehicles.  Is that right?

9  A    In -- in my opinion, yes.  It -- it shows the most detail

10 of the vehicle.  But it's still only showing the driver's side,

11 the left-hand side.

12 Q    Now, so you -- with respect to each of the questioned

13 vehicles going from right to left and left to right, what

14 did -- what -- you extracted the frames which depict the

15 questioned vehicle in each of the sequences.  Right?

16 A    That's correct.

17 Q    And in the left to right there were five frames?

18 A    That's correct.

19 Q    And in the right to left there were four frames.  Is that

20 right?

21 A    That's correct.  Yes, sir.

22 Q    And what did you do then?  What was your analysis?

23 A    Well, at that point I -- again, I enlarged them to see

24 what detail I could determine.  And once I got to a certain

25 point, I saw there's virtually no detail.  There's no detail

Case 3:13-cr-00008-SLG  Document 754  Filed 09/23/14  Page 30 of 217

**RICHARDS - DIRECT**

1  to -- to try to make a comparison with.

2      Now, when we compare things, there are two things we look

3  for.  One of them is class characteristics and the second is

4  individual identifying characteristics.  The first thing you

5  have to have is class characteristics.  It has to be the same

6  make and model of car.  Then you look for little things like

7  scratch, dings, and dents to positively identify, maybe a

8  license plate, to positively identify a car.

9      In this case, the only class characteristics that were

10  there is it's dark and it's got dark wheels.  Other than that

11  we can't -- I could not determine anything about the make,

12  model, or type of car it was.

13  Q    And the job or the task that you had been asked to do by

14  the United States Attorney's Office was, first of all, to, if,

15  possible, determine the make, model, and year of the questioned

16  vehicle.  Right?

17  A    Correct.

18  Q    And also to determine, if possible, whether the questioned

19  vehicle was the same vehicle as the suspect vehicle; that is,

20  the Honda CR-V.  Is that right?

21  A    Correct.

22  Q    And you indicated -- and I don't think we asked this, but

23  you indicated that they sent you the questioned vehicle videos

24  and then also some suspect vehicle video as well.  Right?

25  A    Yes.

1   Q    And that was of a Honda 2001 CR-V that was blue.  Right?

2   A    That's what I was told, yes.  I mean, for -- actually,

3   even from those photographs, I could not make that

4   determination.  But, yes, that's --

5   Q    But --

6   A    -- what I was told the --

7   Q    But they were asking you to see whether you could

8   determine that those were the same vehicle.  Right?

9   A    Correct.

10  Q    Were you able to do that?

11  A    No, sir.

12  Q    And did you tell them that?

13  A    Yes, sir.

14  Q    With respect to the vehicle that was passing from left to

15  right, were you able to determine the make, model, or year of

16  that vehicle?

17  A    No, sir.

18  Q    Were you able to determine that that was the suspect or

19  the blue Honda CR-V?

20  A    No, sir.

21  Q    Now, with respect to the video clip of the vehicle going

22  from right to left, did you engage in a similar process?

23  A    Yes, sir.

24  Q    And you extracted the frames.  Is that right?

25  A    That's correct.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

**RICHARDS - DIRECT**

1  Q   And you compared the class charac -- saw if there were any
2  class characteristics, right?
3  A   Yes, sir.
4  Q   And then you also looked to see if there were any
5  individualizing characteristics.  Right?
6  A   Well, it -- it was a moot point at that point.  I
7  couldn't -- I couldn't see enough class characteristics in
8  there to even start, and there were no individualizing
9  characteristics whatsoever.
10 Q   Just briefly, what are individualizing characteristics?
11 A   Well, to give you an example, I'll use a face as an
12 example.  If we're looking -- let's -- let's say a bank robber,
13 it's easy -- we're looking at a bank robber's face, and
14 somebody wants me to identify or eliminate the face.  The first
15 thing I have to have is class characteristics.  Of course, a
16 person has to have a nose, eyes, ears, all connected, if
17 they're white, black, whatever.  These are all class
18 characteristics.  If it turns out the bank robber's a male and
19 the suspect is a female, obviously they're eliminated in -- in
20 that particular case.  So class characteristics will not
21 identify anybody but they're good for eliminating things, so
22 you can set them aside.
23     Individualizing characteristics, if you can see enough
24 detail, then you can see scars, pockmarks, chipped teeth, ear
25 patterns.  These are all individual to a person.  And if you

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 33 of 217

**RICHARDS - DIRECT**

1  have enough of those, you can positively identify that person

2  to the exclusion all -- of all others.

3      In addition, let's say they're wearing a Army jacket that

4  is camouflage.  That camouflage jacket is more identifiable

5  than their face is, because it's usually easier to see, and the

6  cut seams and the sewn seams in there are absolutely unique.

7  You'll never find two exactly alike.  They'll be -- they'll be

8  different.

9      So if we have both the class characteristics and the

10  individualizing characteristics, we can positively identify

11  them.  If we only have class characteristics, we can say it's

12  in the same group and it could be.  And if we don't have the

13  class characteristics, then we can't say much of anything.

14  Q   So in this case were there any individualizing

15  characteristics that you could use to attempt an

16  identification?

17  A   No.

18  Q   With respect to the vehicle passing from right to left,

19  were you able to determine the make, model, or year of the

20  vehicle?

21  A   No.

22  Q   And as requested by the United States Attorney's Office,

23  with respect to the vehicle passing from right to left, were

24  you able to determine whether that was the Honda CR-V?

25  A   No.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1  Q    Are you able to determine, therefore, whether the vehicle

2  passing from left to right is the same vehicle as the vehicle

3  passing from right to left?

4  A    No.

5  Q    Is it possible that the vehicle passing from left to right

6  is a different vehicle than the vehicle passing from right to

7  left?

8  A    Yes.

9  Q    Now, you -- after you did your analysis, did you have a

10 meeting with the lawyers from the United States Attorney's

11 Office?

12 A    Yes, sir.

13 Q    When was that?

14 A    That was December -- December 20th, exactly three months

15 after I initially started --

16 Q    And --

17 A    -- of 2012.  Excuse me.

18 Q    Sorry, go ahead.  And when did that meeting occur -- it

19 was December 20th of 2012.  Right?

20 A    Yes.

21 Q    And where did it occur?

22 A    It occurred in my office at my home in Laurel, Maryland.

23 Q    And who was present for that meeting?

24 A    Let's see.  Mr. Cooper, Mr. Schroder, and there was an

25 agent -- don't remember her name right at the moment.

1  Q    Okay.  An F --

2  A    FBI agent.

3  Q    FBI agent.  So Mr. Schroder, who's sitting here, and

4  another U.S. Attorney, and an FBI agent.  Is that right?

5  A    Yes.

6  Q    And at that time did you advise them of the conclusions

7  that you've just reached, that you've just told the jury about?

8  A    Yes, I did.

9  Q    And did they have any -- after -- and after the end of

10 that meeting, did they have any further contact with you?

11 A    Not aft -- not after that meeting, no.  I had sent in an

12 invoice several days later, and I'd heard from the sec -- Mr.

13 Cooper's secretary several times, mostly on invoicing and

14 administrative matters, but that's the last I heard to them,

15 until I contacted Mr. Schroder the day that your office

16 contacted me.

17 Q    And that was just this year, right?

18 A    That was about 30 days ago.  I was contacted by your

19 office, I believe, on March 21st.  March 21st, yeah.

20 Q    So from December 20th of 2012, when you told the United

21 States Attorney's Office your opinions in this case, until

22 sometime in the last 30 days, you didn't hear any more from the

23 U.S. Attorney's Office?

24 A    No.

25 Q    Now, Mr. Richards, how does your analysis differ from

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 754  Filed 09/23/14  Page 36 of 217
(720) 384-8078  attrans@sbcglobal.net

1  someone -- the analysis that you've talked about here, how does

2  that differ from someone who just looks at a photographic image

3  like this and thinks they can recognize the make and model of a

4  car?

5  A   Well, I mean, everybody has an opinion on things.  It's --

6  it's, basically, what is it based on, you know, what is -- what

7  are they looking at.  We recognize things all the time.  So

8  that -- that shows a certain amount of expertise, because you

9  have to be somewhat familiar with what it is.  But as far as

10  identification, that's a long, long ways away from just pure

11  recognition.  In order to recognize something you still have to

12  have some class de -- some class characteristics in there to

13  determine what it is.  And if you don't have those class

14  characteristics, you can't recognize it.  There are many things

15  in that picture we recognize, but we really can't tell exactly

16  what they are.

17  Q   Is it fair to say that any attempt at recognition is

18  dependent on the quality of the photographic image?

19  A   It's all dependent on quality, yes.

20  Q   And if there -- what happens if there's really nothing to

21  recognize in the photograph?

22  A   Then you can't recognize anything.

23  Q   Okay.  And of what value is that type of identification?

24  A   Well, it isn't an identification.  It's -- it's a -- it's

25  an opinion by somebody who really probably doesn't know what

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 754  Filed 09/23/14  Page 37 of 217

RICHARDS - DIRECT

1  they're doing.

2  Q   It -- to translate this more to some of the other work

3  that the FBI does, in terms of, for example, trying to identify

4  a bank robber, how would that compare?

5  A   Well, in -- in -- in trying to identify a bank robber, as

6  I said before, we look at clothes, we look at his face, and we

7  go through the same exact process that I just described for

8  here.  We look for the class characteristics first.  If we

9  can't find them, or if they are different -- now, I'll give you

10 an example.  In another case I had a while back, where a

11 certain individual was -- was accused of a crime, I looked at

12 them, and it was very obvious it was two different people.  And

13 we could prove it.  We could prove it from the pictures, the

14 differences in the class characteristics, so therefore he was

15 eliminated from that particular case.  It was not that person.

16     If we -- you have the class characteristics and they're

17 the same, then we have to go to the next level, is the

18 individualizing characteristics.  If we can find enough of

19 those in -- in -- in a specific order and sequence, then we can

20 positively identify that person or that clothing in the -- in

21 the -- in the questioned photograph.

22 Q   With respect to the quality and detail of the photographs

23 of the questioned vehicles in this particular case, how would

24 that relate to a potential identification of, for example, a

25 bank robbery suspect?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 754  Filed 09/23/14  Page 38 of 217

**RICHARDS - CROSS**

1  A    It would -- it would be an -- basically, it would be no

2  conclusion.  You can't tell.  There just isn't enough

3  information in there to say anything about it for all practical

4  purposes.

5        MR. OFFENBECHER:  I don't have any other questions,

6  Your Honor.

7        THE COURT:  Cross-examination.

8                    **CROSS-EXAMINATION**

9  BY MR. SCHRODER:

10  Q    Mr. Richards, good morning.

11  A    Good morning, sir.

12  Q    We look at that picture on screen.  Is that a car?  Are we

13  looking at a car?

14  A    It appears to be.

15  Q    So we can tell that much?  There --

16  A    Yes, we can tell that much.

17  Q    There's a certain amount of things we can tell.  Correct?

18  A    Well, we're assuming.  But yes, we can -- we can pretty

19  well assume that it is a car.

20  Q    Assuming --

21  A    Or -- or --

22  Q    -- because that --

23  A    -- a van, perhaps.

24  Q    Okay.  And we're assuming because our eyes tell us that.

25  Correct?

**RICHARDS - CROSS**

1    A    We're assuming a lot of things when we look at those

2    pictures, but I -- I'd say we're -- we're fairly reasonable in

3    saying it's a vehicle of some sort.

4    Q    Okay.  Is it an SUV?

5    A    I don't know.

6    Q    You can't tell that?

7    A    You cannot tell that.

8    Q    All right.  Do -- does familiarity with cars -- would that

9    help someone be able to better interpret those images?

10   A    I seriously doubt it.

11   Q    Okay.  So you're saying even somebody with familiarity

12   with cars wouldn't be able to determine whether that's an SUV?

13   A    That's correct.

14   Q    All right.  Now, Mr. Richards, you're -- we did talk to

15   you a year or two ago, but you're now being retained by the

16   defense.  Isn't that correct?

17   A    That is correct.

18   Q    And you said you retired from the FBI Lab in 1993?

19   A    That's correct.

20   Q    So that was, I do my math right, 22, 23 years ago?

21   A    That's correct.

22   Q    Now, how prominent was digital photography in 1993?

23   A    It didn't -- for all practical purposes, it didn't

24   commonly exist, even though I bought while I was in the FBI the

25   third digital camera from Kodiak, which was a -- a true

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 40 of 217

**RICHARDS - CROSS**

1  ancestor to most of our cameras now, at that time for $25,000.

2  Q    So you had -- was it fair to say toward the end of your

3  time at the FBI Lab, you had some experience with digital

4  photography?

5  A    From the -- from the very beginning, when digital

6  photography first came out, I was looking at it very, very

7  closely from its very onset.

8  Q    Okay.  And when was that?

9  A    Oh, I'd say digital photography as we know it today

10  probably came out in the late '80s, where cameras were starting

11  to appear for scientific work or experimental.  Since I had --

12  was -- was with the FBI, I saw many of the experimental models

13  that both Polaroid, Kodak put out, and -- and other companies.

14  Like I said, it was about 19 -- I'd say '92, might have -- '91

15  or '92 -- that they fir -- came out with the first commercial

16  version for the press.  And we also bought one of them, which I

17  believe is still at the FBI in a museum case.

18  Q    So '91, '92, you bought the first digital camera for the

19  FBI?

20  A    For the FBI, yes.

21  Q    And you retired in '93?

22  A    Yes, sir.

23  Q    So your time at the lab, photographywise, was mostly film?

24  A    Yes, sir.

25  Q    And you stated that when you were chief of the -- there's

**RICHARDS - CROSS**

1  the Questioned Documents Section and then -- what'd you say,

2  Photographic Section?

3  A    No.  At -- at that particular time there was a -- a

4  Questioned Documents Section.  In the FBI Laboratory at that

5  time, they considered photographs a form of document, as they

6  also considered some other things as forms of documents.  So

7  they had a special unit, which was the Special Photographic

8  Unit, in there, which was one of the four major units within

9  the -- in the section.  And that also happened to be the -- the

10 largest unit too.

11 Q    Okay.  And --

12 A    At -- at one time when I retired, it was the largest unit

13 in the laboratory.

14 Q    And so I believe you said that -- though, that they didn't

15 handle -- your unit didn't handle video.  Is that correct?

16 A    No, it -- it didn't handle video equipment, but it handled

17 all the video analysis or comparison of pictures from video.

18 But the actual procurement, distribution, and use of video

19 equipment was handled by a separate unit.

20 Q    Now, you talked about -- a little bit about comparing

21 things, but you didn't prepare a presentation for the jury to

22 look at today comparing the images of different days.  Isn't

23 that correct?

24 A    Of different days; what do you mean?

25 Q    You said -- did you have video of different days?  And you

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 754  Filed 09/23/14  Page 42 of 217
(720) 384-8078  attrans@sbcglobal.net

1  said you had images of the questioned doc -- vehicle and a

2  known vehicle?

3  A    Yes.

4  Q    Have you prepared any kind of a comparison presentation to

5  allow the jury to look at that?

6  A    No, sir.  In -- as I advised you and Mr. Cooper at the

7  time back in 2012, there was no reason to make any comparison

8  because there wasn't enough detail in the questioned image to

9  make a comparison with anything.

10 Q    Well, sir, I --

11          MR. OFFENBECHER:  Wait.  Let him finish his answer.

12          THE COURT:  He --

13          THE WITNESS:  And, basically, if you can't make a

14 comparison -- if there isn't enough there to compare other than

15 blocks, little squares or pixels like that, there's no sense in

16 making a comparison.

17 BY MR. SCHRODER:

18 Q    So what you're saying is you've made the decision not

19 to -- that's not comparable.  You're -- you haven't prepared

20 anything to allow the jury to look at it.

21 A    That's correct.

22 Q    All right.  And you talked about how -- you talked about

23 class characteristics at one point.  But wasn't there some

24 characteristics of this vehicle that you were able to

25 determine?  Weren't you able to determine that there appeared

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 754  Filed 09/23/14  Page 43 of 217

**RICHARDS - CROSS**

1  to be brakelights high on the roof post?  Isn't that correct?

2  A    No.  That was a question that was asked of me, and I said

3  there was a light spot back there, but I couldn't really tell

4  if it was brakelights, snow in the background.  Again, we're

5  dealing with maybe two or three of those little white pixels.

6  I couldn't tell if that's actually what it was.  That -- there

7  were several specific questions asked if I can make a

8  comparison and a determination from.  One of them was

9  brakelights; other was tires, and -- and a spare tire, et

10  cetera.  Those were all the questions.  And, basically, for all

11  practical purposes, the answer was "No" to all of them, except

12  for it was dark -- it was a dark vehicle with dark wheels.

13  Q    So you -- there was one class characteristic.  You were

14  able to determine that it had dark wheels?

15  A    As -- as I said, yes, it -- it had dark wheels as opposed

16  to reflective wheels.  The -- the other videos that I was

17  provided with had very highly reflective wheels.  And you could

18  see the bright spots of the wheels in those particular videos.

19  So because this had no bright spots in any of the wheels, I'm

20  assuming it was not a -- a -- a reflective wheel.

21  Q    So the silver wheels, you could easily tell that in the

22  other -- in the videos?

23  A    Not easily, but you can tell it, yes.

24  Q    And so this one had dark wheels?

25  A    Yes.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 44 of 217
(720) 384-8078   attrans@sbcglobal.net

## RICHARDS - REDIRECT

1  Q    All right.  Thank you.  No further questions.

2         THE COURT:  Redirect.

3         MR. OFFENBECHER:  Just briefly, Your Honor.

4                **REDIRECT EXAMINATION**

5  BY MR. OFFENBECHER:

6  Q    Mr. Schroder indicated that you were asked a number of --

7  excuse me.  Mr. Schroder indicated that you were asked a number

8  of questions about whether you could determine specific class

9  characteristics of the car.  Right?

10 A    That's correct.

11 Q    Those are the questions that he and Mr. Cooper asked you

12 way back when.  Right?

13 A    That's correct.

14 Q    They asked you whether you could tell, for example,

15 whether there was a spare tire mounted on the rear.  Right?

16 A    That's correct.

17 Q    And you indicated to them that you couldn't tell that.

18 Right?

19 A    That -- that is correct.

20 Q    You indicated -- they asked you whether it was -- would be

21 possible for the -- for you in your examination to determine

22 whether there's a black bra on the front of that vehicle.

23 Right?

24 A    That's correct.

25 Q    And you told Mr. Schroder that you could not tell that.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 45 of 217
(720) 384-8078  attrans@sbcglobal.net

RICHARDS - REDIRECT

1  Right?

2  A    That's also correct.

3  Q    And with respect to the brakelight, you indicated --

4         MR. SCHRODER:  Objection.  Leading, Your Honor.

5         MR. OFFENBECHER:  I -- I'm just trying to direct his

6  attention to the question.

7         MR. SCHRODER:  Objection.  Leading.

8         THE COURT:  Okay.  Sustained.

9         MR. OFFENBECHER:  Okay.

10        MR. SCHRODER:  He can ask what he determined, what

11 characteristics.

12 BY MR. OFFENBECHER:

13 Q    What -- with respect to the brakelight that Mr. Schroder

14 just asked you about, what did you determine?

15 A    I said I couldn't determine if it was a brakelight.  I

16 mean, I determined there's a white spot back there that could

17 be a --

18 Q    And --

19 A    -- brakelight.

20 Q    And what could it --

21 A    But I couldn't make a positive determination to that --

22 Q    Okay.

23 A    -- fact.

24 Q    And did you have an opinion about what other things that

25 could be?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 754  Filed 09/23/14  Page 46 of 217
(720) 384-8078  attrans@sbcglobal.net

RICHARDS - REDIRECT

1  A    The -- now in the background or just -- it could have

2  been -- one of the other things about this particular -- this

3  particular questioned film is there's artifacts in it.  There's

4  things that really don't exist in it.  And this is because of

5  compression.  These fil -- these videos are basically

6  compressed to save space.  And when they compress them from

7  frame to frame, they will compress the same areas as they

8  change differently and actually produce a different image of

9  that same area as it goes from frame to frame.  So these

10  artifacts in there, sometimes when you're looking at this fine

11  a detail, can confuse you.

12  Q    You were also asked -- and let me just direct your

13  attention -- were you asked by Mr. Schroder and Mr. Cooper

14  whether you could determine the color of the vehicle?

15  A    Yes.

16  Q    And what was your answer to that?

17  A    I said the -- the colors that are most prominent in it or

18  the colors it possibly could be is blue or gray, dark blue or

19  dark gray.

20  Q    Finally, do you know a man by the name of Chris Vorder

21  Bruegge?

22  A    Not -- Richard Vorder Bruegge, I know.

23  Q    Richard Vorder Bruegge, excuse me.

24  A    Yes.

25  Q    Sorry.  Sorry.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 754  Filed 09/23/14  Page 47 of 217
(720) 384-8078  attrans@sbcglobal.net

RICHARDS - REDIRECT

1  A   Yes, I know him very well.

2  Q   Okay.  And how do you know him?

3  A   Mr. Vorder Bruegge came into the bureau while I was still

4  under contract to them.  I assisted in his training and -- this

5  two-year training period, and have worked with him numerous

6  times at that time and throughout the -- throughout the twenty-

7  some years I was in private practice.

8  Q   And do you consider him to be a reputable person in this

9  field?

10  A   Absolutely.

11  Q   Have you -- and have you had a chance to review his

12  materials in this case as well?

13  A   Yes, I did.

14      MR. SCHRODER:  Your Honor, beyond the scope.

15      THE COURT:  Sounds like it's beyond the scope.

16      MR. OFFENBECHER:  All right.  Well, it was just -- can

17  I ask one more question on that, since it's beyond the scope?

18      MR. SCHRODER:  Beyond the scope, Your Honor.

19      THE COURT:  It is beyond the scope.  But go ahead, just

20  one more question.

21  BY MR. OFFENBECHER:

22  Q   Are your conclusions in agreement with his?

23  A   Yes.

24  Q   And, finally, Mr. Schroder asked you whether -- that some

25  of this digital stuff happened in the -- way back when.  Have

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 754  Filed 09/23/14  Page 48 of 217
(720) 384-8078  attrans@sbcglobal.net

## RICHARDS - REDIRECT

1    you made an effort to keep up with developments in the field as

2    you go along?

3    A    Yes.  I'm very famili -- again, even though I retired in

4    1993, for the la -- I just retired from my second career a year

5    ago March.  So up into that time, for the next 20-some years, I

6    paid very, very close attention to digital imagery, since,

7    really, for all -- for all practical purposes, from the year

8    2000, 95 percent of all photography was wet, or film.  By the

9    year 2010, 95 -- about 95 percent of all was digital.  So

10   during that transition period, yes, I spent -- very close

11   attention to digital photography.

12            MR. OFFENBECHER:  I don't have any other questions.

13            THE COURT:  Recross.

14            MR. SCHRODER:  No additional questions, Your Honor.

15            THE COURT:  All right, thank you, sir.  You're excused.

16   Defendant's --

17            THE WITNESS:  Thank you.

18       (Witness excused)

19            THE COURT:  Defendant's next witness.  The ne -- do you

20   have a witness?  Who is it going to be?

21            MR. OFFENBECHER:  Yes, Your Honor.

22            MR. CURTNER:  At this time we're going to call Casey

23   Jones.

24            THE COURT:  Casey Jones.  Good morning.  Just keep

25   heading this way.  Make a hard right at the corner, then come

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 49 of 217

JONES - DIRECT

1  step into the box.  That door pulls out.  I always tell people

2  the door pulls out, because I always -- when I go over there, I

3  always push it in, and it never gets anywhere.  All right,

4  remain standing, sir, just for a second.

5            THE CLERK:  Please raise your right hand.

6            **CASEY JONES, DEFENDANT'S WITNESS, SWORN**

7            THE CLERK:  Okay, thank you.  Please have a seat.  And,

8  sir, if you can please state and spell your full name.

9            THE WITNESS:  Casey Jones.  C-a-s-e-y, J-o-n-e-s.

10           THE CLERK:  Thank you.

11           THE COURT:  All right, counsel.

12           MR. CURTNER:  Thank you, Your Honor.

13                    **DIRECT EXAMINATION**

14  BY MR. CURTNER:

15  Q    Good morning, Mr. Jones.

16  A    Good morning.

17  Q    Where are you employed?

18  A    The U.S. Coast Guard Training Center in Petaluma,

19  California.

20  Q    Okay.  How long you been in the Coast Guard?

21  A    Twenty-eight and a half years.

22  Q    Getting close to retirement?

23  A    Yes.  Looking forward to it.

24  Q    Okay.  What's your rank?

25  A    I'm a CWO-4.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 754  Filed 09/23/14  Page 50 of 217

1 Q    Could you explain to us what that is?

2 A    Well, there's enlisted people and then there's warrant

3 officers and then there's officers that are commissioned from

4 the academy.  And I'm -- I went through the enlisted ranks and

5 applied for a warrant.  I think less than 2 percent of the

6 people that join the Coast Guard as enlisted go warrant, and

7 that's where I am, top of the heap.

8 Q    Okay.  And what type of specialty do you have or what do

9 you do now in the Coast Guard and what kind of training?

10 A    Electronics --

11 Q    And you're --

12 A    -- is my specialty.

13 Q    You're at the training facility for electronics?

14 A    The Training Center at Petaluma, and I'm in charge of the

15 electronics shop.

16 Q    Do you know Jim Wells?

17 A    Yes, I do.

18 Q    And how do you know Jim Wells?

19 A    Past experience working with towers in Alaska.

20 Q    Okay.  In your electronics field, have you had to work

21 with antenna towers as part of your prac -- your career?

22 A    Yes.

23 Q    And do you remember -- you see Mr. Wells in court?

24 A    Uh-huh (affirmative).

25 Q    Do you remember what year you met him?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 754  Filed 09/23/14  Page 51 of 217
(720) 384-8078  attrans@sbcglobal.net

1  A    Probably 2005, pretty close to that.  Could have been

2  2004.  2005, I would guess.

3  Q    Where did you meet Mr. Wells?

4  A    Probably one of the trainings -- we'd have a national

5  working group in Alameda, California once a year for NDS

6  systems.  And so all the key players would get together, and

7  probably that's where I met him.

8  Q    Okay.  And then so -- did you have a professional

9  relationship with Mr. Wells?

10  A    Like in -- with --

11  Q    What kind of working relationship --

12  A    Yes.

13  Q    -- did you --

14  A    Yes.

15  Q    Could you explain that to us?

16  A    Well, I was the project officer, and so I'd work in Alaska

17  and I'd do towers.  And I did climbing, and for a couple years

18  I would go to Kodiak and Mr. Wells and Belisle -- Mr. Belisle

19  would put on training for rescue climbing, how to climb towers,

20  safety stuff.  So I went three years in a row, and then I did

21  the Shemya project.  I was the project officer.  And I would go

22  to Jim for advice on -- on the project.

23  Q    Okay.  So you met Mr. Wells in 2004, 2005.  So you've

24  known him almost 10 years?

25  A    Yes.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 754  Filed 09/23/14  Page 52 of 217
(720) 384-8078  attrans@sbcglobal.net

**JONES - DIRECT**

1  Q    And do you have a good professional relationship working

2  with him?

3  A    Yes.

4  Q    And did you also develop a personal relationship?  Did you

5  get to know him as a person?

6  A    Yeah, on the job, you know, small talk, yes.

7  Q    Okay.  Now, you'd mentioned the Shemya project.

8  A    Yes.

9  Q    And you were the head of that project?

10 A    Yes, I was.

11 Q    Okay.  Could you describe that, what that was like and

12 what that was -- and what -- involved?

13 A    So the Coast Guard was shutting down all the LORAN

14 stations, and adjacent to Shemya is LORAN Station Attu.  Attu

15 had a monitoring antenna that listened for distressed mariners.

16 It was the most western one the Coast Guard had that was

17 monitored by COMMSTA Kodiak.  And for some reason, the Coast

18 Guard didn't have a plan to replace that antenna.  So we got

19 together and we decided, okay, we're going to do a project and

20 put a new antenna on Shemya, which was the closest location

21 with services and --

22        THE COURT:  Okay, battery's down.  Need a new -- we've

23 got as many as you can run down.

24        THE WITNESS:  So Shemya had all the facilities that we

25 need to install the new antenna.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 53 of 217
(720) 384-8078  attrans@sbcglobal.net

1          THE COURT:  Wait -- okay, good.  Good.

2          THE WITNESS:  Sorry.

3  BY MR. CURTNER:

4  Q    I'm sorry.  What was that?

5  A    So Shemya had all the, you know, facilities and -- and

6  infrastructure we needed for the new antennas.  So it was

7  decided we'd put new antennas on Shemya.

8  Q    Okay.  And so how long did that take?  And what was that

9  project like?

10  A    It took two years.  It was supposed to take one year, but

11  it took us two years.  There were a lot of hurdles with

12  logistics.  It's so far west, getting antennas and getting

13  things out there, and concrete and -- I think the first year

14  the delay was the concrete.

15  Q    Okay.  Now, what was -- so this was a big project.  Is

16  that fair to say?

17  A    Only due to it being so far away --

18  Q    Okay.

19  A    -- logistically.

20  Q    And so it was challenging?

21  A    Yes.

22  Q    What was Mr. Wells's role in that project?

23  A    For me, he was -- he was the person I would go to and say,

24  "Okay, you know, what antenna do we need, and how much concrete

25  do we need," because he had putting up -- put up towers before.

1   So he would know, like, the -- all the guy wires, okay, each

2   one needs this much concrete, you know, this deep, due to

3   the -- the terrain or whatever.  So I'd go to him and ask him

4   that.

5   Q   Okay.  So you were ahea -- you were in charge of this

6   project?

7   A   Yes.

8   Q   But Mr. Wells was -- had the know-how or the expertise to

9   advise you on it?  Was he the go-to guy?

10  A   Sure -- he certainly was one of the go-to guys.  He wasn't

11  the only one.

12  Q   Okay.  Now -- but he sometimes would tell you what would

13  be needed and you would go ahead and order it.  Is that

14  correct?

15  A   At the beginning, yeah.

16  Q   Okay.  Now -- and there was some issue about bird

17  diverters on that project, on that antenna?

18  A   Yes.

19  Q   Okay.  Did Mr. Wells have an opinion about placing the

20  bird diverters on the antenna?

21  A   What I know is he didn't want to put them on there.

22  Q   But -- he resist that?  Did he resist you on that?

23  A   I passed to Chief Reckner that they're going to put the

24  bird diverters on, and then Chief Reckner handled that on his

25  end.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 754  Filed 09/23/14  Page 55 of 217

1  Q    And it went up?  The bird diverters were on there, right?

2  A    Yeah.  They -- they put them on.

3  Q    So the -- you have climbed a number of towers with Mr.

4  Wells?  Is that correct?

5  A    Yes, I have.

6  Q    And I think you mentioned that Mr. Wells and Mr. Belisle

7  did a lot of training together?

8  A    Yes.

9  Q    And that was primarily on climbing and safety?

10 A    Yeah, climbing towers, you know, inspecting them, making

11 sure all the equipment was -- was there, the -- rescue

12 training, we -- they both provided that --

13 Q    Okay.

14 A    -- on an annual basis for a couple years, maybe four or

15 five, that I know of.

16 Q    Now, in the time that you've known and worked with Mr.

17 Wells, have you ever seen him be violent?

18 A    Violent, no.

19 Q    Ever seen him get angry?

20 A    No.

21 Q    Have you ever heard him raise his voice?

22 A    No.

23 Q    All right.  That's all I have.  Thank you.

24 A    Welcome.

25          THE COURT:  Cross-examination.

1      MS. DUIGNAN:  Yes, Your Honor.

2                    **CROSS-EXAMINATION**

3  BY MS. DUIGNAN:

4  Q    Good morning, Mr. Jones.

5  A    Good morning.

6  Q    You had mentioned that you had worked with Mr. Wells with

7  the Shemya project.  Right?

8  A    Yes, ma'am.

9  Q    And you also worked with Mr. Belisle during that same

10 time?

11 A    Yes, ma'am.

12 Q    Mr. Curtner asked you if you had worked well with them,

13 and you said "At the beginning."  Can you please clarify what

14 happened?

15 A    At the beginning, everything was, you know, like the past

16 working relationship.  But as it went on, there was more -- how

17 do I say -- it wasn't going as easy.  There was, you know,

18 infighting, you know, with the COMMSTA folks, Mr. Belisle and

19 Mr. Wells and Chief Reckner and the ET1.

20 Q    And you noticed that firsthand?  You --

21 A    Yes.

22 Q    -- saw that there was disagreement?

23 A    Yeah.  Yeah.

24 Q    Within the shop?

25 A    Yeah.  And when I would -- at the beginning, I'd go to Mr.

1  Wells and I would ask, "Okay, how much do I need of this and

2  that?"  And then -- so then we'd order it, and I started

3  realizing when we were on the project that we were ordering way

4  too much or not the right thing.  And so then I started to

5  question.  So then I started going to Chief Reckner, going,

6  "Hey, why -- why did we order this much, and, you know, where

7  did that come from?"

8  Q    And was there a point at which you said that Mr. Belisle

9  started to step up and try to -- he was trying to do the right

10 thing?

11 A    Oh, sure.  Yes.

12 Q    And you noticed that firsthand?

13 A    Yes.

14 Q    That there was disagreement because Mr. Wells was ordering

15 stuff or trying to bring on stuff that was not beneficial to

16 the project, or it was too much?

17 A    Too much.  Yes.  It --

18 Q    Was there a point at which you noticed Petty Officer

19 Hopkins trying to take charge?

20 A    Yeah.  He was tasked with being in charge of the rigger

21 shop down below.  And I was -- well, we were -- we were stuck

22 on Shemya for three weeks, and I knew he was having trouble.

23 It was kind of like -- he would go to work and he -- Jim

24 wouldn't be there, Jim Wells, and so he was always trying to

25 run him down or get him to do things, but --

Case 3:13-cr-00008-SLG  Document 754  Filed 09/23/14  Page 58 of 217

1      MR. CURTNER:  Your Honor, I'm going to object.  If it's

2 not his -- Mr. Jones's personal knowledge.

3      MS. DUIGNAN:  I believe Mr. Jones saw some of this

4 firsthand, so --

5      THE COURT:  Just based on what you observed.

6 BY MS. DUIGNAN:

7 Q    Was there a poi --

8 A    Okay, so on -- on the job, I know that ET1 was very

9 frustrated, because, you know, we would have a plan in the

10 morning and then, you know, he would want Jim to do something,

11 and Jim would go off and do his own thing.

12 Q    Okay.  And Mr. Wells got used to doing his own thing in

13 that shop?

14 A    I -- yeah, it was always that way.

15 Q    In fact, do you recall telling me he was pretty set in his

16 ways?

17 A    Yes.

18 Q    And do you also recall that you said that you saw Mr.

19 Belisle and Mr. Wells get into what you called a tiff?

20 Because --

21 A    Yes.

22 Q    Because Mr. Wells wasn't telling him about things that

23 were happening in the shop and cutting him out of decisions?

24 A    It -- it was actually on Shemya.

25 Q    And what did --

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 754  Filed 09/23/14  Page 59 of 217

1  A    And --

2  Q    What did you see there?

3  A    So it was -- I think we arrived late that evening, and

4  it -- so after the workday we had ate the evening meal.  And

5  then I wanted to go and survey the site and -- and see how far

6  they've come and look at some things, so I asked Mr. Wells if

7  we could go up there.  So him and I went up there, and then we

8  came back a couple hours later.  And then Rich found out that

9  we went up there without him.  And, you know, they were kind of

10  a team.  So Rich was -- was angry with Jim Wells for not

11  involving him and -- and taking him.

12  Q    And do you recall that during the Shemya project, you said

13  that you saw Mr. Belisle and Petty Officer Hopkins both

14  becoming increasingly frustrated with Mr. Wells?

15  A    Yes.

16  Q    And was there a point at which you know that Chief Reckner

17  got involved because of their frustration?

18  A    I know that Chief Reckner always was engaged and tried

19  to -- to keep everybody running right, and so he was fighting

20  little battles.

21  Q    Okay.  And you recall the incident with the bird diverters

22  that Mr. Curtner asked you about?

23  A    Yes.

24  Q    And you knew the bird diverters had to be put on by law --

25  A    Yes.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1  Q    -- right?  In fact --

2  A    Wasn't -- you couldn't negotiate that.

3  Q    It was nonnegotiable.  And Mr. Wells was resistant to

4  that, correct?

5  A    I was told that.

6  Q    Okay.

7       MR. CURTNER:  Objection, Your Honor.

8  BY MS. DUIGNAN:

9  Q    The bird diverters eventually got installed?

10 A    Yes, they did.

11      THE COURT:  So what he's told is not admissible.

12 BY MS. DUIGNAN:

13 Q    But you know from personal knowledge that the bird

14 diverters beca -- they were actually installed at some point?

15 A    I -- I view -- viewed them on the antenna, yes.

16 Q    Mr. Jones, have you ever had an order of yours violated

17 before?

18      MR. CURTNER:  Objection, Your Honor.  Before what?  I

19 don't think that there's been any --

20 BY MS. DUIGNAN:

21 Q    Have you ever given a direct order to a subordinate and

22 had it violated in your career?

23 A    Yes.

24 Q    And at that point some kind of corrective action is

25 required, isn't it?

1  A    On the spot, generally.

2  Q    Thank you.  I don't have any further questions.

3        THE COURT:  Redirect.

4                **REDIRECT EXAMINATION**

5  BY MR. CURTNER:

6  Q    So when you were on Shemya --

7  A    Yes, sir.

8  Q    -- and you and Mr. Wells did some extra work, is that

9  correct, the two of you?

10 A    Yes.

11 Q    And Mr. Belisle -- why was he upset?  Because he wasn't

12 going to get paid the overtime?

13 A    That was my understanding, yes.

14 Q    And was there -- now -- so he was just upset because he

15 wasn't included and that may have cost him --

16       MS. DUIGNAN:  Objection.  He may not know what Mr.

17 Belisle was thinking at that point.  He just knows what he

18 observed.

19       MR. CURTNER:  I think he just answered that question.

20 Well, let --

21       THE COURT:  Okay.

22 BY MR. CURTNER:

23 Q    Just so we're clear, Mr. Jones --

24 A    Yes, sir.

25 Q    -- you didn't see any heated arguments or threats from one

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 754  Filed 09/23/14  Page 62 of 217
(720) 384-8078  attrans@sbcglobal.net

1  person to another, the time you were with Mr. Wells.  Is that

2  correct?

3  A    That's correct.

4  Q    Thank you.

5       THE COURT:  Anything else?

6       MS. DUIGNAN:  One last question, Your Honor.

7                   **RECROSS EXAMINATION**

8  BY MS. DUIGNAN:

9  Q    Mr. Jones, do you have any formal training in targeted and

10 workplace violence?

11 A    No.

12 Q    Thank you.

13      THE COURT:  Okay.  I think we're done.

14      MR. CURTNER:  Yes.

15      THE COURT:  Are we?

16      MR. CURTNER:  Yes.

17      THE COURT:  All right.  Thank you, sir.  You're

18 excused.

19      THE WITNESS:  Thank you.

20   (Witness excused)

21      THE COURT:  Mr. Curtner, next witness.  This person is?

22      MR. CURTNER:  Ryan Miller.

23      THE COURT:  All right.  Just make your way forward.

24 And you need to step -- that door pulls out.  Yep.  And just

25 step into the box, remain standing, and she'll swear you in.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 754  Filed 09/23/14  Page 63 of 217
(720) 384-8078  attrans@sbcglobal.net

1      THE CLERK:  Please raise your right hand.

2            **RYAN MILLER, DEFENDANT'S WITNESS, SWORN**

3      THE CLERK:  Okay, thank you.  Please have a seat.  And,

4  sir, if you can please state and spell your full name.

5      THE WITNESS:  It's Ryan Miller.  R-y-a-n, M-i-l-l-e-r.

6      THE CLERK:  Thank you.

7      MR. CURTNER:  All right, counsel.

8                      **DIRECT EXAMINATION**

9  BY MR. CURTNER:

10 Q    Good morning.

11 A    Good morning.

12 Q    Could you tell us where you're employed?

13 A    Right now, I'm in the Facilities Engineering Department at

14 our Base Portsmouth in Virginia.

15 Q    For the Coast Guard?

16 A    Yes.

17 Q    Okay.  How long you been there?

18 A    About two and a half years.

19 Q    And what type of work experience do you have in the Coast

20 Guard?

21 A    Started off on the Coast Guard Cutter Storis as an

22 engineer officer in training.  Then transferred in the summer

23 of 2007 to Civil Engineering Unit Juneau.  Did tower engineer

24 there for a couple years, and then some construction work.  And

25 2010, I went to grad school in Illinois.  And then in the

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 754  Filed 09/23/14  Page 64 of 217

**MILLER - DIRECT**

1  winter of 2011, I went to Base Portsmouth.

2  Q    Okay.  So you were in the Juneau antenna station in 2007?

3  A    Yes.

4  Q    Okay.  Could you tell us a little bit about what you did

5  there and what that job involved?

6  A    I was the tower engineer for the District 17, which is

7  Alaska.  We would travel around, do inspections of a lot of the

8  tall towers in the state.  Annually, we'd put on climber

9  training for the various units so they could get certified to

10  climb and -- and do their own maintenance on the towers.

11  Q    Okay.  And how long were you there in that capacity?

12  A    From the -- the summer of 2007 to the summer of 2009.

13  Q    Now, while you were in that position, did you have -- did

14  you work with people from the COMMSTA unit up in Kodiak?

15  A    Yeah, I worked with -- work -- the rigger shop pretty

16  extensively, yes.

17  Q    And what was that -- what did that involve?  What kind of

18  working relationship did you have with the rigger shop?

19  A    Well, the -- they're kind of considered the subject matter

20  experts for hands-on safety and -- and rigging and tower

21  climbing procedures, so they were a good source of corporate

22  knowledge for junior officers that came into a new -- into the

23  tower engineering field, to get up to speed on to how

24  everything works and a lot of rules and regulations.

25  Q    Okay.  In that capacity, did you meet Mr. Wells?

Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 65 of 217
A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

**MILLER - DIRECT**

1  A    Yes, I did.

2  Q    You know Jim Wells?

3  A    I do.

4  Q    You see in court today?

5  A    Yes.

6  Q    Okay.  Do you know about his background and experience

7  when you worked with him?

8  A    Yeah, I know he was -- I think he was in the Navy for a

9  short period, then came over to the Coast Guard as some sort of

10 electronics technician.  And he retired and came to his job at

11 the COMMSTA as a rigger.

12 Q    Okay.  Now, did you know Richard Belisle too?

13 A    I did.

14 Q    What was your work relationship with Mr. Belisle and Mr.

15 Wells?

16 A    They were both in the same capacity.  They'd help us out

17 when we did our annual training in Kodiak, an extra site for --

18 for safety and double checking procedures.  We routinely --

19 routinely called them on maybe a lot of historical site info,

20 because our databases aren't perfect.  So I didn't know what

21 happened to a particular tower over the past 20 years, I'd give

22 them a call to see what they knew about the place.

23 Q    Okay.  Now, during that time, did Mr. Wells and Mr.

24 Belisle seem to have a good professional relationship?

25 A    Yeah.  They seemed to, yes.

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 754  Filed 09/23/14  Page 66 of 217

1  Q   Okay.  And did you have a personal relationship with
2  either Mr. Wells or Mr. Belisle?
3  A   Not extensively, because it was a lot of just temporary
4  travel, so mostly just kind of the -- the typical social
5  interactions you'd have when you're out on -- on the road for a
6  week --
7  Q   Okay.
8  A   -- dinner and maybe a couple drinks, or something like
9  that.
10 Q   Okay.  Did you socialize more with one or the other?
11 A   Probably with Mr. Belisle a little bit more.
12 Q   So what are the -- what's Mr. Belisle's personality
13 compared to Mr. Wells', as far as your observations?
14 A   I'd say Mr. Belisle might be a little more extroverted.
15 But both -- both kind individuals, willing to listen.  I mean,
16 they'd kind of -- they'd always take on the chief's role for a
17 junior officer and help mentor us and give us guidance on -- on
18 what we're doing.
19 Q   Okay.  Now, in your experience and -- did Mr. Wells and
20 Mr. Belisle always agree on everything?
21 A   I think -- I think there was probably just disagreements
22 on a few things, but always solved it in a professional manner,
23 just with common-sense discussions.
24 Q   Okay.  You always saw if there was not the same opinion,
25 they would discuss it?

MILLER - DIRECT

1  A    Yeah, I think so.  Yeah.

2  Q    Okay.  And you didn't see any arguments or any bad blood

3  there at all?

4  A    No, nothing that I can recall, no.

5  Q    Okay.  So Mr. Belisle was a little bit more outgoing.  Did

6  you get to know Mr. Wells a little bit while you were working

7  with him, from your first impression?

8  A    He seemed like a kind individual.  I mean, he -- he was

9  very invested in -- in helping us out in what we're doing in

10 our job, but it -- it was mostly professional, I think.

11 Q    What was your first impression when you met Mr. Wells?

12 How's he come across to you when you first meet him?

13 A    Little introverted, but a nice guy, and when he -- when he

14 had something to say, he was very -- very clear and -- and

15 sound in his judgment about what he wanted to say.  I mean, he

16 is -- he is the Coast Guard's expert on rigging, so a very good

17 source of -- of knowledge that I'd seek out all the time.

18 Q    The Coast Guard expert on rigging?

19 A    For -- for really deck plate-level information.  I mean,

20 the engineering-level stuff was more in our offices, but if you

21 were wondering about the history of -- of tower safety or

22 rigging, you could go to him any time.

23 Q    And so what type of temperament and demeanor did you

24 observe in him?

25 A    Seemed routinely calm and collected.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 754  Filed 09/23/14  Page 68 of 217

MILLER - CROSS

1  Q    Okay.  You'd never seen him lose his temper?

2  A    No, I don't believe so.

3  Q    Okay.  That's all I have.  Thank you.

4       THE COURT:  Cross-examination.

5                 **CROSS EXAMINATION**

6  BY MS. DUIGNAN:

7  Q    Morning, Lieutenant Miller.

8  A    Good morning.

9  Q    You said you were friends with Rich Belisle, correct?

10 A    A -- a little bit -- bit more so.  We'd go out for a drink

11 at the Rendezvous whenever I stopped in town sometimes.

12 Q    And when was the last time you had seen him?

13 A    I believe it was probably the spring of 2010.

14 Q    And when's the last time that you'd had any social contact

15 with Mr. Wells?

16 A    Around the same time.  We -- I'd stopped in there for --

17 for some construction work, and I'd usually go over into the

18 rigger shop to say "Hi" to the guys.  So it would have been

19 about that same week or two.

20 Q    So, really, everything that you testified about, your

21 knowledge about Mr. Wells' and Mr. Belisle's relationship was

22 between 2007 and 2010?

23 A    Yes.  Yes.

24 Q    Do you recall saying that Mr. Wells kind of built a little

25 empire in the rigger shop when you were interviewed on April

MILLER - CROSS

1  25th of 2012?

2  A    I may have.  I mean, he -- he had a pretty good little --

3  pretty good setup.

4  Q    And from what you call --

5  A    Pretty good job.

6  Q    -- recall from your time between 2007 to 2010, I think you

7  said he had an empire and he had it pretty good?

8  A    Yeah, but I would have -- I would have liked to have his

9  job, yes.

10  Q    Thank you.  I have no further questions.

11         THE COURT:  Redirect.

12         MR. CURTNER:  No further.  Thank --

13         THE COURT:  Thank you, sir.  You're excused.  Mr.

14  Curtner, what's the plan now?

15     (Witness excused)

16         MR. CURTNER:  I have one I think we could get done by

17  10.

18         THE COURT:  Okay.  Good.  Who is it?

19         MR. CURTNER:  Cesar Acosta.

20         THE COURT:  Okay.  I don't know, it looks to me like

21  this might be number 100, but who's counting?

22         THE CLERK:  One oh five.

23         MR. CURTNER:  Does that mean we have to quit?

24         THE COURT:  One oh five?

25         THE CLERK:  One oh six.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 70 of 217
(720) 384-8078  attrans@sbcglobal.net

ACOSTA - DIRECT

1    THE COURT:  One oh six?  I -- okay.  Just make your way
2  up around the corner there, pull -- get to the witness box.
3  The door pulls out.  Step on in.  Remain standing just for a
4  second.  She'll swear you in.
5    THE CLERK:  Please raise your right hand.
6    **STEVEN CESAR ACOSTA, DEFENDANT'S WITNESS, SWORN**
7    THE CLERK:  Okay, thank you.  Please have a seat.  And,
8  sir, if you can please state and spell your full name.
9    THE WITNESS:  Full name is Steven Cesar Acosta.  S-t-e-
10 v-e-n.  Cesar is C-e-s-a-r.  Acosta's A-c-o-s-t-a.
11    THE CLERK:  Thank you.
12    THE COURT:  All right.  Counsel.
13                    **DIRECT EXAMINATION**
14 BY MR. CURTNER:
15 Q    Good morning.
16 A    Good morning.
17 Q    And where are you employed?
18 A    Currently, I'm employed with the U.S. Coast Guard.  I am
19 stationed at Coast Guard Headquarters in the Office of Civil
20 Engineering.
21 Q    What's your rank and position?
22 A    I'm a commander in -- in the U.S. Coast Guard, active
23 duty.  My position is the resource manager for the Office of
24 Civil Engineering, Commandant Headquarters.
25 Q    Now, in that position you have now, Commander Acosta, what

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 754  Filed 09/23/14  Page 71 of 217

1  do you do there?

2  A    I'm the resource manager for civil engineering.  I manage

3  the whole Coast Guard civil engineering budget.  It's spread

4  out about eight fiscal years, approximately a billion dollars

5  of -- of capital money.  Also manage the workforce as far as

6  organization for civil engineering, and that's approximately

7  400 personnel.

8  Q    And do you have any plans in the near future as far as

9  your career?

10 A    I'm selected at senior service school, so it's a -- it's a

11 program for senior officers to -- to groom them in the ranks of

12 captain and beyond.  So I'll be attending Stanford this summer

13 to pursue my -- my degree, my MBA.

14 Q    Okay.  Have you -- do you know Jim Wells?

15 A    Yes, I've known Jim Wells since 2004.

16 Q    Okay.  Do you see him in the courtroom today?

17 A    Yes, I see Jim today.

18 Q    Okay.  And so could you explain a little bit about your

19 working relationship with Mr. Wells?

20 A    In 2004, I was stationed at Civil Engineering Unit in

21 Juneau, Alaska.  I reported from graduate school, University of

22 Texas.  I reported in February.  I was told that I would be the

23 tower engineer for the Coast Guard civil engineering program in

24 Alaska.  So the tower engineer is the engineer for the Coast

25 Guard that goes around, that maintains all the communication

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 754  Filed 09/23/14  Page 72 of 217
(720) 384-8078  attrans@sbcglobal.net

1  sites and ADA (ph) navigation sites throughout Alaska.  Due to

2  the expertise of personnel that we do have in Alaska, we were

3  frequently called upon to do work in the state of California,

4  Florida, sometimes in New England as well.

5  Q    Okay.  And then what was Mr. Wells's role with what you

6  were doing?

7  A    Mr. Wells worked in the rigger shop at Kodiak as a wage

8  grade employee.  So the rigger shop is -- we liaisoned a great

9  deal with.  So as a lieutenant straight out of grad school,

10  didn't know much about climbing, didn't know much about towers.

11  So it wasn't just me, it was all my predecessors as well.  So

12  when we were charged to maintain the towers throughout Alaska,

13  we would often rely on local experts or resources within the

14  organization to assist us.  So part of my responsibility as a

15  tower engineer was to train approximately 30 to 50 enlisted

16  personnel and officers throughout the Coast Guard specifically

17  on Alaska on how to climb towers.  That may be a small tower,

18  that may be a tall tower.  A small tower -- "small" is a -- is

19  a varying definition, but we typically consider that less than

20  75 feet.  And tall tower was anywhere between 100 and 1,300

21  linear feet in -- in the air.

22  Q    Okay.  So did you know how to climb towers before you came

23  to Juneau?

24  A    Absolutely not.  And -- and frequently -- you need to get

25  a qualification called tower climbing qual.  And then you need

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 73 of 217
(720) 384-8078   attrans@sbcglobal.net

1  to be -- train the trainer.  So when I first got there, my

2  boss, Commander Joe Calman (ph) -- he was the executive officer

3  there -- told me to reach out to the rigger shop in Kodiak to

4  get some training and get some expertise.  So Mr. Jim Wells was

5  really the person who taught me how to climb and taught me how

6  to teach others in the state of Alaska and beyond how to -- to

7  climb towers.

8  Q    Okay.  Was he a mentor to you, then, in that respect?

9  A    Absolutely.  And it wasn't just to me.  It was to all the

10  junior officers in my office.  So specifically as -- as

11  officers in the Coast Guard, we rotate every three to four

12  years.  Believe it or not, sometimes it may be difficult to get

13  officers to go to Alaska, just because they're used to the

14  Lower 48.  But we typically come kicking and screaming; we

15  leave the same way.

16      So when I came up, I -- I did meet Jim.  He -- he

17  definitely trained me, he trained my predecessor, he trained my

18  predecessor's predecessor on how to climb, how to teach others

19  to climb, how to do basic maintenance on towers, and how to

20  identify major deficiencies so that we can do critical

21  infrastructure upgrades or repairs to make sure that we're

22  maintaining our -- our (indiscernible) signal, our LORAN

23  signal, or our communication sites 99.9 percent of the time.

24  Q    Okay.  Did you do a lot of climbing, then, with Mr. Wells?

25  A    I did.  Every summer, I -- and -- and several times

Case 3:13-cr-00008-SLG  Document 754  Filed 09/23/14  Page 74 of 217

1   throughout the year, when there was an emergency, I would climb

2   with Jim.  Typically during the summers, I would say I was with

3   him anywhere between four to eight weeks, and that was

4   throughout the entire state of Alaska, sometimes in Ketchikan,

5   Tok, Attu, St. Paul, Valdez.  So across the -- the entire --

6   entire grid, state.  There were occasions too when we had to

7   replace some insulators at a LORAN station in -- in Middletown,

8   California, and Jim accompanied us as well.

9   Q   Okay.  So when you climbed towers with Mr. Wells, did you

10  go all the way up to the 1,300-foot towers?

11  A   Yes, and -- and that was definitely a -- an exercise.

12  Several hours to get to the top.  Even, like -- so in Port

13  Clarence, that's a -- a very particular tower.  There were

14  several others throughout the -- the entire world.  All the

15  other towers had failed catastrophically and the tower came

16  down.  So our -- our tower in Port Clarence, we wanted to make

17  sure was in tip-top shape, tried to avoid the inevitable.  So

18  frequently we would do some very highly detailed, very

19  complicated inspections on the towers, including the

20  insulators, and Jim was the -- the resident expert for the

21  Coast Guard.  So not just resident, but across the organization

22  on -- on how to do certain inspections and how to do certain

23  maintenance evaluations on the tall towers.

24  Q   Okay.  Could that be a dangerous thing to do, to climb

25  these towers in Alaska?

1  A    Absolutely.  I remember one time Jim -- Jim and I went out

2  to St. Paul, Alaska.  It was a couple weeks before Christmas.

3  There was bad weather.  It was very dry out.  Lights went out

4  in the tower.  And Jim and I flew from -- from Anchorage in

5  the -- out to -- out to St. Paul, the -- the five-hour flight

6  in the aircraft, which is very small.  It was about 20 degrees

7  on -- on the ground when we got there, no daylight.  Jim and I

8  rigged up, approximately 20 pounds worth of gear, carrying up

9  approximately 30 to 50 pounds worth of equipment, to go change

10 out lightbulbs.  So sometimes we would joke what's the most

11 dangerous job in the Coast Guard; it's changing lightbulbs at

12 800 feet in the air, minus 20 degrees, at the top of the tower

13 in St. Paul, Alaska.

14 Q    That sounds pretty challenging, so --

15 A    Absolutely.  And whether it was at St. Paul or Port

16 Clarence or Tok, frequently we would climb these towers.

17 There'd be two, maybe three of us total, several hundred feet

18 in the air, very precarious, sometimes turning wrenches,

19 sometimes handling sensitive equipment, and it -- it -- it was

20 dangerous.  You had to learn how to depend on, one, yourself;

21 two, do things very safely; but then, three, rely on the people

22 on the ground and in the air supporting you in the job that

23 you're currently doing.

24 Q    Okay.  So if it's that dangerous, safety is a big issue?

25 A    Safety's always of the utmost concern.  And the reason why

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 754  Filed 09/23/14  Page 76 of 217
(720) 384-8078  attrans@sbcglobal.net

1  is because there's so few people in the area where we're doing

2  work that safety must be paramount.  It must be the first and

3  foremost consideration before we do anything.  With me being

4  the tower engineer for Alaska, I had some leeway.

5      Typically, what we would do, and Jim and Rich did this all

6  the time, is we'd have something called a GAR model where we

7  evaluate the risks associated with climbing.  It takes into

8  account condition, type of work to be done, weather, believe it

9  or not, animals within the local area, anything that can be

10 considered a -- a concern or a threat.  So with me being a

11 tower engineer, I could always wait until things were yellow or

12 green.  You know, it may take two weeks to do a repair, but

13 that was okay.  I would tell you with Jim and Rich, with the

14 type of equipment they did specifically in Kodiak in

15 communications, they didn't have that luxury, and frequently

16 they would still have to work when things were highly

17 precarious.

18 Q    Okay.  Now, the -- so you've mentioned that Mr. Wells did

19 training?

20 A    Yes, frequently.

21 Q    And how often -- how many people would he train?

22 A    So we did training at least twice a year.  One time was at

23 a -- a (indiscernible) called the Buoy Tender Roundup, which

24 was typically in Juneau.  But we tried to do a -- another one,

25 typically in Kodiak.  Believe it or not, Kodiak is centrally

1  located, and that is because it's easy to get to.  So we can go

2  into Anchorage, fly into Kodiak.  Mr. Wells had a -- a

3  situation in one of the hangars where we rigged up a temporary

4  tower, and what we would do, actually practice climbing inside.

5  We would practice falling inside.  We'd practice rescuing, not

6  just yourself but somebody else, inside the hangar, and we

7  would also practice rappelling.  So the reason why we did this

8  is because, again, most times when we were out in the bush,

9  actually trying to maintain these towers, there's no medical

10  help or no other physical human being other than the primary

11  climber, the secondary climber, and typically a helicopter

12  pilot, for several hundred miles.

13  Q    Okay.  Now, so Mr. Wells trained a number of people like

14  you who are now commanders?

15  A    Yes.  So Jim, I would say, was responsible for training

16  all the JOs in my position at the Civil Engineering Unit, also

17  responsible for climbing -- or for training at least a dozen to

18  two dozen enlisted personnel located on -- on the vessels.  And

19  those could be nonrates, which was our preference, third-class

20  petty officers or first-class petty officers.  We prefer to

21  have the -- the older folks do the climbing.  They're a little

22  bit more responsible, cognizant of risks and danger and tend

23  not to, quote, unquote, "hot dog," as much as some of the

24  younger guys do.

25  Q    So are there people in the Coast Guard of high rank that

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 754  Filed 09/23/14  Page 78 of 217
(720) 384-8078  attrans@sbcglobal.net

1  may have been trained by Mr. Wells sometime over the years?

2  A    Absolutely, including my predecessors.  I can name about

3  half a dozen Jim has trained, you know, as a mentor, as -- as a

4  tower engineer, brought us under his wing, to make sure that we

5  did things the right way, the safe way.  There's more than one

6  way -- there's more than one way to climb, there's more than

7  one way to climb safely, but safety was always of the utmost

8  concern.

9  Q    And was Mr. Wells -- was he always safety conscious in his

10  training?

11  A    Absolutely.  So sometimes -- you always try to climb -- we

12  have something called a rail.  It's the safest way to climb.

13  But sometimes you can't.  It might be that the height is 20

14  feet and you can't (indiscernible) clip onto the rail because

15  it's underwater.  So what Jim really taught us was just, hey,

16  there's always a safe way to do it.  And there's always a safe

17  way to -- to execute that main -- and that mission without

18  having to put yourself or somebody else in danger.

19  Q    Okay.  So the -- in the time that you knew Mr. Wells, how

20  would you describe his demeanor?

21  A    Very -- very knowledgeable, definitely, as I stated, a

22  mentor towards just -- not just me, but to the other JOs, and

23  not just at Civil Engineering Unit Juneau, but all the civil

24  engineering units throughout the Coast Guard.  So we'd

25  frequently have a tower climbing conference.  Him and Rich

1  would -- would also -- would go to those conferences.  They
2  would give their viewpoints, express some of their ideas where
3  the program needs to go, some things we need to tidy up, and
4  some things that we need to make the program better.
5  Q    Okay.  And was -- did you ever see him lose his temper at
6  all?
7  A    In -- since 2004, I've never seen Jim lose his temper.  I
8  have -- Jim has talked to me and others sternly sometimes when
9  we didn't follow safety protocol, but the emphasis there was,
10  hey, there's a right way to do this and a safe way to do this,
11  and you need to do it the safest way you possibly can.
12  Q    So you ever seen him even raise his voice?
13  A    I've never seen Jim raise his voice, no.
14  Q    Okay.  And so over the years, did you have more than a
15  professional relationship?  Do you think you developed a
16  personal relationship with Mr. Wells?
17  A    I did.  And frequently what we would do is we would --
18  we'd go out to -- to Alaska, let's say Port Clarence, and then
19  we'd be in Nome, Alaska, no place like Nome.  I loved it.  It
20  was great.  We would -- we would do our job, we would come
21  back, we'd eat dinner together, we'd eat lunch.  And we'd
22  all -- me, Jim, and Rich would eventually do our own thing,
23  leaving the -- the tourists from the -- the Lower 48.  I'd
24  frequently do the shops.  Rich would try to go hunting,
25  typically moose hunt or something.  Jim would go back to his

1  room, typically read a book or something.

2      Since 2004, I've -- I've crossed paths with Jim several

3  times, intentionally.  When I was the commanding officer out --

4  CEU Honolulu, which is just like CEU Juneau.  I had some DGPS

5  towers and some ATON towers that I paid Jim and Rich to come

6  out to do inspections for.  Also, when Jim was TAD in the

7  Washington, D.C. area, he stopped by to -- to visit.  He'd come

8  over, we'd eat dinner, and we socialized.

9  Q    Okay.  Now, you saw Mr. Wells and Mr. Belisle working

10 together?

11 A    Yes, I did.

12 Q    And what kind of relationship did you observe there?

13 A    Again, I would say it was a -- the mentoring relationship.

14 Rich Belisle, I believe, first reported in 2004, two

15 thousand --

16      THE COURT:  You're a little too close to the

17 microphone.

18      THE WITNESS:  I'm sorry.

19      THE COURT:  Just a little bit.

20      THE WITNESS:  Rich reported in the 2004, 2005 time

21 frame.  So Rich was really, like me, a novice at the time.  And

22 Jim spent his time teaching all of us how to do -- whether it's

23 pulling tensions or climbing a tower, replacing guy wires, how

24 to do it the right way.

25 BY MR. CURTNER:

1  Q    Okay.  And so was -- in your opinion, was Mr. Wells

2  invested in Mr. Belisle's improvement and training?

3  A    Yes.  I saw Jim giving the same amount of stewardship to

4  Mr. Belisle that he gave to any of us.

5  Q    And was there any discussion about Mr. Belisle once he was

6  trained and Mr. Wells retired, that he would replace Mr. Wells?

7  A    I believe the -- the two acts were autonomous.  I don't

8  believe that Jim's retirement was hinged on Rich being trained.

9  I think Rich was getting trained, and Jim would retire.

10 Q    And --

11 A    I don't think they were dependent on each other.

12 Q    Okay.  But do you think that Jim looked at Mr. Belisle as

13 his protegee?

14 A    Yes, I -- I did.

15 Q    And Mr. Belisle looked at Mr. Wells as his mentor?

16 A    Yes, I did.

17 Q    That's all I have.  Thank you.

18        THE COURT:  Cross-examination.

19                    CROSS-EXAMINATION

20 BY MS. DUIGNAN:

21 Q    Commander Acosta --

22 A    Morning.

23 Q    -- good morning.  You said that when you were at CEU

24 Juneau -- this was in 2004.  Correct?

25 A    Yes, ma'am.  2004 to 2007.

Case 3:13-cr-00008-SLG  Document 754  Filed 09/23/14  Page 82 of 217

**ACOSTA - CROSS**

1  Q    And who did you report to?

2  A    I reported to Commander Joe Calman (ph), with my executive

3  officer.  And the commanding officer at the time was Commander

4  Carl Calvel (ph).

5  Q    And this was all in Juneau.  Correct?

6  A    Yes, ma'am.

7  Q    Okay.  And Mr. Wells, who did he report to?

8  A    Mr. Wells reported to the commanding officer at the

9  COMMSTA.  And they had a specific command structure that

10 oversaw the -- the rigger shop.

11 Q    Okay.  So who did he directly report to?

12 A    When I was first introduced to Jim, I believe Jim reported

13 up to the COMMSTA, the XO.

14 Q    Okay.  So he reported -- in your knowledge, in 2004, he

15 reported directly to the XO?

16 A    Yes, ma'am.

17 Q    Okay.  And you were there when Mr. Belisle was first

18 hired, correct?

19 A    Yes.

20 Q    And at that point he was fairly new to the rigger shop and

21 to antenna rigging.  Correct?

22 A    Yes, ma'am.

23 Q    Okay.  And so Mr. Wells at that point was more of a

24 teacher to him in 2004 to 2007?  That -- that's what you

25 testified to, I think?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

ACOSTA - CROSS

1  A    Yes.  Teacher to all of us, yes.

2  Q    Okay.  In 2004 to 2007, when you would go visit Mr. Wells

3  at the rigger shop, you pretty much said that Mr. Wells ran the

4  rigger shop?

5  A    Mr. Wells -- when -- when I would report, Mr. Wells would

6  make sure that everything that was required to be done, whether

7  it was for training or whether it was for maintenance, would

8  ensure that there was compliance there.  So that includes

9  maintaining all the gear, making sure -- and what I mean by

10 gear, there's -- there's two sets.  There's the personal

11 protective equipment, and then there's the actual gear to do

12 the maintenance.  And, yes, Jim would make sure that we had

13 both prior to engaging in any activity outside of the rigger

14 shop.

15 Q    So from your observation, Mr. Well -- Mr. Wells was the

16 one in charge at the rigger shop?

17 A    I wouldn't say -- I couldn't tell you formally that he was

18 in charge, but like every command structure, there's always

19 somebody behind the scenes that gets stuff done, and Jim was

20 what I observed as the guy getting stuff done day to day.

21 Q    That was your observation?

22 A    Yes, ma'am.

23 Q    Did you visit the rigger shop at all in 2011 or 2012?

24 A    No, ma'am.  I was stationed at headquarters at the time.

25 And although I'd love to come back to Alaska, I just never had

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 84 of 217
(720) 384-8078  attrans@sbcglobal.net

1  the opportunity to.

2  Q    Right.  I see you have a Command Ashore pin.  You said you

3  were the CO at one point of a unit?

4  A    Yes, ma'am, I was the commanding officer of the Civil

5  Engineering Unit in Honolulu, Hawaii.

6  Q    Did you ever have anybody there disobey your direct order?

7  A    I mainly had civilian personnel.  I would say we'd have

8  healthy conversations.  But I would say at the end of the day,

9  what we focused on wasn't necessarily the -- the direct command

10  that came out of my mouth but what the overall intent of the

11  project is supposed to be.  I -- I would say I've had people

12  challenge my orders, but at the end of the day, I would tell

13  you meeting the mission came first --

14  Q    Okay.

15  A    -- whether it was --

16  Q    Did --

17  A    -- I relented or somebody else did.  But we made sure that

18  we got done what we needed to get done.

19  Q    Did you ever -- anybody steal anything from CEU Honolulu

20  under your command?

21  A    No, ma'am.  No.

22  Q    If that had happened, would you have taken direct --

23  corrective action?

24  A    Absolutely.  As a property custodian and just as a steward

25  of the government.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 85 of 217
(720) 384-8078  attrans@sbcglobal.net

ACOSTA - CROSS

1  Q    Were you aware that Mr. Wells was given a letter of

2  reprimand for stealing fuel in the COMMSTA Kodiak in 2012?

3  A    No, ma'am.

4  Q    Thank you.

5         THE COURT:  Redirect.

6         MR. CURTNER:  No questions for Commander --

7         THE COURT:  Thank you, sir.

8         MR. CURTNER:  -- Acosta.

9         THE COURT:  You're excused.  We'll take a 15-minute

10  recess.

11      (Jury not present)

12         THE COURT:  You're free to go.  Thank you, sir.  Please

13  be seated.  What's the plan next?  Next witness is going to be?

14      (Witness excused)

15      (Side conversation)

16         MR. OFFENBECHER:  We'll call Mr. Sturgis, Your Honor.

17         THE COURT:  Okay.  So are we going to skip Mr. Iber?

18  Is that going to be --

19         MR. OFFENBECHER:  Right.

20         THE COURT:  Okay.  So I'll put a X through that.

21  Take -- take 15 minutes, and come back.

22         THE CLERK:  All rise.  Matter stands in a 15-minute

23  recess.

24      (Court recessed at 10:09 a.m., until 10:33 a.m.)

25      (Jury not present)

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1          THE CLERK:  All rise.

2          THE COURT:  Okay, we're ready with the new witness.

3   Okay, bring the jury in.

4          THE CLERK:  His Honor the Court, the United States --

5          THE COURT:  Oh, we've got one right here.

6          THE CLERK:  -- District Court is again in session.

7   Please be seated.

8      (Jury present)

9          THE COURT:  Please be seated.  Next witness is?

10          MR. OFFENBECHER:  Special Agent Joe Sturgis, Your

11   Honor.

12          THE COURT:  Okay.  All right.

13      **JOSEPH MICHAEL STURGIS, DEFENDANT'S WITNESS, SWORN**

14          THE CLERK:  Okay, thank you.  Please have a seat.  And,

15   sir --

16          MR. OFFENBECHER:  Special Agent Sturgis --

17          THE CLERK:  I'm --

18          THE COURT:  Let --

19          THE CLERK:  I'm sorry, one moment.  If you could please

20   state and spell your full name.

21          THE WITNESS:  Joseph Sturgis.  J-o-s-e-p-h, S-t-u-r-g-

22   i-s.

23          THE CLERK:  Thank you.

24          THE COURT:  All right.  Counsel.

25          MR. OFFENBECHER:  Thank you, Your Honor.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 87 of 217
(720) 384-8078  attrans@sbcglobal.net

1                    DIRECT EXAMINATION

2  BY MR. OFFENBECHER:

3  Q    Special Agent Sturgis, good morning.

4  A    Good morning, sir.

5  Q    You -- you've testified earlier in this case, right?

6  A    Yes, I have.

7  Q    And you've been present in court throughout the case,

8  right?

9  A    Yes, sir.

10 Q    Just to refresh the jury's memory, you are a special agent

11 with the Coast Guard Investigative Service.  Right?

12 A    That is correct.

13 Q    And you are stationed at Kodiak, right?

14 A    Yes, sir.

15 Q    And you are one of two resident agents there?

16 A    Yes, sir.

17 Q    Special Agent Sturgis, as -- and you were one of the

18 agents who investigated the homicides at the COMMSTA on April

19 12th.  Is that right?

20 A    Yes, sir.

21 Q    As part of your duties, did you have occasion to observe

22 any searches of the Buskin River that were conducted by law

23 enforcement authorities?

24 A    Yes, sir.

25 Q    Could you tell the jury about that?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 88 of 217
(720) 384-8078  attrans@sbcglobal.net

1  A    I showed up to the river to drop off tools.  I saw people

2  in the river.  That's about all I know about it.

3  Q    All right.  Can you call up Defense Exhibit 208, please?

4  Special Agent Sturgis, can you take a look at that?  You --

5  I've previously shown you these pages, haven't I, and you

6  flipped through the pages for me?

7  A    Yes, sir.

8       MS. LOEFFLER:  I'm sorry, can -- do we have a -- I'm

9  sorry, counsel, do we have a hard copy that I can just take a

10  look at, if you're -- or, if not, I'll look through it here.

11       MR. OFFENBECHER:  Yeah, we -- I actually don't have a

12  second hard copy --

13       MS. LOEFFLER:  Okay.

14       MR. OFFENBECHER:  -- but just --

15       MS. LOEFFLER:  Let me just --

16       MR. OFFENBECHER:  Well, just take your time and flip

17  through them there.  That's fine.

18       MS. LOEFFLER:  Okay.  Can we --

19       MR. OFFENBECHER:  Sure.

20       MS. LOEFFLER:  Can you just go to the first one, so I

21  can --

22       MR. OFFENBECHER:  Sure.

23       MS. LOEFFLER:  -- then I'll ask.  Okay, can we look at

24  the second page, counsel, please?

25       MR. OFFENBECHER:  Sure.  Yeah.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 89 of 217
(720) 384-8078  attrans@sbcglobal.net

STURGIS - DIRECT

1          MS. LOEFFLER:  Thank you.  And the third page.  Okay.

2          MR. OFFENBECHER:  There's a couple more if you want to

3     see those.

4          MS. LOEFFLER:  Oh, sorry.

5          MR. OFFENBECHER:  Want to go and look at all of them?

6     Sure.

7          MS. LOEFFLER:  Is there another page?

8          MR. OFFENBECHER:  Yeah.  Okay?

9          MS. LOEFFLER:  Yeah.  That's fine.  Is that the --

10         MR. OFFENBECHER:  All right, so --

11         MS. LOEFFLER:  Is that the last page?

12         MR. OFFENBECHER:  Yeah.

13         MS. LOEFFLER:  Okay.

14    BY MR. OFFENBECHER:

15    Q    So, Special Agent Sturgis, does -- you've taken a look at

16    Defense Exhibit 208.  Is that right?

17    A    That's correct.

18    Q    What does that appear to you to be?

19    A    It looks like a quadrant search of part of the river.

20    Q    And the ensuing pages -- can you flip through those for

21    him, please?  Do those appear to be a record of the search of

22    the Buskin River?

23    A    Yes, sir.

24    Q    And this -- does the date on this document refresh your

25    memory as to when the search of the Buskin River occurred?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 90 of 217

1  A    Yes, sir.

2  Q    When is it?

3  A    This page in particular is a -- the 2nd of May 2012.

4  Q    And go ahead and take a look at all of the pages real

5  quick.  And you can flip through, Mr. Johnson, please.  Does it

6  appear that all of the documents in Defense Exhibit 208 reflect

7  searches that occurred in the Buskin River on May 2nd of 2012?

8  A    Yes, sir.

9  Q    And are you aware of the indi -- does this refresh your

10 memory as to the individuals who conducted the search?

11 A    It has people's names listed there.  To be honest, I don't

12 recall exactly who was there.  I only saw one particular -- one

13 of the pages in this.  I've only saw that portion of the

14 search.

15 Q    Okay.  All right, well, you see the Special Agent

16 Oberlander's name is there.  Right?

17 A    Yes, sir.

18 Q    Do you recall him being one of the agents that was

19 searching the water?

20 A    I -- I do recall seeing him in a wetsuit, yes, sir.

21 Q    Okay.  So he was in a wetsuit, right?

22 A    Yes.

23 Q    And he's testified here before, right?

24 A    Yes, sir.

25 Q    He was one of the divers who was searching underwater in

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 91 of 217
(720) 384-8078   attrans@sbcglobal.net

1  the Buskin River.  Right?

2  A    I believe so.

3       MR. OFFENBECHER:  Now can you call the map -- 70 -- the

4  Defense -- or Government Exhibit 74, please.  Your Honor, I'd

5  move for the admission of Defense Exhibit 208.

6       MS. LOEFFLER:  I do object, and I want to ask -- and

7  may I voir dire one question of the witness?

8       THE COURT:  Sure, go ahead.

9                      VOIR DIRE

10 BY MS. LOEFFLER:

11 Q    Is your name anywhere on this document?

12 A    Not that I saw, ma'am.

13 Q    Did you have anything to do with this search other than

14 the tools you talked about?  I'm sorry, I had two questions.

15 A    No, ma'am.

16      MS. LOEFFLER:  Then I object.

17      MR. OFFENBECHER:  Well, whether his name is on the

18 document, it's not the judge -- the question is -- it's

19 refreshed his memory about when it was and where the search

20 occurred.  I can ask him more questions --

21      THE COURT:  You can ask him those questions.

22      MS. LOEFFLER:  Sure.  But he doesn't --

23      MR. OFFENBECHER:  Sure.

24      MS. LOEFFLER:  I guess my objection, Your Honor, is he

25 doesn't know anything about this document and he didn't

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 754  Filed 09/23/14  Page 92 of 217

1  participate in the search.  So I don't have any problem if he

2  knows the dates or any of those questions.

3          THE COURT:  Okay.

4              **DIRECT EXAMINATION, CONTINUED**

5  BY MR. OFFENBECHER:

6  Q   Well, you know, Mr. Sturgis, that at the bottom of the

7  page it has a name.  Gaston is the person who signed off on

8  that.  Right?

9  A   Yes, sir.

10  Q   Who's that?

11  A   I believe he's an FBI agent, former.

12  Q   Former FBI agent.  Right?

13  A   Yes, sir.

14  Q   About how many people did you see in wetsuits searching

15  the Buskin River that day?

16  A   I saw two, particular.

17  Q   Okay.  And what part of the Buskin River did you see them

18  searching?

19  A   If you flip through your pages here, I can -- I can kind

20  of --

21  Q   Sure, go ahead --

22  A   -- give you --

23  Q   -- Mr. Johnson.

24  A   That page right there.

25  Q   Okay.  And so you observed the divers searching the water

Case 3:13-cr-00008-SLG  Document 754  Filed 09/23/14  Page 93 of 217

1  at this part of the Buskin River.  Is that right?

2  A    Yes, sir, in -- in that roundabout area, yes, sir.

3  Q    Okay.  And that's the part of the Buskin River where

4  Rezanof Road crosses over the river?  Is that right?

5  A    That's correct.  It's right by the Comfort Inn area.

6  Q    Okay.  And it's just a short piece from Anton Larsen Road?

7  A    Yes, sir, it's really close.  The Self Help building is

8  right there on that corner, and on the other side of the river,

9  on the same side, the opposite side of Anton Larsen is the

10  Comfort Inn.

11  Q    Let me just show the map, please, on G -- or, excuse me --

12  yeah, Government's Exhibit 74.  This has been admitted already.

13  Can you blow up that section, please, Mr. Johnson?  Can you

14  publish it, please?  So, Special Agent Sturgis, do you have a

15  pointer up there?

16  A    No, sir, I don't.

17  Q    All right.  Well, I'll just -- can I approach the witness,

18  Your Honor?

19         THE COURT:  Yes.

20  BY MR. OFFENBECHER:

21  Q    Special Agent Sturgis, can you indicate with your pointer

22  that part of the Buskin River where you saw the law enforcement

23  officers searching the Buskin River in connection with this

24  homicide?

25  A    Yes, sir.  Right there.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 94 of 217
(720) 384-8078   attrans@sbcglobal.net

**STURGIS - DIRECT**

1  Q   Okay.  So you've indicated the part of the map where, if

2  one were coming, for example, from the COMMSTA, you would drive

3  down to Rezanof Drive.  Right?

4  A   If you're coming from the COMMSTA?

5  Q   Right.

6  A   You'd come down Anton Larsen.

7  Q   I'm sorry, Anton Larsen Bay Road.  Right?

8  A   Yes, sir.

9  Q   Sorry if I misspoke.  And then you would turn right on

10  Rezanof.  Is that right?

11  A   That is correct.

12       MS. LOEFFLER:  If I can object at this point to

13  leading.  I'd ask it be nonleading.

14       MR. OFFENBECHER:  I'm just trying to get through the

15  map, Your Honor.

16       THE COURT:  Okay, go ahead.  He's already pointed to

17  the spot, right?

18       MR. OFFENBECHER:  Right.

19  BY MR. OFFENBECHER:

20  Q   And it's where the -- can you point where the river

21  crosses underneath the Rezanof Road?

22  A   Right there.

23  Q   Okay.  And so that's where --

24       THE COURT:  Just for the record, he's pointed to the

25  spot below the E.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 754  Filed 09/23/14  Page 95 of 217

1    THE WITNESS:  Yeah, it's -- it's in between -- if you

2  can see on the map, there's -- this is Anton Larsen, and it

3  comes across, there -- right across where that road is.  And

4  I'm kind of -- my hand's a little shaky, but right there is

5  where the Self Help is.  And if you turn right onto Rezanof and

6  you cross the bridge --

7  BY MR. OFFENBECHER:

8  Q    Right.

9  A    And I think it's Bridge 5.  I'm not -- I'm not certain.

10  But if you make a left and come down this road right here,

11  that's the airport, Comfort Inn, all those areas right in

12  behind the Comfort Inn.

13  Q    Okay.  So would it be before you got to the Comfort Inn on

14  Rezanof?

15  A    It would have been directly behind the Comfort Inn.

16  Q    Okay.  And this is where you saw the divers, the law

17  enforcement divers, searching the river?

18  A    Yes, sir.

19  Q    And that is what's accurately reflected on the page that

20  you've indicated.  Can you go to 158 of that?  158 of the 208

21  exhibit, please.

22    MS. LOEFFLER:  Counsel, I don't object to the admission

23  of that page, if that's --

24    MR. OFFENBECHER:  Fine.  We'll move the admission of

25  that page.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 754  Filed 09/23/14  Page 96 of 217

1          THE COURT:  That page -- okay.  Can we define it a

2    little more specifically?  It's Exhibit --

3          MR. OFFENBECHER:  Exhibit 208, and the Bates number at

4    the bottom is 005198.

5          THE CLERK:  That's Exhibit DE-208, correct?

6       (Defendant's Exhibit DE-208, page 158 only, admitted)

7          MR. OFFENBECHER:  Can you publish that now, please?

8    BY MR. OFFENBECHER:

9    Q    So can you just -- in the next 30 seconds, all I want you

10   to do is just clarify what you just testified about the map

11   here and --

12   A    Yes, sir.

13   Q    Yeah.  Go ahead.

14   A    This is Anton Larsen, coming from the COMMSTA.

15   Q    Yeah.

16   A    This is Rezanof Drive.

17   Q    Right.

18   A    This is the bridge.

19   Q    Okay.

20   A    Comfort Inn is sitting right here.

21   Q    Okay.

22   A    Self Help is right here.  Where I saw the divers was right

23   in this area.

24   Q    So is that -- okay.  And that -- is that map consistent

25   with what you saw that day in terms of the law enforcement

1  divers searching for -- searching the river?

2  A    Well, everything down south of the bridge I can attest to.

3  I don't know what they did above it.

4  Q    All right.  Thank you.

5       MR. OFFENBECHER:  I don't have any other questions of

6  this witness, Your Honor.

7       THE COURT:  Okay.  Cross-examination.

8       MS. LOEFFLER:  I don't have any questions.

9       THE COURT:  All right.  Thank you, sir.  You're

10 excused.  The defendant's next witness.

11      MR. OFFENBECHER:  Daryl Allison, Your Honor.

12      THE WITNESS:  You want me to leave the pointer?

13      THE COURT:  Can he -- do you want him to leave the

14 pointer?

15      MR. OFFENBECHER:  I think I'll take the pointer.

16 Thanks.

17      THE COURT:  Okay.  She'll swear you in in a minute.

18      THE CLERK:  Oh, I'm sorry.

19   (Side conversation)

20      THE CLERK:  Okay.  Please raise your right hand.

21      **DARYL ALLISON, DEFENDANT'S WITNESS, SWORN**

22      THE CLERK:  Okay, thank you.  And, sir, if you can

23 please state and spell your full name.

24      THE WITNESS:  Daryl Allison.  D-a-r-y-l, A-l-l-i-s-o-n.

25      THE CLERK:  Thank you.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 754  Filed 09/23/14  Page 98 of 217
(720) 384-8078  attrans@sbcglobal.net

1          THE COURT:  All right, counsel.

2          MR. OFFENBECHER:  Thank you, Your Honor.

3                    **DIRECT EXAMINATION**

4    BY MR. OFFENBECHER:

5    Q    Special Agent Allison, good morning.

6    A    Good morning.

7    Q    So you have testified, obviously, before here, before this

8    jury.  Right?

9    A    Yes.

10   Q    You're the FBI's case agent for this case.  Is that right?

11   A    Yes.

12   Q    And you've been here for the whole testimony in this case

13   so far?

14   A    Yes.

15   Q    Mr. Allison -- or Special Agent Allison, I want to direct

16   your attention to April 18th of 2012.  And direct your

17   attention to the seizure of the tire that the jury has seen in

18   this case.  Do you recollect that?

19   A    Yes.

20   Q    You were one of the individuals who participated in the

21   seizure of the tire that is the subject of Mr. Bolden's

22   testimony and so forth?

23   A    Yes.

24   Q    Can you just briefly remind the jury about that, about

25   your seizure of the tire?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 754  Filed 09/23/14  Page 99 of 217
(720) 384-8078  attrans@sbcglobal.net

1  A    We -- we obtained a warrant -- subsequent to the initial

2  search of the truck, we obtained a separate warrant to seize

3  the tire.  Trooper Dupras and I returned to the Kodiak Trooper

4  Post, where the truck was being kept, and seized the tire.  We

5  also took the tire pressure of all of the tires that were on

6  the truck at the time.

7  Q    And did you have a good look at the tire at that time?

8  A    The tire that we seized?

9  Q    Yeah.

10 A    Yes.

11 Q    Yeah.  So can you show the witness Defense Exhibit 204 --

12 is that right -- please?  Next page, please.

13      MS. LOEFFLER:  I'm sorry.  I'm sorry, I was writing a

14 note.  If you could flip it back one, that'd be --

15      MR. OFFENBECHER:  Sure.  Take a look at that.  Tell me

16 when you're done.

17      MS. LOEFFLER:  Okay.

18      MR. OFFENBECHER:  Next page.

19 BY MR. OFFENBECHER:

20 Q    So, Special Agent Allison, what is that?

21 A    Oh, that's the tire that was left by the Evidence Response

22 Team in the back of Mr. Wells' truck.

23 Q    Okay.  Is this the tire that was seized by you?

24 A    Yes, it is.

25 Q    All right.  And it's the tire that we saw that was

ALLISON - DIRECT

1  packaged and sent to Mr. Bolden?

2  A    Yes, I believe so.

3         MR. OFFENBECHER:  All right.  Your Honor, I'd move for

4  the admission of Defense Exhibit 204.

5         MS. LOEFFLER:  I'm not -- probably not going to have an

6  objection at all.  I just want to know how many pages it is,

7  because I'm just looking on the screen.

8         MR. OFFENBECHER:  Just the -- it's just the coversheet

9  and the photograph.

10        MS. LOEFFLER:  Oh.  That's fine.

11        THE COURT:  It'll be received.

12     (Defendant's Exhibit DE-204 admitted)

13        MR. OFFENBECHER:  Can you publish that, please?

14  BY MR. OFFENBECHER:

15  Q    So, Special Agent Allison, just so we're clear, this

16  fairly represents the tire before you actually seized it out of

17  Mr. Wells' truck?

18  A    Yes.

19  Q    All right.

20        THE COURT:  Which tire are you referring to?

21  BY MR. OFFENBECHER:

22  Q    It's this tire right here.  Is that right?

23  A    Yes.

24        THE COURT:  The one in the forefront of the picture?

25        MR. OFFENBECHER:  Yeah.  It's in the foreground.  I'm

ALLISON - DIRECT

1  sorry, Your Honor.  I should describe it for the jury, for the
2  record.
3  BY MR. OFFENBECHER:
4  Q    So the tire here in the foreground, the largest tire, is
5  the tire that you seized from Mr. Wells' truck which was
6  eventually transmitted to Mr. Bolden.  Is that right?
7  A    That's correct.
8  Q    And it's in over here as Government's Exhibit 231, I
9  think?  Is that -- do you recall that?
10  A    I don't know the number, but yes.
11  Q    Okay.  All right, you can take that down now.  And then
12  can you bring up Defense Exhibit 205, please?  Mr. Allison,
13  take a quick look at that.
14  A    Yes.
15  Q    I've showed you this earlier.  Right?
16  A    Yes.
17  Q    Do you recognize what that is?
18  A    It -- it appears to be the same tire.  That's not the way
19  I found it.  The way I found it, I believe, was in the back of
20  the truck as in the previous picture.
21  Q    Sure.
22  A    But I don't -- I -- I presume that that's the same tire,
23  but I -- again, I -- that's not the way I found it, the ERT --
24  not the way the ERT team left it.
25  Q    Okay.  Does it appear to you to be the same tire?

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 102 of 217

1  A    Yeah.  It appears to be similar, yes.

2  Q    Okay.

3           MR. OFFENBECHER:  Your Honor, I'd move for the

4  admission of DE-205.

5           MS. LOEFFLER:  No objection.

6           MR. OFFENBECHER:  Can you publish that for him?

7           THE COURT:  I just didn't hear him -- it appears to the

8  be the same tire or it appears to be a similar tire?

9           THE WITNESS:  It appears to be similar.  I -- I --

10  again, that's --

11          THE COURT:  Well, either way --

12          THE WITNESS:  -- not the way -- again, that's not the

13  way I found it, so --

14          THE COURT:  Either way, it's probably admissible,

15  either as the same tire or a similar tire.

16          MR. OFFENBECHER:  Well, I can certainly clarify that if

17  you want.

18          THE COURT:  Okay.

19      (Defendant's Exhibit DE-205 admitted)

20  BY MR. OFFENBECHER:

21  Q    Did you seize and send to Mr. Bolden more than one tire?

22  A    No, I did not.

23  Q    Okay.  And do these items that are here, placed in this

24  Exhibit 205 -- first of all, is the tire -- does it appear to

25  you to be the same tire that you sent to Mr. Bolden?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 103 of 217
(720) 384-8078  attrans@sbcglobal.net

ALLISON - DIRECT

1  A    It does appear to be, yes.

2  Q    And are those other items other items that were seized

3  from Mr. Wells's truck or from his residence?

4  A    I -- I would have to say the truck.  I mean, I honestly

5  don't remember seeing those particular items.  I don't believe

6  they were seized, but they do appear to be -- actually, the

7  other tire, yes, I remember seeing that in the back of the

8  truck.  So it does appear to be --

9  Q    These are item --

10 A    -- items -- items from the truck, yes.

11 Q    Items taken from the back of Mr. Wells' truck?

12 A    Yes.  Yes.

13 Q    And the one tire is the one sent to Mr. Bolden, then,

14 right?

15 A    Yes.  I believe so, yes.

16 Q    Okay.  Can you publish 205 now?  Just so the jury can see

17 what we're talking about, I'm going to put my pointer around

18 this tire here.  Am I right that that's the tire that we're

19 talking about that was sent to Mr. Bolden?

20 A    Yes.  Yes.

21 Q    And then this other tire was just some other tire that was

22 in the back of Mr. Wells's truck?

23 A    Correct.

24 Q    And this is just some other stuff that was in his truck?

25 A    Yes.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

ALLISON - DIRECT

1  Q    All right.  Thank you, Special Agent Allison.  So on that

2  day when you observed the tire, did you observe any markings on

3  the edges of the tire that we've seen earlier?

4  A    No.

5  Q    Can you bring up Government's Exhibit Number 93B, which

6  has been admitted.  So, Special Agent Allison, this is

7  Government's Exhibit Number 93B, which has previously been

8  admitted.  You've seen this before, right?

9  A    Yes.

10 Q    And this is one of the photographs from Mr. Bolden.

11 Right?

12 A    Yes.  I believe so.  Yes.

13 Q    Yeah.  And I'm directing your attention to these bands or

14 marks that appear to be on the edge of the tire.  Is that

15 right?

16 A    Yes.

17 Q    Now, this tire also appears to be the tire that you seized

18 and sent to Mr. Bolden.  Right?

19 A    Yes.

20 Q    Directing your attention to these bands, when you seized

21 the tire and sent it to Mr. Bolden, did the tire have these

22 bands on the side?

23 A    Based on the photos you just showed me, it doesn't appear

24 so.

25 Q    Okay, well, based on the photos and also your recollection

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 105 of 217

ALLISON - CROSS

1  of the tire that you --

2  A    No, I don't recall them.  No.

3  Q    You don't recall those bands being there --

4  A    No.

5  Q    -- do you?  Now, as part of your investigation -- you can

6  take that -- well -- yeah.  You can take (indiscernible).  As

7  part of your investigation, I understand that you also measured

8  the tire pressure on -- of that tire on April 18th of 2012.

9  Right?

10 A    Yes.

11 Q    And what was the tire pressure on April 18th -- well, this

12 is before you sent it to Mr. Bolden.  Right?

13 A    Yes.

14 Q    So before you sent it to Mr. Bolden, what was the tire

15 pressure of the tire?

16 A    Twenty-five psi.

17      MR. OFFENBECHER:  I don't have any other questions,

18 Your Honor.

19      THE COURT:  Cross-examination.

20                     CROSS-EXAMINATION

21 BY MR. LOEFFLER:

22 Q    Special Agent Allison, have you ever let air out of a

23 tire?

24 A    Yes, ma'am.  About a month ago I overinflated my wife's

25 tires and had to let some air out of them.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 106 of 217

1  Q    Okay.  Now, the -- when you pulled the tire out of the

2  back of the truck -- there's been a lot of testimony about the

3  nail -- did you actually see the nail in the tire?

4  A    I did.

5  Q    Did you observe anything about the nail?

6  A    It -- the head of the nail was below the -- well, it

7  was -- first of all, it was in between the -- the -- in between

8  the treads where it penetrated the tire, and the head of the

9  nail was below the tread that -- or below the top of the tread.

10 Q    Did that lead you to do anything further as part of the

11 investigation?

12 A    It lead me to -- led me to send it to an expert to

13 evaluate it.

14 Q    Thank you.

15                    **REDIRECT EXAMINATION**

16 BY MR. OFFENBECHER:

17 Q    Ask you this.  Special Agent Allison, before you sent the

18 tire to Mr. Bolden, you didn't alter it or any way change

19 its -- or appearance, did you?

20 A    Did I?

21 Q    Yeah.

22 A    No, I don't believe so.

23 Q    No.  I'm assuming you wouldn't.

24 A    Not --

25 Q    You didn't wash it or anything like that?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

ALLISON - REDIRECT

1  A    No.

2  Q    You didn't hose it off or clean it up?

3  A    No.

4  Q    Nothing like that?

5  A    No.

6  Q    Okay.  No other questions.

7           MS. LOEFFLER:  No, Your Honor.

8           THE COURT:  All right.  Thank you, sir.  Next witness.

9      (Witness excused)

10          MS. LOEFFLER:  Could we just know who the witness is,

11  so we can figure out which --

12          THE COURT:  All right.  That's what I --

13          MS. LOEFFLER:  -- one of us is --

14          THE COURT:  I need to know too, so I can write it down.

15          MR. CURTNER:  I think it's Mr. Bruce Currie.  You know,

16  we have people coming and going, but I think -- Mr. Currie's

17  here now.

18          MR. SCHRODER:  Your Honor, we're going to -- we'd like

19  to approach.  Have an issue here.

20          THE COURT:  Okay.

21      (At sidebar with the Court and counsel)

22          MR. SCHRODER:  Two things.  First, yesterday we got a

23  disc from the defense with some additional photos that they say

24  they're going to use with Mr. Currie.  Those additional photos

25  all have to do -- it's in the other file -- all have to do with

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 108 of 217
(720) 384-8078  attrans@sbcglobal.net

1  the blowups of the head of the nail.

2       THE COURT:  Okay.

3       MR. SCHRODER:  Mr. Currie didn't really make any

4  findings on the head of the nail, and so I'm concerned that if

5  they're using those photos, he's going to come in and make

6  findings today based on the head of the nail that aren't

7  reported.  And so if it's something that's not reported, I

8  don't think he should be allowed to testify on it.

9       THE COURT:  Okay.

10      MR. SCHRODER:  The second issue -- I'm going to have

11  the same issue with Mr. Swanepoel as well when he comes.  Now,

12  the other issue is --

13      THE COURT:  (Indiscernible) your concern he's

14  testifying beyond what his (indiscernible) his report.

15      MR. SCHRODER:  Correct.

16      THE COURT:  Okay.

17      MR. SCHRODER:  Correct.  And --

18      THE COURT:  That's not permissible, is it?

19      MR. SCHRODER:  Correct.

20      THE COURT:  Okay.  So --

21      MR. SCHRODER:  And the next issue is with Mr. Currie.

22  I would like to voir dire him.  He's made a number of findings

23  in his report base -- about the nail.

24      THE COURT:  About this nail?

25      MR. SCHRODER:  Yeah, it's bent, it's whatever.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 109 of 217
(720) 384-8078  attrans@sbcglobal.net

1          THE COURT:  Okay.

2          MR. SCHRODER:  And I don't see any toolmark expertise

3    anywhere in Mr. Currie's --

4          THE COURT:  Okay.  Well, we'll --

5          MR. SCHRODER:  -- background.

6          THE COURT:  -- deal with that.  But that's not --

7          MR. SCHRODER:  Okay.

8          THE COURT:  -- this witness?

9          MR. SCHRODER:  That is this witness.

10          THE COURT:  Oh, that is this witness.

11          MR. SCHRODER:  Yeah.

12          THE COURT:  Do you want to voir dire him in front of

13    the jury?

14          MR. SCHRODER:  I don't care.  I just --

15          THE COURT:  Okay.

16          MR. SCHRODER:  But I just want to make it clear that's

17    what I'm going to do.

18          THE COURT:  Okay.

19          MR. OFFENBECHER:  (Indiscernible) not aware of any rule

20    that says that the witness is limited to testifying about

21    what's in his report.  Because we certainly could have objected

22    to a number of experts on that (indiscernible).

23          THE COURT:  So why do you need reports, then?

24          MR. OFFENBECHER:  To give the opposing party a general

25    idea of what the inve -- what the witness is going to be

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 754  Filed 09/23/14  Page 110 of 217

1    testifying --

2             THE COURT:  (Indiscernible) --

3             MR. OFFENBECHER:  -- uh-huh (affirmative).

4             THE COURT:  -- all information or half of it or part of

5    it or --

6             MR. OFFENBECHER:  Well, we've only gotten part of it

7    along the way, but --

8             THE COURT:  (Indiscernible) that's the new rule.

9             MR. OFFENBECHER:  Well, it's not a new rule, Your

10   Honor.

11            THE COURT:  So we just give them what we want

12   (indiscernible)?

13            MR. OFFENBECHER:  Well, Your Honor --

14            THE COURT:  Trying to understand what (indiscernible).

15            MR. OFFENBECHER:  Well, Your Honor, witnesses testify

16   for hours and hours.  Not everything that they say is in the

17   report.  They testify -- they make findings about certain

18   things in their reports, but if they have other findings

19   that -- based on their --

20            THE COURT:  So --

21            MR. OFFENBECHER:  -- review --

22            THE COURT:  -- what's the bottom line here?  What are

23   you saying (indiscernible).

24            MR. CURTNER:  Okay.  Your Honor, this is my witness.  I

25   don't think he's going to testify beyond the report.  I think

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1 everything he's going to testify about was noted in the report.

2 Now, if he mentions some things about the nail, it's his

3 general observations because -- and I don't think that, you

4 know, it's -- he's had expertise not only as a tire expert but

5 in nail puncture. So he can make general descriptions of the

6 nail without doing any special toolmark expertise. Mr.

7 Swanepoel does have toolmark expertise and did examine the

8 nail, and I think he's qualified to do that. And he submitted

9 a report to the government --

10          THE COURT: So --

11          MR. CURTNER: -- on that.

12          THE COURT: -- they tell me he's going to testify

13 outside the scope of the report, you tell me he's not.

14          MR. CURTNER: Right.

15          THE COURT: Mr. Offenbecher tells me --

16          MR. OFFENBECHER: Don't listen to me.

17          THE COURT: Okay. He says it doesn't matter what's in

18 the report, so ignore what he says.

19          MR. CURTNER: (Indiscernible).

20          THE COURT: Okay. And how am I supposed to make a

21 judgment?

22          MR. SCHRODER: Your Honor, I'll -- I just want to make

23 clear, I'll object if I think they're going outside the scope

24 of the report, and you can take a look at the report.

25          THE COURT: Okay. Now, I understand they don't have to

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 112 of 217
(720) 384-8078  attrans@sbcglobal.net

say every word that they said in the report.  (Indiscernible)

2 it's not intended for that purpose.  I --

3        MR. SCHRODER:  Yes.

4        THE COURT:  -- understand that.

5        MR. SCHRODER:  Yeah.

6        THE COURT:  The purpose of reporting is to avoid

7 surprises --

8        MR. SCHRODER:  Right.

9        THE COURT:  -- and shock and to give the other side an

10 opportunity to respond.

11        MR. SCHRODER:  Right.

12        THE COURT:  (Indiscernible) I understand

13 (indiscernible).

14        MR. SCHRODER:  And that -- and that's my concern, that

15 I think we've put on experts who said certain things about the

16 nail without benefit of potentially knowing what's going to be

17 said today.

18        THE COURT:  We've already said that I may give you

19 extensive time -- additional time in rebuttal, even to include

20 telephonic testimony, if you are caught off -- not -- by

21 surprise, (indiscernible) the questions (indiscernible).

22        MR. SCHRODER:  Thank you, Your Honor.

23        THE COURT:  That's all I can do so far.

24        MR. CURTNER:  Okay.

25        (End of sidebar)

1   say every word that they said in the report.  (Indiscernible)

2   it's not intended for that purpose.  I --

3        MR. SCHRODER:  Yes.

4        THE COURT:  -- understand that.

5        MR. SCHRODER:  Yeah.

6        THE COURT:  The purpose of reporting is to avoid

7   surprises --

8        MR. SCHRODER:  Right.

9        THE COURT:  -- and shock and to give the other side an

10  opportunity to respond.

11        MR. SCHRODER:  Right.

12        THE COURT:  (Indiscernible) I understand

13  (indiscernible).

14        MR. SCHRODER:  And that -- and that's my concern, that

15  I think we've put on experts who said certain things about the

16  nail without benefit of potentially knowing what's going to be

17  said today.

18        THE COURT:  We've already said that I may give you

19  extensive time -- additional time in rebuttal, even to include

20  telephonic testimony, if you are caught off -- not -- by

21  surprise, (indiscernible) the questions (indiscernible).

22        MR. SCHRODER:  Thank you, Your Honor.

23        THE COURT:  That's all I can do so far.

24        MR. CURTNER:  Okay.

25        (End of sidebar)

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 113 of 217

CURRIE - DIRECT

1     THE COURT:  Good morning, sir.

2     MR. CURRIE:  Good morning.

3     THE COURT:  If you'll please stand, she'll swear you

4  in.

5     THE CLERK:  Okay.  Raise your right hand.

6     **BRUCE ALLAN CURRIE, DEFENDANT'S WITNESS, SWORN**

7     THE CLERK:  Okay, thank you.  Please have a seat.  And,

8  sir, if you can please state and spell your full name.

9     THE WITNESS:  My name is Bruce Allan Currie.  And it's

10 B-r-u-c-e, A-l-l-a-n, C-u-r-r-i-e.

11    THE CLERK:  Thank you.

12    THE COURT:  All right, counsel.

13               **DIRECT EXAMINATION**

14 BY MR. CURTNER:

15 Q    Good morning, Mr. Currie.

16 A    Morning.

17 Q    Where are you employed, Mr. Currie?

18 A    Well, I have my own consulting business, Currie

19 Engineering, LLC.

20 Q    Okay.  And what do you do in that capacity?

21 A    I basically work with attorneys on lawsuits, tire

22 lawsuits.  Most of the work I do has to do with failed tires.

23 Q    Okay.  Could you tell the jury a little bit about your

24 education?

25 A    Okay.  I have a -- a bachelor's of science degree in

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 114 of 217
(720) 384-8078  attrans@sbcglobal.net

1  chemical engineering from the University of Cincinnati, 1971.

2  I have a master's of business administration from East Texas

3  State University in 1976.  And I have a master's degree in

4  engineering from GMI in 1995.

5  Q   Okay.

6  A   I also have a professional engineer's license in the State

7  of Ohio, in 1980.

8  Q   Can you tell us a little bit about your work experience?

9  A   I started my career at Cooper Tire and Rubber Company

10  in -- September 18th, 1967.  I was a co-op student with Cooper

11  Tire.  At the University of Cincinnati, if you were in the

12  engineering college, you had to co-op.  That was a requirement.

13  So, basically it's a --

14  Q   I'm sorry, Mr. Currie, what -- could you explain what co-

15  op means?

16  A   Well, basically, what it is is you -- I went to school for

17  four quarters.  The first three of the freshman year and the

18  first quarter of the sophomore year.  After that, I alternated.

19  I went to work for a quarter, went to school for a quarter,

20  work for a quarter, school for a quarter, until I had 21

21  quarters of work in.  And you go year-round, and it's basically

22  a five-year program.

23  Q   Okay.  And then so -- and this was with the Cooper Tire

24  Company?

25  A   Yes, Cooper --

1   Q   Where's --

2   A   -- Tire and Rubber Company.

3   Q   Where's that located?

4   A   It's in Findlay, Ohio.

5   Q   Okay.  So -- go ahead, I'm sorry.  Go ahead.

6   A   Oh, okay.  And then in 1971, when I graduated, I went

7   full-time working for Cooper Tire.  I started out as a project

8   engineer, working on various projects like evaluating tire

9   uniformity, working on a projector alignment system that aligns

10  materials on a tire-building machine.  1972, I went to the

11  Radial Passenger Tire Development Department.  I became

12  Cooper's first radial passenger tire development engineer and

13  basically developed Cooper's first radial passenger tire in

14  1974, which we took down to Texarkana, Arkansas and put into

15  production in our Texarkana, Arkansas plant.  I was down there

16  for four years, working on the startup or production, doing the

17  technical aspects of it.

18      After that, I came back to Findlay, Ohio and I was

19  supervisor of radial passenger tire development.  And then

20  about a year or so later, 1979, I think it was, I -- Cooper was

21  getting into light truck tires, and I developed the first

22  radial light truck tire that Cooper manufactured.  I became

23  manager of radial truck tire development.  And then two or

24  three years later, they combined the Radial and the Bias Truck

25  Tire Departments, and I became manager over just truck tire

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 116 of 217

1  development, total.

2      After that, in the mid-1980s there was a lot of
3  computerization going on, and Cooper needed to computerize
4  their technical systems, tire development systems.  And so I
5  got a job on working on development of those aspects.  And at
6  the same time, I was still in product development.  I had
7  responsibility for inner tube development, which we were still
8  making inner tubes back then.  And I also got responsibility
9  for curing bladder development, which -- curing bladders are
10  what are used in tire curing presses to cure tires out in
11  production.

12      We did a lot of modernization with the curing bladders,
13  did a lot of injecting molding with those, to get a much more
14  uniform bladder, which makes a better tire than the old method,
15  which was compression molded.  So that, basically, until 1999.
16  During that time we were -- also developed curing envelopes,
17  which we developed.  And curing envelopes are used in the truck
18  tire retread process for the Bandag type retreading, the cold
19  cap.  And I got a patent in 2005 on a curing bladder design --
20  or a curing envelope design, sorry, in the manufacturing
21  process to make that curing envelope, which again was a
22  compression molded process that we used.

23      Then in 1999, I went to Technical Relations Department.
24  That department had two functions.  The first function was that
25  the people in that organization, myself, particular, were on

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 117 of 217

1 the industry committees, like the Tire and Rim Association,

2 whose primary job is to standardize tire dimensions for

3 interchangeability between manufacturers on tires and wheels

4 and valves.  The Rubber Manufacturers Association, which puts

5 out pamphlets and documents about things like repairing tire

6 punctures, tire upsizing, things like that, that the consumer

7 needs to use.  The ASTM, which was an organization that made --

8 developed standards for testing tires, testing rubber

9 materials, and things of that sort.  Society, Automotive

10 Engineers, which also was like ASTM.  They developed test

11 standards for tires.  A few other things.  And then the second

12 thing that that department did was worked with our Legal

13 Department on lawsuit tires, do forensic examinations of

14 lawsuit tires and help them with discovery, affidavits, do

15 depositions, testify at trial, do those things.

16      I had started doing forensic examination of tires in -- in

17 the early '80s, and this was a formulization of it or

18 continuation of that job.  And I basically had that job till I

19 retired in 2004.

20 Q    And what was your position when you retired in 2004?

21 A    Senior manager of technical relations.

22 Q    So you had a long history with Cooper Tires?

23 A    Yeah.  Most of it was product development work.

24 Q    And how long did you work at Cooper Tire?

25 A    A little over 37 years.

1  Q    Okay.  And do you belong to any professional affiliations?

2  A    The National Society of Professional Engineers is one of

3  them.  I'm not sure who else.  I'm still a member of the SEA,

4  Society, Automotive Engineers.  I'm also a member of the ASTM

5  Committee, still on that committee.  The other ones, you

6  actually have to be working for the company to be a member, for

7  tire and remnant RMA.

8  Q    So some of the associations you were a member of, you're

9  no longer a member --

10 A    That's -- that's --

11 Q    -- because you're not an employee of Cooper?

12 A    That's true, yes.

13 Q    Okay.  Now, since 2004, then, what has been in your --

14 have you been involved in the forensic inspection and analysis

15 of tires?

16 A    Yes, I have.

17 Q    As a consultant?

18 A    Yes.

19 Q    Okay.  And have you done training seminars and attended

20 training seminars?

21 A    I have attended quite a few.  I haven't really put on any

22 formal training seminars, no.

23 Q    Have you been qualified as an expert in forensic

24 inspection of tires before?

25 A    Yes.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 119 of 217
(720) 384-8078   attrans@sbcglobal.net

CURRIE - DIRECT

1  Q    How many times, do you think?

2  A    Oh, I would say I've probably testified, I don't know, 30,

3  40 times, probably --

4  Q    And --

5  A    -- in total, in deposition and trial.

6  Q    What different jurisdictions?

7  A    State courts, federal court.  That's it, basically.

8       MR. CURTNER:  Okay.  And, Your Honor, I'd offer Mr.

9  Currie as an expert in forensic inspection of tires.

10      THE COURT:  Voir dire?

11      MR. SCHRODER:  Not if that's going to be the limit of

12 his expertise, Your Honor.  I'm fine with that.

13      THE COURT:  Okay.  So he's being offered as an expert

14 in what, now?

15      MR. CURTNER:  In the forensic inspection and analysis

16 of tires.

17      THE COURT:  Forensic inspection and analysis of tires.

18 Will be received in that capacity.

19      MR. CURTNER:  Okay.

20 BY MR. CURTNER:

21 Q    Now, Mr. Currie, were you retained to be involved in this

22 case of United States versus James Wells?

23 A    Yes.

24 Q    And could you tell us when you first became involved and

25 retained in this case?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 120 of 217
(720) 384-8078   attrans@sbcglobal.net

1  A    I'm trying to think.  I -- remember -- well, let me look

2  at my notes here.  I think it was sometime -- I don't have the

3  exact date, but I think it was in the summer of 2013.  I know I

4  inspected the -- the tire, the wheel, and the nail that was in

5  the tire on October 29th and 30th of 2013.

6  Q    Okay.  And doing your inspection and analysis, what did

7  you review?  What did you receive in order to do your

8  inspection of the tire and the nail?

9  A    Well, what I received was I received the tire dismounted

10  from the wheel, and the nail removed from the tire.

11  Q    Did you also review materials that were submitted to you

12  from Gary Bolden?

13  A    Yes.

14  Q    Now, do you know who Gary Bolden is?

15  A    Yes.

16  Q    He is somewhat in the same business you are?

17  A    He works for Standard Testing Labs, and they do tire

18  testing, basically.  He also does testifying on forensic

19  lawsuits.

20  Q    Okay.  Now -- so do you recall what -- everything that you

21  reviewed in your analysis in this case?

22  A    I think so, yes.

23  Q    Well, if you could tell us what you looked at and --

24  besides the tire and the nail?

25  A    Well, yeah, basically, I looked at the tire, I looked at

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 121 of 217

CURRIE - DIRECT

1   the nail.  And I got on the Internet, basically, because I
2   wanted to see what size the nail was.  And based on what I
3   found on the Internet, it was a 16-penny nail.  It's three and
4   a half inches long.  The shaft diameter was about .155 inches,
5   and I think the common nail is about .162 inches, so it was a
6   little smaller than that.  But it wasn't as small as a box
7   nail.  But the nail was severely weathered, corroded, and I
8   think it probably lost some of its diameter just through the
9   weathering.
10      The other thing that I did was I reviewed the testing
11  that -- that Gary Bolden had done with the tire when he
12  received it.  And --
13  Q   Okay, so Mr. Bolden had this tire before you got it.  Is
14  that correct?
15  A   Yes.
16  Q   And you read his report?
17  A   Yes.
18  Q   And could you tell us about the testing that Mr. Bolden
19  did with this particular tire?
20  A   Well, I think initially when he got the tire, he measured
21  the air pressure in the tire, and I think it was 20 psi, is
22  what he measured.  Was fairly low, and it was leaking a little
23  bit of air.  Then the next thing that he did was he inflated
24  the tire, put 80 psi air in the tire, and mounted it on a test
25  wheel, ran it at 62 miles per hour and I think about 80 percent

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 122 of 217
(720) 384-8078   attrans@sbcglobal.net

CURRIE - DIRECT

1   of the max load for 24 hours, 1,488 miles.  And the test wheel

2   that's used is a -- I don't know if we have a photo of that

3   or --

4   Q   You know, let me show you a photo.  It's been marked as

5   Defense Exhibit --

6   A   Okay.

7   Q   -- 203.  If you could look at it on your screen.  And can

8   you identify that?

9   A   Yeah.  That's the test wheel.  In fact, it's on STL's own

10  website that shows their machine, test machine.  You can't see

11  the -- the wheel, but the drive wheel in the center of this is

12  62.24 inches in diameter.  That's a standard test wheel size

13  for tires.  The government specification uses that wheel.  When

14  I started in the tire industry in the '60s, that was the

15  standard, and it still is, basically.  It's about 20 inches

16  wide, it's solid steel, and you load the tire up against it and

17  the wheel turns and drives the tire.

18  Q   I wonder if -- so this is a photograph you got from the --

19  Mr. Bolden's company's site, website.

20  A   Yes.

21  Q   And this -- and you're familiar with this type of wheel

22  for testing tires.  Is that correct?

23  A   Yes.  All tire --

24  Q   I'd move --

25  A   All tire companies use that wheel.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

CURRIE - VOIR DIRE

1    MR. CURTNER:  Can I move for the admission of Defense
2 Exhibit 203?
3    MR. SCHRODER:  Voir dire, one question, Your Honor?
4    THE COURT:  Go ahead.
5    MR. SCHRODER:  Or a couple questions.
6                          VOIR DIRE
7 BY MR. SCHRODER:
8 Q   Mr. Currie, do you know whether this was -- for sure that
9 this was the machine they used?
10 A   Yes.  He said he used the dynamometer, which is what that
11 is.
12 Q   But you weren't there?  I mean, you don't -- I mean, do
13 you know that this is the only one they have?  I mean, I'm
14 just --
15 A   No, they --
16 Q   -- trying to figure that out.
17 A   They have more than that.  I've been to STL a number of
18 times.
19 Q   So --
20 A   -- I've seen their equipment.
21 Q   -- it may or may not be this one?
22 A   Well, may not --
23 Q   You said they had more than that?
24 A   May not be that exact machine, but it's one similar.
25 Q   What does the -- the large surface that touches the tire,

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 754  Filed 09/23/14  Page 124 of 217

CURRIE - VOIR DIRE

1 what's that shaped like?

2 A    It's circular.  It's a round drum, 67.24 inches in

3 diameter.

4 Q    But I mean, widthwise, what's the shape?

5 A    Twenty inches wide.

6 Q    But, I mean, is it curved, flat?  This --

7 A    It's flat.

8 Q    -- looks flat to me.

9 A    Yeah, it's flat.  It's flat in the one direction, it's

10 curved with the diameter the other direction.

11        MR. SCHRODER:  You know, Your Honor, I'm concerned that

12 it's not the same machine.  I think Mr. Bolden said that it

13 was -- I -- in fact, I know he said it touched a wheel that

14 deflected the tire.  That was his testimony.

15        MR. CURTNER:  Your Honor, this just demonstrates --

16        MR. SCHRODER:  So it wasn't a flat sur -- he said it

17 was not a flat surface.

18        MR. CURTNER:  This demonstrates --

19        THE COURT:  (Indiscernible) --

20        MR. CURTNER:  -- he's been to the -- Mr. Bolden's

21 business.  This demonstrates how tires are tested.  And he can

22 describe this for the jury.

23        MR. SCHRODER:  He can describe it, Your Honor.  I'm

24 just not sure this --

25        THE COURT:  I've just -- I recall --

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 754  Filed 09/23/14  Page 125 of 217
(720) 384-8078  attrans@sbcglobal.net

CURRIE - VOIR DIRE

1          MR. SCHRODER:  -- an accurate depiction.

2          THE COURT:  -- him saying about it was a rounded

3   surface.  But I can't remember specifically.  Is this the same

4   thing or not?  You got the --

5          MR. CURTNER:  Yes, you can --

6          THE COURT:  -- witness there.

7          MR. CURTNER:  -- see it.  Yes, if we could --

8          THE COURT:  But it looks flat.  But he's the expert.  I

9   don't --

10         MR. CURTNER:  Can we --

11         MR. SCHRODER:  He said it was flat, Your Honor.

12  BY THE COURT:

13  Q   Is this the same thing or not?  Do you know, sir?

14  A   Yes.  They have a number of those.  They probably have,

15  oh, six --

16  Q   Is the --

17  A   -- six or seven like that.

18  Q   Is the base surface always flat or rounded, or what?  The

19  bottom surface?

20  A   It's always flat, and it's 67 inches in diameter.  It's

21  just a big -- it's like a big pulley, but it's flat, basically.

22         THE COURT:  Does that clear it up for anybody?

23         MR. SCHRODER:  No.

24         MR. CURTNER:  Well, yes, Judge.  I -- if we can do this

25  for demonstrative purpose --

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 126 of 217
(720) 384-8078  attrans@sbcglobal.net

CURRIE - DIRECT

1          THE COURT:  You can do it for demonstrative purposes --

2          MR. CURTNER:  Okay.  Thank you.

3          THE COURT:  -- but we don't know if it's the same

4   machine.  It's close, maybe.

5          MR. CURTNER:  Well, we'll just use it for

6   demonstrative --

7          THE COURT:  Okay.

8          MR. CURTNER:  -- purposes --

9          THE COURT:  For demon -- that's fine.

10         MR. CURTNER:  -- if that's okay.  Can we publish it,

11  then?

12         MR. SCHRODER:  Yes.

13                 **DIRECT EXAMINATION, CONTINUED**

14  BY MR. CURTNER:

15  Q   Okay, this -- we're talking about this right here, Mr.

16  Currie?

17  A   Yes.  You can see the drum.  It -- it's protected by the

18  guards, and --

19  Q   Now, this is a drum that you're talking about, right?

20  A   Yes.  And it goes on around.  You can see it's -- it's the

21  diameter.

22  Q   So it's like a big drum, almost like a big wheel?

23  A   It is.  It's a big steel wheel.

24  Q   Okay.  And it's a steel surface there?

25  A   Yes.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 127 of 217
(720) 384-8078  attrans@sbcglobal.net

CURRIE - DIRECT

1   Q    And when you say flat, you mean it's flat, I suppose, on

2   the sides?

3   A    Well, it's flat across.

4          THE COURT:  It doesn't look flat.  Doesn't it look

5   rounded?

6          THE WITNESS:  Well, it's rounded in that direction, but

7   it's flat the other way.  In other words, there's no curvature

8   to the wheel on the -- you know, going sideways.

9   BY MR. CURTNER:

10  Q    All right.  So it's a consistently round drum?

11  A    Yeah, it's a round drum, yes.

12  Q    Now, and so how would this work in a business of tire

13  testing?  For example -- and you're well familiar with how this

14  works.  Right?

15  A    Yes.

16  Q    So how would you test a tire?  What would you have to do

17  in order to put 1,488 miles on a tire in this kind of test --

18  tire test machine?

19  A    Well, basically, you can see up on top, that machine,

20  that's the motor, the motor that runs that drum.

21  Q    Okay.  This motor runs the drum?

22  A    Yes.  And that's what gives you the speed that the test

23  runs at.

24  Q    So that can be controlled at the speed that you're running

25  the test and the length --

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 128 of 217
(720) 384-8078  attrans@sbcglobal.net

CURRIE - DIRECT

1   A   Right.

2   Q   -- how long you run it?

3   A   And there's a tire on there that you can see.  And it's --

4   Q   Uh-huh (affirmative).

5   A   -- got a cylinder that pushes it into the wheel.

6   Q   Okay.  So right --

7   A   And --

8   Q   -- now, it's not touching the wheel?

9   A   No.

10  Q   But when it's in -- when you're doing the test, it would

11  be up against this drum?

12  A   Yes.

13  Q   And then as --

14  A   Yes.

15  Q   -- drum turns, the wheel would turn?

16  A   Yeah.  The drum drives the tire.

17  Q   Okay.

18  A   That's what makes it run.

19  Q   And that's a standard practice in testing tires?

20  A   Yeah.  The -- the government testing, the FMVSS testing

21  that's all done, is done with that -- that wheel, that size

22  wheel.

23  Q   Okay.  Let me -- if we could show you Defense Exhibit 202B

24  on your screen.  And do you recognize that?

25  A   That's a tire serial number of the tire I looked at.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 129 of 217
(720) 384-8078   attrans@sbcglobal.net

CURRIE - DIRECT

1 Q   Okay.  That's the tire that you examined?

2 A   Yes.

3       MR. CURTNER:  Okay, move for admission of 202B.

4       MR. SCHRODER:  No objection, Your Honor.

5       THE COURT:  It'll be received.

6   (Defendant's Exhibit DE-202B admitted)

7 BY MR. CURTNER:

8 Q   Okay, so this is the tire you examined, that was sent to

9 you by the FBI after Mr. Bolden had done his examination?

10 A   Yes.

11 Q   Okay.  Let's look at Government's Exhibit 203, that was

12 just admitted into evidence -- I'm sorry, 204.  Or is it -- or

13 Defense Exhibit 204 that was just admitted.

14   (Side conversation)

15 Q   Okay, Mr. Currie, do you recog -- this was the tire that

16 was seized by the FBI from Mr. Wells's truck.  Do you recognize

17 that?

18 A   Yes.

19 Q   That's the tire that you examined?

20 A   Yeah, I'm fairly certain it is.  It was the one that was

21 sent to me.

22 Q   Okay.  Now, do you notice anything -- well, let me show o

23 another exhibit.  This is Government's Exhibit 93B.  It's

24 been -- already been admitted, hasn't it?  Yes.  And is that

25 the same tire?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 130 of 217
(720) 384-8078  attrans@sbcglobal.net

1  A    Yes, it appears to be.  It's got the same tread pattern.

2  Q    Okay.  Now, do you remember -- did you get a chance to

3  review Mr. Bolden's testimony?

4  A    Yes.

5  Q    Before you came up here?

6  A    Yes.

7  Q    And you saw the photographs that he submitted in his

8  testimony?

9  A    Yes.

10 Q    And this is one of the photographs you -- that he -- was

11 submitted in his testimony?  Did you have a chance to look at

12 this?

13 A    Yes.

14 Q    Okay, now, in this particular photograph there seems to be

15 this edge here on both sides.  Did you have a chance to

16 observe -- to look at this photograph?

17 A    Yes.

18 Q    And did you have a chance to listen to Mr. Bolden's

19 testimony about that?

20 A    Yes, I read it.

21 Q    Now, do you have an -- now, is this different -- did you

22 observe this when you had the tire in your shop?

23 A    I don't recall for sure.  I have some photographs, but I

24 don't recall.

25 Q    Now, do you have an opinion about why this surface of the

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 131 of 217
(720) 384-8078   attrans@sbcglobal.net

1  tire on each edge would be different than what's in the middle?

2  A   Yes.

3  Q   And what would that be?

4  A   It's from running on the steel wheel, the steel test

5  wheel.  And in -- this tire has studs in the shoulder which you

6  can see.  And the -- the light area on that tire lines right up

7  with the edge of the studs from the left side to the right side

8  around the tire.  And when you run a studded tire on that metal

9  wheel, you tend to get metal shavings from the stud on the

10 wheel itself.  And as the tire runs, it heats up, the tread

11 tends to get sticky, so it tends to pick up those metal

12 shavings that end up on the test wheel.  And so you end up with

13 kind of a shiny appearance like this.  You wouldn't see that on

14 a tire that didn't have studs.

15 Q   Okay.  So in your opinion -- well, first of all, is it

16 very common to test studded tires in the -- in Ohio, in your

17 experience?

18 A   I know when I worked at Cooper Tire, we never ran studded

19 tires on the wheel because we didn't want to damage the surface

20 of the wheel with the studded tire.

21 Q   So in your opinion, would these marks be from running this

22 tire on the wheel for 24 hours with those studs on it?

23 A   Yes, it could, very definitely.

24 Q   Okay.  Now, what other impact might have -- there be on --

25 as I understand it, Mr. Bolden ran this tire on that wheel for

1  24 hours with the nail in it.  What kind of impact would

2  that -- might have?

3  A    Well, I think my main problem was that -- was the fact

4  that it had been tested before I ever got a chance to see it or

5  to evaluate the air loss in the tire.  And of course --

6  Q    Now -- so, I mean --

7  A    -- I got the tire without the nail in it either, so

8  there's not much you can do when you get it at that point.  But

9  when the tires run on the wheel, there's a couple things.

10  Number 1, the test wheel room was at 100 degrees Fahrenheit.

11  Number 2, when you run it at 62 miles per hour with 80-percent

12  full load up against the wheel, the tire's going to heat up.

13  The shoulders of the tire are going to go up probably in the

14  200-degree range.  And the internal pressure temperature, the

15  air that's inside the tire, is also going to heat up.  And it

16  will heat up probably at least 50 degrees.  So you're running a

17  tire that has maybe 150-degree air inside of it and you're

18  taking your results of air loss while it's doing that.

19       And one of the main problems you have is that, first of

20  all, when the rubber gets hot, the rubber gets sticky, it's

21  more pliable, it tends to conform around the nail.  It'll seal

22  off a lot better.  The nail itself gets hot.  And metal expands

23  slightly when it gets warm, so it fits the hole a little

24  tighter.  So it's really difficult, in my opinion, to compare

25  test data on a test wheel at those temperatures versus --

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 133 of 217

CURRIE - DIRECT

1  versus the condition of the tire at the time of the incident

2  and the temperature was 32, 34 degrees Fahrenheit.  And the

3  rule of thumb is, for every 10 degrees change in temperature,

4  the psi should change roughly 1 degree.  So if you're 100

5  degrees warmer in temperature, then you should be 10 psi

6  high -- higher in pressure on the tire.

7  Q    So do you think that would have a significant difference

8  in trying to measure air pressure if it was in a 100-degree lab

9  compared to, let's say, a natural environment where it was

10 closer to 30 degrees?

11 A    Yeah, definitely.  I mean, it's not a real accurate way of

12 trying to simulate, you know, the -- the -- the day that the

13 incident occurred.

14 Q    And, of course, when the FBI sent you this tire after Mr.

15 Bolden had examined it, it didn't have -- the nail was out by

16 that time.

17 A    Yes.

18 Q    And you couldn't duplicate any type of analysis with the

19 nail in it.  Is that correct?

20 A    That's true, yes.

21 Q    Okay.  Let me show you what's been marked as -- on your

22 screen as Defense Exhibit 202C.

23      (Side conversation)

24 Q    You see a picture there?

25 A    Yes.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 134 of 217

CURRIE - DIRECT

1  Q   Is that a picture that you took?

2  A   I believe so, yeah.

3  Q   Okay.  And what does that picture depict?

4  A   That's the picture of the nail hole from the outside of

5  the tire.

6  Q   Pardon me?  It's the picture of what?

7  A   The nail hole from the outside of the tire.

8  Q   Okay.  And this is --

9  A   Without the nail in it.

10 Q   So you examined the tire yourself?

11 A   Yes.

12 Q   Without the nail in it?

13 A   True, yes.

14 Q   And you took this photograph during your examination of

15 the tire?

16 A   Yes.

17      MR. CURTNER:  I'd like to move for Exhibit -- Defense

18 Exhibit 202C.

19      MR. SCHRODER:  No objection.

20      THE COURT:  It'll be received.

21   (Defendant's Exhibit DE-202C admitted)

22 BY MR. CURTNER:

23 Q   So, Mr. Bold -- Currie, what could you tell us about your

24 observation of the nail hole in the tire when you got it?

25 A   Well, basically, you can see it there.  And there's a few

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 754  Filed 09/23/14  Page 135 of 217

CURRIE - DIRECT

1 other marks around the surfaces there on the tire.  But the one

2 thing I wanted to do was try to figure out the direction of the

3 nail hole in the tire.  And the best I figured to do was

4 basically -- I took a paper clip and I bent it open and I stuck

5 it in the hole so I could see what angle the nail hole was in

6 the tire.

7 Q    Now looking at this nail hole, what are your observations

8 about the hole itself and any kind of wear around the hole?

9 A    Well, I don't know if I would really call it wear too

10 much.  But any time you puncture a tire with something, you're

11 going to have some movement of the material pushing it out of

12 the way as it actually goes through, and it kind of looks like

13 that's what's happened here.  It's kind of rolled it up on the

14 sides around it.

15 Q    Well, let me go to Defense Exhibit 202E.  Is that on your

16 screen?

17 A    Yes, I have it now.

18 Q    Do you recognize that?

19 A    Yes.  That's the photograph I took with the paper clip.

20 Q    And you took this photograph with the paper clip during

21 your examination of the tire?

22 A    Yes.

23        MR. CURTNER:  Move for admission of Defense Exhibit

24 202F -- I'm sorry, 202E.

25        MR. SCHRODER:  No objection.

A & T TRANSCRIPTS

(720) 384-8078  attrans@sbcglobal.net

Case 3:13-cr-00008-SLG  Document 754  Filed 09/23/14  Page 136 of 217

1    THE COURT:  It will be received.

2    (Defendant's Exhibit DE-202E admitted)

3  BY MR. CURTNER:

4  Q    What can you tell us about this, then?

5  A    Well --

6  Q    First of all, this is -- what is this right here?

7  A    That's where the nail hole is down there in the tire, and

8  that's the paper clip that I straightened and slid into the

9  hole.  The paper clip is -- is not nearly as large around as

10 the hole is, so, you know, it -- it's an estimate, basically,

11 of what -- what that angle should be.  But it gives you an idea

12 of the direction of it.

13 Q    And, now, is this your yellow marks?

14 A    No.  That was on there.

15 Q    And that was already on there from the examination of Mr.

16 Bolden?

17 A    It was on there when I received it.

18 Q    Okay.

19 A    Yeah.

20 Q    Now, you see that we have these scuff marks or scrapings

21 here on the side of the tire?

22 A    Yes.  They're there.  Yes.

23 Q    And it also is -- looks like the white -- the yellow paint

24 or markings have also been worn down somewhat?

25 A    Yes, a little bit.

1  Q    And then that -- is it your opinion that it's all from

2  running this on the test wheel for 24 hours?

3  A    I think the other picture shows it better, but that's --

4  that is the same thing.

5  Q    The same thing that you recognized already.  Is that

6  correct?

7  A    Yes.

8  Q    Now -- so what is -- so this -- obviously, the nail's not

9  perpendicular to the tire?

10  A    That's true.

11  Q    And so what is that angle, in your opinion?  Did you

12  measure that?

13  A    Yes.  It was about 25 degree to the vertical direction.

14  Q    Okay.  And, now, I imagine in your career, have you

15  examined many tires with nail punctures?

16  A    Well, I know that I've -- we've had tires with screws in

17  them of different sizes, nails of them -- of all kinds and

18  shapes.  We've had them with pieces of wood in them that have

19  punctured them, pieces of plastic that have punctured them.  We

20  have had thorns that have punctured tires.  We've had a

21  rattlesnake tooth that punctured a tire.  We've had different

22  pieces of metal that have gotten in tires.  We've had glass.

23  There's been all kinds of things.

24  Q    Well, how many times do you think you've examined or seen

25  a nail in a tire?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 138 of 217
(720) 384-8078  attrans@sbcglobal.net

1  A    I think, between all of the tire development work I did

2  and examining tires that came back through our adjustment

3  center and lawsuit tires and claim tires, probably at least a

4  couple hundred or so that have been punctured.

5  Q    Now, for a tire that puncture -- I mean a nail to puncture

6  a tire, is that 25-degree angle unusual?

7  A    No, it's not unusual.

8  Q    Could you explain that?

9  A    Well, like I said before, I was a member of the Rubber

10 Manufacturers Association, and -- and one of the things that

11 that organization does is it publishes repair procedures for

12 punctured tires.  And the RMA uses in their procedure a patch

13 and a plug.  And, basically, the document states that if that

14 angle is less than 25 degrees, you can use a one-piece patch

15 with a plug stuck to it, to put in the hole.  If that angle is

16 more than 25, you have to use a two-piece repair procedure,

17 where you actually put the plug in the hole and through it, cut

18 it off on the inside, and then put a patch over the -- the

19 plugged hole.  So, you know, their procedure really qualifies.

20 There's no limit on the angle that you can have in the tread

21 area to repair a tire, basically.

22 Q    But a 25-degree puncture by a nail in a tire, that's not

23 unusual at all?

24 A    No, it's not unusual.

25 Q    Okay.  Let's go to Defense Exhibit -- on your screen, it

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 139 of 217
(720) 384-8078   attrans@sbcglobal.net

1  would be 202F.  Do you see that?

2  A    Yes.

3  Q    And is that a photograph you took?

4  A    Yes.

5  Q    Okay.  And it also shows the same paper clip?

6  A    Yes.

7        MR. CURTNER:  All right.  I wonder -- move for

8  admission of 202F, Defense Exhibit 202F.

9        MR. SCHRODER:  No objection.

10        THE COURT:  It will be received.

11     (Defendant's Exhibit DE-202F admitted)

12        MR. CURTNER:  If we could publish that.

13  BY MR. CURTNER:

14  Q    What does that show, Mr. Currie?

15  A    Well, what this is, it's a side view of the tire, and it

16  shows the angle of the hole going forward or backwards around

17  the tire.  And the interesting thing here is that angle lines

18  up with the shoulder slot that's in the side of the tire.

19  Q    Now, I'm sorry, could you explain that?  This lines up

20  with which?

21  A    The shoulder slot there --

22  Q    This is a shoulder --

23  A    -- from the side of the tire, yes.

24  Q    Okay.  And why is that significant to you?

25  A    Well, because a lot of times when you get a puncture in a

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 140 of 217

1   tire, you'll get it in a groove or you'll get it in a slot.

2   One reason you do that is because the sides of the groove and

3   slide -- size of the slot has a tendency to kind of push the

4   item to the middle of the -- the lower spot.  It -- it's easier

5   to puncture it in a groove like that than it is to actually

6   puncture it on a flat spot on the top of the tire.  And it

7   looks like in this case that that side slot had something to do

8   with the way the nail came into the tire from the slide.

9   Q   So that side slot, do you think that might have helped

10  guide that nail into the tire at that particular location?

11  A   Yes, I think it's a good possibility.

12  Q   Okay.  So in your professional opinion, do you think that

13  in your observation of that tire and the nail hole, that this

14  could have picked up on a road surface?

15  A   Yes.

16  Q   And explain that, why you feel that way.

17  A   Well the thing that we don't know is how the nail got into

18  the tire or where the tire picked the nail up.  We don't know

19  if the vehicle was going forward or backwards, pulling out of a

20  parking spot, turning a corner.  There's all kinds of things

21  that -- that can happen for that nail to be picked up the way

22  it was, and that's -- that's really not unusual.  A lot of the

23  roads were dirt roads, gravel roads.  You get all kinds of junk

24  that gets down in the dirt and gets in the gravel, and it can

25  be just pointed up a little bit.  You could bring the car

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 141 of 217

1  around, you could turn and happen to turn just right, and turn

2  right into it.  So it's not unusual for it to come in from the

3  side.  That's a -- very possible in this case.

4  Q    And I wonder if I could show you Defense Exhibit 202G.  Do

5  you recognize that?

6  A    Yes.

7  Q    And what is that?

8  A    That's the photograph I took of the nail.

9  Q    Okay.

10        MR. CURTNER:  And move for admission of Defense Exhibit

11  202G.

12        MR. SCHRODER:  No objection.

13        THE COURT:  It'll be received.

14     (Defendant's Exhibit DE-202G admitted)

15  BY MR. CURTNER:

16  Q    Okay, so you took this photograph?

17  A    Yes.

18  Q    And this is -- well, explain to the jury again what this

19  is and what you saw.

20  A    Well, basically, I just laid the nail down there on that

21  yellow sheet of paper and took a photograph of it.  Basically,

22  what it shows is the -- the nail's pretty well weathered.  It's

23  a -- an old nail.  It's well used.  We have some other

24  photographs that'll show some things a little better, but you

25  might notice that about -- this is three and a half inches

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 142 of 217

1  long, so if you just --

2  Q    This is all three and a half inch -- okay.

3  A    Yeah.  If you go down just from the -- the head of the

4  nail to the right, there's a little notch out of there --

5  Q    Uh-huh (affirmative).

6  A    -- out of the nail.  And that nail has gouges around the

7  upper part, just below the -- the -- the head, in that area,

8  which appears to me like which would happen if you use a

9  nail --

10       MR. SCHRODER:  Objection.  Now he's making a toolmark

11  determination, Judge.

12       MR. CURTNER:  Yeah, I don't think he has to be a

13  toolmark expert.  We have a toolmark expert coming.  But I

14  don't think you have to be a toolmark expert for him to observe

15  that there's a gouge that could be similar to a claw hammer or

16  being pulled out.

17       MR. SCHRODER:  Well, we had a toolmark expert up,

18  Judge, who said he couldn't determine what that was from.

19       THE COURT:  Well, I don't know if he can testify

20  without guessing.  First, I guess, ask an opin -- if he has an

21  opinion.

22  BY MR. CURTNER:

23  Q    Do you have an opinion on that -- on what you observed on

24  this nail?

25  A    Yes.  I think that's what -- the marks from the nail being

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 754  Filed 09/23/14  Page 143 of 217
(720) 384-8078  attrans@sbcglobal.net

CURRIE - DIRECT

1  pulled out of a piece of wood.

2  Q    And what did you observe here?

3  A    Well, it's got about a seven-degree bend on the nail, on

4  the end of it, about the last third of it.

5  Q    Okay.  And that was bent when you got it?

6  A    Yeah, it was like that when I got it.

7  Q    Okay.  It wasn't in the tire?

8  A    No.

9  Q    It was in a separate package?

10 A    Yes.

11 Q    And you didn't bend it yourself?  That's the way it came?

12 A    Yes, that's right.

13 Q    And did you notice anything about the tip of the nail?

14 A    Yeah, the tip of nail -- we have some other photographs

15 that show it better, but the tip of the nail's been blunted.

16 It's been flattened.  And what it looked like to me, it would

17 be like a nail you'd hammer into a piece of wood and you'd hit

18 maybe another nailhead or something and another piece under it,

19 and it would flatten the point of it.  And then you'd pull it

20 out because it -- it won't go in any further.  So you pull it

21 out.  When you pull it out, it gets bent.  And it gets -- you

22 know, it gets thrown down like that.  And -- and can get into

23 the pavement or wherever it was picked up at.

24 Q    So, Mr. Currie, do you have an opinion, professional

25 opinion with your experience, if it was -- if this nail might

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 144 of 217

1  have been picked up on the road or manually inserted?

2  A    Could very easily have been picked up on the road

3  somewhere, especially on dirt and gravel.

4  Q    Would you -- in your opinion, was it more likely than not

5  picked up on the road?

6  A    Yes.  More likely than not.

7  Q    Thank you.

8          THE COURT:  Cross-examination.

9                    CROSS-EXAMINATION

10  BY MR. SCHRODER:

11  Q    Mr. Currie, do you have any background, training, anything

12  like that, in toolmarks?

13  A    I've done a lot of construction work.

14  Q    Have you ever published -- you ever had training in

15  toolmark analysis?

16  A    No, I haven't.

17  Q    You ever published any articles on toolmark analysis?

18  A    No.

19  Q    You ever taught any courses on toolmark analysis?

20  A    No.

21  Q    Ever been qualified as a toolmark analysis expert in

22  court?

23  A    No.

24  Q    Now, you did a report for -- to -- that was distributed

25  for this testing you did for the defense today.  Correct?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 145 of 217

CURRIE - CROSS

1  A    Yes.

2  Q    And when you do those reports, is it important for you to

3  be accurate?

4  A    Yes.

5  Q    Is it important for you to be thorough?

6  A    Yes.

7  Q    And do you try to do that?

8  A    Yes.

9  Q    And I want to take you back to your finding just a minute

10 ago that -- you said you think it's likely that this nail --

11 and let's look -- before we do that -- can I have the ELMO?

12 Oh, actually, we can go to -- never mind.  We can go -- if I

13 could have Defense 202F, actually, that would do what I need.

14 So anyway, it -- it's important to be accurate.  Correct, Mr.

15 Currie?

16 A    Yes.

17 Q    Now, this opinion that you gave about the nail coming in

18 from the side, isn't it true that that's not in your report

19 anywhere?

20 A    I didn't specifically say that, no.

21 Q    Right.  So that's not --

22 A    I didn't say -- I didn't say how the nail came into the

23 tire.

24 Q    All you said in your report simply was you thought it was

25 picked up naturally?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 146 of 217

1  A    Yes.

2  Q    You didn't give any basis for that in your report.  Is

3  that correct?

4  A    I didn't go into detail, no.

5  Q    All right.  But, I mean, you gave no basis for -- I'm

6  not -- I'm not talking about details.  You said it was picked

7  up naturally.  You gave no basis for that conclusion, did you?

8  A    It was based on my observation --

9  Q    Right.

10  A    -- of the nail itself.

11  Q    But it's not in the report, correct?

12  A    No.  Not --

13  Q    All right.

14  A    -- specifically.

15  Q    And you said you had -- well, let's go talk about

16  (indiscernible).  Now, you talked about running on the wheel,

17  the -- that this was done -- the tests -- this -- I think Mr.

18  Bolden called it a dynamic test.

19  A    Yes.

20  Q    You -- and you said you reviewed his report.  Correct?

21  A    Yes.

22  Q    And you said your understanding was they had done that

23  test right after they'd looked at the tire and then remounted

24  it?

25  A    I don't know what the timing was, but --

1  Q    All right.

2  A    -- but they did an air loss test first, and then they

3  mounted the tire and put it on the wheel and ran the wheel

4  test --

5  Q    Okay.

6  A    -- second.

7  Q    All right.  So -- and your opinion's based on running on a

8  flat-surface wheel, correct?  That's what you're saying here

9  today?

10  A    Well --

11  Q    That the testing device you said you showed on the screen,

12  the wheel touches a flat surface.

13  A    No, it's not flat.  I mean, it's flat this direction, but

14  it's a circle.

15  Q    Right, it's a circle, but it's not --

16  A    And it's got -- if you --

17  Q    It's --

18  A    -- if you looked at it, it has one point across it that --

19  Q    Okay.

20  A    -- it contacts first.

21  Q    Okay.

22  A    And then when the tire goes up against it, it actually

23  becomes concave --

24  Q    Okay.  Right.

25  A    -- on the wheel.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 148 of 217
(720) 384-8078   attrans@sbcglobal.net

CURRIE - CROSS

1  Q   What becomes concave?

2  A   The tire.  The tire isn't completely flat on the wheel.

3  The -- the tread area is actually a little concave.

4  Q   Right.  So if the surface that it touched was actually

5  convex, would that be different?

6  A   I don't know what you mean by convex.

7  Q   Convex -- I mean, you said concave as it curves in like

8  this, but if the wheel hit a surface that was rounded, not

9  flat, then that would be different from what -- from your

10 conclusion, right?  You said it was from a flat surface.

11 A   No, I don't think that'd change my conclusion.

12 Q   You don't think it would change your conclusion?

13 A   No.

14 Q   Okay.  Let's see.  Could we get Defense Exhibit 202 -- I

15 think it's E.  No, the -- C, please.  I'm sorry.

16     (Side conversation)

17 Q   So I see the hole there in the center, but I also see a

18 ring around it there.  Is that -- do you see that, Mr. Currie?

19 A   Yes.

20 Q   Now, is that possible that was -- that ring was created

21 from the nailhead?

22 A   I don't think it's from the nailhead.  I think it's from

23 the nail going into it.  And when you're displacing the rubber

24 that's in the tire, it's got to go somewhere.  So it tends to

25 roll up around the edges, basically, when the nail goes through

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net

1   it.

2   Q    So you're saying that perfectly round ring around the

3   edge, which is right about the width of the nailhead, is not

4   the nailhead?

5   A    No.  No.

6   Q    All right.

7   A    That's -- that's actually material that's been rolled up

8   because it's been displaced.

9   Q    All right.  202F, please.  Now, you said that the tire

10  went in from a 25-degree angle, if you're looking at the tire,

11  from the pro -- from the edge.  Is that correct?

12  A    Yeah.  If you have a tire like this and the diameter is

13  this direction --

14  Q    Right.

15  A    -- the 25 degrees is looking at the tread this way.

16  Q    But this is -- this -- you call this the side view --

17  A    Yes.

18  Q    -- right?  The profile.  Isn't that a perpendicular angle

19  there, 90 -- about 90 degrees?

20  A    It's pretty close, yes.

21  Q    All right.  Now, you had read Mr. -- you said you'd read

22  Mr. Bolden's report before you made your findings?

23  A    No.  I read it afterwards.

24  Q    I thought you told the defense counsel you read

25  beforehand.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 754  Filed 09/23/14  Page 150 of 217
(720) 384-8078  attrans@sbcglobal.net

1   A    I have read it, yeah.  I read -- read it --

2   Q    But you didn't read --

3   A    -- before today.

4   Q    Now you're saying you didn't read it before you made your

5   findings?

6   A    I don't believe so, no.

7   Q    All right.  And you made no findings -- isn't it correct

8   you made no findings related to the condition of the nailhead.

9   Isn't that correct?

10  A    I have photographs of it.

11  Q    But you made no findings, correct?

12  A    Well, the photographs speak for themselves.

13  Q    You made no findings in your report.  Isn't that correct?

14  A    I didn't mention it, no.

15  Q    All right.  And you made no findings in your report about

16  the shape of the hole in the tire you examined.  Isn't that

17  correct?

18  A    Yes.

19  Q    All right.  And you made no findings related to the

20  perpendicular angle of the nail.  Isn't that correct?

21  A    It's in my notes.

22  Q    But you did not make a finding of that in your report.  Is

23  that correct?

24  A    Well, it's not on that page, no.  But it's in my notes.

25  Q    But it's not in your report.  Correct?

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 151 of 217

CURRIE - REDIRECT

1  A    That's true.

2  Q    No further questions.

3        THE COURT:  Redirect.

**REDIRECT EXAMINATION**

5  BY MR. CURTNER:

6  Q    Mr. Currie, do you have your report with you?

7  A    Yes.

8  Q    Okay.  Let's look at the report that you submitted to the

9  government.  If -- there's one long paragraph.  Is that

10 correct?

11 A    Which report are you talking about?

12 Q    I think it was dated January 23rd, 2014.

13 A    Yes.  I've got it.

14 Q    Now, could you read to us what you put in your report, the

15 first two -- in that second paragraph, the first two sentences?

16 A    Where it says, "My examination"?

17 Q    Uh-huh (affirmative).

18 A    Says, "My examination of the tire, wheel, and nail was

19 completed on 10/29 and 10/30/2013.  The nail that I observed

20 was a used nail that had serration gouges -- see my inspection

21 photos, 41, 42, 43 -- just below the head, as would have

22 occurred if the nail was pulled out of a piece" --

23        MR. SCHRODER:  Objection, Your Honor.

24        THE WITNESS:  -- "of wood" --

25        MR. SCHRODER:  This is the --

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 152 of 217
(720) 384-8078   attrans@sbcglobal.net

1        MR. CURTNER:  You know, he asked him --

2        MR. SCHRODER:  It's toolmarks analysis --

3        MR. CURTNER:  -- what was in his report.

4        MR. SCHRODER:  That doesn't mean he gets to put in --

5        THE COURT:  Well, it's a toolmark issue.  He's not an

6  expert in toolmarks, but it's in his report, and the jury

7  understands he's not an expert in toolmarks.  But he can

8  respond to your question.

9  BY MR. CURTNER:

10 Q    Okay, I'm -- I apologize, Mr. Currie.  Can you complete

11 that sentence that you were reading?

12 A    Yes.  "Just below the head, as would have occurred if the

13 nail was pulled out of a piece of wood with a claw hammer or

14 nail-puller.  Also, the point of the nail was flattened -- see

15 my inspection photos 37, 38, 39, and 44 -- as if, when used, it

16 came up against a hard surface, a piece of metal, for example,

17 and could not be driven further into the wood it was being

18 nailed into."

19 Q    Okay.  And then one more question.  So Mr. Schroder asked

20 you if you had anything in your report about the angle of the

21 nail.  Could you read the next sentence in your report that you

22 submitted to the government?

23 A    Okay.  "In the tire, the nail hole was at 3 o'clock in

24 groove 1 and at an approximate 25-degree angle to the tread

25 surface.  See my inspection photos 27 and 28."

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 153 of 217

1  Q   Okay.

2  A   The --

3  Q   Well, that's fine.  And that's what your testimony was

4  today.  Is that correct?

5  A   Yeah, it's basically the same thing.  One thing I would

6  like to say further, though, is --

7  Q   Uh-huh (affirmative).

8  A   -- on that hail hole -- the head of the nail couldn't have

9  been down to the bottom of the hole, because the edge of the

10  head of the nail was against the lug on the side of the hole,

11  and it was actually gouged on that lug where it had been

12  wedged.  So I don't think it was ever all the way down.

13  Q   All right.  Okay, thank you, Mr. Currie.

14          THE COURT:  All right.  Recross.

15                      **RECROSS EXAMINATION**

16  BY MR. SCHRODER:

17  Q   Okay, Mr. Currie, just to be clear, we're talking about

18  two different angles here.  If you're looking at the tire from

19  end, you found a 25-degree angle.  Correct?

20  A   Yes.

21  Q   But there's a separate angle if you're looking on it from

22  the side view; it went in at 90 degrees.  Correct?

23  A   Yes.

24  Q   And that's not in your report, correct, what you just

25  read?

**CURRIE - RECROSS**

1   A    Let me read this again.  "In the tire, the nail hole" --

2            THE COURT:  Read it -- just read it to yourself, and --

3            THE WITNESS:  Okay.  I didn't mention anything about

4   the other direction.  I just said look at my photos 27 and 28,

5   which show that.

6            MR. SCHRODER:  No further questions, Your Honor.

7            THE COURT:  Okay.  Thank you, sir.  You're excused.  It

8   looks like we're about lunchtime, unless you have a real short

9   witness.

10       (Witness excused)

11           MR. OFFENBECHER:  No.  No, that's good.

12           THE COURT:  Want to come back at 1 o'clock, ladies and

13  gentlemen.  Stand in recess till 1 o'clock.

14       (Jury not present)

15           THE COURT:  Okay, please be seated.  What's the plans

16  for the defense now?

17           MR. CURTNER:  Well, we're going to finish today.  We

18  probably have, I think, one, two, three witnesses left.

19           THE COURT:  Can you tell us who's next up?

20           MR. CURTNER:  I think next up would be Anthony

21  Pecoraro.  And then we want to recall Deatrich Sheffield very

22  briefly.  And then Jaco Swanepoel, our toolmark expert, will be

23  the final witness.

24           THE COURT:  So that takes -- yes.

25           MS. LOEFFLER:  I just want to ask, for Ms. Sheffield, I

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 155 of 217
(720) 384-8078   attrans@sbcglobal.net

```
 1   will have an objection if it's for a prior inconsistent
 2   statement.  If it is not --
 3           MR. CURTNER:  No, it's not that, no.
 4           MR. SCHRODER:  Then I will -- probably won't have an
 5   objection.
 6           THE COURT:  So that -- will that finish up -- finish --
 7   are you going to rest after that?
 8           MR. CURTNER:  We anticipate that, yes.
 9           THE COURT:  Okay.  And so that means you've got to
10   start tomorrow --
11           MS. LOEFFLER:  Yes.
12           THE COURT:  -- with anything you have.
13           MS. LOEFFLER:  Yes.
14           THE COURT:  So keep me posted, so we don't have any
15   surprises.  Now, did the defense send me a jury instruction --
16   a letter jury instruction of some sort?  I have the
17   government's objection to something I did -- I didn't get the
18   ini -- what they're objecting to.
19           MR. OFFENBECHER:  Oh, that was our error, Your Honor.
20   We emailed to the Court -- I think it was in chambers -- a --
21   proposed instructions --
22           THE COURT:  So it's an email to me.
23           MR. OFFENBECHER:  I think so, yeah.  That
24   (indiscernible) --
25           THE COURT:  Did you find it?
```

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 754  Filed 09/23/14  Page 156 of 217

1              MR. OFFENBECHER:  We'll re -- we'll have it resent in
2    the next --
3              THE COURT:  Well, I know they object to it, but I'm not
4    quite sure what -- I don't --
5              MR. CURTNER:  Well, at least we copied them.
6              MR. OFFENBECHER:  Disregard their objection.
7              THE COURT:  Okay.  So we'll -- I didn't get what your
8    object -- I can figure it out, but --
9              MR. OFFENBECHER:  We'll make sure you -- we'll make
10   sure that you get (indiscernible).
11             THE COURT:  Okay.  All right.  So see you at five -- at
12   1 -- close to 1 o'clock.
13             THE CLERK:  All rise.  This matter stands in recess
14   until 1 p.m.
15        (Court recessed at 11:53 a.m., until 1:04 p.m.)
16        (Jury not present)
17             THE CLERK:  All rise.  His Honor the Court, the United
18   States District Court for the District of Alaska is again in
19   session.  Please be seated.
20             THE COURT:  Yes?
21        MS. DUIGNAN:  Your Honor, I just want to ask the
22   defense to make an offer of proof about the limit of the
23   questioning of this particular witness, because I believe that
24   their original intention might have been to get into some of
25   the matters that you had earlier ruled were inadmissible --

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 157 of 217

1         THE COURT:  Well, let --

2         MS. DUIGNAN:  -- regarding Deborah Hopkins.  So I just

3 want to ensure that we're not going into those matters.

4         THE COURT:  Who is this?

5         MS. DUIGNAN:  This is his -- her brother.

6         MR. OFFENBECHER:  Commander Anthony Pecoraro, Your

7 Honor.  It's Mrs. Hopkins' brother.

8         THE COURT:  Oh.  Good afternoon, sir.

9         MR. PECORARO:  Thank you.  Good afternoon, sir.

10         MR. OFFENBECHER:  I understand the Court's rulings.

11         THE COURT:  It's as clear as a bell.  I've made it

12 about three times.  Why would you --

13         MS. DUIGNAN:  Okay.

14         THE COURT:  They wouldn't do it in light of that clear,

15 clear ruling.  Counsel, the --

16         MS. DUIGNAN:  I just want to make sure.

17         THE COURT:  -- this is a professional we're dealing

18 with here.

19         MS. DUIGNAN:  Yes, Your Honor.

20         THE COURT:  Right?  Okay.  Anything else?  Okay, I

21 don't even know if the jury's in the big room.  Are they?

22         THE CLERK:  Not yet.  (Indiscernible) --

23         THE COURT:  They're moving their way on down.  You

24 know, Nancy, if they're coming, you can bring them right on in.

25         THE CLERK:  Huh?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 754  Filed 09/23/14  Page 158 of 217
(720) 384-8078  attrans@sbcglobal.net

1           THE COURT:  You can bring them right on in.  Usually

2   people stand when the jurors come in.

3           MR. PECORARO:  Okay.

4           THE COURT:  And you'll see, because the door will open.

5           MR. PECORARO:  All right.  Thank you, Your Honor.

6       (Jury present)

7           THE COURT:  Okay, please be seated.  Defendant's next

8   witness.

9           MR. OFFENBECHER:  Your Honor, the defense would --

10          THE COURT:  Oh, sorry.

11          THE CLERK:  Go ahead.

12          THE COURT:  Okay.  Defendant's next witness.

13          MR. OFFENBECHER:  Thank you, Your Honor.  Your Honor,

14  the defense will call Commander Anthony Pecoraro.

15          THE COURT:  All right, sir, if you'll just stand for a

16  second, she's going to swear you in.

17          THE CLERK:  Please raise your right hand.

18      **ANTHONY MICHAEL PECORARO, DEFENDANT'S WITNESS, SWORN**

19          THE CLERK:  Okay.  Thank you.  Please have a seat.

20  And, sir, if you can please state and spell your full name.

21          THE WITNESS:  Commander Anthony Michael Pecoraro.  P-e-

22  c-o-r-a-r-o.

23          THE COURT:  All right.

24          THE CLERK:  And your other names are common spelling?

25          THE WITNESS:  Yes.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 754  Filed 09/23/14  Page 159 of 217
(720) 384-8078  attrans@sbcglobal.net

1       THE CLERK:  Thank you.

2       THE COURT:  All right, counsel.

3                   **DIRECT EXAMINATION**

4   BY MR. OFFENBECHER:

5   Q    Commander Pecoraro, what is your occupation?

6   A    Commander, United States Navy.

7   Q    Where do you live?

8   A    Currently, Seattle, Washington area.

9   Q    And what is your duty station?

10  A    My duty station will be Kitsap Naval Base.

11  Q    And what will be your position -- you're just moving to

12  that new duty station?

13  A    That's correct.

14  Q    And what will your position be at Kitsap?

15  A    Executive officer, Naval Base Kitsap.

16  Q    And that's in the Puget Sound region?

17  A    Yes, it is.

18  Q    Commander Pecoraro, what is your relationship to Deborah

19  Hopkins?

20  A    I am her paternal brother.

21  Q    Now I'm going to direct your attention to April of 2012,

22  when Mrs. Hopkins' husband died.  Did you have occasion at that

23  time to come to Kodiak to assist her?

24  A    Yes, I did.

25  Q    And did you have occasion to assist Mrs. Hopkins with her

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 160 of 217

1  finances?

2  A    Yes, I did.

3  Q    And in what capacity did you do that?

4  A    We were -- I'd gone through the bills that she had there

5  at the home and also worked with the credit union to figure out

6  what bills that she had, so that we could get them paid off.

7  Q    And during the course of your assisting your sister with

8  her finances, did you come to know the amounts -- you became

9  familiar with her finances, I guess, right?

10  A    Yes, I did.

11  Q    Did you come to know what amounts came to Mrs. Hopkins as

12  a consequence of her husband's death?

13  A    It was approximately 100,000 death gratuity, and then

14  400,000 Servicemen's Group Life Insurance death benefit.  And

15  then they also had some finances with Smith Barney --

16  Q    And when you say --

17  A    -- Investments.

18  Q    I'm sorry, go ahead, yeah.  And when you say finances with

19  Smith Barney, was that through Mr. Hopkins' family or how --

20  where was that?

21  A    That was both through his family, I believe a -- a --

22  beneficiary benefits from when his mother had passed away that

23  was left to him, and then also his own investment over the time

24  that he'd been in both the Navy and the Coast Guard.

25  Q    And were you able to determine the amount of those

1 investments both from his mother's death benefit and the other

2 investments that they had?

3 A    From the information that I was gather -- able to gather

4 at Deborah and Jim's home, I believed it to be somewhere in

5 the -- the neighborhood of 50,000 to $100,000.

6 Q    Okay.  And did you also become familiar with the debt that

7 the Hopkins had at the time Mr. Hopkins passed?

8 A    Yes, I was.

9 Q    And was it mostly consumer debt?

10 A    Yes.

11 Q    And what was the approximate debt that you were able to

12 determine?

13 A    Not having the figures in front of me, I believe it was

14 75,000 to 100,000, somewhere in there.  It was vehicle, ATVs,

15 and then credit cards.

16 Q    And was a trust created to handle Mrs. Hopkins' finances?

17 A    Yes, there was.

18 Q    And were you made the trustee of that?

19 A    Yes, I was.

20 Q    And what was the purpose of the trust?

21 A    So that persons couldn't take advantage of Deborah's --

22 in -- in -- take advantage of Deborah in causing her to misuse

23 the monies.

24       MR. OFFENBECHER:  No other questions, Your Honor.

25       THE COURT:  Cross-examination.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 162 of 217

1                    CROSS-EXAMINATION

2    BY MS. DUIGNAN:

3    Q    Commander Pecoraro, you're on active duty, correct?

4    A    That's correct.

5    Q    Do you also have $400,000 of SGLI benefit, as any military

6    member does, that you would have coming to your family if

7    something happened to you?

8    A    Yes, I do.

9    Q    And the same thing goes for the $100,000 in death benefit

10   that goes to any military member, doesn't it?

11   A    That's correct.

12   Q    And you mentioned that you helped Deborah to take care of

13   her finances.  Isn't that because she asked you?

14   A    Yes, it is.

15   Q    She said that she couldn't take care of it and she needed

16   somebody to help her?

17   A    That's correct.

18   Q    And you went through all her financials, and at the time

19   her debts were all current, correct?  All the debts were being

20   paid on time?

21   A    I couldn't establish that.

22   Q    Do you remember saying that on September 5th of 2012, when

23   the investigators came to talk to you?

24   A    No, I don't remember that.  That was two years ago.

25   Q    Okay.  Do you also remember that she had come to you

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 163 of 217

1 because she said that she had not dealt with the finances

2 before, and she didn't really even know about the SGLI?

3 A    I may have said that, yes.

4 Q    Okay.  And you were, in fact, relieved from handling her

5 finances, weren't you?

6 A    Yes, I was.

7 Q    Because you in fact had helped yourself to some of the

8 money that was supposed to be in your care for her benefit?

9 A    Helped myself?

10 Q    You took money from the account that you weren't supposed

11 to take.

12 A    You would be wrong in saying that.

13 Q    Did you bring the Rolex that you were supposed to bring

14 today to give to her?

15 A    The Rolex that I'm supposed to give to her?  No, ma'am.

16 Q    You didn't bring that today?

17 A    No.

18 Q    And you didn't bring the diamond ring either?

19      MR. OFFENBECHER:  Your Honor, I object to this as

20 beyond --

21      THE WITNESS:  But --

22      MR. OFFENBECHER:  -- the scope of the direct

23 examination.  I'm not quite sure what -- that counsel's getting

24 to.  I mean, we should probably have a sidebar.

25      THE COURT:  Is there anything more?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 754  Filed 09/23/14  Page 164 of 217

1          MS. DUIGNAN:  Well, we talked about the fact that Mrs.

2    Hopkins was concerned about her finances and family getting to

3    it.  I think this establishes it was a legitimate concern.

4          THE COURT:  Okay.  (Indiscernible).

5    BY MS. DUIGNAN:

6    Q    Do you recall being relieved from the trust and having a

7    lawyer involved in that process?

8    A    Yes, I do.

9          MR. OFFENBECHER:  Asked and answered, Your Honor.

10         THE COURT:  Overruled.

11         MS. DUIGNAN:  They called this witness, Your Honor.

12   BY MS. DUIGNAN:

13   Q    And, in fact, right now you're on an installment pay plan

14   to pay the trust back in order to reestablish the money you

15   took from the trust.  Isn't that true?

16   A    That's correct.

17   Q    And you're supposed to pay at least $1,000 a month --

18   A    That's correct.

19   Q    -- including principal and interest?

20   A    That's correct.

21   Q    And that started on the first day of March of 2014?

22   A    That's correct.

23   Q    And then you're supposed to escalate payments and pay

24   $1,500 a month starting on October 1st of 2014 through

25   September 1st of 2015.  Isn't that true?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 165 of 217
(720) 384-8078   attrans@sbcglobal.net

PECORARO - REDIRECT

1  A    That's correct.

2  Q    And then you're supposed to start an escalating payment of

3  $2,000 a month until the debt is paid in full?

4  A    That's correct.

5  Q    I have no further questions.

6         THE COURT:  Redirect.

7                    **REDIRECT EXAMINATION**

8  BY MR. OFFENBECHER:

9  Q    Commander Pecoraro, you borrowed some money from the

10 trust, right?

11 A    Yes.

12 Q    And you're paying that money back?

13 A    Yes.

14 Q    And Deborah knew that you were borrowing the money from

15 the trust?

16 A    Yes.

17 Q    No other questions.

18         THE COURT:  Recross.

19         MS. DUIGNAN:  No, Your Honor.

20         THE COURT:  Thank you, sir.  You're excused.

21 Defendant's next witness.

22         THE WITNESS:  Thank you, Your Honor.

23    (Witness excused)

24         THE COURT:  Who is this?

25         MS. DUIGNAN:  Is that our witness?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 166 of 217
(720) 384-8078   attrans@sbcglobal.net

**SHEFFIELD - FURTHER REDIRECT**

1     MS. LOEFFLER:  Who's this?

2     MR. CURTNER:  This is going to be Deat -- we're going

3  to recall Deatrich Sheffield.

4     THE COURT:  Okay.

5     THE CLERK:  Please raise your right hand.

6  **DEATRICH SHEFFIELD, DEFENDANT'S WITNESS, RESWORN**

7     THE CLERK:  Okay, thank you.  Please have a seat.  And,

8  ma'am, if you can state and spell your full name.

9     THE WITNESS:  Deatrich Sheffield.  D-e-a-t-r-i-c-h,

10  Sheffield, S-h-e-f-f-i-e-l-d.

11     THE CLERK:  Thank you.

12     THE COURT:  All right, counsel.

13  **FURTHER REDIRECT EXAMINATION**

14  BY MR. CURTNER:

15  Q   Mrs. Sheffield, you've testified earlier in this case?

16  A   Correct.

17  Q   And you did some investigation on behalf of Mr. Wells in

18  this particular case?  Is that correct?

19  A   Yes, I did.

20  Q   And part of that investigation was reviewing some surv --

21  some videotapes of surveillance cameras?

22  A   Yes.

23  Q   All right.  And approximately how many hours have you

24  reviewed videotapes, surveillance tapes?

25  A   Total?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 167 of 217
(720) 384-8078  attrans@sbcglobal.net

1  Q    Just estimate.

2  A    Probably 50 to 100.

3  Q    Now, just recently, did you review more of these

4  surveillance tapes, videotapes?

5  A    Yes.

6  Q    How recently was that?

7  A    Last week.

8  Q    Did there come -- something come to your attention that

9  might be of interest in this case?

10  A    Yes.

11  Q    And what tape were you reviewing at that time?

12  A    The T2 surveillance camera.

13  Q    That would have been the camera that aims from the rigger

14  shop?

15  A    Yes.

16  Q    And it aims toward the flagpole?

17  A    Correct.

18  Q    All right.  And then what time of day or night -- what day

19  were you looking at the video coverage?

20  A    It was early morning of April 12th.

21  Q    All right.  And so let me just show you on your screen

22  what's been marked as Defense Exhibit DE-194.  Is that a short

23  clip of the surveillance video footage you reviewed?

24  A    Yes.

25  Q    And why was it of interest to you?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 168 of 217
(720) 384-8078   attrans@sbcglobal.net

SHEFFIELD - FURTHER REDIRECT

1  A    I noticed a flash of light go across the screen as I was

2  watching it.

3  Q    Okay.  And why was that of interest to you?  Because --

4  A    It clearly was not something that was there in any of the

5  other footage I watched and it was not something constant.  So

6  it -- it was something that moved across at that time.

7           MR. CURTNER:  I'd like to move for admission of the --

8  Defense Exhibit 194.

9           MS. LOEFFLER:  No objection.

10          THE COURT:  It will be received.

11     (Defendant's Exhibit DE-194 admitted)

12  BY MR. CURTNER:

13  Q    So, Ms. Shef -- Mrs. Sheffield, we're going to play this,

14  and just tell us after it's gone through what you see.  Now --

15  A    It's pretty quick, so I don't know -- you might have to

16  see it again.  But if you look at the bottom left-hand corner

17  of the screen, that's where you see a flash of light that kind

18  of goes from right to left across.

19  Q    Okay.  And did you take some still shots -- screen shots

20  of this?

21  A    Yes.

22  Q    And did -- were those screen shots frame for frame?

23  A    Yes, as close as we could -- as many frames as we could

24  get.

25          MR. CURTNER:  Okay.  And I'd move for admission of

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 169 of 217

1    Defense Exhibit DE-193, which would be the screen shots.  Can

2    you look on your monitor for that?  And if we could display

3    that.

4        (Side conversation)

5            MR. CURTNER:  Yeah, no admiss -- yeah, we'd move for

6    admission of --

7            MS. LOEFFLER:  I'm sorry.

8            MR. CURTNER:  -- DE-193.  These are --

9            MS. LOEFFLER:  Counsel, is this supposed -- oh, there

10   it is.

11           THE COURT:  That -- that's --

12           MS. LOEFFLER:  Okay.

13           THE COURT:  -- what you're looking for?

14           MS. LOEFFLER:  I'm not --

15           MR. CURTNER:  Yes --

16           MS. LOEFFLER:  DE-193 didn't have this.  I don't know

17   which one you're --

18       (Side conversation)

19           THE WITNESS:  There's a progression of them.

20           MS. LOEFFLER:  Oh, okay.  That's fine.  Sorry, I was

21   trying to figure out what it was.

22           MR. CURTNER:  Okay.

23           THE COURT:  So --

24           MS. LOEFFLER:  No, I don't object to it, I just wasn't

25   sure what it was.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 170 of 217
(720) 384-8078  attrans@sbcglobal.net

1          THE COURT:  Okay.  It'll be --

2       (Defendant's Exhibit DE-193 admitted)

3          MR. CURTNER:  Okay, so just show the first page.

4    There's several pages in this, several pages of screen shots.

5    BY MR. CURTNER:

6    Q    Okay, so this is a still shot of one frame of that video?

7    A    Correct.  Right before I saw the light.

8    Q    Okay.  And then -- now, what is the date and the time,

9    according to this exhibit?

10   A    It's April 12th at 3:09 a.m.

11   Q    Okay.  And then let's go to the second page.  And what do

12   you see here?

13   A    That's where you first saw the light come into the bottom

14   corner of the screen, bottom left-hand corner.

15   Q    All right.  And then let's go to -- it looks like the

16   fifth page.  Can you barely see anything?

17   A    Yeah.  That's as it's kind of moving out of the frame of

18   view of the camera.

19   Q    Okay.  And so that's what caught your attention when you

20   were reviewing these videotapes?

21   A    Correct.

22   Q    Okay, thank you.

23          MR. CURTNER:  That's all I have, Judge.

24          THE COURT:  Cross.

25          MS. LOEFFLER:  Can we put DE-193 back up for -- whoever

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 171 of 217
(720) 384-8078   attrans@sbcglobal.net

1  has control?  Thank you.  And if I can, Mr. Johnson, I want the

2  one with the -- where the flash is.  You can see the -- boy,

3  that's not as good as the -- can we have the -- I'm sorry, the

4  brightness is better on our screens than on that.  I'm sorry,

5  Nancy.  Is --

6       THE CLERK:  Okay.

7       MS. LOEFFLER:  I think if you fix that, we should be

8  able to see it as well.  I know you've done this magic before.

9  There we go.  Thank you.  Great.

10            **FURTHER RECROSS EXAMINATION**

11  BY MS. LOEFFLER:

12  Q   Ms. Deatrich, in the Exhibit DE-193, you see this sort

13  of -- if you look down on your screen, there's sort of little

14  triangular -- it looks like there's a triangle sticking up.

15  Right?

16  A   Part of it, yeah.  It looks like little peaks, kind of.

17  Q   Right.  And there's no other, like, shadows farther out in

18  the gravel.  Right?

19  A   No.

20  Q   Okay.  And let me just ask you, in -- this is April, and

21  we're presently in April.  Would you agree with me that kind of

22  the first insect that you see in your house in April are moths,

23  this time of year?

24  A   I guess you could.

25  Q   Okay.  And if the frame rate of the camera is low or the

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 172 of 217
(720) 384-8078   attrans@sbcglobal.net

1  video is compressed, couldn't this be a moth in front of the

2  camera?  I mean, it's got triang -- where the wings are beating

3  too fast and it's not actually catching the -- you know each

4  frame of the moth's wings beating?

5  A    I would not be able to say.  I -- I don't know if you

6  compress things how that changes -- not being a video expert,

7  as far as how that would change.

8  Q    So you just don't know?

9  A    No, I -- I don't what it is in the -- in the photo.

10 Q    Thank you.

11        THE COURT:  Redirect.

12        MR. CURTNER:  No, Your Honor.  Thank you.

13        THE COURT:  Thank you, ma'am.  You're excused.

14 Defendant's next witness.

15    (Witness excused)

16        MR. CURTNER:  We're calling Jaco Swanepoel.

17        THE COURT:  Okay.  Just head on up here.  We got a

18 chair for you.  You may -- take a hard right.  That door pulls

19 out.  Step into the witness box, remain standing, and my clerk

20 will swear you in.

21        THE CLERK:  Please raise your right hand.

22   **JACOVUS MICHIEL SWANEPOEL, DEFENDANT'S WITNESS, SWORN**

23        THE CLERK:  Okay, thank you.  Please have a seat.  And,

24 sir, if you can please state and spell your full name.

25        THE WITNESS:  Jacovus Michiel Swanepoel.  My first name

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 173 of 217

 1  is J-a-c-o-v-u-s.  My middle name is M-i-c-h-i-e-l.  My last

 2  name is Swanepoel.  S as in Sam, w-a-n-e, p as in Peter, o-e-l,

 3  Swanepoel.

 4          THE CLERK:  Thank you.

 5          THE COURT:  All right, counsel.

 6                   **DIRECT EXAMINATION**

 7  BY MR. CURTNER:

 8  Q    Good afternoon, Mr. Swanepoel.

 9  A    Good afternoon, sir.

10  Q    Where are you employed?

11  A    I'm employed with a company called Forensic Analytical

12  Sciences, over in Hayward, California.

13  Q    And what do you do there?

14  A    I'm a forensic scientist that analyzes criminalistics-

15  related cases.

16  Q    Okay.  And what type of analysis do you do?

17  A    I do firearms and toolmark (indiscernible) analysis and

18  examinations.  I do fingerprint and impression examinations.

19  And then I also do crime scene reconstruction.

20  Q    Where's your office located?

21  A    It's in Hayward, California.

22  Q    Is that a California accent that you have?

23  A    No, sir, it's not.

24  Q    Tell me where you received your training.  Could you tell

25  us about your experience and training?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 174 of 217
(720) 384-8078   attrans@sbcglobal.net

SWANEPOEL - DIRECT

1    A    So I received my training as a firearms and toolmark

2    examiner through the South African Police Services.  This is

3    the National Forensic Science Laboratory, which is based in

4    Pretoria, South Africa.  And it has a training program that

5    stretches over three years, where I would be trained in various

6    aspects of forensics and forensic firearms examinations.  We

7    typically start off with something as simple as theoretical

8    training, a written test, and then under the tutelage and

9    guidance of a senior expert or examiner, we'd start off doing

10   cases.  And then it would progress to more complicated cases,

11   where you would eventually do multiple firearms, multiple

12   victims, crime scene reconstruction, the whole spiel of -- of

13   forensic work.

14   Q    Now, in -- at the South African Police Services, did you

15   achieve a certain rank there?

16   A    I was a lieutenant colonel with the South African Police

17   Services when I took my discharge.  And I was commander of the

18   Forensic Photography Unit for the National Forensic Science

19   Laboratory.

20   Q    Okay.  And then how long were you employed with the South

21   African Police Services?

22   A    I started my career back in 1989, and then I immigrated to

23   the United States in 2005.

24   Q    Now, were -- when you were still in South Africa, were

25   you -- had been qualified as an expert witness before?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 175 of 217
(720) 384-8078   attrans@sbcglobal.net

1  A    Yes, sir.  I've qualified as an expert in firearms and

2  toolmark examinations, fingerprint examinations and

3  comparisons.

4  Q    Now, when did you come to the United States?

5  A    October 2005.

6  Q    And where have you worked since you arrived in the United

7  States?

8  A    I've only been employed with Forensic Analytical Sciences.

9  Q    And since what date?  I'm sorry.

10 A    October 2005, sir.

11 Q    And what have you -- how many cases have you examined

12 since you've been at that office?

13 A    Well, I would say well in excess of 500 cases, and it

14 ranges from firearms and toolmarks cases through to fingerprint

15 comparisons, crime scene reconstruction, impression evidence

16 comparisons.

17 Q    And what does Forensic Analytic Sciences -- who -- what

18 kind of -- who do you work for?  Who do you contract with or

19 consult with?

20 A    Well, we will contract across the board with public

21 defender agencies, private investigators, private attorneys.

22 We also will work for the government agencies, local police

23 agencies, the federal government as well.

24 Q    And what type of courses did you take when you were back

25 at South Africa with the South African Police Service?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 176 of 217
(720) 384-8078  attrans@sbcglobal.net

SWANEPOEL - DIRECT

1  A    Well, I did several training courses and -- as I've
2  mentioned, the firearms and toolmarks course is probably the
3  most significant one as far as the expertise is concerned.  But
4  there were several other courses in criminal examination, the
5  comparison of fingerprint and impression evidence, the
6  collection and documentation of forensic evidence, courses on
7  crime scene reconstruction, draftsmanship, crime scene
8  photography, courses along those lines.
9  Q    Have you also taken training courses here in the United
10  States?
11  A    Yes, sir, I have.
12  Q    Could you explain some of the training you've gotten in
13  the United -- received in the United States?
14  A    Well, sir, here in the United States, you know, I did
15  several training courses with private entities as well as the
16  California Criminalistics Institute, these courses ranging,
17  pathology of wounds, the reconstruction of crime scenes,
18  trajectory reconstruction, fingerprint or impression evidence
19  comparisons.  I've also done training while I was actually in
20  South Africa with the Federal Bureau of Investigation in
21  gunshot residue analysis, trajectory reconstruction, and the
22  identification of firearms.
23  Q    Have you had training in firearms and ammunition
24  manufacturing?
25  A    Well, yes, sir.  That was part of the training that we

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 177 of 217
(720) 384-8078   attrans@sbcglobal.net

1 would do, is we would visit factories to see, first of all,

2 firsthand, how ammunition is manufactured, how it's put

3 together, what sort of markings can we expect, for instance,

4 that's as a result of the manufacturing process versus the

5 marks, that we are mostly interested in as far as identifying

6 something through a unique source.

7 We were also trained in internal ballistics, external

8 ballistics, wind ballistics, and then -- or terminal

9 ballistics, and then exterior ballistics. So interior

10 ballistics would be anything that happens inside the firearm

11 with those cartridge cases and the fired bullet. Exterior

12 ballistics would be once the bullet lie -- leaves the barrel of

13 the gun and what it does in flight and what it does to the

14 target, what the target does to it. We would also have

15 training in intermediate ballistics, you know, what happens to

16 these combustious gases that comes out of the barrel.

17 Obviously, our training would also include toolmarks. If

18 you think about it, you know, a firearm is essentially just a

19 tool that's designed to propel a bullet downrange. So the

20 field of firearms and toolmark analysis would include marks

21 made by other tools and the interaction between those surfaces.

22 Q   Okay. Could you tell us about your professional

23 affiliations?

24 A   I'm a member of the Association of Firearms and Toolmark

25 Examiners. I'm also a member of the California Association of

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 754  Filed 09/23/14  Page 178 of 217

1  Criminalists, and I'm also a member of the International

2  Association of Identification.

3  Q    And during your career, you've been -- completed

4  proficiency testing in your work?

5  A    Yes, sir.  So our lab policy states that we have to

6  complete a proficiency test in every discipline that we are

7  experts in on an annual basis

8  Q    Are you -- also been involved in some publications on your

9  work?

10  A    Yes, I have published through the Association of Firearms

11  and Toolmarks Examiners and I've also presented at their

12  professional training seminars.

13       MR. CURTNER:  Your Honor, I would offer Mr. Swanepoel

14  as an expert in firearms, ballistics, and toolmark examination.

15       MR. SCHRODER:  No objection.

16       THE COURT:  He'll be received in that capacity.

17  BY MR. CURTNER:

18  Q    So, Mr. Swanepoel, were you -- have you been involved in

19  this case, retained in the case of United States versus Wells?

20  A    Yes, sir.  That is correct.

21  Q    And did you conduct a ballistic analysis in this

22  particular case?

23  A    Yes, I did.

24  Q    And could you tell us what you did as part of your

25  analysis?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 179 of 217

1  A    Well, essentially, I received fired bullets.  I then took

2  those five bullets that was recovered at the crime scene and

3  compared them using a bullet comparison microscope, and

4  determined, first of all, to see whether they are from the same

5  source.

6  Q    Okay.  Did you make a caliber determination?

7  A    Yes, sir.  A caliber determination would be part of the

8  initial sort of write-up, if you want to call it that, of those

9  particular items.  As we received them, we would make notes

10 about caliber, weight, diameter, et cetera, et cetera.

11 Q    And what was the result of that?

12 A    I found that all those bullets were fired from the same

13 gun.

14 Q    Did you conduct a microscopic comparison too or -- of the

15 bullets?

16 A    Yes, sir.  So what we will do initially is we will compare

17 class characteristics.  And so class characteristics is

18 something that's common to other sources as well.  But it is

19 very useful in making a large group of items and separate them

20 out in smaller groups just by use of the class characteristics.

21 Class characteristics -- obviously, if there is a difference in

22 class characteristics, we can immediately separate items out as

23 not being from the same source.

24     The second step to that whole process is where we would

25 use the comparison microscope and look for these individual

1  striae that we then compare.  So where class characteristics

2  are compared or are man-made, if you want to call it that, it's

3  determined by the manufacturer.  These individual

4  characteristics are random.  And we as the manufacturer or the

5  user of the firearm has no control over how those marks are

6  formed and in what path and then sequence they show up.  And

7  that is essentially what gives the gun its own signature, or

8  fingerprint, if we want to call it that.

9  Q   Okay.  Now, so did you come to a conclusion about the

10  bullets that you examined?

11  A   Yes, sir, I did.  Those bullets were all fired by the same

12  gun.

13  Q   And so what did you -- what identi -- individual

14  characteristics did you notice from your examination of these

15  bullets?

16  A   So from the examination of these bullets, we would be

17  looking at the striations, or striated markings that is found

18  in the land and groove impressed areas on that bullet.  As the

19  bullet travels down the barrel, it will receive these markings

20  from the barrel onto the bullet, and, because the bullet is

21  moving, we would be looking for these striated markings that we

22  can then orientate, line up, and then facilitate an

23  identification through those.

24  Q   Okay.  And from that process, did you have a conclusion as

25  to the type of firearm that was used to fire these bullets?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 181 of 217

1   A    Yes, I did.

2   Q    Could you tell us what that is?

3   A    So from looking at both the -- the class characteristics,

4   in other words, the weight, the design, the number of lands and

5   grooves, I was able to determine that it was a .44-caliber

6   firearm that fired these bullets.  Once we use that information

7   and we actually search it through our database, our database

8   would give us a list of possible firearms manufacturers that

9   will have similar information or similar recorded class

10  characteristics.  And that list indicates that you can find

11  Smith & Wessons, Llamas, and Tauruses with exactly the same

12  characteristics, if you want to call it that.

13  Q    Okay, so these are three firearm manufacturers that

14  manufacture guns with these same characteristics.  Is that

15  correct?

16  A    Yes, for this particular caliber, correct.

17  Q    And can you distinguish one of those three particular

18  firearms?

19  A    No.  With the information that we find on the bullets, we

20  cannot tell whether this bullet actually came from a Smith &

21  Wesson or from a Taurus or from a Llama.

22  Q    And did you provide an opinion as to how many individual

23  firearms manufactured by these three manufacturers might have

24  similar class characteristics?

25  A    Well, we could literally be talking about thousands, if

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 182 of 217
(720) 384-8078   attrans@sbcglobal.net

1  not tens of thousands, of gun -- firearms that could have the

2  same class characteristics.

3  Q    So from these three manufacturers, there could be thous --

4  tens of thousands of these particular weapons that could have

5  fired this particular -- these bullets?

6  A    Yes, sir.

7  Q    Okay.  And you've submitted a report based with this -- on

8  those conclusions.  Is that correct?

9  A    That is correct.

10  Q    Did you do a second analysis and report in this particular

11  case?

12  A    Yes, sir, I did.

13  Q    And what was that about?

14  A    It was regarding a nail and the toolmarks that was found

15  on that particular nailhead and the way that it was interacted

16  within the particular circumstances, in this case, a tire.

17  Q    Okay.  So tell me what you received in the lab, what you

18  reviewed as part of your analysis of this nail?  And --

19  A    Well, I received several bits of discovery material, which

20  included notes by various examiners, reports by various

21  examiners.  I actually looked at the nail myself in preparation

22  of my report and, you know, countless photographs of various

23  documentations of this particular nail.

24  Q    Okay.  So you examined some of the government's expert

25  reports about the nail and the tire?

1  A    Yes, sir, I did.

2  Q    And did you review some of the photographs that Mr. Gary

3  Bolden, one of the government experts, submitted as part of his

4  report?

5  A    Yes, sir, I did.

6  Q    Okay.  I wonder if we could go to Defense Exhibit DE-171.

7  It should be on your screen, Mr. Swanepoel.  Can you see that?

8  A    Yes, sir, I can see this.

9  Q    You -- can you identify that photograph?

10 A    This is a photograph that I took of the particular

11 nailhead when I had it in my laboratory, or --

12 Q    And that's part of your analysis?

13 A    Yes, sir.

14       MR. CURTNER:  Okay.  Move to admit Defense Exhibit 171.

15       MR. SCHRODER:  No objection.

16       THE COURT:  It'll be received.

17    (Defendant's Exhibit DE-171 admitted)

18       MR. CURTNER:  If we could publish that.

19 BY MR. CURTNER:

20 Q    This is a -- could you tell us what this is?

21 A    So, basically, this is just a photograph that I took of

22 the nailhead, and we are looking at the top or sort of the top

23 side of the nailhead, if we want to call it that.  On the

24 bottom hand, you'll see that I've also included a scale just

25 for reference purposes.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 184 of 217
(720) 384-8078   attrans@sbcglobal.net

1  Q    And what did you note in your examination of the nailhead

2  that might be demonstrated in this photograph?

3  A    Well, there were several -- several areas of interest that

4  I wanted to look at and noticed.  First of all, I was looking

5  at these two areas here, which is striated markings or areas of

6  abrasion.  And then I was also looking at this larger area down

7  here, where it appears to be more of the impressed kind of

8  marking.  I was also interested in sort of the dirt and the

9  grime and the discolorations that we note on this particular

10  nailhead.

11  Q    So what are striations?  What do you mean by striations?

12  Could you explain what that means to you?

13  A    Well, so when we do firearms and toolmark examinations,

14  we're primarily looking at two kinds of marks.  One is

15  obviously an impressed mark.  If you think of a hammer striking

16  a particular surface and there's no subsequent movement, that

17  would be an impressed mark, or if you think of a screwdriver

18  getting drilled down onto a particular surface.  We're also

19  looking at striated markings, where one surface would contact

20  another and there would be some sort of dragging or pulling

21  action between the two surfaces.  You can also find a

22  combination of those two markings, where it would start off,

23  for instance, as an impressed marking and then a subsequent

24  drag which creates both markings, sort of in one general mark,

25  if you want to call it that.

SWANEPOEL - DIRECT

1  Q   Okay.  And could you demonstrate the striations you
2  noticed here when you received this nail again?
3  A   Well, so the two striated markings you can see is over
4  here and over here, and the marks are sort of running as you
5  look at the picture, from, let's say, the 11 o'clock position
6  to about the 4 o'clock position or maybe the 5 o'clock
7  position.  These markings, when you look at them under the
8  microscope, have topographical features.  In other words, they
9  have height, they have width, they have depth, which clearly
10 indicates that there was an interaction between some sort of a
11 tool and this particular surface.
12 Q   Okay.  Is there anything else you can tell us from this
13 photograph of the striations?
14 A   No, sir.  Just like -- like I mentioned earlier, I was
15 looking at all the trace materials on there, the dirt, the
16 grime, and --
17 Q   Yes, so could you explain --
18 A   -- discolorations --
19 Q   Let's go into that a little bit more, what you noticed as
20 far as any kind of debris or --
21 A   Well, there is lots of debris on this nailhead, and my
22 first inclination is that this is a well-weathered nailhead.
23 In other words, it's not factory fresh, if we can call it that.
24 And you will also notice that when we look at this impressed
25 mark, we can see that some of the dust and the trace material

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 186 of 217

1  and the debris is actually inside the markings itself, where

2  when we look at this mark and this mark and we compare the two

3  to them, we can see that this one is -- is a fresher mark in

4  the sense that it rubbed off some of the trace material that --

5  coating that's on the nail instead of just being on it or in

6  it.

7  Q    Okay.  Let's go to Defense Exhibit DE-176 and see if you

8  recognize that on your screen.  Do you recognize that?

9  A    Yes, sir, I do.

10 Q    What is that?

11 A    This is a photograph, again, that I took of the particular

12 nailhead.  And it's just done under more magnification.  And

13 the nailhead is just slightly rotated.  But all the features

14 that I've already talked about and described is also visible in

15 this particular photograph.

16      MR. CURTNER:  Move for admission of Defense Exhibit

17 176, DE-176.

18      MR. SCHRODER:  No objection.

19      THE COURT:  Will be received.

20   (Defendant's Exhibit DE-176 admitted)

21      MR. CURTNER:  If we could publish that.

22 BY MR. CURTNER:

23 Q    So this is a -- I'm sorry, this is a closer view?

24 A    Yes, it's a -- it's a closer view, if I can say closer

25 view.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 187 of 217
(720) 384-8078   attrans@sbcglobal.net

1  Q    Magnified view, I mean?

2  A    It's a magnified view.

3  Q    I'm sorry.

4  A    And, you know, so I will put this under our stereo

5  microscope and I will use a different camera to photograph it.

6  So again we can see what I call the impressed markings over

7  here and then the striated markings with those various

8  topographical features over here and over here.

9  Q    Okay.  Does this photograph show anything else you can

10  explain to us or --

11  A    No, sir.  Basically, we've covered --

12  Q    Okay.  If we can go to Defense Exhibit DE-178.  Do you see

13  that on your screen?

14  A    Yes, sir, I do.

15  Q    Okay.  And is that another photograph you took in part of

16  your examination?

17  A    Yes, sir, that's correct.

18         MR. CURTNER:  Move for admission of DE-178.

19         MR. SCHRODER:  No objection.

20         THE COURT:  Will be received.

21     (Defendant's Exhibit DE-178 admitted)

22         MR. CURTNER:  If we could publish that.

23  BY MR. CURTNER:

24  Q    What does this show you -- show us?

25  A    Well, so, basically, this is the same nailhead.  All that

SWANEPOEL - DIRECT

1  I did was rotate it 90 degrees.  And now we are looking at the
2  side of the nailhead.  And the deformation in the middle that
3  you see here is an extension of those two striated markings
4  that we saw in the top of the nailhead.
5  Q    Okay.  Is there anything else from this photograph that
6  would help us to -- if you could explain anything else you
7  observed?
8  A    No, sir, that's essentially what I've covered --
9  Q    All right.
10 A    -- from that initial photograph.
11 Q    Let's go to Defense Exhibit 172 and see if you recognize
12 that photograph.
13 A    So, again, it -- sorry.  Yes, I do recognize 172.
14 Q    And this was another photograph you took as part of your
15 examination?
16 A    Yes, sir, it is.
17      MR. CURTNER:  Move for admission of Defense Exhibit
18 172.
19      MR. SCHRODER:  No objection.
20      THE COURT:  Will be received.
21   (Defendant's Exhibit DE-172 admitted)
22      MR. CURTNER:  If you could publish that.  And, let's
23 see, this is -- I'm sorry --
24   (Side conversation; pause)
25      MR. CURTNER:  Judge, how about a five-minute break?

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 189 of 217

1 I'm sorry, this --

2      THE COURT:  Will that solve the problem, or can you

3 just use the paper version?

4      UNIDENTIFIED SPEAKER:  Yeah, I need about five.

5      THE COURT:  Okay.  We'll take a five-minute recess, if

6 that's possible.

7      MR. CURTNER:  Okay, (indiscernible).

8      THE COURT:  All right.

9   (Jury not present)

10      THE COURT:  All right, please be seated.  So I'm

11 thinking to myself, if this is going to be the -- defense is

12 going to rest today, why can't we do closings tomorrow

13 afternoon, give you all morning, and you can do whatever you

14 have to do, unless you've got significant rebuttal.

15      MS. LOEFFLER:  Well, we have a --

16      MR. SCHRODER:  We do.

17      MS. LOEFFLER:  I mean, we do.  I -- it's not going

18 to -- I -- I'm not going to tell you it takes all day --

19      THE COURT:  I know.

20      MS. LOEFFLER:  -- to do our rebuttal.  Most of our

21 witnesses are going to be very short, I think, on the rebuttal.

22 But then, you know, I have two sort of views of this.  One,

23 Judge, we got to get the electronics -- you know, there'd be a

24 break to make sure the electronics work.  We want to test them.

25 We already know they didn't happen.  And to be honest, I

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 190 of 217
(720) 384-8078  attrans@sbcglobal.net

1  also -- these are really long days for the jury, I think for

2  both sides.  With -- the jury's here at 8:30.  They're awake,

3  they're alert, they're not listening to three or four hours of

4  testimony and then listening to closings.  And I -- my view

5  would be, actually, that that's the best way.  The jury listens

6  to both sides as --

7          THE COURT:  Well, what I see --

8          MS. LOEFFLER:  -- if they're fresh --

9          THE COURT:  -- happening tomorrow is we're going to

10 come in here, stay for a couple of hours, and then send them

11 home again for most of the day.

12         MR. OFFENBECHER:  Your Honor, I agree with Ms.

13 Loeffler.  I think --

14         THE COURT:  I know, both --

15         MR. OFFENBECHER:  -- after a month-long trial, having a

16 fresh jury at 8:30 is a good idea.  Maybe some fresh lawyers.

17         THE COURT:  That's what I'm worried about.  Am I right,

18 that we'll get in here, we'll start tomorrow at 8:30; by 10

19 we'll be done, and I'll send them home.

20         MS. LOEFFLER:  Well, let me look -- I don't actually --

21         THE COURT:  I mean, by 11 --

22         MS. LOEFFLER:  -- have my --

23         THE COURT:  In other words, it'll be another half --

24         MS. LOEFFLER:  I think it'll be -- I think the -- well,

25 I'm trying by memory to figure out the list.  I mean, I think

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 191 of 217
(720) 384-8078  attrans@sbcglobal.net

```
 1   what we -- we will probably be done at noon, but I just
 2   think -- we've got to get in, get the -- make sure that, you
 3   know, all of the exhibits -- I assume the defense is going to
 4   want to double check their exhibits.  I know we're on top of
 5   that, but I also want to make sure the electronics work.  And I
 6   don't want to be in there going -- you know, what just happened
 7   now to Mr. Curtner was, like, I can't get this up, let's get
 8   this thing charged, let's make sure it works, so we're not in
 9   the middle of this, going, now we can't do the closing.  And
10   I --
11            THE COURT:  When I was a young attorney --
12            MS. LOEFFLER:  What?
13            THE COURT:  -- decades ago --
14            MS. LOEFFLER:  Yeah.
15            THE COURT:  -- I had a trial similar to this where I
16   was given 15 minutes to give my closing argument.  And you want
17   a whole day.  I knew you -- I'm going to give it to you, but I
18   just want to give you a chance to convince me.
19            MS. LOEFFLER:  Okay.
20            THE COURT:  So we'll stop tomorrow at noon.  You'll
21   have all afternoon to get prepared, and start at 8:30 Thursday
22   morning.
23            MS. LOEFFLER:  That'd be great.
24            THE COURT:  I know that's what you both want, but --
25            MS. LOEFFLER:  And I want Mr. Offenbecher to give me
```

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 192 of 217

1 credit for arguing for him here.

2       THE COURT:  I -- just trying --

3       MR. CURTNER:  He did agree with you, though.

4       THE COURT:  I just wanted to get something you both

5 agreed upon.  I figured this --

6       MS. LOEFFLER:  Yeah.

7       THE COURT:  -- would be it.

8       MS. LOEFFLER:  You know, I just --

9       MR. OFFENBECHER:  I -- Ms. Loeffler --

10       MS. LOEFFLER:  -- think that --

11       MR. OFFENBECHER:  -- and I always agree on things.

12       MS. LOEFFLER:  In a long trial, I think you want them

13 fresh.

14       THE COURT:  Well, how long are your closing arguments

15 going to be?  And it will be close -- now you can argue -- it's

16 not a opening argument, it's a closing argument.

17    (Side conversation)

18       MS. LOEFFLER:  I'm turning to my colleague.  He's

19 the --

20       THE COURT:  I know.

21       MS. LOEFFLER:  -- opening, closing, I'm the rebuttal,

22 so -- just so you know, from us.

23       THE COURT:  He's going to do the opening, closing,

24 you'll do the rebuttal.

25       MS. LOEFFLER:  Yeah.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 193 of 217
(720) 384-8078  attrans@sbcglobal.net

1          THE COURT:  So you split it in half?

2          MR. SCHRODER:  Yeah.

3          MS. LOEFFLER:  No, I think it'll be more on the

4    opening, closing, and a little less than the rebuttal -- only

5    because I talk faster than Mr. Schroder.  But, no --

6          THE COURT:  Okay.  So --

7          MS. LOEFFLER:  -- I suspect --

8          THE COURT:  -- if he --

9          MS. LOEFFLER:  -- it'll be a couple of hours, total,

10   from the --

11         THE COURT:  That reasonable, two hours?  I mean, that's

12   an awful long time.

13         MR. OFFENBECHER:  Two hours?

14         THE COURT:  I can't imagine you taking more than two

15   hours.

16         MS. LOEFFLER:  No.

17         THE COURT:  I was going to give you 90 minutes each.

18   But if you both want a -- if you -- let's shoot for 90 minutes,

19   but I'll be very loose and I won't hold you to exactly 90

20   minutes.

21         MS. LOEFFLER:  Okay.

22         THE COURT:  I mean, if you need to go a little longer

23   to finish up -- is that reasonable?  I don't know.

24         MR. OFFENBECHER:  I'm -- and including a couple of

25   breaks, I think, for the morning, after their opening, a break

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 754  Filed 09/23/14  Page 194 of 217

SWANEPOEL - DIRECT

1  for us to get set up.  I would assume the Court would be okay

2  with that.  Then -- and maybe another break for their rebuttal

3  argument.  I would assume that if we start at 8:30, we'll be

4  done by 11.

5          MS. LOEFFLER:  That's what I say.

6          THE COURT:  Okay.

7          MS. LOEFFLER:  (Indiscernible) again.

8          THE COURT:  So I have -- they're having problems.

9          MR. CURTNER:  We're ready.

10         THE COURT:  Oh, they're ready.

11         MS. LOEFFLER:  Okay.

12         THE COURT:  Okay.  See I figured --

13         MR. CURTNER:  We're done.

14         THE COURT:  -- I can kill the time.  All right.  Ready

15  for the jury, then.  The reason we did this within 10 minutes

16  is because we didn't leave the courtroom.

17     (Jury present)

18         THE COURT:  All right, please be seated.  Okay, we've

19  had the equipment repaired and we're ready to continue with

20  direct examination.  Mr. Curtner.

21         MR. CURTNER:  Thank you, Your Honor.

22  BY MR. CURTNER:

23  Q    Mr. Swanepoel, now do you see a picture on your screen?

24  A    Yes, sir, I do.

25  Q    And can you identify that?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 195 of 217
(720) 384-8078  attrans@sbcglobal.net

SWANEPOEL - DIRECT

1   A    Yes, sir, that's a picture that I took of my --

2   Q    As part of your examination.

3   A    -- in -- in my laboratory --

4          MR. CURTNER:  Move for --

5          THE WITNESS:  -- yes.

6          MR. CURTNER:  -- admission of Defense Exhibit 172.

7          MR. SCHRODER:  No objection.

8          THE COURT:  It'll be received.

9          MR. CURTNER:  You can publish that.

10  BY MR. CURTNER:

11  Q    I'm sorry, this -- what do you see in this photograph?

12  A    Well, sir, this is a photograph that I took of the outsole

13  of the tread area of the tire.  You can see in the middle of

14  the photograph these two features.  This is the hole where the

15  nail was in, and then there's another feature in the lug

16  adjacent to the hole.

17  Q    Okay.  Explain what your observations were about both of

18  these features.

19  A    Well, I was looking at the hole in the tire, and I can see

20  there's an area of abrasion.  There is obviously some trace

21  material in there.  I can see cracking and tearing of the

22  fabric.  There's also -- I can see there's a craterlike

23  indentation, which is -- to me suggests the direction of the

24  nail.  And when we look at this particular area, how it starts

25  and it gets rubbed or abraded all the way up to there; to me it

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 754  Filed 09/23/14  Page 196 of 217

1 indicates that there is some interaction between this nail and

2 the adjoining surface, that the -- the rubber of the tire.

3 Q    Okay.  And then what was the other feature that you

4 noticed?

5 A    So this was a feature that was not initially described in

6 any of the notes that I reviewed.  But you can see there is a

7 clear gouge or a piece of this rubber that's taken out of this

8 lug adjacent to the -- to the hole.

9 Q    Okay.  Anything else you can tell us from this photograph?

10 A    No, sir.  The only other features that are -- that I was

11 interested in mostly was -- you can see there's a red

12 discoloration for -- some sort of a trace material.  And then

13 these bright-yellow marks and the fainter white marks here,

14 that sort of circles the area of where the impression was made.

15 Q    Okay.  And that's -- are those marks from prior

16 examinations?

17 A    Yes, sir.  That's not something that I put onto the

18 surface.  This was done by --

19 Q    Okay, if we could go to Defense Exhibit DE-175.  And if

20 you could look at your screen and identify that.  Is that a

21 photograph you took in your examination?

22 A    Yes, sir, it is.

23        MR. CURTNER:  Okay.  If we could move for admission of

24 Defense Exhibit 175.

25        MR. SCHRODER:  No objection.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 197 of 217
(720) 384-8078  attrans@sbcglobal.net

1      THE COURT:  It'll be received.

2      (Defendant's Exhibit DE-175 admitted)

3      MR. CURTNER:  Could publish that.

4  BY MR. CURTNER:

5  Q    What do we see in this picture, Mr. Swanepoel?

6  A    So, essentially, we're again looking at the tread of the

7  vehicle tire, and then it's sort of a perpendicular shot or an

8  angle towards the impression or the mark or the hole left by

9  the nail.  And so we can see the area that's abraded around

10 here, those cracks or tears.  And then this fine dusty trace

11 material over here, that to me indicates at least there was

12 some interaction between this tire and the nail.

13 Q    Okay.  Now, to your knowledge, was this tire and nail --

14 were they examined by other experts or forensic labs before

15 they got to you?

16 A    Yes, sir, they were.

17 Q    And do you know how many labs or where it went before the

18 FBI deliver --

19 A    To my knowledge, it went to a lab called STL.  And then it

20 also went to the Federal Bureau of Investigations Lab in

21 Quantico.

22 Q    Now, in your work -- in your analysis, would you want to,

23 when you're looking at these -- examining these -- the nail and

24 the tire, would you want to know what the status of the nail

25 and the tire were when -- before they were tested?

1  A    Yes, sir.  I would say that's very important,

2  particular -- under this particular case or this particular set

3  of circumstances.  The way that the nail and the tire looked

4  before anybody did anything to it is really important to me as

5  an examiner, to try and determine some sort of -- or facilitate

6  some sort of an opinion as to what happened to this nail in

7  this particular tire.

8  Q    And do you know if it was documented, any of the -- the

9  condition of the nail and the tire or the hole in the tire,

10  from your review of the materials?

11  A    Well, it was (indiscernible) documented.  From what I can

12  ascertain, it wasn't, however, documented the second that it

13  came out of the crate, for instance.  There has been several

14  other tests done to it before it was photo-documented.

15  Q    What was the earliest lab photographs that you may have

16  looked at in -- as part of your review for this case?

17  A    Well, so I received a laboratory report from the STL lab.

18  Q    That was Mr. Bolden, his lab?

19  A    Yes, sir.

20  Q    Okay.

21  A    And in that, we thought they would do photographs.  And so

22  I was sort of (indiscernible) when reading the report and

23  looking at the photographs, and it sort of went from there as

24  to, well, was the -- are these original photographs of the

25  condition received or are these photographs of sometime later,

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 754  Filed 09/23/14  Page 199 of 217

SWANEPOEL - DIRECT

1    showing that condition.

2    Q    Were you able to look further into that and to check out

3    the -- those photographs?

4    A    Yes, sir.  So we -- I initially asked you to see if we can

5    get the original digital images that were taken.  Those were

6    provided.  And I would -- looked up what we refer to as the

7    metadata.  And the metadata indicated that these photos were

8    taken on the 16th of August 2012, which is --

9    Q    Well, maybe you could explain a little bit how the --

10         MR. SCHRODER:  Objection, Your Honor.  I think we're

11   coming down to this area where I have concerns about.  We're

12   making findings that were not in any of the reports, nothing

13   that we were provided.

14         MR. CURTNER:  Your Honor, this is part of his

15   examination.  In order to look at the materials he was

16   provided, he was able to check the metadata of the photographs

17   and date them, and that's important for part of his analysis.

18         MR. SCHRODER:  Your Honor, I'm not questioning the

19   importance.  I'm questioning the fact that they're trying to

20   sandbag the government by not giving a report of something that

21   was done after the report we were provided.

22         THE COURT:  He can state his understanding of the data

23   of the photographs.

24         MR. CURTNER:  Thank you, Your Honor.

25   BY MR. CURTNER:

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 200 of 217
(720) 384-8078  attrans@sbcglobal.net

SWANEPOEL - DIRECT

1  Q   So how did you -- first of all, what is metadata, Mr.
2  Swanepoel?
3  A   Well, metadata is -- to put it in the simplest form, is
4  data about --
5          MR. SCHRODER:  Oh, and I guess --
6          THE WITNESS:  -- data.
7          MR. SCHRODER:  -- I'd make another objection, Your
8  Honor.  I mean, there's no indication Mr. Swanepoel is a
9  computer expert that's able to determine whether the metadata
10 indicated when photos were taken, when they were copied to a
11 disc --
12         THE COURT:  I understand.
13         MR. SCHRODER:  -- any number of other things.
14         THE COURT:  I've just said he could state his --
15         MR. SCHRODER:  Yeah.
16         THE COURT:  -- opinion as to when they're taken.  We
17 don't have to go into all the other -- he has an impression,
18 right or wrong, as to when they were taken.  He can give you
19 that impression.
20 BY MR. CURTNER:
21 Q   This is something you might do in your lab from time to
22 time, look at photographs and try to find the metadata?
23 A   Yes, sir.  That way, we would do it on -- on a regular
24 basis to see what data was taken and whether that matches with
25 other evidence that we receive.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 201 of 217
(720) 384-8078  attrans@sbcglobal.net

1  Q    And what would you use to do that?

2  A    I -- I beg your pardon, sir?

3  Q    What kind of program, or how would you retrieve that

4  metadata from a photograph?

5  A    So in our lab, I would use Adobe Bridge, and it's actually

6  fairly simple.  You would just open the photograph in Adobe

7  Bridge, you would select it, and the metadata would then

8  subsequently be placed next to the photograph on the screen.

9  Q    Okay.  So could that metadata from the Adobe Bridge tell

10 you what type of camera was used?

11 A    Yes, sir, it would.

12 Q    And in this case did -- were you able to determine what

13 type of camera was used to take these photographs?

14 A    It was a Canon EOS, E-O-S.  And I think it was a Model 1D.

15 I'm not 100-percent sure.  I'll have to check my notes for the

16 exact model.  But it --

17       THE COURT:  This sounds like it's getting beyond his

18 expertise.  I just said he could give you his impression as to

19 when --

20       MR. CURTNER:  Well --

21       THE COURT:  -- they were taken.

22 BY MR. CURTNER:

23 Q    -- do you have an impression when these photos were taken

24 from the metadata that you reviewed?

25 A    Yes, sir.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 202 of 217
(720) 384-8078   attrans@sbcglobal.net

1  Q    What was that date?

2  A    That was August 16th of 2012.

3  Q    And is that the earliest documentation of this tire and

4  nail from your review?

5  A    Well, the photo documentation, they were obviously -- hand

6  wrote the notes about the documentation.  In my case, that's

7  where the confusion sort of arises.

8  Q    Okay.  Now, can you tell -- could you reach any

9  conclusions about this nail from your review of what you had to

10 work with?

11       MR. SCHRODER:  Again, objection, Your Honor.  This is

12 going to be a conclusion reached that we've had no

13 documentation of, no opportunity to have our experts look at

14 this and comment on.

15       THE COURT:  I don't know.  What's your response to

16 that?

17       MR. CURTNER:  Well, I'm just asking if he's had any

18 conclusions about what he had to review.

19       THE COURT:  I know what you asked him.

20       MR. CURTNER:  Pardon me?

21       THE COURT:  I know what you asked him.  But the

22 question, is it beyond the scope of the report.

23       MR. CURTNER:  No, it's just -- his -- the reason his

24 report says he could not reach these conclusions because he

25 couldn't document -- you know, this evidence was not preserved

1   for him to do a proper examination.

2          MR. SCHRODER:  He can put --

3          THE COURT:  Are we (indiscernible) --

4          MR. SCHRODER:  He can put it -- he can put that in

5   another report, Your Honor.  He had every opportunity to do

6   that.  We provided all the materials to him ahead of trial.

7   And it's the day of the testimony, and we're getting this

8   conclusion that we've never seen before.

9          THE COURT:  See what I do every day?  I mean, do you

10  want to talk more about it up here?

11         MR. CURTNER:  Sure.

12         THE COURT:  Okay.

13    (At sidebar with the Court and counsel)

14         THE COURT:  So what's the question, what's

15  (indiscernible).

16         MR. CURTNER:  Okay, here's the question.  Can he tell

17  if those striations were from the road or from the test that

18  was done at STL.  Or the debris --

19         THE COURT:  What striation?

20         UNIDENTIFIED SPEAKER:  (Indiscernible).

21         MR. CURTNER:  Yeah.  He looked at the nail.  And

22  because you can't tell the initial --

23         THE COURT:  And what's his answer going to be?

24         MR. CURTNER:  He can't tell.  Because he doesn't know

25  what the original condition of the nail was.  So it could have

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 204 of 217

1    been caused --

2         THE COURT:  Okay, what -- what's the problem --

3         MR. CURTNER:  -- (indiscernible) --

4         THE COURT:  -- with that?  (Indiscernible) --

5         MR. SCHRODER:  It's not in here.  I mean --

6         THE COURT:  All he's saying is --

7         MR. SCHRODER:  All --

8         THE COURT:  -- he can't tell.

9         MR. SCHRODER:  All he's saying -- it says -- he

10   describes the nail, what he sees on it, and that's it.  No

11   conclusions.  And now he's offering a conclusion.

12        THE COURT:  His conclusion is he couldn't tell.  That's

13   all he's saying.

14        MR. SCHRODER:  Well, but the way they're setting up the

15   conclusion is to say could it be from the --

16        MR. CURTNER:  No, (indiscernible) --

17        MR. SCHRODER:  -- test.  That's what they're asking.

18   If they just ask what -- if he can draw any conclusions from

19   the striations, I have no problem with that.

20        THE COURT:  Okay, well, then there's no problem,

21   because that's all you're going to ask.  Right?

22        MR. CURTNER:  Okay, that's all I'll ask.

23        THE COURT:  Okay.

24        MR. CURTNER:  I'm not going to ask him when he got the

25   photos.  Do you remember when you got the photos?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 205 of 217

SWANEPOEL - DIRECT

1          UNIDENTIFIED SPEAKER:  The (indiscernible) --

2          MR. SCHRODER:  We sent them -- 27th of March.

3          THE COURT:  Okay.  Is everybody happy?

4          MR. CURTNER:  Yeah.  We're --

5          THE COURT:  I've ruled, right?

6          MR. CURTNER:  Yeah.

7      (End of sidebar)

8          THE COURT:  Okay.  Keep going.

9  BY MR. CURTNER:

10 Q   Mr. Swanepoel, when did you receive from the government

11 the real photos of this tire and nail --

12         MR. SCHRODER:  Object to the --

13         MR. CURTNER:  -- the --

14         MR. SCHRODER:  -- "real photos," Your Honor.

15         MR. CURTNER:  The original photos --

16         THE COURT:  The photo --

17         MR. SCHRODER:  We sent them a bunch of photos at the

18 time that we revealed our evidence and revealed our --

19         THE COURT:  Okay.

20         MR. SCHRODER:  -- experts, and that was in October of

21 last year.

22         THE COURT:  Okay.

23 BY MR. CURTNER:

24 Q   And when did you receive the original photos that you

25 could retrieve metadata from?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1   A    I'm not 100-percent sure.  I don't --

2   Q    You want to --

3   A    -- know that I actually made a note of that particular

4   date --

5   Q    Can you --

6   A    -- when those photographs --

7   Q    Can you estimate, was it this year?

8   A    Well, it was definitely after I prepared my initial -- my

9   report.

10  Q    And at the time you received your -- you initial -- your

11  initial report on the nail, could you reach any conclusions

12  about the nail besides what you've told us today?

13  A    No, sir.

14  Q    Okay.  Thank you.

15          THE COURT:  Cross-examination.

16          MR. SCHRODER:  No questions, Your Honor.

17          THE COURT:  Okay.  Thank you, sir.  You're excused.

18          THE WITNESS:  Thank you, Your Honor.

19      (Witness excused)

20          THE COURT:  Well, I think we have to have a break, so I

21  can talk with the attorneys to see what's going on.  Because I

22  think we're getting close to the end, so it's a good break.  Am

23  I right?  Do we need to talk?

24          MR. CURTNER:  Yes.

25          THE COURT:  All right.  Let's stand in recess for 10

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 207 of 217
(720) 384-8078  attrans@sbcglobal.net

1  minutes or so.

2      (Jury not present)

3      THE COURT:  All right, please be seated.  I want to

4  wait till Nancy gets back in.  I think the record is still on,

5  but I want to make sure it is.  Are we still on the record?

6      THE CLERK:  Yes.

7      THE COURT:  Okay.  All right, so my understanding, Mr.

8  Curtner, is that this is the conclusion of your evidence.  Is

9  that right?

10      MR. CURTNER:  Yes.  The defense would rest at this

11  time.

12      THE COURT:  All right.  And, Mr. Wells, it's my

13  understanding you're not going to testify.  Is that right?

14      THE DEFENDANT:  That's correct.

15      THE COURT:  Okay.  So based on that, I'll bring the

16  jury back in.  I'll ask Mr. Curtner what his position is.  He

17  can say in front of the jury that the defense rests.  I will

18  then turn to Ms. Loeffler and say, "Do you have any witnesses?"

19  You'll say, "Yes, we have some rebuttal witnesses."  And I'll

20  say, "Okay, we'll do those first thing in the morning."  Or

21  you -- unless you have them right now.

22      MS. LOEFFLER:  No, they're arriving and they're all --

23  be here tonight.

24      THE COURT:  Okay.  Okay.  Okay.

25      MS. LOEFFLER:  Okay.  I just wanted to let you know.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1  We --

2      THE COURT:  That was just a question.

3      MS. LOEFFLER:  -- have them all lined up --

4      THE COURT:  Okay.

5      MS. LOEFFLER:  -- physically all here.

6      THE COURT:  I got you.  And so then we'll start

7  tomorrow at 8:30.  We'll probably just go -- roughly --

8  probably be done by noon tomorrow.  I'm just going to tell the

9  jury this.  Then we'll spend the -- the jury instructions are

10 going to be simple, because I've already got the packet.  I've

11 got no objections from the government.  I've got minor, minor

12 objections from the defense.  So we'll -- you know, I'm on top

13 of the jury instructions, unless I hear more from --

14      MR. SCHRODER:  We might have a couple of minor things,

15 I noticed, Your Honor, that we'll bring up --

16      THE COURT:  Okay.

17      MR. SCHRODER:  -- with you --

18      THE COURT:  Okay.

19      MR. SCHRODER:  -- so --

20      THE COURT:  So we'll discuss those tomorrow.

21      MS. LOEFFLER:  Yeah.  Be great.

22      THE COURT:  And then you'll have all afternoon to get

23 your equipment in order, to get everything squared away.  8:30

24 Thursday morning, closing arguments.  Be done by noon.  Pick

25 the alternates, send the matter off to the jury.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 209 of 217
(720) 384-8078  attrans@sbcglobal.net

1          MS. LOEFFLER:  There -- there's one easy thing, Your

2     Honor, and it may be --

3          THE COURT:  Well, I -- and then --

4          MS. LOEFFLER:  Oh, sorry.

5          THE COURT:  -- surrebuttal if appropriate.

6          MS. LOEFFLER:  Okay.

7          THE COURT:  Okay.  And I -- you know, rebuttal is

8     rebuttal.  With the exception of that one doctor, I'm going to

9     be pretty strict about what's rebuttal and what's not rebuttal.

10         MS. LOEFFLER:  I have -- okay.  And we'll give you the

11    list.

12         THE COURT:  Okay.

13         MS. LOEFFLER:  We'll give you the list.  And this is

14    just my own conservatism.  I know you asked the defendant if it

15    was -- he was deciding not to testify, but I always -- it just

16    makes me feel better when the judge says -- you know, he -- I'm

17    sure he's consulted with eminent counsel and he knows --

18         THE COURT:  You know that --

19         MS. LOEFFLER:  -- he has the right -- I mean --

20         THE COURT:  -- I have told him this --

21         MS. LOEFFLER:  -- it's his decision.

22         THE COURT:  -- at the pretrial conference --

23         MS. LOEFFLER:  Okay.

24         THE COURT:  -- I told him this every single time we've

25    met.  I've done it --

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 210 of 217
(720) 384-8078  attrans@sbcglobal.net

1          MS. LOEFFLER:  Okay.

2          THE COURT:  Federal court, we don't even have to

3    technically do it at all.  State court --

4          MS. LOEFFLER:  I know.  I'm just con --

5          THE COURT:  -- we have to do it twice.  So I've done it

6    about a half-dozen times.

7          MS. LOEFFLER:  Okay.

8          THE COURT:  But to make you happy, I'm going to do it

9    one more time.

10         MS. LOEFFLER:  All right.

11         THE COURT:  Mr. Wells, you understand you have a right

12   to testify.  And you discussed that with your attorney, and

13   it's my understanding you've chosen, after consulting with your

14   attorney, not to testify.  Is that true?

15         THE DEFENDANT:  Yes, Your Honor.

16         MS. LOEFFLER:  Now I'm (indiscernible) -- thank you,

17   Your Honor.

18         THE COURT:  Okay.

19         MS. LOEFFLER:  I'm just very concerned about that.

20         THE COURT:  Well, I understand.  So --

21         MS. LOEFFLER:  Okay.

22         THE COURT:  Okay, I've outlined the procedure.  Any

23   objection to proceeding in that fashion?

24         MR. CURTNER:  No, Your Honor.

25         MR. SCHRODER:  No, Your Honor.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 211 of 217

1          THE COURT:  Okay.  Bring them in.

2      (Jury present)

3          THE COURT:  All right, please be seated.  All right,

4  Mr. Curtner, does the defendant have any further witnesses?

5          MR. CURTNER:  No, Your Honor.  At this time, the

6  defense rests.

7          THE COURT:  All right.  Then, Ms. Loeffler, the

8  government have further witnesses?

9          MS. LOEFFLER:  We do, Your Honor.

10         THE COURT:  Okay.  All right.  So here's the status of

11  the situation.  The defense has rested.  So you heard the

12  government's case, you heard the defendant's case.  The

13  government has a right to present some rebuttal.  It's limited,

14  it won't be long.  And that's where we stand.

15         Here's my best estimate.  You get to go home today,

16  okay.  Come back tomorrow at 8:30.  We'll probably be done by

17  noon tomorrow with the evidence.  Guess -- I'm guessing, okay.

18  So then you'll get to go home again.  8:30 Thursday morning,

19  we'll hear closing argument.  And that could go all morning,

20  because each side is given an hour and a half or two to argue

21  the case to the jury.  The process is, you hear first from the

22  government, then you hear from the defendant, and then the

23  government gets, under the rules, a final say, and then we're

24  done.

25         Then we put 12 -- four -- 15 names in our little

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 212 of 217

```
 1   spindle, wherever Nancy's got it down here.  We give it a crank
 2   of a yank, we pick out three names, and those people are the
 3   alternates.  They get to go home and catch up on their
 4   newspaper reading.  The other 12 stay here and deliberate the
 5   remainder of the day.  Friday, come back and deliberate from
 6   8:30 to whenever you reach a verdict or until 5 o'clock.  If
 7   you don't reach a verdict, come back Monday and continue
 8   deliberations.  But you don't break separately for lunch.
 9         You order lunch.  That's the good news.  There'll be a
10   menu in there Thursday morning, and you order your lunch and it
11   will be brought to you.  I'm trying to give you a pretty good
12   overview.  I mean, done a -- do you understand what's going on
13   now?  Okay.
14         So we'll stand in recess.  See you tomorrow at 8:30.
15   Don't read the newspaper.  Don't look at TV.  Don't talk to
16   anybody.  Don't let them talk to you.  You got it.  No.  That's
17   right.  And the Internet.
18      (Jury not present)
19         THE COURT:  Okay.  See you at 8:30 tomorrow.  Is there
20   anything you want to talk to me about?  Yeah.
21         MS. LOEFFLER:  When I -- I know you probably want the
22   list just for your own convenience.
23         THE COURT:  Yes.
24         MS. LOEFFLER:  Do you want us to file it under seal so
25   they can -- so you can have a -- I want to -- how -- to know
```

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 213 of 217

1  how to get it to you.  I know how to get it to them.  I can

2  e --

3          THE COURT:  I don't care, just as long as it's sitting

4  on my chair -- I mean on my table tomorrow at 8:30.

5          MS. LOEFFLER:  Oh, okay, we'll do it that way.

6          THE COURT:  Okay.

7          MS. LOEFFLER:  I just want to know what way you wanted

8  it, Judge.

9          THE COURT:  Okay.

10          MS. LOEFFLER:  Okay.

11          THE CLERK:  All rise.  Matter stands in recess until

12  8:30 tomorrow.

13      (Proceedings concluded at 2:17 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 214 of 217
(720) 384-8078  attrans@sbcglobal.net

CERTIFICATE

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____s/Teresa K. Combs_____          _____9/15/14_____
Teresa K. Combs, Transcriber          Date

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 754  Filed 09/23/14  Page 215 of 217

1                            **INDEX**

2                                                           FURTHER
                          DIRECT   CROSS   REDIRECT   RECROSS  REDIRECT
3
   DEFENDANT'S WITNESSES
4
   Gerald B. Richards      3307    3335     3341
5  Casey Jones             3346    3353     3358      3359
   Ryan Miller             3360    3365
6  Steven Cesar Acosta     3367    3378
   Joseph Michael Sturgis  3384
7  Daryl Allison           3395    3402     3403
   Bruce Allan Currie      3410    3441     3448      3450
8  Anthony Pecoraro        3456    3459     3462
   Deatrich Sheffield                                 3468     3463
9  Jacovus Michiel
      Swanepoel            3470
10
   DEFENDANT'S EXHIBITS                                        ADMITTED
11
   DE-171   Nailhead, closeup by Mr. Swanepoel                    3480
12
   DE-172   Photograph - nailhead                                 3485
13
   DE-175   Photograph - nail hole                                3494
14
   DE-176   Photograph - nailhead, microscope                     3483
15
   DE-178   Photograph - magnified nailhead                       3484
16
   DE-193   Screen prints of video - 4/12/12, 3 a.m.,
17            on COMMSTA T2                                        3467

18 DE-194   Video - 4/12/12, 3 a.m., COMMSTA T2                    3465

19 DE-202B  Photograph - tire                                     3426

20 DE-202C  Photograph - tire nail hole                           3431

21 DE-202E  Photograph - tire with paper clip                     3433

22 DE-202F  Photograph                                            3436

23 DE-202G  Photograph - nail                                     3438

24 DE-204   Photograph - tire                                     3397

25 DE-205   Photograph - tire                                     3399

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 754  Filed 09/23/14  Page 216 of 217

1                          **INDEX**, (Continued)

2    DEFENDANT'S EXHIBITS                                    ADMITTED

3    DE-208   Photograph - diagram, diving search, Buskin
              River (page 158 only)                          3393
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 754   Filed 09/23/14   Page 217 of 217
(720) 384-8078   attrans@sbcglobal.net