1    UNITED STATES DISTRICT COURT

2    FOR THE DISTRICT OF ALASKA

3    UNITED STATES OF AMERICA    )    Case 3:13-cr-00008-RRB
                                 )
4         Plaintiff,             )    Anchorage, Alaska
                                 )    Wednesday, April 23, 2014
5         vs.                    )    8:40 o'clock a.m.
                                 )
6    JAMES MICHAEL WELLS,        )
                                 )
7         Defendant.             )
     _____)    **TRIAL BY JURY – DAY 17**

8
                    **TRANSCRIPT OF PROCEEDINGS**
9
              BEFORE THE HONORABLE RALPH R. BEISTLINE
10                 UNITED STATES DISTRICT JUDGE

11   APPEARANCES:

12   For the Plaintiff:        KAREN L. LOEFFLER
                               U.S. Attorney
13                             BRYAN SCHRODER
                               KATHLEEN ANN DUIGNAN
14                             Assistant U.S. Attorneys
                               Office of the U.S. Attorney
15                             222 West 7th Avenue, #9, Room 253
                               Anchorage, Alaska  99513-7567
16                             (907) 271-5071

17   For the Defendant:        F. RICHARD CURTNER
                               Federal Defender
18                             Office of the Federal Public Defender
                               601 West 5th Avenue, Suite 800
19                             Anchorage, Alaska  99501
                               (907) 646-3400
20
                               PETER OFFENBECHER
21                             Skellenger Bender, P.S.
                               1301 5th Avenue, Suite 3401
22                             Seattle, Washington  98101-2605
                               (206) 623-6501

23

24

25

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 1 of 206
(720) 384-8078  attrans@sbcglobal.net

1  APPEARANCES (Continued):

2  Court Recorder:            NANCY LEALAISALANOA
                              U.S. District Court
3                             222 West 7th Avenue, #4, Room 229
                              Anchorage, Alaska  99513-7564
4                             (907) 677-6111

5  Transcription Service:     A & T Transcripts
                              6299 West 111th Avenue
6                             Westminster, Colorado  80020
                              (720) 384-8078

7

8  Proceedings recorded by electronic sound recording; transcript
   produced by transcription service.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 755  Filed 09/23/14  Page 2 of 206
(720) 384-8078  attrans@sbcglobal.net

1      <u>**ANCHORAGE, ALASKA – WEDNESDAY, APRIL 23, 2014**</u>

2

3           (Call to Order of the Court at 8:40 a.m.)

4           (Defendant present; jury not present)

5                THE CLERK:  His Honor the Court, the United States

6      District Court for the District of Alaska is now in session,

7      with the Honorable Ralph R. Beistline presiding.  Please be

8      seated.

9                THE COURT:  Okay.  Do we have a technical problem?  Is

10     that the issue?

11               MR. MCGEE:  Yes, sir.

12               THE COURT:  Do we need the screen for the first few

13     witnesses?

14               MS. LOEFFLER:  Not for number 1 and -- do you need it

15     for number 2?

16               MS. DUIGNAN:  No.

17               MS. LOEFFLER:  Not for number 2.

18               MS. DUIGNAN:  Not for number 3 either.

19               MS. LOEFFLER:  Not for number 3.

20               MS. DUIGNAN:  We need it for 4.

21               MS. LOEFFLER:  We need it for 4.

22               THE COURT:  Okay.  Well, let's work on for -- I don't

23     want to keep the jury waiting all day.

24               MR. OFFENBECHER:  Your Honor, I have a brief matter we

25     can take up --

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1          THE COURT:  Yes.

2          MR. OFFENBECHER:  -- before the technical one, if --

3          THE COURT:  Yes.

4          MR. OFFENBECHER:  -- you want to.

5          THE COURT:  Okay.

6          MR. OFFENBECHER:  Want me to just do it from here?

7          THE COURT:  Yes.  Oh, yeah, that's fine.

8          MR. OFFENBECHER:  Your Honor, we're going to ask this

9   morning, in the alternative, to reopen for just about 10

10  minutes' worth of testimony that we forgot to put on yesterday.

11  And there has been no -- nothing in the intervening time.  And,

12  in the alternative, I think there's a friendly amendment that

13  all of the testimony that we would elicit would be from

14  witnesses that the government is going to call anyway, and so

15  we could simply ask them the 10 minutes' worth of questions on

16  cross-examination.  They might -- I don't know what the

17  testimony's going to be, so it might be beyond the scope of the

18  direct.  And so, out of an excess of caution --

19          THE COURT:  Okay.  Well, doesn't that solve the problem

20  if I just give you a little bit of leeway in cross-examination?

21          MR. OFFENBECHER:  Yeah, I think it does.

22          THE COURT:  Okay.

23          MS. LOEFFLER:  Well, the alternative is they can just

24  go first.  Call whoever you want, and -- I mean, I don't have a

25  problem with you doing that.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 755  Filed 09/23/14  Page 4 of 206
(720) 384-8078  attrans@sbcglobal.net

1          THE COURT:  Okay.

2          MR. OFFENBECHER:  I think it'd be more expeditious to

3    do it the other way, but I'm open either way.

4          THE COURT:  Well, let's see.  No more secrets, so let's

5    find out who these are.

6          MR. OFFENBECHER:  Sure, Your Honor.  Here's the proper

7    testimony.

8          THE COURT:  Okay.

9          MR. OFFENBECHER:  Mrs. Belisle, it looks like she's

10   going to be called as a witness.  I'm not sure what the topic

11   will be.  But I'm going to ask Mrs. Belisle, who's present in

12   court right now, just whether she knew whether her daughter

13   Hannah knew Mr. Barnum.  And depending on the answer to that

14   question, I may call Mr. Allison about his representations to

15   Hannah that Nicola Belisle had told him that she -- that Hannah

16   did know Barnum.  And -- so I expect that to be, like, 10

17   minutes of testimony.

18         MS. LOEFFLER:  Your Honor, I think the Barnum stuff has

19   to be outside the presence of the jury.  Let's do the proffer.

20   I mean, we -- you've ruled on this again and again.

21         MR. OFFENBECHER:  Well, that's fine.

22         MS. LOEFFLER:  And I don't -- and that --

23         MR. OFFENBECHER:  I'm fine with that, Your Honor.

24         MS. LOEFFLER:  That's -- I -- that's what I would like

25   about that.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 5 of 206
(720) 384-8078  attrans@sbcglobal.net

1          MR. OFFENBECHER:  Yeah.  I have no objection to that.

2          MS. LOEFFLER:  Okay.

3          THE COURT:  Okay.  You want to take care of that right

4     now?  She's --

5          MS. LOEFFLER:  Why don't we take care of that right

6     now, because --

7          THE COURT:  Okay.

8          MS. LOEFFLER:  -- and then we'll bring the jury in and

9     we won't be doing something outside the presence.

10         THE COURT:  Okay.  Somehow, Ruth, I left my witness

11    lists on the -- somewhere in the other -- list of witnesses.

12         MR. CURTNER:  And, Judge, just before --

13         MS. LOEFFLER:  Yeah, Judge, I think we handed you --

14         THE COURT:  I know.  She's getting it.

15         MS. LOEFFLER:  And just so everybody knows, the list

16    we're giving you is not in order, because all of our copiers

17    apparently were sequestered, and none of them work.  So we

18    can't print anything this morning.

19         THE COURT:  Okay.

20         MS. LOEFFLER:  So it's a list, but this isn't the order

21    we're calling them in.

22         MR. CURTNER:  Okay, and, Judge, I would like to address

23    some of the witnesses on the list I have before they come in.

24    I don't think it's proper rebuttal evidence.  And at some point

25    I just want to make -- address the Court on those.  About five

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 6 of 206
(720) 384-8078  attrans@sbcglobal.net

1  witnesses.

2        MS. LOEFFLER:  Well, let's take it up now.

3        MS. DUIGNAN:  Yes.

4        MR. CURTNER:  Yeah.  Okay, Judge, Dr. Gan was our

5  witness.  And, as I see in the government exhibit I received

6  this morning, covers treatment or -- of VA records going back

7  months.  And I think that's really -- would have been for

8  cross-examination.  That's not rebuttal, to call our witness.

9  And I don't think rebuttal means a do-over on cross-

10  examination.  So I don't think Dr. Gan is a rebuttal witness.

11       MS. DUIGNAN:  Your Honor, if I may respond to that.

12       THE COURT:  Yes.

13       MS. DUIGNAN:  The defense on their case put in evidence

14  of the fact that Mr. Wells allegedly had diarrhea as a symptom

15  of his gallbladder disease, I believe through Mr. Pletnikoff.

16  And I believe the government is entitled to rebut that.

17       MR. CURTNER:  Well, Your Honor, Dr. Gan testified.  She

18  testified to what she knows.  And I don't see how doing a

19  cross-examination of her would be rebuttal.

20       MS. DUIGNAN:  It -- it's not a cro -- Your Honor, all I

21  intend to do is introduce the records, especially the one that

22  the jury member wanted to have from April 2nd, to show the

23  visits as well as to show the lack of symptoms that Mr.

24  Pletnikoff testified to.

25       MR. CURTNER:  And that was the one question, what the

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 7 of 206
(720) 384-8078  attrans@sbcglobal.net

1   date was.  If the government wanted to just introduce -- VA

2   record for April 2nd, I wouldn't have any objections to that.

3        MS. DUIGNAN:  Your Honor, I would like to say, though,

4   on their examination of Mr. Pletnikoff, they put in more

5   evidence than just that one day.  They talked about the entire

6   time that Mr. Wells had gallbladder disease, and we're entitled

7   to rebut that.

8        THE COURT:  Okay, briefly.  You can rebut it briefly.

9   Okay, next.

10       MR. CURTNER:  Then Mr. Skonberg and Mr. Williamson are

11  employees at Island Air.  I don't remember us presenting any

12  evidence about Island Air, and I don't think they're proper

13  rebuttal witnesses.

14       MS. LOEFFLER:  Your Honor, if I may on that,

15  (indiscernible) --

16       MR. CURTNER:  Or Servant Air.

17       MS. LOEFFLER:  It's Servant Air.  And I have a brief on

18  that, because I thought they might bring it up, but I didn't

19  know that they -- if they were going to.  So we're about to go

20  file it.  I have a copy for everybody on that and I will argue

21  it.  If I can hand it to everybody.

22       THE COURT:  Hand it to everybody.

23       MR. CURTNER:  And then, finally, Your Honor, Carsten

24  Stoeckler and Chris Stoeckler I don't think are proper rebuttal

25  witnesses.  There was some testimony about some relationship

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 8 of 206
(720) 384-8078  attrans@sbcglobal.net

1   between Mrs. Hopkins and Carsten Stoeckler, but I don't see

2   where that's proper rebuttal evidence. She admitted the

3   relationship, so I don't think there's anything to rebut.

4      (Side conversation)

5        MS. LOEFFLER: We're probably not going to call them,

6   but -- and the other thing is, they called Debby Hopkins. I

7   don't know how they can say it's not rebuttal to something that

8   they put on. But we're probably not going to call them. We're

9   just -- you know, have them on the list and they're ready to

10   go --

11        THE COURT: Okay, well --

12        MS. LOEFFLER: -- in case there's something that comes

13   up, but --

14        THE COURT: I'm going to --

15        MS. LOEFFLER: -- if they call Debby, I don't think

16   how -- they could say it's not rebuttal to somebody they

17   called.

18        MR. OFFENBECHER: Because it's not rebuttal to what she

19   said. She admitted it.

20        THE COURT: So, anyhow, when I saw the names, I

21   wondered what they were going to be called for. And we'll just

22   wait and see. Have to do it outside the presence of the jury

23   initially to see if it's rebuttal.

24        MS. LOEFFLER: And do you want me to address Skonberg

25   and Tim Williamson?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1          MR. OFFENBECHER:  Could we have just a minute to read

2    the memorandum that --

3          THE COURT:  Sure.

4          MR. OFFENBECHER:  -- we were handed?

5          THE COURT:  Go ahead.

6          MS. LOEFFLER:  Okay.

7       (Pause)

8          THE COURT:  We're about done, I think.  You can tell

9    them we're getting close, we're just about done.  We're fixing

10   the overhead.  Is it fixed, by the way?

11         MR. MCGEE:  The turning left and right are working, but

12   the document camera's not working now.

13         THE COURT:  Okay.  Are you working on that?

14         MR. MCGEE:  Yes, sir.

15         THE COURT:  Okay.  And we can go off the record, Nancy,

16   if we're --

17         THE CLERK:  Okay.  Off record.

18      (Off record at 8:49 a.m.; on record at 8:53 a.m.)

19      (Jury not present)

20         THE CLERK:  On record.

21         THE COURT:  Yes.

22         MR. CURTNER:  Since we have a minute, there's two

23   exhibits that we had to redact --

24         THE COURT:  Okay.

25         MR. CURTNER:  -- that I think were admitted.  And I

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 755  Filed 09/23/14  Page 10 of 206
(720) 384-8078  attrans@sbcglobal.net

1  just want to make sure the redacted versions are --

2          THE COURT:  Good.  Very well.

3          MR. CURTNER:  -- in evidence.  This is the newspaper

4  article, now -- this is the redacted version.  And it's going

5  to be Defense Exhibit 032.

6          THE COURT:  Very good.  Very well.

7          MR. CURTNER:  And then we also had a list of

8  automobiles, and we redacted any personal identification --

9          THE COURT:  Okay.

10         MR. CURTNER:  -- information, and that would now --

11  it's Defense Exhibit 159R.

12         THE COURT:  Okay.  Very well.  With those redacted

13  actions, they can be admitted.

14     (Defendant's Exhibit DE-159R admitted)

15         THE COURT:  Okay.  I under -- I know -- we've -- I've

16  had a chance to review the briefing.  The government's plans

17  now are to present -- what's the first witness you plan -- oh,

18  did -- oh, we were going to take care of Ms. Belisle first,

19  right?

20         MS. LOEFFLER:  I was going to put her on first, but

21  apparently they want to reopen their case and put her on for

22  something else.  I'm --

23         THE COURT:  Okay.

24         MS. LOEFFLER:  -- simply putting her on to -- and

25  I'll -- to say where Hannah was the night of -- before her

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 755  Filed 09/23/14  Page 11 of 206
(720) 384-8078  attrans@sbcglobal.net

 1  father was murdered.

 2              THE COURT:  Okay.

 3              MS. LOEFFLER:  That's the only thing I was putting her

 4  on for.

 5              THE COURT:  But they wanted to ask a question about Mr.

 6  Barnum.

 7              MS. LOEFFLER:  And I think that has to be outside the

 8  presence --

 9              THE COURT:  Right, so --

10              MS. LOEFFLER:  -- of the jury -- okay.

11              THE COURT:  -- let's do it right now.

12              MS. LOEFFLER:  Okay.

13              MR. OFFENBECHER:  Your Honor, at some point can I also

14  address the issues raised in their rebuttal memorandum?

15              THE COURT:  Yeah.  And those aren't -- and those

16  witnesses won't be for a little while, will they?

17              MR. OFFENBECHER:  Okay.  Sure.

18              MS. LOEFFLER:  Let me just look at my order.  Hold on.

19  Sorry, Judge, I have to look to -- back to the -- where'd I put

20  the order.

21              THE COURT:  Okay, we're still -- we're doing --

22              MS. LOEFFLER:  They're witnesses 6 and 7, Your Honor.

23              THE COURT:  So we'll take a break right before we do

24  them.

25              MS. LOEFFLER:  Okay.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 755  Filed 09/23/14  Page 12 of 206
(720) 384-8078  attrans@sbcglobal.net

**BELISLE - VOIR DIRE**

1          THE CLERK:  I'm sorry.  Please raise your right hand.

2          **NICOLA ANNE BELISLE, DEFENDANT'S WITNESS, SWORN**

3          THE CLERK:  Okay, thank you.  Please have a seat.  And,

4     ma'am, if you can please state and spell your full name.

5          THE WITNESS:  Nicola Anne Belisle.  N-i-c-o-l-a, A-n-n-

6     e, B-e-l-i-s-l-e.

7          THE CLERK:  Thank you.

8          THE COURT:  All right, Mr. Offenbecher.

9          MR. OFFENBECHER:  Thank you, Your Honor.

10                         VOIR DIRE

11    BY MR. OFFENBECHER:

12    Q    Mrs. Belisle, good morning.  Do you have -- do you know

13    who Jason Barnum is?

14    A    I do now.

15    Q    Did you know who Jason Barnum was before your husband

16    passed away?

17    A    My husband didn't pass away.  My husband was murdered.

18    And I really need you to stop saying that.  Did I know who

19    Jason Barnum was before?  I never heard of his name.  I knew

20    him by the -- the rumors.

21    Q    Okay.  Did you know what he looked like before?

22    A    I have never set eyes on him before, no.

23    Q    Had anyone described him to you?

24    A    Just "the tattoo guy."

25    Q    So you knew that there was a person who was "the tattoo

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 755  Filed 09/23/14  Page 13 of 206
(720) 384-8078  attrans@sbcglobal.net

**BELISLE - VOIR DIRE**

1  guy" in the community?

2  A   Yes.

3  Q   Who did you learn that from?

4  A   I have no idea.

5  Q   Did you learn that from your daughter?

6  A   I have no idea.

7  Q   Is there anyone else that you would have heard that from?

8  A   I talk to a lot of people.

9  Q   Other than your daughter, is there anyone you would talk

10  to about a person with tattoos?

11  A   Yes.  Lots of --

12  Q   Who?

13  A   -- people.

14  Q   All right.  So let me just try to focus.  So just take a

15  second.  You knew that you had heard about a person with

16  tattoos?

17  A   Yes.

18  Q   You had heard that he was involved in the drug community?

19  A   Yes.

20  Q   You were concerned that your daughter might be involved

21  with him as well?

22  A   Are we talking before or after my husband was killed?

23  Q   Before.

24  A   I have no idea before.

25  Q   Right.  But you were concerned that he might be involved

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 14 of 206
(720) 384-8078  attrans@sbcglobal.net

1  with her.  Right?

2  A    No.

3  Q    Well, why would you be discussing Mr. -- this person with

4  a tattoo with anybody other than that?

5  A    Sensationalism.  There --

6  Q    Was it --

7  A    -- there's a guy who shows up in our community covered in

8  tattoos.  Who's not going to talk about him?

9  Q    So he was the subject of some discussion?

10  A    Yes.

11  Q    And you can't recall whether you discussed it with your

12  daughter?

13  A    No.  The ti -- that time, it was -- it -- it's rather a

14  blur to me.

15  Q    Well, do you recall telling Special Agent Allison about

16  this person?

17  A    Yes.

18  Q    When was that?

19  A    Well, it must have been after my husband was murdered.

20  Q    Okay.  Do you know whether -- how long after your husband?

21  A    No, I have no idea.

22  Q    Well, you met with Mr. -- Special Agent Allison on a

23  number of occasions, didn't you?

24  A    Yes, I did.

25  Q    And some of those occasions were recorded.  Right?

1  A    Yes.

2  Q    And some of them weren't recorded.  Right?

3  A    I have no idea.

4  Q    Do you recall telling Special Agent Allison that your

5  daughter knew Jason Barnum?

6  A    I remember vaguely mentioning it to him, that he might

7  have been some part of the drug culture and that Hannah might

8  have known him.

9  Q    And what is it that happened that caused you to tell the

10  special agent investigating your husband's homicide that your

11  dau -- you had heard about this person and that Hannah might

12  have known him?

13  A    You're going to have to say that again.

14  Q    Okay.  What I heard you say is that you had heard that Mr.

15  Barnum was part of the drug culture, right, in Kodiak.  Right?

16  A    Yes.

17  Q    Okay.  And that you told the special agent that Hannah

18  might have known him?

19  A    Yes.

20  Q    What is it that caused you to tell the special agent that

21  Hannah might have known Mr. Barnum?

22  A    Well, as you so tactfully brought up, my daughter was

23  going through a rather hard time and was using drugs.  So

24  anybody in our small community who had any relationship to

25  drugs.

1  Q    So you just assumed that there was some chance that your

2  daughter knew Mr. Barnum?

3  A    It's a small town.

4  Q    Okay, I'm just asking you why you told the agent, that's

5  all.

6  A    Because I wanted the person responsible for my husband's

7  murder to be brought to justice.  And I wanted no stone left

8  unturned, because I think it was just as important to bring the

9  person responsible as well as disproving those who were not.

10 Q    And so in telling the special agent investigating your

11 husband's murder about a possible connection between your

12 daughter and Mr. Barnum, you thought that that might be a

13 possible lead, that Mr. Barnum might be involved in your

14 husband's murder?

15 A    No, that he wasn't involved in my husband's murder.  No

16 stone left unturned.

17 Q    When you say no stone left unturned, what do you mean?

18 A    Look at every possibility, because it's just as important

19 to know who did it as to who did not do it.

20 Q    And do you consider that Mr. Barnum was one of the stones

21 that needed to be unturned?

22 A    I don't know what I was thinking.  My husband was dead,

23 still is.

24 Q    Uh-huh (affirmative).  You were trying to help the special

25 agent investigate --

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1  A    Well, of course.

2  Q    -- your husband's murder.  Right?  Okay, right?

3  A    I answered you.

4         MS. LOEFFLER:  Your Honor --

5         THE WITNESS:  Yes, of course.

6         MS. LOEFFLER:  Your Honor, at this point I think I'd

7  ask that this just stop.  And I think you have enough to know.

8         THE COURT:  I think he's just about done.  Are you

9  about done?

10        MR. OFFENBECHER:  Uh-huh (affirmative).

11        MS. LOEFFLER:  Okay.

12 BY MR. OFFENBECHER:

13 Q    Do you -- did your daughter Hannah or any of her

14 friends -- ever mentioned Jason Barnum?

15 A    Not that I can remember, no.

16 Q    Who is it that told you about Jason Barnum?

17 A    I have no idea.  I talk to a lot of people.

18        MR. OFFENBECHER:  Just a moment, Your Honor.  Yeah, I

19 don't have any other questions for this witness.

20        THE COURT:  Redirect.

21        MS. LOEFFLER:  No, Your Honor.

22        THE COURT:  Okay, so we're not going to cover that in

23 front of the jury, I take it.

24        MR. OFFENBECHER:  Well, Your Honor, I would like to

25 call Mr. Allison next.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 755  Filed 09/23/14  Page 18 of 206
(720) 384-8078  attrans@sbcglobal.net

1          MS. LOEFFLER:  You know, Your Honor, I -- there's a --

2    you know, there's a bad guy with a tattoo in town that does

3    drugs.  There's no connection to anything.  I mean, I guess, if

4    you want to keep doing offers of proof, but I think if you're

5    ready to rule, we should just move on to admissible evidence.

6          THE COURT:  Well --

7          MR. OFFENBECHER:  Well, Your Honor, Mr. Allison told

8    Hannah Belisle that her mother said she did know Mr. Barnum.

9    Now, I'm sure that Mr. Allison will have an explanation for

10   that, but at least the jury ought to be able -- you know, ought

11   to be able to hear that.  I mean, I'm making an offer of proof

12   that Mr. Allison told Hannah Belisle that Nicola Belisle said

13   that she knew Jason Barnum.

14         THE COURT:  Say that again?

15         MR. OFFENBECHER:  Here, sure.

16         THE COURT:  Mr. Allison said that --

17         MR. OFFENBECHER:  Yeah.  Mr. -- here, let me just put

18   it in context.  On September 4th, 2013, Mr. Allen -- Allison,

19   Special Agent Allison, conducted a tape-recorded interview of

20   Nicola Belisle.

21         THE COURT:  Uh-huh (affirmative).

22         MR. OFFENBECHER:  Showed her a picture of Mrs. Belisle,

23   and said to her -- at least it looks like he's showing her a

24   picture, because he says, "There's something we need to clear

25   up."  Says, "Uh-huh."  "That we talked about before."  Mr.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 755  Filed 09/23/14  Page 19 of 206

1  Allison says, "If you remember, I met you at the airport one
2  time and showed you a photo of somebody, and you told me that
3  you hadn't met them."  And then he says, "This is the same
4  person, okay?"  And she says, "Yeah."  I'm pretty sure that
5  she's show -- he's showing her a picture.

6          THE COURT:  Okay.

7          MR. OFFENBECHER:  "So now I believe you actually have
8  met him.  Is that correct?"  Ms. Belisle says, "No, I never met
9  him before."  He says, "Oh, you haven't?"  And then she says,
10  "No, I dated the son of the guy who was friends with him."  And
11  then I'll skip over some stuff.  We can read it all if you
12  want.  He says, "I'm sorry, your moth -- mom must have got her
13  wires crossed, because she told me you had actually met him."

14          THE COURT:  So Hannah says she has -- hadn't met him,
15  which she testified to.  So are you going to -- you want to
16  cross-examine Ms. Belisle now, or do you want to --

17          MR. OFFENBECHER:  Well, no.  No.

18          THE COURT:  That's an offer of proof that --

19          MR. OFFENBECHER:  I think I've already -- I think I've
20  done all I need to do with Mrs. Belisle.  What I would like to
21  do is put Mr. Allison on, because --

22          THE COURT:  Okay.

23          MR. OFFENBECHER:  -- Mr. Allison told Hannah Belisle
24  that Mrs. Belisle said, "She told you -- she told me you had
25  actually met him."

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 755  Filed 09/23/14  Page 20 of 206
(720) 384-8078  attrans@sbcglobal.net

1    THE COURT:  Okay.  So let's put him on real quick, get

2 the record clear, so we have the --

3    MR. OFFENBECHER:  Right.

4    THE COURT:  Switch places.

5  (Witness excused)

6    THE CLERK:  And reswear?  Your Honor, reswear?

7    THE COURT:  Yeah, go ahead and swear him in.

8    THE CLERK:  Okay.  Raise your right hand.

9    **DARYL ALLISON, DEFENDANT'S WITNESS, SWORN**

10    THE CLERK:  Okay.  Thank you.  Please have a seat.

11 And, sir, if you can please state and spell your name.

12    THE WITNESS:  Daryl Allison.  D-a-r-y-l, A-l-l-i-s-o-n.

13    THE CLERK:  Thank you.

14  (Side conversation)

15                      VOIR DIRE

16 BY MR. OFFENBECHER:

17 Q    Special Agent Allison, good morning.  Morning.

18 A    Good morning.

19 Q    You've been here and you've heard this last exchange?

20 A    I've heard, yes.

21 Q    Okay.  So I'm -- just want to direct your attention to

22 September 4th, 2013.  Do you recall that you conducted a tape-

23 recorded interview with Hannah Belisle?  Is that right?

24 A    Yes.

25 Q    And at the beginning of the interview -- you've heard me

1    read a passage in which it appears that you showed Ms. Belisle

2    a -- go ahead and take a look at that.

3    A    No, I remember the interview.

4    Q    Yeah.  You showed Ms. Belisle a photograph of Mr. Barnum,

5    right?

6    A    Yes.

7    Q    During this exchange, right?

8    A    Let me make sure which one it is.

9    Q    Yeah.  Look about line 20 or 21 there.

10   A    Okay, yeah, this is -- yeah, the second about --

11   Q    Yeah.

12   A    -- yeah, Mr. Barnum.

13   Q    And you had -- you made reference to an earlier interview

14   where you had met her at the airport, right?

15   A    Yes.

16   Q    And shown her another picture or maybe the same picture of

17   Mis --

18   A    The same picture.

19   Q    Yeah.  Is it similar to the picture that's in -- we have

20   marked here?

21   A    I'm not sure which one you had marked.

22   Q    Okay.  It's a head shot of Mr. Barnum.

23   A    You have one -- if it's the one from your opening, then

24   no.  Because that one's cropped to make him look a little more

25   evil than he normally does.  But, yeah, it -- it's -- it's Mr.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 22 of 206
(720) 384-8078   attrans@sbcglobal.net

1   Barnum.

2   Q    Okay.  It's a picture of Mr. Barnum with the tattoos all

3   over him.   Right?

4   A    Yes.

5   Q    Okay.  And so you showed her a picture on there -- at the

6   airport interview, she had said she didn't know him.  Right?

7   A    Yes.

8   Q    And at the September 4th interview, you were coming --

9   kind of doing a followup on that.  Right?

10  A    Yes.

11  Q    And the reason -- and so you showed her the picture again.

12  Right?

13  A    Yes.  Well, I think I did.  Yeah.

14  Q    And you asked her whether she -- again, whether she knew

15  Mr. Barnum?

16  A    That's correct.

17  Q    And the reason you were doing a followup is because Mrs.

18  Belisle had indicated to you that Hannah Belisle did know him,

19  right?

20  A    Not -- I wouldn't say knew him.  She said she thought she

21  may have met him before.  But as far as knowing him, no, I

22  don't believe so.

23  Q    Okay.  So Mrs. Belisle told you that she thought that

24  Hannah had met him?

25  A    She thought it was possible, yeah.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 23 of 206
(720) 384-8078   attrans@sbcglobal.net

1 Q   Well, let me direct your attention to page D6316, which is

2 page 3 of the interview, at lines 9 through 10.  Do you recall

3 that during your interview of Hannah Belisle, you said, "I'm

4 sorry, your mom must have got her wires crossed, because she

5 told me you actually had met him"?

6 A   Yes, I said that.

7 Q   That's what you told Ms. Belisle?

8 A   Yes -- no, that's -- what -- Hannah, yes.

9 Q   Yeah.  Is that true?

10 A   That I told her that?  Yeah.

11 Q   Is it true that Mrs. Belisle told you you actually had met

12 him -- that Barnum had actually met him?

13 A   That Hannah had met Barnum?

14 Q   Yeah.

15 A   She thought that that might have been possible, yeah.

16 Q   I know you said you thought it might have been possible,

17 but that's not what you said here in this interview, is it?

18 A   No.

19 Q   You said "Because she told me you actually had met him."

20 That's what you told Hannah.

21 A   She thought she might have met him, yes.  I don't know

22 that she knew for sure.

23 Q   Okay.  But that's what you told Hannah?

24 A   That -- oh, yeah.  Sometimes we say things in

25 interviews -- we don't actually phrase them exactly the way,

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 24 of 206
(720) 384-8078   attrans@sbcglobal.net

1  you know, we hear them, because we want to give people the

2  impression we know things that we may not know.  So I wanted

3  her to think that I knew that, that -- even though that may not

4  have been the verbiage that Ms. Belisle used.

5      MR. OFFENBECHER:  Okay, I don't have any other

6  questions, Your Honor.

7      THE COURT:  Okay.  Any redirect?

8      MS. LOEFFLER:  No, Your Honor.

9      THE COURT:  Okay.  All right.  Well, thank you.  I'm

10 going to stick with my earlier ruling.  I think it's just too

11 much of a stretch, it's collateral, and I'm not going to allow

12 that testimony, for the reasons I articulated in my written

13 opinion.

14     MR. OFFENBECHER:  I'm certainly not going to quibble

15 with the Court.  I just want to -- just in terms of the

16 rationale for it, it seems to me that there's a fair inference

17 to the jury that they can decide whether Ms. -- Mrs. Belisle

18 knew that Hannah had met Jason Barnum.  I think that's a fair

19 inference to the jury, that even though Mrs. Belisle cannot

20 remember it today, and as her memory has failed her on that

21 issue, that the most likely person to have talked with her

22 about Jason Barnum is her daughter.  And the reason that she

23 was concerned about it is because her daughter was involved

24 with the druggies at Jackson Trailer Park, and that a fair

25 inference from this -- although everyone is having it -- a

1  failure of memory at the present time -- that the jury could

2  easily conclude both that Hannah Belisle told her mother that

3  she knew Jason Barnum and had met Jason Barnum, that Mrs.

4  Belisle told the special agent that she had met Jason Barnum.

5  That's clearly what he said in the interview.  He said that

6  directly, without any equivocation.  The jury ought to be able

7  to hear that, to decide whether it's true, and that we ought to

8  be able to put on the Jason Barnum testimony based on that.

9       THE COURT:  Okay.  Mr. Barnum denied knowing them, they

10  denied knowing him.  There's just no evidence of any contact

11  between those parties.  I think I laid it out pretty well in my

12  written memorandum.

13      MR. OFFENBECHER:  And the fact that -- excuse me, Your

14  Honor.  The fact that they -- that Hannah Belisle has denied it

15  and told the agent that she didn't, denied it on the stand.

16  Again, she's admitted that she lied to the agent on some other

17  issues.  If she lied to him on this, it would be very

18  important.

19      THE COURT:  Okay.  All right.  Are you ready with your

20  next witness, then?

21      MS. LOEFFLER:  Yeah.  Let me just -- my first witness

22  is Mrs. Belisle, so I just want to make sure (indiscernible) --

23      THE COURT:  Okay, can I bring the jury in?

24      MS. LOEFFLER:  Yeah.  Absolutely.

25      THE COURT:  Okay.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 755  Filed 09/23/14  Page 26 of 206
(720) 384-8078  attrans@sbcglobal.net

1          MR. OFFENBECHER:  Oh, Your Honor, one thing we should

2    take up.

3          THE COURT:  Yes.

4          MR. OFFENBECHER:  Maybe up -- let me just talk with

5    these folks.  Can I talk to counsel?

6          THE COURT:  Yeah.  You --

7          MS. LOEFFLER:  Are we bringing the jury right in?

8          THE COURT:  Yes.

9          MS. LOEFFLER:  Okay.

10          THE COURT:  Oh, what -- what's going on?

11     (Side conversation)

12     (Jury present)

13          THE COURT:  Well, good morning.  Please be seated.

14    We're moving on down the road.  Are we ready to go?

15          MS. LOEFFLER:  I think Mr. Offenbecher has something he

16    wants to bring up here.

17          THE COURT:  Okay.

18     (At sidebar with the Court and counsel)

19          THE COURT:  Okay.

20          MR. OFFENBECHER:  Your Honor, I've just asked Ms.

21    Loeffler if -- that Mrs. Belisle take -- she's got a button

22    with her husband's picture on it, and (indiscernible).  She's

23    been wearing it (indiscernible) big deal of it, but it's not

24    appropriate for her to have that on her (indiscernible).  I

25    think Ms. Loeffler agrees that Mrs. Belisle (indiscernible)

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 755  Filed 09/23/14  Page 27 of 206
(720) 384-8078  attrans@sbcglobal.net

1  having a picture of the decedent on their (indiscernible) is

2  just not -- it's prejudicial for the jury.

3      MS. LOEFFLER:  Your Honor, I know it's really important

4  to her.  We've put in the picture of her husband.  I don't

5  think anybody doubts that she's a grieving widow, so I don't

6  know how it's prejudicial.  I made sure that Hannah did not

7  have any such thing on.  And this is, like, a huge deal to her.

8  I just don't see how this --

9      THE COURT:  I can't see -- I can't even see the

10  picture.

11      MR. OFFENBECHER:  The jury (indiscernible) --

12      MS. LOEFFLER:  There's no --

13      MR. OFFENBECHER:  -- button this big right here on her

14  left lapel.

15      THE COURT:  (Indiscernible) --

16      MR. OFFENBECHER:  She can just put it in her pocket and

17  put it back on when she sits down.  That's (indiscernible).

18  (Indiscernible) the jury there couldn't be anything worse than

19  a picture of her dead husband on her lapel.  (Indiscernible) --

20      THE COURT:  Okay, just have her take her coat

21  (indiscernible) off.

22      MS. LOEFFLER:  Okay.

23      THE COURT:  And then she can put it back on.

24      MS. LOEFFLER:  Right.

25      THE COURT:  If this -- (indiscernible) she says

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 755  Filed 09/23/14  Page 28 of 206

1  (indiscernible).

2        MS. LOEFFLER:  Yeah.

3        THE COURT:  Okay.

4        MS. LOEFFLER:  I'll try to -- let's just --

5        THE COURT:  Try to calm her down.

6        MS. LOEFFLER:  Can you just give me a minute to calm

7  her down?

8        THE COURT:  Okay.

9        MS. LOEFFLER:  Okay.

10        THE COURT:  I understand how she feels, but --

11        MS. LOEFFLER:  Yes.

12        THE COURT:  -- why mess up the whole trial over

13  something --

14        MS. LOEFFLER:  No, I understand.  And I'm just trying

15  to --

16        MR. OFFENBECHER:  (Indiscernible).

17        MS. LOEFFLER:  You need to just give me a minute to

18  calm her down.

19        MR. OFFENBECHER:  (Indiscernible).

20        MS. LOEFFLER:  Yeah, that's (indiscernible).

21        MR. OFFENBECHER:  Yeah, (indiscernible).

22        MS. LOEFFLER:  Or do you want to (indiscernible) --

23        THE COURT:  Well, if she can do it --

24        MS. LOEFFLER:  Just give me a minute.

25        THE COURT:  -- quickly --

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 755  Filed 09/23/14  Page 29 of 206
(720) 384-8078  attrans@sbcglobal.net

1          MS. LOEFFLER:  Yeah.

2          THE COURT:  -- then do it quickly.  Otherwise, --

3          MS. LOEFFLER:  Otherwise, we'll call somebody else

4  first.

5          MR. OFFENBECHER:  Whatever you want to do.

6          MS. LOEFFLER:  Okay, I'll do that.

7       (End of sidebar)

8          THE COURT:  Okay, we're still on schedule, like I said

9  before.  I've got a list of potential witnesses here today.

10 And the government's trying to -- who's got the next witness?

11 Is that yours?

12         MS. DUIGNAN:  Ms. Loeffler --

13         THE COURT:  Oh, she's --

14         MS. DUIGNAN:  The next witness after.

15         MS. LOEFFLER:  Oh, I (indiscernible) too, Your Honor.

16         THE COURT:  Okay.  All right.

17         MS. LOEFFLER:  Give me just a minute.

18         THE COURT:  All right.  Go.

19         MS. LOEFFLER:  I promise, I'll be right back.

20         THE COURT:  Okay.  All right.  Have some water.  Make

21 yourself comfortable.  Go off the record.

22         THE CLERK:  Off record.

23      (Off record at 9:16 a.m.; on record at 9:17 a.m.)

24      (Jury present)

25         THE COURT:  All right, ma'am.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 755  Filed 09/23/14  Page 30 of 206

BELISLE - DIRECT

1        THE CLERK:  On record.

2        THE COURT:  We're not going to swear her in again.

3   She's still under oath, because she's been -- testified

4   earlier.  So you can just be seated, ma'am.  You want to get

5   her name, though, for the record?

6        THE CLERK:  Okay.  Ma'am, if you can please state your

7   name.

8        **NICOLA ANNE BELISLE, PLAINTIFF'S REBUTTAL WITNESS**

9                        **PREVIOUSLY SWORN**

10       THE WITNESS:  Nicola Belisle.

11       THE COURT:  All right.  Counsel.

12                    **DIRECT EXAMINATION**

13  BY MS. LOEFFLER:

14  Q    Mrs. Belisle, where was your daughter the night before

15  your husband was murdered?

16  A    She -- she came home about 9:30, 10 o'clock that night.

17  Q    Did she spend the night at home?

18  A    Yes.

19  Q    Do you have any doubt about that?

20  A    No.  Because I woke her up for school the next morning.

21  When Hannah goes to sleep, Hannah's asleep.

22  Q    That's all I have.  Thank you.

23       THE COURT:  Okay.  Cross-examination.

24       MR. OFFENBECHER:  No questions, Your Honor.

25       THE COURT:  Thank you, ma'am.  You're excused.  The

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 31 of 206
(720) 384-8078   attrans@sbcglobal.net

1 government's next witness.

2     (Witness excused)

3     (Side conversation)

4     MS. DUIGNAN:  The government calls Judy Pletnikoff to

5 the stand.

6     THE COURT:  Okay.  All right.  Come on forward, this

7 way.  And you can just kind of make your way up, come around

8 here.  That door pulls out, that little door -- swinging door

9 pulls out.  Step in the witness box.  Just stay standing for a

10 second.  She'll swear you in.

11     THE CLERK:  Please raise your right hand.

12     **JUDY PLETNIKOFF, PLAINTIFF'S REBUTTAL WITNESS, SWORN**

13     THE CLERK:  Thank you.  Please have a seat.  And,

14 ma'am, if you can please state and spell your full name.

15     THE WITNESS:  My name's Judy Pletnikoff.  Do you want

16 me to spell my first name?

17     THE CLERK:  Yes.

18     THE WITNESS:  J-u-d-y, P-l-e-t-n-i-k-o-f-f.

19     THE CLERK:  Thank you.

20     THE COURT:  All right.  Counsel.

21                     **DIRECT EXAMINATION**

22 BY MS. DUIGNAN:

23 Q    Mrs. Pletnikoff, good morning.

24 A    Hi.

25 Q    In what city and state do you live?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 755  Filed 09/23/14  Page 32 of 206
(720) 384-8078  attrans@sbcglobal.net

1 A    Kodiak, Alaska.

2 Q    And how long have you lived in Kodiak?

3 A    Twenty-five years.

4 Q    Do you know the Wells family?

5 A    I do.

6 Q    And how do you know them?

7 A    Nancy and I met through work.  I have -- my two youngest

8 sons, one has autism and the -- we adopted a young infant with

9 fetal alcohol syndrome after that.  And Nancy provided them

10 services through the Infant Learning Program at KANA.  And we

11 worked together.

12 Q    And how long have you known Nancy Wells?

13 A    Twenty -- just a minute.  Twenty -- a little over twenty

14 years.

15 Q    And would you consider yourself to be friends with her?

16 A    We worked together closely for -- for many years, and she

17 was a very close friend of mine.  We -- we probably could have

18 built small countries on the amount of work that we

19 accomplished.  I think we -- I think we did really well.  And

20 was a very good friend.

21 Q    Did you used to do things for one another?

22 A    Oh, sure.  I think she probably did more for me.  She's a

23 very giving person.  She taught me a lot about how to get

24 services and provide services for disabled people.  She helped

25 us create a school program for autism and a adult services

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 755  Filed 09/23/14  Page 33 of 206
(720) 384-8078  attrans@sbcglobal.net

1  program, which I'm now on the board of the nonprofit that

2  provides adult services for individuals with disabilities.  So,

3  yeah, we did a lot together, both socially and businesswise.

4  Q    And what kind of things would you do for her?

5  A    Well, I -- I wanted her to be healthy, so we walked.  And

6  we walked and we talked and we walked and we talked a lot.  I

7  guess that was my -- my contribution.

8  Q    Would you ever take care of her car in any way?

9  A    Oh, yeah.  And we traveled -- we also traveled together,

10  and so that put us a lot of time together.  Yes, I did.  I used

11  to -- after the kids grew up, her children -- her children are

12  older than ours -- she travels so much for work and her husband

13  also travels a lot, that there was a problem about the --

14  leaving the car at the airport, which she originally would put

15  in long-term parking.  And then her windows got broken out, so

16  after that I always took care of her car.  I did it for a

17  couple years.  She would let me know when I needed to move it

18  and I would move it until she came back, and then I would put

19  it back for her.

20  Q    Okay.  So what was the practice about -- you would move

21  the car home?  She would let you know when she was leaving

22  town?

23  A    Oh, Nancy was very conscientious.  She would let me know

24  ahead when she was going on a trip, which I usually knew

25  anyway.  And then she would call me before she went.  She would

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 755  Filed 09/23/14  Page 34 of 206
(720) 384-8078  attrans@sbcglobal.net

1  call me from the airport in Kodiak when she was there and tell

2  me I had two hours to move her car, and I would take it

3  offsite.  And then she would call me when she got to Anchorage

4  and make sure I had done it.

5  Q    Okay.

6  A    So she was really good about taking care of it.

7  Q    Do you recall the week of April 10th, 2012?

8  A    Yeah.

9  Q    The --

10  A    Uh-huh (affirmative).  Uh-huh (affirmative).

11  Q    -- because of what happened?

12  A    Uh-huh (affirmative).

13  Q    Did you ever get any requests from her to deal with the

14  car?

15  A    No, not at that time, because Jim was in town, so that

16  would have been -- the job would have fallen on him.

17  Q    Okay.  Did -- do you have -- you mentioned Jim.  You were

18  talking about Jim Wells?

19  A    Yes.

20  Q    Did you ever have any opportunity to spend any time with

21  him?

22  A    The -- the strong friendship was between Nancy and I, and

23  by extension, our families became acquainted as well.

24  Q    And how long would you say you've known him?

25  A    Well, probably somewhat as long as I've known Nancy,

1  although maybe I didn't meet him as early.  I'd say it has to

2  be close to 20 years.

3  Q   And would you say that you knew him both before and after

4  the murders?

5  A   Oh, yes.

6  Q   Was there a time at which you observed any change in his

7  behavior?

8  A   Well, I did.  I -- I -- in hindsight, I think it was

9  earlier, but when it was -- it began earlier, because he was a,

10  you know, fine, upstanding baseball coach kind of guy.  But

11  there -- I -- in hindsight there was some change, but when it

12  really --

13          MR. CURTNER:  Your Honor, I'm going to --

14          THE WITNESS:  -- is remarkable --

15          MR. CURTNER:  I'm sorry.  At this point, I have to

16  object.  I think this is not rebuttal evidence.

17          MS. DUIGNAN:  If --

18          MR. CURTNER:  (Indiscernible) --

19          MS. DUIGNAN:  If I may make an offer, I will direct the

20  witness to the time that I'm talking about.  I believe it's

21  direct rebuttal, Your Honor.

22          THE COURT:  Okay.

23          MR. CURTNER:  Plus, I don't know if she's qualified to

24  talk about behavioral changes.

25          MS. DUIGNAN:  This is direct rebuttal to the

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 36 of 206
(720) 384-8078   attrans@sbcglobal.net

1  witnesses --

2          THE COURT:  Okay.

3          MS. DUIGNAN:  -- that Mr. Curtner called --

4          THE COURT:  Okay, direct --

5          MS. DUIGNAN:  -- on his case.

6          THE COURT:  Direct your test -- questions to the --

7  BY MS. DUIGNAN:

8  Q   Are you aware of when the defendant went to Shemya for

9  work?

10 A   I am.

11 Q   And you had seen him quite a lot before he left on that

12 Shemya trip.  Correct?

13 A   Oh, yes.

14 Q   And you saw him again after he returned from the Shemya

15 trip.  Right?

16 A   Many times.

17 Q   Did you notice any change in his behavior immediately upon

18 returning from that Shemya trip?

19 A   Yes, a remarkable change.

20 Q   Can you please describe what that was?

21         MR. CURTNER:  Again, Your Honor, the same objection.

22         THE COURT:  Overruled.  She can testify as to what she

23 saw.

24         MR. CURTNER:  Thank you.

25 BY MS. DUIGNAN:

Case 3:13-cr-00008-SLG  Document 755  Filed 09/23/14  Page 37 of 206

**PLETNIKOFF - DIRECT**

1  Q    What did you see?

2  A    He appeared frustrated.  There was some inappropriate

3  behavior.  And maybe, like, a -- a lot of tension.

4  Q    And did he make -- had you met anybody that he knew from

5  work at any point?

6  A    I met the girls.  I really didn't know -- I know Nicola.

7  I did not know Rich or Mr. Hopkins.  I don't know any of the

8  men.  I do -- I did meet the girls.

9  Q    And was there a time that you gave both Jim and Nancy

10 Wells a ride to the airport after the murders?

11 A    The last time I gave them a ride to the airport was when

12 they were going to Nevada for the weekend, which was well after

13 the murders.

14 Q    And can you describe whether Mr. Wells had any type of

15 behavioral issues that you noticed at that time?

16        MR. CURTNER:  Your Honor, objection.

17        THE COURT:  Just describe what you saw.

18        THE WITNESS:  What happened was he asked me if the FBI

19 had called, made any more calls to my house, and I responded

20 they had.  And he asked what I did.  And he said -- and I spoke

21 to the FBI.  He said, "I told" --

22        THE COURT:  I -- now, I don't want hearsay, though.

23        MS. DUIGNAN:  This is what the defendant said, Your

24 Honor.

25        THE COURT:  Okay.  I'm sorry, that's right.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 38 of 206
(720) 384-8078  attrans@sbcglobal.net

1          THE WITNESS:  I'm sorry, I lost my train of thought a

2    second.

3          THE COURT:  I -- my fault.  I --

4          MS. DUIGNAN:  That's okay, Your Honor.

5          THE WITNESS:  Just a second, I'll get it back.  Oh,

6    yeah.  So I -- I had spoken to the FBI.  And he said, "I told

7    you not to talk to them.  You're to slam down the phone if they

8    call."

9    BY MS. DUIGNAN:

10   Q    And how would you describe his demeanor at that point

11   compared to other times you had seen him?

12   A    I would describe it as -- as rage and kind of posturing.

13   He was behind me.  Nancy was next to me in the car.  He was

14   behind me and I was watching my rearview mirror.  And he was

15   getting big in the chair and yelling loud, so loud I rolled my

16   window down.  And I just didn't talk.  I said, "No."  That's

17   all I said.

18   Q    And how did that make you feel?

19   A    Intimidated.  Violated.  And very threatened.

20   Q    Thank you.  I have no further questions.

21          THE COURT:  Cross-examination.

22                    **CROSS-EXAMINATION**

23   BY MR. CURTNER:

24   Q    Good morning, Mrs. Pletnikoff.  We've talked before.  Is

25   that correct?

PLETNIKOFF - CROSS

1 A   Just briefly.

2 Q   Your husband is Bob Pletnikoff.  Is that correct?

3 A   Robert.

4 Q   Robert.  You and your husband have been good friends with

5 the Wells and the Penningtons and the Carvers, or -- who else?

6 A   That's actually not true.  I wouldn't characterize it like

7 that.

8 Q   Do you know the --

9 A   I've been very close friends with Nancy.  We've been

10 acquainted -- the Penningtons, we only are acquainted.  We've

11 only seen them maybe a few times.  Very nice people.  But I

12 wouldn't -- I've never seen them except for at Jim and Nancy's

13 house.

14 Q   Okay.

15 A   And the Carvers, also very nice.  But I wouldn't

16 characterize it as a friendship, because I just don't know

17 them.

18 Q   You've socialized -- you and your husband socialized with

19 those families as well, correct?  Just couples?

20 A   Only at the Wellses' house.  We've never socialized with

21 them outside of that venue.

22 Q   Now, I assume you didn't take care of Nancy's car at the

23 park -- when -- every time she traveled.  Is that right?

24 A   Most every time.  Not when Jim as in town.

25 Q   Yes, not when Jim was in town, right.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 755  Filed 09/23/14  Page 40 of 206
(720) 384-8078  attrans@sbcglobal.net

PLETNIKOFF - CROSS

1  A    And I think she once might have had somebody else do it

2  because I was unavailable.  But I was pretty much the primary

3  car parker.

4  Q    And this last time you were taking them to the airport,

5  did you know what type of things that happened to Mr. Wells

6  during this investigation, all of the searches about his place,

7  being accused in the community about being the murderer?  Are

8  you aware of all those things that were happening to him at

9  that time?

10 A    I know what I read in the paper.

11 Q    Thank you.

12         THE COURT:  Recro -- redirect.

13         MS. DUIGNAN:  No other questions, Your Honor.

14         THE COURT:  Thank you, ma'am.  You're excused.  The

15 government's next witness.

16    (Witness excused)

17         MS. DUIGNAN:  The government calls Joe Francisco to the

18 stand.  It's straight up to the box, and there's a door that

19 pulls out.

20         THE COURT:  That's what I'm supposed to tell him.

21         MS. DUIGNAN:  I'm sorry, Your Honor.

22         THE COURT:  That door pulls out.  Remain standing there

23 for a second, and she'll swear you in.

24         THE CLERK:  Okay, sir, please raise your right hand.

25    **JOSEPH OLIVER FRANCISCO, PLAINTIFF'S REBUTTAL WITNESS, SWORN**

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 755  Filed 09/23/14  Page 41 of 206
(720) 384-8078  attrans@sbcglobal.net

FRANCISCO - DIRECT

1    THE CLERK:  Okay, thank you.  Please have a seat.  And,
2    sir, if you can please state and spell your full name.
3    THE WITNESS:  Joseph Oliver Francisco.  J-o-s-e-p-h, O-
4    l-i-v-e-r, F-r-a-n-c-i-s-c-o.
5    THE CLERK:  Thank you.
6    THE COURT:  All right, counsel.
7                        **DIRECT EXAMINATION**
8    BY MR. DUIGNAN:
9    Q    Good morning, Mr. Francisco.   In --
10   A    Good morning, ma'am.
11   Q    In what city and state do you currently live?
12   A    Kodiak, Alaska.
13   Q    And how long have you lived in Kodiak?
14   A    Since 1997.
15   Q    What job do you have right now?
16   A    I work for Alaska Aerospace, Kodiak Launch Complex.
17   Q    And before that, did you ever serve in the Coast Guard?
18   A    Yes, ma'am.
19   Q    And for how long?
20   A    Twenty-one years.
21   Q    And, presumably, you retired from the Coast Guard?
22   A    Yes, ma'am, in 2003.
23   Q    And at what rank did you retire?
24   A    Chief petty officer.
25   Q    And what was your rating?

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net

**FRANCISCO - DIRECT**

1  A    IT chief.  At that time I was -- was -- been a TT chief,

2  but the rate changed, so I retired as a TT chief.

3  Q    Okay.  And an IT or a TT chief, can you explain what that

4  rating means?

5  A    It's telecommunications.  So we took care of computer

6  systems and the comm systems and telecommunications circuits

7  and stuff like that.

8  Q    Was there a time where you ever worked at the

9  communication station in Kodiak, Alaska?

10  A    Yes, ma'am, from 1997 to 2003.

11  Q    And what was your position there?

12  A    I was in charge of the rigger shop.

13  Q    And for that entire time?

14  A    Yes, ma'am.

15  Q    Do you know the defendant?

16  A    Yes, I do.

17  Q    And how do you know him?

18  A    He worked for me from '97 to 2003.

19  Q    And when he worked for you at the shop, was there ever an

20  opportunity for you to do work off hours in the shop?  Did you

21  ever use the shop for things other than work?

22  A    Yes, we -- we did minor work in the shop, woodwork and

23  stuff like that, and personal things that we were authorized to

24  do.

25  Q    And was there any authorization to ever work on cars in

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 43 of 206
(720) 384-8078   attrans@sbcglobal.net

**FRANCISCO - DIRECT**

1  the shop?

2  A    Well, we did.  We did.  We did work --

3          MR. CURTNER:  Excuse me, Your Honor.

4          THE WITNESS:  -- minor work.

5          THE COURT:  Yeah.

6          MR. CURTNER:  Can we approach?

7      (At sidebar with the Court and counsel)

8          THE COURT:  Yes.

9          MR. CURTNER:  Your Honor, this is not rebuttal

10 evidence.  This is their case in chief, part 2.

11          THE COURT:  (Indiscernible).

12          MR. CURTNER:  And --

13          THE COURT:  (Indiscernible) got your point.

14          MS. DUIGNAN:  May I reply?  This is direct rebuttal.

15 They put on a tire expert to talk about the fact that the alibi

16 was not false.  I think we're entitled to rebut the fact.

17          THE COURT:  (Indiscernible).  You're saying that

18 (indiscernible) and how is it rebuttal?

19          MS. DUIGNAN:  It's rebuttal because they've put on a

20 tire expert to talk about the fact that the tire picked up the

21 nail naturally and therefore the alibi couldn't have been

22 false.

23          THE COURT:  (Indiscernible) --

24          MS. DUIGNAN:  We want -- we're entitled to point out

25 the fact that the defendant changed tires and worked on tires

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 755  Filed 09/23/14  Page 44 of 206
(720) 384-8078  attrans@sbcglobal.net

1  before in the shop before with this man.

2      MR. OFFENBECHER:  (Indiscernible) case in chief.

3  (Indiscernible) witnesses in their case in chief

4  (indiscernible) testified they would change their tires in the

5  shop.  They --

6      THE COURT:  I -- I'm still having a hard time --

7      MS. DUIGNAN:  Well --

8      THE COURT:  -- seeing how it's rebuttal.

9      MS. DUIGNAN:  -- because he will actually talk about

10  the fact that you can repair them, not just change them.  And I

11  believe in their case in chief that they were disputing the

12  fact that that was possible.

13      MR. OFFENBECHER:  We didn't -- introduced any evidence

14  on that.  We didn't introduce one scrap of evidence.  They

15  tried to introduce -- they've been trying to introduce evidence

16  from their direct that you could change your tires

17  (indiscernible).

18      THE COURT:  Okay.  (Indiscernible).

19    (End of sidebar)

20      THE COURT:  I don't know if they have more questions or

21  not.

22      MS. DUIGNAN:  I do.

23      THE COURT:  Okay.

24  BY MS. DUIGNAN:

25  Q    You said you knew the defendant.  Did you also know

1   Commander Tlapa?

2   A    Yes, I did know Greg Tlapa.

3   Q    And at that time, what was his rank?

4   A    I think he was a lieutenant at that time in Juneau.

5   Q    And how did you know him?

6   A    He was a person we dealt with for certain antenna projects

7   and stuff like that, so he was our sort of (indiscernible).

8   Q    Okay.  And did you ever notice interaction between the

9   defendant and then-Lieutenant Tlapa?

10  A    Yes, I did.  Excuse me.

11  Q    And how would you describe the interaction he had with the

12  lieutenants who worked in Juneau as opposed to the interaction

13  he had with people with the rigger shop?

14  A    Well, it was different.  It was totally different.  One of

15  the concerns I had as a new chief in the shop was that I was in

16  charge --

17       MR. CURTNER:  Your Honor, I'm sorry.  Again, I don't

18  see how this is rebuttal evidence.

19       MS. DUIGNAN:  They called three prior lieutenants.  I

20  believe this is direct rebuttal, Your Honor.

21       THE COURT:  It sounds like rebuttal.

22  BY MS. DUIGNAN:

23  Q    Can you please answer?  Sorry, Mr. Francisco.  So how --

24  what was the difference between the defendant's interaction

25  with those lieutenants from the CEU Juneau that they called in

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 755  Filed 09/23/14  Page 46 of 206
(720) 384-8078  attrans@sbcglobal.net

1  this case and the interactions between the people who worked in
2  the rigger shop?
3  A   Well, it -- it was more direct with Juneau and Jim than it
4  was with Jim and I.
5  Q   Okay.  Did you notice any different interactions between
6  how the defendant was at work as opposed to in a social
7  setting?
8  A   Yes.  It -- it was different between Jim and I at work and
9  in a social setting.
10 Q   And can you please describe that?
11 A   Well, in a social setting, outside, when I would see Jim,
12 we were cordial with each other, and we often laughed about
13 that fact that I didn't like Kodiak as much as I did.  But at
14 work it was totally different between us, supervisor and -- and
15 employee was different, very different.
16 Q   Was there a time that you ever directly challenged him in
17 any way?
18     MR. CURTNER:  Objection, Your Honor.  We're going back
19 to 2003.  I don't see how this is rebuttal evidence.  This is
20 actually before --
21     MS. DUIGNAN:  2004 to --
22     MR. CURTNER:  -- 2003.
23     MS. DUIGNAN:  Two thou -- yeah, I was about to say it's
24 actually the same period of time that Mr. Curtner called his
25 witnesses, so it's direct rebuttal.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 47 of 206
(720) 384-8078   attrans@sbcglobal.net

1      THE COURT:  Overruled.

2      THE WITNESS:  I'm sorry, could you repeat the --

3  BY MS. DUIGNAN:

4  Q    Do you recall the Buoy Tender Roundup?

5  A    Yes, ma'am, I do.

6  Q    And can you please describe what happened?

7  A    Well, at the COMMSTA, we were -- we were in the middle of

8  antenna recap projects.  There was a lot of things that we

9  needed to do at the COMMSTA.  And I think Jim was wanting to go

10 to the Buoy Tender Roundup, and he and I -- conversation was

11 that I didn't think he should go because we had things to do.

12 But he had already spoken to Juneau, and I guess they had

13 already approved it.  So that was a -- a -- a pretty tense

14 situation between us.  And I think he spoke to my supervisor,

15 so he went above me.  And my supervisor had already notified

16 him that I was not going to allow that.

17     So when Jim got the word that he could not do that, he

18 came back down to the shop, and it was very heated between he

19 and I, to the point where, I mean, we were real close, and I

20 mean, he kind of -- he was very upset, and he really stared me

21 down for a while and he -- he challenged that I had no right to

22 cancel that trip.  And I told him that I had every right to

23 cancel that trip.  And I had spoken to my supervisor.  So he

24 actually went around me to speak to him, and he gave him the

25 same information, was to do that.  So Jim came out of the shop,

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 48 of 206
(720) 384-8078   attrans@sbcglobal.net

1  and it was pretty heated between the two of us.

2  Q    Did you know Rich Belisle at all?

3  A    Yes, I did.

4  Q    And how did you know him?

5  A    I knew him when he was working for MilPol as chief.  So I

6  knew him prior to the COMMSTA.

7  Q    At the time that you were working at the COMMSTA, how many

8  civilians were working in the rigger shop?

9  A    Jim was the only civilian in the rigger shop.

10 Q    Okay.  And when was Rich Belisle hired?

11 A    Rich Belisle was hired after I left the -- the rigger

12 shop.

13 Q    Did you stay in touch with people from the rigger shop

14 after you left?

15 A    Yes, I did.  I would occasionally see Jim and Rich in the

16 airport, going on trips and traveling together.  So I did.

17 Q    And when Rich was first hired, how would you describe the

18 interaction between Rich Belisle and Jim Wells?

19 A    Oh, they -- they got along well.  They got along real

20 well, at -- at -- most of the time when I saw them in the

21 airport, they were going off and they were doing well together.

22 Q    And was there a time where you observed that relationship

23 change?

24 A    Yes, it was.  I went over to the COMMSTA at the -- in

25 November or December of the year prior to this, and we were

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 49 of 206
(720) 384-8078   attrans@sbcglobal.net

1  going to procure some equipment from the COMMSTA for the launch

2  site.  And Jim was not there.  I think he was out sick.  But

3  when I was talking to Rich, at that --

4          MR. CURTNER:  Objection, Your Honor.  This is going to

5  be hearsay.

6          MS. DUIGNAN:  You know, I'll ask your impression.

7          THE COURT:  (Indiscernible).

8  BY MS. DUIGNAN:

9  Q    So what was your impression as a result of that

10  conversation?

11          MR. CURTNER:  Your Honor, an impression based on

12  hearsay.

13          MS. DUIGNAN:  It's not based on hearsay.  It's based on

14  what he saw.

15          THE WITNESS:  I was -- I was at the rig --

16          THE COURT:  Okay, let me just say this.  Don't say what

17  anybody said to you.

18          THE WITNESS:  No --

19          THE COURT:  You can say your impressions.

20          THE WITNESS:  I was at the rigger shop, talking to

21  Rich --

22          THE COURT:  Okay.

23          MS. DUIGNAN:  Okay.

24          MR. CURTNER:  Well --

25          THE WITNESS:  -- Belisle.  I was at the rigger shop,

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 755  Filed 09/23/14  Page 50 of 206
(720) 384-8078  attrans@sbcglobal.net

**FRANCISCO - DIRECT**

1  talking to Rich.  And prior to that, Rich -- conversation and

2  I -- about Jim in the shop was --

3  　　　MR. CURTNER:  Your Honor, I'm sorry, why -- how is this

4  not hearsay?  He's testifying about his conversation with Mr.

5  Belisle.

6  　　　THE COURT:  Well, if it begins with "He told me," then

7  it's hearsay.

8  　　　MS. DUIGNAN:  It's going to be based --

9  　　　THE COURT:  If it begin -- if it's "My impression after

10 that," then he can tell his impressions.  We always make that

11 distinction.

12 　　　MS. DUIGNAN:  As a result --

13 　　　THE COURT:  But it has to be based on observations, not

14 "He told me."  Do you understand?

15 　　　THE WITNESS:  Yes, sir.

16 　　　THE COURT:  Okay.

17 BY MS. DUIGNAN:

18 Q   Okay.  So as a result of that conversation, based on

19 demeanor and everything you had observed, what was your

20 impression about the relationship between Mr. Belisle and Mr.

21 Wells at that point?

22 A   Rich was very shut down.  He didn't say much at a -- not

23 to me at all.  I asked about Jim personally, where was Jim, how

24 things were going, and --

25 　　　MR. CURTNER:  Objection, Your Honor.

1        THE WITNESS:  -- he said nothing.

2        THE COURT:  Okay.

3   BY MS. DUIGNAN:

4   Q    And saying nothing to you, is that a change from what you

5   had observed before?

6   A    A big change.

7   Q    Thank you.  I don't have anything further.

8        THE COURT:  Okay.  Cross-examination.

9                    **CROSS-EXAMINATION**

10  BY MR. CURTNER:

11  Q    Just a few questions, Mr. Francisco.  Now, you knew Rich

12  Belisle when he was the chief at the military police.  Is that

13  correct?

14  A    Yes.

15  Q    How long was he the chief there?

16  A    I don't remember.

17  Q    Okay.  Do you know if he was there for some time while you

18  knew him?

19  A    Yes.

20  Q    A number of years?

21  A    Probably.

22  Q    Okay.  And do you know how long -- when he left as the

23  chief of police for MilPol?

24  A    No, I do not.

25  Q    And do you also know if he was with TACLET?  Do you know

1 what that is?

2 A    No.

3 Q    You know what --

4 A    I knew he was a boatswain mate, working at the LORAN

5 station at one point.

6 Q    Okay.  Do you know anything about law enforcement duties

7 at -- before he was a chief of military police?

8         MS. DUIGNAN:  Objection.  Beyond the scope.

9 BY MR. CURTNER:

10 Q    You can just -- this is the last question.  You can tell

11 me if you know --

12         THE COURT:  Okay.

13 BY MR. CURTNER:

14 Q    -- or you don't know.

15 A    I do not.

16 Q    Okay.  Thank you.

17         THE COURT:  All right.  Anything else?

18         MS. DUIGNAN:  No further questions, Your Honor.

19         THE COURT:  Thank you, sir.

20         THE WITNESS:  Okay, thank you.

21         THE COURT:  You're excused.

22         THE WITNESS:  Uh-huh (affirmative).

23     (Witness excused)

24         THE COURT:  The government's next witness.

25         MR. SCHRODER:  Ms. McEntee, come up to the front there

MCENTEE - DIRECT

1  on the right.  I'm not going to tell you how to get into the

2  box, though, because that's the judge's.

3       THE COURT:  Just keep coming.  When you get up here at

4  the corner, you take a hard right, then a hard left, and that

5  door pulls open, pulls out.  Okay, just step up into the box

6  and remain standing for a second.  She'll swear you in.

7       THE CLERK:  Please raise your right hand.

8  **SUSAN ANN MCENTEE, PLAINTIFF'S REBUTTAL WITNESS, SWORN**

9       THE CLERK:  Okay, thank you.  Please have a seat.  And,

10  ma'am, if you can please state and spell your full name.

11       THE WITNESS:  Susan Ann McEntee.

12       THE CLERK:  Spell your full name.

13       THE WITNESS:  S-u-s-a-n, A-n-n, M-c-E-n-t-e-e.  Thank

14  you.

15       THE COURT:  All right, counsel.

16                    **DIRECT EXAMINATION**

17  BY MR. SCHRODER:

18  Q   Ms. McEntee, where do you live?

19  A   I live in Kodiak.

20  Q   And what part of Kodiak do you live in?

21  A   Bells Flats.

22  Q   And where do you work?

23  A   I work at Providence Kodiak Island Hospital.

24  Q   And where in the area of Kodiak is the hospital?

25  A   Kodiak -- is in city limits in Kodiak.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

**MCENTEE - DIRECT**

1  Q   So how do you travel from your house to your job?  What's

2  the route?

3  A   I drive down Rezanof Drive.

4  Q   And do you do -- what do you do for a living for that

5  hospital?

6  A   I'm an OB nurse.

7  Q   And do you do day work or shift work?

8  A   I do day work.  It's from 7 a.m. to 7:30 p.m.

9  Q   And let me take you back to April 12th, 2012.  Is that a

10 day you remember?

11 A   It is, yes.

12 Q   And was your hospital work affected by the homicides that

13 happened on that day?

14 A   It was, in that the hospital was put in a lockdown.

15 Q   Okay.

16 A   So I had to talk to my patients about it.

17 Q   So you have a specific memory of that day?

18 A   I do.

19 Q   Now, when you do your work, what time -- you said you

20 start at -- what time did you say you start?

21 A   We have to clock in by 0700.

22 Q   Okay.  So what time do you leave work in the morning to

23 get there?

24 A   I leave the house about 7 -- or 6:25.

25 Q   Okay.  And do you believe that was the time you left that

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 55 of 206
(720) 384-8078  attrans@sbcglobal.net

**MCENTEE - DIRECT**

1  morning?

2  A   Yes.

3  Q   Okay.  And what kind of car do you drive?

4  A   I drive a 2006 bright-blue Ford Escape.

5  Q   Okay.  And why do you look -- have you look in ex -- at

6  exhibit marked 145A.

7  A   Okay.

8  Q   Can you see it on your screen there?

9  A   Yes.

10  Q   And have you seen this exhibit before?

11  A   Yes.

12  Q   All right.  Now, the lighting conditions are a bit dim,

13  but how does the car you see on screen compare to your car?

14  A   I would say it appears to be the same size and color of my

15  car.

16       MR. SCHRODER:  Okay.  And we're going to have

17  additional testimony on that photo.  I mean, I'm going to try

18  to admit it, counsel.  If you want to wait till we --

19       MR. CURTNER:  No, no problem.

20       MR. SCHRODER:  Go ahead and admit it?

21       MR. CURTNER:  No objection.

22  BY MR. SCHRODER:

23  Q   So I'm going to -- so that your -- that looks like your

24  car -- I'm going to ask for admission of 145A.

25       MR. CURTNER:  No objection.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 755  Filed 09/23/14  Page 56 of 206
(720) 384-8078  attrans@sbcglobal.net

1          THE COURT:  Will be received.

2      (Plaintiff's Exhibit 145A admitted)

3          MR. SCHRODER:  And we can -- like I say, we'll have

4  some additional testimony on that photo, though.  All right,

5  thank you, Ms. McEntee.  I have no further questions.  The

6  defense counsel may have questions for you.

7          MR. CURTNER:  No questions, Your Honor.

8          THE COURT:  All right, thank you, ma'am.

9          THE WITNESS:  Thank you.

10      (Witness excused)

11          THE COURT:  Government's next witness.

12          MS. LOEFFLER:  Special Agent Joe Sturgis.

13      **JOSEPH STURGIS, PLAINTIFF'S REBUTTAL WITNESS, SWORN**

14          THE CLERK:  Okay, thank you.  Please have a seat.  And,

15  sir, if you can please state and spell your full name.

16          THE WITNESS:  Joseph Sturgis.  J-o-s-e-p-h, S-t-u-r-g-

17  i-s.

18          THE CLERK:  Thank you.

19          THE COURT:  All right, counsel.

20                  **DIRECT EXAMINATION**

21  BY MS. LOEFFLER:

22  Q    Special Agent Sturgis -- actually, I'm going to go right

23  back to Government Exhibit 145A.  And if we can pull that back

24  up.  And that's the -- what's that a photo -- where is that

25  photo taken?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 755  Filed 09/23/14  Page 57 of 206
(720) 384-8078  attrans@sbcglobal.net

**STURGIS - DIRECT**

1  A    That is from the guard shack on the main base entrance.

2  Q    Okay.  And of the car that Ms. McEntee just testified

3  about?

4  A    Yes, ma'am.

5  Q    Now, at the bottom it says 6:53 a.m.  Is that the correct

6  time?

7  A    No, ma'am.  I earlier testified that there was an 18-

8  minute difference, so the correct time would be 6:35,

9  approximately.

10  Q    Okay.  6:35 in the morning, and what day?

11  A    12 April 2012.

12  Q    Okay.  And that's about how long after Ms. McEntee said

13  she probably would have left home in Bells Flats?

14  A    Seven to ten minutes, approximately.

15  Q    Okay.  Thank you.  Let me go -- oh, one other -- then

16  another area.  I don't think we ever asked anybody, in terms of

17  the drive from Bells Flats to the COMMSTA, what part of it's

18  paved and what's -- part of it's gravel.

19  A    Basically, the entire trip is paved except for an area in

20  Bells Flats.

21  Q    Okay.  So Rezanof and Anton Larsen are paved?

22  A    Yes, ma'am.

23  Q    And Bells Flats is not?

24  A    Correct.

25  Q    Okay.  Okay.  Now I want to turn to Exhibit 51, please.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 755  Filed 09/23/14  Page 58 of 206

**STURGIS - DIRECT**

1  Okay.  The map of the airport.  Did you do, as part of your

2  investigation, check around the areas of the airport as to what

3  buildings have cameras and what buildings don't?

4  A    Yes, ma'am.

5  Q    Can you explain that, please?

6  A    Well, immediately after sometime in that first week or so,

7  I went into each open business.  At the time, there was some --

8  one of the buildings that didn't -- that were not being used.

9  I went into the Comfort Inn; they had video there.  I went into

10  Island Air; they had video there.  I went into the Goldstreak

11  at Era Alaska terminal; they had video there, they had video

12  into the --

13       THE COURT:  Though -- what he's saying doesn't make any

14  sense to me.  Is he --

15       MS. LOEFFLER:  Oh, you want a --

16       THE COURT:  Without a pointer, I don't know what he's

17  talking --

18       MS. LOEFFLER:  What -- I'm sorry.

19       THE WITNESS:  Oh, I'm sorry.

20       MS. LOEFFLER:  Thank you, Your Honor.

21  BY MS. LOEFFLER:

22  Q    Let's grab a pointer and you can point out the places.

23  A    Yes, ma'am.

24       (Side conversation)

25  A    I first went here, to the Comfort Inn, and they had a

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net

**STURGIS - DIRECT**

1  security system, video there.  Island Air, which is this

2  building right here, also had a -- a video surveillance, closed

3  TV video-recording system.  This bay, this Goldstreak area, and

4  the terminal, inside of the terminal, had video.  And I believe

5  that was all the places in the airport area that had video.

6  Q    Did you go to Servant Air?

7  A    Yes, ma'am, I did.

8  Q    Did they have a videocamera inside?

9  A    No, ma'am.  Not that --

10 Q    Okay.

11 A    -- I saw.

12 Q    All right.  Now I want to go to a different area.

13      (Side conversation)

14      MS. LOEFFLER:  Just a minute, Your Honor.  I didn't --

15 this one, I missed the exhibit number.

16      (Side conversation)

17 BY MS. LOEFFLER:

18 Q    Okay.  Showing you what's been marked as Exhibit 50.  Can

19 you tell us what that is?

20 A    Yes, ma'am.  That's the -- that's Anton Larsen Road.  And

21 you can see the DOT building, you can see some of the rental

22 car area.  You also can see the -- the road that goes to Nimitz

23 and Lake Louise housing.

24 Q    Okay.

25 A    It's basically right before you can see Rezanof Drive,

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 60 of 206
(720) 384-8078   attrans@sbcglobal.net

1  coming from Anton Larsen Bay.

2        MS. LOEFFLER:  Okay.  I'd move Exhibit 50.

3        MR. OFFENBECHER:  I have no objection, Your Honor.

4        THE COURT:  It'll be received.

5     (Plaintiff's Exhibit 50 admitted)

6  BY MS. LOEFFLER:

7  Q    Now I'm going to -- without repeating any testimony of

8  anybody else, do you recall some testimony from Mr. Nelson

9  about a car seen near Bridge 6?

10 A    Yes, ma'am.

11 Q    Okay.  Did you actually see that vehicle yourself on the

12 date of the murder?

13 A    Yes, ma'am, I did.

14 Q    Where was it?  Can you point with your --

15 A    Right --

16 Q    Hopefully I pulled up one you can show.

17 A    Right there by Bridge 6.  It was parked nose in, right by

18 Bridge 6.

19 Q    Okay.  About what time did you see it?

20 A    Around 8:05 to 8:10 that morning.

21 Q    To the best of your ability, what kind of car was it?  To

22 your --

23 A    From what I remember of the vehicle, it was a Dodge Dakota

24 with a same-color cap on it.

25 Q    Why do you think it was that?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 755  Filed 09/23/14  Page 61 of 206
(720) 384-8078  attrans@sbcglobal.net

1  A   I've owned that style of vehicle before.  I've owned a

2  Dodge Durango, the 2000-year range.  And it was a -- a similar

3  Dakota of the Dodge Durango.  It had the same rounded shapes.

4  I've owned them, I've worked on them.

5  Q   Okay.  Now I'm going to turn to another subject.  We're

6  just flopping around from subject to subjects --

7  A   Yes, ma'am.

8  Q   -- Special Agent Sturgis, on a bunch of different things.

9  Turning to Exhibit 424.  Okay.  Now, Special Agent Sturgis, I

10 know you were here yesterday when we were -- saw a video of

11 some -- something with some light on it that the defense showed

12 by the COMMSTA.  Right?  You know what I'm talking about?

13 A   Yes, ma'am.

14 Q   Okay.  Can you tell us what Exhibit 424 is?

15 A   It is the camera on the T2 building, the rigger shop, and

16 it -- it displays part of the dumpster enclosure, the roof line

17 of the building.  It also displays the camera and the light

18 behind it.

19          MS. LOEFFLER:  I move Exhibit 424.

20          MR. OFFENBECHER:  Just one question.

21                         VOIR DIRE

22 BY MR. OFFENBECHER:

23 Q   When was this photograph taken, Special Agent Sturgis?

24 A   Recently.

25 Q   Recently --

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 62 of 206
(720) 384-8078   attrans@sbcglobal.net

1  A    I believe sometime in the last week.

2          MS. LOEFFLER:  I can follow up.  Was that --

3          MR. OFFENBECHER:  Yeah.  No questions.  Yeah, no

4  objection, Your Honor.

5          THE COURT:  Okay.

6      (Plaintiff's Exhibit 424 admitted)

7                    **DIRECT EXAMINATION, CONTINUED**

8  BY MS. LOEFFLER:

9  Q    Okay.  So if we can Exhibit -- put up Exhibit 424.  The

10  light -- could you point with the camera, the light right

11  above?  And just to be fair, was that light there in 2012 also?

12  A    Yes, ma'am.

13  Q    Okay.  And in terms of the evenings, are you aware whether

14  that light tends to be on or off?

15  A    The light would be on at night.

16  Q    Okay.  Now, have you reviewed the videos in this case for

17  how many hours?

18  A    Endless.

19  Q    Okay.  And, in fact, did you actually look last night at

20  the videos to determine whether there were things that you

21  could see illuminated by this light?

22  A    Yes, ma'am, I looked last night and many, many times

23  before.  I've -- I've seen a lot of different things on the

24  video.

25  Q    Did you pick out a couple of things showing that -- what

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 755  Filed 09/23/14  Page 63 of 206

**STURGIS - DIRECT**

1  things look like in front of a light?

2  A    Yes, ma'am, I have.

3       (Side conversation)

4  Q    Showing you what's been marked as Exhibit 426.  This is

5  a -- captured from the video what night?

6  A    It was April 10th, 2012 --

7  Q    Okay.

8  A    -- around 2:45, approximately, in the morning.

9       MS. LOEFFLER:  I'd move Exhibit 426.

10      MR. OFFENBECHER:  No objection.

11      THE COURT:  It'll be received.

12      (Plaintiff's Exhibit 426 admitted)

13 BY MS. LOEFFLER:

14 Q    Okay, and there's, like, a -- you know, something

15 illuminated at the bottom.  What's that?

16 A    Right here.  That's a fox that walked past the camera.

17 Q    Okay.

18      THE COURT:  That's a -- what did you say?

19      THE WITNESS:  A fox.

20      THE COURT:  Okay.

21 BY MS. LOEFFLER:

22 Q    It just appears as -- well, and what does it appear in the

23 video --

24 A    It looks like a white blob to me.

25 Q    Okay.

**STURGIS - DIRECT**

1  A    But viewing this video numerous times, I know it to be a

2  fox.

3  Q    Okay.  Turning to what's been marked as 425, there's a

4  part of a video which has not been admitted.  And I'll ask you

5  whether this is something that you pulled up last night.  You

6  want to play it?

7       (Side conversation)

8            MR. OFFENBECHER:  What's the number, counsel?

9            MS. LOEFFLER:  425.

10           THE WITNESS:  Yes, ma'am, it is.

11  BY MS. LOEFFLER:

12  Q    And what does the video show?

13           MS. LOEFFLER:  Well, actually, I'd move 425.

14           MR. OFFENBECHER:  Can you just run that, Karen --

15           MS. LOEFFLER:  Sure.

16           MR. OFFENBECHER:  -- one more time?

17           MS. LOEFFLER:  Can you click through it, uh-huh

18  (affirmative).  I'm sorry, do we have a -- I'd move 425.

19           THE COURT:  I'm waiting for them --

20           MR. OFFENBECHER:  Oh, no -- no objection, Your Honor.

21           THE COURT:  Okay, it'll --

22           MS. LOEFFLER:  Okay.

23           THE COURT:  -- be received.

24           MR. OFFENBECHER:  Yeah.

25           (Plaintiff's Exhibit 425 admitted)

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 755  Filed 09/23/14  Page 65 of 206
(720) 384-8078  attrans@sbcglobal.net

**STURGIS - DIRECT**

1  BY MS. LOEFFLER:

2  Q   Okay, we're going to play 425.  And can you just tell the

3  jury what you're seeing -- oh, sorry, it hasn't come up yet.

4       (Side conversation)

5  Q   Okay, to your best -- what's the thing flying around in

6  that?

7  A   I believe it to be some type of a bug.

8  Q   Okay.  And with regard to the defense -- the light that

9  was shown on the defense exhibit yesterday, what do you think

10 that was?

11 A   I believe it to be the same thing, just closer.  I believe

12 the -- the bugs flying around, that's normal in April to see

13 bugs flying.  It -- I can't be certain, but I believe it was a

14 moth or -- or some type of winged bug.

15 Q   Okay.  Now, finally, I want to turn to Exhibit 385, which

16 has not been admitted.

17      MR. SCHRODER:  It's the (indiscernible) -- don't -- get

18 to show it to him, but not facing the jury.  Counsel, it's the

19 timeline, and I'm just going to ask him whether we can admit

20 it.  It's not a move to admit the --

21 BY MS. LOEFFLER:

22 Q   Well, actually, a preliminary question.  The exhibit

23 that's been marked 385, Special Agent Sturgis, have you

24 verified at least the -- it -- that it's a list of times and

25 certain actions based on those times?

**STURGIS - DIRECT**

1   A    Yes, ma'am.

2          MS. LOEFFLER:  Okay.  I'd move 385.

3          MR. OFFENBECHER:  Yeah.  No objection.

4          THE COURT:  It'll be received.

5      (Plaintiff's Exhibit 385 admitted)

6          MS. LOEFFLER:  Okay.  We'll just turn -- take the --

7   can we turn the Post-its off at this point?

8          MR. OFFENBECHER:  Yeah.

9          MS. LOEFFLER:  Okay.

10          MR. OFFENBECHER:  Well, no, it's been redacted pursuant

11  to the Court's order.

12          MS. LOEFFLER:  Well, then I can print it -- we'll print

13  it out (indiscernible) --

14          THE COURT:  Well, leave the -- leave them on till I

15  know what you're talking about, please.

16          MS. LOEFFLER:  Your Honor, there's been --

17          MR. OFFENBECHER:  Can we approach at sidebar?

18          THE COURT:  I remember.  This -- those were redacted.

19          MR. OFFENBECHER:  That's what I thought.

20          THE COURT:  Yes, it can be admitted with --

21          MS. LOEFFLER:  Thank you.

22          THE COURT:  -- the redactions made to it subsequently.

23          MS. LOEFFLER:  Okay.

24  BY MS. LOEFFLER:

25  Q    I want to -- my -- counsel have pointed out that I -- when

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 67 of 206
(720) 384-8078  attrans@sbcglobal.net

**STURGIS - DIRECT**

1  you were pointing to the things with the picture of Exhibit

2  51 -- if we'll pull that back up.  There's one thing I forgot.

3  You actually didn't point to where Servant Air was.

4  A    Yeah, absolutely.  Servant Air is here.

5  Q    That's all I have.  Thank you.

6         THE COURT:  All right.  Cross-examination.

7         MR. OFFENBECHER:  No questions, Your Honor.

8         UNIDENTIFIED JUROR:  Your Honor, (indiscernible)

9  feedback (indiscernible).

10        THE COURT:  Yeah, we -- we're getting a feedback too.

11        MS. LOEFFLER:  Okay.  I think -- we try -- I think

12  (indiscernible).

13        THE COURT:  We solved it.

14        MS. LOEFFLER:  Let me do this.  If I stand over here.

15  BY MS. LOEFFLER:

16  Q    The question I asked you was where was Servant Air on the

17  photo.

18  A    Can you bring it back up?

19  Q    Yes.

20  A    All right.  Servant Air is right here.

21  Q    Okay.  Thank you.  Sorry.

22        MR. OFFENBECHER:  No questions, Your Honor.

23        THE COURT:  Okay.  Thank you, sir.

24        THE WITNESS:  Yes, sir.

25        (Witness excused)

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 755  Filed 09/23/14  Page 68 of 206
(720) 384-8078  attrans@sbcglobal.net

1          THE COURT:  Next witness.  Let's see, you --

2          MS. LOEFFLER:  The next witness is witness 6 and 7.

3          THE COURT:  Okay, let's take a 15-minute recess and

4    then come back, 15 minutes.  Okay.

5       (Jury not present)

6       (Side conversation)

7          THE COURT:  Okay, please be seated.  All right.  Who's

8    going to -- who you want to call next?

9          MS. LOEFFLER:  Mr. Skonberg and then Mr. Williamson,

10   Your Honor.

11         THE COURT:  It is going to be multiple -- are they

12   going to say the same thing?

13         MS. LOEFFLER:  Well, one is the general manager of

14   Servant Air.  The other is the pilot that was there that

15   morning.  They're both going to say that there was no one else

16   that -- basically, that Mr. Wells wasn't there that morning.

17   One was the manager, one is the pilot.  So I'm -- they were

18   both there at different -- actually pretty much the same

19   time --

20         THE COURT:  At Servant Air.

21         MS. LOEFFLER:  -- although the pilot was in and out.

22   At Servant Air.

23         THE COURT:  And how is that rebuttal?

24         MS. LOEFFLER:  Your Honor, a couple of things.  First,

25   the opening, which I had transcribed, for the defense stated

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 755  Filed 09/23/14  Page 69 of 206
(720) 384-8078  attrans@sbcglobal.net

1  that he spent to 20 to 25 minutes in Servant Air.  Then in
2  their case, they -- first witness they called was Dr. Gan to
3  talk about diarrhea.  And they -- and then called a bunch of
4  other witnesses and asked them whether he had diarrhea.  They
5  also put in the video from Alaska Airlines.  And I look at the
6  opening, and their argument was that, you know, he wasn't there
7  on the 12th because this video would have caught him, or
8  something like that.  I can't say what the closing is going to
9  be.

10  But the case law that we put out is -- I am assuming
11  they're going to argue, based on the evidence they put in, that
12  he had diarrhea and was going to the bathroom somewhere in
13  those 34 minutes.  Now, the case -- so it is rebuttal to that,
14  and we are entitled to show -- look, that's why I called Mr.
15  Sturgis first, okay.  All these places have cameras.  Here's a
16  place with a bathroom that didn't, and we know he wasn't there.

17  The other thing that we've pointed out in the case law
18  that we provided is that when the defense opens and says flat
19  out, he was there for 20 minutes, just saying -- you know, what
20  the case law shows, you have -- it -- it's appropriate for us
21  to be able to say, you know, he wasn't there, and they did open
22  the door by putting in all this stuff about diarrhea, unless
23  they're going to get up in the closing and say he didn't have
24  diarrhea during those 34 minutes.

25  I know we are entitled to use our method to rebut the

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 70 of 206
(720) 384-8078  attrans@sbcglobal.net

1   fact that he had diarrhea in the airport area in the 34

2   minutes.  And that's exactly why we're calling them.  And it is

3   also the place that they said in opening, and they chose to

4   make that statement.  But -- and then they put on evidence to

5   support it.

6         THE COURT:  Okay.

7         MR. OFFENBECHER:  Your Honor, the -- as the Court has

8   reminded us on a number of occasions, reminded the jury,

9   opening statements are not evidence.  This is the time for

10   evidence to rebut the evidence that the defendant has produced.

11   The defendant has not produced any evidence that he was in the

12   Servant Air.

13         What I suspect has happened here, Your Honor, and with

14   the length of the brief -- although I like these lawyers very

15   much -- they have saved this up -- this evidence up and this

16   memorandum in the event that Mr. Wells testified here today.

17   It appears to me that they've saved this to rebut his

18   anticipated testimony.  But he didn't testify, and the defense

19   has introduced no evidence that he was in Servant Air.

20   Therefore, the -- to rebut that, there's really no rebuttal to

21   be done of that.

22         To -- it's not appropriate for them to rebut what they

23   think the closing argument's going to be.  If -- you know, if

24   there's no evidence of it, there's no evidence of it.  But

25   they're just trying to rebut what they speculate the closing

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 755  Filed 09/23/14  Page 71 of 206
(720) 384-8078  attrans@sbcglobal.net

1  argument's going to be.

2       We didn't -- we introduced -- there's some evidence

3  that, you know, Mr. Wells has been sick during this period of

4  time.  They -- that's been offered to show that -- if there was

5  a change in his demeanor during this period of time.  But there

6  has been no evidence on that.  That's the state of the record

7  here.  And this is not proper rebuttal.  If they wanted to

8  introduce this -- I mean, there's no reason based on the

9  rationale that they've provided that it was opened in opening

10 statement.  They could just as easily have put it on in their

11 case in chief, if that's all you had to do was respond to the

12 defendant's opening statement.  But that's not the law.  The

13 law is -- was -- if the defendant puts on some evidence, you

14 got to respond to that evidence.  And this is not rebuttal.

15      MS. LOEFFLER:  Your Honor, if I may, if the defense

16 isn't going to argue that he had diarrhea during the 34-minute

17 gap, it would be one thing.  But we are absolutely entitled,

18 since their first witness in their case was Dr. Gan, to talk

19 about diarrhea.  They also called other witnesses in their case

20 to talk about diarrhea.

21      THE COURT:  I know we've been talking about diarrhea a

22 lot.  There's no question about that.

23      MS. LOEFFLER:  The point is, Your Honor, once they do

24 that --

25      MR. OFFENBECHER:  Not about Servant Air.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 755  Filed 09/23/14  Page 72 of 206
(720) 384-8078  attrans@sbcglobal.net

1          MS. LOEFFLER:  -- and the -- and we -- and then they're

2     going to say -- obviously, they're going to go get up in

3     closing.  And we are entitled to put in our evidence and say --

4     if they want to talk about diarrhea, we are just going to make

5     clear, these -- place had cameras and this place didn't, and he

6     wasn't in that place.  I mean, we could try to call witnesses

7     to say he wasn't in every place, but we are rebutting exactly

8     the argument that they did.

9          And we also cited you the case law that says it is not

10    fair -- I mean, this is direct evidence that we're entitled to

11    prove the way we want to, because we are going to be arguing in

12    closing that he did not have diarrhea during those 34 minutes.

13    Now, we can do it by -- you know, we're calling the doctor back

14    for something, and we're going to argue, and they are going to

15    argue that he did.  But we're entitled to go on and say, well,

16    if he did, Judge, where did he go into.  And, you know, these

17    places had cameras, and this place, he didn't go into.  And

18    it's a direct rebuttal to this.

19         And in addition, we gave you case law that says, you

20    know -- it's -- you can't unring the bell when the defendant

21    stands up in the opening and says, "Let me tell you exactly

22    where he was."  And so we're entitled to do that.  And, you

23    know -- so what did -- I didn't know they were going to object.

24    So we prepared a brief in case they objected.  But this is the

25    case law.  And the case law seems to be pretty clear that we're

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 755  Filed 09/23/14  Page 73 of 206
(720) 384-8078  attrans@sbcglobal.net

1 entitled to rebut statements that are made by counsel.

2          But here, it isn't a statement that was just out of the

3 blue.  You know, they don't get to control what we use to

4 counter their claim that in that 34-minute time, when they've

5 already said he was by the airport, he had diarrhea, and we're

6 going to say, okay, what -- you know, here's one place we know

7 he wasn't, and that's what we're doing.  And it's direct

8 rebuttal to what they said.

9          MR. OFFENBECHER:  But, Your Honor, they've saved up

10 witnesses for what they thought was going to be the defense

11 case.  It turns out that wasn't the defense case.  Rebuttal is

12 for evidence that's been produced by the defense.  They've

13 introduced evidence from Leah and Para also that there was

14 diarrhea.  But, you know, there simply hasn't been any evidence

15 that he went to Servant Air and had diarrhea, and I'm sure

16 they're going to point that out in their closing argument, that

17 there was no evidence of that.  But --

18          THE COURT:  I'm going to think about it.  I'm --

19 doesn't quite sound like rebuttal to me, but --

20          MR. OFFENBECHER:  Yeah.

21          THE COURT:  -- I'm still thinking, okay.  Take 10

22 minutes.

23          THE CLERK:  All rise.  Matter stands in a 10-minute

24 recess.

25          (Court recessed at 10:07 a.m., until 10:29 a.m.)

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 74 of 206
(720) 384-8078  attrans@sbcglobal.net

1        (Jury not present)

2            THE CLERK:  All rise.  His Honor the Court, the United

3    States District Court is again in session.

4            THE COURT:  Okay.  Further argument?

5            THE CLERK:  Please be seated.

6            MS. LOEFFLER:  Yes, Your Honor.

7            THE COURT:  Here's a question I have.

8            MS. LOEFFLER:  Yeah.

9            THE COURT:  The defense had an investigator in one of

10   the offices taking pictures, looking out the window.  What

11   were -- remind me what that was all about.

12           MR. CURTNER:  That was at the Goldstreak --

13           THE COURT:  That was at the Alaska Airlines?

14           MR. CURTNER:  That's Alaska Airlines --

15           THE COURT:  Okay.

16           MR. CURTNER:  -- baggage, Goldstreak office.

17           THE COURT:  Okay.

18           MS. LOEFFLER:  Your Honor, as we -- you said, they put

19   on in their case the stuff about diarrhea.  The only reason

20   that is --

21           THE COURT:  Diarrhea everywhere.  I agree with that.

22           MS. LOEFFLER:  Okay.  Right.  But the only reason that

23   is -- relevance is that is their explanation; I expect in

24   closing that's going to be their explanation as to what he was

25   doing and how to take up the 34-minute gap.  In their opening,

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 755  Filed 09/23/14  Page 75 of 206
(720) 384-8078  attrans@sbcglobal.net

1   a central piece of --

2           THE COURT:  Well, that would -- here -- let me just --

3           MS. LOEFFLER:  Sure.

4           THE COURT:  We're having a discussion.  If they did

5   that and if there's no evidence of that, I could say, "Wait a

6   second, ladies and gentlemen, there's been no evidence of

7   that."  Couldn't I?

8           MS. LOEFFLER:  You mean that they --

9           THE COURT:  That there's no evidence of that.

10          MS. LOEFFLER:  That they --

11          THE COURT:  I can tell the -- wait, wait, they can't

12  argue that, there's no evidence of that, if I don't allow the

13  rebuttal.

14          MS. LOEFFLER:  Well, that's what I was going to tell

15  you, Your Honor.  If you were going to say -- I mean, you can

16  tell them that they may not argue that he was in Servant Air

17  going to the bathroom and that the -- that they have to -- the

18  jury has to put aside any belief that he was in Servant Air at

19  all, it's better to just put the people on and have them say he

20  wasn't there.  Then they can argue he was somewhere else, they

21  can cross-examine him.  But it is direct rebuttal --

22          THE COURT:  Okay, I'm -- I haven't made up my mind.  I

23  told you I haven't made up my mind.

24          MS. LOEFFLER:  Well, I know.  You asked me --

25          THE COURT:  I want to hear from both sides.  I got some

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 755  Filed 09/23/14  Page 76 of 206
(720) 384-8078  attrans@sbcglobal.net

1 tough questions for them too, so --

2     MS. LOEFFLER:  Okay.  I mean, I --

3     THE COURT:  -- keep going.  You got a better argument?

4     MS. LOEFFLER:  Okay.  No, Your Honor.  And the other

5 thing that we put on is the -- and the case law shows that the

6 type of thing, when you stand up in opening -- and this was a

7 central part of our opening --

8     THE COURT:  Oh --

9     MS. LOEFFLER:  This wasn't a side piece.  I --

10     THE COURT:  I agree -- that -- what does the case law

11 say -- I --

12     MS. LOEFFLER:  Excuse me?  The -- you mean the case law

13 in the brief about if they put on an opening, that we're

14 entitled --

15     MR. OFFENBECHER:  Now --

16     MS. LOEFFLER:  -- to rebut it?  Because how --

17     THE COURT:  Well, that's clear as a bell.

18     MS. LOEFFLER:  Okay.

19     THE COURT:  But it doesn't say you're clear -- entitled

20 to rebut it in rebuttal.

21     MS. LOEFFLER:  Well, yes, Your Honor, here's what

22 happened.  How could we have put this on in our case in chief?

23 In the case in chief, they have not really -- they haven't put

24 on any evidence that he was having diarrhea that they could use

25 in the time of the murder.  That was the -- that was their

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 755  Filed 09/23/14  Page 77 of 206
(720) 384-8078  attrans@sbcglobal.net

1  case.  We didn't put on diarrhea.  They put it on in their

2  case.  So we'd be up there sticking some guy on that says he

3  wasn't in the bathroom in Servant Air before anybody said he

4  was in the bathroom.

5          THE COURT:  Okay.

6          MS. LOEFFLER:  And so this is the proper place to put

7  it.  We waited for their evidence.  There's -- you know, I

8  mean, and we would add an objection that it was irrelevant that

9  there was no evidence that he was -- you know, had diarrhea and

10  would have been going to the bathroom for the 34-minute gap.

11         THE COURT:  Question.  Mr. Curtner, it says in this

12  *Marsh* case, it says:  "Even if it had been possible for

13  government to present rebuttal evidence in its case in chief,

14  it was within the court's discretion to admit that -- their

15  testimony in rebuttal."  Ninth Circuit -- or maybe it's --

16  who -- which of these two gentlemen -- I guess it's you.

17         MR. OFFENBECHER:  I'll do it.

18         THE COURT:  Okay.  That's what -- I'm reading this

19  case.

20         MR. OFFENBECHER:  Well, but, Your Honor, it -- that's

21  assuming that it's proper rebuttal evidence in the first place.

22  They couldn't --

23         THE COURT:  Well, let me see if it says that.

24         MR. OFFENBECHER:  Which page, Your Honor?

25         THE COURT:  Oh, I'm just looking at the keynote in the

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 755  Filed 09/23/14  Page 78 of 206
(720) 384-8078  attrans@sbcglobal.net

1  *Marsh* decision.

2         MR. OFFENBECHER:  Okay.  I didn't get a chance --

3         THE COURT:  Even if --

4         MR. OFFENBECHER:  -- to get the cases.

5         THE COURT:  "Even if it had been possible for the

6  government to present rebuttal witness" -- this is in its case

7  in chief -- "it was within the court's discretion to admit

8  their testimony in rebuttal."

9         MR. OFFENBECHER:  Right.

10        THE COURT:  So that tells me that it's not quite as

11  open-and-shut as I thought it was before.  Because the

12  government says it wasn't even possible for the -- them to

13  present it in their case in chief because they hadn't heard the

14  theory other than in opening statements.  You -- now you say,

15  yeah, it was possible; they should have done it then if they

16  were going to do it.  Right?

17        MR. OFFENBECHER:  Well, right.  By the end of the

18  government's case, Your Honor, all of the evidence, the

19  evidence they're talking about regarding diarrhea, at least

20  most of the evidence, had come in.  And the point is that --

21        THE COURT:  And through cross-examination?  Is that

22  what you're saying?

23        MR. OFFENBECHER:  Yeah.  I mean, the -- it was there.

24  I mean, if they thought that was an issue that they could offer

25  evidence on, they could have done that.  But the point is, it's

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 755  Filed 09/23/14  Page 79 of 206
(720) 384-8078  attrans@sbcglobal.net

1   not proper -- you know, that's a different issue.  The diarrhea

2   is one issue.  The issue that they want to rebut is basically

3   they want to say, "The defendant said he went into Servant Air,

4   and so we're going to prove that he didn't."  But there's no

5   evidence that he went into Servant Air, and so that's why they

6   can't rebut it.

7           THE COURT:  Well, what about the opening statement?

8           MR. OFFENBECHER:  The opening statement is not

9   evidence.

10          THE COURT:  Well, did you think they heard it?

11          MR. OFFENBECHER:  I think they heard it, but the rule

12  is that if we introduce evidence, they get to rebut it in their

13  case.

14          THE COURT:  Well, what if you're -- I don't know which

15  of you two is doing closing.  What if whoever's doing closing

16  says, "Ladies and gentlemen, he could have been in Servant Air

17  going to the bathroom.  He had diarrhea."

18          MR. OFFENBECHER:  Your Honor, I'm assuming that

19  whoever's doing the defense closing argument will follow the

20  Rules of Evidence and will only argue from the evidence that's

21  produced in court.  And I'm the one who's doing it.

22          THE COURT:  And would you be shocked if you did that

23  and I said, "Stop.  Ladies and gentlemen, there's absolutely no

24  evidence that he was in Servant Air going to the bathroom.  You

25  are to disregard that argument"?

1          MR. OFFENBECHER:  I --

2          THE COURT:  Would that offend you if I did that?

3          MR. OFFENBECHER:  I would be a little shocked, because,

4    really, what I would expect is the government rebuttal would

5    stand up and say, "Wait a minute."

6          THE COURT:  You couldn't be shocked if I'm telling you

7    that in advance.

8          MR. OFFENBECHER:  Pardon?

9          THE COURT:  You shouldn't be shocked if I'm telling you

10   in advance.

11         MR. OFFENBECHER:  All right, I won't be shocked, then.

12         THE COURT:  Okay.

13         MR. OFFENBECHER:  I won't be shocked.  But what I would

14   expect is the government gets the last word, as they always do.

15   And they would say, "Wait a minute, Mr. Offenbecher said he

16   went into Servant Air.  There was no evidence of Servant Air."

17   That's how that gets done.

18         THE COURT:  But we're having this discussion now and we

19   know it's an important issue.  The government has evidence that

20   he didn't go in --

21         MR. OFFENBECHER:  Your Honor, I think you can assume

22   that the defense closing argument will be based on the evidence

23   that's produced in court, period.  And, you know, we simply

24   haven't produced any evidence for them to rebut.  I --

25   honestly, I think I like the prosecutors a lot, but I think

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 755  Filed 09/23/14  Page 81 of 206
(720) 384-8078  attrans@sbcglobal.net

1   they're sandbagging on this.  They saved this up for Mr. Wells

2   to testify, and they come in with the punch at the end, and it

3   didn't happen.  And so that's a tactical choice that the

4   government has made in this case, and this is how it has turned

5   out.  You -- sometimes you do save rebuttal evidence because

6   you think something's going to happen and you want to have

7   something left at the end.  And that's a tactical choice --

8           THE COURT:  Well, that argument doesn't mean anything

9   to me.

10          MR. OFFENBECHER:  All right.

11          THE COURT:  I'm trying to get to the merits of this

12  argument.

13          MS. LOEFFLER:  And, Your Honor --

14          MR. OFFENBECHER:  It's not rebuttal.

15          MS. LOEFFLER:  -- let me just explain.  We did turn --

16  and Mr. Skonberg's statement over in January, so it wasn't like

17  we hid what Mr. Skonberg was going to say.  But let me point

18  out --

19          THE COURT:  So my question -- why didn't you present --

20  your case in chief.  And your answer is --

21          MS. LOEFFLER:  Because --

22          THE COURT:  -- "Because we didn't know they were going

23  to" --

24          MS. LOEFFLER:  Right.  I mean, they stand up -- the

25  other thing was to say that we were sandbagging, you know.  The

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 755  Filed 09/23/14  Page 82 of 206
(720) 384-8078  attrans@sbcglobal.net

1    defense stood up in opening and said --

2         THE COURT:  I didn't give any credibility to the

3    sandbagging argument.

4         MS. LOEFFLER:  Okay, thank you.  Because if the defense

5    stands up and says -- I mean, you're not supposed to stand up

6    and give an opening on evidence that you absolutely -- you

7    know, that you're not going to put in.  And so let me go --

8         THE COURT:  That's a concern to me.

9         MS. LOEFFLER:  Yeah.  And you can't unring that bell,

10   which is what these cases are saying.  The other thing is, I

11   don't know how the defense can say we've put in no evidence

12   of -- in our case of our theory.  Dr. Gan was their first

13   witness.  The reason they called Dr. Gan as their first witness

14   was to put in the diarrhea story.  They also called Hank

15   Pennington and they asked him all about diarrhea and chronic

16   diarrhea.  If this was something that wasn't important to them

17   at all, they wouldn't have put it in in their case.

18        And I don't think it's sufficient to say, you know --

19   since we know we can put these guys on for five minutes and

20   say, "Look, he wasn't in Servant Air," they can cross-examine,

21   they can get up in the closing and argue whatever they want.

22   But otherwise, we're going to in this situation where they

23   say -- you know, I don't want the judge to be stopping a

24   closing argument and say, well, now you've gone over the line

25   about saying, you know, in the 34 minutes he had diarrhea and

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 755  Filed 09/23/14  Page 83 of 206

1   he went somewhere in the, you know, airport area.

2       Well, we're entitled to say, here's our investigation.

3   We went to the places that he -- these places had cameras, this

4   place didn't; that's the place we went to people and we talked

5   to them.  I mean, if they argue at all that he had diarrhea and

6   went anywhere in the airport area, it's appropriate -- you

7   know, they can challenge our investigation, but it's

8   appropriate for us to say, okay, we didn't go to, you know,

9   investigate all these places with cameras; we went to the place

10   that did that.

11       And the other thing is, the cases we've cited really

12   talk about not allowing an unfair situation where they say, you

13   know, this, but you can't put on the evidence.  You know, I

14   don't know how we would have put it on in the case in chief.

15   They called Dr. Gan as their first witness.  So that's a key

16   part of their defense, and we're entitled to rebut it, that

17   defense any -- you know, what -- any way that's proper.

18       THE COURT:  A concern I have is when I gave the jurors

19   jury instruction number 17, explaining what an opening

20   statement is, I said opening statement is not evidence, I told

21   them that.  But I said, "It is an outline to help you

22   understand what the party expects the evidence will show."  So

23   it is of some significance.  An opening statement is an -- this

24   is pattern instruction -- an outline of what the party expects

25   the evidence will show.  So it may not be -- rise to the level

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 755  Filed 09/23/14  Page 84 of 206
(720) 384-8078  attrans@sbcglobal.net

1  of evidence, but it's significant.

2          MS. LOEFFLER:  Yeah.

3          THE COURT:  So tell me exactly what you're going to --

4  would ask these witnesses.

5          MS. LOEFFLER:  I have -- I'm happy to do that, Your

6  Honor.  My direct of Mr. Skonberg would be:  Where do you work?

7  How long have you worked there?  Where's Servant Air?  You

8  know, turn to April 12th; were you there that day?  When do you

9  get to work?  And was this individual there that day?  And --

10  you know, and:  Where's your bathroom?  I have a picture of the

11  bathroom.  And could he have been in the bathroom?

12          And then the other guy, Tim William -- the -- was pilot

13  that had the flight at 7, I think, 45 or 40 -- I have to look

14  at the schedule.  And just -- he's -- I'm going to ask him

15  actually even less questions.  Just:  Were you there?  Did you

16  see this individual?  You know, were you in the lobby?  Did you

17  see anybody you didn't know in the lobby?  Those are my sets of

18  questions.  I don't -- it'll take five minutes.  And then we

19  solve this issue of you trying to interpret whether the

20  argument is unfair.

21          THE COURT:  Any last word?

22          MR. OFFENBECHER:  I made my argument, Your Honor.

23          THE COURT:  Okay.  I'm going to allow the testimony,

24  because I'm looking at this keynote.  It says:  "Even if it had

25  been possible for the government to present rebuttable

1  witnesses," which the government says it was not reasonably

2  possible of the posture of the case, I don't know.  But this

3  says even if it had been possible for the government to present

4  rebuttal witness in its case in chief, it was within the

5  court's discretion to admit their testimony in rebuttal,

6  because of the opening statement, because it's what the parties

7  indicated to the jury what they expected the evidence to show,

8  because it's embedded in the mind of the jury despite my

9  admonition that opening statements are not evidence.  And in

10  order to ensure that it -- things are presently fair and I

11  don't have to interject myself in the closing arguments, I

12  think, briefly, this is -- I'm going to permit it, allow

13  defendant ample opportunity to obviously cross-examine the

14  witnesses or additional time that they feel is necessary to

15  respond to that argument.  So ordered.  Next.  Bring the jury

16  in.

17          MS. LOEFFLER:  Yeah.

18          MR. OFFENBECHER:  Your Honor, I just have one other

19  thing.  And I'm assuming that means you're not going to

20  interrupt me during closing argument, (indiscernible).

21          THE COURT:  No promises.

22          MR. OFFENBECHER:  Your Honor, with respect to Mr.

23  Pearson, we don't know who he is, frankly.  We've asked the

24  government and they haven't told us.  We don't have any

25  discovery, we don't have any Jencks, we don't have anything.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 755  Filed 09/23/14  Page 86 of 206
(720) 384-8078  attrans@sbcglobal.net

1    Rather than trying to object --

2            THE COURT:  Who's Mr. Pearson?

3            MS. LOEFFLER:  I'll tell you now.  He was the guy that

4    was living at Red Cloud Ranch at the time of the murders.

5            THE COURT:  Bingo.  That's who he is.

6            MS. LOEFFLER:  That's who he is.

7            MR. OFFENBECHER:  Okay.

8            THE COURT:  What else do you want to do on -- what else

9    do you want to know?

10           MR. OFFENBECHER:  One of the things, Your Honor, with

11   respect to Mrs. Pletnikoff's testimony, we're going to move to

12   strike it on the following basis.  It was not prior -- didn't

13   come out until she testified.  But, really, what Mrs.

14   Pletnikoff testified about was Mr. Wells becoming angry after

15   the homicides.  The whole point of the -- the in -- all the

16   intro -- stuff that we've introduced is prior to the homicides.

17   And what happened afterward --

18           THE COURT:  Five years prior to the homicide, two oh

19   seven and back.  But --

20           MR. OFFENBECHER:  Yeah.  But, I mean, their theory is

21   that he's an angry guy before the homicides.  It's simply not

22   rebutting that to say of course --

23           THE COURT:  I'm not going to strike it.  It's

24   relevant --

25           MR. OFFENBECHER:  I just made the motion.  Thank you,

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 87 of 206
(720) 384-8078   attrans@sbcglobal.net

1  Your Honor.

2         THE COURT:  No, you're doing well, you're making your

3  motions.  I'm trying to do the best I can.  I feel like I'm

4  getting shot at from arrows, like the guy in the tower.  Bring

5  them in.  Get your witness, please.  Good morning, sir.  Okay,

6  that door pulls open.  If you can just stand in there and let

7  the jurors -- get in there.

8     (Jury present)

9         THE COURT:  All right, please be seated.  Government's

10  next witness.

11         MS. LOEFFLER:  If you --

12         THE COURT:  Oh, no, you're going to have to stand for

13  just a second.  She's going to swear you in.  I just wanted her

14  to tell us your name.

15         MS. LOEFFLER:  Oh, I'm sorry.  Your Honor, the United

16  States calls Kelvin Skonberg.

17         THE COURT:  Okay.  Now she's going to swear you in,

18  then you get to sit down.

19         THE CLERK:  Okay, please raise your right hand.

20  **KELVIN DALE SKONBERG, PLAINTIFF'S REBUTTAL WITNESS, SWORN**

21         THE CLERK:  Okay, thank you.  Please have a seat.  And,

22  sir, if you can please state and spell your full name.

23         THE WITNESS:  What was that?

24         THE CLERK:  If you can --

25         THE COURT:  She wants you to --

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 88 of 206

SKONBERG - DIRECT

1      THE CLERK:  -- state and spell your full name.

2      THE COURT:  -- state your full name and then spell it,

3  if you could, please.

4      THE WITNESS:  Kelvin Dale Skonberg.  K-e-l-v-i-n, D-a-

5  l-e, S-k-o-n-b-e-r-g.

6      THE CLERK:  Thank you.

7      THE COURT:  Good.  Thank you.  Counsel.

8                    **DIRECT EXAMINATION**

9  BY MS. LOEFFLER:

10 Q    Mr. Skonberg, where do you live?

11 A    Kodiak.

12 Q    And where do you work?

13 A    At Servant Air.

14 Q    What's your job title at Servant Air?

15 A    Flight coordinator.

16 Q    How long have you worked there?

17 A    About 12 years.

18 Q    And if I can simply pull up Exhibit 52 and ask you where

19 Servant Air is.  Just a second.  You're going to see on your --

20 on the screen.  And I think you have a pointer there, or maybe

21 I have.  Which building in that picture is Servant Air?

22 A    It's the top left.

23 Q    Okay.  The -- I think you have a pointer.  And you need to

24 point at the screen --

25 A    Okay.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

**SKONBERG - DIRECT**

1  Q    -- here so the jury can see it.

2  A    Oh.

3  Q    Point at that one.

4  A    That building.

5  Q    Okay.  Thank you.  Now I want to turn to the date of April

6  12th -- I'm sorry, April 12th, 2012.

7  A    Uh-huh (affirmative).

8  Q    Do you recall the day that the murders happened in Kodiak?

9  A    Yes.

10  Q    Did you go to work that day?

11  A    Yes.

12  Q    When do you get to work?

13  A    About 7.

14  Q    And to the best of your memory, would that have been about

15  when you got to work that day?

16  A    Yeah, about five to 7, 7 o'clock, somewhere in that

17  ballpark.

18  Q    Okay.  Does anybody -- would -- was anybody at work before

19  you got there?

20  A    No.

21  Q    And what do you do -- how do you get in when you get

22  there?

23  A    Open the door with a key.

24  Q    Okay.  That's what I was asking, is were the door -- are

25  the doors locked before you get there?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 90 of 206
(720) 384-8078   attrans@sbcglobal.net

1  A    Yes.

2  Q    And were they locked before you got there on April 12th?

3  A    Yes.

4  Q    All right.  Now, does Servant Air have a bathroom?

5  A    Yes.

6  Q    How far is the bathroom from the front counter?

7  A    About 20 feet.

8  Q    Okay.  And do you have a practice, if somebody comes into

9  Servant Air that you don't know?

10 A    There's people once in a while, but, I mean, I'm looking

11 at both doors.  I know who's coming into my building.

12 Q    Okay.  The morning of April 12th -- well, first of all, I

13 forgot to ask you, do you have a camera on the interior of

14 Servant Air?

15 A    No.

16 Q    Okay.  And I'll ask you, on the morning of April 12th, did

17 the individual that is sitting over here with the long beard

18 come into Servant Air?

19 A    No.

20 Q    Thank you.

21       THE COURT:  Cross-examination.

22                 **CROSS-EXAMINATION**

23 BY MR. CURTNER:

24 Q    Good morning, Mr. Skonberg.  Now, when were you first

25 questioned about April 12th, 2012?  When is the first time

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1  somebody talked to you about that?

2  A    Within a week.

3  Q    Now, do you remember being interviewed by invest --

4  Special Agent Joe Sturgis on May 24th?

5  A    I don't recall any names.  I don't know who he was.

6  Q    Do you see the gentleman sitting in the dark suit at the

7  end of the row here?  Do you --

8  A    Yes.

9  Q    Okay.  Is that -- could that have been the person that

10 interviewed you on May 24th, 2012?

11 A    Yeah.

12 Q    It had been about six weeks after April 12th.  Is that

13 correct?

14 A    Probably.  I -- there -- I was talking to a lot of people

15 there for a while.

16 Q    Okay.  But you remember being interviewed by this

17 gentleman --

18 A    Yes.

19 Q    -- in -- May 24th, okay.  Now, you -- so you usually get

20 to work around 7?

21 A    Yeah.

22 Q    Okay.  And, not always?  It depends on the flights?  Is

23 that correct?

24 A    Depend -- depends on the flights.

25 Q    Okay.  Do you recall being interviewed sometime later by

1  an investigator from -- in this case, Barbara Brink?

2  A    Yes.

3  Q    You recall that?

4  A    Uh-huh (affirmative).

5  Q    All right.  Now, when you -- Ms. Brink talked to you, were

6  you kind enough to -- well, first of all, let me ask you, were

7  you kind enough to go back and look at your records and see

8  what flights went out on April 12th, 2012?

9  A    Yeah, we did.  We show -- we gave her everything --

10 Q    Okay.  And do you recall --

11 A    -- that we did.

12 Q    -- yourself the first flight that day?

13 A    I think it was a Ouzinkie flight.

14 Q    Pardon me?

15 A    I think it was a flight to Ouzinkie that morning.

16 Q    What time would that have been?

17 A    Right around 8.

18 Q    Okay.

19        THE COURT:  Okay, you're saying -- are you saying a

20 name of a town?  I can't hear the flight name.  What flight?

21 BY MR. CURTNER:

22 Q    What flight would have been the first flight out that day?

23 A    Flight 600.

24 Q    And that goes --

25        THE COURT:  To Ouzinkie?  Is that what you said?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 93 of 206
(720) 384-8078   attrans@sbcglobal.net

1        THE WITNESS:  Ouzinkie, yeah.

2        THE COURT:  Ouzinkie.  Okay, that's what I thought you

3   said.

4   BY MR. CURTNER:

5   Q    Is that a village on the island?

6   A    Yes.

7   Q    Okay.  And so the first flight out that day would have

8   been about 8 o'clock?

9   A    Yeah.

10  Q    So -- and was there anybody on that flight that day?

11  A    Yeah, there were some passengers.

12  Q    Okay.  If you look at -- let -- let's draw up Defense

13  Exhibit DE-111.  Maybe this'll help you remember.  As -- see --

14  is that on your screen?

15  A    It's blurry.

16  Q    Maybe we could blow up Flight 600 for Mr. Skonberg.

17       (Side conversation)

18  Q    Defense Exhibit DE-111.

19       (Side conversation)

20       MS. LOEFFLER:  Counsel, we have a scanned version if

21  you would like it, to put -- hold up.

22       MR. CURTNER:  Well, my investigator --

23       MS. LOEFFLER:  Okay.

24       MR. CURTNER:  -- and technical assistant had it marked

25  as a defense exhibit, so --

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 755  Filed 09/23/14  Page 94 of 206

SKONBERG - CROSS

1      MS. LOEFFLER:  Okay.

2      MR. CURTNER:  And let's hope he can bring it up for Mr.

3   Skonberg.  I'm sorry, it should be Defense Exhibit 211.  But

4   we'll just show it to you on the screen here.

5      THE CLERK:  I just need to clarify.  DE-211.

6      MR. CURTNER:  Yes.

7      THE CLERK:  Thank you.

8   BY MR. CURTNER:

9   Q   Okay, is that the list you made up for us?

10  A   Yes.  Yes.

11  Q   Okay.  And do you see the Flight 600?  Does that indicate

12  no passengers going out, just you were out -- going out to pick

13  up passengers?

14  A   Correct.

15  Q   Okay.  So nobody was on that flight, it was just more of a

16  pick-up flight?

17  A   Yeah, just a pilot and freight.

18  Q   Okay.  Now -- so when you're in the office -- you were in

19  the office by yourself that morning?

20  A   Yeah.

21  Q   And what are you doing there when you first open up and

22  there's a flight an hour later with nobody on it?  What kind

23  of -- what do you do --

24  A   I'm just prepping my head for the day.

25  Q   All right.  Let me show you what's been marked as Defense

1  Exhibit DE-210 and see if that looks familiar.

2  A    That's our lobby.

3  Q    Okay.  Is that a reasonable representation of what your

4  office and lobby looks like?

5  A    Yes.

6        MR. CURTNER:  Okay, I'd move for admission of Defense

7  Exhibit DE-210.

8        MS. LOEFFLER:  No objection.

9        THE COURT:  It'll be received.

10     (Defendant's Exhibit DE-210 admitted)

11        MR. CURTNER:  And we could publish that.

12  BY MR. CURTNER:

13  Q    So just help us a little bit.  Where -- when you come in

14  at 7 o'clock and you're there by yourself, where would you

15  normally be?

16  A    Right where it says "K.S."

17  Q    Right where?

18  A    I go there.

19  Q    Oh, "K.S.," all right.  And do we have -- so this is two

20  entries into this -- you have sort of a vestibule or something?

21  A    Yeah, a little corridor.

22  Q    Okay.  Then you come in this way, and the restrooms are

23  right here?

24  A    Yes.

25  Q    And you might be behind the counter while you're working?

1  A    Sitting right there, yeah.

2  Q    Okay.  And then how about the -- what's back here?

3  A    Just some other offices.

4  Q    All right.

5       (Side conversation)

6       MR. CURTNER:  If we can move -- if we can put up

7  Government Exhibit 416.

8       MS. LOEFFLER:  I have no objection if you want to move

9  it in.

10      MR. CURTNER:  I'd move for admission.  We could publish

11 that, then --

12      THE COURT:  Okay, 416 --

13      MR. CURTNER:  -- if you --

14      THE COURT:  -- will be admitted.

15      (Plaintiff's Exhibit 416 admitted)

16 BY MR. CURTNER:

17 Q    But this is a picture of your lobby?

18 A    Yes.

19 Q    Is it -- now, this is a recent picture?

20 A    Yes.

21 Q    Has it changed since that time --

22 A    Not really,  no.

23 Q    -- since April 2012?

24 A    No.

25 Q    Now, what is this back here, then?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 97 of 206
(720) 384-8078   attrans@sbcglobal.net

**SKONBERG - CROSS**

1  A    That's an -- that's another computer, right alongside me.

2  Q    Okay.  So --

3  A    About five, six feet away.

4  Q    -- this is a workstation area where you might do --

5  A    Yes.

6  Q    -- be on the computer?  The back room would be then out of

7  the scope here?

8  A    Out of sight, yeah.

9  Q    And these would be the restrooms?

10 A    Yes.

11 Q    And this would be the entryway, just, like, coming in from

12 those doors.  If somebody were to come in and go to the

13 restroom, they'd come this direction, right?  That would be --

14 A    Yes.

15 Q    -- the path?

16 A    Yeah.

17 Q    So the -- so you were working by yourself until -- what

18 time did somebody else come in that morning?

19 A    I think just a little after 7, Tim -- Tim came in, another

20 pilot.

21 Q    Sometime during the morning?

22 A    Yeah.

23 Q    Okay.  And how long were you by yourself, then?

24 A    Five, ten minutes.

25 Q    Then when Mr. -- is it Mr. Williamson?

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 98 of 206

1   A    Yeah.

2   Q    When he came in, then, you guys were discussing the day's

3   plans --

4   A    Yes.

5   Q    -- and all that.  All right.  Did you happen to see any

6   vehicles parked in the vicinity of your office?

7   A    We have a lot of vehicles parked there.

8   Q    Do you recall recogni -- did you see a blue SUV?

9   A    In front of our building?  No.

10  Q    Yeah.  Or a white truck?

11  A    No.

12  Q    Now, did -- at one point, did the -- Special Agent Sturgis

13  show you a photograph of somebody for you to identify?  Did

14  they ever show you a -- any photographs to identify?  In fact,

15  did they show you identi -- a photograph of what they said was

16  Jim Wells, for you to identify?

17  A    I don't -- I don't remember.

18  Q    You don't remember that at all?

19  A    No.

20  Q    Okay.  Do you know Nancy Wells?

21  A    Yes.

22  Q    And she made a lot of -- she made flights through your --

23  A    Yeah, she's flown with us a few times.

24  Q    She goes out to some of the villages on her work?

25  A    Yes.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 99 of 206
(720) 384-8078   attrans@sbcglobal.net

1  Q    Okay.  So you know who she is?

2  A    Yeah.

3  Q    And she's familiar with your office?

4  A    Yeah.

5  Q    Okay.  That's all I have.  Thank you.

6          THE COURT:  Redirect.

7                    REDIRECT EXAMINATION

8  BY MS. LOEFFLER:

9  Q    Can we pull up -- oh.  Can we put 416 up?  That's the

10 picture of your lobby, Mr. Skonberg.

11 A    Uh-huh (affirmative).

12 Q    Let me just ask you, when you're standing at the counter,

13 can you hear the plumbing in the bathroom?

14 A    Yes.

15 Q    Okay.  And do you know -- were you on the computer all

16 morning that morning, or where were you standing in regard to

17 that picture, to the best of your memory?

18 A    I'm on the right-hand corner there.  He'd have to walk at

19 least 20 feet to get the bathroom from the door.  And I'm by

20 myself; I'm going to see who walks in my building.

21 Q    Okay.  I don't have anything further.  Thank you.

22          THE COURT:  Recross.

23                    RECROSS EXAMINATION

24 BY MR. CURTNER:

25 Q    I mean, I understand, Mr. Skonberg, six weeks later it

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 100 of 206
(720) 384-8078   attrans@sbcglobal.net

**WILLIAMSON - DIRECT**

1  might be difficult to remember exactly where you -- what you

2  were doing at work that morning?

3  A    No.

4  Q    You remember every --

5  A    I know what I did that morning, because I was getting my

6  day prepped.

7  Q    Okay.  All right.  Thank you.

8        THE COURT:  Thank you, sir.  You're excused.  The

9  government's next witness.

10    (Witness excused)

11        MS. LOEFFLER:  Tim Williamson, please.  Sir, just come

12  on around here and step into the witness box.  And she -- my

13  clerk will swear you in.  She's right over here.

14        THE CLERK:  Please raise your right hand.

15    **TIM WILLIAMSON, PLAINTIFF'S REBUTTAL WITNESS, SWORN**

16        THE CLERK:  Okay.  Thank you.  Please have a seat.

17  And, sir, if you can please state and spell your full name.

18        THE WITNESS:  Tim Williamson.  T-i-m, W-i-l-l-i-a-m-s-

19  o-n.

20        THE CLERK:  Thank you.

21        THE COURT:  Counsel.

22                    **DIRECT EXAMINATION**

23  BY MS. LOEFFLER:

24  Q    Mr. Williamson, where do you live?

25  A    Kodiak, Alaska.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 101 of 206
(720) 384-8078  attrans@sbcglobal.net

**WILLIAMSON - DIRECT**

1  Q   What do you do for a living?

2  A   I'm a pilot.

3  Q   Who are you a pilot for now?

4  A   Hageland Aviation Service.

5  Q   I want to turn back to April 12th of 2012 and ask you,

6  were you at work in Kodiak on the day that the murders

7  happened?

8  A   Yes.

9  Q   Who were you working for at the time?

10 A   Servant Air.

11 Q   And did you have a flight out that morning?

12 A   Yes.

13 Q   Okay.

14         MS. LOEFFLER:  Counsel, did you move in D-211 or do you

15 want me to move in --

16         MR. CURTNER:  The flight schedule?

17         MS. LOEFFLER:  The schedule.

18         MR. CURTNER:  You can -- I didn't move for admission,

19 but I'm -- no objection to that.

20         MS. LOEFFLER:  Okay.  Yeah, if we can pull up

21 Government 42 --

22         MR. CURTNER:  And, you know, just so you know, there's

23 names.

24         MS. LOEFFLER:  Counsel, I have the redacted version.

25         MR. CURTNER:  Okay.

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 102 of 206

1      MS. LOEFFLER:  Okay.

2  BY MS. LOEFFLER:

3  Q    So if I can -- on your screen, what's been marked as

4  Government Exhibit 428.  And ask you is that the -- does that

5  appear to be a flight schedule from Servant Air that morning,

6  that day?

7  A    It describes the flight schedule, yes.

8  Q    Okay.

9      MS. LOEFFLER:  Okay.  I'd move Government Exhibit 428.

10     THE COURT:  Be received, without objection.

11     (Plaintiff's Exhibit 428 admitted)

12     MS. LOEFFLER:  Okay.

13 BY MS. LOEFFLER:

14 Q    And, Mr. Williamson, which flight were you flying out that

15 day (indiscernible) --

16 A    My first flight was Flight 600, departed at 7:45.

17 Q    Okay.  And to the best of your ability, when did you come

18 to work that day?

19 A    Right around 7 a.m.

20 Q    How long were -- what's your practice when you come to

21 work if you have a flight at 7:45?

22 A    I generally walk in the building and speak with the flight

23 dispatcher, Kelvin, about the day's schedule.  And then we

24 preflight the airplanes, fuel them, load them, call passengers

25 for --

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 103 of 206

1  Q    So you don't hang out in the lobby the whole time?

2  A    Not the whole time, but we're in and out of the lobby --

3  Q    Okay.

4  A    -- between flights.

5  Q    Then I'll ask you, did you see anybody that morning in

6  Servant Air that, you know, was not either a passenger or one

7  of the, you know, people that worked there?

8  A    No, ma'am.

9  Q    That's all I have.  Thank you.

10        THE COURT:  Cross-examination.

11                    **CROSS-EXAMINATION**

12  BY MR. CURTNER:

13  Q    Good morning, Mr. Williamson.

14  A    Good morning.

15  Q    So when you -- were you flying out that first flight that

16  morning, and what -- tell us what you have to do to get ready

17  for a flight.

18  A    That -- typically, we pull the planes out of the hangar if

19  they're not out of the hangar already, do a preflight.

20  Generally takes 10 minutes or so to look over the plane.  And

21  then fueling, loading.  Loading's usually assisted by the cargo

22  agents.  And then in for paperwork, do paperwork, check weather

23  in the computers, and call the passengers, load them, and go.

24  Q    Okay.  So that first flight that morning was actually

25  7:45?  Is that the correct time?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 755  Filed 09/23/14  Page 104 of 206
(720) 384-8078  attrans@sbcglobal.net

1  A    I would have to see my manifest to know exactly what time

2  I departed, but if that's --

3  Q    Do --

4  A    -- what you have, yeah.

5  Q    Did you just look at the government's exhibit -- was that

6  up there for you to look at?

7  A    Yes.

8  Q    If we could just bring that up.  That would be Defense

9  Exhibit --

10         THE COURT:  Pull that microphone a little closer.

11         THE WITNESS:  What?

12         THE COURT:  Get a little close to the mic.

13         THE WITNESS:  Oh, okay.

14  BY MR. CURTNER:

15  Q    211.  Okay, this is -- you -- maybe you don't recall Mr.

16  Skonberg preparing this list of flights out that morning?

17  A    This is -- this is something that was prepared for the

18  courts.  It's not the standard Servant Air schedule.

19  Q    Okay.  Does that look familiar, there, that the Flight 600

20  might go out at 6 -- 7:45?

21  A    Yeah, it would probably typically be an 8 o'clock

22  departure.

23  Q    Okay.  So you would be -- you had a number of things to do

24  that morning before you took off --

25  A    Yes, sir.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 105 of 206

1  Q    -- as the pilot.  Didn't have any passengers going out

2  that day?

3  A    Yes, we did.

4  Q    Okay, I'm sorry.  Mr. Skonberg said the flight went out

5  with no passengers and it picked up three passengers.  Was that

6  not correct?

7  A    Well, that's what that one says, yes.

8  Q    Do you recall?

9  A    I would have to have my flight manifest to know for sure.

10 Q    Now, when was the first time somebody talked to you about

11 April 12th, 2012 and what happened at Servant Air that day?

12 A    Shoot, not long ago.

13 Q    This year?

14 A    Yes, sir.

15 Q    About two years later?

16 A    Yes, sir.

17 Q    Okay.  And let me just show you briefly Defense DE-210.

18 If we can publish that.  Okay, so this -- does this look like a

19 diagram or a picture -- kind of an outline of Servant Air?

20 A    Yes, sir.

21 Q    Do you recognize that?  Okay, and so this is a counter.

22 There's a workstation here.  Is that correct?

23 A    There is, yes.

24 Q    And then this workstation here, is that facing that wall?

25 A    No, it's -- it's kind of in the corner there.  It kind

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 106 of 206
(720) 384-8078   attrans@sbcglobal.net

1  of -- I guess it's --

2  Q    This is the counter area.

3  A    It's -- it -- it -- it has equal vision towards the wall

4  you pointed to and the other wall.

5  Q    But, primarily, if you're doing work at this station along

6  this counter, you're looking as -- facing that wall.  Is that

7  correct?

8  A    I don't work in that, but from observing Kelvin and the

9  way he sits, he's normally facing into the corner of that

10  counter.

11  Q    Okay.

12  A    So he would --

13  Q    And this is the back office?  That correct?

14  A    Well, the back office is through another door that doesn't

15  seem to be shown on the -- the picture there.

16  Q    Okay.  And then this is the -- what is this door?

17  A    There's an entrance door there that goes outside.

18  Q    And that's how you would go out, then, toward -- to work

19  on the plane?

20  A    Negative.  That would be further up on your picture.

21  Q    Oh, I'm sorry.  How would you get out to the plane?  This

22  way?

23  A    That way, yes.

24  Q    Okay.  So the first time somebody asked you about April

25  12th, 2012 was just this year --

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 107 of 206
(720) 384-8078   attrans@sbcglobal.net

1  A    Yes.

2  Q    Well -- okay, thank you.

3           THE COURT:  Redirect.

4           MS. LOEFFLER:  Yeah.  If we can pull up Defense Exhibit

5  210.  And I hate to do this, Mr. Johnson, but I'm going to ask

6  you to pull up the date on the corner, because you're the one

7  who has the control there, so that we can read it, if you can,

8  there's a way to see that.

9                    **REDIRECT EXAMINATION**

10 BY MS. LOEFFLER:

11 Q    Can you read what that date appears to be, or does it

12 appear to be April something, '13?

13 A    It appears to be April 18th, '13.

14 Q    Okay.  I don't have anything further.  Thank you.

15           THE COURT:  Anything else?

16           MR. CURTNER:  No, Your Honor.  Thank you.

17           THE COURT:  Thank you, sir.  You're excused.  The

18 government's next witness.

19    (Witness excused)

20           MS. LOEFFLER:  We're going to call Dr. Gan, if she's

21 here.  We had -- she had something this morning, so we said

22 we'd try to put her on when she got here.

23           MR. SCHRODER:  Mr. Brennick, you can just come up to

24 the front there to the right.

25           THE COURT:  And good morning, sir.  Just kind of make

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 108 of 206
(720) 384-8078   attrans@sbcglobal.net

BRENNICK - DIRECT

1  your way up around there.  Pull that door open, step into the

2  box.  Remain standing for a second, and she'll swear you in.

3  Right over here.  She'll swear you in.

4         THE CLERK:  Please raise your right hand.

5  **KEVIN WADE BRENNICK, PLAINTIFF'S REBUTTAL WITNESS, SWORN**

6         THE CLERK:  Okay, thank you.  Please have a seat.  And,

7  sir, if you can please state and spell your full name.

8         THE WITNESS:  Kevin Wade Brennick.  B-r-e-n-n-i-c-k.

9         THE CLERK:  Okay, and your full name, sir.

10        THE WITNESS:  K-e-v-i-n, W-a-d-e, B-r-e-n-n-i-c-k.

11        THE CLERK:  Thank you.

12        THE COURT:  All right, counsel.

13                    **DIRECT EXAMINATION**

14  BY MR. SCHRODER:

15  Q   Mr. Brennick, where do you currently live?

16  A   Leavenworth, Washington.

17  Q   And before you moved down to kind of Central Washington

18  there, where did you live before that?

19  A   Kodiak.

20  Q   And how long did you live in Kodiak?

21  A   Roughly 15 years.

22  Q   And were you living there in April of 2012?

23  A   Twenty -- yes.

24  Q   And are you related to Casey Brennick?

25  A   Yes.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1    Q    And how so?

2    A    I'm his father.

3    Q    And do you own any commemorative firearms?

4    A    Yes.

5    Q    And how many?

6    A    I just own one.

7    Q    Okay.  And would you describe that, what that gun is?

8    A    It's a Fiftieth Anniversary of Alaska Ruger .44 Mag.

9    Q    Okay.  And let me make that clear.  What -- who's the

10   maker of that gun?

11   A    It's a Ruger .44 Mag, one of only 500 made.

12   Q    Okay.  And did you own it on -- did you own it in April

13   '12, April 2012?

14   A    Yes.

15   Q    And where was it in April of 2012?

16   A    It was packed up and in my bedroom closet.

17   Q    All right.  And so it was in your possession?

18   A    Yes.

19   Q    And was it in your possession even in the months before

20   that?

21   A    Oh, yes.

22   Q    And where is it now?

23   A    It's in my possession.

24   Q    Okay.  And have you ever allowed federal agents to examine

25   it?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 110 of 206
(720) 384-8078   attrans@sbcglobal.net

**BRENNICK - CROSS**

1  A    Yes.

2         MR. SCHRODER:  No further questions, Your Honor.

3         THE COURT:  Cross-examination.

4                     **CROSS-EXAMINATION**

5  BY MR. CURTNER:

6  Q    Good morning, Mr. Brennick.

7  A    Good morning.

8  Q    At that time was Casey living with you?  April 12th, 2012?

9  A    I -- I don't believe so.  I --

10 Q    Where would he have been living, do you think?

11 A    I believe he had a -- a place of his own, if -- if I

12 remember right.

13 Q    Do you remember if -- did you have problems with Casey

14 maybe stealing things?

15        MR. SCHRODER:  Objection, Your Honor.  Beyond the

16 scope.

17        THE COURT:  I'll let you go ahead.

18 BY MR. CURTNER:

19 Q    Did you have problems with Casey stealing things from you

20 over the years?

21 A    I -- I don't really recall anything in particular, no.

22 Q    Okay.  Now, the firearm that you have, did the agents --

23 what -- they looked at it, right?  Do you know if they took it

24 for testing or anything, or they just looked at it?

25 A    It's had one shot fired through it, and that was from the

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 111 of 206

1  factory.  It's commemorative.

2  Q    So they just looked at it?

3  A    Yeah, they looked at it.

4  Q    Okay.  Thank you.

5         THE COURT:  Anything else?

6         MR. SCHRODER:  Nothing, Your Honor.  No.

7         THE COURT:  All right, thank you, sir.  The

8  government's next witness.

9         THE WITNESS:  Thank you, Your Honor.

10        THE COURT:  All right.

11     (Witness excused)

12        MR. SCHRODER:  Mr. Stein, I think you remember the way.

13        MR. STEIN:  Pardon me?

14        MR. SCHRODER:  Remember the way the -- to the witness

15  stand?

16        MR. STEIN:  Okay.

17        THE COURT:  Same place.  Okay, just --

18        MR. STEIN:  Morning.  Morning, Your Honor.

19        THE COURT:  -- step on in the -- good morning.  If you

20  can just stay there for a second.  She's going to swear you in.

21        THE CLERK:  Please raise your right hand.

22  **JOHN A. STEIN, PLAINTIFF'S REBUTTAL WITNESS, SWORN**

23        THE CLERK:  Okay, thank you.  Please have a seat.  And,

24  sir, if you can please state and spell your full name.

25        THE WITNESS:  I'm going to have to ask everybody to

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 112 of 206
(720) 384-8078   attrans@sbcglobal.net

1  speak up today, because --

2         THE COURT:  I'm going to -- we -- and --

3         THE WITNESS:  -- my hearing aid died, and --

4         THE CLERK:  Do you want --

5         THE COURT:  Yes.  We got a -- we got something for you.

6         THE WITNESS:  Oh.

7         THE COURT:  Make sure it's got batteries in it.

8         THE CLERK:  Says it's charged.

9         THE COURT:  It says it's charged.  Just try it.

10        THE WITNESS:  Wonderful.  Thank you.

11        THE COURT:  Just try it, see -- and you can't take it

12 with you, but stick it in there.  Testing, testing, one two --

13        THE WITNESS:  All right.  All right.

14        THE COURT:  -- testing.  Can you hear me?

15        THE WITNESS:  Yes, I can.

16        THE COURT:  Okay.  I'll try not to -- don't talk too

17 loud.

18        THE CLERK:  Okay, sir, can you please state and spell

19 your full name?

20        THE WITNESS:  Pardon me?

21        THE COURT:  That was her -- that -- she wants you to

22 state and spell your full name.

23        THE WITNESS:  My name is John A. Stein.  Anything else?

24        THE COURT:  Spell it.

25        THE WITNESS:  Pardon me?

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 113 of 206

STEIN - DIRECT

1         THE COURT:  Spell it.

2         THE WITNESS:  Oh.  J-o-h-n, S-t-e-i-n.

3         THE COURT:  Good.  Thank you.  Counsel.

4                    **DIRECT EXAMINATION**

5    BY MR. SCHRODER:

6    Q    Mr. Stein -- can you hear me okay?

7    A    Yes, sir.

8    Q    All right.  So -- now, you'd testified previously about

9    owning a couple of Smith & Wesson Model 429 .44 Magnum

10   revolvers.  Correct?

11   A    629.

12   Q    629, sorry.  I -- Mr. Allison was reminding me.  So I'm

13   going to ask you to take a look at an exhibit that's already

14   been admitted.  It's going to come up on that screen to your

15   right.

16        THE COURT:  To your left.

17   BY MR. SCHRODER:

18   Q    To your left, my right.

19   A    Yes, sir.  Yes, sir.

20        THE COURT:  Okay.

21   BY MR. SCHRODER:

22   Q    And I'm going to ask you to look to a particular portion

23   of that.  Go to the second page.  And if you can enlarge that

24   section.  Can you see that, or should we make it a little

25   bigger?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 755  Filed 09/23/14  Page 114 of 206

1   A    I can read that very well.

2   Q    Okay, thank you.  So -- now, the firearms circled on the

3   right, which of those two 629s is that gun?

4   A    The one that was stolen?

5   Q    Right.  And --

6   A    That was the six-inch barrel.  Uh-huh (affirmative).

7   Q    Okay.  And then let's talk about the one on the left on

8   the diagram.  And we -- why don't we put it up so the jury can

9   see as well.

10         MR. CURTNER:  Your Honor, I think this was already

11  admitted, and I think this was already covered.  I don't know

12  why -- how it's rebuttal testimony.

13         THE COURT:  I don't either, but we'll find out.

14         MR. SCHRODER:  We're going to --

15         MR. CURTNER:  Well --

16         MR. SCHRODER:  -- talk about the other gun, because

17  young Mr. Cable Wells talked about a gun that had a problem, of

18  Mr. Stein's.

19         THE COURT:  Okay.

20         MR. SCHRODER:  So we're clearing that up.

21         THE COURT:  Okay.

22         MR. SCHRODER:  So --

23         THE CLERK:  What exhibit is this?

24         UNIDENTIFIED SPEAKER:  232B.

25         THE CLERK:  Thank you.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 115 of 206
(720) 384-8078  attrans@sbcglobal.net

1  BY MR. SCHRODER:

2  Q    All right, Mr. Stein, and -- so that gun on the left, what

3  does it indicate the barrel length or what is -- have you seen

4  that gun recently?

5  A    Yes, I have.

6  Q    All right.  And what's the barrel length on that gun?

7  A    It has a four-inch barrel.

8  Q    And did it always have a four-inch barrel?

9  A    No.  It started out as a eight.

10 Q    Okay.  And what -- did you have an issue with that gun at

11 some point?

12 A    Yeah, I was experimenting with some low-power loads and I

13 got a squib.  In other words, the bullet did not leave the

14 barrel.  And I fired another round, and that struck the bullet

15 that was lodged in the bore.  And it left a bulge in the

16 barrel.

17 Q    So I take it that's not good for guns?

18 A    No.  I had to send it back to the factory.

19 Q    All right.  And what happened when you sent it back to the

20 factory?  What did they do to it?

21 A    Well, I asked them to take the eight-inch barrel off and

22 replace it with a four.

23 Q    Okay.  And -- go ahead.

24 A    And they did that.  And they sent the gun back to me and

25 they -- they sent me the old eight-inch barrel too.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 116 of 206

**STEIN - DIRECT**

1 Q   And what'd you do with that old eight-inch barrel?

2 A   I kept it out of curiosity, and it just rattled around in

3 my shop for a few years.

4 Q   Okay.  Now, if you look on that chart -- and I don't know

5 whether you have a laser pointer up there in front of you, a

6 black thing.  Now, if you look on that chart, is it indicated

7 anywhere in there that you had the barrel replaced?

8 A   Yes.  It indicates under "Gunsmith" there, "New barrel,

9 6", dash, "90."

10 Q   Okay.  And is that consistent with your memory of when you

11 had that --

12 A   Yes.

13 Q   -- gun replaced?

14 A   Yes, sir, uh-huh (affirmative).

15 Q   All right.  That's all I have.  Thank you.

16 A   Thank you.

17      THE COURT:  All right.  Wait, wait, wait, wait.  Wait.

18 Cross-examination.

19      MR. CURTNER:  No, Your Honor.

20      THE COURT:  Oh, okay.  All right.  Thank you, sir.  You

21 can -- you're free to go.  Thank you.

22      THE WITNESS:  Thank you.

23   (Witness excused)

24      THE COURT:  Government's next witness.

25      MS. DUIGNAN:  We're checking to see if the next witness

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 117 of 206

**ALLISON - DIRECT**

1  is here, Your Honor.

2        THE COURT:  Okay.

3        MS. LOEFFLER:  We're just checking if she's out there.

4  If she's not, we'll call Special Agent Allison, who's our --

5        THE COURT:  Okay.

6        MS. LOEFFLER:  -- one after that.  I was just letting

7  somebody look out the door and see if she's right there.

8        THE COURT:  No.

9        MS. LOEFFLER:  Okay.  Then we'll call Special Agent

10  Allison.

11        THE COURT:  Let's see.  You've already been sworn in

12  today, haven't you?

13        **DARYL ALLISON, PLAINTIFF'S REBUTTAL WITNESS**

14                    **PREVIOUSLY SWORN**

15        THE WITNESS:  Yes, sir.

16        THE COURT:  Okay.  You're still under oath.  We won't

17  swear you in again.

18        THE WITNESS:  Okay.

19        THE COURT:  Okay, counsel.

20                    **DIRECT EXAMINATION**

21  BY MS. LOEFFLER:

22  Q    Special Agent Allison, I have a few areas I want to talk

23  to you about.  The first thing is, did the FBI take a weapon in

24  the -- into evidence that belonged to Jim Hopkins?

25  A    Yes, we did.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 755  Filed 09/23/14  Page 118 of 206

**ALLISON - DIRECT**

1  Q   What was it?

2  A   It was a .460 Magnum revolver.

3  Q   Okay.  Are you familiar with a .460 Magnum revolver?

4  A   I am.  I own the exact same gun.

5  Q   Okay.  And was it logged in under the wrong -- in error

6  under the wrong model?

7  A   Yes, the agent that -- that --

8       MR. OFFENBECHER:  I object on the grounds that she's

9  leading the witness at this point, Your Honor.

10       THE COURT:  Sustained.

11  BY MS. LOEFFLER:

12  Q   What was it logged in under?

13  A   It was logged in as a .44 Magnum.  The agent that -- that

14  seized it didn't really know that much about weapons.

15       (Side conversation)

16  Q   And do you have Exhibit 234 with you, sir?

17  A   I do.

18  Q   And I'll ask you if that's the weapon we're talking about.

19  A   It is.

20       MS. LOEFFLER:  Okay.  I'd move Exhibit 234.

21       THE COURT:  Any objection?

22       MR. OFFENBECHER:  No objection.

23       THE COURT:  It can be received.  Now you can show it to

24  the jury.

25       (Plaintiff's Exhibit 234 admitted)

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 119 of 206
(720) 384-8078  attrans@sbcglobal.net

1    MS. LOEFFLER:  Oh --

2    THE WITNESS:  Oh --

3    MS. LOEFFLER:  -- sorry.

4    THE WITNESS:  -- sorry.

5  BY MS. LOEFFLER:

6  Q    And right on it, does it say what it is?

7  A    Yes, is -- .460 Smith & Wesson Magnum.

8  Q    The other thing is -- I want to switch now to a different

9  topic.  With regard to in Kodiak, have you driven up to the

10  Bells Flats area?

11  A    Many times.

12  Q    Okay.  And I'm going to ask you about -- I think I had

13  something on -- I want to clear something up.  In the Bells

14  Flats area, is some of the area gravel?  Or can you just

15  explain what's gravel and what's paved in --

16  A    Most of the roads in --

17  Q    -- that area?

18  A    Most of the roads in Bells Flats are paved.  Mr. Wells's

19  driveway, which is on Pavloff Circle, is -- is not paved.  But

20  most of Bells Flats is paved.

21  Q    And is Sargent Creek Road paved?

22  A    Yes, it is.

23  Q    Okay.  Now I want to switch to another subject area.  I

24  know you were present when Mr. Casey Brennick testified.

25  A    Yes.

1   Q   Okay.  And there were some questions about an individual

2   named Marco DeCastro --

3   A   Yes.

4   Q   -- do you recall?

5   A   Yes.

6   Q   And I want to clear something up, because the evidence

7   came in about Mr. DeCastro being arrested for something, and I

8   want to know, did that have anything to do with a federal case?

9   A   No, that was a drug case that the Kodiak Police

10  Department --

11         MR. OFFENBECHER:  Your Honor, I -- excuse me, Your

12  Honor.  I would object, on the grounds of lack of personal

13  knowledge.

14  BY MS. LOEFFLER:

15  Q   Do you have personal knowledge?

16  A   I've -- I've spoken with the Kodiak Police Department --

17         MR. OFFENBECHER:  That would be hearsay.

18         THE WITNESS:  -- about this case.

19         MR. OFFENBECHER:  That would be hearsay.

20         THE COURT:  Well, he can answer "Yes" or "No" and not

21  go into any more detail.

22  BY MS. LOEFFLER:

23  Q   Sure.  Did it have anything to do with this case at all?

24         MR. OFFENBECHER:  Objection.  That's --

25         THE WITNESS:  No, it did not.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 121 of 206
(720) 384-8078   attrans@sbcglobal.net

1    MR. OFFENBECHER:  -- a leading question.  And it is

2  hearsay.  The answer is hearsay.

3    THE COURT:  Well, he's --

4    MS. LOEFFLER:  He -- no --

5    THE COURT:  He's a case agent --

6    MS. LOEFFLER:  Yeah.

7    THE COURT:  -- so I think he can answer that question,

8  and then nothing else.

9    THE WITNESS:  Mr. DeCastro's name came up only with

10 regard to this text message.  It had nothing to do with this

11 case.

12 BY MS. LOEFFLER:

13 Q   Thank you.  Now I want to go to another area.  And that

14 is -- has to do with a nail that came out of the tire in this

15 case.

16 A   Yes.

17 Q   Did you do any further investigation, and recently, as to

18 whether the nail could be shot out of any nailgun?

19 A   Yes, we did.  We rented a nailgun, a power-actuated

20 nailgun that uses a .22 charge.  And we -- we actually inserted

21 the nail is it right now, even with the -- being bent, and it

22 fit into the nailgun.

23    MR. OFFENBECHER:  Your Honor, I would object, on the

24 grounds that there's -- can we approach at sidebar?

25    THE COURT:  All right.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 755  Filed 09/23/14  Page 122 of 206

1      (At sidebar with the Court and counsel)

2           THE COURT:  Okay.

3           MR. OFFENBECHER:  Yesterday we had a raft of objections

4      about -- that Mr. Swanepoel couldn't testify because it wasn't

5      in his expert report that he'd done.  Here we have no discovery

6      on something that they -- he's apparently done some

7      experiments.  We've had no discovery, no Jencks on it, we've

8      had no reports.  It -- it's like they've gone out and done

9      their whole expert, and it's -- they're ambushing it in a

10     rebuttal case of the -- at the last 15 minutes.

11          THE COURT:  Okay.

12          MR. OFFENBECHER:  It's not fair.  It's exactly what Mr.

13     Schroder argued we couldn't do with an expert that hadn't

14     disclosed reports.

15          THE COURT:  Okay.

16          MS. LOEFFLER:  Your Honor, it's not an expert report.

17     I'm not asking him to give an opinion.  He went in with exactly

18     what (indiscernible) if they want to look at it.  He ran the

19     nailgun just to see (indiscernible).  (Indiscernible) but he's

20     not testifying as an (indiscernible) expert.  (Indiscernible)

21     you can stick it in there.  (Indiscernible).

22          MR. OFFENBECHER:  (Indiscernible) experiment

23     (indiscernible) and that's what you should do right now.

24          MS. LOEFFLER:  It's -- (indiscernible), Your Honor,

25     it's not a -- I mean, first of all, it is not an expert report.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 123 of 206

1  If it were an expert report, I absolutely (indiscernible).

2  He's not going to give an opinion about -- but he just wanted

3  to show -- he said, can you rent a nailgun that this thing can

4  go in.  And the answer to that's "Yes."

5       MR. OFFENBECHER:  (Indiscernible) sure, yeah,

6  (indiscernible) expert report.  I mean, we could -- you know,

7  we -- we're (indiscernible) to have our own, you know, person

8  go out and do the same thing (indiscernible) be redone.  Just

9  (indiscernible) they could have told us about this

10 (indiscernible) did this (indiscernible) no discovery and

11 there's no reason why (indiscernible).

12      THE COURT:  Any other questions of this witness?

13      MS. LOEFFLER:  No.  That's it.

14      THE COURT:  Okay.  Well, I think they're entitled to a

15 recess and (indiscernible).  But what's your -- you have one

16 more witness this morning, right?

17      MS. LOEFFLER:  We have two.

18      THE COURT:  Two more.  And then I think I'm going to

19 allow defense as much time as they need for rebuttal, or to

20 think about it.  So we'll have the lunch hour, come back, let

21 me look at (indiscernible).

22      MS. LOEFFLER:  Okay.

23      THE COURT:  That's the best I can do (indiscernible) --

24      MR. OFFENBECHER:  If you want -- just don't want to

25 (indiscernible).  Which we don't even know what it is.  There's

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 124 of 206
(720) 384-8078  attrans@sbcglobal.net

1  no report (indiscernible) some Jencks material,

2  (indiscernible).

3       MS. LOEFFLER:  I'm sorry?

4       THE COURT:  If he -- he said if you still want to offer

5  this evidence.  I don't have any problem (indiscernible) some

6  voir dire of this witness before you decide whether you want to

7  use surrebutal, and then give you the whole lunch hour to do

8  whatever you need to do, and then come back and tell me what

9  you're thinking.  And then if you need more time, then,

10 obviously, (indiscernible) a little bit more time.  It seems to

11 me, just trying to be fair to both sides.  Okay, but let's keep

12 going -- you have no more questions of this witness.

13      MS. LOEFFLER:  No, I don't.

14      THE COURT:  You can reserve cross-examination -- you

15 can reserve your cross-examination and can do it -- what you

16 want --

17      MR. CURTNER:  I think we'd like to voir dire this

18 witness --

19      THE COURT:  Outside the --

20      MR. CURTNER:  Out -- yes --

21      THE COURT:  -- presence of the jury.

22      MR. CURTNER:  -- before lunch.

23      THE COURT:  Before lunch.

24      MR. OFFENBECHER:  And if there's any --

25      THE COURT:  And then you can put your heads together,

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 125 of 206
(720) 384-8078  attrans@sbcglobal.net

```
 1   tell me --
 2           MR. CURTNER:  Yes.
 3           THE COURT:  -- what you think you want to do.
 4           MR. OFFENBECHER:  Also, if there's any Jencks material
 5   that's in the report, (indiscernible).
 6           THE COURT:  Okay.  Obviously, provide anything.
 7           MS. LOEFFLER:  I don't have any such things.
 8           THE COURT:  Jencks, notes, anything.  Okay.  So no more
 9   questions, and --
10           MS. LOEFFLER:  No.
11           THE COURT:  -- we'll excuse you now, but we'll voir
12   dire (indiscernible).
13           MR. OFFENBECHER:  Looks like I have --
14           MS. LOEFFLER:  Okay.
15           MR. OFFENBECHER:  -- a few questions, I just
16   (indiscernible).
17           THE COURT:  If you want to -- you want to take care of
18   that now?
19           MR. OFFENBECHER:  (Indiscernible) that's what I was
20   going to -- not (indiscernible) --
21           THE COURT:  Okay.
22           MR. OFFENBECHER:  Not (indiscernible).
23           THE COURT:  Okay.  And here -- that's (indiscernible)
24   be on his previous testimony earlier in the day.
25           MR. OFFENBECHER:  No, no, no.  (Indiscernible).
```

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 126 of 206

1          THE COURT:  Oh, (indiscernible) again.  Do you have

2     anything on another subject you can (indiscernible)?

3          MR. OFFENBECHER:  All right, of course.  Yeah.

4          THE COURT:  Or later.

5          MR. OFFENBECHER:  Yeah.  All right.  Thanks.

6        (End of sidebar)

7          THE COURT:  Okay.  Was that -- we're ready for cross-

8     examination.

9          MR. OFFENBECHER:  No questions at this time.

10         THE COURT:  Okay, at this time, all right.

11    Government's next witness.

12       (Witness excused)

13        MS. DUIGNAN:  The government calls Dr. Gan.  Okay, good

14    morning, Doctor.  You've done this before.  Make yourself

15    comfortable here and remain standing.  We'll swear you in.

16         THE CLERK:  Please raise your right hand.

17    **SONG-QING GAN, PLAINTIFF'S REBUTTAL WITNESS, SWORN**

18         THE CLERK:  Okay, thank you.  Please have a seat.  And,

19    ma'am, if you can please state and spell your full name.

20         THE WITNESS:  Song-Qing Gan.  S-o-n-g, dash, Q-i-n-g,

21    last name G-a-n.

22         THE CLERK:  Thank you.

23         THE COURT:  All right, counsel.

24                    **DIRECT EXAMINATION**

25    BY MS. DUIGNAN:

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 127 of 206
(720) 384-8078  attrans@sbcglobal.net

**GAN - DIRECT**

1   Q   Good morning, Dr. Gan.

2   A   Hi, good morning.

3   Q   Just to be clear, you've testified before about treating

4   Mr. Wells.

5   A   Right.

6   Q   I'm going to hand you what has been marked as Government

7   Exhibit 412A, which has already been provided to the defense,

8   and ask you to look at it.

9        MR. CURTNER:  Your Honor, I'm sorry.

10       THE WITNESS:  Okay.

11       MR. CURTNER:  We need to approach sidebar first, I

12   think.

13       THE COURT:  Okay.

14     (At sidebar with the Court and counsel)

15       MR. CURTNER:  As I understood, Your Honor, they're just

16   going to introduce records through Dr. Gan.  And if it's for

17   April 2nd, which is two pages, I'm not going to object to

18   introducing this two pages of records from April 2nd.  I don't

19   think going back more months would be appropriate.

20       MS. DUIGNAN:  Your Honor, in response, this is

21   rebuttal, and they called a witness.  I believe it was Mr.

22   Pennington who testified that the diarrhea problem occurred

23   during -- throughout his treatment for gallbladder disease.

24   I'm introducing the portions for gallbladder disease to show

25   what the entries were, in fact, and the records show that there

**GAN - DIRECT**

1 was no diarrhea complaint at that time.

2          THE COURT:  (Indiscernible).  Go ahead.

3      (End of sidebar)

4 BY MS. DUIGNAN:

5 Q    Doctor, I've handed you what has been marked Government

6 Exhibit 412A, and I'd just ask you to look over it.  And when

7 you're done, just look up.

8 A    Okay.

9 Q    Okay.  What are those records?

10 A    It looks like a consult request.

11 Q    The whole package.  Just if you can summarize --

12 A    Oh, yeah.

13 Q    -- what all those pages are.

14 A    Oh.  Okay, some of them are medical records, record of

15 progress notes.  And the first page was consult request.  And

16 some are (indiscernible) Telehealth notes.

17          MS. DUIGNAN:  Your Honor, can I do a little bit of

18 leading, just to lay the foundation?

19          THE COURT:  To lay the foundation.

20 BY MS. DUIGNAN:

21 Q    Dr. Gan, are those, in fact --

22 A    Yeah.

23 Q    -- all of those excerpts of medical -- they're medical

24 records from Mr. James Wells' VA medical record.

25 A    Correct.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 129 of 206

**GAN - DIRECT**

1  Q    And they're -- they appear to be treatment records from

2  the end of 2011 through April 2nd of 2012.  Is that correct?

3  A    Let me see.  Correct.

4  Q    Okay.  And those records are kept in the course of how you

5  provide treatment to patients at the VA Hospital.  Right?

6  A    Correct.

7  Q    And it's your regular practice any time a patient's seen

8  to make a notation or make a record of when the patient is

9  seen?

10 A    Right.

11 Q    And all of those records, you -- you have -- your name has

12 been listed as a note of either somebody who saw him or someone

13 who approved the record.  Right?

14 A    Correct.

15 Q    And when you make records, you do it at or near the

16 time -- of the time you see the patient.  Isn't that right?

17 A    Correct.  It's after the fact, after you see the patient.

18 Q    Okay.  But it's within a reasonable period of time?

19 Usually do it that same day or sometime close to the time you

20 see the patient?

21 A    Yes.

22 Q    And those records appear to be the records that you made

23 for the treatment of Dr. -- I mean the treatment of Mr. Wells?

24 A    Yes.  Some of them made by me, some of them made by

25 nurses.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 130 of 206

**GAN - DIRECT**

1  Q    And the ones that are made by nurses, you review when you

2  treat Mr. Wells.  Isn't that right?

3  A    Yeah.  I acknowledge the receipt, yes.

4       MS. DUIGNAN:  Your Honor, at this time I'd move

5  admission of Government Exhibit 412A.

6       MR. CURTNER:  Same objection we've already presented,

7  Judge.

8       THE COURT:  Okay.  I'll receive the -- I mean, I'll

9  admit them tentatively, but if necessary I'll look at them more

10  closely and see if there's some that I want to redact.  But at

11  this point, for discussion purpose, they'll be admitted.

12       (Plaintiff's Exhibit 412A admitted)

13       MS. DUIGNAN:  Well, Your Honor, I was just going to

14  admit the records, but if you think there are any other

15  questions that I should ask, I will.

16       THE COURT:  No, I just -- I don't know what's in them,

17  and --

18       MS. DUIGNAN:  I -- I'll ask a couple of followup

19  questions, just to be clear.

20  BY MS. DUIGNAN:

21  Q    Looking over the records, are --

22  A    Uh-huh (affirmative).

23  Q    -- those excerpts of the portions of the records for Mr.

24  Wells for his treatment of gallbladder disease?

25  A    Say one more time?  Was --

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 131 of 206

**GAN - DIRECT**

1  Q    Are those the portions of the records for Mr. --

2  A    Right.

3  Q    -- James Wells that deal with the treatment for the

4  gallbladder disease that he came to see you for?

5  A    Correct.

6  Q    And those are all the records that cover his treatment for

7  the gallbladder disease, to your knowledge?  You can look them

8  over again if --

9  A    Yeah.

10 Q    -- you'd like to.

11 A    All the records, I don't know.  At least this portion of

12 the records.

13 Q    Okay.

14 A    I don't know of -- all the record -- yeah.

15 Q    Okay.  So if the records were received in response to a

16 subpoena for the records, those would be all the ones

17 maintained by the VA?

18 A    Okay.

19        THE COURT:  That was a question.

20        THE WITNESS:  Oh, was that a --

21 BY MS. DUIGNAN:

22 Q    That was a question.

23 A    A question was -- the --

24 Q    In response to a subpoena to the Veterans Administration

25 Hospital --

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 132 of 206

1    A    Uh-huh (affirmative).

2    Q    -- we received those records back.

3    A    Okay.

4    Q    The business practice of the VA would be to provide all

5    records responsive to the subpoena.  Correct?

6    A    That should be the standard practice.

7    Q    Okay.  And according to those records, what is the last

8    date that you saw Mr. Wells for gallbladder disease?

9    A    April 2nd, 2012.

10        MS. DUIGNAN:  Okay.  Thank you very much, Your Honor.

11        THE COURT:  Cross-examination.

12                    **CROSS-EXAMINATION**

13   BY MR. CURTNER:

14   Q    Good morning, Dr. Gan.

15   A    Good morning.

16   Q    Now, would that -- would those records that you have in

17   front of you, would they include records from Dr. Anbast?

18   A    I did not see -- I do not see in this --

19   Q    And who is Dr. Anbast?

20   A    He is a gastroenterologist in private practice.

21   Q    And that's somebody -- how do you know him in this -- in

22   relation to Mr. Wells?

23   A    A working relationship.  Well, what happened is we send a

24   request for him to see a specialist, and then VA will find a

25   specialist.  In this case happened to be Dr. Anbast.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 133 of 206

1  Q    Okay.  So while you're treating Mr. Wells, you may have

2  referred him to a specialist, Dr. Anbast?

3  A    Yeah, in this case.

4  Q    And his records are not included in what you have.  Is

5  that correct?

6  A    No.

7  Q    And how about the surgeon?  Do you know the surgical

8  records or the operative report -- are those included in that?

9  A    I do not see.

10  Q    Okay, let me just show you what's been marked as Defense

11  Exhibit 209 and see -- just on your screen, see if you

12  recognize that.

13  A    Not completely focused.  Can you --

14  Q    Oh.

15  A    Yeah.  Okay.

16  Q    All right, if we could just blow up the top part of it.

17  A    Okay.  Now I see.

18  Q    Okay.  And do you recognize what that might be?

19  A    Yeah.  It looks like intraoperative report of findings.

20  Q    For which patient?

21  A    For Mr. Wells.

22  Q    And who were the surgeons?

23  A    Dr. Simpson.

24  Q    And the second -- first assistant surgeon?

25  A    Dr. Congdon.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 134 of 206
(720) 384-8078  attrans@sbcglobal.net

**GAN - CROSS**

1  Q    Okay.  And if you go down to the middle of that, it says

2  "date of operation."  If we could look at that.

3  A    February 9th, 2012.

4  Q    Okay.  So this is a report of the gallbladder operation,

5  February 9th, 2012?

6  A    Correct.

7  Q    And is that included in the records you have in front of

8  you?

9  A    So far, I do not see.  I can go through pages

10 (indiscernible) again.

11 Q    Yes, please.

12      (Pause)

13 A    Not included.

14 Q    Okay.  So you didn't see -- that's not in those records.

15 And there may be -- would you expect that Mr. Wells would have

16 gone to see the surgeons for some kind of followup examination

17 after surgery?

18 A    Could be, yeah.

19 Q    Thank you.

20      THE COURT:  Anything else?

21      MS. DUIGNAN:  No, Your Honor.

22      THE COURT:  All right.  Thank you, Doctor.  You're

23 excused.

24      THE WITNESS:  Okay.

25      (Witness excused)

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 135 of 206
(720) 384-8078   attrans@sbcglobal.net

1    MS. LOEFFLER:  United States calls John Pearson.

2    THE COURT:  Good morning.  If you can just make your

3 way into the -- up front here, step into the witness dock --

4 box.  The door pulls out, right there, and then she'll swear

5 you in.

6    THE CLERK:  Please raise your right hand.

7    **JOHN PEARSON, PLAINTIFF'S REBUTTAL WITNESS, SWORN**

8    THE CLERK:  Okay, thank you.  Please be seated.  Okay,

9 and, sir, if you can please state and spell your full name.

10    THE WITNESS:  John Pearson.  J-o-h-n, P-e-a-r-s-o-n.

11    THE CLERK:  Thank you.

12    THE COURT:  You need to get a lot closer to the

13 microphone.  Okay, then -- you're ready to go.

14                        **DIRECT EXAMINATION**

15 BY MS. LOEFFLER:

16 Q   Mr. Pearson, where do you live currently?

17 A   I live in Palmer, Alaska.

18 Q   What do you do?

19 A   Right now I'm farming.

20 Q   What did you do before you took up farming, Mr. Pearson?

21 A   I'm a -- or was, still am, a nurse, and I work for the

22 U.S. Public Health Service.  And --

23 Q   For how many years?

24 A   Twelve, thirteen.

25 Q   Before you lived in Palmer, was there a time that you

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 136 of 206

PEARSON - DIRECT

1  lived in Kodiak, Alaska?

2  A    I did, for five years.

3  Q    When did you live in Kodiak, Alaska?

4  A    November of 2007 until August of 2012.

5  Q    Now I want to turn to April of 2012.  Where were you

6  actually living in Kodiak?  Where was your residence?

7  A    I was living at Red Cloud Ranch in Anton Larsen in Kodiak.

8  Q    Okay.

9       (Side conversation)

10       THE COURT:  Sir, while they're doing that, can you get

11  a little closer?  Get that -- that's good.  That's plenty.

12       (Side conversation)

13  BY MS. LOEFFLER:

14  Q    Okay, see this Google Earth map?  When you see something

15  marked "Red Cloud Ranch," is that where you're living?

16  A    That's correct.

17  Q    Who were you living there with?

18  A    My wife and children.

19  Q    Okay.  How long did you live at the Red Cloud Ranch in

20  2012?

21  A    Just from January of 2012 until the end of April.

22  Q    Now, did you --

23  A    The same year, 2012.

24  Q    Were you -- did you work at that time?

25  A    I did.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 137 of 206
(720) 384-8078   attrans@sbcglobal.net

1  Q   Where did you work?

2  A   I worked at Kodiak Area Native Association Clinic.

3  Q   Okay.  And was there a time of day that you would go to

4  work?

5  A   Yes.

6  Q   What time?

7  A   Usually leave about 6 in the morning.

8  Q   Okay.  Now I want to turn to the day of April 12th, 2012.

9  Do you recall the day that the murders happened?

10 A   Yes.

11 Q   Did you go to work that day?

12 A   I did.

13 Q   What time?

14 A   Normal time, about 6-ish.

15 Q   Okay.  And the night of April 12th, 2012, was there

16 anybody at your house other than your family?

17 A   No.

18 Q   Okay.  And in terms of that winter, was there much traffic

19 on Anton Larsen Bay Road?

20 A   No.  There was -- for a while there was hardly any traffic

21 besides us.

22 Q   Was that because of the weather?

23 A   Yeah.

24 Q   Okay.  Now, you said that your wife and family were with

25 you out at the Red Cloud Ranch.  If you were at work and your

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 755  Filed 09/23/14  Page 138 of 206

 1  wife wasn't there, what would Red Cloud Ranch look like to

 2  people going by?

 3  A   It would look pretty deserted.  It was off the grid, run

 4  on a generator.  So when we left, we shut everything off.  And

 5  there would be no cars.

 6  Q   Okay.  And I'm just going to ask you, the night of the

 7  12th -- could you tell -- let me back up a second.  Could you

 8  tell when you were at Red Cloud Ranch whether somebody, you

 9  know, was going by in the middle of the night?  Was that a

10  common occurrence, or how would you describe it?

11  A   It was not common, but we always knew.  The house was

12  right by the road.

13  Q   Okay.

14  A   So --

15  Q   And was any -- at the time when you were living there, was

16  anybody else living there with you other than your family?

17  A   No.

18  Q   Okay.  I don't have anything further.

19          THE COURT:  Cross-examination.

20                      **CROSS-EXAMINATION**

21  BY MR. OFFENBECHER:

22  Q   Mr. Pearson, good afternoon.

23  A   Good afternoon.

24  Q   Can you call 158 up, Kim?  So, Mr. Pearson, in mid-April

25  of 2012, the Red Cloud Ranch was not abandoned, was it?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 139 of 206

1  A    No.

2  Q    In fact, you were living there?

3  A    Right.

4  Q    And your wife and your children were living there?

5  A    That's correct.

6  Q    And if an FBI agent had stopped and walked up to your

7  front door and knocked on the door, you or your family would

8  have answered it.  Right?

9  A    If we'd have been home, yeah.

10  Q    But you didn't have any reason to hide out there.  Right?

11  A    No.

12  Q    And if somebody had asked you some questions about the

13  traffic or what was going on there, you'd have answered their

14  questions, wouldn't you?

15  A    Sure.

16  Q    And if an FBI agent had asked you to search your property,

17  you would have given him permission to search your property,

18  wouldn't you?

19  A    If it was necessary, yes.

20  Q    Okay.  Well, if they come out there with a warrant to

21  search, you would have let them do that.  Right?

22  A    Sure.

23  Q    But you didn't have anything to hide, did you?

24  A    No.

25  Q    And so if the agents had come out and wanted to walk over

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 140 of 206

1  your property and look for something there, then you would have

2  let them do that, wouldn't you?

3  A    Yes.

4  Q    And if they'd have -- wanted to go to some of those

5  outbuildings and some of those abandoned trailers and other

6  things that are there, you'd let them do that, wouldn't you?

7  A    I suppose.

8  Q    Because you didn't have anything to hide, did you?

9  A    No.

10 Q    And when is it that the agents -- or the law enforcement

11 agents first contacted you about this investigation?

12 A    Saturday, a couple of days ago.

13 Q    So when you say Saturday, you're referring to just this

14 past Saturday, about four days ago.  Right?

15 A    Yes.

16 Q    So back in 2012, around the time that these homicides

17 occurred on Kodiak, no FBI agent ever came out to your house,

18 did they?

19 A    Not while we were home.

20 Q    And nobody ever left a note on your door or a card saying,

21 "Please call Special Agent Allison," or something like that,

22 did they?

23 A    Not to my knowledge.

24 Q    And if they had left a note on your door, you would have

25 called them and talked with them, right?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 141 of 206

1  A    Sure.

2  Q    And two years ago when that happened, you would have

3  answered all of their questions about what you remembered back

4  then.  Right?

5  A    Uh-huh (affirmative).

6  Q    And if they had wanted to search any of this property, you

7  would have let do that.  Right?

8  A    Sure.

9  Q    Call up DE-38, please.  Now, Mr. Pearson, I'm showing

10 you -- or we're showing up on the screen here, actually, a

11 photograph that's been labeled DE-38.  Do you see that okay?

12 A    Yes.

13 Q    Is that a fair representation of the place that you lived

14 in April of 2012?

15 A    Uh-huh (affirmative).

16 Q    And is this the main house over here that you're talking

17 about?

18 A    It is.

19 Q    And then what is this building here?

20 A    A -- just a shed.  Just a --

21 Q    Okay.

22 A    Yeah.

23 Q    How about this building that I'm putting the circle around

24 that has kind of a rounded roof there?  What's that?

25 A    Yeah, I think it was a -- a chicken pen at one point.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 142 of 206
(720) 384-8078  attrans@sbcglobal.net

1  Q    And was that being used for anything?

2  A    No, I don't think so.  Maybe storage of stuff.

3  Q    But you weren't using it for anything.  Right?

4  A    No.

5  Q    How about this little shack or shed over, just to the

6  right of that one you just talked about?  The -- were you using

7  that for anything, right over here?

8  A    No.  I don't know.  Uh-uh (negative), no.

9  Q    Okay.  How about this?  Is this a trailer?  Is that what

10 that looks like, kind of an Airstream kind of a trailer there?

11 A    I believe it was a collapsed camper of some sort.

12 Q    Okay.  Were you using that for anything?

13 A    No.

14 Q    So you weren't getting in and out of that or anything like

15 that --

16 A    No.

17 Q    -- during that period of time?

18 A    That's right.

19 Q    How about over here?  What are these buildings over here?

20 See where I'm pointing over here?

21 A    I do.  There were a whole lot of little sheds over there.

22 Q    So the -- there's a main house here, right?

23 A    Right.

24 Q    But there's a lot of other little sheds and buildings and

25 other kind of things off to the right there, aren't there?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 143 of 206
(720) 384-8078   attrans@sbcglobal.net

1  A    There are.

2  Q    And those were buildings that you weren't using or living

3  in at the time, were you?

4  A    No.

5  Q    And they were buildings that you didn't even go and

6  inspect or anything.  Right?

7  A    We did -- you know, we poked around.  There's a lot of

8  things.  My -- my kids would walk around and look in the

9  buildings a lot.

10  Q   All right.  Can we go to DE-39, please?  That's a picture

11  of the house that we were talking about?

12  A    Right.

13  Q   And then some of these other buildings were in the back,

14  right?

15  A   Actually, what you're pointing at is part of the house.

16  It's connected to the house.

17  Q   This right here is connected?

18  A   Yes.

19  Q   Excuse me.  Go to 40 now.

20  A   As -- as is the building behind that.

21  Q   Uh-huh (affirmative).  So this one's connected and then

22  this one behind here is connected as well?

23  A   And the one past that.

24  Q   And this one over here?

25  A   Yes.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 144 of 206

1    Q    Okay.  And the next one, please.  What's this depict here?

2    A    That's the other side of the street.  That'd probably be

3    taken from the house, looking right across the street.

4    Q    So there's another little cabin over here, right?

5    A    Yes.

6         THE CLERK:  Just to clarify, this is Exhibit --

7         MR. OFFENBECHER:  Yeah, Defense Exhibit 040.

8         THE CLERK:  Thank you.

9         MR. OFFENBECHER:  You're welcome.

10   BY MR. OFFENBECHER:

11   Q    So I'm pointing the pointer at what looks like a little

12   kind of a log cabin, maybe, or some kind of a cabin across the

13   street?

14   A    Yes.

15   Q    Who lived there?

16   A    It was locked up.  We had access to it, but we didn't use

17   it.

18   Q    Okay.  That wasn't being used.  Right?

19   A    No.

20   Q    How about over here?  Is this a barn over here on the

21   side?

22   A    It's a collapsing barn, yeah.

23   Q    Did you use that?

24   A    No, we didn't.

25   Q    How about this truck or car, this white vehicle here?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 145 of 206

PEARSON - CROSS

1  A    Somebody's abandoned -- there were a multitude of

2  abandoned vehicles.  That was one of them.

3  Q    And you weren't using that?

4  A    No.

5  Q    How about this bus over here?  Another abandoned vehicle?

6  A    Someone was using it for storage.

7  Q    Okay.  So somebody was -- it was there and somebody was

8  using it to store stuff in, right?

9  A    Somebody.  It -- it may have been the owner.  I'm not sure

10 whose stuff it was.  But it was just a storage place.

11 Q    So there's an owner of the Red Cloud Ranch, right?

12 A    Yes.

13 Q    And who's that?

14 A    His name is Duncan Fields.

15 Q    And so you were renting the -- this property from Duncan

16 Fields, right?

17 A    Yes.

18 Q    But even though you were renting it, you -- Mr. Fields had

19 access to some of these other places for storage and so forth.

20 Right?

21 A    Yeah.  It -- it's his land.

22 Q    So he could come and use -- for example, store some stuff

23 in this bus if he wanted to, couldn't he?

24 A    If he wanted.  Yeah.

25 Q    Or he -- there's another trailer, it looks like I'm

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 146 of 206

1  pointing to, over here on the left.  Right?

2  A    Yeah.  That thing was open to the air on -- on top.  It --

3  it's --

4  Q    So --

5  A    -- collapsed.  It's deceptively useful there, it's --

6  yeah.

7  Q    Okay.  So it was open to the air, but you weren't using

8  it, right?

9  A    No.

10  Q    And then were there any other vehicles or other buildings

11  that were behind this trailer and this cabin?

12  A    The only thing I can think of as far as buildings would be

13  a little to the left off that would be an open steel-welded

14  building, but it didn't have walls on it.  It's just a -- a

15  wooden shed or -- someone had horses there for a while.

16  Q    Okay.  There was an equipment shed.  And then -- but Mr.

17  Fields -- for these buildings that you weren't using, the

18  house, Mr. Fields would have had access to those.  Right?

19  A    Sure.

20  Q    So is it fair to say that all during the year of 2012, no

21  law enforcement agent ever came out to your house to do --

22  conduct any kind of a search or interview you about anything.

23  Is that right?

24  A    I spoke to nobody.

25  Q    But you would have spoken to them if they'd come out and

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 147 of 206

1  talked with you.  Right?

2  A    Sure.

3  Q    All right.  Now I want to direct your attention -- well,

4  let me ask you this.  When the agents -- did some agents come

5  out -- well, say -- you weren't living there last Saturday,

6  were you?

7  A    No.

8  Q    So you don't know whether agents had ever gone out to

9  search the Red Cloud Ranch, do you?

10  A    I was told that someone had come by afterward.

11  Q    Okay.

12  A    But --

13  Q    But you don't know anything about that, right?

14  A    No.

15  Q    So let me direct your attention to the day before the

16  homicides occurred.  So assume for a moment the homicides

17  occurred on April 12th of 2012.  Right?

18  A    Okay.

19  Q    On the night before that, you were at your house, right?

20  A    Yes.

21  Q    And what kind of vehicle do you have?

22  A    I -- I had then a red Ford truck, four-door truck, and a

23  Ford 15-passenger four-wheel-drive van.

24  Q    So you had a red Ford pickup truck?  Is that right?

25  A    That's right.

1  Q    Yeah, you just have to speak out loud, because it's --

2  A    Sorry.

3  Q    -- being recorded.  Sorry.  Nodding doesn't work.  And

4  then you had a 15-passenger van.  Is that right?

5  A    Yes.

6  Q    And what color is that?

7  A    Sort of a teal, blue-green.

8  Q    Now, any other cars?

9  A    Not at that time.

10  Q    All right.  Now, on the evening of April 12th, that is,

11  the night before the murders occurred, did you drive down to

12  the COMMSTA, the T2 rigger shop?

13  A    You said the evening before?

14  Q    Right.

15  A    No.  I -- I mean, I pass it -- passed it every day when I

16  came home from work, but --

17  Q    Sure.  Can you call up 158, please?  DE-158.  So Red Cloud

18  Ranch -- just looking at this, you -- is up here with

19  (indiscernible), right?

20  A    Yes.

21  Q    And when you went to work, you would come down Anton

22  Larsen Bay Drive and then go to work after that.  Right?

23  A    That's correct.

24  Q    And you were working in town, did you say?

25  A    Yes.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 149 of 206
(720) 384-8078   attrans@sbcglobal.net

1   Q   Okay.  So you would turn left and go up Rezanof.  Right?

2   A   Well, usually I would take a right, go to the Coast Guard

3   base, go to the gym, shower, and then --

4   Q   Okay.

5   A   -- head into town after that.

6   Q   Sure.

7   A   Yeah.

8   Q   All right.  But you recognized that the COMMSTA is right

9   here with this -- I'm showing you right here.  Right?

10  A   Right.

11  Q   So on the evening of April 12th, you didn't get in your

12  car and drive down to the COMMSTA about 10 o'clock, did you?

13  A   No.

14  Q   And you aren't the person who kind of took, you know, a

15  white pickup and took a slow turn through the COMMSTA that

16  night, are you?

17  A   No.

18  Q   You didn't own a white pickup truck then, did you?

19  A   No.

20  Q   And so you did not come at 9 or 10 o'clock and take a

21  couple of slow turns through the COMMSTA parking lot, did you?

22  A   No.

23  Q   Just a moment.  And just to be clear, if I said April

24  12th, I met the night -- April 11th, in the night before the

25  homicides.  Right?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 150 of 206

**PEARSON - REDIRECT**

1  A   I've never driven through the COMMSTA at any point, so --

2  Q   Okay.

3  A   -- I could pretty much answer that.

4  Q   All right.  So you didn't take a slow turn in a white

5  pickup any night, did you?

6  A   No.

7  Q   All right.  And you didn't go at a high rate of speed

8  down -- at 2 o'clock in the morning down that road past the

9  COMMSTA, did you?

10  A   No.

11  Q   And you didn't hear any other car do that either, did you?

12  A   No.

13  Q   All right.  I don't have any other questions.

14       THE COURT:  Redirect.

15       MS. LOEFFLER:  Sure.

16               **REDIRECT EXAMINATION**

17  BY MS. LOEFFLER:

18  Q   Mr. Pearson, can you think of any reason why somebody

19  would have thought you committed the murders?

20  A   No.

21  Q   Okay.  So -- anyway, won't go into search warrants.

22  But -- and Mr. Offenbecher asked you about, you know, if

23  somebody had come to your house when you were home, you would

24  certainly have talked to them.

25  A   Uh-huh (affirmative).

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 151 of 206
(720) 384-8078  attrans@sbcglobal.net

1  Q    Were you at work most weekdays?

2  A    Every weekday.

3        MR. OFFENBECHER:  Objection.  He's leading -- she's

4  leading the witness now.

5        MS. LOEFFLER:  I'm entitled to get to the -- you want

6  me to --

7        THE COURT:  Just to get there.

8        MS. LOEFFLER:  Let -- okay.

9  BY MS. LOEFFLER:

10 Q    So let me ask you what your work schedule was in April of

11 2012.

12 A    8 to 4:30, or whenever I finished work, Monday through

13 Friday.

14 Q    Okay.

15 A    Yeah.

16 Q    And were there times when your wife was not at Red Cloud

17 Ranch?

18 A    Sure.  Yeah.

19 Q    And if she wasn't there, what would Red Cloud Ranch look

20 like to somebody who was driving by?

21 A    Vacant.

22 Q    Okay.  Now, the other thing is -- how many children did

23 you -- do you have, sir?

24 A    I have eight.  There were six with us then.

25 Q    Okay.  You had six kids living there.  Did the kids do any

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 152 of 206
(720) 384-8078  attrans@sbcglobal.net

1  exploring around those buildings?

2  A    Sure.

3  Q    Okay.  Was there anybody that you didn't know secretly

4  living in any of the buildings that we've just looked at?

5  A    No.

6  Q    Okay.  Why did you leave the Red Cloud Ranch?

7  A    Around the end of April --

8  Q    I --

9  A    -- of 2012.

10 Q    Why?

11 A    A lot of reasons.  It was a little too deserted, it was a

12 bad winter.  There was not good communication.  The phone

13 service was horrible out there, if nonexistent.

14 Q    Thank you.

15        THE COURT:  Recross.

16                 **RECROSS EXAMINATION**

17 BY MR. OFFENBECHER:

18 Q    So, Mr. Pearson, your -- you were living there with your

19 wife and six children?

20 A    Right.

21 Q    And your wife was working outside of the home?

22 A    No.

23 Q    She was living at home, right?

24 A    Yes.

25 Q    At the Red Cloud Ranch, right?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 153 of 206

1    A    That's correct.

2    Q    With six children?

3    A    That's right.

4    Q    Now, if the FBI had come by at any time in the last --

5    well, any time you were living there up to the end of April,

6    and knocked on the door, do you suppose that your wife would

7    have answered the door?

8    A    She would.

9    Q    And if they had asked her any questions about what was

10   going on or anybody in the area two years ago, your wife

11   probably would have answered those questions, wouldn't she?

12   A    Sure.

13   Q    And if your wife had been asked for permission to search

14   any of those buildings or shacks or vehicles, your wife

15   certainly would have given them permission to do that, wouldn't

16   they?

17   A    As long as there was a good reason.

18          MR. OFFENBECHER:  No other questions, Your Honor.

19          THE COURT:  Anything else?  All right.  Thank you, sir.

20   You're excused.

21          THE WITNESS:  Thanks.

22       (Witness excused)

23          THE COURT:  The government have any witnesses before

24   lunch?

25       (Side conversation)

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 154 of 206

1          MS. LOEFFLER:  We're done, Your Honor.

2          THE COURT:  Okay.  We're going to be -- it's -- it --

3  we're going to take a little longer than I thought, so we're

4  going to have to take a lunch hour and come back at 1:30.

5  Okay.  Sorry.  I think we were going to be --

6          UNIDENTIFIED JUROR:  1:30?

7          THE COURT:  1 -- I think --

8          MR. OFFENBECHER:  1?

9          THE COURT:  What time do you think you'll need?  1:15

10  or 1:30?

11          MR. CURTNER:  1:15 will be fine.

12          THE COURT:  1:15.

13          MR. OFFENBECHER:  1:15's fine.

14          THE COURT:  1:15.

15     (Jury not present)

16          THE COURT:  Well, when did you want to do your voir

17  dire?

18          MR. CURTNER:  Oh, could we do it now, just to find out

19  what he -- Agent Allison actually did, and then we can discuss

20  it --

21          THE COURT:  Okay.  So --

22          MR. CURTNER:  -- and see if we're going --

23          THE COURT:  -- I'm just wondering if I should have told

24  them 1:30.  Because how long we're going to be -- please be

25  seated.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 155 of 206

1      MR. CURTNER:  The voir dire would just take a few
2  minutes.

3      THE COURT:  Okay.

4      MR. CURTNER:  And I think we can be prepared to give
5  you some answer by 1:15.

6      THE COURT:  Okay.  Go for it.

7     (Side conversation)

8     **DARYL ALLISON, DEFENDANT'S WITNESS, PREVIOUSLY SWORN**

9      THE COURT:  All right, sir.  You're still under oath.
10  We won't swear you in again.

11      THE WITNESS:  Yes, Your Honor.

12      THE COURT:  Counsel.

13                      VOIR DIRE

14  BY MR. OFFENBECHER:

15  Q   Special Agent Allison, you started to testify about some
16  work you did that -- with a nailgun.

17  A   Yes.

18  Q   Can you tell us what that was?

19  A   We went to --

20  Q   First of all, can you tell us -- maybe I'll just take it
21  through.  When did you do it?

22  A   I believe it was yesterday or the day before.

23  Q   Okay.  Did you take any notes of what you did?

24  A   No.

25  Q   Take any pictures of what you did?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 156 of 206
(720) 384-8078   attrans@sbcglobal.net

1   A    No.

2   Q    Write any reports about what you did?

3   A    No.

4   Q    Why'd you do it?

5   A    Because I wanted to -- we wanted to see if we could find a

6   nailgun that the nail that was removed from the tire would fit

7   into.

8   Q    And when you say "we," who do you mean?

9   A    Special Agent Sturgis and I.

10  Q    And did you consult with the United States Attorney's

11  Office on this?

12  A    Yes.

13  Q    And who did you talk to there?

14  A    All three of the attorneys working this case.

15  Q    And was it your idea or their idea to do this?

16  A    It was mine.

17  Q    Okay.  And they approved it and told you it was okay?

18  A    Yes.

19  Q    And so you -- when did you actually complete whatever you

20  did?

21  A    This morning, about 7:50.

22  Q    This morning?

23  A    Yes.

24  Q    Okay.  Well, let -- first of all, what did you do?

25  A    We went and -- we went and found a nailgun.  At --

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 157 of 206
(720) 384-8078   attrans@sbcglobal.net

ALLISON - VOIR DIRE

1   Q    Okay, let me -- I'll just take it through slowly, if we're
2   going to do it that fast.
3   A    Okay.
4   Q    Where did you get a gun?
5   A    A -- a nailgun?  We got it at a tool rental --
6   Q    Okay.
7   A    -- shop.
8   Q    What day was this?
9   A    Believe it was two days ago.
10  Q    So it would have been Saturday or Sunday or --
11  A    Wait.  Today Tuesday or Wednesday?  I'm losing track of
12  days.
13  Q    It's Wednesday today.
14  A    It was Monday then.  I believe it was -- yeah, I think it
15  was Monday.
16  Q    And which --
17  A    I could be wrong -- you know what, I could be wrong.  It
18  could have been yesterday.  I can't remember.
19  Q    Okay.  You didn't take any --
20  A    I've got a receipt.  I could -- if you want me to go look
21  at it, I can find it.  I --
22  Q    I think for right now, we'll just --
23  A    It was this week.  Monday or Tuesday.
24  Q    Okay.  But you didn't write down any notes of what you
25  did?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 158 of 206

1  A    No.  I've got the receipt, if you'd like to look at it.

2  Q    No, that's all right.  And what was your intent in doing

3  this?

4  A    Wanted to see if we could find the nailgun the nail that

5  was removed from the tire would fit into.

6  Q    And how did you go about doing that?

7  A    I took the nailgun and I stuck the nail into the board --

8  the nailgun.

9  Q    You took the nail that's in evidence here?

10  A    Yes.

11  Q    Where did you take it?

12  A    To the tool rental shop.

13  Q    You took the nail that's in evidence here in court?

14  A    No, it's -- wasn't in here in court.

15  Q    But the nail's been admitted as an exhibit in court?

16  A    Yes.

17  Q    And you took it to the tool rental shop in Anchorage?

18  A    I did.

19  Q    Did you get permission from anyone to do that?

20  A    The attorneys at the U.S. Attorney's Office knew.  It was

21  in my possession.  It's FBI evidence.  So no.  Well, other than

22  the attorneys that I've been working with.

23  Q    So when you go to the tool rental shop, what did you do?

24  A    We asked them if they had a nailgun, powder-actuated

25  nailgun that we could look at.  They showed us one.  And we

1  took the nail and gently inserted it into the bore, so as not

2  to damage the nail.

3  Q    And what kind of nailgun was it?

4  A    I have it here if you'd like to see it.

5  Q    Well, first I'm going to ask you what kind of a nailgun it

6  was.

7  A    It's a Remington.  I believe it's a Model 490, if I'm not

8  mistaken.

9  Q    How many different kinds of nailguns did they have at the

10  shop?

11  A    I think they had another one, but this is the first one

12  that we looked at.

13  Q    So you think that they had two different kinds of

14  nailguns?

15  A    I believe they were both Remington.  I don't know if

16  they're the same model.

17  Q    And so did you rent the nailgun?

18  A    I did.

19  Q    And did you do this, whatever you did at the nail -- at

20  the rental shop?

21  A    Yes.

22  Q    And you've indicated your -- you didn't take any

23  photographs of it?

24  A    No.

25  Q    Was I think you and Special Agent Sturgis?

1  A    It was.

2  Q    Anybody else witness this?

3  A    The -- the guy that worked there.

4  Q    Okay.  And did he show you how to insert a nail into the

5  nailgun?

6  A    No, he did not.

7  Q    You already knew how to do that?

8  A    It's not that difficult.

9  Q    I'm just asking "Yes" or "No," did you know how to do that

10  already?

11  A    I looked at the nailgun and figured it out.

12  Q    Okay.

13  A    So, no --

14  Q    Have you --

15  A    -- I didn't know how before.

16  Q    Have you ever used a nailgun before?

17  A    Not the powder-actuated type.  I've used a -- a pneumatic

18  nailgun before.

19  Q    And did you -- how did you know how to insert the nails

20  into the nailgun?

21  A    There's a hole at the end of the nailgun, and you stick

22  the nail into it.

23  Q    Okay.  So is a nailgun like this normally operated one

24  nail at a time?

25  A    Yes.

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 161 of 206

1  Q    So that you -- this is a nailgun where you put one nail

2  in, you shoot it, you put one nail in, you shoot it, you put

3  one nail in, you --

4  A    Yes.  Yes --

5  Q    -- shoot it?

6  A    -- it is.

7  Q    So this is not the type of nailgun where a gang of nails

8  is inserted into it?

9  A    You mean like a stick or a drum nailer, no, it's not.

10 It's not a pneumatic nailer.

11 Q    And do you know what type of nails are specified for this

12 particular nailgun?

13 A    Not exactly, no.

14 Q    I mean, did you check with Remington to see what kind of

15 nails are recommended for this type of nailgun?

16 A    No.

17 Q    Did you check with any other source to see what type of

18 nails are recommended for this nailgun?

19 A    No.

20 Q    In what fashion did the nail fit in the nailgun?

21 A    I'm not sure what you mean by that.

22 Q    Well --

23 A    What the -- you take the nail and you stick it in the bore

24 of the nailgun.  I don't know what else you mean.

25      MR. OFFENBECHER:  Well, Your Honor, I guess we are

 1  going to have to probably take a look at the nailgun.

 2        THE COURT:  Makes sense.  It's right here.

 3        MR. OFFENBECHER:  Yeah.  Yeah.  May I approach the

 4  witness, Your Honor?

 5        THE COURT:  Yes.  It's not loaded, is it?

 6        THE WITNESS:  It is not.  Just double check to make

 7  sure.

 8        THE COURT:  Okay, good.

 9  BY MR. OFFENBECHER:

10  Q    Thanks.  It's not loaded, right?

11  A    No.

12        MR. OFFENBECHER:  Have just a moment, Your Honor?

13        THE COURT:  Be fine.

14     (Side conversation)

15  BY MR. OFFENBECHER:

16  Q    So you -- let me just be clear what you did.  You put the

17  nail into the nailgun?

18  A    Yes.

19  Q    And then what'd you do?

20  A    I pulled it back out and stuck it back in the packaging,

21  the evidence packaging.

22  Q    Okay.

23  BY THE COURT:

24  Q    I guess I misunderstood.  So the nail was never actually

25  shot into a tire.  Is that right?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 755  Filed 09/23/14  Page 163 of 206
(720) 384-8078  attrans@sbcglobal.net

ALLISON - VOIR DIRE

1  A    Not that -- not the evidence.  Not the nail from evidence,
2  no.
3  Q    Okay.  We just insert -- okay.
4        MR. OFFENBECHER:  Yeah, that -- that's what I
5  understand too.
6        THE COURT:  Okay.
7  BY MR. OFFENBECHER:
8  Q    So, first of all, you took the nail just to see whether it
9  would fit in here.  Is that right?
10  A    That's correct.
11  Q    Okay.  And did you do anything else?
12  A    This morning we tested it with a different nail, just to
13  make sure I knew how it worked, and that it was possible to
14  shoot a nail, a bent nail out of it.
15  Q    So tell us what you did this morning.
16  A    We took a nail that had a slight bend in it, and we stuck
17  it in the nailgun, and we shot it into a tire.
18  Q    Where did you get the nail?
19  A    We bought it at the store.
20  Q    What store did you buy it at?
21  A    Special Agent Sturgis, I believe, bought it at Home Depot.
22  Q    So you didn't buy it?
23  A    No.
24  Q    What size nail did you get?
25  A    A 16-penny nail.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 164 of 206
(720) 384-8078  attrans@sbcglobal.net

ALLISON - VOIR DIRE

1  Q   And it was a brand-new nail?

2  A   Yes.

3  Q   And how did you bend the nail?

4  A   Special Agent Sturgis did that.  I don't know.

5  Q   And were you there when the nail was shot out of the gun?

6  A   I did it myself.

7  Q   Okay.  So Special Agent Sturgis bent a nail, you think?

8  A   Yes.  I know he did.

9  Q   Okay.  What, you weren't there when he did that?

10 A   No, I was not.

11 Q   Okay.  And then you -- what did you do next?

12 A   After we shot it into the tire?

13 Q   Before you shot it into the tire.  Just tell me the

14 process --

15 A   I'm not sure -- where were we -- I don't remember what --

16 the last --

17 Q   Well, Special A -- well --

18 A   -- thing I said was I remembered I shot it into the tire.

19 I don't know what you're asking about next.

20 Q   Okay, I'll --

21 A   From what point are we talking?

22 Q   Sure.  I'll slow it down a little bit.  The -- where did

23 this occur?

24 A   At the FBI office.

25 Q   And what tire did you use?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 165 of 206
(720) 384-8078   attrans@sbcglobal.net

1  A    Oh, it was just a old tire we had sitting around.

2  Q    And what did you do?

3  A    From what point?

4  Q    Okay.  You got an old tire.  It's --

5  A    Yes.

6  Q    -- sitting around.

7  A    Yes.

8  Q    Then what did you do?

9  A    I put it up next to a wall and I put the nailgun -- nail

10 on top of the tire, stuck the nailgun over the tire, and shot

11 it into the tire.

12 Q    So you actually took the nail and put it on the tire?

13 A    The new nail, not the evidence --

14 Q    Right.

15 A    -- yes, because you -- that -- yeah, you can't actually

16 stick it -- it won't actually stay in the bore.  You actually

17 have to -- you know, unless you have a -- I -- I can't remember

18 what they call it.  It's a piece of plastic.  That usually when

19 you use a nailgun like this, you put a piece of plastic around

20 the nail and it holds it inside of the gun.  But we didn't have

21 that, so we stuck the nail in the tire, put the gun on it until

22 it made contact with the piston, and then we shot it into the

23 tire.

24 Q    So you've never actually used this type of nailgun before?

25 A    No, I have not.

1  Q    So somebody must have told you about the plastic part,

2  right?

3  A    I've actually seen them in the store --

4  Q    Okay.

5  A    -- with the little plastic -- nails with the little

6  plastic around them.

7  Q    So there's a special nail that you buy for this nailgun?

8  A    I don't know if it's nail or -- it -- it -- other -- you

9  might -- maybe you'll buy the plastic and just stick it around

10 the nail.  I don't know.

11 Q    Or -- but you didn't have that?

12 A    No.

13 Q    And that -- that's the device that would hold the nail

14 under normal circumstances in the nailgun?

15 A    I believe so, yes.

16 Q    So that you could just take the gun with a nail in it and

17 apply it to some surface.  Right?

18 A    Yes.

19 Q    But you didn't have that part?

20 A    No.

21 Q    So you just stuck the nail on the tire?

22 A    Yes.

23 Q    And then you put the nailgun over the back of the nail --

24 A    Yes.

25 Q    -- or the top of the nail?

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 167 of 206

ALLISON - VOIR DIRE

1  A    That's correct.

2  Q    And then what'd you do?

3  A    I pulled the trigger.

4  Q    Okay.  And then what happened?

5  A    The nail went into the tire.

6  Q    Okay.  How far in did it go?

7  A    All the way.

8  Q    When you say all the way, what do you mean?

9  A    Up until -- it was a smaller tire, it was a -- it was a

10 car tire, so the treads were a lot closer together.  So it --

11 it stopped when it hit the treads.  There was no room for it to

12 go in between them.

13 Q    So it did not go in between the treads.  Right?

14 A    No, it couldn't go in between the tread.  It was -- the

15 treads were too close together on that tire.

16 Q    And so the top of the nail was sticking out?

17 A    It was on -- it was on top of the tread, yeah.

18 Q    On top of the lugs, right?

19 A    Yeah.

20 Q    And did you take any photos of that?

21 A    No.

22 Q    Where is that tire now?

23 A    It's at our office.

24 Q    And was the tire filled with air at the time?

25 A    No, it wasn't.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 168 of 206
(720) 384-8078  attrans@sbcglobal.net

ALLISON - VOIR DIRE

1  Q   Was it on a rim?

2  A   No.

3  Q   So this was an unrimmed tire, just kind of sitting there?

4  A   It was.

5      MR. OFFENBECHER:  Have just a moment.

6  BY MR. OFFENBECHER:

7  Q   So did you just buy the one nail?

8  A   That's it.

9  Q   And did the -- to your recollection, did the nailgun leave

10  any mark on the head of the nail?

11  A   I don't know.  There's a mark there now because we used a

12  pair of pliers to pull it out.

13  Q   So the mark on the nail -- so you pulled that nail out?

14  A   Yeah, we did.

15  Q   So you didn't leave it where it was?

16  A   No.

17  Q   Didn't take a photograph of it?

18  A   Nope.  Oh, actually, I'm sorry, we did.  Yes.  Special

19  Agent Sturgis did, yeah.

20  Q   Okay.  And after you -- you don't know whether the nailgun

21  left a mark on the head of the nail?

22  A   No.  I -- I didn't have a microscope.  I was -- I'm not

23  qualified, really, to look for that.

24  Q   But you pulled it out with a pair of pliers?

25  A   Yes.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 169 of 206

1  Q    And did that mark it up?

2  A    Yes.

3  Q    Where's that now?

4  A    It's in my backpack.

5  Q    Could we see that, please?

6  A    Sure.

7         THE COURT:  Remember, I said 1:30.  That was me that

8  said 1:30.

9         MR. OFFENBECHER:  I think we're getting close to the

10 end of this episode.

11        THE COURT:  Okay.

12        MR. OFFENBECHER:  May I approach the witness, Your

13 Honor?

14        THE COURT:  That'll be fine.

15        MR. OFFENBECHER:  I'll put this right here.  Those are

16 all the questions I have right now, Your Honor.

17        THE COURT:  Any cross-examination?

18        MS. LOEFFLER:  No, except to say I just want you to

19 know I never had any intention of going into the shooting in

20 the tire and any of that.

21        MR. OFFENBECHER:  Oh, okay.

22        MS. LOEFFLER:  The only thing I -- I just want to let

23 you know that.  I was never intending to go into any of that.

24 I just wanted to ask him --

25        MR. OFFENBECHER:  Well --

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 755  Filed 09/23/14  Page 170 of 206

1          MS. LOEFFLER:  -- whether the nail would fit in the

2     bore.

3          THE COURT:  So what -- can -- remind me what you --

4     came out before the jury?

5          MS. LOEFFLER:  I think it came out that the nail would

6     fit in the bore.  I think that's -- yeah, I'm getting --

7          THE COURT:  That's -- okay.

8          MS. LOEFFLER:  -- a nod.  That's what I asked him, and

9     that did.

10         THE COURT:  So that's all that's gone into the -- okay.

11    No -- the jury didn't hear anything about shooting the nail

12    into the tire?

13         MS. LOEFFLER:  No, I was never --

14         THE COURT:  Okay.

15         MS. LOEFFLER:  -- intending to --

16         THE COURT:  Okay.

17         MS. LOEFFLER:  -- introduce that.

18         THE COURT:  All right.  All right.  Okay.  So that --

19         MR. CURTNER:  So, Judge, just so we know, is that going

20    to be -- are you going to present more evidence, or is that --

21    or is this subject to --

22         MS. LOEFFLER:  No, that was all I was going to do.

23         THE COURT:  Well, now --

24         MR. CURTNER:  You were done, okay.

25         THE COURT:  -- the ball is in your court.  They're

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 171 of 206
(720) 384-8078  attrans@sbcglobal.net

1   done -- they're done.

2           MS. LOEFFLER:  I'm done.

3           MR. CURTNER:  They're done, okay.

4           THE COURT:  And the ball is in your court.

5           MR. CURTNER:  Okay.

6           THE COURT:  How I should respond to this, if at all, if

7   I should give a cautionary instruction, if at all.  I just want

8   to know what you think.  And you --

9           MR. CURTNER:  Well, we'll let you know, yeah, I mean,

10  by 1:15 (indiscernible).

11          MR. OFFENBECHER:  Well, Your Honor, I think the easiest

12  answer is that I think you should strike it.  Then that'll be

13  the end of the inquiry on this and we'll be done.

14          THE COURT:  Okay.  Well, I don't know.  Give me some

15  time to think about it.  You know, how would you strike it?  I

16  mean, give me some -- how -- what language you could use to

17  strike it.  Just -- I'm giving you time to think about it --

18          MR. OFFENBECHER:  Okay.

19          THE COURT:  -- so you don't have to go like that.

20  Okay?

21          MR. OFFENBECHER:  Sure.

22          THE COURT:  I want to do it right.  I don't know what

23  to do.  I'm -- we understand that all the stuff that you

24  solicited was not presented to the jury.

25          MR. OFFENBECHER:  Yeah.  I had thought that this was

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 755  Filed 09/23/14  Page 172 of 206

1  the -- where we're headed, so, frankly --

2          THE COURT:  Okay.

3          MR. OFFENBECHER:  But, still, I think the fact that

4  they conducted an experiment, you know, in the past couple of

5  days with -- I mean, it's the same objection Mr. Schroder's

6  made many times.  And --

7          THE COURT:  Well, I'll --

8          MR. OFFENBECHER:  -- which was sustained by the Court,

9  frankly.  Experiments, you know, without any kind of reports

10  and -- you know, it's just --

11         THE COURT:  Well, I just want to know.  I don't know

12  what to do, but I want your suggestions, and if you want it

13  stricken, I want to know how you would strike it, the language

14  you would use.  I want the government to respond.

15         MR. OFFENBECHER:  Fine.

16         THE COURT:  I don't know what I'm going to do.  I

17  haven't decided.  But I think you should be able to think about

18  it.

19         MR. OFFENBECHER:  All right.  Thank you, Your Honor.

20         THE COURT:  So see you back here at 1:15.

21         MR. OFFENBECHER:  Thank you, Your Honor.

22         THE CLERK:  All rise.  This matter stands in recess

23  until 1:15.

24     (Court recessed at 12:16 p.m., until 1:22 p.m.)

25     (Jury not present)

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 755  Filed 09/23/14  Page 173 of 206

1         THE CLERK:  All rise.  His Honor the Court, the United

2    States District Court is again in session.

3         THE COURT:  All right.  Please be seated.

4         THE CLERK:  Please be seated.

5         THE COURT:  How are we doing?

6         MS. LOEFFLER:  Good, Judge.

7         THE COURT:  What's new?  Anything new?

8         MR. OFFENBECHER:  No, we --

9         THE COURT:  What --

10        MR. OFFENBECHER:  We have a proposed curative

11   instruction which we gave you.

12        THE COURT:  Anything else?

13        MR. OFFENBECHER:  No.

14        THE COURT:  Did you see it?

15        MS. LOEFFLER:  I just saw it.  Obviously, we --

16        THE COURT:  Okay.

17        MS. LOEFFLER:  -- object to it, but I'll wait for --

18   see what the Court wants me to -- where we are, Judge.

19        THE COURT:  Well, it sounds to me where we are is that

20   I'm going to give a curative instruction and ask the jury not

21   to consider that testimony, and then you're going to rest.

22   Right?

23        MR. CURTNER:  Yes.

24        MS. LOEFFLER:  I assume you're not going to give this

25   curative instruction.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 174 of 206

1        THE COURT:  No, I'm not.  I'm --

2        MS. LOEFFLER:  Okay.

3        THE COURT:  I do it the -- I get the message across,

4   though.

5        MS. LOEFFLER:  You know, Your Honor, the only -- my

6   only -- here's my only thing.  I'm not -- I am not arguing with

7   your ruling.  I just want to make sure we're not going to have

8   a closing argument that says you can't put a bent nail in a

9   nailgun.

10       THE COURT:  If they do, then I will interject.  I

11  will --

12       MS. LOEFFLER:  Okay.

13       THE COURT:  -- say that's not the evidence.  There's

14  been no evidence one way or the other on that subject.

15       MS. LOEFFLER:  Okay.  That's fine.

16       THE COURT:  I'm going to be fair to both sides.  I'm

17  just looking for something here.  So I guess what I'm hearing

18  is we're going to be in recess for the remainder of the day,

19  and then do closing arguments tomorrow morning.

20       MS. LOEFFLER:  8:30 --

21       THE COURT:  That's what I'm hearing?

22       MS. LOEFFLER:  -- tomorrow morning.

23       MR. OFFENBECHER:  Right.

24       THE CLERK:  Your Honor, I do need to clarify

25  (indiscernible) --

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 175 of 206
(720) 384-8078  attrans@sbcglobal.net

1          THE COURT:  Oh, would you do that, please?  This is a

2    good time to do it.

3          THE CLERK:  Okay, I was informed that Exhibit DE-127M,

4    like Mary, was not admitted.  It should be DE-127N, like Nancy.

5    That was done on day 8 of the trial.

6          THE COURT:  Have -- you get that cleared up?

7          THE CLERK:  I just want to make sure if the parties

8    agree that the exhibit admitted should be DE-127N, like Nancy,

9    should be the one that's admitted, and not M, like Mary.

10          MS. LOEFFLER:  If somebody just shows it to us, I

11    suspect we can figure that out, but --

12          THE CLERK:  I don't know if Bruce would be able to pull

13    that up.

14          MR. CURTNER:  Can you pull that up, Mr. Johnson?

15          MS. DIXON:  I had -- I also -- my notes show N, not M.

16          THE CLERK:  Okay.

17          MS. DIXON:  N as in Nancy, not M as in Mary.

18          THE CLERK:  Okay.

19          MS. DIXON:  So N was admitted, is what I show on my

20    notes.

21          THE CLERK:  Oh -- that was the only clarification I

22    needed.

23          THE COURT:  Okay.  Is everybody happy with that, that

24    adjustment?

25          MR. CURTNER:  Yes.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 176 of 206

1          THE COURT:  Okay.

2          MS. LOEFFLER:  Yeah.  Think so.

3          THE COURT:  Bring them in.

4      (Jury present)

5          THE COURT:  Well, I hope you all had a good lunch.

6  Ladies -- please be seated.  Ladies and gentlemen, we are on

7  schedule.  It looks like we're going to wind up here pretty

8  quick, and then tomorrow at 8:30 do closing arguments, which

9  will take most of the morning.  Then excuse the alternates, and

10 then it'll be in the hands of the jury.

11         I gave you some instructions initially.  I know you

12 don't remember them all.  But there'll be a packet of

13 instructions, one for each one of you.  One of the

14 instructions -- I -- I'm referring to instruction number 12 --

15 said:  Sometimes I may order that evidence may be stricken from

16 the record and that you disregard it or ignore the evidence.

17 That means that when you are deciding the case, you must not

18 consider the evidence that I told you to disregard.  Probably

19 don't remember I said that to you, but you understand what I'm

20 saying?  I'll read it to you again.

21         Sometimes I may order that evidence may be stricken

22 from the record and that you disregard or ignore the evidence.

23 That means that when you are deciding the case, you must not

24 consider the evidence that I told to disregard.

25         I've got one item of evidence that falls into that

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 177 of 206
(720) 384-8078  attrans@sbcglobal.net

1   category. Special Agent Allison began to testify just before

2   lunch about a nailgun, and I've determined that that evidence

3   is inadmissible. That means the evidence should be disregarded

4   and not be considered by you for any purpose. Anyone have any

5   difficulty following that instruction? I'm looking at each one

6   of you. You're all saying you're okay. Who disagrees? No

7   one. Okay. I made it as clear as I can. You ready to go home

8   and take a nap? We'll see you tomorrow morning, 8:30.

9         JUROR NO. 2: (Indiscernible).

10        THE COURT: What?

11        JUROR NO. 2: (Indiscernible).

12        THE COURT: You thought it was joking?

13        JUROR NO. 2: No, I was thinking (indiscernible).

14        THE COURT: That was it. We are through with the

15   evidence in the case. You've taken that. The parties are

16   going to go home and work on their closing arguments, and

17   that's what we're going to be doing, try to get it so the

18   equipment works, and so when you come on tomorrow morning it's

19   clean and it's sharp and we get right into it. That's what

20   we're working towards. So when we're -- when you're napping,

21   we're working, okay? All right, we see you --

22        JUROR NO. 2: (Indiscernible) we are napping, we work.

23        THE COURT: Oh, okay. Oh, that -- I presume that's

24   right. You've probably got work to do.

25      (Jury not present)

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 178 of 206
(720) 384-8078   attrans@sbcglobal.net

1          THE COURT:  Okay.  The jury is gone.  What else did the

2  government have?

3          MS. LOEFFLER:  We just have a couple of errors and

4  corrections in the jury instructions.  Most of them are minor.

5          THE COURT:  Okay.  I got them in my --

6          MS. LOEFFLER:  Do you want to go through that?

7          THE COURT:  Sure.

8          MS. LOEFFLER:  Okay.

9          MR. OFFENBECHER:  Your Honor, can we just make sure

10  we're working off the same set?

11          THE COURT:  I'm afraid we're not, because some of

12  the -- but I emailed it to both of you.

13          MR. OFFENBECHER:  Right, but it's -- this looks like an

14  earlier version to me than when we discussed it before.

15          THE COURT:  Well --

16          MR. OFFENBECHER:  For example, I -- just for example,

17  just to see if we can spot it -- I'm just kind of spitballing

18  it, but the -- on number 27 you in -- you had indicated that

19  you were changing that to "there's been evidence that another

20  person," not "the defendant."

21          THE COURT:  Right.  I actually handed that out in open

22  court.

23          MR. CURTNER:  Right.

24          MR. OFFENBECHER:  Oh.  Oh, I see.  So that's a

25  substitute for this one.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 755  Filed 09/23/14  Page 179 of 206

1          THE COURT:  Right.

2          MR. OFFENBECHER:  Okay.

3          THE COURT:  Do you got it?

4          MR. OFFENBECHER:  I missed that.

5          MR. CURTNER:  No, this is the one I think we got this

6   morning, which looks like an earlier version.  I don't think --

7          THE COURT:  Oh, you got something this morning?  I

8   didn't send you anything this morning.

9          UNIDENTIFIED SPEAKER:  Jan did.

10         THE COURT:  Oh, Jan did?

11         MR. CURTNER:  I guess (indiscernible) -- yeah.

12         MR. OFFENBECHER:  Yeah.

13         MR. CURTNER:  Because it looks like an earlier draft.

14         MR. OFFENBECHER:  It looks like a --

15         THE COURT:  Oh, she sent you the wrong draft.

16         MR. CURTNER:  Yes.

17         MR. OFFENBECHER:  That's what I'm thinking.

18         THE COURT:  Oh, come on.

19         MR. OFFENBECHER:  Yeah, because a lot of the --

20         MR. CURTNER:  You didn't hear that from us --

21         MR. OFFENBECHER:  -- edits I think that you've made on

22   it aren't in here.  That's all I'm saying.

23         THE COURT:  Well, don't -- work from the draft that you

24   had last week.  And she always is --

25         MR. CURTNER:  Well --

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 180 of 206
(720) 384-8078   attrans@sbcglobal.net

1          THE COURT:  -- telling me throw away and use the right

2     draft.  And so she's the one that --

3          MR. OFFENBECHER:  Okay.

4          MR. CURTNER:  Do you --

5          THE COURT:  So do you have the right -- anyone have

6     the -- I have the right draft.

7          MR. OFFENBECHER:  I don't think we do, Your Honor.

8          MS. LOEFFLER:  Let's make sure we all have the same --

9          MR. SCHRODER:  Well, this one says it's defendant's

10    proposed.

11         MS. LOEFFLER:  Yeah.

12         MR. SCHRODER:  I mean, it's clear that it's not the

13    final, I think.

14         MS. LOEFFLER:  It's not -- yeah.  It wasn't the one you

15    gave us --

16         MR. SCHRODER:  Yeah.

17         MS. LOEFFLER:  -- so there's --

18         THE COURT:  Well, she probably --

19         MS. LOEFFLER:  -- the draft we're working off is not

20    the --

21         THE COURT:  So is -- okay.  Let me just -- let's all

22    turn to instruction number 18.  I'm going to read that tomorrow

23    before closing arguments.  That'll be the one instruction I'll

24    read before closing arguments.  Any objection?

25         MR. OFFENBECHER:  No.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 181 of 206
(720) 384-8078  attrans@sbcglobal.net

1          THE COURT:  It's a pattern.

2          MS. LOEFFLER:  No.

3          THE COURT:  Then we go to 19.  That's pattern.

4  Everyone -- it says, "Members of the jury, now that you've

5  heard all the evidence."  Everyone see that one?

6          MR. SCHRODER:  Uh-huh (affirmative).

7          MS. LOEFFLER:  Uh-huh (affirmative).

8          THE COURT:  Okay, then --

9          MR. OFFENBECHER:  I --

10         THE COURT:  -- we go to 20.

11         MR. OFFENBECHER:  Is this going to be your -- is -- I'm

12  sorry, was 18 your first instruction?

13         THE COURT:  It's the first one I will read tomorrow.

14  I've already read 1 through 17.

15         MR. OFFENBECHER:  Okay.

16         THE COURT:  And they'll get the entire packet.  They

17  will get 1 -- they've al -- I've already read 1 through 17.

18  The first new one I read will be 18.  I'll read that before

19  closing arguments.  Then the next one I will read after closing

20  arguments will be -- start with number 19.  Everybody with me?

21         MR. SCHRODER:  Uh-huh (affirmative).

22         MS. LOEFFLER:  Uh-huh (affirmative).

23         THE COURT:  Then I'll go to 20, and that's just simply

24  Count 1.

25         MR. SCHRODER:  Uh-huh (affirmative).

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 182 of 206
(720) 384-8078  attrans@sbcglobal.net

1           THE COURT:  21 is Count 2.  22 is Count 3.  23 is

2    Count --

3           MS. LOEFFLER:  Your Honor, there's just a typo.

4           THE COURT:  Okay, tell me that.

5           MS. LOEFFLER:  On 22 it says, "Fourth, Richard W.

6    Belisle was a federal officer or employee and," and the "and"

7    needs to be struck out.

8           THE COURT:  Strike the "and."

9           MS. LOEFFLER:  There's a grammatical error, yeah.

10          MR. SCHRODER:  I think it should need a -- probably be

11   a period too.

12          MS. LOEFFLER:  I think it's probably a period, yeah.

13          MR. SCHRODER:  Yeah.

14          MS. LOEFFLER:  It's just a grammatical error.

15          THE COURT:  So all you're asking me to do is strike the

16   word "a-n-d"?

17          MS. LOEFFLER:  Strike the word "and" and put a period

18   the --

19          MR. SCHRODER:  Change the colon -- semicolon to a

20   period.

21          MS. LOEFFLER:  Right.

22          THE COURT:  Okay.  So after the word "employee," there

23   should be a period?

24          MR. SCHRODER:  Uh-huh (affirmative).

25          MS. LOEFFLER:  Right.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 183 of 206

1              THE COURT:  Okay.  So we got to modify number 22.  Then
2    we go to 23.  Any issues like that?
3              MR. SCHRODER:  No.
4              MS. LOEFFLER:  No.
5              THE COURT:  Then we go to 24.
6              MS. LOEFFLER:  Yeah.  We have -- yeah.  It's the --
7    yeah, you have "using and carrying," and should be "using or
8    carrying."  You know, it's the old "Plead in the conjunctive,
9    prove in the disjunctive."
10             THE COURT:  So it should be "used or carried"?
11             MS. LOEFFLER:  Right.
12             MR. SCHRODER:  Uh-huh (affirmative).
13             MS. LOEFFLER:  You plead in the conjunctive, prove in
14   the disjunctive.
15             THE COURT:  "Second, the defendant knowingly used or
16   carried," okay.
17             MS. LOEFFLER:  Yeah.
18             THE COURT:  Any other changes?
19             MS. LOEFFLER:  And that's what -- 25 has the same one.
20             THE COURT:  Okay, 25.
21             MS. LOEFFLER:  "Or carried," yeah.
22             THE COURT:  Okay.  "Or carried."  Made that change.
23   26?
24             MR. OFFENBECHER:  26, I think we suggested it might not
25   be appropriate.  I thought you were taking --

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 755  Filed 09/23/14  Page 184 of 206

1          THE COURT:  We did, but we did that wrongly, and Jan

2    reminded me that knowingly is an element of the last two

3    charges.

4          MR. SCHRODER:  Yes.

5          THE COURT:  And I had overlooked it.

6          MR. OFFENBECHER:  Okay.

7          THE COURT:  And so because it's an element of

8    instruction number --

9          MS. LOEFFLER:  Oh, Your Honor, in instructions 24 and

10   25 --

11         THE COURT:  Yes.

12         MS. LOEFFLER:  -- we've got --

13      (Side conversation)

14         THE COURT:  We need more people working on that one.

15         MS. LOEFFLER:  There's two -- okay, 24 and 25, there

16   are two places we have to take the "and" out and change it --

17         THE COURT:  Okay, where's the --

18         MS. LOEFFLER:  -- to an "or."

19         THE COURT:  -- other place?

20         MS. LOEFFLER:  Okay.

21         MR. SCHRODER:  First line.

22         MS. LOEFFLER:  First line of 25 has an "and," and first

23   line of 24 has an "and" that should be "or."

24         THE COURT:  Okay.  Let's start with 24.  Tell me where

25   the change is proposed.  The --

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 185 of 206
(720) 384-8078  attrans@sbcglobal.net

1          MS. LOEFFLER:  The last word in the first line of

2    instruction number 24.

3          THE COURT:  The last word --

4          MS. LOEFFLER:  In the first line in instruction 24.

5          THE COURT:  We obviously are looking at something

6    different.

7          MR. OFFENBECHER:  Yeah.

8          MS. LOEFFLER:  Well, that's -- sorry, that -- I think

9    that's what the defense brought up, is our copies may not be

10   the same as the one you're working.

11         THE COURT:  Well, how could that be a problem with

12   this?  It says, "The defendant is charged in Count 5 of the

13   indictment with carrying and -- with using and carrying."  And

14   you say that should be "or."

15         MS. LOEFFLER:  "Using or" --

16         MR. SCHRODER:  Right.

17         MS. LOEFFLER:  -- "carrying," yes.

18         THE COURT:  That's okay.  We can --

19         MS. LOEFFLER:  That's all.

20         THE COURT:  Okay.  "Using or carrying."

21         MS. LOEFFLER:  Yeah.  Well, he fixed the one below.  He

22   fixed the one below.

23         THE COURT:  I fixed the other one already.

24         MS. LOEFFLER:  And then 25 has the same thing.

25         THE COURT:  "With using or carrying" --

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 755  Filed 09/23/14  Page 186 of 206

1          MS. LOEFFLER:  "Or carrying."

2          THE COURT:  -- got you.  We're back on track.

3          MS. LOEFFLER:  Okay.

4          THE COURT:  Now we turn to 26.

5          MS. LOEFFLER:  That's the knowingly one.

6          THE COURT:  That's a pattern, knowingly.  Then we turn

7    to 27.

8          MS. LOEFFLER:  And we don't have the one -- what we

9    have in our packet is not the one you --

10         THE COURT:  I know, but I --

11         MS. LOEFFLER:  -- gave us.

12         THE COURT:  -- passed it out to you several days ago.

13   You want -- where's Ruth?  I need to get copies of this to you.

14         (Off record at 1:35 p.m.; on record at 1:38 p.m.)

15         (Jury not present)

16         MR. OFFENBECHER:  Your Honor, our only suggestion --

17   are we on 27?

18         THE COURT:  Yeah.  Back on the record, yes.

19         THE CLERK:  We're on record.

20         MR. OFFENBECHER:  The one we presented indicates that

21   there's been evidence that another person not the defendant --

22   I understand that the Court has modified it, but -- when the

23   Court indicates "the defendant contends," it's kind of -- it's

24   a bit of a --

25         THE COURT:  We -- how would -- what word would you use?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 755  Filed 09/23/14  Page 187 of 206

1          MR. OFFENBECHER:  Well --

2          THE COURT:  "Suggest"?  "Alleges"?  "It is defendant's

3     position"?

4          MR. OFFENBECHER:  Yeah, I think "it is defendant's

5     position" is more neutral.  I think that's a good suggestion.

6     Don't you think?

7          MR. CURTNER:  Uh-huh (affirmative).

8          MR. OFFENBECHER:  Yeah.

9          THE COURT:  Okay.

10         MS. LOEFFLER:  That's fine with that.  We don't --

11         THE COURT:  Okay.

12         MS. LOEFFLER:  We don't -- that's fine.

13         THE COURT:  Okay.  So on number 27, if Jan's listening,

14    which she probably is, it should read:  "It is defendant's

15    position that a person or persons other than him."  Okay.

16    Hearing nothing else, I'll turn to -- I'm going to throw away

17    the 27.  We'll turn to 28.  This is a pattern, alibi.  I'll

18    strike the question marks and I'll strike the number and I'll

19    strike the word "alibi."

20         MR. OFFENBECHER:  This is just the pattern, right, Your

21    Honor?

22         THE COURT:  It's the pattern.

23         MR. OFFENBECHER:  Yeah.  Your Honor --

24         THE COURT:  6.1.

25         MR. OFFENBECHER:  -- we don't have any objection to

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 755  Filed 09/23/14  Page 188 of 206

1   that.

2           THE COURT:  It's the pattern.

3           MR. OFFENBECHER:  Yeah.

4           MS. LOEFFLER:  29's fine.

5           THE COURT:  Oh, you're still on -- you moved ahead.  I

6   thought you -- complaining about 28.

7           MS. LOEFFLER:  Oh, no, sorry.  No, we -- Your Honor,

8   28's okay.

9           THE COURT:  Okay.  29.

10          MS. LOEFFLER:  29.

11          THE COURT:  Yes, 29's no problem.

12          MR. OFFENBECHER:  Right.

13          MS. LOEFFLER:  Right.

14          THE COURT:  30.  I modified it based on what I think it

15  should be, and you tell me if I'm wrong.  "You may consider --

16  you have heard evidence the defendant committed other acts not

17  charged here.  You may consider this evidence only for its

18  bearing on -- depending on the question of defendant's motive

19  and for no other purpose."

20          MR. SCHRODER:  No --

21          MR. OFFENBECHER:  Think that's right.

22          MS. LOEFFLER:  Can we -- let -- let's have a minute

23  over here.

24          THE COURT:  Sure.  Then we -- the brackets will be

25  removed away, and it said, "You may not consider this evidence

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 189 of 206

 1  as evidence of guilt of the crime for which the defendant is

 2  now on trial."

 3      (Side conversation)

 4      MS. LOEFFLER:  Okay, Your Honor, our position is the

 5  defendant's motive, opportunity, preparation, or plan, because

 6  we -- you know, at least it's the government's theory that he

 7  stole John Stein's gun, and that ended up being part of the

 8  preparation and plan and opportunity.

 9      MR. OFFENBECHER:  Stole John Stein's gun in 1997 before

10  any of the other evidence occurred?

11      MS. LOEFFLER:  Well, I'm not saying the original taking

12  was planning this murder, but I'm thinking that it was part of

13  a plan to use the gun that he had taken.  I mean, it's

14  obviously our theory that he'd -- you know, because it didn't

15  trace back to when -- that's where we're coming from on it.  I

16  don't think it's a secret.

17      MR. OFFENBECHER:  Your Honor, the other acts and things

18  like the gas card -- it's clearly -- at least it was alleged in

19  their opening brief and arg -- and suggested during their

20  argument during the course of the trial that this was motive

21  evidence.  I think we've --

22      MR. SCHRODER:  That's correct.

23      MR. OFFENBECHER:  -- hit it right on the head.

24      MS. LOEFFLER:  Yeah, it's true.

25      MR. OFFENBECHER:  And if it's -- it's not for planning

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 755  Filed 09/23/14  Page 190 of 206

1 or preparation or anything else.  It's motive evidence.

2         THE COURT:  Your turn.

3         MS. LOEFFLER:  Well, I just said there's multiple acts.

4 I mean, it's not like there's one act that can

5 (indiscernible) --

6         THE COURT:  I understand that.

7         MS. LOEFFLER:  There's acts related to motive and then

8 there's, you know, acts related to, you know, the preparation

9 and planning.

10         MR. OFFENBECHER:  Well, what --

11         MS. LOEFFLER:  We're not saying that he stole the gun

12 originally because he was planning on killing people later.

13 But it was certainly our theory that, you know, using the

14 stolen gun that didn't trace back to him.

15         THE COURT:  How about if I just keep in the word

16 "motive" and "plan," and not --

17         MR. OFFENBECHER:  Well --

18         THE COURT:  -- get into all these other ones?

19         MR. OFFENBECHER:  Well, Your Honor, I think -- I don't

20 think that's appropriate, because what they're -- the act is

21 the act of stealing John Stein's gun, if that's what they're

22 suggesting.  And they're not even asserting that the act of

23 stealing the gun was part of the plan to commit this crime.

24 They're just saying he stole the gun and it happened to be

25 there, and so he used it.  That's what I hear them saying.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 191 of 206

1  That's not a plan.  And, you know, they're saying they're not

2  going to argue plan.

3       MS. LOEFFLER:  Well, then use the word "opportunity."

4  I mean, that's still our theory, the -- taking the gun, and

5  then he had this gun that didn't (indiscernible) was part of

6  the opportunity.  And I can -- I'm happy with the word

7  "opportunity," if you want to take out "plan."

8       MR. OFFENBECHER:  Your Honor, the whole case, they've

9  argued motive.  They're going to shift horses --

10      THE COURT:  Well, I don't know if they've argued motive

11 the whole case.  I think that the gun was part of the -- either

12 the plan or the opportunity.  I don't want to drive it twice.

13      MS. LOEFFLER:  Nope.  Take --

14      THE COURT:  You choose, "plan" or "opportunity."

15      MS. LOEFFLER:  I like --

16      MR. SCHRODER:  "Opportunity."

17      MS. LOEFFLER:  -- "opportunity."

18      THE COURT:  Okay.  So it's going to read, "You have

19 heard evidence that defendant committed other acts not charged

20 here.  You may consider this evidence only for its bearing

21 depending on the question of the defendant's motive and

22 opportunity and for no other purpose.  You may not consider

23 this evidence as guilt of -- evidence of guilt of the crime for

24 which the defendant is now on trial."  Okay.  "Separate crimes

25 as charged against" -- 31 is standard.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 192 of 206
(720) 384-8078   attrans@sbcglobal.net

1    MS. LOEFFLER:  Yeah.

2    THE COURT:  32, standard.  Any objection to 32?

3    MR. OFFENBECHER:  No.

4    MS. LOEFFLER:  No.

5    THE COURT:  33.  I think we have had summaries

6 presented, haven't we?

7    MS. LOEFFLER:  There are some.  I'm trying to remember.

8    MR. OFFENBECHER:  Yeah, there are.

9    MS. LOEFFLER:  There probably are.  There were some

10 demonstrative evidence -- exhibits.

11    THE COURT:  Okay, so I'll use -- give 33 as presented.

12 It's -- it is a pattern.  Then what about 34?  Do we need --

13    MS. LOEFFLER:  You need to give 34.

14    THE COURT:  -- both of these?  That's the question.

15    MS. LOEFFLER:  Because there were a -- there were also

16 a bunch of charts and summaries that were admitted.

17    THE COURT:  Okay, so I guess --

18    MS. LOEFFLER:  You have to leave 34 in.

19    THE COURT:  Yeah, I think I have to leave 34 in too.

20    MS. LOEFFLER:  Yeah.

21    THE COURT:  35, I've already given it once, but I'll

22 give it again.

23    MS. LOEFFLER:  Yeah.

24    THE COURT:  36.  Leave that in.

25    MS. LOEFFLER:  Of course.  And you have to take out 37.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 193 of 206

1          THE COURT:  Delete 37.  38 is pattern.  39 --

2          MS. LOEFFLER:  Let me -- hold on, let me -- oh, let me

3   just double check.  I think -- yeah, but before you get to 39,

4   Judge --

5          THE COURT:  Okay.

6          MS. LOEFFLER:  -- you're missing a couple that should

7   go in before there.

8          THE COURT:  What's that?

9          MS. LOEFFLER:  That is -- model instruction 4.14 is

10  about experts.  And I don't believe there's any --

11         THE COURT:  I've already read that.  I've already read

12  that.

13         MS. LOEFFLER:  Okay, I'm sorry.  I didn't --

14         THE COURT:  No, don't be sorry.  Just -- I already read

15  it.  You're free to use it as many times as you want.

16         MR. OFFENBECHER:  Okay.  I just want to make sure it

17  was in the packet, and I didn't --

18         THE COURT:  It's in the packet.

19         MR. OFFENBECHER:  Okay.

20         THE COURT:  That's fine, where it is, though.  I don't

21  want to tell you something that's not true.  It's number 10.

22         MS. LOEFFLER:  All right, thank you, Your Honor.  I --

23         THE COURT:  Okay.

24         MS. LOEFFLER:  I hadn't gone -- I was starting where

25  you started.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 194 of 206
(720) 384-8078  attrans@sbcglobal.net

1          THE COURT:  No, that's right.  That's -- I've had these
2  memorized.  Okay.

3          MS. LOEFFLER:  Okay.

4          THE COURT:  Next.

5          MR. OFFENBECHER:  Well, Your Honor, I -- yeah, I mean,
6  this is going to come up later, but I think there ought to be a
7  presumption of innocence instruction in the final instructions
8  to the jury.  I know you gave it to them four weeks ago.

9          THE COURT:  I said I -- I said it's in 35.

10          MR. OFFENBECHER:  Okay.  I'm sorry, I didn't see it.
11  Apologize.

12          THE COURT:  Well, proof beyond a reasonable doubt?  Is
13  that what you meant?  Or you want something beyond that?

14          MR. OFFENBECHER:  Just the presumption of innocence.
15  The defendant is presumed innocent, has no burden of coming
16  forth with any evidence.

17          THE COURT:  I've already given that before.  You want
18  me to give it again?

19          MR. OFFENBECHER:  At the end of the trial, yes, Your
20  Honor.

21          THE COURT:  You know, I think I've given it a couple
22  times.  I gave it when we selected the jury.  I gave it when I
23  read the initial instructions.

24          MR. OFFENBECHER:  It's the last paragraph of
25  instruction number 3.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 755  Filed 09/23/14  Page 195 of 206

1          THE COURT:  I've read -- there it is, in number 3.  So

2     you can blow that up and do whatever you want with it, because

3     it's part of the packet.  And then number 5 is reasonable

4     doubt.  I usually don't give that one twice.  I usually give

5     reasonable doubt twice.  So let me think about it.  I'm

6     probably inclined to just keep it as it is.  Okay, what else

7     did the government have?  You said I had several I omitted.

8          MS. LOEFFLER:  No, I -- you didn't omit the one, and

9     then I --

10        (Side conversation)

11        MS. LOEFFLER:  Judge, I think there was a -- there was

12    an issue about the character evidence, and we had said just --

13    there's a 4.4 model instruction on character.  And they had

14    proposed something we objected to --

15        THE COURT:  Yeah.

16        MS. LOEFFLER:  -- and we tried a pleading on it, and we

17    just don't know where you are on that, Your Honor.

18        THE COURT:  I'm -- I -- I'm not going to give it.

19        MS. LOEFFLER:  Okay.

20        MR. OFFENBECHER:  Will you give the model instruction,

21    Your Honor?

22        THE COURT:  Well, let me read 4 -- it's 4.1, you said?

23        MS. LOEFFLER:  4.4 is the model, but it said --

24        THE COURT:  Okay, it --

25        MS. LOEFFLER:  -- anyway --

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 755  Filed 09/23/14  Page 196 of 206

1          THE COURT:  -- said -- starts off, "The committee

2     believes that the trial judge need not give an instruction on

3     the character of the defendant when such evidence is admitted."

4     So that's --

5          MS. LOEFFLER:  Right.

6          THE COURT:  In Ninth Circuit they don't have that.

7     Now, I hate to inject myself into the decision-making process.

8          MS. LOEFFLER:  Right.

9          THE COURT:  Because they've heard evidence of

10    defendant's character for peacefulness.  They've also heard

11    evidence of defendant's --

12         MS. LOEFFLER:  Yeah.

13         THE COURT:  -- from his brother-in-law, his sister, the

14    chief, of evidence where maybe he didn't have such peaceful an

15    attitude.  I don't know if I should be focusing one way or the

16    other.  I can let -- you're clear to argue.

17         MS. LOEFFLER:  Yeah, it's --

18         THE COURT:  Both parties are clear to argue.

19         MS. LOEFFLER:  Right.

20         THE COURT:  But when I got to -- Ninth Circ --

21         MS. LOEFFLER:  But I think -- I'm sorry.

22         THE COURT:  -- advise -- telling me it's not necessary,

23    and when I got con -- inconsistent testimony on that issue, I

24    just hate to jump into it.  You can argue as much as you want.

25         MR. OFFENBECHER:  Your Honor, the instruction we've

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 755  Filed 09/23/14  Page 197 of 206

1    offered both says about peacefulness and nonviolence, and it

2    also says, "You should consider any evidence offered to rebut

3    the evidence offered by the defendant."  It's a pretty fair --

4           THE COURT:  So -- okay, what --

5           MR. OFFENBECHER:  -- even-handed --

6           THE COURT:  Are you -- but just not a pattern?

7           MR. OFFENBECHER:  No, it's not a pattern.  It's a

8    pattern in some other jurisdictions --

9           THE COURT:  Yeah.

10          MR. OFFENBECHER:  -- and other circuits, but --

11          MS. LOEFFLER:  Yeah.  I thought you should give Ninth

12    Circuit or nothing.  I don't want to start going after other

13    jurisdictions on one instruction.

14          MR. OFFENBECHER:  Well, I'm sure you don't.

15          THE COURT:  Not unless they want it.

16          MR. OFFENBECHER:  It's -- I --

17          THE COURT:  I know.  I -- I've been down the road

18    before.  You think this is my first time?

19          MR. OFFENBECHER:  It's obviously a big issue in the

20    case, Your Honor.  Their entire rebuttal case was --

21    substantially involved trying to rebut the character evidence,

22    so --

23          THE COURT:  So what are you proposing?  It's "You have

24    heard evidence of the defendant's character for peacefulness"?

25          MR. OFFENBECHER:  "Peacefulness and nonviolence."

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 198 of 206

1          THE COURT:  Well, I don't even see "nonviolence" in

2     this pattern.  "You have heard evidence of the defendant's

3     character for peacefulness.  In deciding this case, you should

4     consider that evidence together with and in the same manner as

5     all the other evidence."

6          MR. OFFENBECHER:  Yeah.

7          THE COURT:  Could I then say, "You've also heard

8     evidence that the -- of circumstances where defendant has been

9     not peaceful.  You should consider this evidence as you would

10    all other evidence"?

11         MR. OFFENBECHER:  Well, no, I don't think you should.

12         THE COURT:  No, of course I shouldn't.

13         MS. LOEFFLER:  It's too confusing then.  I guess our

14    position is to follow the guidance of the Ninth Circuit that --

15         THE COURT:  I should keep --

16         MS. LOEFFLER:  -- says don't give it at all, let --

17         THE COURT:  -- my mouth closed.

18         MS. LOEFFLER:  -- everybody argue it.

19         MR. OFFENBECHER:  Your Honor, we've offered

20    instructions --

21         THE COURT:  I know.

22         MR. OFFENBECHER:  -- and we've stated --

23         THE COURT:  I know.

24         MR. OFFENBECHER:  -- our authorities.

25         THE COURT:  I -- listen, I tossed and turned over this,

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 199 of 206
(720) 384-8078  attrans@sbcglobal.net

1  but every -- I can think of arguments on both sides, and when

2  you do nothing but create problems, sometime it's better to

3  just say nothing, allow you to argue it as much as you want in

4  your closing, allow the government to argue. I'm not doing

5  anything to curtail argument. I'm just trying to keep myself

6  out of the process as much as possible. And when I do tell

7  them to disregard something, I expect them to obey it. And I

8  think they do, because I'm not always -- I -- it's seldom that

9  I do that. Okay?

10         MS. LOEFFLER: Yeah.

11         THE COURT: All right.

12         MS. LOEFFLER: Think we're done.

13         THE COURT: What else from the government?

14         MR. SCHRODER: Think that's it.

15         MS. LOEFFLER: That's it, Your Honor.

16         THE COURT: What else from the defendant?

17         MR. OFFENBECHER: Your Honor, my only -- and I've made

18  this -- I just want to be clear. I would like the Court to

19  give a presumption of innocence instruction at the end of the

20  case. I know they heard it four weeks ago. I know I can use

21  it in closing. But I don't want to spend a lot of time reading

22  instructions to them. I think it's a key fundamental principle

23  of the American criminal justice system --

24         THE COURT: You -- tell me the pattern you're referring

25  to.

A & T TRANSCRIPTS
(720) 384-8078 attrans@sbcglobal.net
Case 3:13-cr-00008-SLG Document 755 Filed 09/23/14 Page 200 of 206

1          MR. OFFENBECHER:  It's your instruction, it's number 5.
2    I don't have a pattern with me.
3          THE COURT:  Okay.  Okay.  It's my 5 is what you mean.
4    You probably requested it and I gave it initially.
5          MR. OFFENBECHER:  Oh, I'm sorry, it's not 5.  It's --
6    no --
7          THE COURT:  I know which one -- yeah.
8          MR. CURTNER:  3.
9          MR. OFFENBECHER:  3.
10         THE COURT:  It's 3.
11         MR. OFFENBECHER:  That -- it's a --
12         THE COURT:  You know, I'm -- it doesn't offend me to
13   give that.  I just --
14         MR. OFFENBECHER:  Good.  That's -- those are the
15   fundamental principles of American criminal justice.
16         THE COURT:  I know about that.  So you just want the
17   one sentence?
18         MS. LOEFFLER:  Well, I just -- Judge, if you're going
19   to read it again, I'd just have you read the whole instruction
20   again, not take one sentence out of it.  And I'm not going to
21   object if they want you to read it again, but I don't think we
22   should take one sentence out of it.
23         THE COURT:  I don't mind.  I'll read it again, the
24   whole instruction.
25         MS. LOEFFLER:  Okay.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 755  Filed 09/23/14  Page 201 of 206

```
 1          THE COURT:  I'll read number 3.  I'll stick it in down
 2   the line somewhere.
 3          MR. OFFENBECHER:  Thank you, Your Honor.
 4          THE COURT:  I don't know --
 5          MS. LOEFFLER:  That's fine.
 6          THE COURT:  -- where.  But it'll be toward the end.
 7          MR. OFFENBECHER:  Thank you, Your Honor.
 8          MS. LOEFFLER:  Okay.
 9          THE COURT:  So I'm going to -- I don't know where I'll
10   stick it in, but it'll be in there somewhere, okay.
11          MR. OFFENBECHER:  Thank you.
12          THE COURT:  All right.  So 39.  Is everyone looking at
13   39?
14          MS. LOEFFLER:  Uh-huh (affirmative).
15          MR. OFFENBECHER:  Right.
16          THE COURT:  That's signifi -- more significant than you
17   all think it is if they have a lot of playback.
18          MS. LOEFFLER:  And that's a standard instruction, so --
19          THE COURT:  It's a pattern instruction, but --
20          MS. LOEFFLER:  Yeah.
21          THE COURT:  -- I don't require the jurors to listen to
22   the entire trial again.  They come and they listen to what they
23   want.  But I also tell them that any testimony as it -- played
24   back should not be considered in isolation but must be
25   considered in the context of all the evidence presented during
```

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 202 of 206

1  the trial.  Also, I'm going to have to tell them at some time

2  that playback will be done here in the courtroom; the parties

3  will be here; during the entire playback, no one is to talk, we

4  will not talk, they should not talk among themselves, because

5  it's part of the deliberation process that's to kept -- be kept

6  confidential.  And then that's what we've agreed we're going to

7  do.  We're going to sit here and listen.  And when they want to

8  go, they'll go.  Okay?

9        MR. OFFENBECHER:  Yep.

10        THE COURT:  All right.  Number 40.

11        MS. LOEFFLER:  That's the standard.

12        THE COURT:  Standard.

13        MS. LOEFFLER:  Yeah.

14        THE COURT:  41.

15        MS. LOEFFLER:  That's the standard.  Fine.

16        THE COURT:  42.  I've read that a half a dozen times

17  already.

18        MS. LOEFFLER:  Yeah.  That's fine.

19        THE COURT:  We'll get the for -- verdict forms

20  together.  And they're just going to be -- each verdict form

21  for each count, with a "guilty," "not guilty" at the bottom.

22        MS. LOEFFLER:  Yep.

23        THE COURT:  No one submitted verdict forms to me, so

24  we'll have to come up with them.  That's what we'll do,

25  standard, simple verdict forms.  "Until you reach your ver" --

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 203 of 206

1   44.

2          MS. LOEFFLER:  Yep.  (Indiscernible).

3          THE COURT:  I will have packets of these instructions

4   in final form on your desks tomorrow morning.

5          MS. LOEFFLER:  Thank you.

6          THE COURT:  And they may be done before then, if you

7   want to give us a call.

8          MS. LOEFFLER:  Okay.

9          THE COURT:  Have all the exhibits been admitted to

10  everyone's satisfaction?

11      (Side conversation)

12         MS. LOEFFLER:  I think other -- yeah.  We just double

13  check today's stuff, and then we're good.

14         THE COURT:  Okay.  Well, I'll be here for a while, so

15  if you need anything, I'll be around.  I'm going to finalize

16  these instructions.  Anything else from the defense?

17         MR. CURTNER:  No, Your Honor.  Thank you.

18         THE COURT:  All right.  Thank you.

19         THE CLERK:  All rise.  This matter stands in recess

20  until tomorrow at 8:30 a.m.

21      (Proceedings concluded at 1:56 p.m.)

22

23

24

25

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 204 of 206
(720) 384-8078  attrans@sbcglobal.net

1          CERTIFICATE

2    I certify that the foregoing is a correct transcript from the
     electronic sound recording of the proceedings in the above-
3    entitled matter.

4
        _____s/Teresa K. Combs_____        _____9/18/14_____
5    Teresa K. Combs, Transcriber        Date

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net

**INDEX**

|                          | DIRECT | CROSS | REDIRECT | RECROSS | FURTHER REDIRECT |
|--------------------------|--------|-------|----------|---------|------------------|

PLAINTIFF'S REBUTTAL WITNESSES

|                          | DIRECT | CROSS | REDIRECT | RECROSS | FURTHER REDIRECT |
|--------------------------|--------|-------|----------|---------|------------------|
| Nicola Anne Belisle      | 3544   |       |          |         |                  |
| Judy Pletnikoff          | 3545   | 3552  |          |         |                  |
| Joseph Oliver            |        |       |          |         |                  |
|   Francisco              | 3555   | 3565  |          |         |                  |
| Susan Ann McEntee        | 3567   |       |          |         |                  |
| Joseph Sturgis           | 3570   |       |          |         |                  |
| Kelvin Dale Skonberg     | 3602   | 3604  | 3613     | 3613    |                  |
| Tim Williamson           | 3614   | 3617  | 3621     |         |                  |
| Kevin Wade Brennick      | 3622   | 3624  |          |         |                  |
| John A. Stein            | 3627   |       |          |         |                  |
| Daryl Allison            | 3631   |       |          |         |                  |
| Song-Qing Gan            | 3641   | 3646  |          |         |                  |
| John Pearson             | 3649   | 3652  | 3664     | 3666    |                  |

PLAINTIFF'S EXHIBITS                                              ADMITTED

| 50   | Photograph - aerial map, Kodiak                  | 3574 |
| 145A | Photograph - blue car                            | 3570 |
| 234  | Gun                                              | 3632 |
| 385  | Printable timeline slides from FBI Headquarters  | 3580 |
| 412A | Mr. Wells' medical records                       | 3644 |
| 416  | Photograph - lobby of Servant Air                | 3610 |
| 424  | Photograph - light behind COMMSTA T2             | 3576 |
| 425  | Video with bug                                   | 3578 |
| 426  | Photograph - camera of COMMSTA T2 with fox       | 3577 |
| 428  | Redacted flight information for Servant Air      | 3616 |

DEFENDANT'S EXHIBITS                                             ADMITTED

| DE-159R | Redacted DMV blue SUV chart by Deatrich Sheffield | 3524 |
| DE-210  | Photograph - lobby of Servant Air                 | 3609 |

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 755   Filed 09/23/14   Page 206 of 206
(720) 384-8078   attrans@sbcglobal.net