1              UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF ALASKA

3  UNITED STATES OF AMERICA    )  Case 3:13-cr-00008-RRB
                         )
4          Plaintiff,      )  Anchorage, Alaska
                         )  Thursday, April 24, 2014
5     vs.             )  8:36 o'clock a.m.
                         )
6  JAMES MICHAEL WELLS,       )
                         )
7         Defendant.      )
  _____)  **TRIAL BY JURY – DAY 18**

8

             **TRANSCRIPT OF PROCEEDINGS**

9

      BEFORE THE HONORABLE RALPH R. BEISTLINE
10         UNITED STATES DISTRICT JUDGE

11  APPEARANCES:

12  For the Plaintiff:      KAREN L. LOEFFLER
                       U.S. Attorney
13                    BRYAN SCHRODER
                       KATHLEEN ANN DUIGNAN
14                    Assistant U.S. Attorneys
                       Office of the U.S. Attorney
15                    222 West 7th Avenue, #9, Room 253
                       Anchorage, Alaska  99513-7567
16                    (907) 271-5071

17  For the Defendant:      F. RICHARD CURTNER
                       Federal Defender
18                    Office of the Federal Public Defender
                       601 West 5th Avenue, Suite 800
19                    Anchorage, Alaska  99501
                       (907) 646-3400
20

                       PETER OFFENBECHER
21                    Skellenger Bender, P.S.
                       1301 5th Avenue, Suite 3401
22                    Seattle, Washington  98101-2605
                       (206) 623-6501
23

24

25

1   APPEARANCES (Continued):

2   Court Recorders:          DENALI ELMORE
                              NANCY LEALAISALANOA
3                             U.S. District Court
                              222 West 7th Avenue, #4, Room 229
4                             Anchorage, Alaska  99513-7564
                              (907) 677-6123/6111
5
    Transcription Service:    A & T Transcripts
6                             6299 West 111th Avenue
                              Westminster, Colorado  80020
7                             (720) 384-8078

8
    Proceedings recorded by electronic sound recording; transcript
9   produced by transcription service.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 2 of 222
(720) 384-8078  attrans@sbcglobal.net

1       <u>**ANCHORAGE, ALASKA - THURSDAY, APRIL 24, 2014**</u>

2

3       (Call to Order of the Court at 8:36 a.m.)

4       (Defendant present; jury not present)

5           THE CLERK:  His Honor the Court, the United States

6   District Court for the District of Alaska is now in session,

7   with the Honorable Ralph R. Beistline presiding.  Please be

8   seated.

9           THE COURT:  Okay.  Well, good morning.  Did counsel get

10  the ver -- the jury instructions emailed to you?

11          MR. CURTNER:  Yes, Your Honor.

12          MR. SCHRODER:  We did, Your Honor.

13          THE COURT:  Any changes or additions?

14          MR. CURTNER:  No.

15          MR. SCHRODER:  I don't think so.

16          MR. CURTNER:  No, Your Honor.

17          THE COURT:  What about the verdict forms?  Did you get

18  a chance to look at them?

19          MR. CURTNER:  Yes.

20          THE COURT:  They're all okay?

21          MR. CURTNER:  Yes.

22          MR. SCHRODER:  We'll have to -- we'll look at the

23  verdict forms.

24          THE COURT:  Looked at the verdict forms, I'm going

25  to --

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 3 of 222
(720) 384-8078  attrans@sbcglobal.net

1          MR. SCHRODER:  They're in my --

2          THE COURT:  -- go with them unless someone tells --

3          MR. SCHRODER:  They're in my bag.

4          THE COURT:  -- me otherwise.

5          MR. SCHRODER:  Right.

6          THE COURT:  Okay, the jury's here.  Are we ready to go?

7          MR. SCHRODER:  We are.

8          THE COURT:  Okay.  Bring them in, please.  Hope they're

9  coming.

10     (Jury present)

11         THE COURT:  Okay, looks like we've got the whole team.

12  Please be seated.  Good morning, ladies and gentlemen.  How are

13  you doing?

14         UNIDENTIFIED JUROR:  Good.

15         THE COURT:  Looking great, still looking good.  Okay.

16  We're going to start.  We're going to do closing arguments.

17  Let me read you an instruction here.  Says:  At the close of

18  the trial, counsel have the right to argue the case to the

19  jury.  The arguments of counsel, based upon study and thought,

20  may be and usually are distinctly helpful.  However, it should

21  be remembered that arguments of counsel are not evidence and

22  cannot rightfully be considered as such.  It is your duty to

23  give careful attention to the arguments of counsel, so far as

24  the same are based upon the evidence which you have heard and

25  the proper deduction therefrom and the law as given to you by

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1  the Court in these instructions.  But arguments of counsel, if
2  they depart from the facts or from the law, should be
3  disregarded.  Counsel, although acting in the best of good
4  faith, may be mistaken in their recollection of testimony given
5  during the trial.  You are the ones to finally determine what
6  testimony was given in this case as well as what conclusions of
7  fact should be drawn therefrom.
8      Okay.  We're going to now do closing arguments.  We'll
9  begin with Mr. Schroder.
10     MR. SCHRODER:  Thank you, Your Honor.
11            **CLOSING ARGUMENT OF PLAINTIFF**
12  BY MR. SCHRODER:
13     On April 12th, 2012, James Wells executed a carefully
14  planned attack.  He took a .44 Magnum handgun into his
15  workplace, the COMMSTA Kodiak rigger shop, and killed the man
16  that -- men that he believed were pushing him aside:  Rich
17  Belisle and Jim Hopkins.  He fired until they fell to the
18  ground, and then he went back and fired another round into each
19  of the men, to make sure the job was done.
20     And the bullets that ripped through Jim Hopkins and
21  Rich Belisle were not the only damage done by the defendant.
22  In this trial, he's ripped at their families as well.  You
23  might remember the image of Debby Hopkins on the stand, having
24  her life dragged through the mud, even after the government had
25  shown in its case that it was physically impossible that she'd

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 5 of 222
(720) 384-8078  attrans@sbcglobal.net

1  committed the murder.  And you may remember the image of Hannah

2  Belisle weeping on the stand after defense counsel thrust text

3  messages in front of her that only served to show how much her

4  father loved her.

5        Jim Wells left his house at about 6:40 or so on the

6  morning of April 12th.  For 20 years, he had been the man at

7  COMMSTA Kodiak rigger shop.  He did things his way, and if his

8  bosses challenged him on it, he just waited them out until --

9  his military bosses, until they had to leave.  But the past

10 year had been different.  The current command had put

11 increasing pressure on him from the full command -- not just

12 his supervisor, but all the way up the chain.  His role in the

13 shop had diminished, in many ways replaced, by Rich Belisle and

14 Jim Hopkins.  After coming back from an illness, he found that

15 the shop had moved on without him.

16       Being moved aside was too much to bear for a man who

17 considered himself prominent in the tower community and in his

18 world.  He had been fantasizing about the solution for some

19 time, and at that point he started to put his planning into

20 action.

21       The only way to return to his position of prominence

22 was to eliminate the competition.  Carrying a gun he believed

23 was clean, because he had gotten it from -- taken it from John

24 Stein 15 years ago, he drove to the COMMSTA, passing the main

25 gate at the Coast Guard base at 6:48, registering on the main

1  gate's camera.  He drove to the airport, switched to his wife's

2  Nancy's car, which was the start of his deception.

3      Then it was about 6:55, and he had to wait for Jim

4  Hopkins to go by.  Rich Belisle's schedule was pretty constant.

5  He was there every day at 7 o'clock, but Hopkins, not so much,

6  and timing was the key to this plan.  He had a window of

7  opportunity to kill and escape, and it was all based on being

8  right behind Jim Hopkins as he went into work.  And he was.

9  Hopkins arrived at 7:08.  Wells was right behind in his wife's

10 car at about 7:09.

11      He parked behind the building, nex -- probably next to

12 the line truck, and I'll show you a picture of that, coming up,

13 which was hidden -- the building blocked view -- his view, the

14 line truck blocked his view.  And you'll see in the pictures

15 that there were snowcats that blocked the view from the other

16 way.

17      He slipped around the building, underneath the T2

18 camera.  He went through the unlocked door and went immediately

19 to the office.  He fired two rounds into Richard Belisle, bang,

20 bang.  Then he moved quickly out to the other office, toward

21 the break room, where he encountered Jim Hopkins, coming

22 forward with his half-rolled uniform jacket in his hand.  He

23 fired one round into Mr. Hopkins, bang, directly in the face.

24 Then he went back to the office where Mr. Belisle was lying on

25 the ground and he shot him lying on the ground, bang.  And then

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 7 of 222
(720) 384-8078  attrans@sbcglobal.net

1   he went back to where Hopkins was lying, bleeding, the blood

2   already starting to pool, and he fired one more round into his

3   supervisor to finish the job, bang.  He walked out the door,

4   around to his car, got back in the car, checked to make sure

5   there were no cars coming from any direction that could see

6   him, and he left the T2 building, heading back to the airport.

7        He moved a little more quickly, little -- a little more

8   purpose on the way, because he was on a mission.  He needed to

9   get home and get his alibi set before those bodies were found.

10  He quickly went to the airport, changed -- this time pulling

11  into the airport parking area quickly, got back in his truck,

12  and headed toward Bells Flats.  He passed the main gate camera

13  at the Coast Guard base at 7:22, setting the time on a 34-

14  minute period that would end up being the biggest thing he

15  couldn't explain at the end of the case.

16       He got -- he was spotted in Bells Flats at about 7:25

17  and he got home in time to make a call to Jim Hopkins at 7 --

18  Jim Hopkins' email at 7:30, where he said he had a flat tire.

19  He had to call Jim Hopkins.  Jim Hopkins was his supervisor.

20  Even knowing he was dead, he had to make that call.  But he

21  didn't embellish much.  When he called Scott Reckner at 7:31,

22  his chief who he knew was alive, then he embellished a bit.  He

23  talked about his -- he'd had a problem getting off his lug

24  nuts.  So then he'd set himself up for a little extra time, and

25  then once he was home he had to take care of whatever he was

1   doing there, and he could return to work, telling everyone that
2   he'd had a flat tire.

3        We're going to spend a considerable amount of the time
4   this morning talking about the evidence in each of a number of
5   categories, because it's evidence you must consider.  But
6   there's a couple things I wanted you to consider before we move
7   along.  The judge read you an instruction on the government's
8   burden of proof before you -- at your -- before we started the
9   evidence, and he'll read it to you again.  And that's going to
10  talk about our burden of proof of guilt beyond a reasonable
11  doubt.  And that's set in the Constitution, and it's what we
12  have to prove, and it's what we have proven.

13       But that instruction will also tell you -- it will
14  describe to you what reasonable doubt is and how you can define
15  it for yourself.  And it talks about common sense, you, as the
16  jury, using your common sense.  And it's one of the strengths
17  of our jury system, is that you get to come in here and apply
18  your common sense to the facts and the evidence we put before
19  you.

20       But it also says a reasonable doubt is based on common
21  sense, but not speculation.  And that's what the defendant has
22  shown you so -- in this case.  That's what the defense has
23  shown, only speculation.  When you apply your common sense to
24  the facts and the evidence in this case, you'll realize the
25  government's case makes sense, the defense case is speculation,

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 9 of 222
(720) 384-8078  attrans@sbcglobal.net

1   and we will ask you to find James Wells guilty of this crime.

2          And one other thing I want to do is I tend to be kind

3   of the detail guy.  So the judge is going to read you some

4   elements of the crime at -- once we get done today, before you

5   start your deliberation.  And we understand that the essential

6   issue in this case is who did the crime.  But I think it's

7   important that we talk about the elements just briefly so you

8   understand that and you understand that the evidence the

9   government is going to put forward -- at least where to look

10  for that evidence, where we've shown we've proved each of those

11  elements.

12         Charges 1 and 2 in this case are murder of an employee

13  on federal -- basically, federal land.  The first element is

14  the defendant unlawfully killed Richard Belisle or James

15  Hopkins; second, the defendant killed -- could -- Mis -- we use

16  Mr. Hopkins or Mr. Belisle, with malice aforethought.  And

17  we'll talk about that in a minute.  Third, the killing was

18  premeditated; and, fourth, the killing occurred in this ca --

19  in this situation at U.S. COMMSTA Kodiak, in Kodiak, Alaska.

20         Now, this is -- Counts 3 and 4 are murder of a federal

21  employee.  The first three elements are the same as Counts 1

22  and 2.  And the fourth element is that the employee in this

23  case, Richard Belisle and Jim Hopkins, are a federal officer or

24  employee.

25         Let me talk about that fourth element for a moment for

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 10 of 222
(720) 384-8078  attrans@sbcglobal.net

1  both of those charges.  That's what we call a jurisdictional

2  element, why there's federal jurisdiction.  And that one's the

3  one we can take care of quickly.  We have introduced evidence,

4  both in stipulation and through witnesses, that Mr. Belisle was

5  a federal civilian employee, actively employed, Mr. Hopkins was

6  on his -- was on a final enlistment, and that the property is

7  federal property.  U.S. COMMSTA Kodiak is on federal property.

8          THE COURT:  Okay, Mr. Schroder, you tell us how to do

9  the lights.  When you want them up or down, you tell us, okay?

10         MR. SCHRODER:  I'll tell you, Your Honor.  Only --

11         THE COURT:  Okay.

12         MR. SCHRODER:  -- I -- well, can we see that?  Can we

13  not see that?  Well, I guess I'm looking at a screen, so --

14  would you folks rather have the lights up or down?  Lights up?

15  Okay, we'll do that.  All right.

16         So going first, the defendant lawfully [sic] killed

17  Richard Belisle and Jim Hopkins.  All the evidence we're going

18  to introduce is going to point towards that.  So we are

19  confident that that -- we are going to show you more -- plenty

20  of evidence, more than enough evidence, to show that Jim Wells

21  committed these murders, and you'll see that throughout our

22  presentation.  We'll prove that it's Jim -- that the murderer

23  was Jim Wells and it could only be Jim Wells.

24         The second element, malice aforethought -- and you'll

25  see below there, the definition of malice aforethought means to

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 756  Filed 09/23/14  Page 11 of 222
(720) 384-8078  attrans@sbcglobal.net

1  kill either deliberately and intentionally or recklessly.  This

2  case is deliberately and intentionally.  And we're going to

3  talk about what a personal and intentional attack this was.

4  We're going to introduce evidence on that, and that will meet

5  that second element of malice aforethought.

6          Third, the killing was premeditated.  And premeditation

7  means with planning or deliberation.  And we're going to

8  present -- we're going to talk a considerable amount of time

9  about the planning this crime took and how much Mr. Wells'

10 knowledge of the area and how much planning it took to execute

11 this crime.  And at that point you -- you'll -- I think it'll

12 be clear to you that the killing was premeditated.

13         Now, Counts 5 and 6, 18 U.S. Code 924(c), carrying a

14 firearm -- using or carrying a firearm in a violent crime.

15 The -- let me go back to that -- the first element says

16 defendant committed the crime of murder.  So you will find

17 first if -- that those elements are met.  And then, second,

18 that the defendant knowingly used or carried a forty -- a

19 firearm, 40 bore -- .44-caliber ammunition in relation to that

20 crime.  Once you decided that Jim Wells will commit the --

21 committed these murders, there's no issue that this was

22 committed by a .44 Magnum handgun, so you will find him

23 guilty -- we'll ask you to find him guilty of this crime as

24 well.

25         One final topic I want to talk about before we get into

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 756  Filed 09/23/14  Page 12 of 222
(720) 384-8078  attrans@sbcglobal.net

1  the evidence is geography.  And I think you all probably

2  understand this, that it's essential to understand the

3  geography of Kodiak, of the areas we're talking about, to

4  understand how the crime was committed.

5       So as I've -- as I talked about a few moments ago, Jim

6  Wells started off at his residence down here at Bells Flats,

7  comes down to Rezanof Drive, goes by, passes -- there's that

8  main gate camera that triggers at 6:48.  Comes around the

9  corner to the airport.  Switches cars, drives up Anton Larsen

10 Bay Road to COMMSTA Kodiak.  Commits the murders, returns the

11 same way, down Anton Larsen Bay Road to Kodiak Airport.

12 Switches cars again.  Back out, triggering that camera at 7:22.

13 And returns home to Bells Flats, where he's seen by a couple of

14 his neighbors coming home at about 7:25.

15      When he arrived -- let's see if this works -- he came

16 up this direction, was caught on the camera in his wife's Honda

17 CR-V right here, turned into this third entrance, and parks

18 back behind this line truck.  Notice that that blocks the view

19 of people coming in, and these snowcats even block the view of

20 someone coming south, if a car's tucked back in there.  And

21 like I said, then he returned home the same way that he came,

22 switching cars at the airport, parking his wife's car down here

23 to make a quick switch.  Comes out, drives that way back

24 towards Bells Flats.

25      Now, you might remember, in the opening Ms. Loeffler

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 756  Filed 09/23/14  Page 13 of 222
(720) 384-8078  attrans@sbcglobal.net

1  talked to you about how this crime was personal and
2  intentional, it was planned and premeditated, and it was -- but
3  it was not perfect, and there were mistakes that the defendant
4  made that provided some of the key evidence in this case.  I'm
5  going to use that same structure to talk about the evidence.

6      A person with -- intentional.  Let's start with
7  intentional.  Some of the key points are that both victims were
8  targeted.  You heard from Mr. Morton, you heard from the law
9  enforcement officers on the scene, their impression from
10  evaluating the crime scene was that both of these men were
11  targeted.  The murderer was intimately familiar with the
12  building.  He knew the schedules of the victims.  And he had a
13  conflict with both men.  And the only person to meet -- that
14  we -- you've seen evidence that meets any of that criteria is
15  James Wells.

16      First, let's talk about knowledge.  Knowledge was
17  essential to this crime, for a number of reasons:  the obscure
18  location of COMMSTA Kodiak, knowing the schedules of the
19  people.  We're going to talk a bit about timing, and timing
20  ends up being very important in this case.  Knowledge of
21  cameras and knowledge of the building layout, because it was a
22  difficult, strategic layout, and the killer knew right where to
23  go.  There were a number of problems -- there were too many
24  problems for somebody not having knowledge to have committed
25  this crime and gotten away with it without any significant

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 756  Filed 09/23/14  Page 14 of 222
(720) 384-8078  attrans@sbcglobal.net

1    evidence that would indicate it.  A person who didn't have this

2    kind of knowledge could not have done this crime.  And the only

3    person left, again, once we're done talking about this, is

4    going to be Jim Wells.

5        First, it was an obscure location.  You might remember

6    that none of the law enforcement officers who talked to you,

7    although many of them patrolled that area, had that in their

8    patrol area, had ever been in the building, ever been in T2.

9    Trooper Dupras, Special Agent Sturgis, Special Agent Woods,

10   none of them had been -- even the MilPol officers -- none of

11   them had been in there.  And not to mention any of the civilian

12   witnesses we asked.  The most -- I think you'll remember the

13   most common response when we asked any of the civilian

14   witnesses about the rigger shop or COMMSTA was, "What's that?"

15   Meaning it was a building maybe some people realized was there,

16   but people didn't have really any idea what it was.

17       And a knowledge of personnel was important, because

18   they needed to know who worked in the building.  We're going to

19   talk about when, but it was also important to understand how

20   many worked in the building.

21       Now, you might remember this photo.  If we could have

22   the lights for just a second, Denali.  You might remember this

23   photo we've shown a number of times.  And these are the key

24   four cars.  We had -- a number of witnesses told us that those

25   four cars were the four cars that were there when they arrived.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 756  Filed 09/23/14  Page 15 of 222
(720) 384-8078  attrans@sbcglobal.net

1   So when the murder -- committed, those were the four cars.  You

2   had Petty Officer Hopkins' truck, Mr. Belisle's truck, and two

3   government vehicles.  Someone with no knowledge of what was --

4   of who worked in there and all -- and how many vehicles there

5   were would think they were going in with possibly four people

6   in the building.  That would not be a good idea with a six-shot

7   revolver.  But someone with knowledge, somebody like Jim Wells

8   went in there knowing there were only two people in there, and

9   a revolver, especially a heavy revolver like a .44 Magnum, was

10  going to get the job done.  Thank you, Denali.

11          And it was important to know schedules.  He had to know

12  who would be there, who would not be there, and when the other

13  people came along, so he could get in and get out.  And he had

14  to have a knowledge of cameras.  He had to know what cameras

15  faced where.  And we're going to talk about that morning in

16  depth in a little while.  But that was part of the essential

17  planning of the murders, was to make sure you didn't get

18  caught, certainly, by all the cameras.  You know, we all know

19  it was caught by the T1 camera, but that was a much longer shot

20  than the T2 camera, which getting caught by that camera would

21  have meant almost certain identification.

22          Now let's talk about the building layout.  Both Mr.

23  Morton from the FBI and Trooper Dupras, who's an experienced

24  law enforcement officer and an Army officer, said that this

25  building posed a very difficult strategic problem for entry.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 16 of 222
(720) 384-8078   attrans@sbcglobal.net

1 Now -- I think what I'd like to do now is use the -- we'll put
2 up the building layout so you can look at that, but I think
3 what I'd like to do is use the model.

4       Now, you can -- first, look at that model.  You can see
5 someone who wouldn't know -- first off, wouldn't know which
6 door to come in.  There's a number of doors.  And you've heard
7 testimony that many of those doors -- all those doors were
8 generally locked.  A couple of them were card-swipe doors.  And
9 the one -- but, really, somebody only with familiarity would
10 know that this door right here was going to be open.  Even some
11 of the people who worked upstairs -- up at the T1 didn't know
12 that was open all the time, or open during the workdays.

13       So then when the killer would come in, you'd have a --
14 you know, he wouldn't be able to see any of the victims.
15 You're in this locker room area.  Anybody in here, like where
16 Mr. Hopkins was, would be blocked by this wall.

17       THE COURT:  Can all the jurors see?  I --

18       MR. SCHRODER:  Oh, I'm sorry.  I'll try to stand
19 farther to the side.  In here, the person would not be able to
20 see anybody in the office.  So you wouldn't know where to go,
21 you wouldn't know where the victims were.  It would be a very
22 difficult tactical situation if you didn't know.  In fact, it
23 would be kind of a maze, if you look at that, if you didn't
24 know where you were going when you were walking in the door.

25       Yet, with all these difficulties an outsider would

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 17 of 222
(720) 384-8078   attrans@sbcglobal.net

1   face, the killer in this case murdered these men swiftly and

2   efficiently.  There was no wandering around inside the

3   building.  That would have aroused the suspicions of Belisle

4   and Hopkins, and you would have found them moving somewhere

5   farther away from their workplaces.  But what happened was, the

6   evidence shows that Mr. Belisle was still sitting in his chair

7   when he was shot, and Mr. Hopkins was still rolling up his

8   sleeves in the break room and only had the opportunity to move

9   a couple feet toward the door before he was shot.  In fact, Mr.

10  Hopkins had to move so quickly that his -- he had his

11  military -- his -- what they call the ODU blouse in his hand.

12  If you notice on this photo, there's a rolled-up sleeve and

13  there's not.  He had to move so quickly, he didn't even have

14  the time to roll up both his sleeves.  He only got one done.

15       Part of that efficiency was the killer being in the

16  perfect position.  And, again, going back to the -- this -- I'm

17  going to try -- not try to model again.  The shots were fired

18  to Mr. Belisle from somewhere near -- in this doorway or maybe

19  slightly inside, and from here, Mr. Hopkins, in this area.  At

20  all times, the killer kept his tar -- between the targets and

21  the door.  He always had an escape, and the -- and Belisle and

22  Hopkins did not.  That was somebody who understood the

23  strategic use of the building.

24       This gave him -- and the other advantage to Mr. Wells

25  for doing the killing in the building and doing it

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 756  Filed 09/23/14  Page 18 of 222

1  swiftly and -- efficiency in the proper position, was it
2  minimized the chance of his leaving evidence.  Being between
3  the victims and their escape path and having -- be able to fire
4  from a distance with a powerful handgun meant -- means he
5  didn't have to take the risk of getting close enough to step in
6  blood or get his hands in blood, which really would have been
7  the only evidence that could have tied him to the crime, the
8  only forensic evidence.

9        Committing the murders in a workplace where he'd been
10 20 years negated any DNA or fingerprint evidence of him other
11 than in blood, because there was DNA -- going to be DNA and
12 fingerprint evidence from him all over that place.  So all he
13 had to do was make sure he didn't step in blood, make sure he
14 didn't touch any blood.  And you heard from two members of the
15 FBI ERT team, Special Agent Espeland and Special Agent Strause,
16 that there were no footprints, no handprints in any of the
17 blood.

18        We also can take away another nonpersonal aspect of
19 this attack, and that's robbery.  We know it was not a robbery.
20 We know that because both men had money in their pockets when
21 they were killed and when they were found, about $60 in each of
22 them.  In fact, I think you heard from Mr. Morton and also from
23 Special Agent -- or Trooper Dupras that there was no -- even
24 sign of a struggle.  What -- these men didn't have -- did --
25 weren't in the situation where they recognized a threat and put

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 756  Filed 09/23/14  Page 19 of 222
(720) 384-8078  attrans@sbcglobal.net

1   up some kind of a defense.

2           And we know it's not a robbery, because their power

3   tools were left behind.  Trooper Dupras told you that one of

4   the most popular things that gets stolen in a theft is power

5   tools.  The place had bunches of power tools.  All of them were

6   left there.  Again, none of those drawers were pulled open by

7   somebody looking for tools.

8           And maybe, to me, one of the most, you know, kind of

9   insightful photos toward that is right here, this telescope.

10  That's an easy thing to grab, throw over your shoulder if

11  you're looking for a robbery, and an easy thing to sell to make

12  a few bucks.  All of that was still there.  You heard Chief

13  Reckner talk about going through the place afterwards and

14  determining that there was nothing missing.

15          The final conclusion of all this:  It was an inside

16  job.  Your common sense will tell you what the law enforcement

17  officers told you, that this was -- crime was committed by a

18  person intimately familiar with the rigger shop.  Some of the

19  witnesses also talked about what a personal attack this was,

20  and common sense will con -- also confirm that to you.

21          And, first, let's talk about the murder weapon.  .44

22  Magnum's a legendary handgun, a gun so powerful that

23  outdoorsmen carry it to protect themself from bears.  Jim Wells

24  brought that power to make sure no one was alive when he left.

25  And it was a gun so powerful, the sound was so powerful,

1    especially in that cement-block building of T2, that it left

2    him rubbing his ears during the day, and that was noticed and

3    testimony was provided about that by Para Upchurch, who's a

4    friend of the defendant.

5        And how do we know it was a .44 Magnum?  This bullet

6    was removed from Mr. Belisle.  These two casings were taken

7    from the room next to Petty Officer Hopkins.  They were

8    examined by Robert Shem, of the Alaska Scientific Crime

9    Detection Laboratory.  He determined it was a five right twist.

10   He determined that a .44 Magnum with a fine -- five right twist

11   comes down to three different manufacturers:  Smith & Wesson,

12   Taurus, and Llama.  And he told you that about -- I don't -- I

13   think he said he never even had to deal with a Llama.  And he

14   said about 90 percent of those weapons he's seen are Smith &

15   Wessons.

16       Another factor to consider in the personal and

17   intentional nature of this crime was multiple rounds.  Mr.

18   Morton told you that Mr. Belisle was shot first, sitting in his

19   chair, probably two times, and then shot another time later.

20   So a total of three rounds.  Three rounds with a .44 Magnum.

21   That intent is to kill.  There's no other explanation of that

22   than the intent is to kill, and to kill in a very personal way.

23       Mr. Morton told you that Petty Officer Hopkins was shot

24   next.  First shot as he encountered Mr. Wells, one round to the

25   face.  And I don't know anything that be -- could be much more

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 756  Filed 09/23/14  Page 21 of 222

1    personal than that.  A total of two rounds.  And even shooting

2    him in the face, he went back and did it again.  And that's

3    important, because that's what Mr. Morton, Special Agent

4    Morton, used the French term, "coup de gras."  A finishing

5    blow.  After he'd knocked both of these men down and they were

6    either dead or surely dying, he went back and put one more

7    round into each -- them -- each of them to make sure it was

8    done.  That shows that this was an extremely personal attack.

9         Now, while there's no question of this is a case of

10   workplace violence, because it certainly happened in the

11   workplace, this was clearly more personal and couldn't have

12   been done by anybody but a co-worker.  So it is co-worker

13   violence.  And it could have only been done by one co-worker:

14   Jim Wells.

15        Motive is an important factor in any murder case.  The

16   problem is that a -- you know, in a multiple homicide or a case

17   like this, there's a lot of misinformation that we have that

18   comes from the news, it comes from TV, it comes from the

19   movies, it comes from the Internet.  And we hear things about

20   these crimes, we see things on TV, and we get misperceptions or

21   maybe misinformation about the basis of those crimes, the

22   motive for those crimes.  None of those sources is inherently

23   reliable.  That is why we brought Dr. Meloy to -- excuse me --

24   to give you a baseline.  We brought him in to provide you some

25   information on this type of extreme violence, which,

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 756  Filed 09/23/14  Page 22 of 222
(720) 384-8078  attrans@sbcglobal.net

1    fortunately, most of us have never had to encounter before.

2    Most importantly, Dr. Meloy told you that this was a

3    targeted and intended killing. He said one-third of workplace

4    vio -- he didn't say this killing, but Dr. Meloy said one-third

5    of workplace violence killings are targeted and intended. He

6    said it clears up that misconception that somebody has to snap.

7    In a targeted and intended killing, it's not emotional -- the

8    other types of killing are emotional or reactive, and that's  a

9    significant portion, obviously. But there is this whole

10   category of targeted and intended violence, violence done to

11   get to accomplish a purpose.

12   And he talked about that with -- they have specific

13   victims, the killer has a specific victim. Their plan to --

14   they -- there -- it -- there's planning to heighten the

15   probability of success. That's the goal. There's a goal to

16   accomplish. And to accomplish that, there's distinct planning.

17   Thus, there's often no direct threat to the victims, because

18   that would lessen the chance of success. There's often no

19   personal history of violence. There's a goal in mind, and they

20   look for an opportunity. And we're going to talk about that

21   opportunity later.

22   Now, Dr. Meloy also talked -- I think this was

23   especially important -- about a pathway to violence. And it

24   starts with a grievance. And Dr. Meloy talked about,

25   especially with someone with narcissistic traits, someone who

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 23 of 222
(720) 384-8078   attrans@sbcglobal.net

1   has a sense of self -- strong sense of self, a sense of

2   entitlement, and you saw this in a number of places with Jim

3   Wells and through a number of witnesses about Jim Wells.  You

4   heard people talk about his pride and his belief that he was at

5   the top of his profession.  And you also some -- saw some

6   concrete examples of these narcissistic traits.

7           This may be the best example.  And I'm not going to

8   blow it up.  But this has to do with testimony you received on

9   a communications shack from Adak, that they flew a

10  communications shack out to Adak.  You heard from -- I believe

11  it was Mr. Eskew talked about that.  Flew a communications

12  shack out to Adak.  Very difficult to get space on a big C-130

13  to get it out there.  They finally did.  They got out there.

14  Mr. Wells wanted to bring it home, because they had put a

15  new -- some new part -- no -- piece in it, a transformer, I

16  think they might have said -- and he was concerned they weren't

17  going to have the parts needed to put it in there.

18          His command went back to him and said, "No, you cannot

19  do that."  They understood that if they brought that thing back

20  to Kodiak, it could be months before they got room on a C-130

21  to take it back, and the repairs needed to be done onsite to

22  get that thing up and going.  Mr. Wells was given a direct

23  order on what to do, but he didn't care.  He thought he was

24  right, and he ignored direct orders from his commander to bring

25  that plane back.  That is the height of ego.  And you heard it

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 756  Filed 09/23/14  Page 24 of 222
(720) 384-8078  attrans@sbcglobal.net

1   from Mr. Wells' own words, when his sister, Theresa Kiele, and
2   brother-in-law talked to you about after the murders, from a
3   question from his niece, concerned about the victims, the
4   defendant's reaction was to get angry and talk about how
5   incompetent they were and how he taught them everything he
6   knows.

7        Now getting back to that pathway to violence.  As you
8   might remember, the next step is the violent ideation Dr. Meloy
9   talked about, someone starting to fantasize about taking care
10  of their problem through violence.  But then that planning
11  moves to research -- or that ideation moves into a research and
12  planning phase.  And Dr. Meloy gave you some ideas of what
13  those are:  weapons, selection of weapons; timing; approaches;
14  escapes.  All of these things were part of the defendant's
15  planning in this case and were important to what he thought was
16  going to be the success of this case.

17       Now, the defense talked a -- when they cross-examined
18  Dr. Meloy focused on a graph that said about 11 percent of
19  workplace homicides are co-worker and about 9 percent have to
20  do with spouses, exes, significant others, implying that that
21  was equally likely basis for this crime.  But that did not
22  account -- that was not accurate, for two reasons.  It was a
23  simplification, for two reasons.  And one is gender.  And you
24  heard from both Dr. Meloy and Special Agent Morton that women
25  do not kill in the workplace.  Women kill at home.  The -- you

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 25 of 222
(720) 384-8078   attrans@sbcglobal.net

know, I think the implication here was that somehow Debby

Hopkins had gone to the place and killed her husband.  But

that's not how it happens.  Women do not kill in the workplace.

And the other thing that he talked about was that women

do not kill people unrelated or unconnected to the

relationship.  In this case there was no connection outside of

the office between Petty Officer Hopkins and Mr. Belisle, so it

makes it extremely unlikely that a woman involved would kill

one of them for a relate -- domestic violence or a relationship

issue and be willing to kill a person who was not connected.

And keep in mind that that person would have been -- had to be

willing and planning to kill three people, because Mr. Wells

should have been there that day.  It's just extremely unlikely

and it didn't happen that way.  It wasn't an issue of domestic

violence.

Now let's talk about Jim Wells and this pathway to

violence.  And the key to understanding this is the year before

the murders, is that time a year before the murders.  Now, we

introduced the defendant's personnel record.  But we didn't do

that for purposes of making him look bad.  He -- whether he was

a problem employee -- there's a lot of problem employees.  That

doesn't make them murder -- murderers.

The disciplinary matters set the stage for our

discussion of that last year.  Those disciplinary documents,

which you can read -- that's Exhibit 3D that you're going to

Case 3:13-cr-00008-SLG  Document 756  Filed 09/23/14  Page 26 of 222

1  have in the jury room -- are going to show that the defendant

2  ran the rigger shop, he did what he wanted to do his way, he

3  was occasionally held responsible.  But all he had to do, as he

4  told Para Upchurch and Leah Henry -- you heard them talk about

5  that -- was wait out his bosses, and things would be good.

6       And you saw examples of that.  You saw -- we showed you

7  examples where he was disciplined or it was documented he was

8  disciplined for not telling his bosses where he was, for

9  cutting -- you know, fire -- cutting firewood from the trees,

10  you know, going on trips without telling his bosses.  And when

11  Chief Reckner arrived, that exact thing was going on again.  He

12  just waited out the first boss and he was doing it all over

13  again.  Twenty years, he had done things his way.  But in the

14  spring of 2011, things changed.  He had a crop of new military

15  supervisors, and unlike the previous supervisors, they were

16  dedicated to bringing Jim Wells back in line.

17       And Dr. Meloy, in the grievance section, talked about

18  this concept of an accumulation of grievances.  And he said --

19  accumulation of humiliations, I mean.  And he said those

20  humiliations are even worse for someone with these narcissistic

21  traits.  And that's exactly what happened in this case.

22       And that year of pressure and -- or year of

23  confrontation and increasing pressure started in April of 2011.

24  And you remember, you saw the letter of expectations written by

25  Chief Reckner, written by Master -- Senior Chief Bill Reed, who

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 756  Filed 09/23/14  Page 27 of 222
(720) 384-8078  attrans@sbcglobal.net

testified.  He's the -- remember, he's the guy who testified by

video that they were having those same problems that had been

documented earlier:  not reporting leave; not report -- or not

doing things on time; taking trips without telling the command;

and the firewood problem.  So they decided to get control of

that.  So the first document's issued in April of 2011.

Then in July of 2011, one of the biggest projects they

had done for the past couple of years, they're out in Shemya,

Chief Reckner, Wells, Belisle, Hopkins, and they have to put

up -- and they have to put bird diverters on the antenna.  And

the defendant doesn't want to do it.  That's not what he --

it's not the way he thought was right.  He didn't want to do

it, even though it was required by regulations.  And even

though Mr. Belisle had found some kind of mitigating solution,

he complained at the end when they did it, "They won't let me

do my job."  And you remember, one of the defendant's

witnesses, Chief Warrant Officer Casey Jones, got up and talked

about that.  And he remembers the tension between the T2 crew

that was out there.  He said they were trying to bring Wells

into line, but they were having difficulty with that.  It

wasn't working.

And August 2011, you remember, that was the tree-

collaring incident where Chief Reckner hears about trees being

collared out in areas of Kodiak that are Coast Guard antenna

land, that those trees had nothing to do with protecting the

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 756  Filed 09/23/14  Page 28 of 222
(720) 384-8078  attrans@sbcglobal.net

1    antennas.  They're being collared by Mr. Wells to feed his

2    firewood, to feed his firewood pile.  Chief Reckner finds out

3    about it, shows his bosses.  None of this Chief Reckner did on

4    his own.  But he takes control of that situation.  He tells

5    Wells, "You will not cut trees unless I tell you you can cut

6    trees."

7         Then in September of 2011, they find out about the

8    missing fuel card, so that pressure starts.  Nothing's

9    happened, they're just investigating.  But Wells has got to

10   know that this isn't going to work very well.  And the two

11   people who are the key witnesses in that incident, in that

12   investigation -- and you've seen -- you have the investigation

13   as part of the evidence in this case, you can see it.  The two

14   statements made in there, Jim Hopkins and Rich Belisle.

15        But in November, really -- that's really when the

16   pressure starts to build, really starts to build.  Chief

17   Reckner decides he needs to document the tree-collaring

18   incident.  He writes a letter.  He sits down, he counsels

19   Wells.  And that counseling session, which has -- related to

20   that letter, was for tree collaring -- it gets heated.  Chief

21   Reckner tells Wells he either needs to get with it, or retire.

22   And he tells him -- for the first time, he uses the concept of

23   "If we had you on videotape pumping that fuel, we'd fire you."

24   So now he's starting to learn that his job may even be in

25   jeopardy.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 756  Filed 09/23/14  Page 29 of 222
(720) 384-8078  attrans@sbcglobal.net

1          In December 2011, Chief Reckner moves a desk down to
2     T1.  Now, that had to be an additional humiliation for the
3     defendant, because all of a sudden his boss is putting a desk
4     in the same room he is, and he's saying, "I have no choice but
5     to watch you.  I got to watch you all -- almost all the time."
6          Then we have the NATE convention.  Remember, that's the
7     tower erectors convention that the defendant went to.  It was
8     important to Wells.  You know it was important to him, because
9     he brought it up to Reckner, "What are we doing?  When are we
10    going?"  And it had to be a great humiliation to him that he
11    wasn't going to that.  His place at the convention, again,
12    taken by Belisle and Hopkins.  And you get a view into Wells'
13    psyche when you hear the comment that he made to Reckner,
14    pointing at Belisle's chair, "He's just a rigger.  Why he's --
15    why is he going?"  And then it must have been a really severe
16    blow for Reckner to then tell that Belisle's star was rising,
17    and he was, in Reckner's opinion, almost equal to Wells.  And
18    remember what Chief Reckner talked about, that NATE section --
19    session discussion:  It was so heated that at the end, heated
20    and had -- again, humiliating to the defendant, that he had to
21    try to get Reckner into a staring contest.  He had to try to
22    somehow intimidate him.  That's how bad it had gotten.  And
23    then the final humiliation:  being called on the carpet by the
24    commanding officer of the unit and told they believed he was a
25    thief and that they no longer trusted him.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 30 of 222
(720) 384-8078  attrans@sbcglobal.net

1    And again, it must have been increasingly embarrassing

2  and humiliate him -- humiliating to him to understand that now

3  the issues were starting to escape the rigger shop.  It wasn't

4  just an issue with Belisle and Hopkins and Reckner in the

5  rigger shop; it had now moved up to the T1 building and

6  potentially even to other people in the tower community at the

7  NATE conference, who probably were surely going to ask where

8  was Jim Wells, and maybe they found -- maybe they were going to

9  find out.

10   It's good to take a look at that letter that was

11 issued, that letter of caution that was issued for the rigger

12 shop for the fuel card issue, because it's got some pretty

13 strong language.  Says:  "I am deeply troubled by the misuse of

14 this general fuel card."  And the final -- the -- paragraph 4,

15 also very important.  And it -- just the first and last

16 sentences I think are the key:  "Your conduct is unacceptable

17 and will not be tolerated."  And at the end, "Future instances

18 of misconduct will result in disciplinary action taken against

19 you, up to and including removal for federal -- of federal

20 service."  So now there was discussion going on about -- a

21 warning that he could be removed from federal service.

22   So in addition to all the pressure coming from the

23 command, there were als -- was also the additional humiliation

24 of his loss of status.  Prior to his sickness, everything went

25 through -- you heard testimony that everything went through Jim

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 756  Filed 09/23/14  Page 31 of 222
(720) 384-8078  attrans@sbcglobal.net

 1    Wells in that shop.  But when he came back, things had changed.

 2    They had realized and they had figured out they could do the

 3    job without him, and they had moved on.  You heard about the

 4    antenna book project, you heard about the warehouse cleanup,

 5    and you heard Chief Reckner and a number of other witnesses say

 6    Hopkins and Belisle are the two guys who had stepped up and

 7    kept things running when Jim Wells was gone.  And by the time

 8    he got back, he wasn't -- he didn't have that place of

 9    prominence anymore.  They knew they could operate without him.

10         And now you can envision how this chain of humiliations

11    to the defendant's ego started him down this path, the path to

12    that attack.  And there's a couple more aspects of this to

13    consider as the time of the murder neared.  You heard Dr. Meloy

14    talk about as the killer nears the attack, they start to

15    withdraw and isolate themselves.  And that's certainly shown by

16    the evidence here.

17         A number of witnesses, including Chief Reckner and

18    Chief Mills, describe Wells as detached and withdrawn when he

19    returned from his illness and all this stuff had piled up.

20    Remember when he got back, the day he gets back, he gets the

21    letter and he gets back and he realizes that the shop has moved

22    on without him.  And you heard discussions about during that

23    period, in matters that he always would have participated in

24    before, he detached, he withdrew, he wasn't participating.

25         And, finally, you heard Dr. Meloy talk about a sense of

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 756  Filed 09/23/14  Page 32 of 222

1   relief the targeted killer gets once they make the decision to
2   kill, almost a sense of happiness.  And remember the testimony
3   of Commander Musman, the defendant's friend, who said he had
4   breakfast with him, I believe he said a week to 10 days before
5   the murder, and he talked about how happy Wells had been.  That
6   decision had been made.  There was a sense of relief.  Jim
7   Wells was going to solve his problem and he was going to
8   eliminate the men he thought were taking his place.

9          Now let's move on to talk about planning and
10  premeditation.  Knowledge is really a key aspect of this.  And
11  it -- it's knowledge of the geography of COMMSTA, it's
12  knowledge of the schedules of the COMMSTA and its employees,
13  and it's knowledge including even knowledge of the vehicles
14  those people drove.  And Jim Wells, having worked in that
15  building 20 years, even worked before that at COMMSTA as an
16  enlisted Coast Guard person, had the knowledge he needed to
17  pull off this crime.  And the way that knowledge was best used
18  was to avoid detection.

19         We've seen this picture before.  But one you'll notice
20  will pop up here, up in the upper inset, there's a camera.
21  Camera right here, and the lights above it.  We had a little
22  bit of that in the defense case, in our rebuttal case, talking
23  about that camera, that it was essential to avoid that camera.
24  I think I mentioned that earlier, that, you know, the T1
25  camera's one thing, but if he would have got picked up by this

1   camera, it would have been much easier to identify a vehicle.

2   And we knew -- we know that Wells knows where that

3   camera was, and, more importantly, where it's pointed. Because

4   when he was interviewed by the agents, he drew a diagram. Now,

5   this was before he knew he was caught on the T -- the Coast

6   Guard main base camera. He drew them a diagram, showed them

7   exactly where that camera was and exactly where it pointed.

8   With that knowledge, he would, again, enter through that third

9   entrance, park back here beside the line truck, walk around,

10  right under the camera there, and in through that open door.

11  Anybody who was an outsider -- we talked about this being

12  inside job -- anybody who was an outsider wouldn't necessarily

13  know that camera there -- was there, and even if they did, they

14  wouldn't know where it was pointing. They wouldn't have the

15  knowledge to avoid that camera.

16  And I mentioned earlier that timing was a key point.

17  Timing was essential. And we'll talk about timing in a couple

18  of different ways. But the first way is talking about the

19  timing of the T1 crew and how Wells had to commit this murder

20  within a certain time window and escape, to make sure that he

21  wasn't found by any of the T -- or I mean the T2 crewmembers,

22  the people who worked in the rigger shop.

23  We know that Mr. Hop -- or Mr. Belisle arrived pretty

24  much at 7 o'clock every day and we know that -- but we know

25  that ET1 Hopkins, although he didn't have to report till 8, he

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 756  Filed 09/23/14  Page 34 of 222
(720) 384-8078  attrans@sbcglobal.net

was always there earlier every day, but usually 7:05 to 7:10.
You can look at -- Special Agent Andersen did a table of that.
She reviewed the videotape.  That's Exhibit 383.  And we know
that he had till about 7 -- at about 7:10, or whenever Hopkins
came in, till probably about 7:35 or 7:40, when -- you remember
they talked about the nonrates come in because they have to do
colors.  So that was the window that he had to commit the
crime.  And the key to it was being as close to the time of
Hopkins as possible, as close to the time of the front end of
that, 7:10, as he could, so he'd have time to get away.

And that's exactly what he did.  There's the arrival of
Petty Officer Hopkins.  That's his truck arriving at 7:08.  Can
you run it, Kim?  If we could have the lights, Denali.  And
then here's 7:09.  And you see the blue car come right in
there.  And then five minutes later, at 7:14, you see it leave.

But there was another part of the timing too that was
also important.  And that had to do -- we can have the lights
up, Denali please -- and that had to do with the timing of the
T1 crew.  And this is where -- really where Wells's knowledge
of how that place operated came into play.  He needed to
account for the T1 watch standers.  But you remember, we talked
to a number of those folks, and they told you that they come in
at about 7 to 7:10 to relieve the watch.  And that takes a few
minutes, and then they leave somewhere, 7:25, 7:30, or later.
So again, Wells knew to minimize the chances of getting seen by

3754

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 756  Filed 09/23/14  Page 35 of 222
(720) 384-8078  attrans@sbcglobal.net

1   somebody, minimize the chances of detection, he needed to

2   commit the murders within that window so he could get away

3   without people seeing him.  Now, this was certainly much more

4   difficult to predict, but it shows -- when you look at one --

5   going to the documents that's in evidence, we'll see how his

6   timing really worked amazingly well.

7        New, this document, you'll remember Special Agent

8   Sturgis introduced this primarily for the purpose of showing

9   that all the cars on the T1 camera were accounted for that day

10   except for the blue car of Mr. Wells.  But it shows us

11   something else.  I don't know how well you can see that, but

12   it -- if you look at these two where the yellow bar is at the

13   end, this is the arrival at 7:09 of the small blue car.  This

14   is the exit of the small blue car at 7:14.  Within that window,

15   within that five- or six-minute window, only two other cars

16   came and went.

17        Ms. Fortier (ph), who arrived at 9:40 -- so she didn't

18   come up the road until after Wells had already parked and

19   hidden the car, so that worked out right.  And Petty Officer

20   Jared Andrews, who leaves, but he leaves at 14:22, minute 14:22

21   before Wells.  So if Wells comes out, sees the road is clear,

22   he slips out; only two cars have gone on during that period,

23   and he's avoided both of them.  His timing couldn't have been

24   better.  Now, might have some of the been luck?  Yeah, sure, it

25   was probably luck.  But luck is always improved by good

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 756  Filed 09/23/14  Page 36 of 222
(720) 384-8078  attrans@sbcglobal.net

1    planning.  And his planning was very good.

2          Now, another part of the planning was his -- Wells's

3    wife being out of town, and that was important for two reasons.

4    First was her schedule.  You remember Amanda Sanford talked

5    about how Mrs. Wells goes to work at -- I think she said either

6    between 8 and 8:30, which means from Bells Flats she probably

7    had to leave sometime between 7:45 to 8:15.  That means he

8    couldn't commit the murder while she was there, because she

9    would have been home when he got home.  And he didn't --

10   certainly wasn't going to put his wife in that kind of

11   position.

12         And, again, we talk about the car being there.

13   That's -- that -- that's that opportunity piece that Dr.

14   Meloy -- obviously the second reason was so he had the car in

15   place to switch cars and commit the murder.  But that's that

16   opportunity piece that Dr. Meloy talks about that is often

17   the -- part of the triggering function for a targeted and

18   intended killer.

19         But of course he needed another reason.  He needed

20   for -- like I say, he needed another car to drive to the

21   murder.  That's the other reason he needed the wife to be gone,

22   because he needed that car.  And you heard us say -- why did he

23   need that?  You heard us ask almost all the COMMSTA witnesses

24   about what kind of car Jim Wells drove.  And they all said big

25   white truck with a cab on it.  It was a car he was identified,

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 756  Filed 09/23/14  Page 37 of 222

1  like lots of people are identified with their car, so he
2  absolutely could not drive that car to commit the murder.  He
3  needed another car.  His wife's car, staged at the airport, was
4  the perfect opportunity.  It was along the travel route, it was
5  staged.  All he had to do was avoid what Jim and Nancy Wells
6  normally do, which is not leave their car at the airport, which
7  is have a friend take it home or have a friend help them take
8  it home.  And you heard Para Upchurch and Judy Pletnikoff say
9  they were -- they did that function for them regularly.  They
10 were there, they were available.  The call never came, and the
11 call never came for a good reason:  He needed that car to
12 commit the murders.
13        Now let's talk about the car.  This is a good
14 opportunity to talk about the car.  One thing I think you need
15 to think about and we want you to -- ask you to think about is
16 this is -- this case is not some battle of experts.  We had a
17 number of experts talk about things, but they were here to
18 assist you.  In the end, make your decision based on the
19 evidence that you will see, most of it -- the 34-minute gap;
20 the personal nature of the offense; the insider knowledge that
21 was necessary; the planning.  Those are the things that are
22 going to tell you that this murder was committed by Jim Wells,
23 and you're clearly going to be able to determine it was
24 committed by Jim Wells.  The experts are here to help you
25 confirm and -- in light of all the other evidence, that that

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 756  Filed 09/23/14  Page 38 of 222
(720) 384-8078  attrans@sbcglobal.net

1  blue car was Jim Wells' blue Honda CR-V.

2        But it seemed the defendant had somewhat of a

3  misunderstanding of what we were doing with the blue car

4  people.  We didn't bring them in to give you an opinion that

5  that car is -- the car they see in the video is definitely a

6  Honda CR-V, because they couldn't do that.  The video wasn't

7  good enough for that.  What we brought them in was to give

8  you -- first, to help -- they helped us focus the

9  investigation, and then now to help give -- help you determine,

10 help you look at the documents, help you look at the

11 comparisons.  And the comparison function is especially

12 important.  So when you're considering all the evidence at a

13 whole, you can decide that that's Jim Wells's blue car that he

14 used to commit this crime.

15       We talked about Neil Schmidt.  He was -- I think he was

16 our first witness related to the car.  Extensive industry

17 experience with Honda.  I don't -- and also he talked about

18 was -- I think interesting, his extensive experience outside of

19 work, racing his own cars, rally -- rallying cars, pit crews.

20 He is a true car enthusiast and told you he had been a car

21 enthusiast since his childhood.

22       And Mr. Well -- Mr. Schmidt was the only one to look

23 really in depth at the characteristics of cars.  We heard

24 people kind of generally talk about shapes and colors.  But Mr.

25 Schmidt talked about -- he looked at things like wheel base, he

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 756  Filed 09/23/14  Page 39 of 222
(720) 384-8078  attrans@sbcglobal.net

1   looked at front and rear overhangs.  He looked at roof line

2   shape, windshield shape, color.  I mean, a lot of people look

3   at color.  But that's what an expert in the industry, someone

4   who understands their field of expertise -- they look at the

5   things that the rest of us don't necessarily notice.  And

6   that's what Mr. Schmidt did.  And he was looking at color.

7   That -- and he -- I think he testified that that particular

8   color of car Honda made, electron blue pearl, was only during

9   that -- like, a two-year period there in, like, the 2000, 2001

10  models.

11          But he also said he -- you know, he said he'd get about

12  70 -- he thought it was 70-percent likelihood that that was a

13  Honda CR-V.  And remember, he said an early-model Honda CR-V.

14  He was able to determine by the shapes and the characteristics

15  that it would be an early-model CR-V.  But he said there are

16  other vehicles that it could potentially be, and he said he

17  could be certain -- 90-percent certain that it was a CR-V,

18  Hyundai Santa Fe, a Toyota RAV4, and a Ford Escape.  And that

19  allowed the agents to focus their investigation and figure out

20  and try to find people with those cars, to see if there was

21  anybody else out there.

22          Now, the defense may claim that Mr. Schmidt had a bias

23  because he's a Honda guy, but I think that's too simplistic.

24  First, he's more than a Honda guy.  And, again, I talked about

25  him being a car enthusiast.  And you might even remember him

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 756  Filed 09/23/14  Page 40 of 222
(720) 384-8078  attrans@sbcglobal.net

1   talking about, as a seven-year-old, being able to distinguish

2   between the various year groups and models of Mustangs, because

3   they had a Mustang.  He's been a car enthusiast his whole life,

4   again, raced, done all those things.  So he -- you know, he's

5   more than just a Honda guy.  I don't think you can pigeonhole

6   him just into that.

7        And, second, as a Honda guy, he's certainly going to

8   know his competition.  And he was -- he talked to you about he

9   was especially engaged as a -- as an engineer for the CR-V.

10   That was his model line, so he was very familiar with it and

11   familiar with the other cars, similar size cars that other

12   manufacturers were making.

13        The third thing to consider is when he works for Honda,

14   Honda doesn't have any kind of special interest in wanting to

15   come in and identify one of their cars used in a murder.  But

16   yet he was here and he was willing to do that.  And, finally, I

17   think you might want to ask yourself, just again, applying your

18   common sense, if somebody who knows something so specifically,

19   aren't they just as likely to understand the differences

20   between that thing they know and other things and point out

21   those differences?  So I don't think -- just because he's a

22   Honda guy is too simplistic.  And I think what Mr. Schmidt gave

23   you was an honest assessment based on, again, looking at those

24   characteristics that the other people didn't talk about, on

25   what he believed that car was.

1          Then we talk -- we talked to Dr. Richard Vorder Bruegge
2    from the FBI Lab.  He did a couple of things for us.  He was
3    the first person -- and this is very important -- to start down
4    the comparison process.  You're going to have a number of these
5    documents, a number of these photos.  You're going to be able
6    to look at them in the jury room and help decide, in the light
7    of all this other evidence, that that car -- those two cars --
8    you're going to be able to compare -- is Jim Wells' car.  And
9    he compared -- you'll notice the one on the left, the
10   questioned vehicle, that was the day, the 12th of April -- that
11   was the car on the 12th of April that went in at the time of
12   the murder, and the one on the right is Jim Wells' and Nancy
13   Wells' CR-V.  That is their car.  So you're comparing their car
14   to the car that went in that day.  And I believe you will see
15   in those side-by-side comparisons that it's very, very
16   accurate.

17         Now dimensions.  He also found dimensions.  And he did
18   a process called reverse-projection photogrammetry, which, as
19   you might remember, what he does is he takes a known object,
20   again on the right, the Wells vehicle.  He knows what that is,
21   he knows how long it is, and he puts in -- he puts that into
22   the -- kind of as a measuring stick, and he counts the pixels.
23   And he said this is what 177 inches looks like.  And then he
24   goes back and he applies that to the other vehicle and found,
25   as he stated in this case, exact names -- exact number of

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 756  Filed 09/23/14  Page 42 of 222
(720) 384-8078  attrans@sbcglobal.net

1    pixels.  Now, was there an error rate?  Yes, there was an error

2    rate.  But it's a close comparison.  And he did the same thing

3    for height.  He did the same comparison for height.  And you

4    will have these pictures in the jury room with you.

5          Then we had Mr. Toglia come and talk to you and also

6    provide some exhibits.  And, again, so you can determine with

7    all the other evidence that that is the Wells car and that --

8    and they -- Jim Wells committed this crime.  He -- and remember

9    his methodology, and I'll try to move through this quickly.

10         He takes a survey.  He went to Kodiak, actually

11   surveyed the area in the view of the camera.  He created a

12   computer model, and then he overlayed the video on top of the

13   computer model and aligned them.  Because that way, when he put

14   a verified, accurate model of the car in the picture, he could

15   line it up with the video and show you the comparison.  And

16   that's what he did.

17         And he did something else that was -- that's very

18   interesting, I think it's going to be very useful for you in

19   the jury room.  Not only did he show an overlay here, but he

20   also did an outline, so you can compare what's in there.  And

21   this is the northbound overlay and outline from April 12th.  He

22   also did a southbound one you can compare.  He did a comparison

23   northbound and southbound of the known vehicles on the 19th.

24   You can look at those.  You can look at the southbound.  And

25   then he put a couple of comparison slides of the 12th and the

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 756  Filed 09/23/14  Page 43 of 222
(720) 384-8078  attrans@sbcglobal.net

1   19th side by side, so you can look at those.

2           And another thing he did that you might find useful is

3   he admitted -- you remember, it's nine frames of video, so we

4   got nine screen captures of that video.  He admitted the actual

5   nine screen captures.  And what you might find useful is to

6   request to use a magnifying glass and look at those images.  I

7   think you might find that useful.

8           Now, the defense had a -- an expert, Mr. DiTallo.

9   And -- but I don't think he really stacked up to the folks that

10  you saw that the government put on.  As compared to Mr.

11  Schmidt, what you saw was Mr. DiTallo compare only dimensions.

12  He didn't compare those characteristics.  And he -- they

13  admitted a document where you'll see overlays of different

14  cars.  And I think if you over -- look at those overlays,

15  you'll see that some of those characteristics, roof lines and

16  different things, are different.  Mr. DiTallo made no

17  comparison to any of those characteristics.  He just said

18  there's a number of cars that are roughly the same length.

19          And another thing I think was -- kind of struck me was

20  that they ran an animation created by Mr. DiTallo, and the

21  animation ran by the slides saying which car it was, and he was

22  asked which car, he didn't know.  He had to run back to the

23  animation title thing to know which car it was.  And, again, I

24  don't think you're going to find that Mr. Schmidt would have to

25  do that.

1          As compared to Mr. Vorder Bruegge, it was interesting

2     that the key aspect to Mr. Vorder Bruegge's reverse-projection

3     programmetry is to start with a known vehicle.  You know what

4     size it is, you know what the parameters are, then you would

5     know from there.  Somehow, Mr. DiTallo didn't seem to get that.

6     He thought Mr. Vorder Bruegge had somehow worked with an un --

7     with the unknown and had just magically gotten it close to

8     right.  But I think what you see is Mr. DiTallo just didn't

9     quite understand that process.

10          And as compared to Mr. Toglia, I think it's important

11    to understand that he -- Mr. DiTallo wouldn't provide you with

12    the comparison.  He said, oh, you don't need to do that.  And

13    he wouldn't provide you with the overlay.  He didn't compare

14    the 12th to the 19th, to give you those comparisons of the

15    known vehicle.  And he wouldn't provide you an overlay, because

16    he said, well, that doesn't really make any difference.  And

17    I -- I'm not -- to me, that doesn't seem logical, because, you

18    know, if you're going to try to compare something like this

19    cup, and you put that in front of it and say that's the

20    overlay, you're not going to be able to accurately see whether

21    that fits.  Those outlines provided by Mr. Toglia do that for

22    you.

23          But, again, want to be -- reemphasize this.  This case

24    is not about experts.  All those other things we talked about,

25    especially talking about in the planning and in the personal

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 45 of 222
(720) 384-8078   attrans@sbcglobal.net

1   nature and intentional nature of this, those are going to be --
2   and the things we're going to talk about in a minute -- the 34-
3   minute gap, some of the mistakes made by the defendant -- those
4   are really going to be the key to this case.  Don't get caught
5   up in a battle of experts.  They were -- these folks were here
6   to help you make that decision and see that these cars are
7   consistent.  And in the whole totality of the circumstances, a
8   term we lawyers like to use, that the defendant is guilty.

9           Now, I talked a minute about the blue SUV
10  investigation.  That's something that Mr. Schmidt helped the
11  investigation do by narrowing it down to those four cars that
12  he thought would be at 90 percent:  the CR-V, the RAV4, the
13  Santa Fe, and the Ford Escape.  Hundred and thirty -- you heard
14  Special Agent Allison talk about this -- a hundred and thirty-
15  nine of those cars registered on Kodiak Island.  Nine found to
16  be not on the island; one owner passed away; one belonged to
17  Jim and Nancy Wells.  So they did 128 interviews, and I think
18  you heard they did more, but specifically of this, they did 128
19  interviews.  And when they were done with that, nothing in --
20  nothing that worked out to require any additional
21  investigation.

22          Now planning related to the gun.  Revolvers don't leave
23  these.  This is the bullets in there, part of it.  But it --
24  they don't leave brass.  A semiautomatic handgun -- I'm sure
25  there's some of you who are shooters -- ejects shell casings,

1    and now there's evidence that's out there.  Revolvers don't do

2    that.  So you take a revolver, and that's five or six less

3    pieces of evidence you don't have to worry about picking up

4    when you're done with the crime.  The selection of a revolver

5    and the selection of such a powerful revolver was a key part of

6    planning in this case.  And, certainly, getting rid of the gun

7    was a -- had to be a part of the plan.

8        No question we didn't find the gun.  You heard about

9    some extensive searching that was done.  But if you go and look

10   at the map of Kodiak, you search all along these roads, you

11   search down here; but I think most Alaskans would understand,

12   in -- especially as things are starting to grow, if you can get

13   something 20 yards out into the alders, the chances of finding

14   that's going to be pretty limited.  And look at all this water.

15   The chances of finding that gun were pretty minimal.  And Mr.

16   Wells had plenty of time to plan this, he had plenty of time to

17   how to -- on how to get rid of the gun, and he had a lot of

18   territory and a lot of opportunity to get rid of that gun.

19       Now let's move to the next section.  Let's talk

20   about -- you know, there's no perfect crime.  And, certainly,

21   as much as Mr. Wells planned this, he made mistakes.  And those

22   mistakes provide some of the key evidence in the case that

23   you've seen.  You know, his planning helped him keep from

24   getting any bloody footprints.  It helped him get out -- in and

25   out of T1 without being seen by the T2 camera, in and out of T2

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 47 of 222
(720) 384-8078   attrans@sbcglobal.net

1   without being -- getting seen by the T2 camera.  It helped him

2   get rid of the gun.  But there were mistakes.

3         In the first case, first mistake and probably the most

4   significant mistake was the -- had to do with the main base

5   gate camera.  Mr. Wells had to have an alibi.  Kodiak's a small

6   town.  He travels on one road in and out.  There's lots of

7   people that know him.  He had to have an explanation in case

8   someone saw him driving to or from the airport before he could

9   switch cars.

10        The tire alibi was a simple one:  Had a low tire,

11  checked it, drove back.  The problem was, he didn't account for

12  the time.  He just accounted for location.  He didn't think

13  about that.  He thought about, "Well, I need to account for

14  people seeing me," but the time aspect of it wasn't really

15  important.  And that turned out to be a serious mistake,

16  because that camera catches him coming in at 8:48 and it

17  catches him going out at 7:22.  That is a 34-minute gap of time

18  where his alibi of driving a mile -- 1.7 miles to the airport,

19  checking his tire, and coming back, doesn't come close to

20  even -- doesn't come close to explaining.  And when combined

21  with other things, like the T1 camera and the voicemails that

22  he leaves for Chief Reckner and Hopkins, all of this paints a

23  timeline that fits Wells and only Wells.  And we're going to

24  walk through that timeline.

25        (Side conversation)

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 756  Filed 09/23/14  Page 48 of 222
(720) 384-8078  attrans@sbcglobal.net

1          MR. SCHRODER:  As 6:48 in the morning, Wells' car is

2     captured going by the T1 camera on the way toward the airport.

3     Next.  At 7 o'clock, Rich Belisle badges in at the rigger shop.

4     Next.  At 7:08 -- we've seen this picture before -- Mr. Hopkins

5     arrives at the rigger shop.  At 7:09, the T1 camera -- and you

6     can see the -- where that camera captures.  Captures the blue

7     CR-V, the blue small SUV coming into T2.  Next.  And then at

8     twelve oh -- we're not going to show you the animation, but you

9     remember at 7:12, we see Mr. Rudat, who testified before you,

10    goes by the front of the rigger shop.  Next.

11         7:14, the small US -- small blue SUV leaves.  Next.

12    And then at 7:22, Mr. Wells' car is captured going south

13    toward -- towards Bells Flats, by the main gate camera.  Next.

14    At 7:25, he's seen by Charlene Bell and Annette Ecret going up

15    the road toward his house.  And then at 7:30, he leaves a

16    voicemail for Hopkins.  We'll listen to that, but we'll listen

17    to that a little later.  And at 7:31, he leaves a message for

18    Chief Reckner.  And then we won't go through the rest of these.

19    You remember that this says 7:31, Aaron Coggins arrives at the

20    leader -- at the rigger shop.  Soon thereafter, Cody Beauford

21    arrives and finds the bodies.

22         Now, one important -- we can have the lights, Denali.

23    Thank you.  One important aspect of this is understanding the

24    time of the murders.  There's no question that the murders

25    occurred between 7:08 and about 7:35.  7:08, the time Hopkins

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 756  Filed 09/23/14  Page 49 of 222
(720) 384-8078  attrans@sbcglobal.net

1    arrived, 7:35, the time that Cody Beauford found the bodies.

2    Had to happen in between those two times.  But the most obvious

3    indicator of when the murders occurred was Rudat.  And Rudat --

4    we see Rudat at about 7:12, and his testimony was that sometime

5    before that, he -- as he select -- soon before that, he hears

6    this loud metal-on-metal sound that he -- sort of sound --

7    sounds like dropping a grate on -- heavy grate on something.

8    And since it was before the twelve minute -- minute twelve,

9    just after minute twelve, oh six, I think it's safe to say,

10   7:10, 7:11 is when Rudat heard that sound.

11       But that's not the only evidence that the murder

12   occurred at that time.  You had testimony from FBI Special

13   Agent Holly Steeves, who went over Belisle's -- Mr. Belisle's

14   computer profile, and found that he got in about 7, he signed

15   in, turned on Internet Explorer, turned on email, and the last

16   sign she can see of any action that he takes is at 7:10.  She

17   sees an email later that morning about 7:30, 7:32, not read,

18   not answered.

19       And there's two things that tell us that Jim Hopkins

20   hadn't been in the building long.  Again, one, we -- we've

21   looked at this before.  We know what he -- we had testimony

22   that the first thing he often did in the morning was go roll up

23   those sleeves on that blouse, and that's what he was doing at

24   the time.  He was in that room, and he only had time to roll up

25   one sleeve.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 756  Filed 09/23/14  Page 50 of 222

1          One other aspect of Mr. Hopkins -- we might need the

2   lights for a moment, Denali -- was you had testimony, I

3   believe, from Special Agent Woods, who told you that the Coast

4   Guard uses a security system on their computers where you have

5   to insert an ID card into a reader before you can use it.

6   That's right there.  No, there's no card in it.  So Mr. Hopkins

7   had not had time to sign on his computer.  He'd just gone in to

8   roll up his sleeves and got one rolling up -- rolled up when he

9   was killed.

10          When you look at all the evidence before you -- Rudat's

11  testimony, Belisle's computer, Hopkins's sleeves, Hopkins'

12  computer -- it seems -- it's almost cert -- it's certainly --

13  it is certain that the murder happened at about 7:10 to 7:11.

14  And that tells us that it happened perfectly timed, in between

15  the arrival and the departure of that blue car at 7:09 and

16  7:14.  The conclusion:  The killer was in that blue car.

17          Now, I told you we were going to talk a bit about

18  timing, so we're going to talk a little bit more.  Another

19  interesting aspect has to do with the outbound timing.  And

20  you -- this is the -- what I've titled the escape timing.  And

21  this is a exhibit prepared by Special Agent Sturgis.  And the

22  timing is almost precise how this works.  Let's walk through

23  it.

24          Small blue SUV leaves COMMSTA T2 at 7:31.  They

25  calculated it would take about three minutes and five seconds

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 756  Filed 09/23/14  Page 51 of 222
(720) 384-8078  attrans@sbcglobal.net

to get to the corner of Airport Way and Rezanof.  That would
put it at 7:17:36.  Another minute and a half to get to the
airport, to switch cars, and to get back onto Airport Way,
about 7:19:26.  And then two minutes and eight seconds
calculated to get to the airport.  So that would be a
calculated time at 7:21:30.  And the white truck goes by that
camera at 7:22:09.  Another seven minutes and thirty-nine
seconds of calculated time to get to the Wells residence.  That
would be a calculated time of 7:29:13.  The call to Jim Hopkins
is made at 7:30.

It is precise and it works, because that's exactly what
happened.  It's change -- he left T2 in that little blue car.
He drove to the airport and switched cars.  He drove his white
truck.  At 7:22, he was captured by the camera.  And at home --
he was home at 7:30 and made those calls.  You can't argue with
time.

Now, another mistake was the tire.  And, again, we're
going to talk a little bit about experts, but not a battle of
the experts.  Apply your common sense first.  And, Denali, they
can -- come up with the lights.  Common sense tells you that
when you have a low tire, you deal with the low tire.  You go
to the nearest place where you can deal with the low tire.  You
go to a gas station, you go fill up your tire, you do whatever.

In this instance, when Special Agent Allison sees that
tire, 25 psi in an 80-psi tire -- you heard from Mr. Bolden

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 52 of 222

1  that you risk damage to a tire by driving it at that low.  Mr.
2  Wells was seven miles from Bells Flats, seven miles from his
3  home.  He was two miles from COMMSTA Kodiak.  At COMMSTA
4  Kodiak, where they have a nice, big, dry garage, air tools,
5  fittings for air tools, a big floor jack.  And yet he drove
6  home.  You heard from a number -- and you heard from a number
7  of the COMMSTA folks that it's acceptable for them to do
8  certain types of maintenance.  Certainly would have been fine
9  to change that tire.  You heard from a number of COMMSTA folks
10 say that they just didn't understand why he drove home and
11 didn't drive to work.  But that wasn't part of the plan.

12         But let's talk about what some of the experts told us.
13 And, again, the beauty of this is the common sense.  Mr. Bolden
14 told you that normally a nail goes in to tread depth.  It only
15 goes farther if it's pushed in by odd things in the road, rocks
16 or other things in a road that push it in.  And if that
17 happens, it gets heavily abraded and you can see that on the
18 nailhead.  And, frankly, even if it doesn't, if you apply
19 common sense, even if the nail doesn't get pushed in, then it's
20 going to rub on the road and it's going to be heavily abraded.
21 In any case, you're going to have a nail that's got a heavily
22 abraded head.

23         And the other thing he told you was nails, especially a
24 16-penny nail, do not go in perpendicularly.  And you can just
25 see the logic of that, I mean, how hard that would be.  That

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net

1  thing would have to be perfectly positioned.  Trying to do it

2  over here.  That thing would have to be perfectly positioned,

3  sticking up out of the road, for that to happen.  It just -- it

4  doesn't make sense.

5          And, indeed, those common-sense factors applied in this

6  case.  The nail was -- or those things that Mr. Bolden talked

7  about, and, I think, remember was confirmed by Mr. Mills -- we

8  didn't see any of that.  The nail was below the tread.  And

9  remember -- I think there's been some kind of confusion about

10 that -- but remember, Special Agent Allison testified to you

11 that when he sees the tire, the nail was below the tread.  This

12 is not something that happened somewhere else.  He noticed that

13 the nail was below the tread level, which was the reason he

14 sent it to be inspected in the first place, because he thought

15 that was odd.  And the nail's perpendicular.  It was a large

16 nail, like I showed you, very difficult for that to get in.

17 And the only mark on the head indicating any kind of a strike,

18 as Mr. Mills told you, he interpreted from a nailgun.

19          And don't forget about the leak aspect of this.  Again,

20 if it was a low 25 psi -- 80-psi at 25 degrees, you'd have the

21 damage issue.  There was no issue that the tire was ever

22 damaged.  And Mr. Bolton said the leak was so low that it would

23 take hundreds of miles for someone to -- for that nail to have

24 worked in there, and the nail would have been in there for

25 hundreds of miles and you would see tremendous abrasion on

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 756  Filed 09/23/14  Page 54 of 222

1    that.  And, again, you'll have that nail in the room, and you

2    won't see anything like that kind of abrasion that they've

3    talked about.

4         We had different experts, but they reached the same

5    conclusion, that -- Mr. Mills and Mr. Bolden -- that when you

6    pick up a nail on the road, naturally, you see abrasions on the

7    head, and they -- were no abrasions in this case.  Mr. Bolden

8    said the tire was never operated with the nail in it, and Mr.

9    Mills testified that the nail was inserted by a nailgun.

10        And, actually, I want to go to -- now, the defense had

11   a theory -- Mr. Currie had a theory that, somehow, something

12   came through one of these side lugs that was open, and got in

13   here.  But his own documents, his own photos kind of betray

14   that.  Denali, if we could get it down for a minute.  If you

15   look at his paperclip sticking out of there, the angle that the

16   thing had to enter, it didn't come from anywhere near that side

17   lug.  It came up.  It had to be well up above that.  So there's

18   no -- that doesn't make sense.

19        And he had no explanation for why any of the key

20   findings that Mr. Bolden made -- his didn't address it.  He

21   didn't address the issue of the abrasion on the nailhead.  He

22   didn't address the issue, although there is it -- is the --

23   there is it in the picture of that hole, from this angle, being

24   perpendicular.  And it just showed you just how impossible that

25   would be.  Mr. Swanepoel inspected the nail.  His -- you know,

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 55 of 222
(720) 384-8078   attrans@sbcglobal.net

1  he said he couldn't reach a conclusion on how it was inserted.

2  So Mr. Mills' conclusion that it was inserted by a nailgun is

3  unchallenged at this point.

4       And let me talk a bit about those two.  Let's look at

5  the -- remember these two angles from the side.

6       THE COURT:  So about how long -- much longer are --

7       MR. SCHRODER:  And vertically --

8       THE COURT:  -- you going to go?

9       MR. SCHRODER:  Do you want to take a break, Your Honor?

10       THE COURT:  Well, I (indiscernible).

11       MR. SCHRODER:  I don't know, we probably have another

12  half-hour, maybe.  Maybe 20 minutes.

13       THE COURT:  We do.  Take a break.  Fifteen -- take a

14  fifteen-minute recess.  I -- I've got the signs now.

15     (Side conversation)

16     (Jury not present)

17       THE COURT:  Okay.  Please be seated.  So this is

18  take -- this is going to take longer than two hours apiece, it

19  sounds like.  Already taken an hour and 20 minutes, but,

20  anyhow, that's fine.  We'll see you in 15 minutes.

21       THE CLERK:  All rise.  This matter is in recess for 15

22  minutes.

23     (Court recessed at 10:00 a.m., until 10:18 a.m.)

24     (Jury not present)

25       THE CLERK:  All rise.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1          THE COURT:  Okay.  We're going to bring the jury in.

2     Ready?

3          MR. SCHRODER:  Yep.

4          THE COURT:  Okay.  The jury's on their way.

5       (Jury present)

6          THE COURT:  Okay.  Please be seated.  Mr. Schroder, are

7     you there?

8          MR. SCHRODER:  I am, Judge.

9          THE COURT:  Okay.  All right.

10         MR. SCHRODER:  (Indiscernible) here to see, though.

11         THE COURT:  Okay.  All right.  Proceed --

12         MR. SCHRODER:  Denali, can I have the lights for just a

13    minute?  Picking up where we left off, I would submit to you

14    that the defendant's theory that this set of angles, 25 degrees

15    from the side, perpendicular to the top, was picked up

16    naturally does not make sense.  But there is an explanation for

17    that that does make sense.

18         I'll do it up here instead of on the ground.  But what

19    makes sense is, car on wheel well here, and you come up to this

20    thing with a nailgun and you go "Boom," and it fires it right

21    in.  That makes sense.  The perfect position, the perfect angle

22    to explain what they found.  Okay, Denali, thank you.

23         As we work our way through the mistakes and how that

24    evidence plays out, the next was the gun.  And this may be more

25    accurately -- not show whether the mistake was not assuming

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 756  Filed 09/23/14  Page 57 of 222
(720) 384-8078  attrans@sbcglobal.net

1   that the government would not do a thorough investigation, or

2   maybe believe, as Mr. Wells's son test -- Cable testified, that

3   John Stein was dead, or had dementia, somewhere.

4       But we did find John Stein, and John Stein was not

5   dead, and John Stein knows guns.  And he came in here and he

6   talked to you about that.  And when you get him started talking

7   about guns, he knows what he's doing.  And he said that he left

8   his safe with the Wells in two thousand -- nineteen ninety --

9   it was either late 1996, early 1997, left it at Wells, left it

10  at their home, left only Mr. Wells with the combination.  And

11  when he came back six months later, seven months later, he

12  looks in the -- walks in the house, he looks at the safe, and

13  it's open.  And the only thing missing is a Model 629 Smith &

14  Wesson .44 Magnum revolver with a six-inch barrel.  He asked

15  Wells about it, and the only answer he gets back is:  "No

16  idea."

17      And why do we know Mr. Stein is right about his

18  testimony?  Because he's got corroboration.  Yeah, an

19  inventory.  So he checks his inventory and he figures out the

20  one gun that's missing, a six-inch Smith & Wesson Model 629, a

21  great bear gun.  And for those of you who may even be familiar

22  with Kodiak or other areas, stainless steel, because that's

23  good in those marine environments.

24      We also know that because Mr. Stein made a report,

25  and -- police report, because he was concerned about the gun

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 58 of 222
(720) 384-8078  attrans@sbcglobal.net

1  maybe being used in a crime, interestingly, and he makes that

2  report, and when -- who's he tell the police to contact about

3  it?  He tells them to contact Jim Wells.  You'll have those

4  documents in the jury room.

5       But how do we know Mr. Wells kept the gun?  That was

6  1997.  May not have kept the gun.  That can certainly be an

7  argument.  But I think he probably did.  We -- or not probably,

8  I think what -- he definitely did, and we'll -- the reason we

9  know that is because two of his friends and friends of his

10 family, Luke Robinson and Robert Pletnikoff, both saw a silver

11 revolver, once with Mr. Wells when he was hunting, and once,

12 Mr. Robinson said, on the kitchen table in the Wells house.

13 They're both friends of the Wells family.  They have no need to

14 lie.  Another reason is, it appears that Mr. Wells doesn't get

15 rid of much.  So something as valuable as a gun, he's not

16 likely to get rid of.

17      And then the last reason is the swords.  You heard Mr.

18 Stein say that about the same time he left Kodiak, he was -- he

19 found he was missing a ceremonial sword, it's got his name on

20 it, John Stein.  And these swords -- this sword and the two

21 Japanese swords -- we didn't bring those in -- were found in

22 the Wells gun safe in 2013.  If he kept those swords, he kept

23 that gun.

24      Now, the defendant's sons testified, to counter this

25 evidence somewhat -- defendant's son Matthew Wells testified

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 756  Filed 09/23/14  Page 59 of 222
(720) 384-8078  attrans@sbcglobal.net

1  that -- his testimony was basically he didn't remember the
2  safe.  But he had no -- he seemed to remember the safe when it
3  was at Stein's house but not remember the safe when it was at
4  his house; but he had to admit that he -- in previous
5  statements that he said, "Well, it might have been there, but I
6  don't remember."  It seems interesting that he would remember
7  it being in Stein's house but have no memory or no viable
8  memory of it being in his house.  And, certainly, you got to
9  understand, he's Mr. Wells' son.  He's in a difficult position.
10 But I would say you have to evaluate that memory when he says
11 that there was never a silver revolver in the house.  And he
12 said never.  He didn't say, "I don't remember one."  And I
13 think you have to evaluate his memory on whether that's
14 accurate, especially compared with his friend, Luke Robinson, a
15 man with no reason to lie, who tells you he saw a silver
16 revolver in that house.

17        And then defendant's son Cable testified.  You know,
18 unlike his brother, he agreed that the safe was in his house,
19 so he contradicts his brother on that matter.  I think he was
20 trying to add confusion about which gun of Mr. Stein's was
21 missing, that maybe he was trying to imply that -- they were
22 trying to imply that this gun that had a squib, as Mr. Stein
23 called it, maybe that was the gun that was missing and the gun
24 that was out of the safe.  But Mr. Stein was quick to rebut
25 that.  He had two guns, both listed on his inventory.  It was

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 756  Filed 09/23/14  Page 60 of 222
(720) 384-8078  attrans@sbcglobal.net

1  the second gun, the one with the four-inch barrel that had had

2  the problem, had been sent to Smith & Wesson -- it says so on

3  the inventory -- and was returned in 1990.  So there's no

4  confusion, and you heard him say that.  The gun that was

5  missing was a six-inch Smith & Wesson Model 629, and that gun

6  is still missing and has never been accounted for, last seen in

7  the custody of Jim Wells.

8        And also, maybe somewhat of a mistake here, Mr. Wells

9  had a lot of boxes of ammo but no .44 ammo that was consistent

10 with the ammo that killed the two victims.  But in that big

11 pile, and you saw the picture of the big pile, tucked in was

12 this.  Maybe he didn't account for that.  You heard Mr. Mills

13 tell you that, of the 12 rounds that fit in here, 11 of those

14 were consistent with the ammunition that killed Richard Belisle

15 and Jim Hopkins.  So he had a gun consistent with the murder

16 weapon and he had bullets consistent with what killed both

17 defendants.

18        Now let's talk about another mistake:  the blue car.

19 Moving to the blue car.  We talked about how Mr. Wells didn't

20 take advantage of the drivers that would normally help him

21 return his car, he and his wife -- car to home.  He didn't take

22 advantage of it, because, again, as we've seen, the blue car

23 was an essential part of the plan.  But it was parked -- this

24 is Amanda Sanford's diagram -- it was parked where you would

25 normally park a car when you go to the airport.  If you can,

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 756  Filed 09/23/14  Page 61 of 222
(720) 384-8078  attrans@sbcglobal.net

1   you park, you know, closest to the terminal.  And that's where

2   they parked.  The problem was, CGIS and the FBI were able to

3   find that it had been moved.

4          And, again -- Denali, could I have the lights for just

5   a second?  You can see the cone is where it's found.  And all

6   the way down here is the Alaska Airlines terminal.  Was moved a

7   considerable distance.  We heard some questions about -- that's

8   okay, Denali.  Thank you.  Some questions about traffic flow

9   and whether there's a requirement to drive to the end.  You

10  heard people say, you know, whether you were supposed to move

11  it to the end if you were going to have it more -- there for a

12  couple days.

13         You haven't heard anybody testify that that was a

14  practice in Kodiak.  That's just a suggestion by the defense

15  that there was some kind of policy.  You heard no evidence of

16  that.  You heard evidence that there's no curbing, there's no

17  barriers, there's nothing at the time to keep people from

18  pulling around and parking right in the end, and that's exactly

19  what the defendant did on his way back, because he wanted to

20  get in and get out of there as quick as he could.  And he left

21  that car sitting there.  And you'll remember, Lieutenant Will

22  Ellis talked about that, he -- from the wildlife troopers; he'd

23  been a regular trooper 10 years.  He'd seen the video.  They

24  determined that the blue car was -- had carried the killer in

25  and out.  He went to the airport that night, he drove up.  He

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 756  Filed 09/23/14  Page 62 of 222
(720) 384-8078  attrans@sbcglobal.net

said when he saw that, it just struck him:  That car is in the
right place, it's the right shape, it's the right color.  He
had no idea whether it belonged to Jim Wells.  But he was
confident that there was a car consistent with the car that
brought in the murderer.  And it is not a coincidence, ladies
and gentlemen, that he found that car.

There's a lot of things in here in this case -- and you
have to ask yourself, because a lot of things would have had to
be coincidence, serious coincidences, for Jim Wells to not be
the murderer in this case.  And all those coincidences don't
add up.  And you can talk about that.  That's something you can
consider in the jury room.

And this just shows the long-term parking and the
short-term parking.  That traffic pattern -- the defendants in
their opening showed us this traffic pattern and some video
from the cargo office at Alaska Airlines.  But that makes some
kind of assumption that people are going to drive all the way
down there.  And they might drive down there if they were going
directly to the terminal.  But there's no -- there -- there's
no reason they can't cut that that short and park right down
here.  And that's what you heard from the witnesses, and that's
what happened.

Now let's talk about another error.  Sometimes slips of
the tongue can be -- can say something.  Let's listen to the --
and I think most of this -- if we were calling somebody and

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 63 of 222

1    telling them we had a flat tire, you'd say, "I had a flat tire
2    on the car."  Listen to what Jim Wells says.
3    10:31:20
4        (Audio played)
5    10:31:29
6        MR. SCHRODER:  "A flat tire in the truck."  And that
7    might have been true, because the tire might have well been in
8    the truck, positioned in the back where it was found with the
9    nail in it, ready to hand over to the FBI, because I think he
10   probably thought that through, that it was going to somebody --
11   because he wasn't there at the time, he was going to be a
12   suspect at the start, and he was going to have to ex -- have an
13   explanation.  By the time he calls in that morning, tire's
14   probably in the back of the truck, ready to be staged, ready to
15   be used as part of the alibi.
16       But now let's listen for something else.  This is the
17   next email to Chief Reckner.  And the first email from Jim
18   Hopkins -- he knows Hopkins is dead.  There's no reason to
19   embellish on that.  But in this one he's going to talk about
20   lug nuts.
21   10:32:22
22       (Audio played)
23   10:32:35
24       MR. SCHRODER:  And again, "in the truck."  But, really,
25   the question is, when did he have time to check the lug nuts?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 756  Filed 09/23/14  Page 64 of 222
(720) 384-8078  attrans@sbcglobal.net

1  Let's look at our chart again.  We see at the end that,
2  according to the timing, and the timing is pretty precise,
3  because he passes -- the actual time he passes the gate is
4  7:22, that idea -- he's -- he'd probably be there about 7:29.
5  He arrives and makes the call at 7:30.  7:30.  And it was
6  probably a little later than 29, because that was a -- that --
7  7:22's a little later than 7:21.  So if he arrives 7:29, maybe
8  closer to 7:30, when does he have time to check lug nuts on the
9  truck?

10         First off, he's got to get out tools.  How is that
11  going to happen like that?  Even if he -- you know, we've heard
12  somebody suggest he knows where things are in that garage and
13  maybe he does.  But there's not going to be enough time to go
14  in and find tools to check and see if -- your lug nuts.  That
15  was an embellishment on the lie, so he could buy himself a
16  little bit more time before he comes in.

17         And last of the mistakes we want to talk about are
18  James Wells' own words.  And, in a way, this takes us back to
19  the first mistake:  the main gate camera and that 34-minute
20  gap.  Because that's what the agents ask him to explain.
21  You'll remember it's the last clip that was played for you, and
22  Mr. Wells -- they lay out for Mr. Wells that -- well, "It's
23  about this long to drive to the airport, about this long to get
24  in and out of your car, about this long to get back."  They
25  kind of lay that whole thing out for him.  And then they let

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 756  Filed 09/23/14  Page 65 of 222
(720) 384-8078  attrans@sbcglobal.net

1  him know they've got this camera with -- this camera of stills

2  that show that 34-minute gap, and they ask him to explain.

3  Because that 34-minute gap is longer than the alibi will

4  support.  It's much longer than the alibi will support, so they

5  ask him to explain it.

6       And this is a crucial moment in the case, and I want

7  you to listen to it carefully.  And one thing I want you to

8  listen to, especially in the initial time they ask him, is how

9  long it takes for him to respond.  Listen for that timing.

10  Kim.

11  10:34:55

12     (Audio played)

13  10:37:14

14       MR. SCHRODER:  I counted 14 seconds from the time he

15  got asked that first question to when he answered.  And he

16  said, "I have no reasonable explanation for it."  And they gave

17  him another chance.  And, again, more gaps.  And, finally, "I

18  don't have a theory at the moment."

19       Ladies and gentlemen, if I ask you what you did last

20  night, you wouldn't have to develop a theory.  You would know.

21  And Jim Wells knew what he did that morning.  He knew that he

22  killed those men.  But he couldn't tell the truth.  At that

23  point he needed a theory.  He needed something for his alibi,

24  and he needed it badly.  But he just couldn't come up with it

25  on the fly.  So all he could do was say, "I have no theory at

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 756  Filed 09/23/14  Page 66 of 222
(720) 384-8078  attrans@sbcglobal.net

1   the moment."  And that "at the moment" part is actually

2   important, because he started developing theories.  And we've

3   seen that -- we saw it the day after -- actually the day of

4   that interview, we saw the theories start to develop, and I'll

5   talk about that in a minute, and it's continued through this

6   trial.  You've theor -- you've seen some theories kind of

7   develop and kind of evaporate.  But they've all been theories.

8   They've all been based on speculation.  And when you apply your

9   common sense to the defense case, you're going to realize Jim

10   Wells is guilty, and he's the only one who could be guilty of

11   this crime.  There's no theory that can obscure that.

12         But let's talk about the diarrhea theory.  And this is

13   the one that started developing the afternoon of that

14   interview.  Defendant knew he was in trouble.  He was

15   confronted with the 34 gap -- minute gap, and he needed to

16   explain more time and he needed to look for places at the

17   airport he can say he was, where he couldn't be proven

18   otherwise.

19         Videocameras had been his downfall, so he checked those

20   first.  You heard testimony from FBI agents who were doing

21   surveillance on the blue car that they saw him arrive about

22   6:30 on the evening of the 13th.  They saw him go walk into

23   Island Air.  And Ms. Olivia Terry picks up the story from

24   there.  He walked in, walked up to that camera in the corner,

25   and stared at it.  Ms. Terry from behind, out of the office,

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 756  Filed 09/23/14  Page 67 of 222
(720) 384-8078  attrans@sbcglobal.net

1  came there and asked him if she could help him.  He just stood

2  and stared.  Made her so uncomfortable that she had to go get a

3  co-worker.  He walked down to the end of the -- their waiting

4  area, looked at another camera, and then left.  And the agents

5  then pick up the story and say that he went down to Servant Air

6  and he walked in there and he looked around.  The theory was

7  developing.

8          Special Agent Sturgis testified that he went around --

9  they checked all the kind of public bathroom areas at the

10  airport for cameras, and they found out there's a camera at the

11  Alaska Airlines terminal, there's a camera at the Comfort Inn.

12  We know there's a camera at the Island Air.  Servant Air, only

13  place that doesn't have a camera.  But yesterday you heard from

14  Mr. Skonberg and Pilot Williamson, from Servant Air, he wasn't

15  there that morning.

16          Now, the diarrhea theory also -- I don't want to talk

17  about this for too long, but we heard that from a few people

18  like Mr. Pennington, that somehow it seemed to maybe be related

19  to the -- his gallbladder problems.  But we introduced the

20  medical records yesterday with Dr. Gan, and you can go look

21  through those.  And you'll see that that wasn't ever a symptom

22  he reported as part of his gallbladder.  And the key one to

23  look at, I think, is 412A, which was a report that he went for

24  a checkup on the -- I believe it's the 2nd of April, reports

25  he's doing fine, and reports -- doesn't report anything about

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 756  Filed 09/23/14  Page 68 of 222
(720) 384-8078  attrans@sbcglobal.net

1  diarrhea.  And even after, Mr. Pennington admit -- they spend a
2  bunch of time out fishing that summer; nobody had any problems
3  with diarrhea.  There is no chronic diarrhea.  The diarrhea was
4  part of the story, developed after the fact, because he needed
5  time to fill that alibi.

6       Now, often part of what the defense does is try to
7  distract, to have you looking at things that is not really the
8  evidence in the case, things that are speculation.  And we --
9  we're going to as you to look at the evidence, to see through
10 those distractions, to see through those speculations, focus on
11 the evidence which is going to only show you that Jim Wells is
12 guilty of this crime.

13      Well, let's talk about some of the other theories.
14 Theory of Debby Hopkins, that somehow Ms. Hopkins killed her
15 husband.  There are a couple bases for this theory:  money or
16 divorce.  You heard from -- the Hopkins had some debts, but
17 they were fairly normal.  They bought a retirement RV, a truck
18 to pull it, certainly a significant expense, but not unusual
19 for somebody be -- ready to retire.  And you also heard from
20 Mr. Pecoraro that Mr. Hopkins had money in savings, he had
21 money in accounts.  So it wasn't -- they weren't destitute, by
22 any means.  They had debts, but they also had savings.  You
23 also heard that -- you know that Mr. Hopkins had a pretty good
24 job, and you heard from his wife that he'd gotten offered
25 even -- maybe a better job somewhere else, more money.  And he

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 756  Filed 09/23/14  Page 69 of 222

1   could have retired from the Coast Guard.  So he would have gone

2   there with a new higher-paying job plus his Coast Guard

3   retirement.  So the money issue is a red herring.

4         And, you know, Mrs. Hopkins, certainly she got some

5   money for life insurance and a death gratuity, but those are

6   all things that any serviceman would get if a spouse died.  And

7   I think the final thing to consider is, she put it in a trust.

8   I mean, how often do you imagine somebody who's trying to kill

9   somebody for money, and then go take the money and put it in a

10  trust.  It just -- it doesn't make sense.  It defies common

11  sense.

12         The other theory was divorce.  Certainly, the Hopkins

13  admitted they had talked about divorce, but that was before

14  moving to Alaska.  By all accounts, their relationship was

15  stronger.  The daughter said they were getting better.  People

16  who saw them, talked about them, said they always saw them

17  together.  The only person who really testified about the

18  pending divorce, again and again, was defense counsel.  And the

19  judge told you that's not evidence.  And when he asked those

20  questions, you should also remember what the responses were.

21  The witnesses said, "I don't -- I've never heard that."

22  There's just -- there's nothing to those rumors.  They are pure

23  speculation.

24         And, finally, we know Debby Hopkins didn't commit the

25  crime, because Debby Hopkins was sitting on her couch when the

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 756  Filed 09/23/14  Page 70 of 222
(720) 384-8078  attrans@sbcglobal.net

1    crime happened.  Her son came in and testified to you that he

2    came -- soon after his father left that morning, he came

3    downstairs, got a cup of coffee, he sat with his mom till it

4    was time to go to the bus stop.  At 7:25, he went to the bus,

5    standing right across the street from his house.  By the time

6    he left, his mom hadn't gone anywhere.  And remember, only one

7    vehicle.  They had one vehicle, and that vehicle was parked at

8    COMMSTA, at the rigger shop.  She had no way to get up there to

9    do anything.

10          But they added to that theory with what we're calling a

11   postmurder encounter, that she had a sexual encounter with a

12   man.  But that was after.  That was six weeks after the

13   murders.  And there's no evidence to indicate, and it's only

14   relevant that there's no evidence to indicate that that was

15   going on at any time before the murders.  There's some evidence

16   that maybe she'd met the man before at a place they talked

17   about, the Brewhouse in Kodiak, but it was always with her

18   husband.  And there's no evidence that there was anything going

19   on between the two of them before the murder.  Anything

20   suggesting that that's true is just speculation.

21          Then there's the Hannah Belisle theories, and these

22   are -- seem to be kind of follow -- hard to follow, and they

23   rode developed and undeveloped during the trial.  And,

24   certainly, I question why it was necessary to damage that young

25   girl, and maybe we'll hear this theory clarified during

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 756  Filed 09/23/14  Page 71 of 222
(720) 384-8078  attrans@sbcglobal.net

1 defense's closing argument.  But the speculation is that Hannah

2 Belisle or a friend of Hannah Belisle's killed Rich Belisle,

3 for no motive anybody can seem to discern.  Hannah Belisle

4 loved her dad.  She only spoke positively about her dad.

5     And these young men that have come before you, while

6 they may not be, you know, the highlight of any community, none

7 of them had any ill will against her.  None of them even knew

8 Rich Belisle.  None of them had any kind of a motive to hurt

9 him.  And, in fact, what you heard from them was after the

10 murders, their -- what they did was they bought flowers and

11 they to know it up to Hannah, because they felt bad for her.

12 Yet somehow, maybe in some theory of the defense, one of these

13 men -- young men was able to put together a murder where he

14 would be able to slip in and out of COMMSTA Kodiak rigger shop,

15 a place they would have no idea how to -- anything about it,

16 slip in and out of it undetected, leave no evidence, and

17 somehow implicate Jim Wells.  That's a heck of a coincidence.

18 And it's not a coincidence, because it's not true.

19     Some of this had to do -- part of the theory was the

20 ranch.  We heard a lot of about the ranch, that maybe whoever

21 this person was came from the alternate direction up Anton

22 Larsen Bay Road.  But, again, all speculation, nothing to back

23 it up.  Travis Biocic said he had lived at the ranch but had

24 been gone over -- for more than a year.  And, finally, we had

25 Mr. John Pearson, the man who was actually living at the ranch,

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 756  Filed 09/23/14  Page 72 of 222
(720) 384-8078  attrans@sbcglobal.net

1    and he said -- with his six kids and wife.  And he said there

2    was nothing going on out there, he didn't see anybody out

3    there.  Any evidence that there was something going on at that

4    place besides Mr. Pearson trying to raise his kids is, again,

5    speculation.  No evidence, and it doesn't make sense that

6    somebody might be hiding out there, hiding in the shed without

7    Mr. Pearson knowing about it for no reason, with no car.

8    Doesn't make any sense.

9          And the military police officers, Petty Officer

10   Kolodzik and Petty Officer Honour, said they made rounds that

11   night, 2 a.m., 6 a.m.  They went all the way past the golf

12   course up to the ski chalet area, saw nothing odd.  No odd

13   cars.  That's their job, to look for cars, odd cars.  Saw

14   nothing odd up there.

15         And, again, part of that brings in, I guess, this

16   mystery white truck that's on the video.  Petty Officer --

17   again, Petty Officer Kolodzik and Petty Officer Honour told you

18   it's not unusual for kids to go up to the golf course area,

19   and, as she delicately put it, steam up the windows.  So ask

20   yourself what makes more sense.  That that was some kids out

21   doing a little joyriding or steaming up the windows, or it was

22   somebody trying to sneak in or figure out a way to sneak in the

23   COMMSTA by driving right in front of the camera.  It just

24   doesn't make sense, and it's pure speculation.

25         All these related -- this series of Hannah Belisle

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 756  Filed 09/23/14  Page 73 of 222
(720) 384-8078  attrans@sbcglobal.net

1    things, they share some common connections or some common
2    traits:  no connection to Rich Belisle.  None of these people
3    have ever met him.  No ill will toward Hannah Belisle; bringing
4    her flowers.  And that equals no motive to kill Rich Belisle,
5    much less any motive to kill Jim Hopkins, who they didn't even
6    know.  And that -- they also share that trait with the theories
7    that it might have been someone besides a Belisle family member
8    or a Hopkins family member, the postmurder encounter theory, as
9    we're terming it.  No connection to the dead men, no connection
10   to COMMSTA Kodiak, no motive, no evidence.  All those theories
11   are just speculation.

12        Now let's talk about the nonviolence theory.  We're
13   getting toward the end.  We see my pile's getting smaller,
14   so -- in the defense case they put on a number of witnesses to
15   talk about how they had never seen the defendant violent.  But
16   those people had some common traits as well.  They had to admit
17   they had not spent time with Wells at work.  They admitted they
18   really hadn't spent much time with Wells in the past year.  And
19   remember, the last year at work, that's where things were
20   happening.  That's where the pressure was being put on.  That's
21   where the confrontations were happening.  So seeing him -- if
22   you didn't see him during that period and in that place, it is
23   questionable, the validity of those observations.

24        And we had a number of Coast Guard people, but I think
25   it was important also to see none of them had a supervisor

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 756  Filed 09/23/14  Page 74 of 222
(720) 384-8078  attrans@sbcglobal.net

1  relationship with Wells.  They got along with him fine, but
2  he -- they didn't supervise him.  The people you heard
3  supervising him -- Chief Reckner, Eskew, Bill Reed, Dave
4  Pizzurro, the XO, Pete Van Ness, the CO, they're the ones who
5  tell you the story, because they're the one who had to
6  supervise him.

7          One of those people the defense put on with the
8  insight -- I mentioned him before, though -- was Chief Warrant
9  Officer Casey Jones.  Defense put him on, and he was in a
10 pretty good position to understand this, because he was with
11 all four of the main players, Chief Reckner, Wells, Belisle,
12 and Hopkins, at the project in Shemya where he -- the antenna
13 project in Shemya, where he was in charge of the project.  So
14 he was in a position to know.  And his observations were, he
15 could see the tensions building and he could see they were
16 having problems.  And remember, Dr. Meloy told us, for one,
17 there's often no history of violence in targeted and intended
18 murders, and that 80 percent do not communicate a threat to the
19 target beforehand.  These theories are all red herrings, based
20 on speculation and meant to confuse you.  Keep your eye on the
21 evidence that's come in.

22         The defense closing -- defense is going to get to close
23 here in a couple of minutes, and you will listen attentively,
24 but I want you to keep a few things in mind during this
25 closing.  Common sense.  Again, like I said, that's one of your

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 75 of 222
(720) 384-8078  attrans@sbcglobal.net

1    great strengths of your part in the jury system, is applying

2    that common sense, so continue to apply that common sense.

3    Guard against speculation.  It has no place here.  Speculation

4    does not equal reasonable doubt.  Focus on the evidence.

5    That's what you're required to consider in the courtroom and in

6    the jury room.  And ask a few questions during the defendant's

7    closing.  How are they going to explain that 34-minute gap?

8    How are they going to explain the precision of the timeline?

9    How are they going to explain the obvious insider nature of

10   this, that someone, to commit this crime and to get in and out

11   there, had to know COMMSTA, had to know the rigger shop; how do

12   they explain that?  And how do you explain that this was such

13   a -- the evidence of this was such a brutal and personal

14   murder?

15            When you look at the evidence in this case -- evidence,

16   not speculation -- when you look at the evidence of the

17   intensely personal nature of this attack, of the brutal intent

18   to kill, of the insider knowledge of COMMSTA Kodiak that was

19   required, of the extensive level of planning that made use of

20   that insider knowledge to commit this crime in the way it was

21   committed, and combined with the mistakes that Wells made that

22   can't be explained -- the 34-minute gap, the precise --

23   precision of that timeline, the alibi that defies common sense,

24   and Wells' own words that shows he was clearly caught in a lie,

25   and the evidence that he's the only man who has motive to kill

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 76 of 222
(720) 384-8078  attrans@sbcglobal.net

1  these two men, to kill both these two men -- all of that

2  evidence adds up to one man and only one man who committed the

3  murders of Richard Hopkins -- Richard Belisle and Jim Hopkins.

4  And that man is only and can only be James Wells.  And we will

5  ask you to find him guilty.  Thank you.

6          THE COURT:  Thank you.  We're going to take a 10-minute

7  recess, to kind of do -- adjust the room here.  Come back in 10

8  minutes.

9          THE CLERK:  All rise.  This matter is in recess for 10

10 minutes.

11    (Court recessed at 10:54 a.m., until 11:25 a.m.)

12    (Jury not present)

13        THE CLERK:  All rise.  His Honor the Court, this --

14        THE COURT:  I think were ready.  (Indiscernible) ready?

15        THE CLERK:  Yes, we're ready.

16        THE COURT:  Jury's on their way.

17    (Jury present)

18        THE COURT:  Okay, please be seated.  Mr. Offenbecher.

19              **CLOSING ARGUMENT OF DEFENDANT**

20 BY MR. OFFENBECHER:

21        May it please --

22        THE COURT:  Yes.  Yeah.

23        MR. OFFENBECHER:  May it please the Court, counsel, Mr.

24 Wells, ladies and gentlemen of the jury.  Jim Wells is

25 innocent.  Jim Wells did not commit these brutal murders.  But

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 756  Filed 09/23/14  Page 77 of 222
(720) 384-8078  attrans@sbcglobal.net

1    that is not the question you are going to be asked to decide at

2    the end of the case by the judge today.  The judge is going to

3    give you instructions and he's going to ask whether the

4    government has carried its burden of proving beyond a

5    reasonable doubt that Jim Wells committed these terrible

6    murders.  And at the end of the evidence, they have failed.  At

7    the end of your deliberations, you will conclude as well that

8    the government has failed to carry its burden of proving its

9    case, its story, beyond a reasonable doubt.  And for that

10   reason, you should find Jim Wells not guilty.

11          Now, you are not going to be satisfied at the end of

12   your deliberations, because you are not going to know who

13   killed these two men.  And the government lawyer said as much

14   in her opening statement.  She warned you ahead of time in her

15   opening statement.  She said there's not going to be any bloody

16   fingerprints, nothing to collect, nothing that will say, quote,

17   "This is the murderer for sure."  That's what the government

18   lawyer told you.  There's not going to be anything that's going

19   to tell you that this is the murderer for sure.

20          And then the government lawyer said, "The evidence

21   comes from the geography of Kodiak, the layouts of cameras I'm

22   going to talk about that caught Mr. Wells' action."  And then

23   she said this:  None of the evidence is going to be a "Aha,

24   this is it."  None of the evidence is going to be this is the

25   murderer for sure.  And the government has delivered on that

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 756  Filed 09/23/14  Page 78 of 222

1   promise, because there is no evidence that -- from which you

2   can conclude this is the murderer for sure.  Surely not that

3   Jim Wells is the murderer.

4           The problem is that at the end of the day, at the end

5   of your deliberations, you are not going to know who committed

6   this murder either, and, partly, it's because of the way the

7   investigation was conducted.  It was focused with tunnelvision

8   from the very first 30 minutes on Jim Wells, to the exclusion

9   of all of the rest of the world.  So you'll see that all of the

10  investigation in this case was focused on Jim Wells like a

11  laser beam from the beginning.

12          A number of leads were passed up and searches that

13  could have been conducted were not conducted.  Because of that

14  tunnelvision, we may never know who killed these men.  So

15  that's why I tell you, when you see these photos of these men

16  who were brutally murdered, when you hear their family members

17  and the pain that they have gone through, you will want to

18  convict someone of a crime.  We know that.  You will want

19  someone to be punished.  We know that.

20          When you go back to the jury room, you are going to

21  feel like you want to do something for these people because of

22  the pain that they're going through.  We understand that.  We

23  know that you are going to want to give them some closure, give

24  them some justice.  We know that.  But the judge has instructed

25  you that you should let neither sympathy nor prejudice guide

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 756  Filed 09/23/14  Page 79 of 222
(720) 384-8078  attrans@sbcglobal.net

1  your deliberations.

2        And at the end of the day, because the evidence shows

3  that no one really knows who killed these people, as the

4  prosecutor predicated -- what has happened is a terrible,

5  terrible, brutal crime here.  But nothing -- the only thing

6  that could make this worse than the -- than it already is, make

7  the pain of these families worse, is to compound this terrible

8  crime by convicting an innocent man of murder.  And that's the

9  only thing in the world that could make it worse.  And at the

10  end of the case, you're not going to do that, because the

11  government has failed.  The government has failed.  There's a

12  reasonable doubt because of the evidence, and we're going to

13  talk about all of that evidence here today.  And we're going to

14  talk about the lack of evidence, the evidence that the

15  government has failed to muster, has failed to bring to you.

16        But, first of all, let's talk about this.  The

17  government's story makes no sense.  Now, the government's

18  lawyer is a good story teller, but there is no evidence to

19  support it.  The government's story is speculation.  But when

20  you look at the broader picture -- and we'll look at the

21  very -- we're going to look at the details, we're going to look

22  at the video evidence, we're going to look at all of it.  But

23  look at the bigger picture for just a moment.  Does this whole

24  story make sense?

25        Jim Wells, a 62-year-old man, a peaceful man by all

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 80 of 222
(720) 384-8078  attrans@sbcglobal.net

1    accounts, who unquestionably has a history of peacefulness and

2    nonviolence. Witness after witness after witness, people who

3    have known him well for decades, and they know him in a broad

4    variety of interactions. Dr. Gary Carver, a professor of

5    geology. Matt Wells, Jim's son. He's a police officer; his

6    wife's a police officer as well. Cable Wells, Jim's son, who

7    is an airline pilot. Amanda Sanford. Commander Musman.

8    Commander Tlapa. Commander Cesar Acosta. Luke Robinson. Hank

9    Pennington. All of these -- professor -- (indiscernible)

10    professor. All of these people know him over decades and

11    decades and decades. And not just in one context, not just in

12    the work context, although many of them do know him in the work

13    context. But they know him at work, at home, working in the

14    community as a baseball coach. They know him in a fishing

15    boat, try to reel in a halibut. They know him in a tent in the

16    woods, camping. They know him as Rich Belisle knew him, woke

17    up at the top of a 1,300-foot tower, where both of their lives

18    depended on one another the whole time.

19        Those people know him well. They know him for decades.

20    And not one -- you have not heard one moment of violence from

21    Jim Wells in 62 years. Look at the broader context of this

22    man's life. And it's not as though the government has not

23    tried to turn over every single stone that they could, not to

24    find the killer, but to focus on Jim Wells. They have given --

25    they have brought on the entire resources of the United States

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG Document 756 Filed 09/23/14 Page 81 of 222
(720) 384-8078 attrans@sbcglobal.net

1    government in this case to try to convict Jim Wells, using

2    every expert, every resource, everything they possibly could.

3    And they -- with all of that work, all of that effort, not one

4    act of violence in this man's life.  He's 62 years old.  And

5    you have only heard a couple of times where he's even lost his

6    temper in 62 years.

7         And what is Jim Wells really known for?  At work,

8    what -- what's the one thing that jumps to your mind right now?

9    What's -- what -- at work, what's he known for?  He's known for

10   safety.  He is Mr. Safety.  That -- I know that's the word that

11   came to your mind as soon as I said that.  Because every single

12   person has talked about what his primary imprimatur on this

13   whole thing was that he was the guy who was always making sure

14   people were wearing hardhats, always making sure people had

15   their ropes together.

16        Does this whole case make any sense to you?  A guy with

17   no history of violence, no criminal history, no history of

18   alcohol abuse or drug abuse, all of a sudden becomes a

19   homicidal maniac.  Does that make any sense to you?  No.  The

20   government's story doesn't make any sense.

21        Now, the government lawyer also said, well, those are

22   just people, you know, who know him from someplace else, who

23   don't know -- you know, who know him from Juneau or something

24   like that.  Well, nonsense.  That's not at all what the

25   evidence is.  The evidence was, from the XO, Mr. Pizzurro, from

1  the CO there, Mr. Van Ness, even from Mr. Reckner -- all

2  those -- Mr. Coggins, Mr. Beauford, Ms. Upchurch -- all of

3  those people were asked about -- and you better believe, if

4  there was one act of violence by any of those people who know

5  him right now, in this context, you would have heard about it.

6  You didn't hear about it, because it doesn't exist.  Jim Wells

7  is innocent.  This story just doesn't make any sense.

8         Now, you did hear a couple of times where Jim lost his

9  temper.  When was that?  With Ms. Kiele and Ms. Pletnikoff.

10  And what's different about that?  That's after Jim is falsely

11  accused of a murder.  And you can imagine that you or a loved

12  one, if falsely accused with murder, might get a little

13  frustrated when your house is searched, when your cars are

14  searched, where you're being surveilled 24-7, when there's

15  people across the hill with a camera and binoculars on you all

16  the time.  Would that make you a little bit frustrated?  Sure,

17  it would.  Nevertheless, is there any act of violence?  Not one

18  act of violence, ever, in a person who is peaceful, quiet, and

19  who is not a person with anger.

20         Now, the government has charged Mr. Wells with a

21  violent crime, and offered the testimony of Dr. Meloy to show

22  what the characteristics of a person who would commit this type

23  of crime are.  We're going to talk a lot about Dr. Meloy,

24  because I think he has some important information for you to

25  look at.  But are there any fits of anger, any fits of rage?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 756  Filed 09/23/14  Page 83 of 222
(720) 384-8078  attrans@sbcglobal.net

1  Not even punching the wall.  Has anybody ever even just punched

2  the wall, kicked the cat, anything?  Not one iota of evidence.

3  The government wants you to convict this man of these brutal

4  murders based against a history -- a lifetime history of

5  violence and service to the Coast Guard and service to the

6  community.

7          Jim Wells is no more capable of committing these brutal

8  and terrible homicides than the other people you saw come in

9  here, the people that he hangs out with.  Gary Carver.  Hank

10 Pennington.  There is not one scrap of evidence that Jim Wells

11 is capable of such a depraved and brutal act as occurred here.

12 And for that reason alone, that is a reason to doubt the

13 government's case and a reason that you should acquit.

14         Now, the Court has given you instruction, instruction

15 number 3, and he's going to read all of these instructions.

16 And I'm just going to talk briefly about a couple of them,

17 because they're difficult instructions for a jury to apply.

18 Because when people come into court and they're sitting next to

19 me here in court, they're not your friends, they're not your

20 loved ones, they're a stranger to you, and they're charged with

21 serious crimes.  And the judge has instructed you and will

22 instruct you again that a defendant is presumed innocent until

23 the government proves the defendant -- unless and until the

24 government proves defendant guilty beyond a reasonable doubt.

25 And that the defendant never has to prove innocence or present

1   any evidence.  And that's a difficult instruction to apply.

2           We all say, well, in America we have the presumption of

3   innocence.  But, you know, it's a hard thing to do when

4   someone's charged with a very serious crime.  And one way for

5   you to approach that is this.  Suppose for a moment that your

6   friend or your loved one, your dad or your brother or someone

7   like that, were charged with a serious crime, and that person

8   told you, just like Jim Wells told Special Agent Oberlander, he

9   said, "You know, I was fixing a flat tire when the murders

10  happened.  I had nothing to do with it."  That's what he said,

11  basically.  "I was fixing a flat tire.  I had nothing to do

12  with" -- and suppose your loved one that you loved and believed

13  in, who was 62 years old with a history of nonviolence --

14  suppose that you believed your dad or brother and you believe

15  that they were innocent.  Then you would actually -- you would

16  presume that your dad was not guilty.  Now, Jim's not your

17  loved one.  But you need to apply that same presumption of

18  innocence as if he was your brother or your dad and you

19  believed that he was innocent.

20          The government has the burden of proof.  Now, you

21  wouldn't require your dad or your brother to come against

22  the -- all these resources of the United States government and

23  prove his or her innocence, and that's what the judge has told

24  you.  You have to -- and that makes sense.  The government,

25  with all its resources, should have to shoulder the burden.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 756  Filed 09/23/14  Page 85 of 222
(720) 384-8078  attrans@sbcglobal.net

1  There may be no way for an innocent person to prove that the
2  charges are false, so that's why the judge tells you that and
3  that's the instruction that you have to fall -- follow.

4       Before you would believe that your loved one is guilty,
5  you would make the government prove its case and you wouldn't
6  require your loved one to prove he was innocent.  And that's
7  why, throughout this entire trial, the burden of proof stays
8  right here on this table, throughout the entire trial.  It
9  never shifts anywhere else.  So when you go back to deliberate,
10 you apply that presumption of innocence, that burden of proof
11 to the government, just as if it were your dad or your brother
12 sitting next to me.

13      Then the judge gives you another instruction called the
14 proof beyond a reasonable doubt, the definition of reasonable
15 doubt.  We'll talk more about it later, but I just want to tell
16 you, so, as we go through the evidence, you have it in mind.

17      If your loved one was charged with a crime, you would
18 require the government not just to prove probably that this
19 happened or maybe that this happened.  You would want proof
20 beyond a reasonable doubt before you would believe that your
21 dad or your brother had committed this serious crime.  You
22 would want not just a handful of letters of caution or
23 reprimand in a personnel file that are masquerading as a motive
24 for murder.  Not just a blurred blue image passing across a
25 surveillance camera that the government wants you to imagine in

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 86 of 222
(720) 384-8078  attrans@sbcglobal.net

1    your mind is Nancy Wells' car and wants you to imprint as Nancy

2    Wells's car.  Not just the speculation of a tire guy that a

3    rusty old nail like this was not -- wasn't picked up on the

4    road but it must have been inserted somehow in the tire.  Not

5    just that kind of speculation.  You would want more than that,

6    and you should, before you would convict or believe that your

7    loved one was guilty of a serious crime.

8            When you see at the end of the case that the government

9    has not met that burden of proving its case, proving its story

10   about this evidence beyond a reasonable doubt -- now, the

11   instruction tells you that the -- a reasonable doubt may arise

12   from the evidence.  So we're going to look at the evidence that

13   the government has brought you, as thin as it is, and as thin

14   as the prosecutor predicted it.  We're also going to look at

15   the lack of evidence, because the instruction tells you that a

16   reasonable doubt may arise from the evidence or from the lack

17   of evidence.  Because the government has the burden of bringing

18   the evidence to you and persuading you beyond a reasonable

19   doubt that Mr. Wells is guilty.  And so if there is a lack of

20   evidence, then you must also acquit.  So we're going to look at

21   two big categories:  the lack of evidence and the evidence.

22           But the first thing we're going to look at is what the

23   government lawyer just mentioned:  the timeline.  And the

24   government lawyer said, like to hear Mr. Offenbecher talk about

25   the timeline.  So that's what we're going to do right now.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 87 of 222
(720) 384-8078   attrans@sbcglobal.net

1   We're going to do that the first thing.  Because the timeline
2   is absolutely critical to the government's theory of the case.
3        In order for the government's story to have any
4   credence at all -- there's two videos here, the two
5   surveillance videos, going from left to right and going from
6   right to left, the T1 camera.  You've heard about it.  It
7   has -- first of all, those two images have to be the same car.
8   They have to be the same car for the government's story to hold
9   water.  And, second of all, they have to be Nancy Wells' car
10  for the government's story to hold any water.  Because without
11  that, the government's theory goes up in smoke.  There is no
12  case.  Their timeline is blown.  It's over with.  They have to
13  prove beyond a reasonable doubt that it's the same car and they
14  have to prove that it's Nancy's car.  And if the government
15  can't prove to you at the end of your deliberations beyond a
16  reasonable doubt that that is Nancy Wells' car passing from
17  left to right in that first video at 7:09, and if the
18  government can't prove to you beyond a reasonable doubt that
19  that other image going from right to left is Nancy Wells' car,
20  then you must acquit Jim Wells of this crime, because their
21  entire story here, their entire theory of the case, is built on
22  that house of cards.
23       So let's look at the evidence of the blue blur.  Excuse
24  me.  Now, you didn't hear much about Mr. Richards, the expert
25  who came in and testified during the government's opening, and

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 756  Filed 09/23/14  Page 88 of 222
(720) 384-8078  attrans@sbcglobal.net

1    there's a good reason for that.  That's because he started off

2    being the government's expert.  He's the dean of these

3    photographic identification experts, and he was hired by the

4    government.  As it turned out, he not only couldn't help the

5    government prove its theory that it had, but he destroyed the

6    government's theory.

7            You know, on April 12th, Mr. Reckner immediately

8    focused suspicion on Jim Wells.  You'll remember that.  And

9    they looked at the surveillance videos and they saw this blue

10   blur, and they immediately thought, well, that must be Nancy's

11   car.  So they convinced themselves immediately that there must

12   be -- they had to put surveillance -- that the surveillance

13   video must be Nancy's car.  And with hours -- within hours they

14   had seized Nancy's car and searched for it at the airport.

15   And, really, from that moment forward, from that moment

16   forward, they looked no further.

17           We'll talk about how they never searched up the -- to

18   the north, up Anton Larsen Bay Road, and we'll hear about all

19   the reasons and excuses that they gave for not doing that.  But

20   we'll -- it -- you'll see that the search -- every part of this

21   investigation was -- had tunnelvision.  It was focused like

22   tunnelvision, like blinders, just on Jim Wells.  And so all

23   searches are between the COMMSTA and Jim Wells' house.  That's

24   the only place they searched.  They searched it well, and they

25   didn't find any evidence there.  And the reason they didn't

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 89 of 222
(720) 384-8078   attrans@sbcglobal.net

1   find any evidence between the COMMSTA and Jim Wells' house is

2   because Jim Wells is innocent.  That's why there was no

3   evidence there.

4        But let's look back at the blue blur.  Let's look at

5   what the video surveillance really shows and what it does not

6   show.  And what you have had here is the best photographic

7   identification experts in the country from the FBI Laboratory,

8   both -- and you've had, really, two generations of them.

9        Mr. Richards, who was originally hired by Mr. Schroder

10  here, he is the dean of this.  He's the one who's -- for over

11  20 years, he was the head of the Federal Bureau of

12  Investigation Photographic Identification Laboratory.  He is

13  really the first generation of FBI analysts who performed that

14  in the FBI Laboratory in Quantico, Virginia.

15       Now, Mr. Vorder Bruegge is really, I would suggest to

16  you, the second generation of that.  He's a very smart guy, a

17  young guy, who was trained by Mr. Richards and who was very

18  honest, very forthright.  He told you the straight scoop.  And

19  they both agreed on their essential conclusions in this case.

20  They both did the same work, they looked at the same video,

21  they came to the same conclusions.

22       The experts have done scientific examination of the

23  available photographic evidence, and they have universally

24  concluded that it is of low quality and that it's difficult to

25  make almost any conclusion about what -- depicted in the

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 756  Filed 09/23/14  Page 90 of 222
(720) 384-8078  attrans@sbcglobal.net

1   surveillance video.  But these experts conclude that the car
2   going from left to right cannot be identified as Nancy Wells'
3   car.  They also conclude that the car going from right to left
4   cannot be identified as Nancy Wells' car.  And they also agree
5   that you can't even tell if those are the same two cars.

6        Now, I invite you to look at these photographs.  You'll
7   have many of them.  And we'll look at a couple in a minute
8   here.  But you look at them and you see for yourself what it
9   looks like.  It looks like more of a van coming from right to
10  left, and some other kind of a car going from left to right.
11  But it's not a question of what, you know, I think it looks
12  like.  The -- this information was taken to the best experts in
13  the country, maybe the best experts in the world.  And they
14  tell you that it cannot be done.  Now, there's a little bit of
15  cartoons, other stuff, that Mr. Toglia did that kind of tries
16  to influence you there.  And we'll talk about that too.

17       But remember, think for a second.  Why is it that Mr.
18  Schroder, the government lawyer in this case, went to Ms.
19  Richards in the first place, back in 2012?  The -- they had all
20  of the resources of the United States government behind them.
21  They could have hired anybody in the world.  They could have
22  gone to the FBI.  They chose Mr. Richards because he's the
23  best.  That's why they did that.  He was their first choice.
24  And they asked him to do the analysis and he extracted the
25  videos, as he told you, and he looked at them, and he gave them

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 756  Filed 09/23/14  Page 91 of 222
(720) 384-8078  attrans@sbcglobal.net

1    an answer that did not support their story.  The answer that

2    Mr. Richards gave is that there is not enough information on

3    this video to determine the make, model, or year of the car

4    going from left to right or right to left, and "I can't even

5    tell you if they're the same car going from right to left -- or

6    left to right and right to left."

7            And what did the government do?  Well, the government

8    just walked away from Mr. Richards.  That's the last they heard

9    of him.  They met with him December 20th of 2012, you'll

10   recall.  And that's the last they heard of him until we called

11   him about a month ago to come in and testify.

12           Why didn't they bring Mr. Richards into court?  Why

13   didn't they even mention Mr. Richards in their closing?

14   Because he doesn't support their theory of the case.  And

15   that's really one of the themes of what this prosecution is

16   about.  They've got tunnelvision.  If the evidence doesn't help

17   their case, they ignore it.  They don't want to put it on.

18   They try to minimize it.  The government has tried throughout

19   the case -- they have had tunnelvision, and both in the

20   investigation and the presentation.  If it doesn't point to Jim

21   Wells, they don't want to hear about it.  Now, the government

22   went both to Mr. Vorder Bruegge, Mr. Vorder Bruegge at the FBI

23   Lab, and they asked him to conduct much the same analysis as

24   Mr. Richards.

25           So first they were asked to see if they can determine

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 756  Filed 09/23/14  Page 92 of 222

1    the make, model, and year of the car going from left to right;

2    and, second, whether they could identify either of those

3    questioned vehicles as Nancy Wells' car.  Because, after all,

4    if they could do that, think about what that would do for the

5    government's case.  We wouldn't be having this argument here

6    right now.  We -- you know, if you -- if they could persuade

7    you beyond a reasonable doubt that that was Nancy's car going

8    up this way and Nancy's car going that way, that puts a big --

9    that makes a big help in their case.  And they -- they're just

10   kind of assuming, they want you just to come along on that.

11   Want you to come along -- it's a blue thing going this way, a

12   blue thing going that way, and that's a case.  But, you know,

13   the best scientific experts in the world have told you there's

14   not enough information.  We can't make that judgment.

15         So let's take a quick look at those photo exhibits,

16   just so you'll have those in mind.  Can we take it down,

17   Denali, please?  Thank you.  So this is the questioned vehicle

18   that passes from left to right.  You can see it right here.

19   That's really all you can see there.  And then the next slide,

20   please.  Here it is, zoomed-in image.  This is what Mr.

21   Richards was talking about, this is what Mr. Vorder Bruegge --

22   are talking about.  Can you determine the make, model of that

23   car; can you determine whether that's Nancy Wells's car.  And

24   the answer, unsurprisingly, is "No."

25         Now, we'll talk about Mr. Schmidt in a minute and

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 93 of 222
(720) 384-8078   attrans@sbcglobal.net

1  how -- somehow, that he can look at that and he can determine

2  that -- what kind of car that might be.  But as Mr. Richards

3  told you, the dean of these photographic identification

4  experts, it's a guess.  All right, you can take that down,

5  please.  Thank you.

6      But remember, there's two of these.  With respect to

7  that one, they couldn't tell what kind of car it was, the best

8  experts.  But there's another video going back the other way.

9  Let's just go ahead and put that one up.  Can I have the

10  lights, Denali?  Thank you.

11      So here's the other questioned video.  And remember,

12  there's -- all the experts told you that there's five views of

13  the car going from left to right and there's four views going

14  from right to left.  And what they've done is they've tried --

15  each of the experts is trying the best they can to see if they

16  can identify the car.

17      This isn't -- you know, remember, this isn't some fast-

18  talking guy that we've brought in from, you know, Arizona to

19  try to, you know, persuade you of our point of view.  These are

20  the government experts.  These are the best experts in the

21  country.  And they just happened to have the wrong answer for

22  the government, and that's why they're not talking about it.

23      So here's the car going from left to right.  It does

24  appear to be a car.  What kind of car?  Maybe it's an SUV,

25  maybe it's a van.  They can't really tell much more than that.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 756  Filed 09/23/14  Page 94 of 222
(720) 384-8078  attrans@sbcglobal.net

1   And the next slide, please.

2          And here is the closeup of that.  Again, they can't

3   tell, and you can understand why they can't tell, what kind of

4   a car that is.  They certainly can't identify to a specific

5   car.  And there's no question about that.  You didn't hear any

6   expert -- and we can go through all of them:  Toglia, Schmidt,

7   DiTallo, Mr. Richards, Mr. Vorder Bruegge.  You didn't hear any

8   experts say, "I can tell you what that car is."  You didn't

9   hear any expert tell you, "I can tell you that that's Nancy

10  Wells' car."  And if you can't know beyond a reasonable doubt

11  that that is Nancy Wells' car going from left to right and

12  right to left, then the government's case is over and you have

13  to find Jim Wells not guilty.  Because their whole timeline

14  depends on it.  Nothing makes any sense unless they can prove

15  that beyond a reasonable doubt, and they can't.  And for that

16  reason alone, you should find him not guilty.

17         They can't even determine whether those two cars --

18  that is, one going from left to right, which is kind of blue,

19  and the other car, going from right to left, this one -- they

20  can't even tell if they're the same car.  And, of course, they

21  could very well be different cars.  You get in your head that

22  they've got to be the same car, but of course they don't.  It

23  could be one car going from left to right and then, a few

24  minutes later, a different car comes down Anton Larsen Road,

25  which might even be a bigger car, maybe Mr. Pearson's blue

1  van -- who knows.  Who knows what that is?  I can't tell.  You

2  can't tell.  The best experts in the country can't tell.  But

3  one thing we know for certain.  They can't identify it as Nancy

4  Wells' car, and that's why you must acquit.

5         Now, I don't want to talk too much technical, because

6  that's the bottom line on it.  All the expert -- none of the

7  experts can do it.  But I'm going to address a couple of things

8  that the government lawyer said.  First, that Mr. Schmidt had

9  had the inside track on this because he's a car enthusiast,

10 that he -- you know, he does -- yeah, he's been working at

11 Honda and so forth.  You know, I'm sure that Mr. Schmidt's a

12 very nice guy.  I'm not going to say that he's not a nice

13 person.  But these are the best experts in the world who are

14 trying to -- you know, who do scientific analysis, you know,

15 photogrammetry, and they count the pixels and they can figure

16 out exactly what the size is.

17        Now, the government lawyer suggested that Mr. Schmidt

18 somehow had the inside track because he was talking about class

19 characteristics as -- and the other guys weren't.  Not so.

20 Vorder Bruegge and Richardson both told you right here, just

21 this week, that -- or Vorder Bruegge was the week before.

22 Sorry.  That's exactly what they do.  They have class

23 characteristics, so they try to narrow it down to a group of

24 cars.  They have individualizing characteristics, like the

25 number of windows or the -- you know, certain other particular

1    things, where they -- if there's a dent in the car or rust in

2    the car.  Then they can actually identify the specific car.

3    But that's exactly what they do.  They narrow it down by class,

4    they narrow it down by individualism, and they do a

5    measurement.

6         And so let's look at what -- the measurements.  They

7    can tell the general size of the vehicle and what parameters

8    there are.  You'll remember that Mr. Vorder Bruegge did a very

9    precise, calculated size of the questioned vehicles, and he

10   concluded -- he just tried to compare it to the -- he was

11   trying to make the -- you know, make it the -- Nancy's SUV,

12   Nancy Wells' car.  I mean, they were trying to get information

13   where they could come in here and tell you that it was Nancy's

14   SUV.  But they can't.  But -- so they compared it to Nancy's

15   SUV.  And what they said is that it could be Nancy's SUV, but

16   it could also be a car that's 10 inches longer or it could also

17   be a car that's 10 inches shorter.  They said it could be

18   Nancy's SUV, that model of a car, but it could also be a car

19   that's five inches taller or five inches shorter.

20        And so where does that leave you?  In a car that could

21   be -- the car going from left to right could be anywhere from

22   67 -- I'm sorry, 167 to 187 inches long.  And you guys have

23   taken great notes on this, I've seen you taking notes.  You

24   rely on your notes.  If I say something that's not right, you

25   do.  And we're going to talk about some of the things the

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 756  Filed 09/23/14  Page 97 of 222
(720) 384-8078  attrans@sbcglobal.net

1  government lawyer said here in a minute too, that I recall a

2  bit differently.  But I'm -- totally rely on your notes.

3      But here's what I remember.  It was about 167 to 187

4  long.  So that includes a whole, huge bunch of cars.  And it

5  was from 60 -- 6 -- excuse me, 60 to 70 inches tall.  Want to

6  make sure I got that right too.  From 60 to 7 [sic] inches

7  tall.  So that's a whole lot of cars.  What that means is that

8  there's a whole lot of different models of cars.  And, of

9  course, a different model of car means there may be hundreds or

10  thousands of actual cars that are within those parameters.  And

11  then you have the fact that there are two separate questions

12  vehicles, one left to right, one right to left.  So, in fact,

13  it could be that the car that's going from left to right could

14  be as long as 10 inches longer than the car that's going from

15  right to left, and same with the height.

16      So the cars could be that big in difference in size,

17  and no one who is just looking at it, just spitballing -- you

18  know, trying to guess what it is -- here -- here's your --

19      MR. SCHRODER:  Your Honor, objection.  We -- I don't

20  believe this is admitted.

21      MR. OFFENBECHER:  Yeah, I think it is.

22      THE COURT:  I think it was.

23      MR. OFFENBECHER:  Yeah.

24      MR. SCHRODER:  Our records say it was admitted for ID

25  only.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1              MR. OFFENBECHER:  No, it was admitted.

2              THE COURT:  I -- it may have been admitted for

3    identification.  I can't --

4              MR. OFFENBECHER:  Anyway, this is the -- this is how

5    they measure the cars, basically.  This is the -- Mr. Richards

6    told you that this is how they measure the car.  They blow

7    down -- they enlarge it as much as they can.  And here's the

8    information that's on the video.  I mean, you didn't really see

9    this from anybody else, and it maybe is a little technical, but

10   this is how they can do it.  And they try to figure out where

11   the car is and then they count the pixels.  Remember, they --

12   Mr. Vorder Bruegge said this too, "That's how we measure how

13   big they are."  They count the pixels from here to here, they

14   count the pixels from here to here, and that's how they

15   determine how big the car is.  But on these photographic

16   images, this is all the information there is.  And on the

17   color -- you know, there's lots of different colors of the

18   pixels.

19             So what they were telling you is that the cars -- you

20   can take that one down, (indiscernible).  The two cars in the

21   videos, based on the scientific evidence, quite clearly could

22   be two separate cars.  If, in fact, they are separate cars,

23   then the government's theory goes up in smoke.  The timeline

24   means nothing if they are two different cars.  And that's what

25   the government's experts have said, that's what everybody's

1  have said.  And for that reason alone, you should acquit Jim

2  Wells.

3         Now, there were some other folks that came in, Mr.

4  Toglia, Mr. Schmidt -- excuse me -- and then Mr. DiTallo.

5  Again, Mr. Toglia knew and acknowledged that the real

6  photographic evidence was not good enough to make a

7  determination of the make and model of the vehicle or to

8  identify it as Nancy's car.  Again, that's another government

9  excerpt -- expert comes to the same conclusion.

10        Now, the government lawyer told you -- and I'll just

11 say this once.  The government lawyer told you, "This is not

12 going to be a battle of experts, I don't want you to have a

13 battle of experts."  But that's not because they didn't try.

14 They have hired expert after expert in this case.  But the

15 reason they don't want it to be a battle of experts is because

16 they lose that battle.  None of the experts really support the

17 essential elements of their case.  And that's why, ultimately,

18 they need it not to be a battle of the experts, even though

19 they hired them, even though they tried to get them to help out

20 their case.

21        Now, the one that you're going to have to watch out

22 for, and the government lawyer tried to make sure that you paid

23 attention to this, was Mr. Toglia.  He did a -- kind of a

24 recreation.  He did some -- put some -- he put some lines

25 around the cars.  He took the images and he put -- superimposed

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 100 of 222
(720) 384-8078  attrans@sbcglobal.net

1   some other things.  And so I want to take a quick look at that,

2   just to make sure that you have in your head what that's

3   intended to do.  It's intended to influence you to think that

4   it's Nancy's car.  Can you bring up that image, please?

5            So here's the real image.  This is the image of the car

6   in the real surveillance tape.  And what Mr. Toglia has done is

7   this.  He takes a picture or a little -- I'm in your way here a

8   little.  Sorry.  He takes a -- kind of a little cartoon of a

9   blue SU -- Honda CR-V, and he superimposes it over the real

10  blur.  And then, when you saw his PowerPoint presentation --

11  can you go back to the real car?  This is the real image here.

12  And then go -- he goes back again to the -- to that one.

13           And so what's going on here is that they flip back and

14  forth.  And in his image -- in his PowerPoint presentation,

15  over 100 slides, I think it was, you'll see that he goes from

16  the real image and then back to the blurred image.  This is the

17  real -- excuse me.  That's the real image here, and then he has

18  the little cartoon over it.  And what that's intended to do,

19  like maybe 50, 60 times, is intended to make you think that

20  somehow it is identifying that car, that little cartoon image,

21  as Nancy's car.  But it's not.

22           The -- this is the real information.  Putting the

23  little cartoon over it, drawing a little line around it that's

24  the same size as Nancy's car, that doesn't make it Nancy's car.

25  Putting a little blue cartoon picture over a real image, like

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 101 of 222
(720) 384-8078  attrans@sbcglobal.net

1     that, that doesn't make it Nancy's car.  That's the real car,

2     and they don't know what it is.  And because they can't prove

3     to you beyond a reasonable doubt what it is, Jim Wells must be

4     acquitted, because the whole rest of their timeline is gone.

5     Can take that down now.  Thanks.

6           Mr. Schmidt, again, I think was a very nice guy and he

7     was trying his best to help out.  And he did.  And the best he

8     could do is he could say, "Well, you know what, I'm going to

9     say it's 70 percent.  That's the best I can do, based on

10    everything that I know," you know, being a car enthusiast and

11    so forth.  But as Mr. Richards told you, he's just guessing at

12    it.

13          But let's get -- you know, the one thing that was kind

14    of interesting is the -- if you're just looking at a car and

15    you have familiarity with it and you're trying to recognize

16    what a car is -- let's look at some people -- some evidence of

17    people in this case who tried to identify a car when they

18    really knew what the car was.  You remember, there was Laura

19    Demi, Doris Sanderson, Collette Francisco.  These people had --

20    you know, they had put that newspaper article out saying, you

21    know, "If you see Nancy and Jim's car, you know, give us a

22    call, because we want to find out where it is."  You remember

23    that.

24          Well, those people all falsely identified -- and I say

25    falsely, because they were just mistaken -- the car, because

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 102 of 222

1  each one of them testified about seeing the car in a place

2  where it was physically impossible for either Nancy's car or

3  Jim's pickup truck -- all of them testified that they saw the

4  car in a place where it physically couldn't be, because it

5  was -- Jim's truck was at T1 or Jim was back at house or

6  Nancy's car was at the airport.  And they saw it, you know,

7  someplace else.

8          What's the point of all that?  Well, the point is that

9  even when these people, who were actually familiar with Nancy's

10  car or actually familiar with Jim's car -- I mean, they knew

11  that particular truck and that particular car -- they were --

12  they fooled themselves.  They saw a car.  They wanted to help

13  out.  They saw a car on the street.  They remembered seeing it

14  there.  They called in and said, "I saw Jim -- you know, Jim's

15  car, you know, at such-and-such a place on the way to

16  Kodiak" -- said Laura Demi.  But, you know, it wasn't true.  It

17  was false.  And those people actually know the car.

18          Here's Mr. Schmidt, trying to look at an image, not in

19  person, not seeing the car, trying to identify the car, and he

20  says he's 70-percent sure.  Even if Mr. Schmidt were right that

21  he were 70-percent sure, 70-percent sure is not good enough to

22  convict a fellow citizen of the crime of murder.

23          Finally, no one can determine the make and model of

24  either car.  No one can determine whether it's Nancy's car.

25  Because they can't determine that they're the same car or

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 103 of 222

1  Nancy's car, you need to find Jim Wells not guilty.

2          All right, let's move on to some of the other evidence.

3  We're going to talk about the evidence, then we're going to

4  talk about the lack of evidence.  Let's talk about this tire

5  and nail evidence.  Here's the nail.  Now, you've probably seen

6  that -- now, may I just approach a little bit, Your Honor?

7          THE COURT:  (Indiscernible).

8          MR. OFFENBECHER:  About this far.

9          THE COURT:  That's good.

10         MR. OFFENBECHER:  Okay, thanks.  All right.  Here's the

11  nail.  And you're going to get --

12         UNIDENTIFIED SPEAKER:  The lights.

13         THE COURT:  Lights.

14         MR. OFFENBECHER:  Lights up.  Sorry.  Thanks.

15         THE COURT:  Uh-huh (affirmative).

16         MR. OFFENBECHER:  Thank you.  This is the nail, right

17  here.  I want you to look at it when you go back in the jury

18  room.  You hold it in your hand, you look at it, you look at

19  the end, you look at the side.  You tell me whether this old

20  nail looks like a nail that was picked up on the road, has been

21  in service for years and years and years, or if this is some --

22  looks like something that was inserted into a tire with a

23  nailgun.  You look at the head of that, you -- you know, you

24  tell me.  But we'll see what the experts have to say, we'll

25  look at the pictures that they have, because we're perfectly

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 104 of 222
(720) 384-8078  attrans@sbcglobal.net

1   willing to accept their opinion.

2          Okay, that's the nail we just showed you.  Take it down

3   for me a little bit.  Thank you, Denali.  So here's the nail.

4   We looked at it.  You'll get to touch it and feel it.  It's got

5   some -- it looks almost kind of rusty.  But you make your own

6   opinion about what it is.

7          Let's talk about Mr. Mills, the government's own

8   expert, again, who came to testify about it.  He talked about

9   the condition of the nail.  He said there's dirt and debris on

10  the nail.  And, again, I want you to look at your own notes on

11  this.  You have your own judgment.  And contrary to what I

12  heard during the government's opening, Mr. Mills did not

13  testify, to my recollection, that this nail was inserted by a

14  nailgun.  He -- what he said, as I recollect it -- you tell me

15  if I'm right -- is that at some point he believed that the nail

16  had been shot out of a nailgun, but he didn't say it had been

17  inserted in this tire in the nailgun.  What he said is that he

18  saw some marks consistent with it having been shot out of a

19  nailgun at some point.

20         But then, the other testimony is that there was all

21  this dirt and debris on the nailhead that was filling in the

22  grooves and the other impressions, which is, of course,

23  consistent with the nail having been driven by a nailgun

24  sometime ago.  I mean, he didn't know when it had been driven

25  by a nailgun.  But sometime ago it had been driven by a

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 756  Filed 09/23/14  Page 105 of 222

1   nailgun.  And then in the meantime, it had picked up all this
2   paint, all this other dirt, all this other debris on the
3   nailhead.  So you use your own recollection of that, but that's
4   my recollection of what happened.

5       What else did he talk about?  Well, he said that the --
6   can you go to the next one, please?  Thank you.  He also said
7   that there were abrasions on the nailhead, contrary to, I
8   think, what you just heard.  He was talking about these
9   abrasions right here.  There have been some abrasions.  Can I
10  see the next one, please?  Thanks.

11      Okay.  And then this is back -- yeah, back -- can you
12  go back one?  You were right the first time.  All right.  So
13  that -- there are some abrasions on the edge of the nail
14  consistent with it having been scraped.  Abrasions is what he
15  talked about.  Actually, can you give me the one back, even,
16  from there?

17      Okay, so here's the nailhead.  You're looking down now.
18  It's got some marks on it consistent with perhaps being struck
19  at some point with a nailgun.  And then on the edge over here
20  there are some abrasions, and you can tell because they're a
21  different color metal.  They're the silvery-color metal, not
22  the old paint, rusty, whatever -- you know, dirt that's on the
23  nail.  These have been scraped as if it had been inserted in --
24  it had been stuck in the tire and then scraped along the road.
25  And, indeed, that's what Mr. Mills indicated -- Mr. Currie

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 106 of 222

1    indicated, is that the nail looks to him -- looked as though it

2    was picked up on the road and then scraped on the edges there.

3    That would account for those abrasions.  All right, can you go

4    forward one now?  And then one more.

5         And then you heard Mr. Swanepoel and some of the other

6    experts testify that this is the nail hole.  And what -- the

7    important part to look here is this is where the nail went in.

8    And what Mr. Swanepoel indicated is that the -- if the nail was

9    here, this indicates some interaction between the underside of

10   the nailhead and the surface of the tire there.  See how this

11   part's all shiny there, but this part's not shiny.  That's

12   because there's been a nail there and there's been some

13   interaction.  And what -- by -- what he means by interaction is

14   that the nail was in there and it was going like that.  So

15   there's scraping -- excuse me -- making a different color than

16   the colors around there.  That's what Mr. Swanepoel said.

17        Now, Mr. Mills compared the two Mark 23 (ph) nailers

18   that were seized, but there were no matches.  Excuse me.  But

19   Mr. Mills did indicate that there were abrasions along the

20   edge, there were those scrape marks along the edge.

21        Now Mr. Bolden.  You'll remember, he was the

22   government's tire guy.  I'm sure Mr. Bolden's a very nice

23   person, but he was confused about what he had done, the

24   condition he had gotten the tire in.  He -- you look at your

25   own notes.  He got that wrong.  He seemed to think that when

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 756  Filed 09/23/14  Page 107 of 222

1  the tire came to him, it had those marks around the edges.  Of

2  course it did.  And Special Agent -- you know, that's what he

3  testified to in his direct examination, and then we had to call

4  Special Agent Allison to clear that up.  Of course, those were

5  the marks from the dynamometer that he had used to take those

6  tests on the edge.  But first he said those were marks, then he

7  said they weren't marks.  And he was pretty much confused about

8  when he had taken the photos.

9        And the problem for him is that he had not taken any

10 photos of the tire when it first got to him.  The only photos

11 he had were after.  And, of course, that's the poorest

12 laboratory procedure at all.  And when he realized the mistake

13 he had made, he had to backtrack to cover himself by saying,

14 "Oh, yeah, that's the way it was when I got it from the FBI."

15 But, of course, he was wrong.  Ladies and gentlemen, we

16 confirmed that.  And when the government put that -- the

17 government never even cleared that up.  We had to clear that

18 up.  Mr. Bolden -- again, that kind of testimony cannot

19 possibly be the testimony that you would convict a fellow

20 citizen on.

21       And then, finally, Mr. Currie, our tire guy.  He

22 indicated -- Special Agent Allison indicated that it was 25

23 pounds pressure, that was the pressure when he checked it and

24 then sent it off to Mr. Bolden.  Mr. Currie said -- has a long

25 history and experience in the tire industry; you look at your

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 108 of 222
(720) 384-8078   attrans@sbcglobal.net

1    own notes on that -- this is more probably than not picked up

2    on the road, that the tread guides the nail into the tire.

3         Oh, and then there's one more photo.  This photo again.

4    This photo, what Mr. Currie indicated -- you know, here, again,

5    is the hole with the little discoloration, and that this mark

6    here, it corresponds to the edge of the nail that -- coming in

7    contact with the tire.  Again, cutting out different color of

8    the rubber here, the shiny rubber here, and the rubber there,

9    indicating that that nail was coming in contact with the tire

10   while it was on the road.  His opinion what -- it was

11   probably -- more probably than not picked up on the road.  And,

12   of course, Mr. Swanepoel talked about the dishing and the

13   abrasions on the nailhead, all consistent with the nail being

14   in the tire and being on the road in the tire.

15        All right, so now let's change -- shift gears a little

16   bit.  We've talked about the blue blur, we've talked about the

17   tire and the nail.  What I've told you is that the government

18   focused immediately on Jim Wells to the exclusion of other

19   avenues of investigation.  And what I suggest to you, with all

20   due respect to the government, is that this tunnelvision

21   distorted the investigation from the get-go.  And I'm just

22   going to go through a couple of examples of how tunnelvision on

23   Jim Wells distorted this investigation and how that should

24   affect your deliberations.  What the judge has told you is that

25   you should presume him innocent.  But from -- after the first

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 109 of 222

 1   half-hour, they presumed he was guilty and only tried to
 2   collect evidence against him.
 3       What happened?  Immediately, they saw Nancy's car at
 4   the airport and they -- Mr. Ellis was told to go look.  He saw
 5   six cars, six blue cars, but he picked out Nancy's car, because
 6   Jim Wells worked there and they were the -- somebody had said
 7   Jim Wells might be involved.  There were six other cars.  You
 8   can see pictures of those six other cars.  Here's Nancy's car.
 9   Six other cars.  They didn't investigate those, as far as we
10   know.  They only investigated Nancy's car.  Why not the other
11   blue cars that were there?  Because what -- it's just
12   tunnelvision.  I'm not suggesting that there was -- this was
13   any on wrongdoing or evil intent on this, but, you know, you
14   just get in your mind somehow that Jim Wells is guilty and it
15   must have been Nancy's car, and then you -- everything you look
16   at after that, you try to get it into the case.  And that's
17   what the government did in this case.  That's what the
18   investigators did.
19       The other thing you should look at is look at the way
20   the wheels are turned on Nancy's car.  You know, they showed a
21   little video of the agents trying to drive the wrong way and
22   parking their car, because they had in their head that that's
23   the story.  But these wheels are turned consistent with this
24   car being brought in the normal way from Alaska Air, brought in
25   here and turned into the parking space.  That's the way the

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 110 of 222

1    wheels end up when you're turning left into that parking space.

2    It's not -- it's -- and with the way the agent, you know, had

3    their little 171 video -- you remember that exhibit where the

4    agents kind of came down to the airport and they turned in and

5    they changed cars and they did that -- that was because they

6    don't have any evidence of that, and so they had to create some

7    evidence to try to get in your head their story, their theory

8    of the case.  But if you normally drove your car in and

9    followed -- you know, followed the normal traffic pattern on a

10   one-way street, that's what your wheels would look like if you

11   had come right past the Alaska Airlines camera.

12         So where did they search?  Can you give me number 14,

13   please?  Okay.  So this is the tunnelvision part.  Where did

14   they search?  All right.  Now, I'm going to use my pointer

15   here, but you already know the answer.  You know exactly where

16   my pointer's going to go, because you know where they searched.

17   You know that they had tunnelvision.  And here's where it goes.

18         It starts right here at the COMMSTA, at the Kodiak

19   rigger shop.  And they started searching -- you'll remember

20   that Trooper Ellis said, "We searched about 30 yards up this

21   way," so maybe right there.  I don't know exactly where.  But

22   "We searched 30 or 40 yards up north and then we started going

23   this way."  And then all the other information you have about

24   this investigation, all the searches they did, all the searches

25   of the Buskin River, all the searches that Mr. Salas did of the

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 111 of 222

1  tidal flats when there was a super-low tide, all the searches

2  of the dump, all of those are all here.  They're from here at

3  the Buskin River bridge, all the way down here -- down here --

4  sorry.  All the way down Anton Larsen Bay Road.  And then they

5  go over here, and then they search the tidal flats all along

6  here.  Why are they doing that?  Because they have

7  tunnelvision.  They believe that it's Jim Wells who did this,

8  and so all of their search is down here.

9       And then they come down to Jim Wells's house and they

10  search some more, and they do lots of search warrants there.

11  They search his septic tank.  They search the garbage down

12  here, where -- Jim Wells's garbage.  They take all the garbage

13  out and they spread it on the ground.  They search every

14  possible place that any gun or clothes or anything else could

15  be.  And they search only between Jim Wells' house and here.

16  Did they search up here?  No.  Why not?  Because they think

17  it's Jim Wells.  They're not -- they don't have in their head

18  that it's possible that someone had come from the north and

19  committed these terrible crimes.  They just won't let it into

20  their head.  And so all they did, from the first 30 minutes, is

21  search down here.  And that has tainted the investigation.

22       Trooper Dupras, Trooper Ellis, and Trooper Jones showed

23  you what it means to search for some evidence.  They walked

24  through the woods right behind there.  They got down on their

25  hands and knees.  They were looking for a gun or for some

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 112 of 222

1    bloody clothes or a ski mask or some evidence, some real
2    evidence of a crime.  But did anyone ever do that anywhere
3    except from here all the way down to the Wells residence?
4    Nowhere else in the whole world have they looked.  That's the
5    only place in the whole world.  And why is that?  Tunnelvision.
6    Tunnelvision on Jim Wells, because they believed that he was
7    the person who committed the crime.  Can I see the next one?

8          Again, when they're asking for information about cars,
9    what do they do?  Do they say, "We want some blue SUVs within
10   the parameters of the cars that we're looking for, or some
11   white trucks within the parameters"?  No.  They want people --
12   you know, they put this in the front page of the Daily Mirror.
13   That's not just some SUV, that's Nancy's car.  This is not just
14   some white truck.  That's Jim Wells' car.  They -- the FBI has
15   requested that anyone who observed this car or this car on
16   those places should come and give them some information.  They
17   just didn't -- they didn't say, "We saw a blue blur" and any
18   cars that fit; they wanted people to come because they were
19   focused on Nancy and they were focused on Jim.  That's
20   tunnelvision.  That's having the blinders on.  All right.  You
21   can take that down now.

22         All right, so we told you the judge is going to
23   instruct you at the end that the evidence -- that reasonable
24   doubt can arise from the evidence or the lack of evidence.  And
25   the government lawyer in the opening statement prepared you for

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 113 of 222

1  the fact that there is going to be a lack of evidence in this
2  case.  And the lack of evidence is another reason that you
3  should find Jim Wells not guilty.  So let's look -- take a look
4  at the lack of evidence.

5       Despite calling over 110, maybe a little bit more,
6  witnesses, there is no physical evidence, there is no trace
7  evidence, there is no real evidence, no digital evidence.  In
8  these times, I mean, you watch TV enough to know that digital
9  evidence is very important.  You use the Internet, you use your
10 phone, you do Google searches.  And there's no photographic or
11 video evidence.  We already looked at that.  There's no
12 photographic or video evidence that assists the government in
13 proving its case here.  There is an astonishing lack of any
14 kind of evidence in a serious murder case.  It's another reason
15 for you to find Mr. Wells not guilty.

16      So let's take a look at this evidence.  The government
17 has been trying for two years to develop some kind of evidence.
18 They haven't developed any.  And that lack of evidence is why
19 you should find him not guilty.  So is there any type of murder
20 weapon, bloody clothing, fingerprints?  Think that -- their
21 story is that Jim Wells committed this crime and then went
22 home.  But after that he was under 24-7 surveillance.  There
23 were people watching him, there were cameras across the thing.
24 The FBI had it set up.  They pumped his septic tank, they did
25 his garbage, they did it -- they searched his house numerous

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 756  Filed 09/23/14  Page 114 of 222

1    times, and still there's no evidence.  And the reason that

2    there's no evidence is because he's not guilty.  There would be

3    some evidence someplace.  But they say, oh, it's because he's

4    the -- he's just the perfect mastermind of the crime.  But

5    that's also what it would look like if you were innocent.

6          Think about this for a second.  He's either the

7    smartest, most mastermind crime in the whole world, or he's

8    innocent.  Because if he's innocent -- that's what it would

9    look like if you were innocent.  There wouldn't be any gun in

10   your septic tank, there wouldn't be any bloody clothes in your

11   house.  There wouldn't be any of that evidence.

12         There's also no trace evidence here.  Now, you don't

13   have to watch enough "CSI" to know that, you know, trace

14   evidence is important, and they looked for it in this case.

15   You remember the crime scene was terrible.  You know, there was

16   blood all over, there were other, you know, parts of -- flying

17   about.  There were little bits of gun residue or -- excuse me,

18   bullets and so forth that had ricocheted here and there.  But

19   it was a terrible scene.  And you'll remember that Special

20   Agent Strause testified that there was blood spattered on the

21   walls and there was a great deal of blood.

22         And they did a careful search of the crime scene, but

23   they also did a careful search of Nancy's car.  They took

24   Nancy's car and they searched it up.  They opened it up -- they

25   got the special vacuums.  Remember, Special Agent Espeland

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 115 of 222

1  talked about the special vacuums that they have.  They have

2  little filters in them.  They vacuum up the whole thing, so

3  that if there's any one little drop of blood or one piece of

4  hair or a piece of, you know, tooth or bone or anything that

5  gets caught there, they can take that to the laboratory, they

6  can analyze it, they can -- if it's Mr. Belisle's DNA or Mr.

7  Hopkins' DNA on that, then they've got some real evidence.

8  It's called trace evidence, because it traces back to the

9  original scene of the crime.  Was there any trace evidence

10  here?  No.  And in this terrible, terrible crime scene, that's

11  what you would expect.

12          Now, the government has suggested somehow that Jim

13  Wells was so clever that he could do this, commit this crime,

14  you know, and avoid any trace evidence, for whatever reason.

15  But you'll remember the testimony from Mr. Morton, and it was

16  terrible testimony.  But that's what his conclusion was, is

17  that these men were shot individually, and then the person came

18  back and stood right over each of them and shot them again.

19          Now, this is not a long-range shot that the government

20  told you about.  The medical examiner, Ms. Lann, Dr. Lann, and

21  Mr. Morton both testified that these individuals were shot

22  first and then the killer, who was not Jim Wells, came right up

23  on top of them and shot them again, that those are

24  circumstances in which there is going to be some trace

25  evidence, where there's going to be some blood.  Both of these

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 756  Filed 09/23/14  Page 116 of 222

1   gentlemen were bleeding at that point.  Certainly the person

2   who stood over them after they were shot and shot them again is

3   going to have blood on their shoes, is going to have blood on

4   their pants, is going to have blood or tissue all over.  And

5   there's none of that evidence in Jim Wells' car, there's none

6   of that evidence in Nancy Wells' car, and there's none of the

7   evidence at their house.  And that's because Jim Wells is not

8   guilty.  That's because he's not the killer.

9          There is someone out there who stood over these men and

10  shot them at close range and got blood on their shoes and got

11  blood on their pants and on their hands.  There is someone out

12  there, but that evidence is not in Jim Wells' house or Nancy's

13  house or the pickup truck.  And it's because he's innocent.

14         Can I see 16, please?  So we talked a little about

15  this.  We don't need to belabor it.  But these are the

16  different groups of things that they tried.  These are the

17  vacuum sweepings from the crime scene.  They had some tire

18  castings that they took in the back.  You better believe, if

19  those tire -- you know, tire castings there -- you better

20  believe, if any of those tire castings match Jim Wells' pickup

21  truck or Nancy Wells' car, you would have heard about it here.

22  They don't.

23         You've got debris, including some possible tooth

24  material.  You've got fingerprints, vacuum sweepings from the

25  area.  Next one, please.  This is the Wells residence.  They

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 117 of 222

1    took a bunch of ammunition, of course, and Jim has a lot of

2    guns.  That's not unusual on Kodiak.  A lot of people have a

3    lot of guns.  And, you know, if this were, you know, in Seattle

4    or someplace, that might be a big deal.  But it's not.  A lot

5    of people have different guns, they got a lot of ammunition.

6         They got -- they took boots, they took towels with a

7    stain.  They took -- they tried to get as much information that

8    they thought might be helpful and they sent it to the FBI

9    laboratory.  This is the stuff they sent to the lab.  Can I see

10   the next one, please?

11        Here's from Nancy's car, vacuum sweepings from the

12   driver's side, vacuum sweepings here, vacuum sweeping there.  A

13   swab.  They took swabs.  Because if this was in fact -- you

14   know, if the government's story about what happened is true,

15   this was, lickety-split, somebody shot these men, stood over

16   them, shot them again, standing right over them in a huge pool

17   of blood, and then ran out, jump in Nancy Wells' car, ran down

18   to the airport, jumped out of that car, got in this other car,

19   and then went home.  If that were true, then there would be

20   some evidence here.  The reason there's no evidence is because

21   it's not true.  Can I see the next one, please?

22        Here's the same thing with Jim's pickup.  You know, the

23   story just doesn't make any sense.  There's -- there would be

24   some trace evidence.  This is what the trace eviden -- and this

25   all went to the laboratory, and then this is from his person.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 118 of 222
(720) 384-8078  attrans@sbcglobal.net

1  Again, they've taken swabs, they've taken vacuum cleanings.

2  This is what it looks like when they do all of this analysis on

3  you, your car, your house, and you're innocent.  Because they

4  sent all this stuff to the laboratory, and there are no

5  matches.  That is what it looks like for an innocent man.

6         No digital evidence.  Now can I see that next one?

7  Okay, you saw this probably a little bit.  But, you know, in

8  this day and age, the other way, the other "CSI" is not just

9  DNA and blood and that kind of thing.  It's also digital

10 evidence.  Because we all know that we're on the Internet all

11 the time, we've got cell phones, we're sending text messages.

12 This is critically important evidence.  So they seized his

13 computers.  They seized his iPhones.  They seized everything

14 that has any kind of digital information on it, so that if

15 somebody sends an email threatening someone, it's here; so that

16 if someone does a Google search on how to commit the perfect

17 crime, it's here; so that if someone expresses displeasure with

18 their supervisor, you know, sends an email to their friends,

19 saying, "Hey, I really hate so-and-so, that's my supervisor,"

20 it's here someplace on this email.  That's where they find that

21 evidence.  And what did they find in this case?  They sent this

22 to the laboratory.  They found nothing.

23        There is not one shred of evidence, not one email, not

24 one text message, not one Google search, not one tiny bit of

25 digital evidence that supports the government's case here.  And

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 119 of 222

1  why is that?  It's because Jim Wells is innocent.  That's what
2  it looks like when they take every bit of digital and computer
3  and evidence and phones, his iPhones -- that's what it looks
4  like when they search all of that for just one threat, one
5  little message that could connect you to the crime.  That's
6  what it looks like when you're innocent.  All right.  No
7  corroboration where you expect it.  Now, can I have 158,
8  please?  Yeah.  Yeah, thank you.

9        Now, Special Agent Sturgis told you -- and if you need
10  a break, raise your hand and we'll take a break.  I'm sure the
11  judge will (indiscernible).  The -- Special Agent Sturgis told
12  you that everyone in Kodiak knows one another.  That's probably
13  not exactly true, but most people know each other, they know
14  their cars, they know each other -- cars.  They wave to each
15  other when they see each other in their cars.  And yet there is
16  not one citing of Jim Wells in Nancy's car or in his car that
17  is consistent with the government's case.

18        Remember, the government's case is that there's a
19  switch that's done here at the Kodiak Airport, and then Jim
20  Wells gets in Nancy's car -- this is their story -- and drives
21  up Anton Larsen Bay Road to the COMMSTA, and we heard today for
22  the first time this theory that it's parked in the back, you
23  know, behind the line truck or whatever.  That's just totally
24  made up, it's a total story.  There's no evidence to support
25  that, where that -- you know, it's just what you've got to

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 756  Filed 09/23/14  Page 120 of 222

1  imagine if you want to convict Jim Wells.

2        That -- drives up here, commits a crime, gets back in

3  the car, and then drives back down Anton Larsen Bay Road in

4  Nancy's car.  Now think about that for a second.  And then

5  comes and does another car switch over here.

6        So think about this.  This is shift change at the

7  COMMSTA.  I mean, people are coming in and out.  You remember,

8  Mr. Bullis is leaving right then, the new shift is coming on.

9  These -- there are a ton of people on this road, and, more

10  importantly, there are a ton of people who know Jim Wells.  I

11  mean, those are his colleagues.  Those are the people at T1 and

12  T2.  They all know each other.  Don't you think that if Jim

13  Wells had gotten in Nancy's car and driven here in the middle

14  of shift change, when people are coming to work, to the

15  COMMSTA, that at least one person would have seen him in her

16  car, would have seen Nancy's car?  Isn't it possible that just

17  one person would have seen her?

18        It goes all the way up here, and not one person would

19  have seen Jim Wells parking Nancy Wells' car behind the

20  COMMSTA?  That with all these cars and trucks -- we've seen

21  those -- these big charts of all the cars coming in.  The

22  reason there's so many lines on that is because it's the shift

23  change.  People are coming in.  People are coming out.  This is

24  where -- you know, and -- but the thing is, it's not like he's

25  going with a bunch of strangers.  These are his people.  All

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 756  Filed 09/23/14  Page 121 of 222

1    these people know him.  Someone would have seen him.  Someone

2    would have seen him in Nancy's car, someone would have seen

3    what's happening.

4         And then he turns at some point in the government's

5    case, he comes back this way.  Now, really, everybody is coming

6    to work at T1 and T2.  All these people are coming either from

7    the flats down here or from the base over here or from Kodiak

8    over here.  They are coming.  They come down here and they are

9    coming up Anton Larsen Bay Road, and they are people who know

10   Jim Wells.  And yet there is not one, not one citing of Jim

11   Wells.  And that's because he's innocent.  You would expect at

12   least one person would have seen -- had a citing of Jim in that

13   car that is consistent with the government's story.  You would

14   expect that with all this traffic, and there isn't any.

15        And then you see -- well, the other part of it, of

16   course, is that, according to the government's story, they

17   drive into the Kodiak -- he drives into the Kodiak Airport and

18   does this car switch that they've tried to create the little

19   video on.  Well, don't you think at least one person in that

20   whole airport would have -- who -- in this very small town

21   would have known Jim, would have known Nancy, would have seen

22   the cars there, would have said, "Oh, yeah, I saw Jim drive in

23   here," or "I saw Jim drive out of there," or "I saw Nancy's car

24   drive out of there."  Not one person saw any of this -- two car

25   switches and all this traveling back and forth in the middle of

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 122 of 222

1   the shift change, even though it's rush hour and there'll be

2   opposing traffic.  That's not evidence of what really happened,

3   of course.  That's just the government's theory of the case.

4   But the fact that there's no corroboration of the government's

5   theory of the case is a lack of evidence and it's a reason you

6   should acquit Jim Wells.

7           Let's talk briefly about Exhibit 171.  There is no

8   evidence of this car switch.  It's simply a theory that they

9   have because it helps them convict Jim Wells.  I mean, it's

10  just -- it has to be that way if they're going to convict Jim

11  Wells.  So what they did -- there was no real evidence.  So

12  what they did is they had the agents act one out.  Yeah, 171

13  probably doesn't mean anything to you, but it's this one where

14  Special Agent Woods gets in the car and they follow another

15  couple cars down.  They're actors, they're agents.  They're

16  driving down to the airport, and then he does that kind of

17  wrong-way turn, parks his truck, jumps out of the car, gets in

18  the other one, and drives away, okay.  And that's all they're

19  really showing because they want you to get that in your head

20  that somehow that's possible.  There's no real evidence that

21  that happened.  But they did that because of this tunnelvision.

22  They wanted to persuade not only that there could be a car

23  switch, but that somehow that Jim Wells went the wrong way on a

24  one-way part there, and so they drove their car in the one-way

25  to try to persuade you that he did that somehow, to avoid the

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 123 of 222

1  cameras.  They're trying to put that in your head, but that's
2  how the government's tunnelvision has affected their
3  presentation of the case.

4       We talked about some of the experts.  We talked about
5  Mr. Toglia.  You just need to keep in your head that that
6  little blue car, that's just a cartoon car that's put over the
7  real car to make you think that.

8       Let's take a look at look briefly at where they didn't
9  search.  Again, this is part of the tunnelvision.  We showed
10 you where they did search, and now we're going to show you
11 where they didn't search.  And again, I'm going to use my
12 pointer, but you know the answer.  You know exactly where I'm
13 going to put my pointer and where it's going to go, because you
14 know where they didn't search.  They didn't search from the
15 COMMSTA, this direction.  They only searched from the COMMSTA
16 in this direction.  And that's because that was their theory of
17 the case.

18       It didn't ever enter their mind that someone could have
19 committed this crime who either was at the Red Cloud Ranch or
20 was in one of these cars at the Anton Larsen Bay dock or, you
21 know, anywhere along here, whose car was there earlier that
22 day.  They don't have to live at the Red Cloud Ranch, of
23 course.  They might -- you know, here's -- we learned a little
24 bit later that there was about 12 cars out here at the bay
25 dock.  And then, of course, there's a bunch of islands.  People

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 124 of 222

1 launch their boats there and go out to the islands. Who knows.
2 Who knows? Did anybody ever search out there? No.

3 You know, you heard about the troopers going -- you
4 know, walking on their hands and knees 30 yards up here to look
5 for stuff. But look at all this place that they didn't search.
6 This is a long road.

7 You'll remember that Trooper Dupras told us -- first he
8 told us that the Red Cloud Ranch he thought was abandoned. Of
9 course, that's not true. But he said there's a ski chalet up
10 here and there's actually a pretty steep cliff there at one
11 point. Did anybody go the days after the homicides and look
12 here to see if anybody had thrown a gun out there, maybe, to
13 see if anybody had thrown some bloody clothes out there, maybe,
14 that maybe there were some bloody boots out there someplace?
15 Did anyone get out of their car and look for that? No, they
16 didn't search for that, because, you know what, it didn't fit
17 their case. They had tunnelvision.

18 They didn't look at the Red Cloud Ranch. They didn't
19 look at Anton Larsen Bay. They did look -- eventually one of
20 the agents, Special Agent Doran, about four or five days later,
21 drove out to Anton Larsen Bay. He didn't get out of the car
22 because he didn't think anybody lived at the Red Cloud Ranch.
23 But, of course, Mr. Pearson and his family of eight were living
24 there the whole time. He said that there was snow on the
25 ground and it didn't look disturbed to him, but that couldn't

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 125 of 222
(720) 384-8078  attrans@sbcglobal.net

1   be true, because Mr. Pearson was going to work every day and

2   his whole family was living out there.  That shows you the

3   quality of the investigation that they did out here at the Red

4   Cloud Ranch.  Did they even get out of their car?  Did they

5   even get out of their car and put a card in Mr. Pearson's

6   screen door so that they could give him a call if he wasn't

7   home?  They never knocked on the door; he might have been home,

8   his wife might have been home, who knows.

9        But think about the quality of this investigation.  It

10  all focused on Jim Wells, and they didn't even entertain in

11  their heads the possibility that evidence could be out here or

12  that someone could be hiding in one of those little shacks out

13  there or somebody had parked their car -- they didn't even make

14  note if there was a blue car out in -- parked out in here.

15  There could have been a blue car parked out here.  And, of

16  course, we know Mr. Pearson has a blue van.

17       The -- but that's the quality of the investigation, and

18  that's what I'm talking about, about tunnelvision, about there

19  could have been someone who committed this crime and threw the

20  gun out there.  And do you know what?  If they had, it would

21  still be there.  The gun could be laying on the side of the

22  road, 10 feet off the road, and it could still be there while

23  we're having this argument here in court today, because no one

24  has ever searched there.  No one has ever taken the time.  All

25  of that important evidence which might link the real killer of

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 126 of 222

1  these poor men, it could still be there and they still haven't

2  searched.

3         And we didn't even know until last Saturday who lived

4  there.  Well, Mr. Pearson lived there.  He never saw anybody

5  hiding out in the shacks, but nobody ever looked.  Why didn't

6  they want to look up that road?  Why didn't they just want to

7  go up and do a search up that road?  You know, it's two years

8  since this happened now.  They didn't do it, and they're still

9  not going to do it, because it doesn't fit their theory of the

10 case.

11        Where else didn't they search based on their -- well, I

12 listened to the testimony carefully.  I didn't hear that they

13 even looked in the dumpster at T2.  You know, there's a little

14 dumpster right next to it.  Did they even -- here's the

15 dumpster here.  Did they even empty the dumpster to look in

16 there?  I didn't hear that.

17        Let's look at tunnelvision -- a little bit how the case

18 was investigated again.  Mr. -- and we'll just do this very

19 briefly, because I think we've identified some important things

20 for you to think about.  Mr. Pletnikoff.  He was brought in

21 front of the grand jury, you'll recall.  And when he didn't

22 give the prosecutor the correct answer that supported the

23 prosecutor's case, what happened to him?  He was threatened

24 with a perjury charge.  Think about that, if you're a citizen,

25 you come in and say what you think happened, it doesn't fit the

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 756  Filed 09/23/14  Page 127 of 222

1 government's case, and they threaten you with perjury. And

2 what happens? Well, then his story became consistent with the

3 government's case. Why? Because it was tunnelvision. They

4 had to have the correct answer to their case.

5     Again, Travis Biocic, Everett Grass. There's no

6 evidence that these people were even interviewed. Now, the

7 agents knew about these people. They knew that they were kind

8 of rough people, living in the Jackson Trailer Park. They knew

9 that they had some contact with the Belisle family. They knew

10 that -- or could have known that Travis Biocic was -- used to

11 live out at the Red Cloud Ranch. They knew that -- they could

12 have known if they'd investigated that Everett Grass used to go

13 out and do hunting and stuff at the Red Cloud Ranch.

14     Each of them were independently interviewed by Mr.

15 Curtner here and his investigator, Barb Brink. They each gave

16 the same statement as to what had happened the night before the

17 homicides. You'll remember that. They gave independent

18 interviews. They each gave the same statement about the party,

19 how long the party went, what happened after that. Then they

20 were visited two or three days later by the investigators, and

21 after the investigators, just like Mr. Pletnikoff, they changed

22 their story, so that by the time they got here in court, each

23 of them had changed to a different story.

24     You be the judge of what happened there. You saw them

25 testify. You judge their credibility. You'll figure out what

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 756  Filed 09/23/14  Page 128 of 222

1    happened.  Why is that important?  It's important because it's
2    another example of how this investigation has been shaped by
3    this tunnelvision, this desire to convict Jim Wells to the
4    exclusion of the truth.

5          What about Casey Brennick?  He was at the party the
6    night before the homicides.  He heard talk about Rich Belisle
7    there and how he had a lot of guns and so forth.  And a couple
8    days later, he was trying to sell a gun on the Internet that
9    matches the murder weapon.  But it wasn't until a year and a
10   half later that they conducted any investigation.  Again, a
11   case of no stone left unturned if you can convict Jim Wells,
12   but if it's -- if it doesn't point to Jim Wells, it's not
13   helpful.

14         Again, tunnelvision in the investigation.
15   Unfortunately, some of the people closest to the decedents
16   did -- weren't truthful in their interviews with the FBI.
17   There's just -- there's no getting around that.  Did they
18   follow up on those interviews?  Did they push those interviews?
19   Again, they did not.  When a person close to the decedents lies
20   about a material matter, it just taints the whole
21   investigation.  And that was part of the problem here with the
22   investigators following up.

23         All right.  Tunnelvision in the investigation.  Looking
24   for another blue car on the island.  So they've testified that
25   they looked for another blue car, just couldn't find one.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 129 of 222

1   Well, I think you saw the questionnaire that was used in this
2   case.  It said, you know, "Were you driving a blue car close to
3   the homicide scene?"  I think it's pretty clear that a
4   murderer -- anybody who's involved in this wouldn't say "Yes"
5   to that, and anybody who wasn't there would say "No" to that,
6   so you're going to get a lot of "No" answers.

7         What do you really get from this?  Well, are you really
8   looking for another car?  Are you really looking for someone
9   who's involved in the homicides?  Or are you just trying to go
10   through the motions so you can come into court and say you've
11   looked for another car?  Of course, even what they did only
12   targets the cars that are registered in Kodiak, not all the
13   Coast Guard cars.  This survey that they send out requesting
14   information barely scratched the surface.

15         All right.  A little more tunnelvision.  If you can
16   hang with me, I'm getting pretty close to being done here --
17   maybe not that close, but pretty close.  Okay.  So tunnelvision
18   distorting the presentation.  Again, if it doesn't fit their
19   case, they -- it -- the evidence gets presented in a different
20   way.

21         Now, the government lawyer in her opening statement
22   said this.  And what you will hear from the evidence is this
23   road, Anton Larsen Road, it only goes for about a mile and a
24   half further in the winter.  It goes up to the golf course.  It
25   goes farther, but it's not maintained in the winter, and almost

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 130 of 222

1  nobody drives that road in the winter that isn't going to the

2  COMMSTA.  That's the government's opening statement in this

3  case.

4        Well, this is emblematic of how the cases is -- really

5  have been presented to you.  That's simply a misrepresentation

6  of what happened.  And I won't suggest for a moment that it was

7  intentional.  It was simply a case where no investigation was

8  done to find out what the truth was about Anton Larsen Bay

9  Road, and the government lawyer simply accepted that because it

10 fit their case.  She undoubtedly believed that was true when

11 she said that.  I have no question at all in my mind that she

12 believed that that was true.  But the fact is, nobody ever

13 investigated.  Nobody ever found out.

14        And then they put Trooper Dupras on the stand, and he

15 said he thought the property was -- may have been abandoned,

16 the Red Cloud Ranch, but of course it wasn't abandoned.  Mr.

17 Pearson was living there with his children and his wife.  Why

18 did the government offer that testimony from Mr. -- from

19 Trooper Dupras that -- remember he said it's really hard to get

20 up there, it's probably closed, you know, it's not passable in

21 the winter, probably the source of that information.

22        They're willing -- they were willing, frankly, to put

23 up testimony that helps their case even if it's not been

24 investigated, even if it's not true.  If the facts help the

25 case, the government endorses it.  And if not, then they try to

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 131 of 222
(720) 384-8078  attrans@sbcglobal.net

1  discredit it, as we saw before.

2       Then Special Agent Doran.  Again, four to five days

3  later, Special Agent Doran drove out to Anton Larsen Bay Road

4  and he was looking for a white car.  He wasn't looking for a

5  blue car, because they already had the blue car.  He would have

6  looked for a blue car if they were really looking for a blue

7  car, but they thought they had Nancy's car.  They thought that

8  was the car.  So he didn't make any note when he went out to

9  Anton Larsen Bay.  He saw about a dozen cars, he said, parked

10 out at the dock out there.  He didn't make any note of any blue

11 cars that were out there which could have certainly been

12 involved in this homicide, because they thought they had the

13 car already.  They didn't care about any other cars.  He was

14 looking for a white car that had passed through earlier,

15 because they were trying to make sure they identified all those

16 cars.

17      But, of course, the cars that come from Anton Larsen

18 Bay to the back of the COMMSTA, as the government lawyer said,

19 park there and then go back to the north are not on any video.

20 None of the videos show you the killer that came from the

21 north.  Now, do we -- who -- know who that is?  We have no idea

22 who that is.  But those cameras don't help you at all with that

23 information.  But did they think about that?  No.  They were

24 just looking for cars that had gone through the camera, a white

25 truck.  And here's what their investigation was.  They got in a

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 132 of 222

1   car, they drove up past the golf course, they drove up past the
2   ski chalet, they drove up to Red Cloud Ranch, they looked
3   around, saw that nobody lived at the Red Cloud Ranch.  They
4   didn't get out of their car.  They looked around, they said
5   they looked and there was snow but no marks in the snow, even
6   though Mr. Pearson drives to work every morning, and that his
7   kids live there and his family lives there.  They drove out to
8   Anton Larsen Bay Road, didn't see the white vehicle that they
9   were looking for.  Then they turned around and drove all the
10  way back.  They didn't stop at the ranch again to look around
11  and see if there was a gun thrown in the back of one of those
12  buses or in one of those sheds over there.  And then they drove
13  down to the golf course.  They did get out, they talked to the
14  guy at the golf course, and that was the end of their day.
15  That was the extent of their investigation.  What does that
16  tell you?  That -- tell you they're not really looking for
17  evidence up there of the crime.  They think they've already got
18  it.
19          And, of course -- Defendant 28, please.  Here's the
20  blue blur, whatever, vehicle that's coming from, again, Anton
21  Larsen -- from the north, Anton Larsen Bay, from right to left.
22  Is that a van, a blue van like Mr. Pearson has?  We can't tell
23  and we're never going to know, because there's not enough
24  information on that photograph to tell.  You can take that
25  down, please.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 133 of 222
(720) 384-8078  attrans@sbcglobal.net

1              To this day, no one has investigated up there.  No one

2      has gone to the ranch.  No one has looked in that bus there

3      where that guy -- where the landlord stores stuff.  No one's

4      looked through the chicken coop.  No one's looked anywhere up

5      there.  They don't care, because it doesn't fit their theory of

6      the case.  That evidence could be there, it could be there

7      right now, and that's our -- enough reason for you to acquit

8      Mr. Wells.

9              All right, let's move on to a different topic.

10     Presentation in court.  What happens with tunnelvision.  Mr.

11     Richards -- again, they hired Mr. Richards because he's the

12     best in the field.  But Mr. Richards did not give them the

13     right answer.  He told them there's no way that it --

14     scientifically we can determine that this is Nancy's car, that

15     they're even the same car, or make, model, and year of the car.

16     And so what did they do?  They just walked away from him.  They

17     didn't bring him in here and just say, "Look, this is all we

18     can do.  We can't determine that."  They didn't say, "Here's

19     our case against Jim Wells and here's the information.  That's

20     not helpful to us, but we're going to tell you anyway because

21     we want to tell you the whole truth about it."  Did they do

22     that?  No.  They just presented the part that helped them.  We

23     had to get Mr. Richards and bring him here into court.

24             All right.  Keeping Mr. Morton in the dark.  Now, the

25     government lawyer has taken some pretty hard shots against the

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 134 of 222

1　defense lawyers in this case for dragging the victims through

2　something.  You will recall that it's the government that

3　called Hannah Belisle as a witness in this case.  The

4　government called Hannah Belisle to try to advance its case, to

5　portray that situation in the way that they wanted to.  What's

6　important about this evidence is this:  The expert, Mr. Morton,

7　wrote a report for the government lawyers and he told them that

8　in his report he needed complete information about the personal

9　lives of the victims in order to determine what the appropriate

10　motive would be, so that he could determine whether there were

11　any controversies in their lives that makes any sense in terms

12　of the motive.

13　　　　　And there was a long list of information that Mr.

14　Morton acknowledged was important.  I won't go through it all.

15　But it was personal information, like the information that we

16　elicited here in court.  That personal information about

17　relationships, about intimate relationships, about conflict in

18　marital relationships, about divorce, all of those things that

19　we asked about, those are things that Mr. Morton said are

20　important facts for him to determine motive, for him to decide

21　what was going on.  That's the import of that evidence, that

22　there was this evidence.  The government knew about the

23　evidence and the government kept its own expert in the dark.

24　　　　　Now, they want you to believe that Mr. Morton can

25　somehow tell you, you know, what the motivation is, it's

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 135 of 222

1  workplace violence, not workplace violence, whatever.  But what

2  they did is they brought Mr. Morton in and then they didn't

3  give him the information.  He didn't get any of the interviews

4  with the family.  He didn't know any of that information that

5  you've learned about the personal lives of these people.

6       We're not suggesting for a moment that -- well, perhaps

7  the government's suggesting we did that just out of pure spite,

8  to prejudice you.  But that was to show you that there is

9  important information that the government hid from its expert,

10 that the government's expert thought would be important in

11 determining motive.  And, most importantly, that the people

12 close to the decedents, the -- close to the people who died,

13 were not forthright with the investigators.  And Mr. Morton

14 said that was very important for him to know, if there was

15 something going on -- if he was going to determine the motive,

16 well, who committed these crimes, he would want to know if the

17 people close to the decedents were making false statements to

18 the FBI -- they were.  And they hid that from him.  So you

19 should consider Mr. Morton's opinions in light of the fact that

20 the government kept him in the dark, didn't give him any of

21 that information.

22      Some more presentation of the case in court.  Mr. Van

23 Ness -- excuse me, Lieutenant -- I think it was Lieutenant

24 Commander Van Ness, maybe Commander Van Ness.  Direct

25 examination from the government, they ask him when they told

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 756  Filed 09/23/14  Page 136 of 222

1    Mrs. Belisle about -- that her husband had been killed, they
2    elicited the following:  that her first words were "Jim Wells."
3    And then they said that was at -- then they -- that was the end
4    of that stanza.  They walked away from it.  But what Mrs.
5    Belisle really said -- and we had to go get him, bring him back
6    into court, and make sure that you know that that wasn't true.
7    What the government had represented, it -- that testimony
8    wasn't true.

9         What Mrs. Belisle really said was, "Jim Wells wouldn't
10   hurt Rich.  Jim Wells was always on the toilet."  That's what
11   really was said.  But when the government presented that
12   evidence to you -- it's this tunnelvision.  If it helps your
13   case, you put it on.  So they just put on "Jim Wells."  But the
14   rest of that sentence is, "Jim Wells wouldn't hurt Rich.  He's
15   always on the toilet."

16        Now, what's important here is that the government put
17   on evidence suggesting to you that Mrs. Belisle was accusing
18   Jim Wells of this homicide on the very first day that she
19   learned about it, April 12th.  But it wasn't true.  In fact,
20   the opposite was the truth.  Mrs. Belisle was saying Jim Wells
21   wouldn't hurt Rich Belisle.  It's just another example of how
22   the government has blinders on, the government has tunnelvision
23   and will present the evidence only that helps its case.

24        The -- Trooper Alan Jones' photographs.  You know, you
25   remember -- yeah, again, you don't have to watch a lot of

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 137 of 222

1    "CSI." If there's been a crime that's occurred in a building,

2    one of the things you look for is entry or the signs of entry,

3    points of entry or attempted entry. That's what Trooper Jones

4    did. He went -- he -- his job was to come and go -- do the

5    whole circumference of the building, see if there was any signs

6    of entry, you know, see -- do a -- and contain the scene.

7         So they put him on the stand. But they didn't

8    introduce the photographs of -- that Trooper -- you got to --

9    you'll see here in just a second, where Trooper Jones found

10   that some of the doors were ajar in the back. You know, the

11   government has suggested this place was locked up tighter than

12   a drum in the back, but it looks like someone tried to get in

13   those two back doors. The -- remember the arctic entry door;

14   we'll take -- we'll (indiscernible) in a second. And then the

15   boiler room door, they were both ajar. And Trooper Jones took

16   pictures of that, because he knew that was important. He knows

17   that if there's a murder that's happened in a building and the

18   back doors are ajar, that that's an attempt -- a point of

19   attempted entry or possible entry into the building. That's

20   important evidence. "I'm going to take a photograph of it."

21   And yet when they put him on the stand, they don't even show

22   you those photos.

23        And who knows if Mr. Morton even saw -- Mr. Morton

24   probably didn't see those photos either. Those are important

25   evidence, important information for the crime scene analysts to

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 138 of 222

1  see and important information for you to see, because you have
2  to decide who was it that went into this building to commit
3  these terrible crimes.

4      So what had happened?  On cross-examination, we
5  introduced those photos, because we want you to know what
6  happened.  We want you to see that it looks like somebody might
7  have tried to get into those back doors.  The government didn't
8  want -- because it doesn't fit their case.  It doesn't fit
9  their case because they -- they're accusing Jim Wells of coming
10 in that building.  And, of course, everybody knows that Jim
11 Wells wouldn't try those back doors, because Jim Wells works
12 there.  He knows there's a slider in the boiler room door.
13 Nobody can get through that.  And of course there's that
14 bootprint on the back of the door too.

15     But that didn't fit their case, the doors being ajar,
16 because Jim Wells wouldn't leave the doors ajar.  Jim Wells
17 would know you can't get in there because they're locked from
18 the inside with a slider.  We put on that evidence because we
19 want you to know the truth.

20     All right.  Let's talk a little bit about manufacturing
21 a motive for murder.

22     THE COURT:  Let me ask you how long -- what your
23 situation is, because you've been going over an hour and a
24 half.  So it might be a break time if -- unless you're about
25 done.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 139 of 222

1        MR. OFFENBECHER:  It's probably going to be another, I

2  would say half-hour (indiscernible).

3        THE COURT:  Well, let's take a 15-minute recess.

4     (Jury not present)

5        THE COURT:  Okay, please be seated.  We'll take 15

6  minutes.  Do you need something?  Okay.

7     (Court recessed at 1:01 p.m., until 1:23 p.m.)

8     (Jury not present)

9        THE CLERK:  All rise.  His Honor the Court, the United

10 States District Court is again in session.  Please be seated.

11       THE COURT:  We're bringing the -- we're working on the

12 jury.

13    (Side conversation)

14       THE COURT:  And you said about 30 minutes, so I can

15 make plans?  You said about 30?

16       MR. OFFENBECHER:  Yes, Your Honor.  That okay?

17       THE COURT:  Yes, and then we'll break again, because

18 I've got -- getting the jurors fed and taken care of, so --

19       MR. OFFENBECHER:  Sure.

20    (Jury present)

21       THE COURT:  Okay.  Please be seated.  And we'll

22 continue with defense, Mr. Offenbecher.  Go ahead.

23       MR. OFFENBECHER:  Thank you, Your Honor.  So let's talk

24 for a minute about the motive evidence that the government has

25 brought you and whether that makes any sense either.  They've

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 140 of 222
(720) 384-8078   attrans@sbcglobal.net

1    put Jim Wells' life under a microscope for 22 years, and this
2    is what they have come up with.  They've strung together a set
3    of relatively trivial employment issues in an attempt to
4    manufacture a motive for this, to make their story make some
5    sense.  Let's see if it makes any sense.

6         We have the testimony of the executive -- excuse me,
7    the commanding officer at the COMMSTA for the three years, you
8    know, immediately preceding when this happened, from the --
9    2009 to 2012, Commander Van Ness.  Commander Van Ness says he
10   reviewed Jim Wells' record over the time that he had been
11   there, when he came to the COMMSTA.  Commander Van Ness said he
12   characterized these as minor performance issues.  Check your
13   notes.  That's what he said.  He said, in his opinion, the
14   commanding officer said things were getting better.

15        Now, Commander Van Ness acknowledged that sometimes
16   there's blue-suit, you know, civilian thing that goes on.  It
17   happens on Coast Guard bases.  Mr. Acosta talked about it too.
18   Mr. Acosta manages a whole office full of en -- civilian
19   engineers in the Coast Guard or Coast Guard employees.  So
20   there is a dynamic between uniformed Coast Guard officers and
21   the civilian employees that's a little bit different, and it
22   requires some management skill.  But Van Ness, Commander Van
23   Ness characterized these issues as minor performance issues.

24        The government suggests that the atmosphere at T2 was
25   somehow tense and brittle and ready to explode, that something

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 141 of 222

1    was going to happen.  But that's not what the evidence is.

2    That's not what the witnesses said when they were asked.  Let's

3    just go through these quickly.  But Aaron Coggins said, "Mr.

4    Wells enjoyed working there, he enjoyed it as much as me.  We

5    all thought it was a good place to work."  T2 was operating as

6    a well-oiled machine with a little conflict."  That's what Mr.

7    Coggins said.

8         Mr. Beauford:  "It was a small shop and everyone got

9    along pretty good.  Not hostile, no big arguments."  Nate

10    Pacheco:  "Everyone got along at T2, one big, happy family.  No

11    conflicts with Jim Wells."  That's not the picture that fits

12    their story, I know.  But that's what the evidence is.  That's

13    what the truth is.

14         Para Upchurch:  "Rich and Jim were a team, and they got

15    along fine.  Rich and Jim were a team, and they got along

16    fine."  Even Mr. Reckner, who there was some friction with,

17    said he wanted to bring Jim along and into the fold.  He wasn't

18    trying to push Jim out.  That's what he testified, he was

19    trying to bring him into the fold.

20         And Leah Henry gave some very important testimony here

21    during our trial.  She said that Jim -- and she said this and

22    so did Para Upchurch -- said Jim Wells' attitude was this:  He

23    said, "These Coast Guard guys come and these Coast Guard guys

24    go."  And he said, "After three years or a few years, they move

25    on, somebody else moves in.  You just have to be patient, just

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 142 of 222
(720) 384-8078  attrans@sbcglobal.net

1 have to wait it out." That was Jim Wells' mantra. Not that he
2 was like a time bomb waiting to explode or they were coming
3 down on him. These were -- and remember, these disciplinary
4 things, they've been going on for years and years and years, as
5 Commander Van Ness said. These were minor performance issues.
6 There was, you know, stuff going on, there was given -- there
7 were reprimands and other things going on. But every time he
8 got a performance he got the full bonus, because he exceeded or
9 met expectations. From Askew on, every performance evaluation
10 you've seen, he's gotten a monetary bonus. It just didn't
11 matter (indiscernible).

12        The other thing, they said Mr. Hopkins was about to
13 retire. Everybody knew that, he was about to put in his
14 retirement paper. You've heard that from a number of different
15 people. He's going to get the -- maybe the job in Italy. Does
16 it make sense to you that Jim Wells would commit this terrible
17 crime when Jim Hopkins -- supposedly to get rid of Jim Hopkins,
18 because this is some kind of targeted thing against Jim
19 Hopkins? Jim Hopkins was leaving anyway. And, frankly, Leah
20 Henry said that Rich Belisle was planning on taking over for
21 Jim Wells' spot when Jim Wells retired, and Jim Wells was fine
22 with that. He was -- he considered Rich Belisle in some ways
23 to be -- you know, he was about 10 years younger; he was his
24 successor in interest. He had taught Rich Belisle a lot of
25 stuff. They worked together. They worked at the top of these

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 143 of 222
(720) 384-8078   attrans@sbcglobal.net

1   1,300-foot towers, and they thought of it as a good place to

2   work.

3          Mr. Reckner talks about having -- you know, that Jim

4   Wells all of a sudden changed and had his back, you know, to

5   everybody, you know, and -- when they were talking.  But, of

6   course, if you look at the officers -- and you remember what

7   the testimony was.  This is Jim Wells' desk right here.  If Jim

8   Wells sits at his desk and looks at his computer, his back is

9   to everybody, he's looking at his computer.  That just the way

10  it is.  There was nothing unusual about that.

11         This attempt to kind of generate this atmosphere that

12  something was evil or wrong in T2, it's just not consistent

13  with the evidence.  I -- it's consistent with the government's

14  story, but that's not what the evidence says.  That's not what

15  the people say.  And then they asked Jim Wells himself when

16  they interrogated him, they said, "How are -- you know, how are

17  things in the shop?  Is there a lot of conflict there?"  And

18  Jim said -- he said, "I guess in a small unit there's probably

19  a lot of butting heads."  And Jim said, "No, I would say we

20  didn't butt heads.  No, we were a pretty tight unit, because,

21  you know, well, what do -- especially when we're climbing

22  towers or the work that we do, is you got to rely on who you're

23  working with," Jim said.  "I mean, I don't climb with anybody

24  that I don't trust with my life.  It's just -- I mean, we teach

25  climbing classes, and if you -- I don't feel safe with you,

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 144 of 222

1  you're not getting qualified.  Because, basically, I have to
2  put my life in your hands.  If you have to rescue me and I
3  don't feel safe then, you know, you don't -- and Rich --
4  Rich" --
5       MR. SCHRODER:  Your Honor, is -- objection.  I'm not
6  sure that's in evidence.  Is that -- you have a cite, a --
7  evidence cite for that?
8       MR. OFFENBECHER:  24B-1.
9       MR. SCHRODER:  (Indiscernible).
10       THE COURT:  Okay.
11       MR. OFFENBECHER:  I'll go back again.  "It's --
12  because, basically, I have to put my life in your hands.  If
13  you have to rescue me and if I don't feel safe, then, you know,
14  you don't -- and Rich -- Rich -- this is, you know -- we're
15  together on that."  "Rich and you have any issues or anything,
16  two civilians in -- and like that?"  Jim says, "No, we usually
17  work it all out."  That was the atmosphere from everybody's who
18  at T2 who gave a statement to the FBI.  There's not some evil
19  cloud over T2.  Things were going well at T2.
20       What other information we have.  Mrs. Hopkins also
21  testified -- she didn't testify, but she indicated in her
22  statement to the agents, and her testimony reflected that here,
23  when she was asked about -- you know, they were asking her, you
24  know, is there any conflicts at work, things like that, Deborah
25  Hopkins said, "No conflicts at work.  Relationship with Jim

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 756  Filed 09/23/14  Page 145 of 222
(720) 384-8078  attrans@sbcglobal.net

1    Wells was nice.  Jim Wells is a nice guy.  I always seen him as

2    nice."  And then we heard Mrs. Belisle say, "Jim Wells wouldn't

3    hurt Rich" as well.  And who would know better than -- the

4    relationship Jim Wells had with Rich Belisle and Jim Hopkins

5    than their wives?  And that's what they had to say about it.

6         There was come conflict with Mr. Reckner, it seems

7    clear.  I'm sure Mr. Reckner is a very nice person.  But the

8    evidence shows that the management skills in terms of managing

9    the civilian employees were different than Mr. Acosta's kind of

10   discussion and getting things along.  At the same time that Mr.

11   Reckner was trying to strictly enforce some of these rules, he

12   was violating the direct orders of Mr. Van Ness and Mr.

13   Pizzurro by bringing guns onto the base, letting the other

14   folks down at T2 bring guns.  Jim Wells never did that, never

15   brought a gun on.  No testimony about that.  But other people

16   were bringing guns on, and Mr. Reckner actually bought a gun in

17   T2.  So a little bit of a double-edge -- a double standard, Mr.

18   Reckner maybe trying to show who's boss a little bit at that

19   point of time.  And then we heard about the stare-down contest

20   with Mr. Wells, apparently a management technique that didn't

21   work that well.  I would contrast it with Mr. Acosta's

22   management style with civilians:  "We all work together.  We're

23   getting the job done.  We discuss it.  We get it resolved."

24   That wasn't, I don't think, Mr. Reckner's style.

25        And then you talked -- again, these people talked about

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 756  Filed 09/23/14  Page 146 of 222

1    what Jim Wells was all about, and they always said that Jim

2    Wells was always about getting the job done safely.  He wanted

3    everybody to go home safe at the end of the day.  He didn't

4    want people to fall off a tower or get hurt.  He was emblematic

5    of the safety.  Everybody goes home at the end of the day.

6           All right, so we -- I -- I'm going to go through this

7    quickly, because I think -- I would respectfully suggest to you

8    that these are largely trivial things, these disciplinary

9    things that have been, you know, churned up into this big

10   motive.  But let's just go through them quickly.  Attu hut.

11   Mr. Eskew talked about it.  Happened 2003, nine years before

12   this.  There's a legitimate debate on whether it was a good

13   idea to fix the thing in place or bring it back to the shop,

14   whatever.  I mean, some -- you know, Mr. Eskew, who is the

15   commander, he decided not to, and Mr. Wells said the -- we're

16   going to -- and put it on the plane, and it went.  And it came

17   back and it got fixed.  So he got a reprimand letter.

18          How big of a deal was it at the time?  Well, Mr. Eskew

19   made sure that Mr. Wells got the highest personnel evaluation

20   he could, and made sure that he got the monetary award.  He was

21   upset because he hadn't given him the monetary award the year

22   before, you'll recall.  That's how big of a deal it was to Mr.

23   Eskew, that's how big of a deal it was to Mr. Wells.  It just

24   didn't matter to him.  He got paid.  Everything was going fine,

25   not a big deal.  Is it a motive for murder?  No.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 147 of 222
(720) 384-8078  attrans@sbcglobal.net

1        The tree-collaring letter.  Well, you know what, if

2  people were tree collaring and they were not supposed to do

3  that, then they got a letter in their file saying, "Don't do

4  that."  It's not the end of the world.  It's -- it is what it

5  is.  Mr. Belisle was also admonished about the firewood.  It's

6  just not that big a deal.  It's not a motive for murder.

7        Jim's unapproved absences.  Well, as it turns out, Mr.

8  Reckner signed off on all of them.  He didn't sign off on the

9  sick leaves until after, because when you go on sick leave you

10  usually don't get signed off until after.  Again, a big deal?

11  No.  A motive for murder?  Doesn't make any sense.

12        The fuel card investigation.  The official

13  investigation was inconclusive.  They couldn't determine

14  exactly what happened, but they -- there was a reprimand

15  letter.  Jim Wells denied that he had done it and he felt bad

16  because Commander Van Ness brought him into the office and

17  talked to him about it, and gave him a letter and had him sign

18  off on the letter.  And Jim Wells felt bad because he told Mr.

19  Van Ness, "I'm -- I feel like I've lost your trust, Commanding

20  Officer."

21        But what did he do?  I mean, what was his reaction?  I

22  mean, think about this.  Did he get angry and yell?  Did he

23  pound his fist on the table?  Did he scream at anybody?  Did he

24  yell at anybody?  Did he pick up a paperweight and throw it

25  through the window?  Did he do anything violent?  No.  He sat

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 756  Filed 09/23/14  Page 148 of 222

at the CO's off -- desk for a little while, shook his head, and signed off the thing, walked, went back to his job. A big deal? Not a big deal. Van Ness characterized it as a child being chastised for some kind of mistake he had made. That was the end of it. Motive for murder? No.

Dr. Meloy testified, people get reprimands, people get the letters in their file. Things happen at work. People get fired. He wasn't fired. But, you know, people just -- these are the kind of disappointments that happen to thousands and thousands of people all the time. That doesn't mean it's a motive for murder, particularly in Jim's situation where he's at the end of his career like this.

The NATE conference. Jim Wells couldn't have gone to the NATE conference anyway. He was having surgery at that time. The warehouse cleanup, initiated -- made into a big deal as part of this motive for murder. The XO and the CO had decided that the people in Kodiak were hoarding too much stuff and they wanted to clean up before the next CO came. That's what Van Ness said. So they got going on that. They put some people in charge of it. Jim Wells was sick most of the time when they were cleaning up the warehouse. He did -- wasn't even involved in this.

But one day -- and Mr. Encinas tells us -- excuse me -- one day Mr. Encinas tells us that Mr. Wells had -- in his way, had arranged all of the nuts and bolts in little boxes, by

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 149 of 222

1   sizes, the stainless-steel ones here and the other ones here.

2   Some people knew that.  Well, they organized everything in

3   their shop like that, and he came over, he saw that they had

4   just dumped all that stuff into a big pot so they were all

5   mixed up again, and they were going to get thrown away.  Jim

6   was -- Jim wasn't happy with that, he thought that was a waste,

7   and he thought that wasn't the right thing to do.  What did he

8   do?  Did he scream, did he yell, did he, you know, kick a car,

9   did he break somebody's headlights, do anything violent?  No.

10  Just turned and he walked away.

11        The antenna book.  Mr. Reckner says this antenna book

12  was a big deal and that Jim wouldn't do the antenna book.  But

13  both Mr. Pizzurro and Mr. Van Ness indicate that there already

14  was an antenna book when they got there, and that's because

15  they just wanted to update it.  And that the project went

16  slowly and they wanted it to go more fast.  Jim Wells was not

17  refusing to do an antenna book.  He had already done the

18  antenna book.  That was the antenna book when Pizzurro and Van

19  Ness got there.  Leah referred to Wells working a lot in the

20  antenna book, and said Jim never got angry or upset about the

21  antenna book being updated.  Was he violent?  Of course not.

22  Excuse me.

23        Look at the personnel evaluations.  We looked at a

24  bunch of those.  We -- might take a -- please take a look at

25  those when you get back there.  He gets either the highest or

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 150 of 222
(720) 384-8078  attrans@sbcglobal.net

1   the middle rankings, always gets a monetary award.  These are

2   the evaluations.  And if you'll look in the personnel

3   evaluations, you'll see that he does update.  It's recorded in

4   there that he's doing the antenna manuals.

5          The April 11th antenna discussion.  Remember, on April

6   11th they were installing a new antenna on top of the building

7   at T1.  The question was, "Should we run the wire up through

8   the middle of the roof, drill a hole in the roof, or should we

9   make the wire come around and go up on the top?"  Jim Wells's

10  idea was it'd be better to bring it up the side.  Mr. Belisle's

11  idea was to punch a hole in the roof.  Whatever, it's a small

12  technical issue.  It's not the end of the world.  Mr. Reckner

13  picked Mr. Belisle's idea.  Is that a motive for murder?  No.

14  Did anybody say that Jim Wells started to yell and scream, to

15  throw something through the window?  No.  He said he just

16  acceded to the decision that Mr. Reckner made.  Is that a

17  motive for murder?  No.

18         And Jim Wells' change of demeanor, finally.  The fall

19  of 2011 and early 2012.  Well, Jim Wells was sick.  He missed a

20  lot of work.  He wasn't feeling good, and they couldn't figure

21  out what was wrong with him.  Finally, in February, where this

22  period of time takes place, he has surgery.  And even when he

23  comes back from work, Ms. Henry indicates that he's -- or Para

24  Upchurch indicates he was still ill and sick for a while.  He

25  was having a hard time.  He was having a hard time working.  Of

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 756  Filed 09/23/14  Page 151 of 222

course his demeanor changed.  He wasn't feeling well.  He was
sick.  As Para said, "It's hard to be a good worker when you're
not feeling well."  Is that a motive for murder?  No.  Is that
a precursor to murder?  No.  The guy's sick.

Personnel evaluations.  I'm not going to go through
them.  You've seen them.  You look at those when you're back
there.  You remember what they look like.  He exceeds
expectations all the way through, and then at the end, Mr.
Reckner or Mr. Smith or Mr. Eskew or whoever it is signs off on
a full bonus for Mr. Wells.  Was that a big deal?  Any -- were
any of these things a big deal?  No.  He got great evaluations.
He got paid his full (indiscernible).

All right, let's talk about Mr. Meloy.  There's been
some talk about Mr. Meloy and how important that testimony was,
and I think we need to address that.  Mr. -- Dr. Meloy said
this.  He said people don't just all of a sudden snap and go
from kind and gentle father, husband, friend, mentor, teacher,
co-worker, fishing companion, to brutal homicide guy.  That's
what he said.  He said that's not how it works.  He said there
are lots of signs.  He said sixty per seven cent -- 67 percent
of workplace violence perpetrators are either adjudged
psychotic or show psychotic behaviors.  There is no evidence
that Jim Wells showed any kind of psychotic behaviors.  Yet
two-third of anyone who is involved in this conduct does.

He had gallbladder problems, gastrointestinal problems,

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 756  Filed 09/23/14  Page 152 of 222

1  diabetes.  He had tinnitus, ringing in the ears.  That was part

2  of his service-related disability.  Is there any scrap of

3  evidence that he was psychotic?  No.  This is a guy who climbs

4  up to the top of 1,300-foot towers, trains people how to do

5  that, does it with Rich Belisle, does it with all these other

6  people, with Commander Musman, all these other people we've

7  talked about.  Does he seem like a guy who's psychotic?  He

8  must be pretty calm, actually.  He must be pretty much in

9  control to be able to do that kind of work.  There's nothing

10 that's consistent with Dr. Meloy's work.

11      43 percent, says Dr. Meloy, have a history of violence.

12 Is there one word of violence here?  No criminal history, but

13 not even like, you know, punching out a window or something,

14 like in 61 years, there's not one?  That's a remarkable record.

15 And Jim is -- again, he's Mr. Safety.  He's inconsistent with

16 Dr. Meloy's profile.  50 percent of perpetrators have had a

17 psychiatric history.  Is there any here?  No.  66 have made

18 threatening statements to someone.  No.  He's the safety guy.

19      And then we talk about what's meant by workplace

20 violence.  "Workplace violence" is a geographical term.  It

21 means violence that happens at the workplace.  It has nothing

22 to do with who does it.  That's what Dr. Meloy said.  He's --

23 there's a very small percentage, about 11 percent, in the big

24 pie chart -- there's the pie chart.  He said there's about 11

25 percent where -- that -- where it's actually co-workers and

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 756  Filed 09/23/14  Page 153 of 222

1  former workers, and then this about the same number if you add

2  these up, spouses, acquaintances, and exes.  And then there's

3  this huge part, 66 percent, is just robbers and other

4  perpetrators.  It's just -- you know, it just -- you don't know

5  what it's going to be.  It's a random thing.  It's -- workplace

6  violence is -- just means it happens there.

7        It depends -- the motivations for workplace violence

8  are the same as any kind of violence anyplace else.  You know,

9  financial, personal grudge, perhaps a robbery.  And in this

10  case there's been such suggestion this couldn't have been a

11  robbery because nobody actually stole any money.  But of course

12  that's too simple of an approach to the way real life is.

13  Sometimes people come in, want to do a robbery, they surprise

14  somebody, somebody gets shot, somebody else gets shot.  After

15  all that, the robber says, "You know what, I better get out of

16  here."  They don't have doing the robbery.  It's an attempted

17  robbery.  It's a burglary.  Somebody goes in the room, turns

18  out to be a bad scene, people get killed.  They leave before

19  they get a chance to steal any money.  But that doesn't mean it

20  wasn't this big 66 percent of robbers and other perpetrators.

21        Important -- the most important finding of Dr. Meloy --

22  excuse me -- was about the people who actually see violence as

23  a solution to what could happen.  Take the lights back up now,

24  I think.  What Dr. Meloy said is that if a personal

25  grievance -- we're talking about personal grievance -- is

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 756  Filed 09/23/14  Page 154 of 222

1  perceived as something that's temporary, then it's much less

2  likely to be -- turn into violence. Well, this was all -- this

3  was -- what this is all about.

4        First of all, Jim Hopkins was retiring. Everybody said

5  that. Second of all, Jim Wells was 60 years old, 61 years old.

6  I mean, he could climb tires, you know, 1,300-foot tires --

7  towers for a while, but he wasn't going to be doing that in --

8  you know, what -- while he was 85. He could retire -- had

9  retirement from the Navy, retirement from the Coast Guard, and

10  he had civilian retirement. He was in a position where he

11  could retire if he wanted to. This wasn't -- he wasn't, like,

12  hanging onto his job with his fingernails. Of, of course, at

13  some point he wasn't going to be able to climb towers to 1,300

14  feet. And, importantly, what he tells Para and Leah is, "Look,

15  you know what, the blue suits, the blue suits go pretty much

16  every three years, and you just got to hang in there and see

17  what it says." And look -- Dr. Meloy would say is if you see

18  it as temporary, like that, you're not likely to do any

19  violence. So Dr. Meloy actually supports -- doesn't support

20  the government's theory at all. Because that's not what Jim

21  Wells's attitude was.

22        All right, let's look at the crime scene, see what this

23  evidence looks like. Now, the judge is giving you an important

24  instruction, instruction number 28. Says it's the defendant's

25  position that a person or persons other than him committed the

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 155 of 222
(720) 384-8078   attrans@sbcglobal.net

1    crimes charged.  That is our position.  Somebody else did this.
2    Jim Wells had nothing to do with it.  He's innocent.  But the
3    judge, importantly, says to you the defendant is not required
4    to prove another person's guilt.  Because, of course, we can't
5    prove who committed this crime.  This crime occurred two years
6    ago.  The trail went cold in about a half-hour after they
7    decided that Jim Wells did it and they had the wrong guy.  They
8    never followed up any of the other leads.  They never searched
9    in any of the other places.  And that's not our burden to prove
10   who committed this crime.  It's their burden to prove beyond a
11   reasonable doubt that the defendant is charged with the crime.
12   They haven't done it, and that's why you should find him not
13   guilty.

14        But let's look at what kind of, you know, real evidence
15   there was at the crime scene.  Can you get 32 for me, please?
16   Dr. Meloy indicates that perpetrators engage in kind of a
17   boundary probe.  See, it's called -- calls it casing the joint.
18   When, here's -- at 10:32 that evening, here's what's going on
19   at T2.  Is it just a coincidence?

20        Now, maybe that's just a person who's driving through,
21   turning around, and going back.  But just a few minutes later,
22   what happens?  The same truck comes back and makes a different
23   pass through the place where the camera and the lights are.
24   Take a look at that.  You've seen it.  (Pause) At that point,
25   looking right at the camera as he drives in, and then turning

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 156 of 222

1    to the left and driving out.  That came, as we've shown you and

2    as the testimony was, from the direction of Anton Larsen Bay.

3    Whatever's out there, the Red Cloud Ranch, whatever.  Thank

4    you.

5            As Mr. Bullis said, this -- Mr. Bullis, he's the watch

6    guy.  Remember Mr. Bullis?  He's the watch.  He said totally

7    out of the ordinary because of the manner that it turned around

8    right in front of the flagpole, and then really unusual when it

9    came right back a few minutes later.  After turning around

10   slowly in the T2 parking lot, if -- it heads out back onto

11   Anton Larsen Bay Road.  Is that just a coincidence, that, you

12   know, six hours before these guys are -- die, that someone

13   looks like they're casing that, that someone looks like they're

14   trying to see where the cameras are, that someone's trying to

15   see where the doors are, that someone's trying to see if any

16   security risk (indiscernible)?  I don't know the answer to

17   that.  Did they investigate it?  Did they investigate the white

18   car?  No.  There's no evidence they investigated it at all.

19           Can you bring up 34 for me, please?  Okay, this is

20   the -- okay, here's the layout.  We've seen this a bunch of

21   times.  But you'll recall that this is the boiler room door in

22   the back here.  This is the arctic entry to the kind of garage

23   area.  Here's the office where Mr. Belisle was.  And here's the

24   cooler over here where Mr. Hopkins was.

25           You'll recall that Trooper Jones -- this is the entire

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 157 of 222

1   area.  You recall that Trooper Jones found that this boiler
2   room door back here was ajar.  This is the physical evidence
3   we're talking about.  When people go out and look at a crime
4   scene, they want to see if the doors have been opened or left
5   open, to see if somebody tried to get in.  And this door was
6   left ajar, as if someone had tried to get in there.

7           Now, could that have been Jim Wells that was trying to
8   get in there to enter that room?  No, of course not.  Because
9   Jim Wells knows that there is a bolt on this door right here.
10  This door is bolted from the inside.  You can't get in.  Having
11  a key doesn't make any difference.  It's a slider across the
12  inside right here.  So if someone tried to get in through the
13  boiler room door and maybe kicked that footprint on the back of
14  that door, because that's where that foot -- that bootprint
15  is -- if someone did that, we know one thing for sure:  It
16  wasn't Jim Wells.  Because Jim Wells knew you couldn't get in
17  through here, and kicking that door wasn't going to make any
18  difference.  So who is it that left that door open and left
19  that bootprint on the door?  Well, we don't know who that was.
20  But it wasn't Jim Wells.  It couldn't possibly have been Jim
21  Wells.  Can you give me the next one, please?

22          Here's just a view of the back, so that you can see
23  that again.  I'm going to get out of your way.  This is the
24  boiler room door that we were talking about.  This is shot from
25  that little berm in the back.  Mr. Jones took this picture for

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 158 of 222
(720) 384-8078  attrans@sbcglobal.net

1   us.  This is the door that was ajar.  And then if you go over
2   here, this is the arctic entry to the garage.  Again, Trooper
3   Jones -- and you can actually see it there from this one --
4   that door, again, is left ajar, as if someone came in here,
5   tried this door, couldn't get in, came over here, tried the
6   arctic entry door and then that was locked with a slider on the
7   inside too.  So someone tried this door, someone tried this
8   door.  But we know one thing:  It couldn't have been Jim Wells,
9   because Jim Wells knows that both of those doors are locked
10  with a slider on the inside.  Can I see the next slide, please?

11          This is the boiler room door.  And there it is ajar.
12  You can see that someone has left that open.  Was it Jim Wells?
13  No.  Someone -- excuse me -- because if someone was trying to
14  get into the office or the boiler room, they could have gotten
15  into the boiler room but not into the office through here.
16  Next one, please.

17          Here's the arctic entry door.  Again, it was left ajar.
18  Trooper Jones took a picture of that because he knew that was
19  important evidence for you to see, and that's why we put it on
20  for you, and that's why anybody who was analyzing the crime
21  scene, and you, should have had it in front of you.  Can I see
22  the next one, please?

23          Okay.  And then -- here.  The bootprint -- it's a
24  little bit faint for you to see, but you can see there's the
25  bottom of the boot and the top of the boot, and here is the

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 159 of 222

knob.  And on the -- this is on the boiler room side of the
boiler room door, and then the other side is the water cooler.
This is locked with a slider.  It looks -- now, one of the
agents testified that it looks like someone was checking the
door.  Well, perhaps.  But that's -- looks -- it's also
certainly possible that someone was trying to kick that door.
And I'm -- yeah.  You decide for yourself whether it looks like
someone was trying to kick in that door.  Would it -- who would
it have been?  We don't know, but we know that it wasn't Jim
Wells, because Jim Wells -- know you can't kick that door.

Only a person -- and it talked about being familiar
with the rigger shop, it had to be somebody who knows.  Well,
of course, it didn't have to be someone -- anybody who went in
through there and tried to get in and kicked that boot -- door,
had to be somebody who was what?  Unfamiliar.  Because a person
familiar with the shop wouldn't have tried to get in through
the boiler room door.  They wouldn't have tried to kick that
door in.  They wouldn't have tried to get in through the
garage, the arctic entry.  Only a person unfamiliar would have
done that.

And then perhaps when they were done -- let's look
here.  If they tried to get in and couldn't get in, tried to
get in here, couldn't get in, tried to get in here, couldn't
get in, what would be the next thing they would do?  Well, if
you just keep walking around the building, the next door that

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 160 of 222
(720) 384-8078  attrans@sbcglobal.net

1   you come to is locked.  That's the key door, the card -- swipe

2   key.  The next door that you come to is open.  So anybody -- I

3   mean, you don't have to have any special knowledge to get in

4   here.  If you wanted to get into this building, you try here,

5   you try here, if you don't know that they're locked.  You come

6   around here, you come around here.  That door's a swipe key.

7   This door is open.  That's the first door that's open.  You

8   don't have to know anything.  That's what anybody would do who

9   was trying to get in there.

10          And where would you park?  They say, oh, you have to

11  have some special knowledge to park in the back here.  No.

12  Where do you park if you're going to burgle a place?  Where do

13  you park if you're going to rob somebody in a building like

14  that?  You park out here in front where all the cars are and

15  the camera is?  No, you don't park there.  If you're a

16  criminal, you park in the back.  That's where you park.  You

17  park in the back and you hide your car back there someplace.

18  First you try to get in through the back, but if you can't, you

19  come around to the first open door and you go in the first open

20  door.  That's what happened here, and that's -- and Jim Wells

21  had nothing to do with it, because he's innocent.

22          Go to 41, please.  There are eight unidentified

23  fingerprints on doors.  Again, "CSI," perhaps.  But they did --

24  they dusted for fingerprints.  Of course they would want to do

25  that.  They would want to see if anybody had left any evidence

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 161 of 222

1    that they were there.  They checked the fingerprints against

2    people that they knew, including Jim Wells, of course, but

3    other people who might be in there.

4           And the Coast Guard, of course, knows all the people

5    who are supposed to have access to this building.  They know

6    that.  It's a military base.  They have control over all the

7    people who have access to this building, because it is a

8    military base.  And you better believe that they've got the

9    fingerprints from all the people who had access to this

10   building, and checked them against these unknown fingerprints.

11   And eight of the fingerprints remain unknown.  And one of those

12   is the boiler room door.  Eight of the fingerprints -- you

13   heard the testimony of Ms. Raymond and Mr. Espeland -- eight of

14   those fingerprints remain unidentified.  That is, they're not

15   the people who were supposed to be there.

16          We still don't know who those people are.  Most

17   importantly, one of them's on the boiler room door.  They were

18   people they don't know and they're people who shouldn't be

19   there.  Are they perhaps involved in these homicides?  We just

20   don't know.  We don't have any way to show you who those

21   fingerprints are.  But they are fingerprints that are

22   unidentified for people who shouldn't be there.  Take that

23   down.  Thank you.  Number 42, please.

24          All right, let's take a quick look at this.  We're

25   going to cover this quickly, because it seems clear.  There's

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 162 of 222

the suggestion in the government's argument and perhaps in Mr.
Morton's testimony, although I really didn't hear this, that
someone had to have some kind of super-special knowledge of
this and had to really know what they were doing to get in this
building and to commit this terrible crime.  But it's not true.

Here's the deal.  If somebody's coming from this side,
they're going to be picked up in this camera.  You remember the
camera picks up a spot that's kind of right out here someplace.
That's what the T1 -- it's not exactly, but it's just a little
slice that's right about in here, okay.  And then the T1 -- the
T1 camera shoots out towards the flagpole here.  Anybody, by
the way, who walks under the T2 camera -- and you heard this
testimony -- can look up and see where the camera's pointed.
You don't have to have any special knowledge.  You'll remember
the testimony, the camera's right about here.  The testimony
was it's got -- and you can see it in the pictures you've
got -- it's got a glass globe underneath it, and the testimony
was that you can look up at it and see which way it's pointed.
But in any case, we know that it was pointed out in this
direction here.

And you remember all these photos, these videos of the
cars coming in and parking, Mr. Coggins getting dropped off and
walking away.  You can see that the camera doesn't even pick up
any part of these cars or the dumpster.  So you don't have to
crawl on your belly to avoid the camera.  All you've got to do

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 163 of 222
(720) 384-8078   attrans@sbcglobal.net

1   is walk around the building in the normal fashion.  All you've

2   got to do is walk around this building, just like this.  You're

3   not going to be on the camera.  Remember, the dumpster is right

4   here.  And then these cars are all kind of parked in here.  But

5   when you see the T2 camera view, you don't see the dumpster at

6   all.  You don't see the cars parked there at all.  The first

7   thing that picks up the field is kind of right out here in the

8   middle.  That's where you see Mr. Coggins walking out.

9        Remember, Coggins gets dropped off in here, and then

10  you see him start to walk out this way, and then all of a

11  sudden you see him when he's about here and he's headed for the

12  flagpole.  But you don't have to have any special knowledge.

13  You can just walk right through here, you know, close to the

14  building.  You don't have to hug the building, because it

15  doesn't pick you up until you're out here.  It's a perfectly

16  natural thing to do.  And again, anybody could come park their

17  car in the back here, walk around.  The first open door is

18  right there.  Go in the door, commit these terrible crimes, get

19  back in their car, and drive north.

20       Now, of course, the investigators assumed it was Jim

21  Wells and it -- they tried to make this blue blur be Nancy's

22  car over here.  But, you know, there's not a bit of evidence on

23  this side.  Anyone could have driven in -- whether it was

24  opportunistic that day, whether it was a plan to kill one

25  person, plan to kill two people, whatever it was, they could

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 164 of 222

just as easily, and frankly, if they knew about all these
cameras, would have come in from the north.  Come in from the
north, go in the back door.  As the government lawyer said,
probably park in the back.  You would assume that.  Now, we're
just making that up.  We don't know what happened.  But you
would assume that a person who's going to rob and kill would
want to hide their car in the back.  So they could come in the
back here, never be seen on a camera.  Get out of their car,
try this door here, try this door here, just keep going until
they find an open door, this door here, and come into the door.
And then Mr. Hopkins, unfortunately, is here and he hears
someone come in, and comes out and gets shot.

Now, what's the order that these people get shot in?
Who knows.  Mr. Morton suggests, for some reason, that Mr.
Belisle was shot first and then Mr. Hopkins responded to it.
Perhaps that's so.  Perhaps Mr. Hopkins responded.  But one
thing we do know:  Both of these individuals responded in an --
were not in the place that you would expect them to be.  In
other words, they were alerted to the presence of somebody
else.

Because when you look at this, you'll remember -- and
Mr. Morton might have been under a misimpression here.  Because
remember, Mr. Belisle was found right here at this desk.
That's Mr. Wells's desk, if you remember the testimony.  He was
not at his desk.  His desk is in the back here.  So Mr. Belisle

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 165 of 222
(720) 384-8078  attrans@sbcglobal.net

1  was alerted to something and perhaps was headed for the door

2  here when he was shot, and he fell here under Mr. Wells' desk.

3  He's not at the place where he would -- you would expect him to

4  be if he was sitting at his desk.

5      Similarly, Mr. Hopkins was over here.  He was not -- he

6  was blousing his uniform over here at the -- at this.  And yet

7  he ended up over here.  So he obviously was not in a place

8  where you would expect him to be.  Neither of these decedents

9  were in the place where you would expect them to be if they

10  knew the person who had come in the door.  They were all --

11  they were both responding to some kind of alert.

12      You've heard the -- Mr. Bullis, the watch officer,

13  indicate that it was his job to be on the watch for anything

14  unusual.  As he was driving out about 7:30, he saw an older-

15  model Chevy or Ford pickup parked on the other side of the

16  dumpster.  Never accounted for in any of those spreadsheets.

17  You look at them when you're back there.  There is no black old

18  Chevy model, Ford pickup truck parked right about in here,

19  which is what Mr. Bullis said.  There's no truck like that

20  parked there, accounted for in these sheets.

21      And what that means is one thing.  What that means --

22  I'm sorry to get in front of you -- what that means is that

23  this car didn't go back out in the camera.  You know, the only

24  cars that are accounted for in their spreadsheet are cars that

25  go back out for the camera.  So you've got to go either in the

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 166 of 222
(720) 384-8078   attrans@sbcglobal.net

1  T2 camera, which is this spot here, or you've got to go back

2  out on the road to get in the T1 camera.  But if you come in

3  from the side, over here -- there it is, thank you -- if you

4  come in from this side, park here where the black truck --

5  where Mr. Bullis said, and then you just go back out, you're

6  never on the camera.  That's the whole point, isn't it?  You're

7  never on the camera, so there's never going to be any video

8  evidence.  And that's another reason that you should acquit Mr.

9  Wells.

10      It also means that the black truck had to come from the

11  north, because it's never on any of those cameras.  So the

12  black truck that Mr. Bullis saw had to have come from the

13  north, from Anton Larsen Road -- Bay to the north.  Mr. Bullis

14  is the watch guy.  That's his job to see all those trucks.  And

15  Mr. Bullis, importantly, knows everybody's cars.  He could tick

16  off Mr. Coggins' car, he could tick off everybody else's car.

17  It was not a Jeep or anything like that.  He said it was a old

18  Chevy pickup, and it's not accounted for, it's not in the

19  camera, and that's because it went back north.

20      All right.  We're almost done.  The judge has

21  indicated -- has instructed you that -- he's instructed you

22  many things.  But he's instructed you that you can base your --

23  reasonable doubt can be based on evidence or a lack of

24  evidence.  In this case, there are many reasons to doubt the

25  government's story of this case.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 167 of 222

1           There's the white truck conducting surveillance.
2    There -- what's that about?  The back door is ajar.  That's not
3    Jim Wells.  It's somebody else who has tried that back door,
4    both of them.  The bootprint on the door.  Someone has tried to
5    kick that door.  That's not Jim Wells.  He never tried to kick
6    that door.  There's the unidentified fingerprints.  People are
7    in there who were not supposed to be in there, including on the
8    boiler room door.  How come those fingerprints haven't been
9    accounted for?  Whose fingerprints are they?  Are they the
10   perpetrator of this crime?  We don't know.  And that's a reason
11   for you to have a doubt.

12          The black truck that Mr. Bullis saw that left out of
13   the cameras and went north, that's a reason for you to doubt.
14   Jim Wells, his history of peacefulness and nonviolence, over 60
15   years, that's a reason for you to doubt.  You know a person's
16   reputation for nonviolence, a person who has a good reputation
17   in the community.  That is a reason for you to doubt.

18          The failure of the government investigators to search
19   anywhere north of COMMSTA four to five days later, one day
20   later -- today, they still haven't searched for the gun or any
21   evidence out there.  That's a reason for you to doubt.

22          No one's seen Jim Wells in possession of Mr. Stein's
23   gun for -- since 1997.  Now, if Mr. Wells had actually stolen
24   Mr. Stein's gun, it would have been to use it.  Mr. Wells is an
25   outdoorsman.  He goes out all the time.  If he -- that's a bear

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 168 of 222

1  gun, as everyone has described.  That's a gun that you keep
2  when you go hunting and fishing in case you run into a bear.
3  If he had had that gun, it would have been to use it.  Somebody
4  would have seen him out on all the hunting and fishing trips
5  that he does with the gun.  Nobody ever saw, in 20 years -- the
6  government's story doesn't make any sense, and there's no
7  evidence to indicate that even if he had Stein's gun that it's
8  any more likely to be the murder weapon in this case than any
9  of the other guns that they've seized along the way.  There's
10 no evidence that that gun, wherever it is, that got lost is the
11 murder weapon or that anybody had actually seen Jim Wells with
12 it.

13      The truth is, if Jim Wells were guilty, there would be
14 some real evidence of it.  There would be some evidence in
15 those cars.  There would be some evidence on the road back to
16 the airport.  There would be some evidence in the SUV or the
17 pickup on the road back.  The -- there would be some evidence
18 at his house and all those places.  The evidence is not where
19 it ought to be if Jim Wells were guilty.  This is what it looks
20 like when you do an intense investigation of Jim Wells and you
21 turn over every stone and he's innocent.  This is exactly what
22 it looks like.  Because there's a lack of evidence, and the
23 judge has told you that you should -- reasonable doubt is based
24 on evidence or the lack of evidence, and that's why you should
25 acquit him.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 169 of 222

1          Ladies and gentlemen, the government's story of what
2     happened makes no sense.  Makes no sense in the broader picture
3     of Jim Wells' life.  He was going through some hard times
4     medically.  He was hurt.  He had surgery.  But he'd been there
5     a long time, he'd been through a lot of blue-suit guys.  It
6     just wasn't a big deal to him.  He was getting paid.  He was
7     probably going to retire.  Mr. Hopkins was going to retire.  It
8     simply makes no sense that he would try to harm either of these
9     men who he worked with, especially Mr. Belisle, all of this
10    time.

11         And the government makes one other assertion, that it
12    had to be -- somebody had to be after both of them, therefore
13    it had to be Jim Wells.  Well, that's nonsense.  Of course, if
14    someone really targeted one of these individuals for killing
15    and the other one happened to be there at that time, you can
16    see how the other person might get killed, because, as Mr.
17    Morton said, sometimes another person gets killed because they
18    are a witness to a homicide or a witness to some other crime.
19    So this idea that they had to both be killed or the -- someone
20    had to be after them both is nonsense.  It simply makes no
21    sense at all.

22         But, at the same time, it could be that there was
23    somebody who came to burgle the place, to rob the place, ran
24    across these guys, and, unfortunately, they just happened to be
25    in the wrong place at the wrong time.  The fact that a large-

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 170 of 222

1  caliber gun was used is probably just an artifact of living in

2  Kodiak.  The fact that someone continued to shoot them after

3  they were harmed is probably a reflection of the fact that the

4  person wanted them to die.  But what does that tell you about

5  the person, the motive of the person?  The whole thing makes no

6  sense.

7          Ladies and gentlemen, I will get no more opportunity to

8  talk with you.  After I'm done, the government lawyer will get

9  a chance to talk with you again.  And so I'm going to ask you

10  to look at the government lawyer and ask all those questions

11  that I have just posed to you.  I want you to look at the

12  government lawyer and, in your own mind, ask those questions.

13  It may not seem fair, but it's right that the government gets

14  the last word, because the government has the burden of proof

15  and the government has to carry its burden beyond a reasonable

16  doubt.

17          The one thing I want you to remember -- I want you to

18  remember all of it, but the one thing I want you to remember is

19  that the government's case, the government's story, is built in

20  a house of cards.  They hired the best experts in the country

21  to try to shore up this case, to try to prove Jim Wells was

22  guilty.  And it was critically important that they be able to

23  prove to you right here, beyond a reasonable doubt, that the

24  car going northbound is Nancy Wells car and that the car going

25  southbound is Nancy Wells' car.  If they haven't proved that to

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 171 of 222

1  you beyond a reasonable doubt, then their case is nothing, it
2  makes no sense.  And that's why you should find Jim Wells not
3  guilty.

4          Ladies and gentlemen, there are a lot of reasons to
5  doubt.  There's a lack of evidence that was pointed out to you
6  by the government lawyer in her opening statement that there's
7  not going to be an "Aha" moment, that there is not going to be
8  any evidence for which you're going to be able to say this is
9  the murderer for sure.  Well, ladies and gentlemen, if you
10 can't say beyond a reasonable doubt that this is the murderer
11 for sure, then you have to find Jim Wells not guilty.

12          Jim Wells is innocent.  You only get the chance here
13 today to find him not guilty.  There's no verdict form that
14 says "innocent."  There's just a verdict form that says "The
15 government has failed to prove its case beyond a reasonable
16 doubt, and we find the defendant guilty [sic]."  That's the
17 verdict you should enter.  There are reasonable doubts in this
18 case.  I ask you to find Jim Wells not guilty.

19          THE COURT:  All right, thanks.  We'll take a 15-minute
20 recess, and then come back for the government's final.

21          THE CLERK:  All rise.  The matter stands in a 15-minute
22 recess.

23      (Court recessed at 2:14 p.m., until 2:28 p.m.)

24      (Jury not present)

25          THE CLERK:  His Honor the Court, the United States

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 172 of 222

```
 1  District Court is again in session.  Please --
 2          THE COURT:  The jury is on their way.
 3          MS. LOEFFLER:  It's the timeline, Your Honor.
 4          THE CLERK:  Please be seated.
 5          THE COURT:  The jury's coming through the door here, I
 6  think.  Mr. Schroder, did you get a chance to look at the
 7  verdict forms yet, or not?
 8          MR. SCHRODER:  I'll do that right now.  I'm sorry.
 9          THE COURT:  Okay.
10          MR. OFFENBECHER:  This exhibit was redacted.
11          MS. LOEFFLER:  Well, I unredacted it for closing,
12  because --
13          THE COURT:  You're supposed to.  It is redacted, right?
14          MR. OFFENBECHER:  That's what I'm saying.
15      (Jury present)
16          THE COURT:  Got to redact it.
17          MS. LOEFFLER:  Your Honor, if I may --
18          THE COURT:  Yes.
19          MS. LOEFFLER:  -- talk to you.
20          THE COURT:  She -- she's got it.  He's got it.  He's
21  got the thing.
22          THE CLERK:  Oh.
23          THE COURT:  Okay.  Please be seated.  I'll stand.
24  Okay.  Got everything, then, squared away here.  All right,
25  very good.  We'll hear finally from the government.
```

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 756  Filed 09/23/14  Page 173 of 222

1       **FINAL ARGUMENT OF THE PLAINTIFF**

2    BY MS. LOEFFLER:

3            All right, ladies and gentlemen, I will -- I know

4    everybody's been very patient, and I will try to be organized,

5    but this is when I respond, so I'm going to -- it'll be a

6    little bit disjointed.  But let me tell you something.  You all

7    know April 12th, 2002 [sic], when these two men, Jim Hopkins

8    and Richard Belisle, were found murdered in their offices,

9    Rich Belisle in his office, Jim Hopkins just rolling up a

10   sleeve, with really no evidence of -- that they were surprised

11   by some intruder, some mystery man.  They were both in their

12   normal places of work.  And there was one other person that

13   should have been there:  Jim Wells.  Just one other person.

14   And he was missing.  And he was missing, and there was a story

15   that he told later.  It was a story that doesn't work.  And

16   what was missing from the very eloquent and lengthy defense

17   closing was any reference to that story or the timeline that

18   absolutely proves and is the key evidence showing that Jim

19   Wells did this.

20           And I'm going to talk about a little -- I'm going to

21   talk about some of the red herrings that were thrown up, but

22   I'm going to talk about what they didn't talk about in terms of

23   the evidence.  When counsel said there's no evidence in this

24   case, well, time was a very important set of evidence in this

25   case, as Mr. Schroder said and as we'll point out here, and

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 174 of 222

1  this is what was never mentioned at all when they said there's
2  no evidence.

3        Let me start a little bit with, as you all have heard
4  again and again, the 34-minute gap.  Wells passes the main gate
5  at 6:48.  And I'm going to just go to some of these.  And we
6  know that he comes back at 7:22.  This is the BSU gate.  That's
7  the 34-minute gap that was never mentioned.

8        And Mr. Wells -- what the truth is and what's the most
9  common-sense thing, he planned this murder, but the one camera
10 he didn't think of was the main gate one.  Why?  He doesn't
11 work there.  You heard in the evidence that camera feeds into
12 the administration building on the base, where he has no reason
13 to be.  He didn't know that camera would catch him on the road.
14 He prepared an alibi, which I'm going to discuss again was
15 false, but it didn't work.  And that was never even discussed
16 in the last two hours, the alibi that doesn't work.  And that
17 alibi and this time period is exactly when the murders
18 happened.

19        And time is evidence.  It's very important evidence in
20 this case, because, again, as Mr. Schroder pointed out, when
21 did the murders happen?  They happened between about 7:10 or 11
22 and 7:14.  The reason you know that is Rich Belisle, at 7:10 is
23 the last thing on his computer.  Jim Hopkins comes in at 7:09
24 and he's rolling up a sleeve, one of the first things he does.
25 And they never get beyond that.  So the murder happens right in

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 756  Filed 09/23/14  Page 175 of 222

1  between when the two -- when the blue SUV goes one way and the

2  other.  That's when the murder happens.  That's when Rudat

3  heard the loud noise and the cars coming in and out.

4          So what happened between 6:48 and 7:22?  Well, the

5  timing is exact.  And we went through this in the opening,

6  closing, and in the case.  But what was the explanation Mr.

7  Wells gave?  When the investigators -- they talked to everybody

8  the first day, but then they discovered this 34-minute gap.

9  And they asked Mr. Wells -- okay, and they didn't ask him just

10  once -- "Tell me what you did."  And he tells this story about,

11  "Well, I went there, I sort of saw a low tire, and I turned

12  around and came back."  Okay, well, that takes about four

13  minutes.  I mean, we had the -- Special Agent Sturgis went up

14  there and he -- she told you exactly -- he told you exactly how

15  much miles it is from the gate to the airport.  And they have

16  this wrong here.  It's about 1.7 miles.  I don't have that in

17  front of me, but it's very short.  Takes about two minutes to

18  drive it.  And he says -- he pulls off at Comfort Inn, maybe,

19  kind of looks at his tire; it's low; and goes back.  Okay, that

20  takes about four or five minutes.  There's 29 left.  So his

21  story doesn't work.

22          But they went back to him the second day and they asked

23  him again, "What did you do?"  "Well, I went home and then I --

24  you know, I got some rain pants out, and I looked -- this, and

25  the lug nuts were" -- he's telling this whole long story.  And

1  then they go to him and they say, "Doesn't work." Did they
2  confront him, did they yell at him? No, you heard them.
3  "Look, help us out. Thirty-four minutes. Your story doesn't
4  work." And what does he say then? "I don't have an ex --
5  reasonable explanation for it. I don't have a theory. I don't
6  know. Nope, there's nothing I can add to that."

7      This is the day after his colleagues are brutally
8  murdered. And his counsel says he's totally innocent. There
9  is no possible reasonable explanation why he wouldn't have
10  known. If he were innocent of this crime, he would know
11  exactly where he was. And this doesn't work at all.

12      So when you asked why somebody looked at him -- he
13  wasn't there; his story was a lie; he couldn't explain where he
14  was; the low tire made no sense. Even the people at the rigger
15  shop were saying, you know, why would you drive home seven
16  miles instead of just going to the rigger shop and fixing it.
17  He had no explanation. And the government has the burden of
18  proof, but you had no explanation after a month of trial.

19      But there is one. There's an obvious one. Why, the
20  day your colleagues are murdered, when you tell a story and it
21  doesn't work -- why didn't he have an explanation? Because he
22  was lying. He had prepared an alibi and it didn't work,
23  because he didn't know this camera was going to catch it. And
24  nothing he could say could solve it. He wasn't ready for it.
25  And the other reason you knew he wasn't ready for it and he was

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 756  Filed 09/23/14  Page 177 of 222

1  lying was because, as Mr. Schroder showed you and you listened

2  to in the opening, closing, when they said, "Can you help us

3  here?  What's going on?  What happened" -- dead silence for 15

4  seconds.  Because he got caught and he had no answer.  Had no

5  answer because he had murdered those people and he was not

6  expecting that camera.

7           Now let me talk about another part for which we heard

8  nothing, and the evidence is absolutely clear and established.

9  And that is his story about the tight lug nuts.  Now, I don't

10 have up here the timeline on that, but I believe Mr. Schroder

11 showed it to you in the opening, closing.  And that is,

12 7:22:09, he's on the camera, headed back to his house.  And, in

13 fact, people did see him.  That's why he had to have a story

14 about leaving and the tire.  Two of his neighbors saw him

15 turning in at 7:25.  And at 7:30, he's making a phone call.

16          Well, Special Agent Sturgis did -- you know, he

17 calculated, driving the speed limit, it would take about

18 seven -- he -- you know, minutes or so to get home.  He would

19 have gotten home at the foot of his driveway about 7:29.  7:30,

20 he makes the first call.  7:31, he calls Scott Reckner, the

21 supervisor, and said, "Gee, I'll be in late.  I had trouble

22 with my lug nuts."  Okay.  Flat-out lie.  Could not, by

23 evidence and timing, have happened.  I mean, and, in fact, in

24 the parts we played you in the statements, he told this story

25 about, "I went in, I went to the bathroom, you know, took me a

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 178 of 222
(720) 384-8078  attrans@sbcglobal.net

1   while to find the stuff.  The pneumatic wrench wouldn't take it

2   off enough.  And I called."  Except he didn't know that this

3   camera caught him at 7:29.  So the lug nut story is a flat-out

4   lie.

5        And you also had an agent come in and tell you it took

6   him 14 minutes to change the other three tires.  So it

7   obviously -- I mean, maybe the one tire had a tight lug nut,

8   but it doesn't make much sense, since the other three obviously

9   came off like this.  But what you know absolutely, positively,

10  for sure is he was lying when he called and gave his alibi for

11  where he was.  He had no explanation when the murders happened

12  and he has no explanation today, and the reason he has no

13  explanation is because he was the murderer.

14       Now let's go into this statement.  I want to go

15  through -- stay on -- some of the what I would call the red

16  herrings that came up just now.  First of all, let me talk a

17  little bit, and then I'm going to lead into these various

18  things that were just said and I want to talk about them.

19       The crime scene is very important, because the crime

20  scene -- this story that it could have been a robbery or a

21  burglary -- there's not a single person that showed up there

22  that thought it could be a robbery or burglary.  First of all,

23  no money's missing.  Second, there's nothing disturbed in the

24  whole place.  I mean, you saw that.  It's a ridiculous story,

25  and it's not true.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 179 of 222

1    These two men were killed in their workplaces, inside

2  their offices.  And what Supervisory Special Agent Morton

3  talked to you about, about targeted murders, is that burglars

4  and robbers don't stand over somebody after they kill them and

5  go, "Let me shoot you again.  Let me shoot you again."  They

6  don't do that.  They try to get the money and leave.

7    There was nobody else there.  Nobody was surprised.

8  What this was was a targeted, intentional murder.  That's

9  exactly what it looked like and that's what it was.  And the

10  only person who could do it was somebody who wanted to kill

11  both of these people.  And they had no connections except the

12  workplace.

13    So let me go through some of the evidence that supports

14  why Jim Wells did it and why Jim Wells was lying when he talked

15  to the -- well, he wasn't lying when he said he had no

16  explanation.  When he said lug notes and when he said he had a

17  low tire, that was lies.  When he said he had no explanation

18  and no theory, that was the truth, because he did the murder.

19    Now let's talk about a few of these things.  The

20  defense has now said that you have to find beyond a reasonable

21  doubt that Nancy Wells' car is the blue car.  And you're not

22  actually going to get a jury instruction that says as an

23  element you have to find that Nancy Wells' car was the blue

24  car.  But let me show you, they said, and you should rely

25  solely on Gerry Richards.  And I'll talk a little bit about Mr.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 180 of 222

1   Richards for a second.

2          Mr. Richards says that's not a car.  He was up here and

3   he said, "It had black wheels -- I'm sorry -- but these

4   aren't -- you can't see from any of these that that's a car."

5   And that was ridiculous.  And Mr. Richards may have been very,

6   very competent in his age, but the fact is, he left the FBI

7   some -- 20-some years ago, at the very beginning of digital

8   evidence.  And the fact is, digital evidence passed him by.  I

9   mean, this is somebody who got up there and said, "You can't

10  see that that's a car."  I suspect every one of you can see

11  that that's a car.  And the defense called it a car and we

12  called it a car and so did the defense experts.

13         So what happened is, you should just -- that's a red

14  herring.  You know, people went to him -- and it's true, the

15  government went to him.  But he wasn't competent anymore, and

16  we went on to people that are better.  And the fact is, the

17  defense went on to someone better.  They hired a guy named

18  DiTallo.  Nobody really wanted to rely on Mr. Richards,

19  because -- nice man; time's passed him by.  And he's a little

20  bit arrogant.  When time passed him by, he said nobody else's

21  evidence is relevant.  So the whole Richards thing is a

22  complete red herring, unless you think -- I -- I'm not going to

23  say -- you know, we think it's an elephant on wheels or

24  something.  It's clearly a car, and he decided if it wasn't him

25  and he didn't know what to do with it, you know, there wasn't

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 181 of 222

1    anything that anybody else should be able to do with it.

2           So let's go on to what the evidence actually was.  Let

3    me -- excuse me a second, I'm looking for my -- ah.  So this --

4    Nancy Wells' vehicle.  Trooper Ellis went down -- and it wasn't

5    that the government didn't investigate anybody.  He was there

6    on the day.  He goes down to the airport.  He did take picture

7    of other cars.  But the one that caught his eye was Nancy

8    Wells' blue vehicle.  Caught his eye, because to his naked, you

9    know, necessarily, you know, untrained eye, it looked like the

10   one on the video, which, of course, it does.

11          Now -- and we heard in closing, oh, well, it could have

12   been Mr. Pearson's 15-person passenger van.  That's a red

13   herring.  Not only did the government's expert and Neil Schmidt

14   tell you it's a CR-V -- SUV, so did the defense expert, called

15   it an SUV also.  So telling you all that nobody called it an

16   SUV and it could be that Mr. Pearson's 15-passenger van is

17   ridiculous.  Mr. -- Dr. Vorder Bruegge -- excuse me -- Dr.

18   Vorder Bruegge said, you know -- and you'll see the slides --

19   you know, he measured this car and he compared it to this one,

20   and he said because the pixels aren't perfect, there's a plus-

21   or-minus range on it, but it's certainly not big enough to be a

22   15-passenger, you know, car.  That's just nonsense that was

23   just thrown out for you.

24          So remember also that the car -- the blue SUV that came

25   in, came in at 30 seconds and came out at 15, right after the

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 182 of 222

1  murders.  Everything that's logical and all the timing will

2  tell you that the murderer came in this car.  And what connects

3  that car to Jim Wells and Nancy Wells is not just your ability

4  to compare the two, but it's exactly where it was.  The

5  opportunity.  Mr. Wells wants to do this.  His wife is out of

6  town.  The car is at the airport.  Normally, that -- he would

7  call Para to pick it up.  As Judy Pletnikoff said, Nancy Wells

8  did not like leaving her car at the airport beyond two hours.

9  "I will pick it up, or if Jim Wells was in town, he would do

10  it."  There were people to pick it up.  So why did the car

11  move?  Why did it move from where it had been left when Nancy

12  Wells went to the airport and where the officers found it?  It

13  moved because it was used in the murder.

14       Now -- so -- and then we had the statement that the

15  government did no investigation.  In fact, even the defense

16  investigator had missed.  The government's tracked down every

17  blue vehicle that was of the four that Neil Schmidt said would

18  get him up to a 90-percent view of which car it was.  They

19  tracked down every single one except the guy that was dead and

20  the Wellses' vehicle.  And as they said in the opening, there

21  were nine that were not even on the island on the time.  So

22  they did an extensive investigation, turned it over to the

23  defense, and there's nothing in any of that that would tell you

24  it was anybody else's car.

25       So, certainly, nobody could get up there and say, "I

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 756  Filed 09/23/14  Page 183 of 222

can see a scratch in the windshield; it's Nancy Wells's car."
Where you get that connection is the timing, where it was, that
it moved from where she left it, and where it was found after
the murder.  And you also get it from -- I'm going to go
through the reverse timing one more time, because this is
another thing that the defense never mentioned, and tells you
exactly, by evidence -- time is evidence -- that Jim Wells did
this.

       And that is, on the way out, this blue SUV leaves at
7:14:31.  Now, what Special Agent Sturgis did is he just did
time-math calculations along the road, and he showed you that
if you drove that car to the airport and you took how much time
it would take, which was two or three minutes.  I don't have
the chart in front of me.  And then the time it would take, and
that was -- Special Agent Woods, he showed you on a video, so
you could actually see he wasn't speeding or doing anything.
He showed you what time it would take if you drove over,
changed cars, and went back to the road.  And then Special
Agent Sturgis said if you're going the speed limit, here's how
long it takes to get to the BSU gate.

       And he did that calculation for you and you'll have it.
And it was in approximately 30 seconds of the time that Jim
Wells passed by there in his white truck.  It is not possible
to have engineered that perfect a connection randomly.  The
world doesn't work that way.  How could some random person have

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 184 of 222

1  murdered these two and managed to do it in a car that looks
2  very much like Nancy Wells', and head home in the exact amount
3  of time that it took Jim Wells to go past this gate?  And
4  that's something that the defense never wanted to mention,
5  because they don't want you to look at it, because it's
6  evidence and it's conclusive evidence of what Jim Wells did
7  that day.

8          Okay.  Let's go to some of these other things that were
9  brought up.  We did have a discussion, and the defense said
10 that the government didn't investigate.  And one of the reasons
11 they said the government didn't investigate was because they
12 didn't talk to Casey Brennick and ask about the gun that he
13 tried to sell but he never had.  Okay, I will admit, the
14 government did not anticipate everything that the defense was
15 going to make up in this courtroom.  But when they stood up
16 there and tried to say that Casey Brennick wanted to sell a gun
17 and so somehow that was the murder weapon, we actually called
18 Casey Brennick's father here, got him on a plane, put him in
19 front of you, showed it to you all, and guess what?  The gun
20 they were talking about was a Ruger.  So that's not the murder
21 weapon.  And Mr. Brennick had it the whole time.  So it's -- a
22 Ruger isn't the murder.  It had to be a Smith & Wesson, a
23 Taurus, or a Llama.

24          So, yes, I don't know how that's evidence that the
25 government didn't investigate.  What they did is when the

1    defense started making things up, we've hauled somebody in and

2    said, okay, it's not that guy either.  It's not a question of

3    lack of evidence.  It's a question of responding to things that

4    were brought up that were complete red herrings.

5         And, apparently, the whole dragging Hannah Belisle and

6    that family and Debby Hopkins and her family through the mud, I

7    guess they've abandoned that as a theory for murder.  I mean,

8    it never went anywhere, and it never went anywhere because

9    there was no motive for this murder except a co-worker.

10        You know, what the defense did with this is -- when

11   Supervisory Special Agent Morton was here, he talked about the

12   fact that looking at this crime scene with his years of

13   experience, both, you know, nationally and internationally,

14   this was a personal targeted murder, he called it, somebody who

15   wanted to kill these two men, both of them.  But he also said

16   one of the factors he looked at in addition to the crime scene

17   was the characteristics of the victims, and they didn't seem to

18   be high-risk individuals.  And, apparently, glomming onto that

19   statement, the defense takes us through three weeks of trashing

20   the families, which I guess they've now abandoned.  Okay.  The

21   Belisle family had nothing to do with the murder, and neither

22   did the Hopkins family.  This was a co-worker targeted murder.

23        Now, we also heard that this could have been random

24   and -- I don't know, somebody would have tried to break in the

25   back door and kill them.  But you need to remember something.

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 186 of 222

1    You have the pictures.  All of the blood was contained within

2    those two rooms.  Where Rich Belisle was killed, there was

3    actually not a lot of blood around him.  Where Mr. Hopkins was

4    killed, there was a lot of blood.  There was not a speck, a

5    spot, an iota of blood outside those two rooms on the egress

6    area.

7           So their theory that somebody, you know, random person

8    was standing over them and killing them and would have gotten

9    them on their shoes, I don't even know where that came from,

10   because it couldn't possibly have happened.  There were no

11   bloody footprints.  We brought in everybody that had been on

12   the scene to show it hadn't been contaminated.  Every single

13   person told you there were no bloody footprints.

14          There wasn't evidence that we didn't find there.  The

15   murderer killed them, stood over them, stepped out of the

16   blood, and shot them again.  So there were no blood spots on

17   the floor.  There was no trace evidence to lead to anything.

18   There was nothing on the shoes, because if there was blood on

19   the shoes, it would have been on the floor.  So there isn't a

20   lack of evidence.  There's planning and motive in this case.

21   And, obviously, there would be no fingerprints or DNA of -- I

22   mean, the fingerprints and DNA of Mr. Wells is useless at the

23   crime scene.

24          So now the defense says, well, there were eight

25   unidentified fingerprints.  Yeah, there were.  Obviously,

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 187 of 222
(720) 384-8078  attrans@sbcglobal.net

1   they're not fingerprints of people with a criminal record,

2   because it was run through that database.  But if you look at

3   where they are, they were on the woodshop doors, places where

4   the murderer wasn't, and I believe it was inside of the boiler

5   room was the only fingerprint that was even within miles.  And

6   that's not a place the murderer would have been either.

7         I'm sorry to make you do this, but if you look at the

8   pile of blood under Mr. Hopkins, you will see, you couldn't

9   have walked into the boiler room, and I don't know why the

10  murderer would -- to put that fingerprint there.  And

11  fingerprints don't have a timeline on it.  It could have been

12  from any time.  And if some member -- could be some member --

13  of a family member, whatever.  We know that it's not an actual

14  serving Coast Guard member, because they're in the database,

15  and we know it's not a criminal.  Okay.  So this theory that

16  the fingerprints show somebody else is -- it's a red herring

17  and it's nothing.  The fingerprints, there were none that the

18  murderer would have left on the scene.

19        Okay.  Now we have -- the doors were ajar.  Well,

20  that's actually a little bit odd, because what happened is when

21  Trooper Jones went around, it was after the military police

22  people had been there.  So he took the photos after they had

23  done the rounds.  And the -- there was -- one of the guys that

24  had been -- I think it was Bullis who had done the round the

25  night before, had said he seated the door, but he obviously

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 188 of 222

1    didn't check that it was locked.  The one to the boiler room

2    probably was not locked that night.  But, of course, it was

3    locked from the inside so you couldn't get in.

4         And the other door that counsel keeps talking about was

5    a screen door of an arctic entry, and the door inside was

6    locked.  And I remember when he was here, he went through the

7    pictures and mentioned it was ajar 17 times.  I think that's

8    what I counted.  But it was screen door.  The one inside was

9    locked.  And there's no evidence somebody tried to get in

10   there.

11        And let me just ask you to use your common sense.  Rich

12   Belisle is shot and killed sitting in Jim Wells's desk chair,

13   which, by the way, is right next to his desk.  It is -- his

14   desk was not at the end.  So he's sitting.  Maybe he had the

15   time to put a hand up when he's shot.  And Hopkins still has

16   the blouse in his hand and turns toward the door when he's shot

17   in the face.

18        In order to believe this defense theory that somebody

19   was trying to break in the back door and kick in the boiler

20   room door, somebody -- they would have had to sat there and

21   said, "Please come in and murder us.  I'm just going to sit

22   here while you're trying to break in the door.  Now I'll sit

23   here while you go try the arctic entry.  Now I'll sit here

24   while you wander around."  It's totally ridiculous, it's not

25   what happened, and it makes no sense.  You're not try --

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 189 of 222
(720) 384-8078   attrans@sbcglobal.net

1   required to get rid of your common sense to do this case.  The

2   crime scene showed they were sitting, they were surprised by

3   the murderer.  It was not somebody trying to get in deadbolted

4   doors.

5          Let's talk for a minute about the gun.  We just heard

6   that no one saw the revolver.  Except that's not what you heard

7   in the evidence.  The revolver that was left with Mr. Wells,

8   the 629 Smith & Wesson that qualifies as one of the murder --

9   potential murder weapons, was at Jim Wells's house.  He did

10  what he often does when he does something wrong, what he did

11  here.  He's just told Mr. Stein, "I don't know what happened to

12  it."

13         But people did see it with him.  A friend of his,

14  Robert Pletnikoff, said, "I was hunting with him.  He didn't

15  usually take a handgun, he took a rifle."  I think Mr.

16  Pletnikoff said it was a 7-millimeter.  I may have that wrong.

17  I admit I'm not a gun person.  "But he didn't usually have a

18  handgun, but I saw him with that silver revolver that one

19  time."

20         And then Luke Robinson, very close friend of the

21  family, somebody who clearly loved the Wells family, comes in

22  and said, "Yeah, I saw a silver revolver on the counter."  So

23  the statement that there was no evidence and no one ever saw it

24  isn't true.  In fact, two people told you about it.  Okay.

25         Let's talk about the Red Ranch, or what I would sort of

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 190 of 222

say the red herring Red Ranch.  So the defense claims nobody
investigated because nobody went up Anton Larsen Bay Road.  But
then, as they admit, Alex Doran, in fact, did go up Anton
Larsen Bay Road.  And nobody investigated -- well, wait a
minute, he told you he flew over in a fruit -- flute -- excuse
me, I'm sorry.  Been a long day.  He flew over in a floatplane
and spoke to the Old Believers -- I think he didn't use the
term "Old Believers," I think he used a wrong term; I don't
remember what it was -- for the community out there.  And he
also had to move a boulder to get to the parking lot at the
end.  And there was no white truck there which he was looking
for.  And, obviously, if he had seen a blue vehicle that
resembled this one, he would have told somebody.  So, in fact,
people did go up there.  Yes, he didn't see anybody at the
ranch at that time.  And what Mr. Pearson told is us "I went --
I'd be -- I was at work, and if my wife wasn't there, it
would -- you would think it was abandoned."

        And this story about, well, they should have searched
all the buildings -- why?  I mean, I guess you could argue that
they should have searched every person in Kodiak.  But there
was no evidence connecting anything up there to the murder.  As
was told to you a number of times, this building was obscure.
The three law enforcement investigators, Dupras, Aaron Woods,
and Joe Sturgis, had never been in it.  It's an obscure
building with almost no windows in the front.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 756  Filed 09/23/14  Page 191 of 222
(720) 384-8078  attrans@sbcglobal.net

1          So this theory that you should investigate a -- you

2    know, this is not a commonly used road.  John Pearson told you

3    that, one, he would almost always know if somebody came by;

4    you'd see the headlights at night.  I mean, nobody came by the

5    night before the murder.  And, two, most of the winter it

6    wasn't passable, you know.  It goes out to a community of about

7    a dozen people, the Old Believers.  So this theory that someone

8    snuck over the road and did this is also ridiculous, because it

9    had to have been committed by someone who knew the place, knew

10   these people, and wanted to kill them.  So this whole Red Ranch

11   thing, and you should have searched all the -- I guess the

12   crushed trailer and the empty buildings -- is just a red

13   herring.

14         So, yes, the government didn't bring Mr. Pearson here

15   until the end.  And you're right.  The government did not

16   anticipate everything the defense was going to bring up.  But

17   the fact that they could disprove it -- that we could disprove

18   it in about a day shows you it had no basis.  When the defense

19   started to talk all about the ranch, we -- you know, Mr. Biocic

20   said, "Well, I hadn't been there in a year and a half."  So the

21   government went out and found the guy that did live there, and

22   he clearly didn't do it -- or maybe that was the defense theory

23   that he did.

24         Yes, it wasn't a lack of investigation.  It was the

25   defense being -- appropriately, the defense came up with some

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 192 of 222

inventive theory that makes no sense. It took a day or two to
find the guy that lived there and bring him in here. Okay,
that one's gone. He was the guy living there. It's not like
there's a huge community out there. Okay.

So -- oh, we also had the theory that that bootprint
was somebody trying to kick in the door. And I don't know
about you guys, but, remember, Mr. Wells, like the -- Cody
Beauford said, as he was withdrawing and being isolated at the
end, they found him, I think, hanging out in the boiler room
for a couple of hours, reading a book. And I don't know
whether it was Mr. Wells or anyone else, and I don't know about
you, but when I'm -- even in this case, sometimes I have a cup
of coffee and a book in one hand and I open a door like this.
I'm not saying that's what happened. I'm just saying that that
bootprint doesn't show anything. And it's certainly
meaningless when these two guys were killed with no evidence
that they had any warning. They -- and they wouldn't have been
sitting there if somebody was trying to kick in the door. So
that's a complete red herring.

Let's talk about the white truck. The defense, again
and again, came back to this white truck, because in the middle
of the night there's a white truck that drives in twice. And
yes -- I don't remember if I recognize -- Petty Officer Bullis
said -- after the murders they went back and said, "Was there
anything unusual that night? We saw a white truck." But it's,

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 193 of 222

1    like, at 10 at night, 10:20.  There's no evidence it came back.

2    It's right on the camera both times, so obviously it's not

3    somebody who was -- you know, knew how to hide from the

4    cameras.  And Special Agent Sturgis actually took the stand and

5    told you that if you watch the video longer -- you can't

6    identify, because you can't see in the dark the road going out.

7    But he said if you watched it longer, you could actually see

8    two cars heading back out.  There's actually no evidence that

9    that white car came from Anton Larsen Bay.  And if that were

10   the case, Mr. Pearson would have known it, because he told you

11   he was home that night and he can tell if a car went by over

12   the road.

13        And we also have more than that.  You know, we brought

14   you back the MilPol people.  2 in the morning, 6 in the

15   morning, they did rounds, they checked the side roads, they

16   looked for any weird cars, they went up to the golf course.  So

17   that white truck left.  It wasn't there.  It didn't sneak back.

18   There were actually rounds done.  And by the way, when Special

19   Agent Doran went across to the bay, there was no white truck

20   back there either.  So that's a complete red herring.

21        Now let's talk about -- for a minute about the black

22   truck that we just heard was clearly there, hiding the

23   building.  That was Mr. Bullis.  And he said -- it's not "Mr.

24   Bullis," but I apologize to the Coast Guard people.  I can't

25   remember his rank.  But he left.  And we brought up the video

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 194 of 222

1    and showed you with Special Agent Sturgis, he didn't leave --

2    he was heading out of the building -- until 7:35.  And he left

3    after Cody Beauford was already there and the bodies had been

4    discovered.

5         So this theory -- and I don't know where it suddenly

6    became a Chevy truck.  He said he saw a black truck, he

7    thought, around the building.  But if you actually watch the

8    video, when he's coming down, there's a black truck going up.

9    And the other black vehicle there is Coggins', Aaron Coggins'

10   vehicle.  And Aaron Coggins told you there was no car right in

11   front of him.  And Leah -- I think it was Leah Henry who was

12   also -- I think she's the silver car over, and she said there

13   was no car in front of her.  He just misstated on the stand, "I

14   thought I saw a black truck."  The one that they know has the

15   murderer.  Couldn't possibly have been the murderer, because he

16   couldn't have seen it until after the bodies had already been

17   discovered.

18        And that's why we put Special Agent Sturgis back on the

19   stand, to show you that, first of all, there was a black truck

20   going up the hill when Mr. Bullis came down, and, secondly,

21   that he didn't come down the hill until after Cody Beauford was

22   there, parked, and had found the bodies.  So that's a red

23   herring.  That didn't happen.

24        So let's talk about the tire.  I know you're getting

25   tired, ladies and gentlemen.  I'm sure you're exhausted, and I

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 195 of 222
(720) 384-8078  attrans@sbcglobal.net

am too.  I will try my best to run through this as quick as I can, and -- but it's -- you know it's important, so I'm not going to go on about that.  The tire.  Now, what you heard is the tire had 25 pounds in it when it was found by Special Agent Daryl Allison, when they took it out.  And what Mr. Bolden told you is a car with -- a tire with only 25 pounds of air in it would be more than low.  The maximum for this tire is 80.  You would have evidence of it being destroyed.  And the defense called an expert.  They say we called experts.  They called an expert too, and he never got up there and said anything different about that.

So what happened is Mr. Wells let some of the air out of the tire when he -- you know, because he needed his alibi.  And when he says the tire was in the truck, which it was -- let's talk a little bit what -- you should use your common sense on the nail.  The defense theory is that somehow a nail that's this big gets run over by a front tire and goes in vertically.  And I think you should go back there and just try this and think about it.  It's -- unless it was held straight up and down in a board, I don't think it -- there's any way that that's possible.  But I'd like you to think about it.

But the other thing is, that nail was below the level of the tread.  And Special Agent Allison told you it -- that's where it was when he found it, and that's what the pictures all show.  So how does a rock -- pick -- first of all, you have to

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 196 of 222

1    pick the nail up.  And there's a perfectly round hole.  It

2    doesn't get extended.  Apparently it goes in perfectly

3    straight, doesn't wiggle in, and somehow, as you're running

4    down the road -- remember, these actually are paved, except for

5    a small area of Bells Flats -- and it's supposedly knocked in

6    and again and again and again by a rock, I guess, or something.

7            And there's no scrape marks on the top.  There's some

8    abrasions on the very edge.  There's no possible way that nail

9    could have gotten in naturally without the nailhead being

10   scraped.  It might be one thing if it was at the very top of

11   the tread, but it's not.  It's in part -- halfway down the

12   tread, with no bright metal flecks from it being hit again and

13   again and again by a rock, which is what it would have had to

14   take to drive it in that way naturally.  And I -- you know, I

15   think you should just -- I mean, I'm sorry, my finger -- you

16   know, you put a three-inch finger up and try to run something

17   over it, and see how it would go in vertically like that.

18           But even more importantly, part of the reason that you

19   know this is a complete lie is because of the lug nut story.

20   When he said, "Gee, I had this low tire and I couldn't get the

21   lug nuts off," you know the lug nuts are a lie, because the

22   timing's bad.  So what Mr. Wells is, is he's making up an alibi

23   and it doesn't work.

24           Now let me talk a little bit about motive.  Let's see.

25   Oh, I will tell you one other thing on the tire.  Now, the

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 197 of 222
(720) 384-8078  attrans@sbcglobal.net

1   defense has said you should listen to Mr. Currie, because he

2   said it was picked up naturally.  But if you recall, Mr. Currie

3   was the tire guy that they called, their expert -- we had an

4   expert -- who had absolutely no toolmark experience.  Never

5   studied one, never been trained as one, had no toolmark

6   forensics, was -- never been qualified as a toolmark expert.

7   And he's the only guy who said it came up naturally.  The

8   Supervisory Special Agent Well -- Mills from the FBI Crime Lab

9   told you what he could do and what he couldn't.  He said it's

10  got a mark, it was -- you know, looks like it was shot by a --

11  you know, some sort of nailgun.

12          Now I want to go to a few other areas.  One is this

13  nonviolence.  And I'll call that nonviolence a red herring.

14  The defense says there's no evidence that Mr. Wells was

15  violent, and therefore he didn't do it.  Well, in fact, I want

16  to combine this a little bit with Dr. Meloy.

17          Dr. Meloy talked about all sorts of multiple murders,

18  including mass murders, which don't apply in this case, and

19  that's where the defense got some of its evidence about

20  psychotics.  He was talking about mass murders, the type of

21  things we've read in the paper.  What Dr. Meloy gave you is a

22  picture of lots of different kinds of murders.  But what he

23  told you is about one kind of murder that fits Mr. Wells to a

24  T.  And that's the predatory murder, the guy that thinks and

25  plans, and it was that whole analysis that Mr. Schroder told

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 198 of 222
(720) 384-8078   attrans@sbcglobal.net

1  you at the beginning.

2        You know, murder never makes sense.  And murder of two

3  innocent men like this never makes sense.  But in making sense

4  of it, in studying it, what Dr. Meloy said, there are people

5  who have this very hypersensitive view of their work

6  importance.  Called it narcissistic sensitivity.  And then they

7  get -- they take as an -- extra humiliations other things that

8  the rest of us might say, "Okay, my boss yelled at me, my boss

9  did this."  And they get planning.  And when they're planning

10 and thinking, most people, he said, don't act.

11       But here's what happens with those that act.  Here's

12 the characteristics of those that do when it's a planned,

13 thoughtful, prepared, you know, workplace murder, in this case

14 a co-worker murder.  Here's characteristics you will see:

15 Hyper-view of their own value.  Hyper-humiliation.  That's

16 people -- things would call run-of-the-mill insults.  80

17 percent of those don't communicate their threats, and they

18 become isolated and withdrawn before the murder.  And then when

19 they make the decision, their mood may go up.  And that fits

20 Mr. Wells to a T.

21       That alone wouldn't tell you he did it, because Dr.

22 Meloy in no way said, oh, if you find these, he's a murderer.

23 All it does is say there is a pattern of murderers that do fit

24 Mr. Wells.  We will never know why he decided to kill his

25 colleagues, but he did.  And a history of violence is not a

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 199 of 222

1  characteristic of this.  As you can imagine, this was a
2  military institution.  He was a violent man, he wouldn't have
3  had a job up until the time of these circumstances.  You know,
4  the fact that he didn't beat people and scream and yell -- I
5  mean, Dr. Meloy also talked about that.

6          That's reactive emotional violence, you know, where you
7  are screaming all at me, and I come immediately and I beat you
8  back.  That's not what this crime scene showed.  This crime
9  scene showed planning, premeditation, and a desire to kill
10 these people.  So the -- you know, he didn't scream and yell
11 has absolutely nothing to do with these -- case.

12         So -- now I want to talk a little bit about the motive.
13 And I will tell you again, murder is never -- murder of two
14 innocents like this is never going to make sense.  But what did
15 Mr. Wells actually say that came from his lips to his sister
16 and brother-in-law when they came up -- we made them -- and
17 they testified?  "Rich is an incompetent drunk."  That's what
18 he said to his brother and sister-in-law when their niece said,
19 "How are the families doing?"  "Jim Hopkins was incompetent.
20 He didn't know what he was doing.  I know it all.  They don't
21 know what they're doing."  When they told him he couldn't go to
22 the NATE conference, he said, "He's just a rigger."  Those are
23 words that came out of his mouth.

24         This was not, at the time of the murders, a happy,
25 wonderful place where everybody was getting along.  Yeah, the

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 756  Filed 09/23/14  Page 200 of 222
(720) 384-8078  attrans@sbcglobal.net

1    nonrates, the lowest of the low, lovely young people that came

2    in here, are not in the office talking to the other guys.  What

3    happened is, he withdrew.  He wasn't participating.  And what

4    Chief Reckner told you is he tried to bring him back into the

5    fold, tried to say, "Hey, we're making this decision, Jim.  You

6    want to participate?"  And Mr. Wells didn't, because he had --

7    he was withdrawn, he was becoming isolated, and he wasn't

8    participating anymore.  And we'll never know exactly why he

9    made the decision to murder, but he did.

10        Now, the statement that Mrs. Belisle at one point said

11   "Jim wouldn't do this" is taken a little out of context.  She's

12   hysterical and she's screaming.  And she's not saying, "Hey,

13   he's a great guy.  They're getting along."  What would you

14   think in your mind?  The natural -- the one guy who wasn't

15   there, that has the false story, is Jim Wells, and you'd think,

16   gee, "I -- I mean, he wouldn't do this, would he?"  And I think

17   that's just sort of not -- a statement that goes either way.

18        Go to -- so, apparently -- I guess we don't have to

19   discuss Hannah and Debby.  I don't know why the defense dragged

20   those poor families through the mud, because there was nothing

21   at all related to them.

22        So I want to sort of round up.  And I am actually

23   coming to the end, ladies and gentlemen, and the case is going

24   to go to you.  But I want to summarize how many pieces of

25   evidence explain that there's only one theory that works.  The

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 201 of 222

1  defense had no reasonable theory to explain why Mr. Wells was
2  missing, why he was lying and why he was missing for the exact
3  time the murders happened, and why the timing of switching cars
4  fits almost to the second his activity.

5      But the government does have a theory.  And I'm going
6  to talk a little bit about it.  The crime scene said this was a
7  co-worker.  That's what it said.  Something who wanted to
8  murder both of these people.  And Mr. Morton said both were
9  targeted.  Not one.  Both.  And their only connection was work.

10      So how many things line up.  Well, I'm going to do it a
11  little backwards.  If you think Mr. Wells didn't do it and we
12  haven't proved it, you'd have to believe the following:  Jim
13  Wells just happened to be the only person at the rigger shop
14  that was having work conflicts.  And you remember from the
15  Kieles, that was very angry about other people be advanced.

16      You have to say it just happened that his wife was out
17  of town, the opportunity arose, because otherwise she would
18  have seen him when he came home.  She just happened to leave
19  her car at the airport, and she just happened this one time not
20  to pick it up.  And it just happened that that car moved from
21  before when she left it and where it was found after the
22  murders.  And it just happened to be an early-model CR-V, which
23  is consistent and looks like the murder vehicle.

24      And Mr. Wells just happened that morning to have a flat
25  tire or a low tire that he didn't notice until after he left

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 202 of 222

1  near the airport.  And it just happened to be a flat tire that

2  had a nail in it, that when we sent it to an expert, because it

3  seemed odd that it was below the tread, the expert would --

4  having no knowledge of what we were looking for, said, you

5  know, that nail didn't go in naturally.

6       It just so happens that he has no explanation for the

7  34 minutes that he had, that he's missing, and it does not fit

8  his alibi.  It just happens that the lug nuts on that one tire

9  are stiff and all the other ones come off easily.

10      It just so happens that after Jim Wells shot these two

11  men five times with a .44 Magnum, or that somebody did, that

12  he's sitting there that day, and the two women that liked him

13  the most, Leah Henry, Para Upchurch, both noticed he's rubbing

14  his ears.  Because it hurts when you shoot off a .44 Magnum in

15  a cement building, as Robert Shem told you.  It just so happens

16  that his tinnitus hits exactly when it would if you just

17  murdered people.  It just so happens that the nail that's in

18  the tire has a mark having been shot from a nailgun.  And it

19  just happens that he lied about the nut -- lug nuts because he

20  decided to make up a story that day.

21      So -- and it happens that he's a -- he's got a weapon

22  that doesn't tie to him, but that he had in his possession that

23  matches the murder weapon.  And he has ammo in his house that

24  matches the ammo that was used in the murder.

25      It is not possible in the world -- and I think I'm

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 756  Filed 09/23/14  Page 203 of 222

1   missing four or five of "it just so happens" to fit this.
2   That's not reasonable.  What is reasonable is one explanation
3   that we proved in this case.  And the key evidence in that was
4   time.  The evidence that the defense never, ever mentioned in
5   its closing.  And I'm going to wrap up, really, by showing you
6   the time that's exactly with what Jim Wells did.

7           He was having trouble at work, for reasons that we'll
8   never know.  In his mind, he decided to act along that path.
9   His wife was gone.  He knew she was going to be gone at a
10  convention.  He went with her -- I mean after her when she
11  dropped the car at the airport.  Sometime along the way, either
12  after the murder or before, he moved it to the place where he
13  could trade cars without it being in the middle of the parking,
14  where he'd have the ability to do it and see if anybody was
15  around.

16          He drove out of his house that morning -- now, he knew
17  that neighbors might see him going one way or another, so he's
18  got to have some story that says why "I'm not at home, but I'm
19  not at work."  So he drives there, switches cars, gets his
20  wife's car, that other people don't know.  They all knew his
21  white truck.  He gets into another car.  He bypasses the
22  cameras, murders these two individuals, who were not -- had no
23  time to defend themselves, because they would expect Jim Wells
24  to be there.  And he goes back and switches cars, and he's
25  caught on this camera, something he didn't prepare for.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 204 of 222
(720) 384-8078  attrans@sbcglobal.net

1          And when he's asked about it, he has no explanation, no

2   theory, no idea, nope.  And he's the one man missing that

3   morning, missing with lies as to where he was and what he was

4   doing, with motive, with opportunity, with planning, with a gun

5   that matches that doesn't trace to him, on a crime scene that

6   shows a planned, premeditated, thought-out murder.  And the man

7   who did it was Jim Wells, and I ask you to find that that's

8   what happened.  Thank you.

9          THE COURT:  All right.  Could you take these two charts

10  down, please --

11         MS. LOEFFLER:  Yes, sir.

12         THE COURT:  -- and just put them down, so I --

13         MS. LOEFFLER:  Of course.

14         THE COURT:  All right, ladies and gentlemen, I'm going

15  to read you the instructions.  It won't take too long.  And

16  then we're going to pick the alternates, and you'll begin your

17  deliberations.

18         Members of the jury, now that you've heard all the

19  evidence, it is my duty to instruct you on the law that applies

20  to this case.  Copies of these instructions will be available

21  in the jury room for you to consult.

22         It is your duty to weigh and to evaluate all of the

23  evidence received in the case and in that process to decide the

24  facts.  It is also your duty to apply the law as I give it to

25  you to the facts as you find them, whether you agree with the

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 205 of 222
(720) 384-8078  attrans@sbcglobal.net

1 law or not.

2       You must decide the case solely on the evidence and law

3 and must not be influenced by any personal likes or dislikes,

4 opinions, prejudices, or sympathy.  You'll recall that you took

5 an oath promising to do so at the beginning of the case.

6       You must follow all these instructions and not single

7 out some and ignore others.  They're all important.  Please do

8 not read into these instructions or any -- or into anything I

9 may have said or done any suggestion as to what the verdict

10 should be.  That is a matter entirely up to you.

11       This is a criminal case brought by the United States

12 government.  The government charges the defendant with murder

13 in the first degree in Counts 1 and 2, in violation of 18

14 U.S.C. 7(3) and 1001(a) and (b); murder of an officer or

15 employee of the United States in Counts 3 and 4, in violation

16 of 18 U.S.C. 1114 and 1111; and possession and use of a firearm

17 in relation to a crime of violence, Counts 5 and 6, in

18 violation of 18 U.S.C. 924(c) and (j).

19       Charges against the defendant are contained in the

20 indictment.  The indictment simply describes the charges the

21 government brings against the defendant.  The indictment is not

22 evidence and does not prove anything.

23       Defendant has pled not guilty to the charges and is

24 presumed innocent unless and until the government proves the

25 defendant guilty beyond a reasonable doubt.  In addition, the

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 756  Filed 09/23/14  Page 206 of 222

1　defendant has the right to remain silent and never has to prove

2　innocence or present any evidence.

3　　　　The defendant is charged in Count 1 of the indictment

4　with murder in the first degree, in violation of Sections 7(3)

5　and 1111(a) and (b) of Title 18 of the United States Code.  In

6　order for the defendant to be found guilty of that charge, the

7　government must prove each of the following elements beyond a

8　reasonable doubt:

9　　　　First, the defendant unlawfully killed Richard W.

10　Belisle; second, the defendant killed Richard W. Belisle with

11　malice aforethought; third, the killing was premeditated; and,

12　fourth, the killing occurred at the United States Coast Guard

13　Communications Facility, Kodiak, Alaska.

14　　　　To kill with malice aforethought means to kill either

15　deliberately and intentionally or recklessly, with extreme

16　disregard for human life.

17　　　　Premeditation means with planning or deliberation.

18　Amount of time needed for premeditation of a killing depends on

19　the person and the circumstances.  Must be long enough after

20　forming the intent to kill for the killer to have been fully

21　conscious of the intent and to have considered the killing.

22　　　　Defendant is charged in Count 2 of the indictment with

23　murder in the first degree, in violation of 7(3), 1111(a) and

24　(b) of Title 18 of the United States Code.  In order for the

25　defendant to be found guilty of that charge, the government

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 207 of 222

1    must prove each of the following elements beyond a reasonable

2    doubt:

3         First, the defendant unlawfully killed James A.

4    Hopkins; second, the defendant killed James A. Hopkins with

5    malice aforethought; third, the killing was premeditated; and,

6    fourth, the killing occurred at the United States Coast Guard

7    Communication Facility, Kodiak, Alaska.

8         To kill with malice aforethought means to kill, either

9    deliberately and intentionally or recklessly, with extreme

10   disregard for human life.

11        Premeditation means with planning or deliberation.  The

12   amount of time needed for premeditation of a killing depends on

13   the person and the circumstances.  Must be long enough after

14   forming the intent to kill for the killer to have been fully

15   conscious of the intent and to have considered the killing.

16        Defendant is charged in Count 3 of the indictment with

17   murder in the first degree, in violation of Section 1114 and

18   1111 of Title 18 of the United States Code.  In order for the

19   defendant to be found guilty of that charge, the government

20   must prove each of the following elements beyond a reasonable

21   doubt:

22        First, defendant unlawfully killed Richard W. Belisle;

23   second, defendant killed Richard W. Belisle with malice

24   aforethought; third, the killing was premeditated; and, fourth,

25   Richard W. Belisle was a federal officer or employee.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 208 of 222
(720) 384-8078   attrans@sbcglobal.net

1          To kill with malice aforethought means to kill either

2     deliberately and intentionally or recklessly, with extreme

3     disregard for human life.

4          Premeditation means with planning or deliberation.  The

5     amount of time needed for premeditation of a killing depends on

6     the person and the circumstances.  Must be long enough after

7     forming the intent to kill for the killer to have been fully

8     conscious of the intent and to have considered the killing.

9          Defendant is charged in Count 4 of the indictment with

10    murder in the first degree, in violation of Section 1114 and

11    1111 of Title 18 of the United States Code.  In order for the

12    defendant to be found guilty of that charge, the government

13    must prove each of the following elements beyond a reasonable

14    doubt:

15         First, the defendant unlawfully killed James A.

16    Hopkins; second, the defendant killed James A. Hopkins with

17    malice aforethought.  Third, the killing was premeditated; and,

18    fourth, James A. Hopkins was a federal officer or employee.

19         To kill with malice aforethought means to kill either

20    deliberately and intentionally or recklessly, with an extreme

21    disregard for human life.

22         Premeditation means the planning or deliberation.  The

23    amount of time needed for premeditation of a killing depends on

24    the person and the circumstances.  Must be long enough for --

25    after forming the intent to kill for the killer to have been

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 209 of 222

fully conscious of the intent and to have considered the killing.

Defendant is charged in Count 5 of the indictment with using or carrying a firearm during and in relation to the murder of Richard W. Belisle, in violation of Section 924(c)(1)(A) and (B)(ii) and 924(j)(1) of Title 18 of the United States Code. In order for the defendant to be found guilty of that charge, the government must prove each of the following elements beyond a reasonable doubt:

First, defendant committed the crime of murder of Richard W. Belisle, as charged in Count 1 and 3 of the indictment, which I instruct you is a crime of violence; and, second, the defendant knowingly used or carried the firearm capable of firing .44-caliber ammunition during and in relation to that crime.

And that defendant used or -- a firearm if he actively employed the firearm during and in relation to the murder; defendant carried a firearm if he knowingly possessed it and held, moved, conveyed it, or transferred -- transported it in some manner on his person or in the vehicle.

Defendant is charged in Count 6 of the indictment with using or carrying a firearm during, in relation to the murder of James A. Hopkins, in violation of Section 924(c)(1)(A) and (B)(ii) and 924(j)(1) of Title 18, United States Code. In order for the defendant to be found guilty of that charge, the

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 210 of 222

government must prove each of the following elements beyond a
reasonable doubt.

First, the defendant committed the crime of murder of
James A. Hopkins, as charged in Count 2 and 4 of the
indictment, which I instruct you is a crime of violence;
secondly, the defendant knowingly used or carried the firearm
capable of firing .44-caliber ammunition during, in relation to
that crime.

Defendant used a firearm if he actively employed a
firearm during and in relation to the murder.  Defendant
carried a firearm if he knowingly possessed it and held, moved,
conveyed, or transported it in some manner on his person or in
a vehicle.

An act is done knowingly if the defendant is aware of
the act and does not, through ignorance, mistake,
or accident -- an act is done -- if the defendant is aware of
the act and does not act through ignorance, mistake, or
accident.  The government is not required to prove the
defendant knew that his acts or omissions were unlawful.  You
may consider evidence of the defendant's words, acts, or
omissions along with all other evidence in deciding whether the
defendant acted knowingly.

It is defendant's position that a person or persons
other than him committed the crimes charged.  Defendant is not
required to prove another person's guilt.  It is the

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 211 of 222
(720) 384-8078   attrans@sbcglobal.net

1 prosecution that has the burden of proving the defendant guilty

2 beyond a reasonable doubt.  If, after considering all the

3 evidence, including any evidence that another person committed

4 the crimes charged, you have reasonable doubt that defendant

5 committed the crimes charged, you must find the defendant not

6 guilty.  If, after considering all of the evidence presented,

7 you are convinced beyond a reasonable doubt that defendant

8 committed the crimes charged, you must find the defendant

9 guilty.

10      Evidence has been admitted the defendant was not

11 present at the time and place of the commission of the crimes

12 charged in the indictment.  The government has the burden of

13 proving beyond a reasonable doubt that the defendant was

14 present at the time and place.  If, after consideration of all

15 the evidence, you have a reasonable doubt that the defendant

16 was present at the time the crime was committed, you must find

17 the defendant not guilty.

18      The parties have agreed to certain facts that have been

19 stated to you.  You should therefore treat those facts as

20 having been proven.

21      You've heard evidence that defendant committed other

22 acts not charged here.  You may consider this evidence only for

23 its bearing, if any, on the question of the defendant's motive

24 and opportunity and for no other purpose.  You may not consider

25 the evidence as evidence of guilt of the crime for which the

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 212 of 222

1    defendant is now on trial.

2          Separate crime is charged against defendant in each

3    count.  You must decide each count separately.  Your verdict on

4    one count should not control your verdict on any other count.

5          You've heard testimony that defendant made a statement.

6    It is for you to decide whether defendant made the statement

7    and, if so, how much weight to give to it.  In making those

8    decisions, you should consider all the evidence about the

9    statement, including the circumstances under which the

10   defendant may have made it.

11         During the trial, certain charts and summaries were

12   shown to you in order to help explain the evidence in the case.

13   These charts and summaries were not admitted in evidence and

14   will not go to the jury room -- these charts and summaries were

15   not admitted in evidence and will not go into the jury room

16   with you.  They are not themselves evidence or proof of facts.

17   If they do not correctly reflect the facts or figures shown by

18   the evidence in the case, you should disregard these charts and

19   summaries and determine the facts from the underlying evidence.

20         Certain charts and summaries have been admitted in

21   evidence.  Charts and summaries are only good as the

22   underlying -- supporting material.  You should therefore give

23   them only such weight as you think the underlying material

24   deserves.

25         Proof beyond a reasonable doubt is proof that leaves

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1   you firmly convinced that defendant is guilty.  It is not

2   required that the government prove guilt beyond all possible

3   doubt.  A reasonable doubt is a doubt based upon reason and

4   common sense and is not based purely on speculation.  It may

5   arise from a careful and impartial consideration of all the

6   evidence or from lack of evidence.

7           If, after a careful and impartial consideration of all

8   the evidence, you're not convinced beyond a reasonable doubt

9   that the defendant is guilty, it is your duty to find the

10  defendant not guilty.  On the other hand, if, after a careful

11  and important -- and impartial consideration of all evidence,

12  you are convinced beyond a reasonable doubt that the defendant

13  is guilty, it is your duty to find the defendant guilty.

14          A defendant in a criminal case has a constitutional

15  right not to testify.  You may not draw any inference of any

16  kind from the fact that defendant did not testify.

17          The punishment provided by law for this crime is for

18  the Court to decide.  You may not consider punishment in

19  deciding whether the government has proven its case against the

20  defendant beyond a reasonable doubt.

21          At the end of the trial, you will have to make your

22  decision based on what you recall of the evidence.  You will

23  not have a written transcript of the trial.  If you believe

24  that it is necessary to have the testimony of any witness

25  played back to you after you've begun your deliberations, you

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 214 of 222

may ask to hear it.  However, you should give full

consideration to the entirety of a witness testimony without

placing undue emphasis on any portion thereof.  Any testimony

that's played back should not be considered in isolation, but

must be considered in the context of all the evidence presented

during the trial.

You with me?  I'm reading it pretty fast because each

one of you gets a copy of these, okay?  I'm going to pause for

a moment at this instruction number 39, because I told you

about evidence playback.  You may want to listen to some

evidence or you may not.  It's your choice, completely up to

you.  If you do, it would -- you'd have to come back into the

courtroom.  We would all be here, the parties -- not the

audience, the parties -- and you can have played back whatever

you thought you wanted to have played back.  You're not to talk

during that period of time.  We won't talk to you.  It's just

something you're entitled to do.  But whatever you decide to

do, any evidence that is played should not be considered in

isolation but must be considered in the context of all the

evidence presented during the trial.

I just tell you that now, because sometimes you say, "I

want playback," and you walk in and you're surprised to see us

all sitting here.  But that's the way it would go, okay.

Let me go on.  Instruction number 40.  If it becomes

necessary during your deliberations to communicate with me, you

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 215 of 222

1  may send a note through the bailiff, signed by any one or more

2  of you.  No member of the jury should ever attempt to

3  communicate with me except by a signed writing, and I will

4  respond to the jury concerning the case only in writing or here

5  in open court.

6        If you send out a question, I will consult with the

7  lawyers before answering it, which may take some time.  You may

8  continue your deliberations while waiting for the answer to any

9  question.

10       Remember that you are not to tell anyone, including me,

11  how the jury stands, numerically or otherwise, on any question

12  submitted to you, including the question of the guilt of the

13  defendant, until after you have reached a unanimous verdict or

14  have been discharged.

15       When you begin your deliberations, elect one member of

16  the jury as your foreperson, who will preside over the

17  deliberations and speak for you here in court.  You will then

18  discuss the case with your fellow jurors, to reach agreement if

19  you can do so.  Your verdict, whether guilty or not guilty,

20  must be unanimous.

21       Each of you must decide the case for yourself, for --

22  but you should do so only after you have considered all the

23  evidence, discussed it fully with other jurors, and listened to

24  the views of your fellow jurors.  Do not be afraid to change

25  your opinion if the decision persuades you -- if the discussion

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 216 of 222

1    persuades you that you should, but do not come to a decision
2    simply because other jurors might think it is right.

3         It is important that you attempt to reach a unanimous
4    verdict, but, of course, only if each of you can do so after
5    having made your own conscientious decision.  Do not change an
6    honest belief after -- about the weight and effect of the
7    evidence simply to reach a verdict.

8         Because you must base your verdict only on the evidence
9    received in the case and on these instructions, I remind you
10   that you must not be exposed to any other information about the
11   case or to the issues it involves, except for discussing the
12   case with your fellow jurors during your deliberations.  Do not
13   communicate with anyone in any way, do not let anyone else
14   communicate with you in any way about the merits of the case or
15   anything to do with it.

16        This includes discussion of the case in person,
17   writing, or by phone or electronic means, via email, text
18   messagings, or other Internet chat room, blog, website, or
19   other feature.  This applies to communicating with your family
20   members, your employer, the media or press, and the people
21   involved in the trial.  If you're asked or approached in any
22   way about your jury service or anything about the case, you
23   must respond that you have been ordered not to discuss the
24   matter and to report the contact to the Court.

25        Do not read, watch, or listen to any news or media

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 217 of 222

1   accounts or commentary about the case or anything to do with

2   it.  Do not do any research, such as consulting dictionaries,

3   searching the Internet, or using other reference materials, and

4   do not make any investigation in any way to try to learn about

5   the case on your own.  The law requires these restrictions to

6   ensure the parties have a fair trial based on the same evidence

7   that each party has had an opportunity to address.  Any juror

8   who is exposed to any outside information, please notify the

9   Court immediately.

10          Verdict forms have been prepared for you.  After you

11  have reached a unanimous verdict on the verdict, your

12  foreperson should complete the verdict form according to your

13  deliberations, sign and date it, and advise the bailiff that

14  you are ready to return to the courtroom.

15          On the day you reach your verdict, you should agree --

16  if you should agree upon your verdict before 5 p.m., you should

17  have your foreperson date and sign the verdict form unanimously

18  agreed upon by your members, and return it immediately into

19  open court in the presence of the entire jury, together with

20  any exhibits and these instructions.

21          In the event that you do not arrive at a verdict before

22  5 p.m., you may go to your homes or place of abode for the

23  night, but you must return to the jury room to continue your

24  deliberations at 8:30 a.m. the following morning.

25          Those are the instructions.  I've got 12 --

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 218 of 222

1  unfortunately, only 12 copies.  Because, unfortunately, only 12

2  of you can stay.  This is the saddest part of the whole thing,

3  when we have to -- this has been one heck of a good jury.  I

4  appreciate very much your service.  Nancy has been dreading

5  this moment, but she has the responsibility -- she's putting

6  all 15 names in that spindle.  Any of you feel that you can't

7  serve before I do this?  All ready to keep going?  Counsel, any

8  reason why we can't pick the alternates at this time?  The

9  government?

10        MS. LOEFFLER:  No.  Go ahead, Your Honor.

11        MR. CURTNER:  No, Your Honor.

12        THE COURT:  Coun -- okay.  All right, Nancy.  And, by

13  the way, whoever the alternates are, I'll talk to you in a few

14  minutes, thank you especially, personally.  All right, raise

15  your hand when your name is called.  And frequently the

16  alternates do win the Tanana Valley -- I mean, the Nenana Ice

17  Classic.

18        THE CLERK:  Number 1.  Number 4.  Number 12.

19        THE COURT:  Okay.  We'll stand in recess.  You go back

20  to the room.  You can take your notes with you.  You can talk

21  about the case.  We're going to bring the exhibits in to you

22  pretty soon.  We're going to bring the jury instructions in to

23  you pretty soon.  And go to work.  Thank you.

24    (Jury not present)

25        THE COURT:  Okay.  Let's get the exhibits together.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 219 of 222

1   Please be seated.  Okay, we've already agreed that we want

2   playback.  I want to make sure I have telephone numbers for all

3   the parties so that we can -- no one should be more than 15

4   minutes away from the courthouse in case there's a question.

5   I'll call the parties in event of any question, unless it's a

6   question such as, "Can we have some pencils, can we have" --

7   you know, those kind of questions.  But anything of substance,

8   I will bring the parties back to discuss.  What else do you --

9          MR. OFFENBECHER:  Your Honor, could I have one matter

10  at the sidebar?

11         THE COURT:  Yes.

12      (At sidebar with the Court and counsel)

13         MR. OFFENBECHER:  (Indiscernible) client who's a

14  witness for the government in trial in the Southern District of

15  New York in federal court --

16         THE COURT:  Yes.

17         MR. OFFENBECHER:  -- in our trial right now, and I need

18  to be there tomorrow morning at 9 o'clock for testimony on --

19         THE COURT:  Okay.

20         MR. OFFENBECHER:  -- looks like Monday.  So I'd like

21  permission to leave and participate telephonically --

22         THE COURT:  Okay.  You know, Mr. Curtner's the lead

23  attorney.  You work it out with him however you want to do it.

24  It's fine with -- just have to have one of you in the

25  courtroom.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 220 of 222
(720) 384-8078   attrans@sbcglobal.net

1          MR. OFFENBECHER:  Right.

2          THE COURT:  And Mr. Curtner's morning people will have

3   (indiscernible) he wants to -- if you want to make telephonic

4   (indiscernible), we'll work with you on that.  Is that fair?

5   Okay.  (Indiscernible) New York too?  No.  You're here.  Is

6   that okay?  Anything else?

7          MR. OFFENBECHER:  Yeah, I just wanted to

8   (indiscernible).

9          THE COURT:  I don't have a problem with that.

10  (Indiscernible) see you again (indiscernible).

11      (End of sidebar)

12         THE COURT:  Okay.  Are we gathering the exhibits

13  together?

14         MS. LOEFFLER:  We have to go back to our office, Your

15  Honor, (indiscernible).

16         THE COURT:  Okay, get your exhibits together.  I'm

17  going to go thank the alternates again.  I'll be back, and

18  don't leave until I come back again to -- you leave to get your

19  exhibits, and, Nancy, get any information you need from them.

20  Okay?

21         THE CLERK:  Yes, Your Honor.  Okay.  All rise.  This

22  matter stands in recess, subject to call.

23      (Proceedings concluded at 3:38 p.m.)

24

25

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 756   Filed 09/23/14   Page 221 of 222
(720) 384-8078  attrans@sbcglobal.net

1                          CERTIFICATE

2      I certify that the foregoing is a correct transcript from the
       electronic sound recording of the proceedings in the above-
3      entitled matter.

4
       ___s/Teresa K. Combs_____        _____9/21/14_____
5      Teresa K. Combs, Transcriber          Date

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net