1             UNITED STATES DISTRICT COURT

2           FOR THE DISTRICT OF ALASKA

3  UNITED STATES OF AMERICA     )  Case 3:13-cr-00008-RRB
                          )
4         Plaintiff,     )  Anchorage, Alaska
                          )  Wednesday, September 10, 2014
5     vs.              )  1:17 o'clock p.m.
                          )
6  JAMES MICHAEL WELLS,       )
                          )
7        Defendant.     )
  _____)  **RESTITUTION HEARING**

8

9           **TRANSCRIPT OF PROCEEDINGS**

10     BEFORE THE HONORABLE RALPH R. BEISTLINE
            UNITED STATES DISTRICT JUDGE

11  APPEARANCES:

12  For the Plaintiff:     BRYAN D. SCHRODER
                      Assistant U.S. Attorney
13                    Office of the U.S. Attorney
                      222 West 7th Avenue, #9, Room 253
14                    Anchorage, Alaska  99513-7567
                      (907) 271-5071
15

16  For the Defendant:     F. RICHARD CURTNER
                      Federal Defender
                      Office of the Federal Public Defender
17                    601 West 5th Avenue, Suite 800
                      Anchorage, Alaska  99501
18                    (907) 646-3400

19  Probation Officer:     MARCI LUNDGREN
    (Telephonically)      U.S. Probation/Pretrial Services
20                    222 West 7th Avenue, Box 48, Room 168
                      Anchorage, Alaska  99513-7562
21                    (907) 271-5492

22  Court Recorder:        NANCY LEALAISALANOA
                      U.S. District Court
23                    222 West 7th Avenue, #4, Room 229
                      Anchorage, Alaska  99513-7564
24                    (907) 677-6111

25

```
 1   APPEARANCES (Continued):

 2   Transcription Service:    A & T Transcripts
                               6299 West 111th Avenue
 3                             Westminster, Colorado  80020
                               (720) 384-8078

 4

 5   Proceedings recorded by electronic sound recording; transcript
     produced by transcription service.

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 793  Filed 03/16/15  Page 2 of 37

**ANCHORAGE, ALASKA - WEDNESDAY, SEPTEMBER 10, 2014**

1

2

3      (Call to Order of the Court at 1:17 p.m.)

4      (Defendant present)

5           THE CLERK:  His Honor the Court, the United States

6  District Court for the District of Alaska is now in session,

7  with the Honorable Ralph R. Beistline presiding.  Please be

8  seated.

9           THE COURT:  Okay.  We're on the record, United States

10 of America versus James Michael Wells, case number 3:13-8.

11 This is the time set for restitution hearing.  I see the

12 parties have filed some documents with the Court.  What's the

13 government's plan?

14           MR. SCHRODER:  Your Honor, the government has the

15 burden of demonstrating the restitution amount, which I

16 think -- my reading of the law is we've already met that by

17 filing the report of Dr. Taylor.  However, we do have Dr.

18 Taylor here today, and I'm ready to put her on and give the

19 Court -- it's not an extensive rundown of the analysis, but let

20 her explain her analysis of the report.

21           THE COURT:  Okay.  Mr. Curtner, what's your position?

22           MR. CURTNER:  Well, we'll hear from Ms. Taylor and --

23           THE COURT:  Okay.  All right, very well.

24           MR. SCHRODER:  Government calls Dr. Laura Taylor.

25           THE COURT:  Good afternoon, ma'am.  You just need to

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 793   Filed 03/16/15   Page 3 of 37

1 get up there fairly close to that chair, then my clerk will

2 swear you in and we'll go from there.

3        THE CLERK:  Please raise your right hand.

4        **LAURA TAYLOR, PLAINTIFF'S WITNESS, SWORN**

5        THE CLERK:  Okay.  Thank you.  Please have a seat.

6 And, ma'am, if you can please state and spell your full name.

7        THE WITNESS:  Name is Laura Taylor, spelled L-a-u-r-a,

8 last name T-a-y-l-o-r.

9        THE CLERK:  Thank you.

10       THE COURT:  All right, counsel.

11                    **DIRECT EXAMINATION**

12 BY MR. SCHRODER:

13 Q   Dr. Taylor, what's your occupation?

14 A   I'm an economist.

15 Q   And as an economist, do you -- are you part of a business

16 or do you work for yourself?

17 A   So I have two areas of employment.  I have a sole

18 proprietorship where I do consulting work such as this, and I

19 also am on the faculty at Willamette University in Salem,

20 Oregon.

21 Q   So let's talk about your consulting work.  What kind of --

22 A   Uh-huh (affirmative).

23 Q   -- consulting work do you do?

24 A   In most civil litigation, personal injury and wrongful

25 death and wrongful termination claims, where I put together a

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 793   Filed 03/16/15   Page 4 of 37

**TAYLOR - DIRECT**

1  estimation of economic damages --

2  Q    Okay.

3  A    -- resulting from some sort of tort.

4  Q    And do you generally do -- is it personal type of

5  economics or business damage?

6  A    I only do personal cases.

7  Q    And how many cases have you been involved in where you've

8  provided this kind of economic analysis, roughly?

9  A    I don't -- roughly, yeah.  I don't --

10 Q    Yeah.

11 A    -- have an exact number, but I would say, I mean, well

12 over 200.

13 Q    And what were you asked to do in this case?

14 A    In this case I was asked look at the two decedents and

15 look at their earnings and benefits information and to put

16 together a -- an economic loss calculation.

17 Q    And how often have you done this type of economic loss

18 calculation?

19 A    So -- overall, again, I --

20 Q    Yeah.

21 A    -- would say more than a couple of hundred times.

22 Testifying, around 20 times, maybe.

23 Q    So when you say you've done a couple hundred cases, it's

24 mostly this kind of analysis that you've done in those cases.

25 Is that correct?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 793   Filed 03/16/15   Page 5 of 37
(720) 384-8078  attrans@sbcglobal.net

1 A   Oh, I understand your question now.  Yes, in -- in --

2 every case involves some sort of economic damages analysis, so

3 every case would be -- you know, all cases have their little

4 twists and turns, but they all generally would be this kind of

5 analysis.

6 Q   Right.  Now let me go back and ask you a few questions

7 about --

8 A   Uh-huh (affirmative).

9 Q   -- your educational background that brought you into this

10 field.  Do you have an undergraduate degree?

11 A   I do.

12 Q   In what area?

13 A   I have two bachelor's degrees, one in economics and one in

14 Russian.

15 Q   And from where?

16 A   From Goucher College in Towson, Maryland.

17 Q   Okay.  And do you have a postgraduate degree?

18 A   I do have a master's degree in economics from DePaul

19 University.

20 Q   And how about Ph.D.?

21 A   I have a Ph.D. in economics from Colorado State

22 University.

23 Q   And you mentioned at the start you're also employed in

24 academia.  So what --

25 A   Uh-huh (affirmative).

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 793   Filed 03/16/15   Page 6 of 37
(720) 384-8078  attrans@sbcglobal.net

1  Q  -- do you do?

2  A  I teach economics at Willamette University.  I'm in the --

3  I'm a tenured professor at Willamette.

4  Q  And how long have you been doing that?

5  A  I started at Willamette in 2005.

6  Q  And are you in leadership positions at Willamette as well?

7  A  I am.  I -- I've been department chair in the past.  I'm

8  currently chair of the International Studies Program.  I serve

9  on elected councils.

10  Q  Okay.  Are you a member of any professional organizations

11  or societies?

12  A  I'm a member of three forensic economic societies, yes.

13  Q  Okay.  And could you give us the names of those?

14  A  Yes, the Collegium of Pecuniary Damages Experts.  It's

15  quite the mouthful.  The National Association of Forensic

16  Economists.  And the American Academy of Economic and Financial

17  Experts.

18  Q  And do any or all of those relate to the type of analysis

19  that you were asked to do in this case?

20  A  They all relate to that.

21  Q  Okay.  And have you published any papers in peer-reviewed

22  publication topics related to forensic economics?

23  A  Yes, I have.

24  Q  And any related specifically to Alaska?

25  A  I would say yes.  So -- I wrote a paper on the legal

1    framework under which these kinds of damages calculations are

2    done in the state, based on case law and statutory law.

3    Q    Okay.  And do you have a -- I mean, do you have other

4    connections to the State of Alaska, or just professional?

5    A    Well, I grew up here.  I grew up in Fairbanks.

6    Q    All right.

7    A    Yeah.

8    Q    And do you have any papers you published related to

9    military?

10   A    Yes, I co-authored a paper on how to value military

11   retirement pensions.

12   Q    You said you've testified before on a number of occasions.

13   A    Uh-huh (affirmative).

14   Q    Any criminal cases?

15   A    I have test -- I have had my reports presented in criminal

16   cases, yes.

17   Q    And have you been declared an expert before?

18   A    I have in both federal and state courts.

19   Q    All right.  In criminal or civil cases?

20   A    In both criminal and civil.

21   Q    All right.  And have you been declared an expert in

22   Alaska?

23   A    I have.

24   Q    In both federal and state courts?

25   A    Yes, both federal and state in --

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1  Q    All right.

2  A    -- Alaska.

3  Q    All right.  More than once?

4  A    More than once, yes.

5          MR. SCHRODER:  Your Honor, the government moves that

6  Laura Taylor be declared an expert in the -- witness of

7  forensic economics.

8          THE COURT:  Any voir dire?

9          MR. CURTNER:  No, Your Honor.

10         THE COURT:  All right.  She'll be received in that

11 capacity.

12 BY MR. SCHRODER:

13 Q    Okay, Dr. Taylor, I think we talked about generally what

14 kind of analysis you did in this case, and you did it for both

15 the victims, Mr. Belisle and Petty Officer Hopkins.  Is that

16 correct?

17 A    Yes, I did.

18 Q    All right.  Now, you said you've done this analysis many

19 times.  Was the process you used in this case essentially the

20 same process or was it different in some way?

21 A    No, it -- it -- I mean, every -- again, every case has its

22 little twists and turns, but the essential approach is the

23 same.

24 Q    Right.  And is this an unusual type of analysis in your

25 field?

Case 3:13-cr-00008-SLG   Document 793   Filed 03/16/15   Page 9 of 37

1  A    Not unusual, no.  I mean, this is equivalent to a civil

2  wrongful death calculation.

3  Q    And is there anything unusual that you found in this case

4  compared to other cases where you've done the same type of

5  analysis?

6  A    Not unusual.  I would say it's less common to consider

7  survivor benefits, which were an issue in this case in terms of

8  making that deduction, but I -- that's not unusual, just not

9  often.

10 Q    Okay.  Now, the final number you were trying to find,

11 you've listed as a total loss amount.  What does that mean?

12 A    It -- it means that when you -- at the end of the day,

13 when you look at the loss -- the survivors for the loss and

14 earnings and benefits and household service support, that's the

15 final loss -- net loss number in present value terms.

16 Q    Okay.  And let's talk about the first one.

17 A    Uh-huh (affirmative).

18 Q    There's -- or let -- let's -- first let's say -- what was

19 your final conclusion as to the total loss amount for Mr.

20 Belisle?

21 A    It was $770,000.

22 Q    Okay.  And what was your calculation and conclusion on the

23 total loss number for Petty Officer Hopkins?

24 A    713,000.

25 Q    Now, you said there were two component parts to this,

**TAYLOR - DIRECT**

1  earnings loss and household services loss.  So let's talk about

2  the first one.  What is earnings loss?  What is that

3  calculation to you?

4  A    So you look at the individual's employment at the time of

5  his death.  You anticipate when that individual would have

6  exited the labor force.  You look at the benefits, the pension

7  benefits, for example, that the individual received related to

8  his employment, add those things up together, any retirement he

9  was already receiving, and then you make some appropriate

10 deductions for some taxes and consumption and the survivor

11 benefits.

12 Q    And what about household services loss?  What is that?

13 A    So when you do household services loss, typically the

14 approach is to look at statistical data.  So the idea is that

15 the decedent would have provided services to the household such

16 as -- think about mowing the lawn and taking care of the cars

17 and -- and cooking dinner.  And because those services are no

18 longer able to be provided by the decedent, you're looking to

19 value the replacement cost of those services.

20 Q    And you said you -- you mentioned statistical --

21 A    Uh-huh (affirmative).

22 Q    -- analysis or you used statistics for that?  Where do

23 those statistics come from?

24 A    It's a -- specifically a publication called "The Dollar

25 Value of a Day."  And those numbers come from the American Time

1  Use Survey, which is something that's published, I believe, by

2  the Bureau of the Census --

3  Q    Okay.

4  A    -- on the Bureau of Labor Statistics Website.

5  Q    So that is a government publication?

6  A    It is, yes.

7  Q    Now let's go back to -- let's talk about each of the

8  victims specifically, first Mr. Belisle.  What were the sources

9  that you considered for his lost income?

10 A    From the earnings category, he had his civilian earnings

11 with the U.S. Coast Guard, as well as a -- a small amount of

12 part-time employment with the Kodiak Island School District.

13 And then on the pension side, he received an employer match for

14 his defined contribution plan.  He received a military pension.

15 And then he later would have participated as a federal employee

16 in the FERS pension system.

17 Q    Okay.  And how did you get to the figure you reached for

18 his household services --

19 A    So I looked at --

20 Q    -- loss?

21 A    I -- I looked at data for an individual -- a male, right,

22 who's married, who doesn't have any children in the house, and

23 just took aggregate statistical data.  So under the assumption

24 that he might have provided more hours or fewer hours, but what

25 do men of his demographic typically provide to the household.

1  Q    And were there any key assumptions that you had to use, or

2  what were the key assumptions you had to use to do this

3  analysis?

4  A    Well, a couple of independent contributions that I had to

5  make included things like how would his wages have changed over

6  time, what that growth rate would have been, when would he have

7  exited the labor force.  And so I used, again, stati -- you

8  know, some -- some data for that.  What -- how would the

9  pension have changed over the years, in terms of how would it

10 have grown, you know, what's the forecasted inflation rate, for

11 example.

12 Q    Okay.  And are any of these unusual for this type of

13 analysis?

14 A    No, I -- I used very standard sources, very credible data.

15 Q    Okay.  In your report you use the terms "past loss period"

16 and "future loss period."  What does that mean?

17 A    So I'm just demarcating at the date of sentencing with

18 this idea that from the date of death to sentencing, those are

19 sort of known past loss amounts.  And then the future

20 projections are -- are taken out into the fut -- into the

21 future, of course, and then have to be reduced to a present

22 value date, because we're making a decision on an amount --

23 Q    And when you say --

24 A    -- today.

25 Q    -- reduced to present value date, what does that mean?

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 793   Filed 03/16/15   Page 13 of 37
(720) 384-8078  attrans@sbcglobal.net

1  A    I mean discounting with an interest rate to present value.

2  Q    Okay.

3  A    Yeah.

4  Q    What the money's worth now versus what it might have been

5  worth 20 years from now?

6  A    Correct.  So -- so, for example, we might be talking about

7  earnings in 2020, what would that be worth in today's dollars.

8  Q    Now, also in your report you state that the losses are

9  presented net of appropriate taxes, Mr. Belisle's own expected

10  consumption, and Mrs. Belisle's OWCP survivor benefit.  What

11  did you mean by that?

12  A    So I'm trying to get to a net figure in terms of the loss.

13  So I have to consider the fact that Mr. Belisle would have paid

14  taxes on his earnings.  I have to consider the fact that some

15  of his money would have -- spent on own maintenance.  That's

16  what we call personal consumption.  And so that wouldn't have

17  gone to the survivors anyway.  That would have paid for his

18  food and clothing and things like that.  And I have to consider

19  the fact that some of the loss is already being compensated,

20  right, in the form of a survivor benefit.  So I don't want to

21  double -- I don't want to double-count that.

22  Q    Right.  And it is common to use -- in this type of

23  analysis to exclude those factors?

24  A    It is, yes.

25  Q    Is there anything -- I think I asked this already, but was

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1  there anything unusual in the calculation you had to do for Mr.

2  Belisle?

3  A    No, it was very straightforward math.

4  Q    Okay.  All right, now let's talk briefly about Petty

5  Officer Hopkins.

6  A    Uh-huh (affirmative).

7  Q    What were the sources you considered for his lost income?

8  A    So I considered the fact that he would have -- or assumed

9  he would have remained in the Coast Guard until his 30-year

10  date, so that's another eight years --

11  Q    Okay.

12  A    -- or so after the date of death.  And then a secondary

13  source of earnings would have been upon retirement, because he

14  was fairly young.  But he would have spent about 11 and a half

15  years in the private sector, earning in his occupation.

16  Q    Okay.  And how about the household services loss?  Was

17  that calculated similar to Mr. Belisle's?

18  A    Yes, similarly, using statistical data, yes.

19  Q    Right.  But probably different for Mr. Hopkins' age --

20  A    Right.  So -- so, for example --

21  Q    -- potentially?

22  A    -- we -- the hours would change upon retirement, and those

23  two individuals would have retired at different times.

24  Q    All right.  And what -- were there any different key

25  assumptions that you used for Petty Officer Hopkins' analysis?

**TAYLOR - DIRECT**

1  A    The only real difference was in -- in the assumption of a

2  private sector employment upon retirement from the military.

3  You know, the ages were -- were different between the two

4  decedents, so --

5  Q    Right.

6  A    -- that was special to Petty Officer --

7  Q    Now let's talk about --

8  A    -- Hopkins.

9  Q    And did you consider his profession, you know, what he did

10  in the Coast Guard, being in electronics field?

11  A    Yeah.  So what I did was I -- I matched that with private

12  sector earnings.  So I assumed he would have continued in the

13  same occupation.

14  Q    All right.  Now, you also -- let's talk a minute about one

15  special kind of thing.  You assumed that he would retire from

16  the military in 2020.  And why'd you use that number?

17  A    That's his 30-year active duty date.

18  Q    Okay.  Now, if he had retired earlier than that, let's say

19  at 20 years instead of 30 years, how, generally, would that

20  have affected your calculations?

21  A    So it -- the private sector earnings would -- he would

22  have been paid more in the private sector than he received as a

23  Coast Guard petty officer.  So by assuming he would have stayed

24  in the military until his 30-year date, that would then

25  understate the loss if we assumed he would retire earlier.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 793   Filed 03/16/15   Page 16 of 37
(720) 384-8078  attrans@sbcglobal.net

1   Q   Again, anything unique to Petty Officer Hopkins'

2   calculations?

3   A   No.  Again, very straightforward math.

4   Q   Okay.  And what were the final numbers again?

5   A   For Mr. Belisle it was 770,000.  And for Petty Officer

6   Hopkins it was 713,000.

7          MR. SCHRODER:  Your Honor, no further questions on

8   direct.

9          THE COURT:  Cross-examination.

10                    **CROSS-EXAMINATION**

11  BY MR. CURTNER:

12  Q   Good afternoon, Dr. Taylor.  As I understand your

13  testimony, you have to make assumptions and calculations based

14  on those assumptions when you do this calculation loss?

15  A   You do, yes.

16  Q   And as far as earnings, future earnings loss, that's based

17  on the assumptions in both these cases that these gentlemen

18  would retire at about the age of 62?

19  A   So -- yes.  So based on -- for Chief Petty Officer -- or,

20  excuse me -- for Petty Officer Hopkins, that's a statistical

21  retirement date based on his age and education level.  And for

22  Mr. Belisle it's based on his defined pension plan, the first

23  defined pension plan.  So for Mr. Belisle it was 62.  For Mr.

24  Hopkins it was 61.6.

25  Q   Okay.  Now, if you had -- are you aware of any of the

A & T TRANSCRIPTS
(720) 384-8078   attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 793   Filed 03/16/15   Page 17 of 37

1  testimony at the trial or any of this -- during this case about

2  the retirement, the expectations of either one of these

3  gentlemen?

4  A    I've had some brief conversations with Mr. Schroder

5  about -- yeah, about -- about the idea of how long Chief -- or,

6  excuse me -- Petty Officer Hopkins would have stayed in the

7  military.

8  Q    So if Mr. Hopkins was planning to retire in the military

9  back in 2012, that would have been an assumption that you did

10  not rely on in your calculation.  Is that correct?

11  A    That's correct.  I assumed he would have stayed in till

12  2020.

13  Q    And so if that was -- in fact, had filed a retirement

14  letter in 2012, then that would -- your assumption would have

15  been wrong that he planned to be there for 30 years?

16  A    That's correct.  He would have retired earlier than that.

17  Q    And your -- also, your assumption is when he did retire,

18  that he would have -- be fully employed.  Isn't it possible

19  that somebody -- you could also assume that somebody who's

20  retired would not be employed, and live on their retirement?

21  A    You can -- I'm -- you can make that argument.  I've

22  assumed in my calculations that, given, his age, he would have

23  continued to work for another 11 and a half years.

24  Q    Okay.  And that was your assumption based on your -- that

25  you used in this case?

1  A    Well, it's based on statistical data for someone with his

2  educational background, how long that individual would have

3  been expected to stay in the labor force.  So that number's not

4  out of nowhere.

5  Q    Now, the household services, again, your calculations are

6  based strictly on statistical data?

7  A    Right.  I didn't poll the -- the survivors and ask how

8  many hours the individuals provided to the household.  I used

9  statistical data, which is my meth -- my methodology whenever I

10 do a household services analysis.

11 Q    So normally in a civil case, would they have -- expect

12 some type of evidence of what actual household services were

13 provided by somebody in a household in order to estimate what

14 their future household services might be worth?

15 A    You -- you sometimes see that in -- in deposition

16 testimony or -- or trial testimony.  But the vast majority of

17 calculations I've seen use statistical data.

18 Q    And so in all your cases you just use statistical data.

19 You don't actually even inquire as to what type of household

20 services might be provided in a case?

21 A    I don't.  And people have a tendency to not report

22 accurately right -- those kinds of pieces of information, so

23 forensic economists like myself generally rely on the

24 statistical hours.

25 Q    Okay.  And in this case you have no idea what actual

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 793   Filed 03/16/15   Page 19 of 37

1 services were provided in either case?

2 A    I do not, no.

3        MR. CURTNER:  That's all I have, Your Honor.  Thank

4 you.

5        THE COURT:  Redirect.

6        MR. SCHRODER:  None, Your Honor.

7                        VOIR DIRE

8 BY THE COURT:

9 Q    You say you did a paper on VA or military retirement?

10 A    On military retirement, yes, so how to calculate the

11 defined benefit pension for a servicemember who is vested in

12 the military retirement system.

13 Q    In this case, for instance, I have some indication that

14 Mr. Wells would be entitled to military retirement and VA

15 payment, $2,600 or so.  Is there any way of calculating the

16 present-day value of that?

17 A    Yes.  If I had information about his monthly or annual

18 benefit, I could -- that -- present value calculation of that

19 can be done.

20 Q    And you would have to presume his life expectancy in doing

21 it?

22 A    You would.  You would -- you would have to -- I --

23 typically, I would presume a statistical life expectancy,

24 although certainly --

25 Q    Okay.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 793   Filed 03/16/15   Page 20 of 37
(720) 384-8078  attrans@sbcglobal.net

 1   A   -- a life expectancy expert could opine something

 2   differently.

 3   Q   Can you just tell me -- I don't expect you to know the

 4   answer to this --

 5   A   Yeah.

 6   Q   -- what is the life expectancy today for a 62-year-old

 7   person?

 8   A   It's going to be somewhere in the early eighties for a

 9   male.

10   Q   Early eighties.  So it's getting older.

11   A   It is -- at -- the older you are, the older you're

12   expected to live.

13   Q   Okay.

14   A   If he was 18, it would be somewhere in the high seventies.

15          THE COURT:  Anything -- any followup on that?

16          MR. SCHRODER:  No, Your Honor.

17          THE COURT:  All right.

18          MR. CURTNER:  No, Your Honor.

19          THE COURT:  All right, thank you.  Thank you, Doctor.

20          THE WITNESS:  Thank you very much.

21          THE COURT:  Uh-huh (affirmative).  The government's

22   next witness.

23      (Witness excused)

24          MR. SCHRODER:  Your Honor, we don't have any more

25   witnesses.  We're ready to argue.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1    THE COURT:  Okay.  I'll hear from the defense.

2    MR. CURTNER:  No, no witnesses.

3    THE COURT:  Okay.

4    MR. SCHRODER:  Your Honor, because this is a violent

5    crime and the most violent of crimes, restitution's mandatory

6    under the Mandatory Victims Restitution Act.  Loss is

7    determined by comparing what actually happened, the loss of

8    these two men, with what would have happened had the defendant

9    not murdered them.

10   There are a number of things the Court's not -- it's

11   not to consider under the case law:  their econom -- the

12   defendant's economic circumstances; viability of a civil suit;

13   or that the victims have been paid by some other source.  Those

14   things could potentially weigh in as offsets on the collection,

15   but are not to be considered by the Court in setting the

16   economic damages.

17   So the procedures for the government to present

18   evidence demonstrating the loss, which we've done through the

19   court testimony of Dr. Taylor -- she's calculated the earnings

20   loss and the household support loss.  While it may seem unusual

21   a little bit to see this in a criminal court, it's not really

22   that unusual in the civil work done by the federal criminal

23   courts and the district courts.  As the Ninth Circuit Court of

24   Appeals found in the *Cienfuegos* case which we've cited, while

25   calculations of future income must be based on economic

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 793   Filed 03/16/15   Page 22 of 37
(720) 384-8078  attrans@sbcglobal.net

1  assumptions, the concepts and analysis involved are well

2  developed in federal law, and thus the district court is not

3  without perva -- persuasive analogy for guidance.  With some --

4  other than a few questions on cross-examination, there's really

5  been no rebuttal to the numbers that Dr. Taylor has found.

6        The defense in their briefing has taken a position that

7  the Court has the option of not awarding damages because it's

8  too complex and better left to civil litigation.  The

9  government would argue that's incorrect.  The defendant cites

10 the case of *U.S.* *v.* *Serawop*; however, *Serawop*'s the law -- not

11 the law of this circuit.  It's a Tenth Circuit case.  For this

12 circuit, the Court must be guided by *Cienfuegos*.  In that case

13 the district court did exactly what the defendant is asking

14 this Court to do, which is put the restitution calculation off

15 because it's too complex.  The result of the *Cienfuegos* case

16 was the district court was reversed there.

17       The court in *Cienfuegos* specifically found that the

18 complexity exception, the Ninth Circuit, such as the one in the

19 MVPA, was inapplicable to violent crime, so there's no

20 complexity exception.  Moreover, the Mandatory Victims

21 Protection Act specifically instructs the Court that it can't

22 consider a possible compensation in a civil suit.

23       *Cienfuegos* court found that the way to assure the

24 awards are not based on speculation is to hold the government

25 to its burden of demonstrating the loss and to require any

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 793  Filed 03/16/15  Page 23 of 37

1  additional documentation if necessary.  And I -- we would

2  argue, Your Honor, that we've met that obligation.  And as

3  discussed above, the *Cienfuegos* court recognized that

4  assumptions, concepts, and analysis to calculate future lost

5  income are well developed in federal law, not speculative, and

6  are not too complex.

7       The government's met that burden.  The calculations of

8  Dr. Taylor are based on well-developed concepts, assumptions,

9  and analysis, not speculation.  And we request that the Court

10  award the restitution amount in the amount calculated by Dr.

11  Taylor for both Mr. Belisle and Petty Officer Hopkins.

12       THE COURT:  All right.  Mr. Curtner.

13       MR. CURTNER:  Well, Your Honor, while -- under the Act,

14  restitution is mandatory; but it's very clear that it can't be

15  speculative.  And that -- I think that's what we raised in our

16  briefing, is that some of these figures are speculative.  As

17  far as past earnings lost, those can be calculated, and we're

18  not contesting that.  But when we're getting to future earning

19  lost, obviously there are assumptions here made that were

20  contrary to the testimony we've heard at trial and at

21  sentencing as to the retirement plans for both Mr. Belisle and

22  Mr. Hopkins.  So I would say that the future earnings

23  calculation is too speculative to -- for the Court to accept as

24  proof of a -- the loss in this case for restitution purposes.

25       Speaking more specifically to household services, that

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 793   Filed 03/16/15   Page 24 of 37
(720) 384-8078  attrans@sbcglobal.net

1  is completely based on statistical data and assumptions, which

2  to me is a definition of speculation.  It's not based on any

3  evidence or facts of what kind of household services that

4  either -- would apply in either case, and so I think under

5  those circumstances that's too speculative for the -- for Ninth

6  Circuit case law.

7       So I'd ask the Court to take those factors into

8  consideration, look at what's speculative and what's been

9  proven to the court as far as coming up with a restitution

10 order in this case.  And we'd also ask that any restitution

11 order, since this case is on appeal, would be stayed pending

12 the appeal in this case.

13      THE COURT:  Okay, let's have a discussion here.  Under

14 the Mandatory Victims Restitution Act, the Court's required or

15 it's -- to consider three factors:  financial resources and

16 other assets of the defendant, including whether any of these

17 assets are jointly controlled.  No one's talked to me about

18 that today.  B, projected earnings and other income of the

19 defendant.  Given his life sentence, that's probably unlikely.

20 C, any financial obligations of the defendant, including

21 obligations to dependents.  Not aware of any obligations to

22 defendants -- to dependents.  I do have the -- a document filed

23 at Docket 698 setting forth the family assets.

24      And no one has talked to me about -- first of all, I

25 have no problem accepting the government's figures as

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 793   Filed 03/16/15   Page 25 of 37
(720) 384-8078   attrans@sbcglobal.net

1    established by the economist.  I don't think that they're

2    speculative.  I think that they're conservative.  Both these

3    gentlemen were relatively young, talented, skilled.  Whether

4    they retired from the military or went on to civilian life,

5    they had -- I think both of them had significant opportunities

6    for earnings in excess of what the doctor's talked about here

7    today.  But I think it's reasonable to accept this because

8    it's -- in my mind, it -- both figures for both of the deceased

9    are clearly reasonable as an indication -- as a conservative

10   indication of the loss to their respective estates as a result

11   of their premature death.  I don't have a problem with that at

12   all.

13           But -- and so I can enter judgment accordingly.  But it

14   seems to me that under the Victims Restitution Act, that's not

15   where my inquiry ends, because -- and tell me if I'm wrong

16   here.  We've got -- Mrs. Wells has an interest in some of these

17   assets as well.  And it says that the Court should consider the

18   financial resources and other assets of the defendant, which

19   I -- all I have is which -- is what's been given to me here at

20   Docket 698 -- including whether any of these assets are jointly

21   controlled.  I presume that they all are, because they are

22   assets that were obtained during the course of the marriage,

23   primarily.  Again, I'm not concerned about projected earnings

24   of defendant.  Any financial obligations of the defendant, I

25   only have this limited information provided to me.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 793   Filed 03/16/15   Page 26 of 37

1        So I don't have a -- any problem concluding that the
2   loss to the estates were as set forth by the government.  What
3   I'm trying to figure out is how to award these assets, to whom,
4   and -- while preserving interest that Mrs. Wells might have.
5   I'm not going to stay a decision here, because that would --
6   there's no reason to.  We've got assets, we've got the victims
7   who are entitled to compensation.  I might consider, after the
8   money has been designated, holding it in an interest-bearing
9   account until the appeal is resolved, therefore addressing that
10  issue.

11       So no one's talked to me about the things that I have
12  to wrestle with here today.

13       MR. SCHRODER:  Your Honor, I guess I -- I'm looking --
14  I'm -- I pulled open the Act here and I'm looking for those
15  three -- that section you cited, the --

16       THE COURT:  I cited --

17       MR. SCHRODER:  -- three things.

18       THE COURT:  Well, it's in the brief -- it's in your --
19  it's in Mr. Curtner's brief.  It was in the independent
20  research that I did on my own.  Mandatory Victims Restitution
21  Act -- I mean, to me, it's not a secret.  Mandatory Victim --

22       MR. SCHRODER:  No, Your Honor -- I mean, I -- I mean,
23  all that gets done.  I guess our analysis of it was that the
24  proper place to look at the ownership interest of the property
25  is on the collection end.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 793   Filed 03/16/15   Page 27 of 37
(720) 384-8078  attrans@sbcglobal.net

1          THE COURT:  Well --

2          MR. SCHRODER:  Because the number is just the number --

3          THE COURT:  Well, the --

4          MR. SCHRODER:  -- of --

5          THE COURT:  -- I'm not -- I have no problem with the

6    number.

7          MR. SCHRODER:  Yeah.

8          THE COURT:  But I have to read -- the Mandatory Victims

9    Restitution Act requires that a district court consider three

10   factors before ordering restitution.  I have no problem with

11   the number, because that's reasonable, it's conservative.  I

12   don't have any problem with that.  But it sounds like, before I

13   order restitution, I can enter a judgment as to the amounts

14   you're suggesting, but it says before I order restitution I

15   have to consider the -- these items that I've just referred to:

16   A, the finance -- resources, other assets of the defendant,

17   including whether any of these assets are jointly controlled,

18   which, you know, I can -- appears that they are.  B, project --

19   B, I'm not concerned about.  C, any financial obligation of the

20   defendant.  Okay.

21         MR. SCHRODER:  I mean, I understand, Your Honor, but

22   I'm looking and I'm not seeing where that is in the statute.

23         THE COURT:  Mr. Curtner, you cited it.

24         MR. CURTNER:  And we cited 18 U.S.C. 3664(f).

25         THE COURT:  (2)(A).

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 793   Filed 03/16/15   Page 28 of 37
(720) 384-8078  attrans@sbcglobal.net

1          MR. CURTNER:  (2)(A) through (C).

2          THE COURT:  Okay.  So I have -- as I've -- I prepared

3   for this hearing, I have no pro -- revert -- reviewed the

4   expert's reports.

5          MR. SCHRODER:  Well --

6          THE COURT:  I thought it was very reasonable, the

7   amount involved, in terms of the loss to the estate.  But then

8   I'm dealing with this language, which is step number 2.  I have

9   no problem with step number 1.

10         MR. SCHRODER:  It looks to me like it's two -- it's

11  kind of -- I don't know that we're that far apart, Your Honor.

12  It says upon -- that section you've cited says, "Upon

13  determination of the amount of restitution owed to each

14  victim."

15         THE COURT:  Okay.

16         MR. SCHRODER:  Okay, I think that's the number we're

17  talking about -- "the Court shall, pursuant to Section 3572,

18  specify in the restitution order the manner in which and the

19  schedule according to which the restitution is to be paid" in

20  consideration of those three things you've listed.

21         THE COURT:  True.

22         MR. SCHRODER:  So, I mean, I think that's our position,

23  is that the restitution amount is what we've laid out.  It's

24  the collection process that --

25         THE COURT:  Well, it's what's available to be collected

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 793   Filed 03/16/15   Page 29 of 37
(720) 384-8078  attrans@sbcglobal.net

1   from.  All the --

2         MR. SCHRODER:  Well -- and I think -- you know, one of

3   the things Mr. Curtner and I have talked about and I think we'd

4   certainly be willing to do was have a discussion with him and

5   then maybe make a proposal to the Court on how to do that.

6         THE COURT:  I have -- I -- in the last three days, I've

7   come up with three different proposals to myself.  But that's

8   not my job.

9         MR. SCHRODER:  Right.

10        THE COURT:  Because I know that there's a pile of cash

11   in the -- in Thrift Savings account.

12        MR. SCHRODER:  Right.

13        THE COURT:  I've calculated the assets, including the

14   house, take $45,000 to get it saleable, et cetera, et cetera.

15   I've looked at all that.  So I in my mind have come up with a

16   figure with cash available if everything were sold.

17        Now, I know -- understand -- I don't know -- I believe

18   Mrs. Wells is -- has an interest in those items as wife, and I

19   think this tells me I have to consider that before determining

20   the amount of restitution.  Not the amount of restitution, the

21   availability of what restitution would be taken from.  If -- I

22   think your figure is right.  If more money came up that we

23   found that was hidden in the basement or under the mattress,

24   then that big figure is still controlling.  I would have to

25   consider that.  I mean, you can think about this; it's --

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 793   Filed 03/16/15   Page 30 of 37
(720) 384-8078  attrans@sbcglobal.net

1    MR. SCHRODER:  I did -- yeah, and I just don't think

2  we're ready to make -- to do that part, Your Honor.  I think --

3    THE COURT:  Well, I know.  That's what I think too.

4    MR. SCHRODER:  Yeah.  I think we have the amount set,

5  but --

6    THE COURT:  I --

7    MR. SCHRODER:  -- I don't think we have enough --

8  frankly, I don't think we have information to go to the

9  collection piece yet, which is what that is.

10    THE COURT:  Well, I'm read -- I'm -- I can -- I wanted

11  to get this done.  I've reviewed the figures.  I think the

12  figures are reasonable.  They're based on appropriate economic

13  principles.  And, certainly, when you consider these two

14  deceased gentlemen and their life potential in terms of

15  earnings, those figures not unreasonable at all.  They're

16  conservative, in my mind.  But that's not where I'm hung up.

17  I'm hung up on the next phase.  What of this estate is

18  available for the deceased to recover from?  That's all I want

19  to know.

20    MR. SCHRODER:  Well, I -- seems to me a way to proceed,

21  Your Honor, might be to -- I think you need to set the

22  restitution amount, because I think it's --

23    THE COURT:  I've got the --

24    MR. SCHRODER:  -- there.

25    THE COURT:  -- resti -- well --

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 793  Filed 03/16/15  Page 31 of 37
(720) 384-8078  attrans@sbcglobal.net

1        MR. SCHRODER:  And then -- but then I think what you

2 could do is give the parties an opportunity for -- it doesn't

3 need to be too long.

4        THE COURT:  I -- this is exactly how I thought this

5 hearing was going to end up today.  I was going to tell you I

6 think the figures are right, but I need more information to

7 determine how -- what is available from which to take that

8 money.  And that's usually the type of thing two professionals

9 negotiate.

10        MR. SCHRODER:  Right.  And we'll -- but I still think

11 you should enter the restitution amount based on today's

12 hearing.

13        THE COURT:  I've said it.  It's all being recorded.

14        MR. SCHRODER:  Okay.

15        THE COURT:  I think your figures are accurate --

16        MR. SCHRODER:  Okay.

17        THE COURT:  -- for the amount of restitution.

18        MR. SCHRODER:  All right.

19        THE COURT:  I have no problem with that.  My problem is

20 what's available from which to take that money, given Mrs.

21 Wells' interest.  Okay?  What else can I say?

22        MR. SCHRODER:  No, I understand your position, Your

23 Honor.  So --

24        THE COURT:  Well, that's not my position.  It's the

25 law.

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 793   Filed 03/16/15   Page 32 of 37
(720) 384-8078  attrans@sbcglobal.net

1         MR. SCHRODER:  Yeah -- no, I understand.  But --

2         THE COURT:  Okay, so we -- want two weeks to brief the

3 matter?

4         MR. CURTNER:  That'd be fine, two weeks.

5         MR. SCHRODER:  I -- I'm not going to be able to do it

6 in two weeks.

7         THE COURT:  Well, three weeks.

8         MR. SCHRODER:  I have a trial in two weeks, Your Honor.

9         THE COURT:  Oh, four weeks.

10         MR. SCHRODER:  So if -- have to be four weeks.

11         THE COURT:  The sooner the better.

12         MR. SCHRODER:  Yeah, I agree.

13         THE COURT:  But I'm willing to work on this.  I'm not

14 sure we even need another hearing, but you can tell me that in

15 your briefing.  And I'm presuming -- only thing I have is

16 Docket 698, the representation by defendant as to what assets

17 are available.  If there's more assets available, then -- if --

18 or if they're subsequently discovered, that's fine.  But I'm

19 only working with the information I have.  And that tells me

20 there's assets available.

21         And I do think -- I don't want to put this off, but I

22 do think the parties should also discuss having the money put

23 in an account, interest-bearing, and held until the appeal is

24 resolved.  Because that ends any potential problem.  It secures

25 the widows' money while secures defendant's right to proceed on

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 793   Filed 03/16/15   Page 33 of 37
(720) 384-8078  attrans@sbcglobal.net

1    appeal.

2              MR. SCHRODER:  Okay.

3              THE COURT:  So any questions?

4              MR. SCHRODER:  Yes.  We -- I would just request that

5    the Court enter the restitution amount and then order --

6              THE COURT:  I'm finding today the rest --

7              MR. SCHRODER:  -- then we provide additional briefing

8    on the --

9              THE COURT:  No -- that's what I've said.

10             MR. SCHRODER:  -- manner and schedule, which is the

11   language of --

12             THE COURT:  I'm accepting the government's figures.

13             MR. SCHRODER:  Okay.

14             THE COURT:  James Hopkins, restitution is 713,005.

15   Richard Belisle, $770,470.  Accurately represents --

16   conservatively represents the loss to their respective estates

17   and would enter a restitution order so indicating.  However, I

18   think that that order has to also address the issue of how --

19   what monies are available, at least initially, from which that

20   can be taken.  So I can't finalize the process today, but I can

21   give you the relief you're asking --

22             MR. SCHRODER:  All right.

23             THE COURT:  -- as to the amount of restitution.

24             MR. SCHRODER:  Thank you, Your Honor.

25             THE COURT:  But that's not the amount recoverable,

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG   Document 793   Filed 03/16/15   Page 34 of 37
(720) 384-8078  attrans@sbcglobal.net

1   because I have to keep -- the statute says I have to keep --

2   remember that Mrs. Wells owns some of this property.

3           MR. SCHRODER:  Right.  Understand, Your Honor.

4           MR. CURTNER:  Four weeks.

5           THE COURT:  I haven't heard much from you.  Four weeks?

6           MR. CURTNER:  Yes.

7           THE COURT:  Okay.  Is that reasonable?

8           MR. SCHRODER:  Yes, Your Honor.  Thank you.

9           THE COURT:  So I'm -- look forward to briefing in four

10  weeks.  If we feel the subsequent hearing is necessary, I'll

11  schedule it or the parties can request it.  Otherwise, we'll

12  work what we have.  Frequently, these things are best resolved

13  by talking it through, because certain money is much more

14  easy -- like the Thrift Savings is much more accessible than

15  the sale of the house.

16          MR. SCHRODER:  Right.

17          THE COURT:  Good luck.  Thank you.

18          THE CLERK:  All rise.  This matter stands adjourned.

19  Court stands, subject to call.

20      (Proceedings concluded at 1:53 p.m.)

21

22

23

24

25

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG   Document 793   Filed 03/16/15   Page 35 of 37

1       CERTIFICATE

2   I certify that the foregoing is a correct transcript from the
    electronic sound recording of the proceedings in the above-
3   entitled matter.

4
        s/Teresa K. Combs                    3/12/15
5   Teresa K. Combs, Transcriber        Date

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A & T TRANSCRIPTS
Case 3:13-cr-00008-SLG  Document 793  Filed 03/16/15  Page 36 of 37
(720) 384-8078  attrans@sbcglobal.net

**INDEX**

|  | DIRECT | CROSS | REDIRECT | RECROSS | FURTHER REDIRECT |
|---|---|---|---|---|---|
| PLAINTIFF'S WITNESSES | | | | | |
| Laura Taylor | 4 | 17 | | | |

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net
Case 3:13-cr-00008-SLG  Document 793  Filed 03/16/15  Page 37 of 37