**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>*Plaintiff-Appellee,*<br><br>v.<br><br>JAMES MICHAEL WELLS,<br>*Defendant-Appellant.* | Nos. 14-30146<br>15-30036<br><br>D.C. No.<br>3:13-cr-00008-<br>RRB-1 (JDR)<br><br>OPINION |

Appeal from the United States District Court
for the District of Alaska
Ralph R. Beistline, District Judge, Presiding

Argued and Submitted July 10, 2017
Seattle, Washington

Filed December 19, 2017

Before: A. Wallace Tashima and Jacqueline H. Nguyen,
Circuit Judges, and Donald E. Walter,[*] District Judge.

Opinion by Judge Walter;
Concurrence by Judge Nguyen;
Partial Concurrence and Partial Dissent by Judge Tashima

---

[*] The Honorable Donald E. Walter, United States District Judge for
the Western District of Louisiana, sitting by designation.

**SUMMARY**[**]

**Criminal Law**

The panel reversed convictions for two counts of First Degree Murder, two counts of Murder of a Federal Employee, and two counts of Use of a Firearm in Relation to a Crime of Violence Resulting in Death; and remanded for a new trial.

The panel disapproved of the Government's interference in the status of the defendant's representation, but held that the magistrate judge's removal of the defendant's second court-appointed attorney following the Government's decision not to seek the death penalty did not constitute an abuse of discretion. The panel wrote that the magistrate judge was within his discretion to find that the federal public defender's continued representation afforded the defendant adequate representation under the Criminal Justice Act.

The panel held that the district court erred in allowing the Government to use criminal profile testimony as substantive evidence of guilt, and that the error is reversible.

The panel rejected the defendant's contention that testimonial excerpts admitted by the district court were improper character evidence under Fed. R. Evid. 404(a)(1). The panel held that the district court erred in admitting a 2003 incident that was neither inextricably intertwined nor permissible motive evidence under Fed. R. Evid. 404(b)(2).

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel upheld the admission of remaining other-acts evidence under Rule 404(b)(2).

The panel held that the district court did not abuse its discretion by allowing a forensic tire expert and a Honda expert to testify.

The panel found that the prosecutor committed misconduct in connection with the direct examination of a witness, but held that there was no prejudice, and that the district court did not plainly err in failing to declare a mistrial.

The panel held that the district court properly excluded evidence of third-party culpability.

The panel concluded that the Government's actions, unchecked by the district court at critical points, so tipped the scales of justice as to render the trial fundamentally unfair.

The panel instructed that the case be reassigned on remand in order to preserve the appearance of justice.

Judge Nguyen concurred in part. She did not join fully in Part III.A of the opinion because, although she agrees that the magistrate judge did not abuse its discretion by removing CJA-appointed counsel, she sees no need to "offer a cautionary note" on the magistrate judge's decision-making process, once the government was no longer seeking a punishment of death.

Judge Tashima concurred in part and dissented in part. He dissented from the majority's decision to reassign the

case on remand because the circumstances here were neither rare nor extraordinary.

## COUNSEL

Davina T. Chen (argued), Glendale, California, for Defendant-Appellant.

Elizabeth D. Collery (argued), United States Department of Justice, Washington, D.C.; E. Bryan Wilson, Assistant United States Attorney; Bryan Schroder, United States Attorney; United States Attorney's Office, Anchorage, Alaska; for Plaintiff-Appellee.

## OPINION

WALTER, District Judge:

Defendant-Appellant James Michael Wells ("Wells") appeals from his jury trial convictions for two counts of First Degree Murder, in violation of 18 U.S.C. § 1111(a), (b); two counts of Murder of a Federal Employee, in violation of 18 U.S.C. §§ 1114, 1111; and two counts of Use of a Firearm in Relation to a Crime of Violence Resulting in Death, in violation of 18 U.S.C. § 924 (c), (j). Wells was sentenced to four consecutive, and two concurrent, terms of life imprisonment, and ordered to pay restitution, in the total amount of $1,483,475.00, to the victims' estates. Wells challenges his convictions and restitution order. We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.

As Justice Louis D. Brandeis warned many years ago: "The greatest dangers to liberty lurk in insidious

encroachment by men of zeal, well-meaning but without understanding." *Olmstead v. United States*, 277 U.S. 438, 479 (1928) (Brandeis, J., dissenting). After all, United States prosecutors are bound to appear in the name of Justice. We are of the opinion that the Government overstepped its bounds early in the pretrial process and continued to overreach during trial. The Government's actions, unchecked by the district court at critical points, so tipped the scales of justice as to render Wells' trial fundamentally unfair. Therefore, we reverse and remand for a new trial.

## I. BACKGROUND

### A. The Crime and Investigation

Wells' convictions arise out of the deaths of Richard W. Belisle and James A. Hopkins, federal employees and Wells' co-workers at the United States Coast Guard ("USCG") antenna maintenance facility, located at the USCG Communication Station ("COMMSTA") on Kodiak Island, Alaska. COMMSTA consists of two main buildings: a large operations center, known as T1; and the antenna maintenance facility, or "rigger shop," known as T2. Most COMMSTA members work in the T1 building, while T2 maintains only eight regular employees, which included Wells and both of the victims.

Surveillance cameras captured Hopkins' truck pulling into the T2 parking lot at approximately 7:09 a.m. on April 12, 2012. Relevant footage also showed a blurry image of a small blue SUV, which had been traveling behind Hopkins, without headlights. At approximately 7:14 a.m., a small blue SUV was again captured, this time traveling in the opposite direction at almost twice the speed of the blue car captured just a few minutes earlier, traveling behind Hopkins.

Wells' typical 8.8-mile morning commute, from his residence to COMMSTA, included approximately 5.1 miles to the USCG main gate, then 1.7 miles to the Kodiak airport, and finally 2 more miles to reach T2. Along that route, various surveillance cameras are positioned to capture passing traffic and parking lots. Wells claimed that, on the morning of April 12, upon noticing that he had a flat tire, he turned around in a hotel parking lot adjacent to the airport, and drove back home to change the tire. The surveillance camera at the USCG's main entrance gate captured Wells' white Dodge pickup truck passing at 6:48 a.m., traveling away from his residence and towards COMMSTA, and then again at 7:22 a.m., traveling in the opposite direction, leaving an unaccounted for 34-minute window. At 7:30 a.m., Wells left a voicemail message on then-deceased Hopkins' phone, as well as Chief Scott Reckner's phone, explaining that he had a flat tire and would be at work as soon as he could change the tire.

At the time of the murders, Wells' wife, Nancy Wells, was away from Kodiak Island and had left her vehicle, a blue 2001 Honda CR-V, parked at the Kodiak airport. On the afternoon of April 12, a law enforcement agent, who was aware of the surveillance image of the small blue SUV, noticed Nancy Wells' car in the airport parking lot. The investigation subsequently revealed that, on April 12, the car was not parked where Nancy Wells had left it two days earlier. At trial, the Government's theory was that Wells drove his white Dodge pickup truck to the airport, where he swapped vehicles and drove Nancy Wells' blue Honda CR-V to COMMSTA to commit the murders.

At approximately 7:30 a.m., on April 12, 2012, Petty Officer Third Class Cody Beauford arrived to work at T2 and discovered the bodies of Hopkins and Belisle. Each victim

had suffered multiple gunshot wounds from a large caliber weapon. There was no evidence of forced entry or robbery, and nothing else in T2 appeared to have been disturbed. Hopkins, an Electronic Technician First Class (ET1) and the rigger shop supervisor, was found on the break-room floor. Belisle, a retired Chief Boatswain's Mate and one of the rigger shop's two civilian employees, was found in the adjacent office. Wells, the other civilian employee who would have normally been present at that time, was absent.

Each victim's arrival at T2 on the morning they were murdered was time-stamped by surveillance footage, which monitored the usual employee parking area situated at the front of T2. The times of their respective arrivals, combined with the last recorded activity on Belisle's computer and the positions of the bodies relative to the known morning rituals of each victim, led the investigators to conclude that the murders occurred between 7:10 and 7:14 a.m., on April 12, 2012. The crime window thus fit squarely within the 34-minute period of time for which Wells could not account. It was this unexplained discrepancy which captured the attention of the interviewing agents and upon which the Government relied heavily at trial.

Upon discovering the bodies, Beauford notified the USCG watch officer and requested that emergency services be dispatched. Soon after the first responders arrived, an Alaska State Trooper cleared and secured the facility, now a crime scene, for investigative purposes. Wells arrived at T2 at approximately 8:23 a.m., well over an hour past his normal start time, immediately claiming to have had a flat tire.

In the aftermath of the murders, Wells consented to a search of his truck, where law enforcement agents found and seized a tire with a nail in it. The Government sent the tire to

its forensic tire expert, Gary Bolden, for examination and testing. The tire was then returned to the FBI lab, where a tool mark examiner performed further testing on the nail and its position in the tire. Both Bolden and the tool mark examiner concluded that the nail had been manually inserted into the tire, undermining the foundation of Wells' alibi that he had picked up a nail while driving to work on the morning of the murders.

### B. The Indictment and Wells' Representation

Approximately ten months after the murders, on February 19, 2013, Wells was indicted on the following six counts: Counts 1 and 2, murder in the first degree, in violation of 18 U.S.C. §§ 7(3) and 1111(a), (b); Counts 3 and 4, murder of an officer or employee of the United States, in violation of 18 U.S.C. §§ 1114, 1111; and Counts 5 and 6, possession and use of a firearm in relation to a crime of violence resulting in death, in violation of 18 U.S.C. § 924 (c), (j). Pursuant to 18 U.S.C. § 3006A, Alaska's Federal Public Defender ("FPD"), F. Rich Curtner, was appointed to represent Wells. Within three weeks of Wells' initial appearance, FPD Curtner successfully moved to have a second court-appointed attorney, Peter Offenbecher, assigned to the then-capital case, pursuant to 18 U.S.C. § 3005. In a motion for reconsideration thereof, the Government unsuccessfully challenged, *inter alia*, the *ex parte* nature of Mr. Offenbecher's appointment.

Soon thereafter, beginning on May 7, 2013 and continuing through the conclusion of trial on April 25, 2014, the Government was represented by no fewer than three attorneys, including then-United States Attorney for the District of Alaska, Karen Loeffler. On August 5, 2013, the Government declared that it would no longer seek the death penalty. On August 21, 2013, the Government filed a motion

to remove Wells' second court-appointed counsel, arguing that Mr. Offenbecher's appointment was no longer appropriate, as this had become a non-capital case. Because Mr. Offenbecher is based out of Seattle, the Government also argued that the appointment of a geographically distant attorney could not be justified. Although it recognized that the Criminal Justice Act does not prohibit maintaining two court-appointed attorneys in non-capital cases, the Government insisted that the instant case lacked "extenuating circumstances," which might otherwise support Mr. Offenbecher's continued appointment, pursuant to the Guide to Judiciary Policy §§ 630.30.10 and 630.30.20.

FPD Curtner opposed the Government's motion, arguing that "extenuating circumstances" did exist because: Mr. Offenbecher had established an attorney-client relationship with Wells and invested considerable time and effort in reviewing discovery; Mr. Offenbecher's removal would leave FPD Curtner as the sole attorney, while simultaneously managing an FPD office in an unprecedented fiscal crisis; there were no available FPD staff attorneys to assist Curtner; and the Government's three trial attorneys constituted an unfair imbalance of resources, all of which jeopardized Wells' Sixth Amendment right to counsel.

On September 11, 2013, the magistrate judge granted the Government's motion, excusing Mr. Offenbecher and leaving FPD Curtner as Wells' sole attorney, until March 2014, when Mr. Offenbecher re-enrolled as retained counsel prior to trial. FPD Curtner filed objections to the magistrate judge's order. Therein, he stressed the unique burdens being faced by the FPD, the Government's lack of standing to interfere with counsel's appointment, and the imbalance of resources. In closing, FPD Curtner stated that "[u]nder these unique circumstances, the trial of Mr. Wells could hardly be

deemed a 'fair fight.'" The objections were never addressed, and no further action was taken by the district judge on the issue of Wells' representation.

## II.  ISSUES ON APPEAL

Wells raises the following issues on appeal. First, Wells challenges the district court's removal of his second court-appointed attorney following the Government's decision not to seek the death penalty. Second, Wells challenges the admission of expert testimony from three witnesses, one of which we address separately, for reasons explained below. Third, Wells challenges the admission of various character and "other acts" evidence. Fourth, Wells alleges prosecutorial misconduct in the elicitation of prejudicial testimony. Fifth, Wells claims that the district court abused its discretion in precluding evidence of third party culpability. Sixth, Wells requests that we reassign this case to a different district judge on remand.[1]

We do not discuss Wells' challenge to the sufficiency of the evidence, as we explicitly do not vacate the conviction on the basis of insufficiency of evidence and therefore do not risk offending the Double Jeopardy Clause in remanding for

---

[1] Wells also appeals the denial of his motion to suppress certain statements made during investigative interviews in the days following the crime. We address this challenge in a memorandum disposition filed concurrently with this opinion. Additionally, Wells has conceded two other claims on appeal. In light of recent Ninth Circuit decisions in *Arellano Hernandez v. Lynch*, 831 F.3d 1127 (9th Cir. 2016) and *United States v. Calvillo-Palacios*, 860 F.3d 1285 (9th Cir. 2017), Wells has conceded that murder is a "crime of violence" under 18 U.S.C. § 924(c)(3). Wells further concedes that binding precedent forecloses his claim that Counts One and Two are multiplicitous with Counts Three and Four, in violation of the Double Jeopardy Clause. *United States v. Hairston*, 64 F.3d 491, 496 (9th Cir. 1995).

a new trial. *See Burks v. United States*, 437 U.S. 1, 15 (1978) ("[R]eversal for trial error, as distinguished from evidentiary insufficiency, does not constitute a decision to the effect that the government has failed to prove its case[;] it implies nothing with respect to the guilt or innocence of the defendant."). Finally, because we reverse Wells' convictions, we do not discuss the restitution order, which is necessarily vacated pursuant to this opinion.

## III.   DISCUSSION

### A.  The Government Overstepped in Moving To Excuse Second Defense Counsel

A district court's decision to grant or deny services under the Criminal Justice Act ("CJA"), 18 U.S.C. § 3006A, is reviewed for abuse of discretion. *See United States v. Smith*, 893 F.2d 1573, 1580 (9th Cir. 1990). Thus, the relevant question is not whether we, as the reviewing court, would have reached the same result. *See Nat'l Hockey League v. Metro. Hockey Club, Inc.*, 427 U.S. 639, 642 (1976); *Krull v. S.E.C.*, 248 F.3d 907, 912 (9th Cir. 2001) (our task is "not to revisit the [issue] anew or impose our independent judgment on the merits" thereof). Applying this deferential standard, we do not find that the removal of Mr. Offenbecher was reversible error, but neither can we accept without comment the Government's interference in the status of Wells' representation.

Mr. Offenbecher was appointed pursuant to 18 U.S.C. § 3005. In this circuit, § 3005 does not require that two attorneys be, or continue to be, appointed whenever the Government indicts a defendant for a crime punishable by death but does not seek the death penalty. *United States v. Waggoner*, 339 F.3d 915, 919 (9th Cir. 2003). Acknowledging this Court's precedent in *Waggoner*, Wells

argues that this case is distinguishable, because *Waggoner* fails to address the impact of 18 U.S.C. § 3599(e), on which Wells relies to urge an enhanced statutory right to continuity of counsel. Because we find that Wells failed to properly present this statutory argument below, we decline to entertain it on appeal. *See Peterson v. Highland Music, Inc.*, 140 F.3d 1313, 1321 (9th Cir. 1998). Instead, we address Wells' assertion that Mr. Offenbecher's removal constituted an abuse of discretion under 18 U.S.C. § 3006A. *See Martel v. Clair*, 565 U.S. 648, 659 (2012) (recognizing that "Congress enacted the legislation now known as § 3599 to govern appointment of counsel in capital cases, thus displacing § 3006A for persons facing execution (but retaining that section for all others)").

The CJA does not prohibit courts from appointing, or maintaining, a dual appointment in a non-capital case. Instead, § 3006A(c) generally governs the duration and substitution of all CJA appointments and directs the magistrate judge or the court to make such determinations in accordance with the "interests of justice." 18 U.S.C. § 3006A(c). Section 630.30 of the Guide to Judiciary Policy ("the Guide") specifically governs "Death Eligible Cases Where Death Penalty Is Not Sought," and assists courts in determining whether a particular case supports continuation of a dual appointment.

As recognized by the magistrate judge, § 630.30.10 directs a court to consider the questions of number of counsel and rate of compensation, once it is determined that the death penalty will not be sought. The Guide, Vol. 7, Ch. 6, § 630.30.10. Section 630.30.20 explains that a court "*should*, absent extenuating circumstances, make an appropriate reduction in the number of counsel." *Id.* § 630.30.20(a) (emphasis added). The Guide then sets out the following four

factors to consider in deciding whether extenuating circumstances exist:

> (1) the need to avoid disruption of the proceedings; (2) whether the decision not to seek the death penalty occurred late in the litigation; (3) whether the case is unusually complex; and (4) any other factors that would interfere with the need to ensure effective representation of the defendant.

*Id*. § 630.30.20(b). Here, the magistrate judge adequately considered the Guide's directives and found that this case was not unusually complex, the parties were adhering to the pretrial motion schedule, the decision not to seek the death penalty was not delayed, and the continuation of FPD Curtner's representation would conserve the District of Alaska's CJA budget while protecting Wells' Sixth Amendment right to counsel and preserve any attorney-client relationship. In upholding the excusal of Mr. Offenbecher, we intentionally employ the word *adequately*, to emphasize the limitations placed on our review, and we offer a cautionary note.[2]

First, problematically, we find no indication that the magistrate judge considered the candid statements of FPD Curtner, advising of the crippling effects of the unprecedented fiscal crisis as it related to his ability to serve as Wells' sole counsel. Given FPD Curtner's statements, the absence of any explicit consideration thereof sits in stark contrast to at least one other non-capital case, wherein the

---

[2] The concurrence criticizes the inclusion of a cautionary note, in part, "because we ultimately conclude that the ruling was correct." This opinion merely finds no abuse of discretion.

same magistrate judge reconsidered his denial of dual-appointed counsel. *See United States v. Kott*, No. 3:07-CR-056-JWS-JDR, 2011 WL 2357508, at *1 (D. Alaska June 13, 2011). There, the defendant was being retried, after an initial 15-day trial, involving two retained defense counsel. *Id.* at *3. In denying dual appointment for the re-trial, the magistrate judge, *inter alia*, found persuasive that the previously-retained attorneys would be available for consultation and that the original trial transcripts would provide appointed counsel with knowledge of the Government's case. *Id.* Noting, first, that counsel had been appointed at her own request, the magistrate judge nevertheless recognized the attorney's express concerns about serving as the defendant's sole attorney. *Id.* at *4. The magistrate judge requested that the attorney "reassess her role" and advise accordingly, implying that her relative willingness to serve in that capacity would be taken into consideration. *Id.* In this Court's opinion, the careful consideration given to the concerns of appointed counsel in *Kott* is highly preferable to the lack thereof afforded to FPD Curtner in this case.

Second, and of much greater concern to this Court, is the means by which the question of Mr. Offenbecher's continued appointment was placed before the magistrate judge. After contesting the initial dual appointment, the Government again placed itself in an ethically compromised position by challenging the continuation of Mr. Offenbecher's appointment once the death penalty was eliminated. This strikes the Court as highly unusual. Indeed, it constitutes two improper insertions by the prosecution into a matter exclusively within the province of the judiciary. While such a motion would be disfavored in any setting, it is particularly so where a successful challenge would leave a uniquely beleaguered FPD battling against the unlimited

resources of the Government, on behalf of a client whose liberty is at stake. *See United States v. Hartfield*, 513 F.2d 254, 258 (9th Cir. 1975), *abrogated on other grounds by United States v. Sneezer*, 900 F.2d 177 (9th Cir. 1990) ("If the fairness of our system is to be assured, indigent defendants must have access to minimal defense aids to offset the advantage presented by the vast prosecutorial and investigative resources available to the Government."). The Government's decision to insert itself into the important determination of Wells' fair representation carries with it a reprochable air of stacking the deck, for which we cannot offer tacit acceptance.

The administration of the CJA is a judicial function for which the Judicial Conference of the United States has approved official guidelines. *In re Smith*, 586 F.3d 1169, 1172 (9th Cir. 2009). The prosecution is typically precluded from participating in the determination of a defendant's eligibility for CJA-appointed counsel. *See* The Guide, Vol. 7, Ch. 2, § 210.40.20(e) ("Employees of law enforcement agencies or U.S. attorney offices should not participate in the completion of the Form CJA 23 (Financial Affidavit) or seek to obtain information from a person requesting the appointment of counsel concerning the person's eligibility."); *id.* § 230.26.20(c) ("Case budgets should be submitted *ex parte* and filed and maintained under seal."); 18 U.S.C. § 3006A(e) (directing that CJA applications for services other than counsel should be filed *ex parte*, and proceedings on such applications should be heard *ex parte*); *see also United States v. Feldman*, 788 F.2d 625, 626 (9th Cir. 1986) (declining to call on government to brief a novel CJA reimbursement claim because "the [CJA] excludes the government from participation in the Act's compensation and reimbursement arrangements"); *United States v. Gonzales*, 150 F.3d 1246, 1257 (10th Cir. 1998) (the CJA

process is non-adversarial and has "traditionally been closed to the prosecution").

The Government's exclusion from the administration of the CJA is a significant contributing factor to the fairness of our system and the CJA's role in redressing the imbalance of power between an indigent defendant and the Government. "A contrary position might well result in a system wherein the outcome of criminal trials would be determined by the poverty of the accused rather than the integrity of the fact-finding process." *Hartfield*, 513 F.2d at 258.

While we find that that the jury's fact-finding role was reversibly undermined by errors in this case, we do not find that Mr. Offenbecher's removal constituted an abuse of discretion. Despite our disapproval of the Government's interference, and regardless of whether we might have decided the question differently, the magistrate judge was within his discretion to find that FPD Curtner's continued representation afforded Wells "adequate representation" under the CJA. 18 U.S.C. § 3006A(a). Nevertheless, in the future, the Government should tend to its own knitting.

> ### B. The District Court Erred in Allowing the Government To Use Criminal Profile Testimony as Substantive Evidence of Guilt

We generally review a district court's decision to admit or deny expert testimony for abuse of discretion. *United States v. Reed*, 575 F.3d 900, 918 (9th Cir. 2009). However, we review *de novo* the "construction or interpretation of . . . the Federal Rules of Evidence, including whether particular evidence falls within the scope of a given rule." *United States v. Durham*, 464 F.3d 976, 981 (9th Cir. 2006). Where the district court fails to engage in necessary Rule 403 balancing, we likewise review *de novo*. *United States v.*

*Boulware*, 384 F.3d 794, 808 n.6 (9th Cir. 2004) (where "[t]he district court [] did not perform a Rule 403 balancing analysis," the "review [is] de novo"); *see also United States v. Moran*, 493 F.3d 1002, 1012 (9th Cir. 2007) (per curiam).

Dr. J. Reid Meloy is a licensed, board-certified forensic psychologist, who was tendered as an expert in "targeted, intended workplace multiple-homicide violence."[3] While the parties portray the substance of Dr. Meloy's testimony differently, there is no real dispute as to the intended role of his testimony within the Government's case. This testimony was presented on the sixth day of trial, during the Government's case-in-chief, and invited the jury to find a "fit" between Dr. Meloy's criminal profile and the lay witnesses' testimony concerning Wells' own character traits.

On appeal, Wells challenges Dr. Meloy's testimony as improper "profile" evidence used as substantive evidence of Wells' guilt. For the reasons explained herein, we find that Dr. Meloy's testimony was admitted without regard to Federal Rule of Evidence 404(a)(1) or the sensitive balancing required by Rule 403. Before we reach the merits, however, we must first address the parties' dispute as to

---

[3] We decline to address Dr. Meloy's qualifications. At the outset of the tender, defense counsel requested a sidebar, during which the transcript clearly indicates that Mr. Offenbecher was confirming his "continuing objection"; however, the transcript is "indiscernible" as to the exact nature thereof. Nevertheless, the court clarified Wells' position before proceeding with the tender: "Your objection is based on relevance, not on his expertise, right?" Defense counsel then responded: "Right." It is thus clear that Wells waived any challenge to Dr. Meloy's expertise by accepting the tender without objection. *See United States v. Olano*, 507 U.S. 725, 733 (1993) (defining waiver as "the intentional relinquishment or abandonment of a known right") (internal quotation marks omitted).

whether Wells properly preserved this claim for appeal. Our analysis begins with the relevant timeline of objections.

Pretrial, Wells moved to exclude Dr. Meloy's testimony under Rules 401–403, 404(a), and 608, and requested a *Daubert* hearing. At the hearing, Wells argued, in pertinent part:

> [T]his is in the realm of creating a profile, and that could, I think, arguably only be applied to Mr. Wells if this is workplace violence. [T]his is a classic example of vague generalizations that are too broad to be admitted in this particular case under these circumstances.

In response, the Government recognized that Wells' "attack seems to be that you can't testify as to general characteristics," and then criticized the failure to cite any case law addressing the use of profile evidence. The Government also relied, then and now, on the advisory committee's note to the 2000 amendments to Rule 702, providing that it might "be important in some cases for an expert to educate the factfinder about general principles, without ever attempting to apply these principles to the specific facts of the case." Fed. R. Evid. 702 advisory committee's note to 2000 amendments.

Although the magistrate judge ultimately recognized the potential dangers in Dr. Meloy's testimony, his post-hearing ruling only peripherally acknowledged Wells' profile challenge, as follows:

> The defense complains that Melroy [sic] is creating a profile that can only be applied to the defendant if the crime was workplace

violence. That observation is not a sufficient reason to preclude the government from calling an expert witness to testify about workplace violence.

The magistrate judge further deemed it "appropriate in this case for the government to offer the opinion of a forensic psychologist as to whether certain characteristics present in this case suggest workplace violence," while recognizing that Dr. Meloy had not examined Wells personally. Finally, the magistrate judge concluded:

> [T]he subject matter of [Dr. Meloy's] proposed testimony may but not necessarily will assist the trier of fact depending on the evidence presented at trial. The probative value of Dr. Meloy's proposed testimony may or may not outweigh the danger of unfair prejudice, confusion of the issues, or misleading evidence that would be placed before the jury. At this stage of the proceedings Dr. Meloy's analysis and theories, based upon his experience and training, *are not sufficiently relevant to the case at hand to be ruled admissible at trial*.
>
> . . .
>
> *The remaining issue is whether [Dr. Meloy's] proposed testimony passes the balancing test of Federal Rules* [sic] *of Evidence 403*. The government should be given the opportunity at trial to support the issue of admissibility of Dr. Meloy's testimony before it is presented to the jury. Ruling on the Defendant's Motion

> in Limine to Exclude Testimony on Issues of
> Violence and Psychological Characteristics
> of Perpetrators of Violent Crimes, Docket
> 216 is *held in abeyance pending further*
> *consideration at trial*.

(first emphases added, last italics supplied). There were no
objections to the magistrate judge's ruling.

In his trial brief, filed on March 17, 2014, Wells
reiterated his objections to Dr. Meloy's testimony, arguing,
in part, that:

> Incidents of workplace violence are so
> common in our culture, that jurors will be
> able to apply their own common sense to
> understand this evidence without any need
> for expert interpretation. . . . The government
> has not cited a single case in support of
> admitting an expert to testify about
> workplace violence.

Although the trial brief seemed to focus on relevance and
reliability, the recently re-enrolled Peter Offenbecher
clarified his objection during the final pretrial conference, on
March 24, 2014, as follows:

> The problem comes where the experts are
> permitted to testify that a person who
> commits workplace violence has these
> characteristics, X, Y, and Z, and then–
> although they don't ask the expert to connect
> the dots, they then–the next witness testifies
> that the defendant has these characteristics,
> X, Y, and Z.

> And what they're ending up doing is having the expert–they don't connect the dots in court, but certainly the jury knows, and you end up with impermissible character evidence because they're saying the characteristics of a person who commits this crime, and there are these–you know, these particular things, and then they just line them up and they try to prove that the defendant has those characteristics.
>
> So it's just a way around the rule that you cannot permit the government to introduce character evidence or make an opinion that the defendant is the person who commits the crime.

Substantively, this is the same argument presented on appeal.

The Government countered by asserting: "It's not improper character evidence. The jury looks at it and they say, does it fit, does it not fit? And what we do is we use him to disabuse the jury of commonly held notions that basically come from TV." The Government confirmed that it intended to have Dr. Meloy describe the characteristics of those who commit "targeted individual multiple homicide workplace violences," without discussing Wells personally, because Dr. Meloy had not examined him.

The district court reflected that the Government was likely correct on this issue, because "[i]t's done all the time," but allowed Mr. Offenbecher to respond. Mr. Offenbecher pointed out that the magistrate judge had not yet ruled on the admissibility of Dr. Meloy's testimony and further noted that

the testimony was particularly problematic because, in this specific workplace, there are "only seven people . . . and two of them are deceased."[4] Mr. Offenbecher concluded with:

> So, in effect, you're permitting Dr. Meloy to testify that Jim Wells is the person who committed the crime, even though that's impermissible because it goes to the ultimate fact in the case. And also it's an attempt to get around the rule prohibiting character evidence. We're asking the Court just to abide by [the magistrate judge's] ruling on Dr. Meloy.

The district judge then acknowledged that the ultimate decision was his to make, declared that he thought that Dr. Meloy's testimony was "probably permissible," and instructed the Government to provide its questions in advance so the court could "just rule question by question." The Government agreed to do so, and the court concluded the discussion with these remarks:

> We do drug cases all the time,[5] and we ask them, experts to testify about characteristics

---

[4] Though defense counsel did not use the terms "prejudice" or "unduly prejudicial," those concerns, at the heart of Rule 403 balancing, were clearly the basis for his statement. *See United States v. Ward*, 747 F.3d 1184, 1189 (9th Cir. 2014) ("Although defense counsel did not use the term 'Fifth Amendment,' the substance of the objection was patently clear.").

[5] Presumably the district court's reference was to the use of drug courier profiles, as is the case in most of the jurisprudence relating to criminal profile evidence, discussed *infra*. Any reference thereto is particularly troubling given the narrow circumstances in which profile testimony, even that of drug courier profiles, is admissible.

> that are–you know, this doesn't shock me
> what you're talking about, but I'll look again
> to make sure that I understand the concerns
> of the defendant.
>
> . . .
>
> But again, no matter what we've already
> decided, we can't go to the–none of these
> witnesses can testify as to the ultimate
> question and ask, "Do you believe Mr. Wells
> did this?"

Thus, the district court made two erroneous assumptions: first, he presumed admissibility of this type of testimony, generally; and, second, he mistakenly believed that Dr. Meloy's testimony was, at this point, admissible. To the contrary, the magistrate judge had held his ruling in abeyance, finding that the testimony was *not yet admissible*, unless and until the district court determined that it survived Rule 403's balancing test.

Following the final pretrial conference, in response to the court's request for advance questions, the Government provided a summary outline of Dr. Meloy's anticipated testimony. This summary had previously been provided to the defense several months earlier. Therein, the Government generally advised that Dr. Meloy would "elaborate on targeted and intended violence, workplace violence, multiple murders and the personality and other psychological characteristics of those who commit these types of crimes," and specified that "Dr. Meloy **will not** be asked to give an opinion about how these characteristics apply to the known facts concerning Mr. Wells." (Emphasis in original). It further provided bulletpoints, categorically

grouped by the topics of his expertise, of "[s]ome of the characteristics" that he would describe and explain.[6] The district court issued no further ruling.

On the first morning of trial, the Government inquired as to whether the court was going to permit Dr. Meloy to testify. The district court indicated its belief that it had already ruled, and neither party pressed the issue. Later, when Mr. Offenbecher objected during Dr. Meloy's tender, the district court reiterated that the objections to Dr. Meloy had already been addressed. At that time, Mr. Offenbecher expressed concern surrounding Dr. Meloy being tendered as an expert, suggesting that it would "give [him] the imprimatur of the [c]ourt." The court confirmed that Mr. Offenbecher's objection was based on relevance rather than expertise and allowed the Government to proceed with Dr. Meloy's tender.

On review, it is regrettable that Wells' trial objections failed to specifically re-urge his pretrial argument that Dr. Meloy's testimony was improper character evidence in the form of a profile; however, the failure to do so is not fatal to the preservation of this claim. Wells' pretrial objections were clear and consistent.[7] The district court had the

---

[6] The topics of his expertise were broken down into the following categories, with outlined characteristics pertaining to each: (1) targeted and intended violence; (2) workplace violence; (3) multiple murders; (4) personality and other psychological characteristics.

[7] The Government cites *United States v. Gomez-Norena*, 908 F.2d 497 (9th Cir. 1990), to argue that Wells forfeited his claim, because objecting to expert testimony as improper character evidence is not the same ground as alleging improper profile evidence. The Government's reliance is misplaced. *Gomez-Norena* involved drug courier profile testimony admitted "for the limited purpose of providing the jury with background information." 908 F.2d at 502. This Court clearly stated that the facts therein did not implicate concerns regarding the potential for

opportunity to rule, mistakenly believed it had done so, and led the parties to believe that further argument was both unnecessary and unwelcome. Even in the absence of any trial objection, an issue may be sufficiently preserved by a party "objecting and moving for its exclusion on [the specific] basis before the commencement of trial." *United States v. Palmer*, 3 F.3d 300, 304 (9th Cir. 1993); *see also Palmerin*, 794 F.2d at 1413. Thus, this claim is properly before us, and we turn now to the merits thereof. While our concern is rooted in the Government's use of Dr. Meloy's testimony as substantive evidence of guilt, we begin by presenting the substance thereof.

At the outset of Dr. Meloy's testimony, he explicitly disclaimed any attempt to characterize Wells personally, yet he advised the jury that his process began with a review of materials and records specific to this case, and culminated with the preparation of a report concerning his findings in the four areas of targeted and intended violence; workplace violence; multiple-homicide; and the personality and psychological characteristics of those who commit such acts. As his testimony continued, the specific criminal profile emerged.

Dr. Meloy began by distinguishing two broad categories of the types of violence in which human beings tend to engage: targeted or intended violence, called "predatory violence"; and emotional or reactive violence, called "affective violence." He described targeted or intended violence as something that is planned and prepared for; is

---

unfair prejudice, as are involved in admitting profile testimony as substantive evidence of guilt. *See id.* at 501. Thus, the objections in this case were clearly presented in a different context and sufficed to preserve the claim.

carried out in an intended fashion; involves tactical planning; and is opportunistic rather than impulsive, meaning it involves "finding an opportunity where the act could be carried out successfully." On the other hand, affective violence was described as emotional; responsive to a threat; something that is not controlled; purely defensive; and involves an immediate or impulsive reaction. The majority of his testimony focused on the former category.

Dr. Meloy relied on 2012 data compiled from the National Center for Victims of Crime and the Bureau of Labor Statistics, which indicated that there were 463 homicides in the workplace during 2012. Of those 463 homicides, 375 involved intended violence with a firearm, 10% of which were committed by a co-worker and 6% by a spouse. These statistics were used to explain the rarity of such an event. He then tied these statistics back to the two categories of violence, explaining that workplace violence typically falls under the targeted or intended category, involving "planning and preparation." He testified that both workplace killings and multiple murders are "virtually always" committed by males.

Dr. Meloy described the typical pattern of "individuals who would perpetrate a workplace targeted homicide," to include: an attack, using a firearm; motivation from either a real or delusional grievance in reaction to an accumulation of losses or humiliations, a sense of rejection, or a felt injustice; a determination to seek revenge; a decision to intentionally act in violence; the existence of violent ideations; and development into the violent act itself, through research and planning. The planning stage was presented as especially important if the individual has never done this before. Dr. Meloy explained that planning would typically be secretive and involve thinking about the targets,

the movements of the targets, what weapons would be used, and how to approach and leave the situation. Later, Dr. Meloy elaborated on the planning phase to include looking "at the behavioral patterns of the victims, when are they in that particular location, . . . [and whether] they [are] going to be alone."

Dr. Meloy then disparaged the popular concept of "snapping," that is, the term commonly used by lay people to describe a perpetrator of a violent crime as having "lost their mind" or being "out of control." He explained that this is a myth, unsupported by research of targeted violence or of multiple murders. Instead, he referenced the descriptions offered by survivors of "multiple homicides" as having described the perpetrator as "calm, controlled, deliberate, cool." He contrasted psychotic and nonpsychotic perpetrators, explaining that the former tended to kill strangers, in mass numbers, while the latter tended to specifically target "one or more people that have angered or humiliated the individual."

Dr. Meloy further explained that perpetrators of targeted or intended violence are typically "pathologically narcissistic," with a "very inflated view of themselves," such that what might objectively be perceived as slight criticism would, in their mind, be "very, very wounding." Dr. Meloy described this type of perpetrator as having a "narcissistic sensitivity that comes from the individual's personality." The perpetrator might "be a legend in their own mind," and "have a strong sense of entitlement," such that criticism in the workplace "cuts deep" and is "then carried with them" to become the source of "the formulation of the grievance."

Dr. Meloy explained that approximately 80% of multiple homicides have a "triggering event," but that "direct causality" may not always be established. On redirect, he

clarified that the perpetrator's actions might seem "very illogical and irrational to the observer." He explained that the perpetrator will typically have a personality disorder, which he described as having "over time created problems . . . with other people who are close to them." He testified that 80% of people carrying out targeted violence do not communicate a direct threat or "warn the target beforehand." And, because employers typically screen people with a history of violent criminality, he explained that perpetrators instead tend to have "histories of chronic conflict with those in authority over the person in the workplace."

Trial testimony purported to show that both Belisle and Hopkins were generally well-liked, and that the two victims had no connection to each other outside of their employment. Wells, while highly regarded for his knowledge and expertise in antenna maintenance, was described by two higher-level supervisors as being difficult to control. Trial testimony indicated that Wells' insubordination and instances of workplace discord were occurring with increasing frequency before the murders. Chief Reckner testified that, in December 2011, he decided to move his office from T1 to T2, because Hopkins was not being respected as the rigger shop supervisor. Reckner testified that Wells was having ongoing disciplinary issues during this time, as well as health problems, causing him to be absent from work. As a result, Reckner made the supervisory decision not to allow Wells to attend an annual conference, which sparked a "heated" discussion between Wells and Reckner. The conference attendees were Reckner, and the two victims, Hopkins and Belisle.

On appeal, Wells summarizes Dr. Meloy's testimony as having constructed the following profile of the perpetrator: male; pathologically narcissistic, with a grandiose view of

himself and an unreasonable sense of entitlement; his decision to carry out the murders would be triggered by one or a series of humiliations in love or work; his narcissistic sensitivity would cause him to be wounded deeply by the criticism; although he may not show it, this wound would serve to formulate a "grievance"; this grievance would convert into anger, which may or may not be expressed openly, and he would begin to fantasize about solving his problems through violence.

The Government attempts to distinguish Dr. Meloy's testimony from criticized profile evidence by arguing that his actual testimony was much broader than Wells' portrayal thereof;[8] his criminal profile was not "personal" to, or based on an examination of, Wells; and his testimony was not the key evidence of Wells' guilt. We find each of these arguments disingenuous. Dr. Meloy's testimony was made personal to Wells by the Government's admitted use of Dr. Meloy's profile to "fit" Wells' personal characteristics. Indeed, the Government attempted to defend its use of the testimony by explaining: "It's not improper character evidence. The jury looks at it and they say, does it fit, does it not fit?" And, the Government twice stated, in its closing rebuttal, that Dr. Meloy's testimony about predatory violence "fits Mr. Wells to a T." *See United States v. Kojayan*, 8 F.3d 1315, 1323 (9th Cir. 1993) (recognizing that "closing argument matters . . . a great deal").

---

[8] During oral argument, the Government repeatedly directed this Court to review Dr. Meloy's powerpoint presentation, identified as Government's Exhibit 10, purportedly to refute Wells' characterization of the testimony. Notably, Government's Exhibit 10 was never admitted at trial; it is not found in any excerpts or supplemental excerpts of record; and it is not referenced in briefing before this Court.

The Government explains that proving its trial theory required that it intertwine several separate but interconnected strands of evidence to show:

> [T]he only conclusion consistent with all the evidence was that Wells carefully planned and executed the murder of his colleagues, motivated by his frustration and resentment over disciplinary issues at work, his increasing problems with COMMSTA management, and his loss of a position of respect and deference in the rigger shop. . . .
>
> The evidence as a whole established that on the morning of April 12, 2012, knowing Belisle and Hopkins would be alone at work, Wells drove to the airport in his white pickup truck, and switched cars to his wife's 2001 blue Honda CRV, which had been left at the airport earlier in the week. He then drove past the entrance to the rigger shop, bypassing the camera that he knew would capture the image of any vehicle entering the normal parking area, parked behind the building, walked under the camera and entered the rigger shop through the door that he knew would be unlocked and open, bypassing the card reader entrance that would otherwise record his presence.
>
> Wells then shot Belisle and Hopkins multiple times and left the building, again bypassing the rigger shop camera, drove back to the airport where he parked his wife's car, got back into his truck and drove home.

> Immediately upon arriving at home he called and left a message on Hopkins' and Reckner's voicemail, giving a previously-planned false alibi, claiming that he had a flat tire and would be late to work.

Regardless of how broad or narrow Dr. Meloy's findings might have been, the record reflects that his testimony was improperly used by the Government, in conjunction with its overbroad motive theory, to substantively connect the strands of circumstantial evidence in such a way as to fit Wells into the criminal profile.

As Chief Justice Roberts recently confirmed: "Our law punishes people for what they do, not who they are." *Buck v. Davis*, 580 U.S. ____, 137 S. Ct. 759, 778 (2017). Rule 404(a)(1) provides that "[e]vidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait." Fed. R. Evid. 404(a)(1). Again, there is no question as to the Government's purpose for offering this testimony. It explicitly stated that Dr. Meloy would testify as to the characteristics of those who commit "targeted individual multiple homicide workplace violences" in order to determine, given the lay witnesses' testimony concerning Wells personally, "does it fit, does it not fit?"

This Court has "stated in dictum that testimony of criminal profiles is highly undesirable as substantive evidence because it is of low probativity and inherently prejudicial." *United States v. Gillespie*, 852 F.2d 475, 480 (9th Cir. 1988). "The admission of drug courier profile evidence is inherently prejudicial to the defendant because the profile may suggest that innocuous events indicate criminal activity." *United States v. Lim*, 984 F.2d 331, 334–

35 (9th Cir. 1993). "Every defendant has a right to be tried based on the evidence against him or her, not on the techniques utilized by law enforcement officials in investigating criminal activity." *United States v. Lui*, 941 F.2d 844, 847 (9th Cir. 1991) (quoting *United States v. Beltran-Rios*, 878 F.2d 1208, 1210 (9th Cir. 1989)).

Although "profile" evidence is not *per se* inadmissible, it is only permitted in narrow and limited circumstances, such as: (1) background evidence, *Gomez-Norena*, 908 F.2d at 501 ("[A]dmitting drug courier profile testimony for [the] limited purpose [of providing background material] greatly reduces the potential for unfair prejudice and thus cannot amount to plain error."); (2) investigative tools, *United States v. Carter*, 901 F.2d 683, 684 (8th Cir. 1990) (drug courier profiles are investigative tools, not to be admitted as evidence of guilt); or (3) rebuttal evidence, when a party "opens the door" by introducing potentially misleading testimony, *Beltran-Rios*, 878 F.2d at 1211–12 (profile evidence admissible in rebuttal where defendant initially "opened the door" by emphasizing that he did not fit the stereotype of a drug smuggler).[9]

The Government attempts to place Dr. Meloy's testimony in the third category, arguing that Wells "opened the door" and placed his character in issue, by relying on Wells' history as a non-violent, non-threatening and peaceful man. Presumably recognizing the inherent

---

[9] "[T]he Eighth Circuit has held that such testimony may *never* be introduced as substantive evidence of guilt." *Gomez-Norena*, 908 F.2d at 501 (emphasis added) (citing *United States v. Carter*, 901 F.2d 683, 684–85 (8th Cir. 1990) ("Drug courier profiles are investigative tools, not evidence of guilt. . . . [They] are not to be admitted as substantive evidence of guilt.")).

weakness in making this argument *given Dr. Meloy's placement in the Government's case-in-chief,* the Government focuses on Wells' attempts to show his "character for non-violence" during his opening statement and through questions posed during cross-examination of prosecution witnesses.[10]

This argument lacks merit. This Court has cautioned that "the 'opening the door' doctrine is not so capacious as to allow the admission of *any* evidence made relevant by the opposing party's strategy, without regard to the Federal Rules of Evidence." *United States v. Sine*, 493 F.3d 1021, 1037 (9th Cir. 2007) (emphasis in original); *see also Beltran-Rios*, 878 F.2d at 1213 n.2 ("The Government may introduce profile testimony of this sort only to rebut specific attempts by the defense to suggest innocence based on the particular characteristics described in the profile."); *Gillespie*, 852 F.2d at 480 (finding error in admitting testimony of clinical psychologist on characteristics common to child molesters, where defendant never put general character at issue or offered testimony of specific character traits that rendered him incapable of molesting a female child). We have found

---

[10] The Government quotes Wells' opening statement, as follows:

> So I think the first assumption that you'll see that's just wrong is that there was a lot of conflict at the rigger shop. Mr. Reckner had problems with Jim Wells you'll hear, but the rest of the workers, they got along. There was no arguments. There was no violence. There was no threats. There was no fights. . . . The other thing I should tell you about Jim Wells at 62 years old, he doesn't have any – he's never been charged with a crime before. He's never been violent. There is nobody who can say he ever raised a hand to anybody, ever got in a fight. 62 years of raising a family and no violence, nothing at all.

that a defendant did not "open the door" to expert testimony establishing his knowledge of a drug trafficking organization, after the district court denied the defendant's motion to exclude said testimony and advised defense counsel to "plan accordingly." *See United States v. Pineda-Torres*, 287 F.3d 860, 865–66 (9th Cir. 2002). Clearly, by the time trial began, Wells knew that Dr. Meloy would be permitted to testify, as extensive pretrial efforts to exclude his testimony had ultimately failed.

The vast majority of relevant federal case law addresses the use of profile evidence in the context of drug couriers. Indeed, the district court presumably referenced this jurisprudence when he mistakenly assumed admissibility. However, we do also find persuasive the principles discussed in the state and military jurisprudence, cited to us by Wells, rejecting the use of other criminal profiles as substantive evidence of guilt.

"Those jurisdictions that have considered profiles of battering parents, pedophiles, rapists, and drug couriers unanimously agree that the prosecution may not offer such evidence in its case-in-chief as substantive evidence of guilt." *Ryan v. State*, 988 P.2d 46, 55 (Wyo. 1999) (collecting cases). *Ryan* recognized that these cases generally articulate three evidentiary bases for *excluding* evidence tending to establish that the defendant fits a particular profile: (1) relevancy, *see, e.g.*, *Commonwealth v. Day*, 409 Mass. 719, 723 (1991) (collecting cases to show that "[t]estimony regarding a criminal profile is nothing more than an expert's opinion as to certain characteristics which are common to some or most of the individuals who

commit particular crimes");[11] (2) the probative value of the evidence is substantially outweighed by its prejudicial effect, *see, e.g.*, *State v. Percy*, 507 A.2d 955, 960 (Vt. 1986) (explanations or excuses offered by other rapists not relevant to what this particular defendant said in response to the offense charged, and even if relevant, the evidence failed Vermont's state equivalent of Rule 403's balancing test); and (3) it is impermissible character evidence, *see, e.g.*, *Haakanson v. State*, 760 P.2d 1030, 1036 (Alaska Ct. App. 1988) ("We hold that the prosecution may not introduce a profile to show that the defendant is more likely to have committed an offense because the defendant fits within that profile. To admit this testimony at the beginning of trial was clearly erroneous."). *See* 988 P.2d at 55–56.

As recognized in *United States v. Banks*, 36 M.J. 150 (C.M.A. 1992), which Wells cites as particularly instructive, "[o]ur system of justice is a trial on the facts, not a litmus-paper test for conformity with any set of characteristics, factors, or circumstances." 36 M.J. at 161. In *Banks*, the prosecution presented a characteristic "profile" to present appellant's family situation as ripe for "child sexual abuse." *Id.* at 162. Then, "[t]hroughout th[e] case, the prosecutor orchestrated this 'profile' evidence to persuade the members that appellant fit the profile and was a child molester." *Id.* As the Government did at Wells' trial, the prosecutor revisited the profile in closing argument, implicitly referencing the

---

[11] In *United States v. Rangel-Gonzales*, 617 F.2d 529, 532 (9th Cir. 1980), an illegal re-entry case, this Court recognized the inherent problem with this type of testimony, albeit without labeling it as "profile" testimony or even character evidence: "This [affidavit of an INS investigator] setting forth the conduct of others, in circumstances which are unexplained, would not appear to have any bearing on what this particular individual would have done in the particular circumstances facing him."

profile in explaining how the evidence had proven the appellant's guilt. *Id.* Although, in closing, the prosecutor remarked that "we're not trying to prove our case that way," the military appeals court found that statement "disingenuous." *Id.* In *Banks*, the prosecution's closing argument belied "any assertion that th[e] profile was offered for any other purpose than to prove appellant's guilt." *Id.* at 163. *Banks* concluded that "[t]he prosecution's strategy of presenting a 'profile' and pursuing this deductive scheme of reasoning and argument to prove that appellant is a child sexual abuser was impermissible." *Id.* Here, too, the manner in which Dr. Meloy's testimony was used by the prosecution was similarly impermissible, and the prosecution's efforts to distinguish his testimony from criticized profile evidence are equally disingenuous.

The probative value of Dr. Meloy's testimony is found only in its ability to answer the impermissible question of whether, based on his character profile, Wells acted in accordance therewith on the morning of April 12, 2012. As explained in *Michelson v. United States*, 335 U.S. 469 (1948):

> Courts that follow the common-law tradition almost unanimously have come to disallow resort by the prosecution to any kind of evidence of a defendant's evil character to establish a probability of his guilt. Not that the law invests the defendant with a presumption of good character, but it simply closes the whole matter of character, disposition and reputation on the prosecution's case-in-chief. . . . The overriding policy of excluding such evidence, despite its admitted probative

> value, is the practical experience that its
> disallowance tends to prevent confusion of
> issues, unfair surprise and undue prejudice.

*Id.* at 475–76 (citation and footnotes omitted). The
prosecution made no attempt to establish an ulterior basis for
the admission of this improper character profile in its case-
in-chief, and the district court erred in admitting it as such.

Generally, if we conclude that evidence has been
improperly admitted, "we consider whether the error was
harmless." *United States v. Bailey*, 696 F.3d 794, 802–03
(9th Cir. 2012). The erroneous admission of expert
testimony is subject to harmless error review, just like all
other evidentiary errors. *See United States v. Rahm*, 993 F.2d
1405, 1415 (9th Cir. 1993).[12] Reversal is required "only if
the error affect[ed] a substantial right of the party," Fed. R.
Evid. 103(a), meaning "we require a finding of prejudice,"
*Obrey v. Johnson*, 400 F.3d 691, 699 (9th Cir. 2005).

We begin with a presumption of prejudice, in reviewing
the effects of this erroneous admission. *See Jules Jordan
Video, Inc. v. 144942 Canada Inc.*, 617 F.3d 1146, 1159 (9th
Cir. 2010). Given the uniquely and inherently prejudicial
nature of this evidence, the Government has failed to rebut
that presumption "by a showing that it is more probable than
not that the jury would have reached the same verdict even

---

[12] We note that the Supreme Court recently recognized that an
expert's prejudicial effect was "heightened due to the source of the
testimony[,]" given that the witness, as did Dr. Meloy, "took the stand as
a medical expert bearing the court's imprimatur[;] the jury learned at the
outset of his testimony that he held [impressive credentials and
experience;] . . . [and] [r]easonable jurors might well have valued his
opinion concerning the central question before them." *Buck*, 137 S. Ct.
at 777.

if the evidence had not been admitted." *Id.* (internal quotation marks omitted). The Government admits that "[p]roving [its] theory of the crime depended on the intertwining of multiple strands of evidence." Dr. Meloy's testimony was undoubtedly instrumental in tying those strands together, allowing the Government to argue that Dr. Meloy's profile "fit[] Mr. Wells to a T." As we have explained:

> When the district court has erroneously admitted or excluded prejudicial evidence, we remand for a new trial. We do so even if the district court errs by failing to answer a threshold question of admissibility. We have no precedent for treating the erroneous admission of expert testimony any differently.

*Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 466 (9th Cir. 2014) (en banc) (citations omitted). We do not hesitate in finding that the admission of Dr. Meloy's testimony constituted reversible error.

Although we find that Dr. Meloy's testimony was clearly inadmissible under Rule 404(a)(1), we write further to stress the important role of Rule 403. "As long as it appears from the record as a whole that the trial judge adequately weighed the probative value and prejudicial effect of proffered evidence before its admission, we conclude that the demands of Rule 403 have been met." *United States v. Sangrey*, 586 F.2d 1312, 1315 (9th Cir. 1978). However, this is not a case where we could easily find that the lower court "implicitly balanced the probative value against the prejudicial effect," *see United States v. Johnson*, 820 F.2d

1065, 1069 (9th Cir. 1987),[13] nor does "the record make[] clear that the question of prejudice figured crucially in the court's mind," *see United States v. Verduzco*, 373 F.3d 1022, 1029 n.2 (9th Cir. 2004). Instead, the magistrate judge placed the question explicitly and squarely before the district court, and from there, there is no indication that prejudice was ever a consideration, much less a crucial one. *Cf. United States v. MacDonald*, 688 F.2d 224, 228 (4th Cir. 1982) (upholding *exclusion* of tendered expert psychiatric character testimony where district judge "was keenly aware of the [Rule 403] factors . . . and painstakingly examined each"). As we have explained, testimony of this nature is "inherently prejudicial," has no place as substantive evidence of guilt, and would therefore fail Rule 403's balancing test. *See Gillespie*, 852 F.2d at 480; *Lim*, 984 F.2d at 334–35; *see also Michelson*, 335 U.S. at 475–76.

### C. The District Court Erred in Admitting "Other Act" Evidence

Wells challenges a significant amount of testimony as impermissible character and other act evidence, under Federal Rules of Evidence 404(a) and 404(b), respectively. Generally, "[a] district court's evidentiary rulings should not be reversed absent clear abuse of discretion and some prejudice." *Grand Canyon Skywalk Dev., LLC v. 'Sa' Nyu Wa Inc.*, 715 F.3d 1196, 1202 (9th Cir. 2013) (internal quotation marks omitted). "Whether evidence falls within

---

[13] Even though *Johnson* ultimately affirmed the district court's decision, this Court cautioned: "Nonetheless, we remind the district court that its duty to weigh the factors explicitly maintains the appearance of justice by showing the parties that the court recognized and followed the dictates of the law, and facilitates immeasurably the process of appellate review." 820 F.2d at 1069 n.2.

the scope of Rule 404(b) is a question we review de novo." *United States v. Smith*, 282 F.3d 758, 768 (9th Cir. 2002); *see also Durham*, 464 F.3d at 981. Admission of evidence to which there was no objection raised below is reviewed for plain error. *Sine*, 493 F.3d at 1038.

For our purposes, all testimony challenged under Rule 404(a) is subject to plain error review.[14] As to the evidence challenged under Rule 404(b), the Government provided pretrial notice of various other act evidence, for which Wells' pretrial objections were definitively overruled, adequately preserving these claims for appeal. *Palmer*, 3 F.3d at 304; *see also Palmerin*, 794 F.2d at 1413. The district court determined that this evidence was admissible as inextricably intertwined, or alternatively, as other act evidence, permissible to prove motive under Rule 404(b)(2). Thus, we review *de novo* the district court's application of the Federal Rules of Evidence to the other acts evidence.

Each of Wells' challenges under Rules 404(a) and 404(b) are made against the backdrop of Dr. Meloy's profile testimony. Wells argues that this character and other acts evidence was made relevant by Dr. Meloy's criminal profile of a narcissistically-sensitive individual for whom even minor criticism or setbacks could trigger violence. He argues that the same is true for the district court's alternative finding, that certain other acts were admissible to prove motive under Rule 404(b)(2), because this evidence was only relevant if the Government's motive theory was viewed

---

[14] As set forth below, Wells challenges a wide variety of testimony under Rule 404(a). Of the specific excerpts challenged, defense counsel only objected to the comment about Wells "strut[ing]" at professional conferences, and the objection was made on the basis of relevance. Accordingly, Wells failed to properly object to any of this testimony, such that our review is for plain error.

in the context of Dr. Meloy's profile. The motive theory is thus pertinent to our analysis and is described by the Government, as follows:

> Wells for years had been allowed to operate as his own boss. Throughout his work history prior to 2011, Wells had been able to do what he wanted when he wanted. He had a high opinion of himself, and any time he ran afoul of management he would just wait them out and go back to his same practices. However, things changed beginning in 2011 with the change in command at COMMSTA. New supervisors were tasked to try and get Wells to "get with the program." Pressure was put on him to conform. As 2011 progressed, the pressure increased. Then Wells became ill. As he missed work, the Command realized they could do the work without him. Belisle had stepped up and could replace him. When he returned, he was told he could not go to the annual antenna conference, which made him angry.

As an initial matter, we find that the Government crafted this motive theory with much too broad a brushstroke, paving the way for it to introduce evidence which was not truly relevant to the charged crimes. More persuasive is the Government's argument that much of the other act testimony concerned actions which were detailed in Wells' USCG personnel folder, referred to during defense counsel's opening statement and admitted without objection at trial.

Our analysis begins with Rule 402 of the Federal Rules of Evidence, which declares that all "[r]elevant evidence is

admissible," except as otherwise provided. Fed. R. Evid. 402. As we have explained:

> Rule 404, which separately deals with "character" evidence, and its subsection 404(b), which covers evidence of other (1) crimes, (2) wrongs, or (3) acts, is not a different pathway to the admission of evidence-although it is frequently misunderstood as such. Rule 404 is simply a specific qualification of the general rule of the admissibility of all relevant evidence.

*United States v. Curtin*, 489 F.3d 935, 943 (9th Cir. 2007) (en banc) (footnote omitted). Because "[c]haracter evidence is of slight probative value and may be very prejudicial," Rule 404 curtails the use of such "bad man" evidence. *Id.* at 944. Rule 404(a)(1) prohibits using "[e]vidence of a person's character or character trait . . . to prove that on a particular occasion the person acted in accordance with the character or trait." Fed. R. Evid. 404(a)(1).

Wells challenges a laundry list of testimonial excerpts under Rule 404(a)(1), by which lay witnesses were permitted to describe him as: "having a poor attitude"; "quite conceited at times"; "only receptive to change if he had played a part in coming up with the change"; not being "known to be [the] kind of person" who did "as [he was] told"; "view[ing] himself as extremely knowledgeable"; taking "pride in his role" in the tower community as shown by his "strut[ting]" at conferences; "just set in the way he would do things"; "difficult at times"; and "not real good at sharing the information he had." In support of the alleged relationship between this testimony and Dr. Meloy's profile, Wells points to the Government's closing argument, during which it

repeatedly referenced excerpts of this testimony to demonstrate Wells' "narcissistic traits," his "strong sense of self," his "sense of entitlement," "his pride and his belief that he was at the top of his profession," in order to fit the profile. Without explicitly explaining why it deemed this evidence to be relevant, the Government argues that it is not prohibited character evidence, as it was not offered to show that Wells acted in conformity therewith. That is, it was not offered to show that, at the time of the April 12, 2012 murders, Wells was being narcissistic, difficult, or set in his ways.

While we are sensitive to the interconnected nature of this testimony as used by the Government to fit Dr. Meloy's decidedly inadmissible profile, the improper admission of Dr. Meloy's testimony does not render otherwise relevant evidence inadmissible. To the extent these witnesses had personal knowledge of the topics on which they testified, this testimony provided background information regarding Wells' relationships with his co-workers, his working environment and his work history, all of which is relevant in a workplace homicide prosecution. Furthermore, it is also true that Wells relied on favorable aspects of these same evidentiary areas. Yet, he now takes the inconsistent position that his commendable record of service to the United States Navy and Coast Guard and his congenial relationships with co-workers are relevant evidentiary points, while the inconvenient, less commendable details thereof are not. *See Bowoto v. Chevron Corp.*, 621 F.3d 1116, 1130 (9th Cir. 2010) (where plaintiff opened the door to incident-specific testimony, district court did not abuse its discretion in allowing testimony as to defendant's version of the incident). The district court did not plainly err in admitting this relevant evidence.

We turn now to Wells' challenges to the other act evidence, which we have summarized as including: a 2003 incident in which Wells disobeyed an order to leave a fiberglass hut on Attu Island for repairs; a 2012 letter of caution, issued to Wells based on the consensus of USCG command, despite an inconclusive investigation, that Wells had used a USCG fuel card for personal use; an accusation of having improperly "collared" trees on USCG property, in order to cause their early death, for use as personal firewood; and other disagreements with co-workers. Although the district court's rulings addressed this evidence as a whole, we deem it necessary to describe the first of these incidents, and the relevant trial proceedings, in further detail. As will be explained below, our finding of error is limited to the district court's admission of the 2003 incident, which occurred nearly one decade before the charged crimes.

As to the 2003 incident, wherein Wells directly disobeyed an order involving the transportation of a fiberglass hut, the relevant testimony was given by Thomas Eskew, one of Wells' former USCG supervisors. Though Eskew did not directly supervise Wells, he testified that Wells was under his supervision for six years, from 2001 to 2007. The incident at issue involved Wells' role in the installation of a remote transceiver, on Attu Island, at the far end of the Aleutian Chain. The transceiver had been installed in a large fiberglass hut, and loaded onto a military transport airplane, before being flown out to Attu Island, at which time a technical problem arose. Despite being ordered to leave the fiberglass hut on Attu Island, Wells disobeyed the direct order and returned to Kodiak Island with the hut in tow.

Without objection, on direct examination, Eskew testified that Wells' actions made him "furious" and "quite angry," that Wells never expressed remorse or apologized,

and further described this incident as the most significant act of disobedience he had experienced in his thirty years with the USCG. Immediately thereafter, the following exchange occurred:

> Q. And I think you said before he was a very knowledgeable person; is that fair?
>
> A. That's quite true.
>
> Q. And did he have a view of his own knowledge, in other words?
>
> > MR. CURTNER: Objection, Your Honor. I don't see where–. . . I don't think that's relevant.
> >
> > MS. LOEFFLER: Your Honor, *it's directly relevant to the character that we're going to be discussing throughout this trial*.
> >
> > THE COURT: If you know, you can answer.
>
> BY MS. LOEFFLER:
>
> Q. Did you have enough interaction with him to see how he viewed his value and knowledge?
>
> A. Yes. I thought he was quite conceited at times, actually.

> Q. In terms of working with him, was he receptive to changes or differences when things were done not the way he wanted to do it?
>
> A. He was only receptive to change if he had played a part in coming up with that change; otherwise, he was resistant and would protest it.

(emphasis added). During its closing argument, the Government highlighted this incident, in the context of Dr. Meloy's profile, as the "best example" of Wells' "narcissistic traits" and "the height of ego."

As mentioned, during the final pretrial conference, the district court assessed and ruled on the entire body of other act evidence as a whole, finding:

> In my view, it's inextricably in[ter]twined with the events such that those items are admissible. They're relevant to motive, help paint a picture of the work environment, and are truly admissible, especially in a situation where you have two co-workers who are killed and a third charged with murder. And I think the events in question that are suggested are not too remote and are relevant and therefore are admissible.

We address the district court's alternative rulings in turn. For the reasons that follow, we find that the district court erred in admitting the 2003 incident, as it was neither inextricably intertwined nor permissible motive evidence under Rule

404(b)(2). We uphold the admission of the remaining other acts evidence under Rule 404(b)(2).

Rule 404(b)(1) prohibits using evidence of crimes, wrongs, or other acts "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). Such evidence may be admissible for other purposes, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). Thus, "Rule 404(b) is a rule of inclusion-not exclusion-which references at least three categories of other 'acts' encompassing the inner workings of the mind: motive, intent, and knowledge." *Curtin*, 489 F.3d at 944.

"Evidence of 'other acts' is not subject to Rule 404(b) analysis if it is 'inextricably intertwined' with the charged offense." *United States v. Beckman*, 298 F.3d 788, 793 (9th Cir. 2002). "This exception applies when (1) 'particular acts of the defendant are part of . . . a single criminal transaction,' or when (2) '"other act" evidence . . . is necessary [to admit] in order to permit the prosecutor to offer a coherent and comprehensible story regarding the commission of the crime.'" *Id.* at 794 (citation omitted). Only the second of these scenarios is relevant to our discussion, and we address it first, as it was the primary basis for the district court's finding of admissibility.

As we have acknowledged, "[the inextricably intertwined] exception to Rule 404(b) is most often invoked in cases in which the defendant is charged with being a felon in possession of a firearm." *United States v. Vizcarra-Martinez*, 66 F.3d 1006, 1013 (9th Cir. 1995). One such case, cited by the Government, is *United States v. Dorsey*, 677 F.3d 944 (9th Cir. 2012), which we find easily

distinguishable but illustrative to our finding that that this evidence was not properly admitted as inextricably intertwined.

*Dorsey* involved a defendant who had pled guilty to offenses involved in motor vehicle trafficking and was then found guilty, after a jury trial, of the related crimes of witness tampering and discharging a firearm in relation to a crime of violence. 677 F.3d at 948. In an effort to prove the discharge of a firearm, the Government sought to introduce testimony of two witnesses who had seen the defendant with a gun before the relevant shooting. *Id*. at 951. This Court upheld the admission of the testimony, as inextricably intertwined, in pertinent part, "[b]ecause the testimony bore *directly* on the commission of the charged crimes." *Id*. at 952 (emphasis added). "[E]vidence that Dorsey had a gun of the same or a similar type as the gun used in the shooting . . . was relevant because it tended to prove that Dorsey had the means to commit the charged crimes and that he was in fact the shooter." *Id*.

*Dorsey* illuminates the difference between finding that evidence is inextricably intertwined, and therefore not subject to Rule 404(b) analysis, and finding that evidence falls under one of Rule 404(b)'s permissible uses, namely to prove motive. In determining whether particular evidence is necessary to the prosecution's "coherent and comprehensible story," we ask whether the evidence bears directly on the charged crime. 677 F.3d at 952 (internal quotation marks omitted). "There must be a sufficient contextual or substantive connection between the proffered evidence and the alleged crime to justify exempting the evidence from the strictures of Rule 404(b)." *Vizcarra-Martinez*, 66 F.3d at 1013. Here, none of the other acts evidence bears "directly" on the charged crimes, or has the

requisite "contextual or substantive connection" to be categorized as inextricably intertwined. It was error for the district court to admit it as such, but the alternative admission under Rule 404(b)(2) saves all but the 2003 incident.

In order to determine whether the challenged evidence was properly admitted to prove motive, under Rule 404(b), we must first address the foundation therefor. The Government's motive theory unfolded in the following basic sequence: Wells' frustrations began with a 2011 change in COMMSTA command, which placed unwelcome pressure on him to conform to the chain of command. Due to personal illness and his resulting absences from work, Wells became increasingly frustrated by a loss of professional independence and importance. His frustration turned to anger and culminated in the murders of his co-workers, whom he deemed threats to maintaining his station within the rigger shop.

While it is reasonable to grant some flexibility to a prosecution tasked with constructing a motive theory to prove a double workplace homicide, we must also insure that reasonable limits are employed. We accept the Government's motive theory if it begins with the 2011 investigation into the unauthorized use of the fuel card; proceeds to the resultant letter of caution issued in 2012; recognizes that, throughout that time, Wells suffers a consistent loss of "rank" within the rigger shop; builds to the decision by USCG command to disallow Wells' attendance at an annual conference; and finally culminates in Wells' murder of his co-workers. There is, however, no logical basis to explain how a 2003 incident, marked by a different supervisor and bearing no connection to either victim, might provide motive for a double homicide nearly one decade

later. It is an unexplainable outlier. The only possible purpose of this testimony would be to show Wells' propensity. Indeed, the Government's response to Wells' trial objection—that Eskew's testimony was "directly relevant to the character that we're going to be discussing throughout this trial"—belies the Government's claim that the evidence was offered to prove motive. Instead, it convinces us that the Government's motive theory was couched in the broadest possible terms in order to sidestep evidentiary hurdles. Doing so allowed the Government to compound the erroneous admission of Dr. Meloy's profile by arguing in its closing that this incident was the "best example" of Wells' "narcissistic traits."

As was the case with the admission of Dr. Meloy's testimony, the failure of the district court to engage in Rule 403 balancing solidified the erroneous admission of the 2003 incident. Of course, we find that that incident was neither inextricably intertwined nor permissible motive evidence under Rule 404(b)(2), and therefore, our analysis thereof would not have reached Rule 403. *Cf. Curtin*, 489 F.3d at 944 ("Once it has been established that the evidence offered serves one of [the purposes authorized by Rule 404(b)(2)], . . . the 'only' conditions justifying the exclusion of the evidence are those described in Rule 403: unfair prejudice, confusion of the issues, misleading the jury, undue delay, waste of time, or needless presentation of cumulative evidence."). However, had the district court considered Rule 403, the evidence should not have survived. Though we find that testimony surrounding this incident was wholly lacking in probative value, it is difficult to avoid the conclusion that a nine-year-old incident with no connection to the victims or the relevant chain of command is unfairly prejudicial, confuses the issues, and would be misleading to the jury. *See* Fed. R. Evid. 403. Thus, we again emphasize the importance

of conducting Rule 403 balancing and stress, by way of Dr. Meloy's testimony and this example, the deleterious effects of failing to do so.

Again, "we consider whether the error was harmless." *Bailey*, 696 F.3d at 802–03. On its own, this question might have given us pause; however, we consider it in light of the erroneous admission of Dr. Meloy's testimony, which by itself constituted reversible error, and into which this evidence was interwoven. We find that the district court's erroneous admissions and failure to engage in Rule 403 balancing "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Hein v. Sullivan*, 601 F.3d 897, 917 (9th Cir. 2010) (internal quotation marks omitted).

With that important limitation on the Government's motive theory, we turn to the application of Rule 404(b)(2) to the remaining "other acts" evidence. "Other acts evidence is admissible under Rule 404(b) if it (1) tends to prove a material point in issue; (2) is not too remote in time; (3) is proven with evidence sufficient to show that the act was committed; and (4) if admitted to prove intent, is similar to the offense charged." *Beckman*, 298 F.3d at 794. "Of course, the probative value of the evidence must not be 'substantially outweighed by the danger of unfair prejudice.'" *United States v. Blitz*, 151 F.3d 1002, 1008 (9th Cir. 1998) (quoting Fed. R. Evid. 403).

Applying this four-part test to evidence surrounding the 2012 letter of caution, Wells' tree collaring instances, and our catch-all category of Wells' disagreements with co-workers, we are satisfied that the district court properly admitted this evidence under Rule 404(b)(2). This evidence, as a whole, was relevant to Wells' work environment, including his relationships with relevant co-workers and

supervisors; was not too remote in time and fits within a reasonably tailored version of the Government's motive theory; and was proven through both the admission, without objection, of Wells' personnel file, as well as the testimony of the co-workers and supervisors involved in the underlying acts. On balance, the probative value of this evidence is unique in a workplace homicide trial, and we do not find that it is substantially outweighed by any danger of unfair prejudice.

> D. The District Court Did Not Abuse its Discretion in Allowing Experts Gary Bolden and Neil Schmidt to Testify

The parties disagree as to the appropriate standard of review to be applied by this Court. Each of these experts was challenged via a pretrial *Daubert* motion, on which the magistrate judge held a hearing and issued a report and recommendation, which was adopted by the district court. Thereafter, during the final pretrial conference, the district court revisited the *Daubert* issues and reaffirmed his rulings. Thus, we reject the Government's argument that review is for plain error only and find instead that Wells' challenges were thoroughly explored pretrial and preserved for appeal. *See Palmerin v. City of Riverside*, 794 F.2d 1409, 1413 (9th Cir. 1986) ("reject[ing] an invariable requirement that an objection that is the subject of an unsuccessful motion *in limine* be renewed at trial"). The district court's decisions to admit the expert testimony are therefore reviewed for abuse of discretion. *Reed*, 575 F.3d at 918.

> 1. Forensic Tire Expert

Gary Bolden is the Director of Forensics at Standards Testing Labs, Inc., and testified as the Government's forensic tire expert. Accepting Mr. Bolden's qualifications,

Wells argues that Mr. Bolden's testimony should have been precluded as a sanction for the Government subjecting Wells' alibi evidence (flat tire) to "destructive" testing.[15] The appropriate rule, governing sanctions for destruction of evidence, is found in Judge Anthony Kennedy's 6–5 concurrence in *United States v. Loud Hawk*, 628 F.2d 1139 (9th Cir. 1979), an en banc decision with several opinions. *United States v. Sivilla*, 714 F.3d 1168, 1173 (9th Cir. 2013). "According to Judge Kennedy's controlling concurrence, '[o]ur principal concern is to provide the accused an opportunity to produce and examine all relevant evidence, to insure a fair trial." *Id.* (quoting *Loud Hawk*, 628 F.2d at 1151) (Kennedy, J., concurring)). "Courts must balance the quality of the Government's conduct against the degree of prejudice to the accused, where the government bears the burden of justifying its conduct and the accused of demonstrating prejudice." *Id.* (internal quotation marks omitted).

Six days after the shootings, law enforcement agents obtained a tire, along with an embedded nail, from the bed of Wells' truck. By this time, the FPD had been asked to represent Wells, though he would not be arrested for ten

---

[15] Although Wells argues that the Government's destructive testing of the tire violated his due process rights, we find that Wells has waived this argument. In pretrial briefing, Wells stated: "The government's arguments regarding a due process violation based on malicious destruction of evidence *are not on point since Mr. Wells is not raising a due process violation*." (Emphasis added). A party forfeits a right when it fails to make a timely assertion of that right and waives a right when it is intentionally relinquished or abandoned. *Olano*, 507 U.S. at 733. "Forfeited rights are reviewable for plain error, while waived rights are not." *United States v. Perez*, 116 F.3d 840, 845 (9th Cir. 1997) (en banc). Furthermore, Wells acknowledges that he does not seek the due process remedy of dismissal, but rather preclusion of Mr. Bolden's testimony.

more months. The tire was seized in order to evaluate Wells'
alibi that he was late to work on the day of the shooting due
to a flat tire. Wells had left voicemail messages to that effect
on the phones of both Hopkins and Reckner on the morning
of the shootings, and he later repeated this alibi to
investigators. At this investigatory stage, the tire could have
been exculpatory, supporting Wells' alibi, or inculpatory,
proving the alibi to be a sham.

The Government sent the tire to Mr. Bolden's lab,
without notifying the FPD of the tire seizure or testing. Upon
receipt of the tire, Mr. Bolden made a visual check and
measured the air pressure, which was at 20 psi. He then
inflated the tire to its operating pressure of 80 psi and
checked for leaks, finding what he called a "slow leak"
around the nail. Mr. Bolden then carefully removed the tire
from the rim, examined it inside and out, and x-rayed the
tire, which simply confirmed that there was no structural
damage to the tire. The interior of the tire was then
photographed before it was remounted to perform both a
static air retention test and a dynamic air loss test, using a
dynamometer to simulate actual highway use. After running
the dynamic test for a 24-hour period, Mr. Bolden
determined that the rate of observable air leakage was so low
that a typical driver would not perceive any air loss for three
or four hundred miles. Mr. Bolden photographed the nail in
place; at no time did he remove the nail from the tire. Based
upon his tests and observations, Mr. Bolden opined that the
nail had been inserted manually, rather than having been
picked up on the road, and the tire had not been driven on
with the nail in it.

The tire was then sent to an FBI lab, where a tool-mark
examiner further analyzed the nail. The examiner first
photographed the position of the nail in the tire and then

removed it for further testing. The examiner agreed with Mr. Bolden's conclusion that the nail had been manually inserted into the tire, via a nail gun. The tire and nail, as well as Mr. Bolden's report, were then sent to Wells' forensic tire expert, Bruce Currie, for further examination.

Pretrial, in support of his *Daubert* challenge to Mr. Bolden's testimony, Wells submitted an affidavit from Mr. Currie. Therein, Mr. Currie asserted that, as a result of Mr. Bolden's 24-hour dynamic air loss test, the condition of the tire was "definitely altered," making it "impossible to further evaluate the condition of the tire at the time of the incident." He further opined that the deflection of the tire, which occurred approximately 937,440 times during the 1,488-mile test, "would have a significant effect on the condition of the nail relative to the nail hole in the tire." At trial, Mr. Currie challenged Mr. Bolden's tests and conclusions on multiple fronts, and explained that his receipt of the tire, after the nail had been removed, prevented him from being able to independently evaluate the tire's condition and air loss or to effectively duplicate Mr. Bolden's tests or analyses. Instead, Mr. Currie's own testing was limited to using a paperclip to determine the angle at which the nail had entered the tire, through the hole left by the removed nail. He opined that the nail could have been picked up and entered the tire on a road surface and that he believed such a scenario was "[m]ore likely than not."

Applying *Loud Hawk*'s balancing test, the Court must first evaluate the quality of the Government's conduct, inquiring:

> whether the evidence was lost or destroyed while in its custody, whether the Government acted in disregard for the interests of the accused, whether it was negligent in failing

> to adhere to established and reasonable standards of care for police and prosecutorial functions, and, if the acts were deliberate, whether they were taken in good faith or with reasonable justification. . . . It is relevant also to inquire whether the government attorneys prosecuting the case have participated in the events leading to loss or destruction of the evidence, for prosecutorial action may bear upon existence of a motive to harm the accused.

*Sivilla*, 714 F.3d at 1173 (quoting *Loud Hawk*, 628 F.2d at 1152). The quality of the Government's conduct is then balanced against the degree of prejudice, which is analyzed by considering:

> a wide number of factors including, without limitation, the centrality of the evidence to the case and its importance in establishing the elements of the crime or the motive or intent of the defendant; the probative value and reliability of the secondary or substitute evidence; the nature and probable weight of factual inferences or other demonstrations and kinds of proof allegedly lost to the accused; the probable effect on the jury from absence of the evidence, including dangers of unfounded speculation and bias that might result to the defendant if adequate presentation of the case requires explanation about the missing evidence.

*Id*. at 1173–74 (quoting *Loud Hawk*, 628 F.2d at 1152).

At the outset, we agree with the district court's finding that the Government's testing neither destroyed nor substantially altered the tire or the nail. The Government might have notified the FPD of the seizure and testing; however, it was under no affirmative obligation to do so. It is undisputed that the Government did not have probable cause to arrest Wells at the time of the testing, indeed he was not arrested for nearly ten more months, such that the results of the tire testing could have ultimately proved inculpatory or exculpatory. In an effort to identify an alleged perpetrator for formal accusation, the Government took reasonable actions in evaluating Wells' stated alibi, followed industry standards, and documented all steps in Mr. Bolden's report. Mr. Currie then had full access to all photographs, testing, methodology, and reports from the Government's nail and tire experts, in addition to the nail and tire themselves.

As to any degree of prejudice, Mr. Currie could have, and indeed *did*, launch extensive challenges to Mr. Bolden's tests and conclusions. As *Daubert* confirmed, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 596 (1993). Furthermore, as found in the district court, Wells can only speculate as to whether his own expert would have reached any different conclusions as to the condition, location, or angle of the nail while still in the tire. On balance, the quality of the Government's conduct in this case was far from "poor," *see Sivilla*, 714 F.3d at 1173; rather, it was reasonable, in pursuing investigative avenues necessary to narrow the focus on a particular suspect in a double workplace homicide. Allowing Mr. Bolden to testify as to his expert conclusion was not an abuse of discretion.

### 2. Honda Engineer

Neil Schmidt is an engineer and "technical specialist," with twenty years' experience at Honda, including seven years as an engineer responsible for the Honda CR-V, which was the make and model of Nancy Wells' vehicle. At trial, Schmidt was tendered as "an expert in Hondas, [with an] associated knowledge of related vehicles." Schmidt's expertise was used to identify what appeared to be a blurry image of a small blue SUV, caught on surveillance footage on April 12, 2012. His testimony was relevant, in order to place Wells in Nancy Wells' 2001 blue Honda CR-V, on the morning of the murders.

Schmidt testified that he was 70% certain that the depicted vehicle was an early model Honda CR-V. On direct examination, the Government inquired of Schmidt whether he was able to identify other automobiles that could be consistent with the vehicle in the surveillance image and which might raise his level of certainty regarding his identification. Schmidt testified that he had identified three makes and models, other than the Honda CR-V but significantly similar thereto. During the investigation, these comparators were then used by photogrammetry comparison experts and law enforcement agents, in ruling out other vehicles with possible connections to the murders.

Wells did not renew his objection to Schmidt's qualifications at trial. On appeal, Wells accepts Schmidt's knowledge of the Honda CR-V but challenges his qualifications to *reliably* testify to the likelihood that the car was a Honda, due to his lack of specialized knowledge in ruling out other vehicles. Federal Rule of Evidence 702's reliability requirement asks whether an expert's testimony has "a reliable basis in the knowledge and experience of the relevant discipline." *Kumho Tire Co. v. Carmichael,*

526 U.S. 137, 149 (1999) (alteration omitted). The inquiry is "a flexible one." *Id.* at 150 (quoting *Daubert*, 509 U.S. at 594). Courts have broad latitude in determining the appropriate form of the inquiry. *See United States v. Alatorre*, 222 F.3d 1098, 1102 (9th Cir. 2000) ("Nowhere . . . does the Supreme Court mandate the form that the inquiry into relevance and reliability must take.").

Here, the magistrate judge conducted a pretrial *Daubert* hearing and determined that Schmidt's 20 years' experience as a Honda engineer qualified him to opine as to the likelihood that the vehicle in the image was the same make and model on which he had worked directly for seven years. At the final pretrial conference, the district judge reaffirmed that the blurry quality of the video might affect the weight of the testimony, rather than its admissibility, and could be explored on cross-examination. *See Daubert*, 509 U.S. at 596; *see also United States v. Ford*, 481 F.3d 215, 220 (3rd Cir. 2007) (expert could testify that characteristics of shoe print were similar to defendant's shoe despite inability to rule out other shoes due to lack of clarity in the print). We find no abuse of discretion in allowing Schmidt to opine and testify.

E. The District Court Was Not Required To Declare a Mistrial Upon Elicitation of Prejudicial Testimony

During the prosecutor's direct examination of the USCG commander responsible for notifying Nicola Belisle of her husband's death, the prosecutor asked a question which mischaracterized the widowed spouse's verbal identification of Wells. Wells immediately objected, but did so on the basis of relevance, and moved to strike the testimony. Later, Wells moved for a mistrial. On appeal, he argues prosecutorial misconduct.

"To obtain a reversal based on prosecutorial misconduct, [the defendant] must establish both misconduct and prejudice." *United States v. Wright*, 625 F.3d 583, 609–10 (9th Cir. 2010), *superseded by statute on other grounds as recognized by United States v. Brown*, 785 F.3d 1337, 1351 (9th Cir. 2015). "Where defense counsel objects at trial to acts of alleged prosecutorial misconduct, we review for harmless error on defendant's appeal; absent such an objection, we review under the more deferential plain error standard." *United States v. Hinton*, 31 F.3d 817, 824 (9th Cir. 1994). Because Wells did not object on the basis of prosecutorial misconduct below, our review now is for plain error.

On the morning of the murders, COMMSTA Commander Peter Van Ness and an Alaska State Trooper visited Nicola Belisle, the wife of victim Richard Belisle, to notify her of her husband's death. The trooper was wearing a recording device. Both the audio recording and transcript thereof were provided to Wells during pretrial discovery. The transcript is twenty pages long and reflects a highly emotional scene, with very little coherent conversation. Once Ms. Belisle calmed down, the trooper asked her whether her husband had any problems with anybody. Ms. Belisle responded "[j]ust Jim," clarified that she was referring to the defendant, "Jim Wells," and then stated "Jim wouldn't hurt Rich."

At trial, the Government called Commander Van Ness to testify about the spousal notification:

> Q. What was her reaction?
>
> A. She was hysterical, very, very upset. In fact, I–I don't know that we even had to say anything. When we walked in in uniform–she

had already heard. Kodiak's a small town.
They were aware something was going on at
the communication station by that point. I
think–I don't remember the exact time, but I
believe it was around 10 o'clock in the
morning, so it had been, you know, two hours
or so. Word gets out. And so when we walked
in in uniform–

Q. Did she blurt out a name?

A. Yes.

Q. What was that name?

A. Jim Wells.

Wells immediately objected on the basis of relevance and
moved to strike the testimony. The Government argued that
the statement was admissible as an excited utterance and was
not being offered for the truth thereof. The district court
deferred ruling, instructed the Government to move on with
questioning, and later revisited the issue outside the presence
of the jury.

During oral argument on this issue, the Government took
the inconsistent positions that the statement was admissible
as both an excited utterance and to show that there was some
discord between Richard Belisle and Wells. As to the latter,
the Government's position was that Ms. Belisle's statement
tended to rebut two defense themes: that Chief Scott
Reckner's hostility toward Wells caused investigators to
focus on Wells to the exclusion of other suspects; and that
Wells and Belisle got along. These positions are of course

contradictory because the latter could only be valid if the statement was indeed offered for the truth thereof.

Wells moved for a mistrial. The district court denied the mistrial and instead gave the following limiting instruction:

> I need a cautionary–I'm concerned about a comment that was made during the last witness when a question was asked–or when the commander and those with him conveyed to Mrs. Belisle that her husband had been killed, and her response was–you remember what her response was. She said a name.
>
> I have to make it clear to you that she had no personal knowledge of that. And so that statement cannot be used by you as evidence of that event. It could be limited, very, very limited. It explains possibly, and maybe not, her relationship–her impr–her personal impression of the relationship between her husband and Mr. Wells and the information she conveyed at the time to the commander and those there. But it is not evidence of–against Mr. Wells as to who committed this crime, because she didn't know. She simply did not know. It's an emotional reaction. That was it. And to give it more weight than that would be highly inappropriate. Tells you her reaction, and possibly limited to other ways. But it is not, cannot, should not be used in any way to suggest that the defendant committed the crimes he's charged with, because she didn't know.

. . .

> Anything else I can say beyond what–I'm
> trying to make it as clear as a bell. This is
> very, very limited. It's what we call an
> excited utterance. It's an emotional response.
> But it has no evidentiary basis as to the issue
> you have before you as to who committed
> these crimes. Very, very limited as to her
> emotional response at the moment and the
> impression possibly that she had with regard
> to her husband's relationship with the
> defendant. And of course whatever
> impressions might have been created in the
> minds of those standing before her at the
> moment.

The jury was released for the day, and the court then
addressed counsel, declaring that the jury's body language
indicated that they "seemed to clearly understand that this
was not evidence as to who committed the crime."

The next morning, outside the presence of the jury, the
district court heard further argument on the issue. At that
time, the court was initially inclined to instruct the jury to
disregard the testimony but was ultimately satisfied that the
above-described instruction "clearly limit[ed] any
prejudice." Upon request, Wells was allowed to recall
Commander Van Ness in an attempt to clarify the context of
the statement introduced the day before. When Commander
Van Ness testified that he did not recall the conversation
with Ms. Belisle, the Government stipulated to the contents
of the transcript. At the time, Wells explicitly did not seek
reconsideration of the prior day's ruling that the statement
was an excited utterance, and the merits of that ruling are not

before us on appeal. Instead, we are asked to decide whether prosecutorial misconduct required a mistrial, or now, requires a reversal. As mentioned, such a finding requires both misconduct and prejudice. *Wright*, 625 F.3d at 609–10.

"A prosecutor has a special duty commensurate with a prosecutor's unique power, to assure that defendants receive fair trials." *United States v. LaPage*, 231 F.3d 488, 492 (9th Cir. 2000) (addressing a prosecutor's duty when he knows that his witness commits perjury). "It is certainly within the bounds of fair advocacy for a prosecutor, like any lawyer, to ask the jury to draw inferences from the evidence that the prosecutor believes in good faith might be true." *United States v. Blueford*, 312 F.3d 962, 968 (9th Cir. 2002).

Here, we find that the prosecutor committed misconduct for several reasons. First, the prosecutor's question interrupted Commander Van Ness describing what happened when the two officers "walked in in uniform." This mischaracterized the timing of Ms. Belisle's statement, by giving the jury the false impression that it was immediately uttered upon seeing the uniformed officers. Second, the prosecutor's phrasing, inquiring whether the widow "blurt[ed] out a name," again mischaracterizes the statement as being made suddenly and without considered thought. In reality, the statement was made approximately ten minutes after the officers approached Ms. Belisle, and in response to direct questions which required consideration of possible suspects. The phrase "blurt out" plainly ignores the role played by the officers in eliciting Wells' name as a possible suspect. Third, not only did the prosecutor choose not to bring this sensitive issue to the district court's attention *prior to* questioning Commander Van Ness, but upon verbalizing the mischaracterization and being confronted with the ramifications, the prosecutor failed to

assist in mitigation thereof. Although this constitutes misconduct, we find no prejudice.

The district court adequately redressed the Government's action. In addition to instructing the jurors that questions are not evidence, the district court gave a lengthy limiting instruction. Wells neither objected to the limiting instruction itself nor did he request any further instructions. "Generally, when evidence is heard by the jury that is subsequently ruled inadmissible, or is applicable only to limited defendants or in a limited manner, a cautionary instruction from the judge is sufficient to cure any prejudice to the defendant." *United States v. Escalante*, 637 F.2d 1197, 1202–03 (9th Cir. 1980). "This procedure is the preferred alternative to declaring mistrial . . .; mistrial is appropriate only where there has been so much prejudice that an instruction is unlikely to cure it." *Id*. at 1203. "[O]ur court assumes that the jury listened to and followed the trial judge's instructions." *Id*. at 1202; *see also United States v. Gallenardo*, 579 F.3d 1076, 1082 (9th Cir. 2009) (affirming denial of motion for a mistrial because it is "presume[d] that the jury followed the district court's limiting instruction").

In addition to the limiting instruction, the district court allowed Wells to recall Commander Van Ness, in an effort to place the prejudicial statement in its proper context. *See United States v. Whitworth*, 856 F.2d 1268, 1285 (9th Cir. 1988) (opponent may introduce evidence "to rebut any false impression that might have resulted from the earlier admission"); *Standard Oil Co. of Cal. v. Moore*, 251 F.2d 188, 220 (9th Cir. 1957) (in the context of hypothetical questions posed to experts, prejudicial error seldom results where "the objecting party can, through cross-examination, expose to the jury the asserted deficiencies of the hypothetical question as asked"). Furthermore, the parties

ultimately stipulated to the contents of the transcript, such that the jury was well aware of its proper context. The district court did not plainly err.

### F. The District Court Properly Excluded Evidence of Third Party Culpability

"We review for abuse of discretion a claim that the trial court improperly excluded evidence of third-party culpability." *Territory of Guam v. Ignacio*, 10 F.3d 608, 611 (9th Cir. 1993).

"There is no question that the defendant has the right to introduce evidence of third-party culpability." *Ignacio*, 10 F.3d at 615. "The defendant's right to present evidence which may exonerate him, however, is not absolute and may have to 'bow to accommodate other legitimate interests in the criminal trial process.'" *Id.* (quoting *Chambers v. Mississippi*, 410 U.S. 284, 295 (1973)). This type of evidence is not admissible "if it simply affords a possible ground of suspicion against such person; rather, *it must be coupled with substantial evidence tending to directly connect that person with the actual commission of the offense*." *Perry v. Rushen*, 713 F.2d 1447, 1449 (9th Cir. 1983) (internal quotation marks omitted) (emphasis added).

At trial, Wells sought to introduce evidence of an alternative perpetrator, Jason Barnum. The district court allowed Wells to proffer the testimony of Mr. Barnum himself, along with seven other witnesses, in an attempt to show some logical connection to any of the facts in this case. Despite multiple witness proffers, Wells was never able to elicit any testimony that Barnum knew any of the victims or the victims' families or that he had any connection to, or familiarity with, the COMMSTA facility. The district court applied the balancing test set forth in *Miller v. Stagner*,

757 F.2d 988 (9th Cir. 1985),[16] and found that Mr. Barnum had "nothing meaningful, reliable, or relevant to offer." Having probed the proffered testimony ourselves, we agree with the district court that it has no probative value. Far from abusing its discretion, the district court granted Wells every opportunity to show some logical connection, however weak or remote, between Jason Barnum and this case, and he failed to establish any relevancy.

### G. We Reassign To Preserve the Appearance of Justice

This Court will reassign a case on remand only under "unusual circumstances or when required to preserve the interests of justice." *United States v. Wolf Child*, 699 F.3d 1082, 1102 (9th Cir. 2012). We need not find actual bias on the part of the district court prior to reassignment. *Krechman v. Cty. of Riverside*, 723 F.3d 1104, 1111 (9th Cir. 2013). Rather, we consider:

> (1) whether the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously expressed views or findings determined to be erroneous or based on evidence that must be rejected,

---

[16] In determining whether the exclusion of trial evidence violated a defendant's due process rights, the *Miller* factors seek to balance the following considerations: "the probative value of the evidence on the central issue; its reliability; whether it is capable of evaluation by the trier of fact; whether it is the sole evidence on the issue or merely cumulative; and whether it constitutes a major part of the attempted defense." *Miller v. Stagner*, 757 F.2d 988, 994 (9th Cir. 1985). Due weight should also be given to the governmental interests in "preserving orderly trials, in judicial efficiency, and in excluding unreliable or prejudicial evidence." *Id*. at 995.

> (2) whether reassignment is advisable to
> preserve the appearance of justice, and
> (3) whether reassignment would entail waste
> and duplication out of proportion to any gain
> in preserving appearance of fairness.

*Wolf Child*, 699 F.3d at 1102 (quoting *United States v. Quach*, 302 F.3d 1096, 1103 (9th Cir. 2002)). "The first two factors are equally important and a finding of either is sufficient to support reassignment on remand." *Krechman*, 723 F.3d at 1112.

Wells requests reassignment based on the district court's extensive comments, made at sentencing, in response to Wells' insistence upon his own innocence. Having reviewed those comments, in light of the above factors, we expect that the original judge would have substantial difficulty in setting aside his views of this case.[17] We therefore find that reassignment is advisable to preserve the appearance of justice and order that this case be reassigned on remand.

---

[17] The dissent recognizes that "the district court undoubtedly used strong language" at sentencing and enumerates the statements that raise the possibility or appearance that the original trial court might have difficulty setting aside its views of this case. In particular, we note that the district court relied on the very profile evidence we hold warrants a new trial here, calling Wells "angry, selfish, jealous, narcissistic, and envious." Thus, this is not a case where the district court merely "expressed [its] opinion of the defendant's guilt at sentencing," but one where at least some of the subject statements were founded on error.

## IV.    CONCLUSION

For the foregoing reasons, we find that Wells did not receive a fair trial.

**REVERSED AND REMANDED FOR A NEW TRIAL AFTER BEING REASSIGNED.**

---

NGUYEN, Circuit Judge, concurring in part:

While I otherwise concur, I am unable to fully join in Part III.A of the opinion. I agree that the magistrate court did not abuse its discretion by removing Mr. Offenbecher as appointed counsel under the CJA, once the government was no longer seeking a punishment of death. Given this holding, I see no need to "offer a cautionary note" on the magistrate court's decision-making process. In doing so, the opinion wrongly assumes that the magistrate judge failed to consider the budgetary constraints faced by the Federal Public Defender's Office because the majority "find[s] no indication" in the record that it did so. But a failure to comment specifically on these concerns does not equate to a failure to consider them. Indeed, the opinion's discussion of *United States v. Kott*, No. 3:07-CR-056-JWS-JDR, 2011 WL 2357508 (D. Alaska June 13, 2011), suggests that this magistrate judge was well aware of the FPD's budget problems and had a practice of considering them. Here, given FPD Curtner's express representations in connection with his opposition to the government's motion to relieve Mr. Offenbecher, it's highly unusual for an appellate court to assume that the magistrate judge failed to consider these relevant statements and then criticize the judge for not doing so. This is especially so because we ultimately conclude that the ruling was correct.

The opinion also harshly criticizes the conduct of the government in this case, and rightly so. The motion to remove Mr. Offenbecher was unusual and unbecoming. The government occupies a powerful role in our justice system, and it has vast resources to accomplish its prosecutorial functions. The government bears a unique responsibility not to tip the scales against a defendant, and it failed to demonstrate sufficient sensitivity to that duty here. But, however ill-advised and rare it is to do so, I have found no clear prohibition to the government seeking removal of counsel under these circumstances. Thus, it's not entirely obvious that the Assistant United States Attorneys "placed [themselves] in an ethically compromised position" by doing so here. In fact, there is evidence that the government has misstepped in the same fashion on other occasions. *See, e.g.*, *United States v. Rodriguez*, No. 12-CR-83S, 2015 WL 1120157, at *3 n.3 (W.D.N.Y. Mar. 12, 2015); *United States v. Eldridge*, No. 09-CR-329, 2014 WL 4640848, at *1 (W.D.N.Y. Sept. 16, 2014). This is an important issue on which the Department of Justice could provide additional training and guidance to its line AUSAs in order to avoid prosecutorial overreach.

TASHIMA, Circuit Judge, concurring in part and dissenting in part:

Although I concur in the rest of the opinion, I respectfully dissent from the majority's decision to reassign the case on remand. As the majority acknowledges, we reassign a case only in "rare and extraordinary circumstances." *Krechman v. Cty. of Riverside*, 723 F.3d 1104, 1112 (9th Cir. 2013) (quoting *Air-Sea Forwarders,*

*Inc. v. Air Asia Co., Ltd.*, 880 F.2d 176, 191 (9th Cir. 1989)). The circumstances here were neither rare nor extraordinary.

At sentencing, the district judge undoubtedly used strong language. For example, the judge said, "[T]here's one thing that's absolutely clear to me beyond a reasonable doubt, and that is that James Wells is a cold-blooded murderer"; "You can fight for your innocence, but that won't make you innocent, because you're guilty"; and "Two men cut down in their prime by an angry, selfish, jealous, narcissistic, and envious man."

While the district judge's comments may not have been "as restrained as we would wish them to be," that alone does not justify reassignment. *California v. Montrose Chem. Corp.*, 104 F.3d 1507, 1521 (9th Cir. 1997).

It is perfectly appropriate for a judge to express his opinion of the defendant's guilt at sentencing, after the jury has returned its guilty verdict. After all, if the judge believes that the verdict is a miscarriage of justice, he or she should either grant an acquittal or a new trial–not sentence a defendant he or she believes to be innocent. Moreover, 18 U.S.C. § 3553(a) *obligates* a sentencing judge, on the record, to "consider the nature and circumstances of the offense and the history and characteristics of the defendant." *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (en banc) (citing 18 U.S.C. § 3553(a)(1)). The district court must also state its reasons for imposing the given sentence, in order to permit meaningful appellate review. 18 U.S.C. § 3553(c). The majority's decision forces a sentencing judge to justify her sentence without being *too* firm, or to risk reassignment in the event of remand. That is an unenviable position. When we reverse a conviction and remand for a new trial (or resentencing), we routinely remand to the same judge who presided over the first trial and sentencing. The

majority's decision to require reassignment in the circumstances of this case calls that practice into question and, indeed, opens the door to reassignment based on the whim of the panel. I say "whim," because the majority's decision to reassign here is standardless.

In the few other cases in which we have reassigned based on comments the district court made at sentencing, judges explicitly signaled their "substantial difficulty" setting aside previous views. *See, e.g.*, *United States v. Quach*, 302 F.3d 1096, 1103–04 (9th Cir. 2002) (reassigning where the judge stated he would have denied a sentencing motion that was not brought initially, but could be filed on remand); *Benvin v. U.S. Dist. Court for the Dist. of Nev. (In re Benvin)*, 791 F.3d 1096, 1104 (9th Cir. 2015) (reassigning where the court improperly inserted itself into plea negotiations and had "expressed explicit views on the appropriate terms" of an eventual agreement).

By contrast, nothing in the record here suggests that this district judge will be unable to follow this court's mandate on remand. *See United States v. Johnson*, 812 F.3d 757, 765 (9th Cir. 2016) (holding sentencing comments about defendant's credibility did not justify reassignment). All of the judge's comments which form the basis of the reassignment are based on the trial record, which includes the presentence investigation report of the Probation Officer.

The majority, unable to point to any specific, articulable reason why this case should be reassigned to a different district judge on remand, attempts to justify its recusal of the district judge because "at least some of the subject statements [at sentencing] were founded on error," specifically noting "that the district court relied on the very profile evidence we hold warrants a new trial." Maj. Op. at 2 n.17. But this focus is misdirected. By definition, when

we reverse for a prejudicial evidentiary ruling, the court will
have based its trial and sentencing decisions, at least in part,
on evidence that should not have been admitted.  But we
don't routinely require reassignment in such cases.  Instead,
we ask whether the record discloses any reason why the
district judge cannot set aside his erroneous view and follow
the mandate of this court.  As we stated in *United States v.
Wolf Child*, 699 F.3d 1082 (9th Cir. 2012):

> Although the district judge erred in making
> remarks expressing the view that Wolf Child
> categorically presented a danger to all
> children, including his own daughters, we
> believe our opinion gives sufficient guidance
> that, should he determine that it is necessary
> to impose new conditions relating to Wolf
> Child's being in the company of other
> minors, he will impose only suitably narrow
> conditions that will comply with the
> applicable legal requirements set forth above.

*Id.* at 1102–03.  *See also Krechman*, 723 F.3d at 1112
("Despite his error of law in the prior hearing now under
appeal, we have no reason to believe that [the district judge]
would be unable fairly and correctly to apply the [correct]
standard on remand.").

In sum, I do not believe that a judge's expression of
agreement with the verdict, however strong, itself can serve
as sufficient evidence that the judge will be unable to afford
the defendant a fair retrial.

I respectfully dissent from the order of reassignment.