Peter A. Camiel
Law Offices of Camiel & Chaney P.S.
520 Pike Street, Suite 2500
Seattle, WA 98121
(206) 624-1551
petercamiel@yahoo.com

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. 3: 13-cr-00008-SLG |
| Plaintiff, | ) ) ) | MEMORANDUM IN SUPPORT OF MOTION TO PROHIBIT IRRELEVANT 404(b) EVIDENCE |
| vs. | ) ) | |
| JAMES MICHAEL WELLS, | ) ) | |
| Defendant. | ) ) ) | |

James Wells moves for an order prohibiting the government from introducing evidence under the guise of F.R.E. 404(b) that is irrelevant to the issues before the jury, and whose probative value is substantially outweighed by the unfair prejudicial effect of such evidence. This motion is separate from defendant's motion to prohibit inadmissible character evidence.

At issue are allegations of employment misconduct by Wells and the opinions Wells' coworkers and supervisors developed from these acts. This evidence includes a 2011 allegation of misusing a fuel card, an allegation of collaring trees without permission, and what the Ninth Circuit characterized as a "catch all category of Wells disagreements with co-workers." Prior to the first trial the government listed the 404(b) evidence in the Notice of Intent to Introduce In-trinsic Evidence and Fed. R. Evid. 404(B)

> (1) Defendant Wells had been counseled on several occasions by his U.S. Coast Guard supervisors for failing to obey orders, ignoring his supervisors, significant ethical con-tracting violations, diminished work performance, failure to participate as a fully func-tioning team member, and unexcused absences.

Memorandum in Support of Motion
To Exclude Evidence
(United State v. Wells, 3:13-cr-0008-SLG)

Case 3:13-cr-00008-SLG   Document 944   Filed 03/19/19   Page 1 of 12

(2) Defendant Wells had been confronted about misuse of a U.S. government credit card that had been improperly used to buy gasoline on the U.S. Coast Guard base during a time when the other crewmembers were traveling out of town for work, and when the government vehicles did not require fuel.
(3) Defendant Wells was counseled for taking U. S. Coast Guard property for his personal use, yet possessed various items of U.S. Coast Guard property in his home, and these items were later identified by U.S. Coast Guard supervisors as being U. S. government property.
(4) Defendant Wells had been counseled on past occasions about removing trees from Coast Guard property, in order to obtain firewood at no cost to the defendant. This included improperly "collaring" trees to cause their premature death.
(5) Defendant Wells had had his travel orders to a professional conference cancelled a few months prior to the murders because of his diminished professional performance, and one of the victims was substituted to attend in his place.
(6) Generally, defendant's professional performance had diminished in the years leading up to the murders, and newly reported Coast Guard command members were holding defendant accountable for his actions, when in the past, defendant had been able to "fly under the radar." (Doc. 181)

Over Mr. Wells' objection at the first trial, the government was permitted to introduce prior act evidence to show Wells had both the narcissistic character traits and the accumulation of humiliations Dr. Meloy described in his profile of the perpetrator. Dr. Meloy's testimony was found to be erroneously admitted, and the government will not be calling him in this trial. The district court also erroneously permitted the evidence as inextricably intertwined with the crime and as motive evidence. (3/24/2014 RT 11)[1]. The Ninth Circuit found the evidence was not inextricably intertwined with the crime. The Ninth Circuit did not find error in the admission of the more recent "other act" evidence but did find error in the introduction of a 2003 incident. However, much of the other act evidence, as it came in at trial, was simply used to bolster Dr. Melloy's testimony, and used to argue propensity and should be excluded from this trial.

The government was permitted to elicit the prior act evidence purportedly to show Wells' motive to kill Hopkins and Belisle. (3/24/2014 RT 11). These ranged from a 2003 incident in which Wells disobeyed an order to leave a fiberglass hut on Attu Island for repairs (RT 822-

---

[1] RT refers to the Reporter's Transcript of the proceedings.

846), which the Ninth Circuit found to be error, to a 2012 letter of caution issued to Wells based on the consensus of command he had used a government fuel card to fuel his own vehicle, despite an inconclusive investigation into the matter, and the fact that the fuel tank in his truck would not have accommodated the amount of fuel stolen. (RT 493-94, 791-809, 909-929, 1020-21, 1166-1178, 1262-1270, 1335-1336). Indeed, the investigative report regarding the fuel card states "There is inconclusive evidence to determine who used the fuel card."

Other incidents included an accusation of having improperly collared trees on Coast Guard property to cause their early death so he could use them as firewood (RT 493, 906-909, 1179-1186, 1331-1332), having disagreements regarding the placement of bird diverters on an antenna tower (RT 904-906), having a difference of opinion about how to wire a particular antenna (RT 489-490, 937-939), failing to participate in a project to clean out a warehouse (RT 490-491, 854-857, 934-936, 1021, 1057-1058, 1186-1189), and a perception of resisting collaborating in a project to prepare an antenna book. (RT 491, 930-932, 1058-1060, 1189-1190, 1251-1252, 1327-1330). These accusations—and Wells' defense to them—occupied two full trial days. (RT 791-1348).

Federal Rule of Evidence 404 twice forbids evidence of a person's character, character traits, or acts to prove character to show that on a particular occasion the person acted in accordance with the character or trait. Fed. R. Evid. 404(a)(1), (b)(1). "The gravamen of the historic attempt to exclude such character evidence is to force the jury, as much as humanly possible, to put aside evidence" going only to a defendant's character, "and consider the body of evidence, both testimonial and physical before them, in order to decide if the prosecution has convinced them, beyond a reasonable doubt, that the defendant is guilty of the crime charged." *McKinney*, 993 F.2d at 1385 (granting habeas relief in murder prosecution on basis of admission of evidence of defendant's fascination with knives); *see also Old Chief v. United States*, 519 U.S. 172, 182

(1997) ("There is . . no question that propensity would be an 'improper basis' for conviction"); *Michelson*, 335 U.S. at 475-76 ("The state may not show defendant's prior trouble with the law, specific criminal acts, or ill name among his neighbors, even though such facts might logically be persuasive that he is by propensity a probable perpetrator of the crime"). And yet, the government was permitted to put on volumes of such evidence at Well's first trial, specifically to prove "the character that we're going to be discussing throughout this trial." (RT 831). In its closing, the government referred repeatedly to this evidence as showing Wells' "narcissistic traits," his "strong sense of self," his "sense of entitlement," "his pride and his belief that he was at the top of his profession." (RT 3742-43).

The only purpose of this evidence was to prove that Wells was a bad employee and that on the day of the shootings, Wells acted in accordance with this character or trait—which, according to the government, was to commit an otherwise illogical, irrational murder. It was, therefore, classic propensity evidence that should be excluded.

**The Other Act Evidence Was Not Admissible to Show Motive**

The court admitted evidence of misconduct and reprimand dating back nearly a decade as "relevant to motive." (3/24/2014 RT 11). But the government's theory of admissibility went not to motive, but to character and propensity. The government used the other act evidence to allege that Wells was a narcissist who had suffered setbacks in the workplace and thus committed murder. Because other acts are not admissible to show motive where the only logical connection between the acts and the crime relies on propensity, *United States v. Bradley*, 5 F.3d 1317, 1321 (9th Cir. 1993); *United States v. Brown*, 880 F.2d 1012, 1015 (9th Cir. 1989), this evidence should not have been admitted.

The government introduced a litany of unproved and relatively trivial infractions—resulting in four letters of reprimand, two letters of caution, one letter of expectation, one letter for the

record, and one letter of notification (RT 1243) in what was Wells' otherwise outstanding career with the Coast Guard. Wells had served eight years in the Navy, from which he was honorably discharged; thirteen years in the Coast Guard, from which he received a medical discharge; and twenty-two years as a civilian for the Coast Guard, during which time his superiors had always rated him as meeting or exceeding expectations in all core competencies. Importantly, neither the alleged instances of misconduct themselves, nor the reaction of the chain of command, involved either of the victims of this offense.

As for the implication Wells' workplace problems were escalating to the point where Wells would commit murder to avoid further discipline, in fact, the testimony was that, during Wells twenty-two years as a civilian employee of the Coast Guard, he had only received four letters of reprimand, two letters of caution, one letter of expectation, one letter for the record, and one letter of notification. (RT 1243). The most recent letter of reprimand–the most serious form of discipline–was not from the year before the murders, but nearly ten years before, in 2003, regarding a matter the Ninth Circuit found to be too remote to be admissible. (RT 895) Indeed, Wells was out on medical leave more than he was at work in the months leading to the murders.

The evidence at trial revealed that Chief Reckner was the primary source of criticism directed at Wells. Reckner had arrived at COMSTA in July of 2010. (RT 886) Neither Hopkins nor Belisle had accused Wells of stealing fuel or collaring trees; nor did they issue the letter related to these incidents. Even if it could be said that anyone would commit murder because he had been accused of killing trees or stealing gas, there was no logical argument that Wells would kill two individuals uninvolved in the accusations for this reason.

The government cannot explain how any conflict Wells had with Reckner would give him motive to murder Hopkins or Belisle. The other act evidence involves a variety of relatively

Memorandum Re Motion To Prohibit 404(b)
Evidence-5

trivial complaints about Wells, but neither Hopkins nor Belisle featured prominently, if at all, in these complaints. The government proffered a theory Wells murdered Hopkins and Belisle to eliminate them as a threat to his position as top dog at the Rigger shop. But Hopkins was set to retire (RT 514, 802, 1001-1002, 1065, 1117, 2842), Wells was often ill and also on the brink of retirement (RT 3008-3009), and Belisle was described as Wells' protégé (RT 1086, 1087, 3377-3378). Even if workplace issues, consistent with issues Wells had been having for over twenty years, gave him a motive in 2012 to murder, they gave him no motive to murder Hopkins or Belisle.

To determine whether any evidence is relevant, the court needs to start with the charges. Mr. Wells is charged with the intentional killing of two coworkers, Hopkins and Belisle. It appears that the government theory as to motive is that Wells became frustrated following a 2011 change in COMMSTA command which put more pressure on him to conform to the chain of command."

The Ninth Circuit determined the government's motive theory as follows:

> The Government's motive theory unfolded in the following basic sequence: Wells' frustrations began with a 2011 change in COMMSTA command, which placed unwelcome pressure on him to conform to the chain of command. Due to personal illness and his resulting absences from work, Wells became increasingly frustrated by a loss of professional independence and importance. His frustration turned to anger and culminated in the murders of his co-workers, whom he deemed threats to maintaining his station within the rigger shop.

The Ninth Circuit also stated: While it is reasonable to grant some flexibility to a prosecution tasked with constructing a motive theory to prove a double workplace homicide, we must also insure that reasonable limits are employed." In finding that the 2003 incident was not properly admitted the court stated: "There is, however, no logical basis to explain how a 2003 incident, marked by a different supervisor and bearing no connection to either victim, much provide motive for a double homicide nearly one decade later."

What the Ninth Circuit and Judge Beistline missed was that neither the fuel card incident, the tree collaring incident, the bird diverter disagreement, the difference of opinion about how to wire an antenna, failing to participate in the warehouse cleanup, or working on the antenna book did not involve Wells being criticized or reprimanded by either victim.

As is noted in more detail below, the letter of caution from the investigation of the fuel card came from Commander Van Ness. The bird diverter disagreement was between Wells and Chief Reckner (RT 904-906). Similarly, it was Chief Reckner who confronted Mr. Wells about the collaring of trees. (RT 906-909) As to the disagreement about how to run an antenna wire to a roof satellite dish, it was Chief Reckner who made the decision to follow Belisle's suggestion rather than Mr. Wells suggestion. (RT 490)

The Ninth Circuit also found that Judge Beistline never indicated on the record that he engaged in the required Rule 403 balancing and determined that the probative value of the 404(b) evidence was not substantially outweighed by the danger of unfair prejudice. "the failure of the district court to engage in Rule 403 balancing...." This Court is required to engage in Rule 403 balancing for each of these incidents.

**The Fuel Card Allegation**

The fuel card allegation stemmed from an investigation into whether Wells used the government fuel card to fuel up his own vehicle. That investigation ended in inconclusive findings rather than a finding that Wells had in fact misused the fuel card. The investigative report provides: "There is inconclusive evidence as to determine who used the fuel card." The letter of caution, dated January 4, 2012, came from Commander Van Ness. The government was permitted to spend considerable time having witnesses describe this incident, the investigation of the fuel card use, and Wells reaction to receiving the letter of caution. The evidence about the fuel card came in through several witnesses including Chief Cartier who conducted the

investigation including Chief Reckner, Nathaniel Pacheco, Lt. Pizzaro and Commander Van Ness. This allegation had nothing to do with either victim.

**Tree Collaring Allegation**

The tree collaring allegation at issue not only involved Wells being accused of collaring trees without permission but also involved Belisle collaring trees. Wells received a memorandum from Reckner entitled "Establishment of expectations other than performance." (RT 914) Both Wells and Belisle were cautioned by Chief Reckner. How this is even remotely relevant to the intentional murder of Belisle and Hopkins is a mystery.

**Catch All Allegations**

The Ninth Circuit described another category of events as "Catch All Allegations." These were not "bad acts" but merely instances of workplace disagreements. But not disagreements with the victims, Belisle and Hopkins, but with Chief Reckner.

**The NATE Convention**

The Convention matter involved Chief Reckner deciding that Wells would not be attending the winter 2012 annual convention held by the National Association of Tower Erectors. The decision that Wells not attend was made by Chief Reckner and approved by the chain of command, but that decision did not involve either victim. (RT 922) The government described this incident as follows:

> In January 2012, Reckner told the defendant that, because of his disciplinary problems and excessive absences, the defendant could not attend the annual National Association of Tower Erectors (NATE) conference. The defendant had attended the conference for many years, but Reckner decided that only he, Hopkins, and Belisle would attend the 2012 conference. Reckner and the defendant had another heated argument regarding the decision. After they had finished arguing, the defendant simply sat and stared at Reckner. Reckner stated that he was "sick" of the defendant's attitude and stared back for what seemed like a long time.

**The Warehouse Cleaning Project**

The cleaning of the warehouse project involved the cleaning out the warehouse at the Rigger Shop prior to a change in command that involved organizing and discarding old items. (RT 490) Wells was out sick for a good part of this task. (RT 490) There was testimony that at one point, Wells walked in while the cleaning was taking place and shook his head and said something and walked out. (RT857) The decision to clean out the warehouse was not made by either victim and Wells was not reprimanded for not participating in this project. Thus, this incident is not even remotely relevant.

**The Antenna Book Project**

The antenna book project involved Seaman Henry being tasked with putting together a binder with all the information on all the towers. (RT 491) Chief Reckner testified that when he first came to the station, he had been told that at an earlier time Mr. Wells had been assigned to create the Antenna book but that it had not been done. Because Mr. Wells had been absent so frequently, he assigned the task to ET1 Hopkins and to Seaman Henry. (RT 931) Henry testified that she was directed by Hopkins and Reckner regarding this project (RT 1059) Wells was not reprimanded or disciplined in any way regarding this matter.

**Satellite Antenna Wire**

On April 11, 2012, the day before the murders, there was a discussion about putting a satellite antenna on the roof of the communications station. The discussion concerned whether to run the wire through the roof of the building or outside of the building (RT 489) Belisle suggested running the wire through the roof and Wells suggested running the wire up the side of the building. Chief Reckner made the decision to run the wire through the roof. (RT 490) There is no evidence that Wells reacted angrily to Reckner's decision.

**The Bird Diverter Issue**

In the summer of 2011, there was a discussion about whether to install bird diverters on a tower. Chief Reckner wanted to put the diverters on the tower and Wells disagreed. (RT 905) Reckner made the decision to install the diverters and described Wells reaction as "upset." (RT 906) In their trial brief the government described this incident as follows:

> In July of 2011, Reckner, Hopkins, Belisle, other Rigger Shop personnel, and the defendant were erecting new towers at a remote Coast Guard facility. The defendant had decided not to install devices required by the Environmental Protection Agency on the towers. Reckner ordered the devices to be installed. The defendant argued with Reckner over the decision and yelled at anyone who would listen to him that Reckner wasn't letting Wells do his job. (Govt Trial Brief, Doc. 362 at p. 14)

The matter had nothing to do with either victim.

**Wells Not Keeping His Superiors Informed as to Where He Was**

The government also introduced evidence and argued that Wells was "disciplined or it was documented for not telling his bosses where he was at.. and going on trips without telling his bosses." (RT 3746) The government described this incident as follows:

> In April 2011, the Engineering Officer (EO), Senior Chief Reed, issued Wells a memorandum of "EO Expectations/Clarifications." Wells was instructed to notify the command when he was taking time off from work, and to receive command approval for official travel. Wells's supervisors were often not aware when he was gone, or where he was. Wells would travel to other parts of the country to assist other units, and if the other units provided the funding, Wells would sometimes not bother to inform his bosses. (Govt. Trial Brief, Doc. 362 at pp. 14-15)

As with the other matters, this had nothing to do with either victim.

### Additional Inadmissible Other-Act Evidence

**Allegations of Stolen Property**

During the first trial the government also introduced evidence suggesting that Wells stole property. For example, John Stein was questioned about his ceremonial sword that he had last seen before he sold his house that was found in Wells' residence with the implication that Wells

had pilfered the sword from Stein. (RT 2196) This matter did not involve Wells employment at all.

The government also introduced evidence that government property was found in Wells home when it was searched, implying Wells had stolen the property. In it's notice regarding 404(b) evidence the government wrote: "Defendant Wells was counseled for taking U. S. Coast Guard property for his personal use, yet possessed various items of U.S. Coast Guard property in his home, and these items were later identified by U.S. Coast Guard supervisors as being U. S. government property." (Doc. 181) Nothing about this matter involves either victim.

**Abuse of Sick Leave**

The government has also alleged that Mr. Wells abused sick leave. The government wrote:

> In August of 2011, the defendant became ill and was in and out of the office through most of the fall of 2011 and winter of 2012, only returning to full-time duty in February 2012…. In December of 2011, Reckner told the defendant that he was abusing his sick leave and needed to report back to work or retire. The defendant and Reckner had a heated argument which was heard by others outside of Reckner's office.
> (Govt. Trial Brief, Doc. 362 at pp. 16-17)

As with the other incidents, this matter did not involve either victim. By contrast, the evidence at trial revealed that Chief Reckner, the primary source of criticism directed at Wells, condoned other employees—including Belisle and Hopkins—committing major misconduct by bringing firearms into the Rigger Shop. Indeed, Reckner participated in the misconduct himself by purchasing a firearm from Belisle at work. (RT 505-506, 993-995).

None of the incidents described above, even when they led to some form of minor disciplinary action has sufficient probative value on the issue of the murder of Belisle and Hopkins. Instead, these matters simply attempt to paint James Wells as a problematic employee.

Memorandum Re Motion To Prohibit 404(b) Evidence-11
Case 3:13-cr-00008-SLG Document 944 Filed 03/19/19 Page 11 of 12

### F.R.E. 403 Balancing Weighs Against Admissibility

F.R.E. 403 requires that the court balance the probative value of evidence against unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time or needlessly presenting cumulative evidence. Thus, even when evidence is deemed to have some relevance it must be excluded if the probative value is outweighed by any of the above listed concerns. The Ninth Circuit found that the district court failed to engage in Rule 403 balancing. This court must do so. Wells' disciplinary history did not involve either victim. The admission of this evidence unfairly portrays Wells as simply a "bad employee." The admission of days of testimony regarding prior bad acts, and the opinions Wells' coworkers and supervisors developed from those acts, is simply not relevant.

### Conclusion

For the above-stated reasons, the court should rule that the other act evidence described above is inadmissible under F.R.E. 404(b) and that any slight probative value is substantially outweighed by the danger of unfair prejudice pursuant to F.R.E. 403.

Dated this 19th day of March, 2019.

*Peter A. Camiel*
Peter A. Camiel
Attorney for Defendant Wells

I hereby certify that on the 19th day of March, 2018, I caused the foregoing to be electronically filed with the Clerk of the Court of the United States District Court for the District of Alaska using the CM/ECF system. I further certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the district court CM/ECF system.

/*s/Peter A. Camiel*
Peter A. Camiel