BRYAN SCHRODER
United States Attorney

STEVEN E. SKROCKI
Deputy Criminal Chief
CHRISTINA SHERMAN
Assistant U.S. Attorneys

KELLEY STEVENS
Special Assistant U.S. Attorney
Federal Building & U.S. Courthouse
222 West Seventh Avenue, #9, Room 253
Anchorage, Alaska 99513-7567
Phone: (907) 271-5071
Fax: (907) 271-1500
Email:  steven.skrocki@usdoj.gov
        christina.sherman@usdoj.gov
        Kelley.L.Stevens@uscg.mil

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | No. 3:13-cr-00008-SLG |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | |
| JAMES MICHAEL WELLS ) | |
| ) | |
| Defendant. ) | |
| ) | |

**UNITED STATES' OPPOSITION TO MOTION TO EXCLUDE OTHER ACT EVIDENCE**

COMES NOW the United States of America, by and through above-named counsel, and files with the Court this opposition to the Motion to Exclude Other Acts Evidence.

(Doc. 943). Wells mischaracterizes the evidence from the first trial as propensity or character evidence. Such is not the case. The evidence the government seeks to introduce is admissible as other acts evidence under Federal Rules of Evidence 404(b)(2) and 403.

## I.     Other Act Evidence is Admissible to Prove Motive.

The Federal Rules of Evidence exist to ascertain the truth and secure a just determination. FRE 102. To that end, all relevant evidence should be admitted. Relevant evidence is evidence that "has any tendency to make a fact more or less probable than it would be without that evidence and the fact is of consequence in determining the action." FRE 401. Relevant evidence has limitations. One of the areas where the Federal Rules of Evidence limits its use is when it is introduced to prove a person is of a bad character or to prove a character trait for the sole purpose of propensity.

> Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with that character.

FRE 404(b)(1). Such propensity evidence is not admissible. However, FRE 404(b) continues and establishes exceptions for evidence that may show a "character trait" as long as it is admissible for another purpose. A "character trait" can take several forms. Federal Rule of Evidence 404(b)(2) states:

> This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.

Thus, the first step in the analysis is whether the evidence offered is admissible for 'another purpose,' such as motive in this case. The second step is an analysis of the evidence under

U.S. v. James Michael Wells
3:13-cr-00008-SLG                                  2

a balancing test pursuant to FRE 403.

> Rule 404(b) is a rule of inclusion – not exclusion – which references at least three categories of other 'acts' encompassing the inner workings of the mind: motive, intent, knowledge. Once it has been established that the evidence offered serves *one* of these purposes, the relevant Advisory Committee Notes make it clear that the *'only'* conditions justifying the exclusion of the evidence are those described in Rule 403....

*United States v. Curtin*, 389 F.3d 935, 944 (9th. Cir. 2007)(*en banc*).(emphasis added).

Once a court determines that evidence is admissible for another purpose other than propensity, the court must then conduct a FRE 403 balancing analysis to consider whether the probative value of the evidence outweighs the danger of unfair prejudice, confusion of the issues, misleads the jury, is cumulative, or wastes time or causes delay. FRE 403. When the court examines the evidence proffered by the government here, it will conclude the evidence is permissible as to motive, and not excluded under FRE 403 balancing.

The use of other act evidence for proper purposes has been long recognized. The United States Supreme Court in *Huddleston v. United States*, 485 U.S. 681 (1988), recognized that "[e]xtrinsic acts evidence may be critical to the establishment of the truth as to a disputed issue, especially when that issue involves the actor's state of mind and the only means of ascertaining that mental state is by drawing inferences from conduct." *Id*. at 685, as is the case here. The Supreme Court recognized, also, that there is a concern that FRE 404(b) could lead to the admission of unduly prejudicial evidence. However, the Court in *Huddleston* thought the protection against such a concern was not to prohibit the

evidence under 404(b), but to require the evidence be admitted for a permissible purpose, require it to be relevant under FRE 402, require the trial court conduct a 403 determination, and require the use of a limiting instruction to the jury that the evidence should only be used for a proper purpose. *Id*. at 691-92.

More recently, the Ninth Circuit developed a four-part test in determining whether evidence is admissible under FRE 404(b):

> Such evidence may be admitted if: (1) the evidence tends to prove a material point; (2) the other act is not too remote in time; (3) the evidence is sufficient to support a finding that defendant committed the other act; and (4) (in certain cases) the act is similar to the offense charged.

*United States v. Bailey*, 696 F.3d 794, 799 (9th. Cir. 2012)(*citing United States v. Romero, 282 F.3d 683, 688 (9th Cir. 2002)*). The fourth requirement of the similarity of conduct relates to cases in which the extrinsic evidence is being introduced to prove intent. *See United States v. Bradley,* 5 F.3d 1317, 1320 (9th. Cir. 1993).

Evidence of other acts of a defendant that establish motive are admissible if they go towards proving motive and not propensity so long as the probative value outweighs the danger of unfair prejudice.

**II. The Evidence the Government Seeks to Introduce in this Case is Admissible Under FRE 404(b)(2) and FRE 403.**

The defense motion essentially makes two overarching arguments. Each will be discussed in turn.

First, Wells claims that the government seeks to introduce this evidence for the purpose of propensity – essentially that Wells was a "bad employee" and therefore he acted

in conformity as a "bad employee" when he killed his co-workers. The defense argues that despite the Ninth Circuit not finding any error in the admission of the recent other act evidence, this evidence was simply used to bolster the testimony of Dr. Meloy and was argued as propensity and should therefore now be excluded. (Doc. 944 at 2.) Wells essentially argues that since Meloy's testimony is now excluded, the additional evidence listed below should be precluded.

The Ninth Circuit however, spent a significant amount of its opinion in this case addressing the testimony of Dr. Meloy, the other act evidence and the arguments of improper character evidence. Had the Ninth Circuit believed that the underlying facts and other act evidence Dr. Meloy utilized to form his opinion were not properly admitted, it certainly would have said so. Instead, it opined quite the opposite. The Ninth Circuit, after determining the 2003 Attu incident should have been precluded because it was too remote in time, found that the other act evidence could properly be admitted at retrial. *See Wells*, 879 F.3d 900, 928 (9th Cir. 2018) ("[w]e uphold the admission of the remaining other acts evidence under Rule 404(b)(2).")[1]

Second, the defense argues that since many of the other acts were not in response to or involved the victims, James Hopkins and Richard Belisle, the evidence should be precluded because it can't possibly go to motive. The defense claims the District Court and the Ninth Circuit missed this analysis entirely. Here, Wells is simply wrong because while neither Court addressed this specifically, the analysis of admissibility of other acts

---

[1] Given the reversal, the Court of Appeals clearly drafted its opinion with retrial in mind.

U.S. v. James Michael Wells
3:13-cr-00008-SLG  5

pertaining to motive was thoroughly examined by the Ninth Circuit. The argument made by Wells is that because Hopkins and Belisle weren't the direct cause of each and every one of Well's work issues, letter of caution, and work-related frustrations, that this vacuum somehow makes these acts less of a motive to kill his co-workers. This argument is an over-simplification of the government's theory of the motive in this case and Wells provides this court with no authority in support of other act evidence needing to be so tightly bound to either the victims or the actions of the United States Coast Guard. The government's theory is far broader than Hopkins and Belisle making Wells angry so he murdered them. Clearly, as when shown below, the motive is more complex, which was something recognized by the Ninth Circuit.

In its opinion, the Ninth Circuit accurately summarized the government's motive theory from the sequence of events presented at the first trial:

> Wells' frustrations began with a 2011 change in COMMSTA command, which placed unwelcome pressure on him to conform to the chain of command. Due to personal illness and his resulting absences from work, Wells became increasingly frustrated by a loss of professional independence and importance. His frustration turned to anger and culminated in the murder of his co-workers, whom he deemed threats to maintaining his station within the rigger shop.

*Wells,* 879 F.3d at 929. The Ninth Circuit then went on to say it accepted that theory so long as it began in 2011 with the fuel card investigation and progressed from there, finding that the events prior to 2011 are too remote in time to be admissible under 404(b)(2). *Id.* [2]

---

[2] As indicated earlier, the United States will not be calling Dr. Meloy as a witness at trial nor will it seek to introduce the 2003 Attu incident.

U.S. v. James Michael Wells
3:13-cr-00008-SLG                               6

The government's theory of Wells' motive in this case remains largely the same. The defendant, a long-time employee at the COMMSTA began to experience work-related issues after the 2011 change in command. During that entire time, Hopkins and Belisle were working in the Rigger Shop. Belisle was a retired Coast Guard civilian employee and Hopkins was the supervisor of both Belisle and Wells. These two men were often intertwined in the events that establish Wells' motive. It was the series of events in 2011 and 2012 that led to Well's frustration and feeling like he was being marginalized, overlooked and no longer seen as the leader of the Rigger Shop. As a result, Wells chose to kill his direct supervisor and the co-worker who was taking his place. These events are each relevant and admissible evidence of other acts under FRE 404(b)(2) to prove motive. Further, the probative nature of each of these admissible events far outweighs any unfair prejudice under FRE 403.

Ultimately, with the exclusion of the 2003 Attu incident, the Ninth Circuit determined that all these other acts were properly admitted at Wells' trial under FRE 404(b)(2). As stated by the court;

> (h)ere, none of the other acts evidence bears 'directly' on the charged crimes, or has the requisite 'contextual or substantive connection' to be categorized as inextricably intertwined. It was error for the district court to admit it as such, but the alternative admission under Rule 404(b)(2) save all but the 2003 incident.

*See*, *Wells*, 879 F.3d at 929. Clearly, the court's opinion on all of these matters was authored most certainly with re-trial in mind. In conclusion, on its analysis of the 404(b)(2) matter, the Court held,

U.S. v. James Michael Wells
3:13-cr-00008-SLG 7

> This evidence, as a whole, was relevant to Wells' work environment, including his relationships with relevant co-workers and supervisors; was not too remote in time and fits within a reasonably tailored version of the government's motive theory…On balance the probative value of this evidence is unique in a workplace homicide trial, and we do not find that it is substantially outweighed by any danger of unfair prejudice.

*Wells,* 879 F.3d at 930.

The government in this retrial does not seek to introduce additional other acts evidence, and intends to limit the acts it seeks to admit as described further in the next section. This Court should conduct the requisite analysis under FRE 404(b)(2) and 403 and determine that each of the other acts the government seeks to introduce are relevant and admissible to prove motive in this case. Having established its admissibility under FRE 404(b)(2), the Court will further find that the probative value outweighs any unfair prejudice consistent with the opinion of the Ninth Circuit.

### III. Specific Other Acts the Defendant Seeks to Preclude

Since the defense sets forth a specific list of acts it seeks to preclude, the government will address each of these individually below explaining whether the government in fact intends to introduce that other act. Each of these acts the government intends to introduce prove Wells' motive.

#### A. 2003 Attu Incident Will Not Be Sought For Admission

This incident is addressed generally in the defense motion, but not specifically listed in the items the defense seeks to preclude. Based on the Ninth Circuit opinion and a recent thorough review of the evidence in this case, the government does not intend to introduce

evidence of the 2003 incident on Attu. Should the defendant open the door during cross-examination of the government's witnesses or during the defense case, the government will notify the Court and make a separate application outside the presence of the jury prior to any inquiry of any witness.

### B. Fuel Card Investigation and Letter of Caution

In 2011, as the rest of the Rigger Shop crew was getting ready to deploy to Shemya Island, Hopkins discovered that a fuel card, usually kept in Wells' desk, had gone missing. Hopkins reported the missing fuel card. An investigation revealed that during the time the card was missing and while most of the employees of the Rigger Shop were off Kodiak Island on Shemya, the card was used to purchase fuel on the U.S. Coast Guard base. The government vehicles did not require fuel at that time. The card reappeared later in Wells' desk. Hopkins, Belisle, Reckner, and Wells all submitted written statements as part of the investigation. Wells' explanation was determined to be inconsistent with the surveillance video that captured him entering the base shortly before the fuel card was used, although ultimately the administrative investigation was deemed inconclusive. In 2012, Commander Peter Van Ness felt that Wells' inconsistent statement when compared to the surveillance video warranted a letter of caution regarding the misuse of the fuel card. To that end, the command presented Wells with his letter of caution during a meeting held in the Commander's office. During the meeting, Commander Van Ness presented Wells with the letter and some back and forth discussion ensued. Wells refused to sign the letter acknowledging its receipt. After more back and forth, CDR Van Ness, the senior officer,

stood indicating the meeting was over and signaling everyone to leave. Everyone else stood in respect to CDR Van Ness while Wells remained defiantly seated for a time long enough to make everyone uncomfortable. Wells expressed that he was upset that the Commander didn't trust him. Wells' response to being issued a letter of caution and being told he had lost the trust of the Command goes directly to Wells' displeasure with the chain of command.

### C. Tree Collaring

Prior to the murders, the Command accused Wells of collaring trees out in the field around the antennas causing them to die prematurely so he could down them and use them for firewood. The command confronted him about collaring trees without permission in August 2011. Hopkins and Belisle were present during that counseling. Wells got defensive during the meeting and tried to defend the practice as being preemptive, but when Reckner, Belisle and Hopkins' supervisor, stated that that there were trees not near roads being collared, Wells became very quiet. Wells was later given a memorandum setting expectations that trees were not to be collared. Wells being reprimanded, and his response during that situation, go directly to motive.

### D. NATE Convention (National Association of Tower Erectors)

For years, Wells attended the annual NATE Convention. He would attend as a prominent person in the field and evidence established at trial indicated this conference was very important to Wells' ego. It was Reckner's impression that Wells liked being the person who knew a lot about antenna towers at the conference. However, based on Wells'

recent performance and absences within the last year, Chief Reckner informed Wells he would not be attending the NATE Convention. Instead, Reckner, Belisle, and Hopkins would be attending the conference. When Reckner informed Wells of this, he got into a heated argument with Reckner and tried to "stare him down". The fact that Wells wasn't allowed to attend a conference he had attended for years, and instead the fact that Belisle and Hopkins would be attending, goes directly to Wells' motive.

### E. Allegations of Stolen Property

At this time the government does not intend to introduce evidence in its case-in-chief regarding the stolen property located at Well's residence after the homicide.

Should the defendant open the door during cross-examination of the government's witnesses or during the defense's case, the government will notify the Court and make a separate application outside the presence of the jury prior to any inquiry of any witness.

### F. Work-Place Disagreements

Several of the other acts the defense seeks to preclude fall under the general category of "workplace disagreements" but are similarly relevant to motive under FRE 404(b)(2). The government intends to introduce these instances as each of them are applicable and support the government's theory of motive previously accepted by the Ninth Circuit when this exact evidence was on review. Nothing raised in the defense's motion in limine changes the admissibility of this evidence under FREs 404(b)(2) and 403 based on the government's motive theory. Each are addressed individually below.

### 1. Warehouse Cleaning Project

A storage warehouse was cleaned out in March 2012 primarily during a time when Wells was not present. Coast Guard personnel will testify they performed this task while he was gone because they knew Wells would be upset because he doesn't like to get rid of things. Belisle, Petty Officer Cody Beaford, and other Coast Guard personnel cleaned out the warehouse in his absence. While cleaning out various old nuts and bolts and other items into a box, Wells entered the warehouse and saw the box of items to be discarded. He muttered something, shook his head, and walked out. Petty Officer James Encinas observed that this upset Wells. Belisle was involved in leading the Coast Guard personnel charged with cleaning out the warehouse. The evidence of the victim and others in the command discarding items holding a personal importance to Wells, the fact his colleagues knew of its importance, and Wells' reaction to the removal and discarding of these "important" items, goes directly to his motive.

### 2. Antenna Book

Testimony will establish that Wells harbored and kept close much of his knowledge about towers and the antennas placed on the towers. At one point, Hopkins directed Wells to create an antenna book documenting each antennae's specifications and capturing Wells' breadth of knowledge for ease of reference for other Coast Guard personnel. Wells failed to do so. Testimony will establish that while Wells was out sick, the employees at the rigger shop learned they could complete much of Wells' antenna work themselves. Hopkins then had one of the other Coast Guard personnel create the antenna reference

book. This book allowed everyone ready access to the knowledge that previously belonged to just Wells. This evidence, again, is relevant to motive under the theory that Wells was feeling marginalized and the command managed to operate without him as others filled his shoes and gained the knowledge to do his job. This evidence, taken alone or in conjunction with the other evidence sought to be introduced, goes directly to Wells' motive to murder Hopkins and Belisle.

### 3. Satellite Antenna Wire

On April 11, 2012, the day before the murder of Hopkins and Belisle, Wells, Hopkins, and Belisle went to the main administrative building, called "T-1"for the purpose of installing a satellite antenna wire on T1. The men discussed the best way to run the antenna wire up to the roof for the satellite antenna. Part of the discussion occurred on the roof of T1 and included Reckner, Hopkins, Belisle and Wells. Testimony will establish that Wells opined he wanted to run the antenna wire up the side of the building. Belisle suggested running the antenna wire through the roof. After discussion, Reckner decided to follow Belisle's suggestion over Wells' recommendation. The next day, both Belisle and Hopkins were murdered. The discussion, that once again left Wells feeling marginalized, clearly and properly goes to support the government's theory of motive.

### 4. Bird Diverters

In the summer of 2011, most of the Rigger Shop personnel flew out to Shemya Island, including Wells, Hopkins, and Belisle. During that trip, there was a disagreement about the bird diverters. Testimony will establish that Wells didn't want to install bird

U.S. v. James Michael Wells
3:13-cr-00008-SLG 13

diverters on the antenna. Reckner told Wells they had to be installed because it was the law. This upset Wells. Belisle actually suggested a way to mitigate Wells' concerns about the use of the bird diverters. Wells, Belisle, and Reckner were all in a truck together when Reckner ultimately decided to put the bird diverters on the antenna. Reckner observed Wells as being upset with this decision. This reaction further illustrates Wells' overall motive to commit the murders.

### 5. Failure to Inform Superiors & Abuse of Sick Leave

Evidence at trial will establish that Wells had repeatedly failed to tell his supervisors about his whereabouts during the workday. The Command's position on the proper use of sick time and vacation time was included in the memorandum of expectation given to Wells in 2011. The memorandum included a reminder that Hopkins was the rigger shop supervisor and Wells was to keep Hopkins informed of his whereabouts so Hopkins could report that up the chain of command. In late 2011, well after the command provided Wells with the memorandum of expectation, Wells again absented himself without providing the command with any notice. Reckner confronted Wells about the abuse of sick leave and they got into a heated argument on this issue. Wells' angry reaction to Reckner's confrontation about abuse of leave, and his direct violation of the command's order to inform his supervisors of his whereabouts/absences are directly relevant to Wells' motive.

Each of these individual events are examples of Wells' poor performance, abuse of leave, and other work-related issues with supervisors and co-workers prior to the murders. They demonstrate a clear timeline of Wells feeling marginalized, becoming upset when his

chain of command followed the suggestions of his peers, or when he was accused of misconduct. The evidence establishes that Wells was no longer permitted to do whatever he wished, whenever he wanted, without consequence and that under the new command started holding him accountable. While away during long periods of absence, it was becoming clearer that the other employees of the rigger shop could readily carry on the work and execute the mission without him. Each of these other acts, and Well's response to the confrontations involved, are admissible under FRE 404(b)(2) and FRE 403. They go directly to prove his motive for killing his direct supervisor – Hopkins – and his co-worker, Belisle, who was supplanting him in terms of knowledge and the trust of his command. It was clear by these actions that Wells was becoming a non-essential member of the Rigger shop.

## IV. Conclusion

The United States, guided by the Ninth Circuit's very clear ruling on the workplace conduct issues, will seek admissibility of this evidence to prove motive. During its case in chief, the government will not, in accord with the Ninth Circuit's ruling, seek to introduce the testimony of Dr. Meloy, evidence of the 2003 Attu Incident, or evidence of the stolen Coast Guard property found at Well's residence.

The Federal Rules of Evidence allows the government to prove motive through the other acts evidence. The events the government seeks to introduce evidence that proves Wells' motive for killing his co-workers and is not unduly prejudicial. Finally, the government will be requesting a limiting instruction to ensure this other acts evidence is

U.S. v. James Michael Wells
3:13-cr-00008-SLG 15

used by the jury for the proper purpose.

RESPECTFULLY SUBMITTED April 8, 2019, in Anchorage, Alaska.

BRYAN SCHRODER
United States Attorney

s/Christina Sherman
CHRISTINA SHERMAN
Assistant U.S. Attorney
United States of America

**CERTIFICATE OF SERVICE**

I hereby certify that on April 8, 2019, a true and correct copy of the foregoing was served electronically on:

Counsel of Record

s/ Christina Sherman
Office of the U.S. Attorney