<pre>
 1                  UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF ALASKA
 2

 3  UNITED STATES OF AMERICA,  )
                               )
 4          Plaintiff,         )
                               )
 5  vs.                        )   CASE NO. 3:13-cr-00008-SLG
                               )
 6  JAMES MICHAEL WELLS,       )
                               )
 7          Defendant.         )
    _____)
 8

 9           PARTIAL TRANSCRIPT OF STATUS HEARING
                 (Testimony of Nancy Wells)
10     BEFORE THE HONORABLE SHARON L. GLEASON, DISTRICT JUDGE
                 January 22, 2019; 1:33 p.m.
11                     Anchorage, Alaska

12  FOR THE GOVERNMENT:
          Office of the United States Attorney
13        BY:  STEVEN SKROCKI
          BY:  CHRISTINA M. SHERMAN
14        BY:  KELLEY L. STEVENS (via speakerphone)
          222 West 7th Avenue, #9
15        Anchorage, Alaska 99513
          (907) 271-5071
16

17  FOR THE DEFENDANT:
          Office of the Federal Public Defender
18        BY:  GARY COLBATH
          601 West 5th Avenue, Suite 800
19        Anchorage, Alaska 99501
          (907) 646-3400

20        Camiel & Chaney, P.S.
          BY:  PETER A. CAMIEL (via speakerphone)
21        520 Pike Street, Suite 2500
          Seattle, Washington 98101
22        (206) 624-1551

23  _____

24              SONJA L. REEVES, RMR-CRR
             Federal Official Court Reporter
             222 West 7th Avenue, #4
25              Anchorage, Alaska 99513
       Transcript Produced from the Stenographic Record
</pre>

1       (Call to Order of the Court at 1:33 p.m.)

2       (Proceedings took place and are not included in

3   this transcript, after which, the testimony of Nancy

4   Wells transpired as follows:)

5           (Oath administered to the witness)

6       DEPUTY CLERK:  For the record, can you please

7   state your full name and then spell your full name.

8       THE WITNESS:  Nancy Jean Wells, N-a-n-c-y,

9   J-e-a-n, W-e-l-l-s.

10      THE COURT:  Go ahead, please, Mr. Colbath.

11      MR. COLBATH:  Thank you, Your Honor.

12      Before I ask Ms. Wells any questions, I would

13  inquire of the Court about you indicated you reviewed

14  portions of the presentence report.  Did the Court

15  happen to review Part C of the presentence report, in

16  other words, Mr. Wells' family background and history at

17  all?

18      THE COURT:  Yes, I did read that, and I really

19  read it pretty thoroughly.  I think where I spent the

20  least amount of time was, for purposes of this

21  proceeding, with regard to the victim impact statements.

22      I read the description of the event from the

23  PSR's perspective, and then I read the end portion of

24  the background.  That was my focus.

25      MR. COLBATH:  Thank you, Your Honor.  I didn't

1   want to belabor the family part if the Court had a

2   general sense, but I also wanted to spend time on it if

3   the Court had no sense of Mr. Wells' familial

4   background.

5                   THE COURT:  No, I did read that.

6                   MR. COLBATH:  Thank you.

7                   NANCY WELLS, DEFENSE WITNESS, SWORN

8                       DIRECT EXAMINATION

9   BY MR. COLBATH:

10     Q.  Ms. Wells, how long have you been married to Jim

11  Wells?

12     A.  On the 29th of this month, it will be 47 years.

13     Q.  And you have how many children?

14     A.  We have three children.

15     Q.  What are their ages and the communities in which

16  they currently live in?

17     A.  Our oldest is 42.  He lives in Klawock on Prince

18  of Wales Island.  Our next is our daughter, she is 40.

19  She lives in Beaverton, Oregon.  And our last child is a

20  boy, he is 38, and he lives in St. Helens, Oregon.

21     Q.  Where do you currently reside?

22     A.  I have been residing primarily with my daughter

23  in Beaverton.

24     Q.  Do you still own your home in Kodiak?

25     A.  Yes.

1     Q.   And why is it that you don't live there?

2     A.   Under the terms of the restitution agreement from

3   the first trial, following the first trial, I was

4   required to maintain the value of the home.   The

5   Government began at one point garnishing 50 percent of

6   my husband's Coast Guard retirement, which simply did

7   not leave me with sufficient money to pay the house

8   payment, so I resorted to renting the house in order to

9   maintain the value.

10            And initially, was in California, back and forth.

11   My mother at the time has severe dementia, and so I was

12   helping to care for her.   Three years ago, in June of

13   this coming year, she required being placed in a much

14   more secure facility.   She -- we placed her in a home,

15   and so at that point in time, then I began pretty much

16   living with my daughter at that point.

17     Q.   And the restrictions on the family residence are

18   because of Jim's potential half interest in the

19   residence, that's what the Government was able to

20   attach.   They were not able to attach or force the sale

21   or levy against your homeownership interest as your

22   family homestead, right?

23     A.   You know, it was an extremely -- I'm not really

24   sure.   The restitution agreement was -- well,

25   contentious, let's just put it that way.

1    Q.  So it was ordered -- if I can cut to the chase.

2    A.  It was ordered by the Court.  And there currently

3  is an order in Superior Court in Kodiak, the victims'

4  families have filed a civil lawsuit against my husband,

5  and so they asked for an injunction barring me from

6  doing anything with the house.

7    Q.  Okay.  And again, you don't have the financial

8  ability to live there without renting the house, so

9  that's the catch-22 that you're in and primarily why you

10  live with your daughter?

11    A.  Well, the house is now paid for, so with the

12  restitution agreement having been voided with the

13  reversal of his conviction, I could afford to live in

14  the house.  However, I have grandchildren, and as my

15  children say, we're on the wrong side of the ocean.  So

16  I choose to be where my grandchildren are primarily,

17  which is on the West Coast.

18    Q.  All right.  Under the proposal that's proposed --

19  first of all, as I think the Court is aware, you visited

20  with the pretrial services, the probation office and

21  answered -- both filled out the paperwork that they

22  requested and answered the questions that they posed to

23  you, correct?

24    A.  Correct.

25    Q.  If the Court were to release Jim on bond under

the proposal that we have made, would you be willing to

secure, working with the same folks at probation, secure

a residence within whatever locale that would be

ultimately directed by the Court that would meet

probation's and the Court's restrictions?

A.   Yes.

Q.   And you believe you have the financial ability to

do that?

A.   Yes.

Q.   If there were additional obligations of the

installation of either a landline phone or a cellular

phone dedicated, either of those dedicated to the

programming of electronic monitoring, GPS monitoring,

that type of equipment, if there was both requirements

along those lines and/or costs associated with those

things, you would be willing to assist in the, first,

acquisition of setting up those things, as well as

paying for whatever is directed by the Court?

A.   Yes.

Q.   And with -- did you review or have you discussed

both with me and to some extent with probation concerns

about the number of restrictions that would be placed on

Jim, the very clear and tight different requirements

that he would have to abide by, and, therefore, you

would have to abide by if the Court were to grant a

1  bond?

2      A.  Yes.

3      Q.  And was it also made apparent, if not by myself,

4  but also by the pretrial services office, that you would

5  be personally responsible for any failure to report or

6  any assistance that you would provide in any violation,

7  even the most minor of violations of any bond condition

8  whatsoever?

9      A.  Yes.

10     Q.  You understood that obligation could even

11  potentially subject you to a contempt of court or a

12  criminal prosecution?

13     A.  Yes, I'm very well aware of that.

14     Q.  The Government has indicated in some of its

15  filing that, first of all, you believe in your husband's

16  innocence, and that's true, correct?

17     A.  That's very true, very correct.

18     Q.  Regardless of the fact that you believe that your

19  husband is innocent and that these charges are

20  wrongfully brought, do you understand that, I guess, the

21  process here and the necessity for right, wrong or

22  otherwise, the process to go forward to conclusion of

23  this next trial that we have here today scheduled for

24  August 5th?

25     A.  Yes.

1    Q.   And that your belief or your feelings about the
2   propriety of the charges, your husband's innocence,
3   guilt, anything like that cannot or should not sway at
4   all your following the bond conditions or any conditions
5   imposed upon him, and, therefore, you by the Court if
6   release is considered?
7    A.   Yes.
8    Q.   And regardless of what I'm sure have been your
9   strong-stated belief or feelings that your husband is
10  innocent, are you willing to honor any and all
11  conditions put forward by the Court for Jim's release?
12   A.   I am.
13   Q.   Even if they were conflicting with your beliefs
14  about him, about his history, about his behavior, about
15  the charges, any of those things, do you understand that
16  that does not change in any way the obligation that you
17  would have to strictly abide by them?
18   A.   I'm quite well aware, and I have no difficulty
19  with abiding by what -- I have abided by all the
20  conditions to date at any point in time that have been
21  put forth.
22   Q.   Let me ask you briefly about that.  Now, prior to
23  -- after the -- after April 12th of 2012, but prior to
24  Jim's arrest and formal charge, did you have
25  interactions with both law enforcement and/or the legal

1    system as the investigation sort of developed?

2        A.   Yes.

3        Q.   And were you asked to keep the Government, law

4    enforcement, others notified of any intention you and

5    Jim had of traveling, leaving Kodiak, being anywhere

6    other than at your home?

7        A.   We were not required to notify anyone if we were

8    on -- Kodiak is an island, so if we were within the road

9    system, there was not a requirement to notify anyone.

10           If we were leaving the island, we notified the

11   public defender's office, who then notified the

12   Government, and that was done every time we traveled.

13       Q.   And during the -- it was roughly ten months

14   between April of 2012 and when Jim was ultimately

15   charged, correct?

16       A.   Yes.

17       Q.   During that time, on how many occasions and to

18   where did you and he leave the island?

19       A.   We went to Southeast --

20       Q.   Southeast Alaska?

21       A.   Southeast Alaska in May.  You will have to pardon

22   my memory.  We went to Gustavus, our oldest

23   granddaughter's birthday.  We went -- Jim went to

24   Boston.

25       Q.   By himself?

1    A.  By himself.

2    Q.  Generally for what?

3    A.  To go to a Bruins game.  He did that every year.

4    I don't like hockey, so not a trip --

5    Q.  Where else did you go?

6    A.  We went to California, I believe, and I'm not

7    sure if it was through Seattle or if it was through

8    Portland, during Thanksgiving.  We went to Las Vegas in

9    the beginning of December of that year.

10    Q.  And on each of those occasions, you or Jim

11    voluntarily chose to notify my office and ensure that

12    prior to the travel either law enforcement or the U.S.

13    Attorney's office was notified?

14    A.  Yes.  We also -- I'm not sure if I went with him

15    or if I flew up, but we brought building materials back

16    on the ferry in September, I believe, of that year,

17    September of 2012.

18    Q.  Did Jim also leave the island on a number of

19    occasions, both accompanied or unaccompanied, to come

20    here to Anchorage for medical purposes or other type

21    purposes?

22    A.  Yes.

23    Q.  Legally at that time, did you folks have your

24    regular identifications, your passports, all the

25    documents you needed to travel wherever you wanted to

1   travel?

2      A.  Yes.

3      Q.  The Government has indicated in its response that

4   on a number of occasions during that period of time and

5   even subsequent to then you've had interactions with law

6   enforcement where you have expressed your displeasure

7   with their actions or angry with the investigation.

8          Is that true, that you're not happy with the

9   investigation?

10      A.  Yes.

11      Q.  All right.  Those feelings, having those

12   feelings, believing what you believe about anything

13   that's transpired through the development of this case,

14   from day one when your homes were searched starting less

15   than 48 hours after the incident through today, despite

16   having any of those feelings, beliefs, with regard to

17   law enforcement, investigators, anybody who's been

18   involved in the case, would you allow that to color or

19   change in any way the legal obligation that the Court

20   would put on you here today if the Court ordered you to

21   comply with the third-party obligation that you would be

22   undertaking supervising your husband on bond?

23      A.  Absolutely not.

24      Q.  Despite no matter how wrong you thought law

25   enforcement investigation might have been or the

1   handling of any particular incident, your property,

2   anything else, you feel you're able to separate those

3   feelings from your obligation here that the Court might

4   impose on you as a third-party custodian?

5       A.   Yes.

6       Q.   You would not -- well, do you feel -- first of

7   all, in light of the very serious and violent nature of

8   the charges, do you have any personal safety concerns

9   for yourself relative to your husband?

10      A.   No.

11      Q.   Do you believe that -- obviously, whether it be

12  you, who is in a particularly sensitive situation being

13  Mr. Wells' husband (sic), or really any third-party is

14  put in this situation -- you obviously love your

15  husband, you believe he's innocent, you care for him

16  deeply, you've been married to him 47 years.

17           Taking on this obligation could very well result

18  in you returning him to jail or getting him somehow in

19  further legal trouble relative to this case if you had

20  to report any violation, even the most minor violation.

21           And first of all, you're willing to put yourself

22  in that sort of -- in the middle of that situation?

23      A.   Yes, I am.

24      Q.   Do you have reservation whatsoever?  You took a

25  minute to answer, and I appreciate that.  I'm aware

1    you're thinking of that, but do you have any reservation

2    with your own personal strength or ability to stand up

3    to your husband or to make clear that your legal

4    obligations as a third-party custodian, your duties and

5    legal expectations are separate from him and that you

6    need to exercise those 100 percent independently of any

7    feelings he might have about any of that?

8        A.   Okay.  That was a long question.

9        Q.   That was terrible.

10       A.   And I'm not sure --

11       Q.   Before you answer, let me rephrase it.

12            Do you think you can stand up to your husband?

13   If it appeared that he was going to violate or was in

14   the process of violating or whatnot, can you

15   nevertheless report any violation, even if it seems

16   trivial, even if it seems minor, even if he tries, no

17   matter what he tries, to convince you otherwise to go

18   along with it?

19       A.   Yes, I can.

20       Q.   And would you?

21       A.   I would.

22       Q.   Why?

23       A.   Please understand I and my family have undergone

24   a nightmare for the past six years.  I have every firm

25   -- I have total belief in my husband's innocence.  The

only way this nightmare ends is with a fair and
impartial trial. I will do nothing to hamper, prevent,
or impede that.

Q. That trial?

A. That trial. I want this trial to go forth. I
will do nothing that would prevent it for anyone,
including my husband.

Q. All right. I guess it was -- the Court is aware
certainly through the Government's filing, but Her Honor
has indicated she has read back -- now, you have been
proposed as the third-party custodian before?

THE COURT: The hearing that I listened to was
when people outside of Kodiak City were being -- that's
the hearing I read.

MR. COLBATH: Thank you, Your Honor.

BY MR. COLBATH:

Q. There has been some argument made and some past
-- past arguments made and then current arguments again
made on the same topic by the Government about Jim's
alleged use or solicitation of what was deemed either
prostitutes or escorts or some type of female
companionship outside of your marriage. You're aware of
those things, correct?

A. Yes.

Q. Those were in fact the topics brought up at

1    previous hearings?

2        A.    Yes.

3        Q.    And you were aware of them even predating this

4    case?

5        A.    Yes.

6        Q.    Generally, as I understand it, you suffered some

7    medical conditions of your own prior to this case

8    beginning, correct?

9        A.    In 2005, I was diagnosed with breast cancer.  I

10   underwent treatment, a bilateral mastectomy, radiation,

11   chemotherapy, Herceptin, and then other drugs that are

12   designed to limit the hormone production in order to

13   prevent the cancer from reoccurring.

14           Those had a profound effect on my body.  And I

15   would hope that -- you know, breast cancer treatment has

16   come a long way in the last 10 to 14 years, but it did

17   leave me with residual problems, so --

18       Q.    Did those things place various strains on your

19   marriage?

20       A.    Extreme strains on our marriage.  It's not

21   exceedingly romantic when someone makes an overture and

22   you turn into a blinking hot flash and drip water all

23   over.  It's very uncomfortable.

24       Q.    So in the couple of years predating maybe -- at

25   some point during the couple of years predating this

1  case and these charges, did you become aware of

2  instances where, generally I guess, aware of instances

3  where Jim had sought some form of companionship outside

4  your marriage?

5      A.  We discussed.  I gave permission.  I did not want

6  to know specifics.  And I, to my regret and shame,

7  refused to discuss it.  And --

8      Q.  So let me interrupt you there.  Am I right in

9  understanding then that you did not know the details?

10     A.  I did not know the details.  I did not want to.

11 I did not want to know the details.  And --

12     Q.  Well --

13         MR. SKROCKI:  She's not done, Your Honor.

14     A.  That's true.

15     Q.  All right.  Did you at the time condone, to your

16 knowledge, any illegal activity by your husband?

17     A.  No.

18     Q.  Did you intend to?

19     A.  No.

20     Q.  If you're allowed to be third-party custodian, do

21 you understand that part of that obligation, moving

22 forward to today, part of that obligation would require

23 you to both communicate with your husband and know all

24 the details about all of his activities regardless of

25 what they related to?

1    A.  Yes.

2    Q.  If you determined that anything he did was even

3  arguably contrary to the law or a violation of either

4  the law or the conditions set by the Court, would you be

5  willing to report those?

6    A.  Yes.

7    Q.  Would anything -- would you condone any activity

8  that was anything like that or frankly things that you

9  may have ignored in the past?

10    A.  No.

11        MR. COLBATH:  If I can have just a minute, Your

12  Honor.

13        THE COURT:  Certainly, take a moment.

14        (Pause)

15        MR. COLBATH:  For now, Your Honor, subject to

16  cross, that's all the questions I have for Ms. Wells.

17        THE COURT:  Mr. Skrocki, am I going to hear

18  from you?

19        MR. SKROCKI:  Yes, Your Honor.

20        THE COURT:  Go right ahead, please.

21                CROSS EXAMINATION

22  BY MR. SKROCKI:

23    Q.  Hi, Mrs. Wells.

24    A.  Hi.

25    Q.  I would say good afternoon, but it's not a good

1  afternoon for you I'm sure to some extent.

2      A.   That's your characterization.

3      Q.   Okay.  I want to know, did you read the

4  Government's brief that we filed in opposition?

5      A.   No, I have not seen it.  I'm sorry.  I haven't

6  seen it.

7      Q.   Okay.  You weren't shown it before coming into

8  court today?

9      A.   No.

10     Q.   If there was representations in there that you

11 had stated to the FBI while they were in your house

12 doing searches that it would be fun if one of them were

13 electrocuted while in your home, do you recall saying

14 that?

15     A.   That was not at all what was said.  What was said

16 -- the FBI wished to -- came with a search warrant and

17 wished to look down -- stick a camera down our well

18 housing.

19          And my comment was, "Let me show you how to turn

20 the power off because I don't think you want to be

21 electrocuted."  They obviously did not know how a well

22 housing, how a well water system functioned.  And you

23 have to turn off the power before you start messing with

24 putting things down the well housing or you will be

25 electrocuted.

1    I did not want them electrocuted in my home.  I

2   didn't want any harm to come to them.  If they took it

3   as a joke, it was meant as a protective factor, not that

4   I was thinking it was amusing.

5   Q.  Uh-huh.  Okay.  So they may have misunderstood

6   you making reference to something like that?

7   A.  Yes.

8   Q.  Mr. Colbath asked you a number of questions about

9   your views of your husband's innocence.

10  A.  Yes.

11  Q.  I want to ask you some questions about that.  You

12  believe your husband is 100 percent innocent?

13  A.  I do.

14  Q.  You were not on Kodiak during the time these

15  murders took place, correct?

16  A.  I was in Anchorage at a conference.

17  Q.  And you were there for several days, correct?

18  A.  No, I returned the next day.

19  Q.  So how long were you in Anchorage?

20  A.  Overnight.

21  Q.  So if somebody stated that you had stayed longer

22  than just overnight, that would not be correct?

23  A.  You are discussing almost seven years ago.  The

24  murders occurred on -- the 12th, I believe, was a

25  Thursday.  Am I correct?

1     Q.  The 12th is fine.

2     A.  No.

3     Q.  Let me see if I can help you out.  Is it possible

4 there may have been a one- or two-day difference because

5 of the time length?

6     A.  I believe we flew up on Wednesday evening, but

7 I'm not sure.  It was a conference that we went to every

8 year.  It was a very -- it ended up being exceedingly

9 traumatic, so I can't tell you.

10       I do know that I came back before the conference

11 ended on Friday.  I know that I returned on Friday.

12     Q.  Okay.  But factually though, you weren't in

13 Kodiak the day Mr. Hopkins and Mr. Belisle were killed,

14 right?

15     A.  No, I was not.

16     Q.  So whatever information you have about your

17 husband's activities, you've obtained from him, haven't

18 you, about what happened, what he was doing that day?

19     A.  Well, and from others.

20     Q.  From your husband, correct?

21     A.  From my husband, yes.

22     Q.  But you don't know exactly what he was doing the

23 day those murders took place because you weren't here?

24     A.  No.

25     Q.  You've never lived in Anchorage, correct?

1    A.   Well, depends -- if you define what "living" -- I

2  spent multiple months up here while I was undergoing

3  breast cancer treatment.

4    Q.   But never a home, a long-term residence?  Your

5  home has been in Kodiak?

6    A.   My home has been in Kodiak.  No, I was here for,

7  I believe the longest was three months by myself here.

8    Q.   How long have you been living with your relatives

9  or your son down in the Lower 48?

10    A.   My daughter.

11    Q.   How long?

12    A.   I left Kodiak in 2016.  '15 and '16, I was going

13  back and forth with my mother.  We had in-home

14  caregivers, and then I also would go and stay with her

15  for long periods of time.

16         And then I believe it was in 2016 that we placed

17  my mother -- it was in June we placed my mother in an

18  assisted living home.  And so then after we -- we had to

19  clear out her house and rent it.

20         And so at that point in time, I pretty much moved

21  in with my daughter in Beaverton.

22    Q.   So how long have you been out of Alaska then,

23  just in terms of --

24    A.   You mean as far as how long -- I'm not quite sure

25  what you're asking me.  If you're asking me how long --

1  how often I come back and forth.  If you're asking --

2      Q.  Since the trial has been concluded, how long have

3  you been away from Alaska?

4      A.  Not residing here, probably since -- probably

5  April of 2016.  While I was caring for my mother, I was

6  going back and forth.  I would be here months and there

7  months.

8      Q.  Excuse me, but I didn't sit through the first

9  trial, but you sat through the first trial?

10     A.  Yes, I did.

11     Q.  Every day?

12     A.  Yes.

13     Q.  Having sat through the first trial every day, you

14  believe your husband innocent?

15     A.  Yes.

16     Q.  And you're not happy about this investigation,

17  are you?

18     A.  No.

19     Q.  You believe that the victims in this case should

20  be looked at as possible suspects in these homicides?

21     A.  No.

22     Q.  You believe the Government has fabricated

23  evidence against your husband?

24     A.  I believe that what the Government calls evidence

25  is probably, a lot of it may not be actual evidence.

1    Q.  You want to explain that to the judge?

2    A.  Well, my understanding of circumstantial evidence

3 is that it is evidence for which there is no other

4 reasonable -- that in order to use it correctly, it is

5 evidence for which there is no other reasonable

6 explanation, that if there is reasonable explanations

7 that that needs to be a factor that needs to be

8 weighted, and that those reasonable explanations need to

9 be explored.  And so I am dissatisfied with the quality

10 of the investigation.

11    Q.  Do you believe that the Government is withholding

12 evidence against your husband or in favor of your

13 husband?

14    A.  I don't know.  I hope not.

15    Q.  And you and your husband are in this together,

16 right?  This impacts you as well as your husband,

17 doesn't it?

18    A.  This impacts multiple people.  This impacts our

19 family.  It impacts the victims' family.  It impacts the

20 community of Kodiak.  This is rather like dropping a

21 rock in a puddle or into a pond.  The ripples impact

22 people you would have no idea.  But yes, it's very

23 impactful.

24    Q.  And is part of that impact because you believe

25 there is another murderer on Kodiak who hasn't been

1  arrested yet?

2      A.   I believe someone solved a problem with two

3  homicides, yes.

4      Q.   So you believe there is somebody else at large on

5  Kodiak who's responsible for these murders and not your

6  husband?

7      A.   I don't have any idea where that individual is or

8  who it is.

9      Q.   But there is somebody else out there, correct?

10     A.   I believe so.

11     Q.   You had a career before this happened?

12     A.   Yes.

13     Q.   How long were you working, ma'am?

14     A.   I was the infant learning coordinator, which is

15  the birth-through-three children with special needs.  In

16  Alaska, it's done through private agencies that are

17  granted.  I worked for the Kodiak Area Native

18  Association for 23 years.

19     Q.   Did you have a retirement from that?

20     A.   I did.

21     Q.   Do you have that money from your retirement

22  still?

23     A.   No.

24     Q.   Where is that money?

25     A.   That money was spent on living expenses and for

1   paying for -- to bring Mr. Peter Offenbecher back into

2   the case after he was dismissed by the magistrate,

3   against Mr. Curtner's protestations that during the

4   sequestration he did not have the funds or another

5   attorney to assist him.  So Peter had availability at

6   the very -- right before the trial started, and they

7   asked if I had any possible way of making it happen.

8       Q.  So you spent your retirement money for your

9   husband's defense?

10      A.  I did.

11      Q.  Did he have retirement money at the same time?

12      A.  My husband does.

13      Q.  Was that spent on his defense or was it just your

14  money?

15      A.  There was an injunction filed against that fund,

16  so it couldn't be.

17      Q.  Was there any attempt to spend that money before

18  the injunction was filed?

19      A.  No.

20      Q.  How long did your husband partake with other

21  women, we'll just put it that way?

22      A.  I have no idea.

23      Q.  He never shared with you how long he was doing

24  that?

25      A.  I have said I don't -- I did not want to know the

 1    specifics and I did not ask.

 2        Q.  And he didn't share?

 3        A.  Oh, he tried.  He tried.  But you know, I'm a

 4    fairly stubborn person.

 5        Q.  Fair enough.  Were you told as to where he would

 6    do this and when?

 7        A.  By whom?

 8        Q.  By your husband.

 9        A.  No.

10        Q.  He didn't share that with you?  How about the

11    cost, did he ever share the cost with you?

12        A.  No.

13        Q.  So he kept all that from you?

14        A.  No.  I did not -- there is a difference between

15    someone who refuses to listen or ask, or rebuffs your

16    intentions to share.  That was my position.  I rebuffed

17    any attempt to share on his part.

18            So to characterize that he did not choose to

19    share or make efforts is wrong.  That was my -- that's

20    on my -- that's my responsibility.  That's -- and that's

21    a matter between the two of us.

22        Q.  Uh-huh.  You would agree that if they were

23    prostitutes, that prostitution is not legal, is it?

24        A.  No, it's not.

25        Q.  So that's not law abiding, is it?

1    A.   Well, in the -- if you're going to take an

2    absolutest position, no.

3    Q.   What do you mean by that?

4    A.   Well, it is illegal here.  It is illegal now.

5    Just as marijuana was illegal and is no longer illegal

6    unless you're in federal.  I don't agree with

7    legalization of marijuana.  I would say I am not a moral

8    censor for anyone, but it is illegal.  Legally, it is on

9    the books, it is illegal.

10        So if you're asking if he was to want to do that

11   again, under the terms of a bond release, it's illegal,

12   no, I would not.  I mean, my understanding is that the

13   stipulations would be set by Judge Gleason, but they

14   could be as much as that he needs to be 24/7 in the

15   house, I need to be in the house if he's there.

16        I mean, to the point that he could not be left in

17   the yard, that he may be transported by marshals, by his

18   staff.  I don't know what the stipulations would be, but

19   whatever they would be, I will abide by them.

20   Q.   I was just asking you about prostitution back

21   when you said it was okay with you.  So it was okay with

22   you back then even though it was illegal?

23   A.   I don't know that he was.  I don't know what he

24   was doing.  I simply gave him permission to seek

25   companionship.  Whether that was a girlfriend or not --

1     Q.   You just don't know?

2     A.   I don't.

3     Q.   You just don't know, like you don't know what he

4     was doing the day these murders took place, right?

5     A.   Well, no.  I do not know where -- I don't know

6     what you were doing on the day these murders took place.

7     I wasn't there.  I don't know.

8     Q.   Okay.  Have you ever, while this investigation

9     was going on, told people in Kodiak there were other

10    people or maybe another individual responsible for these

11    murders and not your husband?

12    A.   Of course I've suggested that someone else was

13    responsible.

14    Q.   Have you provided alibis for your husband to

15    people in Kodiak about what he was doing that morning?

16    A.   I can only state what he told me, and it is to my

17    shame that I repeated it to someone.

18    Q.   What did he tell you?

19    A.   He said he stopped at the airport to use the

20    bathroom.

21    Q.   What about the nail in his tire, did he tell you

22    about that?

23    A.   That he -- that he -- yes.

24    Q.   Had a flat.  He told you about the flat?

25    A.   He said he had a nail in his tire and he went

1    home to change it.

2        Q.  Have you told people that in Kodiak, too?  You

3    have explained that to folks that he had a nail in his

4    tire, too?

5        A.  Yes.

6        Q.  So a nail in his tire, and he stopped to use the

7    bathroom at the same time?

8        A.  Yes.

9        Q.  Who would you have told that to?

10       A.  Well, I know I told Para (phonetic).

11       Q.  Are you looking at your husband?

12       A.  No, I was looking at the new marshal who just

13   took a position behind him.

14       Q.  Para who?

15       A.  Para Upchurch.

16       Q.  Do you believe that the Government has fabricated

17   the video evidence that you saw in the first trial of

18   your husband's truck going by the gate at the Coast

19   Guard base?

20       A.  That they fabricated the video?

21       Q.  Yes.

22       A.  No.

23       Q.  Do you believe there is other evidence about that

24   video that is being withheld or somehow manipulated by

25   the Government?

1    A.   I question, yes, I did question that.

2    Q.   Please explain.

3    A.   I find it hard to believe that the largest Coast

4  Guard base in the United States has their cameras going

5  to a digital server that does not have precise time.

6    Q.   Okay.  Is that all?

7    A.   Yes.

8    Q.   So what's your problem with the timing?

9    A.   My problem with the timing is that at the time of

10 the day -- I think the explanation was very clear if you

11 read Ms. Davina Chen's brief --

12   Q.   This would be the appellate brief?

13   A.   Yes, about the timing.  I think she said it very

14 succinctly that real-life conditions don't go by Google

15 Map.

16   Q.   So you believe somehow the evidence presented at

17 trial was not correct or is somehow ineffective because

18 of Google Maps?

19   A.   No, I believe the reliance on Google is extremely

20 surprising.

21   Q.   Is there any evidence that would be presented to

22 you that would convince you your husband is guilty of

23 this crime?

24   A.   Are you asking that as a hypothetical question?

25 Are you --

1    Q.  Yes.

2    A.  Then yes.  If you -- yes.  Hypothetically, I have

3 seen none of it.  Hypothetically, you could present

4 evidence of anyone in Kodiak committing that crime, and

5 if it was vetted and sufficient, I would believe it.

6    Q.  That's not where you're at right now though?

7    A.  No, absolutely not.  I have no idea who committed

8 that crime.

9         MR. SKROCKI:  Just a moment, Judge.  I know

10 you're getting close to your deadline.

11        THE COURT:  We are very close.

12        MR. SKROCKI:  That's all I have.  Thank you.

13        THE COURT:  Mr. Colbath, can you conclude your

14 redirect in two minutes or not?

15        MR. COLBATH:  I don't have any, Your Honor.

16        THE COURT:  Thank you, ma'am.  You may be

17 excused.

18        (Witness excused)

19        (Requested excerpt concluded, proceedings

20 continued.)

21

22

23

24

25

1              CERTIFICATE

2      I, Sonja L. Reeves, Federal Official Court Reporter
   in and for the United States District Court of the
3  District of Alaska, do hereby certify that the foregoing
   transcript is a true and accurate transcript from the
4  original stenographic record in the above-entitled
   matter and that the transcript page format is in
5  conformance with the regulations of the Judicial
   Conference of the United States.

6

7      Dated this 25th day of April, 2019.

8
                         /s/ Sonja L. Reeves
9                        SONJA L. REEVES, RMR-CRR
                         FEDERAL OFFICIAL COURT REPORTER
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25