BRYAN SCHRODER
United States Attorney

STEVEN E. SKROCKI
Deputy Criminal Chief
CHRISTINA SHERMAN
Assistant U.S. Attorneys

KELLEY STEVENS
Special Assistant U.S. Attorney
Federal Building & U.S. Courthouse
222 West Seventh Avenue, #9, Room 253
Anchorage, Alaska   99513-7567
Phone: (907) 271-5071
Fax: (907) 271-1500
Email: steven.skrocki@usdoj.gov
       christina.sherman@usdoj.gov
       kelley.l.stevens@uscg.mil

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,      )<br>                                                        )<br>            Plaintiff,                        )<br>                                                        )<br>    vs.                                           )<br>                                                        ) No.   3:13-cr-00008-SLG<br>JAMES MICHAEL WELLS,          )<br>                                                        )<br>            Defendants.                 )<br>                                                        )<br>                                                        )<br>                                                        )<br>_____ )  | |

**UNITED STATES' MOTION IN LIMINE TO PRECLUDE TESTIMONY OF DEFENSE EXPERT STEVEN D. BECK FOR FAILING TO COMPLY WITH THE REQUIRMENTS OF FRE 702**

The United States files with the court a Motion to Preclude the Expert Testimony of Steven Beck, an after-the-fact Forensic Audio Analysis Expert, which is being offered solely to discredit a percipient witness's testimony. The report and analysis is directed toward disproving that one government witness, who was walking by the murder scene during the murders, and testified he heard a sound like metal being dropped on concrete emanating from the rigger shop, is not 'reliable.' As will be shown here, Beck's audio report hops from one speculative fact to the next in order to build a conclusion founded upon several ifs and hypotheticals. Moreover, Beck's conclusion, that the witness's reaction to hearing this sound is not credible, is not based on Beck's expertise at all, but instead on roughly three sentences from *Runner's World* Magazine. The government moves to exclude this testimony on witness auditory credibility and reaction to sound as Mr. Beck's career and work is based on analyzing *existing* recordings of gunshots, or the direction of incoming artillery or other type of gunfire. His resume and background fail to provide any educational or vocational training in how humans react to noises such as described here. In addition, Mr. Beck conducted no tests inside the scene of the murders with a firearm of the type in question and the keystone of his summary relies on a study of acoustics from a gunshot data collection experiment conducted on an outdoor range in Austin, Texas, in 1997, some 22 years ago. Given that these murders happened indoors, the report, which attempts to discredit a percipient witness, is fatally flawed. Accordingly, all of these facts, and more, establish that the Beck audio testimony should be precluded for lack of foundation and failing to meet the requirements of FRE 702.

**FACTS**

At trial, the United States will call witness Don Rudat. (See, Docket 744, pgs. 4-20, TR 1789-1805) In the prior trial, Mr. Rudat testified to, and the United States expects he will testify to the following facts: That on the morning of the murders he was taking a walk prior to beginning work. At roughly the time Messrs. Hopkins and Belisle were murdered by James Wells, Mr. Rudat was walking by the COMMSTA facility. As he walked, Mr. Rudat had earphones/earbuds on and an Adelle song was playing on the music player function of his iPhone. At roughly 7:12 a.m., as he walked by the rigger shop, Mr. Rudat heard a noise coming from the rigger shop which to him sounded like 'a metal grate being dropped on concrete.' [1] Mr. Rudat's testimony provides circumstantial evidence that he heard at least one of the five shots fired by James Wells, when Wells murdered Messrs. Hopkins and Belisle. Mr. Rudat's testimony is clear. The noise he heard that morning emanated from the rigger shop, which was only some 200 feet from where he was walking.

In response to this testimony, the defense hired Steven D. Beck, who describes himself as an *'expert signal analyst with a primary emphasis on audio voice and gunshot recordings.'* (*See Beck, Curriculum Vita, Exhibit 1,* pg. 1) Mr. Beck lists his experience

---

[1] The COMMSTA is short for 'communications station' and includes the rigger shop, also known as the "T-2" building, and the "T-1" building, a two-story building approximately 100 yards away from the rigger shop which housed administrative and other personnel.

in having analyzed 'thousands of hours of audio data' and that he was chief architect for two gunfire localization systems for the military. *(ibid)* Nowhere in the C.V. is any mention of Beck's experience with human's responding to sounds, recreating sound direction without a recording or live-fire test, or on how humans react to the locations of specific sounds, or other similar areas. While his report is replete with scores of mathematical equations, well above this author's comprehension, there is nothing in the report or C.V. establishing any work or education in human reaction to sounds. Mr. Beck's relevant work experience lists 10 items from 2010 to the present. Eight (8) list the study of previously existing recordings, along with several which list acoustically localizing incoming hostile fire. (*See, Exhibit 1,* pgs. 2-3*)* None of the relevant papers listed on page 3 discuss human directional location of acoustic reports at all. All refer in one way or another of analyzing recordings or live activity.

Attached as Exhibit 2 is Beck's forensic audio report. The reason for the report, as stated at pg. 1 was due, as he claims, for the "*need for an acoustic analysis of gunshot sounds."* Beck next describes the defense request for his testimony as follows:

*I was asked to review the details pertinent to this case, analyze the acoustic sound propagation, and determine if the earwitness (Don Rudat) could have reasonably heard gunshots fired from inside a converted bunker,* **and** *if those gunshots could be distinguished from a metal clanging sound.[2]*

---

[2] There is no evidence in the government's investigation that the Rigger Shop (T-2) was a 'converted bunker.' Moreover, nothing in Beck's report establishes that fact. While it is a

*(ibid) (emphasis added)*

As the court knows, there are no recordings of gunfire for Mr. Beck to analyze. At trial, Mr. Rudat testified, beginning on Docket 744, pg. 209, or TR 1789, that while walking the morning of the murders, and at around 7:12 heard the sound he described as a 'metal grate being dropped on concrete' coming from the maintenance building, i.e., the building where the murders occurred. (*Ibid at 209*, RT 1794) During Mr. Rudat's walk, he was listening to an Adelle album/song on his iPhone and had his earphones/earbuds inserted into his ears, at what volume is unknown.

The defense request, as described by Beck, and his work based on that request is very important. Beck was charged by the defense to determine if Rudat, a percipient witness, could have 'reasonably heard gunshots fired from inside a converted bunker" **and,** if those gunshots could be distinguished from a metal clanking sound. As shown below, Beck's report is based on an after-the-fact analysis with dissimilar acoustical characteristics. It is also based on the speculative, and non-fact supported, assumption that another metallic on concrete sound, occurring at that time, was responsible for what Rudat heard while some 280' away from the Rigger shop. There are no facts in the report to establish the contemporaneous occurrence of any significant work being done in the area at that time, nor whether any sound of sufficient strength was coming from another

---

cinderblock constructed building it has many windows and wide garage doors for the ingress/eagress of equipment. Calling it a 'converted bunker' is not accurate based on this record. (*See, Exhibit 3*-photos of Rigger Shop)

area, aside from the Rigger shop.

In addition to those issues, the United States provides the following relevant facts, which establish why this report doesn't muster as relevant, why it is lacking in foundation, and why it fails to pass the requirements of FRE 702.

-Beck's analysis of the distances involved show Rudat being approximately 280 from the rigger shop, and more than 1,000' away from the sewage treatment plant where some alleged construction work was occurring. Said approximations of distance are based on Google Earth distances. However, Beck apparently conducted no sound testing of a discharging .44 handgun *inside* the rigger shop. Indeed, there is no evidence he has ever tested firearms indoors at all. If he did, the report and C.V. do not indicate so. (*Exhibit 1, pgs. 2-5*)

-The conclusion as to the decibel level of a .44 magnum originates from an outside, open-air test, not an inside a building test. As stated in the report, "*The peer reviewed paper (Ref 2) describes a controlled scientific gunshot data collection experiment.*" Exhibit 1, pg. 7 'Ref 2' relates to a study done by Beck in 2010 entitled, '*Variations in Recorded Acoustic Gunshot Signals*.' (*See, Exhibit 1, pg. 19*)

The 2010 study, attached here as Exhibit 4, is actually titled, *Variations in recorded acoustic gunshot waveforms generated by small firearms.* In that report, Beck was involved in; '*A gunshot data collection experiment…**at an outdoor range** in Austin, Tx, on August 16, 1997. The purpose of this experiment was to determine acoustic source*

*and propagation channel characteristics that can effect **recorded** gunshot wave platforms.*" (*Exhibit 4, pg. 5,* located at bottom left, and photograph of same, pg.6), show an outdoor handgun testing on flat, grass covered ground, which is a far different environment than where these murders occurred.

This 1997 experiment conducted by Beck was based on **'recorded'** acoustic gunshot signals taken outdoors, in a controlled and microphoned environment, over flat ground. The test sampling for these outdoor shots varied from 1.5 meters to 30 meters, or 98.4 feet. (*ibid,* at 1753) The foundation for this report cannot be analogous to test firing and recording gunfire from a .44 caliber pistol in an enclosed environment for similar acoustic traits and volumes. It is not and cannot be analogous to the circumstances of the murders present here. More importantly, there are no recorded gunshots to examine in this case.[3] Even if there were, the report states that things like ground reflections, and other materials can impact the sound wave even in a flat shooting range in Austin, Texas. It cannot compare with the rolling terrain of Kodiak, nor can it compare with a more appropriate test. That being, duplicating the discharge of a .44 caliber pistol inside the rigger shop and recording that acoustic report from 200 feet away. (*Exhibit 4, pg. 5*)

In Beck's ultimate conclusion, with no indoor gunshot testing, and no

---

[3] Beck's reference list for his report contains citations to the Anchorage Daily News, a 'Tutorial to Sound Propagation Outdoors', other textbook references, and 3 articles from Wikipedia.

Page 7 of 18          3:13-cr-00008-SLG
                                    U.S. v. James Michael Wells

Case 3:13-cr-00008-SLG   Document 979   Filed 05/02/19   Page 7 of 18

corroborating evidence of whether any sound was made by the construction crew at the relevant timeframe, no idea how loud or not Rudat's music is as follows at pg. 14:

> *In the case of a person listening to stereo music with strong vocals (Adele) and with constant pounding background instrumentals (drums and piano), most of the spatial clues will not be effective at these signal levels. A person walking along the road using earbuds and listening to music is not paying attention to the surrounding sounds. (15)[4] If that person heard a transient clanging or clattering sound along with their music, they would likely be startled, look around for a car on the road, and shift their attention to a visual source, which in this case would be the T2 Building. Therefore, in my professional opinion, the earwitness's perceptual sense of accurate sound direction would be compromised and is not reliable in this case.*

The United States will break this conclusory paragraph down into several component parts.

In order to reach the conclusion that Rudat's sense of 'accurate sound direction' was not reliable, Beck makes the following generalizations: #1) that without knowing the volume of the music being played at the time, nor testing or knowing the sensitivity of Rudat's hearing, that any 'spatial clues' would not be "effective," #2) That, without foundation, 'a person' walking along a road listening to music is not paying attention to other sounds, therefore Rudat wasn't either, #3) **If** a person **heard** a loud 'transient clanging or clattering sound' #4) that a sound actually occurred--with their music on 'they would,' #5) likely be startled' and #6) then look for a car, or shift attention to a visual, like the T-2 building.

Thus, based on the multitudes of unsubstantiated and notional facts, Beck

---

[4] Beck cites to reference 15 for this proposition. Reference 15 is a citation to a 'Runner's World' article, 'Should you listen to music while running.' This will be discussed in more detail later.

leapfrogs from one speculative must-have-to happen occurrence to another in order to opine that Rudat's testimony is not credible. By the government's count, he relies on six (6) jumps of unsubstantiated and hypothetical fact

There remains, however, a seventh piece, the complete foundation for Beck's summary. As noted in his report, and cited above, Beck concludes without foundation, the oversimplification that walkers listening to music are inattentive to surrounding sounds. Beck states as follows:

*A person walking along the road using earbuds and listening to music is not paying attention to the surrounding sounds. (15)*

In support of this generalization, Beck refers the reader to Reference 15. Reference 15 is not a report authored by him, or some academic study on listening to music while running, or in this case walking. Instead, Beck cites to a *Runner's World* magazine article on new earphones to support his conclusion that 'a person,' and by reference Rudat, is not paying attention to his or her surroundings with music playing. In order to ground truth this citation, the United States found a copy of the article online. A reading of the *Runner's World* (*See Exhibit 7*) article cited by Beck. For this conclusion the magazine provides this and only this:

*If you are consumed in your music on a run, you **might not be able to hear** approaching cars, people trying to communicate with you, or even bad weather in the distance. In 2016, there were more than 3,000 deaths caused by distracted drivers, according to the [National Highway Traffic Safety Administration](#).*

*If you know you'll be on a busy road or packed towpath, it might be best to ignore the headphones for one run.*

This is hardly a scientific, peer reviewed or other extensive study on the issue. The magazine's comment on this matter, and cited by Beck, amounts to one sentence. No more. Another small point, Rudat was walking, a far less strenuous and active endeavor than running, and the reporter for this article warned you '*might not be able to hear.*" Instead of, 'you won't be able to hear.' Nor did the reporter mention distraction, look the wrong direction or otherwise. Frankly, this discussion is rather silly given an expert report is relying on a magazine article for its ultimate conclusion. This establishes that human reaction to an acoustic event is clearly outside of Beck's area of expertise. There is nothing in his C.V. indicating he has ever studied it, nor written about it. His area of expertise lies with recorded sounds and/or localizing the area from where sound originated in a controlled experimental environment. Nothing in this report provides sufficient data or methodology for the notion that Rudat was 'startled' and he somehow mistakenly identified the origination of the noise as coming from the rigger shop when it did not.

This summation is hardly the stuff of a Rule 702 analysis and is nothing more than speculation built upon generalities and more speculation to reach a conclusion without any analysis factually identical testing, or scientific method. It is simply too speculative and lacking in foundation to be introduced.  Moreover, Beck, while possessing a background in sound direction, is no expert on how human's, particularly the one in this case, would react on the day in question. This conclusion is clearly outside the scope of

Beck's professional experience. Some of his report is certainly the stuff for cross-examination, but it hardly fits the bill of permissibility under FRE 702.

A. ARGUMENT

FRE 702 governs admission of expert testimony in the federal courts. It provides as follows:

*If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.*

Beck provides some scientific and mathematical analysis to this issue, however, it is factually inapposite to what occurred in April, 2012. Beck's analysis cites to tests, which are undefined, as they are not listed in his report, and apparently were not performed inside the building in question. He can only speculate and or postulate on how humans react to sound, as he is certainly no expert in that field. Beck's world is acoustics based on recordings, none of which exists here. (See Exhibit 1, pgs. 21-22, a listing of more than 10 'recorded acoustic gunshot signal' references.)

The Supreme Court, in *Daubert v. Merrell Dow Pharmaceuticals Inc., 509 U.S. 579* (1993), concluded that the *Frye v. United States, 54 App.D.C. 46, 293 F. 1013 (*1923), "general acceptance" test had been superseded by the 1975 enactment of Rule 702. *Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147* (1999), established that the trial judge's role as gatekeeper applies to all expert testimony, not just the scientific ones.

Thus, the court holds the gatekeeping function for any type of expert evidence.

The trial judge applies these principles in ruling on admissibility, acting as a "gatekeeper." Consistent with Kumho, Rule 702 admits "any evidence created or validated by expert methods and presented by an expert witness that is shown to be reliable" even if it is not "'scientific' evidence, however such evidence might be defined." *United States v. Herrera, 704 F.3d 480, 486* (7th Cir. 2013) (fingerprints). "[A] witness need not have formal education as a scientist if his other training and experience otherwise qualifies him to testify as an expert." *United States v. Williams, 2017 WL 3254895* (11th Cir. Aug. 1, 2017).

As to the elements guiding admission of expert testimony under FRE 702, each is discussed in turn.

1. **Beck's Specialized Knowledge, In the Field of Acoustics, is Limited to Just That-Reliance on a Runner's World Magazine Article to Impugn Rudat's Testimony as Not Reliable. This is Clearly Outside Beck's Area of Expertise**

Beck's expertise lies with recording sound volume, detecting its direction and analyzing recorded gunshots. In the end, despite all the mathematical calculations, Beck cannot get around the fact that he did not conduct any tests inside the rigger shop building, didn't conduct any tests on Rudat's hearing, was not aware of how loud the music was playing, or even if any sounds emanated from the water treatment plant during

the time in question. More importantly, even if he did, he cannot second guess nor conclude based on a *Runner's World* article that Rudat's recollection of that morning is faulty. Far too many things have to line up for this to be successful. Here are just a few. The workers have to be working, something has to be stricken with enough force to startle Rudat, Rudat must have been confused and looked at the wrong building, and the murder shots, speculatively, were not loud enough for detection.   Beck has no facts to support which song Rudat was listening to, how low or high the volume would have been, nor even how attentive or not Rudat was to his surroundings while walking by the rigger shop. Try as he might, Beck cannot mathematically utilize mathematical formulas based on speculation and faulty facts to claim, ultimately, that Rudat heard something from 1,000 feet away and mistakenly believed it came from the rigger shop some 280 feet away.[5]

## 2. The Report and Presumed Testimony is based on Inapplicable Testing, Facts and Data from the Investigation

There is no evidence in Beck's report that he has ever conducted a test to measure the acoustics of a .44 pistol being fired indoors, let alone in the rigger shop. Thus, basis for his conclusion and mathematical models is flawed. As shown in Exhibits 5 and , 6 there is no evidence of any sounds referenced in these reports, save for the conclusion

---

[5] Just as importantly, there are no facts in Beck's report, nor can there be, that any sound or work from the sewage treatment plant, 1,000 feet away, actually occurred at the time Rudat was walking by the rigger shop. Nor is there any analysis that a softer sound emanating from the rigger shop would be heard by Rudat, but not by the water treatment workers.

Page 13 of 18                                       3:13-cr-00008-SLG
                                                   U.S. v. James Michael Wells

Case 3:13-cr-00008-SLG   Document 979   Filed 05/02/19   Page 13 of 18

that at some unspecified time there was cutting of old water tanks at the time of the murders of Messrs. Hopkins and Belisle. None. At page 14 of Beck's report, he has to speculate again. "*The witness statements described a water treatment plant that had construction activity in the area at that time, with heavy machinery that was cutting and moving a large metal water tank. If the water tank were dropped onto concrete or the tank as was bumbed (sic) by a piece of construction equipment, the sound could be loud enough to hurt your ears, and as loud as 120db SPL or louder at the source. (*mathematical calculations omitted*) …This level should certainly be loud enough to be detected and would likely be recognizable over the Adele song noise level.*"

Again, the report is based upon speculation. Beck first assumes the equipment made a discrete noise at the time consistent with Rudat's version of events. He also has to speculate that 'if' the tank was dropped or bumped, such a noise was the one Rudat heard. This is speculative factual second guessing which fails. For Beck's testimony, he will rely on 1) construction must have been occurring at that time, 2) if it was, equipment bumped a tank, or dropped a piece of it, 3) if those two things happened, they happened at such a volume that it would cause pain, *and must have been* what Rudat heard as, according to *Runner's World*, Rudat looked at the wrong location, even though the rigger shop was less than 300 yards away, while the construction area was 770 feet further away *and in front of Rudat*. (280' versus 1050') (*See Exhibit 1, pg. 5*) (*See Exhibits 5 and 6*, Interview of Wilton Nelson, and Chris Deeder, respectively) (These two exhibits are

reports of an investigation by the defense, discovered to the United States per request of the United States based on reviewing Beck's report. As this court knows, Beck claimed construction work was reported being done in the area. However, neither report specifically claims any collision between equipment as alleged by Beck, though one claims that the construction work 'as usual was pretty loud.')

### 3. The Conclusion of the Beck Report is Not the Product of a Reliable Principle and Method

The government cannot discern any reliable principles nor methodology in these reports as to how people react while walking and listening to music when sound occurs, nor any methodology to establish that Rudat was mistaken. What has been provided is nothing but speculation upon speculation.

### 4. No Principles and Methods are Reliably Applied to the Facts of the Case: Only Speculation.

The Advisory Committee Note to Rule 702 identifies several additional factors to be considered by the court in performing its gatekeeping function under Rule 702. Among these are, (1) whether the expert is proposing to testify about matters growing naturally and directly out of research the expert has conducted independent of the litigation, (2) whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion, (3) whether the expert adequately accounted for alternative explanations, (4) whether the expert is being as careful as she would be in her regular

professional work outside of paid litigation support, and (5) whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinions the expert would give. Fed.R.Civ.P. 702 advisory committee note (2000).

With respect to this report, there is simply too much speculation for any validity to be assigned to the conclusion as to whether Rudat was mistaken as to the direction of the sound he heard that morning or not. Here, nothing was tested in Kodiak, inside the murder scene, at the water treatment plant or elsewhere. Becks report summarizes a string of if's, that if construction was occurring, and if there was a loud sound, by whatever source, and if Rudat was listening to one of several postulated songs by Adele, and if a sound came from the sewage plant it was loud enough at 1,000 feet+ to startle Rudat who, without any supportive study, outdoor testing, or whether Rudat misidentified the source of the sound even though Rudat was some 800 feet closer to the rigger shop. Beck would have been better served simply setting up recording equipment approximate to Rudat's location and recording loud sounds from inside the rigger shop, and the sewage treatment plant. This he has not done.. All of this, again, precipitates from an analysis not based on testing or an inside the scene of the murder analysis. While principles and calculations are applied in abundance, none of them are applicable to this case, especially given this entire analysis is based on such speculation. The Supreme Court has stated that "[t]rained experts commonly extrapolate from existing data." *General Elec. Co. v. Joiner, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508* (1997). It is where expert opinion is "connected to existing data only by the ipse dixit of the expert" that there may be "too

Page 16 of 18                3:13-cr-00008-SLG
U.S. v. James Michael Wells

Case 3:13-cr-00008-SLG   Document 979   Filed 05/02/19   Page 16 of 18

great an analytical gap between the data and the opinion preferred" to support inclusion of the testimony. Id. Joiner requires an expert to justify a foundational assumption or refute contrary record evidence. *United States v. Chischilly, 30 F.3d 1144, 1152–53* (9th Cir.1994).[6]

## B. CONCLUSION

FRE 702 and expert testimony are designed to provide evidence and or scientific analysis to a specific problem. Here, Beck's report and methodology are based on too many 'what if's' and require several factual leaps to make it work. Once you remove the foundational facts of the report, which are far too general and assuming, the report provides nothing for the jury. Even if it did, Mr. Beck is not qualified to testify on how humans react when confronted with a sound. There is no peer review or study of any of Beck's conclusions. That alone is sufficient to preclude him from testifying. If that is not, then a citation to a *Runner's World Magazine*, which even that fails to support his ultimate claim, should be enough of a reason for preclusion at trial.

RESPECTFULLY SUBMITTED May 2, 2019, in Anchorage, Alaska.

BRYAN SCHRODER
United States Attorney

s/Steven E. Skrocki
STEVEN E. SKROCKI
Assistant U.S. Attorney
United States of America

---

[6] 'Ipse dixit' required the undersigned to conduct a search. Said search reveals a translation of 'he or she said it himself, without supporting proof.' Such is the case here, *res ipsa loquitor,* borrowing from Torts.

**CERTIFICATE OF SERVICE**

I hereby certify that on May 2, 2019, a
true and correct copy of the foregoing was
served electronically on:

Counsel of Record

s/ Steven E. Skrocki
Office of the U.S. Attorney