Gary G. Colbath
Assistant Federal Defender
FEDERAL PUBLIC DEFENDER
FOR THE DISTRICT OF ALASKA
425 G Street, Suite 800
Anchorage, Alaska 99501
Phone: (907) 646-3400
Fax: (907) 646-3480
Email: gary_colbath@fd.org

*Counsel for Defendant James Michael Wells*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          Plaintiff,<br><br>vs.<br><br>JAMES MICHAEL WELLS,<br><br>          Defendant. | Case No. 3:13-cr-00008-SLG<br><br>**DEFENDANT'S SUPPLEMENTAL BRIEFING RELATED TO MOTIONS TO EXCLUDE 404(b) & CHARACTER EVIDENCE [943-946]** |

Defendant James Michael Wells, through counsel, Gary G. Colbath, Assistant Federal Defender, files this supplemental brief, consistent with the record made at the motion hearing before the court on April 22, 2019, and in further support of his motions to exclude various other acts evidence and character evidence.

## I.  INTRODUCTION

As an initial matter, the parties agreed that the court should evaluate, on an issue by issue basis, the "other acts" instances noticed by the government for individual admissibility purposes under Rules 403 and 404.  The same analysis should also be conducted with respect to the body of generalized "bad character" testimony previously offered by the government beyond the specific instances of other

acts conduct although no additional analysis of those statements will be made. This memorandum will treat each act or area of character testimony individually by 1) noting the witnesses and exhibits, including transcript cites, used to present such evidence; 2) addressing the inadmissibility of each instance under Rule 404(b); and 3) addressing the inadmissibility of each instance under Rule 403.

## II. ARGUMENT & AUTHORITIES

At the outset of the hearing on this matter, the court questioned whether it could review the matters sought to be excluded by the defense on an individual basis and whether the court was bound by the determinations made by the Ninth Circuit on these matters in its prior decision. Although the parties agreed an independent, individual analysis was called for, Wells submits the court is legally bound to conduct such analysis and is in no way bound by the appellate decision on these issues. The Ninth Circuit has noted that "we may decline to apply the decision of a previous panel of our court as the law of the case if "'(1) the decision is clearly erroneous and its enforcement would work a manifest injustice, (2) intervening controlling authority makes reconsideration appropriate, or (3) <u>substantially different evidence was adduced at a subsequent trial</u>.'" (Emphasis added.) *United States v. Jingles*, 702 F.3d 494, 502-03 (9th Cir. 2012), citing *Gonzalez v. Arizona*, 677 F.3d 383, 390 n. 4 (9th Cir.2012) (en banc) (quoting *Jeffries v. Wood,* 114 F.3d 1484, 1489 (9th Cir.1997) (en banc)).

Here, there can be no doubt that the evidence to be adduced on retrial will be substantially different than what was presented at the prior trial. Moreover, the legal circumstances under which evidence will be presented will be different. Both of these changes materially alter the process and analysis this court should follow in determining the admissibility of the evidence contested in the two motions under consideration now before the court. As previously noted, the nature of the government's case has been substantially altered by the removal of Reid Meloy as a witness as he was the key witness who tied the government's "overly broad" motive theory together. Moreover, not only will the defense not seek to admit evidence of the Defendant's personnel file, good behavior or traits of character, but also the defense objects to each piece of evidence covered by the motions at issue here, most of which was introduced at the prior trial without objection or contest whatsoever.

In its prior decision in this case, the Ninth Circuit set out the general analysis for evaluating the admissibility of evidence under Rules 404(b) and 403. "Other acts evidence is admissible under Rule 404(b) if it (1) tends to prove a material point in issue; (2) is not too remote in time; (3) is proven with evidence sufficient to show that the act was committed; and (4) if admitted to prove intent, is similar to the offense charged." Beckman, 298 F.3d at 794. "Of course, the probative value of the evidence must not be 'substantially outweighed by the danger of unfair prejudice.'" *United States v. Wells,* 879 F.3d 900, 930 (9th Cir. 2018) citing *United States v. Blitz*, 151 F.3d 1002, 1008 (9th Cir. 1998) (quoting Fed. R. Evid. 403).

Federal Rule of Evidence 403 provides that a district court:

> "[M]ay exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." "Unfair prejudice is an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one. The Rule requires that the probative value of the evidence be compared to the articulated reasons for exclusion and permits exclusion only if one or more of those reasons substantially outweigh the probative value."

*United States v. Anderson*, 741 F.3d 938, 950 (9th Cir.2013) (citations and internal quotation marks omitted).

It is within the above framework that Defendant urges the court to analyze each area of evidence sought to be admitted by the government to support its motive theory and exclude the same:

## III.    OTHER ACTS EVIDENCE – 404(b)

### A.  Fuel Card Incident.

The government's filing only reports a portion of the use it made of the fuel card incident and the witnesses who testified about it.  At the outset, Wells notes that cites to the transcript on each incident will be made to not only the evidentiary portions of the record related to the incident but also to counsel's arguments to the jury about the same as it is equally important for the court to understand and assess how the evidence was actually used at trial as that frequently was different than how the government represents the evidence was/will be used. At the prior trial, the

government elicited testimony regarding this incident from nine witnesses, as well as counsel making reference to it in both opening and closings. TR. pp. 254, 784-809, 910-913, 915-917, 925-927, 932, 1004-06, 1011, 1020-21, 1031, 1048, 1166-1179, 1200-06, 1262-70, 1273-74, 1335-36, 3011-12, 3020, 3382, 3748.[1] Additionally, the exhibits noted by the government are relevant to the analysis of the topic. Notably, the government's current characterization of the incident is both disingenuous and misleading.

At the hearing, government counsel described the incident as one wherein Wells was "disciplined" for misusing a fuel card belonging to the U.S. Coast Guard. Counsel also tied the relevance of this issue to the fact that "Wells' direct supervisor, victim Jim Hopkins, was part of the investigation and at the very meeting where Wells was given the disciplinary letter." The assertions, however, are not true. To begin with, the evidence at trial established that Chief Scott Reckner was Wells' direct supervisor. Jim Hopkins was the supervisor of the Coast Guard members who worked in the rigger shop, but was in no way the supervisor of either of the civilians, Wells and Rich Belisle. Also contrary to the description by counsel, the letter of caution sought to be admitted by the government explicitly indicates that "[t]his letter is non-disciplinary and will not be placed in your Official Personnel Record…" Finally, uncontroverted testimony showed that neither victim, Jim Hopkins nor Rich

---

[1] All cites in this document will be to the trial transcript pages alone.

Case 3:13-cr-00008-SLG   Document 983   Filed 05/03/19   Page 5 of 32

Belisle, was present for, or had any involvement, in the meeting where Wells received the letter. The incident and surrounding investigation fails the test under Rule 404(b).

The factors for consideration apply as follows: 1) The evidence does not tend to prove any material point in issue. While it is certainly disputed whether Wells had any motive to murder Hopkins and Belisle, the fact that someone stole $232.44 worth of fuel from the U.S. Coast Guard several months before the murders and a thorough investigation failed to determine who did so, does not create in any way a motive to kill uninvolved co-workers. The government argues that it is not trying to introduce a substantiated claim that Wells stole fuel. This very statement is an admission that the government cannot "prove" the incident it seeks to admit because although not substantiated, the government's testimony and exhibits clearly assert that Wells stole the fuel and the government argued as much at the prior trial.

2) The incident occurred in September of 2011 and Wells received the letter of counseling on February 24, 2012, almost two months prior to the murders. The government repeatedly throughout its filing argues that the timeframes involved fit "within the time frame relevant to the government's motive theory." However, the court must look at the date of murders, April 12, 2012, and determine on its own, whether something is "remote" by its context and relationship, if any, to the murders. The government does not get to set the timeline for this determination and remoteness is not considered in relation to the government's "theory."

3) The incident is in no way "proven" sufficiently to show the act was committed. Again, the uncontroverted evidence shows that the U.S. Coast Guard's own investigation into the incident concluded that "[t]here is inconclusive evidence to determine who used the fuel card." This fully explains why Wells was specifically NOT disciplined nor was the cautionary letter to be "placed in his file." Wells suffered no adverse employment consequences and was not held responsible for the incident precisely because it was not proven.

4) The evidence about the incident is not offered to show intent so its dissimilarity to the crimes charged here in no way support admission.

If the court somehow concluded that the incident did satisfy the four-part test so as to be admissible to show motive under Rule 404(b), the evidence should be excluded under Rule 403. First, the incident undoubtedly is prejudicial to Wells. The clear implication from the evidence that the government wants the jury to accept is that Wells is a bad person because he is a thief. Although not charged or disciplined, and surely not convicted of anything, the government's spin on this evidence is that Wells was guilty of theft of fuel from the government, got caught by his employer, and was reprimanded which caused some adverse reaction by him. Indeed, during the trial the prosecutor asked:

> Are you aware that in February of 2012, the commanding officer of COMMSTA Kodiak personally issued him a letter of caution *for stealing fuel* for his—from—for his personal vehicle with a government fuel card? (TR p. 3011 emphasis added).

Case 3:13-cr-00008-SLG   Document 983   Filed 05/03/19   Page 7 of 32

Of course the truth is that 1) the U.S. Coast Guard's own detailed investigation resulted in an inconclusive determination about who, among numerous employees, may have stolen the fuel at issue; 2) Wells was not reprimanded, but instead cautioned on a better and more secure way to monitor the fuel card; 3) the decision to provide such cautionary letter and meeting regarding the same had nothing whatsoever to do with either victim, Hopkins or Belisle; and 4) Wells did not act in an angry, or threatening, or violent, or vindictive manner whatsoever in response to receipt of the letter but instead was sad and simply disappointed that his superior had mistakenly lost trust in him. Given the trivial nature of the event ($232.44 in fuel), its remoteness to the murders (several months earlier), the fact that it did not involve the victims, and Wells' non-threatening reaction to the cautionary letter, the probative value of this evidence is marginal at best while its prejudicial impact is high.

In addition to the prejudice the evidence will create, dealing with this issue at trial will confuse the issues, mislead the jury and waste substantial time. Indeed, at the first trial the government presented needless cumulative evidence on this topic having at least nine different witness testify about the incident while admitting several documents related to the same. Without Meloy's improper testimony and explanation about how he felt this type of incident fit the profile of a workplace murderer, the jury will be confused about why this whole contested theft allegation and its administrative fall-out is being presented. There is a high likelihood that the

jury will be misled into thinking it must determine in the first instance whether Wells actually stole the fuel, and then if so, were his superiors' reactions to that appropriate and then what does Wells' response to that mean? If the court allows the government to present this evidence, the defense intends to call or question several additional witnesses (2-4) that have knowledge of the circumstances as well as introduce documents from the internal, inconclusive investigation done by the government. This will increase the wasted time on this singular issue and result in a mini-trial about how these few gallons of fuel went missing and who could have been responsible. The court should exclude this evidence under each of the concerns identified in Rule 403.

### B. Tree Collaring

The government apparently again intends to present evidence that it will characterize as negative and reprimanding in nature about Wells improperly taking trees from government property in violation of U.S. Coast Guard rules. Like the prior trial, the implication the government would have the jury believe is that Wells wrongfully killed and stole trees that he should not have taken, and was disciplined for his actions. At the prior trial the government actually called four witnesses (not three) to testify about this conduct as well as counsel referencing it in both opening and closings. They further introduced one of the letters of expectation related to the issue.

The government's proffer here is incomplete and misleading. In reality, the evidence is not negative to Wells nor relevant to anything related to the killings of Hopkins or Belisle. 1) The evidence certainly does not tend to prove any *material* point in issue. Indeed, the practice by rigger shop employees for years predating the murders, including both Wells and Belisle, was to at times collar trees around antenna sites in order to ease their later removal. Employees, again including Wells and Belisle, would later remove and use the trees to personally heat their homes. The evidence shows that Wells had actually had discussions with past supervisors about this very topic and his file contained references to the same dating back years. There is nothing in dispute about what happened historically with this practice and nothing to show it was related to the murders in any way.

Belisle and Wells each received two memos and counselling regarding the command's policy on this, contrary to the government's discussion about a single letter to Wells alone. Wells was not singled out for the tree collaring by command, that was only done by the government after the murders. Moreover, the letters were presented by Chiefs Reed and Reckner. Hopkins was not involved in dealing with either civilian (he was not their supervisor) and Belisle was certainly on Wells' "side" or in the same boat with him as opposed to in a position to generate animosity with him. None of the proffered evidence on this topic shows that Wells protested receipt of the letters, reacted in a violent or threatening manner, or expressed any concern with either victim about them. To the contrary, although the government states in

their Supplemental Brief at Docket 973 that "Wells' response when he was confronted with the tree collaring issue was that *he got angry and raised his voice* (italics added)," in fact what Reckner actually testified at trial was, "At that point he [Wells] stopped talking and got quiet."

2) The evidence related to tree collaring spans many years predating the murders and is remote at best relative to the killings. The government argues that since Wells received a letter which discussed in part the practice in November the year before the murders, that it somehow is relevant to motive. Given the long history of many employees engaging in the accepted but later frowned upon practice, the whole discussion is remote relative to the murders.

3) There is insufficient evidence to establish that Wells did anything improper regarding tree collaring so as to "prove" the act was committed. Indeed, the evidence shows that not only did Wells receive letters which discussed the practice but also victim Belisle received the very same counseling and letters as he too engaged in the practice. Rather than serve to show any grounds for a motive to harm Belisle, or Hopkins for that matter as he had nothing whatsoever to do with the collaring or letters of counseling, the evidence regarding this practice contributes no probative value to the government's motive theory. And of course, because it is only offered on that ground, and not to show intent, its dissimilarity to the murders again cuts against admissibility as well.

If the court somehow concluded that the incident did satisfy the four-part test so as to be admissible to show motive under Rule 404(b), the evidence should be excluded under Rule 403. First, the incident is again undoubtedly prejudicial to Wells. This is yet another example of the government trying to present evidence that basically only asks the jury to infer bad things about Wells as a person. It is another attempt to present Wells as dishonest or someone who stole from the government and was a bad employee.

The jury will again be confused about what they are supposed to determine about this long-standing practice and what if any meaning the letters to Wells and Belisle about the topic might mean relative to the murders. The possibility for the evidence to mislead the jury into considering it solely to judge Wells' character is high. Given the number of witnesses and materials presented related to the topic, it will waste needless time during the trial on a very trivial topic. If the court allows such testimony, the defense will be forced to call or question additional witnesses to demonstrate how the years-long practice developed, how it was an oft practiced, regular occurrence, and how the policies related to the practice set forth in the documents given to both Wells and Belisle were developed and implemented. Again, the defense will have no choice but to waste additional jury time and create more confusion for them by engaging in this much-to-do-about-nothing exercise to refute evidence that in no way contributes to a motive for murder of unrelated people. The court should reject this evidence under Rule 403.

### C. Attending the NATE Conference

Next, the government seeks to offer evidence about an incident wherein Wells' supervisor, Scott Reckner, determined that in February of 2012, Wells could not attend a conference that Wells had attended many of the prior years he worked at the rigger's shop. The government used the evidence at trial to show the decision was made "because of [Wells] diminished professional performance, and the command's desire to increase the responsibility and opportunities for others in the office." At trial, the government called two witnesses to evidence this matter as well as counsel referencing it both in opening and closings. TR pp. 919-924, 1002-03, 1332-1335, 1347.

The evidence about this single incident is really another not-so-veiled attempt by the government to simply paint Wells as a bad employee. If that were not the case, the reasons for why the decision was made would be unnecessary to present. Nevertheless, the reasons proffered by the government are actually untrue and contradicted by the evidence. The evidence shows that in fact Wells was kept in the loop via email throughout the end of 2011 and knew he would not be attending the conference days before Reckner told him about the decision. The evidence fails to contribute to motive under Rule 404(b). 1) The evidence is not offered to prove a material point at issue. A decision, long before the murders, by Wells' supervisor Reckner to not have Wells attend a conference that occurred two months before the murders, is not material to anything at trial. Because the decision rested solely with

Reckner, and was not the doing of the victims, it could not create a motive to commit the crimes charged. The issue is a red herring proffered by the government as a means to allow Reckner to again offer a negative opinion about Wells' bad character. The evidence is nothing more than that, and the government attempts to prop it up in their Supplemental Brief at Docket 973 by stating that "Wells became upset and cursed regarding Belisle," when in fact Reckner testified that Wells asked about Belisle's attendance by saying, "Why is he going? He's just a F'ing rigger." This was immediately followed up by Reckner admitting that "He [Wells] didn't say F'ing." The government's stating that Wells "cursed," when in fact he did not only serve to negatively color the conversation he had with Reckner regarding attending the conference.

2) The evidence involves a matter remote in relation to the murders. The decision was made months prior to the April murders, as the conference at issue actually occurred the February before. Moreover, the timing of the decision and conference is important because Wells had surgery in Alaska the very same week the conference occurred in Nevada, so it was never a possibility that he would have been in attendance during that year anyway. Rather than being surprised and angry by Reckner's "final decision," Wells knew he was not attending and had scheduled medical procedures while his co-workers would be away attending the conference.

3) The evidence offered does not "prove" anything relative to a bad act committed by Wells, but rather only shows a decision made by his superior, Reckner,

not by either of the victims. Testimony at trial was that Wells was upset by the decision and "stared" at Reckner for several minutes. However, there was no evidence about threatening behavior, violence, revenge, or vindictiveness shown by Wells. This was true even as it relates to Reckner, the only other person involved, much less to either victim.

4) Finally, because the evidence is again only offered to try to show motive, and not to show intent, its dissimilarity to the murders at issue cuts against admissibility as well.

If the court somehow concluded that the incident did satisfy the four-part test so as to be admissible to show motive under Rule 404(b), the evidence should be excluded under Rule 403. First, the incident is again undoubtedly prejudicial to Wells. The evidence is prejudicial because it is really not limited to a single decision about attendance at a conference but rather is used to attempt to illustrate that Reckner felt Wells was showing "diminished professional performance," and Reckner wanted to let others in the office attend the event. First off, Belisle had attended the event with Wells several of the years prior to the murders so his attendance would not have been upsetting to Wells at all. Moreover, Hopkins had no say or part of the decision about Wells not attending, nor was he part in the discussion between Wells and Reckner. The evidence at the prior trial about this topic mostly centered around an attempt by Reckner to describe his personal negative opinion of Wells' job

performance. It was and is prejudicial propensity evidence, not evidence establishing motive.

Allowing this evidence will definitely confuse the jury as to its meaning and result in a mini-trial. The government's proffer on this topic is particularly misleading and disingenuous. If the court allows the government to discuss this incident, the defense will counter with evidence that long *after* Reckner's decision to not have Wells attend the annual conference in February, Reckner approved Wells' attendance at another conference scheduled the very same month as the murders. This information would be essential to show that attendance at conferences was administered fairly and impartially to all individuals employed or assigned to the Rigger Shop. Moreover, the evidence directly contradicts the testimony of Reckner and the proposed purpose for which the government offers the evidence now. This evidence of course flies directly in the face of Reckner's prior testimony about Wells "diminishing professional performance." What the evidence does is create a situation where the jury will again be lead to believe it must pass some judgment on whether Wells was in fact a bad employee, and what it might have meant that he could not go to a prior conference but then was recommended and approved by the same person to attend a different conference closer in time to the murders. This min-trial about conference attendance approval, the timing of events, and whether Wells showed diminished or continuing good performance will all be a distraction from any relevant

Case 3:13-cr-00008-SLG   Document 983   Filed 05/03/19   Page 16 of 32

issue at trial and wholly confuse the jury about the purpose for the presentation of this evidence.  Accordingly, the court should reject this evidence under Rule 403.

### D. Workplace Disagreements

Next, the government offers a block of testimony, through approximately six witnesses it characterizes as "General Disagreements with Co-Workers." Interestingly, NONE of the proffered "disagreements" were with or involved either murder victim.  Nevertheless, the government called witnesses at trial, which it again seeks to do, to discuss a number of specific incidents or topics it used to characterize Wells as a bad employee.  Each area of evidence should be analyzed separately by the court for exclusion.

#### 1. Warehouse Clean-out Project

The government called six witnesses to discuss a project that involved the cleaning out of a warehouse where the rigger shop historically stored and cached parts, old equipment, and miscellaneous items used as part of its work. TR pp. 490-491, 506-507, 854-857, 861-863, 934-936, 1021, 1057-58, 1070-71, 1179-89, 1194-99. Again, counsel also referred to the incident in opening and closings.  The testimony showed that over a period of decades, several warehouses across Base Kodiak had accumulated a mess of property, used items and "junk" that was either old, broken, or out of service.   LT David Pizzurro and CO Van Ness initiated the clean-up project. When they both arrived in 2009 there was a lot of excess government property piled

up in warehouses and cages around the facility. Stuff had piled up over time, some of it had been there since the 1940s. So, they had actually begun the project over three years earlier to try to downsize the excess holdings.

The project regarding the rigger shop warehouse was primarily coordinated by Belisle, with a number of U.S. Coast Guard members from the rigger shop doing the actual work. Wells was NOT involved in the project as it began when he was gone on medical leave. He was asked at times about what certain equipment was or whether things were still serviceable and he provided his knowledge about older items when asked. At trial the government elicited testimony that Wells reacted negatively upon his return to work when he discovered employees were removing things he wanted to save. The government, in their Supplemental Briefing, stated that Wells' was "muttering under his breath and storming out," whereas actual testimony showed that, "He walked in, he saw all his equipment going into this box, and then he said something, and then he walked out. I didn't hear what he said."

Evidence related to this incident is not relevant to motive. 1) The evidence does not tend to show or prove any material issue in dispute, much less related to the murders that occurred over a month later. 2) The incident began with a process that started some three years prior. The rigger shop warehouse clean-out occurred over several weeks more than a month prior to the murders and while Wells was primarily on leave. The clean-up had nothing to do with Wells and was a Base-wide effort to prepare things for a change in command. This long-standing process was remote to

the murders and completely unrelated.  3) The evidence is not really subject to being "proven" sufficient to say it was committed, but rather is another example of the government using an event to allow others to describe Wells negatively and evidence one of his character traits in order to paint him generally in a poor light.  4) And of course, since only offered to somehow show motive rather than intent, the complete dissimilarity between this trivial incident and the murder of two co-workers fails to support its relevance at trial.

If the court somehow concluded that the incident did satisfy the four-part test so as to be admissible to show motive under Rule 404(b), the evidence should be excluded under Rule 403.  First, the incident is again prejudicial to Wells, as by description, it is offered to show "he reacted negatively" to the incident ordered to be completed by his superiors.  However, neither Hopkins or Belisle ordered the clean-up, and any reaction by Wells was not observed by them or directed at them, so Wells' vague, single response noted in one random observation during the process was really meaningless as respect to the murders over a month later.  Perhaps more importantly, the "negative" reaction was described at trial as Wells simply "[saying] something, and then he walked out."  Although the government, as it often did during trial, later mischaracterized the testimony and argued that Wells "had an angry reaction and stormed out," that characterization was false.  Yet the significant trial time that was wasted through the testimony of six witnesses explaining this long

process that all agreed Wells was really not involved with was all offered to set up the single observation about Wells' reaction to one particular event.

Despite no testimony about Wells' behavior containing anger, threats, violence, a need for revenge, or any such conduct, the government spun the lone observation into a negative characterization of Wells to fit their "theory." The evidence regarding this cleaning project does nothing to contribute to an understanding of the environment or background of the work place and in no way is related to the murders.

Allowing this evidence will force the defense to present the jury with additional testimony about how the project developed, why it developed, when it developed, how it was implemented, and who all was involved. This again puts the jury in the position of judging the propriety of the project itself and then somehow weighing Wells response; then taking that determination and seeing if it fits at all with a motive to later murder two co-workers neither of whom dealt with Wells during the project. The more likely result of this process for the jury is that they will be confused by the relevance of this evidence, or as the government wants, will be persuaded by it to find that Wells was simply a bad employee with a propensity to then do bad things. Again, this incident has amazingly nominal relevance yet will waste time, be cumulative, and confuse the jury all resulting in substantial prejudicial effect on Wells. It must be excluded under Rule 403.

2. <u>Completion of an Antenna Book</u>

Like the prior incident, the government presented testimony through six different witnesses at trial regarding the updating of an antenna book by someone other than Wells, Belisle or Hopkins. TR pp. 491, 930-932, 1058-60, 1071-72, 1189-90, 1208-09, 1251-52, 1327-28, 1344-45, 1348. Again, counsel also referenced the matter in both opening and closings.

The government's submission on this incident is inaccurate. Hopkins did not order Wells to share knowledge in the form of an antenna book. In fact, Lt. Pizzurro testified that the book had already been created before he arrived there in roughly 2009. *It was primarily created by Jim Wells and another former Chief.* Pizzurro received a draft copy when he first reported and presented it to CO Van Ness. The CO sent it back down because he wanted it to be more robust and have more detail.

The government says Leah Henry created the book. She did not. After she became pregnant and was limited to desk-work, and Hopkins had failed to get the book updated as he was directed to do by Reckner, Henry was assigned to <u>update</u> the book.

The government says Wells was not helpful in providing Henry information. In reality her testimony demonstrated that she gathered a lot of research manuals do to the project and referred to Wells quite a bit. Sometimes he was very forthcoming and other times he did not want to talk about it. Although it could be frustrating at times when she needed to complete the project and was not always getting answers

from him, he knew the majority of information she needed and he willingly gave it to her. The book was completed before March 2013 when Henry left. During the process, Wells "was really the only one who [she] got assistance from" since he had the wealth of information on the antennas.

Despite the true nature of the testimony, the government, like it did not most of these incidents, and as it does now, misstates or mischaracterizes witness' descriptions of Wells and then argues traits and characteristics it feels fits its motive theory, regardless of the truth. Here, although not testified to by anyone relative to the antenna book, the government used and again wants to use this incident as a means to portray Wells as difficult to work with, withholding and uncooperative.

The testimony proffered on this topic is blatant bad character evidence irrelevant to any issue at trial. 1) The evidence does not relate to any material point at trial. The task of completing the book was actually originally assigned (in the year or so prior to the murders) by Reckner to Hopkins. However, he failed to complete the task. When Henry became pregnant and unable to do work outside the office, she was assigned the task. The evidence showed that she completed the book over a month before the murders and in doing so consulted with Wells on a regular basis receiving much help and information from him. Nothing about the project though relates to anything material to trial. The testimony's only purpose is to allow the government to argue behavior and character traits of Wells that it says supports its motive theory.

2) The evidence about this project spans years (the book existed before 2009) and is vastly remote in time from the crimes charged. The testimony shows that a year or more before the murders, a decision was made to update the book, which had needed to be done "for years." The project was completed before the murders.

3) Again, there is nothing to really be "proven" related to this incident that the court can use to determine whether the act (whatever that might be) was committed. Instead, no one disputes an antenna book was ordered to be updated. The government claims the testimony shows Wells was somehow a bad employee for not more fully participating in that process yet the actual transcripts show the opposite. They also prove the project got done. The "act" proffered for the jury to consider cannot even be proven sufficient to be considered much less determined to somehow be relevant to show a motive for murder.

4) Last, since again only offered to somehow show motive rather than intent, the complete dissimilarity between this normal work flow incident and the murder of two co-workers cuts wholly against its relevance at trial.

If the court somehow concluded that the incident did satisfy the four-part test so as to be admissible to show motive under Rule 404(b), the evidence should be excluded under Rule 403. The evidence surrounding the antenna book updating, relative to Wells, is again prejudicial. By description, the testimony related to Wells' involvement is offered so the government can argue he was unhelpful, or withholding, or difficult to get information from, all blatantly negative character traits that the

government wants the jury to attribute to Wells. If accepted, this propensity evidence would necessarily create nothing but prejudice against him.

Again, if the court allows this character assassination to proceed through a description of this incident, the defense will be forced to call and question additional witnesses to show historically how the project developed, why it developed, when it developed, how it was implemented, and who all were involved. This again puts the jury in the position of judging the propriety of the project itself, understanding why it is even being discussed, and then somehow weighing Wells' response. They will then have to take that determination and see if it fits at all with a motive to later murder two co-workers neither of whom dealt with Wells during the project.

The government would have the jury hear all this solely for the purpose of considering the evidence as it might relate to motive but not substantively against Wells. Of course that is very hard to separate and extremely unfair to ask of a jury. The more likely result of this process for the jury is that they will be confused by the relevance of this evidence and persuaded by it to find that Wells was simply a bad employee with a propensity then to do bad things. This evidence is a waste of time, cumulative, and does not show what the government says it does. It should be excluded under Rule 403.

3. <u>Installation of Bird Diverters</u>

Next the government presented testimony at trial, and again seeks to do so, from three witnesses about a work project that occurred near Sheyma, Alaska, that involved the installation of bird diverters on an antenna being worked on by Wells and others from the riggers shop. TR pp. 904-906, 1003-04, 1024-45, 3351-52, 3356-57. Counsel also referenced this in opening and closings. Again, the purpose for the testimony was only to show that Wells was a disagreeable employee who did not follow orders.

Interesting, the government argues in its brief now, and did at trial before, that the incident is necessary to show in part that it demonstrates "his diminished position in the rigger shop." This theme is actually part of the profile evidence (which the government now solely calls motive theory) and was repeated in argument by reference to a number of these 404(b) acts. The government also now argues that this incident is relevant to show "Wells' opposition to what was required by Command and required by law." Thus, the government wants to use this incident to show Wells' disregard of the law. Important for the court to recognize is that NO ONE related to the testimony about the bird diverter incident, nor related to any other 404(b) topic, testified that Wells said or felt his position was "diminished" or he thought "he would be replaced," or he felt like "his authority was threatened." Instead, these attributes were contrived conjectures made by profiler Meloy and through argument of counsel, unsupported by real evidence. Like the other materials, the bird diverter incident is

irrelevant to the issues at trial and does not contribute to the government's motive theory.

Under Rule 404(b), 1) The evidence is unrelated to any material point at issue at trial. The evidence instead simply deals with a normal work process and discussion that had nothing to do with the murders occurring in April 2012. 2) The incident happened in July 2011, near Sheyma, Alaska, which are both remote in time and place from the April 2012 murders at the rigger shop. 3) The defense disputes whether Wells even failed to follow orders or acted inappropriately relative to the incident and the government cannot prove the matter sufficiently even to show such an act was committed. Finally, 4) the incident could not be more dissimilar to the crimes charged and since again the evidence related to it is only offered to somehow show motive rather than intent, this dissimilarity weighs wholly against its relevance at trial.

If the court somehow concluded that the incident did satisfy the four-part test so as to be admissible to show motive under Rule 404(b), the evidence should be excluded under Rule 403. The evidence surrounding the installation of bird diverters on a remote antenna, relative to Wells, is again prejudicial. By description, the testimony the government wants to use is really related to showing that Wells was a disagreeable or "know-it-all" employee who did not follow orders. Again, these are simply character traits. These may have fit the government's inadmissible profile evidence used at the first trial but they do not prove motive to murder and should be

excluded here. The government will undoubtedly use them as a back door way to have witnesses describe Wells being disagreeable, insubordinate, stubborn, etc. These are character traits. If admitted, the government will later argue that these behaviors somehow translate to giving Wells a motive to murder co-workers who were not even materially involved with the incident being discussed. This cumulative, waste of time evidence is not probative of anything and as such its minimal probative value is substantially outweighed by its prejudicial effect.

### 4. Unexcused Absences from Work – Letter of Expectation

Finally, the government offered testimony at trial from two witnesses and through arguments of counsel regarding evidence of Wells' alleged unexcused absences from work, failure to keep his employers informed of his whereabouts, and his receipt of a "letter of expectations" provided to him to address these and "other" concerns with his behavior. This evidence does not comport with the 404(b) purpose for which it is offered.

To begin with, Wells and Belisle were the only civilian employees at the rigger shop. As such, they were governed by different employment standards and conditions than were the active U.S. Coast Guard members. Relative to this topic, both Wells and Belisle received the exact same letters of expectation in 2011 as updated or documented records of their superiors' expectations about the work place. Each received two letters and none involved Hopkins. In the face of that reality, the

government presented testimony about only one of the letters Wells received, failing to note that Belisle also received the exact same letter, and arguing that it was really created to address bad behaviors by Wells even though neither him or Belsisle received no actual negative employment consequences from the process.

1) This evidence does not tend to prove any material point at issue at trial. As the letter was not written by nor presented to Wells and Belisle by Hopkins, the letter could not have created any animosity between the three. Indeed, Wells and Belisle were sided together on this issue as the only two rigger shop civilian employees. The letter the government used itself in not a reprimand nor negative on its face. Like other 404(b) "acts" it is the spin about Wells' behavior that the government witnesses attribute to creation of the letter that the government seeks to argue. This is another overt attempt to simply show Wells acting as a bad employee, not an attempt to prove motive.

2) The testimony about Wells' alleged abuse of leave and his failure to keep his employers appraised of his location spans over more than a year. The first letter of expectation was issued on April 29, 2011 almost a full year before the murders. The government of course wants to ignore this. The second letter was written on November 2, 2011, again months before the murder. This, like the one from April of that year was not unusual. In fact, as far back as September 4, 2004, similar letters setting out civilian work policies and procedures were given to Wells and other civilians to document U.S. Coast Guard policies. This evidence is all remote to the

April 2012 murders, especially when considered with the fact that the letters came from supervisors and not the victims.

3) That the letter was received by Wells, is a proven fact. However, why the letter was created is not proven but instead is disputed. Wells' actual leave records, received from the government in discovery show that virtually all of Wells' sick and personal leave was accounted for by submitted time and leave requests, almost all approved by either Reckner or someone above him, and then later by the U.S. Coast Guard time and leave officer. What these letters really allow is the government a chance to call a witness who can generally comment on Wells' alleged poor work performance or failure to follow orders or policies. This again is just character evidence the government will argue later to the jury makes Wells the kind of person who would commit murder. The fact that Wells received non-disciplinary policy letters in 2011, just as he did in years past, can in no way be twisted into some circumstance where it supports a theory of motive to murder.

4) Finally, as with the other 404(b) matters, this evidence is dissimilar to the crimes charged, offered to somehow show motive rather than intent, and as such weighs wholly against its relevance at trial.

If the court somehow concluded that the incident did satisfy the four-part test so as to be admissible to show motive under Rule 404(b), the evidence should be excluded under Rule 403. The evidence surrounding Wells' work attendance and a policy letter received in November 2011 is again prejudicial. The letter speaks for

itself and is not a letter of reprimand nor one that does anything other than set forth some of the policies or standards by which the civilian rigger shop employees were to work. The prejudice comes not from the actual evidence of what the letter says, but rather from the characterization of Wells' behavior that the government will argue "caused" the letter to be created. The real evidence the government seeks to use, by description, is evidence which allows the government to argue Wells' poor and inappropriate performance at work. This is nothing more than cumulative, bad character evidence used to persuade the jury to look at and feel negatively about Wells as a person. If allowed by the court, the evidence will necessitate the defense to introduce disputed testimony and numerous exhibits to get into Wells' actual leave and attendance, as well as explain in detail his performance over the months and year or more leading up to the murders. This will confuse the jury as to the purpose of that evidence and will not be easily understood as limited to applying to only some remote or potential motive to kill others who did not issue or control Wells' employment expectations. The evidence bears no real probative value on any issue the jury must decide but carries the same and cumulatively contributes to the prejudice created by this tireless string of negative, bad employee character evidence sought to be admitted by the government. It should be excluded under Rule 403.

# IV. CONCLUSION

What the court is really faced with here, is an attempt by the government to present profile evidence of a bad employee, as substantive proof for murder. Although the Ninth Circuit took away the government's hired profiler, the argument and underlying evidence it seeks to present is the same. The government just substitutes a "motive theory" in place of its prior profile theory and proffers the same litany of character evidence and characteristics of Wells as purported proof to establish something it otherwise has no evidence of, i.e. a motive for Wells to kill these particular victims. That particular piece of evidence, a motive to kill specifically Hopkins and Belisle, is what the court must focus on and require any proffered 404(b) evidence be related to. The government's proffer here is clearly made because it lacks substantive evidence of guilt. Its case does not include eye witnesses, forensic evidence, a murder weapon, admissions by the Defendant that show he had anything to do with the murders. Thus, in the absence of any real proof of guilt, the government is left with desperately cherry picking through Wells' past employment history and stringing together innocuous details and behaviors that it cumulatively batches together to try to disparage him with. This allowed their expert witnesses to portray Wells as a likely killer in the first trial. The Ninth Circuit was quick to reverse that tactic and clear in pointing out the fundamental unfairness of such use of character evidence. This court is essentially being asked to let the government do the same thing, just without a single expert to tie it all together. Calling profile character

Case 3:13-cr-00008-SLG   Document 983   Filed 05/03/19   Page 31 of 32

evidence a "motive theory" does not make it so.  The court should not fall prey to that trap.

For all the reasons set forth in Defendant's initial motions, as well as upon the argument and authorities set forth above, the court should exclude the 404(b) and character evidence proffered by the government.

DATED at Anchorage, Alaska this 3rd day of May, 2019.

Respectfully submitted,
FEDERAL PUBLIC DEFENDER
FOR THE DISTRICT OF ALASKA
*/s/ Gary G. Colbath*
Gary G. Colbath
Assistant Federal Defender
*Counsel for James Michael Wells*

Certificate of Service:
I hereby certify that I electronically filed the foregoing and any attachments with the Clerk of Court for the United States District Court for the District of Alaska by using the district's CM/ECF system on May 3, 2019. All participants in this case are registered CM/ECF users and will be served by the district's CM/ECF system.
*/s/ Gary G. Colbath*