Gary G. Colbath
Assistant Federal Defender
FEDERAL PUBLIC DEFENDER
FOR THE DISTRICT OF ALASKA
425 G Street, Suite 800
Anchorage, Alaska 99501
Phone: (907) 646-3400
Fax: (907) 646-3480
Email: gary_colbath@fd.org

Counsel for Defendant James Michael Wells

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>Vs.<br><br>JAMES MICHAEL WELLS,<br><br>Defendant. | Case No. 3:13-cr-00008-SLG<br><br>**DEFENDANT'S RESPONSE TO GOVERNMENT'S MOTION TO PRECLUDE TESTIMONY OF DEFENSE EXPERT STEVEN D. BECK [979]** |

Defendant James Michael Wells, through counsel Gary G. Colbath and Peter A. Camiel, files this response to Docket No. 979, the government's motion in limine to preclude the testimony of defense expert Steven D. Beck.

## I.    INTRODUCTION

The government moves to preclude the testimony of expert Steven D. Beck asserting that "the Expert Testimony of Steven Beck is being offered solely to discredit a percipient witness' testimony."  Furthermore, the motion states that "the report and analysis is directed toward disproving that one government witness, who was walking by the murder scene during the murders, and testified he heard a sound

like metal being dropped on concrete emanating from the rigger shop, is not reliable." Beck is characterized as an "after-the-fact Forensic Audio Analysis Expert.

To be sure, the government got one thing right, Beck is a Forensic Audio Analysis Expert. However, as for the purpose of his testimony, Beck's report and analysis concludes the exact opposite of what the government contends. Contrary to the government's assertions, Beck's report starts with the premise that the witness in question, Don Rudat, did in fact accurately hear and report a sound like metal being dropped on concrete. The witness never stated that he heard the soft low frequency "pop pop pop" sound of gunshots fired inside an enclosed structure and heard from outside the building some 280 feet away. Beck's report, using sound scientific methods and reasonable inferences drawn from undisputed facts about the case, concludes exactly what government witness Rudat reported, that he likely heard the loud clang of a large metal object contacting concrete or another hard surface in the general area of the rigger shop as he walked by on the morning of the murders.

Beck, with over 30 years of experience of describing and classifying acoustic transient sounds, demonstrates in his report that the sound of metal being dropped on concrete has very different temporal and spectral characteristics compared with the low frequency pop sound of gunshots, and shows that these two sounds are so different that they are very unlikely to be confused. Beck is a well-qualified expert

whose opinions are reliable and relevant to assisting the jury in determining the meaning of key pieces of testimony and evidence that will be presented at trial.

## II.   FACTS

Despite a prior transcript to concretely identify what is fact and what is argument, the facts outlined by the government relevant to determination of this motion are purely colored in light most favorable to the government's "theory" about the murders and slanted to support only its self-serving version of what it opines happened on April 12, 2012, at the T2 building along Anton Larson Bay Road.  The Court should not base its ruling on the fictional events described by the government.

The record shows that victim Rich Belisle arrived at work on April 12, 2012, right around 7:00 a.m.  Jim Hopkins arrived approximately eight (8) minutes later at around 7:08 a.m.  Both men were found dead approximately 26 minutes later at 7:34 a.m. by the next co-worker to enter the building.   No evidence exists determining when either man was shot and killed.

Coast Guard civilian employee Don Rudat was out for a walk during the time frames noted above.   Security camera footage from the T1 area camera shows Rudat out for a morning stroll, and walking along Anton Larson Bay road, heading towards the town of Kodiak at approximately 7:12 a.m. As he walked, Rudat had earbuds in his ears and was listening to music playing on the music player function of his iPhone. Rudat testified that as he walked by the area of the rigger shop, he heard a noise that "sounded like a – a steel – metal grate being dropped on concrete."  His report was of

*United States v. James Michael Wells*
Case No. 3:13-cr-00008-SLG                                                                    Page 3

a singular noise, and he thought it came from the nearby "lower maintenance building" which was T2. At the time he heard the "metal grate being dropped," Rudat was approximately 280 feet away from the T2 building.

Additional evidence shows that just down Anton Larson Bay road from T2 is a water treatment facility serving the area. Testimony will establish that in April 2012 crews were doing construction at the facility; replacing the old metal water tanks with new tanks. On April 12, 2012, work at the site had begun at 7:00 a.m. Witnesses will testify that part of the project involved the cutting of the existing large metal tanks into pieces to "disassemble" them so they could be hauled away. The existing concrete foundations for the tanks were also broken apart and the area excavated in preparation for new foundations. Heavy equipment was being used on that day to move the cut sections of the metal tanks; the broken slabs of concrete; and the associated rocks, dirt and other debris around at the site and to load all of this into dump trucks and onto trailers for removal. Finally, testimony will establish that the work on this industrial construction site was often "loud." The water treatment facility is located approximately 1050 feet from where Rudat was walking on Anton Larson Bay Road adjacent to T2.

### III.    ARGUMENT & AUTHORITIES

Although contained within the factual portion of the government's motion, the information provided beginning on page 3 and continuing through the beginning of the "Argument" section on page 11 does not really represent factual analysis at all,

Case 3:13-cr-00008-SLG   Document 990   Filed 05/14/19   Page 4 of 23

but instead is the government interpretation of Beck's report and much argument which seeks to challenge its veracity rather than truly its admissibility. As discussed below, Beck is a well-qualified expert whose opinions are both reliable and relevant. The defense contends that, to fulfill the gatekeeping requirements of *Daubert*, the Court should make a preliminary determination on the pleadings that the proffered expert testimony is admissible and allow the government to address further questions regarding the credibility of any such expert testimony through normal cross examination at trial.

Use of an expert at trial is largely determined by Federal Rule of Evidence 702, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, (1999), which widened the use of *Daubert*. The *Daubert* Court changed the previous standard which was set by *Frye v. United States*, 293 F. 1013, (1923) to one which looks at several factors to evaluate the admissibility of an expert's testimony. *Daubert* holds that a court should begin with a Federal Rules of Evidence 104 evaluation of "whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Daubert*, 509 U.S. at 592.

In making its initial assessment of expert testimony, the Court should make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93. In this

Case 3:13-cr-00008-SLG   Document 990   Filed 05/14/19   Page 5 of 23

application it is important to remember that "[m]any factors will bear on the inquiry" and that the Court did not create a "definitive checklist or test." *Id.* at 593.

The Court identified a non-exclusive list of several factors the Court should consider in evaluating expert testimony. The first asks whether the theory being used is testable and reliable under the scientific method. *Id.* The second factor identified "is whether the theory or technique has been subjected to peer review and publication . . . ." *Id.* When looking at this factor the judge must not treat it as "a *sine qua non* of admissibility" particularly if the technique is "too particular, too new, or of too limited interest to be published." *Id.* The third evaluation is to consider the method's error rate. *Id.* at 594. Fourth, the Court should look to the "existence and maintenance of standards controlling the techniques operation . . . ." *Id.* Fifth, the Court should consider if there is a "general acceptance . . ." of the theory within the relevant communities. *Id.* (quoting *United States v. Downing*, 735 F.2d 1224, 1238 (1985)).

The Supreme Court further noted that along with not being exclusive, these factors should be applied "flexibl[y]" and should be applied to the "principles and methodology, not on the conclusions that they generate." *Id.* at 594-95. The Court must, of course, also keep in mind rules other than Federal Rule of Evidence 702, including Rule 703, Rule 706, and Rule 403. *Id.* at 595.

Subsequent to *Daubert,* the Supreme Court held that the "special obligation upon a trial judge to 'ensure that any and all scientific testimony . . . is not only

relevant, but reliable . . . '" applied not "only to 'scientific' testimony [but] to all expert testimony." *Kumho,* 526 U.S. at 147 (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993)). The Court held that it applies to all expert testimony because Federal Rules of Evidence 702 "makes no relevant distinction between 'scientific' knowledge and 'technical' or 'other specialized' knowledge . . . any such knowledge might become the subject of expert testimony." *Id.* The Court noted that the *Daubert* factors are not relevant to every expert, and might not even be used for all scientific experts because they are "meant to be helpful, not definitive." *Id.* at 151. The Court rejected the notion that Federal Rule of Evidence 702 "creates a schematism that segregates expertise by type while mapping certain kinds of questions to certain kinds of experts." *Id.* The main focus is to "ensure the reliability and relevancy of expert testimony . . ." by requiring any expert to use "in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152.

Federal Rule of Evidence 702 guides the Court on factors deemed appropriate for considering the admission of expert testimony. The rule recognizes the wide range of people able to qualify as an expert through their "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. A potential expert is allowed to testify if the four parts of Rule 702 are found to be satisfied. The first requirement is simply that the expert's knowledge "will help the trier of fact to understand the evidence or to determine a fact in issue . . . ." *Id.* 702(a). The second requirement is that "the

Case 3:13-cr-00008-SLG   Document 990   Filed 05/14/19   Page 7 of 23

testimony be based on sufficient facts or data . . . ." *Id.* 702(b). The third requirement is that "the testimony is the product of reliable principles and methods . . . ." *Id.* 702(c). Finally, the expert must be shown to have "reliably applied the principles and methods to the facts of the case" *Id.* 702(d).

### A. Beck is a Qualified Expert

To begin with, it is apparent throughout the government's motion that the author understands far too little about the field of acoustics to validly comment on either Beck's qualifications or report. Thus, much of their argument for preclusion is a repetitive resort to sarcasm and personal attack, rather than a meaningful and thoughtful analysis of the merits of the report. Nevertheless, the defense will endeavor to point out the errors in the government's attack on science it does not understand.

Mr. Beck, with over 30 years of experience of describing and classifying acoustic transient sounds, demonstrates in his report that the sound of metal being dropped on concrete has very different temporal and spectral characteristics compared with the low-frequency pop sound of gunshots, and shows that these two sounds are so different that they are very unlikely to be confused.

The government's assertion that "*Mr. Beck's conclusion that the witness' reaction to hearing this sound is not credible, and is not based on Mr. Beck's experience*" is again exactly the opposite of any fair reading of Beck's report. In fact, the analysis in the report goes out of its way to show that the witness' perception and

reaction is exactly what would be expected under the circumstances described. The government takes considerable issue with the report noting that the fact that listening to music with earbuds obstructs sound and impedes the listener's ability to detect and locate sounds is so well established that it is even written up as a safety concern in popular laypeople's magazines like *Runners World*.

The government fails to mention Beck's references of scientific studies conducted by the American National Standards Institute (ANSI) on the effects of wearing hearing protection (Beck's reference [8]), and the book *Computational Auditory Scene Analysis* (Beck's reference [14]) that describes the effect of noise on human's acoustic source localization capability. Beck is in fact very knowledgeable and experienced in this area:

a) Beck was the chief acoustics system architect for the U.S. Army Future Combat Systems Acoustic Locating Array System (ALAS), and spent weeks performing live gunfire testing and tuning the system. Tuning high performance acoustic source locators for the battlefield, one of the noisiest and cluttered audio environments, requires knowledge and implementation of human response mechanisms like the *First Wavefront* effect.

b) Beck was a principle investigator, along with Prof. Rahul Sarpeshkar of the Massachusetts Institute of Technology (MIT), on the Defense Advanced Research Project Agency (DARPA) Bionic Ear project, where they implemented and tested human-like detection, sound recognition, and location with single analog chip Bionic Ear cochlear implants.

c) As a BAE Systems Engineering Fellow, Beck worked on implementing and testing Head Related Transfer Functions (HFTRs), which are methods of generating spatial surround sound over a pair of headphones [V.R. Algazi and R.O. Duda, "Headphone based Spatial Sound," IEEE Sig. Proc. Magazine, January 2011].

d) Beck was an invited speaker on the gunshot acoustics panel at the 2017 AES International Conference on Audio Forensics in Washington DC, and gave the talk, "Physics and Psychoacoustics Related to Earwitness Accounts".

## B. Beck's Opinions are Reliable & Based on Relevant Testing

Next, the government states that *"Mr. Beck's career and work is based on analyzing existing recordings of gunshots, or the direction of incoming artillery or other type of gunfire."* It goes on to assert that *"Mr. Beck conducted no tests inside the scene of the murders with a firearm of the type in question and the keystone of his summary relies on a study of acoustics from a gunshot data collection experiment conducted on an outdoor range in Austin, Texas, in 1997, some 22 years ago. Given that these murders happened indoors, the report, which attempts to discredit a percipient witness, is fatally flawed".*

These arguments illustrate government counsel's lack of understanding in the field of acoustics. The 1997 experiment Beck cites is the most comprehensive and scientifically controlled set of gunfire measurements known today. The paper was peer reviewed by researchers under the premier professional acoustics organization in the world (the Acoustical Society of America) and is widely referenced throughout the scientific community. The measurements describe fundamental acoustic properties of source and propagation. Those fundamental properties of physics DO NOT CHANGE OVER TIME, were valid in 2012, and remain valid today. The

experiment was conducted outdoors and carefully designed to separate all source and propagation effects and to measure fundamental acoustic properties.

These fundamental properties are what allow experts like Beck to analyze a source in a different set of circumstances, like inside of a building, and know with engineering exactness how the sound waves propagate, reflect, absorb, and transmit. This process is called the basic scientific method, is 100% applicable to the indoor gunfire situation, and the ensuing analysis complies with methods prescribed in the referenced textbooks (Kinsler & Frey and Blackstock). Once again, the keystone of Beck's report is that the witness is actually credible. This is because the witness never stated he heard gunfire –(unlike the government's theory it clings so tightly to)– but instead says that he heard a sound unmistakably different from gunfire, a metal grate being dropped on concrete, and his perception of source direction is exactly what would be expected under those circumstances.

In truth, it is the implied rejection of the government's *theory* in Beck's report that the government is really concerned about. Beck's report starts with the premise that Rudat did in fact hear what he claimed, *"a loud noise that 'sounded like a – a steel – metal grate being dropped on concrete.'"* Beck's report, in a clear and methodical manner, demonstrates the following:

1. Extremely loud gunshot sounds on the order of 146 dB SPL re 20 μPa, generated inside the Rigger shop, might be heard outside as a low popping sound in a quiet environment with unimpeded ears;

Case 3:13-cr-00008-SLG   Document 990   Filed 05/14/19   Page 11 of 23

2. Sounds of lower loudness levels, even 120 dB SPL re 20 μPa (as loud as a jet engine), generated inside the Rigger shop, would be almost inaudible from outside and in a quiet environment with unimpeded ears;

3. Simply wearing earbuds and no music will impede and lower the sound level, possibly by as much as 10 dB SPL re 20 μPa (Beck's report reference [8]). Beck's report used a very conservative 3 dB attenuation (half power), which is a reasonable engineering estimate;

4. The low popping sound of gunfire is quite unmistakable from a loud clattering sound like sheet metal dropped on concrete - based on their very different temporal and spectral (timbre) characteristics. Again, we point out that the percipient witness never said he heard gunfire, let alone 5 or 6 shots.

These conclusions are all based on sound scientific principles and methodologies well beyond the normal understanding of a lay jury. Analysis of sounds, sound propagation, sound characteristics and the like are all proper subjects of expert testimony that here will assist the jury in judging the credibility of Rudat, as well as the veracity of the government's theory which is contrary to Rudat's testimony and all other evidence known about the area of the rigger shop on the morning of the murders.

### C. Beck's Report Properly Applies Reliable Methods

The paragraphs below will address the numerous factual errors and misstatements made in the government's motion designed to somehow disqualify Beck as an expert witness in this case.

On page 5, the government argues that Beck's report is based on an after-the-fact analysis with dissimilar acoustical characteristics. Further, on page 7 the

Case 3:13-cr-00008-SLG   Document 990   Filed 05/14/19   Page 12 of 23

government argues the foundation for Beck's report cannot be analogous to test firing and recording gunfire from a .44 caliber pistol in an enclosed environment for similar acoustics traits and volumes. These statements are in fact blatantly incorrect.

Beck's paper, "Variations in Recorded Acoustic Gunshot Waveforms Generated by Small Firearms," noted in his reference section [2], is a foundational paper that provides careful measurement of isolated source characteristics, including that from a .44 caliber revolver. These are in fact the very measurements that an engineer is directed to plug into known and tested equations to determine propagation, reflection, absorption, and transmission characteristics of the sound waveforms. These equations and characteristics have been peer tested and reviewed and are accepted by the engineering and scientific community, are presented in numerous text books, and taught in major universities (Beck has lectured on these topics as an engineering fellow at BAE Systems and at the University of Texas at Austin). It is clear government counsel has no idea how to interpret what they are reading in Beck's report.

On page 6 of its motion, the government states that there is no evidence that Beck has ever tested firearms indoors at all. In reality, Beck has been involved with indoor testing of firearms under very controlled conditions, and has personal experience outside of indoor firing ranges listening to the sounds. Based on his extensive experience with live gunfire testing, Beck would not advocate test firing a .44 revolver inside an enclosed building like the Rigger shop for safety concerns.

Indeed an analysis of the topics discussed here do not require the same. The reverberation from the muzzle blast would last for over a second and the sound pressure level would far exceed the OSHA dosimetry recommendations [ANSI-S12.19-1996: MEASUREMENT OF OCCUPATIONAL NOISE EXPOSURE]. There is also the safety concern of a ricochet or from bullet shrapnel. This is exactly why experts such as Beck isolate source levels and apply equations that model the behavior of the emanating sound characteristics.

It is further illustrative of counsel's lack of understanding of this field (much like a lay jury) that the motion raises this lack of indoor testing as a reason to disqualify Beck as an expert witness, when in fact this issue demonstrates that Beck not only deeply understands the acoustics, but also understands and practices safety as well. Additionally, Beck test fired blanks as well as ammunition with bullets in the referenced 1997 experiment. The results were not included in the 2011 JASA paper due to the 12 page limit, but the extended report to the sponsoring agency describes the muzzle blast's reliance on the bullet weight, the powder grain, and the barrel length. The results with blanks are shown to have significantly different sound pressure levels and characteristics from firing bullets, thus an inability to fire blanks inside the Rigger shop building for test purposes. This is further of little consequence as the Coast Guard altered the wall configuration and fully cleaned out the building contents of the rigger shop after the murders so the scene could not be accurately replicated for testing in any event.

*United States v. James Michael Wells*
Case No. 3:13-cr-00008-SLG                                                                 Page 14

Next, the government also discusses Beck's experience with *incoming* gunfire several times in criticizing his work. While one would hope this is a misstatement by the author of the motion, this argument is more likely another glaring illustration of the government's sheer lack of a base understanding of acoustics and the work which it criticizes. In this case, the concern when analyzing the relevant acoustics is with the muzzle blast, which is the pressurized gas escaping the muzzle as the bullet exits. Incoming gunfire refers to the bullet coming at you. Generally muzzle blast is used to determine the direction to the source, independent of the incoming firing direction. Incoming bullet sounds like the ballistic shockwave are used to calculate distance to source, but the direction estimate from the shockwave will frequently point to somewhere else entirely [T. Damarla, *Battlefield Acoustics*, Springer Switzerland, 1015, B.G. Ferguson, "Defense Applications of Acoustic Signal Processing", ASA Acoustics Today, Vol 15, Issue 1, 2019].

On page 9 of the motion, the government argues that "Mr. Beck leapfrogs from one speculative must-have-to-happen occurrence to another in order to opine that *Rudat's testimony is not credible*." (Emphasis added). Again this statement is simply inaccurate and very misleading, because Beck's report clearly demonstrates that in all likelihood Rudat is entirely credible. Beck makes the case for a jury to believe Rudat heard what he claims and even that he perceived the sound as coming from the direction of the Rigger shop. The government simply argues Beck's conclusion, from the report on the bottom of page 14, "*Therefore, in my professional opinion, the*

*earwitness' perceptual sense of accurate sound direction would be compromised and is not reliable in this case,"* as meaning something different than what it says. This conclusion does NOT state that Rudat's testimony is not credible, but only that his perceptual sense of accurate sound direction may not be reliable. This is a conclusion based on scientific research and testing in Beck's field of expertise. It will be for the jury to decide how properly to interpret Rudat's testimony. The expert scientific testimony based on scientific fact (see report references to Battlefield Acoustics and Defense Applications of Acoustic Signal Processing, report [2]) will greatly assist them in making this determination.

It is clear that the government misunderstood several statements from Beck's report, and given the technical nature of the material, this is understandable. Beck is without question an expert in gunfire source localization, was the chief acoustics architect for two major U.S. Army gunfire localization systems, and has significant experience with human perceptual sound source localization. Beck's reference [14], *"Computation Auditory Scene Analysis, Principles, Algorithms, and Applications,"* demonstrates that significant scientific work has been done in the area of human sound perception in complex acoustic environments. This body of scientific work is specifically referring to the area of understanding auditory information embedded in clutter, or in other words, the "cocktail party problem". This analysis and understanding of acoustical dynamics is exactly applicable to understanding auditory dynamics presented in circumstances as this case presents.

First, nowhere in any of the written investigative reports, witness testimonies, or pictures is there any mention of finding any *metal that had recently fallen on concrete*, or a candidate metal grate. Apparently, no occurrences of metal falling on concrete was reported either inside or outside of the Rigger shop. As Beck's report explains, one can conclude with reasonable scientific certainty that the noise of metal being dropped on concrete inside of the Rigger shop would not produce a sound loud enough to be heard from outside the Rigger shop where Rudat was walking 280 feet away. Moreover, the government's arguments fail to give any evidence supporting a source of a metal-hitting-concrete sound from the direction of the Rigger shop. The government also failed to identify any reasonable source of such a sound in the immediate vicinity of the Rigger shop. Given Rudat's uncontradicted description of what he thought he heard, there is no solid evidence of the source of such a sound. Also given that Rudat did not hear the unmistakable popping sounds of multiple gunshots, and no source was found inside of the rigger shop analogous to what Rudat describes, it is reasonable to question where the sound he heard could possibly have come from. As an expert in sound source localization and in human sound perception, Beck's testimony will help the jury understand whether a sound from a different location could have been heard by someone close to the rigger shop.

There is also uncontradicted evidence that construction crews were working at the water treatment plant about 1050 feet away from the rigger shop from 7:00 a.m. to 7:45 a.m. the morning of the murders, and that they were using heavy construction

equipment to cut, break up, and remove sections of a large, steel water tank and concrete foundations. Beck does not claim that this is what Rudat necessarily heard, but merely analyzed whether he could have heard a loud clang or clatter sound emanating from the water treatment plant.

The government's motion states that Beck's acoustical analysis did not take into account the dense trees and rolling hills between the water treatment plant and the rigger shop. To begin with, the terrain in the area, both between the rigger shop and Anton Larson Bay Road, as well as between the water treatment plant and the location where Rudat walked along the road, is virtually flat with minimal elevation changes and vegetation primarily consisting of low scrub and leafless trees. Moreover, any knowledgeable expert in acoustic propagation would say that the sound arriving at the rigger shop would likely be substantially louder than Beck's stated conservative estimate. According to Beck's reference [4], "Tutorial on sound propagation outdoors," and reference [9] "The Science of Sound", sound refraction from the early morning temperature gradient will cause sound to bend back down to the earth and be heard at much longer distances and at much louder sound levels. It is a scientific fact that in the early morning, sound will bend over terrain features, and will have significantly less attenuation that the normal isothermal 6 dB SPL attenuation per doubling of the distance. This is why you hear sound from much further away at night. Beck has in fact confirmed this phenomenon in making calibrated measurements for BAE Systems, where gunfire was heard and measured

over a large expanse of trees at night, but was completely inaudible at the same distances during the day.

The government says repeatedly that Beck is not qualified to address how someone would perceive sound in a cluttered environment and react. Ignoring Beck's extensive qualifications, however, does not make them any less present. Beck is one of the nation's leading experts on the effects of signal and sound information in a cluttered environment. He was the lead on detecting and locating gunfire in a cluttered battlefield conditions for two U.S. Army systems, and implemented many human-based mechanisms like the "First Wavefront" principle, mentioned in Beck's reference [12]. Beck has extensively studied auditory scene analysis, which is the perception of sound in complex and cluttered environments, as referred to in Beck's reference [14] "*Computation Auditory Scene Analysis, Principles, Algorithms, and Applications*." For a research and development project at BAE Systems, Beck implemented and tested "Head Related Transfer Functions", which is the method generating sounds that appear to be from different spatial locations using sound over headphones [V.R. Algazi and R.O. Duda, "Headphone based Spatial Sound," IEEE Sig. Proc. Magazine, January 2011].

Beck has significant experience with the effects of level difference vs. time delays in creating spatial sound perception, and the effect of noise and clutter on human perception. Furthermore, Beck was a principal investigator, along with then MIT professor Rahul Sarpeshkar, for the Defense Advanced Research Project Agency

(DARPA) on the Bionic Ear program – which tested sound detection, recognition, and location using Sarpeshkar's Bionic ear chip and human-like auditory processing. The work with Professor Sarpeshkar and the Bionic ear was extended to investigating in-ear sound level monitoring for use in sound cluttered battlefields for the U.S. Army Natick Soldier Center. Beck has presented many of these results at DARPA, and presented some of these experiences in lectures [S. Beck, "Forensic Acoustics," University of Texas Graduate Seminar in Acoustics, Austin, TX, Jan. 27, 2012]. Finally, Beck is a professionally recognized audio forensics expert and was invited to give a panel talk at the 2017 AES International Conference on Audio Forensics [S. Beck, "Physics and Psychoacoustics Related to Earwitness Accounts", AES International Conference on Audio Forensics, (2017)].

### D. Beck's Testimony is Reliably Applied to the Facts Here

Beck is scientifically correct in using source level measurements from outdoor experiments and applying them to the correct equations for indoor sound propagation, reflection, absorption, and transmission to offer an opinion in this case. Beck recommends against live fire inside enclosed rooms without appropriate safety equipment and safety procedures in place, and does not recommend firing blanks as a substitute for the sound produced by ammunition with bullets. He also understands the futility of testing in an environment that has been changed since the time of the murders.

Beck's report demonstrates he does not doubt Rudat's description of what he heard nor his perception of the direction from which he thought the noise originated. In fact, Beck's entire report and analysis was based on Rudat's statements and the environment surrounding him. Given that he did not hear multiple low popping sounds of gunfire from inside the rigger shop, and no evidence was reported related to any metal that had recently been dropped onto concrete, Beck's report explored whether a sound from the water treatment plant could be heard at the rigger shop. Beck was clear in his report that he was very conservative in his estimate of the loudness of the sounds produced by the industrial construction activity happening at the water treatment plant between 7:00 a.m. and 7:45 a.m. on the morning of the murders. Nevertheless he establishes that such sounds could and would undoubtedly be heard from Rudat's location at the time.

Beck does not say that the loud noise that Rudat heard that sounded like someone "dropping a metal grate onto concrete" came from the water treatment plant, but instead simply notes that such loud outdoor sounds will bend down and can be heard over extended distances. He is an established expert in specific areas of the human perception of sound, particularly in dealing with sound localization and in the ability to understand information embedded in clutter. His conclusion that it is entirely reasonable that Rudat was listening to music at normal dinner conversation sound pressure levels of 70 dB SPL re 20 $\mu$Pa, and this affected Rudat's auditory perceptions, is based on sound scientific methods. Earbuds alone, much less those

playing music, impede sound from the outside and along with it, the information that humans use to locate sound source direction. Music is clutter, and clutter creates significant problems when estimating time delays – the primary mechanism for estimating sound source direction from low frequency ( below 1000 Hz) sound.

Finally, although the government finds much fault in Beck's citation to a popular media article on the topic, at a non-scientific level, the citation was simply included to illustrate the almost common-place knowledge that listening to music with earbuds is recognized as a safety concern because it impedes our ability to hear outside sounds. This public recognition shown in Beck's reference [15] *Runner's World* magazine, was simply included as secondary support of the scientific principles shown by Beck's analysis. The government however chose to ignore Beck's reference [14] on Computation Auditory Scene Analysis, and focus only on a non-scientific report in an attempt to discredit well known and established scientific facts. It is noteworthy that in making its motion, the government offered no evidence, scientific or otherwise, that listening to music over earbuds does not impede hearing and the processing of information from outside sound sources.

## IV.    CONCLUSION

Even a cursory review of Beck's qualifications and report demonstrates that he is a qualified expert in his field and that his methodology was sound, leading to a reliable set of conclusions that will be helpful to the jury in determining the meaning and credibility of various evidence presented at trial. The Court can also see that the

*United States v. James Michael Wells*
Case No. 3:13-cr-00008-SLG                                                      Page 22

Beck's testimony and exhibits will be helpful to the jury by assisting them in identifying the possible source of sounds and location of sounds heard around the scene of the murder as described by several witnesses in the case. Beck's testimony should be admitted.

WHEREFORE, Wells respectfully urges that the government's motion to preclude the testimony of Steven D. Beck under Fed. R. Evid. 702 be denied, without need for a hearing.

DATED at Anchorage, Alaska this 9th day of May, 2019.

Respectfully submitted,

*/s/ Gary G. Colbath*
Gary G. Colbath
Assistant Federal Defender

*/s/ Peter A. Camiel*
Peter A. Camiel WSBA 12596
Attorney for Defendant

*Attorneys for James Michael Wells*

Certificate of Service:
I hereby certify that I electronically filed the foregoing and any attachments with the Clerk of Court for the United States District Court for the District of Alaska by using the district's CM/ECF system on May 14, 2019. All participants in this case are registered CM/ECF users and will be served by the district's CM/ECF system.
*/s/ Gary G. Colbath*