Peter A. Camiel
Law Offices of Camiel & Chaney P.S.
520 Pike Street, Suite 2500
Seattle, WA 98101
(206) 624-1551
petercamiel@yahoo.com

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. 3:13-CR-00008-SLG |
| | ) | |
| Plaintiff, | ) | RESPONSE IN OPPOSITION TO |
| | ) | GOVERNMENT MOTION TO |
| v. | ) | PRECLUDE DEFENSE EXPERT PARK |
| | ) | DIETZ FROM TESIFYING ON |
| JAMES MICHAEL WELLS, | ) | WORKPLACE VIOLENCE [DOC. 975] |
| | ) | |
| Defendant. | ) | |
| | ) | |

_____

Defendant Wells through counsel Peter A. Camiel and Gary Colbath file this

response to the government motion to preclude the testimony of Dr. park Dietz.

**INTRODUCTION**

The Government has moved to prohibit defense expert Dr. Dietz from

testifying. Their reasoning is that they claim they will not be using the phrase

"workplace violence" in their case, and they have challenged Dr. Dietz'

qualifications to testify as to workplace violence, and his qualifications to rebut the

opinions of government crime scene expert Morton. The government motion should

be denied. Dr. Dietz' testimony about workplace violence is particularly relevant

RESPONSE IN OPPOSITION TO MOTION TO PRECLUDE DIETZ
*(USA v. James Michael Wells, 3:13-cr-00008-SLG)--1*

given the expected government evidence, the government's broad motive theory, and the expected testimony of government crime scene expert Morton. Dr. Dietz is extraordinarily qualified by his education, training, and experience to give testimony on the subjects in his report. His testimony is both reliable and relevant and therefore admissible expert testimony under F.R.E. 702 and *Daubert*.

## DAUBERT AND F.R.E. 702

The Ninth Circuit Court of Appeals recently summed up *Daubert* and its progeny in *Murray v. Southern Route Maritime SA,* 870 F.3d 915, 922-23 (9th Cir. 2017):

The Court in *Daubert* . . . constructed a flexible test examining the "reliability" and "fit" of the offered expert testimony. See *Id.* at 589-92, 113 S.Ct. at 2786. The question of reliability probes "whether the reasoning or methodology underlying the testimony is scientifically valid." *Id.* at 592-93, 113 S.Ct. 2786. To give shape to the inquiry, the court identified four' factors that may bear on the analysis: (1) whether the theory can be and has been tested, (2) whether the theory has been peer reviewed and published, (3) what the theory's known or potential error rate is, and (4) whether the theory enjoys general acceptance in the applicable scientific community. See *Id.* at 593-94, 113 S. Ct. 2786. But the Court was quick to emphasize that the factors are not "a definitive checklist or test" and that the reliability analysis remains a malleable one tied to the facts of each case. *Id.* at 591, 593, 113 S.Ct. 2786. Later cases have reiterated that the *Daubert* factors are exemplary, not constraining. *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 150, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999); *Id.* at 159, 119 S.Ct. 1167 (Scalia, J., concurring) ("[T]he *Daubert* factors are not holy writ...").

The *Daubert* factors are not "equally applicable (or applicable at all) in every case." *Daubert v. Merrell Dow Pharm., Inc.,* 43 F.3d 1311, 13176 (9th Cir. 1995). Applicability "depend[s] on the nature of the issue, the expert's particular expertise, and the subject of his testimony," *Kumho Tire Co.,* 526 U.S. at 150, 119 S. Ct. 1167 (citation omitted). A district court may permissibly choose not to

examine factors that are not "reasonable measures of reliability in a particular case." *Id.* at 153, 119 S. Ct. 1167

## RELEVANCE OF EXPERT TESTIMONY ON WORKPLACE VIOLENCE

While the government will not be calling Dr. Meloy at this retrial, and while the government states that it will not be using the phrase "workplace violence" in its' case, a review of the government's motive theory and the evidence it intends to introduce show that the government *will* be arguing that in fact the murders were an act of workplace violence. They may substitute the term "insider violence" but it is the same thing. Thus, although the government says it is not seeking to introduce evidence of workplace violence, or defendant's likelihood to commit workplace violence, that is exactly what it seeks to do. The government will be presenting this theory through their crime scene expert Morton, and through at least a dozen witnesses who will be giving testimony about the work place environment, work place disagreements, and "other act" evidence involving workplace issues involving Mr. Wells. At the end of the case, it is expected that the government will argue, as it did at the first trial that:

> Now, while there's no question of this is a case of workplace violence, because it certainly happened in the workplace, this was clearly more personal and couldn't have been done by anybody but a co-worker. So, it is co-worker violence. And it could have only been done by one co-worker: Jim Wells. (RP 3741)

And the government will argue the murder was committed by an insider:

> You heard from Mr. Morton, you heard from the law enforcement officers on the scene, their impression from evaluating the crime scene was that both of these men were targeted. The murderer was intimately familiar with

RESPONSE IN OPPOSITION TO MOTION TO PRECLUDE DIETZ
*(USA v. James Michael Wells, 3:13-cr-00008-SLG)--3*

the building. He knew the schedules of the victims. And he had a conflict with both men. And the only person to meet – that we -- you've seen evidence that meets any of that criteria is James Wells. (RP 3733)

In their supplemental brief on other act evidence, doc. 973, the government lists approximately a dozen witnesses who will give testimony on other act matters. The government suggests such testimony is relevant to show Wells' motive based on his alleged "increasing anger with the Coast Guard Command telling him what to do and not to do," that Wells was "feeling mistreated and his increasing anger," that he had "increasing frustrations with the Coast Guard Command." This testimony coupled with the crime scene expert Morton's speculative opinions that the crime was committed by someone who was familiar with the shop location, had knowledge of the victim's time schedule, knew that no one else would be at the shop, and that only these two victims were targeted, smacks of an underlying theme that this was a case of workplace violence rather than something else. Morton's testimony, in essence, would be an opinion that the murders had to have been committed by a coworker because who else would have the requisite knowledge. Indeed, the government previously described Morton's opinion as being: "that the murderer was an insider" Doc. 238 p. 11

Mr. Morton has opined that this was a targeted event, not a random event, and that this was a personal cause homicide. (RP 1620) He eliminated robbery, (although as there was no inventory of the rigger shop there is no way to know if

RESPONSE IN OPPOSITION TO MOTION TO PRECLUDE DIETZ
*(USA v. James Michael Wells, 3:13-cr-00008-SLG)--4*

something was missing), eliminated an attempted robbery, and eliminated some other random killing or other motive.

The government's quote of a passage from the Ninth Circuit opinion in this case in support of the effort to use other act evidence at the retrial shows that they will continue to argue that this is a "workplace homicide trial." (Doc. 957, p. 8)

> This evidence, as a whole, was relevant to Wells' work environment, including his relationships with relevant co-workers and supervisors; was not too remote in time and fits within a reasonably tailored version of the government's motive theory…On balance the probative value of this evidence is unique in a *workplace homicide trial,* and we do not find that it is substantially outweighed by any danger of unfair prejudice.
> *Wells,* 879 F.3d at 930. (emphasis added)

The government writes that Dr. Dietz' testimony 'is offered to rebut Mr. Moore's [sic] testimony, the report offers nothing but speculative theories not based, nor supported by any evidence." (Doc 975 p. 9)[1] However, it is Mr. Morton who offers the "speculative theories not based nor supported by any evidence" and Dr. Dietz is simply pointing out that Morton's opinions are no more than speculation. Morton opines what he believes was in the shooter's mind (how he knows this is not explained), the sequence of shots fired, (even government experts disagreed on this point), whether the motive was for a personal cause or random,  and whether this was an intended targeted killing.  Yet there is no forensic or evidentiary support for those opinions.   As both a forensic psychiatrist and a criminologist Dr. Dietz is qualified to comment on Morton's theories.

---

[1] We presume that "Mr. Moore" is a clerical error and the government is referring to Mr. Morton.

RESPONSE IN OPPOSITION TO MOTION TO PRECLUDE DIETZ
*(USA v. James Michael Wells, 3:13-cr-00008-SLG)--5*

Dr. Dietz core opinions the defense seeks to offer as indicated in his report

include:

The fact that two men were killed in a workplace does not necessarily mean
that the killings were not random, does not necessarily mean that the
individuals were targeted, and does not necessarily mean that the motives
for either killing were connected to anyone's work. Just as the locations of
violence and the relationships between victims and offenders are variable, so too
are the motives for violence. To simplify the presentation of aggregate data, both
researchers and data-gathering agencies often lump together disparate categories,
and this is particularly true for variables as complex as motive, where multiple
motives may be lumped into singular categories for the sake of simplicity. Even
so, there is no context in which a classification of violence into two categories-
workplace violence and random violence-would be defensible. Any motive or
combination of motives is possible for violence that occurs in a workplace,
and some of those motives could be considered personal, targeted, directed,
or otherwise non-random, while others could be sensibly described as random with
respect to location, random with respect to victim, or otherwise  random.

Dr. Dietz will also opine that:

Workplace violence can occur in any setting. It occurs, for example, in
offices, lobby areas, cafeterias, breakrooms, parking lots, surrounding
grounds, work vehicles, offsite meeting venues, offsite work activity venues,
and home offices. Depending on an organization's policies regarding off-duty
behavior, anywhere else one worker interacts with another can be the site of
workplace violence. In the case of toxic agents and bombs, it may even
occur through U.S. Mail or courier services. Depending on an organization's
policies and one's definition of violence, it may even occur through social or
other electronic media.
Workplace violence offenders and victims include current or former
employees and contractors; current and former acquaintances, friends, and
family of employees; customers, clients, visitors, and guests; and third
parties with no affiliation to the organization.
In 2012, the year in which Mr. Belisle and Mr. Hopkins were murdered, the
Bureau of Labor Statistics identified 475 victims of "work-related" homicide,
of whom 376 were male. The killers of these 376 men included robbers
(36%), other assailants (27%), coworkers or work associates (14%),
students, patients, or customer/client (12%), inmate, detainee, or suspect
not yet apprehended (8%), and relative or domestic partner (3%). 13 Thus, if
robbery were ruled out and these data were probative of the identity of the
killer of Mr. Belisle and Mr. Hopkins-as the presentation of Dr. Meloy's

testimony at trial seemed to suggest-the data suggest that the most probable class of killer was that of "other assailant" and not that of "coworkers or work associates." In 2012, the killers of males in the workplace were approximately two times more likely to be other assailants than to be coworkers or work associates.

Dr. Dietz will also opine that:

I disagree with the opinion to which Mr. Morton testified that "In this case, by basically going into a building and attacking two people, it shows that both victims were intended targets. "It is equally possible that (a) one was targeted and the other was collateral damage, (b) that neither was targeted and the offender simply did not care who was killed, (c) that both were killed by someone targeting the institution rather than the individuals, or (d) that both were killed for reasons unrelated to targeting.
Determining whether a particular homicide was "predatory" or "affective"-if one were to accept this dichotomous classification-requires knowledge of the state of mind and motivation of the killer at the time of the crime. Often that information comes from interviews of the killer and the observations of surviving witnesses to the crime. Where the killer hasn't confessed and there are no surviving witnesses, one is left to inferences based on crime scene and historical evidence. In a double homicide, both homicides may be "predatory," both may be "affective," or one homicide may be "predatory" and the other "affective."

Dr. Dietz opinions are well within his area of expertise. Over decades he has acquired specialized knowledge based on research regarding workplace violence. His testimony will "help the trier of fact to understand the evidence or to determine a fact in issue." His testimony is based on sufficient facts and data as he has reviewed a significant part of the record in this case. His testimony is also the product of reliable principles and methods, and he has reliably applied the principles and methods to the facts in this case. He clearly meets the expert criteria set forth in F.R.E. 702 The fact that he disagrees with government expert Morton does not make his testimony inadmissible.

## DR. DIETZ IS WELL QUALIFIED TO TESTIFY REGARDING HIS ANALYSIS AND OPINION ABOUT WHETHER THIS WAS A CASE OF WORKPLACE VIOLENCE

Federal Rule of Evidence 702 permits qualified experts to opine on specialized knowledge that will assist the trier of fact in determining a fact in issue. Ultimately, however, that specialized knowledge must also be reliable and relevant. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 591 (1993); *Daubert v. Merrell Dow Pharmaceuticals, Inc.* ( "*Daubert II*" ), 43 F.3d 1311, 1315 (9th Cir. 1995). A witness must be "qualified as an expert by knowledge, skill, experience, training, or education" and may testify "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702; *see also Kumho Tire v. Carmichael*, 526 U.S. 137, 141, 148-49 (1999).

Far from imposing specific scientific criteria for expert reports the cases make clear that an expert may be qualified to render an opinion based on experience alone. Thus, in certain fields, "experience is the predominant, if not the sole basis for a great deal of reliable expert testimony." Advisory Committee Notes to Rule 702.  Dr. Dietz' experience in the area of workplace violence is indisputable.

**DR. DIETZ' QUALIFICATIONS ON THE TOPIC OF WORKPLACE VIOLENCE**

Either intentionally, or negligently, the government misstates Dr. Dietz' qualifications. Dr. Dietz has extensive knowledge, training, and experience in the field of criminal behavior analysis (formerly "criminal profiling") that is Mr. Morton's claim to expertise. In fact, Dr. Dietz has provided training to Mr. Morton at the FBI Academy and in FBI-sponsored events. Dr. Dietz worked closely for years with several of the pioneers in criminal behavior analysis, including Roy Hazelwood, Bob Ressler, John Douglas, Jim Wright, Ken Lanning, Gregg McCrary, and Ron Walker who were Mr. Morton's predecessors and mentors. Dr. Dietz contributed to the development of the field of criminal behavior analysis and authored some of the most important papers in that field.

Dr. Dietz is qualified to rebut Mr. Morton in the event that Mr. Morton does not correct or acknowledge the flaws in his previous testimony as is set forth in Dr. Dietz's report of 1/1/19. This includes Morton's focus on a single theory that was brought to him by investigators before he had begun his work, his opinion that the case involved a personal cause rather than an impersonal cause, the sequence of shots, whether there was verbal interaction between the killer and victims, and the false dichotomy of workplace violence vs. random violence.

The Government motion emphasizes that the website for Park Dietz & Associates, Inc., does not mention workplace violence as a discipline (which it is not) but except for a sentence in Footnote 1 fails to attend to Dr. Dietz's other

firm--Threat Assessment Group, Inc. (www.taginc.com)--mentioned on p. 1 of Dr.

Dietz's CV, which was the world's first company devoted to workplace violence

prevention. Even the most cursory review of the website for Threat Assessment

Group, Inc., would reveal extensive expertise on workplace violence.

The Government's motion alternates between calling Dr. Dietz a forensic

psychiatrist (which is true) and a forensic psychologist (which is not true), fails to

recognize that he is also a criminologist with a Ph.D. in sociology and has a

Masters Degree in Public Health. Individuals with degrees in any of these

disciplines could also be an expert in workplace violence and/or workplace

homicide, as is Dr. Dietz.

A review of Dr. Dietz CV shows he has either published, given seminars or

trainings on the topic of workplace violence dozens of times. Just a few examples

from his CV are illustrative:

20. Dietz P: Threat assessment, workplace. In: Jamieson A, Moenssens A (eds.):
Wiley Encyclopedia of Forensic Science. West Sussex, UK: John Wiley & Sons,
Ltd., 2009, pp. 2460-2465.

83. Dietz PE: "Workplace Violence," International Security Management
Association, La Paloma, Arizona, January 20, 1994.

85. Dietz PE: "Workplace Violence: Can it be Prevented?," American Society for
Industrial Security Workshop, "Workplace Violence-Strategies to Communicate,"
Tempe, Arizona, February 28, 1994.

86. Dietz PE: "Identifying and Dealing with the Potentially Dangerous Employee
in the Workplace," American Bar Association Committee on Employee Rights and
Responsibilities, Mid-Winter Meeting, Scottsdale, Arizona, March 10, 1994.

89. Dietz PE: "Workplace Violence: An Intensive One-day Violence Prevention Seminar Designed for Top Level Executive and Human Resource Management," Woods, Rogers & Hazelgrove, P.L.C., Roanoke, Virginia, June 17, 1994.

90. Dietz PE: Plenary Session: "Avoiding Workplace Violence," Seyfarth, Shaw, Fairweather & Geraldson, The 1994 Labor Law Symposium, Beverly Hills, California, October 13, 1994.

91. Dietz PE: "Violence in the Workplace," Western States Bank Security Directors Meeting, San Diego, California, October 14, 1994.

92. Dietz PE: "Preventing Violence in the Workplace: What Can the Employer Do?", Seyfarth, Shaw, Fairweather & Geraldson seminar, "Understanding, Preventing, and Responding to Workplace Violence," Chicago, Illinois, November 16, 1994.

93. Dietz PE: "Violence in the Workplace: What Can the Employer Do?," California Employment Law Council Annual Meeting, Los Angeles, California, November 18, 1994.

94. Dietz PE: "Countermeasures to Workplace Violence," Federal Occupational Health Agency Conference, "The Prevention of Workplace Violence: A Contemporary Public Health Crisis," San Francisco, California, November 30, 1994.

95. Dietz PE: "Changes in Workplace Violence: The Increasing Standard of Care," Workers' Compensation and Employers' Liability Committee, Tort and Insurance Practice Section, American Bar Association, San Diego, California, March 18, 1995.

96. Dietz PE: Keynote Address: "Overview of Workplace Violence and Countermeasures," Threat Management Conference, Central Intelligence Agency, McLean, Virginia, August 22, 1994.

107. Dietz PE: "Workplace Violence Prevention," College and University Professional Association for Human Resources, Southwestern Regional Conference, Colorado Springs, Colorado, April 29, 2003.

162. Dietz P: "Challenges to Threat Assessment and Workplace Violence Prevention Programs," Global Security Executives Roundtable, Twitter Headquarters, San Francisco, CA, October 3, 2018.

163. Dietz P: "Domestic Violence and the Workplace," National Multidisciplinary Conference On Domestic Violence, National District Attorneys Association, Long Beach, CA, October 30, 2018.

33. Corcoran WB, Dietz PE, Lombardi JH, Thompson JD, Wolf KL, Wright JL: "Workplace Violence: Strategies to Communicate," American Society for Industrial Security, Tempe, Arizona, March 1, 1994

Dr. Dietz has also prepared many workplace violence prevention training packages, videos, and e-learning courses. A sample from his CV include:

1995 *Supporting a Nonviolent Workplace: A Training Program for Managers and Supervisors* (with Sheryl Niebuhr, Ph.D., a facilitated training program developed for 3M Company), and later editions thereof
1999 *Gatekeeper Safety: How to Deal with Unwanted Letters, Calls and Visits* (training video with Ann Coppel for Safeco Corporation)
2003 *Managing Troubled Employees* (training video)
2003 *Managing Troubling Situations* (training video)
2003 *Your Role in Workplace Violence Prevention* (training video)
2015 *Principles of Workplace Violence Prevention* (training video)
2015 *Investigation* (training video)
2015 *Assessing and Managing Workplace Threats* (training video)
2015 *Intimate Partner Violence and the Workplace* (training video)
2015 *Your Role in Workplace Violence Prevention* (training video)
2017 *Principles of Workplace Violence Prevention* (e-learning course)
2017 *Assessing and Managing Workplace Threats* (e-learning course)
2017 *Your Role in Workplace Violence Prevention* (e-learning course)
2019 *Your Role in Workplace Violence Prevention* (e-learning course)

In addition, Dr. Dietz has taught workplace violence prevention courses at over two-hundred events between 1994 and 2019. See Dietz CV pp. 78-92.

## DR. DEITZ OPINIONS REBUTTING MORTON'S CONCLUSIONS

As a forensic psychiatrist, criminologist, and having a PhD in sociology, Dr. Dietz is qualified to rebut Mr. Morton's opinions if they remain consistent with his report and prior trial testimony. This includes Morton's focus on a single

RESPONSE IN OPPOSITION TO MOTION TO PRECLUDE DIETZ
*(USA v. James Michael Wells, 3:13-cr-00008-SLG)--12*

theory that was brought to him by investigators before he had begun his work, his unqualified opinion that the case involved a personal cause rather than an impersonal cause, the sequence of shots, whether there was verbal interaction between the killer and victims, and the false dichotomy of workplace violence vs. random violence.

Dr. Dietz's opinions about the conclusions of Mr. Morton come after having reviewed relevant discovery materials, relevant portions of the trial transcript, Mr. Morton's report and testimony, and portions of the government trial arguments.

For example, Dr. Dietz notes that before Morton had even begun his work on the case, Morton knew that Jim Wells was the primary suspect in the murders of Mr. Belisle and Mr. Hopkins. Dr. Dietz writes that:

Knowledge of a suspect on whom law enforcement has focused inevitably biases any profiler, crime scene analyst, or criminal behavior analyst regardless of the analyst's skill or objectivity, and Mr. Morton was tainted with this information before his work had begun." (Dietz report p. 2)

Dr. Dietz notes that Morton's report and testimony "all put forth one plausible theory of the case—the theory that was brought to him by investigators before he had begun his work.." Dr. Dietz point out that this is not the only plausible theory and that alternative hypotheses should have been considered. This is an opinion grounded in facts from the record in this case. The government's own reports confirm that Morton was advised Wells was the suspect in the case before Morton had reviewed any of the case file.

Dr. Dietz goes through each of Morton's conclusions from his own perspective as an expert in criminology and criminal behavioral analysis which is also Morton's claim of expertise. Indeed, as noted above, Dr. Dietz provided training to Morton at the FBI Academy on the topic of criminal behavioral analysis.

## CONCLUSION

A review of Dr. Dietz' qualifications and report demonstrate that he is a qualified expert in forensic psychology, criminology and criminal behavioral analysis, that the materials underlying his opinions are reliable, and his methodology in formulating his opinions is sound. If the government presents evidence through Mr. Morton or others that these murders were committed by an insider, and that these were targeted personal killings, then they have opened the door to the testimony of Dr. Dietz that the facts in this case do not necessarily support a conclusion that this was a case of workplace violence or a crime committed by an insider or for personal cause. If the government takes issue with Dr. Dietz' opinions, it can do so through cross examination or contrary evidence, but not through the exclusion of his testimony. Therefore, the government motion to exclude Dr. Dietz should be denied.

Dated this 14th day of May, 2019.

Respectfully submitted,

*/s/Peter A. Camiel*
Peter A. Camiel WSBA 12596
Attorney for Defendant Wells

/s/*Gary Colbath*
Gary Colbath
Assistant Federal Public Defender

**Certificate of Service**

I hereby certify that on the 14th day of May, 2019, I caused the foregoing to be electronically filed with the Clerk of the Court of the United States District Court for the District of Alaska using the CM/ECF system. I further certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the district court CM/ECF system.

/s/*Peter A. Camiel*
Peter A. Camiel