# PARK DIETZ & ASSOCIATES, INC.
## Forensic Experts

**Administrative Offices**

2906 Lafayette Road
Newport Beach, CA  92663
Tel:  949-723-2211
Fax:  949-723-2212
Email: expert@parkdietzassociates.com
Website: www.parkdietzassociates.com

**Specialties of the Firm**

- Forensic Psychiatry
- Forensic Pathology
- Forensic Neurology
- Forensic Psychology
- Forensic Social Work
- Forensic Science
- Criminology
- Security

January 9, 2019

Gary Colbath, Esq.
Federal Defender's Office for District of Alaska
601 W. Fifth Ave.
Suite 800
Anchorage, AK  99501

Via e-mail:  Gary_colbath@fd.org

Re:  United States v. James Wells

Dear Mr. Colbath:

At your request, I have reviewed materials submitted to me concerning the opinions of Robert Morton (FBI, ret.) and Reid Meloy, Ph.D., in the above-captioned case.  This brief report synopsizes my several points of disagreement with these experts in anticipation of rebuttal testimony.

## SOURCES OF INFORMATION

The information submitted to me for review consisted of the following:

- Referral to BAU, 4/17/12 (047251 – 047254)
- Robert J. Morton Summary of Assistance Provided, 5/23/12 (Wells1800047350 - Wells1800047352)
- Crime scene and autopsy photographs and diagrams reviewed by Mr. Morton (064477 – 064512)
- Robert J. Morton Criminal Investigative Analysis, 10/11/13 (19284 – 19291)
- Robert J. Morton resume (19276 – 19283)
- E-mails regarding Mr. Morton's analysis (079360, 079389, and 079397)
- Letter from US Attorney Karen Loeffler to Dr. Meloy, 4/19/13
- Report of Dr. Meloy, 11/22/13
- Dr. Meloy's CV
- Expert disclosure re. Dr. Meloy (19271-19275)
- List of materials reviewed by Dr. Meloy (21031-21032)
- Trial transcript, pp. 1607-1657 (Testimony of Mr. Morton)
- Trial transcript, pp. 1365-1449 (Testimony of Dr. Meloy)

- Dr. Meloy's PowerPoint (D-6556 – D6584)
- Govt. Exh. 392 (Building diagram)
- Trial transcript, pp. 3724-3796 (Closing Argument of Plaintiff)
- Trial transcript, pp. 3893-3957 (Final Argument of Plaintiff and Jury Instructions)
- *US v. Wells*, 879 F. 3d 900 - Court of Appeals, 9th Circuit 2018
- Letter from Dr. Meloy to AUSA Walker, 9/20/18
- Morton Supplemental Report, 11/30/18

## REBUTTAL OF GOVERNMENT EXPERTS

I note at the outset that the original referral of the case to BAU-2 on 4/17/12 followed a telephonic discussion of the case with SSA Morton and asked that BAU-2 "review audio recording from two interviews of subject in above captioned investigation and provide a behavioral assessment of James Wells."[1] Thus, Mr. Morton knew that co-worker Jim Wells was a suspect in the murders of Mr. Belisle and Mr. Hopkins before undertaking any work in this matter. Knowledge of a suspect on whom law enforcement has focused inevitably biases any profiler, crime scene analyst, or criminal behavior analyst, regardless of the analyst's skill or objectivity, and Mr. Morton was tainted with this information before his work had begun.

Moreover, I note that Mr. Morton properly introduced his 10/11/13 report with the caveat that "The information provided is based upon probabilities."[2] Yet no such caveat appears in Mr. Morton's testimony, where the terms "probable," "probability," "probabilities," or "likely" appear in only two sentences:

- "I taught at the Alaska Peace Officer Association at a meeting down in Kenai probably -- I guess 10 years ago."[3]
- "Based on the physical evidence that was there -- in other words, the trajectory of the bullets, where the rounds were recovered inside of the floor -- I determined that it appeared Mr. Belisle was sitting with his back to the door, probably in a chair."[4]

### Focus on a Single Theory of the Case

Mr. Morton's profile, testimony, and supplementary report all put forth one plausible theory of the case—the theory that was brought to him by investigators before he had begun his work—but it is not the only plausible theory. Alternative hypotheses include but are not limited to these:

---

[1] Wells1800047251
[2] Robert J. Morton Criminal Investigative Analysis, 10/11/13, p. 1 (19284)
[3] Trial transcript, p. 1611
[4] Trial transcript, p. 1617

2

- <u>Targeting the Coast Guard</u>:  In the eight other incidents I've been able to identify since 1993 in which more than one victim was murdered at a military installation within the U.S., the motives have been mental illness in four, terrorism in two, a love triangle in one, and a workplace dispute in one.  The killers in these eight incidents were active service members in four, a former service member in one, a civilian employee in one, a civilian contractor in one, and an outsider in one.  The killers in these eight incidents ranged in age from 20 to 53, with an average age of 31.9 (the 4th decade of life).  I am informed that someone made a bomb threat toward the Coast Guard proximal to these murders, which could be consistent with the hypothesis that it was the Coast Guard and not the individuals that was targeted, and that the killer selected one of the most vulnerable buildings on Coast Guard property without concern for the identity of its occupants.
- <u>Personal motive toward one of the victims</u>:  Someone with personal but undiscovered animosity (childhood bullying; sexual abuse in childhood; an unpaid, secret debt; anger; resentment; jealousy; a perceived slight; or perceived persecution) studied the habits of the target victim and the worksite and killed the other victim to eliminate the witness.
- <u>Murder for hire of one of the victims</u>:  Someone was hired to kill one of the victims (for life insurance, to become free of an unsatisfactory or painful marriage, or in retaliation for some event in the victim's personal, recreational, or work life) and killed the other victim to eliminate the witness.
- <u>Random psychopathic homicide</u>:  Someone interested in testing his or her skill at recreational homicide, seeking a thrill, testing a recently acquired weapon, fulfilling a "Dirty Harry" fantasy, or gaining admission to a group requiring an initiation kill entered an unlocked door and made quick work of it.
- <u>Psychotic homicide</u>:  Someone with delusions of persecution, delusions of imposters (Capgras syndrome), or command hallucinations killed both victims for psychotic reasons.

One could only conclude that the Morton hypothesis is more probable than these alternatives if the alternatives had each been fully investigated.  Some homicide investigations prematurely focus on one suspect without fully exploring all avenues of investigation and thus fail to identify the true killer.

**Personal Cause vs. Impersonal Cause**

Mr. Morton testified, "I believe that in this case the offender targeted Mr. Hopkins and Mr. Belisle for a personal cause."[5]  In response to a question of how he eliminated the possibility of a "random event," Mr. Morton testified, "Because the nature of the facility, of the layout of the building, and the fact that two victims, who just happened to be there at the same time, were

---

[5] Trial transcript, p. 1614

Case 3:13-cr-00008-SLG   Document 991-2   Filed 05/14/19   Page 3 of 8

murdered kind of eliminated it for me."[6]  But these factors do not eliminate the possibility of impersonal causes unrelated to the two victims, such as targeting the institution, thrill-seeking, or terrorism, to name a few.  This is an example of Mr. Morton expressing unwarranted certainty rather than an opinion as to probability.

## Sequence of Shots

In his profile and supplementary report, Mr. Morton concluded that after shooting both Mr. Belisle and Mr. Hopkins—in that sequence—the offender returned to Mr. Belisle to shoot him two more times and ensure he was dead. This conclusion appears to rest on the undisclosed assumption that had the offender shot Mr. Belisle three times before shooting Mr. Hopkins, the confrontation with Mr. Hopkins would have gone differently.  This conclusion was not put forth in Mr. Morton's trial testimony, which was that other than saying the offender shot Mr. Belisle first and Mr. Hopkins second, "After that, based on the evidence, I can't really give you a sequence of the shots that occurred other than the fact that he shot twice more into Mr. Belisle and once more into Mr. Hopkins."[7]  Nonetheless, Mr. Schroder apparently relied on Mr. Morton's report, not his testimony, when in his Closing Argument he said, "He fired until they fell to the ground, and then he went back and fired another round into each of the men, to make sure the job was done."[8]

## Whether There Was Verbal Interaction Between Killer and Victims

Mr. Morton testified, "Doesn't appear to be any verbal interaction at all, based on their body positions and their wounds."[9]  While I agree that it is probable that Mr. Belisle was shot before there had been any significant verbal interaction with the offender, after the first shot was fired there could have been literally any type of verbal interaction—or none at all—with each victim.  There is no way to know what verbal interaction did or did not occur after the first shot was fired, but obviously it would make a significant difference in the analysis if there were evidence that the offender accused the victims of infidelity with his wife or of monitoring his thoughts, if he apologized to one of them for having to kill him for being in the wrong place at the wrong time, or if he yelled, "Allahu Akbar."

## Conflation of Mass Murder in All Settings with Double Murder in the Workplace

Dr. Meloy's report and testimony contained considerable material on mass murder and relied on research concerning mass murder with three or more victims, which is not relevant to this case.  In his testimony and PowerPoint,

---

[6] Trial transcript, p. 1615
[7] Trial transcript, p. 1620
[8] Trial transcript, p. 3724
[9] Trial transcript, p. 1620

4

however, Dr. Meloy refers to "multiple murder," apparently having become aware of this issue.  Even though he testified about "multiple murder," most if not all of his testimony about multiple murder is based on findings regarding mass murder, which may or may not apply to double murders or any particular double murder.  There is no reasonable basis for believing that double murders resemble murders of larger numbers of victims more than they resemble single victim homicides.  I expect the reason Dr. Meloy relied so heavily on the mass murder literature in his report and testimony is that there was then and still is comparatively little empirical research on double homicides in the U.S., as the literature consists mostly of case reports, small series of cases, and data on double homicides followed by suicide.  I am unaware of any empirical studies of double homicide in the workplace, but this does not make studies of mass murder a suitable proxy.

## Conflation of the Concepts of Intended, Targeted, Predatory, and Instrumental

While there can be no doubt that each of the two homicides was intentional, this does not in itself imply, much less prove, that either or both victims were "targeted" in advance of the killer entering the building, nor does it imply or prove that either homicide was "predatory" as opposed to "affective" or that either homicide was "instrumental."

I disagree with the opinion to which Mr. Morton testified that "In this case, by basically going into a building and attacking two people, it shows that both victims were intended targets."[10]  It is equally possible that (a) one was targeted and the other was collateral damage, (b) that neither was targeted and the offender simply did not care who was killed, (c) that both were killed by someone targeting the institution rather than the individuals, or (d) that both were killed for reasons unrelated to targeting.

Determining whether a particular homicide was "predatory" or "affective"—if one were to accept this dichotomous classification—requires knowledge of the state of mind and motivation of the killer at the time of the crime.  Often that information comes from interviews of the killer and the observations of surviving witnesses to the crime.  Where the killer hasn't confessed and there are no surviving witnesses, one is left to inferences based on crime scene and historical evidence.  In a double homicide, both homicides may be "predatory," both may be "affective," or one homicide may be "predatory" and the other "affective."

Dr. Meloy uses the terms "intended," "targeted," "predatory," and "instrumental" interchangeably[11] and makes broad generalizations about this purportedly singular category, but these terms are certainly not generally accepted as having identical meanings.  "Intended" homicide implies that the

---

[10]  Trial transcript, p. 1621
[11]  D-6561

5

killer had intended to harm a person. "Targeted" homicide—a term I may have introduced in the 1980s in reference to stalkers and assassins—implies that the killer selected a particular victim in advance of the killing. "Predatory" homicide refers to an unemotional subjective state of the killer. "Instrumental" homicide implies goal-directed behavior other than repelling a perceived threat, such as robbery, gang initiation, eliminating a witness, eliminating a rival, or regime change and is contrasted with "Expressive" homicide, such as terrorism, revenge, or impulsive, angry killings.

Dr. Meloy's imprecise use of these terms underlies his mistaken reliance on Bureau of Labor Statistics data regarding "intentional" homicides in the workplace, as he apparently does not recognize that "intentional" in this context does not refer to "targeted," "predatory," or "instrumental," but rather is used to distinguish intentional killings from "accidental" killings, a distinction derived from efforts (in which I played a role[12]) to direct the attention of the public health community (particularly the CDC and OSHA) to intentional injury—not just unintentional injuries, so-called "accidents"—to encourage the application of public health approaches to the prevention of homicide, suicide, assault, and rape.

**The False Dichotomy of "Workplace Violence" vs. "Random Violence"**

The fact that two men were killed in a workplace does not necessarily mean that the killings were not random, does not necessarily mean that the individuals were targeted, and does not necessarily mean that the motives for either killing were connected to anyone's work.

Just as the locations of violence and the relationships between victims and offenders are variable, so too are the motives for violence. To simplify the presentation of aggregate data, both researchers and data-gathering agencies often lump together disparate categories, and this is particularly true for variables as complex as motive, where multiple motives may be lumped into singular categories for the sake of simplicity. Even so, there is no context in which a classification of violence into two categories—workplace violence and random violence—would be defensible. Any motive or combination of motives is possible for violence that occurs in a workplace,

---

[12] Baker SP, Dietz PE: Injury prevention. In: The Institute of Medicine, National Academy of Sciences: Healthy People: The Surgeon General's Report on Health Promotion and Disease Prevention: Background Papers. Washington, D.C.: U.S. Government Printing Office, 1979 (DHEW (PHS) Publication No. 79-5507lA), pp. 53-80; Baker SP, Dietz PE: The epidemiology and prevention of injury. In: Zuidema GD, Rutherford RB, Ballinger WF (Eds.): The Management of Trauma, 3rd ed. Philadelphia: W. B. Saunders, 1979, pp. 794-821; Committee on Trauma Research of the National Research Council and Institute of Medicine: Injury in America. Washington, D.C.: National Academy Press, 1985; Dietz PE, Baker SP: Murder at work. Am J Public Health 77:1273-1274, 1987

Case 3:13-cr-00008-SLG   Document 991-2   Filed 05/14/19   Page 6 of 8

and some of those motives could be considered personal, targeted, directed, or otherwise non-random, while others could be sensibly described as random with respect to location, random with respect to victim, or otherwise random.  For example, there have been workplace homicides in which a targeted victim was not present upon the killer's arrival, and others have been killed instead; workplace homicides in which the killer targeted an institution or organization rather than particular individuals and killed only strangers; and workplace homicides in which the killer would have preferred a high value target but settled for a more vulnerable location (such as the 7/16/15 shootings at a military recruiting center and the U.S. Navy Reserve Center in Chattanooga, TN).

Workplace violence can occur in any setting.  It occurs, for example, in offices, lobby areas, cafeterias, breakrooms, parking lots, surrounding grounds, work vehicles, offsite meeting venues, offsite work activity venues, and home offices.  Depending on an organization's policies regarding off-duty behavior, anywhere else one worker interacts with another can be the site of workplace violence.  In the case of toxic agents and bombs, it may even occur through U.S. Mail or courier services.  Depending on an organization's policies and one's definition of violence, it may even occur through social or other electronic media.

Workplace violence offenders and victims include current or former employees and contractors; current and former acquaintances, friends, and family of employees; customers, clients, visitors, and guests; and third parties with no affiliation to the organization.

In 2012, the year in which Mr. Belisle and Mr. Hopkins were murdered, the Bureau of Labor Statistics identified 475 victims of "work-related" homicide, of whom 376 were male.  The killers of these 376 men included robbers (36%), other assailants (27%), coworkers or work associates (14%), students, patients, or customer/client (12%), inmate, detainee, or suspect not yet apprehended (8%), and relative or domestic partner (3%).[13]  Thus, if robbery were ruled out and these data were probative of the identity of the killer of Mr. Belisle and Mr. Hopkins—as the presentation of Dr. Meloy's testimony at trial seemed to suggest—the data suggest that the most probable class of killer was that of "other assailant" and not that of "coworkers or work associates."  In 2012, the killers of males in the workplace were approximately two times more likely to be other assailants than to be coworkers or work associates.

The preliminary 2011 data relied upon by Dr. Meloy in his testimony (because neither final 2011 data nor 2012 data were available at the time) lumped together "Robbers and Other Perpetrators" as committing 66% of workplace homicides,[14] yet Dr. Meloy said that the large green area on the

---

[13]  https://www.bls.gov/iif/oshwc/cfoi/cfch0011.pdf, accessed 1/8/19
[14]  D-6564

Case 3:13-cr-00008-SLG   Document 991-2   Filed 05/14/19   Page 7 of 8

pie chart[15] for that category "are robberies,"[16] omitting the "Other Perpetrators" who make up a large proportion of the lumped category, and that "most of the violence in the workplace is done during a -- a felony crime such as robbery. So this could be like in a -- in a 7-Eleven store or retail market, something along those lines. And work associates come next . . ."[17] This misleading testimony suggested that if robbery were excluded, a coworker would be the most likely offender, which is untrue.

Respectfully,

*Park Dietz, MD*

Park Dietz, M.D., M.P.H., Ph.D.
Clinical Professor of Psychiatry and Biobehavioral Sciences
David Geffen School of Medicine at U.C.L.A.
Diplomate, American Board of Psychiatry & Neurology
Distinguished Life Fellow, American Psychiatric Association
Fellow, American Academy of Forensic Sciences

---

[15] D-6564
[16] Trial transcript, p. 1385
[17] Trial transcript, pp. 1384-1385

8