1  video is compressed, couldn't this be a moth in front of the

2  camera?  I mean, it's got triang -- where the wings are beating

3  too fast and it's not actually catching the -- you know each

4  frame of the moth's wings beating?

5  A    I would not be able to say.  I -- I don't know if you

6  compress things how that changes -- not being a video expert,

7  as far as how that would change.

8  Q    So you just don't know?

9  A    No, I -- I don't what it is in the -- in the photo.

10  Q    Thank you.

11        THE COURT:  Redirect.

12        MR. CURTNER:  No, Your Honor.  Thank you.

13        THE COURT:  Thank you, ma'am.  You're excused.

14  Defendant's next witness.

15     (Witness excused)

16        MR. CURTNER:  We're calling Jaco Swanepoel.

17        THE COURT:  Okay.  Just head on up here.  We got a

18  chair for you.  You may -- take a hard right.  That door pulls

19  out.  Step into the witness box, remain standing, and my clerk

20  will swear you in.

21        THE CLERK:  Please raise your right hand.

22  **JACOVUS MICHIEL SWANEPOEL, DEFENDANT'S WITNESS, SWORN**

23        THE CLERK:  Okay, thank you.  Please have a seat.  And,

24  sir, if you can please state and spell your full name.

25        THE WITNESS:  Jacovus Michiel Swanepoel.  My first name

1  is J-a-c-o-v-u-s.  My middle name is M-i-c-h-i-e-l.  My last

2  name is Swanepoel.  S as in Sam, w-a-n-e, p as in Peter, o-e-l,

3  Swanepoel.

4       THE CLERK:  Thank you.

5       THE COURT:  All right, counsel.

6                **DIRECT EXAMINATION**

7  BY MR. CURTNER:

8  Q    Good afternoon, Mr. Swanepoel.

9  A    Good afternoon, sir.

10 Q    Where are you employed?

11 A    I'm employed with a company called Forensic Analytical

12 Sciences, over in Hayward, California.

13 Q    And what do you do there?

14 A    I'm a forensic scientist that analyzes criminalistics-

15 related cases.

16 Q    Okay.  And what type of analysis do you do?

17 A    I do firearms and toolmark (indiscernible) analysis and

18 examinations.  I do fingerprint and impression examinations.

19 And then I also do crime scene reconstruction.

20 Q    Where's your office located?

21 A    It's in Hayward, California.

22 Q    Is that a California accent that you have?

23 A    No, sir, it's not.

24 Q    Tell me where you received your training.  Could you tell

25 us about your experience and training?

1  A    So I received my training as a firearms and toolmark

2  examiner through the South African Police Services.  This is

3  the National Forensic Science Laboratory, which is based in

4  Pretoria, South Africa.  And it has a training program that

5  stretches over three years, where I would be trained in various

6  aspects of forensics and forensic firearms examinations.  We

7  typically start off with something as simple as theoretical

8  training, a written test, and then under the tutelage and

9  guidance of a senior expert or examiner, we'd start off doing

10 cases.  And then it would progress to more complicated cases,

11 where you would eventually do multiple firearms, multiple

12 victims, crime scene reconstruction, the whole spiel of -- of

13 forensic work.

14 Q    Now, in -- at the South African Police Services, did you

15 achieve a certain rank there?

16 A    I was a lieutenant colonel with the South African Police

17 Services when I took my discharge.  And I was commander of the

18 Forensic Photography Unit for the National Forensic Science

19 Laboratory.

20 Q    Okay.  And then how long were you employed with the South

21 African Police Services?

22 A    I started my career back in 1989, and then I immigrated to

23 the United States in 2005.

24 Q    Now, were -- when you were still in South Africa, were

25 you -- had been qualified as an expert witness before?

1  A   Yes, sir.  I've qualified as an expert in firearms and

2  toolmark examinations, fingerprint examinations and

3  comparisons.

4  Q   Now, when did you come to the United States?

5  A   October 2005.

6  Q   And where have you worked since you arrived in the United

7  States?

8  A   I've only been employed with Forensic Analytical Sciences.

9  Q   And since what date?  I'm sorry.

10 A   October 2005, sir.

11 Q   And what have you -- how many cases have you examined

12 since you've been at that office?

13 A   Well, I would say well in excess of 500 cases, and it

14 ranges from firearms and toolmarks cases through to fingerprint

15 comparisons, crime scene reconstruction, impression evidence

16 comparisons.

17 Q   And what does Forensic Analytic Sciences -- who -- what

18 kind of -- who do you work for?  Who do you contract with or

19 consult with?

20 A   Well, we will contract across the board with public

21 defender agencies, private investigators, private attorneys.

22 We also will work for the government agencies, local police

23 agencies, the federal government as well.

24 Q   And what type of courses did you take when you were back

25 at South Africa with the South African Police Service?

1   A    Well, I did several training courses and -- as I've

2   mentioned, the firearms and toolmarks course is probably the

3   most significant one as far as the expertise is concerned.  But

4   there were several other courses in criminal examination, the

5   comparison of fingerprint and impression evidence, the

6   collection and documentation of forensic evidence, courses on

7   crime scene reconstruction, draftsmanship, crime scene

8   photography, courses along those lines.

9   Q    Have you also taken training courses here in the United

10  States?

11  A    Yes, sir, I have.

12  Q    Could you explain some of the training you've gotten in

13  the United -- received in the United States?

14  A    Well, sir, here in the United States, you know, I did

15  several training courses with private entities as well as the

16  California Criminalistics Institute, these courses ranging,

17  pathology of wounds, the reconstruction of crime scenes,

18  trajectory reconstruction, fingerprint or impression evidence

19  comparisons.  I've also done training while I was actually in

20  South Africa with the Federal Bureau of Investigation in

21  gunshot residue analysis, trajectory reconstruction, and the

22  identification of firearms.

23  Q    Have you had training in firearms and ammunition

24  manufacturing?

25  A    Well, yes, sir.  That was part of the training that we

1    would do, is we would visit factories to see, first of all,

2    firsthand, how ammunition is manufactured, how it's put

3    together, what sort of markings can we expect, for instance,

4    that's as a result of the manufacturing process versus the

5    marks, that we are mostly interested in as far as identifying

6    something through a unique source.

7        We were also trained in internal ballistics, external

8    ballistics, wind ballistics, and then -- or terminal

9    ballistics, and then exterior ballistics.  So interior

10   ballistics would be anything that happens inside the firearm

11   with those cartridge cases and the fired bullet.  Exterior

12   ballistics would be once the bullet lie -- leaves the barrel of

13   the gun and what it does in flight and what it does to the

14   target, what the target does to it.  We would also have

15   training in intermediate ballistics, you know, what happens to

16   these combustious gases that comes out of the barrel.

17       Obviously, our training would also include toolmarks.  If

18   you think about it, you know, a firearm is essentially just a

19   tool that's designed to propel a bullet downrange.  So the

20   field of firearms and toolmark analysis would include marks

21   made by other tools and the interaction between those surfaces.

22   Q    Okay.  Could you tell us about your professional

23   affiliations?

24   A    I'm a member of the Association of Firearms and Toolmark

25   Examiners.  I'm also a member of the California Association of

1  Criminalists, and I'm also a member of the International

2  Association of Identification.

3  Q   And during your career, you've been -- completed

4  proficiency testing in your work?

5  A   Yes, sir.  So our lab policy states that we have to

6  complete a proficiency test in every discipline that we are

7  experts in on an annual basis

8  Q   Are you -- also been involved in some publications on your

9  work?

10 A   Yes, I have published through the Association of Firearms

11 and Toolmarks Examiners and I've also presented at their

12 professional training seminars.

13          MR. CURTNER:  Your Honor, I would offer Mr. Swanepoel

14 as an expert in firearms, ballistics, and toolmark examination.

15          MR. SCHRODER:  No objection.

16          THE COURT:  He'll be received in that capacity.

17 BY MR. CURTNER:

18 Q   So, Mr. Swanepoel, were you -- have you been involved in

19 this case, retained in the case of United States versus Wells?

20 A   Yes, sir.  That is correct.

21 Q   And did you conduct a ballistic analysis in this

22 particular case?

23 A   Yes, I did.

24 Q   And could you tell us what you did as part of your

25 analysis?

**SWANEPOEL - DIRECT**

1  A   Well, essentially, I received fired bullets.  I then took

2  those five bullets that was recovered at the crime scene and

3  compared them using a bullet comparison microscope, and

4  determined, first of all, to see whether they are from the same

5  source.

6  Q   Okay.  Did you make a caliber determination?

7  A   Yes, sir.  A caliber determination would be part of the

8  initial sort of write-up, if you want to call it that, of those

9  particular items.  As we received them, we would make notes

10 about caliber, weight, diameter, et cetera, et cetera.

11 Q   And what was the result of that?

12 A   I found that all those bullets were fired from the same

13 gun.

14 Q   Did you conduct a microscopic comparison too or -- of the

15 bullets?

16 A   Yes, sir.  So what we will do initially is we will compare

17 class characteristics.  And so class characteristics is

18 something that's common to other sources as well.  But it is

19 very useful in making a large group of items and separate them

20 out in smaller groups just by use of the class characteristics.

21 Class characteristics -- obviously, if there is a difference in

22 class characteristics, we can immediately separate items out as

23 not being from the same source.

24      The second step to that whole process is where we would

25 use the comparison microscope and look for these individual

1  striae that we then compare.  So where class characteristics

2  are compared or are man-made, if you want to call it that, it's

3  determined by the manufacturer.  These individual

4  characteristics are random.  And we as the manufacturer or the

5  user of the firearm has no control over how those marks are

6  formed and in what path and then sequence they show up.  And

7  that is essentially what gives the gun its own signature, or

8  fingerprint, if we want to call it that.

9  Q    Okay.  Now, so did you come to a conclusion about the

10 bullets that you examined?

11 A    Yes, sir, I did.  Those bullets were all fired by the same

12 gun.

13 Q    And so what did you -- what identi -- individual

14 characteristics did you notice from your examination of these

15 bullets?

16 A    So from the examination of these bullets, we would be

17 looking at the striations, or striated markings that is found

18 in the land and groove impressed areas on that bullet.  As the

19 bullet travels down the barrel, it will receive these markings

20 from the barrel onto the bullet, and, because the bullet is

21 moving, we would be looking for these striated markings that we

22 can then orientate, line up, and then facilitate an

23 identification through those.

24 Q    Okay.  And from that process, did you have a conclusion as

25 to the type of firearm that was used to fire these bullets?

**SWANEPOEL – DIRECT**

1  A    Yes, I did.

2  Q    Could you tell us what that is?

3  A    So from looking at both the -- the class characteristics,

4  in other words, the weight, the design, the number of lands and

5  grooves, I was able to determine that it was a .44-caliber

6  firearm that fired these bullets.  Once we use that information

7  and we actually search it through our database, our database

8  would give us a list of possible firearms manufacturers that

9  will have similar information or similar recorded class

10 characteristics.  And that list indicates that you can find

11 Smith & Wessons, Llamas, and Tauruses with exactly the same

12 characteristics, if you want to call it that.

13 Q    Okay, so these are three firearm manufacturers that

14 manufacture guns with these same characteristics.  Is that

15 correct?

16 A    Yes, for this particular caliber, correct.

17 Q    And can you distinguish one of those three particular

18 firearms?

19 A    No.  With the information that we find on the bullets, we

20 cannot tell whether this bullet actually came from a Smith &

21 Wesson or from a Taurus or from a Llama.

22 Q    And did you provide an opinion as to how many individual

23 firearms manufactured by these three manufacturers might have

24 similar class characteristics?

25 A    Well, we could literally be talking about thousands, if

1  not tens of thousands, of gun -- firearms that could have the

2  same class characteristics.

3  Q    So from these three manufacturers, there could be thous --

4  tens of thousands of these particular weapons that could have

5  fired this particular -- these bullets?

6  A    Yes, sir.

7  Q    Okay.  And you've submitted a report based with this -- on

8  those conclusions.  Is that correct?

9  A    That is correct.

10  Q    Did you do a second analysis and report in this particular

11  case?

12  A    Yes, sir, I did.

13  Q    And what was that about?

14  A    It was regarding a nail and the toolmarks that was found

15  on that particular nailhead and the way that it was interacted

16  within the particular circumstances, in this case, a tire.

17  Q    Okay.  So tell me what you received in the lab, what you

18  reviewed as part of your analysis of this nail?  And --

19  A    Well, I received several bits of discovery material, which

20  included notes by various examiners, reports by various

21  examiners.  I actually looked at the nail myself in preparation

22  of my report and, you know, countless photographs of various

23  documentations of this particular nail.

24  Q    Okay.  So you examined some of the government's expert

25  reports about the nail and the tire?

SWANEPOEL - DIRECT

1  A    Yes, sir, I did.

2  Q    And did you review some of the photographs that Mr. Gary

3  Bolden, one of the government experts, submitted as part of his

4  report?

5  A    Yes, sir, I did.

6  Q    Okay.  I wonder if we could go to Defense Exhibit DE-171.

7  It should be on your screen, Mr. Swanepoel.  Can you see that?

8  A    Yes, sir, I can see this.

9  Q    You -- can you identify that photograph?

10  A    This is a photograph that I took of the particular

11  nailhead when I had it in my laboratory, or --

12  Q    And that's part of your analysis?

13  A    Yes, sir.

14        MR. CURTNER:  Okay.  Move to admit Defense Exhibit 171.

15        MR. SCHRODER:  No objection.

16        THE COURT:  It'll be received.

17     (Defendant's Exhibit DE-171 admitted)

18        MR. CURTNER:  If we could publish that.

19  BY MR. CURTNER:

20  Q    This is a -- could you tell us what this is?

21  A    So, basically, this is just a photograph that I took of

22  the nailhead, and we are looking at the top or sort of the top

23  side of the nailhead, if we want to call it that.  On the

24  bottom hand, you'll see that I've also included a scale just

25  for reference purposes.

SWANEPOEL - DIRECT

1 Q   And what did you note in your examination of the nailhead

2 that might be demonstrated in this photograph?

3 A   Well, there were several -- several areas of interest that

4 I wanted to look at and noticed.  First of all, I was looking

5 at these two areas here, which is striated markings or areas of

6 abrasion.  And then I was also looking at this larger area down

7 here, where it appears to be more of the impressed kind of

8 marking.  I was also interested in sort of the dirt and the

9 grime and the discolorations that we note on this particular

10 nailhead.

11 Q   So what are striations?  What do you mean by striations?

12 Could you explain what that means to you?

13 A   Well, so when we do firearms and toolmark examinations,

14 we're primarily looking at two kinds of marks.  One is

15 obviously an impressed mark.  If you think of a hammer striking

16 a particular surface and there's no subsequent movement, that

17 would be an impressed mark, or if you think of a screwdriver

18 getting drilled down onto a particular surface.  We're also

19 looking at striated markings, where one surface would contact

20 another and there would be some sort of dragging or pulling

21 action between the two surfaces.  You can also find a

22 combination of those two markings, where it would start off,

23 for instance, as an impressed marking and then a subsequent

24 drag which creates both markings, sort of in one general mark,

25 if you want to call it that.

1 Q    Okay.   And could you demonstrate the striations you

2 noticed here when you received this nail again?

3 A    Well, so the two striated markings you can see is over

4 here and over here, and the marks are sort of running as you

5 look at the picture, from, let's say, the 11 o'clock position

6 to about the 4 o'clock position or maybe the 5 o'clock

7 position.   These markings, when you look at them under the

8 microscope, have topographical features.   In other words, they

9 have height, they have width, they have depth, which clearly

10 indicates that there was an interaction between some sort of a

11 tool and this particular surface.

12 Q    Okay.   Is there anything else you can tell us from this

13 photograph of the striations?

14 A    No, sir.   Just like -- like I mentioned earlier, I was

15 looking at all the trace materials on there, the dirt, the

16 grime, and --

17 Q    Yes, so could you explain --

18 A    -- discolorations --

19 Q    Let's go into that a little bit more, what you noticed as

20 far as any kind of debris or --

21 A    Well, there is lots of debris on this nailhead, and my

22 first inclination is that this is a well-weathered nailhead.

23 In other words, it's not factory fresh, if we can call it that.

24 And you will also notice that when we look at this impressed

25 mark, we can see that some of the dust and the trace material

1  and the debris is actually inside the markings itself, where

2  when we look at this mark and this mark and we compare the two

3  to them, we can see that this one is -- is a fresher mark in

4  the sense that it rubbed off some of the trace material that --

5  coating that's on the nail instead of just being on it or in

6  it.

7  Q    Okay.  Let's go to Defense Exhibit DE-176 and see if you

8  recognize that on your screen.  Do you recognize that?

9  A    Yes, sir, I do.

10  Q    What is that?

11  A    This is a photograph, again, that I took of the particular

12  nailhead.  And it's just done under more magnification.  And

13  the nailhead is just slightly rotated.  But all the features

14  that I've already talked about and described is also visible in

15  this particular photograph.

16       MR. CURTNER:  Move for admission of Defense Exhibit

17  176, DE-176.

18       MR. SCHRODER:  No objection.

19       THE COURT:  Will be received.

20     (Defendant's Exhibit DE-176 admitted)

21       MR. CURTNER:  If we could publish that.

22  BY MR. CURTNER:

23  Q    So this is a -- I'm sorry, this is a closer view?

24  A    Yes, it's a -- it's a closer view, if I can say closer

25  view.

1  Q    Magnified view, I mean?

2  A    It's a magnified view.

3  Q    I'm sorry.

4  A    And, you know, so I will put this under our stereo

5  microscope and I will use a different camera to photograph it.

6  So again we can see what I call the impressed markings over

7  here and then the striated markings with those various

8  topographical features over here and over here.

9  Q    Okay.  Does this photograph show anything else you can

10 explain to us or --

11 A    No, sir.  Basically, we've covered --

12 Q    Okay.  If we can go to Defense Exhibit DE-178.  Do you see

13 that on your screen?

14 A    Yes, sir, I do.

15 Q    Okay.  And is that another photograph you took in part of

16 your examination?

17 A    Yes, sir, that's correct.

18       MR. CURTNER:  Move for admission of DE-178.

19       MR. SCHRODER:  No objection.

20       THE COURT:  Will be received.

21     (Defendant's Exhibit DE-178 admitted)

22       MR. CURTNER:  If we could publish that.

23 BY MR. CURTNER:

24 Q    What does this show you -- show us?

25 A    Well, so, basically, this is the same nailhead.  All that

**SWANEPOEL - DIRECT**

1  I did was rotate it 90 degrees.  And now we are looking at the
2  side of the nailhead.  And the deformation in the middle that
3  you see here is an extension of those two striated markings
4  that we saw in the top of the nailhead.
5  Q   Okay.  Is there anything else from this photograph that
6  would help us to -- if you could explain anything else you
7  observed?
8  A   No, sir, that's essentially what I've covered --
9  Q   All right.
10 A   -- from that initial photograph.
11 Q   Let's go to Defense Exhibit 172 and see if you recognize
12 that photograph.
13 A   So, again, it -- sorry.  Yes, I do recognize 172.
14 Q   And this was another photograph you took as part of your
15 examination?
16 A   Yes, sir, it is.
17      MR. CURTNER:  Move for admission of Defense Exhibit
18 172.
19      MR. SCHRODER:  No objection.
20      THE COURT:  Will be received.
21   (Defendant's Exhibit DE-172 admitted)
22      MR. CURTNER:  If you could publish that.  And, let's
23 see, this is -- I'm sorry --
24   (Side conversation; pause)
25      MR. CURTNER:  Judge, how about a five-minute break?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1  I'm sorry, this --

2          THE COURT:  Will that solve the problem, or can you

3  just use the paper version?

4          UNIDENTIFIED SPEAKER:  Yeah, I need about five.

5          THE COURT:  Okay.  We'll take a five-minute recess, if

6  that's possible.

7          MR. CURTNER:  Okay, (indiscernible).

8          THE COURT:  All right.

9      (Jury not present)

10          THE COURT:  All right, please be seated.  So I'm

11  thinking to myself, if this is going to be the -- defense is

12  going to rest today, why can't we do closings tomorrow

13  afternoon, give you all morning, and you can do whatever you

14  have to do, unless you've got significant rebuttal.

15          MS. LOEFFLER:  Well, we have a --

16          MR. SCHRODER:  We do.

17          MS. LOEFFLER:  I mean, we do.  I -- it's not going

18  to -- I -- I'm not going to tell you it takes all day --

19          THE COURT:  I know.

20          MS. LOEFFLER:  -- to do our rebuttal.  Most of our

21  witnesses are going to be very short, I think, on the rebuttal.

22  But then, you know, I have two sort of views of this.  One,

23  Judge, we got to get the electronics -- you know, there'd be a

24  break to make sure the electronics work.  We want to test them.

25  We already know they didn't happen.  And to be honest, I

1   also -- these are really long days for the jury, I think for

2   both sides.  With -- the jury's here at 8:30.  They're awake,

3   they're alert, they're not listening to three or four hours of

4   testimony and then listening to closings.  And I -- my view

5   would be, actually, that that's the best way.  The jury listens

6   to both sides as --

7           THE COURT:  Well, what I see --

8           MS. LOEFFLER:  -- if they're fresh --

9           THE COURT:  -- happening tomorrow is we're going to

10  come in here, stay for a couple of hours, and then send them

11  home again for most of the day.

12          MR. OFFENBECHER:  Your Honor, I agree with Ms.

13  Loeffler.  I think --

14          THE COURT:  I know, both --

15          MR. OFFENBECHER:  -- after a month-long trial, having a

16  fresh jury at 8:30 is a good idea.  Maybe some fresh lawyers.

17          THE COURT:  That's what I'm worried about.  Am I right,

18  that we'll get in here, we'll start tomorrow at 8:30; by 10

19  we'll be done, and I'll send them home.

20          MS. LOEFFLER:  Well, let me look -- I don't actually --

21          THE COURT:  I mean, by 11 --

22          MS. LOEFFLER:  -- have my --

23          THE COURT:  In other words, it'll be another half --

24          MS. LOEFFLER:  I think it'll be -- I think the -- well,

25  I'm trying by memory to figure out the list.  I mean, I think

1   what we -- we will probably be done at noon, but I just

2   think -- we've got to get in, get the -- make sure that, you

3   know, all of the exhibits -- I assume the defense is going to

4   want to double check their exhibits.  I know we're on top of

5   that, but I also want to make sure the electronics work.  And I

6   don't want to be in there going -- you know, what just happened

7   now to Mr. Curtner was, like, I can't get this up, let's get

8   this thing charged, let's make sure it works, so we're not in

9   the middle of this, going, now we can't do the closing.  And

10  I --

11          THE COURT:  When I was a young attorney --

12          MS. LOEFFLER:  What?

13          THE COURT:  -- decades ago --

14          MS. LOEFFLER:  Yeah.

15          THE COURT:  -- I had a trial similar to this where I

16  was given 15 minutes to give my closing argument.  And you want

17  a whole day.  I knew you -- I'm going to give it to you, but I

18  just want to give you a chance to convince me.

19          MS. LOEFFLER:  Okay.

20          THE COURT:  So we'll stop tomorrow at noon.  You'll

21  have all afternoon to get prepared, and start at 8:30 Thursday

22  morning.

23          MS. LOEFFLER:  That'd be great.

24          THE COURT:  I know that's what you both want, but --

25          MS. LOEFFLER:  And I want Mr. Offenbecher to give me

1  credit for arguing for him here.

2         THE COURT:  I -- just trying --

3         MR. CURTNER:  He did agree with you, though.

4         THE COURT:  I just wanted to get something you both

5  agreed upon.  I figured this --

6         MS. LOEFFLER:  Yeah.

7         THE COURT:  -- would be it.

8         MS. LOEFFLER:  You know, I just --

9         MR. OFFENBECHER:  I -- Ms. Loeffler --

10        MS. LOEFFLER:  -- think that --

11        MR. OFFENBECHER:  -- and I always agree on things.

12        MS. LOEFFLER:  In a long trial, I think you want them

13  fresh.

14        THE COURT:  Well, how long are your closing arguments

15  going to be?  And it will be close -- now you can argue -- it's

16  not a opening argument, it's a closing argument.

17     (Side conversation)

18        MS. LOEFFLER:  I'm turning to my colleague.  He's

19  the --

20        THE COURT:  I know.

21        MS. LOEFFLER:  -- opening, closing, I'm the rebuttal,

22  so -- just so you know, from us.

23        THE COURT:  He's going to do the opening, closing,

24  you'll do the rebuttal.

25        MS. LOEFFLER:  Yeah.

 1          THE COURT:  So you split it in half?

 2          MR. SCHRODER:  Yeah.

 3          MS. LOEFFLER:  No, I think it'll be more on the

 4  opening, closing, and a little less than the rebuttal -- only

 5  because I talk faster than Mr. Schroder.  But, no --

 6          THE COURT:  Okay.  So --

 7          MS. LOEFFLER:  -- I suspect --

 8          THE COURT:  -- if he --

 9          MS. LOEFFLER:  -- it'll be a couple of hours, total,

10  from the --

11          THE COURT:  That reasonable, two hours?  I mean, that's

12  an awful long time.

13          MR. OFFENBECHER:  Two hours?

14          THE COURT:  I can't imagine you taking more than two

15  hours.

16          MS. LOEFFLER:  No.

17          THE COURT:  I was going to give you 90 minutes each.

18  But if you both want a -- if you -- let's shoot for 90 minutes,

19  but I'll be very loose and I won't hold you to exactly 90

20  minutes.

21          MS. LOEFFLER:  Okay.

22          THE COURT:  I mean, if you need to go a little longer

23  to finish up -- is that reasonable?  I don't know.

24          MR. OFFENBECHER:  I'm -- and including a couple of

25  breaks, I think, for the morning, after their opening, a break

1  for us to get set up.  I would assume the Court would be okay

2  with that.  Then -- and maybe another break for their rebuttal

3  argument.  I would assume that if we start at 8:30, we'll be

4  done by 11.

5          MS. LOEFFLER:  That's what I say.

6          THE COURT:  Okay.

7          MS. LOEFFLER:  (Indiscernible) again.

8          THE COURT:  So I have -- they're having problems.

9          MR. CURTNER:  We're ready.

10         THE COURT:  Oh, they're ready.

11         MS. LOEFFLER:  Okay.

12         THE COURT:  Okay.  See I figured --

13         MR. CURTNER:  We're done.

14         THE COURT:  -- I can kill the time.  All right.  Ready

15 for the jury, then.  The reason we did this within 10 minutes

16 is because we didn't leave the courtroom.

17     (Jury present)

18         THE COURT:  All right, please be seated.  Okay, we've

19 had the equipment repaired and we're ready to continue with

20 direct examination.  Mr. Curtner.

21         MR. CURTNER:  Thank you, Your Honor.

22 BY MR. CURTNER:

23 Q   Mr. Swanepoel, now do you see a picture on your screen?

24 A   Yes, sir, I do.

25 Q   And can you identify that?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

**SWANEPOEL - DIRECT**

1  A    Yes, sir, that's a picture that I took of my --

2  Q    As part of your examination.

3  A    -- in -- in my laboratory --

4         MR. CURTNER:  Move for --

5         THE WITNESS:  -- yes.

6         MR. CURTNER:  -- admission of Defense Exhibit 172.

7         MR. SCHRODER:  No objection.

8         THE COURT:  It'll be received.

9         MR. CURTNER:  You can publish that.

10 BY MR. CURTNER:

11 Q    I'm sorry, this -- what do you see in this photograph?

12 A    Well, sir, this is a photograph that I took of the outsole

13 of the tread area of the tire.  You can see in the middle of

14 the photograph these two features.  This is the hole where the

15 nail was in, and then there's another feature in the lug

16 adjacent to the hole.

17 Q    Okay.  Explain what your observations were about both of

18 these features.

19 A    Well, I was looking at the hole in the tire, and I can see

20 there's an area of abrasion.  There is obviously some trace

21 material in there.  I can see cracking and tearing of the

22 fabric.  There's also -- I can see there's a craterlike

23 indentation, which is -- to me suggests the direction of the

24 nail.  And when we look at this particular area, how it starts

25 and it gets rubbed or abraded all the way up to there; to me it

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1  indicates that there is some interaction between this nail and

2  the adjoining surface, that the -- the rubber of the tire.

3  Q    Okay.  And then what was the other feature that you

4  noticed?

5  A    So this was a feature that was not initially described in

6  any of the notes that I reviewed.  But you can see there is a

7  clear gouge or a piece of this rubber that's taken out of this

8  lug adjacent to the -- to the hole.

9  Q    Okay.  Anything else you can tell us from this photograph?

10 A    No, sir.  The only other features that are -- that I was

11 interested in mostly was -- you can see there's a red

12 discoloration for -- some sort of a trace material.  And then

13 these bright-yellow marks and the fainter white marks here,

14 that sort of circles the area of where the impression was made.

15 Q    Okay.  And that's -- are those marks from prior

16 examinations?

17 A    Yes, sir.  That's not something that I put onto the

18 surface.  This was done by --

19 Q    Okay, if we could go to Defense Exhibit DE-175.  And if

20 you could look at your screen and identify that.  Is that a

21 photograph you took in your examination?

22 A    Yes, sir, it is.

23        MR. CURTNER:  Okay.  If we could move for admission of

24 Defense Exhibit 175.

25        MR. SCHRODER:  No objection.

SWANEPOEL - DIRECT

1      THE COURT:  It'll be received.

2      (Defendant's Exhibit DE-175 admitted)

3      MR. CURTNER:  Could publish that.

4  BY MR. CURTNER:

5  Q   What do we see in this picture, Mr. Swanepoel?

6  A   So, essentially, we're again looking at the tread of the

7  vehicle tire, and then it's sort of a perpendicular shot or an

8  angle towards the impression or the mark or the hole left by

9  the nail.  And so we can see the area that's abraded around

10 here, those cracks or tears.  And then this fine dusty trace

11 material over here, that to me indicates at least there was

12 some interaction between this tire and the nail.

13 Q   Okay.  Now, to your knowledge, was this tire and nail --

14 were they examined by other experts or forensic labs before

15 they got to you?

16 A   Yes, sir, they were.

17 Q   And do you know how many labs or where it went before the

18 FBI deliver --

19 A   To my knowledge, it went to a lab called STL.  And then it

20 also went to the Federal Bureau of Investigations Lab in

21 Quantico.

22 Q   Now, in your work -- in your analysis, would you want to,

23 when you're looking at these -- examining these -- the nail and

24 the tire, would you want to know what the status of the nail

25 and the tire were when -- before they were tested?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1  A    Yes, sir.  I would say that's very important,

2  particular -- under this particular case or this particular set

3  of circumstances.  The way that the nail and the tire looked

4  before anybody did anything to it is really important to me as

5  an examiner, to try and determine some sort of -- or facilitate

6  some sort of an opinion as to what happened to this nail in

7  this particular tire.

8  Q    And do you know if it was documented, any of the -- the

9  condition of the nail and the tire or the hole in the tire,

10 from your review of the materials?

11 A    Well, it was (indiscernible) documented.  From what I can

12 ascertain, it wasn't, however, documented the second that it

13 came out of the crate, for instance.  There has been several

14 other tests done to it before it was photo-documented.

15 Q    What was the earliest lab photographs that you may have

16 looked at in -- as part of your review for this case?

17 A    Well, so I received a laboratory report from the STL lab.

18 Q    That was Mr. Bolden, his lab?

19 A    Yes, sir.

20 Q    Okay.

21 A    And in that, we thought they would do photographs.  And so

22 I was sort of (indiscernible) when reading the report and

23 looking at the photographs, and it sort of went from there as

24 to, well, was the -- are these original photographs of the

25 condition received or are these photographs of sometime later,

1  showing that condition.

2  Q   Were you able to look further into that and to check out

3  the -- those photographs?

4  A   Yes, sir.  So we -- I initially asked you to see if we can

5  get the original digital images that were taken.  Those were

6  provided.  And I would -- looked up what we refer to as the

7  metadata.  And the metadata indicated that these photos were

8  taken on the 16th of August 2012, which is --

9  Q   Well, maybe you could explain a little bit how the --

10       MR. SCHRODER:  Objection, Your Honor.  I think we're

11  coming down to this area where I have concerns about.  We're

12  making findings that were not in any of the reports, nothing

13  that we were provided.

14       MR. CURTNER:  Your Honor, this is part of his

15  examination.  In order to look at the materials he was

16  provided, he was able to check the metadata of the photographs

17  and date them, and that's important for part of his analysis.

18       MR. SCHRODER:  Your Honor, I'm not questioning the

19  importance.  I'm questioning the fact that they're trying to

20  sandbag the government by not giving a report of something that

21  was done after the report we were provided.

22       THE COURT:  He can state his understanding of the data

23  of the photographs.

24       MR. CURTNER:  Thank you, Your Honor.

25  BY MR. CURTNER:

SWANEPOEL - DIRECT

1 Q    So how did you -- first of all, what is metadata, Mr.

2 Swanepoel?

3 A    Well, metadata is -- to put it in the simplest form, is

4 data about --

5          MR. SCHRODER:  Oh, and I guess --

6          THE WITNESS:  -- data.

7          MR. SCHRODER:  -- I'd make another objection, Your

8 Honor.  I mean, there's no indication Mr. Swanepoel is a

9 computer expert that's able to determine whether the metadata

10 indicated when photos were taken, when they were copied to a

11 disc --

12          THE COURT:  I understand.

13          MR. SCHRODER:  -- any number of other things.

14          THE COURT:  I've just said he could state his --

15          MR. SCHRODER:  Yeah.

16          THE COURT:  -- opinion as to when they're taken.  We

17 don't have to go into all the other -- he has an impression,

18 right or wrong, as to when they were taken.  He can give you

19 that impression.

20 BY MR. CURTNER:

21 Q    This is something you might do in your lab from time to

22 time, look at photographs and try to find the metadata?

23 A    Yes, sir.  That way, we would do it on -- on a regular

24 basis to see what data was taken and whether that matches with

25 other evidence that we receive.

**SWANEPOEL - DIRECT**

1  Q    And what would you use to do that?

2  A    I -- I beg your pardon, sir?

3  Q    What kind of program, or how would you retrieve that

4  metadata from a photograph?

5  A    So in our lab, I would use Adobe Bridge, and it's actually

6  fairly simple.  You would just open the photograph in Adobe

7  Bridge, you would select it, and the metadata would then

8  subsequently be placed next to the photograph on the screen.

9  Q    Okay.  So could that metadata from the Adobe Bridge tell

10  you what type of camera was used?

11  A    Yes, sir, it would.

12  Q    And in this case did -- were you able to determine what

13  type of camera was used to take these photographs?

14  A    It was a Canon EOS, E-O-S.  And I think it was a Model 1D.

15  I'm not 100-percent sure.  I'll have to check my notes for the

16  exact model.  But it --

17         THE COURT:  This sounds like it's getting beyond his

18  expertise.  I just said he could give you his impression as to

19  when --

20         MR. CURTNER:  Well --

21         THE COURT:  -- they were taken.

22  BY MR. CURTNER:

23  Q    -- do you have an impression when these photos were taken

24  from the metadata that you reviewed?

25  A    Yes, sir.

SWANEPOEL – DIRECT

1 Q    What was that date?

2 A    That was August 16th of 2012.

3 Q    And is that the earliest documentation of this tire and

4 nail from your review?

5 A    Well, the photo documentation, they were obviously -- hand

6 wrote the notes about the documentation.  In my case, that's

7 where the confusion sort of arises.

8 Q    Okay.  Now, can you tell -- could you reach any

9 conclusions about this nail from your review of what you had to

10 work with?

11      MR. SCHRODER:  Again, objection, Your Honor.  This is

12 going to be a conclusion reached that we've had no

13 documentation of, no opportunity to have our experts look at

14 this and comment on.

15      THE COURT:  I don't know.  What's your response to

16 that?

17      MR. CURTNER:  Well, I'm just asking if he's had any

18 conclusions about what he had to review.

19      THE COURT:  I know what you asked him.

20      MR. CURTNER:  Pardon me?

21      THE COURT:  I know what you asked him.  But the

22 question, is it beyond the scope of the report.

23      MR. CURTNER:  No, it's just -- his -- the reason his

24 report says he could not reach these conclusions because he

25 couldn't document -- you know, this evidence was not preserved

1  for him to do a proper examination.

2          MR. SCHRODER:  He can put --

3          THE COURT:  Are we (indiscernible) --

4          MR. SCHRODER:  He can put it -- he can put that in

5  another report, Your Honor.  He had every opportunity to do

6  that.  We provided all the materials to him ahead of trial.

7  And it's the day of the testimony, and we're getting this

8  conclusion that we've never seen before.

9          THE COURT:  See what I do every day?  I mean, do you

10  want to talk more about it up here?

11          MR. CURTNER:  Sure.

12          THE COURT:  Okay.

13      (At sidebar with the Court and counsel)

14          THE COURT:  So what's the question, what's

15  (indiscernible).

16          MR. CURTNER:  Okay, here's the question.  Can he tell

17  if those striations were from the road or from the test that

18  was done at STL.  Or the debris --

19          THE COURT:  What striation?

20          UNIDENTIFIED SPEAKER:  (Indiscernible).

21          MR. CURTNER:  Yeah.  He looked at the nail.  And

22  because you can't tell the initial --

23          THE COURT:  And what's his answer going to be?

24          MR. CURTNER:  He can't tell.  Because he doesn't know

25  what the original condition of the nail was.  So it could have

1  been caused --

2        THE COURT:  Okay, what -- what's the problem --

3        MR. CURTNER:  -- (indiscernible) --

4        THE COURT:  -- with that?  (Indiscernible) --

5        MR. SCHRODER:  It's not in here.  I mean --

6        THE COURT:  All he's saying is --

7        MR. SCHRODER:  All --

8        THE COURT:  -- he can't tell.

9        MR. SCHRODER:  All he's saying -- it says -- he

10  describes the nail, what he sees on it, and that's it.  No

11  conclusions.  And now he's offering a conclusion.

12        THE COURT:  His conclusion is he couldn't tell.  That's

13  all he's saying.

14        MR. SCHRODER:  Well, but the way they're setting up the

15  conclusion is to say could it be from the --

16        MR. CURTNER:  No, (indiscernible) --

17        MR. SCHRODER:  -- test.  That's what they're asking.

18  If they just ask what -- if he can draw any conclusions from

19  the striations, I have no problem with that.

20        THE COURT:  Okay, well, then there's no problem,

21  because that's all you're going to ask.  Right?

22        MR. CURTNER:  Okay, that's all I'll ask.

23        THE COURT:  Okay.

24        MR. CURTNER:  I'm not going to ask him when he got the

25  photos.  Do you remember when you got the photos?

**SWANEPOEL - DIRECT**

 1          UNIDENTIFIED SPEAKER:  The (indiscernible) --

 2          MR. SCHRODER:  We sent them -- 27th of March.

 3          THE COURT:  Okay.  Is everybody happy?

 4          MR. CURTNER:  Yeah.  We're --

 5          THE COURT:  I've ruled, right?

 6          MR. CURTNER:  Yeah.

 7       (End of sidebar)

 8          THE COURT:  Okay.  Keep going.

 9  BY MR. CURTNER:

10  Q    Mr. Swanepoel, when did you receive from the government

11  the real photos of this tire and nail --

12          MR. SCHRODER:  Object to the --

13          MR. CURTNER:  -- the --

14          MR. SCHRODER:  -- "real photos," Your Honor.

15          MR. CURTNER:  The original photos --

16          THE COURT:  The photo --

17          MR. SCHRODER:  We sent them a bunch of photos at the

18  time that we revealed our evidence and revealed our --

19          THE COURT:  Okay.

20          MR. SCHRODER:  -- experts, and that was in October of

21  last year.

22          THE COURT:  Okay.

23  BY MR. CURTNER:

24  Q    And when did you receive the original photos that you

25  could retrieve metadata from?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

**SWANEPOEL - DIRECT**

1  A    I'm not 100-percent sure.  I don't --

2  Q    You want to --

3  A    -- know that I actually made a note of that particular

4  date --

5  Q    Can you --

6  A    -- when those photographs --

7  Q    Can you estimate, was it this year?

8  A    Well, it was definitely after I prepared my initial -- my

9  report.

10  Q    And at the time you received your -- you initial -- your

11  initial report on the nail, could you reach any conclusions

12  about the nail besides what you've told us today?

13  A    No, sir.

14  Q    Okay.  Thank you.

15        THE COURT:  Cross-examination.

16        MR. SCHRODER:  No questions, Your Honor.

17        THE COURT:  Okay.  Thank you, sir.  You're excused.

18        THE WITNESS:  Thank you, Your Honor.

19      (Witness excused)

20        THE COURT:  Well, I think we have to have a break, so I

21  can talk with the attorneys to see what's going on.  Because I

22  think we're getting close to the end, so it's a good break.  Am

23  I right?  Do we need to talk?

24        MR. CURTNER:  Yes.

25        THE COURT:  All right.  Let's stand in recess for 10

1    minutes or so.

2        (Jury not present)

3        THE COURT:  All right, please be seated.  I want to

4    wait till Nancy gets back in.  I think the record is still on,

5    but I want to make sure it is.  Are we still on the record?

6        THE CLERK:  Yes.

7        THE COURT:  Okay.  All right, so my understanding, Mr.

8    Curtner, is that this is the conclusion of your evidence.  Is

9    that right?

10       MR. CURTNER:  Yes.  The defense would rest at this

11   time.

12       THE COURT:  All right.  And, Mr. Wells, it's my

13   understanding you're not going to testify.  Is that right?

14       THE DEFENDANT:  That's correct.

15       THE COURT:  Okay.  So based on that, I'll bring the

16   jury back in.  I'll ask Mr. Curtner what his position is.  He

17   can say in front of the jury that the defense rests.  I will

18   then turn to Ms. Loeffler and say, "Do you have any witnesses?"

19   You'll say, "Yes, we have some rebuttal witnesses."  And I'll

20   say, "Okay, we'll do those first thing in the morning."  Or

21   you -- unless you have them right now.

22       MS. LOEFFLER:  No, they're arriving and they're all --

23   be here tonight.

24       THE COURT:  Okay.  Okay.  Okay.

25       MS. LOEFFLER:  Okay.  I just wanted to let you know.

1  We --

2          THE COURT:  That was just a question.

3          MS. LOEFFLER:  -- have them all lined up --

4          THE COURT:  Okay.

5          MS. LOEFFLER:  -- physically all here.

6          THE COURT:  I got you.  And so then we'll start

7  tomorrow at 8:30.  We'll probably just go -- roughly --

8  probably be done by noon tomorrow.  I'm just going to tell the

9  jury this.  Then we'll spend the -- the jury instructions are

10 going to be simple, because I've already got the packet.  I've

11 got no objections from the government.  I've got minor, minor

12 objections from the defense.  So we'll -- you know, I'm on top

13 of the jury instructions, unless I hear more from --

14         MR. SCHRODER:  We might have a couple of minor things,

15 I noticed, Your Honor, that we'll bring up --

16         THE COURT:  Okay.

17         MR. SCHRODER:  -- with you --

18         THE COURT:  Okay.

19         MR. SCHRODER:  -- so --

20         THE COURT:  So we'll discuss those tomorrow.

21         MS. LOEFFLER:  Yeah.  Be great.

22         THE COURT:  And then you'll have all afternoon to get

23 your equipment in order, to get everything squared away.  8:30

24 Thursday morning, closing arguments.  Be done by noon.  Pick

25 the alternates, send the matter off to the jury.

1          MS. LOEFFLER:  There -- there's one easy thing, Your
2     Honor, and it may be --
3          THE COURT:  Well, I -- and then --
4          MS. LOEFFLER:  Oh, sorry.
5          THE COURT:  -- surrebuttal if appropriate.
6          MS. LOEFFLER:  Okay.
7          THE COURT:  Okay.  And I -- you know, rebuttal is
8     rebuttal.  With the exception of that one doctor, I'm going to
9     be pretty strict about what's rebuttal and what's not rebuttal.
10         MS. LOEFFLER:  I have -- okay.  And we'll give you the
11    list.
12         THE COURT:  Okay.
13         MS. LOEFFLER:  We'll give you the list.  And this is
14    just my own conservatism.  I know you asked the defendant if it
15    was -- he was deciding not to testify, but I always -- it just
16    makes me feel better when the judge says -- you know, he -- I'm
17    sure he's consulted with eminent counsel and he knows --
18         THE COURT:  You know that --
19         MS. LOEFFLER:  -- he has the right -- I mean --
20         THE COURT:  -- I have told him this --
21         MS. LOEFFLER:  -- it's his decision.
22         THE COURT:  -- at the pretrial conference --
23         MS. LOEFFLER:  Okay.
24         THE COURT:  -- I told him this every single time we've
25    met.  I've done it --

1              MS. LOEFFLER:  Okay.

2              THE COURT:  Federal court, we don't even have to

3      technically do it at all.  State court --

4              MS. LOEFFLER:  I know.  I'm just con --

5              THE COURT:  -- we have to do it twice.  So I've done it

6      about a half-dozen times.

7              MS. LOEFFLER:  Okay.

8              THE COURT:  But to make you happy, I'm going to do it

9      one more time.

10             MS. LOEFFLER:  All right.

11             THE COURT:  Mr. Wells, you understand you have a right

12     to testify.  And you discussed that with your attorney, and

13     it's my understanding you've chosen, after consulting with your

14     attorney, not to testify.  Is that true?

15             THE DEFENDANT:  Yes, Your Honor.

16             MS. LOEFFLER:  Now I'm (indiscernible) -- thank you,

17     Your Honor.

18             THE COURT:  Okay.

19             MS. LOEFFLER:  I'm just very concerned about that.

20             THE COURT:  Well, I understand.  So --

21             MS. LOEFFLER:  Okay.

22             THE COURT:  Okay, I've outlined the procedure.  Any

23     objection to proceeding in that fashion?

24             MR. CURTNER:  No, Your Honor.

25             MR. SCHRODER:  No, Your Honor.

1     THE COURT:  Okay.  Bring them in.

2        (Jury present)

3     THE COURT:  All right, please be seated.  All right,

4  Mr. Curtner, does the defendant have any further witnesses?

5     MR. CURTNER:  No, Your Honor.  At this time, the

6  defense rests.

7     THE COURT:  All right.  Then, Ms. Loeffler, the

8  government have further witnesses?

9     MS. LOEFFLER:  We do, Your Honor.

10    THE COURT:  Okay.  All right.  So here's the status of

11 the situation.  The defense has rested.  So you heard the

12 government's case, you heard the defendant's case.  The

13 government has a right to present some rebuttal.  It's limited,

14 it won't be long.  And that's where we stand.

15    Here's my best estimate.  You get to go home today,

16 okay.  Come back tomorrow at 8:30.  We'll probably be done by

17 noon tomorrow with the evidence.  Guess -- I'm guessing, okay.

18 So then you'll get to go home again.  8:30 Thursday morning,

19 we'll hear closing argument.  And that could go all morning,

20 because each side is given an hour and a half or two to argue

21 the case to the jury.  The process is, you hear first from the

22 government, then you hear from the defendant, and then the

23 government gets, under the rules, a final say, and then we're

24 done.

25    Then we put 12 -- four -- 15 names in our little

1  spindle, wherever Nancy's got it down here.  We give it a crank

2  of a yank, we pick out three names, and those people are the

3  alternates.  They get to go home and catch up on their

4  newspaper reading.  The other 12 stay here and deliberate the

5  remainder of the day.  Friday, come back and deliberate from

6  8:30 to whenever you reach a verdict or until 5 o'clock.  If

7  you don't reach a verdict, come back Monday and continue

8  deliberations.  But you don't break separately for lunch.

9         You order lunch.  That's the good news.  There'll be a

10 menu in there Thursday morning, and you order your lunch and it

11 will be brought to you.  I'm trying to give you a pretty good

12 overview.  I mean, done a -- do you understand what's going on

13 now?  Okay.

14        So we'll stand in recess.  See you tomorrow at 8:30.

15 Don't read the newspaper.  Don't look at TV.  Don't talk to

16 anybody.  Don't let them talk to you.  You got it.  No.  That's

17 right.  And the Internet.

18     (Jury not present)

19        THE COURT:  Okay.  See you at 8:30 tomorrow.  Is there

20 anything you want to talk to me about?  Yeah.

21        MS. LOEFFLER:  When I -- I know you probably want the

22 list just for your own convenience.

23        THE COURT:  Yes.

24        MS. LOEFFLER:  Do you want us to file it under seal so

25 they can -- so you can have a -- I want to -- how -- to know

how to get it to you.  I know how to get it to them.  I can

e --

THE COURT:  I don't care, just as long as it's sitting

on my chair -- I mean on my table tomorrow at 8:30.

MS. LOEFFLER:  Oh, okay, we'll do it that way.

THE COURT:  Okay.

MS. LOEFFLER:  I just want to know what way you wanted

it, Judge.

THE COURT:  Okay.

MS. LOEFFLER:  Okay.

THE CLERK:  All rise.  Matter stands in recess until

8:30 tomorrow.

(Proceedings concluded at 2:17 p.m.)

1                                CERTIFICATE

2     I certify that the foregoing is a correct transcript from the
      electronic sound recording of the proceedings in the above-
3     entitled matter.

4
          s/Teresa K. Combs                        9/15/14
5     Teresa K. Combs, Transcriber        Date

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                            A & T TRANSCRIPTS
                  (720) 384-8078  attrans@sbcglobal.net

1                              **INDEX**

2                                                        FURTHER
             DIRECT   CROSS   REDIRECT   RECROSS   REDIRECT
3
  <span>DEFENDANT'S WITNESSES</span>
4

| | DIRECT | CROSS | REDIRECT | RECROSS | FURTHER REDIRECT |
|---|---|---|---|---|---|
| Gerald B. Richards | 3307 | 3335 | 3341 | | |
| Casey Jones | 3346 | 3353 | 3358 | 3359 | |
| Ryan Miller | 3360 | 3365 | | | |
| Steven Cesar Acosta | 3367 | 3378 | | | |
| Joseph Michael Sturgis | 3384 | | | | |
| Daryl Allison | 3395 | 3402 | 3403 | | |
| Bruce Allan Currie | 3410 | 3441 | 3448 | 3450 | |
| Anthony Pecoraro | 3456 | 3459 | 3462 | | |
| Deatrich Sheffield | | | | 3468 | 3463 |
| Jacovus Michiel Swanepoel | 3470 | | | | |

5
6
7
8
9
10

<span>DEFENDANT'S EXHIBITS</span>                              ADMITTED
11
DE-171   Nailhead, closeup by Mr. Swanepoel            3480

DE-172   Photograph - nailhead                          3485

DE-175   Photograph - nail hole                         3494

DE-176   Photograph - nailhead, microscope             3483

DE-178   Photograph - magnified nailhead               3484

DE-193   Screen prints of video - 4/12/12, 3 a.m.,
         on COMMSTA T2                                  3467

DE-194   Video - 4/12/12, 3 a.m., COMMSTA T2           3465

DE-202B Photograph - tire                              3426

DE-202C Photograph - tire nail hole                   3431

DE-202E Photograph - tire with paper clip             3433

DE-202F Photograph                                     3436

DE-202G Photograph - nail                             3438

DE-204   Photograph - tire                            3397

DE-205   Photograph - tire                            3399
12
13
14
15
16
17
18
19
20
21
22
23
24
25

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1                         **INDEX,** (Continued)

2    DEFENDANT'S EXHIBITS                                    ADMITTED

3    DE-208   Photograph – diagram, diving search, Buskin
              River (page 158 only)                          3393
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

UNITED STATES OF AMERICA    )    Case 3:13-cr-00008-RRB
                            )
        Plaintiff,          )    Anchorage, Alaska
                            )    Wednesday, April 23, 2014
    vs.                     )    8:40 o'clock a.m.
                            )
JAMES MICHAEL WELLS,        )
                            )
        Defendant.          )
_____)    **TRIAL BY JURY – DAY 17**

**TRANSCRIPT OF PROCEEDINGS**

BEFORE THE HONORABLE RALPH R. BEISTLINE
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:     KAREN L. LOEFFLER
                       U.S. Attorney
                       BRYAN SCHRODER
                       KATHLEEN ANN DUIGNAN
                       Assistant U.S. Attorneys
                       Office of the U.S. Attorney
                       222 West 7th Avenue, #9, Room 253
                       Anchorage, Alaska  99513-7567
                       (907) 271-5071

For the Defendant:     F. RICHARD CURTNER
                       Federal Defender
                       Office of the Federal Public Defender
                       601 West 5th Avenue, Suite 800
                       Anchorage, Alaska  99501
                       (907) 646-3400

                       PETER OFFENBECHER
                       Skellenger Bender, P.S.
                       1301 5th Avenue, Suite 3401
                       Seattle, Washington  98101-2605
                       (206) 623-6501

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1 APPEARANCES (Continued):

2 Court Recorder:          NANCY LEALAISALANOA
                          U.S. District Court
3                         222 West 7th Avenue, #4, Room 229
                          Anchorage, Alaska  99513-7564
4                         (907) 677-6111

5 Transcription Service:   A & T Transcripts
                          6299 West 111th Avenue
6                         Westminster, Colorado  80020
                          (720) 384-8078
7

8 Proceedings recorded by electronic sound recording; transcript
produced by transcription service.
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      ANCHORAGE, ALASKA - WEDNESDAY, APRIL 23, 2014

2

3      (Call to Order of the Court at 8:40 a.m.)

4      (Defendant present; jury not present)

5           THE CLERK:  His Honor the Court, the United States

6  District Court for the District of Alaska is now in session,

7  with the Honorable Ralph R. Beistline presiding.  Please be

8  seated.

9           THE COURT:  Okay.  Do we have a technical problem?  Is

10 that the issue?

11          MR. MCGEE:  Yes, sir.

12          THE COURT:  Do we need the screen for the first few

13 witnesses?

14          MS. LOEFFLER:  Not for number 1 and -- do you need it

15 for number 2?

16          MS. DUIGNAN:  No.

17          MS. LOEFFLER:  Not for number 2.

18          MS. DUIGNAN:  Not for number 3 either.

19          MS. LOEFFLER:  Not for number 3.

20          MS. DUIGNAN:  We need it for 4.

21          MS. LOEFFLER:  We need it for 4.

22          THE COURT:  Okay.  Well, let's work on for -- I don't

23 want to keep the jury waiting all day.

24          MR. OFFENBECHER:  Your Honor, I have a brief matter we

25 can take up --

1        THE COURT:  Yes.

2        MR. OFFENBECHER:  -- before the technical one, if --

3        THE COURT:  Yes.

4        MR. OFFENBECHER:  -- you want to.

5        THE COURT:  Okay.

6        MR. OFFENBECHER:  Want me to just do it from here?

7        THE COURT:  Yes.  Oh, yeah, that's fine.

8        MR. OFFENBECHER:  Your Honor, we're going to ask this

9    morning, in the alternative, to reopen for just about 10

10   minutes' worth of testimony that we forgot to put on yesterday.

11   And there has been no -- nothing in the intervening time.  And,

12   in the alternative, I think there's a friendly amendment that

13   all of the testimony that we would elicit would be from

14   witnesses that the government is going to call anyway, and so

15   we could simply ask them the 10 minutes' worth of questions on

16   cross-examination.  They might -- I don't know what the

17   testimony's going to be, so it might be beyond the scope of the

18   direct.  And so, out of an excess of caution --

19       THE COURT:  Okay.  Well, doesn't that solve the problem

20   if I just give you a little bit of leeway in cross-examination?

21       MR. OFFENBECHER:  Yeah, I think it does.

22       THE COURT:  Okay.

23       MS. LOEFFLER:  Well, the alternative is they can just

24   go first.  Call whoever you want, and -- I mean, I don't have a

25   problem with you doing that.

1              THE COURT:  Okay.

2              MR. OFFENBECHER:  I think it'd be more expeditious to

3    do it the other way, but I'm open either way.

4              THE COURT:  Well, let's see.  No more secrets, so let's

5    find out who these are.

6              MR. OFFENBECHER:  Sure, Your Honor.  Here's the proper

7    testimony.

8              THE COURT:  Okay.

9              MR. OFFENBECHER:  Mrs. Belisle, it looks like she's

10   going to be called as a witness.  I'm not sure what the topic

11   will be.  But I'm going to ask Mrs. Belisle, who's present in

12   court right now, just whether she knew whether her daughter

13   Hannah knew Mr. Barnum.  And depending on the answer to that

14   question, I may call Mr. Allison about his representations to

15   Hannah that Nicola Belisle had told him that she -- that Hannah

16   did know Barnum.  And -- so I expect that to be, like, 10

17   minutes of testimony.

18             MS. LOEFFLER:  Your Honor, I think the Barnum stuff has

19   to be outside the presence of the jury.  Let's do the proffer.

20   I mean, we -- you've ruled on this again and again.

21             MR. OFFENBECHER:  Well, that's fine.

22             MS. LOEFFLER:  And I don't -- and that --

23             MR. OFFENBECHER:  I'm fine with that, Your Honor.

24             MS. LOEFFLER:  That's -- I -- that's what I would like

25   about that.

1          MR. OFFENBECHER:  Yeah.  I have no objection to that.

2          MS. LOEFFLER:  Okay.

3          THE COURT:  Okay.  You want to take care of that right

4   now?  She's --

5          MS. LOEFFLER:  Why don't we take care of that right

6   now, because --

7          THE COURT:  Okay.

8          MS. LOEFFLER:  -- and then we'll bring the jury in and

9   we won't be doing something outside the presence.

10         THE COURT:  Okay.  Somehow, Ruth, I left my witness

11   lists on the -- somewhere in the other -- list of witnesses.

12         MR. CURTNER:  And, Judge, just before --

13         MS. LOEFFLER:  Yeah, Judge, I think we handed you --

14         THE COURT:  I know.  She's getting it.

15         MS. LOEFFLER:  And just so everybody knows, the list

16   we're giving you is not in order, because all of our copiers

17   apparently were sequestered, and none of them work.  So we

18   can't print anything this morning.

19         THE COURT:  Okay.

20         MS. LOEFFLER:  So it's a list, but this isn't the order

21   we're calling them in.

22         MR. CURTNER:  Okay, and, Judge, I would like to address

23   some of the witnesses on the list I have before they come in.

24   I don't think it's proper rebuttal evidence.  And at some point

25   I just want to make -- address the Court on those.  About five

1  witnesses.

2       MS. LOEFFLER:  Well, let's take it up now.

3       MS. DUIGNAN:  Yes.

4       MR. CURTNER:  Yeah.  Okay, Judge, Dr. Gan was our

5  witness.  And, as I see in the government exhibit I received

6  this morning, covers treatment or -- of VA records going back

7  months.  And I think that's really -- would have been for

8  cross-examination.  That's not rebuttal, to call our witness.

9  And I don't think rebuttal means a do-over on cross-

10 examination.  So I don't think Dr. Gan is a rebuttal witness.

11      MS. DUIGNAN:  Your Honor, if I may respond to that.

12      THE COURT:  Yes.

13      MS. DUIGNAN:  The defense on their case put in evidence

14 of the fact that Mr. Wells allegedly had diarrhea as a symptom

15 of his gallbladder disease, I believe through Mr. Pletnikoff.

16 And I believe the government is entitled to rebut that.

17      MR. CURTNER:  Well, Your Honor, Dr. Gan testified.  She

18 testified to what she knows.  And I don't see how doing a

19 cross-examination of her would be rebuttal.

20      MS. DUIGNAN:  It -- it's not a cro -- Your Honor, all I

21 intend to do is introduce the records, especially the one that

22 the jury member wanted to have from April 2nd, to show the

23 visits as well as to show the lack of symptoms that Mr.

24 Pletnikoff testified to.

25      MR. CURTNER:  And that was the one question, what the

1 date was. If the government wanted to just introduce -- VA

2 record for April 2nd, I wouldn't have any objections to that.

3      MS. DUIGNAN: Your Honor, I would like to say, though,

4 on their examination of Mr. Pletnikoff, they put in more

5 evidence than just that one day. They talked about the entire

6 time that Mr. Wells had gallbladder disease, and we're entitled

7 to rebut that.

8      THE COURT: Okay, briefly. You can rebut it briefly.

9 Okay, next.

10      MR. CURTNER: Then Mr. Skonberg and Mr. Williamson are

11 employees at Island Air. I don't remember us presenting any

12 evidence about Island Air, and I don't think they're proper

13 rebuttal witnesses.

14      MS. LOEFFLER: Your Honor, if I may on that,

15 (indiscernible) --

16      MR. CURTNER: Or Servant Air.

17      MS. LOEFFLER: It's Servant Air. And I have a brief on

18 that, because I thought they might bring it up, but I didn't

19 know that they -- if they were going to. So we're about to go

20 file it. I have a copy for everybody on that and I will argue

21 it. If I can hand it to everybody.

22      THE COURT: Hand it to everybody.

23      MR. CURTNER: And then, finally, Your Honor, Carsten

24 Stoeckler and Chris Stoeckler I don't think are proper rebuttal

25 witnesses. There was some testimony about some relationship

1 between Mrs. Hopkins and Carsten Stoeckler, but I don't see

2 where that's proper rebuttal evidence.  She admitted the

3 relationship, so I don't think there's anything to rebut.

4      (Side conversation)

5          MS. LOEFFLER:  We're probably not going to call them,

6 but -- and the other thing is, they called Debby Hopkins.  I

7 don't know how they can say it's not rebuttal to something that

8 they put on.  But we're probably not going to call them.  We're

9 just -- you know, have them on the list and they're ready to

10 go --

11          THE COURT:  Okay, well --

12          MS. LOEFFLER:  -- in case there's something that comes

13 up, but --

14          THE COURT:  I'm going to --

15          MS. LOEFFLER:  -- if they call Debby, I don't think

16 how -- they could say it's not rebuttal to somebody they

17 called.

18          MR. OFFENBECHER:  Because it's not rebuttal to what she

19 said.  She admitted it.

20          THE COURT:  So, anyhow, when I saw the names, I

21 wondered what they were going to be called for.  And we'll just

22 wait and see.  Have to do it outside the presence of the jury

23 initially to see if it's rebuttal.

24          MS. LOEFFLER:  And do you want me to address Skonberg

25 and Tim Williamson?

1          MR. OFFENBECHER:  Could we have just a minute to read

2     the memorandum that --

3          THE COURT:  Sure.

4          MR. OFFENBECHER:  -- we were handed?

5          THE COURT:  Go ahead.

6          MS. LOEFFLER:  Okay.

7       (Pause)

8          THE COURT:  We're about done, I think.  You can tell

9     them we're getting close, we're just about done.  We're fixing

10    the overhead.  Is it fixed, by the way?

11         MR. MCGEE:  The turning left and right are working, but

12    the document camera's not working now.

13         THE COURT:  Okay.  Are you working on that?

14         MR. MCGEE:  Yes, sir.

15         THE COURT:  Okay.  And we can go off the record, Nancy,

16    if we're --

17         THE CLERK:  Okay.  Off record.

18       (Off record at 8:49 a.m.; on record at 8:53 a.m.)

19       (Jury not present)

20         THE CLERK:  On record.

21         THE COURT:  Yes.

22         MR. CURTNER:  Since we have a minute, there's two

23    exhibits that we had to redact --

24         THE COURT:  Okay.

25         MR. CURTNER:  -- that I think were admitted.  And I

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1    just want to make sure the redacted versions are --

2              THE COURT:  Good.  Very well.

3              MR. CURTNER:  -- in evidence.  This is the newspaper

4    article, now -- this is the redacted version.  And it's going

5    to be Defense Exhibit 032.

6              THE COURT:  Very good.  Very well.

7              MR. CURTNER:  And then we also had a list of

8    automobiles, and we redacted any personal identification --

9              THE COURT:  Okay.

10             MR. CURTNER:  -- information, and that would now --

11   it's Defense Exhibit 159R.

12             THE COURT:  Okay.  Very well.  With those redacted

13   actions, they can be admitted.

14        (Defendant's Exhibit DE-159R admitted)

15             THE COURT:  Okay.  I under -- I know -- we've -- I've

16   had a chance to review the briefing.  The government's plans

17   now are to present -- what's the first witness you plan -- oh,

18   did -- oh, we were going to take care of Ms. Belisle first,

19   right?

20             MS. LOEFFLER:  I was going to put her on first, but

21   apparently they want to reopen their case and put her on for

22   something else.  I'm --

23             THE COURT:  Okay.

24             MS. LOEFFLER:  -- simply putting her on to -- and

25   I'll -- to say where Hannah was the night of -- before her

1  father was murdered.

2        THE COURT:  Okay.

3        MS. LOEFFLER:  That's the only thing I was putting her

4  on for.

5        THE COURT:  But they wanted to ask a question about Mr.

6  Barnum.

7        MS. LOEFFLER:  And I think that has to be outside the

8  presence --

9        THE COURT:  Right, so --

10        MS. LOEFFLER:  -- of the jury -- okay.

11        THE COURT:  -- let's do it right now.

12        MS. LOEFFLER:  Okay.

13        MR. OFFENBECHER:  Your Honor, at some point can I also

14  address the issues raised in their rebuttal memorandum?

15        THE COURT:  Yeah.  And those aren't -- and those

16  witnesses won't be for a little while, will they?

17        MR. OFFENBECHER:  Okay.  Sure.

18        MS. LOEFFLER:  Let me just look at my order.  Hold on.

19  Sorry, Judge, I have to look to -- back to the -- where'd I put

20  the order.

21        THE COURT:  Okay, we're still -- we're doing --

22        MS. LOEFFLER:  They're witnesses 6 and 7, Your Honor.

23        THE COURT:  So we'll take a break right before we do

24  them.

25        MS. LOEFFLER:  Okay.