BRYAN SCHRODER
United States Attorney

STEVEN E. SKROCKI
Deputy Criminal Chief
CHRISTINA SHERMAN
Assistant U.S. Attorneys

KELLEY STEVENS
Special Assistant U.S. Attorney
Federal Building & U.S. Courthouse
222 West Seventh Avenue, #9, Room 253
Anchorage, Alaska   99513-7567
Phone: (907) 271-5071
Fax: (907) 271-1500
Email:steven.skrocki@usdoj.gov
       christina.sherman@usdoj.gov
       kelley.l.stevens@uscg.mil

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No.   3:13-cr-00008-SLG |
| | ) | |
| JAMES MICHAEL WELLS, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |

**OPPOSITION OF THE UNITED STATES TO DEFENSE MOTION TO SUPPRESS EVIDENCE DERIVED FROM INTERROGATION CONDUCTED IN VIOLATION OF FIFTH AMENDMENT**

The United States submits the following Opposition to the Defense Motion to Suppress Evidence Derived From Interrogation Conducted in Violation of the Fifth Amendment based on *Garrity v. New Jersey*, 385 U.S. 493 (1967). Wells' subjective and unsubstantiated beliefs fail to provide the court with sufficient facts in support of a motion to suppress. Here, the motion fails to provide the court with any critical facts, in the form of an affidavit, declaration or otherwise establishing that a *Garrity* violation occurred. In support of this motion, the United States provides the court with transcripts of Wells' recorded interviews with law enforcement on April 12 and 13th, 2012. It also refers to the evidentiary hearing record, factual findings and conclusions of the magistrate judge and district court in denying Wells' claims of failure to provide Miranda warnings, and voluntariness of his statements. All of this evidence reveals the lack of any facts to support the claim that law enforcement or the Coast Guard threatened the defendant with forfeiture of his employment unless he cooperated with law enforcement. For all of these reasons, the defendant's motion should be denied.

**A. Overview and Procedural History**

As this court knows, on April 12, 2012, Richard Belisle and James Hopkins were murdered in a building known as the Rigger Shop of the United States Coast Guard facility on Kodiak Island, Alaska.[1] By the time their bodies were discovered, most, if not all Coast Guard and civilian employees of the facility, save for Jim Wells, had reported to work for the day. Wells was supposed to have been at work at the time Richard Belisle

---

[1] The 'rigger shop' was also known by the acronym "T-2."

and James Hopkins were murdered; however, he escaped the incident, via incurring a low-pressure tire, and a belatedly-not-until-trial-revealed restroom stop due to a diarrhea episode.

Investigators took reasonable protective measures the day of the murders to ensure the safety of Wells' co-workers. At some level, and by some directive, all employees of the COMMSTA mustered in the T1 building for accountability and so that law enforcement could conduct interviews in order to develop leads, and in order to provide security for the employees inasmuch as the elusive murderer, at that time, remained at-large.

Prior to the first trial, Wells filed a motion to suppress his statements to law enforcement. (Docket 120-121). The United States opposed at Docket 138. A hearing was held on the matter as reflected in Docket 187. Both the Magistrate Judge and the District Court denied the motion to suppress at Dockets 267, and 366, respectively. The facts adduced under oath at the suppression hearing, along with Wells' interviews, form the factual backbone of this opposition.[2]

### B. Facts of Wells' Interviews by Law Enforcement

The United States attaches as Exhibits 1-7, the interviews of pertinent Coast Guard command staff, and Jim Wells' interviews which occurred on April 12th and 13th, 2012. None of the interviews shows any coercion, job loss threats, or other communications

---

[2] By this motion, the United States incorporates the facts and arguments made at Docket 138, insofar as they are of relevant application to this motion under *Garrity*.

U.S. v. Wells
3:13-cr-00008-SLG
Page 3 of 20

Case 3:13-cr-00008-SLG   Document 995   Filed 05/14/19   Page 3 of 20

eluding to threats impacting job security, or an understanding by Wells that he would be fired for not submitting to an interview with law enforcement. Wells makes no mention of this in any of his six interviews, nor do any of the agents make reference to linking cooperation with job retention. In fact, during all of the interviews, the conversation is professional and cordial. Highlights of each interview are provided below:

Exhibit 1 is an interview of by the FBI and USCG investigators with Chief Warrant Officer Scott Reckner, the IT Division Chief of the Communication station, and the direct supervisor of the defendant and the murdered men, Richard Belisle and James Hopkins. There is nothing in this interview where anybody mentions being detained or forced to cooperate as a condition of keeping their jobs or an overarching policy/plan by command staff that compelled individual cooperation at the risk of being fired. Similarly, Docket 187 compels the same conclusion. In the suppression hearing on the *Miranda* issue, Commander Van Ness testified that there were discussions on keeping personnel together and accessible as a whole in the event investigators needed to speak with them. Van Ness did not give any specific instructions to Wells individually. (Docket 187, pgs. 18-20). Those who worked in the rigger shop, including Mr. Wells, were collected in a room in the T1 building as the rigger shop was now a crime scene and off limits. (Id., at pg. 21).[3]

Exhibit 2 is an interview, which begins at 7:21 p.m. with Jim Wells, Special Agent Kirk Oberlander of the FBI, and Sean Bottary, United States Coast Guard.

---

[3] Special Agent Kirk Oberlander's testimony from the suppression hearing can be found at Docket 187, pg. 61-106. The United States incorporates that testimony as well into its opposition.

During the first interview, the agents advised Wells, "obviously you've seen us talking to everybody in the shop. Just trying to get a feel for, you know, what might have happened down there." (Exhibit 2, pg. 3). Early in this first interview, Wells informed the agents, unsolicited, that his schedule was basically 7:00 to 3:30, and "the only reason I wasn't here this morning was at 7:00 was I had a flat tire in my truck". (Ibid). Wells was asked 'where did you get the flat?' To which he responded, "Ah, I don't know, well… What do you mean by where?' (Ibid).

When asked at what point Wells knew he had a flat, he responded several times with not knowing, stating, "shit, I don't know." (Exhibit 2, pg. 8). There is no evidence from this recorded interview that Wells was forced to submit to an interview under penalty of job termination.

Exhibit 3 is the second interview of Wells, which occurred at 8:24 p.m. the day of the murders. During this interview, Wells consented to the search of his truck and his cell phone in writing. (Exhibit 3, pg. 5, pg. 9). He also turned down food when offered. (Exhibit 3, pg. 8). There is no evidence from this recorded interview that Wells was forced to submit to an interview, waive his rights under the 4th Amendment or other rights under penalty of job termination.

Exhibit 4 is Wells' third interview, which began at 9:05 p.m. the day of the murders. During this interview, Wells was advised there were more questions, and that agents wanted to take him home to take care of his diabetes. (Exhibit 4, pg. 1). Wells, declined, and instead wanted to stay and answer more questions. (Ibid). There is no

U.S. v. Wells  Page 5 of 20
3:13-cr-00008-SLG

evidence from this recorded interview that Wells was forced to submit to an interview under penalty of job termination.

Exhibit 5 is a transcript of an interview from 9:22 p.m., April 12, 2012, the last interview of the day. For this interview, Special Agent Angela Strauss was present in order to ask Wells if he shot any firearms that day. The agents advised Wells that it was a question they have 'been asking everybody and we just forgot to ask you.' (Exhibit 5, pg. 1). Wells responded, "no" and consented to having his hands swiped for gun residue.

Exhibit 6 occurs the next day, on April 13, 2012, and begins at 11:25 a.m. Wells begins the interview by asking, "why was my wife interviewed by the FBI?" (Ibid, pg. 1). Wells then asked, "did you guys drive to my house last night?" (Ibid). The agent's responded in the negative. During this interview, Wells was Mirandized by the agents. (Ibid, pgs. 6-9). Wells was also offered a sandwich and water during this interview, which he declined. (Ibid, pgs. 15-16). Wells was asked extensively about his actions the mornings of the murders. When asked about stops he made during the morning prior in detail there is no mention of a stop at Servant Air, or any other stop aside from checking his tire. (Ibid. pgs. 62-74). When asked about the time between video footage capturing Wells going by the base gate camera at 7:15, and the 34 minutes it took for Wells to pass the camera in the other direction, Wells responded, "no, I don't have a reasonable explanation for it," and further adds, "I don't have theory (sic) at the moment." (Ibid, pgs. 71-72). Wells then terminates the interview stating, 'We better terminate this thing.' (Ibid, at 72). When asked if he needed to use the restroom, Wells responded, "Nope."

(Ibid). There is no evidence from this recorded interview that Wells was forced to submit to an interview under penalty of job termination nor did Wells ever state an understanding that his job hinged on cooperation. Similarly, no agent mentioned anything with respect to Wells' job being in jeopardy in the event he refused to cooperate with investigators.

Exhibit 7 is a transcript of the agents affirmatively confronting Wells as the murderer of Richard Belisle and James Hopkins. Once he realizes that, Wells terminates the interview and requests a lawyer. Special Agent Oberlander immediately ends the interview and stops the recording. (Exhibit 7, pgs. 1 and 2). There is no further communication with the defendant, nor any comment or statement by the agents that Wells must cooperate or lose his job.

### C. Facts of Evidentiary Hearing on Motion to Suppress

The following facts are summarized from the evidentiary hearing, which occurred prior to the first trial. The pertinent facts set forth below are from the testimony Peter Van Ness, the USCG Commander at the time, and Special Agent Kirk Oberlander of the FBI. (See, Docket 187, pgs. 64-130). The testimony of both witnesses is provided here as Exhibits 8 (Van Ness) and 9 (SA Oberlander) and provided to the court for ease of reference.

#### 1. Summary of Testimony of Evidentiary Hearing

Most of the crew who worked at COMMSTA Kodiak worked at the main building up the hill, known as T1. The Rigger Shop (T2) was a smaller outpost apart from the

main command. The entire Rigger Shop at T2 was comprised of only eight people. The personnel allowance list for the entire command of COMMSTA Kodiak, inclusive of the Rigger Shop, consisted of 51 total positions. But the Rigger Shop at T2 was physically isolated from the T1 "command building" located nearby. The Rigger Shop was led by a Petty Officer First Class (James Hopkins), who supervised two civilian workers (James Wells and Richard Belisle), a Petty Officer Third Class, and four non-rates.

The one other employee who was supposed to already be working at T2 on the morning of April 12, 2012 at the time of the murders was the defendant, James Wells. Once the first co-workers from T2 arrived and saw the murder scene, they reported the emergency to the watch officers at T1. First responders, and eventually the Alaska State Troopers, arrived that morning to secure the scene. All of these events unfolded quickly and in rapid succession, creating an anxiety-ridden atmosphere. As those who worked at T2 arrived that morning, they were sent up to T1 to muster, because their workplace had transformed into a crime scene. (Docket 187, pg. 23).

That morning, those who began to show up for work at the Rigger Shop, and then later the command staff, were specifically looking for James Wells. This was an obvious and natural reaction in light of the fact that James Wells' two co-workers had just been murdered, he was supposed to have been in the Rigger Shop alongside them working at the time of the murders. James Wells' whereabouts were as of yet unknown. It was unclear to the Coast Guard and investigators at this point, whether Wells was also dead, wounded, or just missing.

Once law enforcement authorities were on scene and had secured the crime scene, the command gathered everyone in a common area of T1 known as the "ET space" for several reasons: (1) to account for everyone assigned to the command; (2) to ensure everyone's safety; (3) to allow law enforcement to begin processing the crime scene; and (4) to gather as much useful and fresh information as early as possible from those assigned to COMMSTA Kodiak. Once Mr. Wells eventually arrived to work later that morning at some time after 8:00 a.m., he was told to muster at T1 – just like everyone else. Wells was not given any specific orders or instructions by Van Ness, nor was he treated differently than anyone else. Wells never expressed any concern about being interviewed, nor did any concern of Wells, if he had any, make it to Van Ness. (Docket 187, pgs. 24-31).

The defendant states that the area around building T1 was enclosed by a fence, with an "electronically operated gate that remained closed from approximately 9:00 a.m. on April 12, 2012, through April 13, 2012, based on the available video feed." Docket 121, pg. 3. There are actually two gates, a vehicle gate and smaller pedestrian gate. The defendant's implication that he was confined in some way by the fence and gate is inaccurate. T1 is a secure facility, as was T2, having a mechanized gate around the parking area, security cameras mounted on the approaches to the building, and locked doors providing restricted access to unauthorized visitors. That protection was even more important on April 12, 2012 when two crewmembers had just been murdered, and the killer was on the loose. The fence and gate do little to hold anyone in but are successful at keeping unauthorized individuals out. (Docket 187, pgs. 11-12).

The apparent security protections around these buildings were known to all who worked there. Anyone working at COMMSTA Kodiak knew how to open the gate to T1 – both to get in and to get out. Anyone inside the gate could leave through the pedestrian gate simply by pressing a button to exit. Moreover, Wells' truck was not parked within the gated fence. It was parked outside of the fence in the crew's parking lot.

Agents from the FBI arrived in Kodiak to assume the investigative lead at approximately 2:30 p.m. A group of T2 workers remained at the T1 building later into the evening to be interviewed, as the investigators split their tasks. Most of the T2 shop stayed at T1 until 9:30 p.m. that evening. None were detained at T1 or any place else that day. All had reported to T1 that morning as part of their duties that day, stayed to assist in the investigation, and for moral support. They were free to come and go for water, food, and restroom breaks. In fact, the command specifically brought in both lunch and dinner to ease logistical difficulties. COMMSTA Kodiak has a vending machine, but no messing or cafeteria facilities. The command tried to make the situation as comfortable as possible at the time for all affected, including Mr. Wells. (Docket 187, pg. 19, 21, 22-23). Van Ness testified that nobody expressed to him any concern about being interviewed nor did he order anyone to submit to an interview. (Docket 187, pgs. 24-25, 26, 27).

When Mr. Wells was interviewed, agents treated him like everyone else. (Ibid at 26). He was interviewed in an office that they used to interview many others. Mr. Wells was seated closest to the door, with the agents facing him furthest from the door. The

agents were dressed in plain clothing and wore jackets that concealed their weapons. The door was closed for all interviews for privacy, because the hallway outside of the office was heavily trafficked and the interview contents would have been known to all had the door remained open. In fact, interviews of all the T2 crewmembers were conducted with the door closed. The door remained unlocked throughout. (Docket 187, pg. 70).

Moreover, the transcripts of Mr. Wells' interviews show that he was offered any needed breaks, including offers of any needed medication or food to ensure his diabetes was addressed. The agents asked questions to ensure his personal and medical needs were being met. (Docket 187, pg. 72). As one example, the first 30-minute interview of the defendant concluded as follows:

**Agent 1:** [. . .] Ah hum, what's your clock for your, your medicine? What are we looking at here?

**Wells:** Hum.

**Agent 1:** Because if for some reason, we're not done, but you still need your medicine.

**Wells:** We'll [sic], I'm going to need to eat something. And the box lunches, don't, aren't, don't do anything for me.

**Agent 2:** What type of food would you need?

**Wells:** Oh, I don't, I don't know. Right now, I haven't. I don't have. I don't have an appetite.

**Agent 2:** Okay.

**Wells:** You know, it's just.

**Agent 1:** Are you okay? I mean.

**Wells:** Yeah. Yeah. I, I'm just had chips today, so. A couple of fruit cups and that's it.

**Agent 2:** Are you on any other medications other than insulin? Or.

**Wells:** Well, yeah.

**Agent 2:** Okay.

**Agent 1:** Anything we need to be concerned about?

**Wells:** No.

Exhibit 2 at pg. 34-35.

Later interviews of Mr. Wells that day display the same level of concern for his health and welfare. Exhibit 4, pg. 1-2. The last interview of Wells that day concluded at 9:30 p.m. and only lasted seven minutes. Exhibit 5. It was a very quick interview to determine whether he had fired a gun recently and gauge his reaction to taking gun residue samples. He was free to leave at any time and expressed no concerns about his health. In fact, he left immediately following that interview.

The last two interviews of Mr. Wells (Exhibits 6 and 7) did not occur until after 9:00 a.m. the next morning. Along with the rest of the employees, the defendant was allowed to go home the evening of April 12, 2012, had the opportunity to take any

U.S. v. Wells  Page 12 of 20
3:13-cr-00008-SLG

needed medication, eat anything necessary for his well-being, and get a good night's sleep. He was allowed to come to work the next day at 9:00 a.m., two hours after the beginning of his normal start time.

At the beginning of the fifth interview, the first one on April 13th, the defendant was read his *Miranda* rights. Exhibit 5. He agreed to speak to the officers and signed a *Miranda* waiver form. Exhibit 6. He spoke to the officers for more than an hour. At the sixth interview, he invoked his right to counsel, and the interview was immediately terminated. Exhibit 7.[4]

### 2. Findings of the Court Below

The district court and magistrate judge concluded that nobody, including Wells was arrested, treated as if they were arrested, nor restrained in their freedom of movement associated with a formal arrest. Docket 267, pg. 27 All of Wells' arguments posed here, an 'interrogation room,' a closed door, two agents, etc., were all ruled upon, in the negative by an extensive 45 page report and recommendation issued by the magistrate judge and adopted by the district court. (See Docket 267, pgs. 15-45, adopted herein by reference).

//

//

---

[4] The United States also adopts the factual findings of the magistrate judge's order denying the motion to suppress as they are applicable to a *Garrity* issue. Here, there was no evidence produced by the defendant to establish any *Garrity* violation, nor any factual evidence recited by the magistrate judge establishing such a violation occurred. If defense would have found any, they would have cited to such. It is of note that the defense motion uses the word, 'ordered' however; there is no factual support anywhere that the defendant was 'ordered' to do anything.

### D. Argument

Wells now argues for the first time, post-appeal, that his statements were given under a threat of dismissal, and should be suppressed under *Garrity v. New Jersey*, 385 U.S. 493 (1967). Despite the substantial record below, Wells provides the court with no declaration, affidavit, regulation, advisement or facts that his continued employment was contingent on being interviewed by law enforcement.

-He provides no USCG regulations prohibiting refusal to comply with authorities or to give written or oral statements;

-He provides no date nor location of when he was previously advised that failure to comply with command orders and USCG regulations could result in disciplinary actions, including removal from federal service;

He cites to nothing in this record uttered by any of the agents compelling him to cooperate, speak with or sign a waiver under penalty of disciplinary action or removal from federal service.

### 1. There is no *Garrity* Violation Here

*Garrity v. New Jersey*, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967), the Supreme Court has delineated a prophylactic rule parallel to that of *Miranda*: The government may not threaten substantially to penalize a person for asserting his Fifth Amendment privilege. *Minnesota v. Murphy*, 465 U.S. 420, 434, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984); *Garrity,* 385 U.S. at 497–98, 87 S.Ct. 616. Where it has threatened to do so, the government has created a "classic penalty situation," and any answers given

by the suspect are "deemed compelled and inadmissible in a criminal prosecution." *Murphy*, 465 U.S. at 435, 104 S.Ct. 1136. *Garrity* explained that the Fifth Amendment right to self-incrimination is violated when public employees are forced to choose between providing unprotected incriminating testimony or losing their jobs. It typically comes into play when a public employee makes an incriminating statement to an internal affairs investigator involuntarily, under threat of being fired should he or she refuse to make the statement. Id. at 497; *Aguilera v. Baca*, 510 F.3d 1161, 1171 (9th Cir.2007). Specifically, the constitutional violation occurs when an employee is forced to waive self-incrimination rights under threat of being fired if he or she declines to answer job-related questions. Id. In *Garrity*, each police officer was warned that "if he refused to answer he would be subject to removal from office." *Garrity*, 385 U.S. at 494 Here, in contrast, the record is utterly devoid of any threats made to Wells by command, vis a vis cooperation or termination.

The *Baca* opinion is illustrative of this issue. In *Baca*, deputies from the Los Angeles County Sheriff's Department were instructed to return to their station at the end of a shift to answer questions about an accusation that deputies had used excessive force. The 9th Circuit found no *Garrity* violation because the "deputies were not compelled to answer the investigator's questions or to waive their immunity from self-incrimination. Indeed, it appears that the deputies were never even asked to waive their immunity." *Id.* at 1172 (emphasis in original). It is important to note there are no facts to suggest that any of the Coast Guard or civilian personnel (like Wells) were ever asked to waive immunity. The waiver of immunity fact appears to be the clear dividing line between triggering or

not triggering *Garrity's* protections. Here, the record is clear; no waiver was suggested or asked.

In *Baca*, sheriff's deputies under investigation had "an affirmative duty to cooperate during [...] an investigation" pursuant to the Sheriff's Department's Manual of Policies and Procedures. *Baca,* 510 F.3d at 1165. The failure of a deputy to cooperate could "subject a deputy to administrative discipline." *Id.* In *Baca*, the commanding officer informed the deputies that "the only way to avoid criminal charges was to 'come forward now,' which they understood to mean to give an immediate and voluntary statement to the ICIB investigators without any protection against later use of such statements against them." *Id*. at 1166. However, "[n]o deputy was asked to waive his or her right against having any statement used against him or her in a later criminal proceeding, and no deputy gave either a compelled or voluntary statement at this time." *Id*. The Ninth Circuit concluded that, "the supervisors did not violate the deputies' Fifth Amendment rights when they were questioned about possible misconduct, given that the deputies were not compelled to answer the investigator's questions or to waive their immunity from self-incrimination." *Id*. at 1172.

Here, the same conclusion must be reached. Wells does not make a claim that he was explicitly threatened with the loss of his job if he invoked the privilege against self-incrimination. At very best, all he can muster is that his command made him available for law enforcement to interview. Indeed, there is nothing in the interview nor in the record to prove Wells was even remotely presented with something resembling a "choice ...

between self-incrimination or job forfeiture." *Garrity*, 385 U.S. at 496. Wells' subjective fears of termination, if there were any, are not sufficient to require suppression under *Garrity*. *See, United States v. Indorato*, 628 F.2d 711, 716 (1st Cir.1980) ("In all of the cases flowing from Garrity there are two common features: (1) the person being investigated is explicitly told that failure to waive his constitutional right against self-incrimination will result in his discharge from public employment ... and (2) there is a statute or municipal ordinance mandating such procedure"). *See, United States v. Seaux* (Dist.Ct. S.D. Calif. 2012).

Wells' beliefs on this issue, if he had any at all, were entirely subjective. He made no waiver, nor was offered one to make. Even with that, while he now claims that there are general Coast Guard manuals or forms – not in the record – that led to a belief – also not in the record – that he would lose his job if he did not cooperate there is no evidence in support of such a claim. Even if that belief were true, it is insufficient. He makes no claim that he was directly compelled to provide a statement or answer questions in this instance, as is necessary under *Baca* and *Garrity*. Indeed, his claim is belied by the facts – he did in fact ask to terminate the interview; the interview was immediately halted, he was not pressured to continue, and he was not disciplined as a result of stopping the interview.

Wells' unsupported claims about his beliefs are one reason the Federal Rules require suppression motions to be litigated pretrial. Neither evidence nor law was presented to the district court, which obviously had no opportunity to even address the

issue.

Even so, none of the cases cited by Wells support his argument in the *Garrity* context. Wells cites *United States v. Saechao,* 418 F.3d 1073, 1077 (9th Cir. 2005) and *Minnesota v. Murphy*, 465 U.S. 420 (1988), and argues that absent an express advisement that the interview is voluntary and refusal to participate will not lead to discipline, "any statements the employee makes are automatically immunized from use in criminal proceedings." Neither *Saechao* nor *Murphy* is a *Garrity* case; both involve probationers who had to answer questions as an express condition of probation. The probationers had been expressly warned that their probation would be revoked if they violated the probation conditions, a direct threat if they failed to cooperate. There was no such direct threat to Wells' employment.

At best, all Wells can argue is a subjective belief of forced cooperation. However, the mere appearance for questioning does not equate for an involuntary, seizure-type incident. As provided *Driebel v. City of Milwaukee*, 298 F.3f 622, 638 (7th Cir. 2002),"[w]e reject the appellant officers' argument that a patrolman is seized, within the meaning of the Fourth Amendment, at the time that he is ordered to report for questioning at a designated, centralized area, such as the headquarters for the internal affairs department (wherever it may be located) or some other suitable location determined by the superior officer." *Driebel* 298 F.3f at 638, citing, *Attreau v. Morris*, 357 F.2d 871, 875 (7th Cir.1966) (Knoch, J., dissenting); *see also United States v. Muegge*, 225 F.3d 1267, 1270 (11th Cir.2000) (per curiam) (no seizure when on-duty civilian Air Force

employee was ordered to report for interview with intelligence officer); and *United States v. Baird*, 851 F.2d 376, 380–82 (D.C.Cir.1988) (same in case involving on-duty Coast Guard officer). Based on the foregoing authorities, merely mustering employees collectively, does not create a *Garrity* violation.

In lieu of distinguishing these authorities, Wells cites to cases concerning themselves with illegal searches and seizures. Wells cites to *United States v. Cuevas-Ceja*, 58 F. Supp.1175, 1186 (D.Ct. Ore.1999) for the proposition that Wells submission to questioning was voluntary, "a burden that is not satisfied by showing a mere submission to a claim of lawful authority." (Docket 984 at 6). *Cuevas-Ceja* was a suppression of evidence and statements case arising from a search of a bus by law enforcement; it has no application in the *Garrity* context. Similarly, *United States v. Hawkins*, 249 F.3d 867-874 (9th Cir. 2001) was a warrantless stop of a vehicle case at a U.S. Air Force base. Finally, *United States v. Shetler*, 665 F.3d 1150, 1157 (9th Cir. 2011) is also of no application as it was a suppression case in a drug matter.

These blanket generalizations concerning suppression do not advance the issue. Here, there are no record cites, no regulations and no evidence to rebut the relaxed and low-key demeanor of the interview, the voluntary nature of it, the utter lack of any threat as to employment status, or any statement by the defendant in the interview that he felt his employment imperiled by refusing to cooperate or answer questions. The magistrate judge's report and recommendation at Docket 267, clearly establishes no *Miranda* violation nor a voluntariness waiver issue. The factual findings, and the transcripts of the

hearing, along with Wells' interviews, provides that the defendant was treated the same as everybody else who was interviewed and there is no evidence anywhere that the defendant was ordered directly to cooperate with investigators and, if he refused, that his employment would be in jeopardy.

## CONCLUSION

*Garrity* is clearly not established here as to fact. Given that lack of evidence, it is not established under the law as well. The defendant's motion to suppress should be denied.

RESPECTFULLY SUBMITTED May 14, 2019, in Anchorage, Alaska.

BRYAN SCHRODER
United States Attorney

s/Steven E. Skrocki
STEVEN E. SKROCKI
Assistant U.S. Attorney
United States of America

## CERTIFICATE OF SERVICE

I hereby certify that on May 14, 2019, a
true and correct copy of the foregoing was
served electronically on:

Counsel of Record

s/ Steven E. Skrocki
Office of the U.S. Attorney