Gary G. Colbath
Assistant Federal Defender
FEDERAL PUBLIC DEFENDER
FOR THE DISTRICT OF ALASKA
425 G Street, Suite 800
Anchorage, Alaska 99501
Phone: (907) 646-3400
Fax: (907) 646-3480
Email: gary_colbath@fd.org

Counsel for Defendant James Michael Wells

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| UNITED STATES OF AMERICA, | Case No. 3:13-cr-00008-SLG |
|---|---|
| Plaintiff, | |
| Vs. | **DEFENDANT'S RESPONSE TO GOVERNMENT'S MOTION TO PRECLUDE TESTIMONY OF DEFENSE EXPERT GREG MCCRARY [980]** |
| JAMES MICHAEL WELLS, | |
| Defendant. | |

Defendant James Michael Wells, through counsel, files this response to Docket No. 980, the government's motion in limine to preclude the testimony of defense expert Greg McCrary.

## I. INTRODUCTION

The government moves to preclude the testimony of expert Greg McCrary asserting that "anticipated testimony runs afoul of Federal Rule of Evidence (Fed.R.Evid.) 702 and 403." For all of the reasons set forth below, the Court should find that McCrary is a well-qualified expert whose opinions are reliable and relevant

to assisting the jury in determining the meaning of key pieces of testimony and evidence that will be presented at trial.

## II. FACTS

The murders of Rich Belisle and Jim Hopkins were discovered just after 7:30 a.m. on the morning of April 12, 2012. Law enforcement was called to the scene and arrived just after the first responders, well before 8:00 a.m. As notification of the incident ran through the Coast Guard chain of command, the rigger shop Chief, Scott Reckner, was notified. Reckner quickly made his way to the area of COMMSTA and the T1/T2 buildings. Upon arrival, he was met almost immediately by the head Alaska State Trooper (AST) on scene, Trooper Dennis Dupras. During this contact, which occurred just outside of the T2 building, Reckner voiced his belief that Jim Wells was responsible for the murders.

In the hours and days following Reckner's first articulation that Wells was responsible, dozens of law enforcement investigators launched an investigation related to the crime. However, from its inception less than an hour following discovery of the victims' bodies, through Jim Wells' arrest some ten months later, the investigation focused solely on Wells as being the only viable suspect. The investigation was limited to only searching for "evidence" that would prove his guilt. Reckner's unfounded belief and constant repetition to everyone he talked with that 'Wells did this' charted the course of the entire investigation.

### III. ARGUMENT & AUTHORITIES

As discussed below, Greg McCrary ("McCrary") is a well-qualified, highly experienced expert whose opinions are both reliable and relevant to this case. The defense contends that, to fulfill the gatekeeping requirements of *Daubert,* the Court should make a preliminary determination on the pleadings that the proffered expert testimony is admissible and allow the government to address further questions regarding the credibility of any such expert testimony through normal cross examination at trial.

Use of an expert at trial is largely determined by Federal Rule of Evidence 702, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, (1999), which widened the use of *Daubert*. The *Daubert* Court changed the previous standard which was set by *Frye v. United States*, 293 F. 1013, (1923) to one which looks at several factors to evaluate the admissibility of an expert's testimony. *Daubert* holds that a court should begin with a Federal Rules of Evidence 104 evaluation of "whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Daubert*, 509 U.S. at 592. In making its initial assessment of expert testimony, the Court should make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93. In this application it is important to remember that

"[m]any factors will bear on the inquiry" and that the Court did not create a "definitive checklist or test." *Id.* at 593.

The *Daubert* court identified a non-exclusive list of several factors the Court should consider in evaluating expert testimony. The first asks whether the theory being used is testable and reliable under the scientific method. *Id.* The second factor identified "is whether the theory or technique has been subjected to peer review and publication . . . ." *Id.* When looking at this factor the judge must not treat it as "a *sine qua non* of admissibility" particularly if the technique is "too particular, too new, or of too limited interest to be published." *Id.* The third evaluation is to consider the method's error rate. *Id.* at 594. Fourth, the Court should look to the "existence and maintenance of standards controlling the techniques operation . . . ." *Id.* Fifth, the Court should consider if there is a "general acceptance . . ." of the theory within the relevant communities. *Id.* (quoting *United States v. Downing*, 735 F.2d 1224, 1238 (1985)).

The Supreme Court further noted that along with not being exclusive, these factors should be applied "flexibl[y]" and should be applied to the "principles and methodology, not on the conclusions that they generate." *Id.* at 594-95. The trial court must, of course, also keep in mind rules other than Federal Rule of Evidence 702, including Rule 703, Rule 706, and Rule 403 in weighing the admissibility of expert testimony. *Id.* at 595.

Subsequent to *Daubert,* the Supreme Court held that the "special obligation upon a trial judge to 'ensure that any and all scientific testimony . . . is not only relevant, but reliable . . .'" applied not "only to 'scientific' testimony [but] to all expert testimony." *Kumho,* 526 U.S. at 147 (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993)). The Court held that it applies to all expert testimony because Federal Rules of Evidence 702 "makes no relevant distinction between 'scientific' knowledge and 'technical' or 'other specialized' knowledge . . . any such knowledge might become the subject of expert testimony." *Id.* The Court noted that the *Daubert* factors are not relevant to every expert, and might not even be used for all scientific experts because they are "meant to be helpful, not definitive." *Id.* at 151. The Court rejected the notion that Federal Rule of Evidence 702 "creates a schematism that segregates expertise by type while mapping certain kinds of questions to certain kinds of experts." *Id.* The main focus is to "ensure the reliability and relevancy of expert testimony . . ." by requiring any expert to use "in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152.

Federal Rule of Evidence 702 guides the Court on factors deemed appropriate for considering the admission of expert testimony. The rule recognizes the wide range of people able to qualify as an expert through their "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. A potential expert is allowed to testify if the four parts of Rule 702 are found to be satisfied. The first requirement is simply

that the expert's knowledge "will help the trier of fact to understand the evidence or to determine a fact in issue . . . ." *Id.* 702(a). The second requirement is that "the testimony be based on sufficient facts or data . . . ." *Id.* 702(b). The third requirement is that "the testimony is the product of reliable principles and methods . . . ." *Id.* 702(c). Finally, the expert must be shown to have "reliably applied the principles and methods to the facts of the case" *Id.* 702(d).

### A. McCrary is a Qualified Expert

To begin with, it is apparent throughout the government's motion that the author understands far too little about the field of criminal investigations and the behavioral sciences underlying such investigations to validly comment on either McCrary's qualifications or report. The defense will endeavor to point out the errors in the government's attack on McCrary's qualifications and science contained in his report while addressing the government's unsubstantiated arguments where appropriate.

McCrary has been involved in violent crime investigations for over 40 years including 25 years as an FBI Agent. In that capacity he investigated violent crimes as a field agent for approximately 17 years and then was promoted and transferred to the FBI Academy in Quantico, Virginia, as a Supervisory Special Agent where he worked in the National Center for the Analysis of Violent Crime (NCAVC). There he was assigned to the operational wing of the Behavioral Science Unit where his primary responsibility was to provide expertise in investigative techniques and crime

scene analysis in violent crime investigations both to FBI field agents as well as to any law enforcement agency around the world that requested FBI assistance.

McCrary has personally investigated over 1,000 homicides nationally and internationally. He has worked with state and federal law enforcement agencies across the United States and foreign law enforcement in more than a dozen other countries. He has testified hundreds of times in both his law enforcement and an expert capacity in state and federal courts. His formal education includes a Bachelor's degree from Ithaca College and a Master of Arts in Psychological Services from Marymount University. He teaches a graduate level course in forensic psychology and criminal justice at Marymount University in Arlington, Virginia, and has done so for over 20 years. McCrary is a contributing author to the FBl's Crime Classification Manual, contributed a chapter to the book Criminal Investigative Failures, and has co-authored an article on stalking. He currently serves on the editorial review board of The Journal of Aggression and Violence. Finally, he has lectured across the country on the causes, impact and avoidance of criminal investigative failures to prosecutors, defense attorneys, coroners, and law enforcement professionals nationally and internationally.

The government's assertion that McCrary's "fields of expertise clearly involve police practices, but not the complex social and/or psychological science surrounding cognitive biases, including 'tunnel vision,' 'confirmation bias,' 'anchor traps,' and 'groupthink,'" is wholly belied by McCrary's education, training and vast experience

as is more fully contained in his CV, which is filed with this response as Exhibit A.

Specifically to the government's point, as noted above, McCrary has taught a graduate level course in the Forensic and Legal Psychology program at Marymount University in Arlington, Virginia, for 20 years. A block of that coursework deals specifically with *defining cognitive biases* and analyzing how they impact decision making in criminal investigations. A partial listing of recent highlights related to this area that McCrary has been involved with includes:

> August 29-31, 2018 – Center for American and Internal Law - Criminal Investigative Failures, Impact, Recognition and Avoidance;
>
> August 7, 2018 Collin County Texas District Attorney's Office –Criminal Investigative Failures, Impact, Recognition and Avoidance;
>
> June 4-5, 2018 University of Virginia Law School; ILPPP Presentation of False Confessions;
>
> April 9-10, 2018 – Center for American and International Law, Plano Texas, Establishing Innocence or Guilt: The Reliability of Convictions;
>
> April 4, 2018 – Texas State University, Department of geospatial intelligence and criminal justice, San Marco, Texas – Crime analysis;
>
> October 30, 2017 – Pennsylvania State Coroner's Association – Equivocal death and investigative failures;
>
> July 24-27, 2017 – NIST/FBI International Forensic Science Error Management Symposium, Gaithersburg, MD – Criminal Investigative Failures, Recognition, voidance and Impact;
>
> October 4th and 6th, 2016 - Stockholm, Sweden, Swedish Police Authority (Polisen) Cognitive Biases; Noble Cause Corruption and Investigative Failures;
>
> June 16, 2016 – International Criminal Investigative Analysis Fellowship

(ICIAF): FBI Academy, Quantico, VA: Cognitive Biases; Noble Cause Corruption and Investigative Failures;

May 13-14, 2016 – International Academy of Investigative Psychology, New York City, Cognitive Biases; Noble Cause Corruption and Investigative Failures;

November 3-6, 2014 Smokey Mountain Law Enforcement Conf., Gatlinburg, TN;

September 19, 2014 – Law Enforcement Conference at DeSales University, Pennsylvania;

March 7-8, 2014 -- Training for homicide investigators from the Massachusetts State Police, Boston Police and prosecutors from the Suffolk County, Mass. District Attorneys' Office re Best Practices for investigations;

August 1, 2012 College and University Police and Investigators Conference CUPIC) Fairfax, VA. – Criminal Investigative Analysis and Failures;
October 29, 2012, Elon University, Elon, N.C. Criminal Investigative Analysis and Failures;

June 29, 2012 American Professional Association on Abuse of Children (APSAC) – 20th Annual Colloquium; Chicago, Illinois – Criminal Investigative Analysis and Failures;
February 27, 2014 – Institute of Law, Psychiatry and Public Policy, University of Virginia, Juveniles in the Criminal Justice System: Best Investigative Practices;

Indeed, McCrary has taught graduate level material on the very topics the government asserts he is not qualified to offer an opinion on to law enforcement, lawyers from DOJ, college students, and countless others. Clearly, he was considered an expert by DOJ in these fields when employed at the FBI, and his breadth of knowledge and experience has cemented his position as one of the foremost experts in this country. The law is clear that "in considering the admissibility of testimony

based on some 'other specialized knowledge,' Rule 702 generally is construed liberally." *United States v. Hankey*, 203 F.3d 1160, 1168 (9th Cir. 2000) citing, *United States v. Ramsey*, 165 F.3d 980, 984 (D.C.Cir.1999) (admission of opinion testimony, given by agent of Drug Enforcement Administration regarding drug trade was not plainly erroneous; while agent was not formally qualified as expert, agent described his qualifications, including his specialized knowledge, education, skill and experience, before giving testimony). Here, McCrary's specialized knowledge, education, skill, and experience gained in over 40 years of work highly qualify him to give the testimony proffered.

### B. McCrary's Opinions are Reliable & Based on Relevant Methods

Next, the government argues in conclusory fashion that "[w]hile Mr. McCrary may have the knowledge, skill, experience, or education to testify on matters of methods for conducting violent crime investigations, including best practices, this Court should prohibit assertions that stray into the psychological and social science fields of expertise, including discussion related, but not limited to, 'tunnel vision,' 'confirmation bias', 'anchor traps', and 'groupthink.'" Contrary to the government's assertion, pages two through five of McCrary's report precisely detail the literature and methodological studies upon which McCrary relies, not only for the training and teaching he regularly performs, but also as foundation for his opinions offered here. The government fails to cite to any contrary authorities or critique any specific reference or body of work relied on by McCrary. The law fully supports that an

*United States v. James Michael Wells*
Case No. 3:13-cr-00008-SLG                                                                                      Page 10

expert's testimony may be "based not upon 'scientific' knowledge, but rather upon 'technical' or 'other specialized knowledge." *Kumho*, 119 S.Ct. at 1173-74, (citations omitted.)

### C. McCrary's Opinions are Reliable

The paragraphs below will address the numerous factual errors and misstatements made in the government's motion designed to somehow disqualify McCrary, or alter the nature of his proffered testimony as an expert witness in this case.

To begin with, as explained above, and in McCrary's report on pages two through five, the concepts identified by the government as material reaching beyond McCrary's area of expertise have been much studied, quantified, and tested. Moreover, the research regarding these phenomena have been extensively peer tested and reviewed. The government fails to cite a single authority that indicates otherwise. Moreover, the government fails to cite any cases, binding or otherwise, that preclude admission of testimony regarding these topics by way of an expert.

The jury in this case will hear extensive evidence from the government about law enforcement's investigation of Jim Wells. It will be firmly established that Wells was identified almost immediately following the murders as the primary suspect and that the investigation never had another focus. Evidence will show that a number of law enforcement agencies worked together sharing common information but with a group focus and purpose – to convict Jim Wells. Finally, evidence will show that

investigators went to extreme lengths to try to find or produce evidence to use against Wells, while at the same time ignoring contradictory and even exculpatory evidence.

McCrary's testimony will first help the jury understand what a proper police murder investigation looks like and what necessary protocol and procedures should be followed. Second, the testimony will help the jury understand why and how mistakes are made and what some of the common subtle traps and hazards are that can make the process go awry. Third, the testimony assist the jury in understanding the areas of cognitive biases, probability errors and organization traps to assist them in evaluating the large volume of evidence presented about the massive investigation that took place in this case.

Oddly enough, the government complains that McCrary "has made no analysis and rendered no opinion related to the facts of the instant case." Ironically, if he had, the government would have surely argued, as it has in its other expert challenges, that McCrary either not qualified to do so, or has misapplied the facts, or has somehow failed to consider everything necessary to offer such opinions. The government's suggestion that McCrary is unable to pin point specific facts that would fit into his methodology and lend support to any defense argument that the investigators and experts in this case fell victim to "tunnel vision", "anchor traps", "confirmation bias", or "group think" could not be farther from the mark. McCrary's testimony is offered precisely to assist the jury in making its own determination of that very argument which the defense fully intends to make.

*United States v. James Michael Wells*
Case No. 3:13-cr-00008-SLG    Page 12

There is obviously more than one way to use expert testimony and how a party chooses to do so matters not to the Court's determination regarding admissibility. "Under settled evidence law, an expert may express an opinion that is based on facts that the expert assumes, but does not know, to be true. It is then up to the party who calls the expert to introduce other evidence establishing the facts assumed by the expert. While it was once the practice for an expert who based an opinion on assumed facts to testify in the form of an answer to a hypothetical question, modern practice does not demand this formality and, in appropriate cases, permits an expert to explain the facts on which his or her opinion is based without testifying to the truth of those facts." *Williams v. Illinois*, 132 U.S. 2221, 2228 (2012) citing Fed. Rule Evid. 703.

"It is well established that an expert may answer questions based on facts offered in the form of a hypothetical question." *See, Smolen v. Chater*, 80 F.3d 1273, 1288 (9th Cir.1996) ("[T]he use of leading, hypothetical questions to elicit expert opinions is entirely appropriate.") (citing Fed.R.Evid. 703); *see also*, *Estate of Carey by Carey v. Hy–Temp Mfg., Inc.*, 929 F.2d 1229, 1235 n. 2 (9th Cir.1991) ("[E]xpert witnesses may be competent to give opinions based upon hypothetical facts even though a foundation that the expert has personal knowledge of those facts has not been laid.") (citing Fed.R.Evid. 703). So long as evidence is presented that supports a foundation for the topics McCrary's testimony discusses, the concepts are relevant, beyond the understanding of the average jury, and the proper subject of expert

*United States v. James Michael Wells*
Case No. 3:13-cr-00008-SLG                                                                                          Page 13

Case 3:13-cr-00008-SLG   Document 1002   Filed 05/16/19   Page 13 of 19

testimony. Because McCrary is qualified to testify about these reliable, well established methods of critiquing a murder investigation, his testimony is admissible to help the jury understand those well-studied concepts. The government cites no authority that requires McCrary to apply the methods to this particular case, although it would certainly be permissible for him to do so.

To the extent the government might complain about this manner of expert testimony or the use of such hypotheticals, "[the prosecution] can, through cross-examination, expose to the jury the asserted deficiencies of the hypothetical question as asked. It is for this reason that it is usually held that defects in such a question go not to the *competency of the evidence*, but merely affect its weight." *Standard Oil Co. of Cal. v. Moore*, 251 F.2d 188, 220 (9th Cir.1958) (emphasis added) (citations omitted). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert,* 509 U.S. at 596. The jury will be free to apply or disregard, as it sees fit, McCrary's opinions and the defense argument derived from them, to instead credit the government's attacks on the opinions and any hypotheticals on which it is based. That process is the appropriate means through which this testimony should be assessed. The government's arguments here go to weight, not admissibility.

Finally, the government's suggestion that the defense owes it a supplemental report or some other form of discovery relative to McCrary's testimony is unfounded.

Again, the government cites no authority for their assertion, nor is it based on factual support in the record. Consistent with its notice to date, the defense has proffered McCrary as an expert to assist the jury in understanding proper police investigation methods for murder investigations and to identify particular means of how such investigations may fail. That is the limit of the proffer from the defense, for which a full report has been provided. Of course, at the time McCrary testifies, considerable evidence will have been presented at trial and McCrary may properly be asked to answer hypothetical questions regarding circumstances analogous to the investigation, provided that the questions are based on facts supported by evidence in the record at the time he testifies. *See* generally, Rule 703, *Smolen*, 80 F.3d at 1288.

### D. McCrary's Testimony is Relevant Here

This case involves a double homicide that led to a massive law enforcement investigation of Jim Wells. However, a criminal complaint against Wells was not filed until ten months after the event, despite the immediate discovery of the victims following their deaths, the immediate identification by Well's supervisor of Wells as the lone suspect and the intense focus of law enforcement on proving the same. McCrary has personally investigated over 1,000 homicide cases. More significantly, he has trained thousands of law enforcement officers, including government expert Robert Morton, on proper investigation techniques and common mistakes to avoid in doing such work.

The evidence will show at trial and the defense will argue to the jury that Wells arrest was the result of an improper police investigation riddled with mistakes and errors commonly made by law enforcement. The jury will need to evaluate the testimony offered and actions taken by numerous law enforcement and government expert witnesses who will testify at trial. McCrary's testimony is directly on point and relevant to all such testimony. Indeed, it has been found appropriate in a similar context by the Seventh Circuit Court of Appeals. McCrary's testimony regarding "about reasonable investigative procedures and ways in which evidence from other witnesses did or did not indicate departures from those reasonable procedures" was upheld by the court affirming the plaintiff's award and verdict in a federal tort claim action. *Jimenez v. City of Chicago,* 732 F.3d 710, 719 (7th Cir. 2013).

The government cites *United States v. Dotson*, 799 F.2d 189, 192–93 (5th Cir.1986) as support for its position that McCrary's opinion is not relevant. *Dotson* actually supports <u>admission</u> of McCrary's testimony. In *Dotson*, the Fifth Circuit reversed Dotson's convictions for firearms possession, finding that the district court erred in allowing <u>government agents</u> to testify as to their opinions of the truth and veracity of Dotson and Dotson's witnesses without offering an adequate predicate upon which they based their opinions. *Id.* at 190. In discussing the propriety of the opinion (not expert) testimony however, the court noted "we do not hold that government agents may not ever express opinion about witnesses in their cases. They may do so on the same basis as any other witness. . . . The error as to the others lay

in admitting, over objection, opinion proof without predicate facts showing its reliability and helpfulness." *Id.* at 194.

Here, McCrary's opinions will not be offered to judge the credibility of other witnesses. *See*, *Jimenez*, *supra*. Instead, his opinions are limited to those reliable, well established concepts that underlie proper police investigations and pitfalls with the same. Both the government and the defense will ask the jury to judge the propriety of the fruits of the massive investigation done to substantiate the charges contained in the indictment here and whether such evidence supports any findings of guilt beyond a reasonable doubt. McCrary's testimony is highly relevant to evaluation of that investigation and the "evidence" derived from it and will greatly assist the jury in making its evaluation. This is exactly the opposite from the situation in *Dotson* in which testimony was admitted without predicate facts showing its reliability and helpfulness.

The government also argues support from *General Electric v. Joiner*, 118 S.Ct. 512 (1997). However, *Joiner* is inapposite to the case here. In *Joiner*, the Court found that the trial judge "conclude[d] that the studies upon which the experts relied were not sufficient, whether individually or in combination, to support their conclusions that Joiner's exposure to PCB's contributed to his cancer, [consequently] the District Court did not abuse its discretion in excluding their testimony." *Id.* at 519. Here however, the government does not argue that McCrary's opinions are based on improper studies, or research, or experience, its argument for exclusion is

that the opinions are sufficiently related to the facts of the case. This was not a requirement found by the Court in *Joiner* nor is it consistent with the holding of the case. The government cites no authority, because none exists, that says the Court cannot admit reliable expert testimony relevant to matters at issue at trial that will assist the jury in evaluating other testimony and evidence before it. That is the precise basis upon which McCrary's testimony is offered and his testimony is based on reliable, well-founded, peer-tested and reviewed research, studies and materials which supplement his 40 years of criminal investigation experience and teaching.

## IV. CONCLUSION

Any reasonable review of McCrary's qualifications and report demonstrates that he is a qualified expert in his field and that the materials underlying his opinions are reliable and his methodology in formulating his opinions here is sound. This results in reliable conclusions that will be helpful to the jury in determining the meaning and credibility of various testimony and evidence presented at trial. The Court can also see that McCrary's testimony will be helpful to the jury by assisting them in determining the propriety of the police investigation done in this case and the evidence derived therefrom as presented through dozens of witnesses from both sides at trial. McCrary's highly relevant testimony should be admitted.

WHEREFORE, Wells respectfully urges that the government's motion to preclude the testimony of Greg McCrary under Fed. R. Evid. 702 be denied, without need for a hearing.

DATED at Anchorage, Alaska this 10th day of May, 2019.

Respectfully submitted,

*/s/ Gary G. Colbath*
Gary G. Colbath
Assistant Federal Defender

*/s/ Peter A. Camiel*
Peter A. Camiel WSBA 12596
Attorney for Defendant

*Attorneys for James Michael Wells*

Certificate of Service:
I hereby certify that I electronically filed the foregoing and any attachments with the Clerk of Court for the United States District Court for the District of Alaska by using the district's CM/ECF system on May 16, 2019. All participants in this case are registered CM/ECF users and will be served by the district's CM/ECF system.
*/s/ Gary G. Colbath*