Gary G. Colbath
Assistant Federal Defender
FEDERAL PUBLIC DEFENDER
FOR THE DISTRICT OF ALASKA
425 G Street, Suite 800
Anchorage, Alaska 99501
Phone: (907) 646-3400
Fax: (907) 646-3480
Email: gary_colbath@fd.org

*Attorneys for Defendant James Michael Wells*

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>             Plaintiff,<br><br>vs.<br><br>JAMES MICHAEL WELLS,<br><br>             Defendant. | Case No. 3:13-cr-00008-SLG<br><br>**DEFENDANT'S MOTION TO LIMIT TESTIMONY OF GOVERNMENT EXPERT ROBERT MORTON** |

Defendant James Michael Wells, through counsel Gary G. Colbath and Peter A. Camiel, moves this Court for an order limiting the opinions and testimony of government expert Robert Morton consistent with the arguments set forth below.

## I. INTRODUCTION

Prior to the first trial in this matter, the government employed FBI behavioral analyst Robert Morton to develop a behavioral assessment profile of its only suspect, Jim Wells. Morton, according to his CV, retired from the FBI in 2014 as a supervisor in the Behavioral Analysis Unit. In that capacity he was primarily a criminal profiler and a supervisor and trainer of criminal profilers. He "provided instruction in a variety of forensic and behavioral topics during the specialized profiler-training

course for new members of the FBI's National Center for the Analysis of Violent Crime." Morton has also served as an instructor and mentor in a formal profiler training program for members of a number of law enforcement agencies.

To complete his report, Morton reviewed two recorded statements of Jim Wells taken by the FBI on the day following the murders, the autopsy report related to the victims, various photos and reports related to the rigger shop and some general information about the victims themselves. Morton prepared his Crime Analysis Report on October 11, 2013.[1] Morton never visited Kodiak Island or the rigger shop prior to preparing his "analysis."

Morton has now provided a supplemental report although it appears his opinions have remained essentially the same.[2] However, Morton has now coined the murders as "personal cause homicides," which he defines as "murders where the offender has or perceives having a conflict or problem with the victim(s) and the solution to the disagreement was to kill the victim(s)." Further Morton continues to claim, as he did in his initial report, that "[t]he motive in this case can be discerned through the actions of the offender, as well as the life styles and occupations of the victims." However, Morton's classification of the murders and his claimed ability to discern the motive for the murders still represents nothing more than his best guess about what may have happened during this crime.

---

[1] Morton's initial report is attached as Exhibit A.
[2] Morton's supplemental report is attached as Exhibit B.

*United States v. James Michael Wells*
Case No. 3:13-cr-00008-SLG                                                                 Page 2

## II. FACTS

The documents detailing Robert Morton's initial invExhibiolvement in this case, and his report generated from that involvement, are illuminating about his real purpose and the government's true intent for using him as an expert. First off, Morton became involved on April 16, 2012, at almost the very beginning of the investigation when he was tasked to "review audio recording from two interviews of subject in above captioned investigation and **provide a behavioral assessment of James Wells**." *See*, Exhibit A. In order to do so, the first documents Morton was provided were the two Mirandized "interviews [of Jim Wells] … sent via Federal Express on 4/16/2012."

Morton used the interrogation interviews of Wells together with selective information about the investigation later given to him by other FBI agents, and quickly developed a profile of the killings and Wells as the perpetrator. Morton was eventually provided more formal material from the investigation. However, the report he produced prior to the first trial regarding his assessment of Wells made clear that he was not tasked to do a "crime *scene* analysis" as the government represented. Instead, Morton produced a "Criminal Investigative Analysis" which in reality was an offender profile assessment that enabled prosecutors to develop the theme for their case in chief and provided government investigators a guide to build the case against Wells.

There is no question that Morton's work was criminal profiling, and not crime *scene* analysis as the government continues to assert. His report begins with the preface: "This report is limited in its scope to an *assessment of the crime* and subsequent analysis." He was asked to listen to Wells' interrogation recordings and develop an assessment of the crime that fit Wells. Clearly this was the task he performed, as he felt it necessary to caution in the next part of his report that "[t]he information provided is based upon probabilities. However, no two criminal acts or criminal personalities are exactly alike, and therefore, the offender may not *fit the analysis in every aspect*." Morton's analysis is based upon information available at the time this report was prepared and assumes that the information set forth is valid and complete." Morton's role, as he summarized, was to use his expertise to determine what the most "probable" characteristics were for the "criminal personality" who committed this crime. But it came with the caution that the suspect may not "fit" his profile in every aspect.

Of course, time shows that the government did what was necessary to "fit" Wells to that profile as best they could. Prior to trial, the government employed Reid Meloy to testify in conjunction with Morton to lay out the characteristics of a workplace killer. Morton's testimony was then recharacterized by the government as crime *scene* analysis. However, his testimony at trial was riddled with profile characteristics, terminology and speculative opinions about a "criminal personality." Only rarely did Morton's testimony involve true crime scene analysis where he was

actually employing some recognized crime scene methodology and assessment. Accordingly, the defense moves to prohibit the following opinions or areas of testimony offered by Morton, as they represent the same profile type testimony deemed inadmissible by the Ninth Circuit:[3]

> "[I]n any crime there's an action that goes on between an offender and a victim. An -- an offender has a certain plan and goes forward interacting with that victim. Now, based on that interaction, the victim can have a – a cause or effect with that offender or not, depending upon how the -- the crime is set up." TR p. 1613, l. 7-12.

> "I believe that in this case the offender targeted Mr. Hopkins and Mr. Belisle for a personal cause." TR p. 1614, l. 9-10.

> "[I]t's a label, if you will, that basically identifies a set of characteristics where an – an offender has a -- a conflict with a victim or victims, and the choice by the offender to end that conflict is in this case a murder." TR p. 1614, l. 13-17.

> "Based on the physical evidence that was there -- in other words, the trajectory of the bullets, where the rounds were recovered inside of the floor -- I determined that it appeared Mr. Belisle was sitting with his back to the door, probably in a chair. The first shot struck him on the left side, going through and exiting into the floor over to where -- closest to the wall. And then he fell down face down and it was sometime after that that he received the other two wounds." TR p. 1618, l. 18-25.

> "I believe that the offender entered into the facility, shot Mr. Belisle first, stepped out, and then first shot to Mr. Hopkins was the one into his face." TR p. 1619, l. 19-21.

> "The offender entered here, walked over here, shot Mr. Belisle here, stepped out, fired at Mr. Hopkins. After that, based on the evidence, I can't really give you a sequence of the shots that occurred other than the fact that he shot twice more into Mr. Belisle and once more into Mr. Hopkins." TR p. 1620, l. 1-5.

---

[3] A complete copy of Morton's trial testimony transcript is attached as Exhibit C. Citations refer to page and line numbers therein.

*United States v. James Michael Wells*
Case No. 3:13-cr-00008-SLG                                                                                          Page 5

"Based on the wounds and the locations and the positions of the victims, this offender's choice in this matter was basically to just confront them with a gun and shoot them. Doesn't appear to be any verbal interaction at all, based on their body positions and their wounds." TR p. 1620, l. 9-13.

"[B]oth first shots to both victims were obviously incapacitating, at a minimum. The other shots that followed were definitely done to ensure that the victims were killed. It was a coup de grace shot -- or shots." TR p. 1620, l. 16-21.

"[B]ased on their daily routine, where they're both into the building at an early hour, if an offender was going to target either one separately, there would have been better times or choices to do that. Offenders choose victims if they're -- if they're going to commit a -- a murder like this based on availability and vulnerability, availability just meaning that the offender chooses a time when they can get to the victim. Vulnerability means that they're in a position where the offender has the advantage to take advantage of the situation and complete their crime. In this case, by basically going into a building and attacking two people, it shows that both victims were intended targets." TR p. 1621, l. 10-21.

"The -- the choice of the weapon -- very obviously, a .44 Magnum is a very powerful handgun. The use of that was deliberate by the offender, shows that the offender was competent with it, confident with it, and -- and brought it with him because he knew it would inflict enough damage to kill these two victims." TR p. 1622, l. 2-7.

"The number of times shooting reflects the offender's goal, if you will, to walk into that building, and his goal when -- when he went in there with that large-caliber handgun was to -- was to kill both of those victims." TR p. 1649, l. 20-23.

### III. ARUGMENT & AUTHORITIES

FRE 702 governs admission of expert testimony in the federal courts. It provides as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony

is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Neither in his report, nor at trial, was Morton able to provide foundation, scientific methodology or research based analysis to support his opinions that are outlined above. Without even visiting the scene or studying more than a small fraction of the reports and materials making up the investigation related to the case, Morton offers opinions about the unique characteristics of the crime including shot sequence and timing, verbal interactions between the offender and victims, the motive for the killings, the thought process of the offender, classification of the killings as targeted (not random or criminally motived), the movements of the offender before, during and after the crime, and the offender's intentions and thoughts surrounding the crime. He does so through rank speculation and a vague assessment of "probabilities" that he personally somehow put together based on his experience with investigating or reviewing other crimes despite the fact that his report cautions that "no two criminal acts or criminal personalities are exactly alike, and therefore, the offender may not fit the analysis in every aspect."

The Ninth Circuit noted in this case that "[t]his Court has 'stated in dictum that testimony of criminal profiles is highly undesirable as substantive evidence because it is of low probativity and inherently prejudicial.'" *United States v. Wells*, 879 F.3d 900, 921 (9th Cir. 2018) citing, *United States v. Gillespie*, 852 F.2d 475, 480 (9th Cir. 1988). The Court of course went on to find that in the prior trial here, "there

[was] no question as to the Government's purpose for offering this testimony. It explicitly stated that Dr. Meloy would testify as to the characteristics of those who commit 'targeted individual multiple homicide workplace violences in order to determine, given the lay witnesses' testimony concerning Wells personally, 'does it fit, does it not fit?'" *Wells*, 879 F.3d at 920-921.

This same testimony is now essentially being proposed through Morton. The opinions noted above all describe "targeted individual homicides" where Morton imputes motive, knowledge of intention, reason for actions and inactions, and a description of how a crime like this "probably" could have happened if it was the type of crime his profile suggests. These opinions, based only on fitting selective pieces of evidence to his speculative theory, accomplish the same thing as the government tried in the first trial, and more importantly, will allow the government to make the same arguments as happened with the admission of Meloy's testimony. The only substantive difference will be in the number of government experts supporting its profile-developed theory. If allowed by this Court, the legal result and likely effect on the jury will be the same. That is, they will be swayed by evidence that is "of low probativity and inherently prejudicial." Once again, Wells will risk being convicted not "based on the evidence against him … [but instead] on the techniques utilized by law enforcement officials in investigating criminal activity." *United States v. Lui*, 941 F.2d 844, 847 (9th Cir. 1991) (quoting *United States v. Beltran–Rios,* 878 F.2d 1208, 1210 (9th Cir. 1989)).

*United States v. James Michael Wells*
Case No. 3:13-cr-00008-SLG                                                                                              Page 8

As to the elements guiding admission of expert testimony under FRE 702, each is discussed in turn.

**1. Morton's Profile Opinions are not Based on Sufficient Facts or Data**

Morton did not possess adequate information to support his conclusions. He did not visit the crime scene to take measurements or to conduct any other forensic investigation. According to his report and prior testimony, he relied solely on the information collected by others to perform his analysis, and based his conclusions on "[c]rime scene photographs, reports, and diagrams; autopsy photographs and reports; and various investigative and laboratory reports". TR pp. 1611-1614.

Morton's reconstruction of the sequence of events is rooted only in the information he was provided by the government. The directive he was given to focus only on Wells led him to unconditionally accept the government's belief that there was only one offender, when in fact he has no way of knowing or determining this. From this very limited information, Morton extrapolates the relative movements and positions of the shooter(s) and victims, and further lays out a sequence of the shots that were fired, going so far as to opine that the shooter(s) went from one victim to the other and then back to each of them once more to perform a "coup de grâce" shot. *See*, record cites above. Morton does this without any actual evidence or knowledge of where the victims were when they encountered the shooter(s), or where the shooter(s) were located when they shot either man. Moreover, Morton's opinion in no way accounts for any simultaneous movement of any of the participants during the

encounter, nor could he ever know if there was such movements. Thus he could not know the positions and angles of the people and firearm when any of the shots were fired. His testimony about the sequence of shots, locations of the victims and shooter(s) during the encounter, and the order of shots is simply fiction.[4]

In formulating his "opinion," Morton really only actually knew 1) what the pathologist described in her autopsy about the location of wounds and bullet paths within each victim's body; 2) where the bullets and/or marks at the scene from the bullets were discovered; and 3) *generally* the location of each victim's body when they were first discovered, as each was moved prior to being photographed. Nevertheless, he opines about a specific sequence of shots fired despite the lack of any evidence whatsoever regarding 1) the position either victim was in when shot; 2) the position of the shooter(s) when the shots were fired; 3) the angle of the firearm relative to the victim during each shot; 4) the movements by either the people or the firearm during this dynamic process; and 5) the beginning or ending time of the entire sequence of events. Morton simply could not know the precise location of either victim prior to the shots being fired, the sequence of those shots or the events transpiring during the shooting. Any opinion about such "facts" is wildly speculative.

Morton's opinions on sequence of shots and the positions of the victims at

---

[4] Indeed, the government's expert pathologist noted that on at least one shot wound path for each victim she could not determine even the entrance and exit paths of the bullets causing the injuries. Further, she noted that "you can't tell in which order the wounds were received." TR pp. 735, 753, 756.

*United States v. James Michael Wells*
Case No. 3:13-cr-00008-SLG                                                                                    Page 10

various times before they fell to the floor are pure *ipse dixit* of the sort this Court is not obliged to accept and should be excluded as unreliable under *Daubert* and Rule 702. *General Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997). The law requires an expert to justify a foundational assumption or refute contrary record evidence when offering opinions. *United States v. Chischilly*, 30 F.3d 1144, 1152–53 (9th Cir.1994). Here, Morton can do neither.

Morton did not visit the location of the shooting, so he did not have direct knowledge of the crime scene. Moreover, neither he nor anyone at the scene took any measurements to extrapolate from. There was no evidence of where the shooter(s) was located during the shooting or the positions of the weapon when each shot was fired. There was no evidence whatsoever about where either victim was *prior* to the shooting or whether and how they moved as each shot occurred. Thus Morton's conclusions and opinions about these things are pure speculation. Morton's reconstruction of the sequence of shots and conclusions regarding the movements of the shooter(s) are based on unsubstantiated foundation.

Morton's opinions about the offender's knowledge of the location of the murders, motive, choice of weapon, and purported lack of verbal interaction with the victims all suffer from the same complete lack of actual evidence to support them as well. Perhaps the best example here relates to his testimony that: "a .44 Magnum is a very powerful handgun. The use of that was deliberate by the offender, shows that the offender was competent with it, confident with it, and -- and brought it with

him because he knew it would inflict enough damage to kill these two victims." In reality, Morton actually knows 1) a .44 magnum is a powerful handgun; and 2) such a gun could inflict sufficient damage to kill a person if shot in a lethal manner. But his knowledge stops there. He does not know if the perpetrator(s) brought a gun with them or happened upon it at the scene. Alternatively, he has no way to know why someone would pick a particular gun to carry with them during this crime. Was it convenience? Was it availability? Was it random? Was it accidental? Nor could he have any idea about the offender's familiarity or intentions with the gun. Was it the first time the person shot the gun? Was it the tenth? Was it the thousandth? Was it selected because of its ability to harm? Was it selected as a good self-defense weapon? Or finally and again, were some of these things just random? Morton can only guess.

Morton's testimony about the lack of randomness of the crime, or the offender's knowledge of the scene and the victims' habits, suffers from the same level of speculation. First off, random acts by nature cannot be accounted for through prediction, which is why they are termed "random." Consequently, there is no way to rule them out. The rigger's shop, although owned by the Coast Guard, was not, contrary to Morton's statements in his report, on the Kodiak Coast Guard Base, nor was it well-secured. The facility is a simple L-shaped building with a garage/shop on each end and is actually located along a well-travelled public roadway. The first person to work typically opened a door and left it open for all to enter thereafter for

the entire day. A number of vehicles were parked at the building at all times, with some coming and going, but many staying 24/7. Moreover, Coast Guard employees typically came to work beginning at 8 a.m., with only one of the two victims scheduled to arrive at 7 a.m. Trying to determine or impute any special knowledge to an offender, while at the same time ruling out some impossible-to-know, random act just cannot be done. While a profile for such events may be able to be developed through some means, reliable testimony based on sufficient foundational facts or actual data applicable here is impossible.

**2. Morton's Opinions are not the Product of Reliable Principles and Methods**

Morton's testimony contains no explanation of the principles or methodology that allows him to reach the opinions set forth above that are related to actual crime scene analysis as opposed to criminal profiling. Morton does have the personal investigative experience, educational background, specialized training, and knowledge of relevant research to develop a profile that would allow him to give case agents or prosecutors a "probable" profile of an offender who may have committed this crime. The problem here is that criminal profiles are not admissible. The law prohibited admission of such evidence before the first trial and certainly is now the law of this case. "As we have explained, testimony of this nature is 'inherently prejudicial,' has no place as substantive evidence of guilt, and would therefore fail Rule 403's balancing test. *See, Gillespie*, 852 F.2d at 480; *Lim*, 984 F.2d at 334–35;

*see also*, *Michelson*, 335 U.S. at 475–76, 69 S.Ct. 213." *Wells,* 879 F.3d at 924.

As respects the opinions quoted above, Morton's experience developed over the years he spent with the Behavioral Analysis Unit are what he primarily relies on to develop his crime analysis (profile). Developing profiles is what the FBI's Behavioral Analysis Unit does. However, none of Morton's experiences are scientific or peer tested and reviewed. Neither the accuracy of his criminal profiling nor Morton's subjective work on past cases have identifiable error rates, nor can such work be specifically replicated in any way. His initial report is telling on this point where Morton fully admits: "The information provided is based upon probabilities. However, no two criminal acts or criminal personalities are exactly alike, and therefore, the offender may not fit the analysis in every aspect." Which of the "aspects" here is the jury supposed to accept and which should they reject as too probable? This uncertainty and the probable nature of such work is precisely why the Ninth Circuit has rejected evidence that amounts to an attempt to show "the defendant is more likely to have committed an offense because the defendant fits within [the] profile" developed by law enforcement." *Id.* at 922, citing, *Haakanson v. State*, 760 P.2d 1030, 1036 (Alaska Ct. App. 1988).

It is extremely problematic when an expert's testimony does not track the report they write and makes pretrial consideration of their opinions difficult, but this Court has the benefit of the prior trial to not let this happen again. Morton properly introduced his 10/11/13 report (Exhibit A) with the caveat that "The information

provided is based upon probabilities."  Yet no such caveat appears anywhere in Morton's testimony (Exhibit C), where the terms "probable," "probability," "probabilities," or "likely" appear in only two sentences:

> --"I taught at the Alaska Peace Officer Association at a meeting down in Kenai *probably* -- I guess 10 years ago."  TR p. 1611, l. 2-3;

> -- "Based on the physical evidence that was there -- in other words, the trajectory of the bullets, where the rounds were recovered inside of the floor -- I determined that it appeared Mr. Belisle was sitting with his back to the door, *probably* in a chair."  TR p. 1617, l. 18-22.

Although Morton gave a guarded or cautioned set of opinions in his report and noticed to the defense, what he said at court was without caution or limitation.  Instead, the speculative theories he developed were presented to the jury as expert conclusions somehow arrived at through sound science and methodology.  This scientific process and methodology was of course never explained because it does not exist.  What Morton's initial profile report, testimony, and supplementary report all put forth is one plausible theory of the case-the theory that was provided to him by investigators before Morton had begun his work-but his testimony purports this to be the *only* plausible theory of crime.  Because it is not the product of reliable principles and methods, Morton should not be allowed to parrot this unsubstantiated theory built on probabilities to jury.  This is especially true when it is not even accurately presented by the government on direct.

### 3. Morton's Opinions are not Reliably Applied to the Facts of this Case

Morton does not reliably apply the results of the other experts who actually

conducted the investigation to his analysis. At the prior trial, Morton frequently reinterpreted the autopsy results to fit his version of events. As noted above, the government's pathologist testified at least twice that it was not possible to determine the sequence of shots. Although Morton initially stated that "after the shooting of both Victim #1 and Victim #2 … it is not possible to determine the sequence of the next three shots," he later opined that "The offender returned to the office and shot Victim #2 two more times." He then not only somehow determined the shot sequence but also was able to label the shooter(s) intent behind each shot when he opined that "[t]he two additional gunshots Victim #2 suffered and the second gunshot wound Victim #1 suffered to his upper left arm and chest were 'coup de grâce' shots fired by the offender to ensure the victims were dead." This opinion is offered despite the fact that the pathologist testified that at least one of the final gunshots referred to by Morton would not have been fatal. The pathologist noted, Victim #1 "died as a result of a gunshot wound of the head."

Morton relies on diagrams and pictures created by others to reconstruct the events at the crime scene. First, he reports that the rigger shop was "located on the Kodiak Island Coast Guard Base" and that "the location of the murder scene, located on a Coast Guard Base reduces the chances that this was a random event." His report and opinions, however, are belied by those same reports he reviewed because they actually show that the rigger shop was not located on Base, but instead was a publically accessible building located along a well-traveled public roadway. Morton

*United States v. James Michael Wells*
Case No. 3:13-cr-00008-SLG                                                                                     Page 16

goes on while describing the scene to note that "[u]pon entering the room, the desk area where the victim was found was immediately on the right, adjacent to the doorway, and the desk was butted up against the wall where the doorway was located." Morton fails to perceive that this desk was the one used by James Wells, not Victim #2. At 7:10:31 a.m., victim #2 was working on his email at his computer, (according to FBI Digital Evidence Laboratory Report of Examination, March 13, 2014, at 3) and to do so he would have had to be at his own desk, which was located diagonally across the room from the area that he was found in. If victim #2 was shot at the desk near where his body was found, the offender may actually have thought he was shooting Jim Wells, not Rich Belisle.

Morton continues: "[a]gainst the wall on the far side of desk there was a filing cabinet. There were also boxes stacked on the floor against this wall." Morton again fails to note a critical fact - that these boxes were not in their original position (where they would have been during the shooting) when the crime scene photographs and diagrams were created, as one of the first responders had moved them out of the way to access Victim #2 and was unable to recall their original location in the room. (FBI Witness Interview of Daniel Smith, 10 January 2013). Throughout his analysis Morton failed to reliably apply proper analysis to accurate facts about this case.

Where facts do not exist, Morton simply fills in gaps with assumptions, guesses and conjecture. Given the lack of forensic evidence found at the scene or recovered later from any source, the lack of any eye or ear witnesses to the shooting, the lack of

*United States v. James Michael Wells*
Case No. 3:13-cr-00008-SLG                                                                                             Page 17

recovery of the murder weapon, and the vast realm of possible suspects and motives for the murders, Morton really had no other choice than to develop his best guess or a "probable" theory on what happened. This fully explains the overall conclusion of his report when he notes "[a]fter analyzing all of the physical evidence, **the probable** sequence of events is as follows…."

IV. CONCLUSION

The government should not be able to present its theory of what "probably" happened through expert testimony at trial. This approach was rejected before by the Ninth Circuit and should be rejected again by this Court. The government remains free to again argue its theory at trial, to the extent it is supported by actual evidence, but the Court should not allow such argument to come in under the guise of substantive proof put forth by expert testimony. Morton's opinions should be limited to those truly related to reliable and scientific crime <u>scene</u> and forensic analysis that is based on professionally accepted principles and methodology. Morton should be restricted from testifying about any and all profile-like conclusions, opinions, assessments, motives, or characteristics. The Court should exclude the opinions and testimony outlined above.

//
//
//
//

DATED at Anchorage, Alaska this 16th day of May, 2019.

          Respectfully submitted,

*/s/ Gary G. Colbath*
Gary G. Colbath
Assistant Federal Defender

*/s/ Peter A. Camiel*
Peter A. Camiel WSBA 12596
Attorney for Defendant

*Attorneys for James Michael Wells*

Certificate of Service:
I hereby certify that I electronically filed the foregoing and any attachments with the Clerk of Court for the United States District Court for the District of Alaska by using the district's CM/ECF system on May 17, 2019. All participants in this case are registered CM/ECF users and will be served by the district's CM/ECF system.
*/s/ Gary G. Colbath*