RAYMOND – RECROSS

1  they sometimes submit in -- to the federal system and sometimes

2  they don't.

3  Q   Okay.  So that could be 50-percent inclusive of everybody

4  who's been charged with a crime or 90-percent, or who knows?

5  A   I have no idea of the number.

6  Q   All right, thank you.

7  A   No idea.

8        THE COURT:  Anything more on that subject?

9        MS. DUIGNAN:  No further questions, Your Honor.

10        THE COURT:  All right.  Thank you, ma'am, and you're

11  excused.  The government's next witness.

12     (Witness excused)

13        MS. LOEFFLER:  I'm sorry, the United States calls

14  Robert Morton.

15        THE COURT:  Okay.

16     (Side conversation)

17        THE COURT:  Go ahead.  Head up here.  There's a little

18  door there that pulls out.  Once you get there, you'll just

19  remain standing, and she'll swear you in.

20        THE CLERK:  Please raise your right hand.

21        **ROBERT J. MORTON, PLAINTIFF'S WITNESS, SWORN**

22        THE CLERK:  Thank you.  Please have a seat.  And, sir,

23  if you can please state and spell your full name.

24        THE WITNESS:  My name is Robert J. Morton.  That's M-o-

25  r-t-o-n.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

**MORTON - DIRECT**

1      THE CLERK:  And Robert's common spelling?

2      THE WITNESS:  Yes, ma'am.

3      THE CLERK:  Thank you.

4      MS. LOEFFLER:  Just a minute, Your Honor.  I was --

5      THE COURT:  Okay.

6      MS. LOEFFLER:  -- just getting exhibits lined up.

7                    **DIRECT EXAMINATION**

8  BY MS. LOEFFLER:

9  Q    Mr. Morton, where do you work?

10 A    I work for the FBI and I work at the National Center for

11 the Analysis of Violent Crime.

12 Q    Okay.  What is your title with the FBI at the National

13 Center for the Analysis of Violent Crime?

14 A    I'm a supervisory special agent.

15 Q    What does a supervisory special agent mean versus -- we've

16 had some people who've said they're special agents.

17 A    It just means I have -- a slightly higher rank.

18 Q    Okay.  Now, what is the National Center for --

19 something -- of Violent Crime (indiscernible) --

20 A    The National Center for the Analysis of Violent Crime.

21 Q    Analysis.  I knew there was a word missing.  Analysis of

22 Violent Crime.  Explain.

23 A    It's basically a clearinghouse for state, local,

24 international law enforcement agencies.  And what we do is we

25 basically assist them in unusual, bizarre, or repetitive

1   crimes.

2   Q    And how long have you worked there?

3   A    I've worked there for 16 years.

4   Q    And what types of -- what has been your role, if you can

5   give us a brief history of 16 years of work there.

6   A    Basically, as a supervisor there, you provide assistance

7   in -- in these unusual cases by doing a number of different

8   things, including crime scene analysis.

9   Q    And I -- we're going to get into the crime scene analysis.

10  Somebody's wiggling.  Am I standing too close or -- I'm okay.

11  Okay, thank you.  Are there other types of things that you have

12  consulted on in addition to your crime scene analysis duties?

13  A    Yes, there are.

14  Q    Okay.  What types of other things?

15  A    I've consulted on all types of serial murder cases, sexual

16  murder cases, domestic homicide cases, serial sniper cases,

17  just to name a few.

18  Q    And before you joined the National Center for the Analysis

19  of Violence Crime, did you have a career in law enforcement in

20  the FBI before that?

21  A    Yes, I did.  I spent -- as an agent, I spent 10 years in

22  the Chicago office.

23  Q    What types of things did you do in the Chicago office?

24  A    I worked not only terrorism, but I spent the greatest

25  majority of my time working violent street gangs.

1  Q   Okay.  And I -- are there some, I mean, fairly well-known
2  cases that you have been -- testified in and worked the crime
3  scene?
4  A   Yes.  As part of my duties there, I was one of the team
5  leaders on the FBI's Evidence Response Team.
6  Q   Okay.
7  A   I went to the Oklahoma City bombing case, the Atlanta
8  Olympic bombing case, and 9-11 as well.
9  Q   Okay.  Now, what types of training have you had, both
10 training and experience, in crime scene analysis?
11 A   I've had a number of training blocks in crime scene
12 analysis.  Like I said, I was a -- an FBI ERT team leader.  I
13 also have a certification from the International Association of
14 Identification, which is an independent body, as a senior crime
15 scene analyst.  In order to obtain that, you are required to
16 not only have a prerequisite amount of experience and training,
17 but actually take a 400-question exam and then periodically --
18 it's about every four years, I believe -- you have to renew
19 that, take another exam to show that you're certified.
20 Q   Have you also taught in the area of -- that you -- in
21 these -- your areas of expertise?
22 A   Yes, I have.  I've taught not only in the United States
23 and law enforcement agencies, but all over the world.
24 Q   And did that include Alaska?
25 A   Yes, it did.

1  Q    Okay.  And I just -- where have you taught in Alaska?

2  A    I taught at the Alaska Peace Officer Association at a

3  meeting down in Kenai probably -- I guess 10 years ago.  And we

4  also -- the FBI put on a violent crime seminar here in

5  Anchorage a number of years ago as well.

6  Q    And have you been qualified as an expert in federal and

7  local courts around the country?

8  A    I've been certified in state courts, yes.

9        MS. LOEFFLER:  I would move Mr. Morton as an expert in

10 crime scene analysis at this point.

11        THE COURT:  Voir dire?

12        MR. OFFENBECHER:  No.

13        THE COURT:  He'll be received in that capacity.

14 BY MS. LOEFFLER:

15 Q    Now, Special Agent Morton, did you do a crime scene

16 analysis of the murders of Rich Belisle and James Hopkins?

17 A    Yes, I did.

18 Q    And can you get me through the procedure that you used to

19 do a crime scene analysis?

20 A    Yes.  A -- a crime scene analysis is basically a process

21 where you take a number of factors at the crime scene,

22 interaction between the offender and the victim, the nature of

23 who the victim is, the circumstances when that crime took

24 place, as well as the location where that crime took place.

25 Q    Now, did you physically travel to the COMMSTA in Kodiak to

MORTON - DIRECT

1  do your analysis?

2  A    No, I did not.

3  Q    And is that an important thing as part of your crime scene

4  analysis to you?

5  A    Sometimes it can be, but a -- a lot of times, based on the

6  cases that I look at, particularly in older homicide cases, the

7  crime scenes a lot of times have changed, and the benefit of

8  going directly to the scene is -- is -- is not so important

9  anymore.

10  Q    Okay.  So do you look at evidence that actually preserves

11  what the scene was at the time?

12  A    Yes, I do.

13  Q    Okay.  And did you in this case?

14  A    Yes, I did.

15  Q    And so we're talking about photographs, right?

16  A    Photographs, correct.

17  Q    Is that something that you commonly rely on to do a crime

18  scene analysis?

19  A    Yes, it is.

20  Q    Okay.  Now, in terms of -- let me just stop there a

21  second.  I'm sorry, I wanted to make sure somebody had left,

22  okay.  In terms of the analysis in this case, did you look at

23  the crime -- what did you look at with regard to Mr. Hopkins

24  and Mr. Belisle?

25  A    I reviewed all the crime scene photographs.  I reviewed

1  the autopsy reports.  I reviewed the autopsy photographs.  I
2  reviewed any of the investigative reports that dealt with that
3  building and that scene.
4  Q    And you talked earlier about what you're looking for as
5  the physical interactions.  And can you explain to the jury
6  what you mean by "I look at the physical interactions"?
7  A    Yes, I can.  And in any crime there's an action that goes
8  on between an offender and a victim.  An -- an offender has a
9  certain plan and goes forward interacting with that victim.
10 Now, based on that interaction, the victim can have a -- a
11 cause or effect with that offender or not, depending upon how
12 the -- the crime is set up.
13 Q    Before I get into your conclusion on this case, I think I
14 neglected to ask you how many crime scene analyses have you
15 done or reviewed in your career?
16 A    I really don't count.
17 Q    Okay.  Let me -- I know this is something that you hate
18 from lawyers, but are you talking over 100?
19 A    Yes.  I mean, I -- I -- I routinely look at between 60 and
20 70 cases a year.
21 Q    Okay.  Now, is there a specific type of crime scene
22 analysis or do you look at all of the -- I mean, have -- let me
23 ask it a better way.  In terms of your experience with murder
24 sites, do you have a familiar experience with all different
25 types of murders?

1  A    Yes, I do.

2  Q    Okay.  And based on that experience, in your analysis in

3  this case were you able to draw a conclusion of the nature of

4  the crime in this case?

5  A    Yes, I wa -- yes, I was.

6  Q    I'm going to ask you for your conclusion and then I'm

7  going to go through all the bases for that, if I may.  What was

8  the conclusion that you reached?

9  A    I believe that in this case the offender targeted Mr.

10 Hopkins and Mr. Belisle for a personal cause.

11 Q    When you say targeted for personal cause, can you explain

12 what you mean by that, please?

13 A    Yes.  It's -- it's a -- it's a label, if you will, that

14 basically identifies a set of characteristics where an -- an

15 offender has a -- a conflict with a victim or victims, and the

16 choice by the offender to end that conflict is in this case a

17 murder.

18 Q    Okay.  Now, when you say personal cause, I'm going to ask

19 you what led to that conclusion.  Did you eliminate some other

20 types of motives for murder?

21 A    Yes.  And through that process you -- I would have

22 eliminated a number of things, such as robbery, a random event,

23 et cetera.

24 Q    Okay.  Why did you eliminate robbery?

25 A    Because nothing was taken.

MORTON - DIRECT

1  Q   Okay.  Why did you eliminate random event?

2  A   Because the nature of the facility, of the layout of the

3  building, and the fact that two victims, who just happened to

4  be there at the same time, were murdered kind of eliminated it

5  for me.

6  Q   I'm going to go to the -- actually, well, let's pull up

7  Exhibit -- I think it's 392, the chart, so I can go through

8  that.

9      (Side conversation)

10 Q   So I think you said a minute ago that a random event you

11 eliminated in part of the layout in the facility.  And I'll you

12 just to explain that a little further, Special Agent Morton.

13 A   Yes.  Not only is it the nature of the facility, but if

14 you think about it, if it's a random event, one of the other

15 things I look at is you look at victimology of the -- of the

16 two victims.  In other words, the lifestyle of those victims,

17 what they do for a living, how they make their living, how old

18 they are, et cetera; the crime rate of the community in

19 general; and a number of other things.

20 Q   When you say the lifestyle of the victims, can you further

21 elucidate that, please?

22 A   Yes.  If -- if -- if they're married, if they're in a -- a

23 stable relationship, if they have a steady job, if they're not,

24 to be crass -- if they're not a drug dealer engaged in -- in --

25 in those kind of activities.

**MORTON - DIRECT**

1  Q   Now, did you also look at the -- we're going to come back
2  to this -- a second, but I want to get in -- did you try to do
3  an analysis to reach a conclusion of how the actual murders
4  come down within -- in the building?
5  A   Yes, I did.  Part of doing that crime scene assessment is
6  to determine -- is best as can be determined, the interactions
7  between that offender and that -- and those victims.
8  Q   I'm going to ask you -- let me start with Mr. Belisle.
9  And I am going to show you what's been marked as Exhibit 370.
10 If I put it on the doc cam, can -- so the jury can't see it?
11        UNIDENTIFIED SPEAKER:  Uh-huh (affirmative).
12        MS. LOEFFLER:  Counsel, 370 is the one I handed you,
13 that's this one.
14        MR. OFFENBECHER:  Yeah.
15    (Side conversation)
16 BY MS. LOEFFLER:
17 Q   Is 370 a photograph that you used in your analysis and
18 that actually has some of your handwriting on it?
19 A   Yes, it is.
20 Q   Okay.  And is it useful to help explain how you determined
21 your conclusion as to the shooting of Mr. Belisle?
22 A   Yes, it is, ma'am.
23        MS. LOEFFLER:  I'm going to move 370, but I'm going
24 to -- oh, that works much better.  And this is, Your Honor, one
25 of the pictures, but it has to use -- it's necessary to explain

1  this testimony.

2          THE COURT:  It has been admitted?

3          MS. LOEFFLER:  It has not, because this is the one that

4  has his handwriting on it.

5          THE COURT:  Okay, so are you seeking --

6          MS. LOEFFLER:  I'm moving the -- 370.

7          THE COURT:  Any objection?

8          MR. OFFENBECHER:  Subject to earlier discussion, Your

9  Honor.

10         THE COURT:  Okay.  It will be admitted.

11     (Plaintiff's Exhibit 370 admitted)

12  BY MS. LOEFFLER:

13  Q    So on 370, with Mr. Belisle, those are actually your

14  drawings on it?

15  A    Yes, ma'am.

16  Q    And I'm just going straight to -- what was your conclusion

17  about how the interactions with Mr. Belisle happened?

18  A    Based on the physical evidence that was there -- in other

19  words, the trajectory of the bullets, where the rounds were

20  recovered inside of the floor -- I determined that it appeared

21  Mr. Belisle was sitting with his back to the door, probably in

22  a chair.  The first shot struck him on the left side, going

23  through and exiting into the floor over to where -- closest to

24  the wall.  And then he fell down face down and it was sometime

25  after that that he received the other two wounds.

MORTON - DIRECT

1  Q   Okay.  And I'm going to show you what's been marked as

2  Exhibit 371 and ask you, does that -- also a photograph from

3  the crime scene that has your actual notation on it?

4  A   Yes, it is.

5  Q   And is this part of -- will help to explain why you

6  believe that that's the order of shots of Mr. Belisle?

7  A   Yes, it does.

8        MS. LOEFFLER:  I move Exhibit 371.

9        THE COURT:  It'll be received.

10       (Plaintiff's Exhibit 371 admitted)

11 BY MS. LOEFFLER:

12 Q   Okay.  Okay, we just had 370 up, and what is it about 371

13 that led to your conclusion?

14 A   If --

15 Q   Oh, by the way, you have a -- you should have a laser

16 pointer there, so if you could explain it to the jury with a

17 laser pointer.

18 A   This is the round that I think was the first round, that

19 would have entered his left side and exited his right side,

20 striking the floor.  This is the second round that was fired

21 through his right side that exited.  He was found originally

22 face down, right on top of this bullet hole.  And if you look

23 at the pictures, the trajectory actually matches up with the

24 shot to the right side -- right of the chest, going here and

25 entering the floor.

1  Q    Okay.

2  A    That's how I determined my sequence of events.

3  Q    Okay.  I will take this off now.  Thank you.  And Mr.

4  Belisle -- were there two shots or were there any more shots

5  into Mr. Belisle?

6  A    There was three.

7  Q    Okay.  So now I'm going to go -- we don't have to show the

8  photos of Mr. Hopkins -- well, let me ask, was it a little --

9  was it difficult to piece together the analysis for Mr.

10 Belisle?

11 A    Yes, it was.

12 Q    Okay.  Why?

13 A    It was very confusing, simply because of the fact that

14 there's a number of wounds, some of which started on the left

15 side -- one of which started on the left side, two of which

16 were in the right side.  And to figure out the -- the sequence

17 of events and matching it up to the evidence took me some time.

18 Q    With regard to Mr. Hopkins, what was your conclusion?

19 A    I believe that the offender entered into the facility,

20 shot Mr. Belisle first, stepped out, and then first shot to Mr.

21 Hopkins was the one into his face.

22 Q    Let me put the chart at -- 392 back up, please.  So using

23 your later -- laser pointer, can you explain how you believe

24 the interactions between the perpetrator and the two victims

25 happened?

1   A    Yes.  The offender entered here, walked over here, shot
2   Mr. Belisle here, stepped out, fired at Mr. Hopkins.  After
3   that, based on the evidence, I can't really give you a sequence
4   of the shots that occurred other than the fact that he shot
5   twice more into Mr. Belisle and once more into Mr. Hopkins.
6   Q    Okay.  Now, based on those interactions, you said earlier
7   that you thought this was a personal cause homicide.  What was
8   it about the shooting that led you to that conclusion?
9   A    Based on the wounds and the locations and the positions of
10  the victims, this offender's choice in this matter was
11  basically to just confront them with a gun and shoot them.
12  Doesn't appear to be any verbal interaction at all, based on
13  their body positions and their wounds.
14  Q    Okay.  And is there anything about the patterns of the
15  shots that led you to that?
16  A    Yes, the -- both first shots to both victims were
17  obviously incapacitating, at a minimum.  The other shots that
18  followed were definitely done to ensure that the victims were
19  killed.  It was a coup de grace shot --
20  Q    You said coup de grace.
21  A    -- or shots.
22  Q    That's a French term.  Can you -- what does in the
23  meantime?
24  A    It's a French word that means basically "the end."
25  Q    Okay.

1   A    Finishes it.

2   Q    And based on or experience, is that consistent with sort

3   of random -- or the, you know, nonpersonal murders that you've

4   seen?

5   A    Yes.  It -- it reflects the -- the need of the offender to

6   ensure that these victims are dead.

7   Q    Now, based on, again, your analysis and your experience,

8   did you reach a conclusion as to whether one or both of these

9   appeared to be the targets of the murderer?

10  A    It -- based on their daily routine, where they're both

11  into the building at an early hour, if an offender was going to

12  target either one separately, there would have been better

13  times or choices to do that.  Offenders choose victims if

14  they're -- if they're going to commit a -- a murder like this

15  based on availability and vulnerability, availability just

16  meaning that the offender chooses a time when they can get to

17  the victim.  Vulnerability means that they're in a position

18  where the offender has the advantage to take advantage of the

19  situation and complete their crime.  In this case, by basically

20  going into a building and attacking two people, it shows that

21  both victims were intended targets.

22  Q    Now, is there anything about the weapon or the load in the

23  weapon that affected your conclusions or had any impact on your

24  conclusions?

25  A    Yes, it did.

Case 3:13-cr-00008-SLG   Document 1004-3   Filed 05/17/19   Page 15 of 50

MORTON - CROSS

1  Q    And can you explain that, please?

2  A    Yes.  The -- the choice of the weapon -- very obviously, a

3  .44 Magnum is a very powerful handgun.  The use of that was

4  deliberate by the offender, shows that the offender was

5  competent with it, confident with it, and -- and brought it

6  with him because he knew it would inflict enough damage to kill

7  these two victims.

8  Q    How long would it take to do this?

9  A    Not very long.

10 Q    If I can have just a minute.  I have nothing further at

11 this time.

12      THE COURT:  Cross-examination.

13      (Side conversation)

14      MR. OFFENBECHER:  Just a minute, Your Honor.

15                       CROSS-EXAMINATION

16 BY MR. OFFENBECHER:

17 Q    Mr. Morton, good morning.

18 A    Good morning.

19 Q    Mr. Morton, you've indicated that you have done a number

20 of different crime scene analysis -- analyses before, right?

21 A    Yes, sir.

22 Q    Hundreds, perhaps.  Is that right?

23 A    If not more, yes, sir.

24 Q    Okay.  And you've indicated that one of the cases you

25 worked was the Atlanta bombing case.  Is that right?

1 A    I worked that case from an evidence standpoint, sir.

2 Q    And what was your involvement in that case?

3 A    I was again a -- a team leader on the Evidence Response

4 Team and I picked up evidence in that case.

5 Q    Did you do the crime scene analysis on that case?

6 A    No, I did not.

7 Q    Okay.  Did the FBI do the crime scene analysis on that

8 case?

9 A    I don't think a crime scene analysis was done in that

10 case.

11 Q    So the FBI was not involved in any crime scene analysis?

12 A    The FBI -- in other words, it was -- it was a bombing

13 scene.  The -- the -- our Explosives Unit may have done some

14 kind of assessment of what the bomb was, but I did not do that.

15 Q    Okay.  Did the FBI do any of the other followup on the

16 Atlanta bombing investigation?

17 A    Yes, they did.

18 Q    As it turns out, the FBI had the wrong man in the Atlanta

19 bombing investigation.  Isn't that right?

20 A    Oh, eventually they caught Eric Rudolph.

21 Q    Right, but he -- person who was originally indicated as a

22 suspect turned out to be the wrong person, is that right?

23 A    That's correct, sir.

24 Q    Now, Mr. Morton, you've indicated in your report and also

25 in your -- you've provided a report to the government in this

**MORTON - CROSS**

1  case.  Right?

2  A    Yes, sir, I did.

3  Q    And that report was provided on October 11th, 2013.

4  Right?

5  A    Yes, sir, I believe that's correct.

6  Q    You've indicated in your report that complete

7  information -- and also in your direct examination that

8  complete information about the victim of a crime is an

9  important part of the crime scene analysis.  Is that right?

10 A    Yes, it is, it's part of it.

11 Q    Well, you indicated in your report that it's an important

12 part of the crime scene analysis?

13 A    That's correct, sir.

14 Q    Because an individual's personality and lifestyle will

15 affect their chances of becoming a victim.  Right?

16 A    That's correct.

17 Q    And so as you testified in your direct examination, one of

18 the things you want to do is find out -- you're assuming

19 there's some kind of conflict in this case between the

20 perpetrator and the victims.  Right?

21 A    That's correct.

22 Q    And you want to find out if you can figure out what that

23 conflict might be.  Right?

24 A    That's correct.

25 Q    And so your job, as you testified on direct examination,

1  would be to eliminate any other motives for this.  Is that

2  right?

3  A   As best that I can, yes, sir.

4  Q   Such as robbery or some other random event, right?

5  A   Correct.

6  Q   But part of what you want to know is about the personal

7  lives of the decedents in order to determine whether there were

8  any other controversies in their lives.  Right?

9  A   That's correct.

10 Q   That's part of your job in attempting to determine what

11 kind of a motive there is.  Right?

12 A   That's correct.

13 Q   So, for example, you would want to look into the personal

14 lives of the decedents to find out what was going on in their

15 lives, any controversies that might make them the victim of a

16 violent crime.  Right?

17 A   That's correct.

18 Q   Now, in this case you have indicated on direct examination

19 that you reviewed the autopsy reports, right?

20 A   Correct.

21 Q   Autopsy photos, right?

22 A   Correct.

23 Q   You also reviewed the photographs, all the crime scene

24 photographs in this case?

25 A   Yes, sir.

1  Q   And that's how you came to your conclusion in this case.

2  Is that right?

3  A   That's correct.

4  Q   Were there any other items that you reviewed in

5  preparation for your opinion in this case?

6  A   Yes.  As far as the analysis was concerned, I also looked

7  at investigative reports concerning the movement of vehicles

8  around that facility as well.

9  Q   Okay.  Investigative reports around the movement of the

10  facil -- vehicles.  Anything else?

11  A   Not that I can recall.

12  Q   So in preparation, you were not provided, for example, the

13  interviews of Hannah Belisle in this case.  Is that right?

14  A   Not to my knowledge, sir.  I don't remember reviewing

15  those.

16  Q   You remember reviewing the interviews of Deborah Hopkins

17  in this case?

18  A   Again, I don't remember specifically reviewing those.

19  Q   Do you remember reviewing the interview of Nicola Belisle

20  in this case?

21  A   I don't recall, sir.

22  Q   Do you remember interview -- reviewing the interview of

23  Angela Birchfield?

24  A   I don't recall.

25  Q   Do you remember the interview of Jillian Martinez?

MORTON - CROSS

1  A    No, sir.

2  Q    Do you remember the interview of Anthony Pecoraro?

3  A    Now.

4  Q    Do you remember the interview of Carsten Stoeckler?

5  A    No, sir.

6  Q    Well, let's look about -- at the information you've

7  indicated would be important, any controversies in the

8  individuals' lives or any other motives for homicide, because

9  that's really a subject that you're familiar with.  Right?

10  A    Correct.

11  Q    So, for example, you would want to find out about the

12  financial circumstances of the decedents to determine whether

13  there were any possible financial motives for a homicide.

14  Right?

15  A    Yes, sir, in general.

16  Q    So -- well, in particular, you would want to know if any

17  particular person stood to gain financially from the death of

18  either of the decedents.  Right?

19  A    Yes, sir.

20  Q    For example, if there were a large life insurance policy

21  that was going to go to someone as a result of the death of

22  the -- one of the decedents, you would want to know that,

23  wouldn't you?

24  A    Yes, that would be one factor weighed against the other

25  factors.

MORTON - CROSS

1  Q    Right.  But that's information -- if you were going to

2  look at the whole big picture, that's information you would

3  want to know.  Right?

4  A    Yes, sir.

5  Q    And were you provided any such information in this case?

6  A    I was provided general information concerning the victims.

7  Q    I'm sorry?

8  A    I was provided general information concerning the victims.

9  Q    Okay.  Were you provided any information that anyone stood

10 to gain financially from the death of either of the decedents

11 in this case?

12 A    Not that I can recall.  I'm sure everybody has life

13 insurance, so -- I don't recall anything unusual in that

14 aspect.

15 Q    Okay.  I just want to know whether the government provided

16 you in this case any information that any person would stand to

17 gain financially from the death of one of the decedents.  Any

18 specific information, not just general information about life

19 insurance.

20 A    I -- I remember hearing about life insurance, which is why

21 I brought that up, sir.

22 Q    What do you remember about life insurance?

23 A    One or both of them had life insurance, just like

24 everybody else does, sir.

25 Q    Everybody has life insurance?

1  A    Almost everybody has life insurance.

2  Q    Okay.  Who was the beneficiary in this case of the life

3  insurance policies?

4  A    I believe both wives were the beneficiaries.

5  Q    And what were the amounts of the life insurance in this

6  case?

7  A    I don't recall, sir.

8  Q    Were there any other benefits that would go to any person

9  at all as a result of the death of the decedents in this case?

10  A    Not to my knowledge.

11  Q    The prosecutors didn't give you any other information on

12  that, did they?

13  A    No.

14  Q    You would also want to know in evaluating any possible

15  motives whether there had been any conflict between either of

16  the two spouses about how either of the decedents' property

17  would be distributed in the event of the decedents' death,

18  wouldn't you?

19  A    Sometimes, yes.

20  Q    Well, if there had been any controversy between either of

21  the decedents and their spouses about how property would be

22  distributed in the event of the decedent's death, if there'd

23  been any controversy or argument between them, that's something

24  you would want to know, right, to weigh in the big picture?

25  A    Yes.

1  Q    And you weren't provided any of that type of information

2  in this case, were you?

3  A    No.

4  Q    An intimate or romantic relationship can also provide a

5  motive sometimes for a violent act such as a homicide.  Right?

6  A    That's correct.

7  Q    So you would want to know about the nature of the romantic

8  or marital relationship of a decedent in order to form an

9  opinion about a possible motive, wouldn't you?

10 A    Yes.

11 Q    And you testified on direct examination that you -- your

12 understanding is that there was no such problem in the

13 marriages of either of these folks.  Right?

14 A    Not at the time of the incident.

15 Q    Okay.  Were you aware of it at any other time?

16 A    I was aware there -- there was one incident involving Mr.

17 Belisle, yes.

18 Q    Okay.  And what was the incident involving Mr. Belisle

19 that you're aware of?

20 A    I believe it was infidel -- infidelity.

21 Q    And do you know when that was?

22 A    I have no idea, sir.

23 Q    So in forming your opinion, you would want to know whether

24 either of the spouses had been having any extramarital

25 relationships, basically.  Right?

1  A    Correct.

2  Q    Because that's the kind of a thing that could precipitate

3  in some cases a homicide or some other violent act.  Right?

4  A    That's correct.

5  Q    And you would want to see, for example, if the surviving

6  spouse is all of a sudden intimately involved with another

7  partner, wouldn't you?

8  A    Yes, sir, based upon other factors in the case as well,

9  yes.

10 Q    You would want to know that because that might be evidence

11 of some other premar -- predeath marital relationship.  Right?

12 A    It may.

13 Q    And you weren't provided any such information in this

14 case, were you?

15 A    No.

16 Q    You would want to know generally in forming your opinion

17 whether either decedent or their spouse upon discovering any

18 infidelity made any threatening statements to the other spouse.

19 Right?

20 A    Yes, sir.

21 Q    Any ultimatum-driven statements about the infidelity.

22 Right?

23 A    That's correct.

24 Q    And did the prosecutors in this case provide you any such

25 information?

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

**MORTON - CROSS**

1  A    Other than what I stated earlier, that I generally knew

2  that there had been an infidelity earlier in the -- in the

3  relationship, but at the -- at the time of the incident there

4  was no such thing.

5  Q    And the -- no information regarding that was provided to

6  you.  Isn't that right?

7  A    Correct.

8  Q    About any threat?

9  A    Correct.

10 Q    Were there -- were there any information about any threats

11 being made regarding infidelity at any time?

12 A    Not that I recall, sir.

13 Q    You've indicated in your report that it would be important

14 for you to find out whether either of its decedents or their

15 spouses had engaged in any high-risk behaviors.  Right?

16 A    Correct.

17 Q    And when you say high-risk behaviors, what do you mean?

18 A    High-risk behavior are -- are things like dealing in

19 criminality, engaging in other very reckless conduct that puts

20 them in a position where somebody would commit a violent crime

21 against them.

22 Q    And you would include in that -- in reckless conduct other

23 infidelities, for example, like swinging and things like that?

24 A    That may have -- that may have a bearing, yes, sir.

25 Q    You would also -- because that might generate negative

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

**Exhibit C, Page 26 of 50**

1  emotions or jealousy in another person?

2  A    It may.  Yes, sir.

3  Q    In determining what motive might be for a homicide, you

4  would also want to know whether either of the wives of the

5  decedents believed that her husband was planning on abandoning

6  her, on leaving his wife.  Wouldn't you want to know that?

7         MS. LOEFFLER:  I'm going to object.  Assumes facts not

8  in evidence.  Been brought up lots of times.  Nobody's -- well,

9  sorry, I'll stop.

10        THE COURT:  Well, I have told the jury very clearly,

11  the questions of attorneys are not evidence.  I'll say it

12  again.  Go ahead.  Go ahead.

13        MR. OFFENBECHER:  Sure.

14  BY MR. OFFENBECHER:

15  Q    Well, you would agree, wouldn't you, that the actual or

16  perceived abandonment of a sexual intimate like a marital

17  partner could be a reason for a homicide.  Is that right?  And

18  that's information that you'd at least want to know.  Right?

19  A    Yes, sir.

20  Q    You would want to know whether either of the decedents had

21  been perhaps disparaging or engaged in angry talk with his

22  spouse about their attractiveness, for example, or made other

23  disparaging comments.  Is that right?

24  A    Yes, sir, that may have some bearing.

25  Q    And you would want to know, in terms of determining

1  motive, whether one of the spouses was imminently intending to

2  leave the other spouse, because that could generate negative

3  emotions.  Right?

4  A    Yes, it may.

5  Q    You would want to know, in determining the overall motive,

6  whether the mistress or whatever word you would want to use,

7  the paramour, of one of the decedents was engaging in any kind

8  of stalking behavior of the decedent.  You would want to know

9  that, wouldn't you?

10 A    Yes, sir.

11 Q    And were you provided any such information about that in

12 this case?

13 A    No, sir.

14 Q    You would want to know if the spouse who had been cheating

15 on his other spouse had incurred --

16     MS. LOEFFLER:  I'm going to object again, Your Honor.

17 They're -- this is just rank speculation.

18     MR. OFFENBECHER:  No, it's not.  This all comes from

19 FBI interviews, Your Honor.

20     THE COURT:  Well, all I'm saying is, first of all, let

21 me rule.  We can go on and on and on.  That's why I keep

22 cautioning the jury, questions of attorneys are not evidence.

23 Sometimes you get questions because people are entitled to ask

24 questions, and later the evidence supports it or doesn't

25 support it.  That's why we tell you don't place weight on

 1  questions.  That's all I can say.

 2  BY MR. OFFENBECHER:

 3  Q    And I'm -- just to be clear, I'm just asking you whether

 4  these are factors that could be important and whether you have

 5  any information on it, that's all.

 6  A    Yes, sir, they could be important.

 7  Q    Sure.  And information that the spouse had encouraged his

 8  spouse to directly engage with the jilted mistress on Facebook

 9  and email and so forth, that would be information you'd want to

10  know if it was there.  Right?

11  A    Correct.

12  Q    And you weren't provided any such information in this

13  case, were you?

14  A    No, sir.

15  Q    In terms of financial problems, financial problems can

16  sometimes cause emotions or get people into trouble where

17  there's violence or homicide.  Right?

18  A    Yes, sir.

19  Q    So you would want to know in determining the motive and

20  doing your crime scene analysis and what you call victimology.

21  Right?

22  A    Correct.

23  Q    You call it victimology?

24  A    Yes, sir, I do.

25  Q    You would want to know whether either the decedent or his

1  spouse or associates were experiencing some financial problems,

2  wouldn't you?

3  A   Yes, sir.

4  Q   Or had high anxiety or stress over debt levels, right?

5  A   Yeah, it may have -- that may have a bearing.

6  Q   That could have a bearing in your determination of the

7  motive or the reason for the homicide.  Right?

8  A   Correct.

9  Q   And were you provided any such information by the

10 prosecutors about that?

11 A   Other than I originally stated, I received general

12 information about the victims.

13 Q   All right.  And here's my question.  Did you receive any

14 information that either of these decedents or their spouses

15 were -- had financial problems or were suffer -- were

16 experiencing stress over high debt?

17 A   Not that I recall.

18 Q   There are other possible motivations that you as a

19 professional look at, other facts that could provide a

20 motivation for homicide besides the ones we've talked about.

21 Right?

22 A   Yes, sir.

23 Q   For example, if a decedent has -- is either a law

24 enforcement officer or is a former law enforcement officer,

25 that's a fact that could be important to you.  Right?

1    A    It may, yes, sir.

2    Q    And that's because a former law enforcement officer may

3    have made enemies of people in the criminal life.  Isn't that

4    right?

5    A    That's correct.

6    Q    And so one of the things you want to look at is whether a

7    former law enforcement or a law enforcement officer has made an

8    enemy of the -- by arresting someone or prosecuting someone,

9    and then that criminal might want to come back and get revenge.

10   Right?

11   A    That's possible, yes, sir.

12   Q    And so that's a fact you would want to know about whether

13   either of the decedents had been a former criminal -- a former

14   law enforcement officer?

15   A    Yes, sir.

16   Q    And the prosecutors didn't provide you any information

17   about that in this case, did they?

18   A    Not per se.  I don't recall that either one of them was a

19   law enforcement officer, sir.

20   Q    And you weren't provided any information that either of

21   these decedents had been involved in law enforcement, were you?

22   A    No.

23   Q    You know from your experience that the other family

24   members besides the spouse -- for example, the children or

25   other relatives -- can also generate emotions that might result

1  in some kind of violence or homicide.  Right?

2  A    They may, yes, sir.

3  Q    For example, one's children sometimes can, you know --

4  there can be conflict between a parent and a child?

5  A    Correct.

6  Q    And that that family conflict can sometimes go -- not

7  usually, but sometimes escalate into some kind of violent

8  misconduct.  Right?

9  A    Yes, sometimes it can.

10 Q    And so you would want to know whether either of the

11 decedents in this case was experiencing a significant

12 disciplinary problem with a child that could possibly have

13 escalated into a violent confrontation, wouldn't you?

14 A    Yes, sir.

15 Q    And the prosecutors in this case didn't give you any

16 information that there was any such disciplinary problem in

17 this case, did they?

18 A    No, sir.

19 Q    You would want to know, in determining your motive, as

20 you -- as you've indicated, and the personal circumstances of

21 the decedent -- you would want to know whether any of the close

22 family members of the decedents or associates were closely and

23 intimately involved with individuals who are criminals or

24 involved in drug dealing or things like that.

25      MS. LOEFFLER:  Objection, Your Honor.

1    MR. OFFENBECHER:  Is that --

2    MS. LOEFFLER:  This one I know -- for the reasons that
3 we've stated before.

4    MR. OFFENBECHER:  Your Honor, this is straight from the
5 FBI interviews.  I'm asking the questions.

6    THE COURT:  Well, listen.  I -- people can come up with
7 all kinds of theories.

8    MS. LOEFFLER:  Okay.

9    THE COURT:  Counsel are asked to -- are allowed to ask
10 questions.

11    MS. LOEFFLER:  Right.

12    THE COURT:  Questions are not evidence.  And someti --
13 and we have to keep telling you that, because if it comes in
14 the courtroom, probably someone says, "Well, I heard it in
15 court."  That's why I told you, ladies and gentlemen, if you
16 heard it in the courtroom it's not evidence unless it comes
17 from a witness or through the exhibits or agreement of the
18 parties.  Can I be any clearer?  I think I've done a good job
19 of explaining that.  So I'm allowing some leeway.

20    MR. OFFENBECHER:  All right.  And --

21    THE COURT:  But --

22    MR. OFFENBECHER:  -- just so we're clear, all I'm --
23 yeah --

24    THE COURT:  Your job is to ask the questions --

25    MR. OFFENBECHER:  Right.

MORTON - CROSS

1      THE COURT:  -- but it's not evidence.

2      MR. OFFENBECHER:  Right.

3      THE COURT:  Okay.

4  BY MR. OFFENBECHER:

5  Q   And it's not evidence.  I'm just asking you, if that fact

6  were there, would it be important to your determination, and

7  you're answering the question.

8  A   It -- it -- it --

9      THE COURT:  So your question --

10     THE WITNESS:  -- may be, yes.

11     THE COURT:  Let me ask --

12     MR. OFFENBECHER:  Yeah.

13     THE COURT:  -- it -- your questions are hypothetical,

14  in the event.

15     MR. OFFENBECHER:  Right.  If there were any such

16  information, exactly.

17  BY MR. OFFENBECHER:

18  Q   If there were any such information, that might be

19  important to you, right?

20  A   It may be, yes, sir.

21  Q   And the prosecutors did not provide you any information on

22  that topic, did they?

23  A   No, sir.

24  Q   You would also want to know, Mr. Morton -- in determining

25  whether there's anybody who might be interested in harming

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1  these individuals, you would want to know whether either of the

2  decedents had recently taken any legal action against a violent

3  or criminal person that -- and thus might end up being the

4  object of that person's revenge.  Right?

5  A    I'm -- I'm not clear on your question.

6  Q    Yeah, because I didn't articulate it very well.  Let me

7  try again.  You would want to know whether the decedent, one of

8  the decedents or their close family members, had recently taken

9  legal action against some other criminal person.  For example,

10 if there -- had taken out a restraining order or something like

11 that, you would want to know, because that person against whom

12 the restraining order was taken might want to seek revenge for

13 that, right?

14 A    Again, that may be, yes.

15 Q    And you weren't provided in this case by the prosecutors

16 any information regarding that, were you?

17 A    No.

18 Q    Now, as a trained criminal investigator, you would expect

19 there to be interviews of close family members regarding these

20 topics, right?

21 A    Correct.

22 Q    And you would expect the investigating agency, in this

23 case the FBI or the Coast Guard Investigative Service, to

24 conduct close interviews of those family members to determine

25 the facts that we've just talked about.  Right?

**MORTON - CROSS**

1    A    Yes, sir.

2    Q    And if you were a trained criminal investigator and these

3    people were interviewed and they made false statements to the

4    investigators, that would be something that you would want to

5    know about too, isn't it?

6    A    Correct.

7    Q    Because the fact that a spouse or close family member made

8    false statements in official investigation to the FBI or the

9    Coast Guard Investigative Service would be something that would

10   cause you suspicion about what the true motives for the

11   homicide were.  Right?

12   A    Yes, sir, again, it may.

13   Q    And in this case, the government has not provided you any

14   such information, have they?

15   A    No, sir.

16   Q    Mr. Morton, you talked on direct examination about whether

17   both of these individuals were targets of the perpetrator or

18   whether just one of them was a target of a perpetrator.  Is

19   that right?

20   A    That's correct.

21   Q    Now, in this case, the person who came into the T2 rigger

22   shop shot and killed Mr. Belisle first, you indicated.

23   A    Well, he shot Mr. Belisle first.

24   Q    That's your analysis?

25   A    Correct.

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

**Exhibit C, Page 36 of 50**

**MORTON - CROSS**

1  Q   And then shot Mr. Hopkins.  Is that right?

2  A   Correct.

3  Q   And that's based on your assessment of the physical

4  evidence and the photographs?

5  A   Correct.

6  Q   Is it fair to say that your experience sometimes -- and in

7  your experience in Chicago and all around the country in these

8  cases, that sometimes a single person is targeted but there are

9  other people who are present at the scene and that they are

10  killed so that they won't be a witness to the targeted

11  homicide?

12  A   Such things are possible, yes, sir.

13  Q   Well, surely in your years in Chicago there have been

14  instances in which a per -- an individual was targeted and

15  somebody else was there, for example, a spouse, a co-worker, a

16  friend, somebody walking down the street who might be a witness

17  to the crime.  Right?

18  A   Would -- would somebody else be at the crime and be a

19  witness?  Is that what you're asking me, sir?

20  Q   Right.

21  A   There could be, yes.

22  Q   And that the person who killed the targeted person didn't

23  want there to be a witness to the crime.  Right?

24  A   That could be possible too, yes, sir.

25  Q   And that person who was merely a witness to the targeted

1  event would also be killed so that there wouldn't be any

2  witnesses.  Is that right?

3  A   That's entirely possible.

4  Q   And you've had cases where that's happened before.  Right?

5  A   Not in this set of circumstances, though.

6  Q   Right.  But I'm just talking about generally, the fact

7  that there --

8  A   Yeah, generally, if you -- I'll -- let me -- I'll answer

9  your quest -- generally, if you look at certain murder cases,

10  there are instances where there's more than one -- the victim

11  is there and somebody else is there and somebody else will get

12  shot.  That usually falls along the lines, though, when you're

13  talking about people involved in criminality.

14  Q   Now, in this case, the perpetrator came in and shot Mr.

15  Belisle, right?

16  A   Yes, sir.

17  Q   And, in fact, the perpetrator shot everybody that was at

18  the T2 rigger shop that morning.  Is that right?

19  A   That's correct.

20  Q   So that if somebody else had come in earlier that day out

21  of schedule and just happened to be in the break room, that

22  person might have been killed as well.  Right?

23  A   Only if you go along the theory that -- that the -- one of

24  the victims was killed because they were a witness instead of

25  both victims being targeted.

1  Q    And that happens sometimes, you said?

2  A    Possible, yes.

3  Q    Part of your -- the premise of your opinion that they're

4  both targets rather that -- one, is that they were both --

5  these two individuals both were in the building at the time the

6  shooting occurred.  Is that right?

7  A    That's one of the factors, yes, sir.

8  Q    That assumes that the person who did the shooting actually

9  knew the schedules of both of the persons.  Right?

10 A    Yes, it does.

11       MR. OFFENBECHER:  I don't have any other questions,

12 Your Honor.

13       THE COURT:  Redirect.  It is break time, but if we can

14 finish it up before break, I -- unless everybody's -- is that

15 okay, try to finish this witness?

16       MS. LOEFFLER:  Yes, Your Honor.

17       THE COURT:  Okay, good.

18                    **REDIRECT EXAMINATION**

19 BY MS. LOEFFLER:

20 Q    Special Agent Morton, first, if somebody was a military

21 police officer a decade before these events, would that weigh

22 really heavily in your analysis of motivation?

23 A    No, it would not.

24 Q    Okay.  So the time period of these alleged statements

25 would actually matter?

1   A    Yes, they would.

2   Q    Okay.  Now, Mr. Offenbecher asked you about the fact that

3   sometimes when somebody's killing one person, there are

4   circumstances when someone else might get killed as sort of

5   collateral damage, I'm going to call that.

6   A    Yes.  Yes, ma'am --

7   Q    Okay.

8   A    -- that's possible.

9   Q    Did that appear to apply at all in this circumstance?

10  A    No, it did not.

11  Q    Why not?

12  A    The -- the choice of the building, first of all, to walk

13  in there to shoot someone, there's vehicles parked outside, so

14  whenever the offender's entering the building, he knows there's

15  more than one person in there to begin with.  The layout of the

16  building being very unusual, this -- this offender had to

17  confront one victim, turn around and confront the other victim

18  almost immediately.

19  Q    Because there -- let me just ask that.  Because there's

20  lots of rooms.  If you don't know the building, other --

21       MR. OFFENBECHER:  Objection.  That's a leading question

22  now --

23       MS. LOEFFLER:  I haven't finished --

24       MR. OFFENBECHER:  -- on redirect.

25       MS. LOEFFLER:  -- the question.

1         MR. OFFENBECHER:  It's leading.

2         THE COURT:  But it starts -- it sounds leading.

3         MS. LOEFFLER:  Okay.  I'm leading as a foundation.

4         THE COURT:  Okay.

5         MS. LOEFFLER:  Okay.

6         MR. OFFENBECHER:  Now --

7 BY MS. LOEFFLER:

8 Q   You said the building was unusual.  Explain to the jury

9 why you mean it's unusual.

10 A   The building's unusual because, unless you had a -- a key

11 card to get into the building, the only door that was unlocked

12 was a door that -- that led into that, basically, locker

13 storage room.  So when you entered that building, you would

14 have had to make an immediate left and then make a right and go

15 around into the office where Mr. Belisle was, come out of

16 there, stand into that same central hallway, and then engage

17 with Mr. Hopkins.

18 Q   And let's put up 392 again for a sec.  Okay, there we go.

19 So when you -- whoops, we just went up and we went down again.

20 Okay.  So --

21     (Side conversation)

22 Q   So if you look at this building, and you don't know the

23 building, and you come in, how are you going to know where

24 people are?

25 A   I don't think you are, because you come in here.  There's

1  a locker room.  This is where Mr. Belisle was.  This is where

2  Mr. Hopkins was.  So when you come in here, you're basically

3  not looking at anybody or anything.  You're looking basically

4  at a -- at a storage area.  It's not a public building, so

5  there's no main entrance where you can walk up to a desk and

6  say, "I need something."  So whoever comes in here has to hunt

7  out and find the victim, the first victim here, Mr. Belisle,

8  come back out, and then engage with Mr. Hopkins.

9  Q   Okay.  And is this building -- have -- if somebody -- if

10  there -- if you don't know the schedule, are there places --

11  lots of places in this building where people could be?

12        MR. OFFENBECHER:  Objection.  That's a leading

13  question.

14        MS. LOEFFLER:  No, it isn't.  Didn't ask him yes or no.

15  Well, actually, I did.  I'll come back and I'll phrase it

16  again.

17        THE COURT:  Okay.

18        MS. LOEFFLER:  How's that.

19  BY MS. LOEFFLER:

20  Q   Okay, if you don't know this building, are -- is there

21  anything about it that would make it difficult if you're trying

22  to target somebody?

23  A   Yes.  I mean, from a tactical standpoint of an offender

24  going into this building to kill somebody, it would be a -- it

25  would be a disaster, because when -- the minute you enter the

1  building, you have no idea where anybody could be in that large
2  complex.
3  Q    Now let me go back to Mr. Offenbecher's question about the
4  circumstances in which somebody wants to kill one person and
5  ends up killing the other.  In your experience, what types of
6  circumstances does that happen?
7  A    That would happen, like, within a -- a -- a drug killing,
8  organized crime kind of killing, those kind.
9  Q    Now, is that in your opinion something that happened here?
10  A    No, not at all.
11  Q    Why not?
12  A    First of all, the -- the -- the nature of these victims
13  overall in general in their lifestyle does not indicate they're
14  involved in any organized crime or in any drug dealing
15  themselves.  And in -- in any kind of drug murder the victim is
16  usually the person who's engaged in that -- in that activity.
17  Q    Now, is there anything about the actual shootings and the
18  number of times they were shot that also enters into your
19  analysis?
20  A    Yes, it does.  The number of times shooting reflects the
21  offender's goal, if you will, to walk into that building, and
22  his goal when -- when he went in there with that large-caliber
23  handgun was to -- was to kill both of those victims.
24  Q    Now, Mr. Offenbecher asked you a whole lot of questions
25  suggesting domestic violence motives.  Is that consistent with

1  what you saw in the crime scene?

2  A    No, it's not.

3  Q    Why not?

4  A    Because offenders choose to -- if an -- in other words --

5  let me back up here.  If someone decides to kill a spouse

6  because of --

7  Q    Yeah.

8  A    -- whatever the reason -- conflict in the marriage --

9  there's always -- there's a -- there's a time that they can

10  pick when the victim is available and vulnerable.  There's --

11  there are much better times to choose than when they're at

12  work, when there's going to be other people there.  So in other

13  words, if I wanted to kill a spouse, why not do it at home when

14  you're right there with the victim.  Why not do it on the way

15  there, why don't you do it alone -- since you know the routine

16  so -- so well, why don't you do it at a time when you know

17  they're going to be alone by themselves, and then you only have

18  to engage with one person.

19  Q    How many cases have you seen of domestic violence where

20  there is a -- well, I'm going to call it a collateral damage

21  victim or an -- who has nothing to do with whatever the

22  conflicts are.

23  A    If one spouse -- in other words, if one spouse targets

24  just the one spouse, I have never seen that.

25  Q    Okay.  And Mr. Offenbecher asked you about -- if there was

1  a martial infidelity in something, that could enter an

2  analysis.  Right?

3  A   Correct.

4  Q   Does it turn on whether it's recent or whether it's years

5  in the past?  I mean, does that affect --

6          MR. OFFENBECHER:  Objection.

7          MS. LOEFFLER:  I'm sorry, I --

8          MR. OFFENBECHER:  It's a leading question.

9          MS. LOEFFLER:  I can -- Your Honor, I have to follow up

10  on the statements he made.  I can ask him --

11         THE COURT:  I -- okay.

12         MS. LOEFFLER:  Okay --

13         THE COURT:  Go ahead, ask the question.

14         MS. LOEFFLER:  Okay.

15  BY MS. LOEFFLER:

16  Q   If a -- I'm asking you a hypothetical question.  If a

17  marital infidelity happened years in the past, does that affect

18  at all your analysis of whether it has relevance or not to a

19  crime scene?

20  A   It -- it can, and -- and if I may explain.  The -- the --

21  the focus on just who the victims are and what the victims do

22  is only one portion of the analysis.  You have to weigh that

23  against the other -- the other -- the other things that are

24  going on in the incident.  In other words, how the offender

25  chooses to approach the victim, how the offender engages the

1 victims, how the offender chooses to kill the victims.  It --

2 it's not -- it's not the central factor, it's a factor.

3 Q   Okay.  Now, Mr. Offenbecher asked you about the fact of

4 whether somebody -- I think it was something about life

5 insurance or -- well, let me ask you this.  With regard to

6 military victims, would you -- do you have any understanding of

7 whether they would have life insurance or not?

8 A   Yes, they would.

9 Q   Okay.  And whether they would or wouldn't, would that

10 affect any -- your analysis here?

11 A   I -- I assumed that they did have it, because they were

12 either in the military or retired.

13 Q   Okay.  And with regard to working people, people that are

14 lucky enough to have, you know, government jobs or even, you

15 know, jobs with employers that can afford this type of thing,

16 which everybody doesn't have, would you expect to -- there be

17 financial benefits to people whose spouses are murdered on the

18 job?

19 A   I'm -- yes, there would be some -- some kind of benefit

20 financially.

21     (Side conversation)

22       MS. LOEFFLER:  One second, Your Honor.

23 BY MS. LOEFFLER:

24 Q   Your Honor -- I'm sorry, I didn't mean Your -- you're not

25 Your Honor, you're the witness.  Mr. Morton, Mr. Offenbecher

MORTON - CROSS

1 asked you whether if somebody had a restraining order that
2 could be relevant to motive.  Do you recall that?
3 A    Yes, he did.
4 Q    Okay.  And if the person the restraining order was against
5 wasn't on the island, would that matter?  If they're not
6 physically capable of doing it at the time, would that be a
7 relevant inquiry?
8 A    Yes, that would basically eliminate them for my analysis
9 purposes.
10 Q    Okay.  Mr. Offenbecher asked you a lot of questions about
11 marital issues and conflicts that can happen in a marriage.
12 Did any of his questions change your conclusion in this case
13 about the targeting of the two individuals?
14        MR. OFFENBECHER:  Your Honor, the questions weren't
15 evidence.  The questions about whether he had been provided
16 information, he indicated he hadn't been provided that
17 information.
18        THE COURT:  I don't know if that's an objection or not,
19 but if it is, it's overruled.
20        THE WITNESS:  I'm sorry, could you repeat the question?
21 BY MS. LOEFFLER:
22 Q    Okay.  Based on what has gone on in the courtroom today,
23 do you have any difference in your view of what the -- your
24 conclusions as to the killing of these two people?
25 A    No, I do not.

1  Q    Why not?

2  A    Simply because the information that I -- that I received

3  and asked for concerning these victims in particular -- like I

4  said, it's only a small portion of -- of -- of -- of the

5  analysis process, looking at the victimology.  If there is

6  nothing that jumps out in the beginning, based upon the

7  interaction of the offender with the victims, it really becomes

8  a negligible issue.

9  Q    Okay.  And with regard to this crime scene, what was the

10 most important information that you saw that led to your

11 conclusion?

12 A    I think the fact that both victims were at work at their

13 usual time, and the offender chose at that time to walk into

14 that building and basically shoot both of them to death.

15 Q    Nothing further.  Thank you.

16        THE COURT:  Recross.

17                    **RECROSS EXAMINATION**

18 BY MR. OFFENBECHER:

19 Q    Mr. Morton, you've indicated that at the National Center

20 for the Analysis of Violent Crime, your principal occupation is

21 dealing with unusual, bizarre, and repetitive crimes.  Right?

22 A    That's correct.

23 Q    That was your direct examination, right?

24 A    That's correct.

25 Q    So the average spousal homicide is really not a bizarre,

1 unusual, or repetitive crime, is it?

2 A   I don't know what an average spousal murder is, sir.

3 Q   Okay.  Well, what's an unusual, bizarre, or repetitive

4 crime for you?

5 A   Repetitive crimes are serial murder cases.

6 Q   Okay.

7 A   To most -- and that can incur -- include anything from

8 murder to rape to anything else that occurs on a serial basis.

9 Bizarre crimes basically can be any kind of crime scene that

10 doesn't appear in a -- in a manner that local police are used

11 to seeing.  In other words, most sexual murders fall within

12 that bound because of the bizarre interactions of that offender

13 with the victims.  Unusual crimes can be absolutely anything,

14 from -- from a -- a serial burglar who hasn't been caught in 25

15 years to a unusual domestic homicide case.

16 Q   Okay.  Now -- excuse me.  You indicated in your direct

17 examination that the fact that the in --

18      MS. LOEFFLER:  Your Honor, I'm going to object as

19 beyond the scope of --

20      MR. OFFENBECHER:  No, no, this -- I --

21      MS. LOEFFLER:  -- redirect.  If we're going back to the

22 direct examination --

23      THE COURT:  Well, I'm concerned about our -- I thought

24 we were about ready for a break.  Are you -- is it --

25      MR. OFFENBECHER:  Sure.  I -- it might be a good idea

1  to take a break.

2          THE COURT:  Okay.  We'll take a 15-minute recess.  All

3  right, you've got 15 minutes, sir.

4          THE CLERK:  All rise.  Matter stands in a 15-minute

5  recess.

6      (Jury not present)

7          THE COURT:  Okay, 15 minutes.

8          THE CLERK:  Off record.

9      (Court recessed at 10:22 a.m., until 10:42 a.m.)

10     (Jury not present)

11         THE CLERK:  All rise.  His Honor the Court, the United

12 States District Court is again in session.  Please be seated.

13         THE COURT:  Okay.  They're coming in.

14     (Jury present)

15         THE COURT:  Okay, please be seated.  I guess we're at

16 recross.

17 BY MR. OFFENBECHER:

18 Q   Right.  Just a couple more questions, Mr. Morton.  You

19 provided your report to the government in this case on October

20 11th, 2013.  Right?

21 A   Yes, sir.

22 Q   And one section of your report is entitled Victimology.

23 Right?

24 A   Correct.

25 Q   And you would agree with the following statement in that: