BRYAN SCHRODER
United States Attorney

STEVEN E. SKROCKI
Deputy Criminal Chief
CHRISTINA SHERMAN
Assistant U.S. Attorneys

KELLEY STEVENS
Special Assistant U.S. Attorney
Federal Building & U.S. Courthouse
222 West Seventh Avenue, #9, Room 253
Anchorage, Alaska 99513-7567
Phone: (907) 271-5071
Fax: (907) 271-1500
Email: steven.skrocki@usdoj.gov
christina.sherman@usdoj.gov
kelley.l.stevens@uscg.mil

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) <br> ) <br> Plaintiff, ) <br> ) No. 3:13-cr-00008-SLG <br> v. ) <br> ) <br> JAMES MICHAEL WELLS, ) <br> ) <br> Defendant. ) <br> ) | |

**GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION IN LIMINE TO LIMIT TESTIMONY OF GOVERNMENT EXPERT ROBERT MORTON**

Defendant Wells has filed with the court a motion in limine seeking to preclude or limit the testimony of Robert Morton, an expert witness sought to be called by the United States for purposes of explaining the facts surrounding the murders of Richard Belisle and James Hopkins. While the defendant spends many pages claiming that a good portion of Mr. Morton's testimony will be based on speculation, the defense motion is equally and ironically guilty of the same claim, speculating ahead of time as to what Morton's testimony may be in this second trial. Based on Mr. Morton's prior trial testimony, the defense claims a similar set of questions and answers will be posed by the government in this case. The defense is mistaken and should cease living in the past and speculating that things will be posed the same and answered the same. The motion, based on prior trial testimony is premature as a new trial is forthcoming, and certainly will not be a carbon copy of the one that went before. For those reasons, along with the appropriateness of Morton's testimony under FRE 702, the defendant's motion in limine should be denied.

## I. INTRODUCTION

The court has before it yet another motion wherein the defense makes incorrect and speculative statements as to the testimony of a government witness based on prior trial testimony. In doing so, Wells attempts to yet again leverage the reversal by claiming that the government is clearly intent on making this trial a duplicate 'workplace violence' case. While not being true, Wells cannot escape the very real fact that he murdered his co-workers/colleagues in cold blood when they arrived to begin their work day at their place of their employment. The approximate time and location of murders are established

facts. They are just as factual as Jim Wells' unbelievable alibi of having to return home due to a low tire, thus being the only one of the three who failed to make it work the day of the murders.

Like many motions filed with this court, the defendant casts aspersions, and spends a considerable amount of time and pages repeating the prior trial. Wells does this for two reasons. The first is to claim that the government has the ill-intent to, with the loss of the Meloy testimony, unethically camouflage its case by the use of Morton or other witnesses in order to call this yet another work-place violence trial. Next, Wells does so with the intent of a not so subtle effort to limit the government's testimony and color the trial with the specter of reversal on appeal. As shown below, the defense motion is premature, and suffers from the same speculative liabilities it claims taints Morton's testimony.

Based on the foregoing, the court should deny the defendant's motion as premature, speculative and permit Morton to testify under FRE 702.

## II. FACTS FOR MORTON'S TESTIMONY AT TRIAL

On the morning of April 12, 2012, Jim Wells left his home in the Bell's Flat area of Kodiak, Alaska with murder at the forefront of his mind. With his wife out of town in Anchorage, and her car parked at the Kodiak Airport, Wells' premeditated murder plan was in motion well before he left for work that morning. Prior to murdering the two men he worked with every day, Jim Wells concocted an alibi scheme, shot a 16 penny nail into his truck tire with a nail gun, grabbed a .44 pistol stolen from an old friend, loaded it

with at least 5 bullets, and focused on his scheme to avoid or deflect scrutiny because, as one who should have been at work at the time of the murders, Wells knew he would be under scrutiny by investigators-an inescapable fact, and one he knew all too well.

    Far from focusing on Jim Wells' exclusively, the defendant ignores the fact that the investigation interviewed hundreds of individuals, examined hundreds of cars, issued pleas for assistance to the public, conducted searches for the murder weapon and took 10 months to arrest Wells. Ironically, despite all the planning, it was Wells himself who by, action and inaction, made himself a prime suspect. The government didn't need to focus on Wells for lack of suspects, nor did it need Robert Morton to provide a suspect to fit a theory. Wells called attention to himself all on his own. He did this by asserting a bogus 'low tire excuse' while his wife was out of town, blurted out, "I had a flat" to his supervisor to justify his missing work that morning. He called one of the men he murdered to report his absence from work due to a nail in the tire. He also did it by switching/using his wife's car at the airport the morning of the murder, not counting on a camera at the T1 building catching his wife's blue car arriving immediately before the murders, and departing immediately thereafter. He made himself a prime suspect by entering the rigger shop without detection-one of the few people that could-as there was no other way to get to Mr. Belisle and Mr. Hopkins at the same time. Wells made himself the prime suspect by drawing a map of the rigger shop's camera's field of view, establishing knowledge of the field of view and later during his interview with agents utterly failing to account for his whereabouts the morning of the murders when

U.S. v. Wells
3:13-cr-00008-SLG                                        4

confronted with a 34 minute gap in his alibi. He made himself a prime suspect when the 'nail in the tire' wasn't driven on, and, in fact, that the tire contained 28 pounds of pressure-more than enough to drive on normally.

Far from the defendant's claims of a 'paper thin case,' the case against Wells is incredibly detailed, factually supported and is so due to Wells' own actions and inactions in attempting to unsuccessfully conceal himself as his colleagues' murderer.[1]

As to Robert Morton, Morton produced a Criminal Investigative Analysis report based on information provided to him by the investigation. He clearly listed the sources relied upon in the Criminal Investigative Analysis. (Defense Ex. A, pg. 1). Morton's testimony will be based on his summary and opinion of the facts and circumstances as they are listed primarily in the supplement. Wells claims Morton is acting as a de-facto profiler. There is no evidence of this. Morton's report characterizes the murderer as an "offender' and neither directly nor indirectly refers to nor cites to the defendant by name. (See, Defense Ex. A, pgs. 5-8). Nor does Morton do so in his supplement to his initial report. (See Defense Exhibit B, pgs. 1 and 2). While the supplemental report will provide a context and background for the government's examination of Morton at trial, the government, as stated previously, will not be seeking any evidence on 'workplace

---

[1] Note the government is not going to refer to Mr. Morton's prior testimony. What is forthcoming is a new trial, with a new approach, and new questions. Despite Wells' rather unscrupulous claims that the government is attempting to substitute Morton for Meloy, nothing could be further from the truth. The fact remains Wells murders his colleagues where the men worked and in the building where they all worked together. Those specific facts are unescapable for Wells, try as he might to limit them or the government's use of them.

U.S. v. Wells
3:13-cr-00008-SLG                                    5

violence.' It is, however, clear and unavoidable that Messrs. Belisle and Hopkins were murdered at their place of employment, and that their colleague, Jim Wells, should have been at work with them when the murders occurred. The fact that he was not, coupled with a failed and botched alibi attempt, is also factual evidence the government is fully entitled to present and the jury fully entitled to consider.

In any event, despite Wells' protestations of profiling and 'workplace violence' Morton's report does not contain nor refer to any such statements or conclusions, nor does it provide a 'criminal profile' of Wells either psychologically, financially, personally or otherwise. It is a clinical analysis of the facts of the murders and the acts of the murderer and the victims.

As to the supplemental report, Morton found as follows and will testify along the following conclusions:

- The offender entered a United States military base and drove to the building where both men worked. The T-2 Rigger Shop was a non-descript building that was not open to the public.
- The offender entered the building where both men worked during the early morning hours. This was their normal routine, and they were there alone. Both victims' vehicles were clearly parked outside the building.
- The door to the communication shop, that was left open, entered into a locker/storage room. The offender had to enter the building, make an immediate left turn, then make a right turn and go to the office where victim Belisle was sitting.
- The evidence indicated Mr. Belisle was first shot while sitting in his chair, which his back to the door. This indicated Mr. Belisle was not concerned about the person, who entered, or did not hear the offender enter the shop. The second victim, Mr. Hopkins was shot as he stood in the doorway of the break room. Both victims were then each shot again, Mr. Belisle two more times, Mr. Hopkins once more. The offender then left the scene.

U.S. v. Wells
3:13-cr-00008-SLG 6

- The circumstances and activities of this crime reflect an offender who was familiar with the shops location, had knowledge of the victim's time schedule, and knew no one else would be at the shop at the time. Although a number of people worked at this particular shop, only these two victims were killed, indicating they were targeted. All of the actions of offender reflect a singular purpose, to kill both victims. The assault on the two victims was direct and immediate. The offender brought a large caliber weapon and fired multiple times to ensure the death of the victims. The lack of evidence of any other interaction other than the gunshots demonstrates that the sole purpose of the interaction was to kill both victims.

    The motive in this case can be discerned through the actions of the offender, as well as the life styles and occupations of the victims. In this particular case, there were no current apparent controversies in either victim's personal life, and their current occupations did not present a high risk for violence. Additionally, the location of the murder scene, located on a Coast Guard Base, reduces the chances that this was a random event. In considering all of these factors, it highlights that the offender killed the victims for some personal reason. These types of murders have been referred to as personal cause homicides. Personal cause homicides are murders where the offender has or perceives having a conflict or problem with the victim(s) and the solution to the disagreement was to kill the victim(s).

See Defense Exhibit B, pg. 2, Docket 1004-2

None of these conclusions are profiling, nor does it spill over into the 'workplace violence' realm. They are appropriate expert testimony and permitted under FRE 702.

### III. MORTON'S TESTIMONY IS NOT PROFILING; RATHER, HIS EXAMINATION OF THE CRIME AND FACTS SURROUNDING IT ARE BASED ON HIS EXPERIENCE AND TRAINING AS A VIOLENT CRIME EXPERT AND FULLY PERMISSIBLE PER FRE 702

Wells attempts to bootstrap the concerns of the Ninth Circuit as to 'workplace violence' into precluding Morton's testimony by labeling Morton's findings as 'offender profile' conclusions, which are designed to assist the government to build a theme and a

case against Wells. This argument is unfounded and makes no sense. It makes no sense because Wells made himself a suspect, if not the prime suspect, within hours of the murders, and continued to do so in the days thereafter. In short, Wells was cagey, evasive, uncertain, and lied to investigators during his interviews. The investigation knew Wells wife Nancy was out of town, therefore there were no witnesses the day before, the day of, nor the day after he murdered his colleagues. Investigators knew Wells he used her vehicle, and took advantage of her absence to drive her blue Honda CRV to the rigger shop to conceal his presence outside the rigger shop before and after the murders. A vehicle identical in color and shape to Nancy Well's vehicle was captured on video going to, and departing the rigger shop area at the time of the murders. Wells had to have done this to avoid having his vehicle identified near or at the rigger shop the morning of the murders. Wells' flat tire alibi was and is bogus, and when confronted with officers about the time gap in his alibi, Wells couldn't formulate an answer for close to 20 seconds. Even after that almost half minute silence, Wells could only state that he had no explanation to offer, and despite several opportunities to do so Wells failed to advise investigators of any diarrhea issues that occurred that day, or the day after.

      Despite all of this, Wells argues Morton is a Meloy substitute. Morton is no Meloy substitute as his expertise is crime scene analysis, not the psychological or other mental profiles of Wells. Here, Morton, unlike Meloy, has not examined Wells' personal life, employment records or other personal information, thus the comparison simply does not work.

Nevertheless, Wells attempts to have the Ninth Circuit ruling on Meloy carry over and cover Morton by calling Morton's testimony 'profiling.' There is no profiling here, only an analysis of the facts and circumstances of the murders. There was no need, either in reality or factual, for Morton to build a theory. Nor, as defendant claims, is the United States seeking to use Morton as a substitute for Meloy. What Morton does do is provide contextual analysis to uncontroverted facts which is designed to assist the jury as to the circumstances of these murders. Indeed, Morton did not and does not even opine that Wells is the murderer. This is a clear example of appropriate expert testimony under FRE 702.

A court must first find that an expert is "qualified [] by knowledge, skill, experience, training, or education" and may testify "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702; see also *Kumho Tire v. Carmichael*, 526 U.S. 137, 141, 148–49 (1999*). United States v. Finley*, expands on this: "[Rule 702] consists of three distinct but related requirements: (1) the subject matter at issue must be beyond the common knowledge of the average layman; (2) the witness must have sufficient expertise; and (3) the state of the pertinent art or scientific knowledge permits the assertion of a reasonable opinion." 301 F.3d 1000, 1007 (9th Cir. 2002).

Of particular importance in assessing whether the expert opinion draws from some special "knowledge, skill, experience, training or education" under Fed.R.Evid. 702, the

court must ensure that "the opinion [] be an expert opinion (that is, an opinion informed by the witness' expertise) rather than simply an opinion broached by a purported expert." *Jones v. Lincoln Elec. Co.,* 188 F.3d 709, 723 (7th Cir. 1999) (citing *United States v. Benson*, 941 F.2d 598, 604 (7th Cir. 1991)). Also of note, to determine whether a proposed expert is qualified, the court must examine whether his or her training, experience, or specialized knowledge is sufficiently related to the subject matter about which he seeks to offer an opinion. See *United States v. Chang*, 207 F.3d 1169, 1172 (9th Cir. 2000) ("[t]o qualify as an expert, a witness must have knowledge, skill, experience, training or education, relevant to such evidence or fact in issue"); *In re Canvas Specialty Inc.*, 261 B.R. 12, 19 (C.D. Cal. 2001) ("It is not enough that the proposed expert have expertise in an area of knowledge. The expertise must be relevant to the determination of the facts in issue"). Certainly in this case, as shown below, Morton's area of knowledge in the areas of crime scene analysis, which spans several decades, makes him qualified to render his opinion as the actions of the murderer in relation to the victims on the day of their death, along with his opinion on the facts surrounding their murders.

As this court knows, it applies these principles in ruling on admissibility, acting as a "gatekeeper." Consistent with *Kumho*, Rule 702 admits "any evidence created or validated by expert methods and presented by an expert witness that is shown to be reliable" even if it is not "'scientific' evidence, however such evidence might be defined." *United States v. Herrera*, 704 F.3d 480, 486 (7th Cir. 2013) (fingerprints). "[A] witness need not have formal education as a scientist if his other training and experience

U.S. v. Wells
3:13-cr-00008-SLG          10

otherwise qualifies him to testify as an expert." *United States v. Williams*, 2017 WL 3254895 (11th Cir. Aug. 1, 2017).

Although subsequent cases refer from time to time to a "Daubert test" or "Daubert hearings," Rule 702 was amended "for the express purpose of resolving conflicts in the courts about the meaning of Daubert," and was intended to "codify a 'more rigorous and structured approach' to the scrutiny of expert testimony than some courts were then employing." David E. Bernstein & Eric G. Lasker, *Defending Daubert: It's Time to Amend Federal Rule of Evidence 702*, 57 Wm. & Mary L. Rev. 1, 7 (2015) (footnotes omitted), citing May 1, 1999 Report of the Advisory Committee on Evidence Rules to the Standing Committee on Rules of Practice and Procedure 7. In other words, the 2000 amendments to Rule 702 (and the accompanying commentary) trump Daubert.

Under the amended Rule, "courts must scrutinize the factual foundation of expert testimony and the reliability not only of the expert's methodology but also of the expert's application of that methodology to the facts at issue." Defending Daubert, *supra.* The oft-cited "Daubert factors" are helpful in proper cases, but entirely optional and methodology is not the only factor to consider under the test. Historical Notes, *supra.* 1) Whether a theory or technique can be (and has been) tested; 2) Whether the theory or technique has been subjected to peer review and publication; 3) The known or potential rate of error of a particular scientific technique; 4) The existence and maintenance of standards controlling the technique's operation; and 5) A scientific technique's degree of acceptance within a relevant scientific community. Daubert, *id.* at 595. Morton's testimony is not of

this type, and these factors are irrelevant to the analysis on the admissibility of his testimony.

Of more applicable application are the 2000 commentary to Rule 702. This commentary identifies additional criteria applied to experts by courts before and after Daubert and they are of particular and relevant application here.

These criteria are whether they: 1) are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying; 2) have unjustifiably extrapolated from an accepted premise to an unfounded conclusion; 3) adequately accounted for obvious alternative explanations; 4) being as careful as they would be in their regular professional work outside their paid litigation consulting; 5) Whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give. In fact, the plain language of Rule 702 makes this clear: **expert** status may be based on "knowledge, skill, *experience,* training, or education." (emphasis added). The Committee Note to the 2000 Amendments of Rule 702 also explains that "[n]othing in this amendment is intended to suggest that experience alone ... may not provide a sufficient foundation for **expert** testimony." Fed.R.Evid. 702 advisory committee's note (2000 amends.).

Additionally, "Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony.*" Gayton v. McCoy*, 593

F.3d 610, 616 (7th Cir. 2010) (internal quote and citation omitted). In making this determination, a "court should consider a proposed expert's full range of practical experience as well as academic or technical training when determining whether that expert is qualified to render an opinion in a given area." *Smith v. Ford Motor Co.,* 215 F.3d 713, 718 (7th Cir. 2000).

As to Morton's testimony, factors 1, 2, 3, 4 and 5, referenced above apply to his testimony which was previously approved by the court for trial.

As to Morton's qualifications, he has been found by this court to be qualified as an expert prior to the first trial. As stated by then Magistrate Judge Roberts, at Docket 303:

Morton was employed as a Supervisory Special Agent (SSA) for the Federal Bureau of Investigation. He is assigned to one of the Behavioral Analysis Units for the National Center for the Analysis of Violent Crime at the FBI Academy in Quantico, Virginia. The Behavioral Analysis Unit is part of the critical incident response group for the FBI. This center serves as a national and international resource center for law enforcement agencies, providing assistance in "unusual, bizarre, and repetitive violent crimes."

He has been assigned to the Center since 1997 and has consulted in hundreds of cases both domestically and internationally. His experience in analyzing homicide cases and violent crimes includes serial murders and sexual homicides. He previously provided crime scene assessment and analysis, investigative strategies, case linkage analysis in serial cases, and on topics including the development of unknown offender

characteristics, the development of interview designs for suspects, and major management issues as well as providing assistance with strategies for prosecution. His previous experience includes investigative assignments with violent crime, gang investigations, terrorism and weapons of mass destruction. He has supervised the processing of crime scenes in major FBI cases that required forensic examination and participated in processing a number of high priority national crime scenes including the Oklahoma City Bombing, the 1996 Atlanta Olympic Park bombing and the September 11, 2001 attack on the Pentagon.

Agent Morton testified in the federal criminal trials of Timothy McVeigh and Terry Nichols as well as the Oklahoma State trial of Nichols for the bombing of the Murrah Federal Building. Agent Morton has over thirty years of law enforcement experience working with the FBI and the Virginia State Police. His curriculum vitae includes a long list of specialized training and research experience as well as a list of abstracts and publications which he authored.

His research experience focuses on the characteristics of serial murders, the search methodologies for abducted children, and characteristics of sexually motivated murder. He previously testified as an expert in areas concerning crime scene analysis in several courts. He has received significant awards, participated in symposiums, and has teaching experience in over 150 training classes and workshops to law enforcement personnel, prosecutors, forensic scientists, medical examiners and coroners, and other criminal justice practitioners.

Based on the foregoing, Morton is clearly and easily qualified as an expert in the area of crime scene analysis.

Specifically as related to this case, other courts have upheld the use of experts testifying about crime-scene analysis. Courts have held that the gathering and analysis of physical evidence is generally recognized as a body of specialized knowledge. *See generally 3 Forensic Sciences, Chapter 35, Crime Scene Procedures* (Matthew Bender 1992); *P. Giannelli and E. Imwinkelried, Scientific Evidence* § 24–1 at 1014 (1986); 2 *Wigmore, Evidence* § 417b at 499 (Chadbourn rev. 1979). Moreover, such evidence has been admitted in several state courts. See generally *Dailey v. State*, 594 So.2d 254, 258 (Fla.1991) (sexual battery*); State v. Asherman*, 193 Conn. 695, 478 A.2d 227, 235 (1984) (bite mark, hair, and blood); *People v. Nolan*, 152 Ill.App.3d 260, 105 Ill.Dec. 336, 338, 504 N.E.2d 205, 207 (2 Dist.1987) (crime scene analysis); *Hill v. State*, 647 S.W.2d 306, 309 (Tex.App. 13 Dist.1982) (defensive nature of wound). Admission of such evidence is consistent here with admission of evidence from qualified police officers concerning the techniques and methods employed in criminal acts. See *United States v. Pearce*, 912 F.2d 159, 163 (6th Cir.1990) (method and techniques employed in drug conspiracy), cert. denied, 498 U.S. 1093, 111 S.Ct. 978, 112 L.Ed.2d 1063 (1991); *United States v. Torres*, 901 F.2d 205, 236–37 (2d Cir.1990) (drug operation*); United States v. Dunn*, 846 F.2d at 762–63 (drug operation); *United States v. Espinosa*, 827 F.2d 604, 611–13 (9th Cir.1987) (drug operation), cert. denied, 485 U.S. 968, 108 S.Ct. 1243, 99 L.Ed.2d 441 (1988); *United States v. Andersson*, 813 F.2d 1450, 1458 (9th Cir.1987) (drug operation). A

suggested "test" for deciding "when experts may be used" is "whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject...." See Fed.R.Evid. 702, Advisory Committee's note. In sum, the proper standard is helpfulness, not absolute necessity; *United States v. Solis*, 923 F.2d 548, 550 (7th Cir.1991).

A case with similar facts allowed for the testimony of an expert related specifically to crime scene analysis. In a military trial of an accused stemming from the brutal murders of two military members, a lengthy investigation, involving the FBI, the Army Criminal Investigation Command (CID), and the state investigators from Alabama and Georgia state police, eventually resulted in the accused making a statement that indirectly incriminated him. As part of this investigation, the accused was interviewed because he was a friend of one of the dead military members. When the case remained unsolved after 12 months, a joint task force was established. Again, the defendant was asked to provide a statement to investigators. Over the period of a week, in two separate interviews, the defendant made statements which indirectly incriminated him in the murders. The court members in this case were tasked with resolving a double homicide to which no eyewitnesses testified. The bodies were discovered in a horribly mutilated condition, raising questions as to the method and order of killing. The Court found that the "members, confronted with such a grotesque scenario, would be greatly assisted by a professional analysis of the crime scene in light of other murder cases. Moreover,

extremely sophisticated observations were made by the agent, not elementary comments concerning well known criminal ventures." See *United States v. Castillo*, 924 F.2d 1227, 1232–33 (2d Cir.1991). The Court reasoned that, "[a] homicide and its crime scene, after all, are not matters likely to be within the knowledge of an average court-martial member." *See United States v. deSoto*, 885 F.2d 354, 359 (7th Cir.1989). Accordingly, the Court held "that there was no abuse of discretion by the military judge in determining such evidence would assist the members". *United States v. Meeks*, 35 M.J. 64, 68–69 (C.M.A. 1992).

Morton's conclusions are supported by his extensive experience of over 30 years as a law enforcement officer, crime scene analyst and expert witness with the FBI and elsewhere. He is not being called to explain workplace violence, but instead to explain the facts found by the investigation as it related to two murders which happened in a place where the victims worked and the defendant, who should have been present for work, was not. That is the basis of Morton's testimony.

## IV. CONCLUSION

The government is very cognizant of the concerns articulated by the Ninth Circuit Court of Appeals in terms of workplace violence. Morton's testimony will not articulate this concept, and his testimony, based on the supplement, is a factual analysis. It is hardly profiling. Moreover, he will be instructed as to the ruling of the Ninth Circuit on that issue and to refrain from discussing the concept, mentioning it or testifying about it. Nor will the government inquire as to Morton's prior testimony on coup de grace shots or the

order of shots after the initial first round of shots as to both victims. In this team's view, questioning after the first shots as to order is irrelevant and no inquiry will be made. Morton can certainly bring his decades of experience to bear to opine as to the crime scene and the possible facts behind it. The defendant's motion should be denied.

RESPECTFULLY SUBMITTED May 30, 2019, in Anchorage, Alaska.

BRYAN SCHRODER
United States Attorney

s/Steven E. Skrocki
STEVEN E. SKROCKI
Assistant U.S. Attorney
United States of America

**CERTIFICATE OF SERVICE**

I hereby certify that on May 30, 2019, a true and correct copy of the foregoing was served electronically on:

Counsel of Record

s/ Steven E. Skrocki
Office of the U.S. Attorney