Gary G. Colbath
Assistant Federal Defender
FEDERAL PUBLIC DEFENDER
FOR THE DISTRICT OF ALASKA
425 G Street, Suite 800
Anchorage, Alaska 99501
Phone: (907) 646-3400
Fax: (907) 646-3480
Email: gary_colbath@fd.org

Peter A. Camiel
Law Offices of Camiel & Chaney P.S.
5200 Pike Street, Suite 2500
Seattle, WA 98101
Phone: (206) 624-1551
Email: petercamiel@yahoo.com

*Attorneys for Defendant James Michael Wells*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JAMES MICHAEL WELLS,<br><br>Defendant. | No. 3:13-CR-00008-SLG<br><br>MOTION TO EXCLUDE THE APRIL 19, 2012 GOVERNMENT DRIVING EXPERIMENT VIDEO<br><br>EVIDENTIARY HEARING REQUESTED |

### SPEEDY TRIAL STATUS

A period of additional excludable delay under 18 U.S.C. § 3161(h) will NOT occur as a result of the filing this motion as this motion will not result in any delay of trial as the Court has ruled this a complex case and has set trial for September 9, 2019, taking into account any pretrial motions that will be filed in this case.

## I.   INTRODUCTION

Defendant Wells though counsel Peter A. Camiel and Gary Colbath moves this Court to exclude the government's April 19, 2012 driving experiment video exhibit.   As will be described more fully below, the

government's prior trial exhibit 168 involved a video recording of government agents conducting an uncontrolled experiment using the Wells' Honda CR-V to drive past the T-1 surveillance camera on Anton Larsen Bay Road in an attempt to substitute the Wells' Honda CR-V for the unidentified vehicle seen in the April 12, 2012 T-1 recording.[1] This exhibit is extraordinarily misleading, not based on actual evidence, argumentative, unfairly prejudicial, will cause confusion of the issues, and will mislead the jury. It should be excluded pursuant to F.R.E. 401 and 403.

## II.  FACTS
### A.  The Government April 19 T-1 Camera Driving Experiment Video

The T-1 surveillance camera is situated at the rear of the parking lot at the T-1 COMMSTA building.  On the morning of April 12, 2012 that camera recorded an unidentified vehicle (hereinafter the "subject vehicle") drive up Anton Larsen Bay Road past the T-2 rigger shop building at 7:09a.m., and possibly the same or a different vehicle drive down the same road at 7:14a.m.[2] (See Attachment A).

_____

[1] The FBI conducted a similar experiment with the Wells' Honda CR-V one day later, on April 20, 2012. The resultant driving experiment video was provided to some of the government experts, with one of them, Richard Vorder Bruegge, stating that he declined to use the April 20th video as it "was recorded in bright sunlight" and could not be accurately compared with the T-1 April 12 recording. (Tr. 2328). The government did not introduce the April 20 driving experiment video at the first trial, however all of the arguments and authorities cited herein also apply to this second driving experiment video.
[2] No expert could say that the same vehicle was recorded at 7:09am and at 7:14am.

In an attempt to illustrate the government's theory that the blurry subject vehicle recorded on April 12 is the Wells' Honda CR-V, the government conducted an experiment using the T-1 surveillance camera to manufacture a video it used at trial as a demonstrative or illustrative exhibit. On April 19, 2012, one week after the murder of Belisle and Hopkins, government agents used Wells' Honda CRV to drive past the T-1 camera in both directions several times on Anton Larsen Bay Road. They then used this driving experiment video and still images from that video as illustrative exhibits at the first trial. (See Attachment B). These exhibits were introduced through the agent involved in creating the video and through government experts in a concerted attempt to convince the jury that the subject vehicle seen on the T-1 April 12 recording was the Wells' Honda CR-V.

The government speculates that the subject vehicle in the T-1 April 12 recording is the Wells' Honda CR-V, yet there is no evidence to support this fact. The many government experts who examined the blurry T-1 April 12 recording concluded that because of the very low resolution of the video and the distance of the camera from the road, they could not determine the make or model of the vehicle and could not even be sure of the color. (Tr. 2339-2362, 2521-2535, 3307-3344).[3] Experts could not even be confident that the same vehicle was recorded at both 7:09a.m. and at 7:14a.m. (Tr. 2357). Even after the retained government experts were specifically told the government

_____

[3] Transcript excerpts cited herein will be provided to chambers for convenience.

believed the vehicle to be the Wells' Honda CR-V, the best the experts could opine was that the blurry subject vehicle from the T-1 April 12 recording shared some similar characteristics with the Wells' Honda CR-V.

There are no witnesses who claim to have seen the Wells' Honda CR-V on Anton Larsen Bay Road or anywhere near the T-2 building on April 12. Between 7:00a.m. and 7:30a.m. on April 12, 2012 there were many people driving to and from the T-1 building and none saw a blue SUV of any type, much less a Honda CR-V. The vehicle in the T-1 April 12 recording would have been travelling on Anton Larsen Bay Road right around the shift change at COMMSTA. There were employees leaving from the T-1 building and others arriving for work at the T-1 building. There were people sitting in cars waiting outside the T-1 building to pick up people ending their shifts. None of these people saw a blue SUV that morning. There was one witness, Don Rudat, who walked both up and down Anton Larsen Road past the T-2 building shortly after 7:00am, at the time the government says the murders occurred. He did not see a blue SUV.

### B. Introduction of the April 19 Driving Experiment Video at the First Trial

On April 16, 2012, only four days after the homicides, FBI agents sent a request to the FBI's Forensic Audio, Video, and Image Analysis Unit (FAVIAU) to compare the unidentified subject vehicle in the T-1 April 12 recording with the Honda CR-V owned by the Wells. (See Attachment C). On April 20, the FBI

agents received a report back from FAVIAU signed by FBI expert Chris Iber stating that he had "extracted, processed and printed" seven images from the April 12 recording and that he was forwarding these "enhanced images" to the FBI's Anchorage office. (See Attachment D, government's prior trial exhibit 110). Iber's report stated that "due to the insufficient detail of the questioned vehicle depicted in the Q1 images no conclusion of the make or model could be reached", and also included a signed statement by FBI analyst George Skaluba stating that "due to the limited detail of the vehicle within the images and the distance between [the] vehicle and the camera no conclusion could be reached as to the make and/or model of the questioned vehicle." (See Attachment E).

On April 19, 2012 beginning around 3:20p.m., FBI Special Agent Doran repeatedly drove the Wells' Honda CR-V past the T-1 camera to create the driving experiment video. (Tr. 2275, 2295). It appears the FBI closed or blocked the road as there was no other traffic at the time of the FBI experiment. Agent Doran drove the Wells' Honda CR-V at varying speeds past the T-1 camera for the purpose of giving the experts "multiple options to choose from." (Tr. 2276). Doran made seven passes in each direction in front of the T-1 camera at speeds varying between 5 and 35 mph. (Tr. 2277).[4] (See Attachment F).

---

[4] The April 19 driving experiment video was admitted, over objection, as government trial exhibit 168.

The FBI provided the April 19 driving experiment video to FAVIAU, and after examining the new material, FBI expert Iber elaborated in more detail about why he was unable to make a conclusion on the vehicle in question: "There are multiple factors contributing to my inability to come to a conclusion on the vehicle in question. These include; low resolution, poor image quality, low frame rate and blurring caused by motion through the frame. All of these factors not only make a conclusion that the car in the video is the same as the suspect's car impossible it also makes a conclusion about the class characteristics of the vehicle's make and model not viable." (See Attachment G).

FBI expert Gerald Richards also reviewed the T-1 April 12 recording and the April 19 and April 20 government driving experiment videos. Richards stated that the quality of the video was poor, and there was not much he could do to enhance the images as there were too few pixels to make any determination. He also stated that the unidentified subject vehicle was a dark grey or blue. (See Attachment H).

FBI expert Richard Vorder Bruegge, the fourth FBI analyst to attempt a comparison, testified at trial that his task was to compare the Wells' Honda CR-V in the 19 April driving experiment video to the subject vehicle in the T-1 April 12 recording to determine whether he could say that they were the same vehicle or different. (Tr. 2346). After viewing and manipulating the April 19 government-manufactured driving experiment video and still images extracted

from that video along with the T-1 April 12 recording and still images extracted from that recording, Vorder Bruegge created a presentation that repeatedly compared the enlarged and enhanced still frames from both of them. (Tr. 2329, 2336). (See Attachment I; government trial exhibit 129). Vorder Bruegge concluded that it was not possible to either identify or eliminate the Wells' Honda CR-V as the vehicle in the T-1 April 12 recording. (Tr. 2347). In his report, Vorder Bruegge stated that "due to the limited resolution of the Q9 video images, it is not possible to identify the questioned vehicle as the known vehicle to the exclusion of all other vehicles." (See Attachment J).

Another government expert, Angelo Toglia, an accident reconstructionist, was also provided with the T-1 April 12 recording and the extracted and enhanced images from the same, in addition to the April 19 driving experiment video and its related still images. Toglia visited the scene in February of 2013 and used a government-provided fire department boom truck to access the T-1 camera (See Attachment K).[5] Toglia's purpose was to attempt to match up and overlay all of the previously extracted and enhanced still images from the T-1 April 12 recording and the April 19 driving experiment video. (See Attachment L).[6] In the most egregious manipulation of these already modified images, Toglia contrived a presentation, government

---

[5] The bottom portion of the dome covering the T-1 camera is visible at the top of this image. Note the distance from the camera out to Anton Larsen Bay Road and the T-2 building.

[6] In this image, Toglia is holding up one of the extracted and enhanced images from the T-1 April 12 recording.

Case 3:13-cr-00008-SLG   Document 1012   Filed 06/07/19   Page 7 of 33

prior trial exhibit 111 (See Attachment M), that purports to establish the dimensions of the unidentified subject vehicle in the T-1 April 12 recording with dimensions he extrapolated from the April 19 driving experiment video of the Wells' Honda CR-V. Testimony at the first trial included the fact that other SUV models such as the Toyota Rav 4, Ford Escape, and Hyundai Santa Fe have very similar dimensions as the Honda CR-V. (Tr. 2514). Even after conducting all of his manipulations and enhancements, Toglia was still only able to testify that he could not eliminate the Rav 4, Escape or Sante Fe as being the unidentified subject vehicle in the blurry T-1 April 12 recording. (Tr. 2533).

Government Honda expert Neil Schmidt was questioned at the first trial about being shown the April 19 government driving experiment video. He agreed that this video, compared to the T-1 April 12 recording, was of better quality and "it was better—easier to see, yes." (Tr. 2377). Despite this, Schmidt, who works for Honda, testified that the vehicle in the T-1 April 12 video could possibly be a Rav 4, Escape, or Santa Fe.[7] (Tr. 2374-75).

For the retrial, the government has hired another accident reconstructionist, Steven Becker, in an attempt to prop up and support Toglia's conclusions. They also have hired a photogrammetry analyst, Lalit Mestha, who created his own computer code in order to further manipulate the images

---

[7] In fact Schmidt testified that based on size, shape and proportion there were 22 different vehicles models that could be the vehicle in the T-1 video. (Tr. 2377).

and attempt to contrive a useful comparison between the unidentified subject vehicle and the Wells' Honda CR-V.

### C. The T-1 April 12 Recording and the April 19 Driving Experiment Video are not the Same

A comparison of the T-1 April 12 recording and the government's manufactured April 19 driving experiment video shows that the two items are so dissimilar that it makes the April 19 driving experiment video unfairly misleading and unfairly prejudicial.

#### 1. Environmental Factors

##### *Weather*

April 12 and April 19 of 2012 were meteorologically similar only regarding temperature and barometric pressure but very dissimilar as to other weather conditions. It was partly sunny and dry on April 12 with light winds (See Attachment N), as opposed to April 19, which was overcast and rainy, with stronger winds (See Attachment O). As a result, on April 19, when the FBI manufactured the driving experiment video, the Wells' Honda CR-V was wet and glistening at least part of the time; refracting the available light and distorting the outline, color, and other attributes of this vehicle. Under the dry conditions on April 12, the unidentified subject vehicle would have been dirty and dusty, conditions that also distorted the outline, color, and other attributes of this vehicle. The considerable variance in weather between April 12 and April 19 and its effects on the unidentified subject vehicle and the Wells Honda

CR-V make a scientifically meaningful comparison between these vehicles impossible.

### *Time of Day*

The T-1 April 12 recording covers the hours from 7:00am to 8:00am, when the day was shorter, it was still dark outside and just beginning to transition to daylight. Sunrise on this day was at 7:05am and sunset at 9:16pm. (See Attachment P). All the vehicles arriving at the buildings on this morning had their headlights on, casting shadows and glare. The subject vehicle drove up Anton Larsen Bay road past the camera at 7:09am. That vehicle or a similar vehicle drove back down Anton Larsen Bay road past the rigger shop at 7:14am. The April 19 driving experiment video was made in the afternoon between 3:00pm and 3:45pm, eight hours later than the T-1 April 12 recording, during the brightest part of the day when the sun was just past zenith. Sunrise on April 19 was at 6:46am, 19 minutes earlier than on April 12, and sunset occurred at 9:31pm. (See Attachment P). The shadows produced by the angle of the sun at the time of day when the government manufactured the April 19 driving experiment video would have cast in a completely different orientation to the Wells' Honda CR-V than the shadows present in the T-1 April 12 recording of the unidentified subject vehicle. The resultant disparate distortions of the vehicle outlines, colors, and other attributes make a scientifically meaningful comparison between these vehicles impossible.

### *Snow Cover*

On April 12 the snow cover was considerable (See Attachment Q), whereas by April 19 much of it had melted away (See Attachment R). The significant difference between the depths of snow cover in these two settings makes the levels of both brightness and contrast extremely dissimilar. FBI expert Gerald Richards highlighted the challenges presented by the snow cover in determining specific features of the unidentified subject vehicle in the T-1 April 12 recording. When asked if he was able to identify brakelights high on the roof post of the subject vehicle, he replied negatively, commenting that with all the snow in the background, the only thing he could tell was that "it was a dark vehicle with dark wheels." (Tr. 3339-3340). Government expert Richard Vorder Bruegge, when describing a still frame that was extracted from the April 19 driving experiment video, also noted this variance when he commented that "there isn't as much snow in the background in this frame." (Tr. 2328). Because the depth of snow cover is radically different in each of these settings, no scientifically meaningful comparison between the unidentified subject vehicle and the Wells' Honda CR-V can be drawn under these circumstances.

### 2. Situational Factors

Whereas the T-1 April 12 recording depicts a routine morning of arrivals and departures at the Coast Guard COMMSTA, at least up until the point where first responders arrive, the government's apparent intent in

constructing the April 19 driving experiment video was to remove everything extraneous from the setting that would detract from a clear and unobstructed view of the Wells' Honda CR-V.

### *Vehicular Activity*

There is steady vehicular activity throughout the T-1 April 12 recording, as Coast Guard members show up for duty and relieve members who then depart the area. In the one-hour time frame of this recording, a total of 50 vehicles are seen coming from and going on Anton Larsen Bay Road and to the T-1 and T-2 Coast Guard buildings and parking lots. These vehicles, belonging to Coast Guard members as well as members of the general public, were later identified as having travelled along the public roadway on the morning of April 12 about the same time as the murders occurred. (See Attachment S). In the April 19 driving experiment video, there is no vehicular traffic either coming or going to the buildings or parking lots, and only one vehicle is observed on Anton Larsen Bay Road. The vehicular traffic situation on April 12 is completely different from that of April 19.

### *Vehicles Parked in the T-1 Parking Lot Outside of the Fence*

In the T-1 April 12 recording, there are four vehicles visible in this outer parking lot. These vehicles are located between the T-1 camera and the road. Three of these are parked in designated spaces, and the fourth, a lighter colored vehicle, is parked perpendicular to the others (the driver is temporarily parked there for more than 15 minutes, with headlights on, waiting for her

husband to get off duty). The full width of the vehicle in the front row is not visible. These parked vehicles partially obscure Anton Larsen Bay road and block or partially block the view of the subject vehicle (See Attachment T).

In the April 19 driving experiment video, only one vehicle is parked in this parking lot, which does not match any of the vehicles present on the T-1 April 12 recording. The width of this lone vehicle is completely visible, as is space on the passenger side of it. Interestingly, the color of this lone vehicle appears to bear a strong resemblance to that of the Wells' Honda CR-V, creating a strongly suggestive setting in which one vehicle color dominates. (See Attachment U). This is a completely different situation from that depicted on the T-1 April 12 recording and does not fairly and accurately represent the conditions of this parking lot at the time of the murders.

### *Vehicles Parked in the T-1 Parking Lot Inside of the Fence*

In the T-1 April 12 recording, there are two vehicles visible in this internal parking lot, five "Reserved For" signs are visible along the grassy edge to the right of the parked cars, and the parking lot features are generally blurry and nondescript. A portion of the sidewalk is visible to the right of the darker colored vehicle. (See Attachment T).

In the April 19 driving experiment video, there are three vehicles in this parking lot, none of which are the same as in the April 12 video. Six "Reserved For" signs are visible along the grassy edge to the right of the parked cars, and the parking lot features are generally crisp. Puddles and wet areas from the

day's rains are clearly outlined. None of the sidewalk is visible. (See Attachment U). This shows that the camera angle, focus, and orientation had been manipulated prior to the government manufacturing the April 19 driving experiment video. Again, this is a completely different situation from that depicted on the T-1 April 12 recording and does not fairly and accurately represent the conditions of this parking lot at the time of the murders.

### *Obstructions and Orientation of Objects on Anton Larsen Bay Road*

In the T-1 April 12 recording, only a very small portion of this road is visible, just to the left of the corner of the T2 building. The unidentified subject vehicle is only partially visible. All other sections of this road are obscured by vehicles in the outer T1 building parking lot. (See Attachment T).

In the April 19 driving experiment video, there are no obstructions to a clear view of a large section of this road, and the Wells' Honda CR-V is observable in its entirety. There appear to be several traffic delineators or similar type items in front of or just off to the side of the Wells' vehicle that are not present in the T-1 April 12 recording. (See Attachment U). This demonstrates that the April 19 driving experiment video does not fairly and accurately depict the conditions of the roadway at the time of the murders.

### *T2 Building Lights*

In the T-1 April 12 recording, lights are clearly visible inside the building and cycling on and off on the exterior of the building. There are no

interior or exterior lights visible on the April 19 driving experiment video. (See Attachment T).

The situational context, orientation, and obstruction of objects in the government-manufactured April 19 driving experiment video bears no resemblance to the T-1 April 12 recording, and in no way fairly and accurately represents the conditions that existed at the time of the murders. (See Attachment U).

### 3. Factors Involving the Parameters and Settings of the T-1 Camera

None of the original settings or parameters for the T-1 April 12 recording were documented. Thus, it was impossible for investigators to reproduce the T-1 April 12 recording, so instead they conducted a driving experiment with the Wells' Honda CR-V on April 19 and manufactured a completely new video. The purpose of this was clearly not to try to recreate the conditions of April 12, but to make the Wells' CR-V as visible as possible in the April 19 driving experiment video.

Investigators did not know the speed at which the unidentified subject vehicle was travelling in the T-1 April 12 recording, so the best the government could do was to operate the Wells' Honda CR-V at increments of five miles per hour, which they did seven times in each direction in front of the realigned and refocused T-1 camera on Anton Larsen Bay Road. However, the sole purpose of the differing speeds was to assist their government experts in achieving the

best possible view of the Wells' Honda CR-V rather than trying to approximate the April 12 recording.

The government investigators' memo on how they manufactured the April 19 driving experiment video (See Attachment F) shows that the intent was to exercise complete control over the camera so that the entirety of the Wells' Honda CR-V would be visible and unobstructed as the FBI drove it back and forth in front of the realigned T-1 camera. To accomplish this, Anton Larsen Bay Road was blocked off and activity was suspended in and around the COMMSTA buildings. The T1 external parking lot was cleared of all except one vehicle.

These careful arrangements and predetermined choreography set the stage for the April 19 driving experiment video, and subsequent manipulations to the camera settings and parameters cemented the cinematic aspects of the production. Almost one full minute of continuous repositioning, refocusing, and realignment of the T-1 camera is visible beginning at the three-minute mark on the government's April 19 driving experiment video. (See Attachment B, government prior trial exhibit 168). With these extensive manipulations, any similarity whatsoever to the camera settings of the T-1 April 12 recording vanished.[8]

---

[8] The T-1 camera was again extensively manipulated the following day in preparation for manufacturing the April 20 driving experiment video. See Attachment V.

A comparison of the respective locations and visibility of just a few of the various objects in the T-1 April 12 recording and the April 19 driving experiment video reveals the extent to which the camera parameters were modified.

### ***Stand of Trees***

In the T-1 April 12 recording a large stand of trees is completely visible in the upper left background above Buskin Lake. In the April 19 driving experiment video, the location of this same stand of trees has been shifted so far to the top of the frame that the upper half of the stand is cut off. (See Attachments T and U).

### ***Geodesic Dome and Building***

There is a geodesic dome and associated building shown in the mid-upper left of both the T-1 April 12 recording and the April 19 driving experiment video. In the T-1 April 12 recording, the outline of the dome is indistinct and could potentially be identified as a snow-covered tree. In the April 19 driving experiment video, the outlines of the dome and building are much sharper, and these are also located further towards the top of the frame, demonstrating that both the focal point of the camera and the field of view have been modified from the original settings of the T-1 April 12 recording. (See Attachments T and U).

### *Fire Hydrant and Bollards*

In the mid-far right area of the recording and video, there is a fire hydrant and protective bollards. In the T-1 April 12 recording, the hydrant and four bollards are clearly visible, while in the April 19 driving experiment video only the hydrant and two bollards can be seen. This difference clearly shows that the field of view was modified from the original settings on April 12. Also of note is the complete absence of snow cover in this area in the April 19 driving experiment video, whereas in the T-1 April 12 recording the hydrant and bollards are partially concealed by the considerable snow cover depth. (See Attachments T and U).

### 4.  Summary of Dissimilar Factors

The April 19 driving experiment video occurred at a different time of day than the T-1 April 12 recording. The time difference completely changes the lighting conditions and traffic conditions. The variance in daylight angle and intensity creates different shadows and reflections in each instance, significantly impacting the appearance and color of the vehicle. In the T-1 April 12 recording there is snow on the side of the road affecting the lighting conditions.  This is not so in the April 19 government driving experiment video. Government expert Vorder Bruegge was well aware of this when he testified that: "Lighting conditions, particularly outdoor lighting conditions, have a significant effect on what things look like." (Tr. 2326).

In addition, in the T-1 April 12 recording there are several vehicles parked in the T-1 lot in the foreground of the video that partially obscure the view of the road and the unidentified blurry subject vehicle. In the April 19 driving experiment video, those parked vehicles are not present, which makes the road visible. The speed of the vehicle in the government-created video is different than in the T-1 April 12 recording, a fact noted by government expert Vorder Bruegge. (Tr. 2342). The T-1 April 12 recording is very blurry whereas in the April 19 driving experiment video the government manipulated the camera so it is considerably sharper and focused further out on Anton Larsen Bay Road where the agents drove the Wells' Honda CR-V. Even with these extensive efforts, the low resolution T-1 camera still recorded a blurry image of the Wells' Honda CR-V on the April 19 driving experiment video.

The T-1 camera is able to be panned to the left and right, tilted up and down, zoomed in and out, and otherwise easily manipulated as the operator chooses, and in producing the April 19 driving experiment video, the government employed all of these options. The settings and parameters that the government established for the T-1 camera in preparation for fabricating the April 19 driving experiment video are not at all similar to the settings of the T-1 April 12 recording. In fact, a review of the entire April 19 driving experiment video shows that the government operator spent almost a full minute manipulating the camera until they were satisfied with the new focal

point and field of view. This was done, and the new settings locked in, *before* the government drove the Wells' CR-V.

This point was driven home by Government Honda expert Neil Schmidt when he was questioned at the first trial about being shown the April 19 government-created April 19 driving experiment video. He agreed that this newly fabricated video, in comparison to the T-1 April 12 recording, was of better quality and "it was better—easier to see, yes." (Tr. 2377).

Based on all of these dissimilarities, the April 19 driving experiment video in no way fairly and accurately depicts the conditions that existed on April 12 as respects the scene, the weather, the lighting, or the camera located at the T-1 building.

## III.   ARGUMENT AND AUTHORITIES

### A. Governing Law Regarding Video Experiment Evidence

Demonstrative or Illustrative exhibits are properly used to demonstrate or illustrate admitted evidence such as testimony in order to help explain that evidence. In this case, the government is not attempting to use the April 19 driving experiment video to demonstrate, illustrate, or explain any testimony, but rather it is trying to use it to somehow demonstrate or illustrate the T-1 April 12 recording. This is an impermissible use of demonstrative or illustrative exhibits. The T-1 April 12 recording stands alone and begs no explanation. There are no witnesses who saw the Wells' Honda CR-V on Anton Larsen Bay Road on April 12, 2012. The content of the actual T-1 April 12 video

speaks for itself. The jury must decide for themselves whether the vehicle in that video can be identified.

The introduction of the April 19 driving experiment video as a demonstrative or illustrative exhibit requires a proper foundation by the government. The required foundation is similar to requirements of Rules 401 and 403. Because the government wants to use the video, it has the burden of laying a foundation of accuracy and fairness for the exhibit. *Sanchez v. Denver & Rio Grande Western Railroad Co., 538 F.2d304, 306 n.1 (10th Cir. 1976).* The government must also show that this video is not more prejudicial than probative.

The government exhibit is not really demonstrative evidence at all. Demonstrative evidence has been defined as "any display that is principally used to illustrate or explain other testimonial, documentary, or real proof." [9] The government exhibit at issue here is not "demonstrative" or "illustrative" of any factual testimony or real proof. There is no fact testimony that the Wells' Honda CR-V was the unidentified subject vehicle that drove past the T-1 camera on April 12. Instead the government conducted an experiment on April 19, using the Wells' Honda CR-V to drive past the T-1 camera in an effort to

---

[9] Robert D. Brain & Daniel J. Broderick, The Derivative Relevance of Demonstrative Evidence: Charting Its Proper Evidentiary Status, 25 U.C.DAVIS L.REV. 957, 968-69, (1992) (footnotes omitted). Brain and Broderick note that demonstrative evidence "is, in short, a visual (or other sensory) aid." *Id*. at 969.

create a better quality video in place of the low resolution, blurry T-1 April 12 recording. The government then provided this new, modified, and enhanced video to their experts in a predetermined effort to have these experts identify the vehicle in the T-1 April 12 recording as the Wells' Honda CR-V.

A number of courts have held that the standard for admission into evidence is different for a reenactment and an illustration. Reenactments, like experiments, are held to a higher standard. "Experimental evidence is admissible so long as it is relevant and probative, and such evidence has probative value if the conditions of the experiment are identical with or similar to the conditions of the transactions in litigation." *Glick v. White* Motor Co., 458 F.2d 1287, 1294-95 (3d Cir. 1972) (citing *Crown Cork & Seal Co. v. Morton Pharms.*, Inc., 417 F.2d 921 (6th Cir. 1969)) (affirming the trial court's ruling that proffered experimental evidence was not sufficiently probative to be admissible). "When confronted with photographs, films, and videotapes of experiments or demonstrations that purport to replicate actual events, courts require the party seeking to admit the evidence to prove that the experiment or demonstration was conducted under substantially similar circumstances as the actual event." *Russo v. Mazda Motor Corp.*, Civ. A. No. 89-7955, 1992 WL 309630, at *2, *3 (E.D. Pa. Oct. 19, 1992) (Huyett, J.) (citing John W. Strong, et. al., McCormick on Evidence § 214, at 19-20 (4th ed.1992)) (photographs purporting to replicate an accident were admissible "to demonstrate

mechanical principles relative to the vehicle and as a visual summary of the expert's opinion").

Most case law on the subject of the admissibility of video reenactment has arisen in the civil context, such as cases involving accident reconstruction. But both civil and criminal courts have consistently held that to be admissible, an expert's reenactment of an accident generally must be "conducted under substantially similar conditions" as the accident itself. See *Burchfield v. CSX Transp., Inc.*, 636 F.3d 1330, 1336 (11th Cir. 2011) (quoting *Barnes v. Gen. Motors Corp.*, 547 F.2d 275, 277 (5th Cir. 1977)).

In *Espinoza v. Dunn,* 38 F.3d 462 (9th Cir. 01/18/1995), an unpublished opinion, the Ninth Circuit rejected a demonstration on dissimilarity grounds in an excessive force case. In that case, there was a factual dispute as to whether the plaintiff had hit his head against the window of a car. *Espinoza,* 1995 WL 21601 at *1. During trial, the jury saw a demonstration where the law clerk-in place of the plaintiff-sat in the car and was unable to hit her head against the rear window. *Id.* at *2. However, the law clerk was told not to move, whereas the plaintiff was allegedly kicking and thrashing. *Id.* at *4. The Ninth Circuit concluded that this dissimilarity "was of such a nature as to create a discernible risk that the demonstration was seriously misleading." *Id.* Indeed, "[t]he very physical possibilities the court wished to test may have depended upon the element excluded from the demonstrations." *Id.*

In *United States v. Jackson,* 479 F.3d 485, 489 (7th Cir. 2007), the court found no error in the admission of a drive time demonstration to see how long it would take to get from the scene of a shooting to defendant's girlfriend's residence.  The Court there found no error in the admission of this demonstration for two reasons.  First, it was offered in rebuttal to rebut the defendant' alibi, and second, the Court found that the test was conducted under substantially similar circumstances.  The Court drew a distinction as to the admissibility of such evidence based on the purpose for which it was being offered:

> Whether in a criminal case or a civil one, however, the requirement's application always depends on the purpose for which the experiment is introduced. *See Jones v. Ralls,* 187 F.3d 848, 853 (8th Cir.1999). So, if the purpose is to recreate an event, the timing and physics of which are critical, courts will only admit evidence of experiments that are conducted under nearly identical conditions as the actual event. *Broun, McCormick* § 202. For instance, in *Jackson v. Fletcher,* 647 F.2d 1020, 1026-28 (10th Cir.1981), the district court erred by admitting evidence of an experiment purporting to recreate an accident between a car and a truck in order to determine the precise speed of the truck at the time of collision. The court held that since the simulation truck was empty whereas the actual truck carried a full load (creating a weight differential of 37,000 pounds), and the two trucks were different model years, the experimental conditions were not substantially similar to the actual ones. *Id.*

When events portrayed in the recreation are inconsistent with the testimony to which it relates, the recreation should be excluded as unduly prejudicial.  Furthermore, the reenactment must also "fairly and accurately" represent the evidence in the case.  In this case, the April 19 driving experiment video is significantly dissimilar to the conditions that were present

on the morning of April 12, 2012. These dissimilarities include the time of day, the lighting, the presence or absence of obstructions between the camera and the roadway, other traffic on the roadway, the camera settings and parameters, and the sole use of the Wells' Honda CR-V to the exclusion of all other model vehicles.

> When a party generates demonstrative evidence based on conditions that may be dissimilar to the actual conditions, the dissimilarities create uncertainty that undermines the probative value of the evidence. *United States v. Baldwin*, 418 F.3d 575, 579-80 (6th Cir. 2005) (affirming trial court's refusal to admit a defendant's videotaped reenactment of his alleged kidnapping when the car used in the demonstration was not identical to that present during the alleged kidnapping, the defendant was in a different position during the demonstration than during the alleged kidnapping, and the rope used in the demonstration was knotted less than the one with which the defendant was supposedly bound). In this case, even if the videotape might inform jurors, the risk of inaccuracy both limits the videotape's probative value and increases the possibility of unfair prejudice. *United States v. Williams,* No. 09-0026 Doc. 93 (D.D.C. 10/18/2010)

There are several cases in which a videotaped reenactment of a crime was held inadmissible due to the failure to establish that the video was substantially similar to the actual events and the risk of prejudice from inflammatory images. *See, e.g.*, *State v. Stockmyer*, 83 Wn.App. 77, 920 P.2d 1201 (1996); *Dunkle v. State of Oklahoma*, 2006 OK CR 29, 139 P.3d 228 (2006); *Eiland v. State*, 130 Ga. App. 428, 203 S.E. 2d 619 (1973)). *State v. Trahan*, 543 So. 2d 984, 997 (La. Ct. App. 1989). ([The videotaped reenactment] was inadmissible because the reconstruction did not accurately depict the condition or the position of the parties."), *State v. Hopperstad,* 367 N.W. 2d 546, 549

(Minn. Ct. App. 1985), (overruling the trial court's admission of a video reenactment depicting the events surrounding defendant's arrest); *State v. Caudill*, 789 S.W. 2d 213, 216 (Mo. Ct. App. 1990).

("A videotape reenactment of a crime ... where the victim reenacts the crime with a third party playing the role of the defendant, should be and is hereby declared inadmissible in Missouri."); *Lopez v. State,* 651 S.W. 2d 413, 416, (Tex. Ct. App. 1983) ("We find that any staged, re-enacted criminal acts ... involving human beings are impossible to duplicate in every minute detail and are therefore inherently dangerous, offer little in substance and the impact of re-enactments is too highly prejudicial to insure the State or the defendant a fair trial."). *Bowden v. State,* 297 Ark. 160, 7761 S.W. 2d 148 (When a test or experiment is an attempt to reenact the original happening, the essential elements of the experiment must be substantially similar to those existing at the time of the original occurrence).

In *Borough v. Duluth, Missabe & Iron Range Railway Co.*, 762 F.2d 66 (8th Cir. 1985) the Eighth Circuit upheld the trial judge's decision to exclude the railroad's video exhibit in a case where the plaintiff employee was injured when he stepped from a moving locomotive. Preparing for trial, the defendant produced a video that showed the proper method for stepping off a moving locomotive. Sustaining the plaintiff's objection, the trial judge refused to admit the video reenactment into evidence and the Eighth Circuit agreed that the

video was properly excluded under Rule 403. The Court held that the video was carefully staged by the railroad for the purpose of this litigation.

In *Eiland v. State,* 130 Ga.App. 428, 203 S.E.2d 619 (Court of App. 1973), the Court stated:

> However, photographs and especially movies which are posed, which are substantially different from the facts of the case, and which because of the differences might well be prejudicial and misleading to the jury, should not be used, and this is especially true where the situation or event sought to be depicted is simple, the testimony adequate, and the picture adds nothing except the visual image to the mental image already produced.

The Sixth Circuit has held that "[e]xperimental evidence is admissible so long as the evidence is relevant and probative, and experimental evidence is deemed to have probative value if the conditions of the experiment were identical with or similar to the conditions of the transaction in litigation." *United States v. Baldwin*, 418 F.3d 575, 579-80 (6th Cir. 2005) (quoting *Crown Cork & Seal Co. v. Morton Pharm., Inc.*, 417 F.2d 921, 926 (6th Cir. 1969)). Courts can properly admit experimental evidence if "the tests were conducted under conditions substantially similar to the actual conditions." *Persian Galleries, Inc. v. Transcon. Ins. Co.*, 38 F.3d 253, 258 (6th Cir. 1994) (citing *Randall v. Warnaco, Inc.,* 677 F.2d 1226, 1233-34 (8th Cir. 1982)).

In *United States v. Mayfield,* (E. Dt. Mich. No. 17-20060, 8/23/17) a defendant charged with being a felon in possession of a firearm objected to a government video where the government recorded a demonstration of how the defendant could have thrown a firearm they had recovered on the street, from

his moving car.   In disallowing the video because it was not "substantially similar," the court noted:

> Defendant notes there are a number of differences between the video, and the facts from the police report and affidavit discussing the events. First, the demonstrative video was filmed during the daytime when it was not snowing. Second, the car that is driven in the demonstrative is not a Cadillac.  Third, the car that is driven by the individual portraying Plaintiff and the car that is driven by the individual recording the video appear to be following the 25 mph speed limit.  Defendant does acknowledge at least one similarity: the cars in the demonstrative video follow the route that Plaintiff is claimed to have followed.

## B. There is No Foundation for the April 19 Driving Experiment Video

To support admission of the April 19 driving experiment video as a demonstrative exhibit, the government must show first that there is foundation for the content of the video.  Second, to use it as a demonstrative aid, they must offer the video to demonstrate or illustrate some other admissible evidence.  In the context of this case, the government cannot do either.  The April 19 driving experiment video was made under completely different circumstances than the T-1 April 12 recording was captured.  The only thing the April 19 driving experiment video purports to demonstrate is the government's theory that the unidentified subject vehicle from the T-1 April 12 recording was the Wells' Honda CR-V.  Again, the T-1 April 12 recording speaks for itself and what it shows is a question for the jury to decide.

The April 19 driving experiment video is also not a proper demonstrative aid to the government's many video experts. Without evidentiary foundation to support its admission in the first instance, the government cannot manufacture a video that shows exactly what it wants to depict, then give it to their experts to use for analysis, and then somehow claim use of the video is necessary to illustrate the testimony it has asked the experts to give. There is no legal support for a self-serving exercise like this. No Rule of Evidence or caselaw supports the creation and use of an experiment in this fashion. Because there is no foundation for the April 19 driving experiment video and because it does not properly demonstrate or illustrate the testimony of any witness, the court should exclude this video.

## C. The April 19 Government Driving Experiment Video Is Misleading

Even with a limiting instruction and cross examination, the use of the government-manufactured April 19 driving experiment video is misleading to the jury. Defense expert Dr. Daniel Reisberg's report discusses the concerns where a jury is asked to consider the low-quality visual input from the T-1 April 12 recording when also presented with the government's manufactured April 19 video which uses the Wells' vehicle. Dr. Reisberg notes the phenomenon of the "top down" or "expectation driven effects" in vision.

> For purposes of this report, however, let me assume that the judge will allow both the video and the expert testimony into the trial. How should this information be presented to a jury? One possibility is that the Government will start by presenting the enhanced version of the

Case 3:13-cr-00008-SLG   Document 1012   Filed 06/07/19   Page 29 of 33

video - i.e., the version created by Toglia. The Government will surely acknowledge, though, that the jury must decide for itself what the original video shows, and so they will next show the jury the original video - perhaps with some declaration that 'We have shown you what *we* think the video depicts; you must now decide for yourself.'

The science of visual perception tells us that the sequence just described (or any of a number of variants on it) would be highly problematic. What is at issue here is the perceptual analogue to confirmation bias - and, specifically, effects that are often referred to as 'top-down' or 'expectation-driven' effects in vision. The idea, in brief, is that our vision is heavily influenced by our knowing what we are 'supposed to' see, and, once we have perceived a pattern in one fashion, it is extremely difficult to "un-see" that pattern and to go back to being an objective viewer.

For clarity, we should be clear here that we are not talking about something like the Rorschach test (or related tests) for which (supposedly) people "project" their unconscious wishes and desires onto the perceptual input. Instead, top-down processing refers to the ordinary mechanisms through which every one of us draws on knowledge and expectations to supplement the visual input, and to interpret that input. Not surprisingly, top-down effects are strongest when the input is of low-quality (for example: a fast and blurry video, precisely the case in the present investigation), because this is a situation in which the need for supplementing and interpreting is greatest. Let's also be clear that top-down processing is not a deliberate, conscious process separate from ordinary perception. (It is thus not the case that one first sees a pattern and then interprets it as a separate step.) Instead, top-down processes permeate and literally shape what one sees. (See Attachment W; Reisberg Report p. 11-12).

Allowing the government to use the driving experiment video that was staged on April 19 will create the exact danger that Dr. Reisberg discussed in his report, and the jury will be unavoidably mislead and confused.

## D. The April 19 Government Driving Experiment Video is not Helpful to the Jury

The use of the government-manufactured video will not "help the trier of fact to understand the evidence." F.R.E. 702. The government's own experts

have previously testified that even after they reviewed and compared the T-1 April 12 recording to the April 19 driving experiment video, they were unable to confirm or rule out that the unidentified subject vehicle in the T-1 April 12 recording was in fact the Wells' Honda CR-V. (Tr. 2347). FBI expert Gerald Richards was explicit about this issue when asked if he had "prepared any kind of a comparison for the jury to look at," and he responded "No, sir. [T]here was no reason to make any comparison because there wasn't enough detail in the questioned image to make a comparison with anything." (The "questioned image" in this instance was the unidentified subject vehicle from the T-1 April 12 recording.) (Tr. 3339).

Clearly, the April 19 driving experiment video is not substantive evidence. Rather, it was completely manufactured by the government. The T-1 April 12 recording is the only true item of substantive evidence. Allowing the government to ask the jury to compare its fabricated April 19 driving experiment video with the T-1 April 12 recording creates the illusion that these two grossly dissimilar items are actually comparable. Because the April 19 driving experiment video is also not demonstrative evidence related to any testimony, it in no way helps the jury to decide a material issue at trial.

### E. The Use of Only the Wells' Honda CR-V in the April 19 Government Driving Experiment Video is Extremely Prejudicial

The most prejudicial aspect of the government-manufactured April 19 driving experiment video is that the government agents only used the Wells'

Honda CR-V in their experiment despite multiple experts indicating that the make, model, and color of the unidentified subject vehicle in the T-1 April 12 recording cannot be determined. They did so despite these same experts also noting that the dimensions of the unidentified subject vehicle in the T-1 April 12 recording are actually consistent with several other makes and models of SUV. Use of this manufactured video is therefore exceptionally misleading because even the government retained experts cannot definitively state that the suspect vehicle is a Honda CR-V. The April 19 driving experiment video essentially creates a one – person (one-vehicle in this case) lineup. See, *Manson v. Brathwaite*, 432 U.S. 98, 116, 97 S.Ct. 2243 (1977) (Where the "indicators of [a witness'] ability to make an accurate identification" are "outweighed by the corrupting effect" of law enforcement suggestion, the identification should be suppressed.) See also, *Stovall v. Denno*, 87 S.Ct. 1967 (1967); *Simmons v. United States*, 88 S.Ct. 967 (1968); *Foster v. California*, 89 S.Ct. 1127 (1969); *Neil v. Biggers*, 93 S.Ct. 375 (1972).

## IV.   CONCLUSION

The government should not be allowed to argue their theory of the case during the evidentiary part of the trial by way of exhibits that are based on speculation and not fact. Argument about theory of the case should be restricted to closing argument. Moreover, using the Wells' Honda CR-V, and only the Wells' Honda CR-V in the manufactured April 19 government driving

experiment video, will only serve to mislead and confuse the jury. For the reasons stated herein the government video should be excluded.

DATED this 7th day of June , 2019.

Respectfully submitted,

*/s/Peter A. Camiel*
Peter A. Camiel WSBA 12596
Attorney for Defendant Wells

*/s/Gary Colbath*
Assistant Federal Defender
Attorney for Defendant Wells

Certificate of Service:
I hereby certify that I electronically filed the foregoing and any attachments with the Clerk of Court for the United States District Court for the District of Alaska by using the district's CM/ECF system on June 7, 2019. All participants in this case are registered CM/ECF users and will be served by the district's CM/ECF system.
*/s/ Gary G. Colbath*