1    THE CLERK:  All rise.  His Honor the Court, the United
2 States District Court is again in session.

3    THE COURT:  Okay, the --

4    THE CLERK:  Please be seated.

5    THE COURT:  -- jury's on its way.

6    (Jury present)

7    THE COURT:  Okay.  Please be seated.  The government's
8 next witness.

9    MR. SCHRODER:  Your Honor, the government calls John
10 Stein.

11    THE COURT:  Okay.  Up here, sir.  If you make your way
12 up here, and then this -- that door pulls out, that little door
13 into the witness box.  And then you just step into the witness
14 box and remain standing just for a second here.  And this
15 lady's going to swear you in.

16    THE CLERK:  Please raise your right hand.

17        **JOHN STEIN, PLAINTIFF'S WITNESS, SWORN**

18    THE CLERK:  Okay, thank you.  Please have a seat.  And,
19 sir, if you can please state and spell your full name.

20    THE COURT:  Okay, she just -- she's sitting over here.
21 That voice came out of nowhere.  She said, "Could you please
22 state and spell your full name?"

23    THE WITNESS:  Okay.  Is this working?

24    THE COURT:  It's working.

25    THE WITNESS:  I'm -- name?

STEIN - DIRECT

1        THE COURT:  Your full name.

2        THE WITNESS:  Yeah.  I'm John Stein.

3        THE COURT:  Spell your -- John, J-o-h-n?

4        THE WITNESS:  J-o-h-n.

5        THE COURT:  Stein is?

6        THE WITNESS:  Stein, S-t-e-i-n.

7        THE COURT:  S-t -- very well.  Counsel.

8                    **DIRECT EXAMINATION**

9   BY MR. SCHRODER.

10  Q   Mr. Stein, are you currently employed?

11  A   No, sir, I'm retired.

12  Q   And were you ever in the Coast Guard?

13  A   Yes, sir, I spent about 20 years in the Coast Guard.

14  Q   And what did you do when you were in the Coast Guard?

15  A   I was an electronics technician.

16  Q   And where were some of the places that you were assigned?

17  A   My first assignment was the Coast Guard Communication

18  Station on Kodiak Island.

19  Q   And did you do more than one tour on -- at COMMSTA Kodiak?

20  A   Yes, I -- I went back there later on in 1981.

21  Q   And when you were at COMMSTA Kodiak, did you know the

22  defendant, Jim Wells?

23  A   Yes, I certainly did.

24  Q   And what was your professional relationship with him?

25  A   At that time I was the electronics officer of the

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

**STEIN - DIRECT**

1  communication station, and Jim Wells was the technician in

2  charge of our -- our receiver site.

3  Q   So did he work for you?

4  A   Yes, he certainly did.

5  Q   And did you also do things together outside of work?

6  A   Yes, I know him personally.  We hunted and fished together

7  occasionally, things like that.

8  Q   All right.  Now, do you have -- when did you leave the

9  Coast Guard?

10  A   Pardon me?

11  Q   When did you leave the Coast Guard?  When did you retire?

12  A   Okay, I retired in October of 1989.

13  Q   And where were you assigned when you retired?

14  A   My last assignment was Coast Guard Headquarters.

15  Q   And did you stay in Washington, D.C. when you retired?

16  A   No, I immediately returned to my home in Kodiak.

17  Q   Okay.  And did you have a home you owned in Kodiak?

18  A   Yes, I did, uh-huh (affirmative).

19  Q   Okay.  Now, when you got back to Kodiak, did you go to

20  work right away?

21  A   No.  I took a -- about a year of vacation.

22  Q   All right.  And what'd you do during that year besides

23  hang --

24  A   Pretty much nothing.

25  Q   -- around?

1  A    Fishing.  Hunting.

2  Q    And do you have a -- did you have an interest in

3  airplanes?

4  A    Oh, yes.  I -- okay, I got to be honest here.  I'm -- I'm

5  a flight instructor.  I did teach flying --

6  Q    Okay.

7  A    -- when I was out there.

8  Q    All right.  And after that year of semi-retirement, what

9  did you do after that?

10 A    I got a job as a schoolbus driver, and did that for five

11 years.

12 Q    Okay.  Now, what did you do after you stopped being a

13 schoolbus driver?

14 A    I began touring around the world.  I left Kodiak Island

15 and --

16 Q    And what kind of places did you travel?

17 A    I went all over Central and South America and Australia

18 and Asia.

19 Q    And did you keep the house in Kodiak?

20 A    No, I eventually sold that.

21 Q    All right.  And you -- I guess I didn't ask you this

22 before, but do you have an interest in firearms?

23 A    Yes, I've been interested in firearms since I was a kid,

24 and when I -- when I was stationed at Point Barrow, my second

25 duty station, I acquired a federal firearms license.

**STEIN - DIRECT**

1  Q   So you bought -- you sold firearms at one point?

2  A   Yes.

3  Q   Did you also own firearms?

4  A   Yeah, quite a few.

5  Q   And what kind?  Have you owned some -- different kinds?

6  Could you describe some of the ones you've owned, just

7  generally?

8  A   Well, I'm -- I -- I like handguns.  I own about 25 or 30

9  handguns right now.  And I'd use them skeet shooting and --

10  that's about it.

11  Q   And did you ever sell a gun -- did you sell many guns when

12  you had a federal firearms license?

13  A   Did I sell many?

14  Q   Did you sell many?

15  A   A few, yeah.

16  Q   Yeah.  Did you sell any to -- remember ever selling any to

17  the defendant, Jim Wells?

18  A   Yes, I sold one gun to Mr. Wells, uh-huh (affirmative).

19  Q   Do you remember what it was?

20  A   It was a Ruger, a Super Blackhawk.

21  Q   All right.  Now, when you decided to go traveling, what

22  did you do with -- what'd you do with your guns at that point?

23  A   Well, I had a huge gun safe, and at one point I cleaned

24  out my house and I moved the gun safe into Jim Wells's house.

25  Q   All right.  Was it heavy?

1  A    Pardon me?

2  Q    The gun safe?  Was the gun safe heavy?

3  A    Was -- oh, yeah.  It was -- it was at least 500 pounds,

4  yeah.

5  Q    All right.  Did you help move it into Mr. Wells house?

6  A    Yes, I did.

7  Q    And where was it located when -- in the house?

8  A    We took it in through the garage and then we went upstairs

9  into the living quarters and we parked the safe up -- up there

10  at the top of the stairs.

11  Q    All right.  And when you left it, when you left to go

12  traveling and left the safe there, did you -- was it locked?

13  A    Yeah, I believe it was, uh-huh (affirmative).

14  Q    Okay.  And who had the combination?

15  A    Jim Wells had the combination.

16  Q    All right.  And did you give it to anybody else?

17  A    No.

18  Q    All right.

19  A    No.

20  Q    Now, when you went traveling on that particular occasion,

21  did -- were you traveling anyplace in particular at that time?

22  A    In particular?

23  Q    Yeah.  Was there a location you liked to visit at that --

24  about that time?

25  A    Yeah.  I -- I -- I had -- I had some friends in Honduras.

1  Q    Okay.

2  A    And I would go down there for months at a time.

3  Q    All right.  Now, when you returned -- after you left

4  Honduras, did you come back to Kodiak?

5  A    Yes.

6  Q    And was that -- how -- a few months later?

7  A    Yeah.  I -- I don't like to get bogged down in dates here,

8  because this was a long time ago, and I -- I don't have any

9  written record to refer to --

10  Q    Right.

11  A    -- no.

12  Q    So when you came back, did you go visit the Wells, the

13  Wells family?

14  A    Yes, of course.  Uh-huh (affirmative).

15  Q    And did you check your gun safe?

16  A    Yeah, immediately, uh-huh (affirmative).

17  Q    And what did you find?

18  A    Well, when I entered the house, I found the door to the

19  safe wide open.

20  Q    Okay.  And did you maintain any kind of a list of your

21  firearms?

22  A    Yes, I had a detailed inventory.

23  Q    All right.  So did you note whether anything was missing

24  from the safe, any firearms?

25  A    Yeah.  I noticed right away that a -- a Smith & Wesson

**STEIN - DIRECT**

1   revolver was missing, a Model 629.  And a rifle scope was

2   missing.  And I think that's all I noticed at the time.

3   Q   All right.  At the time, how many Smith & Wesson Model

4   629s did you own?

5   A   I owned two of them.

6   Q   And what was the sizes of the two, the barrel sizes?

7   A   Okay.  These are identical guns, both Model 629s.  One had

8   a -- one had a six-inch barrel, one had a four-inch barrel.

9   Q   Which was the one that was missing?

10  A   The six-inch.

11  Q   And did you ask Mr. Wells about that firearm?

12  A   Yes, I did.

13  Q   And what did he say to you?

14  A   He said he didn't know anything about it.

15  Q   And were you satisfied with that answer?

16  A   No, I -- no, I was kind of upset.  This is a expensive

17  gun, and I really wanted it back.

18  Q   Did you press him on the issue?

19  A   A little bit, yeah.

20  Q   All right.  Now -- oh, let's -- one more question.  What's

21  a -- Model 629, what caliber of handgun is that?

22  A   That -- it's a .44 Magnum.

23  Q   All right.  Now, after you talked to Mr. Wells about it,

24  did you decide you needed to take any more action based upon

25  that missing gun?

**STEIN - DIRECT**

1  A   Yes.  After we -- after I moved my gun collection down to

2  my brother's house in Wisconsin, we took another inventory and

3  made sure that this gun really was missing.  And then I

4  reported it to the police.

5  Q   Okay.  And did you make an oral report or was it in

6  writing?

7  A   I -- I sent the report in writing.

8  Q   Okay.  Now, do you remember the full contents and details

9  of that report?

10  A   All I said was that -- I told them where the gun

11  disappeared from, I think, and the serial numbers of the --

12  both the gun and the scope.  And that's about all, I think.

13  Q   And do you have it in your memory what the serial number

14  of that gun was?

15  A   No.

16  Q   All right.  I'm going to ask you to look at Government

17  Exhibit --

18      (Side conversation)

19  Q   -- 232A.  Now, you can look -- right next to you is a

20  computer screen.  And I don't know how well you can see it.  If

21  you can't see it very well, I could give you a written -- a

22  hand -- a paper copy.

23  A   Well, it looks pretty clear.

24  Q   Okay.

25          THE COURT:  That looks clear to you?

**STEIN - DIRECT**

1  BY MR. SCHRODER:

2  Q   You're reaching like you're looking for your glasses.

3  A   Yeah.

4  Q   Would it be easier for me to give you a paper copy to look

5  at?

6  A   No, I -- I have the glasses, yeah.

7  Q   Okay.

8  A   What did you want to ask?

9  Q   I just want to ask you are you familiar with this letter?

10  A   Of course.

11  Q   And is it signed?

12  A   Yes.

13  Q   And who's it signed by?

14  A   Yes, I signed it.

15  Q   And is this the report you made that was -- you just

16  discussed?

17  A   Yes, uh-huh (affirmative).

18  Q   And did you make it at least within a few weeks of the

19  actual loss of the gun?

20  A   Yes, this is August -- and -- okay.

21  Q   Okay.  And did you have personal knowledge of the facts?

22  A   Yes, I believe.

23  Q   All right.

24      MR. SCHRODER:  Your Honor, the government moves for

25  admission of Exhibit 232A.

1    MR. CURTNER:  No objection.

2        THE COURT:  It'll be received.

3    (Plaintiff's Exhibit 232A admitted)

4  BY MR. SCHRODER:

5  Q   All right.  So, Mr. Stein, I'm going to have you give us a

6  couple of highlights of this.

7    (Side conversation)

8  Q   Now let's blow up paragraph 5, just to make that clear.

9  And it says the -- what does that say?

10 A   You're asking me?

11 Q   Yes.

12 A   "The lost firearm is a Smith & Wesson Model 629.  This is

13 a stainless-steel .44 Magnum with six-inch barrel.  Serial

14 number is AJI2172."

15 Q   Okay.  Now, it looks like there might have been a write-

16 over there, where it says the "four" and the "six" there?

17 A   It looks -- it looks like it's covering up a plus sign.

18 Q   Okay.  Right.  But is there any doubt in your mind which

19 of your two firearms that was missing?

20 A   No, that's exactly the one.

21 Q   Okay.  All right.  And did you check that serial number

22 against your list?

23 A   I'm sure I did.

24 Q   Okay.  Right.

25 A   I wouldn't -- I wouldn't have remembered that, you know --

1  Q   Without it?

2  A   Right.

3  Q   All right.  And let's look at the number at the top.

4  There's a handwritten number.  In the blue, Kim.  Now, did

5  you -- when you reported this to the police, did they give that

6  case number to you?

7  A   No, you know, I -- I -- they didn't send me anything back.

8  Q   Okay.

9  A   So this is the first time I've seen -- you know, when you

10  showed me this letter, that's the first time I saw those

11  numbers.

12  Q   Does that look -- whose -- does that look like your

13  handwriting?

14  A   No.

15  Q   Okay.  All right.  And then at the bottom, let's look at

16  number 7.

17  A   Well, wait a minute, I take that back.  Maybe I did write

18  that down.  Maybe I had a phone call or something.

19  Q   Does that trigger your memory at all, looking at that?

20  A   Fax -- well, apparently --

21  Q   Well, that's okay.  Let's go back -- I want to look at --

22  A   Yeah.

23  Q   -- paragraph 7.

24  A   Okay.

25  Q   And what does that say?

1  A    Says, "For further information, you contact Mr. Jim

2  Wells," and phone number.

3  Q    All right.  And, now, you said you moved the safe and the

4  firearms.  Why were you so concerned with documenting it and

5  making this police report?

6  A    Pardon me?

7  Q    Why were you so concerned with making a police report on

8  this?

9  A    Well, I was very concerned about the -- this pistol going

10 missing, and I didn't know who had it.  And if it was involved

11 in a crime, it would reflect very poorly on me.

12 Q    Now, did you ever get an explanation from Mr. Wells

13 subsequently about what happened to that gun?

14 A    No.

15 Q    All right.  Now I want to -- what was your rank in the

16 Coast Guard when you retired?

17 A    CWO3.

18 Q    And what does that mean?  What is CWO?

19 A    Chief warrant officer.

20 Q    All right.  And as a chief warrant officer, did you ever

21 have occasion to use a sword?

22 A    Yes.

23 Q    For operational purposes?

24 A    No.

25 Q    For what?

1  A    Ceremonial purposes.

2  Q    All right.  And did you own such a sword?

3  A    Pardon me?

4  Q    Did you own a ceremonial --

5  A    Yeah.

6  Q    -- sword?

7  A    Yes, I certainly did.

8  Q    And were there any markings on the sword that indicated it

9  was yours?

10 A    Yeah.  My name is engraved on the blade.

11 Q    All right.  And did it have a case?  Did it come in a

12 case?

13 A    Yes.

14 Q    And did that have any markings that indicated it was

15 yours?

16 A    Well, my initials are painted on it somewhere, on the lid

17 or -- I guess, or --

18 Q    Okay.  Now I'm going to ask you to look at Government

19 Exhibit 215.  Yes, it's already admitted.  Now, are you

20 familiar with that?  And look at the case too.

21 A    Yes, sir.  That's --

22 Q    All right.

23 A    -- those are my initials and "USCG" on there.

24 Q    And have you looked at those before your testimony today?

25 A    Yes.  Yeah.

**STEIN - DIRECT**

1 Q   Okay.

2 A   You showed them to me.

3 Q   Yeah.  And is that your sword?

4 A   Yes, that's my name engraved right there on the blade.

5 Q   All right.  Now, other than when you looked at it before

6 in your trial preparations, when was the last time you'd seen

7 that sword?

8 A   Just before I sold my house.

9 Q   Okay.  And where was it?

10 A   It was standing in the closet, in the bedroom.

11 Q   All right.  And at some point did you realize that it was

12 missing?

13 A   Yes.  I intended to ship that sword to my brother, because

14 he had been promoted to officer grade.  And when it came time

15 to ship the guns and the sword, I couldn't find the sword.

16 Q   Okay.  And was -- when you sold your house, were -- was

17 Mr. Wells involved in assisting you with that at all?

18 A   Yeah, I believe Jim and Nancy cleaned the house for me.

19 Q   Now, when you -- did you get notified at some point that

20 this sword may have been found?

21 A   Yes.  An FBI agent called me at home.

22 Q   All right.  And at the time when you found out about that,

23 did you mention any other items that the FBI might want to look

24 for?

25 A   Uh-huh (affirmative).  When he told me he had found my

1  Coast Guard sword, I said, "Well, if you found the sword, you

2  probably found a couple of Japanese swords too."

3  Q   Okay.

4  A   Because they were also missing.

5  Q   All right.  Now, when you said -- where did you obtain

6  these Japanese ceremonial swords?

7  A   Where did I obtain them?

8  Q   Yeah, where'd you get those?

9  A   Oh, I bought those when I was stationed in Japan.

10 Q   All right.  And were they expensive items?

11 A   No.  I -- I consider them souvenirs.

12 Q   All right.  And when was the last time you had seen those

13 items, the swords?

14 A   They were -- they were kept in the closet, right alongside

15 my ceremonial sword.

16 Q   All right.  Now I'm going to ask you to take a look at

17 Government Exhibit 222.

18 A   Yeah, that's -- that would be my sword, yeah.

19 Q   And also Government Exhibit 223.

20 A   Yes, same thing.

21 Q   All right.  Now, did Mr. Wells -- did you give those

22 swords to Mr. Wells or give him permission to have those?

23 A   Absolutely not.

24 Q   Now, another firearm question.  Are you familiar with the

25 term "ported" or "Mag-na-ported" with a firearm?

STEIN - CROSS

1  A    Yes, I am.

2  Q    And have any of your firearms ever had that treatment done

3  to them?

4  A    No, I have never owned a ported gun and never will.

5  Q    Okay.

6        MR. SCHRODER:  No further questions, Your Honor.

7        THE COURT:  Cross-examination.

8                    **CROSS-EXAMINATION**

9  BY MR. CURTNER:

10 Q    Good afternoon, Mr. Stein.

11 A    Morning.

12 Q    How are you doing?

13 A    Afternoon.

14 Q    Now, you've known -- how long have you known Mr. Wells?

15 A    I met Mr. Wells in 1981.

16 Q    Over 30 years.  And how long did you work with him?

17 A    Four years.

18 Q    Four years, okay.  Was he a pretty good person to super --

19 you were his supervisor?

20 A    Yes.  I -- he was an excellent technician.

21 Q    So he was a good person for you to supervise?

22 A    Yeah, very easy to get along with, and did his job.

23 Q    Okay.  Now -- then you got -- so you've known him for a

24 number of years?

25 A    Pardon me?

1  Q    You've known him for a long time, then, even after he --
2  you were supervising him?
3  A    Oh, yeah, uh-huh (affirmative).
4  Q    You were still friends?
5  A    In fact, he sold my house for me.
6  Q    Okay.  Oh, let's -- we'll talk about that in a minute.
7  But -- so when you -- the time he was working with you and the
8  time you guys went hunting and fishing, did you ever see him to
9  be violent?
10 A    No, never.
11 Q    You ever see him even lose his temper?
12 A    No, I don't believe I have.
13 Q    Okay.  So you had remained friends through many years,
14 even when you were driving the schoolbus?
15 A    Uh-huh (affirmative).
16 Q    Did you know his children?
17 A    Yes, they were -- I used to eat dinner at his house quite
18 often.
19 Q    Okay.  And do you remember -- what's his -- the children's
20 names?  Do you remember?  The names of his three children, do
21 you remember those?
22 A    Matt, Elizabeth, and Cable.
23 Q    Cable, okay.  Now, you -- I think you were interviewed a
24 couple times about this case.  Right?
25 A    Oh, yeah, uh-huh (affirmative).  I got a --

**STEIN - CROSS**

1  Q   Two days apart?

2  A   I got a lot of visitors.

3  Q   And about this case?

4  A   Yeah.

5  Q   Now -- so when you were first interviewed, would that have

6  been May 17th of last year?

7  A   I -- I haven't kept notes.

8  Q   Okay.  Have you had a chance to review what you said

9  earlier?

10  A   No.

11  Q   You haven't?

12  A   No, I haven't -- I haven't kept any notes, and we just --

13  when I get a visitor, we usually rehash what was said last

14  time.  That's about it.

15  Q   Okay.  Do you remember the first time an FBI agent talked

16  to you about this and you couldn't -- at that time you couldn't

17  remember Cable or Liz's -- or, no, I'm sorry, Matt and Liz's

18  name.  Is that right?

19  A   Right, uh-huh (affirmative).

20  Q   But you remembered Cable's name?

21  A   Oh, yeah, uh-huh (affirmative).

22  Q   Okay.  Now, you drove -- when you drove the schoolbus,

23  those kids were on your schoolbus for a number of years.

24  Right?

25  A   Right.  Uh-huh (affirmative).

STEIN - CROSS

1  Q   Okay.  And -- but back in -- last year, you couldn't

2  remember two of their names.  Is that -- that's what --

3  A   Yeah.

4  Q   All right.

5  A   I'm getting a little --

6  Q   Okay.  Me too.  But that happens.  So how long did you

7  drive the schoolbus?

8  A   Five years.

9  Q   And why did you quit driving the schoolbus?

10 A   It was time to move on, you know.

11 Q   Was there any kind of --

12 A   I wanted to -- I wanted to travel.

13 Q   Okay.  Was there any kind of incident or anything when you

14 quit?

15 A   Any kind of what?

16 Q   Incident or anything happen?

17         MR. SCHRODER:  Objection.  Relevance, Your Honor.

18         THE WITNESS:  No.

19         THE COURT:  I don't know what you're talking about, so

20 I don't know if it's relevant.

21 BY MR. CURTNER:

22 Q   Was there anything that happened unusual when you quit

23 driving the schoolbus?

24 A   Absolutely not.

25 Q   Okay.  Now let's talk about the house, then.  When you

A & T TRANSCRIPTS
(720) 384-8078  attrans@sbcglobal.net

1  went traveling, you had Jim and Nancy sell your house for you?

2  A    Jim, yeah, uh-huh (affirmative).

3  Q    Jim did.

4  A    I -- I gave him power of attorney.

5  Q    Okay.  So you gave him a power of attorney so he could

6  sell your house when you were gone.  And so you trusted him

7  quite a bit, then?

8  A    Uh-huh (affirmative).

9  Q    And they cleaned your house?

10  A    I believe they did, yeah.

11  Q    Okay.  So what did that entail?  Did it take them a long

12  time to clean your house?

13  A    I wasn't there, I don't think, at the time.  I -- they --

14  I think they cleaned it after I left.

15  Q    They had to clean it in order sell it?

16  A    Hmm?

17  Q    They had to clean the house so that they could sell your

18  house?

19  A    Yeah, right.

20  Q    Okay.  Now, didn't you put a lot of your things in storage

21  before you left?

22  A    No, I sold just about everything.

23  Q    Okay.  You -- when you left, you wanted to travel light.

24  Is that correct?

25  A    Yeah.  The only thing I -- the only thing I didn't want to

1  sell was my gun collection.

2  Q    Okay.  And -- but everything else, all your personal

3  items, you either put in storage or --

4  A    Well, I -- I had a --

5  Q    -- gave away or --

6  A    -- I had a house sale and sold all the other stuff,

7  stereo, books, and kitchen stuff.

8  Q    Do you remember telling the FBI agent that you thought

9  your swords were in storage?  Did you ever say that?

10  A    Did I what?

11  Q    Did you ever tell the FBI agent that your swords -- you

12  thought your swords were in storage when you left?

13  A    I still didn't understand the question.

14  Q    Okay.  Do you remember telling one of the agents here when

15  they asked you questions about the swords --

16  A    The sword.

17  Q    The sword --

18  A    Swords.

19  Q    Okay -- yes.  Did you ever say that you thought that you'd

20  put them in storage?

21  A    No, I didn't.  I -- I didn't put them in the safe, no.

22  No, I did -- I -- I intended to do that and then I -- for some

23  reason or other, I did not.

24  Q    Now -- so did you -- I know we're talking back what --

25  we're talking almost 20 years?  We're talking 1997, '96?  '96.

**STEIN - CROSS**

1  So did you ever pay Mr. and Mrs. Wells for taking the power of

2  attorney and selling the house for you?

3  A    Pay him?

4  Q    Yeah.

5  A    I don't think so.

6  Q    Did you ever pay them for cleaning out your house so they

7  could sell it?  Did you ever give them anything?

8  A    No, I don't -- no, I -- I don't believe that.  Never paid

9  them any -- I don't think I did.

10  Q    Are you sure -- could it be possible that you let them

11  have those swords because you were traveling and you wanted to

12  get rid of things, and that you -- that was something for

13  them -- well, all the work that they did on your house?

14  A    No, I had already promised that sword to my brother.

15  Q    Okay.

16  A    My brother was a chief petty officer in the Navy and he

17  got promoted to lieutenant JG.  And he called me, and I asked

18  him if he'd bought a sword; he said, "No."  So I said, "Would

19  you like mine?"  And he said, "Yes, absolutely."  So I said, "I

20  will ship it down to you with the guns."

21  Q    Okay.  Now, as I recall, you were interviewed twice within

22  two days.  Do you remember that?  One agent talking to you,

23  then two more -- two days later another agent came to talk to

24  you?

25  A    If you say so.

1 Q   Well -- the first interview, do you remember saying that

2 you spent -- well, you lived with the Wells for a while.  Is

3 that correct?

4 A   Yeah, uh-huh (affirmative).

5 Q   And the first time you told them it was for two months?

6 A   You know, I really don't remember.  I -- I had a bunk

7 there for a while and I -- I only -- I only slept there a few

8 times.  But mostly I was traveling and I was just using their

9 house as an address.

10 Q   Okay.  Do you remember the second time you talked to the

11 FBI agents, you said you lived there for two weeks?

12 A   Yeah, something like that, uh-huh (affirmative).

13 Q   Okay.  But the first time, it was two months?

14 A   I don't know.

15 Q   Do you remember the first time you were interviewed about

16 your gun, you said it was a 625 Smith & Wesson?

17 A   Yeah, I made a mistake.

18 Q   Okay.  Then the next time you said it was a 629.  Is that

19 correct?

20 A   Yeah.  I own a 625.

21 Q   Okay.  But you -- so --

22 A   But, yeah, it was a 629, not a 5.

23 Q   But the first time you said it was a 625?

24 A   That's right.  I made a mistake.

25 Q   Now, I think when you were talking about traveling and you

1  were telling the FBI agents how you traveled all around, the

2  first time you said it was for -- you had been traveling for

3  six months?  Do you recall that?

4  A    Yeah.  Again, I -- I -- I don't have a -- I don't have my

5  diaries from that period and I can't tell you exactly.

6  Q    Okay.  Well, I understand.  Now, did you at some point two

7  days later tell them it was actually for five years that you

8  were traveling?

9  A    Well, I did travel for five years.

10 Q    The first time you said it was six months?

11 A    That was one trip.

12 Q    And the next time they asked you about that trip, you said

13 it was for five years?

14 A    All I can say is off and on, I traveled for five years.  I

15 did -- I didn't spend much time in Kodiak without a home, so --

16 Q    The letter that we just looked at, Government's Exhibit

17 232A, can we put that on the screen again for -- oh -- for Mr.

18 Stein?  Okay, so do you see that letter in front of you?

19 A    What's -- what's the question?

20 Q    Okay.  The question is, you wrote that in August of 1997?

21 A    Right.

22 Q    And the first paragraph, you report the loss of a firearm.

23 Is that correct?

24 A    Right.

25 Q    You didn't use the word "stolen" or somebody had taken.

1  You said it was lost, there was a loss of a firearm.  Is that

2  correct?

3  A    Yeah.

4  Q    And the second paragraph of that letter, you said that you

5  rented out your house in 1996.  Is that what you wrote?  June

6  1996?

7  A    Okay.

8  Q    And then you -- then you say you put most of your

9  household goods in storage at Kodiak Transfer.  Do you recall

10 that?

11 A    Yeah.  You know, I don't remember that, but I wrote it

12 down, so I guess it must be true.

13 Q    Okay.  So when you rented your house in 1996 --

14 A    Yeah, I guess.

15 Q    -- you did put your household goods in storage?

16 A    Yeah, I -- I'm not going to disagree with anything in the

17 letter here.

18 Q    Okay.  Now -- then you said that when you returned

19 traveling in January 1997, that's when you first notice that

20 a -- your gun was missing.

21 A    Okay.

22 Q    Paragraph 3.

23 A    I guess so, yeah.

24 Q    So you noticed that your firearm was missing in January,

25 and you wrote this letter in August, eight months late --

STEIN - CROSS

1  later.  Right?

2  A   Yeah.

3  Q   And you didn't mention any swords in this letter at all.

4  Correct?

5  A   I -- I wrote the letter because I was having difficulty

6  getting a -- police to accept my -- my problem.  I -- I took --

7  I went to the Kodiak Police, I went to the -- I think I went to

8  the Kodiak troopers too.  But since there was no crime

9  committed, nobody was interested.  I couldn't get -- I even

10  called the Wauwatosa City Police, and they were bored by it

11  all.

12  Q   Well, you -- asked if there was some reason you were

13  concerned about the missing gun, and didn't you -- weren't you

14  concerned about collecting insurance for it?

15  A   Was I what?

16  Q   Were you concerned about -- you had it insured.  Is that

17  correct?

18  A   No.  No.

19  Q   You didn't have your gun insured?

20  A   None of my gun --

21  Q   Are you sure about that?

22  A   None of my guns were insured.

23  Q   You didn't file a claim for insurance?

24  A   I don't think so.

25  Q   Did you have a -- NRA insurance?

1  A    Oh, NRA, yeah.   I -- I've never collected anything --

2  those guys either.

3  Q    Did you try to collect from them for this gun?

4  A    Apparently I did.   That's -- that's when I found out they

5  don't pay off.

6  Q    Okay.   So -- now, when you got back to Kodiak in January

7  1997, do you know if Matt Wells was there?

8  A    What about -- what about Matt?

9  Q    Was he there when you went back and you saw the safe at --

10  or that was open?

11  A    I believe Matt was still in the home, yeah.

12  Q    Okay.   So he would have been there to see that, right?

13  A    Yeah.

14  Q    Matt's a pretty good kid?

15  A    Far as I know.

16  Q    Okay.   You know he's a police officer now.   Did you know

17  that?

18  A    Yeah, uh-huh (affirmative).

19  Q    Okay.   And was Cable there?

20  A    I think Cable had already moved to Juneau.

21  Q    All right.   Now, how well did you know Cable?

22  A    Probably since I met Jim, somewhere around there.

23  Q    Since he was a kid?

24  A    Yeah.

25  Q    And did you ever shoot guns with him?

**STEIN - CROSS**

1  A    Was I --

2  Q    Did you ever -- you and Cable ever shoot those handguns

3  together?

4  A    Yes.  Oh, yeah.  One -- at least once.

5  Q    Okay.  And was that the two Smiths and -- Smith & Wesson

6  629s?

7  A    Yeah, we had both of them.

8  Q    Okay.  You shot one and he shot the other?

9  A    (No audible reply).

10 Q    And, now, when they asked you about this gun, didn't you

11 think -- didn't you say that you thought maybe Cable took it?

12 A    I -- yeah, I was thinking that one of the kids might have

13 borrowed it.

14 Q    Okay.  Now, you said Cable really liked that gun.  Right?

15 A    Yeah.  He -- I gave him a choice when we went shooting.

16 He could have the short barrel or long barrel.  He immediately

17 grabbed the long barrel, and so he liked that gun, yeah.

18 Q    And didn't you say when they first asked you about this,

19 you thought maybe Cable grabbed the pistol?

20 A    Grabbed it?

21 Q    Yeah.  I think that's what your words were.

22 A    Well, he -- yeah, he was -- he was pretty excited.  Yeah,

23 he, okay, grabbed, the gun, "Yeah, I want to shoot this."

24 Q    Did you also tell them that he boogied off with it?

25 A    That he what?

1  Q    Boogied off with it, took off with it.

2  A    Say that again.

3  Q    Boogied.

4  A    Boogied off with it?

5  Q    Yeah.

6  A    No, I never said that.

7  Q    Okay.  And --

8  A    We were -- we were standing right to each other shooting,

9  so --

10  Q    I know.  And he liked the gun when you were shooting?

11  A    Yeah.

12  Q    And this is before you left.  And then when you came back

13  and you thought the gun was missing, your first thought was

14  maybe Cable took off with it.

15  A    Yeah.  Well, you know, Cable was in Alaska and he was -- I

16  think he was learning to fly.  And I thought he might want to

17  have a -- a -- a heavy handgun for flying across country.  So I

18  thought he had -- he would have a reason or -- to keep it or

19  use it, you know.  So that's all I suggested, maybe he had it.

20  Q    He had it and he took it with him to Juneau?

21  A    Yeah, sure.

22  Q    Okay.  Your Smith & Wesson 629s, what kind of handle --

23  grips did they have?

24  A    I don't remember.

25  Q    Okay.

1 A    I usually replace the wooden grips on my guns with rubber

2 ones.

3 Q    So more than likely, your guns that you had, you had

4 rubber grips on that you replaced from the wooden ones?

5 A    Yeah.  I -- I -- I really like rubber grips, so --

6 especially on a hand -- a Magnum.

7 Q    Yeah, especially on a .44 Magnum, it's a lot easier to

8 shoot if you have a rubber grip that you can exchange.  Right?

9 And that's what was on your --

10 A    Yes.

11 Q    -- two guns?

12 A    Yeah.

13 Q    Thank you.  I just want to ask you about a license --

14 federally licensed firearms dealer.

15 A    Yeah.

16 Q    Were there a lot of people who did that on Kodiak?

17 A    Yes.  Of the NR -- I mean the FF -- the BATF told me that

18 there were something like 180 dealers on Kodiak Island.

19 Q    A hundred and eighty federally-certified --

20 A    Dealers.

21 Q    -- firearms dealers?

22 A    Yeah.

23 Q    On Kodiak Island?

24 A    Yeah.  A huge number.

25 Q    Yeah.  And is that a -- is there a reason for that?

STEIN - REDIRECT

1  A    Hmm?  The reason?

2  Q    Yeah.

3  A    Well, everybody uses the FFL to buy handguns.  You know,

4  the -- the -- you can -- you can buy them wholesale.  And if

5  you want to, you can sell legally, and so forth.  And it's --

6  it's -- and it's free, you know, it's only -- at that time I

7  think it was $50 a year or something like that.  So if you --

8  if you like guns, yeah, the FFL was a great -- great idea.

9  Q    Okay, all right.  Thank you.

10           THE COURT:  Redirect.

11              REDIRECT EXAMINATION

12  BY MR. SCHRODER:

13  Q    Mr. Stein, is there any -- Mr. Curtner talked to you a bit

14  about whether -- your impression that maybe Cable Wells might

15  have had that gun.  Did you ever see any evidence of that?

16  A    No.  No.

17  Q    Okay.  Was it based on anything more than the fact that

18  he'd liked the gun one time when you went shooting?

19  A    No.  No.

20  Q    Mr. Wells ever tell you that?

21  A    Did Mr. Wells tell --

22  Q    That Cable might have the gun?

23  A    No, he certainly did not.

24  Q    Now I'm going to show you what's been marked as Government

25  Exhibit 232B.  Now, do you know what -- are you familiar with

1  this exhibit, Mr. Stein?

2  A    It looks like part of my inventory.

3  Q    All you're seeing is the first page.  So -- but is that

4  what it is, the first page of your inventory?

5  A    I have to take your word for that.

6  Q    Well, what do we need to do to help you -- I can give you

7  a paper copy if that would help.  Or if you'd like to look at

8  another page, we can show you other pages too.

9  A    Boy, it's hard for me to read.

10    (Side conversation)

11  Q    Does that help?

12  A    Yeah.  Okay.

13  Q    Now, is -- are you familiar with this document now?

14  A    Well, if it's part of my gun collection, I guess I am.

15  Q    Yeah.  So how did you take this inventory?  What did

16  you -- it looks like it's not handmade.  How did you do -- did

17  you put the information into it?

18  A    Well, I typed it up on my computer.

19  Q    You had a computer back in 1995?

20  A    Yeah, I --

21  Q    Kind of an earlier adopter at that point?

22  A    Yeah.  Coal burning, right.

23  Q    And did you check -- as you put those in there, did you

24  check each handgun -- each firearm to make sure you had the

25  right information on those firearms?

STEIN - REDIRECT

1  A   Well, yeah, I did the best job I could.

2  Q   All right.

3       MR. SCHRODER:  Your Honor, the government moves for

4  admission of 232B.

5       MR. CURTNER:  I'm sorry, did he identify this as his?

6       THE COURT:  He said he typed it up on his computer, the

7  coal-burning one.

8       MR. CURTNER:  I missed that.

9       THE COURT:  Okay.

10      MR. CURTNER:  No objection.

11      THE COURT:  It'll be received.

12    (Plaintiff's Exhibit 232B admitted)

13      MR. SCHRODER:  Could we go to page 2?  Can we blow up

14  that middle section?

15 BY MR. SCHRODER:

16  Q   Now, are there -- let me -- I'm going to -- want you to

17  look at that for a moment.

18  A   Okay.

19  Q   All right.  And is there info for -- on that page, is

20  there information for one or two handguns?

21  A   Yeah, I got two.

22  Q   And which ones?

23  A   The -- the six-inch barrel was the one that was marked

24  stolen.

25  Q   All right.  And what is the serial number for the one with

1  the six-inch barrel?

2  A    For the stolen one?

3  Q    Yes.

4  A    Looks like AJL.  I can't tell -- that looks -- yeah,

5  AJL2172.

6  Q    Okay.  And I want to go back to 232A.  Let's blow up that

7  paragraph 5.  And what's the serial number listed there for

8  that missing firearm, Mr. Stein?

9  A    Yeah, it's hard -- hard to tell if it was an I or an L.

10  It looks like I put a I, period.

11  Q    Okay.  What's the number behind it?  If we blow -- we'll

12  blow that up a little bigger.  That's maybe too big.

13  A    Okay, it's an L.

14  Q    Okay.  So one more time.  Fair to -- get a compromise.

15  A    I'd have to say that's an L.

16  Q    And then what's -- what are the numbers?

17  A    What's the what?

18  Q    What's the full serial number?

19  A    A -- A -- AJL2172.

20  Q    All right.  Thank you.  No further questions.

21          THE COURT:  Recross.

22          MR. CURTNER:  No, thank you.

23          THE COURT:  All right.  Thank you, sir.  You're all

24  done.

25          THE WITNESS:  All right.