BRYAN SCHRODER
United States Attorney

STEVEN E. SKROCKI
Deputy Criminal Chief
CHRISTINA SHERMAN
Assistant U.S. Attorneys

KELLEY STEVENS
Special Assistant U.S. Attorney
Federal Building & U.S. Courthouse
222 West Seventh Avenue, #9, Room 253
Anchorage, Alaska   99513-7567
Phone: (907) 271-5071
Fax: (907) 271-1500
Email:steven.skrocki@usdoj.gov
        christina.sherman@usdoj.gov
        kelley.l.stevens@uscg.mil

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  3:13-cr-00008-SLG |
| | ) | |
| JAMES MICHAEL WELLS, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| _____ | ) | |

**OPPOSITION OF THE UNITED STATES TO DEFENSE MOTION TO
EXCLUDE THE APRIL 19, 2012 GOVERNMENT DRIVING EXPERIMENT**

The United States submits the following Opposition to the Defense Motion to

Exclude a straightforward, relevant and admissible video re-enactment/demonstration

prepared by investigators for trial. One week after the murder of Messrs. Belisle and Hopkins, investigators performed a drive-by, north and south on Anton Larson Road, using the Wells' blue Honda CR-V in order for it to be captured by the same video camera at the T-1 building which captured a very similar small blue vehicle driving toward, and then away from the Rigger Shop/T2 building on Anton Larson Road at the approximate time of the murders. The defendant's brief significantly exaggerates the minor variables between the two video recordings, arguing that unless an exact duplication of all conditions is made the video is inadmissible. The law, however, does not hold any recreation/duplication effort to such a comprehensive standard, finding that any discrepancies which might exist go to weight, not admissibility. All of the arguments raised by Wells can be remedied and addressed on cross-examination or by a tailored jury instruction.

In addition to the foregoing reasons for denying the motion, this is yet another argument raised during the first trial and yet raised again. In the prior trial, counsel for the defense clearly objected to the admission of this demonstration/re-creation on the very same issues they now file upon here: similarity and FRE 403 prejudice. In both circumstances the district court denied the defense application. Moreover, Wells failed to raise either of these two issues on appeal. Consequently, the law of the case controls on this issue as well.

For these reasons and others provided here, this Court should deny defendant's motion to exclude the video.[1]

---

1 Defendant characterizes the investigative activity as one of a 'driving experiment.' This moniker is taken from *United States v. Jackson*, 479 F.3d 485, 489 (7th Cir.2007) wherein a true driving experiment was conducted in

Case 3:13-cr-00008-SLG   Document 1040-1   Filed 06/21/19   Page 2 of 33

## A. FACTS OF THE DEMONSTRATION VIDEO AND USE OF IT AT TRIAL

### 1. Video Footage on April 12, 2012, the Day of the Murders, and Video Re-Enactment of April 19, 2012 One Week Later.

On April 12, 2012, Richard Belisle and James Hopkins showed up for their workday at their usual time. The building where they worked was known as the 'Rigger Shop' or 'T-2.' James Wells murdered both men shortly after their arrival and beginning their workday for the United States Coast Guard.

The United States conducted a thorough, detailed and all-encompassing investigation. As part of that investigation, investigators reviewed surveillance camera footage from a camera located on the nearby administrative building, known as 'T-1', and footage from a camera at the USCG Kodiak Main Base entrance, located several miles away from the T-2/Rigger Shop, and discovered the following relevant and admissible facts:

- Video surveillance footage from the USCG Base Kodiak captured Wells' white Dodge pickup traveling in the direction of the Rigger Shop/T2 at 6:48 a.m. (See Exhibit 1 below). This was Wells' usual commute time for work as he usually arrived at 7:00 a.m.

---

order to defeat the defendant's alibi as to time and location of the defendant during the time of a shooting. The video was admitted, and weaknesses of the video were elicited on cross-examination. *Ibid.*, 479 F.3d at 490. This exhibit is not an experiment but a demonstration offering the possibility that the Wells' personal vehicle, and the vehicle captured on the T-1 surveillance camera the morning of the murders are the same. While defendant complains that the government used only the Wells' personal vehicle, case law criticizes, and, in fact, precludes using dissimilar vehicles. *Ibid.*

Case 3:13-cr-00008-SLG   Document 1040-1   Filed 06/21/19   Page 3 of 33



Exhibit 1

- Thereafter, video surveillance footage taken from the "T-1" administrative building, located up the rise from the Rigger Shop/T-2 building revealed a small, blue vehicle, possibly an SUV-type vehicle, heading toward the Rigger Shop at approximately 7:09 a.m., roughly 21 minutes after Wells' white truck had passed the front gate, and shortly after Messrs. Belisle and Hopkins had arrived for work. (See Exhibit 2 below, photo left, "4-12-2012"). The video footage is very brief, lasting only five frames and approximately a second in duration.

Case 3:13-cr-00008-SLG   Document 1040-1   Filed 06/21/19   Page 4 of 33



Exhibit 2

- Roughly five minutes after the small blue car is captured driving on Anton Larson Road toward the back entrance to the Rigger Shop/T2, the video surveillance footage from the same camera at the "T-1" administrative building depicted what appears to be the same blue vehicle driving in the opposite direction at a higher rate of speed heading back in the direction of the Kodiak Airport at 7:14 a.m. (See Exhibit 3 below, photo left, 4-12-2012). Again, the video footage, is only four frames and lasts approximately one second in duration.

Case 3:13-cr-00008-SLG   Document 1040-1   Filed 06/21/19   Page 5 of 33



Exhibit 3

- Shortly thereafter, at 7:22 a.m., and just eight minutes after the blue SUV exited the camera frame heading in the direction of the airport, the Coast Guard front gate camera captured Jim Wells' white Dodge pickup driving at a higher rate of speed in the direction of his home located in Bell's Flats.[2] (see Exhibit 4, photo below) A total of 38 minutes had transpired from the time Wells first passed the USCG Kodiak main base entrance (Exhibit 1) to the time the camera recorded

---

2  Wells' white Dodge truck passed the USCG Kodiak Main Base gate at 6:48 a.m., headed toward the Rigger Shop/T2 building. 38 minutes later, at 7:22 a.m., Wells' Dodge truck was recorded by the same camera heading back toward his home. When confronted with this 38 minute timespan by investigators during his interview, Wells had no explanation as to his activities aside from noticing a problem with his tire.

him returning toward his home. (Exhibit 4) In between that time, Wells murdered his colleagues.



Exhibit 4

- At 7:25 a.m., Wells was nearing his home in Bells Flats. Prior to reaching home, however, witness, Annette Ecret, saw Wells in his white Dodge truck turning right off of Rezanof Drive towards the direction of his residence in Bells Flats.

- Just five minutes later, at approximately 7:30 a.m., Wells used his home land line to call his now murdered supervisor James Hopkins, leaving a false alibi in a voice mail message. Wells' message to

Hopkins stated he was going to be late due to a 'flat tire in the back of his truck.'

Investigators, in response to the video evidence of a small blue vehicle in front of the Rigger Shop/T2 the morning of the murders, attempted to locate a vehicle similar to the vehicle shown in Exhibits 2 and 3, left side photos. Jim and Nancy Wells blue Honda CR-V was found by investigators parked in the parking lot of the Kodiak Airport the evening of April 12th.   (See Exhibit 5, photo below).



Exhibit 5

Over the course of the entire investigation, only three other blue Honda CR-V's were located on Kodiak Island. None resulted in any further investigative action.   FBI Special Agent Alex Doran testified at trial as to driving the Wells' vehicle for the video captured by the T-1 camera. (See Docket 747, pgs. 11, 14 through 15). In so doing, Agent

Doran made seven passes in, and seven passes back on Anton Larson Road in front of the Rigger Shop/T2 building which was intentionally recorded by the T1 camera as it did on the morning of the murders. The recording which was made was identified as Exhibit 168 at trial. (*Ibid.,* at 18) The video was admitted subject to defense objection for similarity and FRE 403 claims, precisely similar to those made in the defense motion now before this Court.

As to those prior and now repeated objections, Mr. Offenbecher stated, *'[a]nd so we do have an objection to that, based on the fact that the conditions were not similar. And the Court—and so I just wanted to make sure that you understand what it is. I don't want to make a big fuss in front of the jury…"* (*Ibid.,* pgs., 5-7, 8). Mr. Offenbecher continued with his objection as defense counsel also sought to preclude the Exhibit 168 under FRE 403. The opposition was denied by the court in the following exchange:

 *:Mr. Schroder: Exhibit 168 is the video.*

 *:The Court: Okay, the defendant's objecting to 168 as not being an accurate representation of events at the time in question. Is that—*

 *:Mr. Offenbecher: And should be precluded under 403. So I've made—*

 *:The Court: Oh, the probative value is outweighed by the prejudice?*

 *Mr. Offenbecher: Yes*

 *The Court: Okay, I disagree with you on that, but that's fine. That's why we have appeals.*

 *Mr. Offenbecher: You're the judge.*

 *The Court: That's right. Remember that. Okay counsel.*

*The Clerk: So is it admitted, 168, or not?*

*The Court: It will be when they offer it.*

In fact, Judge Beistline made a specific comment that the government would have to highlight the fact that the video was not made on the same day. The court then stated 'that would probably go to weight.' (Docket 747, pg. 6) The court admitted Exhibit 168, the video demonstration of the Wells' Honda CR-V testified to by SA Doran, "subject to our earlier discussion." (*Ibid.*, pg. 19).[3]

### 2. Use of April 12, 2012 Suspect Video Footage and the April 19, 2012 Wells' SUV Footage at Trial, Including Insertion of Missing Obstruction Which Defendant Has Objected on the April 19, 2012 Video Captures.

The United States provides for the court several exhibits used in the prior trial which will explain the use of the April 12, 2012 footage, the April 19, 2012 re-creation/demonstration footage, as compared to photos taken of the Wells' CR-V. As the Court will see, the re-creation/demonstration is more than sufficiently similar save for minor discrepancies as to parked vehicles. Moreover these exhibits remedy the complaints of the defense as to the April 19, 2012 re-creation/demonstration.

The United States begins with Exhibit 5, with a photo of the Wells' Honda CR-V, located by investigators at the Kodiak Airport the night of the murders. The investigation was looking for a vehicle of similar characteristics shown in pleading Exhibits 2 and 3, photos on the left, after investigators reviewed the video footage from the T-1 camera earlier that morning and noticed the small blue vehicle coming and going from the direction of the Rigger Shop/T-2.

---

3 Exhibit 168 has been provided to the court as defense Attachment B to this motion.

Case 3:13-cr-00008-SLG   Document 1040-1   Filed 06/21/19   Page 10 of 33



At trial, the government called an expert witness, Angelo Toglia, and will do so again for this trial. Mr. Toglia's testimony can be found at Docket 748, pgs. 5-70. The current defense team did not object to Mr. Toglia's testimony and they did not file any motions prior to trial to exclude his testimony.   At trial, Mr. Toglia testified as to his use of Exhibit 168 to create pleading Exhibits 2 and 3, (prior trial Exhibits 120 and 121) shown below. Each exhibit is a comparison of two captures from the videos taken on April 12th and April 19th showing the subject vehicle coming and going compared to the Wells' actual vehicle coming and going. These were admitted without objection. (See, Docket 748, pg. 53). The United States does not contest that in Exhibits 120 and 121, the April 19th video lacks the other cars parked and visible on April 12th.



Exhibit 2



Exhibit 3

From trial Exhibit 168, the video footage taken from the T1 camera on April 19, 2012, Mr. Toglia took several screen captures for comparison to footage taken on April 12, 2012, the morning of the murders.

Provided below is Exhibit 6, prior trial Exhibit 112, which will be testified to by Mr. Toglia. It depicts a screen capture from the day of the murder, April 12th, and with a Honda CR-V overlay. As the court can see, Mr. Toglia inserted the obstruction which is present in the actual footage.



Exhibit 6

Shown below is Exhibit 7, prior trial Exhibit 113, taken on the day of the murders, it depicts the actual footage from the T1 camera with an obstruction included and the actual vehicle caught on camera that morning. The Rigger Shop/T2 building is visible to camera's right, above the exhibit sticker in each image.

Case 3:13-cr-00008-SLG   Document 1040-1   Filed 06/21/19   Page 13 of 33



Exhibit 7

Exhibits 8 and 9, (prior Trial Exhibit 114 and 115) are the same type of visuals, comparing the subject vehicle, and the Wells' vehicle departing the scene on Anton Larson Road. Again, both Exhibits contain the obstruction which existed in the April 12th footage.



Exhibit 8

Below, Exhibit 9, Trial Exhibit 115, depicts an original video capture from T-1 Camera with the original vehicle depicted, an outline of the vehicle, and the foreground obstruction.



Exhibit 9

Exhibit 10/Trial Exhibit 116 depicts a Honda CR-V overlay on April 19 recreation footage to show the similarity between the Wells' vehicle and the Honda CR-V overlay.



Exhibit 10

Exhibit 11, Trial Exhibit 117, from the re-creation video on April 19th, shows an outline/overlay of a CR-V on the Wells' CR-V. Toglia's testimony will establish that the outline in Exhibit 117 will match the edges of the Honda CR-V overlay in Exhibit 116.



Exhibit 11

Exhibits 12 and 13, trial exhibits 118 and 119, from the April 19th recreation, again depict the Wells' vehicle with an overlay and outline of a Honda CR-V, in order to establish similarity of vehicle outline shape and body.



Exhibit 12



Exhibit 13

All of these exhibits were admitted at trial after the court ruled in favor of admissibility of Exhibit 168.

As this Court knows, Wells was convicted on all counts, and an appeal followed. In its lengthy appeal brief, some 141 pages, the defense had ample opportunity to, but failed to raise the denial of its motion to preclude Exhibit 168 based on not being an accurate representation of the events at the time in question and under FRE 403. (*See, United States v. Wells*, 879 F.3d 900 (9th Cir. 2018) (*See*, Appellate Docket 27, case 14-30146, opening brief, March 7, 2016.) The appeal brief makes no mention of this exhibit or this issue whatsoever.

## B. ARGUMENT

### 1. The 'Not Substantially Similar" and 403 Arguments Fail Under the Law of the Case Doctrine as They Were Denied by the District Court at Trial and Were Not Subsequently Raised on Appeal.

The defense claims made here were previously made and denied by the trial court. As shown above in the facts section of the government's brief, Wells has made precisely the same arguments, i.e., that the video demonstration in question are/were "not similar" along with an FRE 403 argument based probative vs. prejudice. The defense failed to appeal the ruling of the district court on appeal. Based on the foregoing, this court can and should deny this motion under the law of the case doctrine.

As briefed in another matter by the United States, the law of the case doctrine generally precludes reconsideration of "an issue that has already been decided by the same court, or a higher court in the identical case." *United States v. Alexander*, 106 F.3d 874, 876 (9th Cir. 1997) (*quoting Thomas v. Bible*, 983 F.2d 152, 154 (9th Cir. 1993)). In a circumstance like this, "a judgment of reversal by an appellate court is an adjudication only of matters expressly discussed and decided, which become the law of the case in further proceedings on remand and re-appeal." *Hansen & Rowland v. C.F. Lytle Co.*, 167 F.2d 998, 999 (9th Cir. 1948). To show that an issue is not controlled by the law of the case, parties must show that it was not "decided explicitly or by necessary implication" by a prior decision. *United States v. Garcia-Beltran*, 443 F.3d 1126, 1129 (9th Cir. 2006) (*quoting Liberty Mut. Ins. Co. v. EEOC*, 691 F.2d 438, 441 (9th Cir. 1982)). As a prudential rather than jurisdictional doctrine, the law of the case doctrine does not apply "if the court is convinced that its prior decision is clearly erroneous and would work a manifest

injustice." *Pepper v. United States*, 562 U.S. 476, 506–07, 131 S.Ct. 1229, 179 L.Ed.2d 196 (2011) (internal quotation marks and brackets omitted) (*quoting Agostini v. Felton*, 521 U.S. 203, 236, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997)), *Rocky Mountain Farmers Union v. Corey*, 913 F.3d 940, 951 (9th Cir. 2019). See, generally, United States v. Smith, 389 F.3d 944, 948-949 (9th Cir.2004)(while not an 'inexorable command' and discretionary, the doctrine does serve to promote consistency and revisiting of legal questions previously ruled upon should be avoided. While a court may examine an earlier ruling, it must do so under strong and reasonable conviction that the earlier ruling was wrong and that rescinding it would not cause undue harm to the party that benefitted from it)

On this issue, there is nothing in the prior court's ruling that would qualify as a manifest injustice. Indeed, had Wells believed such an injustice occurred he would have devoted and could have devoted one or two pages of his 141 page appellate brief challenging this ruling. He did not do so. Moreover, this matter was expressly discussed, argued, and ruled upon by Judge Beistline, on precisely the same basis as is raised here.

Accordingly, the law of the case doctrine is applicable here. There is not basis for further review.

> **2. Even if the Law of the Case Doctrine Does Not Apply, the Court Can Make Its Own Specific Findings That the Video Comparison Utilizing the Wells' CR-V, Made Nine Days After the Murders, is Substantially Similar With the Video Captured the Day of the Murders by the T1 Camera.**
>
> > **a. Wells Misstates the Standard on 'Substantially Similar' which is Only Necessary When a Re-enactment of An Event Where Timing and Physics Are Critical.**

Case 3:13-cr-00008-SLG   Document 1040-1   Filed 06/21/19   Page 20 of 33

The video footage prepared by the investigation is being offered to show the similarities between the vehicle captured on the T1 camera the morning of the murders, and the Wells' personal vehicle, a blue Honda CR-V, as evidence that the Wells' vehicle is the vehicle captured on the April 12, 2012 video footage from the T-1 Camera. The evidence is relevant and admissible to prove a fact in controversy, and is therefore admissible under FRE 401. All relevant evidence is, in one way or another, prejudicial to the defense, but that, in and of itself, is not a bar to admissibility.

Wells argument essentially boils down to where to draw the line on what is 'substantially similar.' Wells argues that the video in his supplied Exhibit B needs to be precisely duplicative as to time of day, weather, positioning, vehicle cleanliness or not, snow conditions and other trivial, irrelevant and minor inconsistencies between the two. None of the points argued by the brief defeat what is truly a 'substantially similar' video. None of the arguments alter what the court, and more importantly, what the jury will see with respect to both videos taken by the same camera, at the same location one week later using a substantially similar vehicle. Change in snow pack, movement of bollards, time of day, placement of cars are all appeals for an exacting 100% duplication or 'perfect identity' of the demonstration. While the government agrees that vehicles were not exactly placed back into position, such a duplication is not supported in the law. The conditions sought by the defense would not be possible under any circumstances. What is clear is that case law does not require meeting the defense perfect duplication standard be met.

In this circumstance, the video provided in Exhibit 168 is substantially similar in the points where it matters to make it relevant for the jury. It is taken one week after the murders, from the same camera, at the same angle with the Wells' vehicle, a small, blue car which is similar to the subject vehicle, during daylight. As case law provides below, Wells' picayunish complaints about snow melt, weather, sky, time of day and other minute variables can all be cured on direct examination by the prosecution, by cross-examination and/or by a tailored jury instruction and most likely all three.

To begin, there is a relative scarcity of cases addressing this issue on point and when one does the research those few cases overlap and tend to refer to one another. With that, however, there is one axiom which can be found in each case—that being that video experiments/re-enactments are not required to be scrupulously similar, but are required to 'substantially similar.' This standard makes sense for obvious reasons. They are also quite clear that the introduction or refusal of the re-creation evidence lies within the discretion of the trial judge. *Espinoza v. Dunn*, 48 F.3d 1227 (9th Cir. 1995) (Unpublished).

In *Espinoza*, the defendants in a civil case contended that the vehicle demonstration, conducted by the court itself with court staff, was not illustrative of trial testimony therefore the district court abused its discretion by admitting it. In finding error on a glaringly apparent dissimilar test, the *Espinoza* court stated, "[A] court may properly admit experimental evidence if the tests were conducted under conditions substantially similar to the actual conditions." (*citing*, *Champeau v. Fruehauf Corp*., 814 F.2d 1271, 1278 (8th Cir.1987) (internal citations omitted); *see also Hinds v. General Motors Corp*., 988 F.2d 1039, 1048 (10th Cir.1993); *Smith & Wesson v. United States*, 782 F.2d 1074, 1083 (1st

Cir.1986). At the same time, the *Espinoza* court drew from *Champeau* in adopting the rule that "perfect identity between actual and experimental conditions" is not required. If there are differences in the conditions, such differences or dissimilarities ordinarily "affect the weight of the evidence, not its admissibility." *Citing*, *Champeau*, 814 F.2d at 1278. "We recognize that "the admissibility of [demonstration] evidence lies largely in the discretion of the trial judge," *Champeau*, 814 F.2d at 1278, and that "the trial judge is ... the first and best judge whether conditions of the experiment are sufficiently similar and enlightening to render the testimony based thereon admissible." *Derr v. Safeway Stores, Inc.*, 404 F.2d 634, 639 (10th Cir.1968). Thus, while the conditions of the demonstration need not be identical to the event at issue, "they must be so nearly the same in substantial particulars as to afford a fair comparison in respect to the particular issue to which the test is directed. *Illinois Gulf R.R. Co. v. Ishee, Mississippi*, 317 So.2d 923, 926 (Miss.1975), *United States v. Gaskill*, 985 F.2d 1056, 1060 (11th Cir.1993), *United States v. Metzger*, 778 F.2d 1195, 1204 (1985)(holding that video of FBI re-enactment of explosion in car was properly admitted despite the fact that not every variable was identical); *United States v. Baldwin*, 418 F.3d 575, 579-80(6th Cir. 2005)(Where the conditions of the reenactment are substantially similar, any dissimilarities go to the weight of the evidence rather than admissibility.) *United States v. Smith*, 502 F.3d 680, 687 (7th Cir.2007)(Demonstrative evidence that is probative of an element of the offense should be admitted in all but the most egregious cases)

Here, the court can easily find, based on the facts above, that the demonstration conducted by the investigation on April 19, 2012, is sufficiently similar and possesses more

than enough 'substantial particulars' consistent with the conditions of the area on April 12, 2012. (*See*, Exhibits 2 and 3.) The time of day is of no moment as the April 19, 2012 video was taken during the day only seven days after the murders. Snow cover is irrelevant. The camera angles are, to the naked eye, roughly the same. While it is true the same vehicles were not used in the foreground of the April 19th video, the government's expert inserted coverage as if those vehicles were in fact there. Moreover, the jury will be able to see for themselves that the vehicles are not present. There will be no secrets there, (*See*, Trial Exhibits 6-13), thus neutralizing Wells primary complaint. And while the April 19th recording was not made at the same time of day, there appears to be no other discernable difference between the two images. Those visible differences are not glaringly apparent, nor obvious.

Based on the foregoing, this is not a re-creation where "the circumstances of the [incident], as alleged, are so different from [the] test as to make the results largely irrelevant if not misleading," thus warranting exclusion. *Espinoza*, 48 F.3d 1277, at 5, *citing, Gladhill v. General Motors Corporation*, 743 F.2d 1049, 1051–52 (4th Cir.1984)

Case law from other circuits support these tenants. In *United States v. Jackson*, 479 F.3d 485, 489 (7th Cir. 2007), the defendant was convicted of being a felon in possession of a firearm. The defendant claimed at the time of the shooting he was actually picking up his girlfriend from work. To rebut the alibi, a deputy U.S. Marshal conducted a drive to see how long it would take to drive from the scene of the shooting to the defendant's girlfriend's place of employment. *Ibid*, at 487. This would be a true experiment and due to the alibi, the timing of the drive was important. The Marshal testified that the time in order

U.S. v. Wells                                    Page 24 of 33
3:13-cr-00008-SLG

to do so as claimed by the defendant was short which permitted argument that the defendant could have committed the shooting and picked up his girlfriend. On appeal, the drive, having been offered in rebuttal, was permitted as it was conducted under substantially the same circumstances.

As the *Jackson* court stated, 'substantially similar' does not mean 'absolutely identical.' Thus, Wells over-read of the law is dispatched. Neither *Espinoza*, nor *Jackson* support it-nor do any other cases located by the United States. In fact, *Jackson* is instructive for the proposition and citation that any discrepancies or dissimilarities goes to weight, which is a prevalent and overriding theme in the caselaw:

*Evidence of experiments is most commonly used in the context of products liability law, where recreations of accidents, explosions, and product malfunctions are now common. See, e.g., Buscaglia v. United States, 25 F.3d 530, 533 (7th Cir.1994); Carey ex rel. Carey v. Hy–Temp Mfg., 929 F.2d 1229, 1235 n. 2 (7th Cir.1991). Because this type of evidence can be quite persuasive, in order to avoid unfair prejudice, the conditions under which an experiment is performed must be "substantially similar" to those surrounding the simulated event. Mihailovich v. Laatsch, 359 F.3d 892, 908 (7th Cir.2004). This is a flexible requirement: "substantially similar" does not mean "identical," and dissimilarities can be explored on cross-examination. See Buscaglia, 25 F.3d at 533. In other words, as a general matter, "dissimilarities between experimental and actual conditions affect the weight, not the admissibility of the evidence." 33A Fed. Proc., L.Ed. § 80:254 (2006).*

Case 3:13-cr-00008-SLG   Document 1040-1   Filed 06/21/19   Page 25 of 33

Although there is little circuit precedent on the subject, the substantially similar requirement also applies in the criminal context. See United States v. Baldwin, 418 F.3d 575, 579–81 (6th Cir.2005); United States v. Birch, 39 F.3d 1089, 1092–93 (10th Cir.1994); Russell, 971 F.2d at 1105–06. Whether in a criminal case or a civil one, however, the requirement's application always depends on the purpose for which the experiment is introduced. See Jones v. Ralls, 187 F.3d 848, 853 (8th Cir.1999). So if the purpose is to recreate an event, the timing and physics of which are critical, courts will only admit evidence of experiments that are conducted under nearly identical conditions as the actual event. Broun, McCormick § 202. For instance, in Jackson v. Fletcher, 647 F.2d 1020, 1026–28 (10th Cir.1981), the district court erred by admitting evidence of an experiment purporting to recreate an accident between a car and a truck in order to determine the precise speed of the truck at the time of collision. The court held that since the simulation truck was empty whereas the actual truck carried a full load (creating a weight differential of 37,000 pounds), and the two trucks were different model years, the experimental conditions were not substantially similar to the actual ones. Id.

By contrast, where the purpose of the experiment is not to recreate events but simply to rebut or falsify the opposing party's sweeping hypothesis, the substantial similarity requirement is relaxed. Broun, McCormick § 202.

On this issue, then, the court has a spectrum of choices as to which standard to apply. The United States' submission is that the subject vehicle on April 12, 2012 is the Wells' CR-V. This re-creation is not a physics nor timing issue, but one of identification and re-creation. No matter whether the court believes the 'substantially similar' rule is relaxed or

in full effect, the government's evidence is factually as similar as can be met, short of having the same vehicles in the same locations on April 19th. That gap is not fatal to the substantially similar construction of the demonstration. To remedy that omission, the government's exhibits and expert added shading to appropriately and correctly duplicate the masking of the lower part of the vehicle as if the other vehicles were still present.

As to general standards on admissibility, and foundation complained of by Wells, the Sixth Circuit offers the following general standards: "[e]xperimental evidence is admissible so long as the evidence is relevant and probative, and experimental evidence is deemed to have probative value if the conditions of the experiment were identical with or similar to the conditions of the transaction in litigation." *Crown Cork & Seal Co. v. Morton Pharm., Inc.*, 417 F.2d 921, 926 (6th Cir.1969). Later, much later in fact, the 6th Circuit case of *United States v. Baldwin*, 418 F.3d 575, 579–80 (6th Cir. 2005) stood for the same general principles as those cited in *Jackson*, that being there is no need for perfect identity between actual and demonstrative, holding that the conditions of the experiment must be "substantially similar" to those of the event at issue, but "[a]dmissibility ... does not depend on perfect identity between actual and experimental conditions." *citing*, *Persian Galleries, Inc. v. Transcon. Ins. Co.*, 38 F.3d 253, 258 (6th Cir.1994) (citation and quotation marks omitted). The Sixth Circuit similarly finds that where the conditions are substantially similar, any "dissimilarities affect the weight of the evidence, not its admissibility." *Id.* (citation and quotation marks omitted). (*See*, Persian Galleries, 38 F.3d at 258) (video admitted shot at the scene of the crime) *See*, *Baldwin*, 418 F.3d 575, 579–80 (6th Cir. 2005)

In the 10th Circuit, *Jackson v. Fletcher*, 647 F.2d 1020, 1027 (10th Cir.1981) holds that"[T]he party introducing the evidence [of an experiment] has a burden of demonstrating substantial similarity of conditions. They may not be identical but they ought to be sufficiently similar so as to provide a fair comparison." The United States has no problem with this burden and the April 19th recording meets it. The footage at issue was taken by the same camera, one week after the murders. The camera itself had not moved its physical location, nor could it. It was pointed and recorded with roughly, give or take a few degrees, the same field of view. A car, identical in size, shape and style was utilized on April 19. The lighting looks similar as does the Rigger Shop/T2 building, among other things.

Arguments made by Wells that the camera angle was not same fail to carry the day. That actual measurements were not taken affects the weight of the evidence, not its admissibility. *See Szeliga v. General Motors Corp*., 728 F.2d 566, 567 (1st Cir.1984) ("Dissimilarities between experimental and actual conditions affect the weight of the evidence, not its admissibility." *Renfro Hosiery Mills Co. v. National Cash Register Co*., 552 F.2d 1061, 1065 (4th Cir.1977) ( "If there is substantial similarity, the differences between the test and the actual occurrence ordinarily are regarded as affecting the weight of the evidence rather than its admissibility."). The court properly instructed the jury to disregard the expert testimony if it believed the testimony lacked adequate foundation. *United States v. Wanoskia*, 800 F.2d 235, 238 (10th Cir.1993) and, *See, United States v. Stearns*, 550 F.2d 1167, 1170 (9th Cir.1977)(Rehearing Denied)(where photographs were offered in rebuttal by the government, precise technical details as to camera settings, type of film, shutter speed and other technical issues were not necessary for foundation)

As required by the courts, as long as the United States' video reenactment or demonstration bears a 'reasonably close relationship to the underlying events in question,' a district court's decision to admit the video should be upheld regardless of minor differences between the reenactment or demonstration and the actual events. Just as in the Circuits cited above, the significance of the differences is not a bar to admissibility, but a question of weight, if any. Perfect symmetry or a 100% accurate replication is simply not the necessary standard for admission of this evidence.

### b. An Evidentiary Hearing is Not Necessary

Based on the foregoing facts, an evidentiary hearing is not necessary. The prior trial testimony establishes the nature and purpose of offering the United States' trial exhibits, along with the use of the photographs included in this brief. While requesting one, Wells fails to articulate the basis for such a hearing. Based on the lack of a clear reason for a hearing, and given the very clear nature of the video, the hearing request should be denied.

### c. The Foundation Argument is Really An Authentication Argument and is Premature

Wells makes much as to 'foundation' and relevance.' What Wells is really arguing is authentication. The question of authenticity is left to the discretion of the trial judge. *United States v. Spetz*, 721 F.2d 1457, 1476 (9th Cir.1983); *United States v. Perlmuter*, 693 F.2d 1290, 1292 (9th Cir.1982). The government need only make a prima facie showing of authenticity, as "[t]he rule requires only that the court admit evidence if sufficient proof has been introduced so that a reasonable juror could find in favor of authenticity or identification." 5 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 901(a) [01], at 901-16

to -17 (1983). *United States v. Black*, 767 F.2d 1334, 1342 (9th Cir. 1985). *See*, *also*, FRE

401 which provides the standards for authentication:

> (a) In General. To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is.
> (b) Examples. The following are examples only--not a complete list--of evidence that satisfies the requirement:
> (1) Testimony of a Witness with Knowledge. Testimony that an item is what it is claimed to be.

Fed. R. Evid. 901

Thus, any agent participating in the April 19, 2012 demonstration with personal

knowledge and viewing of the Wells' vehicle proceeding back and forth on Anton Larson

Road is qualified to testify and authenticate Exhibit 168.

As to relevance, defense maintains the video is not relevant and has the potential to

mislead the jury. Such is not the case. FRE 401 states:

> Evidence is relevant if:

> (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and
> (b) the fact is of consequence in determining the action.

Wells motion is also premature. He cannot, based on prior trial testimony lodge a

preclusion motion based on what occurred before. In this case, the witness order will be

different, exhibits fewer, and approaches to foundation, authentication, who will be

testifying about what, will change. Wells simply cannot seek to exclude as to what occurred

before. He's more than welcome to raise an objection during trial, but seeking to preclude

an agent for a mis-labelled foundational argument based on prior testimony, some of which

was stipulated, is premature.

//

//

### d. The April 19, 2012 Video is Not Misleading, Nor Prejudicial But is to the Contrary Very Helpful to the Jury.

As to these issues, the United States is again on the polar opposite of the defense argument. The video is in no way misleading and assists the jury to understand the government's theory of the case. That being, once passed the USCG Kodiak Main Gate (Exhibit 1), Wells pulled into the Kodiak Airport parking lot, switched to their blue Honda CR-V, waited until Richard Belisle and James Hopkins arrived for work, followed them in, murdered them, drove back to the Kodiak Airport, got back into the white Dodge pickup and then, with 38 minutes transpiring since passing the USCG Kodiak Main Gate, drove home to place false alibi phone calls. The blue vehicle in question is consistent with the Wells' Honda CR-V vehicle. There will be no doubt about that fact. Testimony will establish the date of the recording, one week later, and will discuss dissimilarities as to the time of day, weather, if any, and the like. There will be nothing 'misleading' about this testimony. The defense many not like the results of the drive-bys, as they are clearly prejudicial to their client, but there is nothing misleading about the video. Any argument as to dissimilarities on the two videos can be remedied by jury instruction and cross-examination and a road map to that process is laid out in the defendant's brief.

The last and final issue is whether the video is helpful to the jury or not. Judge Beistline found that it was, over defense objection, and nothing in that respect has changed. FRE 401 provides that evidence is relevant if it has any tendency to make a fact more or less probable than it would be without the evidence; and the fact is of consequence in determining the action. Under this standard, the video is clearly relevant, and therefore

helpful. How? It establishes evidence, which the jury can weigh for itself that the subject vehicle of April 12, 2012 is in fact the Wells' blue Honda CR-V, thus placing Wells at the Rigger Shop/T2 building, driving their diminutive and non-descript CR-V as opposed to his very noticeable white Dodge pickup with a distinctive white camper shell. Putting Wells at the murder scene, at the time of the murders is a fact of consequence to the crimes charged, along with showing motive and intent in concealing his identity as the murderer by not using his usual 'go to work' vehicle which would be easily noticed by others who knew him and worked with him.

**CONCLUSION**

The law of the case doctrine effectively prevents re-argument of the very issue raised in the first trial, that being not substantially similar and failing to pass muster under FRE 403. Judge Beistline denied both applications and Wells failed to raise this issue on appeal. In the event the court wishes to conduct an inquiry into the video demonstration taken on August 19, 2012, it is clear that the video is substantially similar in almost all respects to that which is relevant to the jury. Any miniscule issues as to time of day, melting snow or dirt on the Wells' vehicle can be cured by cross examination, go to weight, or can be remedied by a limiting instruction. The exhibit is relevant and easily authenticated by agents on the scene. An evidentiary hearing is not necessary. Absolute duplication is not the standard here, and the video is more than substantially similar to meet any test as to admissibility, authentication, and relevance.

RESPECTFULLY SUBMITTED June 21, 2019, in Anchorage, Alaska.

BRYAN SCHRODER
United States Attorney

s/Steven E. Skrocki
STEVEN E. SKROCKI
Assistant U.S. Attorney
United States of America

**CERTIFICATE OF SERVICE**

I hereby certify that on June 21, 2019, a
true and correct copy of the foregoing was
served electronically on:

Counsel of Record

s/ Steven E. Skrocki
Office of the U.S. Attorney