

# SUPPLEMENTAL REPORT

Case: USA v Wells
Case ID: 3:13-cr-00008-SLG
Requester: B. Johnson (Investigator)
Requesting Agency: US Federal Public Defender (AK)
Venue: Anchorage, AK USA
Request Date: 3 July 2019
Report Date: 16 July 2019

## ANALYST

Jim Hoerricks, PhD, Senior Consultant, Apex Partners, Ltd., Henderson, NV USA
Statement of Qualifications submitted with this report (Hoerricks Statement of Qualifications 3-2019.pdf)

## SUPPLEMENTAL REPORT

In addressing the request to clarify my conclusion provided for US v Wells in the Analysis Report dated 6 May 2019, my reply will be focused around three main themes which all reinforce the centerpiece of Daubert, the reliability of the tools / methods employed in the work previously performed. The reliability requirement differentiates testimony premised upon the methods and procedures of science as opposed to subjective belief or unsupported speculation.

The evidence footage from 4-12 does not contain data sufficient to support a conclusion of "unknown object = automobile / compact SUV / Honda / CR-V / 2001 / trim / a specific vehicle." The level of detail (nominal resolution) necessary to make the progression from class (automobile) through the subclasses of type / make / model / year / trim level / a specific vehicle does not exist in the evidence footage. This fact is noted affirmatively by Iber and Richards.

- Iber (in 047255 - 047256.pdf): ""Due to the insufficient detail of the questioned vehicle depicted in the Q 1 images no conclusion of the make or model could be reached."
- Iber (in 081032 - 081033.pdf): "There are multiple factors contributing to my inability to come to a conclusion on the vehicle in question. These include; low resolution, poor image quality, low frame rate and blurring caused by motion through the frame. All of these factors not only make a conclusion that the car in the video is the same as the suspect's car impossible it also makes a conclusion about the class characteristics of the vehicle's make and model not viable."
- Richards (in Richards, Gerald Transcript.pdf): "... because of the extreme poor quality of the questioned video, a comparison in this case was somewhat meaningless."
- Richards (in Richards, Gerald Transcript.pdf): "... I enlarged them to see what detail I could determine. And once I got to a certain point, I saw there's virtually no detail. There's no detail to try to make a comparison with."
- Richards (in Richards, Gerald Transcript.pdf): "... I could not determine anything about the make, model, or type of car it was."

These conclusions follow the guidelines set forth in *Section 16. Best Practices for Forensic Photographic Comparison. Version 1.1. 2009.01.16* (see graphic below).

**Apex Partners Ltd.**
*8560 S Eastern Ave, Ste 250, Las Vegas, NV 89123, USA*
*Ph: 702-570-2456 • e: info@apexpartnersltd.com*

Page 1

**Attachment A**

Case 3:13-cr-00008-SLG   Document 1072-1   Filed 07/17/19   Page 1 of 10



# SUPPLEMENTAL REPORT

## Apex Partners Ltd.

| Continuum of Conclusions Examples For Photographic Comparative Analysis | | | |
|---|---|---|---|
| **Identification** | Identification | Identification | Identification |
| | Similar | | Powerful support same |
| | | Similarities noted | Strong support same |
| | No conclusion, but with similarities | | Moderate support same |
| | | Neither/Nor – with explanation | Limited support same |
| **No conclusion** | No conclusion | | Inconclusive |
| | | | Limited support different |
| | No conclusion, but with dissimilarities | | Moderate support different |
| | | | Strong support different |
| **Elimination** | Dissimilar | | Powerful support different |
| | Elimination | Elimination | Elimination |
| | No comparison Possible | Not suitable – with explanation | No comparison Possible |

With a conclusion of "no comparison possible," as well as a notation that the evidence footage is "not suitable" with the explanation centered around the distance involved and the resulting nominal resolution, the work stops. Given the insufficiency of the data, there is no way to rule out alternative theories for "object = auto." Given the nominal resolution, the approximate measure of the object, if it is an automobile, would mean that auto's measure puts it well within a normal distribution. The alternative explanations in this case, object = any one of over 20 different makes / models / years of automobiles, cannot be sufficiently disproved.

As to the traffic collision reconstruction specialists, they suffer from a different problem. Whilst the field of traffic collision reconstruction is known to reach reliable results when investigating traffic collisions, there is no research available that validates the mixed-methods approach used in this case – not in 2012 and not now. To that point, in a recent documentary on Netflix called Exhibit A, the methodology employed by the reconstructionists was severely criticized as resulting in the imprisonment of an innocent person. The case featured, Tx vs Powell, was referred back to the trail court for a new trial as a result of the Texas Forensic Science Commission's inquiries into the faulty photogrammetry work performed, and the testimony offered in the case by a reconstructionist using unproven and flawed methods and tools which aren't fit for purpose. Thus, to the question

**Apex Partners Ltd.**
*8560 S Eastern Ave, Ste 250, Las Vegas, NV 89123, USA*
*Ph: 702-570-2456 • e: info@apexpartnersltd.com*
Page 2

**Attachment A**

Case 3:13-cr-00008-SLG   Document 1072-1   Filed 07/17/19   Page 2 of 10



# SUPPLEMENTAL REPORT

**Apex Partners Ltd.**

required in Daubert, "does the actual data, obtained through sound methodology, support the conclusion," the answer is clearly "no."

To further clarify the concept that the 4-19 footage should be excluded, it should be noted that the 4-19 footage is not competent in that it does not tend to prove the matter in dispute. Given the dissimilarities in camera settings, scene lighting, and scene setting between 4-12 and 4-19, the 4-19 footage serves to mislead more than to inform. The following three points will serve to reinforce my opinion on the need to exclude the 4-19 footage.

1. The underlying science, standards, and accepted practices both now and as they were known in 2012.
2. Given #1, the dissimilarities between the evidence footage (4-12) and the demonstratives created on 4-19, subsequently used in various exhibits in the case.
3. Given #1 & #2, the biasing and misleading nature of creating a demonstrative comparison featuring a limited amount of incorrect information.

**Point 1.**
To begin, we'll consider the design of the CCTV system that was installed to Monitor the area depicted in the evidence footage. Monitor is capitalized and made bold in this report as it is one of five camera view types described in *HOSDB CCTV Operational Requirements Manual 2009, Publication No. 28/09* (attached), the dominant guidance document for the design, installation, and use of CCTV systems around 2012.

From page 8 of *Publication No. 28/09*:

"*To simplify the situation and provide guidance to a system specifier, five general observation categories have been defined, which are based on the relative size that a person appears on screen (figure 4). As part of the OR development, the user will be asked to decide which of these four categories best reflects the type of activity being observed. The CCTV installer will then be able to fit a suitable camera to meet the requirement.*"

"*Monitor and Control: A figure occupies at least 5% of the screen height and the scene portrayed is not unduly cluttered. From this level of detail an observer should be able to monitor the number, direction and speed of movement of people across a wide area, providing their presence is known to him; i.e. they do not have to be searched for.*"

**Apex Partners Ltd.**
*8560 S Eastern Ave, Ste 250, Las Vegas, NV 89123, USA*
*Ph: 702-570-2456 • e: info@apexpartnersltd.com*

**Attachment A**



# SUPPLEMENTAL REPORT

**Apex Partners Ltd.**

The other views are listed as:
- Detect = 10% of screen height
- Observe = 25-30% of screen height
- Recognize = at least 50% of screen height
- Identify = at least 100% of screen height

A generous estimate of the height of the unknown object in question is 15 px. The total screen height is 480. Thus, the percentage of screen height given to vehicles on the road (more than 1000' from the elevated camera position) is less than the amount suggested to even effectively monitor activity.



Figure 4: Height based 'levels of detail' for the more commonly used screen heights

Given that the percentage of screen height dedicated to vehicles on the distant road is below even the lowest threshold for views, attempting to Identify an object, person, or vehicle at the distance and resolution present in the evidence items is not advisable as no conclusion would be possible.

**Apex Partners Ltd.**
*8560 S Eastern Ave, Ste 250, Las Vegas, NV 89123, USA*
*Ph: 702-570-2456 • e: info@apexpartnersltd.com*

**Attachment A**



# SUPPLEMENTAL REPORT

Nevertheless, attempts were made at identifying the object in the footage that can be classified as "photographic comparison," "reverse projection photogrammetry," and "vehicle make / model determination." Each of these tasks have their own guidance / standard practice documents.

**Photographic Comparison**
At the time of the incident, the Scientific Working Group for Imaging Technology (SWGIT) document, *Section 16 - Best Practices for Forensic Photographic Comparison. Version 1.0 2009.01.16.*, was the current guidance document available to forensic science practitioners engaged in photographic comparison. The various Scientific Working Groups were and are funded by agencies within the US federal government. The FBI's FAVIAU staff were participants in SWGIT, and were thus must have had knowledge of Version 1.0 of Section 16, which was produced in 2009 and was the current version in April 2012.

From Section 16, page 2:

"*VALIDITY*
*The basis for conclusions reached through photographic comparison lies in the detection of correspondence or discordance of subject features. In some cases, a statistical model may exist, or a model can be developed which will provide a formal, probabilistic basis for a conclusion. In other cases, statistical models may not be practical.*

*The absence of a statistical model does not necessarily preclude formulating a sound conclusion. In such cases, expert experience is critical for the recognition of features and their significance. These experts must be able to explicitly state the underlying assumptions, observations and chain of reasoning behind their conclusions in order to demonstrate that validity.*"

"*CRITICAL ASPECTS OF FORENSIC PHOTOGRAPHIC COMPARISON*
*There are a number of critical practices, processes, and factors used to ensure and demonstrate validity in forensic photographic comparison. The relative importance of any one of these may vary among cases. Regardless of the protocol used in conducting photographic comparisons, the methodology used should be documented.*"

"*Class vs. Individual Characteristics*
*The concept of class vs. individual characteristics is fundamental to forensic photographic comparison. Class characteristics are used to subdivide things into groups or classes. Individual characteristics allow one to differentiate objects within a class from one another. Individual characteristics may be used to uniquely characterize an object. They arise from such events as random natural processes, intentional alteration, and wear-and-tear.*"

**Apex Partners Ltd.**
*8560 S Eastern Ave, Ste 250, Las Vegas, NV 89123, USA*
*Ph: 702-570-2456 • e: info@apexpartnersltd.com*

**Attachment A**

# SUPPLEMENTAL REPORT

**Apex Partners Ltd.**

"*The ability to identify an individual person or object requires a correspondence of individual characteristics. The number of such characteristics necessary for such an identification is a function of the subject matter, the quality and quantity of details in the images, and the expertise of the analyst; no arbitrary number of characteristics is required. A correspondence of class characteristics may be useful for establishing candidate subjects. Likewise, a discordance of class characteristics can be used to eliminate potential subjects.*"

At ~5" / pixel, there is no chance to detect subject features that would move the unknown object from "unknown object" to "class." One can assume class="automobile." But, in the absence of specific features, class remains an unproven assumption. From the above, "*The ability to identify an individual person or object requires a correspondence of individual characteristics.*" There is no provable correspondence. Thus, given Section 16 and the evidence, any conclusion would not be valid.

## Reverse Projection Photogrammetry

SWGIT addresses the use of photographic comparison and photogrammetry on page 7 of Section 16, "*...Care must be taken in deriving 3-dimensional measurements from 2-dimensional imagery. Differences in imaging conditions can lead to differences in measurements despite the fact that the identical feature is being measured in both images...*"

The *Handbook of Digital Forensics of Multimedia Data and Devices* (2015) defines reverse projection in Section 5.2.3 Reverse Projection.; "*[r]everse projection means projecting images from a camera on new images from the same camera or at least on images from a camera with similar internal (i.e. focal length and distortion) and external (i.e. position and orientation) parameters.*" Further on, Section 5.6 advises, "*[i]f the result is used as evidence, independent of the method used for photogrammetry, there is the need for validation of the result. Once a proper validation is performed the result of the measurement on the questioned image is defendable in court. On uncontrolled images, validation can only be case driven, so validation experiments have to be set up for such specific cases.*"

Given the uncontrolled nature of the evidence footage, the validation experiments would have to be case driven. No record of validation experiments were provided to us for review.

## Vehicle Make / Model Determination

Given the problems noted above, the lack of nominal resolution, the lack of validity for even attempting a photographic comparison, and the lack of characteristics that could reliably assist in proving the transition from class=object to class=vehicle, no vehicle make / model determination is possible.

**Apex Partners Ltd.**
*8560 S Eastern Ave, Ste 250, Las Vegas, NV 89123, USA*
*Ph: 702-570-2456 • e: info@apexpartnersltd.com*
Page 6

**Attachment A**

Case 3:13-cr-00008-SLG   Document 1072-1   Filed 07/17/19   Page 6 of 10



# SUPPLEMENTAL REPORT

**Apex Partners Ltd.**

**Point 2**



The figure above depicts colour corrected frames from 4-12 (left) and 4-19 (right). They look very similar. The show the general look and feel of an area as Monitoring CCTV views tend to do. But, there are significant differences that preclude the 4-19 footage from being used as a demonstrative or in a reverse projection photogrammetry experiment as-is.

Notice in the top left corner of the frame (4-12, left), there is a stand of trees. In the footage from 4-19 (right), the stand of trees is cut off at the top. This indicates that the camera had changed position from 4-12. Given that the camera in question was a Pan/Tilt/Zoom camera, which is typical of Monitoring View cameras, and that the camera was utilized in the active security functions of the facility in the week between the date in question and the exercise performed that resulted in the 4-19 footage, this change in position is to be expected.



**Apex Partners Ltd.**
*8560 S Eastern Ave, Ste 250, Las Vegas, NV 89123, USA*
*Ph: 702-570-2456 • e: info@apexpartnersltd.com*

**Attachment A**



# SUPPLEMENTAL REPORT

**Apex Partners Ltd.**

Used as the basis for his calculations, Dr. Vorder Brugge used Frame 29 from 4-19 to calculate a pixel length of the unknown object, assumed vehicle. The image above has been magnified several times to illustrate that the measurement has to attempt to resolve the 3D nature of the object of interest, depicted in a 2D medium. Thus, the 32-pixels of length estimate is a "best attempt" to "measure" from the rear corner to the front corner of the object. From the 4-19 video, the figure above shows a 32-pixel line. If the vehicle used in the creation of the demonstrative is 177" long, then the nominal resolution in the target area is ~5.53" / px.

Given the positional change in the evidence footage, and the lack of a determination of vehicle make / model, and obstructions present that were not present on 4-19, an attempt was made to perform the same exercise (shown below). The result is a measurement of 29 pixels (see below). This difference may seem insignificant to most. But, given the nominal resolution of the demonstrative, a difference of 3 pixels would mean a real-world difference of ~16.5". This measurement puts the length of the unknown object (assumed vehicle) below the median size of compact SUV's available in the US and Canada. Using the nominal resolution derived from the demonstrative with the measurement taken from the evidence footage, the length of the object in question is ~160.3".



With the positional change in the camera, and the distance to the road, and the lack of a valid reference in the target area in the evidence footage, an accurate nominal resolution calculation is simply not possible. Thus, a comparison of the 4-19 footage to the 4-12 footage is not valid or accurate and should be excluded.

Page 1 of SWGIT's Section 16 clearly separates photographic comparison from the creation of demonstrative comparisons. "*Photographic Comparison is an assessment of the correspondence*

**Apex Partners Ltd.**
*8560 S Eastern Ave, Ste 250, Las Vegas, NV 89123, USA*
*Ph: 702-570-2456 • e: info@apexpartnersltd.com*



# SUPPLEMENTAL REPORT

**Apex Partners Ltd.**

between features in images and known objects or images for the purpose of rendering an expert opinion regarding identification or elimination (as opposed to a demonstrative exhibit)." In the creation of his exhibits, Dr. Vorder Brugge refutes his own reporting – that he can "*neither include nor exclude the vehicle*" – in creating a demonstrative that includes the vehicle in question. He asks the Trier of Fact to make the connection, but offers only a single choice in what amounts to a "single person line-up."

**Point 3**
Given points 1 and 2, the reasoning can be applied to the creation of the demonstratives made by the Traffic Collision Reconstructionists.

Traffic Collision Reconstruction is a rather mature practice. Investigators arrive at a collision scene and collect evidence and measurements of relevant scene features present at the time of the measurements.

Unfortunately, there is no validation study available today (or available in 2012) that addresses the mixed-methods approach of using a 3D laser scanning device to measure "now," then inserting a 2D representation of "then," into the laser-scanned point cloud to measure items present in the 2D representation of "then" which are not present in the 3D "now" reference.

It is a fundamental premise of science that one can measure in the present using valid and accurate tools, but to measure events of the past or future, one must either have a valid reference or build and validate a prediction model. We can use a barometer and a thermometer to measure pressure and temperature now. But, for tomorrow's temperature and pressure, we must rely upon prediction models to forecast what will be a potential range of values. Similarly, measuring distances in recorded footage requires "a model." Single-Image Photogrammetry techniques such as Single View Metrology (SVM) build a model of the scene, using the measures of known features (the reference) to output a range of potential values as a result (see *Analysis-Single Image Photogrammetry. HOSDB. September 2007*. attached). With SVM, error increases as nominal resolution decreases. Thus, SVM, though a valid technique in general, would not be appropriate in this case.

As of the writing of this report, none of the major manufacturers of laser scanning hardware / software support the mixed-methods approach used in this case. This was certainly the case in 2012. Even more troubling, and as previously noted, the techniques used by the reconstructionists in this case are quite similar to those in Tx vs Powell, which were the object of ridicule in the recent Netflix series, Exhibit A.

**Apex Partners Ltd.**
*8560 S Eastern Ave, Ste 250, Las Vegas, NV 89123, USA*
*Ph: 702-570-2456 • e: info@apexpartnersltd.com*

Page 9

**Attachment A**

Case 3:13-cr-00008-SLG   Document 1072-1   Filed 07/17/19   Page 9 of 10



# SUPPLEMENTAL REPORT

Additionally, the use of models presupposes a result of a vehicle make / model determination. If all available vehicles (make / model / year / trim) from a given range were employed at a similar resolution as that in the evidence footage, and were presented to the reconstructionists in a "black box" study, meaning that they had to choose which was the "correct" vehicle from among the range of possibilities, no result would be possible. Thus, their presupposition – likely influenced by contextual information given to them by the investigators – invalidates their conclusions and renders their demonstratives not only invalid, but harmful. Thus, the reconstructionists' exhibits should be excluded.

**Prepared By**

Jim Hoerricks, PhD
16 July 2019

**Apex Partners Ltd.**
*8560 S Eastern Ave, Ste 250, Las Vegas, NV 89123, USA*
*Ph: 702-570-2456 • e: info@apexpartnersltd.com*