


# DANIEL REISBERG

*Patricia and Clifford Lunneborg Professor of Psychology*
*Reed College*

*mailing address*
9220 SW Barbur Blvd
Ste. 119 / # 192
Portland, OR 97219

*email*
reisberg@reed.edu

*telephone*
503.770.0636

*fax* (direct to Reisberg)
503.914.0477

26 May 2019

Peter Camiel
Camiel & Chaney P.S.
520 Pike Street
Suite 2500
Seattle, WA 98101

Re: U.S. *v.* James Michael Wells

Dear Mr. Camiel:

As you requested, I am writing with some comments to supplement the report I submitted in 2014 in the above referenced case.

1. In the five years since my report, I have been recognized as an expert and allowed to testify in a broader range of jurisdictions, and on a somewhat broader range of topics. I have now been recognized as an expert in both federal court and in state courts in Alaska, California, Colorado, Idaho, Illinois, Montana, Nevada, New Hampshire, Oregon, and Washington. I have also consulted on cases (in civil, criminal, and military courts) in several other jurisdictions.

   In all cases, though, the content of my testimony was rooted in my scientific expertise in cognitive psychology – a specialty that examines how people perceive the world, how they remember what they have perceived, and how they use their knowledge as a basis for action or further thought. Specifically, I have, in several cases, testified about the ways in which perception and memory can be colored by the knowledge and expectations someone brings into a situation. I have also testified about how memory for an event (even a recently witnessed event) can be shaped by knowledge gained *after* the event.

2. When I submitted my 2014 report, the government's experts had not yet testified, and so I obviously had no access to their testimony. I have now reviewed their testimony, with a specific focus on whether the key experts (Schmidt and Toglia) were describing analytic procedures that could have sheltered them from, or at least minimized, the impact of confirmation bias.

   It is my understanding that both Schmidt and Toglia offer conclusions

**Attachment B**

that ultimately rest on a subjective judgment. Specifically, they were doing their best to assess the degree of resemblance between the blurry image captured by a surveillance camera and the appearance that the subject car would have presented if captured by the same camera. Plainly, the quality of the information available to these experts did allow them to rule out some options (and so, for example, we know from Toglia's testimony that the blurry image captured on the day of the crime is highly unlikely to show a Durango or a Honda sedan). However, there seems to be no dispute that the visual information available to these experts was far from ideal – and so neither expert offers a statement of certainty that the image showed the target CR-V. (We also have information from other experts, from the FBI, confirming the low quality of the image.)

This certainly seems a setting, therefore, in which Schmidt and Toglia had to use their judgment about the degree-of-match (between the image and the target CR-V). This is exactly the sort of subjective human judgment that is open to error, and can be swayed by many factors, including confirmation bias. I believe, therefore, that there is no basis for claiming that these experts were somehow relying on procedures or measurements that would have sheltered them from confirmation bias.

3. In the trial in this case, Mr. Schmidt was explicitly asked (during re-direct) a question about whether his judgment had been somehow influenced by (some version of) confirmation bias. In particular, he was asked whether his opinion about the surveillance video had been influenced by his knowing the VIN of the target vehicle.

   I would respectfully suggest that the government's question on this point, first, seems an acknowledgement that confirmation bias might be relevant to Schmidt's judgment. More important, I would suggest that the government's question relies on an assumption that is untenable: The government seems to assume that Schmidt has full insight into exactly how his mental processes function, including what factors do or do not influence that function. I see no basis whatsoever for this assumption, and, in fact, there is reason to believe that confirmation bias (together with other forms of reasoning short cuts) functions unconsciously and uncontrollably. We therefore learn little by asking Schmidt directly whether his judgment was somehow compromised by some form of bias.

4. I believe it is also important to note that law enforcement did have the option in this case of taking steps that would have minimized the impact of confirmation bias. One model for how they might have proceeded is based on modern procedures for collecting "I.D." evidence from crime witnesses or victims. The courts and law enforcement have acknowledged that I.D.'s are more prone to error if the witness or victim can discern which face, within the lineup, the police believe to be the suspect's. To avoid this concern, many authorities now encourage

**Attachment B**

(or, in some cases, require) a "double-blind procedure," in which neither the officer administering the lineup, nor the witness or victim, has any way to know which face is the one of special interest to the police. Generally, this means that the officer conducting the procedure is someone not otherwise involved in the investigation, and it requires a lineup procedure in which nothing draws attention to the suspect's photograph. In the *absence* of these safeguards, I.D. evidence is often ambiguous: We have no way to know whether the witness/victim chose a particular picture because that picture 'matches' the witness/victim's crime memory, <u>or</u> whether the witness/victim chose that picture because of some sort of (inadvertent, unnoticed) guidance by the investigator. And, of course, that sort of ambiguity erodes the probative value of the identification.

Many researchers have urged law enforcement to take comparable steps in other types of evidence collection. In the instant case, law enforcement could (for example) have withheld from Toglia the information that they were especially interested in a specific vehicle, and instead provided him with an unbiased "lineup" – one showing the target CR-V and five other plausible alternatives. In addition, the officer communicating with Toglia could have been (and arguably should have been) someone who did not know which vehicle was the one of special interest to the investigation. Simple steps like these would have markedly reduced – and perhaps eliminated – concern that Toglia was somehow 'led' to a particular judgment. Related precautions could have been taken with Schmidt. (Given Schmidt's employment at Honda, the investigators could, perhaps, have told him that they would also present the image to experts from other car companies; this would have removed the concern that Schmidt would realize immediately that Honda's were of central interest to the investigation.)

5. In testimony, Schmidt testified that there was a 70% chance that the blurry image in the surveillance video showed a first-generation CR-V, and that he was 90% sure the image showed one of four candidate vehicles (including the CR-V). This testimony can perhaps be evaluated in light of what research has told us about the relationship between someone's degree of certainty (often expressed as a percentage) and the likelihood of error.

Scientific studies have told us for decades that we can easily document cases in which there is no correspondence at all between degree of certainty and accuracy, but that there are also cases in which certainty <u>is</u> an indicator of accuracy. In the last decade, researchers have gained a rich understanding of this mixed data pattern, and we now understand the circumstances in which certainty is informative, and circumstances in which it is not. Hand in hand with this, we now have an understanding of the mental processes that lead to someone offering a particular level of certainty.

Among other considerations, research tells us that repeated questioning often leads to (so-called) "confidence inflation," in which the person becomes more and more confident in their response. Note, though, that the content of the response is, in these cases, not changing – and so we have a change (an inflation) of confidence together with no change in accuracy, a configuration that gradually erodes any correspondence between confidence and accuracy. Research also tells us that *feedback* of various sorts leads to confidence inflation. The feedback can be direct (along the lines of "yes, that's what we expected") or indirect (along the lines of "you have been helpful") or implicit (as, for example, when a witness sees that their information has led law enforcement to take further steps). The feedback can also come in the form of subsidiary information (if, for example, the witness learns that law enforcement has other evidence that seems to fit with the witness's report). In any of these forms, the impact on certainty can be quite powerful – so that, in some studies, participants without feedback offer confidence levels of roughly 40% (on average) while participants with feedback offer confidence levels of over 70% (on average). In essence, then, feedback can almost double the percentage that a witnesses uses to express certainty.

I should also add that this inflation is "retrospective." In other words, participants are asked how certain they *were* at the time of making their judgment – that is, how certain they were before receiving the feedback. Even with this framing of the question, feedback effects are consistently observed and powerful – an indication that participants are unaware of how the feedback has influenced them.

Given the sequence of events in the Wells case, I would urge any finder of fact to be alert to the danger of confidence inflation, and therefore to be cautious in relying on Schmidt's (or any other expert's) statement of certainty.

6. My understanding is that the government has expressed concerns that any testimony I would offer would not be based on research that specifically has tested automobile experts. I would offer several comments in response to these concerns. First, there is a body of research on how experts look at, and pay attention to, complex patterns. This research confirms that experts do have the advantage of knowing *where to focus their attention* in looking at these patterns. Thus (for example) highly trained police officers tend to focus more on details in a scene that may be forensically relevant (but at the cost of paying less attention to other details). In this specific regard, experts do seem distinctive in the information they 'pick up' from the world.

Second, a small body of research has focused specifically on automobile experts, and this research does reveal some regards in which these experts are distinctive. For example, we know that virtually all humans rely on specialized brain areas for the recognition of *faces,* and, specifically, rely on a brain region called the fusiform face area (FFA).

Page 4 of 8

**Attachment B**

However, some research suggests that this region may be mis-named, because the same region is activated by forms of specialized perception other than faces. One study, for example, showed a higher level of FFA activation when car experts were looking at, and making judgments about, cars.

Third, research confirms that expertise in a domain does not, and cannot, alter certain fundamental properties of the brain and nervous system. Expertise does not, for example, improve the resolving power of the human eye, and so blurry images do not become somehow less blurry when examined by an expert. Expertise does not, and cannot, change the processes within the brain that control central aspects of reasoning and judgment – including the processes relevant to confirmation bias.

Fourth, and in support of the prior claim, there is a substantial and growing body of research that examines the judgment processes of experts, including experts with years of training and experience; including experts working in their professional setting (and not in some artificial laboratory study); including experts making highly consequential judgments. This research consistently confirms that, even with these potential safeguards, experts are still vulnerable to exactly the same biases – including confirmation bias – that we routinely document in every other human.

7. My understanding is that the government has expressed concern that I have no direct or explicit basis for asserting that Schmidt and Toglia (or any other experts) were influenced by confirmation bias (or some other form of bias). The government is correct in this point. I have no view, and will offer no view, that these experts *are* the victims of some sort of influence. Instead, my understanding is that my testimony would be educational in nature, allowing the finder of fact to understand how various forms of bias can influence a judgment, and, as a related point, allowing the finder of fact to understand the concerns about (for example) asking Schmidt if he was influenced by knowing the VIN. Put differently, my testimony would describe the circumstances and mechanisms that create a *risk* of confirmation bias. It would then be up to the finder of fact to decide whether, in this case, the risk of bias was sufficiently great so as to undermine the value of the experts' evidence.

8. Finally, I should reiterate a concern I expressed in my 2014 report. In that report, and again here, I have indicated the concern that the government's experts may have been influenced by some form of bias, and that these experts might have reached different conclusions if they had not known the government's expectations for what the blurry video (supposedly) showed. A similar concern applies to the jury in the upcoming trial. The jury – I assume – will not be composed of car experts, and so, even if one somehow supposes that these experts are immune to bias, this point would provide no protection for the jurors. Instead, the jurors will view the video after hearing some portion of the

**Attachment B**

government's case, and perhaps after hearing well-credentialed experts, relying on impressively high-tech reconstructions, offering confident assertions about what the video shows. The jurors may also view the blurry video after seeing the government-created video showing the Wells' Honda. This configuration is one that would create a high level of risk that the jurors would be guided by this advanced knowledge, and thereby "see" things in the blurry video that they would never have seen without these various forms of suggestion. Said differently, the concern here is that the jurors would be vulnerable to bias just as the experts were, and this point could undermine the objectivity and the accuracy of the jurors' perception of the video.

Finally, as one last matter, let me address an issue that I expect will come up: Attorneys routinely ask me, "What research did I rely on, in forming my conclusions?" That question, while sensible from the attorneys' point of view, is peculiar from a scientist's point of view. No responsible scientist would offer conclusions based on (or "rely on") just one or two studies. Instead, scientific claims necessarily rest on a network of interlocked studies – some directly on point; some checking on whether the claims are replicable; some asking whether the results are robust across procedural variations (a crucial reassurance that the results are not just the byproduct of some specific detail in the procedure); some providing the basis for key assumptions; some providing the assurance that the methods and statistical procedures are valid; some checking on whether the claim is compatible with other evidence concerning the functioning of the mind, or the functioning of the nervous system; and so on.

On this basis, non-scientists, seeking to understand the evidentiary base for a scientific claim, are well-served by secondary sources which, by their nature, offer claims with a broad base of evidence. In this domain, I would recommend, first of all, two of my own books: *The Science of Perception and Memory: A pragmatic guide for the justice system* (2014, Oxford University Press), and *Cognition: Exploring the science of the mind* (2019, W.W.Norton; I might note that this book is well-enough regarded so that it is now in its 7th edition). I would also recommend Gilovich's older book, *How we know what isn't so: The fallibility of human reason in everyday life* (1991, Free Press).

For discussion of how confirmation bias can (and does) influence the so-called forensic sciences, much of the relevant research is summarized in papers by Kassin, Dror, et al. These authors have done some of the central empirical work in this arena, but have also written papers describing the broad pattern of the data, and have helpfully made many of their papers available via Saul Kassin's website. Another perspective is provided by Charman, in "The forensic confirmation bias: A problem of evidence integration, not just evidence evaluation" (*Journal of Applied Research in Memory and Cognition,* 2013), or by Haber & Haber, in "The culture of science: Bias and forensic evidence" (*Journal of Applied Research in*

*Memory and Cognition,* 2013). I do note that forensic scientists have themselves commented on these claims, sometimes acknowledging the concern (e.g., Butt, "The forensic confirmation bias: Problems, perspectives and proposed solutions – Commentary by a forensic examiner," in *Journal of Applied Research in Memory and Cognition,* 2013), and sometimes offering challenges (e.g., Oliver, "Response to Kukucka et al." and "Response to Dror et al.", but then also see Dror et al. "No one is immune to contextual bias – Not even forensic pathologists", all in *Journal of Applied Research in Memory and Cognition,* 2018). I should perhaps add that much of this debate has been unfolding in a scientific journal – *Journal of Applied Research in Memory and Cognition* – for which I am the Associate Editor.

In these studies of forensic scientists, confirmation bias is documented in settings in which highly-trained, experienced individuals are showing confirmation bias in their professional work. Related data come from studies of highly-trained, experienced police officers who are demonstrably more likely to (mistakenly) perceive gun threats if they are in a situation in which they believe a gun is likely (e.g., Eberhardt et al., "Seeing Black: Race, crime, and visual processing, *Journal of Personality and Social Psychology,* 2004).

Also relevant is research on "visual hindsight bias," a term referring to the fact that, once someone decides (or is instructed) what a pattern shows, this belief powerfully influences both what the person claims to "see" in the pattern also what he or she believes others will "see" in the pattern. Some of this research documents visual hindsight in highly-motivated, well-trained professionals – such as expert radiologists inspecting lung x-rays. One illustration of this research can be found in a paper by Harley et al., "The 'saw it all along' effect: Demonstrations of visual hindsight bias" (*Journal of Experimental Psychology: Learning, Memory & Cognition,* 2004). Another useful resource is by Roese & Vohs, "Hindsight bias" (*Perspective on Psychological Science,* 2012). Another useful paper is Fessel and Roese's paper, "Hindsight bias, visual aids, and legal decision making: Timing is everything" (*Social and Personality Psychology Compass,* 2011). Other studies document that these effects are unconscious, so that people are unaware of these biases in their processing of visual evidence (e.g., Granot et al., "In the eyes of the law: Perception versus reality in appraisals of video evidence," *Psychology, Public Policy, and Law,* 2018).

I also note that, in the courtroom, researchers are often asked questions that require some extrapolation from the available scientific data – in essence, questions that ask the researcher to opine about some new domain that has not itself been examined in scientific studies. The legitimacy of this extrapolation itself depends on research – research that asks whether the already-documented pattern remains in place as we examine one new domain after another. In other words, researchers will generalize from an extant result after they have shown, through the appropriate studies, that the result is indeed generalizable. On this issue, I draw attention to the wide variety of studies described in the sources already listed. In fact, I can think of no

**Attachment B**

domains in which researchers have shown a robust *absence* of confirmation bias.

Finally, perhaps also useful is research asking whether an individual can "introspect," and thereby gain insight into what factors did or did not shape his or her views. The classic paper here is by Nisbett & Wilson, "Telling more than we can know: Verbal reports on mental processes" (*Psychological Review,* 1977). This paper was in some ways prescient, and its claims have been amply confirmed by decades of subsequent research (including the Granot et al. paper already mentioned).

Please let me know if you need clarification of any of these points.

Sincerely,

Daniel Reisberg
   *Patricia and Clifford Lunneborg Chair of Psychology*
   *Reed College*