1 government's next witness.
2     (Witness excused)
3     (Side conversation)
4     MS. DUIGNAN: The government calls Judy Pletnikoff to
5 the stand.
6     THE COURT: Okay. All right. Come on forward, this
7 way. And you can just kind of make your way up, come around
8 here. That door pulls out, that little door -- swinging door
9 pulls out. Step in the witness box. Just stay standing for a
10 second. She'll swear you in.
11     THE CLERK: Please raise your right hand.
12     **JUDY PLETNIKOFF, PLAINTIFF'S REBUTTAL WITNESS, SWORN**
13     THE CLERK: Thank you. Please have a seat. And,
14 ma'am, if you can please state and spell your full name.
15     THE WITNESS: My name's Judy Pletnikoff. Do you want
16 me to spell my first name?
17     THE CLERK: Yes.
18     THE WITNESS: J-u-d-y, P-l-e-t-n-i-k-o-f-f.
19     THE CLERK: Thank you.
20     THE COURT: All right. Counsel.
21     **DIRECT EXAMINATION**
22 BY MS. DUIGNAN:
23 Q   Mrs. Pletnikoff, good morning.
24 A   Hi.
25 Q   In what city and state do you live?

1 A    Kodiak, Alaska.
2 Q    And how long have you lived in Kodiak?
3 A    Twenty-five years.
4 Q    Do you know the Wells family?
5 A    I do.
6 Q    And how do you know them?
7 A    Nancy and I met through work. I have -- my two youngest
8 sons, one has autism and the -- we adopted a young infant with
9 fetal alcohol syndrome after that. And Nancy provided them
10 services through the Infant Learning Program at KANA. And we
11 worked together.
12 Q    And how long have you known Nancy Wells?
13 A    Twenty -- just a minute. Twenty -- a little over twenty
14 years.
15 Q    And would you consider yourself to be friends with her?
16 A    We worked together closely for -- for many years, and she
17 was a very close friend of mine. We -- we probably could have
18 built small countries on the amount of work that we
19 accomplished. I think we -- I think we did really well. And
20 was a very good friend.
21 Q    Did you used to do things for one another?
22 A    Oh, sure. I think she probably did more for me. She's a
23 very giving person. She taught me a lot about how to get
24 services and provide services for disabled people. She helped
25 us create a school program for autism and a adult services

1  program, which I'm now on the board of the nonprofit that
2  provides adult services for individuals with disabilities.  So,
3  yeah, we did a lot together, both socially and businesswise.
4  Q    And what kind of things would you do for her?
5  A    Well, I -- I wanted her to be healthy, so we walked.  And
6  we walked and we talked and we walked and we talked a lot.  I
7  guess that was my -- my contribution.
8  Q    Would you ever take care of her car in any way?
9  A    Oh, yeah.  And we traveled -- we also traveled together,
10 and so that put us a lot of time together.  Yes, I did.  I used
11 to -- after the kids grew up, her children -- her children are
12 older than ours -- she travels so much for work and her husband
13 also travels a lot, that there was a problem about the --
14 leaving the car at the airport, which she originally would put
15 in long-term parking.  And then her windows got broken out, so
16 after that I always took care of her car.  I did it for a
17 couple years.  She would let me know when I needed to move it
18 and I would move it until she came back, and then I would put
19 it back for her.
20 Q    Okay.  So what was the practice about -- you would move
21 the car home?  She would let you know when she was leaving
22 town?
23 A    Oh, Nancy was very conscientious.  She would let me know
24 ahead when she was going on a trip, which I usually knew
25 anyway.  And then she would call me before she went.  She would

1  call me from the airport in Kodiak when she was there and tell
2  me I had two hours to move her car, and I would take it
3  offsite. And then she would call me when she got to Anchorage
4  and make sure I had done it.
5  Q    Okay.
6  A    So she was really good about taking care of it.
7  Q    Do you recall the week of April 10th, 2012?
8  A    Yeah.
9  Q    The --
10 A    Uh-huh (affirmative). Uh-huh (affirmative).
11 Q    -- because of what happened?
12 A    Uh-huh (affirmative).
13 Q    Did you ever get any requests from her to deal with the
14 car?
15 A    No, not at that time, because Jim was in town, so that
16 would have been -- the job would have fallen on him.
17 Q    Okay. Did -- do you have -- you mentioned Jim. You were
18 talking about Jim Wells?
19 A    Yes.
20 Q    Did you ever have any opportunity to spend any time with
21 him?
22 A    The -- the strong friendship was between Nancy and I, and
23 by extension, our families became acquainted as well.
24 Q    And how long would you say you've known him?
25 A    Well, probably somewhat as long as I've known Nancy,

1  although maybe I didn't meet him as early.  I'd say it has to
2  be close to 20 years.
3  Q   And would you say that you knew him both before and after
4  the murders?
5  A   Oh, yes.
6  Q   Was there a time at which you observed any change in his
7  behavior?
8  A   Well, I did.  I -- I -- in hindsight, I think it was
9  earlier, but when it was -- it began earlier, because he was a,
10 you know, fine, upstanding baseball coach kind of guy.  But
11 there -- I -- in hindsight there was some change, but when it
12 really --
13         MR. CURTNER:  Your Honor, I'm going to --
14         THE WITNESS:  -- is remarkable --
15         MR. CURTNER:  I'm sorry.  At this point, I have to
16 object.  I think this is not rebuttal evidence.
17         MS. DUIGNAN:  If --
18         MR. CURTNER:  (Indiscernible) --
19         MS. DUIGNAN:  If I may make an offer, I will direct the
20 witness to the time that I'm talking about.  I believe it's
21 direct rebuttal, Your Honor.
22         THE COURT:  Okay.
23         MR. CURTNER:  Plus, I don't know if she's qualified to
24 talk about behavioral changes.
25         MS. DUIGNAN:  This is direct rebuttal to the

```
 1  witnesses --
 2          THE COURT:  Okay.
 3          MS. DUIGNAN:  -- that Mr. Curtner called --
 4          THE COURT:  Okay, direct --
 5          MS. DUIGNAN:  -- on his case.
 6          THE COURT:  Direct your test -- questions to the --
 7  BY MS. DUIGNAN:
 8  Q    Are you aware of when the defendant went to Shemya for
 9  work?
10  A    I am.
11  Q    And you had seen him quite a lot before he left on that
12  Shemya trip.  Correct?
13  A    Oh, yes.
14  Q    And you saw him again after he returned from the Shemya
15  trip.  Right?
16  A    Many times.
17  Q    Did you notice any change in his behavior immediately upon
18  returning from that Shemya trip?
19  A    Yes, a remarkable change.
20  Q    Can you please describe what that was?
21          MR. CURTNER:  Again, Your Honor, the same objection.
22          THE COURT:  Overruled.  She can testify as to what she
23  saw.
24          MR. CURTNER:  Thank you.
25  BY MS. DUIGNAN:
```

1  Q    What did you see?
2  A    He appeared frustrated.  There was some inappropriate
3  behavior.  And maybe, like, a -- a lot of tension.
4  Q    And did he make -- had you met anybody that he knew from
5  work at any point?
6  A    I met the girls.  I really didn't know -- I know Nicola.
7  I did not know Rich or Mr. Hopkins.  I don't know any of the
8  men.  I do -- I did meet the girls.
9  Q    And was there a time that you gave both Jim and Nancy
10 Wells a ride to the airport after the murders?
11 A    The last time I gave them a ride to the airport was when
12 they were going to Nevada for the weekend, which was well after
13 the murders.
14 Q    And can you describe whether Mr. Wells had any type of
15 behavioral issues that you noticed at that time?
16            MR. CURTNER:  Your Honor, objection.
17            THE COURT:  Just describe what you saw.
18            THE WITNESS:  What happened was he asked me if the FBI
19 had called, made any more calls to my house, and I responded
20 they had.  And he asked what I did.  And he said -- and I spoke
21 to the FBI.  He said, "I told" --
22            THE COURT:  I -- now, I don't want hearsay, though.
23            MS. DUIGNAN:  This is what the defendant said, Your
24 Honor.
25            THE COURT:  Okay.  I'm sorry, that's right.

1       THE WITNESS: I'm sorry, I lost my train of thought a
2 second.
3       THE COURT: I -- my fault. I --
4       MS. DUIGNAN: That's okay, Your Honor.
5       THE WITNESS: Just a second, I'll get it back. Oh,
6 yeah. So I -- I had spoken to the FBI. And he said, "I told
7 you not to talk to them. You're to slam down the phone if they
8 call."
9 BY MS. DUIGNAN:
10 Q   And how would you describe his demeanor at that point
11 compared to other times you had seen him?
12 A   I would describe it as -- as rage and kind of posturing.
13 He was behind me. Nancy was next to me in the car. He was
14 behind me and I was watching my rearview mirror. And he was
15 getting big in the chair and yelling loud, so loud I rolled my
16 window down. And I just didn't talk. I said, "No." That's
17 all I said.
18 Q   And how did that make you feel?
19 A   Intimidated. Violated. And very threatened.
20 Q   Thank you. I have no further questions.
21       THE COURT: Cross-examination.
22       **CROSS-EXAMINATION**
23 BY MR. CURTNER:
24 Q   Good morning, Mrs. Pletnikoff. We've talked before. Is
25 that correct?

**PLETNIKOFF - CROSS**

1 A  Just briefly.
2 Q  Your husband is Bob Pletnikoff. Is that correct?
3 A  Robert.
4 Q  Robert. You and your husband have been good friends with
5 the Wells and the Penningtons and the Carvers, or -- who else?
6 A  That's actually not true. I wouldn't characterize it like
7 that.
8 Q  Do you know the --
9 A  I've been very close friends with Nancy. We've been
10 acquainted -- the Penningtons, we only are acquainted. We've
11 only seen them maybe a few times. Very nice people. But I
12 wouldn't -- I've never seen them except for at Jim and Nancy's
13 house.
14 Q  Okay.
15 A  And the Carvers, also very nice. But I wouldn't
16 characterize it as a friendship, because I just don't know
17 them.
18 Q  You've socialized -- you and your husband socialized with
19 those families as well, correct? Just couples?
20 A  Only at the Wellses' house. We've never socialized with
21 them outside of that venue.
22 Q  Now, I assume you didn't take care of Nancy's car at the
23 park -- when -- every time she traveled. Is that right?
24 A  Most every time. Not when Jim as in town.
25 Q  Yes, not when Jim was in town, right.