1         UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF ALASKA
2

3   UNITED STATES OF AMERICA,  )
                               )
4          Plaintiff,          )
                               )
5   vs.                        )   CASE NO. 3:13-cr-00008-SLG
                               )
6   JAMES MICHAEL WELLS,       )
                               )
7          Defendant.          )
    _____)
8

9    TRANSCRIPT OF EVIDENTIARY HEARING ON MOTION TO EXCLUDE
     THE APRIL 19, 2012 GOVERNMENT DRIVING EXPERIMENT VIDEO
10   **BEFORE THE HONORABLE SHARON L. GLEASON, DISTRICT JUDGE**
                 July 30, 2019; 9:29 a.m.
11                   Anchorage, Alaska

12  **FOR THE GOVERNMENT:**
         Office of the United States Attorney
13       BY:  STEVEN SKROCKI
         BY:  CHRISTINA M. SHERMAN
14       222 West 7th Avenue, #9
         Anchorage, Alaska 99513
15       (907) 271-5071

16  **FOR THE DEFENDANT:**
         Office of the Federal Public Defender
17       BY:  GARY GEORGE COLBATH
         601 West 5th Avenue, Suite 800
18       Anchorage, Alaska 99501
         (907) 646-3400
19
         Camiel & Chaney, P.S.
20       BY:  PETER A. CAMIEL
         520 Pike Street, Suite 2500
21       Seattle, Washington 98101
         (206) 624-1551
22

23  _____

            **SONJA L. REEVES, RMR-CRR**
24         Federal Official Court Reporter
            222 West 7th Avenue, #4
25           Anchorage, Alaska 99513
        Transcript Produced from the Stenographic Record

1                     I N D E X

2                  July 30, 2019

3

4    Witnesses:        Direct    Cross    Redirect    Recross

5    Joseph Sturgis     7         24         67          70

6    Jim Hoerricks     73        156        176         195

7    Daniel Reisberg 198         --         --          --

8

9                E X H I B I T   I N D E X

10   Exhibit                                          Page

11   14           Video Clip                           14

12   15           Document                            106

13   16           Document                            106

14   A            April 12 T-1 Video                   34

15   B            April 19 T-1 Video                   34

16   B-1          April 19 Video Manipulations         34

17   C            First Request to FAVIAU              34

18   D            Toglia uses April 12 and 19          34
                  Comparison to Measure the Vehicle
19
     E            FAVIAU Extracts Seven Images from     34
20                April 12

21   F            FBI 302 on April 19 DEV              34

22   G            In August 2012 Iber Elucidates       34
                  Previous Conclusions on April 12
23                Image Quality

24   H            FBI 302 Reviewing April 12 Video     34
                  with Richards
25

| | | | |
|---|---|---|---|
| I | Vorder Bruegge's Presentation | 34 |
| J | Vorder Bruegge's Report | 34 |
| K | Toglia in Boom Truck | 34 |
| L | Toglia in Boom Truck Holding an Image Extracted from April 12 Video | 34 |
| M | Toglia Presentation | 34 |
| N | April 12 Weather in Kodiak | 34 |
| O | April 19 Weather in Kodiak | 34 |
| P | April 2012 Sunrise/Sunset | 34 |
| Q | April 12 Snow Cover | 34 |
| R | April 19 Snow Cover | 34 |
| S | April 12 T-1 Vehicular Traffic | 34 |
| T | April 12 Situation and Camera | 34 |
| U | April 19 Situation and Camera | 34 |
| V | FBI 302 on April 20 DEV | 34 |
| W | Hoerricks' CV | 74 |
| X | Hoerricks' Primary Report | 121 |
| Y | Hoerricks' Supplemental Report | 122 |
| HH | Hoerricks' Amped FIVE Report | 138 |
| MM | Hoerricks' Ref Publication | 139 |
| NN | Reisberg Report | 222 |
| OO | Reisberg Supplemental Report | 222 |
| PP | Reisberg CV | 199 |
| QQ | FAVIAU SOP | 42 |
| UU | April 19 DEV Time Analysis | 121 |

1    WW            April 12 Recorded Frame Snip 0709    67

2    XX            April 19 Recorded Frame Snip 1521    67

3    YY            April 20 Recorded Frame Snip 0941    67

4    AAA           Hoerricks' Bench Notes               121

1              (Call to Order of the Court at 9:39 a.m.)

2              DEPUTY CLERK:  All rise.  Her Honor, the Court,

3    the United States District Court for the District of

4    Alaska is now in session, the Honorable Sharon L.

5    Gleason presiding.

6              Please be seated.

7              THE COURT:  Good morning.  We're on record here

8    in United States versus Wells.  Mr. Skrocki is here with

9    Ms. Sherman.  And --

10             MS. BOWMAN:  Ms. Bowman.

11             THE COURT:  I'm sorry.  Good morning.  And

12   Mr. Colbath, Mr. Camiel, Mr. Wells is here.  The correct

13   Mr. Wells.  I understand there were complications there.

14             THE DEFENDANT:  The older one.

15             THE COURT:  We're all here ready to proceed on

16   the defendant's motion.  Any preliminary matters we need

17   to take up first?

18             MR. SKROCKI:  Nothing from us.

19             MR. COLBATH:  I don't think so, Your Honor.  We

20   provided an exhibit book that I'm not sure we'll cover

21   all of the exhibits but to be safe, I was overinclusive.

22   But there's copies.  The Government has them.  The Court

23   has them.  We'll address them as we go.

24             THE COURT:  All right.  So want to me give me a

25   roadmap of your plans for the day.

1          MR. COLBATH:  Your Honor, my thought was,

2    although this was our motion, and I think Mr. Skrocki

3    will agree we discussed it, although this is our motion,

4    I think initially it deals with an offer or proffer by

5    the Government of a piece of evidence.

6          It's their burden to initially establish that

7    they're going to offer that or what they're going to

8    offer and the purpose for which.  So I think they'll go

9    first.  I understand they have a person involved in the

10   creation of the video to call as a witness, make their

11   offer.

12         We then anticipate calling the two experts we

13   identified.  One, Mr. Hoerricks I'll call first.  And I

14   have him here for live testimony.  I have the other one,

15   Dr. Reisberg, in his office standing by for our ready to

16   alert him that he's to fire up the video and testify by

17   video.

18         I'll probably request between Mr. Hoerricks and

19   Mr. Reisberg just a short recess so we can get the video

20   up and running, make sure we don't have IT issues.

21         THE COURT:  Sure.  All right.

22         MR. COLBATH:  Then if the Court wants argument,

23   we would be prepared to argue today, although we've

24   briefed it and whatnot.

25         THE COURT:  Pretty thoroughly.  All right.

 1    Very good.

 2              Mr. Skrocki, do you agree with that game plan?

 3              MR. SKROCKI:  Yes, Judge.  We spoke ahead of

 4    time and agreed to put our witness on first.

 5    Ms. Sherman has the direct.

 6              MS. SHERMAN:  We call Joe Sturgis.

 7              (Oath administered to the witness)

 8              DEPUTY CLERK:  For the record, can you please

 9    state your full name for the record and then spell your

10    full name for the record.

11              THE WITNESS:  Joseph Michael Sturgis,

12    J-o-s-e-p-h, M-i-c-h-a-e-l, S-t-u-r-g-i-s.

13       JOSEPH MICHAEL STURGIS, GOVERNMENT WITNESS, SWORN,

14                      DIRECT EXAMINATION

15    BY MS. SHERMAN:

16       Q.  Mr. Sturgis, where do you work?

17       A.  I work for the U.S. Coast Guard.

18       Q.  Where are you stationed now?

19       A.  Sector North Bend Oregon.

20       Q.  What sort of work are you doing there?

21       A.  Aviation maintenance.

22       Q.  How long have you been there?

23       A.  A little over a year.

24       Q.  Where were you in 2012?

25       A.  I was stationed at CGISRAO, Kodiak, Alaska.

1    Q.   A lot of initials.  What is CGIS?

2    A.   Coast Guard Investigative Service Resident Agent

3    Office.

4    Q.   What did you do working for the Coast Guard

5    Investigative Service?  What was your job?

6    A.   I was a special agent in investigations is what I

7    did.

8    Q.   Any investigations regarding the Coast Guard?

9    A.   Yes, ma'am.

10   Q.   Crimes committed on the Coast Guard base, those

11   sorts of things?

12   A.   Yes, ma'am.

13   Q.   Were you involved in the investigation from

14   April 12, 2012, the murders at the rigger shop?

15   A.   Yes, ma'am, I was.

16   Q.   You actually did quite a few things as part of

17   that investigation?

18   A.   Yes, ma'am.

19   Q.   So we're going to focus just on what happened on

20   April 19th.  Do you recall that day?

21   A.   Yes, ma'am, I do.

22   Q.   We're going to go through the steps in detail of

23   what you did, but what was the purpose of what you did

24   on April 19th?

25   A.   The purpose was to see if the vehicle in question

 1    was consistent with the video from April 12th.

 2       Q.   So how -- were you the only agent involved in

 3    that?

 4       A.   No, ma'am, I was not.

 5       Q.   Who else was involved?

 6       A.   Special Agent Price, Special Agent Doran and

 7    Special Agent Bottary.

 8       Q.   Why don't you describe what each of your roles

 9    were for us?

10       A.   My role was to try to set up the camera as best

11    possible for the view from April 12th so we could do a

12    pass in front of the camera.

13       Q.   Okay.  What was --

14            THE COURT:  Sir, you can push that microphone

15    down.  It's a little high.  There you go.  Very good.

16    Thank you.  Go right ahead.

17    BY MS. SHERMAN:

18       Q.   So that was your role.  What did Special Agent

19    Doran do?

20       A.   I believe he was the one driving the vehicle.

21       Q.   And then Price?

22       A.   I believe he was standing as a safety observer.

23       Q.   Okay.  On the road?

24       A.   Yes, ma'am.

25       Q.   So you decided to drive -- you say the vehicle in

1    question.  What vehicle are you talking about?

2        A.  The Honda CRV, Mr. Wells' Honda CRV.

3        Q.  And you were looking to see if that was

4    consistent with the April 12th video?

5        A.  Yes, ma'am.

6        Q.  If that had not been consistent with the

7    April 12th video, would that have impacted your

8    investigation?

9        A.  Greatly.

10       Q.  You said that you positioned the camera.  Let's

11   talk for a minute about the camera.  Where was the video

12   camera that was utilized?  Where was it located?

13       A.  It was the T-1 building on a pole towards the

14   back of the parking lot.

15       Q.  And the video from April 19th, was that taken

16   from that same camera?

17       A.  Yes.

18           THE COURT:  Just for our court reporter, it's

19   T-1, correct?

20           MS. SHERMAN:  Yes, capital T-1, and then we'll

21   also reference T-2.

22           THE COURT:  I'm aware of that.  All right.

23   BY MS. SHERMAN:

24       Q.  So at the T-1 camera, where were you physically

25   during this demonstration?

1    A.   I was inside of the T-1 building behind the
2  camera control.
3    Q.   Had you ever been in there and controlled those
4  cameras before?
5    A.   No, ma'am.
6    Q.   So how did you decide where the camera would be?
7    A.   I used the April 12th video from the original
8  video and tried to eyeball it best I could to match that
9  area.
10    Q.   When you say "match," what are you talking about
11  matching?
12    A.   Just the way the camera was set up and the view
13  of the camera itself, I did the best I could do with the
14  original video to try to at least mirror the image as
15  close as possible.
16    Q.   So you're focused on the field of view as it
17  were?
18    A.   Yes, ma'am, the field of view and trying to
19  decide the distance was correct or not.
20    Q.   Whether it was zoomed in or zoomed out?
21    A.   Yes, ma'am.
22    Q.   So as you set this up, was there anything that
23  your counterparts down on the road did to determine
24  about this field of view?
25    A.   Yeah.  They set up cones on the road to try to

1 help better set the camera system up based upon where we

2 thought the best view was in regards to when we saw the

3 original video and the original vehicle driving past and

4 the original vehicle going back out.

5     Q.  How were those cones then used during this

6 demonstration of the vehicle?

7     A.  They were helpful for the build to view to be

8 able to see and they were also used for timing for

9 passes of the vehicle.

10     Q.  So how many times is the vehicle, Mr. Wells'

11 vehicle driven past that camera?

12     A.  I believe it was 14 passes, seven one way, seven

13 the other.

14     Q.  And why did you do 14?

15     A.  Just to try to determine the speed of the vehicle

16 from the original video.  We were trying to see if we

17 could match up based upon the review of the original

18 video if we could get close to the camera framing.

19     Q.  So the same number of frames?

20     A.  Well, just from the original video, we were

21 trying to see if we could get it within the same

22 timeframes and make it mirror the original to try to

23 gauge how fast maybe the vehicle was coming in or going

24 out.

25     Q.  Did you notice in your review how the speed of

1    the vehicle affected the view on the camera?

2        A.  Yes, I did.

3        Q.  Can you describe that for us?

4        A.  Of course at a slower speed, it was a little more

5    clearer, and at faster speeds, it was a little more

6    blurry.  But the video itself was not the best video for

7    clarity to begin with, so --

8        Q.  And what speed did you start with on pass one?

9        A.  Five miles per hour.

10       Q.  And what was the last speed that was driven?

11       A.  35 miles an hour.

12       Q.  And how many increments did you go up in?

13       A.  Five-mile-an-hour increments.

14       Q.  When you -- where did the vehicle stop on these

15   passes as it was heading in towards the rigger shop,

16   towards T-2?

17       A.  They were trying to make the stop at the last

18   turn-in to the right as it came in, which would be an

19   entrance to the T-2 building.

20       Q.  Have you reviewed a CD of the video created from

21   April 19th from about 3:18 p.m. to 3:30 p.m. that day?

22       A.  Yes, ma'am.

23       Q.  When did you do that?

24       A.  Yesterday.

25       Q.  And was it a fair and accurate depiction of the

1  video as you saw it back on April 12, 2012?

2      A.  Yes, ma'am, it was.

3      Q.  Did you do anything to that CD review to indicate

4  that's the one we're talking about here today?

5      A.  I initialed and dated it.

6          MS. SHERMAN:  Your Honor, at this point I'm

7  going to move to admit Exhibit No. 14.  We have 13 in

8  our brief, so I didn't want to number it 1 --

9          THE COURT:  All right.

10         MS. SHERMAN:  -- for the purposes of this

11  hearing.  I would also note this is a smaller portion of

12  what was attached to the defense's brief as

13  Attachment B.  This is the shorter portion the

14  Government actually intends to introduce at trial.

15         THE COURT:  Any objection for purposes of this

16  hearing?

17         MR. COLBATH:  No, Your Honor.

18         THE COURT:  Then 14 is admitted.

19         (Exhibit No. 14 admitted)

20         MS. SHERMAN:  Your Honor, I know you've

21  reviewed all the video from previously.

22         THE COURT:  If you want to play it, that's

23  fine.  Actually, it was when I last saw you that I

24  reviewed it, so it would be helpful to review it again.

25         MS. SHERMAN:  Okay.

1        THE COURT:  First, I had a question for the

2   witness.  Were you able to determine the speed of the

3   vehicle on April 12th, as I understood that's what you

4   were trying to do?

5        THE WITNESS:  No, ma'am, not exactly.  We were

6   just trying to see if it was visible based upon the

7   distance that we had.  Of course it was at a pretty far

8   distance away and the image was blurry, so we assumed it

9   was moving within the 5- to 35-mile-an-hour frame.

10        THE COURT:  You have no opinion as to --

11        THE WITNESS:  No, ma'am, I don't, because I

12   didn't have anything to do with the actual determination

13   of the speed.  I was just helping with the --

14        THE COURT:  I guess going back to high school

15   math here, but couldn't you take the distance moved and

16   the time that it moved that distance and determine the

17   speed?

18        THE WITNESS:  There are ways of doing that

19   time-distance equation.  But with the poor video and the

20   distance, we were unable or we were unsure if we were

21   able to gather that information.  We had the vehicle.

22   We had the opportunity, so we tried to utilize that

23   opportunity to see if we could make it look as the

24   original vehicle or the original video.  The idea was to

25   see if we could make it match and see if the actual

 1   camera frames were caught on the original date using

 2   that vehicle.

 3          THE COURT:  All right.  Follow-up at all on

 4   those topics?

 5          MS. SHERMAN:  No, on those topics, no.

 6          THE COURT:  Very good.

 7          MS. SHERMAN:  Madam Clerk, if we can go ahead

 8   and play this.

 9          (Video playing in open court).

10   BY MS. SHERMAN:

11     Q.  So we just saw a vehicle drive by, or is that a

12   different vehicle?  Sorry.  Mr. Colbath was distracting

13   me.

14          Mr. Sturgis, how were you communicating with who

15   was down on the street if you're up in T-1?

16     A.  We had handheld radios.

17     Q.  So they would do something and you would say, "I

18   can see that," or "I can't"?

19     A.  Yes, ma'am, and they would let me know when they

20   were going to go up at the five-mile-an-hour and when

21   they were going to make their passes.

22          (Video continues playing in open court)

23   BY MS. SHERMAN:

24     Q.  So we just saw another vehicle drive by.  How

25   were you controlling traffic on that road?

 1    A.  Our safety observer was allowing traffic through

 2   as we would either drive past, remove the vehicle from

 3   the roadway and then drive back.  It was all being

 4   coordinated through the radio system.

 5    Q.  So you didn't block off the road for this entire

 6   thing, you'd simply, during the passes, stop people from

 7   driving?

 8    A.  Yes, that's correct.  We just didn't want to have

 9   an unsafe condition out there.

10        (Video continues playing in open court)

11   BY MS. SHERMAN:

12    Q.  Can we pause it there, please.

13        So we see people moving around.  What was he

14   doing?

15    A.  I believe he was removing the cones, but I'm

16   unsure exactly what -- I believe that's what he was

17   doing was moving the cones away.

18    Q.  So you -- as we see from the time stamp here,

19   this occurred in the afternoon, right?

20    A.  Yes, ma'am.

21    Q.  Why did you do this in the afternoon?

22    A.  Opportunity.  The weather was reasonable that day

23   and clear.  And we had the vehicle.  It was just for

24   opportunities purposes.

25    Q.  Can you describe in general the weather in Kodiak

1  in April and what that can look like?

2      A.  The weather in Kodiak pretty much all year round

3  is pretty unpredictable, but it could be snowy one

4  minute and it could be clear the next.  Any time the sun

5  comes out it melts away what's there, and a week later

6  it could snow again and, you know, so it's kind of

7  unpredictable.  It could be rainy, it could be icy, just

8  a lot of varying factors.

9      Q.  So you chose to do this at 3:00 p.m. or around

10  3:00, 3:15 p.m. based on what the weather was doing?

11      A.  For most part, yes.  It was we had the

12  opportunity to do it.  We had people and time, so we

13  took advantage of an opportunity.

14      Q.  When we talked about the speed and the varying

15  speed, 5 miles, 10 miles an hour, 15 and so on, how was

16  that determined?  Did you have -- how were you to

17  determine that Mr. Doran was driving that speed?

18      A.  We had discussed it ahead of time, you know, just

19  to see if we could figure out how fast the vehicle was

20  moving.  And we had the vehicle and we were able to

21  utilize it, so we tried to determine if we could see if

22  it would make any difference.  Because as you can see,

23  the clarity, the vehicle, you don't see a consistent

24  vehicle going in and a consistent vehicle going out.

25  It's like clips.

1          So it was kind of difficult to determine, but we

2     wanted to try.  I mean, that was part of the

3     investigative way we tried to see if we could determine

4     how fast it was moving.

5          Q.  How was Mr. Doran determining the car was

6     actually at a particular speed?  Was he using the

7     speedometer or --

8          A.  Yes, ma'am.

9          Q.  -- was he using a radar gun?

10         A.  He was using the speedometer.

11         Q.  Okay.  Why did you stop after 14 passes?

12         A.  We were unsure of how fast -- because of the

13    area, it's pretty short distance, we didn't know if

14    going over 35 miles an hour would be safe because of how

15    short it is between the second driveway to the curve

16    where the bridge is.  And we didn't want to cause an

17    unsafe condition, plus we didn't want to damage

18    anybody's vehicle or do anything out of the ordinary.

19         Q.  Now, there are some differences between the video

20    on the 12th and the video on the 19th?

21         A.  Correct.

22         Q.  Can you describe what some of those are?

23         A.  Of course here it's much clearer.  It's a better

24    visibility.  There's no snow on the ground.  There may

25    be some simple differences in the exact positioning.

1   The camera was very difficult to position.  It was very

2   touchy.  It would move, you know, pretty easily with

3   control.  So yeah, we did the best we could with trying

4   to match it up to the original view.

5       Q.  So --

6           THE COURT:  I'm sorry.  What happened to the

7   camera was that in use on the 12th, the one that caught

8   the image on April 12th?

9           THE WITNESS:  What happened to the camera?

10  Nothing that I know of.

11          THE COURT:  Could you have used that one?

12          THE WITNESS:  That was the same camera.

13          THE COURT:  So then why are you moving it?

14          THE WITNESS:  It had been moved before.  I

15  didn't have any control.  What we knew was that the

16  camera had been moved.  They use the camera for other

17  reasons than security.  They scan the fields.  They look

18  in other areas with that camera.

19          So what we tried to do as best we could is try

20  to mirror what we saw in the original video with the

21  camera.  I also was not very familiar with the camera

22  system, so whenever I was working with some of the crew

23  there at the communications station, they assisted

24  helping us try to set the camera up as best they could.

25          THE COURT:  Thank you.  Go ahead, please.

BY MS. SHERMAN:

    Q.  So let's talk a little bit more about the camera. We're talking about the same camera. You said it was moved. What sort of functions did that camera have from what you could tell?

    A.  If I remember correctly it could be zoomed in and out. It could turn. It had a joystick and then a couple of button controls. Zoom in, out, turn up, down, left, right.

    Q.  That's what you were trying to do to get it back to where it was on the 12th so it looked similar?

    A.  Yes, ma'am. Yeah, that's what we were -- we were trying to mirror the original video as best as possible. Of course, you know, the camera system was very finicky.

    Q.  In this video we see some cars up at T-1. We only see one car in the parking lot. Did you have access to all those -- well, how many vehicles were in -- or were there more vehicles in the video from the 12th?

    A.  The video from the 12th, there was more vehicles. Of course, it was -- it's a different video. There were different people there. The idea was just to try to gain -- to see if the vehicle was consistent with the original video and see if we could figure out how fast the vehicle was moving.

1    Q.  So if the -- if the vehicle -- you had Mr. Wells'
2  vehicle.  If you drove it by and you're watching on the
3  video and it was not consistent, it didn't look anything
4  like the video from the 12th, how would that have
5  affected your investigation?
6    A.  It would have greatly affected it, because if the
7  vehicle wasn't consistent, then clearly, that vehicle
8  wouldn't have been even considered in further
9  investigation.  It was considered a -- a consistent view
10 of the vehicle seemed very similar to the original, and
11 yeah, that's why we used it.
12   Q.  So you drove Mr. Wells' vehicle past the first
13 time and you determined it was consistent?
14   A.  Yes.  We could see through the view that it was
15 of a similar view to the original video.
16   Q.  And that was with your naked eye, right?
17   A.  Yes, correct.
18   Q.  Are you a videographer?
19   A.  No, ma'am.
20   Q.  Are you trained or know anything about reverse
21 photogrammetry?
22   A.  No, ma'am.
23   Q.  So you are doing this just to determine are we on
24 the right track, are we -- should we be including this
25 vehicle in our analysis?

1    A.   Yes, ma'am.  That's exactly right.

2    Q.   Did the snow on the ground or the fewer vehicles

3  in the lot, did that impact the ability to drive that

4  vehicle and capture that vehicle on the video?

5    A.   On the 19th, the vehicles in the parking lot were

6  not what we were focusing on.  We were trying to see if

7  the vehicle, the speed could match possibly with the

8  original video and we were trying to see if it was

9  consistent with the original video.  The vehicle -- you

10  know, from the distance that we were at, we tried to set

11  the camera up as best as we could to be able to see a

12  very similar view and we were trying to see if it would

13  be consistent.

14    Q.   And by the 19th, had there been any changes in --

15  on Anton Larsen Bay Road, that road -- Anton Larsen

16  Road?  Excuse me.

17    A.   The road itself, no, there were no physical

18  changes to the actual road.  The weather of course was

19  different.  I mean, that's almost any given day in

20  Kodiak.

21    Q.   Are you aware of any records or documentation

22  that the Coast Guard would have saying that this camera

23  was exactly at this angle on this day that is kept as

24  part of the log?

25    A.   I'm not particularly aware.  I don't kind of

recall that, but we -- just based upon the video footage itself, of course, there was record of the original video.

Q. That's all you had to determine this is as close as I can get it to the --

A. Yes, ma'am, that's correct.

MS. SHERMAN: Those are all my questions. We have the exhibit for the Court I can give Madam Clerk after.

THE COURT: That sounds fine. Thank you. Mr. Colbath or Mr. Camiel, go ahead, please.

CROSS EXAMINATION

BY MR. COLBATH:

Q. Mr. Sturgis, as I understand it, there were principally four of you involved in the exercise on April 19th?

A. Yes, sir.

Q. I could not find -- so tell me if I'm wrong, but I could not find a report authored by you summarizing or detailing in any fashion either the role you played or the role of others in the exercise.

A. That's correct, sir.

Q. I did see one of Agent Doran. I did see one I think of Bottary maybe. But I didn't see others. Are you aware of others?

1     A.   No, sir, not that I'm aware of.

2     Q.   All right.  When the decision -- well, first of

3 all, when was the decision made to go do this exercise

4 to determine the consistency, the possible consistency

5 of the Wells' vehicle?

6     A.   I'm not sure.  I don't recall the actual time

7 that the decision was made, but I remember it was a team

8 decision.  We went out and worked it as a team.

9     Q.   And at whose direction was the decision to do

10 this experiment in the first place?

11     A.    I believe it was Special Agent Daryl Allison, but

12 I'm not exactly sure.

13     Q.   When you say it was -- obviously the work was a

14 team process because there was four of you involved.

15 Were there more folks involved in the decision-making or

16 the activities of setting this up besides the four of

17 you?

18     A.   Yes, sir.

19     Q.   Who would have else been involved?

20     A.   The team lead at the time would have been the one

21 helping us, making certain decisions and guide us

22 through.

23     Q.   And that was Mr. Allison?

24     A.   Yes, sir.

25     Q.   All right.  And so physically out there on the

1    19th, was Mr. Allison present or did you have any

2    written directions from him?

3        A.   No, sir.  We didn't have written directions.  We

4    had verbal directions.

5        Q.   Did you do some kind of briefing before you

6    started the process to sort of set some parameters or

7    some expectations, or how did that work?

8        A.   Yes, sir.  It was done with the four-person team.

9    There had been direction given.  We got together and

10   worked it together.

11       Q.   Can you summarize for me or do you remember the

12   directions that you received?  Prior to the four of you

13   going out and making the decisions you made on scene,

14   what direction -- do you remember any of the directions?

15       A.   I don't recall the exact directions.  It's been

16   seven years, but the general consensus of what we were

17   there to do was to see if the vehicle was consistent

18   with the original video, try to set it up as best as

19   possible to the way the camera was set up based on the

20   naked eye.

21            Clearly, I didn't have the education or

22   understanding of the video itself to get it exact.  But

23   we went in, we saw the original video.  We tried to set

24   it up to where it would be consistent with the view that

25   was originally taken, and we drove the vehicle past it

1    to try to determine the speed that the vehicle came in

2    and went out.  We had access to that vehicle, so we

3    utilized that vehicle.

4        Q.  Let me ask you about a couple of things from that

5    answer.  First of all, with respect to evidence

6    collection on April 12th, who collected the video from

7    the camera system on April 12th; do you know?

8        A.  I don't recall that.

9        Q.  Do you know how it was collected?  In that was

10   there some sort of download from the system onto some

11   other media-type device?  Was the hard drive taken from

12   the system on April 12th and different hardware put in?

13   Do you know about that?

14       A.  I don't recall that specifically.  I want to say

15   that from my recollection that they took the hard drive

16   from the system.  But I don't know exactly when that was

17   done.

18       Q.  Okay.  Do you know whether on April 12th or at

19   any time related to the April 12th, the actual evidence

20   video, was there anything done to preserve or capture

21   the camera settings that existed at the time the

22   evidence was recorded?

23       A.  I don't recall that.  Just to speculate, I would

24   say that the settings were probably saved in the system

25   itself.  Whenever they recovered whatever evidence they

1    recovered from it, it would be in that, in the metadata

2    or something along that.  We didn't physically look at

3    the setup of the camera system and record it, that I can

4    recall.

5        Q.  So if the settings were somehow captured on

6    April 12th, then you don't know whether they were,

7    that's just an assumption on your part?

8        A.  Yes, sir.  That's an assumption.  I have no idea.

9        Q.  But if those settings were captured, nobody tried

10   to determine those or shared those with you such as to

11   say, we know what the settings were on April 12th, we'll

12   just set the camera to the same settings, that didn't

13   happen?

14       A.  That did not happen, sir.

15       Q.  Instead you said you looked at what happened on

16   April 12th and you eyeballed it as best you could to get

17   the same setting?

18       A.  That is correct.

19       Q.  Now, for the judge's purpose, because she asked

20   you about this, a little bit about that camera.  I think

21   it's fairly similar.  Right here on the TV that we have

22   in the courtroom, on top of that, there's a camera

23   there.  And that camera that's there can be made to tilt

24   up and down, it can spin from the judge where it's now

25   facing over to me, pan back and forth, and then it can

also zoom in real close on somebody's face or pan back
and get the whole camera.  So it's pan, tilt and zoom.

      As far as you could tell from operating the
camera out there at T-1, same type of camera -- I mean
same type of mechanism?

A.  Similar mechanism, I would say, yes, sir.

Q.  In other words, with the joystick, you could go
left or right?

A.  Yes.  Yes, sir.

Q.  You could go up or down?

A.  Yes, sir.

Q.  You could zoom in or out?

A.  I believe so, yes, sir.

Q.  And well, in fact, we see not on the part of the
video that was shown here, but prior to the beginning of
the recording, you in fact manipulated the camera or
somebody there showing you what to do manipulated the
camera in all three respects.  In other words, it was
panned, it was tilted, it was zoomed at various times to
sort of -- in that process of getting it right?

A.  I believe so, yes, sir.

Q.  All right.  And when you say we were looking at
what happened on April 12th and eyeballing it to get it
in the same place, what are you looking at to -- for
comparative purposes?  Do you have a video?  Do you have

1  still shots from the video?  What do you have that

2  you're eyeballing to?

3      A.  I don't recall.  I want to say that it was from

4  the understanding of the video originally.

5      Q.  So you watched the video originally and then had

6  in your mind, okay, that's about what that looks like,

7  and then sat behind the camera on April 19th and tried

8  to simulate in your mind what you were looking at from

9  what you saw before?

10     A.  Yes, sir, that's correct.

11     Q.  And ultimately, the decision to stop where you

12  stopped and use the camera location that we just saw in

13  the video, that was in the end your decision, you got it

14  as close as you could, like you said, and then decided,

15  now that's good?

16     A.  Yes, sir.  That's correct.

17     Q.  All right.  I think you've said this, but you had

18  prior to this no audio/video training, those kind of

19  things?

20     A.  Not on the system, no, sir.

21     Q.  And did you -- did any of the other three

22  individuals that were assisting you as part of the team,

23  to your knowledge, did they have training on this system

24  or training in the conduct of a video capture like this?

25     A.  Not that I know of.

1    Q.   Did you -- as part of the pre-experiment briefing

2    or the setup to this, did you consult with anybody who

3    did have training on the system and training in the

4    construct of an exercise like this?

5    A.   The only person I actually consulted with was the

6    operator at the camera system.

7    Q.   So that would have been one of the watchmen or

8    one of the Coast Guard employees that was normally

9    assigned to that observation post?

10   A.   Yes, sir.

11   Q.   So they could show you how to manipulate the

12   camera?

13   A.   Yes, sir, that is correct.

14   Q.   Did they provide you, beyond showing how to

15   manipulate the camera, any technical advice regarding

16   the capabilities of the system, frame rates -- well, any

17   technical information?

18   A.   No, sir.

19   Q.   Just how to run it?

20   A.   Yes, sir.

21   Q.   So that I am clear, you cited a couple of times

22   the purpose at the outset was two things.  See just

23   visually or observationally does this on April 19th,

24   driving this car past, look like what we saw on

25   April 12th.  Is it consistent, that was purpose number

1  one?

2      A.   Yes, sir.

3      Q.   And purpose number two was we'll drive it at

4  different speeds and see if we can't, based on rough

5  replication, determine the speed of that thing we saw on

6  April 12th?

7      A.   Correct.

8      Q.   Those were the two purposes?

9      A.   That I recall, yes, sir.

10     Q.   Well, had anybody consulted with technical or

11 expert witnesses for purposes of capturing things that

12 experts were going to use later.  Was that discussed

13 with you?

14     A.   Not with me, sir, no.

15     Q.   And so I take it if that wasn't discussed with

16 you, you had no understanding that -- nobody gave you

17 direction to capture any information or preserve

18 anything for purposes of later technical analysis.  You

19 weren't trying -- that wasn't one of your purposes, at

20 least that you were aware?

21     A.   Correct, sir.

22     Q.   All right.  Did you as any part of the -- now,

23 two of the team members involved on April 19th were FBI

24 agents and two were Coast Guard Investigative Services?

25     A.   That is correct, sir.

1      Q.   And then case Agent Allison, he was of course

2  with the FBI, directed the thing initially or gave the

3  directions initially to conduct the experiment?

4      A.   I believe that is true.

5      Q.   Were you aware of -- or at any time during the

6  direction or the briefing, were you aware of the

7  standard operating procedures of the FBI for conducting

8  photographic examinations or photogrammetry experiments?

9      A.   No, sir, I was not.

10      Q.   Did anybody discuss with you anything about the

11  existence of standards or that they had a procedure for

12  doing things like this?

13      A.   Not at the time, no, sir.

14           MR. COLBATH:  Can you pull up QQ?

15           Your Honor, before I pull up this exhibit, I'd

16  like to do this:  In our exhibits to the Court, from our

17  exhibit list, Exhibit A through V, we have them all

18  alphabetized, but A through V match consistently with

19  the attachments previously filed with the Court relative

20  to the motion that we filed.

21           At this time, so that they're officially in the

22  record as evidence offered and related to the hearing,

23  I'd like to move A through V.  I think they've all been

24  previously provided through the docket process as well

25  as here again to the Government.  Most are Government

items.  And they do include Exhibit B, which subsumes

the video that Ms. Sherman referred to.  But I'd like to

offer A through V.

THE COURT:  Any objection?

MS. SHERMAN:  No objection.

THE COURT:  A through V are admitted.  Go

ahead, please.

(Exhibit Nos. A through V admitted)

MR. COLBATH:  If you could bring up Exhibit QQ.

BY MR. COLBATH:

Q.  Go to the second page, if you will.

So, Mr. Sturgis, I asked you about a standard

operating procedure for the FBI.  The front page of

that, it's from the Forensic Audio, Video, and Image

Analysis Unit.  That document was never shared with you

or you didn't see or consult that before you

participated?

A.  Not that I can recall.

Q.  Do you have any knowledge as to whether anybody

from the FBI that was involved in the process, Agent

Allison or the agents that were there in the field

assisting you, consulted this during -- before or during

the process?

A.  Not that I recall or that I can recall.

Q.  All right.  That's fine.

1          Were you aware that the FBI's procedures

2   recommended that individuals involved in evidence

3   capture like that be proficient in the use and

4   application of the process?

5      A.   I was not.

6      Q.   Do you know after the completion of this

7   April 19th exercise who extracted or who captured the

8   video from the system?

9      A.   I don't recall.

10     Q.   Do you know or have you seen any capture of the

11  camera settings that you used and the team used on

12  April 19th?

13     A.   No, sir, I don't recall that.

14     Q.   You weren't involved after you were the one

15  running the camera, at the conclusion of it -- well,

16  either before the experiment started or at the

17  conclusion of it, you weren't involved in any process to

18  say, before we change this or move this, let's record

19  exactly what the settings are on the camera?

20     A.   Not that I'm aware of.  Other than the video

21  itself.

22     Q.   You may have testified to this, but I want to

23  make sure.  The decision to make seven passes back and

24  forth, the total of 14 video images, that was based on

25  determining speed?

1    A.  Yes, sir.  That was the understanding that I had.

2  It was to determine the speed that the original video

3  and the original vehicle was moving.

4    Q.  Now, did you know at any time prior to or during

5  this process that that camera system, for instance on

6  April 12th, was capturing four frames per second,

7  approximately four frames per second?

8    A.  No, sir, I did not.

9    Q.  You testified that as you observed it, and I

10 think we can see it on the video, but when the images go

11 across or through the video, it's sort of jerky a little

12 bit.  It's not a smooth flow.  It's a little jerky.  You

13 observed that, right?

14   A.  Yes, I did.

15   Q.  And so you understood that what that system

16 was -- a closed-circuit television system was really

17 doing is just capturing a number of pictures.  And

18 because it's not high definition or because of the

19 capabilities or incapabilities of the system, it doesn't

20 present as a beautiful flowing video, instead it

21 presents in that jerky fashion?

22   A.  Yes, sir, that's correct.

23   Q.  That's consistent with your observations?

24   A.  Yes, sir.

25   Q.  You could see just with your naked eye certainly

1   a difference between the car on April 19th going by at

2   five miles an hour compared to at the end of the test

3   going by at 35 miles an hour?

4      A.  Yes, sir.

5      Q.  You knew that the lower speeds, the five, the

6   ten, those were not consistent with -- from a speed

7   standpoint, with what you saw on April 12th?

8      A.  After they were -- the passes were made, yes,

9   sir.

10      Q.  Right.  Did you or anyone that you know of

11   attempt to determine the number of frames captured by

12   the system on April 19th relative to each pass?

13      A.  Not that I'm aware of, sir.

14      Q.  So even though you were trying to replicate

15   speed, nobody did a speed calculation that you're aware

16   of?

17      A.  I did not.

18      Q.  Well, are you aware that anybody else did?

19      A.  I'm not.  I can't recall that.  I don't know if

20   somebody else did or not, but I know I did not.

21      Q.  How about are you aware -- I presume you did not

22   do this either, but did you or are you aware of anybody

23   just trying to determine and match frame counts?

24      A.  I am not aware of that.

25      Q.  All right.  What's the speed limit at that point

1    on Anton Larsen Bay Road?

2        A.   I don't recall at this point, but I want to say

3    it's in between the 5- and 35-mile-an-hour zone.

4        Q.   Did the posted speed limit play any part in the

5    decision to either start at 5 or stop at 35?

6        A.   I do not believe that was a part of the

7    consideration.

8        Q.   Prior to beginning the first pass and the

9    recording process, did you or any of the people involved

10   in the exercise move or have moved any of the vehicles

11   in the parking lot that is in the foreground?

12           Can you bring up -- I don't know which one will

13   show it best.  Bring up I, if you would.  Go over to the

14   first photo on that page three, I think.

15           So first of all, you said -- let me strike the

16   last question that I asked you before you answer that

17   one.

18           In order to be -- to try to create consistency or

19   determine consistency, you first looked at what you saw

20   on April 12th, right?

21       A.   Yes, sir.

22       Q.   And if we --

23       A.   You just rotated.

24       Q.   Yeah.  Can we rotate that, do we think?  Try the

25   orange one at the very -- all the way.  Try that.

1          We can -- I think we can figure it out here

2     rotated.

3          So this is a screen shot from the April 12th

4     video I will tell you.  And at the bottom of this

5     picture, in its rotated fashion, at the bottom of this

6     picture -- there's actually in this picture two parking

7     lots, right?  The one at the top of the picture is the

8     T-1 parking lot in front of the T-1 building.  That's

9     the building where you were sitting inside of running

10    the camera, correct?

11         A.  Yes, sir.

12         Q.  All right.  And that parking lot is inside a

13    fence, correct?

14         A.  Part of the parking lot is inside the fence.

15         Q.  Right, the parking lot immediately adjacent to

16    the building?

17         A.  Yes, sir.

18         Q.  Outside of the parking lot there, outside of the

19    fence, excuse me, there's a secondary parking lot.  And

20    you see the vehicles parked there, they would be at the

21    bottom of our screen as we're looking at this?

22         A.  Yes.

23         Q.  You see that.  And over the top of those

24    vehicles, that second set of vehicles that we're talking

25    about, beyond those and over the top of those is Anton

1    Larsen Bay Road down the hill near the rigger shop?

2        A.   Correct.

3        Q.   And so you were aware that throughout the

4    relevant timeframe on April 12th, there were vehicles

5    parked in that secondary parking lot basically between

6    the camera view and Anton Larsen Bay Road.

7            There we go.  That one looks better.  This is a

8    different view of the same thing.  It is VV.  There

9    are -- as you look at this screen, on the left-hand

10   side, you can see a number of vehicles in the parking

11   lot outside the fence there between the camera and Anton

12   Larsen Bay Road, right?

13       A.   Yes, sir.

14       Q.   Now, on April 19th -- let's see if we have a good

15   photo of that.  So I'm going to show you what's marked

16   as Exhibit XX.  Now, that's the same view, but this is

17   from April 19th.  We see the same parking lot.  There's

18   a singular blue car parked there.  You see that?

19       A.   Yes, sir.

20       Q.   All right.  Prior to starting the April 19th

21   exercise, did you or anybody else that you're aware of

22   cause people to move or empty out this parking lot where

23   the lone blue car is sitting?

24       A.   I don't recall that.  I don't recall us asking

25   people to move vehicles or -- I think we were more

1    focused on the road itself.

2        Q.   So by not recalling that, are you telling me that

3    that could have happened and you just don't recall it,

4    or you weren't part of it, or that it's your belief here

5    today, as you think back on it, that that did not

6    happen?

7        A.   I believe that is -- I just don't recall us

8    asking anyone to really move vehicles or anything.  I'm

9    not sure if that happened or not.

10       Q.   Okay.  The blue vehicle that's depicted, do you

11   know how or why it is in the scene?

12       A.   I do not.

13       Q.   Okay.  You don't know either how long it had been

14   there, who placed it there, who made the decision to

15   leave it there, those types of things?

16       A.   No, sir.

17       Q.   You agree with me that XX certainly shows more of

18   Anton Larsen Bay Road and far less obstruction than did

19   the prior image we looked at, QQ?

20       A.   There are more vehicles parked in between the

21   camera and the road, yes.

22       Q.   And because there are more vehicles, on

23   April 12th, you could see much less of Anton Larsen Bay

24   Road?

25       A.   Yes, sir, because of the vehicles.  Yes, sir.

1    Q.  Right.

2          MR. COLBATH:  Your Honor, I'm going to move XX

3  just because we referred to that.

4          THE COURT:  Any objection?

5          MS. SHERMAN:  No objection.

6          THE COURT:  All right.  That will be admitted.

7          (Exhibit No. XX admitted)

8          MR. COLBATH:  I'll also, because we referred to

9  it, move QQ.

10         MS. SHERMAN:  No objection.

11         THE COURT:  QQ is admitted as well.

12         (Exhibit No. QQ admitted)

13  BY MR. COLBATH:

14    Q.  Just for perspective purposes, could you pull up

15  Exhibit K for me?

16         Can you -- how do I get that off my screen?  How

17  do I clear this screen?  Can you clear my screen?

18         THE COURT:  We can take a break and get IT here

19  if need be.

20         MR. COLBATH:  If I touch the screen, it leaves

21  a dot.  And I know one of these -- there's some

22  functionality that allows me to clear it, but I don't

23  know --

24         (Pause to try to get screen cleared)

25         THE WITNESS:  If it's any help, the blue dot

```
 1   doesn't bother me at all.
 2             THE COURT:  It doesn't bother me either.
 3             (Pause to work on DEPS system)
 4             THE COURT:  Let's take a short break.  We're
 5   going to get IT here or we're going to be overtaken by
 6   blue dots.
 7             DEPUTY CLERK:  Court stands in a brief recess.
 8             (Recessed from 10:28 a.m. to 10:39 a.m.)
 9             DEPUTY CLERK:  All rise.  Her Honor, the Court,
10   the United States District Court is again in session.
11   Please be seated.
12             THE COURT:  All right.  We're back on record
13   here.  Ready to proceed, Mr. Colbath?
14             MR. COLBATH:  Yes.
15   BY MR. COLBATH:
16     Q.  Mr. Sturgis, I have Exhibit K that's been
17   admitted up here.
18          Could you just bring -- make the picture bigger,
19   fill more screen.
20          So the picture is dark, I understand, but in an
21   unmagnified state, this is the view from the camera.
22   This fire truck is at the camera or approximate location
23   of the camera, and down beyond that parking lot is Anton
24   Larsen Bay Road, correct?
25     A.  Yes, sir.
```

1    Q.  So if you went out and stood in the parking lot

2    and looked at the camera and -- the camera is mounted up

3    on a pole?

4    A.  Yes, sir.

5    Q.  So in reality, it is -- well, do you know how far

6    it is from Anton Larsen Bay Road?

7    A.  I don't recall.

8    Q.  Did you or anybody on the team measure that at

9    the time?

10   A.  I don't recall that.

11   Q.  Okay.  Let me -- so then -- so as we're looking

12   at Exhibit K here, you don't know the -- you don't know

13   the distance from camera to road, correct?

14   A.  I don't -- I don't recall.

15   Q.  All right.  And then could you pull up Exhibit T?

16        So this is a picture from -- we'll have her blow

17   this up a little bit.  So this is a picture -- can you

18   get the whole picture in there?  Sorry.

19        So this is a screen shot from the April 12th

20   video.  I will tell you that.  All right?  And it

21   appears -- does it appear to you to be a camera view

22   from the same camera, the camera that you used on

23   April 19th?

24   A.  Yes, sir.

25   Q.  And we can see the vehicles here in the

1  foreground, and we can see beyond to Anton Larsen Bay

2  Road much better in this view than the last one we just

3  saw, Exhibit K.  Do you know the distance from what we

4  see here in the foreground to the distance of the road,

5  in other words, how much magnification have we gained

6  from no magnification in K up to how focused or

7  magnified was it on April 12th?  Do you know that?

8      A.  No, sir.

9      Q.  Go to Exhibit U and blow that picture up.

10         So this is a screen shot now on April 19th, the

11 one that you were involved recording.  In the foreground

12 here, down where the fence is, we can see a different

13 perspective and a different amount of fence in the

14 foreground than we could see in the one I just showed

15 you in Exhibit T.  So the camera is more zoomed yet.  So

16 do you know the distance between the foreground camera

17 view here and the roadway?

18     A.  No, sir.

19     Q.  Do you agree with me that -- I'll put the

20 pictures back up there if you'd like, but from no

21 magnification to what the magnification was on

22 April 12th to what the magnification was on April 19th,

23 that the three differences are different, three camera

24 views are different?

25     A.  I would say they are.

1    Q.  You referred to during your testimony that one of

2  the reasons you selected April 19th to do this test was

3  based on sort of weather and availability?

4    A.  Correct.

5    Q.  Will you pull up N, Exhibit N for me.

6       Were you part of the investigation that took

7  place on April 12th?

8    A.  Yes, sir.

9    Q.  So you were involved from the beginning of the

10  case or pretty much the beginning?

11    A.  Yes, sir.

12    Q.  And you were aware that on the morning of the

13  12th at the time the video in question, the evidence

14  video was captured, it was between 7:00 and 8:00 in the

15  morning?

16    A.  Yes, sir.

17    Q.  And there had not been any measurable

18  precipitation that day.  It was mostly, albeit early in

19  the morning, partly cloudy to mostly sunny at that time?

20    A.  I don't recall the rain or the actual exact

21  temperature or anything like that.  I just remember it

22  was a normal Kodiak day.

23    Q.  I didn't think we had those on Kodiak Island.  At

24  least the times I've been there, there's no such thing

25  as a normal Kodiak day because, as you said, that could

1 be in the same day snow, rain, sleet and sun.

2     A.   Exactly.

3     Q.   Between 7:00 and 8:00 in the morning -- is there

4 a second page to this?

5     So can you highlight for me between 7:00 and 8:00

6 in the morning?

7     Mr. Sturgis, when you created the exercise on

8 April 19th, did you go back if you couldn't recall at

9 the time and try to figure out at all what the weather

10 had been exactly at the time when you were trying to

11 make this consistency comparison?

12     A.   No, sir.

13     Q.   Okay.  So from at least -- well, we can see from

14 6:53 here to 8:53, so that was the timeframe -- would

15 you agree with me that was -- probably encompasses the

16 timeframe when the murders took place?

17     A.   From 7:53 to 8:53?

18     Q.   From 6:53 to 8:53.

19     A.   Yes, sir.

20     Q.   Certainly that encompasses the time when this

21 video that you were trying to see -- check consistency

22 for, that video was just after 7:00 on April 12th, the

23 evidence was collected just after 7:00, right?

24     A.   Yes, sir.

25     Q.   And at the time, the temperature was in the 30s?

1    A.   According to the sheet, yes, sir.

2    Q.   And passing clouds, no precipitation.  Either

3  passing clouds or partly sunny and no precipitation,

4  right?

5    A.   According to your sheet, sir, yes.

6    Q.   You don't have any reason to remember the weather

7  differently on April 12th, do you?

8    A.   No, sir.

9    Q.   Show me then Exhibit O.

10       Now, you had the Wells' vehicle, law enforcement

11  had the Wells' vehicle seized very shortly after

12  April 12th or maybe even on April 12th, I can't recall,

13  but had it for a number of days in law enforcement

14  possession to utilize it for whatever testing or search

15  or whatever purposes you wanted, correct?

16    A.   I believe so, yes.

17    Q.   All right.  So first of all, on Exhibit O here,

18  this is the weather on the 19th.  Will you go to that

19  second page for me.  Do you see that it is either fully

20  cloudy or rainy from early morning hours, 3:00 a.m. all

21  the way throughout the day?  You see that?

22    A.   Yes, sir.

23    Q.   And indeed, in the pictures that we looked at --

24  so you did your exercise at -- between 2:00 and 3:00 in

25  the afternoon.  You see that it was around 10 to

1  12 degrees warmer at that time?

2      A.  Yes, sir.

3      Q.  And do you know what effect the temperature has

4  on the recording system as it captures colors and images

5  on the system that you used to create your video?

6      A.  I have no idea.

7      Q.  Okay.  You see that during that time that you

8  recorded your video, the report is from both prior to

9  the beginning, 2:53, we looked at a video that starts at

10 3:18 and stops at 3:30, all the way through 3:53,

11 throughout that hour, there was a low cloud ceiling, so

12 it was not sunny at all.  Do you see that?

13     A.  Yes, sir.

14     Q.  If we put up Exhibit XX.

15         That's a photo we admitted of a screen shot from

16 your April 19th video just -- if we look at that parking

17 lot, the biggest parking lot, we can see the puddles,

18 you can see the water, remnants of the rain that day in

19 actually both of the parking lots, can't you?

20     A.  Yes, you can see puddles.

21     Q.  Do you know what effect the low clouds had

22 compared to partly sunny on the image capture or the

23 color capture on the video system that you used?

24     A.  I do not.

25     Q.  Do you know what effect the difference between

1   recording things or capturing images of things that are

2   dry, completely dry, as compared to things that are wet,

3   what effect that has on either the capture of the image

4   or the color of the images?

5       A.  No, sir.

6       Q.  While we've got this -- well, I'd like to back up

7   to -- let's back up to N.  I'm sorry, not N.

8           April 12th screen shot, if you will, for me.  Q.

9   Just regular Q.

10          I want to show you a photo that's Exhibit Q.

11  This is actually a blown-up screen shot, and you see

12  what's depicted here, correct?  You see the building

13  that's in this photo is the rigger shop?

14      A.  Yes, sir.

15      Q.  And the vehicles in the foreground of the photo,

16  those are the ones that were in that parking lot we

17  discussed between the camera and Anton Larsen Bay Road?

18      A.  Yes, sir, there's vehicles there.

19      Q.  All right.  And you see where it says, "Heavy

20  snow cover present" and the four lines.  There's snow

21  out beyond the trees, pretty much continuously that you

22  can see through the snow, and along Anton Larsen Bay

23  Road, the lines that are going down depict snow along

24  the roadway as it was captured on April 12th?

25      A.  Yes, sir.

1    Q.  Then if you'll put R, photograph R.

2         So a similar view, but this is from April 19th

3    when you conducted your experiment.  Those same four

4    areas are generally highlighted or pointed out in this

5    photo.  You agree that all of that snow, it appears,

6    along the tree line beyond where the roadway is, all or

7    virtually all of that snow is gone as is the snow along,

8    right along Anton Larsen Bay Road?

9    A.  Yes, sir.

10   Q.  That was melting that took place because of the

11   spring temperatures between April 12th and April 19th,

12   you would assume?

13   A.  Yes, sir, the change in temperature.

14   Q.  Okay.  And so what effect does the difference in

15   white or white snow background behind Anton Larsen Bay

16   compared to brown vegetation and no snow background have

17   on the system that you used as far as capturing images

18   or picking up color in its process?

19   A.  I'm unsure what you're -- do I know what the

20   system does with different colors in the background, is

21   that what you're asking?

22   Q.  Right.  Do you know what effect is caused by

23   either if I'm looking at an image and the background is

24   white snow as compared to I'm looking at something and

25   the background is brown grass, does the -- what effect

1    does that have on what -- either the image or the colors

2    the system captures?

3        A.  Well, it's a different view.  I mean, it's a

4    different visual representation, just as indicated in

5    the pictures.

6        Q.  Do you know from a technical standpoint how the

7    video system processes that difference, in other

8    words --

9        A.  I do not.

10       Q.  -- what -- how does that change the color, do you

11   know, other than being different?

12       A.  Technically, no, sir, I have no idea.

13       Q.  Could you pull up Exhibit T for me.

14           This is a screen shot from the April 12th

15   evidence video.  You agree with me that's generally the

16   same camera view that we see, correct?

17       A.  I believe so, yes, sir.

18       Q.  First of all, in the very foreground, we see a

19   fence, correct?

20       A.  Yes, sir.

21       Q.  And do you see that on that chain link fence,

22   each of the vertical posts about midway up is separated

23   with a horizontal post, so it makes an H?  You see that?

24       A.  Yes, sir.

25       Q.  The fence takes a turn here in the foreground.

It's running from the top left corner to the bottom
right corner, and then right before it runs out, it goes
back to the left in the foreground.  Do you see that?

A.  Yes, sir.

Q.  Up about midway up the picture on the right-hand
edge, you see a fire hydrant there in the snow and you
see four protective bollards around it that are labeled
fire hydrant bollards?

A.  Yes, sir.

Q.  And then in the very top left-hand corner of the
photo, you see a stand of green trees that says, "Stand
of trees."  You see those?

A.  Yes, sir.

Q.  You'd agree with me that as you observed the
video on April 12th, for purposes of making a
comparison, eyeballing your camera settings, all of
those things would have been captured in the April 12th
video, right?

A.  With the attempt, yes, sir.  The attempt was to
eyeball as close as possible.  Of course, I didn't get
exact.

Q.  Well, let's see about that.  Let's bring up U.

So in the foreground where the fence we talked
about, you can now see that as the fence takes a turn,
you can see the whole H brace.  Before you could only

1   see half of that H and those -- do you know those are

2   ten-foot sections?  Do you know that?

3       A.  I do not, sir.  No.

4       Q.  If I told you that was my belief, would you have

5   any reason to disagree with me?

6       A.  Other than I don't have it as factual evidence, I

7   don't agree or disagree.  I just don't know.

8       Q.  Well, whatever the length of that cross post, in

9   the previous picture, we could see half or less of it

10  and now we can see the whole thing.  So it could be as

11  much as zoomed back to allow at least five more feet or

12  several more feet of foreground view.  You see that?

13  The fence is different?

14      A.  Yes, the fence is different.

15      Q.  If we go up the side of the right-hand side to

16  where the fire hydrant was, first of all, in a prior

17  picture from April 12th, we could see the fire hydrant

18  and we could see all four of the bollards that are out

19  next to it there.  There are several feet in each of the

20  four directions around it.  You see now we can only see

21  two of the bollards and the fire hydrant, not the other

22  bollards?

23      A.  Yes, sir.

24      Q.  And of course we can't see anything beyond the

25  other bollards that we could see in the prior photo?

1     A.   Yes, sir.

2     Q.   So again, left to right, we're -- at least at

3  that view, at that position, we're several feet

4  different left to right in camera angle, correct?

5     A.   Yes, sir.  As previously stated, I got it as

6  close as I could visually get it.

7     Q.   I understand.  The fire hydrant and the bollards,

8  you'd agree with me, are half the distance to Anton

9  Larsen Bay Road or less probably from the camera?

10    A.   State that again.  I'm sorry.

11    Q.   Sure.  The distance from the camera to where that

12 fire hydrant is up on the flat surface where the T-1

13 building is, the distance from there to the fire hydrant

14 is about half the distance or less than half the

15 distance to all the way down on the -- in front of the

16 rigger shop to Anton Larsen Bay Road?

17    A.   I'm not exactly sure of that.

18    Q.   You have to drive down the hill, flatten out to

19 the rigger shop, beyond the rigger shop several hundred

20 feet to get to Anton Larsen Bay Road just from the gate

21 that's depicted here, right?

22    A.   Yes, sir.  It's a downhill slope there.

23    Q.   And somewhat of a distance?

24    A.   Yes, sir.

25    Q.   All right.  In addition, near the fire hydrant

1  before when we looked at the other picture, that entire

2  lawn there with the fire hydrant, it was all surrounded

3  by snow and this is another place where we lost our snow

4  cover from April 12th to April 19th?

5      A.  Yes, sir.  You indicated it was ten degrees

6  warmer.

7      Q.  Okay.  And then now up in the left-hand corner,

8  we see that same stand of trees and where those trees

9  were fully visible in the previous picture on

10  April 12th, we could see the full height of the trees

11  and actually land beyond those, we can now not see the

12  whole trees, correct, the whole stand of trees?

13      A.  That's correct.

14      Q.  So from a focal distance from afar, from a left

15  to right, and from a foreground, all directions, you'd

16  agree with me, your eyeballing was off?

17      A.  As I stated before, yes, sir.

18      Q.  Do we have a -- can you put up Exhibit WW?

19          I don't think that's W, is it?  Can you -- we see

20  from the top corner this is a screen shot from

21  April 12th.  Pull up the next one.  Leave that one there

22  if you can and pull up XX, the next one.

23          Slide that one to the right so we can see the

24  vehicle in question.  That's all right.  I'll do it with

25  paper.

1          So the Court has paper copies of our --

2              THE COURT:  Uh-huh.

3    BY MR. COLBATH:

4      Q.  This is going to work best for me.

5          Mr. Sturgis, I'm going to show you WW which we're

6    looking at here.  It's a screen shot from April 12th.

7    And I'm going to show you Exhibit XX, which is the same

8    general location, screen shot from the video that you

9    observed.

10          And then I'm also going to show you -- and first

11   I want to ask you, I understand that this hearing

12   involves and we're talking about the video that you were

13   involved and the process you were involved in on

14   April 19th, but actually, you and some of the other

15   agents went back out the following morning, April 20th,

16   and made another, I guess, similar video, didn't you?

17     A.  Yes, sir.

18     Q.  That was around between 9:00 and 10:00 in the

19   morning.  Do you recall that?

20     A.  Yes, sir.

21     Q.  Different weather conditions.  It was nicer that

22   day?

23     A.  Yes, sir.

24     Q.  All right.  So I would also want to show him then

25   Z -- or excuse me, YY.  So WW, XX, YY, those three

1  exhibits.

2       Because I can't bring them all up on your screen

3  at once, I want to see if you agree with me on

4  something.  So what I'm going to ask you to do is we're

5  going to take those three exhibits and we're going to

6  look at -- we're going to focus on the rigger shop and

7  that parking lot and the vehicle in question, that area.

8  Okay.

9       Generally that area and the grass in front of it,

10 just so you can see.  All right?

11      (Mr. Colbath approaches with exhibits)

12 BY MR. COLBATH:

13   Q.  Can you start with the first one.  Start with WW.

14      I just want you to look at that picture.  This is

15 April 12th.  This is the evidence video.  And just note

16 the brown grass, the rigger shop, the unidentified

17 object out on Anton Larsen Bay Road beyond that.  You

18 see those generally.  This would have been something

19 that you perhaps looked at in trying to set up what you

20 were going to do on April 19th, right?

21   A.  Yes, sir.

22   Q.  Then you look at the next one, if you look at the

23 next one, which is XX here, if you look at -- now, this

24 is April 19th.  In the similar view, do you see that the

25 grass in this photograph, as you compare those, the

```
 1    grass in the foreground, much lighter, much brighter,
 2    much different in color than the grass from April 12th.
 3    Do you agree with me on that, different in color?
 4        A.   There are differences.
 5        Q.   Similar, the rigger shop building itself, the
 6    main part of the building, a little bit different?
 7        A.   Yes, sir.
 8        Q.   And in fact, the object out on the roadway, this
 9    we know is the Wells' vehicle, there's a difference in
10    color there, it appears?
11        A.   Yes, sir.
12        Q.   Then if you look at the next one -- well, hold
13    on.  Oh, there we go.  No, the other way.  I'm sorry,
14    the other way.  Leave XX and leave YY.  Can you do that?
15             Okay.  That's good.
16             So these are the two videos that you were
17    involved in creating just one day -- less than 24 hours
18    apart, correct?
19        A.   Yes, sir.
20        Q.   Again, let's look at the grass in the foreground.
21    Much brighter or I guess reflective on the left-hand
22    side of the screen than the right hand.  Do you agree
23    with that?
24        A.   Yes, sir.
25        Q.   There's -- immediately above that there's what
```

looks like a blue car in that parking lot, and it's the
same blue car from the day before, or it appears to be
the same blue car, the license plate looks the same, the
hood emblem looks the same.  It's parked almost in the
same location.  You see that car?

    A.  I do.

    Q.  The color is very much different between those
two, correct?

    A.  Very much different?  I mean, there's some
differences.  I wouldn't say they're very much
different.

    Q.  The one on the left is darker than the one on the
right.  You can tell that with your naked eye?

    A.  Yes.  Yes, sir.

    Q.  All right.  Let's go in the same circle, if we
just adjust the circle and we look out at the Wells'
vehicle.  Now, you know and I know looking at these two
images that that is in fact the same vehicle owned by
Mr. Wells with probably the same agent driving it on
those two days in generally the same location, right?

    A.  Yes, sir.

    Q.  And on the left, it is very, very dark compared
to on the right, not very dark.  Would you agree with
that?  There's certainly a material difference in color?

    A.  There are differences, yes, sir.

1    Q.  And you don't know whether those differences --

2    first of all, this is the same camera?

3    A.  Yes, sir.

4    Q.  Same road?

5    A.  Yes, sir.

6    Q.  Same people involved?

7    A.  Yes, sir.

8    Q.  And so something just -- the camera has been

9    moved though.  We can tell that, right?

10   A.  Yes, sir.

11   Q.  And the reason -- one of the reasons I can tell

12   is on the left, now I can see the fire hydrant and all

13   the four bollards.  That's the one on April 20th.  So

14   you've panned back out from the day before, because

15   there I can't see all of the fire hydrant.  The roadway

16   on Anton Larsen Bay, I can see less of Anton Larsen Bay

17   Road on April 20th.

18        But you don't know whether it was moving the

19   camera, whether it was changing the weather, whether it

20   was the foreground or the background that caused just

21   the appearance of the same car to be two different

22   colors less than 24 hours apart, do you?

23   A.  No, sir.

24   Q.  But you would agree with me they appear to be

25   different?

1    A.  Color?

2    Q.  Correct.

3    A.  Yes, sir.

4    Q.  We know they're not different.  It's the same

5  car.  Nobody's painted the car overnight, right?

6    A.  No.

7    Q.  When you discussed with Agent Allison or the

8  others setting up this experiment, did anybody tell you

9  that one of the purposes for preserving this or creating

10  this was to use for scientific analysis?

11    A.  At the time, no, sir.  Nobody said, "Yeah, we're

12  going to do this for scientific analysis."

13    Q.  If I understood your testimony, and we talked

14  about it, it was speed determination and was it

15  consistent with what you saw on April 12th?

16    A.  Correct.

17    Q.  I'm still not sure that I understand.  When you

18  were setting up the camera and you said you were inside

19  the T-1 building, that's where the camera controls and

20  the unit that captures the images, that's where that's

21  located, right?

22    A.  That is correct, sir.

23    Q.  And so when you were inside the building and

24  sitting there, obviously, you can't see the roadway with

25  your naked eye, you're not out by the camera looking at

1    anything, you're just looking at the monitors?

2        A.   That is correct, yes, sir.

3        Q.   So on that day looking at the monitor of the T-1

4    camera, I'm not clear on what you were looking at, if

5    anything, to eyeball it.

6        A.   I don't recall exactly clearly at this point.

7    It's been seven years ago, but --

8        Q.   Right.  I mean, did you -- do you think you had a

9    laptop there or some type of other computer that was

10   playing or showing you the April 12th video?  Did you

11   have still shots, like eight-by-ten photographs like

12   we've been looking at from April 12th, or would you have

13   looked at those first and then went down and sat and

14   just did it from memory?

15       A.   I don't recall.  Yeah.

16       Q.   Okay.  As far as you know, you didn't do -- after

17   the creation of April 19th, neither you nor anybody else

18   did the speed determination part of your purpose, right?

19       A.   I'm not sure what you're --

20       Q.   Well, one of the two reasons you created the

21   April 19th video was to try to see if you can figure out

22   the speed.  Nobody tried to run any technical or

23   computational analysis to see if speeds matched?

24       A.   I did not, no, sir.

25       Q.   Do you know if anybody did?

1      A.   I don't.

2      Q.   All right.  Nobody tried to break those frames

3 down and say, oh, look, on April 12th, this one went

4 four frames going left to right and four frames going

5 right to left and one of our passes is that many frames,

6 so there we are?

7      A.   I did not do that, no, sir.

8      Q.   And you're not aware of anybody that did that?

9      A.   I'm not aware of it.

10      Q.   And you're -- the speed control was just the

11 agent in the car looking at the speedometer and trying

12 to hold it steady?

13      A.   Yes, sir.

14      Q.   It's not a digital speedometer, it's an

15 old-school speedometer.

16      A.   I don't recall.

17      Q.   2001 Honda, you don't know?

18      A.   I just don't know.

19      Q.   The other purpose, I wanted to see if it was

20 consistent, when you say that, I presume -- and you

21 correct me if I'm wrong because I don't want to put

22 words in your mouth -- but you wanted to see if the

23 vehicle you had on April 19th, the Wells' vehicle, was

24 consistent to your eye in what you were seeing on the

25 April 12th evidence video?

1    A.   Correct.

2    Q.   And you said it would make a difference if it was

3  not consistent?

4    A.   Yes, sir, it would.

5    Q.   What did you do as far as any other consistency

6  determination or hypotheses as far as determining

7  whether it was consistent with any other make of

8  vehicle?

9    A.   What did I do personally?

10   Q.   Right.

11   A.   On that day?

12   Q.   Right.

13   A.   I didn't make any other determinations.

14   Q.   So you didn't use a Toyota RAV4 vehicle, to drive

15  a blue one of those down Anton Larsen Bay Road and say,

16  oh, that also looks the same?

17   A.   No, sir, I do not.

18   Q.   Or an Isuzu Rodeo?

19   A.   No, sir, I did not.

20   Q.   Or Ford Escape or any small blue SUV or even a

21  small blue car to see if the images generally looked

22  consistent?

23   A.   No, sir, I did not.

24   Q.   Had you known that driving a blue Ford Escape or

25  driving a blue Honda Civic or driving a blue Dodge

 1   Caravan also looked the same, generally consistent,

 2   would that have impacted your investigation?

 3       A.  Yes, sir, I'm sure it would have.

 4       Q.  How?

 5       A.  Because it would be consistent.

 6       Q.  So if it was consistent, if those other vehicles

 7   were consistent, would it cause you to go and

 8   potentially investigate links to any other vehicles

 9   other than the one singular one you chose?

10       A.  Yes, we -- yes, that's correct.

11       Q.  But that wasn't part of the equation here?

12       A.  Not on April 19th.  We utilized the vehicle that

13   we had.

14       Q.  Well, you didn't try to find or obtain or utilize

15   any other vehicles?

16       A.  I'm unaware of that.  I know that we had this

17   vehicle for this purpose at this time.

18       Q.  And during no part of the setup process or

19   discussion process did you hear it discussed or

20   understand that anybody looked to use or compare any

21   other vehicles?

22       A.  On the 19th, I did not.  I just -- we came up

23   with a plan to do the passes on the video, and that's

24   what we did based on direction.

25       Q.  All right.

```
 1              MR. COLBATH:  If I can have just a minute here.
 2              (Pause)
 3              MR. COLBATH:  Your Honor, I'd like to offer the
 4    photos that I showed, which were XX, YY, WW.
 5              THE COURT:  All right.  Any objection?
 6              MS. SHERMAN:  No, Your Honor.
 7              THE COURT:  Those will be admitted.
 8              (Exhibit Nos. WW, XX, and YY admitted)
 9              MR. COLBATH:  I think at this moment that's all
10    the questions I have.
11              THE COURT:  Go ahead, please, Ms. Sherman.
12                         REDIRECT EXAMINATION
13    BY MS. SHERMAN:
14       Q.  On April 19, 2012, were you trying to do a full
15    reconstruction video?
16       A.  No, ma'am.
17       Q.  You were asked questions about moving vehicles.
18    If you -- if people were going to be ordered to move
19    their vehicles out of that area, would that have been
20    something where Coast Guard command would be involved?
21       A.  Yes, ma'am.
22       Q.  Do you recall Coast Guard command getting --
23    would you have remembered if you had command get
24    involved and had people move vehicles?
25       A.  Yes, ma'am, I think I would have.
```

1    Q.  And do you recall doing that?

2    A.  I do not recall that.

3    Q.  We talked about weather in Kodiak.  Did you ever

4  look at proposed weather reports and base how your day

5  was going to go based on that in Kodiak?

6    A.  No, ma'am.  The weather was very unpredictable.

7    Q.  At some point talking about the technical data,

8  metadata, as it was referred to on the camera, at the

9  time or even now, were you aware for certain there was

10  data that would allow you to move that camera to the

11  exact position as it was on the 12th?

12    A.  No, ma'am.

13    Q.  You did the video on the 19th.  Were you going to

14  be involved in any analysis or what the Government may

15  do with this video in the future?

16    A.  No, ma'am.

17    Q.  Were you trying to do reverse projection

18  photogrammetry analysis when you were doing this?

19    A.  No, ma'am.

20    Q.  What was the goal of the video again?

21    A.  To see if the vehicle was consistent.

22    Q.  Were you trying to do frame counts, or was that

23  going to happen later by someone else?

24    A.  I was not trying to do frame counts or anything.

25  My general purpose was to go there, get the camera as

close as possible to see if the vehicle was consistent
and try to make a determination on the speed, if
possible.

Q.  So when you were doing that, you mentioned the
camera, what other things were important factors for you
for this demonstration?

A.  The important factors to me was, number one, was
the vehicle consistent with the original video.  And
number two, trying to determine the speed, if possible,
based on the secondary video to see if it was a close
match with the first.

Q.  So at that point, you're focused on the road and
the vehicle?

A.  Yes, ma'am.  Nothing really else at that point.

Q.  You weren't focused on the fire hydrant or the
stand of trees or those things when you were trying to
line up the camera?

A.  No, ma'am, not in particular.  I was trying to
get the visible view of the original video at Anton
Larsen.  It was generally the same view as what I was
trying to do.

Q.  On April 19th when you ran Mr. Wells' vehicle
back and forth across, did you have any other suspect
vehicles in your custody?

A.  No, ma'am, we did not.

 1    Q.   What was -- you had Mr. Wells' vehicle in

 2  custody.  Why was that a possible suspect vehicle?

 3    A.   The location the vehicle was in at the time.  The

 4  vehicle was parked at the airport.  That's where we

 5  observed it originally.  Based upon interviews, we knew

 6  that Mr. Wells was in that area and the vehicle was

 7  there.  So access and availability, that's the general

 8  reason.

 9    Q.   At that point that's why?

10    A.   Yes, ma'am, at that point.

11         MS. SHERMAN:  Those are all the questions I

12  have.

13         THE COURT:  Any recross at all?

14         MR. COLBATH:  Just very brief, Your Honor.

15                   RECROSS EXAMINATION

16  BY MR. COLBATH:

17    Q.   Mr. Sturgis, after completion of the April 19th

18  video, did you go back and review it before you sort of

19  concluded the exercise and re-review April 12th to sort

20  of see if you were consistent or to make your

21  determination?

22    A.   On the 19th?

23    Q.   Yeah.

24    A.   Did I go back and review?

25    Q.   Uh-huh.

1      A.  I reviewed all the three.  On the 19th, of
2   course, yes, I was there.  I was viewing the actual, and
3   it seemed very consistent with the original.

4      Q.  Okay.  And then nevertheless, you went out the
5   next day, did another one, same thing?

6      A.  Yes, sir.

7      Q.  And --

8      A.  Actually more so on the second.

9      Q.  I'm sorry?

10     A.  I'm sorry.  Actually more so on the second video
11  that we did.  Just a comparison.

12     Q.  When you say the second video, to your eye, it
13  was more -- the one on the 20th was actually more
14  consistent with the April 12th one?

15     A.  Well, the size was the same.  I mean, obviously,
16  it was the same vehicle from the 19th to the 20th.  The
17  sunlight of course changes the color slightly, but the
18  vehicle itself was consistent, yes, sir.

19     Q.  Okay.  And as far as speed goes, you were just
20  making a visual determination of speed.  That one looks
21  about the same as that one compared to this one is much
22  slower or --

23     A.  I was, yes, sir.

24     Q.  So that's the only thing you did to determine
25  speed was just a visual, again eyeballing it?

1     A.   Yes, sir.  That's exactly right.

2     Q.   All right.  What was done besides -- what

3     considerations went into other suspect vehicles other

4     than the Wells' vehicle, do you know?

5     A.   What do you mean?

6     Q.   Well, was there any other investigation or

7     anything else discussed between the team or part of the

8     investigation that you were aware of that at that point

9     would have caused you to think it appropriate to run any

10    other vehicle by that same spot on the road other than

11    the Wells' vehicle?

12    A.   On the 19th?

13    Q.   Yeah.

14    A.   I'm unaware.

15    Q.   All right.

16         MR. COLBATH:  That's all I have right now for

17    you, sir.

18         THE COURT:  All right.  Thank you, sir.  You

19    may be excused.

20         (Witness excused)

21         THE COURT:  No more witnesses for the

22    Government at this time.  Do you want to call your first

23    witness?

24         MR. COLBATH:  I can, Your Honor.

25         THE COURT:  Go right ahead.

```
 1          MR. COLBATH:  We would call Jim Hoerricks.
 2          THE COURT:  Good morning.  If you could come
   all the way forward, please.
 3
 4          (Pause)
 5          (Oath administered to the witness)
 6          DEPUTY CLERK:  For the record, can you please
 7   state your full name and then spell your full name.
 8          THE WITNESS:  I'm Kenneth James Hoerricks,
 9   K-e-n-n-e-t-h, J-a-m-e-s, H-o-e-r-r-i-c-k-s.  I prefer
10   Jim.
11          JIM HOERRICKS, DEFENSE WITNESS, SWORN
12                  DIRECT EXAMINATION
13   BY MR. COLBATH:
14      Q.  Mr. Hoerricks, would you tell us where you
15   generally reside and work?
16      A.  I am a resident of Las Vegas, Nevada.  My office
17   is in Henderson, Nevada.
18      Q.  What do you do for a living, sir?
19      A.  A little bit varied practice.  Apex Partners
20   Limited is my company.  It is a limited partnership.  We
21   do forensic science consulting, education, curriculum
22   development at the state, local, and federal level.
23      Q.  I have up on the -- I have up on the screen here
24   your CV.  That is Exhibit W.  Is that a document you
25   provided to my office with respect to your
```

1   qualifications?

2       A.   Yes, I believe that was provided in March.

3           MR. COLBATH:  All right.  And Your Honor, I

4   would move for admission of W.

5           MR. SKROCKI:  No objection.

6           THE COURT:  W is admitted.

7           (Exhibit No. W admitted)

8   BY MR. COLBATH:

9       Q.   And can you summarize, and particularly I guess

10  relevant to the work you've done in this case summarize

11  your education, experience, work history?

12      A.   Certainly.  I began in police service with Los

13  Angeles Police Department in 2001 as a surveillance

14  specialist, electronic surveillance and

15  counter-surveillance, specifically the use of

16  exploitation of CCTV recording systems, both in

17  miniature and in large facility stuff.

18          After 9/11, there was a specific need issued by

19  the chief of detectives at the LAPD to begin retrieving

20  this video type of evidence and making sense of it.  But

21  at the time, there wasn't a robust training offering.

22  There wasn't robust standards around this discipline.

23  And so the generation that I occupied in early 2000s

24  kind of led the way in the creation of those standards.

25          Received my first little bit of training early

1    2000s.  And what I found was that there wasn't kind of

2    fit-for-purpose training and -- in a law enforcement

3    criminal justice context.  There was a lot of industry

4    training.  The manufacturers of the different systems

5    would tell you what buttons to push and so on.  But

6    there wasn't adequate instruction on how to make sense

7    of it from an analytical point of view.

8            So along the way, involved with various

9    organizations, the very first put together the best

10   practices for the retrieval of digital CCTV evidence in

11   2008 under the auspices of the Department of Defense

12   funded by the U.S. Government.

13           So that's collectively known as the Red Foot

14   Book, as opposed to what the Secret Service put out for

15   the seizure of electronic evidence, which is known as

16   the Green Foot Book.  The difference being if I walked

17   into T-1 and walked out with a CD or a thumb drive, I've

18   retrieved evidence.  If I walk in and take the hard

19   drive, I've seized evidence.  That's the distinction

20   there.

21           And then we operationalized, the group of us that

22   created that document, we operationalized it into a

23   training course that was held at the federal law

24   enforcement training center in Glynco, Georgia, to this

25   day called recover class.

From that course, it was operationalized to teach the FBI field offices how to recover video. And I was not involved in the offering of that, but advising its creation. A contractor offered that in the late 2000s.

From that point, I was invited to participate in the facial imaging scientific working group. I attended its first meeting organized by Dr. Vorder Bruegge from the FBI's FAVIAU, led by myself.

And my agency declined to further participate because it was more concerned with machines than it was with human identification and the manual of facial features and so on, which is what we did in police service. We didn't really employ any kind of automatic facial recognition, so it wasn't a good use of our very busy time.

And then with the National Academy of Sciences report in 2009 about the state of forensic science in the United States, President Obama initiated a process that created the Organization of Scientific Area Committees for Forensic Science housed in the Department of Commerce at NIST to try to bring police service to a state of science.

I was a founding member of the video imaging technology and analysis subcommittee and currently serve as the video task group chair. We just met last week in

1  Orlando.

2      Q.   From a work standpoint, when did you leave police

3  service and found your own company or work day to day in

4  a private sector?

5      A.   Certainly.  I retired from police service in 2016

6  in the spring.  I was enticed into retirement by the

7  company who made the software that I used primarily and

8  I used in this case to support their contract with

9  Taser, to kind of translate between cop and science.  I

10  served with them for about three years.

11      When they this spring abruptly left the U.S.

12  market -- they're an Italian company -- their contract

13  with Taser ended last year.  And so with that is the

14  founding of Apex Partners.

15      Some of the stuff that we were doing under the

16  Taser Axon now branding, it wouldn't have been

17  appropriate for a software manufacturer to do, for

18  example, casework and so on.  There's a little bit of

19  conflict there.

20      So in the divorce, if you will, the kind of

21  separating of the business identities, we founded Apex

22  just about a year ago and started doing casework and

23  consulting and so on under that brand.  Since we were no

24  longer -- my partner and I, we were no longer in an

25  association with the software manufacturer, Amped SRL,

1  in Italy.

2      Q.  And the Taser involvement, the software

3  manufacturer would -- many of the taser guns or taser

4  instruments that police use have a video recording

5  component to them?

6      A.  Absolutely.

7      Q.  And your work, as I understand it, was with the

8  software that allowed the taser unit to capture video

9  and then obviously later be retrieved, be utilized for I

10 guess police purposes, case -- either investigation or

11 ultimately courtroom purposes?

12     A.  Yes.  With the maturation of that company going

13 from Taser to Axon, with Taser as a division, and Axon

14 handling all of the video, including their body cameras

15 initiatives and their evidence management, the

16 evidence.com, the value proposition for Amped was

17 explained to me that they, in terms of the market, had

18 the only tool available to take CCTV-type evidence in

19 non-standard formats and get it ready for display and

20 storage in evidence.com.

21          So that's what necessitated this exclusive

22 partnership between the two companies.  That lasted

23 three years.  And I supported Axon's customers through

24 training and technical support and kind of translation

25 between standards and cop language.

Q.  Axon's customers were law enforcement, primarily law enforcement, body cameras, tasers.  I suppose the security companies, you had other folks, but the vast majority of that had to be law enforcement related?

A.  Absolutely.

Q.  And so wasn't until your tie through that contract to law enforcement just within the last year or so ended that the sort of inherent conflict you talked about went away such that you could start advising, just doing general consulting?

A.  Yes.

Q.  And you referred a couple of times to CCTV.  I just want to make sure as we go that we're all talking the same language.  That is what?

A.  Closed-circuit television.

Q.  And when we talk about a body camera on an officer recording something, the camera above the bank teller, the camera on the pole outside of T-1, are all of those CCTV?

A.  In a general sense, yes.

Q.  How are they different, and how are they the same?

A.  In an infrastructure protection CCTV system, you have control.  You have monitors.  So you would have the ability as the operator to watch the live feed coming

from the camera system unaffected by compression, which
happens when you store.

The other side of that, the body camera part of
the question, you don't necessarily have a live feed.
There are some manufacturers that have a forward-facing
LCD screen as you are being recorded. But it is not a
feature of the predominant portion of the market. But
it is a closed circuit.

Q. Prior to your work in this case, I think you
mentioned Mr. Vorder Bruegge, who is one of the
Government witnesses. Were you familiar with the
Government law enforcement witnesses who have been
involved in the forensic video analysis here prior to
your work here?

A. Yes.

Q. That would be Mr. Iber, Mr. Richards,
Mr. Vorder Bruegge?

A. Yes. Chris Iber and I sit on the video image
technology and analysis subcommittee. The level above
that is the digital and multimedia subject area
committee, and Richard Vorder Bruegge sits here.

Q. As do you?

A. I do not. No. I'm on the same level as Chris
Iber. And if you want to think of levels,
Dr. Vorder Bruegge is above us.

1    Q.  All right.  And how about with the private sector

2    Government witnesses who did work in this case,

3    Mr. Toglia, Mr. Becker, those folks, Mr. Mestha maybe.

4    Any work relationship or work with them in the past

5    prior to this case?

6    A.  No.

7    Q.  Can you describe generally what the -- what a

8    vehicle either class or make or model determination is?

9    A.  If you begin with unknown object, all right,

10   object is blue.  How does one move from object is blue

11   to object is car to object is type of car to object is

12   model of car to object is year trim level and so on?

13        You do that through an experimentation, through a

14   determination.  And so you require a certain amount of

15   resolution in order to perform it.  The difference

16   between a full-size SUV and a small-sized sedan is not

17   only one of distance and height, but it's also features,

18   the length of the nose of the vehicle, if there is a

19   nose present.  The difference between a Dodge van and a

20   Mercedes van.  One might be more angular and so on.

21        So within the standards for vehicle make/model

22   determination, within the standards for photographic

23   comparison, we talk about class, subclass,

24   individualizing characteristics, and it's just a flow of

25   information.  Can I get from a loose clump of blue

1   pixels to that loose clump of blue pixels is car.  What

2   is the resolution, the nominal resolution?  The

3   resolution at the point of the target necessary to

4   perform that.

5       That's how the generalized work flow would go.

6   Q.  What is photographic comparison?

7   A.  It is taking an exemplar, a known ground truth,

8   whatever you'd like to call it.  The literature refers

9   to different things in relation to ground truth.  Things

10  that we know.  And attempting to link it to a past

11  event, a photograph of a past event.

12      So you have a shirt in a property room and you

13  want to see if it's the shirt that's in the surveillance

14  video.  You perform a photographic comparison.  So

15  irrespective of object, you're trying to find

16  similarities, patterns and go from there to uniquely

17  identifying things, tattoos on individuals, scars and so

18  on that make that uniqueness present in the video.

19  Q.  Are the processes, the methodologies different

20  between an object determination, a photographic

21  determination compared to a photographic comparison?

22  A.  I think one is kind of a subset of the other.

23  You are doing a comparison and a determination because

24  in order to have a comparison, you need a data set to

25  compare to, to draw from.

1        And so once you get to a vehicle, the presence of

2   A and B pillars and wheel positions and rims and so on,

3   you can note shapes and colors and elements of trim, but

4   in order to get to make and model, you have to have some

5   sort of reference.

6       Q.  All right.  I would -- this hearing is about the

7   appropriateness or the -- our objection to the use of

8   the April 19th video, but I'd like to start with the

9   April 12th evidence video to show the comparison.  So I

10  want to ask you some questions about that first.

11       Were you asked by my office to do that -- a

12  photographic determination or a make/model, class

13  make/model determination of the 4-12 video?

14      A.  Yes.

15      Q.  And did you reduce your process and findings to a

16  report?

17      A.  Yes.

18      Q.  I will ask that we refer to Exhibit X, please.

19           MR. COLBATH:  Your Honor, for the record this

20  is also an attachment to Docket No. 992, which was our

21  response to the Government's motion objecting to that

22  Mr. Hoerricks's testimony and sort of the trial

23  testimony.  We attached this report.

24           THE COURT:  All right.

25           MR. SKROCKI:  This is not the summary, Counsel?

1          MR. COLBATH:  No, this is not the supplemental

2    report.  This is the first report that he prepared.

3    BY MR. COLBATH:

4      Q.  I want to walk through that if we can.  And

5    initially, as you refer to terms here, the report begins

6    with the definition of a bunch of terms so that your

7    technical terms are identified as they're discussed

8    later, correct?

9      A.  Yes.  Words mean different things to different

10   people.  And so what I've done is I've gone through the

11   kind of industry agreed-upon definitions for these

12   things.  So I'm not making anything up.  I'm just using

13   what the Scientific Working Group on Digital Evidence in

14   their glossary says these things mean.

15     Q.  And the Scientific Working Group on -- that

16   glossary where you drew those things from, let me see if

17   I can't find that.  We've got that marked as perhaps

18   Exhibit LL.

19          Is that a -- the Scientific Working Group on

20   Digital Evidence produces those I guess

21   industry-accepted or field-accepted definitions of the

22   different terms, so we're all talking apples to apples

23   sort of thing?

24     A.  Yes.

25     Q.  All right.  If we can go back to Exhibit X.

1    After providing the definitions, it says -- you list a
2    couple of what are called assumptions.
3         What are assumptions, and what are their meaning
4    to your analysis here?
5         A.   Did you want to page forward so we can --
6         Q.   Yeah.  They're at the bottom of page two --
7    bottom of page three.  Excuse me.
8         A.   I was not physically present on Kodiak Island.
9    I've never been there.  I received from your office a
10   number of items to review, and I did that review.  And
11   so I don't know the real world distance from the camera
12   position at T-1 to the roadway in question.  And so I am
13   taking that from the listed documents to --
14        Q.   Mr. Toglia has -- it's listed here that you took
15   it from page two of this Bates numbered report, which is
16   a Toglia -- that's a Government expert report?
17        A.   Yes.  And so that distance is approximately
18   1,000 feet.
19        Q.   So you list that as an assumption because it is
20   not a measurement that you took that you can be
21   confident in, but rather something you're relying on
22   data collected by others?
23        A.   Yes.
24        Q.   At the top of page four, there's a second
25   assumption.  Top of the next page it's entitled Lossy

1    Compression?

2        A.   Yes.

3        Q.   And what is that?

4        A.   So this particular system and the evidence that

5    was provided to me is -- each frame, if you will, of the

6    video is a still JPEG image.  And the process defined by

7    the Joint Picture Experts Group in compressing each

8    frame, you generally lose information.

9            A raw frame of video would have a certain size,

10   which I have -- based on the resolution, the X by Y, the

11   640 by 480, plus -- multiplied by color components,

12   multiplied by bit depth, and so on, it should give a

13   value if it's not compressed.

14           In a general sense, compression means loss.  You

15   have to throw things away.  And compression is how

16   manufacturers of systems get from uncompressed one day

17   of storage to compressed 60 days of storage, for

18   example, by throwing away redundancies and irrelevancies

19   in the programmatic standpoint, not in the investigative

20   standpoint.

21           And so what I tried to do is establish what the

22   loss factor, what the lossy factor was.  There is no

23   industry standard.  I've seen a compression ratio of up

24   to 600 to 1.  But in this case, it's around 27 to 1,

25   meaning a whole bunch of information was thrown away by

1    the system or never recorded in the first place in order

2    to preserve the overall look and feel of the scene but

3    have enough time, days or weeks or months of data

4    storage on the system.

5        Q.   This may be a good time, before we start to talk

6    about your findings, to explain I guess in layman

7    fashion for the Court what this particular system, as

8    you understand it, at T-1 is doing when it's capturing

9    and preserving data.

10           First of all, let me ask you:  If I was sitting

11   at the desk watching the screens of this system, is it

12   your understanding that there are multiple cameras?

13       A.   Yes.

14       Q.   And they're all feeding into one central location

15   where there is a -- I don't know if you would call it a

16   server or a -- some sort of preservation device that is

17   collecting information from all of the cameras?

18       A.   A recorder, yes.

19       Q.   First of all, before we discuss the recording

20   part of it, as I'm watching the cameras, I'm watching

21   what we would -- is it fair to call that a live feed?

22       A.   Yes.

23       Q.   So when I see -- when I look at my screen and I'm

24   looking at the T-1 camera and it's looking out on those

25   parking lots, how much information am I getting, how

1    clear is that to me?

2        A.    27.27 times clearer, because you're seeing live

3    feed.    You're seeing the direct signal from the camera.

4    You're not seeing the compressed recording.

5        Q.    So let's call that reality.    I'm looking at their

6    reality because really, I'm looking through the window

7    of the monitor, out the eye of the camera and seeing

8    live things as they go on?

9        A.    Yes.

10       Q.    The machine that's on the -- next to me at the

11   desk, it's taking that same feed that I'm looking at and

12   the information that allows me to see what's on the

13   monitor, it's putting that in the box and storing it,

14   correct?

15       A.    Some of it, yes.

16       Q.    And so explain that process, how that happens and

17   how things can affect that process.

18       A.    So based on what I received from your office, it

19   appeared to me that in terms of folder structure and the

20   organization of the evidence that was on the hard drive,

21   that the cameras are segregated into folders,

22   Windows-type folders.    Then within the camera view,

23   year, month, day, and then hour and minute are all

24   segregated.

25            And so within the time in question, within the

tested time, all of the storage for that time was in a
single file called archive.iva. Within there, there's a
certain amount of pictures, JPEG pictures. And so one
of my first steps in terms of triage is what is the
frame rate, what is going on in here. Right?

In terms of the signal path coming down to the
live view, we would generally think of that as 29.97
frames per second or 30 frames per second, if you would.
But inside of that container, I found a little more than
four frames per second.

This is often because the system is underpowered
to receive all 30 frames per second per camera if all of
these cameras are observing motion and these types of
things. They just don't have the technological
capability to pass all of this data down and store it.
That's not to say they're bad or good. It's just what
it is. So you get in your recording the overall look
and feel of the scene, but fine details end up getting
lost.

Q. So the live feed, it just -- camera -- T-1
camera, sends we'll call it 30 frames per second through
to me and my eyes on the monitor, and the system can do
that. I can visualize that. But those same 30 frames
you said stored in the box get smashed down, the same 30
JPEG images, pictures, still pictures get smashed down

1    to selectively about four and stored for that same
2    whatever the time increment is?
3        A.  Not entirely, no.  It's capable of grabbing
4    information one frame at a time, but it's so
5    underpowered relative to the other cameras that it's
6    trying to process, that frame rate per camera per second
7    is about four frames per camera per second.
8        Q.  All right.  And I'm putting up from our book
9    Exhibit AAA.  It's the very last exhibit in the book.
10        Scroll down to right where the photos stop.
11        A.  Keep going.
12        Q.  Keep going?
13        A.  Yeah, keep going.  One more.  There it is.
14        Q.  Hold on right there.  So first of all, what is
15    Exhibit AAA?
16        A.  I received in evidence from your office the data,
17    and I also received a program to play the data back.
18    And the program to play the data back is old.  It
19    requires a version of an operating system I no longer
20    have because time.
21        And so what I wanted to see is the validity of
22    using my modern terms -- tools with the old evidence.
23    And so I was able to recreate an environment where I
24    could use the old software to extract a single still
25    frame.  And then I took the archive file from the

1    evidence folder, and I brought it into my modern tool
2    and I extracted the same frame.

3         And I wanted to compare the two frames from
4    qualitative standpoint.  But in the process, I wanted to
5    conform that particular one minute of time to the amount
6    of frames present in the container, and the result is
7    the frame rate of 4.3667.

8         Q.   Okay.

9              MR. SKROCKI:  Your Honor, I have been trying to
10   be lenient, but I have a relevance objection.

11             THE COURT:  A relevance objection?

12             MR. SKROCKI:  Yes.  We're dealing with the
13   issue of whether these videos -- the video on April 19th
14   is substantially similar.  Now, I understand that really
15   in the record, but this level of detail may be pertinent
16   maybe to the jury, but we're talking about April 12th.

17             Now it sounds like we're getting towards maybe
18   a motion to suppress April 12th.  I'm not quite sure
19   what the relevancy of this is.  Perhaps Mr. Colbath will
20   enlighten us, but this level of extreme detail is just
21   not relevant to the issue before the Court on
22   April 19th.

23             THE COURT:  Mr. Colbath?

24             MR. COLBATH:  Sure, Your Honor.  One of the --
25   part of Agent Sturgis's testimony was one of the only

two purposes identified by the Government evidence for
collecting the video was to make a speed determination.

         And he also testified regarding how the camera
looked jerky as things went across it and that he
understood that to be it was capturing frames and
whatnot, although he doesn't know the frame rates.

         Mr. Hoerricks does know the frame rates.  He
does know also the frame rates not only of the true
evidence, April 12th, but when the Government chose to
use different speeds and then put them all on one video,
they created a whole bunch of different frame captures,
if you will.

         And the ones they used for comparison or the
ones the jury sees, if it's demonstrative of anything,
should be consistent with the evidence or, at a minimum,
the testimony.  And so I need to document I think
because it's one of -- and it's an important
dissimilarity.  One of the things the Court needs to
decide is, is April 19th similar in respect to
April 12th.

         The frame rates are not.  The materials
captured are not.  And what the Government experts later
did was taking different frame rates, which affect what
you see, they took those and compared them to
April 12th.  So they took oranges and said, see, they're

consistent with the apple that we captured.

But you can't -- you and I can't see that, or at least I couldn't see it.  I don't think Agent Sturgis saw it.  But technically, I think Mr. Hoerricks can describe to you why it's different and why it's unfair to take things from that April 19th video that were not -- that are maybe generally, oh, yep, I can eyeball that the same.  It's not the same.

THE COURT:  Well --

MR. SKROCKI:  This is -- I'm sorry, Your Honor.

THE COURT:  Go ahead.

MR. SKROCKI:  This is not what's been briefed.

THE COURT:  All right.  I'm trying to focus on the applicable case law, which to me does not get as much into this level of science.  It's substantial similarity.  And so I'm looking at these two videos, and I do see a topic on the speed.  And not to show my hand here, but I am inclined if there was evidence by either side as to cut this video down, because the Government's own expert said the first two, 5 and 10 miles per hour, not consistent.

Which ones are consistent?  And that would be of interest to me is if any of these speeds are -- if any of these experts have looked at that topic.

MR. COLBATH:  Then if I can just go a little

1    farther with this, I'll try to cut to the chase.

2            THE COURT:  Did you want to be heard on that,

3    Mr. Skrocki?

4            MR. SKROCKI:  Well, I think if the --

5            THE COURT:  But I haven't ruled that.  I

6    just -- that came to my mind when I read all of these

7    materials.

8            MR. SKROCKI:  Sure.  Let's -- Mr. Colbath asked

9    for some leeway, that's fine.  Maybe we can get to it

10   before it gets to the noon hour or some point close.  I

11   know you have a 1:30 p.m.

12           We may have to have another witness if it goes

13   far enough that the Court has some concern.  So we need

14   to examine that.  We are far afield of where we expected

15   to be in terms of --

16           THE COURT:  That's a fair observation.  Go

17   ahead, Mr. Colbath.

18   BY MR. COLBATH:

19      Q.  The April 12th video captured then frames at the

20   rate of four -- you've determined approximately 4.3667

21   per second?

22      A.  Yes.

23      Q.  And do you know how many pictures then of the

24   unidentified object go across the screen in either pass?

25      A.  Complete views, four or five.

 1      Q.  All right.  During the -- I'm going to show

 2   you -- so I'm going to -- if you'd look at Exhibit UU,

 3   can the same determination be made of the April 12th --

 4   or excuse me, the April 19th video?

 5      A.  In terms of the quantity per pass?

 6      Q.  Yeah.

 7      A.  As a sample size of one, yes.

 8      Q.  So you can look at the first pass going five

 9   miles per hour as --

10           THE COURT:  What page is this document?

11           MR. COLBATH:  This is UU.

12           THE COURT:  Thank you.  Go ahead, please.

13   BY MR. COLBATH:

14      Q.  So at the very top, at the beginning, pass one,

15   it says, estimated speed five miles per hour.  It shows

16   the times that it's shown on the April 19th video.  And

17   there, going that direction, there's 14 frames.  Then

18   the similar pass going back comes back, although it's

19   still estimated at five miles an hour, 13 frames?

20      A.  Right.

21      Q.  And so on.  For each of the single exercises, we

22   see the frames.  And you said that April 12th is

23   actually four and four, roughly?

24      A.  Roughly.

25      Q.  So that would be consistent with potentially the

1    last two passes?

2        A.   Yes.

3        Q.   Can you calculate speed from knowing -- the judge

4    asked Mr. Sturgis a question about, well, can't you

5    identify how many frames the vehicle goes across and

6    then run some calculation to simply determine the speed?

7        A.   From the evidence item, you have no ground truth.

8    You have no relationship to time as it was then because

9    you didn't measure anything then.  You only have the

10   evidence item.  And you have no idea how the actual

11   performance of the CCTV system works.

12         So it is certainly possible to design an

13   experiment to do that, and I've written about it, I've

14   taught.  You know, it's a subset of photogrammetry.

15   You're measuring something in video, measuring speed.

16         So first, what you have to determine through

17   experimentation is what is the range of values for

18   frames per camera, per second, per minute and so on.

19   And it would be a range.  It will not be a fixed number.

20         So from that range, you bring in distance, right,

21   which through an experimentation, you will get range of

22   values.  Because of the speed going on, I believe the

23   gentleman testified it was blurrier the faster they

24   went.  Well, there's a reason for that, because when a

25   camera's aperture opens and an item is in a certain

position and then it's changed position when the
aperture, when the eyeball closes and then it encodes
that picture, that's where the blur comes from.  So that
blur has to be accounted for in a distance measurement.

So it's not simple division in this case.
There's a range of values, a range of values, an error,
and you come up with an average speed.  It's a rather
expensive experiment to conduct.

Q.  Did anything about the experiment that was done
on April 19th provide anything close to enough data to
make an accurate speed calculation?

A.  No.

Q.  So you did not attempt to do that because there
was no data to do it with, insufficient data to do it
with?

A.  Well, I wouldn't have done it on the evidence,
and I wasn't asked to do it with the device, which I
believe is no longer available.  So no, I wasn't asked
to do it.

Q.  The bottom half -- same chart on the bottom half
of the device, these color-coded things involve a pass
at 10 miles an hour, a pass at 15 miles an hour and a
pass at 25 miles an hour.  You see those and their frame
rates?

A.  Yes.

```
 1      Q.  10, 8 and 5?

 2      A.  Yes.

 3      Q.  Can you go to Exhibit D if you will.

 4           MR. SKROCKI:  Another objection.

 5           THE COURT:  On relevance?

 6           MR. SKROCKI:  Yes.  And what's becoming clear

 7  to me, and I asked counsel ahead of the hearing this

 8  morning, because reading the reports of the two experts

 9  testifying for the defense today, I was asking, why are

10  you calling these individuals on this issue of the

11  April 19th admissibility.

12           And I got some sort of response, but -- and I'm

13  not taking issue with their response.  But what it seems

14  to me is going on here is that we are trying to

15  establish in today's hearing with these experts a

16  bootstrapping mechanism to challenge two other

17  Government experts that are already on line to testify.

18           Mr. Toglia, for example, and

19  Mr. Vorder Bruegge.  By attacking the -- without us

20  having the right to response, attacking in this level of

21  detail the video, it's very clear to me now that --

22           THE COURT:  The April 12 video?

23           MR. SKROCKI:  Correct.  That's not at issue

24  here.

25           THE COURT:  Right.  I agree.
```

1          MR. SKROCKI:  We're being a little bit

2  blindsided by this level of detail.  It's not in the

3  brief.  The brief is really primarily about the standard

4  of review for admitting April 19.

5          So we feel that we're way outside of where we

6  should be.  In fairness, the motions deadline has

7  passed.  If they want to litigate that, they should

8  bring it on full force and effect with this Court in a

9  motion and say, April 12th can't come in either because

10  of these reasons and these experts can't rely on it, but

11  not through this mechanism here today.

12          THE COURT:  Thank you.

13          You're not seeking to --

14          MR. COLBATH:  The questions I have --

15          THE COURT:  I'm sorry.  Are you seeking to

16  exclude the April 12 video?

17          MR. COLBATH:  No, absolutely not.

18          MR. SKROCKI:  Can we follow up?  Are you

19  seeking to exclude the testimony of Mr. Toglia and

20  Mr. Vorder Bruegge based on anything that happens in

21  today's hearing?

22          THE COURT:  And I ask you that as well,

23  Mr. Colbath.

24          MR. COLBATH:  I am seeking to -- I have asked

25  the Court in my motion to not allow the use of the

1  misleading and inappropriate video created by Agent

2  Sturgis and the other folks on April 19th.  And by not

3  allowing it, not allow any witness, fact, lay, military,

4  expert to utilize it in their testimony, the April 19th

5  video.

6        All I'm talking about is exclude the April 19th

7  video.  I have no challenge to any other experts or

8  whatnot.  This is my point.  We are talking about

9  Exhibit D.

10        THE COURT:  Why don't we -- can you conclude

11  this line of questioning shortly, and then we'll take a

12  lunch break?

13        MR. COLBATH:  Yes.

14        THE COURT:  Go forward.  Then I haven't heard

15  the motion being made that the Government has concerns

16  about being out there.  I'm focused on April 19.

17        MR. SKROCKI:  But you heard him say that if you

18  preclude this, then our experts who relied on any part

19  of April 19th don't get to testify about it.  That's

20  what's going on here.

21        THE COURT:  You know, I don't think I've read

22  the Toglia report, and I wonder if that might be

23  helpful.  That was not one of the many people that was

24  the subject of these motions.

25        MS. SHERMAN:  No, because I believe it was the

subject of motion work before anyone in this room was
assigned to this case. I believe that was motion work
prior to the first trial is my recollection.

THE COURT: Well, I think I would be in a
better position to understand the Government's concern
if I was familiar with what that expert said in his
report. So I'm happy to review that if that would be
helpful.

MR. SKROCKI: Yes. I'm sorry to -- just back
from leave, so I'm kind of like --

THE COURT: All right.

MR. SKROCKI: If that's --

THE COURT: In any event --

MR. SKROCKI: If that's the case we would
request further briefing, because I really feel this is
what's -- we're at a disadvantage here based on this
line of questioning.

THE COURT: All right. Well, let's continue
with this line and then take a break. And then if you
wanted to bring back the Toglia report after the break,
I can look at that.

And incidentally, my notebook doesn't have UU
either, what you were referring to, that chart. So I
could get that after the break too.

MR. COLBATH: We'll get the Court a copy of

1   that.

2            THE COURT:  Go right ahead.

3            MR. COLBATH:  Just so we're clear, I just don't

4   think there's any surprise or shouldn't be by the

5   Government.  The Exhibit D here that I'm referring to is

6   a page, three pages from Mr. Toglia's report.  It's

7   attached to my original motion.

8            THE COURT:  That I've seen, yes.

9            MR. COLBATH:  Mr. Skrocki's concerns are

10  exactly what's going on.  The April 19th video shouldn't

11  be used, and it shouldn't be used by anyone for any

12  purpose.  That's our motion.

13           THE COURT:  I understood that was your motion.

14  BY MR. COLBATH:

15    Q.  So here, Mr. Hoerricks, you've seen this as part

16  of your review, correct?

17    A.  Yes.

18    Q.  Can you flip to the next page of D.  And the next

19  page of D.  Back up to the first one.

20           Each of these is a comparison use of the

21  April 19th video compared to, for consistency or some

22  purposes, the April 12th video.  This one in particular

23  where it is time we see at the top on the April 19th

24  video, the time that this still shot was extracted,

25  15:23:06, we can tell that that was part of the part of

1  a pass that occurred, number five from the UU exhibit,

2  just from the timing.

3       If we flip to the next page, again, the

4  April 19th video being used to compare to the

5  April 12th, April 19th taken at 15:21:31, which is when

6  the car was going, according to the agents in April 19,

7  15 miles an hour, where it was capturing eight frames

8  per second, double what April 12th was, correct?

9     A.  Yes.

10    Q.  The next page, the next page of D, this one taken

11 at 2034 is actually the one highlighted in yellow where

12 the camera on April 12th is capturing ten frames a

13 second as opposed to four on April 12, two and a half

14 times more information captured on April 19th, yet

15 compared here, correct?

16    A.  Yes.

17    Q.  I got distracted on the comparison point.  But in

18 your initial analysis, just make/model determination,

19 just looking at the April 12th video, which I asked you

20 to later then look at the April 19th video and determine

21 why it might be misleading or problematic to use,

22 correct?

23    A.  Yes.

24    Q.  All right.  Prior to doing that, when you looked

25 at just April 12th, just explain to the Court your

 1    conclusion from a photo determination standpoint.

 2        A.   The data supports no conclusion.

 3        Q.   Why does the data support no conclusion?

 4        A.   The nominal resolution of the area of interest is

 5    so low that features cannot be identified.  I can't

 6    identify windows.  I can't identify -- and I use that

 7    word specifically, "identify," because I don't know the

 8    vehicles involved.  I'm doing this blind.

 9           So I cannot extract features from the video that

10    would get me to class of vehicle.  Vehicle is SUV,

11    compact SUV, minivan, sedan.  I can't get to that level.

12    So I can't get beyond that level into make and model and

13    so on.  So the data simply supports no conclusion.

14        Q.   Just as a standalone using April 12th, you can't

15    tell anything?

16        A.   Yes.  Cannot tell anything.

17        Q.   All right.  I will suggest that we break here,

18    because when we pick up from lunch, I'm going to ask you

19    about the comparison then of April 19th, looking at that

20    and if it's fair to use that and compare in any fashion

21    or if it is problematic to use that.

22        A.   Okay.

23           THE COURT:  All right.  Very good.  How

24    about -- just a moment.

25           (Pause)

1          THE COURT:  I'm just going to take a short

2    moment here.  Why don't we come back at 1:00.  But I'm

3    of the view that the 1:30 p.m. is likely to be

4    continued.  It was Mr. Bachmeier who just got a new

5    attorney.

6          MR. COLBATH:  Your Honor, my understanding from

7    Mr. Dattan, who took that matter over, was that it was

8    his intention to basically show up and advise the Court

9    that he did in fact just take over the case.  He needs

10   some additional time to be prepared for sentencing and

11   that --

12         THE COURT:  That's what I anticipated.

13         MR. COLBATH:  -- it was going to be basically

14   his suggestion to just reschedule the sentencing.

15         THE COURT:  All right.  With that said, then

16   let's take a lunch break until 1:15 p.m. and then if the

17   other parties appear, I might need -- or we could wait

18   until 1:35, and it sounds like I could continue that

19   hearing at 1:30.

20         MR. COLBATH:  My understanding is Mr. Dattan is

21   going to show up and just ask that that sentencing be

22   continued.  So it may make sense rather than to go

23   15 minutes and break, I'm happy to go 15 or 30 minutes

24   and then --

25         THE COURT:  I think it makes the most sense

1    just to come back at 1:35.

2            DEPUTY CLERK:  All rise.  This matter is in

3    recess until 1:35.

4            (Recessed from 12:11 p.m. to 1:40 p.m.)

5            DEPUTY CLERK:  All rise.  Her Honor, the Court,

6    the United States District Court is again in session.

7            Please be seated.

8            THE COURT:  We are back on record here.  And I

9    have read this, Collision Research.  I just didn't

10   recognize the name of the person, but I have read this

11   document.  All right.  The name of the company.  This I

12   have seen.  Very good.  I heard you had an issue to

13   bring up.

14           MR. SKROCKI:  A modified application.  And we

15   would also move to admit for your consideration for the

16   hearing those two exhibits we've given you, 15 and 16,

17   as part of -- Toglia's two reports for the hearing.

18           THE COURT:  Oh, I see.  All right.  Okay.  Any

19   objection to 15 and 16?

20           MR. COLBATH:  No.

21           THE COURT:  Those will be admitted.

22           (Exhibit Nos. 15 and 16 admitted.)

23           MR. SKROCKI:  Your Honor, I would like to renew

24   my objection to the scope of the hearing.  We spent a

25   considerable amount of time over the lunch break, and we

appreciated the length of it. And in summary, we would
like to provide just the following for the record. I
think that I have a solution to some of this, and I'll
propose that at the end.

We've got a couple issues with the scope of the
hearing, as I've articulated earlier. One is in the
notice of the pleadings. If the Court looks at the
pleadings as we have, both in the initial motion to
preclude, which is at Docket 1047, and later in the
supplemented 1072, there's only one reference to at
least the subject matter of the latest testimony of
Mr. Hoerricks with respect to frame rates. And that's
at --

THE COURT: The motion we're on is 1012.

MR. SKROCKI: I have 1047. 1012. That was
ours.

THE COURT: Very good.

MR. SKROCKI: That's the clear one. So with
all due respect, 1012 is the motion.

So at page six, there's one reference to frame
rate. It's very obscure. It does not whatsoever refer
to the degree and specificity of Mr. Hoerricks's
testimony here today.

The motion also deals with this laundry list of
environmental and/or viewable factors: Fire hydrant,

1 the bollards, the snow, time of day, the weather

2 conditions, the what are zoomed in or zoomed out, the

3 framing in this piece, the viewable amount of image. It

4 doesn't mention Mr. Hoerricks whatsoever in the first

5 opening brief.

6          So naturally our response was okay, they seem

7 to have issues with whether this is substantially

8 similar to these factors so listed.

9          In the supplemental brief, or the notice of

10 issues for the evidentiary hearing at Docket 1072,

11 they're framing the issues pretty much the same way.

12 There is a reference to Mr. Hoerricks for the first

13 time, that he's not offering any new or additional

14 opinions during the motions process and that he intends

15 to present related information of the April 19th

16 experiment video. Now, this, again, a rather oblique

17 reference. I'm not sure what related information means.

18 It wasn't explained.

19          So we have notice issues as to the scope and

20 depth of the experts. I'm not sure what Mr. Reisberg is

21 going to testify to given what we've seen up to this

22 point today.

23          Friday we received electronically these

24 exhibits, so this package. Had we even had the time to

25 digest it and give it to our experts, it really wouldn't

have made much difference because Mr. Hoerricks's two
reports don't -- unless we've overlooked it in our
review -- don't mention frame rates whatsoever anywhere.

And that is of some concern to us. Because
they've been produced since July. The first one I
believe came out in May. In this amount of data here,
Exhibit UU, page 6 of 18 --

THE COURT: Which evidently I did have in this
notebook. I just overlooked it.

MR. SKROCKI: -- there is a reference to frame
rate, but it's not explained as to what it's there for,
nor explained to us in either the first report or the
supplemental. So we have a notice issue with respect to
this.

Am I missing anything, Counsel? Okay.

So look, we've all been around a long time
here, and I get that we're on a retrial and there's
appeal issues and things like that. So on the one hand,
in my view, we could move to preclude Mr. Hoerricks. It
may not be granted. I understand that.

But on the other hand, what we would like to
propose is that we continue with the testimony of
Mr. Hoerricks and Mr. Reisberg. We note our objections
for the record as we have and that we be permitted to
file after today's hearing either a motion to preclude,

1    modify or do whatever is necessary along with being

2    given an opportunity to have some time to digest this

3    information in an appropriate manner.  Friday's

4    disclosure of this without the key in the report about

5    what this all means doesn't do us any good.

6              And so we would like a little bit of leave to

7    file a motion with the Court, provide this information

8    to experts and, for example, maybe on cross examination,

9    Mr. Hoerricks can tell me, we have no idea what software

10   program he used to produce some of these results.

11   Apparently, he had to create his own.  And that

12   wasn't --

13             THE COURT:  That's not in the report.

14             MR. SKROCKI:  -- something known to us.  If I'm

15   mistaken, I know Counsel here will let me know.  But

16   that's our position at least as of this afternoon.

17             THE COURT:  All right.

18             MR. SKROCKI:  And again, our biggest premise is

19   the notice pleading directed us one way, and we are well

20   into the granular details the other way.

21             THE COURT:  Well, I came thinking about the

22   topics in the motion as well, I will say, the weather

23   and the various items that were listed out in the

24   motion.  So let's set that aside.

25             On the other hand, I guess one observation I

would make is that far better to have this discussion in early -- I was almost going to say August, late July, outside the presence of the jury and sort these issues out than in the middle of trial.  So that's the good news.

With that said, Mr. -- so the application -- let me ask Mr. Colbath, what are your thoughts on that proposal by the Government?

MR. COLBATH:  Well, I need to respond and make my record as long as that's what we're doing.  And I'll start at the beginning with what the real bait and switch in this is.

At trial last time, Agent Sturgis did not testify about the creation of this video.  Agent -- none of the four testified.  And the video, the April 19th video was not offered through any of the agents.  One agent, the agent who drove the car, did reference that on a later date he drove the car.  But other than that, it wasn't offered through them.

What the Government did was offer and only have its expert witnesses, Vorder Bruegge, Toglia, they didn't have Becker at the time, but now Becker has replicated the same thing.  Those were the folks that used the April 19th video.  Those were the folks that used it for scientific purposes, scientific comparison

and scientific testimony.

I was concerned about that.  Mr. Skrocki's statement before on the record, not just a minute ago, but earlier when he objected on relevance, he was dead on.  I was concerned about that, and my motion to preclude the video 100 percent squarely I thought put the issue before the Court of I don't want anybody to use that video because it's not appropriate.  Therefore, whoever is going to talk about it, who I could only reasonably have notice of from the Government and anticipate, would be their experts primarily.

When we had the last hearing then, let's fast-forward to the last status hearing after we filed the motion -- first of all, let's talk about this exhibit book.  This exhibit book, the first three-quarters of it is made up of the attachments that I filed a month and a half ago with the motion.

THE COURT:  I'm aware of that.

MR. COLBATH:  Which of course the Government got.  They're in the record right now.  They're sealed, but the Government certainly has access to them, and they are made up of primarily Government documents.

Included in that is Mr. Toglia's report that I have issue with, because it is based and all centered around comparative work with the 4-19 video.  I extract

in those attachment parts of the video -- or parts of Toglia's report out and hone in on them, write what I'm complaining about. So from a notice standpoint, I don't think they're -- that's just wrong. That's a wrong argument.

THE COURT: Does Mr. Hoerricks discuss this concept of frames per second in his report?

MR. COLBATH: Yes. I can have him I guess explain that, where it is and how it is. But what I will say is when we had the last status hearing, we discussed this motion. And as we started to argue it, our argument before we got to the merits of the motion was, Judge, we've asked in our motion from day one, we want an evidentiary hearing.

Rather than -- I can't file a pleading and explain to the Government every sentence that we're going to say, tell them every fact and piece of evidence that I think should play into the evaluation and that they should be cognizant of so that they are fully prepared. Can't do that, won't do that. The law does not compel me to do that.

What I can do is ask for the Court for an opportunity to come to court and make that record, which is, what I understood from the last status hearing, here is your chance. Come make your record. That's what an

1  evidentiary hearing is for.

2         But I did not -- I was not content with that or

3  I did not want to risk where somehow we've ended up

4  right now, because right after the status hearing, in

5  addition to the exhibits that are the first half of this

6  book, the day after the hearing where this Court said

7  we're going to have an evidentiary hearing, I called

8  Mr. Hoerricks to make sure -- now, the Government

9  already had his original report, which it's attached to

10  our response.  It's in the record.  They had it at the

11  expert disclosure.

12         THE COURT:  The one that was a few days after

13  their --

14         MR. COLBATH:  May 6th.  So the day after you

15  said we can have an evidentiary hearing, I called

16  Mr. Hoerricks and said, if we're going to talk about all

17  of this, went through with him real quick the meaning of

18  all these differences that I had already understood from

19  consulting with him, and I said, you know, just to be

20  safe so the Government can't complain that we're hiding

21  the ball, could you put that in a supplemental just

22  discussing what we're going to discuss at the

23  evidentiary hearing?

24         He did that within a few days.  And on July 6,

25  three weeks ago, I think is the date of it -- let me see

if I have this, see if I have the supplement.  I'm
sorry.  July 16th.  On July 16th, he created it, and he
sent it to me digitally.

      THE COURT:  The notice of issues?

      MR. COLBATH:  No.  His supplemental report,
which is in this book, it's a report that I'm just going
to -- I haven't even got that far.  I haven't even got
to even make my evidentiary record yet at the
evidentiary hearing.  But that's what I'm going to start
discussing.

      But I had him prepare this.  I said -- when he
sent it to me, I said, thank you, can you include in a
digital file each and every standard referred to, each
and every article you referenced, every -- your bench
notes, everything that underpins this, the creation of
this report?

      That's the rest, almost all the rest of these
documents.  The day that I got those things, I forwarded
the report and the notice of issue, or the next day the
report and the notice of issue.  I filed that in the
docket.  I sent the Court a copy of the supplemental
report.  I attached it.  And I sent the Government a
copy of the supplemental report.

      I had intended that same day to have all of the
attachments put in the Dropbox.  Ms. Sherman contacted

1   me and said, hey, you forgot to do that.  So within a

2   couple of days or the day we got her response, I know,

3   or her reminder, I provided all of that.

4           So it was not Friday that the Government got

5   this book, I'm quite sure.  These attachments were sent

6   long ago.

7           THE COURT:  So my question is:  Do you object

8   to Mr. Skrocki's application to be able to file a motion

9   with regard to the scope of -- as I understood it, the

10  scope of Mr. Hoerricks' testimony at trial at some point

11  to be determined after today's hearing?  That's how I

12  understood the application.

13          MR. COLBATH:  No.

14          THE COURT:  Then I think we can proceed

15  forward.

16          MR. COLBATH:  That would be fine.

17          THE COURT:  And it's helpful I think most

18  importantly for the jury to sort out as many issues as

19  we can in advance of trial.

20          MR. COLBATH:  As long as I get to -- obviously,

21  if the Court grants this motion, Mr. Hoerricks -- you

22  know, we're not going to talk about any of this stuff.

23  I don't know how you frankly deny this motion and then

24  not let me attack -- not let me attack the April 19th

25  video, but I'll cross that bridge when I get there.  If

they file a motion, I presume it will not come without
an opportunity for me to respond.

THE COURT:  It shouldn't.

MR. SKROCKI:  Of course not.  Sure.

MR. COLBATH:  But the frame rates are
discussed -- well, they're calculated and noted in the
report.

THE COURT:  Which report, the supplemental or
the --

MR. COLBATH:  I'm not sure that it's not both,
but I'll have him point out where and how.  The
Amped FIVE software, there -- also, the breakdown of the
frame rate calculation, the actual mechanical, show it
to your expert, have somebody walk you through the math,
is in the bench notes that I sent long before this
hearing.

But the import of all of this, the meaning of
all of this -- and we said before you granted the
evidentiary hearing, we said in our request we intended
to call Mr. Hoerricks, we intended to call Mr. Reisberg.
We reiterated it once you granted it before we left the
status hearing.

I then reiterated it in the notice of issues,
and I laid out the legal issues of the sequence of what
I thought the Court needed to decide.  What I will say

is, you know, what the Government has shown you here

today should end the inquiry, because what they offered

you to establish to meet their burden of the

admissibility of April 19th is if they want to talk

about notice, my -- first of all, there's no pleading I

guess that the Government filed that dealt with

April 19th.

I only concluded and inferred from the expert

disclosures they gave to me, which were for all over the

place, Toglia, Becker, Mestha, Vorder Bruegge, every one

of them uses photo still comparisons using that

April 19th video.

Even though the Government did no notice

pleading, did no motion work, did nothing but a standard

expert disclosure that did not alert me specifically to

anything about the intended offer of the April 19th

video, I knew it was coming, or at least I thought it

was, so I filed this motion to object.

It's their burden to establish that it is --

it's not substantive evidence.  We all know that because

they created it.  It's not real evidence.  The crime

occurred on April 12th.  The video was manufactured

100 percent by the Government, 100 percent controlled by

them seven days later.  It's not substantive evidence.

So it's demonstrative.

1          Today I learned for the first time that it's

2    demonstrative of two things.  We did it to see if it was

3    consistent on our eyeball observation and to see if we

4    could tell anything about the speed of the vehicles.

5    That's what I heard it's offered for.  That's what I

6    heard it was created for.  That's what I'm now hearing

7    it's offered for.

8          Yet they jumped up and said, we object to

9    relevance.  If you keep this out our experts can't use

10   it.

11        THE COURT:  Okay.

12        MR. COLBATH:  But so I even today honestly

13   don't know is this demonstrative of Mr. Sturgis's

14   testimony?  Is it demonstrative of Agent Doran's

15   testimony, the guy driving the car?  Is it demonstrative

16   of Vorder Bruegge, who did this thing with it?  Is it

17   demonstrative of Toglia, whose report you have in hand?

18   And I was just starting to go through his photo

19   comparison.

20        I don't know.  But if it's demonstrative of one

21   single expert's testimony, then it's one thing for you

22   to understand that the fire hydrants are in different

23   spots, but I don't think -- no disrespect to the Court,

24   I didn't understand it.  What that means relative to

25   whether this video is eyeballed okay or it is a truly

scientifically misleading-to-the-jury type of experiment
is not apparent by just eyeballing it.

You need somebody to explain what it means when
a full stand of 20-foot-tall trees is reduced to 10 feet
in the picture.  Is that just an innocuous little
detail?  Because I can still tell they're trees.  Or
does it really mean something?

That's what I've said all along I'm going to
call an expert to try and explain what the missing snow
covers mean, what the shift in the camera means, what
the change in perspective means.

THE COURT:  So I'm going to cut you off here,
Mr. Colbath.  The reason why is I feel like I'm hearing
a summation on the motion.  And what I heard the
Government say, I think, is that they're okay with going
forward with the conclusion of Mr. Hoerricks' testimony
and reserve, and I will accord to the Government an
opportunity to file a motion seeking to strike some or
all of the testimony, or preclude it at trial is a more
accurate statement.

So with that said, I think -- I'm feeling --
I'm unavailable after tomorrow, and I would like very
much to get, I think all of you get this issue resolved.
So that's why I cut you off.  And why don't we resume
with the witness.

1           MR. COLBATH:  I'll ask Mr. Hoerricks to resume

2     the stand.

3           THE COURT:  All right.

4           (Pause)

5           MR. COLBATH:  Your Honor, Madam Clerk pointed

6     out to me I had neglected, even though we talked about

7     them in the testimony, I did not move Exhibit X, UU, or

8     AAA, the last three we talked about.  I didn't move to

9     admit those.

10          THE COURT:  X, UU and AAA?

11          MR. COLBATH:  Yes.

12          THE COURT:  Any objection to those?

13          MR. SKROCKI:  No objection.

14          THE COURT:  All right.  Very good.  Those will

15    all be admitted.  Go ahead, please.

16          MR. COLBATH:  Thank you.

17          (Exhibit Nos. X, UU, and AAA admitted)

18    BY MR. COLBATH:

19       Q.  Mr. Hoerricks, did you prepare a supplemental

20    report relative specifically to the inquiry -- and I

21    apologize if I asked you about this -- but relative to

22    the inquiry of the problems with the 4-19 video?

23       A.  Yes, I did.

24       Q.  Could you put up Exhibit Y.

25          That is your supplemental report.

1          MR. COLBATH:  Your Honor, this is the report

2     that I --

3          THE COURT:  I have this right here.

4          MR. COLBATH:  This is what I referred to in my

5     notice of issues, and so I would move -- before I have

6     the witness discuss the aspects of it, move to admit it.

7          THE COURT:  Any objection to Y?

8          MR. SKROCKI:  No.

9          THE COURT:  Y is admitted.  Go ahead, please.

10          MR. COLBATH:  Thank you.

11          (Exhibit No. Y admitted)

12     BY MR. COLBATH:

13     Q.  Mr. Hoerricks, I guess at the outset of the

14     report, you restate your -- sort of the foundational

15     conclusion that we already talked about that was in your

16     first report, that the just making a photographic

17     determination alone from the 4-12 video, there is

18     insufficient evidence to reach any type of determination

19     looking at 4-12 alone, correct?

20     A.  Correct.

21     Q.  So explain to the Court what we are looking at

22     and the process here that's described, the chart on page

23     two and the process or the import of that original

24     finding when you go on to determine whether or how

25     you're going to consider the 4-19 video.

1     A.   Certainly.   The Scientific Working Group on

2   Imaging Technology, which has since been absorbed into

3   the Scientific Working Group on Digital Evidence, in

4   their document entitled Section 16, they have a

5   conclusion matrix, which is what you see on the screen.

6         And so if I was to make a determination that I

7   have powerful support for my conclusion, then my summary

8   would illustrate the points of comparison and so on.  So

9   this is a matrix from identification to elimination,

10  suggested language for inclusion in a report.

11        At the very bottom is no comparison is possible.

12  I don't have any data to support a conclusion.  It's not

13  suitable, et cetera.  And so in forming my conclusion

14  that the data supports no conclusion and that no

15  comparison is possible, I'm referencing Section 16

16  guidance on how to explain that.

17    Q.   And the standards that you drew this from, those

18  that you refer to -- let me just see if I can find my

19  chart.  Just so there was no question about the

20  standards, what they were or where you referred to, that

21  would be Exhibit MM, if we can just show that front page

22  of that.  That would be the right, correct document?

23    A.   Yeah.  If you'd page forward one more, you should

24  get title and so on.  There it is.  Section 16.

25    Q.   This is the best practices for forensic

1    photographic comparison developed by the Scientific

2    Working Group on Digital Evidence?

3        A.   On Imaging Technology.

4        Q.   Oh, I'm sorry.   I did the other Scientific

5    Working Group.

6        A.   Yes.

7        Q.   And this would have been the best practices

8    standard in the field, if you will, that existed in

9    2012?

10       A.   Yes.

11       Q.   At the relevant time this work was being done?

12       A.   Yes.

13       Q.   Continues to be relevant and the best practices

14   today?

15       A.   Yes.   The Scientific Working Group on Imaging

16   Technology has since disbanded and been absorbed into

17   the Working Group on Digital Evidence.   And so many of

18   the same people are still involved.   They've moved the

19   standards into their website and so on.

20       Q.   Would the FBI have had reason to know about these

21   standards or somehow been alerted to their existence?

22       A.   The FBI was the funding source for SWGIT, and the

23   SWGIT website is still resident on FBI servers.

24       Q.   So if we can go back to your report then.   You

25   say, "Given the finding of no comparison possible, the

1    work stops."  What do you mean by that?

2        A.  If the data supports no conclusion, then there's

3    nothing left to do --

4        Q.  Okay.

5        A.  -- if the question is can you compare these two.

6        Q.  That was a photographic determination, and we

7    understand your result.  You nevertheless went on to

8    look at can there be a photographic comparison using the

9    April 19th video and the April 12th video?

10       A.  Yes.

11       Q.  So in the next paragraph, you note, "There's no

12   research available that validates the mixed method

13   approach used in this case, not in 2012, not now."

14          What are you talking about as far as a mixed

15   method approach?  What did you observe the approach used

16   to do a comparison was?

17       A.  Bear in mind that this is a response to questions

18   that I received from your office.  So can I perform a

19   mixed methods examination?  As an analyst, I want to

20   engage in peer-reviewed, published, accepted science.

21          So the question becomes can I take this cloud

22   data, this point cloud data, this three-dimensional

23   data, and insert CCTV images and go along that route.

24   And the answer is not that I can or I can't, but there

25   is nothing in the documentation then or now that

supports this mixed method.

       And I use that term specifically to mean that
when I go out and I use -- as many law enforcement
agencies do, including the Los Angeles Police
Department, a laser scanner, there is a fundamental
principle of science in that I can only measure now.  I
cannot measure then in any direction of time.

       For then, like with the weather, I have to
predict, right?  Baseball batting averages and so on.
What am I going to hit next week?  We make a prediction
model, and that's certainly possible.  But in mixing
pieces of then, a recording of then in a measurement
scenario of now, it becomes a mixed method approach.

       There to date has not been a validation of that
methodology.  That's what I'm saying.

   Q.   So the method capture of then is the April 12th
video, that's what happened then?

   A.   Yes.

   Q.   And by comparing it to what happened on
April 19th, or whenever we take measurements and look at
the scene now, we compare those, that is then compared
to now?

   A.   Right.  My preferred measurement method and the
measurement method that I suggested that we go down that
road is analytical trigonometry.  It's the accounting

for the perspective effect that is present in the

knowledge, such that one pixel, one picture element in

the image is not equidistant as you go further into the

scene.

So your discussion previous about the fencing and

its representation of real world distance and as you get

further into the scene, deeper into the scene, the

frequency at which those vertical pillars in the fencing

seem to get closer and closer, but in reality, they're

equally spaced, that is the perspective effect.

And so what that means is, and I reference this

in my primary report, nominal resolution becomes vitally

important for determining length of vehicle, right?

And so assuming that the -- Toglia's

measurements, you know, the reported measurements was

approximately 1,000 feet to the target area, the nominal

resolution becomes approximately five and a half inches

of real world distance for every one pixel depicted on

the screen.

Q. All right. So in performing the exercise

relative to the 4-19 video that I asked you to perform,

did you come up with essentially three main points as

illustrated here in your report that do -- that led to

your conclusion that the April 19th video should or

could not be used?

1  A. Yes.

2  Q. So point number one, it's on page three of your

3 report. Let's -- just below that. Let's summarize for

4 the Court point number one here and the import of that.

5  A. The import of this has to do with purpose, right?

6 For any system, it should be designed for a purpose.

7 What is that purpose? And so from the standpoint of the

8 CCTV system, what is the purpose of that camera view?

9   It's quite obvious that it is a monitoring view.

10 I give kind of the guidance from the home office

11 scientific development branch in the United Kingdom

12 through the graphic of the four particular camera views.

13 That guidance has been available for quite some time by

14 the United Kingdom Government.

15   But a camera can really only serve one purpose

16 because of that concept of nominal resolution. If you

17 have for your purpose the identification of license

18 plates or faces, then the camera must be positioned very

19 close relative to target.

20   If you have as a purpose the monitoring of the

21 parking lot at a shopping center, for example, then your

22 lensing is going to be such that you can keep a very,

23 very wide view at which point nominal resolution of

24 things like license plates and faces drops. So that

25 monitoring is not fit for purpose for identification,

1  and identification is not fit for purpose for

2  monitoring.

3      Q.  So to keep that simple, if -- or maybe draw

4  another analogy, just to make sure I understand it or

5  it's clear.  We think of a bank.  We all know banks have

6  closed caption monitoring.  If my purpose, my camera

7  system purpose is to monitor the flow of coming and

8  going in what's say the main area of the bank the size

9  of this courtroom, I may have a fisheye camera up in the

10  corner of the room that pretty much shows everything.

11  That would be a monitoring camera?

12      A.  Yes.

13      Q.  And if my purpose is to identify bank robbers as

14  they stand and pass a note to the teller, and be able to

15  capture details of their features so as to later

16  identify them, that is the purpose for the camera that's

17  right over each teller station trained right on the area

18  where the customer stands, that's an identification

19  purpose?

20      A.  Yes.  With 100 percent of that height or that

21  object in full view.

22      Q.  And in this case, was it at least -- did you make

23  an assumption about knowing that this camera was on a

24  post by the T-1 building over 1,000 feet or

25  approximately 1,000 feet from the roadway but

1  encompassing the parking lot, was this a monitoring

2  camera or an identification camera or something in

3  between?

4          MR. SKROCKI:  I'm going to object, Your Honor.

5  I know you want to move this along, but this is

6  consistently leading and --

7          THE COURT:  There was an intro to the question

8  that was somewhat leading.

9          MR. COLBATH:  I'll withdraw that.

10  BY MR. COLBATH:

11    Q.  If we turn to the next page of your report,

12  explain what the graphic shows and --

13          THE COURT:  Which page of the report are we on?

14          MR. COLBATH:  Page four of the report.  I'm

15  sorry.

16          THE COURT:  That's fine.

17  BY MR. COLBATH:

18    Q.  There's a graphic in the middle.  Mr. Hoerricks,

19  just explain what that graphic depicts and how it

20  relates to the camera that you were asked to consider

21  here, the T-1 camera.

22    A.  Right.  Figure 4 from the home office's document

23  just graphically illustrates the four different camera

24  views from monitoring down to identifying.

25          So if you wanted to make a vehicle make/model

determination, you would need the amount of pixels, the
amount of information that you would see in the identify
view to have enough information to resolve make/model,
trim level, year, et cetera, which is certainly not
present in the 4-12 video.

Q.  So the identification camera, that's in -- the
picture of just the single person standing in the image?

A.  Yes, bottom right.

Q.  And what did you conclude, if anything, from
that -- the camera view in this case, the 4-19 video,
showed us?

A.  A monitoring view of the scene.

Q.  Which would be the upper left?

A.  Upper left, yes.

Q.  All right.  Did you measure and do you know how
many pixels relative to the entire screen that are
captured on an image or object out at 1,000 feet?

A.  I believe that's on the next page.

Q.  All right.

A.  We began that discussion.  So I start with
reverse projection photogrammetry because that is the
primary methodology that the FAVIAU unit uses.  In
reverse projection photogrammetry, what I want to do is
to overlay the video that I've created, or that someone
else has created on a different date, overlay that to

1   the evidence video and look for similarities.

2       And in doing that, I would have to align things

3   that are fixed in the scene, like the rigger shop, like

4   the fire hydrant and the bollards and those things would

5   have to be in relatively the same place.  So then I can

6   conduct a visual measurement to say yeah, that the

7   overlay works, that it fits within that dimensions.  But

8   in this case, I wasn't able to do that.

9   Q.  You attempted to do that.  What was the problem?

10   A.  The problem was because the system was not

11   secured, and it was continued to be used, the pan tilt,

12   zoom mechanisms right over the course of the week

13   between 4-12, 4-19, the 4-19 videos' settings do not

14   match, and therefore, you have differences of nominal

15   resolution, you have differences of position and so on,

16   which I illustrate further on into the report.

17   Q.  We will get to those then.  I struggle with

18   making sure I understand the term "nominal resolution."

19   Is that the same as where the camera is focused on?

20   A.  Sort of.  You look up the night sky and you see

21   the moon.  And we all know how big the moon is.  It's

22   humongous.  But I can put my thumb over the moon and

23   block it out, because of the distance the moon sits.  So

24   that far away, it looks very tiny, just as in this

25   instance, cars on the street look very small relative to

cars in the foreground.

So nominal resolution deals with the amount of pixels at that location when we capture. For those of us that have phones that have cameras and we take pictures of the moon on a full moon and we wonder why it's this tiny little dot, it has to do with lens. Ultralight angle lenses don't do a very good job of capturing things at a distance.

And so here you have all of these technical problems conspiring to a very low nominal resolution. Then in that difference calculation, in that overlay problem, they don't quite add up. The real world distance, the real world effect of being off by two or three or four pixels, add a pixel equals five or so inches is a foot or more in measurable difference.

Q. So recalling the pictures I showed to Agent Sturgis, on April 12th, you see a fence right in the foreground of the picture that's very close to the camera as compared to 1,000 feet away to the road. Do you recall that?

A. Yes.

Q. In April 19th, you see more of that fence by a number of -- he didn't know the numbers when I asked him, but I suggested five feet, several feet more of the fence in the foreground. Again, the road is in the same

1   place far away.  Do you recall that?

2       A.  Yes.

3       Q.  Is the difference in perspective -- the

4   difference we see in the fence in the foreground the

5   same, different, less, more than what would be expected

6   1,000 feet away at the fence?

7           MR. SKROCKI:  Objection; assumes facts not in

8   evidence, and foundation.

9           THE COURT:  I had trouble understanding the

10  question, quite frankly.

11      A.  If we can illustrate on my bench notes.

12          THE COURT:  I'm sorry.  Go ahead and rephrase.

13  BY MR. COLBATH:

14      Q.  Sure.  We'll get there, I think, Mr. Hoerricks.

15  Let me do this:  For nominal resolution, does the -- is

16  there a correlation to the effect of a change in nominal

17  resolution, is there a correlation between that and

18  distance from the camera of what you're looking at?

19      A.  The real world distance is fixed.  What is not

20  fixed is the zoom factor and the positional changes from

21  one date to another, or from 4-19 to 4-20 and so on.  So

22  that zoom factor changes, what gives the difference of

23  nominal resolution.

24          If it were possible, if the optics supported it

25  and you could zoom in completely narrowly to just that

position between the rigger shop and the edge of the
view so that you could fill the whole road with it, the
nominal resolution would increase.  The distance to the
road is fixed, but the zoom factor, the ability to
adjust lensing in the system is what's not fixed and
what's not maintained between the three different dates.

Q.  All right.  So have we covered the first point,
the first problem you saw with comparison of the two
videos?

A.  I think so.

Q.  So if we go to page seven of your supplemental
report, you discuss a second point of comparison that
you found problematic.  Describe what that is.

A.  When I attempted the reverse projection, I
noticed that the stand of trees were cut off in the 4-19
video.

Q.  If we could show the top image, if we can
highlight the top image there.  The whole image.

On the --

A.  On the left side is 4-12, and on the right side
is 4-19 for the same position of camera.  And so on the
left side, you see a full stand of trees in the upper
left corner.  But you see that stand of trees cut off in
the right.

Q.  All right.

     1      A.   The bollards that you discussed earlier are cut

     2   off and so on.  So it was a different zoom factor.

     3      Q.   And so --

     4      A.   That changes the nominal resolution calculation.

     5      Q.   How?

     6      A.   Explaining in the report, all we have is -- for

     7   reference is the length of a 2001 Honda CRV and the

     8   distance to the road.  Those are what we have to work

     9   with.

    10      Q.   All right.  So let me stop you there.  On 4-19,

    11   the Government used a known Honda CRV?

    12      A.   Yes.

    13      Q.   And they could measure that and know now what the

    14   size of that is?

    15      A.   Yes.

    16      Q.   And they told you that they took measurements and

    17   it was more or less 1,000 feet, approximately 1,000 feet

    18   from the camera to the road now, and we believe that is

    19   the same?

    20      A.   Yes.

    21      Q.   So those were the two known measurements?

    22      A.   Yes.

    23      Q.   All right.  What's the next step then?

    24      A.   So if that is the case, if that is the ground

    25   truth, the known reference, then using that information

1 to measure the car depicted in 4-12, the measurement

2 difference is rather significant.

3     Q.  All right.  Let's first talk about the knowns

4 known on 4-19, because they knew what car they used,

5 they knew what camera, where the road was, the things

6 you discussed?

7     A.  Yes.

8     Q.  So how would you go about determining the nominal

9 resolution or the pixel size I guess there?

10     A.  It's a straight pixel count, how many pixels

11 across.

12     Q.  And did you do that?

13     A.  I did.

14     Q.  And is that on the bottom illustration here?

15     A.  Yes.

16     Q.  All right.

17     A.  So what I have done here is, because we have a

18 little bit clearer view in this image, I've attempted to

19 measure from bumper to bumper exclusive of the rear

20 portions of the vehicle, right, because we have a skewed

21 angle.  It's not perfectly perpendicular to the camera,

22 this road.  So I've measured 32 pixels from what I

23 believe is bumper to bumper.

24     Q.  And how do you know that unit of measurement,

25 pixel, or do you have a way to look at this photo, or

1    does your software tell you the size of a pixel relative

2    to the entire size of the image?

3        A.   Yeah.   When I draw a line, the software tells me

4    how many pixels of length.   And so I'm just reporting

5    that.   My bench notes have some of that information as

6    well.

7        Q.   And your bench notes are I believe --

8        A.   HH.

9        Q.   HH?

10       A.   Yes.

11       Q.   Exhibit HH.   And so if somebody wanted to

12   recreate or reconstruct the calculations, that could be

13   done through -- these are laid out step by step in the

14   process that you went through to arrive at that?

15       A.   Yes.

16            MR. COLBATH:   Your Honor, I would move HH as

17   foundational to the report here.

18            MR. SKROCKI:   No objection.

19            THE COURT:   All right.   HH is admitted.

20            (Exhibit No. HH admitted)

21   BY MR. COLBATH:

22       Q.   And before I leave that prior --

23            THE COURT:   Did you want to admit MM?   The

24   clerk is inquiring.

25            THE COLBATH:   I did.   I do.   I'm sorry.

1          MR. SKROCKI:  No objection.

2          THE COURT:  That's admitted as well.

3          (Exhibit No. MM admitted)

4     BY MR. COLBATH:

5       Q.  Before I leave that, the last answer you gave,

6     you said the car -- when you did your measurement, you

7     measured bumper to bumper.  Could you explain the

8     relevance of that better as opposed to measuring the

9     image, the entire pixels taken up by the image as

10    compared to what you measured here?

11      A.  The reference I was given was the length of the

12    vehicle.  And in general sense, the length of the

13    vehicle is from fixed objects of the vehicle, bumper to

14    bumper.  Items like a push, a cow pusher mounted to the

15    front or a spare mounted to the back, those are options

16    and not generally included in the manufacturer's

17    specification for vehicle length.  So I looked for, as

18    much as I could find, bumper and measured that.

19      Q.  And when you measured bumper to bumper and came

20    up with 32 pixels, given the known information that you

21    were given about the bumper to bumper size of a Honda

22    CRV, are you then able to make a calculation of what one

23    pixel means?

24      A.  Yes.

25      Q.  Okay.  Do we want to discuss the other

1  measurements on 4-12 before we do that, or now?

2      A.  Do you want to discuss what's on the screen?

3      Q.  Sure.

4      A.  Sure.

5      Q.  So that was the 4-19 video, 32 pixels.  Did you

6  then by comparative purposes try to perform the same

7  exercise with a similar screen shot from 4-12?

8      A.  Yes.

9      Q.  And describe the process and the result.

10     A.  Same process in terms of attempting to determine

11 at what point to start and finish.  I come up with 29

12 pixels.  So the difference of three pixels in the real

13 world is in excess of 15 inches of vehicle length.

14     Q.  And so from a comparison standpoint, what does

15 that mean as far as you did the same thing to them both

16 but came up with differing results?  Is that

17 problematic?

18     A.  Incredibly.

19     Q.  Why?

20     A.  Because in this case, two assumptions.  They are

21 the same, the zoom factor eliminates any ability to do a

22 comparison because they don't compare, or I've excluded

23 the vehicle.

24     Q.  Why would your measurements exclude the vehicle?

25     A.  Because if one is 177 inches and change, the

other one is about 160 inches.

Q. And so they can't be the same vehicle but yet have measurements of over a foot difference; is that what you're saying?

A. There are some missing variables if they're the same vehicle. We don't have zoom factor.

Q. And is it that lack of zoom factor because the two photos were taken with a camera that had been zoomed to different distances? Is that what makes the comparison unknown?

MR. SKROCKI: Objection; leading.

THE COURT: That is sustained.

BY MR. COLBATH:

Q. Well, you said we have a different zoom factor. Why does that mean, or why are you concerned about that in performing this comparison?

A. If you examine the literature and the guidance on doing photogrammetry in reverse projection, it is to attempt to resolve both the source and the unknown as an overlay. I cannot overlay these because they have different positional elements. You have things that are missing. You have a slight change in perspective and pan, tilt and zoom in this case.

And so I don't have valid reference points. So I cannot extrapolate from 4-19 because so many of those

settings are missing, not defined.  I cannot extrapolate

that data, that measurement information and infer for

4-12 from it because it's so substantially different.

    Q.  In your opinion, is the 4-19 video, based on the

description you just gave, similar enough for a

comparative value photo comparison or dissimilar enough

that it should not be used?

    A.  It's dissimilar enough that I didn't use it for

photographic comparison.  I did this exercise to

illustrate why.

    Q.  The next point also on page nine, there's a third

and sort of independent point that you note troubling

about the 4-19, use of the 4-19 video.  Summarize that

for us.

    A.  So what I'm summarizing here is this is -- and

this is something that -- this question was examined at

my former agency, and I took a small part in that

experiment, is when science seeks answers, we conduct

research experiments.  And so the question became:  Is a

DVR a valid piece of evidence, a valid tool for the

conducting of traffic investigations?

        And the LAPD and the City of Los Angeles spent a

bunch of money to come to how that experiment would be

designed and what it would cost to do, and the results

of which in the generic are that the results of one test

cannot be generalized to any other results because of
the nature of manufacturing and the amount of people
involved and so on.

That being said, there are collision
reconstruction folks that are doing that. A very recent
example was in the Netflix show "Exhibit A" where a
traffic reconstruction, crime scene reconstruction
person engaged in a measurement that the Texas Forensic
Science Commission was so upset about that they
basically sent back down to the lower court for a
retrial in this case. And that television show, it kind
of explains their reasoning and so on.

There is a particular problem when disciplines
cross over. I have training and experience, for
example, in the acquisition of mobile devices, but I
don't have training and experience in the analysis of
the data that comes from mobile devices, so I would
decline those cases. I would not work a traffic
reconstruction case as such. I have no training in
lasers and so on.

And there is no literature that supports again
the mixed methods of then and now measurements. And so
I'm pointing that out again in kind of answer to your
question at the time that one can only measure now. In
order to measure then, using the 4-12 video, we have to

have valid references in that exercise.  And so the tool
that I use to do single-view photogrammetry from the
literature or single-view metrology from the actual
methodology, at 1,000 feet, the error will exceed the
measure.

Q.  What do you mean by that?

A.  Meaning the nominal resolution is so low I will
not have a valid reference for which to conduct my
experiment.  So the data will not support a conclusion.
In a general sense, I want to be within 15 or 20 feet
camera view of the things I'm trying to measure, not
1,000 feet.

Q.  You say, "In arriving at that conclusion, one
must either have a valid reference" -- that's what you
were just referring to?

A.  Yes.

Q.  What would have been or would there have been or
could there have been in the 4-12 video a valid
reference?

        MR. SKROCKI:  Objection; foundation,
speculation.

        THE COURT:  I will sustain that.  Go ahead.
BY MR. COLBATH:

Q.  You say one must either have a valid reference or
build a valid prediction model.  First I want to ask

1    you, what would be a valid reference?

2        A.   Things that are fixed, immovable.  So if the

3    question is how tall is a person, as a person walks

4    through the door of this courtroom, we know how high

5    that doorway is, we can use that as a valid reference.

6    So the reference must exist in the same plane, so up and

7    down the Z plane, horizontal X and Y planes.  The

8    references must match.

9        Q.   In the April 19th video, as you looked at it,

10   1,000 feet from the camera at the point of the roadway

11   where the vehicle was, is there enough nominal

12   resolution to get a concrete or a valid reference point?

13              MR. SKROCKI:  Objection; assumes facts in

14   evidence and leading -- not in evidence and leading.

15              MR. COLBATH:  Your Honor, you know, I would

16   note that we're at an evidentiary hearing --

17              THE COURT:  We're at an evidentiary hearing.

18              MR. COLBATH:  -- where the rules of evidence

19   don't apply.

20              THE COURT:  Well, I was debating that in my own

21   mind.  Are the rules relaxed in this type of proceeding?

22              MR. COLBATH:  I know of no exception in a

23   hearing like this compared to a suppression hearing or

24   any other evidentiary hearing.

25              THE COURT:  In any event, go ahead.  Let's hear

1    the question again.  I'll allow it.

2    BY MR. COLBATH:

3       Q.   I believe I asked, in considering the April 19th

4    video, that's in evidence, that's facts in evidence,

5    right, we all agree that that's what you looked at?

6       A.   Yes.

7       Q.   One of the videos.  Mr. Toglia's report,

8    Exhibit M, that's in evidence provided by the

9    Government.  You took the roadway being approximately

10   1,000 feet away from his measurement, right?

11      A.   I took it from the reports, yes.

12      Q.   Knowing that the car was out on that road

13   approximately 1,000 feet from the camera, were you able

14   to see a valid reference point at that location based on

15   the nominal resolution in the video that you see or the

16   stills that you see?

17      A.   There's nothing in the report to indicate

18   anything out on the road was measured.  In the surface

19   of the road, right, if the question is, is vehicle

20   length, then it would have to be within that same plane,

21   perpendicular to the vehicle length.

22           There's nothing to indicate any measurements were

23   made that are off of things that are visible in any of

24   the videos that would indicate something down there is a

25   certain length that I could use as a reference.

THE COURT:  Mr. Colbath, I'll interrupt and say you're correct.  Under Evidence Rule 1101, the rules of evidence don't apply to preliminary examination in a criminal case.  So it's broader than just motions to suppress.  I would consider this to be such a proceeding, I suppose.

But leading questions aren't as helpful for me --

MR. COLBATH:  I understand, Your Honor.

THE COURT:  -- in hearing the witness testify. But go ahead.

MR. COLBATH:  I'm trying to balance moving us forward and --

THE COURT:  Fair enough.  That's fine.  Go ahead.

BY MR. COLBATH:

Q.  You say you either need a valid reference point, which we just discussed, or you need to build and validate a prediction model.  What is that?

A.  Well, from the world of statistics, we want to see how a particular thing will operate.  We need to predict it.  We predict batting averages, we predict weather and so on.  So we would build a model of performance.

In this case, that model would necessarily

1    involve the recording system.  And so we would have to

2    conduct and run a series of tests.  We would first have

3    a sample size calculation.  How many of these tests do

4    we actually need to run to build the type of model we

5    need to build?  And then we have to run that amount of

6    tests.

7        Q.  And was that done in this case?

8        A.  No.

9        Q.  Was it predictive?  The agent testified that they

10   drove the car back and forth 14 times.  Was that enough

11   to glean some predictive information from?

12       A.  No.

13       Q.  Why?

14       A.  One of the things that is kind of stressed

15   heavily in the National Academy of Sciences report in

16   2009 is that the police services do a very bad job at

17   statistics.  And one of the elements they do a bad job

18   in is what is an appropriate sample size, right, how

19   many.

20          And so from a practical standpoint, we don't do

21   one-on-one lineups, stand-ups, whatever you call them

22   here, in terms of witness identification.  We create

23   six-packs and these types of things so that there is a

24   chance built into the system.

25          In conducting this type of experiment, this

generation of a performance evaluation, as we know from

looking at the different camera views and frame rates

and so on, there's a lot of error in the system.

And so controlling for all of the different

cameras and all of the different data choke points, to

create a performance, like what we think this thing is

going to do, a logistic regression analysis, the sample

size, if you're an academic researcher and you're

comfortable with being wrong five times out of the 100,

is somewhere around 90 attempts completed.

If you are less comfortable with error and you

want to get as close as you can to perfect, one chance

in 100, then that sample size looks at about 160

completed tests.  If you go below 50, for example, a

coin flip becomes more accurate, meaning more chances of

being wrong than being right.

Q.  So a sample size of one is particularly

problematic?

A.  Yes.

Q.  At the very conclusion of that page, page nine of

your report, you again discuss the mixed methods

approach and the software involved in those processes,

correct?

A.  Yes.

Q.  And first of all, were you aware of what software

1   was used by Government witnesses to take -- for

2   comparative purposes with the 4-19 video?

3       A.   From the reports is all the data I had to work

4   with.

5       Q.   Yes.  But that was generally those -- the

6   programs they were using and were generally identified

7   in their reports?

8       A.   Yes.

9       Q.   And were you able to find any type of reliability

10  or methodology data that supported the use of any of

11  that --

12      A.   No.

13      Q.   -- in making a comparison?

14      A.   No, I was not.

15      Q.   So why isn't it -- why isn't it, Mr. Hoerricks,

16  enough to, just like Agent Sturgis described, eyeball

17  that and be reasonably close, or is it enough to eyeball

18  that and be reasonably close for compare -- if we're

19  just going to be comparing the --

20      A.   It's completely unfair.

21      Q.   How so?

22      A.   If you translate this to people, for example, and

23  you go from class human, you start diving into racial

24  types and so on, you've basically described a

25  five-foot-eight, 160-pound male.  And so of the male

population of the United States, 68 percent will fit
that description.  So pick one and bring them to trial.
That's essentially what you've done.  That's why we
don't do it.

Q.  Does this -- you mentioned it before, and so I
want to see if I understood you.  Does the consistency
experiment that Mr. Sturgis described he was involved in
on April 19th bear any similarity or relationship to
what you said was a showup or a law enforcement?

A.  It's one to one only.  It doesn't account for
alternative explanations.  It doesn't run the additional
car types through.  I'm not a car person.  But the
previous questions and testimony, Ford Escape, Isuzu
Rodeo, Hyundai Sante Fe and so on are all within that
distribution of lengths.  And so if I was conducting an
experiment, I'd want to run all of those by and see what
they look like.

Q.  In your opinion, is it, I guess, scientifically
misleading to only use one for comparative purposes?

A.  Yes.

Q.  Slightly?  Substantially?  Quantify how
problematic it is.  Because the judge has to decide are
these minor similarities or substantial dissimilarities.

A.  So if you assume Honda and if you assume Honda
CRV, then the denominator in the equation, how many cars

do we have to eliminate in order to get to the one?
From the time that the Honda CRV was first manufactured
to the time of the crime, you're speaking of hundreds of
thousands sold in the United States and Canada.

And so how do we eliminate all of these hundreds
of thousands?  And that's just for Honda CRV.  That's
not Honda Pilot, that's not Honda Element, that's not
Honda Accord, and it's certainly not Ford Escape, Isuzu
Rodeo, Toyota RAV4 and so on.

So the amount of vehicles that you would have to
specifically exclude from your equation is in the tens
if not hundreds of thousands into millions at that
point, depending on how far back in time you go.

Q.  What's your opinion on the gravity of the subtle
changes that were described in the -- you heard Agent --
or Mr. Sturgis's testimony, the difference in the trees,
the difference in where the fire hydrant is or the
fence, the snow cover, those things.  What's the gravity
of those differences?

A.  It changes the overall measure of the vehicle in
4-12.  If you assume the measurements from 4-19, then
the vehicle depicted in 4-12 is roughly 160 inches long,
thus it's not a Honda CRV, which is 170-something inches
long.

Q.  My last area of questions for you, sir, is also,

1    you heard Mr. Sturgis testify about comparing the still

2    shots of the images showed that the colors were

3    different, yet they were all recorded by the same

4    camera, same location, all within the same week.  Does

5    color matter?

6        A.  Absolutely, it matters.

7        Q.  How so?

8        A.  You're looking for a blue Honda CRV.  So

9    determining what blue is is very important.

10       Q.  And what factors within the data capture are

11   determinative or can affect color?

12       A.  If you imagine -- color temperature is the thing

13   that we -- the word that we use to define this.  But

14   color temperature is a very esoteric concept to the

15   layperson.  But up here in Alaska, I think I understand

16   a better way to explain this.

17           When you throw a log on a fire, right, color

18   temperature is relative to the thing that's burning, in

19   our case the sun.  But when you're at home and you throw

20   a log on the fire, the color that is coming at you from

21   the fire is orangeish-yellow.  When wood burns it burns

22   at a certain color temperature.  We measure that in

23   Kelvin.

24           When the sun burns, it's always the same

25   temperature.  What changes the color as we perceive it

1   is atmosphere and the angle of incident between the sun

2   and us, and the atmosphere gets in the way.  So that

3   temperature will change between kind of white to kind of

4   blue to really blue over the course of the day.

5        Underground parking structures with their sodium

6   and mercury vapor lights, they give off an orange color

7   and so on.  All of this can be corrected for if you know

8   what you're doing.  The tools Photoshop and FIVE and so

9   on are all very supportive of that in terms of balancing

10  histograms and so on.

11       But if you don't correct for color and you

12  attempt to determine color, then your determination is

13  going to be off.

14  Q.  So if you had wide variation in the lighting, the

15  ambient temperature, other environmental factors, do

16  those become more or less significant when you're

17  comparing things?

18  A.  Ambient temperature, like what temperature is it

19  outside, isn't entirely relevant to the equation.  It is

20  the quality of light as it comes through the medium, in

21  this case the atmosphere, and it hits the capture of

22  light.

23       So my iPhone, for example, has automatic white

24  balancing.  A lot of higher-end cameras have white

25  balancing.  What that tries to do is eliminate this

1  color temperature problem.

2      If you look at social media accounts and so on of

3  people's ski trips and they look overly blue, has a blue

4  color cast to it, it's related to this concept of color

5  temperature and then the lack of white balance.

6  Surveillance video from at night and inexpensive

7  lighting conditions will show up as orange and so on.

8      In a imaging process work flow, these are things

9  that can be determined, calculated and mitigated because

10  they are disturbs, they are -- they get in the way of

11  conclusions.

12      Q.  Did you see that done here to balance those

13  things between 4-12 and 4-19?

14      A.  I saw nothing in the reports that indicated that

15  color was controlled in any way.

16      Q.  Could you observe it or detect it from your

17  analysis of looking at the two?

18      A.  Yes.  And I've done so, and my bench notes

19  illustrate those.

20      Q.  In other words, you color corrected it?

21      A.  Yes.

22      Q.  But did you see in any of the documents sent to

23  you that anybody else did?

24      A.  No.

25          MR. COLBATH:  Right now that's all I have for

1   Mr. Hoerricks.

2           THE COURT:  All right.

3           MR. SKROCKI:  Five minutes before cross?

4           THE COURT:  That's fine.  We'll take a short

5   break.  We'll go off record.

6           DEPUTY CLERK:  All rise.  Court stands in a

7   brief recess.

8           (Recessed from 2:49 p.m. to 3:00 p.m.)

9           DEPUTY CLERK:  All rise.  Her Honor, the Court,

10  the United States District Court is again in session.

11          Please be seated.

12          THE COURT:  We're back on record.  Go ahead,

13  Mr. Skrocki.  Are you read to proceed?

14          MR. SKROCKI:  I appreciate the break, Judge.

15  Thank you.

16                  CROSS EXAMINATION

17  BY MR. SKROCKI:

18    Q.  Mr. Hoerricks, good afternoon.

19    A.  Good afternoon, sir.

20    Q.  You mentioned in your testimony here that part

21  of -- some part of a statistician's job or something

22  like that is predicting the weather?

23    A.  I'm sorry.  Repeat.

24    Q.  Is part of the statistician's job is how to

25  predict the weather, use tools and numbers to predict

1  the weather?

2     A.  In terms of creating a model, fundamental

3  statistics are employed, yes.

4     Q.  If you could figure out one that works for this

5  state, we'd be grateful.  So give that some thought in

6  the future.

7        Just a couple of questions for you, sir.  I don't

8  think I'll have you on the stand for too long.

9        You've had occasion to be contacted by the public

10  defender's office on this case, correct?

11     A.  Yes.

12     Q.  When was that first contact made?

13     A.  Many months ago.

14     Q.  Many months ago.  Did you have occasion to review

15  their pleadings filed with the Court in this case on

16  this issue?

17     A.  I don't believe the majority of that stuff -- all

18  of my direction has been essentially verbal, test this

19  question, test that question, can you answer this

20  question.

21     Q.  You haven't had a chance to read the pleadings

22  filed with the Court in this case?

23     A.  No.

24     Q.  I'm going to take a wild guess and presume you're

25  familiar with the still photos of April 12th, 2012 and

1    April 19th, 2012?

2        A.  Yes.

3        Q.  You've looked at them probably many, many times?

4        A.  Yes.

5        Q.  You testified about them at length.  Did you do

6    the analysis of these on your own, or did you have

7    somebody assisting you?

8        A.  When I received the data, the data transfer from

9    the public defender's office, I did all of the work

10   myself.  I had no assistance.

11       Q.  With respect to the April 12th screen capture,

12   the video, we call it the original, the April 12th and

13   the April 19th, there are things in those two videos and

14   the stills in particular that you can see are the same

15   in the image.  For example, the building appears to be

16   the same, doesn't it?

17       A.  Yes.

18       Q.  There's a wire chain link fence?

19       A.  Yes.

20       Q.  You can see that in both?

21       A.  Yes.

22       Q.  No issue there, right?

23       A.  You can see a little bit less of the chain link

24   fence from one to the other, but we would still agree it

25   is fence.

1    Q.  And you can see there's a fire hydrant in one,

2    correct?

3    A.  Yes.

4    Q.  And there's bollards around that fire hydrant?

5    A.  Yes.

6    Q.  And then there's bollards on the other, on the

7    April 19th video too, or from the screen capture you can

8    see those bollards as well?

9    A.  You can see fewer in certain views than others,

10   but yes.

11   Q.  That's -- if I got your testimony correct, the

12   difference is because the zoom angle probably wasn't --

13   it wasn't the exact zoom angle, was it, or zoom factor?

14   A.  Right.

15   Q.  Okay.

16   A.  Correct.

17   Q.  So that makes -- that takes -- that makes that

18   image a little bit smaller or bigger depending on which

19   one you're looking at?

20   A.  Yes.

21   Q.  And in addition, you can see trees in the

22   background on both images, right?  One is a little

23   different than the other.  You can see trees in the

24   background?

25   A.  Yes.  Some are cut off.

1    Q.   There's a geodesic dome you can see, correct?

2    A.   I don't recall, but okay.

3    Q.   In one or the other.  Okay.

4         And you can see grass and pick out other kind of

5    details, right?

6    A.   Certainly.

7    Q.   So from a maybe I'll call it a 10,000-foot view,

8    you can see there are significant similarities to those

9    two captures?

10   A.   Yes, to the overall look and feel of the scene, I

11   would agree.

12   Q.   In one of those, on April 19th, you can see

13   there's a car depicted in the April 19th video capture?

14   A.   Yes.

15   Q.   Okay.  And it's a blue car, blue color?

16   A.   Are you speaking of the car that's parked in the

17   foreground or the --

18   Q.   The Wells' vehicle.  Let's call it the Wells'

19   vehicle.  You can see there's a blue car traveling on

20   Larsen Bay Road?

21   A.   I can see an object moving.  I haven't made a

22   determination as to what it is.

23   Q.   You're telling the Court you can't tell that's a

24   car?

25   A.   I can anecdotally hear, read, and say, yeah,

1  sure, I agree.  But for a determination, I haven't

2  performed that.

3      Q.  What do you mean by determination?

4      A.  I haven't conducted any experiments that the

5  results would lead me to the conclusion of car equals

6  Honda CVR.  I read the reports, I believe what I heard

7  in testimony that they drove the car back and forth, and

8  that's enough for me.

9      Q.  But if I showed you a picture of April 19th and

10 there's a blue vehicle there, would you, as a common

11 sense person, say, "Yeah, that looks like a blue car to

12 me"?

13     A.  I could say, "Yeah, as common sense, it looks

14 like a blue car," but going beyond that, I wouldn't -- I

15 wouldn't have enough information.

16     Q.  So we can agree you can identify on April 19th

17 that there's a blue car there?

18     A.  You're using words that mean something in my

19 discipline.

20     Q.  Correct.  I'm trying to get you off your

21 discipline for a moment.

22     A.  Okay.

23     Q.  As a common person and --

24     A.  I would recognize it as a vehicle, yes.

25     Q.  And as -- we'll leave it at that.  You can

1    recognize it as a vehicle?

2        A.   Yes.

3        Q.   Okay.  On April 12th, can you recognize that

4    segment as partially a vehicle?

5        A.   Yes.

6        Q.   And you would agree with me too there are other

7    similarities as to sort of fixed things in both video

8    captures on April 12th and 19th that establish they are

9    at the same approximate location?

10       A.   Certainly.

11       Q.   And approximately the same field of view?

12       A.   Yes.

13       Q.   And if I -- I don't mean to be -- you're a

14   scientist, correct?

15       A.   Yes.

16       Q.   You work for law enforcement or have done work

17   for law enforcement?

18       A.   Yes.

19       Q.   So your primary focus is to get things to the

20   precise scientific granular quantum detail as possible?

21       A.   I wouldn't categorize it that way, no.  I would

22   say my job is to take questions and try to derive

23   answers.

24       Q.   Okay.  But you also do work to try and make law

25   enforcement do better?

1      A.   In education, absolutely.  And not just law

2  enforcement, but the community at large.

3      Q.   Of course.  And thank you for that.  That's

4  important work.

5           In this case though, it's -- what you observed is

6  a couple law enforcement officers doing a -- what they

7  tried to do is a recreation, correct, of a vehicle going

8  one way and another?

9      A.   That's what I read in the reports, yes.

10     Q.   So you haven't been to Kodiak?

11     A.   I have not.

12     Q.   Haven't experienced Alaska weather except for

13  nice day here in Anchorage?

14     A.   This is the first full day in Alaska in my life.

15     Q.   Welcome.  Great.  You picked a good one.

16          So you haven't had occasion to be in the T-1

17  building, nothing like that, since you --

18     A.   Nothing.

19     Q.   Do you know how many Honda CRVs were on Kodiak at

20  that time that were blue in color?

21     A.   I do not.

22     Q.   They didn't tell you that number?

23     A.   No.

24     Q.   How about if I told you the number was three,

25  would that surprise you?

 1     A.   I don't think it would surprise or not surprise
 2   me.
 3     Q.   I want to talk to you about the testimony you
 4   gave around noon-ish and later on frame rates.  Do you
 5   remember that testimony?
 6     A.   Yes.
 7     Q.   Can you direct us in your report or your
 8   supplemental report where the statement as to frame
 9   rates or substantial discussion as to their application
10   to this case exists?
11     A.   Certainly, but not under that context.
12     Q.   What do you mean by that?  I'm asking you to look
13   at the reports.
14     A.   Right.
15     Q.   Do they exist in the reports?
16     A.   The frame rate of the video was not a tested
17   question, and so it wasn't tested as such.  It was a
18   derivative of the validation that I performed initially
19   in the initial report that I did.  Can I use my
20   preferred tool as opposed to using the software export?
21   Do these perform the same?
22          And so in that exhibit, it's AAA, that is where I
23   report the frame rate as just one of the steps in the
24   process.
25     Q.   And there's Exhibit UU, do you remember that,

1    with the chart you had -- we had that they showed you?

2        A.   Yes.

3        Q.   Where is that referenced in your report?

4        A.   That's not my work product.

5        Q.   That's not your work product?

6        A.   No.

7        Q.   Whose work product is it?

8        A.   I believe it's from the public defender's office.

9        Q.   So you never saw it until when?

10       A.   Yesterday.

11       Q.   You were showed it yesterday for the first time?

12       A.   Yes.

13       Q.   Do you know who made it?  Any idea?

14       A.   I don't know for certain.  But I believe it is an

15   employee of the public defender's office.

16       Q.   When were you given it, what time yesterday?

17       A.   Let's see.  I landed at 3:00.  I was in their

18   office by 5:00-ish, so somewhere between 5:00 and 7:00.

19       Q.   Okay.  And so that body of data is not in your

20   report, is it?

21       A.   No.

22       Q.   It's not in your supplemental report, is it?

23       A.   No.  Not in that presentation, no.

24       Q.   What was the point of introducing that?

25       A.   It was so you would ask.

1    Q.   Well, I'm asking you.

2    A.   In terms of the experiment, you have a total

3    available frame count across 4-19 and 4-20.  You have

4    the testimony of the gentleman previous about things

5    looked blurrier the faster they went.

6        And so what I believe the intent of that is to

7    show that rather than attempt to recreate and compare

8    apples to apples, the fast 35 miles per hour generating

9    four frames per second, that that demonstrative shows

10   that different speeds were taken from different times

11   and so on, so that there is a remarkable difference.

12       And these particular frames out of a total

13   quantity of frames were chosen for a reason.  What is

14   that reason?

15   Q.   And who told you that information?

16   A.   It's what I assumed.

17   Q.   Oh, you assumed that?

18   A.   Yes.

19   Q.   You had time last night to maybe do a

20   supplemental to your supplemental and get that

21   information to the U.S. Attorney's Office?

22   A.   I don't understand the question.

23   Q.   Well, you were provided this information that was

24   used as an exhibit, correct?

25   A.   This information.

1    Q.  You testified about it?

2    A.  I testified to a question that was asked and an

3  exhibit offered.

4    Q.  Right.  As to UU.  Now, you didn't do that

5  data -- you didn't do that analysis on Exhibit UU, did

6  you?

7    A.  I did not.

8    Q.  So you trusted that it was accurate?

9    A.  I did.

10    Q.  You didn't verify it?

11    A.  I was not able to, no.

12    Q.  You take issue with Mr. Toglia's work?

13    A.  In certain areas that I've explained, yes.

14    Q.  Why don't you give me just a bullet list of what

15  those areas are?

16    A.  I have no doubt that in his discipline of

17  reconstruction, he's very good and trained and competent

18  at what he does.  But in the construction of educational

19  exercises, we try to refer to standards and practices

20  and to scientific foundations for things.

21        And when I looked at is this something I want to

22  do in practice, is this something I want to introduce to

23  students, I couldn't find a validation that explained

24  what he did from a scientific standpoint or validated

25  what he did from a scientific standpoint.  And in

certain instances, I found the absolute opposite.  I'm

aware that people are doing it, but it's not valid until

proven.  So that's the foundation of my argument.

Q.  You both work in different disciplines, don't

you?

A.  Yes.

Q.  So his views in his discipline may be absolutely

correct just as yours?

A.  In traffic construction, absolutely.

Q.  So we have maybe a difference of expert opinion

and methods?

A.  Is he recreating a collision?  No.  He's

attempting to measure something that existed prior to

his arrival, which is absolutely my discipline,

photogrammetry.

Q.  But he has his own discipline, doesn't he?

A.  Yes.  The measurement of things that happened

that are still there.

Q.  Can you direct us in your report as to where we

would find this discussion as you just testified to on

Mr. Toglia?

A.  In the supplemental?

Q.  Either one.

A.  Okay.  Could we see?

Q.  Do you want to see it?

1    A.  Yes, please.

2    Q.  If you could pull up -- I guess is it W?  Which

3 one is it, sir?

4        MR. CAMIEL:  Y is the supplemental.

5    A.  So if you'll page through to where it's the end.

6    Q.  What's the date of this supplemental, the 16th of

7 July?

8    A.  You're on page one?

9    Q.  And the last page too, it looks like, 16 July?

10   A.  So on page nine, is that what you're referring

11 to?

12   Q.  Yeah.  Well, I'm asking you, you tell me where

13 the Toglia information exists.

14   A.  Where the Toglia information --

15   Q.  We were talking about Mr. Toglia and you had

16 issues with his work.

17   A.  Right.

18   Q.  I'm asking you, where does that appear in your

19 report?

20        THE COURT:  Can you remind me which exhibit

21 number the supplemental report is?  I'm sorry.

22        MR. SKROCKI:  Yes, ma'am.  Exhibit Y.

23        THE COURT:  Y.  Thank you.

24        MR. COLBATH:  Can I just give Mr. Hoerricks a

25 copy of it so that he can thumb through it himself?

```
 1           THE COURT:  Any objection to that?

 2           MR. SKROCKI:  No, ma'am.

 3           THE COURT:  Go ahead.  Thank you.

 4           (Mr. Colbath approaches with exhibit)

 5      A.  So on page two, I'm speaking in the generic.

 6      Q.  No reference to Mr. Toglia himself, is that what

 7   you mean?

 8      A.  Right.  No specific reference.

 9      Q.  This is page two of Exhibit W, for the record,

10   yes -- I'm sorry, Exhibit X?

11           THE COURT:  Y.

12           MR. SKROCKI:  Y.  Thank you.

13      A.  That train of thought continues onto page three

14   and then ends with the transition to point one.  So

15   that's again in the generic about I guess the propriety

16   of that discipline engaging in measurements of things in

17   a still image.

18      Q.  So it's in a generic, but in your testimony

19   today, it's directed towards Mr. Toglia specifically,

20   yes?

21      A.  As the person doing this, yes.

22      Q.  Does that also carry over to Mr. Vorder Bruegge's

23   work?

24      A.  Mr. Vorder Bruegge didn't do a three-dimensional

25   data analysis.
```

1    Q.   Do you have criticism of his work?

2    A.   Not at all.

3    Q.   There was some discussion at the end of your

4    direct on color.  Do you recall that just a few minutes

5    ago before the break?

6    A.   Yes.

7    Q.   Where is that referenced in either one of your

8    two reports?

9    A.   In the report, no.  In the bench notes, yes.  I

10   correct for it.

11   Q.   What do you mean you correct for it?

12   A.   I attempt to remove the predominant color cast

13   and put them side by side so that they appear to be the

14   same.

15   Q.   Are you an expert in color analysis?

16   A.   Analysis, no.  Correction, yes.

17   Q.   Correction in terms of like Adobe Lightroom where

18   you can move sliders back and forth, change things,

19   contrast, brightness, saturation?

20   A.   2008, I wrote a book called Forensic Photoshop

21   where I describe three different methods of doing it in

22   Photoshop, and those methods are capable of being done

23   in Amped FIVE, which I use now.

24   Q.   Okay.  But I guess my point is, sir, is that

25   before the break, you were on the stand for about ten

minutes talking about color back and forth and analysis

and how things change and sunlight and fireplaces and

things like that, right?

A. Yes.

Q. Is any of that in either of these two reports?

A. In the reports, no.

Q. So we would have to go to the bench notes to find

those?

A. It wasn't a tested question, so to the extent I

needed to address it in the processing of things that

led to these reports, that's where they are in the bench

notes.

Q. So you use color in terms of processing for your

analysis?

A. In most cases, yes.

Q. How about in this case?

A. Yes.

Q. So that's not in your report, but it's in your

bench notes?

A. There were no questions related to color that I

was asked to answer.

Q. But nevertheless, irrespective of that, you used

color in your analysis for these two reports?

A. I don't understand the question.

Q. Irrespective of whether they asked you about

1  color or not, you used a color analysis in connection

2  with these two reports?

3      A.  I used a color correction in a workflow that I've

4  been using for quite some time, so yes.

5      Q.  What did you adjust?

6      A.  I adjusted for the overall dominant color realm.

7      Q.  Explain that to Judge Gleason.  I may know what

8  that is, but explain that to the Court.

9      A.  When the capture device is, to use the

10 literature, disturbed or influenced by the temperature

11 of light, it creates a kind of bluish, grayish haze.

12 And so I wanted to get and remove that.  And that

13 process is shown in my bench notes.

14     Q.  So we would have to go to the bench notes to see

15 what that was?

16     A.  Yes.

17     Q.  And so you manipulated those digital images?

18     A.  Yes.

19     Q.  Didn't you?

20     A.  Yes.

21     Q.  And that's -- but it's not in your reports, it's

22 in your bench notes?

23     A.  Yes.

24     Q.  What slider did you use to do that?

25     A.  Slider?

1    Q.  Yeah.  What analysis tool did you use to adjust

2  this?

3    A.  For the entirety of this exercise, I used the

4  product called FIVE from Amped SRL in Italy.

5    Q.  Okay.  And so you adjusted for -- tell me what

6  you adjusted for.

7    A.  Certainly.  I can show you.  So we can look at

8  HH.  Page down.  Page down.  So these are a list of the

9  actions that I performed on this file.  And so the large

10  bold type is the frame number, time index and so on.

11  There's comparisons.  There's differences.  These are

12  all of the steps that I performed.  If you want to click

13  on any of these you can and read the actual settings,

14  the slider, if you will.

15    Q.  Well, tell the judge in commonsense language what

16  you do -- what you did to change the overall tone of

17  these photographs.

18    A.  Certainly.  Can you scroll down one more.  I'm

19  sorry.  Up one.  In the -- there is -- for T-1, 2012014,

20  it's the second grouping of hyperlinks.  You'll see the

21  button called "White balance."

22    Q.  Uh-huh.

23    A.  If you click on that, click on that hyperlink, it

24  says, "White balance."  What that says, real world

25  explanation, adjust the image to balance out towards

1  neutral gray to get rid of the color cast.

2      Q.  Color cast?

3      A.  Yes.

4      Q.  That would change all sorts of different colors

5  to some degree or another, right, because there's no --

6      A.  Absolutely, yeah.

7      Q.  Overall change of the image, right?

8      A.  Yes.  So the white balance, down into the report

9  it explains all of the settings necessary to repeat that

10 in whatever Photoshop it's in.

11     Q.  Okay.  All right.  Can you go back a couple of

12 pages, I appreciate that, to his measurements?  The

13 exhibit with the measurement slider, the measurement

14 number on it.  You just had them up.

15         Those there.  Yeah.  Thank you.

16         I want to direct your attention to the 29-pixel

17 line.

18     A.  Yes.

19     Q.  You see that there?

20     A.  Yes.

21     Q.  Are you sure that goes all the way to the end of

22 that vehicle on the left-hand side?

23     A.  As best as I was able to, yes.

24     Q.  So maybe not?  You don't sound very confident.

25     A.  Right.  That's why we give an approximate when we

1    talk about pixels per inch and so on.  There's a range.

2    There's an error, yes.

3        Q.  The same would be true with the 32-pixel line,

4    right?  You're approximating?

5        A.  To the best of my ability, yes.

6        Q.  Almost like the way these agents did that video

7    to the best of their ability?

8        A.  Yes.

9        Q.  You don't fault them for that, do you?

10       A.  Not at all.

11              MR. SKROCKI:  Give me a moment.

12              THE COURT:  Certainly.

13              (Pause)

14              MR. SKROCKI:  I think that's all I have, sir.

15    Thank you.

16              THE COURT:  Any redirect, Mr. Colbath?

17              MR. COLBATH:  Very briefly.

18              THE COURT:  All right.  Go ahead.

19                      REDIRECT EXAMINATION

20    BY MR. COLBATH:

21       Q.  Just leave that right there if you will.

22           Mr. Hoerricks, those are found in your bench

23    notes, those pictures we're looking at where you show

24    the 32- and 29-pixel measurements, correct?

25       A.  Yes.

1     Q.   And they're also in your supplemental report,

2   which I think is Exhibit Y?

3     A.   Yes.

4     Q.   Could you put Exhibit M up?  I'm just going to

5   make sure that one is right.  M is not.  M is not what I

6   want.

7          If I can have just a minute to find my index

8   here, Your Honor.

9              THE COURT:   Certainly.

10             (Pause)

11   BY MR. COLBATH:

12     Q.   Put Exhibit D up.

13          I'm going to show you Exhibit D, which is a

14   portion of Mr. Toglia's report that you previously

15   looked at.  Mr. Toglia did a similar thing in his report

16   as what we just saw in your supplemental report, in

17   other words, a measurement, correct?

18     A.   Yes.

19     Q.   And what medium was his -- described in yours was

20   described in pixels.  How did he describe his

21   determination?

22     A.   I believe it's inches.

23     Q.   And on the left as labeled here, we see screen

24   shots and comparisons from April 12th compared to on the

25   right April 19?

1    A.  Yes.

2    Q.  First of all, from the -- I have a number of

3  points with this.

4       From the time stamp that Mr. Toglia identifies

5  here on April 19th, can you tell exactly down to the

6  one-thousandth of a second where this frame capture came

7  from on the April 19th video?

8    A.  Came from?  Are you asking how accurate the time

9  is?

10   Q.  No, I'm just asking if you looked at the video,

11 could you go and retrieve that frame, do you believe,

12 knowing the time?

13   A.  Yes.

14   Q.  And it is hour 15, 23 minutes -- oh, I'm sorry.

15 It must be --

16        THE DEFENDANT:  It's military time.

17   Q.  Hour 15, minute 23, 6 seconds -- 6.733 seconds.

18   A.  There is a dispute in the literature as to what

19 those last three numbers mean, whether they're

20 milliseconds or they're a database indicator for sort

21 order and so on.  But yes, it's a fraction of a second.

22   Q.  Pretty precise.  Okay.

23        And Mr. Skrocki, first of all, asked you about

24 UU -- well, strike that.  Let me back up.

25        You're aware that -- so that's what was done on

     1    April 19th that Mr. Toglia in this particular example

     2    used.

     3         On April 12th, you're aware that the actual

     4    evidence video shows an object go left to right and the

     5    same or a different object go back right to left on one

     6    occasion each, correct?

     7    A.   Yes.

     8    Q.   And you heard Mr. Sturgis testify that on

     9    April 19th, they did that seven times left to right and

    10    seven times right to left, 14 times?

    11    A.   Okay.  Yes.

    12    Q.   You heard him testify to that, right?

    13    A.   Yeah.

    14    Q.   Would there have been more frames captured in the

    15    two passes on April -- in which would there have been

    16    more frames captured, April 12th or April 19th, by the

    17    data collection camera, I guess?

    18    A.   The slower he went, the more it was seen by the

    19    video, so the more frames there would be.  The faster he

    20    went, the fewer frames that the vehicle in question

    21    would be present.  I think that's the answer.  I don't

    22    quite understand the question.

    23    Q.   Let me ask it a different way.  If I gave you

    24    both videos, which I did --

    25    A.   Yes.

1    Q.  -- and as a scientist I said, I want you to

2    conduct a photographic comparison, which I also asked,

3    and I asked you to extract all the frames you could from

4    April 12th and all the frames you could from the

5    exercise done on April 19th, would they be equal, would

6    one generate more, would one generate less total?

7    A.  There would be a slight variation from minute to

8    minute is what I saw when I looked into the data

9    containers when I was trying to validate the use of

10   FIVE.  So there was a very slight variation, which is

11   why you get that remainder when you do this, the

12   per-inch-per-second calculation.

13   Q.  You're not understanding my question.  Because my

14   question is not on any given pass, not in any given

15   instance.  My question is:  For the whole video on

16   April 19th, if I asked you to run it in your Amped FIVE

17   software and isolate every frame that you could pick

18   out, would you pick out more than if you did the same

19   exercise or less than if you did the same exercise that

20   you did with the April 12th video?

21   A.  I can remove, successfully isolate every single

22   frame that's present regardless of the video.

23   Q.  And given that on April 12th you know that an

24   object of interest passed once going left to right and

25   once going back right to left, but you know that on

1   April 19th, there was seven left-to-rights and seven,

2   which would you expect to find more frames?

3        A.   The one that has more passes.

4        Q.   And if the speeds are different, would you expect

5   the quality of the frames to vary in their -- well, I

6   guess the quality of frames to vary based on the speed?

7        A.   As the speed drops, there will be less of a

8   motion blur issue.  So as the speed drops, the quality

9   of the item of interest would improve.

10       Q.   So if you look back to this Exhibit D, if you

11  look at the time there recorded by Mr. Toglia, that's --

12  there's a time stamp on these videos, aren't there, that

13  you reviewed?  You see that there was time measurement.

14  That's how he was able to record this?

15       A.   The time in FIVE is displayed differently.  It's

16  not an overlay.  So I have the raw data from the

17  container.  I found it in a particular folder that is

18  date very specific down to the minute.  That's the

19  archive file, the archive.iva file that I've gotten.

20  And so that is exclusive of a time overlay.  So I

21  identify it by -- in terms of my work, by frame number.

22       Q.   All right.  Mr. Toglia doesn't -- did you see

23  whether or not Mr. Toglia identified a frame number, or

24  do you have any way of telling other than the time when

25  of the many frame choices he selected for comparative

1    purposes, do you have any way to determine that?

2        A.  No.

3        Q.  If I go back to Exhibit UU -- highlight the

4    bottom of the graphic.  Do you have a way to leave that

5    there and take me back to the second page of Exhibit D?

6            So on the right, we have Exhibit D.  Those are

7    Mr. Toglia's comparisons, right?

8        A.  Yes.

9        Q.  And again, you've already testified he made

10   similar type measurements like you made.  His were in

11   inched, yours were in pixels.

12       A.  Right.

13       Q.  You see that down in the bottom comparison?

14       A.  Right.

15       Q.  So you see that his comparison on April 19th was

16   taken from 15, 20, 34.  We'll leave the milliseconds out

17   of it.  Can you find -- and I'll just, I guess, direct

18   you to the yellow highlighted bar, 15:20:34 is on, it

19   appears, if the time stamps are right, if the data is

20   correctly recorded, that that is from the vehicle

21   traveling during its second set of passes.  Do you --

22   would you agree with that?

23       A.  Yes, I can read that.

24           MR. SKROCKI:  Your Honor, I'm going to object.

25   I know the rules of evidence are relaxed, but the time

for Exhibit UU, we believed it was his work product.  It
is not --

THE COURT:  Fair enough.  I would concur,
Mr. Colbath, that as I understood the testimony earlier
this afternoon, this witness didn't prepare this.  You
did or someone in your office.  And he has not, as I
understand it, ascertained its accuracy.  So I don't
intend to rely on this document.
BY MR. COLBATH:
    Q.  Mr. Hoerricks, do you know the -- do you know
where the times on this document came from?
    A.  The times on the document came from the times
embedded in the video.
    Q.  The video that the Government provided in
discovery?
    A.  In evidence, yes.
            MR. SKROCKI:  I would like to voir dire the
witness.
            THE COURT:  You did not go and double-check all
of these?
            THE WITNESS:  I did not.
            THE COURT:  That's all -- I don't intend to
rely on this based on -- what I understood the witness
to say was you got this yesterday and haven't verified
it.

1          MR. COLBATH:  Yeah, that's fine, Your Honor.

2     BY MR. COLBATH:

3       Q.  Mr. Hoerricks, would it make a difference -- just

4     take that off but leave D up there.

5          Would it make a difference if in the measurements

6     depicted there, if the speeds were drastically different

7     in the still shots that are captured here for

8     comparative purposes?

9       A.  As I understood the gentleman's testimony from

10     this morning, he observed that as the vehicle was slow,

11     it was less blurry to his eye.  And that would make

12     sense given the capture process, the lack of blur.  It

13     would make sense.

14       Q.  So the answer would be yes?

15       A.  Yes.

16       Q.  Difference?

17       A.  Difference.

18       Q.  And the more exaggerated the speed, what?

19       A.  The faster it would go, the more blurry it would

20     be.

21       Q.  Why is that, just from a scientific standpoint,

22     related to the camera?

23       A.  When the camera's optics begin the capture

24     process, an item is in a specific position relative to

25     the optics, and then it closes down the aperture, closes

1   down the eye.  The position is moved.

2          So now it begins its encoding process when the

3   thing is in two different places.  So that's -- the

4   result of that is blur.  It can be a softening effect.

5   It could be a linear effect.  There's a number of ways

6   that blurs manifest, but that's the essential problem.

7      Q.  Leaving that there, can you pull up his

8   supplemental report, which I think is Y.  Would you go

9   to page seven of Mr. Hoerricks' report, of Y.

10          Mr. Skrocki asked you questions about -- we'll

11  refer to this bottom picture here, the picture where

12  you, using the tool that you had, measured 32 pixels.

13     A.  Yes.

14     Q.  Do you recall those?

15     A.  Yes.

16     Q.  Can you blow that up at all, that picture, 32,

17  the 32 pixel?  Yeah, that, please.

18          So in measuring -- in choosing where to place

19  your line, you indicated that your attempt to measure

20  was what?

21     A.  Bumper to bumper.

22     Q.  And in this view, how would you describe the

23  car's orientation to the camera view?

24     A.  I would say slightly skewed relative to

25  perpendicular.

1    Q.   So if you hold this Kleenex box up and face you,

2    am I perpendicular, would you say the front of the box

3    is perpendicular to you?

4    A.   I can't see either side at this point.

5    Q.   And so if I just turn it slightly, now that

6    it's -- have I done what you've called skew it?

7    A.   Yes.

8    Q.   And what effect does that have as you observe it?

9    A.   I can now see a portion of the breadth of it as

10   well as the length.

11   Q.   The end of it?

12   A.   Yes.

13   Q.   And so in measuring, do you have to account for

14   that angle?

15   A.   In measuring, I want to attempt to go bumper to

16   bumper and stay on the same plane, the side of the

17   vehicle that's directly visible, right?  And so I want

18   to, as best as possible, not stray into the rear of the

19   vehicle in choosing my pixels.

20        Might I have been one or two off, as the

21   gentleman asked previous?  Perhaps, but I've done my

22   best to maintain my measure within that plane of video.

23   Q.   So can you highlight now the one with the exhibit

24   sticker over it, the image in the bottom corner there?

25        How would you describe the image -- excuse me.

1  How would you describe the orientation of the image to

2  the camera in this view?

3      A.  Same.  It's skewed.

4      Q.  And in fact, do you know whether that's the same

5  image that you used?

6      A.  In terms of the frame number, that's how I would

7  have identified it.

8      Q.  Okay.  And you haven't checked to see whether

9  these are the exact frame numbers, but the image appears

10  skewed the same direction?  Is that what you said?

11      A.  Yes.

12      Q.  And describe the measurement parameters here.

13  Are they the same as yours, save for pixels versus

14  inches, but are they the same as yours?

15      A.  It appears on the leftmost vertical line that

16  they've gone to the edge --

17      Q.  The one by the plus there?

18      A.  Yes.  That they've gone to the extreme edge of

19  the vehicle.  I've read that there is a rear-mounted

20  spare tire, and so it appears to encompass the

21  rear-mounted spare tire as well.

22      Q.  Because this is a picture, this is an

23  April 19th -- from the April 19th video, which you know

24  is the Wells' vehicle which you have seen a close-up of,

25  which you know has a rear spare tire?

1    A.  Yes.

2    Q.  And -- all right.  Is it important to account for

3  the skew or the non-perpendicular nature of the photos?

4    A.  As I said previously, the reported vehicle length

5  by the manufacturer is that kind of bumper-to-bumper

6  measure.  You'll notice in my measure that I don't --

7  for the most part, I -- and it is very hard to see at

8  this resolution, but I try very hard not to stray into

9  that rear area in describing my line and then painting

10  my line in there, whereas in the rightmost image, it is

11  front bumper to the rear of the vehicle displayed, that

12  rear of the vehicle displayed is skewed.

13    Q.  Mr. Skrocki asked you about criticism or critique

14  of Mr. Toglia.  And of course the two reports that we

15  have in evidence here are not the only two reports you

16  prepared, correct?

17    A.  I have a lot of bench notes and other notes and

18  so on, yes.

19    Q.  Right.  And additionally, you prepared an initial

20  document.  I guess I don't know if you call it a report,

21  but you prepared also a report more generally relevant

22  to your testimony where you reviewed the work of

23  Mr. Toglia and a number of other Government witnesses?

24    A.  Yes.  I was given a number of reports, the names

25  you've mentioned, of course, Iber, Vorder Bruegge and so

1    on.  And I did do kind of a line-by-line analysis

2    relative to standards and et cetera, rather lengthy

3    reports, but not certainly a formal experimental

4    analysis report summary, that type of thing.

5        Q.  Sure.  But if Mr. Skrocki wanted to go search out

6    and find your -- more comments that you had made about

7    the propriety or impropriety of Mr. Toglia's work, he

8    could go look there, albeit we're not offering that

9    relative to the April 19th video for this evidentiary

10   hearing, correct?

11       A.  I believe it's turned over to discovery, yes.

12       Q.  All right.  My last question then was about your

13   bench notes, which were provided with your reports.  If

14   we could look at HH, please.  And scroll down to the

15   beginning of the text links.  Do we see the Amped FIVE

16   comparison there?  Do we need to go one more?  Go one

17   more page.

18           You have to blow that up for me a little bit.  I

19   cannot read that screen.  I just highlight the middle

20   section between the two middle lines.  You indicated in

21   responding to Mr. Skrocki's questions about frame rate

22   that -- and I'll summarize, but I think you said, I

23   wasn't asked to calculate the frame rate, it was

24   derivative to the work I was doing to answer the

25   questions I was asked to do.

1    A.   Yes.

2    Q.   So I want to make sure that you explain that as

3  to why a frame rate calculation was accomplished and

4  that it was appended to the notes you had but not

5  discussed -- or appended to the report in your notes but

6  not discussed at length in your notes?

7    A.   All of the reporting and my interpretation of

8  reports, everything seems to be described by time.  But

9  in extracting frames from the archive container, I don't

10  have that information on the screen.  As you saw in the

11  video that was displayed in the previous testimony,

12  there was a time overlay.

13       I didn't have the benefit of that because I was

14  dealing with the raw data.  And so I had to conform it

15  to time, meaning this data file represents one minute of

16  realtime in order to identify the appropriate frames

17  that were referenced in the other reports.

18       And so as a necessary process, I had to conform

19  it to one minute so that I could find the appropriate

20  frames from the reference to say at this particular time

21  is the frame of interest as opposed to frame 29.

22    Q.   And so breaking that all the way down to start at

23  base level, you had to come up with a frame rate per

24  second and work from there?

25    A.   I don't determine in this step the frame rate.  I

tell the program how long it should take to play, and
the frame rate is calculated based on that.

Q.  The software does it?

A.  Yes.  And so I assume from the file structure of
the evidence files that I've been given where it's
broken down minute by minute, that the data container is
meant to represent one minute of time.  So that is the
value that I placed in there, and that is the frame rate
that I'm provided with and that's what allowed me to
find the frames of interest.

Q.  And is finding the frames of interest because
Mr. Toglia's report, Mr. Vorder Bruegge's report,
Mr. Becker's report, any of the analysis that's done
with the April 19th video, nobody watched videos and did
a description of videos as they played.  All of the
comparisons or analysis comparisons were done on a
frame-to-frame basis.  Am I right?

MR. SKROCKI:  Objection to foundation.

THE COURT:  I'll allow that.  You can answer
that.

A.  I don't quite understand the question.

Q.  Sure.  You said you had to -- you had the raw
data, which means what, you had the videos?

A.  I had the archived containers in their native
format as extracted from the scene.  So it was my

understanding in reading the reports that the hard drive was shipped to the FAVIAU unit in the FBI and that they did the acquisition of the data.

And so I found a Windows folder structure, if you will, full of data, full of archives. All of the archives are the same name, archive.iva. And so it's segregated by camera and then by date and then by hour and then by minute and so on.

And so based on the reports of this is the time we want you to look at, I went to that folder down to the minute, extracted the archive. When I dropped it in the program, FIVE, wants to play it back at a normal frame rate, which of course is going to play really fast because there's very few frames.

And so then I said, change frame rates, time equals one minute. And from that, FIVE says, well, I need to play it back at 4.2833 frames per second in order to accomplish that task.

Q. So when you read, for instance, we just looked at a page from Mr. Toglia's report, and you read in that report or you saw in that report, oh, he's comparing something on April 12th to comparing -- he's comparing a frame from the video on April 12th to a frame from the video on April 19th.

In order to find that frame from April 19th or

find both of these frames, you went to that raw data and
ran that process after making sure the computer was
running -- the software was running at the correct rate
so that you could figure out the same two frames you
could compare.  The two frames he compared, you could
look at the same two frames or find the same two frames.
Did I understand that right?

A.  Yes.

Q.  And just in order to be able to do that, you had
to figure out -- because he didn't report what frame
rate he was playing it at or how he counted those or
came to select those frames?

A.  It's my understanding that they used the program
that was derivative from the system to play it, which
would give you the overlay necessarily, and then stop
and save.  I believe that's the method that they used.

Q.  You used newer software than that?

A.  Yes.  And it was also -- one of the things I
attempted in that first validation was I wanted to make
sure that the software wasn't doing anything untoward
with the evidence files and its interpretation of the
archives.

        And so I did use the program, and I did find the
relevant frame, and I did export it out.  And then I
used my tool and I found the relevant frame, and I

brought it out.  And then I compared those two frames across four different similarity metrics to see whether or not my method was valid and that it didn't materially change anything.

And so that is reported in the difference calculation.  But there was -- there's really no difference between the players saving a file and my extracting one from the archive.  I prefer this method because it's a lot faster.

Q.  Okay.  That's explained here in your bench notes?

A.  Yes.  The repeatability numbers are in the bench notes.

Q.  And the question I asked earlier was:  It was necessary to extract individual frames because that's what you saw in the other expert's report, frame comparisons, not descriptions of running video comparisons?

A.  Right.  I wanted to compare frame to frame.

Q.  You weren't asked to watch a clip of video and compare it to a running video and compare it to a clip of running video?

A.  I was not asked that question, no.

Q.  Did you review in any of your work testimony by any of the Government experts where they did that type of comparison?

1    A.  I don't believe as a comparison.

2    Q.  All right.

3    A.  I don't remember that, no.

4         MR. COLBATH:  I think that's all I have for

5    you, sir.

6         THE COURT:  Recross at all?

7         MR. SKROCKI:  I do just on limited matters.

8         THE COURT:  Certainly.  Go ahead.

9         MR. SKROCKI:  Thank you.

10                  RECROSS EXAMINATION

11   BY MR. SKROCKI:

12   Q.  Earlier on, Mr. Hoerricks, you mentioned

13   Mr. Vorder Bruegge?

14   A.  Yes.

15   Q.  You had no issue with his work?

16   A.  No.

17   Q.  If you could pull up Exhibit D, please.  Thank

18   you.

19        Who does Mr. Vorder Bruegge work for?

20   A.  Essentially the Department of Justice.

21   Q.  FBI?

22   A.  FBI.

23   Q.  You were asked a lot of questions about

24   Mr. Toglia's report on Exhibit D.  Do you see that?

25   A.  Yes.

1    Q.   Would it surprise you that this is

2    Mr. Vorder Bruegge's report, not Mr. Toglia's report?

3    A.   Would it surprise me?

4    Q.   Yeah.  It's not Mr. Toglia's.  It's

5    Mr. Vorder Bruegge's.

6    A.   Okay.

7    Q.   Are you aware of that?

8    A.   I am now.

9    Q.   There's an FBI number down at the bottom on

10   class.  See that, "For official use only"?  We can

11   supply it for the Court in our supplemental briefing.

12   But that's Mr. Vorder Bruegge's report for the record,

13   not Mr. Toglia's.

14           THE COURT:  All right.

15           MR. SKROCKI:  That's all I have, Your Honor.

16   Thanks.

17           THE COURT:  Very good.  Thank you, sir.  You

18   may be excused.

19           (Witness excused)

20           THE COURT:  What's our plan at this point?

21           MR. COLBATH:  Your Honor, we have Dr. Reisberg

22   standing by.  I do not believe that he will be -- I

23   believe we could conclude his testimony today.

24           THE COURT:  How long for direct approximately?

25   Mr. Camiel, are you doing that?

1          MR. CAMIEL:  Yes.  I would think 30 to

2     40 minutes.

3          THE COURT:  All right.  Let's give it a try.

4     We'll go off record.  You asked for about five minutes

5     just to get set up?

6          MR. CAMIEL:  Please.  Just to get him on.  He's

7     standing by.

8          THE COURT:  That's fine.  That's fine.  We'll

9     go off record.

10         DEPUTY CLERK:  All rise.  Court stands in a

11    brief recess.

12         (Recessed from 3:55 p.m. to 4:05 p.m.)

13         DEPUTY CLERK:  All rise.  Her Honor, the Court,

14    the United States District Court is again in session.

15         Please be seated.

16         THE COURT:  All right.  We are back on record.

17    Are we ready to proceed?  I hear background noise.  Are

18    we okay?  All right.  Very good.  I'm going to ask the

19    clerk to administer an oath to the witness here, who is

20    who, Mr. Camiel?

21         MR. CAMIEL:  It's Dr. Daniel Reisberg.

22         (Oath administered to the witness)

23         DEPUTY CLERK:  For the record, can you please

24    state your full name and then spell your full name.

25         DEPUTY CLERK:  My name is Daniel Reisberg,

1    D-a-n-i-e-l, R-e-i-s-b-e-r-g.

2              DANIEL REISBERG, DEFENSE WITNESS, SWORN

3                (Testifying via video-teleconference)

4                        DIRECT EXAMINATION

5    BY MR. CAMIEL:

6        Q.   Dr. Reisberg, could you turn your volume down

7    just a little bit?

8        A.   Okay.

9        Q.   Thank you.  Dr. Reisberg, this is Peter Camiel.

10   We haven't met face to face.  We've just talked on the

11   phone.

12       A.   That's right.  Good afternoon to you.

13       Q.   Can you tell us first, where are you today?

14       A.   I'm in my home in Portland, Oregon.

15       Q.   And where do you work?

16       A.   Well, I actually just recently retired from Reed

17   College.  I was on the faculty at Reed for 33 years.

18   1986 until this year.  And so the moment, I'm not

19   working anywhere, although I certainly have many

20   projects.

21       Q.   What is your profession?

22       A.   I am a research psychologist with a specialty in

23   perception and in memory.

24       Q.   And how long have you been working as a -- were

25   you working as a research psychologist?

1    A.  Well, I'm still working.  I mean I have a number

2    of ongoing professional activities.  But I have been

3    working in this domain as a professional since I

4    guess -- let's say since 1986, which would be the year

5    of my Ph.D.

6    Q.  And you sent us some time ago your curriculum

7    vitae?

8    A.  Yes.

9    Q.  I have as Exhibit PP a copy of what appears to be

10   that document dated April 15, 2019.  Is that the update

11   that you sent us?

12   A.  It is.  There are -- I mean, my curriculum vitae

13   is always evolving.  There are some trivial updates

14   since then, but yes, that is the document that I sent

15   you.

16          MR. CAMIEL:  Your Honor, I would offer PP.

17          THE COURT:  I think I already admitted it,

18   didn't I?

19          DEPUTY CLERK:  Did you say PP?

20          THE COURT:  Any objection?

21          MR. SKROCKI:  No, Your Honor.

22          THE COURT:  That's admitted.

23          (Exhibit No. PP admitted)

24   BY MR. CAMIEL:

25   Q.  So we have that document, but could you give us

1    an overview of your professional career, kind of a

2    summary?

3        A.    Sure.    I start with my academic training.    I have

4    a bachelor's degree, a master's degree and Ph.D.    They

5    are all in psychology.    The master's and Ph.D. are in

6    what is technically called experimental psychology,

7    which is the scientific research end of the field.

8            And so just for clarity, I am not a mental health

9    professional.    I do not do therapy or diagnosis or

10   counseling.    I trained as a scientist, and I work on

11   scientific studies about how the mind works.

12           Since my Ph.D. in 1986, I've been working in a

13   variety of ways doing research, teaching, consulting,

14   working in an editorial capacity both on a number of

15   books and also for some of the professional journals,

16   but basically being an active member of the scientific

17   community.

18       Q.    One of the things you mentioned was teaching.    Is

19   that just students at the college, or is it other types

20   of professionals?

21       A.    My main focus has been teaching students at the

22   college, but I have over the years on many occasions

23   given educational presentations for various groups of

24   attorneys, for the Oregon legislature, for the Oregon

25   State Bar, for various groups of investigators, both

1    police investigators and private investigators.

2         So yeah, I've been working overall in a variety

3    of ways to get this information into many people's hands

4    so that the information can be used.

5       Q.  One of the things you mentioned was law

6    enforcement investigators.  What kinds of subjects have

7    you been involved in teaching them?

8       A.  Usually when I'm working with law enforcement,

9    the issue is either a focus on identification procedures

10   with the goal obviously of helping law enforcement get

11   the best possible evidence for IDs.  And then on other

12   occasions, the focus has been on proper questioning to

13   get as much information from a witness as you possibly

14   can without leading the witness, biasing the witness in

15   any way.  So those have been the two main topics for law

16   enforcement training.

17      Q.  One of the things I want to start out talking to

18   you about today has to do with the term "confirmation

19   bias."  Are you familiar with that term?

20      A.  Yes, I certainly am.

21      Q.  How is it that you're familiar with it?

22      A.  I have been teaching about confirmation bias,

23   writing about confirmation bias, supervising the

24   peer-review process for research papers on confirmation

25   bias.  I guess, you know, and certainly it's included in

the law enforcement training we were just talking about.

And all of that has been ongoing for the last, oh, I

don't know, couple of decades and probably about the

last 30 years or so.

Q.  As a general proposition, when I use the term

"confirmation bias," what does that mean to you?

A.  We're going to need to locate the term I guess in

two directions.  First of all, confirmation bias is not

just one process.  It is probably best to think of it as

an umbrella term that includes a number of more specific

processes, all of which have essentially the same

function of protecting the beliefs that you correctly

have and, I mean, basically biasing, how you seek out

information, how you interpret information, what you pay

attention to information, how you remember information,

a variety of things, but all basically tilting the

scales to favor information that is consistent with

ideas or beliefs or views you currently have, in other

words, information confirms -- sorry, I'm not sure I

will be able to turn that off.  I certainly hope I can.

I mean information -- I mean, sorry.

Favored information that fits with and therefore

confirms beliefs and ideas and expectations that you

currently have and simultaneously disfavors information

that might challenge or not fit with information you

1   already have.

2       And if I may, we can also locate the term sort of

3   in the other direction, because confirmation bias is

4   just one of several different patterns, all of which

5   have the impact of mixing together ideas and beliefs

6   that somebody has coming into a situation with the

7   information that they're picking up from that situation.

8   And so they're close cousins to confirmation bias

9   including something referred as top-down processing,

10  something referred to as hindsight bias, but you know, a

11  cluster of interwoven ideas.

12      Q.  Is this something that people in your discipline

13  have studied?

14      A.  Oh, yes, in great detail in many different

15  contexts.

16      Q.  And you mentioned that this factors into your

17  teaching law enforcement people?

18      A.  Yes.

19      Q.  In what way?

20      A.  I mean confirmation bias certainly fits into a

21  forensic context in a number of regards.  When law

22  enforcement is collecting evidence, you want to make

23  sure that they are collecting evidence in a fashion that

24  is as complete as possible, as objective as possible,

25  and not, to put it in informal terms, developing tunnel

1   vision so that they focus on just one possibility and

2   exclude other possibilities.

3       When they collect evidence, it's a consideration.

4   When they weigh evidence, it's a consideration. All a

5   goal of making sure that they get evidence that again is

6   objective and complete.

7       Q.   And have you been involved in, for example,

8   training with regard to eyewitness identification

9   procedures and --

10      A.   Yes, I have.

11      Q.   -- how confirmation bias might play into that?

12      A.   Yes, I certainly have.

13      Q.   Could you describe that?

14      A.   Sure.  I mean, the concern about confirmation

15  bias in an ID procedure is that if the police officer

16  happens to have some expectations about who the guilty

17  party might be, there are a number of things that the

18  police officer can do unintentionally, unwittingly that

19  will serve to confirm the hypothesis that the police

20  officer has from the start.

21      And of course I mean, if there's any worry at all

22  that the police officer might initially be mistaken,

23  that's obviously troubling, because it's going to cement

24  in place a mistake in judgment.  And even if you don't

25  want to assume the police officer is mistaken, the

1    problem with a bias procedure is that it makes the

2    evidence just entirely ambiguous, because if the

3    evidence is collected with a biased procedure, there's

4    no way to know whether the information that you're

5    gaining from the witness is what the witness truly

6    believes, which is obviously what you're after, or

7    whether the information coming from the witness is

8    merely being offered because the police officer somehow

9    tilted things in that direction.  And with no way of

10   knowing which of those it is, it obviously makes it

11   difficult to know how much weight, if any, to give to

12   the evidence.

13       Q.  Has confirmation bias been found in areas

14   involving forensic investigation or forensic analysis?

15       A.  Yes, it has.  I mean, one of the many questions

16   to ask about confirmation bias is in what circumstances

17   do you find it.  And, you know, among other things, do

18   you find confirmation bias when somebody is making a

19   judgment in their area of special expertise.  Do you

20   find confirmation bias when somebody is making a truly

21   consequential judgment?  And as part of those questions,

22   there's now, I'm going to guess, dozens of studies that

23   have specifically examined confirmation bias in the

24   context of forensic investigations.

25       Q.  What kinds of different forensic disciplines have

1 these studies covered?

2    A.  I'm not sure I'm going to be able to give you the

3 full list, but certainly confirmation bias has been

4 documented in fingerprint evaluations, in handwriting

5 evaluations, in the evaluation of polygraph results, in

6 the area of forensic anthropology where you're looking

7 at someone's remains after death and trying to figure

8 out who the person -- what the person's physical

9 characteristics may have been.

10       There are DNA studies.  Does that give you enough

11 of a sampling?  There's others as well.  But it may

12 cross a broad swath of forensic investigation

13 techniques.

14    Q.  What kinds of factors might increase the risk of

15 confirmation bias in forensic analysis?

16    A.  The answer quite simply is confirmation bias in

17 any context is going to depend largely on two

18 considerations.  One of them is how clear or, for that

19 matter, how unclear the visual input is.  On the idea

20 that the visual input is blurry or brief or not well

21 lit, that just obviously leaves a lot of room for

22 interpretation.  That's going to be a situation in which

23 confirmation bias can have a much larger impact.

24       And then the other factor just comes at it from

25 the other side, asking how clearly defined, how

well-established is somebody's belief and expectations.
And again, if somebody comes into a situation with very
strong beliefs about what they're likely to encounter,
that's going to lead to more confirmation bias.  So sort
of a perfect storm is going to be a weak input, but a
strong set of expectations.  That's where you get the
strongest effects.

Q.  So let me ask you to use as an example, you
mentioned one of areas that was studied was fingerprint
analysis?

A.  Yes.

Q.  Can you describe any studies where confirmation
bias was studied with fingerprint analysts?

A.  Sure.  I mean, most of those studies were
conducted by my colleague Ipiel Dror.  And in those
studies -- actually, let me back up and say multiple
studies, each has its own design, each has its own
details as part of the scientific process.

But for example, in an illustrative study, what
you might do is approach experienced, highly trained
fingerprint analysts and in many of the studies you
present them with a fingerprint pair, a latent from a
crime scene and a standard taken from a suspect, a pair
that they have seen before and regarded as ambiguous.

And for some of these experts, you tell them,

 1    look, we have reason to believe that the suspect in this

 2    case has a very strong alibi, even so we want to check

 3    their fingerprints just to be certain.  And then you

 4    tell other experts, look, we happen to know that the

 5    suspect in this case has made a very persuasive

 6    confession, even so, we want to check the fingerprints

 7    just to be certain.

 8          So you're adding incriminating information in one

 9    case and exculpatory information in another case.  I

10    hope it's clear that that information does not change

11    the visual input at all, but nonetheless, if these

12    experts look at a fingerprint pair thinking the guy is

13    likely to be not guilty, that creates a very strong

14    likelihood that they're going to say, these don't match

15    or it's indeterminant.

16          If they look at exactly the same pair but now

17    thinking the guy is likely to be guilty, that creates a

18    very strong likelihood that they're going to say, yes, I

19    perceive there to be a match.

20    Q.  One of the terms you just used was low input

21    information.  Can you elaborate on that?

22    A.  Sure.  The term has a technical meaning.  There's

23    a variety of ways you can measure the quality of the

24    input.  But I mean, basically what it means is an input

25    that is in one way or another visually limited.

1       So that it might be blurry, it might be

2   quick-paced, it might be badly lit, it might be far

3   away, it might be taken with a low resolution device so

4   that it's heavily pixilated.  Again, each of those

5   things is open to measurement by professionals with

6   their relevant technical training.

7       But I mean all of those things amount to cases in

8   which you've got a stimulus input that is on its own

9   indeterminant or to some degree indeterminant and,

10  therefore, in need of interpretation.

11      Q.  Is there any kind of a correlation that's been

12  found between low input information and the danger of

13  confirmation bias?

14      A.  Oh, absolutely, yes.  And many of the studies on

15  confirmation bias want to make sure that we really are

16  looking at confirmation bias.  And so deliberately

17  manipulate the level of focus or the level of blur or

18  the pixelation of the input.  And quite consistently,

19  when any of those parameters make the quality of the

20  input worse, the impact or confirmation bias goes up.

21      Q.  And that's been studied repeatedly?

22      A.  Yeah.  I mean it's just routinely included in

23  studies.

24      Q.  Now, you were sent some materials to review in

25  this case; is that right?

A. Yes, I was.

Q. And you're not -- you've never been out to Kodiak to visit the crime scene, I take it?

A. No, I have not.

Q. You haven't interviewed any witnesses in this case?

A. That's right, I have not.

Q. Do you have any expertise in Honda CRVs?

A. I mean other than being the past owner of one, no.

Q. How about any expertise on forensic video analysis?

A. It's not a technical area in which I'm trained.

Q. Or accident reconstruction?

A. Again, not an area in which I'm trained.

Q. Were you sent a couple different video clips, one from April 12th of 2012 and another from April 19th the same year, 2012?

A. Yes, I was.

Q. What's your understanding of what the April 12th video was?

A. My understanding is that the April 12th video was taken or was recorded on the day of the crime and covers the minutes I believe both leading up to and then shortly after the apparent hour of the crime and

allegedly shows the defendant's vehicle moving first in one direction and then the other direction. Allegedly shows the defendant's wife's Honda moving in one direction and then the other direction.

Q.  And the April 19th video, the second video, what's your understanding of what that is?

A.  My understanding is that that was a video created by -- I'm not sure if I should appropriately say the Government or by law enforcement, the FBI, but some agency involved in the investigation specifically using the defendant's wife's Honda and seeking to portray from I believe the same camera, although with many changes in the technical details, but I assume from the same camera, showing what the defendant's wife's Honda might look like if it had been traveling back and forth on the road that was visible in the earlier video.

Q.  Now, what's your understanding of what the Government would like to do with the April 19th video in terms of trial?

A.  I mean, my understanding, based on I guess some of the briefings that I have seen in the case, is that the Government wants to present the April 19th video to show judge and jury this is what the Honda's -- the defendant's wife's Honda would look like or does look like when viewed from the perspective of that camera.

1    And the message to the judge and jury then that would be

2    their task is to decide whether the April 12th video

3    actually shows the same vehicle.

4        Q.   Now, I want to go back for a minute and talk

5    about forensic experts.  When forensic experts are made

6    aware of the danger or risk of confirmation bias in

7    their work, have there been any studies to show whether

8    that awareness is effective in minimizing the risk of

9    confirmation bias?

10       A.   I'm not all together sure I understand the

11   question.  But let me try to respond, and please let me

12   know if this is off track.  But I mean, certainly

13   forensic experts have rather vocally protested some of

14   the research findings saying that of course they are

15   aware of the possibility of bias and of course they do

16   everything in their power to avoid the bias and go on to

17   assert with some confidence that they are able to avoid

18   the bias.

19        From a research perspective, it is interesting

20   that they say that, because the blunt fact is that

21   they're wrong.  The blunt fact is that even though they

22   assert that they are somehow immune to confirmation

23   bias, that they know about it, that they fight against

24   it, the blunt fact is they still show confirmation bias

25   rather reliably in study after study where the studies

1  are basically conducted as part of these experts'

2  ongoing work.

3       And so on that basis, I think it's pretty clear

4  that the experts both insist that they are immune to the

5  bias and are mistaken about that.

6  Q.  And so that's dealing with experts, and I want to

7  talk now about dealing with a jury.

8       First of all, you've talked about studies and

9  research that's been done in terms of eyewitness

10 identification procedures.  And I want to talk about,

11 for example, the difference between a lineup and a

12 showup with eyewitness identification.  And with a

13 showup, what's the danger there?  I think it's obvious,

14 but if you'd tell us.

15 A.  I mean, I don't know if we should pause to define

16 the terms, but I mean, just quickly, a lineup is

17 identification procedure in which there is one person

18 included who the police believe may be the perpetrator

19 and then five other appropriately similar people

20 included in the lineup who are known to be innocent

21 often referred to as the fillers or the foils.  The

22 question that is put to the witness is which, if any, of

23 these six people is the person that committed the crime.

24      That's in contrast to a showup in which there's

25 just one face in view.  It's the person the police

believe may be the perpetrator, and the question that's
put to the witness is simply, yea or nay, is this the
guy.

With that base, I think it's just universally
understood -- and by universally, I mean by writings
from the courts, writings from law enforcement, writings
from the scientific community, that showups are an
inferior procedure.  And I mean, let's be clear.
There's a time and a place where showups are the
appropriate procedure, and we can talk about that if
it's relevant.

But the evidence is very clear that the overall
accuracy rate with showups is markedly worse than the
overall accuracy rate with lineups, because I mean, to
put it in blunt terms, often the witness has a partial
idea or an incomplete idea or a hazy idea of what the
perpetrator looked like.

And when confronting a lineup is -- that hazy
idea is not going to be enough to point the witness
toward the perpetrator and, therefore, if I can use the
terms often used in the research literature, those
photos sort of siphon away those weak memories because
the witness goes ahead and chooses one of the fillers.
The police know immediately that that's an error, and
therefore, they don't take it seriously.

1    With a showup, if you've got a hazy idea and
2  you're inclined to make a choice, there's only one
3  option in view.  And so all of the errors, 100 percent
4  of the errors pile up on that face because it's the only
5  option.  And that's the disaster.  That's what drives
6  accuracy down with showups.
7    Q.  And so in this case, we talked about or you
8  talked about the fact this April 19th video that was
9  created by Government investigators used Mr. Wells'
10 wife's Honda to drive past the camera.  And is there
11 some parallel between doing that and a showup?
12   A.  Oh, I mean, the fast answer is yes, although if I
13 may say so, what happened in this case is arguably worse
14 than the situation with a showup, and we can walk
15 through it.
16    But yes, the two do seem parallel in a showup
17 with faces, or in this case the question that was put to
18 the experts and the question that potentially will be
19 put to the jury is "this is the car, isn't it," which is
20 the same yes-or-no question that is at the heart of the
21 showup procedure.
22   Q.  You said that this is perhaps worse than a showup
23 with an eyewitness ID situation.  Why do you say that?
24   A.  For, I guess, multiple reasons.  One of them is
25 that in jurisdiction after jurisdiction, the rules are

clear that a showup is permissible only if it's done
within a reasonably short time period after the crime.
Various jurisdictions say one hour or two hours.

And part of the reason for that is that one might
reasonably hope that the witness at that point still has
a fairly clear memory of what the perpetrator looked
like with the goal that perhaps that clear memory will
allow the witness to rise above the suggestiveness
that's built into the showup.

You certainly do not have the parallel here,
because I mean there's not a clear memory that's the
basis for comparison.  All you've got is this very low
quality, very grainy, badly lit April 12th video.  And
so the strong comparison you might hope for in a normal
showup is not in place here.

Then, in case that's not bad enough, because of
the suggested mess of a showup, it is crucial that
showups be done properly with proper instructions that,
among other things, includes an instruction to the
witness saying, this may or may not be the guy, it's
okay if you say it's not the guy, we just -- I mean, we
did not pick this guy up because we have reason to think
he's guilty.

In a typical showup, you say, we picked this guy
up because he happens to be in the neighborhood.  And so

what you're trying to do is pull your witnesses toward a
mindset, toward a perspective that is objective and as
neutral as possible.

        And it seems to me that's exactly the opposite of
what was done here.  Instead, my understanding is the
various experts for the Government were told very
clearly that the law enforcement thought that it was
indeed a match and we're looking for confirmation for
it.

        And then in case that's not bad enough, my
understanding is that law enforcement in this case
created image after image after image from that
April 19th reenactment and chose the one that they
thought provided the best match, the clearest match.

        That is again in flat violation to the standard
rules for how you conduct an ordinary showup.  And
specifically what ordinary showups try to do is make
sure that no steps are taken to artificially or in any
way increase the similarity between the perpetrator and
the suspect, because if you artificially increase that
similarity, you're biasing your witness to start saying,
yes, there's a match.

        And so among other things, you do not require the
person to show up, to put on the hat, to put on the
clothing of the actual perpetrator, because that would

1    be biasing things toward a match.  And yet in this case,

2    the Government's multiple attempts to find the best

3    image seem to me actually to violate that principle.

4       Q.  And so you've been comparing potentially the

5    jury's view of a video of an object, maybe a vehicle, to

6    research that was done and understandings that were

7    developed from trying to identify people.  Does the

8    science allow you to extrapolate that?

9       A.  I mean, if I may, the premise of your question is

10   not quite right.  But the question that you work toward

11   is exactly right.  I mean the science -- I mean the

12   scientific community takes it as a research question to

13   ask whether an extrapolation from the available data is

14   legitimate or not.

15        And there are many forms of data that you

16   basically have to gather before you can say, "Yes, I

17   feel comfortable extrapolating from studies done over

18   here to a novel situation over there."  And I mean, for

19   brevity's sake, I will say the relevant data are in

20   place.  And so I think there is a powerful scientific

21   argument for saying, "Yes, what we know about

22   confirmation bias, and, yes, what we know up showups

23   versus lineups applies to forensic identification of

24   cars just as it applies in a long list of other

25   settings."

1    Q.  Are you aware of any recent research that's been

2  done with regard to identification of cars using showup

3  versus lineup situations or procedures?

4    A.  Yes.  I mean there is in fact one paper that

5  recently crossed my view, I shared it with you, that

6  tackles this issue directly.  I mean I want to be

7  cautious here, because part of the scientific

8  community's standard quality control is the process of

9  peer review, and this paper is so new that that process

10  has not yet happened.

11      But if I take the paper at face value, what they

12  show is that on point after point, the findings for face

13  identification are exactly parallel to the findings when

14  people are trying to make a forensic identification of a

15  car, including in this particular study, the significant

16  advantage of lineups compared to showups.

17    Q.  So, for example, in that study, did they use a

18  vehicle lineup?

19    A.  Yes.  I mean, in that study, the participants

20  viewed a crime and then were subsequently tested, could

21  they identify the perpetrator of the crime and could

22  they identify the vehicle that the perpetrator was

23  driving.  So we've got the two side by side.  Half of

24  the participants were tested with showup and half were

25  tested with lineup, and in a fashion that is in some

ways not at all surprising to me.

The lineup was consistently more accurate.  And also, as it turns out, my terminology showed a better calibration with certainty, which is to say when witnesses said they were certain about either the face or the car after the lineup, that statement of certainty was actually informative.  It did give you some indication that they were likely to be correct.

The parallel statements of certainty after a showup had no information value whatsoever.  People just were not at all calibrated in comparing their level of certainty and their likely accuracy.

Q.  So one of the things you mentioned a little bit earlier was something called the top-down effect.  What is that?

THE COURT:  Excuse me.  It's very distracting if you're chatting or you're communicating.  If you need to take a break before cross, I'll certainly give you that opportunity.  Thank you.  Go ahead, please.

BY MR. CAMIEL:

Q.  I was asking you about the term that you used, the top-down effect.

A.  As I said early on, just as confirmation bias is an umbrella term that covers many specific processes, confirmation bias in turn has let me say close cousins.

And the close cousins all involve cases in which someone
inadvertently colors, shapes, interprets the input
they're receiving based on other beliefs or ideas they
have.

        And the term top-down processing refers to I mean
one of those cousins of confirmation bias.  Top-down
processing refers to the fact that in any situation when
you're trying to perceive the world, what you do is mix
together information that is literally coming to you
through your eyeballs with information that you supply
on your own that tells you what aspects of the scene to
focus on, how to interpret aspects of the scene, and in
many cases, leads you to fill in through what's often a
sophisticated inference bits of the scene that you
simply didn't notice at all but which you can fill in
with sort of an after-the-fact reconstruction.

        And the term top-down influence refers to that
broad set of contributions coming from your beliefs,
your expectations, your attitudes that you bring into
the situation when you're looking at a stained glass.

    Q.  Now, you prepared two different reports for us;
is that right?

    A.  Yes, I did.

    Q.  One in February of 2014?

    A.  Yes, that's right.

1    Q.  And a more recent supplemental report earlier

2  this year?

3    A.  That's right.

4        MR. CAMIEL:  Your Honor, I would offer the

5  February 2014 report, which is NN.  The Government has

6  received this in discovery.

7        THE COURT:  Any objection to NN?

8        MR. SKROCKI:  No, Your Honor.

9        THE COURT:  All right.  That's admitted.

10       (Exhibit No. NN admitted)

11       MR. CAMIEL:  I would also offer OO, which is

12  the supplemental report.

13       THE COURT:  Any objection?

14       MR. SKROCKI:  No, Your Honor.

15       THE COURT:  OO is admitted as well.

16       (Exhibit No. OO admitted)

17  BY MR. CAMIEL:

18   Q.  I wanted to ask you about something you wrote in

19  your original 2014 report.  What you wrote -- and I'm

20  looking at page 11 of your report.  This is where -- a

21  section where you're talking about top-down effects in

22  the courtroom.

23   A.  Yes.

24   Q.  Do you have that in front of you?

25   A.  Yes.  I'm not -- yes, I see that section.

1    Q.  Down toward the lower third of the page, you have

2    got a line that starts, "What is at issue here is the

3    perceptual analog to confirmation bias."

4         Do you see that?

5    A.  Yes.

6    Q.  It's going to be the last full paragraph.  What

7    you say is, "The idea in brief is that our vision is

8    heavily influenced by our knowing what we're supposed to

9    see, and once we've perceived a pattern in one fashion,

10   it's extremely difficult to unsee that pattern and go

11   back to being an objective viewer."

12        I want to ask you about your use of -- what you

13   wrote there and how that comes into play if a jury is

14   shown the April 19th video, told that that video

15   involved the use of the Wells' Honda, and then presented

16   with the actual surveillance video from April 12th.

17   A.  I mean, let me, if I may, sort of provide, I

18   guess, a platform for the answer which is earlier we

19   talked about the circumstances in which confirmation

20   bias can be stronger, and I described what we can think

21   of as the perfect storm of a not very clear input side

22   by side with a very strong belief which can bias the

23   input.

24        We have the same situation here when regarding

25   the top-down influence.  The jury, I assume if they're

looking at the April 12th video is going to be seeing a
video in which the image of the car is small, the image
is heavily pixilated.  It's difficult to see in light of
reflections and shadows, the snow in the background.

And so what you've got is a visual input that I
think everyone has now agreed is relatively weak.  And
now let us imagine that someone sees that in the context
of having seen a relatively clear, relatively crisp
image, which -- I mean for which they are also given the
side information that well-credentialed Government
experts are quite convinced these are the same car.

I mean that seems to me exactly the situation in
which you would expect that, if I can use the common
terminology, witnesses are going to see what you tell
them to see.  They're going to be unable to set to the
side that suggestion and view the input in some neutral
fashion.

What they're going to be doing is trying to fit
that April 12th image into the framework, the
expectations, the schema that's created by the
April 19th video, make -- I mean, very powerfully
biasing them in favor of saying, "Yep, they match,"
whether they match or not.

I mean, again, if the April 19th video is showing
the wrong car, you would clearly be leading jurors

toward a mistaken perception.  And even if we hold that
to the side, if jurors first see the April 19th video
and then later see the April 12th video, we're now stuck
in a situation that will forever be ambiguous because at
that point, there would be no way for the juror, for us
or anyone to be able to tell whether the juror perceived
a match because there was a match or perceived a match
because they have been instructed there was a match.  It
seems to me that sort of ambiguity would, I hope, be
intolerable to the Court.

Q.  Let's take out of the equation for a minute what
the Government experts might tell the jury about their
opinion about the April 19th video and just have in the
equation that the jury is looking at the April 19th
video and told that that video involved using the Wells'
Honda, okay, without any expert testimony giving an
opinion, giving their opinion.  And then still shown the
surveillance video, the blurry, low-resolution video
from April 12th.

Are we still going to have reason to be concerned
about the top-down effect and confirmation bias?

A.  No, we're going to have a list of reasons to be
concerned, not just one.  I mean, what you have here is
again a showup procedure, or something parallel to a
showup procedure, and we've already discussed the fact

1      that that by itself compromises accuracy.

2           We also have a showup procedure in which there is

3      a weak comparison in the April 12th video, and that by

4      itself is going to create the -- make the suggestiveness

5      of the showup even more powerful.

6           We also have a case in which the April 19th video

7      is, I believe, already preselected to enhance or amplify

8      the resemblance between the Wells' vehicle and the

9      April 12th image, and that, again, violates the rules

10     for a showup.

11          And in case that's not enough, I mean, obviously,

12     the jurors know that they are on a jury, they know the

13     defendant's name, they know that Government agencies

14     have reason to believe a prosecution is warranted here,

15     and that sends a very clear message to the jury that

16     this is very likely to be a match.

17          That's exactly the setting in which you have

18     established in the viewer, in the juror, precisely the

19     opposite attitude, the opposite expectation that you

20     would want to create in order to have a high accuracy,

21     objective, reliable identification.

22      Q.  Are there things the investigators could have

23     done in creating another video that would have minimized

24     the risks that you just talked about with the jurors?

25      A.  Absolutely, yes.  And I allude to some of those

1   briefly in my 2014 report.  I described them in a bit

2   more detail in the 2019 report.  I mean, essentially,

3   the simplest thing one could do is create a lineup

4   rather than a showup so that one could imagine showing

5   the jury not just the reenactment with the Wells' car,

6   but a reenactment with the Wells' car and also five

7   other cars, clearly avoid telling the jurors which video

8   is which, and ask the video -- ask the jurors if they

9   can select from this, so to speak, video lineup which,

10  if any, of the vehicles match.  That by itself would be

11  a significant step forward.

12      Q.  Now, one of the things you talked about, when

13  there's a showup with an eyewitness being asked to

14  identify a person -- excuse me, when there's a lineup,

15  there's an admonition that's usually given to the person

16  viewing the lineup, the witness?

17      A.  Yes.

18      Q.  Is that something that would have -- how would

19  that work with a jury viewing the April 9th (sic) video?

20  Is there any kind of limiting instruction or admonition

21  you can think of that the Court could give the jury that

22  would minimize the risk of this top-down effect and

23  confirmation bias?

24      A.  The fast answer is no.  I don't think there's any

25  way to arrange for something that functions as the

1  admonition at this stage.  And I'm happy to explain that

2  if you like, but the answer is I see no reason to think

3  a limiting instruction would reduce the effects at all.

4    Q.  Could you explain that, please?

5    A.  Sure.  If you'll forgive me, I think I need to

6  give you a three-part answer.  Part one starts with the

7  fact that the operation of top-down processes, the

8  operation of confirmation bias is something that is, so

9  to speak, wired into the visual system at a low level.

10  It's not something people do deliberately.  It's

11  certainly not something that people do consciously,

12  knowingly.

13    And so if the process is entirely automatic and

14  unconscious, there's no way for the juror to detect that

15  bias and correct for it.  The bias is basically

16  invisible to the juror and, therefore, not something for

17  which the juror can intercede or adjust.

18    So I mean, the fact that the process is automatic

19  and unconscious is the first of the three reasons why I

20  think a limiting instruction would, I'm sorry to say, be

21  ineffectual.

22    The second reason is that, I mean, even if we are

23  extraordinarily optimistic and assume that jurors will

24  somehow take steps to adjust their confirmation bias, to

25  put the matter, quite simply, they couldn't.  And the

reason is the juror has no way of knowing whether the confirmation bias, whether the top-down effect is having a small impact on them, such that a modest adjustment is called for or whether the top-down effect is having a huge impact on them, so that some more radical adjustment is made.

I mean, there's no way to calibrate the adjustment because they don't know -- I mean, even if they are fully convinced that there is a bias on the scene and they're fully convinced that they must take steps to adjust for the bias, they have no way to calibrate the size of the bias and, therefore, no way to adjust for the response.

And so there's some danger I guess that they might undercorrect, they might overcorrect. That seems a serious obstacle.

And then, if you'll forgive me for the long answer, the third part of the answer is that a number of studies have very specifically explored what happens if you alert people to these biases and tell them clearly and specifically not to fall prey to these biases.

And I can go through the details if you like, but when you put to the test the simple proposition that we can solve these biases with instructions, the result is clear, you cannot solve these biases with instructions.

1        THE COURT:  Are you almost done?

2        MR. CAMIEL:  Thank you, Doctor.  I think the

3   Government attorney will have some questions for you.

4        THE COURT:  How long do you anticipate?  Should

5   we reset for tomorrow?

6        MR. SKROCKI:  Sometimes it depends on the

7   marshal's transport schedule.

8        THE COURT:  It's hard on them to stay after

9   5:00 p.m.

10       MR. SKROCKI:  It's okay to stay after

11  5:00 p.m.?

12       THE COURT:  No, it's hard.  If your witness is

13  available tomorrow morning, I think that would make more

14  sense.

15       MR. CAMIEL:  Doctor, are you available tomorrow

16  morning?

17       THE WITNESS:  If I need to be, I can be.

18       THE COURT:  Very good.  We have to find a

19  courtroom because Judge Holland has this one at 9:00

20  tomorrow.

21       MR. CAMIEL:  So we'll have to get ahold of you

22  and tell you when to call in.

23       THE WITNESS:  Okay.

24       THE COURT:  I think we'll probably be here and

25  we can keep the TV on.  Come back at 9:00 a.m.  Then I

 1    have an hour then until my next hearing at 10:00.  That

 2    should be adequate.

 3              MR. SKROCKI:  Yes.

 4              THE COURT:  Let's do that.  And then we can

 5    adjourn for today.  Thank you, sir.  We'll have you back

 6    tomorrow.

 7              MR. COLBATH:  Your Honor, can we instruct at

 8    this point, are we confident that we can instruct

 9    Dr. Reisberg to call in to the system, same number, at

10    10:00 a.m. his time, 9:00 a.m. Alaska time?

11              THE COURT:  Unless otherwise informed.  If we

12    change the number, we'll let you know, but yes.

13              MR. COLBATH:  As of now, unless you hear from

14    us, Dr. Reisberg, please call back at 10:00 a.m. your

15    time.  That would be 9:00 a.m. Alaska time.  Same setup,

16    same number.

17              THE COURT:  Very good.  All right.  Thank you.

18    We can -- we'll talk with you in the morning.  Thank

19    you, sir.

20              THE WITNESS:  I'll see you at 10:00 my time

21    tomorrow.

22              THE COURT:  Perfect.  So we'll come back then.

23              Anything to take up from the Government at this

24    point.

25              MR. SKROCKI:  No, Your Honor.  Thank you.

1          THE COURT:  All right.  Very good.
2    Mr. Colbath?
3          MR. COLBATH:  Your Honor, I don't know if the
4    Government anticipated requesting further briefing, if
5    the Court anticipated that from either side or if the
6    Court anticipated argument tomorrow, resting on the
7    briefs or what.
8          I think -- I don't know Mr. Skrocki's cross
9    examination.  We don't have any more to present other
10   than what would be a brief redirect.  So we'll be done
11   well before 10:00, I think.
12         THE COURT:  I would like to hear your
13   arguments.  We can see what time we have at that point
14   on the motion and take up also the scheduling for the
15   Government, the briefing and what you propose there, and
16   then I can hear from the defense on that.  Very good.
17         We'll see you tomorrow morning.  We'll go off
18   record.
19         DEPUTY CLERK:  All rise.  This matter is now in
20   recess until tomorrow at 9:00 a.m.
21         (Recessed at 4:57 p.m.)
22
23
24
25

1                         CERTIFICATE

2       I, Sonja L. Reeves, Federal Official Court Reporter
   in and for the United States District Court of the
3  District of Alaska, do hereby certify that the foregoing
   transcript is a true and accurate transcript from the
4  original stenographic record in the above-entitled
   matter and that the transcript page format is in
5  conformance with the regulations of the Judicial
   Conference of the United States.

6
       Dated this 2nd day of August, 2019.

7

8
                         /s/ Sonja L. Reeves
9                        SONJA L. REEVES, RMR-CRR
                         FEDERAL OFFICIAL COURT REPORTER
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25