1                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF ALASKA
2

3   UNITED STATES OF AMERICA, )
                              )
4         Plaintiff,          )
                              )
5   vs.                       )   CASE NO. 3:13-cr-00008-SLG
                              )
6   JAMES MICHAEL WELLS,      )
                              )
7         Defendant.          )
    _____ )
8

9            PARTIAL TRANSCRIPT OF EVIDENTIARY HEARING
       ON MOTION TO EXCLUDE THE APRIL 19, 2012 GOVERNMENT
10                  DRIVING EXPERIMENT VIDEO
                    (Arguments by Counsel)
11    **BEFORE THE HONORABLE SHARON L. GLEASON, DISTRICT JUDGE**
                  July 31, 2019; 9:10 a.m.
12                    Anchorage, Alaska

13  **FOR THE GOVERNMENT:**
         Office of the United States Attorney
14       BY:  STEVEN SKROCKI
         222 West 7th Avenue, #9
15       Anchorage, Alaska 99513
         (907) 271-5071
16

17  **FOR THE DEFENDANT:**
         Office of the Federal Public Defender
         BY:  GARY GEORGE COLBATH
18       601 West 5th Avenue, Suite 800
         Anchorage, Alaska 99501
19       (907) 646-3400

20       Camiel & Chaney, P.S.
         BY:  PETER A. CAMIEL
21       520 Pike Street, Suite 2500
         Seattle, Washington 98101
22       (206) 624-1551

23  _____

                  **SONJA L. REEVES, RMR-CRR**
24             Federal Official Court Reporter
                  222 West 7th Avenue, #4
25                Anchorage, Alaska 99513
         Transcript Produced from the Stenographic Record

1          (Call to Order of the Court at 9:10 a.m.)

2          (Proceedings took place that are not included

3     in this Partial Transcript, after which, proceedings

4     continued as follows:)

5          MR. SKROCKI:  I think what I would like to

6     start out with is the pleadings and the four corners of

7     the pleadings.  The issue here is relatively

8     straightforward:  Is the video of April 19th

9     substantially similar to the video of April 12th?

10         And the answer is yes.  The answer is yes

11    because they use the same equipment.  Certainly they

12    didn't get it within the certain number of degrees by

13    zoom that would have been 100 percent accurate, but that

14    does not make it substantially dissimilar.

15         As we pointed out yesterday, there are so many

16    factors that are fixed and at play that it's difficult

17    to assume why it is not substantially similar.

18         The buildings are fixed.  The fences are fixed.

19    And in terms of the screen capture itself, we're talking

20    about that much of a difference.

21         The other part of that is too is was there any

22    attempt on the agents to manipulate or do something

23    different.  Did they use a stronger camera?  They did

24    not.

25         THE COURT:  How do you -- what are your

thoughts in response to the lineup analogy that was made

by Dr. Reisberg?

        MR. SKROCKI:  That is just that by producing

that one -- that one vehicle?

        THE COURT:  Correct.

        MR. SKROCKI:  Well, a couple of things.  The

defense is able to do their own if they wished.  They

did not.  I assume, from my own perspective, my personal

perspective, they did not because it would have been too

inculpating.  It would be too difficult and would have

probably produced the result that's in court now, that

is the other vehicles are so sufficiently dissimilar

that it would not have been a feasible thing to do.

        I think a limiting instruction by the Court

would remedy the lineup issue.  Frankly, Judge, we're

not here to, in this case and in any case, hide the ball

or state something that's not in evidence.  It would be

a mistake to do that.  We would be called on it by the

defense.

        The jury is entitled to know why the agents did

what they did, and why they did what they did, the

testimony will show is that there was a review of

Mr. Wells going to work before by one of the Coast Guard

agents in his white truck that caused some suspicion.

They saw the blue vehicle, and then, during the course

of the day, they went and looked for the blue vehicle.

They found the blue Honda at the airport, and they said that could have been something that could have been used because it matches the video. And that's exactly what they did.

And so I think by laying out all the facts about why the officers did what they did, the bases for it with the limiting instruction, I think that's sufficient. The jury can certainly -- and I know there will be plenty of testimony that you cannot say that that is Mr. Wells' vehicle.

But I think a curative instruction as to this is what was done and this is why and this is what you can infer or not infer would remedy that situation. Clearly we're well down the road of being able to do something like that. Maybe that would have been a better practice. That was something that was decided a long time ago, but we have to deal with that. But I do think a limiting instruction is the way to go on that issue.

I think that -- we probably cited maybe 15 cases to you about what the standard is, the same ones that Mr. Colbath and Mr. Camiel cited. They carry over one to the other. There isn't any case law out there about whether this is so misleading that we need

to bring in an expert to talk about confirmation bias.
It's not part of the law anywhere that I have been able
to find.

And, again, the good doctor doesn't think any
of us are able to eliminate that from our perspectives,
but that's the way the trial process works. And whether
Mr. Hoerricks or Dr. Reisberg, the desire to have
scientific precision with human nature just doesn't work
because we're not machines.

And part of that process is everybody brings
something different to the courtroom as jurors, as
prosecutors, as judges, and we all do the best that we
can within the confines of the law. I'm sort of moving
into the expert piece.

Unless you have other questions on the
standard, I mean the standard is applicably met here,
and it's really met because there really is no -- if you
want to reverse it, there is no attempt to enhance or
manipulate or zoom or use better equipment. If they
wanted to do something that was really more beneficial
to the prosecution, they would have gotten a higher
resolution camera and zoomed it and said, "Hey, here is
what we found instead," and they didn't do that.

We had a couple of agents acting under the
direction of another agent saying do a duplication, and

1  they did the best they could.  That's what the state of

2  the evidence is.  So unless there is -- these things

3  about --

4          Getting back to the four corners, this case was

5  postured, this motion was postured as to differences in

6  bollards and fire hydrants and trees and all that.  All

7  those things are visible in both images, so I think I

8  used the word picayunish.  I get it that there is some

9  issues there, but those are really what we're talking

10  about here.

11          They are doing what they have to do, and I

12  understand that, but these differences here under the

13  standard of law are just that not significant that it

14  should cause the Court any concern that it's not

15  substantially similar.

16          THE COURT:  I think the first mention of

17  Daubert was in the notice of the issues that came after

18  the briefing.  I didn't see that in the defense motion,

19  but I certainly heard some of that yesterday.  What are

20  your thoughts on that?  I realize it's not in the

21  papers, but your thoughts on that issue?

22          MR. SKROCKI:  With respect to -- can you direct

23  me to what your concern is?

24          THE COURT:  As I heard Mr. Hoerricks yesterday,

25  he was saying that the way that this was done, this

video, filming on the 19th was, and I'm paraphrasing, was so poorly done that it doesn't meet the standard of Daubert for admissibility. I'm paraphrasing.

MR. SKROCKI: I recall. My follow-up question was to him did he have any issue with what the agents did and he said no, they did the best that they could.

But the next question is: Is this a scientific test? And the answer is no, it's not a scientific test.

THE COURT: That's helpful.

MR. SKROCKI: That's one thing I was thinking about on either the way in or the way home last night is this is not one of these tests where -- for example, let me give you an example.

In the Wade case years ago, they used bloodhounds to track Wade from an ATM to his home. We had a Daubert hearing for admissibility. So they brought in, "Is this scientific?" The answer was maybe or maybe not, but we still had to qualify the dogs as to whether they were trained. It was a very fascinating hearing and it worked out that it was admissible.

But here there is nothing scientific about this. We're not trying to figure out anything scientific at all. They were trying to make an assessment of whether this vehicle, for investigative purposes, was similar to the one they saw April 12th.

1          So the videos of April 19th were, yes,

2    subsequently used by other experts, but I don't think it

3    qualifies as scientific.  We're just talking about

4    measuring photographs.  Had we had back in old-school

5    days film and pictures that weren't digital, you would

6    be doing the same sort of analysis.  Are you able to

7    match that?

8          And I think the other piece too is really

9    limiting instructions on that.  You know, the jury is

10   free to accept or disregard, and there is going to be

11   cross examination on that and a rebuttal case.  So it's

12   not just that we have the one and only final say here.

13         I don't view this as a Daubert matter

14   whatsoever.

15         THE COURT:  Fair enough.  Thank you.

16         MR. SKROCKI:  And --

17         THE COURT:  I took under advisement the one

18   topic of Dr. Reisberg in the order I issued on the

19   defense witnesses.  I think you have addressed that, but

20   if there is anything else you wanted to add with regard

21   to this issue of to what extent Dr. Reisberg could

22   testify to a jury about their own biases as opposed to

23   the agents or that process.

24         MR. SKROCKI:  I mean part of the -- yes, Your

25   Honor.  Part of the reason from the briefing to call

Dr. Reisberg was for misleading the jury, that this
video is somehow misleading the jury.

I submit that calling him to talk about this
piece would be very, very confusing to them on almost
any piece of evidence that would come in.  That would --
that scientific analysis precision that none of us are
able to remove this at any stage of the proceeding, and
he's even gone so far to say the Government gets the
best and only advantage because of opening statement.
That would, in our view, trickle down to virtually any
other piece of evidence in the case, not just this one
video.

THE COURT:  Are you familiar at all with in the
Western District of Washington they have this whole
implicit bias film that is shown to the jury in the
assembly room?

MR. SKROCKI:  Would this be Judge Bryan's
courtroom?

THE COURT:  Judge Coughenour.  No, he's one of
the speakers.  Mr. Camiel I'm sure has seen it.  It's a
subject of some discussion.  In fact, we were talking
about it in Spokane at the conference about to what
extent the Court instructs on biases.

MR. SKROCKI:  You know what, Your Honor, if
that's something you want us to review, I'll make a call

1    and we'll review it.

2            THE COURT:  You can look online.  It's simply

3    what role does the Court play versus an expert on these

4    topics.

5            MR. SKROCKI:  I mean, times are changing.

6            THE COURT:  There you go.

7            MR. SKROCKI:  So I will look at that, but I

8    think --

9            THE COURT:  Then there is a very interesting

10   Supreme Court opinion that we actually cite somewhere in

11   the jury instructions, the pattern, that talks about how

12   the Court's role in instructing the jury is one of the

13   important tools in a courtroom to minimize bias.

14           MR. SKROCKI:  Let me say this:  I'll look at

15   those things, and if you want us to provide notice or

16   something or call us back into court, we would be happy

17   to address it.

18           We have a very strong case, and we know we're

19   back on retrial.  We're not worried about the evidence

20   and we're not -- we're going to go ahead and put our

21   case on.  We believe we have a very, very high chance of

22   conviction here.

23           So at the same time though, I recognize things

24   are changing, and so we will look at these two and we'll

25   discuss it amongst ourselves, the trial team, and then

1  back in the office and see what our office's position

2  is.  I can't speak for the U.S. Attorney, but we will

3  look at that.

4          THE COURT:  Thank you.

5          MR. SKROCKI:  Is there anything else?

6          THE COURT:  No, not at this time.  Thank you.

7          MR. SKROCKI:  While I have the podium, I do

8  intend to file a motion per yesterday's order.

9          THE COURT:  Yes.  What's your proposal there?

10          MR. SKROCKI:  I have asked for a transcript of

11  the entire hearing, so that will take me a couple days

12  to get.  So if I could have maybe 15 days, because I'm

13  also working on an alleged Brady motion violation.  I

14  have got that on my plate too.  If I could have 15 days

15  to file this.

16          THE COURT:  How about 14 days.  I'm leaving

17  town tonight, so I'm thinking today is Friday.  How

18  about two weeks from today then?  I am concerned about

19  our impending trial date.

20          MR. SKROCKI:  I can get started without it.  Is

21  there anything else?

22          THE COURT:  No, thank you.

23          Mr. Camiel, Mr. Colbath, go ahead, please.

24          MR. COLBATH:  Your Honor, I'm going to -- there

25  was a reason that I filed the notice of legal matters

before the Court, because this entire situation has

presented the defense with a Government -- which has

been a pattern in this case, of the Government wanting

it both ways and a continual moving target for us, and

here is why.  Here is how I saw the briefing.

We filed our motion initially believing that

this April 12th video -- or excuse me, this April 19th

video was problematic and was a demonstrative exhibit.

As I reread and I looked at the trial transcripts and I

thought about it, and more particularly as I studied the

Government's new expert notices, which in large part

re-notice experts, principally Mr. Toglia, Mr. Schmidt,

Mr. Vorder Bruegge, that were -- that testified at trial

and really have provided no new analysis, no different

analysis, they have just been re-noticed.

When I looked at the way they used them, they

used the April 19th video 100 percent, and it was

admitted by Judge Beistline without restriction and

without a limiting instruction, and without a 404/403 --

or 403 balancing test.

They used it substantively.  The experts

testified about it substantively.  So I knew that it was

created by agents.  I couldn't find any evidence

whatsoever that told me it was done scientifically, that

it was done for scientific purposes, but yet I could see

1   evidence that it was used scientifically, it was

2   testified about scientifically, it was relied on in

3   scientific analysis.

4         So I didn't know where we were.  We filed the

5   motion, rather than to preclude the experts, because if

6   Mr. Toglia wants to look at the April 12th video, which

7   is real evidence, and perform reverse projection

8   photogrammetry and offer an opinion, he can do that and

9   I'll challenge that and we can have some discussion

10   about that.

11         But if he wants to do scientific analysis and

12   provide scientific testing that includes the April 19th

13   video, then I thought that was inappropriate, so I

14   thought, if it's demonstrative, that's one question for

15   the Court; if it's substantive, that's another question.

16         I'm still not -- we're done with the hearing.

17   I have reread all the briefing.  I have heard

18   Mr. Skrocki's arguments.  I can't tell, and here is why:

19   In the briefing -- first of all, I want to point out a

20   couple of things.

21         Yesterday, when Mr. Hoerricks was testifying,

22   the Government jumps out and says, "Timeout.  Frame

23   rates, standards, I didn't realize the motion raised any

24   of these things.  We didn't think that it got to this

25   level.  We didn't think this discussion."

It didn't dawn on me last night until I was
sort of thinking about argument and rereading the
documents, but I reread Mr. Skrocki's brief, and he
wrote, I didn't, he wrote about frame rates on the
video. It's referred to in four places in the
Government's brief. It's referred to in involving a
calculation of speed.

Now, you know because Sturgis told you
yesterday, he can't calculate speed. He can eyeball
things, but an expert calculates speed, and they talked
about that in their video -- I mean, in their briefing,
as Toglia doing that. That's expert analysis.

So then I'm confused. Okay. He argued in his
brief this is relevant under 401, it's admissible, here
is why it's practical and helps the jury, here is why we
get to use it. Those are substantive evidence
arguments.

Four separate places in his brief he suggests
to the Court, and he did here today, that you should --
this doesn't need to be excluded, you just cure it with
cross examination and a limiting instruction.

You have access to all of the limiting
instructions and all the jury instructions you have
given in every case you have ever handled; I don't, but
you have that historical knowledge.

1       I would challenge the Court to go back and look

2  for a circumstance where you gave a limiting instruction

3  on substantive evidence that was not only received for a

4  limited purpose.  And here there is no limited purpose

5  the Government is offering it for.  The only time

6  limiting instructions are given is traditionally in two

7  scenarios that I can recall, that I can research, that I

8  can remember, that I can find, that I have been involved

9  in.  One is typically the 404(b) situation.  You let

10  something in under 404(b), or you let a hearsay

11  statement in not because it's truth of the matter

12  asserted, but because it demonstrates the effect on the

13  listener or something, and you immediately caution the

14  jury, "You just heard this about this act under 404(b).

15  I limit you.  You only consider it relevant to that."

16       Clearly we're not in that situation.  This is

17  not 404(b).  This is a Government construct.  The only

18  other limiting time that you give a limiting instruction

19  is a witness testifies and then they fill out a map,

20  they draw an illustration, they give us a summary chart

21  summarizing their testimony and it's offered for

22  demonstrative purposes.

23       And you may say -- there is this pattern in

24  limiting instruction on charts and summaries.  There is

25  something else.  Those things aren't received in

1    evidence.

2         THE COURT:  We have two.  We have one where

3    they are received.  We have two pattern instructions.

4         MR. COLBATH:  Clearly this is not an evidence

5    summary.  This is a creation.  And in the circumstance

6    where it's just a creation, it's demonstrative, and so

7    you say it's demonstrative.

8         The Government suggested demonstrative

9    resolution to substantive evidence.  If you give a jury

10   instruction, and here is what Mr. Skrocki told you to

11   do, said, "This is how you handle it.  Look, ladies and

12   gentlemen of the jury, this is what was done, this is

13   why it was done, and this is what you can and can't

14   infer from it."  That's what I wrote down that he just

15   argued to you.

16        That's the Court instructing the jury directly

17   on a piece of evidence.  You're telling the jury,

18   "Ladies and gentlemen, this is how the Court views what

19   this evidence was done."  More importantly, that's the

20   Court instructing the jury this is why this evidence was

21   made, and then that's the Court telling the jury here is

22   what you can infer from it and here is what you can

23   infer against it.

24        I will say right now on the record I'll do this

25   trial better the second time than I'll do it the first,

1  because if you give that instruction, it is 100 percent

2  comment on the evidence.  I don't say that flippantly.

3       THE COURT:  I know you don't.

4       MR. COLBATH:  That is not a joke at all.  That

5  is 100 percent an invitation to reversible error,

6  because it's not used demonstratively here.  If it was

7  -- here is the illustration of why.  I want to

8  straighten out one other thing.

9       Yesterday when Mr. Hoerricks was on cross

10  examination, we had referred to -- he and I had referred

11  to -- this is Exhibit D in your thing.  I had tried to

12  reference the times in these, and I had represented that

13  this was Mr. Toglia's work.

14       Mr. Hoerricks said fine.  And Mr. Skrocki got

15  up and said, "There's an FBI number.  Did you know this

16  was Mr. Vorder Bruegge's work?"  Mr. Hoerricks said,

17  "Okay," and he said, "You don't have a problem with

18  that?"  "No."

19       Well, first of all, that was misleading,

20  because Exhibit D, which was trial Exhibit No. 110, this

21  is Mr. Toglia's report, part of it.  And how the Court

22  knows that is, well, first of all, this was analysis

23  originally done by Mr. Vorder Bruegge.  That's why the

24  FBI number is on it.  But if you look across the top, it

25  says, "Left to right, side by side," whatever.  This was

1    Vorder Bruegge's analysis and comparison and

2    measurements derived from both videos, was taken by

3    Mr. Toglia and subsumed within his expert presentation

4    and his expert analysis, and the same slides were used

5    overall as part of his analysis.

6            If you look at Toglia's report, he says, "I

7    looked at the April 12th video. I performed my analysis

8    on it. I inserted -- I put it in my reverse

9    photogrammetry software. I inserted an animated Honda

10   CRV over it. I did some work to it." Stop.

11           The report goes on to say, "I then took the

12   April 19th video, I performed the same analysis, the

13   substantive testing analysis. And I did this and I did

14   that. Then I, after analyzing both videos in an expert

15   process, then I started on the step of doing a

16   photographic comparison. So first thing I did was I

17   went back and looked at what the -- looked at the

18   measurement aspect of it. The FBI had already done

19   that.

20           "Then what I did was" -- this is Exhibit M in

21   your book. "I did a PowerPoint." And in this

22   PowerPoint, if the Court counts, if you go in, you see

23   here that Mr. Toglia takes aspects and analysis from

24   April 19th, puts it on top of and subsumes it into the

25   April 12th video.

1          Just like -- now this is a -- I'll say this
2    comparison here, Exhibit No. 110, is a rudimentary
3    comparison, just a side by side.  Here is your one
4    person showup.
5          What Mr. Toglia does is repeat that -- first of
6    all, he finds that there is five frames going left to
7    right on the April 12th video and four frames going the
8    other way.  What the Court needs to understand, and part
9    of my point with my questions with Mr. Hoerricks was
10   imagine that if instead of showing a video, because all
11   the experts agree Mr. Hoerricks testified yesterday,
12   even Agent Sturgis could observe, these videos with that
13   poor camera are a collection of, or by the time the
14   computer compresses it down and saves it, they are just
15   screen shots.
16         What Mr. Toglia is saying, which the Government
17   put into evidence is, the evidence produced nine screen
18   shots going left to right, and the first part of the
19   April 12th video -- we had five pieces of paper.  I had
20   five screen shots to work with.  There they are.  I have
21   got five.
22         And then five minutes later on the April 12th
23   video, the car or object or whatever it is, assuming
24   it's the same one, went back by, but it only left four
25   screen shots.  So I got four more.  So I've got nine

1   screen shots from April 12th to look at.

2           Agent Sturgis went out, and using the same

3   camera, starting at five miles an hour, he went back and

4   forth 14 times -- I mean, back seven and forth seven.

5   So each of those on the same camera produced screen

6   shots.  And what we know is that at the

7   five-mile-an-hour rate -- and I just tried to make the

8   -- when I offered that Exhibit UU and you said, "I'm not

9   going to rely on it," all of that is in evidence.  That

10  is just --

11          THE COURT:  I understand.

12          MR. COLBATH:  100 percent of the evidence

13  that's evidenced on that document, it's just compiled

14  for the Court because I didn't want to frankly take the

15  time or put the burden on the Court.

16          What I'll tell you is the Government put the

17  video in evidence and the time is running on it.  So if

18  you just take their video and you go sit at your desk

19  and you watch it, it's under 30 minutes long, and you

20  watch the 14 passes, when you watch it go by, you can

21  count how long it is.  As a matter of fact, the video

22  counts itself, and it can count.

23          Well, just for purposes of my argument, you can

24  -- I will tell the Court that my belief is, were you to

25  engage in that analysis of the evidence, what you would

find is five and four, like April 12th, is only
consistent with the 35-mile-an-hour -- the final pass
that the Government exercise showed.

Each one prior produced more screen shots,
which makes sense under everybody's testimony.  Sturgis
said, well, when you go slower, you see the car longer,
which means the camera sees the car longer, which means
the camera captures more shots.

So here is what happened with their expert
analysis:  Nine screen shots to work on the true
evidence, April 12th.  But they didn't do one video -- I
mean, they did one video, but they didn't do one pass on
April 19th.  What they did was 14.  So now they have got
nine at 35 miles an hour, more at 30 miles an hour, more
-- all the way down to five.

They have got, I'll represent to the Court,
somewhere in the neighborhood of 120 screen shots.  So
if I lay them out on the table, I have got 120 pictures
representing different angles, different speeds,
different levels of blur, different situations.  And
what I reduce it down to is I pick the best three or
four or five that I like.

The problem is the right side of this, this is
at one speed.  It's taken at 35 miles per hour.  I
looked at some -- and you can look at it because the

time stamp is here.  If you look at this one, it's taken
at 25 miles an hour, so the car is going different, the
blur is different.  It's not comparing the same thing.

One of these, just the first -- in the first --
I stopped looking after the first three pages, because
the third one compares the picture at ten miles an hour.

And the Court can see that, because they were
nice enough to list the time on their exhibit and the
evidence is there.  So obviously, even by Sturgis'
untrained rudimentary eye, he knows he's looking at
something different going ten miles an hour going across
that screen than going 35 miles an hour; yet the jury
doesn't know that, because nowhere on this, nowhere in
the presentation does it say, "This is what I did."

THE COURT:  How come you couldn't explore that
in cross?

MR. COLBATH:  Here is why I can't explore it on
cross, several different reasons.  First of all, we're
now into -- aren't we having at that point a substantive
discussion?  I'm having an expert analysis discussion.
This is not just what they said it is.  We're seeing if
it was consistent.  This was by no means scientific.  He
said it twice in his argument, "This was by no means
scientific.  We're just using this to -- we're just
using this to see if it was consistent."

1          Well, no.  These have measurements down to the

2     tenth of the inch.  You can't tell that by looking at

3     it.  Somebody did expert analysis, substantive expert

4     analysis.  So that leads me to this, why I have a

5     problem on cross.  Mr. Skrocki made the statement to

6     support his argument that, look, if the defense wanted

7     to do this, the defense could have done this.

8          And I don't mean any disrespect to him, and

9     this is not a personal insult, but that statement is one

10    of two things.  It shows a clear, complete lack of

11    understanding of what happened here or it's dishonest,

12    one of the two, because he knows we can't redo.

13          And here is why:  I tried to have Mr. Hoerricks

14    redo it.  He tried to tell you why he couldn't redo it

15    yesterday and they objected.  They didn't want to have

16    that discussion.

17          I looked for experts to redo it.  Each image,

18    each person trained in photographic identification said

19    for me to create a similar lineup, let's say I wanted to

20    have Mr. Hoerricks go out, use that same camera, pick 12

21    random cars, run them by and do that, Mr. Hoerricks told

22    you, "Well, if I'm going to perform science," which

23    would be what that is, "I'm not just doing a random

24    recreation but I'm going to perform science" -- first of

25    all, this whole thing begs the question of we don't have

1  a burden of proof, we don't have to produce evidence,

2  but I assume the Court is aware of that.

3          THE COURT:  I expect that to be your first

4  point, but go right ahead.

5          MR. COLBATH:  And I expect the Court to be well

6  aware of that, to buy into the argument here, to play

7  that game.  What the scientists tell me is the starting

8  point is, to replicate, I need to know the camera

9  settings from April 12th.

10          I need to know the location, exact location on

11  the road where the car was driven or whatever the object

12  was on the road.  I need to know what was going on then

13  to produce for you something that I can later compare it

14  to and say this is that or this is not that.

15          So I can't find an expert to do the analysis.

16  Do you suppose that's why the Government didn't have an

17  expert do the analysis?  Because I submit to you if it's

18  that easy and Mr. Skrocki wants to clear this up and not

19  offer a one-car showup, why doesn't the Government have

20  its experts go out?  They're the Coast Guard.  Just for

21  me to get on the property, for me to show Mr. Camiel the

22  building, we had to have armed escorts and we weren't

23  allowed to take photos, we weren't allowed to do a bunch

24  of things just to be on the property, but they have no

25  restrictions of that.

 1          Why don't their experts go out and drive a half

 2     dozen cars by there, if they think it's so easy and able

 3     to do it, and if they want to create something that's

 4     not suggestive or not problematic?  The reason is the

 5     scientists say you can't do that.  That's why I had

 6     Mr. Hoerricks testify about there are ways to do this

 7     and there are ways to not.

 8          There is a protocol for both photographic

 9     comparisons.  It wasn't followed here.  There is a

10     separate one for reverse projection photogrammetry.

11     Wasn't produced here.  The answer, when I asked all

12     those questions, the answer from the Government is,

13     "Well, Mr. Sturgis, were you trying to do science?"

14     "No.  No."

15          Well, how does any of this discussion involve

16     Daubert?  Here is how it involves Daubert.  It's again a

17     situation of talking out of both sides of their mouth or

18     bait and switch or putting the Court in the position of

19     saying on the one hand, it's the Government's burden to

20     establish that, if you read all of this, Judge, and you

21     convince -- you're convinced that this is not

22     substantively offered, that this is just a simple

23     non-scientific demonstration, if you read all of that,

24     then the Government -- that's what the Government would

25     have you believe, because they say it's not scientific,

because the only evidence before you as to the creation of the video is an untrained, unknowledgeable agent who was working with other untrained agents who said, "We didn't consult any experts, we didn't consult any manuals, we didn't consult instructions. As a matter of fact, the day I showed up was the day they taught me how to use the camera. I eyeballed it. I don't even remember if I had a picture from April 12th there. It might have been from memory. I might have had a picture. I might have actually reviewed the video, but regardless, I eyeballed it, because I was not doing anything remotely related to science. I wanted to determine speed," which they never did. "And I wanted to just see for investigative purposes," which is what this really is, an investigative exercise, "I wanted to see if" -- the investigation team wanted to see are we on the right track, so they said it was.

What happens later is, not happy with that, the Government takes something it cannot lay scientific foundation for, scientific admissibility for, and they give it to experts who do scientific analysis. Toglia's findings, Vorder Bruegge's findings, Becker's findings, all these people rely on -- they do photographic comparisons. That's a two-prong process.

One of the prongs of the analysis is analysis

of April 19th. The reason Mr. Skrocki felt
uncomfortable enough to jump up and call timeout
yesterday is he knows if you say April 19th is not
admissible, his experts, one of the two legs of the
whole crux that holds up their testimony, goes away,
because it wasn't just a demonstration, it was analysis.
They all perform analysis. They do extrapolations from
it. They take measurements from it. They do
recreations from it. They move it in and out and do
blowups from it.

All of that is science, but none of them came
here and laid the foundation for you to say, "If I was
going to create this and use the Wells' vehicle in a
reverse projection photogrammetry recreation, this is
what I would do." You didn't hear that evidence.

I would ask the Court to infer, because I don't
think there is any other reasonable inferences, the
reason you didn't hear that is, one, because the
Government didn't try to exercise, and, two, because
there are standards on those things and there are rules
in the way you do that. And there have been -- there is
case law on it that says that's not supportable.

There are Daubert considerations that say no
software manufacturer who manufactures the software that
any of these experts used said this is appropriate for

1  that use.  It's not peer tested.  It's not reliable.

2  The methodology has not been proven for the purposes for

3  which they are offering it, and that is in-court

4  photographic comparison.

5          And so they can't have an expert come here and

6  lay the proper foundation because that requires you to

7  engage in the Daubert analysis and then the evidence

8  gets excluded because it can't pass the test.

9          The reason I didn't initially argue it is

10  because I couldn't find that an expert did this.  I

11  wasn't sure it was going to be offered as substantive

12  evidence.  It's not until I read their brief and think

13  about it more and see what was presented here, because I

14  was aware of now what you're aware of.

15          It was four untrained agents just doing an

16  investigative exercise.  That doesn't implicate Daubert.

17  I agree with Mr. Hoerricks yesterday.  I would agree

18  with what he says, that's just them doing their best.

19  But you don't let a jury consider page after page after

20  page of scientific analysis and analytical explanation

21  and measurements down to the tenth of an inch, you don't

22  let a jury consider that from a guy that just did his

23  best eyeballing it.

24          That's the evidence of record where we stand

25  today because the Government didn't present anything

else.  So you're still in the quandary of, well, do I
admit this substantively, because I still don't know.
So if you admit it substantively, I would submit you
have to do the full Daubert analysis, and the evidence
from the Government is Sturgis' testimony.

So I think that's a short analytical process
for the Court.  He said it wasn't scientific and he said
he was untrained.  It's out substantively on that basis.

If you find that it's demonstrative and you're
going to let --

THE COURT:  Let's say, totally different case,
there is a car crash and a police officer takes a photo
with his camera of the car crash.  We're at a trial on
the case and the photo gets introduced.  We don't go
through extensive testimony about the photography skills
of the police officer.

MR. COLBATH:  No, you're right, we don't.

THE COURT:  What's different about the
April 19th video?

MR. COLBATH:  Well, that's not the case here,
first of all.  Let's say in the same instance there is
also a surveillance camera that doesn't run video, it
snaps pictures every ten seconds of the intersection.
And the evidence is there is also, besides the one taken
by the officer just after the accident from ten seconds

prior right at the time of the accident, the surveillance camera snapped one, but that one is crappy. You can't make heads or tails. You're not even sure it's cars involved in the accident. It's very unclear.

So I submit to you that the original photo -- first of all, you would have to assume in this case he took 14 photos and he took them from all different angles and whatnot, and it's after the fact, the accident is done, so we don't know what happened during the accident. That's after the fact.

Let's say somehow the traffic control camera caught it right at the time of the accident. The initial offer might not be -- might be less problematic. We're not going to question his camera-taking ability, although that's finite, but there may be some argument about this is one camera and captures one thing and this is another camera.

But where the problem would come in is in this example, in your case, the Government not only wants to call the officer who took the picture and show the jury the picture, they want to call four experts to say, "I know that's one camera and I know this camera has a different setting, but, look, I have taken his 14 pictures, I have compared them to this one, I have changed them around, I've manipulated them, I've put

them over the top of each other, and the conclusion of

my overall analysis, which I can only do using his

after-the-fact picture with this at-the-time picture,

the only way I can arrive at my conclusions are to use

them both substantively and then this is what I have to

offer."

Well, I'm not so sure, if that was the

scenario, I'm not so sure we wouldn't have a Daubert

hearing on the quality of this picture or the

appropriateness of comparing that, but we would

certainly have some discussion about whether that's an

appropriate process here.

But what the Government is trying to get you to

do is bypass that whole process to just say, "This is

in."

THE COURT:  What I'm hearing really is that

sounds as if the focus of your concern is not so much on

the video of April 19th, but on what the experts are

going to say about that.

MR. COLBATH:  At the last trial, I don't know

because -- I'm not positive, but I don't think they

played the video.  And I think all the testimony was --

because of course the video shows it, and then I would

argue that the video by itself, and we'll get to

prejudice in a minute on all of this, but the Government

1    video of course shows it seven times.

2            And the evidence video, April 12th, shows it

3    one time, shows the vehicle pass one time, so there is a

4    problem with that.

5            THE COURT:  Your motion was to keep out the

6    video.

7            MR. COLBATH:  Well, of course.  And subsumed

8    with that is the stills from the video.  So if the Court

9    understands that, my understanding of the testimony last

10   time was that actually the jury was told there was a

11   video, and, from that, the experts used the video to

12   extract stills and here you have them.

13           So I want to follow through with where I was.

14   Let's assume you're right.  Let's assume that I'm going

15   to allow the pictures and I'm going to give the jury a

16   limiting instruction as suggested.

17           What are you going to tell the jury when they

18   see this?  "Ladies and gentlemen, what you see on the

19   right-hand side of these multiple pictures is

20   substantive evidence.  What you see on the left-hand

21   side you are to not treat the same as what you see on

22   the right-hand side.  You are to only take that as being

23   demonstrative of something," which you're going to have

24   to figure out because I can't, or they are going to have

25   to offer and you are going to have to accept.  "You are

to treat the left side of the page different than the
right side continually."

Now, in a few times that might be okay, but
what do we then when get to the PowerPoint, because in
the PowerPoint, if you page through it, roughly of 129
pages, there is like 40 pages where part of things drawn
from April 19th are either superimposed over, subsumed
within or made part of a screen from April 12th.

THE COURT: Can you point me to a page that
does that? I think I understand your point.

MR. COLBATH: Sure, let's do this.

THE COURT: Say, for example, page 86.

MR. COLBATH: Okay. Let's start much sooner
than that. Go to page 15.

THE COURT: 15.

MR. SKROCKI: Exhibit, Gary?

MR. COLBATH: This is Exhibit M.

THE COURT: I'm on page 15.

MR. COLBATH: We can see from the top this is
video analysis of the day of the incident, 4-12, and we
can see the object in question there going what they say
here is northbound, so that would be left to right.

And then the PowerPoint goes on to the next
page. If you flip on the next page, you can see 4-12
goes -- now it's the just the next frame. He's just

illustrating the frames.

Then the very next page, 17, now we have jumped.  First of all, I'd note we jumped to 4-19, page 17.  I would note that this is not demonstrative.  This is video analysis, so he's doing analytical work here.  He's performing science.  That's what this whole PowerPoint is.  That's what he entitles it.  That's what he calls it.  That's what it is.

This is a frame from that.  Go to the next page.  This is a blowup from that.  So you will have instructed -- I will have asked you to stop -- when he's going through the PowerPoint, I will have asked you to stop at page 16, and before they show 17, instruct the jury, because clearly all page 17 is is 4-19.

Then when he goes to page 18, he's manipulated page 17 and he's blown it up, but, again, it's from 4-19, so I'm going to ask you to instruct them again. This page too is just for demonstrative purposes.  This is how you're to treat page 18.

Then he goes -- well, now what are we doing? Look at page 19.  He's put a Honda CRV in there.  That wasn't part of Sturgis' exercise.  Sturgis didn't have a make-believe Honda CRV, he had Mr. Wells' Honda CRV, but yet Mr. Toglia puts it in there.  So I'm going to ask you again to -- and now he's creating a completely

1    different demonstrative from the demonstrative because
2    he's only working with 4-19 here.
3            THE COURT:  Here is my question:  The motion
4    relates to the April 19th video.
5            MR. COLBATH:  Correct.
6            THE COURT:  There is not a motion, as I recall,
7    of the many motions, that relates to Mr. Toglia's
8    insertion of a Honda CRV onto the April 19th video,
9    correct?
10           MR. COLBATH:  Correct.
11           THE COURT:  All right.  Thank you.  Because I
12   wasn't prepared for that issue, and I thought I had them
13   all, but this is helpful.
14           MR. COLBATH:  Think about it this way, Your
15   Honor, if I move to suppress the drugs, I don't move to
16   suppress the later testing of the drugs.  I assume that
17   you realize that if you exclude the drugs, the later
18   drug test is out.
19           THE COURT:  Fair enough.
20           MR. COLBATH:  So if you exclude 4-19, his later
21   manipulation of it, all his later manipulations are out.
22           So continue with me if you will just briefly.
23   Go to page 20.
24           THE COURT:  All right.
25           MR. COLBATH:  Now he manipulates it again,

because he takes the animation away and puts an outline
above.  Then if we go -- I'm going to have you jump now,
because I don't want to do this all the way through, if
we go up to page 23, so we're back to 4-12, but this
isn't really 4-12 because there is our make-believe car.
He's now superimposed that.

THE COURT:  On page --

MR. COLBATH:  23.  Maybe your screen -- well,
that's the make-believe car over the top of whatever is
there.

THE COURT:  My 23 doesn't have anything
superimposed on it.

MR. SKROCKI:  Mine doesn't either.

MR. COLBATH:  This page 23?  Sure it does.  In
the corner, that's the only thing we're looking at.

THE COURT:  I see it now.  Thank you.

MR. COLBATH:  We're not concerned about the
trees or the fence or the bollards.  We're concerned
about the image.  He covers whatever the image is up
with a make-believe Honda CRV that the computer has made
for him.

So he's doing the same thing, because look at
the next page, page 24.  Now the make-believe goes away
and the outline goes there.  So I will just represent to
the Court that how this PowerPoint runs is, he takes a

 1    slide from April 12th and he shows it.  Then he takes a

 2    slide from April 19th and he shows it.

 3          Then he inserts and overlays on April 19th and

 4    shows the jury, look at how well this fits.  Well, why

 5    does a Honda CRV, a make-believe Honda CRV fit so nicely

 6    on the April 19th video?  It was a Honda CRV.  They knew

 7    it was a Honda CRV.  Why does the outline match

 8    perfectly?  Because they knew it was a Honda CRV.

 9          But then without any explanation or change,

10    then he goes right into with the jury, now I take the

11    same outline and the same Honda CRV and I put it over

12    what you can't see here on April 12th.  So that's one

13    back and forth to the other for 129 pages.

14          So how are you going to instruct the jury to

15    say anything that involves 4-19 treat one way and

16    anything that involves 4-12 treat as substantive or just

17    treat another way?  Infer this from 4-19, infer that

18    from 4-12?  You can't do it.  The whole process --

19          THE COURT:  Isn't there a conditional relevance

20    limiting instruction?  I believe there is in the

21    pattern.

22          MR. COLBATH:  I don't know, but any time -- if

23    you find relevance at all, if you admit this and allow

24    it substantively, we circle back to Daubert, and the

25    Government has to convince you that Mr. Sturgis said, "I

created the video." Mr. Toglia had nothing to do with the video. Mr. Sturgis said, "I am not a reverse projection photogrammetry expert, never been trained in it, nothing."

They can't have somebody create the test, create the work product, and then give it to an expert to run the science on it. There has to be foundation. If Toglia wanted to go out and run it, then I could cross him on it. Then I would have filed a motion to challenge him, not challenge the video, because it's his scientific use of an unscientific video that's the problem.

If the Government wants to have Mr. Toglia testify -- yesterday Mr. Skrocki after the break at lunchtime gave you a copy of his report and submitted it. If you read the report, Toglia says right in it, "You asked me to perform these things. Here is what I did. I took the April 12th video and I did an analysis. I measured this, I put it in my reverse photogrammetry. I did all of this, all of that, and I got to an analysis point."

If the Government wants to offer that, in retrospect, I probably should have, now that I've really spent time with Mr. Hoerricks, I should have filed a Daubert on that because I don't think you can use that

reverse photogrammetry, but I can live with cross examining him on that, the analysis of 4-12.

But he doesn't stop there. What he says is after that -- and you will see they are separated by paragraph. He does it in chronology. He says, "I then jumped to the same scientific analysis of I ran the same process on 4-19." Having completed two scientific analyses, one on an evidence video that was just captured and one on a re-creation that Government agents completely controlled and orchestrated, that I had no scientific involvement and that they did not -- it wasn't even like they went out there and did it at his request for scientific purposes.

They did it for non-scientific purposes. Then he says, "Nevertheless, I ran scientific analysis on it," this piece of evidence that's not evidence. Then he says, "Having my two analyses, I now compared my results, my own results, and now I'm going to come tell the jury I find them consistent and I'm going to repeatedly and over and over show it to the jury and tell them why it's consistent."

Which leads to the last part of if you somehow get through all that mess of legal standards and why it's offered and how you can ever find that the Government has met its burden, if you get there at the

end, you have to then consider Dr. Reisberg's premise of

is this going to be prejudicial.

Well, the bottom line is I heard no explanation

from the Government, other than the defense could have

created it on their own, to your question of what do you

say to the argument of this is really a one-person

showup.  Only this is so much worse than a one-person

showup, but, first of all, find me a case that says a

one-person showup is unduly suggestive and not otherwise

admissible; however, the Court determined that the

defense could have just done their own one-person showup

with somebody different or could have done their own

photo lineup with the witness, and because they didn't,

too bad on them, we'll admit the one-person lineup.

That's not the law.  The law is that one-person

showups are found to be too suggestive.  They are not --

they are not addressed in the case law very recently,

very often, because they are not used by law

enforcement, because at this point in the development of

police investigations, even law enforcement knows a

one-person showup is likely not going to make its way to

court.

And so the answer to the one-person showup, you

know, if they had given their witnesses, or if

Mr. Toglia took just a photo of Mr. Wells' car and said,

"Well, I find it to be consistent. I have overlaid it
or put it in my model or I have done whatever," that
would still be a one-person showup, but it would be
once. He would have one picture of the car to work with
the April 12th video and try to do it.

But here the same argument that they make that
says, "Judge, this boils down to a similarity test and
this is just dead similar," first, the focus of that
camera, all of the dissimilarities illustrate in
different ways the difference between the focus of the
camera between April 12th and April 19th.

And that is so critically important because
what Mr. Hoerricks says, "Why I can't go out and
replicate my own thing is," and, "Why they didn't
replicate their own thing is," if I'm focusing on the
word "Elmo" right here, it says "Elmo," and my camera is
trained on it, if I've got one focus and I can see
"Elmo" and I change the focus, I would have to change it
substantially to still not be able to read the word
"Elmo." It's eight inches away.

If I was reading a license plate in the parking
lot from right here and my camera was focused and I
changed the focus ever so slightly, at 1,000 feet in the
parking lot, you might not be able to tell my car had a
license plate. And so that subtle difference at this

point becomes, well, it's magnified however far it goes.

Again, Sturgis wasn't doing science so we don't know how far it goes, because he didn't know where it started, nobody preserved that evidence, which crippled my experts from ever replicating anything, because nobody in the evidence collection saved the camera settings.

Then Sturgis didn't record how he changed it, so again, Mr. Hoerricks can't go out and say, "I'm going to compare apples to apples. We're all looking at April 12th. They made April 19th. I'll make my own April 19th using the same camera settings, adjusting it so the trees are cut off and the bollards are cut off and the fence is different. I'll use my own settings. Then I'm going to run ten cars by there, not one, and see if we get the same result."

Mr. Hoerricks can't do that because he would be stuck doing what they did. He would have to eyeball it because he doesn't have the camera settings. And if you're off at 1,000 feet a little bit, if he's off a little bit, he's now -- he can have no confidence. He cannot come and tell you, "Judge, I am confident under Daubert I can give you a reliable -- I'm offering you reliable evidence."

I don't have the ability because the Government

1  took the ability by not recording any of those things.

2  And so back to my showup, if they used one picture,

3  that's a showup.  Here, we know from their similarity

4  argument what they did was, it's not a bank surveillance

5  case where the robber is caught on video and then later

6  they show a mugshot of the robber or they stand the

7  person behind the two-way mirror and the person walks in

8  and says, "Yeah, that looks like the video."

9        What they did really was -- I'll take them --

10  for purposes of this discussion, I'll concede the

11  similarities.  What they did was they dressed the car up

12  in the same clothes, made it go into the bank, made it

13  wear and appear and stand in the exact spot and they did

14  the showup exactly the same.

15        And if that wasn't enough, if that wasn't

16  suggestive enough to heighten the one-person, one-car

17  showup, now look what they did, Judge, they took it,

18  and, rather than have the jury stand and look at it

19  themselves, they overlaid it.  So they said, "See,

20  doesn't it fit exact?  Don't you see it?  Doesn't it

21  fit?  If that angle is bad, let me try again because

22  this one, doesn't that fit?"

23        And then they made a cutout of the person they

24  were showing up, in this case the car they were showing

25  up, and put it over.  And they said, "We know the cutout

is precise because we took it from the defendant and
that fits too," and over and over. All this evidence is
a one-car showup repeated. Well, look at how thick the
book is. I think I made my point.

So what they are asking you to do is take care
of -- first of all, how do I cross examine that
suggestibility? My problem is the jury is being -- is
suffering from the suggestibility. And so do I get to
cross examine them? Do I get to just stand in front of
them and say, "Ladies and gentlemen, I know the Court
told you at the beginning don't be biased, kind of like
we tell you in voir dire, don't be prejudiced, but
that's not enough. I'm allowed, because this evidence
is in, I'm allowed to point out to you" -- do I just get
to talk as long as I want to talk about suggesting to
them, "Don't be suggestible. Don't let the 400
different screen shots of this thing dissuade you.
You're to neutrally evaluate this."

Impossible. You know that's impossible. So
think of the prejudice that comes into play here. Well,
what are you doing in a 403 analysis? You're weighing
the probative value versus the prejudicial.

So let's back up. If this is demonstrative,
how probative can it be, because demonstrative by its
nature is only demonstrating other evidence or other

testimony.  And so Mr. Toglia -- that's why I'm back to
my argument of Toglia can testify all day long about his
analysis of 4-12, and that's his testimony.  If he's
only going to just demonstrate something, or if, like
Sturgis said, "We're only demonstrating what we thought
the speed was," or, "We're only demonstrating that we --
we continued our investigation because this was" -- that
doesn't -- how does that help the jury?  That offers
very little to them.

          Whereas look at the suggestibility and the
possibility for error and the potential prejudice,
because Mr. Skrocki's argument was, he wrote in his
brief, if the jury believes that that was Mr. Wells'
car, the only inference is it was Mr. Wells in it and
he's guilty.  So if the jury makes a mistake on this,
it's the most prejudicial thing in the case.

          THE COURT:  I need you to sum up.

          MR. COLBATH:  So under Sturgis' testimony, it's
non-scientific.  That means it's not substantive.  The
experts use it as substantive.  If it's substantive, it
didn't get by Daubert because Sturgis' foundation can't
get it there and no expert was involved in the creation.

          It cannot be cured by a limiting instruction.
I challenge you and Mr. Skrocki to find one because we
have racked our brains and our abilities and nothing

1  will fix that.  If you wade through that mess, under

2  403, this is horrendously, horrendously prejudicial and

3  if it's just a demonstration is not probative of

4  anything.

5         THE COURT:  Thank you.

6         Mr. Skrocki, last word on anything?

7         MR. SKROCKI:  Yes.  I think Mr. Colbath started

8  about five until 10:00.

9         THE COURT:  He had a lot to say.

10         MR. SKROCKI:  None of it is here.

11         THE COURT:  I agree.

12         MR. SKROCKI:  None.

13         THE COURT:  Well, actually some of points he

14  covered were.

15         MR. SKROCKI:  One of the points that he

16  mentions is I mentioned frames in the brief.  Frames in

17  the brief were telling the Court how many frames were

18  created.  That's it.  That's all.

19         The other thing I want to mention is that

20  throughout the course of this case, this Government

21  trial team has been labeled by the defense as

22  disingenuous, lying in their briefs.  That is a lie.

23  Hiding the ball, and other things.

24         Today, it's dishonest.  Caveat or not, words

25  matter, and they are in the public record.  So we know

what we have been doing, and I'll tell the Court that if
Mr. Colbath thinks we're hiding the ball and we're
playing games with him, I have e-mails and I have voice
calls with him saying, "You got a problem or a question,
Gary, you give me a call and we'll hash this out.  You
want to file something late, you got leave to do it
every time."  And instead, in this case, this is a
classic sandbag.

        We go from the four corners of that brief to
the last 35 minutes of soliloquy about Toglia and Vorder
Bruegge.  And that was Vorder Bruegge's report, whether
he says so or not.  If you listen to what he says
sometimes it's characterized in shades of gray.  That
was Vorder Bruegge's report.  It wasn't Toglia's.

        This issue is we were under the impression --
and he had an occasion to file a reply and didn't do it.
This thing about Hoerricks is not in his briefs.  It's
only mentioned in this notice to the Court.  We got the
notice to the Court and I was like, why is this being
filed?  I'm being very naive thinking that's nice, they
are laying out the Court's issues for us and them.  We
even had a conversation about it.  In the footnote, you
got Mr. Hoerricks' testimony.

        I will save the rest of, I guess, the
conclusion of what to do with this for my brief.  If the

 1   Court is going to suppress this based on this expansion

 2   of an initial filed brief and providing us this

 3   information the Friday before, then we need leave to

 4   bring in our own experts and respond to that.  I offer

 5   that.

 6           I did note yesterday that Mr. Hoerricks seemed

 7   to have no difficulty himself doing an analysis as to

 8   the pixel length and other characteristics complained

 9   about so vociferously here.

10           In any event, Judge, unless you have other

11   questions for me, that's the status.  Words do matter.

12   They are in the record.  This really could have been

13   handled in a much more straightforward fashion and a

14   clear fashion than it was.  And now we're far, far

15   afield of where this started based on the briefs.

16           THE COURT:  Thank you.

17           I'll take it under advisement, the motion.  I

18   guess where I tend to -- I will say our goal here in a

19   retrial is not to have, as Mr. Colbath was discussing,

20   yet a third trial.

21           And I am inclined to look, although there is no

22   motion before me, with regard to the extent of

23   Mr. Toglia's superimposition being presented.  That's

24   where I could see a 403 issue having some merit, but

25   that issue is not before me.

1          And I guess my last question would be for the

2     Government, Mr. Skrocki, and that is what's your

3     response on this substantive versus demonstrative use of

4     the April 19th video?

5          MR. SKROCKI:  In the Daubert context, I do not

6     look at that as scientific.  It's mechanical, based on

7     an image and based on frames of reference from the

8     factory as to that vehicle.

9          THE COURT:  So it would be coming in as

10    substantive evidence and then that's where -- am I

11    correct?

12         MR. SKROCKI:  Yes.

13         THE COURT:  And then there is this conditional

14    relevance is the point I was raising, which is to say

15    that the April 19 video would not be relevant unless and

16    until the factfinder -- well, I leave you to ponder

17    that, and that is to say that it would have no relevance

18    if a jury were to conclude that the Wells' vehicle was

19    not driven on April 12th.  What's the relevance of a

20    re-creation on April 19th?

21         MR. SKROCKI:  They are free to make that

22    decision.

23         THE COURT:  Correct.  And that's where --

24    that's what conditional relevance is.  It only becomes

25    relevant if a jury concludes X, and I'll leave that out

there for people to ponder, but I do think, although it
was not a subject of this motion, I do think that some
of the -- that in that context the extent of the
PowerPoint may have, by Mr. Toglia, may have a 403
component because of the fact that the April 19 video
would only be conditionally relevant, so at some point
then there could be the prejudice substantially outweigh
that value.

MR. SKROCKI:  Understood.

THE COURT:  Food for thought, not before me
today, but I will address this motion that is here with
regard to the exclusion of the video.

So anything further?

MR. SKROCKI:  No, Your Honor.

THE COURT:  Now I'm behind for the rest of the
morning, but that's okay.

Mr. Colbath, anything further?

MR. COLBATH:  I apologize for that.

THE COURT:  That's all right.  That's all
right.  It's an important issue to both sides, I
understand.

MR. COLBATH:  If it wasn't so important, Your
Honor, I wouldn't be taking the time, and I appreciate
the Court allowing me to do that.

DEPUTY CLERK:  All rise.  This matter is now

1    adjourned.  Court stands in recess until our

2    10:30 matter.

3            (Proceedings concluded at 10:48 a.m.)

4

5

6                    CERTIFICATE

7       I, Sonja L. Reeves, Federal Official Court Reporter
     in and for the United States District Court of the
8    District of Alaska, do hereby certify that the foregoing
     transcript is a true and accurate transcript from the
9    original stenographic record in the above-entitled
     matter and that the transcript page format is in
10   conformance with the regulations of the Judicial
     Conference of the United States.

11
        Dated this 8th day of July, 2019.
12

13
                         /s/ Sonja L. Reeves
14                       SONJA L. REEVES, RMR-CRR
                         FEDERAL OFFICIAL COURT REPORTER
15

16

17

18

19

20

21

22

23

24

25