1               UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF ALASKA
2

3    UNITED STATES OF AMERICA, )
                              )
4          Plaintiff,         )
                              )
5    vs.                      )    CASE NO. 3:13-cr-00008-SLG
                              )
6    JAMES MICHAEL WELLS,     )
                              )
7          Defendant.         )
     _____)
8

9          PARTIAL TRANSCRIPT OF EVIDENTIARY HEARING
       ON MOTION TO EXCLUDE THE APRIL 19, 2012 GOVERNMENT
10                 DRIVING EXPERIMENT VIDEO
                 (Testimony of Daniel Reisberg)
11    **BEFORE THE HONORABLE SHARON L. GLEASON, DISTRICT JUDGE**
                 July 31, 2019; 9:10 a.m.
12                    Anchorage, Alaska

13   **FOR THE GOVERNMENT:**
            Office of the United States Attorney
14          BY:  STEVEN SKROCKI
            222 West 7th Avenue, #9
15          Anchorage, Alaska 99513
            (907) 271-5071
16
     **FOR THE DEFENDANT:**
17          Office of the Federal Public Defender
            BY:  GARY GEORGE COLBATH
18          601 West 5th Avenue, Suite 800
            Anchorage, Alaska 99501
19          (907) 646-3400

20          Camiel & Chaney, P.S.
            BY:  PETER A. CAMIEL
21          520 Pike Street, Suite 2500
            Seattle, Washington 98101
22          (206) 624-1551

23   _____
              **SONJA L. REEVES, RMR-CRR**
24          Federal Official Court Reporter
              222 West 7th Avenue, #4
25            Anchorage, Alaska 99513
        Transcript Produced from the Stenographic Record

```
 1              (Call to Order of the Court at 9:10 a.m.)

 2              DEPUTY CLERK:  All rise.  Her Honor, the Court,

 3    the United States District Court for the District of

 4    Alaska is now in session, the Honorable Sharon L.

 5    Gleason presiding.

 6              Please be seated.

 7              THE COURT:  All right.  Good morning.  We're

 8    back on record here in the Wells case, and we're going

 9    to continue on with cross examination.  Anything we need

10    to take up before that?

11              MR. SKROCKI:  Nothing from the Government, Your

12    Honor.  Thank you.

13              MR. COLBATH:  Nothing, Your Honor.

14              THE COURT:  Well, I'll remind you, sir, that

15    you're still under oath from yesterday's proceeding.

16    And, Mr. Skrocki, go ahead please, whenever you're

17    ready.

18              MR. SKROCKI:  Thank you, Your Honor.

19                        CROSS EXAMINATION

20    BY MR. SKROCKI:

21       Q.  Good morning.

22       A.  Good morning.  It's "Reisberg," by the way.

23       Q.  Okay.  Dr. Reisberg, good morning.

24       A.  It's still good morning.

25       Q.  Yeah, it is.
```

1          Sir, you're recently retired from Reed College?

2     A.   That's correct.

3     Q.   Congratulations.

4     A.   Thank you very much.

5     Q.   A couple of questions for you, sir.  I won't keep

6     you on the stand for too long.

7          I got your reports, Exhibit NN and OO, from the

8     defense.  Do you have those in front of you?

9     A.   Yes, I do.

10    Q.   Okay.  So one report is your initial report dated

11    February 2014 and the other is a supplement dated 26 May

12    of 2019.  Yes?  Do you have those in front of you?

13    A.   Yes.

14    Q.   You were asked a number of questions yesterday

15    about confirmation bias by Mr. Camiel.  And your

16    testimony in response to some of his questions, you

17    alluded to the blue vehicle as Mr. Wells' wife's

18    vehicle.  Do you recall that?

19    A.   I believe I said that, and that is my

20    understanding.

21    Q.   Who provided you that information that it was

22    Mr. Wells' wife's vehicle?

23    A.   To be honest, I'm not sure where I derived that

24    information.  It may have come from the testimony I

25    reviewed from the prior trial.  It may have come from

1    investigation reports.  I'm sorry, at this moment I

2    don't remember where I got that information.

3        Q.  You're testifying as it's fact, aren't you?

4        A.  It is certainly my understanding.

5        Q.  Okay.  And you also testified yesterday as to the

6    video at issue here, the April 19th video.  You recall

7    that testimony?

8        A.  Yes, I do.

9        Q.  And you used the word "enhanced" video.  Do you

10   recall using that phrase several times yesterday?

11       A.  I'm not sure if I used that word yesterday.  I

12   perhaps mistakenly used that word in my 2014 report.  My

13   understanding is that it's not an enhancement of the

14   original video from the day of the crime.  It's an

15   entirely new video.

16           Perhaps a better word would be to call it an

17   "alleged reenactment" or "supposed reenactment."  That

18   might be more accurate than calling it enhanced.

19       Q.  So if you used the word "enhanced" yesterday a

20   couple of times, you're saying that may not have been

21   the right word choice?

22       A.  That's right.

23       Q.  Sir, have you ever been qualified in federal

24   court to testify before a jury as to confirmation bias?

25       A.  Boy, I would have to think back over the years.

1   It is certainly true that I have been qualified to

2   testify in federal court.  I have been qualified to

3   testify about confirmation bias.

4       I'd need to go looking through my records to

5   think through whether I have been qualified for that

6   conjunction of that issue in federal court.  I believe

7   the answer is yes, but I'm not certain.  I would need to

8   go back and look at records.

9   Q.  Well, I mean, how many times would that yes have

10  been?  One time?  Are you talking two or three times?

11  A.  I believe I have only testified in front of a

12  federal jury perhaps three or four times.  Most of the

13  cases I participate in are state cases.

14  Q.  Right.  And with respect to your federal

15  testimony, you don't recall then offhand if any of your

16  -- you have been accepted as an expert and were able to

17  explain to the jury confirmation bias?

18  A.  That's right, I do not recall that at this

19  moment.

20  Q.  Let's ask from the state perspective.  Have you

21  been able to testify to a state jury as to your theories

22  on confirmation bias?

23  A.  First of all, they are not my theories.  I'm

24  simply reporting the established claims that are well

25  documented in literature, but with that small

clarification, yes, I have many times been allowed to
testify about that topic to juries.

Q.   To juries.  Okay.  When was the last time you did
that, sir?

A.   Boy, it may very well have been -- I don't
remember exactly what topics we covered in which case,
but it may very well have been a state case in Anchorage
where the topic was confession evidence and the concern
about the role of confirmation bias in police
interrogations.  I believe, but I am not certain, that
that may be the most recent case.

Q.   So yesterday your testimony dealt with
confirmation bias in an analogy to photographic lineups.
Do you recall that?

A.   That's one of the bases for analogies.  There is
other bases as well.

Q.   Sure.  And I'm not meaning -- I'm not trying to
trap you into a corner or anything.  This is the piece I
want to talk about right now.

A.   Okay.

Q.   So the lineup, the lineup piece, right, you
talked about that yesterday.

Now, photographic lineups are concerned with
making it happen quickly because of people's memories
and perception and things like that.  Is that relatively

1   accurate?

2       A.   No.   I mean in many cases photographic lineups

3   are administered weeks or months or in some of the cases

4   I have seen years after an event, so --

5       Q.   Okay.

6       A.   I mean the delay certainly varies enormously from

7   case to case.

8       Q.   But in this case, we're dealing with video

9   footage taken about a week apart, aren't we?

10      A.   Yes.

11      Q.   Okay.   So it's a photograph of what happened the

12  day at issue, the day of the murders, April 12th, right,

13  that's one video?

14      A.   Uh-huh.

15      Q.   And then a week later there is another video of

16  the reenactment, however you want to describe it, of

17  April 19th, right?

18      A.   That's right.

19      Q.   So we're not really concerned about people's

20  perceptions on memory as to a possible suspect in this

21  example, are we?

22      A.   I mean, let me echo that back just to make sure

23  I'm understanding.   If in fact we're talking about

24  people who can view the video from the 12th and the

25  video from the 19th within seconds of each other,

viewing one and then immediately viewing the next, then,
first of all, that does indeed minimize concerns about
memory loss because of the passage of time, because not
much time has passed.

There is however still a body of research that
examines pretty much exactly that issue, looking at how
accurate people are in making what is in essence a
side-by-side comparison and the role of bias even in
that setting.

Q.  A couple questions on that.  First, have you done
those studies yourself, or are you just reporting what
those studies have said?

A.  Certainly those studies are included within my
professional work, and so I mean those studies are
studies that I have written about, studies for which I
serve as editor, studies included in my teaching.

However, did I personally collect the data on
those studies?  No, I did not.

Q.  Okay.  And would it, in your view, lessen the
concerns on confirmation bias by the Government playing
the date of the murders, April 12th, video first, and
then after that, soon thereafter during the course of
the trial playing the April 19th video?

A.  The fast answer is yes, that would in some ways
diminish the concern.  What one would want to ensure is

1   that the finder of fact had an opportunity to view the

2   earlier video, in essence make up their minds about the

3   video and only subsequently give the April 19th video.

4           But let me race to say that even in that setting

5   the concern would be whether that sequence would have an

6   impact on the jurors' confidence in their comparison

7   since that's a scenario in which quite readily you could

8   get what is transparently referred to as confidence

9   inflation in which you're reassuring people, yep, that's

10  the right match and so there would still be an impact

11  there, but less of an impact and less of a concern about

12  confirmation bias.

13      Q.  You recognize that the finder of fact in this

14  case is going to be the jury, right?

15      A.  I understand that.

16      Q.  And you have been in court several times so you

17  know how the system works in a trial?

18      A.  Roughly, yeah.

19      Q.  Absolutely.  Have you ever been a juror?

20      A.  No, I have not.

21      Q.  You have not?  Never had the experience?

22      A.  I would love to have the opportunity to sit on a

23  jury.  As you can imagine, given my professional work,

24  the odds of my sitting on a jury are quite low.

25      Q.  I made it.  It was very rewarding, so maybe some

1   day you will too.

2       A.  I hope to follow your lead.

3       Q.  Okay.  So my point of that being is that you

4   realize the jury is the finder of fact, but the judge in

5   this case, Judge Gleason, is the one that sort of

6   instructs the parties, the court and the jury as to the

7   applicable rules and what they should do or not do with

8   respect to evidence?  You understand that?

9       A.  I understand that.

10      Q.  Okay.  And I want to make sure I understand that

11  in your professional opinion, it may not be your

12  personal opinion, but your professional opinion is that

13  limiting instructions will not operate to eliminate in

14  any way confirmation bias?

15      A.  I mean, the evidence is in some ways mixed here.

16  I mean, there are a couple of studies, let's

17  acknowledge, in which instructions do seem to diminish

18  the effect of confirmation bias.

19          However, those studies are clearly a tiny number

20  relative to the broader number of studies in this

21  domain, and the effects are, at best, uncertain, uneven.

22  There is certainly no scientific basis for claiming that

23  with any reliability some sort of limiting instruction,

24  no matter how persuasive, will eliminate concerns about

25  confirmation bias.

1    Q.  And if I'm accurate, that's your professional

2    opinion, right, versus personal?

3    A.  Again, that's my understanding of the available

4    scientific evidence.

5    Q.  Do you have a personal opinion as to whether a

6    limiting instruction would remedy some of your concerns?

7    A.  I mean, I do my best to be respectful of the

8    data, and, therefore, my personal opinion would be in

9    line with my reading of the overall pattern of evidence.

10   And so my personal opinion would be pretty much along

11   the lines of what I just said.

12   Q.  So the answer is yes, you agree with the

13   professional analysis that -- you personally agree that

14   there is no limiting instruction that would operate to

15   eliminate confirmation bias to a scientific validity?

16   A.  That's right.

17   Q.  Okay.  That's what we're talking about is you're

18   talking about scientific validity as to the absolute

19   zero, correct, that it would not?

20   A.  That's right.

21   Q.  Do you recall in your report where you reference

22   that this would even have an impact on the judge, that

23   confirmation bias would have an impact on the judge?

24   A.  I don't recall in which report I said that.  I

25   believe it was the 2014 report.  Yes.

1    Q.   Correct.  Do you have that in front of you, sir?

2    A.   I do.

3    Q.   Okay.  If you could go to page 15 for me.

4    A.   I am looking at page 15.

5    Q.   The last paragraph.

6    A.   Yes.

7    Q.   Could you read that for the record, please?

8    A.   You want me to read it aloud?

9    Q.   I do, yes.

10   A.   Sure.  The paragraph to which I believe you're
11   alluding says:  "In fact, let me respectfully carry this
12   one step further by considering how the videos will
13   appear in your judge's eyes.  Plausibly, the judge's
14   decisions about the video evidence will be shaped by the
15   judge's own assessment of how clear the raw video is,
16   and I hope you can see that the science described here
17   suggests that the judge will overestimate the clarity if
18   the judge has already seen the enhanced version."

19        I pause for a moment to say that's probably the
20   inappropriate use of "enhanced," as you and I have
21   discussed this morning.  But now I continue reading:
22   "As a closely related point, it seems plausible that the
23   judge's decision about the video evidence will be guided
24   by the judge's estimation of what the jury will be able
25   to discern in the raw video, and, again, this estimation

1   will be compromised if the judge has already seen the

2   enhanced version."  End of paragraph.

3       Q.   Okay.  So is this something you believe is an

4   absolute, or do you believe that any judge would be able

5   to, or not able to, eliminate confirmation bias as a

6   judicial officer in a trial?

7       A.   I guess, I mean, with appropriate respect to the

8   judge, let me state that I am assuming the judge has a

9   normal human nervous system, a normal functioning visual

10  cortex, a normal set of eyeballs.  And on that basis,

11  this is, the paragraph that I just read out is

12  essentially tantamount to saying the judge is of course

13  human, and, therefore, vulnerable to any bias that any

14  other human would be vulnerable to.

15       And so that set of, I think, pretty obvious

16  assumptions about the judge's humanity is the basis for

17  what's in that paragraph, and that would apply

18  presumably to any judge, or, again, anyone with a normal

19  human nervous system.

20      Q.   When you wrote that, were you considering that

21  this video had been enhanced?

22      A.   I mean, yes, I used the word "enhanced," I

23  believe twice in that paragraph.  And I again apologize

24  for what was in retrospect a poor word choice.

25       What I was referring to was the video that we're

now referring to as the "alleged reenactment" created, I
believe, seven days later.

Q.   So if it's not enhanced -- so you were operating
in essence of your own confirmation bias that this was
enhanced when it wasn't?

A.   I'm not --

Q.   Wouldn't that be true?

A.   No.  Enhanced was simply, I mean, I fear just a
poor and misleading word choice.  What I was referring
to here was the video from the 19th.

Q.   Were there any other examples of that in your
report you want to alert us to, in either report?

A.   Examples of?

Q.   Poor and misleading word choices.

A.   The word "enhanced" is used several times in this
report, perhaps a dozen times in this report.  And
throughout the issue was, I mean, the video from the
19th, which in some sense one could count as enhanced
because steps had been taken to make it clearer, since,
obviously, the circumstances in which that video was
created were in a variety of ways different from the
circumstances on the 12th, but that's the video that I'm
referring to, with apologies for the potentially
misleading word "enhanced."

Q.   Do you have a Honda CRV?

1    A.  Had.  I sold it several years back.

2    Q.  What year was it?

3    A.  Boy, I'm going to guess early to mid-nineties.

4    It's far enough gone from my ownership that I don't

5    remember the exact year anymore.

6    Q.  Okay.

7         MR. SKROCKI:  One moment.

8         (Pause)

9    BY MR. SKROCKI:

10   Q.  Just one last thing, sir, and then I'll leave you

11   to your retirement and Mr. Camiel.

12        Just to be clear, and I want to phrase this

13   correctly.  To your knowledge, you have never testified

14   in federal court with respect to confirmation bias to a

15   jury?

16   A.  I would not say that.  What I would say is at

17   this moment I cannot recall a specific occasion in which

18   I testified on confirmation bias in federal court to a

19   jury.

20   Q.  Okay.  And are you aware of any court giving an

21   instruction on confirmation bias, any federal court

22   giving an instruction based on your testimony?

23   A.  Not that I know of.  Not that I can recall.

24        MR. SKROCKI:  That's all I have, sir.  Thank

25   you.

1    THE COURT:  Mr. Camiel, go ahead, please.

2             REDIRECT EXAMINATION

3  BY MR. CAMIEL:

4    Q.  Good morning again, Dr. Reisberg.

5    A.  Good morning.

6    Q.  I want to focus on some questions you were asked

7  about the sequence of a jury seeing these videos.  You

8  were asked about whether or not the risk or concern

9  about confirmation bias would be lessened if the jury

10 saw the April 12th actual surveillance video first.

11   A.  Yes.

12   Q.  I think I heard you say something to the effect,

13 and I want you to correct me if I'm wrong, that if they

14 got to make up their minds first and make a

15 determination about what they saw before they saw the

16 other video, that might lessen the concern?

17   A.  Yes.  If I can clarify that point.  My

18 understanding is that juries are uniformly instructed to

19 avoid making judgments, avoid reaching any conclusions

20 until they have seen the full pattern of the evidence.

21 And if juries manage to follow that instruction, then

22 the sequence in some ways might not matter, because, I

23 mean, if juries are following that instruction, then at

24 the moment at which they are trying to make up their

25 mind about the original surveillance video, they also

have in their thoughts, and potentially in the jury room
have in their view, the alleged reenactment video.  In
that case, the sequence of presentation would really not
matter.

The sequence would matter if, somewhat
ironically, you assume the jury is failing to follow the
Court's instructions and is making up their minds about
a particular piece of evidence soon after they see it
and before they have heard the totality of the evidence.
If the jury is, so to speak, misbehaving in that way,
then you would still be concerned, should still be
concerned, would have to be concerned about confidence
inflation, but if the jury is misbehaving in that way,
they have reached a judgment before seeing the
April 19th video and so presumably would not be
influenced in that judgment by the April 19th video
because they haven't seen it yet.

But that would only be true, again, if the jury
is misbehaving, not following the Court's instructions
and, again, that would still leave open the concern
about confidence inflation.

Q.  I'm sure you're familiar with the fact that in
every trial before the jury hears the actual evidence,
the Government or the prosecution gets up and tells the
jury what they expect the evidence to show and their

1  theory of the case?

2      A.  I understand that.

3      Q.  So if the jury heard, even before they saw the

4  video, the Government's theory that it was the Wells'

5  Honda in the April 12th video, then they see the

6  April 12th video, then they see the April 19th

7  reenactment video that only uses the Wells' vehicle, and

8  they hear from two or three different experts who

9  testify about the April 9th (sic) video and their

10  comparison to April 12th, does that enhance the risk of

11  confirmation bias with the jury?

12      A.  One small clarification.  I think I heard you say

13  the April 9th video.  I assume you meant the April 19th

14  video.

15      Q.  I apologize.

16      A.  Perhaps I misheard.  But I mean, yes.  I mean,

17  the larger of the accumulation of, let me say,

18  suggestion to the jury so that they hear in opening

19  argument what they are allegedly going to see in the

20  surveillance video and they hear from experts what is

21  allegedly in the April 12th video, as you accumulate all

22  of those suggestions, yes, in fact a confirmation bias

23  would grow.

24          If I may, let me cast that into something we

25  talked about yesterday.  The two things that will

1  maximize confirmation bias are going to be a poor

2  quality input, which is just undeniably in place here,

3  and the strength of prior beliefs.  So if you give

4  people not one, not two, but multiple reasons to

5  believe, yes, this is likely to be the Wells' Honda,

6  that's going to strengthen the belief, which is indeed

7  exactly the sort of thing that can strengthen

8  confirmation bias.

9          MR. CAMIEL:  Thank you.  That's all I have.

10         THE COURT:  Recross at all?

11         MR. SKROCKI:  Yes.

12                        RECROSS EXAMINATION

13  BY MR. SKROCKI:

14     Q.  I'm back again briefly.

15         You said the "opening argument."  You realize of

16  course in trials it's an opening statement, right?

17     A.  I'm sorry.  I misspoke.  Yes, opening statement

18  and not argument.

19     Q.  You realize that the defense has an opportunity

20  to make an opening statement as well, don't you?

21     A.  I do, although, in my terminology, the

22  Government's opening statement always has the advantage

23  of what is technically referred to as primacy, which

24  sets the agenda from the start.

25         So scientific research on jury understanding

1  suggests that the opening statement from the

2  prosecution, from the Government in this case, has more

3  of an impact on juries' thinking than the subsequent

4  statement for the defense purely because the

5  Government's statement comes first.

6      Q.   But you know what an acquittal is, don't you?

7      A.   I certainly do.

8      Q.   Those happen, don't they?

9      A.   They do.

10     Q.   Even with primacy, correct?

11     A.   I mean --

12     Q.   Yes or no.  Doctor, yes or no.

13     A.   Do acquittals happen even with primacy?  Yes, of

14  course, they do.

15     Q.   And acquittals occur even with possible

16  confirmation bias in courts, don't they?

17     A.   Certainly, they do.

18     Q.   Are you aware of the extent of the investigative

19  evidence accumulated in this case by the investigation?

20     A.   I certainly cannot claim to know all of the

21  evidence.  How could I know all of the evidence?

22     Q.   And do you know any other evidence besides this

23  what you call a "poor quality video"?  Do you know of

24  any other evidence in the case that the Government has

25  accumulated?

1     A.   Certainly in my, I guess it's my 2014 report, I

2   listed out the facts of the case as I understood them

3   then.   I mean, as I recall, those facts also included

4   concerns about timing, concerns about what was, I

5   believe, a 30-minute delay.   So yes, my 2014 report also

6   includes mention of other evidence that at the time of

7   writing that report I thought might be relevant to my

8   assessment.

9         I believe in retrospect it now turns out there is

10   other facts which may be crucial for the trial or not

11   crucial for the narrower purpose of my assessment.

12     Q.   And you know there is cross examination in cases

13   by the defense, correct?

14     A.   Of course there is.

15     Q.   And they can bring witnesses themselves to

16   testify about videos and other matters that the

17   Government presents during its case, can't they?

18     A.   Of course they can.

19     Q.   So this is not just an all one-sided event on the

20   Government's part, is it?

21     A.   Clearly correct.

22         MR. SKROCKI:  That's all I have, sir.  Thank

23   you.

24         THE COURT:  All right.  Thank you, sir.  You

25   may be excused at this time.

1          (Witness excused)

2          THE COURT:  So where does that leave us?  No

3   additional evidence from either side, correct?

4          MR. SKROCKI:  No, Your Honor.

5          MR. COLBATH:  No, Your Honor.

6          THE COURT:  Then it turns out my next hearing

7   is not until 10:30.  I think I said 10:00 yesterday.  In

8   any event, I can hear each side on the motion beginning

9   with the defense.  Mr. Camiel or Mr. Colbath?

10          MR. COLBATH:  Your Honor, I'll be speaking, but

11  I would request, because it's the Government's burden to

12  establish admissibility, that they go first.

13          THE COURT:  Any objection to that?

14          MR. SKROCKI:  I'm not worried about that,

15  Judge.  In fact, I expected it.

16          THE COURT:  Do you think there is going to be

17  -- I looked at the expert reports, but do you intend to

18  call a witness, an expert at trial that would say that

19  vehicle in the April 12th video is the Wells' Honda?

20          MR. SKROCKI:  The closest we're going to get to

21  that is Mr. Schmidt.

22          THE COURT:  The 70 percent?

23          MR. SKROCKI:  Yes, ma'am.

24          THE COURT:  So the other experts would say

25  consistent with?

1          MR. SKROCKI:  Consistent with.

2          THE COURT:  Go ahead, please.

3          (Requested excerpt concluded, proceedings

4    continued.  Remainder of hearing found in transcript at

5    Docket 1103.)

6

7                         CERTIFICATE

8      I, Sonja L. Reeves, Federal Official Court Reporter
    in and for the United States District Court of the
9    District of Alaska, do hereby certify that the foregoing
    transcript is a true and accurate transcript from the
10   original stenographic record in the above-entitled
    matter and that the transcript page format is in
11   conformance with the regulations of the Judicial
    Conference of the United States.

12
       Dated this 14th day of August, 2019.
13

14
                         /s/ Sonja L. Reeves
15                       SONJA L. REEVES, RMR-CRR
                         FEDERAL OFFICIAL COURT REPORTER
16

17

18

19

20

21

22

23

24

25