BRYAN SCHRODER
United States Attorney

STEVEN E. SKROCKI
Deputy Criminal Chief
CHRISTINA SHERMAN
Assistant U.S. Attorneys

KELLEY STEVENS
Special Assistant U.S. Attorney
Federal Building & U.S. Courthouse
222 West Seventh Avenue, #9, Room 253
Anchorage, Alaska 99513-7567
Phone: (907) 271-5071
Fax: (907) 271-1500
Email:steven.skrocki@usdoj.gov
        christina.sherman@usdoj.gov
        kelley.stevens@usdoj.gov

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 3:13-cr-00008-SLG |
| | ) |
| JAMES MICHAEL WELLS, | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |
| ———————————————— | ) |

**OBJECTIONS OF THE UNITED STATES TO DEFENSE EVIDENCE IN RE
EVIDENTIARY HEARING OF JULY 30, 2019 AND OTHER ISSUES**

## A. Introduction

The United States submits the following objections to the defense's expansion of the issues and introduction of corresponding evidence at the evidentiary hearing held on July 30, 2019 surrounding whether or not the two government videos were substantially similar. As shown below, the defense's original filing at Docket 1012 argued the admissibility of the April 19, 2012 video exclusively on the argument of whether it was "substantially similar" to the April 12, 2012 video, and citied to cases thereupon. The defense made no citation, argument, reference, or request for a hearing on *Daubert*, nor raised any other scientific or technical argument supporting the exclusion of either video.

After the filing of the government's opposition identifying the defense's failure to address any scientific issues surrounding the videos, the defense contacted their expert Jim Hoerricks for a "Supplemental Report" advising he directly focus on challenges under *Daubert*. [1] The defense filed no modification, request for late filed reply, supplemental pleading, or other notice whatsoever with the Court on this change in theory, nor did the defense's pleadings provide insight into any of Hoerricks' reports for the upcoming hearing.

The only notice of a potential, though undefined, *Daubert* argument came in mid-July, with the filing of a "Notice of Issues for Evidentiary Hearing Set for July 30, 2019" at Docket 1072. Only one sentence contained therein referenced a *Daubert* issue. The defense omitted any notice as to the depth and breadth of the testimony to be provided. The

1 Mr. Hoerricks' first expert report is dated May 6, 2019.

defense then made the questionable decision to withhold production of the most critical articles of evidence for the hearing until just two business days prior to, when it was far too late for anyone to decipher the technical white noise contained therein.[2]

After this hearing, and the Court's request for briefings on the conditional relevance of the April 19, 2012 video, the Court approved a five page response for both the parties. In their response, the defense, sua sponte, attacked the April 12th video, an issue they advised this Court on the record that they were "absolutely not" seeking to preclude.[3] They levy this new evidentiary attack, tucked into their "conditional relevance" brief, despite having provided no reports, exhibits, or discovery supporting the same to the United States. In so doing, the defense has purposefully mislead the Court about the nature of evidence available to investigators from the Kodiak Airport. Based on this further derailment of the issues, the Court ordered the parties to produce exhibits from the first trial as to the movement of Wells' vehicle. The United States will respond to the court's order in kind, but notes for this record that the United States and this Court are now far, far afield from the initial motion to preclude the April 19th "substantially similar" brief at Docket 1012.

### B. Factual and Procedural Background.

#### a. The Defense's Opening Brief on the Issue of the April 19, 2012 Video: What it Said and What it Didn't Say.

At Docket 1012, filed by the defense almost two months before the July 30th

---

2 The defense provided a CD containing all the exhibits at the close of business the Thursday before the hearing.
3 FPD Colbath advised this Court during the evidentiary hearing that the defense would not seek the exclusion of the April 12 video. *See* Dkt 1082.2 at 98. Given the attack on the video here, the United States is within rights to assume a similar attack on the admissibility of the video will be made at trial, given prior defense tactics in this case.

hearing, the defense moved to preclude the April 19, 2012 video. *See* Docket 1012, filed June 7, 2019.  Their brief contained 33 pages yet lacked any notice or support whatsoever justifying the exclusion of the April 12th video on any grounds, or the exclusion of the April 19th video on scientific grounds pursuant to *Daubert*.  Instead, their brief cited to the following factors for the exclusion of only the April 19th video, none of them being *Daubert*:

1. *Environmental Factors*: Weather, Time of Day, Snow Cover.

2. *Situational Factors*: Vehicular Activity, Vehicles Parked Outside of Fence, Vehicles Parked Inside of Fence and Obstructions, Orientation of Objects on Anton Larsen Bay Road, and T2 Building Lights.

3. *Factors Involving Parameters and Settings of the T-1 Camera, the Stand of Trees, Geodesic Dome and Building, Fire Hydrant and Bollards*.

*See* Docket 1012 at 9-18. The Defense's "Arguments" section of their opening brief is equally void of any reference to a *Daubert* challenge.  In that section, the defense challenges the April 19th video on the following reasons: *lack of foundation, being misleading, not helpful to the jury, and extremely prejudicial.  Id.*  Defense omits any reference to their expert, Mr. Hoerricks, despite having contacted him more than a month prior to filing their motion.[4]  They further omit any mention of the 53 "scientific" exhibits relied upon by Hoerricks and subsequently introduced by the defense at the "substantially similar" evidentiary hearing and disclosed to the government just the Friday prior to the

---

4 Mr. Hoerricks' first expert report is dated May 6, 2019.

U.S. v. Wells

3:13-cr-00008-SLG                                  Page **4** of 26

hearing.

### b. United States' Response in Opposition.

Based on the arguments postured by the defense at Docket 1012, the United States responded by filing an opposition at Docket 1047. The brief of the United States responded, as would be expected, to the allegations surrounding *lack of foundation, being misleading, not helpful to the jury, and extremely prejudicial* as raised by the defense at Docket 1012, (i.e., whether the video at issue was sufficiently similar under the law to be admitted at trial). Notwithstanding their filing with this Court, and the fact that Hoerricks had drafted his initial report more than a month prior to the filing of their motion (i.e. May 6, 2019), they omitted any reference, indication, or inference whatsoever of their reliance or intended import of this "scientific" challenge at the upcoming "substantially similar" evidentiary hearing.

### c. The Defense's Reply.

Following the government's motion in opposition, the defense replied on June 27, 2019 at Docket 1052, about a month prior to the evidentiary hearing.  In its reply, the defense mentions Hoerricks for the first time, stating:

> *Mr. Hoerricks, the defense video expert, will address the significance of the differences in the two videos <u>including matters such as lighting, obstructions and camera focus</u>.*

Docket 1052 at 3 (emphasis added) (i.e., testimony addressing whether or not the videos were substantially similar).  For the most part, this seemed to track with the defense's

opening brief. However, as the Court knows, this of course was not Hoerricks' testimony which was replete with "frame rates," "color corrections" and an attack on government expert witness, Toglia's, work. *See* Docket 1082.2 at 164-167. Further, the defense's reply specifically indicated that,

> *Jim Hoerricks…determined that the resolution of the April 12 video was so poor that no determination could be made of the class characteristics of the vehicle and thus no determination of make or model could be made. He will opine that if no determination could be made from the April 12 video as to the make, or even model color of the suspect vehicle, then the use of the April 19 government created video as* <u>*a comparison would be scientifically improper*</u>*. One example Hoerricks will address is that lighting conditions can affect the perception of vehicle color and that none of the government experts accounted for this in their analysis and that the difference in lighting conditions between April 12, and April 19 is a significant dissimilarity.*

Docket 1052 at 4, emphasis added. Hoerricks' "scientifically improper" comment is the only inference made by the defense to any potential *Daubert* attack in both their opening and reply briefs and the 'lighting conditions' reference was not raised in the opening brief as a technical nor scientific argument.

### d. The Defense's "Notice of Issues" for the Substantially Similar Evidentiary Hearing Set for July 30, 2019.

On July 17, 2019, at Docket 1072, the defense filed a self-styled "Notice of Issues for Evidentiary Hearing, set for July 30, 2019". In that "Notice of Issues" the defense stated:

> *The Defense intends to call two expert witnesses at the hearing, as previously indicated. Expert Jim Hoerricks will testify in person and expert Daniel Reisberg is anticipated to testify by video conference. For the Court's convenience, Mr. Hoerrick's report, prepared solely for the purposes of this hearing, is filed herewith…"*

Docket 1072 at 2. A footnote included in this sentence stated:

> *Mr. Hoerricks prepared two initial reports related to the case in conjunction with his anticipated testimony at trial in this matter which were previously disclosed to the government during normal expert disclosures. Although Mr. Hoerricks is not offering any new or additional opinions during this evidentiary/motions process, for the Court and counsel's convenience, <u>and in order to limit the material necessary for review relevant to the inquiry here,</u> Mr. Hoerricks prepared Attachment A to highlight from his previous analysis the specific testimony he intends to present to the April 19, 2012 experiment video.*

*Id.* The defense implies that all parties were in possession of "all material necessary for review relevant to the inquiry." *Id.* They proffered this to the Court just two weeks prior to the evidentiary hearing. Despite allegedly having all of Hoerricks' reports and bench notes, the defense however chose to not disclose any of this to the government until two business days before the hearing. The 53 exhibit dump fell well outside that which was briefed and consisted of highly technical, convoluted, and rambling analysis, none which seemed logically connected to the other or otherwise relied upon any filed brief. *See* Defense Exhibits *AA-AAA*.

In the defense's "Legal Matters" section of the "Notice of Issues", they asserted, in sum, the following legal issues, 1) Purpose of Offering Exhibit; 2) Whether Government met their burden; 3) a sentence reference to *Daubert*; 4) whether Substantial Similarities were Met; 5) Preclusion under 403 preclusion; and 6) Limiting Instruction. Docket 1072 at 2. While most of the defense's legal issues raised in their opening brief filed at Docket 1012 mirrored their reply brief, they deviated slightly by tucking in a seemingly boiler plate, brief reference to *Daubert* with no context or explanation for the first time.

### e. Exhibits AA-AAA: the Discovery Provided by the Defense the Friday Prior to the Evidentiary Hearing.

On Friday, July 26, 2019, the defense provided the government with a disc of documents identified by and through Exhibits A-AAA. Given these identifiers, the exhibits number 53 separate reference items. In sum, they are as follows:

**A-N**: Portions of previously provided discovery.

**O-P**: Weather and sunrise/set information.

**Q-V**: Portions of government provided discovery.

**X-Y**: Mr. Hoerrick's report and summary report.[5]

**Z:** Article on Comparing Reverse Projection and Laser Scanning Photogrammetry from the FBI.

**AA**: Professional study of "Single Image Photogrammetry", dated 2007, numbering 60 pages.

**BB and CC:** Documents appearing to come from Mr. Hoerricks', however this remains unclear.

**DD:** Technical paper from the United Kingdom Home Office of Scientific Development Branch on the Retrieval of Video Evidence and Production of Working Copies from Digital CCTV Systems, numbering 30 pages.

**EE:** Image from April 12 and 19, respectively.

**FF and GG:** Images from Mr. Hoerrick's work, which show his ability to capture the number of pixels from a screen shot on the April 12 and April 19 videos.

**HH:** Technical "bench notes" from Mr. Hoerrick's from a "color corrected" version of an "Amped FIVE report", numbering 17 pages.

**II and JJ:** Two references both from the United Kingdom, on the number of frames necessary to "Catch a Thief", and a CCTV Operational Requirements Manual, 2009, numbering 59 pages.

**KK**: Mr. Hoerricks' "Draft" letter to the editor of the Journal of Forensic Identification involving comments on scientific precision of testing of human subjects.

**LL:** "Glossary" from the Scientific Working Group on Digital Evidence, numbering 29 pages.

**MM**: Technical paper from the Scientific Working Group on Imaging Technology on "Best Practices for Forensic Photographic Comparison", numbering 10 pages.

**NN through OO:** Dr. Reisberg supporting documentation.[6]

---

5 The court should note the only mention of frame rates in Hoerricks' report is the supplemental report provided to the government the Friday before the evidentiary hearing. *See* Exhibit Y at 1.

6 These documents are of no particular importance for purposes of this motion, nor is any of his testimony. Dr. Reisberg was clearly influenced by the defense and his reports are clearly biased to the point of lacking credibility.

**QQ through TT:** Government discovery provided to the defense of documents from the FBI, numbering 15 pages.

**TT:** Image of the T-1 building, Rigger Shop, Anton Larsen Bay road area.

**UU:** Summary Chart of technical data.

**VV-ZZ**: various images relied upon by Hoerricks.

**AAA**: Frame rate images and corresponding analysis; the details of which are not provided in Hoerricks' reports or the defense briefing.

### f. The Issues Raised at the "Substantially Similar" Evidentiary Hearing.

During the hearing, the defense called two witnesses – Jim Hoerricks and Dr. Reisberg.  As for Dr. Reisberg, his testimony was irrelevant to any issue surrounding whether the videos were "substantially similar" and a waste of the Court's time. His reports were flawed by assumptions of critical facts made without foundation and provided to him by the defense team. As was shown through cross, Dr. Reisberg himself suffered from the very "confirmation bias" that the defense somehow felt related to whether the videos were substantially similar.

Mr. Hoerricks testified as well.  As a surprise to the government, Mr. Hoerricks started talking about highly scientific matters including frame rates, color adjustments and other technical matters associated with the videos.  He testified to the exhibits the defense disclosed on the eve of the hearing and spent a good deal of time focusing on one particular Defense Exhibit – Defense Exhibit UU.  He testified to this exhibit implying to the Court and government that it was his own work. After the noon break, the defense moved to admit Defense Exhibit UU, along with the other exhibits, without foundation from Hoerricks. The government did not object, thinking they were his work product based on the amount of testimony elicited during direct by the defense, and the fact Hoerricks

Case 3:13-cr-00008-SLG   Document 1124   Filed 08/14/19   Page 9 of 26

testified to it as if it was his own.

On cross-examination, the government elicited testimony from Hoerricks that he did not in fact create or otherwise produce this exhibit and did not conduct any of the extensive calculations contained therein. The court ruled it would not consider this Exhibit in deliberations. Despite all his testimony, Hoerricks testified the overall look and feel of the April 12 and April 19 videos are the same. *See* Docket 1082.2 at 160-162.

At the conclusion of the hearing, the Court requested that the parties brief up their respective positions on the "conditional relevance" as to the April 19th video. The defense in turn requested leave to file a brief, and did so at Docket 1097. The United States similarly filed a brief at Docket 1096. As part of this briefing, the defense opened up an attack on the April 12, 2012 video itself for the first time.

### C. Argument

#### a. This Court Should Exclude the Defense Exhibits and Reports that they Were Provided to the United States on the Eve of the July 30, 2019 "Substantially Similar" Evidentiary Hearing.

The defense turned over their "*Daubert*" based exhibits at the end of the business day on Thursday, just two business days prior to the Tuesday hearing, leaving the government no time to engage with experts in order to comprehend and process the 53 scientific documents provided last minute. Mr. Hoerricks then focused his testimony during the hearing on *Daubert* and the government's alleged "scientific" shortcomings surrounding the two videos, all despite the fact that defense, who has had ample opportunity to do so, failed to file any brief or argument on this complex issue; instead

Case 3:13-cr-00008-SLG   Document 1124   Filed 08/14/19   Page 10 of 26

engaging in a bait and switch by raising it during an unrelated evidentiary hearing just a month out from trial.

Knowing very well they would raise this argument, the defense sent Mr. Hoerricks' a request on July 3, 2019, a week after the United States' June 24, 2019 reply in opposition filed at Docket 1047 attacking his initial report, directing that he create a supplemental report addressing *Daubert* matters.  Mr. Hoerricks in turn drafted a "Summary of Request" under the auspices of *Daubert*.[7]  Despite knowing at least a month in advance of the hearing that they would engage in a separate evidentiary attack under *Daubert*, the defense nonetheless provided no notice to this Court of this additional issue, electing instead to keep the Court and the government in the dark. *See* Government Chart of Filing and Event Timelines, attached herein as Exhibit 1.

The defense then inserted Hoerrick's Supplemental Report into their Defense Exhibits, burying it within the other 52 independent scientific resources, for ultimate introduction at the "substantially similar" evidentiary hearing, some 30 days after they first took active steps to investigate concerns under *Daubert*.  Further, they did so absent any request for leave by this Court, without due notice to the United States advising of this issue, and through the creation and reliance on "scientific" documents and expert reports

---

7 Mr. Hoerrick's supplemental report clearly focused on scientific applications: "*In addressing the request to clarify my conclusion provided for US v. Wells in the Analysis Report dated 6 May 2019, my reply will be focused around three main themes which all reinforce the centerpiece of Daubert, the reliability of the tools/methods employed in the work previously performed. The reliability requirement differentiates testimony premised upon the methods and procedures of science as opposed to subjective belief or unsupported speculation.*" *See* Defense Exhibit Y.

so convoluted and disjointed that the United States was deprived of a full and fair opportunity to mount a response or provide all the material to their own expert for a cogent review prior to the hearing. The defense instead employed subversive practices to change the motions landscape entirely so they could weave arguments into inappropriate or unrelated pleadings and hearings that they initially elected not to pursue.

The chronology tells the story here. The defense elected, after the filing of the government's June 24, 2019 opposition, which closed the briefing for the United States, to order a supplemental/*Daubert*-based report from Hoerricks, the likes of which the defense, absent this Court's leave, inserted into the record as outlined above. The defense's furtive trial tactic of raising their *Daubert* challenge without requesting leave to do so beyond the motions deadlines, outside the scope of the instant pleadings, well beyond the opportunity for the government to engage with their experts and file a reply, deprived the United States of a full and fair opportunity to substantially address what has become a constantly moving target. This Court should not reward these serpentine efforts through the exclusion of the government's evidence.

**b. This Court Should Exclude the Testimony of Jim Hoerricks Related to his "Scientific" Analysis and Conclusions for Both the April 12 and April 19 Videos for Lack of Notice and Improper Use of Exhibit UU.**

Notwithstanding that the purpose of the evidentiary hearing as briefed extensively by the defense in its three filings to the Court was to ascertain whether the two videos were substantially similar, the defense improperly elicited testimony from Mr. Hoerricks about many things wholly unrelated to the issue at hand. The defense, absent any prior notice or

appropriate filing with the Court, manipulated a "substantial similarity" evidentiary hearing into one of scientific reliability pursuant to *Daubert*, piggybacking off their improperly elicited expert's opinion regarding the April 19th video to similarly attack the April 12th video.

During the hearing, Hoerricks testified that he made color adjustments to his exhibits without including this in his report, justifying the omission when asked by stating there "were no questions related to color that I was asked to answer".[8]  *Ibid.* pg. 171-175. Further, Hoerricks' criticized the analysis of government expert, Toglia, describing his technical analysis on color as "generic". *Ibid* at pg. 170.  Further, he testified extensively about "frame rates" between the April 12 and April 19 videos despite again, any lack of expert analysis contained in his reports.[9] Furthermore, even if the hearing had been about *Daubert* related issues, despite testifying at length about "frame rates", his reference to "a low frame rate" is actually a quote from another expert, Mr. Iber, and does not come from his independent analysis. This amounts to unfair extrapolation as nowhere in his report does he address or otherwise analyze the frame rates between the two videos.

But there is more.  Most disturbingly, during the hearing, Mr. Hoerricks testified to Defense Exhibit UU, implying to the Court and government that it was his own work. *See* Defense Exhibit UU. This is truly troubling and the seriousness of the defense team's decision to frustrate the rational search for the truth should not be taken lightly. *See e.g.*

---

8 The only reference to color adjustments existed in his "bench notes".
9 The only mention of "frame rates" appear on pg. 1 of Mr. Hoerrick's "Supplemental Report", provided on the eve of the evidentiary hearing to the Government as Defense Exhibit Y.

*United States v. Thoreen*, 653 F.2d 1332, 1340–41 (9th Cir. 1981) ("[m]aking misrepresentations to the fact finder is inherently obstructive because it frustrates the rational search for truth. It may also delay the proceedings.") *See also*, *In re Dellinger*, 502 F.2d 813, 816 (7th Cir.1974), (putting inadmissible evidence before the jury, hampers its ability to decide the case according to the legal principles provided them.)

Given its placement buried within the Hoerricks' discovery, the defense improperly led the Court and the United States to believe that this was in fact Mr. Hoerricks' work product. Given the over 120 calculations on passes, estimated speeds, beginning times, ending times, number of frames, duration of vehicle visible, doing each for vehicle passing left to right and right to left, for both "transit times" and "extracted frames" it was no wonder the United States believed Mr. Hoerricks' created this precise expert analysis. Despite lengthy direct examination implying the information and analysis belonged to himself, cross examination revealed that he did not create it, he in fact could not validate the information found in the exhibit containing roughly more than 120 individual data points, he had no idea if the data was accurate or not, and he had only been provided the exhibit by the public defender's office upon arriving in Anchorage the night before. *See* Docket 1082.2 at 164-167.

The defense, undoubtedly recognizing the weaknesses in its position surrounding the substantial similarities of the videos under the law, sua sponte elected to change course, implementing their own set of procedural rules, ignoring altogether the Court's Scheduling Order, the Federal Rules of Evidence, the Federal Rules of Criminal Procedure, the District

Court of Alaska Court Rules and Procedures, and other rules. Once the defense's bait and switch tactics for introducing argument on *Daubert* became clear during the hearing, the United States took the professional high road by not objecting, nor moving for a continuance. This decision proved critical as the United States, through cross examination, uncovered the defense team's tactic in attempting to smuggle Exhibit UU into the record. During cross examination, Mr. Hoerricks surprisingly revealed the improper admission into evidence of critical, detailed, and technical evidence in support of a late-filed, non-briefed *Daubert* claim that, had the United States not asked the right question, would have gone un-discovered and been improperly admitted and relied upon by this Court in its ruling on this issue, possibly by the jury at trial, and possibly even by the Court of Appeals.

While the defense's *Daubert*-based argument was non-existent in their opening and reply briefs, their "Notice of Issues" one liner mentioning *Daubert* does not cure their omission through bare notice that Hoerricks' will make an appearance at the hearing. Further, the defense's dropping of the term "scientific" in their reply brief following the government's opposition, leaves both the government and the Court wanting on what, if anything, their witness will testify to. Providing clarity of intention late in a "Notice of Issues" does not save the failure to adequately brief the matter, whether or not the intention was to sandbag the prosecution.

Notwithstanding the intent behind this defense team tactic, Hoerricks admitted that the point of introducing the exhibit created by someone on the defense team was, "so you would ask." In other words, the defense wanted the government to elicit testimony of a

scientific nature surrounding the videos for the record to further bolster their surprise argument. Accordingly, due to this failure to authenticate and underhanded attempt by the defense to introduce fraudulent evidence in support of their new theory of attacking the videos, any testimony based on this exhibit, or the information relied upon by Hoerricks which came in reliance on Defense Exhibit UU, should be excluded. The government submits that this would include all exhibits, reports, future testimony, articles, studies, any derivative future testimony related to "scientific" analysis involving frame rates and other technological concepts not briefed by the defense in its filings. *See e.g.*, *BWP Media USA Inc. v. Urbanity, LLC*, 696 F. App'x 795, 797 (9th Cir. 2017) (court found that by withholding evidence, party engaged in "gamesmanship" and an attempt to impact other side's timely defense to dispositive motions and to prepare for trial. Court precluded evidence and found this sanction appropriate where trial was set to start in four weeks.)

Further, the court's consideration of evidence and any argument stemming from the same as related to the defense expert Hoerricks, should be strictly limited to that stated in the defense's opening and reply briefs, in other words, to those issues they actually briefed to the Court and which the government had a fair and just opportunity to respond (i.e, lighting, differences in time of day, environmental and other factors etc).

### D. This Court Should Dismiss the Defense's Subsequent Attack of the April 12, 2012 Video Following the Evidentiary Hearing.

During the evidentiary hearing on July 30, 2019, the United States objected several times to the defense's attempt to suppress/preclude the April 12th video, arguing in short that the defense failed to raise this issue at any point in their filings. *See* Docket 1082.2 at

99. The Court specifically asked Mr. Colbath the following: "*I'm sorry, are you seeking to exclude the April 12th Video?*" to which Mr. Colbath replied, "*No, absolutely not.*" The Court similarly agreed that the April 12th video was not at issue. *Ibid.*, at 98. Despite this exchange, and without filing leave to expand their argument, the defense defiantly applied Defense Exhibit UU and the data forming the basis of its creation to their questioning of Hoerricks' about the April 12th video during this hearing, ambushing the government and the Court. *See* Docket 1082.2 at 102-103.

Following the hearing on July 30, 2019, and in contradiction of their statement to the Court, the defense interjected their objection to the April 12 video arguing that it lacks sufficient support for consideration by the jury and should therefore be excluded. *See* Docket 1097. Most certainly a wholesale argument to exclude will not be far behind. Now, using the fruits of their questionable trial tactics, absent any appropriate notice, months past the scheduled motions in limine filing deadline, and in direct contradiction to their intent made on the record, they seek to preclude the April 12th video by evidentiary ambush. Proper pleading, which the United States is held to, would have brought these issues to head and enabled the Court to rule on any applicable relief months ago, not less than a month before a double murder trial anticipated to last weeks.

Next, for the first time the defense notices with no documentary or evidentiary support that "two people", neither of whom appeared during the investigation or testified at the first trial, or whom the defense otherwise provided notice of to the government, contradict the investigations findings that the Wells' Honda CR-V was moved from one

location to the other on the morning of the murder by Jim Wells. They further direct the Court to view the weight and admissibility of the April 12th video of the T-2 building myopically through the limited perspective of one single indoor camera at the Alaska Airlines check-in kiosk at the Kodiak Airport, not from the voluminous circumstantial evidence in this entire case as a whole.[10]

As to the misleading proposition made by the defense in its filing is related to the two conveniently unnamed mystery people the defense now alleges observed helpful facts to their case. In argument, the defense has the audacity to state that the government "*wants the Court to ignore these facts*." *Ibid*. Quite the contrary; the United States wants no such thing. If these facts exists, turn them over. Because to date, the government has received nothing in discovery and the defense has failed to attach any evidence in the form of a report, interview, audio recording or even a name that the defense team has in support of these broad allegations. The United States most certainly does not object to the Court considering these alleged "facts" once appropriately disclosed, and would very much like to see this evidence too. Now, in fact.[11]

---

10 The defense misleads the Court as to the "Alaska Airlines" video recording system and the extent of its reach. Said video shows only a few feet of view outside of the terminal as its focus is on passengers inside the terminal – not on the parking lot that expands well past the Alaska Airlines terminal. Even though this camera briefly captured Wells truck passing the Alaska terminal the day prior to the murders, to imply, as the defense does, that no camera recorded the Wells' blue CR-V the day of the murders is totally misleading. There was no camera, anywhere, monitoring the Kodiak Airport Parking lot in total, partially, or otherwise. It simply does not exist. If it did, both parties would be in possession of the video. Further, the defense fails to inform this Court that the Wells' blue CRV was parked nowhere near the entrance to the Alaska Airlines terminal, rather it was behind another row of cars, and to the right of the terminal, closer to the long term parking; not in a place where, even if people were paying attention, they would notice who was driving what car.

11 Even if this alleged evidence exists, the United States, following the previous deceptive evidentiary practices of the defense, urges caution and a hearing to assess whether such evidence should be admitted as relevant and not prohibited under Fed.R.Evid. 403. As it stands, the United States and this Court remain totally in the dark as to the credibility, authenticity, and reliability of this alleged "two people" evidence. The government submits in good faith that they possess no such evidence and therefore have not turned over any such evidence. Accordingly, the government

Assuming arguendo that these two defense-friendly witnesses exist, any statement they made should go to weight. Particularly as it is weighed against the following facts, evidence of which the government has actually turned over to the defense in discovery:

1. Wells could not account for approximately 34 minutes of his whereabouts during the time of the murders, stating to law enforcement that he did not have a "theory" at that time.

2. The jury can infer his "flat tire" alibi was false based on the expert report offered by the government that the tire had never been driven on while flat and because the nail was inserted manually, all supporting the fact that Wells certainly had the time to switch out his cars, kill his colleagues, and switch back to his white dodge truck at the airport.

3. The airport was not paved at the time and there was no clear traffic pattern that drivers had to follow. Thus, the day of the murders, Wells could very well have avoided the Alaska Airlines in-door, limited-view camera to swap out his cars.

4. Wells, with his wife out of town, used that opportunity to swap out his white Dodge truck that every employee at the T2 building readily recognized as his, in order to navigate the less than 2 mile route from the airport to the T2 building undetected to carry out the murders.

5. Nancy Wells' colleague, Amanda Sanford, told investigators that the blue CRV Nancy drove them to the airport in just a day prior had in fact moved as she advised them that Nancy parked the car directly in front of the Alaska Airlines terminal and on the day of the murders, investigators discovered it far from its original spot, away from the terminal, closer to the long term parking.

6. Neil Schmidt, a Honda expert his whole professional life, stated he was 70% certain the vehicle visible in the April 12th video is a blue 2001 Honda CR-V, the same make and model year owned by the defendant.

7. As reiterated by the 9th Circuit Court of Appeals, the defendant had the motive, opportunity and other 404(b) evidence that this jury can also rely upon to establish that the defendant was driving the blue CR-V the morning

stands particularly skeptical of these alleged "facts" that lack any tangible evidence in support thereof. Accordingly, this Court should give this proffer by the defense the weight it deserves: zero.

U.S. v. Wells
3:13-cr-00008-SLG                    Page 19 of 26

of the murder.[12]

8. The timing of Wells' use of the blue CRV aligns perfectly with his colleagues arrival schedules and is of particular importance given his insider and intimate knowledge of their routines, the layout of the T2 building, and the camera system that would capture their routines. That truly insider knowledge gave him a short but very clear window to murder his colleagues almost undetected by avoid camera detection, had the ability to get into the building without using his access card by entering through the door he knew would already be unlocked.

These are just but a few things the jury could use to conclude that the April 12th video depicts Wells in the blue CR-V and, therefore, the April 19th video is conditionally relevant. The analysis is much more than just what, if any, video camera captured the vehicle at the airport, or what witness saw what at the Kodiak Airport parking lot the day of the murders. The defense now wants this Court to myopically focus on events exclusively contained to the Kodiak Airport as the United States' "only 'evidence'". *See* Docket 1097 at 2.

On truth and in fact, and as the defense well knows, this Court, *if it is given all the facts completely*, can rely on all, some, part, a little bit, or some other amount of the case put on by the United States in determining whether the jury can find that Wells drove the

---

12 As stated by the 9th Circuit: "Each victim's arrival at T2 on the morning they were murdered was time-stamped by surveillance footage, which monitored the usual employee parking area situated at the front of T2. The times of their respective arrivals, combined with the last recorded activity on Belisle's computer and the positions of the bodies relative to the known morning rituals of each victim, led the investigators to conclude that the murders occurred between 7:10 and 7:14 a.m., on April 12, 2012. The crime window thus fit squarely within the 34-minute period of time for which Wells could not account. It was this unexplained discrepancy which captured the attention of the interviewing agents and upon which the Government relied heavily at trial.

Upon discovering the bodies, Beauford notified the USCG watch officer and requested that emergency services be dispatched. Soon after the first responders arrived, an Alaska State Trooper cleared and secured the facility, now a crime scene, for investigative purposes. Wells arrived at T2 at approximately 8:23 a.m., well over an hour past his normal start time, immediately claiming to have had a flat tire." *United States v. Wells*, 879 F. 3d 900, 931-934 (9th Cir 2017).

Honda CR-V on the day of the murders. To limit this Court to consider facts solely to those arising from the Kodiak airport the day of the murders, ignores the cardinal rule of evidence, that all relevant evidence is generally admissible. More so, the evidence here, as it satisfies the preponderance standard, is overwhelming, particularly in light of the lower burden of proof applicable to its conditional relevance.

What defense counsel argues to this court and before the jury is not evidence. Their statement that two people from the airport have evidence regarding the blue CRV, is not evidence. Should this Court even consider the defense's unsupported proffer of these two mystery witnesses, given the relevance of the April 12 video, and the significance to the government's overall story as it relates to the defendant's overall plan and preparation in carrying out the murders, the government requests leave to respond and an evidentiary hearing where they can cross examine the defense's two mystery witnesses and the proponent who will authenticate and lay the foundation for the Alaska Airlines video.

In short, if the Court is even remotely going to consider this proffer of the defense, then the Court should order the defense to show their cards, face up, and order that the defense be precluded at this stage, from conjuring up any last minute discovery related to this issue without disclosure to the United States. Accordingly, the United States requests that the court deny the defense's motion, tucked into their "conditional relevance" brief, attacking the April 12, 2012 video. Should this Court entertain the defense's argument that the April 12, 2012 video be precluded, then the United States requests an additional evidentiary hearing or oral argument.

### E. The April 12 and April 19 Videos Are Substantially Similar and the Defense's Arguments Surrounding the Minor Differences Between the Two Should Go to Weight, not Admissibility.

As briefed by the United States and further testified to by Special Agent Sturgis of Coast Guard Investigative Services, investigators created the April 19th video as a comparison to the video of the suspect vehicle captured by the cameras on the date of the murders. *See* Docket 1082 at 7-70. Special Agent Sturgis testified that the video recording was not a scientific test and that he did his best in estimating the T-1 camera view. As such, given the urgency in capturing the scene as close to the date of the murders, particularly as the weather got warmer and snow began to melt, and the intended use of the video for investigatory purposes, law enforcement took reasonable and substantially similar steps to mirror the video captured on April 12, 2012. It should come in with an appropriate limiting instruction. *Daubert* simply does not apply here.

### F. Misleading Defense Arguments Made During their Summation

One final comment warrants presentation to the Court. During summation, defense counsel stated that a certain segment of the exhibits produced on the eve of the evidentiary hearing were the United States' own discovery. That is correct and the United States is not opposed to the use of exhibits A-Y. What the defense failed to highlight in their summation however, choosing instead to filibust the Court with their personal attacks on the professionalism of the prosecution team that have become frequently commonplace, are the multitude of last minute technical documents or other exhibits, created reactively and irresponsibly with undue regard to the orderly administration of justice and accurate pursuit

of the truth.

At the evidentiary hearing, in response to the United States' claim of lack of notice, the defense spent much energy and attention on how the term, "frames" appeared five times in the United States' brief, all in an effort to discount the government's argument. Although the government used the term frame three times in its brief, the similarities end there. In an attempt to show this Court that the United States itself argued "frames", the defense mischaracterized the United States' brief entirely. The United States' reference to the term "frame" were not technical and scientific points, but addressed the number of frames contained in the video, not the rate, speed, quality etc. For example, and in actual context, the first reference to "frame" is concerned with the video of Wells' truck, an image not at issue. The brief states "this video footage is very brief, lasting only five frames and approximately a second in duration." Docket 1047 at 4. The second reference to the term "frame" concerns the April 12, 2012 footage. Again, a video not at issue for this proceeding. *See* Docket 1047 at 5, ("[a]gain, the video footage, is only four frames and lasts approximately one second in duration.") The third, and last "frame" reference, out of the "five" claimed by the defense, is a reference to "camera frame" under Exhibit 3. *See* Docket 1047 at 6. These references have nothing whatsoever to do with frame rates or the highly technical nature of Hoerrick's testimony.[13] Another example, found on page three of their brief, decries that "the government's stand-alone 'opportunity' argument in no way

---

13 In a prior order on a different matter, the court opined that it expected the parties to act in accord with professional standards and the rules of evidence. This is just another, and clear example of the defense using misleading tactics and mischaracterizing facts to portray to the Court a reality that simply does not exist.

Case 3:13-cr-00008-SLG   Document 1124   Filed 08/14/19   Page 23 of 26

supports a finding by a preponderance of evidence that Wells drove the CR-V that day". The United States is relying on all facts of the trial in its argument on conditional relevance. The defense completely ignores these facts and is attempting to distract this Court with a myopically focused argument that the only evidence that matters, comes from the Kodiak Airport the day of the murders.

Given the sheer number of times the defense has defaulted to petty attacks on the government prosecutors in its pleadings, the government respectfully requests that the court monitor these distracting and time consuming tactics during trial, as the government has every reason to believe they will continue to do so. The defense arguments and their solicitation of improper testimony related to the defense team's mastered Defense Exhibit UU, illustrates their troublesome tactics aimed at confusing the issue and distracting this Court in order to side rail the presentation of the government's case, disrupt the pursuit of the truth, and highjack this Court's orderly administration of justice. Had the United States engaged in remotely the same trickery, the defense would have howled in opposition.

### G. Conclusion

At one time, this hearing seemed like a relatively straightforward issue about an issue everyone was on notice of: whether the two videos were substantially similar. The defense already knows that *Daubert* does not apply to the issue of the reconstruction video as the agent's work was not scientific. The issue goes to weight. Knowing that, the defense then delayed notice that they would raise any scientific attack and rely on Hoerricks as their expert in support thereof. They further failed to provide notice of the facts relied upon

by that expert, and his basis for forming their argument, instead creating their own for him to rely on; all in an attempt to deprive the government of an opportunity to rebut the same, and forcing both the government and the Court to chase down these moving targets on the day of the "substantially similar" evidentiary hearing.

By various defense pleadings and underhanded tactics, the defense has led the government and this Court far afield of the original question. The government respectfully submits however, that this Court need not entertain these intentional distractions. Substantial similarity remains the properly briefed, properly discovered by the United States at least, and a properly prepared issue presented to this Court; on that alone, the defense motion fails.

As to the April 12 motion on conditional relevance, the United States has been forced to rebut allegations of impropriety on the part of government counsel and otherwise respond to spontaneously raised evidentiary issues wholly lacking in evidentiary support well past the motions deadline. To permit the defense to supersede the authority of this Court in its judicial duties to oversee the orderly administration of justice by allowing them to repeatedly move the issue target will result in undue delay and unnecessary continuances. The court should deny this motion. If the Court is going to seriously entertain precluding the April 12, 2012 video, then the government requests, at a minimum, an evidentiary hearing and oral argument so the government can present a fair response.

Lastly, if the defense has evidence it wants to share which blows a hole in a theory postulated by the United States on a critical issue, admit it, now, and quit hiding behind

unverifiable and unsupported generalities involving the observations of two mystery people who may have seen something different at Kodiak Airport than the government's investigation revealed. Trial is not an evidence ambush, for either side, and since the defense has clearly elected not to turn this over, the Court should not consider this as it amounts to facts not in evidence.

The defense motion to exclude, in all its facets, should be denied for being outside the scope of any report or pleadings not properly briefed by the defense. The April 12 video should be admitted, and the April 19th video conditionally admitted at trial.

RESPECTFULLY SUBMITTED August 14, 2019, in Anchorage, Alaska.

BRYAN SCHRODER
United States Attorney

s/Steven E. Skrocki
STEVEN E. SKROCKI
Assistant U.S. Attorney
United States of America

**CERTIFICATE OF SERVICE**

I hereby certify that on August 14, 2019, a
true and correct copy of the foregoing was
served electronically on:

Counsel of Record

s/ Steven E. Skrocki
Office of the U.S. Attorney