1          UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF ALASKA
2

3    UNITED STATES OF AMERICA, )
                               )
4          Plaintiff,          )
                               )
5    vs.                       )    CASE NO. 3:13-cr-00008-SLG
                               )
6    JAMES MICHAEL WELLS,      )
                               )
7          Defendant.          )
     _____)
8

9              TRANSCRIPT OF STATUS HEARING
     **BEFORE THE HONORABLE SHARON L. GLEASON, DISTRICT JUDGE**
10             July 2, 2019; 9:02 a.m.
                  Anchorage, Alaska
11

**FOR THE GOVERNMENT:**
12        Office of the United States Attorney
          BY:  STEVEN SKROCKI
13        BY:  CHRISTINA M. SHERMAN
          BY:  KELLEY L. STEVENS
14        222 West 7th Avenue, #9
          Anchorage, Alaska 99513
15        (907) 271-5071

16   **FOR THE DEFENDANT:**
          Office of the Federal Public Defender
17        BY:  GARY GEORGE COLBATH
          601 West 5th Avenue, Suite 800
18        Anchorage, Alaska 99501
          (907) 646-3400
19
          Camiel & Chaney, P.S.
20        BY:  PETER A. CAMIEL
          520 Pike Street, Suite 2500
21        Seattle, Washington 98101
          (206) 624-1551
22
     _____
23
                   **SONJA L. REEVES, RMR-CRR**
24            Federal Official Court Reporter
                222 West 7th Avenue, #4
25                Anchorage, Alaska 99513
          Transcript Produced from the Stenographic Record

1          (Call to Order of the Court at 9:02 a.m.)

2          DEPUTY CLERK:  All rise.  Her Honor, the Court,

3  the United States District Court for the District of

4  Alaska is now in session, the Honorable Sharon L.

5  Gleason presiding.

6          Please be seated.

7          THE COURT:  Good morning.  We're on record here

8  in United States versus Wells.  And Mr. Skrocki is here

9  with Ms. Sherman, Ms. Stevens.  Good morning.  And then

10  Mr. Colbath, Mr. Camiel are here with Mr. Wells.

11          And it's the time set for a status conference,

12  see where we are.  I appreciated the notice that the

13  parties filed.  That was helpful.

14          I got sidetracked after our last hearing, I had

15  a few trials in other matters, but I have focused rather

16  intently on this case over the last week or so.  And I

17  anticipate having rulings on all of the pending motions

18  within the next one to two weeks.

19          Some with regard to the experts, at least the

20  draft that I have been working on now, would envision

21  that there be probably some evidentiary proceeding in

22  the course of trial outside the presence of the jury on

23  the Daubert issues, which I'll try to articulate the

24  topics in the orders.

25          I know we had discussed at some point oral

argument.  There was some reference in some of the

motions, particularly with regard to the video, the 4/19

video, of an evidentiary hearing.

Mr. Skrocki, what are your thoughts on that

topic?  And then in the Stein motion, there was some

motion to an evidentiary hearing, but I think that was

an error, because I wasn't clear what would be the scope

of that evidentiary hearing.

MR. SKROCKI:  We had the same question, but my

colleague, Ms. Stevens, has that brief, so she'll

address after me, if we could do that.

THE COURT:  Sure, that's fine.

MR. SKROCKI:  As to the evidentiary hearing on

the April 19th video, we don't think it's necessary.

The video speaks for itself.  To have two experts come

into court and state that it could be overly prejudicial

or plant some sort of seed in the jury's mind doesn't

seem to advance the issue for anybody.

That's something that takes out the purview of

the jury to examine the video.  And I will assure the

Court, as I have assured the parties in the briefing,

that it's very easy to discuss with the witness who is

going to admit the video the differences in time and

place and changes, that it's not exact, things of that

nature.

```
 1              It really goes to weight, and that's the whole
 2     point of this matter, from our perspective, is that the
 3     case law does not require specific absolute similarity,
 4     but it does provide it has to be certainly similar in
 5     some respects, which it is.  There is no way to actually
 6     duplicate what happened the week before.
 7              THE COURT:  Are you opposed to the idea that
 8     was advanced by defense of having the jury -- the
 9     Government is required to play the actual footage from
10     earlier that month prior to playing the recreation?
11              MR. SKROCKI:  Oh, absolutely.  That would be
12     our order of proof.  We wouldn't be playing the --
13              THE COURT:  The 4-19 until after the 4-12?
14              MR. SKROCKI:  Absolutely not.  So to have
15     Mr. Hoerricks and Dr. Reisberg come in in an evidentiary
16     hearing setting and pontificate about why this is
17     improper -- and this sort of boils into, or folds into
18     what we sort of see as the defense -- the defense in
19     this case is about confirmation bias.
20              And that's a theme that we're dealing with here
21     in the briefing.  It's a theme that has been placed on
22     this trial team and the team before it and the
23     investigation, and we get that in terms of litigation
24     tactics.  But to have these two witnesses come in and
25     say, "This is confirmation bias," to the Court, that's
```

1  something that can be dealt with certainly on cross

2  examination.  And I don't really see the utility of

3  having these two individuals coming up here and taking

4  up the Court's time to tell us what's already in the

5  pleadings.

6          I'm just not sure where the evidentiary

7  hearing's points would go on that.  So we would be

8  opposed to a hearing for that reason.

9          And if Ms. Stevens can address the other one.

10          THE COURT:  Why don't I hear from the defense

11  on the evidentiary hearing on the 4-19 and then we'll

12  come back to the Stein one in just a bit.

13          MR. CAMIEL:  Good morning.  Your Honor, we

14  believe an evidentiary hearing is necessary really to

15  determine the admissibility of the April 19th video

16  before it gets in front of the jury, and that this isn't

17  just a matter of weight and cross examination, but

18  whether the jury should see this at all.

19          The Government --

20          THE COURT:  Why do I need -- I have watched the

21  video, let me say.  I watched the -- so I guess I have

22  confirmation bias myself perhaps, Mr. Camiel, I don't

23  know, but I have watched a lot of videos.

24          But in any event, what would an expert give me

25  that's not already in the filings?

1    MR. CAMIEL:  One of the things that the expert

2 would talk about is the differences between the two and

3 the meaningfulness of the differences, why what --

4    THE COURT:  I have read the parties' briefing

5 on that.

6    MR. CAMIEL:  I understand.  But I guess it's a

7 two-part -- there are two parts to it.  One is to

8 highlight the differences from the view of the expert in

9 terms of, for example, the lighting or the obstructions

10 or the movement and change and manipulation of the

11 camera.

12    I mean, one of the things I think is

13 significant is the Government's own expert had to then

14 reinsert obstructions, because even their expert

15 apparently found that the 4-19 video was too misleading

16 without putting back in obstructions that they took out.

17    But they want to show the jury that 4-9 (sic)

18 video repeatedly with their experts.  And I think it's

19 important, what is the 4-19 video?  It's not substantive

20 evidence.  It's an experiment.  And the Government has

21 to show you before it gets in front of the jury, they

22 have the burden of showing you that it's substantially

23 similar, not necessarily absolutely identical, but

24 substantially similar in all meaningful respects in

25 terms of trying to discern what that vehicle is on

1    April 12th.

2          THE COURT:  So I guess my question -- and I

3    understand the briefing there, and so the question is:

4    What would expert testimony give me that is not already

5    in the record in the parties' arguments and in the video

6    itself?  What would an expert -- that's really the

7    question.

8          MR. CAMIEL:  The other thing that I think the

9    expert testimony would focus on, particularly with

10   Mr. Reisberg, is the prejudice that comes from a jury

11   watching this where they only -- this is like -- if you

12   looked at this in terms of an eyewitness identification

13   procedure, before you would allow whatever eyewitness

14   identification procedure was used by law enforcement

15   with a witness, you would listen to and have to

16   determine whether it was overly suggestive.

17         And Dr. Reisberg's testimony would go to the

18   suggestiveness of using just the Wells' vehicle with the

19   Government experts and the problem that impacts, not

20   just the experts, but the jury in doing that.

21         Because that's what this really is, is an

22   identification procedure where it's a one-person showup,

23   but it's a one-car showup is what they've done.

24         And in my experience, the Court would have an

25   evidentiary hearing to determine whether or not it was

1   overly suggestive or not before you let it go in front
2   of the jury.  Whereas what the Government wants to do is
3   first they move to exclude our experts and then they
4   want to put this in front of the jury and say, "Well, we
5   can just cross examine about the differences without
6   being able to explain to the jury why this is
7   prejudicial."
8           But even before that, they want to get it in
9   front of the jury before the Court has even heard from
10  the experts.  And I know you have read the briefing and
11  the reports, but I think it's different to have them
12  come in on both direct and cross examination in an
13  evidentiary hearing setting to really understand just
14  how prejudicial this is and the impact, not just on the
15  Government experts, but on the jury, where, in reading
16  the transcript of the last trial, at some point you
17  don't know which video you're looking at or you're
18  reading about, because sometimes it's the April 19th,
19  sometimes it's the April 12th.
20          And some of the Government's own experts said,
21  I think it was Mr. Schmidt in talking about the videos,
22  he said, "Well, I couldn't really determine what it was.
23  Then I saw the April 19th video and that was much
24  clearer," and then he came up with his opinion.
25          So that's why I think we need an evidentiary

hearing so that you determine before it gets in front of
the jury whether this is even admissible.

THE COURT: Thank you. And on the Stein issue?

MS. STEVENS: Yes, Your Honor. So the
Government's position regarding this motion is an
evidentiary hearing is not required. Although the
defense requested it in its motion, it was silent on why
they would require one or who they would call and what
additional information, apart from the facts already
elicited at the underlying trial, would be added.

So our position is that the record contains all
the necessary information allowing this Court to
determine that the facts the defense seeks here to
preclude are in fact part and parcel to the Government's
overall narrative surrounding the means by which
Mr. Wells committed this offense.

We think an evidentiary hearing is unnecessary.
We believe the Court is well placed at this stage to
find in support of allowing the Steins' testimony in
order to aid the members of the jury in understanding or
overall or overarching narrative about how he could have
come into possession of a potential murder weapon in
this case.

THE COURT: Mr. Colbath, am I going to hear
from you on this motion? This is 1031, my notes

reflect.

          MR. COLBATH:  So I will tell the Court -- I'll
apologize to the Court and apologize to the Government.
There is two mistakes in this motion, and that is in the
caption.  I agree we don't need an evidentiary hearing
on this, which is why the body of my motion is silent as
to why an evidentiary hearing might be necessary.

          THE COURT:  I suspected that might be the case.

          MR. COLBATH:  I also note that the footer is
wrong.  And the footer refers to the video motion, as
does --

          THE COURT:  Well, my law clerk noted that as
well.

          MR. COLBATH:  I think the record and the
briefing, I will agree on the facts, make it fairly
clear what the situation is and what the Court needs to
consider.  I'm happy to offer additional argument on it,
but I agree that an evidentiary hearing is not
necessary.

          THE COURT:  All right.  Thank you.  Then that
issue is resolved.

          Coming back, Mr. Camiel, to the evidentiary
hearing on the video, if we were to have that, how long
would you anticipate?

          MR. COLBATH:  Time-wise, Your Honor?

1          THE COURT:  Correct.

2          MR. COLBATH:  Could I comment briefly on that?

3          THE COURT:  Sure, go right ahead.

4          MR. COLBATH:  Number one, I think if we could

5   have the hearing yet this month, I don't think that the

6   hearing would be more than under two hours.  I think --

7          THE COURT:  So like an hour each expert?

8          MR. COLBATH:  I think less.

9          THE COURT:  Could we do it by video conference?

10         MR. COLBATH:  That was my second thing.  I

11   would ask that they be allowed to appear by video

12   conference.  If that couldn't be expedient or quickly

13   arranged, then even telephonic.

14         And what I would tell the Court is I would

15   equate it to this:  What these experts are going to

16   do -- it's one thing for me to know that my car is broke

17   and somebody at the shop to say, "Your car is broke,"

18   and then me to come home and explain the car is broke,

19   this is what's wrong.

20         It's another thing to sit down with the

21   mechanic and the car and have them walk through here is

22   why it's broke, here is how it's broken, here is what

23   the broken parts mean.  And that's really the difference

24   here.  The Court can read Mr. Camiel and my's argument

25   and understanding of the facts about why these videos

are different, but until somebody who does it for a
living, whether it's speaking of the prejudicial impact
or whether it's speaking of the technicalities and the
importance of the technicalities of the actual videos,
until somebody really does those things for a living,
imparts that wisdom, which they have to us and we have
tried to summarize in the arguments for the Court, I
think it's a big difference.

        I think hearing from the mechanic directly
explains the gravity of the situation.  But we would do
it, I think, in a couple-hour hearing, envisioning both
direct and cross, and certainly set it up so that it
could be done quickly by video or audio.

        THE COURT:  Thank you.

        Mr. Skrocki?  I guess my thought is I'm
inclined to set this up for an evidentiary hearing,
because it is correct, I think it was pointed out in the
briefing, I don't have any sworn -- or any evidence.  I
have the lawyers' arguments, which are very helpful, but
are not evidence.  And then I have the reports, which
are unsworn.  And so I do see that the Daubert 702
analysis requires some evidence put before the Court as
the gatekeeper.

        MR. SKROCKI:  We don't disagree that would be
the most prudent thing to do on this record.  Neither

```
 1   lawyer has still told you anything about why it would be

 2   important, so we'll have to see, in our view.  We would

 3   suggest if we could, due to scheduling amongst the three

 4   of us, July 30th, if that would work for Your Honor.

 5            THE COURT:  Let me get the calendar and we'll

 6   take that up.  Would you agree two hours of video

 7   conference?

 8            MR. SKROCKI:  We're here for the Court, Judge.

 9   We'll make it work.

10            THE COURT:  July 30th?

11            MR. CAMIEL:  That works.

12            THE COURT:  Hold on just a moment.

13            (Pause)

14            THE COURT:  I think that works for me, but

15   she's getting the calendar.

16            So Mr. Colbath, how is July 30th, the morning,

17   9:00 a.m.?

18            MR. COLBATH:  I am second-chairing or

19   co-counseling a trial in front of Judge Beistline that

20   starts the 29th and is scheduled for like 35 witnesses,

21   two weeks.  I'm in the process of trying to get out of

22   that, or see if one of the other lawyers can, since I'm

23   co-counsel, provide assistance with Ms. Staft.

24            Just because we have our pretrial here on the

25   5th, I was just going to step out of trial for the
```

morning if we had our pretrial and I am in that trial.

I know that Mr. Skrocki is out of town up until before

then, and so I don't see a way around it. I'll figure

it out, because this is just too important to not do it.

THE COURT: You could do July 30th at 9:00 a.m.

then?

MR. COLBATH: I'll make that work.

THE COURT: If you can make that work.

MR. COLBATH: I will.

MR. CAMIEL: That works for me.

MR. SKROCKI: Yes. Thank you.

THE COURT: I'll do that. And we can do the

video conference. I will tell you the problem that I've

encountered, and there is no solution that I'm aware of,

is that -- and it's less of an issue without the jury,

and we'll get to this topic on the video conferencing in

a moment, but the problem is two voices can't be on the

video conference at the same time.

And so if we have a talkative person and they

don't breathe, which in my experience a lot of witnesses

get going and they don't stop -- and this really segues

into the point you raised about video conference for

trial -- it's very hard for somebody to interpose an

objection. It's hard for me to interrupt. It's just

problematic.

1          Like I say, much more of an issue when there is

2    a request, as I understand it in your report, for video

3    conferencing in front of the jury.

4          But in any event, for this proceeding coming up

5    at the end of the month, I would simply ask you to each

6    apprise whoever you might be calling, the two experts I

7    assume, of that fact and ask them to break up, to pause

8    after each sentence.  Less of an issue if there is

9    information presented to the Court as opposed to the

10   jury, but if you could just instruct them to take a

11   break.

12         MR. COLBATH:  Your Honor, I assume that if it's

13   feasible to have our witnesses here that there is no

14   problem in having them here.

15         THE COURT:  Oh, no, if you can get your witness

16   up here, it is better.

17         MR. COLBATH:  I anticipate more of a problem

18   having Dr. Reisberg here and less of a problem having

19   Mr. Hoerricks here, and so we will endeavor to have them

20   here because I agree it's preferential.  It will go

21   faster with them in the same room.

22         THE COURT:  It's definitely better.

23         MR. COLBATH:  But we'll let everybody know

24   ahead of time what arrangements we can make.  And we

25   will certainly instruct the witnesses about the

```
 1    logistics of the video conference, if that need be the

 2    way they are going to testify.

 3              THE COURT:  Mr. Skrocki, who would you

 4    anticipate calling for that proceeding?

 5              MR. SKROCKI:  We would be calling the Coast

 6    Guard investigator who created the video, so we would

 7    have him here as well.

 8              THE COURT:  In person?

 9              MR. SKROCKI:  Correct.

10              THE COURT:  We may not have video conference.

11    If we do, that's fine.  If you can give us a notice no

12    later than the Friday before, whatever date that is, the

13    26th, then we'll make sure that's set up.  We can do it

14    here in the courtroom.

15              Like I say, getting to your topic for the jury,

16    it's more problematic, but what I would do is work with

17    IT here to have it so that the Court was able to cut it

18    off, frankly, is what I would see, so that if there was

19    an objection -- and I would explain to the jury, "Here

20    is what we're doing.  We're technologically challenged."

21    And if there is an objection, we'd just cut off the

22    witness, not to be rude, but then rule on the objection

23    and then come back on.  I think that would work well.

24    But just a heads-up on that.

25              MR. SKROCKI:  Thank you, Judge.
```

1          THE COURT:  How many video-conference witnesses

2    do you anticipate at trial from the Government?

3          MR. SKROCKI:  Potentially one due to medical

4    issues, Your Honor.

5          THE COURT:  All right.  And how about from the

6    defense?

7          MR. COLBATH:  Your Honor, it was my idea to

8    include that sort of in the notice or the discussion

9    here only because -- and to be honest with you, I don't

10   really know.  I don't see it happening a lot, but as we

11   started to issue subpoenas and visit with folks, early

12   on in that process, two witnesses -- of course now,

13   given our timing that we're so much later than first

14   trial, lots of folks have left Kodiak and/or Alaska.  We

15   have a lot of Lower 48.  In maybe serving in our five or

16   six subpoenas, two of those people immediately inquired

17   about "I don't think I can do it.  Could I appear by

18   video," whatnot.

19          I could see the writing on the wall that we

20   were going to have that reoccur, because between the

21   parties, we're upwards of 100 witnesses.  And so I only

22   know of one.  Likewise with the Government, I only know

23   of one for sure, and it is also because of medical

24   reasons that the person will likely make -- have us make

25   that request.

1        I just wanted to discuss it or have some idea,

2   so that as we encounter other folks making the request

3   or have logistical problems, we know how hard to push to

4   get them here in person and what the options are to

5   arrange video testimony, if necessary.

6        So I don't see it being a lot of folks, but I

7   see it being a couple anyway.

8        THE COURT:  All right.  I hear no objection

9   from either side to that approach.  I will permit it and

10  we'll take it up at the final pretrial conference.

11       MR. COLBATH:  We should know by then.

12       THE COURT:  You'll know by then or you

13  anticipate knowing by then.

14       MR. SKROCKI:  Yes, Judge.

15       THE COURT:  Very good.  And then, like I say, I

16  think I can work with IT to address that problem and

17  inform the jury that that's what we're going to be

18  doing.

19       And then with regard to the remainder of the

20  motions, like I said, I recall the Government on one of

21  the Daubert motions said maybe an evidentiary hearing,

22  and I will address that as needed.

23       But is there any reason if we were to take that

24  approach that that couldn't be done during trial?

25  That's what I have typically done on Daubert motions.

```
 1          MR. SKROCKI:  We're in agreement with that,
 2   Your Honor.
 3          THE COURT:  Mr. Camiel, Mr. Colbath, is there
 4   any that you see need to be addressed prior to trial?
 5   If you want to take a few minutes and confer --
 6          MR. COLBATH:  I don't think so, Your Honor.  I
 7   think from our standpoint, and I can look for sure, the
 8   only real -- I do see a problem with it.  And I think
 9   from an expert challenge standpoint, we have challenged
10   the scope of expert Robert Morton's testimony, and we
11   have challenged Rick Wyant's.  He is the firearm video.
12          THE COURT:  All right.  Do you agree -- I have
13   watched that one too, that video -- that the requirement
14   of a report can be achieved through a narrated video, in
15   theory?
16          MR. COLBATH:  So here is my problem.  No.  The
17   answer to is that question is no, and here is why:
18   First of all, has the Court watched the video?
19          THE COURT:  Yes.
20          MR. COLBATH:  So you know the Government -- the
21   Government has told me that it's Mr. Wyant that's
22   narrating it, but you can't tell that from the video.
23   You don't see the face of the person ever who's
24   narrating it.  You see the gloved hands doing whatever
25   they are doing and somebody talking.
```

1      The problem I have with that is the rule

2   requires a summary of the opinions.  And I suppose on

3   the video if somebody says, "This is what a gun -- this

4   is what this particular gun sounds like," that that's an

5   opinion, I guess, or something.

6      But with the video, I received a list from the

7   Government of the material that their expert reviewed.

8   It's upwards of 25,000 pages of discovery.  It's

9   multiple videos.  It's audio interviews.  It's

10  extensive.  And almost none of it is necessary to

11  construct a two-and-a-half-minute video for the purposes

12  that are represented in the briefing for what that video

13  shows.

14      And so I can only envision that that expert has

15  more to say or more to offer than what is depicted in

16  that video.

17      THE COURT:  Maybe what might be helpful --

18      MR. COLBATH:  But I don't know because I don't

19  have a report.

20      THE COURT:  What might be helpful to both sides

21  is to apprise you of the fact that I take a fairly

22  narrow view on going outside the scope of a report for

23  both sides.  And I did a whole patent trial in Arizona,

24  and the main objection by both sides throughout the case

25  was unfair extrapolation.  What does that mean?  That

1    means that the expert witness is testifying outside a

2    reasonable four corners of the report.

3           And so I am telling both sides that I plan to

4    have a notebook with all your expert reports and plan to

5    entertain objections of unfair extrapolation, and

6    specifically with -- I'm giving you like a preview of my

7    draft of these orders that I have been working on, but

8    specifically with regard to that video, I would see that

9    that witness, I don't care if he's read 25,000 pages or

10   what, is limited to testifying consistent with the

11   two-and-a-half-minute narration.  That's how that order

12   is likely to be drafted.

13          MR. COLBATH:  If that is the case, then I don't

14   see a problem with having -- I mean I still have

15   prejudice arguments and problems with the substance of

16   the testimony, but in that scenario, I would not see so

17   much with that expert a problem with doing a brief

18   Daubert or a brief hearing mid-trial to do that.

19          With respect to Mr. Morton, that's a different

20   story, because the testimony of Mr. Morton as it

21   respects -- his testimony is twofold, I think.  Half of

22   it deals with crime scene analysis, regular crime scene

23   analysis, this is the forensics, but half of it deals

24   with essentially the same testimony, testimonial type

25   profiling stuff from our eyes as what happened at the

last trial and is very problematic.

It will impact case strategy. It will impact
what is said in opening. It will impact frankly how the
defense is put together, and I would presume how the
Government's case is put together. If the Court said
Mr. Morton cannot testify about his classification of
the crime here or his extrapolating what a motive then
is based on his profile of the crime, if you ruled and
perhaps granted the motion that we filed, I believe that
would change how the Government presents their case.

THE COURT: It actually brings up a question I
had when I don't -- I've read all of that motion
paperwork as well. And it was helpful that you had
delineated the specific topics that you are opposed to
with regard to that expert.

And it wasn't entirely clear to me if you are
opposed to having Mr. Morton -- Is it Dr. or Mr.?

MR. SKROCKI: Mr.

THE COURT: Thank you -- testify that it was a
-- I think it's a personal cause homicide. Are you
opposed to that?

MR. COLBATH: Yes, Your Honor.

THE COURT: That was implicit in your briefing,
but that specific term --

MR. COLBATH: As succinctly as I can be, our

motion is that -- our argument is Mr. Morton talks about
some crime scene information, then he says, "My analysis
is I classify the crime as," which is, "This is my
profile of the crime, not of the person, the crime, it's
a personal cause homicide."

He then uses that to say, "I know -- because I
know what the class of the crime is, the profile of the
crime is, now I can tell you, irrespective of any
individual, I can tell you what the motives for that
class of crime is.  Here is what the profile of the
motive looks like or here's what that kind of crime
looks like."

THE COURT:  I understand you're opposed to
that, but stepping back to the --

MR. COLBATH:  Well, it's based on the initial
classification, so those two things need to be out.  If
he wants to talk about his observation of the actual
facts of this case and what they show or don't show,
that's the purview of expert testimony.

THE COURT:  I guess my question was more --
setting aside -- and I understand the -- I think I
understand the objection to what motives might have
prompted the homicides.

But my question was:  If you set all of that
aside, is there an objection just to the personal cause

1   homicide?

2          MR. COLBATH:  You know, I think there is

3   because I think -- I think there is because I think it's

4   an improper opinion.  It's profiling the crime, no

5   different than the Ninth Circuit disapproved offering

6   profile evidence of the individual.

7          THE COURT:  I think I may disagree with you on

8   that.  That wouldn't be the first or the last time

9   probably, Mr. Colbath.  That's where I was -- if you

10  wanted to confer with Mr. Camiel and respond to me why

11  that evidence would be impermissible or inconsistent

12  with the Ninth Circuit opinion, I'm happy to hear that,

13  but that tentatively is where my thoughts are.

14          (Pause)

15          MR. COLBATH:  So I wasn't maybe clear, and I

16  guess what I was thinking, but if the Court were to

17  allow that, Mr. Morton says, "I have reviewed this.  I

18  have looked at this, and I determined, based on my

19  analysis here, that this homicide is called a personal

20  cause homicide," if he's allowed to place that label on

21  it, then, of course, he has to explain, or I have to ask

22  him, "How did you get that label."

23          Because in the classification manual that the

24  FBI and others in the field develop, there is all kinds

25  of classifications of crimes.  So if he puts a label on

it, then he has to explain or he gets to explain, I
presume, why he put the label on it or how he got the
label.  And that's where we get into "let me describe to
you the profile," there is no other word for it really,
or "the characteristics," that's similar to the Ninth
Circuit language, "Let me explain to you, jury, not what
this situation looks like, but what that classification
is.  Let me explain to you what a personal cause
homicide is," and we're off to the races in talking
about what those kind of -- generally what those kind of
crimes look like.

          And then that opens the door for the Government
to then fit whatever they want evidence in this case
into that classification or those characteristics or
that profile.  That's essentially what happened in the
first case.

          THE COURT:  All right.

          MR. COLBATH:  And there is no way for him to
say though that personal cause homicide without the
explanation of what that is, what that means and how he
got there.  If he's allowed to say it, I want to explore
that, but I don't want to get into it at all because I
don't believe it's appropriate.  But --

          THE COURT:  I read that several days ago, but
as I read it, there was a basis for the expert's opinion

1    that it was a personal cause homicide that derived from

2    the crime scene analysis and a review of the background

3    of the victims and was not focused on the profile then

4    of the perpetrator.  That's my takeaway from Mr. Morton.

5              MR. COLBATH:  You just described -- I mean if

6    you read the underlying literature, you just described

7    what an FBI profiler does.  He looks at the victims, he

8    looks at all the scenario, and not knowing a defendant,

9    he says, "Well, this is what this kind of crime is, and

10   so, therefore, based on the different information I see

11   here, this is what this type of crime is."

12             That's a profile of a crime.  That's exactly

13   the type --

14             THE COURT:  Then you want to get in the

15   evidence of your expert that talks all about randomness

16   versus -- random acts of violence versus -- I can't

17   remember the categories.  Then there is the personal

18   cause homicide, and then there was a third category.

19             You want, as I recall, to have an expert

20   testify about all of that and the percentages.

21             MR. COLBATH:  Sure, we do, because Mr. Morton

22   is going to get up and say this is one thing and one

23   thing only.  I'm happy to give up that expert.  I will

24   -- if the Government will stipulate right now that

25   Morton won't get into any of that, I will agree that

1   Park Dietz won't testify.

2           THE COURT:  I don't expect that stipulation.

3           MR. COLBATH:  I don't expect it either.  I

4   needed to be prepared for the Court to overrule me and

5   disagree, as you indicated you are inclined to do, and

6   so then I believe I have no choice.  But I don't think

7   that's an appropriate legal issue or factual issue in

8   this case to occur, but if you're going to let them do

9   it again, then I'm going to have an expert this time,

10  because they didn't have it last time, I'm going to have

11  an expert explain this time why it's not just that.

12          THE COURT:  What in the way of an evidentiary

13  hearing prior to trial do you see on that motion?

14          MR. COLBATH:  I don't know necessarily that an

15  evidentiary hearing is necessary.  The problem is if you

16  wait to rule -- if you wait to rule on the motion until

17  we're at day seven of trial and it's time to call

18  Mr. Morton, it's way too late for me to -- because my

19  experts hinge on the Court's ruling on that, and frankly

20  what I say in opening about, and I assume what they say

21  in opening about what they are going to show is

22  different if Morton can or can't testify on those

23  issues, so I just want the ruling.

24          THE COURT:  You want the ruling, but don't see,

25  as I hear it, that an evidentiary hearing is necessary

1  prior to trial on -- I don't want to put words in your

2  mouth, but what I'm hearing is on the Morton motion,

3  it's the ruling prior to trial, which I really hope I

4  can get out all but the ones that require an evidentiary

5  hearing in the next couple of weeks, that's what is

6  necessary.

7  　　　　　MR. COLBATH:  That was my concern.  I think the

8  parties have briefed the issue sufficiently or the Court

9  is obviously tracking on the issues.  It's just the

10 ruling on that, much like the ruling, for instance, on

11 404(b) and the character stuff.  That's going to impact

12 what's said in opening, what witnesses we subpoena, how

13 we're going to go forward in constructing things.  And

14 so particularly with Mr. Morton, I think --

15 　　　　　THE COURT:  Sooner rather than later.

16 　　　　　MR. COLBATH:  Sooner rather than later.  With

17 Mr. Wyant, if we take that up midstream, he's not hugely

18 pivotal, and I don't know how much he'll be discussed

19 before we get to him in trial.

20 　　　　　I don't think, from a defense standpoint, we

21 challenged other expert testimony.  So addressing it

22 sort of as we get there in trial is less of a concern,

23 but it is with Morton.

24 　　　　　THE COURT:  On that topic, Mr. Skrocki,

25 anything to add?

1          MR. SKROCKI:  Nothing to add.

2          THE COURT:  Let me ask you then with regard to

3     Mr. Morton's testimony, as I understand it the

4     Government wants to have him opine that it was a

5     personal cause homicide.

6          MR. SKROCKI:  Correct.

7          THE COURT:  Do you then plan to explore the

8     personality profile?

9          MR. SKROCKI:  Of Mr. Wells?

10          THE COURT:  Of a personal cause homicide.

11          MR. SKROCKI:  In a limited sense in terms of

12     background so it makes sense for the jury, but not in

13     terms of Mr. Wells' conduct.

14          THE COURT:  What do you envision in the way of

15     an offer of proof of what Mr. Morton would testify to if

16     I were to allow in, all right, personal cause homicide,

17     then what additional evidence related to a profile of --

18          MR. SKROCKI:  It would be based on the facts of

19     the murder itself, that nothing was stolen, there was no

20     attempt to break in, things of that nature.  Those

21     aspects that are in his report.

22          THE COURT:  That I understood, but in terms of

23     the personality of a perpetrator of a personal cause

24     homicide, would you be seeking to introduce any evidence

25     through Mr. Morton?  If you need to confer with your

1    team and take a few minutes, that's fine.

2                MR. SKROCKI:  Just to be accurate.  The issue

3    is it's a delicate issue, because certainly, as we have

4    said in our briefing, we're not going to be going into a

5    situation of workplace violence.  The fact of the matter

6    is it happened where these men worked.  These two men

7    were murdered at their place of employment.  There is no

8    getting around that fact.

9                For Mr. Morton to testify as to no break-in, no

10   things were stolen, the circumstances of murder bright

11   and early in the morning when they first started their

12   job, those are important.  We don't expect him to -- we

13   are not going to have him testify as to Mr. Wells'

14   conduct or profiling Mr. Wells.

15               This isn't a profile.  This is a conclusion

16   based on facts.  In his experience --

17               THE COURT:  Based primarily on the crime scene,

18   as I understood it.

19               MR. SKROCKI:  Absolutely.  Correct.  And it's

20   important -- and it's appropriate for him to opine in

21   his experience that individuals who are murdered based

22   on these facts conclude -- he can conclude that it is

23   because of a personal bias by somebody.  That's the

24   point.

25               THE COURT:  And my question is:  Do you seek to

elicit then testimony from Mr. Morton as to any
personality characteristics of the perpetrator of those
homicides?

        MR. SKROCKI:  Okay.  Just a moment.

        THE COURT:  Take a moment.

        (Pause)

        MR. SKROCKI:  So I think all three of us are
tracking here.  Thank you for the time.

        The point of it being the conclusion would be,
based on what I observed about this murder scene and
things I reviewed, tells me it's a personal cause
homicide because of those facts that somebody knew how
to defeat the surveillance system, somebody knew how it
was oriented.

        So the facts establish that somebody with
knowledge knew it.  Now, our argument is going to be it
was Mr. Wells.  Those are the facts that he would
articulate as being a personal cause homicide, again,
all based off of the crime scene itself.

        THE COURT:  My question is:  Then do you plan
to elicit from Mr. Morton testimony about the
personality traits?

        MR. SKROCKI:  No.

        THE COURT:  That was the question.  Thank you.

        So back to you, Mr. Colbath, that seemed to be

1    your concern that there would be this -- or why would I

2    not then allow in the evidence from Mr. Morton that this

3    was a -- that in his opinion it was a personal cause

4    homicide based on his review of the crime scene and

5    information, as I understood his report, about the

6    background of the victims?

7        MR. COLBATH:  With all due respect to

8    Mr. Skrocki's representation, it's not what Mr. Morton's

9    report says he's going to say.

10        THE COURT:  So where is it in his report that

11    you take issue?

12        MR. COLBATH:  In the initial report, right on

13    page one in the third paragraph, the paragraph says,

14    "The information provided is based on," first of all,

15    "is based on probabilities."

16        THE COURT:  So let me back up and ask:  If

17    Mr. Morton were restricted to the second -- the

18    supplemental report, would you object to that testimony?

19        MR. COLBATH:  Yes, because I'll read the second

20    sentence right after "it's based on probabilities."  It

21    says, "No two criminal acts or criminal personalities

22    are exactly alike; therefore, the offender may not fit

23    every aspect of the analysis."

24        THE COURT:  That's from the original report.

25        MR. COLBATH:  I understand.  And then at the

1   bottom of page seven, that report says, the original

2   report, "The motive in this case can be discerned

3   through the actions of the offender."

4         So the very first thing he says is "through the

5   actions of the offender," who the offender is unknown.

6         THE COURT:  My question is -- and I'll come

7   back to the Government here in a moment.  If you turn to

8   the supplemental report, and I -- just a moment.

9         MR. COLBATH:  So that paragraph from the

10   original report and what follows, the information about

11   motive, from page seven of the original report is

12   repeated on page two of the supplemental report.  And

13   really the supplemental report says my opinion is

14   100 percent the same as it was in my original report.

15         THE COURT:  Disregarding that.

16         MR. COLBATH:  But what Mr. Morton's testimony I

17   think has to be is in personal cause homicides -- I

18   mean, I guess I can proffer or offer or send to the

19   Court the paragraph that says, "The motive in this case

20   can be discerned through," is a stock paragraph out of

21   the FBI crime -- not the FBI, but the criminal procedure

22   manual.

23         And it essentially says not that the motive in

24   this case was based on the facts of this case, but it's

25   a description of the motive in the class of crimes that

is personal cause homicides.  And so what I think
Mr. Morton will say, and he says it in his report, he
said the offender here killed the victim for some
personal reason, but he has no facts to know because he
doesn't know anything personally about any interaction
between the, other than what happened at the scene of
murder, between the offender and the victims.

        And so what he opines is, well, in these types
of situations, there is some kind of conflict.  He
doesn't know and there is no facts about any conflict.
There is some kind of personal things that a killer like
this thinks about and feels, and he describes feelings.

        He describes conversations that he says did or
didn't happen between these people at the murder scene.
And of course we all know that nobody knows what
conversations --

        THE COURT:  As I understood the Government, and
I can confirm that my understanding is correct, the
Government doesn't intend to elicit testimony in that
regard or about the sequence of the firearms or many of
the other concerns that were articulated in your
briefing, and validly articulated, they were in the
first report and came in at the first trial.

        MR. COLBATH:  That's not the way I understood
it or not my belief, but it was my concern.

1          THE COURT:  Well, that's why we're having this

2    hearing is to sort out these issues.

3          MR. COLBATH:  How does it help the jury -- I

4    mean, maybe I can approach it another way.  To say that

5    it's a personal cause homicide doesn't tell the jury

6    anything, because what he does is, unless it's doing the

7    same thing as what the law outlined by the Ninth Circuit

8    in the original case says, you know, the law on profiles

9    is generally we convict people because of the facts of

10   the case, a defendant cannot be convicted because they

11   fit some general profile.

12          Well, here it does not appear that Mr. Morton

13   says, "Here is what I know about the characteristics of

14   Jim Wells and why I think he fits a personal cause

15   homicide," but he does the inverse.  He says, "This a

16   personal cause homicide.  This is what the profile looks

17   like and these are the things, just generically, like

18   the motive can be discerned generally by these factors."

19          And then you're right, he doesn't conclude --

20   or Mr. Skrocki is right, he doesn't conclude by -- all

21   he does is stop short of saying Mr. Wells fits those

22   characteristics.  What he says is the activities of the

23   offender in this case match the profile of what I just

24   told you a personal cause homicide looks like;

25   therefore, those two things fit.

1          That's the same process, as I saw it, as the

2     prohibited characteristic-type evidence, because part of

3     the analysis or profile or classification, whatever word

4     you use, of labeling this a personal cause homicide

5     requires you, as he says in his original report and in

6     his supplemental report, it's based on discerning

7     things, unknown things or assuming unknown things about

8     the offender.

9          So it's the classification of the crime

10    subsumes some type of profile or some type of general

11    knowledge about the offender.  He says as much in the

12    supplemental report because he says, "Personal cause

13    homicide is created by some unknown personal thing or

14    conflict by the offender."

15          That's what makes this fit into this as opposed

16    to a robbery where somebody gets shot in the course of a

17    robbery.  Then it wouldn't fit that.  But it does not

18    further the evidence in this case or the jury's

19    determination in this case for them to know what type of

20    crime it is.  They need to know what happened and where

21    it happened, and as best they can, the circumstances of

22    how it happened.

23          But to know what some expert or law enforcement

24    might label it, I don't see as contributing to their

25    decision or analysis.  What I see it is if they accept

1    that testimony, I see them being able to say, oh, well,

2    if it's that kind of case, then it only must be this

3    kind of offender, so I guess we'll look and see if this

4    defendant fits somebody that could do that kind of crime

5    as opposed to a different kind of crime, so that's the

6    problem.

7            But if he says things different to or limited

8    from what is in his report -- I mean that's why my

9    motion was not a motion to exclude Mr. Morton.  I think

10   there are things from his report that he clearly is

11   qualified to and it's appropriate for him to testify to.

12   I was trying to limit it.

13           And I guess maybe we have to wait until we get

14   there to see, but the Court has to give us some kind of

15   ruling or guidance or outline before we get there.

16           THE COURT:  Well, I appreciate the discussion,

17   because I will try to clearly delineate the scope of

18   each expert's testimony and hold each side to it.

19   That's the goal here.  Anything more on Mr. Morton?

20           MR. SKROCKI:  Unless you have questions, Your

21   Honor, you pretty much heard everything in both parties'

22   briefs again.

23           THE COURT:  All right.  Mr. Colbath, do you

24   need a few minutes?

25           MR. COLBATH:  I guess I just -- Mr. Camiel

pointed out I maybe didn't answer the Court's question
about the supplemental report as clearly as I could
have.  I'd only refer you to the last sentence of the
second to last paragraph.  It's on page two.

It says, "Personal cause homicides are murders
where the offender has or perceives having a conflict or
problem with the victims and the solution to the
disagreement was to kill the victims."

That's basically a generic description of
personal cause homicide.  Then the argument is going to
be, even though there is not evidence of a conflict or
problems with the victims, the evidence will be
Mr. Wells fits that so it must be Mr. Wells.  I mean
that's the, I guess, argument per problem or limitation
we were seeking from all the information in the second
report, supplemental report.

THE COURT:  That's helpful.  Thank you.

All right.  Anything else on any of these
pending motions?  We'll table the April 19th.  The rest
I will try to get addressed.

I haven't read -- oh, no, that one I addressed,
the vehicle swapping is not an issue, correct?

MR. SKROCKI:  Yes.

THE COURT:  So any other points on any of these
motions?

```
 1              MR. SKROCKI:  No, Your Honor.  Thank you.

 2              THE COURT:  Mr. Colbath, on any of these other

 3    motions?  Take a moment.

 4              MR. COLBATH:  Yeah, I'm just looking through

 5    the docket here to make sure.

 6              I don't think so, Your Honor.  On our

 7    evidentiary hearing on July 30th, I assume if -- as the

 8    Court issues orders between now and then, or if any

 9    other additional motion work or issues come up, I assume

10    we could address them on the 30th if we had time.

11              THE COURT:  Certainly.

12              MR. COLBATH:  And/or then we have the pretrial

13    conference the week, the following week.

14              THE COURT:  As needed, yes.  We can take up

15    whether or not we should adjust that date, but I seem to

16    recall people with travel plans later in August, or

17    there was some reason we put it on so early.  In any

18    event, yes, certainly.

19              That brings us then to the topics you

20    delineated in the notice of issues at Docket 1054.  And

21    it sounds like you've agreed to have a reference, if a

22    party were to cross, for example, on prior testimony, to

23    call it "in another proceeding."

24              I meant to go back and I didn't look.  I did a

25    retrial of a civil case and I know we had a term that we
```

used.  I agree with the parties' proposal to have no
reference to the fact that there was a prior trial or
reasons for the retrial and that a verdict was reached
in the prior proceeding.  I agree with the parties
there.

I'm a little uncomfortable with the term "in
another proceeding" because it almost implies a
different case and I don't see that as accurate.  So
that's why I was going to go back and see what I called
it in the retrial of a civil case, and I just don't
recall.

I'm clearly in agreement with the concept, just
"another proceeding" to me is not entirely as accurate
as it could be to the jury.

MR. SKROCKI:  Whatever the Court decides.  We
can discuss it certainly.

THE COURT:  I'll have an alternative by
July 30th.

MR. COLBATH:  In the last scenario like this
that I did, we simply just used, "You testified at a
prior hearing."

THE COURT:  "Prior hearing" I think is what I
used.

MR. COLBATH:  The jury did not know was that
grand jury, was that a preliminary hearing, was that a

bail hearing, was that an evidentiary motion hearing.
Anybody that knows much about the court system at all is
going to know that a case often has multiple hearings
before it gets to trial, and that is about as vague as
we could be, I think.

THE COURT:  I'm comfortable with "prior
hearing," because that's not -- there is no implication
of inaccuracy.

MS. SHERMAN:  We agree.

THE COURT:  "Prior hearing"?

MR. SKROCKI:  Yes.

THE COURT:  "Prior hearing" it is.  All right.
Then "testified at a prior hearing," and don't need to
say "in this case," just "prior hearing."  Agree?

MR. SKROCKI:  Yes, Your Honor.

MR. COLBATH:  Yes.

THE COURT:  Very good.  Then that addresses
that.

Stipulations is your next one, that you
anticipate reaching stipulations.  I'd refer you to the
model jury instructions for the Ninth Circuit.  They
have a few different ones.  Some deal with stipulations.
Some deal with judicial notice.

The standard, as I recall, is slightly
different in criminal cases versus civil and the import

of stipulations, but certainly, if you're able to agree
on how you want to present it, I would likely accept
that agreement. I have had parties do stipulations of
fact that were read into the record and went back to the
jury room.

I have had them where they are simply read into
the record and then the Court directs -- I use the
pattern language that I didn't pull out, but it's
essentially, "You are to accept these facts as true,"
when the parties have stipulated that to be the case.

So if you can reach any stipulation on that,
I'm fine with that and how you seek to present it. Your
colleagues in the case I recently tried, I think it was
-- was it Ms. Sayers-Fay and -- in any event, we had
some written stipulations in the trial I recently did
with Mr. Moberly and Mr. Curtner as well. And so that
approach is fine, or if you come up with an alternative
and whether or not you agree to have the stipulations go
to the jury.

In a way it raises -- my only thought is unless
it's a complicated sets of stipulations, that it's
really unnecessary and perhaps confusing to the jury to
get some written document going to them, but sometimes
-- the example that comes to mind is a large number of
firearms with serial numbers is helpful to have in a

```
1   written format.  If it's simply a jurisdictional issue,
2   then perhaps a written stipulation is not needed.
3            So in any event, I'm open to -- if the parties
4   can reach agreement on that, I'm likely to sign off.
5            Mr. Colbath, does that address that topic to
6   your satisfaction?
7            MR. COLBATH:  I think that it does.  I think
8   we'll easily be able to work out with Government counsel
9   how we handle that.
10           MR. SKROCKI:  Yes, Your Honor.
11           THE COURT:  Video conference we discussed.  I
12  don't think we need to take up anything further on that.
13           DEPUTY CLERK:  Your Honor, as to the video
14  conference, is it possible to have the parties notify us
15  by the 23rd?
16           THE COURT:  Yes.  The courtroom deputy
17  requested us move up the date of notifying us on the
18  video conference.  I think I had said the 26th.  Let's
19  revise that to the 23rd so IT has sufficient time, one
20  week prior.
21           DEPUTY CLERK:  Thank you.
22           THE COURT:  So July 23rd, would that give you
23  sufficient time?
24           MR. SKROCKI:  Yes, Your Honor.
25           THE COURT:  So notice of video conferencing for
```

July 30th to be provided no later than July 23rd.  We
can use this courtroom.  If we can't for some reason,
sometimes it works better, there is a really big TV
downstairs for arraignments, we could use that as
needed.

The last one was that you anticipate agreeing
on allowing the party that is cross examining a witness
to also provide or elicit new topics.  That's fine.  And
I think your idea of a transition to say, "Now I'm going
to bring up some new topics with you," would be very
helpful.

I hear an agreement to at least try to do then
direct examination, unless the person is an adverse or
hostile witness, in that transition.  Am I correct in
reading your notice on that?

MR. SKROCKI:  Yes, Your Honor.

THE COURT:  Mr. Colbath, that's the plan?

MR. COLBATH:  That's the plan.

THE COURT:  That sounds fine.  I think it would
be helpful to the Court and to the jury if there was a
witness that that was going to be occurring that at the
start of the cross you informed us of that so we're all
on board.

MR. SKROCKI:  Yes.

THE COURT:  Very good.  Any other topics we can

take up today from the -- I'm also thinking that what
would be helpful, going back to this video, I mean I
hear that there are three witnesses, one from the
Government on the -- the person who made the film and
then two from the defense.  And if there is to be
anything different, then I would ask for notice no later
than the Friday prior, but if that's what I'm hearing
and that's consistent with the motion, it will be fine.

Mr. Skrocki, any other topics to take up today
that would help us along here?

MR. SKROCKI:  Nothing from the United States,
Your Honor.  Thank you.

THE COURT:  Mr. Colbath, do you need a few
minutes?  If you would like a few minutes to confer and
then let me know if there are additional topics.

MR. COLBATH:  I don't need to confer.  I do
have one other thing for the Court.  I'm sorry.  I was
looking at the schedule.  The other thing that would be
helpful on the video motion is for --

THE COURT:  What I was saying was I'm hearing
one witness from the Government, the two that you
identified from the defense.  If there is any change in
that, knowing by the Friday prior that there is
something additional, I wouldn't anticipate that, but
that would be good to get the heads-up.

1          MR. COLBATH:  As we stand now, I believe we

2    have our pretrial conference scheduled for Monday,

3    August 5th, and so that makes our exchange of trial

4    briefs, jury instructions, proposed voir dire things due

5    the 29th, the week prior?

6          THE COURT:  Technically, yes.

7          MR. COLBATH:  If that is the case, first of

8    all, I think that a decision following the evidentiary

9    hearing might impact some of what we do or say in those

10   submissions, as well as depending on how near in time to

11   the 29th some of these other rulings come out.  And so,

12   because we're going to meet on the 30th and have

13   rulings, if things could be shifted by a week or so.

14          THE COURT:  I agree.

15          MR. COLBATH:  That seems to make some sense to

16   me.

17          THE COURT:  I can't remember the travel issues

18   that people had, but is there any reason we can't do the

19   final pretrial the week of August 26th instead?

20          MR. SKROCKI:  Fine with us, Your Honor.

21          MR. COLBATH:  That's good.

22          THE COURT:  Why don't we vacate this hearing

23   August 5th.  And we can use the 30th to take up issues

24   that might arise between now and then as well.

25   Basically, vacate the hearing on August 5th and have the

```
 1    final pretrial closer to trial, which makes more sense.
 2              Looking specifically at Friday, August 30th at
 3    9:00 a.m.  Does that work for the Government?
 4              MR. SKROCKI:  It does, Your Honor.  Thank you.
 5              THE COURT:  Mr. Colbath?
 6              MR. COLBATH:  Yes, Your Honor.
 7              THE COURT:  That's a much better time.  And
 8    then the deadlines would be more much workable one week
 9    prior to that.
10              MR. COLBATH:  So August 23rd for trial briefs?
11              THE COURT:  Jury instructions and voir dire,
12    yes.
13              MR. COLBATH:  Could we have then -- the other
14    at least deadline that's set for --
15              THE COURT:  Motions in limine?
16              MR. COLBATH:  No, exchange of exhibits.
17    Exchange of exhibits maybe either at the time of the
18    pretrial conference or sometime the week following, in
19    between the pretrial conference and trial.
20              THE COURT:  So your proposal is August 30th to
21    exchange exhibits?
22              MR. SKROCKI:  The 30th for exhibits, yes.
23              THE COURT:  All right.  Very good.
24              MR. COLBATH:  At the time of the pretrial we
25    would have that ready.
```

```
 1          THE COURT:  You could do it that afternoon too.
 2          MR. COLBATH:  Sure.
 3          THE COURT:  So August 30th exhibit exchange.
 4          MR. COLBATH:  We have submissions due on
 5   August 23rd, exchange of exhibits and the pretrial on
 6   August 30th.
 7          THE COURT:  August 30th, 9:00 a.m.  Where are
 8   we on motions in limine?
 9          MR. SKROCKI:  None.  Deadline has passed.
10          MR. COLBATH:  Subject to perhaps very, very
11   minor things that, I guess, arise between now and then.
12   The deadline has passed, and we don't anticipate any
13   more filing unless it's something triggered by a witness
14   or event that occurs between now and then.
15          THE COURT:  This is good news.  15 motions was
16   plenty.
17          MR. COLBATH:  We tried to file early and often.
18          THE COURT:  Often.  Mr. Skrocki, anything
19   further?
20          MR. SKROCKI:  No, Your Honor.
21          THE COURT:  Anything further?
22          MR. COLBATH:  No.
23          THE COURT:  We'll go off record then.
24          DEPUTY CLERK:  All rise.  This matter is
25   adjourned.  This court stands in recess until the 4:00
```

1  matter.

2          (Proceedings concluded at 10:08 a.m.)

3

4                    CERTIFICATE

5    I, Sonja L. Reeves, Federal Official Court Reporter
   in and for the United States District Court of the
6  District of Alaska, do hereby certify that the foregoing
   transcript is a true and accurate transcript from the
7  original stenographic record in the above-entitled
   matter and that the transcript page format is in
8  conformance with the regulations of the Judicial
   Conference of the United States.

9

     Dated this 16th day of August, 2019.
10

11
                         /s/ Sonja L. Reeves
12                       SONJA L. REEVES, RMR-CRR
                         FEDERAL OFFICIAL COURT REPORTER
13

14

15

16

17

18

19

20

21

22

23

24

25