Gary G. Colbath
Assistant Federal Defender
FEDERAL PUBLIC DEFENDER
FOR THE DISTRICT OF ALASKA
425 G Street, Suite 800
Anchorage, Alaska 99501
Phone: (907) 646-3400
Fax: (907) 646-3480
Email: gary_colbath@fd.org

Peter A. Camiel
Law Offices of Camiel & Chaney P.S.
5200 Pike Street, Suite 2500
Seattle, WA 98101
Phone: (206) 624-1551
Email: petercamiel@yahoo.com

*Attorneys for Defendant James Michael Wells*

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>vs.<br><br>JAMES MICHAEL WELLS,<br><br>    Defendant. | Case No. 3:13-cr-00008-SLG<br><br>**DEFENDANT'S RESPONSE TO GOVERNMENT BRIEF RE: JULY 30 EVIDENTIARY HEARING (DK. 1124)** |

## INTRODUCTION

<u>Dk. 1124, Mr. Skrocki:</u> "Despite knowing at least a month in advance of the hearing (the July 30 hearing) that they would engage in a separate evidentiary attack under *Daubert*, the defense nonetheless provided no notice to this Court of this additional issue, electing instead to keep the Court and the government in the dark."

<u>July 2, 2019 Status Hearing, TR. pp. 12-13:</u>

The Court: Mr. Skrocki? I guess my thought is I'm inclined to set this up for an evidentiary hearing, because it is correct, I think it was pointed out in the briefing, I don't have any sworn -- or any evidence. I have the lawyers' arguments, which are very helpful, but are not evidence. And then I have the reports, which are unsworn.

**And so I do see that the *Daubert* 702 analysis** requires some evidence put before the Court as the gatekeeper. (Emphasis added.)

Mr. Skrocki: We don't disagree that would be the most prudent thing to do on this record. Neither lawyer has still told you anything about why it would be important, so we'll have to see, in our view. We would suggest if we could, due to scheduling amongst the three of us, July 30th, if that would work for Your Honor.

## DEFENSE RESPONSE

Defendant James Michael Wells, through counsel Gary G. Colbath and Peter A. Camiel, files this response to the United States Objections to Defense Evidence in Re: Evidentiary Hearing of July 30, 2019 and Other Issues, Dk. No. 1124.

The government has filed an after-the-fact, scathing personal attack on the defense accusing the defense of changing the character and analysis of its challenge to the April 19 Driving Experiment Video and still frames drawn from it through a "bait and switch" by raising a *Daubert* challenge during an "unrelated evidentiary hearing" just a month out from trial. Dk. 1124, p. 11. As the old legal adage goes: "When the facts are on your side . . . pound the facts; when the law is on your side . . . pound the law; and when neither is on your side . . . pound the table." A review of the facts and the law fully explains how the legal analysis of resolution of the current motion has reached this point and how the law demands complete exclusion of the April 19, 2012 video experiment and all still frames from it.

## FACTS

The government's version of the factual history regarding the use of its April 19, 2012 Driving Experiment Video (and still images produced from it) and the

defense's attempt to exclude it on retrial is far from complete and accurate. It is actually the government who used bait and switch tactics to interject the April 19 video recreation into evidence at the first trial. And as the Court finally exposed at the conclusion of the July 30 evidentiary hearing, it is the government who is trying to use the same tactic again on retrial. To understand the defense's motion and current challenge, an understanding of the use of the video, or more accurately, still frame pictures from the video at the first trial is necessary.

It is important to understand at the outset that the government never introduced the full April 19 video at the first trial, not through Agent Sturgis or any other law enforcement officer involved in its creation. A couple of brief clips were played during the testimony of FBI agent Alex Doran with no analysis. Instead, the "bait and switch" began at the first trial during the testimony of government expert Richard Vorde Bruegge. The government first offered Vorde Bruegge's 49 page "PowerPoint presentation," Exhibit 129, "for demonstrative purposes only," which accordingly drew no objection. TR. p. 2330. This presentation contained multiple still frame images taken from the April 19 video which <u>had never been introduced.</u> After Vorde Bruegge testified at length about his scientific process and reverse photogrammetry set up for comparison of the April 19 stills with frames from the April 12 video, the government extracted key comparison still frames from the demonstrative exhibit and remarked them as exhibits 130, 131, 132, 133, and 134. TR. p. 2335-38. These were then reoffered **as substantive evidence** and used to

scientifically support Vorde Bruegge's expert conclusions regarding the vehicles shown in each set of video frames and their similarities.

This whole bait and switch process occurred again during the testimony of government expert Angelo Toglia. The government first offered Toglia's 129 page "Power Point presentation," exhibit 111, just "to use as a demonstrative exhibit." TR. p. 2482. This proffer again drew no objection as it was presumed just to be demonstrative. Like Vorde Bruegge's exhibit, the presentation contained numerous extracted still frames from the April 19 video, but not the video itself, which still was not in evidence. Toglia testified at length about the highly scientific process and reverse projection photogrammetry analysis he did using the April 19 video still frames to create the presentation. TR. p. 2516, et.seq. Then, to conclude Toglia's testimony, the government remarked certain slides from exhibit 111 (the Power Point) as exhibits 112-121 and readmitted those selective slides **as substantive evidence**. TR. pp. 2516-2521.

The important take away from what occurred at the first trial is that the government never admitted the April 19 video through any law enforcement officer. Instead, still frame pictures from the video were used exclusively by multiple government experts extensively and incorporated into their complex expert presentations. The "evidence" was then combined in one document from each expert with stills from the April 12 video (which was actually offered separately into evidence) and offered first by the respective expert as just a demonstrative exhibit.

Then after offering considerable scientific expert testimony about the presentation at issue, the government pulled the "switch" and reoffered parts of the demonstration including still images extracted from the April 19 video, as <u>substantive</u> evidence. This tactic obviously confused the Court and the defense or lulled each into believing the evidence was admissible as already received. Regardless, the process happened without any foundation or challenge to the propriety of the April 19 video stills.

Moving forward on retrial, the government has re-noticed its use of experts Vorde Bruegge and Toglia. It has also noticed the intention to call expert Steven Becker who, like Toglia, is an accident reconstructionist who was asked to "analyze the surveillance videos to determine the make and model of a vehicle of interest and if it is consistent with Wells' 2001 Honda CR-V." Becker's analysis includes extensive photogrammetry and color analysis using still frames from the April 19 video and making comparisons (like the experts before him) with frames from the April 12 evidence video. The government has now also added a color analysis expert, Lalit Mestha, who provided a highly technical, 62-page report completely making a science-based color comparison using numerous still frames from the April 12 and April 19 videos.

In response to this notice and these four anticipated experts, the defense, believing that the April 19 video driving experiment was **<u>created as a demonstrative aid only and not a substantive piece of evidence</u>**, moved to exclude the April 19 video and still images from it, for demonstrative purposes, under

the "similarities test." Dk. 1112. Having reviewed all discovery from the government as in depth as possible, the defense could only conclude that the April 19 video was not created by experts, nor under expert direction, nor with scientific procedures and processes employed so it had to be limited to only being offered as a demonstrative, non-scientific exercise just done for investigative purposes. Thus, the defense's initial motion made its position clear stating that it viewed the April 19 as a proffer of a demonstrative or illustrative exhibit and that it believed "[C]learly, the April 19 driving experiment video is not substantive evidence." Dk. 1012, p. 31. Despite filing a 33-page response, the government let these representations stand and argued for admissibility but never once corrected the record to advise the defense or the Court that it planned to offer the April 19 video (and stills from it) as _substantive_ evidence instead of just as demonstrative. This key omission on the government's part is the ONLY reason why no _Daubert_ argument was made earlier in relation to use of the April 19 video. Indeed, it is the defense who was kept in the dark about the government's true intentions.

The defense continued to argue against use of the April 19 video as demonstrative in its reply with silence from the government. The Court then held a status/motions hearing on July 2, 2019. As quoted above, it was **the Court** who first brought up evaluation of the proposed use of the April 19 video under _Daubert_, to which Mr. Skrocki responded "We don't disagree that would be the most prudent thing to do on this record." Sensing that the government may pull the same evidence

transition it did at the first trial–demonstrative admission first, then switch to substantive admission in the same expert presentation–the defense whole-heartedly agreed that review under *Daubert* was necessary. This was not some "sand bag effort" slipped in by the defense after the completion of briefing, it was a court acknowledged gate-keeping obligation, brought up by the Court in the first instance, when it was first recognized that the government may be intending to use this video in some *substantive* fashion.

During the very discussion that preceded Mr. Skrocki agreeing that an evidentiary hearing was necessary under *Daubert*, the defense explained its need by arguing that "whether it's speaking of the prejudicial impact or whether it's speaking of the <u>technicalities and the importance of the technicalities of the actual videos</u>, until somebody who really does those things for a living imparts that wisdom, which they have to us and we have tried to summarize in the arguments for the Court, I think it's a big difference." TR. p. 12. Thus, that the defense intended to present technical or detailed expert testimony about technicalities related to the April 19 video or about prejudice caused by the video, was in no way hidden. That the government now claims it did not have notice is simply belied by the record, plain and simple. The many differences in the April 12 and April 19 videos were well briefed and fully explained with voluminous exhibits during the briefing. With the full agreement of the government and at its request, the Court picked July 30 for the date of the evidentiary hearing.

Immediately following the July 2 status hearing where the defense learned it would get the opportunity to present evidence to the Court about "the importance of the technicalities of the actual videos," the defense immediately called its experts to notify them of the need for their testimony. In doing so the defense asked expert Jim Hoerricks to prepare a supplemental report, not making any new findings based on work done beyond that already addressed in his previously disclosed work, but rather simply focusing specifically on the problems with the April 19 video which was the topic of the upcoming hearing. Mr. Hoerricks supplemental report, hearing exhibit Y, was dated and received by the defense July 16, 2019. In light of the upcoming hearing, the defense immediately provided this report to Mr. Skrocki and the prosecution team the very next day, July 17, 2019 at 2:26 p.m.[1] See, attachment A (email sent to Skrocki, Sherman and Stevens with Hoerricks report attached.) The email also advised that defense investigator Johnson would be uploading the entire batch of documents referenced in the report or used to create it to an internet Box file for the prosecution team to access. Ms. Sherman requested those documents from the defense on July 24 and those additional documents, which made up part of the balance of the defense's hearing exhibits, were uploaded to the government on July 25.

The Government makes the bold allegation that after the July 2 hearing:

---

[1] The government's claim in its brief that Hoerricks' supplemental report was not provided until "two business days before the evidentiary hearing" is false.

"The defense then inserted Hoerrick's Supplemental Report into their Defense Exhibits, burying it within the other 52 independent scientific resources, for ultimate introduction at the "substantially similar" evidentiary hearing, some 30 days after they first took active steps to investigate concerns under *Daubert*. Further, they did so absent any request for leave by this Court, without due notice to the United States advising of this issue, and through the creation and reliance on "scientific" documents and expert reports so convoluted and disjointed that the United States was deprived of a full and fair opportunity to mount a response or provide all the material to their own expert for a cogent review prior to the hearing. The defense instead employed subversive practices to change the motions landscape entirely so they could weave arguments into inappropriate or unrelated pleadings and hearings that they initially elected not to pursue." Dk. 1124, pp. 11-12.

However, this claim that the government had no notice of the "motions landscape" and Hoerricks' supplemental expert report is baseless. Mr. Skrocki knew on July 2 that the Court was planning to exercise its gate-keeping function under *Daubert* with respect to deciding the motion. Further he knew of the entire contents of Hoerricks' report on July 17, some two full weeks prior to the evidentiary hearing. This timeline allowed ample time for the government to consult its experts, do the necessary research, or at the very least determine it needed a continuance of the evidentiary hearing in order to be prepared. The fact they did none of these things should gain them no favor at this stage of the Court's analysis.

But the record is even stronger that the government had notice of the defense's position for the July 30 hearing. On July 17, the same day it sent the government Hoerricks' report, the defense filed its "Notice of Issues for the Court for Evidentiary Hearing," Dk. 1072, sending Hoerricks' report to the Court and outlining what the

defense believed was the necessary legal analysis the Court should follow in deciding the motion at Dk. 1112.[2]

Interestingly, as the first "issue" in Dk. 1072 identifies, the defense was still unclear about whether the government was proffering the April 19 video material as demonstrative or substantive evidence. As in the past, the government did not respond or address this issue in any fashion for either the defense or the Court. This question was the first issue because, as the Court had already recognized, if the evidence was only offered as demonstrative, analysis was limited to the similarities test. However, if the evidence was offered substantively, the Court's function under, and analysis using, *Daubert* was triggered. The defense made every effort to clearly lay out the legal standards/arguments which it believed applied which were all dependent on the government's answer to the invited question: is the April 19 video and stills from it being offered as demonstrative or substantive evidence? Despite having a two full weeks to study Hoerricks' report and ponder the defense's notice, answer the notice, object to the notice, or alert the Court in any fashion that it disagreed with the issues outlined or was confused by what standards applied, the government remained silent. Now somehow they argue they were denied a full and fair opportunity to respond? This is simply not so.

---

[2] The Government takes issue with the defense's use of this pleading, arguing its use is somehow improper as a "self-styled" document. As the Court of course knows, this "style" of pleading was first made in this case, and then commonly used by former government counsel, Kim Sayers-Fay. See, Dks. 894, 910, 912. A practice which the Court has commented it found valuable in the past with regard to identifying the issues for upcoming hearings.

*United States v. James Michael Wells*
Case No. 3:13-cr-00008-SLG                                                      Page 10

The July 30 hearing began and the government agreed it was their burden to establish admissibility of the April 19 video. The evidence went quickly and straight-forward because it was undeniable that the April 19 video was not created scientifically and was wholly limited to a simple investigative exercise exclusively done by untrained law enforcement. The government called no expert to support the proposition that it would offer the April 19 video and numerous still frames taken from it to support scientific testimony by way of substantive admission. Being left with no other way to explain to the Court first, why the video evidence could not be substantive, and then second, how the video evidence contained obvious differences that were technically significant so as to make the video highly improper even as a demonstrative exhibit, the defense called Jim Hoerricks to evidence these things. It was at that point the government panicked and the realization of its precarious position set in.

Apparently it was not until that moment that the government knew that although it intended to proceed in the same fashion on retrial as it did at the first trial, an evidentiary dance of that nature was not going to get by either this Court or this defense team. The prior prosecution team was able to lull the prior defense team and Court into admitting stills from the April 19 "as demonstrative" and then later select some key stills after expert discussion about them and admit them substantively without foundation or *Daubert* analysis. The government on retrial had obviously hoped this Court and this defense team would be as complacent and

allow the same. This explains why the government allowed the defense to challenge the April 19 video material as demonstrative and agree the legal analysis should only be based on a similarities test. The government of course did not want the Court to know its intention of making *substantive* use of the April 19 material as that would trigger a *Daubert* analysis it could not pass.

The evidence ultimately concluded on July 31 and the government argued first. Despite all that had transpired, Mr. Skrocki stood before the Court and argued the April 19 "evidence" should be admitted, <u>under the standard relevant to demonstrative evidence,</u> and still, despite months of opportunity and a day and a half in court, failed to articulate the true purpose that the government really intended for the April 19 material. TR. pp. 2-11. He did, however, have to acknowledge that the evidence showed that the April 19 video material "was not scientific" but was "subsequently used by the experts." TR. pp. 7-8. The undersigned counsel then got up and argued at length that this did not pass the test for demonstrative evidence. Counsel reiterated further that under *Daubert* it was clear the evidence could not be admitted in light of the government's limited proffer demonstrating the non-scientific nature of the exercise. It was still clear that the undersigned was unsure whether the government was offering simple non-scientific, demonstrative experiment evidence OR substantive, scientifically based, expert discussed analysis and presentation. This was apparently unclear to the Court as well given what happened next:

Mr. Skrocki was given a final chance to reply to the defense arguments during which the following exchange took place:

THE COURT: And I guess my last question would be for the Government, Mr. Skrocki, and that is what's your response on this substantive versus demonstrative use of the April 19th video?

(20 second thoughtful pause by Counsel)

MR. SKROCKI: In the *Daubert* context, I do not look at that as scientific. It's mechanical, based on an image and based on frames of reference from the factory as to that vehicle.

THE COURT: So it would be coming in as substantive evidence and then that's where -- am I correct?

MR. SKROCKI: Yes.

TR pp. 12-13. Even when directly asked the question by the Court, the government refused to initially commit on the record that its intention was to use the April 19 video material as substantive evidence with its experts. The nonresponsive answer given, describing the process as "mechanical," was a last ditch effort to keep the *Daubert* standard from being applied. Given its admission that the video was not in any way scientifically made, it is no wonder why the government has failed for so long to state its true intentions and hope that the court would apply the limited analysis under the similarities test that is only intended for demonstrative evidence. To substantively admit expert analysis and expert opinions based on the April 19 video materials, experts are held to the standards in *Daubert*, which tests their methodologies and requires peer review and an ability to replicate. The April 19 video

material fails miserably under each area of this analysis and the government has known that all along, hence its complete reluctance until pushed to the end to admit it intends to use the material as substantive evidence interwoven throughout its experts' presentations.

Thankfully the Court refused not to let this pivotal inquiry, a moment that the government hoped would never come, go by. It is the government who picks the standard here to be applied by this Court to decide the issue raised by the motion at Dk. 1112. The government has finally divulged it intent to offer the April 19 video material as substantive evidence. This pronouncement triggers the Court's duty under *Daubert* and the rigorous standards that come with such analysis. That the government is trying to use a "non-scientific" simple, investigative exercise as substantive evidence to underlie expert testimonies is not something conjured up by the defense. Just because its evidence does not support its planned trial strategy is no reason the government should succeed in convincing the court to ignore *Daubert* and Rule 403.

This is the true factual background, supported by the record, of how the legal issues before the Court relative to the defense's motion at Dk. 1112 got us to this point. The question remains whether the April 19 video material, now clearly offered for substantive purposes, meets the necessary legal standards set forth under *Daubert* and Rule 403 for admission. Admissibility of the April 19 video and still frame pictures taken from it, are the only materials raised by the defense motion.

Now that the purpose of the evidence is clear, the legal standards to be applied are clear. A substantive evidence proffer triggers analysis under each of the points raised in the Defense Notice of Issues, Dk. 1072, points 2-6.

If the Court finds the video material admissible under those standards, the government can go forward as the Rules otherwise allow with its intended trial presentation. If the Court finds that the government has not met its burden to establish admissibility of the April 19 video material, the government can still of course admit the April 12 surveillance video, its only real evidence. It can also have its experts testify about their analysis of that video and what they believe they can scientifically determine from it alone. What they would be precluded from doing is incorporating the April 19 video, or stills from it, as comparisons based on scientific analysis involving that material. Analysis under the defense motion is that straight forward.

## ARGUMENT & AUTHORITIES

Ironically, two weeks have passed since the evidentiary hearing and yet the government spent 26 pages lambasting the defense and imploring the Court to exclude or not consider the defense's arguments because they were not given a chance to talk with experts, understand the issues, or properly respond. Despite this passing of time, none of its brief addresses the merits of the issue at hand. The government filed no request to reopen, no Declaration from any of its four "video" experts taking issue with the testimony of Jim Hoerricks, no legal analysis under *Daubert,* just an

attack on the defense and argument that the Court should deny the motion as some sort of sanction. Sanction for what is unclear.

What the government does NOT provide the Court is any authority it has in satisfaction of its burden that would allow this Court to admit a non-scientific, completely law enforcement created, after-the-fact, investigative experiment or exercise as <u>substantive</u> evidence for use in expert witness testimony. This despite its intent to extensively use still frame images from the April 19 video and as part and parcel of no less than four government expert witnesses. Apparently two weeks of additional time following the hearing to consult with its experts, conduct legal research, and fully review the record to date was not sufficient for the government to come up with a single legal argument on the merits to support its non-scientific, but offered as substantive, April 19 video materials.

This failure is not made out of any desire to maintain some "high road", it is made because the government knows that no matter how much time they are given to support it, their position is legally untenable. The government argues several things in support of its "sanction" analysis. One such oft-repeated argument made throughout the government's filing (Dk. 1124) relates to the "53 exhibits" filed just "two business days" before the hearing that somehow made handling of the issues now known to the government impossible. Nonsense.

The defense prepared exhibits A through AAA (55 total), for potential use at the hearing. First off, exhibits A-W were simply the prior attachments to the defense

motion to exclude the April 19 video, Dk. 1112, filed separately or conventionally with the court and government on June 11, 2019; Exhibit X was Mr. Hoerricks' original report provided to the government in May, 2019; Exhibit Y was Mr. Hoerricks' supplemental report provided to the government on July 17, 2019 as detailed above; Exhibits Z-MM (14 total) were the underlying documents referenced in exhibit Y and were provided on July 25, 2019; Exhibits NN-PP related to Dr. Reisberg and were provided to the government in May and June, 2019; Exhibit QQ was an FBI document received *from* the government on July 23, 2019; Exhibits RR-TT were discovery documents received *from* the government; Exhibit UU was an evidence summary of the information contained in Exhibit B (April 19 video) and provided to the government on July 27, 2019; Exhibits VV-ZZ-1 were clips from Exhibit B (the April 19 video); and Exhibit AAA was a repeat of Exhibit HH, provided to the government on July 25, 2019. Even a cursory review of these documents paints a picture far different than the one argued by the government.

First, of the 55 exhibits, 40 of them had been provided to the government long before the evidentiary hearing and the majority of them came from the government in discovery in the first place. Of the remaining 14 documents (HH & AAA were the same) the defense only admitted **2** of the documents sent to the government on July 25, 2019. One was a set of "Best Practices for Forensic Photographic Comparison" which were developed by a working group funded and made up in part by the FBI, and the other was Mr. Hoerricks' bench notes related to his supplemental report,

Case 3:13-cr-00008-SLG   Document 1134   Filed 08/20/19   Page 17 of 34

which were not introduced until after issues raised on cross-examination made them relevant. The testimony presented by the defense was almost wholly based on the two experts' reports and the discovery documents filed as attachments to its original motion. There was no surprise to the government and certainly no meaningful withholding of information, technical or otherwise, by the defense. The government had weeks to prepare with the substance of the material to be presented by the defense.

Next, the government spends considerable time trying to twist the defense's proffer of proposed exhibit UU into a "fraud on the court." See, Dk. 1124. First off, the document was never referenced by Mr. Hoerricks nor defense counsel as anything prepared by Mr. Hoerricks. UU is an evidentiary summary, in chart form, of evidence depicted on defense Exhibit B, a portion of the April 19 video. The video itself, as both Agent Sturgis and Mr. Hoerricks testified, is just a series of still frame images that run together that the eye sees as motion. According to Sturgis, because of the speed of frame capture of the T-1 camera the video appears "jerky." The video has a time stamp on it continuously. All the defense did, which the Court could certainly do as well, was to play the video in slow motion, frame by frame, and note the times and number of frames the Wells' CR-V is depicted going back and forth during each pass on the video. No added evidence or analysis, no computations, no calculations were added, the defense just watched the government's video and wrote down times and number of frames the car is seen. The only additional thing shown on the charts

on UU are which frames correspond with those used in Exhibit D (comparison's done by government expert Vorde Bruegge). This can be determined easily and again with no additional analysis, work, or calculation as Vorde Bruegge's comparison notes the exact times on the April 19 video from which the frames are taken. So UU presents NOTHING new nor any form of calculations or extrapolations as the government argues. It is a summary chart. Of course, Hoerricks' reliance on it was fine given that Fed. Rule of Evid. 703 provides in part that "[t]he facts or data in the particular case upon which an expert bases an opinion or inference … need not be admissible in evidence." Of more particular relevance here though is the fact that the Court determined at the hearing to not take UU into account in ruling on the defense motion. Therefore, no further discussion of its import or use is warranted or necessary. The prior defense proffer of it, in light of its exclusion, certainly gives the government no support in its quest to admit the April 19 video.

Next, the government argues extensively that the defense's presentation relative to "frame rates" was again, somehow improper, caught them by surprise, and bears no impact on determination of the admissibility of the April 19 video. This argument, like its panicked objections at the evidentiary hearing, just illustrates government counsel's lack of understanding of both his own expert evidence and the issue now before the Court. The Court should not confuse ignorance for simplicity. There is nothing magical or technical about "frame rates." A frame rate is simply the number of still images, or frames, a camera captures in each second of video it takes.

The higher the frame rate, the more frames, the better quality of picture the camera produces. The lower the rate frame, the worse the quality is. Mr. Skrocki knows the frame rate of the T-1 camera which took the April 19 video here, he discussed it in his response to the motion to exclude the April 19 video: "this video footage is very brief, lasting only five frames and approximately a second in duration" . . . "[a]gain, the video footage, is only four frames and lasts approximately one second in duration." See Dk. 1047, pp. 4-5. These comments are a simple reference to the camera only capturing 4 to 5 frames per second, which is to say it has a "frame rate" of somewhere between 4 and 5 frame rates per second.

But the government did not need to understand Mr. Hoerricks' testimony or reports to know this, it has been provided this information by each and every one of its experts, all seven, who have worked on the case since 2012. First, an FBI team of analysts Chris Iber, Tony Imel and George Skaluba told the government this information just 8 days after the murders on April 20, 2012 when they determined the camera captured "4 frames a second." See, attachment B. Thereafter, over the course of the next many years, through even its new experts noticed for retrial, this was confirmed and communicated to the government by experts Gerald Richards (5 frames over just one second, four frames in just under a second), Vorde Bruegge (9 images total extracted from 2 seconds of April 12 video, between 4-5 frames per second), Toglia (five images that recorded the vehicle as it travelled northbound and four images of the vehicle as it travelled southbound), Becker (videos have about 4

frames per second and a 640 by 480 pixels resolution) and Methsa (April 12 video 4 frames extracted left to right, 5 frames extracted right to left, approx. 1 second each). See, attachment C, relevant page from each expert's report or bench notes.

The relevance of the camera frames is this: First, because the camera only captures a little less than 5 photo frames per second, the resolution or quality of the frames is very low and nothing any expert can do, has or will improve that fact. Next, **frames** are the relevant discussion here because NONE of the government experts compare the April 12 video to the April 19 video. Instead, each expert extracted <u>ALL 9 frames</u> captured over just 2 seconds of video on April 12, which is the actual evidence in the case. However, they then reviewed <u>ALL approximately 105 frames</u> captured on the April 19 video[3] and selected only those which suited their individual analysis (though not the same expert-to-expert) in making their scientific photo image comparison. Given that the unknown object on April 12 travelled at one speed during each of the two passes by the camera, compared to the testimony of Agent Sturgis who testified that the Wellses CR-V was driven at seven *different* speeds for each set of passes made on April 19, it is easy to see why the government does not want the Court to consider the differences in the quality of the frames captured by the camera on the two dates. Lower speeds equals different and better images, which is what the government experts then used to make a supposedly "similar"

---

[3] There were more frames on April 19 to review because Agents drove the vehicle back and forth 7 times that day, as Agent Sturgis explained, not just one time like really happened on April 12.

Case 3:13-cr-00008-SLG   Document 1134   Filed 08/20/19   Page 21 of 34

comparison. This is a pretty simple concept to understand. The Court should not be fooled by the government's argument that this was some high-level technical analysis that goes to weight instead of admissibility. If the discussion is similarity, the use of differing speeds and the corresponding effects on the frames captured certainly bears consideration, as they are notably not similar. Of course the government does not want to understand or talk about this fact in any analysis as it fails to support their simplistic argument.

Finally, as respects *Daubert*, the Court is well aware that to admit an expert opinion, the court must resolve whether:

> (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702; see also, *Kumho Tire v. Carmichael*, 526 U.S. 137, 141, 148–49 (1999). The court must determine whether the reasoning or methodology employed by the expert is reliable—that is, whether it is "scientifically valid." *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 592-593 (1993). To make this last assessment, the court should consider the following nonexclusive factors, commonly referred to as the "*Daubert* factors:"

> (1) Whether the scientific theory or technique can be or has been tested;
> (2) Whether the theory or technique has been subject to peer review or publication;
> (3) The known or potential rate of error; and
> (4) The general acceptance of the theory or technique in the scientific community.

*Id.* at 594-595. The *Daubert* court emphasized that this test is "a flexible one" that focuses on scientific validity and the principles and methodology, rather than the conclusions they generate. *Id.* The government bears the burden of establishing by a preponderance of the evidence, that its experts' testimonies, based on analysis of the non-scientific April 19 video exercise which they had no part in creating, meets these requirements for admissibility.

The *Daubert* criteria intend to prevent unreliable or otherwise "junk science" from being heard as evidence in an expert's substantive testimony. The burden is on the proponent of the testimony to establish its admissibility by a preponderance of proof. Examining the five-factor test from three different angles - remnants of *Frye*, the concept of Rigor, and a technology's Availability is appropriate here.

<u>Remnants of *Frye*</u>

Prior to *Daubert*, *Frye* was the law of the land. The *Frye* standard is commonly referred to as the "general acceptance test" under which generally accepted scientific methods are admissible, and those that are not sufficiently established are inadmissible. The *Frye* Standard comes from *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923) in which the defendant, who had been charged with second degree murder, sought to introduce testimony from the scientist who conducted a lie detector test.

The D.C. Court of Appeals weighed expert testimony regarding the reliability of lie detector test results. The Court noted, "Just when a scientific principle of discovery crosses the line between the experimental and demonstrable stages is

difficult to define…. [W]hile courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle of discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance *in the field in which it belongs*." *Id.* (Emphasis added.)

The last part of the cited passage is most relevant here - *in the field in which it belongs*. There is an emerging trend, highlighted in the Netflix series Exhibit A, where Traffic Collision Reconstruction specialists (like government experts Toglia and Becker) are venturing into digital/multimedia analysis and working cases involving Photogrammetry. As expert Jim Hoerricks' uncontradicted testimony noted, these individuals are not using the generally accepted methods within the digital/multimedia analysis community. They are not following ASTM standards/guidelines. They are not following SWGDE's best practices. TR pp. 123-125. They are doing the work from their own point of view, using the tools and techniques common to their discipline. Here, they are performing photo image analysis using the tools they know, but NOT "in the field in which it belongs."

Evaluating the government's experts' use of the April 19 video materials from the five-part *Daubert* test is revealing:

1. Whether the theory or technique in question can be and has been tested. Or here, Has the use of traffic collision reconstruction tools and methods for reverse projection photogrammetry been tested? The answer is no, not in any scientific way. The government has offered no evidence to support a methodology that involves incorporating images from a law enforcement created, non-scientific video into such process or any actual tests of validity that have been conducted using the same.

2. Whether it has been subjected to peer review and publication. As with the above, the answer is no, as there is no peer-reviewed publication for this use. The government again has failed to offer any support, required by *Daubert* to show that the propriety of using information like the images drawn from the April 19 video in its experts' mixed-methods approach.

3. The methods' known or potential error rate. Because there are no studies support the methodology the government experts use, there really cannot be a known error rate. Here, the government reconstructionists use Photoshop type tools, to insert 2D images drawn from the April 19 video using a tool that employs planar geometry (which cannot account for perspective) to measure that 2D depiction in their program's 3D space. The government has offered no evidence to support even the existence of the error rate for this type of process.

4. The existence and maintenance of standards controlling its operation. As with points 1-3 above, there are no standards applicable to the use of created images by photogrammetry experts as is proposed here. This is a brand new trend. There might be photogrammetry best practices, as identified by expert Hoerricks at the hearing when he made reference to the various former working groups who have self-policed this area, but not using the mixed-methods approach the government proposes here. There are definitely not standards controlling a methodology where an expert takes random images from a law enforcement created video exercise like was done in this case. There might be scanning guidelines in the world of the collision reconstructionist, but like with *Frye,* those belong to an entirely different field of work - scanning and measuring items and objects present at the time of the scan.

5. Whether it has attracted widespread acceptance within a relevant scientific community. Here again, photogrammetry is gaining speed and is quite attractive, but it hasn't gained acceptance in the scientific community.

With respect to "scientific rigor" and availability, the analysis again supports

exclusion. If a technique can be validated, it can be repeated (not just on one data

set), and can it should be able to be reproduced. In this case, given the non-scientific

experiment done on April 19, the work cannot be validated as it was not done with

any scientific protocol or controls whatsoever. The basics of science is that it is

rigorous. It is not driven so much by expediency that the actual science part gets left

behind. Finally, the scientific tools available to the government experts are not widely available nor easily used for replication purposes.

The CCTV footage in this case (the April 12 video) is the only "real video evidence" and speaks to the facts of the case. By layering on data from other times/dates/conditions, the use of footage from another period (April 19) changes its status to something other than real evidence. It becomes, in essence, demonstrative of a single theory of the case (see Dr. Reisberg's testimony on show-ups). The demonstratives proffered by the government here all fall into this trap of demonstrating a single theory. Because of this, they fail to account for alternative theories or possibilities. When this happens, they become simple *rhetorical or investigative aids* - not scientific exhibits.

Attached to this motion as attachments D, E, F, and G are just a few pages from government experts Vorde Bruegge, Toglia, Becker and Mestha's notes or reports themselves that highlight the scientific use, interpretation, and extrapolation of materials drawn exclusively from still frames taken from the April 19 video experiment. These short excerpts clearly demonstrate how each expert's opinions and conclusions are inextricably intertwined with analysis of data or images derived from the April 19 video experiment for purposes of reverse projection photogrammetry, image comparison and color difference analysis. Of course because each of these experts' work is in some way accomplished using the non-scientific video experiment from April 19, done by untrained law enforcement officers not for the

purpose of scientific use, the methodologies cannot be replicated by any other experts or peer tested. Moreover, as shown by defense expert Jim Hoerricks' testimony and supplemental report, both of which were received in evidence and not contradicted by any government expert testimony whatsoever, such methodology and process completely fails to adhere to industry standards and protocols in numerous ways. These photo and color "comparisons" do not pass *Daubert*. However because the materials are offered as substantive evidence to support scientific expert testimony, they must.

<u>Conditional relevance</u>

Finally, the government somehow faults the defense for making arguments related to the concept of conditional relevance as the Court requested, and criticizes the defense's brief thinking it contains an "objection to the April 12 video arguing that it lacks sufficient support for consideration by the jury and should therefore be excluded." First, it was the Court at the July 30-31 evidentiary hearing who first brought up the idea of whether the April 19 video could be admitted under the Rule related to conditional relevance. TR. pp. 37, 49-50. Second, it was also the Court who outlined the condition under the Rule which would have to be established prior to the April 19 video (or images from it) becoming relevant:

THE COURT: And then there is this conditional relevance is the point I was raising, which is to say that the April 19 video would not be relevant unless and until the factfinder -- well, I leave you to ponder that, and that is to say that it would have no relevance if a jury were to conclude that the Wells' vehicle was not driven on April

12th. What's the relevance of a re-creation on April 19th? . . . And that's where -- that's what conditional relevance is. July 31, 2019, TR. p.49.

After the above discussion between the Court and government counsel, the Court agreed counsel should consider this concept and ordered simultaneous briefing. The defense filed its brief as suggested, Dk. 1097, clearly arguing "[s]ince there is no evidence that Wells drove his wife's Honda CR-V on April 12, 2012, <u>the government-created April 19 video and all images extracted from that video have no relevance and should be excluded.</u>" (Emphasis added.) Nowhere in its submission did the defense even remotely suggest that the <u>April 12</u> video be excluded. Instead, the brief directly and succinctly demonstrates the utter lack of any evidence the government has to established the condition precedent – that Wells drove, or accessed, his Honda CR-V on the day of the murders – in order to establish the relevance of the April 19 video; and compares that paucity to the substantial evidence the defense can show that tends to establish the condition – that Wells drove, or accessed, his Honda CR-V on the day of the murders – does NOT exist.

The April 12 video is actual evidence. Apparently the government is so flustered by the potential of the exclusion of the April 19 video and the effect that may have on its experts' testimonies, that it somehow read in to the defense submission an argument about the April 12 video as well. Again, to be clear, as was stated at the July 30 hearing, the defense seeks only to exclude the April 19 video driving experiment and the use of still frame images taken from the video by all

witnesses. The relevant condition, outlined by the Court not the defense, requires the government to show by a preponderance of evidence that Jim Wells accessed his blue CR-V and drove it away from the airport on the day of the murders. Absent such a showing, the government's extensive proffer of comparison evidence created with the Wellses CR-V on April 19 is not relevant. Of course having no facts to show that Wells moved the car whatsoever on the day of the murders, much less drove it at any time close in time to the homicides, the government spent its entire brief on conditional relevance arguing the legal history of conditional relevance analysis without referencing any actual evidence supporting its position. It concluded by asking the court to 1) admit the April 19 video evidence first, 2) let the government present their whole case, 3) then decide whether the condition was met, and 4) if not established, just tell the jury in some limiting instruction to disregard the hours of testimony and dozens of exhibits that would have discussed the materials at that point. This is a preposterous argument to say the least. It is addressed here as the government took the liberty to reargue its position in Dk. 1124, even though that submission was originally permitted to address government concerns about Mr. Hoerricks' testimony.

This Court had the right focus on July 31, however, and after considering the briefs on conditional relevance issued its order at Dk. 1106, directing submission by the parties of "all relevant citations to the record from the first trial when witnesses testified about Nancy Wells' Honda CR-V being seen at the Kodiak Airport or having

been moved from one parking spot to another parking spot or parking area at the airport close to the time of the homicides". In response, the defense cited the only testimony it could find that discussed actual observation of the location or movement of the Wellses CR-V on April 12, 2012. Although this was testimony about observations made hours after the murders and not "close in time to the homicides," it was the first testimony to discuss observation of the vehicle at the airport on April 12, 2012. The defense also reiterated that in addition to the citation to a witness from the first trial, it intends to call two witnesses on retrial who saw the Wellses CR-V at the airport during the precise hour time frame surrounding the homicides. These are the same witnesses previously referenced in the defense's brief, Dk. 1097, at p. 3.

Interestingly the government filed its response citing testimony of three witnesses, none of whom saw Wells' CR-V at the airport on April 12 or saw Jim Wells on April 12. Certainly none of them saw Wells near, in, or moving the CR-V at the airport. The government did not cite the testimony of its own Trooper who first discovered and secured the CR-V on April 12.

The government is rightfully panicked by the existence of the defense witnesses and is only left to argue they must not be real, or must not be telling the truth, or must be of some inappropriate defense creation. Of course without any legal argument, or citation to legal authorities to support its position, the government implores the Court to disregard the evidence concerning these witnesses or force the defense to disclose the witnesses' identities. Almost comically, the government asks

the Court to sanction a process whereby the defense is forced to call these witnesses at a pretrial hearing where the government can cross examine them and test their veracity. Dk. 1124, p. 21. What a great process that would be for the defense to utilize in cases where the government routinely refuses to disclose its *Jencks*' material prior to trial. Unfortunately for the government in this case, no such legal authority or Rule exists. Just because the government finds itself today in the uncomfortable and difficult position that the defense is regularly left to flounder in does not somehow provide legal support to ease its pretrial discomfort.

The defense is at almost every disadvantage imaginable whether investigative, fiscal, legal or otherwise in a case of this magnitude and indeed in most cases. The Court should in no way break the clear, simple, unambiguous Rules regarding discovery and force the defense to do the government's work for them by way of helping them be prepare to address difficult-to-explain evidence at trial.

The defense will reiterate to the Court and for the government again, that the proffered witnesses were interviewed by the government during its initial investigation and the substance of their statements were made known to investigators at that time. They were likely ignored and disregarded because they did not fit the government narrative at the time (or now). Their identities came to the defense, from the government, buried in a mix of hundreds of witness interviews, dozens of hours of audio and videos files, and what is now discovery Bate-numbered documents of close to 100,00 pages. The fact that the defense found some needles in

the government haystack should not be a surprise, but apparently it is. That fact does not make them anymore discoverable, nor change the Rules of Criminal Procedure which govern both sides.[4]

## CONCLUSION

The defense filed Dk. 1112 seeking to preclude admission of the government created April 19 driving experiment video and the still frame images taken from it. The record now shows that the government has all along intended to offer the video images, not as demonstrative aids to support otherwise admissible testimony, but instead as substantive evidence itself, inextricably intertwined in the powerful testimony of five photo and color comparison experts.[5] Because the government has finally made its intentions with this evidence known, the Court was right in determining that its gate-keeping functions under *Daubert* must be applied. Given that the April 19 video was not scientifically made, nor created in any way by any of the experts, the video and images from it are not substantively admissible under *Daubert*. Indeed, because of the significant and technically important differences between the April 12 evidence video and the April 19 driving experiment video, the April 19 video and images from it are not even admissible as demonstrative aids. Even under alternative analysis using the Rule governing conditional relevance, the

---

[4] As noted in Dk. 1097, the Defense will submit this evidence *in camera* to the Court for review but only after a Court ruling determining that the government has no pretrial right to disclosure of the witnesses' identities.
[5] Experts Vorde Bruegge, Schmidt, Toglia, Becker and Mestha all rely on substance from the April 19 video for parts of their testimony.

Case 3:13-cr-00008-SLG   Document 1134   Filed 08/20/19   Page 32 of 34

government has failed to show by a preponderance of evidence that the necessary condition precedent for admission of the April 19 video – that Wells accessed or drove his CR-V on April 12 near in time to the homicides – can be met. Thus, this Rule provides no grounds for admission of the April 19 video on a conditional basis.

Finally, if somehow the Court determined that the government has, without proof or sound legal support, demonstrated that the April 19 video and images from it are admissible, Rule 403 precludes admission of this nominally probative, but highly prejudicial evidence. The actual April 12 evidence video shows approximately 2 seconds of video of the unknown "blue vehicle." Law enforcement wholly created the April 19 video creating what can only be described as a "one car show-up" using the Wells' CR-V. The government asks the Court to allow it to introduce multiple frames from the April 19 video submersed in hundreds of pages of Power Point presentations to be presented during hours of expert testimony at trial. However, it offers no legal authority to distinguish this video from the long body of case law disallowing single suspect show-ups due to their extremely prejudicial nature. Given the low probative value of the April 19 video that the government created a week after the murders, compared to the high prejudicial effect the evidence will have against Wells at trial (see cases cited in defense briefing re: police show-ups and described by expert Reisberg at the evidentiary hearing), the Court should exclude the April 19 video and images taken from it under Rule 403 in any event.

DATED at Anchorage, Alaska this 19th day of August, 2019.

Respectfully submitted,

*/s/ Gary G. Colbath*
Gary G. Colbath
Assistant Federal Defender

*/s/ Peter A. Camiel*
Peter A. Camiel WSBA 12596
Attorney for Defendant

*Attorneys for James Michael Wells*

Certificate of Service:

I hereby certify that I electronically filed the foregoing and any attachments with the Clerk of Court for the United States District Court for the District of Alaska by using the district's CM/ECF system on August 20, 2019. All participants in this case are registered CM/ECF users and will be served by the district's CM/ECF system.

*/s/ Gary G. Colbath*