BRYAN SCHRODER
United States Attorney

STEVEN E. SKROCKI
Deputy Criminal Chief
CHRISTINA SHERMAN
Assistant U.S. Attorneys

KELLEY STEVENS
Special Assistant U.S. Attorney
Federal Building & U.S. Courthouse
222 West Seventh Avenue, #9, Room 253
Anchorage, Alaska  99513-7567
Phone: (907) 271-5071
Fax: (907) 271-1500
Email:   steven.skrocki@usdoj.gov
            christina.sherman@usdoj.gov
            kelley.l.stevens@uscg.mil

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 3:13-cr-00008-SLG |
| vs. | ) | |
| | ) | |
| JAMES MICHAEL WELLS | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**TRIAL BRIEF OF THE UNITED STATES**

COMES NOW the UNITED STATES OF AMERICA and files its Trial Brief as

follows:

# I.  STATEMENT OF THE CASE

## A.  Summary of Charges

This is a retrial after appeal from the 9th Circuit Court of Appeals wherein error was found with respect to a workplace violence expert, testimony on it, and other testimony and argument during trial. *See, United States v. Wells*, 879 F.3d 900, 914 (2018). Neither this witness nor the subject matter of workplace violence will be part of the United States' case at trial.

The indictment in this case charges James Wells with violations of 18 U.S.C. § 7(3) and 1111(a)&(b), Murder in the First Degree (Counts I & II); 18 U.S.C. § 1114 and 1111, Murder of an Officer or Employee of the United States (Counts III & IV); and 18 U.S.C. § 924(c)&(j), Possession and Use of a Firearm in Relation to a Crime of Violence (Counts V & VI).  These charges arise out of the shooting deaths of United States Coast Guard (USCG) Petty Officer First Class James Hopkins (Hopkins) and USCG civilian employee Richard Belisle (Belisle), a retired Coast Guard Chief Boatswain's Mate.  It is an unavoidable fact that these innocent men were killed at their place of work, Communications Station (COMMSTA) Kodiak, on April 12, 2012 at the very start of their workday. The evidence in this case will show that the defendant, Jim Wells did actually arrive at work that day, albeit a few minutes later than normal, and did so in order to murder his colleagues, which he did in cold blood with a .44 caliber revolver. He did so due to a combination of factors of which this court is now aware through extensive pretrial briefing.

### 1. Factual Summary

At the time the defendant murdered Messrs. Hopkins and Belisle, the defendant was employed as a civilian with the United States Coast Guard as an Antenna Maintenance Specialist at COMMSTA Kodiak. He had been employed there since approximately 1990. Belisle, Hopkins and Wells all worked together in the same office area in a building known as Building T2, or 'the rigger shop.'

Physically, COMMSTA Kodiak is comprised of two primary buildings, T1 and T2. Building T1 is the main facility; housing the command staff, operations and engineering personnel, and most of the information technology personnel. T2 or the rigger shop consists of a small subset of personnel, anywhere between eight and ten individuals, comprised of maintenance and repair personnel for the antennas and other physical property. T1 is located a short distance up a slight hill from T2, and is approximately 100 yards away. Additionally, the unit is also comprised of another building known as R2, but this building is not in the same immediate vicinity as T1 and T2.

The COMMSTA, including Building T2, is on Federal property owned by the USCG, an agency of the Department of Homeland Security. The property is within the Special Maritime and Territorial Jurisdiction of the United States as set forth in 18 U.S.C. § 7(3) because it has been reserved or acquired for the use of the United States. The United States is seeking a stipulation from the defense with respect to that fact.

On the morning of April 12, 2012, the bodies of Richard Belisle and James

Hopkins were found by a Coast Guardsman, Cody Beauford (Beauford), shortly after 7:30 a.m. Beauford will testify that he thought Belisle and Hopkins were conducting a prank. Soon realizing due to their unresponsiveness and pools of blood that it was not a joke, Beauford called the operations deck up the hill at T1, who in turn called the authorities. Beauford, like several other witnesses, will testify as to the strong odor of gunpowder present in the Rigger Shop/T2 building that morning.

Military Police, EMTs and Alaska State Troopers (AST) responded to a 911 emergency call from COMMSTA Kodiak regarding an incident at the Rigger Shop/ T2 Building. By the time the Trooper arrived, several emergency medical personnel were present attempting to save the men's lives. Trial testimony, photographs and a limited number of autopsy photographs will establish the following: Mr. Belisle, a civilian employee of the USCG, was found lying on the floor in the office he shared with his supervisor Jim Hopkins, Chief Scott Reckner, and the defendant, James Wells. Mr. Belisle was shot three times, once in the neck, and twice in his torso. Belisle was also shot on the ground as he lay dead or dying. Crime scene evidence proves this to be the case for both men due to the presence of bullet strikes in the floor beneath their bodies. Belisle had been a civilian employee of the USCG since November 13, 2005 and was murdered in the Rigger Shot/T2 building at the start of his normal work day. Mr. Hopkins, Wells' direct supervisor, had been shot twice – once directly in the face while standing and facing his killer, and once through his torso after he collapsed to the ground after the shot through his head. Mr. Hopkins was an active-duty member of the USCG,

and was both Wells' and Belisle's direct supervisor. He, like Richard Belisle, had been murdered at the start of his normal work day.[1]

## B. Geographic References

Exhibit 1, inserted below, is a map of the relevant areas for trial with reference points for the trial jury and the court.

Wells, Hopkins and Belisle worked at the COMMSTA Kodiak facility, at the upper right of Exhibit 1. At trial, evidence will establish that Wells' home, in the "Bells Flats" area of Kodiak, was roughly an 8.8 mile drive from the COMMSTA. To get to the COMMSTA, which consisted of the T-1 Administrative Offices, and Rigger shop/T-2 building, Wells would have to drive by the Coast Guard Base Kodiak main gate, the commercial city of Kodiak Airport, and then turn left on Anton Larson Road. For the court's information, the COMMSTA was a stand-alone, separate entity, and not connected to Base Kodiak. Thus, as it was not connected by organizational structure to Base Kodiak. Instead, COMMSTA's next level chain of command was a Coast Guard communication facility in Point Reyes, California.

USCG Base Kodiak, is located south of the Kodiak Airport. (See, Exhibit 1) The COMMSTA facility is located approximately 3 miles 'up the road,' north-northwest of Base Kodiak on Mile 2 of Anton Larsen Bay Road. The turn off for Anton Larson Bay Road is immediately north of the Kodiak Airport, identified as 'Airport Parking Lot' as

---

[1] The United States is using similar photographs as those used in the first trial, though fewer in number. The United States can certainly provide those to the court prior to specific witnesses testifying about the photographs of the deceased. They will be provided to the defense at the Exhibit Exchange date set by the court for August 30, 2019.
*United States v. Wells*
3:13-cr-00008-SLG

shown on Exhibit 1.

Exhibit 1



The defendant's residence is located on Pavloff Circle in the Bells Flats area of

Kodiak, south of USCG Base Kodiak in the lower left of the map, at "Wells Residence-

Mile 0". There is one primary road, Rezanof Drive/Chiniak Highway, which runs from

the defendant's residence in Bells Flats, passes Main Gate USCG Base Kodiak and the

Kodiak Airport, to the City of Kodiak. For the defendant to get from the his residence in

the Bells Flats area to the COMMSTA and Building T2, he must pass the main gate of

the Base Kodiak and the entrance road to Kodiak Airport on Rezanof Drive/Chiniak Highway. The court need note that Main Gate USCG Base Kodiak, shown on the map, is outfitted with closed circuit television cameras (CCTV) which are designed to provide images of vehicles entering the base, but, can also capture images of vehicles driving down Rezanof Drive within its view if it is capturing a vehicle entering the base at the same time. In the case of Mr. Wells' travels that morning, that is exactly what occurred.

*Timeline of the murders of Messrs. Belisle and Hopkins, April 12, 2012*

At approximately 6:48 a.m. on April 12, 2012 the Kodiak Base main gate CCTV captured video of Jim Wells' white Dodge truck passing the base gate. As the exhibit depicts, Wells was heading north on Rezanof Drive toward the Kodiak airport and his work place at COMMSTA. The video shows a white Dodge truck with a camper shell with two slanted rear windows. The right front tire on the vehicle, for all intents and purposes, appears to be inflated to normal size. The defendant is the registered owner of a truck fitting this description, and he admitted in later statements that he was driving on the road during a time frame confirmed with this evidence. (See Exhibit 2, below)

//

//

//

//

//

//

*United States v. Wells*
3:13-cr-00008-SLG

7

Exhibit 2



The COMMSTA Building T2, were Wells worked with Belisle and Hopkins is secured at the close of the work day. On the evening of April 11, 2012, at approximately 7:00 p.m., the building was checked by a watch-stander from Building T1.

On the morning of the murders, and based on the electronic key logs and video surveillance, no one entered the building on April 12, 2012 until Belisle arrived at 7:00 a.m. Electronic access records for Building T2 show Belisle's access card was swiped at approximately 7:00 a.m., and CCTV at Building T2 correspondingly showed the arrival of his truck at Building T2 shortly before the access card was swiped. Other historical card swipe evidence shows Belisle almost always arriving at 7 a.m. the week before his murder.

*United States v. Wells*
3:13-cr-00008-SLG

CCTV footage at Building T2 shows Hopkins's truck arriving at Building T2 at approximately 7:08 a.m. Others vehicles also arrived, however while this footage will also be shown at trial, the other arrivals all proceeded to the T1 building, or were captured leaving the T-1 building to go home after a night shift (also known as a "mid-shift").

Soon after Hopkins' truck pulls in to park in front of the Rigger Shop/T-2 building, CCTV from a small tower located in the front of COMMSTA Kodiak Building T1 captures an unknown vehicle in the distance traveling with its headlights off up Anton Larson Bay Road towards T2. Soon after, another camera located on a utility pole towards the back gate of T1 captures a small, blue vehicle, possibly a Sport Utility Vehicle (SUV), with its headlights off, arriving at, and disappearing from view, behind Building T2 at 7:09 a.m. (see, Exhibit 2)

Exhibit 2



This vehicle is similar in appearance in size, shape and color to a blue Honda CR-V owned by Jim and Nancy Wells. (See, Exhibit 3, below, taken at Kodiak Airport Parking lot on the night of the murders)

Exhibit 3



Numerous Coast Guard witnesses will testify that Jim Wells would habitually drive his full-size, cab covered, white Dodge pickup to work. Wells' wife, Nancy Wells, ordinarily drove the Honda CR-V. Witnesses will testify that Wells had driven the CRV to work on a few prior occasions. Trial evidence will show, that Nancy Wells was not in Kodiak that day, nor was she in Kodiak the day before, having left Kodiak to attend a business trip in Anchorage. On this April 10 trip, Nancy Wells was travelling with a co-worker to whom she gave a ride to the airport. At the first trial, the co-worker testified

about the general area in front of the terminal where Nancy Wells parked the vehicle and

that when shown a photo of where the car was recovered, it was no longer in the same

spot it was left by Nancy Wells.

The government will again call Honda engineer, Neil Schmidt, who stated in his

reports and at trial that the vehicle in the video appears to have the profile of an early-

model Honda CR-V. The Ninth Circuit upheld the use of Mr. Schmidt as an expert. *See*,

*Wells*, 879 F.3d at 933 as did this court in pretrial motion practice. (Docket 1071)

Mr. Schmidt will testify that he cannot identify the make and model with absolute

certainty, but would say that he is 70% certain in his identification that the vehicle

depicted on the CCTV footage is a Honda CR-V. Other evidence described below will

also show that the vehicle in the video is consistent with an early-model CR-V. The

vehicle also appears to have a black nose and black wheels. This vehicle did not enter the

Building T2 parking lot via the primary entrance, and, thus, was not captured on the

Building T2 video camera. Instead, it proceeded past the front of T2 where it could have

access to a third possible entrance up an established dirt driveway which lead to the back

of the T2 building. It is important to note that when interviewed by law enforcement,

Wells drew a diagram which showed the location of the CCTV camera located on the

front of the T2 building and its zone of coverage. Thus, Wells knew the coverage zone of

the Rigger Shop/T2 camera. (See, Exhibit 3 below, with red lines paralleling Wells'

knowledge of T2 CCTV camera field of view added for emphasis here) Other

government witnesses will testify that Wells was aware of the CCTV camera coverage of

the building and that he also helped install the cameras.

Exhibit 3

Wells' schematic of interior or Rigger Shop/T2, locations of workstations and

CCTV camera location done during interview with investigators, April 12, 2012

(Upcoming Trial Exhibit 104A)



The small blue vehicle/SUV depicted on the T-1 CCTV pole camera did not pull

into a parking spot with the other vehicles in the front of the Rigger Shop/T2. Had it

done so, it would have been recorded clearly by *both* the T-1 camera and the Rigger

Shop/T2 Camera just as each CCTV camera recorded the arrival of Mr. Hopkins and Mr.

Belisle vehicle's prior to their deaths. Wells was able to avoid the CCTV cameras

capturing his entrance and exit into the T-2 building due to specific knowledge of the

CCTV camera locations and their fields of view.

Mr. Wells, on any normal workday, would have arrived commensurate with the

time he murdered his colleagues. Given that Wells was aware of the COMMSTA's CCTV camera's field of view he avoided being captured by the CCTV camera almost, but not quite altogether, by proceeding down Anton Larson road, and turning into the dirt driveway access and parking behind the Rigger Shop/T2 building unnoticed, as shown on the red line in Exhibit 4. (See, Exhibit 4, photo of Rigger Shop/T2 and Anton Larson Road and other access points to building from Anton Larson Road, red lines inserted for emphasis) The approximate cone of view of the T2/Rigger Shop camera is depicted in yellow, from the location of the camera. It corresponds to Wells' drawing as well. Thus, Wells knew he could circumvent detection from the Rigger Shop/T2 camera and enter the Rigger shop by parking in the back and going around and underneath the camera against the wall of the building. As an added surreptitious entry bonus, Wells would be protected from observation by others due to the vehicles parking in front that morning, to wit, the full-size trucks of Messrs. Belisle and Hopkins, and two white full-size utility pickup trucks used by the Rigger Shop, so four large vehicles in all.

   As the court will see at trial, for the most part, the view of Anton Larson Road leading back to Kodiak, and within the cone of view of the Rigger shop/T2 Camera was obscured by trees and brush save for some small areas.

//

//

//

//

Exhibit 4



From his parking space behind the Rigger shop, Wells could and did walk under

the Rigger Shop/T2 Camera and proceed inside the Rigger Shop/T2 building as usual,

entering through the non-swipe card protected door habitually unlocked by Richard

Belisle when he arrived for work at 7:00 a.m. Wells clearly knew this habit, and most

likely his colleagues had no idea Wells had murder on his mind when he entered the

Rigger Shop that morning, albeit a few minutes later than normal. Wells was inside the

building and at T-2 for approximately less than 5 minutes, arriving at 7:09, and departing

at 7:14 as captured by the T-1 CCTV camera showing the blue vehicle driving towards

and away from the Rigger Shop. (*See* Exhibit 5, the small blue vehicle/SUV departing on

Anton Larson Road, heading back to the direction of the Kodiak Airport, main base Kodiak, and ultimately Wells' home in Bells Flats, Kodiak.)

Forensic analysis of Richard Belisle's computer shows he was logged on and active on email up to 7:10 a.m. No further activity was recorded after that time period. One minute later, at approximately 7:11 – 7:12 a.m., Don Rudat, a jogger/walker on Anton Larson Bay Road, heard a loud "metal hitting concrete" sound clearly emanating from the direction of Building T2 as he was walking away from the area. CCTV footage captured from the T1 pole camera confirmed the presence of Rudat on the road at approximately 7:12 a.m. It appears then, as confirmed by these interlinked pieces of evidence, that on or about that time, the lives of Mr. Belisle and Mr. Hopkins were taken by Wells and his .44 caliber revolver, a type of revolver that does not eject bullet casings.

Wells almost, but not quite, got away with it. He made several critical errors in his planning, and false alibi, and there were several serendipidous breaks obtained by law enforcement throughout the long investigation.

The electronically vigilant CCTV's of main base Kodiak, and the T-1 building, for example, contributed to the conclusion that Wells was the murderer. So too would Wells' own actions, statements, and failure to anticipate the thoroughness of law enforcement's investigation. A brief chronology of these events is as follows:

At 7:14 a.m., CCTV from Building T1 captured a small blue vehicle/SUV, heading in the other direction from behind Building T2 – driving onto Anton Larson Bay Road and heading back towards the Kodiak Airport. This vehicle did not depart the

Building T2 parking lot via the primary entrance, and thus it once again avoided being captured on the Building T2 video camera. Analysis of video evidence shows that the small blue SUV drove inbound towards COMMSTA at about half the speed that it drove when heading outbound. (See Exhibit 5, below)

Exhibit 5



Some eight minutes later, at approximately 7:22 a.m., CCTV at the Base Kodiak main gate again captured Jim Wells' white pick-up truck as it hastily heads southbound on Rezanof Drive towards his home in Bells Flats. This was 34 minutes after Wells originally passed the Kodiak Base main gate camera at 6:41 a.m..[2]  (See, Exhibit 6) [3]

//

//

//

---

[2] This 34 minutes is the "34 minutes" Wells could not explain to investigators when questioned.

Exhibit 6



This gave Wells a full 34 minutes to switch from his readily recognizable white Dodge pickup to the now available and less obvious and known blue Honda CR-V, parked at the Kodiak Airport by his out-of-town spouse. Having swapped vehicles at the airport provided a lay-in-wait position for Wells, as he could, in concealment, the watch for Messrs. Belisle and Hopkins as they drove unknowingly to work that morning. All Wells had to do, and did, was to wait for them to drive passed, follow in behind them at a stealthy distance, park in the back, commit his murders, return to the Kodiak Airport to re-swap vehicles, and then drive back to his home in Bells Flats, arriving there, as he did

by 7:30 a.m. Two USCG civilian employees who knew the defendant, witnessed Wells driving in his white Dodge truck in the area of Bells Flats after 7:25 a.m., heading in the direction of his home.

Just five minutes after being recognized by acquaintances/neighbors in his white truck heading in the direction of his home, Jim Wells left two voice mail messages for his supervisors, Jim Hopkins (who was already dead by Wells' hand) and Scott Reckner, respectively at 7:30 and 7:31 a.m. from his home land line. The messages stated in general that Wells had a flat tire in the back of his truck and was having trouble with his lug nuts, and that he would be in when he got the tire changed.

As mentioned above, shortly after 7:30 a.m.., a U.S. Coast Guard member assigned to duties at Building T2 discovered the bodies of Jim Hopkins and Rich Belisle dead at their workplaces. He reported the situation to Building T1, who alerted police and medical units. USCG military police conducted a security sweep and established that only one door allowing full access into Building T2 was unlocked (the door Belisle habitually unlocked for his colleagues after swiping in) – the other doors remained secure. There were no logged entries through the electronic lock, other than Belisle's access swipe at 7:00 a.m. lending support to the conclusion that Wells entered through the unlocked door leading to the common area of T-2.

Later that evening, a blue 2001 Honda CR-V owned and driven by Nancy Wells, Jim Wells' wife, was found by a Alaska State Wildlife Trooper parked in the two-hour parking lot at the Kodiak Airport. On his own initiative, the Trooper was looking for

vehicles that could possibly match the video evidence from the T-1 CCTV camera.
Nancy Wells, the defendant's wife, told investigators that she flew out of Kodiak to
Anchorage on Tuesday, April 10, 2012, leaving her blue Honda SUV parked at the
Kodiak Airport. A witness who drove with Nancy Wells to the airport stated that she
recalls that they parked in an area where they could walk straight into the Alaska Airlines
terminal – a location consistent with where passengers would park on departing flights.
When discovered by law enforcement however, Mrs. Wells' vehicle was at the very end
of the parking lot, diagonally distant from this location, and therefore appeared to have
been moved after Mrs. Wells had parked the car and before the time it was found on the
day of the murder.

The question arises, then: What about Jim Wells whereabouts for those 34
minutes? In his interview with law enforcement he vaguely claims the good fortune to
have noticed a low tire problem, pulled over at a vague and non-specific location near the
airport, noticed low pressure and returned to home in order to change it out. Wells claims
this despite the fact that the Rigger Shop/T2 was roughly 2 miles away, and replete with
tools capable of changing or filling a tire with air, while his home was almost 7 miles
away, and that both he and other personnel routinely used the shop equipment to change
tires. When queried by investigators as to where he was on the road when he noticed the
issue with his tire, Wells responded, "shit, I don't know" and thereafter gave answers to
what he was doing as 'probably' or some other equivocation. When asked to explain the
34 minute time gap between the time his truck passed the Main Base camera heading

towards the COMMSTA and when it returned, Wells response was "I don't have a theory at the moment."

<u>*The T2 Environment Prior to the Murders*</u>

At the time of the murders, COMMSTA Kodiak was staffed by approximately 60 members. Most worked in the T1 building, and approximately 7 people were assigned full time down in the Rigger Shop/T2 building. Wells and Belisle were the only civilian employees at the COMMSTA; all others were active-duty Coast Guard members.

Chief Scott Reckner took over supervision of the Rigger Shop in July of 2010. James Hopkins was assigned to COMMSTA in approximately 2009, and was the direct supervisor of both Wells and Belisle. When Reckner arrived at COMMSTA, he had recently been promoted to the rank of Chief Petty Officer. In the chain of command, he reported to Senior Chief Reed, the Engineering Officer, and then up the line to the Executive Officer, Lieutenant David Pizzurro, and finally to the Commanding Officer in charge of COMMSTA, Commander Peter Van Ness. Soon after the various command changes that put Van Ness, Pizzurro, Reed, and Reckner in charge of the Rigger Shop functions, the command realized that the rigger shop, and specifically the civilian who had worked there for over 20 years, Jim Wells, appeared to be acting too much as an independent unit lacking in accountability. The command therefore and quite logically wanted T-2 to be brought back into line as a functioning part of the overall COMMSTA command structure. That task fell to Chief Reckner. Reckner instructed Hopkins to supervise the defendant more closely. Later, Reckner even moved his desk into the

Rigger Shop office shared by Hopkins, Wells, and Belisle, so that he could have more day-to-day contact with what was going on in the rigger shop and backstop Hopkins' efforts at supervision.

Jim Wells' role at COMMSTA was as an antenna mechanic. There is no dispute that Wells was extremely knowledgeable about antenna maintenance, was very competent at his job, and very proud of that knowledge. Wells, however, had several clashes with upper management which resulted in him being 'written up,' cautioned, or receiving some other form of counseling, ultimately leading his chain to tell him to retire or to otherwise get with the program. When interviewed by law enforcement, Wells declined to provide any information to law enforcement about clashes with management; instead, he told the agents to "ask them."

The court is familiar with many of these work issue episodes given the parties briefing on relevant character evidence per FRE 403 and 404(b) matters and has ruled the following can be admitted at trial pursuant to Dockets 1074 and 1081. As to each of these matters, the United States will be relying on applicable witness testimony and official correspondence provided to the defendant by management, all prior to the murders and as directed to, or limited by this court's rulings:

1) That defendant had been counseled on several occasions by his supervisors for failing to obey orders, ignoring his supervisors, his diminished work performance, his failure to participate as a fully functioning team member, and his unexcused absences; (Dockets 1074 and 1081)

2) The defendant had been counseled about removing trees from Coast Guard property to obtain firewood for his personal use, including "collaring" trees to cause their premature death; (Docket 1081)

3) The defendant had been confronted, counseled and had a letter of caution presented to him about misuse of a U.S. government credit/fuel card; (Docket 1081)

4) The defendant's travel orders to a professional conference (i.e., the NATE Conference) were cancelled because of his diminished professional performance, and one of the victims was substituted to attend in his place. The defendant became very angry at this news and verbally confronted his supervisor. (Docket 1081)

5) The defendant's professional performance had diminished, and newly reported Coast Guard command members were holding the defendant accountable for his actions.

The United States will call virtually all of the surviving members of the T-2 Rigger Shop who were employed at the Rigger Shop the day of the murders. In addition, the United States will call the defendant's manager and command staff who have relevant testimony to present at trial as both fact witness and percipient witnesses to Wells' behavior towards management at T-2. In addition, Wells' own statements about his work at T-2 will also be admitted at trial in connection with his false alibi/false explanation as to his whereabouts and actions during the time the murders occurred.

## C. The Defendant's Interview

The United States will be seeking to introduce all of the defendant's interview with investigators which occurred on April 12 and April 13, 2019. Unlike the other

*United States v. Wells*
3:13-cr-00008-SLG

proceeding, the United States will seek to admit each and all of the 5 sessions made and recorded with law enforcement. The only redaction the United States will make are statements by the defendant made at the very end of his interview on April 13 where he invokes his right to silence. The defense will be provided notice of the specific redactions being made prior to trial on August 30th, during the final pre-trial conference when exhibits are exchanged.

At trial, the United States will not seek to use contemporaneous DEPS electronic scrolling of the transcripts but will instead provide hard copy, in binders, for the jury and defense to follow. The United States will seek to introduce the five sessions through the testimony of an FBI Special Agent who conducted the interview, and elicit testimony from the agent as to those interviews. The total amount of time for the recorded interviews is roughly 2.5 hours. The United States seeks to include the entirety of the recordings, as opposed to snippets as done in the last proceeding, for the following reasons:

-each recording has relevant and direct information as to a statement the defendant made concerning his work, whereabouts, relationship with the victims and his false alibi,

-a complete introduction of the interview will provide the jury with the entirety of the defendant's statements provided to law enforcement, and will similarly provide the jury with the questions posed by law enforcements, interview techniques, and assists in corroborating the timeline for that day for the jury as to the timing of the interviews that occurred that very day, and the day after the murders.

-a complete introduction of the interviews is not thought objectionable by the defense inasmuch as their client claims innocence and thus his own version of events will be placed before the jury and upon which his defense is undoubtedly built without redaction.

### D.  The False Alibi of Jim Wells

During interviews the day of and the day following the murders, the defendant stated  he was on his way to work the morning of the murders when he noticed he had a low tire on his white Dodge pickup.  After several vague answers as to where Wells first noticed the flat tire, Wells claimed that he pulled off the road "probably" near the Kodiak Airport, that he only looked at the tire without examination, and returned to his home to change the tire because the spare tire and jack were at his residence.  He could not and did not answer any questions as to where he first pulled off the road or how long it took to examine the tire nor did Wells provide any concrete particulars. Wells further explained that he believed he went into the house and went to the bathroom and looked for his equipment before calling his supervisors.

When asked how a person could evade detection by the CCTV located on Building T2, the defendant gave a detailed answer and drew a diagram for the investigators showing them the location, angles, and coverage of the camera.  (See Exhibit 3, above)

Prior to being told about the CCTV videos obtained from the Base Kodiak main gate camera, the defendant was questioned on how long it took him to drive from the

Main Gate at Base Kodiak to the Kodiak airport, check his tire, and drive back to his residence. Investigators told the defendant their estimate was about 6-10 minutes. After hearing the analysis and estimate, the defendant did not commit to a specific time, nor did he correct the investigators when given the opportunity to do so.

At the end of the interview on April 13, the day after the murder, the investigators told Wells that the Kodiak Base gate camera showed him passing the main gate going north toward the COMMSTA at 6:48 a.m., and not returning going south toward his residence until 7:22 a.m. – a gap of 34 minutes that was clearly inconsistent with his stated explanation. When asked to reconcile the 34-minute gap shown by the camera and the estimate of 6-10 minutes, Wells stated: "I can't think of why there would be the time discrepancy." Agents gave him an additional opportunity to explain the time discrepancy, asking him to help them account for the missing time. The defendant stated: "I don't have a reasonable explanation for it." He then added, "I don't have a theory at the moment." When asked again if he had anything to add to that, he responded, "Nope". Wells then terminated the interview.

Immediately after that interview, on April 13, 2012, Wells went to the airport and entered the building at Island Air – a charter airline service located directly across the airport parking lot from the Alaska Airlines Building. Wells stood and stared at the internal cameras located in the building for a long enough time that one of the managers approached him and asked what he was doing. He mumbled something about the café next door being closed and walked away. As the manager noted, she remembered the

incident, because Wells, "creeped her out."

Defendant's low or flat tire story made no sense to anyone familiar with him or the COMMSTA, nor does it fit the established timeline for a number of reasons. First, the COMMSTA is less than 2 miles from the airport and the drive home is almost 4 times that long. Second, the COMMSTA has all of the equipment necessary to change or fix a low tire and employees present to help. It was common and allowable for Coast Guard members to work on cars and use equipment at the Rigger Shop for minor car repairs such as this. Third, the tools at the Rigger Shop were organized and easily accessible and they included a pneumatic wrench, air hose with compressor, and several floor jacks. Moreover, based on the time that he was caught on video passing the Base Kodiak's main gate, and the time he called with his excuse for being late to work, Wells could not possibly have had time to get out tools and check the lug nuts on his tire before claiming his excuse in the calls to both Hopkins and Reckner. Expert testimony corroborates this fact – the alibi was false.

Despite this, Wells was quick to tell virtually anyone the morning of the murders, or the day after, that his absence was due to a flat tire. He even brought the 'flat tire' with him to work as evidence of his alibi.

Pursuant to a search warrant, a studded tire was seized from the bed of the defendant's white Dodge pickup truck. A 3 ½ to 4 inch long 16 penny nail, presumably the reason for the 'low tire' was embedded in a groove of the tire between two of the treads. Forensic analysis of the tire was conducted by Gary Bolden, from an independent

tire testing laboratory. Bolden has 32 years' experience in the tire industry, including 22 years in forensic tire testing. Bolden concluded that the 3 ½ to 4 inch long nail was inserted into the tire manually, and had not been picked up nor present during normal operation of the vehicle. This conclusion is based on the following factors:

- There was no evidence of pavement or debris abrasion on the nail head which would necessarily be present had the nail been picked up during normal vehicle operation.

- The nail was located in the groove between the tread and had penetrated to the extent that the nail head was below the height of the tread. The nail head would not have penetrated below the height of the tread had it been picked up during normal operation.

- The nail shank was slightly bent and the nail penetrated the tire at an angle nearly perpendicular to the tire surface. A nail of this length could only penetrate the tire at an oblique angle during normal operation or the shank would be bent as the tire rolled over it. Moreover, the nail head itself lacked any indicia of having been driven on with the nail in it.

- A toolmarks analysis conducted by the FBI Laboratory, witness Brett Mills, also concluded that markings on the nail head indicated that it has been shot out of a nail gun. Leading to the conclusion that Wells inserted the nail by the use of an automatic or pneumatic nail gun.

### E. Other False Statements

During his interviews, Wells was also asked about any interpersonal problems between him and his co-workers. He stated that there were *none*. However, after the murders when talking to his sister and brother-in-law, he became incensed when their daughter asked about how the families of Hopkins and Belisle were coping. Wells, visibly angry, went on a tirade about how both were incompetent, unable to perform, and undeserving to have their jobs and said that Belisle was a drunk. In fact, all of the

supervisors of both men will have nothing but complementary things to say about both of the men, their competence, work ethic, and dedication to the job.  Indeed, Hopkins was named COMMSTA Enlisted Person of the Year for 2011.

### F.  Weapon Used in Murders

Both victims were shot multiple times.  At the autopsy of Belisle, the Medical Examiner removed a projectile from Belisle's cervical spine.  The projectile was intact, and was removed without further marking the item.  That item was submitted to forensic examination at the Alaska Scientific Crime Detection Laboratory.  The lab determined that the projectile is a .44 caliber bullet bearing markings of a 5 right twist, consistent with a Smith & Wesson Model 29/629 revolver, a Taurus revolver, or a Llama revolver. Despite extensive searches, the murder weapon has never been found.  However, in approximately 1996, a friend of Wells' left his gun safe containing numerous firearms, and the code to the safe with Wells when he left Kodiak for an extended trip.  Included in the inventory was a Smith and Wesson Model 629 .44 Magnum silver revolver of the type that is consistent with one of the three possible murder weapons.  The friend, John Stein, returned one year later to arrange for the gun safe to be sent to his brother.  When he went to Wells' house he found the safe open and the Smith & Wesson Model 629 .44 Magnum silver revolver missing.  He asked Wells what happened to it and Wells gave a noncommittal answer that it must have gotten lost or something. Stein reported the missing firearm to the police and indicated they should ask Wells about it.

Robert Pletnikoff was a friend of the defendant's and had, on at least one occasion,

hunted with the defendant. Pletnikoff stated that on at least one occasion, the defendant was armed with a silver-colored revolver of unknown caliber, but which Pletnikoff believed was "a bear gun." In the searches of the defendant's residence and vehicles, only one revolver was recovered, a .44 caliber Ruger. The Ruger was blued steel. No silver-colored revolver has been found in any location associated with the defendant. Mr. Pletnikoff's testimony, as well as testimony of witness Luke Robinson, has been admitted by this court on the issue of a silver revolver in the possession of the defendant. The United States will abide by, and is aware of the court's ruling as to witness John Stein, which limits the United States' arguments as to the missing Stein pistol in possession of the defendant. (See, Docket 1062)

The Alaska State Crime Lab criminologist reported that the bullets recovered from the bodies and crime scene were .44 Magnum caliber jacketed soft points. In the execution of a search warrant at the defendant's residence, investigators recovered and seized .44 caliber jacketed soft point ammunition. The jacketed soft point ammunition was analyzed at the FBI laboratory and found to be consistent with the bullets recovered from the crime scene.

### G. The Investigation Revealed by Large and Small Items of Evidence that Wells' Murders Were Personal, Intentional, and Well-Planned

The case against Jim Wells is made up of intersecting elements of evidence from witness testimony, physical evidence, lack of evidence, the defendant's actions prior to the murders, and his actions after the murders, and other evidence all of which establish

that the murders of James Hopkins and Richard Belisle were intentionally well-planned and targeted with emphasis on escaping culpability or suspicion. The United States evidence will show these targeted murders were done by somebody who was intimately familiar with the layout of the COMMSTA, particularly the rigger shop, and the daily schedule of its personnel; and, in no small degree, by someone who had access to a small blue car/SUV that was consistent with the one left at the airport by Nancy Wells—who was conveniently out of town. The evidence will further show that Jim Wells was within 1.5 miles of the COMMSTA during the time of the murders with plenty of time to access his wife's vehicle, commit the murders, change vehicles and go home. It further shows that he was not prepared to explain the 34 minute gap in time that was caught on the Base Kodiak main gate camera, that the nail in his tire was manually inserted and the tire never driven on with it in it, and that he had prepared an evolving false alibi that does not account for the gap in time.

In summary, a number of common sense, day to day testimony by those with knowledge will prove the following:

The person who committed the murder chose a time when only a limited number of the staff would normally be on duty at Building T2, namely Belisle and Hopkins. Belisle and Wells normally arrived to work around 7:00 am. Hopkins was usually in between 7:10 and 7:20 a.m. The video evidence shows that the murderer in the blue car/SUV followed Hopkins as he arrived at the Rigger Shop, and thus, was fully aware that Hopkins was in that day by 7:09 a.m. As part of the normal routine, no one else was

likely to be at T2 before 7:30 a.m. or later. Thus, by arriving almost precisely at 7:10 a.m., the murderer likely had approximately 20 minutes to murder two unarmed individuals and escape.

Any person approaching Building T2 at 7:09 a.m. on April 12, 2012, would have seen four trucks parked in front of the building: two government trucks, and the personal trucks of Belisle and Hopkins. A person not familiar with the daily routines and operations at Building T2 would be faced with the possibility of confronting four or more persons in the building. In addition, there are no windows in the front of the T2 building and a "stranger" murderer would not have any idea where anyone was located within the large building. A person familiar with T2, like Wells, would have known only Belisle and Hopkins were inside.

The murderer chose a route into Building T2 that prevented the camera on that building from capturing an image of the vehicle. The murderer also walked under the camera located on the T2 building, so that the camera would not capture his entrance into the building.

The normal routine for the workers at T2 was that the first one into the building, generally Belisle or Wells, would swipe through the card reader door to get in and then unlock the door on the east side of the building. Wells was aware that there would be an unlocked door, enabling him to enter without leaving a trace, or an electronic access card record.

The murderer left no forensic footprint. There were no bloody footprints, no

bloody fingerprints, indeed, no blood evidence at all beyond the two rooms where Hopkins and Belisle were murdered. Although investigators, following standard practice, collected what crime scene evidence they could find, nothing in those collections pointed to the likelihood that the actions where those of a random murderer and, in fact, nothing did. Obviously, evidence that Wells, or any other COMMSTA member, had been present at the crime scene, which of course did exist, would not be of evidentiary value since he worked in those locations.

Crime scene experts and common sense demonstrates that the murderer targeted Hopkins and Belisle and intended to kill them. Despite the fact that the Rigger Shop is a tool shop, and was full of tools, radios, and related gear, there was no evidence that anyone had broken in or taken anything. Both Hopkins and Belisle had money on them that was not taken. There was no evidence of a motive of burglary or robbery. While the shop did have many 'tools' much of the expensive and valuable equipment was simply too heavy to move and there is no evidence any of it was moved.

Each victim was shot multiple times and both were shot while lying on the ground dead or dying with a high powered hand revolver which, by design, left no ejected cartridges.

Both victims were shot in adjoining rooms, exactly where they would be found per their morning routine.

Belisle and Hopkins, although they worked together, were not social acquaintances, and had no connection to each other except work.

*Expert Testimony*

Per the court's ruling at Docket 1071, and based upon its witness list, the United States will be calling the following expert witnesses:[4]

-Brett Mills (Nail in Wells' tire had nail gun stamp on the head, and compares ammunition found in Wells home to that found at murder scene)

-Neil Schmidt (Specialized knowledge of CR-V to vehicle in April 12 and 19th is Honda CR-V)

-Steven Becker: Reviewed videos of April 12 and 19th with color analysis/specifications of both vehicles.

-Rick Wyant (the characteristics of a .44 caliber handgun and demonstration video)

-Meredith Frank nee Lann (Autopsy/Medical Examiner)

-Gary Bolden (nail in tire manually inserted, no road wear on nail head)

-Robert Morton (Analysis of crime scene, with limitations noted in Docket 1071 pg. 12)

-FBI SA Holly Steeves (Analysis of Belisle's work computer)

-Angelo Toglia (reconstruction/graphic animation of suspect vehicle at T-2, and comparisons of videos of April 12 and 19).

-Robert Shem (Analysis of bullets from victims and type of firearm that fired the bullets.)

[4] As of August 20, 2019, the United States has advised the defense it will not be calling expert Lalit Methsa in its case in chief at trial. There are no other United States' experts, the foregoing list reflects those experts who testified in another proceeding save for expert witness Rick Wyant.

*United States v. Wells*
3:13-cr-00008-SLG

## II.    POTENTIAL LEGAL/EVIDENTIARY ISSUES

The United States recognizes that this court has done an extraordinary amount of work pretrial in order to ensure the orderly progression of evidence and to further ensure minimal disruption. Having said that, the following points are provided for further review consideration on items not yet briefed.

### A.  Defendant's False Alibi

#### *Generally*

Federal Rule of Criminal Procedure 12.1 sets forth the procedures governing an alibi defense.  Under the Rule, the defense must, within 14 days of a request by the government, provide: 1) each specific place where the defendant claims to have been at the time of the commission of the offense; and 2) the name, address and telephone of number of each witness the defense intends to call in support.  FRCrP 12.1(a).  The rule allows a defendant "unfettered discretion" both to elect to present an alibi defense and to withdraw the defense without penalty.  FRCrP 12.1(f); *Williams v. Florida*, 399 U.S. 78, 84 (1970) (interpreting similar Florida rule).  Defendant provided such a Notice.  Dockets 106, 118.  Wells has provided an alibi defense to the United States but he has not listed any witnesses that he claims could provide testimony as to where he was during the missing 34 minutes when the murder was committed.

#### *Inconsistent Alibis*

Although the defendant initially provided the "flat tire" alibi to investigators, it is now very clear that the defendant has conjured up another alibi in order to plug the 34

minute gap which, when questioned by investigators, had caught him unprepared. Consequently, it's clear that the defendant may offer an enhanced or different alibi at trial – bowel troubles required him to make an urgent visit to a restroom near the airport on the morning of the murders and that some type of 'embarrassment' caused him not to reveal to investigators during questioning that he had defecated in his pants during the 34 minute gap.

As briefed by the United States and ruled upon by this court at Docket 1005 this will be a very real issue at trial. The United States is continuing to assess this defense and the statements made by the defendant to others, including the defendant's notice of alibi that the stopped at Servant Air, which, as of the last trial, was not proven.

FRCP 12.1 does not permit a defendant to "defer until the moment of his testifying the election between alternative and inconsistent alibis." *Id.* at 85, n. 15, *citing with approval State ex rel Simon v. Burke*, 163 N.W. 2d 177, 181 (Wisc. 1968). A defendant cannot use the alibi procedures as a means of hampering the court's search for truth. *Id.* Nor as the government briefed, can hearsay be used as a supplement for the defendant's own testimony.

### *Representations of Attorney Binding on Defendant*

Any representations to the Court made by defense counsel regarding the defendant's alibi may also be introduced by the Government and the defense counsel provided the government with a notice of its alibi defense. Under Federal Rule of Evidence 801(d)(2)(D), courts routinely allow statements by a defendant's attorney to be

introduced as admissions by a party opponent. *United States v. Benson*, 947 F.2d 1353, 1356 (9th Cir. 1991) (counsel's admission in closing that defendant filed no tax return barred litigating lack of government's evidence on issue); *Magallanes-Damian v. INS*, 783 F.2d 931, 934 (9th Cir. 1986) (absent egregious circumstances, parties are generally bound by admission of attorney); *see also Oscanyan v. Arms Co.*, 103 U.S. 261, 263 (1880) ("any fact, bearing upon the issues involved, admitted by counsel, may be the ground of the court's procedure equally as if established by the clearest proof").

In *United States v. Butler*, 496 Fed.Appx. 158 (3rd Cir. 2012), defendant's attorney, both in conversations with police and during a pretrial hearing, stated that the defendant had fired the gun, but had not intended to fire it at the police. 496 Fed.Appx. at 159. At trial, the court ruled that, should the defendant put on a defense inconsistent with those statements, the prosecution would be allowed to introduce the attorney's statements as rebuttal. *Id.* The Third Circuit held that "statements by counsel, which had been made on the record in the course of pretrial proceedings in the present case, were admissible under § 801(d)(2)(D)." *Id.* at 160-61; *see also, United States v. Joseph*, 483 Fed.Appx. 146, 149-50 (6th Cir. 2012) (admitting defense attorney statements made to IRS during tax fraud investigation); *United States v. Amato*, 356 F.3d 216, 218-19 (2nd Cir. 2004) (pre-trial letter written by defense counsel introduced to rebut witness' inconsistent testimony).

Here, although the defendant may withdraw his alibi at any time without penalty, walking this line with a now supplemented alibi, and waiting until the last possible

minute to decide which side to take should not be permitted. If the defense takes a position which is inconsistent with previous representations to the court, the government should be allowed to introduce the prior representations to impeach the testimony. This could include opening statements by counsel in the other proceeding.

### Prior Consistent Statements

As part of his alibi, the defendant may seek to introduce prior statements which are consistent with the alibi. FRE Rule 801(d)(1)(B) permits the introduction of prior consistent statements, but "only when those statements were made before the charged recent fabrication or improper influence or motive." *Tome v. United States*, 513 U.S. 150, 167 (1995). Statements made by defendant after he became aware of the government's investigation are inadmissible. *United States v. James*, 344 Fed.Appx. 382, 384 (9th Cir. 2009) (statement made after federal agents searched defendant's home); *United States v. Bao*, 189 F.3d 860, 864 (9th Cir. 1999) (statement made after search of defendant's home, but before defendant was told he was a suspect).

### B. Defendant's Exculpatory Statements/Admissions

At trial, the government may introduce prior statements of the defendant as substantive evidence. FRE 801(d)(2)(A); *United States v. Swenson*, 2014 WL 349559, *1 (D. Idaho 2014). Any exculpatory statements made by a defendant are, however, hearsay, and are not admissible through other witnesses. *See United States v. Ortega*, 203 F.3d 675, 682 (9th Cir. 2000). In addition, FRE 106, the rule of completeness, does not compel admission of otherwise inadmissible hearsay evidence. *Ortega*, 203 F.3d at

*United States v. Wells*
3:13-cr-00008-SLG

37

682; *United States v. Caldicott*, 92 F.3d 973, 983 (9th Cir. 1996).

<u>*Demonstrative Evidence*</u>

The government intends to use charts and PowerPoint presentations to summarize relevant evidence in the case, both with fact and expert witnesses. The use of summaries is governed by Fed. R. Evid. 611(a) (demonstrative summaries), and Fed. R. Evid. 1006 (summaries of evidence).

"When considering the admissibility of summary exhibits, it is critical to distinguish between charts or summaries as *evidence* and charts or summaries as *pedagogical devices*." *United States v. Wood*, 943 F.3d 1048, 1053 (9th Cir. 1991) (emphasis in original). Charts and summaries "as evidence" are governed by Fed. R. Evid. 1006, which permits their introduction if composed "of voluminous writings, recordings, or photographs which cannot conveniently be examined in court[.]" *Id.* To be admissible, "[t]he proponent of a summary must establish a foundation that: (1) the underlying materials upon which the summary is based are admissible in evidence; and (2) the underlying documents were made available to the opposing party for inspection." *Paddack v. Dave Christensen, Inc.*, 745 F.2d 1254, 1259 (9th Cir. 1984). These materials must be admissible, but need not themselves be admitted into evidence. *United States v. Meyers*, 847 F.2d 1408, 1412 (9th Cir. 1988).

In contrast, charts or summaries of testimony or documents already entered into evidence are merely pedagogical devices, and are governed by FRE 611(a). Summaries are admissible under FRE 611(a) when they contribute "to the clarity of the presentation

to the jury, avoid[ ] needless consumption of time and [are] a reasonable method of presenting the evidence." *United States v. Gardner*, 611 F.2d 770, 776 (9th Cir. 1980). These summaries may be more "one-sided" in their presentation of the evidence. *United States v. White*, 737 F.3d 1121, 1135 (7th Cir. 2013); *United States v. Nolberto Pena*, 213 F.3d 634, *3 (4th Cir. 2000) (display of photographs admissible despite defense complaints that arrangement made certain defendants look more culpable).

The government must lay a foundation for the summary evidence outside of the presence of the jury, the defendants must be provided an opportunity to review the summaries prior to their admission, and the court should give limiting instructions informing the jury that the summary is not admissible as substantive evidence. *United States v. Olano*, 62 F.3d 1180, 1204 (9th Cir. 1995).

"As jurors have become more visually oriented, counsel in modern trials seek to persuade them with an ever-expanding array of objects, maps, charts, displays, summaries, video reconstructions, computer simulations, and so on." *Baugh ex rel. Baugh v. Cuprum S.A. de C.V*, 730 F.3d 701, 706 (7th Cir. 2013); *see also United States v. Salerno*, 108 F.3d 730, 744-45 (7th Cir. 1997) (allowing jury to walk up to scale model for better viewing). The use of PowerPoint and similar computer presentations during a criminal trial does not violate a defendant's right to a fair trial. *Smith v. Hawaii*, 2007 WL 1853982, *8 (D. Hawaii 2007) (PowerPoint presentation during opening statements and closing arguments); *see also Ammons v. Lewis*, 2012 WL 6645034, *14-15 (C.D. Calif. 2012) (finding only *one slide* of presentation should not have been used because it

appeared to quantify "reasonable doubt").

In *Verizon Directories Corp. v. Yellow Book USA, Inc.*, 331 F.Supp.2d 136 (E.D. N.Y. 2004), the court undertook an extensive analysis of the admissibility of computer generated pedagogical devices and concluded that such devices should be admitted, subject to Fed. R. Evid. 402 and 403, including simulations, models and enhanced images. 331 F.Supp.2d at 137-44. In *Livingston v. Isuzu Motors, Ltd.*, 910 F.Supp.1473 (D. Mont. 1995), the court admitted a computer accident simulation developed by the expert after "studying a wide variety of experimental vehicles, in various situations, equipped with sensors and data recorders [and then] putting various data, such as physics equations, vehicle dimensions, road conditions, and vehicle movements, into computers to reach a simulation of the events involved in the subject accident." *Id.* at 1495; *see also United States v. Wright*, 412 Fed.Appx. 993, 994 (9th Cir. 2011) (demonstrative aid for fingerprint expert); *United States v. Soulard*, 730 F.2d 1292, 1300 (9th Cir. 1984) (allowing charts to be used as visual aid for testimony and closing, but not admitted into evidence).

### C. Spousal Privilege

It may be possible that the defendant's spouse, Nancy Wells, will be called by the defense or that, if the defendant chooses to take the stand, he will testify concerning communications he had with Mrs. Wells.

*Generally*

Fed. R. Evid. 501 provides that "the privilege of a witness [or] person ... shall be governed by the principles of the common law as they may be interpreted by the courts of

the United States in the light of reason and experience." Courts recognize two privileges in a marital relationship: 1) the "anti-marital facts" privilege, which allows a witness to refuse to testify against his or her spouse, *see Trammel v. United States*, 445 U.S. 40, 53 (1980); *United States v. White*, 974 F.2d 1135, 1138 (9th Cir. 1992); *United States v. Montgomery*, 384 F.3d 1050, 1056 (9th Cir. 2004) (witness spouse alone holds privilege and may waive it); and 2) the "marital communications" privilege, which provides that "[c]ommunications between the spouses, privately made, are generally assumed to have been intended to be confidential, and hence they are privileged . . . ." *Wolfle v. United States*, 291 U.S. 7, 14 (1934). This privilege (1) extends to words and acts intended to be a communication; (2) requires a valid marriage; and (3) applies only to confidential communications, i.e., those not made in the presence of, or likely to be overheard by, third parties. *United States v. Marashi*, 913 F.2d 724, 729-30 (9th Cir. 1990). This privilege may be invoked by either spouse. *United States v. Carlson*, 946 F.3d 1115, 1125 (9th Cir. 2013).

These marital privileges "obstruct[ ] the truth-seeking process," and have been construed narrowly "because of society's strong interest in the administration of justice." *Marashi*, 913 F.2d at 730; *Harris v. New York*, 401 U.S. 222, 225-26 (1971) (privileges "cannot be perverted into a license to use perjury by way of defense, free from the risk of confrontation with prior inconsistent utterances.")

### *Mrs. Wells' Testimony*

If Mrs. Wells chooses to testify, she has waived the privilege and cannot refuse to

answers questions from the government, except that she is not required to disclose actual communications between herself and the defendant.  *United States v. Brock*, 724 F.2d 817, 823 (7th Cir. 2013); *see also United States v. Artates*, 2013 WL 321574, *2 (D. Hawaii 2013) (in severed trials, defendant could not testify against wife in his own trial, then claim privilege in wife's trial).  Privileges may not be used as both a sword and a shield.  *See United States v. Kerr*, 2013 WL 4430917, *3 (D. Ariz. 2013) (in case where attorney-client privilege was asserted, defense could not assert "reliance on counsel" defense in opening, then prevent government from calling tax attorney),  *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1162 (9th Cir. 1992) ("Chevron argues that Pennzoil waived the [attorney-client] privilege by using advice of counsel both as a sword to defeat Chevron's tax arguments, and as a shield to protect against disclosure of the basis for Pennzoil's affirmative defense.  This argument has merit.")

    *Defendant's Testimony*

    Should the defendant choose to take the stand, he waives the marital communications privilege in so far as it covers Mrs. Wells' ability to affirm or contradict his testimony.  *United States v. Renzi*, 2010 WL 582100, *10 n. 2 (D. Ariz. 2010) (defendant may waive privilege by testifying as to privileged conversations); *United States v. Nichols*, 594 F.Supp.2d 1116, 1124-25 (C.D. Calif. 2008) ("The marital communications privilege does not preclude the introduction of privileged communications for impeachment insofar as the defendant's testimony constitutes waiver of the privilege."); *United States v. Benford,* 457 F.Supp. 589, 598 (E.D. Mich. 1978)

(testifying defendant waives marital privilege "surrounding the substance of his testimony").

### Statement Used to Question Witnesses

The defendant waives the privilege if he should use any of his wife's statements during cross-examination of government witnesses. *United States v. Burkhart*, 501 F.2d 993, 995 (6th Cir. 1974).

### Statements to Investigators

Any spousal communications which were communicated to investigators by either the defendant or Ms. Wells operate as a limited waiver of the privilege. *United States v. Mendelsohn*, 896 F.2d 1183, 1188 (9th Cir. 1990) (defendant made limited waiver of attorney-client privilege by telling investigators the advice he received from his attorney.)

## D. Character Witnesses

The defendant may present character witnesses to testify concerning their opinion of the defendant's character for truthfulness and honesty or his reputation for the same in the community. Such testimony opens the door for cross examination concerning whether the witness is aware of certain things or has heard of certain things. *See, e.g., United States v. Bush*, 58 F.3d 482, 488-89 (9th Cir. 1995) (witness who has endorsed the character of the defendant may be cross-examined about whether he has heard about prior bad acts of the defendant); *United States v. Gillespie*, 852 F.2d 475, 479-80 (9th Cir. 1988).

Of course, the government must have a good faith factual basis for the questions

asked and the incidents raised during cross-examination of the witness. *United States v. Davenport*, 753 F.2d 1460, 1463-64 (9th Cir. 1985) (good faith belief in conduct of defendant which is to be subject of question must be established to satisfaction of the court outside presence of jury before asked).

Assuming that the defendant elicits opinion or reputation testimony from government witnesses on cross-examination, or presents the same sort of evidence through the testimony of his own witnesses on direct examination, the government should be entitled to ask questions that are relevant to such witnesses' opinions. These include inquiring if they are aware of certain specific instances, including, but not limited to, the defendant's prior bad acts. *See, e.g., United States v. Warren*, 561 F.2d 763, 772 (9th Cir. 1977); *United States v. Moore*, 27 F.3d 969, 974 (4th Cir. 1994) (in prosecution for bank fraud, once defendant introduced evidence of his trustworthiness and dependability in business matters, he "opened the door" to rebuttal by the government by inquiring on cross-examination into relevant instances of conduct); *United States v. Jordan*, 722 F.2d 353, 359 (7th Cir. 1983).

### E. April 12, 2012 Phone Calls

The United States plans to introduce one audio telephone call made from Building T2 to the Communications Watch Officer at Building T1 immediately following discovery of the bodies at Building T2.

The admission of telephone calls to emergency responders does not violate the Confrontation Clause of the Sixth Amendment or *Crawford v. Washington*, 546 U.S. 975

(2005). *Davis v. Washington*, 547 U.S. 813, 822 (2006) ("A 911 call, on the other hand, and at least the initial interrogation conducted in connection with a 911 call, is ordinarily not designed primarily to "establis[h] or prov[e]" some past fact, but to describe current circumstances requiring police assistance.")  As such, the calls are admissible under the "excited utterance" exception in Federal Rule of Evidence (Fed. R. Evid.) 803(2).  *United States v. Gomez*, 472 Fed.Appx. 601, 603 (9th Cir. 2012) (approving admission of statements to dispatcher "made almost immediately after" caller first discovered the victim); *United States v. Zaragoza*, 349 Fed.Appx. 220 (9th Cir. 2009), *citing United States v. Hills, Jr.,* 455 F.2d 504, 505 (9th Cir. 1972) (admission of a police operator's testimony was a "correct application of a well-known exception to the hearsay exclusionary rule").  Emergency calls have also been admitted under the "present sense impression" exception of Fed. R. Evid. 803(1).  *United States v. Presley*, 2008 WL 189565, *4 (W.D. Wash. 2008) (admitting wife's statement that husband "was deleting child pornography from his computer and that [he] was 'scaring the crap out of' her").

### F.  Opinion Testimony by Lay Witnesses

Fed. R. Evid. 701 permits admission of opinions or inferences of a lay witness which are rationally based on the perceptions of the witness and helpful to a clear understanding of the witness's testimony or a fact in issue.  Thus, a witness may testify, based on personal observation, about the various roles played by persons involved in illegal conduct.  *United States v. Fleishman*, 684 F.2d 1329, 1335-6 (9th Cir. 1982).  The investigators in this case may be called upon to discuss their observations and the steps in

their investigation.  The investigators may also be called upon to discuss their approach and reaction to the defendant and other witnesses based upon their training and experience.

### G. Transcripts

As stated above, the United States will provide copies of transcripts previously discovered to the defendant of the audio recordings it will use at trial.  It is generally accepted in the Ninth Circuit and elsewhere that transcripts may be provided to aid the jury while an audio recording is being played.  *United States v. Delgado*, 357 F.3d 1061, 1070 (9th Cir. 2004); *United States v. Franco*, 136 F.3d 622, 626 (9th Cir. 1998).  The United States requests that a proper instruction be provided to the jury, as outlined in the Ninth Circuit Manual of Model Jury Instructions.

### H. Stipulations

The government and defense are discussing and may enter into stipulations regarding certain evidence.  Those stipulations will be made known to the Court prior to trial.

CONCLUSION

In the event additional matters arise of import to the trial the United States will so inform the court. As of this writing, the United States anticipates calling approximately 58 witnesses, who will introduce approximately 230 Exhibits. The United States expects this trial to last at least a month, depending on the defense case, if any, and the length and extent of their cross-examinations.

*United States v. Wells*
3:13-cr-00008-SLG

RESPECTFULLY SUBMITTED August 23, 2019, in Anchorage, Alaska.

BRYAN SCHRODER
United States Attorney

s/Steven E. Skrocki
STEVEN E. SKROCKI
Assistant U.S. Attorney
United States of America

**CERTIFICATE OF SERVICE**

I hereby certify that on August 23, 2019, a
true and correct copy of the foregoing was
served electronically on:

Counsel of Record

s/ Steven E. Skrocki
Office of the U.S. Attorney

*United States v. Wells*
3:13-cr-00008-SLG