Gary G. Colbath
Assistant Federal Defender
FEDERAL PUBLIC DEFENDER
FOR THE DISTRICT OF ALASKA
425 G Street, Suite 800
Anchorage, Alaska 99501
Phone: (907) 646-3400
Fax: (907) 646-3480
Email: gary_colbath@fd.org

Peter A. Camiel
Law Offices of Camiel & Chaney P.S.
5200 Pike Street, Suite 2500
Seattle, WA 98101
Phone: (206) 624-1551
Email: petercamiel@yahoo.com

*Attorneys for Defendant James Michael Wells*

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>vs.<br><br>JAMES MICHAEL WELLS,<br><br>        Defendant. | Case No. 3:13-cr-00008-SLG<br><br>**DEFENDANT'S TRIAL BRIEF** |

Defendant James Michael Wells, through counsel Gary G. Colbath and Peter A. Camiel, submits this brief to assist the Court at trial scheduled for September 9, 2019.

## I.    FACTS

Jim Wells is a 67-year old man who has devoted most of his adult working life to military service. After graduating from high school, Wells served in the United States Navy from 1969 until 1977. After receiving an honorable discharge from the

Navy, Wells enlisted with the United States Coast Guard (USCG). He served in the USCG until 1990. In 1990, Wells was medically discharged. Within a year, however, Wells assumed a civilian post with the USCG where he worked until the time of the murders in this case. Wells worked as a civilian for the USCG for 24 years. Wells has experienced a number of health issues while working at the USCG, including diabetes, tinnitus, digestive track issues and idiopathic anaphylaxis.

On April 12, 2012, Wells' coworkers, USCG Electrician's Mate First Class James Hopkins and retired Chief Boatswain's Mate Richard Belisle, were shot and killed shortly after they arrived at work at T-2. T-2 (the "rigger shop") was a USCG communications station shop facility located near the main Communications station COMMSTA, in Kodiak, Alaska. It was a small building where Hopkins oversaw Wells and Belisle and several recently enlisted USCG non-rates. "Non-rates" are coast guard members who have not yet chosen their specialization. The T-2 building had a small office area and a work shop where the workers at T-2 performed antenna repair work for towers around the state. The T-2 building is located along Anton Larson Bay road, a non-secure public roadway.

While driving to work on April 12, 2012, Wells truck began pulling to the right as he drove along the highway leading to Anton Larson Bay road. Wells turned into the Kodiak airport grounds where he stopped and discovered his front driver's side tire had low air pressure. While out of the truck he entered an area flight service

building, used the restroom, and then returned to his truck. He drove home to change his tire. After changing his tire, Wells drove to work, arriving around 8:20 a.m.

USCG video footage taken from a camera located at the back of the T-1 parking lot on the morning of the homicides shows multiple cars coming and going from the area around T-2 near the time of the homicides. The video shows one particular car pass left to right travelling along Anton Larson Bay Road at approximately 7:09 a.m. A similar car passes back by the camera headed in the other direction at approximately 7:14 a.m. Nothing on the video suggests the car stopped at T-2.

The video, taken from almost a fifth of a mile away from Anton Larson Bay Road is very poor quality. FBI experts who repeatedly reviewed and analyzed the footage have not been able to identify the make or model of the unknown car. However, the government has hired other experts who claim that they can determine that the car in the video is consistent with a blue 2001 Honda CR-V owned by Jim and Nancy Wells.

Based on essentially this circumstantial evidence alone, the government has charged Wells with killing both of his coworkers in violation of 18 U.S.C. §§ 7(3) and 1111(a) & (b); 18 U.S.C. §§ 1114 and 1111; and 18 U.S.C. §§ 924(c)(1)(A) & (B)(ii) and 924(j)(1). The retrial in this matter is scheduled for September 9, 2019.

//

//

## II. THE GOVERNMENT'S CASE

There were no eyewitness to the murders. There were no eye witnesses who saw Wells near T-2 around the time of the murders. There were no eye witnesses who saw Wells in or near his wife's 2001 Honda CR-V on the day of the murders. Wells made no confession. The murder weapon has never been found. Despite extensive law enforcement investigation and testing of items collected from the crime scene, Wells' vehicles, Wells' home, Wells' person, and areas throughout the community thought connected in some way to Wells, no physical evidence linking Wells to the crime exists. Indeed, much of the testing has excluded Wells or particular items from being involved in the crimes.

Although law enforcement conducted a myopically focused, thorough investigation centered on Wells including every aspect of his life, work history, and family, the investigation failed to really produce any evidence tending to show Wells' had a motive to commit the murders or was involved in any way. During its investigation, however, law enforcement ignored or bypassed virtually all other suspects, leads, and hypothesis regarding the murders to the exclusion of its singular focus on Wells. Although the investigation produced no real substantive links to Wells after almost a year of intense surveillance and investigation, Wells was arrested and charged with the crimes which he now faces at trial.

In spite of the lack of evidence linking Wells to the murders, the government has proposed testimony from numerous experts to support its case. One such expert, Robert Morton, a former behavioral analysis with the FBI will undoubtedly purport to offer testimony about what the profile of someone who would kill their coworkers would look like. This testimony, retooled on retrial as "crime scene analysis" will pave the way for the government's motive theory. That theory, premised on the idea that Wells' somehow felt increasing pressure from USCG Command and a loss of stature within the T-2 workplace, is built on a series of Rule 404(b) workplace incidents which amount to no more than trivial workplace occurrences commonly experienced by most who have worked for a long period in a large work force environment.

The other primary group of experts relate to the 2 seconds of T-1 camera video footage that depicts a blurry dark vehicle that passes T-2 on Anton Larson Bay Road near the time of the murders. Although the footage is limited to approximately 1 second of video taken of the vehicle travelling in each direction on the road about 5 minutes apart, the government plans to call no less than four experts to provide hours of testimony and dozens of exhibits in order to say that the vehicle is consistent with a vehicle owned by Wells. This proposed expert testimony attempts to fill in the gaps of the government's investigation and uttered and complete lack of all other evidence linking Wells to the murders. However, a majority of this testimony is neither demonstrably relevant nor reliable.

## III. OUTSTANDING LEGAL ISSUES

The Court has determined several issues during pretrial motions practice relevant to the evidence that will be permitted at trial. The government admitted at the first trial a law enforcement created video purporting to show how a vehicle exchange could have happened at the Kodiak airport to facilitate travel to the murder scene. The government has indicated it will NOT offer this evidence on retrial. The court acknowledged that indication by way of order at Dk. 1057.

The defense moved to exclude the irrelevant testimony of John and Terry Stein. The Court denied this motion, as well as a motion to exclude the testimony of related witnesses Robert Pletnikoff and Luke Robinson, at Dks. 1062 and 1147. However, in doing so, the Court cautioned the government "to avoid stating or implying that the Stein revolver was, in fact, the firearm used in the homicides . . .[and only indicate that the] revolver fits into of a category of firearms that could have been used in the commission of the homicides." The Court determined that "referring to the Stein revolver as being the murder weapon or the likely murder weapon would be an improper reference to facts not in evidence."

The government moved to exclude the testimony of basically all of the noticed defense experts. The Court denied these motions, save for the motion related to expert Chris Coleman. Dk. 1070. The Court determined that each expert could testify for essentially the purposes for which their testimony was noticed, and relates

to the four corners of the testifying expert's report or information fairly derived from such reports. The defense intends to call each expert covered by the Court's order.

The defense moved separately to exclude a number of government experts, including Robert Morton. With respect to Morton's testimony the Court determined that it "will not allow Mr. Morton to testify to the following:

• Materials presented in Mr. Morton's October 11, 2013 report that are not included in his November 30, 2018 report. The Court will hold the government to its assertion that Mr. Morton is only going to testify as to facts, conclusions, and opinions that are found in his supplemental (November 30, 2018) report.

• As to the supplemental report, the conclusions that the offender "drove to the building." The Court is aware of no eyewitness who will testify or video that shows that the vehicle seen in the T-1 video stopped at the T-2 building (or correspondingly ever left the T-2 building). Mr. Morton may refer to the T-1 video but may not definitively state that the relevant vehicle is being driven to or leaving the T-2 building.

• The conclusion "Mr. Belisle was not concerned about the person who entered" the T-2 building This conclusion is too speculative and unreliable to be admissible. This conclusion is based on the victim having his back to the perpetrator, which could have been caused by the victim attempting to run away, simply turning away from an armed threat, or not hearing the perpetrator enter the T-2 building. Mr. Morton has not sufficiently explained how he concluded that the victim was not alarmed.

• The conclusion that the offender's use of a large-caliber weapon was "to ensure the death of the victims." Mr. Morton has provided almost no justification for this conclusion. This conclusion also improperly implies that Mr. Morton has special insight into the mind of the perpetrator."

The Court also ruled that "[p]rior to Mr. Morton opining to the jury that the homicides were "personal cause homicides," the government must make application to the Court outside the presence of the jury to establish that Mr. Morton can reach this opinion in light of the restrictions on his testimony. See. Dk. 1071.

With respect to government expert Rick Wyant the Court determined to allow such testimony but noted that "[t]he Court expects the direct examination of Mr. Wyant to be brief, as he may not testify beyond what is shown and discussed in the video." The government did, as a result of the Court's order, provide the defense with a transcript of the audio portion of the video.

The defense moved to exclude a number of areas of general character testimony presented by the government at the first trial. See Dk. 1074. These included the following 12 statements, or testimony similar in substance to them: testimony describing Mr. Wells as (1) having "a poor attitude;" (2) "quite conceited at times;" (3) "only receptive to change if he had played a part in coming up with the change;" (4) not known to be the kind of person who did "as you're told;" (5) "view[ing] himself as extremely knowledgeable;" (6) taking "pride in his role" in the antennae tower community as shown by his "strut[ting] at conferences;" (7) "just set in the way he would do things"; (8) "difficult at times;" (9) "not real good at sharing the information he had;" (10) "difficult" and "set in the way he would do things;" (11) "more difficult to work with than the other [employees];" and (12) a "narcissist." The Court ruled that all but item (6) of these character opinions (or substantially similar expressions of these opinions) were admissible but noted the government's acknowledgement that it will not be eliciting opinions (2), (3), and (12). However, the Court also determined that "the government shall not expand character evidence testimony beyond the

limited evidence identified in this order of Mr. Wells' character in the workplace unless it first makes application to the Court outside the presence of the jury."

The defense moved to exclude various incidents proffered by the government under Rule 404(b). The Court ruled on the motion at Dk. 1081. The Court determined that in admitting evidence related to the misuse of a government fuel card, "[t]he government should focus its presentation of the fuel card incident on Mr. Wells' reaction to the letter of caution and not dwell on the actual underlying incident of the use of the fuel card being or minute details of the investigation." Also, the Court excluded evidence of "prior acts [from] the June 2011 disagreement about whether to install bird diverters and Mr. Wells' lack of participation in creating an 'antenna book,' which began no later than 2010."

Outstanding for the Court to decide is the defense's motion to exclude an April 19, 2012 Driving Experiment Video using the Wells' Honda CR-V which law enforcement created as a "non-scientific, investigative aid" purportedly to see "if we could determine anything about the speed of the (the unknown) vehicle and to see if we were on the right track with the investigation." See, Dk. 1012. The Court has provided a preliminary notice regarding some of the content of the anticipated ruling on this motion and apparently will decide the issue in full by August 30, 2019. The defense will of course abide by whatever terms the Court orders relative to the April 19 video. The defense would reiterate that despite presenting testimony showing only that this video was not scientifically created and was done for a very limited

purpose, the government seeks to use the video as substantive evidence at trial intertwined in the scientific testimony of numerous expert witnesses who rely on various aspects of the video material to make scientific extrapolations, comparisons and evaluations.

During trial preparation, the defense has also identified several minor evidentiary matters that it will file in a separate omnibus motion in limine to alert the Court and government to these issues and permit some pretrial discussion of the same so as to avoid unnecessary delay during trial. Each of the matters are issues that could simply be objected to during the course of trial, however, pretrial assessment of them provides the Court notice of them and seems the more efficient process with which to deal with them at this point.

### IV. WITNESSES

As the defense has no burden at trial and cannot fully anticipate which witnesses it will call at trial. However, the defense anticipates exchanging its potential witness list with the government no later than the morning of September 9, prior to the start of trial.

### V. JURY ISSUES

Counsel has submitted proposed voir dire questions for the Court to consider in the court's voir dire process. Counsel would request two hours of allotted time for counsel to voir dire the panel in addition to the voir dire conducted by the Court. The

trial of this matter involves the death of two on duty military employees in their workplace. This case is old, it was previously tried to another local jury and has received much publicity. The crimes themselves give rise to serious issues beyond what jurors may normally be asked to consider during trial. The case will involve potentially 100 plus witnesses and extensive expert testimony spanning a total of approximately four weeks. Wells' lifetime liberty is at stake. Two hours of attorney questions with the potential veneer is not unreasonable under the circumstances.

Defense counsel has also submitted proposed jury instructions detailed to the extent possible at this stage of the proceedings. However, counsel reserves the right to withdraw or modify any proposed instruction or propose new and additional instructions depending on further rulings of the Court and the evidence presented at trial. The defense will provide further requested limiting instructions to be given at trial as the evidence and Court's rulings demand.

DATED this 23rd day of August, 2019.

Respectfully submitted,

*/s/ Gary G. Colbath*
Gary G. Colbath
Assistant Federal Defender

Certificate of Service:
I hereby certify that I electronically filed the foregoing and any attachments with the Clerk of Court for the United States District Court for the District of Alaska by using the district's CM/ECF system on August 23, 2019. All participants in this case are registered CM/ECF users and will be served by the district's CM/ECF system.
*/s/ Gary G. Colbath*

*/s/ Peter A. Camiel*
Peter A. Camiel WSBA 12596
Attorney for Defendant

*Attorneys for James Michael Wells*