```
 1                UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF ALASKA
 2

 3   UNITED STATES OF AMERICA, )
                              )
 4        Plaintiff,          )
                              )
 5   vs.                      )   CASE NO. 3:13-cr-00008-SLG
                              )
 6   JAMES MICHAEL WELLS,     )
                              )
 7        Defendant.          )
     _____)
 8
```

```
 9        PARTIAL TRANSCRIPT OF TRIAL BY JURY - DAY 2
                  (Testimony of Scott Reckner)
10   BEFORE THE HONORABLE SHARON L. GLEASON, DISTRICT JUDGE
                  September 10, 2019; 8:37 a.m.
11                      Anchorage, Alaska

12   FOR THE GOVERNMENT:
             Office of the United States Attorney
13           BY:  STEVEN SKROCKI
             BY:  CHRISTINA M. SHERMAN
14           BY:  KELLEY L. STEVENS
             222 West 7th Avenue, #9
15           Anchorage, Alaska 99513
             (907) 271-5071
16
     FOR THE DEFENDANT:
17           Office of the Federal Public Defender
             BY:  GARY GEORGE COLBATH
18           601 West 5th Avenue, Suite 800
             Anchorage, Alaska 99501
19           (907) 646-3400

20           Camiel & Chaney, P.S.
             BY:  PETER A. CAMIEL
21           520 Pike Street, Suite 2500
             Seattle, Washington 98101
22           (206) 624-1551

23   _____

              SONJA L. REEVES, RMR-CRR
24           Federal Official Court Reporter
               222 West 7th Avenue, #4
25             Anchorage, Alaska 99513
         Transcript Produced from the Stenographic Record
```

1          (Call to Order of the Court at 8:37 a.m.)

2          (Proceedings took place and are not included in

3     this transcript, after which, the testimony of Scott

4     Reckner transpired as follows:)

5          (Oath administered to the witness)

6          DEPUTY CLERK:  For the record, can you please

7     state your full name and then spell your full name.

8          THE WITNESS:  Scott Allen Reckner, S-c-o-t-t

9     A-l-l-e-n, R-e-c-k-n-e-r.

10                    DIRECT EXAMINATION

11    BY MR. SKROCKI:

12        Q.  Good afternoon, Mr. Reckner.

13        A.  Good afternoon.

14        Q.  Sir, if you could tell the jury who you work for.

15        A.  United States Coast Guard.

16        Q.  And please tell them how long you've worked for

17    the Coast Guard.

18        A.  23 years altogether.

19        Q.  And how did you start in the Coast Guard, sir?

20        A.  I came in in 2003 after being prior service Navy

21    and Army.

22        Q.  And how long in both Army and Navy collectively?

23        A.  Three years in the Navy, four years in the Army.

24        Q.  And you went into the Coast Guard after that?

25        A.  I did.

1    Q.  About what year?

2    A.  2003.

3    Q.  Sir, did you find yourself in Kodiak in April of

4    2012?

5    A.  I did.

6    Q.  How did you get your -- how did you get to Kodiak

7    in terms of your Coast Guard assignment?

8    A.  Yep.  So I made chief petty officer in 2010 and

9    got orders to communication station Kodiak.

10   Q.  Are you nervous, Mr. Reckner?

11   A.  Say that again.

12   Q.  Are you nervous?

13   A.  A little bit.

14   Q.  You're speaking really fast, so I'm going to ask

15   you to slow down.

16   A.  Okay.

17   Q.  All right.  And what were you doing in the Coast

18   Guard prior to going to Kodiak?  What was your

19   assignment?

20   A.  I was stationed at Electronics Support Detachment

21   Cape Cod.

22   Q.  In Electronics Support Detachment, what were you

23   doing for them?

24   A.  Doing IT work.  Computers, networks, and phones.

25   Q.  And what -- why Kodiak, Alaska?

 1    A.  My first pick was taken by another chief, so

 2  Kodiak was my second.  I figured when am I ever going to

 3  get an opportunity to go to Alaska and let the Coast

 4  Guard send me.  So that's what we decided.

 5    Q.  Who did you bring with you to your Kodiak

 6  assignment?

 7    A.  My wife and three children.

 8    Q.  And how old were your kids?

 9    A.  At the time, we had a junior high and two

10  high-schoolers.

11    Q.  How did they take it?

12    A.  My middle daughter, when we told her at dinner,

13  stood up and ran to the bathroom crying.  She was not

14  thrilled.

15    Q.  When you were heading to Kodiak, what was your

16  understanding of your assignment and responsibilities

17  when you got there?

18    A.  Yes.  So I knew I would have the IT shop and also

19  the rigger shop.

20    Q.  So you mentioned two different things?

21    A.  Yes.

22    Q.  Let's talk about the IT shop briefly first,

23  please.  Tell the jury what the IT shop was all about.

24    A.  Sure.  So I had two ITs, an IT1 and IT2, E6 and

25  E5.  And their responsibility at the station was the

1   computers and networks, telephones, that kind of thing.

2       Q.   And you mentioned the rigger shop?

3       A.   Yeah.  So I also had the rigger shop.  And that

4   was -- the responsibility of the rigger shop was

5   primarily the antenna fields, the antenna structures,

6   maintaining those structures in the field, that kind of

7   thing.

8       Q.   Was this your first assignment to a

9   Communications Station?

10      A.   It was.

11      Q.   And prior to that, did you get any kind of

12  training to deal with towers and maintenance and things

13  of that nature?

14      A.   Sure.  Before I left Cape Cod, I got qualified to

15  climb to 300 feet.

16      Q.   That's a long ways up.

17      A.   It's pretty high.  We have higher, but it's

18  pretty high.

19      Q.   When you arrived at the Kodiak Communications

20  Station -- and I want to focus on the rigger shop.  What

21  was your rank, first of all?

22      A.   So I was the chief petty officer.  I was E7.

23      Q.   Did that change while you were there, or is that

24  the rank you kept?

25      A.   No, I left as a chief petty officer, E7.

1    Q.  Can you briefly tell the jury the distinction

2  between a chief petty officer and a lower rank would be?

3    A.  Sure.  So when you achieve the rank of chief

4  petty officer in the Coast Guard or the Navy or seagoing

5  services, you reach a higher level of responsibility,

6  not so much technical.  You are technical, but more of

7  taking care of your people, mentoring the folks that

8  work under you and training the next batch of chief

9  petty officers.

10    Q.  Is that something you took seriously?

11    A.  I did.

12    Q.  Were there men that you supervised in the rigger

13  shop when you arrived there in -- what year was that

14  when you arrived?

15    A.  2010.

16    Q.  So 2010 were the people you supervised when you

17  arrived in the rigger shop?

18    A.  Can you repeat that?

19    Q.  Sure.  As a -- you mentioned managing the rigger

20  shop?

21    A.  Yes.

22    Q.  Who were the men you supervised?

23    A.  So when I arrived, I had two civilians, Mr. Wells

24  and Mr. Belisle.  I had an ET1, Jim Hopkins.  I had an

25  ET3, Cody Beauford.  Then I had four, we call them

1  non-rates because they're not rated yet, four non-rates.

2      Q.  As to the non-rates, do they have a military

3  equivalent in some other branch?

4      A.  They would be like privates, you know, E2, E3s.

5      Q.  So non-rates would be a private, lower level?

6      A.  Right.

7      Q.  Okay.  You mentioned Mr. Hopkins, and you used

8  the term ET1.

9      A.  Yes.

10      Q.  Is that part of the Coast Guard vernacular as to

11  rank?

12      A.  Yeah.  So that's an abbreviation for electronics

13  technician, ET.

14      Q.  How long did you work with Mr. Belisle and

15  Mr. Hopkins?

16      A.  Almost two years.

17      Q.  Whenever you need to take a drink, go ahead.

18          And you worked with Jim Wells as well?

19      A.  Yes.

20      Q.  Do you see Mr. Wells here in court today?

21      A.  I do.

22      Q.  Where is he seated?

23      A.  Right there.

24      Q.  Pointing towards the defendant, end of the table?

25      A.  Yeah.  Right there in the white shirt.

1            MR. SKROCKI:  Let the record reflect

2    identification, Your Honor.

3            THE COURT:  So noted.

4            MR. SKROCKI:  If we could have the lights,

5    Madam Clerk.  Counsel, I'm going to put up four

6    exhibits.  For identification only, Blair.  15, 16, 220,

7    252, and I might as well add one more for 17.

8    BY MR. SKROCKI:

9        Q.  Mr. Reckner, did you have a chance to scan those

10   photos as they came up on your screen?

11       A.  I did.

12       Q.  Are you familiar with those photographs and what

13   they depict, sir?

14       A.  I am.

15       Q.  And you've seen those before coming into court

16   today?

17       A.  I have.

18       Q.  As to Exhibit 15 and 16, do you recognize

19   individuals in those photographs?

20       A.  I do.

21       Q.  Who are they?

22       A.  That one is ET1 Jim Hopkins and Rich Belisle.

23       Q.  And then 220, individual on the tower?

24       A.  That was a picture of Mr. Belisle that I took.

25       Q.  Okay.  And 252, what does that depict?

1     A.   252, can I see it again?  So that's myself,

2  Mr. Belisle and IT1 Newby doing tower training.

3     Q.   Let's go forward to 17, please, Blair.

4          Recognize the person in that photograph?

5     A.  I do.

6     Q.   And does that reflect Mr. Wells as he looked in

7  2012?

8     A.  Yes, sir, it does.

9     Q.   In the time that you supervised him from 2010 to

10  2012?

11     A.  Yes, sir, it does.

12          MR. SKROCKI:  Move for the admission of 15, 16,

13  17, 220 and 252.

14          MR. COLBATH:  I have no objection to any of

15  those, Your Honor.

16          THE COURT:  Those five will be admitted.  Go

17  ahead, please.

18          (Exhibit Nos. 15, 16, 17, 220 and 252

19  admitted.)

20          THE COURT:  You can go ahead and publish.

21          MR. SKROCKI:  Thank you, Judge.

22  BY MR. SKROCKI:

23     Q.   If we can put up number 15, please, Blair.

24          You recognize that man, sir?

25     A.   I do.

1    Q.   And who is that?

2    A.   That's ET1 Jim Hopkins.

3    Q.   And how long did you say you supervised him?

4    A.   Almost two years.

5    Q.   How much interaction did you have with

6   Mr. Hopkins in your day-to-day work during those two

7   years?

8    A.   So almost daily.  Not every day, but almost

9   daily.

10    Q.   In terms of -- you were his manager, as I

11   understand it?

12    A.   I was.

13    Q.   In terms of you being his manager, could you tell

14   the jury what kind of employee he was like, what was he

15   like to manage, how was he with the people downstream of

16   him?

17    A.   Sure.  So ET1 Hopkins was prior Navy like myself,

18   so we had that in common.  I thought he knew what he was

19   doing.  He was capable.  He was a good leader.  We

20   were -- I was mentoring on some things, but for the most

21   part, I was satisfied.

22    Q.   Was he the type of guy who would get his hands

23   dirty with the people he supervised?

24    A.   Yeah.  Jim Hopkins was the first guy in the

25   trench or a hole with a shovel or taking out rock or

whatever -- whatever the dirty work was, ET1 was not afraid to get in there with the troops and get it done.

Q. In terms of his management experience, prior to becoming ET1 at the rigger shop, what kind of management experience did he have?

A. I think he worked -- you know, he had some technicians who worked under him at some other units. I'm not 100 percent familiar. I know he was on the wave for a while, so he definitely would have had some technicians working for him on the cutter. So he definitely had supervisory experience. This wasn't his first time.

Q. Did he struggle in this position with the rigger shop to some extent?

A. I wouldn't say struggle. He was a little gruff sometimes with the non-rates. But you know, I looked into it and, I didn't think there was anything there.

Q. And if we go to 16, please.

And who is this, Mr. Reckner?

A. That's -- that's Mr. Rich Belisle.

Q. And you familiar with his work ethic and how he conducted himself on the job?

A. I am.

Q. Would you explain that to the jury, please?

A. Sure. Rich was a retired chief and, you know, he

took it -- he took it seriously.  He was a mentor to the

crew.  We had a lot of younger folks down there, and he

took it upon himself to work with them, help them,

whether it was rigger shop business or just in their

Coast Guard career in general.

    Q.  If we could look at 220, please, Blair.

       I believe you mentioned you took this paragraph,

Mr. Reckner?

    A.  I did.  That's my foot.

    Q.  That's your foot.  Okay.  Where were you when you

took this photograph?

    A.  We were in the tower.  We were climbing.  I can't

remember which tower, but we were climbing that day.

Rich was just down below me, and I took my cell phone

out and snapped a shot.

    Q.  And that's Mr. Belisle?

    A.  That's Mr. Belisle smiling.

    Q.  In a T-shirt?

    A.  Yes.

    Q.  Weather always that nice on Kodiak?

    A.  It was not.  That must have been a particularly

nice day.

    Q.  Exhibit No. 252, please.

       So can you explain to the jury what's going on

here in 252?

1   A.   Sure.   So that's a tower training class that Rich

2   was giving.   That's me in the red helmet performing a

3   rescue on IT1 Newby.   That's why he looks like a victim.

4   I'm kind of taking him down the tower safely under

5   Rich's supervision.

6   Q.   I want to give you a little bit of practice and

7   test with the laser pointer we have up on the desk just

8   to make sure.   We've already tested it once, but it's

9   one of these electronic days.   So let's have you point

10  out who's who in that photograph as a test, please.

11  A.   Yeah, that's me.   That's IT1 Newby, and that's

12  Mr. Rich Belisle.

13  Q.   Where was this photograph taken?   Where is this

14  training taking place?

15  A.   So there's a smaller tower right in front of

16  building T-1, the COMMSTA, and that's where we did that

17  training that day.

18  Q.   Go to Exhibit 17, please.

19       What's that's a photograph of, sir?

20  A.   That's Mr. Wells.

21  Q.   And how long were you -- you said you were a

22  supervisor for two years?

23  A.   Almost two years.   Yes, sir.

24  Q.   What kind of interaction did you have with them

25  on a daily basis for those two years?

1    A.   Again, almost daily.

2    Q.   Is there a reason, if we go back to 252,

3  Mr. Belisle is in a line-green shirt.  Do you have any

4  idea about that?

5    A.   I don't, no.

6    Q.   If we can turn off the jury's view, please, and

7  go for a foundational question with Mr. Reckner.  Show

8  him Exhibit No. 222.

9        Mr. Reckner, for foundational purposes, Exhibit

10  No. 222, are you familiar with that?

11    A.   I am.

12    Q.   What's depicted there?

13    A.   I am.

14    Q.   Does that depict the two buildings that comprise

15  the Communications Station on Kodiak when you were

16  there?

17    A.   It does.

18        MR. SKROCKI:  Move to admit 222.

19        THE COURT:  Any objection?

20        MR. COLBATH:  No, Your Honor.

21        THE COURT:  222 is admitted.

22        (Exhibit No. 222 admitted.)

23        MR. SKROCKI:  If we could publish.  I'm sorry,

24  Judge.  Do you want to do the publish or --

25        THE COURT:  No, you can go ahead and publish.

1   Once it's admitted you don't need to make that request

2   unless you need to to your staff.  That's fine.

3          MR. SKROCKI:  Yes, ma'am.

4   BY MR. SKROCKI:

5      Q.  Mr. Reckner, if you could grab the laser pointer

6   now that you're an expert with it.

7          Good.  On the right-hand side, there's a long

8   white building.  Do you see that?

9      A.  This one right here?

10     Q.  Yes.  Can you explain to the jury what that is?

11     A.  So that's what we call the T-1 building.  That's

12  where the command staff was, the OSs, the operators who

13  ran the radios.  We had an operations deck there.  So

14  they were.  And also the ETs had a shop up there.  Those

15  were the guys who worked on the radios, and ITs were up

16  there as well.

17     Q.  About how many people worked in that building,

18  roughly?  I'm not asking you for --

19     A.  On any given day, probably somewhere between 30

20  and 40.  We had 65 altogether at the COMMSTA, but some

21  of those were watch standards so they weren't always

22  there.  They had a rotation.

23     Q.  And where was your office when you first started?

24     A.  Sure.  When I first reported, I had an office up

25  in T-1.

1    Q.    That would be the building on the right?

2    A.    Yep.  This one right here.

3    Q.    Okay.  And you mentioned Communications Station.

4    Can you tell the jury what the role of the

5    Communications Station was then.

6    A.    Sure.  In a nutshell, Communications Station

7    Kodiak was kind of like the 911 of the Bering and the

8    Alaska area of responsibility.  So they would take calls

9    from mariners in distress.  They would take calls

10   communicating with Coast Guard aircraft and other

11   military aircraft, C-130s and helicopters as they were

12   transiting throughout the Alaska AOR.

13   Q.    So if there was a fishing boat in trouble on the

14   Bering and they did a Mayday, it would be received here?

15   A.    More than likely, yes.

16   Q.    So is there -- there are two components to the

17   communication parts of this.  What are they?

18   A.    Can you repeat the question?

19   Q.    Sure.  Someone sends in a Mayday, right, so you

20   receive?

21   A.    Yep.

22   Q.    Do you transmit as well?

23   A.    Correct.  So we had two sites.  That's the

24   transmission site, and it's the T.  We also had a

25   receive side, R2, and we had antennas that would

1   receive.  Then we had a microwave shot from R2 that

2   transmitted that radio signal over to this backboard

3   right there and it would -- the microwave would hit that

4   and then bounce down here somewhere to a receiver, and

5   then the operators could hear the call coming in.  When

6   they transmitted, they would use the towers that are out

7   here.  That call -- these calls would go out of these

8   towers.

9       Q.  There's several towers depicted there, correct?

10      A.  Yes.

11      Q.  And do you know the respective heights?  Do you

12  recall what they were?

13      A.  Sure.  So these four are 300 feet.  That one is

14  600.  And then these are 100, maybe 120, somewhere in

15  there.

16      Q.  And do they require maintenance?

17      A.  They do.

18      Q.  And what part of the Communications Station was

19  responsible for the maintenance?

20      A.  So that was the rigger shop's responsibility.

21      Q.  Can you identify where the rigger shop is on this

22  photograph?

23      A.  I can.  So that's T-2, otherwise known as the

24  rigger shop.

25      Q.  So you're still speaking pretty quick.  So I want

1   to slow you down a little bit.

2       A.   Okay.

3       Q.   Can you for the jury -- they're going to be

4   hearing a lot of names over the next couple of weeks --

5   list, when you were there, particularly in April of

6   2012, the names of the individuals that were employed in

7   the rigger shop?

8       A.   Okay.  So when I arrived, like I said earlier,

9   Mr. Wells; Mr. Belisle; ET1 Hopkins; ET3 Beauford, Cody

10  Beauford; Seaman Upchurch; Seaman Henry; Seaman Coggins

11  and Seaman Pacheco.

12      Q.   And as to the respective sort of layers of

13  responsibility, working your way from the top down, who

14  was doing what job?

15      A.   So ET1 Hopkins was the shop supervisor, so

16  everybody worked for him.  And he worked for me.  And

17  then you had the ET3 who mostly worked the non-rates and

18  made sure that they were doing what they needed to do.

19      Q.   Who was the ET3?

20      A.   ET3 Cody Beauford.  And then we had our technical

21  experts.  Mr. Wells and Mr. Belisle were our technical

22  experts.  They didn't have any supervisory

23  responsibilities.

24      Q.   Okay.  As to Mr. Hopkins and Mr. Belisle -- I'm

25  sorry.  Let me rephrase that -- Mr. Wells and

Mr. Belisle, let's start with Mr. Belisle, what was his
responsibilities?

A.   So Mr. Belisle was our master rigger.

Q.   Can you explain what that means?  It may be
self-explanatory, but please tell them what it means in
your world.

A.   Sure.  So he was the guy who, if we were going to
hoist something, strap something down, you know, we
would carry our lights up or any parts and stuff up the
towers, and he was primarily the guy who would make sure
everything was rigged properly and safely.

Q.   So I want to talk to you for a few minutes about
Mr. Wells.  If we could leave the lights down because
we'll be doing a lot of photographs if that's all right
with everybody.

     Mr. Wells, you worked with him for two years.
Tell the jury how long you knew about his work
experience with the Coast Guard.

A.   Yeah.  So right when I reported, you know, I
was -- I understood that he was probably the technical
expert for antennas and towers in the Coast Guard.  Had
a wealth of knowledge, had been doing it a long time.
And so I understood he was our antenna expert, if you
will.

Q.   And did that come to pass in your experience with

1  him that he was quite knowledgeable?

2      A.  It did.

3      Q.  Can you explain to the jury about that?

4      A.  Well, so Mr. Wells' antenna theory, anything that

5  had to do with that, he knew about.  He had constructed

6  many antennas was my understanding.  So he knew about

7  construction, about building antennas.  If they broke --

8  Kodiak is a pretty harsh place -- he knew about how to

9  repair those things.  So my understanding, and I relied

10 on that expertise when he worked for me, was that he was

11 our expert.

12     Q.  Do you have an understanding of his rank when he

13 left the Coast Guard?

14     A.  He was a retired chief petty officer.

15     Q.  Like you?

16     A.  Like I was at the time.  I'm a chief warrant

17 officer now.

18     Q.  Chief warrant officer.

19         If we could have, for foundational purposes,

20 Blair, Exhibit No. 173.

21         Mr. Reckner, have you seen that map before?

22     A.  I have.

23     Q.  In preparing for today's testimony?

24     A.  Yes.

25     Q.  Are you familiar with the locations that are on

1    that map?

2        A.    Yes, I am.

3        Q.    Are they accurately marked on that exhibit as to

4    locations with respect to Kodiak Island as they're

5    depicted?

6        A.    Yes, they are.

7            MR. SKROCKI:  Move for the admission of 173.

8            THE COURT:  Any objection?

9            MR. COLBATH:  No, Your Honor.

10            THE COURT:  173 is admitted.

11            (Exhibit No. 173 admitted.)

12   BY MR. SKROCKI:

13       Q.    So some geography, Mr. Reckner, if you could grab

14   the laser pointer.  Thank you.  Could you show the jury

15   where the Communications Station is on Exhibit No. 173?

16       A.    Sure.  So that's right there.

17       Q.    All right.  And there's a location down below for

18   Kodiak Airport.

19       A.    Yes, sir.

20       Q.    That's self-explanatory.  Now, can you tell the

21   jury where you lived in relation to the Communications

22   Station and the airport?

23       A.    Sure.  So the first two years I was there, I

24   lived in Aviation Hill right there.

25       Q.    The first two years?

1    A.   First two years.

2    Q.   Then after that where did you live?

3    A.   After that we moved behind the fence line to the

4    base proper, and it's kind of obscured by this, but over

5    here.

6    Q.   And when you lived in Aviation Hill -- and that's

7    between the two, main base Kodiak and the airport?

8    A.   Yes, sir.

9    Q.   -- how long was your commute?

10   A.   To the COMMSTA?

11   Q.   Correct.

12   A.   Five to eight minutes, I guess.  Not far.

13   Q.   We could take that one down, please.  I'm sorry,

14   not yet.  My mistake.

15       Let's go down further south down the road.

16   There's another location down at the bottom left-hand

17   side.

18   A.   Yeah, this location here?

19   Q.   Is there -- what do you remember that being

20   called?

21   A.   That's Kodiak -- it's a bedroom community in

22   Kodiak called Bells Flats.

23   Q.   Bells Flats?  Okay.  Is that accurate generally

24   as to where Mr. Belisle's residence was and Mr. Wells'

25   residence was?

1    A.  Yes, it is.

2    Q.  Okay.  Blair, take that down.  If we could show

3  Mr. Reckner Exhibit No. 1.  We'll try to move these

4  forward.

5        See Exhibit No. 1, Mr. Reckner?

6    A.  I do.

7    Q.  We'll spend some time with that.  Are you

8  familiar with what's being depicted in Exhibit No. 1, in

9  the Google Earth image?

10    A.  I am.

11        MR. SKROCKI:  Move for the admission of Exhibit

12  No. 1.

13        THE COURT:  Any objection?

14        MR. COLBATH:  No objection.

15        THE COURT:  All right.  1 is admitted.

16        (Exhibit No. 1 admitted.)

17        MR. SKROCKI:  Publish.

18  BY MR. SKROCKI:

19    Q.  And just briefly, can you show the jury where

20  Aviation Hill is where you lived?

21    A.  Yes, sir.  So that's Aviation Hill right there,

22  Coast Guard housing.

23    Q.  All right.  And down below at the bottom of the

24  screen, do you see some like tarmac and some white

25  rectangles?

1    A.  I do.

2    Q.  Can you tell the jury what that is?

3    A.  So this is the air station.  So these are the

4  hangars, the air station.  There's a taxiway here that

5  gets to the airport so they can use the runways of the

6  airport.

7    Q.  And what kind of aviation equipment did the Coast

8  Guard have at the main station here?

9    A.  We had Coast Guard C-130s.  We had Coast

10 Guard HH-60s, and those are helicopters, and HH-65s,

11 also helicopters.

12   Q.  And if you go past the main base station, is that

13 where you were working you said the last two years of

14 your deployment?

15   A.  Say that again.

16   Q.  I'm sorry.  Is that where you were living the

17 last two years of your deployment?

18   A.  My last two years, so I was on the base proper

19 behind the fence line right over here somewhere.

20   Q.  That yellow line on the road -- yellow line

21 depicts a road?

22   A.  Yes.

23   Q.  What road is that?

24   A.  That's Rezanof.  That's what takes you back to

25 Kodiak or down to the Flats, Bells Flats.

Q.  Bells Flats.  So if on the upper right, if you
keep going, you go to sort of Kodiak city?

A.  Up here.  If you kept going, yes, sir.

Q.  Kodiak town.  Okay.  And if you go past the
airport runway, there's a road that veers to the left.
Can you tell the jury about that, please.  Orient them
as to what that is.

A.  This one right here?

Q.  Yes.

A.  Yep.  So that's Anton Larsen Road.  That's the
road that led to COMMSTA Kodiak.

Q.  That would be your commute?

A.  Yes.  So I would come out here and turn left
there and go to work.

Q.  If we could remove that and for identification
Exhibit No. 2.

Mr. Reckner, this is a satellite view of the
Communications Station area.  Does that accurately
reflect what it looked like at the time you were there
2010 to 2014?

A.  Yes, it does.

MR. SKROCKI:  Move for the admission of Exhibit
No. 2.

MR. COLBATH:  No objection.

THE COURT:  2 is admitted.

1          (Exhibit No. 2 admitted.)

2    BY MR. SKROCKI:

3        Q.  I'm just going to do the laser pointer myself,

4    Mr. Reckner.  But if you go to the bottom where that

5    yellow road is --

6        A.  Right here?

7        Q.  Correct.  Thank you.  What road is that?

8        A.  That's Anton Larsen Road.

9        Q.  And if you proceeded down that yellow road, where

10   would you ultimately end up?

11       A.  If you went down the sheet, you would end up back

12   at the Rezanof over near the airport.

13       Q.  About how far of a drive from -- minutes from T-1

14   to the airport would that be, roughly?

15       A.  Roughly, less than five I would say.

16       Q.  So let's -- since we're down at the bottom sort

17   of, let's start at the bottom, move our way up.  On the

18   bottom left-hand side of Anton Larsen, as you described

19   it, there's a facility there.  Do you see that?

20       A.  This one right here?

21       Q.  Yes, sir.  Can you tell the jury what that is.

22       A.  Yes.  That's the Kodiak water treatment plant.

23       Q.  And if you proceed from the plant you cross a

24   body of water?

25       A.  Yeah.  Right here you cross the Buskin River.

1    Q.   And is there fish in that river?

2    A.   There is.

3    Q.   Did you ever fish it?

4    A.   I have.

5    Q.   You're under oath, so where's your favorite spot?

6    A.   Give away all my secrets.  Right here there's a

7    point on the COMMSTA that we could fish right there.

8    They would hold there before they ran up to the lake.

9    Q.   What kind of salmon, sir?

10    A.   All four species.

11    Q.   All right.  And if you keep crossing the bridge,

12    I want to run your route to T-1 if you could.

13    A.   Sure.  So I would come in, cross the bridge, and

14    then right here's the driveway up to T-1.  There's a

15    gate right there with a card reader.  Badge in, the gate

16    opens and I would park about right there.

17    Q.   Can you tell the jury what kind of gate that is.

18    A.   Like a sliding gate.  It was a badge reader and

19    also a call box, so you could talk to the watch if you

20    didn't have a badge.  It was normally closed.  You just

21    swipe a badge, and it would kind of go like that, slide

22    open.

23    Q.   All right.  So let's back ourselves to the bridge

24    over the Buskin River.

25    A.   Okay.

1     Q.  And if you go and follow the yellow line to the

2   left, then there's a couple of lighter gray

3   road-ish-type things.  Can you describe what they are?

4     A.  Yep.  So that's a gravel driveway and that's a

5   gravel driveway.  And then you just kind of led into the

6   P-2 parking area right there.

7     Q.  And if you kept going past T-2 up to the upper

8   left along the yellow road there, or what's got the

9   yellow line in it, there's another road up behind that's

10  gray.  Do you see that?

11    A.  Yes.  That one right there?

12    Q.  Thank you.  Yes, please.  Can you tell the jury

13  what that is and the other gray ones as well.

14    A.  Yep.  So this one here and this one here, these

15  back here, those are all roads that led to the antenna

16  field.  They were all gated.  So there would be a gate

17  here.  There was a gate right here.  And then we had a

18  gate here and one over in this area, I believe.

19    Q.  When you say antenna field, is this where -- what

20  occurred there?

21    A.  So that's where we had the antennas.  It's a

22  large piece of property.  The antennas had to have some

23  separation.  So it was a lot of real estate, and there

24  was antennas, you know, all back there.

25    Q.  And what kind of, if you recall, physical

1    maintenance is required for the field itself?

2       A.   Right.   So what we did was probably the biggest

3    thing was in the summertime was to make sure the

4    vegetation was cut back.   So all the tall grass and any

5    trees that might be grown up near an antenna or a guide

6    or anything like that around the structure, our

7    non-rates, our ET3, ET1 would go out there and cut those

8    back.

9          Then we also had some large like -- I wouldn't

10   call them lawn areas, but large open areas near the

11   antennas where Mr. Wells and Mr. Belisle would use --

12   primarily those two guys would use a tractor and go and

13   mow those down with a tractor.

14      Q.   And did you have equipment to do that?

15      A.   We did.

16      Q.   Where was that equipment stored and maintained

17   and/or serviced?

18      A.   So it was all in T-2 right there.

19      Q.   On that image, the Google image, you see a red

20   roof on the T-2?

21      A.   I do.

22      Q.   Is that all there is to that structure?

23      A.   Right here?

24      Q.   Yeah.

25      A.   No.   There's a -- it's like an L-shape building,

1    so it's kind of grayed out because it kind of gets

2    blurry in the image.  But it's there.

3        Q.  We can take that down and move Exhibit No. 3 for

4    foundation.

5            Do you recognize what's depicted on that map,

6    Mr. Reckner?

7        A.  I do.

8        Q.  What is depicted there?

9        A.  Bells Flats.

10           MR. SKROCKI:  Move to admit Exhibit No. 3.

11           MR. COLBATH:  That's fine, Your Honor.

12           THE COURT:  All right.  3 is admitted.

13           (Exhibit No. 3 admitted.)

14   BY MR. SKROCKI:

15       Q.  And the yellow road there that's highlighted on

16   the right, what road would that be?

17       A.  That's Rezanof.  West Rezanof I think they call

18   it.

19       Q.  Do you recall there's an -- off of Rezanof in the

20   upper right is an open area.  Upper right and to your

21   right of the road.  You just had it.

22       A.  Right here?

23       Q.  Yep.

24       A.  Okay.

25       Q.  Do you know what that is?

1     A.   I think that's the fairgrounds, right?  Yeah,
2   that's the fairgrounds.
3     Q.   And generally, to your understanding, Mr. Wells
4   and Mr. Belisle lived in Bells Flats?
5     A.   That's correct.
6     Q.   From the airport, how far of a drive is it to get
7   there, roughly?
8     A.   Again, five, maybe less than ten minutes would be
9   my guess.
10     Q.   Blair, if we can take that down.
11          Now, what I'm going to do, Mr. Reckner, to try to
12   move through these photos quicker is we're going to pull
13   up, Counsel, 4, 5, 6, 7, 8, 9 and 10.  Slowly.
14          Okay.  Take a look at that one, Mr. Reckner.
15   Okay?
16     A.   Yes.
17     Q.   Are you oriented to what that image depicts?
18     A.   I am.
19     Q.   Segments of Kodiak and the Communications
20   Station?
21     A.   Yes.
22     Q.   Move to No. 5, please.  That depicts the
23   Communications Station and T-1 and T-2 buildings,
24   correct?
25     A.   It does.

1    Q.  No. 6, please.  Lower -- reflects -- Exhibit

2  No. 6 reflects the T-2 building and the water treatment

3  plant and Anton Larsen Road, correct?

4    A.  Yes.

5    Q.  7.  Close-up aerial shot of the T-2 building.

6    A.  Yes.

7    Q.  Is that accurate?

8    A.  Yes, it is.

9    Q.  8.  Aerial view from behind the T-2 building.  Is

10  that accurate?

11    A.  It is.

12    Q.  9.  A little further back higher elevation of the

13  back of the T-2 building?

14    A.  Yes, sir.

15    Q.  And 10.  That one -- can you see that,

16  Mr. Reckner, in terms of the data in the line diagram on

17  that exhibit?

18    A.  I can.

19    Q.  Is that an accurate depiction of the

20  Communications Station organizational system in April of

21  2012?

22    A.  Yes, it is.

23    Q.  And the images that you just looked at Exhibits 4

24  through 9, are they accurate as to around the day or two

25  of the murders of Mr. Belisle and Mr. Hopkins?

1     A.   They are.

2          MR. SKROCKI:  Move for the admission of 4

3     through 10, Your Honor.

4          THE COURT:  Any objection?

5          MR. COLBATH:  No.

6          THE COURT:  All right.  4 through 10 are

7     admitted.

8          (Exhibit Nos. 4, 5, 6, 7, 8, 9 and 10

9     admitted.)

10    BY MR. SKROCKI:

11    Q.   If we could have 4, Blair.

12         You got that laser pointer, Mr. Reckner?

13    A.   I do.

14    Q.   Okay.  Can you find where the airport is on

15    Exhibit No. 4?

16    A.   I can.  That would be right there.

17    Q.   And if you could walk -- or do the laser pointer

18    down Anton Larsen towards the Communications Station.

19    A.   Yes.  So you come down here, down this way,

20    across the bridge right here.  And then you would come

21    in.  There's T-2 and there's T-1.

22    Q.   All right.  I want to go back up Anton Larsen

23    Road.  Is there a piece of infrastructure on the road

24    that is connected to the Communications Station that you

25    can see?

1    A.  There is.  So right there is the -- was the

2 warehouse.  We had a warehouse there.

3    Q.  You recall it was a warehouse?

4    A.  The warehouse.

5    Q.  And what was stored in that warehouse?

6    A.  It had a lot of old parts, pieces of antenna,

7 some personal property.  Mr. Wells was there.

8    Q.  We'll get to that.  And then the -- point out the

9 water treatment plant.

10   A.  Sure.  Right there.

11   Q.  Exhibit No. 5.  Just an aerial view, and that's

12 looking up toward the T-2 and T-1 complex?

13   A.  It is.

14   Q.  Exhibit No. 6.  And again, just because it's a

15 closer image, can you point out the water treatment

16 plant?

17   A.  Sure.  Right there.

18   Q.  I want to focus just briefly your attention onto

19 T-2.  And there's -- you could see different color

20 roofs?

21   A.  Yes.  So you can see the gray roof I was talking

22 about earlier and the red roof there.

23   Q.  And behind the building, sir, can you describe

24 what the topography is behind the T-2 building?  Go to

25 the bottom left corner.

1    A.   Yep.  So this is a hill that goes down this way.

2  It slopes down towards the backside of T-2, so it would

3  be pretty hilly right there.

4    Q.   You can see a line there in the vegetation,

5  bottom left-hand corner?

6    A.   Yes, sir, I see it.

7    Q.   Can you tell the jury what that is?

8    A.   So this line right here, it's a transmission

9  cable, and we cover it with large cement or concrete

10  tiles to try to keep the bears around from the

11  transmission cables.  For some reason, they like to bite

12  into them.

13    Q.   They like to bite into them?

14    A.   Yeah, they do.

15    Q.   Do they survive the bite?

16    A.   They do.  They like it.  Yeah, it's crazy.

17    Q.   Fair enough.  No. 7, please.  I want to direct

18  your attention, Mr. Reckner, to that circled area there.

19    A.   Yes, sir.

20    Q.   Can you describe the equipment you see there and

21  its location in reference to the T-2 building?

22    A.   Sure.  So we have two snowcats there.  Another

23  snowcat there.  That's a bulldozer.  This red building

24  is like a Conex storage like you'd see on backs of

25  trucks or on trains sometimes.  Then we have what we

1    call the big line truck, that yellow thing right there.

2        Q.   When you say the big line truck, how big is it?

3        A.   It's pretty big.  I had a Ford F-350 crew cab,

4    and the line truck was bigger than that.

5        Q.   And, Mr. Reckner, do you recognize a vehicle in

6    this photograph in the front of T-2?

7        A.   I recognize -- yeah.

8        Q.   Where?

9        A.   In front.  So there's these here and this one

10   there.

11       Q.   And with respect to the vehicles, these white

12   ones here, can you tell the jury what those are?

13       A.   Yeah.  So the two white ones, one we called the

14   little line truck and the other one was the dually,

15   because it was a Ford dually, and that dark shaped truck

16   is Mr. Belisle's truck.

17       Q.   That one there?

18       A.   Yes, sir.

19       Q.   When was this photograph taken?

20       A.   I would say that photograph was taken the day of

21   or the day after the murders.

22       Q.   Exhibit No. 8.  Mr. Reckner, I want to focus your

23   attention first to the area behind the rigger shop, or

24   T-2 as we're calling it.  Do you see that area there?

25       A.   I do.

1    Q.  I want to get my circle out of there for you.

2        Okay.  I want to move from the left of that

3    building forward.  So on the left, you see an overhang

4    right there?

5    A.  I do.

6    Q.  What is that, sir?

7    A.  That's the door that goes into the boiler room

8    and the equipment room or boiler room of T-2.

9    Q.  We'll get to that in a little bit once we move

10   inside the building.  How about this right there, that

11   alcove-looking item?

12   A.  That's another door that goes into the repair

13   area of T-2.

14   Q.  Is this the line truck you were talking about?

15   A.  It is.

16   Q.  How much space is back here in terms of vehicle

17   access?

18   A.  Sir, quite a bit.  You can drive all the way

19   around it.  And really even with that snowcat there, you

20   can still get around it.

21   Q.  9.  Mr. Reckner, when you worked at these

22   buildings, what time did you usually arrive?

23   A.  I usually arrived somewhere between 8:00 and

24   8:30.

25   Q.  This is the Buskin River here that we talked

1  about before?

2      A.  Yes, sir.

3      Q.  When you came down the bridge I'm drawing on

4  Exhibit No. 9, you would veer to the right?

5      A.  Correct.

6      Q.  At some point, were you able to see as you came

7  down here who was parked in front of T-2?

8      A.  You could.

9      Q.  What would you see every morning?

10     A.  Well, pretty much when you came around this

11 corner, there's some vegetation here, but once you came

12 around here, you had a pretty good shot.  And for sure

13 once you were orientated with the bridge here, you could

14 see the parking lot and you would have a good idea of

15 who was in work that day.

16     Q.  Would you be able to do that as you drove by

17 every day going to T-1?

18     A.  Yeah.  So I would come through, take a glance,

19 see, you know, who's in the shop and just keep going up

20 to my desk up at T-1.

21     Q.  Any way for you to see behind T-2 when you

22 accessed T-1 --

23     A.  No.

24     Q.  -- through that -- as you headed up towards T-1?

25     A.  You could this way, I suppose.  If you turned to

 1   the left you would be able to kind of see the back side

 2   and some of this, not so much over here though.

 3       Q.   I want to focus your attention on these two, I'm

 4   just going to call them gravel, for lack of any other

 5   point.  What are those for?

 6       A.   So those are gravel driveways in order to get,

 7   you know, equipment in and out.  Or if we were going to

 8   go to the gate I showed you down the screen here, you

 9   would just come out this way.  You know, why would you

10   go this way when you can go this way, right?

11           Same thing when you're coming back.  You come in

12   this way.  This one wasn't used as much, but it was.

13   People came in and out of that occasionally.

14       Q.   And is the access from here to there something an

15   automobile could drive on?

16       A.   Yes.

17       Q.   What was the composition of it?

18       A.   Gravel.

19       Q.   All of this?  I'm circling the holes.

20       A.   Yes.  Everything you see that's kind of a darker

21   gray than the road, than the paved road is all gravel.

22   Yes, sir.

23       Q.   And drivable?

24       A.   And drivable, yes, sir.

25       Q.   My colleague points out there's a structure on

1  the wall in the back of T-2.  Can you see that,

2  Mr. Reckner?  We can blow it out for you if you wish.

3       A.   Yeah, could you?

4       Q.   Blair, could you blow out -- there you go.

5  Perfect.  Thank you.  Let me get rid of that one.

6            What is that object, sir?

7       A.   That's the window that looks into the office

8  area.

9       Q.   Okay.  Do you recall, is it something that --

10  like I'm 6-1.  Is this something I could look out?

11      A.   It was pretty high when you were in the office,

12  and the orientation was pretty much up and out.  So if

13  you're sitting in the office, you're going to look up

14  and out towards the hill.  You would see the hill.  If

15  you stood right next to it and kind of stood like that,

16  then you could kind of look out.  But if you were just

17  in there, you would just see the back of the hill.

18      Q.   This alcove here, how is that secured, do you

19  recall?

20      A.   I do.  On the inside, it's locked on the inside.

21      Q.   Then there was a -- we've blown it up quite a

22  bit.  You mentioned this is the boiler room door?

23      A.   Yes.

24      Q.   How was that secured?

25      A.   So that was secured with a key.  There was

1  another door on the other side of the boiler room that

2  was secured by dead bolt.

3     Q.  We'll talk about that a little later on.  Inside

4  the building, it was secured with a dead bolt?

5     A.  Yes, sir.

6     Q.  Blair, you can take that one down.

7        We're going to put 10 up briefly.  It's the big

8  organizational diagram.  Just for a moment.  Then we'll

9  move onto No. 11.

10        Is that an accurate -- I'm just going to call it

11  wiring diagram because that's what I call these things

12  of the Communications Station?

13     A.  Yes, that's an accurate depiction of the chain of

14  command of COMMSTA Kodiak at the time.

15     Q.  Up at the top, who was the commanding officer

16  then?

17     A.  At the time it was Commander Pete Van Ness.

18     Q.  He had some -- beneath him he had an executive

19  officer?

20     A.  Yes, he did.

21     Q.  Who was that?

22     A.  Lieutenant David Pizzurro.

23     Q.  If we could remove that and for foundation show

24  Mr. Reckner No. 11.

25        Is that a little more streamlined organizational

 1    chart concerning the Communications Station and the

 2    organization of the rigger shop?

 3        A.   Yes, that's -- yes, it is.

 4              MR. SKROCKI:  Move to admit Exhibit No. 11.

 5              MR. COLBATH:  That's fine, Your Honor.

 6              THE COURT:  11 is admitted.

 7              (Exhibit No. 11 admitted.)

 8    BY MR. SKROCKI:

 9        Q.   All right.  So I guess we'll start at the top.

10    And the commanding officer?

11        A.   Commander Pete Van Ness.

12        Q.   He has an executive?

13        A.   Lieutenant Dave Pizzurro.

14        Q.   There's an engineering officer?

15        A.   Yeah, that was Senior Chief William Reed.

16        Q.   And who's that there?

17        A.   That's me.

18        Q.   How did the interaction between you and Mr. Reed

19    work in terms of managerial hierarchy?

20        A.   Sure.  So the engineering department you can kind

21    of see in the last diagram consisted of the ETs and the

22    rigger shop and the IT shop.  And so we had two chiefs.

23    I was one.  There was an ET chief who ran the ETs.  So I

24    worked with Bill Reed daily.  He was my direct

25    supervisor.  He was in charge of the entire engineering

1  department.

2      Q.  Thank you.  So you're here in IT in charge.

3  There's your name, Scott Reckner.  Underneath you who's

4  there?

5      A.  That's ET1 Jim Hopkins.

6      Q.  Then we move over to this side.  I've circled the

7  bottom left-hand side.  Can you explain the managerial

8  hierarchy with where it says ET3 Cody Beauford?

9      A.  Sure.  So ET3, Cody Beauford.  And then the four

10  non-rates, Pacheco, Coggins, Upchurch and Henry.  And

11  he -- day-to-day interactions with -- with them were get

12  out and do work, right?  So that's kind of what he

13  supervises that front-line work.

14      Q.  And on the right-hand side, we have who?

15      A.  That's Mr. Wells and Mr. Belisle.

16      Q.  And directly supervised by which individual?

17      A.  By ET1 Jim Hopkins.

18      Q.  Let's try to authenticate foundational purposes,

19  Blair.  Show Mr. Reckner, 12, 13 and 14.

20          Recognize that sign there, Mr. Reckner?

21      A.  I do.

22      Q.  And where did that sign appear?

23      A.  That was on the rigger shop.

24      Q.  Exhibit No. 13, please.  That's an interior

25  diagram, Mr. Reckner?

 1    A.  It is.

 2    Q.  And is that accurate as to the interior of the

 3  Communications Station, rigger shop?

 4    A.  Yes, it is.

 5    Q.  And Exhibit No. 14.  That's an enlargement of the

 6  sort of work area of the rigger shop; is that accurate?

 7    A.  Yes, sir.

 8    Q.  So were all these accurate as to the time of the

 9  murders of Mr. Belisle and Mr. Hopkins on April 12th of

10  2012?

11    A.  Yes.

12        MR. SKROCKI:  Move for the admission of 12, 13

13  and 14, Judge.

14        MR. COLBATH:  That's fine, Your Honor.

15        THE COURT:  12, 13 and 14 are admitted.

16        (Exhibit Nos. 12, 13 and 14 admitted.)

17        MR. SKROCKI:  One moment.  Those are admitted,

18  Your Honor?

19        THE COURT:  Yes.

20        MR. SKROCKI:  Thank you.  Thank you so much.

21  BY MR. SKROCKI:

22    Q.  Exhibit No. 12, please, Blair.

23        Mr. Reckner, where was this sign located where it

24  says "COMMSTA Kodiak Rigger Shop"?

25    A.  It was on the front side of the rigger shop when

1    you drove in.

2        Q.   Under the red roof side or the gray roof side?

3        A.   Under the red roof side.

4        Q.   Okay.  Thank you.  Let's look at Exhibit No. 13.

5    Since we're going to focus another exhibit on this area

6    here, we're going to skip that for a moment,

7    Mr. Reckner, and focus on repair shop, wood shop, garage

8    areas.  Okay?

9        A.   Okay.

10       Q.   So just to orient the jury, the line truck and

11   the Bobcat area or what we saw on those photos earlier,

12   where would they be on this diagram?

13       A.   So we didn't see the Bobcat.  We saw the line

14   truck.  And the snowcats were in this area, yeah.

15       Q.   Back in the back?

16       A.   Right.

17       Q.   So this would be B for back, correct?

18       A.   Yes.

19       Q.   That's not working at all.

20       A.   The hill would be going up in this direction.

21       Q.   Upper right?

22       A.   Up that way, right.  So the line truck was there.

23   The Bobcat was there.  There was like a Conex here.  The

24   hill in this area.

25       Q.   Okay.  There's -- what are these two items here

1  that I circled?

2     A.   Those are our garage doors.

3     Q.   So what would come into this repair shop here in

4  terms of rigger shop activity?

5     A.   So we would use that to stage antennas if we're

6  going to do work.  Or if we're going to go climb, we

7  would stage our climbing gear.  And if we're going to

8  change the light, the light.  The tools we would need,

9  that kind of stuff.  We could drive vehicles in there if

10  we needed to and work on them.  We had our snowplows

11  sometimes in there.  A lot of stuff.  A lot of stuff we

12  used to do our job.

13     Q.   I want to direct your attention to what I'm

14  circling in blue on the upper center of Exhibit No. 13.

15     A.   Okay.

16     Q.   Can you identify what those two items represent

17  there?

18     A.   So that's the door, and then that's the vestibule

19  that I pointed out earlier.

20     Q.   How about in terms of what you call the locking

21  arrangements for both of those doors?

22     A.   So this door would be dead bolted.  And this door

23  was like a screen door or storm door, I think.  I don't

24  think we normally locked that.  But this one was

25  definitely dead bolted.

1    Q.  Sticking with the repair shop a little bit more,

2   circling a door down below at the bottom left of -- the

3   bottom of the repair shop in the diagram, Exhibit

4   No. 13.  Can you talk about that?

5    A.  Sure.  So that door is key carded, so you need to

6   have a key card to get into it or a key.  A key would

7   also open it, but most people I guess used the key card.

8    Q.  And just for foundational purposes, Mr. Reckner,

9   you mentioned you had an office in T-1.  At some point,

10  did that change?

11   A.  It did.

12   Q.  When did that change?

13   A.  In December of 2011.

14   Q.  What happened in December of 2011 just in terms

15  of your office?

16   A.  So I had the ET3 non-rates put a desk down in the

17  office for me.

18   Q.  So did you have access and go into the T-2 on a

19  daily basis during that time?

20   A.  I did.  And before then I had access to it.  But

21  I was there daily.

22   Q.  Did you develop an understanding about how the

23  employees there would access the rigger shop when they

24  started their workday?

25   A.  I did.

1    Q.  Can you tell the jury what your understanding was

2  about their access, please?

3    A.  So this is kind of the parking area right here

4  where you saw the trucks.  The first person in would go

5  through this door, come up this ramp here and go to this

6  door.  This door was dead bolted from the inside, and

7  they would open that door.  And then everybody else who

8  came in would just go through that door mostly.

9    Q.  How is this door controlled?

10   A.  It was a dead bolt.

11   Q.  And then you talked about parking, correct?

12   A.  Yes.

13   Q.  So I want to focus your attention on this area

14  here.  Is that where people would park?

15   A.  Generally, yes.

16   Q.  Did you have an understanding about how people

17  parked?  Is there sort of a parking hierarchy of the

18  rigger shop, would have been at the time you were there?

19   A.  Yes.

20   Q.  Is that fair, sort of accurate that the blue

21  rectangle covered the parking area?

22   A.  It is.

23   Q.  Okay.  If you could tell the jury then, fill in

24  the gaps on who's parking where as you understood.

25   A.  So generally, Mr. Wells would be here.  When I

say generally, I mean always.  He always parked there if
he was coming in to work.  Right here is Rich Belisle,
and then we had our two trucks, our two line trucks
here.

     And then on the other side of that would be
everybody else.  So usually ET1 Hopkins, because he
would be usually the next guy in.  And then the
non-rates over here.  And then I usually parked down on
this side of the building over here.

     Q.  So how did you get the longest walk being the
boss?

     A.  You know, that's a good question.  I don't know
the answer to that.

     Q.  So the non-rates would be to the far left,
correct?

     A.  Yes.  They would be generally over here in this
area.

     Q.  All right.

          MR. SKROCKI:  May I have a moment to confer
with Counsel?

          THE COURT:  Certainly.

          (Pause)

          THE COURT:  Anybody want to stand and stretch,
feel free to, ladies and gentlemen, if you'd like.  Or
not.

1    MR. SKROCKI:  Can we take a stretch break.  We

2 have an exhibit that we're bringing in that's kind of

3 bulky.

4    MR. COLBATH:  Can I look at it real quick?

5 We'll just let everybody stand up.  We'll be one minute.

6    THE COURT:  One minute, I'm going to hold you

7 to that.

8    (Pause)

9    THE COURT:  Are we ready?

10    MR. SKROCKI:  Did I beat the clock?

11    THE COURT:  Pretty good, yeah.  I didn't check.

12 I guess I should have.

13    MR. SKROCKI:  We're all set.

14    THE COURT:  Very good.  Everybody ready to

15 proceed?  Anybody need a break?  No?  All right.  Very

16 good.

17    MR. SKROCKI:  Just for the record, Your Honor,

18 Counsel has had a chance to observe this.  We've spoken

19 about it.  We're just going to move to admit it, have

20 Mr. Reckner authenticate it briefly.  It's very bulky.

21 We would do better if it was just up on the screen, I

22 think.  And then we'll just wheel it out of the way.

23    THE COURT:  Okay.

24    MR. SKROCKI:  Okay.

25    THE COURT:  And what's the exhibit number?

1              MR. SKROCKI:  No. 236.

2              THE COURT:  236.  And there's no objection?

3              MR. COLBATH:  There's not any objection, Your

4    Honor.

5              THE COURT:  All right.  So are you seeking to

6    admit it?

7              MR. SKROCKI:  Please.

8              THE COURT:  All right.  No objection to its

9    admission?

10             MR. COLBATH:  No objection.

11             THE COURT:  All right.  236 is admitted.  Go

12   ahead.

13             MR. SKROCKI:  Thank you.

14             (Exhibit No. 236 admitted.)

15   BY MR. SKROCKI:

16     Q.  Mr. Reckner, if you could stand up.  Thank you.

17   And you've seen this before?

18     A.  I have.

19     Q.  And it's a replica of the inside of the rigger

20   shop office space area, correct?

21     A.  It is.

22     Q.  Without the wood shop or the repair shop?

23     A.  Correct.

24     Q.  Is anything else missing on that in terms of

25   structures?

1    A.  No, I don't think so.

2    Q.  Okay.

3    A.  Looks good.

4    Q.  All right.  Very good.

5         MR. SKROCKI:  That's all the questions I have

6    on that exhibit.

7         THE COURT:  On 236.  Okay.

8    BY MR. SKROCKI:

9    Q.  I believe we were on Exhibit No. 13.  If we could

10   move on to Exhibit No. 14, please.  Mr. Reckner, this is

11   an enlargement of what we had in Exhibit 13 without the

12   wood shop and everything else, correct?

13   A.  Yes, it is.

14   Q.  It's kind of self-explanatory, but on the wood

15   shop part of the T-2 building, what was done there?

16   A.  So we had woodworking equipment, saws, drill

17   presses.  We would use that to work with wood if we

18   needed to, and sometimes we needed to.

19   Q.  In a general sense, the machinery and the

20   equipment, things that you used in the rigger shop, can

21   you sort of give a laundry list?  Were they big?  Were

22   they small?  What kind of equipment was in there?

23   A.  In the rigger shop totally?

24   Q.  Yes.

25   A.  We had a lot of both, honestly.  So we had almost

 1   any tool you can think of to do all of the work with the

 2   antennas and some of our vehicle maintenance.  We had

 3   ropes and chains and straps that we used for rigging.

 4   We had air.  We had pneumatic air throughout the whole

 5   shop, definitely the two garages.

 6        We had pneumatic tools.  So for like taking lug

 7   nuts off our ATVs or vehicles if we needed to.  We had

 8   jacks, jack stands, again for vehicle maintenance and

 9   stuff.  We stored some of our snowplows in there.  Some

10   of the brush hogs, which kind of we used for clearing

11   brush, attached them to the back of equipment, that kind

12   of stuff.

13   Q.  How about you mentioned something about air.  I

14   didn't quite catch it.

15   A.  So we had an air compressor in the building, and

16   we had pneumatic air both in the repair garage and in

17   the Bobcat garage, which we haven't talked about yet.

18   Q.  Do you want to go back to 13 and talk about the

19   Bobcat garage?

20   A.  I can explain it, sure.

21   Q.  Let's go back to 13.  You mentioned Bobcat

22   garage?

23   A.  So here's the wood shop we talked about.  And

24   then this was the Bobcat garage.  It had another garage

25   door there.  This is where we kept the Bobcat and the

1    Bobcat parts.  We had a couple of snowplows for it.  We

2    had a brush hog that could take down a small boulder.

3    Actually pretty cool.  We had all our straps and chains

4    were on the wall here.  And we had pneumatic air in this

5    area.  We had pneumatic air in this area.

6        Q.  Briefly, Mr. Reckner, I want to focus your

7    attention on the back side of this wall here.  These

8    white structures that I just sort of covered over with

9    ink, do you see what those are?

10       A.  I do.

11       Q.  What are those?

12       A.  So they're windows.  That's a window, window,

13   window, window, window, window.  And then on this side

14   too, there's a window there.

15       Q.  So you can do outside -- inside looking out,

16   correct?

17       A.  Inside looking out, yes.

18       Q.  And if you were on the other side looking in,

19   what's the height of those windows?

20       A.  So again, those windows are pretty tall.  Even if

21   you're on the inside, they're tall.  And then on the

22   outside, you could step up to go in, they're even

23   taller.  So you'd have to kind of really get up there if

24   you wanted to look in.

25       Q.  14, please, Blair.

1        Let's sort of work our way from bottom to top,

2   Mr. Reckner.  Where it says locker room there, can you

3   describe what's going on there with respect to the

4   rigger shop to the jury, please?

5       A.  I can.  So these are the doors to the wood shop

6   we saw earlier.  And then we had some lockers here that

7   we used for storing some climbing gear.  I think there

8   was some cold weather gear in there.  Some of the

9   non-rates stored some of their personal stuff in those

10  lockers as well.

11      Q.  And this door there, access is where?

12      A.  That's the door that accesses out into the

13  parking lot.

14      Q.  Let's talk about this area here.  Can you talk

15  about that function for the jury, please, how that area

16  functioned?

17      A.  Sure.  So this was the break room, or I call it

18  the bullpen.  That's where the ET3 and the non-rates

19  sat.  We had two computers that they shared.  We had

20  some more locker space for them in there for their

21  personal belongings or their work gear, safety gear,

22  that kind of stuff.  A table, they can eat lunch.  We

23  have a refrigerator, microwave and then a bathroom.

24      Q.  So I want to focus your attention along that

25  route I just drew with my finger from what you're

1  calling the bullpen, break room past through that door
2  and through that open area and through this door into
3  this area here that I marked with a circle.
4      A.  Okay.
5      Q.  What is this area here I marked with a circle?
6      A.  So that's the boiler room.
7      Q.  Again, this is self-explanatory.  But you got to
8  tell it to the jury.  What's in the boiler room?
9      A.  So the heating the HVAC stuff.  Honestly, I
10 don't -- I'm not 100 percent sure.  But I know that it
11 heated the building and that kind of stuff.
12     Q.  There's an access door to the boiler room,
13 correct?
14     A.  Yes.  Right there.
15     Q.  How is that secured?
16     A.  By a key.
17     Q.  Now, I want to move back towards the bullpen
18 break room area.  There's a door there that's marked on
19 the diagram; is that accurate?
20     A.  It is.
21     Q.  Can you explain to the jury here how that door
22 was secured and how it functioned?
23     A.  Yep.  So that's the door obviously the access
24 into the boiler room area, and that would be dead
25 bolted.  So part of the nightly routine would shut that

1   dead bolt closed.

2       Q.  When you say dead bolted, you'll have to give us

3   on what side of the door.

4       A.  Well, I don't recall exactly, but I know you

5   threw it.  There was like a -- it had like a little

6   handle, and you kind of threw it over.

7       Q.  From this side here?  On the break room side of

8   the door to lock it?

9       A.  Yeah.  I'm sorry.  Yes.  On the break room side

10  of the door, yes.

11      Q.  Okay.  So door would be shut, someone slap the

12  bolt and off you go?

13      A.  Correct.

14      Q.  Let's focus our attention to what's described as

15  the office space.  Do you see that there, sir?

16      A.  I do.

17      Q.  So you mentioned that at some point, you moved an

18  office down into the T-2 building?

19      A.  Right.

20      Q.  We'll talk about that later.  Can you show the

21  jury where your workplace was and at what point and time

22  you started working in this office?

23      A.  Sure.  So in December of 2011, I had a desk put

24  in right there.

25      Q.  So that would be your desk?

1    A.   Yes, sir.

2    Q.   Mr. Hopkins' desk?

3    A.   Right there.

4    Q.   Upper left of the office place -- the office

5    space?

6    A.   Yes.

7    Q.   Then how about Mr. Hopkins?

8    A.   Mr. Hopkins was there.  I was there, and

9    Mr. Hopkins was there.

10   Q.   I'm sorry.  Mr. Belisle?

11   A.   Mr. Belisle was there.

12   Q.   And then this red object, what is that?

13   A.   That's a couch.

14   Q.   Where did Mr. Wells work?

15   A.   He sat right there.

16   Q.   Right here?

17   A.   Yes.  By the door.

18   Q.   There was a door in place at the time of the

19   murders, sir?

20   A.   Yes.

21   Q.   Where it says "Ramp Up," can you explain to the

22   jury what that is?

23   A.   Yeah.  So this part of the building was a

24   different level than the repair part of the building.

25   So there was just a ramp.  Instead of steps they put a

1    ramp in.

2      Q.  If we could leave this up for just a few more

3    minutes.

4        Can you tell the jury your recollection of how

5    the rigger shop was secured morning, evening, things of

6    that nature, in between shifts?

7      A.  Sure.  So in the evening, the last person in the

8    shop would go around and make sure all the doors were

9    locked.  And that was part of routine.  Whoever the last

10   one was in there would make sure those were all locked

11   and then go out through the key card door.  And then

12   that was key carded.

13       And then periodically -- well, not periodically.

14   On a scheduled visit, the chief watch officer up the

15   hill would do walkthroughs of the building.  So I know

16   for sure at one point in the morning, one in the

17   evening, and they might have done one overnight as well

18   to check security of the building.

19     Q.  That's sort of standard operating procedure?

20     A.  Yes, sir.

21     Q.  In a general sense, in the year 2012, do you have

22   an understanding about who would arrive first and then

23   after that?

24     A.  Yes.  So the civilians arrived first.  They

25   started work at 0700.

1    Q.  Tell the jury who the civilians were.

2    A.  Mr. Wells and Mr. Belisle.

3    Q.  They started at 7:00?

4    A.  At 7:00.

5    Q.  Okay.

6    A.  And then the rest of the crew started officially

7    at 8:00, but ET1 Hopkins would generally be there

8    earlier than that, oftentimes around the same time the

9    civilians came in. And then the non-rates and

10   ET3 Beauford would come in. We did colors every day, so

11   they would actually often come in but go up the hill to

12   get the flags. We kept the flags in the basement of T-1

13   for safekeeping. And then they'd bring the flags down

14   and stand by for colors.

15   Q.  So some of us may not be familiar with when you

16   say colors and stand by for colors. Was there a routine

17   with that?

18   A.  Right. So --

19   Q.  Yes?

20   A.  Yes.

21   Q.  Okay. And tell them what the routine was on a

22   daily basis.

23   A.  Okay. So colors is the American flag. And if

24   it's not -- if the flagpole isn't lit, then you have to

25   do colors at 0800 and again at sunset. At the time we

1  were having issues with that, the lights that were

2  shining on the flag.  So we were doing colors every day.

3      Q.  So backing up as to the arrival of people at work

4  in the morning, who would be the first three to arrive?

5      A.  Mr. Wells, Mr. Belisle, and, generally speaking,

6  ET1 Hopkins.

7      Q.  If we could pull up Exhibit No. 8, briefly, which

8  I believe is already admitted.  Yes?

9          THE COURT:  Yes.

10     Q.  With respect to the parking arrangement -- we

11  have the live photo as opposed to the diagram -- could

12  you show the jury your understanding of who was parking

13  there, and if you see someone's vehicle in that image.

14     A.  Yeah.  So you can see a gap here between Rich's

15  vehicle and the building.  That's where Mr. Wells would

16  generally park -- well, always park.

17     Q.  The same orientation, nose in?

18     A.  Nose in, yeah.  Yeah, always nose in.  So

19  Mr. Wells always parked there.  Mr. Belisle would always

20  park there.  And then here are the two, our two

21  Government vehicles, our two trucks.  And then

22  ET3 Beauford and the non-rates would kind of just park

23  like right here, like in a row.  And then I would park

24  on this side of the building.

25     Q.  There's a black truck.  Do you see that in the

1  photograph?

2    A.  This one right there?

3    Q.  What appears to be a black truck.  Do you know

4  whose vehicle that is?

5    A.  Yeah.  It's a blue truck.  It's Mr. Belisle's

6  truck.

7    Q.  If we could have exhibit -- remove this one for

8  me, Blair, please.

9       I'm going to try to save some time with some

10  exhibits here.

11       THE COURT:  Certainly.  Everybody doing okay?

12  Anyone need a break?

13       (Pause)

14       MR. SKROCKI:  We have agreed Exhibits 18 to 32

15  admitted by stipulation.

16       THE COURT:  Is that correct, Mr. Colbath?

17       MR. COLBATH:  That's correct, Your Honor.

18  They're all photos.

19       THE COURT:  All right.  18 through 32 are all

20  admitted.

21       (Exhibit Nos. 18-32 admitted.)

22       THE COURT:  Go ahead, please.

23  BY MR. SKROCKI:

24    Q.  Mr. Reckner, what does this photograph depict?

25    A.  So that's the gravel driveway going up to the

1    repair shop area of the T-2.

2        Q.   All right.  And on the left-hand side, there's a

3    vehicle there.  Do you see that vehicle?

4        A.   I do.

5        Q.   What is that?

6        A.   That's a snowcat.

7        Q.   And then further back, what's that vehicle there?

8        A.   That would be the large line truck.

9        Q.   There's two doors that you see here.  Those lead

10   to where, sir?

11       A.   Those lead into the repair shop.

12       Q.   Do you recognize these two vehicles here that

13   I've circled there, the silver and what looks like a

14   black vehicle in my screen?

15       A.   I do.

16       Q.   Whose vehicles are they?

17       A.   So that is Seaman Henry's vehicle.

18       Q.   That's the silver one, for the record?

19       A.   Yes, sir.

20       Q.   Leah Henry?

21       A.   Leah Henry, yes.

22       Q.   And next to it?

23       A.   That's Aaron Coggins' vehicle.

24       Q.   Is this the hill behind T-2 you were talking

25   about earlier?

1    A.  Yes, sir.

2    Q.  19.  What does that depict?

3    A.  That's the parking lot on the day of the murders.

4    Q.  Do you recognize two vehicles that are parked

5    there towards the gray roof side of the T-2 rigger shop

6    building?

7    A.  I do.

8    Q.  Whose vehicles are those, sir?

9    A.  So the blue one here is ET1 Jim Hopkins, and the

10   other blue one here is Mr. Rich Belisle's.

11   Q.  Do you see on that photograph, sir, where you

12   mentioned the key card assess was to get into the T-2

13   rigger shop building?

14   A.  I do.  It's kind of washed out, but you can kind

15   of see the brown boarding of the top or border at the

16   top.  That would be it right there.

17   Q.  20.  Thank you, Blair.

18        And the orientation on this photograph,

19   Exhibit 20, has changed a little bit, Mr. Reckner?

20   A.  Can you repeat that?

21   Q.  Sure.  The orientation of the photograph has

22   changed a little bit?

23   A.  Yes.

24   Q.  So where is the photographer in this photograph?

25   A.  He's standing on the road leading up to T-1.

1    Q.  On the -- this is the backside of the T-2

2  building?

3    A.  It is.

4    Q.  And are these the windows you described earlier?

5    A.  Yes.

6    Q.  And their height is approximately how high?

7    A.  I'm five-eleven, and they're at least head high

8  to me, so --

9    Q.  21, please.

10        And that's the entire back of the T-2 building,

11  sir?

12    A.  Yes.

13    Q.  Let's go from left to right.  Left to right.

14    A.  Yep.

15    Q.  If you can describe the windows and what they

16  access all the way from left to right, please.

17    A.  Sure.  So that window is the wood shop area

18  window.  I'm sorry.  That window is the Bobcat garage

19  shop area, so where we kept the Bobcat.  That's the wood

20  shop.  That is also the wood shop.  And then here,

21  actually, that's not the wood shop.  That's the break

22  room.  That's the break room.  So these two are break

23  room.  That's the bathroom.  I'm sorry.  I'm not seeing

24  it very well.

25    Q.  Want us to blow it up?

1    A.    Yeah, could you, please?

2    Q.    We're already on it.  Thank you.  Go ahead.

3    A.    That's better.  Let me start over.  Bobcat.  Wood

4    shop.  Wood shop.  So those two are wood shop.  Break

5    room, break room.  So those two look into the break

6    room.  That is the restroom.  That's a fan right there

7    that blows out.  And that is the boiler room area.

8    Q.    If we could reduce that, Blair.  Thank you.

9          And Mr. Reckner -- Blair, if you could enlarge

10   that.

11         I'm highlighting the enlargement there, the

12   cutout, Mr. Reckner.  On the distance, can you tell what

13   that object is?

14   A.    Right there?

15   Q.    Yes.

16   A.    Looks like snow.

17   Q.    And below that?

18   A.    Right here?  Looks like snow.

19   Q.    Is there an access point?

20   A.    There is.  So the driveway, I think the middle

21   driveway would be over in this area.

22   Q.    Thank you, Blair.

23         22.  That's an enlargement of the back of the

24   rigger shop, Mr. Reckner?

25   A.    Yes, it is.

1      Q.   Is this part of the T-2 equipment, this

2   bulldozer?

3      A.   It is.

4      Q.   And this larger vehicle here next to the

5   building, what's that?

6      A.   That's the large line truck I described earlier.

7      Q.   And this door in the vestibule, secured or

8   unsecured, sir?

9      A.   That's secured.  Are you talking about that

10   little one right there?

11     Q.   Yes.

12     A.   That's a screen door.  I think there was a little

13   lock on it.  Sometimes it would be locked.  I don't

14   remember if it was always locked.  But the one on the

15   other side of that was definitely locked.

16     Q.   Mr. Reckner, were there, at the time you were

17   there in the rigger shop before the murders, any video

18   cameras in the back of that building?

19     A.   No.

20     Q.   Do you know why that is?

21     A.   I don't.

22     Q.   Were there video cameras on the T-2 rigger shop

23   building?

24     A.   There was.

25     Q.   Where would that have been located?

1    A.  On the other side of that picture.

2    Q.  23, please.

3        Is that the video camera?

4    A.  Yes, sir, it is.

5    Q.  Where is that located in terms of the orientation

6    of the T-2 building?

7    A.  So this right here is the mechanism for those

8    large garage doors that go into the repair area.  And so

9    the camera is right here, directly adjacent to it.

10   Q.  Can I have 18, please.

11       If you could manage with this Exhibit 18, where

12   is the video camera?

13   A.  It would be right here.  In the last picture, you

14   could kind of see the top of this wood barricade going

15   under the fence, going around the dumpster.  It's like

16   right there.

17   Q.  Okay.  Let's go to 19.  There we go.

18       Can you point it out now?

19   A.  Sure.  Right there.

20   Q.  Right there?

21   A.  That's it, yes, sir.

22   Q.  Mr. Reckner, while you there, did you have an

23   understanding of sort of the field of view of this

24   camera?

25   A.  I did, yeah.

1     Q.   What was it used for?

2     A.   It was usually used to keep an eye on the flag in

3     that direction of the flagpole and keep an eye on the

4     flag.

5     Q.   Why?

6     A.   A couple reasons.  One, they actually -- so at

7     0800 when you blow colors, they would actually do that

8     up at the T-1 ops deck.  And so he could see that the

9     non-rates were in position, ready to do the flag right

10    at 0800.  And also to see if it was lit.  Sometimes

11    those lights would go off.  And then after that, it was

12    general security.  You could kind of see the road going

13    out that way.

14    Q.   And with respect to that camera, where was the

15    line for viewing run?

16    A.   So the camera was controlled up on the ops deck

17    in T-1.

18    Q.   So not being in the Coast Guard myself, could you

19    explain ops deck to the jury?

20    A.   Yeah.  I kind of talked about it earlier.  So up

21    in T-1, we have the operations deck, and that's where

22    the operations specialists work, and they're the ones

23    who are manning the radios.  So there's a bunch of

24    booths and work areas for them to listen to the radios

25    to catch that call when it comes in.  And there's a

1  chief watch officer, and he's in charge of the watch.

2  And he's the one who would be manipulating the cameras

3  around the station when he needed to.

4      Q.  Another self-explanatory question, but what does

5  blow colors mean?

6      A.  So again -- so at 0800, if you've ever been on a

7  military base, you'll hear like a cannon go off maybe or

8  a whistle or something like that.  So when we talk about

9  blow colors, it's usually a whistle or something like

10  that.

11      Q.  For the colors going up?

12      A.  Right.  So going up and down, right.

13      Q.  Okay.

14      A.  That gives the cue of the folks manning the

15  flagpole when to go up and when to go down.

16      Q.  Blair, if we can have 24, please.

17          Another -- what's -- yeah, take your time.

18  Swallow your water.

19      A.  Thanks.

20      Q.  Mr. Reckner, what does that depict?

21      A.  So that is the camera.

22      Q.  The camera we've been talking about at the end of

23  T-2?

24      A.  Yes, sir.

25      Q.  Roughly how high in the air is it?

1    A.  That's got to be 10, 12 feet off the ground
2  probably.  That's pretty high.
3    Q.  Was there any equipment in the rigger shop that
4  you could view what was being recorded on that camera?
5    A.  There was not.
6    Q.  Were you generally familiar with the field of
7  view and what that camera could do in terms of rotation
8  or up and down?
9    A.  Generally.
10    Q.  Generally.  What do you recall?
11    A.  Well, I recall that it could go left or right.
12  That's what I can recall.  I don't remember if it goes
13  up and down.  It may have, but I know it can definitely
14  be panned left and right.
15    Q.  Do you know if it could go straight down?
16    A.  I don't -- honestly don't know.
17    Q.  Can we have Exhibit 25, Blair.  Can you do a
18  little bit of magic and pop up 13 with it.  Thank you.
19       So Mr. Reckner, can you, Exhibit 25, orient the
20  jury as to what door this is and how it's accessed?
21    A.  Sure.  So that's the key card door.  And that's
22  this door right here.  And you can see the card reader
23  right there.  So that's where you would take your badge
24  and badge it.
25    Q.  Is there another way to access that door without

1   using the card reader?

2       A.  There is.  This handle right there had a keyhole

3   in it.  And if you had the key, which some of us did,

4   you could use that.

5       Q.  Could you show the jury where Exhibit No. 25 is

6   on Exhibit No. 13?

7       A.  Yes.  Right there.

8       Q.  Here?

9       A.  Yes, sir.

10      Q.  And with respect to the key card reader that you

11  could see in 25, was that information collected to your

12  knowledge?

13      A.  There was a log that all of the -- any time

14  anybody swiped their badge on it, it would be logged up

15  the hill in T-1.

16      Q.  And to your knowledge, who would have keys to

17  that door where that door locked?

18      A.  To my knowledge, I had one.  Mr. Wells and

19  Mr. Belisle each had one.  ET1 Hopkins had one.  I don't

20  know if -- I think we had one on the duty key ring, so I

21  don't think ET3 and the non-rates had one.  They may

22  have, but I don't recall them having one.

23      Q.  Do you recall how long Mr. Wells had worked in

24  this building, in the T-2 rigger shop building?

25      A.  20 years.  Close to 20.

1    Q.  Do you know if he had keys to other parts of the

2   building?

3    A.  He had keys to all of our gates.  He had keys

4   to -- he had keys to the building.  Definitely that key

5   and perhaps other keys too.

6    Q.  Blair, can we leave 13 up and substitute 26?

7        Thank you.

8        Same thing, Mr. Reckner, if you could look at

9   Exhibit 26 and the door that's there.  Where does that

10  correspond to the access point on Exhibit No. 13?

11   A.  Sure.  So that's this door right here.

12   Q.  All right.  And do you know how this door was

13  accessed?

14   A.  Yes.  That was a dead bolt from the inside.

15   Q.  In terms of your prior testimony about how the

16  work flow of the morning worked, which door would be

17  accessed first and which door would be opened?

18   A.  So this door would be the only door you could get

19  into from the outside.  And you would come around here,

20  and you would unlock this door.

21   Q.  That's the one we see here?

22   A.  Correct.

23   Q.  In Exhibit 26?

24   A.  You could actually -- let me just back up.  You

25  could get into this door with the key card, but it

1  was -- I remember the key card being broken, so we never

2  used it.

3     Q.  Down here in the wood shop?

4     A.  Uh-huh.

5     Q.  If we could leave 13 up, Blair, and go to 27.

6         So this is kind of a new orientation,

7  Mr. Reckner.  Can you tell the jury what we see in 27?

8  Let's start maybe with our back and then move our way

9  forward towards the door.

10    A.  Okay.  So what you see here would be this wall

11 right here.  You can see the lockers on either side, so

12 there's those lockers there.

13    Q.  If you keep moving forward.  Yeah, just like

14 that.

15    A.  Okay.  So this door is the door here.  And then

16 you can see the bolt from the inside right there.

17    Q.  And Blair, can you enlarge that for us just

18 briefly?

19        That's the bolt you were talking about that would

20 be pushed back to open in the morning by whoever got

21 there first with the card?

22    A.  Yes, it is.

23    Q.  28, Blair, please.  Let's leave 13 up.

24        So what are we looking at here in terms of the

25 diagram on our left, Exhibit No. 13?  So what does this

1    tell us?

2       A.   So this is the door we just saw.  You just

3    stepped in, and you're looking to the right to the wood

4    shop area.

5       Q.   So there's some -- Blair, can you enlarge that

6    for me.  Thank you.

7            So if we go to look through that green frame,

8    what are we seeing back there?

9       A.   Sure.  So you see some Vidmars right there.

10   We're storing like saw blades, that kind of stuff in

11   there.  You can kind of see some woodworking equipment

12   back there.

13      Q.   Vidmars?

14      A.   Yeah.  Vidmar is just a term for like storage

15   locker, like drawers.

16      Q.   Is that a Coast Guard phrase?

17      A.   I think we called them Vidmars in the Navy too.

18      Q.   I'll go home and try that.  Okay.

19           So we're looking the wood shop then down here, so

20   through those double doors on Exhibit No. 13?

21      A.   Yes.

22      Q.   Seems like a little bit of a maze in there,

23   Mr. Reckner.

24      A.   It is.

25      Q.   Blair, we're going to skip 29.  If we could have

1    Exhibit 30, and leave 13 up, please.

2         And again, Mr. Reckner, if you could orient the

3    jury as to where this is on Exhibit No. 13.

4       A.  Sure.  So you're just inside the door here, and

5    you're now looking left into this area.

6       Q.  So you walked in this way and looked up that way?

7       A.  Correct.

8       Q.  And so with that point of reference, what we're

9    seeing here in Exhibit 30 on this wall here --

10      A.  Yes, sir.

11      Q.  -- and what are we seeing -- I'm marking

12   Exhibit 30 to the right of the green frame.  What are we

13   seeing there?

14      A.  That's the bookshelf right there in front of the

15   office door, adjacent to the office door.

16      Q.  Do you recall how many steps it would take for

17   you, Mr. Reckner, to get from the locker room entrance

18   to this point in front of that bookcase right there?

19      A.  I never counted, but five maybe.  Six.  Should be

20   pretty close.

21      Q.  Five or six?

22      A.  Yeah.

23      Q.  And if -- and if from this vantage point, and I'm

24   looking at Exhibit No. 13, okay, if you turn to the

25   right, what do you see -- where does that take you in

1   terms of the break room?

2     A.  Yeah.  So it would take you right to the break

3   room area right near this, the water fountain here.  So

4   from that vantage point, you should be able to see the

5   refrigerator here and the microwave in this area.  You'd

6   be able to see all of that.

7     Q.  You mentioned a water fountain.  Can you show the

8   jury where that is again, please?

9     A.  Yep.  So that's the water fountain right there.

10     Q.  This bookcase in Exhibit 30, is it reflected on

11   Exhibit No. 13?

12     A.  It is.

13     Q.  Where?

14     A.  Right there.

15     Q.  And from -- I'm going to mark sort of to the

16   right of the ramp up.  How far to the doorway to your

17   office space?

18     A.  From where you marked this mark here?

19     Q.  Yes, sir.

20     A.  Two steps.  You're standing right there at that

21   point.

22     Q.  Two steps?

23     A.  Yep.

24     Q.  And you would be into the office space or see

25   inside it?

1    A.  Yes, sir.

2    Q.  So where could you see inside that office space

3 from that point of view?

4    A.  You would see the whole thing.

5    Q.  Could you stand here in Exhibit No. 13, look that

6 direction and look that direction and have a clear field

7 of view?

8    A.  You could.

9    Q.  How much distance between the water fountain

10 roughly into the edge of that bookcase, do you recall,

11 Mr. Reckner, roughly?

12   A.  Roughly, 20 feet, 30 feet maybe.

13        MR. SKROCKI:  How are we doing on --

14        THE COURT:  We are at 4:00 p.m.  Ladies and

15 gentlemen, can everybody -- is everyone doing okay?

16 Anyone want a break?  I normally take a break about

17 every hour, hour and a half.

18        MR. COLBATH:  Your Honor, I would appreciate a

19 restroom break just for ten minutes.

20        MR. SKROCKI:  No objection.

21        THE COURT:  There you go.  They made the

22 decision for you.  Let's take about 10 or 15 minutes,

23 and we'll come back on record.  We'll go off record.

24        (Recessed from 4:01 p.m. to 4:16 p.m.)

25        (Jury present)

1          THE COURT:  All right.  Welcome back, everyone.
2     Please be seated, ladies and gentlemen.  And ready to
3     proceed?
4          MR. SKROCKI:  Yes, ma'am.
5          THE COURT:  All right.  Mr. Skrocki, go ahead,
6     please.
7          MR. SKROCKI:  Thank you.  Madam Clerk, if we
8     could have the lights.
9     BY MR. SKROCKI:
10      Q.  Mr. Reckner, let me go back just on a couple of
11    exhibits briefly.  Blair, if we could have Exhibit 19.
12         Do you recognize that photograph, Mr. Reckner?
13      A.  I do.
14      Q.  I want to turn your attention to this green
15    dumpster.  What's that behind there?  What's the
16    structure behind the green dumpster?
17      A.  That's a wood fence.
18      Q.  Okay.  Perfect, Blair.
19         And with respect to the location of this side of
20    the wood fence, where is it oriented and how close is it
21    to the building, T-2?
22      A.  There's enough space for a person to walk between
23    the wall of T-2 and that fence.
24      Q.  Did you ever do that yourself?
25      A.  I have.

1    Q.  If we can pull up 31 briefly.  If you can bring

2  back 13.

3        So before we broke for the afternoon break,

4  Mr. Reckner, we were looking at this area here, correct?

5    A.  Yes.

6    Q.  And maybe even a little further this way, looking

7  that way.

8    A.  Yes.

9    Q.  So Mr. Reckner, with respect to the diagram on 13

10  and the office space, you got a diagram here, but tell

11  the jury what the actual physical size of it was, width

12  and length.

13    A.  So the office was long and narrow like you see

14  there.  There wasn't a lot of space once the desks were

15  in place to walk down that aisle up to my desk area.  So

16  to walk this path here, you know, you'd kind of be like,

17  excuse me, and people have to pull their chairs in kind

18  of thing.  So it was pretty tight.

19    Q.  Blair, can you pull up 14?  That may need an

20  enlargement.

21        Great.  Thank you.

22        So you're saying this is pretty tight space?

23    A.  Yes, sir.

24    Q.  How about this space from here to there?

25    A.  So coming through here, you know, there was space

1   to walk, but still it's pretty tight.  But if you're

2   standing obviously this area here, which is right here,

3   is really tight.  And then this area here would also be

4   pretty tight.

5       Q.  With respect to the photograph you've got in

6   Exhibit No. 31, can you orient the jury as to where

7   that's depicted in Exhibit No. 14?

8       A.  So the person who took this picture is probably

9   standing right about this area looking this way.

10      Q.  Is this structure in Exhibit No. 31 here I'm

11  circling reflected in Exhibit No. 14, and if so where?

12      A.  Yes, sir.  It's the ramp right here.

13      Q.  This is the door in Exhibit No. 31 that enters

14  the office space on 14?

15      A.  Correct.

16      Q.  Blair, if we could take that down and then move

17  to Exhibit No. 235 for identification.

18          Mr. Reckner, I'm going to direct your attention

19  to the summer of 2011.  All right?

20      A.  Okay.

21      Q.  Was this photograph taken during that time?

22      A.  It was.

23      Q.  Do you recognize the people depicted in that

24  photograph?

25      A.  I do.

1      Q.   Who would they be?

2      A.   ET3 Cody Beauford, ET1 Jim Hopkins, Mr. Rich

3   Belisle and Mr. Wells.

4           MR. SKROCKI:  Move for the admission of 235.

5           THE COURT:  Any objection?

6           MR. COLBATH:  No.

7           THE COURT:  235 is admitted.

8           (Exhibit No. 235 admitted.)

9   BY MR. SKROCKI:

10     Q.   Mr. Reckner, you identified some individuals in

11  the photograph for identification.  So do it now for the

12  jury so they know who you're talking about.

13     A.   Sure.  In the red hat, that's ET3 Cody Beauford.

14  That's ET1 Jim Hopkins.  That's Mr. Rich Belisle.  And

15  that's Mr. Jim Wells.

16     Q.   Mr. Wells in the plaid jacket here?

17     A.   Yes, sir.

18     Q.   All right.  And this is Mr. Belisle?

19     A.   Yes.

20     Q.   So Mr. Reckner, who's the boss of this operation

21  here that's going on right now?

22     A.   So this is a technical operation going on, so

23  Mr. Wells is overseeing the technical aspects of

24  tightening up this guy wire.

25     Q.   So I want to use the phrase technical.  Explain

1    to the jury what you mean by technical.

2         A.   Sure.  So again, I kind of explained earlier.  So

3    Mr. Wells and Mr. Belisle were our technical experts

4    when it came to towers.  Tactically, or those in charge

5    of the operation were myself.  If I wasn't there, then

6    it would be ET1 Hopkins.

7         Q.   So Mr. Hopkins is here working with his men here?

8         A.   In this situation, he's in there working with his

9    men.  He's taking direction from Mr. Wells and getting

10   the job done, yes, sir.

11        Q.   You mentioned -- who is this individual in the

12   red?

13        A.   That's ET3 Cody Beauford.

14        Q.   Do you recall how old he was at the time of the

15   murder, sir?

16        A.   19.

17        Q.   Where was this photograph taken?

18        A.   That was taken on Shemya, Alaska.

19        Q.   And what were you doing down there and at what

20   time?

21        A.   It was summer 2011, June.  We were erecting two

22   new antennas out on Shemya.

23        Q.   How come?

24        A.   So we had recently closed down land station 2,

25   which was a manned station.  And we had some assets

1    there, and since it was going to be demanned, there

2    wasn't going to be anyone there anymore, we moved it

3    over to Shemya, which is also Eareckson Air Force

4    Station.  So that is manned with Air Force personnel,

5    and it had the real estate to hold our antennas.

6        Q.   And what agency was in charge of this operation?

7        A.   It was COMMSTA Kodiak.

8        Q.   How far of a flight is it from Kodiak to Shemya?

9        A.   So if you take a direct flight -- well, a direct

10   flight.  The Coast Guard C-130, it could be -- it would

11   be six hours if you didn't go out and do a mission,

12   which the air station often would schedule a mission, so

13   you would go fly the main boundary line, which is the

14   fishing line out there.  That could be 12 hours.

15       Q.   12-hour flight?

16       A.   Absolutely.

17       Q.   And what would you have -- with respect to this

18   operation, what was taken out there to get this done?

19       A.   So we had a lot of parts.  We sent two or three

20   C-130s full of antenna parts, the antennas themselves

21   and all the parts and pieces to go with that.  I think

22   we had two Coast Guard and an Air Force contracted

23   flight.  And then we also had a barge with a bunch of

24   concrete on it that also went out there.

25       Q.   And how many towers did you erect?

1    A.   We erected two.

2    Q.   How tall?

3    A.   The Voba was 88 feet, and the TCI was 120 feet,

4    thereabouts.

5    Q.   I'm sure you had good weather the whole time?

6    A.   We did not.

7    Q.   And who was in charge of this operation from the

8    Communications Kodiak's perspective?

9    A.   So that would be me.

10   Q.   Anybody else you relied upon?

11   A.   So ET1 Hopkins went out on the first wave.  We

12   sent personnel out there in two waves.  So ET1 Hopkins

13   would have been in charge on the ground until I got

14   there.

15   Q.   What did Mr. Hopkins do with respect to

16   organizing this project in Shemya?

17   A.   So he was very important.  He was instrumental in

18   helping coordinate the logistics.  It's not easy.  You

19   would think we're all Coast Guard, it's easy to grab an

20   airplane and put stuff on it.  It's not.  It takes a lot

21   of planning and working with the air station to grab

22   that asset, or the plane in this case, put a bunch of

23   parts on it and get it sent out to Shemya.

24   Q.   And as his supervisor, did you have a chance to

25   examine his work, and did you do anything in response to

1  seeing what he did?

2      A.  I did.  So in 2011, I nominated ET1 Hopkins for

3  sailor of the year.  Enlisted Coast Guard person of the

4  year is how I think they -- the official title.  So I

5  nominated him for that.

6      Q.  Did he receive an award?

7      A.  He did.

8      Q.  What did he receive?

9      A.  Well, he was the COMMSTA Kodiak enlisted sailor

10  of year.  He was also looked at to be the D17, which is

11  all of Alaska.  All Coast Guard members in Alaska,

12  sailor of the year, he competed for that as well.

13      Q.  Did you see potential in Mr. Hopkins' work with

14  respect to the Coast Guard and future advancements?

15      A.  I did.  I talked to him several times about

16  studying for the E7 test, the chief test, becoming a

17  chief.  I told him I thought he was ready for that step,

18  and I thought that if he didn't attain E7 and retired

19  before then, he would regret it.  So I encouraged him to

20  take that path.

21      Q.  Are you aware of some discussion at some point

22  about Mr. Hopkins thinking about retiring from the Coast

23  Guard?

24      A.  So he mentioned it.  And honestly, anybody -- I'm

25  retirement eligible, and I talk about it.  Anybody who

1   is retirement eligible talks about it.  But he never sat

2   down with me in any serious way and said that he was

3   going to drop his letter and retire.

4       Q.   What do you mean drop his letter?

5       A.   So when you retire, you actually fill out a piece

6   of paper stating your intentions, I plan to retire on

7   this date.

8       Q.   Mr. Reckner, I want to turn your attention to

9   when you first arrived at the Communications Station in

10  Kodiak.

11      A.   Okay.

12      Q.   Can you tell the jury what expectations you had

13  as a manager, what your philosophy was going to be when

14  you got there and sort of what you were going to do

15  first time you arrived?

16      A.   Sure.  So my leadership style was not to make

17  drastic changes from day one.  I like to come in, get a

18  sense of operation, how the crew is working together,

19  how the command is structured, right?  Is it -- do we

20  have good top level support from the command on down?

21          Get a sense of all of that.  Get a sense of my

22  boss.  Get a sense of my subordinates and get a sense of

23  the overall shop and how it's running before I will make

24  any changes.  So that's always my plan going into any

25  new unit.

1    Q.  And how long did that plan last when you got to

2  the Communications Station as a manager of the rigger

3  shop?

4    A.  About three or four months.

5    Q.  So let me stop you there.

6    A.  Sure.

7    Q.  And Madam Clerk, if you want to put the lights

8  back on, we're done for a little bit with the overhead,

9  please.

10       So three or four months.  During that time, did

11  you take an assessment about the people and

12  circumstances you were going to be supervising?

13    A.  I did.

14    Q.  Would you please tell the jury what you did and

15  what you observed?

16    A.  Sure.  So initially, I was told that the rigger

17  shop was pretty hands off.  And I wouldn't -- they

18  wouldn't need much oversight.  I found that not to be

19  the case.  So I started to insert myself in the process

20  more to have the chief presence in the shop, which I

21  did.  And then over the course of that year and a half,

22  I guess that increased a bit.

23    Q.  Where was your office when you first arrived?

24    A.  So I had an office up in T-1 on the T deck.

25    Q.  Did there come a point in time you became aware

1    of some issues with both of the civilians working in the

2    rigger shop, namely Mr. Belisle and Mr. Wells?

3        A.   I did.

4        Q.   What were those issues?

5        A.   So I guess the catalyst, the thing that kicked it

6    off was I found out a week before Mr. Belisle and

7    Mr. Wells were going to take a TID trip, a temporary

8    trip to another unit or somewhere in the Lower 48, I

9    think.  But we didn't have any prior knowledge of that.

10   So I went and talked to the engineering officer.

11       Q.   Who would that have been?

12       A.   That was Bill Reed, Senior Chief Reed.  I let him

13   know that I just found this out.  And he said, "We need

14   to fix that," so we did.

15       Q.   Were there other issues besides that lack of

16   notice as to a trip that you became aware of?

17       A.   So that was the trip I was just speaking of.  I

18   wasn't aware of that trip.

19       Q.   What about other issues in terms of office

20   comings and goings, things of that nature?

21       A.   So the other issue that we were having was I

22   would ask ET1 where Mr. Wells was, and he often wouldn't

23   have an answer to that.  So again, I brought that to

24   Bill Reed, my boss.  And he wanted to address that.

25                MR. COLBATH:  Your Honor, I'm going to object

1  as to hearsay conversations.

2          THE COURT:  All right.  That's sustained.  Go

3  ahead.

4  BY MR. SKROCKI:

5      Q.  Were you aware of other issues in general,

6  without what people told you --

7      A.  Yes.

8      Q.  -- as a supervisor that you wanted to remedy?

9      A.  Yeah.  It was my experience that work, the

10 workday wasn't starting or work wasn't starting until

11 Mr. Wells was ready to start work.

12     Q.  Did that result in some activity from the

13 management perspective of the Coast Guard to Mr. Wells

14 and Mr. Belisle?

15     A.  It did.

16     Q.  What was the result of that?

17     A.  So Bill Reed, Senior Chief Reed drafted a letter

18 of expectations.  And in that letter was a memo, spelled

19 out notification processes, procedures, leave processes

20 and procedures, any advanced -- any trips, we were going

21 to have advanced notice of that.  And so we gave that to

22 Mr. Belisle and Mr. Wells.

23     Q.  If we could pull up Exhibit 35, please, for

24 identification for Mr. Reckner.

25          There's two pages to that, Mr. Reckner.  Do you

1    recognize the first page of that document?

2        A.   I do.

3        Q.   If you can go to the next page, Blair.

4             Do you recognize the second page and the

5    signature at the end?

6        A.   I do.

7        Q.   Is that the memo of expectations you spoke about?

8        A.   It is.

9             MR. SKROCKI:  Move to admit Exhibit 35.

10            THE COURT:  Any objection to 35?

11            MR. COLBATH:  Your Honor, my -- I object as --

12   I believe it's hearsay.

13            MR. SKROCKI:  Let me ask him as part of

14   Mr. Wells -- let me get a further foundation.

15            THE COURT:  All right.

16   BY MR. SKROCKI:

17       Q.   Is this something you're familiar with the

18   drafting of?

19       A.   Say that again.

20       Q.   Are you familiar with the drafting of this?

21       A.   So I didn't draft it.  Senior Chief Reed drafted

22   it.  I helped him with some of the verbiage.

23       Q.   Okay.  So you're familiar with it, correct?

24       A.   Yes.

25       Q.   Did you review it?

1    A.   I did.

2    Q.   Was this part of Mr. Wells' personnel file?

3    A.   It is.

4    Q.   Is this something you relied on and communicated

5    with Wells as an employee?

6    A.   It is.

7    Q.   Is this something you communicated to the upper

8    chain of management in dealing with Mr. Wells and

9    Mr. Belisle on this issue?

10   A.   Can you say that again?

11   Q.   Sure.  Did you talk to the higher-ups about this

12   letter?

13   A.   Yes.

14   Q.   And this is part of Mr. Wells' personnel file?

15   A.   It is.

16   Q.   You had access to that personnel file as his

17   supervisor?

18   A.   I did.  It was in my office.

19   Q.   And this was relied upon by you in the ordinary

20   course of business --

21   A.   Yes.

22   Q.   -- with the Coast Guard?

23   A.   Yes.

24        MR. SKROCKI:  Move for the admission of 35.

25        THE COURT:  As a business record?

1          MR. SKROCKI:  Yes.

2          THE COURT:  That's what I heard.

3          MR. COLBATH:  Yes, with that additional

4    foundation, Your Honor, I won't object to 35.

5          THE COURT:  All right.  Then 35 is admitted.

6          (Exhibit No. 35 admitted.)

7          MR. SKROCKI:  If we could have the lights,

8    please.

9    BY MR. SKROCKI:

10    Q.  First thing, Mr. Reckner, I want to direct your

11   attention to the "To" section.  This says, "To Rich

12   Belisle."  Do you see that?

13    A.  I do.

14    Q.  Then I want you to -- Blair, if we can go to the

15   second page.

16         The second page, whose signature is that?

17    A.  That's Mr. Wells'.

18    Q.  And the date?

19    A.  2 November 11.

20    Q.  Let's go back to the first page.

21         So why is there a difference between that first

22   page and the second page?  Can you explain that to the

23   jury?

24    A.  I can.  So that's a clerical error on my part.

25   The two letters are exactly identical with the exception

1  of the names at the top.  So when I had them both in my

2  office and we were discussing the letter and I put them

3  in their files, I just mixed up the top pages.  So

4  that's why Mr. Belisle's name is on this, but the one in

5  Rich's folder says Jim Wells on it.

6      Q.  So let's go back to the date of letter.  Do you

7  see the upper left-hand -- upper right-hand side?

8      A.  Yeah.

9      Q.  What date is that?

10     A.  29 April 2011.

11     Q.  It's reflected in paragraph one the same date?

12     A.  Yes.

13     Q.  Is that the date you had a sit-down with these

14  two men?

15     A.  It is.

16     Q.  Describe what happened during the course of the

17  meeting.  Who was there during the meeting?

18     A.  So it was Senior Chief Reed, my boss; myself and

19  ET1 Hopkins; Mr. Belisle and Mr. Wells.  Senior Chief

20  led the meeting, and he went through the letter and

21  discussed it with both Mr. Belisle and Mr. Wells.

22     Q.  So we're going to go through this piece by piece.

23  There's a section here on sick time and vacation time.

24  Do you see that?

25     A.  I do.

1    Q.   Generally, Mr. Reckner, why is that there?

2    A.   So --

3    Q.   About sick and vacation time?

4    A.   So we weren't getting notification, advance

5    notification to this point of vacation time, and we

6    weren't getting phone calls from Mr. Wells when he was

7    sick.

8    Q.   What does it ask for both these men to do?

9    A.   So it's asking them when reasonably able to do

10   so, to notify their supervisor, ET1 Hopkins, in advance,

11   and then also to notify ET1 Hopkins, myself, the EO, who

12   was Bill Reed, by phone or e-mail if they're going to be

13   sick.  Or they could also call the chief watch officer

14   and let him know that he wouldn't be in.

15   Q.   Thank you.

16        When you say ET1 throughout this whole afternoon

17   and maybe tomorrow, you mean Mr. Hopkins?

18   A.   I'm always referring to Jim Hopkins.

19   Q.   And then look at the second section on travel,

20   please.  Why was that there?

21   A.   So again, we were kind of caught off-guard there

22   when they had a trip scheduled and we didn't know about

23   it.  So Senior Chief Reed wanted to have advanced

24   knowledge of that, and he wanted to be the approval

25   authority of any travel that the civilians were taking.

1    In addition, he wanted them to be able to explain how

2    their travel would benefit the Coast Guard.

3        Q.   Thank you.

4             Let's go to subsection C, Blair.

5             Why did you put that section in the letter?

6        A.   So again, it was my experience I observed ET1

7    Hopkins wasn't being respected as the shop supervisor.

8    He wasn't setting the work schedule.  It was Mr. Wells

9    setting the work schedule, and work wasn't getting done

10   until Mr. Wells wanted to do it.

11            And in addition to that, my boss, Bill Reed would

12   ask me what the civilians were doing or where they are

13   and I couldn't answer him.  So I asked ET1 the same

14   question, and he couldn't answer it.  So we weren't

15   being notified of his whereabouts.  So Senior Chief Reed

16   wanted to have that in writing saying, You need to let

17   us know where you are and that ET1 is the boss.

18       Q.   Thank you.  I want to generally, just generally

19   talk about the trees in paragraph D.  You don't need to

20   blow it up, Blair.

21            Was that something that you felt needed to be

22   communicated to all the staff?

23       A.   Yes.

24       Q.   Okay.  So to all the staff, what was the point of

25   paragraph D with this tree cutting?

1    A.  So in the normal course of business, the antenna

2   field maintenance I spoke of earlier, we take down

3   trees.  So if a tree is being too close to an asset, an

4   antenna, a guy line or road or a fence or something like

5   that, then we'll take that tree down.

6        Once the tree is on the ground and it's been

7   safed, if you will, limbed and in a safe state so it

8   can't hurt anybody, after that the wood was available to

9   anybody on the Communications Station.  So first come,

10  first serve after hours, you could go out and grab some

11  of that wood and take it home for personal use.

12   Q.  And did people do that?

13   A.  People did that, yes.

14   Q.  How did Mr. Wells heat his home?

15   A.  By wood, primarily, my understanding.

16   Q.  Other people heat their house with wood?

17   A.  I think other people did heat their house with

18  wood.  I don't know specifically everybody who did.  But

19  I do know Mr. Wells did because it was discussed.

20   Q.  So this was just generally like, here's how we're

21  going to do this?

22   A.  Yes.

23   Q.  Okay.  In this subsection C, I want a weekly work

24  list e-mailed to Mr. Hopkins and these other folks.  CC

25  is who?

1    A.   CC to myself and to Bill Reed, the EO.

2    Q.   Got it.  Okay.  Next page, please.  And if you

3    could enlarge this entire section, Blair.

4         Could you read that section to the jury, please,

5    Mr. Reckner?

6    A.   I can.  "I have high expectations of you as a

7    former chief in the Coast Guard.  Mainly I expect you to

8    support, assist and mentor the ET1, assigned as the

9    rigger shop supervisor.  I recognize your knowledge and

10   experience and require you to utilize it and share it in

11   order to further the goals and support the mission of

12   the rigger shop.  I expect you to bring up concerns or

13   issues you may have.  I expect you to support the

14   decisions of the command and supervisors, especially in

15   front of the non-rates and junior petty officers in the

16   rigger shop."

17   Q.   So let's take a step back from this, Mr. Reckner.

18   What was the genesis or the reasoning for putting this

19   paragraph at the end of this memo of expectations?

20   A.   So I kind of mentioned earlier both Mr. Wells and

21   Mr. Belisle were retired chief petty officers in the

22   Coast Guard.  And in our organization, we take attaining

23   a rank of chief petty officer pretty seriously.  We have

24   a saying, once a chief, always a chief.

25        And so what we're trying to achieve here is to

let Mr. Wells know that as a former chief in the Coast
Guard, part of your not official duty, but part of your
brotherhood, I guess, in the chiefs' mess is to mentor
the ET1 as a chief in training and also the other folks
in the shop.  So that's what we're trying to get out of
that.

Q.  So I'm going to direct your attention to the
second line.

That's what you mean, this support, assist and
mentor Mr. Hopkins?

A.  Yes.

Q.  What do you do next -- what do you do with the
next sentence?  What are you telling Mr. Wells here and
Mr. Belisle, for that matter?

A.  We're telling them both, because we gave this to
both of them, that we recognize that their knowledge and
experience is valuable to the organization and we need
it to perform the job that the rigger shop needed to
perform.  In order to get the mission done, we were
going to rely on both these men and their knowledge,
expertise to get that done.

Q.  This was in April of 2011.  Finish your water.
Please take your time.

A.  So yes, April 2011 is when we gave that to them.

Q.  And Mr. Belisle's reaction to receiving this

1  letter?

2      A.  So Rich grabbed it, said everything in here seems

3  reasonable, no issues, and that was that.

4      Q.  What was Mr. Wells' reaction to it?

5      A.  Mr. Wells didn't react.  He didn't really say

6  anything.  It was more of a body language, I guess.

7  There was no positive reaction for sure.  Not in any

8  palpable way that I could see.

9      Q.  I want to ask a couple of questions on some

10  things you said.  You said, number one, Mr. Wells was a

11  civilian?

12      A.  Yes.

13      Q.  Not part of the Coast Guard anymore?

14      A.  Well, he was a civilian member of the Coast

15  Guard.

16      Q.  Correct.  But again, not a uniformed member of

17  the Coast Guard?

18      A.  No.  It's still subjected to the UCMJ in some

19  cases.

20      Q.  Is that why these expectations were listed out in

21  this memorandum?

22      A.  Yeah.  So again, I go back to the first line as a

23  former chief, that being a chief in the chief's mess,

24  you know, we take that seriously in our organization.

25  We accept retired chiefs into the mess.  When we have

mess meetings, they're not excluded.  They're certainly
invited.  We value their expertise, their experience.
We call that in the chief's mess.  So every chief's mess
I ever went to at Kodiak always had civilian members of
the Coast Guard there as well and sometimes who weren't
civilians.  They were just retired or work in town.  So
that's what we're getting at there.

Q.  I want to take you back one more step.

A.  Sure.

Q.  So you said chief's mess.  Can you describe what
that is for the jury?

A.  Sure.  So as an organization, you know, all the
chiefs are part of the mess, so -- and then even down to
the unit.  So we had a COMMSTA Kodiak chief's mess, and
all the chiefs were part of that.  And the command would
come to us with certain issues or things that they
wanted us to take on, usually dealing with leadership or
mentoring.

And then there was a larger Kodiak chief's mess
that all of the chiefs in -- stationed at Kodiak would
be a member of or belong to.  And kind of the same thing
where the chief of the mess would interface with the
command at a higher level if there's any issues that
command wanted to bring down for the chiefs to handle
and kind of to attend to, they would.  And plus, we did

1  a lot of charitable stuff as well.

2     Q.  Like what?

3     A.  We raised money for Coastguardsmen/women who

4  maybe had a relative die, and we would send them flowers

5  or send flowers to the funeral home of the relative.  Or

6  if a baby was born, we would buy smaller gifts for the

7  mother and the baby.  And then if someone was in dire

8  straits, financial issues, some house burning down or

9  they lost their house or something, we would gather the

10 money and donate to them for that kind of stuff too.

11    Q.  In terms of participation, was Mr. Belisle active

12 in the chief's mess?

13    A.  He was active.  He went to CCTI.  That's another

14 thing.  Chiefs called to initiation, which is a big --

15 when you become a chief, you go through a process as a

16 new chief being mentored by seasoned chiefs.  And that

17 process is called CCTI, and Rich was at the CCTI dinner.

18    Q.  Mr. Wells participate in the chief's mess?

19    A.  I never saw him there.  In fact, when I was going

20 through CCTI, we would submit words of wisdom, a sheet

21 of paper, to chief petty officers, experienced, seasoned

22 chief petty officers, and request their words of wisdom.

23 So I gave one to each of them.  I received one back.

24    Q.  Each of them?

25    A.  Both Mr. Wells and Mr. Belisle.  I received one

1    back from Mr. Belisle, but not from Mr. Wells. I still

2    have it.

3       Q. With respect to the date here signed by

4    Mr. Wells, what's the date there, sir?

5       A. That's 2 November 11.

6       Q. Why the discrepancy between April and November?

7       A. So we were working with the base HR rep while we

8    were creating these things. We weren't doing any of

9    this stuff in a vacuum. The command was involved. HR

10   was involved.

11      Q. What were you advised to do?

12      A. We were advised to --

13         MR. COLBATH: Your Honor, I'm going to object

14   as to hearsay, what somebody else advised him.

15         THE COURT: That's sustained as to hearsay.

16   BY MR. SKROCKI:

17      Q. When you submitted the -- had the sit-down in

18   April with Mr. Wells, did he sign it?

19      A. He did not.

20      Q. Did you resubmit this to him for signature?

21      A. I did.

22      Q. When did you do that?

23      A. On 2 November 2011.

24      Q. For what purpose? Without telling us what

25   anybody said, for what purpose?

1    A.  We needed to have his signature on the document,

2  and it just signified that he received it.

3    Q.  If you could take that down, Blair.  If we can go

4  back to the first page.

5       Mr. Reckner, as a supervisor of the rigger shop

6  and the IT section of T-1, do you have an understanding

7  about the various levels of, for lack of a better word,

8  discipline or managerial recommendations to employees in

9  the Coast Guard?

10   A.  I do.

11   Q.  And their various levels of severity?

12   A.  Yes.

13   Q.  This letter or memo of expectations, where does

14  that fall on that spectrum of severity?

15   A.  This wouldn't be disciplinary at all.  It's an

16  expectation letter letting the employee know what we

17  expect of them.

18   Q.  After receipt of that memo of expectations in

19  April of 2011, did Mr. Belisle's conduct change as you

20  noticed?

21   A.  Well, I never had an issue with Rich's conduct.

22  We gave it to both of them in the interest of fairness,

23  but we had issues with Mr. Wells' conduct.

24   Q.  Did he ever respond or change as to the requests

25  made in the memo of expectations?

1    A.  Mr. Wells?

2    Q.  Yes.

3    A.  Not that I observed.

4    Q.  Were you Mr. Wells' rating official for his

5  performance for the years 2010 to 2011, 2011 to 2012?

6    A.  Yes.

7    Q.  Is that when it first started 2010, 2011?

8    A.  Yes.

9    Q.  The year prior to that, were you his performance

10  rating official?

11    A.  I was not.

12    Q.  Are you familiar with as a supervisor his

13  performance rating for the years 2009 and 2010?

14    A.  I am.

15    Q.  And that was not done by you?

16    A.  It was not.

17    Q.  But it is in his file?

18    A.  It is.

19    Q.  His rating overall was what, sir?

20    A.  It was exceeds.

21    Q.  Exceeds.  Exceeds what?

22    A.  Exceeds expectations.

23    Q.  Generally, can you tell the jury in that rating

24  year of '09 and '10 what areas Mr. Wells exceeded?

25    A.  So he exceeded in job performance.  What was

1  that, '09/'10, you said?

2      Q.  Yes.

3      A.  So job performance, teamwork.  I can't remember

4  the other two.

5      Q.  But he exceeded.  So that's the highest rating

6  you could get?

7      A.  I mean, I didn't rate him.  Someone else did.

8  But yes.

9      Q.  I'm sorry.  Just to be clear, that was the

10 highest rating you could get?

11     A.  Yes.

12     Q.  When you rated him for the year 2010/2011, do you

13 recall what you rated him as his rating official?

14     A.  I do.

15     Q.  What did you rate him as?

16     A.  So I rated him -- in two of the markings, I rated

17 him -- in two of the metrics exceeds and one in meets.

18     Q.  Two is exceeds and one in meets?

19     A.  Yes.

20     Q.  Which one was meets?

21     A.  Teamwork.

22     Q.  Teamwork?

23     A.  Yes.

24     Q.  What was the sort of general characteristic for

25 teamwork?

1    A.   Everything you would think that that term

2  entails.  Are you a good member of the team?  You know,

3  do you support the team?  That kind of thing.

4    Q.   You his rating official for 2011 and 2012?

5    A.   I was.

6    Q.   And before giving a yearly evaluation, do you do

7  anything with an employee you supervise for what's

8  expected for the upcoming year?

9    A.   Yeah.  We do what we call mid-mark evaluations.

10  So somewhere in the middle of that marking period,

11  they'll sit down and just have a discussion with the

12  member.

13    Q.   Did you have a sit-down with Mr. Wells to that

14  effect?

15    A.   We did not in '11/'12.

16    Q.   How about in 2010/2011 -- or 2011?  Excuse me.

17    A.   We did in 2011.

18    Q.   Okay.  For the upcoming year, 2012?

19    A.   Yes.

20    Q.   And did you -- what did you tell him when you sat

21  down with him?

22    A.   So I think what we are referring to is the end of

23  2010/11 and the beginning of '12 -- of '11/'12, right?

24  So when we sat down and reviewed the old one, we review

25  the old one and then we go over the new one.  So the

1    past, we discuss that, and then we also discuss what

2    we're going to be looking at in the next future for the

3    next marking period.

4        Q.  Did you take any steps as a manager with respect

5    to Mr. Wells' performance plan for 2012?

6        A.  Yes.

7        Q.  Did you make changes?

8        A.  Yes.

9        Q.  Please tell the jury what changes you made as a

10   manager.

11       A.  So we added two more metrics.  We wanted to grade

12   him on timeliness and quality of work and communication.

13       Q.  Why those factors, sir?

14       A.  Because those were two of the factors we were

15   having issues with.

16       Q.  Communication in what respect?

17       A.  Again, not getting updates on his whereabouts,

18   not getting timely leave forms, that sort of stuff.

19       Q.  And then timeliness, what was the issue with

20   that?

21       A.  So quality of work and timeliness or timeliness

22   of quality of work.  So projects, work had been assigned

23   to him and we weren't seeing any results.

24       Q.  As a manager, what was your basis for doing these

25   things with Mr. Wells?

1    A.   Just to correct the deficiencies and get

2    Mr. Wells on board with the process because he was an

3    important part of the organization.  And so, you know,

4    we had -- we needed to kind of address the issues we

5    were having, but at the same time, you're also creating

6    a paper trail.  If the behavior doesn't change, then you

7    have something to go fall back on.

8    Q.   From your perspective as his manager, did you

9    value him as an employee because of his experience and

10   skill and knowledge?

11   A.   I absolutely did.

12   Q.   Did you need it?

13   A.   We needed it, absolutely.

14   Q.   To do the mission of the Communications Station?

15   A.   Yes, especially that year in 2012.

16   Q.   Why is that?  Why that particular year?

17   A.   So winter of 2012 on Kodiak was exceptionally

18   harsh.  We got a lot of snow, and we had bad weather

19   starting early in winter and it just kept up all winter

20   long.  We lost -- somewhere around eight antennas were

21   either broken or damaged in some way, no longer working.

22        So we had a lot of work that we were going to

23   need to do in the summer of 2012 to get all of these

24   assets working again.  So we needed him on board

25   100 percent.

1          MR. SKROCKI:  Judge, this would be a good time

2     to break before we go into --

3          THE COURT:  Is this a good time?

4          MR. SKROCKI:  -- yeah.  Before we go into a

5     long subject.  So is that all right with you?

6          THE COURT:  All right.  That sounds fine.  Is

7     that all right with you all?  All right.  Very good.

8     Leave your notepads here, ladies and gentlemen.

9     Remember my admonition not to discuss the case with

10    family or friends or not to do any research.

11         And we will see you tomorrow at 9:00 a.m.  I'll

12    meet with the lawyers at 8:30, so hopefully we'll be

13    ready to go right at 9:00.  Have a pleasant evening, and

14    thank you for your careful attention.  You can all be

15    excused.

16         (Jury absent)

17         THE COURT:  All right.  Please be seated,

18    everyone.  Sir, 9:00 a.m. tomorrow.  We'll see you then.

19    You may be excused.  Thank you.

20         Mr. Skrocki, any topics we can take up today in

21    our remaining minutes?

22         MR. SKROCKI:  Not from us, Your Honor.  Thank

23    you.

24         THE COURT:  Very good.  Mr. Colbath?

25         MR. COLBATH:  No.

1        THE COURT: Nothing else? All right. Very

2  good. Then I'll see you all at 8:30. If you get

3  something drafted and can e-mail it to Emily and your

4  opposing counsel, that would be great on this one topic.

5  We'll go off record.

6        (Recessed at 4:54 p.m.)

7

8               CERTIFICATE

9    I, Sonja L. Reeves, Federal Official Court Reporter
in and for the United States District Court of the

10  District of Alaska, do hereby certify that the foregoing
transcript is a true and accurate transcript from the

11  original stenographic record in the above-entitled
matter and that the transcript page format is in

12  conformance with the regulations of the Judicial
Conference of the United States.

13

    Dated this 11th day of September, 2019.

14

15

                 /s/ Sonja L. Reeves

16                SONJA L. REEVES, RMR-CRR
                FEDERAL OFFICIAL COURT REPORTER

17

18

19

20

21

22

23

24

25