```
1                    UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF ALASKA
2

3   UNITED STATES OF AMERICA, )
                              )
4        Plaintiff,           )
                              )
5   vs.                       )    CASE NO. 3:13-cr-00008-SLG
                              )
6   JAMES MICHAEL WELLS,      )
                              )
7        Defendant.           )
    _____)
8

9        PARTIAL TRANSCRIPT OF TRIAL BY JURY - DAY 2
                 (Opening Statement of Defense)
10   BEFORE THE HONORABLE SHARON L. GLEASON, DISTRICT JUDGE
                  September 10, 2019; 8:37 a.m.
11                      Anchorage, Alaska

12  FOR THE GOVERNMENT:
         Office of the United States Attorney
13       BY:  STEVEN SKROCKI
         BY:  CHRISTINA M. SHERMAN
14       BY:  KELLEY L. STEVENS
         222 West 7th Avenue, #9
15       Anchorage, Alaska 99513
         (907) 271-5071
16

    FOR THE DEFENDANT:
17       Office of the Federal Public Defender
         BY:  GARY GEORGE COLBATH
18       601 West 5th Avenue, Suite 800
         Anchorage, Alaska 99501
19       (907) 646-3400

20       Camiel & Chaney, P.S.
         BY:  PETER A. CAMIEL
21       520 Pike Street, Suite 2500
         Seattle, Washington 98101
22       (206) 624-1551

23  _____

                    SONJA L. REEVES, RMR-CRR
24              Federal Official Court Reporter
                   222 West 7th Avenue, #4
25                 Anchorage, Alaska 99513
         Transcript Produced from the Stenographic Record
```

1          (Call to Order of the Court at 8:37 a.m.)

2          (Proceedings took place that are not included

3    in this Partial Transcript, after which, proceedings

4    continued as follows:)

5                    OPENING STATEMENT

6          MR. CAMIEL:  It's been seven years.  The

7    Government has had seven years to investigate Jim Wells

8    for these murders.  Seven years.

9          And what you're going to hear is that this was

10   an investigation of Jim Wells, not an investigation of

11   the murders of Jim Hopkins and Rich Belisle.  And there

12   is a difference, and you're going to hear about that

13   difference and what it means when you do a suspect-based

14   investigation, rather than an evidence-based

15   investigation.

16         And what you're going to hear is that in those

17   seven years, the Government has come up with no forensic

18   evidence to connect Jim Wells to these murders, none.

19   No physical evidence to connect him to those murders.

20   No eyewitnesses.

21         You heard about this car switch at the airport.

22   There is not going to be any witness that comes in and

23   sits in that chair, because that's where the evidence

24   comes from, and tells you that Jim Wells was at the

25   airport that morning switching into his wife's car.

1    No witness that saw Jim Wells by the T-2 rigger

2    shop that morning or at the airport.  No firearm

3    connecting Jim Wells to this murder.  Now, he had

4    firearms.  He had a .44 revolver.  They tested it.  It's

5    not the firearm that fired the bullets that killed those

6    two men.  No shell casings.

7    You're going to see pictures, and I'm sorry

8    you're going to have to see them, they're graphic, that

9    show this was a very bloody crime scene.

10    And the reason you need to see them is because

11    there is no blood that connects Jim Wells to these

12    murders, not on his clothes, not in his wife's car, not

13    in his car, not in his home.  None.

14    No hair, no fiber, no DNA, no fingerprints.

15    They took his cell phone.  They looked in his computer.

16    They dug up his backyard.  They went in his septic tank.

17    They went to the landfill.  They executed about 25

18    search warrants in this case on Jim's home, many, many

19    times, on his vehicles.  They took swabs and swabbed the

20    steering wheel, the floorboards.  They vacuumed his

21    vehicles out.

22    You're going to see pictures of his truck.  He

23    hadn't cleaned out that truck probably since he bought

24    it.  They found nothing connecting him to those murders.

25    All of the searches over all of those years and they

1  came up with nothing connecting him to those murders.

2  But the Government wasn't going to take no for an

3  answer.

4          Now, I want to talk to you about the actual

5  evidence in this case, not speculation, not inferences,

6  not guesses, not assumptions, the actual evidence.

7          And let's start with Jim Wells.  Now, Jim is

8  about 68.  I think he just turned 68.  Out of high

9  school, joined the U.S. Navy.  Eight years in the U.S.

10  Navy, honorably discharged.  Then he went over to the

11  Coast Guard.  Another 12 years in the Coast Guard,

12  became a Chief.

13          Had to take a medical discharge after 12 years.

14  He had tinnitus, a severe ringing of the ears.  He had

15  idiopathic anaphylaxis, which is like an allergic

16  reaction that made it hard for him to do his job, and so

17  he got a disability rating and they let him go.

18          But he wasn't gone long.  They wanted him back,

19  and they rehired him as a civilian in less than a year.

20  And for the next 24 years, Jim worked as an antenna

21  mechanic on Kodiak.  He raised his kids there, three

22  adult kids.  His wife Nancy, married 47 years.  They had

23  their home in Bells Flats in Kodiak.

24          Jim had some medical problems over the years.

25  He's diabetic.  He had other medical problems.  But as

1  you get closer to the time 2011, 2012, particularly

2  about the summer of 2011, he started to get really sick

3  and they couldn't figure out what the problem was and he

4  started to miss lots of work.

5  By October, he's missing more and more work.

6  He's hardly there at all in November.  He's not there at

7  all in December.  Come January, he's back for just a few

8  days.  They can't figure out what the problem is.  And

9  finally in February, they figure out he's got to have

10  gallbladder removed, February of 2012.

11  February 9th is when he had the surgery.  He

12  doesn't get back to work until about February 24th, just

13  a couple months before these murders.  Even after he got

14  back to work, he wasn't well.  He is still recovering.

15  He was on light duty.

16  And one of things you're going to hear about in

17  terms of the problems that Jim was having, both well

18  before the surgery and after the surgery, was he had

19  problems, gastrointestinal problems.  And you will hear

20  a number of the employees when -- it was almost a joke,

21  when they talk about "where is Jim," he's always in the

22  bathroom for long periods of time.  If you couldn't find

23  Jim, he was in the bathroom, both before and after the

24  surgery.  And that becomes an important fact as we get

25  into the story and get into the evidence.

1    Let me talk for a minute about where these
2  murders occurred.  There is no dispute that these men
3  were murdered.  No dispute that it happened with a .44
4  -caliber.  No dispute it was a bloody crime scene.  No
5  dispute that it happened on April 12th.
6    But one of the things you need to understand
7  about the building where this happened, the T-2 rigger
8  shop, is that it was not a secure building.  Now, the
9  T-1 building that was up the hill, you saw a picture of
10 it in the antenna field, that bigger building, that had
11 a fence around it, a security gate.
12    But the T-2 building sat right on Anton Larsen
13 Bay Road, and this is a public road.  And if you keep
14 going up the road, you get to a golf course.  You go up
15 a little further, you get to a ski area.  You go up
16 further, there is a little area of some house -- not
17 houses, but kind of cabins called the Red Cloud Ranch.
18    You go even further up the road and there is a
19 boat dock and people park their cars there and live out
20 in some of the remote areas.  So this is a public
21 traveled road.  The building is not fenced in.  There is
22 not a guard there when you show up.  There is not a
23 gate.
24    Now, there are security cameras and they do
25 rounds, and the cameras are all controlled by the folks

up in the T-1 building.

Some other things you need to know about that building and what was going on at that building around the time of these murders:  The night before, at about 7:00 p.m., a Coastguardsman, one of the watch officers named Jason Bullis, is showing up for his shift.  He has the 7:00 p.m. to 7:00 a.m. shift, 12-hour shift.  Before he goes up the hill to the rigger shop -- excuse me, to T-1, he stops at the rigger shop.  He actually goes in the building, goes through it to make sure it's secure.  Goes around back, checks all the doors.  He found all the doors, all the doors appeared to be closed, nothing was ajar, nothing was amiss.

And then he went upstairs -- up the road and went to work in T-1.  While he's up there that night, they have got this operations deck.  That's where he works.  It's a secure area in the building where they can watch all the security cameras.

And something happened that night that became important to him the next morning in particular after he found out about the murders.

About 10:30 that night, he noticed on the camera that looks -- the T-2 building camera, a white truck showed up.  Not Jim Wells' truck.  There is no argument about that.  Everybody agrees it was not Jim

Wells' truck.  And it did something very unusual.  That
truck showed up, drove around near the flagpole and
left.

      And there's a video of it that we're going to
show you.

      (Video playing in open court)

      MR. CAMIEL:  You see the headlights.  You see
it pull in near the flagpole, turn around and leave.

      Now, that was strange enough, because people
aren't up there that time of night, but six minutes
later, the truck came back.

      (Video playing in open court)

      MR. CAMIEL:  Here it comes again.  This time
not just by the flagpole, but pulls all the way in, goes
around the building.  You won't hear about any
investigation that was done of that truck, which is not
Jim Wells' truck, but it was important enough that the
watch officers made a note of it and reported it.  And
it's never been identified as to who is up there going
around that shop at 10:30 at night the night before the
murders.

      That same watch officer when he left his shift
about 7:00 -- a little after 7:00 a.m., getting towards
7:30, he drives down the road, past the T-2 building,
and he looked off to his right toward the building and

he saw something else that caught his eye, it was an
older model black truck. That's the way he described
it, an older model black truck. And it wasn't parked
where any of the employees parked. And none of the
employees had an older model black truck like that.

And he reported it, after he found out about
the murders, to his supervisors, but he was told, "Don't
worry about it, it belonged to a guy named Nate
Pacheco," except that's not who it belonged to because
Pacheco wasn't even on the island and that's not where
he would park. But he wasn't the only one who saw that
truck.

That morning after 7:00 a.m., you're going to
hear about a guy named Don Rudat. And Mr. Rudat was
walking up the road from the airport. He was a
contractor who had come into town, come into Kodiak to
do some work. He was staying down at the Comfort Inn,
which is the hotel at the airport. And he, every
morning, would take a walk. He would walk for one hour,
30 minutes one way, 30 minutes back.

And he decided that morning to walk from the
airport up past the rigger shop up to the golf course
and then back. When he was walking back, there is some
very important observations that he made. He's on
video, and you're going to see him as he walks up and as

he walks back, because he was captured on the T-1 camera, and so you will get to actually see him.

When he was walking up and walking back, the one thing he didn't see was any blue SUV near the rigger shop. Never saw that. But when he was walking back, he saw that same black truck that Jason Bullis, the Coastguardsman, had seen, and he saw it parked right out by the rigger shop. And later that evening after the murders when they questioned him, he told the FBI what he saw. You're not going to hear about any investigation of that black truck or who it belonged to.

Let's talk for a minute about the days leading up to April 12th. April 10th, Jim's wife, Nancy, she works for -- she works in Kodiak. She works for the Kodiak Area Native Association. And she had a conference taking place in Anchorage, and she flew off to Anchorage.

Jim is at work on the 10th. On the 11th, Jim goes into work, regular day, does his job. One of the things you're going to hear is that the Wells at their home in Bells Flats had been having problems with their septic tank, having problems with it failing over the winter.

And when Jim got home on the evening of the 11th, he had got a call that day from the septic guy who

said, "Hey, we're going to finally be able to get out there and pump your tank." So Jim had to, on the 11th, in the evening after work, dig out the opening to his septic tank so the guy could come and pump it.

So he spent hours the night before the murders, not planning some murder, not preparing some alibi, but digging out his septic tank and standing there with the septic guy as he pumped out his tank.

Then you get to April 12th. And Jim gets up, regular day, going to go to work. Leaves in his white truck. He's had that truck for quite a while. As he's headed to work, after he passes the main gate camera, he notices that the truck is not driving right, it's pulling to the right. He knows that truck. He's had it for a while. Something is going on.

He's going to pull over and he's going to take a look at what's wrong with his truck. About the same time, Jim's stomach isn't feeling very good. He needs to get to the bathroom and he needs to get to a bathroom quickly. He pulls over, he jumps out of his truck, he takes a quick look at the tire, it's really low, not flat, but it's low.

But he doesn't spend any time looking for it because he's got to run to the bathroom, which is what he does, by the airport. He didn't make it to the

bathroom in time. He soiled himself. He had to sit in there a while, clean himself up.

He gets out of the bathroom, goes back to his truck, takes another look at the tire. Decides I better go home, I can make it home, change the tire. It's almost -- you know, this is April, mid-April. It's about time to change over your tires. You got to change from the studs to your summer tires.

Jim had his summer tires sitting outside the house ready to go. He was ready to change over. That was going to happen pretty soon.

So he heads on home. Gets home, goes up in the house, got to use the bathroom again, except their septic tank had been pumped out, so they are using a bucket. He's got to put on his rain pants. He goes out, takes a look at the tire, tries to get the lugs off. It's taking longer than he thought. Makes a couple calls into work, leaves messages, "I'm going to be late, I got a flat tire."

Finally gets the lugs off, pulls the tire, sees he's got a nail in it. Throws the tire in the back of his truck, puts on one of his summer tires and heads off to work.

Well, while Jim is headed to work, he gets a call. There has been an incident at the T-2 rigger

shop.  "We need you to come in."  He says, "I'm on my
way.  Had a flat tire."  He shows up at the rigger shop.
There are police there.  There are ambulances there.
There are Coastguardsman blocking the road.

He gets out and they tell him what happened.
And you're going to hear the description that he was
shocked, just like everybody else.  Jim was told to go
up to the main building with everybody else.  He was
told to wait there.  He spent about 12, 13 hours there.
12 or 13 hours waiting as the authorities came and
started interviewing people.

What Jim didn't know was that Chief Reckner,
Jim's supervisor, his boss, had already arrived.  And
when he found out Jim wasn't present, this is what
happened.  This is how we got here in this room today.
This is how Jim Wells is sitting in that chair.

When Chief Reckner arrived, before any
investigation had been done, within 30 minutes of the
discovery of Mr. Hopkins and Mr. Belisle, within
30 minutes, before anybody had been interviewed, any
searches had been conducted, Chief Reckner was accusing
Jim Wells of doing this, telling everybody who was
there, anybody who would listen, "Jim Wells did this.
Jim Wells was responsible."

And from that point forward, in the next hours

1   and days and weeks and years, what happened was the

2   Government focused its investigation on Jim Wells.  And

3   that's not how you do an investigation, and you are

4   going to hear about that.

5          But as Jim is sitting at the T-1 building on

6   April 12th, they want to interview him, and he's

7   actually interviewed four times on the 12th.  He

8   cooperates.  He tells them where he was.  He tells them

9   about the tire.  They ask, "Hey, can we look in your

10  truck?"  He signs a consent to let them search his

11  truck.  "Can we look at your phone?"  He consents to

12  them looking at his phone.

13         He's there for hours.  They record their

14  interviews with him.  Third interview, they call him

15  back in and they say, "Hey, we want to do a gunshot

16  residue test on you," where they swab your hands,

17  sometimes your clothes to look for gunshot residue.  Jim

18  says, "No problem," and consents to the test.

19         What Jim doesn't know is it's all a trick, it's

20  a ruse, just to see how we would react.  They pretend to

21  do the test on him, but they never tested it.  It was

22  all just an FBI trick.  But Jim didn't have any problem

23  going along with that test.

24         Now, to Jim, when he was interviewed, he didn't

25  tell them he had had diarrhea, he didn't tell them he

had soiled himself. At the time he was being
interviewed what was important was him telling them that
he had the flat tire, that's why he didn't get to work
on time, that he had to go home and change the tire.

But you're going to hear, they are going to
make a big deal about him not telling them about this
embarrassing episode of soiling himself.

Next day Jim comes back, they ask him to come
back. He sits there again. They interview him again.
This time they start telling him about times. 6:48 your
truck goes this way. 7:22 your truck is going this way.
He doesn't know if their times are accurate. All he
knows is he turned around at the airport after finding
the low tire, after going to the bathroom, and he went
home. And he never made it to the rigger shop that
morning until later when he came back.

At one point Jim finally says, "Are you
accusing me?" And they say, "Well, yeah, we are." He
says, "Well, then this needs to end." It didn't end.
They took Jim's truck. He tries to go home. They won't
let him in his house. They are searching his house.
You're going to hear they went back to his house with
search warrants about nine times. You're going to hear
that there were -- you're going to hear some more about
the rigger shop and you're going to hear more about the

1    investigation that was done there.

2         I told you it was a very bloody crime scene. I

3    told you there is no evidence of any blood found on Jim

4    or any of his property or vehicles or home or clothes.

5    But you're going to hear some other things. Remember I

6    told you that that one officer who showed up the night

7    before and checked all the doors and everything seemed

8    to be secure. Well, when the police came that morning,

9    that wasn't the case.

10        Around the back, there is a room to the boiler

11   room. There is an outside door that leads into the

12   boiler room. When the police went around there, as they

13   first began conducting their investigation, that door

14   was ajar, and it was actually unlocked and it wasn't

15   supposed to be unlocked.

16        There is actually a picture of that. You can

17   see the door isn't quite seated. When the officer the

18   night before had done his rounds, that door was seated.

19   Now, he'll say he can't remember whether he checked to

20   see if it was actually locked, but he knows it was

21   seated when he went around back.

22        So next morning it wasn't, and not only wasn't

23   it seated, it was unlocked. And not only was it

24   unlocked, but when they went into the boiler room and

25   looked around, there is another door that leads into the

1  main building.

2      Now, that door was still locked.  But there was

3  something on that door that was very important.  It was

4  a boot print right about the level of the door handle.

5  And they took a picture of it, but their investigation

6  of the boot print never went anywhere else.  Their

7  investigation of the unlocked back door never went

8  anywhere else.

9      So the Government has kind of hitched its

10 wagon, their whole case to this video that you're going

11 to hear about, April 12th from the T-1 camera.  This is

12 a camera that sits about a fifth of a mile from the

13 road.  And the Government decided -- see, you know, in a

14 murder case, you got to decide who did it, how they did

15 it, and why they did it.

16     Well, they decided it was Jim Wells within

17 30 minutes without any investigation.  Now they had to

18 figure out how could he have done it because his truck

19 wasn't seen up near the rigger shop.  So they came up

20 with this idea that maybe he did this switch at the

21 airport and maybe he used his wife's car.

22     And all they had to support that, because there

23 are no witnesses at the airport who saw anything like

24 that, all they had to support that was a video, and it's

25 a low resolution, extremely blurry video.  So the

1  Government took that video, and it's literally about one

2  second of video each direction, and that video shows a

3  vehicle driving up past the rigger shop.

4        It doesn't show it stopping at the rigger shop.

5  There is no evidence that vehicle had anything to do

6  with the murders.  There is no video showing it pulling

7  into the parking area.  It's just a video of a vehicle,

8  a blurry vehicle going by in one direction, and then

9  several minutes later, a vehicle going the other way.

10  It's not even clear it's the same vehicle.

11        But the Government locked in on that video, and

12  they took that video, the only evidence they thought

13  they had in the case, to the FBI.  They went to the

14  forensic audio-visual image analysis unit.  These are

15  folks back east who their job is to look at videos like

16  that and see if they can figure out, either enhance or

17  interpret, figure out what's on the video.

18        And they took that video to a guy named Chris

19  Iber, one of the best in the field, works for the FBI.

20  And Iber and his team, he worked with another guy named

21  Emil, they looked at the video.  And they went back to

22  the FBI and they said, "I can't" -- because they said

23  can you give us the make and model of the vehicle on

24  that video.  And Iber said, "We can't do it.  It's too

25  blurry.  It's too low resolution.  You can't do a

make/model determination of whatever vehicle that is."

Well, the Government didn't take no for an answer, didn't like that answer, so they went back to him again. And they said, "Look, is it a Honda CR-V? Can you look at it again," and he gave them the same answer. And his supervisor, George Skaluba, (phonetic) reviewed his report, same answer, can't tell you the make or model of that vehicle, can't enhance the video. It is what it is.

Well, the Government didn't like that answer, didn't take that answer. It's not what they wanted to hear so they went to another recently retired FBI guy, Gerald Richards, another guy back east, sent him the video, asked him to take a look at it. He didn't -- now, Mr. Richards did not consult with Mr. Iber and his team. He independently looked at the video. Guess what? Same results. Too blurry, low resolution, can't tell you the make or model of the vehicle.

Well, the Government didn't like that answer. They went back to Mr. Richards again, actually flew to his house and talked to him to see if he could change his opinion, and he said, "No, can't do it." He's a scientist. He said, "You can't do a make or model determination of that video because of the quality of the video."

1       Well, the Government wasn't going to take no
2   for an answer, so then they went to the next guy, a guy
3   named named Richard Vorder Bruegge, another former FBI
4   guy, asked him to look at the video.  Guess what?  Same
5   answer.  He tells them, "Can't tell you the make or
6   model of the vehicle.  Can't do it, too low resolution."
7   The only thing he could do is he said, "I could do some
8   photogrammetry and give you some rough dimensions of the
9   vehicle."

10      So what he comes up with is, well, it's
11  somewhere between 167 and 187 inches in length of the
12  vehicle, 20-inch range.  And the height is somewhere
13  between 61 and 71 inches, ten inches.  Now, those
14  dimensions basically would cover almost all the
15  passenger vehicles that are made, but that's the best he
16  could do.

17      The Government didn't like that answer, wasn't
18  going to take that answer.  They decided to leave the
19  law enforcement people, and so then they go to a Honda
20  guy, a guy who works for Honda, not somebody who has any
21  experience looking at videos, doing forensic work on
22  videos, trying to identify vehicles from video, just a
23  guy who works for Honda, Honda-engineer type.

24      And they say, "Here, take a look at this
25  video."  They have to go back to that guy four times.

And they tell him what they are looking for.  They say,
"Is this a Honda CR-V?"  They even give him the VIN
number so he can look up the color.

Well, after four trips to this guy, he finally
tells them, well, I'm 70 percent sure it's a Honda CR-V,
but it could be a Ford escape, could be a Rav4, could be
a Hyundai.  Well, that's not getting Government
anywhere, so they decide they need to do something
different.

So now they go totally outside the field of
video analysis or the forensic people who work in law
enforcement and they go to a couple accident
reconstruction guys.  These are guys who in personal
injury cases, that kind of thing, they get hired.  You
get one car that hits another car at an intersection,
and they will put something together to explain how the
accident happened.  They are working with known
vehicles.

But the Government tells them exactly what they
want to know.  They say, "Is this this Honda CR-V,"
actually give them a picture of Nancy Wells' Honda CR-V,
pay these guys a large amount of money, probably over
$100,000, and the best they can get out of those guys
is, "Well, it's consistent with -- there are some things
that are consistent with the vehicle."

1        That's what the Government did in this case.

2  So you have got the who decided within 30 minutes.  You

3  have got the how, which is this theory about switching

4  of a blue Honda, Nancy's blue Honda at the airport, but

5  they had to come up with a why, a motive.  There was no

6  evidence of any threats by Jim Wells toward either one

7  of the victims, none, never.

8        So what they came up with was the few things

9  that you're going to hear about.  You're going to hear

10  that at one point Jim was cautioned about not taking

11  better care of a fuel card that was used in the rigger

12  shop to buy diesel fuel, but the caution didn't come

13  from either one of the victims, it came from the

14  commander.

15        You're going to hear that Jim was cautioned

16  about taking firewood from trees that were in the

17  antenna field.  Mr. Belisle received the same caution

18  because he was doing the same thing.  You're going to

19  hear that they cautioned Jim about his use of sick leave

20  because he had used a lot of sick leave.  Or that Jim

21  was told at one point he couldn't go to a conference.

22        There was what's called a NATE conference,

23  which is an association of tower erectors, these people

24  who climb these towers like Jim Wells does, except

25  you're going to hear that when Jim was told he couldn't

go to that conference, it didn't matter, he was having

surgery right when that conference was taking place.

That conference was February 7th to February 9th.  Jim's

surgery was February 9th.  He wasn't going to that

conference anyway.

        Those are the things they came up with to try

to put together a motive for this crime.  Seven years to

come up with a motive, and that's what they got.

        I want to talk about one more thing, and that's

the airport, the Kodiak airport.  The Kodiak airport is

like the center of activity in Kodiak, particularly on a

weekday morning, particularly on a morning like

April 12th of 2012.

        That morning about 7:00, you have got an Alaska

Airlines flight that's landing from Anchorage and

letting off a planeload of passengers.  You have got all

those people coming off the plane.  You have got people

there to pick them up, people going through the parking

lot to their cars.  You have got another whole group of

people coming through that parking lot or being dropped

off who are going to catch that plane back to Anchorage.

        You have got a construction crew in the airport

parking lot because they are redoing the parking lot.

They have got the asphalt torn up.

        You have got the Comfort Inn, the hotel right

next to the airport, with guests coming and going. You
have got the coffee shop. You have got a couple other
smaller airlines. You have got Alaska Airlines cargo,
the cargo place where people are dropping off and
picking up. So there are at least 200 people, if not
more, around that airport parking lot at the time the
Government claims Jim Wells was switching to his wife's
car to go up and do the murders, and not one person saw
him anywhere near his wife Nancy's car, not one.

But here is the thing, and this is important:
There were two people, two witnesses, and you're going
to hear from, who did see Nancy's car parked there.
They saw Nancy's car parked at the Kodiak airport right
when the Government claims it should be up the road at
the T-2 rigger shop. One witness, she drives in to the
airport. She knows Nancy Wells, she knows her car. She
sees the car. She tells the FBI she saw the car.

You got another witness, he doesn't know Nancy
Wells, he doesn't know Jim Wells. He was at the airport
to pick up some passengers who were coming off that 7:00
flight, that 7:00 a.m. flight. He parked right in front
of the Alaska Airlines terminal. He went into the
terminal, he picked up his passengers, helped them with
their luggage, come out to his car, and as he's driving
off, he sees the blue Honda CR-V right about 7:09, 7:10

1  in the morning, right at the time the Government claims

2  it should have been up the hill.

3        How do we know about this witness?  Because the

4  FBI interviewed him.  They talked to him.  They showed

5  him a picture of Nancy Wells' car and said -- because

6  they knew he had been at the airport -- said, "Did you

7  see this car?"  He said, "Yeah, I did.  I remember the

8  taillights."

9        THE COURT:  Mr. Camiel, I'm going to interrupt

10 and say it's been about 37 minutes, so if you could wrap

11 up in just a few.

12        MR. CAMIEL:  I'm just about done, Your Honor.

13        THE COURT:  Very good.  Thank you.

14        MR. CAMIEL:  The car was right -- the car was

15 seen by those witnesses right where the police found it.

16 It had nothing to do with the murders.  That car has a

17 complete alibi, and so does Jim Wells.

18        Look, April 12th was a terrible day.  Two

19 innocent men were murdered.  That's a tragic, horrible

20 thing.  But it's also a horrible thing to be falsely

21 accused of a crime.  And on April 12th, Jim Wells was

22 falsely accused.  And up to now, the Government hasn't

23 taken no for an answer, no forensics, no witnesses, no

24 physical evidence.

25        Well, it's time to tell the Government no, and

1  it's time to return a verdict of not guilty.

2          Thank you.

3          (Requested excerpt concluded, proceedings

4  continued.)

5

6                    CERTIFICATE

7     I, Sonja L. Reeves, Federal Official Court Reporter
   in and for the United States District Court of the
8  District of Alaska, do hereby certify that the foregoing
   transcript is a true and accurate transcript from the
9  original stenographic record in the above-entitled
   matter and that the transcript page format is in
10 conformance with the regulations of the Judicial
   Conference of the United States.

11
      Dated this 11th day of September, 2019.
12

13                         /s/ Sonja L. Reeves
14                        SONJA L. REEVES, RMR-CRR
                          FEDERAL OFFICIAL COURT REPORTER
15

16

17

18

19

20

21

22

23

24

25