UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

UNITED STATES OF AMERICA, )
                          )
        Plaintiff,        )
                          )
vs.                       )    CASE NO. 3:13-cr-00008-SLG
                          )
JAMES MICHAEL WELLS,      )
                          )
        Defendant.        )
_____)

PARTIAL TRANSCRIPT OF TRIAL BY JURY - DAY 3
(Testimony of Scott Reckner)
**BEFORE THE HONORABLE SHARON L. GLEASON, DISTRICT JUDGE**
September 11, 2019; 8:34 a.m.
Anchorage, Alaska

**FOR THE GOVERNMENT:**
        Office of the United States Attorney
        BY:  STEVEN SKROCKI
        BY:  CHRISTINA M. SHERMAN
        BY:  KELLEY L. STEVENS
        222 West 7th Avenue, #9
        Anchorage, Alaska 99513
        (907) 271-5071

**FOR THE DEFENDANT:**
        Office of the Federal Public Defender
        BY:  GARY GEORGE COLBATH
        601 West 5th Avenue, Suite 800
        Anchorage, Alaska 99501
        (907) 646-3400

        Camiel & Chaney, P.S.
        BY:  PETER A. CAMIEL
        520 Pike Street, Suite 2500
        Seattle, Washington 98101
        (206) 624-1551
_____

**SONJA L. REEVES, RMR-CRR**
Federal Official Court Reporter
222 West 7th Avenue, #4
Anchorage, Alaska 99513
Transcript Produced from the Stenographic Record

1          (Call to Order of the Court at 8:34 a.m.)

2          (Proceedings took place and are not included in

3    this transcript, after which, the testimony of Scott

4    Reckner transpired as follows:)

5                    DIRECT EXAMINATION

6          (Of Scott Reckner Continued)

7    BY MR. SKROCKI:

8    Q.   Good morning, Mr. Reckner.

9    A.   Good morning, sir.

10   Q.   If we could have the lights, Madam Clerk.

11        If we can go back to Exhibit No. 235, please.

12   Mr. Reckner, yesterday you talked about this photograph.

13   Where was it taken, and what work does it depict?

14   A.   That was taken on Shemya, Alaska.  And that's I

15   believe their tension unit guy wire which connects to a

16   tower.

17   Q.   And who's depicted in that photograph again?

18   A.   ET3 Beauford, ET1 Jim Hopkins, Mr. Rich Belisle

19   and Mr. Jim Wells.

20   Q.   If we can have the lights, please.  Thank you.

21        Mr. Reckner, were you on that trip?

22   A.   I was.

23   Q.   How long were you folks down there?

24   A.   About four weeks, maybe a little bit more.

25   Q.   Mr. Wells was on that trip?

1    A.   He was.

2    Q.   Did you have occasion to be involved in an

3  initial meeting with Mr. Wells present before the work

4  in Shemya started?

5    A.   Yeah.  So we meet -- oh, sorry.

6    Q.   Who was present at the meeting?

7    A.   So once the second wave showed up on island, it

8  was myself, Mr. Wells, Mr. Belisle, ET1 Hopkins, Seaman

9  Pacheco, ET3 Beauford and then we also had some staff

10 who came in from other places in the country, Coast

11 Guard petty officers who came and helped us and I don't

12 recall all their names at this time.  But there was

13 probably 10 or 12, 14 of us, something like that.

14   Q.   Were there people from other agencies there as

15 well, other departments?

16   A.   Other Coast Guard units.

17   Q.   Units.  Okay.  And there was a meeting that was

18 held?

19   A.   There was.

20   Q.   How did that meeting start out?

21   A.   It was kind of a kickoff meeting, a

22 meet-and-greet.  And we were all introducing ourselves.

23   Q.   And did Mr. Wells introduce himself?

24   A.   He did.

25   Q.   Did he add anything to that introduction?

1   A.  He did.  So when Mr. Wells introduced himself, he

2   introduced himself as Jim Wells, and he said, "Call me

3   Jim."  We don't use first names on Shemya.  And I kind

4   of interjected and said, "Actually, I'm Chief Reckner."

5       There were a lot of lower enlisted folks.  It's

6   not appropriate for lower enlisted folks to call a chief

7   their first name.  So I just kind of interjected that I

8   would be addressed as Chief or Chief Reckner.

9   Q.  You mentioned that you don't use first names

10  here.  That's what you said?

11  A.  That's what Mr. Wells said, but we will use first

12  names here.

13  Q.  Mr. Wells said what?

14  A.  He said --

15      MR. COLBATH:  Your Honor -- excuse me,

16  Mr. Reckner.  Your Honor, I'm going to object and ask to

17  approach.

18      THE COURT:  All right.  Let's do so.

19      (Begin bench conference.)

20      MR. COLBATH:  Thank you.  I would object.

21  We're talking about a Shemya trip.  We're talking about

22  incidents prior to the fuel card.  This is a specific

23  act of conduct.  And it's a workplace bad act.  It would

24  fall under --

25      THE COURT:  I was wondering the same thing.

```
 1          MR. SKROCKI:  It's not a work -- the testimony

 2   is going to be that Mr. Wells tried to take control of

 3   the meeting, and Mr. Reckner said, I'm more in charge

 4   here in the Coast Guard protocol, and that's all I'm

 5   going to go into.

 6          THE COURT:  Well, I really tried to make clear

 7   that the fuel card incident is the demarkation line.

 8   And this predates that by one month is my understanding.

 9          MR. SKROCKI:  Correct.  One month.  But there's

10   nothing more than -- there's no conflict here.  It's

11   just a question of Mr. Wells is exceeding Coast Guard --

12          THE COURT:  So what all do you want to cover

13   besides the first name issue?

14          MR. SKROCKI:  That's it.  Essentially what he

15   said already.

16          THE COURT:  So you're just going to get out

17   this one thing, what he said about we use first names

18   here and Chief Reckner disagreed?

19          MR. SKROCKI:  Correct.

20          THE COURT:  I'll let one more question, and

21   then we'll move on.

22          MR. SKROCKI:  Permission to lead?

23          THE COURT:  Yes.  All right.  Clear there?

24          MR. COLBATH:  Well, I'm clear.  I mean I want

25   my objection to be reflected.
```

```
 1            THE COURT:  Your objection is --
 2            MR. COLBATH:  And this wasn't part of his
 3    testimony last time.  It's not in any more of the
 4    discovery.  The man was interviewed 14 times, 14 law
 5    enforcement interviews, and I've never heard this
 6    mentioned until right here.  So it's --
 7            THE COURT:  Okay.
 8            MR. SKROCKI:  I don't think that's an accurate
 9    statement of the discovery.
10            THE COURT:  The reason for the ruling, just to
11    be clear, is that the witness has said two different --
12    he's trying to articulate this point.  It's already in
13    the record without objection, and allowing it to be
14    clarified for leading question, it's helpful to the
15    jury.
16            MR. COLBATH:  If that gets us out of here --
17            MR. SKROCKI:  One more just to let you know
18    where we're going next.  We're going to the tree
19    collaring memorandum and tree collaring issue.
20            THE COURT:  Just consistent with the ruling?
21            MR. SKROCKI:  Correct.  And then we're going to
22    the fuel card from there.  And then we'll be going from
23    fuel card to date of the murders after that.
24            THE COURT:  That's very good.
25            (End bench conference.)
```

1          MR. SKROCKI:  Thank you, Judge.  Permission to

2    lead.

3          THE COURT:  Certainly.  Go right ahead.

4    BY MR. SKROCKI:

5    Q.  Mr. Reckner, a couple of leading questions.  When

6    this meeting began, what did Mr. Wells say?

7    A.  So what he said was, "On the island, we don't use

8    rank here."  That's what I took exception here.

9    Q.  And what did you say in response?

10   A.  And I said, "Actually, I'm Chief Reckner and" --

11   getting out that I will be the chief on the island, not

12   Scott.

13   Q.  If I can move you forward to August of 2011.

14   Okay.  When was the Shemya trip?

15   A.  Shemya was June I think to July of 2011.

16   Q.  In August of 2011, did you have occasion to

17   become involved in an issue involving some trees on

18   Coast Guard property in Kodiak?

19   A.  Yes.

20   Q.  Can you tell the jury what that issue was?

21   A.  So the shop was working down at the receive site

22   clearing some brush around one of the antennas.  I drove

23   down just to check on them.  And as I was walking

24   through the site, I noticed a bunch of rings cut in the

25   bottom, the bases of a bunch of trees on the property.

1    And so I asked what that was about.

2         And I was informed that that was the process or

3    procedure called tree collaring.  And I asked why we

4    would do that, because I didn't know anything about

5    that.  And I was told that it was -- I understood that

6    it was slowly to kill the tree, dry it out, so that you

7    could then take it for firewood later on.

8         Q.  So how did you become aware of -- and what you

9    saw, how did you get to where you were when you saw this

10   tree collaring?

11        A.  So I took one of the vehicles and drove down.

12        Q.  Drove down to where?

13        A.  Drove down to the receive site from the building

14   we saw yesterday, from the -- we call it the transmit

15   site, down to the receive site.  It's probably 12 to

16   15 miles or something like that.

17        Q.  Can you describe to the jury what you saw with

18   respect to this tree collaring?

19        A.  Yep.  So all over the property in areas that were

20   nowhere near any antenna gate road, any asset, the base

21   of the tree maybe this high or so off the ground, was a

22   small chain saw-type width cut all the way around and

23   maybe a few inches in.

24        Q.  Had you ever heard of that practice heard?

25        A.  I had never heard of that before.

1     Q.  When you observed that, was anybody in the field

2  with you at the time?

3     A.  So I was with ET1 Jim Hopkins, and the non-rates

4  were there as well, but they were working.

5     Q.  Anybody else?

6     A.  So after I discovered it --

7     Q.  Do you remember anybody else at that time?

8     A.  No.

9     Q.  Okay.  What did you do after you discovered that

10  practice?

11    A.  So after I discovered it, I went back to the T-1

12  and I went and talked to the executive officer Dave

13  Pizzurro, and I told him what I found.

14    Q.  What did you do then?

15    A.  He wanted to see it.  So it was towards the end

16  of the workday.  ET1 Hopkins had already gone home.  But

17  he was living at Aviation Hill, so it was on the way.

18  So I gave him a call and said, "Hey, XO and I are on our

19  way to pick you up.  We're going to go down to the

20  receive site and take a look."

21    Q.  How many of you went to take a look at the

22  receive site?

23    A.  Three of us.

24    Q.  How many?

25    A.  Three of us.

1    Q.   And when you got there, what did you do?

2    A.   I took Lieutenant Pizzurro through the site and

3    showed him what I had seen.  I had kind of taken him to

4    the far end of site where there was no asset, antenna

5    gate road or anything.  And trees all in that area that

6    had been collared for no purpose that would serve our

7    mission.

8    Q.   And why did you make that assessment that there

9    was no purpose to serve your mission?  Can you describe

10   some detail why you made that decision?

11   A.   Right.  So again, they were quite a distance away

12   from any asset, and then also, the practice itself

13   doesn't make any sense when you're talking about antenna

14   maintenance or clearing brush, because at that point,

15   you don't have any control when that tree might fall.

16   So if you kill it slowly and it falls, you won't be

17   there to see it.  You wouldn't know it.  You could

18   potentially, if it was near an asset, damage something

19   with an uncontrolled tree fall.

20   Q.   Was it a concern of yours?

21   A.   It was.

22   Q.   Did you elevate that concern to others in your

23   management?

24   A.   I did.  So obviously, I took the executive

25   officer down, he's number two, and he saw it for

1  himself.  And then we discussed it with Bill Reed, the

2  engineering officer, a day later, I would think.  Yeah.

3      Q.  Did you have your own internal sort of

4  deliberations as to what you wanted to do with this and

5  took action thereafter?

6      A.  So we discussed it, and we decided that the

7  appropriate measure would be to do another memo

8  outlining the practice of taking trees and how we would

9  do that procedure-wise.

10     Q.  And did you create a memo to do that?

11     A.  I did.

12     Q.  What was the scope of the memorandum?

13     A.  So again, it was outlining how and when we take

14 trees, strictly forbidding any tree collaring at all and

15 again reiterating the fact that any wood taken down on

16 COMMSTA property would be available to the whole crew if

17 they went out and got it out after work hours with their

18 own equipment.

19     Q.  If we could have the lights please and for

20 foundation for Mr. Reckner, Exhibit 36.

21         There are two pages to that memorandum.

22 Mr. Reckner, if you could take a look at the first page.

23 Do you see that?

24     A.  I do.

25     Q.  Is that something you authored, sir?

1      A.   It is.

2      Q.   And the second page?

3      A.   Yep.

4      Q.   That's what you authored as well?

5      A.   Yes, sir.

6      Q.   And that reflects a memorandum given to one of

7   the people you supervise, correct?

8      A.   It does, yes.

9      Q.   During the timeframe in question and on the issue

10   we just spoke about for tree collaring?

11      A.   Yes.

12           MR. SKROCKI:  Move to admit Exhibit 36.

13           THE COURT:  Any objection?

14           MR. COLBATH:  Your Honor, in light of our prior

15   record, no.

16           THE COURT:  All right.  Then 36 is admitted.

17           (Exhibit No. 36 admitted.)

18   BY MR. SKROCKI:

19      Q.   If we could publish, please.

20           Mr. Reckner, this is a memorandum.  What's the

21   date of that, sir?

22      A.   2 November 2011.

23      Q.   And who is it to?

24      A.   It's to Mr. Wells.

25      Q.   Now, was Mr. Wells the only one who received this

1  memorandum?

2     A.  No.

3     Q.  Who else received it?

4     A.  We also gave one to Mr. Rich Belisle.

5     Q.  Why did you give it to both these men?

6     A.  So again, we didn't want to single one of them

7  out.  We had two civilians, so we wanted to make sure we

8  were setting the expectations for both of them.

9     Q.  Were you aware that Mr. Wells was tree collaring

10  as well as others?

11     A.  I was aware that Mr. Wells was tree collaring,

12  and I understood that Rich might have been, but I don't

13  know he was for sure.

14     Q.  So the purpose of this memorandum was for what,

15  sir?

16     A.  Again, it was to set the expectations on when

17  we'll take wood from -- when we'll cut down trees from

18  the COMMSTA, what practice we don't do, i.e., tree

19  collaring, no more of that.  Only take trees that pose

20  some sort of risk to an asset, an antenna, a fence, a

21  road.  And also, we asked Mr. Wells to draft a policy on

22  tree cutting.

23     Q.  Did he ever do that?

24     A.  He did not.

25     Q.  If we could turn to the second page, please.

1   There's a date on that.  Do you see that there,

2   Mr. Reckner?

3       A.   I do.

4       Q.   What's the date?

5       A.   2 November 2011.

6       Q.   Blair, if we could take that to the side and then

7   pull up Exhibit 35, page two.  Thank you.

8            Mr. Reckner, do you see the dates are the same?

9       A.   I do.

10      Q.   And the Exhibit 35, what was that again?

11      A.   I'm not sure what 35 is.  Is that the right or

12  left?

13      Q.   To the right.  Sorry about that.

14      A.   So that's the EO expectation and clarifications

15  memo that we gave Mr. Wells in April of 2011.

16      Q.   So you had him sign it that day?

17      A.   I did.  HR policy dictated we needed to have a

18  signature stating that he received it.

19      Q.   So you presented him both memorandums that day?

20      A.   Correct.

21      Q.   When you presented the memorandums, who was there

22  in the room with you?

23      A.   When we did this, it was -- on 2 November, it was

24  just me and him.  We had a discussion earlier in August

25  after I discovered the tree collaring with both

1    Mr. Belisle and Mr. Wells in my office where I told them

2    tree collaring was done, we're not doing it anymore and

3    then the memo followed later.

4        Q.  So you had a conversation with him prior to that?

5        A.  Correct.

6        Q.  During that conversation, what was Mr. Belisle's

7    response?

8        A.  Mr. Belisle said, "Yep, makes sense, no problem."

9        Q.  And Mr. Wells' response was that?

10       A.  So the conversation with Mr. Wells was different.

11   He tried to defend the practice saying that it was

12   preemptive, it was necessary for maintenance.  And when

13   I replied back that there's no reason to preemptively

14   kill a tree, it's actually dangerous, he kind of stopped

15   talking and didn't argue back after that.

16       Q.  We can take those down, Blair.  Thank you.  If we

17   could have the lights, Madam Clerk.

18           Mr. Reckner, did you have occasion to discuss

19   with Mr. Wells another supervision matter with him

20   around that timeframe?

21       A.  I did.

22       Q.  Can you tell the jury just basically what that

23   conversation was about.  Let me rephrase that.  It's

24   inartfully proposed.

25           If you could describe for the jury the general

1    nature of what the conversation was about with

2    Mr. Wells.

3        A.   Sure.  So we had a fuel card that came up

4    missing, and the card was kept in Mr. Wells' desk and --

5        Q.   When you say fuel card, describe what its purpose

6    was for your Communications Station.

7        A.   So this fuel card was a fuel card that we would

8    use at the gas pump on base for the big yellow line

9    truck, I think the bulldozer, and then like regular gas

10    for the gas power chain saws and that kind of stuff,

11    ATVs.

12        Q.   When was that fuel card reported to you as being

13    missing?

14        A.   It was in September, late August or early

15    September, I believe.  It was right before we were going

16    on another trip to Shemya.

17        Q.   Do you know where that fuel card was kept?

18        A.   I do.

19        Q.   Where was it kept?

20        A.   It was kept in Mr. Wells' desk.

21        Q.   So you mentioned Shemya again.  Was there another

22    trip to Shemya at that time?

23        A.   Yes.  We were going back out in September to

24    finish up some of the things.  We had an electrical

25    connection to work on and some other things that needed

1  to be attended to.

2      Q.  Who was going on that trip to Shemya this time?

3      A.  It was myself, Rich Belisle, and a few of the

4  other people in the shop.  I think maybe Pacheco went

5  and a couple other folks.  We had some folks on leave

6  and some in training too.

7      Q.  What was the timeframe about your trip to Shemya

8  and when you became aware of this fuel card matter?

9      A.  It was a day or two before we were getting ready

10  to leave that I was informed that the fuel card was

11  missing.

12      Q.  Was Mr. Wells going to Shemya on this trip?

13      A.  He was not.

14      Q.  Where was he going?

15      A.  He was going up to Anchorage.  I believe he had a

16  VA appointment.  And then he was going onto Denali.

17      Q.  Do you know what vehicle he was taking or how he

18  was getting to Denali Park?

19      A.  He was going to take his personal vehicle.

20      Q.  What kind of personal vehicle does he own?

21      A.  He had a Dodge, white Dodge pickup truck, diesel.

22      Q.  The timing you mentioned was before you were

23  going to Shemya, Mr. Wells was going to Denali and

24  Anchorage for a VA appointment.  How did you become

25  aware this card was missing?

1    A.  ET1 Hopkins came up and told me that it was

2  missing.  They were needing it to go fuel up some

3  equipment.  I don't recall what.  They let me know it

4  was gone.

5        At that point in time, I only had a vague

6  understanding of what the fuel card was.  I didn't

7  really -- I was not really involved in that level of

8  work.  But I told them that we will shelve this for now,

9  we're getting ready to go to Shemya, and we'll deal with

10  it when we get back.

11    Q.  Did you do that?

12    A.  We did.

13    Q.  As you were leaving for Shemya, did you come up

14  seeing anybody you supervised?

15    A.  Yes.

16    Q.  Who was that?

17    A.  So we were over at the passenger terminal

18  standing by to board the C-130 and Mr. Wells came over.

19    Q.  Did he have a conversation with you?

20    A.  So I met him in the parking lot and we walked in

21  together.  And we just had a brief conversation that he

22  was just coming in to say goodbye to the crew, I guess.

23  And a few minutes after that we got call that it was

24  time to board and we left.

25    Q.  Where was this meeting in terms of the Kodiak map

1    we saw before, yesterday?

2        A.   On the air station, so adjacent to the tarmac, I

3    guess.

4        Q.   How long was your conversation with Mr. Wells?

5        A.   Just a few minutes.

6        Q.   You went to Shemya?

7        A.   Went to Shemya.

8        Q.   How did the trip go?

9        A.   Went well.

10       Q.   You came back?

11       A.   Came back, yeah.

12       Q.   What did the Coast Guard management do with

13   respect to this fuel card issue that you're speaking

14   about?

15       A.   So it made it -- so when we came back, ET1 came

16   up and told me that the card was back in Mr. Wells'

17   desk.  And at that point, it seemed suspicious, so I

18   informed the command, the executive officer, and they --

19   the XO and the CO initiated an administrative

20   investigation.

21       Q.   And the XO is who?  For the jury, please, XO and

22   CO are who?

23       A.   Yeah.  So the XO is Dave Pizzurro, and the CO was

24   Peter Van Ness.

25       Q.   Who was in charge of the investigation?

1    A.   SKC Steven Cartier was put in charge of the

2    investigation.

3    Q.   How long did the investigation take?

4    A.   I don't remember.  A couple weeks maybe.  I

5    honestly don't remember.

6    Q.   In a general sense, without going into too much

7    detail, the results of the investigation and the facts

8    of the investigation showed what with respect to

9    Mr. Wells' conduct and this missing fuel card?

10    A.   Yes.  So it was apparent that the fuel card was

11    used on the same day that we went to Shemya and the same

12    day that he was going off on a ferry to the mainland.

13    And --

14    Q.   How much?  For how much money?

15    A.   It was 230 -- $240.  It was like 40-some-odd

16    gallons, I think.

17    Q.   Gallons of what?

18    A.   Diesel fuel.

19    Q.   And how was that timeline established?

20    A.   So they had gate guard footage coming onto the

21    base, and so you could see Mr. Wells' truck coming onto

22    the base and that was consistent to the time that we

23    were -- that we met around that time in the parking lot

24    and we were going to the passenger terminal.

25         And then his truck also left the base.  And it

1  was all consistent with the time that the fuel was taken

2  when they went and got the receipts and the data from

3  the fuel pumps on when the diesel was taken.

4      Q.  Did you review that evidence and information?

5      A.  I didn't.  I saw the final memo, but I wasn't

6  involved in the investigation.  Once it became an

7  administrative investigation, I was a witness at that

8  point in the investigation matter.  So no, I was not

9  involved in that.

10     Q.  Explain to the jury why you were a witness.

11     A.  Well, because I ran the shop and it was reported

12 to me that the card was missing.  And so in the course

13 of the investigation, I would not be the right person to

14 conduct the investigation.  They got someone else in the

15 command who wasn't connected to the rigger shop to do

16 that.

17     Q.  Are you aware of an explanation or -- by

18 Mr. Wells as to what that use of the card could have

19 been?

20     A.  I am.

21     Q.  What was that?

22     A.  I believe he said he must have filled up the big

23 line truck.

24     Q.  Was there any evidence the big line truck had

25 moved?

 1    A.   No, there was no evidence the big line truck went

 2  into the gate that day.

 3    Q.   Nothing on the video?

 4    A.   Nothing on the video.

 5    Q.   Why was -- why were they looking for the fuel

 6  card in the first place?

 7    A.   Again, they were going to fuel some equipment up.

 8  I don't recall exactly what it was.  It could have been

 9  chain saws.  It could have been ATVs.  I can't remember.

10    Q.   Did you have a conversation with Mr. Wells

11  yourself as a manager with respect to this activity?

12    A.   I did.

13    Q.   And other activity as well?

14    A.   Yes.

15    Q.   Can you tell the jury when that conversation

16  happened?

17    A.   It was on 2 November 2011.

18    Q.   The same dates we just saw these documents up on

19  the screen?

20    A.   Yes, sir.

21    Q.   35 and 36?

22    A.   Yes, sir.

23    Q.   Please tell the jury why you elected to have a

24  conversation with Mr. Wells about this.

25    A.   Yeah.  So at that point, it was getting apparent

1    Mr. Wells was taking stuff from the COMMSTA, trees and

2    now fuel.  And so I wanted to let him know that we were

3    aware of these things and they weren't going to be

4    tolerated, that the fuel card incident didn't look good,

5    that there was going to be paperwork coming on that.

6         And I told him that, you know, he's an important

7    member of the crew, we need him and he needed to get on

8    board with the program, essentially.

9    Q.  You said paperwork coming on that?

10   A.  Yes.

11   Q.  Was there?

12   A.  There was.

13   Q.  During this conversation, did you have any

14   conversation with Mr. Wells about his future?

15   A.  Well, only that, you know, if he -- I said

16   something to the effect of, you know, "If you don't want

17   to be here, just retire," or, you know, "If you can't

18   get with the program you should just retire," or

19   something like is that.

20   Q.  What was his reaction to your conversation?

21   A.  So initially, we got a little bit heated.  The

22   voices in my office were raised.  I was up in T-1, my

23   office up there.  Some of the petty officers out on the

24   ET deck could hear us, kind of raised voices.  They

25   asked me about it later.

1      But then in the end, when I told him that if we
2  had had video at the pump of him actually taking the
3  fuel, he would be fired, but we didn't, we didn't have
4  cameras at the pump, but it didn't look good, it was
5  obvious that he had taken it and it's not good,
6  paperwork was coming, he actually thanked me for being
7  honest with him at that time.
8      Q.   From a manager's perspective, Mr. Reckner, what
9  is your goal from June to the fuel card issue with
10 respect to Mr. Wells?
11     A.   Again, so I never went looking for any of this
12 stuff.  I discovered it in the normal course of managing
13 the crew.  Whenever you have issues with an employee, it
14 takes a lot of time and effort from a manager's job.  It
15 takes away from other aspects of the job.
16     This is certainly not something I wanted to do.
17 And in the end, you know, we valued Jim Wells'
18 experience and expertise when it came to antennas.  We
19 wanted to retain that.
20     Q.   Did you make efforts to do that?
21     A.   We did.
22     Q.   If we could have the lights, please, Madam Clerk,
23 and Exhibit 37.
24     Mr. Reckner, there's two pages to this document.
25 Please take your time with your water.

1          Can you see that document, sir?

2     A.   Yes, sir.

3     Q.   If we can go to the second page, Blair.

4          Thank you.

5          That's the second page of that document?

6     A.   It is.

7     Q.   Are you familiar with the contents of that

8     document?

9     A.   I am.

10    Q.   And is that part of Mr. Wells' personnel file?

11    A.   It is.

12    Q.   That's something you had access to?

13    A.   Yes.

14    Q.   Coast Guard relied on it in managing Mr. Wells

15    and had it in his personnel file for a record?

16    A.   Yes.

17    Q.   And it reflects the memorandum issued to him

18    concerning the fuel card issue?

19    A.   It does.

20         MR. SKROCKI:  Move to admit Exhibit 36.

21         THE COURT:  37, I believe.

22         MR. SKROCKI:  37, yes.

23         THE COURT:  Any objection?

24         MR. COLBATH:  Your Honor, not sub- -- not other

25    than subject to my already ruled-on motion by the Court.

1          THE COURT:  All right.  With that I will admit

2    37.  Go ahead.

3          (Exhibit No. 37 admitted.)

4    BY MR. SKROCKI:

5      Q.  If you could go back to the first page, please,

6    and publish.

7          The date of this, Mr. Reckner, if you can see

8    that?

9      A.  January 4, 2012.

10     Q.  And this is directed to Mr. Wells?

11     A.  It is.

12     Q.  Does it have a summary of the investigation

13   concerning the fuel card?

14     A.  It does.

15     Q.  That's on the first page?

16     A.  It is.

17     Q.  That lists the paragraph B.  If we could expand

18   that, Blair.  Yeah.  Thank you.

19         These are the facts concerning the Coast Guard's

20   investigation, correct?

21     A.  Yes.

22     Q.  And the amount of diesel fuel was how much?

23     A.  47.641 gallons.

24     Q.  And the cost to the Government?

25     A.  $232.44.

1    Q.  And I'm just going to block this for just a

2  moment at the bottom.  Is that the reflection of

3  Mr. Wells' explanation?

4    A.  Yes.

5    Q.  What was the Coast Guard's view of that

6  explanation?

7    A.  Well, there was no evidence that supported it.

8  The line truck never moved, so...

9    Q.  Okay, Blair.  Thank you.  And if we can go down

10  to page two.

11      Mr. Reckner, who was the ultimate signatory from

12  the Coast Guard as to this letter of caution as it says?

13    A.  So that was commanding officer, Peter Van Ness.

14    Q.  And the title is Letter of Caution.  Can you

15  explain that to the jury, what that means?

16    A.  Yeah.  So once you move up to the letter of

17  caution range, I guess, it's more serious.  This would

18  go in his file.  If the behavior was repeated it could

19  be grounds for being fired.

20    Q.  Blair, if you could -- paragraph three at the

21  top, if you can expand that.

22      Can you read that for the jury, please,

23  Mr. Reckner?

24    A.  Sure.  "You have been employed as a civilian with

25  the Coast Guard and COMMSTA Kodiak for 20-plus years,

and you were also retired from the Coast Guard as a

chief petty officer.  You have a responsibility to both

properly use and properly safeguard this Government fuel

card.  This unauthorized purchase and supporting

evidence of misuse severely undermines my confidence in

you.

"You are a fiduciary steward of the taxpayers'

moneys, and you did not fulfill your basic

responsibilities.  This letter of caution is imposed to

impress upon you the seriousness of these offenses and

to serve as a warning that any future misconduct will

result in more severe disciplinary action."

Q.  Okay, Blair.  Thank you.

If you could expand paragraph four.

If you could read that to the jury, please,

Mr. Reckner.

A.  Sure.  "Your conduct was unacceptable and will

not be tolerated.  I consider this letter of caution to

be the very minimum action necessary to correct your

behavior and maintain good order and discipline in the

organization.  Any further misuse of Government charge

cards under your control or any further instances of

misconduct may result in disciplinary action being taken

against you up to and including removal from federal

service."

1    Q.   Thank you.  And paragraph five.

2    A.   "It is the policy of the U.S. Coast Guard to

3  offer counseling to employees who may be experiencing

4  personal problems affecting their work performance,

5  attendance or conduct.  If you believe that the employee

6  assistance program could be of assistance, you are urged

7  to contact a counselor at 1 (800) 222-0364.  The EAP is

8  a confidential, free and voluntary program."

9    Q.   Why was that put in there?

10   A.   So if Mr. Wells was having difficulty in his

11 personal life, he could go to EAP, talk to them and they

12 have some mechanisms to help members out.

13   Q.   Number six, please.  Just the first couple of

14 words there.

15   A.   "This letter is nondisciplinary and will not be

16 placed in your official personnel record.  However, it

17 will be retained in your supervisor's employee working

18 folder and may be relied upon if future action is

19 necessary."

20   Q.   It says nondisciplinary?

21   A.   Right.

22   Q.   Is that true?

23   A.   It is.  It is.

24   Q.   We can go back to the first page, but does this

25 letter of caution every directly state Mr. Wells did it?

1      A.   It doesn't.

2      Q.   Why is that?

3      A.   Again, because there were no cameras at the pump.

4  And if there were, he would have been let go, but it was

5  apparent that he was the only one who could have used it

6  at that time.

7      Q.   Were you present when this letter was given to

8  Mr. Wells?

9      A.   I was.

10     Q.   And if we could have the lights, Madam Clerk.

11          I'm sorry.  I jumped ahead too quick.  The date

12  on page two?

13          MR. COLBATH:  Your Honor -- I'm sorry to

14  interrupt, Mr. Skrocki.  Could we approach?  I need to

15  make an objection, and it's better if I --

16          THE COURT:  All right.  That's fine.

17          Feel free to stand and stretch, ladies and

18  gentlemen.

19          (Begin bench conference.)

20          THE COURT:  Go ahead.

21          MR. COLBATH:  Thank you, Your Honor.  I'm going

22  to ask that the Court strike two questions ago

23  Mr. Reckner testified in response to was the letter

24  nondisciplinary.

25          THE COURT:

 1          MR. COLBATH:  Uh-huh.  He said it was

 2    nondisciplinary, but it was apparent that Mr. Wells did

 3    it.  By my count that was the third time he said

 4    Mr. Wells stole the fuel directly.

 5          In the Court's order on this, you indicated the

 6    Government should not argue that Mr. Wells definitively

 7    stole or misused the fuel card.  And the jury -- I mean

 8    Reckner has now said directly three times, when he was

 9    describing the November meeting he had with Mr. Wells,

10    he said, "I know you stole the fuel."

11          And then later in describing the letter, he

12    says -- he says for the second time that Mr. Wells

13    directly stole the fuel.  He said, "The letter doesn't

14    say that, but I'm saying that."

15          THE COURT:  So how about if you were to ask

16    this witness -- can I see this -- "You cannot say that

17    Mr. Wells definitively stole -- the misuse of fuel

18    card."

19          MR. SKROCKI:  I can do it right now.

20          THE COURT:  I think that would --

21          MR. COLBATH:  To clear something up.

22          THE COURT:  Just want to clear up that we

23    cannot definitively say Mr. Wells -- because he didn't

24    have -- there is no camera at the pump.

25          MR. COLBATH:  I just want to make sure that the

```
1   Court's order is complied with and we don't have

2   argument later because the argument -- under the

3   evidence, the argument would now be appropriate because

4   he's said he stole the fuel.

5           MR. SKROCKI:  You can cross examine him on it,

6   but we're in compliance with the Court order.

7           MR. COLBATH:  I don't want to cross examine

8   him.

9           MR. SKROCKI:  For the record, we're in

10  compliance with the Court.

11          THE COURT:  Correct.  But ask him the follow-up

12  question:  You cannot definitively say that.  Just

13  parallel the language in my order.  And if you need to

14  confer with him --

15          MR. SKROCKI:  I would like just to make sure.

16          THE COURT:  Why don't we take our morning

17  break, and you can show him the order and do that

18  clarifying question.

19          MR. COLBATH:  Do you want this?

20          MR. SKROCKI:  No.

21          (End bench conference.)

22          THE COURT:  Ladies and gentlemen, we're a

23  little early for a morning break, but that is what we're

24  going to do is take about 10 to 15 minutes here and come

25  back shortly and then continue with the testimony.  So
```

please leave your notepads here.  Remember my admonition
not to discuss the case.  We'll see you back here in
about 10 or 15 minutes.  We'll go off record.

   (Recessed from 9:39 a.m. to 9:49 a.m.)

   (Jury absent)

   DEPUTY CLERK:  All rise.  Her Honor, the Court,
the United States District Court is again in session.

   THE COURT:  Please be seated.  We're back on
record.  And I understand the topic to take up.

   MR. COLBATH:  Your Honor, it occurred to me as
we were talking about this that we are going to ask the
Court to give -- and I'm just struggling a little bit
with the timing of it.  Of course we're going to ask the
Court to give a limiting instruction on the testimony
about the tree collaring, about the letters of caution,
about the different topics here.

   THE COURT:  So what's your proposal on that?

   MR. COLBATH:  Well, my proposal is this:  That
my first inclination was to -- as each topic is broached
that the Court read it, but since there's going to be a
number of topics and a number of witnesses, that may
seem -- that may be cumbersome and more than is
necessary.

   So my thought would be that the Court -- that
we craft one instruction that says, you know, you've

heard evidence related to these issues.  And just track
the points in the Court's 404(b) order, you know, 2011
tree collaring, November 2011 letter of expectation.
You just have a list of these issues.  You've heard
evidence of --

THE COURT:  I'm looking at the pattern 2.13,
evidence for limited purpose.

MR. COLBATH:  And I left mine down -- I
apologize.  I left mine down on my table down in the
office.  The pattern --

THE COURT:  I can give you a copy of it, but I
assume we could agree on this.

MR. COLBATH:  The pattern is sufficient, other
than you've heard evidence, and then I think we need a
list of these topics to sort of compartmentalize the
evidence for the jury.  And then my request would be --
I saw at one point that the Government proposed or said
they wouldn't object, you know, to the pattern or that
it was appropriate to give the pattern.

The only thing I will say about the pattern is
it's not an instruction to give the laundry list of
permissible 404(b) reasons that the jury can consider
it.  The case law I think is clear in the Ninth Circuit
that when evidence under 404(b) is put forth by a
proponent, the proponent has to identify the grounds,

1    the Court has to find grounds upon which it's being

2    offered that make it admissible under the rule, and then

3    it's that grounds upon which it can be considered.

4          And so this is clearly -- for instance, none of

5    this evidence is offered to eliminate -- it's not

6    offered under accident or some kind of mistake.  It's

7    offered as motive evidence.

8          So the instruction --

9          THE COURT:  Why don't we look at 2.13 and take

10   that up.

11         MR. SKROCKI:  Propose something.  Write

12   something out and we can all talk about it.

13         THE COURT:  Right.  So if you want to write it

14   up, I will read that.  And it would seem that we can use

15   the 2.13 and fill that out.  And would the Government

16   agree that this instruction says, "I instruct you that

17   this evidence is admitted only for the limited purpose

18   of," bracket, describe purpose, motive.

19         MR. SKROCKI:  We'll take this on, Judge.  We'll

20   produce the first draft and we'll circulate it.

21         THE COURT:  Wonderful.  So that would be where

22   I would be inclined to go is with 2.13 and list out the

23   evidence which also the model instruction contemplates

24   bracketing, "Describe evidence to be received for

25   limited purpose."  Can we take that up in due course

1   now?

2           MR. COLBATH:  We can, Your Honor.  And perhaps

3   if we could resolve it maybe at a break between -- at

4   the conclusion of the direct exam.  I mean --

5           THE COURT:  That's fine.

6           MR. COLBATH:  -- there are topics that haven't

7   yet been discussed, so it's not appropriate.

8           THE COURT:  Well, we need a draft of the

9   limited -- of the instruction.  So I hear the Government

10  may propose one, but really I think my order envisioned

11  that defense would, but either way.

12          MR. SKROCKI:  Yeah.  Ms. Sherman is working on

13  it right now.

14          THE COURT:  Very good.  I think we can use 2.13

15  and get that done.  And when it's ready to go, at the

16  next break, perhaps.

17          MR. SKROCKI:  Wonderful.  Thank you.

18          THE COURT:  We're ready to proceed on the

19  question?

20          MR. SKROCKI:  Start with Mr. Reckner with your

21  question --

22          THE COURT:  Right.

23          MR. SKROCKI:  -- and we're ready to go.

24          THE COURT:  All right.  Very good.  Then let's

25  bring in the jury.

1          (Pause)

2          THE COURT:  I wouldn't recommend using that.

3    That's the 2010.  We have substantially -- it's online.

4          MR. COLBATH:  I see that.  But I don't have any

5    of that ability right here.

6          THE COURT:  Or maybe that one's newer.

7          MS. SHERMAN:  2010 addition is online.

8          THE COURT:  It looks like it's 2010, but it's

9    not.  If you scroll down you'll see all the updates.

10         MS. SHERMAN:  Updated 2019 June.

11         THE COURT:  Yeah.  And we're about to update

12   even more.  We are going to have different closing

13   instructions.

14         MR. SKROCKI:  Oh, really?  Can you give us an

15   advance of that?

16         THE COURT:  They're not substantive changes.

17   We tweaked chapter three and chapter seven.

18         MR. SKROCKI:  It's noble work, Judge.

19         THE COURT:  You have to be a grammar

20   aficionado, which we all are.

21         (Jury present)

22         THE COURT:  Very good.  Please be seated,

23   everyone.

24         And I believe we're ready to proceed.

25   Mr. Skrocki, go ahead, please.

1    MR. SKROCKI:  Yes, Your Honor.  Thank you.

2  BY MR. SKROCKI:

3    Q.  Mr. Reckner, with respect to this fuel card

4  investigation, did you or the Coast Guard have any

5  definitive proof that Mr. Wells used the card on the day

6  in question?

7    A.  We did not.

8    Q.  Before the break we were moving into a meeting.

9  Can you tell -- on this fuel card memorandum.  And

10 please tell the jury where the meeting occurred, roughly

11 when and who was present.

12   A.  Sure.  So in February of 2012, the commanding

13 officer wanted to have a meeting to present the letter

14 of caution to Mr. Wells.  We had that meeting in his

15 office.  So the commanding officer, Pete Van Ness, was

16 there.  The executive officer, Lieutenant Pizzurro, was

17 there.  The master chief, Command Master Chief Troy

18 Lowdermilk was there.  The engineering officer, Bill

19 Reed, was there.  I was there and Mr. Wells was there.

20   Q.  In terms of Coast Guard hierarchy significance,

21 how important was this meeting?

22   A.  It's pretty important.  If you're getting called

23 into the commanding officer's office to discuss, you

24 know, something of this magnitude, it's serious.

25   Q.  And the commanding officer again was who, sir?

1    A.   Peter Van Ness.

2    Q.   And who led the meeting?

3    A.   He did.

4    Q.   And you were present?

5    A.   I was.

6    Q.   Was this letter delivered to Mr. Wells?

7    A.   It was.

8    Q.   Was there a general explanation to Mr. Wells

9  about the letter?

10    A.   So the commanding officer explained the letter to

11  him.  Explained that he was disappointed and that the

12  level of trust that he once had with Mr. Wells was no

13  longer the same.

14    Q.   What did Mr. Wells say or do during the course of

15  this meeting in response to what you just said?

16    A.   So Mr. Wells kept repeating, "You guys think I'm

17  a thief.  You know, you guys think I'm a thief."  And he

18  also kept repeating, "It just doesn't sit well.  It just

19  doesn't sit well."

20    Q.   How long did the meeting take place?

21    A.   Probably somewhere between 15 minutes and a half

22  hour, if I had to guess.  It's been a while.

23    Q.   Was there a request made to Mr. Wells with

24  respect to authenticating or signing the letter?

25    A.   Yes.  So again, from the HR department of the

base, we needed a signature just to identify that he
received the letter.  And so I asked him if he could
sign it, but he didn't at that time.

Q.  He did not?

A.  Not at that time.

Q.  Was there some sort of -- did you have a chance
to observe anything with respect to the not signing
portion of this conversation?

A.  Well, so after a period of a few minutes, the
commanding officer stood up and said, "Okay, let's
break."  So we all got up and I left.  I went back to my
office.  I called the HR person over at the base, Stacy
Hoffler, and I told her that Mr. Wells wouldn't sign the
letter.  And she said, "That's okay."

MR. COLBATH:  Your Honor, I'm going to object
as to hearsay.

THE COURT:  That's sustained.

BY MR. SKROCKI:

Q.  Remember what other people say --

A.  Got it.

Q.  Did Mr. Wells ultimately sign the letter?

A.  He did.  So after I got off the phone, I went
back to tell Captain Van Ness what I was informed.  And
at that point, the captain told me that Mr. Wells did in
fact sign the letter.  And so I took the letter back to

1   my office and put it in the appropriate folder.

2       Q.   And if we could have 37 back up, please, Blair.

3   And the lights, Madam Clerk.   Thank you.

4           The letter says Letter of Caution up under the

5   subject.   It's dated -- what's the date there,

6   Mr. Reckner?

7       A.   January 4th, 2012.

8       Q.   If we can go to the second page, Blair.

9           Can you see the date where it's been -- there's a

10  date there under Date?

11      A.   I can.

12      Q.   Which date is that?

13      A.   24 February 2012.

14      Q.   Do you recognize the signature on the left?

15      A.   I do.

16      Q.   Whose is that?

17      A.   That's Jim Wells'.

18      Q.   Why the delay from January to February?

19      A.   So the commanding officer, Pete Van Ness, drafted

20  the letter.   And then his schedule and Mr. Wells'

21  schedule were just not aligned.   Captain Van Ness had

22  left the island for some leave or some business, I don't

23  remember which, but he was off island.

24          Mr. Wells was sick and had some procedures done I

25  think around the same time.   So it was just a scheduling

1   issue to get both of them at the station at the same
2   time to present the letter.
3       Q.  If we could have the lights, Madam Clerk.  Thank
4   you, Blair.
5           You mentioned there, Mr. Reckner, about some
6   medical issues with Mr. Wells.  Do you have a
7   recollection of when these started?
8       A.  So I first remember hearing about them I want to
9   say late summer or early fall of 2011.  And they
10  continued through the winter of 2012.
11      Q.  Of 2012?
12      A.  Yeah.
13      Q.  If you could just tell the jury, in a general
14  sense did it have an impact on his work and his
15  attendance?
16      A.  It did.  So he was absent a lot.  He was going to
17  medical appointments.  Or he would come in, then he
18  wouldn't feel well, he would leave early, or he wouldn't
19  come in at all.  And so he was gone a lot between
20  personal leave and sick leave in the fall and early
21  winter of 2011 and 2012.
22      Q.  As a manager were you monitoring that?
23      A.  I was.
24      Q.  Did you have any concerns about the amount of
25  leave being used and, if so, what did you do?

1    A.   So I didn't.  You know, it was his leave.  He

2  wasn't feeling well.  If he wanted to take it he was

3  certainly entitled, both the personal and the sick

4  leave.  The fall, winter, is a slow time for us anyway.

5  I wanted him to get well, and I wanted him to do what he

6  needed to do to get well.

7        So we were giving him the time he needed.  In

8  fact, I believe he dipped into his -- he had used all

9  his sick leave and was dipping into his next year sick

10  leave, and we were okay with that.

11    Q.   You were okay with that?

12    A.   We were okay with that.

13    Q.   During that timeframe, are you aware of whether

14  he was placed on a certain type of duty?

15    A.   So after his surgery, I believe it was in

16  February, he was on a limited duty due to the surgery

17  for a period of time.

18    Q.   Do you recall what the surgery was for?

19    A.   A gallbladder removal and a hernia.  So they

20  removed his gallbladder and repaired a hernia at the

21  same time.

22    Q.   From there is that where the light duty came

23  from?

24    A.   Yes.

25    Q.   Did that change at some point in time?

1    A.   At some point in time, after he had healed a

2  certain point, you know, the light duty would have

3  expired or the doctor would have said, "You're good to

4  go for full duty."  So that happened at some point.  I

5  don't remember when.

6    Q.   With respect to Mr. Wells' paperwork concerning

7  his illnesses and his leave and after the turn of the

8  year, 2012 up till April of 2012, can you describe that

9  for the jury?  Was he compliant?

10    A.   So he was.  He was getting his personal leave

11  slips in before he was going to take leave, which had

12  been an issue in the past.  And his sick leave, he was

13  submitting those slips when he came back into the office

14  after being sick, though I still wasn't getting phone

15  calls or notifications if he wasn't coming in the office

16  regularly.

17    Q.   You call a sick leave or vacation leave chit?

18    A.   In Coast Guard parlance, that's a chit.  Leave

19  chit.  A slip.  A procedure.  The form we fill out, if

20  you will.

21    Q.   Yeah, we don't call it that, but -- that's a new

22  one for me.  Leave chit or sick leave chit.

23         Okay.  With respect to the operational side of

24  the rigger shop, how involved or how present was

25  Mr. Wells during the timeframe of January to April?

1    A.  Not very.  So he was out a lot obviously, because

2   he was sick and he took some personal time.  And beyond

3   that, while we were in the office discussing the day's

4   work or upcoming projects, I mentioned yesterday we had

5   a lot of damaged antennas that needed to be fixed, and

6   so we were starting to preplan some of that stuff.

7        Mr. Wells would sit in the office at his desk

8   with his back to myself, ET1 Hopkins and Mr. Belisle.

9   In an effort to engage him, reengage him in our

10  business, I would ask him questions.  I would say things

11  like, "How does that sound, Jim?  Are we on the right

12  track?"

13       We're going down the road trying to get him

14  involved in the conversation.  What I got back was

15  mostly one-word answers and not a whole lot of energy.

16   Q.  Did you as a manager rely on other people with

17  Mr. Wells at that time with the sick leave and not being

18  around, things of that nature?

19   A.  Yes.

20   Q.  And if you did, who were they?

21   A.  So ET1 Hopkins, Jim Hopkins, and Mr. Rich Belisle

22  stepped up.  They were learning more.  They were

23  figuring out what it was we were going to do to get

24  these antennas fixed.  I told the executive officer with

25  Mr. Wells's absences that we weren't going to not work,

1    we were going to continue to work.  We may make some

2    mistakes.  If we make mistakes I'll bring those to his

3    attention.  But we were not going to -- we weren't going

4    to stop work just because Mr. Wells wasn't in the

5    office.

6        Q.  Did that in fact occur?

7        A.  It did.

8        Q.  Who led that?

9        A.  So it was mostly Rich Belisle was stepped in and

10   was taking over that antenna mechanic role, if you will.

11       Q.  If we could have the lights, please.  And Blair,

12   if you could pull up Exhibit No. 4.  Blair, if you could

13   look over the screen, if you could enlarge that segment.

14            A little fuzzy there, Mr. Reckner, but can you

15   see a structure off to the left-hand side of the

16   building in Exhibit No. 4?

17       A.  I can.

18       Q.  I want to talk to you a little bit about that for

19   a few minutes.  What is that structure?

20       A.  That right there is the warehouse, the COMMSTA

21   warehouse.

22       Q.  If we -- thank you.  If we could have the lights,

23   Madam Clerk.

24            You mentioned the Communications Station

25   warehouse?

1    A.   Yes, sir.

2    Q.   And with respect to that warehouse, what's its

3 function for your Communications Station?

4    A.   Right.  So we use it to store parts, antenna

5 parts, pieces, gear.  There's a lot of things in there.

6    Q.   And what was Mr. Wells' relationship with that

7 warehouse?

8    A.   So he had been around for a long time.  And so he

9 was putting, you know, storing stuff in the warehouse

10 pretty regularly.  Not just COMMSTA property, but also

11 personal property.

12    Q.   Was there a command decision made as to what to

13 be done with that warehouse and its condition?

14    A.   Yes.

15    Q.   Who made that decision?

16    A.   The CO, Commander Van Ness.

17    Q.   What was the decision?

18    A.   He wanted the warehouse cleaned out.

19    Q.   Who was in charge of implementing that from the

20 Van Ness side?  It all goes downhill, right?

21    A.   Right.

22    Q.   Okay.  So who was next in line downhill?

23    A.   So after the captain, he mentioned it.  It was in

24 a meeting one of our meetings I was in.  So the

25 engineering officer was there, and I was there.  It was

understood that my shop, my warehouse, the rigger shop
was going to do that.

        And so I went to Mr. Wells, asked him to lead
that as the guy who had the most time at the station and
who was familiar with what we had in there to give us a
hand and get that thing cleaned out.

Q.  Did he ever do that?

A.  He did not.  Very limited role.

Q.  Now, the contents of the warehouse, in a general
sense, what was in there, in a general sense?

A.  Again, antenna pieces and parts, tools, boxes of,
I don't know, all kinds of stuff.  I didn't know what it
was because I'm not an antenna mechanic.  But it was a
lot of stuff that was outdated and we no longer needed,
and it was strewn about everywhere.  There was no
cataloguing or organization to it.  There was stuff --
there was -- it was hard to walk around in there, there
was so much stuff.  And it just looked really bad.

Q.  And was there an effort done to do what with this
equipment?

A.  To clean it out, to go through it, ascertain what
was good that we would need in the future.

Q.  Did you do that?

A.  So the team did.  I didn't personally, but yes,
we did it.

1      Q.   So you made an effort what was going to go and

2  what was going to stay?

3      A.   Yes.

4      Q.   And to be fair, some things stayed and some

5  things went?

6      A.   That's correct.

7      Q.   Did you have any personal experience with

8  Mr. Wells while this warehouse cleanout was going on?

9      A.   I did.

10     Q.   What was that?

11     A.   So there were occasions when Rich and ET1 and the

12  crew were down at the warehouse going through it.  They

13  would come across something that they couldn't identify

14  and would ask Jim to come down, Jim Wells to come take a

15  look at it and tell us what it was.

16     Q.   Did he do that?

17     A.   He did once or twice.

18     Q.   Did he seem pleased with this project from your

19  observation?

20     A.   Not at all.

21     Q.   How long did this project take?

22     A.   I heard about it -- I reported it in 2010, and

23  the first time I heard that the commanding officer

24  wanted that cleaned out was probably fall of 2010.  You

25  know, it was one of those projects that didn't need to

1    happen tomorrow.  But it was an ongoing project that the

2    CO wanted done before he transferred out in the summer

3    of 2012.

4        Q.  And with respect to the rigger shop

5    Communications Station, who was the point person for the

6    warehouse clean-out?

7        A.  So the point person -- who became the point

8    person was Rich Belisle.

9        Q.  You have your managers and they take

10   responsibility for the success, but the person on the

11   ground is the one doing the work?

12            MR. COLBATH:  Your Honor, I'm going to object

13   as to leading.

14            THE COURT:  It is sustained.

15   BY MR. SKROCKI:

16       Q.  At the time of the murders in April of 2012, was

17   this project finished?

18       A.  It was not.

19       Q.  Mr. Reckner, are you aware of a conference called

20   NATE?

21       A.  I am.

22       Q.  What is that conference?

23       A.  So NATE stands for the National Association of

24   Tower Erectors.  It's an industry, tower industry

25   conference that is held every year.  It rotates through

1    six or seven cities around the country every year.

2    Every year a different city.

3        Q.   Did you have occasion to attend this conference

4    at a point in time?

5        A.   I did.

6        Q.   Tell the jury when.

7        A.   My first NATE was in February of 2011.

8        Q.   And subsequent to that, did you have occasion to

9    attend a NATE conference?

10       A.   Yes.

11       Q.   When was that?

12       A.   I went again in 2012 and 2013.

13       Q.   Can you explain to the jury the general nature of

14   the NATE conference and what it does, how long, that

15   type of thing?  Why is it important to what you do?

16       A.   Sure.  So again, it's a gathering of folks in the

17   tower industry, if you will.  We have training.  There's

18   a series of training seminars throughout the whole week.

19   And there's also vendors, so a large exhibition hall

20   with vendor booths that you walk through and you can

21   talk to vendors and see what the new equipment is out

22   there, new climbing gear or whatever the new technology

23   is.

24       Q.   Do things change technologically in the tower

25   industry?

1    A.   They do I think mostly with the safety gear.

2   They update that a lot.

3    Q.   In 2011, you mentioned you went to one of these

4   conferences?

5    A.   I did.

6    Q.   Who did you go with?

7    A.   I went with Mr. Wells and Mr. Belisle.

8    Q.   How long were you gone?

9    A.   A week.

10   Q.   Did Mr. Wells seem to enjoy the week at the NATE

11  conference?

12   A.   He always looked forward to it.  He did very

13  much.

14   Q.   To your understanding, had Mr. Wells always

15  attended these over the years when he was at the

16  Communications Station?

17   A.   Yes.

18   Q.   Did there come a time in the spring of 2012,

19  where you had a conversation with Mr. Wells about the

20  2012 NATE conference?

21   A.   It was actually in the winter.  It was January or

22  early February that I had the conference.

23   Q.   In the winter, you had the conversation?  Okay.

24  So when you had that conversation in January or

25  February, where were you when you had this conversation?

1    A.  So we were in the office down in T-2.  It was

2  just him and I.  He had been out sick for a while, had

3  just come back.  He asked me what we were doing about

4  the NATE conference that year.  And I told him that we

5  already made a decision and that myself, ET1 Hopkins and

6  Mr. Rich Belisle would be going this year.

7    Q.  Who made that decision?

8    A.  So I made the decision and the executive officer,

9  I had a conversation with Dave Pizzurro who supported

10  it.

11    Q.  And how much funding did you have to send people

12  for the 2012 conference?

13    A.  The XO told me we could only take three.

14    Q.  And you communicated this to Mr. Wells?

15    A.  I did when he asked, yes.

16    Q.  Can you explain how the ask happened?

17    A.  So again, we were sitting in the office, just him

18  and I down in T-2.  He was at his desk, and I was

19  sitting at Jim Hopkins' desk for some reason.  I don't

20  remember why.  And he said, "So what are we doing about

21  NATE this year?"  I said, "It's already planned.  XO

22  said we can take three, so myself, ET1 Hopkins and Rich

23  Belisle will be going this year."

24    Q.  And his reaction to what you said was?

25    A.  He was angry.

1    Q.  Please elaborate on that for the jury.

2    A.  So he was angry.  He pointed at ET1 Hopkins' desk

3 and said, "Why is he going?"  And I explained to him

4 that ET1 had, you know, done great work this year, he

5 really stepped up, he was the sailor of the year.  He

6 extended for a year, so he chose to spend another year

7 at COMMSTA.  We had a lot of work coming up in 2012, and

8 we could use him to gain the knowledge he would get at

9 NATE to bring that back.  So that's why I decided that

10 ET1 Hopkins would go.

11    Q.  Did he make any comment as to Mr. Belisle's

12 attendance of the NATE conference with you and

13 Mr. Hopkins?

14    A.  So after I explained why ET1 Hopkins was going,

15 he pointed to Rich's chair and he said, "Why is he

16 going?  He's just a fucking rigger."

17    Q.  Those were his words?

18    A.  Those were his words.

19    Q.  What was your response to that?

20    A.  Again, so I explained to him that Rich, same

21 story, had really stepped up this year in Mr. Wells'

22 absence.  And I said that "As far as an antenna mechanic

23 goes, Rich isn't that far from you, knowledge-wise."

24    Q.  Did he have a response to that?

25    A.  So he glared at me, kind of glaring and staring

1  at me for a period of -- it felt like a long time, over

2  30 seconds.

3      Q.  How did you feel about that?

4      A.  I felt intimidated.

5      Q.  Why?

6      A.  I felt like he was trying to intimidate me, that

7  he was angry he wasn't going and, you know, you saw the

8  diagram in the office.  I'm sitting in the back of the

9  office.  He's sitting by the door, you know.  He's a

10  strong man.  The look on his face was intimidating.

11      Q.  How long was this exchange going on, Mr. Reckner?

12      A.  Again, I don't know for sure, but I would say

13  around 30 seconds or maybe longer.  It seemed like a

14  while.

15      Q.  What ultimately broke the staring?

16      A.  He turned around and went back to work and

17  started typing on his desk, and I did the same thing.

18      Q.  When you had this conversation, was there any

19  mention by Mr. Wells of any kind of surgery he had

20  coming up?

21      A.  No.

22      Q.  Was there any mention of him doing other work for

23  the Communications Station?

24      A.  No.

25      Q.  In connection with this conference?

```
1       A.  No.

2       Q.  Had there been a fourth slot, would you have

3  selected him to go?

4       A.  I would not have.

5           MR. SKROCKI:  One moment, Judge.

6           THE COURT:  Certainly.

7           (Pause)

8  BY MR. SKROCKI:

9       Q.  Thank you, Judge.

10          Mr. Reckner, I want to turn your attention to

11 April 11th of 2012.  Do you recall kind of the workday

12 that day?

13      A.  I do.

14      Q.  And do you recall any interaction with Mr. Wells

15 the morning of the 11th?

16      A.  I do.

17      Q.  What do you recall?

18      A.  He disappeared.  Around 9:00 in the morning, we

19 were both in the office.  He told me he was heading up

20 the hill toward ET1.  I had a meeting up there in a few

21 minutes.  I said, "Roger that, I'll see you up there."

22 And I didn't see him again for -- until after lunch.

23      Q.  Did you make attempts to try to locate him?

24      A.  I did.

25      Q.  Were those attempts successful?
```

 1    A.   They were not.

 2    Q.   What did you try to do?  Without telling us what

 3 people said, what did you try to do to locate Mr. Wells

 4 during that morning of April 11th?

 5    A.   I called up to the T-1, to the ET deck and I

 6 asked one of the ETs to go look for him.  I believe it

 7 was Cody Beauford.

 8    Q.   Anybody find him?

 9    A.   No, we did not find him.

10    Q.   Was there any business work conducted in the

11 afternoon of the 11th that you were involved in?

12    A.   Yeah.  So we had a temporary antenna that the DoD

13 was asking us to install.  So we went up onto the roof

14 of the T-1 building, it was a small little antenna, to

15 look at location, and also to discuss how we would run

16 the transmission line from the roof down to the

17 operations deck where the radio and the gear would

18 actually be.

19    Q.   Who was part of that conversation?

20    A.   I was there.  Rich Belisle.  Mr. Wells was there.

21 Cody Beauford was there.  I think Seaman Coggins was

22 there and maybe one or two of the ETs from the ET deck.

23    Q.   And the point of the meeting or the conversation

24 was to do what kind of work?

25    A.   To locate a spot on the roof to put the antenna

1    and then to discuss how we would run that transmission

2    line.

3         Q.   What was the -- in terms of transmission line,

4    what was the concern of the location?  Why was that

5    important?

6         A.   Well, so I mean we got to get into the building

7    down to the equipment.  So as we discussed it, there

8    were really only two options to get it into the

9    building.  We could run it down along the shingles and

10   down to the ground and then in, or there was like an

11   attic space or a void space, right adjacent to the

12   antenna.  So the other option was to run it in that

13   space and then down through the building and then get it

14   to the equipment.

15        Q.   Who made what suggestion?

16        A.   So Mr. Wells suggested that we run it on the

17   outside along the shingles, and Mr. Belisle suggested we

18   run it inside through the building.

19        Q.   Was there discussion amongst you all about that?

20        A.   So we discussed it and, you know, as a guy who

21   made the decision, to me, it made sense to run it inside

22   the building.  At the time, the installation was

23   supposed to be temporary, but often these things became

24   permanent.  Made sense to do the work now and get it

25   inside and protect the cable.  Obviously, Kodiak weather

1   is harsh.  If we could keep it protected on the inside
2   it would last longer.
3       Q.  The equipment that would sort of do the data,
4   where was that located?
5       A.  Down in the operations deck.
6       Q.  The operations deck, if you can explain that to
7   the -- that was yesterday.  Can you explain that one
8   more time?
9       A.  The operations deck is where the operations
10  specialists work, the folks who listen to the radios
11  24 hours.  And we have a bunch of equipment down there,
12  radios and other stuff.  This piece of equipment was
13  going to be placed into the operations deck.
14      Q.  Who ultimately made the decision about where the
15  line was going to be run?
16      A.  I did.
17      Q.  What did you decide?
18      A.  I decided we would run it inside the building.
19      Q.  Who was -- who did you communicate that to?
20      A.  So I communicated to everybody as we were
21  standing there.  I said, "We're going to run it inside."
22  I said, "Rich, great idea.  We're going to run it
23  inside."  And that was it.
24      Q.  Is the operations deck the same location where
25  surveillance cameras are located?

1      A.   It is.

2      Q.   Did Mr. Wells ever tell you -- what did Mr. Wells

3    tell you about where he was that whole morning?

4      A.   I never knew.  He never told me.  I was going to

5    have a conversation with him about it on April 12th, but

6    April 12th, Rich and Jim were murdered, so I never got a

7    chance.

8      Q.   The next day?

9      A.   Yes.

10     Q.   Mr. Reckner, when's the last time you saw

11   Mr. Belisle alive?  Go ahead.

12          (Pause)

13     A.   April 11th.

14     Q.   What were you doing with him?

15     A.   So after the antenna discussion regarding the

16   cable that we just talked about, it was near the end of

17   the day.  I think we probably hit quarters and he left.

18     Q.   How about Mr. Hopkins?

19     A.   So Jim and I --

20          THE COURT:  Do you want to take a few minutes,

21   or are you okay?

22     A.   So ET1 and I were interviewing that day for the

23   summer positions.

24     Q.   Who were you interviewing?

25     A.   They're generally high school students.  We bring

1    in one or two a year to help us with the summer work,

2    the clearing of the antenna fields and whatnot.  So we

3    had three interviews that day.  And one of them was

4    running late.

5         So we were heading down to the rigger shop, and

6    the young man was pulling in.  He kind of got lost

7    getting to the COMMSTA.  And so we said, "Okay, just

8    follow us down to the rigger shop and we'll interview

9    you down there."  And so we did.  And then he left.

10        And ET1 and I went into the office to discuss the

11   candidates and we made a decision on who we were going

12   to hire that summer.  And I drafted an e-mail and sent

13   it to Stacy Hoffler, the HR at the base, to tell her who

14   our candidates were.

15   Q.  Before we get to the next segment of your direct

16   exam, can I see you for just a moment with a sidebar?

17             THE COURT:  Certainly.

18             (Begin bench conference.)

19             MR. SKROCKI:  So in opening statement, there

20   was a conversation about Mr. Reckner focusing on

21   Mr. Wells.  There were several statements that have been

22   produced in discovery and Mr. Reckner's interviews about

23   what he thought the morning of the 12th when he got a

24   phone call.  His verbal response was, "I hope Jim Wells

25   didn't do something stupid."

 1          I don't -- I could inquire on it because of the

 2     defense's opening the door on Mr. Reckner, and that's

 3     what I would like to do along with what he thought about

 4     it.

 5          THE COURT:  You want to get that statement in?

 6          MR. SKROCKI:  I do.  I think it's an excited

 7     utterance.  He thought it, and then he uttered it.

 8          THE COURT:  Any objection?

 9          MR. COLBATH:  First of all, I don't think that

10     we can open the door till we present evidence.  That's

11     my first thought.  My second thought is that being said,

12     I don't necessarily have an objection to the statement

13     as an excited utterance.

14          The explanation of why he thought that or his

15     belief that Mr. Wells -- the underlying reason for his

16     belief that Mr. Wells committed the crime is, one, not

17     relevant and, two, I think objectionable, not

18     appropriate.  That's an opinion on the issue before the

19     jury, why Wells would have committed the murder.

20          And so if there's any testimony or -- the

21     Government can't put in the statement and then ask,

22     well, why did you say that or why did you think that.

23     The why question is where I really have a problem.

24          THE COURT:  Are you going to ask that?

25          MR. SKROCKI:  No.  I'm not going to ask him

1    why.

2              THE COURT:  Just the statement?

3              MR. SKROCKI:  Just the statement.

4              THE COURT:  I hear no objection to the

5    statement as an excited utterance.

6              MR. COLBATH:  To the statement that he said to

7    somebody, because I'm not sure who, but he said to

8    somebody at the initial scene there, "I hope Jim Wells

9    didn't do something stupid."

10             MR. SKROCKI:  And I actually prepped him that I

11   wasn't going to do it.  I'd like to have a moment with

12   him.  And then I will caution him I'm not going to be

13   asking questions about the why.  That wasn't part of our

14   direct anyway.  If you hear questions like, what were

15   you thinking about Mr. Wells, not about -- his

16   statements going to be -- just a moment.  His statements

17   are going to be -- I will say, were you concerned about

18   Mr. Wells and he will answer yes.  Just so you know,

19   we're not going there.

20             THE COURT:  You're not going to reexplore the

21   basis for his opinion?

22             MR. SKROCKI:  Correct.

23             THE COURT:  Just the opinion?

24             MR. SKROCKI:  Uh-huh.

25             THE COURT:  I hear no objection to that.

1          MR. COLBATH:  If we don't go to the basis or

2     the why.

3          MR. SKROCKI:  No.  May I have a moment with him

4     briefly.

5          THE COURT:  Yes.  Do you need me to excuse the

6     jury?

7          MR. SKROCKI:  No.

8          MR. COLBATH:  Could he come to you?  So don't

9     have a conversation there.

10          (End bench conference.)

11          THE COURT:  Sir, would you mind going and

12     talking with Mr. Skrocki for just a moment.

13          Everyone doing okay?  Anyone need a break or

14     anything?  Should be just a minute here.

15              (Pause)

16     BY MR. SKROCKI:

17     Q.  Thank you, Your Honor.

18         All set, Mr. Reckner?

19     A.  Yes, sir.

20     Q.  All right.  When we broke you were interviewing a

21     high school student for some summer work?

22     A.  Yes.

23     Q.  And where did you go after that?

24     A.  I went home.

25     Q.  You spent the night at home?

1    A.   I did.

2    Q.   And do you have a family?

3    A.   I do.

4    Q.   Describe your family.

5    A.   I have a wife and three children.

6    Q.   And you woke up the next morning?

7    A.   I did.

8    Q.   What did you intend to do that day?

9    A.   We were scheduled to climb one of the

10   300-footers, change the lights.  So I woke up thinking

11   we were going to climb that day.

12   Q.   And this is April 12th, the day of the murders?

13   A.   Yes, sir.

14   Q.   At some point did you receive any information

15   concerning something about the Communications Station?

16   A.   I did.

17   Q.   What did you receive?

18   A.   I got a phone call from SK --

19        (Pause)

20   A.   I got a phone call from SKS Cartier asking me if

21   I knew what was going on at the rigger shop.  He said

22   there were a bunch of emergency vehicles there.  He just

23   drove by.  And I told him I did not.  I hung up with

24   him.

25   Q.   Let me stop you there.  Take a drink.

1          You hung up the phone?

2     A.  I did.

3     Q.  Did you have a thought after that?

4     A.  I did.

5     Q.  What was your thought?

6     A.  I hope Jim Wells didn't go fucking crazy.

7     Q.  Did you say anything to that effect after that

8  thought?

9     A.  I did.

10     Q.  What did you say?

11     A.  I said just what I said.

12     Q.  Okay.  What did you do next?

13     A.  I called the watch on the operations deck, and I

14  asked them what was happening down at the rigger shop.

15     Q.  Did you receive any information about that?

16     A.  I was informed that Rich and ET1 Hopkins had been

17  found down.  I said, "What do you mean down?"  And I was

18  informed down, and then the conversation ended.

19     Q.  Did that word down have any significance to you?

20     A.  It sounded serious to me.

21     Q.  Your reaction to that was what, sir?

22     A.  I got ready.  I was in my truck, and I was

23  driving to the COMMSTA.

24     Q.  Where were you living at the time?

25     A.  Aviation Hill.

1    Q.   How long did it take you to get to the

2    Communications Station?

3    A.   Less than five minutes.

4    Q.   When you got there, let me -- I'm sorry.

5         Did you have any conversations with anybody

6    between the time you left your home and the time you

7    arrived at the Communications Station?

8    A.   I did.

9    Q.   With who?

10   A.   I called ET3 Cody Beauford.  I said, "Cody,

11   what's going on?"  He said he found Rich and Jim down.

12   And I said, "Cody, what do you mean down?"  And he said

13   he found them dead.

14   Q.   Take a moment.  Okay?

15        When you received that phone call, Mr. Reckner,

16   where were you in the transit from your home to the

17   Communications Station?

18   A.   I was on Anton Larsen.

19   Q.   About how far away?

20   A.   Minutes.  A minute maybe.  I was not far.

21   Q.   How were you feeling then?

22   A.   I was scared.  I was nervous.  I was upset.  I

23   wanted to get there and find out where my guys were,

24   what happened.  So I was trying to get there as fast as

25   I could.

1      Q.   You were their manager?

2      A.   They were my guys, yes.

3      Q.   And at some point, did you pull up to the

4   Communications Station and specifically the rigger shop?

5      A.   I did.

6      Q.   Can you describe what you saw there?

7      A.   When I drove up, I made that turn off the bridge,

8   I came up, I could see emergency vehicles, State

9   Troopers, CGPD, Coast Guard Police Department.  And so I

10  parked where I -- the only place I could, which is near

11  the flagpole.  I jumped out of my vehicle intending to

12  go into the rigger shop.

13     Q.   Let's stop you there.  We showed you an exhibit

14  before your testimony today.  It's a video clip.  Take

15  all the time you need.

16     A.   Okay.

17     Q.   Do you recall that clip, Mr. Reckner?

18     A.   I do.

19     Q.   Madam Clerk, if we can have the lights.  And

20  Blair, Exhibit 67 for foundational purposes.  If you

21  could just begin to play.  Just stop it there for

22  Mr. Reckner.

23          Is this the video clip we showed you prior to

24  your testimony, Mr. Reckner?

25     A.   It is.

1    Q.  It depicts the scene in front of the rigger shop

2   the morning of Mr. Belisle and Mr. Hopkins' murder?

3    A.  It does.

4    Q.  And you recognize the vehicles that are depicted

5   in that video clip?

6    A.  I do.

7    Q.  Do you see your own vehicle in that video clip?

8    A.  I do.

9        MR. SKROCKI:  Move for the admission of United

10  States 67.

11       MR. COLBATH:  I have no objection, Your Honor.

12       THE COURT:  All right.  67 is admitted.

13          (Exhibit No. 67 admitted.)

14  BY MR. SKROCKI:

15   Q.  Blair, if you can go -- yeah, thank you.  Go to

16  the beginning.  And just for Mr. Reckner and for Blair,

17  I'll be interrupting this at certain points along the

18  way for explanation of things.

19        So let's just post for the jury, please.

20  Mr. Reckner, do you know the field of view of this

21  camera and where it's located?

22          (Exhibit 67 playing in open court)

23   A.  I do.

24   Q.  Where was that?

25   A.  It's the camera that's located on T-2.

1    Q.  It's facing -- there's an item there in the
2  distance.  Do you see what that is?
3    A.  I do.
4    Q.  What is that, Mr. Reckner?
5    A.  That's the Kodiak water treatment plant.
6    Q.  In the center right there, could you tell us what
7  that is?
8    A.  I can.  That's the flagpole.
9    Q.  Where is your vehicle in this image, Mr. Reckner?
10   A.  Mine is right behind this white one, right there,
11 the dark-colored truck right there.
12   Q.  Are there any other vehicles in this frame of the
13 image that you see that you recognize?
14   A.  There is.
15   Q.  Could you point them out for the jury?
16   A.  That's -- I believe that's Joe Sturgis's, maybe.
17 I think it's CGIS.  That's an emergency vehicle,
18 emergency vehicle.  And that is Senior Chief Reed's van.
19   Q.  Can you explain to the jury -- you said CGIS.
20 Just let them know what that means.
21   A.  Coast Guard Investigative Service.
22   Q.  Blair, we can go ahead and forward it.  If you
23 could stop it right there, please.
24       Do you recognize that white truck on the
25 right-hand side that just came into view, Mr. Reckner?

1    A.   I do.

2    Q.   What is it?  Who do you associate that with?

3    A.   That's Jim Wells' truck.

4    Q.   Prior to this event here, had you received any

5    communication directly from Mr. Wells as to his

6    whereabouts?

7    A.   No.

8    Q.   Keep going, Blair.

9         If you can stop right there, please.  And maybe

10   just a little bit further.  Stop.  Thank you.  Let's go

11   to the right-hand side, Mr. Reckner.  A truck that had

12   come into view.  Do you see that?

13   A.   Right there?

14   Q.   Yes.

15   A.   Yes.

16   Q.   Whose vehicle is that?

17   A.   That's Commanding Officer Peter Van Ness's.

18   Q.   And Mr. Wells's truck is to the left now in the

19   frame?

20   A.   Correct.

21   Q.   Do you know the identity of the person that's

22   near the left front tire?

23   A.   I think that's me.

24   Q.   Did you have a conversation with Mr. Wells at

25   that period of time or close to it?

1    A.  I did.

2    Q.  Please tell the jury what you conversed about.

3    A.  Mr. Wells pulled up and asked me what was going

4  on.  I said, "Someone shot Jim and Rich."  He said,

5  "Shit.  I had a flat tire."

6    Q.  Is that near -- that conversation exchange near

7  this frame here?

8    A.  Pretty soon, I think, yeah.

9    Q.  Did he say anything else?

10    A.  Not that I recall.

11        Oh, yeah, he did.  He said, "I tried to call.  I

12  called -- tried to call.  I can't get ahold of Jim and

13  Rich," is what he said.  "I can't get ahold of Jim and

14  Rich."  And I think he said, "I left messages at your

15  voicemail," or something to that effect.

16    Q.  If we can keep going, Blair.

17        If we could stop.  There is an individual in a

18  red jacket on the right-hand side of the frame.  Who is

19  that person?

20    A.  Right there?

21    Q.  Yes.

22    A.  That's the Captain, Peter Van Ness.

23    Q.  We can keep going.  And stop there, please.

24        Can you identify any other individuals in the

25  frame, please?

 1     A.   Yeah.   So that's Cody Beauford, and that's me and

 2   that's Mr. Wells.

 3     Q.   Proceed.   Stop there.

 4          Is that you putting your hands down on your

 5   knees, Mr. Reckner?

 6     A.   It is.

 7     Q.   Who is that coming up to give you a hug?

 8     A.   Captain Peter Van Ness.

 9     Q.   Commander?

10     A.   Commanding officer.

11     Q.   How was your mental state at the time, sir?

12     A.   I was a wreck.   I was in a bad place.   I couldn't

13   breathe.   I was crying.   Some of my guys were dying in

14   my building, in my office.   I was destroyed.

15     Q.   Did you try to keep it together?

16     A.   I was trying.

17     Q.   Keep going, Blair.

18          Stop the frame.

19          Who's that in the orange shirt?

20     A.   That's Mr. Wells.

21     Q.   Do you recall any part of the conversation you

22   had with him there, if there was any?

23     A.   Not anything that I hadn't already just said.

24     Q.   Proceed.   Thank you.

25          We can stop it there, please.

1          So this is at 8:24 on that camera frame.  What

2     time does Mr. Wells usually show up for work, in your

3     experience?

4          A.  7:00.

5          Q.  Thank you.  There's no audio to that camera, to

6     your knowledge?

7          A.  Not to my knowledge, no.

8          Q.  We can stop the frame.

9          Do you know that individual there at the bottom

10    of the screen that just turned around?

11         A.  I don't.  I'm assuming law enforcement, but I

12    don't know.

13         Q.  If we can keep going, Blair.  Thank you.

14              (Exhibit 67 playing in open court)

15    BY MR. SKROCKI:

16         Q.  Was there any exchange between you and Mr. Wells

17    there that you recall that's being depicted on that

18    video?

19         A.  Not that I can recall.

20         Q.  Okay.  Thank you.

21         If you want to see the whole thing we can play

22    the whole thing.  It's close to the end.  How much time

23    is left on that clip, Blair?

24         Since it's an exhibit, let's just finish the

25    play.

1                (Exhibit 67 playing in open court)

2    BY MR. SKROCKI:

3        Q.  Mr. Reckner, during this point in time, as

4    manager of the rigger shop, what did you want to do?

5        A.  I wanted -- I remember wanting to go in.  I mean

6    I wanted to go in and check on my people.  I wanted

7    to -- yeah.

8        Q.  Were you allowed to do that?

9        A.  No.

10       Q.  What are you doing now as you go from screen left

11   to screen right?

12       A.  Walking over -- I'm not sure whose vehicle that

13   is, but talking to whoever that is.  Probably telling

14   them what happened.

15       Q.  Okay.  That concludes the playing of Exhibit 67.

16           If we could have the lights, Madam Clerk.

17           Mr. Reckner, you testified that Mr. Wells told

18   you about leaving some messages.

19       A.  That's correct.

20       Q.  At the time, how did that strike you?

21       A.  It was unusual.  It was suspicious, I guess.  He

22   never left me messages, very rarely.  I wouldn't say

23   never.  Not very often.

24       Q.  How many messages did he say he left?

25       A.  He told me he left a message on ET1 Hopkins'

1  voicemail, on Rich Belisle's voicemail and on my

2  voicemail.

3     Q.  Did you ultimately at some point later hear that

4  voicemail?

5     A.  Yes, later in the morning, I went up to my office

6  in T-1 and I played the message.

7     Q.  We'll get to that.

8        What was your objective as manager after this

9  traumatic event in terms of functionality of the

10  Communications Station?

11    A.  On that day?

12    Q.  Yes.

13    A.  It was to take care of my crew, the people who

14  work for me.  I mean I was, you could see, I was

15  emotionally distraught.

16    Q.  Let me interrupt you there and ask you, during

17  the day, how were you able to handle this?

18    A.  So I mean I don't know that I was.  We -- I went

19  up the hill.  I'm not sure at what point after that

20  video I went up the hill to T-1.  They had the rigger

21  shop folks in the conference room along with ET1 Matt

22  Gross who was the ET shop manager or ET1.

23    Q.  Emotionally, what happened to you during the day?

24    A.  I mean I would cry.  When I walked into the

25  conference room, Matt Gross was crying.

1    Q.  Were you able to control it?

2    A.  I was not able to control it, no.

3    Q.  How about the other folks you observed, just the

4 people you observed, please tell the jury what you

5 observed that morning, the reactions of other people to

6 this event?

7    A.  Everybody for the most part, especially the

8 people who worked in the rigger shop or who knew the

9 people in the rigger shop well, you could tell they were

10 crying.  Their faces were all red.  Their eyes were all

11 red and puffy.  It was obvious that those folks were in

12 distress.

13    Q.  When do you recall heading up to the T-1 building

14 after this video, just roughly?

15    A.  I don't know for sure, because again, I was

16 emotionally a wreck.  It was very traumatic.  I was

17 probably in shock.  I would say approximately an hour

18 after that video, but I don't know for sure.

19    MR. SKROCKI:  Your Honor, in terms of timing,

20 when do you wish to take the morning break?

21    THE COURT:  Whenever is a convenient time is

22 fine.

23    MR. SKROCKI:  This would be good.  I have one

24 more application to make.  So maybe we could do that

25 outside the presence of the jury.

1          THE COURT:  That sounds very good.  Why don't

2     we take about 15 minutes, ladies and gentlemen.  Leave

3     your notepads here.  If you would remember my admonition

4     not to discuss the case or do any research.  We'll see

5     you back shortly after the top of the hour.

6          (Proceedings took place and are not included in

7     this transcript, after which, the testimony of Scott

8     Reckner transpired as follows:)

9          (Jury present)

10          THE COURT:  All right.  Please be seated

11     everyone.  Welcome back, ladies and gentlemen.  And

12     whenever you're ready, Mr. Skrocki.  Thank you.

13          MR. SKROCKI:  We're all set, Your Honor.  Thank

14     you.

15     BY MR. SKROCKI:

16       Q.  Ready, sir?

17       A.  Yes, sir.

18       Q.  Mr. Reckner, that day was an emotional day for

19     you?

20       A.  It was.

21       Q.  When we broke for the morning break, you were

22     discussing observations of other individuals you had

23     seen in the T-1 building after the murders?

24       A.  Yes.

25       Q.  And did you have occasion to see Mr. Wells that

1  morning or at any time that day?

2      A.  I did.  I saw him up in the conference room.

3      Q.  What was he doing?

4      A.  For a large part of the time, he was reading a

5  book.

6      Q.  Did you ever see him shed a tear or anything like

7  that?

8      A.  No.

9      Q.  That morning, Mr. Reckner, did you have occasion

10 to speak with people about just about the murders and

11 things, your reactions to them as well?

12     A.  I did.

13     Q.  Did you tell anybody that Jim Wells did it?

14     A.  You asked me if I ever said Jim Wells did it?

15     Q.  Yes, that morning.

16     A.  I never did.

17     Q.  Is it possible you may have said that?

18     A.  It's possible.  I don't recall ever saying that.

19     Q.  Mr. Wells was supposed to arrive to work what

20 time that morning as to your understanding?

21     A.  7:00.

22     Q.  He showed up at what time?

23     A.  8:30.

24     Q.  Did you advise law enforcement of that?

25     A.  I did.

1    Q.  At some point in time that day, were you

2  interviewed by law enforcement?

3    A.  I was.

4    Q.  Who interviewed you, law enforcement?

5    A.  I was interviewed by the FBI and the Coast Guard

6  Investigative Services.

7    Q.  About how many times were you interviewed, do you

8  recall?

9    A.  For the whole case or just that day?

10   Q.  Just that day.

11   A.  Just the one time.

12       (Cell phone ringing.)

13       THE COURT:  Mr. Skrocki, you're not the first,

14  it's okay, and you won't be the last either.

15  BY MR. SKROCKI:

16   Q.  With respect to the entire investigation, do you

17  recall the number of times you were interviewed or spoke

18  to law enforcement?

19   A.  In total?

20   Q.  Best you can.

21   A.  8, 9, 10 times, I guess.  I had several

22  interviews, multiple interviews with law enforcement.

23   Q.  On that day, do you recall leaving the

24  Communications Station complex?

25   A.  I do.

1    Q.   And why did you leave?

2    A.   We were released, so --

3    Q.   Released meaning what?

4    A.   So immediately after the murders, we were

5    instructed that we had to stay in around the T-1

6    building.  So we did.

7    Q.   What was your understanding as to why?

8    A.   I mean we just had two of our people murdered.

9    We had investigators on the way, and they wanted to keep

10   us all together and make sure we were safe and to make

11   sure we were available for law enforcement when they

12   arrived.

13   Q.   At some point during that day, Mr. Reckner, did

14   you sort of shift into management mode at all?

15   A.   I did some.

16   Q.   Can you tell the jury how you did that and what

17   you did?

18   A.   So we were in the conference room and I was

19   asking if anybody needed anything, if everybody was

20   okay, that kind of thing.

21   Q.   Do you recall if the Coast Guard did things to

22   take care of the people who were there during the day in

23   T-1?

24   A.   I do.

25   Q.   What did they do?

1      A.   They brought us food and drink.

2      Q.   After you left the Communications Station

3  complex, where did you go?

4      A.   I went to Debbie Hopkins' house.

5      Q.   Who's Debbie Hopkins?

6      A.   Jim's wife.  ET1 Hopkins' wife.

7      Q.   Why did you go there?

8      A.   Because my wife was there along with two of the

9  other wives from the station sitting with Mrs. Hopkins

10  during the day.

11      Q.   Any other family members present?

12      A.   Yes.

13      Q.   Who?

14      A.   ET1 Hopkins' son.

15      Q.   How old was he?

16      A.   He was a teenager, 15, 16, 17.

17      Q.   How long did you stay there, Mr. Reckner?

18      A.   A while.  I remember coming in the door and

19  telling Debbie how sorry I was.  And then I went

20  upstairs.  Patrick was up in his room, and as a father

21  myself and ET1's boss, I wanted to talk to him.

22      Q.   Did you do that?

23      A.   I did.

24      Q.   How long did you spend with Patrick?

25      A.   Probably 10 or 15 minutes, maybe a half hour.

1    Q.  After that conversation, did you do anything else

2   with respect to the Hopkins family?

3    A.  So earlier in the day, my wife and the other

4   wives had taken all the guns out of the house and put

5   them in my wife's van.  So then we left, and we

6   transported all the guns to my house.

7    Q.  Why did you do that?

8    A.  Well, in the interest I guess of everyone's

9   safety.  I don't know.  There were a lot of guns there,

10  and so we just took them.

11   Q.  Did you get any sleep that night?

12   A.  I did not.

13   Q.  When you got home, what did you do?

14   A.  I hugged my children.

15   Q.  The next morning, do you recall getting ready for

16  work?

17   A.  I don't.  Again, very traumatic.  There are

18  stretches of time that I don't recall what happened.  I

19  know I went to work, because I was there on the 13th.

20   Q.  Did there come a point in time when you were

21  contacted by law enforcement?

22   A.  I was contacted by law enforcement several times.

23   Q.  How about with respect to anything you told them

24  the day before?

25   A.  It's possible.  I don't recall specifically an

1  interview on the 13th, but it's possible.

2    Q.  Okay.  Do you recall you mentioned earlier in

3  your testimony a voicemail?

4    A.  Yes.

5    Q.  Did you make law enforcement aware of that

6  voicemail?

7    A.  Yes.  That was on the 12th.

8    Q.  That was on the 12th?

9    A.  Yes.

10    Q.  My apologies.  About how early in the morning?

11    A.  It was like -- I had my first interview -- well,

12  what are you asking me?  How early in the morning?

13    Q.  On the 12th with this -- let's start.  Ready?

14  We'll go backwards.

15        So on the 12th, did you have contact with law

16  enforcement about that voicemail?

17    A.  I did.

18    Q.  Okay.  Did you take them to your phone?

19    A.  I did.

20    Q.  Did you have occasion to listen to that before

21  coming into court today?

22    A.  Yes.

23    Q.  Was there a voicemail left on your machine?

24    A.  There was.

25    Q.  Who left the voicemail?

1     A.   Mr. Wells.

2     Q.   And have you had occasion to listen to

3  Exhibit 33, the voicemail from Mr. Wells left on your

4  machine?

5     A.   I have.

6     Q.   Is it authentic as to what was on the machine at

7  the time?

8     A.   It is.

9     Q.   Do you recognize Mr. Wells' voice?

10     A.   Yes.

11     Q.   And your voice?

12     A.   Yes.

13          MR. SKROCKI:  Move for the admission of 33.

14          THE COURT:  Any objection to 33?

15          MR. COLBATH:  It's the recording?

16          MR. SKROCKI:  Yes.

17          MR. COLBATH:  No.

18          THE COURT:  All right.  33 is admitted.

19          (Exhibit No. 33 admitted.)

20  BY MR. SKROCKI:

21     Q.   All set?  Okay.  Go ahead.

22          (Exhibit 33 playing in open court.)

23          (Exhibit 33 terminated.)

24  BY MR. SKROCKI:

25     Q.   That was Mr. Wells' voice, Mr. Reckner?

1    A.   It was.

2    Q.   He mentioned a flat tire in the truck?

3    A.   He did.

4    Q.   Did he ever show you that tire?

5    A.   I never saw it.

6    Q.   Did he ever talk to you about what caused the

7    flat?

8    A.   He never talked to me about the flat at all other

9    than when he pulled up and said he had a flat tire.

10   Q.   I want to ask you some questions about the rigger

11   shop.  Are there things in the rigger shop to assist

12   with tires and things of that nature?

13   A.   There is.

14   Q.   Will you describe that to the jury?

15   A.   So we have pneumatic lug nut wrenches to take the

16   lugs off.  We have floor jacks to lift your car up.  We

17   have jack stands to hold the car in place while you

18   change the tire.  In fact, we allowed the crew to use

19   the rigger shop to put their winter tires on and switch

20   out their all-seasons.  So when winter came, you could

21   put your winter tires on.  In spring you could put your

22   all-seasons as a way to just kind of save people money.

23   Q.   If we could have the lights, Madam Clerk.

24        Blair, if you could for identification and

25   foundation for Mr. Reckner, 227, 229, 230.

1          Mr. Reckner, do you recognize the things depicted

2    in those photographs?

3         A.   I do.

4         Q.   Are they from the inside of the rigger shop?

5         A.   They are.

6         Q.   Do they concern themselves with -- you have

7    familiarity with them, you know what they are?

8         A.   I do.

9              MR. SKROCKI:  Move for the admission of 227,

10   229 and 230.

11             THE COURT:  Any objection?

12             MR. COLBATH:  Yeah, I have no objection.

13             THE COURT:  No objection.  All right.  Those

14   three will be admitted.

15             (Exhibit Nos. 227, 229 and 230 admitted.)

16   BY MR. SKROCKI:

17        Q.   Publish 227.  Mr. Reckner, do you recognize where

18   that photo is in the rigger shop?

19        A.   I do.

20        Q.   Where is that?

21        A.   It's in the Bobcat garage.

22        Q.   There's a -- what is that that I just circled

23   that with my finger, that drum?

24        A.   That's a hose reel for pneumatic air, and that

25   right there is an air chuck.

1    Q.  An air chuck?

2    A.  Yeah, that's where you connect to the hose to

3    connect to your tire to put air in the tire.

4    Q.  So that was available for people to use in the

5    rigger shop?

6    A.  Yes.

7    Q.  Did people avail themselves of those things?

8    A.  Yes.

9    Q.  If we could look at 229.  On the wall there on

10   the right-hand side of 229, what do you see there?

11   A.  Same thing.  It's the hose reel, and you can see

12   the air chuck hanging down here.

13   Q.  All right.  And 230.  A little dark but, Blair,

14   can you enlarge that, please.

15       What's that, Mr. Reckner?

16   A.  That's a floor jack.

17   Q.  You yourself have experience in working on tires

18   in the rigger shop?

19   A.  I work on my truck in the rigger shop and I

20   changed the tires on my wife's van.

21   Q.  Change the tires on your wife's van.

22       How about other people, to your knowledge, do

23   they avail themselves of the things in the rigger shop

24   to change tires or swap tires out?

25   A.  Yes.  We allowed the crew to use the shop for

1  that purpose.

2     Q.  That was a permissible use?

3     A.  Yes.

4     Q.  Madam Clerk, the lights, please, if you could.

5         I want to ask a couple questions about the

6  voicemail that Mr. Wells left you about the flat tire

7  and the lug nuts.

8         In your experience as his manager, supervisor,

9  what was your view of the voicemail in terms of pattern?

10    A.  So it was out of character.  I thought it was

11  strange and suspicious that I would get a voicemail at

12  7:30 in the morning from Mr. Wells if he was only going

13  to be a few minutes late.  It was not a regular

14  occurrence.

15    Q.  What about voicemails in general about being

16  late?

17    A.  Right.  Generally, I didn't get them.  I remember

18  one other time where I got a voicemail from Mr. Wells

19  when the ferry was coming in late.  That's the only time

20  I can remember.  That and the day of the murders were

21  the two voicemails I can remember about him being late.

22    Q.  Did you have occasion to see Mr. Wells on the

23  13th of April?

24    A.  I did.

25    Q.  Can you describe the circumstances of that to the

1  jury?

2      A.  Sure.  So they brought in some grief counselors

3  for the crew.  They split us up by work center, by shop.

4  So the rigger shop, we went down in the basement along

5  with OS1 Mike Haselden.  He was with us that day due to

6  what he witnessed on the 12th.  Mr. Wells was there.  I

7  was there.  Seaman Pacheco, Seaman Upchurch, Seaman

8  Henry, Seaman Coggins and ET3 Cody Beauford and the

9  counselor.

10     Q.  Can you describe the nature of what this

11  counseling session was?

12     A.  So it was an effort to allow us to kind of grieve

13  and talk about it and discuss it amongst ourselves, you

14  know, this traumatic event that happened to us.

15     Q.  Did you speak?

16     A.  I did.

17     Q.  What did you say?

18     A.  I don't remember exactly.  Again, it was still

19  very traumatic.  I remember saying things like, you

20  know, they were great guys and stuff like that.  But

21  honestly, I can't recall the details.

22     Q.  Do you recall the general emotional state of the

23  people you were with in that circle?

24     A.  Yes, it was similar to the day before.  You know,

25  it was obvious that everybody was upset, crying with

their puffy faces, tired. Didn't look like anybody got

any sleep.

    Q.  How about Mr. Wells, what did you observe of him?

    A.  I never observed any emotion coming from

Mr. Wells during the entire process, the entire time.

    Q.  Were the people in the circle contributing to the

conversation?

    A.  Everybody was speaking, you know, crying, trying

to support each other, that kind of thing.

    Q.  Do you recall Mr. Wells making any statement

during the grief counseling session?

    A.  I do.

    Q.  Please tell the jury what you recall him saying.

    A.  He said, "If I only didn't have a flat tire maybe

I could have done something."

            MR. SKROCKI:  One moment, Judge.

            THE COURT:  Certainly.

BY MR. SKROCKI:

    Q.  Mr. Reckner, what kind of vehicle did Mr. Wells

drive to work every day?

    A.  He drove a Dodge, a white Dodge diesel truck.

    Q.  Do you know what kind of car his wife drove?

    A.  She drove a blue Honda CR-V.

            MR. SKROCKI:  Those are the questions I have

for Mr. Reckner's direct exam.

1          THE COURT:  All right.  Ready to proceed,
2    Mr. Colbath?
3          MR. COLBATH:  Yes.  I guess I didn't know if
4    the Court wanted to take up that instruction matter.
5          THE COURT:  Well, we could take that up.  Well,
6    what's your preference?
7          MR. COLBATH:  I mean if we break early, I would
8    certainly be ready to restart early.
9          THE COURT:  Okay.
10          MR. COLBATH:  I'd just take a little bit
11    earlier lunch hour, and we could get that -- my
12    preference would be to have that completed.  Yeah, I
13    think have that completed and proceed in that.
14          THE COURT:  Any objection to that approach?
15          MR. SKROCKI:  None at all.
16          THE COURT:  So ladies and gentlemen, there's an
17    instruction that I started working on with the lawyers
18    that I want to give to you at this point in time, but we
19    have not fine-tuned some of the language.  I need to
20    work more with the lawyers on that.
21          So we'll give you an early lunch break, if
22    you're okay with that, and have you back here at
23    12:30 p.m.  Would that give us sufficient time?  Does
24    that work for everybody, ladies and gentlemen?
25          So please leave your notepads here.  Remember

1    my admonition not to do any research or discuss the

2    case, and we'll see you back here at 12:30 p.m.  I hope

3    you have a pleasant lunch.

4            (Proceedings took place and are not included in

5    this transcript, after which, the testimony of Scott

6    Reckner transpired as follows:)

7            (Jury present)

8            THE COURT:  All right.  Please be seated

9    everyone.  Welcome back, ladies and gentlemen.  And

10   before we resume with this witness, I have not one, but

11   two instructions for you.

12           The first relates to the testimony of this

13   witness, Mr. Reckner.  You heard evidence that Mr. Wells

14   received a general memo of expectation, a memo of

15   expectation regarding tree collaring and a letter of

16   caution regarding the misuse of a fuel card.

17           You've also heard evidence of Mr. Wells'

18   response regarding limitations put on his work travel to

19   a NATE conference, meetings with supervisors, a

20   warehouse cleaning project, the April 11, 2012,

21   satellite antenna wire discussion and general workplace

22   disagreements.

23           I instruct you that this evidence is admitted

24   only for the limited purpose of your consideration of

25   whether or not Mr. Wells may have had a motive to commit

one or more of the crimes charged.  Therefore, you must

consider it only for that limited purpose and not for

any other purpose.

That was my first instruction.

And my second instruction is a more general

instruction, ladies and gentlemen.  And it is as

follows:  The jury has heard that the crimes alleged in

the indictment occurred in 2012.  The defendant was

indicted for these crimes on February 19, 2013.  It is

now 2019.

There are many reasons why criminal trials can

take years to proceed to trial.  Each of those reasons

is grounded on the overriding principle that criminal

trials should be fair and that the interests of justice

are served through such delays.  The jury is not to

speculate about the reason why this case is now

proceeding to trial.

Those are my two instructions.  And with that,

Mr. Colbath, are you ready to proceed?

MR. COLBATH:  I am, Your Honor.  I'm getting

there.  Thank you.

THE COURT:  That's fine.

CROSS EXAMINATION

BY MR. COLBATH:

Q.  Good afternoon, Mr. Reckner.  My name is Gary

1   Colbath.  I don't think you and I have ever met.

2       A.  We have not.

3       Q.  I have some questions to follow up on these

4   things asked to you by Mr. Skrocki, as I'm sure somebody

5   has told you would.

6       A.  Yes.

7       Q.  The transfer to Kodiak, Alaska in 2010, was not

8   only your first experience in Kodiak, Alaska, but it was

9   your first job as a chief?

10      A.  That's correct.

11      Q.  And when you arrived there, you said you had

12  been -- so you didn't have experience in running a

13  rigger shop or an antenna maintenance-type facility,

14  that kind of work?

15      A.  That's also correct.

16      Q.  I heard you mention that you, prior to getting

17  there though, were qualified, got yourself qualified to

18  climb towers at least up to 300 feet?

19      A.  Yes.

20      Q.  Was it Jim Wells by chance that qualified you?

21      A.  It was not.

22      Q.  Now, you learned that that was something --

23  qualifying people like you and others, that was

24  something Mr. Wells had done for years prior to your

25  arrival in 2010?

1    A.   Yeah, that's true.

2    Q.   And he continued to do some of that?

3    A.   Yes.

4    Q.   Those types of trainings, right?

5    A.   Training climbers?

6    Q.   Yes.

7    A.   Yes.

8    Q.   And three -- in the grand scheme of the Coast

9    Guard, 300-foot is a tall tower but not nearly as tall

10   as you folks at times had to climb?

11   A.   That's correct.

12   Q.   There were some that were a thousand feet or

13   better?

14   A.   That's also correct.

15   Q.   Mr. Wells was qualified on all of those, not only

16   to climb them but to train others and qualify others to

17   be able to climb those kind of towers?

18   A.   He was.

19   Q.   And so in the first year, one of the first things

20   I guess I want to talk to you about is -- could you pull

21   up Government Exhibit No. 10?

22        So in this chart, you are right here, correct?

23   A.   Yes.

24   Q.   And so you had the rigger shop, the stuff that's

25   in the circle and highlighted in blue underneath you,

1  and then you had a couple of other IT1 and IT2, some

2  additional folks to supervise that whole unit, right?

3      A.  I did.

4      Q.  And this chart in general depicts a hierarchy, I

5  guess, if you will, in the ranking command?

6      A.  It's the diagram of the chain of command at

7  Communications Station Kodiak at the time of the

8  murders, yes.

9      Q.  That was the word I was looking for is chain of

10  command, not hierarchy.

11          So the civilians, Mr. Belisle, Mr. Wells, they

12  were at the bottom of that.  There was nobody beneath

13  them.  They didn't have authority or a place in the

14  chain of command where they commanded anybody, did they?

15      A.  That's true.  They had no real leadership

16  responsibilities.

17      Q.  So as you took over in 2010, Mr. Skrocki asked

18  you some questions about the evaluation process,

19  evaluating your employees.  That was one of the jobs you

20  did as a chief?

21      A.  Yes.

22      Q.  And one of the -- you discussed Mr. Wells'

23  evaluations.  I think perhaps the first one you

24  discussed was his 2010 to 2011 evaluation.  Do you

25  recall that?

1     A.  I do.  I think it was the second one we
2  discussed, actually.
3     Q.  There was one prior to that?
4     A.  The '09, '10.
5     Q.  In '09 and '10, in each of the areas that
6  Mr. Wells was evaluated and he was found to exceed
7  expectations?
8     A.  That's true.  I didn't rate him on that.  I
9  wasn't his rating official in '09 and '10.
10     Q.  Right.  And so my understanding is when you would
11  have -- well, first of all, let's do this.  The
12  evaluation periods ran April 1 to March 31 of year to
13  year?
14     A.  Correct.
15     Q.  So it wasn't a calendar year type of evaluation.
16  It wasn't January to December.  It was that April to
17  March period.  And you came in the middle of or actually
18  probably towards the tail end of an evaluation period?
19     A.  I came in in -- I came in in July of 2010.  So
20  that period would have started in April 2010, so a few
21  months.
22     Q.  The evaluation and the rating business that was
23  done for the '09-10 was done by the chief that preceded
24  you?
25     A.  That's correct.

1      Q.   So back to my -- I think I heard your answer, but

2 my question then for that evaluation '09, '10, Mr. Wells

3 evaluated to exceed expectations in the different

4 categories he was evaluated in?

5      A.   That's correct.  My predecessor evaluated him

6 that way.

7      Q.   And then for civilian employees, one of the

8 things in addition or as a result of the evaluation they

9 get, they can be recommended for a compensation stipend

10 or some type of either a pay increase or a pay

11 bonus-type thing.  And Mr. Wells was recommended to

12 receive that in '09-'10?

13      A.   Yes.  It's called a cash award, I believe.

14      Q.   And the maximum -- the recommended amount was

15 simply maximum amount allowable?

16      A.   That's correct.

17      Q.   And then it would have been you that did the

18 2010, April 2010 to April -- March of 2011, because that

19 would have been a full year or a full period at which

20 you had familiarity with or mostly?

21      A.   So -- right.  So I came in in July, and that one

22 kicked off in April.  So I had him from July till March.

23 From April to July was not under my purview.

24      Q.   I would like you just for foundational purposes

25 to look at the screen here at what I've had pulled up as

Government Exhibit 34.  You see that first page.  I
think that has -- I can't read for sure, but I think
that has your signature on it there.

    A.  It does.

    Q.  All right.  And just page through that for
Mr. Reckner so he can make sure he's -- slow down just a
little.  Okay.

        MR. SKROCKI:  No objection.

BY MR. COLBATH:

    Q.  First of all, you're familiar with Exhibit 34?

    A.  Yes, sir, I am.

        MR. COLBATH:  Your Honor, I'm going to move to
admit Exhibit 34.

        THE COURT:  There's no objection; is that
correct?

        MR. SKROCKI:  Correct.

        THE COURT:  All right.  34 is admitted.

        (Exhibit No. 34 admitted.)

BY MR. COLBATH:

    Q.  You can publish that first page if you would.

        And this is in fact the 2010-2011 evaluation that
Mr. Skrocki asked you about?

    A.  Yes, it is.

    Q.  In the rating official signature block down below
where the date is, 29 April 2011, that's your signature?

1    A.   It is.

2    Q.   Can you flip to the next page and highlight that

3    second set of boxes there.

4         So with respect to job knowledge and skills,

5    again, like the year prior, Mr. Wells exceeded

6    expectations?

7    A.   He did.

8    Q.   And then go down two blocks there to the next

9    one.  Now, the one -- before you highlight that, the one

10   immediately after the one we just looked at, there's no

11   boxes checked.  He wasn't being evaluated for

12   supervisory leadership.  He wasn't a supervisor of

13   anybody, right, so that didn't apply?

14   A.   That's correct.

15   Q.   The forms here, the evaluation plan and

16   performance, this is a -- performance plan and

17   evaluation.  This is a form that gets used with not just

18   Mr. Wells, it wasn't particular to him, but a regular

19   Coast Guard evaluation form that you had used with

20   others?

21   A.   It's standard throughout the Coast Guard for

22   Coast Guard civilians.

23   Q.   All right.  Now, the bottom box if you could.

24        In teamwork, you found the rating was that he

25   meets expectations?

 1    A.   Yep.

 2    Q.   Which meant that he was -- created an environment

 3 of open communication, mutual respect, innovation and

 4 shared vision.  That's one of their criteria there?

 5    A.   Yes.

 6    Q.   He was -- actively involved other team members in

 7 decisions and problem solving?

 8    A.   So yes.

 9    Q.   He effectively communicated information on

10 performance, work status, changes, things like those?

11    A.   Correct.

12    Q.   You can go to the next page for me.

13         For quality of work, like the year before, there

14 really was not much question about Mr. Wells' work

15 abilities, just from a pure work standpoint, was there?

16    A.   He was the antenna mechanic, technical expert,

17 and in that respect, he was good at that.

18    Q.   As a matter of fact, both him -- now, besides

19 being an antenna mechanic, that was his main position,

20 right?

21    A.   That was his job title.

22    Q.   Okay.  But he was also -- because of the years he

23 had done it and his experience on antennas, he was also

24 a highly skilled rigger like Mr. Belisle.  Mr. Wells

25 could rig and perform all the functions of a rigger as

1   well, certainly, couldn't he?

2      A.   I would agree with that, yes.

3      Q.   All right.  While I'm thinking about it, both

4   Mr. Wells and Mr. Belisle, would it be fair to say that

5   really they were doing for their job positions, both of

6   them were talented enough that they were doing more than

7   probably their position descriptions required?

8      A.   They were doing more than their position

9   descriptions.  Yes, I would agree with that.

10     Q.   Let's go to that next -- the bottom block there.

11          For safety, Mr. Wells exceeded.  That was almost

12  a pet peeve with Mr. Wells about safety and having folks

13  who climbed and worked on the antennas be safe?

14     A.   I would agree with that, yes.

15     Q.   Actually, that was an environment -- it's life or

16  death on those antennas when you're up 100 feet in the

17  air with somebody, and so safety was in your unit

18  extremely important?

19     A.   Yes.

20     Q.   We saw the picture of you in fact with

21  Mr. Belisle and Mr. Newby out training.  You were doing

22  a rescue training right there in front of the building.

23  That was one of the pictures we saw?

24     A.   Yes, it is.

25     Q.   You guys were constantly working on training for

1  safety, safety equipment and making sure everyone was
2  knowledgeable how to do that?
3      A.  We would -- it wasn't something that was
4  regularly scheduled.  If we were having training, which
5  in that case, we were training new climbers, so it was a
6  good opportunity to get some extra training on the
7  safety part.  But it wasn't something that was on the
8  calendar regularly.  It was something that we did
9  periodically, I guess, when needed.
10     Q.  Do the next page, would you?
11         This page just comes up with a work plan overall.
12 We'll highlight that a little bit so it's a little bit
13 easier.  This is an outline of sort of the expectations
14 for Mr. Wells in the -- over the evaluation period of
15 what's expected, what he's supposed to be doing, right?
16     A.  Yes, it is.
17     Q.  And then that next page.
18         And then you do periodic reviews with the
19 employees.  And this one you reviewed with Mr. Wells
20 August 27, 2010, a couple of months after you had gotten
21 there?
22     A.  That's right.
23     Q.  And so initially, it appeared to you no
24 performance issues with Mr. Wells?
25     A.  Initially, that's correct.

1    Q.   Okay.  Can we go to -- now, there was also an

2    evaluation Mr. Skrocki asked you about which was the

3    performance evaluation that would have been from the one

4    immediately following this, 2011 to 2012, correct?

5    A.   Yes.

6    Q.   I'm not sure -- I don't have a number for that.

7    You can take that one down and let's see if we can get

8    the next one.  I apologize.  I didn't write my number

9    down.  Again, you were the one, Mr. Reckner, that

10   performed the following year's evaluation?

11   A.   I initiated '11-'12, yes.

12   Q.   And if you will look at your screen, I'll show

13   you Defense Exhibit No. 115.  Does that appear to be --

14   I'll tell you all the full pages of the evaluation

15   appear to follow that.  Is that the document for the

16   year we're talking about?

17   A.   It is.

18   Q.   Contains your signature there?

19   A.   It does.

20        MR. COLBATH:  Your Honor, I'm going to move

21   115.

22        MR. SKROCKI:  No objection.

23        THE COURT:  All right.  115 -- Defense 115 is

24   admitted.

25            (Defense Exhibit No. 115 admitted.)

1    BY MR. COLBATH:

2        Q.   So this again covers that initial period.   It

3    would have been reviewed with Mr. Wells at the start in

4    April of 2011.   That's why his signature appears at that

5    date on the front?

6        A.   That's correct.

7        Q.   Go to that next page.

8             There's a -- we see in the applied job skills,

9    it's a meets expectation?

10       A.   So actually, this was never finished.   It says

11   meets, but that's probably just because I clicked the

12   box, you know, as I was working with the document or

13   whatever.   If you'll notice as you go on, none of the

14   other metrics have been marked because we didn't have an

15   opportunity to mark Mr. Wells for 2011-2012 because he

16   was no longer working at the COMM station after

17   April 12th.

18       Q.   And the evaluation period would have -- this was

19   dated April 29th?

20       A.   So that's when it kicked off.

21       Q.   Right.

22       A.   That was the initial kickoff, and then we

23   wouldn't have marked him until March of 2012.

24       Q.   Sure.   Okay.

25            And go down below.

1          So again, this one, when it's marked meets --

2    now, you have periodic review throughout the year,

3    correct?

4         A.  So we do.  Yeah.

5         Q.  And you're saying that when you did your periodic

6    review, you didn't mark these?

7         A.  So this is the 2011 to 2012, right?

8         Q.  Correct.  That's what you told me.

9         A.  So I don't believe I marked him at all on that.

10   So even this meets, I don't recall marking him in 2012.

11        Q.  Okay.

12        A.  As a matter of fact, I think the times that we

13   were supposed to meet, we didn't meet because he was out

14   sick.  I don't know if we did any mid mark counseling,

15   mid mark review, because he was not in the office.

16        Q.  Well, this document is something you maintained

17   in his supervisor's work file, correct?

18        A.  That's correct.

19        Q.  And you would have been the one in charge of the

20   document?

21        A.  That's correct.

22        Q.  And do you know if you turned that over to law

23   enforcement?  Is that how law enforcement got it?

24        A.  Correct.  They took his entire folder.

25        Q.  And then they probably turned it over to these

1    folks who turned it over to me.  So do you know if you

2    didn't mark meets who would have marked meets?

3         A.   I don't have an answer for that.  I don't know.

4         Q.   Let's just look at a couple other pages here.

5         A.   Sure.

6         Q.   Now, here it appears -- go ahead and highlight --

7    yeah, all three of those, or four of those, yeah.  Yeah.

8              So I think -- maybe this will refresh your

9    recollection, because I recalled Mr. Skrocki asking you

10   about it yesterday.

11             In the middle -- in two of these here, not the

12   first one, the second, quality of work, not the third,

13   but the fourth, safety, those we saw on the past

14   evaluation and they were marked then and they're marked

15   here meets.  You see that?

16        A.   I do.

17        Q.   Yesterday Mr. Skrocki asked you, were there a

18   couple of other things in this second year of your

19   experience with Mr. Wells that you were going to

20   evaluate him on, and you said, if I recall, and you

21   correct me if I'm wrong, there were.  You marked

22   communication and timeliness, quantity of work.  You

23   recall that testimony yesterday?

24        A.   I do.  So we added those metrics, those were two

25   metrics we wanted to observe and mark him on for that

1    year.

2        Q.  All right.  And at least as we've got it, he

3    meets in all of these, as reflected on his evaluation

4    anyway?

5        A.  These are marked meets.  Again, I don't recall

6    ever marking -- doing a final marking for him because he

7    wasn't available to do it.

8        Q.  Flip the next page for me.  And this is -- you

9    don't have to highlight that.

10            This is a pre-made, typed-out sheet of

11   expectations.  Here's all of the things, the job

12   performance that's planned for the next year, what we

13   expect of you, correct?

14       A.  Yeah.  And it outlines the sixth metrics we're

15   going to mark him on.

16       Q.  Those are the six boxes we just highlighted that,

17   at least at that point, appeared to be marked meets?

18       A.  Yes, sir.

19       Q.  And then the last page here.  Now, you reviewed

20   this in -- you signed this in October of 2011, right?

21       A.  Yes.

22       Q.  So that was after its creation, after you sat

23   down and met with Mr. Wells in April of 2011, because we

24   saw his and your signature on the front page.  You went

25   over the expectations with him and whatnot.  And then it

1  appears you sat down or intended to review it in

2  October.  You made a note he wasn't available.

3       But at that point, in anticipation, isn't it true

4  that in anticipation of that meeting with him, had he

5  been there, you would have shown him you had marked

6  meets in those requirements or categories and discussed

7  it with him?

8     A.  So that's not true.  I wouldn't have marked any

9  of the boxes in the performance evaluation.  We would

10 have discussed his performance on all of those metrics.

11 But the marking, I wouldn't have done until it was final

12 in April.

13    Q.  So you signed off here saying he wasn't available

14 in October on a form that wasn't yet marked?

15    A.  That's correct.  This was a progress review, so

16 through the year, a review of his progress through that

17 year.  And so October is when I did that.

18    Q.  So when you were -- you did a final evaluation or

19 let's call it a final rating here.  And why don't you

20 just read that to us?

21    A.  Sure.  "Mr. Wells was absent for several long

22 periods this year due to sickness and other reasons.

23 Core competencies were merely meets and some barely.  He

24 did perform well in Shemya with the exception of

25 communication.  Mr. Wells is argumentative at times

making some tasks and evolutions more difficult than
they need to be.  His performance overall was
inconsistent.  Mr. Wells is unavailable to review and
sign this evolution -- evaluation."

Q.  You typed that, didn't you?

A.  I did.

Q.  You typed it in the section that read "Final
Rating"?

A.  I did.

Q.  So that was the end of the review period.  That
would have been typed by you at some interim period?

A.  You're right, yeah.

Q.  You typed he -- in core competencies, that's the
six categories we talked about --

A.  Yeah, that's correct.

Q.  -- you typed that he meets.  So it was you that
checked the boxes?

A.  I guess it was.  I don't recall doing it.  So
when I said I didn't recall doing it, I didn't recall
doing it.

Q.  Let's go to the last page.  Maybe next to the
last page.

     And then there wasn't a recommendation for the
cash bonus.  Mr. Wells was -- this was done after
April 12th, the final.  As you said, it happened at the

1  end.  So Mr. Wells was no longer with the Coast Guard.

2  He had been suspended from his position?

3      A.  That's correct.

4      Q.  So he wasn't -- he wouldn't have been receiving

5  any type of pay bonus or anything like that?

6      A.  He was receiving pay, but he was receiving no

7  bonus.

8      Q.  Okay.  I want to go to, if I can, Government

9  Exhibit 35 and ask you a few questions.  I want to move

10  back to some of the time period during that evaluation

11  period that we just talked about.

12          And you can just pull that up.  You remember -- I

13  have some questions about this letter here.

14          This is the letter that you testified about,

15  about setting of expectations for leave and travel and

16  those kind of things.  You said this was I guess

17  prompted or I think you said it was prompted by a

18  circumstance where you came to work and found out that

19  Mr. Belisle and Mr. Wells were going to be traveling in

20  the next like week, and you hadn't been aware of it, and

21  then that ultimately culminated after discussions in

22  this letter being written, or that was one of the things

23  that contributed to this?

24      A.  Yes.  So --

25      Q.  I'm just asking you if that's one of the things

1    that contributed.

2       A.  Yeah.  So that's why the EO, Mr. Bill Reed,

3    drafted this letter, correct.

4       Q.  All right.  That was travel for Mr. Belisle and

5    Mr. Wells.  They often traveled together, be it

6    training, be it a conference function, be it work?

7       A.  They did often travel together.

8       Q.  All right.  And you believed that this was

9    presented to Mr. Wells.  Initially, you talked to him

10   and Mr. Belisle.  First of all, they both got the

11   identical letter, I think you said?

12      A.  That's true.

13      Q.  And they both were talked to about it on

14   April 29th?

15      A.  I know Mr. Wells was for sure.  I can't remember

16   if Rich was, but I think he was.  We talked to them both

17   at the same time.

18      Q.  And if you can just highlight the A2 there,

19   section A2.

20         So with regard to sick leave or vacation time,

21   first of all, the Coast Guard had a procedure where if

22   you had built up leave, whether it's sick leave or

23   annual leave, you would fill out the chit, you called it

24   I think, and send that in, and a supervisor would

25   approve it or not approve it, I guess as the case may

1   be, and then there would be a paper trail of the leave?

2       A.   That's correct.

3       Q.   And you -- in the rigger shop, you were the

4   person who signed off on those?

5       A.   I was.

6       Q.   And this was a direction to Mr. Wells and

7   Mr. Belisle -- this was really an establishment of a

8   policy for leave -- well, for all the things identified

9   in the letter.  It was really an establishment of the

10  civilian policy on these issues, wasn't it?

11      A.   Yes.  It was reestablishing, rebaselining the

12  policy that already exists that they should follow when

13  it comes to these things.

14      Q.   Now, this paragraph we're looking at here, it

15  says, "When reasonably able to do so, notify the rigger

16  shop supervisor in advance, and when it's not possible,

17  you can notify by telephone, e-mail or notify" -- CWO is

18  who?

19      A.   So that stands for the chief watch officer, so

20  that would be the OS chief watch officer on the

21  operations deck.  That was a 24-hour manned,

22  seven-days-a-week position.

23      Q.   And then they could pass along a message?

24      A.   Exactly.

25      Q.   The rigger shop supervisor, would that be

1  Mr. Hopkins?

2      A.  Yes.

3      Q.  All right.  You can take that down.  And then on

4  travel, just do those next two.

5          So with respect to travel, first of all, in order

6  for the civilians to travel at Coast Guard expense, or

7  to -- for Coast Guard purposes, in order to have that

8  paid for, there had to be a request and an approval for

9  that to happen, didn't there?

10     A.  So normally, the normal procedure would be there

11  would be a TDY request.  That's true.

12     Q.  Okay.  So if civilians were to travel on their

13  own without requesting approval or whatnot and they paid

14  for it on their own, if they submitted paperwork and it

15  wasn't approved, they wouldn't be reimbursed, would

16  they?

17     A.  I wouldn't say they wouldn't be.  I mean if they

18  were totally on their own, they just did it without --

19  for any official business, then that's correct.  You

20  know, if the paperwork wasn't done, you know, sometimes

21  in the Coast Guard, we have like hurricanes and people

22  go and do stuff and the paperwork follows.  So I don't

23  know that's 100 percent true.

24     Q.  You can't show us here or point to us a specific

25  example of Mr. Wells ever traveling on the Coast Guard's

```
 1   dime and not being -- not having approval or before the
 2   fact or after the fact just traveling on his own?
 3       A.   Like I said before, the reason that's in there is
 4   because a trip was scheduled that we didn't know about.
 5   I don't know what happened to the approval or where it
 6   was, but it never came through the chain of command.
 7   But I can't point to any specific document that would
 8   prove that.
 9       Q.   So Mr. Reckner, this will go faster if you listen
10   to the questions I asked and answer those questions.  I
11   asked --
12           MR. SKROCKI:  Objection.
13           THE COURT:  Let's hear your question.  Go
14   ahead, Mr. Colbath.
15           MR. SKROCKI:  I think he's being very
16   responsive, Your Honor.
17           THE COURT:  Well, reasonable minds can differ
18   on that, the two of you.  It's for you all to evaluate
19   the testimony.  Let's hear your next question,
20   Mr. Colbath.
21           MR. COLBATH:  Yeah.  I'll re-ask the last one
22   so that we have an --
23           THE COURT:  Let's just --
24   BY MR. COLBATH:
25       Q.   You don't have any examples of Mr. Wells
```

1    traveling when he wasn't approved to travel, do you?

2        A.  I do not.

3        Q.  Thank you.

4            If you can go to the second page of this.  Well,

5    I'm sorry.  Back up one page.  Highlight D there.

6            Now, there was later in your testimony, I guess

7    it was this morning, you talked about some tree

8    collaring issues.  But there was a separate memo written

9    about the collaring of trees and the taking of trees and

10   whatnot.  But this also addressed the taking of wood off

11   COMMSTA property to some extent, didn't it?

12       A.  It did.

13       Q.  And in fact, when you came in 2010, you found it

14   to be a practice or policy of the COMMSTA that as trees

15   were cleared as necessary for the COMMSTA work, after

16   hours, all employees, all COMMSTA employees could come

17   and on their own time remove those, take them off the

18   property, use them for their personal firewood use or

19   crafts or whatever they were going to use that wood for.

20   That had been a practice that had been going on for a

21   long time?

22       A.  That's true, yes.

23       Q.  And this was simply letting these two civilians

24   know that that in fact was the policy but that it

25   applied to not only them, all of COMMSTA, first come,

first serve?

    A.  So this was put in there because there was an
issue with some trees that had been taken down that I
guess Mr. Wells had earmarked for himself, and he was
upset that some of the ETs went out and grabbed the
wood.  So the EO, Bill Reed, put that in there to
specifically outline that once again.  So yes.

    Q.  If you'd go to the next page.

        So both Mr. Belisle and Mr. Wells I think you
said were former chiefs?

    A.  That's correct.

    Q.  So they had, each of them in different units and
at different times, held the position that you had just
moved into there at the rigger shop.  They had held that
years before you, not at the rigger shop but in other
areas?

    A.  That's correct.

    Q.  So they had spent time doing these management
functions and working with people underneath them as
enlisted Coast Guard chiefs well prior to your getting
there as chief?

    A.  So I don't know what their leadership
responsibilities were prior.  I'm not sure how many
folks they had under them at any given time before this
period, but as chiefs, I would expect that's true.  They

```
1    would have probably had folks, subordinates working for
2    them.
3         Q.  Well, it was certainly believed because they were
4    directed here to support, assist and mentor the rigger
5    shop supervisor, Mr. Hopkins?
6         A.  Yes.
7         Q.  And it was presumed that because of their past
8    work with the Coast Guard and their past status as
9    chiefs, they had the ability to do that?
10        A.  Yes.
11        Q.  All right.  That's fine with that exhibit.
12             Now, when we were talking about that letter,
13   Mr. Skrocki asked you, he said that Mr. Wells'
14   performance didn't seem to get better over time on the
15   travel and notification issues.  I think you said that
16   was the case.
17             MR. SKROCKI:  Could you repeat that?
18             THE COURT:  Could we hear the question again,
19   Mr. Colbath?
20             MR. COLBATH:  Sure.
21   BY MR. COLBATH:
22        Q.  I heard you say yesterday that you did not feel
23   that after the issue of this, which in part we'll start
24   with travel and notification, that after it was issued,
25   Mr. Wells did not get better on those issues?
```

1      A.   Largely, that's correct, yeah.  I wasn't getting

2  the phone calls and the advance notice.

3      Q.   And -- all right.  Can we go to Exhibit No. 124?

4           DEPUTY CLERK:  Is that plaintiff or defense?

5           MR. COLBATH:  I'm sorry.  Defense 124.

6  BY MR. COLBATH:

7      Q.   Actually, before you pull that up on the screen,

8  let me ask you this.

9           That letter we just looked at, that was April of

10  2011, correct, April 29, 2011?

11      A.   Yes.

12      Q.   And there's been some discussion about a big

13  project the summer of 2011, spring, summer and you said

14  all the way until end of September of 2011, for

15  replacement of two antennas or movement of two antennas

16  out on Shemya?

17      A.   Yes.

18      Q.   And that project started probably May, spring

19  sometime, but around May of 2011 where the travel

20  started, and there were a number of trips out to Shemya

21  all the way through a trip you took in September; is

22  that right?

23      A.   So the project actually started the year before

24  in 2010 with moving temporary antennas over to Shemya so

25  we still had coverage.  And then also the logistics

1  flights I spoke of, that happened '10 and '11.  And

2  then, as you stated, June, July, and then we went back

3  in September.

4      Q.  So as the weather got better I assume in 2011 and

5  you could travel out there, it was a little better

6  conditions, probably not great, but a little better

7  condition for work, the 2011 work was June, July, out

8  through September?

9      A.  Yes.  That was the actual construction phase, if

10  you will.

11      Q.  Mr. Wells, in the June, July, those trips, not

12  the September trip, but the summer trips, he went out

13  there on and off a number of times with the crew.  I

14  think we saw a picture of him working out there.

15      A.  So he was out there for the entire time of the

16  June, July trip.  He was there for the whole event.

17      Q.  All right.  And those -- that would have been

18  roughly how long between those two events?

19      A.  So the initial construction phase in June, July,

20  I think went on for four or five weeks and then we went

21  back in September.

22      Q.  So now go to Defense Exhibit No. 124.  Go to the

23  second page.

24          So Mr. Reckner, I'm just going to have her real

25  quickly page through these for you and just see if you

1    are familiar with those.  I believe they each have

2    your -- all the forms are the same and they all I think

3    have your signature on them.

4         You're familiar with those forms --

5    A.   I am.

6    Q.   -- what they are.  And in fact, you signed them

7    all?

8    A.   I did.

9         MR. COLBATH:  Your Honor, I'm going to move --

10   well, and then if you can go back to page one.

11   Q.   So can you just look at that, Mr. Reckner, and

12   I'll tell you that -- maybe you need to blow it up a

13   little bit.

14        I have summarized them all there.  Are those

15   records all records that you would have maintained in

16   Mr. Wells' file or the Coast Guard would have maintained

17   in Mr. Wells' file related to leave in 2011, 2012?

18   A.   So those are not records that would have been

19   maintained in his working folder, which is what I had

20   access to.

21   Q.   After you signed them, they would have been

22   passed on somewhere else, probably the payroll office or

23   somebody else who would have maintained them?

24   A.   Yes.

25   Q.   Okay.  But you're familiar nonetheless because

```
 1   prior to getting to the office that maintained them, you
 2   reviewed them and signed them?
 3      A.  Yes, I would have sent them to the timekeeper to
 4   implement.
 5           MR. COLBATH:  I'll move the admission of 124,
 6   Your Honor.
 7           MR. SKROCKI:  There is no objection.
 8           THE COURT:  Defense 124 is admitted.
 9           (Defense Exhibit No. 124 admitted.)
10   BY MR. COLBATH:
11      Q.  Publish starting the second page, if you would.
12           And so Mr. Reckner, I'm going to just go through
13   the first and the last one here.  So this is -- well,
14   this is a leave request made by Jim Wells, and the dates
15   are a little difficult to read, but it's submitted
16   August 24th.  And it's for some annual leave that he was
17   planning for September?
18      A.  Yes.
19      Q.  And so he submitted it ahead of time, you
20   reviewed it, you signed, you approved that leave?
21      A.  That's correct.
22      Q.  If you'll just page until you get to the last
23   one.
24           And so if I go down to the final page, there's
25   about 18 or 19 of these, this final one is a March
```

1    request for some leave that was coming up in April, a

2    few days later.  Do you see that?

3        A.   I do.

4        Q.   Again, you approved that?

5        A.   I did.

6        Q.   So let's back up to the first page.  If you'll

7    just highlight that whole block.

8             What I've done, Mr. Reckner, is those 19 leave

9    requests, I've summarized those, or had them summarized

10   here.  And first of all, in the column in the middle

11   where it shows here sick leave and annual leave, all the

12   numbers that run down below there are all the leave

13   periods from just August of 2011 to April that Mr. Wells

14   was gone.  You said he was gone a long time; is that

15   correct?

16       A.   He was gone a large part of the time during that

17   time period.

18       Q.   Where I would like to focus is really from here

19   to here.  Mr. Wells, do you recall him being gone, where

20   it really began heavy was in October, the months of

21   October, November, December?

22       A.   Yes.

23       Q.   Okay.  If we start right here beginning in

24   October and go down there, there's -- he's gone for --

25   well, far more than he's at work; isn't that true?

1    A.  I don't know that for sure, but it could be,

2  yeah.  I haven't added it all up.

3    Q.  Well, we'll look at that in a minute.  It's fair

4  to say that of all these leave requests, first of all,

5  more than half of them, and I don't know if you want to

6  count, but they're requested ahead of time, just like

7  the memo says you're supposed to request?

8    A.  Yes.

9    Q.  And on ones that are not requested ahead of time,

10 they're submitted the day he gets back to work.  In

11 other words, if he's sick and asks to go home or it's an

12 unplanned illness, he can't come in, they're submitted

13 timely, within a day or two of returning to work, aren't

14 they?

15   A.  So for the sick leave, yes, they would be after

16 he came back.  I wasn't getting phone calls ahead of

17 time or at the time of the sickness saying, "I'm sick,

18 I'm not coming in today."  So then he would come into

19 work or he would contact someone later on, and then we

20 would do the paperwork afterward.

21   Q.  So my question was, Mr. Reckner:  The leave

22 requests were submitted after Mr. Wells got back to

23 work?

24   A.  The sick leave requests, yes.

25   Q.  And of course you don't know on any given

occasion whether Mr. Wells called and told the shop

supervisor he wasn't coming in on any given day?

    A.  If he called ET1 Hopkins or anybody I would have

been notified.

    Q.  You don't know that for sure, Mr. Reckner,

because if you didn't know if -- if he called and talked

to anybody, if he called and talked to Mr. Hopkins, if

he called and talked to Mr. Beauford and they either

forgot to call you, they were busy, there was some

circumstance that prevented them or they just chose not

to call you, you would have no way to know whether that

happened, would you?

            MR. SKROCKI:  Objection, argumentative and

compound.

            THE COURT:  Well, I'll allow the question.  Go

ahead.

    A.  So that scenario would be unlikely.  It would be

unlikely that ET1 Hopkins or ET3 Beauford or Rich or

someone would say -- wouldn't not tell me that Jim

wasn't coming in today.

    Q.  His instruction in the April letter was to call

the shop supervisor?

    A.  That was the instruction, yes.

    Q.  And in -- there's no instances where I was able

to find that Mr. Wells took leave that wasn't approved.

1     A.   Well, you only went back to August, and he worked

2  for me -- August 2011, he worked for me from July 2010

3  through April of 2012.  So for this period that you

4  covered, sir, yes, I would agree with that.

5     Q.   Right.  The questions I was asking about were you

6  gave him -- or discussed with him on April 29, 2011,

7  here's how we work the leave, here's the expectations.

8  And then going forward, I went forward till April 12th,

9  the time of the homicides and then the day after he no

10  longer works there.  And for that period of time, there

11  was no unapproved leave, was there?

12     A.   So this period of time is from August through

13  April.  Is that what you're saying, August through

14  April?

15     Q.   Well, that's what this period is.  Yes, I'm --

16  no, but I'm asking you -- April of 2011 to April of

17  2012, can you tell me of a circumstance where Mr. Wells

18  took leave and it wasn't approved?

19     A.   I can't recall that that's the case, no.

20     Q.   There wasn't much leave going on before August of

21  2011, because almost all of June and July, he was out on

22  Shemya with the rest of the crew working.  That's what

23  you just told me.

24     A.   Well, he was on Shemya, yes, that's correct.

25     Q.   So he wasn't on leave?

1     A.   Not during that period, no.

2     Q.   And he was approved to be on Shemya.  He was

3   supposed to be on Shemya?

4     A.   He was.

5     Q.   So while we've got this up there, I want to look

6   at -- can you highlight -- let's go to the calendar.

7   Let's take this one down.

8          Mr. Reckner, you were paid in the military on

9   paychecks every two weeks, correct, pay periods every

10  two weeks?

11    A.   No.  In the military it's the 1st and 15th of the

12  month.

13    Q.   Oh, I'm sorry.  I guess my question related more

14  to Mr. Wells.  The civilians were every two weeks?

15    A.   Yes.

16    Q.   All right.  And so could you pull up Exhibit

17  No. 168.

18         So I'm going to have you look at this Defense

19  Exhibit No. 168 and ask if you can see that that's just

20  a military biweekly pay period calendar for 2011.  Does

21  that appear to be what that is?

22    A.   That does appear to be what that is, yes.

23    Q.   The second page -- or does it go to a second

24  page?  I'm sorry.  Hold on just a minute.  Okay.

25              MR. COLBATH:  I'll move to admit I guess 168.

1    The second page just continues with 2012.  It's just a

2    blank calendar.

3              THE COURT:  Any objection to Defense 168?

4              MR. SKROCKI:  No, Your Honor.

5              THE COURT:  All right.  That's admitted.

6              (Defense Exhibit No. 168 admitted.)

7    BY MR. COLBATH:

8       Q.  So can you publish that, and do you have a way to

9    put that leave summary, Defense Exhibit No. 124, back up

10   there next to this one?  And then can you -- all right.

11   And then can you highlight just from 21 to February --

12   through February.

13           So Mr. Reckner, if you'll look at this block that

14   she's highlighting -- just slide it over so we can see

15   the dates just a little bit more.  Or will it not let

16   you go any more?  The challenges of technology.  If you

17   can't highlight it, that's fine.

18           I'm going to have you look at that summary,

19   Mr. Reckner, and see if we can't figure out some exact

20   dates for Mr. Wells.

21           Starting here up on the 21st pay period, these

22   numbers are pay periods, correct?  They correspond with

23   the pay period numbers over here on the calendar.  21

24   deals with this.  What was the period of leave that

25   Mr. Wells was gone in that pay period, that October 10th

1   to October 22nd?  Can you see the dates requested off?

2   They're in the column right next to it.

3       A.   I don't know if I understand the question.

4       Q.   Sure.  Can you tell me what days you approved

5   Mr. Wells for leave during that pay period 21?

6       A.   Is that the 10-05-11 through 10-22-11?  I don't

7   know what the header is up top.

8       Q.   That's the pay period, and right next to it is

9   the approved leave.  Or the leave requested.  They're

10  all approved, so it's the leave requested and leave

11  approved.

12          MR. SKROCKI:  If Mr. Colbath can get the header

13  so he can identify what point he's talking about, I

14  think that would help.

15      Q.   There it is.

16      A.   Can you maybe point to the date you're talking

17  about?

18      Q.   Sure.  What leave was approved during that --

19  that's the leave that's requested.  That's what that

20  column is.

21      A.   Okay.

22      Q.   And I will tell you that you've already told us

23  they were all approved.  So what were the dates in pay

24  period 21 that were requested?

25      A.   The 14th of October 2011, and then looks like the

1   20th and 21st.

2       Q.   Actually, I'm going to start right above that as

3   I see here because it starts earlier.  Right above that,

4   he was also gone -- you had approved him to be gone

5   October 3rd through the 12th, didn't you?

6       A.   Yes.

7       Q.   So on Exhibit No. 168 next door, can you just --

8   do you have a way to mark those dates off?  That would

9   be October 3rd through October 21st.

10       Then next, do you agree with me that you approved

11  him to be gone October 26, 7 and 8 and November 4.  Do

12  you agree with that, Mr. Reckner?

13       A.   October 6th, 7th and 8th?

14       Q.   I'm sorry.  October 26, 7 and 8 and November 4?

15       A.   Yes.

16       Q.   Can you mark those?

17       November 7th then through November 14th, that

18  period?

19       A.   Yes.

20       Q.   November 21st through December 9th?

21       A.   Yes.

22       Q.   I want to stop and ask you -- well, let's just

23  finish out December.  Then there's a second request

24  again November -- it's requested the second time, I

25  guess, November 21st through the 9th, but December 12th

1  through the 16th?

2      A.  Yes.

3      Q.  And then 19th to the 28th of December and

4  December 29 all the way through January 4?

5      A.  Yes.

6      Q.  So if I look next door on this calendar over

7  here, it looks to me like Mr. Wells only worked like

8  three days in October, or very few days in October.  Let

9  me just look.  He worked seven days of the five weeks in

10  October.  Do you see that?

11      A.  I do.

12      Q.  And in November, he worked the 1st, 2nd and 3rd

13  and the 15th, 16th, 17th and 18th.  He worked seven days

14  there?

15      A.  That's correct.

16      Q.  And from the 18th of October all the way until

17  the end of the year, gone every day?

18          THE COURT:  Did you mean to say November?

19          MR. COLBATH:  Yes, Your Honor.

20  BY MR. COLBATH:

21      Q.  From November 18th all the way till the end of

22  the year, didn't work anymore?

23      A.  That's correct.

24      Q.  So 13 days in four months, October, November,

25  December, those four months?

1    A.  Yes.

2    Q.  Now, you had testified that you were -- you --

3  during December of 2011, you actually had a desk put in

4  for you down in T-2 in the rigger shop?

5    A.  That's correct.

6    Q.  Normally, when you arrived as chief up to

7  December of 2011, you had your office up in T-1?

8    A.  That's correct.

9    Q.  That's the regular COMMSTA building?

10   A.  Yes.

11   Q.  And that's where you started your day, and that's

12  where you spent at least a portion of your day most

13  days, T-1, up until December of 2011?

14   A.  That's not completely accurate.  I would spend

15  time down in the rigger shop.  I just didn't have an

16  office down there.  So I was between both buildings,

17  depending on what was going on during the workday.

18   Q.  Sure.  Then you had this desk moved down there.

19  And the fact of the matter is you had it moved down

20  there because work was not going on as it should in

21  December of 2011?

22   A.  That's not accurate, no.

23   Q.  Well, in -- Mr. Wells was gone a lot during that

24  timeframe, wasn't he?

25   A.  He was.

Q.  And one of the things that happened is you had a
conversation with the XO where you told the XO, "Look,
Mr. Wells is not here, work needs to happen, and we're
going to figure it out, we're going to do work even in
Mr. Wells' absence, we can't wait, we're not going to
wait for him to get back"?

A.  That's correct.

Q.  And so you were going to figure it out with
Mr. Hopkins, with Mr. Belisle, with the rest of the
shop, even if it meant making some mistakes or not doing
as good a job as you did when Jim Wells was there?

A.  That's correct.

Q.  And moving a desk down there and being available
in the office was going to assist in that?

A.  I thought it would, yes.

Q.  When you moved down there, I noticed from the
schematic that you and Mr. Skrocki went over, you didn't
put your desk next to Mr. Wells where Mr. Belisle was,
you put it at the other end of the office?

A.  I did and that's because of where there was
space.

Q.  Nothing was fixed in there.  I mean you could
have ordered the entire room emptied and reordered or
rearranged, certainly.

A.  I could have, but that seems a little bit

1    extreme.

2        Q.   Okay.  I want to talk about the -- well, let's

3    just finish this.

4            We went up to January.  Now, in January of 2012

5    then, Mr. Wells was gone the 1st -- from the 1st -- we

6    had talked about the 1st through the 4th.  Now, the 5th

7    to the 9th.  You see that, 5th of January to the 9th?

8        A.   I do.

9        Q.   And the 10th to the 13th, both of those weeks in

10   that pay period there?

11       A.   Yes.

12       Q.   And then the 19th and 20th -- the 19th all the

13   way down to the 30th?

14       A.   Yes.

15       Q.   The 31st of January and 1st and 2nd of February?

16       A.   Yes.

17       Q.   And on the 5th of February, the very week after

18   the week that Mr. Wells came back to work, that was the

19   week of the NATE conference, wasn't it?  Do you recall

20   that?

21       A.   I don't recall the dates specific, but if that's

22   what it was, then I wouldn't disagree with that.

23       Q.   If you told you that I believed it was the 7th,

24   8th and 9th of February, the latter half of that week,

25   the week of February 5th, 2011, would you have any

1  reason to disagree with me?

2        MR. SKROCKI:  Objection, Your Honor.

3        THE COURT:  That's sustained.

4  BY MR. COLBATH:

5    Q.  Mr. Wells then was gone February 8th and 9th --

6  well, 8th all the way to the 13th?

7    A.  Are you asking me?

8    Q.  Is that correct?

9    A.  Yes.

10   Q.  And then the 14th all the way down to Friday,

11 February 24th.  So in January, I only see him there on

12 the 16th, 17th and 18th, just three days in January.

13   A.  Okay.

14   Q.  And again in February, I only see him there on

15 the 3rd and the 6th and the 7th, three days in February.

16 Do you agree with that?

17   A.  Well, he was there the 24th, the 27th, 28th --

18   Q.  Oh, I'm sorry.  Up to February 24th?

19   A.  Yes.

20   Q.  Now, do you remember you discussed with

21 Mr. Skrocki that Mr. Wells had gallbladder surgery and

22 hernia surgery in February?

23   A.  I do recall that.

24   Q.  Leading up to that for these months where he had

25 been gone and either not at work for a whole month at a

time or just at work for a few days, he was struggling
with that illness that led up to that surgery, wasn't
he?

     A.  Yeah.  To my understanding, he was not well.

     Q.  He didn't appear well to you?

     A.  He did not.

     Q.  And you knew that there was quite a period of
time where neither Mr. Wells nor his doctors knew what
was wrong with him?

     A.  That's also true.

     Q.  It appeared it was taking them a while to figure
it out?

     A.  It did appear that that was taking some time,
yes.

     Q.  And ultimately, he had his surgery -- do you
remember it being the 9th of February, or do you
remember the date?

     A.  I do not remember the date, no.

     Q.  But it was February 24th when he came back to
work?

     A.  That's what it looks like here, yes.  I don't
recall it specifically.

     Q.  Because -- all right.  If you will take the 168
down and leave the summary.  Get me the rest of that
document.  Just the bottom of it.  Just do that bottom

area, bottom four through the end.  Yeah, do that.

     After coming back from surgery there on
February 24th, you said earlier in answer to one of
Mr. Skrocki's questions that Mr. Wells came to work on
light duty, correct?

     A.   That's what I recall, yes.

     Q.   So do you recall -- then I assume you recall that
he had physical -- some physical limitations as far as
lifting with the hernia surgery and the recovery and
just there were some abilities, certainly couldn't
climb, things like that, during that light-duty period?

     A.   That's correct.  Yes.

     Q.   You don't remember how long that period was?

     A.   I do not.

     Q.   But even despite the light duty and having missed
most of the last previous six months at work, Mr. Wells
then worked all of -- worked the rest of February, all
of the month of March with no leave until the very --
well, until March 25th, he had a period of time off
there, two days off, 16 hours?

     A.   Yes.

     Q.   And also two days in April, April 2nd and 3rd.
Do you know what those were?

     A.   I don't, no.

     Q.   Okay.  So let's look real briefly at that tree

collaring memo, if we could.  That is I think Government

Exhibit 36, maybe.

        And as far as a letter given to Mr. Wells here,

this would have been in November of 2011?

    A.  So yes, that's when -- that's right.

    Q.  And this was also given like the last letter of

expectation, given to Mr. Belisle?

    A.  That's correct.

    Q.  And this was on one of those four days in the

month of November that Mr. Wells was not out sick, he

had been at work?

        MR. SKROCKI:  Objection to the testimonial

nature of some of these questions, Your Honor.

        THE COURT:  That particular question?

        MR. SKROCKI:  There's testimony being elicited

prior to the question.

        THE COURT:  Well, and this was one of the four

days in the month of November that Mr. Wells was not out

sick.  He had been at work.  I think he covered that in

his questions earlier with this witness.  So I'll allow

that question.  Go right ahead.

        MR. COLBATH:  Thank you.

BY MR. COLBATH:

    Q.  Would you go to the second page?

        Mr. Wells signed the letter like you requested?

1    A.  That's correct.

2    Q.  He didn't protest or disagree with the --

3 receiving the letter?

4    A.  With receiving the letter?  He signed it.

5    Q.  Correct.  Now, you had told him that this new

6 practice, new to you practice you observed of tree

7 collaring, you did not feel was appropriate.  That was

8 not going to be allowed?

9    A.  So yeah, it wasn't going to be allowed.  There's

10 no reason for it.  It was completely unnecessary.

11    Q.  In fact, backing up before this letter, you had

12 told him that in August when you first discovered it,

13 because that's what the whole issue of tree collaring --

14 was not in November, it was in August?

15    A.  That's correct.

16    Q.  You had a meeting with Mr. Wells and he -- you

17 told him, there's no purpose, this is not a good

18 practice, we don't want you to do this?

19    A.  So we had a meeting with Mr. Wells, Mr. Belisle

20 and ET1 Hopkins was in the room at the same time, yes,

21 in August.

22    Q.  And now, before you ever got to COMMSTA in

23 2012 -- well, first of all, you knew Mr. Wells had been

24 there for 20-plus years?

25    A.  So I got the COMMSTA in 2010.

1    Q.  I'm sorry.

2    A.  I did -- I did know -- I don't think I knew that

3    before I got there.  I found that out after I arrived,

4    that he had been there for that long, yes.

5    Q.  And did you know that even many of the antennas

6    that they had when you got there in 2010 they didn't

7    have 20 years ago, or they weren't in the locations that

8    they were at 20 years ago?

9    A.  So I was not aware of that.

10    Q.  Some of the antenna lines, the lines that ran

11    from the antennas across the ground, you described one

12    covered with tiles, and ran into the COMMSTA building,

13    those lines were put in within the 20 years preceding

14    you arriving.  Did you know that?

15    A.  I did not know that, no.  They were there for a

16    long time.  I don't know when they were installed.  I

17    couldn't say.

18    Q.  Sure.  All of the antennas in the area -- you

19    said the antenna field was quite large, covered many,

20    many acres around the COMMSTA facility?

21    A.  It's a big field, yes.

22    Q.  And the rigger shop cleared those areas, mowed

23    those areas, cut brush in those areas, all those things?

24    A.  Yes.  That's what the rigger shop did.

25    Q.  If you didn't know it when you got there, you

learned that Mr. Wells had been a part of that for the

past 20 years?

    A.  That's true.

    Q.  And so when you met with him in August and talked

about this tree collaring, one of the things he told you

was that -- well, you said he disagreed with you about

tree collaring.  He said there was a reason for it.  It

was preemptive, I believe is the word you used.

    A.  He said something to that effect, yeah.

    Q.  And preemptive, he said, "Look, some areas don't

need to be cleared today, but we know they're going to

be cleared later for future antennas, future work,

future things, and the trees are easier to take down if

we collar them ahead of time preemptively and take them

down later."  That's what he said to you.  That was his

explanation, wasn't it?

    A.  I don't recall that, those being his words, no.

    Q.  He certainly said they were collared for

preemptive measures?

    A.  He said they were collared for preemptive

measures.  He never mentioned new locations for new

antennas.  I never heard that.

    Q.  You told him that preemptive or not, that was not

part of the mission as you saw it, and tree collaring

wasn't going to be allowed?

          A.   Yes.  It's an unnecessary practice.  New location

or not, you would just go in there and take those trees.

You're certainly not going to create some kind a

dangerous situation.

          Q.   And then later -- well, after you told him that,

after he gave his explanation and you told him that, he

didn't argue further with you?

          A.   He did not.

          Q.   And then you didn't ask him at that time to sign

that letter?

          A.   Because the letter wasn't drafted in August.

So --

          Q.   Ah.  Well, obviously, you didn't ask him to sign

it then.  You later drafted this letter that we're

looking at and discussed it again with him or showed

him, outlined it, whatever on November 2nd?

          A.   That's correct.

          Q.   And on November 2nd, he didn't argue then with

you because you already had the discussion.  There was

no further argument about this.  Mr. Wells signed it as

requested?

          A.   So on that day, we did have an argument.  As I

told Mr. Skrocki, voices were elevated and the guys out

on the deck could hear it through the door.

          Q.   But it wasn't about the practice of tree

1    collaring?

2        A.   I don't recall exactly what was it about.   I

3    think it was about his whole attitude at the COMMSTA in

4    general with the collaring and the fuel card and all of

5    that just kind of coming together.

6        Q.   Well, it wasn't about the tree collaring?

7        A.   I don't remember specifically if it was or not.

8        Q.   Okay.  From August 2011 until he left in April of

9    2012, Mr. Wells did not collar a single tree on COMMSTA

10   property, did he, to your knowledge?

11       A.   To my knowledge, he did not.

12       Q.   Which would have been in compliance with the

13   instruction you gave him in August at the meeting?

14       A.   If he did not collar any trees during that time

15   period, he would have been in compliance, yes.

16       Q.   All right.  In thinking about those days that

17   were gone, you talked about the warehouse that was down

18   the road from the COMMSTA, the warehouse, do you recall

19   that?

20       A.   I do.

21       Q.   And the cleanup of that warehouse was part of a

22   Kodiak main base and COMMSTA area-wide sort of cleanup,

23   wasn't it?

24       A.   I don't recall the main base being involved in

25   that.

1    Q.  And maybe I'm wrong about that.  Because I

2  overstated that.  The COMMSTA area-wide cleanup?

3    A.  Well, it was the warehouse specifically because

4  Captain Van Ness -- Commander Van Ness wanted it cleaned

5  out.

6    Q.  And the warehouse cleanup was part of an overall

7  cleanup of COMMSTA, which included the interior of

8  certain portions of T-1 building, the actual COMMSTA,

9  the antenna fields, a number of different areas.  The

10 warehouse was just one part of that, correct?

11   A.  That's not correct, no.

12   Q.  Okay.  Specifically, the warehouse you said

13 was -- the cleanup of that was going to be the

14 responsibility of the rigger shop?

15   A.  That's correct.

16   Q.  And the cleanup functions started around the end

17 of January or early February and continued into March

18 and actually April of 2012, didn't it?

19   A.  So it actually started before then.  We were

20 given the direction from the captain before then.  Real

21 work didn't start on it until Rich Belisle took over,

22 and that would have been in the timeframe you just

23 outlined sir, yes.

24   Q.  In late -- in February of 2012?

25   A.  Probably January.  December, January, they might

1  have even been down there in the fall of 2011 while

2  Mr. Wells was out, just initiating, starting.  They

3  would go down there periodically.

4      Again, like I said earlier, it wasn't something

5  that was start today, finish tomorrow.  It was, get it

6  done, you got some time, when you're not doing other

7  stuff, go down there and get it done.  So in the

8  wintertime, we had more downtime and so that's when they

9  kind of ramped it up.

10     Q.  Now, Mr. Wells -- Mr. Reckner, you've provided, I

11 think you said, a number of different interviews with

12 law enforcement in this case, haven't you?

13     A.  Yes.  I've been interviewed several times.

14     Q.  In fact, you actually testified in an earlier

15 hearing that we had about some of the issues in this

16 case.  You recall that?

17     A.  I did.

18     Q.  And you've met with these attorneys and other

19 attorneys for the Government at times to talk about your

20 knowledge of this whole circumstance?

21     A.  I have.

22     Q.  And you've not said before that you -- here in

23 court said before that you ever told Mr. Wells he was in

24 charge of the warehouse cleanup, have you?

25     A.  I don't know if that's true.  If I haven't -- if

I didn't say it in court or hearing, I would have said it in an interview.

Q.  Well, you can't recall any specific person you would have said that to?

A.  I cannot.

Q.  That's because the warehouse project really didn't start till Mr. Wells was gone.  So he couldn't have been in charge of it, he wasn't there?

A.  That's not correct.  That's untrue.

Q.  Let me see -- you've certainly been asked about it before, haven't you?

A.  I have been asked about it, yes.

Q.  All right.  I'm going to have him if you can -- Counsel, I'm going to show him that prior hearing starting at 934 and let him -- 933 -- well, 934 is where it starts.

Can you just show him 934?

I'm going to have her show you -- because I know it's been a while, so have her show you some questions and answers that were asked.

THE COURT:  What I'd like to do is show the opposing counsel what you plan to -- so if the way to show it is you need to pull it up off your iPad or whatever, then I'll give the other side an opportunity to do that.

1          MR. COLBATH:  Sure.  Thank you.  I'm just going

2    to go 934 to -- do you have an ability to do that?  I

3    can show --

4          THE COURT:  Why don't we do this:  Let's take a

5    short break.  I will excuse the jury and have you back

6    here in about 10 or 15 minutes.  Please leave your

7    notepads here.  Remember my admonition not to discuss

8    the case, and we'll have you back here shortly.

9          (Proceedings took place and are not included in

10   this transcript, after which, the testimony of Scott

11   Reckner transpired as follows:)

12          (Jury present)

13         THE COURT:  Welcome back.  Please be seated,

14   ladies and gentlemen, everyone.  And we're ready to

15   proceed.

16         MR. COLBATH:  Your Honor, I do want to have --

17   rather than try with the technology, I just have a brief

18   couple of pages of transcript to see if Mr. Reckner --

19         THE COURT:  All right.  And counsel is aware of

20   what you're referring to?

21         MR. SKROCKI:  Yes, ma'am.  I have it right

22   here.

23         THE COURT:  Very good.  Go right ahead.

24         MR. COLBATH:  May I approach?

25         THE COURT:  Yes.

```
 1                (Mr. Colbath handing exhibit to witness.)
 2                MR. COLBATH:  I'll let you read that.
 3                (Pause)
 4      BY MR. COLBATH:
 5          Q.  Mr. Reckner, it's true that you had previously
 6      said Mr. Belisle was the lead on the project to clean
 7      out the warehouse, correct?
 8          A.  I have said that Mr. Belisle, from that document
 9      you showed me, was the lead because at that time he had
10      taken it over.
11          Q.  You've asked -- and you asked Mr. Wells to assist
12      Mr. Belisle, not the other way around?
13          A.  Well, this is after Mr. Wells came back from his
14      sickness.  Mr. Belisle, like I said, had taken over the
15      project, so Rich was doing -- he was leading the project
16      at that point.  I did ask Mr. Wells if he can go down
17      periodically to look at boxes or whatever the crew
18      didn't know what it was.
19          Q.  Mr. Wells did that a couple of times?
20          A.  A couple of times.
21          Q.  But otherwise, that was at the time he was on
22      light duty?
23          A.  That was at the time he was on light duty, that's
24      correct.
25          Q.  Because it was really going on in February and
```

1    March while he was gone and then right after he came

2    back?

3         A.   That's when it started to ramp up.  Like I said

4    earlier, it started earlier than that, ramped up in the

5    wintertime, downtime.  Mr. Wells was gone, but we did

6    previously ask him to take charge of that project.

7         Q.   And Mr. Wells did not complain to you about the

8    warehouse clean-out project?

9         A.   So he didn't complain to me, but --

10        Q.   That's the question I asked.

11        A.   Yep.

12        Q.   Now, you had said that Mr. Wells had some

13   personal property stored in that warehouse?

14        A.   He had personal property stored in the warehouse

15   and actually at T-2 as well.

16        Q.   And that was permissible?

17        A.   I wouldn't say it was permissible, no.

18        Q.   Mr. Belisle had at times personal property stored

19   in the warehouse?

20        A.   If that's the case I wasn't aware of it.

21        Q.   You weren't aware that he had a boat stored in

22   the warehouse at one point?

23        A.   I don't remember a boat.

24        Q.   Stacks of tires?

25        A.   I don't remember that either.

1    Q.   Other individuals, other Coast Guard employees

2    had materials stored in the warehouse?

3    A.   It's possible.  I just don't recall.

4    Q.   At times also in T-2?

5    A.   I definitely don't recall in T-2.  I just don't

6    recall that.

7    Q.   You don't recall other people keeping ATVs there

8    at times?

9    A.   Personal ATVs?

10   Q.   Yes.

11   A.   I don't recall.

12   Q.   Tires and other vehicle materials?

13   A.   Again, I just don't recall.

14   Q.   The warehouse had not only antenna parts and

15   antenna things, but also lots of old things from T-1,

16   the COMMSTA?

17   A.   That is true.

18   Q.   Office furniture, all things that were at one

19   point supposed to be disposed of or in line to be

20   disposed of?

21   A.   I think some of it was earmarked to be disposed

22   of.  Some of it was storage.  I know one of the desks

23   came out of there and went up to the new commanding

24   officer's office when he took over after Captain Van

25   Ness left.  He liked the wood desk, and so we brought it

1   up for him.

2       Q.  Let me ask you about a conversation you had

3   before Mr. Wells came back from his surgery.  That's

4   that conversation you had about the NATE conference.

5   You recall that, Mr. Skrocki asking you about that?

6       A.  I do recall that.

7       Q.  Now, Mr. Wells was only at work a couple of days

8   during the month of January.  Do you recall that it

9   would have been on one of those days that you had that

10  conversation?

11      A.  I would say that's probably true.  I don't

12  remember exact -- the exact date we had the

13  conversation, no.

14      Q.  Let's see if we can orient you.  The conference

15  was in February, and Mr. Wells' surgery was in February,

16  so it would have been before that, because it was a

17  discussion about the conference.

18      A.  Right.  At the time we had a discussion, he

19  didn't have his surgery scheduled, to my knowledge.

20      Q.  I didn't ask you about the scheduling of the

21  surgery.  I asked you about the timing of the

22  conference.  It would have been before February?

23      A.  I apologize.  I heard you say schedule.  That's

24  what I thought you were talking about.

25      Q.  It would have been before February?

1    A.  The conversation?

2    Q.  Yes.

3    A.  It would have been before February, yes.

4    Q.  And it wouldn't have been in December, because we

5   looked at the calendar, Mr. Wells didn't work in

6   December.  He didn't come to work one day in the month

7   of December?

8    A.  It was not in December, no.

9    Q.  So it was sometime on one of those few days in

10  January then that he came to work?

11   A.  That sounds correct.

12   Q.  And his inquiry to you, if I heard you right,

13  was, "What are we going to do about NATE this year?"

14   A.  That sounds accurate to what he said, yes.

15   Q.  And you informed him that -- now, he had not

16  discussed it at all with you up till that point?

17   A.  Not that I can recall.

18   Q.  In the prior -- the immediate prior year, you, he

19  and Mr. Belisle had attended?

20   A.  That's correct.

21   Q.  Prior to that, did you know that he and

22  Mr. Belisle had attended for a number of years leading

23  up to 2011, the year you attended?

24   A.  That was my understanding, that Rich and

25  Mr. Wells went to several of those previously.

1    Q.  And in this year, when he inquired of you about

2  what you were doing, you were the one that approved or

3  made the arrangements for people to go?

4    A.  I approved it.

5    Q.  And Mr. Wells hadn't made any arrangements or

6  submitted any paperwork to you prior to that

7  conversation for him to go?

8    A.  He had not.

9    Q.  And you told him that there were three spots

10  available.  Upon his inquiry, you told him there were

11  three spots available?

12    A.  I don't remember ever telling him there were only

13  three spots available, but I did tell him who was going

14  that year.

15    Q.  The three spots you told him that were going to

16  be filled or go would be yourself again, Mr. Belisle and

17  Mr. Hopkins?

18    A.  Yes.

19    Q.  And that was primarily based on the fact that

20  Mr. Wells had been gone for a period of time, or it was

21  partly based on the fact that Mr. Wells had been gone

22  for a long period of time and really not done much

23  rigger shop work for many, many months leading up to

24  that time period?

25    A.  So I had a conversation with the executive

1  officer on why Mr. Wells wasn't going that year.  And

2  part is true, it was based on the fact that he was gone

3  for a large part of that year, but it was also some of

4  those issues we were having with him throughout the

5  year.

6      Q.  Part of it was based on the fact you only had

7  three spots?

8      A.  Well, that's true.

9      Q.  And after this conversation, you and Mr. Wells --

10  after he disagreed and you had the conversation that you

11  described to us earlier, he just looked at you and you

12  looked at him back and the two of you had that staring

13  match there in the office, as you described?

14      A.  Right.

15      Q.  And a minute or two later, he turned to his desk.

16  It's just the two of you, right, in the room?

17      A.  That's correct.

18      Q.  And you went back to work, he went back to work?

19      A.  That's correct.

20      Q.  He didn't have further conversation with you

21  about the NATE conference or concerns of his or trying

22  to find another way that he could go?

23      A.  I don't remember any conversation like that, no.

24      Q.  Okay.  Now, certainly it wasn't punitive, you

25  weren't trying to be punitive to Mr. Wells and not let

1   him go?

2      A.  I didn't feel like he deserved to go that year.

3      Q.  Well, so is the answer to my question you were

4   being punitive to him?

5      A.  I don't know if punitive is the right word.  It

6   was all of that year in totality and all of the things

7   we had been going through, including his sickness, and

8   those other things we wrote memos about.  It was all

9   factored into the decision that was made, yes.

10      Q.  Well, Mr. Wells was still a valued member of the

11   team?

12      A.  That's true.

13      Q.  He was important to the rigger shop?

14      A.  That's true.

15      Q.  You still had those feelings?

16      A.  I did.

17      Q.  You wanted him to continue to be part of the

18   rigger shop?

19      A.  I did.

20      Q.  You never told him that he was being disciplined,

21   and that's why he couldn't go to the NATE conference?

22      A.  I did not tell him that.

23      Q.  You didn't have plans to further uninvolve him in

24   the business of the rigger shop, as you were uninvolving

25   him in going to the NATE conference, as he had before,

1  right?  You didn't plan to curtail his involvement?

2      A.  No, quite the opposite.

3      Q.  Right.  That was going to be my next question.

4  In fact, at that time, from what I heard you say

5  earlier, your plan was to get him back involved?

6      A.  That's true.

7      Q.  Could you bring up one -- Defense Exhibit

8  No. 209, 210 maybe.  210.  209 and 210.  And just show

9  them for foundation to Mr. Reckner.

10         And then 210, if you would.  Did you have a

11  chance to look at those, Mr. Reckner?

12     A.  I did.

13     Q.  Those are things you're familiar with?

14     A.  I am now.  I had forgotten about them, but yeah.

15     Q.  Right.  But they refresh your recollection on the

16  topics that they talked about?

17     A.  They do.

18     Q.  I want to ask you a couple questions before I get

19  to those.  So in addition to this, you said that NATE

20  conference happened annually, correct?

21     A.  That's correct.

22     Q.  And that wasn't so much a Coast Guard specific

23  conference, but a tower erectors conference that also

24  dealt with civilian towers, could be, you know, cell

25  phone towers, other kind of towers, communications

1   towers, not just to deal with the Coast Guard?

2       A.   That's correct.  Including wind turbines and

3   anything tall like that, yes.

4       Q.   The Coast Guard also had an annual tower

5   conference and tower training that it conducted at

6   different spots, didn't it?

7       A.   They did, though I don't think I ever attended

8   one.

9       Q.   There was in fact right around the time of the

10  NATE conference or just after in the -- there was a tall

11  tower conference in New Orleans for the Coast Guard that

12  was coming up scheduled at the end of April, wasn't

13  there?

14      A.   Yes, that's true.

15      Q.   And in preparation for that, you made plans to --

16  for yourself and part of the rigger shop crew to attend?

17      A.   I did.

18      Q.   Equipment was sent or things were sent ahead of

19  time to assist in activities at the project?

20      A.   It was.

21      Q.   All right.

22      A.   Or we would have.  I don't know if we actually

23  sent it.  I can't remember.  But we were making plans to

24  send it, yes.

25      Q.   All right.  So let's look at Exhibit No. 209.

1          MR. COLBATH:  Your Honor, I'd move the

2    admission -- well, first of all, I'll ask a question.

3      Q.  This 209, you looked at this.  This appears to be

4    an e-mail drafted by yourself regarding the preparations

5    you just described; is that true?

6      A.  That is true.

7          MR. COLBATH:  I'm going to move 209.

8          THE COURT:  Any objection to 209?

9          MR. SKROCKI:  No.

10          THE COURT:  All right.  Defense 209 is

11    admitted.

12          (Defense Exhibit No. 209 admitted.)

13    BY MR. COLBATH:

14      Q.  Could you just blow that up and show the jury?

15          This is -- Chief Reed, that's your immediate

16    supervisor?

17      A.  So no, this is actually addressed to Senior Chief

18    Don Reed, which is why I put Don, not Bill.  If you'll

19    look at the "To" line, there's Donald Reed ETCS, and

20    then I cc'd my boss, the EO William Reed.  So there were

21    two Reeds in the Coast Guard at the time, both ETs, not

22    senior chiefs, though.

23      Q.  The Don Reed, not your supervisor's general

24    function was what?

25      A.  I don't remember exactly.  I think he was -- he

1  was COMMSTA New Orleans EO perhaps, if I remember

2  correctly.  Something like that.  He was definitely out

3  of New Orleans.

4     Q.  And the e-mail refers to SK1, contact your SK.

5  As I understand it, in the Coast Guard, SK is

6  storekeeper?

7     A.  That's correct.

8     Q.  The people that handle the money and the payments

9  of things?

10    A.  And the shipments of things.  So I was going to

11 have my supply guy contact his supply guy to coordinate

12 the sending of the material, correct.

13    Q.  So can we look at Exhibit No. 210, just with

14 Mr. Reckner first.  I'm going to move, Your Honor, the

15 admission of --

16       You've looked at this one as well?  You looked at

17 that earlier, Mr. Reckner?

18    A.  Yes, sir.

19       MR. COLBATH:  All right.  I'm going to move the

20 admission of 210.

21       MR. SKROCKI:  No objection.

22       MR. COLBATH:  Defense 210.

23       THE COURT:  All right.  Defense 210 is admitted

24 as well.

25       (Defense Exhibit No. 210 admitted.)

BY MR. COLBATH:

Q.  Can you just show the jury that?  Now -- can you
blow it up?  Yeah.  A little easier to read.

So the tall tower training was going to be
April 30th to May 3rd.  You, Mr. Belisle and Mr. Wells
were going to attend, correct?

A.  That's correct.

Q.  And I think we've got a second page here.

But one of the things that was going to happen --
the planning started back in March or much earlier.
This was a conference, this annual Coast Guard
conference was something Mr. Wells also attended
regular, like the NATE conference, right?

A.  It was.  I didn't have -- I wasn't as familiar
with this conference as the other one, but yes.

Q.  And Mr. Belisle too, the two of them went?

A.  I would agree with that, yes.

Q.  And in fact, at this one, like in years past,
both Mr. Belisle and Mr. Wells were scheduled to not
only attend, but they were going to actually be
presenting or doing part of the training of the Coast
Guard-wide group that was planned to happen then?

A.  Yes.  They were both going to be instructors for
a block of instruction each, yes.

Q.  And that's fine.  You can take that down if you

1    will, and we can have the lights again.

2        So although he wasn't going to the NATE

3    conference, Mr. Wells certainly would have known -- you

4    also discussed or you would have been aware that these

5    plans were being made.  You said they were made in

6    March, and he would have been attending that conference

7    as normal to conduct training?

8        A.  That's correct.

9        Q.  I want to switch gears and ask you about

10   something that Mr. Skrocki didn't ask you about.  And

11   that is the Coast Guard policy about having firearms,

12   personal firearms in the workplace.  Okay?

13       A.  Okay.

14       Q.  First of all, the Coast Guard and COMMSTA

15   specifically had a policy not allowing there to be

16   personal firearms in the workplace, correct?

17       A.  That's true.

18       Q.  And originally, the main base had a policy and

19   then that was adopted by COMMSTA, and it did not allow

20   guns in the facility buildings?

21       A.  I don't know -- I don't know how that process

22   worked, but it sounds accurate to me, so I'll say sure.

23       Q.  Okay.  Could not have them within the secured

24   perimeter fences?

25       A.  Yes, that's true.

1    Q.  And could not have them in the COMMSTA property

2    building, so I suppose that would be the T-1, the T-2,

3    the warehouse, structures owned by the Coast Guard?

4    A.  That's correct.

5    Q.  Nor carry on your person or carry in your vehicle

6    while on Coast Guard property, that was also prohibited

7    by the policy?

8    A.  That's correct.

9    Q.  And at times, after you became the chief down at

10   the rigger shop in 2010 going up till April of 2012,

11   there were times where people had guns at work that

12   you're aware of?

13   A.  So yeah, if someone bought a weapon and wanted to

14   show it off, they would bring it in.  I bought a double

15   barrel shotgun from Rich Belisle.  He brought it in, I

16   paid for it and I put it in my truck.  So it happened

17   occasionally.

18   Q.  Now, when someone you're talking about -- there

19   was a couple of things in that answer.  If somebody

20   bought a new gun, say, at the Sportsman Warehouse store

21   and they wanted to show it to their co-workers, they

22   might bring it.  There were occasions where people

23   brought it into the building, showed it to everybody,

24   put it back in their car, something like that.  Is that

25   what you're saying?

1    A.   Actually, more often they bought it from the

2  Coast Guard exchange on base and bring it in.

3    Q.   There were circumstances, it sounds like a

4  circumstance anyway, where Mr. Belisle brought one of

5  his personal firearms to work that you were purchasing

6  from him, and you bought it there inside the T-2

7  building, took it then out to your car, put it in your

8  car?

9    A.   So that's not accurate.  He brought it into the

10 building, I paid him for it, I took it out and put it in

11 my car.

12   Q.   Right.  I'm sorry if I misstated it.  That's the

13 way I understood what you said.  Sure.

14        And so you didn't communicate or get approval for

15 that, those things to be going on with either your

16 immediate supervisor, Bill Reed, or the XO or the CO?

17   A.   That's correct.  I did not.

18   Q.   And of course those are direct violations of

19 Coast Guard policy, even if they're minimal, as you've

20 described?

21   A.   Even if it was quite commonplace, which it was on

22 Kodiak, Alaska, for weapons to be around, it was a

23 violation of policy.

24   Q.   And the Coast Guard doesn't make rules that they

25 have unwritten exceptions to that it's okay here and not

okay there, they have rules and the rules are meant to
be followed, right?

    A.  That's true.

    Q.  I want to ask you about the fuel card incident if
I could.  I think that's Exhibit 37.  Go to the second
page for me.  Now, the -- you described the meeting --
the day that Mr. Wells got this document was the same
day that he signed it, right?

    A.  Yes.  24 February.

    Q.  And 24 February we also have already discussed
was the day that Mr. Wells returned after having had his
surgery?

    A.  That's where you showed it, so yes, looks like
it.

    Q.  And so other than those few days in January, he
had been out since November 21st.  I think you said in
an answer to Mr. Skrocki's questions, he and the
commander's schedules had not permitted this discussion
until this day?

    A.  That's correct.

    Q.  This was the first thing then or one of the first
things that happened when Mr. Wells arrived back?

    A.  Yes.

    Q.  Could you just highlight number six there for me.
Again, I just want to make sure.  This was clearly

1    conveyed to Mr. Wells that this was not a disciplinary

2    letter, right?

3        A.   That's correct.

4        Q.   And nor were the other letters that we've talked

5    about, none of these things, not a single thing that

6    you've testified about so far, I guess save maybe for

7    your feeling about the conference, were disciplinary,

8    meant to be disciplinary to Mr. Wells?

9            MR. SKROCKI:  Objection.  I would move to

10   strike that question as to disciplinary.  That wasn't

11   his testimony --

12           THE COURT:  Well --

13           MR. SKROCKI:  -- with respect to the NATE

14   conference.  Rephrase the question would be my

15   objection.

16           THE COURT:  Just a moment.  The witness can

17   answer whether any of the other letters that we've

18   talked about were disciplinary.  So go ahead.  Do you

19   understand the question?

20           THE WITNESS:  I do, yes, ma'am.

21           THE COURT:  Go ahead.

22       A.   So they were not disciplinary.  They could have

23   been used if the behavior wasn't corrected to take

24   disciplinary action up to and including dismissal from

25   federal service.

 1    Q.  But Mr. Wells was specifically told each time,

 2 this is -- this letter is not meant to be disciplinary,

 3 like this one, or this is a letter of expectations, this

 4 is not disciplinary.  It's being given to you and

 5 Mr. Belisle.  Those things were communicated each time,

 6 right?

 7    A.  They were.

 8    Q.  That's good.  I don't need this anymore.  Now, in

 9 the meeting that you had with the other folks that were

10 involved, when Mr. Wells was given this letter, he did

11 not respond aggressively, did he?

12    A.  Are you talking about this letter specifically?

13    Q.  Yes.  This letter we just looked at.  The

14 February 24th meeting, you're in the commander's office.

15 It's you and the other folks you described, the XO, the

16 CO., Senior Chief Reed, those folks that you described.

17        And Mr. Wells is given the letter.  And -- well,

18 first of all, he disagreed with it?

19        MR. SKROCKI:  I object to the form of the

20 question.

21        THE COURT:  That's sustained.  Break it down.

22 BY MR. COLBATH:

23    Q.  The letter we just looked at, you know which one

24 I'm referring to, about the fuel card?

25    A.  I do.

 1      Q.   It was presented to Mr. Wells at a meeting?

 2      A.   It was.

 3      Q.   There was six people there?

 4      A.   That sounds right, yeah.

 5      Q.   You remember the meeting?

 6      A.   I do.

 7      Q.   You remember Mr. Skrocki asking you about the

 8  meeting?

 9      A.   I do.

10      Q.   You remember during the meeting that the

11  commander gave Mr. Wells the letter?

12      A.   I do.

13      Q.   You remember watching Mr. Wells' reaction?

14      A.   I do.

15      Q.   You remember Mr. Skrocki asking you about it?

16      A.   I do.

17      Q.   Mr. Wells said over and over, "You think I'm a

18  thief.  You think I'm a thief."

19      A.   That's correct.

20      Q.   Mr. Wells said, "That doesn't sit well with me.

21  That's not -- that doesn't sit well.  That just doesn't

22  sit well"?

23      A.   "It doesn't sit well" is what he said, yes.

24      Q.   "It doesn't sit well."  But it was after "You

25  think I'm a thief."  So your perception was that's what

1   he was referring to?

2       A.  That's correct.

3       Q.  Mr. Wells wasn't aggressive toward the commander,

4   I mean physically aggressive towards the commander or

5   any other person in the room that you observed?

6       A.  No, he was not.  That's correct.

7       Q.  He wasn't hostile?

8       A.  No.

9       Q.  He was disagreeable, certainly?

10      A.  Yes.

11      Q.  When the discussion continued, Mr. Wells studied

12  the letter as he was saying those things; is that a fair

13  assessment?

14      A.  I don't recall that specifically.  He looked at

15  the letter.  I don't know if he was studying it as he

16  was saying those words.  I don't recall that.

17      Q.  At some point the commander asked him, you know,

18  told him, "You need to sign this acknowledging receipt"?

19      A.  That's correct.

20      Q.  And Mr. Wells just stared at that letter, just

21  stared at that letter.  I guess you don't know whether

22  he was studying it or not?

23      A.  I do not.  That's correct.

24      Q.  And as time passed, you said a couple minutes

25  passed and he did not sign it, and the commander said,

1    "All right then" and stood up?

2       A.  Yes.

3       Q.  And you and the other officers in the room stood

4    up then and exited the room?

5       A.  That's correct.

6       Q.  And you learned later that before Mr. Wells left

7    the room, after a short conversation with the commander,

8    Mr. Wells signed the letter, took the letter, left the

9    office?

10      A.  So I don't know anything about a conversation

11   they may have had.  The commander didn't brief me on

12   that, but he did sign the letter.

13      Q.  Now, this -- the presentation of these letters of

14   expectation to Mr. Belisle or to Mr. Wells or this fuel

15   card letter, those would have been what are called

16   counsel sessions, right?  It's as if somebody is

17   counselled and they're given information.  That's a term

18   I've seen referred to from the Coast Guard?

19      A.  I guess you could call it a counseling.  The

20   paperwork is important because that creates a paper

21   trail.

22      Q.  Okay.  And after Mr. Wells -- the timing here was

23   Mr. Wells was just back from surgery and this long

24   absence, and this fuel card incident happened.  And then

25   Mr. Wells was back at work, right?  Those two things

1  happened simultaneously.  He came back from surgery and

2  a long absence, and on the day back, he got the fuel

3  card letter.  Those happened at the same time, correct?

4      A.  Yes.  He came back from surgery, and he was

5  presented the letter.

6      Q.  After this fuel card letter, your intention was

7  to try to get him back involved in the work flow of T-2,

8  having been gone so long?

9      A.  Yes.  We were paying him to do a job, and we

10  needed him to do that job.  So that was my intention.

11      Q.  One of the things you tried to do over the next

12  several weeks' period of time was -- or next couple of

13  weeks was to involve Mr. Wells through having

14  conversations with him down at the office?

15      A.  So we would have conversations as a group talking

16  about that day's work or the planning, future planning

17  for work.  And Mr. Wells would be in the room, and I

18  would ask him questions, trying to draw him into the

19  conversation to engage him.  So if that's the question,

20  then the answer is yes.

21      Q.  And by the way, when you took over originally,

22  when did you go to your new chief's training?

23      A.  So I went to chief's academy in March, April,

24  March, April 2011, something like that.

25      Q.  Okay.  After you had these conversations with

1    Mr. Wells trying to bring him back into the fold, talk

2    with him and whatnot, your assessment was that went

3    pretty well, I mean he was starting to come around?

4        A.   Repeat that.

5        Q.   Sure.  You just said that you would have these

6    group conversations, and what you would try to do is you

7    would try to move things forward by asking him his

8    advice on things or how you should do things, those kind

9    of things.  And as you tried those tactics to get him

10   back involved, that went pretty well, didn't it?

11       A.   So I would say that's not true, no.

12       Q.   I'm going to have you just review another one of

13   these transcripts.

14            MR. COLBATH:  Your Honor, may I approach?

15            THE COURT:  Yes.  What are you -- is there --

16            MR. COLBATH:  I'm certainly going to let him

17   know here.

18   BY MR. COLBATH:

19       A.   Mr. Reckner, I'm going to show you an interview

20   that was done with you on April 12th of 2012 between you

21   and a member of law enforcement and just ask if -- I'm

22   going to let you review a page of this and ask if it

23   refreshes your recollection, and then I'm going to have

24   a question.

25            (Pause)

1          MR. COLBATH:  I apologize, Your Honor.  I have

2     two transcripts here, and I've got to get between the

3     two of them.

4          (Pause)

5          MR. COLBATH:  Let me do it this way, Your

6     Honor.

7     BY MR. COLBATH:

8     Q.  Moving forward to April 11th -- and we'll talk

9     more about your conversations with Mr. Wells.  Moving

10    forward to April 11th, most days when you came into

11    work, you started your day up at T-2 or I mean down at

12    T-2 or up at T-1, which?

13    A.  So initially, when I first reported, I would go

14    up to T-1.  Once I moved my desk down to T-2, I would

15    normally go to T-2 first unless there was an early

16    morning meeting or something scheduled up at T-1.

17    Q.  And on April 11th of 2012, you and Mr. Wells were

18    in the office it sounds like about 9:00 a.m.?

19    A.  That's accurate.

20    Q.  And the other workers in the office were out

21    doing other tasks, correct?  So you and Mr. Wells were

22    there alone?

23    A.  That's correct.

24    Q.  And he notified you that he was leaving T-2 to go

25    up to T-1?

1    A.  That's correct.

2    Q.  And then after that, there was a period of time

3    where later that morning, you had not seen Mr. Wells

4    come back down to T-2; is that true?

5    A.  That's true.  Like I said earlier, we lost track

6    of him for three hours.

7    Q.  Okay.  And had you been up in that interim to

8    T-1?

9    A.  I believe I went up because I had a meeting not

10   long after he left.  I had a meeting -- I was on the

11   phone when he left.  I had a meeting up at T-2 -- up at

12   T-1.  I actually think I said to him, great, something

13   like, great, I'll be right behind you or something like

14   that.  So I was up there.

15   Q.  Where was your meeting?

16   A.  I don't recall.

17   Q.  Would it have been -- there's an ET desk or a ET

18   deck and an ops deck, two different decks?

19   A.  That's correct.

20   Q.  What are the differences?

21   A.  So the ET deck is where all the ETs sit.  Those

22   are the guys who work on the radios, the electronics

23   technicians.  And then just out the door and to the

24   right there's maybe five paces out the door is the door

25   to the ops deck.  That's a secure space, and that's

1   where the ops deck is.

2       Q.   Your meeting could have been in either one of

3   those places or in some other place in the building?

4       A.   That's true.  We had an unclassified conference

5   room, a classified conference room and then other

6   offices.

7       Q.   All right.  And regardless, at some point yet

8   that morning, you were back down at T-2 and you -- it

9   sounds like you made a telephone call up to T-1 because

10  you were looking for Mr. Wells?

11      A.   That's right.  At some point I made a phone call

12  looking for him.  I don't remember when exactly it was.

13      Q.   You called one of your employees, Mr. Beauford,

14  Cody Beauford, and you asked him to look for Mr. Wells

15  and specifically asked him to look for Mr. Wells in the

16  restroom, correct?

17      A.   I did, yeah.

18      Q.   The reason for that was many of the times

19  Mr. Wells disappeared, it was to the restroom or he

20  spent a large amount of time in the restroom?

21      A.   I don't remember that, no.

22      Q.   There were times, many times, frequently, he

23  would leave T-1 -- T-2 down the hill and walk up the

24  hill just for the sole purpose of using the restroom up

25  there?

1    A.   I don't recall that ever happening.

2    Q.   The T-1 building had a single small restroom, one

3  restroom facility?

4    A.   That is correct.

5    Q.   You had, if everyone was there, eight employees,

6  both male and female?

7    A.   That's correct.

8    Q.   And the bathroom was a single-use bathroom?

9    A.   Yes, that's correct.

10   Q.   And even though you didn't know that Mr. Wells

11 spent time in the bathroom, you called there and

12 specifically had somebody go look for him in the

13 bathroom just out of the blue?

14   A.   So I called them and I said, "Hey, do you see

15 Mr. Wells around?"  And they said, "No, we haven't seen

16 him."  I said, "Send someone to the restroom or go to

17 the restroom just to see if he's in there," because we

18 were trying to cover all the bases.

19   Q.   So you didn't spend enough time down in the T-2

20 shop to know whether or not Mr. Wells spent an

21 inordinate amount of time in the bathroom?

22   A.   I wouldn't -- I did not know Mr. Wells' bathroom

23 habits, no.

24   Q.   Okay.

25        MR. COLBATH:  Just give me a minute if I could,

1    Your Honor.

2            (Pause)

3    BY MR. COLBATH:

4        Q.  Can we look at Government Exhibit 67.

5            I want to talk to you a little bit, Mr. Reckner,

6    about April 12th of 2012.  And they showed the exhibit

7    of you arriving that morning.  Do you recall that?

8        A.  I do.

9        Q.  Okay.  I'd like to ask you a few questions about

10   that, so we'll try to get that pulled up.

11               (Exhibit No. 67 playing live in court)

12           MR. COLBATH:  If you could stop it there.  I'm

13   going to have you -- just like Mr. Skrocki, I'm going to

14   have you stop this in a number of places.

15   BY MR. COLBATH:

16       Q.  Now, I believe you said -- can you take the laser

17   pointer again and show me your truck.

18       A.  Right there.  You can kind of see it behind this

19   white truck.

20       Q.  I thought that.  And -- as we see the screen

21   here, you're out of your truck and off to the left-hand

22   side of the view out of the camera, correct?

23       A.  That's correct.

24       Q.  And you are conversing with others and whatnot,

25   but have not been let into the T-2 building?

1     A.   That's correct.

2     Q.   And do you know who you were talking to up in

3  that area?

4     A.   I believe it was Senior Chief Reed.  I don't

5  remember who else.  There might have been other people

6  there, but I don't recall.

7     Q.   Okay.  And law enforcement?

8     A.   There was a law enforcement officer over there.

9  I don't remember talking to her at any great length, but

10 she was in the area.

11    Q.   It was a female law enforcement officer, as you

12 recall?

13    A.   The CGPD officer that I first encountered was

14 female, yes.

15    Q.   If you can just play this forward.

16         (Exhibit No. 67 playing live in court)

17    Q.   Stop there.

18         Is that you that's walked into the screen?

19    A.   Yeah.  I don't think that is me.  I think I

20 testified earlier it was me, but I don't believe that is

21 me.

22         MR. COLBATH:  Okay.  So let it run.

23             (Exhibit No. 67 playing live in court)

24         MR. COLBATH:  I'm going to have you stop it

25 there.

```
 1                (Exhibit No. 67 stopped)

 2   BY MR. COLBATH:

 3       Q.   Who do you believe it is?

 4       A.   Now looking at it again, I think it's Senior

 5   Chief Reed.  It looks like he's walking over to his van.

 6       Q.   That's his van right behind Mr. Wells' truck?

 7       A.   Yes.

 8            MR. COLBATH:  Go ahead.

 9                (Exhibit No. 67 playing live in court)

10            MR. COLBATH:  All right.  You can stop there.

11                (Exhibit No. 67 stopped)

12   BY MR. COLBATH:

13       Q.   Is that you that walked into the screen with your

14   hands in your pockets?

15       A.   Right here?

16       Q.   Yes.

17       A.   Yes.

18       Q.   Okay.

19            MR. COLBATH:  All right.  Let it run there.

20                (Exhibit No. 67 playing live in court)

21   BY MR. COLBATH:

22       Q.   Now, Mr. Wells walked up and asked you right

23   there what happened, correct?  He spoke first?

24       A.   Yes.

25       Q.   Okay.  And law enforcement is checking his ID
```

1   there, Mr. Wells.  So Mr. Wells handed them something?

2       A.   That's what it looked like.  I don't remember

3   that.

4              MR. SKROCKI:  Objection as to foundation.

5              THE COURT:  That's sustained.

6              MR. COLBATH:  Stop the tape.  Can you back it

7   up?

8   BY MR. COLBATH:

9       Q.   Watch this, please, Mr. Reckner.  Stop right

10  there.  So you were standing there and you're looking at

11  Mr. Wells, and Mr. Wells hands the law enforcement

12  officer something.  You saw him hand him his ID, didn't

13  you?

14             MR. SKROCKI:  Objection as to foundation, Your

15  Honor.

16             THE COURT:  Well, he can answer yes or no.  Did

17  you see what was handed?

18             THE WITNESS:  I don't remember seeing what was

19  handed, no.

20  BY MR. COLBATH:

21      Q.   But you do remember -- do you even remember

22  standing there?

23      A.   I don't remember a lot of that.  It was pretty

24  traumatic.  I don't remember that event that you just

25  described or we've just seen in any detail.

1    Q.  But you remember details about specific things

2    Mr. Wells said?

3    A.  I remember details about what Mr. Wells said, and

4    I remember details about what I said to the captain when

5    he came over, yes.

6    Q.  Okay.  But not some of the other things you may

7    have said?

8    A.  I don't remember everything I said that day or in

9    that specific moment, no.

10              MR. COLBATH:  You can let that go forward.

11                  (Exhibit No. 67 playing in live court)

12              MR. COLBATH:  Stop it there.

13                  (Exhibit No. 67 stopped)

14   BY MR. COLBATH:

15   Q.  Now, Mr. Wells has stepped away from that

16   officer, and there's the man in the red jacket.  You

17   said that was the commander.  He's now talking to the

18   officer, or appears to be.  Would you agree with me?

19   A.  I would agree, yeah.

20   Q.  Mr. Wells has moved over, and he's talking again

21   to you.  Do you see that?

22   A.  I don't know that he was talking.  I don't

23   recall.

24   Q.  Well, I'm going to just let this run so we can

25   move this along.

1     A.  Okay.

2     Q.  But you watch as you and Mr. Wells stand over the

3  next minute together.  And on the tape, you see you look

4  at each other a number of times.  Mr. Wells both looks,

5  gestures and motions towards you, in my observation.  I

6  would like you to see if you think it appears that

7  Mr. Wells talks to you during this next minute or so,

8  has quite a conversation with you.

9          MR. SKROCKI:  Objection as to the form of the

10  question entirely.

11          THE COURT:  Why don't you strike the last

12  phrase.  Go ahead.

13          MR. COLBATH:  Can you play that?

14              (Exhibit No. 67 playing in live court)

15  BY MR. COLBATH:

16     Q.  That's Mr. Wells has moved up back by you.

17  That's you, correct, he's by?

18     A.  That's correct.

19     Q.  All right.  That's good.  You can take that down.

20          Mr. Reckner, as to any further conversation after

21  the initial conversation, I understand you don't

22  remember further conversation with Mr. Wells?

23     A.  That's correct.  I don't recall any conversation.

24     Q.  All right.

25          MR. COLBATH:  Can I have one minute, Your

1    Honor?

2           THE COURT:  Certainly.

3           (Pause)

4    BY MR. COLBATH:

5        Q.  After the events here, after the murders and all

6    of the law enforcement investigation of the process

7    began, all of the rigger shop personnel was up at T-1,

8    did I hear you say, in the conference room?

9        A.  So not everybody was up there, no.

10       Q.  Okay.  Who wasn't there?

11       A.  Seaman Coggins, ET3 Cody Beauford and Seaman Nate

12   Pacheco were not in the conference room.

13       Q.  Where were they?

14       A.  Seaman Pacheco was on the C-130 coming home from

15   Shemya.

16       Q.  He hadn't been involved in any of the activities

17   the 11th or 12th of April because he was a member of the

18   rigger shop that was away on a different duty?

19       A.  That's correct.

20       Q.  Okay.  And then who else?  Mr. Coggins you said

21   wasn't there.  Where was Seaman Coggins?

22       A.  Seaman Coggins was over at CGPD, so the Coast

23   Guard Police Department.

24       Q.  Being interviewed by law enforcement about the

25   events of that day?

1     A.   That's what I would assume.  I don't have any

2   firsthand knowledge though.

3     Q.   And you said also there was a third individual

4   that wasn't there, Mr. --

5     A.   Mr. Cody Beauford, ET3 Cody Beauford.

6     Q.   Where was Mr. Beauford?

7     A.   At CGPD as well.

8     Q.   And then as time went by, at some point on the

9   12th, you were interviewed by law enforcement?

10    A.   I was.

11    Q.   Also on the 13th?

12    A.   I was.

13    Q.   Okay.  And a number of times thereafter, but at a

14  minimum, those two days, the 12th and 13th?

15    A.   Yes.

16    Q.   One of the observations you made on the 12th

17  there while you were waiting in that conference room was

18  that Mr. Wells was reading a book.  You remember saying

19  that?

20    A.   I do.

21    Q.   Now, you knew Jim Wells to frequently carry a

22  book with him throughout the workday?

23    A.   I don't know that I knew that, no.

24    Q.   Okay.  Had you observed him that he had some type

25  of small paperback, book or novel of some kind, some

1    kind of reading material frequently with him?

2        A.   I don't recall it specifically.  It's possible,

3    but I don't recall picking up that detail.

4        Q.   There wasn't work going on in the conference

5    room, nobody was expected to be doing work activities.

6    It was a holding place, if I understand it, correct?

7        A.   It was a place for us to be away from the rest of

8    the crew, yes.

9        Q.   And there was no other activities going on other

10   than visiting with one another, consoling one another,

11   just being away?

12       A.   Just being away from --

13       Q.   The work center?

14       A.   Yes, that's correct.

15       Q.   Mr. Wells calling you that morning and letting

16   you know that he was going to be late, that was

17   something you had instructed him to do?

18       A.   It is.

19       Q.   And the reason perhaps you would have been

20   getting a call is he told you he couldn't get ahold of

21   the rigger shop supervisor, that he had also tried to

22   call and leave him a message, but he couldn't get ahold

23   of him?

24       A.   That's correct.

25                MR. COLBATH:  If I can have just a moment, Your

1  Honor.

2          THE COURT:  All right.

3          (Pause)

4  BY MR. COLBATH:

5      Q.  Mr. Reckner, at that time, on the -- when you

6  were all in the conference and whatnot, you came and

7  went.  Because you were the chief and had other things

8  to attend to in some respects, you came and went some

9  from the conference room, correct?

10     A.  I did.  I traveled between the conference room

11 and my office, the ET deck, the ops deck.

12     Q.  How long were -- generally was the crew required

13 to stay there on April 12th?

14     A.  Stay at the COMMSTA?

15     Q.  Yeah.

16     A.  I think we were released somewhere around 9:00,

17 9:30 at night.  I don't remember exactly, but it was

18 something like that.

19     Q.  So 12, 13 -- everyone was staged there for 12,

20 13 hours, having arrived early that morning and -- 9:00

21 or later that night?

22     A.  That's correct.

23     Q.  All right.  And instructed to report the

24 following day as well, on the 13th?

25     A.  That's correct.

1    Q.  And law enforcement investigation and interviews,

2  that was going on throughout that time, your

3  observation?

4    A.  That's correct.  Yeah.

5    Q.  And one of the instructions that the Coast Guard

6  gave to all of you folks was to not visit about the

7  investigation or visit with others about details of the

8  investigation.  Do you recall that?

9    A.  That's correct.  We weren't generally supposed to

10  talk about it to each other.  That's correct.

11    Q.  And within the workweek following that, following

12  April 12th, that started to happen, didn't it?  People

13  started to talk about things and talk about what might

14  have happened and how it all happened and all of those

15  things?

16    A.  I don't recall the exact timeframe of that.  But

17  eventually, it did start to happen, yes.

18    Q.  All right.

19        MR. COLBATH:  I think that's all -- but just

20  give me one second.

21        THE COURT:  Certainly, take a moment.

22        (Pause)

23        MR. COLBATH:  At this point, Your Honor, I

24  think that's all I'm going to ask Mr. Reckner.

25        THE COURT:  Redirect?

1           MR. SKROCKI:  Yes.  Do you want to take an

2      afternoon break real quick?

3           THE COURT:  How is everybody doing?  Take a

4      break now or continue on?  Anybody need a break?  No.

5      Ready to proceed?

6           MR. SKROCKI:  Yes, ma'am.

7           THE COURT:  All right.  Very good.

8                    REDIRECT EXAMINATION

9      BY MR. SKROCKI:

10     Q.  Mr. Reckner, just a couple questions for you,

11     sir.  You were asked a lot of questions by Mr. Colbath

12     about the performance evaluations of Mr. Wells.

13     A.  I was.

14     Q.  And one of those -- a lot of questions about

15     meets expectations, things like that.  You remember

16     those questions?

17     A.  I do.

18     Q.  Then there's -- Mr. Wells at some point in time

19     exceeded and then he went to meets in one reflecting

20     teamwork?

21     A.  That's correct.

22     Q.  Is there rules about dropping an employee from

23     one level to another?

24     A.  There is.  You can't go --

25     Q.  Explain.

1    A.  So you can't go from exceeds straight down to not

2   meets.  There has to be a process of going from exceeds

3   to meets, having a conversation with the employee, do

4   documentation, as we did, and then allowing that

5   employee to correct the behavior.  If they don't correct

6   the behavior or their performance doesn't improve, then

7   you can drop from meets to not meets.  That's how it was

8   explained to me by the HR rep.

9    Q.  In terms of the teamwork piece that was dropped

10   from exceeds to meets, would you have gone lower if you

11   could?

12    A.  I would have gone lower if I could.  I was told I

13   couldn't.

14        MR. COLBATH:  Your Honor, I'm going to object

15   to the hearsay nature of the last two answers.

16        MR. SKROCKI:  It's not going to the truth.

17   It's why he did what he did.

18        THE COURT:  Well, in any event, I will allow

19   the testimony to stand, but we're going to move to a new

20   topic?

21        MR. SKROCKI:  Yes, we are.

22        THE COURT:  Then the objection is overruled.

23   Go ahead.

24   BY MR. SKROCKI:

25    Q.  Mr. Reckner, there were some questions about

1  light duties.  You remember those questions?  Both

2  Mr. Colbath and I asked you those questions.

3      A.  I do.

4      Q.  At the day of the murder, April 12th, was

5  Mr. Wells still on light duty?

6      A.  He was not.

7      Q.  How far back was he off of light duty?

8      A.  I don't recall.  I think he was fully qualified

9  to work in every aspect of his job a couple of weeks

10  before that, but I honestly don't know exactly when his

11  light duty chit would have expired.

12      Q.  You were asked some questions about the other

13  antenna conference the Coast Guard sponsored.  Do you

14  recall those questions?

15      A.  I do.

16      Q.  I apologize for jumping around.  Did that

17  conference ever occur?

18      A.  We did not attend.  I honestly don't remember if

19  they went on without us, but obviously, two of our guys

20  are dead and one was suspended, so we didn't go.

21      Q.  Mr. Colbath asked you some questions about the

22  circumstances of the fuel card meeting and whether

23  Mr. Wells was aggressive and what people in the room

24  were doing, things of that nature.  Do you recall those

25  questions?

1     A.   I do.

2     Q.   And you mentioned at the end of meeting everybody

3   stood up.  Commander Van Ness stood up.  And what did

4   everybody else do?

5     A.   So Commander Van Ness stood up.  And when the CO

6   is in the room and he stands up, you stand up too.

7     Q.   What did Mr. Wells do?

8     A.   Mr. Wells stayed seated.

9     Q.   For how long?

10     A.   I don't know.  I left and came back, and he was

11   gone.  But I couldn't tell you.

12     Q.   You were asked some questions about the phone

13   call you received and Mr. Wells telling you about phone

14   calls that he made to the rigger shop, Mr. Belisle,

15   Hopkins and you.  Do you recall those questions?

16     A.   I do.

17     Q.   When Mr. Wells told you that, what was your

18   reaction to that?

19     A.   I was surprised.

20     Q.   Why?

21     A.   Because it just never happened.  I cannot

22   remember any other instance where all three of us got a

23   phone call that he was going to be late.  It never

24   happened in almost a year that I was there.

25          MR. SKROCKI:  No further questions.

1          THE COURT:  All right.  Any topics at all?

2   Nothing to explore?  Nothing new?

3          MR. COLBATH:  Nothing new there.  I would have

4   a question about that last -- one question about the

5   last question, and then that's it.

6          THE COURT:  One question.  Go ahead.

7          MR. COLBATH:  Thank you, Your Honor.

8                    RECROSS EXAMINATION

9   BY MR. COLBATH:

10     Q.  You and Mr. Belisle and Mr. Hopkins never all got

11  a call but the -- Mr. Wells was only instructed to call

12  you if he couldn't get ahold of the shop supervisor,

13  Mr. Hopkins.  That's what the prior instruction was,

14  right?

15     A.  The instruction was to call any of us.  We didn't

16  care who he called as long as he called somebody.

17          THE COURT:  Thank you.

18          MR. COLBATH:  The letter said the shop

19  supervisor.

20          MR. SKROCKI:  Objection.

21          THE COURT:  Mr. Colbath, we've covered this

22  topic.  Very good.  Thank you, sir.  You may be excused.

23          (Witness excused)

24          (Requested excerpt concluded, proceedings

25  continued.)

1
CERTIFICATE

2
    I, Sonja L. Reeves, Federal Official Court Reporter
in and for the United States District Court of the

3
District of Alaska, do hereby certify that the foregoing
transcript is a true and accurate transcript from the

4
original stenographic record in the above-entitled
matter and that the transcript page format is in

5
conformance with the regulations of the Judicial
Conference of the United States.

6

    Dated this 12th day of September, 2019.

7

8
                /s/ Sonja L. Reeves

9
                SONJA L. REEVES, RMR-CRR
                FEDERAL OFFICIAL COURT REPORTER

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25