```
 1                    UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF ALASKA
 2

 3   UNITED STATES OF AMERICA, )
                               )
 4        Plaintiff,           )
                               )
 5   vs.                       )   CASE NO. 3:13-cr-00008-SLG
                               )
 6   JAMES MICHAEL WELLS,      )
                               )
 7        Defendant.           )
     _____)
 8
```

```
 9        PARTIAL TRANSCRIPT OF TRIAL BY JURY - DAY 4
                  (Testimony of Michael Haselden)
10    BEFORE THE HONORABLE SHARON L. GLEASON, DISTRICT JUDGE
                  September 12, 2019; 8:34 a.m.
11                      Anchorage, Alaska
```

**FOR THE GOVERNMENT:**
```
12        Office of the United States Attorney
13        BY:  STEVEN SKROCKI
          BY:  CHRISTINA M. SHERMAN
14        BY:  KELLEY L. STEVENS
          222 West 7th Avenue, #9
15        Anchorage, Alaska 99513
          (907) 271-5071
16
```

**FOR THE DEFENDANT:**
```
17        Office of the Federal Public Defender
          BY:  GARY GEORGE COLBATH
18        601 West 5th Avenue, Suite 800
          Anchorage, Alaska 99501
19        (907) 646-3400

20        Camiel & Chaney, P.S.
          BY:  PETER A. CAMIEL
21        520 Pike Street, Suite 2500
          Seattle, Washington 98101
22        (206) 624-1551
```

```
23   _____

                   SONJA L. REEVES, RMR-CRR
24               Federal Official Court Reporter
                   222 West 7th Avenue, #4
25                 Anchorage, Alaska 99513
          Transcript Produced from the Stenographic Record
```

1          (Call to Order of the Court at 8:47 a.m.)

2          (Proceedings took place and are not included in

3   this transcript, after which, the testimony of Michael

4   Haselden transpired as follows:)

5          (Oath administered to the witness)

6          DEPUTY CLERK:  For the record, can you please

7   state your full name and then spell your full name.

8          THE WITNESS:  Michael Birch Haselden.

9   M-i-c-h-a-e-l, B-i-r-c-h, Ha-s-e-l-d-e-n

10        MICHAEL HASELDEN, GOVERNMENT WITNESS, SWORN

11                    DIRECT EXAMINATION

12  BY MS. STEVENS:

13     Q.  Who do you work for?

14     A.  The U.S. Coast Guard.

15     Q.  What's your rank, your current rank?

16     A.  A chief petty officer.

17     Q.  Okay.  And so at work do people typically call

18  you Chief?  Is that what you go by?

19     A.  Yes.

20     Q.  How long have you been with the Coast Guard?

21     A.  About 19 years, 11 months.

22     Q.  Oh, so close to retirement?

23     A.  Yes, ma'am.

24     Q.  Or retirement eligible.  And what do you

25  currently do for the Coast Guard?

1    A.   Currently, I work for the Sector Juneau, Alaska

2  communications.  I'm the communications supervisor for

3  the command center.

4    Q.   Just give the members of the jury an idea of what

5  that job entails.

6    A.   Certainly.  So basically, I dictate a lot of

7  the -- I help write and dictate a lot of policies for

8  communications in the southeast Alaska.  Also, I liaison

9  with our contractors, technical folks, if you will, and

10  we supply support for all our VHF sites.  Also provide

11  support for our subordinate units as well.  Also, I

12  manage probably about close to 15 enlisted personnel

13  that are underneath me.

14    Q.   Prior to your current position, Chief, where were

15  you assigned?

16    A.   You want me to start from the beginning?

17    Q.   Sure.

18    A.   First assignment was at Group Southwest Harbor,

19  Maine.  I was there for about three years.  Then I went

20  to Texas for about seven years, three years on the Coast

21  Guard cutter Dauntless.  It's a 210-foot endurance

22  cutter.  And then four years at Air Station Houston.

23        And then from there, I got assigned to

24  Communications Station Kodiak, Alaska for about five

25  years.  After that I transferred to the District 17

office in Juneau, Alaska for four.  And I just currently

transferred this summer to the Sector Juneau, Alaska

command center.

Q.  So it sounds like going on your ninth year here

in Alaska?

A.  Yes, ma'am, that's right.

Q.  Safe to say you like it here?

A.  I love Alaska, yes.

Q.  And you are currently a chief petty officer?

A.  Yes.

Q.  Kind of help the jury understand the significance

of being a chief petty officer in the Coast Guard.

A.  Certainly.  So basically a chief, it's the best

way of kind of describing it, is an enlisted person, E6

and below, first class petty officers and below, they're

sort of a big backbone of the workforce.  Okay.  Once

you make E7, you step up into a more senior leadership

position in the enlisted ranks, which is a monumental

step forward into your career in the Coast Guard.

What is that designed with?  Well, basically

you're looking at really shaping the enlisted workforce

is part of my duties as locally, and then as you get up

in the chief ranks, you can manage our workforce in the

enlisted ranks from a broad spectrum throughout the

Coast Guard, if you will.

Also, part of my duties as a chief petty officer, I'm a technical expert in my field. With that also I mentor junior petty officers as well as junior officers, typically junior officers that are coming into the Coast Guard. They're coming from the OCS and command -- or the Coast Guard Academy, really don't know much about it.

So typically what they have us do when they're being mentored themselves is they ask their chief. And that's where my part comes in. So I have a unique role of mentoring not only junior enlisted but junior officers as well.

Q. Great. So part of your vernacular, I imagine it's a lot of acronyms?

A. Uh-huh.

Q. So you mentioned OCS?

A. So that's officer Candidate School. So it's basically folks that have a degree or they can apply for this school, and from there, they do some like rigorous training, typically like 16 weeks and from there they get a commission as an officer in the United States Coast Guard as well.

Q. So, Chief, is it accurate to say that a chief petty officer is naturally respected by others given their rank as a chief?

1    A.   Absolutely.

2    Q.   You touched upon it a little bit, and I just

3  wanted to spend a little bit more time here.  What's the

4  interplay between the chiefs and the officers, the war

5  room?

6    A.   So basically, for the junior officers, those are

7  typically your O4 and below or lieutenant commander and

8  below, they really lean upon their chief petty officers

9  as technical experts, experts in workforce management

10  and they -- what they call is they glean off their

11  experience that they've had in the field, in the

12  enlisted field, to really dictate policy for United

13  States Coast Guard locally and broadly as well.  I hope

14  that kind of --

15    Q.   Thank you, Chief.  Are you a little nervous

16  today?

17    A.   A little bit.

18    Q.   So when you were assigned to the COMMSTA in

19  Kodiak, had you put on your anchors yet?  Had you

20  promoted to chief yet?

21    A.   I had not when I initially had been assigned

22  there.

23    Q.   Where were you assigned at the COMMSTA?

24    A.   I was assigned to the communications watch floor

25  that's right above -- I guess our main building in T-1,

1   I guess they would call that.

2       Q.  What did you do there?

3       A.  I was communications watch officer.

4       Q.  What did that job entail?

5       A.  Just a couple things.  Number one, you're sort of

6   the officer of the day.  Basically, you're responsible

7   for just looking out for the facilities, making sure if

8   there's like a fire or any sort of emergency that

9   happens, we're supposed to make sure that we call up

10  emergency services to make sure that gets done or we

11  go -- basically, there as the first responder just to

12  see how it goes.

13      We're also responsible for the commanding officer

14  at that time as the officer of the day.  Also, I was

15  also in charge of maintaining -- or rather of making

16  sure all of our communications equipment at COMMSTA

17  Kodiak was running, making sure that we were getting all

18  our -- all our operations complete out there, gets us

19  a -- various things in the communication field.

20      Q.  Did that include the antennas, both the

21  transmitters and receivers?

22      A.  Yes, ma'am.

23      Q.  You mentioned you're up in the T-1 building.

24  Were the folks stationed up in T-1 fairly separate from

25  the rigger shop and the folks in T-2?

1    A.  They were.

2    Q.  Okay.  While acting as a watch officer, did you

3    have an opportunity to become familiar with the cameras

4    in the COMMSTA, in and around the COMMSTA?

5    A.  I was.

6    Q.  And how so?

7    A.  Well, we used it as part of our duties for

8    security, safety and to also monitor our antennas out in

9    the antenna field.

10   Q.  So you would see the cameras on a daily basis and

11   the screens of what they captured?

12   A.  We would.

13   Q.  Was there a standard operating procedure or any

14   written guidance as it related to the cameras?

15   A.  Not that I can specifically remember with the

16   written guidance.

17   Q.  Any general practice with the cameras?

18   A.  Yes.  So our general practice was we would --

19   primary function for the camera would be security, so we

20   would try to keep it at all the entrances of the fenced

21   area for T-1, also monitor T-2 as well.

22   Q.  So we're going back a couple years now.  I know

23   you haven't been there for two tours, but can you to the

24   best that you can explain to the members of the jury the

25   outdoor cameras located on the T-1 building or around

1  the T-1 building?

2     A.  Certainly.  So start with T-1.  So I believe

3  T-1 -- again it's been about, you know, five years since

4  I've been stationed there.  But I believe there was one

5  that was on -- there's like a little antenna structure

6  that was on the front of the building that was a pan

7  tilt zoom that kind of monitored our parking lot, the

8  front gate area.

9        We also had one that was out there towards the

10  back corner of the perimeter fence out in the parking

11  lot.  I would say there's a parking lot right here, and

12  then the camera was on a pole that was right here.

13  Also, we had another -- that was a tilt zoom 360 camera

14  as well.

15        Then we also had one in our back corner of the

16  perimeter fence, the back right corner near the loading

17  gate.  There was a pole out there that we would use for

18  pan tilt zoom 360 as well.  And then down at T-2 we had

19  one camera I believe that one was right at the front of

20  the building, I think.  I don't remember the position of

21  it, but we did have one at T-2.

22     Q.  And the pan tilt zoom camera you mentioned on the

23  front antenna that looked down at the road and parking

24  lot in front of T-1, did that also capture the water

25  treatment plant in the background?

1    A.   It can, yes.

2    Q.   All right.  And then the T-2 one, did you mention

3  if this was on the front of the T-2 building?

4    A.   Yes, I said it was at the front of the building,

5  I believe.

6    Q.   And that generally looked at what?

7    A.   At the parking lot and then the road area as

8  well.

9    Q.   Did that include the flagpole?

10    A.   It did.

11    Q.   So what have you done, Chief, to prepare yourself

12  for your testimony today?

13    A.   Just looked over my previous statements and we

14  also did look at the video as well.

15    Q.   Okay.  So we're going to be showing you some

16  exhibits for foundational purposes.

17         Blair, let's start with Exhibit 55.

18  BY MS. STEVENS:

19    Q.   So do you remember this video, Chief?

20    A.   I do.

21    Q.   And is this a video captured from the front

22  camera on the T-1 outdoor antenna in the front of the

23  building that you just testified?

24         MR. CAMIEL:  I'm going to object to leading.

25  He should describe the exhibit rather than --

1           THE COURT:  Fair enough.  That's sustained.

2    BY MS. STEVENS:

3       Q.  Do you recognize this video?

4       A.  It's the front camera that should be pointed out

5    near the antenna.  Again, it's a 360.  Typically get

6    that pointing right there at the front gate area.

7       Q.  And the video you just -- you just watched, does

8    that video accurately capture the video at the time it

9    was taken?

10      A.  It does.

11          MS. STEVENS:  Your Honor, we move to admit 55.

12          MR. CAMIEL:  No objection.

13          THE COURT:  All right.  55 is admitted.

14          (Exhibit No. 55 admitted)

15          MS. STEVENS:  Let's go ahead and we'll play

16   this one.

17          (Exhibit No. 55 playing in open court)

18   BY MS. STEVENS:

19      Q.  Chief, as we watch this, what's the date down

20   there?

21      A.  This is 4-11-2012.

22      Q.  The time?

23      A.  It's 09:02 a.m.

24      Q.  And do you recognize that individual walking up?

25      A.  I do.

1      Q.  Blair, you can pause it.

2          Who is that?

3      A.  It looks like Jim Wells.

4      Q.  How do you recognize him?

5      A.  Just by his gait, I guess you would call it.  He

6  had a beard at the time.  He had a flannel.  Always wore

7  a hat.

8      Q.  You can keep playing that.

9          And the next one we're going to look at is 56,

10 Blair, for foundation.

11         Do you recognize this video, Chief?

12     A.  I do.

13     Q.  And does it accurately capture what was taken on

14 the date listed there?

15     A.  It does.

16         MS. STEVENS:  Your Honor, we move for the

17 admission of 56.

18         MR. CAMIEL:  No objection.

19         THE COURT:  56 is admitted.

20         (Exhibit No. 56 admitted)

21         MS. STEVENS:  Let's go ahead and play this.

22         (Exhibit No. 56 playing in open court)

23 BY MS. STEVENS:

24     Q.  What's the date on there?

25         Pause it, Blair.

1    A.   It's 4-11-2012, 9:15 a.m.

2    Q.   Okay.  Go ahead and play it.

3         So can you describe what just happened?

4    A.   The camera was moved from the entrance area to --

5    out to what is facing -- looks like one of our antennas.

6    Q.   What's the general practice after a camera is

7    moved?

8    A.   If there's moved we should move it back to the

9    entrance area.

10   Q.   Now, I'm going to show you for foundation 57.  So

11   this is a still photo.  Do you recognize this?

12   A.   I do.  This is the camera from the back corner of

13   the perimeter -- I would say rather right there in the

14   parking lot.

15   Q.   And what does this camera generally train on?

16   What's it generally looking at?

17   A.   It's generally where it's at right now, the

18   parking lot area.

19   Q.   Is that structure up there in the right-hand

20   corner, do you recognize that?

21   A.   Are you talking about --

22   Q.   The building.

23   A.   Yes.  This one is T-1.

24   Q.   Does this photograph accurately represent the

25   still picture from this camera as it was taken on the

1  11th?

2     A.  It does.

3        MS. STEVENS:  Your Honor, we move for the

4  introduction of 57.

5        MR. CAMIEL:  No objection.

6        THE COURT:  57 is admitted.

7        (Exhibit No. 57 admitted)

8  BY MS. STEVENS:

9     Q.  You can publish that one, Blair.  Thank you.

10       So let's see here.  This right here, this

11  structure, what's that?

12    A.  That's the little tower.  I think it had a -- it

13  had another antenna on it, but it also had the camera

14  system on it as well from the one that faces the gate

15  that was previously shown.

16    Q.  And then how about this, what's that?

17    A.  That one is T-2.

18    Q.  And as this angle is, do you see any of Anton

19  Larsen Road?

20    A.  I do not.

21    Q.  You can take that one down.  The next one we're

22  going to show for foundation is 59.

23       Do you recognize this photo, Chief?

24    A.  I do.  It's the same camera.

25    Q.  And just for purposes of the record, explain

1  which camera this is.

2      A.  It's the camera from the front parking lot, back

3  corner perimeter fence.

4      Q.  Is this an accurate picture of that camera

5  footage as it was taken in the still photograph on the

6  date listed there?

7      A.  It is.

8          MS. STEVENS:  Your Honor, we move to admit 59.

9          MR. CAMIEL:  No objection.

10          THE COURT:  All right.  59 is admitted.

11          (Exhibit No. 59 admitted)

12  BY MS. STEVENS:

13      Q.  And do you recognize who is in this photograph?

14      A.  I do.  It's Jim Wells.

15      Q.  And what time does it say?

16      A.  11:51 a.m.

17      Q.  And the date?

18      A.  It's 4-11-2012.

19      Q.  Blair, you can take that one down.

20      The next one is 60, please, for foundation.  Do

21  you remember this video, Chief?

22      A.  I do.

23      Q.  And does this video -- well, tell us briefly what

24  it's of.

25      A.  It is the camera from the front of the parking

1    lot, T-1, the perimeter fence in the far corner.

2        Q.  Does this video footage accurately represent the

3    video footage that was taken on the date listed there?

4        A.  It does.

5            MS. STEVENS:  Okay.  Your Honor, we move to

6    admit 60.

7            MR. CAMIEL:  No objection.

8            THE COURT:  All right.  60 is admitted.

9            (Exhibit No. 60 admitted)

10   BY MS. STEVENS:

11       Q.  So we're going to play this video, Chief.  And we

12   may pause it a couple times during it.  I'm going to ask

13   you a couple questions as we go.  Okay?

14       A.  Okay.

15       Q.  So first and foremost -- you can play it.

16   Thanks.

17           (Exhibit No. 60 playing in open court)

18   BY MS. STEVENS:

19       Q.  What date is down at the bottom?

20       A.  It's 4-11-2012 or April 11, 2012.

21       Q.  And the time?

22       A.  It's 1:15 p.m.

23       Q.  What do you see happening there in the back left

24   corner?

25       A.  It looks like there are some -- a group of people

1  that are coming up.

2      Q.  Where are they coming up from?

3      A.  Looks like they're coming up from the ramp,

4  probably from T-2.

5      Q.  And do you recognize what some of those

6  individuals in this footage are wearing?

7      A.  Yeah.  Three -- they are Coast Guard uniforms, so

8  those are probably Coast Guard members.

9      Q.  Okay.  And what kind of uniform are they wearing?

10     A.  It's our operational dress uniform, ODU for

11 short.  They're typically blue in color.

12     Q.  Blair, you can go ahead and pause it.

13         Do you recognize anybody else in this screen

14 shot?

15     A.  Yes.  The one that's not wearing blue was Jim

16 Wells.

17     Q.  How do you recognize him?

18     A.  Again, by just the way he's walking, the flannel

19 uniform he had -- or the flannel that he has, the hat

20 that he wore.

21     Q.  Did he usually wear a flannel?  Is that a common

22 thing that he wore?

23     A.  Typically, yes.

24     Q.  All right.  And Blair, you can finish that one.

25         And in the background coming up the hill, the

1    straggler there, do you recognize that individual?

2        A.   I do.

3        Q.   Who is that?

4        A.   It's Rich Belisle.

5        Q.   How do you recognize him?

6        A.   Just sort of clothes that he used to wear, the

7    way he's walking, used to wear the hat, had a beard.

8    Typically wore hoodies.

9        Q.   And where are they standing?  What building are

10   they in front of?

11       A.   They're standing in front of T-1.

12       Q.   Let's go ahead and pull up Government Exhibit 61

13   for foundation.

14            Do you recognize this?

15       A.   I do.  This is the camera on the backside of T-1

16   that typically has -- it's on a pole.  And it's a

17   360 pan tilt zoom camera as well.

18       Q.   And does this footage accurately capture the

19   footage as it was taken on that date?

20       A.   It does.

21            MS. STEVENS:  Your Honor, we move to admit 61.

22            MR. CAMIEL:  No objection.

23            THE COURT:  61 is admitted.

24            (Exhibit No. 61 admitted)

25            MS. STEVENS:  Blair, if you can go ahead and

```
1   play that.
2           (Exhibit No. 61 playing in open court)
3           MS. STEVENS:  Go ahead and pause it.
4   BY MS. STEVENS:
5      Q.  All right.  Let's point out a couple things here.
6   So first and foremost, for the record, can you state the
7   date?
8      A.  It's April 11th, 2012.
9      Q.  And the time?
10     A.  1:19 p.m.
11     Q.  And this is a view from where?
12     A.  This is from the top of T-1 building.
13     Q.  That's what we're looking at?
14     A.  Yes, ma'am.
15     Q.  And what is the structure here, for orientation
16  purposes?
17     A.  So that's the antenna that's right at the front
18  of the building where we had the camera, the front
19  camera, that was aiming at the entrance.
20     Q.  The parking lot and the entrance?
21     A.  Yes, ma'am.
22     Q.  Who is this person right here?
23     A.  That's Jim Wells.
24          MS. STEVENS:  And let's play it.
25          (Exhibit No. 61 playing in open court)
```

1  BY MS. STEVENS:

2     Q.  Pause it, Blair.

3         Do you recognize who this individual is?

4     A.  Yes, Rich Belisle.

5     Q.  All right.  And were you aware of whether they

6  were supposed to be up on the T-1 roof that day, do you

7  remember?

8     A.  I want to say I did, because it was practice to

9  where if they were going aloft they would tell me.

10    Q.  Do you happen to know what they were doing, do

11  you remember?

12    A.  I don't remember.

13    Q.  We can go ahead and keep playing this.

14        The person that just got up on the roof, does

15  that appear to be a civilian or a Coast Guard member?

16    A.  It looks like a Coast Guard member.

17    Q.  Why is that?

18    A.  The uniform.  It looks like it's ODUs that he's

19  wearing.

20    Q.  The next one for foundation is Government

21  Exhibit 62, please, Blair.

22        Chief, do you know what this is?

23    A.  I do.

24    Q.  What is it?

25    A.  It is the camera from the front of the parking

1  lot, the perimeter, on the perimeter corner.

2      Q.  Looking down at what?

3      A.  It's looking out at the parking lot, T-1, and

4  parts of T-2 as well.

5      Q.  And does this -- you reviewed this footage

6  before, correct?

7      A.  I did.

8      Q.  Is this accurate footage of the time of when this

9  camera captured what's on here?

10     A.  It is.

11         MS. STEVENS:  Okay.  Your Honor, we move to

12 admit 62.

13         MR. CAMIEL:  No objection.

14         THE COURT:  62 is admitted.

15         (Exhibit No. 62 admitted)

16 BY MS. STEVENS:

17     Q.  So what we're going to do now, this is a rather

18 lengthy video.  So we're going to go ahead and play it,

19 Chief, and pause it throughout certain times.  I'm just

20 going to ask you some questions as we play it.  It's

21 approximately -- it's about 30 to 40 minutes.

22         THE COURT:  I'm showing by your exhibit list

23 it's about 40.  So we may not be able to complete it

24 today.  We may need to stop it in the middle, just to

25 give you the heads up because it's 4:20 now.

1          MS. STEVENS:  We'll start it.

2          THE COURT:  All right.  Very good.

3          MS. STEVENS:  So Blair, go ahead and play it.

4          (Exhibit No. 62 playing in open court)

5    BY MS. STEVENS:

6    Q.  A couple things here, Chief, I want you to point

7    out for us.  So what's this back here?

8    A.  It looks like part of the parking lot for T-2 as

9    well as the road, Anton Larsen Road.

10   Q.  And then there's some little furry critters up in

11   the front.  What are those?

12   A.  Those are Sitka black tail deer.  I know those

13   quite well.

14   Q.  Do you ever get any bears trying to get through

15   the fence?

16   A.  Oh, yeah.  When I first came in, they tore right

17   through the fence.  It was pretty scary.

18   Q.  Go ahead and just -- what's the date on that?

19   A.  It's April 12, 2012.  Time is -- right now it's

20   7 a.m.

21   Q.  Go ahead and play it.

22       Did you see that, Chief?

23   A.  Oh.

24   Q.  Oh, he was getting water.  Sorry.  Let's back up

25   a little bit.

1    A.   My apologies.

2    Q.   You got to keep your eyes on the screen.

3    A.   I apologize.

4    Q.   That's all right.  We'll back up just a little

5    bit.

6         And whose truck is that?  I'm sorry.  Let me

7    rephrase.  Do you know whose truck that is?

8    A.   Yes.  That looks like it was Rich Belisle's

9    truck.

10   Q.   And the time there?

11   A.   It's 07 a.m.

12   Q.   And where did that truck go?

13   A.   It parked right in the front of the T-2 building.

14   Q.   I want to direct your attention to that right

15   there.  Do you know what that is?

16   A.   Yes.  That's the window that I believe peeks out

17   into the wood shop out there in T-2.

18   Q.   Do you know why that window is that color?

19   A.   It looks like the light is on right now.

20   Q.   You've reviewed this video, correct?

21   A.   I have.

22   Q.   Does that light ever turn off and does anything

23   happen to that light?

24   A.   I don't recall.

25   Q.   Did you see that?

1    A.  Yeah.  I'm sorry.

2    Q.  That's okay.  It looks like we've got someone

3  arriving to work?

4    A.  It is.  Yeah.

5    Q.  And where does it look like this person is going?

6    A.  It looks like they're going to be going to

7  probably -- the time of the day is they're probably

8  going to relieve the watch.

9    Q.  And the gate that they just went through, is

10  that --

11    A.  Yeah.  It's the entrance gate they have.  That's

12  where we typically have -- people are scanned in to go

13  in there.

14    Q.  Can you explain to the members of the jury what

15  access you needed to get through that gate?

16    A.  Yes.  So there was like a particular access

17  machine that we had.  It wasn't anything -- any

18  clearance per se, but we were screened and we were given

19  access using cards that we used to generate for our

20  members that worked specifically at the COMMSTA.

21    Q.  Did you see that?

22    A.  I did.

23    Q.  What was that?

24    A.  That looked like some sort of white truck.

25    Q.  Where did that truck appear to go?

1    A.   It looked like it was going down Anton Larsen

2  Road.

3    Q.   What time was that?

4    A.   I didn't catch the time, but right now it's at

5  0703.

6    Q.   Chief, what time did you normally wake up in the

7  morning?

8    A.   At that time, probably around 5:30 a.m.

9    Q.   What time did you typically get into work?

10   A.   About 7:00.

11   Q.   Do you recall whether you worked the day before,

12  on the 11th?

13   A.   I couldn't recall at the time, no.

14   Q.   Do you now recall whether you worked?

15   A.   I do now.

16   Q.   And what was the answer?

17   A.   Yes.  Yes, I did work.

18   Q.   What was your general routine when you got to

19  work in the morning?

20   A.   Generally, when I got into work, general routine

21  was to do rounds of both buildings, T-2, T-1.  And then

22  after that, just kind of get ready for the workday.

23  Sometimes I would -- if I could squeeze in a workout

24  right before everybody started coming, I liked to do

25  that as well.

1    Q.   When you worked out, where did you do that?

2    A.   We had a gym at the basement of the T-1 is where

3    I would typically work out at.

4    Q.   Is it the same place where the gauges are for the

5    cables for the antennas?

6    A.   It is.

7    Q.   I noticed that the gate, the car gate, the

8    sliding gate is open.  Can you explain why?

9    A.   Yes.  So typically for sort of ease of movement,

10   the watch stander if we know people are just kind of

11   coming in, depending on what our force protection was

12   at, it was kind of -- we had the ability to leave the

13   gate open if we had to.

14   Q.   I want to just focus your attention here for the

15   next couple of seconds.  What do you see there?  What

16   did you just see?

17   A.   It looked like there was a person that was

18   probably either jogging or walking.

19   Q.   And that time, did you note the time there?

20   A.   It was around 7:08 is what I have right now.

21   Q.   Okay.  So walk us through what just happened up

22   here.

23   A.   It looks like there there's a couple cars that

24   just kind of came in.

25   Q.   Do you remember what time you arrived to work

1  that morning?

2      A.  It had to have been around 7:00, between 7:05,

3  7:10, something like that.

4      Q.  Do you remember your drive in that morning?

5      A.  I do.

6      Q.  Tell the members a little bit about what you

7  remember.

8      A.  Yeah.  It was just kind of an icy day.  It was

9  pretty nice just to have a little bit more sun starting

10  to come out after these long Alaska winters, long winter

11  that year.  And right in front of me was a couple of

12  guys I knew that were -- I was driving down the road and

13  there was a couple of vehicles I didn't recognize.

14      Q.  Who was in front of you?

15      A.  Directly in front of me was Petty Officer

16  O'Connor, Kevin O'Connor.  He was one of the people that

17  I worked with.

18      Q.  Do you recall the vehicle he drove?

19      A.  I believe it was like a green SUV.

20      Q.  And was there anybody in front of him?

21      A.  It was.  That was Jim Hopkins.

22      Q.  And so where did Jim Hopkins pull into that

23  morning?

24      A.  He pulled into the T-2 parking lot to get to

25  work.

1    Q.  What kind of car did you drive?

2    A.  A blue 2009 Kia Sedona, minivan.

3    Q.  Who is that coming through the gate?

4    A.  That's me.

5    Q.  Did you see the -- did you see anybody just now

6  pull in?  What was that?  Did you see that?

7    A.  Yeah, that was -- looked like it was a white

8  truck, I think.

9    Q.  Note the time there.

10    A.  That was 7:09.

11    Q.  Okay.  All right.  Did you see that?

12    A.  I did.

13    Q.  What did you see there?

14    A.  Looked like some sort of blue vehicle.

15  Probably -- it's probably too small for a sedan, so it's

16  probably like an SUV-type vehicle.

17    Q.  And the time?

18    A.  That was at 7:09.

19    Q.  So you get there.  That's you, right?

20    A.  It is.

21    Q.  Right there?

22    A.  Yes.

23    Q.  Okay.  Go ahead and play it.

24    Who is that leaving?

25    A.  I can't -- I don't remember.

1    Q.  Chief, I'm going to direct your attention up to

2    that road again.  Keep your eyes on it up there.

3         What do you see there?

4    A.  So it looks like there's a person walking on

5    Anton Larsen Road.

6    Q.  Okay.  When you would drive into work on any

7    given morning, who would you typically see already down

8    at the T-2 rigger shop?

9    A.  Typically, I would see --

10        MR. CAMIEL:  Your Honor, I'm sorry.  I don't

11   mean to interrupt, but while the exhibit is playing,

12   asking questions about other things is distracting.  I

13   think the jury should be able to concentrate on the

14   video, and the questions should be related to the video.

15        THE COURT:  Are you going to tie this into the

16   video?

17        MS. STEVENS:  I'll just save that question for

18   later.

19        THE COURT:  Thank you.

20        MS. STEVENS:  I was just trying to be

21   efficient.

22        THE COURT:  No, no, that's fine.

23   BY MS. STEVENS:

24   Q.  Did you see that, Chief?

25   A.  I did.

1      Q.   What did you see there?

2      A.   It looks like that there was a blue SUV going

3   down Anton Larsen Road.

4      Q.   And note the time?

5      A.   It's 7:14 a.m.

6           MS. STEVENS:  You can pause it.

7           So Your Honor, this would be a logical stopping

8   point.

9           THE COURT:  That's fine.

10          MS. STEVENS:  Even though we're still a little

11  before 5:00 p.m.

12          THE COURT:  That's fine.  Pick up here tomorrow

13  morning?

14          MS. STEVENS:  That would be my suggestion.

15          THE COURT:  That's fine.  8:30, what do you

16  think, Counsel?

17          MS. STEVENS:  Yeah.

18          THE COURT:  Mr. Colbath, Mr. Camiel?

19          MR. CAMIEL:  Your Honor, there's one issue --

20          THE COURT:  Could we take it up now?

21          MR. CAMIEL:  We could.

22          THE COURT:  So tomorrow, ladies and gentlemen,

23  you may recall I said on Fridays, we're going to stop

24  right about noon.  And so plan accordingly.  And is

25  every -- is it convenient for everyone to be here ready

1   to go at 8:30 a.m.?  And then we'll have that extra time

2   in the early part of the day.

3          Seeing no opposition, please leave your

4   notepads here.  Remember my admonition not to discuss

5   the case with family or friends or do any research.

6   Have a pleasant evening.  We'll see you at 8:30 a.m. in

7   the morning.

8          (Requested excerpt concluded, proceedings

9   continued.)

10

11                    CERTIFICATE

12     I, Sonja L. Reeves, Federal Official Court Reporter
    in and for the United States District Court of the
13  District of Alaska, do hereby certify that the foregoing
    transcript is a true and accurate transcript from the
14  original stenographic record in the above-entitled
    matter and that the transcript page format is in
15  conformance with the regulations of the Judicial
    Conference of the United States.
16
       Dated this 17th day of September, 2019.
17

18
                         /s/ Sonja L. Reeves
19                       SONJA L. REEVES, RMR-CRR
                         FEDERAL OFFICIAL COURT REPORTER
20

21

22

23

24

25