```
 1              UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF ALASKA
 2

 3   UNITED STATES OF AMERICA, )
                               )
 4        Plaintiff,           )
                               )
 5   vs.                       )  CASE NO. 3:13-cr-00008-SLG
                               )
 6   JAMES MICHAEL WELLS,      )
                               )
 7        Defendant.           )
     _____)
 8

 9        PARTIAL TRANSCRIPT OF TRIAL BY JURY - DAY 5
                 (Testimony of Michael Haselden)
10   BEFORE THE HONORABLE SHARON L. GLEASON, DISTRICT JUDGE
                 September 13, 2019; 8:36 a.m.
11                     Anchorage, Alaska

12   FOR THE GOVERNMENT:
          Office of the United States Attorney
13        BY:  STEVEN SKROCKI
          BY:  CHRISTINA M. SHERMAN
14        BY:  KELLEY L. STEVENS
          222 West 7th Avenue, #9
15        Anchorage, Alaska 99513
          (907) 271-5071
16

17   FOR THE DEFENDANT:
          Office of the Federal Public Defender
          BY:  GARY GEORGE COLBATH
18        601 West 5th Avenue, Suite 800
          Anchorage, Alaska 99501
19        (907) 646-3400

20        Camiel & Chaney, P.S.
          BY:  PETER A. CAMIEL
21        520 Pike Street, Suite 2500
          Seattle, Washington 98101
22        (206) 624-1551

23   _____

              SONJA L. REEVES, RMR-CRR
24            Federal Official Court Reporter
              222 West 7th Avenue, #4
25            Anchorage, Alaska 99513
      Transcript Produced from the Stenographic Record
```

1          (Call to Order of the Court at 8:36 a.m.)

2          (Proceedings took place and are not included in

3     this transcript, after which, the testimony of Michael

4     Haselden transpired as follows:)

5          (Jury present)

6          THE COURT:  Good morning everyone.  Please be

7     seated.

8          We are back on record here in United States

9     versus Wells.  And I'll remind you you're still under

10    oath from yesterday's proceeding.

11         And Ms. Stevens, go ahead, please.

12                    DIRECT EXAMINATION

13              (Of Michael Haselden Continued)

14    BY MS. STEVENS:

15    Q.   Good morning, Chief.  Welcome back.

16    A.   Good morning.

17    Q.   So yesterday we left off at around this time.

18    Can you just state for the record the date and time you

19    see of this screen shot here just to orient everyone?

20    A.   It's April 12, 2012.  The time is 7:14 a.m.

21    Q.   And just which camera is this?

22    A.   This is the parking lot, T-1 parking lot camera

23    on the side of the perimeter of the fence.

24         MS. STEVENS:  Your Honor, for the record, this

25    is Government Exhibit 62 where we left off yesterday.

1          THE COURT:  Thank you.

2          MS. STEVENS:  So Blair, you can go ahead and

3    start it again, please.

4          (Exhibit No. 62 playing in open court)

5    BY MS. STEVENS:

6    Q.  Chief, do you recognize that person walking

7    through the parking lot there?

8    A.  I don't.

9    Q.  How about this individual walking up?

10   A.  No, ma'am.

11   Q.  Do you recognize what that person is wearing?

12   A.  Yes.  He's wearing the Coast Guard Operational

13   Dress Uniform.

14   Q.  What do you see going on back there with that

15   vehicle?

16   A.  The vehicle looks like it's just kind of -- was

17   kind of circling around the parking lot.  It might have

18   departed.  I couldn't quite -- okay.  Looks like he's

19   just circling the parking lot.  Probably waiting for one

20   of the watch standers.

21   Q.  Do you recognize that individual?

22   A.  No, ma'am.

23   Q.  What does the time say down there at the bottom?

24   A.  It's 7:19 a.m.

25   Q.  What do you see happening here?

1    A.   Looks like there's a vehicle approaching the gate
2   and looks like he's about to come in.
3    Q.   Do you recognize that vehicle?
4    A.   I do not.
5    Q.   What do you see there?
6    A.   So it looks like there's a truck that's
7   departing.
8    Q.   What time is that?
9    A.   7:21 a.m.
10    Q.   Did you recognize that person?
11    A.   I think that might be Sam Gaynor.
12    Q.   And note the time there.
13    A.   It's 7:25.
14    Q.   Up until Mr. Gaynor or who you think may be
15   Mr. Gaynor walked out there, had there been any activity
16   since that one truck departed?
17    A.   No.
18    Q.   Did you see that?
19    A.   I did.
20    Q.   What was that?
21    A.   Some sort of red vehicle.  And that's at
22   7:25 a.m.
23    Q.   Thank you.  What do you notice there?
24    A.   It looks like Mr. Gaynor is departing with his
25   wife down the ramp.

1      Q.  What do you see there?

2      A.  Looks like it's somebody about to get on his bike

3  and -- to leave.

4      Q.  Do you know who that was, do you remember?

5      A.  I don't remember.

6      Q.  Note the time there, please, Chief.

7      A.  It's 7:30 a.m.

8      Q.  Chief, I want to focus you right here for the

9  next couple seconds.  Did you see that?

10     A.  I did.

11     Q.  Note the time, please.

12     A.  It's 7:31.

13     Q.  And what did you just observe there?

14     A.  Looked like it was a vehicle that pulled in.

15     Q.  Pulled into where?

16     A.  To T-2 parking lot.

17     Q.  Go ahead.

18         And keep your attention in that area for us,

19  please.  What did you see there?

20     A.  Looks like there was a person that just walked

21  away from the T-2 building.

22     Q.  Okay.

23     A.  That's at 7:32 a.m.

24     Q.  Thank you.  And what do you see going on in that

25  same area back there on the screen?

1    A.  Looks like it's a Coast Guard person, he's

2  wearing his ODUs, coming up the hill from T-2.

3    Q.  Go ahead and stay focused down on here for us,

4  please.  Did you notice that?

5    A.  I did.  It's another vehicle pulling in the T-2

6  parking lot at 7:34.

7    Q.  Okay.  Did you notice what this person here did

8  by chance?

9    A.  You know, I was focused on that one.

10    Q.  I did tell you to focus there.  All right.

11       Keep focus back here, please.  Did you see that?

12    A.  I did.  Another vehicle that pulled into the

13  parking lot at 7:34 a.m.

14    Q.  Did you mean 7:34?

15    A.  I did.  Did I say 7:34?  I think I did say 7:34,

16  right.

17    Q.  Does that appear to be the car that just came

18  from T-2?

19    A.  Really can't tell.

20    Q.  Okay.  What do you see there?

21    A.  Looks like there's a vehicle that's departing

22  right now.

23    Q.  Do you know whose car that was?

24    A.  I think that was Jason Bullis'.  But I'm not

25  quite -- I'm not too sure.

1    Q.  And note the time, please.

2    A.  7:35.

3    Q.  Can you describe what's going on there?

4    A.  Yeah.  It looks like there's another Coast Guard

5    personnel arriving to work carrying a cup of coffee.

6    Q.  Cup of coffee.  All right.  Thank you.  So is

7    this time around 7:30 generally when some movement

8    happens at the COMMSTA?

9    A.  Generally.

10   Q.  What would that be?

11   A.  I'm sorry?

12   Q.  So at 7:30 in the morning at the COMMSTA, what

13   was typically happening?

14          MR. CAMIEL:  The video is playing and there's a

15   question about what's going on, but not what's going on

16   in the video.

17          THE COURT:  Can you hold that thought,

18   Ms. Stevens, and come back to it?

19   BY MS. STEVENS:

20   Q.  Can you pause it?

21          So at 7:36, the time of this video, what is

22   generally going on at the COMMSTA?

23   A.  People are just slowly arriving to work getting

24   ready for the workday.  Not the watch.  The watch leaves

25   probably a little bit earlier, but people start coming,

1    staggering in.

2        Q.  Thank you.

3            (Exhibit No. 62 continues playing in open court)

4    BY MS. STEVENS:

5        Q.  Blair, can you pause it?

6            What do you see there?

7        A.  Again, another Coast Guard person.  Looks like

8    they're walking towards the gate.

9        Q.  What time?

10       A.  7:36.

11       Q.  Do you see that person's arms moving?

12       A.  I do not.

13       Q.  Where do the arms appear to be?

14       A.  They appear to be crossed around his chest.

15       Q.  Where is that person heading?

16       A.  He is headed to T-2.

17       Q.  Can you please note the time?

18       A.  7:37.

19       Q.  Okay.  Blair, you can take that one down.  And

20   let's move Government Exhibit 63 for foundation.

21           Chief, do you recognize this video?

22       A.  Yes, this is the camera that is at T-2.  It

23   should be located in the front of the building.  It's a

24   pan tilt zoom camera.

25       Q.  Did you have an opportunity to review this

```
 1   footage?
 2       A.  I did.
 3       Q.  And is it an accurate reflection of the footage
 4   as it was captured on April 12th?
 5       A.  It is.
 6           MS. STEVENS:  Your Honor, at this stage we move
 7   for the introduction of 63.
 8           THE COURT:  Any objection?
 9           MR. CAMIEL:  No.
10           THE COURT:  63 is admitted.
11           (Exhibit No. 63 admitted.)
12           THE COURT:  This one, just so the jury is
13   aware, is how long that you're going to play?
14           MS. STEVENS:  This one is about 30 minutes.
15           THE COURT:  All right.
16           (Exhibit No. 63 playing in open court)
17   BY MS. STEVENS:
18       Q.  Blair, can you go back, please?
19           So I want you to focus up here for us, Chief.
20       A.  Okay.
21       Q.  What is that green dome?
22       A.  That's the water treatment -- it was part of the
23   water treatment facility out there at the Buskin River.
24       Q.  Did you see what just passed back there?
25       A.  Yeah, looks like there was some headlights.
```

1    Q.  And now what do you see?

2    A.  Looks like it's a darker color blue or black.  I

3  can't tell from there.  I think it's blue.

4    Q.  Where is that vehicle going?

5    A.  It's going into the T-2 parking lot.

6    Q.  What time?

7    A.  7:00.

8    Q.  Thank you.  Where was that vehicle heading?

9    A.  That vehicle was headed up to the T-1 building.

10   Q.  I want you to focus up here, please.  Did you see

11  that?

12   A.  I did.  It looks like a vehicle, headlights on.

13  It looks like it was white with a camper.

14   Q.  And the time?

15   A.  7:02.

16   Q.  What did you see there?

17       Blair, if you can pause it.

18   A.  Looked like it was another vehicle, headlights

19  on.  I couldn't tell the make.  That's about 7:04.

20   Q.  Great.  Thank you.

21       Blair, can you pause it?

22       And where does that car appear to be heading?

23  Let me -- there you go.  Where does that car --

24   A.  Going to T-1.

25   Q.  What kind of car is that?

1     A.   It's a red truck.  That's at 7:04.

2     Q.   Does it appear to have its headlights on?

3     A.   It does.

4     Q.   Okay.  I want you to keep focused up in there,

5  the water treatment plant.  What do you see there?

6     A.   Another vehicle, headlights on.

7     Q.   Okay.  Pause it.  Where does that car appear to

8  be heading?

9     A.   That's going to T-2.  Headlights are on.  At

10 7:05.

11     Q.   Is it going to T-2?

12     A.   I'm sorry.  T-1.  My apologies.

13     Q.   Did you state the time?

14     A.   Yes, 7:05.

15     Q.   Thank you.  I want to focus your attention up

16 near the treatment plant.  Did you see that there?

17     A.   I did.  Vehicle again, headlights on.  Time is

18 7:08.

19     Q.   And again there?

20     A.   Yes.  Same thing.  And another one.

21     Q.   So how many cars just in sequence there?

22     A.   Three.  All three had their headlights on.

23     Q.   Thank you.  And the time?

24     A.   7:08.

25     Q.   Pause it.

1         Do you recognize that vehicle?

2    A.  I do.  The Dodge I believe belongs to Jim

3 Hopkins.

4    Q.  Where is that car going?

5    A.  That one is going to T-2.

6    Q.  Do you recognize the car behind it?

7    A.  Yes, it's Kevin O'Connor's.  That's going up to

8 T-1.

9    Q.  Go ahead.

10        And do you recognize that vehicle?

11   A.  Yep.  Yep, it's my car.  I'm going up to T-1.

12 That's 7:08.

13   Q.  Can you go back?

14        We're going to go back just a little.  Now I want

15 to focus your attention here.  Do you see that?

16   A.  I did.

17   Q.  And what did that appear to be?

18   A.  Appeared to be some sort of vehicle.  Didn't have

19 its headlights on.

20   Q.  Okay.  Blair, one more time.

21   A.  Some vehicle.  It did not have its headlights on.

22   Q.  Blair, if you can -- if you can try to enlarge

23 it.  I don't know if it will work with video.  All

24 right.  Go ahead and play it.

25        And what do you see right there?

1    A.   It looks like some sort of vehicle.  I guess a

2  truck.

3    Q.   What color is it?

4    A.   Looks like it's white.

5    Q.   Thank you.

6    A.   7:09.

7    Q.   Thank you.  What did you see there?

8    A.   Looked like some sort of SUV-type vehicle that

9  just left coming from T-1.  That was at 7:10.

10    Q.   Keep your attention -- did you just see that?

11    A.   Can you go back, please?

12    Q.   If you want to keep your attention near the water

13  treatment plant, please.  Did you see that?

14    A.   I did.  Looked like some sort of

15  undistinguishable vehicle just going back Anton Larsen

16  Road to the main road.  That's at 7:10.

17    Q.   Chief, go ahead and focus your attention up near

18  the water treatment plant.  What did you see there?

19    A.   Looks like there's another vehicle, headlights on

20  coming down Anton Larsen.  7:13.

21    Q.   Thank you.  What do you see there?

22    A.   Looks like there's a truck going up to T-1.

23  That's at 7:14.

24    Q.   Is that truck's headlights on?

25    A.   The truck's headlights is on.

1    Q.   Thank you.   Now, I want you to focus back to the

2    treatment plant, please.   Did you see that?

3    A.   I did.   Looked like some sort of vehicle moving

4    back down toward -- down Anton Larsen Road towards the

5    main road.

6    Q.   Can you note the time for us, please?

7    A.   7:14.

8    Q.   All right, Blair.   Thank you.   Can you pull up

9    number 64, please, for foundation.

10        Chief, have you seen this exhibit before?

11   A.   I have.

12   Q.   What is it?

13   A.   Looks like a still of vehicles that are -- stills

14   of the camera system showing a vehicle coming in and

15   out.

16   Q.   You've seen this before?

17   A.   I have.

18   Q.   Are these screen shots accurate depictions of the

19   video from which they were obtained from?

20   A.   I believe they are.

21        MS. STEVENS:   Your Honor, we move to admit 64.

22        MR. CAMIEL:   No objection.

23        THE COURT:   All right.   64 is admitted.

24        (Exhibit No. 64 admitted.)

25   BY MS. STEVENS:

1    Q.  So first, what I want to do, Blair, is just have

2    you click through all four and then we'll zoom in.

3    Okay?

4         Did you see that, Chief?

5    A.  I did.

6    Q.  And explain to the jurors what you saw.

7    A.  Looks like some sort of vehicle that was moving

8    down the road.

9    Q.  Did that vehicle appear to have its lights on?

10   A.  No.

11   Q.  Blair, can you zoom in there.  Let's watch that

12   again.  Let's go ahead and go to -- I'm sorry.  Can you

13   pull that back up real quick.

14        Can you state the date and time at the bottom for

15   the record?

16   A.  Yes.  It's April 12, 2012.  7:08 a.m.

17   Q.  7:08 and --

18   A.  Oh.  7:08 and 51 seconds.

19   Q.  And the next slide here.

20        Again, state the time.

21   A.  It's April 12, 2012, 7:08 and 51 seconds.

22   Q.  And then if you can just read the whole thing.

23   A.  Okay.  7:08:51.562.  7:08:51.717.  And

24   7:08:51.585.

25   Q.  Let me go back to that one.  Read that last part

 1  again.

 2      A.  7:08:51.858.

 3      Q.  And that one?

 4      A.  7:08:52.105.

 5      Q.  All right.  And let's go ahead and pull up 65 for

 6  foundation.

 7          Do you recognize this, Chief?

 8      A.  I do.  This is a still of -- again, a still of

 9  the camera that we have at T-2.

10      Q.  Let's go ahead and scroll through.  Did you have

11  an opportunity to see all those slides?

12      A.  I have.

13      Q.  Did you recognize them?

14      A.  I do.

15      Q.  Are they an accurate depiction of the video?

16      A.  They are.

17          MS. STEVENS:  Your Honor, we move for 65, to

18  admit 65.

19          MR. CAMIEL:  No objection.

20          THE COURT:  All right.  65 is admitted.

21          (Exhibit No. 65 admitted.)

22  BY MS. STEVENS:

23      Q.  All right.  Same thing.  Let's go ahead and

24  scroll through these, Blair.

25          And go ahead and explain to the members what it

1    is you see there.

2        A.   Again, looks like it's a vehicle that's moving

3    through that area of the water treatment facility.  I

4    can't -- it doesn't have headlights on or anything like

5    that that I can tell.

6        Q.   What direction is it heading?

7        A.   Looks like it's heading towards the main road.  I

8    think it's Rezanof is the main road.  Down Anton Larsen.

9        Q.   Let's go ahead and close that out and then look

10   at the times.  So for the first slide, what does the

11   date and time say at the bottom?

12       A.   So date is April 12, 2012.  Time is 7:14.47.328.

13       Q.   And this one?

14       A.   This is 07:14:47.483.  And 7:14:47.640.  And

15   7:14:47.780.

16       Q.   Let's go ahead and take that one down and put 66

17   up for foundation.

18            Chief, do you recognize this video?

19       A.   I do.

20       Q.   How so?

21       A.   That's me running down in that video.

22       Q.   Does this video accurately reflect the footage

23   captured on April 12th?

24       A.   It does.

25            MS. STEVENS:  Your Honor, we move to admit 66.

```
 1              MR. CAMIEL:  No objection.

 2              THE COURT:  66 is admitted.

 3              (Exhibit No. 66 admitted)

 4    BY MS. STEVENS:

 5       Q.  Before -- you can just pause it there, Blair.

 6            Before we play this, can you go ahead and state

 7    the date and time?

 8       A.  Date is April 12, 2012.  Time is 7:49 a.m.

 9            (Exhibit No. 66 playing in open court)

10    BY MS. STEVENS:

11       Q.  Where are you heading?

12       A.  I was heading down T-2.

13       Q.  Chief, do you usually run that fast?

14       A.  No.

15       Q.  And why are you running down to T-2?

16       A.  Well, I had that time received a report that

17    there was a situation going down at T-2.  I think I

18    outlined my duties yesterday as the officer of the day.

19    The report was that -- it came from my third-class petty

20    officer.  His name was Jared Andrews.  I was working

21    out.  He said that there's some sort of situation.  One

22    or both, either Rich or Jim Hopkins was hurt, lying in a

23    pool of blood is what was told to me.

24       Q.  When you heard that, what was running through

25    your head?
```

1    A.  I didn't know what was running through my head.

2  I didn't know what to think at that point.  So at that

3  time, I went up to the operations deck to find out some

4  more information of what happened.  I spoke to my watch

5  floor supervisor.  His name is Kevin O'Connor.  And he

6  received a call from at that time Petty Officer

7  Beauford, I believe, and said that there's something

8  that was going on, wanted to know if there was some sort

9  of drill.  So really I didn't -- really I had a picture

10  of someone was hurt.  I really didn't have an idea of

11  the scope of what was going on at the time.

12    Q.  Let's just take a quick step back in time.  When

13  you were arriving to work that morning, remind us who

14  you were driving behind.

15    A.  Yes.  I was driving behind two people.  The one

16  up front was Jim Hopkins.  And then the other person was

17  Kevin O'Connor.

18    Q.  And when you drove past the T-2 shop, did you see

19  anything?

20    A.  I did.  I saw Jim.  He had driven into the

21  parking lot.  It looked like he was about to get out.  I

22  also saw the other truck, the truck pull into -- at the

23  time I recognized it as Rich Belisle's.  And --

24    Q.  What were your duties that day?

25    A.  Again, I was --

1     Q.   Just generally, what were you supposed to do?

2     A.   Generally what we do is make a round of the

3   buildings, T-1 and T-2, at that time.  I saw that we

4   had -- Jim and Rich were there, so space was kind of a

5   small space.  So I elected to say, okay, if anything is

6   going wrong, then Rich or Jim would be able to tell me

7   if anything was going to happen down there.  So I went

8   ahead and just went back up to T-1 and then proceeded

9   just to do a round of T-1.

10     Q.   When you do those rounds, generally what are you

11   looking for?

12     A.   Just safety concerns, security, making sure when

13   we go in just that the locks are secure, if there's

14   anything especially hazardous, because we do work with

15   electronic equipment in some of the areas.  We make sure

16   there's no hazards like that.  Just general safety and

17   security.

18     Q.   Looking for equipment casualties, things of that

19   nature?

20     A.   Yep.

21     Q.   That morning you did not do the security round at

22   T-2, correct?

23     A.   Yes, ma'am.

24     Q.   So after seeing Rich and Jim there and deciding

25   that you weren't going to do the round because they

1    would tell you --

2          MR. CAMIEL:  Your Honor, I'm going to object

3    now to leading.

4          MS. STEVENS:  I'll get to a non-leading

5    question.

6          THE COURT:  All right.  Thank you.

7    BY MS. STEVENS:

8      Q.  So after they told you -- or after you assumed

9    there was nothing going on, what did you do next?

10     A.  Went up, relieved the watch.  After that, I

11   figured I can try and get a quick workout in.

12     Q.  Where is the gym located?

13     A.  The gym is located at the basement at T-1.

14     Q.  How long were you there before you were

15   interrupted?

16     A.  Probably about 25 minutes.  25, 30 minutes,

17   something like that.

18     Q.  When you finally get down to the rigger shop

19   after running down the hill, what happened when you got

20   down there?

21     A.   I went down there, and I saw Petty Officer

22   Beauford and Aaron Coggins.  They were just kind of

23   right outside the entrance to T-2.  And I was trying to

24   find out what was going on is what --

25     Q.  Blair, can you pull up 13.

1          Chief, I believe there may be a pointer up there

2   still from yesterday.

3      A.   This right here?

4      Q.   Yep.

5      A.   Okay.

6      Q.   Okay.  Can you go ahead and point to the location

7   where you encountered Petty Officer Beauford and Seaman

8   Coggins?

9      A.   Yeah.  It was around this area right here towards

10  the entrance.

11     Q.   And after encountering them, what did you do?

12     A.   I asked them, you know, what's going on?  I heard

13  this report.  And then briefly Petty Officer Beauford

14  explained to me what was happening.

15     Q.   Did you enter the building?

16     A.   I did.

17     Q.   Where did you enter through?

18     A.   I entered in right through here.

19     Q.   And how did you get into that door?

20     A.   Well, I just -- I just -- just kind of went in.

21  I scanned -- there's a scan system for after hours, and

22  I'm in the habit of kind of scanning in before I came in

23  there.

24     Q.   After entering through the door, what did you

25  see?  What was the first thing you noticed?

1    A.   The smell.

2    Q.   Describe that.

3    A.   It smelled like gunpowder.  Yeah, gunpowder.

4    Q.   Was the smell strong or subtle?

5    A.   It was pretty strong.

6    Q.   When you smelled the smell of gunpowder, how did

7  you feel?

8    A.   I didn't know what to feel at that time.  I was

9  just kind of -- just trying to figure out what --

10  everything was going on.

11    Q.   What did you do next?

12    A.   Well, I was -- I stepped in here and it's the

13  offices to there, and I saw -- kind of stepped in and I

14  saw -- in there I saw Rich Belisle laying on his belly,

15  I guess you could call it.

16    Q.   Can you tell the jury the position -- get into a

17  little bit more details of his positioning?

18    A.   Yeah.  He was -- his feet was heading toward the

19  entrance.  He was laying kind of on his stomach, head

20  down.

21    Q.   Did you do anything?

22    A.   Yeah.  I shook him, just -- I just kind of --

23  just to see if I can get him awake.

24    Q.   Did you think he was sleeping?

25    A.   No, I didn't think he was sleeping.

1    Q.   What did you think?

2    A.   Well, I definitely thought he was unconscious and

3 more than likely deceased, but at that time, I didn't

4 know what to think.

5    Q.   Did you say anything?

6    A.   Yeah.   I yelled his name, "Rich.  Rich, wake

7 up."

8    Q.   Did you make any conscious efforts to avoid

9 anything in the room?

10    A.   Yeah.   I didn't -- so I didn't want to touch any

11 of the belongings on anything like that.   Looked like he

12 was lying there in some blood.   It looked like he had --

13 I observed a gunshot wound to his torso area.   At least

14 that's what I thought.

15    Q.   And what did you do next?

16    A.   I went into the other room.   I believe it was in

17 this area right here.   May have been right there.

18    Q.   What did you see?

19    A.   I saw Jim Hopkins.

20    Q.   And how did he appear?

21    A.   It looked like he was in sort of a fetal

22 position.   He had a lot of blood around him.

23    Q.   How was he positioned?

24    A.   Kind of like laying on his side in the fetal

25 position, I want to say either towards me -- he was kind

1  of looking towards me, I guess.  It may not be.  I don't

2  recall, but --

3     Q.  And did he appear to be sleeping?

4     A.  No.  No.

5     Q.  How did he appear?

6     A.  He appeared in bad shape.

7     Q.  Tell the members more about that.

8     A.  It looked like he had a gunshot wound to his

9  head.  There was a lot of blood he was in.

10    Q.  And what, if anything, did you do or say to him?

11    A.  I shook him.  And I just yelled his name.  You

12 know, "Jim, wake up."

13    Q.  Chief, had you ever seen a dead body before?

14    A.  No.  Well, I've been to a funeral, but I've never

15 seen anything like that before.

16    Q.  And at some point down there -- let me rephrase

17 that.

18        After encountering both Rich and Jim and

19 understanding the situation, what was running through

20 your head?

21    A.  At that time, I don't know, homicide.  They were

22 killed.  Something happened.  Just --

23    Q.  I'm sorry.

24    A.  No, go ahead.

25    Q.  And emotionally, what was -- what were you

1  feeling?

2    A.  I don't know.  It was -- it was kind of an out of

3  body experience, to be honest with you.  Just to see two

4  guys that you worked around, you've seen them before,

5  and, you know, now they're gone.  It was just surreal.

6    Q.  Did you have an opportunity to observe Cody and

7  Aaron and their demeanor?

8    A.  I did.  I can tell they were -- they were

9  probably in the same state of mind that I was too.

10   Q.  In shock?

11   A.  Yeah.

12   Q.  What happened next?

13   A.  You know, for some reason, I reacted and I said,

14 "Hey, let's get a first-aid kit, let's do something."

15 At that time, Cody said, you know, "I think they're way

16 past that."  So I told him, "All right, everybody just

17 get out of here."  That's my -- at that point kind of

18 snapped, and I thought, okay, is there some sort of

19 active shooter or something like that.  I don't know.

20 We got to get out of there, so I told everybody to

21 leave.

22       And at that time, just to back up, my watch

23 supervisor at the time, Kevin O'Connor, had called up

24 the emergency services, CGPD to get them down here.  So

25 we all left.  I told everybody just to stay behind and

1  let's wait for the police to get there.

2     Q.  Is that what you did?

3     A.  Yes.  Yes.

4     Q.  Eventually that day, did you go up to T-1?

5     A.  I did eventually, yes.

6     Q.  And when you got up to T-1, can you walk us

7  through what you did?

8     A.  Yeah.  You know, I went up.  I happened to see

9  one of my chiefs.  At that time, I was a first class

10  petty officer, but I ended up seeing one of my chiefs

11  that saw me and said something happened.  I said, "I

12  think -- I think there's a homicide," and he couldn't

13  believe I said that.  So we went up and I tried to get

14  back on the watch floor, but I just couldn't.

15     Q.  What do you mean you just couldn't, like you

16  couldn't get in or you just couldn't?

17     A.  I just couldn't stand the watch.  I just was

18  mentally, you know, emotionally, I was just unable to do

19  so.

20     Q.  So someone else stepped into your place to take

21  over the watch?

22     A.  They did.  They did.  It was at the time Jake

23  Gerasimof.

24     Q.  Is that what a Coast Guard member would do for a

25  shipmate in need?

1    A.   Yes.

2    Q.   Did you have the opportunity to observe others

3  from your unit?

4    A.   I did.

5    Q.   How did they appear?

6    A.   They were all pretty distraught.

7    Q.   And did anybody else stand out to you during this

8  emotional time?

9    A.   Yeah.

10    Q.   Who was that?

11    A.   It was Jim Wells.

12    Q.   How so?

13    A.   We were in a conference room and, you know, he

14  just seemed just kind of emotionless, I guess you could

15  say.

16    Q.   Did you have occasion to speak with him that day?

17    A.   I don't recall.

18    Q.   And Chief, last question, had you ever had an

19  opportunity to observe Jim Wells on the ops deck before?

20    A.   I want to say I have.

21        MS. STEVENS:  Okay.  Your Honor, I have no more

22  questions.

23        THE COURT:  All right.  Why don't we take our

24  morning break, and then we'll proceed on.  Please leave

25  your notepads here, ladies and gentlemen.  Remember my

1 admonition not to discuss the case during this break.

2 And we'll take about 10 to 15 minutes.  We'll go off

3 record at this time.

4          (Recessed from 9:51 a.m. to 10:07 a.m.)

5          (Jury present)

6          THE COURT:  Please be seated, everyone.  And go

7 right ahead, Mr. Camiel.

8          MR. CAMIEL:  Thank you, Your Honor.

9                    CROSS EXAMINATION

10 BY MR. CAMIEL:

11    Q.  Good morning, Chief.

12    A.  Good morning.

13    Q.  Could we put up Government Exhibit No. 10,

14 please.  Does that appear to be the Communications

15 Station Kodiak organizational chart?

16    A.  It does.

17    Q.  And do you see where you would fall on that

18 chart?

19    A.  Yeah.  I would be under probably one of the watch

20 sections under the operations officer tree.

21    Q.  Could you using your laser pointer, show us where

22 you are.

23    A.  Sure.  I think I was probably section one or I

24 could have been two.  I don't remember.

25    Q.  All right.  And so you're the chief of that

1  section; is that right?

2      A.  At that time I wasn't.  I was the communications

3  watch officer --

4      Q.  All right.

5      A.  -- of that section.  I was a first class petty

6  officer.

7      Q.  And how many people are in that section or were

8  in that section?

9      A.  Typically five to six people.

10      Q.  All right.  So during a shift, those five to six

11  people would be on duty?

12      A.  That's correct.

13      Q.  And you have got four different watch sections

14  that cover different times or different days?

15      A.  Yes, sir.

16      Q.  And these -- this watch section, this shift is a

17  group of people that are on the ops deck in the T-1

18  building, right?

19      A.  That's correct.

20      Q.  And the T-1 building itself, how many people work

21  in that building during, say, the day shift?

22      A.  Like not including watch, just general people?

23      Q.  Sure.

24      A.  I'd be lying to you if I told you I knew it, but

25  I don't know, probably -- I don't know, probably about

1    20 or 30 people, I guess.

2        Q.   So you got the 20 or 30 people who are not part

3    of the watch section, and then you've got the five or

4    six people that are part of the watch section that you

5    worked?

6        A.   That's correct.

7        Q.   You mentioned a couple other names, and I just

8    wanted to touch on those for a minute.  You mentioned a

9    Kevin O'Connor.  What was his position?

10       A.   Yeah.  He was the watch -- he was in my watch

11   section.  He was the watch supervisor.

12       Q.   Okay.  So we have -- so just to take us through

13   who the members of a watch section are, we have your

14   position.  We have the watch supervisor who was Kevin

15   O'Connor.  And then who were the other members of your

16   watch section at that time?  By "that time," I mean in

17   April of 2012.

18       A.   Watch for that time?  So I think -- let's see.

19   I'm trying to think who was on watch that day.  There

20   was Kevin.  There was Jared Andrews.  There was Carissa

21   King.  I'm trying to remember if there was anybody else.

22   There was Jake Schaeffer, but Schaeffer wasn't there

23   that day.  Those are the ones I can recall, sir.

24       Q.   Would there be a log somewhere that would show

25   who was in your watch section working the morning of

1   April 12th?

2       A.  Yes, sir.

3       Q.  Did the Government ask you to look at that?

4       A.  I don't believe so, not that day.

5       Q.  You mentioned another name when we were looking

6   at some video, a Jason Bullis.  Who is he?

7       A.  So he was the off-going section communications

8   watch officer that day.

9       Q.  So when you say the off-going, he worked the

10  night shift?

11      A.  That's correct.

12      Q.  So if I understand correctly, the shift for the

13  watch is different from the shift for the regular Coast

14  Guard members?

15      A.  Yes, sir.

16      Q.  You worked as a watch officer 12-hour shifts.

17  You worked 7 a.m. to 7 p.m., right?

18      A.  At that time, yes.

19      Q.  All right.  And so Jason Bullis would have been

20  working the 7 p.m. to 7 a.m. shift?

21      A.  Yes, sir.

22      Q.  All right.  So when you arrived, you would be

23  relieving him?

24      A.  Yes, sir.

25      Q.  You talked a little bit about your

1   responsibilities as the watch officer. I want to go

2   through those a little bit.

3       You indicated that your duties were, in part at

4   least, safety and security of the facility, right?

5     A. Yes, sir.

6     Q. And that includes both the T-2 building and the

7   T-1 building, right?

8     A. Yes, sir.

9     Q. And the antennas in the field?

10     A. Yes, sir.

11     Q. And I want to break that down. By safety, you

12   meant safety of the people and safety of the equipment

13   and the structures, right?

14     A. Yes, sir.

15     Q. And by security, one of the things you meant was

16   the security of equipment that might -- that might

17   contain confidential information and security of

18   information?

19     A. That's part of it, yeah.

20     Q. Because on the -- now, the watch standers, the

21   watch, you guys are in the op deck, right?

22     A. Yes, sir.

23     Q. And even though it's in the same building, the

24   T-1 building, it's really a separate deck that's a

25   separate compartment, right?

1      A.   Yes, sir.

2      Q.   And it's secure, right?

3      A.   It's secure.

4      Q.   And by secure, what we mean is that there's a

5 locked door that you have to go through to get into the

6 op deck?

7      A.   Yes, sir.

8      Q.   And that door is -- if somebody has clearance,

9 they can use their badge to get through that door,

10 right?

11     A.   They can.

12     Q.   But if somebody doesn't, then they can't get in

13 there, right?  They can't just walk in?

14     A.   They just can't walk in, no.

15     Q.   So if somebody didn't have clearance, for

16 example, they'd have to sign in to a log?

17     A.   Uh-huh.

18     Q.   Is that a yes?

19     A.   Yes, sir.

20     Q.   And that log is kept and maintained by the Coast

21 Guard, right?

22     A.   Yes, sir.

23     Q.   To show everybody who wasn't clear to go on the

24 op deck who signed in or didn't sign in, right?

25     A.   That's right.

1     Q.   And it shows the date and time, right?

2     A.   It should be, yeah.

3     Q.   And it shows the responsible person who was going

4  to accompany them into the op deck, right?

5     A.   Yes, sir.

6     Q.   Because if somebody wasn't cleared to go on the

7  op deck, they couldn't go in unless they had an escort,

8  right?

9     A.   Typically, that's correct.

10    Q.   And the door that separated the op deck from the

11 rest of the interior of the structure, there's actually

12 a camera on that door, right?

13    A.   There is.

14    Q.   And it sees who's at the door, right?

15    A.   That's right.

16    Q.   Now, the op deck is manned 24 hours a day, right?

17    A.   Yes, sir.

18    Q.   Seven days a week?

19    A.   Yes, sir.

20    Q.   And regardless of whether it's in the evening or

21 during the day, there's several people on the op deck at

22 any one time, right?

23    A.   That's right.

24    Q.   Never one person alone there, right?

25    A.   That's right.

1     Q.  In the op deck, there are different stations
2  where people sit; is that correct?
3     A.  That's correct.
4     Q.  In fact, there's a big room and off that big room
5  there are separate rooms; is that right?
6     A.  That's right.
7     Q.  And some -- for example, there's like a
8  classified conference room off the op deck?
9     A.  There is.
10    Q.  And then an unclassified conference room?
11    A.  That's -- the unclassified conference room is not
12 on the op deck.  It's in the general area.
13    Q.  All right.  In the center of the op deck, is
14 there kind of a horseshoe-like structure that people sit
15 around?
16    A.  There is.  They have desks out there, but for
17 different stations that people could sit around there
18 for.
19    Q.  And some of the people in there, what they're
20 doing is they are monitoring communications, right?
21    A.  That's right.
22    Q.  They're communicating with maritime or aircraft,
23 right?
24    A.  In the horseshoe portion, probably not.  Not in
25 the open one, but in the booths they are.

1    Q.   And right out there in the main area of the op

2   deck, up on the wall, there's what looks like a big

3   flat-screen TV that has the feed from all of the

4   different cameras?

5    A.   I believe so.

6    Q.   You talked both yesterday and today about

7   different cameras, and we're going to talk about those.

8    A.   Okay.

9    Q.   But the feed from those cameras comes into the op

10   deck, right?

11    A.   That's right.

12    Q.   Into the secure contained area in building T-1?

13    A.   Yes, sir.

14    Q.   All right.  And the video is shown on a screen,

15   right?

16    A.   That's right.

17    Q.   And you can see the multiple cameras all at once,

18   right?

19    A.   Yes, sir.

20    Q.   And people sitting there in the op deck can look

21   up and see the screens, correct?

22    A.   That's correct.

23    Q.   And at least one of the watch people there is

24   sitting at some kind of a console or computer where they

25   can control the cameras, right?

1    A.   Typically, yes.   That was my position.

2    Q.   That was what you did?

3    A.   Yes.

4    Q.   And if you weren't doing it, if you got up to do

5 something else, someone else on the watch would do that,

6 right?

7    A.   They could, yes.   They weren't monitoring it

8 24 -- like if I were to, you know, go off deck, they

9 didn't typically, you know, sit in my position and

10 monitor it.

11   Q.   But they could still see the screen from other

12 parts of the room, right?

13   A.   I got -- I don't remember that portion right

14 there, sir.   Because some of the feeds were different

15 when I first got there.

16   Q.   Okay.   By the way, did the Government, did they

17 ask you to look at or bring in the sign-in log to the op

18 deck?

19   A.   They did not.

20   Q.   So let's talk a little bit about the cameras that

21 you mentioned yesterday.   One of the cameras you talked

22 about was the camera that was on the T-2 building; is

23 that right?

24   A.   Yes, sir.

25   Q.   Could we put up Government Exhibit 63 for now.

1  It's a video.

2          (Exhibit No. 63 playing in open court)

3  BY MR. CAMIEL:

4     Q.  We can stop it.

5          That is the T-2 camera that you looked at just a

6  few minutes ago?

7     A.  Yes, sir.

8     Q.  And that's the camera that's mounted outside the

9  T-2 building?

10    A.  Yes, sir.

11    Q.  And that camera both pans, tilts and zooms,

12 right?

13    A.  Yes, sir.

14    Q.  What that means is that although the view at this

15 time is looking out toward the flagpole, there's about a

16 270-degree range that that camera can be turned, right?

17    A.  About that.

18    Q.  And the controls for that camera is up in the T-1

19 building, not in the T-2 building, right?

20    A.  Yes, sir.

21    Q.  At that time, there was no control, no way to

22 control the camera from inside the T-2 building, right?

23    A.  Yes, sir.

24    Q.  And there was no monitor to watch what was on the

25 camera from inside the T-2 building?

1      A.  No, sir, there wasn't.

2      Q.  So in addition to that camera panning, it can

3  tilt, right?

4      A.  Yes, sir.

5      Q.  It can go up, and it can go down.  And if one of

6  the watch standers up in T-1 on the op deck sees

7  something they think is suspicious, they can turn the

8  camera to get a better view of it, right?

9      A.  Yes, sir.

10     Q.  That's the reason why it can move, right?

11     A.  That's right.

12     Q.  If they see something they're concerned about,

13  they can zoom in?

14     A.  Yes, sir.

15     Q.  Now, you talked about another camera that was in

16  the back portion of the T-1 building.  And that's at the

17  back of the parking lot; is that right?

18     A.  I believe so.

19     Q.  Okay.  And that camera had the same capability,

20  right?  It could be panned?

21     A.  Yes, sir.

22     Q.  And it could tilt up or down?

23     A.  Yes, sir.

24     Q.  And it could zoom?

25     A.  Yes, sir.

1    Q.   And that camera as well was controlled from the

2  op deck in the T-1 building?

3    A.   That's right.

4    Q.   There was no ability to control that camera from

5  the T-2 structure?

6    A.   No, sir.

7    Q.   And there was another camera you mentioned.  We

8  saw a video yesterday that we'll look at again in a few

9  minutes that showed the roof of the T-1 building?

10   A.   Yes, sir.

11   Q.   Where was that camera located?

12   A.   I think I said yesterday it was behind T-1 sort

13 of on the back corner near the loading dock.

14   Q.   All right.  And that camera had the same

15 capabilities.  It could be panned?

16   A.   Yes, sir.

17   Q.   Tilted?

18   A.   Yes, sir.

19   Q.   And zoomed?

20   A.   Yes, sir.

21   Q.   I'm sorry.  Can we go back to 63 for a minute and

22 just put up -- without playing it, just put it up.  If

23 we could just stop it.

24        Chief, there are actually two times on this

25 screen, aren't there?

1     A.   There is.

2     Q.   There's a time at the top. You see that?

3     A.   Yes, sir.

4     Q.   And can you read what it says at the top?

5     A.   April 12, '12, 07:05:29 a.m.

6     Q.   So at the top it says 7:05:29 a.m., right?

7     A.   Yes, sir.

8     Q.   What's it say at bottom?

9     A.   4-12-2012, 06:59:59.858 a.m.

10     Q.   Which is the time -- do you see both times when

11 you're on the op deck?

12     A.   I do. We usually went by the bottom time. The

13 top time I believe was the camera itself. The bottom

14 was synced up to the actual software, the actual video

15 recording software that was linked up to the server.

16     Q.   One of the things that you mentioned that are

17 part of your duties was to do something you called

18 rounds.

19     A.   Yes, sir.

20     Q.   And what that involved was you actually

21 inspecting the physical structure either of T-2, the

22 rigger shop, or T-1; is that correct?

23     A.   That's right.

24     Q.   And there were two ways that you did that, right?

25     A.   Uh-huh.

1    Q.   Is that a yes?

2    A.   Yes, sir.

3    Q.   One was physical, right?

4    A.   Yes.

5    Q.   Where you would physically walk through -- for

6    example, if we're talking about the T-2 structure, you

7    would physically go in the door and go through that

8    whole building, right?

9    A.   Yes, sir.

10   Q.   Into every room in the building?

11   A.   Yes, sir.

12   Q.   Check every door?

13   A.   Yes, sir.

14   Q.   All right.  And you would walk around the outside

15   of the building as well, correct?

16   A.   Yes, sir.

17   Q.   All right.  And you would do the same thing up at

18   T-1?

19   A.   Yes, sir.

20   Q.   And what you were required to do was at the start

21   of every shift, you were required to do a physical round

22   or inspection of each of the structures, right?

23   A.   Yes, sir.

24   Q.   And at the end of every shift, you were required

25   to do the same thing?

1    A.  Yes, sir.

2    Q.  In addition to the physical inspection, one of

3  the things that you did was at least every four hours,

4  you did an inspection of the perimeter of both

5  structures using the cameras, right?

6    A.  Yes, sir.

7    Q.  And you did that every four hours?

8    A.  Yes, sir.

9    Q.  All right.  So when you came in and you started

10  your shift at 7 a.m., in addition to doing the physical

11  inspection, you would by way of the cameras -- and it's

12  the cameras we've been talking about, right?

13    A.  Yes, sir.

14    Q.  All right.  By way of those cameras, you would

15  look at each camera to make sure that the perimeter and

16  the facility was secure?

17    A.  Yes, sir.

18    Q.  All right.  So for example, the camera on the

19  back parking lot of the T-1 building, you would look at

20  that camera to make sure that it was -- from what you

21  could see there, you could see the drive up -- you could

22  see the drive up to the T-1 building from T-2, right?

23    A.  That's right.

24    Q.  You could see the gate?

25    A.  Uh-huh.

1    Q.  You could see whether the gate was open or

2  closed?

3    A.  Yep.

4    Q.  You could see the parking lot?

5    A.  Uh-huh.

6    Q.  Yes?

7    A.  Yes.

8    Q.  You could see what vehicles were in the parking

9  lot?

10    A.  Yes.

11    Q.  You could see if there were any people walking

12  around?

13    A.  Yes.

14    Q.  All right.  And you would do the same thing with

15  the camera that was -- that showed the roof of the T-1

16  building?

17    A.  Yes, sir.

18    Q.  And in addition, you'd do the same thing with

19  the -- there's another camera on the roof that looks

20  kind of down into the parking lot of the T-1 building,

21  is that right, kind of on the front of the building?

22    A.  You're talking about the one on the antenna

23  structure?

24    Q.  Yes.

25    A.  Yes, sir.

1      Q.   That one -- if I could have just a minute.

2           (Pause)

3  BY MR. CAMIEL:

4      Q.   While we're looking for that one, let me ask you:

5  As you did the rounds by way of the cameras, one of the

6  things you would be checking is not only is the facility

7  secure, but are all the cameras working properly, right?

8      A.   Yes, sir.

9      Q.   Because without the cameras working properly, you

10 can't do your job?

11     A.   That's right.

12     Q.   And so this is -- and if you saw -- when you were

13 doing the rounds with the cameras, if you saw that a

14 camera was not focused or looking where it should, you'd

15 readjust it, right?

16     A.   Yes, sir.

17     Q.   So this is -- what's the exhibit number?  This is

18 Exhibit 55.  This is the one -- this is the camera

19 that's on the small tower in front of the T-1 building;

20 is that right?

21     A.   That's right.

22     Q.   And it shows the front gate?

23     A.   Yes, sir.

24     Q.   It shows the parking lot?

25     A.   Yes, sir.

1    Q.  All right.  And so this is one of the cameras
2    that you would need to look at every four hours to make
3    sure that the facility was secure, right?
4    A.  Yes, sir.
5    Q.  And this was a particularly important camera
6    because it shows the actual front gate?
7    A.  Yes, sir.
8    Q.  Let me ask you about April 11th.  You were on
9    duty that day, right?
10   A.  Yes, sir.
11   Q.  Working your regular 7 a.m. to 7 p.m. shift?
12   A.  Yes, sir.
13   Q.  And when you arrived that morning on April 11th,
14   before you drove up to the T-1 building, you stopped and
15   you did your rounds at the T-2 building?
16   A.  I believe so.
17   Q.  All right.  Because that's what your usual
18   practice would be, right?
19   A.  That's correct.
20   Q.  That would have meant you would have entered the
21   building, walked through it and then done a perimeter
22   inspection as well?
23   A.  Yes, sir.
24   Q.  How about on April 10th, were you working that
25   day?

1    A.   I don't recall.

2    Q.   If you were, you would have stopped at the T-1

3    build -- T-2 structure before you went up to the T-1

4    building?

5    A.   Yes, sir.

6    Q.   And done the rounds?

7    A.   Yes, sir.

8    Q.   Because that was your usual practice, right?

9    A.   Yes, sir.

10   Q.   And the only time you can recall deviating from

11   that usual practice was on April 12th, right?

12   A.   Yes, sir.

13   Q.   Because every other time you showed up for work,

14   you would -- right about the time you would show up for

15   work, right around 7:05, you would go into the building

16   and do your rounds?

17   A.   Well, it was -- the time had changed at that

18   time, but usually it was at 6:00, but then we deviated

19   to 7:00 later on, but yes.

20   Q.   But that was your pattern, right?

21   A.   Yes, sir.

22   Q.   And you're required to do that.  That was part of

23   your job duty?

24   A.   Yes, sir.

25   Q.   Now, on April 11th, when you were working, after

1  you would have done your rounds down at the T-2

2  building, you went up to the T-1 building, right, and

3  started your shift?

4      A.  Yes, sir.

5      Q.  And when you take over, you would have been

6  taking over from Jason Bullis, you mentioned?

7      A.  Yes, sir.

8      Q.  Would he brief you about anything that happened

9  during his shift so that you would be aware of it?

10      A.  Yes, sir.

11      Q.  Particularly if there was anything unusual?

12      A.  Yes, sir.

13      Q.  So for example, when you showed up for work --

14  let's move to April 12th.  We saw on the video you

15  showed up.  You drove your blue minivan, was it?

16      A.  Yes, sir.

17      Q.  Inside the gate.  You arrived I think around

18  7:05; is that right?

19      A.  Yes, sir.

20      Q.  And then you would have gone into the building,

21  and before you went and did your workout, you would have

22  consulted with Mr. Bullis to receive kind of a briefing

23  about if anything had happened on his shift you needed

24  to know about?

25      A.  Yes, sir.

1    Q.  In addition, since it was the start of your

2  shift, you would have done your inspection of the

3  cameras?

4    A.  Yes, sir.

5    Q.  Then you would go down and do your workout?

6    A.  Yes, sir.

7    Q.  Now, that morning, when you arrived and you met

8  with Mr. Bullis, did he tell you anything about a white

9  truck that had driven into the parking area of the T-2

10  building at about 10:30 that night --

11        MS. STEVENS:  Objection, Your Honor.  Hearsay.

12        MR. CAMIEL:  I'm asking --

13        THE COURT:  No, that's sustained.  It is

14  hearsay.

15  BY MR. CAMIEL:

16    Q.  Did he tell you anything about a white truck?

17        MS. STEVENS:  Again, objection, hearsay.

18        THE COURT:  And I'll sustain.

19  BY MR. CAMIEL:

20    Q.  Were you briefed about anything unusual that

21  happened on the earlier shift, on Mr. Bullis' shift?

22    A.  Not that I can recall.

23    Q.  Did you review any logs that Mr. Bullis kept that

24  would have described anything that happened on his

25  shift?

          MS. STEVENS:  Again, Your Honor, I'm not sure
where counsel is going with this, but if he's asking him
about a log written by somebody else --

          THE COURT:  The question, did you review any
logs, I'll permit.  So that's fine.

BY MR. CAMIEL:

   Q.  Did you review the log that Mr. Bullis would have
filled out from his shift?

   A.  I don't think I did that day.

   Q.  You talked about driving up to work, driving up
to the COMMSTA on the morning of April 12th and you were
kind of in a three-vehicle caravan.  There were three
vehicles kind of all traveling at the same time; is that
right?

   A.  Yes, sir.

   Q.  Who was the first vehicle?

   A.  The first vehicle was Jim Hopkins.

   Q.  What did he drive?

   A.  He drove a blue -- I want to say it was -- I
think it was a black Dodge.

   Q.  Are you sure it was black and not blue?

   A.  I think so.

   Q.  Who was the second person?

   A.  The second one was Kevin O'Connor.

   Q.  What did he drive?

1    A.   He drove a green Tahoe.

2    Q.   And then you?

3    A.   Then me.

4    Q.   And when you drove past the T-2 building, you saw

5    Rich Belisle's truck?

6    A.   Yes, sir.

7    Q.   What did he drive?

8    A.   He drove a -- I want to say it was a blue truck,

9    Ford.

10   Q.   Okay.  Can we go to Government Exhibit 60?

11        That's the view from the back camera on T-1; is

12   that right?

13   A.   Yes, sir.  It's back camera, front parking lot.

14   Q.   And if you'd take a look at the T-2 building, the

15   way the camera is stationed, you can't see any of Anton

16   Larsen Bay Road; is that right?

17   A.   Yes, sir, that's correct.

18   Q.   We can take that one down.

19        Go to Government Exhibit 61.  By the way, the

20   reason you can't see any of Anton Larsen Bay Road on the

21   one we just looked at is because that camera can move,

22   right?

23   A.   Yes, sir.

24   Q.   And either you or somebody on the watch may have

25   moved it, right?

1     A.   That's correct.

2     Q.   Now, this is the view from the back of the T-1

3  building; is that right?

4     A.   Yes, sir.

5     Q.   Can we play this?

6          THE COURT:  What exhibit is this, Mr. Camiel?

7          MR. CAMIEL:  61.

8          (Exhibit No. 61 playing in open court)

9  BY MR. CAMIEL:

10    Q.   Do you recognize who that is?

11    A.   Yes, sir.

12    Q.   The first person?

13    A.   Yes, sir.

14    Q.   Who is it?

15    A.   It's Jim Wells.

16    Q.   Who is walking up behind him?

17    A.   It's Rich Belisle.

18    Q.   And if we could stop it for just a minute.

19         You can kind of pick out Mr. Belisle and

20  Mr. Wells because they're civilians, right?

21    A.   Yes, sir.

22    Q.   So they're not in uniform.  If we could run it.

23         Do you know where -- if we could stop for a

24  minute.

25         Do you know how they would have got on the roof?

1    A.   I believe there was a -- I believe there was a

2    hatch somewhere on the -- there in T-1.  I'm not quite

3    sure.  I don't remember, to be honest with you.  But I

4    know there was a way there, either on the transmitter

5    deck to gain access to it, I believe.

6    Q.   If we could continue the video.

7         (Exhibit No. 61 continues playing in open court)

8    BY MR. CAMIEL:

9    Q.   Can you tell who the third person -- if we could

10   stop it.

11        Can you tell who the third person is in the

12   uniform?

13   A.   I can't tell.

14   Q.   I want to have you look at some additional

15   videos.  And let's start -- you already looked at

16   yesterday and today, part of today Exhibit 62, that's

17   the 40-minute video from the T-1.  Let's just put that

18   up for a second.

19        (Exhibit No. 62 playing in open court)

20   BY MR. CAMIEL:

21   Q.   If we could stop that.

22        So this is Exhibit 62.  And this is the video we

23   were watching yesterday and today from April 12th, is

24   that right, starting at 6:59 a.m.?

25   A.   Yes, sir.

1      Q.   Now, I want to show you just for foundational

2   purposes first, a clip from that video.  It's DE-261.

3           If we could stop it right there.

4           When vehicles would come up the drive from the --

5   down where the T-2 building is, when they pulled off

6   Anton Larsen Bay Road to drive up to the T-1 building,

7   those vehicles would block the view of Anton Larsen Bay

8   Road; isn't that right?

9           MS. STEVENS:  Objection, Your Honor.

10  Foundation.

11          THE COURT:  Well, I don't know about

12  foundation, but I will sustain the objection the way it

13  was phrased.  So try that again, Mr. Camiel.

14  BY MR. CAMIEL:

15     Q.   You see the truck in the video that's driving up

16  with the headlights on?

17     A.   Yes, sir.

18     Q.   All right.  If we could back it up.  Back the

19  video up about ten seconds or so.

20          Okay.  You see the view that you have before the

21  truck comes into view?

22     A.   Yes, sir.

23     Q.   Now, let's let the video run.  Let's just stop it

24  for a minute.  Does this appear to be -- does DE-261

25  appear to be a clip from Government Exhibit 62 that we

1  were watching before?

2      A.  Yes, sir, it appears to be.

3          MR. CAMIEL:  I would offer DE-261.

4          MS. STEVENS:  No objection.

5          THE COURT:  All right.  It's admitted.  Go

6  ahead.

7          (Defense Exhibit No. DE-261 admitted)

8          (Defense Exhibit No. DE-261 playing in open

9  court)

10  BY MR. CAMIEL:

11      Q.  Now, sir, I'd like to show you again for

12  foundational purposes DE-261-A through G, which are some

13  still photos from the video you just watched.

14          Did those appear to be stills that were taken

15  from the video that you just watched?

16      A.  Yes, sir.

17          MR. CAMIEL:  I would offer 261-A through 261-G.

18          MS. STEVENS:  No objection.

19          THE COURT:  Those will all be admitted.

20          (Defense Exhibit No. DE-261-A - G admitted.)

21  BY MR. CAMIEL:

22      Q.  Start with 261-A.  261-B.  261-C.  261-D.  261-E.

23  261-F.  And 261-G.

24          Now, I'd like to -- I'd like to show you again

25  for foundational purposes a short video clip, Defense

1    Exhibit No. 262.  Just have you look at it and I'll ask

2    you about it.

3            (Defense Exhibit No. 262 being shown to witness)

4    BY MR. CAMIEL:

5      Q.  Does that appear to be a clip from the Government

6    Exhibit 62, the April 12th video that you looked at

7    earlier?

8      A.  Yes, sir.

9            MR. CAMIEL:  I would offer Defendant's 262.

10           THE COURT:  Ms. Stevens?

11           MS. STEVENS:  No objection.

12           THE COURT:  All right.  Defense 262 is

13   admitted.

14           (Defense Exhibit No. 262 admitted)

15           (Defense Exhibit No. 262 playing in open court)

16   BY MR. CAMIEL:

17     Q.  Now, I'd like to have you look, sir, for

18   foundational purposes at Defense Exhibit No. 262-A.

19   Does that appear to be a still from the video clip you

20   just looked at?

21     A.  Yes, sir.

22     Q.  The time on this is 7:14:20 hours; is that right?

23     A.  Yes, sir.

24     Q.  On April 12th?

25     A.  Yes, sir.

1          MR. CAMIEL:  I would offer Defense

2    Exhibit 262-A.

3          MS. STEVENS:  No objection.

4          THE COURT:  That will be admitted.

5          (Defense Exhibit No. 262-A admitted)

6    BY MR. CAMIEL:

7      Q.  Now, I'd like to have you look at for foundation

8    purposes Defense Exhibit No. 129.  Does that appear to

9    be another still from the video you just looked at?

10     A.  Yes, sir.

11         MR. CAMIEL:  I would offer Defense Exhibit

12   No. 129.

13         MS. STEVENS:  Just a second, Your Honor.  Could

14   we have a sidebar, please.

15         THE COURT:  Certainly.

16         (Begin bench conference.)

17         MS. STEVENS:  So we got these on a disc this

18   morning in court.  So we haven't had an opportunity to

19   review them.  Looking at them on the screen now, they

20   appear to be enhanced.  This one has different coloring.

21   So I'm not sure what the solution is, whether we take a

22   break and we look at it.

23         THE COURT:  Why don't we do that.

24         MS. STEVENS:  It's just they look significantly

25   different.

1          MR. SKROCKI:  We'd like to revisit the other

2     ones that came in as well.

3          THE COURT:  Why don't we take a break, and then

4     let me know when you're ready.

5          (End bench conference)

6          THE COURT:  Ladies and gentlemen, we're going

7     to take a short recess with you so we can sort out some

8     issues.  Please leave your notepads here.  Remember my

9     admonition not to discuss the case.  We're ending no

10    later than noon today.  So we'll go off record.

11         (Recessed from 10:51 a.m. to 11:02 a.m.)

12         (Jury absent)

13         DEPUTY CLERK:  All rise.  Her Honor, the Court,

14    the United States District Court is again in session.

15         THE COURT:  All right.  Please be seated,

16    everyone.  So what's our update, Ms. Stevens?

17         MS. STEVENS:  So it seems that we've come to an

18    agreement on how to move forward with this particular

19    exhibit.  We're going to allow defense to lead the

20    witness with a question that will I think solve the

21    problem without an objection from us.

22         THE COURT:  This is with regard to which

23    exhibit?

24         MS. STEVENS:  129.

25         MR. CAMIEL:  DE-129.

1          MS. STEVENS:  And then they're going to reserve

2    that exhibit for later if they can make some changes

3    maybe.

4          THE COURT:  Is that correct?

5          MR. CAMIEL:  Yes.  So I'm -- so the Court

6    understands, I'm going to ask him a leading question

7    about the view from these exhibits.

8          THE COURT:  From 129?

9          MR. CAMIEL:  From 129 and the other series of

10   exhibits we just introduced that show that when a

11   vehicle is coming up, it blocks part of the view of

12   Anton Larsen Bay Road.

13         THE COURT:  And then move on?

14         MR. CAMIEL:  Right.

15         THE COURT:  All right.  Are we ready to bring

16   the jury?  Yes?  Very good.

17         (Jury present)

18         THE COURT:  All right.  Welcome back.  Please

19   be seated.  Go ahead, Mr. Camiel.  Thank you.

20   BY MR. CAMIEL:

21     Q.  Thank you, Your Honor.

22         The series of exhibits we just looked at showed

23   vehicles that were coming up and partially blocking or

24   completely blocking the view of the T-1, the back T-1

25   camera from showing any of Anton Larsen Bay Road,

1    correct?

2        A.  Yes, sir.

3        Q.  Now, you gave some testimony about going down to

4    T-2 after you got the report of what had happened down

5    there, and then you went back up to the T-1 -- to the

6    T-1 building, right?

7        A.  I did.

8        Q.  After you got back up there, one of the things

9    you did was you directed Kevin O'Connor to call everyone

10   in the unit, right?

11       A.  I don't know if it was me, but it might have

12   been.

13       Q.  Do you recall that he was tasked with calling

14   everyone in the unit?

15       A.  I do remember him being tasked.  I don't remember

16   if I was the one that gave him direction or not.

17       Q.  He was tasked with telling people there had been

18   an incident at the T-2 building?

19       A.  Correct.

20       Q.  And one of the people he was directed to call was

21   Mr. Wells?

22       A.  Yes, sir.

23       Q.  As far as you know, he did that?

24       A.  He did.

25       Q.  You talked a little bit about Mr. Wells'

1  demeanor, what he looked like up in the T-1 building
2  later that day when you saw him, right?
3       A.  Yes, sir.
4       Q.  Basically, the unit was asked to stay up at the
5  T-1 building for many, many hours, right?
6       A.  That's correct.
7       Q.  What, 12, 13 hours before you were let go to go
8  home?
9       A.  Something like that.
10       Q.  You hadn't had much contact with Mr. Wells since
11  he returned from being sick, right?
12       A.  No, sir.
13       Q.  You knew that he'd been gone for a long time?
14       A.  I honestly didn't know.
15       Q.  And you described your demeanor.  You were
16  extremely distraught, right?
17       A.  Yes, sir.
18       Q.  Couldn't even continue your shift?
19       A.  Yes, sir.
20       Q.  Made it difficult for you to concentrate or to do
21  your job?
22       A.  Yes, sir.
23       Q.  And Mr. Wells was quiet?
24       A.  Yes, sir.
25       Q.  Did you ever listen to the recording of Cody

1    Beauford when he called up to report the incident at the

2    T-2 building?

3        A.   No, sir.

4        Q.   Now, sometimes on the op deck, there would be

5    unit musters there; is that right?

6        A.   Sometimes, yes, sir.

7        Q.   That's where everybody would gather for a

8    meeting?

9        A.   That's correct.

10       Q.   And that was an approved type of meeting where

11   even people who didn't have clearance could come in?

12       A.   That's correct.

13       Q.   When you did that, you would sanitize the room,

14   right?

15       A.   Yes, sir.

16       Q.   Now, what that means is you'd shut down monitors

17   or cover up any sensitive materials, right?

18       A.   Yes, sir.

19       Q.   And when those happened, there would be several

20   people at a time?

21       A.   Yes, sir.

22       Q.   For example, you had seen Rich Belisle on the op

23   deck?

24       A.   Yes, sir.

25       Q.   Or Chief Reckner?

1    A.  Yes, sir.

2    Q.  Or Mr. Hopkins?

3    A.  Uh-huh.

4    Q.  Or other members of the rigger shop?

5    A.  Yes, sir.

6    Q.  After April 12th, you became aware that the FBI

7  arrived and they became involved in the investigation of

8  the homicides that occurred; is that right?

9    A.  Yes, sir.

10   Q.  And in fact, the FBI set up shop in the T-1

11 building?

12   A.  Yes, sir.

13   Q.  On the ops deck?

14   A.  I don't know if it was on the ops deck.  At least

15 I don't remember it being on the ops deck.

16   Q.  But you knew they set up shop there?

17   A.  Yes, sir.

18   Q.  And you could see them going in and out?

19   A.  Yes, sir.

20   Q.  And you could overhear some of the things they

21 were talking about?

22   A.  I never personally overheard anything they were

23 talking about.

24   Q.  You were aware they were there?

25   A.  But I was aware they were there, yeah.

1    Q.   They were bringing in people to interview right

2    there in the T-1 building?

3    A.   Yes, sir.

4    Q.   And they were there for a few weeks?

5    A.   Yes, sir.

6         MR. CAMIEL:  Your Honor, that's all I have.

7         THE COURT:  All right.  Redirect, Ms. Stevens.

8         MS. STEVENS:  Yes.

9                   REDIRECT EXAMINATION

10   BY MS. STEVENS:

11   Q.   Chief, can you explain what the force protection

12   status is for a base?

13   A.   Yes.  So it's a security continuum that we have

14   in the armed services where if there's a perceived

15   threat in the area, then we -- our security posture

16   changes.  So --

17   Q.   Do you remember what the status was for April 12,

18   2012?

19   A.   I can't recall for that day, ma'am.

20   Q.   How often would random people wander up and

21   loiter around the rigger shop?

22   A.   We would see them every once in a while quite a

23   few times.

24   Q.   What would they be doing?

25   A.   Just kind of coming in and out.  Sometimes you

1    would see, you know, significant others coming through

2    that area.  Sometimes you would have, you know -- Kodiak

3    obviously has a lot of visitors for fishing.  They would

4    come out and just check it out or they would have, you

5    know, just kind of random folks just kind of go in

6    around the road.

7        Q.  Did they come up to the rigger shop and try to

8    open the doors?

9        A.  Not that I can recall.

10       Q.  Did they poke around the back?

11       A.  Not that I -- of the building.

12       Q.  You don't recall?

13       A.  Not that I recall.

14       Q.  So you mentioned you were on the watch deck.  One

15   of your roles was monitoring the cameras.  Were you

16   glued to those cameras?

17       A.  I wouldn't say I was glued, no.

18       Q.  And defense showed you two separate times.  And

19   Blair, if you can go ahead and pull up Government

20   Exhibit -- sorry -- 67.

21           (Exhibit No. 67 playing in open court)

22           MR. CAMIEL:  Your Honor, we never showed that

23   one.  This is beyond the scope of cross.

24           THE COURT:  I'll allow it, but then allow you

25   to follow up as well.  Go ahead, please.

```
 1          MS. STEVENS:  That's fine.  We can just move
 2   on.
 3          THE COURT:  All right.
 4   BY MS. STEVENS:
 5     Q.  The defense showed you some footage with time
 6   differences --
 7     A.  Yes, ma'am.
 8     Q.  -- between -- from the T-2 camera.  There was a
 9   time at the top and a time at the bottom.  Can you tell
10   me which was the accurate time?
11     A.  We always went by the -- we always went by the
12   time on the server, that big number right there that
13   was --
14     Q.  The one located at the bottom?
15     A.  Correct.  That's the one that's kind of tied in
16   with the software.  So we typically went with that one.
17   The other one was one for the camera, I believe.  And no
18   way kind of to know for certain if that one was a
19   correct time or not.
20     Q.  So you went according to the bottom one that was
21   attached to the server, correct?
22     A.  Yes, ma'am.
23     Q.  The defense also showed you some vehicles
24   blocking Anton Larsen Bay Road from the T-1 camera
25   looking down and then asked you a question about how
```

1    certain videos in certain positions may hinder a clear

2    view of that road.  Do you remember that?

3        A.   I do.

4        Q.   Was there another camera that looked onto Anton

5    Larsen Bay Road that captured incoming traffic?

6        A.   Yeah.  The front camera --

7        Q.   Okay.

8        A.   -- up there at T-1, that would capture traffic as

9    well.

10       Q.   You talked about the all-hands on the ops deck.

11   Can you just generally describe what an all-hands is for

12   us non-military folks?

13       A.   Yeah.  So something for the commanding officer of

14   any of the bases or anywhere in the armed services, they

15   want to just kind of get face-to-face time, just kind of

16   give either recognition for one of our sailors or if

17   they want to just pass some good information to the

18   whole crew, and also just give him some face time just

19   to do all of that, that's something we would do.  So

20   we'd just gather everybody together in one place.

21       Q.   So it's an opportunity for the commanding officer

22   to address the entire unit?

23       A.   Yes.

24       Q.   If the unit is sitting prior to the commanding

25   officer coming into the room, what happens when the

1  commanding officer enters the room?

2         MR. CAMIEL:  Your Honor, this is beyond the

3  scope.

4         THE COURT:  That is sustained.  It is beyond

5  the scope.

6  BY MS. STEVENS:

7    Q.  So had you done the round that morning, where

8  would you have been?

9    A.  I would have been at T-2.

10   Q.  Thank you.

11        THE COURT:  Anything at all?

12        MR. CAMIEL:  No.

13        THE COURT:  Thank you, sir.  You may be excused

14 and released, right, Counsel?

15        MS. SHERMAN:  We believe he can be released.

16        MR. COLBATH:  Yes.

17        THE COURT:  You may be excused, sir.  Thank

18 you.

19        (Witness excused).

20        (Requested excerpt concluded, proceedings

21 continued.)

22

23

24

25

CERTIFICATE

    I, Sonja L. Reeves, Federal Official Court Reporter in and for the United States District Court of the District of Alaska, do hereby certify that the foregoing transcript is a true and accurate transcript from the original stenographic record in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

    Dated this 17th day of September, 2019.


                              /s/ Sonja L. Reeves
                         SONJA L. REEVES, RMR-CRR
                         FEDERAL OFFICIAL COURT REPORTER