1                    UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF ALASKA
2

3    UNITED STATES OF AMERICA, )
                               )
4            Plaintiff,        )
                               )
5    vs.                       )    CASE NO. 3:13-cr-00008-SLG
                               )
6    JAMES MICHAEL WELLS,      )
                               )
7            Defendant.        )
     ─────────────────────────)
8

9         PARTIAL TRANSCRIPT OF TRIAL BY JURY - DAY 7
                   (Testimony of Steven Becker )
10    **BEFORE THE HONORABLE SHARON L. GLEASON, DISTRICT JUDGE**
                   September 17, 2019; 8:17 a.m.
11                     Anchorage, Alaska

12   **FOR THE GOVERNMENT:**
             Office of the United States Attorney
13           BY:  STEVEN SKROCKI
             BY:  CHRISTINA M. SHERMAN
14           BY:  KELLEY L. STEVENS
             222 West 7th Avenue, #9
15           Anchorage, Alaska 99513
             (907) 271-5071
16

     **FOR THE DEFENDANT:**
17           Office of the Federal Public Defender
             BY:  GARY GEORGE COLBATH
18           601 West 5th Avenue, Suite 800
             Anchorage, Alaska 99501
19           (907) 646-3400

20           Camiel & Chaney, P.S.
             BY:  PETER A. CAMIEL
21           520 Pike Street, Suite 2500
             Seattle, Washington 98101
22           (206) 624-1551

23   ────────────────────────────────────────────────────────
                    **SONJA L. REEVES, RMR-CRR**
24               Federal Official Court Reporter
                    222 West 7th Avenue, #4
25                  Anchorage, Alaska 99513
          Transcript Produced from the Stenographic Record

1          (Call to Order of the Court at 8:17 a.m.)

2          (Proceedings took place and are not included in

3    this transcript, after which, the testimony of Steven

4    Becker transpired as follows:)

5          (Jury absent)

6          (Oath administered to the witness)

7          DEPUTY CLERK:  For the record, can you please

8    state your full name and then spell your full name.

9          THE WITNESS:  Steven Becker, S-t-e-v-e-n,

10   B-e-c-k-e-r.

11                    DIRECT EXAMINATION

12   BY MS. SHERMAN:

13      Q.  And the first thing I wanted to ask you in your

14   report and in the PowerPoint, there is a green box

15   image.  Do you recall that?

16      A.  Yes.

17      Q.  And the one -- there are two.  Can you describe

18   where you took those from?

19      A.  Sure.  The darker green one, so to speak, is from

20   a police photograph, the ones from the listing, and the

21   other one is from the incident video.  It's a snip from

22   a portion of the still frame when the vehicle was

23   visible.

24          THE COURT:  So April 12th?

25          THE WITNESS:  April 12th when the incident

1   vehicle was visible.

2   BY MS. SHERMAN:

3       Q.   Let's go through your background.  Why don't you

4   tell the judge about your education.

5       A.   Sure.  I have a bachelor of science in mechanical

6   engineering from Worcester Polytechnic Institute in

7   Massachusetts.

8       Q.   What year was that?

9       A.   That was '92.

10      Q.   Do you have another degree?

11      A.   Yes.  A master's in business administration from

12  Syracuse University, and a certificate in traffic crash

13  reconstruction I, II and III from Northwestern

14  University.

15      Q.   Let's talk about your career as a mechanical

16  engineer.  Tell us about what you were doing when you

17  first began in that career.

18      A.   If I could start with college.

19      Q.   Okay.  What were you doing during college in

20  relation to that?

21      A.   Yeah.  So first job when I was in college was

22  with Alliant Mini Supercomputers.  I was with Alliant

23  for three years.  There I was systems admin and then a

24  network engineer designing, working with the software

25  systems for mini supercomputers.  I did the network

1  systems for the raster graphics group.

2  　　Q.　What's raster graphics?

3  　　A.　The raster graphics was when we were moving into

4  processing 3D graphics, so they were taking various

5  images and working them with 3D softwares and other

6  things and then processing them on our hardware.

7  　　Q.　You were doing that at the beginning of raster

8  graphics, starting to do that?

9  　　A.　As far as our company goes, yeah.

10  　　　　THE COURT:　Let me try to focus us here, if I

11  can.　Is there a dispute about this witness's

12  qualifications, or is it more the reliability of the

13  opinion?　And it's fine if there is, but we may not need

14  this testimony at this time if that is not a topic in

15  dispute.　Mr. Colbath?

16  　　　　MR. COLBATH:　Your Honor, just because I'm

17  unfamiliar with Mr. Becker and he did not testify at the

18  last trial, I think I would prefer the Government to do

19  the qualifications.

20  　　　　THE COURT:　All right.　Go right ahead.

21  BY MS. SHERMAN:

22  　　Q.　At some point, you left that position?

23  　　A.　Yes.

24  　　Q.　Where did you go?

25  　　A.　While in college, my senior project was with the

Naval Air Development Center working with delta wing
aircraft.  For that, we had designed and developed a new
method of augmenting the vortexes over the delta wings
and testing that in a water tunnel.  We used flow
visualization for doing that analysis.

Q.  When you say "flow visualization," was that done
with a computer?

A.  Both with photography as well as video analysis.
So we set up a scale in the water tunnel and entrained
different color dyes to look at how the vortexes formed
over the delta wings and then processed those and the
images.

Q.  Where did you go from there?

A.  From there, I went to, let's see --

Q.  Are you reviewing your CV?

A.  I just want to make sure I have the right
corporation.  CEI Corporation at New Venture Gear in
Syracuse.

Q.  What did you do there?

A.  There I was working with the design, development
of gearing and transmissions and performing noise and
vibration testing.

Q.  And after that?

A.  That's for automotive vehicles.  After that, I
went to work for modern engineering at Chrysler, so I

was physically located in Chrysler there doing, again,

similar type of work, design, development of vehicles

testing and redesign.

     There we would use various sensors, including

cameras and everything else, for measuring how the

vehicles moved or how subcomponents moved in relation to

other components on the vehicle.  We would make a

variety of measurements based on those.

     Q.  Would that be using photogrammetry?

     A.  Yes.

     Q.  After that, what did you do?

     A.  Then I went to work for -- this one is a little

more convoluted.  I went to work back for New Venture

Gear directly, and then a few years later New Venture

Gear reverted -- they were a venture between General

Motors and Chrysler, and then they reverted back to

Chrysler, so then I was a Chrysler employee for a few

years.  And then they were finally bought out by Magna

Powertrain.

     Q.  What were you doing for them?

     A.  For them, I started out in the quality department

doing end of line testing.  We had sensors and cameras

and end of line system for recording each test of every

product that was going through the assembly line.  And

then we had areas where I noticed we couldn't improve

1  the quality any further, so I started working some of

2  the redesign and moved into the engineering design

3  development tests as a garage -- as the manager there.

4      There we had about eight test cells in

5  production.  I was still designing and developing all of

6  the end of line test machines.  We had probably 20 to 30

7  end of line test machines.  In all of those, as well as

8  in the development cells, we had surveillance video

9  systems set up as one of our sensors for making

10  measurements.

11      For example, like in a durability test cell, we

12  would measure the movement of the prop on the output

13  shaft relative to the system to see when the bearings

14  were getting looser prior to the whole thing exploding.

15  Q.   And when you were doing that, you indicated you

16  were doing it with surveillance.  Did that involve, that

17  analysis involve photogrammetry?

18  A.   Yeah.  Most of that was high-speed

19  photogrammetry, so we were using high-speed cameras.

20  Some of it was with general surveillance systems though.

21  Q.   What year -- timeframe was that?

22  A.   '97 to 2009.

23  Q.   After that, what did you do?

24  A.   And then another portion of that was still over

25  the road vehicle testing.  When we were doing that, we

were setting up cameras in the front and rear sensors on
the vehicle as well as GPS for looking at how the
vehicle moved relative to the roadway or relative to the
off road track we were testing on.

     After that, they were closing my facility down,
and I was going to move to Michigan with them for the
relocation, but instead opted to move to Robson
Forensic.

     Q.   How long have you been Robson Forensic?

     A.   Since 2009.

     Q.   And what have you done for Robson Forensic?

     A.   At Robson, we have sort of two kind of groups,
which we drop our work into.  One is litigation-based
work, and that's the Robson forensic work.  And then we
have Fournier Robson for consulting and design
engineering, non-litigation based work.

     So in that capacity, I have designed machines for
removing snow off the roofs of tractor-trailers, done
acoustical testing, environmental testing, pump noise
testing, et cetera, crash testing.

     And then on the Robson side -- and that's about,
depending on the year, 10 to 15 percent of my work.  On
the Robson side, I do testimony to try and resolve
litigation, primarily based in automotive, so whether
it's automotive products, automotive video analysis,

1  photography or crash reconstruction.

2     Q.  How many years have you been doing video

3  analysis, particularly photogrammetry?

4     A.  Since 1992, so that would be a lot.

5     Q.  Okay.  As part of photogrammetry, do you involve

6  the use of color analysis when you're talking about

7  vehicle identification?

8     A.  Sure.

9     Q.  Okay.  How long have you been using color

10  analysis?

11     A.  Again, since '92-ish.

12     Q.  So in your experience, it's kind of -- it's part

13  and parcel together in your analysis?

14     A.  Well, sure.  Every pixel -- it goes back to

15  what's called digital image processing.  Digital image

16  processing is the concept of taking an image and making

17  it digital instead of like film or how it used to be in

18  the olden days.

19         And digital image processing is the numeratizing

20  of each individual pixel.  That's done through the RGB

21  color scheme.  That's been done since digital image

22  processing has been created in the 1960s.

23     Q.  Do you use -- when you do color analysis, do you

24  use that RGB?  Sorry, is it RBG, RGB?

25     A.  RGB, red, green, blue.

1    Q.   Red, green, blue.  Do you use that scale or chart

2    or whatever in your color analysis?

3    A.   Yes.

4    Q.   And in terms of color analysis, can you describe

5    for the judge the standards you followed when you were

6    being asked to do a vehicle -- well, let me stop there.

7         How many times have you been asked to do a video

8    analysis, whether it be comparison or something else?

9    A.   100 to 200 times.

10   Q.   Have you ever been asked to do a vehicle

11   identification?

12   A.   Yes.

13   Q.   How many times?

14   A.   Identification, probably about 50.

15   Q.   Okay.  And each of those have included the piece

16   of color analysis as well?

17   A.   Depending, yeah.  I mean, in the nighttime ones,

18   sometimes color is not too viable.  They still ask for

19   it, but it's just not a viable option.

20   Q.   So in daytime ones, it's involved in all of them?

21   A.   Yes.

22   Q.   Have you ever testified in court before in

23   regards to photogrammetry, including color analysis?

24   A.   Yes.

25   Q.   How many times?

1    A.   Probably 10-ish.

2    Q.   And was that state court or federal court?

3    A.   Both.   Federal court the one that jumps out is

4 Hobbs, Cohen in Syracuse, New York.   In state court, I

5 was in trial just back in May.

6    Q.   Let's talk about the standards you use in color

7 analysis.   Can you describe for the judge whether you

8 use industry standards in terms of color analysis?

9    A.   Yeah.   I mean the RGB color scheme originated in

10 the 1800s, 1860s by a guy name Helmholtz.   They used a

11 color wheel and they would spin that wheel so that you

12 would see color for their imaging.

13        And then that concept has been applied throughout

14 the whole eons of digital analysis.   There is no real

15 other digital quantification of color except for RGB,

16 hue, luminance and saturation.

17    Q.   And in terms of photogrammetry, are you familiar

18 with, I guess maybe the industry standard isn't the

19 right word, how photogrammetry processing works and the

20 standards by which you undertake that process?

21    A.   Yes.

22    Q.   And can you tell the judge a little bit about, in

23 general, how that process works?

24    A.   Sure.   Basic photogrammetry is understanding

25 objects relative to other objects inside digital images.

1    So of that you have to first understand how the digital

2    image is processed or acquired, and that all begins with

3    the physics of light.

4        So everyone in the room is familiar with sort of

5    the mirage effect.  When you're looking out at a long

6    horizon line you don't see the ground, you then see a

7    mirage.  You're not really seeing a mirage.  What you're

8    seeing is the reflection of the sky.

9        So that's based on your observer's angle of

10   incidence for the object you're viewing, as well as

11   where the light source is.  And that's really the two

12   key characteristics for any photograph analysis, you

13   start there, you understand where the light source is

14   coming from.  So that tells you about shadows.  It tells

15   you about your color composition, whether you've got

16   flat light, bright light, background light, top light,

17   whatever you're looking at.

18       And then you move on to characteristics of

19   objects or sizing.  Depends on what you're doing.

20   Sometimes I'm not too keen on the specific

21   characteristics.  I just want to make some measurements.

22   Other times, I'm not too keen on measurement.  I just

23   want to look at the various characteristics of objects.

24       So you follow those sort of pathways depending on

25   what your final purpose is.  Everything begins with a

scientific method.  You start out with a hypothesis or a
question you want answered, and then you let your
investigation lead you to what you can ultimately
conclude.  And then you test your hypothesis to
determine whether or not that hypothesis was met by your
investigation.

So in this case, I had sort of two hypotheses.
One was to determine the make and model of the vehicle,
and the other was to determine if it was consistent with
Wells' vehicle.  So that led me down the rest of the
path that I can explain later.

MS. SHERMAN:  Okay.  I think those are all my
questions, Your Honor.

THE COURT:  All right.  Mr. Colbath, go ahead,
please.

CROSS EXAMINATION

BY MR. COLBATH:

Q.  Sir, there are no industry standards, published
industry standards for the industry known as
photogrammetry, video analysis, are there?

A.  No, there is.

Q.  What are they?

A.  Well, there is one from the scientific working
group from the FBI digital -- one second -- digital
evidence.  They call it best practices for forensic use

1  of photogrammetry.

2      And then there is a number of companies out there

3  that teach photogrammetry, and those are widely accepted

4  and accepted in courts.  There is a number of cases.

5      Q.  Widely accepted by who?

6      A.  The court.  There is a software called

7  PhotoModeler.  There is software called PC Crash.  There

8  is a whole number of them, Faro Scene.  Everybody and

9  their brother now is doing 3D laser scanning.  The

10  reason many times they are doing the 3D laser scanning,

11  which has also been accepted in court, is that you want

12  to use that to match or create an inverse camera

13  projection.

14      Q.  And --

15      THE COURT:  Can I interrupt?  Going back to

16  those standards from the FBI, did you apply those

17  standards in doing the work in this case?

18      THE WITNESS:  Yes.  Actually, I only mentioned

19  one of them, the photogrammetry one, but there is also

20  another one for photo comparisons, which I also applied.

21      THE COURT:  Thank you.  Go ahead, please.

22  BY MR. COLBATH:

23      Q.  And do you happen to have -- I know I saw you

24  referring up there, referring to something.  Do you have

25  the standard operating procedure, the FAVU standard

1   operating procedure on photogrammetry there with you?

2       A.  I do.

3       Q.  When did you get that?

4       A.  About 2016, '15.

5       Q.  Okay.  Does it have a number?  Those things are

6   usually referred to by number.

7       A.  The one I printed out is version one.  There is a

8   date on it.  September 29, 2015.

9       Q.  September 5th --

10      A.  September 29th.

11      Q.  2015?

12      A.  Yes.

13      Q.  And that is the FAVU standard operating procedure

14  on photogrammetry?

15      A.  I don't know what FAVU is, but it's the

16  scientific working group on digital evidence.

17      Q.  Scientific working group.  Okay.  So let's be

18  sure.  Scientific working group.  That is their

19  photogrammetry standard within the industry or best

20  practices?  Is it one or the other?

21      A.  It's a best practice.

22      Q.  And that working group, sir, you're aware has

23  been disbanded, they finished their work after

24  developing the best practices?

25      A.  I haven't seen an update since then.

     1    Q.  Okay.  And then you referred to there is another

     2  -- there is another one that deals with photo comparison

     3  and you also applied that?

     4    A.  Yes.

     5    Q.  What is the -- what version do you have there of

     6  that?

     7    A.  I didn't print that one out.

     8    Q.  Do you recall the number or the title of it?  Was

     9  it again from this scientific working group?

    10    A.  Yeah.  It would have been best practices for

    11  photographic comparison or something of that nature.  I

    12  might have referenced it in my report.

    13    Q.  And those software companies, the PhotoModeler or

    14  the other companies you listed there, what they develop

    15  are standards and best practices or standards and

    16  practices for utilizing their software products, their

    17  programs?

    18    A.  Sort of.  It's actually a process that can be

    19  applied across a lot of products.  You don't need to use

    20  just their software.  In other words, when you go to the

    21  training class, like I just had a refresher on PC Crash

    22  last month, and that's the same process as what I had

    23  used when went to the Faro training.  And it's the same

    24  process I had learned when I had taken the PhotoModeler

    25  training.

Q.   While the processes are the same though, there is
no collective body that within the photogrammetry
community, if you will, that has published a singular
set of standards that are peer reviewed and tested that
say "when conducting photogrammetry, these are the
industry standards that you follow," or is that what the
group you were referring to was?

A.   No.  Neither is correct.

Q.   Okay.

A.   The scientific working group has a good practice
that's consistent with everyone else's understanding in
the industry that I'm familiar with, but there is a
number of published articles from SAE, Society of
Automotive Engineers, on how to do various practices
with both photogrammetry and reverse projection.

THE COURT:  You cited them in your report.

A.   One of them is cited in my report.  Another is a
book, Handbook of Digital Forensics, by Hogue and Boone
(phonetic), and then people are very familiar with the
process in our field.

Q.   So, sir, I want to -- and in following those
industry standards and arriving at the opinions you
arrived at, to what standard or to what degree of
certainty did you arrive at your opinions?

A.   Reasonable degree of professional and scientific

1    certainty.

2         Q.   And it was in fact then, in your estimation,

3    scientific analysis and processes that you applied per

4    those industry standards that you followed to allow you

5    to reach and ultimately make your conclusions?

6         A.   Yeah, I mean overall it's the scientific method

7    in general.  Those are some of the investigative tools.

8         Q.   Can you just share with us then an outline of the

9    basic methodology?  First, you talked really about

10   having two pieces of your work; first, a make/model

11   determination, the video analysis, and then a "is it

12   consistent with the Wells' vehicle" photo comparison.

13   Did I get those right?

14        A.   Yes, basically.

15        Q.   So, first, with the make/model determination,

16   what was the methodology you used there?

17             THE COURT:  I'm going to interrupt here,

18   because this report has been out for quite some time and

19   I am interested in you focusing not on an entire cross

20   exam of this witness, which we're going to have in front

21   of a jury, I hope, this afternoon.  I would like you to

22   focus on the part of the methodology, or maybe you could

23   articulate for me the part of the methodology that you

24   find does not meet Daubert.

25             MR. COLBATH:  Sure.  Thank you, Your Honor.

BY MR. COLBATH:

1

2    Q.  Sir, in order -- first of all, I did not see in

3  your report that you made that you conducted a

4  make/model determination, the first of the two

5  hypotheses that you described.  Did I miss that in your

6  report or is there a section you can point me to where

7  that is conducted?

8    A.  Sure.  I'll reference my report.  From page 23 to

9  28.  Well, I'm sorry.  To 27, not 28.  And then the

10  finding -- there is multiple findings, but the one,

11  finding number three in particular, that the vehicle

12  make/model -- I didn't say "make," I just said "model,"

13  "consistent with the blue of the vehicle of interest is

14  a 2000 or 2001 model year Honda CR-V or a '95 to '98 and

15  2001 to 2004 Isuzu Rodeo.  The vehicle would have to be

16  medium blue in color, have a front vehicle protector bra

17  that extends beyond the headlights, non-tinted side

18  windows, dark rims or wheel covers and dark non-body

19  colored bumpers and a dark non-body colored spare tire."

20    Q.  In performing that analysis, sir, just in a

21  general sense, without going through all the details so

22  we don't get bogged down in this, but first of all, did

23  you use from pages 23 to that opinion both of the videos

24  provided by the Government?

25    A.  I don't know what you mean by both of the videos

1    that were -- are you talking about -- sorry.  The

2    April 12th and you're talking about the April 19th?

3        Q.   Correct.

4        A.   The April 12th is what's used for the specifics

5    of the make and model.

6        Q.   Okay.

7        A.   The April 19th is for the comparison to the

8    Wells' vehicle and for the make and model, because with

9    both of them you're able to further identify

10   characteristics.

11       Q.   So did you run, for instance, a color analysis on

12   the images from, or some of the images from the

13   April 19th video?

14       A.   No.

15       Q.   There were not -- those are not depicted on --

16       A.   Not for the make and model determination.

17       Q.   For any of your -- for either determination?  It

18   appears that's what it looks like you did on page 12 and

19   page 13 of the report.  I see there is color comparison

20   analysis, graphs, some kind of generated graphs for both

21   the vehicle of interest as well as the Wells' Honda

22   CR-V.

23       A.   Right, and that's not for the make/model

24   determination.  That's for the comparison on Wells.

25       Q.   In order to make the make/model determination it

looks like, if I go back to page 23, which was the first
page that you said, in doing an angular comparison, it
looks like you utilized both a 3D model, the April 12th
video and the April 19th video, which you have labeled
as the Wells' CR-V in the bottom of the three figures
there?

A.  Yes.  Again, that was for the comparison to the
Wells' vehicle.

Q.  Okay.

A.  Not for the model determination.  Well, for the
3D model and the one above of course.

Q.  Any analysis, testing or determination from using
the April 19th video go into the makeup of the make and
model determination?

A.  Yes.  In that analysis, in that video,
comparative characteristics were identified.

Q.  And so you couldn't have made -- for instance,
you couldn't have made -- you could have made
comparative characteristics -- you couldn't have
identified those comparative characteristics without the
April 19th video, could you?  Let's use the bra is
probably the best example.

A.  No, I wouldn't quite say that because the bra is
visible as a disturbance behind the headlights in both
videos, so that would have been noted as a

characteristic.  There is also the geometry behind the
vehicle for the spare tire carrier.  That was noted
either with or without the video.

       The video, the April 19th video added to the
corroboration of the identification of the key
characteristics because they were known attributes from
a known vehicle in the video.  But I also used other
vehicles from the April 12th for other characteristics.

Q.  So I guess, sir, my point is this:  I did not see
anywhere in your report where you took the April 12th
video, the unidentified, unknown video and did an
independent analysis that did not incorporate in some
way, shape or form some attributes or some aspects of
things you took from the Wells' CR-V or the April 19th
video.

       There was not two separate processes here.  It
sounds like one added to the other, if I heard you
right.

A.  One was corroborative of the other.  In other
words, the vehicle make and model determination could
run completely independent of the April 19th video, but
it didn't have to because I had the April 19th video
with known characteristics, so on any given
identification characteristic, it was then consistent
with.

1      Q.   So the April 19th video informed your work on the

2   April 12th video because you had it to identify, know

3   what it was?

4      A.   Sure.  Yeah.  Like in a general analysis, like,

5   say we have a picture of this courtroom and I can't see

6   all of the size of that door, but if there is some other

7   video that shows that door better, I can then use that

8   for the comparison.

9           THE COURT:  Is that approach recognized in the

10  field in which you practice?

11          THE WITNESS:  Yes.

12          THE COURT:  So Mr. Colbath, can you wrap up

13  here?

14          MR. COLBATH:  I can, Your Honor.  I'm prepared

15  to make my argument at this point without asking any

16  further questions.

17          THE COURT:  Very good.  You can be excused.

18          (Proceedings took place and are not included in

19  this transcript, after which, the testimony of Steven

20  Becker transpired as follows:)

21          (Jury present)

22          (Oath administered to the witness)

23          DEPUTY CLERK:  For the record, can you please

24  state your full name and then spell your full name.

25          THE WITNESS:  It's Steven Becker, S-t-e-v-e-n,

1    B-e-c-k-e-r.

2                    DIRECT EXAMINATION

3    BY MS. SHERMAN:

4        Q.   Mr. Becker, what do you do for a living?

5        A.   I'm an engineer.  I work for Robson Forensic.

6        Q.   How long have you been an engineer?

7        A.   Since 1992, although I guess I was an engineer

8    while I was in school.

9        Q.   You mentioned school.  Why don't you tell the

10   jury about your education.

11       A.   I have a bachelor of science in mechanical

12   engineering with aerospace from Worcester Polytechnic

13   Institute in Massachusetts.  I also have a master's in

14   business administration from Syracuse University, and a

15   certificate in crash reconstruction I, II and III from

16   Northwestern University.

17       Q.   Why don't you take us through your career as a

18   mechanical engineer.  You're pulling out a binder.  Why

19   don't you tell us what you're referring to.

20       A.   I'm setting it on my lap.  This part I know.

21   It's not really a memory test.  I started working for

22   Alliant Mini Supercomputers in '90 or '89.  There I was

23   a system administrator as well as a network engineer

24   processing data for raster images and rasterized

25   graphics.

1      From there, when I graduated with my degree in

2  mechanical engineering, I moved on to New Venture Gear

3  through the CEI Corporation working as an engineer

4  designing transmission gearing, transmission components,

5  doing testing over the road to make cars and trucks

6  quieter.

7      Then I moved to working at Chrysler through

8  modern engineering in Detroit.  I was working for

9  Chrysler designing components for the Dodge Viper, the

10  minivan, the Jeep Grand Cherokee, PT Cruiser, Dodge

11  Neon, all variety of structural as well as engine

12  subcomponents.

13      From there, I went back to New Venture Gear as a

14  quality engineer working in the end of line test

15  machines using sensors as well as video cameras for

16  looking at how the parts move relative to each other.  I

17  noticed that some of the quality things that I couldn't

18  fix were just design issues, so I started taking over

19  more of the design aspect, and they moved me up to the

20  engineering services manager in the front garage.

21      There I managed a fleet of vehicles and mechanics

22  and test machines and test cells for both durability

23  testing as well as noise testing.  There we would use

24  surveillance cameras or high speed photography or

25  specialized cameras for flow visualization studies,

durability failures, looking at how like the prop shaft
moved relative to the component for when a bearing
started wearing out and things of that nature.

     Then they were going to close my plant.  Well,
they did close the plant.  And I was going to move back
to Michigan, which was kind of a shoe-in because my wife
is from there, but we decided to jump ship and try
something a little different.  I moved to Robson
Forensic.

     It turned out it wasn't much different.  It was
all the same physics, the same equations, the same type
of analyses.  At Robson, I do probably about 65 percent
plaintiff, 35 percent defense work in support of
litigation, whether it's crash reconstruction from a
motor vehicle accident or a product defect or a repair
issue or just an in general photo or video analysis
case.

     We also have a consulting group where we do
non-litigation based engineering where I design or
perform testing for customers and clients.

     Q.  Let me ask you, you mentioned photo or video
analysis.  When did you start doing photo or video
analysis in your career?

     A.  Back in college.  One of my main projects or
senior project was working with the Naval Air

1    Development Center to redesign delta wing aircraft.  We

2    were augmenting the vortex flow over the wing and we

3    decided we were going to put it in a water tunnel for

4    flow visualization studies to determine the

5    effectiveness of it.

6         There we were running different color dyes and we

7    were taking photographs and video and then measuring how

8    the dyes were moving relative to the new designs.  So

9    that was '91, '92.

10   Q.  Let me ask you another question.  Can you tell us

11   whether you have -- First of all, let me ask you this:

12   What is photogrammetry?

13   A.  Sure.  Photogrammetry is really the study of

14   objects in -- well, nowadays in digital image

15   processing.  In the old days, it used to be of just

16   images.

17   Q.  Have you taken trainings in relation to

18   photogrammetry?

19   A.  Yes, several.

20   Q.  Can you describe those, please?

21   A.  Yep.  One was with the software company for

22   PhotoModeler.  They take software to apply to image

23   processing so you can determine sizes and shapes and

24   relative positions of various objects.

25        Others have been with PC Crash for taking 3D

laser scans of areas and then performing camera matching

on various images so that we can then run simulations of

vehicles through basically photographs.

Then a lot of it goes back to college working

with physics for the optics and how light moves and

reacts with digital image processing and then a lot of

my software background.

Q.   Have you been asked to do vehicle identifications

before?

A.   Yes.

Q.   And when you do those analyses, do you use

photogrammetry?

A.   Many times, not always.

Q.   And when you use photogrammetry, do you also

include an analysis of color?

A.   Yes, as long as we can.  Certain nighttime images

you're not going to have any color available, but if

color is available, that's definitely a key component.

Q.   What sort of method do you use when you are asked

to do a comparison analysis or a color analysis?

A.   Sure.  It all starts with what we call the

scientific method.  So you start out with a hypothesis

or a question you want answered.  You then perform an

investigation.  In photogrammetry and photo analysis,

you're going to be comparing either key characteristics

1  or colors, shapes, sizes, whatever happens to be of

2  interest or available in the images, and then testing

3  that hypothesis to see if you satisfied or came to a

4  conclusion that's either positive or negative, and then

5  reporting that back to your client.

6      Q.  Were you asked to answer a few questions in this

7  case, to render a few opinions?

8      A.  Yes.  I had two hypotheses in this case.  One was

9  to determine the make and model of a vehicle of interest

10  in a video.  The other was to see if that vehicle was

11  consistent with a known Honda CR-V owned by Wells.

12      Q.  And did you apply that scientific method in

13  answering those questions?

14      A.  Yes.

15      Q.  Okay.  And have you testified in court before on

16  photogrammetry?

17      A.  Yes.  Yeah, just a few months ago.

18      Q.  And other times as well?

19      A.  Definitely.

20      Q.  Sure.

21          MS. SHERMAN:  Your Honor, at this time, I would

22  request the Court find this witness has the experience,

23  background and education to give an opinion in regard to

24  photogrammetry, including color analysis.

25          THE COURT:  Based on my prior rulings, I will

1  so find.  Go ahead.  Any objections are preserved.

2        MR. COLBATH:  No additional objections, Your

3  Honor, other than the objections I have already made.

4  Thank you.

5        THE COURT:  Thank you.  Go ahead, please.

6  BY MS. SHERMAN:

7    Q.  I want to start by talking about your approach to

8  this case.  You had been asked two questions.  How did

9  you approach your task?

10    A.  Sure.  So there is this April 12th video.  The

11  first thing you do is you analyze the video itself for

12  the content, the date and timing, and ascertain where

13  the light is coming from in the video.

14        All imagery is basically a reflection of light.

15  Like none of you actually see me right now.  You only

16  see the reflection of light from me back to your eyes,

17  if that makes sense.  The camera is doing basically the

18  same thing.

19        So in this case, we have a low frame rate.  We

20  have a four frame per second video with 680 by 480P,

21  pixels.  So pixels are what make up the digital image,

22  because, of course, we can't store a color in

23  electronics.  You store numbers.  So we quantify those

24  individual pixels.  Each one gets a series of numbers

25  applied to it to define its color and then where it is

1    in a raster graphic.

2        The raster graphic just means that we're making a

3    grid of little tiny points wide and high, and then that

4    is how we define the digital image.

5    Q.  Did you -- you had some photos.  Did those end up

6    in a PowerPoint that might assist in the illustration of

7    your testimony today?

8    A.  Yes.  All video is made up of still images, so in

9    other words, it's a series of still images that are

10   repeatedly shown and a frame rate.  As long as the frame

11   rate is fast enough, it looks like continuous motion.

12   If the frame rate is slower, then you see sort of that

13   stop motion, jerkiness of like some surveillance videos.

14   Q.  Did you use still images in the PowerPoint

15   illustrating your testimony?

16   A.  Yes.  First thing we did was capture the still

17   images.

18   Q.  Hold on.

19       MS. SHERMAN:  If we could display Exhibit 95.

20   I recognize it's demonstrative and won't go back to the

21   jury.

22       THE COURT:  Yes, based on the prior rulings, go

23   ahead.

24   BY MS. SHERMAN:

25   Q.  Can you tell us what we are seeing here and what

1  role this played in the beginning of your analysis?

2     A.  This is a Google Earth overhead image, so now

3  there is two Google Earths, the one that you guys often

4  see on the internet and then there is Google Earth you

5  can download.

6       When you download the Google Earth, it allows you

7  to have this scale that's in the lower right -- lower

8  left corner.  In that I was able to identify there was a

9  T-2 building, a T-1 building.  There is Anton Larsen

10 Road that goes in front of T-2 building sort of

11 generally oriented north-south.

12      And then from the video, I was able to identify

13 the geography and the position of where the camera was

14 and what it was viewing.  We can see that the camera was

15 viewing basically west.  It had a portion of the T-2

16 building visible, this parking lot, a fence partially

17 around T-1 building.

18    Q.  Let's go to the next slide.  Before I have you

19 explain it, I wanted to ask you a few things.  You

20 mentioned frame rate.  Can you tell the jury what a

21 frame rate is?

22    A.  Yeah.  Like in your typical movie, et cetera,

23 it's going to be 30 frames per second, because the human

24 eye perceives motion constant when it's above 15 frames

25 per second.  And a frame is how many still images per

1    second.  You know, it's kind of straightforward.  The

2    camera is basically taking rapid snapshots.

3        Q.  So let's talk about the surveillance video -- the

4    videos that you reviewed.  Can you tell us, tell the

5    jury what lens distortion is.

6        A.  Sure.  Lens distortion, there is kind of two

7    facets to that.  Your typical lens, anyone who has ever

8    seen a pair of glasses or a camera lens, et cetera, you

9    know it's slightly curved.  In that curvature that means

10   that the outer quadrant of the image in each corner is

11   going to be distorted, or, in other words, there is a

12   little bit of curvature to that.

13       It's really most easily seen when you're looking

14   at a photograph of the side of a building with a bunch

15   of uniformed size windows.  You will see a couple of

16   them are actually a little distorted.  That's sort of

17   the classic image distortion.

18       Other things could be damage to the camera or

19   damage to the image.  Those things also can occur.

20       Q.  In the images you reviewed, were there -- was

21   there a lens distortion that impacted your analysis?

22           MR. COLBATH:  Your Honor, I'm sorry.  I have an

23   objection to this.  Can we approach?

24           THE COURT:  All right.  Yes.

25           (Begin bench conference.)

1          MR. COLBATH:  Well, my objection is I don't

2     recall anything in his report about lens distortion.

3     And I didn't object when it was initially asked just

4     because I thought, well, maybe it's just a general

5     camera explanation, but now we're moving into how did

6     lens distortion affect your analysis.

7          THE COURT:  Is it in the report?

8          MS. SHERMAN:  I don't believe that lens

9     distortion.  I'm going to have him talk about

10    resolution.  That was my next question.

11         THE COURT:  So we're done with lens --

12         MS. SHERMAN:  Yes.

13         (End bench conference.)

14    BY MS. SHERMAN:

15    Q.   Let's talk about resolution for a moment.  How is

16    resolution determined?

17    A.   Resolution goes back to those number of pixels I

18    was discussing earlier.  As I said, this one is 640 by

19    480P.  Some people refer to it as 480P.  Other ones are

20    higher resolution, 720P, 1080P, et cetera.  The higher

21    the resolution, the better the detail in the image.  And

22    what that really means is how much you can zoom in and

23    still have a clear image, because you don't have

24    infinite zoom capability.  Otherwise, you get what's

25    called pixilated view.

1    Q.  Let me ask you about this surveillance that's

2  done from 2012.  Is 640 by 480, is that considered a

3  good resolution?

4    A.  For the timeframe of 2012, it's not a bad

5  resolution.  Everybody and their brother is familiar

6  with modern cell phones.  They are running up to 4K now.

7  And that doesn't mean 4,000 pixels, by the way.

8         So this isn't what you would call like high

9  definition.  It's the one just below that.

10   Q.  When you look at these images, what sort of

11  computer are you using?

12   A.  I use my laptop as well as a monitor, depending.

13   Q.  Did it have higher resolution than 640, 480, or

14  is that impacted by the computer you look at?

15   A.  Yeah.  My system is a high resolution system, so

16  there is what's called sub-pixel viewing.  So in other

17  words, when you take an image, as you guys see it up

18  here on the screen, it's whatever the resolution is of

19  the projector regardless of the resolution it was taken

20  at.

21         So when I look at it on my screen, I look at it

22  in the original format.  Also, this is a snipped image,

23  so it's not actually the player of the actual original

24  video.  A snipped image is an image that's been exported

25  and saved as a video -- as a singular image file.

1          All of those things sort of change the

2    characteristic of an image a little bit compared to when

3    you go back to the original.

4        Q.  I want to ask you about the number of frames that

5    you saw from April -- the April 12th video.  How many

6    frames did you observe from, I guess, left to right?

7    Would you describe that as northbound?

8        A.  Sure.  First I'm going to start off with what

9    she's talking about.  In this video, you can see a

10   vehicle traveling on Anton Larsen Bay Road, and on this

11   image, it's currently traveling northbound.

12          So in the northbound travel direction, the

13   vehicle at -- I know it says the timestamp, 9:21, but

14   it's actually 7:09 in the morning, because this

15   timestamp doesn't account for Alaska time.

16       Q.  So how many frames did you capture?

17       A.  I'm sorry.

18       Q.  How many frames did you capture northbound?

19       A.  So northbound, there were five frames.

20       Q.  Did you also look at images southbound?

21       A.  And then southbound at 7:14, there were four

22   frames where the vehicle was visible.

23       Q.  Can we go to the next slide, please.

24          Did you isolate those frames and do further

25   analysis on those frames specifically?

1    A.  Correct.

2    Q.  Okay.  Let's talk about -- you said one of the

3  questions you were asked was to see if the Wells' CR-V

4  was consistent.  Did you look at photos of the Wells'

5  CR-V?

6    A.  Yes.

7    Q.  Can we go to the next slide.

8       Now, I want to ask you about features of

9  vehicles.  What features did you know in looking at the

10  Wells' CR-V that came into your analysis?

11    A.  The first thing we do is we look at just the

12  facts that are available in the case.  In this image of

13  a vehicle, we notice that it's basically a compact SUV.

14  It's of a certain length.  It's got a front-end bra

15  cover.  In other words, what a bra cover is is this

16  black leather cover that's covering a portion of the

17  fender as well as the hood.

18       Some bra covers only cover a portion of the hood.

19  This one wraps onto the fender.  It has bumpers that are

20  not consistent with the body color, but are dark.  The

21  wheels don't have a chrome or aluminum polished type of

22  center rim portion.  There is a rear spare tire carrier.

23  There is the angles of course of what's called an A

24  pillar, B pillar, C pillar and D pillar.

25       A pillar is the support for the roof that's up by

the windshield. And then we kind of work our way back.
On like a sedan, you of course don't have a D pillar.
You have a B pillar between the doors, which you
wouldn't have in a coup, then a C pillar for the rear
door to the rear area, and then a D pillar where the
rear window is.

You can also notice the color of the vehicle. I
think everybody in the room kind of generally sees that
this is sort of a medium blue, but if you really look at
the vehicle in detail, you can see the hood doesn't look
blue, right, because the hood is still blue, but, again,
you're looking at it in a very low angle.

MR. COLBATH: Your Honor, I'm going to object
to the narrative. He's moved onto color from
characteristics.

THE COURT: Why don't you ask your next
question.

BY MS. SHERMAN:

Q. In addition to characteristics, did you look at
the color of the vehicle?

A. Sure. Color is one of characteristics of any
given vehicle because we paint them all different
colors. In this vehicle, it's blue. And as I was
saying, what you notice is down in the very low area,
it's not blue, it's dark.

 1    That's because it's reflecting the ground.  You

 2    can kind of tell the color when you see the portions of

 3    it that are reflected back toward the camera at sort of

 4    what we call the normal angle.

 5    So portions of the vehicle that are angled

 6    upwards or have a shallow angle reflect the sky and they

 7    don't reflect the actual color of the vehicle.  Of

 8    course, if the photographer was standing right next to

 9    the vehicle, you would see his colors of the clothes he

10    was wearing.  And in the low portions that are angled

11    toward the ground, you see ground color.

12    Q.  Before I move to the next slide, I want to ask

13    you, did you take the frames from the April 12th video

14    and zoom in on them before you did your analysis?

15    A.  I did, but there was some more characteristics.

16    Q.  I'm sorry.  So we talked about color.  We talked

17    about the bra and the tire.  What other characteristics

18    did you note on the Wells' vehicle?

19    A.  There is also the headlights.  One of the things

20    we look at in all vehicle IDs is the shape and position

21    of the headlights.  These headlights wrap around into

22    the fender, meaning that they are not just up on the

23    front of the vehicle like in some models of vehicles.

24    There is also a reflector on the side, a yellow one in

25    the front and a red one toward the rear.

1    And then there is some non-body colored trim

2  molding.  There is no chrome around the windows.  And

3  the windows are all fairly translucent, they are not

4  dark tinted.  You also have a non-body colored side view

5  mirror.

6    Q.  Any other characteristics?

7    A.  Non-body colored handles.

8    Q.  Did you isolate the images of the northbound view

9  of the vehicle and zoom in on those?

10    A.  Yes.

11    Q.  Did you enhance them?

12    A.  No.

13    Q.  Is that possible?

14    A.  Well, depends on what you mean by enhancing.

15  Sometimes enhancing is taking a still image of a moving

16  video and zooming in on it.  What I think she's

17  referring to is enhancing like something you see on CSI

18  TV show, et cetera, where you can suddenly make out

19  details that weren't visible in the video prior.

20    That's actually not possible.  You can do some

21  sharpening.  You can adjust light and things of that

22  nature, but you can't enhance something to make it

23  suddenly visible like a face suddenly appears inside a

24  window or in a reflection of some guy's eyeball or

25  something like that.

1    Q.  Let's talk about those images you isolated.  Can

2    we go to the next slide.  Can you tell us what we are

3    seeing here?

4    A.  These are the five frames of the vehicle

5    traveling northbound.  Starting in the upper left corner

6    would be the first frame.  Second frame left to right.

7    Third frame.  Then you go down to the bottom, the

8    fourth.  And then the fifth one, it's moving behind the

9    building T-2.

10   Q.  Did you isolate images of the vehicle of interest

11   southbound as well?

12   A.  Yes.

13   Q.  Can we go to the next slide.  Can you tell us

14   what we're seeing here?

15   A.  These are the four frames of the vehicle

16   traveling southbound.  It's in kind of opposite order.

17   You can see the lower right is when the vehicle first

18   emerges from behind the building.  Then the next frame

19   to the left of it.  Then the upper right and then the

20   upper left.

21   Q.  Okay.  And then did you do the same sort of zoom

22   and collage with images from the 4-19 video, the Wells'

23   CR-V?

24   A.  Yes.

25   Q.  How about we go to the next slide.  Can you tell

1    us what we're seeing here?

2        A.   Yes.   So this is the 4-19 video where they drove

3    Mr. Wells' CR-V through the same site, and we have five

4    frames captured traveling northbound starting with the

5    upper left moving left to right.   And then the bottom

6    right where it's moving to behind the T-2 building.

7        Q.   Then did you do the same thing with the Wells'

8    CR-V southbound?

9        A.   Yes.

10       Q.   Can we go to the next slide.   Can you describe

11   what we're seeing here?

12       A.   This one I put in the same correct order,

13   unfortunately.   So again in the upper left is where you

14   see it emerging from the building.   Then moving left to

15   right.   And then it was just disappearing in the lower

16   right.

17       Q.   Let me ask you a question about you indicated you

18   zoomed.   Did you zoom to the same distance?

19       A.   Not exactly.

20       Q.   Okay.

21       A.   These images are zoomed just about the same.   The

22   image itself is zoomed into the same, but the position

23   in the image is slightly different between the 4-12 and

24   the 4-19 video.

25       Q.   So where the vehicle appears is -- make sure I

1  understand what you're saying.  Where the vehicle

2  appears is different in that image, but it's the same --

3          MR. COLBATH:  Your Honor, I'll object as to

4  leading.

5          THE COURT:  That is leading.

6  BY MS. SHERMAN:

7     Q.  Let me restate it.  Let me ask a different

8  question.

9          You took the 12 video, the April 12th video and

10  the April 19th video?

11    A.  Yes.

12    Q.  Did you then zoom in on these images so they

13  were, I guess, similar?

14    A.  These images aren't necessarily zoomed in.  They

15  are enlarged.  So they are snipped out of the exact same

16  camera position and camera zoom just around the area of

17  the vehicle and then enlarged for your benefit to see

18  them on the screen.

19    Q.  After you have isolated and enlarged those

20  images, what is the next step -- where do you start your

21  actual analysis?

22    A.  In this case, I started with color.

23    Q.  Did you take an example of, not relating to any

24  vehicles, to kind of illustrate what you're talking

25  about in regards to color?

1     A.   Sure.   As I mentioned earlier, color is a little

2   bit confusing in the digital world to the general

3   layperson.   So I took a known object of a known color

4   and did a photo comparison of the color for the green

5   box that is the electrical box that operates the gate

6   both in the video and in a police photograph.

7     Q.   Let's go to the next slide.   Why don't you

8   describe for the jury the different aspects of color.

9     A.   Sure.   Color in digital images is described in

10  the RGB scale, red, green, blue.   Up on the screen you

11  will see that there is the words red, green, blue in the

12  lower right in both of the two sort of color wheels.

13        Even though it's square, we still refer to it as

14  a color wheel because that's where it originally came

15  from.   There is a few other aspects called hue,

16  luminance and saturation.   Everybody remembers back in

17  elementary school mixing colors of paint together.

18        In various combinations of red, green and blue,

19  we can come out with 16 million different colors, and

20  that's because we store them in digital images as

21  numbers, 0 to 256.   So you take those combinations and

22  you can create all the variety of colors that are used

23  for depicting any digital image.

24        So hue -- you can see there is some arrows going

25  left to right.   And hue generally describes the

combination of those colors. If you have any given red,
green and blue, you can define sort of a column of this
is basically red or this is basically blue or green or
whatever.

Saturation is going to be how crisp or muted that
color is. So the more pure the color, the better the
saturation. It gets muted as it moves down in the image
or in the color pallet.

And then lastly, we have luminance. Luminance is
sort of the brightness or the white to gray scale of any
given color. So some colors appear darker, they have a
lower luminance value. Whiter colors have a higher
luminance value.

And then what we see up on the screen is the
green box on the left taken with a pretty decent police
camera and then the surveillance video from the day of
the incident on the right. And what I have done is I
have selected a point in the middle and center of the
green box.

The reason I do that is because we know,
obviously, it's a green box, right. But when you look
at sort of the color splotch, anyone who's been paint
shopping for their house before knows color splotches,
they can be a little mind numbing what the differences
actually are. Well, in digital color analysis, we can

tell you what the actual differences are in the colors
and whether they are from the same sort of color family.

What you see here is you have a comparison of the
two.  The red values and the blue values are both lower
than the green values for the RGB, but the green values
aren't the same.  One is 87 on the left and one is 162
on the right.

Q.  Why don't you grab that laser pointer and point
to where you're talking about those values, please.

A.  So the red value in the image here is 17, and
over here it's 78.  The green is 87.  The blue is 50.
Over here it's 162 and this one is 89.

Just at a first glance, that's a huge difference.
We know this is still the same green box.  Why are they
so different?  They have different lighting conditions,
different cameras, different sea moss sensors in the
cameras that causes the digital image to be stored as a
different color.

But on the left you have hue, saturation and
luminance.  And when you look at the hue, we're talking
about the vertical color.  We have got this little sort
of dot in the center here.  That dot is defining where
that color actually is for this.  Even though it looks
like it's a little washed out in this image, that's
because it has a higher saturation, a lower -- sorry, a

1    lower luminance value, but it's in the same green

2    column.

3         So the hue of 99 and the hue of 85 both describe

4    the same green box.  And the takeaway is that you can

5    define sort of general families of colors by the hue and

6    if those two hue values are somewhat consistent.

7    Q.  Did you look at color in relation to the vehicle

8    of interest from the 12th in comparison to the Wells'

9    CR-V from the 19th on video?

10   A.  Yes.

11   Q.  Why don't we go to the next slide.  Can you tell

12   us -- we see some circles there.  Why don't you start

13   with what those are.

14   A.  Yes.  So the circles just represent the geography

15   on the car where I took the snip of color.  And then

16   these color splotches actually display the color pulled

17   from that area of the vehicle.  You have one from the

18   front fender or quarter panel, one from the door area,

19   and one from the rear quarter panel.

20        The rear quarter panel one is up higher, and then

21   they get progressively lower as they move forward toward

22   the car.  And that's because the car has varied

23   curvatures on it.  You can see that none of them are

24   identical in the color splotch, but looking at the hue

25   value, we see that all the hue values, we got 154, 153,

156, 156, 151, 157.  They are all in the same blue
family.

Also, you look at the luminance, they are all
similar luminance values.  In other words, it's not like
we're looking at one really dark blue car and one ultra
light blue car.  You're looking at basically a light
medium blue car.

Q.  Did you do that same analysis for the images, the
southbound images?

A.  Right.  Actually, yeah, I did the exact same
analysis for the southbound images.

Q.  Let's go to the next slide and you can tell us
what we're seeing here.

A.  So here we have got the same three type of points
moving from higher to lower, from the rear quarter panel
to the rear door into the front quarter panel.  And then
again we've got the same type of hues, within the range
of 150 to 160.

Q.  What did you do -- after you did this color
comparison, what did you do next?

A.  After the color comparison, I started looking at
other things that are affected by light, so in other
words, some of where the shadowing is on the vehicle,
which turned into sort of a feature comparison.

Q.  What is a feature?

1    A.  A feature is any unique identifier, and it

2  doesn't have to be unique.  It just has to be consistent

3  with a given model or vehicle type.

4    Q.  Let's move to the next slide.  Can you tell us

5  what we're seeing here about features between the

6  vehicle of interest and the Wells' Honda CR-V?

7    A.  Yep.  So again we're looking at northbound, and

8  the northbound we have the vehicle of interest on top

9  and the Wells' vehicle below, and then a good image of

10  the Wells' vehicle on the bottom.

11       Here you're able to see that there is an object

12  protruding off the rear of the vehicle of interest, and

13  it shows as a dark area.  And then you can also see in

14  the front above the wheel well on the fender behind the

15  headlight there is another dark area.

16       That's just in the center image.  You can't see

17  it in the first or the third.  Then when they ran Wells'

18  Honda CR-V, you can see the dark in the rear consistent

19  with the rear spare tire carrier, and the dark in the

20  front behind the headlights consistent with the front

21  bra.

22    Q.  Those are the features that you saw in the

23  northbound vehicle of interest and the Wells' CR-V?

24            MR. COLBATH:  I'll object as to leading.

25            THE COURT:  That's sustained.  Go ahead.

BY MS. SHERMAN:

    Q.  Did you do, in relation to those specific features, anything else on the northbound only in relation to this slide?

    A.  Not in relation to this slide, no.

    Q.  Let's move to the next slide.  What are we seeing here?

    A.  Now we are seeing the southbound.  Same type of analysis, looking for other visible characteristics.  So again I talked about how light is traveling and giving us various shadowing.

        You guys probably can't see it right now, but because these lights are off, these tables are creating a shadow line on the floor in front of the tables. That's because the light source is behind them and it's casting that shadow in that direction.

        We know during this testing the light is generally from the south and east in one and south and slightly west in the other.  So the front of the vehicle traveling southbound is not in the shade, so it should be illuminated similarly to the rest of the vehicle, but yet in the Wells' vehicle we see the front bumper is dark, as well in the vehicle of interest the front bumper is dark.

        That tells me that the front bumper in both those

vehicles is not consistent with the body color and is
darker than the body color. Also you can see that same
characteristic behind the wheel well of the sort of bump
and dark off of the wheel well to the headlight. Again,
that feature being consistent with the front bra,
because ordinarily there wouldn't be a dark area behind
the headlight.

Q. Did you look at any other features in relation to
the southbound vehicle of interest in relation to this
slide?

A. Not in relation to this slide.

Q. After looking at those features, what did you
look at next?

A. Next I looked at general size of the vehicle, and
shape.

Q. Okay. Why don't we go to the next slide and tell
us what we're seeing here.

A. Yep. Here you have two kinds of things being
visible. This is the original image on the right for
both northbound on top and southbound on the bottom.
And then what I did is I took the same scale, so in
other words, looking at the size of the T-2 building
relative to the car, I took a snip of the 4-19 known
Wells' vehicle and ghosted it over the top of the image
of the 4-12 vehicle.

And ghosting is a process where you apply an image and then you make it partially translucent so you can see sort of edges. And that's why you see some squareness over the top of this. That's part of the snip that was not part of the vehicle.

So the known vehicle of a certain size and shape of Wells' Honda CR-V is in this image superimposed on top of the vehicle of interest. And what we see is that in the northbound and the southbound images, the Wells' vehicle occupies the same general shape and space as the vehicle of interest.

Q. Did you do your own measurements or rely on someone else's measurements in relation to your analysis?

A. No, I didn't do further measurements. I relied on the other -- the other people who performed analysis on this.

Q. Can we go to the next slide. Did you look at the original -- the specs for a Honda CR-V, the size?

A. Yes. Yeah. The listed specs for the Honda CR-V are 177.6 inches in total length and 65.9 inches in total height.

Q. Let's move on to the next. After size, did you look at anything in relation to how the sun may impact the view of the vehicles in this case?

A.   Yeah.   Moving further with the sun analysis, I
took a look at some of the other vehicles that were
visible in the same incident video.  If you go into the
parking lot prior to the roadway, you had a couple of
parked cars there, quite a pile of them.

You can see how the effects of the shadows work
out on this lightly colored sedan.  You can see that the
front of the car, the very front is in shade and it's
shadowed, but yet you can still see the color of the
bumper.  You can see the brightness of the rim.  In
other words, this vehicle has aluminum or chrome rims,
and because of the angle of the light that reflects back
to the camera, with the same lighting conditions as the
vehicle of interest.

One of the other features you then see is the
reflections on this SUV.  Going back to the concept
everybody likes to know what a mirage -- why a mirage
actually occurs.  What's happening is you're looking at
a low angle of incidence to the ground, and because of
the angle of the light and the angle you're looking at
the object on the ground, you're seeing a reflection of
the sky.  The same thing as that mirage on the hood and
roof of this vehicle, you're seeing very, very light
colors, you're seeing the reflections of the sky or the
clouds in this case.  And that's why the vehicle appears

1    basically white even though it's not a white vehicle.

2        Q.  Let's talk about in relation to the northbound

3    vehicle of interest did you look at those sorts of

4    characteristics, reflection, rims and shadow?

5        A.  Correct.

6        Q.  Let's go to the next slide, please.  Can you tell

7    us what we're seeing here?

8        A.  Yeah.  So this is all just the vehicle of

9    interest, the five slides of it traveling northbound.

10   And we're looking at how those characteristics relative

11   to light reflect back to the camera.  And what you don't

12   see is you don't see a bright rim.  You don't see bright

13   rims in any of the images.

14        You see translucent windows, so in other words,

15   they are not showing up as highly tinted.  And then you

16   see this dark area in the rear when the light is shining

17   from the rear, so if it was not a dark object, it

18   wouldn't appear dark.

19        Q.  Did you look at the same thing northbound?

20        A.  Southbound you mean?

21        Q.  Southbound.

22        A.  Correct.

23        Q.  Okay.  This is the northbound.  Let's go to the

24   southbound slide if we could.

25        A.  So southbound we have the same type of things.

Again, the translucent windows in two of the images, and
then you have this front area being dark even though the
light is low in the sky and from the front.  And then
the dark area above the rim again, and then the
non-reflective rims.

Q.  Did you look at the same sort of rims, windows,
and the dark areas in relation to the Wells' CR-V?

A.  I did.

Q.  Let's go to the next slide.

A.  So here it is northbound, and you have the same
type of appearance or features.  You have the
translucent appearing windows.  You have the
non-reflective or dark appearing rims, and then this
rear dark area.

Q.  And same thing for the southbound Wells' vehicle?

A.  Yes.

Q.  Next slide.

A.  Again, you have that dark front area and then the
dark area behind the headlight visible in multiple
files.  You have the translucent windows and the
non-reflective rims.

Q.  Did you review an image to determine what a
non-translucent, a tinted window would look like on the
T-1 camera?

A.  I did, if that's the next one.

1      Q.   Okay.  Let's go to the next slide.

2      A.   Yeah.

3      Q.   Can you describe what we're seeing here?

4      A.   Sure.  This is looking at two different features.

5   At the bottom, we're looking at those translucent

6   windows.  You can see that they are not really dark.

7   There was a white pickup truck that had passed a little

8   earlier in the day, and it had a black -- it had a cap

9   on the back.  And the back cap must have been a darkly

10  tinted window or a black feature, and that black feature

11  shows up very prominently as dark, indicating that the

12  conclusion of the translucent windows is consistent and

13  are not deeply tinted.

14     Q.   Did you look at photographs of other vehicles and

15  what tinted windows would look like?

16     A.   I did, but there is more on this screen.

17     Q.   I'm sorry.

18     A.   This also shows the --

19          MR. COLBATH:  Your Honor, I would ask that a

20  question be asked.  He should answer and she should ask.

21          THE COURT:  Excuse me.  Go ahead and ask if

22  there is anything else on this slide.

23  BY MS. SHERMAN:

24     Q.   Is there anything else on this slide?

25     A.   There is.  There is -- that same white pickup

1  truck has a brightly colored front wheel rim indicating

2  it had either a white reflective or aluminum polished

3  front rim versus the Wells' vehicle versus the incident

4  vehicle.

5      Q.  Anything else on this slide?

6      A.  No.

7      Q.  Let's talk about the other tinted windows and

8  what those tend to appear like on the next slide.

9      A.  This is broader picture of that white pickup

10 truck.  Again, you can see those features of the window

11 and the rim.  Then there is photographs, of course, of a

12 different quality showing two other vehicles, a Durango

13 and a Jeep.

14      In the Jeep you can see the rear windows that are

15 tinted are dark.  The front window that's translucent is

16 not.  Same thing with the Durango.

17      Q.  After reviewing color, characteristics, features,

18 size, the way the light plays in the video, did you look

19 at anything else in relation to your analysis in this

20 case?

21      A.  Yes.

22      Q.  What was that?

23      A.  This goes back to shape again.  So I was looking

24 at the angles of the pillars of the vehicle.  And, of

25 course, you can't identify every single pillar in a

1    vehicle, but you can identify the A pillar and the D

2    pillar, the front and rear.

3         So in the A pillar, on the 3D model, so this is

4    not one of the images, of course, this is a 3D

5    representation that was prepared by one of the experts

6    for the defense, and I measured the angles of the D

7    pillar and the A pillar to be 42 degrees on the A pillar

8    and 67 on the rear.

9         When I compared them to the incident vehicle,

10   they were consistent.  And then when I compared them to

11   the Wells' vehicle, they were consistent.  I then also

12   compared those to some other vehicles that were

13   evaluated, and one of them here is a Toyota Rav4.

14   Q.  And where is the Rav4 on here?

15   A.  The Rav4 is on the right.  And the D pillar is

16   actually steeper than this, but because there is more

17   sort of vehicle steel or the same body colored material,

18   you're going to get variation into how that would view

19   on any given image.

20        On the A pillar, you're going to see a

21   significant difference.  You're going to see a 34-degree

22   angle versus a 42-degree angle for a Rav4.

23            MS. SHERMAN:  Your Honor, this may be a good

24   time.  We're a little early, but this may be a good time

25   to end for the day before we get into the next section.

1          THE COURT:  Any disagreement?

2          MR. COLBATH:  We haven't been very fast today.

3          THE COURT:  We haven't.  I think we could all

4  agree on that.

5          MR. COLBATH:  I'm just trying.

6          THE COURT:  In any event, can you do one more

7  slide and then call it a day?

8          MS. SHERMAN:  I think that gets into the

9  winnowing down of everything he looked at, so that's all

10  kind of tied in together.

11          THE COURT:  Let's make this our breaking point

12  for the day.

13          (Requested excerpt concluded, proceedings

14  continued.)

15

16                    CERTIFICATE

17     I, Sonja L. Reeves, Federal Official Court Reporter
   in and for the United States District Court of the
18  District of Alaska, do hereby certify that the foregoing
   transcript is a true and accurate transcript from the
19  original stenographic record in the above-entitled
   matter and that the transcript page format is in
20  conformance with the regulations of the Judicial
   Conference of the United States.

21
      Dated this 17th day of September, 2019.
22

23
                    /s/ Sonja L. Reeves
24                  SONJA L. REEVES, RMR-CRR
                    FEDERAL OFFICIAL COURT REPORTER
25