UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

UNITED STATES OF AMERICA, )
)
Plaintiff, )
)
vs. ) CASE NO. 3:13-cr-00008-SLG
)
JAMES MICHAEL WELLS, )
)
Defendant. )
__________________________)

PARTIAL TRANSCRIPT OF TRIAL BY JURY - DAY 7
(Testimony of Leah Henry)
**BEFORE THE HONORABLE SHARON L. GLEASON, DISTRICT JUDGE**
September 17, 2019; 8:17 a.m.
Anchorage, Alaska

**FOR THE GOVERNMENT:**
Office of the United States Attorney
BY: STEVEN SKROCKI
BY: CHRISTINA M. SHERMAN
BY: KELLEY L. STEVENS
222 West 7th Avenue, #9
Anchorage, Alaska 99513
(907) 271-5071

**FOR THE DEFENDANT:**
Office of the Federal Public Defender
BY: GARY GEORGE COLBATH
601 West 5th Avenue, Suite 800
Anchorage, Alaska 99501
(907) 646-3400

Camiel & Chaney, P.S.
BY: PETER A. CAMIEL
520 Pike Street, Suite 2500
Seattle, Washington 98101
(206) 624-1551

---

**SONJA L. REEVES, RMR-CRR**
Federal Official Court Reporter
222 West 7th Avenue, #4
Anchorage, Alaska 99513
Transcript Produced from the Stenographic Record

(Call to Order of the Court at 8:17 a.m.)

(Proceedings took place and are not included in this transcript, after which, the testimony of Leah Henry transpired as follows:)

(Oath administered to the witness)

DEPUTY CLERK: For the record, can you please state your full name and then spell your full name.

THE WITNESS: Leah Henry, L-e-a-h, H-e-n-r-y.

LEAH HENRY, GOVERNMENT WITNESS, SWORN

DIRECT EXAMINATION

BY MS. STEVENS:

Q. Good morning, Petty Officer Henry.

A. Good morning.

Q. Where do you currently work?

A. I am currently stationed at Sector Columbia River in Warrenton, Oregon.

Q. What do you do there?

A. I am a yeoman. It's an administrative role, Coast Guard military personnel.

Q. Explain that a little bit more to the jury what that means.

A. I take care of all military issues. Mainly pay is a huge part of my job. Anything in an administrative role really.

Q. And how long have you been employed by the Coast

Guard?

A. Almost ten years.

Q. Before Sector Columbia River, where were you assigned?

A. I was at Base Seattle as a yeoman as well.

Q. Before Base Seattle?

A. I was at Station Seattle as a boatswain's mate.

Q. Explain to the jury what you did as boatswain's mate.

A. I was on small boat station, so a lot of small boat operations and navigation.

Q. And so you were boatswain's mate, and then you changed over to the yeoman rating?

A. I did.

Q. Can you explain how it was you were able to do that?

A. I had to go back through a secondary school and went to boatswain's mate school primary, and then they allowed me to go back through yeoman school.

Q. Why did you decide to change ratings?

A. My daughter had cancer and it was tough as a single parent, and so the yeoman rating gave me more flexibility.

Q. How is your daughter doing now?

A. She's doing wonderful.

Q. That's good to hear.

And then before Station Seattle, where were you assigned?

A. I was at Base Kodiak at the MWR. It's a morale and recreation division of the Coast Guard. So I worked at a small boat -- we provided small boats for morale purposes for military personnel.

Q. Like for people to rent, basically?

A. Yes.

Q. And did you have your rating as a boatswain's mate, or were you a non-rate?

A. I did.

Q. Okay. Great. And before MWR, where were you?

A. I was at the Communications Station in Kodiak.

Q. Do you recall the dates that you were there?

A. I was there from April 2010 or May, I believe, 2010 to 2013 sometime.

Q. It's been a while, so -- what did you do for the COMMSTA?

A. I was a non-rate there, so we did a lot of antenna field maintenance, a lot of chain sawing, weed whacking, cutting grass was a huge part of the job.

Q. Can you describe the structure of the overall COMMSTA, the difference between the respective buildings that were there?

A. I worked in the rigger shop, which was a separate building. We called it T-2 or the rigger shop. And then up the hill there was T-1 which was kind of the command center.

Q. And what department did the rigger shop technically fall under if you can remember?

A. Can you ask me that again?

Q. Sure. What department did the rigger shop fall under? Was it the ops or engineering department?

A. The engineering department.

Q. And who was your direct supervisor when you were attached to the rigger shop?

A. My first supervisor there was ET3 Imperatres (phonetic), and then after that, it was ET3 Beauford.

Q. And can you describe ET3 Beauford to the members, how he was as a supervisor?

A. He was young. And he was a good supervisor. I gave him kind of a hard time because I was a lot older. And we taught him a lot I think while he was there.

Q. All right. And who else worked down there?

A. I worked with Seaman Upchurch at the time, Seaman Pacheco, ET3 Beauford, Seaman Coggins, and then ET1 Hopkins, Jim Wells and Rich Belisle.

Q. And who was the next in line of the supervisory chain for you?

A. That would have been ET1 Hopkins.

Q. And how would you describe your interactions with ET1 Hopkins?

A. Not the greatest. He was really disgruntled. He didn't give very clear instructions. It was hard to get answers out of him on tasking.

Q. Okay. Who else did you interact with there at the rigger shop?

A. We interacted with the civilians, Jim Wells and Rich Belisle, quite a bit.

Q. How would you describe Mr. Belisle?

A. He was awesome. He was my mentor. He was always willing to help if you had a question. He liked to teach.

Q. And what about Mr. Wells?

A. I went to Mr. Wells as well a lot, and he was also willing to teach. I think both the civilians took us under their wings and helped us significantly in our time there.

Q. And did you have an opportunity to observe Mr. Wells interact with his supervisors?

A. On occasion.

Q. Okay. And can you describe what you observed, how he acted with his supervisors at times?

A. I think that -- give me a minute.

(Pause)

A. I think the hierarchy of the rigger shop is you had the two civilians who had a huge knowledge base and then you had ET1 Hopkins that didn't seem to have a big knowledge base for what we were doing. And so when they would interact, when Jim would interact, he was very knowledgeable and I think that could sometimes be seen as dismissive of his supervisors.

Q. Okay. And did you ever observe him challenge the decisions of his supervisors?

A. Not necessarily.

Q. Yesterday we spoke. Do you remember the conversation we had? Was it yesterday or the day before? On Sunday we spoke. Do you remember that conversation?

A. Uh-huh.

Q. Do you recall indicating that --

MR. COLBATH: Your Honor, I'm going to object as to leading.

THE COURT: It is leading.

BY MS. STEVENS:

Q. Was he respectful?

A. Not always.

Q. Okay. Would he refer to Chief Reckner as Scott?

A. Yes.

Q. How would you describe that?

A. Disrespectful. That's his immediate supervisor.

Q. And can you describe your social relationship, if any, with Mr. Wells?

A. I did. I went to his house a lot. His wife and him would invite us over for dinner. And at that time, it was my support system when I was in Kodiak. Especially after I had my daughter. So that was kind of the extent of my time over there. We spent a lot of time over for holidays.

Q. And you mentioned "us" and "we." Who are you referring to?

A. Seaman Upchurch and myself.

Q. Did any of the other folks from the rigger shop ever join you with those social events at the house? Seaman Coggins?

A. Not that I can remember.

Q. Seaman Pacheco?

A. No.

Q. Cody Beauford?

A. No.

Q. What about ET1 Hopkins?

A. No.

Q. Rich Belisle?

A. No.

Q. Now, were you down in T-2 the whole time that you were there?

A. I was not. I was sent up to T-1 when I was about five months pregnant, just given the nature of the work that we did.

Q. Do you remember more or less the timeframe that you went up to T-1?

A. I was up there from about June 2011 to October 2011.

Q. Now, before you went up to T-1, do you ever recall random people, people in the community just coming into the T-2 building?

A. No.

Q. Going back to 2011, 2012, do you recall if there were any specific threats made against the Coast Guard or Coast Guard men and women there in Kodiak?

A. Not that I recall.

Q. Now, how would you describe T-2, the rigger shop in comparison to the T-1 as a whole, the building up at T-1?

A. We were our own little entity down there for sure.

Q. So let's move to the morning of April 12, 2012. Do you remember that morning?

A. I do.

Q. Okay. Describe to the jury what you observed -- let's start first, where did you live?

A. I lived in Bells Flats.

Q. And how long would it take for you to get to work commuting from Bells Flats?

A. I want to say about 15 minutes or so.

Q. Do you remember what time you arrived that morning?

A. I arrived around 7:45 a.m.

Q. Now, walk the jury through what happened once you arrived.

A. I pulled into the T-2 parking lot. As I was doing that, OS1 Haselden was running down the hill. And I pulled in. I parked. I got my stuff out. I didn't think too much of him running. He was a little odd and it just didn't ring a bell.

I got my stuff out of the car. I walked into the building, and I immediately smelled something. I thought just off the top of my head it was a gas leak or something. ET3 Beauford and OS1 Haselden was standing -- they were standing kind of obstructing the view into our kitchen area, I guess if you want to call it. It's kind of where the non-rates spent our time.

ET3 Beauford was just kind of in shock. He wasn't saying anything. He was just kind of staring.

And OS1 Haselden was yelling at me profusely to get out. He just said, "Get out, get out, get out."

At that point, I turned around and I walked out. Seaman Coggins, I don't remember seeing him when I walked in initially, but he followed me out, and he said something along the lines of, "They're down." And I think I asked him if there was a gas leak. And he said, "They're down, they're down." And I said, "Who's down?" And he said, "ET1 and Rich." He said, "They're dead or they've been shot."

And at that point, the first military police unit pulled into the parking lot. She got out of the car, asked what was going on. I directed her inside. And at that point, more fire trucks were coming in. They were asking what's going on. I directed them inside.

I did not see Seaman Upchurch. So she was -- she is my best friend. Naturally, I was worried about her, so I was calling her. I was walking back to my car. I don't think I knew exactly what I was doing at the time.

And then our SK1 at the time, Petty Officer Cartier, was pulling up. He was on the main road going from the rigger shop to T-1. I flagged him down, told him something had happened, and he asked me to get in his truck and we went up to T-1, to the main building.

Q. At this point, the Government is going to post

for publication Government Exhibit No. 13.

Can you take a look at that? And there should be a pointer up there, a laser pointer up there, Petty Officer Upchurch [sic]. Can you just point out to the jury which door you went through that morning?

A. That one right there.

Q. Okay. And where did you encounter Petty Officer Beauford?

A. Right there.

Q. What area is that listed up there on that exhibit? Can you read that?

A. The locker room.

Q. And when you saw Petty Officer Beauford, how did he appear?

A. He was very pale, just shocked is the best way I could describe it.

Q. And eventually, you mentioned you saw Petty Officer Coggins. How did he appear?

A. He was obviously talking, but he was also just very kind of glazed over.

Q. And then lastly, you mentioned you observed Petty Officer Haselden running down the hill and then you had an opportunity to observe him as well?

A. Uh-huh.

Q. How did he -- how did he look?

A. He was extremely panicked and sweaty. He was yelling.

Q. And do you recall which vehicles were there in the parking lot when you arrived?

A. That morning, closest to that entry, that door, was ET1 Hopkins' truck. And then Rich Belisle's truck was next to it. Then we had two work trucks parked. And then there was the dumpster, and that's kind of -- we parked to the side of the dumpster. So at that point, I remember seeing Seaman Coggins' Jeep was there. I don't remember seeing ET3 Beauford's car.

Q. What kind of vehicle did you drive in to work in?

A. I had a Nissan Xterra, silver.

Q. So you hitch a ride up to T-1 with SK1 Cartier. Can you describe what an SK is to the jury?

A. They handle procurement for anything needed within our unit.

Q. So he was a first class petty officer?

A. He was.

Q. What happened after you got up to T-1? What did you do next?

A. I went to the ET deck where the ETs were. I don't remember who all was on that deck, but I asked them if they had seen Seaman Upchurch, and someone had directed me to the conference room and that's where I

went.

Q. And when you got into the conference room, what did you do next?

A. I saw Para, Seaman Upchurch. It's a little fuzzy on what exactly happened or what took place. At some point, she had called Jim Wells and had asked him where he was at. And he said he had a flat tire. And I think he had mentioned that the ops deck had called him and informed him there was an incident and Para had said, "Okay, I'll see you when you get here."

Q. Why was that -- the conference room, why was that fuzzy for you? Why is it fuzzy for you?

A. Oh, I just -- I don't remember like what I was talking to Para about when I first got in there.

Q. And so after -- can you tell for the record what was your phone number at the time?

A. It was 916-607-3401.

Q. Do you recall whether anybody used your phone that morning?

A. Para had used my phone, because she didn't have very good reception in the conference room and I did.

Q. And after Para had that conversation with Mr. Wells, what happened next?

A. I believe Chief Reckner had come into the conference room and maybe a couple other people. We

were just instructed to stay in the conference room.

Q. What was running through your mind after that conversation with Para and Mr. Wells?

A. Naturally, it was just a really odd thing that on a day like that he had a flat tire.

Q. And how would you describe Mr. Wells' relationship, we'll start with Mr. Belisle?

A. I always viewed them as working well together as the civilians. They headed most of the big evolutions that we did involving antennas. I had learned later in a kind of a joking manner, you know, Rich, I think I had said something and asked him a question of like, "Oh, Rich, what, you don't like Jim or whatever and" --

MR. COLBATH: Your Honor, I'm going to object as to hearsay. Sounds like she's relating a conversation with Mr. Belisle.

THE COURT: Would you agree?

MS. STEVENS: Yeah.

BY MS. STEVENS:

Q. So I'll guide you in a different direction here, Leah. Did you remember observing anything of their working relationship changing in any way prior to the murders?

A. Rich had started heading more of the projects that maybe Jim had done previously. That was the shift

in that.

Q. Did you have an observation about the command's direction with regard to the civilians?

A. As far as -- can you clarify?

Q. As far as their jobs?

A. I don't, no.

Q. And how would you describe the relationship between the defendant and Mr. Hopkins?

A. Jim Wells did not like ET1 Hopkins. He viewed him as being very incompetent.

Q. And can you expand on that further?

A. I don't think that they really interacted a whole lot in terms of evolutions. ET1 Hopkins seemed to kind of take the back seat when that stuff would arise.

Q. Did Mr. Wells articulate his feelings to you? Was he vocal about it?

A. We would have conversations about it when we'd have dinner over at his house.

Q. Did you have an opportunity that morning to observe Mr. Wells?

A. In the conference room?

Q. Uh-huh.

A. Yes.

Q. And can you describe that observation to the jury, please?

A. There wasn't -- he kept to himself a lot. At one point he had given me a hug or put his hands on my shoulders and had given me a handkerchief. And other than that, he sat across the table from I believe where I was sitting. And there just wasn't a whole lot of emotion.

Q. Did he appear worried at all?

A. No.

Q. Or scared for his safety?

A. No.

Q. Did you appear -- did you observe him doing anything physically with his hands?

A. He was rubbing his ears, and either Para or I had asked him what was wrong and he said his ears were ringing.

Q. And when that occurred, what was your impression? What were your thoughts?

A. Honestly, I mean, considering what had just happened, it was just another thing that didn't make sense.

Q. And on April 11th, 2012, did you work that day, the day before?

A. Yes.

Q. And do you recall if you were back down in the rigger shop at that time?

A. I was.

Q. And do you recall observing anything that stood out to you on the 11th?

A. I was in the kitchen area and we had a back room, we called it the boiler room. We had a locker in there where ET3 Beauford would put his uniforms as well as like a janitorial closet, toilet paper, all of that kind of stuff in it.

It had a doorway that went in from where I was sitting into the boiler room, and then there was a door going outside of that room. And Jim had gone in there and closed it behind him. And he was in there anywhere from 10 to 30 minutes.

Q. Did him closing the door leave an impression on you?

A. It caught my eye because it was just really unusual.

Q. Shifting gears just a little bit. When Mr. Wells would use the restroom, where would he go?

A. In the rigger shop, T-2.

Q. And would he spend a lot of time in there or a short -- how would you describe the time he spent in there?

A. Yeah, it was a long time.

Q. What did the other members have -- members of the

rigger shop have to do if he was in there for a long time?

A. We would go up to T-1.

Q. Did it bother you guys at all, him taking all that time in the bathroom?

A. There were others that would do that too, but yeah, it was annoying.

Q. Did he ever complain to you about having any bowel issues?

A. I cannot recall having a conversation with him about that.

Q. Do you recall whether or not he would ever go up to the bathroom in T-1?

A. I don't.

Q. Do you remember who checked the gauges in the basement in T-1? Who was responsible for that generally?

A. The non-rates, so myself, Seaman Coggins, Seaman Pacheco and Seaman Upchurch.

Q. During your -- you personally checking the gauges, how long would it take you to do it?

A. Under five minutes.

Q. Is there any reason why Mr. Wells would spend two and a half to three hours up in T-1 on a given workday?

MR. COLBATH: Your Honor, I'm going to object

as to speculation.

THE COURT: Why don't you lay a little more foundation.

BY MS. STEVENS:

Q. Would Mr. Wells or anybody else from the rigger shop go up to T-1 for extended periods of time?

A. Unless they were meeting with a command or if there was maintenance, we had two generators up there, unless there was maintenance being done, but I can't -- that wasn't something that would happen often.

Q. And are you familiar with the warehouse?

A. I am.

Q. COMMSTA. Were you aware of a project, a specific project that was being conducted with regards to the warehouse?

A. Yes. I believe the direction came from the command or Chief Reckner to clean out the warehouse. We had a lot of equipment that was really outdated, just not being used. So that was what we were tasked with.

Q. And did you participate in that?

A. I did.

Q. Who seemed to be in charge or sort of the boots on the ground for that warehouse project leading all the folks involved on a day-to-day basis?

A. That was Rich Belisle.

Q. Did Mr. Wells participate in that?

A. No.

Q. Did that leave an impression on you?

A. It did.

Q. Can you explain that to the jury?

A. Jim was a part of all of our -- everything that we did, all of our evolutions for the most part, and so the fact that he was not participating, it just kind of set a tone that things were shifting.

Q. Explain that a little more. "Things were shifting," explain that a little more.

A. Rich was kind of coming into that position I think that Jim had held for a really long time. I don't know how else to --

Q. That's fine. Other than, you know, Rich coming into Jim's position, were there any other potential shifts or anybody leaving or --

A. Jim had a lot of knowledge, you know, of the COMMSTA and the equipment. So he was just really involved. And for him to not be involved in something was strange.

And kind of his shift in his personality. Usually he really liked to be a part of things, and at that time, you know, he would just kind of sit in his office and kick his feet up and read a book, which was

really uncharacteristic of him.

Q. What do you mean kick his feet up?

A. On his desk. That was something I observed.

Q. Put his feet up on the desk?

A. Uh-huh.

Q. You mentioned previously an evolution. Just for clarity of the record, what do you mean by an evolution?

A. Just a project.

Q. When you came back down to the rigger shop, do you recall what month that was after maternity leave?

A. I believe I came back on March 1st.

Q. And did you have an opportunity in the month of March to observe Mr. Wells?

A. I did.

Q. How did he appear physically?

A. Physically, I didn't see any changes. I was under the impression that he had been going through a lot of medical stuff, but just really not a part of our shop.

Q. Okay. So that kind of describes some of the things you had testified to previously. But looking at him visually, physically, did he appear well or unwell?

A. Well.

Q. Okay. And then the last question: Do you remember the windows in the T-2 building?

A. I do.

Q. Can you describe those to the jury and whether or not you guys actually utilized those windows at all?

A. No, they were far too high for us to open or close them, so we would just open doors for air.

Q. Thank you, Petty Officer Henry. I have no more questions at this time.

THE COURT: Mr. Colbath, Mr. Camiel.

MR. COLBATH: Thank you, Your Honor.

CROSS EXAMINATION

BY MR. COLBATH:

Q. Good morning, ma'am.

A. Good morning.

Q. You described the Wells as sort of your Coast Guard family?

A. I did.

Q. Did I hear you right? So as a non-rate, they were somebody -- you were single at the time?

A. I was.

Q. Didn't have other family on Kodiak?

A. Correct.

Q. And so they -- besides working with Jim, they sort of took you into their home or invited you regularly to their home to socialize with them?

A. Yes.

Q. And that was true with your best friend, Para, it sounds like as well?

A. Uh-huh.

Q. And so that got -- allowed you the opportunity to sort of know Mr. Wells at work as well as know Jim at home a little bit?

A. Yes.

Q. And you characterized him as a quiet person, just generally, a man of few words sort of?

A. Yeah. It wasn't unusual for him to kind of be in his own world, I guess.

Q. Okay. Well, compare that to you also spent a lot of time and knew -- with Rich Belisle, right?

A. Uh-huh.

Q. Rich was much more outgoing, much more personable or sociable maybe?

A. Yes.

Q. Okay. Would you say Mr. Wells was a private man sort of stay-at-home, to himself kind of guy?

A. I think both Rich and Jim kept their personal lives at home, yes.

Q. Okay. You've described Jim as a man's man that wouldn't really talk about his feelings. I mean, he wasn't going to share with you, somebody much younger and female, his feelings about things, personal

feelings?

A. We spoke of personal feelings while at dinners.

Q. Well, you described him as -- am I right, you described him as a man's man that was not going to outwardly talk about his feelings?

A. Yeah. We had approached him, a lot of those conversations were based around kind of our struggles with ET1 Hopkins. That was something that we could talk to him about.

Q. Sure. And you and Para both talked about the difficulties you had with Jim Hopkins and his supervision of you and sort of his behaviors?

A. Yes.

Q. Mr. Wells listened to that, Rich listened to that?

A. Uh-huh. Yes.

Q. They in fact tried to help you guys with command and other issues to try to rectify some of that toughness that was going on?

A. Yeah. I don't know if anything was ever done, but it was, yes, portrayed to us that they would kind of speak up.

Q. They said they would try to do something for you. Whether it happened or not, you weren't aware?

A. Yes.

Q. The manner in which Mr. Hopkins supervised you non-rates and his behaviors in the rigger shop, that was something that you saw Jim didn't approve of. Rich didn't think it was appropriate either. Right?

A. Correct.

Q. So you worked down in T-2 in the spring and early summer of 2011 and then moved up to T-1 for your duties?

A. Correct.

Q. It would have been about June?

A. Uh-huh.

Q. Now, during that time we've heard other testimony about a project that the rigger shop was doing out on the island of Shemya?

A. Yes.

Q. Was that a project that you went out and traveled to, or did you stay back because of your pregnancy?

A. During that time I did not go.

Q. Now, Jim was out on that project, you're aware of that, right, on the Shemya project?

A. Yes.

Q. And that was before he got sick or before he had been having medical problems that you were aware of, wasn't it?

A. Yes.

Q. And then there came a time when you were either

up at T-1 and getting close to the birth of your child or on maternity leave that Jim became pretty sick. You were aware of that?

A. Yes. I was told while I was gone.

Q. Did you see them outside of work, see Jim outside of work any during that time and have occasion to visit with them?

A. I don't recall any times of seeing him. I was in Anchorage at the hospital for a few months. I had Easter dinner with him and Nancy the week before the shootings.

Q. Okay. So let's -- I want to back up a little further than that, and we'll get to that in a minute. You were out for maternity leave, gone from the whole COMMSTA facility for how long?

A. From October 2011 to March 1st, 2012.

Q. So you didn't know how much -- other than to have other people tell you about it, you didn't know how much Jim was out at that time?

A. No.

Q. But you were aware that he -- fairly close in time to when you were gone, he ended up having gallbladder surgery and a hernia surgery?

A. Yes.

Q. It would have been after you came back March 1st,

and by then, when you came back, he was back from his surgery?

A. He was.

Q. And were you aware that he had just gotten back, he had been back for a period of time? Did you know how long he had been back?

A. I don't recall.

Q. All right. Did you know that he was on light duty at that time, you know, easing back into work?

MS. STEVENS: Your Honor, objection, lack of foundation for this particular witness.

MR. COLBATH: I was asking her if she knew.

THE COURT: Whether or not she knew, that's fine. I'll allow it.

A. I don't know.

Q. Okay. You said sort of at that time frame, that would have been -- the time period after you got back from maternity leave up until the time of the shootings is about a six-week time period, right?

A. Correct.

Q. It was in that time that the warehouse project was going on?

A. Yes.

Q. And it was odd that before his sickness and before his surgeries, pretty much throughout that whole

time before that that you had been at the rigger shop, if there was something going on, Jim was involved?

A. Yes, generally.

Q. And sharing knowledge and being an active participant in the work and doing those types of things?

A. Yes.

Q. Okay. But then -- now you're back and he's back, and it was odd that he wasn't down there participating in the warehouse, right?

A. Yes.

Q. You didn't hear him complain about the warehouse or refuse to do it, he just wasn't there, right?

A. Yes.

Q. Okay. It was during that time that you saw him, he spent more time at his desk reading a book. You said one time you even saw him with his feet up on his desk reading a book?

A. Uh-huh.

Q. Less interactive, less resistant to things or communicative about things?

A. Yeah. He didn't seem to care too much about what was going on in the COMMSTA.

Q. Did I write it down that you said he was kind of off in his own little world?

A. Yes.

Q. All right. Let me ask you about some of that -- the day before the shootings. On April 11th, did you actually -- when you saw Jim go in the boiler room at some point, did you go in there or have occasion to observe him reading in there?

A. No.

Q. Okay. Did you go in there at all?

A. No. That day?

Q. Yeah.

A. No.

Q. And he came back out of the boiler room you said maybe 15 to 30 minutes -- or 10 to 30 minutes he was in there. He went in, closed the door, came back out?

A. Yes.

Q. And there was, besides the boiler, a pressure washer and some other just general maintenance equipment for the rigger shop in there, right? I guess mechanical systems for the rigger shop probably?

A. I don't really recall what else was in there.

Q. Okay. Mr. Beauford, he kept his -- he had a space in there where he would change clothes?

A. Correct.

Q. Do you recall there being a couple of stools in there, areas where you could just sit?

A. I think I recall a stool in there.

Q. Let me see if I can find a picture maybe. We'll see if we can find that and I'll ask you about that.

You said that Mr. Wells would frequently use the bathroom for extended periods of time. You observed that?

A. Yes.

Q. And that -- fair to say that was recent in time or after his surgeries or in that same timeframe that you and I were just talking about, the March 1st to the April?

A. Yes.

Q. And sometimes it would be long enough that if others needed a bathroom, they might have to go up to T-1?

A. Correct.

Q. And are you aware that -- of the other guys in the shop, Mr. Wells, were people cognizant of that of not tying up the bathroom or going to use the bathroom other places if they needed to --

A. Yes.

Q. -- because eight of you had to share the bathroom?

A. Uh-huh.

Q. So certainly it was always an option for anybody in the shop, especially if they needed to use the

bathroom for a long period of time, to go up to T-1 and use the bathrooms up there?

A. Yeah. We didn't -- I mean, we didn't do that very often, but it was an option.

Q. You didn't do that very often. The bathrooms up in T-1, there were multiple bathrooms and the bathrooms had -- well, at least the ones that you used had multiple stalls. It wasn't like the rigger shop with just a single-use bathroom?

A. Correct.

Q. So let's talk about for a minute April 12th. Your -- you, it sounds like, arrived about the time that Mr. Haselden was running down the hill?

A. Yes.

Q. And you were still collecting your things, hadn't made it physically to the shop building by the time Haselden got around the corner and got in there?

A. Correct.

Q. So he was ahead of you. That made three people in the building when you went in: Mr. Beauford, Coggins and then Haselden?

A. Yes.

Q. And Ms. Stevens asked you about your observations of those folks. Mr. Beauford, you said he was just standing there not saying a word, just kind of looked in

shock, just glazed over, just no reaction really or just a shocked silence?

A. That's what I recall.

Q. Okay. And Coggins was talkative, but he -- or was at least saying something, but still you said he was kind of glazed over or not really -- also in shock, I guess is the way you described it?

A. Correct.

Q. Well, Mr. Haselden, he was much different. He was, instead of being shocked, appeared to you far more panicked, yelling, flush, as opposed to pale. He had almost sounds like the opposite reaction or on the other end of the spectrum from Beauford?

A. Yes.

Q. And it wasn't long after that -- after Haselden told you you needed to get out of the building that you saw Mr. Cartier and went up the hill to T-1?

A. Yes.

Q. All right. And when you let Ms. Upchurch use your phone to call Mr. Wells, you were right there, you could hear the conversation?

A. Yes.

Q. That's how you heard -- that's how you heard Mr. Wells say there was -- that the ops deck had called him and told him there was some incident and that he

wasn't there because he had a flat tire?

A. Yes.

Q. Later when he did show up, I wasn't sure -- you said he sat -- he stayed off by himself, but you said he was sitting at a table across from you?

A. There was a large conference table.

Q. You were sitting at the table?

A. Yes.

Q. And Para was sitting at the table?

A. I think so.

Q. Okay. Jim was sitting somewhere at the table?

A. Yes.

Q. At times, Chief Reckner would come in, other folks came in and out, correct?

A. I believe the three of us were in there, just the three of us for a given time, and then people started to come in.

Q. Okay. Jim had a book with him. That was something that was a pretty regular occurrence, it sounds like, that he carried a book with him?

A. I don't remember that.

Q. Okay. Do you remember him -- I thought -- maybe I wrote it down wrong, that he was at -- sometime up there in the conference room, he was reading?

A. I don't remember that.

Q. Okay. So after the shootings and things sort of started to unfold, the law enforcement set up their investigation up there in T-1, correct?

A. Yes.

Q. There were agents around from April 12th for a number of weeks, around the COMMSTA area?

A. I knew when I had an interview that they were there. I wasn't aware of their daily presence there.

Q. Over the period of that day and the following days and weeks, you were interviewed a number of times, correct?

A. I was.

Q. And during the interview with law enforcement, you were asked to sign a form that instructed you you were not to talk about the investigation with anybody and that you could be in trouble if you did?

A. Correct.

Q. I want to ask you just -- I don't want to switch subjects, but I'm going to show you this photograph just for foundation and ask if you have seen that before or if it looks familiar to you.

A. It looks like the boiler room, but I don't remember -- there was a large hole in the ground which I'm not seeing, so --

Q. It might not be a view of the whole room, but it

appears to be a partial picture, a picture of part of the T-2 boiler room?

A. Yes.

MR. COLBATH: Okay. Your Honor, I'm going to move DE-127.

MS. STEVENS: No objection.

THE COURT: It will be admitted.

MR. COLBATH: Oh, I'm sorry. It's Government 127.

THE COURT: Government 127, sorry.

MS. STEVENS: I think it's already admitted.

THE COURT: Already admitted.

MR. COLBATH: You didn't have to guess about it. I could have just showed it to you.

BY MR. COLBATH:

Q. So this has been admitted already as a photo of part of the boiler room at T-2. You said you thought you remembered a stool in there that you could sit on. Do you see that?

A. Yes.

Q. And there was also -- we can see I think the seat of a chair there, the wheels of a chair that rolls around. Can you see that?

A. I can see that, yes.

Q. And so there was places to sit in there, change

clothes in there and then the equipment that we see here or the mechanical systems that we see here, right?

A. Uh-huh.

Q. All right. So I'm going to show you for foundation purposes a document here. It's defense Exhibit, Your Honor, 200.

THE COURT: All right.

BY MR. COLBATH:

Q. And just ask that you review that, Ms. Henry, if you can. Is it legible there on your screen?

A. Yes.

Q. And I'll ask you if your signature appears on that.

A. Yes, it is.

Q. Is that the form that we were just talking about when I was asking you about your interviews and that you signed a form indicating not to talk to anybody?

A. Yes.

Q. Okay.

MR. COLBATH: Your Honor, I'm going to move this Defense Exhibit No. 200 into evidence.

THE COURT: Any objection there?

MS. STEVENS: One second, Your Honor.

THE COURT: Sure, take a moment.

(Pause)

MS. STEVENS: No objection.

THE COURT: All right. Then Defense 200 is admitted.

(Defense Exhibit No. 200 admitted)

BY MR. COLBATH:

Q. And can you just -- well, highlight the top of that there. The top box, yeah. That's good.

So this was an interview of you done regarding the death investigation, right?

A. Uh-huh.

Q. And then the middle section there. When talking to you, the agent had you read these statements and then initial them?

A. Yes.

Q. Could you just read those two boxes that you initialed for us?

A. "I have been advised and understand the following: This is an ongoing investigation. As such I understand that I am not to discuss this investigation or any other information regarding aspects of this investigation with any persons outside of the Coast Guard Investigative Service and/or appropriate legal counsel. I understand that failure to comply with this order may result in a trial by court martial, non-judicial proceeding, administrative proceeding or

trial in a civilian court."

Q. All right. And then they asked you to sign that, which you did, and -- during the interview?

A. Yes.

Q. So in the days following and certainly weeks following the murders, despite warnings like that, there were lots of rumors going around about what might have happened in -- with the shootings, right?

A. Of course.

Q. And it was certainly well-known very quickly that Mr. Wells was the suspect or somebody that they were looking for?

A. Yes.

Q. Okay. That was talked about amongst people?

A. I don't really recall.

Q. Do you recall seeing information in the Kodiak paper about it?

A. The only thing I'm recalling is when he was arrested. I don't remember anything prior.

Q. The other folks at the rigger shop -- well, first of all, Jim never came back to work, wasn't allowed to come back to work after April 12th, correct?

A. He was there the following day with us, on Friday.

Q. And then I guess after April 13th was not back at

the rigger shop?

A. I did not see him.

Q. So he wasn't part of the discussions at the rigger shop or any of those discussions about what might have happened?

A. No.

MR. COLBATH: If I could just have one minute, Your Honor.

THE COURT: Certainly.

(Pause)

MR. COLBATH: That's all the questions I have for Ms. Henry at this point.

THE COURT: Redirect?

REDIRECT EXAMINATION

BY MS. STEVENS:

Q. Hi again.

A. Hi.

Q. Just to follow up on some of questions from defense counsel. Did Mr. Wells care about hogging the bathroom down in T-2?

A. Didn't appear that way.

Q. And then that morning you saw a number of people in shock, right? Did Mr. Wells appear to be in shock?

A. No.

Q. In preparation for trial, were you ever ordered

by anyone to not talk to the defense, their investigators or the defense team?

A. No.

Q. Thank you. No more questions.

THE COURT: Anything on those topics at all?

MR. COLBATH: Just one question, Your Honor.

THE COURT: Go right ahead.

RECROSS EXAMINATION

BY MR. COLBATH:

Q. Ms. Henry, with regard to how Jim appeared in the conference room on April 12th, later in the day on April 12th, you described him, at times he looked maybe not in shock, but in disbelief? You said that before, right?

A. I think I said emotionless is what I referred to.

Q. Did you describe him during one of your interviews as -- to an investigator as he at times looked like he was in disbelief?

A. I don't remember.

Q. Okay.

MR. COLBATH: That's fine, Your Honor.

THE COURT: All right. Thank you. You may be excused. Can this witness be released?

MS. STEVENS: Yes, Your Honor.

MR. COLBATH: Yes.

THE COURT: Very good.

(Witness excused)

(Requested excerpt concluded, proceedings continued.)

CERTIFICATE

I, Sonja L. Reeves, Federal Official Court Reporter in and for the United States District Court of the District of Alaska, do hereby certify that the foregoing transcript is a true and accurate transcript from the original stenographic record in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 19th day of September, 2019.

/s/ Sonja L. Reeves
SONJA L. REEVES, RMR-CRR
FEDERAL OFFICIAL COURT REPORTER