1                UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF ALASKA
2

3    UNITED STATES OF AMERICA, )
                              )
4          Plaintiff,         )
                              )
5    vs.                      )   CASE NO. 3:13-cr-00008-SLG
                              )
6    JAMES MICHAEL WELLS,     )
                              )
7          Defendant.         )
     _____)
8

9          PARTIAL TRANSCRIPT OF TRIAL BY JURY - DAY 8
                (Testimony of Steven Becker )
10    **BEFORE THE HONORABLE SHARON L. GLEASON, DISTRICT JUDGE**
                September 18, 2019; 8:35 a.m.
11                    Anchorage, Alaska

12   **FOR THE GOVERNMENT:**
           Office of the United States Attorney
13         BY:  STEVEN SKROCKI
           BY:  CHRISTINA M. SHERMAN
14         BY:  KELLEY L. STEVENS
           222 West 7th Avenue, #9
15         Anchorage, Alaska 99513
           (907) 271-5071
16

     **FOR THE DEFENDANT:**
17         Office of the Federal Public Defender
           BY:  GARY GEORGE COLBATH
18         601 West 5th Avenue, Suite 800
           Anchorage, Alaska 99501
19         (907) 646-3400

20         Camiel & Chaney, P.S.
           BY:  PETER A. CAMIEL
21         520 Pike Street, Suite 2500
           Seattle, Washington 98101
22         (206) 624-1551

23   _____
              **SONJA L. REEVES, RMR-CRR**
24            Federal Official Court Reporter
              222 West 7th Avenue, #4
25            Anchorage, Alaska 99513
          Transcript Produced from the Stenographic Record

```
 1              (Call to Order of the Court at 8:35 a.m.)

 2              (Proceedings took place and are not included in

 3    this transcript, after which, the testimony of Steven

 4    Becker transpired as follows:)

 5              (Jury present)

 6         THE COURT:  All right.  Good morning, ladies

 7    and gentlemen.  Please be seated, everyone.  Welcome

 8    back.  And I'll remind you, sir, you're still under oath

 9    from yesterday's proceeding.  Okay?

10         THE WITNESS:  Yes.

11      STEVEN BECKER, GOVERNMENT WITNESS, PREVIOUSLY SWORN

12                    DIRECT EXAMINATION

13                       (Continued)

14    BY MS. SHERMAN:

15      Q.  When we left off, we were talking about angles,

16    so if we can put the PowerPoint back up.

17         MS. SHERMAN:  I think we're having an issue

18    with the projector.  Now it's in the right color.  It

19    was all pink about a minute ago.

20         THE COURT:  I have been told it's not the

21    court.

22         MS. SHERMAN:  That's quite possible.  Is the

23    projector on?  It doesn't appear the projector is on.

24    It worked earlier.  We can talk about -- we can talk

25    about this while it's warming up.
```

1          THE COURT:  That sounds great.

2          MS. SHERMAN:  We'll let it warm up and we'll

3    talk about angles.

4    BY MS. SHERMAN:

5      Q.  I would like to talk about the angle of the

6    pillars of the CR-V in comparison to the angles of the

7    pillar of a Rav4.  Can you go ahead and describe whether

8    those are similar or different for us?

9      A.  Sure.  The CR-V angles, I might have mentioned

10   this yesterday, at the D pillar because the D pillar is

11   a little wider, the perceivable angle could be a few

12   more degrees than you would normally expect for the

13   observable difference in the angle there.

14          On the A pillar, it's a fairly tight pillar.  So

15   the angle differences are within a degree or two for a

16   noticeable change.  On the Toyota Rav4, that difference

17   is 8 to 9 degrees and definitely would have been

18   noticeably different.

19     Q.  Blair, we can take that down from the jury before

20   we go to the next slide.

21          So after you have reviewed class characteristics,

22   features, colors, all of the things we talked about

23   yesterday, were you able to narrow down the vehicle from

24   the video 4-12 from all of the vehicles out there?

25     A.  Yes.

1    Q.  And what was the first thing you used to kind of

2    winnow down that list?

3    A.  Sure.  Basically, you know, you start with the

4    most observable characteristics.  That's going to be the

5    overall size and body style.  So the first thing you do

6    is you're eliminating sedans, you're eliminating pickup

7    trucks.  That actually takes care of most of the on-road

8    vehicle market.

9         Pickup trucks are the most sold vehicle on the

10   road today.  Sedans encompass quite a variety of sedans,

11   sports cars, et cetera.  None of those are available

12   options.  So we're down to a sort of compact-size SUV.

13   And I have a list of vehicles that met that sort of size

14   and general shape characteristic.

15   Q.  Did you memorize that list?

16   A.  Of course not.

17   Q.  Is it in your report?

18   A.  Yes.

19   Q.  Would reviewing your report assist you in naming

20   off the vehicles that you narrowed based on size and

21   body type down to?

22   A.  Yes.

23   Q.  Go ahead and look at your report and tell us that

24   list of vehicles.  What page are you on in your report?

25   A.  Pages 23, carried over to 24, last paragraph.

1    Q.  All right.  Go ahead.

2    A.  So it starts out with --

3        MR. COLBATH:  Your Honor, I'm going to object

4    to him reading from his report.  He can certainly

5    refresh his recollection.

6        THE COURT:  Let me look here.  I'll allow the

7    witness to read those into the record.  You're just

8    going on -- the bottom of page 23 to the top of page 24.

9    Go ahead.  That's fine.

10   A.  The vehicles that were consistent in general

11   shape is Volvo XC60; an XC90, also a Volvo; Subaru

12   Forester; Nissan Pathfinder; Mercedes-Benz ML320; Mazda

13   MVP; Lexus RX300; Kia Soul; Kia Sportage; Jeep Grand

14   Cherokee; Hyundai Tucson; Honda Santa Fe; Ford Escape;

15   BMW X3; BMW X5; Suzuki Grand Vitara; Suzuki XL7; Jeep

16   Liberty; Isuzu Rodeo; Honda Passport; Chevy S10 Blazer;

17   Toyota Rav4; Honda CR-V.

18       It looks like one didn't make it on the list.

19   That was the Jeep Wrangler Unlimited is of the same

20   size.

21   Q.  Were you able to further narrow down that list by

22   looking at features of those vehicles?

23   A.  Correct.

24   Q.  Of those vehicles, were you able to eliminate

25   some?

1    A.  Most, yes.

2    Q.  Do you have that list memorized?

3    A.  Sure.

4    Q.  You have that list memorized?  Okay.  Tell the

5    jury what vehicles you were able to eliminate based on

6    features and how that came about.

7    A.  So of the features, again before, I was talking

8    about the headlights.  Like a Jeep Wrangler, everybody

9    knows, you know, it's got the classic Jeep headlights in

10   the front.  They don't wrap around to the side.  That

11   feature eliminates a number of vehicles.

12        The spare tire carrier on the rear eliminates a

13   number of vehicles.  Then heading the option for a

14   non-body colored front and rear bumper is another

15   feature that eliminates a number of vehicles.  So when

16   it comes down to it, you end up with Isuzu Rodeo, Honda

17   Passport and Honda CR-V as possible matching vehicles.

18   Q.  We can put up that next slide.  Why don't you

19   take us through why you were able to exclude these

20   vehicles?

21   A.  Sure.  Like on the Santa Fe, the Jeep Grand

22   Cherokee, the Pathfinder, and the newer CR-Vs, you don't

23   have rear spare tire carriers.  Same thing with the

24   Escape.  On the S10 Blazer, you can have a rear spare

25   tire carrier, only on the two-wheel-drive model, and the

two-wheel-drive model only comes with tinted windows in the back and it doesn't have the -- sort of that same type of shape in the back of the vehicle. Those features would have been noticeable.

Q. Were you further able to eliminate some vehicles based on color?

A. Yes. So then when you take those last few numbers of vehicles, I went and reviewed the available paint colors for the various model years that those vehicles were available.

Q. And what vehicles were you -- why don't we go to the next slide.

Can you tell us what we're seeing here?

A. Yes. In the upper left, we have a Honda Passport. A Honda Passport is basically a clone of the Isuzu Rodeo badged under Honda. They do have a rear spare tire carrier, but the Passport only came in Canal Blue and Indigo Blue. Those are both extremely dark blue colors, and they would not be consistent with the medium blue color.

In the lower portion, we have the Isuzu Rodeo in three different colors, Trooper Blue, Midnight Blue and Clipper Blue. The Trooper Blue being the darker color up top, which would not have been consistent, and then the other two colors, which are potentially consistent,

1    even though the one is fairly dark.  I thought that that

2    might be a potential match if the lighting was right.

3         Q.  And then if we could go to the next slide.

4         A.  Now, here we have the CR-V.  The CR-V had

5    different colors depending on the model year available.

6    So up top you have the Eternal Blue Pearl and Super

7    Marine Blue.  Those again are both very dark navy colors

8    that would not have been consistent.  And then at the

9    bottom, you have Electron Blue Metallic and Electron

10   Blue Pearl.  Both of those colors would have been

11   consistent.

12        Q.  We can take that down.

13             Did you review a list of the registered vehicles

14   in Kodiak?

15        A.  Yes.

16        Q.  Of that list, were you able to narrow it down to

17   how many of the vehicles registered in Kodiak would be

18   consistent with the vehicle that you observed in the

19   4-12 video?

20        A.  Yes.

21        Q.  How many was that?

22        A.  It was nine.

23        Q.  What did they include?

24        A.  So the total list was 32,000 vehicles listed for

25   Kodiak.  And they tell you the make, model, and a

general color name. So it doesn't tell you whether it's dark blue or light blue. It just says blue.

So of that, the nine vehicles, included a couple of Rodeos, one, two, three, four, five. And then four Honda CR-Vs, one of which was Wells' vehicle.

MS. SHERMAN: Thank you. I have no further questions.

THE COURT: Mr. Colbath, go ahead, please.

MR. COLBATH: Thank you.

CROSS EXAMINATION

BY MR. COLBATH:

Q. Mr. Becker, while we're getting set up here, you didn't look at any one of those 32,000-plus vehicles from Kodiak except Mr. Wells' vehicle, did you?

A. You mean physically look at them? I only saw photographs of Mr. Wells' vehicle.

Q. And you didn't see even a photograph of any of the other 32,000?

A. Correct. That wasn't part of my analysis.

Q. It appears to me, sir, from your CV that your work primarily focuses on civil litigation, accident reconstruction and other design-type testimony, largely centered around the automotive industry?

A. Yeah. Most of my work centered around the automotive industry. Some of my work of course in the

photogrammetry realm has been completely non-automotive

related, like a trial a few months ago was photograph of

a container office building with some pipes nearby,

making measurements on that.

Q. It appears to me that other than our case, you've

only testified in two criminal cases?

A. Yeah, two others. I thought there were more,

but --

Q. You haven't -- your testimony is listed in your

CV, right?

A. Yes. I have the last four years per the federal

rule, but there's of course been more testimony than

that.

Q. And neither of those prior cases, the criminal

cases, at least the ones listed, those didn't deal with

video image analysis?

A. No, they both dealt with video image analysis of

motor vehicles.

Q. Sir, one of them was a murder case where you

testified about speeds of a vehicle and a collision that

occurred, right?

A. Yes. And then there was also a video.

Q. And you weren't asked to perform or offer any --

your testimony wasn't accepted as -- any testimony

regarding video analysis in that case, was it?

1    A.   No, I don't think that was part of the question

2  in the end.  The part of my testimony in that case was

3  for the vehicle data and how the collision occurred.

4    Q.   Now, you testified -- I saw one of the cases you

5  had listed was Sivak versus Cody Rides.  That was a

6  federal court case from last year, right?  Do you recall

7  that case?

8    A.   Yes.

9    Q.   There your testimony was offered in the District

10 of Minnesota, federal court in Minnesota?

11   A.   Yes.

12   Q.   You did testify in -- about a couple of different

13 opinions in that case dealing with a couple of different

14 areas of testimony, right?

15   A.   Yeah.  There was video analysis because they had

16 video of an amusement ride that had ejected a few

17 passengers, and there was analysis of the ride and its

18 maintenance records.

19   Q.   The carnival ride?

20   A.   Correct.

21   Q.   And the district court in that case reviewed your

22 testimony and reviewed your qualifications.  You recall

23 that?

24   A.   Not specifically.  It was a deposition, I

25 believe.

1    Q.  Well, when your testimony was submitted, the

2    district court found that you weren't qualified to

3    testify in video imaging analysis; isn't that true?

4    A.  That was never presented to me.

5    Q.  You've not reviewed the opinion where the Court

6    found that your testimony was inadmissible because you

7    had no training in video image analysis?

8    A.  I have never seen a document related to that or

9    had a conversation related to that.

10   Q.  Would you like to see it, sir?

11   A.  It's unrelated.  I provided testimony for

12   deposition in that case.

13           (Mr. Colbath approaches the witness).

14           MR. COLBATH:  It's page four, Counsel.

15   BY MR. COLBATH:

16   Q.  Sir, I would refer you to -- well, first of all,

17   on the first page, you recognize the caption of the

18   case.  That's the case we were talking about, the one

19   cited in your CV?

20   A.  Yes.  Sivak versus Cody Rides.

21   Q.  I refer you to page four, the first full

22   paragraph.  Once you have had a chance to review that, I

23   just have another question for you, sir.

24   A.  Sure.  I never saw this before.

25   Q.  And that was going to be my question.  Nobody

1   shared with you, sir, that the Court had found you were

2   not qualified to offer an opinion about video security

3   images because you had no training in video analysis?

4       A.  Yeah.  Otherwise, I would have been able to

5   respond and address that type of issue.

6       Q.  In looking at your CV, sir, I don't see that you

7   have specific training in video image analysis, forensic

8   video image analysis, correct?

9       A.  No, that's incorrect.

10      Q.  Can you tell me about a specific forensic imaging

11  analysis training that you've had?

12      A.  Sure.  My Faro laser scanning training, my

13  PhotoModeler training, PC Crash software training.  And

14  it also is an aspect that's come up in the Northwestern

15  crash reconstruction courses.

16      Q.  So those are all training in photogrammetry,

17  correct?

18      A.  Photo and video analysis.  In other words, in a

19  lot of the cases related to crash, we have to identify

20  various characteristics just based on the police

21  photographs of the scene.  So there's training of course

22  for the police to have proper documentation of the

23  scene, but that doesn't always occur.  So a lot of times

24  we have to make analyses based just on photographs when

25  evidence is no longer available.

1    Q.   Now, I was following on your CV here, all of

2    those were courses and training that it appears you took

3    before that case we talked about where your testimony

4    was rejected last year.  You don't have any training

5    since then, just in the last, say, 12 months on forensic

6    video image analysis?

7    A.   No.  Actually, there's another update to PC Crash

8    that I took just last month that's not on here yet.

9    Q.   An automobile crash analysis training?

10   A.   No.  It was primarily based on integrating laser

11   scan data with photographs and doing photo matching.

12   Q.   Sure.  You didn't use any laser scanned

13   insertions or information into any of your report in

14   this case, did you?

15   A.   Yeah.  The other experts -- the other analysts

16   did that work.

17   Q.   In fact, you didn't do photogrammetry here.  You

18   didn't take any laser scanning?

19   A.   No, I did photogrammetry, just not with laser

20   scanning.

21   Q.   Well, sir, isn't photogrammetry

22   mathematically-based scientific -- taking

23   mathematically-based scientific principles and

24   dimensional information and putting it into an image

25   reconstruction that allows you to then determine certain

1   characteristics about an unknown object?

2      A.   Yeah.   That's a pretty good summarization.

3      Q.   You testified on direct examination, and I read

4   your report thoroughly, you didn't take any measurements

5   in this case.   You didn't yourself conduct any

6   measurements, did you?

7      A.   That's incorrect.

8      Q.   List for me the measurements that you took.

9      A.   Sure.   The measurements of the various angles of

10  the vehicle, and then I also took the overlay image for

11  comparison of size in comparison with the -- let me get

12  the right phrase, the other analysts' work of the size

13  of the vehicle.

14     Q.   What did you measure with respect to the angles?

15  You were just talking about you drew a line on the paper

16  and determined what angle that that line sat at from a

17  perpendicular degrees?

18     A.   Exactly, yeah.   That's considered a measurement.

19  So you're measuring an angle.

20     Q.   Those were photos you took from somebody else's

21  report, and you simply measured what, to verify the

22  angles?

23     A.   It was from the images of the actual video, the

24  incident video, the images of the 4-19 video, as well as

25  the 3D models from the defense's analyst.

1    Q.   And you talked about another group of

2  measurements, measurements related to the overlay.  What

3  did you measure in respect to making your overlays?

4    A.   There between the 4-12 video and the 4-19 video,

5  I scaled the buildings to make sure -- certain my

6  movement of the ghosted image over top of the other

7  image were consistent in size.

8    Q.   So any other measurements or imaging

9  measurements, calculations, mathematical calculations

10 that you did?

11   A.   Yeah.  One more based on the overhead view from

12 Google Earth determining the distance of the roadway

13 from the approximate location of the camera.

14   Q.   What did you determine there, by the way?

15   A.   It's about 1,000 feet.

16   Q.   So up until now, your testimony here, how much

17 has your company's total billings been to the Government

18 for preparation of your work in this case, your report,

19 your testimony here?

20   A.   I don't have the final value or an exact figure

21 for either of those.

22   Q.   Okay.

23   A.   I know it was budgeted somewhere around 30K.

24   Q.   I saw a bill from beginning of August that --

25           MS. SHERMAN:  Your Honor, he's testifying.

1           THE COURT:  That's sustained.

2           MR. COLBATH:  Sure.

3    BY MR. COLBATH:

4      Q.  Could it be higher than $47,000 prior to your

5    travel here to Alaska or any of the billing for the

6    testimony here?

7      A.  I don't know.  I don't see the bills like that.

8      Q.  Okay.

9      A.  I just have to approve my time and hours.

10     Q.  Nobody asked you to review that information or

11   keep track of that information, did they?

12     A.  That's kept track in my system.  I just didn't

13   print that out.

14     Q.  Okay.  So the purpose of your investigation here

15   was, as you wrote it down, "To analyze the surveillance

16   videos to determine the make and model of the vehicle of

17   interest and see if it was consistent with the Wells'

18   2001 Honda CR-V."  Correct?

19     A.  That's a general summary, yes.

20     Q.  Well, that's how you summarized it in your

21   report, right?

22     A.  You added a few words.  Otherwise, yes.

23     Q.  To analyze the surveillance videos, first of all,

24   there was just one surveillance video in this case,

25   right?

1    A.  Of the incident vehicle, correct, there's one

2   surveillance video and then there -- well, there's two

3   surveillance videos of the day of the incident, one of

4   the different angle that didn't capture the vehicle of

5   interest.  And then there's the vehicle of interest

6   video, and then there's the 4-19 video.

7    Q.  And the 4-19 video isn't surveillance at all.

8   That's the police taking Mr. Wells' car and driving back

9   and forth on Anton Larsen Bay Road?

10   A.  It's still surveillance video because it comes

11  from the same surveillance system.

12   Q.  The police were surveilling themselves.  They had

13  a policeman sitting on one end of the controls of the

14  camera watching a police officer drive the car on the

15  other end.  In your terminology, that's also

16  surveillance?

17   A.  Of course.

18   Q.  Okay.  Now, prior to going out there and

19  conducting that second surveillance video, you were --

20  well, that was all done before you were involved in the

21  case, wasn't it?

22   A.  Yes.

23   Q.  So that wasn't anything law enforcement consulted

24  with you about, how -- the best ways to do that,

25  parameters to use, anything like that?

1    A.  Exactly.

2    Q.  And you've not been to the COMMSTA or been to

3  Kodiak or the area where these videos were taken, have

4  you?

5    A.  No, I had no need to go to the site.

6    Q.  In conducting your work and beginning the

7  process, you indicated it was important to review all

8  the facts.  And the facts that you had prior to

9  determining anything were the 4-12 video, the April 12th

10 actual surveillance video, right?

11   A.  Yeah.  I mean, the materials available for review

12 are listed in my report.

13   Q.  I understand.  These ladies and gentlemen don't

14 have your report, so I'm asking you about that, sir.

15 You had the 4-12 video?

16   A.  Yes.

17   Q.  And you had the 4-19 video, which you knew was a

18 law enforcement video using Mr. Wells' car?

19   A.  Yes.

20   Q.  And you had a picture of Mr. Wells' car?

21   A.  Yes.

22   Q.  And then you had the work and the materials done

23 by other analysts and similar video analysis from the

24 Government, you had some other people's reports?

25   A.  Yeah.  I had one defense report and an e-mail

from one of the investigators, as well as a couple
reports from other investigators.

Q. And so in looking at it, you said it's important
to start with the facts. And what you did was you
reviewed both videos, and you reviewed in detail
photographs of Mr. Wells' car?

A. Yeah. These were all the facts in the start of
the case, the start of my analysis of the case.

Q. So prior -- prior to trying to determine what the
unknown vehicle was or make any independent standalone
assessment of what that vehicle might have been, you
reviewed and had lots of information about the car you
were looking for?

A. Yeah. What the attorney is alluding towards is
informational bias.

MS. COLBATH: Your Honor, I'm going to --

THE COURT: That's sustained.

MR. COLBATH: -- object and have it stricken as
nonresponsive.

THE COURT: Just let's hear your next question.

MR. COLBATH: Well, I would like --

THE COURT: I will strike that. That's fine.
Go ahead.

MR. COLBATH: And so can I have that question
read back? I would like an answer to that question.

1          THE COURT:  That's fine.  Yes.

2          Let's hear that question again.  Madam Court

3  Reporter, can you read that back.

4          COURT REPORTER:  Prior to trying to determine

5  what the unknown vehicle was or make any independent

6  standalone assessment of what that vehicle might have

7  been, you reviewed and had lots of information about the

8  car you were looking for?

9     A.  Yes.

10    Q.  And you talked a little bit about resolution and

11  the surveillance video.  Now, the April 12th video,

12  while the -- the camera that took both of these videos,

13  that's a low resolution camera, isn't it?

14    A.  It's 480P.

15    Q.  And the 480P refers to 640 pixels by 480, which

16  is just the pixel grid that that camera projects or

17  captures from any video, right?

18    A.  Correct.

19    Q.  And it actually -- that's the maximized

20  resolution that that camera is capable of, that's its

21  capability, but it actually functions in this capacity

22  with a much lower resolution than that.  It doesn't even

23  capture four -- 640 by 480, does it?

24    A.  No.  It was 640 by 480.

25    Q.  Well, do you know what the camera's nominal

1    resolution is?  Do you know what nominal resolution is,

2    first?  Let's start there.

3        A.   I do.

4        Q.   And what's that?

5        A.   That's the resolution before you perform a zoom.

6        Q.   And do you know in this camera system

7    configuration how many cameras are there in the camera

8    system that captures data that includes the one that

9    captured the 4-12 video?

10        A.   I'm only aware of the two cameras.

11        Q.   And do you know how it is that when those cameras

12    record images, those images are stored or collected?

13        A.   No.  I was only given the output.

14        Q.   And so, first of all, if there were more cameras

15    and all of the information from all the cameras were

16    reduced down and stored on one device, the device that

17    stores them in the computer, the hard drive, it has to

18    download all that data, all that resolution to store

19    those images, doesn't it?

20        A.   Yeah, it downloads each camera's data.

21        Q.   And the more cameras there are and the more data

22    there is to download, the more that that system has to

23    compress that data in order to store it, because motion

24    takes up a lot of data?

25        A.   Not necessarily.  The systems are generally

1  capacitized to acquire all of the cameras that the

2  system is capable of acquiring generally at full

3  resolution.  When they downsize it is an elected option.

4      Q.  And so you don't have any idea about how much

5  compression went on or how much loss in resolution there

6  was in this system because of all the cameras on the

7  system.  You weren't asked to look at that?

8      A.  The exported information I had was 640 by 480.

9      Q.  But you don't have a way to test the nominal

10  resolution.  You don't have a way to know whether this

11  is capturing full resolution or whether it's something

12  less due to compression.  You didn't do anything to make

13  any of that determination?

14      A.  No.

15      Q.  You weren't provided any of the information about

16  the cameras' settings when it captured the April 12th

17  video, were you?

18      A.  The cameras' settings are embedded in the

19  metadata for the video.  So I had the video.  That's all

20  I needed.

21      Q.  Okay.  And so what was the focal point of the

22  zoom on the 4-12 video at the time the image was

23  captured?  Because you said zoom affects resolution.

24      A.  Yes.  What they do with zoom is there is both

25  digital and mechanical zoom.  If you do digital zoom,

1    you can affect your resolution.  If you do mechanical

2    zoom, it does not affect the resolution.  I didn't

3    investigate that because I took the video as I received

4    it.

5        Q.   Okay.  So I guess my point, sir, is you don't

6    know what the nominal resolution is.  You don't know

7    that we were even capturing the low resolution of 480P?

8        A.   All I can tell you the video I had was 480P.

9        Q.   You were aware as you started your work and

10   started your analysis from reviewing the reports that

11   you had that the FBI's Forensic Audio, Video, and Image

12   Analysis Unit had conducted similar evaluation prior to

13   your involvement, right?

14       A.   If you name the person, I could either agree or

15   disagree with it.

16       Q.   Sure.  You saw work from or information from

17   analyst -- forensic analyst Chris Iber?

18       A.   I saw an e-mail from him, correct.

19       Q.   You saw a report and analysis from Richard Vorder

20   Bruegge?

21       A.   Correct.

22       Q.   In fact, Mr. Vorder Bruegge's report, you used

23   one of his slides, some of his measurements and

24   calculations, you incorporated that into your work?

25       A.   Yes.

1    Q.  And Mr. Iber, Mr. Vorder Bruegge, they determined

2 they could not make any conclusion about the identity or

3 the characteristics of the vehicle in the 4-12 video due

4 to a lack of --

5             MS. SHERMAN:  Your Honor, I'm going to object.

6             THE COURT:  Let's hear the rest of the

7 question.

8 BY MR. COLBATH:

9    Q.  -- due to a lack of or because of poor image

10 resolution?

11             MS. SHERMAN:  I think that mischaracterizes

12 Mr. Vorder Bruegge's report.

13             THE COURT:  I'll overrule the objection.  The

14 witness can answer if he agrees or not.

15    A.  I know in the Iber e-mail, he said he could not

16 determine the make or model of the vehicle and said

17 maybe others could.  I don't recall the conclusion from

18 Vorder Bruegge exactly.

19    Q.  The end analysis that you conducted was really an

20 observational assessment between what you saw on the

21 4-12 video and what you saw on the 4-19 video, wasn't

22 it?

23    A.  The 4-19 video is a confirmation of what I saw on

24 the 4-12 video.  Because the process we typically

25 attempt to use is to get a known object in the same

1  geography as the object we're trying to identify.  So

2  any known object would have worked.  In this case, it

3  happened to be Wells' vehicle.

4      Q.  Any known object would have worked.  So they

5  could have drove any vehicle in front of there?

6      A.  Sure.  Well, as long as I knew what vehicle it

7  was.

8      Q.  The 4-12 video, you talked about frame rate

9  and -- frame rate of the camera, which you agree is

10  about four frames per second, right?

11      A.  Correct.

12      Q.  And the April 12th video, the surveillance video,

13  based on your observation of that, the unknown vehicle

14  is in front of the camera about one second going

15  northbound and one second going southbound?

16      A.  Yeah, about a second and a quarter northbound and

17  about a second southbound.

18      Q.  On the frames really there's a partial view of

19  the vehicle going southbound.  The first time it comes

20  past on Anton Larsen Bay, you see a portion of the

21  vehicle three full frames and a portion of the vehicle,

22  so the two halves it's about four?  Are you referring to

23  something there, sir?

24      A.  I'm just confirming what you're saying or denying

25  it just by looking at the collage I have of the frames

1    of the vehicle traveling northbound.

2         Q.   Yeah.   Sure, if you want to look it's page five

3    of your slides there that we saw.

4         A.   Yep.   Yeah, that's correct.   There's a portion of

5    the vehicle in the first frame and a portion of the

6    vehicle in the last frame.

7         Q.   On the way back, there's, southbound when it

8    comes back down Anton Larsen Bay Road, four, right?

9         A.   Again, in that I guess it would be less than four

10   because there's a portion of the vehicle in the first

11   frame and a portion of the vehicle in the last frame.

12        Q.   And the images that you used, the ones you showed

13   in the 4-12 video with the jury here, did you extract

14   those from the video?

15        A.   Yes.

16        Q.   And how did you do that?   What process did you go

17   through to extract those?

18        A.   It would be in my notes on the -- actually, it

19   would be in the metadata for the exports.   So I don't

20   recall if those were using the Windows snip tool or if

21   they were from an export feature in the VideoCommander

22   software.

23        Q.   You didn't --

24        A.   It was one of those two.

25        Q.   You didn't just take those from one of the other

1    reports you looked at?

2        A.   No.

3        Q.   And so the ones you and I were just talking

4    about, the four or five going one direction and four

5    going the other, it was nine total anyway that you say

6    you exported?

7        A.   Correct.

8        Q.   And then on the 4-19 video, you showed a lot of

9    pictures and comparisons from the 4-19 video.  Who

10   extracted those?

11       A.   I did as well.

12       Q.   Okay.  And so on the 4-12 video, you took all the

13   frames, right, all nine, that's all there was of the

14   unknown vehicle?  You pulled out every one that you

15   could pull out?

16       A.   Yes.

17       Q.   And on the 4-19 video, first of all, you were

18   aware that the -- I'm sorry, Sonja.  Strike that

19   question.  Let me ask you one more about 4-12.

20            You don't know what the speed of the vehicle is

21   as it traveled down Anton Larsen Bay Road southbound and

22   whether it was that vehicle or another coming back by,

23   you don't know the speed in either direction, right?

24       A.   I didn't calculate the exact speed.

25       Q.   Do you have an estimated speed?

1    A.  No, just a comparative speed with fewer frames

2 departing versus arriving.  The departing traveling the

3 same distance would have been traveling slightly faster.

4    Q.  But as to -- I didn't ask you for a difference in

5 speed.  I asked for an estimation of speed, total speed.

6    A.  I thought you just said, do you know -- how do

7 you know -- what I know about speed.  That's what I know

8 about speed.

9    Q.  All right.  So just so I'm clear, because maybe

10 my question was unclear, you don't know or have an

11 estimation of the speed of the vehicle traveling

12 southbound?

13    A.  No, I didn't measure the speed of the vehicle

14 southbound or northbound specifically.  Only relative to

15 each other.

16    Q.  Okay.  Now, I'll go to my questions on the 4-19

17 video about the frames.  You were aware that the police

18 drove Mr. Wells' car down Anton Larsen Bay and back down

19 Anton Larsen Bay on April 19th a whole bunch of times,

20 not just one northbound and one southbound, but actually

21 seven northbounds and seven southbounds, right?

22    A.  Right.  Yeah, there were multiple.

23    Q.  So they also drove it at different speeds.  You

24 knew that?

25    A.  Yeah, I think so.  I think some of the other,

1  whatchamacallit, travels had different number of frames

2  for how long the vehicle was viewable.

3      Q.  So they -- the video started at a very, very slow

4  speed, didn't it, five miles per hour or many, many

5  frames as it traveled across southbound and many, many

6  frames as it traveled slowly back northbound.  Do you

7  recall that from your review?

8      A.  Yeah, not the five miles an hour specifically,

9  but that there were multiple frames, in excess of five.

10      Q.  And then the next time, a few less frames but

11  still far more than the April 12th and back across and

12  so on for each pass all the way up through the seven.

13  You recall that?

14      A.  All I specifically recall is that one of the

15  travels was five frames in each direction.

16      Q.  Okay.  Now, which images -- you were able to look

17  at all those frames in all the different passes, the

18  clarity of them, the vehicle's position relative to the

19  camera in all of those and select the frames you want,

20  correct?

21      A.  No.  I just selected the one route that had five

22  frames in each direction.  That was -- it was up and

23  then back at the same time.  Not the same time, but you

24  know what I mean, sequentially.

25      Q.  Which one was that, do you recall, the first one,

1    the second one, the third one?

2        A.  No, I didn't note the -- like pass number.

3        Q.  Okay.  And again, you had no idea then of the

4    speed of the vehicle?

5        A.  I was not calculating the vehicle speed.

6        Q.  And so you're saying that all the images that you

7    showed us in your report here came from one singular

8    pass -- one singular -- one northbound and one

9    southbound pass?

10       A.  Exactly, yeah.

11       Q.  And did you record at all in your notes or in

12   anything in your report about the time on the video

13   where those were taken so that if somebody wanted to

14   look or wanted to verify that information they could?

15       A.  I would have to review the metadata.  I don't

16   know that I did record the time at which I recorded the

17   4-19 video.

18       Q.  Now, you're aware that the 4-12 video, the

19   April 12th -- or are you aware the April 12th video was

20   recorded at around 7 a.m. in the morning?

21       A.  Yes.  7:09 and 7:14.

22       Q.  And the weather as it appears on the video and

23   the weather that day in Kodiak was dry and mostly sunny,

24   although it's just after sunrise, 7 a.m.?

25       A.  The light was flat at the time, indicating that

1    it was cloudy.

2        Q.  Or dawn?

3        A.  Well, at that time, it was reflecting white light

4    from the sky, so that's clouds.

5        Q.  It was also reflecting substantial white light

6    because Kodiak at that point had a considerable snow

7    cover, especially in the area around Anton Larsen Bay

8    Road and the video capture, didn't it?

9        A.  We're referring to two different types of

10   reflections.  Snow is reflected directly from the areas

11   in the fields and things of that nature.  The reflection

12   I'm talking about is like the roofs of the vehicles, et

13   cetera.  They weren't showing like a blue sky.  They

14   were showing a cloudy sky.

15       Q.  Here the -- both of those reflections were going

16   on, correct, the sky and the snow reflections?

17       A.  Yeah.  There wasn't really reflections of the

18   snow.  It was the snow that's being reflected back to

19   the camera.

20       Q.  Sure.  On both sides of the vehicle, near --

21   between the camera and the vehicle, which was

22   1,000 feet, and on the other side of the vehicle where

23   there was a complete snow field and a frozen lake?

24       A.  Yeah.  There were some trees and snow on the far

25   side of the vehicle.

1   Q.  And on the April 19th video of course, that was

2   taken at 3:00 in the afternoon.  Were you aware of that?

3   A.  Yes, it was between 3:00 and 4:00.

4   Q.  That was on a day where it was in fact cloudy and

5   rainy?

6   A.  It was definitely cloudy.  I don't have any

7   confirmation of the actual like rainfall.

8   Q.  Okay.  You noticed the puddles in the parking lot

9   on the video, the water present in the images, I assume?

10  A.  Yes.

11  Q.  And just like with the 4-12 video, you had no

12  idea, no way to know what the camera settings were or

13  the zoom was on the -- when the April 19th video was

14  taken?

15  A.  Well, actually, the field of view gives you an

16  assessment as to where the camera is pointing.  So on

17  the 4-19 video, the field of view was tipped slightly

18  downward relative to the 4-12 video and slightly to the

19  right.  But the scaling of the T-2 building, the far

20  building near where the Anton Larsen Bay Road is was

21  similar between the two videos.

22  Q.  And you made no adjustment for -- well, you knew

23  the cameras were -- first, they could tilt.  You were

24  aware of that?

25  A.  Yes.  It's a mechanical camera.  They can be

1   panned and tilted.

2       Q.   And the tilt was different on 4-19 than the

3   comparison video of 4-12.  The tilt -- let's just stay

4   on that function, tilt.  That was different between the

5   two videos?

6       A.   Yeah.  If you look at the images between the two

7   videos, you'll see a little bit more pine tree top on

8   the 4-12 video versus the 4-19 video.  But the general

9   geography of where the roadway is is pretty similar

10  between the two images.

11      Q.   The trees that you -- well, let's not let people

12  guess about this.  Could you pull up for me maybe slide

13  No. 2 of Exhibit 95.  And then could you pull up --

14  what's the exhibit number for the screen capture of the

15  4-19 that we looked at?  Try one -- defense exhibit

16  maybe -- sir, that one that we're looking at there, that

17  is page two I think of your PowerPoint presentation

18  there, right, page two of your demonstrative Exhibit 95?

19      A.   Yes.

20      Q.   And my list doesn't have -- try Defense Exhibit

21  No. 197.  Okay.  That's --

22           MR. COLBATH:  Has that been admitted, Your

23  Honor?

24           THE COURT:  No, it has not.

25           MR. COLBATH:  Defense Exhibit No. 197.

1          DEPUTY CLERK:  That has not been offered or

2    admitted.

3          MS. SHERMAN:  Your Honor, I wouldn't object to

4    it being shown, because it's demonstrative.

5          THE COURT:  Go ahead and display it.

6          MR. COLBATH:  All I'm going to do is a

7    demonstration or demonstrative purposes only, Your

8    Honor.

9    BY MR. COLBATH:

10   Q.  So the picture on the right is -- I'll let you

11   look at it, but see if you agree, it's just a screen

12   capture from -- you see that it appears to be the same

13   video camera view, correct?

14   A.  Yes.  Yeah, that's the 4-19 video.

15   Q.  And well, shoot, we've got that time up in the

16   corner.  But you were just referring to some trees.  We

17   were talking about the tilt function, and those were the

18   trees that you were referring to, right?

19   A.  No.  Actually, I was referring to this pine tree

20   and the view of this pine tree as well.

21   Q.  Okay.

22   A.  You can't see that one so well because of the

23   timestamp.

24   Q.  Sure.  But here in the one that I've circled, we

25   can see the whole trees, correct?

1    A.   In this image?

2    Q.   Yeah.

3    A.   You're talking about that tree back there?

4    Q.   Yes, sir.

5    A.   Yes.

6    Q.   And that's all the way -- that's again on the

7    other side of the lake right over top of the

8    unidentified vehicle on Anton Larsen Bay Road?

9    A.   Right.

10    Q.   And you can -- I agree with you it's hard to see

11    there with the timestamp, but you can see the camera now

12    basically cuts off right through the middle of those

13    trees?

14    A.   Yeah.  You can see a portion of the tree or

15    something.  I think it might be the tree right there.  I

16    can't confirm that.

17    Q.   The camera -- even though those are way out there

18    that far away and tall trees like this other one, the

19    camera is tilted enough that we now lose all the ground

20    behind them and part of the trees themselves?

21    A.   Yeah.  Because you're talking about perspective,

22    so the further away from the camera, the greater the

23    change will be relative to small angle changes of the

24    camera.  If you'll look at the fence line you see the

25    difference is pretty small because that's close to the

1    camera.

2        Q.    Sure.   What you're talking about here is -- now,

3    this is just feet away from the camera, right?   The

4    fence runs right below the camera.   You're familiar with

5    that from your very first page that showed the outline

6    of the buildings?

7        A.    Correct.

8        Q.    And in these ten-foot fence sections here, do you

9    know how big the fence sections on a standard chain link

10   fence are?

11       A.    I don't know that that's a standard chain link

12   fence or the length of that specific section.

13       Q.    But in that section right there, we can see all

14   of the cross bracing and starting past this post,

15   correct?

16       A.    Exactly.

17       Q.    And here right at the source of the camera, we

18   lose several feet of the cross brace?

19       A.    There's a difference.   I'm not going to quantify

20   the number of feet.

21       Q.    Okay.   So if it's right at the source of the

22   camera, how many feet do we lose in perspective at

23   1,000 feet away where that car is sitting on the road?

24       A.    Zero.   It's still 1,000 feet away.

25       Q.    I understand, but here we've lost some view of

the fence in the foreground.  We've lost view of the

trees all the way at the other end of the photograph.

And so I'm asking, how much of the vehicle is different

or do we lose in the middle?

    A.   Zero.

    Q.   Besides being able to tilt, the camera can zoom,

correct?

    A.   Yes.

    Q.   And just like the tilt function, this camera was

zoomed in to a different zoom on April 12th compared to

April 19th?

    A.   If there was a difference, it was extremely

small.  So there's means of doing those comparisons, and

that's what I applied when I did my analysis.

    Q.   Say that again for me.

    A.   If there was a difference in zoom, it was very

small, because I measured several features, which I can

point out to you if you wish.

    Q.   Just tell me about the measurements you took.

    A.   Sure.  The T-2 building, I made measures of the

roof line that's visible and the height from the roof

line to the roadway and then compared that to the T-2

building in the other video to make certain that those

were -- they were within my measurement error.

    Q.   I didn't see those in your report.  Did you list

measurements?  And you didn't tell me -- just a minute
ago when I asked you about all the measurements you
took, you didn't tell me about measuring the T-2 roof or
measuring the height of the T-2 building.  You neglected
-- you didn't remember that?

A.  No, I did remember that.  That's what I had
stated when I said I made measurements of the T-2
building to make my overlay, my ghosting of the vehicle.

Q.  You didn't include the measurement calculations
or the information about that in the report?

A.  No, of course not.  Why would that be material?

Q.  And did not do any measurement, actual
measurement of the vehicle of interest?

A.  Again, just the ghosting comparison.

Q.  While we're talking about the measurements -- I
think we can take that down for a minute.  I have some
other questions about measurements as long as we're
talking about that.

      You're aware, sir, of the pixel size in your
images, correct, that are extracted from both videos?

A.  That can be a feature, yes.

Q.  Well, in this case, the pixels at 1,000 feet,
given the resolution of this camera, the pixel
measurement is approximately five inches per pixel, or
each pixel in that camera representation is represented

1  by a real world value of about five inches; isn't that

2  correct?

3      A.  Yeah, about five inches.

4      Q.  So what that means is if we took that -- even if

5  we assume the resolution, the full resolution that you

6  say that the camera was capable of and had, there's 480

7  of those pixels running up and down and 640 across.  So

8  it's like a screen, like a window screen of little

9  squares, isn't it?

10     A.  Yeah.  I believe it was explained by the defense

11 expert, DiTallo.

12     Q.  And if we put that screen, those little pixels

13 over the top of a photograph, each one of the little

14 boxes in the screen, like a window screen or a sieve,

15 each one of those out at 1,000 feet where that car is is

16 five inches, maybe the width of my hand?

17     A.  Yeah, it's an approximate estimation.

18     Q.  Well, you know that other people who reviewed

19 this, including Mr. Vorder Bruegge who you've already

20 said you reviewed his work, he did the math and

21 calculated that out and came up with that valuation,

22 approximately five inches per pixel?

23     A.  Yeah, Vorder Bruegge had said about 4.8.

24     Q.  That was consistent with others or actually the

25 lowest size estimate of other reports that you reviewed,

1  wasn't it?

2      A.   Yeah.   I don't recall anybody else except for

3  DiTallo who had said it was about five.

4      Q.   You did not do any of your own pixel size

5  calculations, did you?

6      A.   No, because I was using sub-pixel marking.

7      Q.   What do you mean by sub-pixel markings?

8      A.   Sure.   If you are looking at an image, and if you

9  go back to my images of the green box, when you zoom

10  out, you can have an approximation as to where an object

11  is.   If you can mark on that at a sub-pixel rate where

12  an object is, you can get a better marking than if you

13  just identify a specific singular pixel.   And that's

14  called sub-pixel marking.

15        So that allows you to then zoom in to the

16  individual pixels, and they get kind of blurry as to

17  like what might be one pixel versus the next pixel, so

18  in your tolerance, you know your range of error.   Part

19  of the scientific method is knowing your range of error.

20  So when I had outlined the broader size of the vehicle,

21  I had used a bandwidth of I think 20 inches, so 167 to

22  187 inches.

23      Q.   There was a whole bunch of information there,

24  sir.   I want to break some of that down so that me and

25  the jury follow that.

1        A pixel is a five-inch, roughly, square at

2   1,000 feet out there?

3      A.   Sure.

4      Q.   And when the camera captures that, that's one

5   color?  A pixel can only be recorded as one color?

6      A.   Right.

7      Q.   And our eyes perceive all those pixels put

8   together as whatever image or form of an image we see as

9   the camera puts those pixels together to form the image?

10      A.   Sort of, yes.

11      Q.   Okay.  And you're saying when you looked at spots

12   out on the vehicles on the roadway on Anton Larsen Bay,

13   you were able to not only isolate pixels, but then

14   isolate spots within pixels?

15      A.   No.  You don't isolate spots within the pixels.

16   You make the measurement from the further view so that

17   you can see the edges more clearly.  Then when you go

18   into zoom into that measurement, your measurement is not

19   bound by where the pixels are.  Your measurement is

20   bound by the CAD system or whatever you're using as a

21   ruler.  So you can make sub-pixel markings that are

22   going to be finer in resolution than the actual pixels

23   themselves.

24      Q.   You didn't put any of that in your report, did

25   you?

1   A.  No, it wasn't necessary.  I didn't do any

2   measurement of the length except for the comparison

3   measurements and the knowledge of what the range of

4   error could be.

5   Q.  What's the range of error you determined?

6   A.  As I mentioned, I used a size of the vehicle from

7   potentially 167 to 187 inches.

8   Q.  So that means when we're talking about a vehicle

9   being -- for instance, we know that a Honda CR-V, a real

10  Honda CR-V is 177.6 inches long, correct?

11  A.  Right.

12  Q.  And so your estimation of the -- with your margin

13  of error on size, the vehicle of interest is somewhere

14  between 167 and 187, a 20-inch difference, right?

15  A.  Yeah.  That's for narrowing the pool down of the

16  vehicles when looking at length, overall length.  So

17  that's why you can look at a Jeep Wrangler or a Jeep

18  Liberty as well as a Mercedes even though they're

19  significantly different in length.  It doesn't mean

20  they're going to match.  It just means that's what a

21  limiting factor is.

22  Q.  But my question was -- we'll get to the vehicle

23  exclusion or inclusion.  Just when we're talking about

24  what you can see and what you can't see, the best

25  distance calculation you can get, size calculation for

1   length is only narrowed down to 20 inches, a 20-inch

2   range, right?

3       A.   I didn't review the other expert's opinions as to

4   their actual range.  When I did my size comparison, it

5   was a ghosting overlay.  It wasn't an actual specific

6   measurement.

7       Q.   Just a minute ago, sir, you said you did

8   measurements and you developed a rate of error and your

9   rate of error was 167 to 187.  So was that accurate that

10  you did measurements, you had an error range and it was

11  167 to 187?

12      A.   Yeah.  That's for a different analysis.  That's

13  for the vehicle inclusion or exclusion.  So if you want

14  to talk -- did you want me to separate or you just want

15  like all lumped into one?

16      Q.   Well, you talked about them all in one.  So yeah,

17  I want to separate.  First, I just want to talk about

18  the length.  Okay?  Not even the length, just the

19  measurement of the pixels.

20      A.   Yeah.  If you're using my ghosting comparison,

21  then it would be a tighter range than that.  For my

22  exclusion, it's a wider range than that.  Because in the

23  comparison, you have a known size vehicle and it

24  overlays with the vehicle of interest.  So you know that

25  your comparison is very similar in that there's not a

1    specific error rate because it's just a comparison.

2         When I did the exclusion, I looked at the whole

3    range of potential measurements that were available for

4    that vehicle.

5         Q.  Let's not get to the exclusion.  Let's keep

6    talking about the measurements you took because the

7    measurements --

8         A.  Two seconds ago you said you wanted it all in one

9    answer.

10        Q.  Well, let's stay on the measurements for a

11   minute.  Okay?  All of the pictures that you -- or all

12   of the images that you analyzed were of moving vehicles,

13   correct?  They were still images taken from moving

14   vehicles?

15        A.  Right.

16        Q.  And at 1,000 feet, well, really or at any range,

17   there is motion blur when a camera captures a still

18   image of a moving vehicle?

19        A.  Yes.  There can be captured pixels to the rear of

20   the vehicle, not in front of the vehicle, but to the

21   rear of the vehicle with motion blur.

22        Q.  And one of the things that happens when you have

23   motion blur is things look longer or larger than they

24   are because of that blur.  The camera has pixels

25   actually going behind the vehicle where there aren't any

1   vehicles, but yet it's perceive -- the camera is

2   perceiving is because it's motion blur?

3       A.  Yeah.  It depends on the speed of the vehicle.

4       Q.  And we already talked about you don't know the

5   speed, did not know the speed of any of the vehicles for

6   the frame captures you used?

7       A.  I didn't calculate the speed.

8       Q.  And here you didn't calculate the motion blur

9   that might have been affecting the pixel change for any

10  of your images, did you?

11      A.  No, that was not one of my concerns because I

12  could see the rear of the vehicle separate from other

13  portions of the roadway.

14      Q.  Okay.  And others did.  You reviewed the others'

15  work, including Mr. Vorder Bruegge again, let's just

16  stay with him, from the FBI there.  He calculated motion

17  blur as well, didn't he?  Do you recall that?

18      A.  No, I don't specifically recall the motion blur

19  calculation.

20      Q.  Would you be surprised then or disagree with a

21  motion blur range of plus or minus two pixels?

22      A.  In total, that's consistent.

23      Q.  Okay.  So what plus or minus two pixels means is

24  we already talked about how big a pixel is, five inches,

25  plus or minus means two pixels is ten inches, right?

1    A.  Right.

2    Q.  And so from your example, something might be

3  longer or you might see something at the rear.  That

4  means just for the motion, not accounting the resolution

5  problems with the pixels, just from motion, the motion

6  of the vehicle can add two extra pixels or ten extra

7  inches on any given spot.  It doesn't have to be on the

8  rear of the vehicle, right?  You'd see the same motion

9  blur on a mirror or on a tire or on a window, all of

10  that sliding by ten inches?

11    A.  If those features were wider than intended, they

12  would be up to that greater size, yes.

13    Q.  If the features were wider than --

14    A.  See, you got to talk about how an object's moving

15  through space.  So if it's moving forward and you have a

16  narrow feature, it can blur behind it.  Of course.

17  Makes sense.  It can't blur in front of it.  So leading

18  edge objects are still crisp.  Trailing edge objects can

19  be blurred.

20    Q.  Okay.  And so the back side of all your features

21  are blurred?

22    A.  Can be blurred.  Depends on the speed.

23    Q.  And so again, at higher speeds, more blur; lower

24  speeds, less blur?

25    A.  Correct.

1    Q.  And you don't know that the vehicles that you

2  compared were going the same speed, because you don't

3  know the speed of either to start with?

4    A.  Just used consistent frame rates.  So the number

5  of frames dictates the speed.  To normally calculate

6  speed, as you asked me, you would take the frame rate,

7  the amount of time, and the distance and that gives you

8  velocity.

9    Q.  And what did you do, sir, to account for motion

10  blur in any of your selection of spots of comparison?

11    A.  Yeah.  That went into that overall 167- to

12  187-inch vehicle range length.

13    Q.  But with respect to any given spot, you didn't do

14  anything to account for or adjust for motion blur, did

15  you?

16    A.  Any given spot?  I don't know what you're

17  referring to.

18    Q.  Well, let's just talk about that.  Let's look

19  at -- let's pull up page 13 of Exhibit 95.  So sir, this

20  is just one of the random pages from your report there.

21  The 13th slide.

22       So when I say any given spot, I'm referring to

23  the spots you made, the circles you made on here.  Those

24  are all different spots on the different vehicles,

25  right?

     A.  Yeah.  Those are leading edge spots.  Well, the
front bumper is a leading edge spot, so that's not
subject to motion blur.  The bra is subject to motion
blur, which would make the bra wider, but it's behind
the headlight and the headlight would appear whiter, so
there would be white blurred rearward from the
headlight, not black.

     Q.  Sir, my question was, those were spots you picked
on the vehicle, right, different spots?

     A.  You asked me why I did those spots, yes.

     Q.  And what tool did you use or what mechanism did
you use to put those red circles on the pictures?

     A.  PowerPoint, I think.

     Q.  Just the standard PowerPoint software that comes
with the Microsoft package?

     A.  Yeah, those just outline geography on an image.

     Q.  Sure.  And how many pixels on any one of those
five images, not the car down below, Mr. Wells' CR-V
down below, how many pixels are contained within just
one of those spots?

     A.  I didn't analyze that.

     Q.  So --

     A.  The size wasn't -- the size of the red circle is
just a general highlight.

     Q.  Just a general highlight?

1    A.   Correct.

2    Q.   It's the area within the circle that you're

3  comparing one to the other, though, right?

4    A.   Yes.

5    Q.   And -- well, would you agree with me that there's

6  somewhere between three and four pixels, that's a three

7  and four pixel width in each side of the circle?

8    A.   Width?  Again, I don't have any specific

9  knowledge of that.

10   Q.   Sure.  Well, and height?

11   A.   As I said, the circles were just PowerPoint

12 circles to highlight the area.

13   Q.   Right.

14   A.   I believe all the circles are the same size.

15   Q.   They are all the same size, right?

16   A.   I believe so.

17   Q.   Okay.  Well, you would want them to be, you're

18 comparing point to point, so you'd want to have the same

19 points of comparison, correct?

20   A.   No.  The circles didn't have anything to do with

21 the comparison.  You make a comparison by looking at the

22 image.  Then you put the circle there so that other

23 people know what you're looking at.

24   Q.   And you tried to circle the point at which you're

25 looking at?

1    A.   The area, yes.

2    Q.   And the area in each of these is in the real

3  world, not on this screen, but in the real world as

4  you're looking at it, had you been standing in the -- at

5  the location of the camera and looking at that car

6  1,000 feet away, each of those circles is about 15 to

7  20 inches around if it's three to four pixels?

8    A.   No.  That's not proper.

9    Q.   Well, we already talked about each pixel at

10  1,000 feet is five inches.  And if that circle -- for

11  instance, the one on the front bumper is three or four

12  pixels wide, out there it's five -- it's the size of a

13  pizza pan.  It's 20 inches wide.

14    A.   A better comparison would be that that size of

15  that circle is greater than the size of the tire, and

16  you can see that that's not the case.

17    Q.   Well, the tires are much -- the rims alone are

18  16 inches?

19    A.   Right.  That's what I'm saying.  So if that

20  represents 20 inches, that would encompass more than the

21  rim and most of the tire.

22    Q.   Do you have one where you put it on the rim?

23    A.   No, but I mean it's PowerPoint.  Things can be

24  moved.

25    Q.   So the circle, you'd agree with me, is roughly

1    the center of the size of the rim?

2       A.   No.  I would say it's smaller than that.

3       Q.   So it's a five, an eight -- an eight-inch

4    difference?

5       A.   Maybe if you included the outer portion of the

6    circle, it's the size of the tire and rim.  I can't make

7    a good judgment call of that because it's not on the

8    rim.  But when you look at it from the Wells' Honda CR-V

9    center image, if I just juxtapose -- juxtaposition the

10   circle, it does not look like it encompasses the width

11   of the entire tire and rim.

12      Q.   Well, it's right below it.  The tire's right

13   below it and it's -- well, I guess everyone can see it

14   whether it's the size of the rim or not the size of the

15   rim.

16           But the point, sir, is you don't know where

17   within that large area you're comparing.  You don't know

18   the specific point within that that you're comparing?

19      A.   It's a visual comparison of objects.  It's not a

20   singular point.  I'm not talking about -- I identified

21   this one pixel and these images as being the dark spot.

22      Q.   Well, a visual comparison requires you to compare

23   comparable things, correct?  You know, you have to look

24   at the same point on two objects to see if they're

25   comparable.  Do you agree with that general premise

1    before we talk about these cars?

2        A.   It's not the same point.  It's the same general

3    area on the object of interest.  If you're looking at a

4    singular point you can be misled because of the objects

5    which you just discussed, such as motion blur, or pixel

6    movement.  So you look at the image as a whole, and you

7    zoom in to the areas of interest.  When I put the

8    circles on there that was to look at an area of

9    interest.  It's actually more difficult to look at those

10   areas of interest even with the circles on it.

11       Q.   And you have no way to know, sir, for instance,

12   as you're identifying -- well, the protocol is to first

13   identify individual areas of interest, so go one by one?

14       A.   Right.  Yeah.  The protocol is to use pointers to

15   identify the areas which you're calling out as a feature

16   or geography of interest in a given --

17       Q.   Let's pick one of those.  Let's pick an

18   individual characteristic like a taillight.  The

19   taillights, the side profile view of a taillight here is

20   less than five inches wide.  Do you agree with that?

21       A.   Yes.

22       Q.   And it's out there at 1,000 feet, and you're

23   going to decide to compare, well, I want to see if this

24   vehicle has two taillights that are similar.  The first

25   thing you have to do is know that for both of them,

1   you're looking at the taillight, right?

2       A.   Right.

3       Q.   And if it's less than five inches wide, and

4   the -- you can't get any closer than a ten-inch area of

5   motion blur tolerance, and then you can't pinpoint it

6   down to the pixel, you might not even -- you might be

7   looking at the taillight on one and a reflection or

8   another spot 10, 12 inches away on another.  So you

9   wouldn't be even comparing the same spot on the car, car

10  to car, before you decide if what you're looking at is

11  the same, right?

12      A.   Dealing with just taillight in this type of

13  imagery, no.

14      Q.   Well, the same would hold true if we compared

15  side-view mirrors?

16      A.   How about headlights?  Because you can see the

17  headlights.  You can't see the side-view mirror because

18  of the color blur.  In other words, the gray of the

19  side-view mirror isn't distinguishable while the vehicle

20  is moving at that distance.

21      Q.   The side-view mirror --

22      A.   But the headlight is white, and the headlight's

23  whiteness can be seen relative to the black of the bra

24  or it would have been visible relative to the color of

25  the vehicle.

1    Q.  Now, with the ten-inch difference of course, the

2  black of the bra could easily be the black of the bumper

3  in one direction or the black of the tire in the other

4  direction?

5    A.  No.  It's above the tire, so it wouldn't be the

6  tire.  The bumper, again, it's above the bumper so it

7  wouldn't be the bumper.

8    Q.  If we take --

9    A.  Blur doesn't move vertically.  Blur only moves

10  laterally in the direction of travel.

11    Q.  Sure.  But you said you weren't getting down to

12  the level of evaluating a pixel, and if we have a margin

13  of error of -- even in length of 20 inches, and you're

14  not down to the pixel point, you might not be looking

15  the -- if you're a pixel or two off, you're on the tire,

16  you're not on the bra.  There isn't a bra because the

17  black that you're seeing is the tire.

18    A.  That's a misrepresentation as to how motion blur

19  occurs.  Because motion blur is linear.  It doesn't

20  occur vertically unless you have vertical motion.  So

21  you're not going to see a tire appear in the upper

22  portion of a fender.  You're not going to see a bra

23  appear in the middle of a hood, because that motion blur

24  is going to be in one direction, as long as that

25  direction is one direction relative to your camera.

1    Q.  And sir, maybe I confused concepts there, and I

2    don't want the jury to be confused.  I'm not talking

3    about motion blur.  There is pixel margin of error both

4    vertically and horizontally here.  That's true, isn't

5    it?

6    A.  That's for making measurements and determining

7    edges, not for evaluating shapes.

8    Q.  So say that again.

9    A.  Sure.  If you look at a shape and something

10   appears round, in all likelihood, it's round.  So the

11   measurement of the width of that circle can have issues,

12   and if there was motion involved, the roundness can look

13   a little oblong, but the height is still going to be the

14   same.  The measurement is going to have error, but your

15   general shape understanding is still that it's round.

16   Q.  You saw the calculations not only for -- that

17   others did for the length of the vehicle, but the height

18   of the vehicle, you have at least a one -- plus or minus

19   one pixel range of error in height, too, correct?

20   A.  Yeah.  And that's going to come in edge picking,

21   so when you're selecting the edge for where the bottom

22   of the vehicle is and the top of the vehicle.

23   Q.  But there's a plus or minus one pixel.  So you

24   can be anywhere you have -- you can't say that a

25   vehicle, for instance, or anything, a building, whatever

1    it is, you can't say at that range, that 1,000 feet, at

2    the 1,000 feet range something is this high, it's

3    60 inches high.  You're plus or minus one pixel, so you

4    have a ten-inch margin on height, a 20-inch margin on

5    width?

6       A.  Unless you have something also moving through the

7    image at the same speed as the object you're evaluating

8    and you know the size of that object and you place that

9    object over the other object.  Then you can say that

10   your actual known variation is lower than your pixel

11   smear.

12      Q.  You didn't do any height, independent height

13   measurement or height calculation, did you?

14      A.  Again, I did the overlay comparison that they

15   occupy the same space.

16      Q.  And that had a margin of error, has a margin of

17   error, just like the length, the height has a margin of

18   error?

19      A.  Yeah, there's going to be some sort of operator

20   ability to match those edges.

21      Q.  And what was your margin of error here, more than

22   one pixel, two, three?

23      A.  No, no.  Again, it wasn't to the pixel, it was to

24   the occupation of the space by the color.  So that's

25   already taking into account the motion blur and those

1  pixel smears.  So it's not -- it doesn't work that way.

2      Q.  Well, I'm not talking about motion blur.  You

3  said motion doesn't go up and down.  I want to know the

4  error of height rate, because I was talking to you

5  earlier about height of things.

6      A.  Sure.

7      Q.  Well, let's do it this way.  Others have

8  calculated it to be a minimum of one pixel.  Do you

9  agree that it's at least that, or was yours more?

10      A.  No, it's typically about a pixel.

11      Q.  And so a pixel is five inches, right?

12      A.  Yes.

13      Q.  We've already talked about that.  So when we're

14  looking at any given spot, if you're not isolating it

15  down to the pixel and you just happen to be looking at

16  two spots that are one pixel off and then you have a

17  rate of error of another pixel at least, you can be

18  looking both vertically or horizontally at something

19  that's a minimum of ten inches away, one car to the

20  other?

21      A.  No.  Because the car is not made up of a single

22  pixel.  So when you align two cars, you're aligning

23  hundreds of features.  You do that instantaneously with

24  your eyeball.

25          If you're looking for a mole on a person's face,

1    and you move it a pixel, yeah, it's going to be off by

2    whatever your range of error is, because that's a single

3    point on a person's face.

4          When you're looking at a car, you have a number

5    of geometry features which you're aligning, which is

6    both the roadway, the tires, the roof line, the front

7    A pillar, the front-end and the rear end.  So no, your

8    actual range of error is more likely going to be less

9    when you have a similarly sized object or a known sized

10   object to which you can compare.

11       Q.   Sir, you weren't comparing car to car.  You were

12   comparing video image to video image, correct?

13       A.   Of a car to a car.

14       Q.   The video images were made up of pixels, correct?

15       A.   Yes, they are.

16       Q.   To align them one to the other and have it be

17   accurate, like you want these people to believe, at

18   1,000 feet, you have to line it up pixel to pixel,

19   because there is so much range of error that if you're

20   just off that minutely, slightly, you have tremendous

21   differences in where you're looking at on car to car;

22   isn't that true?

23       A.   No, that's not true.  It's evidenced by the

24   imagery of the other vehicles that have traveled down

25   that path that you can identify.  For example, the white

pickup truck, it is not similar in size, shape or most
of the angles relative to this SUV.  Those types of
comparison are easily made without relation to one pixel
point potential error.

Q.   Right.  You were able without getting down to the
pixel level to tell that nothing on this screen is a
white pickup with a camper on it?

A.   Cab, yes.

Q.   Cab on it.  Okay.  Let's put that one down.

     Let's talk about color for a minute.  I think I
understood you.  Basically, the vehicles were in the
same blue color family, medium blue?

A.   Yes.

Q.   And that's as detailed of a color analysis as you
did?

A.   Yeah.  They're all within the same hue and lumens
range.

Q.   Let's talk about -- and maybe I belabored the
point, but the last thing I want to talk to you about is
the angles here.  I think it's page 23 of your
PowerPoint.  Can we put that up, please?

     First off, sir, you say that to draw that line,
you can locate within this where on the front of the
vehicle, like in this one, you have window, pillar,
reflection from the windshield?

1     A.   Yeah.   What you see in this zoomed-in image is

2   that the image blurs when you zoom in a lot.   You zoom

3   back out, you take the same angles that you measured

4   from the 3D model, you overlay them, and then you go

5   back and then you zoom in to create this image.

6     Q.   None of that --

7     A.   This is also distorted by our overhead projector.

8     Q.   None of that -- oh, so you say it's better than

9   what we see.   You didn't capture it in any medium that

10  could show us that was that good.   It's just -- for you

11  it was better at some point than what we could see here?

12    A.   Yeah.   I mean, overhead projectors are never as

13  clear as actual computer screens.   They're designed for

14  that type of work.

15    Q.   You got your -- do you have this PowerPoint up

16  there?

17    A.   Yes.

18    Q.   It's no better or no different in paper, is it?

19    A.   In paper, no.   Printing is an even worse.

20  Printing is usually 300 DPI, or dots per inch.

21    Q.   If we do the -- let's call it the A pillar.

22    A.   Yes.

23    Q.   That one I circled.   On the Toyota Rav4, that's

24  about four inches, 4.4 inches wide.   Do you know that?

25    A.   The overall A pillar?

1    Q.  Yeah.

2    A.  I think he's talking about the painted portion is

3 about four inches wide.

4    Q.  And what is there that makes up the A pillar in

5 addition to the painted portion?

6    A.  Well, there's also the attachment to the black,

7 to the windshield.  There's going to be the attachment

8 to the door frame.  There's going to be a number of

9 other components as part of the A pillar as seen by the

10 observer.  You can see that better in the photograph of

11 the vehicle.

12    Q.  So it's roughly five inches then maybe.  You

13 would agree with me about that?

14    A.  Yeah, ballpark.

15    Q.  Similar to a Honda CR-V, about five inches?

16    A.  Oh, between the CR-V and the Toyota Rav4?

17    Q.  Right.  They both have about a five-inch-wide

18 A pillar?

19    A.  Yes.

20    Q.  And so as we've talked about, that's one of those

21 little dots, one pixel out at 1,000 feet, the whole

22 entirety of the A pillar is represented by one pixel?

23    A.  No, not at all.

24    Q.  Well, the width of it is represented by one

25 pixel, five inches?

1     A.   Sure.  Yeah, the width of given point on the

2    overall line is five inches.

3     Q.  And so in order to get your angle correct, you

4    have to have a starting point and an ending point to

5    connect the two dots; is that fair?

6     A.   Yeah, except you don't just connect two dots.

7    You connect all of the dots.  If you only connected two

8    then you would have that same single point issue you

9    were describing before.  But instead what you do is you

10    connect all of the dots on the leading edge.

11     Q.  But you don't -- you have to start somewhere,

12    correct?

13     A.   No, I don't think you do.  I mean, when you're

14    lining up any given line, if you're just drawing a line

15    you start out with one point.  In this case, I started

16    out with a point that wasn't even actually on the

17    vehicle.  So my starting point is not actually related

18    to the vehicle.

19     Q.  And so to calculate angle, if you're incorrect or

20    if any your points are off just a little bit, if where

21    you started, that wasn't on the vehicle, it was off by a

22    pixel, your entire angle becomes severely skewed,

23    doesn't it?

24     A.   No.  I think the observer would throw out any

25    given one point that was skewed.  Because you're looking

1    at multiple points in succession.  You're looking at a

2    line instead of a single point.  You're looking at that

3    relative to any given horizontal object.  So you can

4    move that horizontal object up and down.  That won't

5    change the angle at all.  So the like sort of

6    intersection point isn't very critical.  It's the sum of

7    the points that makes up the line that defines your

8    angle.

9        Q.   Sure.  But the problem here, sir, is you're

10   talking about something 1,000 feet away.  So in front of

11   you, up close, a little bit of -- a one-degree angle,

12   that doesn't make much difference.  But where you are,

13   if you're off just -- where we're looking at these

14   vehicles, if you're off just a little bit, you might not

15   be anywhere close to the A pillar with your angle?

16       A.   That would be incorrect.

17       Q.   Let me try an example.  Have you -- are you

18   familiar with at all -- with shooting firearms or

19   shooting archery, either one of those?

20       A.   Both.

21       Q.   So if I shoot at my target and it's 15 feet away

22   and I'm just a hair off the bull's-eye at 15 feet, my

23   scope is off just a little bit, it's a minor adjustment.

24   I'm only a degree off, but I'm still relatively close to

25   the bull's-eye, right?

1        But if I go out to 1,000 feet, that minor
2   adjustment now causes me to miss by 10 or 12 inches and
3   it's the same minor adjustment because distance affects
4   angle in a drastic way?
5     A.   No.  The analogy is actually improper, because
6   what he's talking about is angle incidence from the
7   viewer.  So remember we were talking about the tilt pan
8   of the camera.  He wanted to point out the tree that's
9   really far away.  Now it's differently viewed.  Because
10  that's really, really far away, you see a greater
11  difference, of course.  But the angle of that tree is
12  still the same.
13       So it's the angle of the object of interest, not
14  the angle of incidence like shooting a gun or shooting
15  an arrow, unless you're shooting that gun and arrow at a
16  line somewhere.  Then that line is still going to be the
17  same line.
18    Q.   And sir, that was my point.  That's why I asked
19  you, you have to start somewhere.  You said you started
20  these -- these are the lines.  You started somewhere.
21  I'm not talking about the view from the camera to there
22  that your angle would be off like this.  I'm talking
23  about your angle down there.
24       Your incidence from the top of the line to the
25  bottom requires a point on either end, and you're saying

1    that those points all match up, all of that matches.

2    And at that distance, you can't tell if your line is

3    starting in the correct spot, if it's tracking the

4    correct spot, matching top of the pillar to the bottom

5    of the pillar.  That's what I was talking about in

6    angle.

7       A.   Yeah.  You don't just match the top and the

8    bottom of the pillar.  He keeps wanting to assign it to

9    two points, but it's the sum of the points that makes up

10   any given line.

11      Q.   Sure.  The Ford Escape, that has an A pillar of a

12   similar angle?

13      A.   Yes.

14      Q.   The Honda Santa Fe?

15      A.   I don't recall.

16      Q.   The Isuzu Rodeo?

17      A.   Yes.

18      Q.   Honda Passport?

19      A.   Yes.

20      Q.   You can take that down.

21           In doing your analysis, I want to end up where we

22   started, sir.  The vehicles that you say that you were

23   able to distill down to nine on Kodiak, none of those

24   vehicles did you look at again except the Wells'

25   vehicle?

1    A.   No, that's outside my scope.

2    Q.   Well, you testified about it.  You said you were

3 able to say that on Kodiak Island, of the 32,000-plus

4 vehicles that law enforcement told you about, only nine

5 of them could be consistent with the Wells' CR-V.  So

6 you testified about that.  But those were all vehicles

7 you did not look at except the Wells' vehicle?

8    A.   Right.  So I guess I have to qualify that.  For

9 them to be consistent, they then also have to have dark

10 rims.  They have to have the dark spare tire carrier.

11 They have to have the front bra.  There's a number of

12 qualifiers that somebody else will have to investigate

13 as to how consistent they are.

14    Q.   Right, because you --

15    A.   But just overall by the registry itself, they are

16 consistent.

17    Q.   Because you didn't look at any of the other

18 vehicles to try to include them or exclude them.  You

19 looked at one, the Wells' vehicle?

20    A.   One was provided, yes.

21         MR. COLBATH:  All right.  That's all I have.

22         THE COURT:  All right.  Redirect?

23         MS. SHERMAN:  I have no questions.

24         THE COURT:  Then ladies and gentlemen, why

25 don't we take our break now.  This person can be

1   released, correct?

2           MS. SHERMAN:  Yes.

3           MR. COLBATH:  Certainly.

4           (Witness excused)

5           (Requested excerpt concluded, proceedings

6   continued.)

7

8                      CERTIFICATE

9       I, Sonja L. Reeves, Federal Official Court Reporter
    in and for the United States District Court of the
10  District of Alaska, do hereby certify that the foregoing
    transcript is a true and accurate transcript from the
11  original stenographic record in the above-entitled
    matter and that the transcript page format is in
12  conformance with the regulations of the Judicial
    Conference of the United States.
13
        Dated this 20th day of September, 2019.
14

15
                            /s/ Sonja L. Reeves
16                          SONJA L. REEVES, RMR-CRR
                            FEDERAL OFFICIAL COURT REPORTER
17

18

19

20

21

22

23

24

25