```
1                    UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF ALASKA
2

3   UNITED STATES OF AMERICA, )
                              )
4         Plaintiff,          )
                              )
5   vs.                       )   CASE NO. 3:13-cr-00008-SLG
                              )
6   JAMES MICHAEL WELLS,      )
                              )
7         Defendant.          )
    _____)
8

9        PARTIAL TRANSCRIPT OF TRIAL BY JURY - DAY 11
                  (Testimony of Angelo Toglia)
10    BEFORE THE HONORABLE SHARON L. GLEASON, DISTRICT JUDGE
                  September 23, 2019; 8:33 a.m.
11                      Anchorage, Alaska

12  FOR THE GOVERNMENT:
         Office of the United States Attorney
13       BY:  STEVEN SKROCKI
         BY:  CHRISTINA M. SHERMAN
14       BY:  KELLEY L. STEVENS
         222 West 7th Avenue, #9
15       Anchorage, Alaska 99513
         (907) 271-5071
16
    FOR THE DEFENDANT:
17       Office of the Federal Public Defender
         BY:  GARY GEORGE COLBATH
18       601 West 5th Avenue, Suite 800
         Anchorage, Alaska 99501
19       (907) 646-3400

20       Camiel & Chaney, P.S.
         BY:  PETER A. CAMIEL
21       520 Pike Street, Suite 2500
         Seattle, Washington 98101
22       (206) 624-1551

23  _____
                    SONJA L. REEVES, RMR-CRR
24               Federal Official Court Reporter
                    222 West 7th Avenue, #4
25                  Anchorage, Alaska 99513
         Transcript Produced from the Stenographic Record
```

1          (Call to Order of the Court at 8:33 a.m.)

2          (Proceedings took place and are not included in

3    this transcript, after which, the testimony of Angelo

4    Toglia transpired as follows:)

5          (Oath administered to the witness)

6          DEPUTY CLERK:  For the record, can you please

7    state your full name and then spell your full name.

8          THE WITNESS:  Angelo Toglia, Jr., A-n-g-e-l-o,

9    T-o-g-l-i-a.

10          ANGELO TOGLIA, GOVERNMENT WITNESS, SWORN

11                    DIRECT EXAMINATION

12   BY MS. SHERMAN:

13      Q.  Good morning, Mr. Toglia.  Where do you work?

14      A.  Good morning.  At Collision Research & Analysis

15   in Gig Harbor, Washington.

16      Q.  And what do you do for Collision Research?

17      A.  I primarily do automobile accident

18   reconstruction, also reconstruct industrial accidents

19   and analyze digital photographs and video.

20      Q.  How long have you been with Collision Research?

21      A.  I've been with them approximately 18 years.

22      Q.  How many accidents have you investigated for

23   Collision Research?

24      A.  It would be hard to put a number on it, but

25   definitely many, many hundreds of accidents.

1    Q.   Where did you work prior to Collision Research?

2    A.   At a company called Exponent Performing

3 Full-Scale Crash Test at their test facility.

4    Q.   Does Collision Research sometimes get involved in

5 matters outside accident reconstruction?

6    A.   Yes, we do.

7    Q.   And does that include specifically digital image

8 analysis?

9    A.   Yes, it does.

10    Q.   Come back to that in a moment.  Take us through

11 your educational background.  Did you go to college?

12    A.   Yes, I did.

13    Q.   Tell us where and what you got a degree in.

14    A.   I received both a bachelor's and master's degree

15 in mechanical engineering from the University of Arizona

16 in Tucson.

17    Q.   Are you a certified Professional Engineer?

18    A.   Yes.  I'm a licensed Professional Engineer in

19 four states.

20    Q.   What are those, what states?

21    A.   Washington, Alabama, Mississippi and Arizona.

22    Q.   And have you received specialized training while

23 at Collision Research?

24    A.   Yes, I have.

25    Q.   What sort of training?  Tell the jury.

1    A.   Generally speaking, training associated with
2  reconstructing automobile accidents, but specifically
3  the photogrammetry work that is involved in analyzing
4  photographs and video.
5    Q.   Is photogrammetry a big part of what you do at
6  Collision Research?
7    A.   Yes, it is.   There's hardly a case that goes by
8  now where we're not using some type of photogrammetry
9  analysis.
10   Q.   Have you been trained in the use of computer
11 tools that help you in doing that analysis?
12   A.   Yes, I have.
13   Q.   Can you tell the jury what sort of tools you use
14 on a day-to-day basis in your 3D imaging and
15 photogrammetry analysis?
16   A.   There are different software programs that allow
17 you to do the -- the photogrammetry analysis that we're
18 going to be talking about involves a lot of math, and so
19 there are computer programs that solve the equations for
20 you and allow you to process that data so you don't have
21 to do it by hand anymore.
22       There also three-dimensional viewing programs
23 that allow you to create models and scenes within the
24 computer such that you can look at them from my angle.
25   Q.   Have you published papers relating to

1    photogrammetry?

2       A.  Yes, I have.

3       Q.  What are those?

4       A.  I published two papers directly related to

5    photogrammetry.

6       Q.  Were those peer reviewed?

7       A.  Yes, they were.

8       Q.  What does it mean to have a paper peer reviewed?

9       A.  When a paper is peer reviewed, it means there are

10   other experts or people that are knowledgeable in the

11   field that review the paper and usually give feedback

12   and make sure that it's respectable and appropriate to

13   be published and it's not just kind of junk science.

14      Q.  What is photogrammetry?

15      A.  Photogrammetry is the process of extracting

16   reliable dimensional information from imagery.  And the

17   image can be a still photograph, or it can be an image

18   of a video.

19      Q.  Have you testified in court on topics of computer

20   modeling and photogrammetry?

21      A.  Yes, I have.

22        MS. SHERMAN:  Your Honor, the Government

23   requests the Court find Mr. Toglia has the requisite

24   training, experience and education to render an opinion

25   in the areas of computer modeling and photogrammetry

1  including video analysis.

2          THE COURT:  Anything to add on that?

3          MR. COLBATH:  Nothing in addition to the

4  motions work and objections we previously filed.

5          THE COURT:  Very good.  Then I will find the

6  witness so qualified.  Go ahead.

7  BY MS. SHERMAN:

8    Q.  You briefly talked about collision research.

9  What sort of products do you make for your clients?

10   A.  Certainly written reports with respect to the

11 work that's performed on a given case.  But with regard

12 to a more traditional accident reconstruction, it's

13 typically a three-dimensional model showing what

14 happened in the crash and sometimes we actually make

15 actual scale models that we can show to a jury or the

16 client, an actual physical three-dimensional model.

17   Q.  Do you do more physical models now or more

18 computer models these days?

19   A.  The physical models are a little more old-school

20 technique.  Nowadays we're doing everything in the

21 computer, so I'll generate a three-dimensional scene,

22 I'll put three-dimensional vehicles in the scene and

23 even animate the vehicles to show what happened and

24 where they ended up and things like that.

25   Q.  I want to turn to your work in this case.  Did

1  you do a 3D computer-generated model of the scene at the

2  COMMSTA?

3      A.  Yes, I did.

4      Q.  How do you go about doing something like that?

5      A.  The first step in generating a three-dimensional

6  scene is, if at all possible, you get out to the scene.

7  So I did visit the COMMSTA site back in I think it was

8  February of 2013 if I remember correctly.

9          While I was out at the site, I documented the

10  landmarks, the surrounding terrain, all of the geometry

11  of the buildings with a piece of equipment called a

12  total station, which is a professional piece of

13  surveying equipment.

14      Q.  How long does that process take to survey a scene

15  like this?

16      A.  It definitely depends on how large the scene is

17  and the detail to which you want to document it.  I was

18  there for a couple of days.  The surveying took at least

19  half a day I would say.  Probably the better part of a

20  day.

21      Q.  So once you've surveyed that, the scene with

22  total station, what do you do with that data?

23      A.  The data I get from that scene is a

24  three-dimensional wire frame model.  So when I go, I

25  digitized points, for example, around the corners of the

building, and then I can connect them in a software

program.  So I now have kind of a wire-frame model of

what that scene looks like.  But it is in three

dimensions, and it's highly accurate.

    Q.  Did you -- you indicated you had done that in

this case?

    A.  Yes, I did.

    Q.  Can we pull up 182 just for Mr. Toglia to take a

look.  If we could just start that for him.

        Is this that 3D model you did for this case?

    A.  Yeah.  Can I go ahead and stop it?

    Q.  You recognize this as what you did?

    A.  Yes.  This is the three-dimensional model that I

generated of the COMMSTA site.

        MS. SHERMAN:  I move for the admission of 182.

        We can -- Blair, if you want to -- that's the

end.

        MR. COLBATH:  That's fine, Your Honor.  I have

no -- subject to our earlier discussion, 182 is fine.

        THE COURT:  All right.  Then 182 is admitted.

        (Exhibit No. 182 admitted)

BY MS. SHERMAN:

    Q.  So we'll go ahead and just publish that for the

jury.

        And if we need to stop as we go through it, you

1    can let me know.

2        A.    Okay.   We're going to want to stop it after it

3    starts to turn a little bit.   Pretty quickly into it.

4        Q.    So we can go ahead and hit play.

5            (Exhibit No. 182 playing in open court)

6        A.    Go ahead and stop it there, please.   Thank you.

7        Q.    So what are we seeing here?

8        A.    So this is the 3D model of the COMMSTA site.   And

9    what you're looking at is an aerial photograph.   If you

10   can see down in the lower right-hand corner here, this

11   is a Google Earth aerial photograph that's been what's

12   called draped down to the 3D terrain.

13           This is the T-1 building over here.   This is the

14   T-2 building.   This is Anton Larsen Bay Road right

15   there.   And what you're looking at in terms of the

16   surrounding terrain, you can see there's some data out

17   in this area as well.   All of that terrain is generated

18   based on U.S. Geological Survey.   So I didn't survey

19   data this far out.

20           As you'll see in the exhibits I'll show you

21   shortly, I documented this area here between the T-1 and

22   the T-2 buildings and also the roadway out in this area.

23       Q.   Go ahead, please.

24           (Exhibit No. 182 continues playing)

25       A.   And because this is a three-dimensional model in

1    the computer, we can look at it from any angle.  You

2    have to go ahead and stop it there.  Great.

3          What you can see over here in the right side of

4    this image is the location of the T-1 camera that's

5    looking generally westbound towards Anton Larsen Bay

6    Road.

7    Q.   Okay.  When you were out at the site at the

8    COMMSTA, did you actually go under that camera and take

9    a view from that camera of what you could see?

10   A.   Yes.  I did several things.  First of all, I

11   actually surveyed or documented the location of that

12   camera.  The camera sits on top of a utility pole.  And

13   I surveyed that location so I know precisely where the

14   actual camera is located.

15         In addition, as you just mentioned, I actually

16   got up on a fire truck and kind of took some pictures

17   from that actual perspective as well.

18   Q.   We can go ahead.

19         (Exhibit No. 182 continues playing)

20   A.   So as we play through this video, what you'll see

21   here is that we're going to move around to different

22   locations.  We're going to come down to Anton Larsen Bay

23   Road.  If we could pause it there for a second.

24   Q.   What are seeing here?

25   A.   This is Anton Larsen Bay Road in the foreground.

1    This is the T-2 building right here.  You can see a

2    little bit of the T-1 building in the background behind

3    this hill.  And this is the camera at the top of utility

4    pole right there.

5        Q.  Go ahead.

6            (Exhibit No. 182 continues playing)

7        A.  Now, again, because we're in three dimensions, we

8    can look at this from any angle.  So we're going to kind

9    of pan through and move through the scene here to get a

10   different perspective.

11           We're going to come behind the camera, so now

12   we're looking generally westbound.  And now what we're

13   going to do is fly into that little yellow ball there

14   which is representative of a camera.  And we're going to

15   actually look at the three-dimensional scene from the

16   perspective of the camera.  If you can hold it right

17   there.

18       Q.  What are we seeing here?

19       A.  So this again is a three-dimensional model of the

20   terrain and the landmarks that are out at the COMMSTA

21   site.  And just like a normal camera that you have where

22   you can zoom in and out, because this is now -- this is

23   a virtual camera in this three-dimensional world, I can

24   zoom in and out to give you different perspectives.

25           If you play it, you'll see that we're going to

1    zoom in a little bit here.  And then I'll ask you to
2    stop it when it's right -- a little more.  Right there.
3           And so what we're looking at now is we've zoomed
4    in to the perspective such that this model here is
5    overlaying the -- what we see in the image.  So you can
6    see up here in the upper left-hand corner of this view,
7    this is an image from the surveillance video that has
8    now been superimposed and aligned with this three-
9    dimensional model.  We're going to talk to you about how
10   that was actually done, but that is showing you how
11   everything aligns.
12          And then if you go ahead and play it, we're going
13   to fade out the data so you can see how the
14   three-dimensional world actually aligns with the image
15   that was extracted from that surveillance video.
16   Q.   Take that down.  I want to talk about what you
17   were just mentioning about lining up this 3D image and
18   the actual images from the scene.  Does that process
19   have a title?
20   A.   Yes, that's the photogrammetry that I mentioned.
21   Q.   Okay.  Did you -- I'm going to talk about, before
22   we get into it, some work you did in addition to this 3D
23   model.  Did you go through and look at some images of
24   the blue vehicle in the video?
25   A.   Yes, I did.

1    Q.  Did you compare those to other vehicles?

2    A.  Yes.

3    Q.  Generally, tell us how that process, how that

4    works.  Just an overview for us.

5    A.  Of the modeling or just the comparison part?

6    Q.  The modeling, do you use a 3D model?

7    A.  Yes.

8    Q.  If you could describe that.

9    A.  I took a three-dimensional model of different

10   vehicles and imported those models into the scene.  I

11   can move the model around, up and down, left and right,

12   anywhere I want in the scene.  What I do is align that

13   three-dimensional model, which is geometrically

14   accurate, I make sure of that, and align that to the

15   image we have in the -- the image of the pixels we have

16   in the image from the surveillance camera.  I move it

17   around until it lines up and I see where that places me

18   in the scene.

19   Q.  Did you do a PowerPoint that will assist the jury

20   and further describe your testimony?

21   A.  Yes.

22   Q.  Why don't we take a look at 181.  Just for

23   Mr. Toglia for foundation.  Is this the PowerPoint you

24   created to assist the jury in understanding your

25   testimony?

1    A.   Yes, it is.

2         MS. SHERMAN:  Your Honor, I once again made a

3    mistake.  I believe 182 should have been published to

4    the jury but not actually admitted, so I would withdraw

5    that.  They are allowed to see it, but it won't go back

6    with them.

7         THE COURT:  It is withdrawn.  Thank you.

8         (Exhibit No. 182 withdrawn)

9         MS. SHERMAN:  At this time, I'm going to

10   request that 181 be published to the jury but not

11   admitted under the same sort of circumstances.

12        THE COURT:  Very good.  I will do so based on

13   prior rulings.  And I could read again the instruction.

14        MS. SHERMAN:  Sure.

15        THE COURT:  Is that the request?

16        MR. COLBATH:  It is, Your Honor.

17        THE COURT:  So ladies and gentlemen, you'll be

18   hearing testimony from this witness who, because of his

19   education and/or experience, will be permitted to state

20   opinions and the reasons for his opinions.  And during

21   his testimony, certain presentations will be made by

22   this witness and will be shown to you in order to help

23   explain the evidence in the case and the basis for the

24   witness's opinion.

25        These presentations are not admitted into

evidence and will not go into the jury room with you.

Various slides and some of the presentations will be

marked with disclaimers as directed by the Court.  And

the presentations are not themselves evidence, nor proof

of any facts.

          And if the presentations in whole or in part do

not correctly reflect the facts shown by the evidence in

this case, then you should disregard these presentations

and determine the facts from the underlying evidence.

          Go right ahead, please.  Thank you,

Ms. Sherman.

BY MS. SHERMAN:

    Q.  We can go ahead and publish that.

          So let's go to -- actually, it might be easier

for you to take us through these slides.

          Your Honor, may I approach with --

          THE COURT:  Certainly.

          (Ms. Sherman approaches witness)

BY MS. SHERMAN:

    Q.  I'll just make sure it works and advance to the

next one.  So let's start with this aerial photograph.

Where did you get this, and what are we seeing here?

    A.  As I mentioned previously, this photograph was

taken from Google Earth, which is publicly available.

    Q.  Is this the image that you overlaid in that 3D

1    model?

2        A.   Yes, it is.

3        Q.   Why don't we go to the next slide.

4             What are we seeing here?

5        A.   This is that same image, and I've located the

6    camera over here at the top of the utility pole.  The

7    T-1 camera is located right there.  So what this exhibit

8    is showing is the field of view that is associated with

9    that camera.

10            So this pink box down here is a full frame from

11   the surveillance video, and that pink box, the view in

12   that pink photograph corresponds to these pink lines

13   right here.  There's a little bit of a -- or there's a

14   dash line here because due to the berm here, you can't

15   actually see what's behind that.  But just in terms of

16   the angular perspective, that's what the pink box shows.

17       Q.   And then the yellow?

18       A.   The yellow box is a zoomed-in portion.  So if we

19   zoom into this section of the image and enlarge it over

20   here, you can see that that then becomes a smaller angle

21   field of view.  And then if we zoom in a little more to

22   the green box over here, just to the left of the T-2

23   building, you can see the perspective that the camera

24   has of that on this aerial.

25       Q.   And I want to -- before we move on, you zoomed

1  in.  Did you do anything else to enhance any of these

2  images that you looked at?

3      A.  No.  None of the images that I analyzed were

4  enhanced in any way.  They were only enlarged so you can

5  see them a little better.

6      Q.  Why don't we go to the next -- the next slide.

7          What are we seeing here?

8      A.  This is the same thing, but we're looking at the

9  T-2 camera now, which is mounted on the corner of this

10  building.  It shows the perspective of that camera

11  that's given in that view right there.

12     Q.  We see dotted lines again.  What is that for?

13     A.  Yes.  So the terrain -- because this is a

14  two-dimensional view, the rays here just show a general

15  angle, but because of the terrain you don't actually see

16  past that portion over there.

17     Q.  Let me ask you a question about this T-2 camera.

18  In your analysis, were you able to tell if someone could

19  walk along the edge of T-2 under that camera?

20     A.  Yes, I was able to determine that.

21     Q.  And what was your -- well, what's your opinion on

22  that, I guess?

23     A.  I determined that based on the location of the

24  camera, the height of the camera off the ground and its

25  field of view that somebody could walk underneath that

1   camera without being seen by a camera.

2      Q.   Why don't we go to the next slide.  It's titled

3   "Scene Generation."  What are you doing when you start

4   to generate the scene?

5      A.   So what I'm going to walk through now are the

6   steps I used to create the three-dimensional model that

7   we saw in the fly-around video.

8      Q.   Take us to the next one.  What are those yellow

9   lines?

10     A.   The yellow lines here, keeping in mind that we're

11  looking down, so this a two-dimensional perspective, but

12  the yellow lines are the actual survey data that I

13  acquired while I was out at the COMMSTA site.  So you're

14  again looking at top-down view, so they look like just

15  lines.

16        But when you look at this from a different

17  perspective that I'll just you in just a second, you'll

18  see that this is actually three-dimensional data that is

19  documenting the geometry of the building, the parking

20  lot and various landmarks.

21     Q.   And the next slide.

22        What are these additional pink lines?

23     A.   The pink lines are a set of data that was

24  provided to me by COMMSTA.  They had done their own

25  survey, and so I utilized that, if you actually go back

1   one slide here.

2          The total station, the surveying piece of

3   equipment is a line-of-sight instrument.  And this is a

4   large distance here.  So I had multiple locations where

5   I surveyed and acquired the data.  But if you notice,

6   for example, on the -- sorry, my pointer keeps going

7   out.

8          On this part of building here and this part of

9   the T-2 building, depending on where I located my total

10  station, I can't see the back of the buildings.  So

11  something that was useful to me is this COMMSTA site,

12  which you can see generally overlays my data very well.

13  It was useful to me in that they had surveyed around the

14  entire building.  So when it came time to generate the

15  three-dimensional model and show you that fly-around

16  video, I had that data that was provided to me by

17  COMMSTA.

18      Q.  And have you relied on site survey data before in

19  generating these sort of 3D images?

20      A.  Certainly the data that I've acquired myself and

21  other experts, yes.

22      Q.  Let's go to the next slide.

23          Here we have photogrammetry mentioned.  What is

24  the first step you take when you're doing a

25  photogrammetry analysis?

1    A.  So now that I've got my three-dimensional data of

2    the scene, I'm going to align this photograph, this

3    image with that three-dimensional data.

4    Q.  Go to the next one.  It's a lot of white.  What

5    are we seeing here?

6    A.  So the way I do that is this doesn't start off

7    looking like this.  This is the end product.  So what

8    you're looking at, the white lines are the actual survey

9    points that I documented.  So as I described, those are

10   actual three-dimensional data.

11        So off on a different screen or a different

12   window, if you notice all of these little triangles over

13   here, these green triangles, I picked those points in my

14   three-dimensional survey and I mark them on this

15   photograph.  Here, here, all these little triangles I

16   physically manually mark those points.

17        Then what the software is able to do, the

18   photogrammetry software, is because I'm telling it the

19   three-dimensional location of those points, the software

20   is able to crunch the math and figure out the

21   perspective that this camera was taken from and the

22   parameters associated with that camera.

23        What that allows the software then to do is align

24   my three-dimensional data with this scene.  And so you

25   can see the roof lines here are lined up.  This fence

1 line is lined up.  There's actually -- I'll go back a

2 slide, and you can see there is a little kink in the

3 fence right there.  You can see how that actually shows

4 up in the survey data as well.

5     There are some terrain lines over here.  These

6 dots are parking stripes.  So all of that data is used

7 to align the image with the three-dimensional data.

8     Q.  So we can go to the next slide.

9     When you align the data that you collected with

10 the image, is that camera matching?

11     A.  Yes.

12     Q.  Can you describe in detail the process of camera

13 matching?

14     A.  Well, that's the process that I just described in

15 terms of marking the three-dimensional points on the

16 two-dimensional photograph.  That's the photogrammetry

17 part.  That's what the software does, and that allows me

18 to then match the camera to my three-dimensional scene.

19     And so what we're doing in going from this view

20 on slide 9 to 10 is instead of overlaying just the

21 three-dimensional wire-frame model that was the survey

22 data, this is the completed model that had been

23 generated in terms of putting in the buildings, putting

24 in the terrain and things like that.

25     Q.  Let's go to the next slide.

1       What are we seeing here?

2   A.   This is going -- this is the fly-around.

3   Q.   Okay.  Let's go to the next slide.

4       What -- we're going to talk about several slides

5   together.  Did you isolate some frames from the video?

6   A.   Yes.  From that April 12th video, there were five

7   frames that showed a vehicle traveling northbound on

8   Anton Larsen Bay Road and I extracted those frames.

9   Q.   Okay.  And if we can go ahead and go through

10  those.

11  A.   So these will be five frames off on the left

12  here.  You'll start to see the vehicle, or there's a

13  vehicle there.  As I step through these frames, there's

14  number three, number four, and number five.  So those

15  are the five frames from April 12th that I analyzed with

16  the vehicle traveling in the northbound direction.

17  Q.   Did you look at some images from the 4-19 video?

18  A.   Yes, I did.

19  Q.   And did you do -- I'm going to talk about what

20  you did before we go to that series.  What you did with

21  the vehicle in the 4-19 video, tell us about that.

22  A.   Yes.  So as I briefly described before, with the

23  video and the image now aligned to the three-dimensional

24  scene, I took a three-dimensional -- an accurate

25  three-dimensional model of various vehicles -- and the

1  first one that we'll show will be the Honda CR-V -- and

2  placed it in the scene so it aligned with the pixels

3  that are visible on the image.

4     Q.  So why don't we go through -- and this is from

5  the 4-19?

6     A.  Yes.  The first example here we'll show is from

7  the 4-19 footage.

8     Q.  We can go through that series.

9     A.  So we're going to zoom in to an image from 4-19.

10  In this case, we know that the vehicle that's depicted

11  here is a blue Honda CR-V.  So all I've done -- again,

12  we haven't enhanced or changed the image at all.  We're

13  just zooming in so you can see things a little better.

14        So I'll fade in the three-dimensional model of

15  the vehicle.  So this is a model again that's accurate

16  in terms of height and length and width, and I'm placing

17  that in the actual model.

18     Q.  Okay.  Then what did you do?

19     A.  So if I flip back and forth here, you can see

20  that the image, the pixel images, the blue pixels align

21  with the three-dimensional model.  So it's important to

22  understand that I'm working in three dimensions here.

23  So just like in the real world, when something gets

24  closer, it gets bigger.  When you move it farther away,

25  it gets smaller.

1    I can take the three-dimensional model of that

2 vehicle, and if I move it closer to the camera, it gets

3 bigger and if I move it farther away, it gets smaller.

4 So I move it in and out and left and right.  I don't

5 have to move it up and down so much because I know the

6 vehicle's wheels are on the ground, so there's not too

7 much adjustment there.  But I move it around back and

8 forth until it lines up with those images that you see

9 in the -- or the pixels that you see in that image.

10    Q.  Let's go to the next slide.  What are we seeing

11 here, this outline?

12    A.  This outline is just kind of an aid to help you

13 make the comparison.  So once I've got this

14 three-dimensional model aligned, I traced the outline of

15 it so that I can remove the model and you can see the

16 pixels behind it.

17    So I think it's important to understand that this

18 outline here is not made from this image.  I didn't look

19 at this image and draw this outline.  You don't have

20 that much detail there.  But this outline is traced from

21 that model so that I can then remove the model and you

22 can see the pixels behind it.

23    Q.  Let's go to the next one.

24    A.  Then I just fade that away again for comparison

25 purposes.

1    Q.   The next slide.

2         And then did you do this as the vehicle in

3    relation to the 4-12?

4    A.   Yes.

5    Q.   Okay.  And before we go through then, because

6    we'll go through them quickly, what -- did you go

7    through the same process, a 3D image over the blue

8    vehicle on the 4-12 video?

9    A.   Yes.  That's exactly the same process.

10   Q.   You did that for each of the images going across

11   the screen?

12   A.   Yes.

13   Q.   Then faded out with the outline as well?

14   A.   Yes.

15   Q.   We're going to talk about several vehicles you

16   did that with, right?

17   A.   Correct.

18   Q.   The first one is the CR-V, though?

19   A.   Yes.

20   Q.   Let's go ahead and click through the next several

21   slides.

22   A.   Okay.  So this is the series of five slides with

23   the three-dimensional model overlay.  Here's the first

24   one with the model.  And then the model will fade out,

25   and you can see the outline there.  I'll just kind of

1    step through these fairly quickly.  It will be the same

2    thing repeated.

3         Here's the model, the outline, and then we

4    advance to the next slide, or the next frame I should

5    say.  The model, the outline.  And then here's the last

6    one.  The back end of the model and then the outline.

7    Q.  Just one moment to catch up.

8         And then when doing this, did you isolate an

9    image from the northbound to compare with that 3D model?

10   A.  Yes.  I did that for all of the images, but what

11   we're going to do here is take a closer look using the

12   image that shows the largest portion of the vehicle.

13   Q.  So let's go to the next slide.

14   A.  So this is the third image.  So you've already

15   seen this model overlay, but we're zooming in here.  On

16   4-12 you can see there were some vehicles in the

17   foreground here that are partially blocking the model or

18   the vehicle out on Anton Larsen Bay Road.  And that's

19   what this gray area here is showing.

20   Q.  Okay.  Then did you do that outline as well?

21   A.  Yes.  So here's that outline of the vehicle and

22   how it compares to the pixels from the 4-12 image.

23   Q.  And then the next image.  Did you do something,

24   this similar process for images going southbound?

25   A.  Yes.

1    Q.  Let's go to the next slide.  How many images did

2  you isolate going southbound?

3    A.  Southbound there were four images that I

4  analyzed.

5    Q.  Let's click through those.

6    A.  You can see the vehicle to the left of the T-2

7  building here proceeding southbound.  And then --

8    Q.  And then you did the same process with the 3D

9  model and then the outline?

10    A.  Exactly the same process.

11    Q.  Let's go through those.

12    A.  So here's the model and then the outline, the

13  model and the outline.  And there's something I forgot

14  to mention.  When I placed this 3D model in the screen,

15  and as I described, I move it back and forth left and

16  right, when I did that and saw that to the extent it

17  aligned with the pixels, the vehicle ended up in the

18  middle of either the northbound lane or the southbound

19  lane, depending on which way the vehicle was going.  So

20  that was kind of what we call a sanity check in that

21  things were making sense.

22    Q.  So it was clear that vehicle was on the road

23  going in the lane of travel it should be if it's going

24  in that direction?

25        MR. COLBATH:  Your Honor, I'm going to object

1  as to leading.

2       THE COURT:  It's sustained.

3  BY MS. SHERMAN:

4    Q.  You indicated it was on the road.  When it was

5  going northbound, tell us about what lane it was in.

6    A.  So for example, as I move the vehicle closer to

7  the camera and farther away to match the size of the

8  pixels, if when I do that and I match that size, I then

9  look at my model and the vehicle is in the dirt, that

10 tells me that something is not right, because I know the

11 vehicle is not traveling in the dirt.

12       So for the northbound images that I analyzed,

13 after I put the model on top of the pixels, I looked at

14 where it is in the three-dimensional scene, and the

15 vehicle was in the middle of the northbound lane.

16       Similarly, for the images that were shown the

17 vehicle traveling southbound, once I placed the

18 three-dimensional model on top of those images, I look

19 at where they are in the scene, and the vehicle was in

20 the southbound lane headed in the correct direction.

21   Q.  Let's continue to click through these southbound

22 images.

23   A.  There's the model, the outline.  And then the

24 last one heading southbound on 4-12, the model and the

25 outline.

1    Q.  Did you do the same thing on the southbound image

2    with the model and the overlay of the additional

3    vehicles?

4    A.  Yes.  So again, this is just a close-up view,

5    because it's obviously pretty small on the full-size

6    images.  So here is the three-dimensional model overlaid

7    again with the gray area depicting the portion of the

8    vehicle that you can't see because of vehicles in the

9    foreground.

10   Q.  Okay.  And then did you do the outline?

11   A.  Here's the outline.

12   Q.  Okay.  And then just the image as well?

13   A.  Right.  You can see how well the outline fits the

14   overall shape of the -- the size and shape of the

15   vehicle.  And then we fade that away.

16   Q.  So let's go to the next slide if we could.  And

17   then you indicated before you did some additional

18   vehicles.  What vehicle did you start with?

19   A.  The first one that I'm going to show you is a

20   Dodge Durango.

21   Q.  Why did you decide to use a Dodge Durango?

22   A.  The Dodge is a vehicle that's substantially

23   bigger than the Honda CR-V.

24   Q.  Did you have a Dodge Durango that you were able

25   to take photos of out -- when you were out in Kodiak?

1    A.   Yes.

2    Q.   Okay.  Let's go through your analysis using the

3   Dodge Durango, if we can click through those slides.

4    A.   So this is the same exact process now.  But

5   instead of using a three-dimensional model of the

6   Honda CR-V, I obtained an accurate three-dimensional

7   model of a Dodge Durango and lined up the front wheel of

8   the Dodge Durango with the front wheels of the Honda

9   CR-V.

10        So I'm not matching the pixels now, and you'll

11   see in just a moment that it's different, but I'm

12   putting the front wheels of whatever the alternate

13   vehicle is at the same location as the CR-V was.

14    Q.   Okay.

15    A.   And now we're going to zoom in and show you this

16   is the same image we've been looking at first with the

17   CR-V that I showed you before, and now here's a

18   three-dimensional model of the Dodge Durango.

19    Q.   All right.  We can go to the next slide.

20    A.   As I did with the CR-V, I then traced the outline

21   so you could see how it compared to the pixels behind

22   once I removed the model.  What you can see here is that

23   there is definitely not a good fit of this outline or

24   this Dodge Durango with the vehicle image as depicted.

25    Q.   Did you do a comparison of a 3D image of a Dodge

1  Durango and another vehicle?

2      A.  Yes.

3      Q.  Okay.  Let's go to the next slide.

4      A.  It's not surprising that this image here, that

5  outline doesn't fit, because when you take a look at the

6  Dodge Durango compared to a Honda CR-V, the Durango is a

7  lot bigger.

8      Q.  All right.  Did you use another vehicle?

9      A.  Yes, I did.

10     Q.  What was that?

11     A.  The next one is a Honda Accord.

12     Q.  Let's go through that.

13     A.  So here is the Honda Accord placed at the same

14  location matching the -- again, it's a different vehicle

15  with different dimensions, so by same location, I'm

16  lining up the front wheels.  And we'll zoom in as we did

17  before first showing the Honda CR-V and then putting the

18  model of the Honda Accord there and with the outline.

19         And again, as with the Durango, you can see that

20  this outline does not match those images very well --

21  sorry, those pixels very well.

22     Q.  And did you do the 3D overlay image as well?

23     A.  Yes.  Again, it's not surprising, the geometry of

24  the Accord, which is a four-door sedan, is much

25  different than the CR-V, which is a sport utility-type

1    vehicle.

2        Q.  Did you do this analysis using 3D models of other

3    SUVs, though?

4        A.  Yes, I did.

5        Q.  Let's go to the next slide.  These are the SUVs

6    you utilized?

7        A.  Yes.  These models were chosen specifically

8    because they were similar in size and shape to the Honda

9    CR-V.

10       Q.  Okay.  Let's go through -- I think the Escape is

11   first?

12       A.  Yes.

13       Q.  All right.

14       A.  So we'll start -- again, we'll kind of go through

15   these faster and faster.  It's the same thing again and

16   again.  So here's the Honda, and then I'll fade out the

17   Honda and go to the Ford Escape.  And then there's the

18   outline, and you can see that there's a pretty good fit.

19   And that's not a surprise because of when you compare

20   the geometry of the two vehicle, the Ford Escape and

21   Honda CR-V are very similar.

22       Q.  Okay.

23       A.  And just to clarify what I'm showing here, this

24   is a white Ford Escape that I've made kind of

25   semitransparent so you can sort of see through it and

1    see the similarities with the CR-V there behind it.

2        Q.   The Ford Escape didn't have a -- the 3D model

3    didn't have a rear wheel carrier?

4        A.   Correct.  The 3D model did not have a

5    rear-mounted spare tire because the Ford Escape in real

6    life does not have a rear-mounted spare tire.

7        Q.   And then did you do the same thing with the Santa

8    Fe?

9        A.   Yes.

10       Q.   Let's go through that.

11       A.   So here's the CR-V, Hyundai Santa Fe.  There's

12   the outline.  Again, a pretty good fit and again, not

13   surprising given the similarity and geometry between

14   those vehicles.

15       Q.   And then the Rav4?

16       A.   First the Honda, then the Rav4.  The outline and

17   the comparison of the models.

18       Q.   Okay.  And then you can go to the next slide, and

19   we'll talk about the images from the 4-19 video.  Did

20   you do the same sort of overlay and outline on those

21   images?

22       A.   Yes.  That's exactly the same process on the

23   video that was acquired on April 19.

24       Q.   Let's go through those.

25       A.   So this is one image where the vehicle is kind of

centered in that space between the edge of the image and
the T-2 building here.  There's the model, and there's
the outline.  We'll zoom in just to show the same thing.
There's the model of the CR-V.  There's the outline.
And again, in this case, we know that the pixels of that
vehicle are in fact a Honda CR-V.  There we go.

Q.  Then you did the same thing with it moving
across?

A.  Yes.  So I analyzed in this case, on April 19,
the vehicle was traveling at a different speed, and so
there are I think 13 images.  I'll step through, and you
can get a sense of the vehicle.  Now, the pixels are
behind the model.  I'm showing the three-dimensional
model overlaid there as it progresses through that
image.

Q.  And then did you do the same thing southbound?

A.  Exactly same thing for the southbound images.

Q.  Then can we go through that series of images?

A.  Here's the full view, the outline, and then
zoomed in, the 3D model of the CR-V again with the
outline.  You can see how well that matches the pixels.
And then again stepping through in the southbound
direction.

Q.  And then did you take images of the vehicle in
similar locations from the 12th and 19th for a visual

1    comparison?

2        A.  Yes, I did.

3        Q.  We can look at the next slide.  Did you enhance

4    these in any way?

5        A.  No.  Again, the only thing that I did here was

6    zoom in to provide the same size image for you to make

7    the comparison.

8        Q.  And then the same thing with southbound as well?

9        A.  Yes.

10       Q.  And if we can go ahead and take that down.

11           And you had shown the Santa Fe before.  Does the

12   Santa Fe have a rear-mounted spare tire?

13       A.  No, it does not.

14       Q.  So in your analysis, you looked at several types

15   of vehicles.  In your opinion, is the Wells' CR-V

16   consistent with the blue vehicle from the 4-12 video?

17       A.  Yes, it is.

18       Q.  Were you able to completely rule out those other

19   SUVs that we looked at?

20       A.  Yes.  Not only the SUVs, but any vehicle that's

21   significantly larger or smaller or has a different

22   shape, like the Accord that we saw, which was a sedan.

23   Or pickup trucks, anything like that, that is very

24   different, you can rule that out.

25           MS. SHERMAN:  Those are my questions.  Thank

1  you.

2         THE COURT:  Mr. Colbath, go ahead, please.

3                    CROSS EXAMINATION

4  BY MR. COLBATH:

5     Q.  Mr. Toglia, the similar vehicles, the Rav4s, the

6  Ford Escapes, those you can't rule out because the

7  geometry of the small SUV classes are the same?

8     A.  That's correct, except that a couple of those

9  vehicles did not have a rear-mounted spare tire.

10    Q.  Right.  And of course you didn't analyze -- you

11 picked three other small SUV models.  You didn't analyze

12 all the small SUV models on the market?

13    A.  Correct.

14    Q.  So let's back up.  I wanted to make sure and

15 clarify that last point.

16        Your business, Collision Research Analysis, is

17 essentially -- or excuse me -- yeah, Collision Research

18 Analysis, that's right?

19    A.  That's correct.

20    Q.  You guys primarily -- there's a number of

21 engineers and folks that work with you primarily

22 specializing in accident reconstruction?

23    A.  That's correct.

24    Q.  And how many -- you said you had provided

25 testimony in other cases.  How many criminal cases

1    besides our case here do you recall testifying in,

2    criminal cases?

3        A.   If it's criminal cases, I think it's probably one

4    or two.

5        Q.   The lion's share of your work would be automobile

6    accident, automobile-related civil litigation?

7        A.   Yes, correct.

8        Q.   And your training and experience, besides your

9    mechanical engineering of course education, but with

10   your work with Collision Research Analysis, that is

11   primarily training based on these photogrammetry

12   processes and the photogrammetry software?

13       A.   The portion of my accident reconstruction

14   training that's relevant to this case is largely the

15   photogrammetry work, yes.

16       Q.   And that's working with the software programs and

17   the equipment utilized to capture the measurement data

18   to put into the software programs, those types of

19   things?

20       A.   Yes.

21       Q.   Learning how to take either a video or a still

22   image and make sure that you get it imported into --

23   along with the other data, into your computer program

24   for it to provide the images that we saw?

25       A.   Yes.

1    Q.  I don't see that you have done work in the past

2  without photogrammetry but just based on forensic video

3  image analysis, or identification of vehicles, just from

4  looking at it forensically, looking at a video?

5    A.  Well, certainly the video analysis involves the

6  photogrammetry.  I'm not sure that they're separate.

7    Q.  So you don't see -- you're not involved in the

8  process of trying to do a photo analysis or a video

9  analysis that does not involve in part your

10  photogrammetry work?

11    A.  Well, as part of my reconstruction work, I'm

12  analyzing photographs all the time, whether it be of

13  accident scenes, trying to figure out what's there in

14  terms of physical evidence in the form of skid marks or

15  gouges or looking at the vehicle, trying to figure out

16  what components are damaged.  So I certainly analyze

17  photographs on a daily basis as part of my normal

18  reconstruction work.

19    Q.  Your -- do you know what your -- how much you've

20  been paid for your work here, up to date here so far for

21  your work in this case?

22    A.  To date I do not.

23    Q.  Would it be fair to say that it exceeds $80,000?

24    A.  It might.

25    Q.  Typically, the work that you do with the

photogrammetry and in the accident reconstruction

business, you're usually identifying known things and

known parameters or aspects of an accident scene to try

to capture that and recreate the accident?

A.  If -- by known, do you mean things that exist

currently?

Q.  Yes.

A.  That is absolutely not the case.  Because one of

the biggest advantages of photogrammetry is that it lets

me as a reconstructionist recreate data that is no

longer there.  So when I go out to an accident scene,

it's typically years after the accident has happened and

the tire marks are gone, the gouges are gone.  Maybe the

roadway has been repaved.

But using the tools of photogrammetry and the

process that I've described here, that allows me to

recreate where the vehicles came to rest, where the tire

marks were and all sorts of physical evidence like that.

Q.  So when you began your analysis in this case, you

knew prior to beginning the analysis that the vehicle

involved, the unknown vehicle involved in the April 12th

surveillance video, law enforcement believed to be a

blue Honda CR-V?

A.  Yes, that's correct.

Q.  Because when you were provided the April 12th

1  video, the unknown surveillance video, law enforcement

2  also gave you a video they had made on April 19th using

3  Mr. Wells' blue Honda CR-V?

4      A.  Yes.

5      Q.  And you had photos of a blue Honda CR-V from this

6  case?

7      A.  Yes.

8      Q.  And so the reason you picked the blue Honda CR-V

9  as your initial computer model and your initial vehicle

10 with which to make your comparisons was because that was

11 the suspected vehicle?

12     A.  Yes.  That was the question I was asked to

13 investigate is whether or not I could determine if it

14 was the Honda CR-V.

15     Q.  And of course at the end of the day, what your

16 analysis can determine only is that the vehicle is

17 consistent in geometry with a blue Honda CR-V?

18     A.  In size and geometry and color, yes.

19     Q.  Well, let's -- I'm glad you brought up color.

20 Let's just talk about color for a minute.

21         With respect to color, you didn't do any photo

22 enhancements, right?

23     A.  That's correct.

24     Q.  So you didn't perform any color -- formal color

25 analysis on the photographs?

1    A.  Correct.

2    Q.  Didn't -- didn't use a software program,

3   photogrammetry or otherwise, to do color correction or

4   color alteration of the images?

5    A.  Correct.

6    Q.  Didn't attempt to take color casts from the

7   photos from -- either from video to video or video to

8   still image, anything like that?

9    A.  No, I did not.

10    Q.  Generally, when you say, well, the vehicles are

11   consistent in color, you mean they both appear to be

12   from a blue -- the medium blue family or generally

13   appear similar in blue?

14    A.  Yes, bluish purple-ish is how I described it.

15    Q.  Now, the April 12th video, the video with the

16   unknown vehicle, you would agree with me that that is --

17   the camera that captured that is a low resolution

18   camera?

19    A.  Yes.

20    Q.  And the spacial resolution on that, how many

21   pixels, you referred to pixels, that are captured in

22   that are 640 by 480?

23    A.  That sounds correct.

24    Q.  And you didn't do anything as far as -- or your

25   photogrammetry software didn't measure for you the size

1   of pixels or the exact number of pixels that, for

2   instance, in any given still frame the vehicle took up,

3   anything like that, right?

4       A.  That's correct.  I wasn't asked to count the

5   pixels.

6       Q.  You're just -- when you get your model, you're

7   just looking at what you can see for pixels as to the

8   appropriate location and trying to place the model as

9   best it does line up with the pixels?

10      A.  That's correct.

11      Q.  And then you said the process where you made

12  sure -- first for up and down, you made sure that it

13  appeared like it was on the roadway to you, that the

14  tires, the black or dark tires matched or met at an

15  appropriate height the black or dark roadway?

16      A.  Actually, the way I made sure the vehicle was on

17  the road is in the three-dimensional model.  So I put

18  the three-dimensional model of the vehicle on the

19  roadway surface, which I have in my three-dimensional

20  scene, the fly-around that you saw, and then I move it

21  around left and right and back and forth.  And like I

22  said, I can't really move it up and down because I don't

23  want to take the wheels off the ground.

24          So I just want to make it clear that by aligning

25  the vehicle's wheels with the ground, I'm not doing that

1  based on the pixels, I'm doing that by keeping the 3D

2  mode of the vehicle on the ground in the 3D model.

3     Q.  And then the left and right, you line up with the

4  pixels?

5     A.  Left and right and in and out.  In and out is

6  very important also.  That's what gives you the

7  three-dimensional perspective.

8     Q.  And while we're talking about the in and out, you

9  said, you know, when you did your model, it turned out

10  that it was in the middle of the roadway, right?

11     A.  That's correct.

12     Q.  Because -- and that helped you know that you were

13  in the right space because, for instance, you weren't on

14  the shoulder of the road or in the dirt?

15     A.  Correct.

16     Q.  But of course on the April 12th video, you have

17  no way to know whether that vehicle was in fact

18  centering, traveling down the center of the road,

19  traveling on the shoulder, traveling in the middle of

20  the lane, you don't know where exactly the vehicle was?

21     A.  Well, actually, based on the analysis that I did,

22  I know it's pretty close to the center of the lane.

23     Q.  Because of your looking at the model -- looking

24  at the pixels and feeling that you had it lined up

25  correctly?

1     A.   Yes.

2     Q.   Now, in constructing your model, you determined

3    the distance between the camera and the roadway at

4    approximately 1100 feet?

5     A.   That's correct.

6     Q.   And sir, you know that -- or would you agree with

7    me that at that distance, at 1100 feet with the

8    resolution of that camera, that each one of those pixels

9    you're lining up in the real world would represent about

10   a five-inch square?

11    A.   I've read that in other expert reports, correct.

12    Q.   Because you weren't asked to measure those types

13   of things, you don't have any reason to disagree with

14   that?

15    A.   Correct, I do not.

16    Q.   And in figuring out how to line things up,

17   because of the resolution of the camera, you know that

18   there's about a plus- or minus-two pixel error there can

19   be or error range in sizing, right?

20    A.   I don't know about the two pixel error.  You can

21   see -- when you're doing this analysis, you can see when

22   you start to move it just a little bit to the left or a

23   little bit closer, there's a noticeable difference.

24    Q.   Okay.  And of course you pulled out still frames

25   from the video and used your lineup on each of the still

1    frames, right?  You didn't try to -- you clicked through

2    still frames, but you didn't try to line up a true

3    movement?

4        A.  Well, the first part of the question is correct.

5    Yes, I analyzed the individual frames of the video.  And

6    as you probably know, a video is just a compilation of

7    still images that you show sequentially.  So you got

8    that sensation or depiction of movement of the vehicle

9    going through the scene as I was flipping through those

10   individual frames.

11       Q.  And because the still images are captured of a

12   moving vehicle, there's some motion blur, depending on

13   how fast the vehicle is going.  The faster the vehicle,

14   the more blur there can be.  You're aware of that?

15       A.  Yes.  There may be a little bit of that, but

16   here's where the distance from the camera actually works

17   in your favor a little bit, because since it's so far

18   away, that blur is going to be a little less than if it

19   were right in front of you going the same speed, it

20   would be real blurry.

21       Q.  Well, the blur at that distance is at least a

22   couple of pixels, meaning that if they're five inches,

23   we can have ten or more inches of blur, correct?

24       A.  I haven't analyzed what the blur is in terms of

25   pixels, but it was pretty readily evident what the area

1  of pixels that were associated with the vehicle were.

2  Q.  Which if we have just say that ten inches on

3  either side of a vehicle, that's why vehicles that

4  aren't exactly the same width could -- or length could

5  fit within the same parameters, is we could be off by

6  ten inches and at 1100 hundred feet, very, very

7  difficult to depict -- or detect?  Excuse me.

8  A.  I'm not sure about ten inches because the Durango

9  was about two feet larger, and that was obviously much,

10  much bigger.  So ten inches being half of that, I think

11  maybe you could still tell that difference.  But I did

12  agree that vehicles that are comparable in size and

13  geometry would be difficult to distinguish.

14  Q.  And you're aware, sir, that the camera, now, it

15  pans and tilts and zooms, it does all of those things,

16  right?

17  A.  Yes, it does.

18  Q.  As was the camera that you were asked to look at,

19  the other camera, the T-2 camera, that looks at the

20  building, the one that you talked about somebody walking

21  under?

22  A.  I believe that one tilts and moves and zooms as

23  well.

24  Q.  Of course, you said that it appeared to you

25  somebody could walk under that, but that was in

1  direction if it was pointed at that flagpole out in

2  front of it?

3      A.  Given the field of view that was presented to me

4  on the April 12th video, I was able to analyze that

5  view.

6      Q.  Of course, if the camera was moved or the view

7  was changed, you wouldn't know what it could capture or

8  who could walk where in a different view?  You weren't

9  asked to analyze that?

10     A.  Strictly speaking, yes.  But given that the

11 camera is mounted, you could probably change the angle a

12 little bit and still be able to walk under it to some

13 extent.  But given the field of view that was presented

14 on the 4-12 analysis, yes, you could walk underneath it.

15     Q.  Now, the April 19th video, the video the police

16 made driving Mr. Wells' car back and forth, you had a

17 number of still images to choose from in picking out

18 which ones you were going to use for comparison value,

19 right?

20     A.  Yes.

21     Q.  More than just the nine or so frames you had on

22 the surveillance video, the April 12th video?

23     A.  Well, both the video from 4-12 and 4-19 are

24 surveillance videos.  The 4-12 video in the northbound

25 direction, there were five frames.  And on the 4-19,

1    there were I think 13 frames.

2        Q.   Okay.  Well, in fact, there were -- you had video

3    that had going -- going northbound on the 4-19 video --

4    first of all, that wasn't surveillance that -- well,

5    that was a police officer at one end of the camera

6    surveilling another police officer driving the Wells'

7    vehicle across the camera screen, right?

8        A.   Right.

9        Q.   You knew that?

10       A.   Yes.

11       Q.   And because they drove it past there a number of

12   times -- you saw that in the video they made?

13       A.   Yes.

14       Q.   -- each time it made different frames?

15       A.   Given the speed of the camera, depending on the

16   speed of the vehicle, you will get a different number of

17   images that capture the vehicle in view, yes.

18       Q.   And you picked one where there was 13 frames

19   instead of five, so the car was going at least two and a

20   half times-ish slower or it created two and a half times

21   more frames, 13 instead of five?

22       A.   That's correct.

23       Q.   Which makes that blurring less, probably?

24       A.   Theoretically.  But actually, I was going to make

25   the point that if you look at those two images, even

1   given the difference in vehicle speed, I think they're

2   pretty -- they're very similar.  So I was going to make

3   the point that I don't think the blurring was very

4   significant.

5       Q.  The 4-19 is clearer.  You would agree with that?

6       A.  Theoretically, yes, but I think when you compare

7   the two, it may not be noticeably clearer.

8       Q.  Well, I wasn't asking theoretically.  I'm asking

9   in reality, do you agree with me or do you not agree

10  with me that the 4-19 video was clearer?  As you

11  observed it, did you think it looked clearer?

12      A.  I don't think it was significantly clearer.

13      Q.  All right.  Now, with respect to talking about

14  the pixels, you said, again, just to be clear, that you

15  didn't do anything to enhance or change the images,

16  correct?

17      A.  That's correct.

18      Q.  And when you extracted the -- when you took --

19  extracting means you had a video and you took each frame

20  out of that and made them or isolated them into a still

21  picture?

22      A.  Yes.

23      Q.  And you have -- of course the camera on 4-12, the

24  camera, as it was recording, it was capturing those

25  pictures that you later took out and looked, right?

1      A.   Yes.

2      Q.   And in the process of capturing those and putting

3 them into the computer or the DVR or whatever that it's

4 saving those pictures, you don't know anything about

5 that downloading process as far as data retention, do

6 you?

7      A.   No.  I don't think there's any type of

8 compression or anything like that.

9      Q.   Well, how do you know -- well, first of all,

10 what's compression?

11     A.   Compression is when you take a large amount of

12 data and make it something smaller.

13     Q.   How many cameras were on that camera system?

14     A.   That, I don't recall.

15     Q.   Okay.  And in order to store video -- first of

16 all, as a general matter, video contains lots of data

17 for a computer to capture or a camera system to capture,

18 correct?

19     A.   Yes.

20     Q.   Okay.  And you don't -- the process of

21 compression means that when the camera has all this

22 data, it needs to try to save it and store it onto

23 whatever system it's saving it.  Oftentimes, the camera

24 compresses or skips some of the data.  When it downloads

25 it, it only saves a portion to save on space and its

1   ability to capture the images, right?

2       A.   Generally speaking, I think that's a possibility,

3   yes.

4       Q.   And when it goes through compression, what that

5   means is if, for instance, a camera is recording the

6   blue wall there, and all those pixels look pretty

7   similar, it may capture that picture and just skip some

8   pixels, because they all seem to be the same pattern.

9   So it doesn't have to save them all.  It gets a

10  representative portion and saves that, saves on space?

11      A.   That's a certain type of compression, yes.

12      Q.   And then when it's pulled back up, the system has

13  an algorithm that fills back in those pixels?

14      A.   I believe so, yes.

15      Q.   And you don't know on this system whether that

16  process happened, would have happened before you ever

17  got the video and looked at it?

18      A.   That's correct.  I'm not aware of that.  I had

19  asked for and it's my understanding that the images or

20  the video that was provided to me was the most original

21  version of the video that was available.

22      Q.   Right.  Whatever was saved onto the DVR system,

23  the original that was saved onto the system?

24      A.   Correct.

25      Q.   And one of the things that a system can do

1  besides compressing the images to save on data is it can

2  only capture a low frame rate, say, four frames per

3  second instead of 12 or 24?

4      A.  That's correct.

5      Q.  And for our eyes, human eyes to perceive fluid

6  motion, like a television, is typically 24 frames per

7  second?

8      A.  24 or 30, yes.

9      Q.  And so this is -- this camera is not trying to

10 record anything that's close to that kind of quality of

11 image, because it would be six times more data to get 24

12 frames every second instead of four frames every second?

13     A.  Well, first of all, it's not the quality of the

14 image.  The quality of the image is whatever it is

15 regardless of the frame rate.  But you're correct, the

16 frame rate is not meant to capture what we would call

17 realtime video.

18     Q.  And in -- once that system has whatever data it

19 has from what it records, when you pull that back up,

20 the filling in of those pixels, that if any are lost in

21 compression, those create artifacts on the picture,

22 don't they?

23     A.  I think that's possible, depending on the system,

24 yes.

25     Q.  And you were working and placing your model

1    wherever you placed it, you were working with the pixels

2    that you had on the images you pulled out of the video?

3        A.    Correct.

4        Q.    In addition to the Ford Escape, that was one of

5    them you found to be similar geometry, correct?

6        A.    Yes.

7        Q.    As well as the Honda Santa Fe and the Toyota

8    Rav4?

9        A.    That's correct.

10       Q.    Did you compare at all or did you use, for

11   instance, the Jeep Grand Cherokee, say, the mid-nineties

12   to early 2000s Jeep Grand Cherokee?

13       A.    I did not.

14       Q.    Now, these models that you get, you just take

15   those off a national auto database or you have a number

16   of internet-accessible tools where you can pull up a

17   Ford Escape and get the accurate dimension, size, get a

18   computer-generated model?

19       A.    Right.  There are several sources that I use to

20   get these 3D models.  And when I do get them, I make

21   sure that the geometry, that the measurements are all

22   valid, that it's an accurate model.

23       Q.    So didn't use or compare like the Chevy S10

24   Blazer, say, again, mid-nineties to mid-2000s?

25       A.    Correct.  I did not.

1    Q.   And you know that the Blazer comes with a rear --

2    or did you know that the Blazer comes with a rear tire

3    mount?

4    A.   That sounds right.

5    Q.   How about a Nissan Pathfinder, again, same years,

6    timeframes.  Did you compare one of those?

7    A.   No, I did not.

8    Q.   Isuzu Rodeo?

9    A.   No.

10   Q.   How about either the Subaru Forester or the

11   Outback wagon, any Subarus?

12   A.   No, I did not.

13   Q.   Do you know the prevalence of either of those

14   models, Subaru Foresters or Subaru Outbacks in Alaska?

15   A.   I do not.

16   Q.   The last thing I want to do, I want to go back to

17   one spot on your PowerPoint here.  Could we --

18       MR. COLBATH:  I'm told -- can you get it up,

19   Blair?  We're having technical difficulties.  It only

20   breaks when I need it.

21       THE COURT:  Could you use the Elmo?

22       MR. COLBATH:  Well, it's the actual DEPS

23   apparently -- but Mr. Johnson is just going to try to

24   reset it here.

25       THE COURT:  Well, if we need to take our lunch

1  break now.  Would that be helpful and get IT in here?

2         MR. COLBATH:  I have two questions, and I think

3  the reboot just made it work.  It just got tired of me

4  talking here.

5  BY MR. COLBATH:

6     Q.  If we could look at your PowerPoint, Mr. Toglia,

7  there.  I'm going to pull up page three of that

8  demonstrative, the 181.

9         And so this box down here, where we see the

10  yellow square with the small green square within it,

11  correct?

12    A.  Correct.

13    Q.  Am I right in understanding that the green box in

14  the blowup is depicting what's between the pink line --

15  at least as far as the view down on the road, is

16  depicting what's between the green line and the pink

17  line down there?

18    A.  Exactly.

19    Q.  Okay.  And so -- now, you were out there at the

20  scene, and you have the geometry here.  Can we back up

21  one page?  So the view actually extends past this

22  driveway into the T-2 structure, correct?

23    A.  I'm sorry.  Are you asking me if the view of the

24  camera -- yeah, because you can see Anton Larsen Bay

25  Road, yes.

1     Q.  And flip to the next page and see if my mark

2     stays in the same spot.  No.  The view, you see the

3     driveway in this one now that we've got the box.  The

4     driveway is right here, right?

5     A.  Yes.

6     Q.  And the camera, where we see the vehicle down

7     here it's -- on the roadway, it's just going out of the

8     screen, which is -- it's just crossing the green line,

9     so it's definitely not turning into that driveway.  It's

10    traveling on Anton Larsen Bay Road at five frames a

11    second past that driveway?

12    A.  Well, it's traveling on Anton Larsen Bay Road,

13    yes.

14    Q.  Right.  And that's the last frame that it's went

15    through.  It goes out of view after that, because the

16    building is obstruction?

17    A.  Correct.

18    Q.  That's what I had for you, sir.  Thank you.  You

19    can take that down.

20          THE COURT:  Redirect?

21          MS. SHERMAN:  No redirect.

22          THE COURT:  Thank you, sir.  You may be

23    excused.

24          (Witness excused)

25          (Requested excerpt concluded, proceedings

1    continued.)

2

3                          CERTIFICATE

4        I, Sonja L. Reeves, Federal Official Court Reporter
     in and for the United States District Court of the
5    District of Alaska, do hereby certify that the foregoing
     transcript is a true and accurate transcript from the
6    original stenographic record in the above-entitled
     matter and that the transcript page format is in
7    conformance with the regulations of the Judicial
     Conference of the United States.

8
         Dated this 24th day of September, 2019.
9

10
                              /s/ Sonja L. Reeves
11                       SONJA L. REEVES, RMR-CRR
                         FEDERAL OFFICIAL COURT REPORTER
12

13

14

15

16

17

18

19

20

21

22

23

24

25