UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

UNITED STATES OF AMERICA, )
                         )
        Plaintiff,       )
                         )
vs.                      )  CASE NO. 3:13-cr-00008-SLG
                         )
JAMES MICHAEL WELLS,     )
                         )
        Defendant.       )
_____)

PARTIAL TRANSCRIPT OF TRIAL BY JURY - DAY 12
(Testimony of Richard Vorder Bruegge)
**BEFORE THE HONORABLE SHARON L. GLEASON, DISTRICT JUDGE**
September 24, 2019; 8:32 a.m.
Anchorage, Alaska

**FOR THE GOVERNMENT:**
        Office of the United States Attorney
        BY:  STEVEN SKROCKI
        BY:  CHRISTINA M. SHERMAN
        BY:  KELLEY L. STEVENS
        222 West 7th Avenue, #9
        Anchorage, Alaska 99513
        (907) 271-5071

**FOR THE DEFENDANT:**
        Office of the Federal Public Defender
        BY:  GARY GEORGE COLBATH
        601 West 5th Avenue, Suite 800
        Anchorage, Alaska 99501
        (907) 646-3400

        Camiel & Chaney, P.S.
        BY:  PETER A. CAMIEL
        520 Pike Street, Suite 2500
        Seattle, Washington 98101
        (206) 624-1551

_____

**SONJA L. REEVES, RMR-CRR**
Federal Official Court Reporter
222 West 7th Avenue, #4
Anchorage, Alaska 99513
Transcript Produced from the Stenographic Record

1          (Call to Order of the Court at 8:32 a.m.)

2          (Proceedings took place and are not included in

3   this transcript, after which, the testimony of Richard

4   Vorder Bruegge transpired as follows:)

5          (Oath administered to the witness)

6          DEPUTY CLERK:  For the record, can you please

7   state your full name and then spell your full name.

8          THE WITNESS:  Yes.  My name is Richard, middle

9   initial W, last name is Vorder Bruegge.  That's a

10  two-word last name.  The first word, Vorder, is spelled

11  capital V, as in Victor, -o-r-d, as in Delta, -e-r.  The

12  second word, Bruegge, is spelled capital B, as in Bravo,

13  -r-u-e-g-g-e.  I work at the Federal Bureau of

14  Investigation in Quantico, Virginia.

15         THE COURT:  Thank you.  Go ahead, please.

16         MR. SKROCKI:  Yes, Your Honor.  Thank you.

17    RICHARD VORDER BRUEGGE, GOVERNMENT WITNESS, SWORN

18                    DIRECT EXAMINATION

19  BY MR. SKROCKI:

20     Q.  Good afternoon, Mr. Vorder Bruegge.

21     A.  Good afternoon.

22     Q.  And welcome to Alaska.

23     A.  Thank you.

24     Q.  Sir, how long have you worked for the FBI?

25     A.  In January, it will be 25 years.

1    Q.  That's a long time.  In what capacity, sir?

2    A.  I was hired as a photographic technologist.  I

3  have been in that role as a photographic technologist or

4  a supervisory photographic technologist or a senior

5  photographic technologist for all of that time, except a

6  year ago the Bureau eliminated the job title

7  photographic technologist.  So now instead of being a

8  senior photographic technologist, I am a senior physical

9  scientist.  Doing the same job, just at different levels

10  of work.

11    Q.  That was my question.

12    A.  Yes.

13    Q.  Same job, new title?

14    A.  Same job, new title.

15    Q.  If you can tell the jury when you first became

16  involved in the field of photo analysis and the things

17  that you do right now.  How did you first get involved

18  with that?

19    A.  So I am engaged in a field called image analysis.

20  And this actually predates my time at the FBI.  I have a

21  master's degree and a Ph.D. in geological sciences.  I

22  got that degree by conducting geological analyses of

23  radar images of the planet Venus.  My field area was a

24  mountain belt on the planet Venus, and I was attempting

25  to determine if the processes that form those mountains

1    on Venus were the same processes that are the ones

2    forming mountains here in Alaska and around the world.

3            And so I conducted analysis of these radar images

4    using image processing, using techniques of

5    photogrammetry and using comparison processes, comparing

6    how the mountains on Venus look compared to how the

7    mountains on the Earth look.  That was work I did in the

8    late eighties up until 1990s.  And so that was work I

9    did before I came to work at the FBI in 1995.

10    Q.  Where were you doing that work involving the

11    Venusian study?

12    A.  I'm sorry?

13    Q.  Where were you doing that work involving the

14    Venus study?

15    A.  So the Venus work was in my graduate school at

16    Brown University at Providence, Rhode Island.

17    Q.  From there you went to the FBI?

18    A.  I spent four years as a contractor for NASA

19    helping plan advanced missions to solar system bodies

20    like Mars, the moon, asteroids, outer planets.

21    Q.  And with respect to your role as a senior

22    physical scientist in image analysis, are there

23    components to that field?

24    A.  Yes.  So within the FBI forensic image analysis

25    group, we do three major things.  One of them is image

comparison. That is comparing objects and people in
imagery or in videos to known -- or, as sometimes
questioned, unknown image -- people and objects. We
also conduct authenticity examinations to determine if
something has been manipulated if it's computer
generated.

And the third thing we do is photogrammetry,
photogrammetry being the measurement of things in
photographs and images. A fourth thing that we do in
virtually all of those cases is image processing.
Taking a photograph, digital image, analog videotape, a
digital videotape, and trying to improve the quality of
the images for the purposes of better seeing what's in
the image.

Q. Okay. And with respect to these components of
image analysis, how long have you been doing that work?
And please -- take your time with the water.

A. So I've been doing that work for the FBI since
1995. But the work that I did in my graduate degrees,
my graduate work in the 1980s was also involved in
comparisons and measurements and image processing.

Q. Do you have occasion to instruct in this field as
well, sir?

A. I do.

Q. In what capacity?

1    A.   So I teach an image comparison class several

2   times a year for members of the U.S. Government as well

3   as for other governments around the world.

4    Q.   Are there any organizations you belong to or you

5   have in fact chaired with respect to image analysis?

6    A.   So the American Academy of Forensic Sciences is a

7   large forensic science organization.  I am a fellow of

8   that group.  I am a fellow of the digital and multimedia

9   sciences section of which image analysis is a component

10  of digital and multimedia sciences.  I am currently the

11  program chair for next February's annual meeting of the

12  American Academy of Forensic Sciences.

13       I also serve on the Forensic Science Standards

14  Board of the OSAC.  OSAC is Organization of Scientific

15  Area Committees for Forensic Sciences.  This is a group

16  that is focused on identifying and developing standards

17  for use in the forensic sciences.

18       There are currently 25 subcommittees in there.  I

19  am on the forensics science standards board because I am

20  the chair of the digital and multimedia scientific area

21  committee which encompasses the four disciplines of

22  digital evidence, facial identification, speaker

23  recognition and a group that is called video imaging

24  technology analysis, which is the group primarily

25  interested in image analysis.

1    Q.   Have you ever heard of the organization called
2  SWGIT?
3    A.   I have.
4    Q.   Can you explain what the acronym SWGIT is to the
5  jury and how you are involved?
6    A.   So SWGIT is Scientific Working Group on Imaging
7  Technology.  It was established by the FBI in 1997.  I
8  was chair of the SWGIT from 2000 to around 2006.  SWGIT
9  is focused on developing standards and best practices
10  for image analysis and imaging technologies, everything
11  from taking crime scene photographs to retrieving video
12  evidence.
13        A few years ago, the SWGIT was incorporated into
14  a group called the Scientific Working Group on Digital
15  Evidence.  You heard me say earlier digital and
16  multimedia sciences is an area.  This consolidation, if
17  you will, was done to bring it all together into one
18  group.
19    Q.   Okay.  Let me back you up real quick back to your
20  college days.  Did you say Brown University?
21    A.   Yes, sir.
22    Q.   What was your major?
23    A.   So I had a bachelor of science degree in
24  engineering.  And in my graduate degree, it was
25  geological sciences.

1    Q.   Geological sciences.   When you did the work on

2  the Venus study, what country were you doing that work?

3    A.   So the work --

4    Q.   Just brief, just what's the country?

5    A.   Well, in the U.S.A. and in the Soviet Union.

6    Q.   Both countries?

7    A.   Yes.

8    Q.   And then after that, did you have any other

9  educational experience with respect to this field?

10    A.   Well, as a part of my training for an FBI image

11  analysis position, I have taken multiple courses related

12  to photography, video processing, photogrammetry, image

13  comparison over the years.

14    Q.   Okay.   Very good.   We asked you to do some work

15  for this case to show to the jury here, correct?

16    A.   That is correct.

17    Q.   You produced a PowerPoint --

18    A.   I did.

19    Q.   -- slide.   And that concerns -- I'm going to use

20  the word overlay.   Is that correct?

21    A.   Yes.   It used an overlay.

22    Q.   It references images taken from two different

23  video segments from two different dates?

24    A.   Yes, that's right.

25    Q.   April 12, April 19?

1    A.   Correct.

2    Q.   You made a presentation for the jury to show a

3 comparison between April 12 and April 19 by overlay

4 method?

5    A.   That is correct.

6         MR. SKROCKI:  Your Honor, we would ask the

7 Court to find Mr. Vorder Bruegge has the experience,

8 background and education to do the presentation and

9 render an opinion on the topic inquired upon here in

10 court.

11         THE COURT:  Any objection there?

12         MR. COLBATH:  None other than the -- the motion

13 work and the other things I've already preserved, Your

14 Honor.

15         THE COURT:  Very good.  Then I'll find the

16 witness so qualified.  Go ahead.

17 BY MR. SKROCKI:

18    Q.   Blair, if you could show Mr. Vorder Bruegge and

19 the Court and counsel Exhibit No. 219.

20         Mr. Vorder Bruegge, we met last night, correct?

21    A.   Yes, we did.

22    Q.   And over the phone prior to that.  Is this the

23 PowerPoint you created to present to the jury here?

24    A.   This first slide appears to be the PowerPoint I

25 prepared.

 1    Q.  Let's go through some slides there.  Is this the

 2  PowerPoint you prepared?

 3    A.  Yes, it is.

 4    Q.  So let's go back to the first slide.  You have a

 5  mouse --

 6    A.  I do.

 7    Q.  -- with a laser.

 8    A.  Okay.

 9    Q.  So can we have the lights, Madam Clerk?

10        And Mr. Vorder Bruegge, what I am going to do is

11  for once not talk and have you do the driving with this

12  and you present to the jury, walk them through your

13  PowerPoint.  Where you need to break with respect to

14  emphasize certain things back and forth, please go ahead

15  and do that.  If I find the need to break it up I'll do

16  that in an appropriate form.

17    A.  Yes, sir.

18    Q.  So what did we task you to do?  We'll start with

19  that.  Then you can go ahead.

20    A.  So I was asked to conduct a comparison between a

21  vehicle that passed from left to right on April 12th to

22  a known vehicle that was depicted on April 19th.  I was

23  also asked to compare a vehicle that passed from right

24  to left on April 12th with a known vehicle that was

25  depicted on April 19th.

1     Q.  Let me stop you there.

2          No projector?  Madam Clerk, is there an issue

3     with the projector, or is it just over on our side?

4          DEPUTY CLERK:  I think it's over on your side,

5     but I do show that it was --

6          MR. SKROCKI:  So we move to publish.

7          THE COURT:  That's fine.  Go ahead.

8          MR. COLBATH:  Your Honor, was the Court going

9     to read --

10         THE COURT:  Oh, yes.  I have that out.  I'm

11    going to read you an instruction first before we begin

12    here.  And that is that you will be hearing testimony

13    from this witness who, because of his education and/or

14    experience, will be permitted to state opinions and the

15    reasons for his opinions.

16         During his testimony certain presentations will

17    be made by this witness and will be shown to you in

18    order to help explain the evidence in the case and the

19    basis for the witness's opinions.  These presentations

20    will not be admitted into evidence and will not go to

21    the jury room with you.

22         Various slides and the presentations will --

23    have been marked with disclaimers that you'll see, and

24    those were included as directed by the Court.  The

25    presentations are not themselves evidence nor proof of

1   any facts.  If the presentations in whole or in part do

2   not correctly reflect the facts shown by the evidence in

3   this case, you should disregard these presentations and

4   determine the facts from the underlying evidence.

5            With that I think we're ready to proceed.  Go

6   ahead, please, Mr. Skrocki.

7            MR. SKROCKI:  Thank you, Your Honor.

8   BY MR. SKROCKI:

9      Q.  Mr. Vorder Bruegge, it's all yours.

10     A.  Your Honor, if I may, just to make sure the jury

11  understands.  I testified earlier that I prepared these

12  slides.  The disclaimer was put on after I prepared the

13  slides, just so --

14     Q.  By our office.

15     A.  By their office.

16           THE COURT:  Thank you for that clarification.

17     A.  I want to make sure I didn't testify to something

18  I didn't do.

19           THE COURT:  Thank you.  All good.  Go right

20  ahead.

21     A.  So for purposes of doing the comparison, my

22  analysis first consisted of reviewing the videotape from

23  April 12th to see when the vehicle in question proceeded

24  from left to right and then from right to left.

25           A number of frames are visible where you see the

1    questioned vehicle proceed from left to right and a

2    number of frames from right to left.  I extracted those

3    images from the video recording and am able to view them

4    as still images on the computer monitor.

5        I then took images from the recording made on

6    April 19th and located instances where it appeared to me

7    as though the known vehicle that was depicted in the

8    April 19th images was in approximately the same

9    location.

10       The idea behind that is that by determining if

11   they are in the same location, I'm going to be able to

12   see if the physical dimensions, the height, the length,

13   the various contours of the vehicle are

14   indistinguishable from one another or see if there are

15   any differences that would allow me to say that it's not

16   the same vehicle.

17       So the purpose of this presentation is to show

18   you that process of going through this comparison

19   analysis.

20           MR. COLBATH:  Your Honor -- excuse me,

21   Dr. Vorder Bruegge.  At this point I would ask that we

22   do this question and answer.  It's a direct examination,

23   not a presentation.

24           THE COURT:  That's fine.  Go ahead.

25   BY MR. SKROCKI:

1    Q.   What's the first slide going to show us?

2    A.   So the first slide, as seen on the screen here,

3    is a title slide which simply describes the dimensional

4    analysis through this reverse projection photogrammetry

5    process.

6    Q.   And go ahead to the next slide.  This references

7    the date of April 12.

8    A.   That is correct.

9    Q.   That's the video clip that you removed an image

10   from?

11   A.   Yes.

12   Q.   Okay.  Go ahead.

13   A.   So this sequence of images shows the vehicle

14   proceeding from left to right.

15   Q.   Then what did you do?

16   A.   Then I enlarged the area that you can see the

17   vehicle in.  The previous set of slides is to show you

18   that I'm giving you the whole picture of everything that

19   was present in the video recording.  Now I'm showing you

20   zoomed in on the one particular area.

21   Q.   Same images, right?

22   A.   That is exactly the same images.  They have just

23   been cropped so that we're only looking at that one part

24   of the frame, the left-hand side of the frame.

25   Q.   What are you doing now?

1    A.  So now I'm just going to put up a single frame

2  from that sequence showing the questioned vehicle.  This

3  is the single frame we're looking at.  And we will next

4  see the cropped and enlarged area of interest.  AOI

5  stands for area of interest.

6    Q.  Now you're making a switch to April 19?

7    A.  This is correct.

8    Q.  Please tell the jury why you do that.

9    A.  So April 19th is the known vehicle, the known

10  2001 Honda CR-V vehicle which was placed into the scene

11  and recorded there at 3:23 p.m. as indicated on this

12  slide.

13       And what is going to be shown next will be the

14  sequence of that vehicle proceeding from left to right.

15  Let me correct myself.  This is just the one frame that

16  corresponds to the previous frame that I showed you in

17  terms of location of the questioned vehicle.

18    Q.  Okay.  Next?

19    A.  So then we have the cropped and enlarged area.

20  So this is the known vehicle in approximately the same

21  location as the questioned vehicle in the frame that I

22  showed you previously.

23    Q.  Okay.  Take us to the next slide, please.  Now,

24  we have the words overlay comparison and document

25  alignment of camera.  Can you explain to the jury what

1   they're going to see next with respect to this next

2   series?

3      A.  So the next series of slides is intended to

4   demonstrate that the overlay of the camera positions is

5   approximately the same.  There is actually a slight

6   difference in that the camera on April 19th is turned a

7   little bit to the left, but I have cropped the two

8   images so that we're only seeing the same area of

9   overlay.

10      And the point of showing the comparison of the

11   April 12th and April 19th frames is to demonstrate that

12   the cameras are sufficiently in alignment that we can

13   conduct an overlay of the two vehicles and have

14   confidence that the camera is effectively picking up the

15   same view of the scene.

16      Q.  Now, when you say overlay, is it -- sort of for

17   the record, I've got my right hand and left hand, kind

18   of doing that?

19      A.  That is correct.  By putting an overlay, another

20   way of thinking about it is in Hollywood, you might see

21   old shows where they had an enlargement of a

22   fingerprint, and they'll take an acetate copy of a

23   fingerprint and lay it over to show where all the

24   similarities are.  This is just like putting an acetate

25   layer over the other image.

1    Q.  I -- pardon me for being maybe pedestrian about

2   the work you do.  Is this overly complicated

3   technologically?

4    A.  Technologically, it is not complicated at all.

5    Q.  So go ahead and take us through the next series

6   of slides.

7    A.  So the purpose of this set of slides, as

8   indicated in this title slide, is to document the

9   alignment of the camera.  So we have the recording from

10  April 12th, and then we have the recording on

11  April 19th.

12       If I could, with Your Honor's permission, flip

13  back and forth.

14        THE COURT:  That's fine.  Go right ahead.

15   A.  So to demonstrate that the alignment is good, I

16  recommend that you pick out a particular feature.  And

17  since we're interested in the far left side of the

18  image, you can look at the building there.  You may want

19  to look at the far side of the lake or some of the trees

20  and the fence line.

21       But as I go back and forth, you will see that

22  there is a pretty good alignment in this case of the

23  images.  And in fact, if you look at the top and right

24  side of the image, you will see how the overlay here is

25  not perfect in that there is the blue edge, the

bluish-toned edge at the top and bottom that corresponds

to the slight offset.  And the camera is tilted.

So I testified earlier that the camera had turned

to the right.  It is actually turned to the left on

April 19th, slightly to the left and down, as you can

see by the framing there.

Q.  Can you hold that image right there for me,

Mr. Vorder Bruegge?

A.  Yes.

Q.  With your laser -- I believe we have one on

there, can you show the jury where the overlay you were

speaking about is on the frame with respect to each

camera?  So which one is that one?

A.  So the one -- the bluish tint frame that you see

on the right side and at the top is the April 12th

recording.  The less blue tint is the April 19th frame.

Q.  Okay.  And if you want to keep going with your --

the next series of slides.

A.  So now I simply repeat that process of showing

you the overlay, only this time I'm focused entirely on

the cropped and enlarged area of interest where the

vehicle in question is located.

And we start with the image from April 12th, and

then we have April 19th.

Q.  Can I ask you, should the jury be focusing on a

1  similar point like you suggested in the other?

2     A.  Yes.  So if you focus on the fixed objects in the

3  scene, the buildings, the trees in the background, and

4  as I flip between them, for example, you might look at

5  the window and see there's a little -- if you really

6  look closely, there might be a tiny little drop.  But

7  otherwise, there appears to be a good alignment.

8     Q.  So let's move forward from there.  What did you

9  do next?

10    A.  So then for the purposes of placing a value on

11 the degree of the measurement uncertainty in this case,

12 I used the manufacturer's specified length of the known

13 Honda CR-V, which is indicated on the slide here as

14 177.60 inches, just to establish this is a known

15 dimension.

16      This is -- the photograph that we are looking at

17 now is from the video of April 19th of the known

18 vehicle.  And that arrow is simply there to indicate

19 that the vehicle is at overall length.

20    Q.  Where did you get that data?

21    A.  Off of the internet and from the manufacturer's

22 specifications.

23    Q.  So just to be clear, did you do any kind of an

24 extrapolation of pixels or pixel lengths or any other

25 kind of technological analysis to pull the -- that

1  number, 177.60 inches, from any of these images?

2     A.   No.   I am simply using the manufacturer's

3  specified distance to give me some idea of what the

4  individual pixel's dimensions are.   I'm using the known

5  vehicle as a scale here.

6     Q.   Okay.   Next slide, please.

7     A.   So then we have the questioned image from April

8  12th with that same arrow corresponding to what it was

9  in the previous image documenting where the vehicle

10  dimensions are from the overlay.   So the --

11     Q.   On the April 12th video?

12     A.   On the April 12th video, correct.

13     Q.   Image.   So this again is something you put into

14  the PowerPoint slide, just added that data by a box?

15     A.   Correct.

16     Q.   Next slide.

17     A.   So then I'm doing exactly the same thing with the

18  manufacturer's specified height of the vehicle of

19  65.90 inches.   Here we have it on the April 19th image

20  of the known Honda CR-V.   And when superimposed on the

21  April 12th image, this is what that looks like.

22     Q.   Thank you.   The next slide.   What are you doing

23  next?

24     A.   So all of the slides that preceded, we were

25  focused on the vehicle going from left to right.   Now

we're focused on the vehicle going from right to left on
April 12th at 7:14 a.m.

So we have a single image from the April 12th
video here. We see the full frame. We enlarge, crop
and enlarge that area to the area of interest so that we
see it here. And just to indicate with the laser
pointer.

Q. Please do.

A. So then we have the April 19th image at 3:21 p.m.
of the known Honda CR-V in approximately the same
location. Again, the full frame now. In the next
slides, I will show you the cropped and enlarged area of
interest. So we have that here. Again, I will indicate
with the laser pointer the location of the known Honda
CR-V in this frame.

Q. Okay. Going from right to left, you did a couple
more slides with respect to a comparison?

A. That is correct.

Q. Based on the overlay. Go ahead.

A. So again, as before, the overlay comparison
allowing you to see the April 12th image versus the
April 19th image. We start with the April 12th image,
and then I flip to the April 19th image. I will go back
and forth. So that then completes the overlay
demonstration.

1    Q.  Okay.  And we have a new slide that says, "Side

2    by Side."  That's kind of self-explanatory.  So can you

3    tell the jury what you're doing with that?

4    A.  So the point here is that as opposed to an

5    overlay, this allows you to look at the two images right

6    next to each other side by side so that you can see what

7    they look like on the same page, if you will.

8         We start though again by saying this is the

9    April 12th image that we are going to be including in

10   the side-by-side comparison, and then we have the known

11   Honda CR-V from April 19th.  That is this image.

12        So we then go to the side-by-side presentation

13   here where we have the questioned vehicle on the left

14   and the known Honda CR-V on the right.

15   Q.  That concludes your slide show at least?

16   A.  That is correct.

17   Q.  Okay.  If we can have the lights.

18        A couple more questions, Mr. Vorder Bruegge.  You

19   said that this was not overly forensically complicated,

20   or words to that effect?

21   A.  That is correct.

22   Q.  What you just did?

23   A.  That's right.

24   Q.  There are other groups and organizations in the

25   United States that, for lack of a better phrase, take

 1    issue with your work?

 2        A.   Yes.

 3        Q.   And challenge the various method and means of the

 4    work that you do?

 5        A.   That's correct.

 6        Q.   As part of preparing for this, you provided us

 7    with some information about two magazine articles that

 8    took issue with your work?

 9        A.   That's correct.

10        Q.   From ProPublica?

11        A.   Yes.

12        Q.   And could you tell the jury in essence what the

13    negativity was with respect to the work that you did?

14    And then we'll get to your explanation of it afterwards.

15    Let's start with the beginning of negative aspects.

16        A.   So forensic science has had a lot of criticism in

17    the last 15 to 20 years, much of it well-founded.  There

18    is a need for us to constantly improve what we do in

19    forensics, and those improvements are being made.

20             In this particular case, the ProPublica article

21    raises some questions about the veracity of some of my

22    testimony and also questions the techniques of forensic

23    comparison analysis.

24        Q.   Okay.  And did you -- you've read both those

25    articles, I take it?

1    A.   Oh, yes.

2    Q.   And what's your response to this jury about the

3    allegations that were made in those articles?

4    A.   So I could probably talk at length about some of

5    the problems, but I would characterize it mostly as

6    incomplete reporting.  For example, there are -- there

7    is an instance in which the reporter states that I wrote

8    a report which said that I could not identify a

9    subject's shirt but that I in fact went into court and

10   testified that I could identify the shirt.

11       And the facts that he states are correct.  I did

12   write a report that said I couldn't identify the shirt,

13   and I did testify in court that I could identify the

14   shirt.  And the reason that it is not factually

15   accurate, what he is conveying, is that he did not

16   report on the fact that there was a second report.  In

17   this particular case, there was both video evidence and

18   film evidence.

19       The case dates from the 1990s.  And our process

20   in the 1990s was to rely upon film rather than video.

21   Because the quality of film imagery was much better for

22   the most part.

23       In this particular case, we had asked for the

24   film, and given the expense of film, there was only one

25   film camera in the bank.  So a good view of the shirt

1 wasn't available.  So I wrote a report that from the

2 film image, I couldn't identify the shirt.

3       They subsequently sent me the videos, and there

4 were better views of the shirt that allowed me to say

5 that I could identify the shirt.  And so the article

6 that was written made no mention of the fact that there

7 was a second report in which I had written that I could

8 identify the shirt.

9       In another instance, the reporter has quoted from

10 a filing that was made in the case by a prosecutor

11 regarding a comparison that I had done between a suspect

12 and the questioned individual in the video.  And the

13 filing that was made before the Court stated that I

14 would identify the person when in the same case I had

15 written a report that said I can't identify the case.

16       The reporter did not include any mention of the

17 actual testimony that I gave in that case in which I did

18 not identify the individual.  The writing simply implied

19 that what the filing said must have been what happened

20 and did not include a statement about the fact that

21 actually, I corrected the record in that case.

22       So --

23   Q.  Okay.  Are there other groups, organizations that

24 are out there that, appropriately so, continue to strive

25 for precision and scientific precision in things,

1   examples like this?

2       A.   Well, yeah.  Actually, in the Organization of

3   Scientific Area Committees, we actively try to seek out

4   all stakeholders.  What's unique about the Organization

5   of Scientific Area Committees for Forensic Science is

6   that it differs from the scientific working groups which

7   were very heavy on practitioners in the field

8   establishing best practices and guidelines for how to do

9   the disciplines.

10          One of the really groundbreaking things that

11  we've done in the OSAC is we have now introduced legal

12  experts, we have introduced statisticians, we have

13  introduced experts in human factors.  Because human

14  judgment is a critical factor of so much that goes on in

15  forensic science that if the mechanism that's going to

16  be used is the brain and the head, we need to make sure

17  we understand what's going on in the brain and take

18  steps to mitigate any effects of things that might

19  happen like bias, and so be aware of those things and

20  improve our processes to avoid those.

21          That also includes bringing in experts in the

22  field who have different views of what we should and

23  shouldn't be doing to really establish the most rigorous

24  analysis possible.

25      Q.   With respect to the year 2012, are any of these

 1    things you spoke about in place?

 2        A.   So the Scientific Working Group on Imaging

 3    Technology had established best practices and guidelines

 4    at the time that I followed at the time that I worked on

 5    this case.  Yes.

 6        Q.   So that was in place?

 7        A.   Yes, it was.

 8        Q.   In terms of -- did you -- digital forensics, how

 9    digitally forensically complicated was what you just

10    did?

11        A.   So for someone that is an expert in this field,

12    this is a relatively simple, straightforward process.

13        Q.   That's all the questions I have for you,

14    Mr. Vorder Bruegge.  Thank you.

15            MR. SKROCKI:  Thank you, Judge.

16            THE COURT:  Certainly.  Mr. Colbath, go ahead,

17    please.

18            MR. COLBATH:  All right.  Thank you, Your

19    Honor.

20                        CROSS EXAMINATION

21    BY MR. COLBATH:

22        Q.   Good afternoon, sir.

23        A.   Good afternoon.

24        Q.   When you start a forensic photo comparison --

25    that's what you were doing, a photographic comparison?

1    A.  That is correct.

2    Q.  So when you start that, by its nature, in a case

3    like this, you knew that your comparative, your known

4    was the defendant's vehicle or the police's suspect's

5    vehicle.  You probably didn't know it was Jim Wells'

6    vehicle, but you knew it was the police vehicle that

7    they thought was the suspect one involved?

8    A.  That is correct.

9    Q.  And the goal is to see what you can see about the

10   unknown to know if those things are, number one, they

11   potentially could match, then you would be able to

12   identify this one is that one?

13   A.  No.  I'm trying to -- when we do the exams in our

14   laboratory, we are first trying to disprove the idea

15   they are the same.  We are looking for differences and

16   trying to establish if there are any differences.

17       If we can't find any differences, then we look at

18   the similarities and try to determine how significant

19   are those similarities in terms of is it significant

20   enough to being able to say that it's the same vehicle.

21   Q.  Sure.  And I was just -- I was going to get

22   there.  I was just starting from the other end, but

23   we'll start at your end.  That's fine.  You look for

24   dissimilarities because, first all, if you see something

25   that is clearly dissimilar, you can say, that is not

1    this one and --

2        A.  Yes.

3        Q.  -- that would be an exclusion.  This one, they

4    don't equal?

5        A.  Correct.

6        Q.  Now, if there are similarities, can be a whole

7    range of classes, right?  You can have class

8    similarities?

9        A.  That's correct.

10       Q.  And those can be general to more specific, to

11   more specific, sort of a hierarchy of those maybe?

12       A.  Correct.

13       Q.  And then you can have individual characteristics,

14   which are unique to a particular thing?

15       A.  Correct.

16       Q.  If you see some similarities you might say, well,

17   these two things fit in the same class, so I can't say

18   it's excluded, they look like the same class, right?

19       A.  That is absolutely correct.

20       Q.  And if you get enough of the class down to the

21   individual ones, ultimately one of the results you could

22   get to was this one is that one, they're the same?

23       A.  Ultimately, you could, yes.

24       Q.  Here you landed in the middle.  You simply found

25   that these two -- that what you saw on the unknown and

1   on April 12th and what you saw in the known one that the

2   police gave you on April 19th was there was some

3   similarities such that you couldn't say they weren't the

4   same and you couldn't say they were the same?

5       A.  That is correct.

6       Q.  Okay.  So that's the end result.  I want to back

7   up and go through some of this other stuff here.

8           The April 12th video, the video that has the

9   unknown vehicle, that was a -- a low resolution video,

10  correct?

11      A.  For the road behind the building, it's low

12  resolution.  The closer you to get to the camera, the

13  higher resolution.

14      Q.  Do you know how far away the road behind the

15  building was?

16      A.  According to the measurements that were given to

17  me, it's 1,000 feet, roughly.

18      Q.  I think somebody told us yesterday 1100 feet.

19  Could that be --

20      A.  It's possible that it could be 1100 feet.

21      Q.  Much farther away than, say, the parking lot or

22  the fence in the foreground?

23      A.  That is correct.

24      Q.  And certainly we had a low spatial resolution out

25  at 1100 feet or 1000 to 1100 feet?

1    A.   That is correct.

2    Q.   Meaning that the camera is not capturing nearly

3  the detail out there that it is capturing up front?

4    A.   Correct.

5    Q.   And that the unknown image that you're looking at

6  doesn't occupy nearly the space of the resolution of the

7  camera as it would if it was, for instance, in the

8  parking lot right in front of you?

9    A.   That is correct.

10   Q.   So those are limiting, in fact, factors in either

11 your or any other analyst's comparison work or trying to

12 figure out what it is you're seeing?

13   A.   That is correct.

14   Q.   Did you do anything to figure out just how --

15 spatially, how much that unknown object took up of the

16 overall screen or view, image view out there?

17   A.   Yes, I did.

18   Q.   And it was less than five percent of the total

19 view, wasn't it?

20   A.   Yes, it was.

21   Q.   And what that means is if we take that whole

22 picture and we drew a little box around anything, a car

23 in the foreground or a tree or the unknown object that

24 we're trying to identify, out of the 100 percent of the

25 picture, we only see that that little box is smaller

1   than five percent of the -- what we're looking for?

2       A.  That's correct.

3       Q.  And in part, that's why when you go through your

4   slide show, you crop that and you enlarge that because

5   otherwise, we're trying to focus on a very small space

6   of the overall scene?

7       A.  That's correct.

8       Q.  Now, in calculating -- well, in doing your work

9   and looking at the images you had here to work with, one

10  of the things you did was try to use the known

11  measurement that you had and the space that that unknown

12  vehicle occupied and try to determine, and maybe there

13  were other things you used to do this, but you tried to

14  determine what a pixel would look like out there at

15  1100 feet?

16      A.  Correct.

17      Q.  Maybe more to the point of not what it would look

18  like out there, but how big it would be out there?

19      A.  Exactly.

20      Q.  And so we've had others talk about this, so I

21  hesitate to have you do the explanation again for the

22  jury.  But a pixel, that resolution is -- when we talk

23  about that, that picture is just a whole bunch of

24  little, tiny pixels that make up the picture, right?

25      A.  There's a grid in the image that's -- there's

1    rows of pixels and columns of pixels, where I'm

2    indicating rows go from left to right and columns go up

3    and down.

4        Q.  And these ones, the ones, the images you were

5    dealing with had 640 across and 480 up?

6        A.  That's right.

7        Q.  And so -- and of course we've already talked

8    about --

9        A.  I'm sorry.  I can't recall if they had 480 in the

10   initial video recording or not or whether they were only

11   240 and then averaged up to 480.  It frequently happens

12   that only one-half of an image is recorded that way.  So

13   I don't want to be on the record as saying that it was

14   480 if it was in fact 240.

15            THE COURT:  All right.  Fair enough.

16       A.  When presented vertically -- so it would

17   definitely be 640 across, but whether it was actually

18   240 or 480 --

19       Q.  Sometimes when these closed camera -- digital

20   closed camera systems capture data and record data and

21   store it, it doesn't record all of the actual

22   resolution, does it?  Is that how that -- is that how

23   that number is cut in half, or did I misunderstand you?

24       A.  You misunderstood.

25       Q.  Tell me why sometimes we would only get 240 out

1  of the 480.

2     A.  So traditional standard definition television

3  actually consists of an analog signal, not a digital

4  signal.  And the analog signal consists of 480 lines

5  that go from the top to the bottom of the screen every

6  30 seconds.

7          In fact, it's not 480 lines at one time, it

8  actually does 240 that are jumped the odd lines, and

9  then the next 240 lines go in and that happens every

10  60th of a second.  So you get an entire picture where

11  the lines are actually interleaved.

12          And as a way of saving space, some digital

13  recording systems actually record the 640 pixels across

14  and 240 in subsequent frames like that or they may

15  combine them into two.

16     Q.  So this one may have been actually only capturing

17  the lower of that, or some of your images may have had

18  even less of the resolution, the 240?

19     A.  It's possible, but I'm not sure.

20     Q.  All right.  It wasn't any more than 640 by 480?

21     A.  No.

22     Q.  And then for pixels related to the object that

23  we're looking at, of the grid, we're looking again then

24  at just less than five percent of the pixels?

25     A.  Yeah.  I believe it was on the order of 36 to 37

pixels across.

Q.  And in knowing the pixels and the distance and whatnot, you calculated that the pixels were just under about five-inch squares.  In real world value if we could see the squares out there on the road from the camera, it would be a bunch of five-inch squares?

A.  That is correct.

Q.  And in calculating then, when you had your distance measurement up there, you were able to use your scale of 100 -- the -- what you knew a Honda CR-V to be, right, 177.6?

A.  Correct.

Q.  You got that off the internet?

A.  Yeah.

Q.  You didn't run -- like you told Mr. Skrocki, you didn't run a photogrammetry program or a fancy computer software with a bunch of other known dimensions to try and see if what the police showed you on April 19th was a Honda CR-V.  You didn't try to figure out if you could calculate it using the picture to be 177.6 inches.  You just put the scale on there because you knew it was a Honda CR-V and the manufacturer says 177 inches long is how we make Honda CR-Vs?

A.  Yeah.  I had the -- used the vehicle as the scale.

1    Q.   And the measurement from the internet as the

2  measurement?

3    A.   That's correct.

4    Q.   And then with that, you could count the -- you

5  could count the pixels that that took up, and that

6  helped you figure out this -- in part, figure out how

7  big your pixels were, right?

8    A.   So that --

9    Q.   Did I follow your notes correctly?

10    A.   The known dimension of the Honda CR-V was the

11  scale that I used to determine how much distance each --

12  how big each pixel was.

13    Q.   You made notes on all of this right in your

14  work --

15    A.   Yes.

16    Q.   -- not part of your PowerPoint, but as you went

17  through and kind of looked at all of this, you made

18  notes.

19        All right.  And in determining your size, I saw

20  that when you put it on there, even though Honda told

21  you a CR-V is 177.6 inches, it said approximately on

22  your measurement, right?  You added the little squiggly

23  approximate before that?

24    A.   That's correct.

25    Q.   And that's because at that distance, with looking

 1     at something in this resolution, there's some error

 2     rate?

 3         A.   So it's partially related to that, yes.

 4         Q.   And certainly if we move over and we try to use

 5     the same scale and decide how big the one that you don't

 6     know is a Honda CR-V, that you don't know what vehicle

 7     it is, when we're trying to scale that, there's

 8     certainly some error range there, right, in trying to

 9     determine the size of that vehicle?

10         A.   So that would be associated with the uncertainty

11     in the size of the pixels, yes.

12         Q.   And the error rate that you calculated or the

13     uncertainty, maybe that's a good word for it, the

14     uncertainty you determined to be plus or minus two

15     pixels or plus or minus about ten inches?

16         A.   That is correct.

17         Q.   And so there's also something going on in these

18     pictures, the still frames that you used, with movement,

19     correct?

20         A.   That's correct.

21         Q.   And as the -- now, you would agree that on the

22     video, when you watched it, the unknown object that you

23     were trying to identify, it was never stationary at any

24     time in the video that you were shown?

25         A.   The April 12th images, the vehicle moves from

1   frame to frame indicating that it's moving.

2       Q.  Right.  You didn't have any stills of the

3   April 12 unknown vehicle to where it was ever captured

4   to your knowledge not moving?

5       A.  To -- for me to say that it was possible that it

6   wasn't moving, I'd have to have two consecutive frames

7   where it didn't move.  And I didn't see any two

8   consecutive frames where it didn't move.

9       Q.  So when we're dealing with moving objects, part

10  of what we get is blurriness or blurred -- blurriness in

11  our still frames that the camera captures?

12      A.  That's correct.

13      Q.  And that also creates some problem in exactly

14  figuring out the boundaries or the borders of the

15  object, doesn't it?

16      A.  Correct.

17      Q.  Because again, I don't want to go all the way

18  back through it, but a pixel is one color, isn't it?

19      A.  Each pixel will have one color, yes.

20      Q.  And if we -- if my hand was on a dark background

21  and then I was moving my hand back and forth in front of

22  a camera and all of a sudden the camera captured a still

23  of my hand but it was moving when it captured it, on the

24  dark background, my light-colored skin, on a dark

25  background, somewhere there's going to be a border

between the dark background and the light of my hand,

correct?

    A.  Yes.

    Q.  And if that border happens to fall in the camera,

on the middle of a pixel, the camera doesn't know or the

system doesn't know, well, does that pixel record as the

dark background, say, a dark blue background, or does it

record as the light skin color of my skin.  The pixel

can only record as one of those two things, right?

        MR. SKROCKI:  Objection, Your Honor.  Compound

question.  We're now far outside the scope of his

project.  If he wants to start doing direct exams, he

can, but leading for an hour on this is not what we

agreed to do.

        THE COURT:  Mr. Colbath, would you concur?

        MR. COLBATH:  No.

        THE COURT:  Let's have a short sidebar.

        MR. COLBATH:  I can withdraw that example and

just ask a more direct question.

        THE COURT:  Either way.  That's fine.

BY MR. COLBATH:

    Q.  If the image perceives two colors at some sort of

edge, the pixel will have -- the system will have to

pick one color or the other or it will be that?

    A.  No.  It may average them.

1    Q.  So it may blend them?

2    A.  Blend them together.

3    Q.  Then it would be sort of a third color

4  altogether?

5    A.  That's right.

6    Q.  That can create some uncertainty in trying to

7  directly define the edges of things?

8    A.  Correct.

9    Q.  So why I wanted to ask you about that is I wanted

10  to know if it was the blurriness or the blur factor, the

11  blur, motion blur that contributes to your plus or minus

12  two pixel error rate, or is that in addition to the plus

13  or minus two pixel error rate?

14    A.  So the plus or minus ten inches is based just on

15  the uncertainty of the size of the pixel.  Blurring

16  would be an additional factor.

17    Q.  And the blurring would then affect potentially

18  exactly where you might put your scale to make sure

19  you're on the correct pixel that corresponds with the

20  exact edges of the object you're identifying?

21    A.  That's correct.

22    Q.  Now, these -- we talked earlier about the

23  different -- you said there was characteristics that you

24  could look for to see if you could exclude a vehicle or

25  include it as being similar?

1    A.  Yes.

2    Q.  You recall that?

3         MR. SKROCKI:  Outside the scope of the

4    presentation.

5         THE COURT:  Well --

6         MR. SKROCKI:  We're talking about vehicle

7    exclusions.  And if he wants to lead him about -- one,

8    he didn't talk about vehicle exclusions in the

9    PowerPoint whatsoever.

10        THE COURT:  So your objection is to the leading

11   nature of the question?

12        MR. SKROCKI:  And now we're well outside the

13   scope.  Even with our agreement, this is being used for

14   other purposes, not this witness's cross examination.

15        THE COURT:  All right.  Mr. Colbath?  Do we

16   need to have a sidebar?  It seems like a good time.

17        (Begin bench conference)

18        MR. SKROCKI:  Ready, Gary?

19        MR. COLBATH:  Uh-huh.

20        MR. SKROCKI:  The objection is based on he

21   didn't write a report about the vehicle comparisons.  He

22   didn't testify about vehicle exclusions.  He talked

23   about overlay.  That was comparing one April 12 segment

24   to the April 19 segment, putting them together, coming

25   and going.

1          This is cross examination for again further
2    argument of our witnesses that have testified and/or in
3    support of defense witnesses that are going to be
4    testifying soon.  It has no relevance to this.  The jury
5    has been beat over the head by this already.  I've tried
6    to be patient with it, but I think it's far outside the
7    scope of cross examination.  I don't know what the
8    direct would be because he didn't write a report about
9    this.
10          THE COURT:  All right.
11          MR. COLBATH:  He did write a report about it.
12   But, Your Honor, the jury was just shown a picture of
13   April 19th saying this is the known length of a known
14   car.  And then immediately thereafter, we're shown a
15   comparison that says, this is the known length of
16   April 12th.
17          That seems like this witness is saying those
18   are pretty similar.  Now, maybe he didn't use the word
19   similar, but the impression clearly left is I know this
20   one is 177 inches approximately and I know this one is
21   177 inches.  It looks to me like he's saying these are
22   comparable, these are similar, these are the same.
23          So I'm trying to explore how -- I mean, I have
24   to give some setup to how it is that we got to being
25   able to put this scale that he just looked up on the

internet and put on the video, that the police told him

was a Honda CR-V on this one and yet calls it known,

calls it exactly the same.

THE COURT:  Why can't you put this up and say

there's nothing known at all about this, instead of --

MR. COLBATH:  Well, because -- I can put it up

and I was trying to get there, but there's reasons that

he doesn't know that.  He took measurements.  There's a

reason --

MR. SKROCKI:  He didn't take any measurements.

MR. COLBATH:  He did.  He made measurements.

MR. SKROCKI:  It's not in his report.

THE COURT:  Excuse me, Mr. Skrocki.

MR. COLBATH:  He made measurement calculations.

His bench notes are full of them.  And there is --

THE COURT:  I don't have those.  All I have is

like a two-page report.

MR. COLBATH:  And there's a reason that he says

this is approximately 177.  What he really calculated

was it's 167 to 187.  So I want to ask him that, but I

need to at least ask him how he -- it won't make any

sense if I just -- because he's not my witness, I can't

just jump to the ultimate conclusion because I have no

faith that he'll answer it with a yes or no with no

explanation.

        THE COURT:  Here's what I would like.  I will

1 allow you to explore these topics.

        MR. COLBATH:  I will try and move forward.

        THE COURT:  I would ask you not to ask leading

questions when you're exploring topics that -- that go

far beyond what was presented by the Government in that

report that I have.  But it sounds like you have notes

that I have not seen.

        MR. COLBATH:  Sure.  I can provide them.

        THE COURT:  I don't need them, but just follow

that.  I'll -- how much longer would you estimate?

        MR. COLBATH:  I'll have to look at my notes,

but I will -- I will try to cut to the chase and be

under 15 minutes.

        THE COURT:  Fair enough.

        MR. SKROCKI:  Wonderful news.  But you notice

the shift from comparables to this?  He testified this

was an insertion of data from the internet.  He didn't

say, "I calculated it."  So he's not relying on even --

I don't think they are in his bench notes, because I

can't recall seeing them.

        But he didn't do any -- I asked him

specifically to avoid this line of inquiry, "Did you do

any internal calculation from the video image itself,"

and he says, "I didn't do that."

1          So now we've got a jumbled argument about he's

2     pulled this out of somewhere.  He pulled it off the

3     internet.

4          THE COURT:  That was clear.

5          MR. SKROCKI:  I'm not sure what the cross

6     examination is.

7          THE COURT:  Let's hear what the questions are

8     and go through that in less than 15 minutes.

9          (End bench conference)

10    BY MR. COLBATH:

11      Q.  Let me get to the right page here.

12          Could we pull up -- Mr. Vorder Bruegge, I want to

13    ask you about a couple of your slides, okay, in your

14    presentation.  And so I think it is page 29.

15    Unfortunately, they're not numbered, but I believe I

16    counted right here.

17          I'll be able to see it here.  That one.  So let's

18    look at this one real quick.  You and I were talking

19    about you taking the known measurement of a CR-V off of

20    the internet to get the calculation, the scale you

21    called it?

22      A.  Yes.  The scale.

23      Q.  And that was this slide where you recognized --

24    do you recognize this to be from the April 19th video?

25      A.  I would have to look at -- oh, it's marked as an

1    experiment, so yeah, it must be the April 19th video.

2        Q.  So you could place -- you were told that was a

3    Honda CR-V so you could place that on there, and you've

4    got your known length, right?

5        A.  Correct.

6        Q.  And then if we flip forward to the next screen,

7    now, which video do you recognize this as being from?

8        A.  This is the April 12th video.

9        Q.  And I believe you said the cars were in roughly

10   the same position during your direct examination?

11       A.  Correct.

12       Q.  And you determined that visually, just you

13   comparing visually slide to slide?

14       A.  Correct.

15       Q.  And I was asking you earlier about that couple

16   pixel variation.  So here when you say known length, the

17   little sign before the 177, that's the sign for

18   approximately, correct?

19       A.  Correct.

20       Q.  And based on your error rate or the variations in

21   what you figured out, you would agree that this

22   really -- the approximate is about ten inches shorter,

23   so 167 inches --

24       A.  Correct.

25       Q.  -- to ten inches longer, 187, that would be the

1   approximate range, about a 20-inch range?

2     A.  With a plus or minus ten at the front and the

3   back, yes.

4     Q.  All right.  And then can we go two more?  Skip

5   the next slide.  No, just to the next slide.  I'm sorry.

6   Back up one.

7       Now, again, you did the same basic thing for the

8   height of the vehicle, correct?

9     A.  Correct.

10    Q.  And again, did you consult the internet or the

11  manufacturer details --

12    A.  The manufacturer details, yes.

13    Q.  And you determined that this was a CR-V, because

14  we see the language about experiment, right?

15    A.  Yes.

16    Q.  This was April 19th, that was the police with the

17  vehicle there.

18       So the known height of a CR-V is 65.9 inches.  On

19  the height, your error rate was a little bit less,

20  wasn't it?  It was plus or minus five inches, not ten

21  inches?

22    A.  Correct.

23    Q.  So if we go to the next one, you recognize

24  that -- now, first of all, there are some obstructions

25  here.  So part of your scale actually is obstructed by

1    the vehicles in the foreground?

2        A.   If you're looking at -- yes, the vehicle in the

3    background.  You can't see the vehicle in the background

4    because of the obstruction of the vehicles in front.

5        Q.   Okay.  But using the scale again, where it says

6    approximately 65.9, although it says known height, what

7    you mean here is that could be up to five -- the range

8    would be up to five inches shorter, so that's

9    60.9 inches to up to five inches taller, that would be

10   70.9 inches, somewhere in that ten-inch range?

11       A.   Correct.

12       Q.   All right.  You can take that one down.

13            And were those ranges of height and width and the

14   comparisons of the areas where they traveled

15   essentially -- I know you did it going both directions,

16   but other than looking at it going each direction, were

17   those basically the comparison components you used to --

18   in your analysis?

19       A.   So the overall measurements but also the

20   configuration of the vehicle, you know, the slope of the

21   hood line and a bright mark at the back of the vehicle

22   as it goes from left to right.

23       Q.   And you weren't able -- you found that they

24   basically shared those similarities?

25       A.   Correct.

1    Q.  Let me ask you about that.  With the bright mark

2    in the back, that was maybe a small group of one to

3    three bright pixels?

4    A.  I don't recall how many pixels they were, but it

5    was a group of pixels, yeah.

6    Q.  And again, those would be pixels that -- in

7    looking at size or how much of a bright spot it is

8    there, those would be affected by the blur as well as

9    have some error rate in sizing them to compare one to

10   the other?

11   A.  Correct.

12   Q.  Overall, sir, you would agree that you can't

13   really see much detail on the vehicles, can you?

14   A.  That's correct.

15   Q.  And that would make an actual identification one

16   to the other impossible?

17   A.  Correct.

18   Q.  Then I don't have any more for you, sir.  Thank

19   you.

20          THE COURT:  Redirect.

21          MR. SKROCKI:  Just a couple questions.

22                    REDIRECT EXAMINATION

23   BY MR. SKROCKI:

24   Q.  Can I have your PowerPoint back up?  Can you put

25   it up for me?  Thanks.

1        Do you still have the mouse?

2    A.  I do, yes.

3    Q.  Can you go to the spot where Mr. Colbath

4  mentioned the bright spot?

5    A.  It would be all the way at the end.

6    Q.  Sure.  So --

7    A.  I'm sorry.

8    Q.  You can keep doing that.  That's helpful.

9    A.  Let me keep going through, because -- there we

10  are.

11    Q.  So is the bright spot there?

12    A.  Yes.

13    Q.  It's on April 12th, right?

14    A.  That is April 12th.

15    Q.  So go to the 19th.

16    A.  Sorry.  There it is.

17    Q.  Same spot, same place?

18    A.  There is a bright spot in what appears to be the

19  same place.

20    Q.  Go back to the 12th.

21        That's all I have.  Thank you.

22        THE COURT:  Follow-up at all on that,

23  Mr. Colbath?

24                    RECROSS EXAMINATION

25  BY MR. COLBATH:

1      Q.   If we leave it right here, there's a fair amount

2   of snow in the background there, correct?

3      A.   Yes.

4      Q.   Can you go back to the other one?  And we see

5   less snow here?

6      A.   Yes.

7      Q.   And then this one in your earlier slide you said

8   was taken at 3:00 in the afternoon?

9      A.   Correct.

10      Q.   And the April 12th one I think was at 7:09 in the

11   morning on your slide?

12      A.   7:09 or -- yeah, 7:09, correct.

13      Q.   All right.  That's -- those are --

14           MR. COLBATH:  That's the only thing I had, Your

15   Honor.

16           THE COURT:  Thank you sir.  You may be excused.

17           (Witness excused)

18           (Requested excerpt concluded, proceedings

19   continued.)

20

21

22

23

24

25

CERTIFICATE

    I, Sonja L. Reeves, Federal Official Court Reporter in and for the United States District Court of the District of Alaska, do hereby certify that the foregoing transcript is a true and accurate transcript from the original stenographic record in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

    Dated this 25th day of September, 2019.


                              /s/ Sonja L. Reeves
                         SONJA L. REEVES, RMR-CRR
                         FEDERAL OFFICIAL COURT REPORTER