```
 1                    UNITED STATES DISTRICT COURT
                       FOR THE DISTRICT OF ALASKA
 2

 3   UNITED STATES OF AMERICA, )
                               )
 4          Plaintiff,         )
                               )
 5   vs.                       )  CASE NO. 3:13-cr-00008-SLG
                               )
 6   JAMES MICHAEL WELLS,      )
                               )
 7          Defendant.         )
     _____)
 8
```

 9        PARTIAL TRANSCRIPT OF TRIAL BY JURY - DAY 13
              (Opposition to Rule 29 Motion)
10   **BEFORE THE HONORABLE SHARON L. GLEASON, DISTRICT JUDGE**
              September 25, 2019; 8:33 a.m.
11                      Anchorage, Alaska

12   **FOR THE GOVERNMENT:**
          Office of the United States Attorney
13        BY:  STEVEN SKROCKI
          BY:  CHRISTINA M. SHERMAN
14        BY:  KELLEY L. STEVENS
          222 West 7th Avenue, #9
15        Anchorage, Alaska 99513
          (907) 271-5071
16
     **FOR THE DEFENDANT:**
17        Office of the Federal Public Defender
          BY:  GARY GEORGE COLBATH
18        601 West 5th Avenue, Suite 800
          Anchorage, Alaska 99501
19        (907) 646-3400

20        Camiel & Chaney, P.S.
          BY:  PETER A. CAMIEL
21        520 Pike Street, Suite 2500
          Seattle, Washington 98101
22        (206) 624-1551

23   _____
                   **SONJA L. REEVES, RMR-CRR**
24              Federal Official Court Reporter
                   222 West 7th Avenue, #4
25                 Anchorage, Alaska 99513
          Transcript Produced from the Stenographic Record

1        (Call to Order of the Court at 8:33 a.m.)

2        (Proceedings took place that are not included

3    in this Partial Transcript, after which, proceedings

4    continued as follows:)

5        MS. STEVENS:  Good morning, Your Honor.  May it

6    please the Court, so as I'm sure you know, the test for

7    determining whether to grant Mr. Colbath's motion is

8    whether the Government presented evidence that was

9    relevant that the jury could reasonably find the

10   defendant guilty beyond a reasonable doubt.  Of course,

11   Your Honor, you would view that evidence in the light

12   most favorable to the Government.

13       Additionally, your analysis must be made while

14   bearing in mind that the jury retains the exclusive

15   function for determining witness credibility and any

16   evidentiary conflicts.

17       So first, I would like to draw the Court's

18   attention to the elements of the crime.  First, being

19   for Counts 1 and 2, that Jim Wells killed Rich Belisle

20   and James Hopkins.  Second, that the defendant killed

21   his colleagues with malice aforethought, which is, as

22   you know, defined as deliberate or intentional or

23   recklessly with extreme disregard for human life.

24       Third, that they were premeditated, meaning

25   that he planned it.  Fourth, and lastly, that it

occurred at the COMMSTA.  The parties have stipulated
that this offense occurred on federal property, so I
won't make argument with regard to that.

With regards to Count 3 and 4, we must prove
those four elements I just discussed as well as the fact
that the two victims were federal employees.  Again, we
stipulated to that.

And then finally, for 5 and 6, we need to prove
the four counts addressed in -- the four elements
addressed in Counts 1 and 2.  And, Your Honor, if we
provided enough evidence to prove those elements, then
the interstate commerce nexus is met for purposes of
Counts 5 and 6.

So starting first with element one.  We know
that the victims died in this case.  I won't belabor
that point.

For elements two and three, the Government has
presented the following facts to show that he acted with
malice, forethought, and that he intentionally and with
premeditation carried out these murders.  I'll talk
first about his motive.

James Wells was angry.  His identity as the
national antenna expert was stripped from him, and Rich
and Belisle (as spoken), they were taking over his spot.
We know this because Chief Reckner testified that

command was having increased issues with him.  He wasn't following the rules.  He was taking stuff that wasn't his.  He wasn't doing the work that was expected of him.

And it rose to such a heightened level that Chief Reckner even moved his office down into the rigger shop and told the defendant to get with the program or retire.

Reckner also testified that the command made changes to Wells' performance plan for 2011 and 2012.  They added two new metrics:  Timeliness and quality of work and communications.  And that's because the defendant wasn't engaging in either of those things.

They wanted him to be more accountable.  They wanted him to tell the command when he was going to be gone, where he was going.  And they wanted him to participate, as opposed to refusing to participate in things like he did with the warehouse project.

We also know that Wells knew that the command was building a paper trail.  They were building the record.  They had talked to human resources.  He knew they talked to human resource because they told Wells to sign the letter of caution.  Human resources told them that he needed to do it.  So the writing was on the wall, his departure was imminent.

But Mr. Wells was not ready to retire.  He told

investigators he had a mortgage to pay and why quit when

he was having fun.  He said that the day his colleagues

were killed.

Further, as the Court heard, Wells missed a

good deal of work in the months before the murders.  And

that was the same time that the COMMSTA was suffering

from multiple antenna casualties.  Eight antennas were

down.  But the communications and the missions, it went

on without him.  The folks in the shop down there

stepped up.

Chief Jordinelli, we heard from him.  He

described them as a competent crew.  They stepped up

quickly.  They addressed the casualties.  And things

that hadn't been addressed for years when Mr. Wells was

running the shop were getting done.

In fact, the casualty list was better than he

had ever seen it.  They were more productive without him

there.

Additionally, Nathaniel Pacheco, he described

the rigger shop changing for the better during his

absence.  ET1's leadership clearly excelled.  He was

selected as the enlisted person of the year.

We heard from Cody Beauford.  Wells' role was

diminished.  Everyone got used to him being gone.  They

were able to cover the work he was supposed to do.  And

it wasn't just colleagues, Your Honor.  It was friends, close family friends.

Judy Pletnikoff, a friend of 20 years, she described Wells as upset, very angry about not being able to attend the NATE conference in February of 2012. He was "devastated," that was her word.  This was a very important part of his job to go to the training.  Why? Because that's where he gets the accolades, that's where he got the awards.  In fact, it was a big part of his identity.  That's what she said.

But it's not just her that testified about the NATE conference.  In February of 2012, when Wells asked Reckner what the plan is, he tells him he's not going. What was his reaction?  Anger.  He pointed at Jim Hopkins' desk and asked, "Why is he going?"  He tells Wells, "Well, you know, Hopkins was doing a great job. He really stepped up.  He was working on getting qualified.  He got enlisted sailor of the year, and he could use the knowledge at NATE to bring back to others," which wasn't being done when Wells was going.

Wells then pointed to Rich Belisle's chair and said, "Why is he going?  He's just a fucking rigger." Then he pulled Jim Wells' stare-down tactic, glared at Chief Reckner for a long time, making him feel intimidated and uncomfortable.

And, Your Honor, this wasn't the first time in the recent months leading up to the murders that Wells was upset with the command and displayed this type of indignant behavior. When he was counseled for the fuel card in Commander Van Ness's office, during the course of that meeting, Wells kept repeating, "You guys think I'm a thief. You guys think I'm a thief. It just doesn't sit well. It just doesn't sit well." He was angry. Shooting Rich, the man groomed to take his job, and Jim Hopkins, the supervisor, was no accident.

Later, when he talks to his brother-in-law, his consciousness of guilt is readily apparent for the jury to take into consideration. He proclaimed, "They are not my friends. They aren't electricians. They're stupid. They're incompetent. They're drunk."

For someone whose colleagues were gunned down, Your Honor, he showed no empathy, no sadness. And the jury can readily infer that these comments suggested he believed the victims deserved what they got, again, going towards elements two and three.

It was also no accident, Your Honor, that he meant to do this and that it was planned, because he used a high caliber revolver to shoot Mr. Belisle and Jim Hopkins all in just under five minutes.

This gun was described as a heavy hitter by

1    Mr. Stein.  And we also know it was the gun that was

2    used to kill the victims, because we found bullets at

3    the scene, and we had Brett Mills and Robert Shem

4    testify that the injuries were inflicted by a firearm.

5         We also know that Wells was tied to a firearm

6    that could have likely been the possible murder weapon.

7    This was Mr. Stein's Smith & Wesson .44 caliber 629

8    stainless steel revolver that went missing at his house.

9         Additionally, Your Honor, this crime was

10   premeditated and well planned, as evidenced by the

11   staging of blue Honda CR-V.  We know that just two days

12   before the murder, he saw his wife off at the airport

13   heading to Anchorage for a work trip, the perfect

14   opportunity to do this crime undisturbed by his wife.

15        He saw her off and noted the location of the

16   car, the jury can infer that.  It's also of note that we

17   established that Judy Pletnikoff, Para Upchurch, friends

18   of the Wells would move the car and not leave it at the

19   airport.  And if Jim was in town, he would move it,

20   because Nancy's car had been broken into before and they

21   didn't want it broken into at the airport.

22        But they didn't do that this time.  So maybe if

23   only one witness had said it was a routine, it wouldn't

24   have been that big of a deal, but we had three witnesses

25   who all corroborated that this was the normal routine.

1  And they're all independent of each other.

2          We also have testimony from Amanda Sanford.

3  She rode with Nancy Wells to the airport on April 10th.

4  She is the one that told us that Wells was there that

5  night.  And she specifically indicated to investigators

6  she would have known if she sat on a black bag and mail

7  addressed to Mr. Wells.  She didn't.  She also told them

8  that the car was parked in front of the Alaska terminal

9  on the right-hand side.

10          Matt Judy testified he got there that day and

11  conducted surveillance, the car was on the left side of

12  the airport in front of a building that was not a

13  terminal.  We know this from a picture of the car

14  compared to an aerial photo of the airport.

15          Further, the choice of using his wife's blue

16  CR-V, that's significant.  His white truck is distinct.

17  Everybody at the COMMSTA recognized it.  And so this

18  fact of switching out the cars also proves preparation

19  and premeditation.

20          We also know that folks at the T-2 and T-1

21  buildings knew where the cameras were and what the

22  cameras' field of views were, including Mr. Wells, who

23  participated in all-hands, who had access to the ops

24  deck.

25          We also know that a white truck would be

readily apparent in the T-2 camera, which remained aimed at the flagpole and saw the Anton Larsen Road in the distance.

We saw Mr. Schilbach's white Toyota that morning. And we could tell it was a white Toyota truck, even from that distance. So what was needed was a blue, dark, small SUV with no lights on, and that's what he did. He picked it up from the airport, swapped out his car, the keys were already in it. He waited there, waited for Rich and Jim to drive by, and then got in line behind Haselden, the CWO for that morning.

And he knew Haselden wasn't down at T-2, because his car continued on up to T-1, it wasn't parked there, so there wasn't a watch stander conducting a round.

Due to the serendipitous circumstance the night before, the T-1 camera was moved, the T-1 pole camera. The U.S. Coast Guard was able to capture a segment of the Anton Larsen Road, and that road caught a blue CR-V with a black rear, a black front above the wheel well indicative of a black car bra, and black rims, characteristics identical to the Wells' CR-V. We have experts that testified to that, so I won't belabor it.

The schedules as well is something that goes toward the planning and the preparation of this offense,

1    Your Honor.  Mr. Wells himself told investigators that

2    Rich and him arrived first, and Jim between 7:10 and

3    7:30.  And he knew where they were coming from.  He knew

4    where they lived.  He knew that he could fall in behind

5    them to confirm that they were there and that nobody

6    else was there.

7            And the timing here is important.  The T-1

8    video shows what is easily identifiable by the naked eye

9    without any discussion of pixels, his small blue SUV

10   drive past the first driveway at T-2 at 7:09.  And we

11   know there was a Conex box in the back and some other

12   big equipment that he could park behind.

13           At 7:14, just five minutes after this blue car

14   arrives, it leaves, just minutes before the COMMSTA

15   watch relief up the hill occurs and folks start leaving,

16   just four minutes after Belisle had his last activity

17   and interaction with his computer at 7:10, and just two

18   minutes after Don Rudat, the speed walker, heading south

19   on Anton Larsen Road heard the loud metal on concrete

20   sound which he testified to definitely came from the

21   rigger shop, not the water treatment plant.

22           And if that isn't enough, Your Honor, we have

23   his alibi.  It starts off first with, "I had a flat

24   tire.  I had issues getting off the lug nuts."  We know

25   this through the voicemail he left Reckner.  He got a

flat tire in the truck, having trouble getting off the
lug nuts.

The timing of this voicemail, Your Honor, is
important. He left it at 7:31, just one minute after
leaving a voicemail with Hopkins. To Hopkins he stated,
"Jim, it's Jim. I got a flat tire in the truck. I'll
be in when I get it. Thanks."

In fact, he would tell everybody he could that
morning he had a flat tire. And he called it a flat
tire, not a low tire, a flat tire.

He tells Para over the phone, "I have a flat.
I'm on my way." Then to Reckner in person when he's
bent over losing his emotions, "Shit, I had a flat tire.
I couldn't get ahold of Jim, but I left you a voicemail.
Make sure you check it," because that will confirm that
I had a flat tire.

When the CO, Commander Van Ness, arrives and
starts to console Chief Reckner and he's advised that
Jim and Rich had been shot, Wells responds, "Oh, my
goodness. I had a flat tire." Commander Van Ness says,
"Why would he tell me that at this moment?" It was
bizarre. It was off. It was weird. All evidence that
the jury can infer that Jim Wells planned this and
carried out this crime.

Naturally, since he was supposed to be there

that morning and he wasn't, the FBI interviews him.  And

his interview, it's not because Reckner said that he's

the guy, it's not because of that.  It's because Jim

Wells drew attention to himself by consistently evading

the questions being asked.

He said things like this:  "The only reason I

wasn't there this morning was because I had a flat tire

on my truck."  But when they asked him when he noticed

his flat, he responds, "Shit, I don't know."  In fact,

he says, "Shit, I don't know," or "Shit, I don't

remember," no less than five times when asked about

times and locations, for a road that he traveled for

20 years on a daily basis.

However, he definitely knows where he didn't

change that tire.  When asked if it was anywhere near

the COMMSTA, he is very quick to reply, "No."  He knows

he wasn't anywhere near the COMMSTA, but he can't

provide any details whatsoever about where on that road,

near the airport, near the Comfort Inn, near the base,

near wherever he changed that tire or looked at the tire

or realized the tire was flat.

He goes on, "It was almost at the airport I

turned around."  And then it's a low tire, realizing

that I couldn't drive on a flat tire, so it must -- I

need to tell people that it was low.  In fact, he brings

1  the tire with him to work to make sure that
2  investigators can confirm that, yes, here's the tire,
3  look at the nail, it's in it, it was a flat tire, it was
4  a low tire.
5          But, Your Honor, what doesn't add up at any
6  point in time, in addition to his flat tire alibi, is
7  the timing in this case. And the timing here is
8  critical because there's 34 minutes where we know Jim
9  Wells passed the front gate camera on the way to the
10 airport. That was at 6:48. And then it comes back in
11 the way towards Bells Flats at 7:22.
12         We know it takes about five minutes to get from
13 the gate to the airport, five minutes to get from the
14 airport to the gate. So 10, 15 minutes to, got a flat,
15 okay, let me turn around and go back. He was gone for
16 34 minutes with no explanation.
17         When asked if he could shed some light on the
18 time gap, he pauses for about 15 to 18 seconds. He
19 responds, "Not at the moment. I can't think of why
20 there would be the discrepancy." So the investigators,
21 they say, "Well, the window of time we are trying to
22 account for, can you help us trying to figure this out?"
23         "No, I don't have a reasonable explanation for
24 it." "How about a theory?" "A theory? What are you
25 suggesting?" "Well, we're baffled." "So am I."

1    Investigators go on to say, "Thank God you

2  weren't in that shop because you could have been one of

3  the victims as well.  We're accounting for people.

4  We're trying to get your explanation on how to fill

5  those holes."  His response, "I don't have a theory at

6  the moment."  When asked if he has anything else, his

7  response, "Nope."

8    So then in June, just a few months after the

9  murder, he tells his sister and brother-in-law when

10  asked pointblank what happened, first, that he had a

11  flat tire.  And when they looked at him quizzically, he

12  says, "Well, if you must know, I shit myself.  I got

13  out, went to the airport, cleaned myself.  I noticed the

14  tire was low, didn't have the tools.  I went home to

15  change it."

16    And then he tells them about a bag of soiled

17  pants that he put upstairs in a closet and then

18  lambasted the investigators for not finding it during

19  their eight searches.  But there was no bag.  There was

20  no diarrhea, Your Honor, and the Government has readily

21  shown that.

22    Then on the 13th, again, to fix this alibi, it

23  wasn't adding up, he shows up at the airport to pick up

24  his wife, but beforehand, 30 minutes beforehand, he goes

25  to Servant Air -- I'm sorry, he goes to Island Air, he

1  looks around, doesn't say anything to the workers.

2  They're intimidated.  He looks up the cameras and

3  stares.

4         He leaves, he goes over to Servant Air, goes

5  inside, he's in there for a few minutes, drives back

6  over to the Alaska terminal, walks inside and goes to

7  the bathroom.  And he sits in there.  So we know he knew

8  where a bathroom was, and that bathroom was in Alaska

9  Air.

10        We also know that on the 12th he didn't go into

11 Servant Air or Island Air because the employees said,

12 "We didn't see him there that morning."  Mr. Skonberg,

13 he knows Jim.  He's seen him before.  He didn't see him

14 walk up the stairs.  He would have heard it.  He would

15 have seen him.  And if he went up into the other office,

16 he would have gone up there because he knows they're not

17 in at that time and it would have been weird.

18        Plus, he would have heard the toilet flush,

19 because that building, "it ain't soundproof."  That's

20 what he said.

21        So, Your Honor, I know that you're not feeling

22 well and I know that I've been up here for a while.  I

23 have many other facts about his behavior after the

24 crimes, but I think at this point the Government has

25 readily proven that we can establish beyond a reasonable

1    doubt the evidence for each element of Counts 1 and 2,

2    and, of course, the additional elements required for 3

3    through 6, two of which have been stipulated to.

4         We presented 59 witnesses, eight experts, and

5    the jury can readily come to a conclusion that the

6    defendant committed these offenses beyond a reasonable

7    doubt.

8

9                    CERTIFICATE

10       I, Sonja L. Reeves, Federal Official Court Reporter
     in and for the United States District Court of the
11   District of Alaska, do hereby certify that the foregoing
     transcript is a true and accurate transcript from the
12   original stenographic record in the above-entitled
     matter and that the transcript page format is in
13   conformance with the regulations of the Judicial
     Conference of the United States.

14
         Dated this 26th day of September, 2019.

15

16
                        /s/ Sonja L. Reeves
17                      SONJA L. REEVES, RMR-CRR
                        FEDERAL OFFICIAL COURT REPORTER

18

19

20

21

22

23

24

25