```
1                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF ALASKA
2

3    UNITED STATES OF AMERICA, )
                              )
4            Plaintiff,       )
                              )
5    vs.                      )   CASE NO. 3:13-cr-00008-SLG
                              )
6    JAMES MICHAEL WELLS,     )
                              )
7            Defendant.       )
     ─────────────────────────)
8

9         PARTIAL TRANSCRIPT OF TRIAL BY JURY - DAY 4
                    (Testimony of Donald Rudat)
10    BEFORE THE HONORABLE SHARON L. GLEASON, DISTRICT JUDGE
                September 12, 2019; 8:47 a.m.
11                     Anchorage, Alaska

12   FOR THE GOVERNMENT:
             Office of the United States Attorney
13           BY:  STEVEN SKROCKI
             BY:  CHRISTINA M. SHERMAN
14           BY:  KELLEY L. STEVENS
             222 West 7th Avenue, #9
15           Anchorage, Alaska 99513
             (907) 271-5071
16
     FOR THE DEFENDANT:
17           Office of the Federal Public Defender
             BY:  GARY GEORGE COLBATH
18           601 West 5th Avenue, Suite 800
             Anchorage, Alaska 99501
19           (907) 646-3400

20           Camiel & Chaney, P.S.
             BY:  PETER A. CAMIEL
21           520 Pike Street, Suite 2500
             Seattle, Washington 98101
22           (206) 624-1551

23   ───────────────────────────────────────────────────────
                    SONJA L. REEVES, RMR-CRR
24              Federal Official Court Reporter
                  222 West 7th Avenue, #4
25                 Anchorage, Alaska 99513
         Transcript Produced from the Stenographic Record
```

1          (Call to Order of the Court at 8:47 a.m.)

2          (Proceedings took place and are not included in

3    this transcript, after which, the testimony of Donald

4    Rudat transpired as follows:)

5          (Oath administered to the witness)

6          DEPUTY CLERK:  For the record, can you please

7    state your full name and then spell your full name.

8          THE WITNESS:  Donald A. Rudat, R-u-d-a-t.

9    Donald, D-o-n-a-l-d.

10                        DIRECT EXAMINATION

11   BY MR. SKROCKI:

12      Q.   Good morning, sir.

13      A.   Good morning.

14      Q.   Can you please tell our jury where you live?

15      A.   Good morning.  I'm from Mobile, Alabama.  Work

16   the aviation training center in Mobile.

17      Q.   Aviation training center for who?

18      A.   For the U.S. Coast Guard.

19      Q.   And what kind of work do you do for the U.S.

20   Coast Guard in Mobile, sir?

21      A.   I am the division chief for training radio

22   operators, radar operators, camera operators, all the

23   sensor system on board the Coast Guard aircraft, for

24   standardization search and rescue.

25      Q.   What kind of aircraft are we talking about?

1    A.  All manners of MH-60s; helicopters, 65s; and then

2    130 aircraft and 144 aircraft.

3    Q.  Involving search and rescue equipment?

4    A.  Correct, sir.  Search and rescue, law

5    enforcement, humanitarian relief and coordination and

6    comms relay for hurricane-impacted areas.

7    Q.  Like right now, for example?

8    A.  Yes, sir.

9    Q.  So Mr. Rudat, prior to this work in Mobile, did

10   you have any military service?

11   A.  Yes, sir.  I'm a retired U.S. Navy.  Retired in

12   2001.  I first came in the Air Force as an enlisted

13   person.  I worked in security police for approximately

14   five years and then two years of enlisted crewman on

15   board aircraft doing communications relay.  And then was

16   picked up, commissioned in the United States Navy.  I

17   retired from the United States Navy in 2001.

18   Q.  What were you doing in the Navy?

19   A.  I worked as a communications officer, a navigator

20   on board our E-6 aircraft, which is a nice, big, white

21   airplane that does communications relay to our nuclear

22   command control functions for missile silos, submarines

23   and B-52s.

24   Q.  And you're retired?

25   A.  Yes, sir.

1    Q.  And your rank was at retirement, sir?

2    A.  At retirement my rank was O-4, lieutenant

3    commander, United States Navy.

4    Q.  So you are doing work for the Coast Guard even

5    today?

6    A.  Correct, sir, as a Coast Guard civilian employee,

7    GS employee.

8    Q.  You had occasion to do some work for the Coast

9    Guard in Kodiak in April of 2012?

10   A.  Yes, sir, that is correct.

11   Q.  Could you please tell the jury what that nature

12   of that work was and what you were doing for them then?

13   A.  Yes, sir.  During the 2012 April timeframe, I was

14   part of a three-man crew that came up from Mobile,

15   Alabama.  I mentioned earlier that we do standardization

16   and a lot of training, hands-on training for our

17   communications relay.

18        For the mission going on up on the North Slope of

19   Alaska, we were also testing the new satellite system.

20   It was a prototype we were testing, collecting data to

21   see how viable it was for our aircraft.

22        So I was up here during a two-week period in

23   April conducting testing from the helicopters, and I was

24   at the COMMSTA station monitoring the satellite

25   communications there.

1    Q.  If we could have the lights, please, and I want

2  to show you an exhibit, Mr. Rudat.  Thank you,

3  Madam Clerk.  Blair, 222.

4       Mr. Rudat, in that photograph, do you recognize

5  what's depicted there?

6    A.  Yes, sir.

7    Q.  There's a -- just a moment.  Could we have it up

8  on the screen.  Thank you.

9       And on the right-hand side, there's a large,

10 long, white building.  Can you identify what that

11 building is?

12   A.  Yes, sir.  This is the ops, the communications --

13 main communications center where all the operations were

14 run out of.

15   Q.  And when you were here in Kodiak in April 2012

16 doing that work, is that the building you were working

17 out of?

18   A.  Yes, sir.  Right here.

19   Q.  And there's a building to the left.  Do you see

20 that building there?

21   A.  Yes, sir.  Right here?

22   Q.  Yes.  And did you ever go to that building when

23 you were there in April 2012?

24   A.  No, sir.

25   Q.  Have you ever been in that building ever?

1    A.  Never.

2    Q.  Any other occasion while you were doing work in

3 the Coast Guard to be involved with anybody in that

4 building?

5    A.  No, sir.

6    Q.  How long was this trip in April of 2012,

7 Mr. Rudat?

8    A.  That trip was a two-week evolution because we

9 were covering multiple MH-65 aircraft, MH-60 aircraft in

10 conjunction with testing we were doing on the satellite

11 system.  So I was there for two weeks.

12    Q.  Where were you staying when you were there for

13 two weeks?

14    A.  We were staying at the Comfort Inn right by the

15 airport.  I believe it was Comfort Inn at that time.  I

16 don't know what it is today.

17    Q.  While you were doing your work in Kodiak in April

18 2012 -- I may have mentioned this, I just want to catch

19 up with my notes here -- did you do any work with

20 anybody from the small, white building you saw in

21 Exhibit No. 222?

22    A.  No, sir.

23    Q.  And when you were doing the work in the -- the

24 white building, where were you working?

25    A.  I was working primarily in the ops center.

1    Q.  The ops center.  Can you describe what that

2  looked like for the jury, please?

3    A.  Yes, sir.  It's a controlled access point, a lot

4  of crypto gear, secret information, equipment that has

5  to be protected.  So it was all behind a secured door, a

6  secure entry into the building and into the room itself.

7    Q.  When you were doing your work, were you working

8  with other people?

9    A.  Yes, sir.  They were working in the COMM center.

10  There was one primary point of contact I worked with,

11  that I coordinated with prior to our trip and as well as

12  test teams from the satellite company itself.

13    Q.  Sounds pretty detailed.  Was it?

14    A.  Yes, sir.  We were into scheduling and making

15  sure we had frequencies alignment between all the

16  parties involved for monitoring purposes.

17    Q.  I want to turn your attention to the morning of

18  April 12, 2012.  Do you recall what you were doing that

19  morning?

20    A.  Yes, sir.

21    Q.  Let me ask you real quick.  You used to be a

22  runner?

23    A.  Yes, sir.

24    Q.  Do you still run?

25    A.  No, sir.

1     Q.   Me neither.  What do you instead?

2     A.   Walk, sir.

3     Q.   You walk.  On April 12th, was that part of your

4 routine?

5     A.   Yes, sir, it was.

6     Q.   Can you tell the jury about the timeframe of how

7 you took your walk that day?

8     A.   All right.  I woke early that morning intending

9 to get out for at least a one-hour walk.  I got held up

10 by some e-mails.  I could reach back over my computer

11 back to my office in Mobile, check e-mails.  I got

12 caught up in e-mail exchange.  It took longer than I

13 originally intended.  I departed the hotel that morning

14 at 6:40 and headed out towards the COMMSTA.

15     Q.   Let me stop you there.  If we could put up

16 Exhibit No. 172 and have the lights, please, Madam

17 Clerk.  Thank you, both.

18          And as to Exhibit No. 172, can you tell roughly,

19 Mr. Rudat, where your hotel was?

20     A.   Yes, sir.  By the middle dot right here where

21 it's labeled Kodiak Airport, the Comfort Inn sits right

22 here on the main road on the entrance into the airport.

23          THE COURT:  Mr. Skrocki, this exhibit, I'm not

24 showing, nor is the clerk, that it's been admitted.  173

25 was admitted, but not 172.

```
 1          MR. SKROCKI:  I might have done a typo.  I have

 2   172.  Is 173 admitted?

 3          THE COURT:  Yes.

 4          MR. SKROCKI:  My apologies.

 5          MR. CAMIEL:  We have no objection.

 6          THE COURT:  173 is admitted.  There is no

 7   objection to 172.

 8          MR. CAMIEL:  We don't have an objection to 172.

 9          THE COURT:  Are you seeking to admit 172?

10          MR. SKROCKI:  Not at this time.  That was a

11   typo in my notes.

12          THE COURT:  That's fine.

13   BY MR. SKROCKI:

14     Q.  So let's go back to 173.  Admitted for the

15   record.  And if you could start us again where the hotel

16   was, Mr. Rudat, and then take us up on your route just

17   briefly and we'll get to it.

18     A.  Yes, sir.  So the hotel is where the -- the

19   orange dot labeled Kodiak Airport, the hotel sits on the

20   same entrance to the airport adjacent to the main road

21   there.

22     Q.  And then your route to the communications

23   station?

24     A.  All right.  So across the road, up a bit and then

25   out on the road labeled Anton Larsen Bay Road.
```

1    Q.   Okay.  And you mentioned there was a time there.

2  If we could take that down, please.  You mentioned a

3  time of departure.  How do you know that?

4    A.   Yes, sir.  I had a screen cap that I saved for

5  the original team that showed my last e-mail that went

6  out at 6:37.  I departed the hotel.  I knew my

7  turnaround time was 7:10.  That's why I'm comfortable

8  with my times.

9    Q.   And why 7:10?

10   A.   That would get me back to the hotel in time to

11 get ready to meet the rest of my team from Mobile, then

12 head into the air station and do our business that day

13 on the air station itself.

14   Q.   What were you using to record your turnaround

15 time for your walk?

16   A.   I was using my iPhone, was my time.  I knew what

17 time I left, so I used that as my point of reference.

18   Q.   Had you taken any walks along that route before?

19   A.   Yes, sir.  I had walked that same route the day

20 prior, so I knew a good estimate of how far I could get

21 out.  I wanted to get at least an hour.  And that was

22 the best I could do that day.

23   Q.   And when you -- so you left the Comfort Inn about

24 what time?

25   A.   I left the Comfort Inn at 6:40, sir.

1    Q.  And you were headed up toward the communications

2  station?

3    A.  Yes, sir.

4    Q.  How long do you think it took for you to get

5  there?

6    A.  It took me 28 minutes to get to the COMMSTA and

7  another two minutes past that point.

8    Q.  And when you would take your walks habitually, do

9  you do anything to entertain yourself?

10    A.  Yes, sir.  I used headphones hooked into my

11  iPhone.

12    Q.  On this date, on the 12th of April of 2012, were

13  you listening to music?

14    A.  Yes, sir, I was.

15    Q.  Please tell the jury who you were listening to

16  that day.

17    A.  Adele.

18    Q.  Who gave you the idea for Adele?

19    A.  My daughter for a Christmas present.

20    Q.  Very nice.  Okay.  When you would take your walks

21  habitually, sir, could you explain to the jury the

22  various volume levels?  How loud do you play or not your

23  music?

24    A.  I'd say the music is kept moderate.  I'm trying

25  to be aware of what's coming from behind me as well as

1   wildlife, especially down in Kodiak area.  So it was not

2   head splitting.  It was a moderate volume level.

3       Q.  And if we could pull up Exhibit No. 6, which I

4   believe has been admitted.  Thank you.  If we can have

5   the lights, Madam Clerk.  Thank you.

6           Mr. Rudat, do you recognize what's depicted in

7   Exhibit No. 6?

8       A.  Yes, sir.

9       Q.  And if you could show the jury your route from

10  where you were coming from the Comfort Inn up further.

11      A.  All right.  So starting at the top of the screen,

12  this is Anton Larsen Bay Road, I came from the top to

13  the bottom and past this point down here on the bottom

14  of the screen.

15      Q.  All right.  And if we could go to exhibit -- you

16  kept walking from the bottom of the screen?

17      A.  Yes, sir.

18      Q.  If we can go to Exhibit No. 2, which I believe

19  has been admitted.

20          THE COURT:  Yes.

21      Q.  Thank you.  And do you recognize what's depicted

22  in that photograph, Mr. Rudat?

23      A.  Yes, sir.

24      Q.  So if you could show again your entire route from

25  the Comfort Inn to your turnaround point that you talked

1    about.

2    A.   All right.   So from the Comfort Inn at the bottom

3    of the screen, this is out this way, and my turnaround

4    point was approximately right in here.

5    Q.   Yeah, there you go.   Right below the gray line in

6    the picture up at the top?

7    A.   Yes, sir.

8    Q.   You knew your turnaround point was where it was

9    by how, by what mechanism?   In other words, how did you

10   determine your turnaround point?

11   A.   Based on time, 7:10.

12   Q.   Looking at your clock?

13   A.   Yes, sir.

14   Q.   If we can move to Exhibit No. 7, which I believe

15   has been admitted.   Do you recognize that building,

16   Mr. Rudat?

17   A.   Yes, sir.

18   Q.   And what is that building?

19   A.   That's the rigger shop, the maintenance facility.

20   Q.   Okay.   And you mentioned you turned around?

21   A.   Yes, sir.

22   Q.   Did you come by that rigger shop on your way

23   back?

24   A.   Yes, sir, I did.   Traveling from the left of the

25   screen to the right along this road.

1    Q.   Okay.  So were you -- what side of the road were

2    you on when you came back?

3    A.   Yes, sir.  I was walking against the flow of

4    traffic, so I'd been on the left-hand side, coming from

5    left to right.

6    Q.   Towards the rigger shop side?

7    A.   Yes, sir.  Correct.

8    Q.   Mr. Rudat, when you came by the rigger shop, did

9    something catch your attention?

10   A.   Yes, sir.

11   Q.   Can you explain to the jury what that is?  Give

12   us all the detail you recall.

13   A.   Yes, sir.  I was walking back along the road.

14   When I got to approximately right here, I heard what

15   sounded to me like sheet metal -- or not sheet metal,

16   but a metal plate, quarter-inch metal plate of -- for

17   example, hitting solid against concrete.  It was a

18   single instance of noise that startled me.  It got my

19   attention.

20        I looked.  I had seen traffic going into the

21   COMMSTA that morning on my way out.  When I looked to

22   the building, there was a personally owned vehicle

23   parked right in here.  When I heard the noise, it

24   startled me, like I said.

25        I looked to the left and at the building, and I

saw a truck sitting there.  Knowing that that was the

maintenance facility, I figured it was the start of the

workday for the maintenance crew.  So it was that quick

of a processing in my mind, and I continued on my way.

MR. SKROCKI:  If I can approach the witness,

Your Honor.  I've showed counsel before we had testimony

today what we've marked as Exhibit No. 7A, a hard copy

of Exhibit No. 7.  I want to ask Mr. Rudat to mark

physically on this exhibit where he was and initial it.

THE COURT:  All right.  Very good.

(Mr. Skrocki approaches witness)

BY MR. SKROCKI:

Q.  I'm going to ask you to do more ink.  You want to

try a different pen?

A.  Yes, sir.

Q.  Does that work better?

A.  Not quite.  There we go.

Q.  Just so it's clear.  Thank you.

Blair, if I could have the camera for just a

moment.

Mr. Rudat, I'll point on Exhibit No. 7A we have

marked, this is your initials and that's what you marked

when you heard the noise where you were?

A.  Yes, sir.

Q.  That's the location?

```
1        A.  Yes, sir.

2             THE COURT:  So are you seeking to admit 7A?

3             MR. SKROCKI:  Yes, we are.

4             THE COURT:  Any objection?

5             MR. COLBATH:  No, that's fine, Your Honor.

6             THE COURT:  Very good.  7A is admitted.

7             (Exhibit No. 7A admitted)

8   BY MR. SKROCKI:

9        Q.  If we can have Exhibit 19.

10            Mr. Rudat, I want to go back to the noise you

11  just testified you heard.  You were playing music that

12  morning of your walk?

13       A.  Yes, sir.

14       Q.  And could you tell the jury as best you can sort

15  of the relationship between what you heard and the music

16  that was being played?

17       A.  The music, as I mentioned earlier, was not

18  blasting.  I was still sensitive to traffic that was --

19  or possible wildlife in the area coming from behind me.

20  It was loud enough, the noise coming from that, that it

21  startled me, caused me to look.  And as I mentioned

22  earlier, I processed when I saw the black truck parked

23  there that maintenance folks had begun their workday.

24       Q.  With respect to the black truck, is that the only

25  vehicle you saw?
```

1    A.  Yes, sir.

2    Q.  Can you use the laser pointer and show the jury

3  where you observed that black truck?

4    A.  Basically right here.  It was most -- the closest

5  to this wing.  This was that north-south wing, but it

6  was parked right here where this truck is.

7    Q.  Any other vehicles -- you mentioned other

8  vehicles.

9    A.  Yes, sir.

10   Q.  Show the jury where you saw those, as you recall.

11   A.  There were two Government white pickups parked

12  right here right next to it, but the order was the

13  personally owned vehicle and then the two Government

14  vehicles, and then off to this side here was two snow

15  tracks or tracked vehicles for snow.

16   Q.  All right.  And did you notice any vehicles

17  parked over here?

18   A.  No, sir.

19   Q.  By your estimation, Mr. Rudat, how far away were

20  you when you were walking on the road to the rigger shop

21  itself?

22   A.  I think from my left side on the return, I would

23  estimate probably in the area of 250 feet.

24   Q.  If we could have Exhibit No. 6, please.

25        Mr. Rudat, can you pick up from the middle of the

1   road here as you progressed on your walk going back to

2   the Comfort Inn?  So you heard the noise, you testified

3   about that.  What did you do next?

4   A.  Yes, sir.  I continued on down Anton Larsen Bay

5   Road.  I crossed this bridge right here, and

6   approximately right in this vicinity I received a phone

7   call from my ops center back in Mobile, Alabama at 7:14.

8   Q.  So your boss is reaching out to you?

9   A.  Yes, sir.

10  Q.  And I want to focus your attention on this area

11  here.  Were you aware of this structure that I circled

12  on Exhibit No. 6, the green dome-ish-like object as you

13  came up from the Comfort Inn?

14  A.  Yes, sir, I had seen the facility.

15  Q.  And please describe to the jury what activity you

16  saw or observed, if any, when you walked by it on the

17  way up the road.

18  A.  Okay.  So that would -- on the way out, I don't

19  recall seeing any activity in that general vicinity.

20  Most of the cars I had seen had gone past that facility

21  and on up towards the COMMSTA on my walk out.  So I

22  didn't see much traffic or activity at all in that area,

23  to be honest with you.

24  Q.  Did you observe on your way outbound any work

25  activity in that area there?

1    A.   No, sir.   None that I recall.   I was on a phone

2  call at that point, so I didn't have a lot of focus on

3  that side of the road as much as I would have probably

4  normally, but I was looking for oncoming traffic and on

5  a phone call with the folks back in Mobile.

6    Q.   How about inbound?

7    A.   Same, sir.   I didn't see any activity in that

8  vicinity.

9    Q.   Do you recall any other loud objects or noises

10  that interrupted your phone call while you were making

11  it to Mobile coming that direction, heading back to the

12  Comfort Inn?

13    A.   Coming from the --

14    Q.   From the COMMSTA going back to Comfort Inn.

15    A.   No, sir.

16    Q.   At some point, were you contacted by law

17  enforcement about --

18    A.   Yes, sir, I was.   I was contacted that evening.

19    Q.   By who, do you recall?

20    A.   CGIS agent and an FBI agent.

21    Q.   And what did you tell them?

22    A.   I relayed basically the story of what I just

23  recounted here and my times and our activities after

24  that morning.   Once we had gone into work, the base was

25  shut down, so we were stuck on base there for a while.

1    Q.  Did you have any recollection at the time you

2  were interviewed about some vehicles you may have seen

3  that morning, and, if so, what?

4    A.  The only other vehicle that specifically was

5  mentioned was the red pickup that I passed on the way

6  back to the Comfort Inn.  It was a red pickup with a

7  gentleman with a beard.  Most of the folks I had seen

8  that morning were in Coast Guard uniform, active-duty

9  members.

10       This individual stuck out in my mind because of

11  the beard.  He caught my attention.  And then as the

12  details started to come out, it bugged me that I was

13  concerned that it was one of the individuals that had

14  been murdered that morning.  So yeah, it was in my mind

15  quite a bit.

16    Q.  Where did you see the individual with the beard

17  in the red truck?

18    A.  Coming back -- he was headed out towards the

19  COMMSTA as I was headed back.

20    Q.  I'm sorry.  Can you say that again?

21    A.  He was headed out towards the COMMSTA as I was

22  headed back towards the Comfort Inn.

23    Q.  Okay.  Got it.  At one point in time during that

24  day, were you made aware of what had actually happened

25  in the rigger shop that morning?

1     A.   Yes, sir.

2     Q.   When did you become aware of that?

3     A.   Approximately 8:20, 8:30 that morning when I was

4  on the air station itself.

5     Q.   You made it back -- where were you?  Were you at

6  T-1?

7     A.   No, no.  I had gone actually to the air station,

8  correct.

9     Q.   And prior to your testimony with law enforcement,

10 were you shown any video footage of the morning in

11 question concerning your walk?

12    A.   Yes, sir.

13    Q.   If we could pull up just for Mr. Rudat's review

14 and just for identification Exhibit 62.

15         Do you recall -- we're running that footage

16 now, Mr. Rudat.  Do you see that footage?

17    A.   Yes, sir.

18    Q.   And is this the footage that we showed you in

19 preparation for trial?

20    A.   Correct.

21    Q.   Do you during that footage see yourself walking

22 up the road past the rigger shop and then again back

23 down the road?

24    A.   Yes, sir.  It does eventually.

25    Q.   You can stop it there.  Thank you, Blair.

1      Mr. Rudat, with respect to the noise you heard

2   that morning you've just testified about emanating from

3   what you said was from the rigger shop, how certain are

4   you of that?

5      A.   Positive, sir.

6         MR. SKROCKI:  That's all the questions I have,

7   Judge.

8         THE COURT:  All right.  Mr. Colbath, go ahead,

9   please.

10                    CROSS EXAMINATION

11   BY MR. COLBATH:

12      Q.   Good morning, Mr. Rudat.

13      A.   Good morning.

14      Q.   My name is Gary Colbath.  I don't think you and I

15   have ever talked or met before.

16      A.   No, sir.

17      Q.   That last question, I didn't hear you say that

18   the noise was emanating from the building, but what I

19   recalled was you said you had walked and you had seen

20   traffic sort of entering or the COMMSTA area, and the

21   noise emanated from that same direction, which is what

22   drew your attention to the buildings and the parking

23   lot.

24      A.   I'm not sure I understand your question, sir.

25      Q.   Well, I didn't hear you -- Mr. Skrocki in his

question said you said that the noise emanated from within the building. But what I heard you say in your testimony, and so I want to be clear on it, was that when you were walking down the road, you had noticed traffic going up towards the COMMSTA prior to the noise, right?

A. Correct.

Q. And then you were startled by this noise, and so because of where you heard it come from and the traffic you had seen earlier, you looked in that direction and it came from that direction. Did I understand you right?

A. Yes, sir.

Q. Okay. And then when you looked, you saw some vehicles, correct?

A. Correct.

Q. All right. So let's just -- if you could pull up Exhibit No. 7, I think was the one. Oh, yes. The same one he drew on, Government Exhibit No. 7.

You've still got your laser pointer there, right?

A. Yes, sir.

Q. So now, first of all, on the outbound -- when you were still walking out, had you just made any observation about the equipment and the vehicles at the building here?

1     A.  Yes, sir.  The two snowcats right here on the

2  outbound lane, I had seen those.  We had joked to

3  ourselves the day prior or two days prior to that that

4  we would like to borrow them for the weekend.  I saw

5  those that morning I was walking out and --

6     Q.  Because they were sort of fresh in your mind from

7  the day before, they were there.  As to any vehicles,

8  either regular driving vehicles, for instance, the two

9  white pickups or the black pickup that you saw, regular

10  vehicles, not machinery or equipment like that, you

11  don't recall on the outbound taking note of anything?

12     A.  No, sir.

13     Q.  How about the trailer, you see the flatbed

14  trailer there that's sort of out away from everything

15  closer to the road, did you remember seeing that?

16     A.  Not specifically, sir.

17     Q.  All right.  So now on the way back, you're

18  walking and again take note of the snowcats.  They were

19  still there, obviously, and not mobile.

20     A.  Right.

21     Q.  And then you're walking down the road and you

22  hear this noise.  And it came from your left, the noise

23  came from your left?

24     A.  Yes, sir.

25     Q.  And you looked in that direction, and I thought

what you said was it was at that time that you observed
the vehicles?

    A.  I observed the black POV.

    Q.  Okay.  And in this picture, there's -- near the
building there, there's -- POV is personal --

    A.  Personally owned vehicle, correct, sir.

    Q.  You distinguish that from I bet GOV,
Government-owned vehicle?

    A.  Correct, sir.

    Q.  And if I heard what you told Mr. Skrocki right,
the two white vehicles there, did you recognize -- were
they there when you looked over after you heard this
noise?

    A.  Yes, sir.

    Q.  In that location or a different location?

    A.  In that location, sir.

    Q.  And you could see a black truck as well, but it
was apparently closer to the building?

    A.  Right in here, sir.

    Q.  Okay.  Closer than that one is?

    A.  I don't recall how far offset from the building
it was, but the order was the personally owned vehicle
and then two Government-owned vehicles.

    Q.  And the white vehicle that we see there away from
the other three, that was not there?

1    A.   No, sir.

2    Q.   And there was a single personal -- a single

3 personal vehicle there?

4    A.   Correct.

5    Q.   And if I heard what you said correctly, you said

6 it was because you observed in addition to the

7 Government vehicles a personal vehicle there, it made

8 sense to you somebody had arrived for work and was

9 obviously doing something which created the noise that

10 is what you heard?

11    A.   That was my assumption, my processing, yes, sir.

12    Q.   It wasn't necessarily that the noise -- you

13 didn't know if the noise was behind the building, next

14 to the building, in the building, but it must be

15 associated with that direction and likely that personal

16 vehicle?

17    A.   Well, the personally owned vehicle indicating

18 that somebody was there performing work that morning,

19 and the maintenance facility being a maintenance

20 facility, that somebody had dropped what sounded like

21 metal hitting concrete.

22    Q.   Sure.  Okay.  You can take that down.  Thank you.

23         I want to back up to a couple of other things.

24 It sounded like on your walk, sir, that you're pretty

25 observant as to the vehicle traffic as you walked up and

1    down the road?

2        A.  Correct, sir.  Particularly the vehicles

3    approaching me head on.

4        Q.  For your own safety?

5        A.  Correct, sir.

6        Q.  Not only -- it sounded like not only observant as

7    to the vehicle for safety but made note of at least some

8    generalities about the drivers, because I heard you say,

9    you know, many people were dressed as Coastguardsman and

10   you could recognize them.  And then something about a

11   man in a red truck, which I'll ask you about as well.

12   But you paid attention to the vehicle and the people,

13   right?

14       A.  That's correct.

15       Q.  And this red truck I want to ask you about, you

16   were able to pay enough attention and remember that the

17   man had a beard?

18       A.  That's correct.

19       Q.  And you remembered it was a dark-colored beard,

20   didn't you?

21       A.  Yes, sir.

22       Q.  Sort of not big and bushy, but fairly well-kept?

23       A.  That's correct.

24       Q.  And that didn't mean much, I assume, to you at

25   the time you were walking, but as you found out later

1  details, you thought it might have been somebody

2  involved?

3      A.  That's correct.

4      Q.  The person was wearing civilian clothes?

5      A.  Yes, sir.

6      Q.  That also stuck in your memory, it wasn't a Coast

7  Guard person in a red truck with a beard, it was a

8  civilian?

9      A.  That's correct.

10     Q.  And do you think as you walked both directions

11 and paid attention to traffic that you saw any other

12 civilians?

13     A.  No, sir.

14     Q.  Would that have stood out to you?  Would that

15 have been something probably in your memory if you had

16 saw that?

17     A.  If I had seen the traffic approaching me head on,

18 yes, sir, definitely.

19     Q.  You don't recall either -- well, you don't recall

20 at any time during your walk seeing a small blue SUV?

21     A.  No, sir.

22     Q.  All right.  Now, the noise that you heard as

23 you're walking back by, you described that as something

24 metal, a heavy piece of metal, the solid drop onto

25 concrete?

1    A.  Correct, sir.

2    Q.  And it was that singular startling noise that

3  drew your attention over to your left, and there was

4  nothing that gave you warning, first of all, that that

5  was going to happen?

6    A.  That's correct.

7    Q.  And after you looked, you didn't see anything

8  going on to your left?

9    A.  No.  There was no activity outside the building.

10    Q.  And nothing beyond on the hill or anywhere around

11  the building that you could see?

12    A.  No, sir.

13    Q.  And no second noise or other audible things that

14  helped you associate what that was?

15    A.  No, sir.  It was a single event.

16    Q.  All right.  Now, were you familiar with -- that's

17  a pretty -- I find that to be a -- that's a specific

18  description, metal on concrete.  Have you been around --

19  do you have construction experience, or do you have

20  experience that helped you associate that?

21    A.  Yes, sir.  I grew up on a farm, and also, the

22  aviation maintenance routine in a hangar, that's a

23  common occurrence is moving grates to cover a drain line

24  or a metal plate to cover up something to move aircraft

25  around it.  So that's -- that was the association I made

1    to it.

2        Q.   You have metal gates, metal fencing on the farm

3    or cattle?

4        A.   Cattle head gates.

5        Q.   Cattle gates.  Okay.  I grew up in South Dakota,

6    so I know exactly what you're saying.

7             How about I thought I heard in your military --

8    in your military experience that you had law enforcement

9    experience?

10       A.   Correct, sir.

11       Q.   Well, first of all, I'm going to guess growing up

12   on a farm, you may have had some familiarity also with

13   firearms?

14       A.   That's correct.

15       Q.   And the noises that firearms make?

16       A.   Rifles, yes, sir.

17       Q.   And then in -- what did you do in the military

18   police or for the military police?

19       A.   Law enforcement.

20       Q.   Did you carry a firearm?

21       A.   Yes, sir.

22       Q.   Were you qualified with it?

23       A.   Yes, sir.

24       Q.   Practiced regularly?

25       A.   Correct.

1    Q.   Train?

2    A.   Qualifying.

3    Q.   Handgun you carried, I assume?

4    A.   Yes, sir.

5    Q.   So you were certainly familiar with the noises

6    that both long guns and handguns made?

7    A.   Right, sir.  From outside.

8    Q.   Sure.  What you heard was not a gunshot, it

9    didn't register with you as a gunshot?

10   A.   It did not register as a gunshot, no, sir.

11   Q.   Do you think you could have told the difference

12   between that metallic noise you're familiar with and a

13   gunshot?

14   A.   Well, sir, I'd like to think I would have.  It

15   had been 22 years at that point since the last time I

16   had been involved with actual firing of a weapon.  And

17   as I mentioned, all my qualification was done on an

18   outdoor range.  So I don't know all the variables that

19   were involved that morning.  Open door, closed door.  I

20   don't know the variables that were involved.  I can only

21   relate to how I processed it and what it sounded like to

22   me.

23   Q.   And that was that familiar metal grate on the

24   heavy concrete?

25   A.   Correct, sir.

1    Q.  All right.  I want to -- could you pull up for

2 me -- pull up Exhibit 19.

3         THE COURT:  Government 19?

4         MR. COLBATH:  Yes, Government 19.  I'm sorry,

5 Your Honor.

6         THE COURT:  That's all right.

7 BY MR. COLBATH:

8    Q.  Well, let's use a different one.  Let's try

9 Government Exhibit No. 6.  I better ask a question about

10 that first.

11        Just a couple more things, Mr. Rudat.  Zoom in on

12 the -- I don't know, bridge, water treatment area.

13 Yeah, that's good.  About there.

14        So as I understand it, when you were return trip,

15 headed back towards the Comfort Inn after hearing the

16 noise, there was a period of time where you got a phone

17 call?

18    A.  Correct, sir.

19    Q.  So the phone call interrupted your music playing?

20    A.  Correct.

21    Q.  Did you answer the phone -- sometimes I use my

22 earphones and I can hear okay with that little mic.  Did

23 your mic have a microphone in the wire?

24    A.  Not at that time, sir.  It was still the

25 old-school iPhone.

Q.  And so did you have to unplug or shut down the
music and talk with the phone held up to your ear, or
were you able to use it and leave the earphones in?

A.  If I recall correctly, the headset was still in
and I just talked on speaker.

Q.  Okay.  And so it was somewhere just between the
bridge and this water facility that's on the right.  Can
you just show me again about where you were when you
think you got that call?

A.  I would estimate it was right about in here.

Q.  Do you recall right at that spot those trees on
your left?  It's sort of an uphill or an embankment
there.  The road is higher on that side than it is -- or
the hill is higher on that side than the other side.  Do
you recall that or --

A.  No, sir.

      MR. SKROCKI:  Objection to the form of the
question.  Counsel is testifying.

      THE COURT:  I'll sustain that.

BY MR. COLBATH:

Q.  I'll rephrase that, Your Honor.

      Do you recall the elevation from what would have
been on your right to what would have been on your left?

A.  No, sir.

Q.  It was the folks at the office back in Mobile?

1    A.  Yes, sir.  Our ops department.

2    Q.  Ops department.  All right.  Do you remember

3    about how long you talked to them?

4    A.  12 minutes, sir.

5    Q.  So you were walking at a fairly -- I was trying

6    to time that and calculate it.  You were walking at a

7    fairly good clip it looked like?

8    A.  Yes, sir.

9    Q.  So you were probably out of this -- well out of

10   this frame before you got off the phone?

11   A.  Correct.

12   Q.  All right.  And as you walked by, you were

13   focused I assume, number one, on your phone call?

14   A.  Correct, sir.

15   Q.  And number two, cognizant, at least for safety

16   purposes as you could, of traffic on the road while

17   keeping track of your phone call?

18   A.  Primarily the traffic coming straight at me, not

19   so much the traffic going away from me.

20   Q.  Okay.  And so if there had been activity, say, up

21   here on the back side of this facility, there certainly

22   could have been activity that you didn't see go on,

23   people up there, vehicles parked, other things

24   happening?

25   A.  Correct, sir.  I didn't see any of that.

1    Q.  Right.  Not that it wasn't there, you're not

2  saying that it wasn't there, you're just saying it was

3  nothing you observed while talking on the phone and

4  watching for oncoming traffic?

5    A.  Correct.  There was nothing that interfered with

6  my phone call.

7    Q.  All right.  You can take that down, I think.

8        MR. COLBATH:  If I can just have one minute.

9        THE COURT:  Certainly.

10        MR. COLBATH:  I think that's all the questions

11  I have for you.  Thank you, Mr. Rudat.

12        THE COURT:  Mr. Skrocki, redirect.

13        MR. SKROCKI:  Briefly.

14                REDIRECT EXAMINATION

15  BY MR. SKROCKI:

16    Q.  I have a few questions, Mr. Rudat.  When you were

17  heading back to the Comfort Inn, were you paying

18  attention to traffic going past you in the same

19  direction?

20    A.  No, sir.  That's what I was mentioning earlier.

21  Traffic that's coming at me, that's headed towards the

22  COMMSTA as I head back to the Comfort Inn, that's my

23  primary focus.

24    Q.  I want to be clear about the question I asked or

25  what I said to you about that sound from the building --

1  from the area of the building.  Your testimony is that

2  that sound came from where?

3      A.   That building.

4      Q.   From that building?

5      A.   Yes, sir.

6      Q.   All right.  And about 8:30 you realized -- you

7  were told two men were killed in that building?

8      A.   Correct.

9      Q.   If we could pull up Exhibit No. 7A again.  I'm

10  sorry, 7.  Thank you, Blair.

11         Were you able to see, Mr. Rudat, around the back

12  side of that building?

13      A.   No, sir.  I didn't notice anything there.  I

14  couldn't see from -- I mean, my focus was where the

15  black pickup is.

16      Q.   This direction here?

17      A.   Correct.

18      Q.   So this is where you heard that sound come from?

19      A.   Yes, sir.

20      Q.   Thank you.

21             THE COURT:  Anything further?

22             MR. COLBATH:  One.

23             THE COURT:  Go ahead, Mr. Colbath.

24                     RECROSS EXAMINATION

25  BY MR. COLBATH:

```
 1      Q.   And Mr. Rudat, except for the -- except for this
 2  white van, those were actually -- I mean, we don't know
 3  if they're the same vehicles, but that was the vehicle
 4  configuration, three vehicles there, of what you recall
 5  observing when you heard the sound and it drew your
 6  attention towards the building?
 7      A.   The noise is what drew my attention to the
 8  building originally.  When I looked at the building, the
 9  realization that there was a -- somebody's personally
10  owned vehicle parked there was a follow-on thought that
11  the workday has begun.
12      Q.   All right.  That's all I have for you, sir.
13          THE COURT:  Can this witness be excused?
14          MR. SKROCKI:  Yes, Your Honor.
15          MR. COLBATH:  We would agree with that.
16          THE COURT:  You may be excused.
17          (Witness excused)
18          (Requested excerpt concluded, proceedings
19  continued.)
20
21
22
23
24
25
```

CERTIFICATE

    I, Sonja L. Reeves, Federal Official Court Reporter
in and for the United States District Court of the
District of Alaska, do hereby certify that the foregoing
transcript is a true and accurate transcript from the
original stenographic record in the above-entitled
matter and that the transcript page format is in
conformance with the regulations of the Judicial
Conference of the United States.

    Dated this 27th day of September, 2019.


                        /s/ Sonja L. Reeves
                        SONJA L. REEVES, RMR-CRR
                        FEDERAL OFFICIAL COURT REPORTER