```
 1                    UNITED STATES DISTRICT COURT
                       FOR THE DISTRICT OF ALASKA
 2

 3   UNITED STATES OF AMERICA, )
                               )
 4          Plaintiff,         )
                               )
 5   vs.                       )   CASE NO. 3:13-cr-00008-SLG
                               )
 6   JAMES MICHAEL WELLS,      )
                               )
 7          Defendant.         )
     _____)
 8

 9          PARTIAL TRANSCRIPT OF TRIAL BY JURY - DAY 12
     (Testimony of Judy Pletnikoff, Donald and Theresa Kiele)
10     BEFORE THE HONORABLE SHARON L. GLEASON, DISTRICT JUDGE
                    September 24, 2019; 8:32 a.m.
11                      Anchorage, Alaska

12   FOR THE GOVERNMENT:
            Office of the United States Attorney
13          BY:  STEVEN SKROCKI
            BY:  CHRISTINA M. SHERMAN
14          BY:  KELLEY L. STEVENS
            222 West 7th Avenue, #9
15          Anchorage, Alaska 99513
            (907) 271-5071
16

17   FOR THE DEFENDANT:
            Office of the Federal Public Defender
            BY:  GARY GEORGE COLBATH
18          601 West 5th Avenue, Suite 800
            Anchorage, Alaska 99501
19          (907) 646-3400

20          Camiel & Chaney, P.S.
            BY:  PETER A. CAMIEL
21          520 Pike Street, Suite 2500
            Seattle, Washington 98101
22          (206) 624-1551

23   _____

                    SONJA L. REEVES, RMR-CRR
24              Federal Official Court Reporter
                    222 West 7th Avenue, #4
25                  Anchorage, Alaska 99513
           Transcript Produced from the Stenographic Record
```

1          (Call to Order of the Court at 8:32 a.m.)

2          (Proceedings took place and are not included in

3    this transcript, after which, the testimony of Judy

4    Pletnikoff, Donald Kiele and Theresa Kiele transpired as

5    follows:)

6          (Oath administered to the witness)

7          DEPUTY CLERK:  For the record, can you please

8    state your full name and then spell your full name.

9          THE WITNESS:  My name is Judy Pletnikoff.  It's

10   J-u-d-y, P-l-e-t-n-i-k-o-f-f.

11         THE COURT:  Thank you.  Go ahead, please.

12         MR. SKROCKI:  Thank you, Your Honor.

13        JUDY PLETNIKOFF, GOVERNMENT WITNESS, SWORN

14                      DIRECT EXAMINATION

15   BY MR. SKROCKI:

16     Q.  We always like it nice and loud so it's not a

17   problem with your volume, Mrs. Pletnikoff.  How are you

18   today?

19     A.  As best as I could be.

20     Q.  Can you please tell the jury where you live,

21   Mrs. Pletnikoff.

22     A.  I live in Kodiak, Alaska.  I've lived there since

23   1988.

24     Q.  Can you tell the jury right now what you do for a

25   living, please?

1    A.   I'm the director of a small nonprofit that

2  supports individuals with disabilities, adults, and also

3  we just put in a behavioral health part that works with

4  children with autism.

5    Q.   Your position that you hold there,

6  Mrs. Pletnikoff?

7    A.   I'm the director.

8    Q.   How many staff do you have underneath you?

9    A.   Well, today it will be seven.  We hire a new hire

10  today.  We have six.

11    Q.   Does that organization you work for service the

12  Kodiak area or other areas?

13    A.   Only Kodiak.

14    Q.   Just Kodiak.  Do you know Jim and Nancy Wells?

15    A.   I do.

16    Q.   How long have you had an acquaintance with them?

17    A.   Since 1992.

18    Q.   And did you have occasion to work with Nancy

19  Wells?

20    A.   I did for many years.

21    Q.   Could you tell the jury what kind of work you did

22  with her?

23    A.   She was the infant learning services coordinator

24  at Kodiak Area Native Association where my -- I have a

25  son with autism, and he got services there.  We built

what I believe is the first applied behavioral analysis
program in the state of Alaska working with someone from
the Lovaas Institute, so it was definitely the gold
standard.

We traveled around the country to look at other
programs in Princeton, New Jersey, and DC and Seal
Beach, California, to study this and build it as best we
could in Kodiak.  I think we did well.

I later -- my husband and I adopted an infant
with fetal alcohol syndrome, and he also was a
beneficiary of the infant learning program.

Q.  You mentioned your husband.  What's your
husband's name?

A.  My husband's name is Robert Pletnikoff.

Q.  And did Nancy Wells help you out with your child
with the issues that you had?

A.  Yes, she was a good infant learning provider.
She knows how to navigate the system, so that allows
parents like me to raise our children to be a mother to
a disabled child or two, and she navigates the systems
and helps us get the resources that we need.

Q.  Mrs. Pletnikoff, about what timeframe are you
talking about with respect to the help you got from
Nancy Wells?  When did this happen?

A.  Well, we started when my --

1    Q.  Just what years?  I'm talking about the

2    timeframe.

3    A.  Probably 1992 or '93 until they graduated high

4    school, until 2012.

5    Q.  2012.  Do you know back in 2012 what Jim Wells

6    did for a living?

7    A.  I do.

8    Q.  Please tell the jury your understanding of what

9    he did.

10   A.  He was an antenna rigger.  He was apparently the

11   top rigger of the antennas in the big antenna fields at

12   Kodiak.

13   Q.  And did you have occasion to speak with him about

14   his work and what he did, how he viewed himself with his

15   job?

16   A.  From time to time.  He claimed to be the top

17   antenna man in the country, apparently.  He explained

18   that he was in charge of training.  He would go to these

19   yearly conferences and do trainings for pretty much

20   everybody in the nation is how he explained it, in these

21   yearly conferences.  And he did the training and took

22   care of the antennas on Kodiak Island.

23   Q.  Were these -- from your conversations with him,

24   were these antenna conferences he attended important to

25   him?

1    A.   Tremendously.

2    Q.   And would the failure to attend one --

3         MR. CAMIEL:  Your Honor, I'm going to object to

4    leading.

5         THE COURT:  That's sustained.

6    BY MR. SKROCKI:

7    Q.   In your view, how would he react if he wasn't

8    able to go to one of these conferences?

9    A.   Well, I could say that, because I mean I

10   witnessed that.  He is just devastated.  It was a very

11   important part of his job to be able to get like awards

12   and all these accolades for his antenna work.  I think

13   it was a big part of his identity.

14   Q.   Did there come a time where you became aware of

15   Mr. Wells traveling to Shemya for work?

16   A.   Yes, I was there that summer.  I knew he went out

17   there.

18   Q.   What summer was that, Mrs. Pletnikoff?

19   A.   2011.

20   Q.   And when he came back, did you have occasion to

21   observe him when he came back from Shemya?

22   A.   From time to time.

23   Q.   Can you relay to the jury what you observed?

24   A.   He seemed very angry.  Very upset.

25   Q.   Did he tell you with respect to who?

1     A.  Oh, yes.  There was some fallout at work.  I

2  believe it was with Rich Belisle.

3          MR. CAMIEL:  I'm going to object to what she

4  believes.

5          THE COURT:  Well, that's sustained, but you can

6  ask what --

7  BY MR. SKROCKI:

8     Q.  Did Mr. Wells speak to you about that directly?

9     A.  I'm not absolutely certain if he spoke to me

10 directly about that.

11    Q.  Your impression was --

12         MR. CAMIEL:  Your Honor, I'm going to object to

13 leading.

14         THE COURT:  That's sustained.

15 BY MR. SKROCKI:

16    Q.  Did you have a basis from Mr. Wells as to why he

17 was upset?

18    A.  Yes.

19    Q.  And what did he tell you?

20    A.  Something was wrong at work.  Someone did not

21 follow his directions, and I think --

22    Q.  Let me stop you right there before we get into

23 some other area.  So about directions at work?

24    A.  Right.

25    Q.  Did you have occasion to be social with Mr. and

1    Mrs. Wells around the 2011, 2012 timeframe?

2       A.   Intermittently.

3       Q.   Did you ever see anybody from the Communications

4    Station come to the Wells' for dinner?

5       A.   Yes.

6       Q.   Who would that have been?

7       A.   Two women.  Para and the other lady that worked

8    with her, a young lady.

9       Q.   Anybody else from the Communications Station,

10   just those two women?

11      A.   That's the only ones I saw.

12      Q.   In your relationship with the Wells, did you have

13   occasion to become familiar with their routine of when

14   one would be gone and another one would be in Kodiak,

15   how the car would be -- the cars would be parked?

16      A.   Yes, I did, particularly after all their children

17   had moved away.

18      Q.   If you could tell the jury your understanding or

19   knowledge as to what would happen when Nancy Wells left

20   the island.  What would happen to her car?

21      A.   Nancy travels -- traveled quite a bit for work.

22   She was very conscientious about her car, because when

23   she put it in long-term, she had had her windows broken

24   out.  So after that she would let me know ahead of time,

25   she would park her car right in front of the doors of

Alaska Airlines terminal, and she would instruct me when
I was to pick it up.  And she would call when she got to
Anchorage and make sure I had indeed picked it up.  Then
I would usually bring it to their house.

Q.  What about with Mr. Wells, did he ever
participate in moving Nancy Wells' car?

A.  If he were in town, but he traveled for work
quite a bit too, or traveled for something.

Q.  But if he was in town, what would happen?

A.  He would take it home.

Q.  You're aware of the murders of Mr. Belisle and
Mr. Hopkins, Mrs. Pletnikoff?

A.  I am.

Q.  Did there come a point in time after those
murders that you occasioned with the Wells going to the
airport?

A.  Yes.

Q.  Who was doing the driving?

A.  I was driving.  I picked them up.

Q.  Who was in the car with you?

A.  Nancy was in the passenger seat, and Jim was in
the back seat.

Q.  During that drive to the airport, was the FBI
mentioned?

A.  Yes.

1    Q.  Could you explain the conversation to the jury

2  about the FBI and who -- what Mr. Wells told you and

3  what he did, please?

4         MR. CAMIEL:  Your Honor, this should be limited

5  not to hearsay.

6         THE COURT:  The question was what Mr. Wells

7  said, not what Ms. Wells said.

8         MR. SKROCKI:  I said Mr. Wells specifically for

9  that reason.

10        THE COURT:  Thank you.  Go ahead.

11 BY MR. SKROCKI:

12   Q.  So this is about what Mr. Wells said and did.

13   A.  So I picked them up at their house and headed to

14 the airport.  Jim Wells said, "Did the FBI call you,"

15 and I said, "Yes."  And he said, "Did you talk to them,"

16 and I said, "Yes."  And he started yelling at me that he

17 had told me to slam down the phone if the FBI called.

18 And then Nancy started yelling.

19        THE COURT:  Excuse me.  So we only want to hear

20 about what Mr. Wells said.  Go ahead.  If you want to

21 follow up on, without getting into the content, you can

22 explore that and that's fine, Mr. Skrocki.

23 BY MR. SKROCKI:

24   Q.  Let's just focus on Mr. Wells first.  As the

25 Court instructed, we don't want to ask about what Nancy

Wells said, but I'll ask you a couple questions about some other things in a little bit. Okay?

So you're driving the car. Where was Jim?

A. He was behind me. So he started yelling loudly. And then I looked in my rearview mirror, and he was coming up like this at me. It was really scary. I didn't know what he was going to do. It was pretty scary.

So I rolled all the windows down in the car and got to the airport and out he went, and that was the last time I think I was ever in the same room with them.

Q. How long did this last, Mrs. Pletnikoff?

A. The car ride, probably ten minutes.

Q. Was he screaming at you at whole time?

A. The whole time.

MR. CAMIEL: Objection; leading.

THE COURT: That's sustained.

BY MR. SKROCKI:

Q. What was Mr. Wells doing the whole time during this ten-minute drive to the airport with you?

A. He was yelling at me, and he wasn't even having a seatbelt on and moving up toward me behind me seat.

Q. How did you feel about that?

A. So threatened.

Q. Without saying what she said, what was Nancy

1   Wells doing at this time?

2       A.   She was yelling too.  I was looking for her to

3   rein him in maybe.

4           MR. CAMIEL:  Your Honor, I'm going to object.

5   It's beyond the scope of the question.

6           THE COURT:  Let's hear the next question.

7   BY MR. SKROCKI:

8       Q.   What were you looking for her to do?

9       A.   I was hoping she would settle him down a little

10  bit.

11          MR. CAMIEL:  This isn't relevant in terms of

12  what she's looking for somebody to do.

13          MR. SKROCKI:  Goes to the nature of their

14  relationship, Your Honor.

15          THE COURT:  I'll allow the question.

16  BY MR. SKROCKI:

17      Q.   So let's rewind just a little bit.  And what were

18  you looking for her to do?

19      A.   I was hoping she would rein him in, but she was

20  yelling too.

21      Q.   Thank you, Mrs. Pletnikoff.

22          MR. SKROCKI:  That's all I have, Your Honor.

23          THE COURT:  All right.  Thank you.

24          Mr. Camiel, go ahead, please.

25                      CROSS EXAMINATION

BY MR. CAMIEL:

Q.  Good afternoon, ma'am.  So --

A.  I'm sorry.  I'm not sure who you are.

Q.  My name is Peter Camiel.  I'm one of Mr. Wells'
attorneys.  We haven't met before or talked before?

A.  No.

Q.  So you've been friends with the Wells for quite a
while?

A.  Uh-huh.  Yes.

Q.  And in fact, after -- right after the murders in
this case, when the FBI seized Mr. Wells' car, you lent
him a car to use, right?

A.  I did.

Q.  So that was on April 13th of 2012, right?

A.  Okay.

Q.  If the murders were on April 12th and he called
and told you on April 13th that he was stuck, he didn't
have a vehicle --

A.  No, sir, that did not happen.

Q.  You did lend him a car, though, right?

A.  Yes.

Q.  It was a Ford Ranger pickup truck?

A.  Yes.  His wife called and asked me to do that.

Q.  And you did that?

A.  I did.

1    Q.  And in the days and weeks after the murder, you

2  understood that the FBI was -- and the law enforcement

3  people were looking at Mr. Wells as a suspect in the

4  case, right?

5    A.  You know, I really did not know that immediately

6  afterward, no.

7    Q.  You saw a picture of Nancy's Honda and Jim's

8  truck in the local paper?

9    A.  That wasn't immediately afterward, was it?

10   Q.  But you do recall seeing a picture of their

11 vehicles in the paper?

12   A.  I remember that being explained to me, and I can

13 tell you what that was if you want me to.

14   Q.  No, I'm just asking whether you saw that in the

15 newspaper.

16   A.  Probably.

17   Q.  All right.  And you knew from your conversations

18 with Jim and Nancy that their house had been searched

19 several times?

20   A.  I can tell you how that was explained to me.

21   Q.  I'm just asking whether you knew that.

22   A.  Yes.

23   Q.  And you knew that the FBI was following them

24 around everywhere they went?

25         MR. SKROCKI:  Objection.  It's going to be

1   hearsay and speculation, foundation, and outside the

2   scope of direct, frankly.

3            THE COURT:  Well, I thought the parties have

4   agreed on some flexibility on that.

5            MR. SKROCKI:  He's going to have to stop

6   leading the witness.

7            THE COURT:  But in any event, the question that

8   you seek to ask is what, how she knew that the FBI was

9   following them around.  It's sustained insofar as you're

10  seeking to elicit hearsay.

11  BY MR. CAMIEL:

12    Q.  Did you know whether the FBI was following Jim

13  and Nancy around?

14           MR. SKROCKI:  I'm going to say it's going to

15  call for a hearsay objection, a lack of foundation.

16           THE COURT:  No, that's sustained.

17  BY MR. CAMIEL:

18    Q.  Did Jim Wells express to you feelings of being

19  upset that he was being followed around?

20           MR. SKROCKI:  Objection.  It's hearsay from the

21  defendant.

22           THE COURT:  That's sustained.

23  BY MR. CAMIEL:

24    Q.  You knew that in -- because of your relationship

25  with Nancy, you knew that in 2011, starting in the

```
 1   summer, fall of 2011, Jim was very sick, you knew that?
 2            MR. SKROCKI:  Objection; hearsay.
 3            THE COURT:  That's sustained.
 4   BY MR. CAMIEL:
 5      Q.  Did you know whether Jim Wells was sick in the
 6   latter part of 2011?
 7      A.  Are you asking me what I believed?
 8      Q.  No, I'm asking whether you were aware of that.
 9      A.  If I'm aware of it does that mean I believe it?
10      Q.  Well --
11      A.  So that's a kind of tricky question, because I
12   don't know what I can say.  Because there were a lot
13   of --
14      Q.  Do you know whether --
15            MR. SKROCKI:  She needs to answer the question.
16            THE COURT:  You asked her whether or not she
17   knew he was sick.  She's trying to answer.
18      A.  Idiopathic.  There was the word they used.  There
19   were a lot of idiopathic, and that was their word, Jim
20   and Nancy, idiopathic illnesses.  And those are illness
21   and don't make sense.  So was there another idiopathic
22   illness?  Maybe.
23      Q.  Did you ever -- did you know that Jim had surgery
24   in early 2012?
25      A.  I think I was aware of that.
```

```
 1      Q.  And did you know whether he missed a lot of work?

 2      A.  I did know he missed a lot of work.

 3      Q.  Now, you knew that Jim was a reader.  He read a

 4  lot of books.  You've seen him do that?

 5      A.  You mean paperbacks?

 6      Q.  Any kind of books.

 7      A.  They had a lot of books on a shelf in their

 8  house.  I don't think I saw him reading a lot of books.

 9      Q.  Did the FBI ever come to your house in 2012 to

10  serve Jim with papers?

11      A.  I don't remember that.  To my house?

12      Q.  Yes.

13      A.  It's possible.

14      Q.  The FBI also called you to talk about Jim Wells;

15  is that right?

16      A.  Yes.

17      Q.  And your knowledge about him?

18      A.  Yes.

19      Q.  And so based on those calls, you knew that he was

20  being investigated?

21          MR. SKROCKI:  Objection.  Judge, if we're going

22  to do direct, we should do direct.

23          THE COURT:  Is your objection leading?

24          MR. SKROCKI:  Yes, ma'am.

25          THE COURT:  That's sustained.
```

1   BY MR. CAMIEL:

2     Q.  What was your understanding of why the FBI was

3   calling you about Jim Wells?

4         MR. SKROCKI:  Speculation; objection.

5         THE COURT:  I'll overrule that.  You can go

6   ahead and answer that.

7     A.  Could you repeat the question, please.

8     Q.  Sure.  Why did you think the FBI was calling you

9   about Jim Wells?

10     A.  Because they might think I have some information

11   they needed.

12     Q.  Did they call you more than once?

13     A.  Yes.

14     Q.  Did they come to your house?

15     A.  Yes.

16         MR. CAMIEL:  Your Honor, that's all I have.

17         THE COURT:  All right.  Redirect?

18         MR. SKROCKI:  No, Your Honor.  Thank you.

19         THE COURT:  Thank you, ma'am.  You may be

20   excused.

21         (Witness excused)

22         THE COURT:  And your next witness, Mr. Skrocki.

23         MS. STEVENS:  Yes, Your Honor.  We are calling

24   Donald Kiele as our next witness.

25         (Pause)

THE COURT:  Good afternoon.  If you can come around the corner, there's a door there, the first door in, and come up to the witness stand.  If you could remain standing for just a moment, then the clerk will administer an oath to you.

(Oath administered to the witness)

DEPUTY CLERK:  For the record, can you please state your full name and then spell your full name.

THE WITNESS:  Donald Cecil Kiele, D-o-n-a-l-d, C-e-c-i-l, K-i-e-l-e.

THE COURT:  Thank you.  Go ahead, please.

MS. STEVENS:  Thank you, Your Honor.

DONALD CECIL KIELE, GOVERNMENT WITNESS, SWORN

DIRECT EXAMINATION

BY MS. STEVENS:

Q.  Good afternoon, Mr. Kiele.

A.  Hello.

Q.  Sir, where are you from?

A.  Wenatchee, Washington.

Q.  And how long have you lived there?

A.  Two years.

Q.  Sir, what do you do for work, if anything?

A.  I'm retired.

Q.  How long have you been retired?

A.  Six years.  You lose track of these things.

1     Q.   So long you forgot.  Fair enough.  What did you

2  do before you retired?

3     A.   I was in the shredding business.

4     Q.   Paper or --

5     A.   Paper.

6     Q.   Anything before that?

7     A.   I was in the shredding business for a long time.

8  I was in micrographics before that.

9     Q.   Are you married, sir?

10    A.   I am.

11    Q.   How did you meet your wife?

12    A.   I was in the Air Force.  I met a man who

13 eventually became her brother-in-law, introduced us and

14 we ended up married.

15    Q.   So how long have you two been married?

16    A.   48 years.

17    Q.   Impressive.

18         And what is your bride's name?

19    A.   Theresa.

20    Q.   Same last name?

21    A.   Kiele, yes.

22    Q.   Do the two of you have children?

23    A.   We do.

24    Q.   And who are they?

25    A.   Our daughter is Kristy.  Our son is Brian.

1    Q.  And do you have any other family here in court

2  today?

3    A.  I have -- the defendant, Jim Wells, is my

4  brother-in-law.

5    Q.  And so who is he related to biologically?

6    A.  He's Terry's brother.

7    Q.  So that makes you his brother-in-law?

8    A.  Correct.

9    Q.  To whom is he married, if anyone?

10    A.  He's married to Nancy.

11    Q.  And do you see her in court today?

12    A.  I believe she's over behind you.  Yes.

13    Q.  All right.  Can you describe the relationship

14  that you and your wife had with Jim and Nancy?

15    A.  We were in-laws and brother-sister on the other

16  side of it.  We did see them for years and years.  We

17  lived in -- both lived in Washington for a while.  He

18  moved up here in the Coast Guard.  Came back.  So we

19  spent time with them.

20    Q.  And how often would you say you guys visited with

21  each other?

22    A.  Well, we would see them at our house more than --

23  obviously, we didn't go to Kodiak very often.  We only

24  went once.  But they would stop and visit with us as

25  they were going through somewhere else.  We saw Jim

1   probably more than Nancy because he traveled more than

2   she did.

3       Q.  Do you know why he was traveling through to visit

4   you?

5       A.  When he was by himself, I would say most of the

6   time he was going for meetings, education to do with

7   tower climbing, teaching classes, that type of thing.

8       Q.  And can you give a rough estimate of how frequent

9   these encounters or visits were per year per se?

10      A.  Well, with both he and Nancy coming through, and

11  himself I would say at least two or three times a year.

12      Q.  And when he traveled for work and traveled

13  through on his way to his final destination, did he ever

14  have any work colleagues with him?

15      A.  Not at our house, no.  But I understand, you

16  know, a lot of times when he was going to work

17  situations, he would travel with Rich Belisle.

18      Q.  And did he ever mention Mr. Belisle to you?

19      A.  They worked closely together.  They worked

20  together for years, and generally he would show up and

21  Rich was meeting friends, because he used to live in

22  Seattle also, I believe.  And then they would get back

23  together at the airport and then travel on.

24      Q.  You mentioned you went to Kodiak one time.  Do

25  you recall when that was, sir?

```
 1      A.  You know, it was in the late nineties.  I want to
 2   say it was '98, but it was either '98 or '99, right in
 3   there.
 4      Q.  And when you visited Kodiak, where did you stay?
 5      A.  We stayed with them.
 6      Q.  At their residence?
 7      A.  At their house, yes.
 8      Q.  How would you describe their house?
 9      A.  It was large.  They had plenty of room, and they
10   had been building on it.  I'm -- it wasn't a brand-new
11   house.  It was older.  Outside of town a ways.  And I'm
12   not sure what you're looking for there.
13      Q.  Well, let me ask you another question.  What kind
14   of things did you see in the house?
15      A.  Well, they had the normal things.  He also had --
16   they had or he had done this always, his garage was full
17   of everything but cars.  And we all have messy garages,
18   but Jim had a lot of tools in his garage.  And he always
19   had lots of tools.
20      Q.  Apart from visiting in person, both, you know, at
21   one trip to Kodiak and then them traveling through and
22   you seeing Mr. Wells two to three times a year, did you
23   have occasion to also speak with them either over the
24   phone or some other way?
25      A.  Yeah.  There were phone calls lots of times.  It
```

seemed like whenever they were going somewhere they

would let us know, but there were just phone calls.

    Q.  Can you tell us a little bit more about that,

when they were going somewhere they would call and let

you know?  Can you explain to the jury what their

routine was?

    A.  My wife can probably tell you more about that.

            MR. COLBATH:  Your Honor, excuse me, I'm going

to object as to relevance, to historical travel routine.

            MS. STEVENS:  We can have a sidebar if you'd

like.

            THE COURT:  That sounds fine.  Let's do that.

            (Begin bench conference)

            THE COURT:  Go ahead, Ms. Stevens.

            MS. STEVENS:  Well, he's -- should I let

Mr. Colbath go first for the relevance argument?

            THE COURT:  How is it relevant?

            MS. STEVENS:  So they would always call -- Jim

would always call Don and Terry when they were

traveling, and this goes towards the vehicle, because

they would tell them, Don and Terry, they would have

somebody --

            THE COURT:  I'll allow the car moving, that's

fine, but make sure he understands --

            MS. STEVENS:  Jim's statements?

1          THE COURT:  Correct.

2          MR. COLBATH:  Well, Your Honor, I'm going to

3    object, because I don't -- first of all, with reference

4    to timeframe, obviously, this is not anything this

5    witness has knowledge of, other than statements.  And I

6    don't think it makes -- I think admissibility, it would

7    have to meet the rules under habit, and I don't think

8    that does.  I don't think this will.

9          I don't think they can lay the foundation for

10   that, and I don't think they can show admissibility,

11   particularly because it sounds like when they would

12   travel, meaning when Jim and Nancy Wells would travel

13   together, they did one thing related to their cars.

14   Obviously, this case does not involve that circumstance;

15   it involves the circumstance where Nancy Wells traveled

16   and Jim Wells didn't.

17          So what Jim Wells did with his cars or didn't

18   do with his cars while he was traveling is irrelevant.

19   He didn't travel in this case.  He was on Kodiak Island

20   the entire timeframe surrounding the murders.  So what

21   he may or -- what Wells may or may not have done with

22   their vehicles historically when the two of them

23   traveled together, as is described by Mr. Kiele on the

24   stand, is a completely different scenario and situation

25   than this case, even if we talk history.

```
 1          THE COURT:  Well, the objection is overruled.
 2   I do see that the Government can attempt to prove --
 3   bring in this testimony.  It's admission of party
 4   opponent, so it's not hearsay in terms of the habit.  I
 5   think that can be explored in cross.  And under 403, I
 6   don't see that any unfair prejudice substantially
 7   outweighs what does appear to be fairly limited
 8   probative value, but nonetheless, I'll allow it.
 9          MS. STEVENS:  And just based on his short
10   response, he did say, you know, it's probably better to
11   ask my wife.  For purposes of cumulativeness, I'll just
12   save that question for her, but the same argument we
13   would make.
14          THE COURT:  Okay.  And the same objection.
15          MR. COLBATH:  Absolutely.
16          (End bench conference)
17   BY MS. STEVENS:
18     Q.  Mr. Kiele, do you recall any regular instances
19   where Mr. Wells would contact you and your wife?
20     A.  He would call and let us know generally when he
21   was coming through town.
22     Q.  And did you come to learn that two people at the
23   Communications Station in Kodiak where your
24   brother-in-law worked had been murdered?
25     A.  Yes, we did.
```

1      Q.  And what was your reaction when you found out

2  about this?

3          MR. COLBATH:  Your Honor, I'm going to object

4  to relevance.

5          THE COURT:  I'll sustain that.

6  BY MS. STEVENS:

7      Q.  So after the murders in June of 2012, did you

8  have occasion to visit with the defendant?

9      A.  We did.

10     Q.  And can you tell the jury a little bit about

11  that?

12     A.  He and Nancy were coming through town on their

13  way to California to visit relatives there.  And they

14  called and asked if we'd like to meet them for dinner,

15  and we said yes.  So we did.  And after dinner was over,

16  we decided that we would go back to our house and have a

17  chance to talk a little bit.

18     Q.  Can you tell the jury why it was you decided to

19  have a chat back at your house?

20     A.  It was more private.  We didn't talk about

21  anything during dinner or anything of any value.  And

22  you know, we were very curious as to what happened.  And

23  so when we got back to our house, that's what we wanted

24  to talk about.

25     Q.  Okay.  So what happened next when you guys

1    returned to your home?

2    A.  Well, we sat down, my wife, I, Jim, Nancy, and

3    our daughter Kristy.  And we -- I asked Jim what

4    happened.  And Nancy started to answer, which she does a

5    lot, and I asked her not to.  I said, "I really would

6    like to hear from Jim what happened."  And so she was

7    quiet, and he had began telling us what happened that

8    morning.

9    Q.  Okay.  What did he say?

10    A.  He said he was on his way to work and had a flat

11    tire, so he pulled over at the airport and didn't have

12    the tools with him to change the flat tire.  And so he

13    went back home, and that was pretty much all he said.

14    And I looked at him, and it was pretty silent for

15    a couple of seconds.  And then he said, "Well, okay, I

16    shit myself."  "Okay.  Then what happened?"  "Well, I

17    got cleaned up and -- I went into the airport, got

18    cleaned up."  Came back out.  And now the tire was low,

19    not flat, and so he drove home to change it, because he

20    didn't have the tools to change the tire.

21    Q.  So let's dissect that just a little bit.  When he

22    told you that he didn't have the tools --

23    A.  Yes.

24    Q.  -- based on your just knowing him, how did that

25    statement make you feel?

```
 1          MR. COLBATH:  Your Honor, I'm going to object

 2   as to relevance.

 3          THE COURT:  That's sustained.

 4   BY MS. STEVENS:

 5      Q.  So after he told you this statement that he had a

 6   flat tire and then it switched to having a low tire, did

 7   he explain which one it was?

 8          MR. COLBATH:  Your Honor, I'm going to object

 9   to the form of the question.

10          THE COURT:  That's sustained.  You can

11   rephrase.

12   BY MS. STEVENS:

13      Q.  Sure.  The defendant told you two versions,

14   correct?

15      A.  Well, he had a flat tire and then a --

16          MR. COLBATH:  I'm going to object -- excuse me,

17   Mr. Kiele.  I'm going to object again as to the form of

18   the question, argumentative.

19          THE COURT:  That's sustained.

20   BY MS. STEVENS:

21      Q.  Did you ever learn of a reason about the -- did

22   you ever learn the true version -- okay.  I'll withdraw.

23          How did Mr. Wells explain to you -- how did he

24   explain his tire to you?

25      A.  What I've already told you, that he had a flat
```

1    tire and then he drove home to change it.  But it

2    couldn't have been flat if he drove home to change it,

3    so --

4         Q.   What was his explanation about that?

5         A.   There really wasn't an explanation.

6         Q.   And what was his explanation about not having the

7    tools?

8         A.   He just said he didn't have the tools to do that,

9    to change it.

10        Q.   Did he say where in the airport he changed his

11   soiled pants?

12        A.   He did not.

13        Q.   Did he mention anything else about the soiled

14   clothes?

15        A.   He said he took them home and put them in a

16   plastic bag and put them in the closet.

17        Q.   Did he make mention of his wife's car during this

18   conversation?

19        A.   Later in the conversation, yes, we talked about

20   that.

21        Q.   Okay.  Can you tell the jury what he said about

22   the vehicle?

23        A.   He said that Nancy's car was left at the airport

24   with the keys in the ashtray.

25        Q.   Did he say anything else about that?

1      A.  It was Kodiak, you could do that.  No one would

2  ever take your car.

3      Q.  Based on your knowledge and your relationship,

4  did you have a reason to believe whether this was common

5  practice for the Wells?

6      A.  To leave --

7          MR. COLBATH:  Your Honor, I would have the same

8  objection as I had.

9          THE COURT:  And that's overruled.  Go ahead.

10     A.  Okay.  Please repeat.

11     Q.  Did you have reason, any reason to believe

12 whether leaving the keys in the car at the airport was a

13 common practice for the Wells?

14     A.  I would say I have no reason to believe it was

15 common practice.  Normally they would drop each other

16 off at the airport, or at least that's what they would

17 say in a phone call and that someone was leaving and "I

18 dropped Jim off this morning, I dropped Nancy off this

19 morning."  So you know, I'm not there.  I don't know if

20 they left the car there on multiple occasions or not.

21     Q.  At any point during this visit in June, did the

22 family express condolences to the victims?

23     A.  Yes.

24         MR. COLBATH:  Your Honor, I'm going to object

25 as to calling for hearsay.

1          THE COURT:  That's sustained.

2          MS. STEVENS:  We can have a sidebar on this, if

3    you'd like.

4          THE COURT:  The family expressed condolences.

5          MS. STEVENS:  So there was a member of the

6    family present that expressed condolences and so --

7          THE COURT:  So it's not for the truth of the

8    matter?

9          MS. STEVENS:  It's not for the truth of the

10   matter, and it's for the effect on the listener.

11         THE COURT:  Do we need to have a sidebar on

12   that?

13         MR. COLBATH:  No.  Same objection.

14         THE COURT:  I'll allow that.  Go ahead.

15   BY MS. STEVENS:

16      Q.  So did anybody in your family express condolences

17   to the victims' families?

18      A.  My daughter did.  She said, "I am so sorry for

19   your dear friends and their families.  How are they

20   doing?"

21      Q.  And what was his response?

22      A.  Unexpected.  His response was, "They are not my

23   friends.  They were not my friends.  I hardly know

24   them."  And then he went into a rant of, "They were

25   unqualified to work there.  I taught them everything

they know.  They're not electronic technicians.  They're
not electricians.  They're not anything.  Rich was a" --
I mean, this just went on.  Rich was a drunk and he
didn't like them.  They had nothing to do with them.
That's pretty much the extent of that.

Q.  And what was his physical reaction?  How did you
observe him physically during this statement?

A.  Well, he tensed up.  Kind of sat on the edge of
the couch and let us have all this information.

Q.  Did he express any sadness or empathy?

A.  No.

MS. STEVENS:  Your Honor, I don't have any more
questions.

THE COURT:  All right.  Mr. Colbath?

MR. COLBATH:  Just one minute, Your Honor.

THE COURT:  Certainly.

(Pause)

CROSS EXAMINATION

BY MR. COLBATH:

Q.  Good afternoon, Mr. Kiele.

A.  Yes.

Q.  My name is Gary Colbath.  I don't think you and I
have met or talked, have we, sir?

A.  I don't believe so.

Q.  Last time you were in Kodiak or you would have

1  visited with Jim and Nancy would have been prior to the

2  year 2000 you think probably?

3      A.  Correct.

4      Q.  And so I guess that is -- is a fair assumption

5  then that as far as firsthand knowledge or anything

6  about what happened up here 12 years later, in 2012, you

7  don't have any specific knowledge of any of that stuff,

8  right?

9      A.  Correct.

10     Q.  And also, if I understand right, far more of the

11 telephone conversations or contact with both Jim and

12 Nancy were with your wife, Jim's sister, than with you,

13 it sounds like?

14     A.  That's correct.

15     Q.  And I'm sure you got bits and pieces of that

16 through her and then had some less conversations

17 yourself?

18     A.  Very few less conversations myself, yes.

19     Q.  Okay.  And this meeting in June would have been

20 June of 2012 where these conversations in person at

21 dinner, after dinner back at your house --

22     A.  Correct.

23     Q.  -- that would have been the first time you had

24 spoke to Jim it sounds like since the occurrence of the

25 murders in 2012?

1    A.  That's not correct.

2    Q.  Okay.  You had talked to him on the phone, you

3  personally had talked to him on the phone --

4    A.  Yes.

5    Q.  -- prior to that?

6       But apparently, you hadn't had the discussion

7  about anything that went on, because you said when you

8  had this meeting, you were curious about what had

9  happened?

10   A.  Correct.

11   Q.  And at that point, June of 2012 -- well, strike

12  that.

13      Mr. Wells passed through one other time, as I

14  understand it, after June of -- June of 2012?

15   A.  He did.

16   Q.  Were you there then and visit with him or see him

17  at all on that occasion?

18   A.  There were actually two times.  One was a little

19  over a week later, I believe it was July 7th, when they

20  came back from California.

21   Q.  Right.  But that was part of their same -- that

22  same trip you said on the way down, they were headed to

23  California, Nancy had other relatives there, her mom?

24   A.  Right.

25   Q.  And then on that same trip, they stopped on the

```
1   way back, but then they went to Kodiak, correct?

2       A.  That's correct.

3       Q.  Then, as I understand it, Jim stopped one other

4   time alone as he traveled through briefly?

5       A.  That's correct.

6       Q.  Did you meet with him on that occasion or have a

7   conversation at all with him on that occasion?

8       A.  Very brief, but yes.

9       Q.  Okay.  That's all I have for you, sir.

10          THE COURT:  Redirect?

11          MS. STEVENS:  No, Your Honor.

12          THE COURT:  Thank you, sir.  You may be

13  excused.

14          (Witness excused)

15          THE COURT:  Your next witness.

16          MS. STEVENS:  Your Honor, the Government calls

17  Ms. Theresa Kiele next.

18          THE COURT:  All right.

19          (Pause)

20          THE COURT:  Good afternoon.  If you could come

21  around the corner up to the witness stand.  When you get

22  there, remain standing, if you would, and the clerk will

23  administer an oath to you.

24          (Oath administered to the witness)

25          DEPUTY CLERK:  For the record, can you please
```

1   state your full name and then spell your full name.

2           THE WITNESS:  Theresa Ann Kiele, T-h-e-r-e-s-a,

3   A-n-n, K-i-e-l-e.

4           THE COURT:  Thank you.  Go ahead, please.

5       THERESA ANN KIELE, GOVERNMENT WITNESS, SWORN

6                   DIRECT EXAMINATION

7   BY MS. STEVENS:

8       Q.  Mrs. Kiele, there's a microphone right in front

9   of you.  So to the extent you can get close to it to

10  talk in, that would be great.  So we just learned that

11  you're married to Donald and you've been married for

12  48 years?

13      A.  Yes.

14      Q.  And do you know the defendant in this case?

15      A.  Yes.

16      Q.  How do you know him?

17      A.  He's my brother.

18      Q.  And is he your only sibling?

19      A.  No.

20      Q.  And where are you as far as age?  Are you close

21  or far apart?

22      A.  Close.  One year.

23      Q.  Now, obviously, you're here testifying on behalf

24  of the Government.  Is this easy for you today?

25      A.  No.

1    Q.   How are you feeling right now?

2    A.   Okay.

3    Q.   There's water up there, so if you need water feel

4    free to grab it.

5         So as kids, growing up, were you guys close?

6    A.   Yes.

7    Q.   And growing up, did you observe your brother

8    having any interests, any specific interests as a kid?

9    A.   Yes.

10   Q.   What was that?

11   A.   He liked tools.  He liked a lot of -- he liked

12   doing things with them.

13   Q.   And have you remained close as adults?

14   A.   Uh-huh.  Yes.

15   Q.   And who is he married to?

16   A.   Nancy Wells.

17   Q.   Did you see them frequently?

18   A.   Fairly frequently.  Like a few times a year.

19   Q.   And would your brother ever stop in and visit by

20   himself without his wife?

21   A.   Yes.

22   Q.   And do you recall the occasions for when he would

23   do that?

24   A.   When he was traveling for business, for his job.

25   Q.   Did you know what he did for work?

1    A.   Yes.

2    Q.   Can you tell the jury what he did?

3    A.   He worked on the towers up at the COMMSTA at T-2.

4    Q.   And how did he appear to feel about his job?

5    A.   I think he loved his job.

6    Q.   Would you also talk to him -- or can you tell the

7 jury how often you would talk to him over the phone?

8    A.   A lot of times when they were going to travel, we

9 would talk.  Or if there was something going on in one

10 of our families, we would talk.  Sometimes I would call

11 him at the building.

12    Q.   Tell the jury a little bit more about when he

13 would call while he was traveling.

14    A.   Just let me know a lot of times that he would be

15 coming through Seattle.  And if he had a layover or

16 extra time he would come by, sometimes stay, sometimes

17 not.

18    Q.   And did you ever have occasion to visit him?

19    A.   Once.

20    Q.   Tell the jury about that trip.

21    A.   We flew up to Kodiak or came to Anchorage, then

22 flew over to Kodiak and went and saw them.  Took a tour

23 of the island, as much as you can take over there, the

24 roads.  And saw their house, and he gave us a tour

25 around Kodiak.

1    Q.  And did you stay at his house?

2    A.  Yes.

3    Q.  Did you observe anything -- a lot of a specific

4    thing at his house?

5    A.  The only thing that I thought was interesting is

6    his garage.  It was full to the brim.  More stuff than I

7    had ever seen.  There was a lot of stuff in there.

8    Q.  What kind of stuff?

9    A.  Some of it I'm sure I couldn't even see.  There

10   was just all kinds of things.  I think there was tools.

11   There was just stuff all piled up.

12   Q.  As an adult, did he share the same interests he

13   had as a child in tools?

14   A.  I think so.

15   Q.  And did you have an occasion to -- at some point,

16   did you come to learn that there was a murder at his

17   work?

18   A.  Yes.

19   Q.  And after the murders, did your brother and his

20   wife have occasion to visit you in June of 2012?

21   A.  Yes.

22   Q.  Can you tell the jury a little bit about that

23   visit?

24   A.  They had called us from Kodiak, and they were

25   coming down to go to California to see Nancy's family

```
1   and her mom and wanted to stop and have dinner with us
2   and see us.
3       Q.   What did you guys do next?  What did you do?
4       A.   We went to our house after that.
5       Q.   What was the reason for going back to your house?
6       A.   He said he would talk to us.  He wanted to talk
7   to us about -- just said he would talk to us when we
8   were there.
9       Q.   Did you have an understanding of what it was he
10  wanted to talk to you about?
11      A.   Not -- we were hope -- well, we were hoping we
12  would hear what happened in Kodiak.
13      Q.   Okay.  So when you get back to the house, can you
14  enlighten the jury as to how that conversation took
15  place?
16      A.   We were in our family room.  And he and Nancy
17  were on the couch, and my husband and I were sitting in
18  chairs.  And my daughter was there.  And she was sitting
19  on the floor.  And my husband asked to know exactly what
20  happened up there.
21      Q.   What did your brother say?
22      A.   He just started talking about the day of the
23  murders and --
24      Q.   What did he say about it?  Did he say where he
25  was?
```

 1    A.  He said that he had driven and stopped at the

 2  airport, and he was -- got out and he noticed that he

 3  had a low tire or a flat tire.  A low tire I thought is

 4  what he said and -- but he said he didn't have any tools

 5  for it.

 6       And then he talked about -- we kind of looked at

 7  him like, okay, what else, you know, what else was

 8  there.  And he said he shit his pants.  And I think he

 9  said he went into the airport and came back out and

10  looked at his tire and decided he was going to head home

11  and change it.

12    Q.  What happened next?

13    A.  Just conversations about that he drove home,

14  changed his tire.  I think he was -- I think he said he

15  got a phone call and had to go back to work and put

16  his -- said he put his clothes in a bedroom in a bag,

17  his clothes that were soiled.

18    Q.  And did he later make any comment about that bag

19  of clothes?

20    A.  Yes.

21    Q.  What was that?

22    A.  That the FBI had searched his house and the

23  clothes were in a closet, I believe, and they had never

24  found them or they hadn't seen them.  And he said they

25  were there the whole time and --

1    Q.  Did he make any other statements regarding the

2  investigators?

3    A.  Well, I'm not sure what you're referring to.

4    Q.  Did he make any other references to the

5  capabilities of the investigators?

6    A.  Yes.

7        MR. COLBATH:  Your Honor, I'm going to object

8  as to leading.

9        THE COURT:  I'll allow it.  Go ahead.

10    A.  Yes.  He didn't care for the investigators.  He

11  didn't care for the FBI.  He pretty much thought they

12  were inept and they were -- I can't think of anything

13  nice that he actually said about them really.

14    Q.  So what was your reaction to his statement?

15        MR. COLBATH:  Your Honor, I'm going to object

16  as to relevance.

17        THE COURT:  That's sustained.

18  BY MS. STEVENS:

19    Q.  What was his physical appearance while he was

20  making this statement?  How did he look?

21    A.  So far he looked okay.  And nothing unusual when

22  he was really talking about the FBI.

23    Q.  So did this conversation into the murders

24  continue?

25    A.  Yes.

1    Q.  Okay.  What did you guys talk about next?

2    A.  God, there's so many different things.  Well,

3 ended up talking about the two men that had died and --

4    Q.  Tell the jury more about that specific piece.

5    A.  Well, it was asked how he felt about the families

6 and the victims.  And then he got very agitated and

7 upset about it and got on the edge of the couch and got

8 very animated in his expressions and hands.  Was very,

9 very angry and just started in telling us about --

10 because we thought the two men were -- I thought they

11 were close friends.

12    And he said they weren't friends.  And then he

13 said they were -- they didn't know anything about their

14 jobs.  He had trained them.  He had taught them

15 everything.  They weren't technicians.  They weren't --

16 didn't know enough about their jobs.  My mouth is dry.

17    Just had real disdain toward the men.  And there

18 was nothing about them that was anything nice.  It was

19 pretty shocking.  Very shocking.

20    MS. STEVENS:  Your Honor, I don't have any more

21 questions.  Thank you.

22    THE COURT:  Mr. Colbath?

23    MR. COLBATH:  Sure.  Thank you, Your Honor.

24 Just finish my note here.

25    THE COURT:  Take a moment.

1          (Pause)

2                    CROSS EXAMINATION

3   BY MR. COLBATH:

4       Q.  Good afternoon, Mrs. Kiele.  You said that you

5   and Jim had other siblings.  How many other siblings do

6   you have?

7       A.  There are seven children, so -- total, so six

8   others.

9       Q.  Seven total?

10      A.  Uh-huh.

11      Q.  And where does Jim fall in range of the seven?

12      A.  He's number three.

13      Q.  And you are one year older or one year younger?

14      A.  One year younger.

15      Q.  And all your other siblings live in the Lower 48,

16  Jim is the only one here in Alaska?

17      A.  Yes.

18      Q.  And you and your husband, Don, have been married

19  48 years.  How long have Jim and Nancy been married?

20      A.  Just right behind us a couple years, I think.

21      Q.  47, 46?

22      A.  Uh-huh.  46 or 47.  I think it's -- might be one

23  year or two at the most.

24      Q.  Runs in the family, apparently.

25          This conversation that happened in June, that

1  would have been the first time that you had seen Jim

2  since the murders had occurred, right, physically seen

3  him since the murders had occurred?

4      A.  Yes.

5      Q.  And he told you he was going to work that morning

6  and got as far as the airport, and that's when he had

7  this low tire?

8      A.  Uh-huh.

9      Q.  She's typing them down, so you just have to say

10  yes or no.

11      A.  Oh, yes.  Uh-huh.

12      Q.  Thank you.  And it was while he was out of the

13  car that, as he described it to you, he had shit his

14  pants, that caused him to go into the airport somewhere

15  and clean up and then he came out and made the decision

16  at that point, seeing the low tire, to go back home to

17  change it?

18      A.  Yes.

19      Q.  That was the basic explanation you got?

20      A.  Basically, yes.

21      Q.  And you were certainly aware from even as far as

22  back as your trip in 1998 that there was a garage full

23  of tools and all kinds of stuff at home?

24      A.  Yes.  Everything in the world in there.

25      Q.  Sure.  We've seen pictures of that, so it's no

1    surprise to anybody.

2        A.   Okay.

3        Q.   And then after sort of the discussions about the

4    morning events and that day, it sounds like it was your

5    daughter that had asked or said something about the men,

6    Mr. Belisle and Mr. Hopkins, who had been shot and their

7    families and things going on.  It was her that asked,

8    right?

9        A.   Yes.

10       Q.   And that's when -- that's when Jim became

11   agitated about somebody asking about how those people

12   were doing or the families were doing.  Obviously,

13   Mr. Belisle and Mr. Hopkins had been murdered, but --

14       A.   Yes.

15       Q.   -- how the families were doing, right?

16       A.   Yes.

17       Q.   And he had not discussed or had not been asked I

18   guess how he and Nancy were faring with the whole

19   investigation and the whole turmoil on Kodiak.  That

20   conversation hadn't made it that far yet, had it, at

21   that point?

22       A.   Not at our house, no.

23       Q.   That was mentioned earlier when you were out to

24   dinner at the --

25       A.   No.  It was --

1    Q.  All right.  I'll -- let's see.

2        Now, after that conversation, as I understand it,

3  Jim and Nancy left, would have been that next day,

4  continuing on to go see her mother?

5    A.  Uh-huh.  Yes.

6    Q.  And then stopped back by on their way back

7  through?

8    A.  Yes.

9    Q.  And then Jim stopped briefly one other time while

10  he was traveling alone later in the summer, your husband

11  told us?

12    A.  Yes.

13    Q.  But that was a short trip, short trip through for

14  Jim?

15    A.  Yes.

16    Q.  And no conversation about the events of

17  April 12th or anything to do with the actual events of

18  that day?

19    A.  Not that day.  Other --

20    Q.  That's all I have then for you, ma'am.  Thank

21  you.

22        THE COURT:  Redirect?

23        MS. STEVENS:  One second, Your Honor.

24        THE COURT:  Take a moment.  That's fine.

25        (Pause)

1           MS. STEVENS:  No questions, Your Honor.

2           THE COURT:  Thank you, ma'am.  You may be

3    excused.

4           (Witness excused)

5           (Requested excerpt concluded, proceedings

6    continued.)

7

8                       CERTIFICATE

9       I, Sonja L. Reeves, Federal Official Court Reporter
     in and for the United States District Court of the
10   District of Alaska, do hereby certify that the foregoing
     transcript is a true and accurate transcript from the
11   original stenographic record in the above-entitled
     matter and that the transcript page format is in
12   conformance with the regulations of the Judicial
     Conference of the United States.
13
        Dated this 29th day of September, 2019.
14

15
                         /s/ Sonja L. Reeves
16                       SONJA L. REEVES, RMR-CRR
                         FEDERAL OFFICIAL COURT REPORTER
17

18

19

20

21

22

23

24

25