```
 1                 UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF ALASKA
 2

 3   UNITED STATES OF AMERICA, )
                               )
 4        Plaintiff,           )
                               )
 5   vs.                       )   CASE NO. 3:13-cr-00008-SLG
                               )
 6   JAMES MICHAEL WELLS,      )
                               )
 7        Defendant.           )
     _____)
 8

 9       PARTIAL TRANSCRIPT OF TRIAL BY JURY - DAY 2
               (Opening Statement of Government)
10     BEFORE THE HONORABLE SHARON L. GLEASON, DISTRICT JUDGE
                   September 10, 2019; 8:37 a.m.
11                       Anchorage, Alaska

12   FOR THE GOVERNMENT:
         Office of the United States Attorney
13       BY:  STEVEN SKROCKI
         BY:  CHRISTINA M. SHERMAN
14       BY:  KELLEY L. STEVENS
         222 West 7th Avenue, #9
15       Anchorage, Alaska 99513
         (907) 271-5071
16
     FOR THE DEFENDANT:
17       Office of the Federal Public Defender
         BY:  GARY GEORGE COLBATH
18       601 West 5th Avenue, Suite 800
         Anchorage, Alaska 99501
19       (907) 646-3400

20       Camiel & Chaney, P.S.
         BY:  PETER A. CAMIEL
21       520 Pike Street, Suite 2500
         Seattle, Washington 98101
22       (206) 624-1551
     _____
23
                    SONJA L. REEVES, RMR-CRR
24              Federal Official Court Reporter
                   222 West 7th Avenue, #4
25                 Anchorage, Alaska 99513
       Transcript Produced from the Stenographic Record
```

1     (Call to Order of the Court at 8:37 a.m.)
2     (Proceedings took place that are not included
3  in this Partial Transcript, after which, proceedings
4  continued as follows:)
5                    OPENING STATEMENT.
6     MS. SHERMAN:  May it please the Court, counsel,
7  ladies and gentlemen of the jury.  On the morning of
8  April 12, 2012, the defendant executed a carefully
9  constructed plan.  He got up that morning.  He got in
10 his white truck.  He drove to the Kodiak airport.  He
11 got into his wife's blue SUV.  It was parked there
12 because she was out of town.
13     He drove that blue SUV up to the COMMSTA, up to
14 the rigger shop where he worked.  He entered that
15 building, and he murdered Rich Belisle and Jim Hopkins
16 with a .44 caliber revolver.
17     He got back in that blue SUV, went back to the
18 airport, got back in his white truck, drove home and
19 constructed an alibis.
20     This case takes place on the Island of Kodiak.
21 This is a map of the general area.  A big part of the
22 community in Kodiak is the Coast Guard.  There's a main
23 base.  There's quite a few Coast Guard members.  And the
24 base actually has two areas.  As you can see, there is
25 the main base, and then there is also the COMMSTA.

1     So COMMSTA is short for Communication Station.
2 You're going to here a lot of the Coast Guard witnesses
3 testify that they worked at the COMMSTA.  So there is
4 the main base and the COMMSTA, and those are the two
5 areas that you're going to hear quite a bit about.
6     In between those is the airport.  Now, if you
7 were to take West Rezanof Drive up, you're going to end
8 up up here.  That's where the city of Kodiak is.  If you
9 take West Rezanof down it turns into the Chiniak
10 Highway, and that's a residential areas known as Bells
11 Flats, and that's going to become important as well.
12     The COMMSTA is small.  It's just two buildings.
13 It's where mariners can call in distress calls and they
14 can dispatch out assistance.  Communications, that's
15 their primary function.
16     There is the main building, which is this
17 longer white building, and you will hear that referred
18 to as T-1.  It's the main building.  It has offices in
19 it.  It has a lot of electronic equipment.  It also has
20 an operations deck where there is security cameras and
21 they are taking the calls.  All of that is in this large
22 building.
23     As you can see, there is antennas, and those
24 are maintained by the individuals who work here in the
25 rigger shop.  It's a smaller building.  It has a lot of

4

1    tools, has a lot of heavy machinery to address snow and
2    grass and has chain saws, things to take care of and
3    maintain the antenna fields.  It also has rigging
4    equipment for when they had to climb the towers.
5            There is several security cameras.  You're
6    going to hear about a camera right about here.  It
7    points this way and it captures the back of the rigger
8    shop and a portion of the road.
9            And you're going to hear about another camera
10   that's actually on the rigger shop itself and it points
11   out this way.
12           This is the rigger shop.  This is the front
13   area.  As you can see, the antennas are still in the
14   background.  It has a couple garages.  You can pull in
15   there.  They can work on equipment in there.
16           This building is where Rich Belisle and Jim
17   Hopkins were murdered on April 12, 2012.
18           There were quite a few people who worked up in
19   T-1, but the group of people who worked in the rigger
20   shop was much smaller.  And you're going to hear me and
21   everyone else say rigger shop, T-2.  That's the same
22   building, that's this building.
23           Scott Reckner was the chief and he actually had
24   an office up in T-1, but because of issues that were
25   going on with the defendant, he actually moved down and

had a desk in the rigger shop. He was the chief. He was the big boss in charge of this group.

The supervisor of the rigger shop was Jim Hopkins. This is him. Jim Hopkins was a hard worker. You're going to hear he'd work alongside his men. He won enlisted person of the year for the Coast Guard for 2011.

You will also hear about Cody Beauford who worked in the rigger shop. He was an electronic technician third class, and his job was to supervise the non-rates. He was 19 years old, but he supervised four individuals. The non-rates are individuals who are new to the Coast Guard. They are often known as seamen. They are brand-new, and they haven't gone to a school so they haven't been given a rating yet. And there were four, and those four you're going to hear from as well.

The defendant worked in the rigger shop. He had worked there for a couple decades. He was a retired chief. And the other civilian was Rich Belisle. This is Rich Belisle. He was a civilian. He had worked there about eight years.

The morning of April 12, 2012 started like any other morning. Rich Belisle got up, he made his wife coffee, he poured his coffee into his silver and green Stanley mug like he did every day, and he rapped on the

1  window as if to say good-bye as he headed off to work.
2  He arrived in the rigger shop at 7:00 a.m.
3          The timeline in this case is going to be very
4  important. Rich Belisle arrived at 7:00 a.m. to the
5  rigger shop and he entered through this door. There is
6  a keycard, a swipe card required, and the first person
7  who had arrived that day, often Rich, would go in
8  through that door. And then he walked around and he
9  unlocked this door. And everyone who arrived after him
10 would enter through this door to start their workday.
11 He went to work on his computer in the office, started
12 checking his e-mail.
13         Jim Hopkins, the supervisor, got up like every
14 other morning and drove to work in his family's vehicle.
15 He arrived at the rigger shop at 7:08. He entered
16 through that unlocked door right here. And he was in
17 the Coast Guard, and, at that time, they had a blouse
18 and you had to roll your sleeves a certain way. The
19 best place for him to do that was in the break room at
20 the table.
21         The defendant also headed to work that morning.
22 He drives a white truck. It has a canopy. It has three
23 windows. You're going to hear everyone could identify
24 everyone else's car. It's common in a small workplace.
25 You know everyone who is working there.

1        He headed to work.  At 6:48, he passes the main
2   base gate.  That's his vehicle.  We'll talk about the
3   time on there, but at 6:48 a.m., he passes the main base
4   gate, before Rich Belisle, before Jim Hopkins, and he
5   heads up to the COMMSTA -- or heads to the airport,
6   excuse me.  He passes that gate, goes to the airport,
7   gets in his wife's blue SUV.  And at 7:09, that blue SUV
8   heads towards the rigger shop.  This is the camera we
9   were talking about that looks at those back windows.
10  That's at 7:09.
11       At 7:10, we know Rich Belisle was checking his
12  e-mail for the very last time.  At 7:12, Don Rudat was
13  out for a morning walk, and at 7:12, he hears a sound
14  that sounds like a metal grate dropping on concrete.
15       Between 7:10 and 7:14, Rich Belisle is shot by
16  the defendant multiple times with a bullet lodging in
17  his neck.  And Rich is shot here in the office.  Jim
18  Hopkins is shot here.  Near to the door, facing his
19  killer, he's shot in the face.
20       At 7:14, that same blue vehicle heads away from
21  the rigger shop and it returns to the airport.  It parks
22  in an area that was different from where the vehicle was
23  initially.  When his wife left town, the vehicle was
24  closer to the Alaska Airlines area, and you will hear
25  that that vehicle had moved.

8

         The defendant heads home.  He's seen heading
into Bells Flats.  He passes the main gate at 7:22.
From 6:48 to 7:22 is 34 minutes that are going to become
very important in this case.
         He's seen at about 7:25 driving into Bells
Flats.  And at 7:30 he's calling Jim Hopkins, who is
already dead, claiming he had a flat tire.  And he
leaves a similar message for Scott Reckner.
         And around the same time he's leaving these
voicemails, the other Coast Guard members start to show
up.  19-year-old Cody Beauford shows up to work, walks
into the rigger shop, and he sees Jim Hopkins on the
ground and there is a lot of blood.  And his first
thought is they must be playing a prank on me.  So he
goes to the office and he finds Rich Belisle facedown
and he's not moving.
         Cody thinks this has to be a prank because it
can't possibly really be happening.  In fact, he meets
Aaron Coggins, one of the non-rates, at the door and
says, "Is this a prank," but it wasn't a prank.  It was
real.  Real blood, real gunshot wounds, and the real
smell of gun powder hanging in the air of the rigger
shop.
         Cody Beauford calls up to T-1 for help.  And
the medics arrive and announce what Cody already knows,

both men are dead.

The defendant was supposed to be at work that morning but he wasn't. And when his colleagues were murdered, everyone wanted to know where he had been.

Now, over the course of the last year, in 2011, the defendant had been having issues in the rigger shop. He had received a memo of expectation because he wasn't complying with the rules. He had received a letter of caution relating to an investigation on the misuse of a fuel card. He was being counseled by his supervisors who were trying to get him to fall in line and he was being resistant.

During that same period of time, he was gone for a while. And while he was gone, Jim Hopkins and Rich Belisle and the other rigger shop employees stepped up and they learned to do his job, and they could do his job without him.

In fact, just the day before the murders, there was a conversation on the top of T-1, and you will get to see part of that. And the defendant makes a suggestion on how they should run a wire and Rich Belisle makes a suggestion as well, and the defendant's idea is dismissed and Rich Belisle's idea chosen.

On the morning of April 12, 2012, the defendant finally shows back up to the COMMSTA at 8:30 in his

1  white truck, and, at that time, he would tell anyone who
2  would listen his alibi. When he arrived on scene and he
3  is told his colleagues are dead, his response, "I had a
4  flat tire."
5  He told the investigators his tire was low and
6  he turned around near the airport, and even brought a
7  tire with him that had a nail in it in the back of his
8  truck.
9  Now, investigators saw this blue car and one of
10 them thought maybe someone is trying to get off the
11 island. It's Kodiak, it's small and isolated and the
12 only way to get off the island is by an airplane or the
13 ferry. So he drives down to the airport and he starts
14 taking photos of all the blue vehicles at the airport.
15 And he finds one of those vehicles is the
16 Wells' 2001 blue Honda CR-V. It's parked not where it
17 was on April 10th. It's parked further away.
18 You're also going to hear that on the morning
19 of the murders that security footage you saw, they
20 looked at it and they were able to identify every single
21 vehicle that drove past that camera that morning except
22 for that blue SUV. A lot of them are Coast Guard
23 members. There was a guy who was going to check the
24 snow at the golf course. Everyone is identified except
25 that blue SUV.

When the investigators asked the defendant to explain what he was doing in that 34-minute gap, in his trips past the main base gate, why it took 34 minutes for him to realize his tire was low, stop, check it and drive home, his response, and you will hear it, "I don't have a reasonable explanation for that," and he didn't.

But you will hear how his explanation has expanded and changed over time. You're going to hear from some witnesses who weren't involved in this case initially, but who were asked to review the evidence, who were asked to do some testing. Their job is going to be to help you interpret the evidence.

And one of those is Gary Bolden. Gary Bolden is a tire guy. He's going to tell you he took a look at that tire, and he's going to tell you in his opinion that nail was never driven on.

And you will hear from Brett Mills, an FBI forensic analyst, and he's going to tell you that that nail appears to have been inserted manually by a nail gun.

You're also going to hear from individuals who analyzed the video, who looked closely at those images, and they are going to tell you that the vehicle, that blue vehicle, is consistent with the Wells' 2001 blue Honda CR-V.

```
 1          You're going to hear in this case about the
 2  depth of the investigation, how many interviews were
 3  done, the sheer volume of the vehicles they looked at,
 4  that they looked everywhere for the gun that the
 5  defendant had ditched.  You're also going to hear that
 6  everyone else involved in that rigger shop was able to
 7  explain what they were doing that morning in great
 8  detail.
 9          You're going to hear that all the evidence
10  points to the defendant as the murderer.  Now, this
11  isn't CSI.  There is not going to be bloody footprints
12  or bloody fingerprints that tie the defendant to the
13  murder.  Like I said, you won't see the gun.  But what
14  you are going to hear is fact upon fact upon fact that
15  overwhelmingly proves beyond a reasonable doubt that the
16  defendant committed these murders.
17          At the conclusion of this case, my colleague
18  will stand before you and he's going to explain how when
19  you take the facts and you apply the law that the judge
20  will give you the defendant is in fact guilty.  He's
21  guilty of the murders of Rich Belisle and Jim Hopkins.
22  And at that point, we will ask you to find him guilty on
23  each and every count.
24          Thank you.
25
```

```
1                         CERTIFICATE

2      I, Sonja L. Reeves, Federal Official Court Reporter
   in and for the United States District Court of the
3  District of Alaska, do hereby certify that the foregoing
   transcript is a true and accurate transcript from the
4  original stenographic record in the above-entitled
   matter and that the transcript page format is in
5  conformance with the regulations of the Judicial
   Conference of the United States.
6
       Dated this 1st day of October, 2019.
7

8
                              /s/ Sonja L. Reeves
9                             SONJA L. REEVES, RMR-CRR
                              FEDERAL OFFICIAL COURT REPORTER
10
```