UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

UNITED STATES OF AMERICA, )
                               )
        Plaintiff,             )
                               )
vs.                            )    CASE NO. 3:13-cr-00008-SLG
                               )
JAMES MICHAEL WELLS,           )
                               )
        Defendant.             )
_____)

PARTIAL TRANSCRIPT OF TRIAL BY JURY - DAY 17
(Testimony of James Michael Wells)
**BEFORE THE HONORABLE SHARON L. GLEASON, DISTRICT JUDGE**
October 1, 2019; 8:43 a.m.
Anchorage, Alaska

**FOR THE GOVERNMENT:**
        Office of the United States Attorney
        BY:  STEVEN SKROCKI
        BY:  CHRISTINA M. SHERMAN
        BY:  KELLEY L. STEVENS
        222 West 7th Avenue, #9
        Anchorage, Alaska 99513
        (907) 271-5071

**FOR THE DEFENDANT:**
        Office of the Federal Public Defender
        BY:  GARY GEORGE COLBATH
        601 West 5th Avenue, Suite 800
        Anchorage, Alaska 99501
        (907) 646-3400

        Camiel & Chaney, P.S.
        BY:  PETER A. CAMIEL
        520 Pike Street, Suite 2500
        Seattle, Washington 98101
        (206) 624-1551
_____

**SONJA L. REEVES, RMR-CRR**
Federal Official Court Reporter
222 West 7th Avenue, #4
Anchorage, Alaska 99513
Transcript Produced from the Stenographic Record

1          (Call to Order of the Court at 8:43 a.m.)

2          (Proceedings took place and are not included in

3    this transcript, after which, the testimony of James

4    Michael Wells transpired as follows:)

5          (Oath administered to defendant)

6          DEPUTY CLERK:  For the record, can you please

7    state your full name and then spell your full name.

8          THE DEFENDANT:  James Michael Wells, J-a-m-e-s,

9    M-i-c-h-a-e-l, W-e-l-l-s.

10         THE COURT:  Go ahead, please.

11         JAMES MICHAEL WELLS, DEFENDANT, SWORN

12                    DIRECT EXAMINATION

13   BY MR. COLBATH:

14     Q.  Thank you, Your Honor.  As the Court can see,

15   Mr. Wells is our next witness.

16         Jim, did you shoot Rich Belisle?

17     A.  No, I did not.

18     Q.  How about Jim Hopkins, did you shoot Jim Hopkins?

19     A.  No, I did not.

20     Q.  I want to back up to -- let's start when you

21   began your military career, what -- how did that happen?

22     A.  Well, it was -- I thought about it in 1969 after

23   I graduated from high school.  I started junior college.

24   Then for some idiotic reason, I enlisted on

25   December 31st, 1969, New Year's Eve, basically.  So I

1  joined the Navy is what I did.

2      Q.  You joined the Navy.  Now, that would have been

3  during the Vietnam conflict?

4      A.  Yes.

5      Q.  And so upon entering the Navy, where did you go?

6      A.  I grew up in San Diego, so I went to boot camp in

7  San Diego, California.

8      Q.  How about after boot camp?

9      A.  I stayed in San Diego for a six-week preparatory

10  what they call a beep school.  It was basically

11  electronics and electric principles.  And after that I

12  went up to the San Francisco Bay area when at the time

13  the Navy owned Treasure Island, which is an island in

14  the middle of San Francisco Bay.  And that was where the

15  ETA school was.

16      Q.  As you started your Navy career, did the Army try

17  to snatch you up?

18      A.  Yes.  While I was in boot camp, I got my draft

19  notice.

20      Q.  So you would have ended up in the military

21  whether you had signed up or not?

22      A.  One way or the other, yes.

23      Q.  You said up in the San Francisco area, that's

24  where the -- I didn't the hear acronym or the initials,

25  but the ETA school?

1    A.   It's electronic technician school.  And it was --

2    an "A" school is the basic school.

3    Q.   And did you go to that school?

4    A.   Yes, I did.

5    Q.   To do what?

6    A.   Learn about -- more about electricity,

7    electronics.

8    Q.   Growing up as a kid and prior to that time in

9    your life, had that -- had electronics and those types

10   of things, mechanical-type things been something you had

11   been interested in?

12   A.   Oh, very much so.

13   Q.   So how long was the ETA school?

14   A.   Originally, or for everybody basic, it's six

15   months.  If you extended your enlistment, they would

16   give you an additional six months.  So my choice was go

17   out into the fleet as an SNET, or a third-class petty

18   officer.  So I extended the additional two years and

19   went the additional six months of school.  So when I

20   graduated from A school, I was a third-class petty

21   officer in the Navy.

22   Q.   So before going out onto the fleet in the normal

23   rotation, you could increase your level or your standing

24   by staying in school?

25   A.   Yes.

1    Q.  And did you successfully complete that, promote
2  through that?
3    A.  Yes, I did.
4    Q.  What happened after that?
5    A.  I got stationed on the USS Mount Katmai, which
6  was an ammunition ship stationed at Port Chicago,
7  California, which was just outside of Concord,
8  California, on the delta where the bay meets the
9  Sacramento River.
10    Q.  And during your time then immediately thereafter
11  in the Navy, did you have occasion to be involved in the
12  war and be on ships that were involved in one way or
13  another in the process there?
14    A.  Well, yeah.  After I got my orders to the Mount
15  Katmai, it was already overseas in the Philippines.  So
16  I flew out of Travis Air Force Base over to the
17  Philippines to pick up the ship.  I was in the
18  Philippines for a week, and we went up to Japan for a
19  week of R&R and then we came back across the pond, back
20  to the San Francisco Bay area where the ship was home
21  ported.
22    Q.  So ultimately, how many years were you in the
23  Navy?
24    A.  7 years, 11 months, 27 days.
25    Q.  Pretty exact?

  1    A.  Well, yeah.  Not that I was counting, but that's

  2  what it was, yes.

  3    Q.  And generally, just from the time you started on

  4  that first ship up until the end of your Navy career,

  5  what types of things did you do or how were you

  6  involved?

  7    A.  Well, as electronic technician, we were

  8  responsible for all the radios, the receivers on board,

  9  all the radio transmitters on board, all the sonars on

 10  board and all the radars on board.  And in addition to

 11  that I was a crypto tech, and so I worked on the

 12  cryptologic equipment that basically coded stuff.

 13    Q.  So was most of your electronic technician work

 14  and work with those other things that you described done

 15  on ships or on Naval vessels?

 16    A.  Well, no.  I also was stationed on the shore

 17  station, so I just worked on electronics wherever they

 18  sent me.

 19    Q.  All right.  Why leave the Navy after 7 years,

 20  11 months and however many days you had counted?

 21    A.  The war had ended.  The Vietnam War had ended.

 22  There was a surplus of people in the military.  I had --

 23  I was a second-class petty officer by that time.  I had

 24  taken the first-class petty officer test four different

 25  times, and it was -- passed it but not advanced because

there just weren't any billets open.  There was a
surplus of people, and they weren't advancing anybody.

So as I was preparing to get out of the Navy, I
attended a career counseling course just -- they were
prepping people for getting out of the -- out of the --

Q.  Out of service.

A.  -- out of the service.  And I was introduced to a
Coast Guard chief that had come over on the COMMSTA at
Point Race, California, the Coast Guard COMMSTA.  And he
was in this class with me, and he basically recruited me
to join the Coast Guard.  And --

Q.  So was that -- would have been a normal finish
time or an -- at the end of that almost eight years,
that was a normal transition where it was either
reenlist or get out and move on to a new career, that
was a normal breaking point?

A.  Yes.  And originally I intended to move up to
Spokane, Washington.  My sister lived there at the time
and find a -- we had property in the area.  So we had
planned to move up there and live.

Q.  But this Coast Guard gentleman that you met
changed your mind?

A.  Well, he got me interested.  And then after I
talked to the recruiter, he offered me the COMMSTA at
New Orleans or he offered me the Coast Guard Cutter

1    Storis on Kodiak, Alaska.

2        Q.   Had you been to Alaska before?

3        A.   No.

4        Q.   How did that sound?

5        A.   I took the job.

6        Q.   All right.  So when did you join the Coast Guard?

7        A.   That would be February of 1978.

8        Q.   Okay.  So your first assignment was the Coast

9    Guard Cutter Storis?

10       A.   Storis.

11       Q.   Storis?

12       A.   Storis.

13       Q.   In Kodiak.  What did you do on the Storis?

14       A.   I was the junior electronics technician on board.

15   There was a first-class petty officer, and I was a

16   second-class petty officer at that time.

17       Q.   Now, at that time did you move your family --

18   were you married at that point?

19       A.   Yes.

20       Q.   To Nancy?

21       A.   To Nancy.

22       Q.   Okay.  How long -- by the way, how long have you

23   guys been married?

24       A.   We got married in January of 1972.

25       Q.   That was a tactical answer as opposed to the

1  number of years.

2      A.  I get in trouble if I try to name the years.

3      Q.  So that's roughly, 1972 to today, 47 years?

4      A.  To today, yes.

5      Q.  So your family moved to Kodiak, and then you were

6  out on the ship, the Storis?

7      A.  Yes.

8      Q.  Was your work on the Storis initially similar to

9  the work that you had done on the Naval vessels?

10     A.  Yes.

11     Q.  So tell us about the Coast Guard.  Tell the jury

12 about your Coast Guard career, sort of how things

13 progressed as you did your work on the Storis.

14     A.  Storis was, you know, again electronics.  We were

15 tasked with patrolling the Bering Sea in the North

16 Atlantic.  Boarding fishing vessels.  Back in those

17 days, the U.S. only had a 12-mile economic zone.  So the

18 fishing vessels that were fishing in the Bering Sea

19 could basically fish up to 12 -- within 12 miles of the

20 shore.  So there were literally hundreds of foreign

21 fishing vessels out there fishing.

22     Q.  Not just locals or American?

23     A.  No, no.  These were Koreans.  These were

24 Russians.  These were Japanese.  These were Taiwanese,

25 just lots of foreign vessels.  There was -- we printed

1   out a FDR, fleet disposition report, every day, and

2   there was usually over 200 ships on that list every day.

3       Q.   Typically commercial vessels?

4       A.   Commercial vessels, yes.

5       Q.   And so was part of your work then monitoring

6   activities of those, dealing with any problems, boarding

7   those vessels, those kind of things?

8       A.   Yes, we boarded a lot of foreign fishing vessels.

9       Q.   Okay.

10      A.   I was a boarding officer, so I participated in

11  those boardings.

12      Q.   All right.  Now, how did that fit in with an

13  electronic technician position or being involved in the

14  electronics and communications?

15      A.   Well, they were looking for bodies to go on

16  boarding parties.  And since I didn't have regularly

17  scheduled duties, I was volunteered to be on the

18  boarding party.

19      Q.   All right.  And so over time, how long were you

20  on the Storis then?

21      A.   I was on the Storis two years.

22      Q.   And what happened after your time on the Storis?

23      A.   I transferred to the Coast Guard Communications

24  Station on Kodiak.

25      Q.   So that's the COMMSTA, T-1 and T-2 that we've

1    been talking about?

2        A.   We had four buildings at that time.  We had the

3    transmitter site, which was T buildings.  We had the

4    receiver site which had four buildings at that time, or

5    three or four buildings at that time, and we also had

6    the tech control station where the command activities

7    were, where the CO and XO and the officers were

8    stationed.

9        Q.   Were all of those things associated with COMMSTA

10   back at that time off main base?

11       A.   Yes.

12       Q.   And where within that conglomeration of buildings

13   did you work then?

14       A.   I started out at the tech control building.  I

15   was the -- they sent me to microwave school.  Then I was

16   responsible for working on the microwave system that the

17   COMMSTA used.

18       Q.   What do you do at microwave school?

19       A.   You learn how to -- you learn how to fix the

20   microwave, that system that we had.

21       Q.   Which is a system that does what?

22       A.   Microwave system, basically, we have

23   line-of-sight antennas so that we would talk from the

24   tech control building to the transmitter site.  We would

25   talk from -- and we had a re- -- microwave reflector up

on Heitman Ridge so we could talk to the receiver site,

so -- and then we had a microwave shop that went

downtown where it received all our off-island

information through Alascom.

Q.  So how long from that point on your -- your

tending to and dealing with the microwave

communications -- progress us through your time in the

Coast Guard of the assignments that you traveled through

following.

A.  As I transferred off the Storis, I had made first

class by then.  So I reported to the COMMSTA as a first

class.  Put my required two years in as first class, and

then I made chief in December of 1982.

Q.  How was that as an accomplishment, making chief?

A.  Oh, that was a tremendous accomplishment.  That's

what you strive for as an enlisted person is to make

chief.

Q.  After making chief in 1982, what was the next

phase?

A.  I was transferred to the receiver site as the ET

in charge of operations at the receiver site.

Q.  How long did you run the receiver site or be in

charge of the receiver site?

A.  About a year and a half.

Q.  And then what?

1    A.  Then I transferred to -- I got orders to COMMSTA

2  San Francisco.

3    Q.  So you left Kodiak for a period of time?

4    A.  Yes.

5    Q.  How long were you down in San Francisco?

6    A.  Four years.

7    Q.  Doing similar work?

8    A.  Very similar, because it was a COMMSTA, so we

9  had -- everything that we had in Kodiak we had in San

10 Francisco, only less of.

11   Q.  Same type of -- you served there in San Francisco

12 as the chief?

13   A.  Yes.  It was actually -- we were actually up

14 north of Marin County in Point Race station.

15   Q.  After San Francisco, you said you were there four

16 years, so it's about 1980 --

17   A.  '87.

18   Q.  '87?

19   A.  Yes.

20   Q.  All right.  What happened then?

21   A.  I got transferred to Seattle.

22   Q.  To another COMMSTA or --

23   A.  To base Seattle at the -- oh, it was -- started

24 out as the ship repair detachment, SRD.  It's changed

25 its name three or four different times while I was

 1    there.

 2        Q.   How long were you there?

 3        A.   Three years.

 4        Q.   And during that time, and maybe it's prior, but

 5    at some point in that timeframe, you had been in the

 6    Coast Guard about at that point 12 years, 10 to

 7    12 years?

 8        A.   No, at that point it would have been nine years.

 9        Q.   Did there come a time where you had some medical

10    episodes or medical incidents that started causing you

11    problems?

12        A.   Yes.  Week after we moved to Seattle area, I had

13    my first anaphylactic attack.

14        Q.   What happened?

15        A.   Well, I didn't know what it was at the time, so I

16    thought it was just normal allergies.  So I laid down in

17    the bedroom, put a warm washcloth over my face to

18    breathe through to filter the air, because that's

19    usually what I do to relieve an allergy attack.  Only it

20    didn't go away.  It got worse.

21        Q.   Ultimately, what happened or what did you --

22        A.   We ended up calling 911.  My wife took me to the

23    closest medical treatment facility, and I got treated

24    for the anaphylaxis.

25        Q.   So over the next year or so, were there episodes?

1   Were there incidents?  Did you try to treat and figure

2   out this condition?

3       A.  Yes.

4       Q.  I want to show you what -- I want -- can we show

5   him defense Exhibit No. 185.  Blow that top half up.

6           So what happened, Jim, relative to the Coast

7   Guard and the medical condition that you discovered you

8   had?

9       A.  Well, in the summer of 1989, I got orders to the

10  Coast Guard Cutter Polar Sea.  I was on the list to make

11  E-8.  I was above the cut, so I was going to kind of get

12  a pass to an E-8.

13      Q.  That would have moved you from chief to what?

14      A.  Basically E-7 to E-8.  I'd still be a chief, but

15  I'd be a senior chief.

16      Q.  Okay.  So you had received that.  That was in

17  process, and you were also going to go out to sea?

18      A.  Yes.

19      Q.  All right.  And then what happened?

20      A.  So as part of my reporting on board, I checked in

21  with the medical department and I handed them my EpiPen

22  and said, "I need to renew this."  And he looked at me

23  and he says, "You what?"  And within ten days, I was

24  transferred off the Polar Sea.

25      Q.  How did your anaphylactic condition relate to not

1  being able to go out to sea?

2      A.   Prudently, the skipper decided he didn't want

3  somebody that might go into anaphylactic shock on the

4  ship in the middle of the ocean.

5      Q.   They might not have had, depending on the

6  situation, the ability to treat you?

7      A.   Correct.

8      Q.   So instead of -- were you reordered, or was there

9  something --

10     A.   I was transferred to the base, back to the base

11 Seattle at Pier 36.

12     Q.   Does that start the process then of your exit

13 from the military?

14     A.   Yes, it did.  They started the process, what they

15 call a medical board.

16     Q.   What we were just looking at, that was the end

17 result of the medical board?

18     A.   Yes.

19     Q.   Now, by the time the medical board was complete

20 and you had -- ultimately, that led to a medical

21 discharge?

22     A.   Correct.

23     Q.   And you had what amount of military active

24 service at that time?

25     A.   Fortunately, when they started the medical board,

1    I already had 18 years service in.  So they gave me the

2    option, I put in a letter to request to serve my

3    20 years and retire with 20.

4        Q.  And that request was granted, so you --

5        A.  So I stayed the 20 years.

6        Q.  And you stayed on land or on base during those

7    last couple of years so --

8        A.  Basically, the last 18 months, yes.

9        Q.  So when did you get out of the Coast Guard active

10   duty?

11       A.  April 24th, 1990.

12       Q.  Where was your home -- where did you consider

13   home base, although you were moving around active

14   military?

15       A.  Kodiak, Alaska.

16       Q.  From your prior time on the Storis and then

17   the -- just stationed at the COMMSTA up there?

18       A.  Yes.

19       Q.  Did you still have property up there?

20       A.  No.

21       Q.  So when you get out, down in Seattle, you get out

22   of active duty, where do you go?

23       A.  I went back to Kodiak.

24       Q.  Nancy, your children?

25       A.  Yes.  I had three children by then, so we hopped

1   in a van and took the Alcan back to Alaska.

2       Q.   And what was the plan?

3       A.   I had talked to people that were in Kodiak, and I

4   personally knew the EO of the COMMSTA at that time.  It

5   was a warrant billet at the time.  He used to be my

6   neighbor when I lived on base in Kodiak.  They had a

7   civilian rigger.  He retired in 1988.  And they were

8   having a lot of problems maintaining the antenna, so

9   they were going to readvertise and rehire a civilian to

10  be the antenna mechanic.  So he made me aware of that

11  position, and I thought that was a dream job for me.

12      Q.   Okay.  So did you continue to have or deal with

13  the anaphylactic shock and the allergy condition that

14  you had?

15      A.   Yes.

16      Q.   Did you have -- have you had just medically other

17  historically medical conditions?

18      A.   Well, I had continued problems with my knee.  I

19  had knee surgery in 1978 when I tore the meniscus.  And

20  I've had continuing back problems and --

21      Q.   Can we look at defendant's Exhibit No. 133.  Blow

22  that top half up maybe.

23           As you left active service, did there come a time

24  when you were awarded, because of the conditions you

25  had, some small amount of disability or an amount of

1   disability based on ongoing medical issues?

2       A.   Yes.

3       Q.   And we see here, the top is the back problems?

4       A.   Yes.

5       Q.   Okay.  Have you had knee surgery?

6       A.   Three times, yes.

7       Q.   And then tinnitus, when did that develop?

8       A.   That had developed probably mid-career, in my

9   combination Navy and Coast Guard career.

10      Q.   And is that something that has continued since

11  that time?

12      A.   Yes.

13      Q.   We can take that down.

14           In addition to those conditions, how about other

15  medical more longstanding or chronic-type things you

16  have dealt with?

17      A.   Well, during -- after I retired, I was noticing

18  symptoms of being thirsty and having to urinate

19  frequently, and so I had made an appointment with the VA

20  in Anchorage.  It was there that we basically -- it was

21  decided that I was Type 2 diabetes.

22      Q.   And so how have you managed and how long have you

23  managed your diabetes condition?

24      A.   Initially, very poorly.  I basically ignored it.

25  Conditions got worse, and then I decided, well, I better

1  do something about this, because my health was

2  deteriorating.

3      Q.  So how -- how have you managed it over the years?

4      A.  Basically, I've been fairly faithful in taking my

5  meds and my daily insulin injections.

6      Q.  When you got your -- so when did you start as an

7  antenna mechanic with the COMMSTA?

8      A.  That would be September of 1990.

9      Q.  And you were hired as a civilian at that time.

10 Your medical conditions that kept you out of the Coast

11 Guard or got you out of the Coast Guard apparently did

12 not prohibit you from joining the civilian workforce for

13 the Coast Guard?

14     A.  No, I was unfit for service in the active duty

15 Coast Guard, but I could go anywhere as a civilian, as a

16 Coast Guard civilian.

17     Q.  What does an antenna mechanic do?

18     A.  As pertains to the Kodiak area, I was responsible

19 for the maintenance of the antennas, the antenna field,

20 the erection or dismantling of antennas.  I was also a

21 17th Coast Guard District asset, so I was made available

22 to travel throughout the 17th Coast Guard District to

23 assist in other units maintaining their antennas.

24     Q.  How did your work, the inside communications work

25 or the work on the ships and the electronics work relate

1    to the antenna work?

2        A.    Even on board ship, we were responsible for the

3    radars and the antennas on the ship.  So we would have

4    to climb the mast to work on radars, antennas or the

5    antennas that were mounted on the mast or various

6    portions of the ship.  So I had climbing experience

7    already, because you have to climb the mast in order to

8    work on stuff.  So I was familiar with that.

9            Lots of electronic experience.  So several of our

10   antennas had electronic controls to move them, so they

11   were rotatable, so I was familiar with that equipment.

12   I had done cabling work.  Any time you install a new

13   antenna, then you have to run a cable.  So I was

14   familiar with running cable and making the connections,

15   putting the connectors on.

16       Q.    So lots of crossover or lots of one leads to the

17   other or works with the other?

18       A.    Yes.

19       Q.    How is -- tell the jury how a rigger's job is

20   different than an antenna mechanic's job.

21       A.    The rigger's job is basically to assist the

22   antenna mechanic.  Mainly more ground support than

23   height support.

24       Q.    Is climbing done alone ever?

25       A.    When I first started off, yes, it was.  Okay.

1    And then through various discussions that I had

2    throughout the Coast Guard, we decided that we needed to

3    change the tower manual and require that there be at

4    least two people available to climb.

5         Q.   And the rigger's position, that was also a very

6    active climbing position and --

7         A.   Yes.

8         Q.   -- very involved?

9         A.   Yes.   Part of that job requirement was the

10   ability to climb.

11        Q.   How many times have you been, say, 100 feet or

12   more in the air working?

13        A.   I would probably -- it's more than over 1,000.

14        Q.   How about 300 feet?

15        A.   That would probably be, say, 500 to 1,000.

16        Q.   Okay.   What's the highest towers you've worked on

17   or served helping the Coast Guard?

18        A.   The highest tower I've climbed would be

19   1,358 feet.   It was a Coast Guard LORAN tower at Port

20   Clarence, Alaska, which is about 75 miles north of Nome.

21   At one point it was the tallest structure in Alaska.

22        Q.   So it was about a quarter mile tall?

23        A.   Yes.

24        Q.   And describe for the jury what it's like to work

25   at the height of 100 or more feet dealing with

conditions, with other people, things like that.

    A.  Well, one of the first things you'll notice when you get above, say, 50 to 75 feet is the wind speed. You can have 0 to 10 miles an hour on the ground, and you get up 100 feet and it can be blowing 30 to 40 miles an hour, and you wouldn't know it by standing on the ground.

        So one of the things you have to be very -- extremely careful about when you're climbing is overexerting yourself. You have to be very methodical when you're climbing to go slow. Because what you don't want to do is break a sweat and then when you get to where you're going to do your work, then you're going to be stationary and you're going to cool off and you'll end up getting hypothermic.

    Q.  How about managing conditions that you don't expect when things -- ropes slip, things break, a wind gust comes, how does all of that work?

    A.  Well, one of the things that we stress and we practice is you're always attached to the tower, one way or the other. Normally, the Coast Guard towers, we have a center rail where we have a slider that goes on, and so you're attached to the tower that way.

        But once you get to the height where you're going to do your work, you basically have a lanyard, a Y

lanyard, so you'll unclip your clip on the lanyard,
disconnect from the slider, and then you can roam about
the tower and do your work.  But you're always attached
to the tower.

    Q.  So as part of your climbing, once you became
qualified and worked into the antenna mechanic position,
did you become a qualifier and a trainer?

    A.  Yes.

    Q.  How many people over the course of your time at
the COMMSTA would you say you qualified to climb?

    A.  It would be approaching the thousands.

    Q.  And have you had to I guess deal with dangerous
situations and others up there or just people that had
more difficulty climbing or difficult experiences up at
those levels?

    A.  Well, as part of an initial training purpose to
teach somebody to climb, you have to trust your
equipment first.  So the first thing we do with a new
climber is we have them climb about four or five feet
and then we have them let go.  They take their hands and
their feet off the tower so they're just hanging by
their harness.

        Still attached to the safety reel, but they need
to know that their harness is going to save them.  You
have to trust your equipment.  If you don't trust your

1  equipment then you're not going to be a very safe

2  climber.  So that's our first mission is to get

3  everybody to trust your equipment.

4      Q.  So have you had -- have you had people I guess,

5  for lack of a better word, freak out up there or panic?

6      A.  I've only had a couple people panic, but lots of

7  people freak out, yes.

8      Q.  How do you deal with that?  Well, first of all,

9  how did you personally develop to be able to deal with

10  that, just operating at those levels?

11      A.  I've never been afraid of heights.  Never been an

12  issue for me.

13      Q.  When others have issues, how, as the person in

14  charge, do you deal with that?

15      A.  You have to stay calm.  That's the very first

16  thing you must do is be calm, and then you start talking

17  to them and get them to not think about how high they

18  are.

19      Q.  All right.  What would you say is one of the most

20  significant keys to successful safe climbing?

21      A.  Trust.  First --

22      Q.  Trust how so?

23      A.  First, you're going to trust your equipment, that

24  it's there to protect you and save your life.  And then

25  secondly, if you're climbing with somebody you have to

1  have trust in them also.

2     Q.  Why is that important?

3     A.  The Coast Guard instituted a -- climbing with a

4  buddy.  Any time you're over 100 feet in the air, you

5  must have a climber within 100 feet of you.  So if you

6  go up 100 feet, you can have somebody on the ground.  If

7  you go up 101 feet, then you have to have another person

8  on the tower with you.

9        And so that person is your safety buddy.  If

10  something happens to you, he's the one that's going to

11  rescue you.  And if something happens to him, I would be

12  the one that would rescue him.

13     Q.  So if we focus on your last several years at the

14  COMMSTA, who was that person for you?

15     A.  For me, it was Rich Belisle.

16     Q.  And how did that -- well, let's -- how did that

17  develop or tell us -- tell the jury about that.

18     A.  We had a previous rigger helper who was a retired

19  Coastie and he decided that he didn't want to work in

20  that job any longer, and so we were going to readvertise

21  for that position.  And I had known Rich off and on, you

22  know, because he was stationed on the Storis also and I

23  knew him as -- when he was chief of police or chief in

24  charge of the Coast Guard police in Kodiak.

25     Q.  That would have been while he was still active

1 duty?

2     A.  Yes.

3     Q.  And you were on Kodiak as well?

4     A.  Yes.

5     Q.  All right.  And so what happened?

6     A.  Basically, I knew ahead of time that we were

7 going to advertise for the position.  So I went down

8 where he was working in town, at Cy's Sporting Goods and

9 walked in and said, "Hey, Rich, they're going to

10 advertise the rigger's job.  If you're interested, I'll

11 give you the heads-up, get your application in."

12     Q.  He had left the Coast Guard, left his chief

13 position and retired from the Coast Guard at that point?

14     A.  Yes.

15     Q.  And was working where?

16     A.  He worked various -- a couple different places.

17 I know he worked on a barge unit, I think.  And then he

18 worked at Cy's, at one of the local sporting goods

19 stores.

20     Q.  And he was hired then?

21     A.  Yes.

22     Q.  Once he was hired for the rigger position, how

23 did -- how was that compared to the person he replaced?

24     A.  Rich was much more knowledgeable in the rigging

25 portion of our job.  He had been a retired boatswain's

mate chief, so part of his responsibility was working
with the deck force on ships.

Q.  As he began his work in the -- at T-2 and in the
rigger shop, how did you find that your knowledge and
your work as an antenna mechanic and his knowledge with
the rigging and the rigger position, how did that seem
to work?

A.  I felt that we complemented ourselves
or complemented us very nicely.  We meshed very nicely.

Q.  You struggled with a couple of those words.  You
have dental issues?

A.  Yes, I do.

Q.  And what's that -- so what's that cause, I guess?

A.  Well, I've had all my teeth removed, and I'm
still waiting to receive dentures.

Q.  Okay.  So you struggle with some of those --

A.  I have trouble forming words.  I have to -- I
struggle with it, yes.

Q.  Okay.  So you said yours and Rich's knowledge
complemented each other.  And how did you find that work
as far as solving problems and doing the jobs necessary
at the rigger shop?

A.  We worked very well together.  And the nice thing
about that was I could trust him, even if he wasn't on
the tower with me.  We always had problems with having

the people on -- the support people on the ground
knowing what to do and how to do it.  Because we just
had people from the shop to work with, and these were
untrained people.  So it was hard to conduct training
while we're actually doing the work.

Q.  Did you ever have questions about Rich not
knowing what he's doing or not trusting what he's doing?

A.  I won't say not knowing what he was doing, but he
was inexperienced in several areas.  So it was just a
question of him learning.  They're new experiences, so
he had to learn from them.

Q.  The antenna --

A.  There was never a question of not trusting him,
no.

Q.  Okay.  And he became a regular climber?

A.  Yes.

Q.  And somebody that also qualified people and
trained people with you?

A.  Yeah, eventually, he got his certification as a
trainer.

Q.  And you and he climbed regularly?

A.  Yes.

Q.  And what was that -- well, what other activities
regularly as part of the job were you engaged in with
him?

1    A.  We traveled to different areas throughout the

2 Coast Guard doing training or doing antenna inspections.

3    Q.  And that was over how many years or what period

4 of time?

5    A.  Basically, after he got hired, I mean, I had

6 always traveled to other units to do work, and then once

7 he got hired and he -- he would travel with me.

8    Q.  And how did you find that the two of you -- was

9 your work -- when you were away and either training or

10 working on other facilities and locations, same

11 relationship and same working together as it was work at

12 the COMMSTA?

13    A.  Yes.

14    Q.  While we're talking about people at the rigger

15 shop, let's just talk about the other folks that you

16 worked with.  How about -- how about let's talk about

17 Mr. Hopkins next.  When did you -- did you know Jim

18 Hopkins before he came to work at COMMSTA?

19    A.  No.

20    Q.  You hadn't had any either Coast Guard or personal

21 experience with him?

22    A.  No.

23    Q.  You know, before I leave Mr. Hopkins, I want

24 to -- I want to think about Mr. Belisle for a minute and

25 ask you one more thing.

1      Did you and him outside of work socialize

2  together?

3      A.  No.

4      Q.  If you had the trust and close working

5  relationship, why not have the outside --

6      A.  We had different lifestyles.  He still had

7  children living at home with him.  Mine were, you know,

8  out of the house, not even in Kodiak anymore.  I'm not a

9  big socializer.  I have -- you know, don't go out and go

10  to clubs or bars or anything like that to meet friends

11  or anything like that.  So I had a select -- select

12  friends that I dealt with.

13      Q.  A couple of close hunting and fishing buddies

14  mostly?

15      A.  Yes.

16      Q.  And not much more than that?

17      A.  No.

18      Q.  So just different social circles, no other

19  reasons to not be together?

20      A.  No.

21      Q.  But at a work environment, was he a work friend,

22  a work -- a co-worker, an important co-worker?

23      A.  Extremely important co-worker.

24      Q.  Mr. Hopkins, I asked you about him.  You had not

25  known him before he came to the rigger shop?

1    A.  No.

2    Q.  And he came in as the -- for the active-duty

3  folks there, the shop supervisor right at the beginning

4  of his -- that's where he started within the rigger

5  shop?

6    A.  Yes.

7    Q.  And as you met and got to know him, did he have

8  similar-type experience that either you or that Rich had

9  in dealing with the things that the rigger shop dealt

10 with?

11   A.  I don't think he had any experience with -- or

12 very little experience with antennas before.  He used to

13 be -- if memory serves me correctly, he was a sonar man.

14 And then when they did away with that rate, he converted

15 to an ET.  So his background was different than the

16 normal electronics technician.

17   Q.  And had that position, the position he moved

18 into -- do you remember when that was?

19   A.  Oh, 2010.

20   Q.  And prior to 2010, had that -- had you had other

21 folks in that position at different times?

22   A.  Yes.

23   Q.  How many, while you had been at the rigger shop?

24   A.  Well, that would have been close to 20 years by

25 then, 19 years.  There were a number.

1    Q.   Okay.  And when Mr. Hopkins came in, how did you

2  find him as a co-worker or to work with?

3    A.   He was good to work with.  His management style I

4  thought at times was a little gruff.

5    Q.   Okay.  How so?

6    A.   He tended to treat the non-rates as -- oh, he

7  just treated them different than, say -- than petty

8  officers.

9    Q.   If you had to say your biggest disagreement with

10 Jim Hopkins, what was that generally?

11   A.   Generally, his language around -- in the shop.

12   Q.   And why was that -- it was my word disagreement.

13 But what about the language --

14   A.   Well, he swore a lot.

15   Q.   And when -- other work-related issues with Jim?

16   A.   Not really, no.

17   Q.   Okay.  He was how old compared to you?

18   A.   Maybe 15 years younger.

19   Q.   Kids at home?

20   A.   He had one son at home.

21   Q.   So did you and him develop away from work

22 interests together or any activities outside of work?

23   A.   Just the occasional COMMSTA, you know, morale

24 gatherings that we would attend.

25   Q.   But again, those were sort of put on by the Coast

1   Guard or work-related functions?

2      A.   Yes.  But no, no socializing other than, you

3   know, through that or at work.

4      Q.   Okay.  In 2012, the 2012 timeframe after

5   Mr. Hopkins had been there for a couple of years, did

6   you have any awareness of what his plans were after

7   COMMSTA?

8      A.   He planned to retire.

9      Q.   How was it that you were aware of that?

10         MS. STEVENS:  Objection, Your Honor.

11         THE COURT:  Mr. Colbath?  It sounds like you're

12   seeking -- are you seeking hearsay?

13         MR. COLBATH:  Well, let me ask you a different

14   question, and I'll try to avoid that.

15         THE COURT:  Go ahead.  Rephrase.

16   BY MR. COLBATH:

17      Q.   Obviously, Mr. Wells, you've been here throughout

18   the testimony in the case.  Do you recall Master

19   Sergeant -- well --

20      A.   Master Chief Lowdermilk.

21      Q.   Master Chief Lowdermilk.  That's who I was

22   looking for.  I don't have my Coast Guard -- despite all

23   of this study, I don't have my Coast Guard hierarchy

24   correct.

25         Did you hear Mr. Lowdermilk discuss an e-mail

1    exchange he had with Mr. Hopkins about a retirement
2    letter or something along those lines?
3        A.   Yes.
4        Q.   And were you aware of those things going on?
5        A.   Yes.
6        Q.   And that was April of 2012?
7        A.   Yes.
8        Q.   Were you aware of whether or not Mr. Hopkins had
9    bought, purchased any vehicles or anything in
10   anticipation of leaving the Coast Guard?
11       A.   Yes.
12       Q.   And that had occurred by April --
13       A.   Yes.
14       Q.   -- to the best of your recollection.  Okay.
15           Let's talk about some of the other folks in the
16   shop.  We've heard from all of these folks that
17   testified, but how about Mr. Beauford, what was your
18   working relationship with him or what do you remember
19   about Cody Beauford?
20       A.   He was younger than my kids.  And he was -- he
21   was very young.
22       Q.   All right.  Anything particular stand out to you
23   about him, other than this young, you know, young age
24   and I suppose very green?
25       A.   Very green.  He was a little goofy, but that just

1    added laughter in the shop.

2        Q.   How regular throughout the -- you were at the

3    COMMSTA how many years?

4        A.   As a civilian?

5        Q.   Yeah.

6        A.   22.

7        Q.   And how many non-rates and 19-year-olds had you

8    dealt with during that time?

9        A.   Hundreds.

10       Q.   All right.  And did you find -- did Mr. Beauford

11   particularly stand out, any reason or not?

12       A.   No.

13       Q.   How about -- we've heard from some of these other

14   folks, how about Ms. Upchurch, she recently -- she's

15   testified with us here the last day or two?

16       A.   Yes.

17       Q.   What was your relationship with her while she was

18   at COMMSTA?

19       A.   We were friends outside of work.  She was an

20   older non-rate, and she was eager to learn.  You could

21   point her in a direction and tell her to do something

22   and she would -- you didn't have to worry about it after

23   that.  If she didn't know something she would ask

24   questions.  Always eager to learn.

25       Q.   How did it come to be that you developed a

1  relationship with her outside of work?  Did she have

2  family on Kodiak?

3      A.  No, she did not.

4      Q.  How did it come to be that you -- was it just you

5  or your family or who?

6      A.  That was -- well, it was my wife and I, because

7  we were the only ones living at the house.  She was very

8  active outdoors-wise, so we would travel out to

9  Pasagshak.  We would be our there on the seashore

10 collecting stuff.  So we would see her out there.  We

11 got to be friends outside of work.

12     Q.  Okay.  How about Ms. Henry, Leah Henry, we've

13 heard from her.  She was a non-rate, right?

14     A.  Yes.

15     Q.  And how did you find working with her?

16     A.  She was good to work with.

17     Q.  Develop any bonds, relationships with her?

18     A.  Again, we had a social relationship outside of

19 work.  She and Para hung out a lot.  So we would see

20 them together outside of work areas.

21     Q.  The relationship with Para, that fostered or

22 helped with the relationship with Ms. Henry?

23     A.  Yes.

24     Q.  Did you have the two of them to your house?

25     A.  Several different times.

1    Q.  Over the years, had you and Nancy provided

2  assistance to young non-rates that didn't have family on

3  the island, cook for people, loan them things, help them

4  with things?

5    A.  Yes.

6    Q.  Is that a fair characterization of these two

7  young ladies?

8    A.  Yes.

9    Q.  How about Mr. Pacheco, we heard from Nate

10 Pacheco.  He was a non-rate at the time.  Do you recall,

11 is there anything that stands out about Mr. Pacheco?

12    A.  He was very good mechanically.  He had prior

13 experience working on automobiles and doing mechanical

14 things, so if something was broken and needed to be

15 fixed, then he would usually want to take first shot at

16 it.

17    Q.  And although -- well, did you and him sort of

18 connect in that way, or did you spend any time with him

19 on mechanical things?

20    A.  Well, we worked at stuff on the shop, yes.

21    Q.  How about outside of work, did you develop

22 anything with him there?

23    A.  No.  He was much younger, and he had friends in

24 town that he would go socialize with.

25    Q.  Would he periodically bring vehicles to the shop

1    and work there at T-2?

2        A.   Yes.

3        Q.   Were you ever involved in that?

4        A.   I helped him I think on a couple different

5    occasions on some problems he had with his Jeep, because

6    I had previously owned Jeeps.

7        Q.   How about Mr. Coggins, I think he told us he had

8    not been there very long and was the new guy?

9        A.   He was the new guy.  I didn't even know his first

10   name.  It was either Coggins or new guy.

11       Q.   So not much interaction with him.  He was another

12   non-rate passing through?

13       A.   Yes.

14       Q.   As a civilian, did you supervise anybody?

15       A.   Not directly, no.

16       Q.   And how about Mr. Belisle, did he supervise

17   anybody directly?

18       A.   Not directly, no.

19       Q.   That was the non-rates and the people that were

20   below you.  Now, above Mr. Hopkins was Mr. Reckner.  How

21   about him, we've heard from him as a witness.  What was

22   your relationship with Scott Reckner?

23       A.   I thought it was amicable.

24       Q.   Okay.

25       A.   He had just reported to COMMSTA after having made

1    chief.  He was what we call a new chief.

2        Q.  All right.

3        A.  And so he was basically getting his feet wet, you

4    know, being recently attached to the COMMSTA.

5        Q.  Okay.  And was that an experience you had been

6    through before, having a new chief or having a chief

7    that hadn't -- wasn't something that moved up within

8    COMMSTA, but somebody that came from outside COMMSTA?

9        A.  Yes.

10       Q.  Adjustments there to be made?

11       A.  Yes.

12       Q.  Were there adjustments with Mr. Reckner like

13   there were adjustments in the past?

14       A.  Yes.

15       Q.  How would you describe that?

16       A.  Expectations.

17       Q.  Expectations by who, by him or by you?

18       A.  By both.

19       Q.  All right.  Both sides always live up to those

20   expectations?

21       A.  Hopefully.

22       Q.  Bumps along the road or growing pains?

23       A.  Certainly.

24       Q.  Was that a new experience?

25       A.  No.

1    Q.  Let's move forward -- I want to talk to you real

2  briefly.  There's been testimony about a big -- go

3  ahead.  Get a drink.  There was quite a Coast Guard

4  project on the island of Shemya in 2011.  Do you recall

5  that?

6    A.  Yes.

7    Q.  And did you do work with other rigger shop

8  members and other Coast Guard folks on Shemya in 2011?

9    A.  Yes.

10   Q.  How many times were you out there?

11   A.  In 2001, I went there in March, March 8th through

12 March 16th, and then we went out again in the summer

13 from June 6th to June 14th -- or excuse me, July 14th, I

14 believe it was.

15   Q.  Have you looked at -- back at some of your travel

16 paperwork and travel orders?

17   A.  Yes.  And then in 2010, I made two additional

18 trips out to Shemya.

19   Q.  Okay.  Did there come a time -- that was over the

20 spring and summer, right, those trips?

21   A.  In 2011, yeah, March 2011, and June and July of

22 the same year.

23   Q.  Did there come a time in September when the folks

24 at the rigger shop or many folks went back out to Shemya

25 and you didn't go?

1        A.   Yes.

2        Q.   And why was it that you didn't make that

3    September trip?

4        A.   I had planned on a medical appointment in

5    Anchorage.

6        Q.   Was it a regular checkup, or had you been having

7    problems or what was going on?

8        A.   No.   I was starting to feel the symptoms of being

9    ill.

10       Q.   All right.   Now, in September of 2011, did you

11   travel off the island on the ferry at all?

12       A.   No, I did not.

13       Q.   How did you go -- how did you attend those

14   medical appointments?

15       A.   Air travel.

16       Q.   All right.   Did you -- what happened with the

17   medical condition?   What was going on that you said you

18   were starting to feel the effects of being sick?

19       A.   I was starting to get nauseous and having the dry

20   heaves.

21       Q.   And what was happening or how were you dealing

22   with that?   What effects was it having?

23       A.   There were times when I couldn't work.   Any type

24   of physical exertion would cause me to get the dry

25   heaves.   And I would start coughing and I would start

1    dry heaving, and I just couldn't do any work.

2        Q.  At the time, did you understand what was going

3    on?

4        A.  No.

5        Q.  Did you associate it with eating food or taking

6    food at all?

7        A.  Yeah.  It seemed -- you know, it would --

8    symptoms would increase after I ate.

9        Q.  Can we show Mr. Wells defense Exhibit No. 168.

10           So did you -- you said that was September, really

11    that first trip up to Anchorage to begin dealing with

12    your medical condition.  And did things appear to get

13    worse?

14        A.  Yes.

15        Q.  And so in -- when did -- when did things really I

16    guess pick up in the fall as far as dealing with the

17    nausea and the dry heaves, the missing of work?

18        A.  Well, it got worse in October, continued through

19    November and December.

20        Q.  All right.  If we look at this, this is Exhibit

21    No. 168A, this calendar.  And first let's -- the month

22    of October it looks like -- or the first couple of

23    weeks -- let's blow those up.  For the first couple of

24    weeks here, you were gone all but one day and then in

25    that second week, only there a couple of three days, the

1  next week, a couple of days.

2      Are those mostly illness-related things?

3  A.  Yes.

4  Q.  Okay.  And how was it -- going through this had

5  you had problems that severe at any time in your recent

6  history before that?

7  A.  No.

8  Q.  How about prior to that illness, dealing with

9  your diabetes and the medications you took for that, had

10  you had prior dry heave or nauseous problems prior to

11  that?

12  A.  No.

13  Q.  Any other complications?

14  A.  The complications I had with the diabetes

15  medicine was diarrhea.

16  Q.  Other effects on either processing food or

17  gastrointestinal?

18  A.  No, just taking the medicine would cause the

19  runs.

20  Q.  Okay.  And could you manage it by -- over what

21  period of time did that go on?

22  A.  Oh, that was several years.  I had discussed with

23  Dr. Gan, because I know we had a major problem when I

24  went from 500 to 750, because that was just -- that was

25  night and day as far as causing stomach problems.

1    Q.   Was there an adjustment period for you?

2    A.   Usually, yes, any time you change doses.

3    Q.   And did you change how you took the medication or

4    how regularly you took it when those things occurred?

5    A.   Yes.  Sometimes I would omit taking the Metformin

6    just to relieve having diarrhea.

7    Q.   Generally, could you manage it?

8    A.   Generally, yes.

9    Q.   So when this started going on in October, was

10   that -- were those -- was that part of the symptoms, or

11   was this different?

12   A.   No.  I always had a continuous problem with the

13   diabetic medicine, but this was completely different.

14   Q.   Okay.  Did you treat at the VA for it?

15   A.   Yes.

16   Q.   This new condition that was happening starting in

17   October, did the doctors know what was wrong?

18   A.   Dr. Gan didn't, so she referred me to a GI

19   doctor, Dr. Ambasht.  So we started a series of

20   different tests to try and find out what was going on.

21   Q.   Initially were they able to figure out what was

22   going on?

23   A.   Well, not initially, no.  They ran several

24   different tests just to try and narrow it down.

25   Q.   And you continued to treat your diabetes as a

1    separate situation?

2        A.   Yes.

3        Q.   After being gone much of October, there was a

4    meeting that's been testified about, a meeting that you

5    had with Mr. Reckner on November 2nd.  Do you recall

6    that meeting?

7        A.   Vaguely.

8        Q.   Let's do -- see Government's Exhibit 35 first.

9            So first of all, Mr. Wells, this is a letter

10   that's been admitted, and it's dated 29 April.  And the

11   front says it's to Rich Belisle, but if we go to the

12   second page, it's dated November 2nd and signed by you.

13   Do you recognize that as your signature?

14       A.   That's my signature, yes.

15       Q.   And you recognize that as a letter that

16   Mr. Reckner would have given you?

17       A.   Yes.

18       Q.   Now, I want to back up before we talk about this

19   letter, and although you signed this in November, had

20   you actually talked to Mr. Reckner before even your

21   October absences and at sometime earlier about what was

22   in this?

23       A.   Yes.

24       Q.   So we'll talk about the contents and we'll talk

25   about what it says here, but is that something you knew

1    about before November 2nd before you -- the day you

2    signed the letter?

3        A.   Yes.

4        Q.   Can we go back to the first page.

5            And first of all, when Mr. Reckner came to you,

6    do you know when it was that you and he had the actual

7    discussion about this?

8        A.   Probably sometime in August.

9        Q.   Okay.  And so that was a discussion he had with

10   you?

11       A.   Yes.

12       Q.   And was Mr. Belisle there?  Was Rich there, as

13   you recall?

14       A.   I don't recall.

15       Q.   Were you aware of whether or not Rich had had a

16   similar discussion with Mr. Reckner?

17       A.   Yes.

18       Q.   When you had that discussion with him in August,

19   was this one of the -- this letter dated from April, was

20   this one of the things he talked to you about?

21       A.   Yes.

22       Q.   This was from -- we see it's from WT Reed.  Who

23   was Mr. Reed?

24       A.   He was the engineering officer.

25       Q.   So that would have been somebody -- that would

1    have been Mr. Reckner's supervisor?

2        A.   Yes.

3        Q.   And then also of course in the chain of command

4    well above you?

5        A.   Yes.

6        Q.   And Mr. Reed had authored this, but Mr. Reckner

7    went through it with you, didn't he?

8        A.   Correct.

9        Q.   And it's an EO expectations/clarifications.  What

10   did you understand it to be, the document to be?

11       A.   Basically, they were listing expectations of my

12   work performance.

13       Q.   Okay.  Yours particularly, the civilian job

14   position or --

15       A.   Yeah, it was -- because it was both Rich and I,

16   so it was the civilian jobs at the COMMSTA.

17       Q.   Did the Coast Guard have as you -- were you aware

18   of whether the Coast Guard had its own set of rules and

19   regulations for the enlisted folks to follow?

20       A.   Yes.

21       Q.   Was there a separate set of regulations, like a

22   similar policy manual for civilians?

23       A.   There was a -- there was a civilian policy

24   manual, but it wouldn't have dealt with any of these

25   situations.

1   Q.   Okay.  So here if we can just go to that first

2   section A.

3        So there was a process to identify sick and

4   vacation-type leave?

5   A.   Correct.

6   Q.   Was that a new policy or something new that a big

7   change was made in?

8   A.   No.  That was always the policy, to try and keep

9   your supervisors informed.

10  Q.   And was there a written things, documentation you

11  had to do to get sick or vacation leave approved?

12  A.   Well, for vacation time, you're usually required

13  to submit it in advance.  Sick leave wasn't always

14  possible to do it in advance, but upon your return, you

15  would, you know, give them the proper paperwork.

16  Q.   So was this a surprise to you at all or

17  information that you hadn't previously had in some

18  respect?

19  A.   No.

20  Q.   The next section I think maybe deals with travel.

21  Now, you indicated you and -- particularly you and

22  Mr. Belisle traveled pretty regular.  Was there a

23  process you went through when you traveled for Coast

24  Guard purposes?

25  A.   Yes.

1     Q.   And what was that, just generally?

2     A.   Generally, there -- a need -- a need would come

3 up, okay, for our service.  Generally, then someone

4 would usually call the XO to inform that they would

5 require our services.  Then the question of who was

6 going to pay for it would come up.

7          And so once that was decided, then a TONO number

8 would be issued.  A travel order number is what that

9 stands for.  So that created the accounting string, so

10 who was going to pay for it.  And then once that was

11 done, a set of orders would be issued.

12    Q.   So sometimes main base would pay for things for

13 COMMSTA?

14    A.   It wouldn't be main base Kodiak.  It would be

15 Juneau or it could be headquarters or, you know, Hawaii

16 or somebody -- you know, just somebody else other than

17 the COMMSTA.

18    Q.   And sometimes the COMMSTA would pay for things?

19    A.   Yes.

20    Q.   All right.  So was this policy of justifying

21 expect to articulate the value of travel to the Coast

22 Guard and permission or approval by the EO, those things

23 new information to you?  Was this new when Mr. Reckner

24 explained this process to you?

25    A.   I won't say it was new, but it was articulated on

1  a piece of paper.  Let's put it that way.

2      Q.  Just do the bottom three there.

3          And this lets you know, that paragraph C,

4  Mr. Hopkins was the shop supervisor and that was

5  generally --

6              MS. SHERMAN:  Objection; leading.

7              THE COURT:  That's sustained.

8  BY MR. COLBATH:

9      Q.  Who was generally the shop supervisor?

10     A.  ET1 Hopkins.

11     Q.  And did anything about Mr. Reckner's letter

12  change that in your mind?

13     A.  No.

14     Q.  Was it a question before you met with -- and went

15  over this with Mr. Reckner?

16     A.  No.

17     Q.  The next paragraph talks about trees dropped

18  during the workday.  And tell the jury about the cutting

19  of trees and how that related to the rigger shop's

20  function.

21     A.  We had -- when the COMMSTA was originally

22  designed, it was pretty much treeless back in the 1940s

23  when it was built.  So over the years, trees have, you

24  know, crept in.  It's happened all over the island.  So

25  we're having trees growing up inside the antenna field.

1          So we need to clear them out, because a lot of

2    times when the wind -- in the winter we get windstorms

3    and they knock the trees over.  So we try and clear out

4    areas where that could happen and remove that threat.

5        Q.   And has that been a process throughout -- was

6    that a process throughout your time at COMMSTA?

7        A.   Yes.

8        Q.   And as the COMMSTA expanded or there was new

9    development, who would be responsible for clearing sites

10   or developing areas where cables would run, things like

11   that?

12       A.   The rigger shop was.

13       Q.   You -- over the years, were you involved in that?

14       A.   Yes.

15       Q.   And so over the time -- as trees were taken from

16   the island or dropped, what was the general practice

17   over the years at COMMSTA?

18       A.   The practice was people could come in after hours

19   and remove wood.  The issue that we had with people is

20   they would take the rigger shop chain saws out without

21   being qualified to use them.  Any piece of equipment

22   that we had, we had a qualification sheet that people

23   had to sign off on.  Okay.

24          So we would have untrained people or unqualified

25   people checking out our chain saws.  So that was the

```
 1   issue that we had with people just taking the chain saws
 2   and going out and cutting wood.  It wasn't taking the
 3   wood.  It was just using the chain saws without being
 4   qualified.
 5       Q.  How did you heat your house primarily or at least
 6   partially on Kodiak?
 7       A.  I had a wood-burning stove, and I also had two
 8   oil heaters.
 9       Q.  So you used firewood?
10       A.  Yes.
11       Q.  And did you acquire some of that wood from
12   COMMSTA?
13       A.  Yes.
14       Q.  Did you have other places you got wood?
15       A.  Yes.
16       Q.  Where?
17       A.  I had friends that I cut on their property.
18   There was a logging operation going on out at Chiniak
19   and they were hauling logs, and then they were cutting
20   off the tops of them so you could purchase firewood from
21   the logging company.
22       Q.  Okay.  So the letter from Mr. Reckner referred
23   to -- or excuse me, from Mr. Reed, was there anything --
24   any change I guess in the tree availability policy?
25       A.  No.
```

1      Q.  Had that ever been -- that's okay.  Strike that.

2          Can we see the second page of that, I'm sorry,

3    Exhibit 35.

4          And the information relayed there, Mr. Wells, did

5    the information relayed to you about Mr. Hopkins, your

6    involvement with him, was that of concern to you?

7      A.  No, because over the years, you know, we have

8    mentored, you know, everybody in the shop, whether it

9    was an ET1 or ET2 as the shop supervisor down to the

10   non-rates.

11     Q.  Now, you say "we."  Who do you mean by "we"?

12     A.  Well, me before Rich joined, and then once Rich

13   joined, we continued that mentoring process.

14     Q.  Was Mr. Belisle also a former chief?

15     A.  Yes, he was.

16     Q.  Did you -- you were aware of that?

17     A.  Yes.

18     Q.  And did you see him, physically see him mentor

19   others and work with others?

20     A.  Yes.

21     Q.  That's fine.  We can take that down.

22          Now, during that same meeting, Mr. Reckner also

23   had -- can we see Exhibit 36.

24          Also, during the same meeting, did Mr. Reckner

25   talk to you about this memorandum which was from him,

1   not Chief -- Senior Chief Reed?

2       A.   Yes.

3       Q.   This deals more with trees.  If we could look at

4   that first paragraph.  Now, what was -- you talked about

5   the dropping of trees.  But was there a practice of tree

6   collaring --

7       A.   Yes.

8       Q.   -- on the island?

9            So tell the jury about that, how that developed

10  or how long that had been.

11      A.   I don't know how long it developed, but Rich and

12  I both would collar trees.  They had to come down

13  because they were in the way.  They weren't always

14  necessarily in the antenna field.  We did the same thing

15  along roads that we traveled to widen the path,

16  especially from driving the big line truck, because the

17  overhead would crash into the crane and the derrick.  So

18  we would widen the road at times too.

19      Q.   Okay.  And did Mr. Reckner during the meeting

20  discuss his familiarity or unfamiliarity with tree

21  collaring during this meeting?

22      A.   Yes.

23      Q.   And were you advised of this policy --

24           MS. SHERMAN:  Objection; leading.

25           THE COURT:  That's sustained.  Go ahead.

BY MR. COLBATH:

1

2     Q.   Did you get any information from Mr. Reckner at

3     the meeting about his expectations about tree collaring?

4     A.   Yes.

5     Q.   And what was it?

6     A.   That the practice would cease.

7     Q.   This would have been sometime in August of 2011,

8     right?

9     A.   Yes.

10    Q.   And what happened, at least as far as you're

11    concerned, with the practice of tree collaring after you

12    talked to Mr. Reckner about this and received this

13    Government Exhibit 36?

14    A.   It didn't happen again.

15    Q.   Okay.  Could trees still be removed without being

16    collared?

17    A.   Yes.

18    Q.   So was this changing of that practice going to

19    cause any problems with maintenance or rigger shop work?

20    A.   No.

21    Q.   Did you have any particular feelings about the

22    change in policy or the change in practice?

23    A.   No.

24    Q.   And then if we could look at the bottom part,

25    number three.  More information there.  Was any of those

```
1    sections -- I'll just have you review that, Mr. Wells.

2    Any of the more defined policy here that Mr. Reckner

3    talked to you about a problem at all in your eyes?

4         A.   No.

5         Q.   Anything there that would have affected the

6    rigger shop's work negatively or prevented you from

7    doing the things that you and Mr. Belisle and the others

8    needed to do?

9         A.   No.

10        Q.   All right.  I want to ask you about something on

11   page two of this.  That first -- the first line under D

12   there.  Do you recall -- I'll just have you review that

13   section D.  Do you recall Mr. Reckner visiting with you

14   about that?

15        A.   I don't recall it, but since it's in the letter,

16   then it -- then it happened.

17        Q.   Do you recall ever -- now, this refers to you

18   drafting or submitting a policy.  Do you recall ever

19   drafting or submitting a policy about tree removal for

20   COMMSTA?

21        A.   No, I did not.

22        Q.   And why not?

23        A.   I was sick.  And it totally slipped my mind that

24   I was required to do that.

25        Q.   The meeting was in August you said?
```

1    A.   Yeah.

2    Q.   And the policy here was supposed to be submitted

3  by when?

4    A.   1 December.

5    Q.   All right.  We can take that down.

6         So these two letters that Mr. Reckner initially

7  went over with you, you didn't sign or anything at that

8  August meeting?

9    A.   No.

10   Q.   When he -- when he contacted you or talked to you

11 again about these things in November then and had you

12 sign them, was there any new or different information

13 that you recall from your perspective?

14   A.   No.

15   Q.   Anything particularly concerning about signing

16 the letters on November 2nd?

17   A.   No.

18   Q.   How did you feel about the information that

19 either he passed along to you about the policies or

20 about having them now written down?

21   A.   Repeat the question, please.

22   Q.   Sure.  How did you feel about any of the

23 information that he passed along to you or having these

24 things now written down?

25   A.   Well, I can't say I had any particular feelings.

1    It was just the policies were now outlined and I would

2    follow the policies.

3        Q.   Well, was there -- was this a change in your eyes

4    of things being different?

5        A.   Only in as much as they were now written down.

6        Q.   And was the tree collaring, I guess was that

7    different?

8        A.   I'm not sure of the question.

9        Q.   Sure.  There had been tree collaring going on and

10   there had never been discussion or a policy about that,

11   right?

12       A.   Correct.

13       Q.   But now there was, so that was going to be

14   different?

15       A.   Yes.

16       Q.   Was your personal ability to get firewood or

17   access going to be changed by that tree collaring

18   change?

19       A.   No, because I had several other sources to

20   acquire firewood.

21       Q.   So after having these discussions with

22   Mr. Reckner, what was your intention with regard to

23   submitting leave requests or sick leave requests or

24   vacation requests?  Those were covered in there.  What

25   happened with those?

1    A.   I always tried to be timely with them.

2    Q.   Okay.  What was your intention about tree

3 collaring?  I think you answered that, but what happened

4 after the meetings?

5    A.   It wouldn't and didn't occur again.

6    Q.   How about what was your intention about

7 communicating with either somebody at the shop or

8 Mr. Reckner if you weren't going to be there because of

9 your illness or for some other reason?

10   A.   Well, I try and let people know my whereabouts.

11   Q.   What -- what was your usual practice in that if

12 you weren't going to be at the shop, say, some morning?

13   A.   I would usually call Rich because I knew he would

14 be there.  And so -- and 99 percent of the time I would

15 get ahold of him and say, "Hey, I'm not feeling well, I

16 won't be in that morning."  Let people know what's going

17 on.

18   Q.   All right.  Could we go back briefly to

19 defendant's Exhibit No. 168A, that calendar.  Blow those

20 three months up.

21        It looks like, Mr. Wells, other than the middle

22 week here in November, that you were away from work; is

23 that correct?

24   A.   Yes.

25   Q.   During -- and November of 2011.  Where did you

 1   spend the Thanksgiving holiday -- I think the underline

 2   is the 24th.  Where did you spend Thanksgiving 2011?

 3       A.   That was at home.

 4       Q.   Why was -- anything special about that?

 5       A.   Well, I was too sick to travel, so we had -- all

 6   the kids flew in for Thanksgiving that year.

 7       Q.   It looks like from that Thanksgiving week, can

 8   you see if -- did you return to work at all for the rest

 9   of that year?

10       A.   It doesn't appear that I did.

11       Q.   And so how about the Christmas holiday, where did

12   you spend the Christmas holiday of 2011?

13       A.   At my son and daughter-in-law's and my

14   grandchild.

15       Q.   Was that Matthew --

16       A.   No, it was my oldest son, Cable.  They were

17   living at that time in Gustavus.

18       Q.   So you traveled to southeast Alaska here?

19       A.   Yes.

20       Q.   Nancy go with you?

21       A.   Yes.

22       Q.   Were you feeling well enough to travel then?

23       A.   I think by that time, they had me on some

24   heavy-duty nausea medication, so it was -- it was

25   better.

1    Q.  Okay.  Had your medical problem been diagnosed at

2 that point or figured out?

3    A.  Not -- I don't think by that point, no.

4    Q.  So did you spend the entire Christmas holiday in

5 southeast with your oldest son --

6    A.  Yes.

7    Q.  -- and his family?

8    A.  Yes.

9    Q.  That would have included Christmas Eve, Christmas

10 day, Boxing Day, the next day?

11    A.  Yes.

12    Q.  Do you remember how long you were there?

13    A.  Probably -- at least a week, I think.

14    Q.  And then from southeast, ultimately back to

15 Kodiak?

16    A.  Yes.

17         MR. COLBATH:  Your Honor, I note it is just a

18 few minutes before 12.  It may be --

19         THE COURT:  Is this a good spot?

20         MR. COLBATH:  -- just a normal breaking point

21 before I start a new discussion about January of 2012.

22         THE COURT:  Let's take our lunch break, ladies

23 and gentlemen.  We'll have you back at about 1:05.

24 Leave your notepads here and remember my admonition not

25 to discuss the case.  We'll see you back here.  Have a

1  pleasant lunch.

2          (Jury absent)

3          THE COURT:  All right.  Please be seated,

4  everyone.

5          And Mr. Wells, you can return to counsel table.

6  And anything we need to take up?

7          MR. SKROCKI:  Nothing from us.

8          MR. COLBATH:  Nothing from us, Your Honor.

9  Other than I was looking at my note, and maybe the Court

10  didn't say it yet.  I didn't hear what you said about

11  when we would come back.

12          THE COURT:  1:05 p.m.  Very good.  We'll go off

13  record.

14          DEPUTY CLERK:  All rise.  The court stands in a

15  brief recess.

16          (Recessed 11:54 a.m. to 1:09 p.m.)

17          (Jury present)

18          DEPUTY CLERK:  Court is in session.

19          THE COURT:  Please be seated, everyone.

20  Welcome back, ladies and gentlemen.

21          Mr. Colbath, ready to proceed?

22          MR. COLBATH:  I am, Your Honor.

23          THE COURT:  All right.  Go right ahead.

24  BY MR. COLBATH:

25      Q.  Mr. Wells, I'm going to start by having

defendant's Exhibit No. 168A back up.  That's the
calendar.  I'm going to show page two of it, Counsel.

　　　　After being off the month of December, did you
continue to be gone in early January?

A.  Yes.

Q.  Can we blow just that two-months' period there?
And so looks like you worked on the 6th and the 20th,
back in January.  When you returned to work, did there
come a time that you recall talking to Mr. Reckner about
upcoming travels or potential upcoming travels?

A.  Yes.

Q.  All right.  And you can go ahead and take that
down.

　　　　And tell us about that conversation.  Did you
inquire of Mr. Reckner, or did he inquire of you?

A.  I believe I inquired with Mr. Reckner.

Q.  What did you ask him about?

A.  The NATE conference.

Q.  And I know the jury has heard some about that,
but tell the jury what the NATE conference was, just
briefly.

A.  Well, NATE stands for National Association of
Tower Erectors.  And they hold a yearly meeting in
various different cities.  Basically it's a collection
of commercial vendors having to deal with the tower

1    industry, and they also have a series of educational

2    classes dealing with tower issues.

3        Q.   Did you in the past prior to 2012 attend that

4    conference?

5        A.   Yes.

6        Q.   How many years?

7        A.   Probably ten.

8        Q.   How about Mr. Belisle, had he attended before?

9        A.   I believe he attended since he was hired.

10       Q.   I'm sorry.  Since he was hired?

11       A.   Yes.

12       Q.   And so would the two of you go together then to

13   that conference?

14       A.   Yes.

15       Q.   In light of your absence in November and

16   December, why were you asking about the conference in

17   January when you returned and talked to Mr. Reckner?

18       A.   Well, I was curious, because I had entertained

19   thoughts of attending.

20       Q.   All right.  Now, had you made any plans at that

21   point to attend?

22       A.   No.

23       Q.   And what were -- what was the normal process,

24   normally -- well, like the year before, who had went?

25       A.   The previous year, myself, Rich Belisle and Chief

1   Reckner attended.

2     Q.  Okay.  So when you asked Mr. Reckner about this

3   year, what did you -- what was the conversation, what

4   did you ask him?

5     A.  Basically who was going to go.

6     Q.  Okay.  And what did you find out?

7     A.  He said that he was attending, Rich was attending

8   and he was going to send Jim Hopkins to go.

9     Q.  Okay.  And what did you think about that?

10    A.  Well, Rich was going to go no matter what,

11   because that was basically part of his job to attend

12   this conference.  Chief Reckner went last year, so I had

13   assumed he was going to go this year.  And the only

14   question I had was why Jim Hopkins was going to attend.

15     Q.  And did you -- you said that's the only question

16   you had.  Was that a question you asked Mr. Reckner?

17     A.  Yes.

18     Q.  Okay.  And why was that a question for you?

19     A.  Well, he wasn't a climber.  He --

20     Q.  Well, let me stop you there.  Pardon my

21   interruption, Mr. Wells.  I neglected to ask you when we

22   were talking about Mr. Hopkins, had you or somebody else

23   qualified him to climb when he came to the COMMSTA in

24   2010?

25     A.  No.  He expressed no desire to climb.

1     Q.  Could he perform his duties as shop supervisor

2  without the necessity of having to climb?

3     A.  Yes.

4     Q.  But during the time that he was there, had

5  Mr. Hopkins climbed or participated in active climbing?

6     A.  No.

7     Q.  So I'm sorry I interrupted you.  You said you

8  were saying to Mr. Reckner about Mr. Hopkins going.

9     A.  Yes.  He had put his retirement letter in.  He

10  had told me about that the previous week.  So he was

11  intending to get out of the Coast Guard.  He didn't

12  climb.  And I didn't see the necessity for him attending

13  when he had no interest in the activities involved.

14     Q.  And so what was -- what do you recall

15  Mr. Reckner's explanation to you about why he would be

16  going?

17     A.  He didn't really give explanation.  He said, "You

18  aren't going to go, so we're going to send Hopkins."

19     Q.  First of all, how did you feel about you not

20  going, having attended the ten previous years?

21     A.  Well, I didn't expect to go because by that time

22  I already had my operation scheduled.

23     Q.  All right.  Do you know whether it was that first

24  Friday -- do you know what day in January you were back

25  to work when this conversation happened?

1    A.  I don't recall, no.

2    Q.  Okay.  And when was the NATE conference typically

3  held?

4    A.  Usually in the second week of February.

5    Q.  All right.  And when was your surgery planned?

6    A.  It was planned for the 8th of February.

7    Q.  And when -- when Mr. Reckner told you that you

8  weren't going to go, regardless of whether you had

9  medical issues, how did you feel about not being allowed

10  to attend?  I mean, did you have any concerns about

11  that?

12    A.  I didn't have any concerns.  I was disappointed

13  that I was going to miss it, but there weren't any

14  concerns because I wasn't going to be able to attend.

15    Q.  Did you know who had made the decision that you

16  weren't going to go?

17    A.  I believe Chief Reckner said he made the

18  decision.

19    Q.  How did you feel about -- you questioned it, so

20  did you have any concerns about Jim Hopkins going?

21    A.  Well, the concerns I had is the benefit for Jim

22  and the Coast Guard as a whole as to, you know, somebody

23  going to a conference that they -- for practical purpose

24  they would have no use for.

25    Q.  Were you mad at Chief Reckner about the decision?

1    A.   No.

2    Q.   Were you mad at Jim Hopkins about the decision?

3    A.   No.   In his place if I got a free trip to, you

4    know, San Antonio, I probably would have taken the trip.

5    Q.   Did you ever discuss it at all with Jim Hopkins?

6    A.   Well, I just told him, I questioned why he would

7    go is --

8    Q.   I'm not talking about a discussion with

9    Mr. Reckner.

10    A.   Oh.

11    Q.   Later after you found out, oh, Mr. Hopkins is

12    going, and you're not --

13    A.   I misheard the question.

14    Q.   So did you ever even end up talking to

15    Mr. Hopkins about it?

16    A.   No.

17    Q.   You said that it was a given that Rich was going

18    to go.  Did you question Mr. Reckner about why Rich was

19    going?

20    A.   No.

21    Q.   Did you call -- did you call Rich an F'ing rigger

22    or a name something to that effect?

23    A.   No, I did not.

24    Q.   Any discussion or concern by you expressed to

25    Mr. Reckner about Rich going?

1    A.  No.

2    Q.  Why not?

3    A.  It was a given he would go.  It was part of his

4  job.

5    Q.  Well, what if it -- did you understand there was

6  only a limited number of spots that could go?

7    A.  Yeah, generally what happened is headquarters

8  would pay for two billets, so that was usually Rich and

9  I.  And then the previous year, the COMMSTA had paid for

10  Chief Reckner to attend.

11    Q.  Well, if Mr. Hopkins was going to go and

12  Mr. Reckner was going to go, would it have been your

13  desire to replace Rich then and -- maybe if only one of

14  you can go, you over him?

15    A.  Well, I wasn't attending, so it wasn't an issue.

16    Q.  During January and into the beginning of the

17  year, is there -- well, first of all, is that NATE

18  conference typically the same timeframe roughly each

19  year?

20    A.  Yes.

21    Q.  And is there another sort of annual tower event?

22    A.  Yeah.  The Coast Guard civil engineering group

23  usually conducted a tower -- tall tower conference where

24  we'd select a Coast Guard site that had a tower and then

25  we would conduct usually an inspection of that antenna

1    and then conduct training and have, you know, seminars

2    and training involved also.

3        Q.   Was that NATE conference exclusive to the Coast

4    Guard?  Did only Coast Guard people attend that?

5        A.   No, it was a nationwide commercial endeavor.

6        Q.   How about this tall tower training, was that

7    exclusive to the Coast Guard?

8        A.   Yes.

9        Q.   And did you attend each year the tall tower

10   training conference?

11       A.   Yes, I did.

12       Q.   And how long had you been attending that?

13       A.   I think 2000 was the first year -- or 1999 I

14   think was the first year I attended.

15       Q.   12 or 13 years then?

16       A.   Yes.

17       Q.   Each year?

18       A.   Yes.

19       Q.   And how about Mr. Belisle, did Rich attend that?

20       A.   Once he was hired, yes.

21       Q.   And besides attending the event, did you or you

22   and he actively participate in sort of the curriculum

23   there at the tall tower training?

24       A.   Yes.  We would often teach portions of the

25   classes, and then we would also lead teams as far as we

1  divide up into teams to do certain aspects of a tower

2  inspection.

3      Q.  And in 2012, was there plans to attend for you,

4  plans to attend that tall tower training?

5      A.  Yes.

6      Q.  And who --

7      A.  Both Rich and I were planning to attend.

8      Q.  Did you know that in January or prior to your

9  February surgery?

10     A.  Yes.

11     Q.  When was the training going to be?

12     A.  It was going to be in later April, down in New

13 Orleans, at the COMMSTA New Orleans.

14     Q.  Time enough for you to recover from surgery?

15     A.  Hopefully, yes.

16     Q.  And who had coordinated or approved the plans to

17 attend the tall tower training?

18     A.  That was headed up by people back at

19 headquarters, and I think CEU, the civil engineering

20 unit, out of Miami was also heading that up, because

21 New Orleans was part of their responsibility.

22     Q.  But within COMMSTA, did Mr. Reckner know that you

23 and Rich were going?

24     A.  Yes.

25     Q.  Would Mr. Reckner have attended that as well?

1      A.   Not necessarily.

2      Q.   So did you end up having the surgery that you

3   were -- can we put 168A back up there.

4           Did you end up having the surgery you were

5   scheduled for?

6      A.   Yes.

7      Q.   When was it?

8      A.   February 8th, I believe, 2012.

9      Q.   Okay.  And when did -- when did you -- well,

10  first of all, what was the surgery for?  What exactly

11  did the doctors do to you?

12     A.   It was gallbladder removal and a hernia.

13     Q.   Both surgical processes in one surgery, or was it

14  two surgeries?

15     A.   One surgery, it was a two for one.

16     Q.   Done where?

17     A.   It was done at the Elmendorf Air Force Base in

18  their operating area.

19     Q.   And you said the surgery was February 8th.  How

20  long were you gone from work then?

21     A.   Well, from work, I came back from surgery and

22  still didn't go to work.

23     Q.   So there was some time spent recovering?

24     A.   Yes.

25     Q.   Do you recall your first day back at work?  You

1    can look at the calendar there.

2        A.   That would be February 24th.

3        Q.   Okay.  Now, that's about two weeks and two days

4    after your surgery.  We can take that down.

5             Were you ready to come back to work, physically?

6        A.   No.

7        Q.   Were you having complications from the surgery?

8        A.   Yes.

9        Q.   What were those?

10       A.   Well, I still had painful muscles in my stomach

11   from the hernia surgery.  The gallbladder surgery was an

12   arthroscopic procedure, so it was very -- just a small

13   hole in the stomach, so that wasn't uncomfortable, but

14   the hernia surgery still was.  I had had three or four

15   previous hernia surgeries, so I knew what to expect on

16   that.

17       Q.   How about side effects at all?

18       A.   Side effects from the gallbladder operation was

19   severe diarrhea.

20       Q.   So if you were not ready to come back to work,

21   why did you come back to work on February 24th?

22       A.   Well, I was out of leave.  I was already 40 days

23   in the hole as far as sick leave goes.  And I didn't

24   have any regular leave left, I don't believe.

25       Q.   All right.  When you went back to work, did you

go on any kind of restrictions?

A.   Well, limited or light duty, because I couldn't lift anything.

Q.   And how about throughout the process of the surgery, the recovery, did you continue to treat or monitor your diabetes?

A.   Yes.

Q.   When you got back to the -- I want to back up for a minute to a prior discussion, prior to February 24th that you would have had with Mr. Reckner about some of those letters.  Do you recall a prior discussion with him or meetings with him about those letters of expectation?

A.   Not any others than previously discussed, no.

Q.   Okay.  Well, did there come a time prior to your surgery and prior to returning to work on February 24th where he had talked to you about a meeting that he expected to happen with the commander?

A.   Yeah.  I recall vaguely saying that we needed to meet with the skipper concerning the fuel card issue.

Q.   And were you aware that -- whether or not you were going to receive anything at this meeting with -- the skipper is what you called the commander?

A.   Yes, the CO.

Q.   Were you aware about any documentation that was

1    going to happen at the meeting?

2        A.   There was going to be a letter, but that's pretty

3    much the extent that I remember the discussion.

4        Q.   Did Mr. Reckner tell you whether or not to be --

5    what to expect, I guess, for lack of a better

6    expectation?

7        A.   Just that it was going to be a letter from the

8    commanding officer concerning the fuel card and it

9    wasn't going to be a disciplinary action.

10       Q.   Okay.  How did you feel about that?

11       A.   I wasn't concerned.

12       Q.   Okay.  Did he say or give you any reason to be

13   concerned?

14              MS. SHERMAN:  Objection; hearsay.

15              THE COURT:  Did he give you any reason, you're

16   not asking for what he said?

17              MR. COLBATH:  No, no, no.

18   BY MR. COLBATH:

19       Q.   Don't tell me anything specific he said.  But in

20   light of the conversation, did you leave there feeling

21   any concern about whenever this upcoming meeting might

22   be?

23       A.   No.

24       Q.   All right.  So when you got back on

25   February 24th, you got back from surgery, was there in

1    fact a meeting that day?

2        A.   Yes, there was.

3        Q.   And maybe we could pull up Government Exhibit 37.

4             Where was the meeting at?

5        A.   The meeting was in the commanding officer's

6    office.

7        Q.   All right.  And who all was there, as you recall?

8        A.   The CO, XO, the EO, I want to say the command

9    master chief and Chief Reckner.

10       Q.   And yourself?

11       A.   And myself, yes.

12       Q.   All right.  And you've seen during the trial here

13   and you heard the commander, that was -- the commander

14   was Mr. Van Ness?

15       A.   Yes.

16       Q.   Who testified here.  You heard him testify about

17   this letter?

18       A.   Correct.

19       Q.   And if we could flip to the second page real

20   quick.  You recognize your signature, and that's the day

21   you received the letter?

22       A.   Yes.

23       Q.   And going into the discussion -- if we can go

24   back to the first page.  Going into the discussion -- or

25   into the meeting, did you have some idea about what the

1    discussion was going to be about?

2        A.   Other than it was concerning the fuel card, that

3    was it.

4        Q.   You didn't know the details?

5        A.   No.

6        Q.   And as the meeting transpired, who did most of

7    the talking?

8        A.   The skipper, the CO.

9        Q.   All right.  And did there come a time when he had

10   given you this letter and allowed you to review it,

11   asked you to sign it?

12       A.   Yes.

13       Q.   And was everybody still present in the room?

14       A.   Yes.

15       Q.   Discussions going on about the letter?

16           MS. SHERMAN:  Objection; leading.

17           THE COURT:  Sustained.

18   BY MR. COLBATH:

19       Q.   Was there discussions going on about the letter?

20       A.   There was some discussion about the letter.

21       Q.   All right.  Did there come a time when, before

22   you had signed it, the meeting got over or the

23   meeting -- some people left?

24       A.   Yes.

25       Q.   When anybody left, was -- first of all, was the

1    meeting over?

2        A.    No.

3        Q.    Well, what happened to cause people to leave?

4        A.    The CO stood up.

5        Q.    Did you stand up?

6        A.    No, I don't believe I did.

7        Q.    And why not?

8        A.    I was still looking at the letter and thinking

9    about it.

10       Q.    All right.  What happened then when the CO had

11   stood up and the other folks stood up?

12       A.    The other folks left the room.

13       Q.    Okay.  Commander Van Ness stay in the room?

14       A.    Yes, he did.

15       Q.    Did he remain standing?

16       A.    No, he sat back down at the table, and we had a

17   discussion.

18       Q.    How long do you think the two of you remained in

19   there discussing the letter?

20       A.    Not more than ten minutes.

21       Q.    What happened at the end?

22       A.    I ended up signing the letter.

23       Q.    Do you recall him -- his testimony and his

24   telling you that he had lost his trust in you?

25       A.    Yes.

1    Q.  Is that something that you remember him sharing

2  during that discussion?

3    A.  I believe he shared that when the rest of the

4  group was there and afterwards, both times.

5    Q.  And how did that make you feel?

6    A.  I was very sad and disappointed.

7    Q.  And why so?

8    A.  For one thing, I didn't take the fuel.  The other

9  thing is it just bothered me that I had lost their

10  trust.

11    Q.  Okay.  Had you spent any amount of time with

12  Commander Van Ness or had any regular contact with him?

13  He was obviously at the top of the COMMSTA chain of

14  command?

15    A.  Yes.

16    Q.  And so do you recall -- well, when you and he

17  were done with the discussion, did you take the letter?

18  Did you sign the letter?

19    A.  I signed the letter and got a copy of it.

20    Q.  Okay.  And did he give you any instructions as

21  you left with the letter?

22    A.  No, not any instructions per se.

23    Q.  Okay.  What was your intention in leaving his

24  office?  What did you plan to do as a result of this

25  meeting with him and the information, the things he told

1    you?

2        A.  Well, I would have to work hard to regain his

3    trust.

4        Q.  All right.  And what was your plan in that

5    regard?

6        A.  I don't say that I had a specific plan, but I

7    would just have to make sure that what I did would not

8    further erode his trust in me.

9        Q.  Did you feel like that he was disciplining you or

10   this was a negative employment mark for you, if that's

11   the right word?

12       A.  Well, it was a letter of caution, so it just --

13   but that was detailing the use of the fuel card.

14       Q.  But did you feel it was disciplinary?

15       A.  Not -- no.  It was cautionary.

16       Q.  Were you mad at Commander Van Ness?

17       A.  No, because obviously, something had happened

18   with the fuel card, so we needed to take better measures

19   to make sure that it didn't happen in the future.

20       Q.  In the -- so you continued -- from February 24th

21   moving forward, you were at work pretty regular or were

22   you at work pretty regular?

23       A.  I believe so.

24       Q.  All right.  You were out of leave?

25       A.  Yes.

```
 1        Q.  All right.  And when you came back to work on
 2   February 24th, was there a project going on to clean out
 3   the --
 4             MS. SHERMAN:  Objection; leading.
 5             THE COURT:  That's sustained.  Let him finish
 6   his whole -- why don't you state the whole question
 7   before the Government interposes an objection.
 8   BY MR. COLBATH:
 9        Q.  When you returned on February 24th, was there any
10   project related to the rigger shop warehouse going on
11   that you were aware of?
12        A.  Yes.
13        Q.  And prior to having left from surgery, were you
14   aware of the warehouse project?
15        A.  No.
16        Q.  Had you been asked by Mr. Reckner or anybody else
17   prior to February to be involved in the cleanup?
18        A.  I don't recollect that, no.
19        Q.  What were you aware of then once you got back to
20   work on February 24th, about the warehouse, that is?
21        A.  That they were cleaning it out and rearranging it
22   and straightening it out.
23        Q.  Now, had you been to that warehouse before?
24        A.  Many, many times.
25        Q.  And what was its uses?
```

1     A.   It was used for storage, dry storage.

2     Q.   For who?

3     A.   For everybody at the COMMSTA.  So there would be

4  furniture from usually up the hill that was either

5  broken or obsolete that they would store down there.

6  There was old transmitters.  We had done a transmitter

7  swap-out, so a lot of the old transmitter carcasses were

8  still stored down there, waiting to be disposed of.  We

9  had -- the rigger shop had a lot of stuff stored down

10  there.  People had personal stuff stored down there.

11     Q.   Who had personal stuff stored down there?

12     A.   Oh, lots of different people.

13     Q.   How about you?

14     A.   I had a bunch of concrete sacks stored down

15  there.  People stored tires down there.  People stored

16  boats in there.  People stored -- you know, just -- I've

17  seen household goods stored in there.  Just lots of

18  different stuff over the years.

19     Q.   When you came back then, who was involved in the

20  warehouse clean-out project that you understood?

21     A.   Well, Rich, Beauford, the non-rates, and they

22  were using people from up the hill.

23     Q.   You say up the hill, that's --

24     A.   That's T-1.

25     Q.   All right.

        A.   So they would be using some of the ETs from up

the hill.

        Q.   Did you take an active role in that?

        A.   No, I did not.

        Q.   Why not?

        A.   I wasn't physically able to really perform any

duties down there.

        Q.   And did you go over there at all?

        A.   Yes, I did.

        Q.   For what purpose?

        A.   Somebody had mentioned a bunch of nuts and bolts

that they needed me to look at.  So I drove my vehicle

down to the warehouse and took a look.

        Q.   And what happened in that regard?

        A.   Well, they had about a four-foot by four-foot

wooden crate, probably about two feet deep, and what

somebody had done is that we had stored a bunch of nuts

and bolts, and mostly stainless steel nuts and bolts

that we used for various repairs on the antennas, and

they were stored in labels in different boxes in the

Vidmars, drawers.  Vidmars is just a commercial name for

a cabinet.  And they had taken them all out of the

Vidmars and dumped them in this box.

        Q.   And what was your thought about that?

        A.   I couldn't understand why they would do that.

There are thousands of dollars worth of stainless steel nuts and bolts in there, and they'd all -- you know, we had -- that were previously sorted and arranged in the Vidmars and now they were all mixed together.

Q.   Were you mad about it?

A.   I was irked about it.  I won't say I was mad about it.

Q.   So did you have any more involvement in that process or the discussions that day?

A.   No.

Q.   Were you asked to make arrangements with regard to those sacks of concrete?

A.   I was.

Q.   What was -- generally, what was your plan with those, or what were you supposed to do?

A.   I had to move them out of the warehouse.  At that particular point in time, I wasn't physically able to do that.

Q.   Was there any time restriction or time limits placed on you?

A.   No.

Q.   Do you recall there being training at the COMMSTA going on, say, in late March or early April of 2012?

A.   Yes.

Q.   And would that have been down at the rigger shop

1  or up at T-1?

2     A.  No.  We conducted training in the basement of

3  T-1.

4     Q.  And had that been something you were involved in

5  in the past?

6     A.  Yes.

7     Q.  And what do you recall that was going on in late

8  March, early April of 2012?

9     A.  We were basically instructing the OSs, the

10  operation specialists from the ops deck on radio wave

11  propagation and antenna use.

12     Q.  And who was doing that training?

13     A.  I gave that training.

14     Q.  How did things like that get arranged up at the

15  COMMSTA?

16     A.  The operations officer, Mr. Jordinelli, basically

17  said he wanted some training done for their operators.

18     Q.  How frequently, say, on a calendar year would

19  there be training of some kind up at T-2?

20     A.  Well, there was usually monthly training

21  scheduled whether from the -- for the ETs, there was a

22  training schedule made out, so various people would

23  instruct on various topics.

24     Q.  And had you instructed before?

25     A.  Yes, I had.

1    Q.  And attended -- had you attended trainings where
2    others were instructing?
3    A.  Yes.
4    Q.  Did you have any reason in early -- late March or
5    early April of 2012 to believe you wouldn't continue to
6    attend those trainings?
7    A.  No.
8    Q.  Or be asked to instruct?
9    A.  No.
10   Q.  I want to go to April 11th of 2012.  The morning
11   of April 11th, do you recall having -- well, first of
12   all, where were you at on the morning of April 11th?
13   A.  April 11th, in the morning I was at my house.
14   Q.  Did you go to work that day?
15   A.  I did.
16   Q.  Normal time?
17   A.  Yes.
18   Q.  Which was?
19   A.  I would leave the house anywhere from 20 until
20   7:00, 6:40 to 6:50, just depending on when I left out
21   the door.
22   Q.  And where did you go when you first got to work
23   that morning on April 11th?
24   A.  T-2.
25   Q.  Do you recall having any discussion with

1  Mr. Reckner at some point or going anywhere leaving the

2  T-2 building?

3      A.  I believe that morning I said I was going up the

4  hill to go to use the bathroom.

5      Q.  Have you seen the videotape here of you walking

6  up the hill to T-1?

7      A.  Yes.

8      Q.  Was that something you had ever done prior to

9  April 11th, and that is walk from T-2 up the hill to use

10  the restrooms?

11      A.  Yes.

12      Q.  Why was that?

13      A.  We only had one restroom facility in T-2, and it

14  didn't do to tie it up for lengthy amounts of time,

15  because other people needed to use it.

16      Q.  What was the restroom situation up at T-1?

17      A.  There was a men's and a women's bathroom, and in

18  the men's bathroom, there was two urinals and I believe

19  three toilet stalls.

20      Q.  So did you -- when you were up at T-1, just what

21  activities did you do up there that morning?

22      A.  I went up and used the facilities, and then I

23  went down into the basement to do a further check on the

24  airflow or we have -- we have airflow meters to gauge

25  the air pressure and the flow rate in all of our

1  transmission lines going out to the antennas.  Because

2  all of our cables are pressurized with dry air.

3     Q.  What's the process of checking the pressure

4  rates?

5     A.  Well, the non-rates would do a daily air round.

6  Okay.  And all they would do is write the figures down.

7  But without interpreting those figures, it didn't do any

8  good to write them down.  So what we would do, we would

9  compare the rate of airflow and air pressure from the

10 previous day or the previous week.

11    Q.  You say "we."  Who was "we"?

12    A.  I would do that normally, and Rich would also do

13 that, because that's how we would find out if we had a

14 problem with the cable.  The issues we were having is

15 the bears like to bite the cable, which we had an

16 inch-and-five-eighths and we had three-inch-diameter

17 cables that we ran our antennas.  And so for some

18 particular reason, they could sense energy flow through

19 those cables, so they liked to bite it.

20    Q.  Did you have bears out in April of 2012?

21    A.  That would be when they would start to come out,

22 and they would have a tendency to bite the cables early

23 April.

24    Q.  Was there any unusual activities going on up at

25 T-1 or more activity than normal on April 11th?

1     A.   That week, and I believe the previous week, we

2    had some people from off island that were working on

3    installing a -- oh, some antennas and some satellite

4    tracking equipment or communications -- not tracking but

5    communications.

6     Q.   Was there any meetings planned or work planned

7    relative to that in the afternoon of April 11th?

8     A.   Yeah.  We were going to go on the roof of T-1 and

9    look about, think about sighting these temporary

10   antennas they planned on putting up.

11    Q.   Backing up before that meeting to the morning, in

12   addition to that pressure checking, was there anything

13   relative to those antennas or those people that happened

14   or that was scheduled to happen?

15    A.   We had had a few meetings before that, either

16   that week or the week before, about how we were going to

17   route the antenna run.

18    Q.   Okay.

19    A.   And there were a couple of issues involved in

20   that thinking.

21    Q.   Okay.  And did you do anything related to that

22   the morning of April 11th?

23    A.   Yeah.  Well, I was -- between bathroom breaks and

24   the air rounds, I went to the microwave room and looked

25   about penetration through the wall of the building to

get a cable through the wall.  We had holes already

drilled, but you had to figure out which hole we could

use and see if there was available holes to use to run

cables external to the building.

Q.  Where is the microwave room in T-1?

A.  That's in the basement.

Q.  And the antenna that was going to be temporary

installed on the roof, where was the -- where was the

line going to go from that antenna, either to or from

that antenna?

A.  Well, it would have to come out of the operations

space, and it would have to go through a special room

where it had a filter panel.  Go through that and

usually run along the cable trays in the basement and

then usually through the microwave room, because that's

where we had exit holes, and then up the side of the

building at T-1.  We already had previous cables that

were already installed running up to that tower outside

of T-1.

Q.  Do you recall after leaving the microwave room or

doing those things when it was that you would have went

back down to T-2?

A.  Probably sometime before lunchtime.  I don't have

an exact time for you.

Q.  Okay.  Did the meeting that you discussed happen

1  then in the afternoon back up at T-1?

2      A.   Yes.

3      Q.   Could we show Mr. Wells Government Exhibit 61.

4          Mr. Wells, this was already admitted and part

5  of -- can we stop it real quick there.

6          What are we looking at here, just to remind

7  everybody?

8      A.   Well, that's a picture from the camera mounted on

9  a telephone pole, very similar to the one that we seen

10 on the other side of T-1.  This covered the back

11 entrance to the ops deck.  There's a loading dock there.

12 But it was -- through that sliding door there is an

13 emergency exit from the operations deck.

14     Q.   All right.  And let's play that for a little bit.

15 And I'll tell you when to stop.

16          (Exhibit No. 61 playing in open court)

17 BY MR. COLBATH:

18     Q.   So did you recognize who that is on the roof?

19     A.   That looks like me.  Well, and then coming up

20 would look like Rich.

21     Q.   Okay.  What are -- in that area of the roof, what

22 are you doing?

23     A.   Well, you see a series of vents that are in the

24 roof.  That roof is actually a false roof.  That --

25     Q.   Let me interrupt you.  What do you mean false

1  roof?

2      A.  The original roof was just a flat concrete

3  bomb-proof roof.  But it had developed leaks, so they

4  ended up -- they couldn't find out where all the leaks

5  were coming from, so they put that roof on top and

6  extended all the vents up from the original roof.

7      Q.  Okay.  And so you and Mr. Belisle are there.

8  What are you looking at again in that area?

9      A.  There was another older vent that was square and

10 flat, not like the ones you visibly see there.

11     Q.  Can you continue to play that if you would.

12          (Exhibit No. 61 continues playing in open

13 court)

14 BY MR. COLBATH:

15     Q.  Are you and he having discussions?

16     A.  Yeah.  We're looking at the vent.  They needed --

17 or they're looking for a flat surface to mount the

18 antenna because, as you can see, that roof sloped pretty

19 good, so --

20     Q.  Okay.  Now, there's more people coming up on the

21 roof there.  Who else came -- ultimately came up on the

22 roof?

23     A.  Chief Reckner was up there.  And I don't remember

24 who else was up on the roof -- probably ET3 Beauford

25 would be my guess.

1    Q.  Okay.  If we could stop it there.

2        Let it run for a minute.  There's somebody else

3    coming.  Is that the end?  Okay.

4        That's the end of the video that we have.  But

5    where are you -- where are you relative to the roof, or

6    what's that area?

7    A.  That's probably where one of the square vents

8    was.

9    Q.  All right.  And did you participate in the

10   discussions up there?

11   A.  Yes.

12   Q.  And then ultimately, what happened?

13   A.  Well, we had discussed how we were going to run

14   the cable.  And there was two options introduced.  And

15   they wanted to drill through -- put a hole through the

16   vent and then run the cable along the original roof and

17   then out towards the side of the building.

18       And the issue that I raised with that is it was a

19   temporary antenna and I didn't like drilling holes in

20   perfectly good watertight, you know, equipment for a

21   temporary installation.  It will end up leaking.

22   Q.  Did you have to leave the meeting at some point?

23   A.  Yes, I did.

24   Q.  Where did you go?

25   A.  I went downstairs in the bathroom in T-1.

1    Q.   Then where did you go after that?

2    A.   After that, I went back down the hill to T-2 and

3    probably left for the day.

4    Q.   This was -- the meeting was into the afternoon?

5    A.   Yes.

6    Q.   Did you have any special -- when you left for

7    work the morning of April 11th, did you have any special

8    plans for after work?

9    A.   I was considering changing my tires because it

10   was coming up on the weekend.  I had been trying to get

11   ahold of the Kodiak Honeywagon because that winter our

12   septic system froze, so we were --

13   Q.   What happened with your septic system?

14   A.   The line froze.

15   Q.   And what did that result in?

16   A.   Well, it resulted in that we couldn't -- I had

17   to -- I basically diverted all of the gray water to run

18   out down the side of my hill.  So that was basically the

19   dishwasher, the washing machine, you know, the showers,

20   all of that, and then we were -- end up using a plastic

21   bucket to go to the bathroom in, other than --

22   Q.   How long had that been going on?

23   A.   Oh, since probably November.

24   Q.   Could the septic system be repaired prior to the

25   ground thawing out?

1      A.   No.

2      Q.   So what happened on April 11th after work?

3      A.   I got a phone call from Kodiak Honeywagon, said

4  they were available to come out and pump my system, my

5  septic tank.

6      Q.   So what did you do?

7      A.   So I got home from work and proceeded to go out

8  and finish digging out the access to the septic tank.

9      Q.   Where in relation to your home was the septic

10 tank?

11     A.   It was probably to the south, southwest out on

12 the lawn area.

13     Q.   Let's look at Exhibit 33 here, which I think has

14 been admitted.

15          What are we seeing here, Mr. Wells?

16     A.   We're seeing the hole where the septic tank is

17 located.  And that white pipe that you see in there,

18 that's the temporary line that I ran to take care of my

19 gray water.

20     Q.   And how was this dug?

21     A.   How was what done?

22     Q.   How was it dug?

23     A.   Oh, dug.  I thought you said done.  I dug it by

24 hand.

25     Q.   What were you digging up?

1    A.  Well, the septic tank was buried a couple feet

2  underneath the normal surface level.  So I had to dig

3  all that dirt out to access the hatch to open it up so

4  it could be pumped out.

5    Q.  And that was the evening of April 11th?

6    A.  Yes.  I had started before that, but I hadn't

7  finished.  So once I knew that the Honeywagon was on its

8  way, then I had to proceed to finish digging that out.

9    Q.  How many septic services was there available to

10  you on Kodiak?

11    A.  There's only one.

12    Q.  Were you able to get it dug out?

13    A.  Yes.

14    Q.  Did the Honeywagon, as you called it, show up

15  that evening?

16    A.  Yes, he did.

17    Q.  All right.  Can I show -- can we quickly show

18  Mr. Wells defense Exhibit No. 278.  Has that been

19  admitted, defense 278, Madam Clerk?

20        DEPUTY CLERK:  Yes.

21  BY MR. COLBATH:

22    Q.  What were you wearing when you were digging the

23  septic tank out?

24    A.  Well, I had my clothing that I had worn that day,

25  and I just put a pair of rain pants over my Carhartts

1    that I wear and my boots, and that's what I was wearing.

2        Q.   The pants we see here in this picture?

3        A.   Yes.

4        Q.   That's fine.  You can take that down.

5             So what happened when the septic service showed

6    up?

7        A.   Basically, finished cleaning it up -- scraping

8    the dirt away so we could access the cover, pried the

9    cover off, because I had sealed it every time -- it's

10   been pumped twice before that.  This was the second time

11   that the septic system had froze up.  So pried the cover

12   off and just waited for him to arrive.

13       Q.   Was he able to get the tank pumped out?

14       A.   Yes.

15       Q.   You were there during that time?

16       A.   Yes.

17       Q.   Once that was completed, what did you do?

18       A.   Basically, put the cover back on, put a little --

19   and finished cleaning up around the area.  And then went

20   back inside the house.

21       Q.   All right.  What happened that evening after you

22   were ultimately back in your house?

23       A.   Well, I fixed some dinner, took my meds and went

24   to bed.

25       Q.   Was your wife at home on April 11th?

1    A.   No, she was not.

2    Q.   Where was she?

3    A.   She was in Anchorage.

4    Q.   How long had she been in Anchorage?

5    A.   She had left Tuesday, April 10th.

6    Q.   So you were home alone that night?

7    A.   Yes.

8    Q.   After cleaning up and eating, what did you do?

9    A.   I went to bed.

10   Q.   What was your normal -- well, were you planning

11   on working the next day?

12   A.   Yes.

13   Q.   What was your normal morning routine or process

14   on a workday?

15   A.   Get up and if the wife was home, I would make

16   coffee and come --

17   Q.   Do you drink coffee?

18   A.   I do not drink coffee.

19   Q.   Ever?

20   A.   Never.  I've made thousands of pots of coffee and

21   I have never dranken a cup.

22   Q.   I interrupted you.  If Nancy was home you would

23   make coffee.  And what if she wasn't home?

24   A.   Then coffee wouldn't get made.

25   Q.   What was the normal routine?

1    A.   I would get up, take a shower, come downstairs,

2    make breakfast.

3    Q.   Were you the breakfast cook at your house?

4    A.   Yes, I was.

5    Q.   What was the normal time to get up?

6    A.   Around 6:00.

7    Q.   And did you have a normal breakfast routine,

8    food?

9    A.   Weekdays I alternated between usually three.  It

10   would either be eggs, French toast, or an omelet.

11   Q.   All right.  And so on the morning of April 12th,

12   do you have any special reason to know when you got up

13   that morning?

14   A.   Normal time, because the alarm was already

15   preset.  It was just a question of turning it on.

16   Q.   And what was your activities that morning?

17   A.   Got up, took a shower, came downstairs, did my

18   meds, did my blood sugar check, did the appropriate

19   amount of insulin.  It was on a sliding scale, so --

20   Q.   Was that a routine part of your morning as well,

21   always an insulin check?

22   A.   Yes.

23   Q.   All right.  Did you have breakfast?

24   A.   Fixed breakfast.  Then get ready to go to work.

25   Q.   What do you typically wear to work that time of

1    year?

2        A.   That time -- well, any time of the year, I wear

3    Carhartts.   In the wintertime, they were insulated.

4        Q.   Pants or coveralls?

5        A.   No, pants.

6        Q.   How about on the top half?

7        A.   A T-shirt and a long-sleeve over-shirt and then,

8    depending on the weather, it would depend on what -- how

9    heavy a duty of coat I would wear.

10       Q.   How about your feet?

11       A.   Boots.

12       Q.   What time do you leave the house that morning,

13   April 12th?

14       A.   Somewhere around 6:45, 6:50, just -- I didn't

15   keep track of the time.   I just walked out the door and

16   got in the truck and went to work.

17       Q.   Was your morning schedule and routine pretty

18   regular?

19       A.   Yes.

20       Q.   And was there anything abnormal at that point

21   about the morning of April 12th?

22       A.   No.

23       Q.   Where would you go to go to work?

24       A.   I went to T-2.

25       Q.   Driving what?

1    A.   My truck.

2    Q.   That's your white Dodge --

3    A.   That's my white Dodge.

4    Q.   -- we've seen pictures of?

5    A.   Yes.

6    Q.   And that morning leaving the house, where did you

7  go?

8    A.   Drove down the driveway, you know, normal course

9  of -- the normal course that I drive.

10    Q.   Is that out through your Bells Flats subdivision?

11    A.   Yes.

12    Q.   Did you have again just a normal route or routine

13  that you drove?

14    A.   Yes.

15    Q.   And at some point along the way, did you divert

16  or not make it to T-2?

17    A.   Yes.

18    Q.   Tell the jury about that.  What was going on as

19  you're driving to work, and where were you?

20    A.   Between, say, the Lash Dock and the main gate of

21  the base, I had noticed I was starting to pull to the

22  right.

23    Q.   Let me ask you about --

24    A.   The vehicle.

25    Q.   Let me ask you the Lash Dock.  What's that?

1      A.   Well, that was a commercial enterprise that

2   leases property from the Coast Guard, and there was a

3   dock there that they use for bringing in barges.  There

4   was a logging company that was staged there, their logs

5   for shipment overseas there.  So a big ship would come

6   in and they would load the logs on them.  In the

7   meantime, they just stored them there on the pier.

8      Q.   You said you noticed your vehicle was pulling to

9   the right, you said.  Did you know what was going on?

10     A.   No, other than just it was pulling to the right.

11     Q.   So what did you do?

12     A.   So I continued on.  Noticed that a little more.

13  So I would have to consciously correct the steering.

14     Q.   Did speed affect the severity of it at all?

15     A.   No, I can't say that I varied the speed.

16     Q.   All right.

17     A.   Other than to account for traffic.

18     Q.   Where did you go?

19     A.   Headed towards work, towards the airport and

20  decided I better turn off and see what was going on.

21     Q.   Where did you turn off?

22     A.   Turned off at the airport road.

23     Q.   Entering the airport road, where did you go?

24     A.   I cruised through the Comfort Inn parking lot.

25  It was activity going on there.  So at that point in

```
 1    time, I felt the urge to go to the bathroom.  So I
 2    continued on through the parking lot and headed towards
 3    the terminal along on that main road.
 4        Q.  Back out onto airport road?
 5        A.  Yes.
 6        Q.  Can we look at -- I think it's Government 91.
 7            Do you have the laser pointer there?
 8        A.  I do.
 9        Q.  Can you -- is the Comfort Inn parking lot where
10    you drove through on that picture?
11        A.  Yeah.  There's an entrance down there that
12    doesn't show.  So I drove in there, along here.  There
13    were a lot more cars that morning.  Drove out of here.
14    Drove down there.  There was a whole lot of activity
15    going on that morning.  So I pulled around through there
16    and parked about there at Servant Air.
17        Q.  All right.  So stay close to the microphone so we
18    can hear.
19        A.  Okay.
20        Q.  So was the tire noticeable or the truck
21    noticeable that --
22            MS. SHERMAN:  Objection; leading.
23            THE COURT:  That's sustained.
24    BY MR. COLBATH:
25        Q.  As you drove, were there any continued problems
```

1    with your truck?

2        A.   Well, I noticed that, you know, figured that the

3    tire was low.  At that speed it wasn't like it was

4    pulling to the right very much because of the slow

5    speed.

6        Q.   Okay.  So why drive to the Servant Air building?

7        A.   Well, because I knew that the Alaska Airline

8    terminal would be very crowded, and I had to go to the

9    bathroom.  So that's why I chose Servant Air.  I had

10   been in there before.

11       Q.   How did you know that the Alaska Airline terminal

12   would be crowded?

13       A.   Well, because it was in the morning and there's

14   usually two flights that arrive every morning at the

15   airport.

16       Q.   Is that -- had that been in 2012 something that

17   you had experienced before, regular flights in the

18   morning at Kodiak airport?

19       A.   Oh, yes.

20       Q.   Were those scheduled events?

21       A.   Yes.

22       Q.   Had you flown on those flights over the years?

23       A.   Yes.

24       Q.   So you mentioned then Servant Air.  Had you been

25   to Servant Air before?

1    A.   Yes.

2    Q.   Under what circumstances?

3    A.   I had flown out of there before.  I had met my

4  wife, Nancy, and either dropped her off or picked her up

5  or waited for her to get back from a trip to one of the

6  many villages on the island.

7    Q.   Remind me or remind the jury what Nancy's work

8  position was.  Did that have anything to do with the

9  Coast Guard?

10    A.   No, none whatsoever.

11    Q.   What did she do?

12    A.   She was a program -- infant -- she was a program

13  coordinator for the Infant Learning Program.

14    Q.   And did she travel the island regularly for that

15  job?

16    A.   Yes, she did.

17    Q.   And commercial flights?

18    A.   Well, charter flights for the -- you know, either

19  Island Air or Servant Air.

20    Q.   Were those the main charters on the island?

21    A.   Yes.

22    Q.   So I interrupted your story.  Can we blow maybe

23  that top half of the picture there up.  Yeah, that's

24  good.

25         You said again -- do you see in this picture,

1  Mr. Wells, near that Servant Air building a vehicle that

2  would have been in the approximate area where you

3  parked?

4      A.  Yes.

5      Q.  What is that?

6      A.  That's that white vehicle right there.

7      Q.  Okay.  And so once you parked your vehicle, what

8  did you do?

9      A.  I got -- started to get out of the vehicle.  Then

10  that -- my truck is fairly high off the ground, so in

11  stretching to get my leg out the door, I ended up

12  having -- messed my pants.

13      Q.  Okay.  How messy, or how severe?

14      A.  I don't know how to explain that.  Not severe,

15  but not lightly.  I would call it moderate.

16      Q.  And so, well, what happened then?  You got out of

17  your truck?

18      A.  Got out of the truck.  Went around the back of

19  the truck, walked up to the right side passenger tire

20  and looked at it and noticed that it was low.

21      Q.  Had you -- did you look at both side tires on the

22  driver -- or the passenger side of the truck?

23      A.  No, I didn't notice -- pay any attention to the

24  rear right tire.  I just looked at the front tire,

25  because that's where the problem was.

1    Q.  Give it an inspection?

2    A.  I looked at it, but I didn't notice anything.

3    Q.  Was it -- how about its condition?

4    A.  As far as?

5    Q.  Well, what --

6    A.  The tire was low.

7    Q.  Okay.  Flat on the rim?

8    A.  No.  If it was flat on the rim, I wouldn't have

9 been driving on it.

10   Q.  All right.  That time of morning, was it dark out

11 or light out?

12   A.  It was light, but I don't believe that the sun

13 had risen yet.  But it was light enough to see.

14   Q.  All right.  Where -- after inspecting your low

15 tire, where did you go or what happened?

16   A.  I think I went back to the back of the truck,

17 walked in front of it and went into the -- what I would

18 call the arctic entranceway of Servant Air.

19   Q.  Can we see that from here on the photo?

20   A.  Well, it's right at that corner, but you can't

21 see the actual door.

22   Q.  Do you go around the corner of the building, or

23 you just go into the arctic entry?

24   A.  You just go to that face of that entryway there.

25   Q.  Did you find the doors unlocked?

1     A.   Yes, they were unlocked.

2     Q.   What did you do?

3     A.   I went in the -- went in the outside doors, and

4 then there was an inner door.  I entered that and went

5 straight to the bathroom.

6     Q.   All right.  Did you go upstairs at all?

7     A.   No.

8     Q.   Did you --

9     A.   I wasn't aware that there was an upstairs, that

10 the access to the upstairs was there.  Can't say I

11 noticed any other doors.

12     Q.   Did you go in the hangar at all?

13     A.   No.

14     Q.   Had you -- did you find the -- the inside doors

15 to Servant Air unlocked?

16     A.   Yes.

17     Q.   And when you went inside, what did you do?

18     A.   I went straight to the bathroom.

19     Q.   Did you see anybody?

20     A.   No.

21     Q.   Did you look for anybody?

22     A.   No.

23     Q.   What did you do when you got to the bathroom?

24     A.   Dropped my pants, sat on the toilet and finished

25 going to the bathroom.

1    Q.  Is that a bathroom where there's multiple
2  stalls --
3    A.  No.  It's a single stall, door.  So once I
4  entered the door, I locked it and then proceeded to --
5    Q.  What happened in the bathroom?
6    A.  Okay.  I sat down and finished going to the
7  bathroom, wiped myself off, because it was fairly messy.
8  Stood up, got some paper towels and toilet paper,
9  cleaned myself off again.  Then got some wet paper
10  towels and cleaned off my pants.
11       Had another bout of diarrhea and proceeded to do
12  that all over again.  And eventually got all cleaned up,
13  you know, washed up, and exited the bathroom.
14    Q.  Any reason to keep track of time during that
15  process?
16    A.  No.
17    Q.  Okay.  And when you exited the bathroom, where
18  did you go?
19    A.  I went straight back outside and to the truck.
20    Q.  Okay.  On your way out the bathroom door and
21  passing through the lobby there, did you note passengers
22  around?
23    A.  No, I wasn't looking in that direction.  I just
24  basically beelined out the door.
25    Q.  Could Mr. Skonberg, who testified from Servant

Air, or anybody else been at the counter?  Did you talk
to any of them or look for any of them?

    A.  Didn't look in that direction.  Didn't talk to
anybody.

    Q.  Do you know whether they were there?

    A.  I couldn't say.

    Q.  Okay.

    A.  Somebody obviously was there because the door was
open.

    Q.  Once you got back out -- well, how did you get
back outside as far as entrance or exit for doorways?

    A.  I went -- exited the same door that I entered
through.

    Q.  Traveled the same route?

    A.  Yes.

    Q.  Where did you go -- you got back to your truck,
what did you do?

    A.  I got in the truck and backed out of the driveway
and made the decision to go home and change the tire.

    Q.  Well, let's talk about that decision.  The tire
was -- was the tire still drivable --

    A.  Yes.

    Q.  -- as you were there?

    A.  Yes.

    Q.  And were you sure at that point what was wrong

1    with it, other than appearing low?

2        A.   No.

3        Q.   Why make -- did you have a spare tire with you?

4        A.   There was a spare tire on the truck, but it was

5    the original tire that -- when I bought the vehicle in

6    2002.

7        Q.   Where was it located?

8        A.   It was underneath the bed of the truck, and I had

9    never taken it off.

10       Q.   Since 2002?

11       A.   Well, since I bought the truck, it had never -- I

12   had never used that tire.

13       Q.   How was it in relation to -- size-wise in

14   relation to the tires that were on your vehicle?

15       A.   It was a different size.

16       Q.   And how did that come to be?

17       A.   When I bought snow tires and summer tires, I

18   bought larger tires, 16 inches, but they were a

19   different diameter.

20       Q.   So why the decision to go home and change the

21   tire?

22       A.   I already had the -- the summer tires were

23   already there, already parked on the driveway ready to

24   go.

25       Q.   Now, the date was April 12th.  When was -- on

Kodiak Island in 2012, when was the tire changeover date where you had to take winter tires off?

A. April 15th.

Q. Did you have winter studded tires on either your truck or on your Honda?

A. Yes. Both.

Q. Had you had in past years?

A. Yes.

Q. And did you have separate sets of tires for each vehicle?

A. Yes.

Q. So you made the decision to go back home and change the tire you said?

A. Yes.

Q. Could you have driven to work and just filled it up with air?

A. I could have, yes, but that wouldn't have solved the problem of the tire going low again.

Q. Well, it would have put more air in the tire?

A. It would have put more air in the tire, yes.

Q. Did you have any of your summer tires with you --

A. No.

Q. -- at the airport there?

A. No.

Q. Any of the summer tires at work?

1    A.  No.

2    Q.  There were tools at work?

3    A.  Yes.

4    Q.  Did you have tools at home?

5    A.  Yes.

6    Q.  So you decided to go back to your residence?

7    A.  Yes.

8    Q.  Did you have your cell phone with you?

9    A.  No.

10   Q.  Why?

11   A.  I had often forgot my cell phone at home.

12   Q.  Okay.  So where did you go from Servant Air?

13       Let's put 91 back up there if we could.  I'm

14   sorry.

15   A.  Okay.  So I backed out of the -- backed out of

16   here.  Drove around here and then went to exit the

17   airport way.  At the time of the morning, there were a

18   lot of people leaving the airport.  So there was a line

19   here waiting to turn to go into town in the right-hand

20   turn lane.  And then towards the corner here, then this

21   side of the exit there was a left-hand turn lane to

22   getting on Rezanof.

23   Q.  At the bottom of the exhibit, 91, down here, that

24   goes to -- that just out of view is what street?

25   A.  Rezanof, or Chiniak Highway, depending on what

you want to call it.

Q.   In this view, if we go to the right, I know it's
the opposite on the road, but if you go to the right
that's the direction of where?

A.   That's towards the main base and out towards
Bells Flats and out to Chiniak.

Q.   Your house?

A.   Yes.

Q.   And the other way is?

A.   Towards town.

Q.   So what route did you take to go home to change
the tire?

A.   Drove out there, got in the left-hand turn lane
and waited for traffic to clear before I could pull out
and get on Rezanof.

Q.   And where did you go?

A.   I went home.

Q.   Okay.  Did you see anybody on the way home?

A.   I remember seeing Annette Ecret.

Q.   That's one of your neighbors.  She came here and
testified about seeing you?

A.   Yes.

Q.   You heard where she said she saw you in the
neighborhood.  Do you remember seeing her?

A.   I recall seeing her right there at the turnoff at

Rezanof and -- I can't remember the name of the street now.  But that's where I remember seeing her.

Q.   Regardless, did you recognize her when you saw her?

A.   Yes, I did.

Q.   Do anything?

A.   I believe I waved to her.

Q.   Had she waved to you?

A.   Yes, I think so.

Q.   All right.  Did you have any more problems with the truck driving home?

A.   No.

Q.   Was it doing -- behaving the same way?

A.   Yes, it was.

Q.   What did you do when you got to your house?

A.   Drove up the driveway, turned in front of the garage side parking and backed into the parking area that was by the foot of the stairs and by the family room.

Q.   Did you have any reason to know what time it was when you got home?

A.   No.  I wasn't keeping track of time.

Q.   All right.  Can we see Government Exhibit No. 141?

Does this -- well, that's your house, right?

1    A.   Yes.

2    Q.   Show generally at all where you would have parked

3 to change the tire?

4    A.   No.

5    Q.   Where -- just using the laser pointer, can you

6 use that picture to kind of explain it?

7    A.   There's probably another 20, 25 feet that extends

8 over this way before it gets to a steep hill, and

9 there's a little crick down the side, but I was over in

10 this direction.

11   Q.   Why over there away from your garage?

12   A.   Well, this area all in here was occupied.  Okay.

13 And this line right from the corner of this building,

14 you can't really tell on this picture, but that starts

15 the -- that starts the part of the steep slope down the

16 driveway.

17        So I wouldn't park on a slope to change a tire.

18 Just wouldn't -- I could do it over here by the garage,

19 because that was all flat, but not there because there

20 wasn't any room to park in front of the garage and this

21 is the start of a steep hill.

22   Q.   What are the tires that are pictured there?

23   A.   Those three tires, so this picture was taken

24 after I changed the tire, but those are my summer tires.

25 I had dug them out from underneath the house the

1    previous weekend getting ready to change the tires out.

2        Q.   Where were they normally stored -- whichever off

3    season you had, summer or winter?

4        A.   There's an entrance underneath the -- that's our

5    arctic entranceway and behind there's a family room, but

6    underneath this area was open.  And it's sloped back up

7    towards the back of the house, and so I stored tires

8    underneath there to keep them out of the weather.

9        Q.   For both vehicles?

10       A.   Yeah.  And I had four-wheeler tires back in

11   there.  A lot of different tires back in there.

12       Q.   So when you backed your truck into that area,

13   what did you do?

14       A.   Got out, went over and opened up the garage door,

15   because I had the tools already set to go.  Grabbed my

16   electric impact wrench.

17       Q.   An electric wrench?

18       A.   An electric impact wrench.  That's what I use

19   normally to undo my lug nuts.

20       Q.   Okay.

21       A.   Went over and knelt down on one knee and tried to

22   break free the nuts.  The impact -- the electric impact

23   wrench didn't have enough oomph to break the nuts free.

24       Q.   So what happened?

25       A.   So I sat that down, went up the stairs, went in

1    the house and called Rich.  Couldn't get ahold of him.

2    I called Hopkins' number.  Couldn't get ahold of him.

3    And I called Chief Reckner's number.  Couldn't get ahold

4    of him.

5         Q.  Leave messages though for some of those folks

6    anyway?

7         A.  Yes.

8         Q.  Then what?

9         A.  Came back downstairs.  Got my rain pants on.

10        Q.  Now, is that the rain pants you were wearing out

11   the night before digging out the septic?

12        A.  No.  I had a set of rain pants in the truck.

13        Q.  Let's look at 159 -- I think it's defense 159

14   maybe.  It might be Government.  Try defense.  I'm

15   sorry.  Yeah.  Government.  Is that Government one --

16   yes, Government.

17            That's your vehicle, Mr. Wells?

18        A.  Yes, it is.

19        Q.  Do we see the rain pants in the --

20        A.  Well, I see them because I know what they look

21   like, but that's them right there, green camouflage.

22        Q.  Green camouflage in the back seat, for the

23   record?

24        A.  Yes.  That's them right there.

25        Q.  Those were in your truck that day?

1    A.   Yes.

2    Q.   So you said you went back outside and put rain

3   pants on.  Was it raining?

4    A.   No, but the ground was probably damp.  And as a

5   matter of course, I always wore rain pants whenever I

6   would be scrounging around on the ground.

7    Q.   What did you do after you put your rain pants on?

8    A.   I went and got the lug wrench out of the garage

9   and an extender bar to go over it.  It was in a T square

10  lug wrench, so there were four different size nuts that

11  I could access the lug nuts.

12   Q.   Did you get the tire off?

13   A.   Well, what I did is I broke all the nuts.  Okay.

14  Then I went around and got my hydraulic jack and jacked

15  up the right front tire and then proceeded with the -- I

16  had sprayed the lug nuts before I went to break them

17  with WD-40 to help loosen them up.  And I went and got

18  the jack, jacked the tire up, got the impact wrench,

19  spun all the nuts off, took the tire off the hub.

20   Q.   Where did you put the tire that was low?

21   A.   The tire I just sat aside, basically leaning up

22  against the passenger side door.

23   Q.   Get the new tire back on?

24   A.   Went over and got the new tire, sprayed the lug

25  nuts again, put the tire on.  Put the lug nuts on.

1   Zipped them all up with the impact wrench a couple

2   different times to make sure they were tight.

3       Q.   Okay.   Then what did you do with the other -- the

4   tire that you had taken off?

5       A.   I looked to see if I could find what was going

6   on, why it was -- it had lost air.

7       Q.   What did you find?

8       A.   A found a nail embedded in the tire.

9       Q.   What did you do?

10      A.   Took my Leatherman and pulled the nail out.

11  Tossed it over -- over into the crick.

12      Q.   Okay.   Were you able to get it out with your

13  Leatherman?

14      A.   Yes, I was.

15      Q.   All right.   Why toss it in the crick?

16      A.   Well, I wasn't going to put it on the ground

17  anywhere.   And you know, out of being irked for a flat

18  tire, a lot of things ended up in that crick at one time

19  or another.

20      Q.   What happened after you did that?

21      A.   Said, ooh, I shouldn't do that because now I

22  won't find the hole, so I went over to one of the

23  landings on the stairs going up.

24      Q.   Let me show you a picture, Mr. Wells.   It's

25  Government 138.

```
 1            DEPUTY CLERK:  It's admitted.

 2            MR. COLBATH:  It is admitted.  Okay.

 3   BY MR. COLBATH:

 4       Q.  So you said you went over to the stair landing.

 5       A.  Yeah.  I'm pretty sure that that's the start of

 6   the landing.  That might be another stair, but what had

 7   happened was these --

 8       Q.  Speak into the microphone if you can, Mr. Wells.

 9       A.  These stairs were built when we added onto the

10   house in 1991 or '92, and they were starting to rot out.

11   And the lower platform section here did in fact rot out.

12   And so Nancy, my wife, had replaced it.  So she had

13   gotten new wood and replaced all the rotted stuff, and

14   she had pulled a bunch of nails out removing it.

15            And then on that platform, there was a bunch of

16   nails down here.  So I went and picked up one of the

17   nails that was on the platform and reinserted it into

18   the tire.

19       Q.  How did you do that?

20       A.  I took my Leatherman, ripped it up toward the

21   head of the nail and then basically put a thumb on it

22   and guided it in, into the hole and pushed it about

23   halfway down.

24       Q.  What was the purpose of that?

25       A.  Just so I could find the hole again.
```

1    Q.   What were you going to do with that tire?

2    A.   Probably take it over to the hobby shop and fix

3 it.

4    Q.   Had you repaired your own tires before?

5    A.   Many times.

6    Q.   Changed your own tires?

7    A.   That's usually when I changed -- buy new tires

8 for either winter tires or summer tires, I would go over

9 to the auto hobby shop, you know, change out the tires,

10 get them balanced and then take them back home.

11    Q.   To put on vehicles?

12    A.   Put on vehicles, yes.

13    Q.   Had you done that recently to April 12th?

14    A.   Yes.

15    Q.   Can we see -- there's an exhibit and I'm not sure

16 what it is, but the --

17         Did you have other tires in your truck?

18    A.   Yes, I did.

19    Q.   I think it's -- I apologize, Your Honor.  Give me

20 one second.

21         THE COURT:  That's fine.

22    Q.   Government 255.

23         Mr. Wells, had you recently got new tires for

24 your wife's car?

25    A.   Yes.

1    Q.  Where?

2    A.  In Anchorage.

3    Q.  When?

4    A.  I was -- I took a trip up August, what, 2, 3

5    and -- 2nd, 3rd and 4th, early -- not August, April.

6    Q.  Had you bought tires there in Anchorage?

7    A.  Yeah, I usually bought my tires at Costco.

8    Q.  And, Your Honor, I'm showing Mr. Wells for

9    foundation Government Exhibit No. 255.

10       And do you recognize that, Mr. Wells?

11   A.  Yes.

12   Q.  And are you familiar with what those are?

13   A.  Yes.

14       MR. COLBATH:  I'm going to move 255.

15       THE COURT:  Any objection to 255?

16       MS. SHERMAN:  No.

17       THE COURT:  That's admitted.

18       (Exhibit No. 255 admitted)

19   BY MR. COLBATH:

20   Q.  Where are these tires, Mr. Wells?  Where is this

21   picture depicting?

22   A.  The back of my truck.

23   Q.  And are those tires for your truck or for another

24   car?

25   A.  Well, the tire in the foreground is from my

truck, and all the ones in the background are from

Nancy's vehicle.

   Q.   And are those the new tires that you had

purchased?

   A.   Well, there's new and old tires in there.  The

new tires would be on the rims, and the old tires would

be without rims.

   Q.   Had you been to the auto hobby shop on base

regarding the new and old set of tires depicted there?

   A.   Yes.

   Q.   What had you done?

   A.   I changed them out.

   Q.   What do you mean changed them out?  Not on the

vehicle?

   A.   No, no.  The tires were loose, so I just took

them and one at a time took the old tire off and then

would install the new tire.

   Q.   On the rim?

   A.   On the rim.  And then I would roll it over to the

office there, and then they would balance it.  So I

would do one and send it over and start the balancing

process, and then I would do another tire and finish

that and roll it over and get it balanced and then

repeat it four times.

   Q.   So this tire with the nail, is that the one we

1  see in the foreground here?

2      A.  Yes.

3      Q.  So again, what was your plan with it?

4      A.  Probably go over on the weekend and repair it.

5      Q.  Okay.  After doing the -- putting the tire then

6  in the truck, what did you do?

7      A.  Basically went back upstairs, washed up, repeated

8  the bathroom episode, collected up the waste in the

9  five-gallon container, brought it back downstairs, put

10  it in the back of the truck.

11      Q.  All right.  Where did you go?

12      A.  Went down the driveway, continued on Middle Bay

13  Drive, and if you take that straight through, bypasses

14  the back side of the asphalt plant and ends up at

15  Sergeant Creek Road.  And across that road is where the

16  community dumpster for this side of Bells Flats was

17  located.

18      Q.  Why did you go there?

19      A.  To get rid of the waste.

20      Q.  From the bucket?

21      A.  From the bucket, yes.

22      Q.  Did you travel from there on to work?

23      A.  Yes, I did.

24          MR. COLBATH:  And can we show Mr. Wells

25  Government Exhibit 67.

```
 1            (Exhibit No. 67 playing in open court)
 2    BY MR. COLBATH:
 3        Q.  Is that you pulling up, Mr. Wells?
 4        A.  Yes, it is.
 5        Q.  To work that morning at 8:23?
 6        A.  Yes.
 7        Q.  Do you recall that officer coming up to the car
 8    there or that person?
 9        A.  Yes, I do.
10        Q.  What did you do?
11        A.  I rolled my window down.
12        Q.  And then?
13        A.  And then he asked me for my license and
14    identification.
15        Q.  Okay.  Did you know what had happened at this
16    point at T-2?
17        A.  Specifically, no.
18        Q.  On the way to work, had you received any phone
19    calls?
20        A.  Yes, I did.
21        Q.  Who was the first one from?
22        A.  I'm not sure of the exact order, but I had a call
23    from somebody up from the ops deck and said that there
24    was an incident at the COMMSTA and they were doing a
25    security check and trying to get ahold of people.
```

1    Q.   Were you on your way to work at that point?

2    A.   I was.

3    Q.   Did you get any details about the incident at

4    COMMSTA?

5    A.   No.  All they said, it was an incident.  That was

6    all that they said.

7    Q.   Did you have a chance to ask them more details?

8    A.   No.  They basically hung up the phone.  I tried

9    calling back a couple or four times to find out what

10   else was going on, and I never could get anybody to

11   answer.

12   Q.   Did you get another phone call as you traveled?

13   A.   Yes, I did.  Yes, I got a call from Para --

14   Q.   Okay.

15   A.   -- Upchurch.

16   Q.   Did she give you any more detailed information?

17   A.   No.  She just said that something had happened at

18   the COMMSTA and where was I.  I said, "I'm on my way in

19   to work."

20   Q.   So then you arrived here like we see?

21   A.   Yes.

22   Q.   And when you got out, did you hear -- well, how

23   was it that you received these calls driving back?  Did

24   you have your phone?

25   A.   Yeah, I picked up my phone.

1     Q.   And so when you got here, did you have -- who's
2     the first people besides that officer that you really
3     had a conversation with?
4     A.   Scott Reckner.
5     Q.   Okay.  And what did Mr. Reckner tell you,
6     generally?
7     A.   Generally, he said that Rich and Jim were dead.
8     Q.   The commander, Mr. Van Ness, had walked up?
9     A.   Yes.
10    Q.   He was there for that part of the conversation?
11    A.   Maybe not the first part, but then very shortly
12    thereafter.
13    Q.   What was your reaction when Mr. Reckner told you
14    that?
15    A.   I was stunned.
16    Q.   And do you remember what you said?
17    A.   "Oh, God," or some other -- maybe a profanity
18    involved in there.  And then I says, "Well, God, I had a
19    flat tire."
20    Q.   And why did you think about your flat tire, or
21    why was that your explanation?
22    A.   Because I should have been at the COMMSTA at 7:00
23    that morning.
24    Q.   How long did you stay right there?
25    A.   A couple of minutes.

1    Q.  Did you have more conversation with Mr. Reckner?

2    A.  And the CO, yes.

3    Q.  This is that conversation going on that you just

4 told us about?

5    A.  Yes.

6        (Exhibit 67 playing in open court)

7    A.  That's the officer returning my ID back to me.

8    Q.  Is Mr. Van Ness talking to the officer?

9    A.  Yes.  I think the officer asked him for his ID

10 also.

11    Q.  Okay.  Are you and Mr. Reckner talking there?  I

12 don't need to know what you said, but are you having

13 more conversation?

14    A.  Yes.

15    Q.  Do you continue to talk there?

16    A.  Yes.

17    Q.  Eventually -- that's fine.  You can stop there.

18        Where do you go?

19    A.  The officer directed me to proceed up the hill,

20 back up to T-1.

21    Q.  And generally, without going through minute by

22 minute, what happens up the hill over the next several

23 hours at T-1?

24    A.  Oh, a lot of confusion, a lot of wondering what

25 happened.  Nobody knows for sure all the details of what

was going on.  There was speculation of what, you know,

what had happened, who had done it, how it happened.

There was no general -- general information other than

rumors and speculation.

Q.  Had a few of the people been down to T-2 before

the police arrived and seen little bits of it?

A.  Yes.

Q.  And that was being talked about?

A.  Yes.  Para had been down there, so she had talked

about it.

Q.  Did you eat during the day?

A.  Sparingly.

Q.  Did you -- how were you -- how were your

thoughts?  What were your feelings about the situation?

A.  I was stunned and bewildered and in shock and

trying to process everything internally as to what was

going on.

Q.  Why internally?

A.  That's how I handle problems.  I internalize

things.

Q.  And has that always been the case?

A.  Always, yes.

Q.  Were you sharing in the conversations with

people?

A.  I was engaging in conversations.  I'm not sure

1    how much I was sharing.

2        Q.   You heard Master Chief Lowdermilk testify about a

3    time during the day when you came in his office and sat

4    on the couch or he said he observed you come in his

5    office and sit on the couch.  What were you doing there?

6        A.   I have no memory of that whatsoever, of doing

7    that.

8        Q.   What you were thinking then?

9        A.   I have no memory of even going into his office.

10       Q.   Okay.  Do you doubt that that could have

11   happened?

12       A.   No.  If he says it, I believe him, but I have

13   absolutely no memory of that ever occurring.

14       Q.   Did you sleep up at T-2 at all that day?

15       A.   I don't believe I was sleeping.  There would be

16   times I would close my eyes and start thinking about

17   things.

18       Q.   Were you tired?

19       A.   I was tired, yes.  It wasn't a time for sleeping.

20   I wouldn't have been sleeping.

21       Q.   How about reading a book?

22       A.   Yes, at some point in time, I went back out to my

23   truck and got a book out of my vehicle.

24       Q.   Did you keep books in your truck?

25       A.   Yes, I did.

1    Q.  Are you a reader?

2    A.  Very much so.

3    Q.  How much very much so?

4    A.  Oh, I have hundreds, if not thousands, of books

5    at the house.  I could read a book in a day or day and a

6    half.

7    Q.  We saw some photos.  I won't pull them up, but

8    the photos in your truck there and there was a whole

9    series of books on the ground there.  Appeared to be by

10   one author.  Who was the author at that time?

11   A.  At that time, it would have been Nora Roberts.

12   Q.  And how many books of hers have you read?

13   A.  I've read everything she has written.

14   Q.  Did you have favorite authors, favorite types of

15   books, what?

16   A.  I have -- my reading appetite varied.  I read

17   lots of different things.  So I did have favorite

18   authors.

19   Q.  When you -- throughout the day, did -- what were

20   you -- what was your understanding of what you were

21   waiting for up there at T-1?

22   A.  We had a meeting where -- I believe it was down

23   in the basement where the skipper came in and said what

24   was going on.  He said we were waiting for

25   investigators, the FBI to come down from Anchorage.  We

1    were all restricted to the COMMSTA until we could be

2    interviewed.  So we were just waiting around for them to

3    show up.

4        Q.  And that happened?

5        A.  Yes.

6        Q.  It was later in the evening when you were first

7    interviewed?

8        A.  Yes.

9        Q.  Had you seen other people come and go being

10   interviewed?

11       A.  I would say I had seen them -- some come, but

12   normally, I can't say I recall them coming back into --

13   you know, into the ET deck where we were waiting to be

14   interviewed.

15       Q.  When you -- when it was your turn to be

16   interviewed, you were interviewed at first by a couple

17   of FBI agents?

18       A.  I believe one FBI agent and one CGIS agent.

19       Q.  Did it seem suspicious or problematic to you at

20   all that it was two agents interviewing you?

21       A.  No.

22       Q.  Did you feel in any way singled out by them?

23       A.  No.  Everybody was being interviewed.

24       Q.  And did you feel like a suspect or a person they

25   were focused on?

1    A.  Not at all.

2    Q.  Why not?

3    A.  I didn't do it.  I wasn't worried about being a

4  suspect.

5    Q.  Did they tell you you were a suspect?

6    A.  No.

7    Q.  And what was the -- from your perspective, what

8  was -- what happened in those -- in that first

9  interview?

10    A.  The first interview was just a general

11  information gathering.  That's how I interpreted it.

12    Q.  And they talked to you about you and your events

13  of the day?

14    A.  Yes.

15    Q.  The rigger shop and different people, all those

16  things that we heard the interview on the tape?

17    A.  Yes.

18    Q.  What we didn't hear was a detailed explanation of

19  your activities at the airport.  Did you share that with

20  them?

21    A.  No.

22    Q.  Did you tell them you had been at the airport

23  that morning with the flat tire?

24    A.  I believe I did.

25    Q.  Why not all the details you're sharing here

1    today?

2        A.   It was very personal and embarrassing.

3        Q.   As far as the information you provided to the

4    agents, did they seem to have other questions or seem to

5    do -- be doing other than collecting information from

6    you?

7        A.   No, they were just asking questions, and I was

8    answering them.

9        Q.   All right.  And did that continue -- they took a

10   break ultimately and then came back and talked to you a

11   second time?

12       A.   Yes.

13       Q.   When they came back the second time, did it feel

14   like there was anything different about it, any

15   different focus by them or change in tone or anything?

16       A.   Not -- no, not to me.

17       Q.   Did the purpose seem any different?

18       A.   No.  Just gathering information.

19       Q.   Did you feel like at that point they were focused

20   in on you for some reason or treating you different than

21   anybody else?

22       A.   Well, I couldn't say how they treated anybody

23   else, because I didn't observe any.  But I didn't feel

24   any different from the -- between the first two

25   interviews, no.

  1    Q.  Again, they took a break, and then they came back

  2  a third time.  Was it suspicious they came back a third

  3  time or did it --

  4          MS. SHERMAN:  Objection; leading.

  5  BY MR. COLBATH:

  6    Q.  Was it suspicious to you?

  7    A.  No.

  8    Q.  Did you have concern that they were talking to

  9  you and then going out of the room and coming back to

 10  talk to you?

 11    A.  No.

 12    Q.  During the third interview, did anything seem out

 13  of the ordinary yet?

 14    A.  No.

 15    Q.  Now, at some point in that third interview, they

 16  asked you about -- do you recall looking at your

 17  telephone?

 18    A.  Yes.

 19    Q.  And they asked you to look at your telephone.  Do

 20  you recall that?

 21    A.  I don't believe they asked me -- oh, I looked at

 22  my telephone to confirm some times.  Okay.  And I didn't

 23  think anything out of the ordinary about that.  Oh, you

 24  mean when they asked me to -- to hand them over the

 25  phone to look at it?  Is that your question?

1    Q.   Yeah.  Did that occur?

2    A.   Yes, it did.

3    Q.   Did you do that?

4    A.   Yes, I did.

5    Q.   Did that seem out of the ordinary, or you have

6    concern about that?

7    A.   No.

8    Q.   They also spoke to you about your pickup truck?

9    A.   Yes.

10   Q.   That was -- you had that there parked at T-1 all

11   day?

12   A.   Yes.

13   Q.   Did you have any issues with them searching the

14   truck or going out to look in the truck?

15   A.   No.

16   Q.   Why did you tell them that the tire was out

17   there?

18   A.   Because that was the reason why I detoured to the

19   airport.  So I think that's why I told them the tire was

20   in the back of the truck.

21   Q.   Had you discussed with them specifically at that

22   point how the low tire came to be?

23   A.   No.

24   Q.   And when you went out to -- did you accompany

25   them outside when they took you up on your offer to

1    search the truck?

2        A.   Yes.

3        Q.   And did you have conversations with Agent

4    Oberlander out there about the tire and the truck and

5    things in the truck?

6        A.   I can't say who I had conversations with, but I

7    had conversations, yes.

8        Q.   And was the nail in the tire discussed out there?

9        A.   Yes, it was.

10       Q.   Did they look in the back of the truck?  Did you

11   see them look in the back of the truck at the tires?

12       A.   Yes.

13       Q.   And did you -- where did you stand while they

14   were searching the truck?

15       A.   Generally at the back of the truck, because there

16   were cars parked on either side.

17       Q.   And one agent or more than one agent?

18       A.   Two or three, maybe four.  I don't recall how

19   many there were.

20       Q.   At some point did you go back in to T-1?

21       A.   Yes.

22       Q.   And when they came back in, the interviewing

23   continued?

24       A.   Yes.

25       Q.   There had been some discussion about not getting

1  done that night or the agents taking you to your house.

2  Do you recall that?

3      A.  Yes.

4      Q.  Did that seem unusual to you or --

5      A.  Yeah, slightly unusual.  I don't understand the

6  reasoning why they would want to accompany me home, but

7  I didn't give it any really deep thought concerning

8  that.

9      Q.  If that needed to happen, were you going to take

10 them to your house?

11     A.  Yes.

12     Q.  Come back to T-1?

13     A.  If necessary.

14     Q.  All right.  Before that discussion further there

15 was a last interview where a third agent came in.  Do

16 you recall that?

17     A.  Yes.

18     Q.  And did you know prior to her coming in with the

19 other two that she was going to be joining you?

20     A.  No.

21     Q.  When she came in, do you recall them talking to

22 you about this gunshot residue test?

23     A.  Yes.

24     Q.  Did you know what that was?

25     A.  Generally, yes.

1    Q.   How?

2    A.   Oh, I had seen it on various TV shows.

3    Q.   Okay.  Did it -- did you understand it to be a

4    real thing?

5    A.   Yes.

6    Q.   Did they tell you it was a real thing?

7    A.   Well, they said they were going to do a GSR test

8    just for elimination processes or just going to do a GSR

9    test.  So I understood it to be real, yes.

10   Q.   Did that appear that they were serious to you?

11   A.   Very.

12   Q.   Okay.  And was -- now, at that point, did you

13   feel like a suspect or a person that they were focused

14   on?

15   A.   No.

16   Q.   Why?

17   A.   They were eliminating stuff.  I had no issue with

18   having the test performed.

19   Q.   Did you watch Ms. Strause?  Did Ms. Strause have

20   the things she needed to do the test?

21   A.   There was some discussion about having a gauze

22   pad, so I offered -- you know, I said, well, we have

23   plenty of first-aid kits stationed around the COMMSTA.

24   Each one of them would have gauze pads in it.  So I just

25   pointed out where she could find a first-aid kit.

1    Q.   Did she do her test?

2    A.   Yes, she did.

3    Q.   Now, your testimony about you watching her get it

4    all packaged up, did you watch her get it all packaged

5    up?

6    A.   Yes, I did.

7    Q.   Why?

8    A.   Well, I was active duty Coast Guard.  I was a

9    urinalysis technician, I suppose I could call it.

10   Tinkle tech was what the vernacular joke was.  The

11   military does various urinalysis tests for its active

12   duty members.

13        So you're required to escort them into the

14   bathroom and observe them, you know, placing a sample in

15   a cup, and then receiving that sample and sealing it and

16   signing for it.  So I had some interest in comparing

17   that procedure to what I was -- what I had done before.

18   Q.   Okay.  Watching her seal it?

19   A.   Yes.

20   Q.   Sign it?

21   A.   Yes.

22   Q.   After that process occurred, the agents didn't go

23   home with you, but you were allowed to go?

24   A.   Yes.

25   Q.   Where did you go?

1     A.   I went home.

2     Q.   And as you drove home or got to your house that

3 night, had anything about the search of your truck or

4 phone, that test, those interviews, made you feel like

5 the police were after you?

6     A.   No.

7     Q.   They were focused on you?

8     A.   No.

9     Q.   Had you just thought to yourself, Mr. Wells, that

10 because you weren't there that morning, you were a

11 suspect?

12    A.   No.

13    Q.   That didn't cross your mind?

14    A.   No.

15    Q.   Okay.

16         THE COURT:  So, Mr. Colbath, is there a good

17 place we could take an afternoon break here?

18         MR. COLBATH:  If I could have one more

19 question, Your Honor, I'm going to move to the next day.

20         THE COURT:  Sure, yes.

21 BY MR. COLBATH:

22    Q.   That night, Mr. Wells, when you got home the

23 night of April 12th, was there activity at your house or

24 were you worried about anything?

25    A.   I wasn't so much worried, but sometime around

11:30 or midnight, there was a car that came partially
up the driveway.  So I looked out one of my front
windows.

Q.  Did you know what it was?

A.  I -- no, it was too far down the driveway to
identify, plus the light -- it was dark, so couldn't see
past the headlights other than it was a vehicle.

Q.  It went away?

A.  It stayed there for a minute or so and then
backed back down the driveway and took off down the
road.

MR. COLBATH:  Okay.  Before I go on to the next
day, Your Honor, that would be fine.  I don't have a ton
more.  But it would be a good time for a break.  That's
fine.

THE COURT:  Let's do that.  Please leave your
notepads here.  Remember my admonition not to discuss
the case.  We'll take about 15 minutes and go off record
at this time.

(Recessed from 2:48 p.m. to 3:11 p.m.)

(Jury present)

DEPUTY CLERK:  Court is again in session.

THE COURT:  Please be seated, everyone.  We're
back on record here.  Ready to proceed, Mr. Colbath?

MR. COLBATH:  I am, Your Honor.  Thank you.

BY MR. COLBATH:

Q.  Mr. Wells, we had ended, it was the night of April 12th.  So on April 13th, you went back to T-1?

A.  Yes.

Q.  And did there come a time at some point where you rejoined those two agents to continue your interviews?

A.  Yes.

Q.  And at the start of the interview, we heard on the tapes them read you some advice or go over a form with you, some kind of advice or rights.  You said you were concerned about that on the tape.  Do you remember that?

A.  Yes, I do.

Q.  What was going on in your mind?

A.  Well, any time somebody reads you -- they didn't call it a Miranda warning, but that's in essence what it was, you should show some concern.

Q.  Okay.  You talked to them about that?

A.  Yes.

Q.  And after visiting more with them, were you concerned?

A.  No, because they said I wasn't a suspect.

Q.  Okay.  Signed the form and continued to talk to them?

A.  Yes.

1    Q.  Did that interview go like -- generally like the

2  ones at the start there, like generally like the ones

3  the day before, or did it proceed differently?

4    A.  No, it was generally the same, just questions and

5  then information seeking, to my knowledge.

6    Q.  Did they provide you details about the events of

7  the investigation?

8    A.  Not then, no.

9    Q.  Any specific information --

10    A.  No.

11    Q.  -- that they had?

12    A.  Not at that time, no.

13    Q.  And as the interview continued there at the

14  beginning, they had you draw a diagram.  You did that?

15    A.  Yes.

16    Q.  One of the things that you depicted on your

17  diagram was the general camera setup.  You were aware of

18  the cameras around the COMMSTA?

19    A.  Yes.  I installed most all of the outside ones.

20    Q.  And you knew how they operated?

21    A.  Roughly.

22    Q.  Okay.  And what did you know about how they

23  functioned and how they were used?

24    A.  Well, they were used to monitor the outside

25  conditions of the COMMSTA, so they had pan and tilt and

1    zoom and focus abilities.

2        Q.   Who picked the operational -- how they were used?

3        A.   Somebody up at the ops deck.

4        Q.   And had you ever been involved in that, the

5    actual monitoring or use of the cameras?

6        A.   I had looked at the monitor, but I had never

7    actually operated a camera.

8        Q.   And at any given time, any given day, did you

9    know anything about the camera's use?

10       A.   Didn't give them a thought, because they could

11   point them wherever they wanted to.  We had no knowledge

12   of where they were pointed unless you were looking at

13   the monitor on the ops deck.

14       Q.   Could you tell from looking at the outside

15   camera?

16       A.   If you were extremely close to them, like within

17   three or four feet, then you could see through the dark,

18   you know, the black dome.

19       Q.   At the beginning of that fifth interview there,

20   the first morning interview on the 13th, did the agents

21   at the outset share information with you about the

22   cameras, any details --

23       A.   No.

24       Q.   -- that they had?

25            Okay.  Did they tell you they had looked at them?

1     A.   They said they hadn't viewed any cameras.

2     Q.   Okay.  And as the interview continued, near the

3     end of the interview, did that change?

4     A.   Yes, it did.

5     Q.   How did it change?

6     A.   They started talking about times and camera

7     angles or, you know, talking about times and camera

8     views.

9     Q.   And was there a discussion of the cameras at the

10    main gate?

11    A.   Yes.

12    Q.   And you knew where they were talking about as far

13    as being a different location -- did you know it was a

14    different location than the COMMSTA?

15    A.   Yeah.  They had stated it was the main gate.

16    Q.   Did you have the same familiarity with the

17    cameras at the main gate that you did with the ones at

18    COMMSTA?

19    A.   No.

20    Q.   When they started talking to you about the main

21    gate cameras, what do you recall them saying or what --

22    what was conveyed to you?

23    A.   Well, they had said that there was -- they had

24    seen me go by at 6:48, I think -- I don't remember the

25    exact time.

1    Q.  Okay.

2    A.  And then going one way and then coming back at

3  7:22, I believe.

4    Q.  When they -- then when they were now telling you

5  about these camera times, what did that make you think

6  about them viewing the cameras?

7    A.  I had no clue what they were really talking about

8  because that's the first time they had started talking

9  about the cameras and times.

10    Q.  Hadn't you talked about cameras earlier?  Hadn't

11  they mentioned those earlier?

12    A.  The main gate cameras, no.

13    Q.  Any cameras?

14    A.  Any cameras, no.

15    Q.  That's what I'm asking you.  Had they mentioned

16  anything about cameras earlier?

17    A.  No.

18    Q.  And so when they told you about these times on

19  the cameras and in relation to your travels, do you

20  recall asking them about a discrepancy or trying to

21  explain a discrepancy?

22    A.  Well, I didn't understand what they -- what they

23  were trying to ask me, because all of a sudden, they

24  were talking about cameras with -- you know, I didn't

25  know anything about.

1     Q.  So what -- when that part of the conversation

2   came up and the agents were focused on that main gate

3   camera, what were you trying -- what was your

4   understanding of the context of the conversation at that

5   point, or what was going on in your head when they were

6   talking to you about these cameras?

7     A.  Well, I'm trying to figure out what's real and

8   what's not, because they said they hadn't looked at any

9   cameras and now all of a sudden, they're talking about

10  cameras and times, so I don't know where they're coming

11  from.

12    Q.  Did you have any times that you had kept from the

13  day before?

14    A.  No.

15    Q.  And had you seen any camera either pictures or

16  videos or anything up to that point?

17    A.  No.

18    Q.  Was it concerning to you, this description of the

19  main gate camera?

20    A.  I don't know that it was -- it was concerning,

21  but I didn't understand what they were talking about.

22    Q.  All right.

23    A.  It was a mixed message.

24    Q.  Mixed, how so?

25    A.  Well, they said they hadn't viewed any cameras

and all of a sudden now they're talking about camera
times.  So I don't know where this was coming from.

Q.  After that, the -- Agent Bottary went on, and do
you recall him giving you information then about things
that had happened up at T-2, times or details up from
the COMMSTA?

A.  Yes.

Q.  And was that information you had known before?

A.  No.

Q.  What details -- as you sat there on April 13th
with them, what details had you known about what had
happened?

A.  I had known that Rich and Jim had been shot
and --

Q.  Who had you heard that from?

A.  That was general rumor going around.  Probably
heard the shot portion from Para.

Q.  Okay.

A.  Heard that Jim was the first one in the building
that morning.

Q.  Jim --

A.  I mean, excuse me, Rich was the first one in the
building that morning, and that was about all I knew.

Q.  So when Agent Bottary told you about people
arriving or the witness he described on the tape or

1    noises there, was any of that information you were aware

2    of?

3        A.   None of it whatsoever.

4        Q.   And they asked you if you had a reasonable

5    explanation or an explanation for those things.  What

6    were you thinking about trying to explain or they were

7    asking you to explain?

8        A.   Well, I had no explanation for what they were

9    talking about at T-2.  That's the first time I had ever

10   heard about it.

11       Q.   Heard about what?

12       A.   The events that they were discussing.

13       Q.   Okay.  And were those events, in your mind as he

14   talked to you then about it, related to what he had just

15   talked to you about on the main gate camera?

16       A.   No, no.

17       Q.   Okay.  Agent Bottary said, "Do you have a

18   theory?"  Did you know what type of theory he was

19   looking for?

20       A.   No clue.

21       Q.   Do you know whether it related to the details he

22   gave you about T-2 or the details about the main gate?

23       A.   I had no clue what he was trying to get a theory

24   about.

25       Q.   Did you tell him that?

1    A.  Yes, I did.

2    Q.  Did the -- could you come up with any information

3  to add to their details or help them explain those

4  details they explained to you?

5    A.  No.

6    Q.  That interview stopped, and they stepped out and

7  they left you.  Did you stay in the room?

8    A.  No, I left.

9    Q.  Where did you go?

10    A.  Back to the ET deck.

11    Q.  All right.  And how long -- you had another

12  conversation with them, right?

13    A.  Yes.

14    Q.  During the break, did you think about the details

15  they gave you or the explanation they asked for?

16    A.  Well, I thought about the details, but I had no

17  way to put it in context, because that's the first time

18  I had ever heard it.

19    Q.  Okay.  And did you try to develop a theory about

20  what had happened or anything, anymore than you had

21  before?

22    A.  No.

23    Q.  When you walked out at the end of that fifth

24  interview with those details they gave you and the

25  camera times they gave you, did you -- were you a

1    suspect then in your mind?

2        A.  No.

3        Q.  Still?

4        A.  Still.

5        Q.  Why did you feel that way?

6        A.  Because I wasn't at T-2 that morning.

7        Q.  But did you feel they had implied -- well, had

8    they said that?

9        A.  Said what?

10       Q.  That you were a suspect or that they thought you

11   were at T-2?

12       A.  No.

13       Q.  All right.  So when you went back in the last

14   time then to talk to them, do you remember them

15   asking or saying that they wanted to talk about it more?

16       A.  Yes.

17       Q.  Do you remember asking them, "Talk about what?"

18       A.  Yes.

19       Q.  Did you understand what it was that they wanted

20   to talk about specifically?

21       A.  No.

22       Q.  And did Agent Oberlander begin to explain that to

23   you?

24       A.  Yes.

25       Q.  In his explanation, was there any time during his

```
 1   explanation that you felt he was accusing you then of --

 2   or making you the suspect?

 3       A.   Yes.

 4       Q.   And how was that?

 5       A.   Well, he started to say -- I don't remember his

 6   exact words, but I believe it was, was it planned or was

 7   it heat of the moment.

 8       Q.   And had you felt up till this last meeting with

 9   them accused by them?

10       A.   No.

11       Q.   I mean accused of the crime?

12       A.   No.

13       Q.   Did that change?

14       A.   Yes.

15       Q.   Did you ask him directly?

16       A.   Yes.

17       Q.   Did he tell you directly at that point?

18       A.   Yes.

19       Q.   And then you guys had no more conversation?

20       A.   Correct.

21       Q.   Were you allowed to leave T-1 shortly after that?

22       A.   Yes.

23       Q.   Did you leave in your truck?

24       A.   No.

25       Q.   Why?
```

1      A.   They had seized it.

2      Q.   Did you -- were you able to go to -- now, your

3  wife was still out of town?

4      A.   Yes.

5      Q.   And where was her vehicle?

6      A.   At the airport.

7      Q.   Were you able to go to the airport and get her

8  vehicle?

9      A.   No.

10     Q.   Why?

11     A.   They said it was impounded.

12     Q.   Okay.

13     A.   Or words to that effect.

14     Q.   Did you know whether it was actually impounded?

15     A.   No clue.

16     Q.   Were you able to get a ride or a car?

17     A.   Yes.

18     Q.   From who?

19     A.   I called Judy Pletnikoff and told her my

20  situation, and she came out and picked me up, took me

21  back into town to her house and loaned me her son's

22  vehicle.

23     Q.   All right.  And so then once you had a vehicle,

24  where did you go?

25     A.   I stayed in town, got something to eat and I

1    drove out to the house.

2        Q.   Your house?

3        A.   My house.

4        Q.   When you got to your house, where did you park?

5        A.   At the bottom of the driveway.

6        Q.   Why park there?

7        A.   Because there was a state trooper vehicle there,

8    and there were a couple of -- there was a van and other

9    vehicles parked at the house.

10       Q.   So were you able to go up your driveway or access

11   your house?

12       A.   No.

13       Q.   How long did you stay there?

14       A.   I stayed there a couple hours.

15       Q.   What did you do?

16       A.   I just basically -- I talked to the trooper a

17   little bit, read a book and waited around until 6:00-ish

18   or so when I knew my wife was coming -- due in at the

19   airport and I proceeded to go to the airport.

20       Q.   Where did you go when you first got back to the

21   airport?

22       A.   I went to Island Air because I was thirsty, and I

23   went to see if I could get something to drink at the

24   coffee shop.

25       Q.   Coffee?

1    A.   No.

2    Q.   All right.  Was the coffee shop open?

3    A.   No, it was not.

4    Q.   You went to the outside doors --

5    A.   The outside door was closed, yes.

6    Q.   So where did you go?

7    A.   I went around to the entrance to Island Air and

8    then proceeded to go to the coffee shop.

9    Q.   Had you been to Island Air before?

10   A.   Yes.

11   Q.   And the coffee shop before?

12   A.   Yes.

13   Q.   And was the coffee shop open from the inside?

14   A.   It was not.

15   Q.   While you were in Island Air, what happened?

16   A.   I had noticed that the cameras were mounted up on

17   the overhead or the ceiling.

18   Q.   Had you been thinking about your conversation

19   with the Agents Oberlander and Bottary from that

20   morning?

21   A.   Yes.

22   Q.   All right.  So what happened then at Island Air?

23   A.   Coffee shop was closed.  I asked, I want to say,

24   Olivia Terry if the coffee shop was open.  She said it

25   wasn't.  After that, I left the building.

1    Q.   What about -- what about the cameras was

2    significant to you?

3    A.   That they -- that -- just that they were visible.

4    And so thinking of that, and then I had a bunch of

5    questions about cameras and times and whatnot, I decided

6    I would go back over to Servant Air and see if there

7    were cameras there that could back up my -- the events

8    that occurred the previous morning.

9    Q.   Had you ever noticed the cameras in Island Air

10   before?

11   A.   No.

12   Q.   And could you recall as you stood there whether

13   Servant Air had cameras?

14   A.   No, I didn't -- didn't recall whether they did or

15   did not.

16   Q.   Where did you go?

17   A.   I went to Servant Air.

18   Q.   And did you go inside?

19   A.   Yes, I did.

20   Q.   Did you see any cameras?

21   A.   I looked around the lobby and walked toward the

22   front desk and didn't see any cameras.

23   Q.   Talk to any people?

24   A.   Didn't talk to anybody, no.

25   Q.   Okay.  Did you know that the FBI was parked out

1  in the parking lot watching you as you went to the two

2  air traffic -- air service places?

3      A.  I was not aware of that, no.

4      Q.  After you left Servant Air, where did you go?

5      A.  I reparked the vehicle in front or close to the

6  Alaska Airlines terminal and went inside the terminal.

7      Q.  What did you do there?

8      A.  Went to the bathroom again.

9      Q.  Any reason to keep track of the time you were in

10  the bathroom?

11     A.  No.

12     Q.  Did your wife arrive?

13     A.  Yes, she did.

14     Q.  Where did you and her go after leaving the

15  airport?

16     A.  We went out to the house.

17     Q.  Were the officers still there?

18     A.  Yes, they were.

19     Q.  Were you allowed to go in?

20     A.  I was not.

21     Q.  Was she?

22     A.  She was allowed to go in and get clothing and

23  medications.

24     Q.  All right.  While she was doing that, what did

25  you do?

 1      A.   Waited down at the base of the hill.

 2      Q.   Having conversations with any of the agents or

 3  anybody?

 4      A.   Not really conversation, just waiting.

 5      Q.   And make any phone calls?

 6      A.   No.

 7      Q.   And leave there with your clothing and your

 8  medication, and you and Nancy leave there with those

 9  things?

10      A.   We had a conversation with one of the agents, and

11  she asked me for my phone.  She said they were getting a

12  warrant for it, and so she wanted my phone.

13      Q.   She didn't give you a warrant?

14      A.   She did not.

15      Q.   But did you give her the phone?

16      A.   I did.

17      Q.   Where did you guys go then?

18      A.   Then we went back to the Comfort Inn and checked

19  in for the evening.

20      Q.   The clothes that you were wearing as you sat

21  there the night of April 13th, how long had you been in

22  those clothes?

23      A.   All week.

24      Q.   What do you mean by that?

25      A.   I put them on Monday and usually changed them on

1   Saturday.

2       Q.   And this would have been Friday, the 13th?

3       A.   Yes.

4       Q.   So you wear the same pants a week at a time?

5       A.   I usually wear the same pants a week at a time.

6   Socks.  I change undershirts or T-shirts every day and

7   sometimes the outer shirt, depending on weather

8   conditions, and the overcoat depending on weather

9   conditions.

10      Q.   So the T-shirt was different, but the rest of

11  your outfit, you had worn each day you worked that week?

12      A.   Yes.

13      Q.   Including the day before, April 12th?

14      A.   Yes.

15      Q.   The day before when you were up on the roof on

16  April 11th?

17      A.   Yes.

18      Q.   You went to the Comfort Inn.  And how long did

19  you stay at the Comfort Inn, you and Nancy?

20      A.   Well, we just booked one evening.

21      Q.   And -- but how long did you ultimately end up

22  staying?

23      A.   Three or four days.

24      Q.   Was there a time when you went and visited the --

25  during those three or four days, visited the

1    Pletnikoffs?

2       A.  Yes.

3       Q.  I'm going to show Mr. Wells for identification

4    defense Exhibit No. 316 and 17.

5           Mr. Wells, are you familiar with those documents?

6       A.  Yes.

7       Q.  Are these documents that you would have received

8    on April 15th?

9       A.  Yes.

10          MS. SHERMAN:  I don't have an objection.

11          MR. COLBATH:  Your Honor, I'm going to move 316

12   and 317.

13          THE COURT:  Did you say no objection?

14          MS. SHERMAN:  No objection.

15          THE COURT:  Then those will both be admitted.

16          (Defense Exhibit Nos. 316 and 317 admitted)

17   BY MR. COLBATH:

18      Q.  And where did you -- where did you receive these

19   documents?

20      A.  I was at Judy Pletnikoff's house.

21      Q.  Who brought them to you?

22      A.  Two agents or three agents.  I'm not sure of the

23   number, but I wasn't sure which particular agents they

24   were.  They could have been FBI or CGIS.  I don't

25   remember exactly.

1   Q.  Had you told them that you were at the

2   Pletnikoffs?

3   A.  No.

4   Q.  But they found you there?

5   A.  Yes.

6   Q.  And this first document was from the commander.

7   Did it place you on administrative leave?

8   A.  It did.

9   Q.  And then can we see -- that was 316.  Can we see

10  317?  Just blow that paragraph up.  Can we get the

11  signature in there?

12      And is this also a document you got that day?

13  A.  It is.

14  Q.  And what did this document do?

15  A.  Basically banned me from entering any Coast Guard

16  property.

17  Q.  And who was JK Moore?

18  A.  He was the commanding officer of the Kodiak base.

19  Q.  We can take that down.  Thank you.

20      So that was April 15th that you got those at the

21  Pletnikoffs' house?

22  A.  Yes.

23  Q.  And were you able to return then at all to

24  COMMSTA or the base after that?

25  A.  No.

Q.  In the days that -- well, were you allowed to go
back to your house then?

A.  No.

Q.  How many days was it, do you recall, before you
went back to the house?

A.  I believe it was Tuesday.

Q.  And as you traveled around and then ultimately
returned to the house, did you become aware that the FBI
was following you?

A.  Yes.

Q.  And how was that?

A.  Well, Saturday morning we checked out of the
Comfort Inn, this would be the 14th of April, and
proceeded to head out towards the Flats to go to the
house, see what was going on.  Nancy got a phone call on
her phone saying, "Where are you going?"  And we said --
or she said --

        MS. SHERMAN:  Objection; hearsay.

Q.  Don't repeat what people say.  You had contact
with the FBI?

A.  We had contact with somebody.  I'm not sure who
it was.  And they said we couldn't go out to the house.

        MS. SHERMAN:  Objection; hearsay.

        THE COURT:  That's sustained.

BY MR. COLBATH:

1    Q.  Don't say what other people say.

2        In the days that followed, did you know the FBI

3  was around?

4    A.  Yes.

5    Q.  Did you see them?

6    A.  Yes.

7    Q.  Did you have periodic contact with them?

8    A.  Yes.

9    Q.  Were they visible, or were they hiding that you

10 could tell?

11   A.  I would say combination of both.  But mostly

12 visible.

13   Q.  Did that continue for a number of weeks or

14 months?

15   A.  Yes.

16   Q.  When you -- as time went on, if you traveled away

17 from your house, did you have communication about that

18 with the FBI?

19   A.  Yes.

20   Q.  What did you do?  Don't tell me anything about

21 anything anybody else said, but what did you generally

22 do?

23   A.  We were requested to inform the FBI any of our

24 travel plans.

25   Q.  And did you do that?

1    A.  Yes.

2    Q.  Did you have contact with the FBI at the Kodiak

3  airport?

4    A.  Yes.

5    Q.  And what happened then?

6    A.  They served us a search warrant or served me a

7  search warrant.

8    Q.  All right.  And what was being looked for or

9  taken or --

10    A.  Electronics.

11    Q.  What were -- did you have any with you?

12    A.  Yes.

13    Q.  What kind?

14    A.  I had a computer.  I had another cell phone.  I

15  had to buy another cell phone, so I had a new cell

16  phone.  I had camera.  I had memory cards, a Kindle,

17  various, you know, things like that.

18    Q.  And were those taken?

19    A.  Yes, they were.

20    Q.  Pursuant to that search warrant?

21    A.  Yes.

22    Q.  How about contact in -- that was in Kodiak you

23  said?

24    A.  Yes.  As we drove up and parked the car, they --

25  and we got out of the car to grab the luggage, they

walked up and served the search warrant and proceeded to
empty my backpack on the pavement and spread everything
out to see what they were going to find and then seize.

Q.   Okay.  Did you have contact at the Anchorage
airport?

A.   Yes, we did.

Q.   How long after April was that?

A.   I believe that was in November.

Q.   So many months later?

A.   Yes.

Q.   Had additional searches -- had they come to your
home and done additional searches?

A.   Yes.

Q.   This contact at the Anchorage airport, did you
know that you were going to be meeting with the FBI when
you arrived in Anchorage?

A.   No.

Q.   When you ultimately met with them, did they have
a search warrant to collect some things from you?

A.   There were five or six agents that met us as we
exited the gate.

Q.   And what was being searched for in that
particular search warrant?

A.   Hair samples.

Q.   And were those ultimately collected?

1    A.   Yes.

2    Q.   Did you learn at all that there were other search

3  warrants they had that needed to be served?

4    A.   They had said that they were going to search the

5  house again.  And I says, "Well, don't break the door,

6  we'll give you the key," so they wouldn't break the door

7  down to enter the house.

8    Q.   Did you do that?

9    A.   Yes, we did.

10   Q.   In thinking about your house, I want to sort of

11 divert real quickly, Mr. Wells, for a minute.  What

12 was -- when did you and John Stein begin having -- begin

13 knowing each other or being friends?

14   A.   When I was at the COMMSTA in 1980, he was the

15 electronics officer.

16   Q.   Many, many years before 2012?

17   A.   Yes.

18   Q.   And how would you describe your friendship?  What

19 was the basis of it, or what was the commonality?

20   A.   We were electronic technicians.  He had started

21 as electronics technician and then made warrant, and he

22 was the EO at that time at the COMMSTA.

23   Q.   Did you become social friends?

24   A.   Yes, we did.

25   Q.   How about after he left the Coast Guard and you

1   went into civilian service?

2      A.   Yes.   He was still living in Kodiak at that time.

3      Q.   All right.   Around the time that he was getting

4   ready to move, explain to the jury from your

5   recollection and your memory how it came to be that his

6   gun safe and gun collection ended up for a time at your

7   house.

8      A.   He wasn't sure what he was going to do.   So he

9   moved the gun safe or we moved the gun safe to our

10  house.   He had asked me to sell his car and sell his

11  house.

12     Q.   And he left both of those things before -- he

13  left the island, and you had control of those two

14  things, the car and the house?

15     A.   And the gun safe at my house, yes.

16     Q.   And did you sell the car?

17     A.   Yes.

18     Q.   What was it?

19     A.   It was a Toyota quarter-ton pickup.

20     Q.   What did you do with these proceeds?

21     A.   I believe I deposited -- he still had a checking

22  account or an account there at the local credit union.

23  I deposited it in there.

24     Q.   Did his house get sold?

25     A.   Yes, it did.

```
 1     Q.   Did he leave it in a condition all ready to sell?

 2     A.   He did not.

 3     Q.   How was it?

 4     A.   It was very messy.

 5     Q.   Did you get it ready to sell, you individually or

 6   you and others?

 7     A.   My family did.

 8     Q.   And do you know how long after he left town that

 9   it took to get the house sold?

10     A.   I don't recall that, no.

11     Q.   And that was -- you had assistance from a

12   realtor?

13     A.   Yes.

14     Q.   And the gun safe at your house, did you ever

15   use -- after John left the island, did you ever use or

16   have any of those firearms out for any reason?

17     A.   No.

18     Q.   And how long was he gone before he came back to

19   the island?

20     A.   I don't recall.

21     Q.   Was it days, weeks, months?

22     A.   No, it was months.

23     Q.   And when he came back, you still had the gun

24   safe.  Did you have the gun safe?

25     A.   I don't remember.
```

```
 1      Q.  Okay.  If you didn't have the gun safe then,
 2   where would it have been?
 3      A.  It would have been shipped.
 4      Q.  Shipped to where?
 5      A.  To his brother's in -- to his brother in
 6   Wisconsin.
 7      Q.  When Mr. Stein came back after several months, do
 8   you recall any discussions with him about --
 9           MS. SHERMAN:  Objection; leading.
10           THE COURT:  Any discussions with him about a
11   certain subject?
12           MR. COLBATH:  Yes, just generally about guns
13   being missing is what my question was going to be, Your
14   Honor.
15           THE COURT:  I'm going to sustain the hearsay
16   objection.
17           MR. COLBATH:  Okay.
18           THE COURT:  Rephrase.
19   BY MR. COLBATH:
20      Q.  When Mr. Stein came back to the island, did you
21   have any knowledge that he was missing any guns?
22      A.  No.
23      Q.  And did you know that at any time prior to him
24   leaving again?
25      A.  No.
```

1    Q.   Did you ever know that?

2    A.   Yes.

3    Q.   And where would Mr. Stein have been when you

4    learned that?

5    A.   He came -- he called me from Wisconsin at his --

6    Q.   Don't tell us what he said, but --

7    A.   I know.  I'd just say he called me from

8    Wisconsin.

9    Q.   Okay.  And did you just get general information

10   about a gun being missing?

11   A.   Yes.

12   Q.   I want to -- did you know where the gun was?

13   A.   No.

14   Q.   Had you ever particularly seen that particular

15   gun that he was talking about, or did you know what gun

16   he was talking about?

17   A.   He mentioned the gun.

18   Q.   Did you know anything about the location of that

19   gun?

20   A.   No.

21   Q.   Was it with you?

22   A.   It was not.

23   Q.   Was it with anybody in your family or anybody

24   that you knew, to your knowledge?

25   A.   Not to my knowledge, no.

1    Q.  Have you ever seen that gun since Mr. Stein left

2    the island?

3    A.  No.

4    Q.  Had you -- can we show Mr. Wells Exhibit

5    No. 232 -- I'm sorry, 232A.

6        So Mr. Wells, did you get a copy of this letter

7    that Mr. Stein sent to the Alaska State Troopers?

8    A.  Yes.

9    Q.  And did it -- what did this relate to?

10   A.  To his missing gun.

11   Q.  And did you read it when you got it?  Did you

12   read that section that I've circled there, section

13   seven?

14   A.  Yes.

15   Q.  And was that accurate information as it relates

16   to you?

17   A.  Other than the spelling of where I lived, yes.

18   Q.  Did the police ever contact you reference this

19   gun or anything?

20   A.  I don't believe they did.

21   Q.  Okay.  And did Mr. Stein ever contact you again

22   reference this gun?

23   A.  No.

24   Q.  Did it ever show up or surface, to your

25   knowledge, that you had anything to do with or

1  involvement with?

2      A.  No.

3      Q.  After -- I want to go back to the timeframe where

4  the searches were continuing and the run-ins with the

5  FBI.  Was there a time that you saw the pictures of your

6  vehicles in the paper?

7      A.  Yes.

8      Q.  Were you aware of news coverage about the murders

9  and involving you?

10      A.  Yes.

11      Q.  Describe what it was like to be on Kodiak Island

12  with all those things going on and all the coverage of

13  the murders.

14            MS. SHERMAN:  Objection; relevance.

15            MR. COLBATH:  Just from his perspective, Your

16  Honor.

17            THE COURT:  Well, do you maintain the

18  objection?

19            MS. SHERMAN:  Yes.

20            THE COURT:  Let's have a brief sidebar.

21            (Begin bench conference)

22            MR. COLBATH:  So Your Honor, I only have about

23  three questions left.  I'm going to ask Mr. Wells that

24  question about what it was like.

25            THE COURT:  Why is that relevant?

1          MR. COLBATH:  That is relevant because the

2    Government has put on evidence from particularly Judy

3    Pletnikoff, as well as Don and Theresa Kiele, about

4    after-the-fact conversations.  And Mr. Wells is going to

5    say that he was -- he felt isolated, he felt persecuted.

6          He was very frustrated with being kicked off of

7    the base and sort of here he is sort of ostracized from

8    the community, and it was very frustrating.  He lost his

9    temper at times.  Things he said, things like that.  I'm

10   not going to go into I guess a bunch of detailed

11   conversations.

12         THE COURT:  I think that's fair.  So that's

13   overruled.  All right.

14         (End bench conference)

15         THE COURT:  Mr. Colbath, go right ahead.

16   BY MR. COLBATH:

17   Q.   Mr. Wells, with the ongoing investigation and

18   things continuing and not being allowed to be at the

19   base and things, how did it feel for you?  How was it

20   those many months while this was going on?

21   A.   It was very frustrating.

22   Q.   And how so?

23   A.   Well, we would talk to friends in town or

24   wherever they lived and then --

25   Q.   Don't tell us what people said, though.  Just

1    frustrating from you.

2        A.   Frustrating from me.

3        Q.   But how so?  Describe your feelings and your own

4    activities.

5        A.   Well, I was excluded from the base, so I was

6    denied medical services because I had continually used

7    the base clinic.  I was denied dental services.

8    Couldn't shop at the commissary.  Couldn't go to the

9    exchange.

10           Couldn't go to work.  Was restricted from talking

11   to friends, co-workers.  Lost contact with a lot of

12   people that I would normally have daily or weekly

13   conversations with.

14       Q.   Was there much of anything in your life that it

15   didn't change or affect?

16       A.   No.  It severely affected my life.

17       Q.   And how was that for you?

18       A.   Very, very frustrating.

19           MR. COLBATH:  That's all the questions at this

20   point I have for Mr. Wells, Your Honor.

21           THE COURT:  All right.  Ms. Sherman, ready to

22   proceed?

23           MS. SHERMAN:  Yes.

24           THE COURT:  Go right ahead, please.

25                         CROSS EXAMINATION

BY MS. SHERMAN:

Q. Good afternoon, Mr. Wells.

A. Good afternoon.

Q. I want to start by talking about your time at the Coast Guard. Your career was very important to you, wasn't it?

A. Yes.

Q. We've heard a lot about your military career today, specific details about where you were stationed and the times you were there, right?

A. Correct.

Q. And you remember all these details?

A. Not all the details. I -- significant details I remember.

Q. And you started in the rigger shop in 1990; isn't that right?

A. Correct.

Q. And you were -- so about that -- by 2012, about 22 years working out of the same building?

A. Yes -- well, no. Originally, when I started, T-2 building was occupied by the ESD unit. We were in the basement of T-1, the rigger shop.

Q. So the rigger shop at T-2, how many years did you specifically work in that building?

A. I don't remember when we moved down there. It

1    was a couple of years that we were in the basement of

2    T-1.

3        Q.   So close to 20 years then?

4        A.   Yes.

5        Q.   You retired from the Coast Guard as a chief?

6        A.   Yes.

7        Q.   That's the goal, right, becoming a chief?  That's

8    what your testimony was?

9        A.   If you're enlisted, yes.

10       Q.   And as a chief, you get to be in charge of

11   others, right?

12       A.   Normally.

13       Q.   And then you retired and you went to work as a

14   civilian?

15       A.   Correct.

16       Q.   And by your estimation, you were actually doing

17   more work as a civilian than you were as an enlisted

18   member, right?

19       A.   No.  I was doing different work.

20       Q.   Do you recall telling investigators you were

21   doing more work than you had -- as a civilian than you

22   had as enlisted?

23       A.   No.  I was traveling as opposed to being active

24   duty.  I went to more different places.

25       Q.   So that's what you meant?

1    A.   Yes.

2    Q.   But that's not what you said, right?

3    A.   Correct.

4    Q.   In terms of the rigger shop, most people in the

5    antenna field would consider you pretty experienced,

6    right?

7    A.   Yes.

8    Q.   You pretty much knew everything about that rigger

9    shop and the antennas, right?

10   A.   Yes.

11   Q.   In fact, most people would look to you for

12   knowledge and expertise over the years?

13   A.   Yes.

14   Q.   And when you were up on those towers, you're good

15   at staying calm in those stressful situations?

16   A.   Correct.

17   Q.   When you attended the NATE conferences, you were

18   probably more knowledgeable than a lot of your peers at

19   those conferences, weren't you?

20   A.   No.

21   Q.   Were you considered an expert in your field?

22   A.   Yes.

23   Q.   And you had no plans to retire, right?

24   A.   Well, I had plans to retire, but it wasn't going

25   to be for a couple, three more years.

1    Q.   And as of April 12, 2012, you were still having

2  fun working in the rigger shop, right?

3    A.   Yes.

4    Q.   And that's what you told investigators, right?

5    A.   Correct.

6    Q.   And you basically ran the shop, right, as -- I

7  know you were a civilian, but you were basically running

8  the shop?

9    A.   No.

10   Q.   Who was running the shop then?

11   A.   ET1.

12   Q.   You made the decisions on what tower work would

13  happen, right?

14   A.   It was a combination of people that made the

15  decision.

16   Q.   Okay.  Do you have some expectations about how

17  people would treat you based on your knowledge and

18  experience?

19   A.   I don't know what you mean by expectations.

20   Q.   Did you expect to be treated a certain way

21  because you knew how to run the antennas at the COMMSTA?

22   A.   I don't say that I expected to be treated.  I

23  expected to be treated as a human being.

24   Q.   You had a good sense of the routine at the shop,

25  right?

1    A.   Correct.

2    Q.   So let's talk about the routine at the rigger

3  shop at least in April 2012.   Your schedule was 7:00 to

4  3:30, right?

5    A.   Yes.

6    Q.   And the Coast Guard employees started at 8:00?

7    A.   Generally.

8    Q.   And you started at work and Rich started work at

9  7:00?

10    A.   Normally, yes.

11    Q.   And even though the Coast Guard employees didn't

12  actually start until 8:00, they would often show up

13  early, sometimes as early as 7:30?

14    A.   Correct.

15    Q.   And Mr. Hopkins would show up even earlier than

16  that?

17    A.   At times, yes.

18    Q.   So the common practice was you and Rich were

19  always the first ones into the rigger shop?

20    A.   Normally, yes.

21    Q.   Let's take a look at Exhibit 44.

22         So you would normally park in the space closest

23  to the door, right here, right?

24    A.   Correct.

25    Q.   And then Rich would park next to you, right?

1    A.  Correct.

2    Q.  And then ET1 Hopkins would fill in and the

3  non-rates, right?

4    A.  In order of arrival normally.

5    Q.  And Rich, if you beat Rich -- excuse me.  If Rich

6  beat you in, he would park in that second spot and leave

7  that first spot for you still, right?

8    A.  Normally, yes.

9    Q.  And the non-rates wouldn't park in your spot if

10 they beat you to work, right?

11   A.  No.

12   Q.  Hopkins would?

13   A.  Occasionally.

14   Q.  Anyone else park in your spot other than

15 Mr. Hopkins?

16   A.  If somebody didn't know the normal parking or

17 they would be parked, you know, wherever there was a

18 vacant slot.

19   Q.  But essentially, that was your spot, people knew

20 that was your spot?

21   A.  Yes.

22   Q.  Let's talk about how people would get into the

23 building in the morning.  Let's look at Exhibit 25.

24       Whoever came in first, you or Rich, would enter

25 through this door, right?

1    A.   Normally.

2    Q.   Okay.   So on occasion you wouldn't?

3    A.   No, I would usually use a key to go into the

4    normal front door.

5    Q.   Okay.   And there's a CAC card reader there,

6    right?

7    A.   No.

8    Q.   There's not a CAC card on this door?

9    A.   No.   That's a separate COMMSTA identification

10   card.   That's not a CAC card.

11   Q.   So you would use a swipe card then to get in?

12   A.   Yes.

13   Q.   And then you also had a CAC card to get on your

14   computer?

15   A.   Correct.

16   Q.   And as a civilian, Rich also had a CAC -- a swipe

17   card for that door?

18   A.   Correct.   All members of the COMMSTA had a swipe

19   card.

20   Q.   Let's look at Exhibit No. 13.

21        So whoever got there first, you or Rich, most

22   likely would enter through this door, right?

23   A.   Correct.

24   Q.   Then you would go around and you would throw the

25   dead bolt on that door, and that's the other door that

1    the second person and subsequent people would come in,

2    right?

3        A.   I would say 98 percent of the time.  Sometimes we

4    would forget to open the front door.

5        Q.   You forget to open that door and someone is

6    banging on it?

7        A.   They're banging on it, or they will go to the

8    swipe card door and enter that way.

9        Q.   Okay.  But most of the time you or Rich would

10   remember to open that door?

11       A.   Yes.  But it wasn't -- you know, it wasn't 100

12   percent of the time.

13       Q.   So after you come in and -- 98 percent of the

14   time come in, unlock, throw that bolt on the door, then

15   you go to work in the office, right?

16       A.   Yes.  We would normally log in -- I would log in

17   on my computer, yes.

18       Q.   And you know Rich would log on in his computer,

19   right?

20       A.   Yes.

21       Q.   So if you showed up and Rich was already there,

22   he's probably not parked in your spot, right?

23       A.   Correct.

24       Q.   He would go in and unlock the door, and you could

25   go through this door, right?

1    A.  Correct.

2    Q.  And if you were -- on a normal day, you would

3  expect to find him, if you were the second one there,

4  expect to find him on his computer, right?

5    A.  Correct.

6    Q.  And he would expect to find you on your computer

7  if you beat him?

8    A.  Correct.

9    Q.  And this looks like a large building, but T-2 is

10  actually a pretty small building, isn't it?

11    A.  No, it's fairly large.

12    Q.  Okay.  Well, the distance between the office and

13  the break room is pretty small, right?

14    A.  It's 15, 20 feet.

15    Q.  You recall calling it a fairly straight shot from

16  the office to the break room?

17    A.  Well, there is a -- say, a 45-degree angle.

18    Q.  So do you recall telling investigators it was a

19  fairly straight shot?

20    A.  Well, that's still a fairly straight shot, yes.

21    Q.  When you started at the COMMSTA, there was -- at

22  the rigger shop, there wasn't a camera there, right?

23    A.  No.

24    Q.  And you actually helped install the camera that

25  was right there on the wall?

1    A.   Yes.

2    Q.   So you helped install all the cameras, right?

3    A.   No.

4    Q.   Okay.  You helped install the pole camera,

5    correct?

6    A.   All of the outside cameras I helped install.

7    There were a number of interior cameras I did not

8    install.

9    Q.   So let's talk about those outside cameras.  You

10   helped install all the outside cameras?

11   A.   Yes.

12   Q.   And you knew all of them could pan, tilt and

13   zoom?

14   A.   No, I can't say that.  I'm not sure what the ones

15   out at R-2 did.

16   Q.   So let's talk about T-1 and T-2.  Those cameras,

17   you knew panned, tilted and zoomed?

18   A.   Yes.

19   Q.   And you knew that the T-2 camera in general would

20   focus out on the lot and then out at the flagpole,

21   right?

22   A.   Normally, yes.

23   Q.   And you knew that that camera on the corner of

24   T-2 is the only camera on the rigger shop, right?

25   A.   Yes.

1    Q.  And when you talked to police, you actually drew

2  a diagram.  Let's bring up 104A.  It's facing the other

3  way, but it's pretty close to Exhibit No. 13, isn't it?

4    A.  No, it doesn't show the -- well, fairly close.

5    Q.  Okay.  And you drew for the investigators what

6  the T-2 camera would normally capture, right?

7    A.  To the best of my knowledge, yes.

8    Q.  And that's what the camera was actually

9  capturing, that view on the morning of April 12th,

10  wasn't it?

11    A.  Yes.

12    Q.  We can take that down.

13       I'm going to talk about your relationships with

14  the people in the rigger shop.  You said that you didn't

15  really socialize with people outside -- from work

16  outside of work, right?  That was your testimony?

17    A.  I did with certain individuals but not everybody

18  in the shop.

19    Q.  So let's talk about that.  You didn't spend time

20  with Hopkins outside of work?

21    A.  I did not.

22    Q.  Didn't spend time with Rich outside of work?

23    A.  That's not true.

24    Q.  Okay.  How often did you spend time with Rich?

25    A.  I don't have a percentage, but I had conversed

1    with him at the Rendezvous, occasionally meeting there.

2    I would see him in town at various other functions and

3    stuff going on.  So it's not like I didn't have contact

4    with him.

5        Q.  Didn't have him to your house, right?

6        A.  He had been to the house before.

7        Q.  You didn't have other -- you didn't have Cody

8    Beauford over to your house, right?

9        A.  I did not.

10       Q.  Didn't have Nate Pacheco to your house, right?

11       A.  I did not.

12       Q.  Didn't have Aaron Coggins to your house, right?

13       A.  I did not.

14       Q.  You had Para Upchurch to your house, right?

15       A.  Correct.

16       Q.  And you had Leah Henry to your house?

17       A.  Correct.

18       Q.  And you knew that Pacheco, Beauford and Coggins,

19   none of them had family on Kodiak either, right?

20       A.  Correct.

21       Q.  I want to go back to early 2011.  The shop was --

22   even though Hopkins was the supervisor, the shop was

23   kind of running itself like it had been, right?

24       A.  I'm not sure when in 2011 you're referring to.

25       Q.  Early.  Let's go back to January or February.

1   The shop is kind of running along, right?

2       A.  Yes.

3       Q.  And Hopkins was the supervisor, wasn't he?

4       A.  Correct.

5       Q.  But he wasn't nearly as experienced as you,

6   right?

7       A.  No.

8       Q.  And Rich Belisle wasn't as experienced as you?

9       A.  No.

10      Q.  But he was learning your job?

11      A.  He was learning his job.

12      Q.  Okay.  He trusted you?

13      A.  Yes.

14      Q.  On the tower he's trusting you with his life,

15  right?

16      A.  As I did him.

17      Q.  Was it difficult working for Mr. Hopkins since he

18  didn't have the experience in antennas?

19      A.  No.  I won't say it was difficult.

20      Q.  You didn't really like how Hopkins was choosing

21  to lead, though, right?

22      A.  I wouldn't say didn't like.  I just had some

23  issues with his leadership style.

24      Q.  Because he was gruff with the girls?

25      A.  No, he was gruff with all the non-rates and even

1   the third class.

2       Q.  So you dispute their testimony that they thought

3   he was a good leader?

4       A.  I won't say I dispute it.  I just had a different

5   view of it.

6       Q.  Chief Reckner came and moved his desk down to the

7   rigger shop, right?

8       A.  Correct.

9       Q.  And he was keeping an eye on you, wasn't he?

10      A.  He was not, because I wasn't there.

11      Q.  No other chief had ever moved their desk down to

12  the rigger shop, right?

13      A.  No, that's not correct.  We had three different

14  chiefs that had desks down there.

15      Q.  Okay.  Mr. Reckner was keeping an eye to make

16  sure Hopkins was running the shop, right?

17      A.  I can't say what Chief Reckner was doing.

18      Q.  Okay.  You were there, right, during 2011, not

19  before -- before you got sick, you were there?

20      A.  Yes.

21      Q.  Okay.  And --

22      A.  But Chief Reckner wasn't down in the shop then.

23      Q.  He was still the chief?

24      A.  Yes, he was.

25      Q.  And he wanted to make sure Hopkins -- you could

1    tell he was having Hopkins run the shop?

2        A.   Correct.

3        Q.   And some of that involved Hopkins ordering things

4    that you didn't necessarily agree with?

5        A.   Possibly, yes.

6        Q.   So you have a meeting in April 2011 with

7    Chief Reckner, right, the first letter of expectation?

8            Why don't we pull up Exhibit 35?

9        A.   I'm not recalling that date.

10       Q.   Well, how about we zoom in right here?

11       A.   Okay.  That's what it says, then I'll agree with

12   that.

13       Q.   Okay.  So on April 29th, you have this meeting

14   about the letter of expectation, correct?

15       A.   Correct.

16       Q.   And part of that letter was to reaffirm that

17   Mr. Hopkins was in charge, right?

18       A.   Correct.

19       Q.   And that you were to report your travel and

20   absences to him, right?

21       A.   Correct.

22       Q.   And when you would travel, you would get per

23   diem, right?

24       A.   Correct.

25       Q.   Earn airlines miles, right?

1    A.  Correct.

2    Q.  You'd also get like hotel points?

3    A.  I don't believe I belonged to any hotels that

4  collected points.

5    Q.  You would get comp time for travel?

6    A.  If I worked or traveled overtime status, yes.

7    Q.  And you know traveling from Alaska, everyone is

8  traveling in the evenings, right?

9    A.  Not necessarily.

10   Q.  You were told in this letter that you needed to

11 tell your supervisors where you were, right?

12   A.  Correct.

13   Q.  And you had to put in leave ahead of time, right?

14   A.  If it was -- if it was planned far enough

15 ahead -- leave, yes.

16   Q.  Right.  And so sick leave, if you knew you were

17 going to miss work because of a doctor's appointment,

18 that needed to be put in early too?

19   A.  Yes.

20   Q.  And you weren't very good before this in keeping

21 people apprised of where you were, right?

22   A.  I don't know about very good, but there were

23 lapses in letting them know, yes.

24   Q.  So there would be lapses and you would actually

25 be in Anchorage, not even on the island, and your

1    supervisors didn't know?

2        A.   No, that would be incorrect.

3        Q.   And so after this, you said you started letting

4    your supervisors know where you were?

5        A.   I attempted to, yes.

6        Q.   You did that by calling Rich, right?

7        A.   Yes.

8        Q.   He was --

9        A.   Sometimes.

10       Q.   But Rich wasn't your supervisor, was he?

11       A.   No, but my supervisor wasn't in the office at the

12   time.

13       Q.   He had a voicemail, though, right?

14       A.   Yes.

15       Q.   All right.

16       A.   And there were occasions when I left him

17   voicemails.

18       Q.   You were told in this letter you were supposed to

19   mentor Mr. Hopkins, right?

20       A.   Yes.

21       Q.   And you've heard testimony about how that wasn't

22   happening, right?

23       A.   I wouldn't say that wasn't happening.

24       Q.   Okay.  So you dispute Chief Reckner's testimony?

25       A.   Yes.

1    Q.   And Mr. Hopkins -- ET1 Hopkins, he got credit for

2    work done out on Shemya, right?

3    A.   I assume he did.

4    Q.   You went out to Shemya as well, right?

5    A.   Correct.

6    Q.   And it was ET1 Hopkins who got sailor of the

7    year, right?

8    A.   Yes.

9    Q.   And that related to the work that he did?

10   A.   I can't say.

11   Q.   Okay.  So you did not -- okay.

12        You sat here through Commander Van Ness's

13   testimony, right?

14   A.   Yes.

15   Q.   And he talked about that, didn't he?

16   A.   Well, yeah, but there's normally a list of items

17   that are listed when you're nominated for sailor of the

18   quarter, and I was not aware of any of the criteria that

19   went into that citation.

20   Q.   You weren't nominated for any of your work on

21   Shemya, right?

22   A.   Not to my knowledge.

23   Q.   So on the second page, we know you signed this on

24   November 2nd, 2011, right?

25   A.   Correct.

Q.  So several months later, they asked you to sign
another letter, they also have you sign this one that
you had seen in April?

A.  Correct.

Q.  You were collaring trees in 2011, right?

A.  We were -- yes.

Q.  And that causes the tree to dry out so it's
easier to drop and use for firewood, right?

A.  It's not easier to drop.  It's easier to use for
firewood.

Q.  You were taking trees that were not an immediate
threat to an antenna, right?

A.  I wouldn't -- I would dispute that.

Q.  So you dispute Chief Reckner's testimony that you
were taking trees that weren't anywhere near an antenna?

A.  No, I'd take -- they were trees that were along
the roads that were collared.

Q.  And during this interaction when you're given
that letter, you're actually -- you push back on
Mr. Reckner, because you were saying they were a threat
to the antenna fields, right?

A.  They were not necessarily to the antenna fields.
They were overgrowing the roads, and so when you drive a
vehicle through, especially the big line truck, they
would interact with the overhead crane.

1    Q.  That was the argument you had with Chief Reckner

2  when he gave you this --

3    A.  I wouldn't classify it as an argument, but that

4  was a discussion.

5    Q.  He classified it as an argument, so are you

6  disputing that?

7    A.  No, I have a different interpretation of that

8  conversation.

9    Q.  I want to talk about the fuel card.  Okay?  The

10  fuel card was kept in your desk, right?

11    A.  Correct.

12    Q.  On the day everyone else went to Shemya, you were

13  the only one in the rigger shop that day, right?

14    A.  I don't recall.

15    Q.  You don't recall that today?

16    A.  Well, no.  There would have been Leah and Para

17  probably, and Coggins possibly could have been there.

18  So I don't remember who was all in the shop that day.

19    Q.  You weren't going to Shemya, and you testified

20  that was because of a medical appointment?

21    A.  I believe that's the reason why.

22    Q.  You were also going to Denali shortly after that?

23    A.  I was not.

24    Q.  So you didn't travel to Denali in 2011?

25    A.  I did not.

1    Q.   You're aware that that card was used to purchase

2    diesel fuel on the base, right?

3    A.   Correct.

4    Q.   And you drive a diesel truck?

5    A.   I do.

6    Q.   And you were seen on the base camera entering the

7    base just a few minutes before that fuel card was used,

8    right?

9    A.   Yes.

10   Q.   And you told -- your report was that you must

11   have been filling one of the Government vehicles, right?

12   A.   Due to the amount of fuel that was purchased, the

13   only vehicle that we had that would hold that amount of

14   fuel would be the big line truck.  That's what I stated

15   in my statement.

16   Q.   You own gas cans, right?

17   A.   Yes.

18   Q.   And the investigation ultimately proved

19   inconclusive, right?

20   A.   Correct.

21   Q.   But you still received a letter of caution from

22   Commander Van Ness?

23   A.   Yes.

24   Q.   In fact, this letter from Commander Van Ness was

25   the third time you received paper from someone in the

1    chain of command within that year, within a year, right?

2         A.  Correct.

3         Q.  You were upset they were accusing you of misusing

4    the fuel card, weren't you?

5         A.  Yes.

6         Q.  You were -- it didn't sit right with you, right?

7         A.  Correct.

8         Q.  And you realized you had lost the command's

9    trust?

10        A.  Yes.

11        Q.  Commander Van Ness specifically told you that?

12        A.  Yes.

13        Q.  And that letter -- we can pull it up if we need

14   to.  That letter said you could lose your job if there

15   were future problems, right?

16        A.  Correct.

17        Q.  Initially you refused to sign that letter, didn't

18   you?

19        A.  Correct.

20        Q.  And Commander Van Ness stood up, and you know

21   what that means, right, when a commander stands?

22        A.  Normally.

23        Q.  Normally, it means meeting is over, right?

24        A.  Yes.

25        Q.  And you didn't stand up?

1    A.  I did not.

2    Q.  Everyone else stood up?

3    A.  Correct.

4    Q.  You know that it's disrespectful not to stand --

5    A.  I wasn't finished with the discussion with the

6  commander concerning the letter.

7    Q.  You weren't finished?

8    A.  Correct.

9    Q.  But the commander had signaled he was finished,

10  right, by standing?

11    A.  No.  The issue still was on the table that the

12  letter wasn't signed.

13    Q.  And eventually you signed it after he told you he

14  was going to talk to civilian personnel, right?

15    A.  No.  We had further discussion concerning the

16  letter, and then I signed it.

17    Q.  And you put that letter on your desk?

18    A.  Yes.

19    Q.  Down in the rigger shop?

20    A.  Correct.

21    Q.  You have a lot of stuff on your desk in the

22  rigger shop?

23    A.  I do.

24    Q.  And that letter of caution that you signed

25  February 24, 2012, that was still on your desk April 12,

1  2012?

2      A.  I believe it was.

3      Q.  At some point you learned that while you had been

4  gone, work had carried on without you, right?

5      A.  Correct.

6      Q.  The casualty list was at an all-time low, wasn't

7  it?

8      A.  No, it was not.

9      Q.  So you dispute Mr. Jordinelli's testimony?

10     A.  I do.

11     Q.  And you dispute that -- the testimony of

12 Mr. Beauford and Pacheco that said they carried on

13 without you?

14     A.  I don't dispute that.

15     Q.  So we heard what the NATE conference is, the

16 National Association of Tower Erectors, right?

17     A.  Correct.

18     Q.  It was a big deal to go to that conference,

19 wasn't it?  You went every year?

20     A.  I went every year.  I don't consider it a big

21 deal.

22     Q.  Okay.  Prior to 2012, you went in 2011?

23     A.  Correct.

24     Q.  2010?

25     A.  Correct.

1    Q.  2009?

2    A.  Yes.

3    Q.  Every single year for ten years?

4    A.  Approximately.  I'm not sure when I went to the

5  first one.

6    Q.  And you have a conversation with Chief Reckner

7  mid January about that conference, right?

8    A.  Yes.

9    Q.  And you bring it up?

10   A.  Yes.

11   Q.  And you didn't start the conversation with, hey,

12  I have -- I've scheduled a surgery, did you?

13   A.  Well, I didn't schedule the surgery.  The VA

14  clinic scheduled the surgery.

15   Q.  And you're aware in your medical records that the

16  scheduling the surgery happened after that meeting,

17  January 31st, right?

18   A.  No, I'm not.

19   Q.  So you asked, "What are we doing about NATE?"

20  Right?

21   A.  Correct.

22   Q.  And you're informed that you are not going?

23   A.  Correct.

24   Q.  But Hopkins is going?

25   A.  Yes.

1    Q.  And your testimony on direct was that you were

2    concerned because he was getting out of the Coast Guard,

3    right?

4    A.  Correct.

5    Q.  Are you aware that he didn't actually even

6    inquire about a retirement letter until April -- the

7    first week in April?

8    A.  No, he had been talking about it.

9    Q.  But he didn't show you a letter that week, right?

10   A.  Which week?

11   Q.  Well, on direct you said he had shown you his

12   retirement letter, he had put that in.

13   A.  That was in April he showed me the letter, about

14   a week before the murders.

15   Q.  So I misunderstood your direct testimony.  On

16   direct you said he had shown you his retirement letter

17   before you had the conversation about NATE.

18   A.  No.  He had talked about retiring.

19   Q.  So you first asked about Hopkins, right, why is

20   he attending?

21   A.  Correct.

22   Q.  And Chief Reckner tells you he's going to bring

23   back the info, right, he's going to bring back the

24   information to share with others?

25   A.  I don't recall that.

        1      Q.   Okay.  And then you point to Belisle's chair, and
        2   you want to know why Rich is going, right?
        3      A.   I did not.
        4      Q.   Okay.  So you dispute the fact that you did that?
        5   You dispute Mr. Reckner's testimony?
        6      A.   I would not question why Rich would be going.
        7      Q.   So you dispute Mr. Reckner's testimony that you
        8   said, "Why is he going, he's just an F'ing rigger?"
        9      A.   I totally dispute that.
       10      Q.   How long did you stare at Mr. Reckner at the end
       11   of that conversation?
       12      A.   A minute, minute and a half.
       13      Q.   So after your surgery, you're not really
       14   participating in work discussions or work-related
       15   things, right?
       16      A.   I would not say I didn't participate in
       17   discussions, but I didn't participate in heavy work,
       18   yes.
       19      Q.   Okay.  You gave your opinions less, right?
       20      A.   Pardon?
       21      Q.   You gave your opinions on what should be done
       22   less?
       23      A.   What was the last word?  Did you say less?
       24      Q.   Less.
       25      A.   I'm not aware of that, no.

1    Q.  So you sat through Mr. Beauford's testimony,
2  right?
3    A.  Yes.
4    Q.  And he said that after you came back from your
5  surgery, you had less input?
6    A.  I won't dispute that.
7    Q.  And in March, Rich led the work cleaning out the
8  warehouse?
9    A.  I'm not aware of when it started.
10    Q.  Well, you knew about it in March?
11    A.  Yes.
12    Q.  And they were throwing out some things that you
13  thought should be kept, right?
14    A.  No, I knew they should be kept.  There wasn't a
15  thought.
16    Q.  It irked you is how you described it?
17    A.  Exactly.
18    Q.  You thought it was a waste to get rid of those
19  items?
20    A.  No, they were valuable stainless steel nuts and
21  bolts that we used for repairing of antennas and various
22  other uses at the COMMSTA.
23    Q.  So command wanting to get rid of those, that
24  upset you?
25    A.  Well, yes, because it was a waste of money.

 1     Q.   You're not a fan of throwing things out, right?

 2     A.   No, I'm not.

 3     Q.   Right.  Keep a lot of things both at work and at

 4  home?

 5     A.   Correct.

 6     Q.   Rich had taken over some of your duties while you

 7  were out sick, right?

 8     A.   I couldn't say because I was out sick.

 9     Q.   When you came back, he was still doing some of

10  your work?

11     A.   I wouldn't classify it as that.  He was doing

12  work.

13     Q.   And you were on light duty when you first came

14  back?

15     A.   Correct.

16     Q.   And Rich could have done your job at that point

17  when you came back, couldn't he?

18     A.   I wouldn't classify that as being a true

19  statement.  He had no electronics knowledge whatsoever.

20     Q.   He had picked up some slack while you were gone,

21  right?

22     A.   Yes.

23     Q.   Okay.  And it was expressed to you that he wasn't

24  that far behind you, right?

25     A.   Yes, it was.

1    Q.  Fair to say that made working there a little more

2    difficult?

3    A.  No.

4    Q.  Your wife left for work on Tuesday, April 10th,

5    right?

6    A.  Correct.

7    Q.  You followed her into the airport, right?

8    A.  I did not.

9    Q.  You saw her at the airport?

10   A.  I did.

11   Q.  And you actually knew she would be going on this

12   trip, you knew about that end of March, right?

13   A.  I'm not sure when I was aware of it, but I knew

14   she was traveling.

15   Q.  Knew it more than the day before, right?

16   A.  Oh, yes.

17   Q.  So April 11, 2011 -- or excuse me, 2012, you go

18   up to T-1 in the morning, right?

19   A.  Correct.

20   Q.  You indicated you went to the bathroom?

21   A.  Correct.

22   Q.  And then you checked the gauges?

23   A.  Correct.

24   Q.  And that took three hours?

25   A.  It did not.

1    Q.  It took more than two hours?

2    A.  That -- which part?

3    Q.  Checking the gauges.

4    A.  No.

5    Q.  How long did it take you to check the gauges?

6    A.  Could be 15, 20 minutes, half an hour.  I didn't

7 time it.  Didn't keep track of time.

8    Q.  How long were you in the bathroom then?

9    A.  I made several different trips.

10   Q.  You're aware that no one knew where you were?

11   A.  I was not aware of that.  I believe I informed

12 Chief Reckner that I was heading up the hill, so they

13 knew I was at T-1.

14   Q.  He didn't -- he didn't see you in T-1 that day,

15 right?

16   A.  I didn't know that he was looking for me, so I

17 can't say.

18   Q.  So that afternoon, nearly everyone from the

19 rigger shop goes up to T-1 to talk about the antenna on

20 the roof, right?

21   A.  Correct.

22   Q.  You and Rich and Mr. Hopkins were all on the

23 roof?

24   A.  Correct.

25   Q.  And Chief Reckner was up there?

 1     A.   Yes.

 2     Q.   He decided to take Rich's recommendation and not

 3 yours, right?

 4     A.   Yes.

 5     Q.   Now, the next day was supposed to be a climbing

 6 day, wasn't it?

 7     A.   Yes.

 8     Q.   And you like to climb the towers, right?

 9     A.   I do.

10     Q.   And you've climbed over the years even though you

11 have diabetes, right?

12     A.   Correct.

13     Q.   Climbing even though you were taking that

14 medication?

15     A.   Correct.

16     Q.   And when you would climb, you would wear a high

17 visibility color, right?

18     A.   Not necessarily.

19     Q.   In March of 2012, you were feeling much better,

20 right, from having had your surgery?

21     A.   It had corrected the gallbladder problem, yes,

22 but it created others.

23     Q.   Okay.  You told Scott Arsenal in March you were

24 feeling much better, right?

25     A.   Yes.  I wasn't dry heaving every day.

1    Q.  And you were feeling -- you were off light duty

2   in March, right, at some point in March?

3    A.  Yes.  I don't recall the date.

4    Q.  Fair to say you were feeling good enough on

5   April 11th to dig out a septic?

6    A.  It was a necessity.  It wasn't to say I was

7   feeling good, but it had to be done.

8    Q.  It was a big pile of dirt, right?

9    A.  Well, most of that had been previously dug.  I

10  didn't take that all out in one night, believe me.

11   Q.  So you didn't engage in discussions about

12  climbing on April 11th, right?  There was a meeting and

13  talking about climbing?

14   A.  I wasn't aware that there was a meeting on

15  April 11th.

16   Q.  Climbing that day would have netted you extra

17  money, right?  You get extra money when you climb?

18   A.  Yes.

19   Q.  You showed up that morning wearing a bright

20  shirt, right?

21   A.  Correct.

22   Q.  Let's talk about April 12th.  You usually left

23  for work you said 6:40 to 6:50, right?

24   A.  Correct.

25   Q.  And you live about nine miles from the COMMSTA,

1  right?

2      A.  I never measured it.

3      Q.  Okay.  Well, you got up that morning and you left

4  before 6:50, right?

5      A.  Correct.

6      Q.  Okay.  Let's go to Exhibit No. 234.  This is your

7  truck, right?

8      A.  Yes.

9      Q.  So you drive a distinctive truck.  You would

10  agree with me that, right?

11      A.  I don't know whether it would be distinctive, but

12  that's my truck.

13      Q.  So you have a canopy?

14      A.  Yes, I do.

15      Q.  And there's three windows on it?

16      A.  Correct.

17      Q.  And there's this part that's higher than the rest

18  of the truck, right?

19      A.  Yes.

20      Q.  And you're missing some trim here, right?

21      A.  No.

22      Q.  Or there's not trim there?

23      A.  There's not trim there.

24      Q.  Okay.  And that's the same on the other side of

25  the vehicle, the windows and the trim?

1    A.  Correct.

2    Q.  And you knew what everyone else at the rigger

3 shop drove, right?

4    A.  Generally.  I won't say I knew what everyone was

5 driving.

6    Q.  You knew Mr. Hopkins' truck?

7    A.  I did.

8    Q.  You knew Mr. Belisle's truck?

9    A.  I did.

10    Q.  And you had been driving this truck for a while?

11    A.  Yes.

12    Q.  So let's look at Exhibit 77A.

13        And this is your truck, right, passing the main

14 base gate?

15    A.  I believe that is.

16    Q.  We heard testimony that clock on there is

17 18 minutes fast, right?

18    A.  Correct.

19    Q.  So you pass the main base gate at 7:48 a.m. --

20 6:48 a.m.?  Sorry.

21    A.  Correct.

22    Q.  The vehicle, when you passed the main base gate,

23 was driving okay, right?

24    A.  No.

25    Q.  It was pulling to the right?

1    A.  Correct.

2    Q.  But it's not rumbling like a flat tire, right?

3    A.  It wasn't flat.

4    Q.  Okay.  So it wasn't low enough to be rumbling,

5    right?

6    A.  Correct.

7    Q.  So it could have been an alignment issue too,

8    right, as far as you know, as you're driving it?

9    A.  No, because alignment normally wouldn't pull the

10   one direction or another.

11   Q.  So your testimony was that you passed the main

12   gate and you realized that it's pulling to the right,

13   and you decide you're going to pull into the airport?

14   A.  Correct.

15   Q.  Let's look at Exhibit No. 172.  So you pull into

16   the airport.  You would agree that when you pull into

17   the airport, you are closer to the COMMSTA than you are

18   at home, right?

19   A.  Correct.

20   Q.  You would agree that the COMMSTA -- the rigger

21   shop specifically has things to put air in a tire,

22   right?

23   A.  It does.

24   Q.  The air was actually plumbed in, right?

25   A.  Yes.

1    Q.  And you said you left your cell phone at home,

2  right?

3    A.  Correct.

4    Q.  So you know that Chief Reckner and ET1 Hopkins

5  and the commander are keeping an eye on you, right?

6    A.  I don't know whether I classify they're keeping

7  an eye on me.

8    Q.  They've told you you need to let them know where

9  you are?

10    A.  Correct.

11    Q.  And it was only two miles up to the COMMSTA,

12  right?

13    A.  Correct.

14    Q.  So you could have driven up there and put air in

15  your tire, right?

16    A.  I could have.

17    Q.  And you chose not to?

18    A.  That's true.

19    Q.  And you could have when you got up there told

20  them, "I have a low tire," and either asked to do it

21  then or you could have added air and then gone home

22  later, right?

23    A.  I could have.

24    Q.  And your testimony was at the point you were at

25  the Kodiak airport, you didn't know why your tire was

1  low?

2      A.  Correct.

3      Q.  And you would agree that people -- well, let me

4  ask you this.  Have you ever run a vehicle on a spare

5  tire?

6      A.  I'm sure sometime in my driving time I have,

7  but --

8      Q.  Sure.  It's possible to drive a vehicle on a

9  smaller spare, right?

10     A.  It's possible, yes.

11     Q.  And you would have been permitted, you're

12  permitted at the rigger shop to work on tires, right?

13     A.  Correct.

14     Q.  And your co-workers had changed tires there?

15     A.  I have changed tires there.

16     Q.  Okay.  So instead of going to the COMMSTA and

17  filling it with air or changing it there, because you

18  had a spare on the truck, right?

19     A.  I had a spare that I never used.

20     Q.  Okay.  Instead you decided to drive home, right?

21     A.  Correct.

22     Q.  Okay.  And let's look at Exhibit 82A.  Actually,

23  let's hold off on that.

24         You go into the airport, and that's when you said

25  you went to Servant Air, right?

1      A.   Well, I drove into the airport driveway.

2      Q.   Okay.  And you check your tire and then go to

3  Servant Air?

4      A.   Correct.

5      Q.   Now we can go to 82A.

6           So you would agree with me this is your truck,

7  right?

8      A.   Correct.

9      Q.   So at 7:22 you're heading home, right?

10      A.   Correct.

11      Q.   And you actually drive home and see Charlene Bell

12  as you're turning into Bells Flats?

13      A.   My memory serves that I saw Annette Ecret as I

14  was turning into Bells Flats.  That's how I remember it.

15      Q.   And that was 7:25, right?

16      A.   I wasn't aware of what time it was.

17      Q.   So we can take that down.

18           Your testimony was you get home, you get the

19  impact wrench, you run into this issue with the lug

20  nuts, right?

21      A.   Correct.

22      Q.   How long did that take?

23      A.   I don't have a specific timeframe.  I wasn't

24  keeping track of time.

25      Q.   Okay.  And then you go and you make a call?

1     A.  I made three calls.

2     Q.  So after the lug nuts, you go upstairs and make

3  three calls?

4     A.  Correct.

5     Q.  You call Rich?

6     A.  I did.

7     Q.  And he doesn't answer because he's dead, right?

8     A.  I'm not aware of that.

9     Q.  You're not aware of that today?

10    A.  I am now, but I wasn't aware of it then.

11    Q.  Okay.  And then you call Jim Hopkins, right?

12    A.  Correct.

13    Q.  And he didn't answer?

14    A.  Correct.

15    Q.  And you know now that's because he was dead?

16    A.  I know now that, yes.

17    Q.  And you leave him a voicemail?

18    A.  I do.

19    Q.  And in your voicemail, you don't mention the lug

20  nuts to Mr. Hopkins, right?

21    A.  I don't recall.

22    Q.  And then you call Chief Reckner, right?

23    A.  I did.

24    Q.  And you left him a voicemail as well?

25    A.  Correct.

1      Q.  So you have no recollection today of how long it

2  took you from the time you get home until the time you

3  made those calls?

4      A.  Not specifically, no.

5      Q.  Okay.  And then after that, you change the tire,

6  you take the tire off, right?

7      A.  I did.

8      Q.  Your testimony is you find a nail in the tire?

9      A.  I did.

10     Q.  Why don't you describe that nail for us.

11     A.  It was a smaller nail than what I replaced it

12  with.  Probably -- it was no larger than 8-penny nail.

13  May have even been smaller than that.

14     Q.  Your testimony is you replaced it with a 16-penny

15  nail, right?

16     A.  I did, yes.

17     Q.  And you pushed that nail all the way in?

18     A.  I did not.

19     Q.  You pushed it how far in?

20     A.  There was at least an inch and a half or maybe

21  two inches protruding from the tire.

22     Q.  So the photos we've seen of the tire in this case

23  with the nail in it, you didn't push it in that far?

24     A.  I did not.

25     Q.  So you didn't drive on it like that?

1    A.   No.

2    Q.   And when you pushed that nail into the tire,

3 there was still air in the tire, right?

4    A.   There was.

5    Q.   So you -- on direct testimony, you were still

6 wearing your soiled pants when you changed the tire,

7 correct?

8    A.   Yes.

9    Q.   And then you wore them all day?

10   A.   I did.

11   Q.   And then you wore them the next day?

12   A.   I did.

13   Q.   Okay.  So you must have not soiled them super

14 bad, because --

15   A.   Well, no, I had cleaned them very thoroughly in

16 the bathroom at Servant Air.

17   Q.   So you show up back at the COMMSTA 8:23, right?

18   A.   Yes.

19   Q.   And that's after you threw the nail in the creek?

20   A.   I threw it over the bank.  I'm not sure where it

21 landed.

22   Q.   So you brought the flat tire with you, low tire?

23   A.   It was in the back of the truck, yes.

24   Q.   You didn't describe it as a low tire in those

25 voicemails, did you?

```
 1      A.  I varied between flat and low tire.  To me, they
 2  were synonymous.
 3      Q.  You said when you called -- let me back up.  You
 4  called Hopkins and Reckner and left voicemails, right?
 5      A.  Correct.
 6      Q.  And in those voicemails, you had a flat in the
 7  truck, right?
 8      A.  Correct.
 9      Q.  That's what you said?
10      A.  Correct.
11      Q.  And at the time you made those calls, you had not
12  actually removed the tire from your truck, right?
13      A.  I had not.
14      Q.  By the time you got to the COMMSTA, nearly
15  everyone else was there who was supposed to be there,
16  right?
17      A.  I can't say whether they were or not.  I believe
18  they were, but I don't know for sure.
19      Q.  Okay.  Everyone else who was supposed to be at
20  the rigger shop that morning was there, right?
21      A.  No.
22      Q.  You saw Cody?
23      A.  I -- yes.
24      Q.  You saw Para and Leah?
25      A.  I did.
```

1   Q.   Pacheco is not there.  He's out in Shemya, right?

2   A.   Correct.

3   Q.   You saw Aaron Coggins that day?

4   A.   I did.

5   Q.   So who else is left?

6   A.   Well, you said COMMSTA.  You didn't say T-2.

7   Q.   I meant the rigger shop.  I'm sorry.

8   A.   Okay.  Then I saw everybody from the rigger shop

9   with the exception of Pacheco, and I'm not sure I was

10  aware he was in Shemya.

11  Q.   You actually talked to Para about what she saw,

12  right?

13  A.   Yes.

14  Q.   And later that -- half hour or so later, you send

15  a text, right, that says, "Jim and Rich are said to be

16  dead."  Right?

17  A.   I believe so.

18  Q.   And by the time you sent that, everyone at the

19  COMMSTA knew Jim and Rich were dead, didn't they?

20  A.   Yes.

21  Q.   At one point -- well, so you're all in the

22  conference room, right?  You moved from the conference

23  room to the basement and other areas, right?

24  A.   Yeah.  We were outside for a while -- at

25  different points during that day.  We were down in the

```
 1    basement.  We were at the ET shop.  I was on the
 2    transmitter deck.  Everybody was wandering around
 3    everywhere.
 4       Q.  From your perspective or from the perspective --
 5    the general perspective of people in the COMMSTA,
 6    there's a killer on the loose, right?
 7       A.  Yes.
 8       Q.  And despite that you fell asleep?
 9       A.  I did not.
10       Q.  So you dispute Mr. Acosta's testimony he saw you,
11    quote, straight-up sleeping?
12       A.  Yes.  I had my eyes closed.  That doesn't
13    indicate that I'm sleeping.
14       Q.  You indicated on direct you like to read, right?
15       A.  I do.
16       Q.  Like to read when you're bored, right?
17       A.  Doesn't have to be because I'm bored.  I like to
18    read, period.
19       Q.  So everyone else is crying, right?  Leah and Para
20    are crying?
21       A.  At times during the day, yes.
22       Q.  And you're reading a book, right?
23       A.  I'm -- yes.
24       Q.  After the murders, Para came and talked to you,
25    didn't she, right before she was leaving?
```

1    A.   Yes.

2    Q.   And she told you that the rigger shop employees

3    had gone down and mowed Nicola Belisle's lawn, right?

4    A.   Correct.

5    Q.   And you had a couple questions about that, didn't

6    you?

7    A.   I did.

8    Q.   And you asked, "Did they use Coast Guard property

9    to do it?"  Right?

10   A.   I may have said that.

11   Q.   And you wanted to know why no one had volunteered

12   to mow your lawn, right?

13   A.   That's correct.

14   Q.   And you went and visited your sister and

15   brother-in-law after the murders, right?

16   A.   A couple different times.

17   Q.   And in June, when they were talking, passing

18   along condolences, you got upset, didn't you?

19   A.   I did.

20   Q.   And you started talking about how Jim and Rich

21   didn't deserve their jobs and they were incompetent?

22   A.   I dispute that conversation.

23   Q.   So you got upset, right?

24   A.   I was upset.

25   Q.   And you said derogatory things about Jim and

1  Rich?

2      A.  I don't believe I did.

3      Q.  So your sister and your brother-in-law who were

4  both there when you had this conversation, you dispute

5  their testimony?

6      A.  Portions of it, yes.

7      Q.  Do you dispute the portion where you said,

8  "They're not my friends"?

9      A.  I don't recall ever saying that.

10     Q.  Do you dispute the portion where you said Rich

11  was a drunk?

12     A.  Yes.

13     Q.  Do you dispute the portion where you said you

14  taught them everything that they knew?

15     A.  I would never say I taught anybody, you know, all

16  that they know.  No, I would never make a statement like

17  that.

18     Q.  Do you dispute the part of that conversation

19  where you said they were unqualified?

20     A.  Yes.

21     Q.  Do you dispute the portion where you said they

22  were incompetent?

23     A.  Yes.

24     Q.  At some point Judy Pletnikoff was taking you to

25  the airport; do you recall that?

A.   I recall her testimony.  I don't recall the trip, no.

Q.   You don't recall being behind her and yelling at her about slamming down the phone when you talk to the FBI?

A.   I recall having a conversation, but it was -- but it wasn't -- I wasn't angry with her.

Q.   So that conversation was at this level, this tone?

A.   No, it was voice raised, but it wasn't angry.

Q.   So you raised your voice?

A.   Yes.

Q.   And you were behind her?

A.   I don't remember where I was seated.

Q.   So you dispute the part where she said you yelled at her for minutes?

A.   For minutes, yes.

Q.   And do you dispute the part where she said you yelled at her?

A.   No.

Q.   You're not surprised she found that intimidating, right?

A.   Yes.

Q.   You are surprised?

A.   Yes.

1    Q.  You went to the airport on April 10, 2012, right?

2    A.  Yes.

3    Q.  You knew where your wife had parked the car,

4    right?

5    A.  Not until after I had arrived.

6    Q.  After you arrived on April 10th, right?

7    A.  Correct.

8    Q.  And when you would go to the airport, you didn't

9    like to leave vehicles at the airport, right?

10   A.  It depended on the situations.  There were many

11   times I traveled to Anchorage for the day, I would leave

12   my truck at the airport.

13   Q.  Nancy's vehicle had been broken into at the

14   airport before?

15   A.  Yes.

16   Q.  And she didn't normally leave her vehicle at the

17   airport, right?

18   A.  Not true.  She made many day trips to the

19   villages, so she would leave her car parked either in

20   front of Island Air, if that's who she was flying with,

21   or she'd leave it parked in front of Servant Air, if

22   that's who she was flying with.

23   Q.  For the day?

24   A.  For the day.

25   Q.  So on a multiple-day trip, she wouldn't leave her

1   car at the airport?

2       A.   Normally not.

3       Q.   Normally Para or Judy Pletnikoff or someone else

4   would take that vehicle home if both of you were

5   traveling?

6       A.   If both of us were traveling, yes.

7       Q.   If only one of you were traveling, it was up to

8   the other one to handle that, right?

9       A.   Correct.

10      Q.   I want to talk about when you were talking to the

11  investigators.

12           Fair to say you provided a lot more details today

13  about the events of April 12, 2012, than you did on

14  April 12, 2012?

15      A.   In certain instances, yes.

16      Q.   Fair to say you didn't provide a lot of detail to

17  the investigators about your whereabouts that morning,

18  right?

19      A.   Portions of it, yes.

20      Q.   You know it's important to be honest when police

21  are investigating a crime, right?

22      A.   Correct.

23      Q.   And they asked you questions, you indicated it

24  was fact-finding, right, they were trying to figure out

25  where you were that day?

1    A.  They were looking for information, yes.

2    Q.  That information involved your whereabouts,

3  right?

4    A.  Correct.

5    Q.  And when they asked you where you got the flat,

6  you said, "I don't know."  Right?

7    A.  Well, I don't know where the nail entered the

8  tire, no.

9    Q.  So that's what you told them, "I don't know."

10  Right?

11    A.  Correct.

12    Q.  And when they asked you what time you got home,

13  you said, "I don't know."  Right?

14    A.  Correct.

15    Q.  And when they asked you what time you left your

16  house, you said you didn't know?

17    A.  Approximately, I gave them a time.

18    Q.  Or did they give you a time?

19    A.  No.  The initial question, I believe I said 6:50,

20  but --

21    Q.  When they asked when you left to go back to work,

22  you didn't have a time for them, right?

23    A.  I did not.

24    Q.  And when they asked where you noticed the low

25  tire, flat tire, you said you didn't know, right?

1    A.  It was in an approximate -- approximately
2  where -- I said approximately where I noticed it.
3  Nothing specific.
4    Q.  But when they were to ask you was it near the
5  COMMSTA, you were quick to say no, right?
6    A.  Well, it wasn't near the COMMSTA, because I
7  didn't go to the COMMSTA.
8    Q.  And when you were asked how long you were out of
9  your vehicle at the airport, you said you didn't know,
10  right?
11    A.  I wasn't keeping track of time.
12    Q.  And so that's -- you said you didn't know?
13    A.  I didn't know.
14    Q.  And when asked about what time you arrived at the
15  COMMSTA that morning, you said you didn't know, right?
16    A.  Correct.
17    Q.  You didn't tell the investigators you pulled the
18  nail out, right, of your tire?
19    A.  No.
20    Q.  You didn't even tell them you had seen the nail,
21  right?
22    A.  No.
23    Q.  You didn't tell them you reinserted it with a
24  Leatherman, right?
25    A.  No.

1    Q.  You didn't tell them that you threw the first

2  nail in the creek, did you?

3    A.  Did not.

4    Q.  You didn't explain what you did that day at the

5  airport, right?

6    A.  I did not.

7    Q.  So you weren't completely honest with them,

8  correct?

9    A.  No.  I didn't feel that it was important.  That I

10  was at the airport, that's what I explained to them.  I

11  didn't give a detailed description of what I did at the

12  airport.

13    Q.  Okay.  When they asked you about 34 minutes and

14  the time you passed the main base gate camera, you

15  didn't have a reasonable explanation, right?

16    A.  Because they had started talking about timelines.

17  They said they didn't -- hadn't viewed any film of

18  cameras, and then all of a sudden they're talking about

19  specific times, so I'm getting a mixed message here from

20  them.  Well, did they look at cameras?  Are these times

21  correct?  I had no idea what those times meant.

22    Q.  Okay.  But you did not provide them any

23  information about between 6:48 and 7:22, what you were

24  doing in those 34 minutes, right?

25    A.  I provided some information.  I didn't provide

1 complete information.

2     Q.  So you didn't tell them everything?

3     A.  Correct.

4     Q.  You never told them you had to stop at Servant

5 Air and go to the bathroom?

6     A.  I did not.

7     Q.  And you didn't think that was important, right?

8     A.  At the time, I was at the airport.

9     Q.  It was apparent to you in these interviews,

10 though, they're trying to account for what you did that

11 morning, right?

12     A.  It was not that apparent to me, no.

13     Q.  So when they were asking you, "What did you do

14 this morning," it wasn't clear to you that they were

15 trying to figure out what you did that morning?

16     A.  I was at the airport, and that's what I told

17 them.

18     Q.  You never had to take a bathroom break during

19 your interviews, right?

20     A.  No, but they were fairly short.  So not during

21 the interviews, I did not, no.

22     Q.  You claimed that the fact that you soiled your

23 pants and had to go into Servant Air and use the

24 bathroom, that that was personal and embarrassing,

25 right?

1    A.   It is.

2    Q.   You were too embarrassed to tell them about the

3  fact you soiled your pants?

4    A.   At that time, yes.

5    Q.   I just want to make sure.  You were sitting there

6  and they're asking you questions in a double murder

7  investigation, and you were too embarrassed to tell them

8  that I stopped and went to the bathroom?

9    A.   I told them I was at the airport, and that, to

10  me, fulfilled that answer.

11    Q.   You weren't too embarrassed to talk to them about

12  feces, though, right?

13    A.   I don't believe I talked to them about feces.

14    Q.   You told them you were pooping in a bucket,

15  right?

16    A.   Well, yeah, I said number two or somebody said

17  number two, and I agreed with that.

18    Q.   And you actually volunteered that you took a

19  bucket of poop and dumped it in the dumpster, right?

20    A.   Well, yes.

21    Q.   So you weren't too embarrassed to talk about

22  feces, right?

23    A.   At that time, no.

24    Q.   So in the time they were asking you where were

25  you, you were too embarrassed, but then you volunteered

1    that you --

2        A.   Well, there's a difference between going to the

3    bathroom at your house and then messing your pants.

4        Q.   You provided no information about where you

5    stopped at the airport, right?

6        A.   Correct.

7        Q.   You could have gone to the bathroom at the Alaska

8    Airlines terminal, right?

9        A.   I could have.

10       Q.   But you didn't?

11       A.   It was crowded.

12       Q.   The bathroom was crowded?

13       A.   The airport terminal was crowded.

14       Q.   They have a camera too, right?

15       A.   I have no idea.

16       Q.   But you've seen video from the airport?

17       A.   Now I'm aware of that.  At the time I wasn't

18   aware of that.

19       Q.   You could have gone to Island Air, right, to use

20   their bathroom?

21       A.   I could have.

22       Q.   You didn't?

23       A.   I did not.

24       Q.   And they have a camera, right?

25       A.   I wasn't aware of that at the time.

1    Q.  You weren't aware until you showed up the next

2  day and stood there and looked at it, right?

3    A.  That's correct.

4    Q.  You heard the testimony of Mr. Skonberg, right?

5    A.  I did.

6    Q.  You heard he was there on April 12, 2012, right?

7    A.  Correct.

8    Q.  And he did not see you, right?

9    A.  I did not see him either.

10    Q.  And he testified that he would have seen or heard

11  you in the bathroom, right?

12    A.  Yes.

13    Q.  So your testimony today is that you chose to go

14  to a bathroom in the only building at the airport that

15  didn't have cameras, you managed to get in there without

16  Mr. Skonberg seeing you, you were in there for

17  30 minutes and then left without anyone seeing you?

18         MR. COLBATH:  Your Honor, I'll object to the

19  form of the question as being both argumentative and

20  compound.

21         THE COURT:  Why don't you rephrase.

22  BY MS. SHERMAN:

23    Q.  Sure.  Your testimony is you chose the bathroom

24  at Servant Air, right?

25    A.  Correct.

1    Q.   And you never told the investigators that, right?

2    A.   Correct.

3    Q.   And you know Servant Air doesn't have cameras,

4    right?

5    A.   I wasn't aware at the time that it didn't.  I am

6    now.

7    Q.   And you managed to go in the bathroom without

8    Mr. Skonberg seeing you, right?

9    A.   Correct.

10   Q.   Your testimony today is you were in there for

11   quite some time, right?

12   A.   Correct.

13   Q.   You cleaned up your pants, right?

14   A.   I did.

15   Q.   You went to the bathroom two more times, right?

16   A.   I'm not sure how many times.  I wasn't keeping

17   track.

18   Q.   You were in there for about 30 minutes?

19   A.   I don't know how long I was in there.  I wasn't

20   keeping track of time.

21   Q.   And then you left, right?

22   A.   I did.

23   Q.   And that all occurred without Mr. Skonberg or any

24   passengers at Servant Air seeing you, right?

25   A.   I'm not sure if anybody saw me.

1          MS. SHERMAN:  Those are all my questions.

2          THE COURT:  Redirect?

3          MR. COLBATH:  Just briefly, Your Honor.

4                    REDIRECT EXAMINATION

5  BY MR. COLBATH:

6     Q.  Mr. Wells, on April 12th or 13th, when you talked

7  to the investigators, you were on trial for murder at

8  that time?

9     A.  I was not.

10    Q.  Did the gravity seem more important then than the

11 gravity seems today about being detailed?

12    A.  No.

13    Q.  How does it seem today, the importance?

14    A.  Extremely important.

15    Q.  I want to ask you about just a couple of things.

16 Can we see 235?  I think it's Government 235.

17         You were asked about Shemya and Mr. Hopkins.

18 Remember that picture?

19    A.  Yes.

20    Q.  And you and Mr. Hopkins, Rich are all here,

21 right?

22    A.  ET3 Beauford, Jim Hopkins, Rich Belisle and

23 myself.

24    Q.  And are you supervising here while they do what

25 with a guy --

1    A.   Yeah.   They're beginning to take up tension on a

2  guy wire.

3    Q.   Are you -- were you in 2012 a sailor?

4    A.   I'm not sure what you mean by sailor.

5    Q.   Well, were you in the Coast Guard?

6    A.   I was a civilian employee of the Coast Guard.

7    Q.   As a civilian, were you even eligible to get

8  sailor of the year?

9    A.   I was not.

10    Q.   That was for enlisted people?

11    A.   It was.

12    Q.   Can we see -- can we see maybe Government Exhibit

13  No. 130.

14         And that's your desk on -- as it looked on

15  April 12th?

16    A.   It is.

17    Q.   Can you give me Government Exhibit 32.   Maybe 32

18  is -- yeah.

19         Did your desk typically look like that,

20  Mr. Wells?

21    A.   Typically.   I would have occasions where I would

22  clean it up.

23    Q.   And so the fuel card letter that you were asked

24  about, was it in this pile of mail here?

25    A.   I couldn't say where it was.

1    Q.  Okay.

2    A.  I mean, it was probably -- it was on the desk,

3  let's put it that way.

4    Q.  Along with all your documentation from a lengthy

5  time at work?

6    A.  Yes.

7    Q.  On April 11th, the morning of April 11th when you

8  were in the basement of T-1, how long did it take in the

9  microwave room and inspecting the cable trays and the

10  exits to the building?

11    A.  I couldn't say because I wasn't keeping track of

12  time.  I was just looking at possible routes and where

13  we could have egress for the cable.

14    Q.  Was that in addition to the bathroom and the

15  gauge checking?

16    A.  Yes.

17    Q.  Did you plan to climb the tower on April 12th?

18    A.  Probably not.

19    Q.  Okay.  Because of your health?

20    A.  Yes.

21    Q.  All right.  And on the -- when you met with the

22  investigators and you went through the timeline of

23  things at the airport, how did you not appreciate the

24  significance of each detail of what you did?

25    A.  I accounted for my time by being at the airport.

1    The specifics I didn't believe pertained to anything

2    other than that I was at the airport.

3         Q.   Did you lie about being at the airport?

4         A.   I did not.

5         Q.   Did you lie about going back home and changing

6    the tire?

7         A.   I did not.

8         Q.   Did they ask you specifically about the nail or

9    what happened at the house with regard to the nail or

10   the tire or those things?

11        A.   No, they did not.

12        Q.   Did you lie about any of the process in changing

13   things in your travel route?

14        A.   I did not.

15        Q.   And did your travel -- did you know about the

16   timeline of your travels, in other words, how long

17   everything took?

18        A.   I did not.

19        Q.   But did the start-to-finish travels, did you

20   share all those start-to-finish travels, places you --

21   time amount, whatever it was, that you traveled with the

22   agents?

23        A.   The time that I traveled?

24        Q.   Right.

25        A.   I don't know what times I traveled, so --

1    Q.  But --

2    A.  I'm not sure I understand your question.

3    Q.  -- the areas that you went -- excuse me.  Hold on

4    a minute.  The areas that you went -- and I'm sorry I'm

5    not being clear.  The areas that you went, the route,

6    those things, however long it took, did you share that

7    with the agents, wherever you went?

8    A.  I took the routes.  I didn't share times because

9    I wasn't aware of what the times were.

10   Q.  Did you do your best to answer their questions as

11   you understood what was going on on April 12th?

12   A.  Yes.

13   Q.  April 13th?

14   A.  Yes.

15   Q.  Do you have different understandings today about

16   what was going on?

17   A.  Oh, yeah.  I know all the information now.  I

18   know sequence of events, and I've seen the tapes and the

19   videos, and now I have a lot of knowledge of what

20   happened, but I didn't back then.

21   Q.  That day, April 12th, did you shoot Rich Belisle?

22   A.  I did not.

23   Q.  How about Jim Hopkins?

24   A.  I did not.

25        MR. COLBATH:  All right.  I don't have anything

1    further.

2             THE COURT:  All right.  Recross?

3             MS. SHERMAN:  No.

4             THE COURT:  Thank you, sir.  You may be

5    excused.

6             (Defendant excused from witness stand)

7             (Requested excerpt concluded, proceedings

8    continued.)

9                      CERTIFICATE

10       I, Sonja L. Reeves, Federal Official Court Reporter
     in and for the United States District Court of the
11   District of Alaska, do hereby certify that the foregoing
     transcript is a true and accurate transcript from the
12   original stenographic record in the above-entitled
     matter and that the transcript page format is in
13   conformance with the regulations of the Judicial
     Conference of the United States.
14
         Dated this 2nd day of October, 2019.
15

16
                      /s/ Sonja L. Reeves
17                    SONJA L. REEVES, RMR-CRR
                      FEDERAL OFFICIAL COURT REPORTER
18

19

20

21

22

23

24

25