1          UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF ALASKA
2

3   UNITED STATES OF AMERICA, )
                              )
4           Plaintiff,        )
                              )
5   vs.                       )   CASE NO. 3:13-cr-00008-SLG
                              )
6   JAMES MICHAEL WELLS,      )
                              )
7           Defendant.        )
    _____  )
8

9          PARTIAL TRANSCRIPT OF TRIAL BY JURY - DAY 9
                 (Testimony of Peter Van Ness)
10     **BEFORE THE HONORABLE SHARON L. GLEASON, DISTRICT JUDGE**
               September 19, 2019; 8:35 a.m.
11                    Anchorage, Alaska

12  **FOR THE GOVERNMENT:**
           Office of the United States Attorney
13         BY:  STEVEN SKROCKI
           BY:  CHRISTINA M. SHERMAN
14         BY:  KELLEY L. STEVENS
           222 West 7th Avenue, #9
15         Anchorage, Alaska 99513
           (907) 271-5071
16

    **FOR THE DEFENDANT:**
17         Office of the Federal Public Defender
           BY:  GARY GEORGE COLBATH
18         601 West 5th Avenue, Suite 800
           Anchorage, Alaska 99501
19         (907) 646-3400

20         Camiel & Chaney, P.S.
           BY:  PETER A. CAMIEL
21         520 Pike Street, Suite 2500
           Seattle, Washington 98101
22         (206) 624-1551

23  _____

                **SONJA L. REEVES, RMR-CRR**
24             Federal Official Court Reporter
                222 West 7th Avenue, #4
25               Anchorage, Alaska 99513
        Transcript Produced from the Stenographic Record

```
 1              (Call to Order of the Court at 8:35 a.m.)
 2              (Proceedings took place and are not included in
 3   this transcript, after which, the testimony of Peter Van
 4   Ness transpired as follows:)
 5              (Oath administered to the witness)
 6              DEPUTY CLERK:  For the record, can you please
 7   state your full name and then spell your full name.
 8              THE WITNESS:  Peter Russell Van Ness,
 9   P-e-t-e-r, R-u-s-s-e-l-l, V-a-n, N-e-s-s.
10         PETER VAN NESS, GOVERNMENT WITNESS, SWORN
11                      DIRECT EXAMINATION
12   BY MR. SKROCKI:
13      Q.  Good afternoon, Mr. Van Ness.
14      A.  Good afternoon.
15      Q.  Could you tell the jury where you reside, sir.
16      A.  I currently live in Alexandria, Virginia.
17      Q.  And what do you do there currently?
18      A.  So I am a retired Coast Guard officer.  I retired
19   September 1st and just took a new job with SAVA
20   Solutions.  They are an IT service company, and I am the
21   program manager for IT operations for the DEA.
22      Q.  You didn't take any time off between the end of
23   your career and this job?
24      A.  I did take some terminal leave, yes.
25      Q.  Good enough.
```

1    Sir, before this job you just described, what

2 were you doing for a career?

3    A.  I was a Coast Guard officer for 24 years.

4    Q.  And at some point in time were you assigned to

5 the Communication Station Kodiak?

6    A.  I was.  From 2009 until 2012, I was the

7 commanding officer at the Communication Station.

8    Q.  You had some individuals working underneath you

9 at that point in time?

10    A.  I did.

11    Q.  Who was your executive officer?

12    A.  My executive officer was David Pizzurro.

13    Q.  If you could just briefly walk the jury

14 downstream from you, down from Mr. Pizzurro, who would

15 be next in line beneath you?

16    A.  Normal command structure at the Communication

17 Station was commanding officer, myself.  David Pizzurro

18 was the executive officer.  Second in charge under David

19 would be the operations officer, Phil Jordinelli.  And

20 the engineering officer, William Reed.

21    And then I also had a command master chief, so he

22 was a senior enlisted advisor for the members of the

23 crew that were enlisted and an advisor to me as the

24 commanding officer.  And then under each of the

25 operations officer and the engineering officer they had

1    a staff that provided operations and engineering support

2    to the command.

3        Q.   Can you tell the jury, was this your first

4    assignment as communication station commander?

5        A.   It was my first assignment to the Communication

6    Station, yes.

7        Q.   Prior to that, did you have any communication

8    experience?

9        A.   Yes, I did.  Actually, immediately prior to that,

10   I did presidential support.  I worked at the White House

11   communication agency, spent two and a half years

12   supporting President Bush and six months with President

13   Obama.

14       Q.   Interesting work?

15       A.   Very.  Traveled all over the world, 26 different

16   countries.

17       Q.   Cool.

18            If we could have Exhibit No. 222, please, and the

19   lights, Madam Clerk.

20            Mr. Van Ness, are you a photographer?

21       A.   Not professional, but I do take a lot of photos.

22       Q.   Did you take this one?

23       A.   I did.

24       Q.   Is that your station?

25       A.   That is.

1    Q.   If you could describe for the jury just briefly

2    the building to the right, what do you recall that

3    building to be?

4    A.   So the large building in the center is what

5    you're asking?

6    Q.   Yes, I was calling it to the right.  I'll just

7    circle it.

8    A.   Yes.  That would be T-2.  The T stands for

9    transmit.  That's the transmit facility for the

10   Communication Station.  That's our primary building.

11   That was the command offices, the administrative

12   offices.

13        The electronic technicians had offices in there.

14   The transmitters themselves were in that building and

15   then the operations deck, which was a secure space where

16   our operations specialists stood watch, were in that

17   building.

18   Q.   You called this one T-2?

19   A.   T-1.

20   Q.   T-1.  Okay.  How about this one here to the left?

21   I'm circling the white building to the left.

22   A.   Designated T-2, again, for transmitter site.  And

23   we also called that the rigger shop.  So that was a

24   garage and workshop for the staff that maintained the

25   antennas and the grounds that supported the antennas.

1    Q.  We can take that down, Blair.  Thank you.

2        If you can recall roughly the month and year when

3    you arrived to take command of the Communication

4    Station.

5    A.  I believe it was July of 2009.

6    Q.  And before taking command, were you apprised of

7    the general nature of the command and how things were

8    run or not run.

9    A.  I was.  So it's normal for a new commanding

10   officer to come in and spend about a week before you

11   assume command with the senior members of the crew, get

12   a briefing on various aspects of the command, both on

13   the engineering and operations side, and then do a tour

14   of the grounds, do a tour of the facility and visit some

15   of the other commands in the local area to become

16   familiar with the command you're taking charge of.

17   Q.  Is it Captain Van Ness when you retired finally?

18   A.  Correct.

19   Q.  Captain.  I'll just go with Captain.  Captain Van

20   Ness, you're not that far out of the Coast Guard.  When

21   you arrived, did you have a philosophy or a practice you

22   were going to implement when you became commander of the

23   Communication Station?

24   A.  I don't know that I had a formal philosophy, but

25   I did have experience.  It was my third command.  I had

1    commanded two cutters prior to taking command of the

2    Communication Station, so I had some experience being in

3    command.

4        And I did set some expectations for the crew, but

5    it's also kind of expected of a new leader to come in

6    and assess for about the first month, 30 days before you

7    make any major changes, so I did take advantage of that

8    also.

9    Q.  Where was your undergraduate?

10   A.  I have an undergraduate degree from the Coast

11   Guard Academy.

12   Q.  Did you staff your subordinate positions with

13   those you felt could implement your policies in terms of

14   management?

15   A.  No.  In fact, I had very little control over my

16   staff.  They are assigned by the military, by the Coast

17   Guard.  So as I was in command, I definitely have some

18   influence with the assignment officers and having

19   discussion of what kind of skills and individuals we

20   need, but no direct -- I didn't come in as a new CO and

21   choose who worked for me.

22   Q.  Did you have also command over the rigger shop,

23   the T-2 building?

24   A.  Yes, that's correct.

25   Q.  And those inside?

1    A.   Yes.

2    Q.   And do you recall a man named Jim Wells?

3    A.   Yes.

4    Q.   Do you see him here in court today?

5    A.   Yes.  He's sitting at the table right here.

6    Q.   With respect to Mr. Wells, at the time you knew

7  him when you were in Kodiak, who was his supervisor?

8    A.   Direct shop supervisor would have been Jim

9  Hopkins, and that's by nature of the civilian positions

10 were not supervisory positions, so a military member was

11 put in charge of the entire shop.

12       And then Scott Reckner, Chief Reckner was overall

13 in charge from a higher command level.

14   Q.   And at some point in time as his commanding

15 officer, were you made aware of issues with respect to

16 Mr. Wells' conduct in the rigger shop as a civilian

17 employee?

18   A.   Yes.  There had been some challenges with work in

19 the shop.

20   Q.   Which one of those challenges that rose to your

21 level do you recall?

22   A.   The first one that was I was advised of by the

23 staff down there, in particular Mr. Reckner, was an

24 issue with tree collaring, which is basically you wrap

25 the bottom of a tree or cut the bottom of a tree so it

kills it, it dies, and it needs to be taken down because
it could become a hazard.

Q. That didn't rise to your level for any kind of
disciplinary matters, did it?

A. Only that I was advised that it had been
addressed.

Q. Did there come a time when another matter
involving Mr. Wells did come to your direct attention?

A. Yes. So very late in my tour, my three years,
probably about the two and a half year mark, there was
an issue with improper use of the Government fuel card
that we -- the command had a card that was used to fuel
the Government vehicles and it had been improperly used
to fill a personal vehicle.

And so I convened an investigation, asked the
executive officer to assign an investigating officer,
which is usually a member of the command. They go out
and they gather the facts and then present that back to
the executive officer, and then he provides a
recommendation to me based on those findings. And those
findings basically included a recommendation that Jim
Wells -- the facts supported that Jim Wells --

MR. COLBATH: Your Honor -- excuse me, Mr. Van
Ness -- could we approach?

THE COURT: Yes, let's do that briefly.

1          (Begin bench conference.)

2          MR. COLBATH:  Your Honor, I believe this came

3     up during Chief Reckner's testimony as well.  The

4     Court's order precluded the Government from offering

5     evidence directly because the investigation was

6     inclusive.  There was a letter of caution issued.  The

7     Court's order I think --

8          THE COURT:  Definitive was the word I used.  He

9     is not to say that.

10          MR. COLBATH:  I believe that's exactly where

11     we're at, about that point.

12          MR. SKROCKI:  I'll explain.  I just want to get

13     some background.

14          THE COURT:  Have you explained the Court's

15     order not to say definitively he was responsible?

16          MR. SKROCKI:  Yes.  Can I lead him for a couple

17     of questions?

18          MR. COLBATH:  That's what we did with

19     Mr. Reckner.

20          THE COURT:  Let's do that.

21          (End bench conference.)

22     BY MR. SKROCKI:

23     Q.  Captain Van Ness, just to get to the point here,

24     there was an investigation that was conducted, and you

25     developed a memorandum of caution for Mr. Wells,

1  correct?

2      A.  That's correct.

3      Q.  And did you have occasion to sit down and give

4  that letter of caution to Mr. Wells?

5      A.  I did.

6      Q.  I want to focus on that meeting.  Okay?

7      A.  Yes.

8      Q.  And so can you tell the jury when you had that

9  meeting who was present in the room and what your

10  intentions were.

11      A.  To the best of my recollection, it was my

12  executive officer.  It was the -- so David Pizzurro, my

13  executive officer; William Reed, the engineering

14  officer; and Scott Reckner, the supervisor for the

15  rigger shop, as well as Jim Wells.

16      Q.  And did you have occasion to speak with Mr. Wells

17  about the contents of the letter of caution?

18      A.  Yes.

19      Q.  And did you explain the letter to him?

20      A.  Yes.

21      Q.  And did you ask him for his signature on the

22  letter?

23      A.  I did.

24      Q.  Can you tell the jury what happened with respect

25  to whether Mr. Wells signed the letter of caution or

1  not?

2     A.  So initially he did not want to sign the letter.

3  And I talked to him some more.  It was a fairly short

4  meeting, about ten minutes.  But then when he didn't

5  sign the letter, we ended up talking about it some more.

6  I eventually stood up and said that if he did not want

7  to sign it that I would go back to the civilian

8  management support that we had in Kodiak at the Coast

9  Guard base and we would discuss where to move -- how to

10  move forward from here.  And at that point, he did sign

11  it and then pushed it across the table back to me.

12     Q.  Like across the table, just shoved it back, or

13  how did that go?

14     A.  Just slid it.  It was a glass table, so slid it

15  back across the glass table.

16     Q.  A couple other questions for you on a different

17  topic.

18        As the commanding officer, if there were any

19  threats made to the Communication Station, would they

20  rise to your level?

21     A.  Absolutely.

22     Q.  Were any made during your tenure there to the

23  Communication Station that you are aware of?

24     A.  Are you speaking like a bomb threat?

25     Q.  Any kind of threat whatsoever that rose to your

1   attention.

2     A.  Not that I remember.

3     Q.  Okay.  I want to ask you a couple other questions

4   about some other individuals that were in the T-1

5   building that you were supervising or that were under

6   your command, and that would be William Reed.  Do you

7   know who Mr. Reed is?

8     A.  Yes.  William Reed was my engineering officer.

9     Q.  And how about Mr. Ray Fillion?

10     A.  Yes, so he was the senior electronics technician.

11     Q.  Are you aware of any kind of interaction in a

12   negative fashion between Mr. Fillion and Mr. Reed during

13   your tenure?

14     A.  Yes.  So they definitely had some personality and

15   professional conflicts.  There were some challenges on

16   both sides.  William Reed was getting ready to retire,

17   had submitted his retirement letter and was in the last

18   six months or less than a year of his service, 28,

19   29 years, I'm not sure exactly what he retired, but a

20   long service.

21        But I was concerned, a little disappointed in him

22   that he was not, in my mind, providing enough leadership

23   to his team.  He was spending a lot of time in his

24   office and not engaged enough.  And then we had issues

25   with Ray Fillion who worked directly for him.

1       At that time, Ray Fillion had been promoted.

2   They were both senior chiefs so they were of the same

3   rank, but William Reed was the engineering officer, so

4   he was in charge of the engineering department. And

5   they had a lot of disagreements about how it should be

6   run.

7       Some of that came from not enough engagement on

8   William Reed's part. In my opinion, a lot of it also

9   came from Ray Fillion being overbearing, not very

10  respectful of the people that worked for him, and

11  ultimately ended up in a shouting match between the two

12  at some point.

13      Q.  Did you say shouting match?

14      A.  A shouting match, yes.

15      Q.  That came to your attention?

16      A.  It did.  I did not observe it, but it was brought

17  to my attention.

18      Q.  Did you take any administrative action against

19  these two individuals?

20      A.  I did. I took --

21      Q.  Hold on, sir.  Captain, I'm in charge.

22      THE COURT:  No, I am.  Go right ahead,

23  Mr. Skrocki.

24          MR. SKROCKI:  I thought I had a good one.  I

25  really did.  Thank you for that, Your Honor.  And that's

1  on the record.

2  BY MR. SKROCKI:

3      Q.  Captain, did you take any administrative action

4  with respect to the shouting match between these two

5  individuals and their other conduct?

6      A.  Yes, I did.

7      Q.  Please tell the jury what you did.

8      A.  So I basically wrote up official remarks that go

9  in their personnel record that addressed both --

10  addressed the conduct that I felt was inappropriate and

11  set expectations for what I expected to see from both of

12  them.

13      Q.  Did that settle the matter between the two?

14      A.  I think it addressed that specific situation.  In

15  my mind, it addressed the issues I was having with

16  William Reed, but I continued to have some problems with

17  Ray Fillion.  He was just -- he was a difficult person

18  to work for and a very difficult person to manage.

19      Q.  And these instances we're talking about, where

20  did they occur, what building?

21      A.  In T-1.

22      Q.  Any spillover into the T-2 building at all?

23      A.  Not that I'm aware of.

24      Q.  You mentioned that the word respectful.  I want

25  to take you back to the meeting you had with Mr. Wells.

1  When you stood up to call the end of the meeting, did

2  everybody else stand up as well?

3      A.  Everyone but Mr. Wells.

4      Q.  If we could have the lights, please, and

5  Exhibit 67.

6          Mr. Van Ness, in preparation for your testimony,

7  we met before, correct?

8      A.  Yes.

9      Q.  We showed you a video which we're going to put up

10  on the screen here.  It's been admitted.  Just go to the

11  first -- just open up the first frame.

12          Do you recall seeing this video, Mr. Van Ness?

13      A.  Yes, I do.

14      Q.  If you could go ahead and play that, Blair.

15          (Exhibit No. 67 playing in open court.)

16      Q.  Do you recognize that truck coming from right to

17  left, sir?

18      A.  Yes.  That's Jim Wells' truck.

19      Q.  Then right behind.  If we could stop that, Blair.

20      A.  The red truck that pulled in on the right-hand

21  side there is my truck.

22      Q.  That's your truck there?

23      A.  Correct.

24      Q.  And let's go ahead and keep going while we have

25  it up, Blair.

1          (Exhibit No. 67 continues playing in open

2     court.)

3      Q.   This person here in the red jacket, who is that?

4      A.   That's me.

5      Q.   Who were you approaching?

6           If we could stop, Blair.

7      A.   That's Scott Reckner.  He has his back to me.

8     Right there.  He's facing the white truck.

9      Q.   Do you recall what his emotional state was at the

10    time?

11     A.   He was crying.

12     Q.   Blair, keep going, please.

13          (Exhibit No. 67 continues playing in open

14    court.)

15     Q.   What do you do there?

16     A.   I put my arm on his, like on his shoulder.

17     Q.   Let's stop there, Blair.

18          Who is here in the orange shirt?

19     A.   That's Jim Wells.

20     Q.   And is there a point in time you had a -- let me

21    rephrase that.

22          Were you there with Mr. Wells for a period of

23    time, the three of you?

24     A.   Very short period of time, but yes.

25     Q.   Do you recall Mr. Wells saying anything during

1  that period of time?

2     A.   The conversation I recall was that Scott Reckner,

3  you saw him put his hands on his knees, he said,

4  "Someone shot Jim and Rich."  And then Jim Wells said

5  something along the lines of, "Oh, God.  Oh, my

6  goodness.  Oh, no," or something like that, but, "I had

7  a flat tire."

8     Q.   "I had a flat tire"?  What was your reaction to

9  that?

10     A.   I didn't address it directly, but I guess my

11  thought was so what, what does that have to do with the

12  issue we're having here.  This is a huge problem.  We

13  have people who have been shot and we're talking about a

14  flat tire.

15     Q.   Did you actually follow Mr. Wells into the

16  Communication Station?

17     A.   I did.  I followed him down Anton Larsen Road,

18  which is the road that approaches the Communication

19  Station from the main road that runs across Kodiak.

20     Q.   If we can have the lights, please, and you can

21  take that down, Blair.

22         I'm going to maybe walk you back a little bit

23  before this.  How did you find out about an issue at the

24  Communication Station that morning?

25     A.   So my family had been sick, kids, then wife.  I

woke up not feeling well.  I don't remember whether I
left a voicemail or sent e-mail, but I notified my
executive officer that I wouldn't be in right away that
morning, I was going to go by the clinic on base and see
the doctor.  And while was in the bathroom, a call came
in to my phone.  I came out of the bathroom, I picked it
up, there was a voicemail.  It was from the watch at the
Communication Station saying that, at this point, seven
years later, but basically there was someone injured
and there was a lot of blood, was the gist of the
message.

I called them back.  The watch officer didn't
have a lot of info other than someone had been hurt down
in T-1, and, again, there was a lot of blood.  So I
said, "Okay.  I don't need anything else right now.
I'll be in right in."

I may have asked if the police were on the way.
I'll be honest, at this point, I don't remember a lot of
that conversation, but the gist was, okay, thank you,
I'll be right there, because I only lived about two and
a half miles from the Communication Station.

Q.  Where were you living at the time?

A.  I lived on the Coast Guard base in Kodiak.

Q.  So that was only two and a half miles away?

A.  Yes.

1    Q.   How long did it take you to make that drive to
2    the Communication Station on a normal day?
3    A.   Five to ten minutes, depending on traffic.
4    Q.   You still remember that, five to ten minutes?
5    A.   Roughly, yeah.
6    Q.   Okay.  So proceed with what happened with the
7    rest of your morning after you got that phone call.
8    A.   So I got in the car.  I'm driving in.  My phone
9    rang again when I was on Rezanof, which is the main road
10   there in Kodiak.  I stopped because it was the XO.  I
11   answered.  He told me two people had been shot.  I said,
12   "Okay.  I'm on my way.  Meet me when I get in there.
13   I'll meet you at T-1 and we'll figure out what's going
14   on," and then I proceeded in.
15   Q.   At some point in time, did you see a vehicle you
16   recognized ahead of you?
17   A.   Yes.
18   Q.   Whose vehicle was that?
19   A.   Jim Wells' truck was ahead of me on -- so off
20   Rezanof, you come out of the base, take a right on
21   Rezanof, drive less than a mile, maybe a half mile down
22   and take a left onto Anton Larsen, which is the road
23   that goes out to the Communication Station.  So his
24   truck was ahead of me on Anton Larsen.
25   Q.   You seem to remember all these details pretty

well?

    A.  Yes.  Well, it was my commute every day for three years.

    Q.  Only three years?

    A.  Yeah.

    Q.  Okay.  And you saw Mr. Wells' vehicle ahead of you?

    A.  Yes.

    Q.  And you followed him in?

    A.  Yes.

    Q.  You were the commander?

    A.  Correct.

    Q.  We saw you in the video putting your arm around Mr. Reckner.  You had your discussion.  Mr. Wells tells you about the flat tire.  As commander of the base, what did you do next?

    A.  So at some point right after I arrived, right after that conversation, I ended up talking to one of the officers.  He asked me some questions, wanted to see my identification.  I explained I was the commanding officer.  And then I believe I made my way up to T-1, left my truck down there but walked up.

    Q.  At that first couple of minutes, what's your primary mission, concern about your mission at that time?

1     A.  Well, so I was concerned primarily about two

2  things.  One was security.  So we have had people that

3  have been shot.  I don't have any details.  I have

4  police there.  But safety of the crew.

5         And then we have a mission.  We support aircraft

6  flying and we -- the two big concerns I had were

7  aircraft that we support.  They are out doing missions.

8  We maintain their radio guard.  And then we maintain the

9  search and rescue guard for Northern Pacific and Bering

10  Sea.

11         So wanted to make sure that we were still doing

12  our job, and, if not, that we had shifted that job to

13  someone else who could do it for us.  Those were the two

14  things on my mind.

15     Q.  The two men who were murdered that day, who were

16  they?

17     A.  Jim Hopkins and Rich Belisle.

18     Q.  Did you have occasion to submit something to the

19  Coast Guard Alaska with respect to Mr. Hopkins?

20     A.  Yes.

21     Q.  Explain to the jury what that was and what it was

22  for.

23     A.  Okay.  Jim Hopkins was recognized as our sailor

24  of the year for 2011.  So in January of 2012, he was the

25  sailor of the year for our unit and we nominated him to

1  the overall Alaska Coast Guard command.

2       All the units would send their sailors of the

3  year, which is equivalent to employee of the year that

4  you might do at your own place of employment, and then

5  he would complete at that level.  At then at the

6  national level eventually there are some significant

7  rewards for being recognized at the national level.  He

8  was recognized by our unit as a high performing,

9  dedicated member of the crew.

10     Q.  Did you put your name to that application, to

11  that nomination?

12     A.  Yes, I signed it.

13     Q.  Okay.  As commander of the Coast Guard

14  Communication Station Kodiak, did you have to take a

15  role that day in notifying anybody about the deaths of

16  Mr. Belisle and Mr. Hopkins?

17     A.  Yes.  I had to notify both wives that they had

18  lost their husbands.

19          MR. SKROCKI:  That's all I have.  Thank you,

20  sir.

21          THE COURT:  Mr. Colbath, go ahead, please.

22                    CROSS EXAMINATION

23  BY MR. COLBATH:

24     Q.  Mr. Van Ness, Mr. Hopkins was the COMMSTA -- your

25  command, your unit's employee of the year 2011 then?

1  A. Correct.

2  Q. And then he competed with the others at the

3 general base but didn't go on to that national level, he

4 remained your COMMSTA employee of the year as I

5 understand it?

6  A. Not exactly. So the Coast Guard command for

7 Alaska for District 17 is in Juneau, and so all of the

8 subordinate commands that work for that command in

9 Juneau would submit.

10  Q. And he was your submission?

11  A. He was our nomination, yes.

12  Q. And then one sailor, not Mr. Hopkins, was picked

13 for the greater Coast Guard to go on to the nationals?

14  A. Yes, that's correct.

15  Q. Okay. Now, when you arrived in 2009 at the

16 COMMSTA, from an antenna standpoint, you understood Jim

17 Wells to be sort of the go-to guy on antennas and

18 antenna maintenance, construction, those kind of things?

19  A. That's correct, he was our subject matter expert.

20  Q. And that was part of -- you probably acquired

21 that information as part of that sort of pre-takeover

22 briefing where you learned about the different roles and

23 the different folks?

24  A. Absolutely, yes.

25  Q. Was it also during that time that you had learned

1    Mr. Wells had been both 20 years military active duty

2    like yourself and then additionally in a civilian

3    capacity for 20 or more years?

4        A.  Yes.  That's correct.  I'm not sure I knew the

5    exact number of years, but I was aware that he had been

6    active duty, retired, and then had been with the Coast

7    Guard as a civilian for quite a long time.

8        Q.  The Coast Guard had, as it were under your

9    command -- well, for each of the places you commanded

10   I'm sure -- but lots of rules and regulations and

11   policies?

12       A.  Yes.

13       Q.  As the commander then within COMMSTA, you were

14   required to or ultimately responsible for making sure

15   that those were complied with?

16       A.  That's correct.  Yes.

17       Q.  And one of the rules for COMMSTA -- now, COMMSTA

18   was separate and apart from the main base Kodiak?  You

19   were your own command and your own section over at T-1

20   and T-2?

21       A.  Yes, that's correct.

22       Q.  Did you adopt though or were there already in

23   place general regulations that applied not only to the

24   base as well as to COMMSTA?

25       A.  So as the Communication Station my superior

command, by boss was actually in California.  I did not

work for the base.  However, it was good practice to

follow many of the rules that the base established, the

policies the base established, to have consistent policy

on the island.

Q.  One of the consistent policies you had at COMMSTA

from main base was to not permit personal firearms at

COMMSTA?

A.  Not permit -- yes.  So it's Kodiak, and it's not

Virginia, it's not Washington, DC.  So I had to be

realistic about that.  But my expectation was that you

would not have a firearm at work.

     If you drive a truck and it was in your truck and

it's locked up and it's parked at T-2, that's fine.  T-1

was a secure area with a secure fence.  We didn't bring

weapons into T-1.  That was the general expectation I

set.  And certainly not in the buildings.

Q.  So the rules, at a minimum, the rules were no

firearms in the buildings?

A.  That's correct.

Q.  Personal or otherwise.  There were only probably

authorized law enforcement folks that could rightfully

have a gun?

A.  Correct.

Q.  And were you aware that employees were bringing

1    guns into the T-2 rigger shop?

2        A.  I am now based on prior proceedings, but I was

3    not aware at the time, no.

4        Q.  Based on -- during the investigation of this case

5    you learned that?

6        A.  Correct.

7        Q.  And were you aware that in fact maybe guns had

8    been sold between employees or others inside the rigger

9    shop?

10       A.  No.  In fact, that's the first time I've heard

11   that.

12       Q.  That certainly would have been a violation as

13   well and would have been a problem had it been brought

14   to your attention?

15       A.  The possession of firearms in the workshop, yes.

16       Q.  I want to ask you first a little bit about

17   April 12th, the video that you just saw.  It sounds like

18   coincidentally that had started out as a day where you

19   weren't going to be at work?

20       A.  I had intended to go to work, but I was going by

21   the clinic first.

22       Q.  What were your normal hours?

23       A.  I usually arrived between 7:30 and 8:00, and left

24   around 4:00.

25       Q.  On this day, you didn't get there until 8:30.  I

1  didn't -- I was trying to watch the time on the video,

2  but it was sometime 8:20 to 8:30.

3      A.  I didn't see the time on the video and I honestly

4  don't remember at this point.

5      Q.  Suffice it to say you were late and not planning

6  to be there between 7:30 and 8:00, the normal time

7  because of your detour to the clinic?

8      A.  Correct.

9      Q.  But the phone call and the news of the incident

10 at T-2 disrupted that and you made your way directly

11 there?

12     A.  Correct.

13     Q.  And this conversation -- well, at that point,

14 this was near the end of your command, not the

15 beginning, right?

16     A.  Yes.  This actually happened in the last three

17 months.

18     Q.  And you were aware that the civilian employees at

19 the rigger shop, Mr. Wells, Mr. Belisle, they had

20 different hours than the Coast Guard, they actually

21 started their workday generally at 7:00?

22     A.  Yes.

23     Q.  And so when you approached Scott Reckner and Mr.

24 Wells was there and got out of his truck, his first

25 reaction when Mr. Reckner told -- in your presence, told

1   you -- was he telling you that the men had been shot or

2   was he telling Mr. Wells that the men had been shot, or

3   was he just sort of saying it, if you recall?

4       A.  He said it as I put my hand on his shoulder.  It

5   appeared that he was talking to me.

6       Q.  But Mr. Wells was close enough to also hear

7   apparently that conversation?

8       A.  I don't think Mr. Wells had gotten out of the car

9   yet, but I honestly don't remember.

10      Q.  Then when Mr. Wells walked up, did Mr. Reckner

11  say that again to Mr. Wells or did you relay that

12  information to Mr. Wells, do you remember?

13      A.  I don't remember specifically, but having said

14  that, it would make sense that we were all three

15  standing there when that conversation took place.

16      Q.  Because you heard Mr. Wells' first reaction was,

17  I think you said something along the lines of, "Oh, my

18  goodness," or, "Oh, God," or that was the first thing he

19  said?

20      A.  Yes.

21      Q.  Then he said, "I had a flat tire."

22      A.  Yes.

23      Q.  He should have been at work at 7:00 that morning

24  and here it is 8:30 and he's just gotten out of his

25  truck?

1    A.  If that was the time, yes.

2    Q.  It's long after 7:00?

3    A.  I don't know the time, but yes.

4    Q.  Okay.  Let's back up from that, back up from

5    April 12th and talk about this fuel card incident.

6         First of all, you said you were advised about

7    some tree collaring.  That wasn't anything that you got

8    into any investigative level or anything, you had just

9    heard of a practice called tree collaring that had went

10   on?

11   A.  Correct.  I was advised, as the commanding

12   officer, it was a concern, it had been addressed and

13   they just wanted me to be aware of it.

14   Q.  It was no more than informational to you?  You

15   were satisfied if it had been addressed it was fine?

16   A.  Yes.

17   Q.  By addressed, you certainly didn't understand

18   that any disciplinary actions had been taken or things

19   like that?  The practice had been discussed and

20   terminated, or did you even know to that level?

21   A.  I honestly -- I don't remember if we even

22   discussed if any disciplinary action had been taken.

23   Q.  It's nothing today certainly that stands out in

24   your mind, even looking back at the significance of

25   this?

1    A.   It was an issue that my leadership that

2 supervised that shop advised me there was a problem, we

3 addressed it, and that's what they told me.

4    Q.   Sure.   So this issue with the fuel card, that did

5 result in you deciding to issue this letter of caution

6 to Mr. Wells?

7    A.   Correct.

8    Q.   And you drafted that letter?

9    A.   Well, normally that type of letter there would be

10 an investigative report drafted by whoever was assigned

11 to gather the facts.   That would be turned into a letter

12 of caution, but between my XO and the civilian support,

13 civilian management folks on the base, and then given to

14 me.

15        And then I would likely do some minor edits to

16 put it in what I felt was more my approach, my voice.

17 So I wouldn't be the primary drafter, but I would

18 definitely have influence on what it said.

19    Q.   Not the primary drafter, but certainly the last

20 word on the subject?

21    A.   Yes, I signed it.

22    Q.   It was not a disciplinary action, it was a letter

23 of caution.   In fact -- and I can show you if you need

24 to refresh.   We have already got it in evidence.   It

25 said right in it, "This not a disciplinary action,"

1  didn't it?

2     A.  That word "disciplinary" is based on several

3  levels of action that can be taken against civilian

4  employees of the Government, of the Coast Guard.  So

5  there is disciplinary as we all think of disciplinary

6  how we might discipline our kids.  We wouldn't -- we

7  could say we spoke harshly to them and corrected them

8  and call it disciplinary.  There are very formal

9  definitions in Coast Guard civilian management for

10  different levels of addressing problems.

11     Q.  Sure.  Let's just pull up Exhibit 37, Government

12  37.  Can we go to the second page.  If you want to do --

13  just highlight, yeah, six for me.

14        So can you just read that, Mr. Van Ness?

15     A.  "This letter is non-disciplinary and will not be

16  placed in your official personnel record.  However, it

17  will be retained in your supervisor's employee working

18  folder and may be relied upon if future action is

19  necessary."

20     Q.  And you can take that down, not the whole letter,

21  just that box.  And go to the second page for me, and

22  the one right above it.  Can you do number five?

23        Mr. Wells was told at this meeting by you that, I

24  guess, that this was a letter of caution.  I mean that

25  was one of the things he was told?

1    A.  Yes.

2    Q.  And certainly he was not advised that he was

3  being terminated or fired or anything like that?  In

4  fact, it was stressed to him that the desire was to keep

5  him on as a civilian employee?

6    A.  I told him something along the lines of, "I need

7  you to go back down to the rigger shop and do your job

8  and prove that you're a valued employee and I can trust

9  you."

10   Q.  And, in fact, you told him during the meeting

11  that he was a valued employee, but now he was going to

12  have to prove that or reprove that to you?

13   A.  I honestly don't know if I said those exact

14  words.  That was seven years ago.  I don't know.

15   Q.  And he was advised here if he needed -- had any

16  needs or counseling, anything like that, resources were

17  -- you were making resources available to him?

18   A.  Yes, that's a standard paragraph that's put in

19  every personnel action letter.  If this is a result of

20  some other issue, there is help available to you from

21  the Employee Assistance Program to get assistance.

22   Q.  You can take that down.

23       And then ultimately there was a place for him to

24  sign the letter?

25   A.  That's correct.

1    Q.   I don't need that anymore.

2         And when you gave this letter to Mr. Wells, fair

3    to say that his overall reaction was one of sadness?

4    A.   Sadness, disappointment, yes.

5    Q.   I think I saw that you -- well, you had described

6    it at one point as sort of he just slumped back in his

7    chair like a child that had been scolded or chastised?

8    A.   I may have described it that way.

9    Q.   Sort of like you just described in one of your

10   answers here just a few minutes ago about we all think

11   about disciplining our child or whatnot, and that's how

12   this seemed during that meeting as you watched

13   Mr. Wells?

14   A.   Well, I would not say that having this

15   conversation with Mr. Wells was like disciplining one of

16   my children.  He was a respected subject matter expert

17   that I felt I had to hold accountable for something that

18   I did not think I would need to hold someone who had

19   almost 40 years of experience in the Coast Guard

20   accountable for.

21   Q.   Right, but his reaction that you observed was he

22   sort of acted like a child being disciplined, or at

23   least that's how you described it before, right?

24   A.   Yes.

25   Q.   And when at first he didn't sign the letter, he

was -- you had put it across the glass table to him and
asked him to sign it, and he just sat there staring at
it.  He didn't sign it.  There was discussion but there
was a long period where he just wasn't going to sign it?

A.  Correct.

Q.  When you stood up, the other gentlemen in the
room stood up.  Mr. Wells still hadn't signed the
letter, so he didn't stand up, did he?

A.  So normally in any meeting with the commanding
officer, when the commanding officer stands, that's the
signal that's the end of the meeting, people stand and
leave.  He sat at the table while the rest of my folks
got up and started to leave the room.

Q.  And they in fact left the room?

A.  Yes.

Q.  But Mr. Wells didn't leave the room?

A.  Correct.

Q.  And so you sat back down with him?

A.  I honestly don't remember whether I sat down or
remained standing.  I don't know.

Q.  I heard you say that more conversation went on,
and as that more conversation went on, then Mr. Wells
signed the letter, slid it back over to you?

A.  Correct.

Q.  After that -- well, the date on that letter was

1    February 24, 2012, do you recall that?

2        A.   I don't.  I can look at it, but that sounds about

3    right.

4        Q.   Okay.  And Mr. Wells signed it the day you gave

5    it to him, it was within that meeting.  If that's the

6    date it was signed, that's the date of the meeting?

7        A.   Yes.  I would have to look at it to make sure

8    those are the dates.

9        Q.   Just pull it up real quick to make sure I'm not

10   wrong.  That certainly happens.  There we go.  Page two.

11   24 February '12?

12       A.   The first page would have the date that I signed

13   it.

14       Q.   Okay.

15       A.   I actually signed it January 4th.

16       Q.   But my question was -- go to page two.  24

17   February '12, the date Mr. Wells signed it would have

18   also been the date of the meeting?

19       A.   That's correct, yes.

20       Q.   Thank you.

21            So after the -- well, prior to that meeting, Mr.

22   Wells had been out for a considerable period of time

23   sick, right?

24       A.   Yes, that's correct.

25       Q.   And so that's probably in part the reason why you

1  signed in early January and he signed in late February?

2      A.  Yes.  I had also been doing some traveling, so it

3  was a matter of syncing our two schedules.  And I wanted

4  to address it personally with him, so it took some time

5  to get to that point where we could both sit down.

6      Q.  Sure.  Were you aware that actually 24

7  February 2012, that was the first day he had been back

8  from a medical leave where he had had surgery?

9      A.  I knew he was on medical leave and I know he had

10  surgery.  Whether that was the exact day, I don't

11  remember at this point, but, yes, he was out on medical

12  leave.

13     Q.  Prior to that time, your travel and his being

14  gone for quite a bit, Mr. Wells had, during your period

15  of command, come up and talked to you about various

16  different issues, at least occasionally, and had some

17  communications with you?

18     A.  Yes.

19     Q.  After February 24th, this meeting, this letter,

20  really until the day of the homicides, April 12th, when

21  Mr. Wells wasn't back at the command or at the shop

22  after that, in that window, he stopped coming up to see

23  you, didn't he?

24     A.  I'll be honest, I just don't remember.  I don't

25  know whether I sat down and talked between February 24th

1  and when the murders took place.

2  Q.  Nothing stands out as you sit here today in your

3  memory?

4  A.  No.

5  Q.  Now, although you wanted to address it personally

6  with Mr. Wells, it sounds like it's fair to say that you

7  certainly had bigger problems in the unit than this

8  issue with Mr. Wells that had the February 24th meeting?

9  A.  What do you mean by bigger problems?

10  Q.  Well, you had more significant personnel issues

11  or had had?

12       MR. SKROCKI:  Objection as to vagueness.

13       THE COURT:  That's sustained.

14  BY MR. COLBATH:

15  Q.  Well, let's talk about the issues with William

16  Reed and Ray Fillion.  Mr. Skrocki asked you about that?

17  A.  Yes.

18  Q.  The time period that that went on, the behaviors

19  that led to your addressing that situation as you

20  described, those were certainly, from a command issue,

21  more significant than this issue with Mr. Wells, the

22  civilian employee from the rigger shop?

23  A.  No, I don't agree.  May I elaborate?

24       THE COURT:  Mr. Skrocki may give you an

25  opportunity.

BY MR. COLBATH:

    Q.  First of all, sir, I think you were here before and testified at a previous hearing that we had, right?

    A.  Yes, that's correct.

    Q.  Okay.  Let me just see if we have -- do we have a transcript by chance?

        Sir, you have characterized this matter with Mr. Wells, this meeting and fuel card incident as pretty minor, correct?

    A.  No, that's not correct.  It was theft.  It was improper.  It was buying fuel for a personal vehicle.

        MR. COLBATH:  Your Honor, I'm going to ask that this witness -- that answer be stricken as nonresponsive as well as beyond the scope of our -- or in violation of the Court's order.

        THE COURT:  In any event, what I will do is strike that now and before redirect we can have a sidebar and address these topics.

        MR. COLBATH:  Okay.  Thank you.

        THE COURT:  You can be heard on it in due course.  I'm striking it now, but we'll take it up in the redirect as warranted.

        MR. SKROCKI:  Yes, Your Honor.  Thank you.

        MR. COLBATH:  Your Honor, I would like to -- I believe I can conclude with Mr. Van Ness, but I do want

to show him a portion of his transcript that I don't

believe -- that I need just a moment to make a copy of,

I think.

THE COURT:  That's fine.

MR. COLBATH:  Could we just take a brief break?

THE COURT:  Like five minutes?

MR. COLBATH:  I can try to accomplish it in

five minutes.

THE COURT:  Let's take about five minutes.

Please leave your notepads here.  Remember my admonition

not to discuss the case.  And we'll come back and we'll

conclude by 5:00.

(Recessed from 4:36 p.m. to 4:44 p.m.)

(Jury present)

DEPUTY CLERK:  Court is in session.

THE COURT:  All right.  Please be seated,

everyone.  And ready to proceed, Mr. Colbath?

MR. COLBATH:  I am, Your Honor.  Thank you for

allowing me to take that break.

BY MR. COLBATH:

   Q.  Sir, rather than go back and try to find these

things or whatnot, I think I can expedite us here

because we are almost at the end of the day.

       I'm going to show you what's been marked as

Defense Exhibit No. 117.  And sir, just for -- I'll ask

```
1    you if you will review that and see if you're familiar
2    with that.
3         A.  I can't read that.
4         Q.  Let's see if we can't somehow highlight it or
5    make it more -- yeah, that's good.
6         A.  I can manage that.  That's fine.  Okay.
7         Q.  Sir, are you familiar with that document?
8         A.  Yes.
9         Q.  Mr. Skrocki mentioned in his original questioning
10   of you an individual named Raymond Fillion.  Does this
11   document relate to Mr. Fillion and it's from a timeframe
12   during while he was under your command?
13        A.  Correct.
14        Q.  Is this a document that you would have put
15   together with your executive officer and other members
16   underneath the command to address that situation that
17   you described on direct examination?
18        A.  Yes, correct.
19             MR. COLBATH:  Your Honor, I'm going to move the
20   admission of 117, Defense Exhibit No. 117.
21             MR. SKROCKI:  Voir dire the witness.
22             THE COURT:  Yes.
23             MR. SKROCKI:  Captain, is this thing signed?
24             THE WITNESS:  It's not.
25             MR. SKROCKI:  There is another blank above that
```

```
 1    for a contact point.  That's not filled in either, is
 2    it?
 3             THE WITNESS:  This looks like it's probably a
 4    draft.  It's not signed.
 5             MR. SKROCKI:  It's not really an official
 6    document because it's not signed by you, is it?
 7             THE WITNESS:  No, it is not.
 8             MR. SKROCKI:  It's not signed by Mr. Fillion,
 9    is it?
10             THE WITNESS:  No, it is not.
11             MR. SKROCKI:  Objection.
12             THE COURT:  That's sustained.
13    BY MR. COLBATH:
14       Q.  Mr. Van Ness, was a final draft of this ever
15    prepared?
16       A.  Yes.
17       Q.  And did you sign the final draft?
18       A.  I did.
19       Q.  Was it presented to Mr. Fillion?
20       A.  It was.
21       Q.  And was it -- he received it and was he asked to
22    sign it?
23       A.  Yes.
24       Q.  Did he?
25       A.  I believe so, yes.
```

1    Q.  Okay.  And you have reviewed this one, the one we

2  have here, 117?

3    A.  Yes.

4    Q.  Was anything changed before you signed that?

5    A.  I can't answer that.  I can tell you the general

6  message is the same, but can't tell you seven years

7  later whether it's exactly the same.

8    Q.  Sure.  Certainly a draft would have been

9  something -- well, this also would have been something

10  kept in the file or kept as a record, we have it here,

11  although certainly we couldn't tell if this was the

12  version presented to Mr. Fillion?

13    A.  Correct.  This is not the official record.  It's

14  not signed.

15    Q.  But it does contain a draft of the message that

16  you ultimately conveyed to Mr. Fillion?

17    A.  Yes.

18         MR. COLBATH:  Your Honor, I'm going to move it

19  again and/or ask to approach.

20         THE COURT:  All right.  You can approach here

21  and we'll take that up.

22         (Begin bench conference.)

23         MR. SKROCKI:  Just conferring with colleagues

24  about --

25         THE COURT:  Do we have a signed version?

1          MR. SKROCKI:  That's what I was conferring

2    about.  We are pretty sure we discovered the signed

3    version.  I mean if he wants to inquire --

4          MR. CAMIEL:  If we had a signed one that's what

5    we --

6          MR. COLBATH:  The one that I have there is the

7    Bates stamped only one that I got.  That's the one I

8    received as part of the Henthorne material.  To my

9    knowledge, that's all I have ever seen.  I certainly

10   wouldn't have offered an unsigned one.

11         THE COURT:  Right.  Can we have this witness

12   come back in the morning and take up that issue?

13         MR. COLBATH:  I know he's trying to leave.  I'm

14   going to introduce this and confirm that he signed it.

15   I have the one from Mr. Reed.  I'm basically going to do

16   the same and I'm done.

17         MR. SKROCKI:  We conferred with --

18         THE COURT:  How about if this is admitted.  Can

19   the parties stipulate now if the signed one is presented

20   that it's replaced?

21         MR. SKROCKI:  Yes, let's do that.  Let's just

22   do that and avoid the issue.

23         THE COURT:  Yours is admitted, and if the

24   Government can find the signed version, then I can take

25   up an application to put the signed one in place of the

1   unsigned.

2          MR. COLBATH:  That's fine with me.

3          MR. SKROCKI:  While we're here, do you want to

4   the talk about the fuel card?

5          THE COURT:  Yes.  The letter is inconclusive.

6          MR. SKROCKI:  Yeah.  His answer was cut off and

7   he --

8          THE COURT:  What would you seek to ask him?

9          MR. SKROCKI:  Leading that Mr. Colbath asked

10  you questions about whether this was minor or not.  What

11  would your response be, and that would be totally fair.

12  The letter was inconclusive as to Mr. Wells using the

13  card.  Was this a significant infraction as far as were

14  you concerned as the commanding officer.

15         THE COURT:  By someone?

16         MR. SKROCKI:  By someone.

17         THE COURT:  It seems to me the best way to go

18  forward, and you could confer with him privately if need

19  be, is, yes, it's fair to say that occurred, but he

20  couldn't conclusively say Mr. Wells committed petty

21  theft of Government property.

22         MR. SKROCKI:  We have already gone over this

23  part anyway.

24         THE COURT:  So okay with that?

25         MR. COLBATH:  Well, I'm not okay with it, Your

Honor, to the extent that I asked him is it fair to say
this was a minor thing, and he said no and he started to
give an additional answer. And I said, "Hold on a
minute. Did you say," and that's where we got broke
down with the transcript.

I said, "I'll just cut to the chase and move
on." So I certainly did not belabor it or go any more
into it than that. He did answer the question I asked.
I agree he didn't give the additional explanation. I
don't know how much time Mr. Skrocki plans to further
inquire.

MR. SKROCKI: Just what I said. I believe his
answer was cut off and I think the questioning was
marginalizing the impact of that letter of caution and
he had a fair response to it.

THE COURT: I'll allow the response in the
manner I articulated, which was his answer was it was a
serious issue to him, but he couldn't conclusively say
it was Mr. Wells.

MR. SKROCKI: I have to write that down but
yes, I will do that.

(End bench conference.)

THE COURT: All right. Mr. Colbath, go ahead,
please.

MR. COLBATH: Thank you, Your Honor. I'm going

1  to offer, at least for now until I can find a signed

2  one, I'm going to reoffer Exhibit No. 117 and try to

3  work with this one.

4          MR. SKROCKI:  Our objections are noted.

5          THE COURT:  I will admit it.  I think there is

6  going to be an effort made to try to find the signed

7  version.  I'll admit this one which is defense Exhibit

8  No. 117.  I will admit, and then if it's amended, we'll

9  bring that to your attention, ladies and gentlemen.  Go

10  ahead, please, Mr. Colbath.

11          (Defense Exhibit No. 117 admitted.)

12  BY MR. COLBATH:

13    Q.  If you could just highlight that top starting

14  with the date there, that paragraph.

15          And do you know ultimately from a timeframe

16  standpoint -- well, first of all, is the date

17  February -- 8 February 2012 when this was drafted?

18    A.  That would make sense, yes.  I'm not sure that's

19  the date I signed it.  That date would be updated

20  whenever I signed it, but it's roughly correct, yes.

21    Q.  And just read maybe those first two sentences.

22    A.  "Your workplace conduct and personal behavior

23  continue to fail to meet my expectations and Coast Guard

24  standards.  Your behavior on 6 February was

25  unacceptable."

```
 1          THE COURT:  Mr. Colbath, we have five minutes
 2   here to conclude.
 3          MR. COLBATH:  Yes, Your Honor, I understand.
 4   BY MR. COLBATH:
 5      Q.  And just the next sentence?
 6      A.  "Blatant insubordination and disrespect by
 7   screaming and swearing at the engineering department
 8   head, including slamming your door repeatedly, is not
 9   appropriate for any member of my crew and particularly
10   disturbing from a senior chief petty officer."
11      Q.  So you addressed -- the incident that you're
12   addressing was 6 February and this was drafted probably
13   8 February, a couple of days later?
14      A.  Yes.
15      Q.  Then would it have been presented to Mr. Fillion
16   fairly shortly after that?
17      A.  I don't remember the exact date, but, yes, within
18   a reasonable timeframe, and I directly one on one
19   addressed it with him.
20      Q.  Defense exhibit, if you could show just the
21   witness for foundation, Defense Exhibit No. 116.  Blow
22   that up so that it's less fuzzy, if you would.
23          I'll ask you if this one you recognize?
24      A.  Yes, I recognize this one.
25      Q.  Okay.  That one is signed?
```

1    A.   Yes.

2    Q.   With your signature?

3    A.   Yes.

4    Q.   And like the last documents we have seen was it

5    either drafted by you or with your executive officer and

6    others but ultimately approved by you and your

7    signature?

8    A.   Yes, finalized and signed by me.

9    Q.   This one relates to not Mr. Fillion, but the

10   other person you individually spoke of, William Reed?

11   A.   Correct.

12        MR. COLBATH:   I'll move 116, Your Honor.

13        MR. SKROCKI:   No objection.

14        THE COURT:   116 is admitted.

15        (Defense Exhibit No. 116 admitted.)

16   BY MR. COLBATH:

17   Q.   Again, can we have that first paragraph?

18        And the date on this one is what, sir?

19   A.   9 February.

20   Q.   And if I can go down to the middle paragraph

21   where it -- well, or the middle of the paragraph or

22   roughly the middle where it starts with "unprofessional

23   behavior."  Can you read that sentence for me?

24   A.   "Unprofessional behavior, poor attitudes,

25   lethargy and inadequate teamwork have a negative impact

1    on the unit."

2        Q.   Then the next sentence?

3        A.   "Feedback to the command master chief, HSWLS,

4    which is health, safety, work-life staff, and medical

5    staff indicates your department has symptoms of a

6    hostile, high stress and unproductive work environment."

7        Q.   The health, safety, work-life staff and medical

8    staff, those would have been entities that were located

9    on the main base outside of COMMSTA?

10       A.   Correct, not medical, but yes.

11       Q.   You can take that down.  Thank you.

12            Just highlight the bottom there.

13            Can we tell from the bottom, sir, when this was

14   presented to Mr. Reed?  Now, you presented this one to

15   him directly as well?  You had the conversation?

16       A.   Yes.

17       Q.   And can we tell from that when it was presented?

18       A.   No, unfortunately we can't.  It wasn't dated, but

19   right before that colon there would normally be a date.

20   He signed it, but my recollection is I signed it and had

21   him come in and talk to me, so it was the same day, so

22   it should be the same date as my signature.

23       Q.   Let's put that down.  And that date -- so

24   February 9th, fairly contemporaneous and a day after the

25   one with Mr. Fillion?

1    A.   Correct.

2         MR. COLBATH:  Sir, that's all the questions I

3    have for you.  Thank you.

4         THE COURT:  Mr. Skrocki, go ahead, please.

5                    REDIRECT EXAMINATION

6    BY MR. SKROCKI:

7    Q.   Captain Van Ness, during the cross examination

8    Mr. Colbath described Mr. Wells as slumped in his chair,

9    child-like, disappointed type.  Do you recall those

10   questions?

11   A.   Yes.

12   Q.   During that meeting, did you tell Mr. Wells you

13   no longer trusted him?

14   A.   I believe the conversation was along the lines of

15   he asked me, "Does this mean you do not trust me," and I

16   said, "Yes, I do not trust you.  You need to prove to me

17   that I can trust you again."

18   Q.   You were asked some questions about the fuel card

19   and I want to be clear about that, that the letter of

20   caution to Mr. Wells did not conclusively prove that he

21   used the card, correct?

22   A.   So there is multiple levels --

23   Q.   Is that what the letter says?

24   A.   Could you repeat the question?

25   Q.   That the letter of caution to Mr. Wells did not

1    conclusively state that he took the card?

2        A.   Yes, that's correct.

3        Q.   Okay.  And you were asked some questions by

4    Mr. Colbath about the seriousness of Mr. Wells' conduct.

5    Do you consider theft a serious offense as the commander

6    of the COMMSTA?

7        A.   Yes.

8            MR. SKROCKI:  That's all I have for this

9    witness, Your Honor.

10           THE COURT:  Anything else, Mr. Colbath?

11           MR. COLBATH:  No.

12           THE COURT:  Thank you, sir.  You may be

13   released and excused.

14           (Witness excused)

15           (Requested excerpt concluded, proceedings

16   continued.)

17                     CERTIFICATE

18       I, Sonja L. Reeves, Federal Official Court Reporter
     in and for the United States District Court of the
19   District of Alaska, do hereby certify that the foregoing
     transcript is a true and accurate transcript from the
20   original stenographic record in the above-entitled
     matter and that the transcript page format is in
21   conformance with the regulations of the Judicial
     Conference of the United States.

22
         Dated this 4th day of October, 2019.
23

24
                         /s/ Sonja L. Reeves
25                       SONJA L. REEVES, RMR-CRR
                         FEDERAL OFFICIAL COURT REPORTER