1                    UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF ALASKA
2

3   UNITED STATES OF AMERICA, )
                              )
4          Plaintiff,         )
                              )
5   vs.                       )   CASE NO. 3:13-cr-00008-SLG
                              )
6   JAMES MICHAEL WELLS,      )
                              )
7          Defendant.         )
    _____)
8

9          PARTIAL TRANSCRIPT OF TRIAL BY JURY - DAY 11
                    (Testimony of Gary Bolden)
10   **BEFORE THE HONORABLE SHARON L. GLEASON, DISTRICT JUDGE**
                 September 23, 2019; 8:33 a.m.
11                    Anchorage, Alaska

12  **FOR THE GOVERNMENT:**
           Office of the United States Attorney
13         BY:  STEVEN SKROCKI
           BY:  CHRISTINA M. SHERMAN
14         BY:  KELLEY L. STEVENS
           222 West 7th Avenue, #9
15         Anchorage, Alaska 99513
           (907) 271-5071
16
    **FOR THE DEFENDANT:**
17         Office of the Federal Public Defender
           BY:  GARY GEORGE COLBATH
18         601 West 5th Avenue, Suite 800
           Anchorage, Alaska 99501
19         (907) 646-3400

20         Camiel & Chaney, P.S.
           BY:  PETER A. CAMIEL
21         520 Pike Street, Suite 2500
           Seattle, Washington 98101
22         (206) 624-1551

23  _____

             **SONJA L. REEVES, RMR-CRR**
24          Federal Official Court Reporter
             222 West 7th Avenue, #4
25            Anchorage, Alaska 99513
       Transcript Produced from the Stenographic Record

1          (Call to Order of the Court at 8:33 a.m.)

2          (Proceedings took place and are not included in

3    this transcript, after which, the testimony of Gary

4    Bolden transpired as follows:)

5          (Oath administered to the witness)

6          DEPUTY CLERK:  For the record, can you please

7    state your full name and then spell your full name.

8          THE WITNESS:  My name is Gary Charles Bolden.

9    G-a-r-y, C-h-a-r-l-e-s, B-o-l-d-e-n.

10          THE COURT:  Go right ahead.

11          MS. STEVENS:  Thank you, Your Honor.

12          GARY BOLDEN, GOVERNMENT WITNESS, SWORN

13                    DIRECT EXAMINATION

14    BY MS. STEVENS:

15     Q.  Good afternoon, Mr. Bolden.

16     A.  Good afternoon.

17     Q.  Where are you from?

18     A.  I'm from Massilon, Ohio.

19     Q.  Is that the tire capital industry of the United

20    States?

21     A.  Well, it's very close to that.

22     Q.  Okay.

23     A.  It's just south of Akron, which is considered to

24    be the rubber capital of world.

25     Q.  Sounds exciting.

1          Are you, sir, currently employed?

2     A.   No, I am retired.

3     Q.   And what industry did you retire from?

4     A.   From the tire industry.

5     Q.   How long did you work within the tire industry?

6     A.   I was in the tire industry for a little over

7     46 years.

8     Q.   A long time.  How long have you been retired now?

9     A.   About five.

10    Q.   So while in the tire industry for those 46 years,

11    can you, to the extent you can, briefly, give the jury

12    just an idea of what it was that you did?

13    A.   Well, I began in the tire industry as a quality

14    control inspector.  In that capacity, I was responsible

15    for checking all of the raw materials, the processes in

16    the manufacturing process, the equipment setup, and the

17    finished product, which would be tires.  And I was -- by

18    doing that I was -- became familiar with the entire

19    manufacturing process that's used in the process of

20    making tires.

21         After that, I became -- after I got my degree, I

22    became quality control engineer on the corporate staff.

23    In that position, I drafted a quality control

24    instruction manual on x-ray that is used in the

25    manufacturing process to check the quality of tires.

1          From there, I was transferred to the Kelly

2    Springfield tire plant in Freeport, Illinois.  I was a

3    quality control inspector -- or not inspector but

4    engineer there.  I was responsible for overseeing all of

5    the inspectors' works, the reports they turned in.  I

6    also had responsibility for the testing lab that did

7    dynamic testing of sampling of the tires that were

8    produced in that plant.

9          From there, I transferred to Cumberland,

10   Maryland, the Kelly Springfield corporate headquarters.

11   I was a quality assurance engineer there.  I processed

12   reports that came in from all of the manufacturing

13   plants and processed that for upper management.

14         And then after that, I got involved in the return

15   products, standard warranty claims.  I became familiar

16   with how tires failed, what I would see -- how they

17   would come apart, and I would rule on whether they were

18   actually an adjustable or would qualify for adjustment

19   under the warranty program.

20         Then I got into forensic analysis, which was

21   really the area that I enjoyed the most.  In that, I was

22   responsible for analyzing tires that had been involved

23   in accidents where there was property damage or personal

24   injury.  My purpose was to determine what caused the

25   tires to fail.  I would report on that.  And I would

1  also provide technical counsel for our law department as

2  well.

3       And I stayed in that position for about five

4  years and then transferred to the Goodyear corporate

5  headquarters again.  And in there I worked for about a

6  year as a quality control contact engineer working with

7  original equipment customers, quality issues that they

8  had with the products that we made for them.  I would

9  act as a liaison between the customer and our

10  manufacturing facilities.

11       After that, I went back into the forensic end as

12  a product analysis engineer, and I was in that position

13  for approximately eight years, again, doing the analysis

14  of failed tires involved in personal injury or property

15  damage.

16       And then I left Goodyear.  Went to Standards

17  Testing Labs in Massilon, Ohio, which is an independent

18  test lab.  And in that capacity, I continued to work on

19  forensic analysis of tires, testifying in court for a

20  variety of customers, including with tire industry,

21  trucking companies, tire dealers, individuals, whoever

22  had a need to have expert analysis.

23       And then I retired.

24  Q.  So the last company you worked for was Standard

25  Testing Lab?

1    A.  Correct.

2    Q.  And how long did you work for them?

3    A.  16 years.

4    Q.  And how much of that time was doing forensic

5  analysis?

6    A.  The entire time.

7    Q.  So by my calculation and math, was there --

8  you've got almost 30 years of forensic analysis under

9  your belt?

10    A.  Pretty close to that, yes.

11    Q.  And formal education, I think you mentioned at

12  the beginning you've got a degree.  What was that in

13  again?

14    A.  My degree is in civil engineering from the

15  University of Akron.

16    Q.  Do you recall how many cases you've testified in

17  where you've discussed all of your tire knowledge?

18    A.  I would estimate in excess of 50 times.

19    Q.  Did those include criminal cases?

20    A.  This is the only criminal case that I've actually

21  testified in.  I've done work on other criminal cases,

22  but I did not testify in those.

23    Q.  And your knowledge and experience, in addition to

24  the forensic analysis, does it also include just

25  specialized knowledge about how a tire is made and put

1    together?

2      A.   Yes.   It's very important to know how the tire is

3    manufactured, the various components that are in it.

4    Most people just look at a tire and they just think it's

5    a big rubber donut.   If it were just rubber, it would

6    act like a balloon.   As you apply inflation, pressure,

7    it would just keep expanding and expanding and

8    eventually just pop off the wheel.   So to prevent that,

9    you have to put reinforcing materials in the tire to

10   keep it from expanding.

11          So typically, a passenger or light truck tire has

12   probably over 20 components in it.   There are two steel

13   beads, which is the anchor point for all of the other

14   components.   These beads consist of high tensile steel

15   wire that are wound around a form.   There's probably 30

16   or more strands of wire in each bead.   And that's the

17   part of the tire that actually sits on the wheel or the

18   rim and provides an airtight seal so that the tire

19   doesn't lose air.

20          Now, in addition to those beads, there are inner

21   liners, which is a sheet of specially compounded rubber

22   that's impervious to air --

23      Q.   Mr. Bolden --

24      A.   -- so air won't migrate out of the tire.

25      Q.   Sorry to -- you're jumping ahead just a little --

1    A.  Okay.

2    Q.  -- which is -- we'll get there in a second.  I

3 know you're excited.

4        Real quick, though, before I ask the judge a

5 specific question, within your tire analysis, have

6 you -- in your previous experience, did you ever have an

7 opportunity to examine tires that had foreign objects

8 punctured in them?

9    A.  Yes.

10        MS. STEVENS:  Your Honor, at this stage I move

11 for the Court to recognize Mr. Bolden as having

12 specialized knowledge, training, education, and

13 experience in order to make an opinion in the area of

14 tire forensic analysis.

15        THE COURT:  Any objection?

16        MR. COLBATH:  No.

17        THE COURT:  All right.  I'll find the witness

18 so qualified.  Go ahead, please.

19 BY MS. STEVENS:

20    Q.  So you were just talking about the component of

21 the tire, which it sounds like there's quite a bit.  I

22 think you left off at the internal beads and bands.  So

23 you want to pick up there really quick?

24    A.  Surely.  The inner liner, which is, as I said, a

25 sheet of specially compounded rubber to prevent air from

passing through it.  On top of that would be the plies.
This particular tire has two plies.  And the plies
consist of cables of polyester cord.  And these -- each
cable has a number of polyester filaments that are
twisted together, and they're all oriented parallel to
each other in the same direction.  And those polyester
plies are coated with rubber on both sides.  So there
are two of those plies in this tire.

There would also be chafer material which is
applied beside the bead, and when it's -- when the tire
is finally vulcanized, it will prevent chafing of the
rubber against the steel wheel.

There's an apex component that goes on each bead,
on top of each bead, which is located on top of the bead
in the lower sidewall of the tire.  And that is to
stiffen the lower part of the tire so that it flexes
properly when it operates.

On top of that would be sidewall rubber, which is
a solid rubber component that goes on top of the
sidewall components just to protect it from the
elements.  Then on top --

Q.  Mr. Bolden --

A.  Yeah.

Q.  -- quick question for you.  How many components
would you say consists of generally a single tire?

```
 1      A.   Over 20.   Typically, 20 to 25, depending on what
 2   type of tire it is.
 3      Q.   And did you have an opportunity to examine a tire
 4   in the instant case?
 5      A.   In which case?
 6      Q.   In the instant case.
 7      A.   Yes, I did.
 8      Q.   Great.   And you kind of just pointed up a little
 9   bit.   Do you see that tire here?
10      A.   I do.
11      Q.   Can you just point it out?
12      A.   It's the tire that's lying on the table there in
13   front of me.
14          MS. STEVENS:   Your Honor, I'd like the record
15   to reflect that the witness has identified Exhibit 72.
16          THE COURT:   Any disagreement there,
17   Mr. Colbath?
18          MR. COLBATH:   That's the tire.
19          THE COURT:   We all agree that's 72.   So noted.
20   BY MS. STEVENS:
21      Q.   So you were contacted to conduct analysis on this
22   tire.   Who contacted you?
23      A.   The FBI.
24      Q.   And do you recall when they contacted you?
25      A.   It was in I believe May, April or May in 2012.
```

1    Q.   And so they contacted you.   And eventually, did

2    you receive the tire?

3    A.   I did.

4    Q.   Do you recall the date?

5    A.   Yes.   Let me make sure I get that right.

6    Q.   So before you take a look at those documents, did

7    you draft a report in this case?

8    A.   I did.   Yes.

9    Q.   And is that what you are referring to right now?

10   A.   Well, actually, what I would refer to, I have a

11   summary sheet that's on top of my analysis, tire

12   analysis.

13   Q.   So how about we do this, before you look at the

14   notes that you brought, we have some notes here that we

15   can use to refresh your recollection.

16   A.   Okay.

17           MR. COLBATH:   Your Honor, I would ask the

18   witness not to refer to notes until he's shown them.

19           THE COURT:   Fair enough.

20           MS. STEVENS:   Your Honor, may I approach?

21           THE COURT:   Yes.   Go right ahead.

22           (Ms. Stevens approaches the witness)

23   BY MS. STEVENS:

24   Q.   Were you able to recall the date in which you

25   received it?

1    A.   Yes.  It was 6-4 of 2012.

2    Q.   And prior to receiving it, or when you received

3  it, did any law enforcement agent contact you and speak

4  to you directly?

5    A.   I really don't have a specific recollection of

6  that.

7    Q.   And before examining the tire, did you have any

8  knowledge about the facts surrounding this case?

9    A.   No, I did not.

10    Q.   And when you received the tire, what were you

11  tasked with?

12    A.   Basically to examine the tire and look for any

13  abnormalities that I would see.

14    Q.   So what was the tire packaged in when you

15  received it?

16    A.   It was in a wooden crate.

17    Q.   And what did you do when you received that wooden

18  crate?

19    A.   I opened the crate up, looked at it, noticed that

20  there was a nail in the tread.  And at that point, I

21  checked the air pressure in the tire, because it was

22  still mounted on the rim.  And the air pressure measured

23  20 PSI, I believe.

24    Q.   Can I have 161, please.

25         Mr. Bolden, I'm showing you what we've marked as

1    Government Exhibit No. 161 for foundation.  Do you

2    recognize this?

3        A.  Yes.

4        Q.  How is it that you recognize it?

5        A.  That's the tire that I received and actually

6    looked at for the first time on 6-22.

7            MS. STEVENS:  Your Honor, move for the

8    admission of 161.

9            MR. COLBATH:  Your Honor, could I ask a couple

10   of voir dire questions?

11           THE COURT:  Sure.  Go ahead.

12           MR. COLBATH:  Sir, this Exhibit No. 161, do you

13   know who took that photograph?

14           THE WITNESS:  I do not.

15           MR. COLBATH:  Is that a picture that was taken

16   at your facility?

17           THE WITNESS:  No.

18           MR. COLBATH:  It's a picture taken of the tire

19   before you received it?

20           THE WITNESS:  I assume so, yes.

21           MR. COLBATH:  Well, okay.  So you're not saying

22   this is one of the photographs that you took or was part

23   of your examination.  It just happens to be a picture of

24   the tire that you ultimately received.

25           THE WITNESS:  Correct.

1          MR. COLBATH:  With that understanding, Your

2     Honor, I don't have an objection to 161.

3          THE COURT:  All right.  Then 161 is admitted.

4          (Exhibit No. 161 admitted)

5          THE COURT:  Go ahead, please.

6     BY MS. STEVENS:

7       Q.  Okay.  Go ahead and publish that.  Thank you.

8          And is this -- after you removed it from the

9     crate, was the tire in a similar condition as what you

10    see here in this photograph?

11      A.  Yes, it was.

12      Q.  Can we put up -- well, don't put up, but just for

13    foundation, 203, please.

14          Do you recognize this?

15      A.  I do.

16      Q.  How do you recognize it?

17      A.  This is a photo that was taken by our staff

18    photographer.

19      Q.  And what is it a photo of?

20      A.  It's a photo of the subject tire.

21      Q.  And is it an accurate representation of the tire

22    when it was photographed by STL?

23      A.  It is.

24      Q.  Can we do 204?

25          Same questions.  Do you recognize this?

1    A.   Yes.  It's the same tire, just the opposite

2   sidewall.

3    Q.   And is it an accurate depiction of the tire on

4   the day the picture was taken by STL?

5    A.   Yes.

6    Q.   206, please, Blair.

7         Do you recognize this?

8    A.   I do.

9    Q.   How do you recognize it?

10   A.   That's also another photo that was taken at STL.

11   Q.   What was -- a photo of what?

12   A.   It's the tread area of the tire showing -- at

13  least on one edge of the photo, you can see where the

14  nail was lodged in the tire.

15   Q.   And then the last one -- and is this an accurate

16  depiction of the tire the date it was photographed?

17   A.   It is.

18   Q.   And then 208, please, Blair.  Do you recognize

19  this?

20   A.   Yes.

21   Q.   How do you recognize it?

22   A.   That is a photo of the subject tire on the

23  interior surface where the nail penetrated through the

24  inner liner.

25   Q.   Is it an accurate reflection of the nail in the

1 tire on the date it was taken?

2     A.  Yes.

3          MS. STEVENS:  Your Honor, at this stage we move

4 to admit 203, 204, 206, 207 and 208.

5          THE COURT:  Did you put up 207?  No.

6          MS. STEVENS:  Did I not put up 207?

7          THE COURT:  I don't believe so.

8 BY MS. STEVENS:

9     Q.  Could you do 207, please.

10         Do you recognize this picture?

11     A.  I do.

12     Q.  How do you recognize it?

13     A.  It's a close-up of the nail that's lodged in the

14 subject tire.

15     Q.  And is it an accurate depiction of the nail on

16 the date the picture was taken?

17     A.  Yes.

18         MS. STEVENS:  Your Honor, we move for the

19 admission of 203, 204, 206, 207 and 208.

20         THE COURT:  Mr. Colbath?

21         MR. COLBATH:  I have no objection to any of

22 those.

23         THE COURT:  All right.  Those will all be

24 admitted then.

25         (Exhibit Nos. 203, 204, 206, 207 and 208

1  admitted)

2  BY MS. STEVENS:

3      Q.  Before we publish any of those, you mentioned you

4  took the tire out of the crate and you measured it, you

5  measured its PSI.  And what did you say the PSI was when

6  you received it?

7      A.  20 PSI.

8      Q.  And what date did you take that measurement?

9      A.  6-22 of '12.

10     Q.  Did you have an initial gut reaction when you saw

11 the tire?

12     A.  Well, it appeared to be a perfectly good tire.

13 No evidence that it had been abused in any way, other

14 than the fact that it had a nail in the tread.

15     Q.  So in your experience and training, your time in

16 this field, how would you describe to the jurors what

17 like -- what a flat tire is?

18         MR. COLBATH:  Your Honor, I'm going to object

19 as beyond -- outside the opinions previously noted.

20         THE COURT:  All right.  Ms. Stevens, do you

21 agree to move on?

22         MS. STEVENS:  Yeah, I'll move on.

23         THE COURT:  Very good.

24 BY MS. STEVENS:

25     Q.  So after you got it out, you did the PSI.  What

1  did you do next?

2      A.  It was dismounted from the rim and -- so that I

3  could examine the interior of the tire.  And that

4  examination revealed the fact that the interior of the

5  tire was pristine.  There was no evidence of the tire

6  ever having been run low or flat.

7      Q.  And did you -- you mentioned you observed

8  something lodged in the tire.  Can you describe what you

9  observed and how it looked?

10     A.  Yes.  The -- as I said, the inner liner was

11 pristine.  There was no evidence of any chafing or flex

12 cracking, which would -- you would anticipate seeing if

13 the tire had been run low or flat.

14     Q.  And in relation to the hole where the object

15 penetrated the tire, can you expand on that?

16     A.  Yes.  The material around the nail shank was

17 compressed tightly against the nail.  There was no

18 evidence of any wear or tearing in the area of the

19 puncture.

20     Q.  Was this notable to you?

21     A.  Yes.  It would indicate that the tire was not

22 used with the nail in it.

23     Q.  So after you examined it visually and took the

24 pressure, what did you do next?

25     A.  We had the tire x-rayed so we could confirm if

1  there was any damage to the interior components of the

2  tire.

3      Q.  Do you recall where on the tire the nail

4  penetrated it?

5      A.  Yes.

6      Q.  Where?

7      A.  It's located in groove number one, which would be

8  the outermost groove of the tire as it was mounted on a

9  vehicle.

10     Q.  Okay.  So let's --

11         MS. STEVENS:  Your Honor, with your permission,

12 can we have the witness approach the tire, Exhibit 72

13 and point out to the jury essentially what he is

14 referencing?

15         THE COURT:  Sure, that's fine.  Go ahead, sir.

16         THE WITNESS:  Thank you.

17     A.  Okay.  This tire has actually four ribs or sets

18 of lugs and three grooves.  The grooves -- this is

19 groove number one.  It's the outboard side of the tire

20 as it was mounted on the vehicle as it would have been

21 based on how it was mounted on the rim.

22         So groove number one, and it's at the 3:00

23 position.  See, I've referenced the number three here.

24 Using the serial number as the 12:00 position, so it's

25 like a clock face.  So the serial number would be 12:00

1  and then 3, 6 and 9, just so we can locate different

2  reference points on the tire.

3    Q.  Okay.  Blair, can you pull up -- you can go ahead

4  and sit down.  Thanks.  203, please.

5        (Witness returns to witness stand)

6  BY MS. STEVENS:

7    Q.  Mr. Bolden, you just mentioned the serial number

8  with the 12:00 and the 3:00.  Can you explain this

9  picture to the jury, please?

10   A.  Yes.  It's a picture of the subject tire with the

11  clock positions noted on it.  You will also see between

12  the 9:00 and 12:00 positions, there's a small V, which

13  is where the valve was located as it was mounted on the

14  rim.  That way we could remount the tire in its original

15  position.

16        THE COURT:  Can you state the exhibit number?

17  I don't believe you did, Ms. Stevens.

18        MS. STEVENS:  203.

19  BY MS. STEVENS:

20   Q.  Right here is the 3:00 position that you just

21  referenced with Exhibit 72; is that correct?

22   A.  Yes.

23   Q.  And so that is about the location where the nail

24  was found?

25   A.  Correct.

1    Q.   And did you come to learn of what the maximum --

2    well, can you tell the jury what maximum rated inflation

3    pressure means?

4    A.   Yes.  Every tire has a load-carrying capacity.

5    And to operate at that maximum capacity, it also has to

6    be inflated to a specific air pressure.  This particular

7    tire is a Load Range E tire, and it requires 80 PSI to

8    operate at its maximum carrying capacity.

9    Q.   So is that the pressure that it's normally

10   inflated to?

11   A.   No.

12   Q.   What's that?

13   A.   The operating pressure is determined by the

14   vehicle manufacturer, because they know what loads are

15   anticipated to be encountered on that particular

16   vehicle.  So on this vehicle, the rear inflation

17   pressure was specified to be 80 PSI.  The front pressure

18   was specified to be 55 PSI.

19   Q.   And when you say "this vehicle," do you recall

20   what kind of vehicle that was?

21   A.   Yes.  It was a Dodge Ram pickup truck.

22   Q.   And can you explain why the difference between

23   the recommended PSI for the front and the back tire?

24   A.   You mean the difference between why there's a

25   different pressure for the back versus the front?

1    Q.   Yeah, why there's a different recommendation.

2    A.   Yes.  Well, with a pickup truck, as you load the

3    tire -- or load the truck, the load is carried in the

4    rear of the vehicle.  The front does not carry as much

5    load, so there's not as much inflation pressure

6    required.  So you need the higher pressure on the back

7    to carry the additional load.

8    Q.   And so who determines that?

9    A.   The vehicle manufacturer does.  They know what

10   the balance is between the front and rear axle.

11   Q.   So after you figured out all this information,

12   what was the next step that you took with regard to

13   testing the tire?

14   A.   Well, after we had the x-ray done, we could see

15   no evidence of any structural damage to the interior

16   components.  So we remounted the tire on the wheel and

17   did a static air retention test.

18   Q.   Explain to the jury what that means.

19   A.   What we did was inflate it to its maximum

20   recommended pressure of 80 PSI and just let it stand at

21   room temperature and measured it daily for a period of I

22   think 13 days and measured the amount of air that was

23   lost over that timeframe.

24   Q.   And do you recall the amount of air that was

25   lost?  So I notice that you are again referring to your

report for the record.  So just go ahead and refresh
your recollection, and then when you're done just look
up, please.

   A.  Yes.  It lost 7 PSI over a period of 13 days.

   Q.  So for us non-tire people, how would you -- how
would you describe that in layman's terms?

   A.  Well, it's a very, very slow leak.  It amounted
to .5 PSI per day.  Of course the tire was not loaded.
It was just resting on the floor at room temperature,
and it was not loaded in any way.

   Q.  So did you do anything after that?

   A.  After that, we did a dynamic air retention test.

   Q.  What is that?

   A.  Well, with the dynamic test, we actually put the
tire on a piece of equipment called a dynamometer.  And
that enables us to operate the tire and it simulates
actual surface conditions.  So we can regulate the speed
that it runs, and we can also regulate the amount of
load that's on the tire.

   Q.  And can you explain the machine to the jury, like
what does it look like, how does it operate, things like
that?

   A.  Yes.  The dynamometer is a piece of equipment
that's used throughout the tire industry for just that
purpose, to test tires, simulating actual usage

conditions.  It consists of a 67-inch diameter steel
wheel that has a smooth steel surface on it.  And
typically, there are two test positions, one on either
side of the wheel, of the steel wheel.

And it can be loaded either hydraulically or
pneumatically or with dead weights.  And it pushes --
presses against that steel, large steel wheel, and then
the steel wheel is driven by an electric motor.  So we
can run it at any speed we desire to run it.

Q.  Let's pull up 206, please, Blair.

When you ran the tire on the dynamometer test,
what did you do with the nail, if anything?

A.  We didn't do anything with the nail.

Q.  Okay.  So the nail remained lodged in the tire?

A.  Yes, it did.

Q.  And this exhibit -- when was this photograph
taken, before or after the test was conducted?

A.  It was taken after the test.

Q.  And there's little -- these little things.  You
see those?

A.  Yes.

Q.  Can you tell the jury what those are?

A.  Yes.  Those are studs.  They are steel that have
a tungsten carbide tip, and they are used in
applications where you would encounter ice on the roads.

1   It provides extra traction for the tire.

2        Q.   Did the dynamometer -- did running this tire on

3   the dynamometer impact the tire in any way with the

4   studs in it?

5        A.   Well, you can see there's a -- like a

6   discoloration band on either shoulder of the tire, kind

7   of a light gray appearance.  And that's a result of the

8   residue, the wear residue of the tungsten studs as they

9   were run over the steel wheel.  Two very hard surfaces,

10  so it creates wear.

11       Q.   And I believe you've got a little pointer up

12  there.  So your description was relatively clear, but

13  just in case, can you identify those strips that you're

14  referring to with the pointer?

15       A.   Yes.  That would be the top, and that would be

16  the bottom.  And that's the discolorated area.

17       Q.   And I also notice over here there's something.

18  Can you explain what that is?

19       A.   That was the nail that was lodged in the tire

20  when we received it.

21       Q.   Based on your testimony where you raised the --

22  Exhibit 72 for the jury to see, which side of this tire

23  is the front tire that would be exposed to the road?

24       A.   Well, the tire -- the part of the tire that would

25  be outermost on the vehicle --

1    Q.  Yes --

2    A.  -- would be this side right here, which is the

3    serial side as it was mounted on the wheel.

4    Q.  And can you explain what this is again?

5    A.  That is the first groove, groove number one.

6    Q.  So how long did you run the dynamometer test for?

7    A.  It ran -- excuse me.

8         THE COURT:  There's some water there, sir, if

9    you need it.

10        THE WITNESS:  I think I do.

11        (Pause)

12        THE WITNESS:  Sorry.

13   BY MS. STEVENS:

14   Q.  Are you okay?

15   A.  Yeah, I'm fine.  Thank you.

16   Q.  So I think my question was, how long did you run

17   it for?

18   A.  24 hours.

19   Q.  And after running it for 24 hours, did you have

20   any observations?

21   A.  Yes.  Well, I should say that that 24-hour period

22   we had, we used what we call a rotary air union so that

23   we could check the air loss periodically over that

24   24-hour period without stopping the dynamometer.  But at

25   the conclusion of the test, the tire had lost 17.2 PSI.

1    Q.   And what was the speed that you ran it at?

2    A.   It was run at I believe -- yeah, 62 miles per

3    hour.

4    Q.   And how come you ran it at that speed?

5    A.   Well, there was another tire being tested on that

6    dynamometer, and the specified speed for that test was

7    62 miles an hour.  And there was an available test

8    position open, so we just put the subject tire on that

9    available position, so it ran at the same speed.

10   Q.   So that begs the question then, what impact at

11   all does a higher rate of speed have on the testing

12   results?

13   A.   Well, the higher the speed, it stresses the tire

14   more.  So it would be as the speed increases, the stress

15   goes up and you would expect to have more leakage

16   because of the additional flexing of the tire.

17   Q.   Okay.  So after running this for 24 hours, do you

18   recall what total mileage that was?

19   A.   Yes.  It was 1488 miles.

20   Q.   Okay.  And again, the overall rate of air loss

21   you said was 17.2?

22   A.   17.2 PSI, yes.

23   Q.   So again, not being a tire expert myself, is that

24   a lot for that time and distance, is it minimal, like

25   how would you describe it?

1      A.   Well, it would be considered a rather slow leak

2   over that distance for certain.   That distance is

3   equivalent to running from Anchorage to Seattle.   And to

4   lose that amount of pressure in that distance would not

5   be considered a tremendous amount of air loss.   Of

6   course you would have to maintain and add air, but it

7   was not catastrophic by any means.

8      Q.   Now, I just want to go back really quick.   You

9   mentioned some x-rays that you conducted at the

10  beginning where -- do you recall that?

11     A.   Yes.

12     Q.   Did those x-rays reveal anything?

13     A.   They revealed that there was really no structural

14  damage to the components.   The nail shank actually

15  passed between the steel cables, so the steel belts.

16  And so the only abnormality would have been the fact

17  that it had the nail in it.

18     Q.   And the puncture hole around the nail, did you

19  have an opportunity to observe the interior of that?

20     A.   Yes.

21     Q.   Can you explain that to the jury, please?

22     A.   Well, I think we saw a photo of that previously.

23     Q.   Let's pull up 208, please, Blair.

24     A.   So you can see the rubber material of the inner

25  liner is tightly compressed against the shank of the

nail.  And there's no tearing or rounding off of any of

the rubber material in that puncture.

Q.  So why -- when you mention no tearing or rubbing

off, where would that come from?

A.  Well, that would come from the fact that the tire

would be flexing as it's being used.  And over time,

that flexing will cause the nail to actually move or

wallow in its position, and it will actually eventually

chafe away material, rub it off and the hole enlarge,

and the leak will-- the leak rate will increase.

Q.  So are you able to form an opinion by looking at

this picture of this tire and nail?

A.  Yes.

Q.  What was that?

A.  Well, it had not done any wearing at all, and my

conclusion is that the tire was not used on the highway

with this nail in it.

Q.  So there's also a picture of the nail that I'd

like to put up for you.  And that's -- let's see.  207,

please.  Let's talk about this really quick.  Can you

explain to the jury some of your observations that you

made with regard to this nail.

A.  Yes.  The nail is an old nail.  It was a nail

that had been used sometime previously.  The surface,

the surface of the head is what I would call weathered.

1   But there are no indications of pavement striations that

2   you would expect to see if the tire were operated on

3   pavement or gravel or any type of road surface.

4         There's no rust.  There is a little bit of red

5   pigmentation that's -- you can see.  But really no

6   evidence of any highway usage on the nailhead.  The only

7   mark that I did notice was this one linear impression,

8   which is not at all consistent with any kind of road

9   abrasion.

10   Q.  What would you expect to see of a nail that had

11   been traveled on on a road or --

12   A.  Well, you would expect to see all sorts of

13   scratches as if like sandpaper was rubbed on the head of

14   the nail, and they would be kind of in random

15   directions.

16   Q.  Could we pull up 209, please, Blair, for

17   foundation.

18         Do you recognize these photos, Mr. Bolden?

19   A.  Yes.

20   Q.  And what are they of?

21   A.  These are tires that I have taken -- or photos

22   that I've taken from other tire cases from the photo

23   records that we had on file.

24   Q.  And are they accurate representations of those

25   tires and respective nails or objects on the date that

1    you took them?

2       A.   Yes.

3             MS. STEVENS:  Your Honor, we move to admit 209.

4             MR. COLBATH:  Could I ask a question, Your

5    Honor.

6             THE COURT:  Yes, go right ahead.

7             MR. COLBATH:  Sir, the tire depicted in each of

8    those two photos, it's not this tire we have here in the

9    courtroom?

10            THE WITNESS:  That's correct.

11            MR. COLBATH:  And the nails -- I can't tell if

12   that one is a nail.  But the nail in the one on the left

13   and the metal object in the one in the right, those are

14   not the nails from this case?

15            THE WITNESS:  That is correct.

16            MR. COLBATH:  Your Honor, I object as to

17   admission of 209.  If it is offered for demonstrative

18   purposes, if he has something to say about it, I

19   wouldn't object to demonstrative, but --

20            THE COURT:  So you don't object to its

21   publication?

22            MR. COLBATH:  No, that's fine.

23            THE COURT:  Any objection to that?

24            MS. STEVENS:  No, Your Honor.

25            THE COURT:  Then that's what we'll do.  209 is

1  not admitted but may be published to the jury.

2  BY MS. STEVENS:

3     Q.  Mr. Bolden, let's talk about these nails.  The

4  one on the left here, can you explain some of the

5  characteristics that are notable?

6     A.  Well, the purpose of this photo was to show that

7  the head of the nail was flush with the tread surface,

8  which would indicate that that nail was -- that puncture

9  was sustained while it was in service.

10    Q.  So can you explain that a little more?  Why is it

11 being flush with the surface important to you?

12    A.  Well, because if it's picked up on the highway,

13 the force that it takes to push that nail into the tire

14 is provided by the weight of the vehicle pressing

15 against the pavement.  And the pavement cannot extend

16 below the tread surface.  It can't get down into the

17 groove, so it can't push it any farther than the top

18 surface of the tread.

19    Q.  And then to the left here, we have -- to the

20 left -- or I'm sorry.  To the right we have another

21 picture.  Can you explain what that is?

22    A.  Yes.  That's -- it looks like possibly a wire

23 that became embedded in the tire.  And again, it is

24 flush with the top wearing surface of the tread.  And if

25 you can look closely, you can actually see the

1　striations on the tip of that wire.

2　　　So that would indicate the type of wear that you

3　would see if it was operated on a pavement and also the

4　fact that it is not down below the running surface of

5　the tread.

6　Q.　Is that polished or not polished?

7　A.　It is polished, yes.

8　Q.　Does that give you any basis for forming an

9　opinion?

10　A.　Yes.

11　Q.　What would that be?

12　A.　The fact that it was -- it had pavement contact,

13　so it was operating with that wire in it on the

14　pavement.

15　Q.　Okay.　We can take that down now.

16　　　Now, going back briefly to the static test,

17　because we had talked about -- we had talked about the

18　maximum pressure for a tire and then the recommended

19　pressure for a tire.　You mentioned that 5 PSI -- I'm

20　sorry, 7 PSI was lost over a course of about 13 days,

21　right?

22　A.　Yes, on the static test.

23　Q.　That static test, you had inflated the tire to

24　80 PSI?

25　A.　Yes.

1    Q.   Can you explain to the jury if that level of leak

2    changes as the internal inflation of the tire changes?

3    A.   Yes.  Yes.  The leakage rate is just basically

4    the gradient.  It's the difference of the amount of

5    pressure that's in a tire versus atmospheric pressure.

6    So you have -- at 80 PSI you have 80 pounds of pressure

7    higher than what's outside the tire.  So as that

8    pressure goes down, the leakage rate decreases over

9    time.  So the higher the pressure, the faster the leak

10    rate.  And as that pressure decreases, the leak rate

11    will also decrease.

12    Q.   When you did the dynamometer testing, what was

13    the temperature of the lab?

14    A.   It was 100 PSI, plus or minus five degrees.

15    Q.   You mean 100 degrees Fahrenheit?

16    A.   Yes.

17    Q.   You're trying to trick me?

18    A.   No, I'm just --

19    Q.   What, if any, importance does that have on the

20    test?

21    A.   Well, it really won't have a great effect on the

22    leak rate of the tire.  The -- more importantly what

23    counts is the actual temperature, operating temperature

24    of the tire.  So as the tire is used in service, the

25    flexing of the tire actually generates heat in the tire.

1  The tire actually warms up.

2        So as the tire warms up, the rubber compounds

3  soften.  And as it softens, it allows -- in this case,

4  it would allow a nail or a puncturing object to move

5  more in the tire as it heats up.

6        The ambient temperature really has very little

7  effect on that, other than the fact that it's, you know,

8  slightly warmer than it would be if it were freezing

9  outside.

10  Q.  And what do you mean by ambient temperature?

11  A.  The air temperature.  In other words, the air

12  temperature, the ambient temperature in here is I would

13  suspect around 70 degrees.

14  Q.  You mentioned this was a slow leak and comparable

15  of driving from Denver to Seattle.  Would the driver

16  notice it?  Explain that to the jury of if this would be

17  something noticeable.

18  A.  Well, the amount of air loss that we experienced

19  in these tests would not be significant enough to allow

20  to alert the driver that there was something wrong.  You

21  have to get down to about 30 percent of what the

22  recommended pressure of the tire is before you'll notice

23  a handling change in the vehicle or to even visually see

24  a larger bulge in the sidewall of the tire that would

25  alert you that the air pressure is low.

    Q.   For -- I'm sorry.   I'm going to make you do some
math.   For a tire that the recommended PSI is 55, what
would be that 35 percent for that type of tire?   And it
may be in a different report that I have up here for
you.

    A.   So what was your question again?

         MS. STEVENS:  Can you read that back?

         (Question was read back by court reporter)

    A.   Oh, well, it would have to be 35 percent of 55.

    Q.   Again, I'm not doing the math.

    A.   Yeah.  So --

    Q.   But if you need your memory to be refreshed, I
can provide you your other report to help you out.

    A.   That would help.

         MS. STEVENS:  Your Honor, may I approach?

         THE COURT:  Yes, go right ahead.

         (Ms. Stevens approaches the witness)

    A.   May I use a calculator?

    Q.   I don't think I have one.

    A.   I think I have one.

    Q.   Mr. Bolden, we'll move on.   I'm not going to make
you suffer through a math equation.

         So let's focus on the nail.   You mentioned it was
on the exterior groove, groove number one.   Can you
explain the angle that you observed it at?

1    A.  Well, I could not determine what the precise

2  angle was with the nail in the tire.  But judging from

3  the appearance of the shank inside the tire, it appeared

4  to be perpendicular with the interior surface of the

5  tire, which is different than the exterior surface.

6    Q.  And where was the head of the nail in relation to

7  the tread?

8    A.  The nailhead was well below the wearing surface

9  of the tread.  It was pushed down into the groove.

10   Q.  Did that lead you to make an opinion?

11   A.  Yes.

12   Q.  What was that?

13   A.  That the tire was not picked up while the tire

14  was -- the nail was not picked up while it was in

15  service.

16   Q.  Blair, could you pull up 261, please.

17       Did you have an opportunity to review any other

18  reports in this case from other individuals with

19  specialized knowledge, training and experience?

20   A.  I did.

21   Q.  And do you see what's in front of you right now?

22  Do you recognize that?

23   A.  Yes.

24   Q.  And how do you recognize it?

25   A.  That was -- these are photos that were taken by

1    Bruce Curry, who was the defendant's expert.

2        Q.   And what is your understanding of these

3    photographs?

4        A.   Well, when he received --

5            MR. COLBATH:  Your Honor, I'm going to object

6    as to both foundation and speculation.

7            THE COURT:  Let's take a short sidebar.  This

8    is 261?

9            MS. STEVENS:  261.

10           (Begin bench conference)

11           MR. COLBATH:  I would also note that's the

12   third time he's used the word expert.

13           THE COURT:  But it's your expert.

14           MR. COLBATH:  Well, I'm not going to call him

15   that.

16           THE COURT:  Fair enough.  Do you tell your

17   witnesses --

18           MS. STEVENS:  I did.

19           THE COURT:  It's okay.

20           MR. COLBATH:  They are too used to it.

21           THE COURT:  That's what I would assume.

22           MR. COLBATH:  Your Honor, it's not my intent to

23   offer that exhibit with Mr. Curry.  And so again, I

24   guess that is not something that I think is otherwise

25   going to be in evidence.  It's not something that this

witness utilized or any demonstration of how that was
created.  That was not anything that this witness used.
And so if for demonstrative purposes they want to ask
him a question about it, that would be fine, but --

THE COURT:  You're not going to seek to admit
it, are you?

MS. STEVENS:  No, it would be for demonstrative
purposes.  He did rely on it in his report.

THE COURT:  Who?

MS. STEVENS:  Mr. Bolden.

THE COURT:  Oh, he did?

MS. STEVENS:  Yeah.  And actually created
additional demonstrative exhibits that sort of counter
their expert's opinion.

THE COURT:  So coming in as demonstrative or
published?

MR. COLBATH:  If you want to publish -- if it's
published just as --

MS. STEVENS:  It doesn't have to go back.

MR. COLBATH:  If it's published just as
demonstrative to ask him you had seen this before, did
you do your own, and then he talks about the creation of
his own, that's fine.

THE COURT:  All right.

MS. STEVENS:  Yeah.

1          MR. COLBATH:  He doesn't know how this one was

2    created.

3          MS. STEVENS:  Right.  Essentially, he's going

4    to show how in his opinion he thinks that the angle from

5    the defense supports that it was not inserted normally,

6    through normal driving.

7          THE COURT:  Okay.  I think we can move forward

8    then.  You're not going to seek to admit it, and you're

9    not going to ask what the other side did with the

10   exhibit, you're just going to ask what he did with it?

11         MS. STEVENS:  Right.  How he was able to form

12   his opinion based on it.

13         THE COURT:  All right.  Very good.

14         (End bench conference)

15   BY MS. STEVENS:

16    Q.  Okay.  So are you familiar with the pictures

17   depicted in 261?

18    A.  I am.

19    Q.  And did you use these photographs to do any --

20   any sort of testing or make an opinion yourself?

21    A.  I did form an opinion, yes.

22         MS. STEVENS:  Okay.  So at this stage, Your

23   Honor, we would move to publish them as a demonstrative

24   aid.

25         THE COURT:  All right.

```
 1          MS. STEVENS:  As 261, Government Exhibit
 2  No. 261, but not to be admitted.
 3          THE COURT:  And I understand no objection,
 4  correct?
 5          MR. COLBATH:  Yeah, as a demonstrative, that's
 6  fine.
 7          THE COURT:  All right.  Go right ahead.  Then
 8  261.
 9  BY MS. STEVENS:
10     Q.  Okay.  Mr. Bolden, so the pictures that you see
11  here, when did you review those?
12     A.  Five years ago.
13     Q.  And your understanding of these pictures, what do
14  they depict?
15     A.  Well, they depict the puncture hole with a wire
16  that was inserted into the puncture hole.
17     Q.  The puncture hole of what?
18     A.  The tire.
19     Q.  Okay.  And did you make a conclusion based on the
20  angle that you can share with the jury?
21     A.  Yes.
22     Q.  Go ahead.
23     A.  The angle of the puncture hole is inconsistent
24  with the tire that is picked up in service.  You can see
25  looking from the sidewall, in other words, looking from
```

the side of the tire, the hole is actually perpendicular

to the surface of tread.  If you look at the tire, at

the tread head on, you can see there's an angle that

goes out to the outboard side of the sidewall of the

tire.

        For a nail to be picked up on the highway, it has

to go in at an angle.  In other words, not

perpendicular, but it would be at an oblique angle.  So

this is actually just opposite of what you would

anticipate to see in terms of the angle that the nail

penetrates the tire.

    Q.  And you mentioned that the angle and also the

location of the nail below the surface led you to an

opinion, correct?

    A.  Yes.

    Q.  And again, what was that taken together?

    A.  Together, my conclusion was that the nail was

inserted manually in the tire as opposed to being picked

up on the highway.

    Q.  Let's go to this -- we're going to offer this one

also as a demonstrative exhibit.

            THE COURT:  All right.

            MS. STEVENS:  Mr. Colbath --

            THE COURT:  What's the exhibit number there?

            MS. STEVENS:  210, please, Blair.

1    BY MS. STEVENS:

2        Q.   Do you recognize this?

3        A.   I do.

4        Q.   How so?

5        A.   Those are photos that I took of a tire puncture

6    that I sustained on my personal vehicle.

7        Q.   What did you do with it, with that tire?

8        A.   Well, I -- of course I dismounted it.  Whatever

9    punctured the tire was not retained in the tire.  So I

10   was able to take a paper clip and insert it in the

11   puncture hole.  And as you can see --

12       Q.   Well, before you do that, because it's not

13   published yet --

14       A.   Okay.

15       Q.   Are these accurate depictions of the -- of your

16   tire when you received that hole in it?

17       A.   Yes.

18            MS. STEVENS:  So Your Honor, at this stage we

19   move to admit just as demonstrative Exhibit No. 210.

20            THE COURT:  Can be published.  That's fine.

21   BY MS. STEVENS:

22       Q.   You were going to explain it, so go ahead.

23       A.   So as you can see, looking head on at the tread,

24   as if the tire was actually rolling towards you, the

25   puncture hole is vertical to the tread surface.  But as

1  you look from the side of the tire, you can see the nail

2  went in at an oblique angle to the tread surface.  This

3  is just exactly opposite to the hole orientation that we

4  have in the subject tire.

5     Q.  Can you pull up 261 and do a side by side.

6        So this picture here, that view, that angle of it

7  is similar to which of the two photos on the right-hand

8  side?

9     A.  This photo.

10    Q.  Okay.  And so for the subject tire, it's at an

11  angle, and for your tire it's perpendicular?

12        MR. COLBATH:  Your Honor, I'm going to object

13  as to leading.

14        THE COURT:  That's sustained.

15  BY MS. STEVENS:

16    Q.  Can you explain the difference?

17    A.  Well, the difference is that the nail puncture or

18  the puncture that I sustained in my tire demonstrates

19  that the nail went in at an oblique angle to the tread

20  as viewed from the sidewall.  That's the only way that a

21  nail can go into a tire if it's picked up on the

22  highway.

23    Q.  We can take those down.

24        So overall, after you examined the tire, you

25  conducted the test, you looked at the nail, what was

1   your ultimate conclusion?

2       A.  Well, first, that the tire had not been operated

3   underinflated or flat.  The nail in the tire was located

4   below the tread surface and at an orientation angle that

5   is inconsistent with being picked up on the highway, but

6   is consistent with a manual insertion into the tire.

7   And that the condition of the tire was such that there

8   was no damage to it.  And in fact, the tire as it sits

9   today would be serviceable if you repaired the puncture

10  hole.

11      Q.  And just really quick, what about the head of the

12  nail, did you make a conclusion about the nailhead?

13      A.  Yes.  Aside from the fact it was below the

14  surface of the tread, that's what enabled the tire -- or

15  that's why there was no abrasion on the head of the

16  nail, which would indicate that it was never in service.

17      Q.  Great.  Just one second.

18          THE COURT:  Sure.

19          (Pause)

20          MS. STEVENS:  No more questions, Your Honor.

21          THE COURT:  All right.  Thank you.  Is it

22  better to start tomorrow?

23          MR. COLBATH:  Probably, Your Honor.  It's

24  quarter to 5:00, and I have pictures to look at and some

25  questions for Mr. Bolden that I'm sure will take us more

1  than 15 minutes.  It doesn't make much sense to start if

2  that's okay.

3        THE COURT:  8:45, Counsel, is that a good time

4  for the jury tomorrow?

5        MR. COLBATH:  Yeah, I think that is from us,

6  8:45.

7        THE COURT:  Mr. Skrocki, 8:45?

8        MR. SKROCKI:  Certainly.

9        THE COURT:  Ladies and gentlemen, then I'm

10  going to excuse you for the evening.  Please leave your

11  notepads here.  Remember my admonition not to discuss

12  the case with family or friends or do any research, and

13  we'll see you tomorrow morning at 8:45.  Have a pleasant

14  evening.

15        (Requested excerpt concluded, proceedings

16  continued.)

17                    CERTIFICATE

18     I, Sonja L. Reeves, Federal Official Court Reporter
   in and for the United States District Court of the
19  District of Alaska, do hereby certify that the foregoing
   transcript is a true and accurate transcript from the
20  original stenographic record in the above-entitled
   matter and that the transcript page format is in
21  conformance with the regulations of the Judicial
   Conference of the United States.

22
      Dated this 4th day of October, 2019.
23

24
                        /s/ Sonja L. Reeves
25                      SONJA L. REEVES, RMR-CRR
                        FEDERAL OFFICIAL COURT REPORTER