```
 1                  UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF ALASKA
 2

 3   UNITED STATES OF AMERICA, )
                              )
 4          Plaintiff,        )
                              )
 5   vs.                      )   CASE NO. 3:13-cr-00008-SLG
                              )
 6   JAMES MICHAEL WELLS,      )
                              )
 7          Defendant.        )
     _____)
 8

 9         PARTIAL TRANSCRIPT OF TRIAL BY JURY - DAY 12
                   (Testimony of Gary Bolden)
10     BEFORE THE HONORABLE SHARON L. GLEASON, DISTRICT JUDGE
                 September 24, 2019; 8:32 a.m.
11                      Anchorage, Alaska

12   FOR THE GOVERNMENT:
          Office of the United States Attorney
13        BY:  STEVEN SKROCKI
          BY:  CHRISTINA M. SHERMAN
14        BY:  KELLEY L. STEVENS
          222 West 7th Avenue, #9
15        Anchorage, Alaska 99513
          (907) 271-5071
16
     FOR THE DEFENDANT:
17        Office of the Federal Public Defender
          BY:  GARY GEORGE COLBATH
18        601 West 5th Avenue, Suite 800
          Anchorage, Alaska 99501
19        (907) 646-3400

20        Camiel & Chaney, P.S.
          BY:  PETER A. CAMIEL
21        520 Pike Street, Suite 2500
          Seattle, Washington 98101
22        (206) 624-1551

23   _____
                    SONJA L. REEVES, RMR-CRR
24              Federal Official Court Reporter
                   222 West 7th Avenue, #4
25                 Anchorage, Alaska 99513
          Transcript Produced from the Stenographic Record
```

1          (Call to Order of the Court at 8:32 a.m.)

2          (Proceedings took place and are not included in

3    this transcript, after which, the testimony of Gary

4    Bolden transpired as follows:)

5          THE COURT:  Sir, I'll remind you you're still

6    under oath from yesterday's proceedings.  Whenever

7    you're ready.

8          MR. COLBATH:  Okay.  Thank you.

9     GARY BOLDEN, GOVERNMENT WITNESS, PREVIOUSLY SWORN

10                    CROSS EXAMINATION

11   BY MR. COLBATH:

12      Q.  Good morning, sir.

13      A.  Good morning.

14      Q.  The tire that you had to review, the tire here

15   that we have, I can't recall the exhibit number, but the

16   one you were sent from the FBI, that arrived with you on

17   June 4th of 2012, I think you told us yesterday?

18      A.  Yes.

19      Q.  And it came packaged in a crate, some sort of

20   box-type structure?

21      A.  Correct.

22      Q.  And it still had -- it didn't look like it looks

23   here today.  It was on the rim?

24      A.  That's correct.

25      Q.  And you don't know, first of all, sir, what

condition it was in when it was taken into the FBI's
custody, you didn't receive any pictures or any
information about the tire prior to it coming to you,
did you?

    A.  I did not.

    Q.  All right.  And you didn't take any photos of it
still in the crate or as you observed it, just as you
opened the lid?

    A.  No, I did not.

    Q.  And didn't remove it while still on the rim and
take close-ups of the nail or document it before taking
it off the rim, as I understand it?

    A.  That's correct.

    Q.  And you did an initial test and found in sort of
your initial observations and conclusions that the tire
was at 20 PSI when you received it.  It had 20 pounds of
air pressure in it?

    A.  Yes.

    Q.  But you don't know how long it had been at 20 PSI
or the circumstances under which it got to there, that
state of inflation, right?

    A.  Correct.

    Q.  So -- and you understood that the tire was taken
around April 12th or had last potentially been driven on
on April 12th of 2012, that same year?

1    A.  I was not aware of that.

2    Q.  Okay.  So you didn't know how long it had been

3  since the tire had been driven on or what air pressure

4  it might have last had when it was actually on a

5  vehicle?

6    A.  Correct.

7    Q.  Now, you talked a little bit yesterday about

8  handling characteristics and what the tire should have

9  been.  On a pickup truck, where this tire came from, on

10  the front of a pickup truck, it would have normally been

11  operated at 55 PSI?

12    A.  That would be the recommended pressure, yes.

13    Q.  And somewhere between 55 and well before we got

14  to 20, a driver -- if the tire was going low, a driver

15  would know that or potentially sense that in the vehicle

16  long before it got to 20 PSI, right?

17    A.  I don't know how long before.  It would have to

18  get pretty low for him to notice that.

19    Q.  Well, I noticed in your report, one of your

20  conclusions was there would have been a significant

21  deterioration of the vehicle's handling characteristics

22  before reaching 20 PSI?

23    A.  That is correct.

24    Q.  That was one of your conclusions?

25    A.  Yes.

1    Q.   You can't put -- you can't say, well, when it

2  goes from 55 to 40, then you start noticing it, or 42 or

3  38 -- somewhere in the range between 55 and 20, you

4  would have expected something to be noticed?

5    A.   Yes.

6    Q.   Certainly some of that would have been probably

7  also related to potentially the type of road you're

8  driving on as well as the driver's familiarity with the

9  vehicle, I suppose?

10   A.   I don't know that the roadway would have anything

11  to do with it.  It's essentially the fact that the

12  rolling resistance of the tire will increase as it loses

13  air pressure.

14   Q.   Okay.  I want to look at -- could we pull up

15  Exhibit No. 2 -- Government's 207.

16        Now, sir, this is a photo of the nail, correct?

17   A.   Yes.

18   Q.   As you saw it.  And I notice a couple of things

19  here.  There appears to be like a crack right there, and

20  I'm going to move that line.  You see that line there?

21   A.   I do.

22   Q.   Okay.  I'm going to get that back out of the way

23  because I drew over it.  That was in the tire obviously

24  as you observed it here, because this is a photo of the

25  nail in place, you haven't done anything to it, right?

1     A.   Correct.

2     Q.   And you see some of this red discoloration?  Do

3  you perceive that or did you perceive that as rust on

4  the head of the nail?

5     A.   No.

6     Q.   Okay.  You agree that this was an, obvious to

7  you, old, weathered-looking nail?

8     A.   Correct.

9     Q.   In other words, the nail was not a brand-new nail

10  that had been -- punctured this tire and not been out in

11  the weather in -- sometime in its lifetime, I guess?

12     A.   It was not a new nail.

13     Q.   It was bent, had a certain degree bend to it?

14     A.   Once I dismounted it and looked at the interior,

15  I could determine that, yes.

16     Q.   And it had this long mark across, just had kind

17  of a long line across it there.  That was -- also had

18  the same weathering in it.  Didn't appear to be any kind

19  of new mark to you that you could see?

20     A.   Well, I would say it was certainly newer than the

21  rest of the flat surface of the nail.

22     Q.   Okay.  And I noticed that right here along the

23  lug, it looks like the head of the nail, although now

24  it's not in contact with that, you can see the line that

25  it cut into the rubber there.  If you look at it close

1   you can see that line, correct?

2      A.   I'm not sure I can see much in this photograph.

3      Q.   Okay.  Well, on your visual inspection, did you

4   notice where the nail had actually went down into the

5   lug?

6      A.   I believe so, yes.

7      Q.   All right.  And then additionally, I noticed --

8   it's hard to see of course because the nail is in place

9   as we see it in this picture, but as the tire lays here

10  on the table the nail is not in it, right?

11     A.   Yes.

12     Q.   And the hole where that's in, there's actually a

13  divot.  It's actually got a hole, and then around the

14  hole, it almost looks like where the nailhead at one

15  time -- was all --

16         MS. STEVENS:  Your Honor, Mr. Colbath is

17  testifying.

18         THE COURT:  Let's -- why don't you rephrase.

19  I'll sustain that.

20         MR. COLBATH:  Sure.  I'll rephrase.

21         THE COURT:  Thank you.

22  BY MR. COLBATH:

23     Q.   Did you see, sir, upon your inspection of the

24  tire that where the nail hole is, there's actually a

25  divot around it where it appears that maybe the nailhead

1   or some larger portion of the nail other than the shank

2   left an impression in the tire?

3      A.  Well, I did not see the tire with the nail

4   removed, so I can't answer that.

5      Q.  Okay.  While we're talking about this nail, one

6   of your conclusions you made about it was that it was

7   your impression from the things you discussed yesterday

8   that the nail was manually inserted.  That means

9   somebody stuck it in the tire as opposed to it somehow

10   got in there while the tire was rolling around on the

11   roadway?

12      A.  Correct.

13      Q.  And how would -- how do you believe that that

14   happened, the manual insertion?

15      A.  I have no way of knowing what method was used.

16   You could do it with a hammer, but I doubt that a hammer

17   would have been used.  I suspect it was probably a power

18   tool of some sort, either a pneumatic nail gun or a

19   powder-charged gun.

20      Q.  So a hammer, you could take a vice grip or a set

21   of pliers and just hammer it in there?

22      A.  Correct.  And there would be definite markings on

23   the nailhead if that were the case.

24      Q.  Sure.  You would expect those same markings with

25   a pneumatic nail gun or a charged nail gun though as

1   well, right?

2     A.  They would not resemble a hammer mark at all.

3     Q.  Right.  Those two would be different kind of

4   marks, but each would relieve their -- each would leave

5   their respective kind of marks.  Do you agree with that?

6     A.  There would be a tool mark, yes.

7     Q.  Those would really be the pliers and hammer or a

8   power tool, really the two ways you could think of that

9   that would happen?

10     A.  Yes.

11     Q.  And then one of the things, sir, let me just

12   find -- one of the observations I think you made after

13   you had the -- again, sticking with the nail.  After you

14   had the rim off and you were able to look inside and

15   inspect the inside, one of the things you noticed was

16   the area right around where the nail went through

17   appeared to be a little concave.

18         And that is the inner liner of the tire adjacent

19   to the nail indicated that it looked like it had

20   actually pulled out some or been repositioned.  Do you

21   recall making that observation?

22     A.  No, I don't.

23     Q.  Okay.  You didn't say -- well, do you remember

24   both e-mailing and talking on the phone with the case

25   agent, Daryl Allison, the man who sent you the tire?

1    A.   I don't have a specific recollection of that, no.

2    Q.   Okay.  Do you remember telling him the curvature

3  of the inner liner of the tire adjacent to the nail

4  indicated the nail had been pulled outward and

5  repositioned?

6              MS. STEVENS:  Your Honor, I'm sorry.

7              THE COURT:  That's sustained.

8              MS. STEVENS:  So if he wants to --

9              MR. COLBATH:  I'm asking if he said that.

10             THE COURT:  You can refresh his recollection,

11  but I would sustain the objection to reading in

12  something without giving the witness and the opposing

13  counsel an opportunity to look at it.

14             MR. COLBATH:  Sure.

15             THE COURT:  Thank you.

16             MR. COLBATH:  It's Bates -- I only have one

17  copy.  43751.

18             Can I approach, Your Honor?

19             THE COURT:  Certainly.

20             (Mr. Colbath approaches the witness)

21  BY MR. COLBATH:

22    Q.   Sir, I'll let you look at that there.

23             MS. STEVENS:  Your Honor, can we just have a

24  minute to read it?

25             THE COURT:  Certainly.

1          (Pause)

2     A.  Okay.

3     Q.  Hold on a minute.

4          So, sir, my question is:  Does that refresh your

5     recollection at all about a conversation you might have

6     had with Mr. Allison, the gentleman who sent you the

7     tire?

8     A.  Well, I really don't recall that conversation,

9     but I wouldn't dispute the fact if you have a record of

10    it.

11    Q.  Sure.  All right.  And certainly once the nail is

12    in there, you could -- a person could -- it could be --

13    well, you could pull a nail out of a tire, right?

14    You've probably done that personally many times?

15    A.  You can.

16    Q.  And how would you go about that?

17    A.  Well, you would have to use -- depending on what

18    the condition of the nail was and how it was situated in

19    the tire, you may have to use pliers or something of

20    that nature.

21    Q.  And once the hole is there, obviously, like we

22    saw yesterday, you showed you were able to put a wire

23    back through there or put things -- once the hole is

24    made, you could position things to determine angles or

25    rearrange things for demonstration.  So that's possible

1  once the hole is there, I guess?

2      A.  Well, I didn't do that, but that is possible.

3      Q.  You didn't reposition this nail at all, you left

4  the nail as you found it when it arrived for you

5  throughout your work on the tire?

6      A.  That is true.

7      Q.  Your tests were done -- the machine that you ran

8  it on that left those little silver marks that wore the

9  studs on the edge, the nail was in the tire while you

10 were running it on the machine, correct?

11     A.  On the dynamometer, yes.  That's true.

12     Q.  And even though it went the 1400 or 1500 miles on

13 your machine that it ran, it doesn't appear -- as I look

14 at it, it doesn't appear that it wore out the inside of

15 the tire or left chafing, the things you described,

16 around the nail hole that is there, correct?

17     A.  Well, I haven't examined the tire since the nail

18 has been removed, so I can't really say.

19     Q.  And your conclusion that -- part of the basis of

20 your conclusion that the nail was not picked up on the

21 roadway is based on the positioning and angle of the

22 hole that you found or the orientation of the nail, I

23 guess would be a better way to say it?

24     A.  Yes.

25     Q.  Of course you don't know the driving

circumstances or the conditions under which the nail was
first -- or the hole was first discovered in the tire at
all?  You never saw the tire on Kodiak Island or on the
roadway or on the vehicle, any of those circumstances?

   A.  I did not.

   Q.  All right.  Then that's all I have for you, sir.

       THE COURT:  Ms. Stevens, any redirect?

       MS. STEVENS:  Just a few, Your Honor.

       THE COURT:  Sure.  Go right ahead.

             REDIRECT EXAMINATION

BY MS. STEVENS:

   Q.  So Mr. Colbath pulled up a photo of the nail.  Do
you recall that, Government's Exhibit No. 207?

   A.  Yes.

   Q.  We'll pull it up for you.

       MR. COLBATH:  Do you want it again?

       MS. STEVENS:  Yeah, if you don't mind.

BY MS. STEVENS:

   Q.  He asked you about that discoloration?

   A.  Yes.

   Q.  The red color there?

   A.  Yes.

   Q.  What does that look like to you?

   A.  It looks like a red pigment, possibly residue
left over from paint.

1    Q.   And how long ago did you conduct the testing in

2 this case?

3    A.   Approximately seven years ago.

4    Q.   And given your 46 years of experience, what's

5 your opinion about the nailhead that we spent some time

6 just now talking about?

7    A.   Well, my conclusion would be that this tire or

8 this nail was never in the tire while the tire was

9 operating on the road.

10    Q.   And how confident are you about that?

11    A.   100 percent.

12    Q.   Mr. Colbath also pointed your attention to the

13 angle of the nail.  What's your opinion about that?

14    A.   Well, the angle of the nail is totally

15 inconsistent with being picked up naturally, but is

16 consistent with a manual insertion.

17    Q.   Mr. Colbath also focused your attention on the

18 puncture hole.  You were able to observe it while the

19 nail was still in the tire.  Based on that observation,

20 what was your opinion regarding the puncture hole?

21    A.   Well, the nail was situated below the surface of

22 the tread, which is inconsistent with being picked up

23 naturally on the road.  And there were actually no

24 indications on the nailhead of any pavement or roadway

25 contact.

1      Q.   And lastly, Mr. Colbath made mention of

2    conditions in Kodiak, road conditions and other things,

3    speeds, stuff like that.  Do those conditions change

4    your opinion in any way?

5      A.   No, they do not.

6      Q.   And ultimately, what was that opinion?

7      A.   Well, the tire was never operated in an

8    underinflated or flat condition.  There was no damage

9    noted on the interior of the tire.  The inner liner was

10   actually pristine as it came from the factory.  The only

11   problem with this was that there was a nail that had

12   penetrated the tire.

13     Q.   I have no more questions.  Thank you.

14          THE COURT:  Any follow-up at all, Mr. Colbath?

15          MR. COLBATH:  No.

16          THE COURT:  Thank you, sir.  You may be

17   excused.

18          (Witness excused)

19          (Requested excerpt concluded, proceedings

20   continued.)

21

22

23

24

25

```
 1                       CERTIFICATE

 2        I, Sonja L. Reeves, Federal Official Court Reporter
      in and for the United States District Court of the
 3    District of Alaska, do hereby certify that the foregoing
      transcript is a true and accurate transcript from the
 4    original stenographic record in the above-entitled
      matter and that the transcript page format is in
 5    conformance with the regulations of the Judicial
      Conference of the United States.
 6
          Dated this 4th day of October, 2019.
 7

 8
                              /s/ Sonja L. Reeves
 9                            SONJA L. REEVES, RMR-CRR
                              FEDERAL OFFICIAL COURT REPORTER
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```