```
 1                  UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF ALASKA
 2

 3   UNITED STATES OF AMERICA, )
                               )
 4          Plaintiff,         )
                               )
 5   vs.                       )   CASE NO. 3:13-cr-00008-SLG
                               )
 6   JAMES MICHAEL WELLS,      )
                               )
 7          Defendant.         )
     _____)
 8

 9          PARTIAL TRANSCRIPT OF TRIAL BY JURY - DAY 15
                  (Testimony of Frank E. Stearns)
10     BEFORE THE HONORABLE SHARON L. GLEASON, DISTRICT JUDGE
                  September 27, 2019; 8:47 a.m.
11                      Anchorage, Alaska

12   FOR THE GOVERNMENT:
             Office of the United States Attorney
13           BY:  STEVEN SKROCKI
             BY:  CHRISTINA M. SHERMAN
14           BY:  KELLEY L. STEVENS
             222 West 7th Avenue, #9
15           Anchorage, Alaska 99513
             (907) 271-5071
16

17   FOR THE DEFENDANT:
             Office of the Federal Public Defender
             BY:  GARY GEORGE COLBATH
18           601 West 5th Avenue, Suite 800
             Anchorage, Alaska 99501
19           (907) 646-3400

20           Camiel & Chaney, P.S.
             BY:  PETER A. CAMIEL
21           520 Pike Street, Suite 2500
             Seattle, Washington 98101
22           (206) 624-1551
```

---

                        **SONJA L. REEVES, RMR-CRR**
                    Federal Official Court Reporter
                       222 West 7th Avenue, #4
                        Anchorage, Alaska 99513
             Transcript Produced from the Stenographic Record

```
1              (Call to Order of the Court at 8:47 a.m.)

2              (Proceedings took place and are not included in

3   this transcript, after which, the testimony of Frank E.

4   Stearns transpired as follows:)

5              (Oath administered to the witness)

6              DEPUTY CLERK:  For the record, can you please

7   state your full name and then spell your full name.

8              THE WITNESS:  Frank E. Stearns, S-t-e-a-r-n-s.

9         FRANK E. STEARNS, DEFENSE WITNESS, SWORN

10                     DIRECT EXAMINATION

11  BY MR. CAMIEL:

12     Q.  Good morning, Mr. Stearns.

13     A.  Good morning.

14     Q.  Mr. Stearns, where are you visiting us from?

15     A.  Missouri.

16     Q.  And when did you get here?

17     A.  Last night.

18     Q.  Was there a time where you lived in Kodiak?

19     A.  Yes, sir, for years.

20     Q.  What years did you live there?

21     A.  Last 30 years, 25 years.

22     Q.  When did you leave Kodiak?

23     A.  A couple months ago.  I bought a retirement place

24  in Missouri.

25     Q.  When you were living in Kodiak, how were you
```

1  employed?

2      A.  Plumber, welder, pipefitter.

3      Q.  How many years have you been doing that kind of

4  work?

5      A.  1972.

6      Q.  I want to turn your attention back to April 12th

7  of 2012.  You were living in Kodiak then?

8      A.  Yes, sir.

9      Q.  And who were you working for then?

10      A.  That would be Tundra Plumbing.

11      Q.  And was there a particular job that you were on

12  on April 12, 2012?

13      A.  The Kodiak Coast Guard water plant.

14      Q.  Where was that located?

15      A.  Up Buskin River Road toward the golf course.

16      Q.  Is it up near the COMM Station?

17      A.  Yes, sir.

18      Q.  What kind of work were you doing up there?

19      A.  Demoing three big steel filter tanks.

20      Q.  And how long a period of time did you guys work

21  on that job?

22      A.  Over two years.

23      Q.  I want to show you a picture that's been admitted

24  as Defense Exhibit No. 310.  I think this was admitted

25  yesterday.

1          THE COURT:  Yes.

2     Q.  Do you see one of the water tanks you were

3   working on?

4     A.  Yes, sir.

5     Q.  Is that this structure right here?

6     A.  Yes, sir.

7     Q.  Can you tell us generally what were you doing to

8   those tanks?

9     A.  There was three of those tanks, I believe, and

10  they were filters for the water plant.  And we demoed

11  those and then put in four big Tonka water filters.

12    Q.  And to demo those, how did you go about doing

13  that?

14    A.  First off, they are full of sand.  We had to pump

15  them all out.  Then the bottom half is full of concrete.

16  And then we skip cut all the way around them.  And then

17  we split the tanks in half.  There is about six, eight

18  feet sticking inside the building, so we split them in

19  half and pulled them out of the building.

20    Q.  I want to talk to you about April 12th, that

21  morning.  All right.  Do you remember that morning?

22    A.  If that's the morning in question, yes.

23    Q.  And you recall that you heard about murders that

24  took place up at the COMM Station?

25    A.  Yes.

1    Q.  So I want to talk about that morning, April 12th.

2  What time did you get to the water treatment plant that

3  morning?

4    A.  In the neighborhood of 6:30.  We always get there

5  half hour for just morning coffee with the boys before

6  we start.

7    Q.  What was your position on the crew?

8    A.  General foreman.

9    Q.  And how many members of the crew did you have up

10  there working?

11    A.  I had five or six at least, if not more.

12    Q.  All right.  Was that, April 12th, going to be a

13  slow day or a busy day or do you remember?

14    A.  No, we had prepped for that day for a week or

15  two.  That was a big day.  We were pulling the tanks

16  that day.

17    Q.  All right.  So you said you got there, what,

18  about 6:30?

19    A.  In that neighborhood, yes, sir.

20    Q.  When you first arrive, are you the first one

21  there?

22    A.  I can't honestly tell you if I was or not.  We

23  all get there about the same time.  I don't know if

24  somebody was there before me or not.  I can't honestly

25  say that.

1    Q.  Now, what do you do when you first get there?

2    A.  Usually, as a rule, we have the keys to the -- I

3    have to open the building.  And then as soon as you open

4    the building inside, there is a keypad like everybody

5    has on their garage door.  I set the keypad, that opens

6    the building.  And then we basically get prepared for

7    the day, just make sure -- you got to check the

8    equipment, just what you do every morning.

9    Q.  Is there some kind of an alarm system on the

10   building?

11   A.  Yes, sir.

12   Q.  What do you have to do with that?

13   A.  As soon as you unlock the key, you got X amount

14   of time to push the code.  I think our code is real

15   easy, like 1234, or something, a construction code.

16   Q.  So that morning when you get there, before you

17   did the code to the alarm, did you do any preparations

18   for work?

19   A.  You have to call, get a burn permit, and then you

20   have to get things going, just get trucks running and

21   welders running.

22   Q.  Tell us what you actually have to do.  What do

23   you have to get running and how do you do that?

24   A.  Well, you got air compressors.  You got a couple

25   welders you got to get running.  You got to check the

oils.  Just the guys running the equipment have to check
their oils, get their equipment up and running, get
everything warmed up, get your safety gear out, make
sure you got a burn plan, fire extinguishers, things
like that.

Q.  That's all stuff that you're doing before you
turn off the alarm and start the work?

A.  No, I turn off the alarm as soon as I get there
because people have to come and go.  And then I call the
fire department as soon as I get there, because we were
usually, people that have the everyday alarm, that's the
ones the fire department does first, and then they come
and quiet your alarm.

Q.  All right.  That morning, after they quieted the
alarm, were you guys up and ready to go?

A.  Yes, sir.

Q.  What does that mean?  What did you actually start
doing right after they turned off the alarm?

A.  The idea was to pull tanks as fast as we could.
We skip cut them, so then we hook the excavator to them
with cables and safeties and all that stuff, and the
operator approves it, and then we start cutting it.  And
you just start peeling that tank backwards until you got
it open.

Q.  You mentioned something about skip cut.  Can you

1  tell us what that is?

2     A.  Well, we had been there for three or four days.

3  We got the tanks all ready, so we go around them, draw a

4  line about in the middle of them, then cut six or eight

5  feet and then leave two or three inches, and cut six or

6  eight feet and leave two or three inches for safety so

7  that tank can't roll on nobody or slide.

8     Q.  So you had done all of that before April 12th?

9     A.  Yes, sir.

10     Q.  So on April 12th, when you start work, tell us

11  what you do at that point.

12     A.  Well, basically, once the excavator is hooked up,

13  we start right where the excavator is sitting on the end

14  of the tank.  He's got his hook on there and he's

15  lifting and we just start cutting.  Then there is

16  usually one cutter and one apprentice that you cut and

17  then the guy with the sledge hammer beats it.

18        As you go down the tank, the excavator starts to

19  open up the gap and just walk through the tank that way.

20     Q.  Do you remember how many excavators you were

21  using on that job?

22     A.  If I remember correctly, there was one to pick

23  and one to jack hammer the cement out of the tanks after

24  we got the top off of them.

25     Q.  You had two different excavators then?

1    A.   Yes, sir.

2    Q.   And you mentioned the skip cuts.  And so that

3    morning, if I understand what you're saying, you're

4    going around and you're cutting the sections that hadn't

5    been cut yet?

6    A.   Yes, sir.

7    Q.   And what are you using to cut that?

8    A.   Oxygen acetylene.

9    Q.   You said something about somebody doing something

10   with a hammer.

11   A.   Beats the slag.  When you cut, these are rolled

12   tanks, they got rust inside and the water, the film or

13   whatever you want to call it inside, so as you cut, you

14   get it hot, sometimes you have to beat it to knock the

15   slag off the inside so the torch will walk through.

16   Q.   When somebody is beating on that tank with a

17   sledge -- first of all, what kind of a sledge are they

18   using?

19   A.   Five-pound, three-pound, whatever, it's up to

20   their choice.  They are good-size sledge hammers.  They

21   are not little hammers.  Usually it's a one-handed

22   hammer where somebody can stand up there and beat on the

23   tank.

24   Q.   So this is bigger than that, you need two hands?

25   A.   No.  I mean, I don't actually remember which

hammer they used that day, but they were three-, four-,
five-pound sledge hammers swinging.

Q.  What kind of a sound does it make when that tank
is being beat on with that sledge hammer?

A.  Very loud.  That tank is empty.  It's hollow.  It
rings.

Q.  Are you all wearing any kind of ear protection --

A.  Oh, yes, sir.

Q.  -- when you're doing this work?

A.  Yes.

Q.  What are you wearing?

A.  Most of us wear earplugs.  Some guys wear muffs.

Q.  And so are you trying to -- you're talking about
trying to get the top off the tank.  Were you doing this
work -- are you doing the work inside the building or
outside the building?

A.  There is very little inside the building.  The
tanks are rounded on the end like you see in the
picture.  It protrudes inside the building just a couple
of feet where the connections for the tank go to the
water plant.  Yes, there is several feet inside the
building, but 99 percent of the tank is outside.

Q.  All right.  So how soon after the alarm is turned
off do you think it was that somebody was cutting on the
tank and banging on the tank with a hammer?

1    A.  I would say instantly, but that's not a real

2  number.  I mean, as soon as she said, "Yes, you can

3  burn," I had crews working.  I mean, I can't give a

4  minute, but when she turned the alarms off, I put the

5  boys to work.  That I'm sure of.

6    Q.  And was there a reason why you wanted to get them

7  to work right away?

8    A.  We were paying Brecken because we were renting

9  all their equipment that day, and my boss was paying

10  that bill.

11    Q.  What's the equipment that was being rented?

12    A.  I believe there was two excavators.  We had a

13  lowboy to haul the tanks away.  That kind of big

14  equipment.  We don't own big equipment; we rent from

15  Brecken.

16    Q.  At some point that morning, did police officers

17  or law enforcement show up to talk to you?

18    A.  Yes, sir.

19    Q.  And did you talk to them?

20    A.  Yes, sir.

21    Q.  And did you see them talking to other members of

22  the crew?

23    A.  They basically separated us when they got there.

24  We had no idea what was going on.  They basically just

25  came in there and said, "Shut down all work," and kind

1    of just stand around, not next to each other, not miles

2    or nothing, just there's a big yard there.  They just

3    kind of went around and talked to each person.

4        Q.  After that, after the police were there, did they

5    leave and come back?

6        A.  Yes, sir.

7        Q.  What happened when -- first of all, when did they

8    come back?

9        A.  Like I said, I don't have exact timeframe, but

10   still within the morning.  I mean, not long after or

11   long like that.

12       Q.  When they came back, what happened?

13       A.  He asked us how much noise we were making.  You

14   know, we told him, and he said, "Can you repeat," or I

15   forget the exact word, but, "Can you make that noise

16   again?"  I said, "Yeah, I got two more tanks to come

17   out.  Yes, I can repeat the noise."

18       Q.  All right.  And so what did you do to repeat the

19   noise?

20       A.  We kept working and he listened, I mean, because

21   we were beating on the tanks and cutting them, and we

22   did exactly what we were doing on the first tank.

23       Q.  All right.  When you were doing that, what did

24   you see the police officer do?

25       A.  This one was talking on the radio.  Of course, by

1  then the rumors were flying.  We all kind of figured he

2  was trying to figure if they could hear us.  We had no

3  idea where anything had happened yet.

4          MR. SKROCKI:  Objection; speculation.

5          THE COURT:  That's sustained.  Go ahead.

6  That's fine.  He'll ask the next question.

7  BY MR. CAMIEL:

8     Q.  Without telling us what anybody said, did you see

9  a police officer using the radio while you were

10  replicating the sounds that you had made earlier that

11  morning?

12    A.  I would say yes.

13    Q.  How long were the police there that second time

14  to have you go through this demonstration of the noise

15  that you made earlier?

16    A.  He was talking to us four or five minutes,

17  something like that, but they were in and out all day

18  that day.

19          MR. CAMIEL:  That's all I have for you.  Thank

20  you, sir.  I think the Government attorney will have

21  some questions for you.

22          THE COURT:  Go ahead, please, Mr. Skrocki.

23                   CROSS EXAMINATION

24  BY MR. SKROCKI:

25    Q.  Good morning, Mr. Stearns.

1    A.  Good morning.

2    Q.  I'm Steve Skrocki with the U.S. Attorney's

3  Office.  How are you?

4    A.  Good.

5    Q.  Okay.  You're from Missouri?

6    A.  Yeah, just bought a retirement home there.  I

7  still work in Alaska, but I'm getting that set up.

8    Q.  Congratulations.

9        I'm going to take you back to April 12th.  You

10  seem to be a professional at what you do, sir?

11    A.  Yes, sir.

12    Q.  Okay.  And you had a big job you were going to do

13  in Kodiak with respect to these water filters?

14    A.  I couldn't hear you, sir.

15    Q.  You have a big job you were going to do with

16  respect to these water filters at the Communication

17  Station?

18    A.  Yes, sir.

19    Q.  You mentioned that you were aware of what had

20  gone on that morning?

21    A.  We had no idea what had happened.

22    Q.  Later on?

23    A.  All of a sudden the troopers showed up.  We had

24  no idea.

25    Q.  Sure, but later on you knew that two people had

 1   been murdered at the Communication Station?

 2       A.  Yeah, rumor mill was flying shortly after that.

 3       Q.  Sure.  You were asked a lot of sort of broad

 4   questions about work being started and things, and I

 5   want to focus you on what happened that particular

 6   morning, if you recall.  Okay?

 7       A.  Yes, sir.

 8       Q.  So did you trip the alarm in that water treatment

 9   plant that morning?

10       A.  No, we never tripped it.  When I listened to your

11   tape, I'm calling to get the fire alarm shut off, which

12   has to be -- I can't burn until I have a burn permit and

13   I can't have a burn permit until they secure the

14   building and the fire department knows that that

15   building is off.

16       Q.  Okay.  So you mentioned the tapes.  You were

17   interviewed by the FBI, right?

18       A.  Yeah, I think so, yes.

19       Q.  Your interview was recorded?

20       A.  Yes.

21       Q.  Sure.  I'm just --

22       A.  I don't want to use the wrong word, but, yeah,

23   that's what I think.

24       Q.  Nobody wants you to do that.  That's not a

25   problem.  But you listened to your recording this

1   morning before coming into court?

2     A.  Yes, sir.

3     Q.  And so maybe I'm under a misimpression, but the

4   alarm -- you had to call in to somebody to get

5   permission to start work?

6     A.  You have to call in to have the fire alarm shut

7   off every day.  You have to have it turned on every

8   night when you leave.

9     Q.  So you have to call in and then they turn off the

10   alarm and then you go in to start your work?

11     A.  They show up at the job and silence the alarm,

12   yes, sir.

13     Q.  Do you recall what time that happened that

14   morning when you called in and they turned off the alarm

15   for you to start your work?

16     A.  Not exact time, but according to the tape -- it

17   was on the tape.  I think I heard it.

18     Q.  What do you recall -- what do you recall that

19   was?

20     A.  I think 7-7 or something it said this morning, or

21   7:00, something like that.

22     Q.  Does that jibe with your recollection?

23     A.  Yeah, they are pretty good about being there at

24   7:00, so 7-7, we wouldn't call that late.  They have

25   other things to do too.

1    Q.  You mentioned that these tanks were pretty large

2    and you had already precut around them to some extent?

3    A.  I don't understand.

4    Q.  You mentioned these tanks, to remove bits and

5    pieces of them, you had already cut them with a torch?

6    A.  Yes.  We skip cut, yes.

7    Q.  Skip cut.  That's not something I have ever done

8    in my life, so I don't know your language.  So you skip

9    cut them.

10          And if I understand you right, the point of the

11   skip cut was to get an excavator and pull them apart?

12   A.  It's for safety so that we get 90 percent of the

13   work done before we're paying for the excavator.

14   Q.  During this work, you want to wear hearing

15   protection, right?

16   A.  Yes, sir.

17   Q.  Is that mandated by law or is it just a smart

18   thing to do?

19   A.  By OSHA it is, yes, sir.

20   Q.  All right.  Do you know Mr. Wilton Nelson?  Do

21   you remember him?

22   A.  I don't know if I do or not.  I meet a lot of

23   guys and work with them.

24   Q.  And do you recall what time the excavator showed

25   up that morning to begin this work?

1    A.  I think the first excavator was there the day

2  before and then the second one I think came in on the

3  lowboy that took the tank out, the first tank when we

4  got done.

5    Q.  And did any of the excavators get fired up before

6  7:30?

7    A.  Yeah, Chris Dietz was running them, and he fires

8  up as soon as he gets there.  He's got to get everything

9  warmed up and check oils.

10    Q.  But did any actual work on the tanks by an

11  excavator begin before 7:30 or around there?

12    A.  As soon as she gave me the burn permit -- I'm

13  sure we were hooked up waiting for her.  And then once I

14  had the burn permit, I'm sure I went to work, which I

15  can't honestly say what time that was.

16    Q.  Because, yeah, I mean you can't say honestly what

17  time you started work?

18          MR. CAMIEL:  Argumentative.

19          THE COURT:  Let's hear the question.  Go ahead.

20  BY MR. SKROCKI:

21    Q.  Can you honestly tell the jury here what time the

22  pounding work began that morning on April 12th?

23    A.  As soon as I got the burn permit, we went to

24  work.  On your tape it said what time I got the burn

25  permit, I think, and I'm sure once she gave me my burn

```
 1    permit, I said go and we started.
 2        Q.  That was 7:10?
 3            MR. CAMIEL:  Your Honor, object; he's
 4    misstating the evidence.
 5            THE COURT:  That's sustained.
 6            MR. SKROCKI:  I'm not misstating any evidence.
 7            THE COURT:  Excuse me, Counsel.  I said the
 8    objection was sustained.  Let's hear your next question.
 9            MR. SKROCKI:  Yes, Your Honor.
10    BY MR. SKROCKI:
11        Q.  Do you have any independent memory of when you
12    obtained the burn permit, sir?
13        A.  No, other than -- I wouldn't even have thought
14    about it.  Until I heard that tape this morning, I
15    wouldn't even have thought about it because it's
16    something we do every day.
17        Q.  Do you have any independent memory of actually
18    when specifically the work on those tanks started that
19    morning?
20        A.  Just the fact that I would have gone to work as
21    soon as I got it.  I mean I got a whole crew sitting
22    there standing by.
23        Q.  I think I understand.  Do you remember Martin
24    Heckerman?
25        A.  Oh, yeah, Marty, yeah.
```

1    Q.   What was his job that day?

2    A.   He was an apprentice back then.

3    Q.   Do you remember him as being a good guy?

4    A.   Oh, yeah.  I have known Marty for years.

5    Q.   Would you have any reason to disagree with him if

6    he testified --

7            MR. CAMIEL:  Your Honor, I'm going to object.

8            THE COURT:  That's sustained.

9    BY MR. SKROCKI:

10   Q.   You were interviewed by the public defenders in

11   this case, correct?  Do you remember that, an

12   investigator from the public defenders?

13   A.   When they came to Kodiak a couple months ago?

14   Q.   Yeah.

15   A.   Yes, sir.

16   Q.   You were interviewed with Marty Heckerman; do you

17   remember that?

18   A.   Yes, sir, me and Marty were working at the

19   airport together when they showed up.

20   Q.   They interviewed you at the same time, didn't

21   they?

22   A.   Once again, I would say I think so.

23   Q.   When the police came the morning of April 12th,

24   were you all interviewed separately?

25   A.   Yes, sir, he took -- you know, not real separate,

1    but he kind of stood everybody -- yes.

2            MR. SKROCKI:  That's all I have for

3    Mr. Stearns.  Thank you, sir.

4            THE COURT:  Redirect?

5                    REDIRECT EXAMINATION

6    BY MR. CAMIEL:

7    Q.  Mr. Stearns, did the FBI show up at your hotel

8    room this morning?

9    A.  Yes, sir.

10   Q.  Was it a surprise?

11   A.  No, because I had a text last night when I came

12   in that they wanted to talk to me here because I told

13   them you were picking me up, or I was supposed to meet

14   you here.  I don't know who I talked to, but they were

15   going to give me a ride, and I told that to those

16   gentlemen and they showed up and let me hear that tape.

17   Q.  Did they show you a transcript of the recording?

18   A.  No, sir.

19   Q.  Do you remember hearing a time in the recording

20   of when the tape was turned off -- excuse me, the alarm

21   was turned off?

22   A.  I think that's where I got the 7:10 or 7-7 from

23   you.  I think I did hear that.

24           MR. CAMIEL:  Your Honor, I'm going to ask to be

25   able to show the witness something to refresh his

1   memory.

2         THE COURT: I thought he just -- what does he

3   not remember, Mr. Camiel?

4         MR. CAMIEL: He said 7:07 or 7:10, and I wanted

5   to show him the transcript from the recording.

6         THE COURT: Okay.

7         (Mr. Camiel approaches witness)

8   BY MR. CAMIEL:

9    Q.  Does that -- Mr. Stearns, does that look like a

10  page -- in looking at that, does that look like part of

11  the transcript of the recording they played for you this

12  morning?

13    A.  Except I can't turn the fire alarms off. I can

14  turn -- I can turn the burglar alarm, whatever the word

15  would be, but I can't touch the fire alarms.

16    Q.  Is there a time there that helps you remember

17  what time the alarm was turned off?

18    A.  7:07.

19         MR. CAMIEL: Thank you. I don't have any other

20  questions.

21         THE COURT: All right. Anything further?

22         MR. SKROCKI: No, Your Honor.

23         THE COURT: Thank you, sir. You may be

24  excused.

25         (Witness excused)

1        (Requested excerpt concluded, proceedings

2  continued.)

3

4                    CERTIFICATE

5    I, Sonja L. Reeves, Federal Official Court Reporter
in and for the United States District Court of the
6  District of Alaska, do hereby certify that the foregoing
transcript is a true and accurate transcript from the
7  original stenographic record in the above-entitled
matter and that the transcript page format is in
8  conformance with the regulations of the Judicial
Conference of the United States.

9

    Dated this 3rd day of October, 2019.

10

11
                        /s/ Sonja L. Reeves
12                    SONJA L. REEVES, RMR-CRR
                    FEDERAL OFFICIAL COURT REPORTER

13

14

15

16

17

18

19

20

21

22

23

24

25