```
 1              UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF ALASKA
 2

 3   UNITED STATES OF AMERICA, )
                               )
 4        Plaintiff,           )
                               )
 5   vs.                       )   CASE NO. 3:13-cr-00008-SLG
                               )
 6   JAMES MICHAEL WELLS,      )
                               )
 7        Defendant.           )
     _____ )
 8

 9        PARTIAL TRANSCRIPT OF TRIAL BY JURY - DAY 13
                (Testimony of Daryl Allison)
10   BEFORE THE HONORABLE SHARON L. GLEASON, DISTRICT JUDGE
                September 25, 2019; 8:33 a.m.
11                    Anchorage, Alaska

12   FOR THE GOVERNMENT:
          Office of the United States Attorney
13        BY:  STEVEN SKROCKI
          BY:  CHRISTINA M. SHERMAN
14        BY:  KELLEY L. STEVENS
          222 West 7th Avenue, #9
15        Anchorage, Alaska 99513
          (907) 271-5071
16

17   FOR THE DEFENDANT:
          Office of the Federal Public Defender
          BY:  GARY GEORGE COLBATH
18        601 West 5th Avenue, Suite 800
          Anchorage, Alaska 99501
19        (907) 646-3400

20        Camiel & Chaney, P.S.
          BY:  PETER A. CAMIEL
21        520 Pike Street, Suite 2500
          Seattle, Washington 98101
22        (206) 624-1551
```

**SONJA L. REEVES, RMR-CRR**
Federal Official Court Reporter
222 West 7th Avenue, #4
Anchorage, Alaska 99513
Transcript Produced from the Stenographic Record

```
1              (Call to Order of the Court at 8:33 a.m.)

2              (Proceedings took place and are not included in

3    this transcript, after which, the testimony of Daryl

4    Allison transpired as follows:)

5              (Oath administered to the witness)

6              DEPUTY CLERK:  For the record, can you please

7    state your full name and then spell your full name.

8              THE WITNESS:  Daryl Allison, D-a-r-y-l,

9    A-l-l-i-s-o-n.

10              DARYL ALLISON, GOVERNMENT WITNESS, SWORN

11                     DIRECT EXAMINATION

12   BY MR. SKROCKI:

13       Q.  Agent Allison, good morning.

14       A.  Good morning.

15       Q.  Go ahead and pour your water.

16           Okay.  Please tell the jury who you work for,

17   sir.

18       A.  The FBI.

19       Q.  How long have you worked for the FBI?

20       A.  It will be 16 years in October.

21       Q.  And where are you currently stationed?

22       A.  Anchorage office.

23       Q.  Was that the case in April of 2012?

24       A.  Yes.

25       Q.  Prior to beginning your work with the FBI, could
```

1 you give the jury an idea about your background, your

2 education and other jobs you may have had?

3  A. I have a degree in accounting.  I was a CPA for

4 three years immediately after I graduated college, and I

5 was a computer programmer for another eight years after

6 that.

7  Q. And from there, you went to the FBI?

8  A. Yes, I did.

9  Q. If I could turn your attention please to April of

10 2012.  Do you recall April 12, 2012?

11  A. Yes, I do.

12  Q. Did you get a request to go do some traveling

13 that day?

14  A. Yes.  About 9:00, 9:30 in the morning, my boss

15 came to me and said there was a double homicide at the

16 Coast Guard base in Kodiak and that we would all be

17 traveling to Kodiak that day, a Coast Guard C-130 would

18 be coming to pick us up.

19  Q. And did you do that?

20  A. I did.

21  Q. Who went with you to Kodiak?

22  A. There were a number of agents from my office.  A

23 lot of them were on the ERT team.  Some of them

24 testified here this week.  There was some Coast Guard

25 agents as well.

1    Q.   And were you given a particular assignment once

2  you landed in Kodiak?

3    A.   I was the case agent, meaning I was responsible

4  for the overall investigation.

5    Q.   Why is there a need for a case agent?

6    A.   Well, someone has to be responsible.  The

7  investigation has to -- basically, that's it.  I'm

8  overall -- have overall responsibility for the

9  investigation.

10    Q.   When you landed in Kodiak, did you go -- where

11  did you go next?

12    A.   Initially, I went to the Coast Guard police

13  station where they were -- where Cody Beauford was

14  waiting to be interviewed.  I participated in the first

15  interview of him.  Well, not the first interview.  That

16  was the first interview I did there.  And then

17  subsequent to that, we went straight to the T-1

18  building.

19    Q.   The T-1 building at the Communication Station?

20    A.   Yes.

21    Q.   When you got to the T-1 building, what did you

22  first do?

23    A.   Well, the ERT team had already gone straight to

24  the T-2 building to start processing the crime scene.  I

25  went to the T-1 building and began basically liaisoning

1   with the command staff there, Commander Van Ness and

2   David Pizzurro.

3       Q.   As the case agent, once you were in the T-1

4   building, did you have an objective as to coordinating

5   the investigative activity for the next couple of days?

6       A.   It was my responsibility to coordinate the

7   investigation as the case agent, so we initially just

8   set up a command post in one of the conference rooms

9   there and took over that conference room and began

10  assessing what evidence had already been collected by

11  the troopers and the Coast Guard Investigative Service.

12      Q.   And did you have occasion -- you had other agents

13  with you, correct?

14      A.   Yes.

15      Q.   And what did you do with respect to those agents

16  that you had with you in terms of the investigation for

17  that day on April 12, 2012?

18      A.   Initially, we reviewed what information we

19  already had and we prioritized the interviews.

20      Q.   Okay.  And prior to -- specifically with

21  application to yourself, you mentioned you talked to

22  some of the command staff?

23      A.   Yes, I did.

24      Q.   Why did you do that?

25      A.   Well, we were going to be interviewing everybody

1  at the COMMSTA that day, or not -- I don't know that we

2  were going to interview them all that day, but we were

3  going to need to keep them there, have them available

4  for interviews, so I needed to get with the command

5  staff and make sure that everyone was available when we

6  needed them.

7      Q.  Were there other investigative reasons that you

8  wished to speak with the command staff?

9      A.  Well, we needed to get kind of a lay of the land

10 of the COMMSTA.  We need to understand how it operated.

11 We needed to understand the structure of the -- of what

12 went on at the T-2 building basically, the crime scene.

13 We needed to know who worked there and the command

14 structure at the T-2 building.

15     Q.  Were you aware of the deceased's names and

16 occupations at the T-2 building?

17     A.  Yes.

18     Q.  So one of them was a supervisor?

19     A.  Yes, he was.

20     Q.  So did you try to get information with respect to

21 about him and other people involved?

22     A.  Yes.  We went to his immediate supervisor, Chief

23 Scott Reckner.

24     Q.  Was Mr. Reckner interviewed?

25     A.  Yes, he was.  He was one of the first interviews.

1    Q.   Did he provide information to your investigation?

2    A.   He did.

3    Q.   What did you do with that information that you

4    obtained from Mr. Reckner and other members of the

5    command staff?

6    A.   Based on that information we determined that we

7    needed to prioritize the interview of James Wells.

8    Q.   Why is that?

9    A.   Because he had been of the -- well, as you heard

10   here, he had been having difficulties at work,

11   discipline issues.  And in addition, he arrived late to

12   work that day.  He should have been at the T-2 shop when

13   the murders occurred.

14   Q.   Did you assign anybody to undertake the interview

15   of Mr. Wells?

16   A.   Yes, I did.

17   Q.   Who was that?

18   A.   CGIS, Coast Guard Investigative Service, Special

19   Agent Sean Bottary and FBI Agent Kirk Oberlander.

20   Q.   Are you aware of the interview length and breaks

21   with respect to the interview of Mr. Wells on

22   April 12th?

23   A.   Yes.

24   Q.   What was conveyed to you as the case agent with

25   respect to those interviews during that April 12 period?

1    A.   As far as the substance of the interviews?

2    Q.   Correct.

3    A.   That Mr. Wells was being evasive and the

4  information that we were receiving from him was not

5  consistent with what we knew from what I would consider

6  irrefutable sources of information, such as the video

7  from the front gate of the base of the Communication --

8  the main Coast Guard base.

9    Q.   And with respect to the work that was going on,

10  you mentioned the Coast Guard base videos and things of

11  that nature.  Had you had occasion to be briefed on what

12  was being found elsewhere?

13    A.   Yes.

14    Q.   And did that factor into your decision, if any,

15  to continue interviews of Mr. Wells?

16    A.   Yes.

17    Q.   Why is that?

18    A.   Well, like I said, the information he was giving

19  us was not consistent with what we knew to be what I

20  would say would be irrefutable video evidence.

21    Q.   And whose decision was it with respect to the

22  interviews of Mr. Wells to keep going in, going out and

23  then ultimately concluding the interviews for that day?

24    A.   Well, ultimately, the people who were

25  interviewing at the time made the decision to at certain

points that they needed to stop the interview, come talk
to me in the command post and determine if there was any
additional information that we accumulated that they
needed to talk to Mr. Wells about and give me the
information that Mr. Wells had been giving them.

Q. At some point time, were you aware of consent to
search Mr. Wells' vehicle and cell phone?

A. Yes.

Q. Were you involved in that decision in any
capacity?

A. I don't recall if the agents asked me ahead of
time before asking him, but it's a logical step in the
investigation. And they did come to me afterwards and I
approved. And then after that, they did conduct the
searches.

Q. There came a time where a technique was utilized
with respect to Mr. Wells and some gunshot residue
testing?

A. Yes.

Q. And that was not -- that was done and described
here as a ruse?

A. Yes.

Q. Could you explain to the jury the purpose of that
and your involvement with it?

A. It was my idea. I instructed them to do it.

1  Based on the fact that -- a ruse, anything like that

2  when we're dealing with someone that we believe is being

3  intentionally evasive or deceptive, we sometimes have to

4  employ techniques that we wouldn't otherwise employ with

5  someone that we believe is being honest.  So we employed

6  that ruse to see what his reaction would be to having

7  his hands wiped for gunshot residue.

8      Q.  To your knowledge, nothing illegal about that?

9      A.  Absolutely not, and in this situation,

10  appropriate.

11      Q.  And during this period of time, were you

12  communicating with any legal authorities getting legal

13  advice?

14      A.  Yes, with the U.S. Attorney's Office in

15  Anchorage.

16      Q.  Again, not part of this trial team here?

17      A.  No.

18      Q.  Could you speak to the jury about audio recording

19  the interviews of Mr. Wells?

20      A.  At the time, the FBI did not routinely record

21  interviews.  We had to get special permission in this

22  case to audio record interviews.  We asked for blanket

23  authority to record every interview because we believed

24  in this case it was very important to have a very

25  complete record of what we were doing.

1       As far as -- well, actually, we really weren't

2   equipped even to audio record.  I actually had to send

3   agents to Wal-Mart to buy audio recorders to complete

4   these recordings.  But we were not equipped to video

5   record any interviews.

6       Q.  So you didn't?

7       A.  No, we did not.

8       Q.  Please tell the jury how long you were in the T-1

9   building on April 12th.

10      A.  I believe about 36 hours.  I don't think I left

11  for 36 hours.

12      Q.  You mentioned earlier on a command post?

13      A.  Yes.  We set up in the conference room that's

14  been discussed here before.

15      Q.  And you were in the command post the 12th?

16      A.  I was.

17      Q.  How about the 13th?

18      A.  Yes.

19      Q.  Did you have occasion to observe Mr. Wells with

20  respect to that command post on either the 12th or the

21  13th?

22      A.  Yes, I did.

23      Q.  Please tell the jury what you observed.

24      A.  As Helena Chavez has related, Mr. Wells several

25  times walked into the command post.  The door was open

at the time.  He walked in and was kind of looking
around.  We attempted to ask him if there is something
he needed and kind of ushered him out.

We were concerned -- we actually did have
firearms in the room, which is one of our main concerns.
They were locked in Pelican cases, but we didn't really
want people walking around in the room.  That behavior
was inconsistent with everyone else at the COMMSTA that
day.  Most of them were very respectful, came to the
door if they needed something and allowed us to address
them first.

After that happened a couple of times, I closed
the door and taped a folder over the window.  Shortly
thereafter, Mr. Wells burst into the room, and that's
the only way I can describe it, and grabbed something on
the table.  I believe it was food or something like
that.

Q.  Did you have occasion to discuss or talk to him
when he burst into the room, as you described it?

A.  I attempted to ask him if he was having medical
issues maybe with his diabetes.  The response I got was
mumble.  I really didn't understand what he said, and we
kind of ushered him out again.

Q.  Do you recall other food being present outside of
the command center?

1    A.   There was food everywhere.  The main Coast Guard

2  base had sent over box lunches for everyone at the

3  COMMSTA.  It was literally everywhere.  Most of it was

4  unopened and I think ended up getting thrown away.  It

5  was on tables in the hallway.  It was in all the common

6  areas.

7    Q.   When did you, as the case agent, first become

8  aware of the nail in the tire that Mr. Wells brought to

9  the Communication Station in the back of his truck?

10   A.   It was that night when Special Agent Oberlander

11  and Bottary searched Mr. Wells' truck.

12   Q.   At some point on the 12th or the 13th, did you

13  have occasion to instruct in the creation of search

14  warrants?

15   A.   Yes.

16   Q.   With respect to what?

17   A.   We applied for search warrants for Mr. Wells'

18  home and his white truck and his blue SUV.

19   Q.   How did the blue SUV factor into your decision at

20  that time?

21   A.   Well, Mr. Wells had access to that SUV during the

22  time that the murders occurred.  Based on the video from

23  the front gate of the base, we saw his truck headed

24  toward the airport.  Subsequent to that, we saw the blue

25  SUV arrive and depart from the T-2 building.  And then

1    after that happened, we see Mr. Wells' truck again

2    driving back toward his home.

3        Q.  As a case agent, FBI agent, have you had occasion

4    in your career to apply for search warrants?

5        A.  Many times.

6        Q.  Can you just give the jury an overview about what

7    you have to do with respect to applying for a search

8    warrant and who ultimately is the one approving those?

9        A.  We have to write a document called an affidavit.

10   It lays out the facts of the case and attempts to

11   establish to the judge that we have probable cause to

12   believe that evidence will be found in a very specific

13   location.

14           We present that to a judge and he just reviews it

15   to determine if we have probable cause, and if we do,

16   they'll sign it and grant us the search warrant.

17       Q.  And when you make application to the judge for a

18   search warrant, do you have to be precise as to the

19   things you're looking for based on the probable cause

20   you've articulated in the affidavit you mentioned?

21       A.  Yes, you have to very precise about what you're

22   looking for and where you think you're going to find it.

23       Q.  Sometimes does that -- in this case in

24   particular, did that permit searches of the entire

25   Wells' residence?

1    A.   In this case, yes.

2    Q.   Can you describe for the jury the size of the

3    Wells' residence?  You participated in these warrants,

4    correct?

5    A.   Yes.  I have heard it described here and I

6    believe it's accurate; about 3,000 square feet.  There

7    is a garage with, I guess, an apartment above -- I don't

8    know apartment, but a room above the garage.  The

9    residence basically extends to that room over the

10   garage.

11        There is an upstairs as well where the bedrooms

12   are.  There's a significant amount of crawl space

13   underneath the residence as well.

14   Q.   With respect to Mr. Wells' white Dodge pickup, do

15   you recall when that was seized by the investigation?

16   A.   We seized it on the 13th.

17   Q.   You've heard testimony that there was a concern

18   by Mr. Wells that maybe the FBI was in his driveway the

19   night of 12th.  Was that the case?

20   A.   That's not accurate.  We were not.  To my

21   knowledge, no one drove up in his driveway.

22   Q.   Was he under surveillance at that time?

23   A.   Up until about 3:00 a.m. in the morning we had

24   somebody out on the street in front of his house.

25   Q.   With respect to the work that you were doing as

 1  case agent on the 12th and the 13th, did you have

 2  specific priorities and/or concerns that you were trying

 3  to mitigate?

 4      A.   Primarily, it was public safety.  Two people had

 5  been murdered, so that was our first concern is public

 6  safety to make sure there were no more murders.  I'm

 7  sorry.  What was the --

 8      Q.   Did those, the public safety aspect, factor into

 9  your decision-making process on the 12th and 13th?

10      A.   As far as surveillance?

11      Q.   All of your decisions.

12      A.   Well, yeah, it did.  That was our primary concern

13  was to make sure no one else got killed.

14      Q.   How about in terms of your investigative

15  decisions?  You lost that part.  Let me rephrase it.

16          You mentioned that public safety was your primary

17  concern?

18      A.   Yes.

19      Q.   Did you have investigative concerns with respect

20  to the work that you were doing on 12th and 13th in

21  terms of evidence collection or otherwise?  Still not

22  tracking?

23      A.   No.

24      Q.   I'll move on to something else.

25          Why was Mr. Wells' home put under surveillance?

1    A.   Well, Mr. Wells was put under surveillance

2  initially.

3    Q.   Fair enough.  Please explain, why was that?

4    A.   Well, I mean, based on his evasiveness in the

5  interview, you know, and the facts that we were

6  gathering from the video, the fact that we found his

7  wife's vehicle at the airport, he had access to it

8  during the time of the homicides, he was a logical

9  suspect at the time.

10    Q.   Where was his wife at that time?

11    A.   His wife was in Anchorage.  She had been there

12  since the Tuesday and the homicide occurred on a

13  Thursday, so she flew to Anchorage on Tuesday for a

14  conference.

15    Q.   I want to jump ahead time-wise.  We'll come back

16  to some other things in a moment.

17         Do you recall around what time, what date Mr.

18  Wells was arrested?

19    A.   He was arrested in February of 2013.

20    Q.   February 2013?

21    A.   Yes.

22    Q.   With respect to your investigation, when, in your

23  view, did your investigation cease?

24    A.   All substantive investigative steps were

25  completed by April of 2014.  In preparation for this

1  trial, starting probably a year ago, we began

2  re-interviewing witnesses just to make sure we have

3  consistent statements from them.

4       Occasionally, one of them might say something a

5  little different than they said it before or something

6  new might come up, but all substantive investigation

7  stopped in April of 2014.  The last search warrant we

8  executed was September of 2013.

9       Q.  Let's talk about some of those warrants just

10  briefly.  There was discussion that you know of and

11  heard in court with respect to searching the hillside

12  next to Mr. Wells' home?

13       A.  Yes.

14       Q.  What was that search for and why was it done?

15       A.  We had learned through the investigation that Mr.

16  Wells used to do target practice into the hillside next

17  to his house with his firearms.

18       Q.  So what were you looking for?

19       A.  Bullets.  Bullets that might be able to be

20  matched to the bullets from the crime scene.

21       Q.  None were located, correct?

22       A.  None were located that were suitable for

23  comparison.  Well, I'm sorry.  There was two that were

24  actually suitable for comparison that were .44 Magnum

25  caliber.  Those two did not match the bullets from the

crime scene.

Q.  Overall, the number of warrants for Mr. Wells'
home was for how many?

A.  I believe there were nine.  Two of those warrants
were actually executed simultaneously.  While we were at
the residence executing one of the warrants, we
developed probable cause to seize something else.  In
this case, it was Mr. Stein's swords.  So there were
nine warrants, but two of them were executed at the same
time.

Q.  Did each of those, to some extent, have an
independent basis to search for something else?

A.  Yes, they did.  As the investigation progressed,
we would develop probable cause to look for additional
items that we did not know we needed to look for in the
previous searches.

Q.  So that's why another warrant was obtained?

A.  Yes.

Q.  Did you yourself participate in some of those
searches?

A.  Yes, several.

Q.  I want to talk about one search in particular,
then move on to some other aspects of your investigation
in a general sense.

        If we can have the lights, please.  If you could

1  for identification 151 and 152, Blair.

2      Do you see Exhibit No. 151, Agent Allison?

3   A.  Yes.

4   Q.  If you can go to 152, Blair.

5   A.  Yes.

6   Q.  Were these two items depicted in 151 or 152

7  seized by the FBI pursuant to search warrants that you

8  are aware of and/or conducted?

9   A.  Representative samples of these items were

10  seized, yes.

11   Q.  Are those photographs accurate depictions of what

12  was in the home at the time?

13   A.  They are.

14      MR. SKROCKI:  Move for 151 and 152.

15      MR. COLBATH:  I have no objection.

16      THE COURT:  Those are admitted.

17      (Exhibit No. 151 and No. 152 admitted.)

18  BY MR. SKROCKI:

19   Q.  If we can publish 151, Blair.

20      Agent Allison, the photograph of two bags, do you

21  see those?

22   A.  Yes.

23   Q.  What did they contain?

24   A.  Nails.

25   Q.  Why were those photographed?

A.   At the time we were executing a search warrant

for nails.   Basically, after we received the analysis

from our lab regarding the nail that was in the tire, we

went back to search for nails that were similar to the

ones that were found in the tire.

Q.   152.   The same question, why is that -- why was

that photographed?

A.   Same reason.   We were there searching for nails

that were similar to the ones found in Mr. Wells' tire.

Q.   Blair, if we could enlarge that section there,

please.

Those were nails you felt consistent with the one

in the tire?

A.   Yes, we took a sample of ones that we felt were

consistent.

Q.   Thank you, Blair.

If we could have Exhibit No. 105, which I believe

has been admitted.   Thank you.

I want to ask you some questions, Agent Allison,

with respect to vehicle identification and/or

elimination as we were looking at 105 here.   This is an

attempt to do what, sir?

A.   To account for all the vehicles seen on the video

from the T-1 camera around the time of the homicides.

Q.   And there were some questions that were posed to

various witnesses about Coast Guard vehicles.  Do you
have information as to the work that was done to
eliminate Coast Guard vehicles that may not have been
registered on Kodiak or elsewhere?

    A.  Yes.  We depended on the Coast Guard
Investigative Service agents that were stationed at the
Coast Guard base.  It's the largest Coast Guard base in
the country, but it's still very small relative to your
average military base.

        So the Coast Guard Investigative Service agents
there were pretty much familiar with most of the
vehicles coming in and out of there and they would be
able to determine whether there was any similar
vehicles.  Over a period of time, they would be able to
determine whether there is any similar vehicles on the
base.

    Q.  Did they ever report back to you of any
similarities they observed?

    A.  They did.  The one they found actually, the
person had transferred there after the homicide.

    Q.  We can take that down, Blair.  If we could have
the lights.

        So with respect overall to your investigation,
Agent Allison, did you utilize the FBI forensic labs?

    A.  Yes.

1    Q.  Please tell the jury what divisions you utilized

2  for this investigation.

3    A.  The fingerprint unit, the DNA unit, the

4  mitochondrial DNA unit, the hair and fiber unit.  We

5  utilized the special projects unit for some of the

6  diagrams that you've seen here.

7    Q.  And had they come up --

8    A.  I'm sorry.  The firearms and tool marks unit as

9  well.  Brett Mills testified yesterday from that unit.

10    Q.  If anything in furtherance of your investigation

11  had been discovered, the jury would have heard about

12  that?

13    A.  Yes.

14    Q.  Let's talk about interviews that the

15  investigation conducted.  Are you aware as to the number

16  of interviews and the method, manner and means of the

17  interviews conducted during the course of this

18  investigation?

19    A.  Yes.

20    Q.  Can you please tell the jury the results of that

21  and the number that were conducted?

22    A.  The number was, by my count -- I didn't count

23  them all.  There was too many.  But it was over 700.

24    Q.  How many of those 700 interviews that you

25  conducted -- that the investigation conducted were

1   recorded?

2       A.   About 350.

3       Q.   With respect to vehicles that were looked at

4   and/or identified, how many vehicles were investigated

5   pursuant to this investigation on Kodiak?

6       A.   So we did a search, we began a search looking for

7   similar vehicles.  We limited it to Rav4s, Ford Escapes

8   and Honda CR-Vs.  We obtained a list of all the vehicles

9   registered on Kodiak, which was thousands.

10          We narrowed it down to those three types of

11  vehicles.  And we initially began looking for all of

12  them.  I believe ultimately we ended up interviewing

13  about 350 owners of vehicles to determine where they

14  were that day, if they had any association to the

15  COMMSTA.

16          Subsequent to that, after just talking with Neil

17  Schmidt, who you've heard from, we actually included the

18  Hyundai Santa Fe in that list and went and looked for

19  the owners of those as well.  Ultimately we ended up

20  limiting the scope of the vehicle search to just blue

21  and shades of blue since it was obvious to us that it

22  really, it was a blue vehicle.

23          Initially, the 350 that we -- or the number we

24  initially started with we were looking for everything.

25  It didn't matter what color, but the vehicle is clearly

 1    not white, it's not red, so we limited the scope.  And

 2    ultimately there was approximately 120 of those, and I

 3    think we accounted for all but about four of them.

 4        Q.  Now that all was not done overnight, was it?

 5        A.  No, it was not.

 6        Q.  How long?

 7        A.  Oh, we initially -- I and a number of other

 8    agents went to Kodiak for a week, maybe two, and we got

 9    -- found a lot of them, and then the rest of it went on

10    for months.  I mean occasionally -- months, I guess, we

11    would continue searching.

12        Q.  Was there a questionnaire that factored into this

13    search?

14        A.  There was two, yes.

15        Q.  If we could have the lights, please.  And, Blair,

16    if you could pull up for identification 218.

17            Do you recognize this document, Agent Allison?

18        A.  Yes.

19        Q.  And what is that, just in a general sense?

20        A.  This is actually the questionnaire that we used

21    when interviewing the employees at the COMMSTA.

22        Q.  Okay.  And there were other questionnaires that

23    were submitted by the investigation to other people,

24    correct?

25        A.  There was two other questionnaires that we used

1    during the search for the vehicles to get a -- in order

2    to have some consistency between interviews.

3         Q.  Can you explain that to the jury, please, why

4    that would be important.

5         A.  Well, not everybody that knows the case as well

6    as I do or some of the other Coast Guard agents that are

7    working it, so we wanted to give them a consistent set

8    of questions that even if they weren't as familiar with

9    the investigation they would be able -- we would be able

10   to get somewhat the same information, but this

11   questionnaire wasn't really to be limiting.  It was just

12   a starting point, so if something -- the person said

13   something of interest, the agents were free to delve

14   into that and get more information if they thought it

15   was appropriate.

16        Q.  With respect to the questionnaires that you

17   mentioned there were approximately three of them, who

18   was doing the filling out of the form?

19        A.  It was the agents.  The agents were actually

20   doing the interview and filling out the forms.

21        Q.  Is this Exhibit No. 218 an example of one with

22   reference to the COMMSTA?

23        A.  Yes.

24             MR. SKROCKI:  We would move for admission of

25   218.

1      THE COURT:  Any objection?

2      MR. COLBATH:  No.

3      THE COURT:  218 is admitted.

4      (Exhibit No. 218 admitted.)

5  BY MR. SKROCKI:

6      Q.  What was the purpose investigatively for a

7  questionnaire for employees at the Communication

8  Station?

9      A.  Well, the purpose of the questionnaire is to

10  provide consistency between the questions, between the

11  questions we were asking to them, but, obviously, the

12  questions themselves each had their own individual

13  purposes.

14      Q.  Yes.  Were you involved in the drafting of these

15  questionnaires?

16      A.  I approved it and I provided input.  It was my

17  decision whether or not to deploy this questionnaire.

18  This is actually not the first draft.  I rejected some

19  of the questions that were initially brought to me.

20      The first draft of this actually had questions

21  specific to Mr. Wells on it.  I had those removed

22  because I thought it was a little early in the

23  investigation to be concentrating just on Mr. Wells.  I

24  wanted to keep a broader scope to the investigation.

25      Q.  How come?

A.   Well, we have to keep an open mind.   Just because
we have some evidence that implicates one person, we
can't rule out everyone else.   We have a duty to be
objective and to continue the investigation, have a
broader scope and try to collect as much information as
we can.

Q.   Okay.   Can we have the lights for just a few more
minutes.

A couple of questions with respect to other
aspects of the investigation, Agent Allison.   To your
knowledge, is there any, or was there any at the time,
April 2012, surveillance at the Kodiak airport, video
surveillance of the outside area?

A.   Outside?   The only video that we could find that
captured anything outside the outside area of the
airport was inside of the Alaska Air cargo terminal.
There was a camera inside that was focused on the front
desk.

It's purpose was not to capture the outside, but
it did capture a little bit of the parking lot, maybe a
few feet of the parking lot outside the window, but that
wasn't the purpose of the camera.   And depending on
lighting, sometimes you couldn't even see out of it.
There was a glare out of it.

Q.   Your investigation didn't find an omnidirectional

1  camera that captured the entire parking lot?

2      A.  No, there was nothing like that at all.

3      Q.  Did your investigation ever locate the murder

4  weapon?

5      A.  No.

6      Q.  Could you advise the jury about the steps that

7  your investigation took to try to locate the murder

8  weapon?

9      A.  We really didn't have anything indicating where

10 that weapon would be, so there were several just kind of

11 ad hoc searches where we thought, well, maybe it was

12 here, we'll go look there.

13      There was a -- just by chance close to the time

14 of the murder the Coast Guard had organized several

15 clean-up operations for like the side of the road, it

16 was April, the snow had been melting.  So kind of like

17 they do here, they were going to go out and clean up the

18 road, so we sent -- some of the people that organized

19 that search wanted to help so they suggested that they

20 might search for the weapon as well.

21      So we sent agents out with those different groups

22 of people just to be there just in case they found

23 something, but really we didn't have anything directing

24 us to a specific location to look for the weapon.

25      Q.  And with respect to the search of Mr. Wells'

1  home, you didn't find the murder weapon, being a .44

2  Magnum possible Smith & Wesson in his home?

3      A.  No.

4      Q.  I want to go back to something with respect to

5  Mr. Wells' interviews by Agent Bottary and Agent

6  Oberlander briefly.  Do you recall in the interview the

7  request to go back to Mr. Wells' home to get medicine

8  and being driven there by the agents?

9      A.  Yes.

10     Q.  Were you advised of that plan?

11     A.  After they suggested it to Mr. Wells, I was.

12     Q.  Tell the jury what you did once you heard that.

13     A.  I told them we were not doing that.  I thought it

14  was overly intrusive and unlikely to yield anything of

15  value.

16     Q.  Do you know -- I'm going to switch back to the

17  firearm piece real quick.

18         Do you know who the Penningtons are?

19     A.  Yes, I do.

20     Q.  Who are they?

21     A.  Friends of the Wells'.

22     Q.  They provided some assistance to the

23  investigation concerning some firearms?

24     A.  They did.  We learned that Mr. Pennington is very

25  prolific in his acquisition of firearms.  He had quite a

few of them.  We also learned that he had several .44
Magnums.

     We requested from Mr. Pennington that he allow us
to search his home.  He consented to that.  During that
search, we found two Smith & Wesson model 629 revolvers.
We had those tested and they did not match the bullet
from the crime scene.

Q.   You called that a consent search?

A.   Yes, it was a consent search.

Q.   You asked him and he said yes?

A.   Yes.

Q.   How did John Stein come to the attention of the
investigation?

A.   We were conducting what we call a public records
database search, which comes from things like phone
records, financial records, you know, property records.
And during that -- it was just a computer search.  We
just go type in the -- I think we just went and typed in
the Wells' address.

     And Mr. Stein came up as someone that had listed
the Wells' address as his residence at some point in
time.  So I sent a lead to our Tacoma office.  Once I
located Mr. Stein, where he was, I sent a lead to our
Tacoma office to go interview Mr. Stein.

Q.   And that's how the investigation became aware of

1    that missing .44 caliber Smith & Wesson stainless steel

2    revolver?

3        A.  Yes, it is.

4        Q.  I'll turn your attention to some work you did

5    yourself with respect to the Kodiak Coast Guard main

6    base station video camera.  Did you do some work with

7    respect to that camera and the timing of it?

8        A.  Yes, I did.

9        Q.  If we could have Exhibit 80, which I believe has

10   been admitted.

11        Are you familiar with that, Agent Allison?

12        A.  Yes, I am.

13        Q.  If we could also put next to it Exhibit 81,

14   please.  Thank you, Blair.

15        Do you have your laser pointer there, Agent

16   Allison?

17        A.  I do.

18        Q.  Can you explain to the jury the work that you did

19   in connection with the verification of the clock on the

20   main base station Kodiak camera?

21        A.  So it was pretty important to us to determine

22   exactly what the timing difference was on this camera

23   because clearly it was not accurate.  It was -- we

24   determined it was consistent, but not accurate.

25        So the first photo here, this is a screen shot of

the video player that I was reviewing footage on.  So in

order to determine -- what I believed I needed to

determine was the time difference before the first time

we see Mr. Wells' truck that day and the time difference

after the all events that day had occurred, including

Mr. Wells driving back to his home, back to the COMMSTA

after the homicides.

So as I was reviewing the video from the day of

the homicide, April 12, I came across this image here.

Now, something I think we need to point out though is

there's two times on this video player.  There is a time

right up here and there is also a time down here that's

circled in red.  What's important to realize is this

time here is actually --

Q.  Can we enlarge this for you?

A.  Please.  This is the current time on the computer

that you're looking at the video on.  So I was reviewing

this video March 21, 2013 at 4:26 p.m.  So that's what

this time is the upper right-hand corner.  It's always

going to be the current time that your computer thinks

it is right now.

Q.  Can you back out of that, Blair.  Go ahead.

A.  The time down here that's circled in red, that's

the timestamp of the video that you're reviewing.  So if

you notice this is April 12, the date of the murder, at

5:36 a.m., before the first time we ever see Mr. Wells'

truck on the video.

Q.   Okay.  Done now?

A.   No, not quite.

Q.   Go ahead.

A.   I think it's important to realize what this photo

is.  This video is just a still of the desk that the

Coast Guard police officer who is on duty that day is

where they sit.  So it's enclosed in glass.

This door here that you see in the background,

that's the front door to the Coast Guard police station.

And this is actually the monitor here is the one we're

looking at over here.

So what we're looking at here is video from a

camera that's behind that officer.  So this is the glass

here that separates him from the people coming in.  So

also located on that same wall that that video camera is

is a lock, which is circled in red here.

So if you notice, it's a reflection, so,

obviously, the numbers are going to go counterclockwise

in this instance.  This is 12, 1, 2, 3, 4, and between 5

and 6, you will notice the hour hand is between 5 and 6.

So it's between 5:00 and 6:00 a.m., and the minute hand

is between 3 and 4, closer to 4.  It's about 5:18,

according to that clock.

1       If you go back and you look at this clock here,

2   the timestamp, that's the time the computer thought it

3   was, it's 5:36.  That's our 18-minute time difference.

4   So the computer was 18 minutes ahead of that clock on

5   the wall.

6       Q.  Did you take another step to verify the accuracy

7   of the time you believe it to be?

8       A.  I did.  So after -- so that was before Mr. Wells'

9   truck ever passed the front gate.  That was the 5:36 in

10  the morning, or actually 5:18.  The computer just

11  thought it was 5:36.

12      So on the right here what we have is a photo that

13  Special Agent Andersen took with her iPhone.  This is

14  again --

15      Q.  Do you want that one up by itself?

16      A.  Yes, please.  So again, we have two timestamps.

17  This one down here is the timestamp of the video we're

18  reviewing, which in this case is not relevant to the

19  situation.

20      What we're trying to determine is, again, how far

21  off the current time is, and, again, this is the current

22  time from the computer, the time in the upper

23  right-hand.  So enlarge that.  We could see what that

24  is.  It's 9:07 p.m. on the 12th.

25      Okay.  So now this inside window here -- again, I

think it's important to understand what that is.  This
is actually a screen shot from my computer at work.  You
notice the Windows start bar and all the different
programs I have got loaded up here.

What's taking up the rest of that frame is that
photo from Special Agent Andersen.  If you look at this
inset here, what that is I opened that image that we're
looking at it in the background and a text editor.  It's
Note Pad, it comes with Windows.  What that is showing
is that the timestamp that's on the photo -- so any time
you take a photo your iPhone or really any digital
camera, it embeds information into that photo.  Usually
one of the things it embeds, and in this case it was, is
the time you took that photo.

So Special Agent Andersen took this photo at
8:49 p.m. the day of the murder.  And that time -- your
phone is probably the most accurate timepiece you have.
It gets that time from the cellular network.  And the
cell phone providers spend a lot of money making sure
that time is accurate because their system functioning
depends on that time being accurate.

So we can be very certain this is an accurate
time.  If you compare these two times, it's about 17
minutes and 47 seconds difference.  That's how we
established that the time difference before the first

1  time we see Mr. Wells' truck is approximately 18

2  minutes.  And we have a very definite -- we're very

3  definite at this point in time, at 9:00 at night, it's

4  17 minutes and 47 seconds.

5     Q.  Can we have the lights, please.

6        A couple of other things before we conclude here,

7  Agent Allison.  There were some diagrams I believe

8  yesterday and during the trial that were prepared at the

9  Communication Station and that showed one blue truck.

10       Do you remember that diagram?

11    A.  Yes.

12    Q.  And why only one blue truck?

13    A.  I believe what happened, just based on what I

14  know from FBI searches -- well, first of all, I believe

15  that diagram was prepared by our lab, the special

16  projects unit at our lab.  And they prepare those

17  diagrams from different things that we send them, such

18  as photos.

19       So based on what I know from those photos, it

20  appears that the vehicles in that photo were taken from

21  what we call an exit photo from the scene, meaning when

22  we go into a scene we take pictures of everything just

23  to show how it was when we walked in.  When we leave, we

24  take pictures of everything as we left it.  We do that

25  in every search.

          So what it appears to me happened there is that
those vehicles were moved.  Ms. Hopkins -- the Hopkins
family has only one vehicle.  She requested before we
were done with the crime scene that she be allowed to
take that vehicle.

Q.  Did you let her do that?

A.  We did.  We searched the vehicle and then gave it
to back to her.

Q.  During April 12th?

A.  12th and 13th, before we were probably done with
the crime scene.  I know before we were done with the
crime scene.

          The other two vehicle out there belonged to Aaron
Coggins and Leah Henry.  They were also moved at some
point.  So it appears to me that that diagram was
constructed using an exit photo after those vehicles had
been moved.

Q.  With respect to other aspects of your
investigation, what did the investigation do concerning
the victims in this case and background work?

A.  It's important in a homicide like this that you
investigate background of the victims; friends, family,
associates were interviewed.  We reviewed financial
records looking for any anomalies or any person that
might know of somebody that wanted to do harm to these

1    people.

2        Q.   How about electronic information?

3        A.   Their computer profiles at work were looked at as

4    well.

5        Q.   How about e-mails?

6        A.   Yes.

7        Q.   At one point in time during the investigation did

8    you issue a press release?

9        A.   A couple of times, I believe.

10       Q.   For what purpose?

11       A.   The first time was just looking for general

12   information, anybody that had information about the

13   homicides could call the FBI.

14       Q.   And what about canvassing other police

15   departments in the state?

16       A.   Yes.  We sent out requests to all the police

17   departments in the state that if they had come across

18   any .44 Magnums in their investigations to please turn

19   them over so that we could test them to see if the

20   bullets matched the bullets from the crime scene, and

21   none of them did.

22       Q.   Did the investigation request information on .44

23   Magnums from retail outlets in the state?

24       A.   Yes, we did.  We got records from all of the

25   major gun retailers in the state, including Wal-Mart,

the Post Exchanges on base, a lot of gun stores here in

town.  And I honestly don't remember the timeframe in

which we looked, but we had a number of Coast Guard

agents who pored over these records for weeks looking

for any .44 Magnum that was sold within whatever the

timeframe was.  It was a long time.  And they would

attempt to contact the person that bought that weapon to

see if they had any connection with the COMMSTA or they

had sold that weapon to someone who may have a

connection to COMMSTA or Kodiak.  They spent weeks doing

that, and we didn't find anything.

Q.  Were those follow-ups done?

A.  Pardon?

Q.  Were those follow-up interviews done with

specifics as to what was found from these retail store

disclosures?

A.  Yes.  These people were called and requested

information from them, yes.

MR. SKROCKI:  That's all the questions I have

for Agent Allison, Judge.

THE COURT:  All right.  Then why don't we take

our morning break now and come back in 15 minutes.

Please leave your notepads here.  Remember my admonition

not to discuss the case, and we'll go off record at this

time.

1          (Recessed from 9:58 a.m. to 10:15 a.m.)

2          (Jury present)

3          DEPUTY CLERK:  All rise.  Court is again in

4    session.

5          THE COURT:  Please be seated, everyone.

6    Mr. Colbath, whenever you're ready, go ahead, please.

7                    CROSS EXAMINATION

8    BY MR. COLBATH:

9      Q.  Good morning, Mr. Allison.

10     A.  Good morning.

11     Q.  Could we have Defense Exhibit -- Mr. Allison, you

12   mentioned during your testimony there that a couple of

13   press releases were issued during the course of the

14   investigation, correct?

15     A.  Yes.

16     Q.  All right.  And I'm going to show you what has

17   been marked Defense Exhibit No. 2 and ask if you have

18   reviewed that or seen that?

19     A.  I don't know if I saw this one in the Kodiak

20   Daily Mirror.  I definitely knew it was issued.

21          MR. COLBATH:  Your Honor, I'm going to move to

22   admit Defense Exhibit No. 2.

23          MR. SKROCKI:  No objection.

24          THE COURT:  No. 2 is admitted.

25          (Defense Exhibit No. 2 admitted.)

BY MR. COLBATH:

Q.   So what's the date on that?

A.   April 23, 2012.

Q.   And the four vehicles depicted belong -- first of all, actually, that's pictures of two different vehicles, right, two pictures each?

A.   Yes.

Q.   Those are the Wells' vehicles?

A.   They are.

Q.   And those were photos provided to the Kodiak Daily Mirror by the FBI?

A.   Yes.

Q.   And these were, to your knowledge, the only photos and the only vehicles that the FBI provided to the Kodiak Daily Mirror at any time during the investigation to seek public assistance about it?

A.   These were the only two vehicles that we had any reason to believe were involved in the homicides.

Q.   My question was:   These are the only two vehicles that you provided pictures of to the Kodiak Daily Mirror?

A.   The answer is yes, that's correct.

Q.   And in addition to this, the FBI issued its own press release, correct?

A.   Yes, I believe so.

Q. Okay. Let's look at Defense Exhibit No. 3. And maybe blow that up a little bit. It's hard to read on the screen there.

Are you familiar with this, Mr. Allison?

A. I don't know that I saw this before it was issued, but I definitely approved the -- its issuance.

MR. COLBATH: Your Honor, I'm going to move Exhibit No. 3, Defense Exhibit No. 3.

MR. SKROCKI: No objection, Judge.

THE COURT: No. 3 is admitted.

(Defense Exhibit No. 3 admitted.)

BY MR. COLBATH:

Q. Can we blow up the body of that, the language part of it or the writing part of it.

And this was issued -- actually, prior to the other one, this one was issued on April 20th?

A. Yes.

Q. And who is Kevin Donovan or who was Kevin Donovan?

A. He was one of the two assistant special agents in charge of the Anchorage office.

Q. So that would have been a supervisor of yours at the time in April of 2012?

A. My boss's boss.

Q. And how was this issued? In other words, where

1   was this posted or where was this communicated to the

2   public?

3       A.  This appears to be from our website, the FBI

4   website.

5       Q.  And then if you can take down the blowup part.

6   Again, those are the same vehicle photos that we saw in

7   the last exhibit with the Kodiak Daily Mirror?

8       A.  Yes, they appear to be.

9       Q.  That's fine.  You can take those down.

10          I want to talk to you a little bit about this --

11  the day of April 12th and the work there.

12          First of all, when you and the group of agents

13  were dispatched to Kodiak, you were able to collect all

14  of the equipment you needed or that you anticipated you

15  might need and get that out to the Air Force base in

16  anticipation of your trip to Kodiak, correct?

17      A.  We took everything that was available to us that

18  we thought we would need.

19      Q.  Okay.  And that included a vehicle of your own.

20  I mean, you, all the agents, a vehicle, everything, were

21  able to drive right onto a C-130 and get down to Kodiak?

22      A.  Yes.  We had either a Tahoe or a Suburban that

23  was being used by our evidence response team.  It had a

24  lot of their equipment in it.

25      Q.  And then once you were down at the Communication

1    Station after you spent your time at the -- well, you

2    spent your initial time at the Coast Guard police

3    department it sounds like?

4        A.  It was probably about 30 minutes at the Coast

5    Guard police department.

6        Q.  And they had agents that joined your

7    investigation or you were working jointly with them as

8    the investigation started?

9        A.  The Coast Guard police department was assisting

10   us with security at the crime scene, things like that,

11   but they are not an investigative agency.  The Coast

12   Guard Investigative Service was assisting us with the

13   investigation.

14       Q.  So that's two different groups, Coast Guard

15   Investigative Service as well as the Coast Guard -- the

16   regular Coast Guard police?

17       A.  Yes, those are two separate groups.

18       Q.  And so you had both now manpower and then other

19   resources, if needed, that they could contribute to the

20   investigation?

21       A.  That day, there was about three Coast Guard

22   Investigative Service agents there.  There was only one

23   that was permanently stationed there that day.  There

24   was two assigned to that office.  One was out of town.

25   And I believe two more came with us on the C-130.

 1    Q.  And when you -- after your time at the military

 2 police office, you went up and staged at T-1 building at

 3 the COMMSTA, right?  And that's when the command post

 4 was set up?

 5    A.  Yes, that's correct.

 6    Q.  As the interview processes occurred, it was

 7 around 7:00 p.m. in the evening when Mr. Wells was first

 8 interviewed, correct?

 9    A.  I don't recall the time.

10    Q.  Okay.  It was apparently -- now, during the

11 course of this investigation, how many reports have you

12 written, do you think, Mr. Allison?

13    A.  I have no clue.

14    Q.  Countless?

15    A.  A lot.

16    Q.  Dozens?

17    A.  A lot.

18    Q.  Dozens you would say?

19    A.  Yes.

20    Q.  All right.  It was sometime after Mr. Wells --

21 the first time that Agent Bottary and Agent Oberlander

22 had interviewed Mr. Wells that Mr. Wells entered the

23 conference room and took this food off the table that

24 you described, wasn't it?

25    A.  I'm sorry.  Can you repeat that?

Q.  Sure.  It was sometime after that initial evening interview with Mr. Wells that he walked in the conference room and took this food off the table that you described?

A.  I believe that's correct, yes.

Q.  Because you asked him about his medical condition, and it was during that first interview that he had told agents about his medical condition, so it had to be well into the evening?

A.  Yes, that makes sense.  Yes.

Q.  And other than to take the food from the room, Mr. Wells did not take anything else from the room, certainly?

A.  No, we approached him immediately, because it was so out of the ordinary that he would burst into the room like that, and I wouldn't say confronted him, but asked him about why he was in there and we kind of escorted him out.  We didn't push him, but I think he got the point that he needed to leave.

Q.  By then you said you had prioritized an interview on him.  He was at least a partial, a seriously partial focus of your investigation.  Did I hear you right?

A.  We prioritized the first interview of him, and yes.

Q.  And you didn't make any law enforcement report

1  about him bursting into the conference room or record

2  that in any fashion, in any written fashion, did you?

3      A.  No, I did not write it down, and we did not have

4  a recorder going in the command post at the time, so no.

5      Q.  And you didn't make either a contemporaneous note

6  at the time nor have you from that time, April 12, 2012,

7  until you just said it here this morning, made any kind

8  of agent notes, a 302, which is what you guys call the

9  FBI official reports, any kind of description of that,

10  did you, written description?

11      A.  No, I did not.

12      Q.  As those interviews progressed, there was

13  ultimately the decision to make -- to do the ruse that

14  was described, the gunshot residue ruse, right?

15      A.  Yes, I made that decision.

16      Q.  And, of course, throughout an investigation, and

17  during a process of talking with a subject like Mr.

18  Wells or a witness or anybody, you're allowed as law

19  enforcement officers to provide both accurate

20  information from your investigation as well as

21  inaccuracies to people as you interview them or talk to

22  them, aren't you?  There is nothing illegal per se about

23  that?

24      A.  It's not illegal and we are allowed to.  It's not

25  something we do during the normal course of an interview

1    if we believe someone is being honest with us.

2        Q.   You do it at the agent or the supervisory agent's

3    discretion and you do it when you feel that the

4    circumstances warrant it, regardless of who you're

5    talking to?

6        A.   The agent doing the interview has the discretion,

7    can make that decision.

8        Q.   And in this case, part of the intention of the

9    ruse was to capture Mr. Wells, not only what he said,

10   you were capturing that on audio, but to capture his

11   physical reaction, his looks, his demeanor, his

12   behavior, those kind of things?

13       A.   That's correct.

14       Q.   And, of course, you could have videotaped it?

15       A.   I don't believe we had anything with us to

16   videotape.

17       Q.   Agents -- you all had iPhones or many of you had

18   iPhones or some form of smart phones.  Anybody could

19   have easily recorded that on a cell phone, correct?

20       A.   I actually don't recall what kind of phones we

21   had back then.  The FBI was kind of in the dinosaur age.

22   We had BlackBerrys for a long time.  I don't think those

23   would record.

24            There were some Coast Guard agents that had

25   iPhones.  I don't know if those were their personal

1   phones or not.

2     Q.  Well, you just, right at the end of your

3   testimony, referred to Agent Andersen taking a picture

4   of a computer screen with her iPhone.  She had an

5   iPhone.

6     A.  It could have been her personal phone, but I

7   actually think that probably was her Coast Guard phone.

8     Q.  Of course, Wal-Mart has both smart phones as well

9   as video recorders?

10     A.  I don't have the authority to go spend that much

11   money.

12     Q.  Suffice it to say if the FBI wanted to figure out

13   a way to record Mr. Wells, they could have recorded Mr.

14   Wells?

15     A.  Sure.

16     Q.  You said that one of the things you did was on

17   that first day on April 12th was review the T-1 camera

18   video footage, right?

19     A.  Not me personally, but it was reported back to

20   me.

21     Q.  You know that that T-1 camera does not record the

22   blue vehicle stopping at T-2?

23     A.  No, it does not.

24     Q.  It records it passing by and disappearing behind

25   the building on Anton Larsen Bay Road?

1    A.   Yes, that's correct.

2    Q.   Can we see Defense Exhibit No. 146?

3         Are you familiar with what this depicts, Agent?

4    A.   I have never been on that particular dock, but I

5    believe that's the boat dock near the end of Anton

6    Larsen Bay Road on the west side of the island.

7         MR. SKROCKI:  No objection.

8         MR. COLBATH:  Your Honor, I'll admit 146.

9         THE COURT:  146 is admitted.

10        (Defense Exhibit No. 146 admitted.)

11   BY MR. COLBATH:

12   Q.   Agent Allison, as part of your investigation, you

13   did ultimately drive from the COMMSTA out past the golf

14   course and down Anton Larsen Bay Road, correct?

15   A.   At the time, I did not.  We had an agent do that.

16   Q.   Okay.  And the first time that was done was

17   approximately three days after the murders, on

18   April 15th, right?

19   A.   I don't recall the exact date that was done.

20   Q.   It certainly wasn't done during that first

21   36 hours that you were there, April 12th and April 13th?

22   A.   I don't remember the exact day or time.

23   Q.   Ultimately, you yourself drove out there,

24   correct?

25   A.   Months later probably.

1    Q.  Okay.  At the time the first agents went out

2    there and then later when you went out there, no

3    photographs were taken or vehicle information recorded

4    from anybody that was seen out in that area, were they,

5    that you're aware of?

6    A.  No, we didn't see any vehicles of interest.

7    Q.  And no interviews were done with people that were

8    at this boat dock or vehicles staged at this boat dock?

9    A.  I don't know that there was anybody at the boat

10   dock.

11   Q.  If there were vehicles in the parking area that

12   was described past this or in the parking area along the

13   boat dock, the vehicles, the license plates,

14   information, those weren't recorded that you're aware of

15   in any report?

16   A.  Again, I don't know that there were any vehicles

17   or people at the dock.

18   Q.  That's fine.  You can take that one down.

19        Can we see for foundational purposes Defense 156?

20   If you can just blow the top half of that up.

21        Mr. Allison, as part of the investigation is one

22   of the things that law enforcement collected the flight

23   manifest of the Era flight that arrived at the Kodiak

24   airport on April 12th, the morning of April 12th at

25   around 7:00?

1      A.  I believe it was, yes.  I don't remember this

2 specifically, but I know that we collected information

3 like that from the airlines.

4      Q.  And individuals that may have been at the airport

5 departing that flight, there was attempts made to

6 contact them and people that were contacted were

7 interviewed about any observations they might have made

8 at the airport that morning?

9      A.  Yes, we contacted as many as we could find.

10          MR. COLBATH:  Your Honor, I'm going to move

11 156.

12          MR. SKROCKI:  No objection.

13          THE COURT:  156 is admitted.

14          (Defense Exhibit No. 156 admitted.)

15 BY MR. COLBATH:

16      Q.  And so that morning, the morning of April 12th,

17 there was an Era flight that arrived around 7:00 at the

18 airport, 7:00 a.m., or maybe you don't know the time?

19      A.  I don't recall, but that sounds about right from

20 my knowledge of Kodiak.

21      Q.  And to the extent that, as you have said, to the

22 extent that law enforcement could, you looked for the

23 folks that are listed here and attempted to interview

24 them to see if any of them made observations about

25 either Mr. Wells' blue Honda that was known to be at the

airport or might have seen Mr. Wells at the airport,
correct?

    A.  Yes, we did what we could.

    Q.  And then if we could look at 157 and 157A.
That's just the authentication.  I think there is 157A.
Similarly, Mr. Allison, there was also an Alaska
Airlines flight that was arriving that morning, the
morning of April 12th, at the airport.  And you obtained
or law enforcement obtained a manifest from Alaska Air
to try and identify those folks as well, correct?

    A.  Yes, we did.

        MR. COLBATH:  I'll move, Your Honor -- I guess
the only thing that needs to be in probably is 157A.
The first page is just a verification from Alaska
Airlines.

        THE COURT:  157A, any objection?

        MR. SKROCKI:  No objection, save for redaction
of the PII that's on the document.

        THE COURT:  Let's make sure that's done.

        MR. COLBATH:  Sure, Your Honor.

        THE COURT:  157A is admitted.

        (Defense Exhibit No. 157A admitted.)

        MR. COLBATH:  Can we publish that?

        THE COURT:  Any objection to publishing it?

        MR. SKROCKI:  No.

1          THE COURT:  Go right ahead.

2   BY MR. COLBATH:

3      Q.   Again, you had a number of looks like 25-ish

4   people arriving that morning, 7:00, 7:15 on Alaska

5   Airlines, and a number of those folks were looked for

6   and identified and interviewed?

7      A.   Yes.

8      Q.   All right.  Let's take that down, please.

9           Could we see Exhibit No. 179.

10          Now, on April 12, 2012, there was a motel that's

11  been testified about operating, open for business, also

12  located right at the entrance to the grounds of the

13  Kodiak airport, the Comfort Inn.  You recall that,

14  correct?

15     A.   Yes.

16     Q.   And law enforcement went to the Comfort Inn and

17  obtained a list of registered guests and people that

18  would have been registered to be at the Comfort Inn on

19  April 12th.  Do you recall that?

20     A.   Yes.

21     Q.   And so do you recognize Defense Exhibit No. 179

22  as being the information provided by the Comfort Inn to

23  law enforcement?

24     A.   Honestly, I don't remember it, but it appears to

25  be.

1          MR. COLBATH:  Your Honor, I'm going to move,

2     and again to the extent, I don't think there is any

3     personal information here, but to the extent that there

4     is, we would certainly remove identifiers, but otherwise

5     I would move 179.

6          MR. SKROCKI:  We have no objection.

7          THE COURT:  179 is admitted.

8          (Defense Exhibit No. 179 admitted.)

9     BY MR. COLBATH:

10    Q.   And again, Agent Allison, these folks were

11    attempted to be contacted, get ahold of as many as you

12    could and see if they made any observations about Mr.

13    Wells or either of Mr. Wells' vehicles while at the

14    airport on April 12th?

15    A.   Yes.

16    Q.   I want to talk, if we can, a little bit about

17    some of the searches that went on.  Now, one thing you

18    said was at the conclusion of the gunshot residue ruse

19    on the night of April 12th, you were aware there had

20    been discussions about agents physically going with Mr.

21    Wells to his house.  You recall that testimony?

22    A.   I was aware that Special Agent Bottary brought

23    that up in an interview with Mr. Wells, did not ask me

24    about that before he did that.

25    Q.   And then after you learned of that, you said you

1    made the decision that agents would not go to Mr. Wells'

2    house because you weren't ready for that intrusion?

3         A.   That's correct.

4         Q.   Simultaneously though at that time you had

5    already begun the process of putting together search

6    warrant affidavits and had intention of getting a search

7    warrant for Mr. Wells' house?

8         A.   Yes, that's correct.

9         Q.   Let's talk about some of those searches now.

10   During the searches of Mr. Wells' house, a number of

11   items of multimedia or electronics were seized, correct?

12        A.   Yes.

13        Q.   And generally, when we're speaking about search

14   warrants you say you have to be very specific and you

15   have to be detailed in what gets approved to be looked

16   for?

17        A.   Yes, the judge makes sure of that.

18        Q.   But oftentimes your search warrants, while it

19   contains detailed items, they are often detailed classes

20   of items?  So, for instance, if you're looking for

21   something that might be contained on multimedia, photos,

22   videos, those kind of things, your search warrant may

23   just say any computers, any electronic storage devices,

24   any hard drives, any -- you know, all multimedia devices

25   that might be able to capture a picture, if it's a

picture you're looking for, right?

     A.  Yes, that's correct.  We don't have any idea what

multimedia device they may be storing it on, whatever

we're looking for, so yes.

     Q.  It's broad in that sense in that you get a

category of things and then you're allowed to look for

and seize that category of things?

     A.  It can be, unless we can somehow narrow down the

scope of what we are looking for, yes.

     Q.  In this case, taken from Mr. Wells was a computer

from his home, ultimately a Kindle device, a number of

scan disc cards, media cards or storage devices,

telephones, all of those types of things were taken,

correct?

     A.  I remember phones and computers.  The other

things I don't specifically remember, but it's possible,

yes.

     Q.  And everything that was taken -- all of those

things that were taken were searched and looked through

for photos, videos, evidence of things you were looking

for, correct?

     A.  I believe that they were, yes.

     Q.  And those could be things such as any e-mail or

written-type correspondence that might somehow relate to

the investigation?

1    A.  Yes, that's correct.

2    Q.  Could have been photos dating back many, many

3  years of firearms or of some other thing that you might

4  have felt depicted Mr. Wells and tied to the

5  investigation?

6    A.  Yes.

7    Q.  Videos, similar?

8    A.  Yes.

9    Q.  Internet research done or internet activity that

10  you felt might have been related to somehow the planning

11  of a murder or related to some aspect of the

12  investigation?

13    A.  Yes, all of that is possible.

14    Q.  That's -- when you seize those devices, that's

15  the kind of things you're looking for?

16    A.  Yes, that's correct.

17    Q.  Now, you said that the surveillance of Mr. Wells

18  ran on April 12th after he left COMMSTA at about 10:00

19  that evening, you said surveillance ran until about 3:00

20  a.m.?

21    A.  I recall agents being in front of his house until

22  approximately that time.

23    Q.  Now, did either the Alaska State Troopers or some

24  facet of the Kodiak folks, either CGIS or base police,

25  did anybody else pick up the surveillance beginning at

1   3:00 a.m.?

2     A.  No, and I don't believe we were actually

3   surveilling him when he left.  They eventually -- we

4   eventually put someone in front of his house until

5   approximately 3:00 a.m., but at that point I called off

6   the surveillance and I don't believe it was reinitiated

7   until later in that week.

8     Q.  Mr. Wells came back the next morning as

9   instructed on April 13th, came back to T-1, and you

10   again saw him the next morning?

11     A.  Yes, that's correct.

12     Q.  And then it was beginning later that day after he

13   left on April 13th that surveillance resumed?

14     A.  Yeah.  I don't believe we surveilled him away

15   from the COMMSTA.  At some point, we were in front of

16   his house.  We had agents in front of his house until

17   approximately 3:00 a.m. the next morning.

18     Q.  But then later on April 13th you heard --

19     A.  I just got my dates wrong.  Until approximately

20   -- that would have been the 13th.  3:00 a.m. on the

21   13th.

22     Q.  And then you heard Agent Judy testify that later

23   on the 13th, he was -- that night he was sitting at the

24   airport and they were watching the vehicle, but as Mr.

25   Wells arrived, they then began surveillance of Mr.

1  Wells, followed him to businesses, into the airport, and

2  ultimately began surveillance at that point of Mr.

3  Wells.  You heard that, correct?

4     A.  That's correct.  We did not follow him away from

5  the COMMSTA, but we did have those two agents at the

6  airport watching the vehicle.  And once he arrived

7  there, they did begin to surveil him again.

8     Q.  After he left the airport, you're aware that he

9  and Mrs. Wells -- he was there to pick Mrs. Wells up.

10 They went to their residence and you had already

11 commenced, or the residence was already secured by

12 agents.  They initially weren't allowed back in the

13 house at that point, were they?

14    A.  No, they were not allowed back in.

15    Q.  And they went to the Comfort Inn, and agents

16 began, at some point after they checked in, surveilling

17 them coming and going from the Comfort Inn?

18    A.  Honestly, I would need to see the documentation

19 to make sure of that, but that sounds about right.

20    Q.  You made documentation of that because you were

21 the one ultimately approving the surveillance?

22    A.  All surveillance was documented, yes.

23    Q.  And that continued, that surveillance continued

24 for how long?

25    A.  I don't recall specifically.  It was probably a

1  couple of weeks.

2     Q.  Now, one of the agents testified earlier in the

3  case that on the 8th of May he saw from the hillside

4  across the way he saw Mr. Wells change his tires, so

5  that would have been almost 30 days after the murders.

6  You recall that testimony?

7     A.  I do, yes.  So probably it must have been more

8  than two weeks.

9     Q.  The searches that continued on Mr. Wells' house,

10  when you needed equipment and metal detectors and other

11  things to search that hillside, you were able to line up

12  and access the equipment necessary to do the bullet

13  collection from the hillside, right?

14     A.  I'm sorry.  Can you repeat that?

15     Q.  Sure.  When the decision was made to search the

16  hillside for bullets at Mr. Wells' house, you were able

17  to get the equipment?  We saw equipment in the pictures,

18  get that all lined up and get a team of agents available

19  to go conduct that?

20     A.  Yes.  I'm not exactly sure where that equipment

21  came from.  It might have come from our -- from Quantico

22  where all of our engineering research facility is and a

23  lot of other specialty units are.

24        We did have not agents but personnel come out

25  that were familiar with the rigging aspect of the

1    search, because it was on a hillside, a rather steep

2    hillside, so we had those individuals come out and they

3    may have brought that equipment with them.

4        Q.   The searches that were done looking for the

5    firearms you said were the community based clean-up or

6    in conjunction with the search all and up down Anton

7    Larsen Bay Road from the COMMSTA to Rezanof Drive.  That

8    area was searched?

9        A.   Yes, it was searched by, you know, civilians.  It

10   wasn't really law enforcement doing the search, but yes.

11       Q.   Sort of law enforcement monitored or -- not

12   supervised, but monitored in case you said something was

13   found?

14       A.   Yes, we did have agents with the groups.

15       Q.   There is an area out there, the Berma Road Trail,

16   that area was searched?

17       A.   I don't recall that specifically.

18       Q.   The area from Mr. Wells' house along the route

19   down to the landfill and the dumpsters that we saw

20   pictures of earlier in the case, those areas were

21   searched?

22       A.   Are you referring to the junkyard?

23       Q.   No, well, I was going to ask you about that, but

24   prior to that.

25       A.   The landfill is quite some distance from Bells

1    Flats.

2         Q.   I'm referring to the dumpsters, I guess, that

3    ultimately were emptied and then taken to the landfill.

4         A.   So the question is was that area searched?

5         Q.   Yes.

6         A.   I don't recall specifically that area was

7    searched.

8         Q.   And then there was a junkyard.  Ultimately,

9    Mr. Wells' septic tank, the whole thing had to be

10   replaced.  That was taken out to a junkyard.  You went

11   there and took photos and did some searches?

12        A.   I personally didn't, I don't believe, but it

13   sounds reasonable.

14        Q.   Nobody took -- I noticed nobody took, other than

15   his phone and his car, any photos of Mr. Wells on

16   April 12th, while he was there at the COMMSTA for

17   13 hours, did they?

18        A.   I don't know.  I don't recall.  I don't recall

19   having any in the case file.

20        Q.   In all this time you haven't seen any, that any

21   law enforcement photos, close-ups of him, close-ups of

22   his clothing, his shoes, his jacket, any of that stuff

23   from that day?

24        A.   All we have is what's on the video from the T-2

25   camera.

Q. Okay. The things, the searches that were conducted and done on April 12th, those were all before you all received any warrants, so that was all consent searches?

A. April 12th was the crime scene, so, yeah, the Coast Guard consented for us to search the T-2 building, I guess you could say.

Q. Well, on April 12th, was Mr. Wells' phone?

A. Yes, I'm sorry. Mr. Wells' phone and truck was by consent.

Q. And the physical -- the gunshot ruse, he consented to that. That was something he was told ahead of time he didn't have to consent to, but he did, even though he didn't know you weren't going to use it. That was also a consent process, I guess?

A. Yes, it was all by consent.

Q. How was -- once Mr. Wells' car was seized at the airport, how was it taken to where those photos were taken at the Alaska State Trooper facility?

A. You know, I don't recall whether we drove it or towed it.

Q. Prior to moving it from the scene there at the airport, it was not searched at that location, the search was done at the AST office, correct?

A. I believe the search of the CR-V was done at the

1    Kodiak Police Department.

2        Q.   Okay.  And during that process, there was no

3    measurements taken between, for instance, the front seat

4    and the steering wheel to see how the seats were

5    adjusted, either in the passenger or the driver's seats?

6        A.   I don't believe there were, no.

7        Q.   The items in the car, other than the vacuum

8    sweepings, there was really no evidentiary items

9    retained from the interior of the car?

10       A.   Other than photographs of the mail on the front

11   seat, I don't believe there was anything taken.

12       Q.   There was nothing particular about that mail that

13   was, the contents of it, that appeared to be pertinent

14   to anything to the investigation?

15       A.   Not the contents, just its location on the front

16   seat.

17       Q.   You were asked about the different agencies, FBI

18   agencies or parts of your agency that were involved in

19   this, and you listed Mr. Mills, the lab he was from, and

20   the DNA folks and the fingerprint folks.

21            One of the agencies you didn't list was the

22   forensic audio and video image analysis unit.

23       A.   Yes, I did forget about that.  That is where

24   Dr. Vorder Bruegge, who testified yesterday, that is the

25   unit he works in.

1    Q.  And originally you had requested review of the

2    April 12th surveillance video, you had requested that

3    unit to make initial review of the video quite early on

4    in the case, a few days, maybe into that first week of

5    the investigation, correct?

6    A.  Yes, that's correct.

7    Q.  And the forensic analyst who started out doing

8    the analysis was an individual named Chris Iber,

9    correct?

10   A.  Yes.

11   Q.  You communicated with Mr. Iber back and forth as

12   he did his review and came to some preliminary results,

13   and you actually asked him to do a couple of different

14   reviews or processes?

15   A.  Yes.

16   Q.  And then after speaking with Mr. Iber, it was

17   later in the month of November, so several months later,

18   in November, you went down -- or some agents went down

19   and started the communications with Mr. Schmidt from

20   Honda?

21   A.  I don't recall the date, but we did do that.

22   Q.  If I told you I believe that was November -- the

23   first contact with Mr. Schmidt was November 18th, would

24   you have any reason to disagree with that?

25   A.  I can't say.  I don't know when it was.

1    Q.  You made reports of your communications.  You

2  e-mailed back and forth with Mr. Schmidt and

3  communicated with him by phone a number of times?

4    A.  Yes.  If you can show me those reports, I can

5  tell you a more specific date.

6    Q.  Your memory it was near in time -- I can, but it

7  was not near in time to April, it wasn't a week or two

8  from the time you were in Kodiak?

9    A.  No, it was months later.

10    Q.  After speaking with Mr. Schmidt, there was

11  occasion where an individual who had formerly worked for

12  the forensic audio video unit, an individual by the name

13  of Gerald Richards, he was consulted in the case and

14  asked to do basically a review similar to that of

15  Mr. Iber, correct?

16    A.  I'm not really familiar with Mr. Richards.  I

17  never met him myself.  That was something that two of

18  the attorneys that were working on the case at the time

19  did independently.

20    Q.  And you were made aware of that contact through

21  the attorneys and made aware of that process, I assume

22  as case agent, you realized that was going on?

23    A.  I knew that they had contacted him and I knew

24  that they had visited him.

25    Q.  After talking to Mr. Schmid, back to the forensic

1  audio visual unit, Mr. Vorder Bruegge was then asked to

2  look at it in December?

3      A.  Again, I don't know when.  He was asked to

4  perform a different type of analysis on the photo, or

5  the video, excuse me.

6      Q.  And then it was after speaking with the folks at

7  the forensic audio and visual analysis unit that

8  decisions were made to consult both Mr. Toglia and

9  Mr. Becker, the other witnesses we heard about here?

10 That was done at a later time after the FBI had sort of

11 concluded their forensic work on the process?

12     A.  I seem to remember, if I remember correctly,

13 Mr. Toglia was consulted before Mr. Vorder Bruegge.  I

14 could be wrong about that, but that's my recollection.

15     Q.  All right.  In doing firearms research in this

16 case, one of the things that was focused on in getting

17 all these gun sale records from firearms dealers on

18 Kodiak, you tried to obtain those records and obtained

19 many of them?

20     A.  Yes, we did.

21     Q.  Firearms records from the Anchorage area and

22 southern Alaska here for gun sales of .44 Magnums, you

23 obtained many of those?

24     A.  Yes, we did.

25     Q.  And throughout all of those records, one of the

1  things that you said agents pored over looking for were

2  gun sales to Mr. Wells?

3      A.  No, not specifically.  It was really any sales of

4  any .44 Magnums.  Anybody -- obviously, that would have

5  been of interest to us, but it was sales to anybody.

6  They were trying to contact anybody that bought a .44

7  Magnum and determine where that gun had gone or if that

8  person had any connection to the Communication Station.

9      Q.  And for the folks that were contacted and anybody

10  that was -- the determination was did they still have

11  their firearm, first of all?

12      A.  That was one of the questions we asked.

13      Q.  And then did they have any contact with COMMSTA?

14      A.  We tried to determine their association, if any,

15  with the COMMSTA.  For that particular set of people, we

16  didn't really have a defined set of questions like we

17  did in the other two instances.

18      Q.  And, again, particularly look at anybody --

19  looking for anybody that might have sold a gun to Mr.

20  Wells or other people that you could associate to the

21  COMMSTA or Kodiak area?

22      A.  Yes.

23      Q.  And nothing ever turned up any of that?

24      A.  No, nothing was ever brought to my attention.

25      Q.  Ultimately, though you did turn up maybe a dozen

1  or more actual firearms in the investigation that were

2  tested, none of which had any association to the bullets

3  found at the crime scene?

4     A.  I don't know how many it was honestly, but we did

5  find firearms -- I mean, we -- like I said, we canvassed

6  police departments across the state.  We actually had a

7  Smith & Wesson model 629 that was found on the side of

8  road in a backpack.  I believe it was Cordova or

9  Soldotna.  We tested that one.  We had a couple others

10  we found that way.  We had Mr. Pennington's model 629s

11  we tested.  I believe we tested Mr. Wells' Ruger

12  Blackhawk .44 as well as his .45.

13     Q.  As it turned out both Mr. Hopkins and Mr. Belisle

14  had owned .44 calibers.  Later Mrs. Belisle brought hers

15  to you and that got turned in and tested as well?

16     A.  That's not correct.  That's not the caliber they

17  were.  Mr. Belisle owned a .44 Special and Mr. Hopkins

18  owned a .460 Magnum.  Neither of them owned .44 Magnums,

19  but the weapons I just mentioned were tested.

20     Q.  Mr. Shem, who you heard from, I think that was

21  yesterday, ended up testing the Taurus model, the .44

22  Special?

23     A.  Yes, I believe so.

24     Q.  And, again, of the firearms found, nothing

25  matched the projectiles at the crime scene?

1    A.   That's correct.  We never found the firearm that
2   was used in the double homicide.
3    Q.   There was, as the process continued and your
4   investigation continued into the summer, there was a
5   time where you obtained a search warrant to get both
6   hair samples and fingerprints and biological samples
7   from Mr. Wells and Mrs. Wells actually, correct?
8    A.   Yes, that's correct.
9    Q.   And that was done in part to allow the testing
10   that you said that the FBI lab did or samples that were
11   ultimately sent for testing to the lab?
12    A.   Yes.
13    Q.   And in order to obtain those samples, you and
14   four other agents determined at one point in August that
15   Mr. and Mrs. Wells would be traveling through Anchorage
16   and you met them at the airport, correct?
17    A.   Yes.  We determined that the safest place to
18   approach Mr. Wells was at the airport after he had
19   already been through metal detectors at the Kodiak state
20   airport, so we do that on occasion, talk to people at
21   the airport or places that we know they have already
22   been screened.
23    Q.   You had been and back and forth to the Wells'
24   house on a number of occasions, both when Mrs. Wells was
25   there, as well as had a number of consent searches by

1   that point done from Mr. Wells?

2      A.   We had the two consent searches the day of the

3   12th, yes, and then subsequent searches were with

4   warrant.

5      Q.   So when Mr. Wells and Mrs. Wells get off the

6   plane here in Anchorage from Kodiak that evening, you

7   hadn't made arrangements ahead of time to meet with them

8   or anything.  Were you just waiting for them as they got

9   off the plane?

10     A.   No.  We had not made arrangements for that,

11  because, in addition to those searches, we actually had

12  a search warrant for the residence as well and we did

13  not want to alert them to the fact we had that warrant,

14  because we did not want -- obviously, we can't tell

15  people before we search the residence because they might

16  destroy evidence.  We did not alert them we had any of

17  these warrants.

18     Q.   Before they got on their next plane to travel in

19  Anchorage, you took them to the airport police station

20  there and head, hair, different hairs and samples from

21  their bodies were taken and collected pursuant to the

22  search warrant that you had?

23     A.   Yes.  Members of the ERT team who have

24  specialized training in collection of those items did

25  that.

1    Q.   They were cooperative, the Wells were cooperative

2    with that?

3    A.   They allowed us to take the samples.  I don't

4    know that I would call them cooperative.

5    Q.   You informed them at that point of the search

6    warrant back at their house, inquired about how you

7    might get in and they told you the garage door is open,

8    it's unlocked, you don't need a key or anything,

9    correct?

10   A.   I don't specifically recall them saying that, but

11   we always ask if we can -- if there is a way in or if we

12   can have a key to the residence because we prefer not to

13   damage any property when we're entering the residence.

14   Q.   Did you go serve the search warrant in Kodiak?

15   Were you part of that?

16   A.   I don't recall that specific warrant.  I'm sorry.

17   I don't recall being there for that specific warrant.  I

18   do recall the warrant.

19          MR. COLBATH:  If I can just have a minute, Your

20   Honor.

21          THE COURT:  Certainly.

22          (Pause)

23   Q.   I apologize, Agent.  I thought I had it right

24   here, but I don't.

25          (Pause)

 1     Q.   Agent, I'm just going to have pulled up this

 2   Bates number, Counsel, on the screen.  I'll have you

 3   look at the screen there and review -- that's not the

 4   one I'm looking for.  The airport one.  I'll find it.

 5         Suffice it to say after you collected the items

 6   you needed to collect at the airport, you were able to

 7   go, while the Wells were gone from their house, access

 8   the house, that search was conducted?

 9     A.   Again, I don't know if it was me, but the search

10   was conducted.

11     Q.   And you're not aware that agents had to break

12   down the door or do any forced entry into the house?

13     A.   No, I don't think we ever actually forced entry

14   into the house.

15     Q.   There was another time that Mr. Wells was --

16   well, strike that.

17         On April 12th, when he turned over his phone, it

18   was searched and reviewed, correct?

19     A.   Yes.  We photographed the phone and reviewed it,

20   yes.

21     Q.   And then after April 12th, within the first

22   couple of weeks of the investigation, there was an

23   actual search warrant, as you and I have discussed, for

24   electronics and other items and the phone was actually

25   seized pursuant to that search warrant so a full review

1  could be done?

2      A.  Yes.  The initial search we just basically just

3  looked through the phone ourselves.  The search warrant

4  allowed us to use a more comprehensive method of

5  searching the phone.

6      Q.  A forensic tool or computer-type tool to search

7  that?

8      A.  Yes.

9      Q.  And then several months later, again, there was a

10 second search warrant and Mr. Wells was met, when he was

11 traveling alone, he was met at the airport and a search

12 warrant was served where another phone and a Kindle

13 device was taken from him as he traveled?

14     A.  Yes.

15     Q.  And so that would have been -- that wasn't the

16 same phone, it was a replacement phone or a different

17 phone, I guess.  You don't know probably what it was,

18 but a different phone?

19     A.  Yes.

20     Q.  And again, Mr. Wells wasn't told that you all

21 would be waiting for him at the airport, it was done for

22 those -- at that location for those same reasons you

23 just told us?

24     A.  Yes.  We can't tell people when we're coming to

25 serve a search warrant on them or they might destroy

1    evidence.

2        Q.   The decision to review and interview -- all the

3    car interviews, those started during the course of the

4    summer.  You started with the long 200 to 300 list of

5    people, interviewing people who you determined had

6    similar cars, correct?

7        A.   I have to be honest, I don't remember exactly

8    when we started that.

9        Q.   That was well after you had left Kodiak

10   initially.  You said you and some agents went back for a

11   couple of week period and started that and then it

12   trickled on after you left?

13       A.   Yes.  It wasn't the next trip I made.  I made

14   many trips to Kodiak during this time, and I don't

15   remember which trip it was, but, yes, at some point I

16   did go back with a number of agents and the Coast Guard

17   Investigative Service agents that are stationed in

18   Kodiak assisted with that.

19       Q.   Could we pull up I think it's Government 218.

20   And this was the questionnaire, Mr. Skrocki discussed

21   with you.  Do that bottom half.

22            You recall the questionnaire, right?

23       A.   This is the questionnaire used when we talked to

24   the COMMSTA personnel.

25       Q.   Okay.

1    A.   Not the car search.

2    Q.   On this one, with respect to COMMSTA, there was

3    information about Mr. Wells' two vehicles left in your

4    questionnaire as folks were specifically being asked

5    about that morning?

6    A.   You see there on the bottom that is a note to

7    investigators.  That is not something that was discussed

8    with the individuals at the COMMSTA.  The question in

9    bold there is the one that was asked of the individuals

10   working at the COMMSTA.

11   Q.   Right.  And investigators were -- if the person

12   specifically had any observations about either of those

13   two vehicles or similar vehicles, there was a note there

14   to make sure that whichever investigator was talking to

15   the person took special note of that?

16   A.   Yes, if the person we were speaking with brought

17   these vehicles up, then, yes, it was there to alert the

18   investigator doing the interview that those vehicles

19   were of interest, yes.

20   Q.   So you followed a similar process as you did with

21   the COMMSTA employees, use of a questionnaire that is,

22   when you went out to do the questioning of the folks

23   with the vehicles, correct?

24   A.   Yes.

25   Q.   If we could pull up -- let's look at Defense

Exhibit No. 182. This may be a couple of pages. Is there any more or is it just those two? Okay. Will you flip back to the first page.

Agent Allison, do you recall or recognize, I should say, this exhibit, Defense Exhibit No. 182?

A. Yes.

Q. And do you need to see the second page or you're okay with that?

A. No.

MR. SKROCKI: I would like to see it, please.

MR. COLBATH: Could you flip to the second page?

MR. SKROCKI: Thank you.

BY MR. COLBATH:

Q. Would this have been, Agent Allison, one of the questionnaires from one of the vehicle interviews that you -- this was one that you personally did?

A. It appears so.

MR. COLBATH: I'm going to move the admission, Your Honor, of Exhibit No. 182.

MR. SKROCKI: No objection.

THE COURT: 182A was admitted with redactions. There were just a few pages picked out.

MR. COLBATH: Correct. 182 is a separate exhibit from 182A. They are different.

```
 1            THE COURT:  Any objection?

 2            MR. SKROCKI:  Just those two pages, no

 3   objection.

 4            THE COURT:  182 is admitted.

 5            (Defense Exhibit No. 182 admitted.)

 6            MR. COLBATH:  This started out as like six

 7   pages, Your Honor, so I did 182A were the other pages.

 8   These first two pages deal with Mr. Allison.

 9   BY MR. COLBATH:

10      Q.  Could you do the top half for me.  Get his name

11   in there.  Thank you.

12            Agent Allison, you recognize this to be one that

13   you participated in because your name is at the top

14   here, and then it's being done it looks like

15   December 11th of 2012?

16      A.  Yes.

17      Q.  And do you recall that most of the interviews

18   were done during the fall of yet that year, 2012?

19      A.  It continued for a while.

20      Q.  Okay.

21      A.  The searches I mean, sorry.

22      Q.  I'm sorry?

23      A.  The searches continued for a while.

24      Q.  And again, this is one done regarding a blue Ford

25   Escape?
```

1    A.   Yes.

2    Q.   You can take that part down.

3         Now, you and the other agents were using the same

4    questionnaire for all of the car interviews so that you

5    could maintain that consistency or try to get similar

6    information from folks even if the investigation was

7    done by differing agents?

8    A.   Yeah, just to provide a framework for the

9    questioning.

10   Q.   Go to the second page.

11        Now, this one does contain information about, not

12   only Mr. Belisle and Mr. Hopkins, inquiry about whether

13   the person knew either of them, correct?

14   A.   Yes.

15   Q.   And then information about did they know Mr.

16   Wells or Mr. Wells' family?

17   A.   Yes, it includes questions about Mr. Wells.

18   Q.   So unlike the COMMSTA questionnaire that

19   specifically referenced Mr. Wells, or did not -- excuse

20   me, did not specifically reference Mr. Wells, this one

21   did?

22   A.   Yes, at this point, it was months later.  We had

23   collected a significant amount of information regarding

24   Mr. Wells and he was clearly a suspect at the time.

25   Q.   And, of course, the prior one where you're

1    interviewing COMMSTA people and Coast Guard witnesses,

2    you didn't have to specifically identify Mr. Wells,

3    because questions on there were specifically about the

4    rigger shop, the rigger shop employees, the other

5    knowledge of people at COMMSTA, so that included Mr.

6    Wells, you knew he worked there?

7       A.   He was included in the group of people that we

8    were questioning and asking questions about, but we did

9    not specifically mention Mr. Wells.

10      Q.   That's fine.  You can take 182 down.  Thank you.

11           Just a couple more inquiries here, sir.

12           Yesterday we heard from Quantico there from the

13   tool mark lab, Mr. Mills' testimony.  You were here for

14   that, right?

15      A.   I believe most of it, yes.

16      Q.   One of the things he was talking about were some

17   nail guns and there was a powder-actuated nail gun, a

18   real older model he said was one he looked at.  That was

19   taken from the COMMSTA property itself, correct?

20      A.   Yes, it was.

21           MR. COLBATH:  If I could have just a minute.

22           THE COURT:  Certainly.

23           (Pause)

24   BY MR. COLBATH:

25      Q.   Agent Allison, COMMSTA employee Ray Fillion was

1  not at work on April 12, 2012, was he?

2     A.  I don't recall Ray Fillion specifically.  I

3  recall the name.  I don't recall the interviews with

4  him.

5          MR. COLBATH:  Thank you.  I don't have anything

6  further.

7          THE COURT:  All right.  Mr. Skrocki, go ahead.

8                    REDIRECT EXAMINATION

9  BY MR. SKROCKI:

10    Q.  Agent Allison, Mr. Colbath asked you questions

11  about the nail gun seized from the COMMSTA, the old one?

12    A.  Yes.

13    Q.  Why that one?

14    A.  Mr. Wells had access to all of the nail guns in

15  the T-2 building.

16    Q.  It was searched because of that reason?

17    A.  Yes.

18    Q.  And the press release that he showed you about

19  way before at the beginning of the cross examination, do

20  you recall that press release?

21    A.  Yes.

22    Q.  April 20th of 2012?

23    A.  Yes, I recall that.

24    Q.  So by that time had you eliminated suspect --

25  everyone at T-1 and T-2 as suspects in this case?

1    A.  If we hadn't eliminated everybody we were close

2  to eliminating everyone else.

3    Q.  By that time you had also tracked down all the

4  vehicles shown on the video at T-1?

5    A.  We had.

6         MR. SKROCKI:  That's all I have.

7         THE COURT:  Any follow-up on that topic?

8         MR. COLBATH:  Not on that topic.

9         THE COURT:  Thank you, sir.  You may be

10  excused.

11         (Witness excused)

12         (Requested excerpt concluded, proceedings

13  continued.)

14                    CERTIFICATE

15    I, Sonja L. Reeves, Federal Official Court Reporter
   in and for the United States District Court of the
16  District of Alaska, do hereby certify that the foregoing
   transcript is a true and accurate transcript from the
17  original stenographic record in the above-entitled
   matter and that the transcript page format is in
18  conformance with the regulations of the Judicial
   Conference of the United States.
19
     Dated this 4th day of October, 2019.
20

21
                    /s/ Sonja L. Reeves
22                  SONJA L. REEVES, RMR-CRR
                    FEDERAL OFFICIAL COURT REPORTER
23

24

25