1              UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF ALASKA
2

3   UNITED STATES OF AMERICA, )
                              )
4          Plaintiff,         )
                              )
5   vs.                       )   CASE NO. 3:13-cr-00008-SLG
                              )
6   JAMES MICHAEL WELLS,      )
                              )
7          Defendant.         )
    _____ )
8

9        PARTIAL TRANSCRIPT OF TRIAL BY JURY - DAY 17
              (Testimony of Jennifer Raymond)
10   **BEFORE THE HONORABLE SHARON L. GLEASON, DISTRICT JUDGE**
                October 1, 2019; 8:43 a.m.
11                    Anchorage, Alaska

12   **FOR THE GOVERNMENT:**
          Office of the United States Attorney
13        BY:  STEVEN SKROCKI
          BY:  CHRISTINA M. SHERMAN
14        BY:  KELLEY L. STEVENS
          222 West 7th Avenue, #9
15        Anchorage, Alaska 99513
          (907) 271-5071
16

    **FOR THE DEFENDANT:**
17        Office of the Federal Public Defender
          BY:  GARY GEORGE COLBATH
18        601 West 5th Avenue, Suite 800
          Anchorage, Alaska 99501
19        (907) 646-3400

20        Camiel & Chaney, P.S.
          BY:  PETER A. CAMIEL
21        520 Pike Street, Suite 2500
          Seattle, Washington 98101
22        (206) 624-1551

23   _____
              **SONJA L. REEVES, RMR-CRR**
24           Federal Official Court Reporter
                222 West 7th Avenue, #4
25              Anchorage, Alaska 99513
          Transcript Produced from the Stenographic Record

1      (Call to Order of the Court at 8:43 a.m.)

2      (Proceedings took place and are not included in

3  this transcript, after which, the testimony of Jennifer

4  Raymond transpired as follows:)

5      (Oath administered to the witness)

6      DEPUTY CLERK:  For the record, can you please

7  state your full name and then spell your full name.

8      THE WITNESS:  Jennifer Raymond,

9  J-e-n-n-i-f-e-r, R-a-y-m-o-n-d.

10      JENNIFER RAYMOND, DEFENSE WITNESS, SWORN

11           DIRECT EXAMINATION

12  BY MR. CAMIEL:

13   Q.  Good morning, Ms. Raymond.

14   A.  Good morning.

15   Q.  Where are you testifying from this morning?

16   A.  Huntsville, Alabama.

17   Q.  It looks like you're in a courtroom there?

18   A.  Yes, I'm at the federal courthouse.

19   Q.  Ms. Raymond, where do you work?

20   A.  The Federal Bureau of Investigation in the

21  terroristic explosive device analytical center or TEDAC.

22   Q.  And is that separate from the crime laboratory or

23  is that a part of the crime lab?

24   A.  I'm sorry.  You were cutting out.

25   Q.  Is that part of the FBI crime lab or is that a

1  different --

2      A.  Yes, it is.  It's just a different location.

3      Q.  All right.  Can you tell us a little bit about

4  the training you have had to do the job that you're

5  doing now?

6      A.  Yes.  I received an undergraduate degree from the

7  University of Central Oklahoma in forensic science.  I

8  also completed a two-year training program with the

9  Federal Bureau of Investigation, which included several

10  moot court exercises, comparison exercises, oral boards,

11  numerous written and oral tests, as well as how to

12  conduct cases under the supervision of a mentor, how to

13  write reports and properly document my examinations.

14      Q.  Were you working in the same capacity back in

15  2012?

16      A.  I was working at the lab in Quantico in the

17  latent print operations unit.  I am now working at the

18  laboratory in Huntsville, Alabama, the TEDAC laboratory

19  in the scientific and biometrics analysis unit, but I am

20  still conducting latent print examinations.

21      Q.  For how long have you been doing latent print

22  examinations?

23      A.  Approximately 11 years.

24      Q.  Can you give the jury an overview of fingerprint

25  examinations, what you do and how you do it?

1      A.   On the palm or surfaces of the hands, as well as

2   the soles of the feet there is a specialized form of

3   skin known as friction ridged skin.  This skin is

4   comprised of raised ridges and valleys or furrows.  When

5   this skin becomes coated with a substance, such as

6   sweat, oil, dirt, grease, and then comes in contact with

7   a surface, there is a chance to leave behind a

8   reproduction of the arrangement of this friction ridged

9   skin on the item.

10          These chance reproductions are usually

11   fragmentary in nature and require some sort of visual or

12   chemical -- physical or chemical process to be applied

13   in order to be able to visualize these prints.  This is

14   what we refer to as a latent print.

15          A known print is an intentional recording of

16   these friction ridges, and it's when the friction ridges

17   are coated with a substance like black printer's ink and

18   then rolled, if you're taking a fingerprint recording,

19   they're rolled from nail to nail in the fingerprint ink

20   and then rolled from nail to nail on a contrasting

21   background such as a fingerprint card.

22          That is what is referred to as a known

23   fingerprint.  And as part of my job, I compare the

24   latent prints developed on items of evidence to the

25   known prints that are either submitted into our database

1   or submitted as part of a case.

2       Q.  Were you involved in doing some fingerprint work

3   with regard to the April 12, 2012 double homicide that

4   happened on Kodiak Island at the Coast Guard station?

5       A.  Yes, I did receive a case.

6       Q.  And what kind of work were you asked to do in

7   that case?

8       A.  I was asked to develop prints on several items of

9   evidence, as well as look at several latent lifts that

10  were taken from the crime scene and then compare those

11  to numerous individuals.

12      Q.  What's an elimination print?

13      A.  Elimination print is a known print collected from

14  an individual who would have legitimate access to the

15  crime scene.

16      Q.  So that might be, say, a first responder?

17      A.  Absolutely.

18      Q.  Or somebody who worked or had a legitimate reason

19  to be at a particular location?

20      A.  Yes.

21      Q.  Do you know how many lifts you received from the

22  crime scene, the rigger shop, to look at?

23      A.  I believe it was approximately 53.

24      Q.  And were all of those lifts suitable for trying

25  to do a comparison?

1    A.   No.  I believe 28 of them I actually had latents

2   captured on, and I believe 15 of them I actually found

3   latent prints that were suitable for comparison on.

4    Q.   What's the difference between a latent print

5   that's suitable for comparison and one that's not?

6    A.   There needs to be a sufficient quantity and

7   quality of information within that print in order to be

8   able to use it for comparison.  So the information that

9   I'm looking at is all determined in my analysis.  So I

10  look at the latent print and I'm trying to determine how

11  much information is there and how much information is

12  present.

13       I look at three levels of detail.  The first is

14  the overall pattern type or the overall ridge flow of

15  the latent.  I then look for what's called second-level

16  detail, and these are all the little minutia that are

17  occurring along the ridge path.

18       So it can be ending ridges, which are ridges that

19  just flow and then stop.  It could a dividing ridge,

20  which is a ridge that flows and then divides into two or

21  more ridges.  Or it could be a dot, which is a ridge

22  that looks kind of like the period at the end of a

23  sentence, it's as wide as it is long.

24       So I'm looking for all of these characteristics

25  when I'm doing my analysis.  I'm looking at not only the

type, but I'm looking at the direction that it's

flowing, its spacial relationship within the print, as

well as its location -- its location within the print

and its spacial relationship to all the other

characteristics that are around it.

Once I've looked at all of this information, I'll

then determine if the print has enough information to

move on to the comparison phase or not.

Q.  So if you decide that a print doesn't have enough

information, then you don't try to compare it to

anything?

A.  That is correct.  The analysis is done first.

Q.  So if there is not enough information, then you

stop right there with that particular print?

A.  That is correct.

Q.  All right.  In this case then, if I understand --

so again, what was the total number of lifts that you

received?

A.  I believe it was 53.

Q.  All right.  And how many of those -- now, were

some of those finger and some of those palm prints?

A.  Of the ones that I determined were suitable for

comparison, yes, there were fingerprints and palm

prints.

Q.  How many --

1    A.   There was also an impression.

2    Q.   We'll get to that.  How many fingerprints were

3    there that you thought were suitable for comparison?

4    A.   May I refer to my notes?  I would like to get an

5    exact number.

6    Q.   Sure.

7    A.   A total on the lifts, I had 18 prints, it looks

8    like 16 of which were fingerprints, one of which was a

9    palm print, and one impression.

10   Q.   So of those 18 that were suitable for comparison

11   then, did you compare those to elimination prints that

12   you had been provided with?

13   A.   I did.  I compared those to a number of

14   individuals.

15   Q.   Okay.  And did that include the two victims,

16   Mr. Belisle and Mr. Hopkins?

17   A.   Mr. Hopkins and Mr. Belisle were included in the

18   list, yes.

19   Q.   Was Mr. Wells included in that list?

20   A.   I'm sorry.  You cut out.

21   Q.   Was Mr. Wells included in the list of people that

22   you did comparisons to?

23   A.   Yes.

24   Q.   And your understanding was the other people in

25   the list were first responders or other people who

1    worked in the facility?

2        A.  Some of the people that were actually hits from

3    automated searches, but, yes, a large number of those

4    people were also elimination people.

5        Q.  After you went through the comparisons, did you

6    end up with any prints, either palm or fingerprints,

7    that you weren't able to identify to anyone?

8        A.  Yes.

9        Q.  How many?

10       A.  How many?  Four fingerprints, one impression, and

11   then the palm print.

12       Q.  Did you run those prints through any kind of

13   automated system to see if they -- see if anything came

14   up that way?

15       A.  I did.  I ran five of those prints through the

16   automated database.  One was determined not suitable for

17   automated searching.

18       Q.  So as of your -- the status of your notes right

19   now indicate how many of the prints from the -- that you

20   received out of that original 53 are still unidentified?

21       A.  Six.

22       Q.  You talked about some notes that you have?

23       A.  Sorry.

24       Q.  Do your --

25       A.  Yeah, six from the lifts.

1   Q.   Do your notes indicate where those unidentified

2   prints came from, where they were found at the crime

3   scene?

4   A.   Yes.  I actually did compile a table that would

5   assist me in making those connections quicker, if I may

6   use that.

7   Q.   Sure.  Can you tell us where the various

8   unidentified prints were located at the crime scene?

9   A.   Okay.  I had -- one fingerprint was located --

10  these are the descriptions from the back of the lift

11  cards.  One fingerprint was located on the door between

12  the Bobcat garage and workshop, Bobcat garage side.

13       One fingerprint was located on the door between

14  the Bobcat garage and the workshop, wood shop side.

15       The impression was located on the double doors

16  between the wood shop and locker room, wood shop side

17  right door.

18  Q.   Let me stop you just for a minute because you

19  used the term impression and I wanted to have you

20  clarify what you meant by impression.

21  A.   Yes.  The impression is simply a latent print

22  that -- or a section of friction ridged skin where I

23  cannot determine based on just my analysis if it is a

24  fingerprint or a palm print, so it gets compared to both

25  fingerprints and palm prints until identified.

1    Q.  And where was that impression found?

2    A.  The impression was found on the double doors

3    between the wood shop and the locker room, wood shop

4    side right door.

5    Q.  And then the next unidentified print was found

6    where?

7    A.  The next unidentified print was found -- it was a

8    fingerprint found on the door between the Bobcat garage

9    and workshop or wood shop, wood shop side.

10   Q.  All right.  And the next one?

11   A.  There was another fingerprint on the boiler room

12   door.

13   Q.  Did that lift card indicate which side of the

14   boiler room door, whether it was interior or exterior?

15   A.  I do not have that noted here, so I would have to

16   refer to the lift itself.

17   Q.  All right.  And then the next unidentified print?

18   A.  The next three are all palm prints.  There was

19   one on the repair shop north door exterior.  And the

20   other two palm prints were actually on other items of

21   evidence that were submitted.

22   Q.  All right.  Now, what were those?

23   A.  One was on a doorknob from the French doors into

24   the wood shop that I received at the laboratory.  And

25   the other one was on a black glove on ramp that I also

1    received at the laboratory.

2        Q.   Just to be clear now, none of the prints that you

3    looked at or any of the ones that were suitable for

4    comparison matched Mr. Wells; is that correct?

5        A.   That is correct.  The palm prints however were

6    not compared to Mr. Wells and the impression was not

7    compared to the palm prints of Mr. Wells, because I

8    receive -- I didn't receive any palm prints.

9        Q.   Did you also -- were you also asked to look at

10   some ammunition boxes?

11       A.   I was.

12       Q.   And did you find any prints on those ammunition

13   boxes that were suitable for --

14       A.   I'm sorry.  You cut out.

15       Q.   I'm sorry.  I got away from the microphone.

16           Did you find any prints on the ammunition boxes

17   that were suitable for comparison?

18       A.   Yes.  There were three prints, two latent

19   fingerprints and a palm print detected.  I have to refer

20   to another case file to tell you exactly what on.  So

21   there is one fingerprint detected on a cartridge, one

22   fingerprint -- or I'm sorry, one palm print detected on

23   a gray box and one fingerprint detected on a cartridge.

24       Q.   Do you know where those items were found?

25       A.   I do not.  I do not know where those were found.

1    Q.  Did you compare those prints that you just

2    mentioned from the cartridge and the box?

3    A.  Were they what?  You cut out again.

4    Q.  Did you do a comparison or attempt to do a

5    comparison with the fingerprints that were found on the

6    cartridge and the box?

7    A.  Yes.  The two fingerprints that were found on the

8    cartridge I did compare.

9    Q.  And what was the results of that?

10    A.  I compared them to the fingerprint card bearing

11    the name James Michael Wells, and they were non-ID, they

12    were excluded.  I did not have any palm prints to

13    compare, so the palm print was not compared.

14    MR. CAMIEL:  Thank you.  That's all I have.

15    THE COURT:  Go ahead, please.

16                        CROSS EXAMINATION

17    BY MS. SHERMAN:

18    Q.  Good morning, Ms. Raymond.  My name is Christina

19    Sherman.  I'm with the U.S. attorney's office.  How are

20    you today?

21    A.  Good morning.  I'm well.  How are you?

22    Q.  Good.  I want to start with generally as an

23    analyst you want every lift that's taken sent in to the

24    FBI lab, even if it may not be suitable for comparison,

25    right?

1    A.  Absolutely.

2    Q.  So of those 53, as an analyst, you know some of

3  them are not going to be suitable for comparison?

4    A.  Absolutely.

5    Q.  You indicated there were -- so 18 were suitable

6  for comparison.  Did I get that amount right?

7    A.  I thought it was 16, but --

8    Q.  16.  So of those 16, you were able to identify

9  prints belonging to individuals who had worked in the

10  rigger shop, right, from elimination?

11    A.  Yes, and I believe there was one automated hit as

12  well.

13    Q.  I want to talk about -- you said there were six

14  unidentified and you mentioned a black glove.  Do you

15  have your June 22nd report?

16    A.  Yes.

17    Q.  June 22, 2012?

18    A.  Yes.

19    Q.  So you would agree with me that an automated

20  search of the glove, the prints in the glove identified

21  those as Pedro Elizondo, right, on page two?

22    A.  Yes, the fingerprints on that glove, due to an

23  automated search, were Pedro Elizondo.

24    Q.  And do you know whether he's employed by the

25  Coast Guard police department?  Did you have that

1   information?

2       A.   I did not at the time of the identification.

3       Q.   Okay.  Now, fingerprints, you would agree, can

4   last a long time, depending on the circumstances in

5   which they are left?

6       A.   Yes.  There are a variety of circumstances that

7   would either lend them to last for a long time or be

8   wiped away immediately.

9       Q.   In your training as an analyst and in your

10  experience, have you come across situations where a

11  print can be left on an item from a manufacturer and

12  it's found years later?

13      A.   I don't know specifically from a manufacturer,

14  but I do know that we have developed prints on items

15  years later.

16      Q.   And you would agree with me you expect to find

17  fingerprints of people who are allowed to be in a

18  particular location within that location, right?

19      A.   Absolutely.  Any time you come into contact with

20  an object, you have the potential to leave behind a

21  latent print.

22      Q.   And would you agree with me that if there is no

23  evidence a suspect were in a particular area, the value

24  of those prints that you might identify would go down?

25          MR. CAMIEL:  Your Honor, I'm going to object to

1  speculation.

2        THE COURT:  I'll sustain that.  Can you

3  rephrase?

4    Q.  You identify prints from whatever is sent in,

5  right?  You're not given full information about the

6  investigation?

7    A.  Correct.

8    Q.  So you identify prints and it doesn't necessarily

9  -- or I guess don't identify prints.  It doesn't -- you

10  don't do the analysis of whether that print would relate

11  to a suspect or the rest of the investigation; is that

12  correct?

13    A.  That's correct.  My only job is to compare the

14  latent prints that are detected or submitted to known

15  individuals or search them.  It has no bearing on my

16  examination who the individual is, and most of the time

17  I don't know.

18        MS. SHERMAN:  Okay.  Thank you.

19        MR. CAMIEL:  I have no other questions.

20        THE COURT:  Thank you, Ms. Raymond.  You may be

21  excused at this time.

22        (Witness excused)

23        (Requested excerpt concluded, proceedings

24  continued.)

25

CERTIFICATE

        I, Sonja L. Reeves, Federal Official Court Reporter
in and for the United States District Court of the
District of Alaska, do hereby certify that the foregoing
transcript is a true and accurate transcript from the
original stenographic record in the above-entitled
matter and that the transcript page format is in
conformance with the regulations of the Judicial
Conference of the United States.

        Dated this 16th day of December, 2019.


                            /s/ Sonja L. Reeves
                            SONJA L. REEVES, RMR-CRR
                            FEDERAL OFFICIAL COURT REPORTER