```
 1                   UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF ALASKA
 2

 3   UNITED STATES OF AMERICA, )
                              )
 4          Plaintiff,        )
                              )
 5   vs.                      )   CASE NO. 3:13-cr-00008-SLG
                              )
 6   JAMES MICHAEL WELLS,     )
                              )
 7          Defendant.        )
     _____)
 8

 9          PARTIAL TRANSCRIPT OF TRIAL BY JURY - DAY 14
                   (Testimony of Christopher Iber)
10      BEFORE THE HONORABLE SHARON L. GLEASON, DISTRICT JUDGE
                   September 26, 2019; 8:33 a.m.
11                       Anchorage, Alaska

12   FOR THE GOVERNMENT:
            Office of the United States Attorney
13          BY:  STEVEN SKROCKI
            BY:  CHRISTINA M. SHERMAN
14          BY:  KELLEY L. STEVENS
            222 West 7th Avenue, #9
15          Anchorage, Alaska 99513
            (907) 271-5071
16

17   FOR THE DEFENDANT:
            Office of the Federal Public Defender
18          BY:  GARY GEORGE COLBATH
            601 West 5th Avenue, Suite 800
19          Anchorage, Alaska 99501
            (907) 646-3400

20          Camiel & Chaney, P.S.
            BY:  PETER A. CAMIEL
21          520 Pike Street, Suite 2500
            Seattle, Washington 98101
22          (206) 624-1551

23   _____

              SONJA L. REEVES, RMR-CRR
24           Federal Official Court Reporter
               222 West 7th Avenue, #4
25              Anchorage, Alaska 99513
        Transcript Produced from the Stenographic Record
```

```
 1              (Call to Order of the Court at 8:33 a.m.)
 2              (Proceedings took place and are not included in
 3    this transcript, after which, the testimony of
 4    Christopher Iber transpired as follows:)
 5              (Oath administered to the witness)
 6              DEPUTY CLERK:  For the record, can you please
 7    state your full name and then spell your full name.
 8              THE WITNESS:  My name is Christopher Iber,
 9    C-h-r-i-s-t-o-p-h-e-r, I-b-e-r.
10         CHRISTOPHER IBER, DEFENSE WITNESS, SWORN
11                      DIRECT EXAMINATION
12    BY MR. COLBATH:
13       Q.  Good morning, Mr. Iber.
14       A.  Good morning.
15       Q.  Tell us where you live.  Where did you come here
16    from?
17       A.  I live in Northern Virginia.
18       Q.  And what do you do for a living, sir?
19       A.  I am an examiner, an image examiner for the
20    Federal Bureau of Investigation.
21       Q.  And how long have you worked for the FBI?
22       A.  Nearly 16 and a half years.
23       Q.  And describe generally what a forensic examiner
24    is.
25       A.  Well, forensics means pertaining to law, and then
```

an examiner is a person who analyzes or looks at
information for the purpose of testifying in court.

Q.  And is there a particular type of information
that you examine or your work focuses on?

A.  Yes.  I am -- my official title is a photographic
technologist.  I'm an examiner of questioned
photographic evidence, so I do four primary types of
exams at the FBI.

I do comparison analysis.  That is where I
compare anything that's depicted within an image.  It
could be an automobile, person, face, clothing, handgun.
And then I compare that to another image that depicts a
known item or person, and I try to see if they are the
same or if they are an exclusion, different.

I do photogrammetry.  Photogrammetry is simply
the science of taking measurements from photographs.
Typically that would be height analysis.  I can also
recreate a crime scene from a photograph, put items back
in place in a crime scene or measure objects within the
scene.

Authenticity exams.  I look at an image, mostly
digital images, but also old film images or analog video
for if it has been manipulated, has it been changed, and
also did it come from a particular camera.

And then the last type of exam I do is what we

1    call information extraction, which is basically

2    enhancements.  That's where I try to pull information

3    that's within the image out to make it look better.

4        Q.  And tell the jury when you first became involved

5    in the field of image analysis or photography work.

6        A.  I have a bachelor of science degree in biomedical

7    photographic communications from RIT, Rochester

8    Institute of Technology, where while I was there I did

9    two internships.  I did one in the Monroe County medical

10   examiner's office as a photographer, and the other I did

11   at the Monroe County public safety laboratory, which is

12   the forensic lab there in Rochester, New York.

13           After that, I got a job at George Washington

14   University Medical Center as a medical photographer

15   where I photographed operations, also did PR work for

16   the university and many other things, including

17   duplication and anything they needed me to do there.

18   Then I was hired at the Bureau after that.

19       Q.  And so did some of that educational experience

20   and the photography done during that education involve

21   forensic work before you got to the FBI?

22       A.  The internships at the medical examiner's office

23   and at the laboratory would have been forensics.

24       Q.  And so since joining the FBI 16 years ago, have

25   you received additional training related to the fields

1  of forensic image analysis?

2    A.  When I was first hired at the FBI, I went into a

3  two-year training program, so it's almost like a

4  master's program in a college.  And that included

5  classroom, it included going to lectures and conferences

6  pertaining to what I'm doing now, as well as reading

7  texts and articles.  And then most importantly, during

8  those two years, I actually worked on forensic casework

9  under the supervision of a senior image examiner.

10    Q.  Who was that senior image examiner?

11    A.  My supervisor at the time was Dr. Vorder Bruegge.

12    Q.  We have heard from him.

13      Are you familiar with the FBI's standard

14  operating procedures and the general body of

15  publications in forensic image analysis and the

16  processes that you follow?

17    A.  Yes.

18    Q.  Do you regularly apply those in your work and in

19  the four types of exams that you do?

20    A.  Yes, as required.

21    Q.  And have you testified previously --

22    A.  Yes, I have.

23    Q.  -- in other cases?

24    A.  Yes, I have.

25    Q.  Federal and state court?

1      A.   And military, yes, sir.

2           MR. COLBATH:  Your Honor, at this point I would

3      ask the Court to find that Mr. Iber has the education,

4      training, experience and qualifications to offer

5      specialized opinions in the field of forensic audio

6      evaluation and analysis.

7           THE COURT:  Audio?

8           MR. COLBATH:  Oh, I'm sorry, visual evaluation

9      and analysis.

10          MS. SHERMAN:  To that I have no objection.

11          THE COURT:  Very good.  I will find the witness

12     so qualified.

13          MR. COLBATH:  No audio work, correct, Mr. Iber?

14          THE WITNESS:  Correct.

15          MR. COLBATH:  Other than to having to listen to

16     me.

17     BY MR. COLBATH:

18     Q.   So when did you first -- were you -- how did you

19     become involved in this case?

20     A.   So in my unit, in the digital evidence

21     laboratory, we receive requests from the field.  So

22     agents will send in a request asking for analysis in one

23     of those four types of exams that I conduct.

24          So in this case, I received a what we call EC, an

25     electronic communication, our unit did, and it was

1   assigned to me.  It was a request for what we call a

2   make and model, which would be a comparison exam.

3       Q.   Do you know when you received that request?

4       A.   April of 2012, I believe.

5       Q.   Okay.  And so you were asked to do a request for

6   a make and model exam.  What is a make and model exam?

7       A.   So like I said, it's a comparison exam, but it's

8   not -- earlier when I had mentioned comparison, I talked

9   about taking a questioned image and comparing it to a

10  known image to see if they are the same.

11      A make and model, all that I'm trying to do is

12  work out just the make and model, so it's not a specific

13  car, but one of a large group.  So when I do a

14  comparison exam, I look at class characteristics and

15  individualizing characteristics.

16      Class characteristics are things that can put

17  something into a group, so like a baseball cap or a

18  cowboy hat.  Individualizing characteristics would be

19  characteristics that are stronger that would be more

20  unique to an object or a person so that I could actually

21  identify that object or that person.

22      So make and model, all I'm looking for are class

23  characteristics, those features on a vehicle to where I

24  could say that it is a particular make and model and

25  within a generation, so the timeframe that make and

1  model was made.

2      Q.  And so what information did you receive with this

3  request to try to -- that you were asked to perform your

4  analysis on?

5      A.  I received a video, a copy of a video on a CDR

6  disc.

7      Q.  And that video was the April 12th surveillance

8  video in this case that showed some images of an unknown

9  vehicle?

10      A.  The video was of a pole camera in a parking lot

11  that was pointing toward a building in a parking lot,

12  and I was -- and I was told which images were of

13  interest.  There was a questioned vehicle that was

14  driving down a road in both directions, and so I

15  captured images from that to do the analysis.

16      Q.  So describe the steps for us that you went

17  through.  You have got this -- you said it came on a

18  disc, a CD?

19      A.  Yes, sir.

20      Q.  So describe for us the steps that you then went

21  through to perform your make and model analysis?

22      A.  So we follow our standard operating procedure.

23  So when we receive evidence, we follow those procedures,

24  which include marking and protecting the evidence.  Then

25  we make a copy of that video onto our work station.  Of

course, this is a digital evidence laboratory, so this
is all digital evidence.

We review the video and look for pertinent images
that we can use for our analysis. We save those images,
and then at that point we do the information extraction.
We do enhancements of those images to try to pull out as
much information as we can from those images.

From there, we go to a comparison analysis. In
the case of a make and model, since I don't have a known
vehicle that I'm comparing it to, we have a database of
images of known vehicle make and models. It's called
the DAIS, the Digital Automotive Image System.

And we also use the internet as well that,
obviously, everyone has access to to find known images
of particular make and models over the generation when
they were created.

Then the comparison, we look at the features of,
in this case a vehicle, so we're looking for window
shape, we're looking for grille, headlight shape,
taillight shape, we're looking for license plate
location, we're looking at how many doors, what kind of
vehicle is it. Is it a pickup truck? Is it an SUV? Is
it a sedan?

We're trying to get -- we're trying to see these
features, any kind of trim that might be on there, so

that I can then compare that to the database to try to

find something that matches those same features.  When

enough features match, then I give a conclusion of a

make and model.

THE COURT:  Sir, can you push that monitor

down?  I'm thinking Juror No. 1 can't really see you

very well.  Can you get it lower?

THE WITNESS:  Is that better?  I'll sit up as

well.

THE COURT:  Thank you.  Go ahead, please.

MR. COLBATH:  I have the same problem up here.

BY MR. COLBATH:

Q.  In this case, in performing that, going through

that process with the video you received, were you

working alone?

A.  No.  At the time, I was supervising a new

photographic technologist, Anthony Imel, so at that

point he was considered a tech, so he was going through

his two years of training.  And so I was one of the

certified examiners, senior certified examiners that was

part of that.

So he was actually working on the case with me.

So he would be the one that would go through those

standard operating procedures, and, of course, come to

me to show me the images that he worked on.  And we

1  would -- I would make the final decision if they were

2  correct.

3      Q.  So in looking at the -- you keep referring to

4  images, but you started with the video.  You took still

5  images out of that video?

6      A.  So a video is just simply a sequence of still

7  images played back at a rate to kind of fool our mind

8  that there is motion.  So video is just still images.

9          So when we get evidence in that is a video, we

10 are going to break that down into its smallest

11 denominator, which would be a still image.

12     Q.  And once you had the images from the video, you

13 said something about enhancement.  Did you do something

14 to the images in this case to enhance them or change

15 them in any way?

16     A.  So the tech, Anthony Imel, he did some basic

17 contrast enhancements where he changes the levels

18 between the lighter part of the image and the darker

19 part, which makes it a little bit easier to see some of

20 the information within it.  He also did some sharpening,

21 which is a filter that tries to take edges and it tries

22 to enhance the contrast at edges to make edges come out

23 a little bit more, which gives you some more detail as

24 well.

25     Q.  So was it before or after the enhancement process

1   then that you start looking for these characteristics

2   that try to help you make your determination?

3       A.  The comparison would be done after enhancements.

4       Q.  In this case, what was the result of your and

5   Mr. Emmel's I guess determination, or what was -- at the

6   end of your comparison, what were you able to come up

7   with for a conclusion?

8       A.  That there was insufficient image detail.  So

9   there were many factors that a picture is a

10  two-dimensional copy of a three-dimensional space.  And

11  so the further you go back into an image in the

12  background, you have less information to give you that

13  detail.

14      So the questioned vehicle was pretty far back in

15  the image and so there was not a lot of detail.  There

16  were a couple other factors as well.  There was some

17  motion blur because the vehicle was moving, and that's

18  just due to the camera the way it captures an image.  If

19  something is moving fast enough -- I'm sure you have

20  seen motion blur before in images.  If something is

21  moving fast enough, you can actually get a little bit of

22  a blur, which gives you less detail, less defined edges.

23      So due to those factors, and that the vehicle was

24  obscured by some parked vehicles and some of the frames

25  that we were using for comparison, I was not able to

1  come to a conclusion.

2    Q.  You mentioned some of the frames.  How many -- do

3  you recall how many images you were able to look at or

4  get from the video to be able to try to perform your

5  work?

6    A.  So in this particular request, there were seven

7  images that we felt were pertinent to a make and model

8  exam.

9    Q.  And did the -- is that a large number, a small

10  number?  Did it matter how many images there were to

11  you?  Did that play into the evaluation?

12    A.  Well, typically, if there is more images, the

13  better.  I have done make and models on single images

14  before.  The more images you have the more information

15  that you can typically get.

16    Q.  You mentioned the image or the object being far

17  away in the image.  Are you talking about -- well,

18  explain that to me, how it can be far away in the image.

19    A.  So it's distance from the camera, so where the

20  camera was placed and recording the image.  So again,

21  it's a two-dimensional -- a picture is two dimensional,

22  but the space that it was recording is three

23  dimensional.

24        So think of train tracks.  So train tracks going

25  off in the distance, eventually they look like they

meet, but we know they don't. That's the vanishing

point. So close in the frame the tracks are apart.

Right. And then as you look back into the image,

because there is less information, there is less of --

so a digital image is made up of pixels, and pixels are

the smallest element of that image. And so as you get

further into that image, you have fewer pixels

representing the objects that are farther in the image.

Q. And this one, the object you were looking at was

far away in the image?

A. Correct.

Q. So once you make a determination here or the

determination that you can't make a determination, what

do you do?

A. I write a report and send that back to the

requester.

Q. And you did that in this case?

A. Yes.

Q. Is there any type of review or checks or balances

within the FBI lab or procedure you follow in producing

your report and reporting back to whoever asked you to

do this work?

A. Based on our standard operating procedures, all

of our exams are peered by another certified examiner.

So I would have written the report -- I would have done

15

the analysis, written the report, all of the paperwork

and information would be given to another certified

examiner and they would have to concur with my

conclusions and they sign off on that.

      And then after that, it goes through an

administrative review to make sure all the papers are

there and evidence has been -- chain of custody and has

been shipped correctly back to the requester.

Q.  And so in this case, when you and Mr. Imel were

done with your work and you wrote up your report,

another examiner -- was there another examiner that

looked at it prior to it going out of the FBI lab?

A.  Yes, it was peered.

Q.  And who was that?

A.  That would be George Skaluba.

Q.  What is Mr. Skaluba's position within the lab?

A.  He is also an image examiner.

Q.  Like yourself?

A.  Yes.

Q.  And who was that material then or your

information sent back to?

A.  The request came from Special Agent Gaston

(phonetic), I believe, and so it would have been

returned to him.

Q.  And that was an agent working here in Alaska?

1    A.   That's correct.

2    Q.   So did you have an occasion after performing that

3    initial analysis and that initial comparison to work on

4    or look at that video or something with this case again?

5    A.   Yes.

6    Q.   And how did that come about?

7    A.   So one of -- in our standard operating

8    procedures, if we're given a copy of a video or an

9    image, we ask the submitter if we can get an original.

10   Occasionally, with surveillance video, the digital video

11   recording system, the way it records the video is a

12   proprietary format, which means that it uses a

13   particular software to record that.

14        And when you make a copy, rarely, but it does

15   happen, sometimes the copy can have more compression to

16   make the file smaller.  So compression in video is where

17   video takes up a lot of space on a hard drive or on a

18   disc, and so they use compression, which there is

19   different kinds of compression.  There is temporal and

20   spacial.

21        The spacial compression is where they take

22   pixels, the smallest picture element in the images, and

23   ones that are repeated over and over again, they use

24   mathematical formulas to calculate for those and then

25   they drop them out.  And it actually makes the file

smaller.  And then on the other end, you decompress it,
and that mathematical equation is used to recreate the
scene.

        This can cause artifacts, compression artifacts,
depending on the quality of the compression algorithm
that you're using.  And in this case a proprietary
software can also change that.  So I asked for the
original video from the requester.

Q.  What does those artifacts look like if you're
just looking at a picture where those exist?  What would
we see if we didn't know what we were looking at?

A.  Typically, it's blocking, so if you have ever
seen a poor quality digital image and there is a lot of
blocking, little eight by eight blocks, and that can
cause disruption in information in the image.  You can
lose detail based on that.

Q.  So the video camera put those blocks in?  They
weren't really in the picture?

A.  It wouldn't be the video camera.  This would be
the actual recording process from the video camera when
it's being recorded to save space.  So in the olden days
of analog video, you had that VHS tape that you stuck in
the recorder, and that could -- there was only so much
tape on that, and so you either had to -- when it ran
out of tape, you had to stick a new tape in there.

1      Well, people got tired of putting -- taking tapes

2 in and out, so they came up with different ways to get

3 more information on that tape. Well, when the digital

4 video surveillance came around, it was the same thing.

5 Digital video takes a lot of space. So if you -- you're

6 talking about millions of pixels per image or thousands

7 of pixels per image, and then you have got thousands of

8 images. It adds up. It takes a lot of space, so they

9 use this compression to save space.

10   Q. Were you able then to get from the office here in

11 Alaska an original video to look at?

12   A. Yes. So Special Agent Allison was able to give

13 me a copy of the proprietary video file, which was sent

14 to the laboratory.

15   Q. And what happened once you received the

16 proprietary or the original video in the case?

17   A. So I had to figure out what the proprietary file

18 was so that I could get the proper proprietary video

19 player to play it back. Once I had that, the process is

20 basically the same as doing it from the copy video that

21 was sent. So the same method, same process going

22 through.

23   Q. And the video -- so was the video you looked at

24 this second time, it was the same video, just an

25 original, not a copy basically?

1    A.   That's correct.

2    Q.   And then you said you did the same analysis, same

3    steps?

4    A.   I did not do a make and model analysis.  At this

5    point, I was just trying to see if the copy possibly had

6    more compression in it, so I was trying to see if the

7    proprietary video file -- excuse me.  I'm a little under

8    the weather.

9    Q.   That seems to be going around in our system here.

10    A.   So the proprietary -- what I was trying to do

11    here was I trying to see if the imagery in the

12    proprietary video had less compression, which would mean

13    more detail.  And hopefully, I would be able to assist

14    the Anchorage field office by doing that.

15    Q.   Did the video have any more detail or was it any

16    better quality to let you do a new make and model

17    determination?

18    A.   No, it was not.  It was equivalent to the copy

19    video.

20    Q.   So no different decision, no different outcome?

21    A.   Correct.

22    Q.   And once you determined that, what did you do

23    then, once you determined the original couldn't help you

24    any more than the past one had been?

25    A.   A report would have been written.  It would have

gone through a peer review and an administrative review
and sent back to the requester.

Q.  That would have been Agent Allison again then,
sent back to him?

A.  That's correct.

Q.  Now, that second process that we just talked
about, was that back in 2012 as well?  How far in time
after your first look at it, how far in time was that
second review of the original information?

A.  I believe that request came in in June of 2012.

Q.  So first April, then June?

A.  Correct.

Q.  Did there come a time where you were again
contacted relative to this case by Agent Allison or
somebody from Alaska to do some additional work in the
case?

A.  Yes.  There was a request in June of 2018 for a
vehicle comparison.

Q.  So last year?

A.  Yes, sir.

Q.  All right.  And were you asked at all about --
first of all, did the vehicle comparison involve the
same video?

A.  No.  It was of the same location but a different
camera.

1    Q.  All right.  And was there any part of the inquiry

2    that dealt with the first video that you looked at or

3    the vehicle that you were unable to find detail in?

4    A.  No, this involved a pickup truck that pulled into

5    a parking lot.

6    Q.  Okay.  Had there been any changes in your work,

7    the laboratory, anything from your first work, or would

8    there have been any reason for you to review the work

9    you did before on the first video?

10   A.  No.

11   Q.  All right.  So I'm going to -- could we show

12   Mr. Iber Exhibit No. 160.  I think it's Defense 160.

13       Mr. Iber, I'm going to have you look at this

14   video, it's been admitted, and see if you recognize it.

15       (Defense Exhibit No. 160 playing in open

16   court.)

17   A.  That's the questioned vehicle that was of

18   interest that they wanted the comparison.

19   Q.  And so last year in 2018 when you received this

20   video, did you receive the video alone or did you

21   receive it with other materials?

22   A.  So they were requesting a make and model.  They

23   were actually requesting a comparison to a known

24   vehicle, so I also received images of a known vehicle.

25   Q.  And say again for me the difference between a

1    make/model determination and a photo comparison.  You

2    treat those as separate or different inquiries?

3        A.   So a make and model is a comparison, but that's

4    only class characteristics, so features that would be

5    found on many different vehicles.  A comparison, I'm

6    looking for features on the vehicles that would be more

7    unique, be more individualized, so that I could make a

8    determination if it's the same vehicle or not the same

9    vehicle.

10       Q.   In the first determination you did, the

11   make/model, when you don't have the detail to, like you

12   found, you don't have the detail to make that make/model

13   determination, can you do a comparison with that?

14       A.   Typically, no.

15       Q.   Why not?

16       A.   If there is not enough detail to see features to

17   do a class characteristic, such as a make and a model,

18   chances of actually doing a one-to-one comparison to a

19   known would not be beneficial.

20       Q.   In this case though you received some photos to

21   compare to the video of the white truck we saw?

22       A.   That is correct.

23       Q.   I'm going to show you -- first of all, what steps

24   then did you go through to perform that comparison

25   analysis?

1    A.   So the same steps as with the make and model.

2   The evidence was reviewed and pertinent images were

3   exported from the video, so I'm working with still

4   images again.  Enhancements would have been done.  And

5   then I would also take the known images, if they need to

6   be enhanced, they are enhanced as well, and then I do a

7   side-by-side comparison looking for features that are

8   similar or dissimilar.

9        In the process, I generally create a chart

10   showing any of the features that I found similar or

11   dissimilar as well.

12    Q.   Do you have, once you make a determination, the

13   same review process and those things that's not -- is

14   that followed as well?

15    A.   Yes.  So just like the make and model, it would

16   be reviewed, a peer review by another examiner,

17   certified examiner, and then go through the admin.  And

18   then a report would be written, and that would be

19   returned to the requester.

20    Q.   And were you able to make a comparison in this

21   case?

22    A.   Yes, I was.

23    Q.   I'm going to show you what is Defense Exhibit

24   No. 307, and it will be on the screen there in front of

25   you first, sir.

1          MR. COLBATH:  Your Honor, I understand that

2     there is no objection to this Defendant's 307, so before

3     I have Mr. Iber talk about it, I'm going to move to

4     admit that.

5          MS. SHERMAN:  That's correct.  No objection.

6          THE COURT:  307 is admitted.

7          (Defense Exhibit No. 307 admitted.)

8          MR. COLBATH:  Your Honor, if I could approach,

9     I need to give Mr. Iber the laser pointer here.

10          THE COURT:  Certainly, that's fine.

11          (Mr. Colbath approaches witness.)

12     BY MR. COLBATH:

13     Q.  You won't be the first one to be shaky with it.

14     A.  I'll try to keep my hand as steady as I can.

15     Q.  First of all, before you have to point to

16     anything, Mr. Iber, just tell us what we're looking at

17     here in Defense Exhibit No. 307.

18     A.  So the images on the left are going to be the

19     questioned vehicle that was depicted in the video.  And

20     the images on the right --

21     Q.  Let me interrupt you right there.  So you took --

22     you took those images out of that video?

23     A.  Correct.  So when I exported images for the

24     video, pertinent images that would help with my exam,

25     these are three of the images that I exported.

1    The images on the right are the supplied known

2  images of a known vehicle.

3    Q.  And then what do you do?

4    A.  I simply look at features between the vehicles.

5  Now, this is a pickup truck with a cap, and since you

6  can remove a cap from a pickup truck, I was actually

7  looking at the cap separately from the truck.  In a way,

8  it was almost two comparisons.

9    So if you look at the features on the cap, there

10  is windows on the side and you can see the roof of the

11  cap.  Now, when I do a comparison, I mentioned before

12  I'm looking for class characteristics and

13  individualizing characteristics.

14    One of the things about doing a comparison is

15  that you can eliminate something easier than you can

16  identify something.  If class characteristics don't

17  match, then you can eliminate.  So a baseball cap, if

18  I'm comparing a baseball cap to a cowboy hat, obviously,

19  I don't need any individualizing characteristics.  I

20  know that that can't be the same hat.

21    So to be able to say something is the same thing,

22  I have to have characteristics.  I have to have some

23  kind of feature that would be individualizing to those

24  two objects or vehicles in this case to where I could

25  say they are the same.

1      So the cap here, you can see the window

2  configuration and you can see the top of the cap.  On

3  the known vehicle, it's a different window configuration

4  and there is a little bit of a bump-up up here on the

5  top, so those were differences that I noticed in

6  features of the cap.

7      When it comes to the vehicle, the truck has a

8  crew cab and I did not see the crew cab.  I would expect

9  to see a larger window area here if that crew cab

10  existed.  And so that's a difference.

11      And then there is also this trim here, which is a

12  decent thickness black trim.  I would expect to see

13  something here and down here on this side as well, and I

14  do not.  So those were differences that I noted.  Now,

15  those are just class characteristics, but because they

16  are differences, I was able to say that this vehicle and

17  cap are not the same as that vehicle and cap.

18  Q.  So that was your ultimate determination was one

19  is excluded from being the other?

20  A.  Correct.

21  Q.  And what did you do then with your findings

22  relative to this?

23      We can take that down.  You can just leave that

24  laser pointer sit there, if you would.

25      What did you do then once you made that

1  determination?

2      A.  So again, a report would be written.  It was peer

3  reviewed, admin reviewed, and then that, plus the charts

4  that I created and any enhanced printed images were sent

5  back to the requester.

6      Q.  And that was Mr. Allison?

7      A.  That's correct.

8          MR. COLBATH:  That's all the questions I have

9  for Mr. Iber, Your Honor.  Thank you.

10         THE COURT:  Ms. Sherman, go ahead, please.

11                    CROSS EXAMINATION

12  BY MS. SHERMAN:

13     Q.  Good morning, Mr. Iber.

14     A.  Good morning.

15     Q.  Fair to say you probably watched that video of

16  the white truck several times in pulling out those

17  images?

18     A.  Yes, ma'am.

19     Q.  You would agree with me that that truck never

20  stops in that parking lot?

21     A.  That's correct.

22     Q.  Nowhere in your report did you indicate that

23  Mr. Imel actually assisted you on this, did you?

24     A.  It would be in the notes.  He would be considered

25  a tech.

1    Q.  Back in 2012, what was the resolution of your

2   computer that you were using to do this analysis?

3    A.  You mean the monitor or -- I'm not sure.  It

4   would have been a higher resolution than what the video

5   was.

6    Q.  Okay.  So originally, in April 2012, you get a CD

7   and you're able to extract just seven images, right?

8    A.  We selected seven images.  We could have

9   extracted more, but we selected seven.

10    Q.  In June or July, that summer, you actually

11   extracted nine images from the hard drive?

12    A.  That is correct.

13    Q.  And five northbound, right?

14    A.  I believe that's correct.

15    Q.  And four southbound?

16    A.  I believe that's correct.

17    Q.  Okay.  And you would agree those images contained

18   a blue vehicle, right?

19    A.  A blue tone vehicle, yes.

20    Q.  And you never compared those to any other images

21   of blue vehicles, right?

22    A.  No, I did not.

23    Q.  And then in August of 2012, you sent an e-mail to

24   Special Agent Allison about your -- the reasons you

25   couldn't make a make/model determination, didn't you?

1    A.   That is correct.

2    Q.   And in there you talked about the things you've

3 mentioned here, low resolution, image quality, pixels,

4 blur, all those things?

5    A.   Yes, ma'am.

6    Q.   And you recall at the end of your e-mail you

7 indicated you can always show the images to a person,

8 car dealer or mechanic, and they might be able to

9 recognize the make and model, right?

10   A.   So I'm an expert in comparison analysis.  I'm not

11 necessarily an expert in all automobiles.  There are too

12 many makes and models for me to be considered an expert

13 on all makes and models.

14       So what I'm an expert on is comparing things that

15 are depicted within imagery, so it can be anything,

16 cars, clothes, guns, anything, faces.  One of the things

17 that we do, sometimes when we have imagery where we're

18 actually able to pull something out of the video, but my

19 method, I have to follow my standard operating

20 procedures and my method on doing comparison.

21       There wasn't enough information there for me.  So

22 sometimes we do recommend to the submitters that they

23 might want to take it to an automobile expert and that

24 they might be able to help them.

25   Q.   Are you familiar with Neil Schmidt from Honda?

1     A.   I am not.

2          MS. SHERMAN:   Thank you.

3          THE COURT:   Redirect?

4          MR. COLBATH:   Just very briefly.

5                    REDIRECT EXAMINATION

6   BY MR. COLBATH:

7     Q.   Mr. Iber, Ms. Sherman first asked you about

8   whether it was a blue vehicle, and you said blue -- blue

9   tone?

10    A.   Yes.

11    Q.   And why -- why the clarification or the caveat of

12  blue tone?

13    A.   Well, with video, color is not always reliable,

14  and so we typically do not do -- examinations, we do not

15  talk about color.   We'll talk about tonality.   The other

16  reasons, just to be more exact, there is so many

17  different varieties of color, so each color has many

18  different hues.

19         So when one person says blue, another person

20  might say cyan or a different color, so we typically

21  stay away from color and we just consider it tone.   So

22  it was a bluish tone.

23         MR. COLBATH:   That was the only follow-up I

24  had, Your Honor.   Thank you.

25         THE COURT:   Thank you, sir.   You may be

1    excused.  I hope you feel better.  I'm struggling with a

2    cold too.

3            (Witness excused)

4            (Requested excerpt concluded, proceedings

5    continued.)

6

7                        CERTIFICATE

8        I, Sonja L. Reeves, Federal Official Court Reporter
     in and for the United States District Court of the
9    District of Alaska, do hereby certify that the foregoing
     transcript is a true and accurate transcript from the
10   original stenographic record in the above-entitled
     matter and that the transcript page format is in
11   conformance with the regulations of the Judicial
     Conference of the United States.

12
         Dated this 16th day of December, 2019.
13

14
                            /s/ Sonja L. Reeves
15                          SONJA L. REEVES, RMR-CRR
                            FEDERAL OFFICIAL COURT REPORTER
16

17

18

19

20

21

22

23

24

25