1                    UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF ALASKA
2

3     UNITED STATES OF AMERICA, )
                                )
4            Plaintiff,         )
                                )
5     vs.                       )   CASE NO. 3:13-cr-00008-SLG
                                )
6     JAMES MICHAEL WELLS,      )
                                )
7            Defendant.         )
      _____)
8

9          PARTIAL TRANSCRIPT OF TRIAL BY JURY - DAY 12
                    (Testimony of Brett Mills)
10     **BEFORE THE HONORABLE SHARON L. GLEASON, DISTRICT JUDGE**
                  September 26, 2019; 8:32 a.m.
11                      Anchorage, Alaska

12    **FOR THE GOVERNMENT:**
              Office of the United States Attorney
13            BY:  STEVEN SKROCKI
              BY:  CHRISTINA M. SHERMAN
14            BY:  KELLEY L. STEVENS
              222 West 7th Avenue, #9
15            Anchorage, Alaska 99513
              (907) 271-5071
16

      **FOR THE DEFENDANT:**
17            Office of the Federal Public Defender
              BY:  GARY GEORGE COLBATH
18            601 West 5th Avenue, Suite 800
              Anchorage, Alaska 99501
19            (907) 646-3400

20            Camiel & Chaney, P.S.
              BY:  PETER A. CAMIEL
21            520 Pike Street, Suite 2500
              Seattle, Washington 98101
22            (206) 624-1551

23    _____

                    **SONJA L. REEVES, RMR-CRR**
24               Federal Official Court Reporter
                    222 West 7th Avenue, #4
25                   Anchorage, Alaska 99513
            Transcript Produced from the Stenographic Record

1    (Call to Order of the Court at 8:32 a.m.)

2    (Proceedings took place and are not included in

3    this transcript, after which, the testimony of Brett

4    Mills transpired as follows:)

5    (Oath administered to the witness)

6    DEPUTY CLERK:  For the record, can you please

7    state your full name and then spell your full name.

8    THE WITNESS:  My name is Brett Mills,

9    B-r-e-t-t, M-i-l-l-s.

10    BRETT MILLS, GOVERNMENT WITNESS, SWORN

11    DIRECT EXAMINATION

12    BY MR. SKROCKI:

13    Q.  Good morning, Mr. Mills.

14    A.  Good morning, sir.

15    Q.  Sir, if you could please tell the jury where you

16    work and in what capacity.

17    A.  I work at the FBI laboratory in Quantico,

18    Virginia.  I am a firearms tool mark examiner.

19    Q.  If you could just briefly describe to the jury

20    the work you do as a firearm and tool mark examiner.

21    A.  I receive evidence from federal, state, local,

22    sometimes even international law enforcement agencies,

23    and it could be anything from bullets and firearms, or

24    it could be tools, say a door that was pried open.

25    But my job is to examine it, see if I can or

cannot identify the evidence to each other or if I can
exclude them from each other. And then after that, I'll
write a report. And then if called upon to testify, I
will do that.

Q. You have done this for how long, sir?

A. I have been in the laboratory for over 30 years,
and now qualified, I believe it's 26.

Q. And with respect to the examinations that you
have conducted over the course of your career, what do
they include in terms of firearms and tool mark analysis
and comparison just by way of example?

A. So mostly it's like you see on the TV. You have
a firearm cartridge case is left at a scene, bullets
recovered from bodies. The investigator will think it's
the gun and so he'll send it to the lab in order for us
to do the processing.

For tool marks, it's more of usually your
breaking and entering, auto theft, chop shop rings.
They use tools to actually chop up the vehicle and sell
the parts, so we can compare those and see if those were
the tools that were used to commit the crime.

MR. SKROCKI: May I have just a moment, Judge?

THE COURT: Yes.

(Pause)

BY MR. SKROCKI:

1    Q.   With respect to your work, do you also train

2    others with respect to tool mark and firearm analysis?

3    A.   Yes, sir.  The laboratory does teach classes in

4    firearms identification, tool mark identification,

5    gunshot residue, serial number restoration, and bullet

6    trajectory reconstruction or shooting incident

7    reconstruction.

8    Q.   Over the course of your career, if you could

9    estimate how many exams you have done in the area of

10   tool mark and firearms analysis?

11   A.   It's well into the thousands easily.

12   Q.   And you have been qualified in state and federal

13   courts with respect to firearms and tool marks analysis

14   over the course of your career?

15   A.   Yes, sir, I have.

16   Q.   Including here in Alaska?

17   A.   Yes, sir, I have.

18        MR. SKROCKI:  Your Honor, we would move to ask

19   the Court to find that Mr. Mills has the experience and

20   training, background and education to render opinions on

21   the topics inquired upon in this case.

22        MR. CAMIEL:  No objection.

23        THE COURT:  I'll find the witness so qualified.

24   Go ahead.

25   BY MR. SKROCKI:

1    Q.   Mr. Mills, you were asked to conduct several

2  exams with respect to this case, yes?

3    A.   That is correct.

4    Q.   And the first one -- we're going to sort of go

5  through them subject by subject.  The first we're going

6  to talk about is clothing.

7         Were you sent clothing to examine with respect to

8  the homicides in this case?

9    A.   Yes, sir, I was.

10    Q.   In general, what were you asked to look for?

11    A.   I was asked to do gunshot residue.  It's not like

12  you would see from hand swabs.  This is from a

13  perspective of the end of the barrel to an object.  In

14  this case, it was clothing.

15         And so when a bullet leaves the end of the

16  barrel, it's not the only thing that leaves.  You have

17  gas, you have partially burnt and unburnt gunpowder and

18  you will have vaporous lead and particulate lead.

19         If the firearm -- and this is usually rule of

20  thumb:  Greater than six feet, you usually won't see

21  that pattern because it's very fluid.  It will just

22  expand and dissipate real quick, but if it's less than

23  six feet, you can create that pattern.  It will catch on

24  the surface of whatever is in between there.

25         You can chemically process it and then test fire

1  using like ammunition in the gun to determine a

2  distance.  So that was the exam that was asked of me, to

3  see if I could do a distance determination.

4  Q.  Were you asked -- were you able to determine

5  whether there was any residue of a gunshot or a firearm

6  shot on the clothing of Mr. Belisle and Mr. Hopkins?

7  A.  On Mr. Belisle, yes, sir.  The only thing I could

8  get was it's referred to as bullet wipe.  So when a

9  bullet passes through the garment, any vaporous lead or

10  particulate lead that has abraded to the surface, when

11  it passes through, it will transfer to the garment.

12        When I process it, it will create a purple visual

13  effect.  So I believe three of the holes on

14  Mr. Belisle's clothing tested positive for bullet wipe.

15  On Mr. Hopkins, bullet wipe was negative, but I had

16  copper particulate.

17  Q.  And that would come from what, sir, in your

18  experience?

19  A.  From a bullet and a bullet jacket.

20  Q.  Were you asked to conduct an exam with respect to

21  metal fragments in the trash can?

22  A.  Yes, sir, I was.

23  Q.  Did you have any results with respect to that

24  exam?

25  A.  The trash can was chemically tested for lead and

copper.  One of the holes tested positive for lead.  The
other hole tested positive for lead and copper.  The
fragments that were recovered in the trash can were
consistent with lead, but there were no marks of value
on them.

Q.  Were you provided a piece of furniture of that
furniture within the crime scene for testing as well?

A.  Yes, sir, I received a cabinet door.

Q.  And what did you test that for?

A.  There was a possible impact on the surface of the
door and I was asked to test to see if it would test
positive for either lead or copper.  And it did test
positive for lead.

Q.  But not for copper?

A.  No, sir.

Q.  Were you provided some of what was described as
debris to examine from the crime scene as well that was
collected from the investigation?

A.  Yes, sir, I believe it was in the foyer.  It was
a small non-magnetic piece of fragment, but source was
unknown and there were no marks of value for comparison
purposes on that.

Q.  Were you also asked to exam some seized pistol
cases and holsters from the investigation sent to you?

A.  Cartridge cases, sir?

1    Q.  Pistol, revolver cases.

2    A.  Oh, as the holsters.  Yes, sir, I did.  There

3  were I believe four holsters and a pistol case that I

4  examined.

5    Q.  With respect to those items you examined, were

6  any of them matching with respect to a Smith & Wesson

7  .44 caliber revolver with a six-inch barrel?

8    A.  No, sir, not that make and model.

9    Q.  Were you asked to conduct any firearms testing?

10    A.  I was requested to do a .44 Magnum Ruger

11  Blackhawk revolver and to examine a .44 Magnum

12  Winchester carbine.

13    Q.  The results of that -- I'm sorry.  Let me

14  rephrase that.

15        What kind of exam did you do with respect to

16  those firearms?

17    A.  Did basically a simple function to see if the gun

18  fired as designed.  There were some cartridge cases that

19  were submitted.  Two of them, I believe -- two of them

20  were identified back to having been fired in the Marlin

21  rifle, and I believe two of them were identified as

22  having been fired in the Ruger.

23    Q.  Did you have occasion to examine those firearms

24  with respect to bullets that were sent to you from

25  investigators from the crime scene?

1    A.  Yes, sir, I did.

2    Q.  Was there a match with respect to those or not?

3    A.  No, sir, they were excluded.

4    Q.  Excluded being negative?

5    A.  Yes, sir, the bullets from the scene were not

6    fired by those two weapons.

7    Q.  As part of your work as a firearms tool mark

8    examiner, do you have occasion to compare certain

9    bullets, one bullet to another?

10   A.  Without a gun?  Yes, sir.

11   Q.  Without a gun, yeah.  Did you do that in this

12   case?

13   A.  Not bullet to bullet.  Are you talking about

14   fired ammunition?

15   Q.  Maybe it's my nomenclature, so let me back up.

16       Were you asked to compare bullets seized from the

17   crime scene with bullets seized from Mr. Wells' home in

18   this case?

19   A.  There were two bullets and two bullet jacket

20   fragments from the scene.  I was given basically close

21   to 400 rounds of ammunition, which is a cartridge

22   itself.  The cartridge is what houses the bullet, if

23   that's what you're referring to.

24   Q.  See, it was my nomenclature.

25   A.  Yes, sir.

1    Q.  Were you asked to compare cartridges seized from

2  Mr. Wells' home in a small pouch to bullet fragments and

3  bullets seized from the crime scene?

4    A.  Yes, sir, there was -- it was a camouflage pouch.

5  It had 12 .44 Magnum cartridges in them.  12 of them

6  were Winchester soft-point bullets, and one Federal

7  hollow-point bullet.

8    Q.  So I think either right in front of you or behind

9  you there is Exhibit No. 150 on the floor.  You see that

10  there, Mr. Mills?

11    A.  This one right here?

12    Q.  Yeah.  Is there a 150 tag on it?

13    A.  Yes, sir.

14    Q.  Could you open that up and take that out for the

15  jury, please?  Do you want gloves for that?

16    A.  No, sir.

17    Q.  Okay.  Could you hold up the pouch for the jury

18  to see?  And you stated what kind of cartridges are in

19  that pouch?

20    A.  These are .44 Magnum.

21    Q.  And how many are there?

22    A.  Now there are ten.

23    Q.  Okay.  When you received them, how many were in

24  there?

25    A.  An even dozen.

1    Q.   And if you could tell the jury -- you examined

2    each one.   What types were contained in that pouch?

3    A.   So what I wound up -- from my exams, in order to

4    compare the bullet to bullet, I used a kinetic bullet

5    puller.   Basically you just take the kinetic energy and

6    it will literally allow the bullet to come out of the

7    cartridge case and then you can get to the powder, but

8    it doesn't damage the bullet, doesn't create marks or

9    anything on it.

10        Then I can look at what I refer to as general

11   class characteristics.   So when a manufacturer designs

12   anything, whether it's a bullet, a car, or a firearm,

13   they want it to look a particular way, they want it to

14   perform in a particular way.

15        So with ammunition, depending on who's their

16   engineer, you could have a hollow point.   There has been

17   at least six or seven different types of hollow points.

18   The rule still stays the same, it's a hollow cavity in

19   the nose of the bullet.

20        The base of the bullet, do they want to

21   facilitate the expansion so that as the bullet travels

22   down the gas doesn't pass by the bullet, you want that

23   tight seal, so they will put a concave shape in the base

24   of it.

25        All of these are their design characteristics.

1    And normally they will not cross over into other

2    manufacturers unless they are licensed to.

3         So in this case, the Winchester that I pulled was

4    a soft point.  It had actual cannelure.  Cannelure is

5    the narrow grooves that are cut around.  For revolver

6    ammunition and rifle ammunition, it's basically used to

7    seat the bullet at the proper height.  Originally the

8    design was you would lubricate it with a grease or a wax

9    so that it wouldn't foul the barrel as easily.

10         The Federal -- oh, and it had a concave base.

11   The Federal was a hollow-point bullet and it had a

12   jacket on it, but it was flattened on the bottom.

13        Q.  So how many -- you mentioned Winchester.  What

14   was the grain weight of that?

15        A.  It's a 240-grain bullet.

16        Q.  And there was a Federal bullet in there as well,

17   in that pouch?

18        A.  Yes, sir, it was.

19        Q.  How many Winchester 240-grain soft points and how

20   many Federals in that pouch, Exhibit No. 150?

21        A.  There was 11 Winchester with the soft points and

22   one Federal with a hollow point.

23        Q.  If we could have Exhibit No. 265, please, for

24   identification.

25        With respect to what you just explained to the

1  jury, Mr. Mills, did you create a photograph to help you

2  explain it more clearly?

3      A.  Yes, sir.

4      Q.  On the -- did you take this photograph?

5      A.  Yes, sir, this is from my notes.

6      Q.  And the one to the right, you took that one as

7  well?

8      A.  Yes, sir, I did.

9      Q.  And with respect to two bullets on the left, one

10  comes from the crime scene, correct?

11      A.  Yes, sir.

12      Q.  And other comes from the pouch?

13      A.  Yes, sir.

14      Q.  All right.

15          MR. SKROCKI:  Move for the admission of 265.

16          MR. CAMIEL:  No objection.

17          THE COURT:  265 is admitted.

18          (Exhibit No. 265 admitted.)

19  BY MR. SKROCKI:

20      Q.  Mr. Mills, you're the expert, so why don't you

21  walk us through the comparisons that you made and what

22  formed the basis of your comparison and your opinion,

23  please.

24      A.  All right, sir.  So on the left-hand side, this

25  is a bullet that was recovered from the scene.  You can

1  see a land impression and a groove impression.  So this

2  bullet has actually been fired.

3       The one on the right is a bullet that I pulled in

4  my lab suite.  And then --

5     Q.  From where?

6     A.  From the ammo pouch.  That would be Q45 is on the

7  right.  So when you -- so for general class

8  characteristics, I would measure from the base of the

9  bullet to the first -- the bottom of the cannelure.

10       You look at the design characteristics of the

11  cannelure itself.  Then you come up and you have the

12  soft point, height, and then how much they actually want

13  to expose.

14       So these general class characteristics along with

15  the base of bullet is consistent with Winchester.

16     Q.  So the one on the left and the one on the right

17  are Winchester manufactured?

18     A.  Yes, sir.

19     Q.  Okay.  And given what you have available in terms

20  of forensic evidence, is there anything else

21  forensically you can do to further this association that

22  you just made?

23     A.  No, sir.

24     Q.  Can you explain to the jury why that's where your

25  science kind of ends?

1    A.   So the problem with the manufacturer of bullets,

2  if you just picture a big factory assembly line, they

3  could just start producing thousands of bullets every

4  shift.  And as the bullets go down, they get dropped

5  into a big hopper.  Say the hopper holds 100,000 rounds

6  of bullets, they take those and they're going to load

7  those into cartridges.

8         When the bullets are then loaded, they get dumped

9  into a hopper, so now say you're running two or three or

10  four assembly lines going to one central point, then you

11  have the reloading and then they go to two different

12  points.

13         You can see how you're actually going to track

14  one actual cartridge or the tool marks that produce it.

15  Then once they are boxed up, then it has to be shipped

16  out.  Who is their buyer?  Is it Wal-Mart?  Is it Dick's

17  Sporting Goods?  Each one as their own way of

18  distributing their own ammunition.  Does it go to the

19  individual stores?

20         So it's statistically impossible for us to track

21  how ammunition is manufactured, sorted, placed in the

22  same box.  So we can never say, you know, these bullets

23  came from the exact same box if I had a box of

24  ammunition.  It's impossible for us to do it

25  statistically.

1    Q.   Okay.  Moving on to the next area.  Were you

2    asked to examine a tire and a nail with respect to this

3    investigation?

4    A.   Yes, sir, I was.

5    Q.   All right.  If I could have you -- you can put

6    that away.  Please do.

7         If I could have you briefly jump out of the box,

8    Mr. Mills, and have you come take a look at what we have

9    marked as Exhibit 72.  Just take a look at that for me

10   and I'll ask you some questions when you get back to the

11   microphone.

12         (Pause.)

13   Q.   Do you recognize that item?

14   A.   Yes, sir, I do.

15   Q.   What is that, sir, besides being a tire?

16   A.   When it was brought into the laboratory, it was

17   assigned a specimen number.  For me it's Q86.  I'm not

18   sure what Government exhibit it is.  It's a truck tire.

19   Looks like it has -- basically a snow tire.

20         And in the original examination there was a wheel

21   and there was a nail that was sitting -- where you see

22   that yellow circle right there, you could actually see

23   the head of it.  So it would be more like a box nail or

24   not like a finished nail.

25         So because I was going to have to disassemble the

tire, we transferred the evidence to our special photo
unit.  That's a photography unit that does specialized
photos for these.  They took photos of the nail as the
condition it was received in the laboratory.  Once we
removed the wheel from the tire, they photographed on
the inside so that I would have a record of what the
nail looked like.

In order for me to perform my examinations, I
then had to get the nail out of the tire.  The tire is
too big for comparisons under a comparison microscope.
Comparison microscope are two microscopes that are
joined together by an optic bridge, but most of the
specimens we're looking at are probably no greater than
two or three inches.  So in order for me to do any
exams, I actually had to remove it.

Once it was all documented, I tried to push it
through with just wearing gloves trying to force it out.

Q.  How successful were you with that effort?

A.  I wasn't.

Q.  Why not?

A.  The friction was too great to overcome.

Q.  So what did you do?

A.  So I just took a two-by-four and used it on the,
basically the nose of the nail and pushed it back out
and had somebody catch it.

1      Q.   Why did you use a two-by-four?

2      A.   It's a softer material, won't create tool marks.

3           MR. SKROCKI:  If we could have the lights,

4  Madam Clerk.  I believe 211 to 215 are admitted.

5           THE COURT:  Is that correct?

6           DEPUTY CLERK:  No.

7           MR. SKROCKI:  No?  That's why we check.

8  BY MR. SKROCKI:

9      Q.   Let's have for identification then 211 through

10 215 for Mr. Mills.  We'll scroll through these briefly.

11          Take a look at that, Mr. Mills.  Is that

12 something your folks with the cameras took?

13     A.   Yes, sir, that is what I asked them to

14 photograph.

15     Q.   212 as well?

16     A.   Yes, sir.

17     Q.   213, please.

18     A.   Yes, sir.

19     Q.   214?

20     A.   Yes, sir.

21     Q.   And then I have 215 here.  Let's take a look at

22 that one real quick.  That's physical.  Got it.

23          MR. SKROCKI:  And if I may approach just to

24 save a minute.

25          THE COURT:  Certainly.

```
 1              (Mr. Skrocki approaches witness)
 2    BY MR. SKROCKI:
 3       Q.  215.
 4       A.  215.
 5       Q.  Yes.  We'll get to that as well, Mr. Mills.
 6    That's Exhibit No. 215.  You recognize that pouch and
 7    item?
 8       A.  I recognize this envelope, yes, sir.
 9       Q.  And what's contained in the envelope?  You can
10    open it if you wish.  Do you need scissors?
11       A.  No, sir, it's open.
12       Q.  I'm thinking it's the yellow one.
13       A.  Just in this one?
14       Q.  Yeah, the sealed one.
15       A.  I'm not feeling anything in there, sir.  Right
16    here?
17       Q.  Yep.  Want scissors?
18       A.  Scissors, yes, sir.
19       Q.  You gave me a little bit of a scare with the
20    empty envelope, Mr. Mills.
21       A.  I didn't mean to, sir.  I was a little scared
22    myself because I know I shipped it back.
23       Q.  It's a big envelope with a small item.
24       A.  Okay.  Want me to take it out of this one also?
25       Q.  No.  Just describe to the jury what you have
```

1    there in your hand.

2        A.   This is what was removed from the tire.  Q86.1 is

3    my specimen number.

4        Q.   Put it down, please.  Great.

5            MR. SKROCKI:  Move for the admission of 215

6    then.

7            THE COURT:  Any objection?

8            MR. CAMIEL:  No.

9            THE COURT:  215 is admitted.

10           (Exhibit No. 215 admitted.)

11           MR. SKROCKI:  And the photos as well, 211 and

12   214.

13           THE COURT:  211 through 14 or just --

14           MR. SKROCKI:  211 through 14.

15           THE COURT:  Any objection?

16           MR. CAMIEL:  No.

17           THE COURT:  Those will be all be admitted then.

18           (Exhibit Nos. 211 through 214 admitted.)

19   BY MR. SKROCKI:

20       Q.   Mr. Mills, while you have the nail out, if you

21   could describe for the jury the type of nail it is, and

22   then show it to them one more time.

23       A.   This is a 16-penny common nail, about three,

24   three and a half inches long, shaft of about .14 inches.

25   Normally used for old-time framing instead of like all

1  the stick nail guns that you see nowadays.

2      Q.  Is there a bend in the nail?

3      A.  Oh, yes, sir, there is damage to it.  The nail is

4  -- has a slight curvature that you see along here along

5  the shaft.  There is some abrasion marks that run down

6  the shaft, and then there is marks back up underneath

7  the head itself.

8      Q.  We'll see some of those in these photographs

9  coming up, correct?

10     A.  Yes, sir.

11     Q.  And with the framing nail like that, is it bare

12  metal, is it another type of nail, can you tell?

13     A.  Oh, do you mean is it coated or anything?

14     Q.  Correct.

15     A.  This was a galvanized nail.

16         MR. SKROCKI:  And thank you, Madam Clerk.  If

17  we could have the lights.

18  BY MR. SKROCKI:

19     Q.  And we'll pull up 211.  That's a photo from the

20  lab, sir?

21     A.  Yes, sir.

22     Q.  Okay.  And if you could take the laser pointer

23  and if you could point out some of the characteristics

24  you see on the nail head and the tire itself.

25     A.  So this was -- this yellow mark was already drawn

1  on the tire itself to show me what area I was to be

2  looking at.  Found this nail inside of here.

3      The photographers basically captured the moment

4  of what the nail looked like, the positioning as it was

5  received in the laboratory.  I don't know if you can

6  zoom in, but actually you can see some abrasion marks

7  along the side of the head across here.  It's not

8  greatly in focus.  And then you actually see score marks

9  along underneath the head itself.

10     Q.  Okay.  And then how about to the tire to the

11  right of the nail head, what do you see there?

12     A.  To the right, you can see where the rubber is --

13  has a rip or a tear inside of it.

14     Q.  212, please.  You have inserted a ruler?

15     A.  Yes, sir, to give scale.

16     Q.  What does that show the jury?

17     A.  It's showing -- you can actually tell the head of

18  the nail is below the tread surface versus the actual

19  height of the ruler itself with the tread.

20     Q.  So what number should they be focusing on to show

21  where the tread height is and the nail height is with

22  respect to the ruler?

23     A.  They are not directly perpendicular, but the

24  depth is probably about six or seven, if you imagine the

25  ruler being straight up, but the nail itself is probably

1     about two or three.

2         Q.  Okay.  And 213.  Blair, if you could enlarge that

3     for us, see how that looks.

4             Mr. Mills, let's start down at the bottom of the

5     nail head here.

6         A.  Yes, sir.  So you can see abrasion marks going

7     along the edge of the head of the nail here.  I couldn't

8     define the source as to what would have caused that.

9     You can see that there is some red-ish paint or appears

10    to be paint along the surface, and then I guess I would

11    call it a putty.

12            And then there is a score mark that comes across

13    the surface here.  Again, I couldn't identify a source

14    on that one.

15        Q.  Bear with me just a moment.  When you say score

16    mark, because it's hard to see, it's above the blue line

17    I have just put there.  Can you point your laser pointer

18    on that again?

19        A.  Yes, sir.  Basically it runs across the head

20    right here.

21        Q.  Now, does that score mark appear to be straight?

22        A.  Yes, sir.

23        Q.  Okay.  Do you have any idea what would have

24    caused that?

25        A.  No, sir.  It could have been sawing.  It could

1    have been abrading.  That's why I couldn't give you a

2    definitive source.

3        Q.  Generally with a tool mark, a harder object

4    struck a softer object to make a scoring something like

5    that?

6        A.  Yes, sir, for our definition of what is a tool

7    and tool marks identification, it's just a harder of two

8    objects.  Webster defines a tool as something that

9    provides mechanical advantage.  We're just looking to

10   see the harder object striking the softer object.

11       Q.  Is there another item on the top of the nail

12   itself that you observed concerning tool mark analysis?

13       A.  Yes, sir.  I'm not sure if you can see it.  The

14   lighting is not that great.  But with the shadow line

15   you see this arc coming back up across here.

16       Q.  Please tell the jury what your opinion is with

17   respect to that arc.

18       A.  It's consistent with a piston from an actuated

19   nail gun.  It could be either be pneumatic or it could

20   be what's referred to as powder actuated,  but it would

21   be the piston coming down and striking it.

22       Q.  We'll talk about that in a little bit more detail

23   in a moment.

24           If we can go to 214.  Blair, if you could blow

25   that up.  Thank you.

1      Is this an accurate photo of how the nail was in

2   the tire when it arrived at your facility?

3      A.   Yes, sir, it was.

4      Q.   Is this the nail you tried to push through with

5   your hands back out through the tire?

6      A.   Yes, sir, I was wearing leather gloves, but I

7   couldn't get it back through the rubber.

8      Q.   Where did you place the two-by-four to push it

9   out of the tire?

10     A.   Oh, I just took the blunt end of the two-by-four

11  and just pushed with downward pressure right on the very

12  tip.

13     Q.   On the tip?

14     A.   Yes, sir.

15     Q.   If you could pull back out.  If we can go back to

16  213, Blair.  I would like to leave this up while we have

17  the remainder of our discussion.

18          MR. SKROCKI:  And, Judge, I think we can finish

19  right close to noon with the direct.  I don't think I'll

20  go over.  If I do, it won't be for very long.

21          THE COURT:  That sounds fine.  Everybody

22  holding up?  Very good.  All right.  Go ahead.

23  BY MR. SKROCKI:

24     Q.   So Mr. Mills, with respect to the nail gun, or

25  the nailer impression tool mark you saw on the nail, how

1    did you make that determination, sir?

2       A.   Well, with my own personal experience with nail

3    guns themselves doing construction work.  There was an

4    arc surface to it.  I can't say definitively that it was

5    a piston from that.  It's consistent with, meaning it

6    has the same class characteristics.  I only had a

7    partial arc.

8           So there is two types that actually use piston

9    drive.  The original powder actuated nail guns were

10   actually just powder driven, there was no piston.  It

11   was basically like shooting a bullet and your nail was

12   the bullet itself.

13          Then they designed, probably back in the fifties

14   they started using different types of what they call ram

15   sets, which are the actual pistons.  Even like with your

16   stapler, you come down, you have that anvil come down

17   and strike it and that drives the nail down and in.

18          That's why I referred to it as consistent with a

19   nail driver.

20      Q.   Were you given nail guns by investigators in this

21   case to examine in connection with this nail here?

22      A.   Yes, sir, I was.

23      Q.   How many were you given?

24      A.   Five in total.

25      Q.   Okay.  Were you able to make any determinations

1 or associations between the five nail guns that you

2 received and the exhibit here where you have the nail we

3 have depicted in Exhibit No. 213?

4     A.  No, sir, no association.

5     Q.  Why is that?

6     A.  The first one was a Brad nailer, totally

7 different type of nail.  You can -- depending on -- if

8 you've ever seen a finished nail, it's just a big

9 straight pin.

10       Then you have the stick nailers.  I believe there

11 were two Hitachis that were sent in.  The problem with

12 those is that the nails they use nowadays they are

13 smaller, thinner and lighter, and the head diameter is

14 smaller, so the throat where the nail drops in and the

15 plunger comes down on it is too small for the 16-penny

16 nail to be actually manually inserted and shot.

17     Q.  So the nail is too big?

18     A.  The nail is too big for it, yes, sir.

19       The fourth was a powder -- Hilti powder actuated

20 piston drive nail gun.  The problem with that one is the

21 throat was too small in diameter for the nail to

22 actually be placed into it.

23       And then the last one was a JobMaster, and it was

24 pretty old.  There was no piston system.  It was

25 basically just shoot a blank cartridge inside of it and

1 you drive the nail forward.  And that one, because it

2 wouldn't leave tool marks, I could come to no

3 conclusion.  I mean the throat is big enough, but it's

4 not going to leave any tool marks for me to make a

5 decision.

6  Q.  This last one, the JobMaster you talked about

7 would have fit a 16-penny nail in the throat, but since

8 it's powder actuated, it wouldn't leave a tool mark on

9 the top of the nail right there?

10  A.  That is correct, because the gases themselves are

11 actually the driving force.

12  Q.  What could you do to determine when that nail at

13 some point its life met that nail gun?

14  A.  I can't.

15  Q.  With respect to the nail itself, and we're moving

16 away from the nail gun, did you observe any other kind

17 of score mark or other kind of tool mark on it to

18 indicate other types of use?

19  A.  Just the abrasion on the side.  If we're

20 strictly, talking strictly on the head --

21  Q.  Let's go there first and then you can go to the

22 side.

23  A.  So the side of the head right here, you had

24 abrasion marks.  If you have ever looked at something --

25 like a good example would be if you took coarse

sandpaper and ran it across metal, you know how you see
the scratches and everything, those are the abrasion
marks that I'm talking about.

　　　And then across the head was the score mark that
was about a third of the way down that went all the way
across.  I can't tell you what the source would be for
either of those.

Q.  We can go to 214, Blair.

　　　And similarly with the shaft of the nail, were
there other marks you observed consistent with some
other types of tooling?

A.  There was score marks that went along
perpendicular with the shaft itself almost the full
length.  Couldn't tell you what the source of that was,
but it was a very hard material in order to score it.

　　　And then I noted that there was damage to the
nose or the tip of the nail itself.  If you have ever
messed up, hammered a nail in and you turned a board
over and you take your hammer and you tap it you will
notice how the tip will get blunted.  That's what I
noted on that.

Q.  In conclusion then with respect to the nail guns
you examined, that JobMaster, it's possible that that
could have shot that nail?

A.  It is possible, yes, sir.

1      Q.   Just by how mechanically it's set up to do that?

2           MR. CAMIEL:  Your Honor, this is all leading.

3           THE COURT:  That's sustained.

4           MR. SKROCKI:   That's all the questions I have

5      for Mr. Mills, Judge, and it's five until 12:00.

6           THE COURT:  Thank you, Mr. Skrocki.  All right.

7      Ladies and gentlemen, let's take our lunch break now.

8      Please leave your notepads here.  Remember my admonition

9      not to discuss the case and let's have you back at ten

10     after 1:00.  I hope you have a pleasant lunch.

11          (Recessed from 12:01 p.m. to 1:15 p.m.)

12          (Jury present)

13          DEPUTY CLERK:  Court is in session.

14          THE COURT:  All right.  Please be seated,

15     everyone.  Back on record here.  And Mr. Camiel?

16          MR. CAMIEL:  Yes.

17                    CROSS EXAMINATION

18     BY MR. CAMIEL:

19     Q.   Good afternoon, Mr. Mills.

20     A.   Good afternoon, sir.

21     Q.   You talked a little bit about doing this gunshot

22     residue test on the victims' clothing; is that right?

23     A.   Yes, sir, that is correct.

24     Q.   And that's different than the gunshot residue

25     test people might be familiar with with wiping of the

1  hands and testing in that way?

2      A.  That is correct.

3      Q.  But you're looking for similar compounds and

4  elements, right?

5      A.  Ours is based upon nitrates, so gunpowder is

6  basically nitrated cellulose that provides the oxygen.

7  So when the gun discharges and it burns, it converts the

8  nitrates to nitrites, so we're looking for a pattern.

9  On the hands, I'm not really sure what they are looking

10 for.  I believe they are looking more for elements.

11     Q.  And you did it on the victims' clothing, but it

12 could be on any clothing, right?

13     A.  It could be on clothing.  We have worked on cars

14 where a gun has been discharged within a vehicle itself.

15 Sometimes even shooting through glass, if you're close

16 enough, you can actually develop gunshot residue off of

17 it.

18     Q.  And other types of objects?

19     A.  Yes, sir.

20     Q.  And then you gave some testimony about the

21 ammunition.  You looked at the ammunition from the crime

22 scene and the victims, and you determined that it was

23 probably Winchester?

24     A.  Yes, sir, it's consistent with Winchester.

25     Q.  And Mr. Wells had some Winchester ammunition that

1    was similar?

2        A.   Whatever was in the camo pouch, yes, sir.

3        Q.   And that's -- Winchester is probably one of the

4    top three selling brands in terms of ammunition?

5        A.   Yes, sir, it is one of the top three.

6        Q.   So you can get that at Wal-Mart or any sporting

7    goods store that sells ammunition?

8        A.   Yes, sir, whoever sells it.

9        Q.   And then I wanted to ask you just a couple

10   questions about the tire.  Could we look at Exhibit --

11   it's Government 211.  I think you testified to this.

12   There is kind of a gouge mark here in the rubber, looks

13   like made from the head of the nail.

14       A.   Yes, sir.

15       Q.   So at some point that nail must have been

16   pressing against the rubber there to cause that gouge?

17       A.   It's one possibility, yes, sir.

18       Q.   Like if it was driven on and it was pressed into

19   the rubber?

20           MR. SKROCKI:  Objection; foundation,

21   speculation.

22           THE COURT:  Well, I'll allow that question.

23       A.   It's possible, but I don't have any wear on the

24   head of the nail and the nail is below the surface of

25   the tread.

1    Q.  You said you saw some abrasion marks on the head

2  of the nail, but you couldn't tell what the source was?

3    A.  Yes, sir, along the -- right along the edge right

4  through here.  I'm sorry.  Did you see that?

5    Q.  Let me clear my --

6    A.  Basically along the edge right around the sides

7  right here.

8    Q.  Sure.  And then you also commented that it

9  appeared that at some point in its lifetime that nail

10  had been -- some kind of a nail gun had impacted that

11  nail?

12    A.  That is correct.

13    Q.  But no way to tell when?

14    A.  No, sir.

15    Q.  And then you testified that you looked at five

16  different nailers or nail guns; is that right?

17    A.  That is correct, sir.

18    Q.  And you couldn't make any association between any

19  of those and the marks on the head of the nail?

20    A.  No, sir, I could exclude four of the nail guns.

21    Q.  All right.  And the fifth one -- I think the last

22  one you talked about was the Olin JobMaster?

23    A.  Yes, sir.

24    Q.  That didn't come from Mr. Wells' house, you know

25  that?

1    A.  No, sir, I don't know that.  I don't know where

2    the nail guns came from.

3    Q.  And that one you couldn't tell anything because

4    it wouldn't leave a mark?

5    A.  That is correct.

6    Q.  Did you test -- I know you said that the nail in

7    this case that you pulled out of the tire would fit in

8    the throat of that particular nail gun, but did you

9    actually test fire that nail gun using a 16-penny nail?

10   A.  No, sir, because there wasn't a piston in it.  It

11   would have just been I guess test firing it would be the

12   only thing I could say, but, no, sir.  If I could fit it

13   inside of it though, they will shoot.

14   Q.  Do you know whether that kind of a nailer would

15   in fact damage the head of the nail because that

16   16-penny nail has a rather thin head?

17   A.  I would disagree.  The 16-penny nail has a very

18   robust head.  The idea for that, when they manufactured

19   them, is to withstand the blow of 16-ounce or 20-ounce

20   hammer.  I have even seen people hit them with a sledge

21   hammer, but you're not going to break the head.

22   Q.  In any event, in this case, you couldn't tell

23   anything either way about that particular nailer and

24   whether it had anything to do with the nail in this

25   case?

1    A.   No, sir.

2         MR. CAMIEL:  Thank you.

3         THE COURT:  Redirect?

4         MR. SKROCKI:  No, thank you.

5         THE COURT:  Thank you, sir.  You may be

6    excused.

7         (Witness excused)

8         (Requested excerpt concluded, proceedings

9    continued.)

10

11                    CERTIFICATE

12       I, Sonja L. Reeves, Federal Official Court Reporter
     in and for the United States District Court of the
13   District of Alaska, do hereby certify that the foregoing
     transcript is a true and accurate transcript from the
14   original stenographic record in the above-entitled
     matter and that the transcript page format is in
15   conformance with the regulations of the Judicial
     Conference of the United States.
16
         Dated this 18th day of December, 2019.
17

18
                          /s/ Sonja L. Reeves
19                       SONJA L. REEVES, RMR-CRR
                         FEDERAL OFFICIAL COURT REPORTER
20

21

22

23

24

25