BRYAN SCHRODER
United States Attorney

STEVEN E. SKROCKI
Deputy Criminal Chief
CHRISTINA SHERMAN
Assistant U.S. Attorneys

KELLEY STEVENS
Special Assistant U.S. Attorney
Federal Building & U.S. Courthouse
222 West Seventh Avenue, #9, Room 253
Anchorage, Alaska 99513-7567
Phone: (907) 271-5071
Fax: (907) 271-1500
Email: steven.skrocki@usdoj.gov
      christina.sherman@usdoj.gov
      kelley.stevens@usdoj.gov

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> JAMES MICHAEL WELLS ) <br> ) <br> Defendant. ) <br> ) | No. 3:13-cr-00008-SLG |

**THE UNITED STATES' SENTENCING MEMORANDUM**

COMES NOW, the United States of America, by and through undersigned

counsel, and submits that, for the reasons provided below, this Honorable Court should

impose a sentence of consecutive life terms, as outlined below, for the crimes committed by James Wells. Sentences of life imprisonment are mandatory for Counts 1-4. The government further submits that imposing sentences of life for Counts 5 and 6, to be served consecutively to any and all other sentences imposed by this Court, is both justified and warranted under the facts of the crime, the sentencing factors outlined in 18 U.S.C. §3553(a), and the United States Sentencing Commission Guidelines.

This recommendation is further supported by the victim impact letters and statements provided to the Court in aid of sentencing, and the abhorrent conduct of James Wells, who since his first conviction, appeal, and subsequent retrial, has shown no remorse and continues to paint himself as a victim of the judicial system despite twice now being convicted.

### A. Procedural History

A panel consisting of six men and six women found James Wells guilty of all six counts of the Indictment following a 21-day jury trial. His first count of conviction was for the murder in the first degree of Richard Belisle, a violation of 18 U.S.C. §§ 7(3) and 1111(a) and (b). The offense of conviction in Count 2 was murder in the first degree of James A. Hopkins, a violation of 18 U.S.C. §§ 7(3) and 1111(a) and (b). The offense of conviction in Count 3 was murder of an officer or employee of the United States, Richard Belisle, a violation of 18 U.S.C. §§ 1114 and 1111. The offense of conviction in Count 4 was murder of an officer or employee of the United States, Petty Officer James A. Hopkins, a violation of 18 U.S.C. §§ 1114 and 1111. The offense of conviction in Count

5 was possession and use of a firearm in relation to a crime of violence, the murder of Richard Belisle, a violation of 18 U.S.C. §§ 924(c)(1)(A) & (B)(ii) and 924(j)(1). Finally, the offense of conviction in Count 6 was possession and use of a firearm in relation to a crime of violence, the murder of James A. Hopkins, a violation of 18 U.S.C. §§ 924(c)(1)(A) & (B)(ii) and 924(j)(1).

The instant convictions followed a 9th Circuit Court of Appeals reversal of a 2014 previous conviction for the same crimes and a remand for a new trial. In the first trial, a jury of his peers found the defendant guilty of the same offenses, and in July 2014, Senior U.S. District Judge Beistline sentenced James Wells to Life imprisonment on Counts 1 and 3, to be served concurrently; Life imprisonment on Counts 2 and 4, to be served concurrently to each other and consecutively to all other terms; Life imprisonment on Count 5 to be served consecutively to all other terms; and Life imprisonment on count 6 to be served consecutively to all other terms.

**B. Background**

On April 12, 2012, Chief Boatswain's Mate (retired) Richard (Rich) Belisle and Electronic Technician First Class (ET1) James (Jim) Hopkins woke up, drove to work and started their days the same as they did most days. The weather, forecasted to be sunny and pleasant, did not stop Rich Belisle from donning long underwear as he anticipated colder weather at the top of a 300-foot tower he was scheduled to climb later that day. As his wife Nicola lay in bed drinking the coffee he had brewed, he did one last spin in his long johns, eliciting giggles from the woman who had stolen his heart at a pub

in Bahrain 21 years before, and given him three beautiful daughters. Meanwhile, a few miles away in Coast Guard housing on Aviation Hill, before making the short five-minute drive down Anton Larson Bar Rd., Jim Hopkins said goodbye to his wife Debbie and his teenage son. In fact, neither Rich nor Jim had any reason to suspect that they would be dead before the sun had fully risen along with the morning colors on the flagpole. As they left their homes that morning, it would be the last time they ever saw their loved ones.

At 07:09, a camera from the T1 COMMSTA parking lot captured the Wells' small blue Honda CRV heading towards the back entrance of the T2 building. Wells parked the Honda behind the back entrance to avoid detection, and between 07:10 and 07:14 he shot his unsuspecting colleagues multiple times at close range, mortally wounding Rich Belisle, and killing ET1 James Hopkins instantly. In Wells' mind, their deaths that morning would ensure that his decades-long reign as the Coast Guard's antennae climbing expert and overseer of the "Happy Republic of T2", would remain intact. With his supervisor and the man poised to replace him upon retirement or dismissal gone, Wells believed that he was once again indispensable. Their deaths cemented his place because now the Coast guard would need to keep him employed, as he was the only experienced rigger/antenna man still alive.

At around 07:50 that morning, Nicola Belisle said a prayer for the unknown victim that emergency vehicles were speeding towards as she drove in the opposite direction down Rezanof Highway, heading to work in downtown Kodiak. Little did she know they

were racing to the scene where her husband's body had just been discovered by his youngest colleagues; where the lingering smell of gun powder would become encoded in their memories forever as the smell of cold-blooded murder. Hours later, after a morning of frantic unanswered calls to her husband, the Commanding Officer of COMMSTA Kodiak, dressed in his Service Dress Blues, would arrive at her work to do the most difficult task of his entire Coast Guard career, and her world would never again be the same.

The investigation and trial revealed James Wells to be a deliberate and calculated murderer. He invented his own twisted solution after experiencing formal push back from his chain of command who made it clear to him that he needed to get with the program or retire. Knowing very well that ET1 James Hopkins and Rich Belisle stood to replace him upon his imminent departure, he methodically planned their certain deaths, and coordinated the execution of his sick solution in a manner to optimize a short and precise window of time, to leave no trail of his involvement, and to take full advantage of the resources available to him while his wife was away on a work trip. A plan concocted in advance and executed in mere minutes for his own personal gain left a trail of destruction, loss, pain, and suffering in its wake; suffering that no sentence will ever mend, but one that can hopefully enable all those impacted by his selfish deeds to begin the slow process of moving on.

The trial involved 61 government witnesses, including eight experts, and over 200 government exhibits, including bullet fragments recovered at the crime scene and the

"flat" tire James Wells fashioned to fit his alibi. Seeing directly through his countless lies, including those made under oath at trial, the jury returned a verdict of guilty as to all counts after just eight hours of deliberation. James Wells was, once again, guilty of the murders of Richard Belisle and ET1 James Hopkins.

### C. Recommended Sentence

No sentence will ever make the Belisle or Hopkins families whole. Consecutive sentences of life imprisonment, however, will ensure that James Wells never takes another step as a free man, and will give the families, friends, and colleagues of both Rich Belisle and James Hopkins the sense of security to move forward and try to heal. As such, this Court should hand down the greatest punishment available within the bounds of the law, and that is four consecutive life terms as outlined below.

#### a. Counts 1 - 4

Even though the only available sentence of incarceration for counts 1-4 for James Wells is life in prison, this Court has the discretion to mandate whether these mandatory sentences of life run either concurrently or consecutively with the other. 18 U.S.C. § 3584. The government submits that Counts 1 and 3, the murder counts related to Rich Belisle, and Counts 2 and 4, the murder counts related to ET1 James Hopkins, represent crimes involving the same victims and the same conduct. Therefore, the life sentence imposed for counts 1 and 3 should run concurrently with each other, and the life sentences for 2 and 4 should run concurrently with each other. Further, Counts 1 and 3, and Counts 2 and 4, call for separate and consecutive sentences of life because they

represent distinct crimes committed against two individuals. As such, the concurrent life sentence for Counts 1 and 3 should run consecutively to the concurrent life sentence for Counts 2 and 4.

Awarding consecutive life sentences is well within the sound discretion and sentencing authority of this Court, and certainly warranted in the instant case due to the heinous and premeditated nature of these crimes. Bryant v. Civiletti, 663 F.2d 286, 291 (D.C. Cir. 1981). Furthermore, imposing consecutive sentences is "normal and ordinary in the enforcement of the criminal laws of the states and the United States." Id. Doing so has long been recognized as appropriate. As example, in Bryant, the defendant murdered two FBI agents in the course of their duties and was sentenced to consecutive terms of life imprisonment. While the defendant in Bryant claimed those sentences were "fundamentally unfair," the District of Columbia Circuit found that contention "wholly frivolous." Id. at 290-91.

  b. **Counts 5 and 6**

Turning now to the firearms offenses contained in Counts 5 and 6, this Court must also sentence James Wells for his illegal use of a firearm in the murders of Rich Belisle and ET1 James Hopkins. Wells' conviction of both firearms offenses at trial subjects him to two consecutive terms of imprisonment, both of which carry mandatory minimums. See Deal v. United States, 508 U.S. 129 (1993). His use of a firearm in Count 5 was predicated on his commission of murder in Count 1 and his use of a firearm in Count 6 was predicated on his commission of murder in Count 2. As Wells' illegal use

Page 7 of 16                          *United States v. Wells*
3:13-cr-00008-SLG

Case 3:13-cr-00008-SLG  Document 1347  Filed 12/31/19  Page 7 of 16

of a firearm in two separate crimes of violence were tied to these two separate predicate offenses, his first conviction under § 924(c) triggers a statutory mandatory minimum sentence of ten years, 18 U.S.C. § 924(c)(1)(A)(iii), and his second conviction triggers a statutory mandatory minimum sentence of twenty-five years, Id. § 924(c)(1)(C)(i).  See United States v. Beltran–Moreno, 556 F.3d 913, 915 (9th Cir.2009).  Each mandatory minimum sentence must be imposed consecutively. 18 U.S.C. § 924(c)(1)(D)(ii); Beltran–Moreno, 556 F.3d at 915.

Notwithstanding the mandatory minimum sentences of 10 and 25 years for Counts 5 and 6, Congress authorized life sentences under § 18 U.S.C. § 924(j)(1). In this case, life sentences for both firearms offenses is readily supported by the §3553(a) factors.

### D.  18 U.S.C. §3553(a) Factors

The following sentencing factors, as set forth in 18 U.S.C. § 3553(a), apply with respect to the sentence to be imposed in this case.  Specifically, the factors determine whether the mandatory sentences of life for Counts 1-4 should be served consecutively or concurrently and whether to impose sentences of life for Counts 5 and 6.

### a. Nature and Circumstances of Offense and the History and Characteristics of the Defendant.

James Wells shot Rich Belisle as he sat at his computer, drinking his coffee and reading his morning email.  The first bullet pierced his neck causing him to fall face down onto the ground in the office he shared daily with his killer and the "antenna expert" he trusted with his life.  There, while lying face down on the cold concrete floor, James Wells stood over Rich Belisle and shot him again. Not once, but twice. He shot

United States v. Wells
3:13-cr-00008-SLG

him at close range in his torso with a high caliber revolver guaranteed to cause grievous internal damage and death.

Just feet away, while preparing his uniform for the day, ET1 James Hopkins heard the deafening sound of a revolver firing .44 caliber rounds in an enclosed concrete space. Likely confused and dazed from the ear-piercing noise, he turned, finding himself staring directly into the face of James Wells standing behind the barrel of a .44 caliber revolver. James Wells would be the last person ET1 James Hopkins would ever see alive before a bullet pierced his upper lip and exited the back of his skull, killing him instantly.  ET1 James Hopkins was dead before his body hit the ground.  Despite shooting him through his skull, James Wells emptied another round into his body; ensuring the death of his immediate supervisor.

Here, the government presented overwhelming evidence of James Wells' calculated, vindictive, cold-blooded execution of Richard Belisle and ET1 James Hopkins. Once Wells entered the rigger shop with his plan in motion; these unsuspecting men had no chance of making it out alive.  He acted methodically, quickly, and he perfectly coordinated his actions to evade detection by others coming and going to the COMMSTA that morning.

Further, his use of a high-caliber handgun, a "heavy kicker" as described by one witness, guaranteed their deaths.  The use of such a powerful lethal weapon ensured that neither of these men would displace him from his perceived reign over the rigger shop.

No less than 16 minutes after the Wells SUV is seen fleeing the scene of the crime, James Wells sets his alibi in motion. An alibi that has steadily evolved and eroded over time, yet one that he has continued to promote and modify to fit the overwhelming evidence of his guilt. At 7:30, Wells left two voicemails claiming to have a flat tire – one to his dead colleague, and the other to his surviving supervisor, Scott Reckner. Seven years later, Wells continues to publicly profess his innocence while promoting a façade of victimization at the hands of the government.

Wells, an individual who has taken what he wants throughout his life whenever he wants, expresses no empathy. After he shot his defenseless colleagues in cold blood, he had the audacity and nerve to wonder why nobody cared how he was feeling. He expressed disdain that members of the COMMSTA mowed Nicola Belisle's lawn. "Why didn't anyone mow my lawn?" he asked. He even questioned if they used equipment from the COMMSTA – his equipment. Then, during a visit a few months after the murders, after his niece expressed sorrow and sympathy for the families and the terrible losses they suffered, Wells, fueled by hatred and rage, threw himself into a verbal tirade condemning both men, even in death. His actions before, during, and after the murders demonstrate that he is nothing more than a narcissist who cares only for himself.

The nature and circumstances of this case warrant the strictest punishment available within the bounds of the law, and that is four consecutive life sentences. James Wells killed two unsuspecting and defenseless servants of the Federal government, both of whom were fathers, husbands, sons, brothers, and soldiers who honorably served their

country. He executed them in an environment they believed was safe, by a man who they trusted with their lives. The consequences of this crime must match the severity of the senseless, selfish, heinous nature in which it was carried out by this murderer. His actions warrant the taking of his freedom for the rest of his life with the imposition of four consecutive life sentences.

### b. Need for the Sentence to Reflect the Seriousness of the Offense, Afford Deterrence, Protect the Public, and Rehabilitate the Defendant.

Family members, close friends, and colleagues will provide victim impact statements to this Court; some in person, some in writing. The Court will soon see however, that no words, no matter how conveyed, can accurately capture the seriousness of his crimes and the impact his actions have had on the loved ones left behind. Debbie and James Hopkins' dreams of adventure traveling the lower 48 in an RV and a new life living closer to their grandchildren following Jim's retirement from the Coast Guard, will remain just that – dreams of what could have been. This Court will never fully comprehend the pain Nicola Belisle feels when she holds her grandson and sees Rich's smiling eyes looking back at her. The aching she feels over the loss of those moments between grandfather and grandson torment her.

James Wells' swift convictions under Counts 1-4 hold him accountable for the murders, but do not reflect the additional seriousness of using a deadly weapon that guaranteed a quick and efficient kill, with little evidence left at the scene. With just the pull of a trigger, James Wells stole every future moment that could have been for these men and their loved ones. The available sentence of four consecutive terms of life in

*United States v. Wells*
3:13-cr-00008-SLG

prison, although it will never offset the daily pain and devastation these families feel, is the only appropriate sentence in this case to address the seriousness of his actions carried out through the use of a deadly weapon.

Furthermore, there is no doubt that James Wells would kill again if released. His deliberate and thoughtful decision to use a .44 caliber revolver to murder two men who posed no real threat to him, evidences his deranged and sadistic mindset. All James Wells had to do was follow direction – "don't lie, don't steal, let us know where you are". But as a 62-year-old man who refused to be told what to do, set in his ways from years of having free reign at the rigger shop, there was no falling in line for him, nor will there ever be.

As such, the need to protect the public from James Wells remains of paramount concern. Although the likelihood of him ever walking out of prison a free man, particularly given his age, is close to nonexistent, imposing the strictest sentence available under the law will inform the public that heinous acts committed with deadly weapons will not be tolerated. The strictest punishment, short of death, will not only promote respect for the law, but will aid in the deterrence of others at a time where the use of guns to inflict pain and death, and where stories of gun violence perpetrated in places of worship, schools, and within the walls of military bases, occur daily and infiltrate our news feeds.

The right to bear arms promotes the protection of life and liberty; it does not promote the taking of innocent lives. This Court's task of ensuring that the integrity of

our constitutional right is not blemished by the evil doings of this man demands a strict sentencing approach. This rings particularly true here in Alaska, a jurisdiction where the ownership of a firearm for lawful purposes is almost as commonplace as owning a fishing pole.

Part and parcel to the deadly consequences that flow from the illegal use of firearms, comes the judiciary's formidable responsibility in righting the ship when it veers off course. This Court must protect and keep sacred the responsibility that accompanies this right by demonstrating that where this right is abused, the wrongdoer will face steadfast and uncompromising accountability, to the fullest extent permissible by law. The illegal use of a firearm to rob another of their life and liberty must carry with it the most severe punishment available to ensure deterrence and respect for the law.

Accordingly, James Wells has earned himself sentences of life imprisonment for his convictions of Counts 5 and 6. These sentences, by statute, must be consecutive to any other sentence. United States v. Beltran-Moreno, 556 F.3d 913, 915 (9th Cir. 2009). (This includes life sentences. United States v. Staggs, 152 F.3d 931 (Table), 1998 WL 447943 (9th Cir. 1998)).

### c. Sentencing Ranges Available

The United States recognizes that the applicable guideline range available for Counts 5 and 6 are those posed in the pre-sentence report. The government nonetheless strongly reinforces that sentences of life for both Counts 5 and 6, to be served

consecutively to all other sentences imposed as mandated under the law, is appropriate for this case.

### d. Need to Avoid Sentence Disparity

An imposition of consecutive life sentences, particularly for the firearms offenses, given the especially heinous and premeditated nature of the crime, would not result in significant disparity between other similarly situated defendants. As example, in United States v. Charley, the court upheld the defendant's final sentence of three concurrent life terms for first-degree murder in violation of 18 U.S.C. §§ 1111 and 1153(a) and three consecutive life terms for possession or use of a firearm in connection with a crime of violence in violation of 18 U.S.C. § 924(c) and (j)). 417 Fed. Appx 627 (9th Cir. 2011). See also, United States v. Snyder, 865 F.3d 490. (7th Cir. 2017).

### e. Fine/Forfeiture/Restitution

The United States reserves its right to submit specific matters relating to restitution and submits that conditions for restitution, as agreed on by the parties, will be presented to the Court in subsequent filings at a later date.

## E. Conclusion

James Wells appears now before this Court facing mandatory consecutive life sentences for his heinous crimes. Although he stands before this Court seven years older than he was at the time he killed Rich Belisle and James Hopkins in cold blood, and suffering from additional physical ailments than his 61 year old self, the United States urges the Court to not lose sight of the pain and suffering he wrought on so many

innocent family members, friends, and colleagues; pain and suffering that remains as fresh and sharp as it did the morning of April 12, 2012.

In the wake of Rich Belisle and James Hopkins' deaths, remain distraught loved ones, friends, colleagues, and a saddened Coast Guard that they served honorably and with pride. The loss felt by all is immeasurable. No sentence will ever remedy the damage caused by this man's senseless and selfish actions. Four consecutive life sentences however, will ensure that he never inflicts death or pain on any other human being again as a free man. Additionally, it will give the numerous victims a small sense of relief to aid them in finally moving past the nightmare that has haunted them over the last seven years, and one that they have endured again, and again, through the lengthy criminal justice process.

Accordingly, the government respectfully moves this Court to sentence James Wells to: 1) a term of life imprisonment for Counts 1 and 3 (the murder of Richard Belisle); 2) a term of life imprisonment for Counts 2 and 4 (the murder of James Hopkins), to run consecutively to all other sentences imposed; 3) a term of life imprisonment for Count 5 (use of a firearm in the murder of James Hopkins), to run consecutively to all other sentences imposed; and 4) a term of life imprisonment for Count 6 (use of a firearm in the murder of Richard Belisle), to run consecutively to all other sentences imposed; for a total of four consecutive life sentences.

//

//

RESPECTFULLY SUBMITTED this 31st day of December, 2019, at

Anchorage, Alaska.

                                            BRYAN SCHRODER
                                            United States Attorney

                                            s/ Kelley L. Stevens
                                            KELLEY L. STEVENS
                                            Special Assistant U.S. Attorney

**CERTIFICATE OF SERVICE**

I hereby certify that on December 31, 2019,
a copy of the foregoing was served
electronically on:

Counsel of Record

s/ Kelley L. Stevens
Office of the US Attorney