```
 1              UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF ALASKA
 2

 3    UNITED STATES OF AMERICA, )
                               )
 4          Plaintiff,         )
                               )
 5    vs.                      )   CASE NO. 3:18-cr-00008-SLG
                               )
 6    JAMES MICHAEL WELLS,     )
                               )
 7          Defendant.         )
      _____)
 8

 9
                    TRANSCRIPT OF STATUS HEARING
10     BEFORE THE HONORABLE SHARON L. GLEASON, DISTRICT JUDGE
                   August 17, 2018; 1:04 p.m.
11                      Anchorage, Alaska

12

13    FOR THE GOVERNMENT:
              Office of the United States Attorney
14            BY:  KIMBERLY SAYERS-FAY and JONAS WALKER
              222 West 7th Avenue, #9
15            Anchorage, Alaska 99513
              (907) 271-5071
16

17    FOR THE DEFENDANT:
              Office of the Federal Public Defender
18            BY:  GARY GEORGE COLBATH
              425 G Street, Suite 800
19            Anchorage, Alaska 99501
              (907) 646-3400
20

21

22    _____

23                 SONJA L. REEVES, RMR-CRR
                 Federal Official Court Reporter
24                 222 West 7th Avenue, #4
                   Anchorage, Alaska 99513
25       Transcript Produced from the Stenographic Record
```

 1          (Call to Order of the Court at 1:04 p.m.)

 2          DEPUTY CLERK:  All rise.  Her Honor, the Court,

 3     the United States District Court for the District of

 4     Alaska is now in session, the Honorable Sharon L.

 5     Gleason presiding.

 6          Please be seated.

 7          THE COURT:  Good afternoon.  We're on record in

 8     United States versus Wells.  I have Ms. Sayers-Fay,

 9     Mr. Walker, Mr. Colbath, Mr. Wells all present here.  So

10     as I recall our main goal today is to establish a

11     motions deadline.

12          Are there other topics?  Maybe I'll hear first

13     from Mr. Colbath on that topic and any others that you

14     sought for us to address.

15          MR. COLBATH:  Thank you, Your Honor.  I

16     recalled from our last hearing, and my understanding of

17     this hearing was that, based on the discussions we had

18     and where things were at at the last hearing, of course,

19     that was pre-disclosure of the new "old" discovery from

20     the government and anticipation of receiving discovery

21     and things, frankly, it was my first hearing as being

22     counsel, which the Court might remember was June 21st,

23     and so I understood this to be in fact, yes, a hearing

24     to make sure discovery was started or being in process,

25     to discuss a motions deadline, and as just sort of a

status hearing to see where we're at, because, of course, no one, it appeared, was ready to pick deadlines for sure.

In anticipating a discussion of deadlines and trying to, from the defense's perspective, explain to the Court how I see our status, it would be most helpful to me, with the Court's permission, if I could briefly have my investigators testify and just make a little record before the Court.

THE COURT: Can you give me an offer of proof of what you intend the testimony to be?

MR. COLBATH: Sure. I can tell the Court that today my position on deadlines is going to be that this case is so large, this case is so complex, there is so much information and I am so far not into the process that I am not even sure I can in good faith articulate what appropriate deadlines going forward should be to the Court.

The reasons for that are that -- and because I'm not the one physically doing the processing, the reasons for that are complex. They are related to the volume of discovery. They are related to the fact that this is a retrial and there was things done before, which common sense would tell people that makes it easier. It doesn't. It makes it harder for very

specific and articulable reasons, and we can show that
to the Court.

THE COURT: Are we talking about the pagination
issue or something totally distinct from that?

MR. COLBATH: Oh, lots of things separate and
apart from that. There are complicating things about
discovery of things previously provided. There are
things that have been provided in different forms and
shapes and ways. There are things that were previously
provided that haven't yet been provided.

Then there is, separate from those things, new
discovery that is exceedingly significant in relation to
the case that's going to require what I anticipate, if
that's the only issue we had, a couple of months minimum
of investigation.

And so you know, I can explain that to the
Court easiest if I just have Ms. Sheffield, Dietrich
Sheffield, testify real briefly, because she's
principally the one been organizing things and helping
me work through things. We can show the Court some very
concrete examples that I think are important to put on
the record, because I cannot allow this case to go
forward in good faith, I can't, without making some
record as to what we're up against.

And so I want it to be as clear for the Court

and understandable as early on as possible why I take
the positions I take or just what it is we're up
against, because it's significant.  And it's easiest
shown with some specific examples rather than me just
try to articulate it to the Court or tell the Court.

        And then secondarily my suggestion is going to
be -- I do have some discussion I would like to have or
some things I would like to talk to the Court and
Counsel about about the new discovery that was provided,
what I guess was referred to or discussed at our last
hearing about some *Jencks* material that the government
provided with respect to a witness, and that discussion
Mr. Johnson has been helping me with and I have a few
things to say or present about that.

        That probably, given the protective orders that
have been entered in the case, needs to be a discussion
that's probably had, I would leave it up to the
government, but probably that discussion needs to be had
in-camera or in a closed proceeding.

        So I won't belabor the points and I won't take
time that I feel is unnecessary.  I don't think it will
take more than 10 or 15 minutes.

        THE COURT:  Can I back up and ask, have you
articulated to Ms. Sayers-Fay what your issues are with
discovery?

1          MR. COLBATH:  In a general sense.

2          THE COURT:  I think before we have any evidence

3    presented to the Court on discovery issues, it's

4    incumbent on the two sides to discuss what the issues

5    are, lay them out to Ms. Sayers-Fay, see if you can

6    resolve them, and if you can't, then that's where the

7    Court gets involved.

8          MR. COLBATH:  The Court misunderstands it.  I'm

9    sorry if I interrupted.  I am not going to present

10   issues to you or present any testimony regarding

11   discovery about things that are not being complied with,

12   things that are not being produced.

13          I want to make a record so that the Court

14   understands what the discovery is, what the state of the

15   discovery is, what it is when we talk about discovery

16   and investigation and needing time for experts or

17   needing time for motions, just the volume and breadth of

18   the case.

19          I will not go into -- I certainly agree with

20   the Court.  I will not go into anything about we haven't

21   been provided something and I want any assistance from

22   the Court, or there are problems with the discovery that

23   we want the government to straighten out and I need the

24   Court's help with that.  That's not at all my purpose.

25          THE COURT:  Here is what I'd ask you to do

first.  This was on for a status hearing, not an
evidentiary hearing.  I would ask you to sit down with
Ms. Sayers-Fay, see if you can get a stipulation as to
the scope of discovery.  That's what I understand you
would like to do, is make a record of what this case
consists of.

I anticipate you put on all of your evidence
without notice to Ms. Sayers-Fay, until I assume about
five minutes ago, then she puts on her perspective, and
what am I supposed to do with that other than say you
see the case differently.

My guess is there are many things about the
scope of discovery you can agree on.  I can say that I
have no idea.  It's a fair statement, Mr. Colbath.  And
informing me of the scope of discovery would be helpful.

You calling a witness at a status hearing --
did you have notice of this?

MS. SAYERS-FAY:  No.

THE COURT:  You calling a witness at a status
hearing without working with opposing counsel and seeing
if there is agreement is not the way we're going to
proceed.  I'm happy to put this on again next week, but
first I want to see if the parties can agree on what the
scope of discovery is.  It would be helpful to me.  I am
saying that, but this is not the way I see us proceeding

1   if every time we have a status hearing people come in

2   and say now I want to present witnesses to present

3   evidence unbeknownst to the other side.

4         MR. COLBATH:  That's perfectly understandable,

5   and thank you, Your Honor.  I will tell the Court

6   Ms. Sayers-Fay and I talked, and as her filing of today,

7   I think it was today, the government's notice of

8   proposed deadlines --

9         THE COURT:  Oh, I did not see that.  Did you

10   file something today?

11         MS. SAYERS-FAY:  Yesterday.

12         MR. COLBATH:  As that filing indicates, we did

13   confer and I did make in a general sense my position

14   known that the case is -- we don't agree on deadlines

15   and that I'm uncomfortable agreeing on deadlines and

16   that I have a bunch of outstanding issues.

17         We didn't go through all of those because we

18   basically agreed to disagree on a schedule, because in

19   large part, we couldn't be sure what the Court's

20   thinking was going to be on deadlines.  So we agreed to

21   disagree, and that's what's reflected in her proceeding.

22         THE COURT:  I'm sorry.  I will go get that

23   because the last document I have is August 8, 854,

24   United States discovery production.

25         MR. COLBATH:  It's Docket 855.  It was filed

yesterday. It must have been towards the end of the day.

THE COURT: I intended to look at the docket this morning and I didn't. In any event, I agree with your perspective, Mr. Colbath, that an understanding by the Court of the scope of discovery, the size, the issues, the work that needs to be done would be very helpful.

I question whether it needs to be presented in an adversarial format of you putting on your perspective and Ms. Sayers-Fay putting on her perspective, or at least that that's how we commence this discussion as opposed to seeing where there is agreement, there are X thousand pages that have been produced, there were X number of witnesses in the last case, there were X number of expert witnesses, here is what we anticipate, if you have that information at this point, and then where you are on these topics.

That would inform the Court's decision in the event of a dispute on deadlines, which I hear is out there and which I can't say I didn't anticipate, in fairness to both sides.

So hearing all of that, how would you propose we proceed today?

MS. SAYERS-FAY: May I be heard, Your Honor?

 1          THE COURT:  I'm sorry, Ms. Sayers-Fay.  Maybe
 2  you're totally fine with his approach, in which event I
 3  will accept that stipulation.
 4          MS. SAYERS-FAY:  Your Honor, I understood
 5  today's hearing as a hearing at which we were going to
 6  set trial deadlines, motion deadlines, expert witness
 7  discovery deadlines, bearing in mind the trial date of
 8  February 19th.
 9          And so with that in mind, on August 1st, I did
10  begin a meet-and-confer effort with the defense to try
11  to work toward a mutual proposal.  And we did have some
12  back and forth on that.  And what I describe in the
13  pleading that I hope you will have a chance to review is
14  that we did -- the government, we adjusted our schedule
15  in response to some fair points that Mr. Colbath made.
16          But ultimately the government was determined to
17  make a schedule that was consistent with the current
18  trial date in this case.  So I think what I understood
19  Mr. Colbath to be saying is that, you know, he was not
20  ready at that time to commit to those dates because it
21  sounds to me like he's going to make a motion to
22  continue trial.
23          So the government has made a proposal.  That
24  proposal is responsive to some of the concerns that the
25  defense raised and I think still tries to make an

attempt to honor the trial date, which I think frankly
is quite feasible given the fact that this is a retrial
and there is not -- a lot of the mystery frankly is not
there.

And I will say as to discovery, I haven't had
any -- we did reproduce all of the prior discovery in
what I think is a very orderly fashion. We went to
great lengths to provide a digital and searchable log.
We produced that on June 17, two days before the Court
had ordered it. And I have not heard anything from the
defense since then concerning any issues with that.

Two days ago, I did get an e-mail in response
raising a few issues. I immediately replied on
August 15th. Frankly a lot of it was saying, "You do
have that, it's at this Bates number, those jail calls
don't exist." I did not find any of the concerns raised
in that letter to be pointing out, for example,
sufficient deficiencies in our production or
organization.

So I don't -- I appreciate the opportunity to
meet and confer. I did not have any notice of the
suggestion that we were going to have an evidentiary
hearing. And I further suggest to the Court that it
sounds to me like what Mr. Colbath is positing is what
would most -- he's bringing evidence intended plainly to

move the trial date.  So I think the most appropriate
way to go forth in that event is to, if he's going to
make that motion, then make that motion and evidence
concerning the discovery or any difficulties that he
perceives seems to me would rightly be organized within
the paradigm of a motion to continue trial with an
appropriate notice to the government and appropriate
briefing of the issues.

And that's what we would ask for.  I mean I
don't think there is good reason to move the trial.  I
think everything the government has done in this case,
including the very early disclosure of important *Jencks*
materials, which is ongoing, and we have been very
dedicated to getting that out --

THE COURT:  I have seen your notices.

MS. SAYERS-FAY:  There will be more, because we
understand the importance and we are dedicating a lot of
our time to reviewing those same documents and getting
those documents within our possession, not just in the
government's possession at large.

It is something that we're definitely dedicated
to, but given the fact that that's quite a typical --
and we have done that because of the very strong
importance we place on resolving this matter, not as
originally planned in November of this year, but at

1    least in February of next year. And I think that with

2    diligence and good faith communications concerning any

3    issues that Mr. Colbath has that we can surmount those

4    problems and stay on schedule.

5         THE COURT: What's your proposal for today?

6         MS. SAYERS-FAY: Your Honor, I would appreciate

7    it if you had the opportunity to review the government's

8    proposal.

9         THE COURT: I am looking at your chart right

10   here. It's certainly within the timeframe that I

11   believe we were discussing.

12        MS. SAYERS-FAY: These are all the deadlines.

13        THE COURT: As I recall Mr. Colbath he was

14   talking about large numbers of motions at Thanksgiving.

15   This would be consistent with that.

16        MS. SAYERS-FAY: One of the things Mr. Colbath

17   and I talked about was he thought the government should

18   have two weeks to respond to those motions. The

19   government believes we should have three. I based that

20   primarily on the timing and on the fact that he had

21   spoken -- he indicated he anticipated a significant

22   number of motions. So given that, I think three weeks

23   is fair.

24        I have tried to make the deadlines October 1st,

25   and the idea here is October 1st the government would be

prepared to turn over its expert witness reports. And I
discussed this a bit with Mr. Colbath as well. I think
because it's a retrial that that should be a reciprocal
swap. In other words, to the extent that he's already
out there updating what his prior rebuttal experts have
done, and that information is organized, that it should
be turned over on October 1st, and for the government to
do the same, any updates or any expert witness reports.

Now, his point --

THE COURT: Or do you envision a notice saying
we intend to use the old one or --

MS. SAYERS-FAY: Yes. I think that would be
appropriate. Either we intend to use the old one or
here is the prior expert and a supplemental report for
the prior expert, or here is a brand-new expert and
their report. So I am contemplating not just the sort
of skinny notice of this is the person, but really the
report for both sides, to the extent that those are
ready.

Now, Mr. Colbath raised the point, and this is
fair, that, look, if we come with something new, that
then there would be a rebuttal. So that's what
November 2nd -- or as I look at this, I wonder if I'm
looking at the same -- Your Honor, what is the date that
you have for --

1          THE COURT:  For what?  Documents, examinations,
2    expert witnesses, summary and reports October 1st.
3          MS. SAYERS-FAY:  Which is line item four.
4          THE COURT:  No, it's six on my document.  Four,
5    five and six.
6          MS. SAYERS-FAY:  Right.  And then the rebuttal
7    experts, line item number nine.  What's the date that
8    you have on that, Your Honor?
9          THE COURT:  I have November 16th.
10         MS. SAYERS-FAY:  So I'm sorry.  I'm looking at
11   the copy of it which was before we changed.  The
12   government switched it from November 2nd to November 16
13   to allow a month and a half primarily for defense
14   organization of rebuttal experts.
15         And then if there should be surrebuttal, that
16   would be approximately one month later.  Again, either
17   side could take advantage of that as well, with the
18   bottom line being that before Christmas all expert
19   witness information will have been disclosed and
20   exchanged, allowing a sufficient time before the January
21   deadline for motions in limine, which would then have to
22   be resolved by the end of January, or approximately on
23   or about.
24         We would be replying at the end of January,
25   right around the time of the final pretrial conference.

1  With that schedule, I believe we would be in good stead

2  for the trial to begin on February 19th.

3          THE COURT:  You're proposing three weeks to

4  respond to motions filed November 2nd?

5          MS. SAYERS-FAY:  Yes, Your Honor.

6          THE COURT:  And then what about response time

7  for the motions that might be filed, line 13 and 14?

8          MS. SAYERS-FAY:  So if they are filed on

9  January --

10          THE COURT:  I'm sorry, 14.

11          MS. SAYERS-FAY:  -- then the government --

12  either side, because there could be motions in limine

13  from either side, would be January 28th, a response

14  deadline.

15          THE COURT:  To the 13?  So two weeks on the --

16          MS. SAYERS-FAY:  Two weeks on the motions in

17  limine.  Again, we don't know quite what to anticipate,

18  but on the other hand, all of this -- a lot of this

19  evidence will be recycled.  This is a case where it's

20  been through the trial before, so again much mystery has

21  sort of evaporated.

22          Each side I'm sure, because we weren't the

23  trial attorneys before, will have a different spin and

24  perhaps some new inventions, but that doesn't change the

25  fact that the case is what the case is and it's been

through trial once.  There is a lot of transparency
concerning much of the evidence, which should allow more
efficiency with regard to the filing of motions in
limine and frankly to pretrial motions.

THE COURT:  So as I indicated to Mr. Colbath, I
see a benefit in the Court understanding the magnitude
of the discovery out there and the witnesses that were
produced.  So my thought is that you and Mr. Colbath
confer here for about 10 or 15 minutes and see if you
can jointly agree how many thousands of pages of
discovery are we talking, how many witnesses testified
at the last trial, expert and lay, and what you --
because you both told me you thought it would be
shorter, although I don't intend to -- Mr. Colbath was
pretty new when he was talking about the case.

That's what I would like you to do.  And then
after I hear that from each side, I'm not going to have
evidence presented today, but then I would like to hear
Mr. Colbath's response to 855-1, to the schedule that is
set out there.  But first it would be helpful for me to
understand the magnitude of the production, but I don't
see that I need that through investigator evidence when
that was not the intent for this status hearing, so --

MS. SAYERS-FAY:  I think, Your Honor, I know
that to get accurate numbers for you concerning, for

example, the number of documents presented, the number
of expert witnesses, I have a ballpark number on that.

The number of percipient witnesses I'm not sure
that I could -- I would be greatly assisted by the
ability to confer with my office.  I don't know if we
want to return, for example, in a half an hour.

THE COURT:  Sure.  I would like to get it
resolved today.  I'm not as available next week.

MS. SAYERS-FAY:  I can be a lot more accurate
if we had more than ten minutes.

THE COURT:  So you want about a half hour break
and then meet with Mr. Colbath, and we'll come back on
record in about an hour.  Mr. Colbath, is that agreeable
to you?

MR. COLBATH:  I think it's completely
insufficient for my purposes and not going to result in
all the information or completely accurate information
being presented to the Court.  If that's the schedule
that we have and that's the process that we're going to
follow, I will follow that.

THE COURT:  Thank you.  If there is a motion to
continue in front of me at some point, it may be a
different one, but right now we have a February 19, 2019
trial date and the purpose of today's hearing is to
establish the pretrial deadlines.

1        As I indicated when we met last a couple months

2   ago, whenever it was, I would take into account to what

3   extent, if at all, the government had provided

4   production from the last status hearing until now, and

5   it appears that, based on the filings, that there has

6   been a voluntary early, very early production of *Jencks*

7   material at this point in time.

8        So with all that said, let's take about an hour

9   and come back and then reevaluate where we are at that

10  time.  But you will have at that point kind of a summary

11  of what each -- what you agree is the sum total of

12  discovery and a sense of the witnesses for the trial

13  based on the past trial, and then Mr. Colbath's view on

14  this document and the schedule that's set out there.

15       So we'll take about an hour.  We'll be back on

16  record shortly.  We'll go off record.

17       DEPUTY CLERK:  All rise.  This matter is

18  recessed for an hour.

19       (Recessed from 1:27 p.m. to 2:42 p.m.)

20       DEPUTY CLERK:  All rise.  Her Honor, the Court,

21  the United States District Court is again in session.

22       THE COURT:  Please be seated, everyone.  We're

23  back on record here.  And ready to proceed?

24       MS. SAYERS-FAY:  Yes, Your Honor.

25       THE COURT:  Mr. Colbath, do you need a few

1  minutes with your client?

2          MR. COLBATH:  No, Your Honor.  Thank you.

3          THE COURT:  Very good.  So from your

4  perspective, Ms. Sayers-Fay, where are we with regard to

5  the scope of discovery and witnesses?

6          MS. SAYERS-FAY:  Your Honor, Mr. Colbath and I

7  conferred, and I know that he'll want to give you his

8  accounting, but many of our numbers do not disagree.

9          I will say that the discovery that is old, and

10  by that I mean everything that was produced for the last

11  case, by our count sums up to 14,734 items.  Now, plus,

12  and I will say that there is also -- some items were

13  exchanged on a hard drive so they weren't Bates

14  numbered, and like a forensic image of something, for

15  example, so there is additional information beyond that

16  that was not sort of amenable to Bates numbering.

17          THE COURT:  How many Bates numbers are there?

18          MS. SAYERS-FAY:  There are 44,244 pages.  As

19  Mr. Colbath will detail, a page sometimes can indicate,

20  for example, that this page corresponds to a ten-minute

21  audio or to a video, so a page is not always indicative

22  of a literal page.  It could be indicative of another

23  sort of medium in the evidence.  Those are all things

24  that were produced last time around.

25          Since the last time around, we have produced

1  439 new items.  But importantly, 424 of those items were
2  Mr. Wells' own jail calls.  There have only been 15 new
3  items that have been produced, summing up to 404 pages.
4  Nearly all of that to date relates to CW1.
5          THE COURT:  All right.
6          MS. SAYERS-FAY:  We do have -- I do anticipate
7  further disclosures, and we are proceeding both as to
8  further disclosures concerning CW1.  As we represented
9  to the Court, that is a rolling disclosure, so we will
10  have more items concerning CW1.
11          We also have more items concerning Mr. Wells
12  himself.  For example, I know that I have his medical
13  file from BOP.  We produced that as a courtesy to
14  Mr. Wells' appellate counsel, so I know that they have
15  it.  But nonetheless, it will be produced in due course
16  along with some other BOP records concerning him as we
17  are able to put those in the queue for production.
18          So there are more coming.  The point is that
19  there has not been to date a large volume of information
20  that was not involved in the last trial.
21          The last trial lasted 19 days.  It involved,
22  for fact witnesses, there were 106; 70 of those were
23  government witnesses.  And having reviewed the last
24  trial and listened to it, we do anticipate significant
25  streamlining of the percipient witnesses from the

1  government's perspective.  There were 36 defense fact

2  witnesses.

3           As for expert witnesses, there were 15 total;

4  11 from the government and 4 from the defense.  And from

5  the government's perspective, we expect roughly the same

6  on that front.  And there will be many repeat experts.

7           I would note that these totals on the

8  witnesses, and particularly the total of 106 fact

9  witnesses, includes people who testified as to matters

10 that the Ninth Circuit has now excluded.  So for

11 example, all the folks who testified concerning Jason

12 Barnum, known as "Eyeball," those folks are included in

13 that tally but will not be presented this time around.

14          There were a total of 271 admitted exhibits by

15 both.  That's inclusive of both sides.  And I think that

16 is -- I think that sums it up from sort of a numbers

17 perspective.

18          THE COURT:  I didn't ask you this before, but

19 do you have an estimation of how many pretrial motions,

20 substantive ones, were filed in the first go-around?

21          MS. SAYERS-FAY:  I don't.  I don't know that

22 number offhand.

23          THE COURT:  I didn't ask you for it, so there's

24 no reason you would.

25          MS. SAYERS-FAY:  I would note when we're

considering the schedule here that I think it would be
appropriate to add to the proposed schedule that we
proposed the swapping of exhibits, which is not included
on there, but I think on January 14th I propose that the
parties swap organized exhibits, tagged and organized,
both digitally and in a binder, and that any rebuttal
exhibits be reciprocally exchanged on January 28th.

I think in that manner we can again preserve
the integrity of the trial date.  That's where we stand
at this moment.  In speaking with Mr. Colbath before I
understand that we discussed in the production that
there may be certain files that they can't open, we see
an extension we don't recognize, and if I am aware of
that, I will do my best to resolve it.  It does not
surprise me, extensions change, sometimes you need an
extra add-in or an application file to run something.

We can overcome those, to the extent that those
problems exist, with regard to any portion of the
production.  As long as we have open and timely
communication of those we'll do our best to resolve
them.

THE COURT:  All right.  Thank you.

Mr. Colbath, go ahead, please.

MR. COLBATH:  Thank you, Your Honor.  Because
it's illustrative, I just want to show the Court this

1 real quick.

2          THE COURT:  All right.  That's an item, is that

3 what you're going to tell me?

4          MR. COLBATH:  No.  That's just -- I'll just

5 give you one page.  So this is the almost 900-page just

6 index of discovery.  This is just a listing of the

7 14,000 items.  If the Court will see, the third column

8 on there is page count.  And so for each one of these,

9 like at the page I'm looking for, the first few items

10 are one page, one page, one page, but there is one

11 that's three, there's one that's 38 on my list, there's

12 one that's 139.

13          So this almost week worth of reading you would

14 just read so as to speak the table of contents to the

15 book.  By my numbers, I do not know what was previously

16 disclosed by the government because I was not -- I have

17 not had -- I don't have any documents or information

18 that would allow me to figure that out, but this list or

19 this stack that I have showed the Court, this 900 pages,

20 that's the index for what the government produced on

21 July 17th.

22          And if you break that down, I can tell the

23 Court that that consists of 44,350 PDF files.

24 Additionally, it consists of 1,170 audio files that make

25 up over 255 hours of witness interviews.  It contains

316 video files, which is over 17 hours of video.  It
contains 78 Excel spreadsheets.

Each one of those spreadsheets is listed on
that list an a single item.  One of those spreadsheets
has 165,000 pages.  It's a log of entries, keyed entries
in and out of one of the two buildings, the relevant
buildings here.  It has multiple entrances and multiple
people have keys and that spreadsheet shows who came and
went from the buildings at issue.

Another one has around 50,000 pages.  All
total, those spreadsheets that on this list appear to be
78 items have around a half a million pages that I'm not
sure could be relevant or -- I know some of which is
relevant.  Some of which is I'm sure not.

THE COURT:  Do you know if the spreadsheet, the
165,000 page one, is searchable, so could you put in a
person's name or their pass number and get --

MR. COLBATH:  I suspect that they are, but I'm
not sure.

THE COURT:  Fair enough.

MR. COLBATH:  I'm not sure.  And then lastly,
there are around 400 file folders that have a folder
extension like "INI" or some are "DWG" or something that
our computers tell us you need a specialized program to
open, which I'll have to get with Ms. Sayers-Fay or

somebody at the government to say we can't open this
one.  There is about 400 of those files, so I'm not sure
how much more is there.

This log that you're looking at also has a file
that has -- it has both a file name and it has an FBI
title so you can see -- like on mine -- well, on mine
the second one down is autopsies of James Hopkins and
Richard Belisle, so that's fairly self-explanatory.  But
the one right above it has 070A-AN, and then a series of
around 40 numbers.  That's what the file is described
as.

I will tell the Court as we went through this
there are some that maybe there is a whole block that
are just referred to as A1A.  It's like Exhibit A1A.
And you look at it, some of them are pictures, some of
them are a lab report, some of them are police reports,
and so there is no rhyme or reason.  It's just -- and I
don't -- it's probably not mislabeled.  It's just in
whatever system gave it to us.

So my point on that is while you could do --
you can't just look at the log and, for instance, grab
all the things related to the crime scene, because they
are not -- the descriptions don't help you in that
respect.  Even if you could, we're about maybe 20,000
pages into the 50,000 pages of discovery, and we have

found hundreds of instances of misdescription, something
is described as a crime scene photo and when you open
the PDF, it's a lab report on a fingerprint lifted off a
vehicle, just complete -- not even a misdescription, but
just an inaccurate one.

Again, I think the government can help me with
some of that, but at the point that I open it and I look
at it and I say this isn't a crime scene photo, this is
a fingerprint report, I don't need Ms. Sayers-Fay to
correct the log for me, I could correct it. I don't
need to ask, I can correct it. I don't know that until
I look at it.

And then on the witnesses, I will tell the
Court that Ms. Sayers-Fay gave you the numbers for
trial, 106 fact witnesses, 11 experts. But I think it's
more relevant -- because we're not at trial, we're at
what I need to worry about in discovery and I think
potential witnesses, and at least identified previously,
and I don't know if this will change, the government
identified 23 experts. I have reports, CVs and whatnot
on 23 government experts. The defense had consulted
with 11 and ended up calling four. I can tell the Court
I have spoken to one.

There were 93 civilian witnesses, what I'll
call civilian witnesses. There was 32 law enforcement

1    witnesses.  There was 48 Coast Guard witnesses.

2          THE COURT:  So not witnesses in the sense of

3    testifying witnesses, but individuals with information

4    that needed to be interviewed on?

5          MR. COLBATH:  Witnesses where either the

6    government -- well, these are all just what I can

7    identify from the discovery, so there were around 200 or

8    more government produced witness interviews, so the

9    government -- they were potential witnesses.

10          THE COURT:  Potential witnesses?

11          MR. COLBATH:  At trial, the government pared

12   their 200-plus group down to 70.  The defense apparently

13   called 36 witnesses.  I have, just at a cursory my work

14   so far, I have already identified probably a half a

15   dozen witnesses that had I been prior counsel I would

16   have called from the defense standpoint that I don't see

17   anybody called.

18          And so I don't know how many -- 36 might be a

19   perfectly fine number for what the defense is ultimately

20   going to call.

21          THE COURT:  It may be different people?

22          MR. COLBATH:  I know they will be different,

23   because I have already found a half dozen that will

24   likely be different.  And as Ms. Sayers-Fay said, the

25   Ninth Circuit changed the context of things and the

trial court ruled on some things that I think will not repeat itself.

To help the Court answer a question you asked Ms. Sayers-Fay, depending on how you determine -- how you term or define the word "substantive," I think there is around 32 substantive motions that were filed. That consists of just shy of 1,000 pages of briefing if you don't count the exhibits.

I can tell from just my reading of the Ninth Circuit opinion that there are probably a half dozen or more motions that should be filed now where the Ninth Circuit said appellate counsel raises this issue, we're not going to address that because it was not raised earlier or raised below, so there is some of those.

There are also some issues that the Ninth Circuit did address but they say we deny this on the grounds raised, defendant here is not making, for instance, a due process argument, that wasn't made below, and so while that issue was somewhat briefed, it needs to be potentially rebriefed if the research is done and a due process argument, for instance, in my example, can be made.

So I think there is 30 or 40 -- there is potentially -- if the same motions were filed or even half the same motions were filed, there is probably 20

substantive motions, but many of them are motions in
limine that I think need to be refiled because we're
doing a new trial.

THE COURT:  If there was a motion in limine
that was filed in the first go-around, ruled on and not
appealed, why would I revisit motions in limine?  I
haven't thought about this, but --

MR. COLBATH:  Well, because depending on the
nature of the Ninth Circuit decision, the Ninth Circuit
decision claimed that some things were error, but for
instance, an error in allowing an expert to testify,
Dr. Meloy, we'll say that one witness that's prevalent
in the Ninth Circuit opinion.

THE COURT:  Right, I recall that.

MR. COLBATH:  Related to his testimony I
believe was potentially issues and testimony or other
evidence entered in by the government that sort of was,
in my view, as I understand it at this point, was
entered to support Meloy's testimony or entered to later
tie together with Meloy's testimony.

Well, now the Ninth Circuit says Meloy is out,
but that doesn't mean that the government won't try to
present a bunch of that other testimony and argue it in
another way.  And the defense previous either objected
to that, and because the trial court overruled the

objection to Meloy and said no, this testimony is in,

that A makes B relevant, A makes B admissible, A is now

out. So I now have to look and say, well, with the

precursor out, what flows from that that is now not

admissible.

And I anticipate there will be much of that.

It's similar in 404(b), if some of the reasons for

admitting 404(b) evidence was because it was tied to or

bootstrapped or made relevant by the testimony of other

witnesses.

THE COURT: I understand your point. So it

falls within --

MR. COLBATH: My belief is we'll have a number

of issues that need to be revisited. Certainly on any

of them -- and I will also tell the Court out of a pure

ethical obligation and duty to represent my client, if I

have any question whatsoever about it, I'm going to file

the motion and let the Court tell me, "No, I think the

law of the case prohibits this or this ruling stands,"

or whatever the case may be.

But my point would be there is around 30 prior

substantive motions, even if we only file half, it's 20

to 25, but I honestly cannot -- those are complicated

matters in the first instance, and I can't -- that's a

whole legal undertaking to just read the research and

make sure the case law hasn't changed, make sure there
is any relevant new arguments to be made to the Court,
because frankly Mr. Wells was not at all, as the Court
might expect, happy with his prior representation, quite
honestly, and the Ninth Circuit found that he was at
least in part right in his complaints.

So I don't trust that motions that were
previously filed were appropriately argued or were fully
argued or were adequately presented, and so I at least
need to read them to make sure, if they were adequately
presented and ruled on, that I understand what the rules
of case are.

THE COURT: Fair enough. I have been working
on this topic actually with the Ninth Circuit. And let
me say that in my mind my understanding of the law, more
importantly of the Ninth Circuit, is to the extent there
is an express ruling by the circuit court, I am bound by
that ruling. I can't revisit it. I can't go beyond it.
It is an express mandate.

To the extent that there is a ruling from this
court, prior ruling that was not appealed, then I would
intend to apply, and it didn't fall within the penumbra
of the circuit court's ruling, then I would intend to
apply the law of the case doctrine, and that would mean
that I would be starting -- I hate to use the word

presumption, that's not really it, but the starting
point would be the prior ruling applies, unless there
was something that was overlooked or it was clearly
erroneous or there are new facts.  That is the standard
I would be looking at.

It is for that reason that I have been of the
belief, which could be shaken, that this case would be
relatively straightforward on a retrial because of the
mandate of the Ninth Circuit and the law of the case
doctrine.  So I give you that heads-up.  That's how I
see the law.

MR. COLBATH:  I appreciate that direction very
much and will certainly keep that in mind.  I will just
in candor to the Court tell you that I'm going to try to
shake you on a number of those issues, because for the
very reason, as I just stated, because I don't think
things were handled correctly previous.

And you know, I want to understand what was
done before, but it's not going to -- I'm going to do
this case from June 21st forward, because that's been my
involvement, and I'm going to handle it how I believe --
the best that I can and how I ethically am required to
and to the fullest extent that I can represent
Mr. Wells.

And if I'm stuck with some things of the past,

obviously, I can't change those.  I believe there are
things that I probably can change, and to the extent
that I find them helpful to try to change going forward,
I will.  And if the Court tells me I can't, I won't.
And I'll operate within the rules that I have.

        Before I ever get to any of that legal work
that you and I are discussing I have to understand the
facts of the case.  I have to know is this previously
innocuous witness now made challengeable because of what
the Ninth Circuit did, or is something that was done
before that seemed not motionable now motionable, or
what seemed -- or arguments that were made before or not
made before because of the way the trial court ruled.
It's all fact dependent.

        And for me, there is just no way to do this
case, regardless of what happened before --
Ms. Sayers-Fay earlier said a lot of this is not a
mystery.  It really kind of is to me because none of
those things have I seen before.  I've just started with
this disclosure of things.  And the only way you prepare
a case for trial, even if it was all prepared before,
the way you do it is you get the discovery, you separate
it out into witness file folders and exhibit file
folders and you make sure that those folders are
complete, and then once you understand what's there from

the government, because that's all their stuff, some of
it I'll use and some of it it's helpful to me, but once
I have it broken down into what we're dealing with, then
I investigate, I file motions, we ready witnesses and we
go to trial.

The fact that she says, the government says,
well, this witness was called before and this witness is
going to be the same, if I know that, in order for me to
proceed without doing anything related -- without doing
my process that I just described, I have to rely on the
fact that, first of all, that what the government used
before is truly identical. I have already went through
this and found mistakes where things aren't identical or
things don't match up, and no ill aspersions cast on the
government. There is just things change.

Number one, I have to go on that assumption
that things are the same. Number two, I have to assume
that the file folder on witness X that the government
says this is what we did before so you can count on
that's what we're going to do again, I have to assume
that the defense team took the time to read 50,000 pages
that was disclosed before and they pulled out the right
documents and they put them in the right file folder, so
that if I cut to the chase and just use that for the
retrial, I have to assume that somebody else's work did

1  that, did it correctly.

2        And I can tell the Court that, again, as I look

3  at it, I don't think they had the time.  I don't think

4  they spent the time.  It was different investigators.  I

5  don't think -- and they pursued different theories than

6  I think were legally the best and appropriate to pursue.

7        So all of that past work is somewhat, while the

8  names might be familiar to other people or some of these

9  things have long been in existence, it's just work for

10  me.  There is no other way I see to shortcut this than

11  to go through 50,000 pages, get them separated as

12  quickly as I can figure out what's irrelevant and put it

13  to the back burner and go forward.

14        THE COURT:  So you indicated you have done

15  about 20,000 so far?

16        MR. COLBATH:  The office has processed that.  I

17  can't tell the Court how far I am personally into it

18  because I spread my time between grabbing a legal issue

19  and understanding the briefing and seeing what's there,

20  and seeing if I can corral the things relevant to

21  Mr. Wells' statements and see what was filed before to

22  challenge those, make sure I read all the statements I

23  know of, and then maybe I research on that for a while.

24  So none of that is discovery related stuff, while

25  somebody has processed in that time 1,000 pages of

discovery.  But then I have to go back, of course, and

understand that 1,000 pages.

To put it in context for the Court, I was

thinking about it riding the bus home last night from

work.  I have changed my entire personal life for this

case, entire personal life, but if I read discovery at

the rate of a Stephen King novel a day, I would be done

in April.  If I didn't do anything else, I didn't work

on anything else and I just read roughly 300 to 400

pages a day to understand it all, I would be done in

April, seven days a week from now until then.

I mean, and that doesn't -- just the new

discovery, Ms. Sayers-Fay said the government just

produced 434 items, 15 of which dealt with this new

cooperating witness, which I will tell the Court, by the

way, in the prior proceeding, the one thing that was not

at all briefed, not at all presented, not at all part of

anything heretofore, was any directly incriminating

statement by Mr. Wells about this.

There was no confession.  There was no even

anything that hinted of a confession.  And now the

government has -- and that was a huge I think --

obviously they overcame it because of the verdict, but

that was obviously a critical piece of evidence that if

the government could have they would like to have.  And

1    that's now what this new discovery is is there is a

2    witness that apparently, if allowed to testify, will

3    say, "Mr. Wells confessed to me the crime."  Well, that,

4    as the Court might imagine, changes everything and

5    becomes in amongst 50,000 pages of material something so

6    hugely significant that if there is an attack to be

7    mounted, we have to spend enormous hours on that.

8           And the government has been working on that

9    issue alone, because I know I have two days' worth of

10   transcripts where Mr. Walker sat at a prison and

11   interviewed this person.  That occurred back in May.  So

12   the government has been building documents and working

13   with this witness and interviewing that person for

14   months and we just got that.

15          And so now we need -- we won't take the same

16   number of months probably, but it actually may take us

17   longer because we can't pick up the phone and say we're

18   coming down to the prison to interview somebody.  We

19   can't pick up the phone and say rally the troops, get us

20   on a plane and we need to stop at three of the prisons

21   this guy was at and we need access to every cellmate he

22   had to know something about his history.

23          So that's been put into play, but separate from

24   those 15 pages on that person, we got 424 jail calls

25   made over the last several years by Mr. Wells, so me and

an intern, trading off, have sat just in the last
30 days, that's over 300 hours of telephone calls. And
it didn't come with a note that said you might look at
call number 236 because that's what we intend to use, or
you might notice call 107 it's got some relevant
information, it's just 300 hours of telephone calls that
you have no way to know did my client make a statement
that the government is going to use at trial, unless you
listen to the 300 hours.

And so that's another -- that's on top of again
the 50,000 pages that I didn't see how we were going to
get through to start with. So my point in just all of
this when I talked earlier about the deadlines is to say
I'm loath to certainly -- the last thing I'll say: I
frankly misspoke -- didn't misspeak. I was wrong on
June 21st when I sat in this courtroom and talked
anything about deadline. I had no business talking
about deadlines to this Court. I did the best I could
and I certainly didn't intentionally misrepresent
anything.

As optimistic as I was back then about my
involvement and what was realistic with trial, with
motions, with experts, I was flat wrong. We are -- it's
way more complicated and way more difficult than I ever,
just from a logistical standpoint, not to mention the

1   legal complexity of it all, but it's just way more than

2   what I thought when I stood before the Court on

3   June 21st.

4           When I talked earlier today about deadlines and

5   what I either couldn't agree to or didn't want to

6   propose or whatever, I didn't really feel like I was in

7   a position yet to propose something to the Court that I

8   can't promise I won't come back later and say again I

9   was wrong.  But be that as it may, what I will tell the

10  Court my position is, and then I don't have anything

11  more -- besides all that material, there is seven hard

12  drives and three cell phone dumps that all consist of

13  more hundreds and thousand of pages that were already

14  given to us that aren't Bates numbered, so those don't

15  count, so hours and hours of that log here too.

16          I'm out of the district Monday and Tuesday, but

17  if the Court -- I will tell the Court I will file a

18  written motion for continuance supported by an affidavit

19  from me and what I believe is appropriate documentation

20  a week from Monday, April 27th.  That's going to be my

21  intention.

22          THE COURT:  August?

23          MR. COLBATH:  Excuse me, August 27th.  And I

24  only delay it that long because I am gone on Monday and

25  Tuesday.  I have some court on Wednesday.  And I'm in

Fairbanks with a full docket on Friday, so it leaves me
Thursday really of next week to work on anything, which
I would work with my co-workers to put together, make
sure it's in good order.  If I can file it next week, I
will, but no later than a week from Monday, I anticipate
moving for a continuance.

        As I stand here, I don't know what I'm going to
ask for yet because I really -- we have put a lot of
thought into this, but I don't -- we'll put more thought
into it.  And as the Court said before, once you have a
formal motion to continue and the reasons for it in
front of you, you can address that.  I'm not prepared
for that today.

        THE COURT:  Today, you're not taking a position
on deadlines?

        MR. COLBATH:  I'm taking a position that I'm
going to need more time than the February 19th trial
date will allow.  And I have no other comment on the
government's proposed deadlines other than they are all
too short.

        THE COURT:  All right.  Fair enough.

        In light of that, what I'm inclined to do today
then is adopt the government's proposed deadlines at
Docket 855-1, and if a motion to continue is filed and
it's granted, then that would be the time at which the

1    deadlines would be reconsidered.  But as of now, based

2    on where we are, I'll adopt that schedule.

3           The only one I -- with regard to simultaneous

4    reciprocal reports and exhibits, Mr. Colbath, setting

5    aside just the concept of the date of when they would be

6    due, what's the defense position on reciprocity with

7    regard to exhibits and experts?

8           MR. COLBATH:  Is the Court referring to the --

9           THE COURT:  Line six.

10          MR. COLBATH:  Not trial exhibits, but exhibits

11   and reports that go with the expert?

12          THE COURT:  The first would be expert witnesses

13   being simultaneous as proposed in really -- I don't have

14   the rule in front of me, but six really is the one that

15   you're proposing be reciprocal.

16          Then I heard Ms. Sayers-Fay also propose a date

17   that is not on here but was placed on the record, and

18   that is January 14th the parties would exchange trial

19   exhibits.

20          MR. COLBATH:  As to an exchange of trial

21   exhibits first, because that to me is the easier one, I

22   have no objection to ultimately, whatever deadline is

23   set, having it be a simultaneous exchange or back and

24   forth with the understanding that, obviously, if my

25   exhibits give rise to something that she then believes

is relevant, she's going to add something in and vice
versa.  But certainly as we initially prepare for trial,
when we get whatever the Court sets, a week, two weeks,
whatever before the trial date, at the time to exchange
exhibits, we can make it simultaneous.  I agree with
that.

As respect to the experts, I would request a
deadline after the government's deadline, because this
is not a case, where at least that I can think of, and I
guess I may be wrong, but it's not a case where we have
went out and hired experts that do anything other than
address issues raised by the government.  In other
words, I don't have, for instance, a psychological
expert that I'm calling to put in something about my
client, some type of affirmative defense about my client
that the government would purely be rebutting or
responding to.  I don't have any case in chief experts.

Each of my experts are called for the purposes
of rebutting one or more of the government's experts.
And because of that, I suppose I could give and try to
give a simultaneous exchange, but it's going to come
with the caveat that there is either no report or a very
cursory report attached that will be revised once my
expert reviews the government's disclosure, because it's
really that purpose, the rebuttal of which I'm calling

```
 1   the person.  So it would be a lot easier to me or more
 2   meaningful if they disclosed, we had a reasonable period
 3   to review that, we disclosed.  And then of course if the
 4   government is going to -- if that then causes them to
 5   hire yet additional experts or their experts produce
 6   rebuttal reports to our reports, you know, we would get
 7   those in whatever normal course they get prepared, but
 8   the simultaneous disclosures is a setup for problems, I
 9   think.
10         THE COURT:  Ms. Sayers-Fay, did you want to be
11   heard on that?
12         MS. SAYERS-FAY:  Just briefly, Your Honor.  I
13   don't know that we have a huge disagreement.  I think my
14   point is we have already disclosed our experts from the
15   last round.  They had rebuttal experts from the last
16   round.  Some of our experts are updating to the extent
17   there is anything new.  I think it's fair to ask them,
18   to the extent they are using those same folks, to do the
19   same thing at the same time.
20         I don't think that will eliminate what he
21   points out, which is if we have new folks or anybody has
22   new opinions, there is going to be a second round.  I
23   think that, given the strange posture of this in that it
24   is a retrial, that they should give their updates at the
25   same time we do.  And then we should be able to take
```

1    advantage of the later date for rebuttal just as they.

2          THE COURT:  I'm inclined to stagger it just

3    because what I envision otherwise is that if the defense

4    had to present theirs at the same time, even if they

5    were updates, what if the update by the government

6    expert was really a revisiting, which would be fine, of

7    the expert's theory, but then the update by the defense

8    would have been updated.

9          It seems problematic, so I think we would all

10   stay on the same basic path better if it was staggered

11   rather than simultaneous.

12         In any event, apart from that, I will issue an

13   order.  I hear a motion may be coming in the near term

14   with regard to the trial date, but as the trial date

15   stands now I will go ahead and issue the schedule

16   proposed by the government with that one change on the

17   staggering of expert reports.

18         So how long after the expert reports from the

19   government were provided to you, the updated reports,

20   how long would you propose as a timeframe for defense to

21   provide yours?

22         MR. COLBATH:  30 days.

23         THE COURT:  All right.

24         MR. COLBATH:  And that's simply because it's

25   logistically hard to pin experts down, get them on the

```
1    phone, get the information conveyed to them and then get

2    them to write you something back.

3            THE COURT:  How long after that,

4    Ms. Sayers-Fay, would you propose for you to do a

5    surrebuttal I guess?

6            MS. SAYERS-FAY:  30 days as well, Your Honor,

7    just keeping in mind that will still be before

8    Christmas.  I think that would be fine.

9            THE COURT:  I'm not sure it would be.  It would

10   be October 1st, November 1st, December 1st, so it would

11   be, yes.

12           MS. SAYERS-FAY:  Right.  That's right.  We're

13   going to have a bit of a Thanksgiving issue.  If I could

14   point out one other sort of practical consideration.  So

15   if the Court is adopting an October 1st deadline for the

16   government's disclosure of experts, what I'm hearing

17   from defense counsel that if he files a motion to

18   continue, for example, on August 27th, I know that I

19   will be out of district from September 10th through the

20   14th, so what I don't want to have happen is the

21   government be having this motion to continue being under

22   consideration and in abeyance and at the same time we're

23   working very hard to ready expert witness disclosures on

24   a deadline that's likely to be postponed.

25           If I could ask that he file his motion to
```

1    continue sooner in August and that the Court set a

2    hearing on that the first week of September, so that

3    we're not sort of -- you know, I feel like we're going

4    to be a hamster in a cage sort of running to meet a

5    deadline.

6              THE COURT:  That's a very valid concern.  Just

7    to complicate that issue, I am going to be out of

8    district for a period of time that falls right in there,

9    from August 27th to September 14th.  So even if the

10   motion was filed August 27th, I would not be back in the

11   district until after the 14th.

12             MS. SAYERS-FAY:  In that case, Your Honor, I

13   would ask that we expedite the filing and consideration

14   of the motion to continue, because in the alternative

15   what's going to happen is the government is going to

16   have to focus --

17             THE COURT:  I understand your concern.  I do

18   understand that.  If it's going to be continued, you

19   want to know sooner rather than later for many reasons.

20             MS. SAYERS-FAY:  Right.

21             THE COURT:  Mr. Colbath, in light of all those

22   factors, what --

23             MR. COLBATH:  Thursday of next week is the

24   soonest I can file it.

25             THE COURT:  If you filed it Thursday, I could

hear argument -- can we do telephonic from Fairbanks on

Friday?

MR. COLBATH:  Absolutely.  I think I'm with

Judge Beistline hourly at 9:00, 10:00 and 11:00.

THE COURT:  You could do the afternoon?

MR. COLBATH:  Any time.

THE COURT:  If we put it late enough in the

afternoon, could you be in person?  There is like a --

MR. COLBATH:  What I would tell the Court if it

was set at -- if you set it 4:00 or 4:30 p.m. on Friday

afternoon, there is -- right now I'm scheduled to fly at

3:45 and get back at about 4:50, but there is a 2:00

flight there.  There is a 2:10 flight, that assuming my

court runs on schedule, I'm usually able to move up my

reservation, get on the 2:00.  It puts me at the airport

here in Anchorage at about 3:15.  I can be in this

building by 4:00.  I don't check luggage.  I'm a very

adept traveler doing it every week.

THE COURT:  4:00 p.m. next Friday?

MR. COLBATH:  4:00 p.m. next Friday.  What I

will do is if things run long on Friday morning or if I

think any reason I'm not going to appear in person, I

will call and alert the Court and then I will move my

flight.  There is also a 7:00, so I'll just move my

flight to 7:00, and I'll stay and do it telephonically.

1    I will endeavor to get here in person.  I will also

2    endeavor to make my motion as complete and explanatory

3    as possible so that the hearing -- I'll put my position

4    and proposed new deadlines in this chart form in the

5    motion so that, to the extent the government can

6    consider it and file ahead of time, and the Court can

7    know what's coming, we can make the hearing expeditious.

8              THE COURT:  Will that work for you?

9              MS. SAYERS-FAY:  To some extent.  I appreciate

10   that, but I cannot -- we need to know what he's going to

11   suggest, because if we're not going to get a filing

12   until Thursday, August 23rd and we have got a hearing on

13   Friday, August 24th, and we have no notice prior to that

14   of the date he's going to propose, I'm completely unable

15   to ascertain whether my experts, whether my percipient

16   witnesses can accommodate that date.

17             THE COURT:  Mr. Colbath, can you give an e-mail

18   to Ms. Sayers-Fay earlier in the week that would

19   indicate what your bottom line is?  Is that what you're

20   asking for?

21             MS. SAYERS-FAY:  Yes, as well as the proposed

22   schedule that he's going to suggest.

23             MR. COLBATH:  I'll have somebody in my office

24   do it.

25             THE COURT:  All right.  And then you can have

1  the explanation on Thursday, but the proposal Tuesday.

2  I forgot what you said you were doing Monday and

3  Tuesday.

4          MR. COLBATH:  I'm getting on a plane tonight at

5  7:00 and I'm leaving the district.

6          THE COURT:  You're unavailable?

7          MR. COLBATH:  I don't have cell service until

8  Wednesday night.  I'm going to have to figure it out

9  between now and 7:00 after the hearing that I have where

10  they just told me they are waiting for me, and somebody

11  from my office will e-mail Ms. Sayers-Fay.  It won't be

12  me, but somebody will.

13          THE COURT:  With that, anything else to take

14  up?

15          MS. SAYERS-FAY:  No, Your Honor, I don't

16  believe so.

17          THE COURT:  Mr. Colbath, anything else to take

18  up?

19          MR. COLBATH:  No.  Thank you so much, Your

20  Honor.

21          THE COURT:  All right.  We'll go off record at

22  this time.

23          DEPUTY CLERK:  All rise.  This matter is

24  adjourned.  This court stands adjourned subject to call.

25          (Proceedings concluded at 3:27 p.m.)

1                           CERTIFICATE

2        I, Sonja L. Reeves, Federal Official Court Reporter
    in and for the United States District Court of the
3    District of Alaska, do hereby certify that the foregoing
    transcript is a true and accurate transcript from the
4    original stenographic record in the above-entitled
    matter and that the transcript page format is in
5    conformance with the regulations of the Judicial
    Conference of the United States.

6

        Dated this 6th day of April, 2020.

7

8
                            /s/ Sonja L. Reeves
9                           SONJA L. REEVES, RMR-CRR
                            FEDERAL OFFICIAL COURT REPORTER
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25