1          UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF ALASKA
2

3   UNITED STATES OF AMERICA, )
                               )
4          Plaintiff,          )
                               )
5   vs.                        )    CASE NO. 3:13-cr-00008-SLG
                               )
6   JAMES MICHAEL WELLS,       )
                               )
7          Defendant.          )
    _____)
8

9        TRANSCRIPT OF STATUS CONFERENCE/HEARING ON MOTION
    **BEFORE THE HONORABLE SHARON L. GLEASON, DISTRICT JUDGE**
10              November 8, 2018; 1:04 p.m.
                    Anchorage, Alaska
11

12  **FOR THE GOVERNMENT:**
            Office of the United States Attorney
13          BY:  KIMBERLY SAYERS-FAY and JONAS M. WALKER
            222 West 7th Avenue, #9
14          Anchorage, Alaska 99513
            (907) 271-5071
15

16  **FOR THE DEFENDANT:**
            Office of the Federal Public Defender
17          BY:  GARY GEORGE COLBATH
            601 West 5th Avenue, Suite 800
18          Anchorage, Alaska 99501
            (907) 646-3400
19
            Camiel & Chaney, P.S.
20          BY:  PETER A. CAMIEL (via speakerphone)
            520 Pike Street, Suite 2500
21          Seattle, Washington 98101
            (206) 624-1551
22

23  _____

              **SONJA L. REEVES, RMR-CRR**
24            Federal Official Court Reporter
                222 West 7th Avenue, #4
25               Anchorage, Alaska 99513
          Transcript Produced from the Digital Recording

1          (Call to Order of the Court at 1:04 p.m.)

2          DEPUTY CLERK:  All rise.  Her Honor, the Court,

3     the United States District Court for the District of

4     Alaska is now in session, the Honorable Sharon L.

5     Gleason presiding.

6          Please be seated.

7          THE COURT:  All right.  Good afternoon.  We are

8     on record in *United States versus Wells*.  And Mr. Walker

9     is here, Ms. Sayers-Fay, Mr. Colbath.  Mr. Camiel, I

10    understand you're on the line; is that correct?

11         MR. CAMIEL:  Your Honor, that's correct.  And

12    I'm in Seattle and I'm in the middle of a trial and my

13    judge has given me a recess to attend, but I was going

14    to ask Your Honor if I could be excused at 1:30 if the

15    hearing is going on because of my obligations down here.

16    Mr. Colbath could continue on.

17         THE COURT:  That sounds fine.  I hope we're

18    done before 1:30, but if we're not, just feel free to

19    hang up at that time.

20         MR. CAMIEL:  Thank you.

21         THE COURT:  All right.  Very good.  And then I

22    understand Jeffrey Robinson is on the phone, who

23    represents CW1.  Am I correct there?

24         MS. SAYERS-FAY:  That's correct, Your Honor.

25         THE COURT:  All right.  And I believe we have

some others on the phone that are just listening in.  We
put this on for a status conference, and I received the
government's notice on the issues.  And there is the
motion to modify the protective order, so with regard to
that motion, why don't we take that up first.

Mr. Colbath, have you had an opportunity to
look at the government's proposed modifications?

MR. COLBATH:  I have, Your Honor.  And if I
might, Mr. Camiel filed that motion and he's going to --
from the defense, he's going to address that, but both
he and I have had a chance to review I think the
government's response.

THE COURT:  All right.  Mr. Camiel, what are
your thoughts on that?

MR. CAMIEL:  Your Honor, as to the first part
of the government's response adding the language to the
language that I proposed --

THE COURT:  In any other case, that language --

MR. CAMIEL:  We don't object to that.

THE COURT:  Okay.

MR. CAMIEL:  Our concern is the second part of
the government's response, which would require us to
give BOP legal counsel 48 hours' notice before we
contact any current BOP inmate.  We think that that
really intrudes upon the defense work product, our

strategy, our ability to investigate the case. Already
to visit a BOP inmate, an investigator or an attorney
has to go through the unit counselor and the inmate has
to give permission to allow a visit, but adding another
layer we think not only interferes with our ability to
contact witnesses, but we are really concerned about
witnesses being scared off from talking to us by this
extra layer of notice that's given. And I don't think
there is any need for it.

        We certainly don't get notice when the
government is seeking to talk to a BOP inmate witness.
These witnesses are fact witnesses. Nobody owns them.
And so we think that's an unnecessary burden and it
really intrudes on the defense ability to do a full
investigation.

        THE COURT: What does the unit counselor do?
What's their role?

        MR. CAMIEL: As I understand it, what they do
is they contact the inmate and see if the inmate agrees
to meet.

        THE COURT: Would the unit counselor -- what if
the unit counselor -- what if there were security risks,
is that the unit counselor's job to assess those?

        MR. CAMIEL: I think -- yeah, I don't know the
full role of unit counselor, but I think certainly if an

1  inmate expressed a security risk, the unit counselor

2  would be required to deal with that.

3          THE COURT:  All right.  So one, the defense

4  agrees with the government's proposed addition.  Two is

5  objected to.

6          So Ms. Sayers-Fay, I think you wrote the

7  opposition.  Do you want to weigh in on this?

8          MS. SAYERS-FAY:  I did, Your Honor, but today I

9  think Mr. Walker can handle it.

10          THE COURT:  All right.  Go ahead, Mr. Walker.

11          MR. WALKER:  Yes, Your Honor.  Thank you.

12          Regarding specifically the second proposal from

13  the government, I hear two objections.  One, that this

14  intrudes on defense work product.  The government

15  respectfully disagrees with that, because if I

16  understand correctly, the defense is already conceding

17  that for every inmate they will be contacting, they will

18  necessarily be giving notice to the Bureau of Prisons.

19          Therefore, from our perspective, giving

20  advanced notice to the correct BOP person doesn't

21  meaningful intrude on defense work product, because the

22  defense will be giving this information anyway.

23  Likewise, it won't create a significant burden.

24          THE COURT:  So do you want this so you know the

25  names of who they are talking to?

```
 1          MR. WALKER:  We want this so that the Bureau of

 2   Prisons can take any appropriate action necessary to

 3   protect CW1 from retaliation.

 4          THE COURT:  So is there any need for the Bureau

 5   of Prisons' legal counsel to communicate with any of the

 6   prosecution team in this case?

 7          MR. WALKER:  There is no need for them to --

 8   there is no need for that counsel to convey that

 9   information to us.  But to answer your question

10   literally, yes, it is essential that counsel does

11   communicate with us, but I'm sure we can work out an

12   arrangement where she will not convey to us the

13   information that we're talking about at this hearing.

14          THE COURT:  So what are you proposing there?

15   Because I do see a valid work product concern from the

16   defense, and I also understand the security risks we're

17   trying to address here, but that -- if there was a way

18   to have it -- that the security risks were addressed

19   without giving you the names of everybody they talked

20   to, wouldn't that be a solution that perhaps both sides

21   could reluctantly live with?

22          MR. WALKER:  Your Honor, I think yes.  I think

23   the right way to do this would be to sort of create like

24   a mini, for lack of a better term, taint team, and the

25   person, the particular BOP counsel that we have worked
```

```
 1    with, we have communicated with her throughout for some
 2    period of time, but I am confident that we could make
 3    sure she understands the importance of the protective
 4    order and not convey that information to the prosecution
 5    team.
 6              THE COURT:  All right.  Mr. Camiel -- I'm
 7    sorry.  Did you have more to add before I ask him?
 8              MR. WALKER:  I was just sort of suggesting,
 9    because of Mr. Camiel's limited time and his nonpresence
10    in the courtroom, that's something that the government
11    and the defense can probably work out and reapproach the
12    Court with some consent language.
13              THE COURT:  All right.  Mr. Camiel, are you
14    willing to give that a try?
15              MR. CAMIEL:  I'm certainly willing to try and
16    look at the language.  We want it to be a completely
17    separate person than whoever they are currently
18    communicating with about inmate issues or CW1.
19              THE COURT:  Well, why don't you see what you
20    can work out.  If not, I'll sort out any differences,
21    but I see merit in each side's perspective.  I see merit
22    in the BOP wanting to know who -- which of the inmate
23    population is having involvement in the case for the
24    protection of the inmates in the facility.  And I also
25    see merit in the defense argument that the defense
```

1 shouldn't have to convey to the prosecution team who

2 they are all trying to investigatory reach out to.

3      So what about if you were to communicate on

4 that.  Mr. Camiel, how much longer are you in trial?

5      MR. CAMIEL:  Probably through next week.

6      THE COURT:  So maybe if by that Wednesday, the

7 28th, you should be out of trial and have a few days to

8 try to work this out with Mr. Walker?

9      MR. CAMIEL:  Yes.

10      THE COURT:  All right.  Very good.  Mr. Walker,

11 does that date work for you as well?

12      MR. WALKER:  Yes, it does, Your Honor.

13      THE COURT:  All right.  So by that date, either

14 you file an amended stipulated protective order that

15 addresses this issue, or each side can file its own

16 proposed amended protective order and I'll look at them

17 and see where the differences are.  And if necessary, we

18 can have another hearing to sort it out, or I'll go from

19 the paper and get an amended protective order.

20      It would be helpful, if you reach an impasse on

21 this issue, if you could find any case law on this, that

22 would be great.  If you can't, I'll put my clerks on it,

23 but I anticipate you'll be able to come to an agreement

24 on that topic.  If not, like I say, then on the 28th,

25 each side can file its own proposed order.

1          Mr. Camiel, anything else on that motion at

2    this time?

3          MR. CAMIEL:  No, Your Honor.

4          THE COURT:  All right.  Anything further on

5    that?

6          MR. WALKER:  No, Your Honor.  Thank you.

7          THE COURT:  So that we'll keep under advisement

8    pending the additional briefing.

9          And then Ms. Sayers-Fay had identified two

10   things.  The PSR from another district, can I provide

11   this approval or must you go to the district court in

12   the district of conviction?

13         I was of the view -- well, let me ask if

14   defense has any position on this.  Mr. Camiel, any

15   position on this?

16         MR. CAMIEL:  I have never dealt with a judge

17   from another district being asked to authorize

18   disclosure of a PSR from a different district, so I have

19   never dealt with this before or seen it.  As to CW1's

20   own attorney getting his own PSR, I'm not sure I can

21   object to that.

22         THE COURT:  All right.  So with regard to one,

23   I didn't pull out the statute, but my recollection is

24   that the probation -- the PSR essentially belongs -- is

25   the property of the district in which it was issued.

Like I say, I didn't go and look at the statute, but
that's my recollection when I last looked at it not all
that long ago.  So with that being the case, then it
would be incumbent, as I see it, for the government to
go to that district and file in that district in that
case a motion seeking its release.

MS. SAYERS-FAY:  Very well.

THE COURT:  That answers number one.  If you
believe I have overlooked authority on that, feel free
to do a motion to reconsider if you'd like or a motion
on it, but that was my inclination.

All right.  Two, certain sealed pleadings
concerning this case, what is at Docket 884.  I didn't
get the opportunity to look at it.

MS. SAYERS-FAY:  Your Honor, that's the sealed
memorandum in support -- defense's sealed memorandum in
support of the motion to modify the protective order.

THE COURT:  Okay.  All right.  And so my
thought is that if the government could sort out what
was important for CW1's attorney to see, you would be in
a better position to assess that than the Court and so
that you would provide to CW1's attorney, that I'm
hearing defense here, Mr. Wells' counsel, does not
dispute, can be provided when they are focused on
discussion of CW1 only.

1       Or no, Mr. Colbath is shaking his head.  I'm

2  sorry, I misunderstood.  Go ahead.

3       MR. CAMIEL:  Your Honor, the presentence report

4  we didn't have an issue with, but the sealed pleadings

5  going to a witness, I don't know what authority there is

6  or why any witness, CW1 or any other witness, should

7  have access to sealed pleadings.  They are not a party

8  to the case.

9       THE COURT:  So let's do it this way:  I'm

10  hearing agreement on the presentence report of CW1; is

11  that correct?

12       MS. SAYERS-FAY:  Yes, Your Honor.

13       THE COURT:  Mr. Camiel, you agree on that, so

14  that the government can release and the Court so --

15  wait, CW1, that's not from this court, correct?  So

16  you'll have to make application in that, whatever court

17  it is, all right.  And then with regard to any other

18  pleadings, if the government is of the view that it

19  should be provided to CW1, first inquire of the defense,

20  Mr. Wells' counsel, and if they indicate no, they don't

21  agree, then file a motion seeking to release it to CW1

22  and I can hear out both sides and make a determination.

23       There also may be a compromise position of

24  redacted versions, I just throw out as one option, of

25  documents that could go without objection, but if you

can't resolve them, then you can file the motion under

seal as needed and I can hear defense perspective and we

can get it sorted out.

Does that resolve that issue?

MS. SAYERS-FAY:  Yes, Your Honor.  My thinking

is that not every sealed pleading would need to be sent,

for example, to CW1's counsel, but that particular

motion was one that profoundly affects the rights of

CW1.

THE COURT:  So file the motion to release it to

him and then the defense can weigh in and I'll get that

sorted out.

MS. SAYERS-FAY:  Thank you.

THE COURT:  Like I say, it may be that there is

a way to redact that both sides could find agreeable and

then go from there, but that would be what I would

direct here to occur.

Mr. Camiel, questions about any of that?

MR. CAMIEL:  Your Honor, it's not exactly on

point, but we do have a concern about sealed pleadings

involving CW1 that we haven't been provided with.  CW1

is a witness who is not a co-defendant or somebody who's

charged in the district.  And as we understand it, for

example, there was some kind of a sealed order for

appointment of counsel.  We don't know how that came

1   about.  I don't understand how -- (indiscernible) -- CJA

2   counsel, and there may be other sealed pleadings

3   involving CW1 that we believe we might be entitled to,

4   non-privileged.

5           THE COURT:  All right.  Ms. Sayers-Fay,

6   Mr. Walker, what are your thoughts there?

7           MR. WALKER:  Your Honor, the Court established

8   a procedure for this status hearing under which the

9   defense and the government were required to give notice,

10  and the government complied.  The defense gave no notice

11  of any issues to the Court.  There is no pending motion

12  regarding the topic that Mr. Camiel brings up, so we

13  would ask the Court to order the defense to file a

14  motion, if they think they are entitled to something

15  that they don't have.

16          THE COURT:  Fair enough.  Mr. Camiel, I'll do

17  that.  If there is an issue, and I realize you're kind

18  of shooting in the dark there when you don't have

19  knowledge of documents that may have been ex parte on

20  the docket, but you can certainly file a motion seeking

21  access to all ex parte filings, as can the government as

22  to the defense, and I can take that up.  To the extent

23  the parties can't come to an agreement on it, I'll sort

24  that out.  All right.

25          MR. CAMIEL:  Thank you, Your Honor.

1          THE COURT:  Very good.  Anything else we can

2    take up before we discuss when it would be best to have

3    a renewed status conference?

4          MR. WALKER:  Nothing further from the

5    government.

6          THE COURT:  Mr. Colbath, Mr. Camiel, anything

7    else?

8          MR. CAMIEL:  No, Your Honor.

9          THE COURT:  All right.  So Mr. Walker, from the

10   government's perspective, when do you feel it would be

11   most useful to have everybody back here, make sure

12   things are on track?  I was kind of thinking right after

13   the first of the year, but I'm open to suggestions.

14         MR. WALKER:  Yes, Your Honor, we concur.

15   Sometime early to mid January.

16         THE COURT:  All right.  Mr. Colbath,

17   Mr. Camiel?  Mr. Camiel, are you going to be up here, by

18   any chance, in early January?

19         MR. CAMIEL:  I'm up for a trial on January 7th,

20   but we were actually thinking that a status conference

21   -- we would like -- there is a December 7th deadline for

22   discovery motions.  And so our thought is that sometime

23   after that, the Court may want to have a hearing on the

24   discovery motions and we could combine those.

25         THE COURT:  All right.  So what's your

1   proposal?

2          MR. CAMIEL:  I would suggest the second week or

3   third week of December.

4          THE COURT:  All right.  Any objection to

5   December 21st?

6          MS. SAYERS-FAY:  That's fine, Your Honor.

7          MR. CAMIEL:  I'm sorry, Your Honor, that's one

8   date that wouldn't work for me.

9          THE COURT:  What about December 19th?

10         MR. CAMIEL:  For me, that works.  I don't know

11  about my co-counsel.

12         THE COURT:  Mr. Colbath is saying yes, and

13  that's generally -- Fridays are not as good for him.

14  He's typically in Fairbanks.

15         MR. COLBATH:  That's correct, Your Honor.

16         THE COURT:  How about 2:00 on Wednesday,

17  December 19th?  Mr. Walker, Ms. Sayers-Fay, yes?

18         MS. SAYERS-FAY:  That's fine, Your Honor.

19  Thank you.

20         THE COURT:  Very good.  So we will have a

21  renewed status conference on that date.  And if there

22  are pending motions that are ripe at that time, I'll be

23  able to address those, so that would be good.  And let's

24  do the same thing with the notice.  Was it noon the day

25  before that I directed?

1    MS. SAYERS-FAY:  Two days.

2    MR. COLBATH:  Two days.

3    THE COURT:  So noon on the 17th, notice of any

4    topics to bring up to be provided, filed with the Court

5    and served.

6    So anything else from the government today?

7    MR. WALKER:  No, Your Honor.  Thank you.

8    THE COURT:  Mr. Colbath, Mr. Camiel, anything

9    further?

10    MR. CAMIEL:  No, Your Honor.

11    MR. COLBATH:  No, Your Honor.

12    THE COURT:  All right.  Very good.  Then we'll

13    stand in recess.  We'll go off record.

14    DEPUTY CLERK:  All rise.  This matter is now

15    adjourned.  Court stands in recess until 2:00 p.m.

16    (Proceedings concluded at 1:22 p.m.)

17    CERTIFICATE

18    I, Sonja L. Reeves, Federal Official Court Reporter
     in and for the United States District Court of the
19    District of Alaska, do hereby certify that the foregoing
     transcript is a true and accurate transcript from the
20    original stenographic record in the above-entitled
     matter and that the transcript page format is in
21    conformance with the regulations of the Judicial
     Conference of the United States.

22
     Dated this 8th day of April, 2020.

23

24
                        /s/ Sonja L. Reeves
25                      SONJA L. REEVES, RMR-CRR
                        FEDERAL OFFICIAL COURT REPORTER