1          UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF ALASKA
2

3    UNITED STATES OF AMERICA, )
                               )
4          Plaintiff,          )
                               )
5    vs.                       )    CASE NO. 3:13-cr-00008-SLG
                               )
6    JAMES MICHAEL WELLS,      )
                               )
7          Defendant.          )
     _____)
8

9              TRANSCRIPT OF STATUS HEARING
     **BEFORE THE HONORABLE SHARON L. GLEASON, DISTRICT JUDGE**
10             January 22, 2019; 1:33 p.m.
                   Anchorage, Alaska
11

12   **FOR THE GOVERNMENT:**
          Office of the United States Attorney
13        BY:  STEVEN SKROCKI, CHRISTINA SHERMAN and
               KELLEY L. STEVENS (via speakerphone)
14        222 West 7th Avenue, #9
          Anchorage, Alaska 99513
15        (907) 271-5071

16   **FOR THE DEFENDANT:**
          Office of the Federal Public Defender
17        BY:  GARY GEORGE COLBATH
          601 West 5th Avenue, Suite 800
18        Anchorage, Alaska 99501
          (907) 646-3400
19
          Camiel & Chaney, P.S.
20        BY:  PETER A. CAMIEL (via speakerphone)
          520 Pike Street, Suite 2500
21        Seattle, Washington 98101
          (206) 624-1551
22
     _____
23
               **SONJA L. REEVES, RMR-CRR**
24           Federal Official Court Reporter
               222 West 7th Avenue, #4
25               Anchorage, Alaska 99513
         Transcript Produced from the Digital Recording

1                    (Call to Order of the Court at 1:33 p.m.)

2                    DEPUTY CLERK:  All rise.  Her Honor, the Court,

3    the United States District Court for the District of

4    Alaska is now in session, the Honorable Sharon L.

5    Gleason presiding.

6                    Please be seated.

7                    Your Honor, I do have Kelley Stevens and Peter

8    Camiel on the overhead.

9                    THE COURT:  Good afternoon.  We're on record in

10   *United States versus Wells*.  I have counsel for both

11   sides here, and Mr. Wells is here.

12                   And Mr. Camiel, can you hear me?

13                   MR. CAMIEL:  I can, Your Honor.  Good

14   afternoon.

15                   THE COURT:  Ms. Stevens, can you hear me as

16   well?

17                   MS. STEVENS:  Yes, Your Honor.  Good afternoon.

18                   THE COURT:  Very good.  All right.  We put on

19   this hearing for a status conference to take up some

20   issues from the last time we were here.

21                   In the interim, there was a motion filed for

22   pretrial release and the government filed an opposition.

23   And we can take that up as well if the parties are ready

24   to proceed on that, but I need to end no later than

25   2:45, so if we can't conclude that -- that's why I

1    didn't put out an order having it on the calendar today,

2    because I wasn't certain what we could accomplish, but

3    why don't we take up the other issues first and then see

4    where we are with regard to that motion.

5            Ready to proceed, Mr. Skrocki?

6            MR. SKROCKI:  We are, Your Honor.  I was

7    wondering if you would consider taking up the motion to

8    continue first.

9            THE COURT:  Yes.  In fact, that's the top of my

10   list.  Mr. Colbath, any objection to that approach?

11           MR. COLBATH:  No, Your Honor.  I think that's a

12   good idea.

13           THE COURT:  I saw you both agreed to moving the

14   trial to August 19.  And regrettably, that is not the

15   best time on my calendar, which is to say I am

16   unavailable from the 22nd through the 27th, and then the

17   week of the 2nd, I have a committee meeting out of

18   district.

19           So that would not be the best time to take up

20   this case.  In light of all of that, Mr. Colbath, it was

21   your motion unopposed, as I understand it, but what are

22   your thoughts?

23           MR. COLBATH:  Your Honor, can you tell me so I

24   understand, the Court has --

25           THE COURT:  I have an out-of-town commitment

1    August 22nd through August 27th, which is basically a

2    long weekend, and then the week of the 2nd is Labor Day,

3    but I am set to be out of district essentially that

4    entire week, returning on the 9th.

5            MR. COLBATH:  So basically August 22nd to

6    September 9th?  There is not an intervening week,

7    correct?

8            THE COURT:  Do you have a little calendar in

9    front of you?

10           MR. COLBATH:  I do, Your Honor.  Well, the 22nd

11   is a Thursday.

12           THE COURT:  Correct.

13           MR. COLBATH:  And so the Court is gone until

14   the 27th, back for --

15           THE COURT:  Just a few days.

16           MR. COLBATH:  Wednesday, Thursday, Friday, and

17   gone the following week.  While there's not an

18   intervening week there, there's a couple of days you

19   have available, but essentially from the 22nd to

20   September 9th.

21           THE COURT:  It's about the worst time you could

22   have picked for my calendar.

23           MR. COLBATH:  First of all, I will tell the

24   Court that the selection of that date is based on this:

25   If we moved us to June, that's essentially only 30 days

1   and does not really accomplish much.

2         I'm not sure of the exact dates, but I know

3   that Mr. Skrocki has an unavoidable several-week

4   out-of-district commitment in what I believe to be early

5   July or for possibly much of July, so we needed to get

6   beyond that.

7         Starting beyond that, it only seemed fair to

8   give him at least a little bit of time to get back into

9   town and get settled and prepare to proceed, and for us

10  to have enough time upon his return to have a pretrial

11  conference before the Court probably two weeks in

12  advance of starting a trial.

13        So we anticipated maybe a pretrial conference,

14  you know, around the 1st of August or first week of

15  August, starting us on August -- about two weeks later,

16  which we determined would be the 19th.

17        We picked getting going then as soon as he

18  returned in July and could be available.  First of all,

19  that worked in my calendar.  It worked in Mr. Camiel's

20  calendar.  It worked in Ms. Sherman's calendar, so for

21  all other counsel it worked there.

22        And then we had believed that the Court was,

23  and you can correct me if I'm wrong, scheduled in the

24  Smith death penalty case beginning of October.

25        THE COURT:  September 30th, I believe, for the

1   rest of the year, if it proceeds through.

2             MR. COLBATH:  Right.  While the parties --

3   well, I guess from the defense perspective, if it had to

4   happen, we would not be opposed to doing it after that

5   case, doing this trial after that case.  It would be an

6   extraordinarily long continuance, longer probably than

7   we need, but not time that would be wasted.

8             We suspected that the Court would not want to

9   go after that case, nor set us as a backup in the event

10  that that case moved and have an untenable date, so we

11  tried to pick a date early enough after Mr. Skrocki was

12  back in July that would get us done before the end of

13  September and give the Court at least a week to look at

14  switching gears and going from one long complicated

15  trial to another.

16            So that's how we arrived at the August date.  I

17  think anything short of a 60-day continuance does not

18  serve its purposes, especially -- I mean things have

19  only become that much more emergent even since the

20  filing of my motion last week.  I have got more

21  information for the Court, which I can put on the

22  record.

23            So Mr. Camiel and I are available -- we're

24  available, but that's how we arrived at the August date.

25  I don't know at all about Mr. Skrocki's plans,

flexibility, and I don't know about the Court's thought
about the likelihood of the Smith trial going or the
prospect of putting us after that.

MR. SKROCKI: A moment, Judge?

THE COURT: Take a moment. That's fine.

(Pause)

MS. SHERMAN: Thank you, Your Honor. We don't
oppose the motion. We had tried to pick a date that
would potentially work with your trial schedule.

Mr. Skrocki is unavailable starting July 12th
for the rest of the month. This date already includes
him canceling a work obligation that was going to take
him into August anyway, and so July 12th through the end
of the month, he's really unavailable.

In terms of this --

THE COURT: I would wonder about August 5th,
given that there are three lawyers on the government's
team and Mr. -- so that would make it feasible. As
Mr. Colbath anticipated, I am very reluctant to move it
to 2020.

MS. SHERMAN: So, Your Honor, in speaking with
Mr. Skrocki, I think that that date would work, with the
understanding that counsel, and we have already
discussed meeting and setting a date of deadlines that
work for the parties and we'll simply require motions in

limine to be addressed and potentially even a final
pretrial conference before that date.  So what we're
really talking about is just a last minute exchange of
exhibits and briefs and things like that.

THE COURT:  So go August 5th then.  Is there an
estimation that you can give me today as to the length
of trial?  I've heard varying things.  Mr. Skrocki, from
your perspective, now that you have arrived in this
case?

MR. SKROCKI:  I think from --

MS. SHERMAN:  I would say no more than four
weeks, Your Honor.

THE COURT:  This is where August 5th gets -- at
one point there was a representation, and Mr. Colbath
can correct me if I'm wrong, but of about two weeks.  It
was with that memory in mind that I proposed that,
because it would be, I think, a hardship on a jury and
on the parties frankly if we took a long break right
toward the end of the case for the Court to leave the
district.

So it was with the idea that we would get the
case to the jury August 21st, which is two and a half
weeks, two weeks and three days to be precise.

MS. SHERMAN:  Your Honor, I know we are
streamlining and cutting witnesses, without knowing

1  obviously the length of the defense case.  I think two

2  weeks is optimistic.  I think three weeks is more

3  likely.  No more than four I would think, even with a

4  lengthy defense case.

5           THE COURT:  Mr. Colbath, what are your thoughts

6  on that?

7           MR. COLBATH:  Your Honor, I mean, what I don't

8  want to happen obviously is for the -- the break to

9  occur in the middle of the defense case, not that it's a

10  good time for any of the parties, but if there -- I

11  don't think a break, as long as it's not too long, would

12  generally, especially in a lengthy trial, would

13  generally be bad for the jury or too prejudicial to

14  either side if it was appropriately timed.

15          That being said, if we are going to start on

16  Monday, August 5th, and try to get to turn it over to a

17  jury to deliberate on August 21st, or prior to that, I

18  fear that the government would take two weeks, and there

19  is just no way that I could commit to two to three days

20  to do my case.

21          THE COURT:  And that's fair.  I think it was my

22  -- well, I wasn't there, but my review of the record

23  indicated it was approximately four weeks.

24          MR. COLBATH:  19 trial days.

25          THE COURT:  19 days.  So I guess worst case

scenario would be that we take that break, which I

really have a commitment on from the 22nd through the

27th. And the following week, I have done that

telephonic, those meetings, so if we were still in trial

the week of September 2nd, I could conclude the case

then. And I hear that would work for everyone?

MR. COLBATH: Your Honor, would the Court

contemplate, we would take the break beginning the 22nd,

give the jury sort of an extended, a five-day, six-day

weekend, and then we would resume on the 28th and go

forward. If the Court needed to take some time, albeit

maybe slightly reduced hours or something, we would just

continue if we were into the week of the 2nd.

THE COURT: We would continue on the 3rd, and

probably on the 5th we would take off a few hours and I

would participate telephonically in the meeting that I

need to attend. That's the key day.

MR. COLBATH: Assuming that, assuming that if

we were working in that posture, you know, if the

government got their case -- if the government's case

went into the week of August 19th, and, you know, we

were within a day of our break, and it made sense, if

there was any way to utilize the time, but just as long

as we have a little bit of say over the break. I guess

that is probably better than continuing the case beyond,

1 you know, the first of the year, which I think is our

2 only alternative.

3 THE COURT: Seems to more or less work

4 uncomfortably with everybody's schedule, which is about

5 the best we can do here. Probably interferes with

6 Mr. Colbath's hunting too, but there you have it.

7 MR. COLBATH: It does horribly, Your Honor, and

8 I have already shared that with Mr. Skrocki, who I fear

9 is the only one involved in the case that can relate.

10 MR. SKROCKI: I can't relate.

11 THE COURT: I did deny a continuance motion in

12 state court for a moose hunter.

13 MR. COLBATH: My biggest fear would be if I

14 upset a juror because of that. I will personally see to

15 it that my work obligation is first and foremost. I

16 will have it in mind if nobody else does to visit with

17 prospective jurors and we'll proceed as quickly as we

18 can.

19 THE COURT: Mr. Skrocki, can you live with

20 that?

21 MR. SKROCKI: Absolutely.

22 MS. SHERMAN: Those dates work.

23 THE COURT: Then that is what we will do. I

24 heard a proposal to see if you could agree on a revised

25 scheduling order, which I believe you did quite

1   effectively last time, which is at Docket 881, I believe

2   is our most recent scheduling order.  And so what's a

3   timeframe for the parties to submit a revised scheduling

4   order?

5          MR. COLBATH:  Your Honor, first of all, I have

6   that document here, 881-1, which is the sort of trial

7   chart.  And where I anticipated beginning on that chart

8   is we're sort of at the stage where the government has

9   provided an initial expert witness disclosure.  I have

10   provided sort of a defense expert disclosure, at least

11   identifying who I believe the folks are.

12          And to the extent I had reports, I had

13   everybody's CVs, I provided that material, but I will

14   start with a deadline, or I would think we would start

15   with the remaining defense experts, government responses

16   to that, and then a new motions deadline and the rest of

17   these deadlines going forward on that.

18          THE COURT:  Any disagreement?

19          MS. SHERMAN:  No, Your Honor.  I agree we would

20   start with the defense disclosure of experts that were

21   January 4th, and we did receive from Mr. Colbath what he

22   has.  We discussed after the last hearing, I think we

23   could submit a new proposal by the end of this week, I

24   believe.

25          MR. COLBATH:  I'm available pretty much all day

tomorrow and all day Thursday.  I'm in Fairbanks on
Friday, but I'm confident that I will find time in the
next two days to get new deadlines so that by the end of
the week we would have a revised set of deadlines sort
of mirroring, at least to the extent that we can, the
gaps that are built into this and whatnot.

The only thing I would, I guess, suggest is
direction from the Court would be to see if the Court
had what your calendar looks like July 10th or July 11th
for a final pretrial conference.

THE COURT:  I do plan to book those before we
get those scheduled.  In fact, I'm going to do another
status probably in about 45 to 60 days from now to make
sure we're all on track.

MR. COLBATH:  Seeing Mr. Skrocki is going to be
gone from the 12th on, if we could have motions in
limine, a final pretrial conference, subject to the
"final" final being immediately before trial, but the
substantive final pretrial conference right before he
leaves, then we'd be in pretty good shape.

We'll work backwards from there to today yet
this week and have the Court a submission of deadlines
by the end of the week.

THE COURT:  If you get it submitted by the end
of the week, and then if you can't agree, you can each

give me your position on it and I'll get you an order
out that addresses whatever issues are in dispute, but I
anticipate that you will be able to reach an agreement
there and get that by the end of the week.

So what's the government's perspective on
having another status conference in 45 to 60 days?
Biggest concern that came to my mind was at our last
status hearing there was a funding for experts by the
defense that, to the best of my knowledge, has not yet
been resolved.

MS. SHERMAN:  Your Honor, I think that day
would be fine.  I think the Court currently has us on
for a status hearing this Friday, the 25th.  I think the
Court could vacate that and set something that works for
the Court's calendar.

THE COURT:  We're not showing it on.  We moved
it.

MR. COLBATH:  We moved it to today.  No.  I
would think perhaps a March date might be appropriate.

THE COURT:  How about the end of March if we
did specifically --

MR. COLBATH:  The week of the 23rd?

THE COURT:  -- 25th I'm looking at, the week of
the 25th.  How about 3:30 on March 27th?  That's a
Wednesday of that week.  Does that work for both sides?

1          MR. COLBATH:  March 25th --

2          THE COURT:  27th.  March 27th, which is a

3   Wednesday, at 3:30 p.m.  Does that work for the

4   government?

5          MS. SHERMAN:  Yes, Your Honor.

6          THE COURT:  Mr. Colbath?

7          MR. COLBATH:  Yes, Your Honor.

8          THE COURT:  All right.  Very good.  Then that

9   will be our next status conference.  And Mr. Skrocki,

10  when exactly do you -- your last available date for a

11  pretrial conference.

12         MR. SKROCKI:  Would be July 8th -- sorry, 7th,

13  depart the 8th.

14         THE COURT:  The 8th is a Monday.

15         MR. SKROCKI:  So it would probably be the

16  Friday.

17         THE COURT:  Which is not the best time.  You

18  don't need to be present?

19         MR. SKROCKI:  Not for this, no.

20         THE COURT:  How about July 12th at 1:30 p.m.,

21  which is about three weeks prior to trial?

22         MR. COLBATH:  That's fine, Your Honor.

23         MS. SHERMAN:  That works.

24         THE COURT:  I will likely at that time give you

25  one more just in the week, the Friday before, make sure

1  -- the Friday right before trial, but we don't need to

2  set that now, but we'll call this one the final pretrial

3  conference.  You can put it in your order.  It will be

4  in the minutes today as well.

5        Anything else on scheduling we should take up

6  at this time?

7        MS. SHERMAN:  Not from the government.

8        THE COURT:  Anything else, Mr. Colbath?

9        MR. COLBATH:  I don't think so, Your Honor,

10  subject to our submitting a list later this week of

11  dates.

12        THE COURT:  The date of the trial by jury is

13  going to be August 5th at 8:30 a.m., and I'll vacate the

14  one that was set and all the associated final pretrial

15  conference for the -- it was April 29th or thereabouts.

16  I'll vacate those as well.

17        We're showing a final pretrial conference of

18  April 5th is vacated, replaced by the date I gave you at

19  the end of March.  And then the trial by jury of

20  April 29th is vacated and replaced by the date in

21  August, the 5th.

22        Any other scheduling issues then from either

23  side at this time?

24        MR. COLBATH:  Not from us presently, Your

25  Honor.

1          THE COURT:  And then when we last met there was

2     a discussion about a number of agreements that the

3     parties discussed relating to experts and discovery.

4     I'm not hearing we need to take those up on the record

5     at this time.

6          MR. SKROCKI:  Not from us, Your Honor.

7          MR. COLBATH:  Your Honor, I was in Fairbanks on

8     Friday and I received, at least electronically,

9     information from the government responding to some of my

10    discovery materials.  I have not been through them all,

11    but it looked fairly comprehensive, and so at this

12    point, I have nothing to raise or no issues with the

13    Court relevant to those discovery matters.

14          At the last hearing, Mr. Skrocki indicated that

15    within about ten days the government was going to make

16    up its mind on a couple of additional experts besides

17    they had indicated not using Mr. Meloy, but there was a

18    new color expert and another individual.

19          After court, we visited, and after discussing

20    the fact that trial would be continued, they did

21    indicate, Mr. Skrocki indicated to me that it may not be

22    within ten days, that they may extend that time a little

23    bit more to look at the new schedule and make a for sure

24    determination.

25          So I'm sort of waiting on those.  I have not --

1    I understood that there would be additional time on

2    that.

3            THE COURT:  All right.

4            MR. COLBATH:  I think those are the only two

5    issues that were discussed.

6            THE COURT:  So nothing else to take up on the

7    record today is what I'm hearing?

8            MR. COLBATH:  Not for those two things.

9            THE COURT:  There is the motion on the pretrial

10   release.  And anything else besides that from either

11   side?

12           MR. SKROCKI:  No.

13           MR. COLBATH:  No, Your Honor.

14           THE COURT:  I have reviewed the following:  The

15   motion, the opposition, the parties' attachments.  I did

16   go back and print out the bail review hearing transcript

17   from May 20th, 2013 at Docket 715 and I've reviewed

18   that.  I have reviewed portions of the presentence

19   report at Docket 676.

20           The government's opposition indicated that

21   there were going to be some audios that were attached.

22   Would it be helpful for the Court to review those before

23   we go forward?

24           MR. SKROCKI:  I don't think they add all that

25   much given the weight of the information you have

1  already reviewed, Your Honor, but we do have them

2  available for the Court.

3       THE COURT:  Are you familiar with what he's got

4  there?  I'm happy to review those if need be or proceed.

5       MR. COLBATH:  Your Honor, my guess is this:

6  First of all, we received 400-plus jail calls in

7  discovery, some of which I have reviewed, not all of

8  which I have reviewed, so I'm not sure that I'm familiar

9  with these two particular calls.

10      I would guess that Mr. Skrocki's description of

11 them in his brief probably accurately summarized them

12 such that I wouldn't expect them to contain a bunch of

13 additional meaningful information to the Court.  He gave

14 me a copy when we came into the courtroom here, so I'm

15 going to trust they say what -- the summary in his brief

16 is a fair summarization.

17      I agree with his perception that, I guess in

18 light of the other factors and balancing of information

19 that the Court is going to take into consideration,

20 these two calls aren't going to make or break the

21 determination.  I would be comfortable, if the

22 government is and the Court, relying on the

23 representations made in the government's brief.  And I

24 don't have evidence to say that anything would be

25 materially different in the calls than what they

 1  represent.

 2          THE COURT:  I'm comfortable going forward.

 3          MR. SKROCKI:  Certainly fine.

 4          THE COURT:  Very good.  It's the defense

 5  motion.  Do you have additional evidence that you would

 6  seek to present on the motion?

 7          MR. COLBATH:  Your Honor, I would simply call,

 8  and I believe at least my portion of it would be brief,

 9  I don't know what the government would anticipate in

10  cross examination, but my only intention, to just tell

11  the Court where I was going, would be to call the

12  proposed third-party custodian, Nancy Wells, just in

13  case the Court had any questions for her.

14          I would ask a short amount of questions, and

15  then that would be the only evidentiary presentation

16  that we were going to make.

17          THE COURT:  From the government's perspective,

18  any objection to that approach?

19          MR. SKROCKI:  No, Judge.

20          THE COURT:  Do you plan to call any witnesses

21  or no?

22          MR. SKROCKI:  I think we'll just sort of see

23  how it goes with this witness.

24          THE COURT:  All right.  Go ahead, then,

25  Mr. Colbath, you can call your witness.

1          MR. COLBATH:  Thank you, Your Honor.  At this

2    time I would call Nancy Wells to the stand then.

3          THE COURT:  Good afternoon, ma'am.  Get up to

4    the witness stand, and when you get up there, remain

5    standing and the clerk will administer an oath to you.

6          (Oath administered to the witness)

7          DEPUTY CLERK:  For the record, can you please

8    state your full name and then spell your full name.

9          THE WITNESS:  Nancy Jean Wells, N-a-n-c-y,

10   J-e-a-n, W-e-l-l-s.

11         THE COURT:  Go ahead, please, Mr. Colbath.

12         MR. COLBATH:  Thank you, Your Honor.

13         Before I ask Ms. Wells any questions, I would

14   inquire of the Court about you indicated you reviewed

15   portions of the presentence report.  Did the Court

16   happen to review Part C of the presentence report, in

17   other words, Mr. Wells' family background and history at

18   all?

19         THE COURT:  Yes, I did read that, and I really

20   read it pretty thoroughly.  I think where I spent the

21   least amount of time was, for purposes of this

22   proceeding, with regard to the victim impact statements.

23         I read the description of the event from the

24   PSR's perspective, and then I read the end portion of

25   the background.  That was my focus.

          MR. COLBATH:  Thank you, Your Honor.  I didn't
want to belabor the family part if the Court had a
general sense, but I also wanted to spend time on it if
the Court had no sense of Mr. Wells' familial
background.

          THE COURT:  No, I did read that.

          MR. COLBATH:  Thank you.

          NANCY WELLS, DEFENSE WITNESS, SWORN

                   DIRECT EXAMINATION

BY MR. COLBATH:

    Q.  Ms. Wells, how long have you been married to Jim
Wells?

    A.  On the 29th of this month, it will be 47 years.

    Q.  And you have how many children?

    A.  We have three children.

    Q.  What are their ages and the communities in which
they currently live in?

    A.  Our oldest is 42.  He lives in Klawock on Prince
of Wales Island.  Our next is our daughter, she is 40.
She lives in Beaverton, Oregon.  And our last child is a
boy, he is 38, and he lives in St. Helens, Oregon.

    Q.  Where do you currently reside?

    A.  I have been residing primarily with my daughter
in Beaverton.

    Q.  Do you still own your home in Kodiak?

1    A.   Yes.

2    Q.   And why is it that you don't live there?

3    A.   Under the terms of the restitution agreement from

4  the first trial, following the first trial, I was

5  required to maintain the value of the home.  The

6  government began at one point garnishing 50 percent of

7  my husband's Coast Guard retirement, which simply did

8  not leave me with sufficient money to pay the house

9  payment, so I resorted to renting the house in order to

10 maintain the value.

11       And initially, was in California, back and forth.

12 My mother at the time has severe dementia, and so I was

13 helping to care for her.  Three years ago, in June of

14 this coming year, she required being placed in a much

15 more secure facility.  She -- we placed her in a home,

16 and so at that point in time, then I began pretty much

17 living with my daughter at that point.

18   Q.   And the restrictions on the family residence are

19 because of Jim's potential half interest in the

20 residence, that's what the government was able to

21 attach.  They were not able to attach or force the sale

22 or levy against your homeownership interest as your

23 family homestead, right?

24   A.   You know, it was an extremely -- I'm not really

25 sure.  The restitution agreement was -- well,

1  contentious, let's just put it that way.

2     Q.  So it was ordered -- if I can cut to the chase.

3     A.  It was ordered by the Court.  And there currently

4  is an order in Superior Court in Kodiak, the victims'

5  families have filed a civil lawsuit against my husband,

6  and so they asked for an injunction barring me from

7  doing anything with the house.

8     Q.  Okay.  And again, you don't have the financial

9  ability to live there without renting the house, so

10 that's the catch-22 that you're in and primarily why you

11 live with your daughter?

12    A.  Well, the house is now paid for, so with the

13 restitution agreement having been voided with the

14 reversal of his conviction, I could afford to live in

15 the house.  However, I have grandchildren, and as my

16 children say, we're on the wrong side of the ocean.  So

17 I choose to be where my grandchildren are primarily,

18 which is on the West Coast.

19    Q.  All right.  Under the proposal that's proposed --

20 first of all, as I think the Court is aware, you visited

21 with the pretrial services, the probation office and

22 answered -- both filled out the paperwork that they

23 requested and answered the questions that they posed to

24 you, correct?

25    A.  Correct.

1    Q.  If the Court were to release Jim on bond under

2    the proposal that we have made, would you be willing to

3    secure, working with the same folks at probation, secure

4    a residence within whatever locale that would be

5    ultimately directed by the Court that would meet

6    probation's and the Court's restrictions?

7    A.  Yes.

8    Q.  And you believe you have the financial ability to

9    do that?

10   A.  Yes.

11   Q.  If there were additional obligations of the

12   installation of either a landline phone or a cellular

13   phone dedicated, either of those dedicated to the

14   programming of electronic monitoring, GPS monitoring,

15   that type of equipment, if there was both requirements

16   along those lines and/or costs associated with those

17   things, you would be willing to assist in the, first,

18   acquisition of setting up those things, as well as

19   paying for whatever is directed by the Court?

20   A.  Yes.

21   Q.  And with -- did you review or have you discussed

22   both with me and to some extent with probation concerns

23   about the number of restrictions that would be placed on

24   Jim, the very clear and tight different requirements

25   that he would have to abide by, and, therefore, you

1    would have to abide by if the Court were to grant a

2    bond?

3         A.   Yes.

4         Q.   And was it also made apparent, if not by myself,

5    but also by the pretrial services office, that you would

6    be personally responsible for any failure to report or

7    any assistance that you would provide in any violation,

8    even the most minor of violations of any bond condition

9    whatsoever?

10        A.   Yes.

11        Q.   You understood that obligation could even

12   potentially subject you to a contempt of court or a

13   criminal prosecution?

14        A.   Yes, I'm very well aware of that.

15        Q.   The government has indicated in some of its

16   filing that, first of all, you believe in your husband's

17   innocence, and that's true, correct?

18        A.   That's very true, very correct.

19        Q.   Regardless of the fact that you believe that your

20   husband is innocent and that these charges are

21   wrongfully brought, do you understand that, I guess, the

22   process here and the necessity for right, wrong or

23   otherwise, the process to go forward to conclusion of

24   this next trial that we have here today scheduled for

25   August 5th?

1      A.   Yes.

2      Q.   And that your belief or your feelings about the

3   propriety of the charges, your husband's innocence,

4   guilt, anything like that cannot or should not sway at

5   all your following the bond conditions or any conditions

6   imposed upon him, and, therefore, you by the Court if

7   release is considered?

8      A.   Yes.

9      Q.   And regardless of what I'm sure have been your

10  strong-stated belief or feelings that your husband is

11  innocent, are you willing to honor any and all

12  conditions put forward by the Court for Jim's release?

13     A.   I am.

14     Q.   Even if they were conflicting with your beliefs

15  about him, about his history, about his behavior, about

16  the charges, any of those things, do you understand that

17  that does not change in any way the obligation that you

18  would have to strictly abide by them?

19     A.   I'm quite well aware, and I have no difficulty

20  with abiding by what -- I have abided by all the

21  conditions to date at any point in time that have been

22  put forth.

23     Q.   Let me ask you briefly about that.  Now, prior to

24  -- after the -- after April 12th of 2012, but prior to

25  Jim's arrest and formal charge, did you have

1  interactions with both law enforcement and/or the legal

2  system as the investigation sort of developed?

3      A.  Yes.

4      Q.  And were you asked to keep the government, law

5  enforcement, others notified of any intention you and

6  Jim had of traveling, leaving Kodiak, being anywhere

7  other than at your home?

8      A.  We were not required to notify anyone if we were

9  on -- Kodiak is an island, so if we were within the road

10 system, there was not a requirement to notify anyone.

11      If we were leaving the island, we notified the

12 public defender's office, who then notified the

13 government, and that was done every time we traveled.

14     Q.  And during the -- it was roughly ten months

15 between April of 2012 and when Jim was ultimately

16 charged, correct?

17     A.  Yes.

18     Q.  During that time, on how many occasions and to

19 where did you and he leave the island?

20     A.  We went to Southeast --

21     Q.  Southeast Alaska?

22     A.  Southeast Alaska in May.  You will have to pardon

23 my memory.  We went to Gustavus, our oldest

24 granddaughter's birthday.  We went -- Jim went to

25 Boston.

1    Q.  By himself?

2    A.  By himself.

3    Q.  Generally for what?

4    A.  To go to a Bruins game.  He did that every year.

5  I don't like hockey, so not a trip --

6    Q.  Where else did you go?

7    A.  We went to California, I believe, and I'm not

8  sure if it was through Seattle or if it was through

9  Portland, during Thanksgiving.  We went to Las Vegas in

10  the beginning of December of that year.

11    Q.  And on each of those occasions, you or Jim

12  voluntarily chose to notify my office and ensure that

13  prior to the travel either law enforcement or the U.S.

14  Attorney's office was notified?

15    A.  Yes.  We also -- I'm not sure if I went with him

16  or if I flew up, but we brought building materials back

17  on the ferry in September, I believe, of that year,

18  September of 2012.

19    Q.  Did Jim also leave the island on a number of

20  occasions, both accompanied or unaccompanied, to come

21  here to Anchorage for medical purposes or other type

22  purposes?

23    A.  Yes.

24    Q.  Legally at that time, did you folks have your

25  regular identifications, your passports, all the

1    documents you needed to travel wherever you wanted to

2    travel?

3        A.   Yes.

4        Q.   The government has indicated in its response that

5    on a number of occasions during that period of time and

6    even subsequent to then you've had interactions with law

7    enforcement where you have expressed your displeasure

8    with their actions or angry with the investigation.

9            Is that true, that you're not happy with the

10   investigation?

11       A.   Yes.

12       Q.   All right.  Those feelings, having those

13   feelings, believing what you believe about anything

14   that's transpired through the development of this case,

15   from day one when your homes were searched starting less

16   than 48 hours after the incident through today, despite

17   having any of those feelings, beliefs, with regard to

18   law enforcement, investigators, anybody who's been

19   involved in the case, would you allow that to color or

20   change in any way the legal obligation that the Court

21   would put on you here today if the Court ordered you to

22   comply with the third-party obligation that you would be

23   undertaking supervising your husband on bond?

24       A.   Absolutely not.

25       Q.   Despite no matter how wrong you thought law

enforcement investigation might have been or the

handling of any particular incident, your property,

anything else, you feel you're able to separate those

feelings from your obligation here that the Court might

impose on you as a third-party custodian?

A.  Yes.

Q.  You would not -- well, do you feel -- first of

all, in light of the very serious and violent nature of

the charges, do you have any personal safety concerns

for yourself relative to your husband?

A.  No.

Q.  Do you believe that -- obviously, whether it be

you, who is in a particularly sensitive situation being

Mr. Wells' husband (sic), or really any third-party is

put in this situation -- you obviously love your

husband, you believe he's innocent, you care for him

deeply, you've been married to him 47 years.

Taking on this obligation could very well result

in you returning him to jail or getting him somehow in

further legal trouble relative to this case if you had

to report any violation, even the most minor violation.

And first of all, you're willing to put yourself

in that sort of -- in the middle of that situation?

A.  Yes, I am.

Q.  Do you have reservation whatsoever?  You took a

1    minute to answer, and I appreciate that.  I'm aware

2    you're thinking of that, but do you have any reservation

3    with your own personal strength or ability to stand up

4    to your husband or to make clear that your legal

5    obligations as a third-party custodian, your duties and

6    legal expectations are separate from him and that you

7    need to exercise those 100 percent independently of any

8    feelings he might have about any of that?

9        A.   Okay.  That was a long question.

10       Q.   That was terrible.

11       A.   And I'm not sure --

12       Q.   Before you answer, let me rephrase it.

13            Do you think you can stand up to your husband?

14   If it appeared that he was going to violate or was in

15   the process of violating or whatnot, can you

16   nevertheless report any violation, even if it seems

17   trivial, even if it seems minor, even if he tries, no

18   matter what he tries, to convince you otherwise to go

19   along with it?

20       A.   Yes, I can.

21       Q.   And would you?

22       A.   I would.

23       Q.   Why?

24       A.   Please understand I and my family have undergone

25   a nightmare for the past six years.  I have every firm

1   -- I have total belief in my husband's innocence.  The

2   only way this nightmare ends is with a fair and

3   impartial trial.  I will do nothing to hamper, prevent,

4   or impede that.

5       Q.   That trial?

6       A.   That trial.  I want this trial to go forth.  I

7   will do nothing that would prevent it for anyone,

8   including my husband.

9       Q.   All right.  I guess it was -- the Court is aware

10  certainly through the government's filing, but Her Honor

11  has indicated she has read back -- now, you have been

12  proposed as the third-party custodian before?

13          THE COURT:  The hearing that I listened to was

14  when people outside of Kodiak City were being -- that's

15  the hearing I read.

16          MR. COLBATH:  Thank you, Your Honor.

17  BY MR. COLBATH:

18      Q.   There has been some argument made and some past

19  -- past arguments made and then current arguments again

20  made on the same topic by the government about Jim's

21  alleged use or solicitation of what was deemed either

22  prostitutes or escorts or some type of female

23  companionship outside of your marriage.  You're aware of

24  those things, correct?

25      A.   Yes.

1    Q.   Those were in fact the topics brought up at

2    previous hearings?

3    A.   Yes.

4    Q.   And you were aware of them even predating this

5    case?

6    A.   Yes.

7    Q.   Generally, as I understand it, you suffered some

8    medical conditions of your own prior to this case

9    beginning, correct?

10   A.   In 2005, I was diagnosed with breast cancer.  I

11   underwent treatment, a bilateral mastectomy, radiation,

12   chemotherapy, Herceptin, and then other drugs that are

13   designed to limit the hormone production in order to

14   prevent the cancer from reoccurring.

15        Those had a profound effect on my body.  And I

16   would hope that -- you know, breast cancer treatment has

17   come a long way in the last 10 to 14 years, but it did

18   leave me with residual problems, so --

19   Q.   Did those things place various strains on your

20   marriage?

21   A.   Extreme strains on our marriage.  It's not

22   exceedingly romantic when someone makes an overture and

23   you turn into a blinking hot flash and drip water all

24   over.  It's very uncomfortable.

25   Q.   So in the couple of years predating maybe -- at

some point during the couple of years predating this
case and these charges, did you become aware of
instances where, generally I guess, aware of instances
where Jim had sought some form of companionship outside
your marriage?

 A.  We discussed.  I gave permission.  I did not want
to know specifics.  And I, to my regret and shame,
refused to discuss it.  And --

 Q.  So let me interrupt you there.  Am I right in
understanding then that you did not know the details?

 A.  I did not know the details.  I did not want to.
I did not want to know the details.  And --

 Q.  Well --

       MR. SKROCKI:  She's not done, Your Honor.

 A.  That's true.

 Q.  All right.  Did you at the time condone, to your
knowledge, any illegal activity by your husband?

 A.  No.

 Q.  Did you intend to?

 A.  No.

 Q.  If you're allowed to be third-party custodian, do
you understand that part of that obligation, moving
forward to today, part of that obligation would require
you to both communicate with your husband and know all
the details about all of his activities regardless of

1  what they related to?

2      A.  Yes.

3      Q.  If you determined that anything he did was even

4  arguably contrary to the law or a violation of either

5  the law or the conditions set by the Court, would you be

6  willing to report those?

7      A.  Yes.

8      Q.  Would anything -- would you condone any activity

9  that was anything like that or frankly things that you

10  may have ignored in the past?

11      A.  No.

12          MR. COLBATH:  If I can have just a minute, Your

13  Honor.

14          THE COURT:  Certainly, take a moment.

15          (Pause)

16          MR. COLBATH:  For now, Your Honor, subject to

17  cross, that's all the questions I have for Ms. Wells.

18          THE COURT:  Mr. Skrocki, am I going to hear

19  from you?

20          MR. SKROCKI:  Yes, Your Honor.

21          THE COURT:  Go right ahead, please.

22                    CROSS EXAMINATION

23  BY MR. SKROCKI:

24      Q.  Hi, Mrs. Wells.

25      A.  Hi.

1    Q.  I would say good afternoon, but it's not a good

2  afternoon for you I'm sure to some extent.

3    A.  That's your characterization.

4    Q.  Okay.  I want to know, did you read the

5  government's brief that we filed in opposition?

6    A.  No, I have not seen it.  I'm sorry.  I haven't

7  seen it.

8    Q.  Okay.  You weren't shown it before coming into

9  court today?

10    A.  No.

11    Q.  If there was representations in there that you

12  had stated to the FBI while they were in your house

13  doing searches that it would be fun if one of them were

14  electrocuted while in your home, do you recall saying

15  that?

16    A.  That was not at all what was said.  What was said

17  -- the FBI wished to -- came with a search warrant and

18  wished to look down -- stick a camera down our well

19  housing.

20        And my comment was, "Let me show you how to turn

21  the power off because I don't think you want to be

22  electrocuted."  They obviously did not know how a well

23  housing, how a well water system functioned.  And you

24  have to turn off the power before you start messing with

25  putting things down the well housing or you will be

1  electrocuted.

2      I did not want them electrocuted in my home.  I

3  didn't want any harm to come to them.  If they took it

4  as a joke, it was meant as a protective factor, not that

5  I was thinking it was amusing.

6      Q.  Uh-huh.  Okay.  So they may have misunderstood

7  you making reference to something like that?

8      A.  Yes.

9      Q.  Mr. Colbath asked you a number of questions about

10 your views of your husband's innocence.

11     A.  Yes.

12     Q.  I want to ask you some questions about that.  You

13 believe your husband is 100 percent innocent?

14     A.  I do.

15     Q.  You were not on Kodiak during the time these

16 murders took place, correct?

17     A.  I was in Anchorage at a conference.

18     Q.  And you were there for several days, correct?

19     A.  No, I returned the next day.

20     Q.  So how long were you in Anchorage?

21     A.  Overnight.

22     Q.  So if somebody stated that you had stayed longer

23 than just overnight, that would not be correct?

24     A.  You are discussing almost seven years ago.  The

25 murders occurred on -- the 12th, I believe, was a

1   Thursday.  Am I correct?

2       Q.  The 12th is fine.

3       A.  No.

4       Q.  Let me see if I can help you out.  Is it possible

5   there may have been a one- or two-day difference because

6   of the time length?

7       A.  I believe we flew up on Wednesday evening, but

8   I'm not sure.  It was a conference that we went to every

9   year.  It was a very -- it ended up being exceedingly

10  traumatic, so I can't tell you.

11          I do know that I came back before the conference

12  ended on Friday.  I know that I returned on Friday.

13      Q.  Okay.  But factually though, you weren't in

14  Kodiak the day Mr. Hopkins and Mr. Belisle were killed,

15  right?

16      A.  No, I was not.

17      Q.  So whatever information you have about your

18  husband's activities, you've obtained from him, haven't

19  you, about what happened, what he was doing that day?

20      A.  Well, and from others.

21      Q.  From your husband, correct?

22      A.  From my husband, yes.

23      Q.  But you don't know exactly what he was doing the

24  day those murders took place because you weren't here?

25      A.  No.

1    Q.   You've never lived in Anchorage, correct?

2    A.   Well, depends -- if you define what "living" -- I

3    spent multiple months up here while I was undergoing

4    breast cancer treatment.

5    Q.   But never a home, a long-term residence?  Your

6    home has been in Kodiak?

7    A.   My home has been in Kodiak.  No, I was here for,

8    I believe the longest was three months by myself here.

9    Q.   How long have you been living with your relatives

10   or your son down in the Lower 48?

11   A.   My daughter.

12   Q.   How long?

13   A.   I left Kodiak in 2016.  '15 and '16, I was going

14   back and forth with my mother.  We had in-home

15   caregivers, and then I also would go and stay with her

16   for long periods of time.

17        And then I believe it was in 2016 that we placed

18   my mother -- it was in June we placed my mother in an

19   assisted living home.  And so then after we -- we had to

20   clear out her house and rent it.

21        And so at that point in time, I pretty much moved

22   in with my daughter in Beaverton.

23   Q.   So how long have you been out of Alaska then,

24   just in terms of --

25   A.   You mean as far as how long -- I'm not quite sure

what you're asking me.  If you're asking me how long --

how often I come back and forth.  If you're asking --

    Q.  Since the trial has been concluded, how long have

you been away from Alaska?

    A.  Not residing here, probably since -- probably

April of 2016.  While I was caring for my mother, I was

going back and forth.  I would be here months and there

months.

    Q.  Excuse me, but I didn't sit through the first

trial, but you sat through the first trial?

    A.  Yes, I did.

    Q.  Every day?

    A.  Yes.

    Q.  Having sat through the first trial every day, you

believe your husband innocent?

    A.  Yes.

    Q.  And you're not happy about this investigation,

are you?

    A.  No.

    Q.  You believe that the victims in this case should

be looked at as possible suspects in these homicides?

    A.  No.

    Q.  You believe the government has fabricated

evidence against your husband?

    A.  I believe that what the government calls evidence

1    is probably, a lot of it may not be actual evidence.

2        Q.  You want to explain that to the judge?

3        A.  Well, my understanding of circumstantial evidence

4    is that it is evidence for which there is no other

5    reasonable -- that in order to use it correctly, it is

6    evidence for which there is no other reasonable

7    explanation, that if there is reasonable explanations

8    that that needs to be a factor that needs to be

9    weighted, and that those reasonable explanations need to

10   be explored.  And so I am dissatisfied with the quality

11   of the investigation.

12       Q.  Do you believe that the government is withholding

13   evidence against your husband or in favor of your

14   husband?

15       A.  I don't know.  I hope not.

16       Q.  And you and your husband are in this together,

17   right?  This impacts you as well as your husband,

18   doesn't it?

19       A.  This impacts multiple people.  This impacts our

20   family.  It impacts the victims' family.  It impacts the

21   community of Kodiak.  This is rather like dropping a

22   rock in a puddle or into a pond.  The ripples impact

23   people you would have no idea.  But yes, it's very

24   impactful.

25       Q.  And is part of that impact because you believe

1    there is another murderer on Kodiak who hasn't been

2    arrested yet?

3        A.   I believe someone solved a problem with two

4    homicides, yes.

5        Q.   So you believe there is somebody else at large on

6    Kodiak who's responsible for these murders and not your

7    husband?

8        A.   I don't have any idea where that individual is or

9    who it is.

10       Q.   But there is somebody else out there, correct?

11       A.   I believe so.

12       Q.   You had a career before this happened?

13       A.   Yes.

14       Q.   How long were you working, ma'am?

15       A.   I was the infant learning coordinator, which is

16   the birth-through-three children with special needs.  In

17   Alaska, it's done through private agencies that are

18   granted.  I worked for the Kodiak Area Native

19   Association for 23 years.

20       Q.   Did you have a retirement from that?

21       A.   I did.

22       Q.   Do you have that money from your retirement

23   still?

24       A.   No.

25       Q.   Where is that money?

A.   That money was spent on living expenses and for

paying for -- to bring Mr. Peter Offenbecher back into

the case after he was dismissed by the magistrate,

against Mr. Curtner's protestations that during the

sequestration he did not have the funds or another

attorney to assist him.  So Peter had availability at

the very -- right before the trial started, and they

asked if I had any possible way of making it happen.

Q.   So you spent your retirement money for your

husband's defense?

A.   I did.

Q.   Did he have retirement money at the same time?

A.   My husband does.

Q.   Was that spent on his defense or was it just your

money?

A.   There was an injunction filed against that fund,

so it couldn't be.

Q.   Was there any attempt to spend that money before

the injunction was filed?

A.   No.

Q.   How long did your husband partake with other

women, we'll just put it that way?

A.   I have no idea.

Q.   He never shared with you how long he was doing

that?

1    A.  I have said I don't -- I did not want to know the

2    specifics and I did not ask.

3    Q.  And he didn't share?

4    A.  Oh, he tried.  He tried.  But you know, I'm a

5    fairly stubborn person.

6    Q.  Fair enough.  Were you told as to where he would

7    do this and when?

8    A.  By whom?

9    Q.  By your husband.

10    A.  No.

11    Q.  He didn't share that with you?  How about the

12    cost, did he ever share the cost with you?

13    A.  No.

14    Q.  So he kept all that from you?

15    A.  No.  I did not -- there is a difference between

16    someone who refuses to listen or ask, or rebuffs your

17    intentions to share.  That was my position.  I rebuffed

18    any attempt to share on his part.

19        So to characterize that he did not choose to

20    share or make efforts is wrong.  That was my -- that's

21    on my -- that's my responsibility.  That's -- and that's

22    a matter between the two of us.

23    Q.  Uh-huh.  You would agree that if they were

24    prostitutes, that prostitution is not legal, is it?

25    A.  No, it's not.

1    Q.  So that's not law abiding, is it?

2    A.  Well, in the -- if you're going to take an

3    absolutest position, no.

4    Q.  What do you mean by that?

5    A.  Well, it is illegal here.  It is illegal now.

6    Just as marijuana was illegal and is no longer illegal

7    unless you're in federal.  I don't agree with

8    legalization of marijuana.  I would say I am not a moral

9    censor for anyone, but it is illegal.  Legally, it is on

10   the books, it is illegal.

11        So if you're asking if he was to want to do that

12   again, under the terms of a bond release, it's illegal,

13   no, I would not.  I mean, my understanding is that the

14   stipulations would be set by Judge Gleason, but they

15   could be as much as that he needs to be 24/7 in the

16   house, I need to be in the house if he's there.

17        I mean, to the point that he could not be left in

18   the yard, that he may be transported by marshals, by his

19   staff.  I don't know what the stipulations would be, but

20   whatever they would be, I will abide by them.

21   Q.  I was just asking you about prostitution back

22   when you said it was okay with you.  So it was okay with

23   you back then even though it was illegal?

24   A.  I don't know that he was.  I don't know what he

25   was doing.  I simply gave him permission to seek

1  companionship.  Whether that was a girlfriend or not --

2      Q.  You just don't know?

3      A.  I don't.

4      Q.  You just don't know, like you don't know what he

5  was doing the day these murders took place, right?

6      A.  Well, no.  I do not know where -- I don't know

7  what you were doing on the day these murders took place.

8  I wasn't there.  I don't know.

9      Q.  Okay.  Have you ever, while this investigation

10  was going on, told people in Kodiak there were other

11  people or maybe another individual responsible for these

12  murders and not your husband?

13      A.  Of course I've suggested that someone else was

14  responsible.

15      Q.  Have you provided alibis for your husband to

16  people in Kodiak about what he was doing that morning?

17      A.  I can only state what he told me, and it is to my

18  shame that I repeated it to someone.

19      Q.  What did he tell you?

20      A.  He said he stopped at the airport to use the

21  bathroom.

22      Q.  What about the nail in his tire, did he tell you

23  about that?

24      A.  That he -- that he -- yes.

25      Q.  Had a flat.  He told you about the flat?

1    A.  He said he had a nail in his tire and he went

2   home to change it.

3    Q.  Have you told people that in Kodiak, too?  You

4   have explained that to folks that he had a nail in his

5   tire, too?

6    A.  Yes.

7    Q.  So a nail in his tire, and he stopped to use the

8   bathroom at the same time?

9    A.  Yes.

10   Q.  Who would you have told that to?

11   A.  Well, I know I told Para (phonetic).

12   Q.  Are you looking at your husband?

13   A.  No, I was looking at the new marshal who just

14   took a position behind him.

15   Q.  Para who?

16   A.  Para Upchurch.

17   Q.  Do you believe that the government has fabricated

18   the video evidence that you saw in the first trial of

19   your husband's truck going by the gate at the Coast

20   Guard base?

21   A.  That they fabricated the video?

22   Q.  Yes.

23   A.  No.

24   Q.  Do you believe there is other evidence about that

25   video that is being withheld or somehow manipulated by

1   the government?

2       A.  I question, yes, I did question that.

3       Q.  Please explain.

4       A.  I find it hard to believe that the largest Coast

5   Guard base in the United States has their cameras going

6   to a digital server that does not have precise time.

7       Q.  Okay.  Is that all?

8       A.  Yes.

9       Q.  So what's your problem with the timing?

10      A.  My problem with the timing is that at the time of

11  the day -- I think the explanation was very clear if you

12  read Ms. Davina Chen's brief --

13      Q.  This would be the appellate brief?

14      A.  Yes, about the timing.  I think she said it very

15  succinctly that real-life conditions don't go by Google

16  Map.

17      Q.  So you believe somehow the evidence presented at

18  trial was not correct or is somehow ineffective because

19  of Google Maps?

20      A.  No, I believe the reliance on Google is extremely

21  surprising.

22      Q.  Is there any evidence that would be presented to

23  you that would convince you your husband is guilty of

24  this crime?

25      A.  Are you asking that as a hypothetical question?

1   Are you --

2       Q.   Yes.

3       A.   Then yes.  If you -- yes.  Hypothetically, I have

4   seen none of it.  Hypothetically, you could present

5   evidence of anyone in Kodiak committing that crime, and

6   if it was vetted and sufficient, I would believe it.

7       Q.   That's not where you're at right now though?

8       A.   No, absolutely not.  I have no idea who committed

9   that crime.

10          MR. SKROCKI:  Just a moment, Judge.  I know

11  you're getting close to your deadline.

12          THE COURT:  We are very close.

13          MR. SKROCKI:  That's all I have.  Thank you.

14          THE COURT:  Mr. Colbath, can you conclude your

15  redirect in two minutes or not?

16          MR. COLBATH:  I don't have any, Your Honor.

17          THE COURT:  Thank you, ma'am.  You may be

18  excused.

19          (Witness excused)

20          THE COURT:  I do need to leave at this point in

21  time, and I would like to hear argument of counsel.  And

22  I'm wondering if we could set a time for you to come

23  back tomorrow that would be convenient to both sides,

24  unless you want to rest on the papers, which, like I

25  say, I would like to hear each side's arguments.

1          But if both sides simply want to proceed on

2     what you already filed, then I would do that instead.

3          Mr. Skrocki, what's your proposal?

4          MR. SKROCKI:  Thank you, Your Honor.  We can be

5     available any time the Court -- tomorrow, if you wish.

6          THE COURT:  What's your schedule like tomorrow?

7     I'm quite open.  I have a hearing at 2:45 p.m.

8          MR. SKROCKI:  Ms. Sherman has an 11:00 a.m.,

9     but morning is probably best.

10          THE COURT:  10:00 a.m.?

11          MR. COLBATH:  10:00 a.m. is fine, Your Honor.

12          THE COURT:  Let's have a continued hearing at

13     10:00 a.m.  At that point, as I understand it, neither

14     side has any additional evidence?  I'll simply hear

15     argument on the statutory factors, correct?

16          MR. SKROCKI:  Can I have a moment with

17     Mr. Colbath?

18          THE COURT:  Sure.

19          (Pause)

20          THE COURT:  10:00 a.m. for both sides?  There

21     is a case, I will give credit where it's due, to my law

22     clerk, that you may wish to address tomorrow.  Ninth

23     Circuit case, fairly old from 1991, 948 F.2d 1118,

24     *United States versus Gebro*, in which the Ninth Circuit

25     reviewed a district court's decision on bail after a

1    jury verdict conviction had been reversed by the Ninth

2    Circuit, so it was similar procedural posture to the

3    case before us, so you might find that helpful.  I would

4    be interested in each side's thoughts on that.

5              Anything further today, Mr. Skrocki?

6              MR. SKROCKI:  No, Your Honor.  Thank you.

7              THE COURT:  Anything further?

8              MR. COLBATH:  Not at this point, Your Honor.

9              THE COURT:  Very good.  We'll go off record.

10   Oh, and all the participants can be telephonic.  No need

11   to file more motions.

12             DEPUTY CLERK:  All rise.  This matter is now

13   adjourned.  Court stands in recess until call of the

14   gavel.

15             (Proceedings concluded at 2:45 p.m.)

16

17                       CERTIFICATE

18      I, Sonja L. Reeves, Federal Official Court Reporter
     in and for the United States District Court of the
19   District of Alaska, do hereby certify that the foregoing
     transcript is a true and accurate transcript from the
20   original stenographic record in the above-entitled
     matter and that the transcript page format is in
21   conformance with the regulations of the Judicial
     Conference of the United States.
22
        Dated this 14th day of April, 2020.
23

24
                         /s/ Sonja L. Reeves
25                       SONJA L. REEVES, RMR-CRR
                         FEDERAL OFFICIAL COURT REPORTER