```
 1                 UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF ALASKA
 2

 3   UNITED STATES OF AMERICA, )
                              )
 4          Plaintiff,        )
                              )
 5   vs.                      )   CASE NO. 3:13-cr-00008-SLG
                              )
 6   JAMES MICHAEL WELLS,     )
                              )
 7          Defendant.        )
     _____)
 8

 9       TRANSCRIPT OF CONTINUED MOTION/DETENTION HEARING
       BEFORE THE HONORABLE SHARON L. GLEASON, DISTRICT JUDGE
10               January 23, 2019; 10:05 a.m.
                      Anchorage, Alaska
11

12   FOR THE GOVERNMENT:
             Office of the United States Attorney
13           BY:  STEVEN SKROCKI, CHRISTINA M. SHERMAN and
                  KELLEY L. STEVENS (via speakerphone)
14           222 West 7th Avenue, #9
             Anchorage, Alaska 99513
15           (907) 271-5071

16   FOR THE DEFENDANT:
             Office of the Federal Public Defender
17           BY:  GARY COLBATH
             601 West 5th Avenue, Suite 800
18           Anchorage, Alaska 99501
             (907) 646-3400
19
             Camiel & Chaney, P.S.
20           BY:  PETER A. CAMIEL (via speakerphone)
             520 Pike Street, Suite 2500
21           Seattle, Washington 98101
             (206) 624-1551
22
   _____
23               SONJA L. REEVES, RMR-CRR
               Federal Official Court Reporter
24               222 West 7th Avenue, #4
                 Anchorage, Alaska 99513
25       Transcript Produced from the Stenographic Record
```

1          (Call to Order of the Court at 10:05 a.m.)

2          DEPUTY CLERK:  All rise.  Her Honor, the Court,

3   the United States District Court for the District of

4   Alaska is now in session, the Honorable Sharon L.

5   Gleason presiding.

6          Please be seated.

7          Your Honor, I have Mr. Camiel and Ms. Stevens

8   on the overhead.

9          THE COURT:  Very good.  Good morning.  We're

10  back on record here in the *Wells* matter.  I was handed a

11  proposed pretrial deadline.  Is this agreed upon by the

12  parties?

13         MS. SHERMAN:  It is.

14         MR. COLBATH:  It is, Your Honor.

15         THE COURT:  I commend you all.  Whoever has

16  this on their computer, can they file it with the Court?

17         MS. SHERMAN:  I will do that, yes.

18         THE COURT:  Thank you.  All right.  We left off

19  with the parties' closing arguments on the motion for

20  pretrial release.  Mr. Colbath, go ahead, please.

21         MR. COLBATH:  Thank you, Your Honor.

22         Your Honor, I'll start with addressing the case

23  that the Court cited to us.  The *United States versus*

24  *Gebro*, 948 F.2d 1118.  I think the case, first of all,

25  of course it's very factually distinguishable from the

present case.  It's an armed robbery case.  The

defendant apparently asserted a singular affirmative

defense, some type of duress defense.  The Court

misinstructed on that and the conviction was reversed on

that.

I think the overriding principle I guess that I

saw that might have some application here is this was a

bond consideration.  This case was a bond consideration

following a vacated conviction, and so I certainly I

don't, I guess, disagree with the general legal

principle stated in the second to last paragraph of the

decision in that the Ninth Circuit approved the district

court's considering the defendant's knowledge that he

had previously been convicted by a jury and had been

given in that case a 132-month sentence or a fairly

lengthy sentence and that those factors could weigh in

the consideration of whether in fact the person was a

flight risk.

So as a general principle, I think certainly

this Court could consider that Mr. Wells has the

knowledge that his case went to trial once before, and

that following the wrongful conviction that was entered

in that case, he received a life sentence.  I don't

think that should carry much -- well, immediately

preceding that paragraph of course the Ninth Circuit in

*Gebro* pointed out the weight of the evidence is the
least important factors that the Court should consider
and the bail statute neither requires nor permits a
pretrial determination of guilt.

So while the Court can consider Mr. Wells'
knowledge on this point, a couple of very I think
significant takeaways here, and those really dovetail or
get me back to where I wanted to start my argument, and
that is I received the government's brief on Friday
afternoon in response to my motion, and I was in
Fairbanks so I have not filed a written response.

But my response or my observation would be
this:  I agree very much with the government that the
Court should take a strong look at what the Ninth
Circuit said in this case about this case, but I
couldn't disagree more with the government's
interpretation.

The government would have you believe that the
Ninth Circuit somehow found as fact substantially what
the government argued at trial, found that there was
overwhelming evidence of Mr. Wells' guilt and somehow
put some stamp of approval on that process as well as
the district court's determinations and findings there,
when I think any fair reading or interpretation of the
Ninth Circuit opinion is 100 percent opposed and the

1    pendulum is completely on the other side of the spectrum

2    as to what the government represents the Ninth Circuit

3    said, because the Ninth Circuit said that, first of all,

4    with respect to the underlying proceeding, quote,

5    "Prosecutorial misconduct began early in the pretrial

6    stages of the proceedings and continued throughout

7    trial."

8        Now, normally, as this Court knows, a case is

9    reversed on appeal less than 2 percent of the time.  I

10   think the statistics are like 98-point-something percent

11   of all cases get affirmed on appeal.

12       THE COURT:  I don't think it's that high.

13   Criminal is much higher than civil.

14       MR. COLBATH:  The criminal statistics from, I

15   think that's a 2016 statistic, which the last one I saw

16   there was about a 1.8 or 1.9 reversal rate, so

17   98 percent affirmance.  So it's rare that of all cases

18   they get overturned.

19       It's even more rare that the Court -- the terms

20   "prosecutorial misconduct" or "unethical conduct," those

21   are not used lightly, exceedingly rare, yet both of

22   those things happened in this case.  It's rare that a

23   double murder case with life sentences would get nothing

24   but the highest level, not that all cases don't get a

25   high level of scrutiny, but certainly this is not

1   something that was overturned lightly.  And despite

2   finding prevalent prosecutorial misconduct, the Ninth

3   Circuit didn't reverse for prosecutorial misconduct.

4   They reversed because of what they determined was the

5   admission of quite clearly inadmissible evidence, and

6   not a singular, like in this Ninth Circuit case, where

7   there was a wrong jury instruction, but not just an

8   instance of the admission of clearly inadmissible

9   evidence, but multiple types of and characters, natures

10  of inadmissible evidence, including fact witness

11  testimony, expert witness testimony, improper argument.

12          I mean, there was 404(b) other acts evidence

13  that was wrongfully admitted, so there is classes of

14  wrongfully admitted evidence.  It's in that context, the

15  context of a case replete with prosecutorial misconduct

16  with a trial judge that did not do his job to the extent

17  that, again, a very rare thing you see on appeal, sent

18  back and reassigned to a new court.

19          So we have all of these circumstances that in

20  and of themselves are rare to occur all occurred in this

21  case.  Well, I think that completely negates or should

22  cause this Court to say, you know, whatever happened

23  previously in this case cannot be our measuring stick

24  that we go by in determining whether when you're looking

25  at the strength of the case, the appropriateness of

prior proceedings or whatever happened.  I think this
Court needs to do just what the bond statute requires,
and that is look at the factors that are set out there,
consider the weight of the evidence argument to be the
least important of the factors and to not take the
government's invitation to presume Mr. Wells guilty or
to conclude that he somehow has done this, but instead
treat him for the pretrial defendant that he is, and
that is with the 100 percent presumption of guilt.

   Mr. Wells --

   THE COURT:  I think you misspoke there.

   MR. COLBATH:  I'm sorry, presumption of
innocence and not make a presumption of guilt.

   THE COURT:  I understand.

   MR. COLBATH:  Mr. Wells certainly knew before
the first trial, just like he knows now, that at
60 years old any sentence for a murder conviction would
be significant, would be likely a life sentence for him
whether it was termed "life" or not, that it could be
treated as nothing more than the most serious of
offenses.

   And so nothing has changed about that simply
because of the prior trial.  If anything, I think
Ms. Wells said it on the stand best, Mr. Wells wants
this trial.  He wants a trial.  He wants a chance to, if

1  he gets a fair trial, to have his name cleared.  And so

2  he has every incentive to, rather than flee and become a

3  fugitive for the rest of his life and actually give the

4  Court or the government some real true reason to

5  prosecute him that he would if he flees undoubtedly then

6  be guilty of fleeing and face punishment for that, he

7  also really gives up the chance to clear his name too,

8  to have his day in court, if you will, his real day in

9  court, because he didn't feel like he got one.

10        And I think the Ninth Circuit supports that.

11  Their ultimate finding was he had a fundamentally unfair

12  trial.  He did not get any meaningful chance to present

13  a real defense.

14        And so I would ask the Court to not consider

15  those things, but instead consider the things that you

16  must, and I pointed those out in my brief.  In the *Gebro*

17  case, that defendant was detained, true.  It was after

18  retrial, but the Court there found the man had been

19  transient for years.  Of course, Mr. Wells has a

20  lifelong residency in Alaska.  He found that the person

21  had no family ties to either that community or the state

22  or really to anybody because he had rejected all contact

23  with even relatives that didn't live there.

24        Well, that's the opposite of Mr. Wells.  He

25  found that this person was unemployed since 1980.  The

1    decision was 1992, so for at least a decade, the

2    defendant there had been unemployed.  Of course,

3    Mr. Wells, military veteran and had two careers in his

4    life.  He found that this person had had a drug problem

5    since the early 1980s and had failed several times to

6    break this habit.  Mr. Wells, no drug habit, no alcohol

7    habit, no substance abuse history, no mental health or

8    other history.

9         The judge found that this person had a criminal

10   record, that while it consisted of mostly drug-related

11   offenses, it also involved operating charges under the

12   influence of controlled substance, trespass, misuse of a

13   syringe, providing false identification to peace

14   officers, possession, manufacture and sale of dangerous

15   weapons.

16        Mr. Wells has no criminal history whatsoever.

17   So from a bail assessment standpoint, and then as the

18   last factor in that case, that the government appeared

19   to have a somewhat strong case.  Here the government's

20   case is, by their own admission, although they say it's

21   I guess characterized as a slam-dunk case, it's a

22   circumstantial case and a hotly contested one.

23        This case is at best a 50/50 case, and given a

24   fair shot, each of the points that the government claims

25   was proved prior are going to be very much contested.

And so given that the weight of the evidence in a circumstantial case is the least important factor, I think the Court needs to revert back to these other factors. And all of these other factors really to a T, whether you're talking about ties to the community, you're talking about criminal history, you're talking about employment history, you're talking about substance abuse history, every one of those factors weighs in Mr. Wells' favor, and so we would ask the Court to consider those things.

I have also pointed out since the last bond determinations were made in court, things have developed and changed. As the Court is aware, Mr. Wells has ongoing problems, and we still have them today, with reviewing discovery and having access to discovery. And it's true that I have lots of defendants that are incarcerated that we work through those issues, but I have no defendants that have 100,000 pages of discovery, that have hundreds of hours of audio and video things to review, that have anywhere close to the breadth of material that Mr. Wells has to review, and he's just not allowed to have that in his cell as a matter of course, so there is logistical problems.

We have got a continuance now and so more time you would think would alleviate that some, but as I

pointed out in my brief, Mr. Wells is now, through no
fault of his own, in segregation for situations he can't
control, and so while his time has been increased some,
his access to things is going to get restricted some.

And both of those situations, his need to be in
segregation for his own safety, as well as his access to
discovery, those could be alleviated by bond. On top of
that, he has changing medical circumstances that are
different than they were when he was previously
incarcerated.

Since arriving back in Anchorage, he has had
severe difficulties with his teeth and dental situation,
such that all his teeth have been removed. He has no
teeth at this point. He needs dentures. He is in the
process of allowing his mouth to heal. It's pretty much
healed to the point where he could be fitted for and
given dentures.

The jail has told him, Ms. Wells has met, and I
have spoken with jail medical as recently as this past
week, and the explanation was, well, you're on the
bottom -- because it's not an emergent circumstance, in
other words, you're not in a medical crisis, you're on
the bottom of the dental list. When you work your way
to the top of the dental list, we'll call the marshals
and see if they will authorize dentures, because the

marshals have to pay for it because you're in federal custody.

To get a tooth pulled is a six- to eight-week wait on the dental list at the jail, so my belief that he'll get to the top of the list for consideration of getting dentures in the next six months is probably not going to happen, but if it does happen, it will go to the marshals.

In the only two past cases I have had in considering fitting for dentures, because it's not again an emergent situation and because he's in pretrial, the Bureau of Prisons won't authorize, or I don't believe the marshals will pay for dentures. Instead, he'll be told, if you're acquitted, you will get out and you can get your own dentures, and if you're convicted, you will have access to those services in the Bureau of Prisons, so you'll get your teeth at some point.

What that does for a man who is an insulin-dependent diabetic and already on a very restricted diet is further puts him in a situation of the diet he could eat before was very limited, and now it's even more limited because he's on an insulin-related and diabetic diet that's now restricted to a soft-food diet, which is already not a good situation at the jail.

1          Besides that medical condition, he's been

2     having pressure sores from sleeping in the cell that

3     he's in and circulatory problems, which is why he's

4     wearing a sweatshirt here.  The room that he reviews his

5     discovery in is cold enough that after an hour or so his

6     hands are cold enough that he can't write legibly and

7     take notes and has to go back to an area where it's

8     warmer.

9          Just all kinds of medical issues.  He's been

10    denied a new mattress or a different mattress or an

11    additional something to sleep on, because as long as he

12    has mobility, they encourage him to walk around and

13    treat his sores that way as opposed to rest.

14         He's got these ongoing dietary, dental and

15    medical issues that, again, are hampering, I guess, the

16    situation, and exacerbated by his placement in

17    segregation.  While all of that can gain some

18    accommodation in a custody setting, those are all things

19    that also he can better treat himself certainly and our

20    incentive for him to get out and take care of himself

21    and prepare for this trial and do nothing other than try

22    to be ready when August 5th arrives.

23         So it's our position that if the Court

24    considers the findings of the Ninth Circuit, that the

25    prior proceedings were fundamentally unfair and gives

this a fresh de novo look, I think the conditions that
we have proposed are very strict, very stringent.
Certainly authorities would know almost immediately if
Mr. Wells were to go anywhere without travel documents,
or other wherewithal I guess at this point is very
unlikely that he has the ability to go anywhere.

And of course leaving would only seriously
increase his exposure in this case, his -- the trouble
that he already finds himself in. And so we would ask
the Court to set the conditions that I have outlined in
my motion and/or add any conditions really that are in
addition to those proposed that the Court might feel are
necessary and allow release.

THE COURT: Thank you, Mr. Colbath.

Mr. Skrocki, go ahead, please.

MR. SKROCKI: Good morning, Judge.

THE COURT: Good morning.

MR. SKROCKI: You won't find it surprising that
we're on very opposite ends of the spectrum on our side
concerning the *Gebro* case and releasing Mr. Wells and
the wisdom and the facts and the legal basis to do so.

A little bit of latitude, if I could. My
colleague, Mr. Colbath, made an effective argument, an
interesting argument and a lot of facts that weren't
produced in testimony, but what I would like to first

1    start off with is Mr. Wells' segregation issue.

2            I spoke with the marshal about that yesterday

3    and was advised that Mr. Wells self-reported himself

4    into segregation, which any inmate can do.  I asked and

5    they have received no threats from Anchorage jail or any

6    kind of documentation referenced by Mr. Wells as to

7    being threatened in the jail by certain groups.  So

8    that's at least, as far as they are concerned, they have

9    no information about that.

10           What is before the Court this morning, Your

11   Honor, is not about the conditions of the jail.  What's

12   before the Court this morning is can the Court fashion a

13   release plan for this defendant, or even should it,

14   based on a number of factors.  The primary factors are

15   the four factors out of *Motamedi*, referenced in *Gebro*

16   and the statute which the Court returned to us

17   yesterday.

18           And the first one is the nature of the crime.

19   We don't have one murder here; we have two.  He's

20   charged with four counts of murder in the first degree.

21   And the Court can look at the Ninth Circuit opinion and

22   stick to the facts, and we disagree with Mr. Colbath's

23   assessment of the Ninth Circuit opinion, but facts are

24   in there that these two gentlemen were killed in cold

25   blood very, very quickly at close range with a very

powerful handgun, which hasn't been found.

And by the end of the case, it became very apparent, and the evidence was overwhelming aside from the issues of the expert witness and one or two testimonial issues that the Court had issues with, the evidence was overwhelming in a circumstantial manner, hundreds and hundred of pieces of evidence that this man did it.

I know that under *Motamedi* and *Gebro* that's the least important factor, but the important thing here is we're not in a real pretrial setting. As *Gebro* indicates, we're in a setting after conviction. He knows his defense didn't work. I sat through a good part of the first trial. I have read the whole trial transcript. There was a defense case. We want to point at this person, we want to point at those people.

The victims' children were called as witnesses, and it may have been some friends of theirs who did it. So there was a pretty significant defense case here over 19 days. He saw that didn't work, and how that factors into the Court's analysis today is the *Gebro* opinion says, hey, you didn't see your duress defense worked, he aided and abetted in a bank robbery, that didn't work, so he's much more likely to flee. That's one thing the Court can really focus on is he knows what happened with

the first trial.

The discovery issue we're talking about here that he's got thousands and thousands of pages, a lot of that is duplicate from the first case. And now that we're moved back to August, there is plenty of time for him -- we'll even help Mr. Colbath in terms of -- we have told him, "Our new evidence we're going to highlight for you," so this thing about looking at every single page I think is really kind of a red herring here because this is a redo and it was reinstituted, repackaged, sent out again just with different Bates numbers. So there really isn't at this point, except for some expert testimony on both sides, a whole lot of new evidence in terms of the procedural landscape here.

So we looked at the nature and seriousness of the offense. You can't get much more serious than this. Aside from a terrorist attack or some sort of mass shooting, a multiple homicide is pretty high up there on the scale. Weight of the evidence, trial evidence is overwhelming.

Let's talk about the defendant's character, family community ties and criminal history. You heard the testimony yesterday that the defendant really didn't seem to have a problem with going out and committing prostitution for an unknown amount of time, unknown

1   amount of occasions, so there is a criminal record

2   there.  There is no real community tie to Anchorage.  I

3   don't dispute that Mr. Wells has spent his life here.

4   We can't do that, but there is no tie to Anchorage.

5   It's all in Kodiak.

6           His children all live out of state, they don't

7   live here.  And then the fourth factor under *Motamedi*

8   and under 3142(g) is the nature and seriousness of the

9   danger to a person or to the community posed by the

10  release.  What we have here is an individual who has sat

11  through a first trial, had a vigorous defense, claimed

12  innocence.  He claimed innocence in front of the

13  sentencing court, because Judge Beistline made comment

14  about that in the Ninth Circuit opinion.

15          His spouse, who is the proposed third-party,

16  who is very, very heavily engaged to a very serious, I

17  think, level of support for Mr. Wells, thinks he's

18  innocent.  She's advocated for his innocence.  She's

19  publicly stated his innocence.  She's publicly stated

20  his alibis.  She believes that he is innocent.  She

21  believes the government has fabricated evidence.

22          Even if you get to the point of, well, should I

23  take a gamble on this and release him to the third-party

24  custodian, I'll just jump to that part, the third-party

25  custodian is not the type of custodian that you should

be releasing Mr. Wells to. They had a relationship

where he seems to control the money, he does what he

wants, he doesn't report back, and she's willfully

ignorant or has willful blinders on as to what kind of

activity he did.

And even in this case, having sat through the

whole trial, she still maintains he's innocent. Even if

the Court was going to consider that -- and to be

candid, Judge, there is no way we would agree to any

kind of release plan for this man. I'll just put that.

It's just not possible for us to do that, not given the

nature of this crime. It was cold blooded, calculated,

quick, planned.

And so when you look at these factors -- and

let me back up a quick second. *Gebro* says the statute

doesn't require a pretrial determination of guilt.

Great. But that's what the Court has here. There were

trial errors that rose to a specific level. We have all

read the case. I watched the oral argument. We know

what the issues are here.

But you have a pretrial determination of guilt

here. That's something the Court should consider in a

couple of different ways. Mainly, the impact on

Mr. Wells, and mainly the evidence was sufficient that

the jury came back relatively quickly and convicted this

1  man.

2          The third-party release plan is opposed by

3  probation.  That's one factor the Court could take into

4  account too, so we're kind of stacking up.  On the no

5  side, no release, the evidence is stacking up quite

6  heavily in favor of no release quite clearly.

7          In *Gebro*, if we read the last yesterday

8  afternoon, here you have a situation where there was an

9  aiding and abetting of a bank robbery.  It's kind of

10 like the lowest level you could possibly have in some

11 sort of violent crime.  He ran the duress defense, which

12 didn't work, looking at 132 months.  We're looking at

13 four consecutive life sentences here.  There is really

14 no way that you can distinguish *Gebro* as not assisting

15 the no bail possibility here.  There is just no

16 comparison.

17         I read the same thing Mr. Colbath did, that

18 Gebro had family help and he had some violent criminal

19 history, but he also had a sister he was reconnecting

20 with, he was seeing his kids again, so he was doing the

21 same thing Mr. Wells is advocating here.  I have got

22 some family connections that are acting as a

23 third-party.  Even at 132 months, the Court almost made

24 a presumption that he's going to flee because he knows

25 his first trial didn't work.

1       For those reasons, Judge, we do not think
2   anything that Mr. Wells would propose to the Court would
3   be sufficient.  And just on the facts of this record, in
4   the event it goes up, the proposal that's made here is
5   just not adequate with the spouse as a third-party
6   custodian.  The tensions in the relationship are just
7   too strong.
8       Frankly, Your Honor, you can't trust a
9   defendant in a situation that Mr. Wells is facing at
10  this time to abide by the Court's conditions.  It's just
11  not possible.  Anything else, Your Honor?
12      THE COURT:  No.  Thank you.
13      All right.  I'm going to take about five
14  minutes here, organize my thoughts, and then I'll come
15  back and give you a decision on the record.
16      DEPUTY CLERK:  All rise.  Court stands in a
17  brief recess.
18      (Recessed from 10:31 a.m. to 10:38 a.m.)
19      DEPUTY CLERK:  All rise.  Her Honor, the Court,
20  the United States District Court is again in session.
21      Please be seated.
22      THE COURT:  We are back on record here.  And I
23  have before me the motion of the defendant to revisit
24  the prior order which had Mr. Wells detained.
25      And the Court is going to deny the motion for

1  the following reasons:  As I understand it, the parties

2  agree that the presumption for detention applies in this

3  particular case given the nature of the charges that I'm

4  going to go through, the factors that are set out in 18

5  U.S.C. 3142(g) and make the following findings:

6          First, with regard to the nature and

7  circumstance of the offenses that have been charged,

8  clearly, the offenses that have been charged are crimes

9  of violence.  And I would concur with the government's

10  observation that apart from crimes of terrorism or mass

11  shootings that a crime of a double homicide charge is

12  among the most serious federal charges.

13          With regard to the weight of the evidence, I do

14  see that in light of the Ninth Circuit decision that a

15  presumption of innocence reattaches to Mr. Wells,

16  despite the fact that a group of jurors found Mr. Wells

17  guilty beyond a reasonable doubt.  But I do find that

18  the fact that a jury did reach this determination to be

19  a factor that is appropriate for the Court to consider

20  in terms of the risk of flight, which is to say that the

21  actual experience of being convicted of a crime, of

22  these crimes and having served time takes it beyond this

23  theoretical possibility that a person would be convicted

24  and found guilty to the reality that that is what

25  occurred in this case, and in the Court's view increases

the risk that Mr. Wells would not be present for his
next trial, acknowledging as I do the perspective as
testified to by Ms. Wells and articulated by Mr. Colbath
as well that there is a desire to clear one's name and
to have a trial at which different evidence would be
presented to some degree by each side.

But I do see that that is a consideration here
that the Court has considered consistent with the case
that I cited to the parties yesterday.

I have considered the history and
characteristics of Mr. Wells, the fact that he has a
long history of employment, has a criminal history that
is essentially nonexistent, apart from these charges
that have been brought against him. I have considered
the medical issues that have been raised. I certainly
don't intend -- or I would recognize an individual that
is being held as a pretrial detainee has rights to
medical care, and if those needs are not being met, I
would expect that to be brought to the Court's attention
and addressed appropriately.

Similarly, if there are issues with regard to
the access to the courts and discovery, I would expect
that issue likewise to be brought to the Court if a
satisfactory resolution cannot be reached.

But I do see those as separate and apart from

1  the risk of flight here that is the primary reason that

2  the Court is denying the pretrial release at this point.

3          I have considered as well the nature and

4  seriousness of the danger to any person or the community

5  that would be posed by the release here, and I do find

6  that that is a factor that warrants the continued

7  detention of Mr. Wells during the course of this second

8  proceeding.  And I say that having looked at the facts

9  of the crime as alleged by the government, the probable

10 cause basis for that case to proceed, and ultimately the

11 fact that a group of jurors heard evidence, albeit heard

12 evidence that the Ninth Circuit said should not all have

13 been presented, but did all find beyond a reasonable

14 doubt that Mr. Wells had committed the crimes that he

15 was charged with.

16          So it is for those reasons that the Court finds

17 by a preponderance of evidence that there is a risk of

18 flight here.  And in terms of the proposed plan of

19 release with respect to Ms. Wells, whether or not -- I

20 would tend to concur with the government's observation

21 and probation that there is no release plan that would

22 really be workable in this case, and so the suitability

23 of Ms. Wells is not the underlying basis for the Court's

24 determination here.

25          Albeit, that being said, I do see in the unique

facts of this case that Ms. Wells would not be an
appropriate third-party supervisor.  She certainly has a
strong belief in her husband's innocence, which the
Court respects her right to that belief, but in terms of
ensuring that Mr. Wells is present at court proceedings,
that belief runs the risk here of interfering with the
assurance that Mr. Wells would be at court proceedings.

So that forms the basis of the Court's
determination.  Either factor is a basis for the denial
of the pretrial release, and here it is the risk of
flight.  And the danger to the community is a factor as
well that I have considered, but the primary issue at
this point given where the case is procedurally is the
risk of flight.

And so I do find that there is no combination
of conditions that would reasonably assure the
appearance of the person as required for continued
proceedings.

Questions or clarification regarding the
Court's order, Mr. Colbath?

MR. COLBATH:  No, Your Honor.

THE COURT:  Questions or clarification?

MR. SKROCKI:  No, Judge.

THE COURT:  All right.  Then we have a next
date in several weeks.  We set our next hearing in this

1   case for a status.  We'll take up the case at that point

2   in time.

3           If there is nothing further, we'll stand in

4   recess at this time.

5           DEPUTY CLERK:  All rise.  This matter is now

6   adjourned.  Court stands in recess until 3:45 p.m.

7           (Proceedings concluded at 10:46 a.m.)

8

9                      CERTIFICATE

10      I, Sonja L. Reeves, Federal Official Court Reporter
    in and for the United States District Court of the
11  District of Alaska, do hereby certify that the foregoing
    transcript is a true and accurate transcript from the
12  original stenographic record in the above-entitled
    matter and that the transcript page format is in
13  conformance with the regulations of the Judicial
    Conference of the United States.

14
        Dated this 15th day of April, 2020.
15

16
                        /s/ Sonja L. Reeves
17                      SONJA L. REEVES, RMR-CRR
                        FEDERAL OFFICIAL COURT REPORTER
18

19

20

21

22

23

24

25