1            UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF ALASKA
2

3   UNITED STATES OF AMERICA, )
                             )
4        Plaintiff,          )
                             )
5   vs.                      )   CASE NO. 3:13-cr-00008-SLG
                             )
6   JAMES MICHAEL WELLS,     )
                             )
7        Defendant.          )
    _____)
8

9      TRANSCRIPT OF ORAL ARGUMENT ON MOTIONS IN LIMINE
    **BEFORE THE HONORABLE SHARON L. GLEASON, DISTRICT JUDGE**
10              April 22, 2019; 1:34 p.m.
                   Anchorage, Alaska
11

12  **FOR THE GOVERNMENT:**
         Office of the United States Attorney
13       BY:  STEVEN SKROCKI
         BY:  CHRISTINA M. SHERMAN
14       BY:  KELLEY L. STEVENS
         222 West 7th Avenue, #9
15       Anchorage, Alaska 99513
         (907) 271-5071
16

    **FOR THE DEFENDANT:**
17       Office of the Federal Public Defender
         BY:  GARY GEORGE COLBATH
18       601 West 5th Avenue, Suite 800
         Anchorage, Alaska 99501
19       (907) 646-3400

20       Camiel & Chaney, P.S.
         BY:  PETER A. CAMIEL
21       520 Pike Street, Suite 2500
         Seattle, Washington 98101
22       (206) 624-1551

23  _____

          **SONJA L. REEVES, RMR-CRR**
24        Federal Official Court Reporter
          222 West 7th Avenue, #4
25        Anchorage, Alaska 99513
    Transcript Produced from the Stenographic Record

1           (Call to Order of the Court at 1:34 p.m.)

2           DEPUTY CLERK:  All rise.  Her Honor, the Court,

3   the United States District Court for the District of

4   Alaska is now in session, the Honorable Sharon L.

5   Gleason presiding.

6           Please be seated.

7           THE COURT:  Good afternoon.  We're on record in

8   *United States versus Wells*.  Mr. Skrocki is here with

9   Ms. Sherman, and then Mr. Colbath, Mr. Camiel,

10  Mr. Wells.  And it's the time set for a hearing on two

11  motions.

12          I want to do something that I don't always do,

13  but it seemed appropriate today.  I'm going to give you

14  what I will term tentative thoughts on each of these

15  motions and then give each party an opportunity to take

16  a short break so you can discuss among yourselves, your

17  team, how you wanted to frame your oral arguments.  So I

18  thought that would be the most helpful way to proceed.

19          Anything we need to take up before I do that,

20  Mr. Skrocki, from the government, or Ms. Sherman?

21          MS. SHERMAN:  No, Your Honor.

22          THE COURT:  Anything we need to take up,

23  Mr. Camiel?

24          MR. CAMIEL:  No, Your Honor.

25          THE COURT:  Very good.  I think this approach,

in my mind, makes sense because I have the benefit of an opinion and mem dispo for that matter from the Ninth Circuit, which I have carefully reviewed, as well as the parties' arguments and case citations.

On the first motion, the one at 943, the motion to exclude other act evidence, the 404(b) motion, I suppose that the Ninth Circuit's opinion on this topic may not be a mandate, but I certainly see that the circuit court's directive or holding would make it probable that the Court would admit each of the prior acts that were identified by the Ninth Circuit and discussed in its opinion, and that, of course, would exclude the 2003, which I understand the government does not intend to introduce in any event here.

And I reached that conclusion, and I would be interested in the parties' arguments addressing the import, if any, of the fact that in the prior trial the defendant did not object to the admission of the personnel file, here there is that objection, and how that interplays.

But why I came away reading the Ninth Circuit opinion with the view that the prior acts would likely be admitted is because not only did the Court address the 404(b), but it undertook a de novo review under 403, and that, to me, is a fairly clear indication that there

is a dispositive determination by a higher court fact
specific to this case.

But like I say, the query I have would be with
the interplay on the personnel records.  And partly
that's due to my lack of familiarity with the testimony,
which was also admitted.  I don't know how much of that
was objected to, but which also supported, as I
understand it just from the Ninth Circuit opinion,
supported the holding of its admissibility, upholding of
its admissibility by the Ninth Circuit.

Those are tentative thoughts with regard to the
first motion which was the 404(b).

On the second motion, the 404(a), I would say
this one is more tentative if we're on the tentative
scale, but how I see it as follows, and then I'm, of
course, interested in each side's arguments:

I would be disinclined to grant the defense
motion to the extent that it is seeking, as I understood
the pleadings, almost a sterilized presentation where
there would be no evidence at all about the workplace
environment.

I instead see the Ninth Circuit as directing
this Court to allow some limited evidence regarding the
workplace environment to be presented.  It is -- and the
reason I stated at the outset on this motion that the

ruling is more tentative is that, as I'm sure counsel
are well aware, the Ninth Circuit's holding in that was
reviewing under a plain error standard, not on the
lesser standard.

And so my tentative thoughts on this would be
that insofar as the defense sought a complete
prohibition on the workplace background, that would
likely be denied, but that it may entail parsing the
testimony from the first trial.

And in the Court's view, logically this task
would begin with the defense to delineate those portions
of the testimony on the 404(a) that came in in the first
trial that should not be in the defense view presented,
and then having the government respond to what is
delineated, with the understanding, and I could go back
and find, and perhaps I will when we take the short
break, the language in the circuit court decision that I
found persuasive was where it talked about in a
workplace double homicide prosecution there needs to be
some -- and I'm paraphrasing -- some recognition or
leeway or ability for the government to be able to
present this type of background.

On the other hand, an example of what I read
from the Ninth Circuit opinion would not be permissible
is a lay opinion that Mr. Wells was a narcissist or some

type of psychological definition.  Where you draw the
line as between a complete ban, which I don't see,
versus psychological testimony by a non-psychologist is
what I am interested in hearing your thoughts on, so
I'll ask the defense first since it's your motions.

        Before we take a short break here, questions or
clarification on my tentative thoughts, Mr. Camiel?

        MR. CAMIEL:  No, I think we understand where
you're going.

        MS. SHERMAN:  No, Your Honor.  Thank you.

        THE COURT:  Five, ten minutes sufficient for
both sides?

        MS. SHERMAN:  Certainly.

        MR. COLBATH:  Ten, Your Honor.

        THE COURT:  Ten.  Very good.  Let's go off
record.

        DEPUTY CLERK:  All rise.  Court stands in a
brief recess.

        (Recessed from 1:42 p.m. to 1:59 p.m.)

        DEPUTY CLERK:  All rise.  Her Honor, the Court,
the United States District Court is again in session.

        Please be seated.

        THE COURT:  All right.  We are back on record.
Mr. Skrocki, Ms. Sherman, ready to proceed?

        MS. SHERMAN:  Yes, Your Honor.

```
 1           THE COURT:  Mr. Camiel?
 2           MR. CAMIEL:  Yes.
 3           THE COURT:  Very good.  They're your motions.
 4   Go ahead, please.
 5           MR. CAMIEL:  Your Honor, understanding the
 6   Court's tentative ruling, I'll start with the other act
 7   motion that we filed.  It's important I think for the
 8   Court to keep in mind the lens through which the Ninth
 9   Circuit analyzed the other act evidence.
10           And the Ninth Circuit was very, very specific
11   in indicating not only did the defense not object to
12   most of the other act evidence that came in, but they
13   noted that the defense affirmatively put in and opened
14   the door to other act evidence referring to Mr. Wells'
15   work performance.
16           And there were -- there is testimony about his
17   evaluations.  In opening statement and then throughout
18   the trial, the defense affirmatively putting in this
19   evidence.
20           So when the Ninth Circuit took a look at this,
21   although they didn't, in the context of the other act
22   evidence, use the -- they didn't state, "We're using the
23   plain error standard of review," they acknowledged there
24   is no objection to this and the defense was putting it
25   in.  In fact, they talked about the defense taking
```

1  inconsistent positions by arguing that this kind of

2  information couldn't come in when the defense was

3  bringing in basically workplace performance and

4  job-related information that the defense thought was

5  favorable.

6          THE COURT:  So let me ask, Mr. Camiel, looking

7  at both these motions, from the defense perspective, is

8  what you envision a trial in which there is zero

9  discussion of the workplace, the job, who does what, who

10  got along with who?

11          MR. CAMIEL:  Not at all, no.

12          THE COURT:  What do you envision then?

13          MR. CAMIEL:  Well, in terms of the workplace,

14  there is nothing wrong with people coming in and

15  testifying about what different individual's job duties

16  were, if people got along with other people.  We haven't

17  objected to those kinds of things.

18          In terms of the kinds of things we're objecting

19  to are what the government is calling workplace

20  incidents or disciplinary incidents that really have

21  nothing at all -- first of all, they are very discrete.

22  And I can go through each one of them and we can talk

23  about them, but they are not really descriptive of the

24  workplace environment at all.

25          THE COURT:  Setting aside the 404(b), what is

it in the 404(a) that you're seeking to exclude then,
because I hear you saying you don't have a problem with
discussion of who did what and who got along with who.

MR. CAMIEL: What we're seeking to exclude are
things where people come into court and characterize
Mr. Wells' character in a negative way, where they say
he was a narcissist, and you already referred to that
indicating that that kind of lay opinion shouldn't come
in, and we agree.

People calling him conceited. People saying he
was difficult. People saying those kinds of character
things. It's different to say, "He did his job, he
didn't do his job," or "He was late coming to work," but
when you start using characterizations, terms like
"conceited," "narcissist," "difficult," that's
different.

And that's not describing the workplace, that's
describing Mr. Wells and a character trait of his as
perceived by somebody in a negative way. And that's
different than talking about the general workplace
environment.

I mean if they had evidence, for example, that
Mr. Wells didn't get along with one of the victims, and
they don't, but if they did, that would certainly be
relevant. Instead they are having people come in and

1    just give generalizations about their opinion of his

2    character, and that's --

3           THE COURT:  It seems almost that the defense

4    approach would potentially invite the inclusion of more

5    prior acts then as opposed to opinions without

6    necessarily the factual basis being presented, meaning

7    be careful what you ask for.

8           MR. CAMIEL:  Well, I'm not trying to open the

9    door to the other acts, because I think --

10          THE COURT:  Here is my thought, and how I read

11   -- more importantly, how I read the Ninth Circuit, and I

12   know you wanted to start with the other acts and I have

13   segued into the 404(a), which to me is, like I say, the

14   harder issue, but one thing for a person to get up and

15   say, "I found it very difficult to work with Mr. Wells

16   in the workplace," and all right, and there is no basis

17   for the opinion expressed, just that opinion.

18          Well, I don't see the Ninth Circuit, at least

19   my reading so far of this opinion, don't see the Ninth

20   Circuit necessarily precluding a follow-up question to

21   support, in essence, lay the foundation for that lay

22   opinion.  "Why would you say he was difficult?"  "Well,

23   there were these 18 experiences."

24          I see at least some willingness or directive on

25   the part of the circuit to allow, perhaps not 18, but

1     that evidence.

2             MR. CAMIEL:  Well, I guess the problem is when

3     you have somebody come in and say, "He was difficult to

4     work with," how is that relevant, because everything has

5     to go back to how is it relevant to the charges in this

6     case and the accusation that he murdered these two

7     specific individuals.

8             Now, if there is testimony that he didn't get

9     along with Mr. Belisle or he didn't get along with Mr.

10    Hopkins, that's different, but some generalization that

11    he was difficult, I don't see how the Court can find

12    that that's relevant because that's the first step is is

13    there any probative value toward -- it's got to be

14    probative toward some issue in the case, which is did he

15    commit these crimes.

16            And so I think we're trying to get the Court to

17    understand that what they are trying to do we believe is

18    simply paint him as a bad employee.

19            THE COURT:  The language that I was rather

20    poorly paraphrasing earlier before our break is on page

21    926 of the opinion, which I read as I think the

22    government alluded to this in the 404(b) context, but I

23    saw it more in the 404(a).

24            "To the extent these witnesses," and referring

25    to co-workers, "had personal knowledge of the topics on

which they testified, this testimony provided background
information regarding Wells' relationships with his
co-workers, his working environment and his work
history, all of which is relevant in a workplace
homicide prosecution."

I read that sentence to envision some degree of
404(a) evidence being admissible as delineated there,
subject of course to 404(b).

We need whoever is on the phone to mute your
phone, please, with the youngster.  Thank you.  Go
ahead, please.

MR. CAMIEL:  Well, again, I think the Court is
making those statements under the lens of the defense
didn't object to this at trial, and so we're looking at
this as was it plain error.  And the problem is that
just because somebody, an employee thinks that Mr. Wells
was difficult, just generally he was difficult, how is
that relevant to the charge?

And I think the Court has to do that analysis
first.  I think that the Ninth Circuit --

THE COURT:  I have the Ninth Circuit telling me
it's relevant, Mr. Camiel.  "Background information
regarding Wells' relationships with his co-workers is
relevant in a workplace homicide prosecution."

It's rare that I have controlling Ninth Circuit

1   authority in the same case.

2          MR. CAMIEL:  If you look at the language that

3   you just read, talking about his relationships with his

4   co-workers, and I don't hear -- there wasn't

5   testimony -- I don't recall any testimony in my review

6   of the transcript that he had bad relationships with any

7   of his co-workers other than, you know, that he was

8   criticized from time to time by his supervisor, but not

9   by the people he -- not by the people he worked side by

10  side with.  And so I think it gets back to that.

11         THE COURT:  What about going back to this

12  proposal I had, and maybe if -- maybe it is too broad a

13  brush here, but to have the defense identify the

14  testimony that came in in the prior trial that you find

15  objectionable.

16         That would be -- I'm not fully aware of the --

17  I'm relying on the Ninth Circuit's summary of the

18  testimony rather than the testimony itself, and maybe

19  that would help.  I'm sure it would help me delineate a

20  ruling that would be helpful to both sides as to what

21  can come in and what can't.

22         MR. CAMIEL:  I think in our motion we actually

23  had transcript cites, but I can go back -- I think I had

24  reported proceeding cites as to each one of the areas.

25  I think I had --

```
1              THE COURT:  I remember reading there was two

2    days of other acts evidence, but in terms -- and I read

3    excerpts, but I did not go back.  And if your

4    representation is you object to solely what you

5    indicated in your motion, then I can rely on that.

6              If that's not the case, then now is the time to

7    let me know.

8              MR. CAMIEL:  Your Honor, we're happy to

9    supplement it, but I think if the Court looks at

10   Document 945, which is our motion on the character

11   evidence --

12             THE COURT:  Right.  Uh-huh.

13             MR. CAMIEL:  -- and on page two.

14             THE COURT:  I have got it right here.

15             MR. CAMIEL:  I think we have -- we had cites to

16   the transcript and then in the footnote the actual

17   testimony.

18             THE COURT:  I see that.  But are you saying

19   that's the entirety of the objection?

20             MR. CAMIEL:  That's what we raised in our

21   motion, yes.

22             THE COURT:  So this -- and I don't mean to --

23             MR. CAMIEL:  If the Court wants us to

24   supplement it, we can.

25             THE COURT:  I only want to rule on this once,
```

hopefully.  If this is the entirety of the objectionable statements, that's fine, I'll work from this.  I read these more as examples.

MR. CAMIEL:  Your Honor, this is what we objected to, and I tried to lay it out.

THE COURT:  So this is the entirety of the objection on the 404(a) is on page two of 946?

MR. CAMIEL:  That's right.

THE COURT:  That's very helpful.  Then I can go from there and I can hear the government's response on that.  Go ahead, Mr. Camiel.

MR. CAMIEL:  Your Honor, if I can, I wanted to get back to the 404(b) other act evidence.  And I think it's also important that the Ninth Circuit ruled that this other act evidence was not inextricably intertwined.  They said none of this, so they were not just talking about the 2003 incident, they were talking about all of the other acts, they said none of it has any direct bearing on the crime charged.

THE COURT:  They said it was not inextricably intertwined, let's put it that way.  Is the "bearing" language from the case law, or is it --

MR. CAMIEL:  I think that's right in the case, Your Honor.

THE COURT:  All right.  I have got it here.  I

1   seized on that because they said it's relevant.

2   MR. CAMIEL:  Well, they said it was relevant,

3   but they were talking about it in terms of 404(b), and

4   the government made an argument both on appeal and then

5   again in their briefing where they again tried to argue

6   that this was inextricably intertwined.

7   THE COURT:  I saw them making that -- I see

8   this -- Mr. Camiel, I agree with you that the

9   inextricably intertwined theory has been rejected by the

10  Ninth Circuit with regard to the other acts.

11  I see it as coming in, if at all, to prove

12  motive under 404(b), or to support a finding of motive.

13  MR. CAMIEL:  And I think if the Court looks at

14  page 929 of the court decision, what they said, and I'm

15  quoting is --

16  THE COURT:  Can you hold on just a moment?  I'm

17  having trouble finding --

18  MR. CAMIEL:  It's at the top of that page.  It

19  says, "Here none of the other acts bears directly on the

20  crimes charged or has the requisite contextual or

21  substantive connection."

22  THE COURT:  Right, "to be categorized as

23  inextricably intertwined," so it's bears directly versus

24  indirectly.

25  MR. CAMIEL:  So the only reason it should come

1  in then under the government's theory is its motive, not

2  as substantive evidence, but as evidence of motive.  And

3  so what that also means is that as this evidence comes

4  in, if the Court allows it in, as to each and every

5  witness, every time a witness takes the stand and starts

6  talking about one of these events, we're going to be

7  asking the Court for a limiting instruction because

8  there is a very limited purpose under which it comes in.

9       The other thing that the Ninth Circuit said was

10  the Ninth Circuit said the government was painting its

11  motive theory too broadly.  And in finding -- and I

12  would go back to talking about the fact that they are

13  making all of these findings that it's not inextricably

14  intertwined, that the government's theory is too broad

15  under the guise of the defense not even objecting to it

16  at the time of trial.

17       And our position is that when they made their

18  403 analysis, that was based on there being no objection

19  and the defense affirmatively trying to use the same

20  type of evidence. And so what we think --

21       THE COURT:  Would you agree if I get past the

22  404(b) issue that this Court is bound by the Ninth

23  Circuit's 403 analysis?

24       MR. CAMIEL:  No, not at all.

25       THE COURT:  How could that be when it's a de

```
 1  novo review of 403?  That would seem, if there was a
 2  mandate, assuming I reach that point, that I don't see
 3  what authority this Court would have to disregard that.
 4          MR. CAMIEL:  Well, for two reasons.  First,
 5  because when the Ninth Circuit looked at this, as I keep
 6  repeating myself --
 7          THE COURT:  That's all right.
 8          MR. CAMIEL:  -- they were looking at it as
 9  evidence that came in that wasn't objected to and that
10  the defense was affirmatively trying to use.
11          If the defense is affirmatively trying to use
12  the same kind of evidence, I'm not sure how you can find
13  that it's unfairly prejudicial when the defense is
14  trying to use the same evidence.  That was the context
15  of the first trial.
16          THE COURT:  That's helpful.  That's a valid
17  point.
18          MR. CAMIEL:  So what we think this Court needs
19  to do is to each one of these other acts that the
20  government wants to introduce, the Court needs to take
21  them individually.  And one of the things the Ninth
22  Circuit did unfortunately was they really lumped these
23  together and they took the 2003 incident and put it
24  aside because of its remoteness in time, and then they
25  looked at all the others together, but we think this
```

1   Court needs to individually look at each one of these
2   incidents and as a starting point decide is it relevant,
3   is it probative and, and how much probative value does
4   it have.
5          And then from there, if the Court finds there
6   is some probative value, then the Court has to decide
7   whether it is substantially outweighed by one of the 403
8   -- do a 403 analysis, and we get into kind of mini
9   trials.  And 403 doesn't just deal with unfairly
10  prejudicial, confusing the issue.
11         So I think a good example is like the fuel card
12  incident.  So you have this issue about the misuse of
13  the fuel card.  And Mr. Wells is given a letter, a
14  caution about a fuel card based on an investigation that
15  was inconclusive, and we have a letter, the actual
16  letter.  What it says is it says this is not a
17  disciplinary finding and this won't even be put in your
18  personnel file.
19         THE COURT:  Where would I find that letter in
20  the record?  I saw the references in the briefing to it.
21  If you don't have it handy, you can do a notice that
22  just gives me that in the next day with no briefing, but
23  just identify.
24         MR. CAMIEL:  I'm not sure that it's in the
25  record as such, but we can get it to the Court.

1          THE COURT:  If it's not in the record, then why

2   would we submit it now?

3          MR. CAMIEL:  Because I think it goes to the

4   Court's evaluation when you start letting this in of

5   what -- if it comes in, what happens as a result of

6   that, because then we get a confusing of the issues

7   because then the defense has to start getting into what

8   does this mean.

9          And just -- if I can, I just want to read you

10  what the last part of the letter says.  It says, "This

11  letter is non-disciplinary and will not be placed in

12  your official personnel record."

13         THE COURT:  So maybe that particular incident

14  doesn't meet the four-factor balancing -- or four

15  requirements that are laid out for this evidence,

16  although I thought the Ninth Circuit explicitly said

17  each of the incidents except the '03 did meet those four

18  factors.

19         MR. CAMIEL:  Because I think the Ninth Circuit

20  didn't go through them individually the way we're -- the

21  way we believe this Court needs to look at each one of

22  these, because there are --

23         THE COURT:  It's troubling though when there is

24  a mandate that would appear to rule against you on this

25  issue.  It doesn't say, "Go back, Judge Gleason," or

whoever tries this on round two, "and re-weigh all the

four factors."  Instead it says, "Here is how we weigh

the four factors or the four requirements and we find

that for all the '03 incident."

MR. CAMIEL:  That's exactly what they did,

given what they had in front of them at the time.  But

we're presenting a different case to the Court, because

we don't plan to be going into character or opening the

door in the same way as the first defense did.

The other thing that I wanted to point out,

because I think it's important as the Court looks at

these, is the Ninth Circuit said a number of things.  In

excluding the 2003 incident, they excluded it because

they said it was too remote in time, but then they

excluded it for other reasons as well.

And one of the things that they said about it

was that it didn't have any connection to the victims.

And one of the arguments we're making as to most of it,

if not all of the other act matters that the government

wants to get into, is similarly they don't have any

connection to the victims.

THE COURT:  I guess it depends how you

characterize the government's motive theory on that.  I

understand there to be -- I'll hear from the government

on it, but go ahead.

 1          MR. CAMIEL:  Well, then the government's theory

 2    gets back to what the Ninth Circuit criticized as being

 3    too broad.  You know, the Ninth Circuit said that it's

 4    too old, it doesn't have any connection to the victims,

 5    and it doesn't have any connection to the crime itself.

 6          And that's the argument that we think this

 7    Court -- or the analysis that we think this Court needs

 8    to go through with each and every one of these.  I know

 9    that it's a burden on the Court to have to do that, but

10    we believe in the context of this case that's now before

11    the Court, the Court does need to do it, and not only do

12    the 404(b) analysis, but then do a 403 weighing of each

13    one of these.

14          Because what we expect to happen if the Court

15    lets this in is not only is it going to lengthen the

16    trial because now we have to bring in evidence to

17    counter it, but at the end of the day this kind of

18    evidence -- the government is going to stand up in

19    closing argument and they are going to say, you know,

20    who had the disciplinary issues at work.

21          And we don't get to bring in disciplinary

22    issues of lots of other employees that may have similar

23    in their 20 years or whatever work history with the

24    Coast Guard, we don't get to bring that in because that

25    would be objected to by the government, and properly so.

 1    But they are going to stand up in closing and say, "Who

 2    had the disciplinary issues?  Who was the one who was

 3    receiving the letter of caution?"

 4         And that gets into misusing this evidence in a

 5    prejudicial way, because it's then really arguing

 6    propensity and going beyond the limited purpose, the

 7    motive purpose that the Ninth Circuit has limited them

 8    to.

 9         So I guess what we're saying is, Judge, this is

10    a new case, and while the Ninth Circuit ruled on what

11    was before them, you have got a different case in front

12    of you with a different defense.  We are raising

13    objections that weren't raised before, and in a retrial

14    we get to do that.

15         And just as the government could bring in

16    additional evidence or amend its theory or change its

17    presentation, we get to do that as well.  So we think

18    the Court needs to rule anew.

19         This isn't the same as, for example, a

20    suppression hearing where the facts haven't changed and

21    the Ninth Circuit upholds, for example, a suppression

22    issue and then the case comes back for a retrial because

23    of some other reason.

24         So while the Ninth Circuit ruling is important,

25    we think that the context is more important and it

requires you to go through things really de novo in terms of your assessment of each one of these.

THE COURT: Thank you, Mr. Camiel.

Ms. Sherman, go ahead, please.

MS. SHERMAN: So I apologize if my comments are scattered, but I want to kind of hit all of the questions the Court had.

You mentioned what the government's theory of motive is. And the Ninth Circuit opinion identified at 929 the government's motive theory, that Wells had frustrations beginning in 2011 with the change in the COMMSTA command, which placed unwelcomed pressure on him to conform to the change of command.

Due to those absences from work, he becomes increasingly frustrated by a loss of both professional independence and importance. His frustrations turn to anger and culminate in the murders of his co-workers, one of whom is his direct supervisor and the other of whom is the individual who appears to be taking over his job.

Hopkins was Mr. Wells' direct supervisor. He was at the meeting on the fuel card. He was involved in all of these decisions. Reckner's direction -- so Mr. Reckner was Mr. Hopkins' boss, and his direction came and filtered down to Wells through Hopkins, so he was a

1  direct supervisor.  He is right in the mix of all of

2  these events.

3          So is Mr. Belisle.  He's directing the

4  non-rates, the new Coast Guard employees about cleaning

5  out the warehouse.  He wrote a statement, along with

6  Mr. Hopkins and Mr. Wells, about what happened to the

7  fuel card.  And command disbelieved what Mr. Wells wrote

8  and appeared to adopt and believe what Mr. Hopkins and

9  Mr. Belisle wrote.

10         THE COURT:  Is that in the record, any of that?

11         MS. SHERMAN:  It was in the first trial record,

12 Your Honor.

13         THE COURT:  All right.

14         MS. SHERMAN:  The basis that -- I believe it

15 was admitted that they each made statements regarding

16 that, and Mr. Wells' statements were not consistent with

17 the surveillance was where that investigation --

18         THE COURT:  Am I hearing that you agree with

19 the defense, that I should look behind the Ninth Circuit

20 ruling and look at each of these acts, because I

21 haven't?

22         MS. SHERMAN:  Okay.  I think that you, Your

23 Honor, to make a reasoned and informed decision need to

24 review these.

25         THE COURT:  Well, I don't have that.  Nobody

has provided it to me, but I have done a fair amount of looking at the law of mandate when a matter is remanded, and I would be curious as to its direction, because in my mind, it would be a misfortune all around to have -- well, in any event --

MS. SHERMAN: Your Honor, I think you are in a unique position that most judges that don't find themselves in. I think the Ninth Circuit very clearly wrote their opinion anticipating a retrial and providing you guidance.

THE COURT: What I hear you saying is you agree with Mr. Camiel, and don't let me put words in your mouth, but you agree with Mr. Camiel that I should look at each of these 404(b) acts anew and determine whether or not they should be -- and arguably, I understood Mr. Camiel's point, even if not explicit in the Ninth Circuit, maybe it was a plain error analysis in light of the personnel records, in which event it may well be required to be reassessed.

Is there agreement there, or do you want to confer? I don't want to put words in anybody's mouth.

(Pause)

MS. SHERMAN: Your Honor, we think that you need to review the trial transcript, review these events as they were set out, because Mr. Camiel is basing his

argument on what was presented at the first trial.  The
evidence at the second trial presented by the
government, the witnesses will testify mostly
consistently.  They have to have their recollection
refreshed, but the Court needs to make an assessment of
these events.

THE COURT:  How do I assess the fact that the
Ninth Circuit made a de novo 403 analysis of each of
these acts and said it passes the balancing test?  Do I
rebalance it?

MS. SHERMAN:  I think that the Court can rely
on the Ninth Circuit, and the Court should --

THE COURT:  The question I have is:  Must I
rely on the Ninth Circuit?  Would it be an error for
this Court to disregard a de novo ruling?

I understood Mr. Camiel's position of no,
because for a number of reasons that he articulated,
that there were different theories presented by each
side, but that's my question.  And --

MS. SHERMAN:  So I think if the Court is to do
the 404(b)(2) analysis and does the three-part test set
out by the Ninth Circuit and reaches the same conclusion
that these are relevant --

THE COURT:  I thought it was a four-part test.

MS. SHERMAN:  It is, but the last part only

relates to intent, so I keep saying three-part. If the
Court does that and reaches the same conclusion that
each of these are relevant and admissible to prove
motive, that they are not remote in time and that the
evidence is based on reliable evidence, that it's going
to be proved through testimony or documents, those sorts
of things, if the Court reaches that, then the Court can
rely on the de novo review and say they have already
done the 403 part of that, because once you reach under
that four-part, three-part test that something is
admissible, the only basis for exclusion is 403, and
that comes from *Curtin*.

THE COURT: So where in the record would I find
the evidence that each side seeks to have the Court
consider on the 404(b)?

MS. SHERMAN: So I think that if the Court is
seeking specific excerpts from the transcripts, I know
they are part of the docket, but the parties can
certainly direct --

THE COURT: Nobody has done that.

MS. SHERMAN: I recognize that. I think what
was unclear to us today was that the Court has not done
an in-depth review of the first trial transcript as we
have and that you have relied on the Wells' decision.

So I think that supplemental briefing in that

1  regard --

2      THE COURT: My intent is not to read the entire

3  transcript of the first trial, but to have the parties

4  for each motion that comes before me tell me where I

5  need to go to review it.

6      If I hadn't made that clear, that was my

7  expectation. But that's good. We can set a timeframe

8  to do that.

9      With regard to the 804(a), if you look at page

10  two of Docket 946, does the government seek to introduce

11  -- if you need a moment to confer, the question is:

12  Would you be planning on presenting all of the same type

13  of testimony, or are there parts where the government

14  would indicate we don't intend to ask whether another

15  co-worker viewed Mr. Wells as having a poor attitude,

16  just to give an example of one of the quotes there.

17      MS. SHERMAN: The government does intend to

18  introduce a majority of the evidence. I'm trying to

19  find -- it's at 926.

20      THE COURT: Docket 946, page two.

21      MS. SHERMAN: Yes, Your Honor. And that

22  laundry list that is listed by the defense is directly

23  quoted within the Wells' decision starting at 926.

24      THE COURT: Okay. So my question is: Do you

25  seek to present all of that evidence at the second

1  trial?

2          MS. SHERMAN:  All of the --

3          THE COURT:  Because that was a plain error

4  analysis that the Court upheld that in that case.

5          MS. SHERMAN:  Yes.  The government does seek to

6  introduce fact witnesses testifying to those facts, that

7  Mr. Wells did not -- appeared to be extremely

8  knowledgeable or appeared to think he was extremely

9  knowledgeable, those sort of things.

10         I want to clarify the record for the Court,

11  because all of these comments about Mr. Wells being a

12  narcissist that have been made in the motions, on

13  argument today, are not statements from any fact

14  witness.  If the Court -- I did a word search and

15  reviewed the first trial transcript.

16         The only mention of that in the trial

17  transcript was from Dr. Meloy, who is not testifying,

18  and in closing argument by government's counsel.  So

19  when we're talking about what a witness viewed, what a

20  person saw in their interactions with Mr. Wells, the

21  fact that he had a bad attitude sometimes at work, those

22  descriptions were made in reference to these other acts

23  and what was happening at the time.

24         And so that falls right under, as 926

25  continues, the improper admission of Dr. Meloy's

1 testimony doesn't render that otherwise relevant

2 evidence admissible. It's not character evidence. It's

3 evidence that the witnesses, with personal knowledge,

4 talk about background information, his relationship with

5 co-workers, his working environment, work history, all

6 of which the Court found relevant.

7 I know that it was in a plain error review, but

8 I don't think that that analysis changes. Those

9 witnesses in a case like this where the government's

10 theory is not that he killed Hopkins and Belisle because

11 he was mad at them, but that command was putting

12 pressure on him and all of this culminated in taking out

13 his direct supervisor and the other civilian who

14 appeared to be filling in and doing his job.

15 I think when the Court looks at those

16 statements, they describe what's occurring during the

17 course of that, since 2011, which was the timeframe that

18 the Ninth Circuit said was okay to talk about, within

19 that timeframe.

20 THE COURT: So just so I'm clear, you're not --

21 the narcissist quote is not from a co-worker?

22 MS. SHERMAN: I don't believe any fact witness

23 testified to that. I believe it was only Dr. Meloy.

24 THE COURT: So you're not planning on --

25 MS. SHERMAN: No.

1          THE COURT:  With regard -- it sounded like one

2     of the acts in 2011, 2012 you're not seeking to

3     introduce about property in the home.

4          MS. SHERMAN:  There was a lot of property at

5     Mr. Wells' home that had Coast Guard insignia on it.

6     We're not seeking to introduce that.  If that were to

7     change, we would make a motion well in advance of us

8     trying to introduce that, but at this point, we don't

9     seek to introduce that.

10          Other than that, the other acts are admissible.

11     When the Court does that test and finds they are

12     admissible, the Ninth Circuit says we already have done

13     403 for you.  You can rely on that because it was a de

14     novo review.

15          And the fact that the defense is not moving the

16     entire personnel record into the record doesn't change

17     that analysis in my opinion.  The first trial involved

18     personnel records I think dating a decade of Mr. Wells

19     was a good employee, here is all this stuff, here is all

20     this stuff from 2011.

21          The government isn't seeking to introduce a

22     decade of records, but the records from 2011 and 2012,

23     including the letter of expectation, the letter of

24     caution, the letter of expectation involved the tree

25     collaring incident and those sorts of things, those

pieces of the personnel record are relevant, even if the
defense objects.

So even if the defense objects, the Court can
still look at that and say, okay, I have this letter.
You're going to hear testimony from the commander who
said, "I issued this letter about the fuel card in
2011." He had a meeting in his office, Mr. Wells was
present, there were other supervisors present.

What's important is not here was this letter,
it was issued. Mr. Wells' reactions in those situations
are what become incredibly important in regards to
motive. When the commander stands up and goes to -- and
indicates meeting is over, when a commander in the Coast
Guard stands up, the meeting is over. Mr. Wells sat
there and stared at him. He didn't stand up. He didn't
leave. He stared at him, and he didn't want to sign the
letter.

So Mr. Wells' reactions during these other acts
are what's relevant. I think the defense would have a
better argument if Mr. Wells was given a letter of
caution and he said, "Yep, I'm real sorry," then maybe
he would have a better argument, but his reactions when
he becomes upset when Chief Reckner has a conversation
with him, when he becomes upset when he's given these
letters of caution and an expectation, when they clean

out the warehouse and throw away things that he wanted

to keep and he mutters something under his breath and

storms out, his reactions in those other act

circumstances is what makes them relevant to motive.

         And so we can certainly provide you with the

citations to the first trial transcript in regards to

our 404(b) notice and our opposition.

         THE COURT:  What about this fuel card letter?

What's your understanding of whether or not it's in the

Court's record at all?

         MS. SHERMAN:  I know that there was testimony

of it.  I don't recall if it was admitted as an exhibit.

If it was, I will provide the exhibit number.

         THE COURT:  How long would it take you to give

a summary of the trial transcript and exhibits with

regard to each of the 404(b) acts that you seek to

introduce?

         MS. SHERMAN:  No later than Friday.

         THE COURT:  Then I'll ask defense in a moment

as well.  And let me look at my other notes.

         Anything else you wanted to be sure to say?

         MS. SHERMAN:  Not unless the Court has

additional questions.

         THE COURT:  No, not at this time.

         Mr. Camiel, will Friday work for the defense as

1  well?

2         MR. CAMIEL:  Just because of other obligations,

3  I would ask for another week.

4         THE COURT:  Another week, next Friday, a week

5  from Friday?

6         MR. CAMIEL:  Right.

7         THE COURT:  Any objection there?  I think that

8  will give us enough time, since the motion was filed

9  early on here, so that would get us to May 3rd.  I don't

10  think there will be snow on the ground.

11         All right.  So each side -- no more argument

12  from either side, please, or explaining why you do feel

13  it's admissible or not.  Simply for each act where in

14  the record I could find the evidence that relates to

15  that specific act.

16         And there is no need for the defense to address

17  the property at home, bad acts, since I have heard now a

18  representation that that's not going to be pursued by

19  the government.

20         Mr. Camiel, further on the motions?

21         MR. CAMIEL:  If I can have a minute, Your

22  Honor.

23         (Pause)

24         THE COURT:  The clerk was saying before I had

25  said first defense and then plaintiff.  In terms of the

fact that all we're doing is designating what is in here
on the bad acts, I think simultaneous briefing will work
fine at this point on that topic.  Any disagreement with
that, Ms. Sherman?

MS. SHERMAN:  No, Your Honor.

THE COURT:  Mr. Camiel?

MR. CAMIEL:  Your Honor, as my co-counsel
points out, we haven't briefed as to each act, the
three- or four-part test.

THE COURT:  Now there is a certain irony is
that both sides come in and say, "Judge, you should have
done this," but none of you have, but I digress.

MR. CAMIEL:  I guess what we would ask to be
able to do is to submit to the Court not only the record
cites of the testimony where each act comes in, but a
brief argument as to each one using that test as to why
we think it shouldn't come in.

THE COURT:  If we did that, then I would see
staggered briefing to make more sense, because -- well,
it's the government that seeks to bring it in, but it's
the defense that seeks to exclude.  So how would you
propose the briefing be done on that, simultaneous or
staggered?

MR. CAMIEL:  I don't have a problem with
staggered briefing, Your Honor, if ours was due May 3rd

1    and then the government had time to respond.

2         THE COURT:  All right.  And then the other

3    question, and this is unrelated, is the 404(a) where you

4    have identified your objection, the quotes on page two

5    of Docket 946, but I wonder if there are pages before

6    and after that are relevant to that and would be

7    critical for the Court to address in order to be able to

8    rule on whether or not having a poor attitude was

9    admissible.

10        And so the only point, if there is more of this

11   testimony either in cross or direct or other places than

12   the one page you have given me for each of these that

13   would be helpful for the Court to review in order to

14   understand the full scope of this dispute, that would be

15   helpful.  Could you do that as well by next Friday?

16        MR. CAMIEL:  Yes.

17        THE COURT:  This is -- you understand what I'm

18   proposing there?

19        MS. SHERMAN:  Yes, Your Honor.

20        THE COURT:  And if you had a week after that,

21   would that be sufficient or would you need more time?

22        MS. SHERMAN:  Frankly, I think simultaneous

23   briefing should be fine.  The government issued a 404(b)

24   notice as well, and so I think if the parties just say

25   here is why it is and here is why it isn't, whether

1    under the four-part test, the Court can compare those.

2         I don't know if we necessarily need to respond.

3    We have already done the response just without the

4    citations to the first record.

5         THE COURT:  All right.  I assume no objection

6    to simultaneous.  I'll get everything May 3rd.  If I

7    feel that it would be helpful for me to have argument or

8    supplemental briefing from the parties, then I'll do a

9    notice.

10        Otherwise, I'll get each side's May 3rd and go

11   from there.  So the filings from each side will address,

12   first of all, with regard to the 404(b), each of the

13   acts that remain at issue, not the 2003, not the

14   property at the home, and the four-factor test with

15   citations to the record.

16        And then same with the quotes that are at

17   Docket 946, page two, each side to provide references

18   and then analysis as to why testimony of that particular

19   nature that's quoted there would be or would not be

20   warranted in the second trial.

21        All right.  Anything else we can take up on

22   these motions today, Mr. Camiel?

23        MR. CAMIEL:  No, Your Honor.  Thank you.

24        THE COURT:  Ms. Sherman?

25        MS. SHERMAN:  No, Your Honor.

1        THE COURT:  I will await that.  Do we have a

2    status hearing?  What's our next date?  Would it be

3    helpful to meet again before the final pretrial

4    conference?  I'm thinking it may very well be.  I didn't

5    bring in the deadlines because I know my trusty

6    courtroom deputy has them at her fingertips.

7        THE COURT:  So the next hearing is August 5th.

8    We put it on fairly early, that's right, even after I

9    moved the trial.

10       MR. COLBATH:  I can tell the Court that

11   currently we have a motion deadline of June 14th, a

12   motion -- well, we have both a regular motion and motion

13   in limine deadline.

14       THE COURT:  I believe they were, yes.  I don't

15   have the schedule.

16       MR. COLBATH:  We have motions deadlines, at a

17   minimum motions on June 14th.  I can tell the Court that

18   in the next 30 days we'll be filing two or three other

19   substantive motions similar to these relating to

20   experts, relating to other testimonial things.

21       And so I don't know if the Court wants to wait

22   to receive our motion and then set a deadline for --

23   well, we have already talked about, two weeks to

24   respond.

25       THE COURT:  Is there a reply in this case

1    that's written in or no?  I don't recall.

2         MR. COLBATH:  One week.  Replies are due in one

3    week.

4         THE COURT:  So it would be June 28th.  That

5    would get us to July 5th.  So if we were to have a

6    hearing --

7         MR. COLBATH:  I would suggest --

8         THE COURT:  When are you gone?

9         MR. COLBATH:  I'm assisting Ms. Staft,

10   co-counsel in a two-week trial that starts mid July.

11        THE COURT:  Could we do July 11th?

12        MR. COLBATH:  I would suggest a June hearing.

13        MR. SKROCKI:  I'm the one gone in July.

14        THE COURT:  Sorry.  I knew it was somebody was

15   gone a long period of time.  Can we move up the deadline

16   for the motions?  If you want the hearing in June, that

17   would be necessary.  Mr. Colbath?

18        MR. COLBATH:  When was -- first of all --

19        THE COURT:  The best time for the Court,

20   although people I know are traveling, but that week of

21   July 1st I'm not going to be in trial.  That much I

22   know.

23        MR. SKROCKI:  Sure, July 1st is fine.

24        MR. COLBATH:  That wouldn't require a change in

25   the deadlines.

1      THE COURT:  It would require a change in the

2  deadlines, because June 14th, June 28th, July 5th.  We

3  need the reply before the hearing, and I would like

4  several days to read it all before the hearing.

5      MR. COLBATH:  I guess if we bumped everything

6  forward a week, motions June 7th, then we would have two

7  weeks and one week.

8      THE COURT:  June 7th, all right.  Then

9  June 21st, then June 28th.  How about if we did July 2nd

10  for a hearing on all then pending motions?

11      And I would strongly urge the parties to get

12  documents filed sooner.  I have never known lawyers to

13  do that.  Well, you did in this case, got your motion

14  in.  Everybody waits.  If I had more time, I could do a

15  better review for both sides.

16      MR. COLBATH:  We intend on filing as early as

17  some other motions beginning next week.

18      THE COURT:  I changed the order so now the

19  deadlines are two weeks from filing so that should help.

20      July 2nd at 9:00 a.m. hearing on all pending

21  motions.  What I would ask is when you file your reply

22  that you give, or even with the motion, an estimation of

23  the amount of time if there was to be a request for any

24  evidentiary hearing as opposed to oral argument so that

25  I know how much time to set aside on that day.

1        And the government can weigh in on that as well

2  if there is any evidence that the government was

3  intending to produce on motions that you don't know yet

4  may or may not be filed, but in your opposition that

5  would be helpful.

6        MR. SKROCKI:  Yes, ma'am.

7        THE COURT:  So 9:00 a.m. July 2nd I'm hearing

8  everybody is available.  We'll have a continued status

9  hearing and take up oral argument on any motions then

10  pending, and, as needed, any evidentiary hearings.

11        And then we'll keep on that August date and

12  address it as necessary on July 2nd.

13        Anything else, Ms. Sherman?

14        MS. SHERMAN:  No, Your Honor.

15        THE COURT:  Mr. Colbath, Mr. Camiel?

16        MR. CAMIEL:  No, Your Honor.

17        THE COURT:  Very good.  I'll look forward to

18  your additional filings, and I'll see you all on

19  July 2nd.  We'll go off record at this time.

20        DEPUTY CLERK:  All rise.  This matter is now

21  adjourned.  Court stands in recess until call of the

22  gavel.

23        (Proceedings concluded at 2:48 p.m.)

24

25

1                          CERTIFICATE

2        I, Sonja L. Reeves, Federal Official Court Reporter
    in and for the United States District Court of the
3    District of Alaska, do hereby certify that the foregoing
    transcript is a true and accurate transcript from the
4    original stenographic record in the above-entitled
    matter and that the transcript page format is in
5    conformance with the regulations of the Judicial
    Conference of the United States.

6

7        Dated this 15th day of April, 2020.

8

                            /s/ Sonja L. Reeves
9                           SONJA L. REEVES, RMR-CRR
                            FEDERAL OFFICIAL COURT REPORTER

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25