1              UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF ALASKA
2

3   UNITED STATES OF AMERICA, )
                              )
4          Plaintiff,         )
                              )
5   vs.                       )   CASE NO. 3:13-cr-00008-SLG
                              )
6   JAMES MICHAEL WELLS,      )
                              )
7          Defendant.         )
    _____  )
8

9              TRANSCRIPT OF EVIDENTIARY HEARING
      ON MOTION TO EXCLUDE THE APRIL 19, 2012 GOVERNMENT
10                DRIVING EXPERIMENT VIDEO
    **BEFORE THE HONORABLE SHARON L. GLEASON, DISTRICT JUDGE**
11                July 31, 2019; 9:10 a.m.
                    Anchorage, Alaska
12

    **FOR THE GOVERNMENT:**
13         Office of the United States Attorney
           BY:  STEVEN SKROCKI
14         222 West 7th Avenue, #9
           Anchorage, Alaska 99513
15         (907) 271-5071

16

    **FOR THE DEFENDANT:**
17         Office of the Federal Public Defender
           BY:  GARY GEORGE COLBATH
18         601 West 5th Avenue, Suite 800
           Anchorage, Alaska 99501
19         (907) 646-3400

20         Camiel & Chaney, P.S.
           BY:  PETER A. CAMIEL
21         520 Pike Street, Suite 2500
           Seattle, Washington 98101
22         (206) 624-1551

23   _____

              **SONJA L. REEVES, RMR-CRR**
24          Federal Official Court Reporter
              222 West 7th Avenue, #4
25             Anchorage, Alaska 99513
       Transcript Produced from the Stenographic Record

1                         I N D E X

2                     July 31, 2019

3    Witnesses:        Direct   Cross    Redirect      Recross

4    Daniel Reisberg   --         3        17            20

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Call to Order of the Court at 9:10 a.m.)

2          DEPUTY CLERK:  All rise.  Her Honor, the Court,

3   the United States District Court for the District of

4   Alaska is now in session, the Honorable Sharon L.

5   Gleason presiding.

6          Please be seated.

7          THE COURT:  All right.  Good morning.  We're

8   back on record here in the *Wells* case, and we're going

9   to continue on with cross examination.  Anything we need

10  to take up before that?

11         MR. SKROCKI:  Nothing from the Government, Your

12  Honor.  Thank you.

13         MR. COLBATH:  Nothing, Your Honor.

14         THE COURT:  Well, I'll remind you, sir, that

15  you're still under oath from yesterday's proceeding.

16  And, Mr. Skrocki, go ahead please, whenever you're

17  ready.

18         MR. SKROCKI:  Thank you, Your Honor.

19                    CROSS EXAMINATION

20  BY MR. SKROCKI:

21     Q.  Dr. Reisberg, good morning.

22     A.  Good morning.  It's "Reisberg," by the way.

23     Q.  Okay.  Dr. Reisberg, good morning.

24     A.  It's still good morning.

25     Q.  Yeah, it is.

1          Sir, you're recently retired from Reed College?

2     A.   That's correct.

3     Q.   Congratulations.

4     A.   Thank you very much.

5     Q.   A couple of questions for you, sir.  I won't keep

6     you on the stand for too long.

7          I've got your reports, Exhibit NN and OO, from

8     the defense.  Do you have those in front of you?

9     A.   Yes, I do.

10    Q.   Okay.  So one report is your initial report dated

11    February 2014 and the other is a supplement dated 26 May

12    of 2019.  Yes?  Do you have those in front of you?

13    A.   Yes.

14    Q.   You were asked a number of questions yesterday

15    about confirmation bias by Mr. Camiel.  And your

16    testimony in response to some of his questions, you

17    alluded to the blue vehicle as Mr. Wells' wife's

18    vehicle.  Do you recall that?

19    A.   I believe I said that, and that is my

20    understanding.

21    Q.   Who provided you that information that it was

22    Mr. Wells' wife's vehicle?

23    A.   To be honest, I'm not sure where I derived that

24    information.  It may have come from the testimony I

25    reviewed from the prior trial.  It may have come from

1   investigation reports.  I'm sorry, at this moment, I

2   don't remember where I got that information.

3       Q.  You're testifying as it's fact, aren't you?

4       A.  It is certainly my understanding.

5       Q.  Okay.  And you also testified yesterday as to the

6   video at issue here, the April 19th video.  You recall

7   that testimony?

8       A.  Yes, I do.

9       Q.  And you used the word "enhanced video."  Do you

10  recall using that phrase several times yesterday?

11      A.  I'm not sure if I used that word yesterday.  I

12  perhaps mistakenly used that word in my 2014 report.  My

13  understanding is that it's not an enhancement of the

14  original video from the day of the crime.  It's an

15  entirely new video.

16          Perhaps a better word would be to call it an

17  "alleged reenactment" or "supposed reenactment."  That

18  might be more accurate than calling it enhanced.

19      Q.  So if you used the word "enhanced" yesterday a

20  couple of times, you're saying that may not have been

21  the right word choice?

22      A.  That's right.

23      Q.  Sir, have you ever been qualified in federal

24  court to testify before a jury as to confirmation bias?

25      A.  Boy, I would have to think back over the years.

1    It is certainly true that I have been qualified to

2    testify in federal court.  I have been qualified to

3    testify about confirmation bias.

4         I'd need to go looking through my records to

5    think through whether I have been qualified for that

6    conjunction of that issue in federal court.  I believe

7    the answer is yes, but I'm not certain.  I would need to

8    go back and look at records.

9    Q.  Well, I mean, how many times would that yes have

10   been?  I mean one time?  Are you talking two or three

11   times?

12   A.  I believe I have only testified in front of a

13   federal jury perhaps three or four times.  Most of the

14   cases I participate in are state cases.

15   Q.  Right.  And with respect to your federal

16   testimony, you don't recall then offhand if any of your

17   -- you have been accepted as an expert and were able to

18   explain to the jury confirmation bias?

19   A.  That's right, I do not recall that at this

20   moment.

21   Q.  Let's just ask from the state perspective.  Have

22   you been able to testify to a state jury as to your

23   theories on confirmation bias?

24   A.  First of all, they are not my theories.  I'm

25   simply reporting the established claims that are well

1  documented in literature, but with that small

2  clarification, yes, I have many times been allowed to

3  testify about that topic to juries.

4      Q.  To juries.  Okay.  When was the last time you did

5  that, sir?

6      A.  Boy, it may very well have been -- I don't

7  remember exactly what topics we covered in which case,

8  but it may very well have been a state case in Anchorage

9  where the topic was confession evidence and the concern

10  about the role of confirmation bias in police

11  interrogations.  I believe, but I am not certain, that

12  that may be the most recent case.

13     Q.  So yesterday your testimony dealt with

14  confirmation bias and an analogy to photographic

15  lineups.  Do you recall that?

16     A.  That's one of the bases for analogies.  There is

17  other bases as well.

18     Q.  Sure.  And I'm not meaning -- I'm not trying to

19  trap you into a corner or anything.  This is the piece I

20  want to talk about right now.

21     A.  Okay.

22     Q.  So the lineup, the lineup piece, right, you

23  talked about that yesterday.

24         Now, photographic lineups are concerned with

25  making it happen quickly because of people's memories

1    and perception and things like that.  Is that relatively

2    accurate?

3       A.  No.  I mean in many cases photographic lineups

4    are administered weeks or months or in some of the cases

5    I have seen years after an event, so --

6       Q.  Okay.

7       A.  I mean the delay certainly varies enormously from

8    case to case.

9       Q.  But in this case, we're dealing with video

10   footage taken about a week apart, aren't we?

11      A.  Yes.

12      Q.  Okay.  So it's a photograph of what happened the

13   day at issue, the day of the murders, April 12th, right,

14   that's one video?

15      A.  Uh-huh.

16      Q.  And then a week later there is another video of

17   the reenactment, however you want to describe it, of

18   April 19th, right?

19      A.  That's right.

20      Q.  So we're not really concerned about people's

21   perceptions on memory as to a possible suspect in this

22   example, are we?

23      A.  I mean, let me echo that back just to make sure

24   I'm understanding.  If in fact we're talking about

25   people who can view the video from the 12th and the

1  video from the 19th within seconds of each other,

2  viewing one and then immediately viewing the next, then,

3  first of all, that does indeed minimize concerns about

4  memory loss because of the passage of time, because not

5  much time has passed.

6      There is however still a body of research that

7  examines pretty much exactly that issue, looking at how

8  accurate people are in making what is in essence a

9  side-by-side comparison and the role of bias even in

10  that setting.

11  Q.  A couple questions on that.  First, have you done

12  those studies yourself, or are you just reporting what

13  those studies have said?

14  A.  Certainly those studies are included within my

15  professional work, and so I mean those studies are

16  studies that I have written about, studies for which I

17  serve as editor, studies included in my teaching.

18      However, did I personally collect the data on

19  those studies?  No, I did not.

20  Q.  Okay.  And would it, in your view, lessen the

21  concerns on confirmation bias by the government playing

22  the date of the murders, April 12th, video first, and

23  then after that, soon thereafter during the course of

24  the trial playing the April 19th video?

25  A.  The fast answer is yes, that would in some ways

diminish the concern.  What one would want to ensure is
that the finder of fact had an opportunity to view the
earlier video, in essence make up their minds about the
video and only subsequently give the April 19th video.

        But let me race to say that even in that setting
the concern would be whether that sequence would have an
impact on the jurors' confidence in their comparison
since that's a scenario in which quite readily you could
get what is transparently referred to as confidence
inflation in which you're reassuring people, yep, that's
the right match, and so there would still be an impact
there, but less of an impact and less of a concern about
confirmation bias.

Q.  You recognize that the finder of fact in this
case is going to be the jury, right?

A.  I understand that.

Q.  And you have been in court several times so you
know how the system works in a trial?

A.  Roughly, yeah.

Q.  Absolutely.  Have you ever been a juror?

A.  No, I have not.

Q.  You have not?  Never had the experience?

A.  I would love to have the opportunity to sit on a
jury.  As you can imagine, given my professional work,
the odds of my sitting on a jury are quite low.

1    Q.  I made it.  It was very rewarding, so maybe some

2    day you will too.

3    A.  I hope to follow your lead.

4    Q.  Okay.  So my point of that being is that you

5    realize the jury is the finder of fact, but the judge in

6    this case, Judge Gleason, is the one that sort of

7    instructs the parties, the court and the jury as to the

8    applicable rules and what they should do or not do with

9    respect to evidence?  You understand that?

10   A.  I understand that.

11   Q.  Okay.  And I want to make sure I understand that

12   in your professional opinion, it may not be your

13   personal opinion, but your professional opinion is that

14   limiting instructions will not operate to eliminate in

15   any way confirmation bias?

16   A.  I mean, the evidence is in some ways mixed here.

17   I mean, there are a couple of studies, let's

18   acknowledge, in which instructions do seem to diminish

19   the effect of confirmation bias.

20        However, those studies are clearly a tiny number

21   relative to the broader number of studies in this

22   domain, and the effects are, at best, uncertain, uneven.

23   There is certainly no scientific basis for claiming

24   that, with any reliability, some sort of limiting

25   instruction, no matter how persuasive, will eliminate

1   concerns about confirmation bias.

2       Q.  And if I'm accurate, that's your professional

3   opinion, right, versus personal?

4       A.  Again, that's my understanding of the available

5   scientific evidence.

6       Q.  Do you have a personal opinion as to whether a

7   limiting instruction would remedy some of your concerns?

8       A.  I mean, I do my best to be respectful of the

9   data, and, therefore, my personal opinion would be in

10  line with my reading of the overall pattern of evidence.

11  And so my personal opinion would be pretty much along

12  the lines of what I just said.

13      Q.  So the answer is yes, you agree with the

14  professional analysis that -- you personally agree that

15  there is no limiting instruction that would operate to

16  eliminate confirmation bias to a scientific validity?

17      A.  That's right.

18      Q.  Okay.  That's what we're talking about is you're

19  talking about scientific validity as to the absolute

20  zero, correct, that it would not?

21      A.  That's right.

22      Q.  Do you recall in your report where you reference

23  that this would even have an impact on the judge, that

24  confirmation bias would have an impact on the judge?

25      A.  I don't recall in which report I said that.  I

1    believe it was the 2014 report.  Yes.

2        Q.   Correct.  Do you have that in front of you, sir?

3        A.   I do.

4        Q.   Okay.  If you could go to page 15 for me.

5        A.   I am looking at page 15.

6        Q.   The last paragraph.

7        A.   Yes.

8        Q.   Could you read that for the record, please?

9        A.   You want me to read it aloud?

10       Q.   I do, yes.

11       A.   Sure.  The paragraph to which I believe you're

12   alluding says:  "In fact, let me respectfully carry this

13   one step further by considering how the videos will

14   appear in your judge's eyes.  Plausibly, the judge's

15   decisions about the video evidence will be shaped by the

16   judge's own assessment of how clear the raw video is,

17   and I hope you can see that the science described here

18   suggests that the judge will overestimate the clarity if

19   the judge has already seen the enhanced version."

20            I pause for a moment to say that's probably the

21   inappropriate use of "enhanced," as you and I have

22   already discussed this morning.  But now I continue

23   reading:  "As a closely related point, it seems

24   plausible that the judge's decision about the video

25   evidence will be guided by the judge's estimation of

1    what the jury will be able to discern in the raw video,

2    and, again, this estimation will be compromised if the

3    judge has already seen the enhanced version."  End of

4    paragraph.

5        Q.  Okay.  So is this something you believe is an

6    absolute, or do you believe that any judge would be able

7    to, or not able to, eliminate confirmation bias as a

8    judicial officer in a trial?

9        A.  I guess, I mean, with appropriate respect to the

10   judge, let me state that I am assuming the judge has a

11   normal human nervous system, a normal functioning visual

12   cortex, a normal set of eyeballs.  And on that basis,

13   this is, the paragraph that I just read out is

14   essentially tantamount to saying the judge is of course

15   human, and, therefore, vulnerable to any bias that any

16   other human would be vulnerable to.

17          And so that set of, I think, pretty obvious

18   assumptions about the judge's humanity is the basis for

19   what's in that paragraph, and that would apply

20   presumably to any judge, or, again, anyone with a normal

21   human nervous system.

22       Q.  When you wrote that, were you considering that

23   this video had been enhanced?

24       A.  I mean, yes, I used the word "enhanced," I

25   believe twice in that paragraph.  And I again apologize

1    for what was in retrospect a poor word choice.

2         What I was referring to was the video that we're

3    now referring to as the "alleged reenactment" created, I

4    believe, seven days later.

5    Q.   So if it's not enhanced -- so you were operating

6    in essence of your own confirmation bias that this was

7    enhanced when it wasn't?

8    A.   I'm not --

9    Q.   Wouldn't that be true?

10   A.   No.  Enhanced was simply, I mean, I fear just a

11   poor and misleading word choice.  What I was referring

12   to here was the video from the 19th.

13   Q.   Are there any other examples of that in your

14   report you want to alert us to, in either report?

15   A.   Examples of?

16   Q.   Poor and misleading word choices.

17   A.   The word "enhanced" is used several times in this

18   report, perhaps a dozen times in this report.  And

19   throughout the issue was, I mean, the video from the

20   19th, which in some sense one could count as enhanced

21   because steps had been taken to make it clearer, since,

22   obviously, the circumstances in which that video was

23   created were in a variety of ways different from the

24   circumstances on the 12th, but that's the video that I'm

25   referring to, with apologies for the potentially

1   misleading word "enhanced."

2       Q.   Do you have a Honda CR-V?

3       A.   Had.  I sold it several years back.

4       Q.   What year was it?

5       A.   Boy, I'm going to guess early to mid-nineties.

6   It's far enough gone from my ownership that I don't

7   remember the exact year anymore.

8       Q.   Okay.

9           MR. SKROCKI:  One moment.

10          (Pause)

11  BY MR. SKROCKI:

12      Q.   Just one last thing, sir, and then I'll leave you

13  to your retirement and Mr. Camiel.

14          Just to be clear, and I want to phrase this

15  correctly.  To your knowledge, you have never testified

16  in federal court with respect to confirmation bias to a

17  jury?

18      A.   I would not say that.  What I would say is at

19  this moment I cannot recall a specific occasion in which

20  I testified on confirmation bias in federal court to a

21  jury.

22      Q.   Okay.  And are you aware of any court giving an

23  instruction on confirmation bias, any federal court

24  giving an instruction based on your testimony?

25      A.   Not that I know of.  Not that I can recall.

          MR. SKROCKI:  That's all I have, sir.  Thank
you.

          THE COURT:  Mr. Camiel, go ahead, please.

                  REDIRECT EXAMINATION

BY MR. CAMIEL:

    Q.  Good morning again, Dr. Reisberg.

    A.  Good morning.

    Q.  I want to focus on some questions you were asked
about the sequence of a jury seeing these videos.  You
were asked about whether or not the risk or concern
about confirmation bias would be lessened if the jury
saw the April 12th actual surveillance video first.

    A.  Yes.

    Q.  I think I heard you say something to the effect,
and I want you to correct me if I'm wrong, that if they
got to make up their minds first and make a
determination about what they saw before they saw the
other video, that might lessen the concern?

    A.  Yes.  If I can clarify that point.  My
understanding is that juries are uniformly instructed to
avoid making judgments, avoid reaching any conclusions
until they have seen the full pattern of the evidence.
And if juries manage to follow that instruction, then
the sequence in some ways might not matter, because, I
mean, if juries are following that instruction, then at

1  the moment at which they are trying to make up their

2  mind about the original surveillance video, they also

3  have in their thoughts, and potentially in the jury room

4  have in their view, the alleged reenactment video.  In

5  that case, the sequence of presentation would really not

6  matter.

7        The sequence would matter if, somewhat

8  ironically, you assume the jury is failing to follow the

9  Court's instructions and is making up their minds about

10 a particular piece of evidence soon after they see it

11 and before they have heard the totality of the evidence.

12 If the jury is, so to speak, misbehaving in that way,

13 then you would still be concerned, should still be

14 concerned, would have to be concerned about confidence

15 inflation, but if the jury is misbehaving in that way,

16 they have reached a judgment before seeing the

17 April 19th video and so presumably would not be

18 influenced in that judgment by the April 19th video

19 because they haven't seen it yet.

20        But that would only be true, again, if the jury

21 is misbehaving, not following the Court's instructions

22 and, again, that would still leave open the concern

23 about confidence inflation.

24    Q.  I'm sure you're familiar with the fact that in

25 every trial before the jury hears the actual evidence,

1    the government or the prosecution gets up and tells the

2    jury what they expect the evidence to show and their

3    theory of the case?

4        A.  I understand that.

5        Q.  So if the jury heard, even before they saw the

6    video, the government's theory that it was the Wells'

7    Honda in the April 12th video, then they see the

8    April 12th video, then they see the April 19th

9    reenactment video that only uses the Wells' vehicle, and

10   they hear from two or three different experts who

11   testify about the April 9th [sic] video and their

12   comparison to April 12th, does that enhance the risk of

13   confirmation bias with the jury?

14       A.  One small clarification.  I think I just heard

15   you say the April 9th video.  I assume you meant the

16   April 19th video.

17       Q.  I apologize.

18       A.  Perhaps I misheard.  But I mean, yes.  I mean,

19   the larger of the accumulation of, let me say,

20   suggestion to the jury so that they hear in opening

21   argument what they allegedly are going to see in the

22   surveillance video and they hear from experts what is

23   allegedly in the April 12th video, as you accumulate all

24   of those suggestions, yes, in fact a confirmation bias

25   would grow.

1        If I may, let me cast that into something we

2   talked about yesterday.  The two things that will

3   maximize confirmation bias are going to be a poor

4   quality input, which is just undeniably in place here,

5   and the strength of prior beliefs.  So if you give

6   people not one, not two, but multiple reasons to

7   believe, yes, this is likely to be the Wells' Honda,

8   that's going to strengthen the belief, which is indeed

9   exactly the sort of thing that can strengthen

10  confirmation bias.

11           MR. CAMIEL:  Thank you.  That's all I have.

12           THE COURT:  Recross at all?

13           MR. SKROCKI:  Yes.

14                   RECROSS EXAMINATION

15  BY MR. SKROCKI:

16    Q.  I'm back again briefly.

17        You said the "opening argument."  You realize of

18  course in trials it's an opening statement, right?

19    A.  I'm sorry.  I misspoke.  Yes, opening statement

20  and not argument.

21    Q.  And you realize that the defense has an

22  opportunity to make an opening statement as well, don't

23  you?

24    A.  I do, although, in my terminology, the

25  government's opening statement always has the advantage

of what is technically referred to as primacy, which

sets the agenda from the start.

So the scientific research on jury understanding

suggests that the opening statement from the

prosecution, from the government in this case, has more

of an impact on juries' thinking than the subsequent

statement from the defense purely because the

government's statement comes first.

Q. But you know what an acquittal is, don't you?

A. I certainly do.

Q. Those happen, don't they?

A. They do.

Q. Even with primacy, correct?

A. I mean --

Q. Yes or no?  Doctor, yes or no?

A. Do acquittals happen even with primacy?  Yes, of

course, they do.

Q. And acquittals occur even with possible

confirmation bias in courts, don't they?

A. Certainly, they do.

Q. Are you aware of the extent of the investigative

evidence accumulated in this case by the investigation?

A. I certainly cannot claim to know all of the

evidence.  How could I know all of the evidence?

Q. And do you know any other evidence besides this

what you call a "poor quality video"?  Do you know of
any other evidence in the case that the government has
accumulated?

A.  Certainly in my, I guess it's my 2014 report, I
listed out the facts of the case as I understood them
then.  I mean, as I recall, those facts also included
concerns about timing, concerns about what was, I
believe, a 30-minute delay.

So yes, my 2014 report also includes mention of
other evidence that at the time of writing that report I
thought might be relevant to my assessment.

I believe in retrospect it now turns out there is
other facts which may be crucial for the trial or not
crucial for the narrower purpose of my assessment.

Q.  And you know there is cross examination in cases
by the defense, correct?

A.  Of course there is.

Q.  And they can bring witnesses themselves to
testify about videos and other matters that the
government presents during its case, can't they?

A.  Of course they can.

Q.  So this is not just an all one-sided event on the
government's part, is it?

A.  Clearly correct.

MR. SKROCKI:  That's all I have, sir.  Thank

 1  you.

 2          THE COURT:  All right.  Thank you, sir.  You

 3  may be excused at this time.

 4          (Witness excused)

 5          THE COURT:  So where does that leave us?  No

 6  additional evidence from either side, correct?

 7          MR. SKROCKI:  No, Your Honor.

 8          MR. COLBATH:  No, Your Honor.

 9          THE COURT:  Then it turns out my next hearing

10  is not until 10:30.  I think I said 10:00 yesterday.  In

11  any event, I can hear each side on the motion beginning

12  with the defense.  Mr. Camiel or Mr. Colbath?

13          MR. COLBATH:  Your Honor, I'll be speaking, but

14  I would request, because it's the government's burden to

15  establish admissibility, that they go first.

16          THE COURT:  Any objection to that?

17          MR. SKROCKI:  I'm not worried about that,

18  Judge.  In fact, I expected it.

19          THE COURT:  Do you think there is going to be

20  -- I looked at the expert reports, but do you intend to

21  call a witness, an expert at trial that would say that

22  vehicle in the April 12th video is the Wells' Honda?

23          MR. SKROCKI:  The closest we're going to get to

24  that is Mr. Schmidt.

25          THE COURT:  The 70 percent?

1        MR. SKROCKI:  Yes, ma'am.

2        THE COURT:  So the other experts would say

3   consistent with?

4        MR. SKROCKI:  Consistent with.

5        THE COURT:  Go ahead, please.

6        MR. SKROCKI:  I think what I would like to

7   start out with is the pleadings and the four corners of

8   the pleadings.  The issue here is relatively

9   straightforward:  Is the video of April 19th

10  substantially similar to the video of April 12th?

11       And the answer is yes.  The answer is yes

12  because they use the same equipment.  Certainly they

13  didn't get it within the certain number of degrees by

14  zoom that would have been 100 percent accurate, but that

15  does not make it substantially dissimilar.

16       As we pointed out yesterday, there are so many

17  factors that are fixed and at play that it's difficult

18  to assume why it is not substantially similar.

19       The buildings are fixed.  The fences are fixed.

20  And in terms of the screen capture itself, we're talking

21  about that much of a difference.

22       The other part of that is too is was there any

23  attempt on the agents to manipulate or do something

24  different.  Did they use a stronger camera?  They did

25  not.

1          THE COURT:  How do you -- what are your

2    thoughts in response to the lineup analogy that was made

3    by Dr. Reisberg?

4          MR. SKROCKI:  That is just that by producing

5    that one -- that one vehicle?

6          THE COURT:  Correct.

7          MR. SKROCKI:  Well, a couple of things.  The

8    defense is able to do their own if they wished.  They

9    did not.  I assume, from my own perspective, my personal

10   perspective, they did not because it would have been too

11   inculpating.  It would be too difficult and would have

12   probably produced the result that's in court now, that

13   is the other vehicles are so sufficiently dissimilar

14   that it would not have been a feasible thing to do.

15         I think a limiting instruction by the Court

16   would remedy the lineup issue.  Frankly, Judge, we're

17   not here to, in this case and in any case, hide the ball

18   or state something that's not in evidence.  It would be

19   a mistake to do that.  We would be called on it by the

20   defense.

21         The jury is entitled to know why the agents did

22   what they did, and why they did what they did, the

23   testimony will show is that there was a review of

24   Mr. Wells going to work before by one of the Coast Guard

25   agents in his white truck that caused some suspicion.

1    They saw the blue vehicle, and then, during the course

2    of the day, they went and looked for the blue vehicle.

3           They found the blue Honda at the airport, and

4    they said that could have been something that could have

5    been used because it matches the video.  And that's

6    exactly what they did.

7           And so I think by laying out all the facts

8    about why the officers did what they did, the bases for

9    it with the limiting instruction, I think that's

10   sufficient.  The jury can certainly -- and I know there

11   will be plenty of testimony that you cannot say that

12   that is Mr. Wells' vehicle.

13          But I think a curative instruction as to this

14   is what was done and this is why and this is what you

15   can infer or not infer would remedy that situation.

16   Clearly we're well down the road of being able to do

17   something like that.  Maybe that would have been a

18   better practice.  That was something that was decided a

19   long time ago, but we have to deal with that.  But I do

20   think a limiting instruction is the way to go on that

21   issue.

22          I think that -- we probably cited maybe

23   15 cases to you about what the standard is, the same

24   ones that Mr. Colbath and Mr. Camiel cited.  They carry

25   over one to the other.  There isn't any case law out

there about whether this is so misleading that we need
to bring in an expert to talk about confirmation bias.
It's not part of the law anywhere that I have been able
to find.

And, again, the good doctor doesn't think any
of us are able to eliminate that from our perspectives,
but that's the way the trial process works.  And whether
Mr. Hoerricks or Dr. Reisberg, the desire to have
scientific precision with human nature just doesn't work
because we're not machines.

And part of that process is everybody brings
something different to the courtroom as jurors, as
prosecutors, as judges, and we all do the best that we
can within the confines of the law.  I'm sort of moving
into the expert piece.

Unless you have other questions on the
standard, I mean the standard is applicably met here,
and it's really met because there really is no -- if you
want to reverse it, there is no attempt to enhance or
manipulate or zoom or use better equipment.  If they
wanted to do something that was really more beneficial
to the prosecution, they would have gotten a higher
resolution camera and zoomed it and said, "Hey, here is
what we found instead," and they didn't do that.

We had a couple of agents acting under the

direction of another agent saying do a duplication, and they did the best they could. That's what the state of the evidence is. So unless there is -- these things about --

Getting back to the four corners, this case was postured, this motion was postured as to differences in bollards and fire hydrants and trees and all that. All those things are visible in both images, so I think I used the word picayunish. I get it that there is some issues there, but those are really what we're talking about here.

They are doing what they have to do, and I understand that, but these differences here under the standard of law are just that not significant that it should cause the Court any concern that it's not substantially similar.

THE COURT: I think the first mention of *Daubert* was in the notice of the issues that came after the briefing. I didn't see that in the defense motion, but I certainly heard some of that yesterday. What are your thoughts on that? I realize it's not in the papers, but your thoughts on that issue.

MR. SKROCKI: With respect to -- can you direct me to what your concern is?

THE COURT: As I heard Mr. Hoerricks yesterday,

he was saying that the way that this was done, this
video, filming on the 19th was, and I'm paraphrasing,
was so poorly done that it doesn't meet the standard of
*Daubert* for admissibility. I'm paraphrasing.

MR. SKROCKI: I recall. My follow-up question
was to him did he have any issue with what the agents
did, and he said no, they did the best that they could.

But the next question is: Is this a scientific
test? And the answer is no, it's not a scientific test.

THE COURT: That's helpful.

MR. SKROCKI: That's one thing I was thinking
about on either the way in or the way home last night is
this is not one of these tests where -- for example, let
me give you an example.

In the *Wade* case years ago, they used
bloodhounds to track Wade from an ATM to his home. We
had a *Daubert* hearing for admissibility. So they
brought in, "Is this scientific?" The answer was maybe
or maybe not, but we still had to qualify the dogs as to
whether they were trained. It was a very fascinating
hearing and it worked out that it was admissible.

But here there is nothing scientific about
this. We're not trying to figure out anything
scientific at all. They were just trying to make an
assessment of whether this vehicle, for investigative

purposes, was similar to the one they saw April 12th.

So the videos of April 19th were, yes, subsequently used by other experts, but I don't think it qualifies as scientific. We're just talking about measuring photographs. Had we had back in old-school days film and pictures that weren't digital, you would be doing the same sort of analysis. Are you able to match that?

And I think the other piece too is really limiting instructions on that. You know, the jury is free to accept or disregard, and there is going to be cross examination on that and a rebuttal case. So it's not just that we have the one and only final say here.

I don't view this as a *Daubert* matter whatsoever.

THE COURT: Fair enough. Thank you.

MR. SKROCKI: And --

THE COURT: I took under advisement the one topic of Dr. Reisberg in the order I issued on the defense witnesses. I think you have addressed that, but if there is anything else you wanted to add with regard to this issue of to what extent Dr. Reisberg could testify to a jury about their own biases as opposed to the agents or that process.

MR. SKROCKI: I mean part of the -- yes, Your

Honor.  Part of the reason from the briefing to call

Dr. Reisberg was for misleading the jury, that this

video is somehow misleading the jury.

I submit that calling him to talk about this

piece would be very, very confusing to them on almost

any piece of evidence that would come in.  That would --

that scientific analysis precision that none of us are

able to remove this at any stage of the proceeding, and

he's even gone so far to say the government gets the

best and only advantage because of opening statement.

That would, in our view, trickle down to virtually any

other piece of evidence in the case, not just this one

video.

THE COURT:  Are you familiar at all with in the

Western District of Washington they have this whole

implicit bias film that is shown to the jury in the

assembly room?

MR. SKROCKI:  Would this be Judge Bryan's

courtroom?

THE COURT:  Judge Coughenour.  No, he's one of

the speakers.  Mr. Camiel I'm sure has seen it.  It's a

subject of some discussion.  In fact, we were talking

about it in Spokane at the conference about to what

extent the Court instructs on biases.

MR. SKROCKI:  You know what, Your Honor, if

 1    that's something you want us to review, I'll make a call

 2    and we'll review it.

 3          THE COURT:  You can look online.  It's simply

 4    what role does the Court play versus an expert on these

 5    topics.

 6          MR. SKROCKI:  I mean, times are changing.

 7          THE COURT:  There you go.

 8          MR. SKROCKI:  So I will look at that, but I

 9    think --

10          THE COURT:  Then there is a very interesting

11    Supreme Court opinion that we actually cite somewhere in

12    the jury instructions, the pattern, that talks about how

13    the Court's role in instructing the jury is one of the

14    important tools in a courtroom to minimize bias.

15          MR. SKROCKI:  Let me say this:  I'll look at

16    those things, and if you want us to provide notice or

17    something or call us back into court, we would be happy

18    to address it.

19          We have a very strong case, and we know we're

20    back on retrial.  We're not worried about the evidence

21    and we're not -- we're going to go ahead and put our

22    case on.  We believe we have a very, very high chance of

23    conviction here.

24          So at the same time though, I recognize things

25    are changing, and so we will look at these two and we'll

discuss it amongst ourselves, the trial team, and then
back in the office and see what our office's position
is.  I can't speak for the U.S. attorney, but we will
look at that.

THE COURT:  Thank you.

MR. SKROCKI:  Is there anything else?

THE COURT:  No, not at this time.  Thank you.

MR. SKROCKI:  While I have the podium, I do
intend to file a motion per yesterday's order.

THE COURT:  Yes.  What's your proposal there?

MR. SKROCKI:  I have asked for a transcript of
the entire hearing, so that will take me a couple days
to get.  So if I could have maybe 15 days, because I'm
also working on an alleged *Brady* motion violation.  I
have got that on my plate too.  If I could have 15 days
to file this.

THE COURT:  How about 14 days.  I'm leaving
town tonight, so I'm thinking today is Friday.  How
about two weeks from today then?  I am concerned about
our impending trial date.

MR. SKROCKI:  I can get started without it.  Is
there anything else?

THE COURT:  No, thank you.

Mr. Camiel, Mr. Colbath, go ahead, please.

MR. COLBATH:  Your Honor, I'm going to -- there

1  was a reason that I filed the notice of legal matters

2  before the Court, because this entire situation has

3  presented the defense with a government, which has been

4  a pattern in this case, of the government wanting it

5  both ways and a continual moving target for us, and here

6  is why.  Here is how I saw the briefing.

7          We filed our motion initially believing that

8  this April 12th video -- or excuse me, this April 19th

9  video was problematic and was a demonstrative exhibit.

10  As I reread and I looked at the trial transcripts and I

11  thought about it, and more particularly as I studied the

12  government's new expert notices, which in large part

13  re-notice experts, principally Mr. Toglia, Mr. Schmidt,

14  Mr. Vorder Bruegge, that were -- that testified at trial

15  and really have provided no new analysis, no different

16  analysis, they have just been re-noticed.

17          When I looked at the way they used them, they

18  used the April 19th video 100 percent, and it was

19  admitted by Judge Beistline without restriction and

20  without a limiting instruction, and without a 404/403 --

21  or 403 balancing test.

22          They used it substantively.  The experts

23  testified about it substantively.  So I knew that it was

24  created by agents.  I couldn't find any evidence

25  whatsoever that told me it was done scientifically, that

it was done for scientific purposes, but yet I could see

evidence that it was used scientifically, it was

testified about scientifically, it was relied on in

scientific analysis.

So I didn't know where we were. We filed the

motion, rather than to preclude the experts, because if

Mr. Toglia wants to look at the April 12th video, which

is real evidence, and perform reverse projection

photogrammetry and offer an opinion, he can do that and

I'll challenge that and we can have some discussion

about that.

But if he wants to do scientific analysis and

provide scientific testing that includes the April 19th

video, then I thought that was inappropriate, so I

thought, if it's demonstrative, that's one question for

the Court; if it's substantive, that's another question.

I'm still not -- we're done with the hearing.

I have reread all the briefing. I have heard

Mr. Skrocki's arguments. I can't tell, and here is why:

In the briefing -- first of all, I want to point out a

couple of things.

Yesterday, when Mr. Hoerricks was testifying,

the government jumps out and says, "Timeout. Frame

rates, standards, I didn't realize the motion raised any

of these things. We didn't think that it got to this

level.  We didn't think this discussion."

It didn't dawn on me last night until I was sort of thinking about argument and rereading the documents, but I reread Mr. Skrocki's brief, and he wrote, I didn't, he wrote about frame rates on the video.  It's referred to in four places in the government's brief.  It's referred to in involving a calculation of speed.

Now, you know because Sturgis told you yesterday, he can't calculate speed.  He can eyeball things, but an expert calculates speed, and they talked about that in their video -- I mean, in their briefing, as Toglia doing that.  That's expert analysis.

So then I'm confused.  Okay.  He argued in his brief this is relevant under 401, it's admissible, here is why it's practical and helps the jury, here is why we get to use it.  Those are substantive evidence arguments.

Four separate places in his brief he suggests to the Court, and he just did here today, that you should -- this doesn't need to be excluded, you just cure it with cross examination and a limiting instruction.

You have access to all of the limiting instructions and all the jury instructions you have

1    given in every case you have ever handled; I don't, but

2    you have that historical knowledge.

3            I would challenge the Court to go back and look

4    for a circumstance where you gave a limiting instruction

5    on substantive evidence that was not only received for a

6    limited purpose.  And here there is no limited purpose

7    the government is offering it for.  The only time

8    limiting instructions are given is traditionally in two

9    scenarios that I can recall, that I can research, that I

10   can remember, that I can find that I have been involved

11   in.  One is typically the 404(b) situation.  You let

12   something in under 404(b), or you let a hearsay

13   statement in not because it's truth of the matter

14   asserted, but because it demonstrates the effect on the

15   listener or something, and you immediately caution the

16   jury, "You just heard this about this act under 404(b).

17   I limit you.  You only consider it relevant to that."

18           Clearly we're not in that situation.  This is

19   not 404(b).  This is a government construct.  The only

20   other limiting time that you give a limiting instruction

21   is a witness testifies and then they fill out a map,

22   they draw an illustration, they give a summary chart

23   summarizing their testimony and it's offered for

24   demonstrative purposes.

25           And you may say -- there is this pattern in

limiting instruction on charts and summaries.  There is
something else.  Those things aren't received in
evidence.

THE COURT:  We have two.  We have one where
they are received.  We have two pattern instructions.

MR. COLBATH:  Clearly this is not an evidence
summary.  This is a creation.  And in the circumstance
where it's just a creation, it's demonstrative, and so
you say it's demonstrative.

The government suggested demonstrative
resolution to substantive evidence.  If you give a jury
instruction, and here is what Mr. Skrocki told you to
do, said, "This is how you handle it.  Look, ladies and
gentlemen of the jury, this is what was done, this is
why it was done, and this is what you can and can't
infer from it."  That's what I wrote down that he just
argued to you.

That's the Court instructing the jury directly
on a piece of evidence.  You're telling the jury,
"Ladies and gentlemen, this is how the Court views what
this evidence was done."  More importantly, that's the
Court instructing the jury this is why this evidence was
made, and then that's the Court telling the jury here is
what you can infer from it and here is what you can
infer against it.

1    I will say right now on the record I'll do this
2    trial better the second time than I'll do it the first,
3    because if you give that instruction, it is 100 percent
4    comment on the evidence.  I don't say that flippantly.
5         THE COURT:  I know you don't.
6         MR. COLBATH:  That is not a joke at all.  That
7    is 100 percent an invitation to reversible error,
8    because it's not used demonstratively here.  If it was
9    -- here is the illustration of why.  I want to
10   straighten out one other thing.
11        Yesterday when Mr. Hoerricks was on cross
12   examination, we had referred to -- he and I had referred
13   to this is Exhibit D in your thing.  I had tried to
14   reference the times and these, and I had represented
15   that this was Mr. Toglia's work.
16        Mr. Hoerricks said fine.  And Mr. Skrocki got
17   up and said, "There's an FBI number.  Did you know this
18   was Mr. Vorder Bruegge's work?"  Mr. Hoerricks said,
19   "Okay," and he said, "You don't have a problem with
20   that?"  "No."
21        Well, first of all, that was misleading,
22   because Exhibit D, which was trial Exhibit No. 110, this
23   is Mr. Toglia's report, part of it.  And how the Court
24   knows that is, well, first of all, this was analysis
25   originally done by Mr. Vorder Bruegge.  That's why the

1  FBI number is on it. But if you look across the top, it
2  says, "Left to right, side by side," whatever. This was
3  Vorder Bruegge's analysis and comparison and
4  measurements derived from both videos, was taken by
5  Mr. Toglia and subsumed within his expert presentation
6  and his expert analysis, and the same slides were used
7  overall as part of his analysis.

8          If you look at Toglia's report, he says, "I
9  looked at the April 12th video. I performed my analysis
10 on it. I inserted -- I put it in my reverse
11 photogrammetry software. I inserted an animated Honda
12 CR-V over it. I did some work to it." Stop.

13         Then report goes on to say, "I then took the
14 April 19th video, I performed the same analysis, the
15 substantive testing analysis. And I did this and I did
16 that. Then I, after analyzing both videos in an expert
17 process, then I started on the step of doing a
18 photographic comparison. So first thing I did was I
19 went back and looked at what the -- looked at the
20 measurement aspect of it. The FBI had already done
21 that.

22         "Then what I did was" -- this is Exhibit M in
23 your book. "I did a PowerPoint." And in this
24 PowerPoint, if the Court counts, if you go in, you see
25 here that Mr. Toglia takes aspects and analysis from

1    April 19th, puts it on top of and subsumes it into the

2    April 12th video.

3            Just like -- now this is a -- I'll say this

4    comparison here, Exhibit No. 110, is a rudimentary

5    comparison, just a side by side.  Here is your one

6    person showup.

7            What Mr. Toglia does is repeat that -- first of

8    all, he finds that there is five frames going left to

9    right on the April 12th video and four frames going the

10   other way.  What the Court needs to understand, and part

11   of my point with my questions with Mr. Hoerricks was

12   imagine that if instead of showing a video, because all

13   the experts agree Mr. Hoerricks testified yesterday,

14   even Agent Sturgis could observe, these videos with that

15   poor camera are a collection of, or by the time the

16   computer compresses it down and saves it, they are just

17   screen shots.

18           What Mr. Toglia is saying, which the government

19   put into evidence is, the evidence produced nine screen

20   shots going left to right, and the first part of the

21   April 12th video -- we had five pieces of paper.  I had

22   five screen shots to work with.  There they are.  I have

23   got five.

24           And then five minutes later on the April 12th

25   video, the car or object or whatever it is, assuming

1    it's the same one, went back by, but it only left four

2    screen shots.  So I got four more.  So I've got nine

3    screen shots from April 12th to look at.

4            Agent Sturgis went out, and using the same

5    camera, starting at five miles an hour, he went back and

6    forth 14 times -- I mean, back seven and forth seven.

7    So each of those on the same camera produced screen

8    shots.  And what we know is that at the

9    five-mile-an-hour rate -- and I just tried to make the

10   -- when I offered that Exhibit UU and you said, "I'm not

11   going to rely on it," all of that is in evidence.  That

12   is just --

13           THE COURT:  I understand.

14           MR. COLBATH:  100 percent of the evidence

15   that's evidenced on that document, it's just compiled

16   for the Court because I didn't want to frankly take the

17   time or put the burden on the Court.

18           What I'll tell you is the government put the

19   video in evidence and the time is running on it.  So if

20   you just take their video and you go sit at your desk

21   and you watch it, it's under 30 minutes long, and you

22   watch the 14 passes, when you watch it go by, you can

23   count how long it is.  As a matter of fact, the video

24   counts itself, and it can count.

25           Well, just for purposes of my argument, you can

-- I will tell the Court that my belief is, were you to engage in that analysis of the evidence, what you would find is five and four, like April 12th, is only consistent with the 35-mile-an-hour -- the final pass that the government exercise showed.

Each one prior produced more screen shots, which makes sense under everybody's testimony. Sturgis said, well, when you go slower, you see the car longer, which means the camera sees the car longer, which means the camera captures more shots.

So here is what happened with their expert analysis: Nine screen shots to work on the true evidence, April 12th. But they didn't do one video -- I mean, they did one video, but they didn't do one pass on April 19th. What they did was 14. So now they have got nine at 35 miles an hour, more at 30 miles an hour, more -- all the way down to five.

They have got, I'll represent to the Court, somewhere in the neighborhood of 120 screen shots. So if I lay them out on the table, I have got 120 pictures representing different angles, different speeds, different levels of blur, different situations. And what I reduce it down to is I pick the best three or four or five that I like.

The problem is the right side of this, this is

at one speed.  It's taken at 35 miles per hour.  I
looked at some -- and you can look at it because the
timestamp is here.  If you look at this one, it's taken
at 25 miles an hour, so the car is going different, the
blur is different.  It's not comparing the same thing.

One of these, just the first -- in the first --
I stopped looking after the first three pages, because
the third one compares the picture at ten miles an hour.

And the Court can see that, because they were
nice enough to list the time on their exhibit and the
evidence is there.  So obviously, even by Sturgis'
untrained rudimentary eye, he knows he's looking at
something different going ten miles an hour going across
that screen than going 35 miles an hour; yet the jury
doesn't know that, because nowhere on this, nowhere in
the presentation does it say, "This is what I did."

THE COURT:  How come you couldn't explore that
in cross?

MR. COLBATH:  Here is why I can't explore it on
cross, several different reasons.  First of all, we're
now into -- aren't we having at that point a substantive
discussion?  I'm having an expert analysis discussion.
This is not just what they said it is.  We're seeing if
it was consistent.  This was by no means scientific.  He
said it twice in his argument, "This was by no means

scientific.  We're just using this to -- we're just
using this to see if it was consistent."

          Well, no.  These have measurements down to the
tenth of the inch.  You can't tell that by looking at
it.  Somebody did expert analysis, substantive expert
analysis.  So that leads me to this, why I have a
problem on cross.  Mr. Skrocki made the statement to
support his argument that, look, if the defense wanted
to do this, the defense could have done this.

          And I don't mean any disrespect to him, and
this is not a personal insult, but that statement is one
of two things.  It shows a clear complete lack of
understanding of what happened here or it's dishonest,
one of the two, because he knows we can't redo.

          And here is why:  I tried to have Mr. Hoerricks
redo it.  He tried to tell you why he couldn't redo it
yesterday and they objected.  They didn't want to have
that discussion.

          I looked for experts to redo it.  Each image,
each person trained in photographic identification said
for me to create a similar lineup, let's say I wanted to
have Mr. Hoerricks go out, use that same camera, pick 12
random cars, run them by and do that, Mr. Hoerricks told
you, "Well, if I'm going to perform science," which
would be what that is, "I'm not just doing a random

1   recreation but I'm going to perform science" -- first of

2   all, this whole thing begs the question of we don't have

3   a burden of proof, we don't have to produce evidence,

4   but I assume the Court is aware of that.

5          THE COURT:  I expected that to be your first

6   point, but go right ahead.

7          MR. COLBATH:  And I expected the Court to be

8   well aware of that, to buy into the argument here, to

9   play that game.  What the scientists tell me is the

10  starting point is, to replicate, I need to know the

11  camera settings from April 12th.

12         I need to know the location, exact location on

13  the road where the car was driven or whatever the object

14  was was on the road.  I need to know what was going on

15  then to produce for you something that I can later

16  compare it to and say this is that or this is not that.

17         So I can't find an expert to do the analysis.

18  Do you suppose that's why the government didn't have an

19  expert do the analysis?  Because I submit to you if it's

20  that easy and Mr. Skrocki wants to clear this up and not

21  offer a one-car showup, why doesn't the government have

22  its experts go out?  They're the Coast Guard.  Just for

23  me to get on the property, for me to show Mr. Camiel the

24  building, we had to have armed escorts and we weren't

25  allowed to take photos, we weren't allowed to do a bunch

of things just to be on the property, but they have no
restrictions of that.

Why don't their experts go out and drive a half
dozen cars by there, if they think it's so easy and able
to do it, and if they want to create something that's
not suggestive or not problematic.  The reason is the
scientists say you can't do that.  That's why I had
Mr. Hoerricks testify about there are ways to do this
and there are ways to not.

There is a protocol for both photographic
comparison.  It wasn't followed here.  There is a
separate one for reverse projection photogrammetry.
Wasn't produced here.  The answer, when I asked all
those questions, the answer from the government is,
"Well, Mr. Sturgis, were you trying to do science?"
"No.  No."

Well, how does any of this discussion involve
*Daubert*?  Here is how it involves *Daubert*?  It's again a
situation of talking out of both sides of their mouth or
bait and switch or putting the Court in the position of
saying on the one hand, it's the government's burden to
establish that, if you read all of this, Judge, and you
convince -- you're convinced that this is not
substantively offered, that this is just a simple
non-scientific demonstration, if you read all of that,

then the government -- that's what the government would
have you believe, because they say it's not scientific,
because the only evidence before you as to the creation
of the video is an untrained, unknowledgeable agent who
was working with other untrained agents who said, "We
didn't consult any experts, we didn't consult any
manuals, we didn't consult any instructions.  As a
matter of fact, the day I showed up was the day they
taught me how to use the camera.  I eyeballed it.  I
don't even remember if I had a picture from April 12th
there.  It might have been from memory.  I might have
had a picture.  I might have actually reviewed the
video, but regardless, I eyeballed it, because I was not
doing anything remotely related to science.  I wanted to
determine speed," which they never did.  "And I wanted,
to just see for investigative purposes," which is what
this really is, an investigative exercise, "I wanted to
see if" -- the investigation team wanted to see are we
on the right track, so they said it was.

          What happens later is, not happy with that, the
government takes something it cannot lay scientific
foundation for, scientific admissibility for, and they
give it to experts who do scientific analysis.  Toglia's
findings, Vorder Bruegge's findings, Becker's findings,
all these people rely on -- they do photographic

comparisons.  That's a two-prong process.

One of the prongs of the analysis is analysis of April 19th.  The reason Mr. Skrocki felt uncomfortable enough to jump up and call timeout yesterday is he knows if you say April 19th is not admissible, his experts, one of the two legs of the whole crux that holds up their testimony, goes away, because it wasn't just a demonstration, it was analysis. They all perform analysis.  They do extrapolations from it.  They take measurements from it.  They do recreations from it.  They move it in and out and do blowups from it.

All of that is science, but none of them came here and laid the foundation for you to say, "If I was going to create this and use the Wells' vehicle in a reverse projection photogrammetry recreation, this is what I would do."  You didn't hear that evidence.

I would ask the Court to infer, because I don't think there is any other reasonable inferences, the reason you didn't hear that is, one, because the government didn't try that exercise, and, two, because there are standards on those things and there are rules in the way you do that.  And there have been -- there is case law on it that says that's not supportable.

There are *Daubert* considerations that say no

software manufacturer who manufactures the software that
any of these experts used said this is appropriate for
that use.  It's not peer tested.  It's not reliable.
The methodology has not been proven for the purposes for
which they are offering it, and that is in-court
photographic comparison.

And so they can't have an expert come here and
lay the proper foundation because that requires you to
engage in the *Daubert* analysis and then the evidence
gets excluded because it can't pass the test.

The reason I didn't initially argue it is
because I couldn't find that an expert did this.  I
wasn't sure it was going to be offered as substantive
evidence.  It's not until I read their brief and think
about it more and see what was presented here, because I
was aware of now what you're aware of.

It was four untrained agents just doing an
investigative exercise.  That doesn't implicate *Daubert*.
I agree with Mr. Hoerricks yesterday.  I would agree
with what he says, that's just them doing their best.
But you don't let a jury consider page after page after
page of scientific analysis and analytical explanation
and measurements down to the tenth of an inch, you don't
let juries consider that from a guy that just did his
best eyeballing it.

1          That's the evidence of record where we stand

2     today because the government didn't present anything

3     else.  So you're still in the quandary of, well, do I

4     admit this substantively, because I still don't know.

5     So if you admit it substantively, I would submit you

6     have to do the full *Daubert* analysis, and the evidence

7     from the government is Sturgis' testimony.

8          So I think that's a short analytical process

9     for the Court.  He said it wasn't scientific and he said

10    he was untrained.  It's out substantively on that basis.

11          If you find that it's demonstrative and you're

12    going to let --

13         THE COURT:  Let's say, totally different case,

14    there is a car crash and a police officer takes a photo

15    with his camera of the car crash.  We're at a trial on

16    the case and the photo gets introduced.  We don't go

17    through extensive testimony about the photography skills

18    of the police officer.

19         MR. COLBATH:  No, you're right, we don't.

20         THE COURT:  What's different about the

21    April 19th video?

22         MR. COLBATH:  Well, that's not the case here,

23    first of all.  Let's say in the same instance there is

24    also a surveillance camera that doesn't run video, it

25    snaps pictures every ten seconds of the intersection.

And the evidence is there is also, besides the one taken by the officer just after the accident, from ten seconds prior right at the time of the accident, the surveillance camera snapped one, but that one is crappy.

You can't make heads or tails. You're not even sure it's cars involved in the accident. It's very unclear. So I submit to you that the original photo -- first of all, you would have to assume in this case he took 14 photos and he took them from all different angles and whatnot, and it's after the fact, the accident is done, so we don't know what happened during the accident. That's after the fact.

Let's say somehow the traffic control camera caught it right at the time of the accident. The initial offer might not be -- might be less problematic. We're not going to question his camera-taking ability, although that's finite, but there may be some argument about this is one camera and captures one thing and this is another camera.

But where the problem would come in is in this example, in your case, the government not only wants to call the officer who took the picture and show the jury the picture, they want to call four experts to say, "I know that's one camera and I know this camera has a different setting, but, look, I have taken his 14

1   pictures, I have compared them to this one, I have

2   changed them around, I've manipulated them, I've put

3   them over the top of each other, and the conclusion of

4   my overall analysis, which I can only do using his

5   after-the-fact picture with this at-the-time picture,

6   the only way I can arrive at my conclusions are to use

7   them both substantively and then this is what I have to

8   offer."

9           Well, I'm not so sure, if that was the

10  scenario, I'm not so sure we wouldn't have a *Daubert*

11  hearing on the quality of this picture or the

12  appropriateness of comparing that, but we would

13  certainly have some discussion about whether that's an

14  appropriate process here.

15          But what the government is trying to get you to

16  do is bypass that whole process to just say, "This is

17  in."

18          THE COURT:  What I'm hearing really is that

19  sounds as if the focus of your concern is not so much on

20  the video of April 19th, but on what the experts are

21  going to say about that.

22          MR. COLBATH:  At the last trial, I don't know

23  because -- I'm not positive, but I don't think they

24  played the video.  And I think all the testimony was --

25  because of course the video shows it, and then I would

1   argue that the video by itself, and we'll get to

2   prejudice in a minute on all of this, but the government

3   video of course shows it seven times.

4         And the evidence video, April 12th, shows it

5   one time, shows the vehicle pass one time, so there is a

6   problem with that.

7         THE COURT:  Your motion was to keep out the

8   video.

9         MR. COLBATH:  Well, of course.  And subsumed

10   with that is the stills from the video.  So if the Court

11   understands that, my understanding of the testimony last

12   time was that actually the jury was told there was a

13   video, and, from that, the experts used the video to

14   extract stills and here you have them.

15         So I want to follow through with where I was.

16   Let's assume you're right.  Let's assume that I'm going

17   to allow the pictures and I'm going to give the jury a

18   limiting instruction as suggested.

19         What are you going to tell the jury when they

20   see this?  "Ladies and gentlemen, what you see on the

21   right-hand side of these multiple pictures is

22   substantive evidence.  What you see on the left-hand

23   side you are to not treat the same as what you see on

24   the right-hand side.  You are to only take that as being

25   demonstrative of something," which you're going to have

1　to figure out because I can't, or they are going to have

2　to offer and you are going to have to accept.  "You are

3　to treat the left side of the page different than the

4　right side continually."

5　　　　　Now, in a few times that might be okay, but

6　what do we then when get to the PowerPoint, because in

7　the PowerPoint, if you page through it, roughly of 129

8　pages, there is like 40 pages where part of things drawn

9　from April 19th are either superimposed over, subsumed

10　within or made part of a screen from April 12th.

11　　　　　THE COURT:  Can you point me to a page that

12　does that?  I think I understand your point.

13　　　　　MR. COLBATH:  Sure, let's do this.

14　　　　　THE COURT:  Say, for example, page 86.

15　　　　　MR. COLBATH:  Okay.  Let's start much sooner

16　than that.  Go to page 15.

17　　　　　THE COURT:  15.

18　　　　　MR. SKROCKI:  Exhibit, Gary?

19　　　　　MR. COLBATH:  This is Exhibit M.

20　　　　　THE COURT:  I'm on page 15.

21　　　　　MR. COLBATH:  We can see from the top this is a

22　video analysis of the day of the incident, 4-12, and we

23　can see the object in question there going what they say

24　here is northbound, so that would be left to right.

25　　　　　And then the PowerPoint goes on to the next

page.  If you flip to the next page, you can see 4-12
goes -- now it's the just the next frame.  He's just
illustrating the frames.

Then the very next page, 17, now we have
jumped.  First of all, I'd note we jumped to 4-19, page
17.  I would note that this is not demonstrative.  This
is video analysis, so he's doing analytical work here.
He's performing science.  That's what this whole
PowerPoint is.  That's what he entitles it.  That's what
he calls it.  That's what it is.

This is a frame from that.  Go to the next
page.  This is a blowup from that.  So you will have
instructed -- I will have asked you to stop -- when he's
going through the PowerPoint, I will have asked you to
stop at page 16, and before they show 17, instruct the
jury, because clearly all page 17 is is 4-19.

Then when he goes to page 18, he's manipulated
page 17 and he's blown it up, but, again, it's from
4-19, so I'm going to ask you to instruct them again.
This page too is just for demonstrative purposes.  This
is how you're to treat page 18.

Then he goes -- well, now what are we doing?
Look at page 19.  He's put a Honda CR-V in there.  That
wasn't part of Sturgis' exercise.  Sturgis didn't have a
make-believe Honda CR-V, he had Mr. Wells' Honda CR-V,

but yet Mr. Toglia puts it in there.  So I'm going to
ask you again to -- and now he's creating a completely
different demonstrative from the demonstrative because
he only working with 4-19 here.

THE COURT:  Here is my question:  The motion
relates to the April 19th video?

MR. COLBATH:  Correct.

THE COURT:  There is not a motion, as I recall,
of the many motions, that relates to Mr. Toglia's
insertion of a Honda CR-V onto the April 19th video,
correct?

MR. COLBATH:  Correct.

THE COURT:  All right.  Thank you.  Because I
wasn't prepared for that issue, and I thought I had them
all, but this is helpful.

MR. COLBATH:  Think about it this way, Your
Honor, if I move to suppress the drugs, I don't move to
suppress the later testing of the drugs.  I assume that
you realize that if you exclude the drugs, the later
drug test is out.

THE COURT:  Fair enough.

MR. COLBATH:  So if you exclude 4-19, his later
manipulation of it, all his later manipulations are out.

So continue with me if you will just briefly.
Go to page 20.

         1          THE COURT:  All right.

         2          MR. COLBATH:  Now he manipulates it again,

         3    because he takes the animation away and puts an outline

         4    above.  Then if we go -- I'm going to have you jump now,

         5    because I don't want to do this all the way through, if

         6    we go up to page 23, so we're back to 4-12, but this

         7    isn't really 4-12 because there is our make-believe car.

         8    He's now superimposed that.

         9          THE COURT:  On page --

        10          MR. COLBATH:  23.  Maybe your screen -- well,

        11    that's the make-believe car over the top of whatever is

        12    there.

        13          THE COURT:  My 23 doesn't have anything

        14    superimposed on it.

        15          MR. SKROCKI:  Mine doesn't either.

        16          MR. COLBATH:  This page 23?  Sure it does.  In

        17    the corner, that's the only thing we're looking at.

        18          THE COURT:  I see it now.  Thank you.

        19          MR. COLBATH:  We're not concerned about the

        20    trees or the fence or the bollards.  We're concerned

        21    about the image.  He covers whatever the image up with a

        22    make-believe Honda CR-V that the computer has made for

        23    him.

        24          So he's doing the same thing, because look at

        25    the next page, page 24.  Now the make-believe goes away

1    and the outline goes there.  So I will just represent to

2    the Court that how this PowerPoint runs is, he takes a

3    slide from April 12th and he shows it.  Then he takes a

4    slide from April 19th and he shows it.

5          Then he inserts and overlays on April 19th and

6    shows the jury look at how well this fits.  Well, why

7    does a Honda CR-V, a make-believe Honda CR-V fit so

8    nicely on the April 19th video?  It was a Honda CR-V.

9    They knew it was a Honda CR-V.  Why does the outline

10   match perfectly?  Because they knew it was a Honda CR-V.

11         But then without any explanation or change,

12   then he goes right into with the jury, now I take the

13   same outline and the same Honda CR-V and I put it over

14   what you can't see here on April 12th.  So that's one

15   back and forth to the other for 129 pages.

16         So how are you going to instruct the jury to

17   say anything that involves 4-19 treat one way and

18   anything that involves 4-12 treat as substantive or just

19   treat another way.  Infer this from 4-19, infer that

20   from 4-12.  You can't do it.  The whole process --

21         THE COURT:  Isn't there a conditional relevance

22   limiting instruction?  I believe there is in the

23   pattern.

24         MR. COLBATH:  I don't know, but any time -- if

25   you find relevance at all, if you admit this and allow

it substantively, we circle back to *Daubert*, and the government has to convince you that Mr. Sturgis said, "I created the video." Mr. Toglia had nothing to do with the video. Mr. Sturgis said, "I am not a reverse projection photogrammetry expert, never been trained in it, nothing."

They can't have somebody create the test, create the work product, and then give it to an expert to run the science on it. There has to be foundation. If Toglia wanted to go out and run it, then I could cross him on it. Then I would have filed a motion to challenge him, not challenge the video, because it's his scientific use of an unscientific video that's the problem.

If the government wants to have Mr. Toglia testify -- yesterday Mr. Skrocki after the break at lunchtime gave you a copy of his report and submitted it. If you read the report, Toglia says right in it, "You asked me to perform these things. Here is what I did. I took the April 12th video and I did an analysis. I measured this, I put it in my reverse photogrammetry. I did all of this, all of that, and I got to an analysis point."

If the government wants to offer that, in retrospect, I probably should have, now that I've really

1    spent time with Mr. Hoerricks, I should have filed a

2    *Daubert* motion on that because I don't think you can use

3    that reverse photogrammetry, but I can live with cross

4    examining him on that, the analysis of 4-12.

5            But he doesn't stop there.  What he says is

6    after that -- and you will see they are separated by

7    paragraph.  He does it in chronology.  He says, "I then

8    jumped to the same scientific analysis of I ran the same

9    process on 4-19."  Having completed two scientific

10   analyses, one on an evidence video that was just

11   captured and one on a re-creation that government agents

12   completely controlled and orchestrated, that I had no

13   scientific involvement and that they did not -- it

14   wasn't even like they went out there and did it at his

15   request for scientific purposes.

16           They did it for non-scientific purposes.  Then

17   he says, "Nevertheless, I ran scientific analysis on

18   it," this piece of evidence that's not evidence.  Then

19   he says, "Having my two analyses, I now compared my

20   results, my own results, and now I'm going to come tell

21   the jury I find them consistent and I'm going to

22   repeatedly and over and over show it to the jury and

23   tell them why it's consistent."

24           Which leads to the last part of if you somehow

25   get through all that mess of legal standards and why

it's offered and how you can ever find that the

government has met its burden, if you get there at the

end, you have to then consider Dr. Reisberg's premise of

is this going to be prejudicial.

Well, the bottom line is I heard no explanation

from the government, other than the defense could have

created it their own, to your question of what do you

say to the argument of this is really a one-person

showup. Only this is so much worse than a one-person

showup, but, first of all, find me a case that says a

one-person showup is unduly suggestive and not otherwise

admissible; however, the Court determined that the

defense could have just done their own one-person showup

with somebody different or could have done their own

photo lineup with the witness, and because they didn't,

too bad on them, we'll admit the one-person lineup.

That's not the law. The law is that one-person

showups are found to be too suggestive. They are not --

they are not addressed in the case law very recently,

very often, because they are not used by law

enforcement, because at this point in the development of

police investigations, even law enforcement knows a

one-person showup is likely not going to make its way to

court.

And so the answer to the one-person showup, you

1   know, if they had given their witnesses, or if
2   Mr. Toglia took just a photo of Mr. Wells' car and said,
3   "Well, I find it to be consistent.  I have overlaid it
4   or put it in my model or I have done whatever," that
5   would still be a one-person showup, but it would be
6   once.  He would have one picture of the car to work with
7   the April 12th video and try to do it.

8            But here the same argument that they make that
9   says, "Judge, this boils down to a similarity test and
10  this is just dead similar," first, the focus of that
11  camera, all of the dissimilarities illustrate in
12  different ways the difference between the focus of the
13  camera between April 12th and April 19th.

14           And that is so critically important because
15  what Mr. Hoerricks says, "Why I can't go out and
16  replicate my own thing is," and, "Why they didn't
17  replicate their own thing is," if I'm focusing on the
18  word "Elmo" right here, it says "Elmo," and my camera is
19  trained on it, if I've got one focus and I can see
20  "Elmo" and I change the focus, I would have to change it
21  substantially to still not be able to read the word
22  "Elmo."  It's eight inches away.

23           If I was reading a license plate in the parking
24  lot from right here and my camera was focused and I
25  changed the focus every so slightly, at 1,000 feet in

1  the parking lot, you might not be able to tell my car

2  had a license plate.  And so that subtle difference at

3  this point becomes, well, it's magnified however far it

4  goes.

5          Again, Sturgis wasn't doing science so we don't

6  know how far it goes, because he didn't know where it

7  started, nobody preserved that evidence, which crippled

8  my experts from ever replicating anything, because

9  nobody in the evidence collection saved the camera

10 settings.

11         Then Sturgis didn't record how he changed it,

12 so again, Mr. Hoerricks can't go out and say, "I'm going

13 to compare apples to apples.  We're all looking at

14 April 12th.  They made April 19th.  I'll make my own

15 April 19th using the same camera settings, adjusting it

16 so the trees are cut off and the bollards are cut off

17 and the fence is different.  I'll use my own settings.

18 Then I'm going to run ten cars by there, not one, and

19 see if we get the same result."

20         Mr. Hoerricks can't do that because he would be

21 stuck doing what they did.  He would have to eyeball it

22 because he doesn't have the camera settings.  And if

23 you're off at 1,000 feet a little bit, if he's off a

24 little bit, he's now -- he can have no confidence.  He

25 cannot come and tell you, "Judge, I am confident under

*Daubert* I can give you a reliable -- I'm offering you reliable evidence."

I don't have the ability because the government took the ability by not recording any of those things. And so back to my showup, if they used one picture, that's a showup. Here, we know from their similarity argument what they did was, it's not a bank surveillance case where the robber is caught on video and then later they show a mugshot of the robber or they stand the person behind the two-way mirror and the person walks in and says, "Yeah, that looks like the video."

What they did really was -- I'll take them -- for purposes of this discussion, I'll concede the similarities. What they did was they dressed the car up in the same clothes, made it go into the bank, made it wear and appear and stand in the exact spot and they did the showup exactly the same.

And if that wasn't enough, if that wasn't suggestive enough to heighten the one-person, one-car showup, now look what they did, Judge, they took it, and, rather than have the jury stand and look at it themselves, they overlaid it. So they said, "See doesn't it fit exact? Don't you see it? Doesn't it fit? If that angle is bad, let me try again because this one, doesn't that fit?"

1    And then they made a cutout of the person they
2    were showing up, in this case the car they were showing
3    up, and put it over.  And they said, "We know the cutout
4    is precise because we took it from the defendant and
5    that fits too," and over and over.  All this evidence is
6    a one-car showup repeated.  Well, look at how thick the
7    book is.  I think I made my point.
8        So what they are asking you to do is take care
9    of -- first of all, how do I cross examine that
10   suggestability?  My problem is the jury is being -- is
11   suffering from the suggestability.  And so do I get to
12   cross examine them?  Do I get to just stand in front of
13   them and say, "Ladies and gentlemen, I know the Court
14   told you at the beginning don't be biased, kind of like
15   we tell you in voir dire, don't be prejudiced, but
16   that's not enough.  I'm allowed, because this evidence
17   is in, I'm allowed to point out to you" -- do I just get
18   to talk as long as I want to talk about suggesting to
19   them don't be suggestable.  "Don't let the 400 different
20   screen shots of this thing dissuade you.  You're to
21   neutrally evaluate this."
22       Impossible.  You know that's impossible.  So
23   think of the prejudice that comes into play here.  Well,
24   what are you doing in a 403 analysis?  You're weighing
25   the probative value versus the prejudicial.

1          So let's back up.  If this is demonstrative,

2    how probative can it be, because demonstrative by its

3    nature is only demonstrating other evidence or other

4    testimony.  And so Mr. Toglia -- that's why I'm back to

5    my argument of Toglia can testify all day long about his

6    analysis of 4-12, and that's his testimony.  If he's

7    only going to just demonstrate something, or if, like

8    Sturgis said, "We're only demonstrating what we thought

9    the speed was," or, "We're only demonstrating that we --

10   we continued our investigation because this was" -- that

11   doesn't -- how does that help the jury?  That offers

12   very little to them.

13          Whereas look at the suggestability and the

14   possibility for error and the potential prejudice,

15   because Mr. Skrocki's argument was, he wrote in his

16   brief, if the jury believes that that was Mr. Wells'

17   car, the only inference is it was Mr. Wells in it and

18   he's guilty.  So if the jury makes a mistake on this,

19   it's the most prejudicial thing in the case.

20          THE COURT:  I need you to sum up.

21          MR. COLBATH:  So under Sturgis' testimony, it's

22   non-scientific.  That means it's not substantive.  The

23   experts use it as substantive.  If it's substantive, it

24   doesn't get by *Daubert* because Sturgis' foundation can't

25   get it there and no expert was involved in the creation.

```
 1          It cannot be cured by a limiting instruction.
 2   I challenge you and Mr. Skrocki to find one because we
 3   have racked our brains and our abilities and nothing
 4   will fix that.  If you wade through that mess, under
 5   403, this is horrendously, horrendously prejudicial and,
 6   if it's just a demonstration, is not probative of
 7   anything.
 8          THE COURT:  Thank you.
 9          Mr. Skrocki, last word on anything?
10          MR. SKROCKI:  Yes.  I think Mr. Colbath started
11   about five until 10:00.
12          THE COURT:  He had a lot to say.
13          MR. SKROCKI:  None of it is here.
14          THE COURT:  I agree.
15          MR. SKROCKI:  None.
16          THE COURT:  Well, actually some of points he
17   covered were.
18          MR. SKROCKI:  One of the points that he
19   mentions is I mentioned frames in the brief.  Frames in
20   the brief were telling the Court how many frames were
21   created.  That's it.  That's all.
22          The other thing I want to mention is that
23   throughout the course of this case, this government
24   trial team has been labeled by the defense as
25   disingenuous, lying in their briefs.  That is a lie.
```

1    Hiding the ball, and other things.

2           Today, it's dishonest.  Caveat or not, words

3    matter, and they are in the public record.  So we know

4    what we have been doing, and I'll tell the Court that if

5    Mr. Colbath thinks we're hiding the ball and we're

6    playing games with him, I have e-mails and I have voice

7    calls with him saying, "You got a problem or a question,

8    Gary, you give me a call and we'll hash this out.  You

9    want to file something late, you got leave to do it

10   every time."  And instead, in this case, this is a

11   classic sandbag.

12          We go from the four corners of that brief to

13   the last 35 minutes of soliloquy about Toglia and Vorder

14   Bruegge.  And that was Vorder Bruegge's report, whether

15   he says so or not.  If you listen to what he says

16   sometimes it's characterized in shades of gray.  That

17   was Vorder Bruegge's report.  It wasn't Toglia's.

18          This issue is we were under the impression --

19   and he had an occasion to file a reply and didn't do it.

20   This thing about Hoerricks is not in his briefs.  It's

21   only mentioned in this notice to the Court.  We got the

22   notice to the Court and I was like why is this being

23   filed.  I'm being very naive thinking that's nice, they

24   are laying out the Court's issues for us and them.  We

25   even had a conversation about it.  In the footnote, you

1    got Mr. Hoerricks' testimony.

2            I will save the rest of, I guess, the

3    conclusion of what to do with this for my brief.  If the

4    Court is going to suppress this based on this expansion

5    of an initial filed brief and providing us this

6    information the Friday before, then we need leave to

7    bring in our own experts and respond to that.  I offer

8    that.

9            I did note yesterday that Mr. Hoerricks seemed

10   to have no difficulty himself doing an analysis as to

11   the pixel length and other characteristics complained

12   about so vociferously here.

13           In any event, Judge, unless you have other

14   questions for me, that's the status.  Words do matter.

15   They are in the record.  This really could have been

16   handled in a much more straightforward fashion and a

17   clear fashion than it was.  And now we're far, far

18   afield of this where this started based on the briefs.

19           THE COURT:  Thank you.

20           I'll take it under advisement, the motion.  I

21   guess where I tend to -- I will say our goal here in a

22   retrial is not to have, as Mr. Colbath was discussing,

23   yet a third trial.

24           And I am inclined to look, although there is no

25   motion before me, with regard to the extent of

Mr. Toglia's superimposition being presented. That's where I could see a 403 issue having some merit, but that issue is not before me.

And I guess my last question would be for the government, Mr. Skrocki, and that is what's your response on this substantive versus demonstrative use of the April 19th video?

MR. SKROCKI: In the *Daubert* context, I do not look at that as scientific. It's mechanical, based on an image and based on frames of reference from the factory as to that vehicle.

THE COURT: So it would be coming in as substantive evidence and then that's where -- am I correct?

MR. SKROCKI: Yes.

THE COURT: And then there is this conditional relevance is the point I was raising, which is to say that the April 19 video would not be relevant unless and until the factfinder -- well, I leave you to ponder that, and that is to say that it would have no relevance if a jury were to conclude that the Wells' vehicle was not driven on April 12th. What's the relevance of a re-creation on April 19th?

MR. SKROCKI: They are free to make that decision.

1          THE COURT:  Correct.  And that's where --

2     that's what conditional relevance is.  It only becomes

3     relevant if a jury concludes X, and I'll leave that out

4     there for people to ponder, but I do think, although it

5     was not a subject of this motion, I do think that some

6     of the -- that in that context the extent of the

7     PowerPoint may have, by Mr. Toglia, may have a 403

8     component because of the fact that the April 19 video

9     would only be conditionally relevant, so at some point

10    then there could be the prejudice substantially outweigh

11    that value.

12          MR. SKROCKI:  Understood.

13          THE COURT:  Food for thought, not before me

14    today, but I will address this motion that is here with

15    regard to the exclusion of the video.

16          So anything further?

17          MR. SKROCKI:  No, Your Honor.

18          THE COURT:  Now I'm behind for the rest of the

19    morning, but that's okay.

20          Mr. Colbath, anything further?

21          MR. COLBATH:  I apologize for that.

22          THE COURT:  That's all right.  That's all

23    right.  It's an important issue to both sides, I

24    understand.

25          MR. COLBATH:  If it wasn't so important, Your

1  Honor, I wouldn't be taking the time, and I appreciate

2  the Court allowing me to do that.

3          DEPUTY CLERK:  All rise.  This matter is now

4  adjourned.  Court stands in recess until our

5  10:30 matter.

6          (Proceedings concluded at 10:48 a.m.)

7

8                     CERTIFICATE

9     I, Sonja L. Reeves, Federal Official Court Reporter
   in and for the United States District Court of the
10  District of Alaska, do hereby certify that the foregoing
   transcript is a true and accurate transcript from the
11  original stenographic record in the above-entitled
   matter and that the transcript page format is in
12  conformance with the regulations of the Judicial
   Conference of the United States.

13

      Dated this 19th day of April, 2020.
14

15
                          /s/ Sonja L. Reeves
16                        SONJA L. REEVES, RMR-CRR
                          FEDERAL OFFICIAL COURT REPORTER
17

18

19

20

21

22

23

24

25