1          UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF ALASKA
2

3  UNITED STATES OF AMERICA, )
                             )
4        Plaintiff,          )
                             )
5  vs.                       )   CASE NO. 3:13-cr-00008-SLG
                             )
6  JAMES MICHAEL WELLS,      )
                             )
7        Defendant.          )
   _____  )
8

9          TRANSCRIPT OF FINAL PRETRIAL CONFERENCE
     **BEFORE THE HONORABLE SHARON L. GLEASON, DISTRICT JUDGE**
10              August 30, 2019; 9:19 a.m.
                    Anchorage, Alaska
11

12  **FOR THE GOVERNMENT:**
         Office of the United States Attorney
13       BY:  STEVEN SKROCKI, CHRISTINA SHERMAN and
              KELLEY L. STEVENS
14       222 West 7th Avenue, #9
         Anchorage, Alaska 99513
15       (907) 271-5071

16  **FOR THE DEFENDANT:**
         Office of the Federal Public Defender
17       BY:  GARY GEORGE COLBATH
         601 West 5th Avenue, Suite 800
18       Anchorage, Alaska 99501
         (907) 646-3400
19
         Camiel & Chaney, P.S.
20       BY:  PETER A. CAMIEL
         520 Pike Street, Suite 2500
21       Seattle, Washington 98101
         (206) 624-1551
22  _____

23            **SONJA L. REEVES, RMR-CRR**
            Federal Official Court Reporter
24              222 West 7th Avenue, #4
                Anchorage, Alaska 99513
25      Transcript Produced from the Stenographic Record

1          (Call to Order of the Court at 9:19 a.m.)

2          DEPUTY CLERK:  All rise.  Her Honor, the Court,

3    the United States District Court for the District of

4    Alaska is now in session, the Honorable Sharon L.

5    Gleason presiding.

6          Please be seated.

7          THE COURT:  Good morning.  We're on record in

8    *United States versus Wells*.  I have Mr. Skrocki here

9    with Ms. Sherman, Ms. Stevens.  And Mr. Wells here with

10   Mr. Colbath and Mr. Camiel.  And it's the time set for

11   the final pretrial conference.

12         I have a number of items to go over and then

13   can hear from each side as well.  I understand each side

14   also has delivered exhibits somewhere.  So thank you.

15         All right.  Very good.  So in no particular

16   order here, to take up first, Mr. Skrocki, what's your

17   estimate of the length of the trial at this point?

18         MR. SKROCKI:  The government's case or total?

19         THE COURT:  Government's case.

20         MR. SKROCKI:  Depending on the cross, we're

21   looking at -- we expect four weeks maximum, depending on

22   the cross.  That's the hard part to figure out.  And

23   we're also, as you might remember, we're talking about

24   doing relaxed form of direct, switching witnesses to not

25   have them called back, so I think the best estimate for

us is four weeks given that.

THE COURT:  Mr. Colbath, is there any indication you can give me at this time as to the length of the defense case, if any?

MR. COLBATH:  A week.

THE COURT:  All right.

MR. COLBATH:  Depending on how many folks -- we'll have some duplicate things, I think, and so we'll make some progress in the government's case with some things that we otherwise would have called or done.

THE COURT:  All right.  Very good.  Well, that's a little longer than you had said before, but better to err on the side of too much time, I suppose.

MR. SKROCKI:  If I might, Your Honor.  We are going to meet, and with the Court's latitude and approval, if we had, for example, a witness with ten photographs, mass admission, if not by stipulation, so we're going to try to work on things to move it as opposed to doing the routine with every individual photograph or piece of evidence.  So we have both been around long enough we hope we can make that work.

THE COURT:  So noted.  Very good.  So I think I put out a text order that said we'll go Monday through Thursday full days and then half days on Friday.  I will give you a heads-up now that October 4, which is a

1   Friday, we won't go at all because of other commitments

2   here at the court.  So that will be the plan.  My

3   practice generally is to start at 8:30 with the parties

4   only and have the jury come at 9:00, and that way their

5   time is not wasted while we take up any issues that you

6   have thought about in the evening.

7          If that -- the jury I know generally likes to

8   start earlier, and so if we're -- and my expectation is

9   that maybe after the first week or so we'll iron out a

10  lot of things and can actually start with the jury at

11  8:45 or 8:30.  We'll play it by ear, but for now,

12  certainly, on Monday the 9th we'll start at 8:30 with

13  the parties only and then 9:00 I'll tell the jury clerk

14  to call up the jury.

15         Mr. Colbath, does Mr. Wells waive his presence

16  at sidebars during jury selection?  You want to confer

17  with him and Mr. Camiel on that topic, because that will

18  impact how we proceed here.  I will certainly give you

19  time to confer with him if need be after a sidebar.

20         (Pause)

21         THE COURT:  Mr. Camiel, if you need to come

22  back to me on that question, that's fine.  I don't need

23  an answer today.  It's fine if Mr. Wells wants to

24  participate.  What I'll end up doing is keeping a list

25  of everybody that we need to take up privately and

1  having them called in, with my law clerk's assistance,

2  one at a time to the jury box with the rest of the jury

3  not present.

4       MR. CAMIEL:  We thought you were talking about

5  during the trial.

6       THE COURT:  And during the trial, that's a

7  separate issue.  So during jury selection and during the

8  trial.  So let me know that at some point.  I might come

9  back -- well, in any event we'll sort that out.

10       All right.  Then my thought on the jury is, and

11  I asked Judge Beistline too about number of alternates,

12  and I am inclined to go with four alternates, somewhat

13  reluctantly, but that would be my plan, which would mean

14  that we would seat 16 individuals.

15       And I guess the question I would have is there

16  is a little bit of ambiguity in the rule, or I think a

17  bit of a fair reading of the Rule 24 on jury selection

18  contemplates that the alternates are designated at the

19  beginning.  And it would be my preference, because I

20  think people are better listeners if the alternates are

21  chosen at the end randomly.

22       If both sides agree to that, that's what I'll

23  do as opposed to having somebody knowing I'm the fourth

24  alternate would seem to have --

25       MR. SKROCKI:  We agree.

1          MR. CAMIEL:  We do.

2          THE COURT:  With that, the way we will pick the

3  jury is as follows:  There will be the 16 I indicated

4  that will be seated.  The defense has ten peremptories,

5  plus two additional for the alternates.  The government

6  has six peremptories plus two additional for the

7  alternates.

8          By my math, that results in a total of 36

9  individuals; 16, plus 12 for the defense and 8 for the

10  government.  So the way I will do the selection is as

11  follows:  We'll have the whole back of the courtroom

12  filled with a panel of individuals.  You will get their

13  names, and I would ask however that you refer to them by

14  their number, not by their name.  And they will have a

15  number on their clothing, so please refer to them by

16  their number.

17          If either side requests, I can tell them that I

18  have asked you to do that.

19          MR. COLBATH:  I would like that, Your Honor.

20          THE COURT:  I saw dismay from the defense on

21  that ruling, but it really makes the jury feel more

22  comfortable, I think, with the process.  So I will

23  instruct the jury that at my direction, the lawyers will

24  be addressing you by number.  If I forget that, please

25  feel free to remind me, preferably outside the presence

1    of the jury, but that's fine.

2         So we'll have the whole back.  I will do the

3    voir dire.  And I will give you Monday morning at 8:30,

4    I will review your voir dire that you have submitted

5    with you and tell you which topics I won't be addressing

6    that's on your proposal, which topics you will have an

7    opportunity to address, because I will have up to

8    15 minutes per side that I'll explain here for follow-up

9    questions.

10         And if there are any that I don't see should be

11   asked to this particular panel, I'll tell you about that

12   at that time as well.  So I have not yet reviewed the

13   proposed voir dire that you submitted.

14         But in any event, I'll go through the series of

15   questions with the people in the back and take up any

16   issues outside the presence of the panel over here, if

17   Mr. Wells waives his presence, and then otherwise we'll

18   do this other procedure where we call them in one at a

19   time.  Either way is fine.

20         Then we will have -- if there is challenges for

21   cause, you can bring those up at any time outside the

22   presence of the panel.  And just say, "Judge, can we

23   approach," that's fine and we'll take that issue up, or

24   take it up when there is no jurors present in the

25   courtroom.

1         And then at some point, after we get that

2    process completed, I will have the courtroom deputy

3    randomly select 36 names from this group of individuals.

4    Those 36 people will be seated in the jury box and

5    across the front of the spectator section of the

6    courtroom.

7         There is a questionnaire that our courtroom

8    deputy will hand out, and I have got a copy for you

9    here.  If either side had any changes to that, I'll give

10   you an opportunity to -- why don't you take a minute or

11   two and look at that and -- it's a pretty standard

12   questionnaire.

13        I did include a firearm question, "Do you have

14   firearms in your home," or something along those lines,

15   in light of the fact that that's an issue in this case.

16        Anyway, take a moment, and if there are any

17   changes, corrections or additions that you would

18   propose, I'm open to that.

19        (Pause)

20        MR. SKROCKI:  No objection, Your Honor.

21        THE COURT:  All right.  Mr. Colbath, any

22   changes that you would propose?

23        MR. COLBATH:  Your Honor, could I inquire as to

24   how the Court plans to handle publicity and knowledge of

25   the prior trial or prior case?

THE COURT: Yes. My intention would be during the voir dire of the whole back is to ask -- first I'll give a short statement at the beginning of the -- at the very beginning of what the case is about. And if either side wanted to propose that or work together on that, that would be helpful obviously to tell them a little bit about what the case is about apart from simply reading or summarizing the indictment.

So I think that would be helpful. Like I say, if the parties wanted to propose that, it's fine. My goal would be to make it as bland as possible, but to indicate that it was in Kodiak and that it's a Coast Guard, so to try to refresh people's recollections to the extent that they might have heard about it.

MR. SKROCKI: Let us take that up. We'll start the process, and we'll get it to Mr. Colbath and Mr. Camiel and try to work something out.

THE COURT: Thank you. After -- at some point in the voir dire of the whole back, I will ask, "Does anyone believe they may have heard about this case," and if anyone raises their hand, I'm going to say, "Hold that thought," and get all of their numbers and then take it up privately one by one.

MR. COLBATH: Okay. And that's -- if the Court is going to handle that in that process, we'll have that

```
1    out of the way before we get to this questionnaire.  We
2    have no objection then or additions to the questionnaire
3    as proposed.
4          THE COURT:  There was one that I sometimes have
5    used and I don't have it in here and I'm happy to add,
6    and that is the most important source of news or how do
7    you get your news.  And I don't know if either of you
8    proposed that in your voir dire.
9          MR. SKROCKI:  We did not, but anymore nowadays
10   we did propose a question about social media and people
11   get a lot of their news from social media.  We may not,
12   but a lot of other people do, so there is that little
13   bit of crossover there.
14         THE COURT:  All right.
15         MR. COLBATH:  It would seem -- I think that I
16   asked or I proposed in our voir dire some series of
17   questions both on social media and/or other something
18   along those lines, so it would maybe be an appropriate
19   question.
20         THE COURT:  I'm happy to add it here, the most
21   important source of news or how do you get your news?
22         MR. SKROCKI:  Yes, please.
23         MR. COLBATH:  Yes.
24         THE COURT:  So you got that?
25         DEPUTY CLERK:  Uh-huh.  How do you get your
```

news and social media?

THE COURT:  That sounds a little awkward.  "How do you get your news," I think is fine.

All right.  So we'll have the 36, they will read the answers to that questionnaire.  And there again, if their answer is, such as if it's 14, "Is there any other reason you can think of why you shouldn't serve," oftentimes I'll take those up privately, but we'll come back to those.  And so that's the plan there.

And then I will give each side up to 15 minutes to ask follow-up questions.  You can do it of the group of 36 as a whole, you can do it individually, but you can't use the format that is in state court, which is to spend a day giving your opening or closing in the context of voir dire.

I intend it as a follow-up on topics. Sometimes I won't follow up when a person says some issue, I will say, "Well, thank you for telling us about that, the lawyers may follow up," and then that's your cue that if you have concerns about whatever topic was raised you have that time.

At the end of the 15 minutes, if you feel you haven't been able to adequately follow up on the topics that need to be done, you can make an application for additional time, but I would say that that's a difficult

application and it requires a high showing of good
cause.  So don't plan on additional time, but sometimes
there are individuals that really have a lot to say
other than the lawyers and they won't stop talking, and
that would be a circumstance where I -- you don't want
to cut them off, I respect that.  That would be a
circumstance where I might give you more time.

If you're the one primarily talking, you're not
going to get more time.  So any question on that,
Mr. Skrocki?

MR. SKROCKI:  Very clear, Your Honor.

THE COURT:  Mr. Colbath?

MR. COLBATH:  No, Your Honor.

THE COURT:  Then we'll take a break.  I'll send
the jury out.  I will instruct them probably several
times during the course of the selection process on the
fact that you are all instructed not to communicate with
them at all and this is at its most awkward when we're
doing the selection.

Once we get the jury going down to the other
end of the hall and in the jury room, it's less awkward,
but it is definitely awkward that morning or afternoon,
depending on how long we take here.

In any event, then we'll do peremptories.  I'll
give you time to confer.  We'll then take peremptories

1    beginning with the defense, so this is outside the

2    presence of the panel, begin with the defense because

3    they have more to exercise.  I don't require them

4    simultaneous.  I don't do the list.  We do it on the

5    record, and go back and forth until the defense

6    exercises its 12 or indicates it's fine with the panel,

7    and likewise the eight for the government.

8              If you don't exercise all of your peremptories,

9    then I will begin with whoever is the 36th name, I call

10   and excuse that person.  So if all the peremptories are

11   not exercised, we're still only going to have 16 people,

12   which means whoever was called up last in this group of

13   36 will be excused.

14             Mr. Camiel, that may be different than what I

15   did when I had a trial with you where I randomly

16   selected it.  Now I go for the last person, so you know

17   who it's going to be if you don't exercise all your

18   peremptories.

19             Of course, during the course of the -- we may

20   call in other people to replace along the way and that's

21   fine.

22             In any event, questions -- then at the end of

23   the day, we'll call back in the 36 people, they will

24   stay in the back and I'll call up the 16 names, the rest

25   will be excused.

1    Questions about any of that, Mr. Skrocki?

2    MR. SKROCKI:  No, Judge.  Thank you.

3    MR. COLBATH:  Your Honor, I assume that at some

4    point worked in there, given the anticipated length of

5    trial and the number of folks we have, that that will be

6    one of the things that the Court covers.

7    THE COURT:  Correct.

8    MR. COLBATH:  So before we even get to this

9    questionnaire, we will have had the discussion of, look,

10   you might be here five or six weeks or four or five

11   weeks.

12   THE COURT:  What I have done, and I would

13   expect to do here, if somebody has -- they have been

14   waiting to see some medical specialist and they have an

15   appointment one day during that five weeks, I would not

16   be inclined to excuse that person, but would try to

17   accommodate a change in the trial schedule to allow

18   people to serve.

19   If somebody had a long weekend and they were

20   tickets to go out of town, I would be inclined to excuse

21   that person.  If possible, if it's just an afternoon or

22   an event of some sort in somebody's life, I like to try

23   to accommodate that.

24   MR. COLBATH:  That was the only question I had.

25   THE COURT:  The length of the trial I work in

right at the outset. I will tell them up to five weeks is what I'm hearing. Very good. Then the neutral statement I'm going to get a draft it sounds like.

Questions from jurors during trial I won't allow, but sometimes people ask them, but I'm not going to have that opportunity. It works well in civil cases. I don't use it in criminal cases.

Then let's see, do we have any issues with regard to any witnesses that are going to need special accommodation of any sort?

MS. STEVENS: Your Honor, we have one witness we have requested the Court allow him to testify via VTC, video-teleconference. This person is located in Florida, and there is a hurricane that's expected to land. It probably won't interrupt his ability to testify through VTC, but if it's a Katrina-type hurricane, we may have to just finagle some logistics around.

I just wanted to let the parties know and the Court know that is a potential issue, but at this stage, there is no issue.

THE COURT: All right.

MR. COLBATH: Your Honor, I don't think that we have any witnesses, at this point at least, that we have been alerted to that we have transportation or similar

requests or anything of that nature, which I'm pleased about. I will say with respect to the one government witness that's been identified, we don't have objection to him being able to testify by video, but I will tell the Court I think there is a couple of exhibits we want to talk to that person about that we know maybe ahead of time and so we'll try to make arrangements to get a copy to him or in front of him so that those are already there.

But I also anticipate that we may be requesting at the conclusion of his direct to take a break, and hopefully he'll be in a place where we then can e-mail or fax to him, "In light of your testimony, we want to show you these other two pictures or these other three exhibits," or something, have a brief window of time where we can get some things in front of him knowing what the testimony is or what's been admitted up to that point or something along those lines. And then reconvene and then do the cross so we can talk to him about it.

MS. STEVENS: So I have already advised this potential witness that we would work together to get as many exhibits to him in advance so that he'll have them prior to his testimony.

Additionally, this person does have e-mail

1  capability, so if the defense wishes to e-mail him --

2          THE COURT:  After the direct?

3          MS. STEVENS:  -- after the direct, that

4  shouldn't be an issue, again, barring any catastrophic

5  event.

6          THE COURT:  I saw there is agreement with

7  regard to a witness was deceased, and how does the

8  government propose to present that testimony?

9          MR. SKROCKI:  We would put probably an

10  assistant U.S. attorney in the box to do the reading

11  back and forth.  Mr. Colbath and I have to figure out

12  how the cross examination piece is going to work and we

13  have had small discussions about that.

14          THE COURT:  Was it recorded, the first trial,

15  or was it transcribed?

16          MR. SKROCKI:  It's transcribed.  We have a

17  transcript.

18          THE COURT:  Did you have a court reporter or

19  was it electronic?

20          MR. COLBATH:  The person testified live.

21          THE COURT:  We may have a recording of it.

22          MR. SKROCKI:  We just play it.

23          THE COURT:  And play the recording.  If it

24  wasn't a court reporter that Judge Beistline used, I

25  don't know.  It may be recorded.

```
 1              MR. SKROCKI:  We'll take a look at that.

 2              THE COURT:  Given the timeframe, I would expect

 3      that may well have been the case.

 4              MR. SKROCKI:  We actually hadn't thought about

 5      that.

 6              THE COURT:  And then you're playing the actual

 7      testimony, and then you could clean up if there were

 8      objections or sidebars.

 9              MR. SKROCKI:  We will look into that.

10              THE COURT:  Very good.  Then in terms of

11      decorum in the courtroom, I have -- you all I think will

12      do just fine.  In terms of going to the -- my biggest

13      issue is sometimes, and I don't anticipate this from

14      anybody, but people getting too close to the witness.

15      Just really respect their space.  And so don't lean over

16      and say, "Here, let me show you," or stay up there.  If

17      you want to approach the witness and give him or her a

18      document, that, of course, is absolutely fine.  But I

19      would ask that you ask permission to approach and then

20      leave after you're done approaching.

21              And that I think is respectful of them.  And,

22      of course, keep your distance from the jury.  I don't

23      think this is a trial where I'll need to have the duct

24      tape on the floor, which I did in a civil trial so that

25      -- I don't anticipate that.
```

1          All right.  And I think that is everything on

2   my list.  I guess, Mr. Skrocki, any estimate today of

3   your length of your opening statement?

4          MR. SKROCKI:  Ms. Sherman has the opening, Your

5   Honor, and we're estimating 15 minutes.

6          MS. SHERMAN:  No more than 20.

7          THE COURT:  No more than 20.  All right.  If

8   the defense elects to make an opening, is 20 minutes

9   going to be sufficient?

10          MR. CAMIEL:  Your Honor, we would ask for more

11  time.  I'm thinking probably 30 minutes.

12          THE COURT:  Up to 30?

13          MR. CAMIEL:  Actually, up to 40.  I don't know

14  if the Court will give us that long.

15          THE COURT:  Up to 30.  I just have to say

16  jurors are ready to hear the evidence, not to hear what

17  the evidence is going to be, is my sense.  So I'll give

18  each side up to 30 minutes.  That should be, from my

19  perspective, sufficient time.

20          All right.  I know I have a number of motions

21  pending.  I was out of town, and, obviously, you all

22  were not and were very busy.  And I will get out a --

23  I'm almost done with the April 19 video order.  I think

24  I gave you -- I know I gave you a sneak preview on how I

25  was going to be approaching that.  And I will get out

1    the other orders that are pending.

2           So those were my topics.  Mr. Skrocki, other

3    topics?

4           MR. SKROCKI:  I do have some.  May I have just

5    a minute?

6           THE COURT:  Sure, go right ahead.

7           (Pause)

8           THE COURT:  I'm sorry.  There was one other

9    thing I wanted to say, which is different from how I

10   have done trials in the past.  I am going to try this

11   time to preclude recross examination and only allow it

12   if there is new material that is introduced in redirect.

13          And so I do intend, and I know that's a change

14   from my past practice, but I do see that -- I was just

15   with a group of judges and we were discussing this topic

16   -- that recross should be limited only to the, if at

17   all, only to explore new topics that were brought up in

18   redirect.

19          And so if a party seeks to do recross

20   examination, needs to make application outside the

21   presence of the jury as to what additional -- what new

22   topic was brought up or new material in redirect.

23   Otherwise, it's been my sense that it becomes the

24   redirect rehashes the direct and then the recross

25   rehashes the cross.

1          And I expect the redirect to be pretty concise

2    and focused only on the cross and then eliminate the

3    recross except as to new material that is identified

4    before it occurs.

5          So questions about that, Mr. Skrocki?

6          MR. SKROCKI:  No, Your Honor, we understand.

7          THE COURT:  Mr. Colbath, questions about that?

8          MR. COLBATH:  No, Your Honor.

9          THE COURT:  Very good.  Anyway, that was -- it

10   wasn't on my list and so I overlooked it, but it was a

11   point I wanted to bring up.

12         MR. SKROCKI:  Thank you, Judge.  No need to go

13   to the podium today.  I'll be there plenty in the next

14   couple of weeks.

15         Just a couple of housekeeping things to give

16   you an idea about what's coming.  We have elected to

17   play, as the trial brief indicated, all of Mr. Wells'

18   statements to law enforcement.  We made the decision to,

19   you will see that in your trial binder, to stay well

20   away from any instance of invocation by Mr. Wells at the

21   conclusion of the interview.

22         Mr. Colbath and I are talking about there is

23   one last interview, it's very short, that we did not

24   want to play.  They want it to be played.  So we're

25   going to have some discussions about that, certainly

trying to figure out the mechanics of that.

In your exhibit binder, you will see the transcripts that we're going to be using. They have been authenticated. The disks are ready to go. In fact, all of our evidence is ready to go in terms of production to the defense and to the Court. We have to work that out.

Additionally, we are, as you may be expecting, in heavy trial preparation with witnesses. Some of those witnesses are providing us information that if we believe it's even somewhat close to being new information or something that's kind of new, we are memorializing that with the case agent and we're providing those to defense right away.

And so you will probably be hearing some motion practice about some of that as it comes down. It's our obligation, of course, to get this done now and provide it to them now as opposed to having the witness put it out on direct and/or cross, so certainly we're fulfilling that obligation.

The April 19 ruling we're still waiting for, as you indicated. When you see the exhibits in the binder, they don't have that disclaimer yet. It will be there.

THE COURT: The notice that I did, I'm not -- I'm open to a different disclaimer. Didn't I say "for

example," or something along those lines?  It doesn't
have to be that precise disclaimer if there is a
different way that the government and/or defense
proposed to label it.

        MR. SKROCKI:  If we come up with something
different, we'll let the defense know and we'll try to
work it out amongst ourselves and let you know the
result of those discussions.

        When can we expect to receive the jury list?

        THE COURT:  Well, generally, it comes out the
morning of trial, and sometimes people make application
for sooner.

        MR. SKROCKI:  Okay.  We'll have to make
application.

        THE COURT:  You can do that right now.  What's
your proposal?

        MR. SKROCKI:  That would save some typing.
Friday?  Counsel, Friday?

        MR. COLBATH:  The sooner the better for us.

        THE COURT:  I will do next Friday.  And I
believe the way I have done it is -- well, I will do
what I have done in the past, which is provide it to the
government, I believe, and then the government has been
running APSIN.

        MR. SKROCKI:  Yes.

1        THE COURT:  And then provides that information

2    to the defense.  And then we redact -- we provide the

3    name and the community, but not the address.  I'm trying

4    to recall.  But whatever I have done recently, I will do

5    again.  I did, I believe, in Mr. Bachmeier's case.  In

6    any event --

7        MR. SKROCKI:  We will follow through with that

8    process and go back to the office and talk to some

9    folks.

10        THE COURT:  Obviously, I know I don't need to

11    say it, but I will, and that is to not reach out to

12    these individuals on social media or in any other

13    format, but you can research them.

14        Questions about that?

15        MR. SKROCKI:  No, Judge.

16        THE COURT:  That approach work for you, Mr.

17    Colbath?

18        MR. COLBATH:  It does, Your Honor.  Although

19    that seems -- that will obviously, and it's appreciated,

20    but be some work for the government.  Could we get the

21    list at the same time that they get the list, and then

22    as they do the checks or run that material, then that

23    can come over whenever it's accomplished?

24        THE COURT:  Yes.  Is that agreeable?

25        MR. SKROCKI:  Of course.

1           THE COURT:  So you get the list sooner.  I will

2    talk to the jury clerk and we'll get that to you next

3    Friday morning.

4           MR. SKROCKI:  Sounds great.  We provided a

5    witness list to the defense today, along with our

6    exhibit binders, so they have a list in alphabetical

7    order of who we're going to call.

8           Prior practice for me is that the night before,

9    sometime reasonable, we'll give them an idea who we're

10   calling the next day.  The correct order, so we'll just

11   keep that rolling so there is no surprises for the next

12   day.

13          Defense is coming over to our office next week

14   at 2:00 to look at the physical exhibits.

15          THE COURT:  What day?

16          MR. SKROCKI:  That would be Wednesday, whatever

17   date that is.

18          MR. COLBATH:  That's the 4th.

19          MR. SKROCKI:  For physical exhibits, there are

20   not many, but we want them to have a chance to look at

21   that.

22          I want to give the Court advisement in advance,

23   the Coast Guard members, like the last trial, will be

24   testifying in uniform.

25          THE COURT:  All right.

        MR. SKROCKI:  We're still waiting for a
response on the Shemya bird diverter conversation ruling
that we have filed.  Ms. Stevens --

        THE COURT:  That's the clarification.  I will
get that out.

        MR. SKROCKI:  And for our purposes, we still
have Docket 1159 is an ex parte application concerning
the defense request on the *Brady* issue or the review
thereof that Ms. Stevens was handling, so that one is
still outstanding.  Discovery issue, not *Brady*.

        THE COURT:  Right.

        MR. SKROCKI:  One thing we have been
considering, and I think we can talk to defense first
before having to resort to a filing, is that sometimes
in big cases like this the past practice has been when
government witnesses are being examined and defense has
access to them prior to recorded statements or
transcripts or reports, they are being queried and asked
about them.

        We would like copies of that information so we
know what they are referring to.  I'll talk to
Mr. Colbath and Mr. Camiel about that.

        THE COURT:  So to impeach with?

        MR. SKROCKI:  If they are impeaching or using
it as an exhibit, whatever it happens to be, if we can

get advance production of that so we see what it is so
we're not sitting here looking at it while the witness
is being questioned.

THE COURT:  What's your precise proposal?

MR. SKROCKI:  I want to talk to defense first
and try to keep this out of court.  If we can't come to
an agreement soon, we'll file a motion.  In a sense,
it's reverse *Jencks* to some extent, but it's more about
trial flow.  If we get a transcript of something or we
want to see it, it gets interrupted.

THE COURT:  Certainly, before any document is
shown to a witness by either side, it should be shown to
opposing counsel.  What I understand is you're saying
that doing it at that time immediately before showing
the witness can slow things down.

MR. SKROCKI:  Correct.

THE COURT:  I can understand that.  If there is
a way you could do it sooner, that would be helpful to
moving things along.

MR. SKROCKI:  Thank you.  One quick -- finally,
Your Honor, I would like to introduce you to Mrs. Nicola
Belisle.  She is the spouse of Richard Belisle, so she's
right here in court.  You want to stand up.

THE COURT:  Good morning.

MR. SKROCKI:  She will be exercising her right

1    to be present during the trial.

2             THE COURT:  All right.  Very good.

3             MR. SKROCKI:  That's all we have.  Thank you.

4             THE COURT:  The only point I would caution is

5    during jury selection we're going to have a large group

6    of people, and that's fine.  I'll put all the spectators

7    in a corner and direct people not to communicate with

8    this panel of individuals.

9             And if you have any questions about that, I'm

10   sure Mr. Skrocki can explain that procedure, but we'll

11   put everybody, including the defense who is not up here,

12   back in a corner so that we can fill all of the seats.

13   We don't have a whole lot of seats for the number that

14   we'll probably be calling up here.

15            Very good.  Thank you, Mr. Skrocki.

16            Mr. Colbath, other topics to take up?

17            MR. COLBATH:  Not many, Your Honor.  I do think

18   that we will be able to probably work out the first

19   issue Mr. Skrocki discussed about Mr. Wells' additional

20   statement.  We're going to not oppose the first five

21   statements being played.  The second one I think total

22   is four minutes and six seconds.

23            THE COURT:  This is the very last --

24            MR. COLBATH:  The very last statement.  I think

25   it's total four-ish minutes, The last minute and a half

of which we are going to propose to redact. It's the final invocation of rights, if you will, and counsel and whatnot. It's under two minutes, I think, of what I'm proposing for contextual purposes. We'll see if we can work that out. If we can't, we'll certainly let the Court know.

Having received the government witness list today, Mr. Camiel and I before he leaves town tomorrow we'll look at it and finalize, try to finalize ours, or when he gets back here, finalize ours. We'll certainly before the trial starts get the government a tentative witness list. Ours often, as it always does, is dependent on what happens during the government's case.

But at least at before the outset of trial we will provide the government with an alphabetical list of the folks that we don't see on their list that we know will be on ours. They, of course, already know the experts, which are frankly probably a third of our case at least.

I agree that it's a helpful process, and we will certainly reciprocate with, as the case goes along, when it gets to the defense case, we will certainly provide each day the day before a list of who is up next and who is anticipated in what order.

I will tell the Court that two of our experts

1  have, not terribly tight, but somewhat time commitment

2  or time travel issues.  And so if the government were to

3  go a full four weeks, when we get to that fourth week,

4  the week of September 23rd -- actually, starting the

5  third week --

6          THE COURT:  September 23rd has got to be week

7  three.

8          MR. COLBATH:  Week three.  If we get to that

9  week and they are still thinking they are only halfway

10  or something through the case, we may have to ask to

11  call an expert out of order.  One of ours becomes

12  unavailable beginning the 30th of September for about a

13  ten-day period.

14          The other ones I think we, if we got to that

15  point, I think we could probably deal with new travel

16  arrangements and make it work, but we'll cross that

17  bridge when we come to it.  Otherwise, we'll certainly

18  provide orders as requested.

19          When we go -- the Court has the physical

20  exhibits and the government has the physical exhibits

21  that we were able to assemble and get together for

22  today.  It is far and away the lion's share of them.

23  Due to some audio visual and computer issues and the

24  absence of Mr. Johnson for a brief period the last week,

25  we don't have all the video clips or necessarily a

1  couple of the audio things, just a few of the digital

2  things mostly finalized.  When we come to see the

3  physical evidence on September 4th, anything that -- any

4  additional exhibits that we have identified between now

5  and then are finalized, we'll make sure that the

6  government has no later than then, and we may next

7  Wednesday supplement the Court's binder with a few

8  additional things.

9          I filed sort of a little bit of a catchall

10  motion in limine --

11          THE COURT:  I saw that.

12          MR. COLBATH:  -- bringing up a few issues I

13  identified.  I see the government filed yesterday

14  evening a response to that, so that's outstanding.

15          As Mr. Skrocki pointed out, well, they are in

16  trial preparation and they are getting with witness

17  contact, as it always happens, new information and

18  whatnot.  I can tell the Court we received maybe 200

19  pages of discovery yesterday afternoon that I am still

20  going through that I see contains a number of new issues

21  and things.

22          So I don't know the Court's practice,

23  obviously, on motions in limine.  We can object

24  midstream and as we go.

25          THE COURT:  That's why I like the 8:30.  Any

1  anticipated issues, take up between 8:30 and 9:00.

2        MR. COLBATH:  Frankly, my thought was if I

3  identify something this weekend, I'm likely to first

4  contact the government and see if we can do something,

5  but if we can't, file something sooner rather than

6  later, rather than wait to try to figure it out at 8:30

7  the morning whatever day it becomes applicable.

8        THE COURT:  That's certainly -- that's great.

9        MR. COLBATH:  I don't expect a lot of it, but

10  also if we can do it ahead of time, I think it's

11  beneficial for the Court and certainly the most

12  respectful way with the jury's time.

13        Other than the things outstanding that

14  Mr. Skrocki already identified and that motion in limine

15  that I filed, I don't think we're expecting that there

16  is --

17        THE COURT:  I appreciated that.  I haven't read

18  the government's response, but I think that's helpful.

19        MR. COLBATH:  That's fine.  That's all we have.

20        THE COURT:  The clerk printed out an order from

21  a different case that relates to juror information.  And

22  can you print two more copies and give one to each side,

23  or just one more copy and give them -- take a look at

24  this and see if the terms of this order is -- it does

25  contain some restrictions on the disclosure of the

information by the defense.  So take a look at that.
And it does address the APSIN.  It did -- it does
provide that both sides would get the list, and then the
government do the APSIN thereafter, as the defense
requested here.

So take a look at this, and my intent would be
to enter an order that is the same as this.

MR. COLBATH:  I neglected to ask, but I assume
we'll have a sequestration.

THE COURT:  Let me just say on the record I'm
reading from 3:18-cr-40, Docket 202, which is an order
entered in *United States versus Moore and Pierce*.  I'm
sorry, Mr. Colbath.

MR. COLBATH:  We'll have a sequestration order,
I assume, for the witnesses at trial?

THE COURT:  Yes.  So you're seeking to exclude
witnesses?

MR. COLBATH:  All witnesses from court until --
two things relative to witnesses:  A sequestration order
that keeps witnesses out of the courtroom until --

THE COURT:  During opening as well?

MR. COLBATH:  Yes, I think during openings,
although it sounds like the openings will be brief, save
for as soon as their testimony is complete and they are
excused by both sides, then they are free from the

order, but if they are not excused for some reason under

their subpoena, then we would ask that it still apply,

and that it apply to all witnesses.

I would see as exceptions the case agents

and/or investigators from our office or case agents, I

suppose, Coast Guard and Mr. Allison I suppose from the

FBI.  I'm not sure who for the government.

THE COURT:  Who would you propose from the

defense to be present besides your investigator, if

anyone?  What about experts?

MR. COLBATH:  And I think experts for both

sides.

THE COURT:  You're proposing to exclude, just

from the defense side, everyone except for your experts

and Mr. Johnson?

MR. COLBATH:  And Ms. Sheffield.  And Mark

Heinricks is a paralegal from our office.  I couldn't

anticipate that he would be a witness.  He's not --

THE COURT:  Those --

MR. COLBATH:  He will come and go, and he has,

I guess, handled a few exhibits and documents and

shuffled things around, but his testimony would be

almost a foundational thing or something.  He's not a

fact witness.

THE COURT:  Mr. Skrocki, what are your thoughts

1   on that?

2          MR. SKROCKI:  We don't object to that.  I would

3   try to get some clarification that Nancy Wells is

4   excluded as well if she's going to be a witness.  We

5   anticipate that's a possibility.

6          THE COURT:  Okay.  Mr. Colbath, would you

7   concur, that if you intend to call Ms. Wells she would

8   be excluded then under this rule?

9          MR. COLBATH:  If we intend to call her, yes.

10          MR. SKROCKI:  Can we maybe get a little more

11   definition of intent because that does come and go and

12   change.  Additionally, Mrs. Hopkins may be here as well

13   as a victim spouse, so she may be in court.  And if she

14   does, we'll let you know when she's here.

15          THE COURT:  What does the word "intend" mean to

16   you, Mr. Skrocki?

17          MR. SKROCKI:  From the government's chair, I

18   think it's a very likely possibility she will testify.

19   I haven't -- we have all been doing this a long time and

20   I know things can ebb and flow and change, but in terms

21   of, as we understand it, it may be different once we

22   look at defense exhibits, but given the pretrial posture

23   of this and other evidentiary issues that have come up,

24   it's quite likely she will take the stand.  I think

25   intent is not enough.

1          THE COURT:  A reasonable possibility?  Would

2     you concur that the person would be called would require

3     them to be excluded?

4          MR. SKROCKI:  Co-counsel wants something more

5     definite than that as to any possibility.

6          THE COURT:  Any possibility could be anyone in

7     the whole --

8          MR. SKROCKI:  I think "reasonable" works, Your

9     Honor.

10          THE COURT:  Reasonable possibility of an

11    individual being called?

12          MR. COLBATH:  Certainly, Your Honor.  If I

13    believe there is a reasonable chance that Ms. Wells or

14    any other person will be a witness, then I will instruct

15    them they are excluded.

16          THE COURT:  Very good.  Who do you plan to have

17    present as case agents or otherwise?  And you're

18    agreeable on experts, as I understand it?

19          MR. SKROCKI:  Yes, we're agreeable to that.

20          THE COURT:  What about hybrid people that are

21    -- is that going to be an issue at all?

22          MR. SKROCKI:  Hybrid?

23          THE COURT:  They are fact witnesses but they

24    also provide -- some expert often comes up with law

25    enforcement.

1          MR. SKROCKI:  That won't be a problem.

2          THE COURT:  Who do you plan to have present?

3          MR. SKROCKI:  Darryl Allison, the FBI case

4    agent.  We'll have another Coast Guard investigative

5    service agent, Aaron Woods will be here as well.

6          THE COURT:  Anything else, Mr. Colbath, from

7    the defense perspective?

8          MR. CAMIEL:  Your Honor, in addition to the

9    sequestration order, an order that witnesses not even,

10   when they are excused, not discuss their testimony with

11   other witnesses.

12         THE COURT:  Any objection to that?

13         MR. SKROCKI:  They have been instructed as such

14   already by us, but no objection.

15         THE COURT:  We don't need to have that

16   instruction given to them in front of the jury, but I

17   will do so, to the extent necessary, in the courtroom,

18   but I think if I simply instruct here, Mr. Skrocki, to

19   make sure you give that instruction to each of your

20   witnesses and the defense do to each of its witnesses,

21   then I don't see that we need to take that up further.

22         Is that agreeable to the government?

23         MR. SKROCKI:  Yes, it is, Your Honor.

24         THE COURT:  Mr. Camiel, is that agreeable,

25   simply each side responsible for doing that to the

1  witnesses they call?

2         MR. CAMIEL:  Yes.

3         THE COURT:  Then that is done.  Has the

4  government had a chance to look at this order?

5         MS. SHERMAN:  We're comfortable with that.

6         THE COURT:  Mr. Colbath, do you need a minute

7  to review this?

8         MR. COLBATH:  We think that's okay, Your Honor.

9         THE COURT:  Then I will issue a comparable

10 order in this case with regard to the juror information.

11 Anything else at all?

12        I'm going to be out of town late next week.

13 Otherwise, I would be inclined to have another brief

14 status conference, but if need be, next Friday, I would

15 rather have you contact my office.  I would be

16 available.  I'm at a jury instructions meeting, so I can

17 be available telephonically.  I would rather do that if

18 there is a big issue than have it 8:30 Monday morning

19 and slow down our jury selection.

20        So feel free to jointly or by motion seek a

21 status conference late next week.  Friday is a better

22 day for me meeting-wise than Thursday, but I could do

23 that.  Like I say, I would prefer that, if there is a

24 major development that we need to take up, as opposed to

25 Monday morning.

1          Anything else from the government at this

2   point?

3          MR. SKROCKI:  We think not, Your Honor.

4          THE COURT:  Mr. Colbath, anything else?

5          MR. COLBATH:  Same with us, Your Honor.

6          THE COURT:  Very good.  Then we'll go off

7   record.

8          DEPUTY CLERK:  All rise.  This matter is now

9   adjourned.  Court stands in recess until 11:00 a.m.

10          (Proceedings concluded at 10:11 a.m.)

11

12                    CERTIFICATE

13     I, Sonja L. Reeves, Federal Official Court Reporter
    in and for the United States District Court of the
14   District of Alaska, do hereby certify that the foregoing
    transcript is a true and accurate transcript from the
15   original stenographic record in the above-entitled
    matter and that the transcript page format is in
16   conformance with the regulations of the Judicial
    Conference of the United States.
17
       Dated this 20th day of April, 2020.
18

19
                    /s/ Sonja L. Reeves
20                   SONJA L. REEVES, RMR-CRR
                    FEDERAL OFFICIAL COURT REPORTER
21

22

23

24

25